```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MINNESOTA
 2
     ------------------------------------------------------------
 3                                  )
                                    )   File No. 15-md-2666
 4    In Re: Bair Hugger Forced Air )   (JNE/FLN)
      Warming Devices Products      )
 5    Liability Litigation          )   February 18, 2016
                                    )   Minneapolis, Minnesota
 6                                  )   Courtroom 12W
                                    )   9:30 a.m.
 7                                  )
                                    )
 8                                  )
     ------------------------------------------------------------
 9
                 BEFORE THE HONORABLE JOAN N. ERICKSEN
10                UNITED STATES DISTRICT COURT JUDGE

11                AND THE HONORABLE FRANKLIN D. NOEL
                    UNITED STATES MAGISTRATE JUDGE
12

13                         (STATUS CONFERENCE)

14   APPEARANCES

15
     For the Plaintiffs:        LEVIN PAPANTONIO
16                              Ben W. Gordon, Jr.
                                316 S. Baylen Street
17                              Suite 600
                                Pensacola, FL 32502
18
                                MESHBESHER & SPENCE
19                              Genevieve M. Zimmerman
                                1616 Park Avenue
20                              Minneapolis, MN  55404

21                              CIRESI CONLIN
                                Jan Conlin
22                              225 South 6th Street
                                Suite 4600
23                              Minneapolis, MN

24
                    (Appearances continued next page)
25
```

```
 1      For the Plaintiffs:        ANDREWS & THORNTON
                                   Anne Andrews
 2                                 2 Corporate park
                                   Suite 110
 3                                 Irvine, CA 92606

 4                                 KENNEDY HODGES, LLP
                                   David W. Hodges, Esq.
 5                                 711 W. Alabama Street
                                   Houston, TX 77006
 6
        (Appearing by phone:)      RILEY & JACKSON, P.C.
 7                                 Keith Jackson
                                   3530 Independence Drive
 8                                 Birmingham, AL  35209

 9

10      For the Defendants:        BLACKWELL BURKE P.A.
                                   Jerry W. Blackwell
11                                 Benjamin W. Hulse
                                   Mary S. Young
12                                 431 South Seventh Street
                                   Suite 2500
13                                 Minneapolis, MN  55415

14                                 FAEGRE BAKER DANIELS
                                   Bridget M. Ahmann
15                                 90 South Seventh Street
                                   Suite 2200
16                                 Minneapolis, MN  55402

17
        Court Reporter:            MARIA V. WEINBECK, RMR-FCRR
18                                 1005 U.S. Courthouse
                                   300 South Fourth Street
19                                 Minneapolis, Minnesota 55415

20

21
            Proceedings recorded by mechanical stenography;
22      transcript produced by computer.

23

24

25
```

1                    **P R O C E E D I N G S**

2                         **(9:36 a.m.)**

3                        **IN OPEN COURT**

4              THE COURT:  Hello again.  Please be seated,

5     everybody.  We thought we might have Judge Leary with us

6     today, but he is unable to attend this morning.  So I've got

7     a seating chart that I gather was prepared by the lawyers

8     that were sitting at the table and given to my court

9     reporter.  Have you all met Maria?

10             Okay.  Holley is one of my law clerks, and she's

11    going to help here.  And presiding with me is Judge Frank

12    Noel, my friend, and we'll be doing the case together.  So

13    if you can't get ahold of me, get ahold of him.  So we're

14    here.

15             Now, what I've got is David Hodges, is that right?

16    That is you?  I just met you when you were coming in.

17             MR. HODGES:  Yes, Your Honor.

18             THE COURT:  And Anne Andrews.

19             MS. ANDREWS:  Good morning, Your Honor.

20             THE COURT:  Good morning, from Florida, right?

21             MS. ANDREWS:  California.

22             THE COURT:  California, darn it.

23             And Jan Conlin from my neighborhood.

24             MS. CONLIN:  Good morning, Your Honor.

25             THE COURT:  Genevieve Zimmerman.

```
 1                MS. ZIMMERMAN:  Good morning, Your Honor.

 2                THE COURT:  Ben Gordon.

 3                MR. GORDON:  Good morning, Your Honor.

 4                THE COURT:  Florida.

 5                MR. GORDON:  Yes, ma'am.

 6                THE COURT:  Mr. Blackwell, Jerry Blackwell.

 7                MR. BLACKWELL:  Yes, Minneapolis, that's correct,

 8      Your Honor.

 9                THE COURT:  And that's for 3M now.  And Ben Hulse.

10                MR. HULSE:  Yes, Your Honor, with Mr. Blackwell.

11                THE COURT:  Right.  Bridget Ahmann.

12                MS. AHMANN:  Yes, Your Honor, good morning.

13                THE COURT:  And Mary Young.

14                MS. YOUNG:  Good morning, Your Honor.

15                THE COURT:  Good morning.  All right.  Well, let

16      me find out whether there's anybody who is not sitting up at

17      the table who feels you should be sitting at the table,

18      which is another way of bringing up the topic of the

19      leadership committee.

20                I've got a proposed leadership structure and I

21      don't -- oh, do we have our person on the phone, by the way?

22      Mr. Person on the phone, are you there?

23                MR. JACKSON:  Hi, Judge.  It's Keith Jackson.  How

24      are you?

25                THE COURT:  Great.  Can you hear us okay?
```

```
 1                MR. JACKSON:  Yes, ma'am, I sure can.

 2                THE COURT:  And, Mr. Jackson, you've got a couple

 3      cases; is that right?

 4                MR. JACKSON:  Actually, four filed within the

 5      district as of this morning, Judge, and two outside the

 6      district.

 7                THE COURT:  Okay.  And you are from Birmingham,

 8      Alabama, correct?

 9                MR. JACKSON:  That's correct, Judge.

10                THE COURT:  And you were not seeking to be on the

11      leadership?

12                MR. JACKSON:  I am not.  That is correct.

13                THE COURT:  Okay.  We had a letter from a law firm

14      in New Orleans that purported to seek membership in the

15      leadership committee.  Is that person here?  There's

16      somebody here.  Okay, So tell me your name again.

17                MS. JOCHUM:  Julie Jochum.

18                MR. PFLEEGER:  And Bryan Pfleeger, Your Honor.

19                THE COURT:  Okay.  And have you had a chance to

20      talk with these folks?

21                MR. PFLEEGER:  Yes, Your Honor.

22                THE COURT:  And are you okay with the leadership

23      structure that they've proposed?

24                MR. PFLEEGER:  I have not seen the structure.

25                THE COURT:  All right.  Here's what it says.  This
```

```
 1    is what was proposed.  And before we go any farther, I want
 2    to put a leadership structure in place, whether it's this
 3    one or some different one is going to be the first topic
 4    while we're at it.
 5            Okay, so I've got co-lead counsel proposed as Ben
 6    Gordon, Genevieve Zimmerman, and Michael Ciresi.
 7    Plaintiff's executive committee Anne Andrews, Chris Coffin,
 8    David Hodges, Behram Parekh.  And I just met him, so you
 9    would think I could pronounce his name better than that.
10            MR. PAREKH:  That was perfect, Your Honor.
11            THE COURT:  Oh, we're going to get along fine.
12    And then as liaison counsel, I've got David Szerlag from
13    Pritzker Olsen, who I also just met.
14            MR. SZERLAG:  Yes, Your Honor.
15            THE COURT:  Steering committee:  Paula Bliss,
16    Boston, Massachusetts; Noah Lauricella, Minneapolis; Kyle
17    Bachus, Denver; Richard Lewis, Washington, D.C.; Jeffrey
18    Bowersox, Portland, Oregon; Lee Ann McGartland from Fort
19    Worth, Texas; Martin Crump, I know you're here, I just met
20    you, Davis & Crump in Gulfport, Mississippi; Mark O'Mara,
21    Orlando, Florida.  Yeah, I don't know, it's not Annesley,
22    it's Annesley.  We just had a long conversation about that
23    too.  I know it's Irish.
24            MAGISTRATE JUDGE NOEL:  He's here.  I see him.
25            THE COURT:  Richard Schlueter; Kyle Farrar from
```

1    Houston, Texas; Stuart Talley from Sacramento, California;

2    and Kristine Kraft from St. Louis, Missouri.  So that's what

3    I've got.

4         And do you folks want to talk to these people?  I

5    hesitate to go forward until you've had a chance to interact

6    with each other on the topic of whether you want to

7    participate or not on the steering committee.

8         MR. GORDON:  Your Honor, if I may, I'd be happy to

9    address this, Ben Gordon.  I spoke yesterday with

10   Mr. Pfleeger in Mr. Hingle's office because we hadn't known

11   until just recently after PTO 3 was issued that they had

12   sought participation in leadership.  We, frankly, don't know

13   them.  Well, we reached out yesterday because we were

14   inquisitive as to what they were seeking, and it's my

15   understanding they are seeking a position on the steering

16   committee.  I don't know if that's Mr. Hingle or

17   Mr. Pfleeger or Ms. Jochum.  But I guess on behalf of the

18   rest of the group, I would say we haven't had any experience

19   with them.  We don't know, frankly, what their experience

20   is, what they bring to the table.  We've tried to have a

21   very open, robust process for including discussion with

22   everyone in the country with these cases, and I believe that

23   we copied everyone with a filed case on our proposed

24   leadership structure, and no one reached out to us, which is

25   why I reached out yesterday.

1          So I guess I'm struggling a little bit, Your

2     Honor, with why, you know, what it is that they bring to the

3     table and whether we would want to discuss including them or

4     you would want to discuss including them.  I'm not opposed.

5          At the same time, we have had a very lengthy and

6     fertile relationship with everybody in this room, who is

7     everyone that you read on the list with one exception who

8     missed his flight this morning.

9          THE COURT:  Oh-oh.

10          MR. GORDON:  Yeah.  And we have a good team

11     together.  So, again, I don't want to speak out against

12     them, but I don't know them, and I don't know really what

13     their experience is.

14          THE COURT:  All right.  Why don't you come on up

15     and introduce yourselves?

16          MS. JOCHUM:  Julie Jochum.

17          THE COURT:  Welcome.

18          MS. JOCHUM:  Julie Jochum.  I'm from New Orleans.

19     We have many, many cases in different MDL courts all across

20     the country.  We currently have nine filed cases and two

21     more that are ready to go for this Bair Hugger.  And we have

22     two new associates ready to go to help and work and do

23     document review or whatever is needed, and seeking a

24     position in the leadership counsel for the first time in an

25     MDL panel, but we're ready and eager to help.

 1                    THE COURT:  And so who would it be at your firm

 2       who would be on the steering committee?

 3                    MS. JOCHUM:  Either me or myself or Bryan

 4       Pfleeger.

 5                    THE COURT:  And do we have resumes and information

 6       about you?

 7                    MS. JOCHUM:  Yes, I e-mailed all of that.

 8                    THE COURT:  Okay.  Why don't we take this up in a

 9       bit?  You're not seeking to be one of the co-leaders.

10                    MS. JOCHUM:  Yes.

11                    THE COURT:  It's a question of whether you would

12       be on the leadership team.

13                    MS. JOCHUM:  Yes, ma'am.

14                    THE COURT:  And so I think we can proceed with the

15       other matters on the agenda, and I can talk to you folks,

16       and some people who are on the co-leadership team.  I will

17       approve the proposed structure and just leave open for the

18       moment the inclusion of the additional folks from the law

19       firm in New Orleans.  Does that make sense?

20                    MS. JOCHUM:  Yes.

21                    THE COURT:  All right, thanks.  So don't go away

22       at the end.  At the end of the whole hearing, I've got a

23       chambers back behind the wall here, maybe I'll see you

24       there.

25                    MR. GORDON:  Your Honor, we did not submit a

1    proposed order, but we can do that issue if you'd like.

2              THE COURT:  That was one of the things we

3    discussed.

4              MAGISTRATE JUDGE NOEL:  Indeed.  And they should.

5              THE COURT:  All right.  We'll look for that.

6              MS. ZIMMERMAN:  We'll do that today.

7              THE COURT:  It's my hope that we can get this

8    litigation, you know, under control and stay on top of it.

9    Get it resolved, if possible.  Get it all packaged up and

10   either sent back for trials or do some trials ourselves in a

11   reasonably expeditious manner.  I'm very current on my

12   cases, and I don't see any reason why we'd have to have any

13   delays, so that's my hope.

14             And an MDL is different from a normal case.  I

15   think partly in that I want you to feel comfortable to have

16   informal contact with me if you want.  It is my view of my

17   role to expedite the process and make sure that there aren't

18   any unnecessary delays.  So that's my hope.

19             So don't be afraid of me if I say something that

20   doesn't seem to make sense or is contrary to what your

21   experience is and you want to ask me why I'm doing it or

22   there's a particular problem, I really hope that you'll let

23   me know, because I cannot be helpful to you if you're not

24   straightforward with me about what's going on.  Not really

25   straightforward, I know you'd be, but if you could be more

1    candid than even you normally are, less reserved, less -- I

2    don't know, I always used to be afraid of judges, so it

3    probably doesn't do any good to say please don't be, but I

4    hope you won't be.  How about you, Frank?  Do you want them

5    to be afraid of you?

6         MAGISTRATE JUDGE NOEL:  Yeah, fear me.  It's a

7    good cop, bad cop routine.

8         THE COURT:  You have a very colorful tie.

9         MAGISTRATE JUDGE NOEL:  I am also very accessible,

10    and please call, and don't hesitate to raise whatever issues

11    you have, and we'll try to work them out as best we can.

12    And if they require motion practice or briefing or whatever,

13    we can do that.  If we can just do it with a telephone call

14    and have a conversation among the disputing parties,

15    hopefully, it can help you resolve it, and see if we can't

16    get it worked out, so don't be afraid.

17         MR. GORDON:  Thank you.

18         THE COURT:  And we live near each other.  We've

19    known each other for a long time.  We work together.  We'll

20    stay in communication about it.  But, again, if there's

21    something that you feel like you're getting any sort of

22    mixed signals, that's not going to help the ship stay in the

23    right direction, so let us know.

24         The next item that I have listed was the number

25    and status of cases that are transferred into the master

1    list.  So some of this was addressed, and thank you very

2    much for submitting the joint case management report.

3           You probably noticed I phrased -- so I didn't

4    order that the case management report come in because I

5    hadn't actually set up the leadership structure.  So you

6    noticed it was phrased as an invitation.  You said you could

7    do it, and so if you want to do it, I'd be happy to see it,

8    and it was very helpful.  I saw somewhere in here that you

9    expect what was it 1200 or so cases?

10          MR. BLACKWELL:  I think it was thousands, Your

11   Honor.

12          THE COURT:  Thousands?

13          MR. BLACKWELL:  Yes, Your Honor.

14          MR. GORDON:  And, Your Honor, we'd be happy to put

15   a little meat on that bone and discuss it further if you

16   wish.

17          THE COURT:  How many do we have so far?

18          MR. BLACKWELL:  139, Your Honor.

19          THE COURT:  And that does not include the 37 or so

20   in Ramsey County?

21          MR. BLACKWELL:  That's correct.

22          THE COURT:  What about these other state court

23   cases?  There are five listed in other states.  I was

24   actually a little bit surprised that there weren't any

25   Delaware cases because doesn't 3M have joint citizenship

1    with Minnesota and Delaware?  I'm not trying to rustle up

2    any business --

3              MR. BLACKWELL:  That's correct.

4              THE COURT:  But I was in private practice.  And

5    there aren't any Delaware cases, as far as we know.

6              MR. BLACKWELL:  No, Your Honor.

7              THE COURT:  Well, what about, well, there's what,

8    Wiltshire, Third Judicial Circuit in Madison County,

9    Illinois.  So is there not complete diversity?  Is that

10   what's going on there?  Why isn't that removed?  This can be

11   kind of a problem if there are outliers.

12             MS. ZIMMERMAN:  Your Honor, if I may.  I believe

13   that none of the attorneys, the plaintiff's attorneys that

14   are present in this courtroom to my knowledge are counsel of

15   record in any of these five outlying state cases.  But I

16   suspect what's happened is that they have sued, in addition

17   to 3M, they've sued either the orthopedic surgeon or the

18   hospital in the state.

19             THE COURT:  That was my guess.  And,

20   Mr. Blackwell, I saw people's names here, and so my guess

21   was that those people are in the same, you know, they

22   destroy diversity.

23             MR. BLACKWELL:  That's right, Your Honor.

24             THE COURT:  Wasn't there some litigation maybe in

25   the Walton case about improper joinder or was that a

1    different case I was preparing for that I remember?

2              MR. HODGES:  No, you're correct, Your Honor.

3              THE COURT:  And the nondiverse person remained in

4    the case there, correct?

5              MR. HODGES:  The nondiverse person is still in the

6    case, but they allege fraudulent joinder and removed the

7    case and were successful on that point.  It's in federal

8    court.

9              THE COURT:  So the order that I read.

10             MR. HODGES:  Prestera is the nondiverse defendant.

11   He is still in the case.

12             THE COURT:  Okay, but the Judge's Order said that

13   person can't possibly be found liable or something and,

14   therefore, diversity wasn't -- I read it so fast I --

15             MR. HODGES:  I don't recall exactly what the Judge

16   said.  It was a couple years ago, if I recall correctly, but

17   something to that effect.

18             MR. HULSE:  Your Honor, if I may, the difference

19   there is Mr. Prestera is a 3M sales representative, so

20   unlike these other cases, which are in state court where the

21   hospital or the orthopedic surgeon is in the case, so that

22   was what prompted the fraudulent --

23             THE COURT:  Okay, now it's coming back to me.  I

24   think that paragraph actually said something about there's

25   no precedent for a sales representative and then there was a

1    case cited.

2              MR. HULSE:  Exactly right, Your Honor.

3              THE COURT:  Okay.  This is what happens when I

4    read too fast.

5              Well, Mr. Blackwell, keep us informed and work

6    with our liaison counsel from the plaintiff's side to make

7    sure that there isn't anything that happens in those cases

8    that puts a stick in spokes of the --

9              MS. YOUNG:  Your Honor, if I may, the Martin case

10   was removed yesterday to federal court.  That was in Orleans

11   Parish, Louisiana.

12             THE COURT:  All right.

13             MS. YOUNG:  And that involves also Xarelto drug

14   claims, so it's our expectation that those may be severed,

15   and that case will make its way to this court.

16             THE COURT:  Thank you.  That's all we really need

17   to know about that, don't you think?

18             MAGISTRATE JUDGE NOEL:  Yes.

19             THE COURT:  Okay.

20             MR. SZERLAG:  Excuse me, Your Honor.

21             THE COURT:  Hi.

22             MR. SZERLAG:  I'm David Szerlag, and as fresh

23   liaison counsel, I'll make it a point to make sure that we

24   reach out to those individuals in the state court, and we'll

25   try to get it and provide the status to the Court as well.

1          THE COURT:  And congratulations on your

2     appointment as liaison counsel.

3          MR. SZERLAG:  Thank you.

4          THE COURT:  All right.  The common benefit order,

5     can you folks work on that?

6          MS. ZIMMERMAN:  Certainly, Your Honor.  We just

7     wanted to see if the Court had any indications or

8     preferences.  Sometimes judges express some preferences at

9     the beginning and, if not, we'll confer amongst ourselves

10    and present something to the Court.

11         THE COURT:  It would be most helpful if you could,

12    first, I want to know if there's any disagreement and if you

13    need me, but if you don't need me, I'm content to let you

14    work it out.

15         MS. ZIMMERMAN:  Excellent.

16         MR. GORDON:  Thank you, Your Honor.

17         THE COURT:  Mr. Blackwell, do you care?

18         MR. BLACKWELL:  Your Honor, I don't like to say,

19    "I don't care," but I don't care.

20         THE COURT:  That's what I thought, and Judge Noel

21    just reminded me that I should at least ask you.

22         Okay.  Are there any additional pretrial orders

23    that -- well, I'm sure there will be, but before we talk

24    about that, there was in the joint case management report,

25    there was a request for at least one kind of pretrial order

1     that I think I've already done, and I just wanted to clarify

2     that before we get to whether there are any additional

3     orders that are needed.

4            Somewhere in the joint case management report was

5     a request for an order that any new cases be filed in the

6     MDL.  Now, help me, here is my January 11th Order, and I

7     thought that's what I was doing on page 1.  So maybe there's

8     something else that has to happen.

9            "Any actions filed whether filed directly in the

10    U.S. District Court for Minnesota or any other U.S. District

11    Court related to this litigation are hereby consolidated

12    into one action.  Any tagalong actions later filed and

13    removed to or transferred to this Court or directly filed in

14    the District of Minnesota will automatically be consolidated

15    with this consolidated action.  All related actions that are

16    filed and removed to or transferred to this Court as part of

17    this consolidated action are herein referred to as cases."

18           So is there something in addition that has to

19    happen or does that not do it.

20           MR. GORDON:  Yes, Your Honor, in past MDLs, we

21    have typically asked the Court to enter what we would refer

22    to as a direct file order, which expressly permits the

23    direct filing and reserves the right of the plaintiff to

24    ultimately seek remand back to the original or the

25    appropriate home district for trial if they so choose.  And

 1    we plead that in the Complaint that the case might have been

 2    filed in say Pensacola or Kansas City or what have you, but

 3    to have that actually enunciated in an actual order that

 4    would expressly state that the case can be remanded back to

 5    its original district if the parties, unless the parties

 6    choose to waive lexicon later, it just prevents that whole

 7    issue with whether or not someone has unwittingly waived

 8    lexicon.  And it also prevents folks from having to file in

 9    their own district and wait for the case to be transferred.

10    It just saves an extra step.

11            Now, arguably, some of the language you just

12    quoted may help to accomplish the same goal.

13            THE COURT:  Okay.

14            MR. GORDON:  I would guess I want to look back at

15    the previous direct file orders and see if there's anything

16    we think might need to be added.

17            THE COURT:  Mr. Blackwell?

18            MR. BLACKWELL:  Your Honor, Ms. Young is prepared

19    to speak to that.

20            MS. YOUNG:  And, Your Honor, we've been meeting

21    and conferring with plaintiff's counsel.  We're not opposed

22    to that as an administrative process, but want to ensure

23    that the way that order is written doesn't impact the

24    procedural substantive rights of the parties.  And so Ms.

25    Zimmerman and I spoke this week and thought that was

1      something we could talk to Your Honor about at the next

2      status conference.

3                  THE COURT:  Okay, works for me.  I'm certainly in

4      favor of it in principle since I thought I already did it,

5      so highly unlikely to stand in your way.

6                  And there was one other thing.  The thirteenth

7      paragraph on page 7 of the joint case management report has

8      to do with the request for an extension and a stay.  And

9      that's another one I thought does counsel respectfully

10     request the defendants be granted an extension of time for

11     responding by motion or answer to the newly filed and

12     forthcoming complaints until we have a date by which

13     defendant shall respond by motion, answer, or otherwise.

14                 And, Ms. Young, is this still you?  Is that not

15     already covered in the January 11th Order?

16                 MS. YOUNG:  Your Honor, the parties just wanted to

17     ensure that related to cases that were not yet in existence

18     at the time of your first pretrial order.

19                 THE COURT:  Okay.  So when you are working on the

20     order on the previous issue, do you want to make sure that

21     that's covered in here too?

22                 MS. YOUNG:  Yes, Your Honor.

23                 THE COURT:  Okay.  And is there anything else that

24     you think you need right off the bat by way of a pretrial

25     order?  Confidentiality of documents?  Do you need an order

1    for sharing of discovery materials?  Do you have a way to

2    have a repository for discovery information that's already

3    there, so people can get ahold of it?  What do you need from

4    us?

5              MR. GORDON:  Your Honor, there is an issue

6    relating to preservation in a particularized part of the

7    preservation.  We're happy to meet and confer and have done

8    so to some extent on general global preservation of

9    documents, but concerning third parties, and this relates to

10   the issue for which we were seeking in chambers discussion,

11   we think it is imperative that something be entered as soon

12   as possible.

13             THE COURT:  Okay.  So we can take that up.

14   Anything for general consumption?

15             MR. BLACKWELL:  For general what, Your Honor?

16             THE COURT:  General consumption.

17             MR. BLACKWELL:  Your Honor, I'm not sure this is

18   the appropriate time, but the parties do have a difference

19   of opinion in terms of how it is we stage the discovery in

20   the case, for example, whether we emphasize science first or

21   what have you.  I am prepared to speak to that and would

22   like to speak to it at the time Your Honor feels is most

23   appropriate.

24             THE COURT:  That seems to be its own issue.

25             MR. BLACKWELL:  It is.

1           THE COURT:  That might be I'm gathering from the

2     submissions in this case and other cases, I mean what used

3     to be other cases, that that's going to be a key point for

4     discussion.  So at the moment, I was just wondering if there

5     were any other housekeeping-type matters that would be

6     useful, if anything occurs to you.

7           MR. HULSE:  I would just say, Your Honor, that we

8     have worked also in the Ramsey County cases collaboratively

9     negotiating on things like protective order.  I'm sure we'll

10    be able to work on ESI protocol, so I'm very optimistic

11    we'll be able to address those issues through the meet and

12    confer process.

13          THE COURT:  Okay.

14          MR. GORDON:  And, Your Honor, that is a very good

15    point that the young Ben -- I'm the old Ben, I guess --

16    brings up.  The ESI is a critical piece of this case.

17    There's a great deal of we believe electronically stored

18    data that dates back decades in this case that is going to

19    have to be we're going to have to figure out how that was

20    collected, preserved, and how the volume is, and that this

21    in turn informed this team about how we structure the work

22    that is to be done in this case.  I'm very delighted that

23    Mr. Hulse and the rest of the team is going to meet and

24    confer privately, so I think we can eliminate a lot of the

25    contentiousness of that, and based on past experience in

1     MDLs, but it's a Herculean task, and it's something that we

2     need to meet and confer on right away.  And if we can't

3     reach some kind of process for understanding the volume of

4     that data quickly before the next status conference, then

5     I'd like to be able to come back to the Court and get some

6     help with it.

7              THE COURT:  I'm curious about what's gone on so

8     far with the electronic discovery.  And Judge Leary is not

9     boycotting or anything.  He just isn't here right now.  So

10    maybe when we have an in chambers discussion, can you just

11    informally let me know what's been going on because you've

12    got a couple of cases in the MDL that have been going on for

13    quite a while.  The state case seems to be reasonably far

14    along, so there's got to be some electronically stored

15    information that is being dealt with somehow.  I mean I

16    would think, but anyway if we could have an informal

17    conversation about that.

18             MR. HULSE:  We can discuss that in chambers or at

19    any time that you'd like to.  You're absolutely right, Your

20    Honor, that the Walton and Johnson cases were well advanced

21    in discovery.  There were substantial productions in those

22    cases, and so this road has been gone down before.  There

23    were protective orders in those cases as well, so we do have

24    some precedent to work with here.

25             MR. GORDON:  And as you might expect, Your Honor,

1    we're not quite singing kumbaya yet.  And we might quibble

2    with the definition of substantial discovery, and the

3    reasons for what we believe are anemic production so far.

4    We would probably be better off discussing in chambers.

5             MR. HULSE:  I don't think I can sign on to anemic,

6    but I'm sure we'll have things to discuss with Judge Noel.

7             MAGISTRATE JUDGE NOEL:  Between A and S, anemic

8    and substantial, there's got to been an N or an L word in

9    there somewhere.

10            MR. HULSE:  I can amend to complete, but --

11            THE COURT:  Right, I was just going to let

12   Mr. Gordon know that if you come to Minnesota in the winter,

13   everybody looks kind of anemic.

14            MR. GORDON:  I will tell you by way of full

15   disclosure, I actually come from North Florida, which is not

16   like here, but it is cold.  So I've been in Aruba on

17   vacation for a week, so that's why I'm not as anemic as I

18   might otherwise be.

19            THE COURT:  Bragging.

20            MR. HULSE:  I'm willing to test the North Florida

21   definition of cold anyway.

22            THE COURT:  Yeah, do you know what a wind chill

23   is?  I bet he knows what a heat index is but he doesn't know

24   that windchill is.

25            Okay, so that will be good.  Partly I'm curious,

1    and I'm sure Judge Noel is curious too about how things are

2    going on.

3              MAGISTRATE JUDGE NOEL:  I just have a question

4    when you talk about the issue regarding preservation of

5    evidence extending to third parties and discussing that in

6    chambers, is that reference to this cryptic note in

7    paragraph 17(b) of your additional issue thing?

8              MR. GORDON:  It is, Your Honor.

9              MAGISTRATE JUDGE NOEL:  Okay.

10             MR. GORDON:  And there are things that we can say

11   and not say.  I just as soon --

12             MAGISTRATE JUDGE NOEL:  That's fine.  I don't want

13   you to say anything you don't want to say.  I just want to

14   make sure that I'm on the same page as to what we're talking

15   about it.

16             MS. ZIMMERMAN:  And if I may, Your Honors, while

17   there's been certainly litigation that has commenced in

18   various state courts, for example, in Ramsey County there

19   have been complaints filed and there was a hearing.  There

20   is now a brief that has been submitted requesting Lone Pine,

21   but there is not responsive.  And there's no discovery

22   that's been done, there's no protective order, there's no

23   preservation order, there's no documents exchanged, nothing

24   like that has happened.  There's been no Rule 12 motion, so.

25             THE COURT:  Isn't there a March 25th hearing

1    scheduled in state court?

2            MS. ZIMMERMAN:  So at this point, Your Honor,

3    there was to be a hearing next week in front of Judge Leary.

4    Defense counsel and 3M have requested the opportunity to

5    brief the issue of Lone Pine order at this stage in the

6    proceeding.  We have now reached agreement on an extension

7    of a briefing schedule and that hearing has been cancelled.

8    It has not yet been rescheduled.  It is our expectation it

9    will likely be heard at the end of March, but it's not

10   rescheduled at this point.

11           THE COURT:  Okay.  So the 25th showed up in both

12   February and March.  So I think initially you were all to

13   appear again on February 25th.  And, fortunately, you don't

14   have to do that again.  And when Judge Leary and I talked on

15   the telephone, we were both of the same mind that there's no

16   point having you come unnecessarily, so we're trying to

17   coordinate as much as possible.  But then I thought that

18   there was a March 25th hearing date on the Lone Pine but

19   that's maybe going to happen and maybe not.

20           MS. ZIMMERMAN:  This is inside information and

21   Mary and I are waiting for a call back from Jeremy in Judge

22   Leary's chambers.

23           THE COURT:  Okay.  Plaintiff's initial

24   disclosures.  That is probably related, is that going to be

25   tied in with the issue of whether there should be staged

1     discovery?

2              MS. ZIMMERMAN:  Yes, Your Honor.  To some extent,

3     so defense counsel we have suggested that we would meet and

4     confer about a plaintiff fact sheet, which is typically done

5     in these cases, or perhaps even a preliminary disclosure

6     followed by a more robust plaintiff's fact sheet.  Defense

7     counsel's, I think, initial position, and I'll let

8     Mr. Blackwell make that argument, is that rather than

9     starting there, that they want to have Lone Pine order

10    entered prior to Rule 12 or any other procedural discovery

11    mutual of that kind, and I'm graciously letting you jump in

12    here to make a brief argument on that.

13             THE COURT:  It sounds like we're on that issue

14    now, doesn't it?

15             MAGISTRATE JUDGE NOEL:  I think we've jumped to

16    it.

17             THE COURT:  We've arrived at the nub.

18             MR. BLACKWELL:  If we've arrived at that, Your

19    Honor, if I could have just a couple of minutes to tee up

20    where our concern is, and it isn't just needing a Lone Pine

21    order.  It's broader than that.  It is part science

22    indicates.  We think, for example, it would be helpful to

23    have a science day, Your Honor, which would be a half day or

24    a whole day.

25             THE COURT:  We can all do projects.  We can work

1      on my science project.  I'm going to make a diorama.

2              MAGISTRATE JUDGE NOEL:  I'm going to make a

3      density jar.

4              MR. BLACKWELL:  I was in one in front of Judge

5      Weinstein in New York a couple months ago.  It was very

6      fascinating to question the expert early on in the case, but

7      the purpose of it would be to educate the Court about the

8      product itself, the science supporting the plaintiff's kinds

9      of claims, the responses the defense has to the science,

10     just to give the Court a good backdrop for understanding

11     what the issues are with respect to the science because this

12     is ultimately a science case.  It's what it's all about.

13     Causation.

14              Your Honor has before the Court now 139 cases, a

15     hundred of which are already filed here in the district.  I

16     will represent to the Court that the cases all have

17     something in common, a few things in common.  They all

18     claim, just about, I say generally they claim that there's

19     been an orthopedic surgery of some kind.  They claim that

20     the Bair Hugger was used with a patient warming device that

21     reduces the likelihood of unintentional hypothermia in

22     surgeries.  Afterwards, they claim that there was an

23     infection that developed.

24              Now, Your Honor will find that in 70 percent of

25     the cases, there is no statement about what type of bacteria

1    even caused the infection.  In none of the cases is there

2    anything that traces the bacteria back to the Bair Hugger

3    device.  So if they anticipate thousands of cases, Your

4    Honor can anticipate thousands of cases where there is no

5    specific claim of a specific bacteria that ties back to the

6    Bair Hugger device.

7           Our concern is the same kind of claims could be

8    made about anything in the operating rooms.  There's nothing

9    in there surgical, is sterile, whether if the claim is that

10   we had a surgery, afterwards we developed an infection,

11   claims could be made about the ceiling tile, the ventilation

12   system, the shoes that were worn, anything in the operating

13   room, but the plaintiffs have here asserted that the Bair

14   Hugger caused a surgical site infection.  There's no

15   scientific study that has ever associated an infection

16   causing bacteria to the Bair Hugger.  There isn't any.

17          A product that's been on the market 25 years.

18   Millions of uses, used 50,000 times a day, FDA cleared,

19   never subject to a recall.  So our concern in this case is

20   that upfront is where is the evidence of causation?  Both

21   general causation, can the Bair Hugger cause a surgical site

22   infection?  And specific causation, did it do so in this

23   instance in this case?

24          And so what we've asked for, and the Court has the

25   discretion and authority to do it is to prioritize the

1    science.  It's clear enough that if causation is established

2    in this case, we have many things to argue about.  If there

3    is no causation, there's only one thing to argue about in

4    the case, and that is that there isn't causation

5    established.

6          So since we have to get at issues of causation,

7    scientific cause in any event in this, our request is simply

8    that it be prioritized on the front end.  It will save the

9    Court a world of headache, resources, and time in motion

10   practice of things unrelated to this.  So to the extent

11   there's discovery, let's have discovery on the issue of

12   causation first.

13         To the extent the plaintiffs have already made

14   allegations in their complaints that the Bair Hugger caused

15   the surgical site infection, we in fact have asked for Lone

16   Pine order to have some proof from a competent medical

17   professional that the Bair Hugger in fact did cause,

18   according to the plaintiffs, the surgical site infection.

19         Now, I represent to the Court that in front of

20   Judge Leary, we argued for 50 minutes over just whether this

21   issue should even be briefed.  That's how serious it was for

22   plaintiffs.  Judge Leary heard it over plaintiff's

23   objections.  We are not having briefing on Lone Pine.

24         What we're asking here now, Your Honor, if we're

25   not going to get this accomplished today, is to have a

1    similar opportunity with this Court to be able to set forth

2    our position for why science first makes sense in this kind

3    of a case.  There is some precedent in the Baycol litigation

4    for Lone Pine orders where the Court here entered one, and

5    it was obvious enough at some point in the MDL that the

6    Court has an interest in trying to potentially resolve the

7    cases.  And it's very helpful to know which claims have

8    proper substantiation and which ones do not, if the goal is

9    to try and resolve them as a group.

10           But our concern here is, and I appreciate Your

11   Honor asking us to be straight forward about what's going on

12   and major concerns, this is the major concern is that this

13   is a science case.  If there is no causation, there's not

14   anything else really to talk about.  The science is

15   questionable, 70 percent of the cases filed already don't

16   even state what bacteria is involved in the infection, much

17   less trace it back to the Bair Hugger device, which has got

18   to happen, and we think that ought to be front loaded.  And

19   it would save I think a world of headache and resource and

20   expense for both the Court and all the parties.  And I was

21   hopeful that the plaintiffs will be as excited about this as

22   we are since presumably they don't want to waste their money

23   either.  But as it turns out their interest has been

24   somewhat anemic, Your Honor.

25           THE COURT:  Yeah, that's a meaningful statement

1    coming from you.

2           MR. BLACKWELL:  So, Your Honor, I'll stop there,

3    but that essentially tees up by way of introduction what

4    we're seeking by way of science first, and the components

5    would be seeking a science day, an opportunity to educate

6    the Court.  And we would invite the Court to invite Judge

7    Leary, and invite the other state court judges even.  When

8    we were in New York in front of Judge Weinstein, the other

9    members of the bench were there too.  The magistrates heard

10   it.  It was non adversarial.

11          THE COURT:  Sort of like a patent tutorial maybe.

12          MR. BLACKWELL:  Absolutely, Your Honor, and so we

13   then also seek the Lone Pine order, Your Honor, is a part of

14   this.  And then, finally, we would want or request that the

15   discovery be staged such that the focus and discovery on the

16   front end and this is discovery that's related to general

17   causation.  And we could have early Daubert hearings to kind

18   of get at that, and there's some precedent for doing that.

19   The Court clearly has the discretion.

20          THE COURT:  Okay, thanks, Mr. Blackwell.

21          MAGISTRATE JUDGE NOEL:  I just have one question,

22   Mr. Blackwell.  In the Walton, and what's the other case?

23          MR. BLACKWELL:  Johnson, Your Honor.

24          THE COURT:  Johnson case, has there been any

25   expert disclosures?  Do you know what their claims are about

1    how this Bair Hugger is causing what they claim it causes?

2          MR. BLACKWELL:  Your Honor, there were expert

3    reports that were submitted in Walton and Johnson.  What the

4    Court will find once we get into this issue in looking at

5    what is the credible science, even in those reports, there

6    still was no scientific study that anyone can cite that ever

7    tied an infection causing bacteria to the Bair Hugger of all

8    the myriad different sources and causes of potential

9    surgical site infections.  And I might add that the CDC, the

10   Center For Disease Control, points out that the most common

11   cause for surgical site infection is the patient's own skin

12   because bacteria lives beneath the skin and sweat ducts and

13   hair follicles, and any time there's an incision made, it's

14   necessarily infected with a bacteria typically from your own

15   skin.

16          THE COURT:  Thank you.

17          MR. GORDON:  Your Honor, may I use the podium?

18   I'll refer to my iPad and some notes.  And if I may, I'd

19   like to approach and give copies for the defense counsel and

20   for the Court of an article, since we're talking about

21   science, a published scientific article from the Journal of

22   Bone and Joint Surgery from 2011 concerning this very issue.

23          THE COURT:  Can we hear your words first before we

24   get that because I know from my days of trying cases that if

25   you give people something to read, they won't listen at the

 1    same time.

 2            MR. GORDON:  Great point, Your Honor.  Thank you

 3    for that.  I appreciate that very much.  I'll have these for

 4    you and defense counsel after, and they're familiar with the

 5    study.  For the record, it's the McGovern study when we get

 6    to science.

 7            A moment if I could first about Lone Pine and,

 8    ultimately, I'd like to have co-lead counsel Genevieve

 9    Zimmerman and Ms. Conlin too if she wishes to discuss the

10    procedural rules and why we think this is getting the cart

11    very much ahead of the horse.

12            THE COURT:  I have some thoughts on that myself,

13    so maybe before we spend too much air on it, I can give you

14    my sense and my thoughts about it and then we can have a

15    conversation about it, but I did a little reading and so on.

16            MR. GORDON:  I'm always a fan of having the Judge

17    educate me about what I'm trying to educate the Court on

18    beforehand if possible.  Would you like to go first, Your

19    Honor?

20            THE COURT:  No, no, but just by way of

21    introduction, before you have everybody go into great detail

22    about it.

23            MR. GORDON:  Great, thank you, Your Honor.  I will

24    say that we want this to be an expeditious process as you

25    said also.  We want it to be a fair process, and we want the

1    rules to be followed.  And the rules we believe are there

2    for a reason.

3            Lone Pine is an exceptional process.  There's only

4    10 published opinions in history since 1986 **Lore v. Lone**

5    **Pine** case from the State Court in New Jersey that we could

6    find.

7            THE COURT:  It makes a stack this big I know

8    because I asked Holley to copy them all.

9            MR. GORDON:  And of that stack this big, the stack

10   that concerns medical devices is that big, zero, nada.

11   There are no cases that we could find involving a medical

12   device where a published Lone Pine order was issued.

13           THE COURT:  What about this Baycol case?  Were you

14   involved in Baycol?

15           MR. GORDON:  Peripherally, I did have a few of

16   those cases.  I was not involved in the MDL.  My

17   understanding is, and again Ms. Zimmerman was, she can

18   address this, it was very late in the process.  It was sort

19   of a cleanup after these other matters were handled,

20   12(b)(6), summary judgment, bellwether, all of that happened

21   before the Lone Pine process took place, to my

22   understanding, but again I wasn't directly involved.  I just

23   had a handful of those cases.

24           I will say, you know, again in terms of just the

25   scope in general of the Lone Pine ruling and its progeny, if

1    you will, we're talking about apple and oranges.  We're

2    talking about cases principally that involved exposure to

3    toxic substances and then largely ephemeral toxic substances

4    that are hard to trace and hard to know whether the

5    plaintiff was even exposed ab initio to that substance, like

6    uranium and things from landfills that plaintiffs who sued

7    hundreds of defendants just sort of threw mud against the

8    wall to try to see if they could catch a defendant that

9    happened to contaminate a particular plaintiff.  That's not

10   the case here, Judge.

11          In every single 139 of these cases that have been

12   filed, and I hope every single case that gets filed we're

13   going to have proof positive empirical evidence that they

14   were exposed to the offending product, the Bair Hugger.  If

15   not, it can be discovered in a very quick preliminary

16   disclosure form that Ms. Zimmerman mentions or in a

17   plaintiff's fact sheet and that case probably should be

18   dismissed if the wrong product is involved.

19          So whereas Lone Pine is generally dealing with

20   cases where there is a very serious threshold question about

21   whether the plaintiff was even exposed to the toxin or to

22   the substance.  Here that's not a question.  We can figure

23   out very quickly if the plaintiff was exposed to the Bair

24   Hugger.

25          Now, the next question and to get to the science

1    of whether exposure to that product increased the

2    plaintiff's risk generally and specifically to a microbe is

3    a question of science, as Mr. Blackwell points out, but it's

4    a question that the discovery process has to inform.  We

5    have done our due diligence.  We have satisfied Rule 11.  We

6    are meeting with physicians, and we are meeting with

7    plaintiffs, and we are reviewing their records and vetting

8    the cases carefully to ensure that they have developed a

9    microbial infection in close temporal proximity to exposure

10   to the offending product, the Bair Hugger blanket.

11            And we have experts, in fact, some of which we're

12   meeting with next week, very esteemed experts who have

13   looked at the literature including the McGovern study, which

14   is the seminal paper so far on this issue which found a

15   nearly quadrupling instance or prevalence of development of

16   microbial infections in patients exposed to the Bair Hugger

17   as compared to patients who were warmed by other means, in

18   this case fabric blankets.  In other words, blankets that

19   did not involve the blower.

20            So this is one of the blankets, Your Honor, and as

21   you can see, and we can give this to you if you would like.

22   May I bring it up, Your Honor?

23            THE COURT:  Later.

24            MR. GORDON:  Okay, so this like an inflatable,

25   sort of like an air mattress you have in your swimming pool,

1    but a little smaller, a little thinner.  It has holes in the

2    bottom, or depending on which kind it is, that actually blow

3    hot air from a hose that's connected to a wall mounted or a

4    floor mounted, essentially looks like a vacuum cleaner, but

5    it's a forced air blower.  So this is one of the devices

6    sort of like a canister, like a shop vac almost.

7            And there are questions about, you know, whether

8    or not it's HEPA compliant that we can talk about.  There

9    are a lot of science questions and a lot of discovery that

10    has to be done in the files of the original company Arizant

11    Healthcare and 3M when they made the purchase in 2010 about

12    exactly what the degree of cleanliness of these devices may

13    be or may not be and the hoses and the machines, what the

14    cleaning protocols are.

15            But, fundamentally, our theory of the case is that

16    the device is defectively designed because you bring it into

17    a setting where you know you have microbes.  We know there

18    are bugs.  As Mr. Blackwell correctly pointed out, people

19    come in with bugs on their skin.  O.R. people have bugs on

20    their skin.  There are bugs everywhere.  We know hospitals

21    are dangerous dirty places.  We go in with that presumption.

22            But the goal of the surgical staff, and the reason

23    that the doctors walk around like this with their hands in

24    the air is they don't want to get to where the bugs are

25    because they're dropping off of skin.  They are dropping off

1      of cavities from the body.  There are bugs all over the

2      floor.

3                  THE COURT:  Speak for yourself.

4                  MR. GORDON:  Present company excepted, Your Honor.

5      But we know that there are bugs circulating in the operating

6      room.  What we want to do as the medical community wants to

7      do is minimize the patient's exposure to those microbes.

8      There is something called the SCIP protocol, the Surgical

9      Care Improvement Project.  I think it was 2001 or 2003.  And

10     this all came about because of surgeons in hospitals

11     concerns over these very issues.  How can we make hospital

12     operating rooms cleaner, safer places, and keep the

13     percentage of infections down?

14                  The last thing they envisioned, and what our

15     experts will tell you, and this is an evolving science.  I

16     will concede, Your Honor, and it takes time for the science

17     as Mr. Blackwell and I have talked about.  But what they

18     will tell you is the last thing you want to do in a place

19     where there are microbes on the floor and maybe sometimes on

20     the patient's skin is introduce into that a hot air blowing

21     machine that's a thousand or 1100 watts that churns up this

22     microbial environment and allows these bugs to go up into

23     the sterile field.

24                  Now, I realize that's our burden to prove that,

25     but we do not have to prove that a specific bug on a

1    specific day entered a specific patient to cause their

2    infection and that it was necessarily propionibacterium

3    acnes or the most common one:  MRSA, Methicillin-resistant

4    Staphylococcus aureus.  There are a litany of these bugs.

5    They are ubiquitous.

6            The fact is that most of the clients that we have,

7    they know that they develop an infection.  They know they

8    developed it in close proximity to the surgery and to the

9    use of the Bair Hugger.  And what we end up with based on

10   the statistics and that is the epidemiology that's been done

11   and it's being done, as well as the case reports that do

12   exist, notwithstanding Mr. Blackwell's belief that the

13   science doesn't say what I think it says.

14           You have a doctor who has to take that data and

15   then perform a differential diagnosis.  The doctor has to

16   ascertain whether in a particular plaintiff in a particular

17   instance there was something that explained the causation of

18   their particular microbial or bacterial infection.

19           If the patient comes in with known MRSA, that's a

20   problem for us.  If the patient comes in with other

21   confounding pre-existing and co-existing medical problems

22   that would explain their propensity to have developed an

23   infection on that day, probably it's going to be a very

24   difficult plaintiff's case, and a very difficult thing for

25   that surgeon to say I believe the Bair Hugger was more

1    likely than not within a reasonable degree of medical

2    probability the source of the infection in this case.

3                   THE COURT:  Okay.  Let me ask you a couple of

4    questions.

5                   Do you have a different idea if we don't have a

6    Lone Pine, which I was surprised Lone Pine is actually named

7    after a dump.  You know, we talk about it like it's some big

8    huge case.

9                   MR. GORDON:  Right, a landfill.

10                  THE COURT:  It turns out it's people living next

11   to the Lone Pine dump.

12                  MR. GORDON:  Right.

13                  THE COURT:  But if not a Lone Pine Order, which

14   seems to be a pre-Rule 12 Order and it's extraordinary in

15   that it requires --

16                  MR. GORDON:  Of course, it's to pre-try our case,

17   Your Honor.

18                  THE COURT:  Right, right.  So if we set aside

19   whether it's a Rule 12 process, a Daubert process, a Rule 56

20   process, and get rid of the title "Lone Pine," and if there

21   were to be not a requirement that you make initial

22   disclosures similar to at least in Minnesota you've got to

23   make some if in a medical malpractice case, you have to have

24   an expert.

25                  So what's the plaintiff's view of staged discovery

1    and focusing on general causation as opposed to specific

2    causation partly because the general causation would be

3    something that would be appropriate for the MDL procedure

4    because it would affect all of the cases.  So do you have

5    thoughts on the appropriateness of staged discovery or the

6    timing of the scientific hearing?

7              MR. GORDON:  I guess, Your Honor, my initial gut

8    reaction is I think the rules amply cover the plaintiff's

9    burden to adduce and proffer credible colorable evidence to

10   support their claims without the injection of a stratified

11   or a staged process.

12             Now, I haven't given your specific question a lot

13   of thought, and I guess I would like to talk to my

14   colleagues about it, but in general, I will tell you that we

15   go through, we as the plaintiff's bar, a very exhaustive

16   vetting process for these cases.  And if you ask anyone in

17   the country, and I've spoken about this, and we have met

18   exhaustively about it, the reason there are only 139 cases

19   filed so far in the amount of time that this case has been

20   going on and the couple of years for the Walton/Johnson

21   cases, is because we have been extremely careful and

22   judicious in the vetting process to try to exclude and cull

23   out spurious or tenuous cases.

24             Now, I can't stand here and say, Your Honor, that

25   some of them slipped through the cracks.  But I believe a

1    process to help, you know, winnow those out would be to

2    establish a very good preliminary disclosure form and

3    plaintiff's facts sheet that will require certain bona fide

4    that the plaintiffs have to proffer to the defendant and to

5    the Court after which there may be some cases that get

6    culled out because they don't meet the criteria that we have

7    all, you know, discussed and worked to live up to.  What we

8    certainly don't want to file cases that aren't meritorious,

9    and we're doing everything we can proactively to prevent

10   those from being filed upfront.

11            THE COURT:  Okay.  Thank you very much.  And now

12   I'll take the --

13            MAGISTRATE NOEL:  I was going to ask a question

14   about the study and then maybe we can just preview for me,

15   was the study going to answer this question, which is the

16   one I have, is it the plaintiff's theory that these microbes

17   are just being blown around by the air coming out of the air

18   mattress-like device and therefore getting themselves into

19   the surgical site?  Or is it the plaintiff's theory that the

20   machine itself is sucking these bacteria into the machine

21   and then blowing them out directly into the surgical site

22   through the mattress?

23            MR. GORDON:  It sounds like Your Honor has read

24   our Complaint.  I would say principally the former, but we

25   haven't exhaustively completely with experts ruled out the

1   latter.  And I would ask that if we get down into the weeds

2   on this terribly much, I might ask Gabe Assaad or David

3   Hodges, who are the lawyers, David on our PEC, Gabe is one

4   of his partners who have handled most of the depositions

5   thus far who have been working on this case for two years

6   and understands the science frankly better than I do at this

7   point.

8          But I would say that the question of whether a

9   specific microbe on a specific day may lay dormant in a

10  hose, in a tube, in the machine, and then be transferred

11  more directly to the plaintiff is a question that I don't

12  know has been definitively answered.  Again, they may have

13  more data on that than I do.

14         The basic theory of the case is the former that

15  you enunciated, Your Honor, and that is that the design of

16  the machine is fundamentally flawed in that it churns up

17  microbes below the patient, below the sterile field, and

18  allows them -- what happens --

19         THE COURT:  So they would come in underneath the

20  Bair Hugger, not through the Bair Hugger primarily --

21         MR. GORDON:  Yes, Your Honor, exactly.

22         THE COURT:  But you're not ruling out the

23  possibility that some microbes can squeeze out through the

24  membrane that's enclosing the warm air.

25         MR. GORDON:  I think that's well stated, Your

1   Honor.

2              THE COURT:  Okay.

3              MR. GORDON:  And I'll say there's a downward air

4   flow.  One of the things these articles speak to, and we can

5   give them all to Your Honor if we are going to go down this

6   science road.  And to get to your question, Your Honor,

7   about timing on a Daubert-type setting.  We're not afraid of

8   Daubert or Frye-Mack or a science day.  We love science.  I

9   mean we're science geeks.  It's just not time yet, and we

10  can talk more about what we think the timing may be.

11             But I will say that there is a great deal of

12  literature and data that suggests that positive air flow,

13  some studies call it laminar.  That's principally the rubric

14  used and the technology used in Europe.  But in the United

15  States, there's positive generally downward vertical air

16  flow that comes across the top of the plaintiff, and the

17  idea is that it gently presses, suppresses bugs, microbes

18  down to the floor.  So if there are ubiquitous microbes on

19  the patient, on the doctor, on the instruments that those

20  will fall to the floor, or be gently pressed to the floor.

21             THE COURT:  You don't want something to counteract

22  that.

23             MR. GORDON:  Exactly, to push them back up.

24             THE COURT:  Okay, so the question is when should

25  we have some evidence about this whole thing?  And when

1    should we have a preliminary science day again similar to

2    what I sometimes have if I've got a really complicated

3    patent.  We're sort of having a science day right now but

4    without any scientists.

5                MR. GORDON:  Well, Your Honor, that raises a good

6    point.

7                THE COURT:  When are we going to have a science

8    day?

9                MR. GORDON:  What we might do, and I'm just

10   throwing this out there.  We have lawyers in this audience,

11   Mr. Coffin, who has done this a great deal; Mr. Parekh,

12   Mr. Goldenberg, who have done some of these kinds of science

13   days in other pharma cases.  It's not that different.

14               And what we do sometimes, if Your Honor wants to

15   go down this road, is have a preliminary day where just the

16   lawyers come in and present their case like we're doing

17   today but in more depth with graphs and charts and

18   literature, but without the expense and the burden and the

19   time of pre-trying our case with our experts now before the

20   discovery has been done.

21               THE COURT:  Okay.  Let's put the notion of any

22   kind of a show and tell science day type thing to the side,

23   and let me ask Mr. Blackwell a question.

24               MR. GORDON:  Thank you, Your Honor.

25               THE COURT:  Thanks, Mr. Gordon.

 1              MR. GORDON:  Your Honor, may I deliver these

 2       studies or would you like to wait until the very end?

 3              THE COURT:  I'm not opposed to it except I'm

 4       thinking, well, where am I going to put all of these

 5       studies?  If I'll be getting a lot of studies --

 6              MR. GORDON:  Well, it's just one.  I'm only going

 7       to give you one today.

 8              THE COURT:  Well, but if you have one, then you're

 9       probably going to have another one, and he might have one.

10              MR. GORDON:  I think he's prepared to talk about

11       McGovern.

12              MR. BLACKWELL:  We have 170, Your Honor.

13              THE COURT:  All right, well, I said I'll take it

14       and so I will.

15              MR. GORDON:  Thank you, Your Honor.  I'm bringing

16       a copy to the defense counsel too.  I've got one for each of

17       the judges and one for defense counsel.  Thank you.

18              THE COURT:  Mr. Blackwell, what's your comment on

19       the third paragraph on page 1542 of the study?  I'm just

20       kidding you.

21              MR. BLACKWELL:  I was going to get my notes, Your

22       Honor.

23              THE COURT:  Oh, no.  On the procedure, I've never

24       issued a Lone Pine Order, and I had to hear about it a

25       number of times before I 'fessed up that I didn't really

1    know what it was.  But so it's my understanding that it is a

2    sort of Order that's issued immediately before discovery.

3    It's something that would take the place of ordinary

4    discovery, and it would be in a case where there's a

5    question about whether plaintiffs have or have not met the,

6    you know, whether they can I suppose meet Iqbal because it's

7    always talked about in the context of Rule 12.

8              Now, don't the Rules of Civil Procedure provide an

9    equally effective mechanism for staging discovery, if there

10   is one big question that overrides things, could that be

11   determined after there's discovery in more or less than

12   normal course?  So I guess that's why the efficiencies that

13   you're talking about don't necessarily lead me to conclude

14   that we'd have to ride in and have some extraordinary kind

15   of order where we required an unusual scientific showing.

16   You know, where basically I would impose the medical

17   malpractice pre-filing disclosure requirement on the case.

18   Can't we get to the same place just using the rules as they

19   already exist, the procedures?

20             MR. BLACKWELL:  Your Honor, it really is purely a

21   matter of efficiencies.  And what a Lone Pine-type order

22   does, I think preferably on the front of the case and the

23   trend now to the extent that there is one in federal courts,

24   the current thinking is that Lone Pine orders have tended to

25   be entered too late in cases once the courts learn that

1    they're spending lots of time and resources in disputing

2    cases where the most fundamental thing isn't established.

3    That is there is a significant medical causation issue, and

4    there's no case specific report from an expert, that is time

5    to gather causation.

6         And so what it does for the Court is preserves its

7    resources so you're not spending them on cases that don't

8    need to be litigated over given what's fundamentally missing

9    from them, and that could be found out through summary

10   judgment, Daubert motions, et cetera, but that's further

11   down the line, and lots of time and resources can be

12   expended.

13        THE COURT:  Well, some of the criticism of a Lone

14   Pine procedure that you can glean from the few appellate

15   cases that are there, it's mostly appellate cases that are

16   in that little stack, is that it's a very important

17   decision, and it can be unfair to make that decision before

18   there's been reciprocal discovery.

19        So maybe what I'm trying to ask is is there not a

20   benefit to having reciprocal discovery even if it's on the

21   limited issue of general liability and then have an early

22   Rule 56 or 702 hearing.  But then there would be, I can't

23   imagine that the plaintiffs would object to that, but there

24   does seem to be an unusual aspect of putting it in the

25   Rule 12 context where the burden of coming forward with the

1     evidence is on the plaintiff, and there's not the

2     opportunity for reciprocal discovery.  So I don't hear you

3     saying I don't want them to have reciprocal discovery, it's

4     just if we spend a lot of time agonizing over whether the

5     early disposition of a key issue takes place before Rule 12

6     or after discovery in the Rule 56 context, I just wonder if

7     that's productive.  It does seem that there's a fundamental

8     decision, and there's some legal issues that are in there of

9     what has to be shown before an individual case could go

10    forward.

11              MR. BLACKWELL:  And, Your Honor, while Lone Pine

12    or that type of concept is referred to as an extraordinary

13    approach, what it's asking for is in fact not all that

14    extraordinary because as one federal court recognized, a

15    Lone Pine order merely requires information which plaintiffs

16    and their counsel should have possessed before filing their

17    claims.

18              THE COURT:  Yeah, but that case, that's the

19    Eleventh Circuit case?

20              MR. BLACKWELL:  It's from the Eastern District of

21    Pennsylvania.

22              THE COURT:  But in that case what was required was

23    information that would be more on the order of did this

24    patient have a Bair Hugger during his or her surgery?

25    That's how I -- if I'm remembering that case correctly and

1    as we've already established my memory of cases can be

2    blurry, it wasn't very complicated scientific evidence.  The

3    Court said the plaintiffs should have had this at the time

4    they filed their complaint.  And so it's just basically

5    saying you have to flesh out your complaint a little bit

6    more.

7              And I hear what you're saying about how the

8    plaintiff should in your view in their complaint say this is

9    exactly how the Bair Hugger caused the injury.  And so then

10   we come to the legal issue that I alluded to that's lurking

11   here, what is the required showing?

12             Here, whatever that showing is, whether it's a

13   higher or lower standard, it's going to require scientific

14   evidence.  And as to the scientific evidence, I, as an

15   initial matter, had a hard time imagining that I would want

16   to decide that without there having been some reciprocal

17   discovery.  So that's how I get to, okay, Lone Pine, I don't

18   know exactly what it means in federal court, but it seems to

19   be before reciprocal discovery.  And so that's where I come

20   from.  When I finally thought, okay, now I'm getting a sense

21   for what these things are, it's a requirement for a showing.

22   And in this case, it would be a scientific showing prior to

23   robust reciprocal discovery on that issue.  So my sense of

24   it was that it would make sense to have staged discovery so

25   that there's not a lot of wasted time, but not to try and

1       get it all done immediately before there's discovery on the

2       general causation matter.  That was my sense, and obviously,

3       this is the first time here, so I maybe don't know anything.

4               MR. BLACKWELL:  Well, Your Honor, there is a maxim

5       that comes to mind as I listen to Your Honor that law should

6       lag science and not in fact lead it.  And if the plaintiffs

7       in their Complaints are saying not just that there was a

8       Bair Hugger used and the plaintiff now has an infection, the

9       plaintiffs are in fact pleading and alleging that the Bair

10      Hugger caused it.  It's already been said.  It's out there.

11      It's a positive averment.

12              The question that Lone Pine asked and that needs

13      an answer is who says so?  Is it simply the ipse dixit of

14      lawyers saying this?  Or where is the competent medical

15      person who backs up that claim, the assertion that is

16      already made?  And so in my view it's as though they've

17      already boarded the litigation train and on their way to

18      trial.  And when the conductor asks them where is the

19      ticket, which you are supposed to have before you start on

20      this train, they want to conduct discovery on the conductor,

21      the train company, and the other passengers on the train,

22      when they supposedly already had a good faith basis for

23      making this claim grounded in the opinion of a medical

24      professional before they made the assertion.

25              And so Lone Pine to me is a threshold-type

1    standard that you have made the assertion on Rule 11(b)(3),

2    who says so?  And do you have a competent medical

3    professional who says so?  Was it sufficient for simply to

4    have the lawyers allege it?  And so once we're passed that,

5    the fact that a competent medical professional says that

6    doesn't make it admissible.  We still have all the Daubert

7    issues and other issues that have to get addressed as to

8    whether that's an admissible opinion.

9         But first and foremost, if you've made that

10   assertion under Rule 11, there must be a good faith basis

11   for having made it, which means it needs to be grounded and

12   a proper opinion from a medical professional.  And all that

13   Lone Pine is asking is where is your ticket?  Since you made

14   that assertion, you should have that before you file the

15   suit and make the assertion.

16        THE COURT:  One thing that we should talk about is

17   what, and maybe this is going to bump into some choice of

18   law issues, but what showing is required?  Is there a

19   requirement that there be a specific microbe?  And it sounds

20   right off the bat that there's going to be disagreement

21   about that is they don't show a microbe.  They say they

22   don't have to show what microbe.

23        They say that there's some study, maybe it's in

24   the McGovern study, which I haven't had a chance to fully

25   digest, that says that the Bair Hugger makes it four times

1    more likely that you're going to get an infection in

2    surgery.  So then there's a question let's say they can show

3    it makes it four times more likely?  What does that mean in

4    terms of either Rule 12 or does that get them over 12(f)?

5              MR. BLACKWELL:  Sure, Your Honor, a fair question

6    and, obviously, if I take plaintiffs' assertions about

7    McGovern, which I add is not what the study says, and I'll

8    talk about that in just a minute because it flat out says at

9    the end of the study that its findings, conclusions do not

10   establish causation.

11             THE COURT:  Yes, and what I'm not prepared to talk

12   about what the state of the science is, but I'm trying to

13   isolate what are going be the legal issues, and then once we

14   figure out what questions have to be answered, then we can

15   address what procedures we should put in to make it so that

16   we can get the information necessary to answer those

17   questions.

18             MR. BLACKWELL:  But, Judge Ericksen, your specific

19   question having the plaintiffs at the end of the day simply

20   allege that this or that increases the risk of probability

21   does not establish causation.

22             THE COURT:  Okay.  All right.  And so that's where

23   if -- that would be a Rule 12 issue then.

24             MR. BLACKWELL:  It would be, Your Honor, yes.

25             THE COURT:  If the Complaint says we can show they

1    used the thing, it makes it four times more likely, and then

2    you come in and say dismiss because that's not a sufficient

3    allegation.

4              MR. BLACKWELL:  Right.  An increased probability

5    of rain does not mean it rained, Your Honor.

6              THE COURT:  Gonna rain.

7              MR. BLACKWELL:  Gonna rain or did rain.

8              THE COURT:  All right.  Well, that's complicated.

9              MAGISTRATE JUDGE NOEL:  So if I heard you

10   correctly, Mr. Blackwell, even after this Lone Pine

11   proceeding and putting the plaintiffs through the necessity

12   of establishing a scientific basis for their claim, that

13   there is still going to be Daubert questions about

14   admissibility and whatnot.  What's the point?  What have we

15   gained by having this early determination, if we're not

16   going to make a law of the case kind of determination that,

17   okay, they passed that hurdle, now let's talk about the

18   other issues?

19             MR. BLACKWELL:  A couple things, and Lone Pine

20   ostensibly is conceptualized as a way of staging the

21   discovery aspect of the case, which is different from a

22   Rule 12 motion in that sense, and the standard is different

23   also.

24             THE COURT:  Well, when I first heard about it I

25   thought, okay, well, that makes sense.  And then when I

1     read, I mean I don't know how they did it in New Jersey.  I

2     don't know how they're contemplating doing it in Minnesota,

3     but to me staging discovery might, you know, that seems like

4     a pretty normal thing.  That seems fair.  Everybody has got

5     the same thing, but requiring one side to make -- I mean I

6     don't want to re-do it.  I understand what you're saying is

7     we just want them to give what they should have had anyway,

8     but you were going to answer Judge Noel's questions.

9              MR. BLACKWELL:  What courts find beneficial about

10    Lone Pine generally is that it can separate wheat from chaff

11    in terms of claims that have merit and deserve taking up the

12    Court's time and resources from those that do not.  And it

13    certainly is beneficial, it was in Baycol where the Court

14    found that the order was necessary to identify, evaluate and

15    categorize the claims of those plaintiffs who have and those

16    who do not have factually and legally sufficient support for

17    their alleged claims and injuries or damages, which the

18    Court found was helpful in helping to develop an efficient

19    and effective settlement and mediation program, in terms of

20    attempting to resolve cases, because if you've got this

21    bloated mass of cases that are into the thousands, a number

22    of which don't have any good faith basis in fact, or at

23    least we don't know until well down the road.  At some

24    point, it's fairly common in MDLs that at some stage we talk

25    about other cases or trying to resolve them.  And if we sit

1    down and try to talk about resolving this mass of cases, a

2    number of which we're saying a number of these cases don't

3    have anyone who says that the Bair Hugger has even caused

4    this infection.  There's no way we can even meaningfully

5    talk about it from the defense point of view because it's

6    such a bloated mass of cases.  Counsel's comment

7    notwithstanding about how carefully they're chosen.

8                  THE COURT:  Can't you always file a Rule 12

9    motion?

10                 MR. BLACKWELL:  Your Honor, you can always file a

11   Rule 12 motion to this mess, and we have Rule 12 motions in

12   all the cases based on statute and other things, Twombly,

13   Iqbal, all of which is coming forth down the road.

14                 What courts use Lone Pine as is somewhat of a

15   pre-filter, akin to what happens in med-mal cases where

16   there is an affidavit of some kind from a competent medical

17   professional who says that this conduct has caused this

18   injury, and it's not just lawyers who are making that kind

19   of claim.

20                 I will point out for the Court also in terms of

21   the concept of staging general causation.  First, it was

22   done here by Judge Magnuson in the In Re Viagra litigation

23   where general causation and the evidence and discovery in

24   the case was front loaded to address the general causation

25   issue.

1          THE COURT:  Yeah, that's a pretty common accepted

2     procedure, I think.

3          MR. BLACKWELL:  Right.  So any other questions for

4     Your Honor, I'm tempted to go into the McGovern case, but

5     I'll wait to see if there's an appropriate time to talk

6     about the science.  And I would just say circle it in red

7     because you'll be amazed at what you're going to hear about

8     what really happened in McGovern.  So when we say there's no

9     credible science and that was their best shot of telling

10    Your Honor what their science was.

11         THE COURT:  Okay, well, we can't talk about that

12    until we at least take a little break.  We can't just launch

13    right into that I don't think.

14         Let's work our way down the agenda and make sure

15    we don't have anything else, and then we'll talk about the

16    most effective way to make use of our time today on this

17    Lone Pine stage discovery business, but I want to make sure

18    that we aren't leaving anything else on the table before we

19    come back to that.

20         MR. GORDON:  I want to respond, I was going to

21    hope Ms. Zimmerman could respond briefly to the Lone Pine

22    argument that Mr. Blackwell just made.

23         THE COURT:  What I would like to do is just take a

24    breather from that whole Lone Pine business, and maybe we'll

25    take a little break or something, but I don't want to get

 1    too deep into that.

 2                MS. ZIMMERMAN:  Just to the extent that we can

 3    clarify some of the procedural history particularly in

 4    Baycol and some of the other cases that have been cited by

 5    Mr. Blackwell.

 6                THE COURT:  Yes, it seems pretty clear that every

 7    case is unique, and in every case we need to figure out

 8    what's going to be most effective and efficient in that

 9    case, and what do we need?  So I am only this concerned

10    about what happened in Baycol, and same thing with the I

11    suppose Stryker, Viagra, any of those cases.  They're all

12    different, and so I'm not afraid to issue an order that I

13    think is necessary.  I don't need to know that somebody else

14    did it.

15                And if somebody else did it in a different case,

16    well, it's maybe it's a different case, maybe I wouldn't

17    have done the same thing, who knows?  So you don't need to

18    be too, -- we'll issue whatever orders are needed in this

19    case, and I just want to make sure that we can have a full

20    discussion about what's necessary to decide what has to be

21    decided so.

22                MR. BLACKWELL:  Thank you, Your Honor.

23                MS. ZIMMERMAN:  We welcome that opportunity.

24                THE COURT:  Okay.  Good.

25                All right.  The master pleading, Mr. Gordon,

```
 1    that's where you would have a model complaint?
 2             MR. GORDON:  Yes, Your Honor.  The plaintiffs
 3    would have a standard sort of master complaint with a
 4    check-off short form complaint to just again for efficiency.
 5             THE COURT:  Yes, that seems common, right?
 6             MR. HULSE:  Absolutely.  All we want to make sure
 7    is that all the arguments we've already raised in our 12(b)
 8    motions are handled through that process too, that we don't
 9    lose them.
10             MAGISTRATE JUDGE NOEL:  And you're both talking to
11    each other about that, and you're going to come up with a
12    proposed order for us to enter that basically says what
13    you're going to do, is that correct?
14             MR. GORDON:  Yes, Your Honor.  We're perfectly
15    agreeable.  I think we can work it out.  Absolutely.
16             MR. HULSE:  Correct.
17             THE COURT:  So there are no pending motions
18    because everything that was filed is all stayed, so we'll
19    have to have a new schedule.  And I want to talk to you
20    folks about what a reasonable schedule might be but, again,
21    we can't quite get there until we jump over the, I guess we
22    have no choice but to call it the Lone Pine issue.
23             Now, there was some complaints about the Court
24    website.  Someone called Cathy and said they couldn't find
25    orders on it, but I think they were there, we checked.  So
```

1    the website I think is as good as we can make it at the

2    moment, but I'm looking for you to have your contributions

3    as was set forth, and it looks like everybody was happy to

4    do that.

5            MR. BLACKWELL:  We'll get together and do that

6    also, Your Honor.

7            THE COURT:  That's great.  I've got a proposed

8    schedule of status conferences.  What I don't know is if

9    that's been shared with you.

10           MR. BLACKWELL:  It was on the website, Your Honor,

11   so we took it off of there.

12           THE COURT:  Well, there you go.

13           MR. GORDON:  I think it was addressed in (b)(2) as

14   well, Your Honor.

15           THE COURT:  With all the Thursdays and the dates?

16           MR. BLACKWELL:  Yes, and the difference in times.

17           THE COURT:  How do you feel about that?  How do

18   you feel about that time and day, those dates and times?

19           MR. BLACKWELL:  It's fine, Your Honor.

20           MR. GORDON:  I generally think it's typical of

21   what we've done in others.  It's fine.  I would say I like

22   the Court's approach to accessibility and the opportunity to

23   perhaps have occasional telephonic hearings if there's a

24   need for that in between, so that we don't have to come to

25   Minnesota necessarily given the diversity of the crowd every

```
 1    time there might be a hearing if the Court is willing to

 2    entertain that.

 3              THE COURT:  And who all do you think is going to

 4    come every time we have a status conference?  The whole?

 5              MR. GORDON:  No, Your Honor, something that we

 6    discussed, and it's different in every MDL.  I will say in

 7    this case, given the stridency of the arguments from the

 8    other side and the work load we expect to happen --

 9              THE COURT:  Are you strident or are you anemic?

10              MR. GORDON:  Both at the same time.

11              MR. BLACKWELL:  We're both robust and reasonable,

12    Your Honor.

13              MR. GORDON:  I tend to think we have a big team,

14    but we don't think it's bloated.  We have some very unique

15    set of skills in different areas with this group.  I think

16    we're going to need most of them here for a lot of these

17    issues, especially the science issues.  So I anticipate a

18    lot of them will be coming, but I wouldn't say it would be

19    required for everyone to attend every hearing.

20              MR. BLACKWELL:  And, Your Honor, I presume if we

21    wanted a telephonic hearing, you would expect us to comply

22    with the Local Rules 7.3, Your Honor.

23              THE COURT:  We're very fond of our Local Rules.

24              Two o'clock I thought would be easier for people

25    who are going to fly in?
```

1          MR. GORDON:  Yeah, I like that idea, Your Honor,

2     thank you.  Especially coming from Pensacola, I have to make

3     a connection.

4          THE COURT:  Do you go through Atlanta?

5          MR. GORDON:  Every time, Your Honor.

6          THE COURT:  Yeah, so you must fly Delta.

7          MR. GORDON:  All the time, Your Honor.

8          THE COURT:  Probably upgraded to first class.

9          MR. GORDON:  I'm usually number one on the list,

10    but I don't always get it.

11         THE COURT:  The advantage of going through Atlanta

12    is that you get more miles than if you did a direct flight.

13         MR. GORDON:  Silver lining.

14         THE COURT:  Or the gold or platinum lining,

15    depending.  Now, for our lawyer who is on the phone,

16    Mr. Jackson, if you're still there, did you have anything

17    that you wanted to say?

18         MR. JACKSON:  Judge, I am very comfortable with

19    the competent leadership.  I have nothing to add.

20         THE COURT:  Okay, thank you very much.  I think

21    we've worked our way through.

22         Counsel for either Mr. Gordon or Mr. Blackwell,

23    anything else that you think we should talk about now?

24    We've got some other matters to take up.  We're going to

25    take up in a more focused the way the Rule 12, Rule 56 Lone

1    Pine issue.  I'm going to talk to the New Orleans lawyers,

2    and we're going to talk about the steering committee.  And I

3    want to talk to the lawyers on that Texas, the Walton, that

4    cryptic.

5          MR. GORDON:  Walton, Your Honor, yes.  And if it

6    would be possible, I'm co-counsel with David Hodges and Gabe

7    Assaad, if we could bring them with us.  I'm sorry, and

8    Coffin as well.

9          MR. BLACKWELL:  No objection, Your Honor.

10          THE COURT:  Are you in on that?

11          MR. BLACKWELL:  Yes, definitely, Your Honor.

12          THE COURT:  Do you want to take that up first?

13          MR. BLACKWELL:  That would be fine, first.

14          MR. GORDON:  Happy to, Your Honor.

15          THE COURT:  I imagine with a group this large,

16    somebody wants to at least take a break.  So just let's take

17    the, whenever you're ready, the people who want to talk in

18    chambers on that Walton issue come on back.  We'll then

19    decide whether we need an in chambers conference on -- well,

20    then we'll have an in chambers conference on the steering

21    committee matter.  And then we'll talk about how we're going

22    to proceed with the more substantive discussion that we've

23    deferred.  Make sense?

24          MAGISTRATE JUDGE NOEL:  Sounds good to me.

25          MR. GORDON:  Your Honor, do you want us to come

1    back now or take five minutes and then come back?

2              THE COURT:  Come back when you're ready.  I was

3    trying to be delicate because you're from the south.

4              MAGISTRATE JUDGE NOEL:  But they're still lawyers,

5    and when you say, "when you're ready," they may not be ready

6    until tomorrow.

7              MR. GORDON:  I've just been given a good

8    suggestion actually by the more capable female better fair

9    sex here and suggested that maybe it would be best to take

10   up Walton last, so that others who are not involved in that

11   could leave after the rest of the matter is --

12             THE COURT:  It depends on how long Walton is going

13   to take, but it's up to you.  I am totally in the dark about

14   what that is, so I don't care whether we take it up first or

15   last.

16             MR. BLACKWELL:  Your Honor, if it's the

17   plaintiff's pleasure to take it up last, we're fine with

18   that also.

19             THE COURT:  All right.  Then so ordered.  It will

20   be taken up last.

21             MAGISTRATE JUDGE NOEL:  So just to be sure, we're

22   going to take a break for five minutes, but everybody go do

23   what they need to do.

24             THE COURT:  Right, check their e-mails.

25             MAGISTRATE JUDGE NOEL:  Meet in chambers with

```
 1    whom?

 2              THE COURT:  On the steering committee.  So before

 3    you come back to chambers, talk to the -- get the steering

 4    committee issue squared away if you can, and then come back

 5    and let us know whether you're able to take care of that.

 6    And then when you're done with that, then I'd like the

 7    lawyers who are at the tables to come back and have a

 8    conversation about how we can most productively figure out

 9    where we're going to go next on the Lone Pine matter.

10              MR. BLACKWELL:  Very good.  Thank you.

11              MR. GORDON:  Thank you, Your Honor.

12              THE COURT:  We're in recess.

13                   (Court adjourned at 11:00 a.m.)

14

15                        *     *     *

16

17         I, Maria V. Weinbeck, certify that the foregoing is

18    a correct transcript from the record of proceedings in the

19    above-entitled matter.

20

21              Certified by:  s/ Maria V. Weinbeck

22                             Maria V. Weinbeck, RMR-FCRR

23

24

25
```