```
 1                    UNITED STATES DISTRICT COURT

 2                      DISTRICT OF MINNESOTA

 3      --------------------------------------------------------
                                       )
 4                                     )   File No. 15-MD-2666
        In Re: Bair Hugger Forced Air  )   (JNE/FLN)
 5      Warming Devices Products       )
        Liability Litigation           )   April 29, 2016
 6                                     )   Minneapolis, Minnesota
                                       )   Courtroom 12W
 7                                     )   10:00 a.m.
                                       )
 8                                     )
                                       )
 9      --------------------------------------------------------

10             BEFORE THE HONORABLE JOAN N. ERICKSEN
                 UNITED STATES DISTRICT COURT JUDGE
11
               And THE HONORABLE FRANKLIN D. NOEL
12                UNITED STATES MAGISTRATE JUDGE

13            And THE HONORABLE WILLIAM H. LEARY III
                      RAMSEY COUNTY JUDGE
14
                        (STATUS CONFERENCE)
15

16      APPEARANCES

17      FOR THE PLAINTIFFS:      LEVIN PAPANTONIO
                                 Ben W. Gordon, Jr.
18                               316 S. Baylen Street
                                 Suite 600
19                               Pensacola, FL 32502

20                               MESHBESHER & SPENCE
                                 Genevieve M. Zimmerman
21                               1616 Park Avenue
                                 Minneapolis, MN  55404
22
                                 CIRESI CONLIN
23                               Michael Ciresi
                                 Jan Conlin
24                               225 South 6th Street
                                 Suite 4600
25                               Minneapolis, MN
                           (Appearances continued next page)
```

```
 1    FOR THE PLAINTIFFS
                  (APPEARING BY PHONE:)
 2                                PRITZKER OLSEN, P.A.
                                  Brendan Flaherty
 3                                45 South 7th Street, #2950
                                  Minneapolis, MN  55402-1652
 4
                                  KENNEDY HODGES, LLP
 5                                David W. Hodges
                                  Gabriel Assaad
 6                                711 W. Alabama Street
                                  Houston, TX 77006
 7
                                  KIRTLAND AND PACKARD LLP
 8                                Behram V. Parekh
                                  2041 Rosecreans Avenue
 9                                Third Floor, Suite 300
                                  El Segundo, CA  90245
10
11                                DEGARIS LAW GROUP, LLC
                                  Annesley H. DeGaris
12                                3179 Green Valley Rod 235
                                  Birmingham, AL 35243
13
                                  JULIE M. JOCHUM, ESQ.
14                                Julie M. Jochum
                                  220 Gause Blvd
15                                Slidell, LA  70005
16                                PETERSON & ASSOCIATES, P.C.
                                  Brian Emerson Tadtman
17                                801 W. 47th Street
                                  Suite 107
18                                Kansas City, MO  64112
19                                BERNSTEIN LIEBHARD LLP
                                  Dae Lee
20                                10 East 40th Street
                                  New York, NY  10016
21
                                  PAPPAS & HEALY
22                                Steve Healy
                                  221 N. LaSalle St. #3410
23                                Chicago, IL  60601
24                                DEAN XENICK
                                  303 Banyan Blvd
25                                West Palm Beach, FL 33401
      FOR THE PLAINTIFFS
```

```
 1    FOR THE PLAINTIFFS
      (APPEARING BY PHONE:)      GOZA & HONNOLD LAW FIRM
 2                               Kaitlyn Neufeld
                                 11181 Overbrook Road
 3                               Suite 200
                                 Leawood, KS 66211
 4
                                 THE OLIVER LAW GROUP, P.C.
 5                               Alyson Oliver
                                 363 W. Big Beaver Road, #200
 6                               Troy, MI  48084

 7                               MCSWEENEY/LANGEVIN
                                 Katie Babb
 8                               2116 2nd Avenue South
                                 Minneapolis, MN  555404
 9
                                 LAMOTHE LAW FIRM
10                               Richard Martin
                                 400 Poydras St, #1760
11
                                 PITTMAN DUTTON & HELLUMS
12                               Jonathan S. Mann
                                 2001 Park Pl #1100
13                               Birmingham, AL  35203

14                               LAW OFFICES OF JAMES S. ROGERS
                                 James Rogers
15                               1500 4th Avenue #500
                                 Seattle, WA  98101
16
                                 LAW OFFICES OF BRIAN TIMOTHY
17                               MEYERS
                                 Laura Young
18                               1125 Grand Boulevard, Suite 1610
                                 Kansas City, MO  64106
19
                                 MURRAY LAW FIRM
20                               Caroline Whitney Thomas
                                 650 Poydras Street
21                               Suite 2150
                                 New Orleans, LA  70130
22
      FOR THE DEFENDANTS:        BLACKWELL BURKE P.A.
23                               Jerry W. Blackwell
                                 Mary S. Young
24                               Ben Hulse
                                 431 South Seventh Street
25                               Suite 2500
                                 Minneapolis, MN  55415
```

```
 1
        FOR THE DEFENDANTS
 2       (Continued):              FAEGRE BAKER DANIELS
                                   Bridget M. Ahmann
 3                                 90 South Seventh Street
                                   Suite 2200
 4                                 Minneapolis, MN  55402

 5
         Court Reporter:          MARIA V. WEINBECK, RMR-FCRR
 6                                 1005 U.S. Courthouse
                                   300 South Fourth Street
 7                                 Minneapolis, Minnesota 55415

 8
                 Proceedings recorded by mechanical stenography;
 9       transcript produced by computer.

10

11              *      *      *      *      *      *      *

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                   P R O C E E D I N G S

 2                      (10:06 a.m.)

 3            THE COURT:  Good morning, again.  Please be

 4      seated.  We have, I believe, the appearances of everyone in

 5      the courtroom, but we do not have the appearances of the

 6      telephone participants.  So could we have those please?

 7               (Inaudible speaker.)

 8            THE COURT:  Could you please start over?

 9      Technical difficulties here, so once again from the top.

10            MS. OLIVER:  Alyson Oliver.

11            MS. BABB:  Katie Babb.

12            MR. MARTIN:  Richard Martin.

13            MS. JOCHUM:  Julie Jochum.

14            MR. TADTMAN:  Brian Tadtman.

15            THE COURT:  Repeat, please.  Repeat the last one

16      please.

17               (Inaudible speaker).

18            THE COURT:  Nope, didn't get it.

19            MR. HEALY:  Steve Healy.

20            MR. CIRESI:  It was Brian something.

21            THE COURT:  Okay, is there a Brian someone who

22      identified themselves?

23            MS. NEUFELD:  Kaitlyn Neufeld.

24            MR. LEE:  Dae Lee.

25            MR. MANN:  John Mann.
```

```
 1              MR. GORDON:  John Mann, M-a-n-n.  Did I hear
 2      Annesley DeGaris?
 3              (Inaudible speaker.)
 4              MR. XENICK:  Dean Xenick.
 5              MR. ROGERS:  Jimmy Rogers.
 6              MS. THOMAS:  Caroline Thomas.
 7              MS. YOUNG:  Laura Young.
 8              THE COURT:  Anyone else on the phone who has not
 9      identified themselves?
10              All right.  We'll get started then.  We had a
11      number of submissions yesterday afternoon and that looks
12      great in terms of progress.
13              The agenda, the joint agenda begins with a
14      discussion of pretrial order number 4.  And there was
15      discussion last time about deadlines, so you say here is
16      that you are basically not having any problems with those
17      deadlines, but that you might agree on some modest
18      refinements.  That's how I read it.
19              MR. BLACKWELL:  Your Honor, I think that's fair.
20      We just haven't really been able to have our discussion in
21      earnest about it, but we understand that the point was to
22      tweak it and not to completely overhaul it so.
23              THE COURT:  Okay.  So hearing nothing specific, we
24      will assume that the deadlines remain the same, but if you
25      come up with anything that's not workable, let us know.
```

1          MR. GORDON:  Thank you, Your Honor.

2          THE COURT:  Science day, as I indicated informally

3     when I came out here a few minutes ago, is set for May 19th,

4     and it's currently scheduled from 2 o'clock until 6 o'clock

5     p.m.  I am able to start that hearing at noon, and I

6     understand that that would actually be preferable from the

7     point of view of counsel and the witnesses.  So unless I

8     hear some objection right now, we'll get that moved to noon.

9          MR. GORDON:  No objection, Your Honor.  One

10    question if I may.

11         THE COURT:  Sure.

12         MR. GORDON:  So we talked about coming in early

13    for status conference, should we do that on science day?

14    And it might be problematic to have phone attendance at that

15    given the non-evidentiary basis of it, so I just question

16    whether we need to address that.

17         THE COURT:  What about you phone people?  All

18    right, hearing nothing, makes sense to me.  Judge Noel?

19         MAGISTRATE NOEL:  The only question I had was by

20    moving the start time from 2:00 to 12:00, are we moving the

21    end time from 6:00 to 4:00 or are we adding two hours to the

22    day?

23         MR. BLACKWELL:  I think the answer is yes, Your

24    Honor.  I think the intent is still to have it be within the

25    four-hour hash marks.

1      MR. GORDON:  That was our understanding or

2  impression as well, Your Honor.

3      THE COURT:  Right.  This does give us a chance to

4  have a coffee break if we wanted.

5      MR. BLACKWELL:  Could I just ask one other kind of

6  housekeeping question for clarification around science day?

7  I had a discussion with Mr. Gordon just about the format

8  process, and whether there would be opportunities for

9  rebuttal or sur-rebuttal or is that more adversarial than

10  the Courts anticipated?

11      MR. GORDON:  Your Honor, for what it's worth, our

12  understanding from the Court's informal guidance last time,

13  although we're happy to discuss the process, was that each

14  side would have two hours to use as we deemed appropriate.

15      THE COURT:  I think so.  The words "rebuttal" and

16  "surrebuttal" sound adversarial to me, but if there's a

17  point that a witness makes that you feel in the interest of

18  the educational mission, should be addressed by someone, I

19  don't think we'll say no, that person can't answer that

20  point because that would be surrebuttal, and we're not doing

21  that.  So as necessary, within the time allotted.

22      MR. BLACKWELL:  Yes.

23      MR. GORDON:  So to be clear, Your Honor, our

24  belief would be or our position would be that if we preserve

25  some period of time within the two hours, and believe we

1    have some type of response as you've indicated to certain

2    points, we'd have the opportunity to do that after the

3    defense presents.

4             MAGISTRATE NOEL:  I have nothing to add other than

5    I just realized I have a conflict at noon, but that's okay.

6    I'll catch up.

7             THE COURT:  What time is your conflict?

8             MAGISTRATE NOEL:  One.  It's a pro se project CLE

9    that I promised I would be at.

10            (Discussion off the record.

11            THE COURT:  Maybe we should start at one.

12            MR. GORDON:  We're fine with 1:00, Your Honor.

13            THE COURT:  All right.  We'll start it at 1:00 and

14   then you folks can come ahead of time and talk to me if you

15   want.

16            MAGISTRATE NOEL:  My apologies.

17            THE COURT:  All right.  An update on the number

18   and status of cases that have been transferred.

19            MR. FLAHERTY:  Thank you, Your Honor.  Brendan

20   Flaherty for David Szerlag.  249 cases filed as of

21   yesterday, and we submitted to the Court an updated master

22   service list, which should be accurate.

23            COURT REPORTER:  Please slow down and speak

24   louder.

25            THE COURT:  Come on up to the podium.  All the way

1    up.

2            MR. FLAHERTY:  Okay, so 249 cases filed as of

3    yesterday, and we submitted to the Court via e-mail

4    yesterday an updated master service list, which should be

5    accurate.  And as far as I know, that's the updated

6    information.

7            THE COURT:  Okay.  There were 242 -- do you know

8    if Margaret Weimer is in there twice?  Would you check on

9    that?  Look at 16-CV-796.  And 16-CV-621.  Those look very

10   similar.  So Thomas Stephen, that would be 16-CV-804 and,

11   16-827, could you just verify that those aren't duplicate

12   cases?

13           MR. FLAHERTY:  Absolutely.  If it is, we will just

14   resubmit the corrected version.

15           THE COURT:  Okay.  Anything else?

16           MR. FLAHERTY:  I don't think so, not unless

17   there's any questions from you, Your Honor.

18           THE COURT:  Anything on the state court cases?  We

19   haven't heard from any of the state judges other than our

20   own Judge Leary about science day.

21           MR. FLAHERTY:  No, Your Honor, and as far as I

22   know, there's no real activity in any of those various

23   litigations at all, so.

24           THE COURT:  It didn't look like it.

25           MR. GORDON:  There has, Your Honor, if I might,

1    and defense may know more about this.  There has been a

2    scheduling order entered in one of the cases, one of the

3    Texas cases, I believe.

4             MR. HULSE:  Yeah, I can speak to it, Your Honor.

5    So we have reached agreement in one of the two Texas cases

6    in the scheduling order that lines up with the scheduling

7    order in this court, which is good.  We had the Court in

8    Harris County sua sponte enter a scheduling order that would

9    have us going to trial in February of next year.

10            But we're going to work with the plaintiff's

11   counsel, who is the same ones we just reached the agreement

12   with in the other case to get that one lined up too because

13   they don't have any interest of getting ahead of this Court,

14   so I think it's all going to work out just fine.

15            THE COURT:  Okay.  And keep our liaison counsel

16   informed.

17            MR. HULSE:  Indeed, Your Honor.

18            THE COURT:  And that XARELTO, there's nothing for

19   us to do about that.

20            And, Judge Leary, your cases are following along.

21   You don't have any additional orders or requirements of the

22   counsel?

23            JUDGE LEARY:  No, I don't.  At some point, I would

24   like an opportunity to address with regards to the trial

25   that's coming up or rather the pretrial orders coming out of

1    State Court.

2              THE COURT:  Is now a good time?

3              JUDGE LEARY:  Well, if I can, thank you, Judge

4    Ericksen.

5              THE COURT:  Sure, did you want to come up here?

6              JUDGE LEARY:  No, no, that's okay.  With regard to

7    the pretrial orders, there's reference in the agenda to

8    pretrial order number 4, as well as some additional pretrial

9    orders 5, 6 and 7.  Have any of those orders, I know 5, 6

10   and 7 have not been adopted by the State Court or by myself.

11   How about pretrial order 4?  Is that in place in the State

12   Court action?

13             MS. ZIMMERMAN:  Not at this time, Your Honor.

14   Pretrial order number 4 is the pretrial order from Judge

15   Ericksen regarding the scheduling order, so, setting for the

16   science day and the different discovery deadlines.

17             JUDGE LEARY:  I guess my comment or my question is

18   I would like to see to the extent that I can, have my

19   pretrial orders following the pretrial orders of Judge

20   Ericksen.  And so what I would ask that liaison counsel

21   contact my chambers and provide me with proposed orders that

22   reflect orders that have already been adopted by Judge

23   Ericksen.

24             MR. BLACKWELL:  We can make that happen this

25   coming week.

1              JUDGE LEARY:  Okay, very good.

2              MR. GORDON:  I apologize for interrupting, Your

3      Honor.  I'm getting a text from one of our PSE members

4      saying that no one on the phone can hear anything any longer

5      at all, like they've been muted perhaps.

6              MAGISTRATE NOEL:  I think it's from prior

7      experience, I think it's because nobody is speaking into a

8      microphone.  Can you hear me?

9              MR. GORDON:  Let's see their response.  By the

10     way, Your Honor, it's Annesley DeGaris.  You know him.  So

11     I'm texting him now to see if he heard what you just said.

12             THE COURT:  The proceedings of the Court have come

13     to a halt to receive a text message.

14             MR. GORDON:  Well, modern technology.  He

15     responded, Your Honor, and said, no, he did not hear -- he

16     is not hearing any of this.

17             MAGISTRATE NOEL:  I guess it's not just the

18     microphone.

19             THE COURT:  Well, privacy is on.  I wonder if

20     that's it.  How about now, Mr. DeGaris?  You can un-mute

21     yourself and answer right loud using your words.

22             MR. DEGARIS:  Yes, Your Honor.  I've been texting

23     other people and they could not hear, but I now can hear

24     you.

25             THE COURT:  All right.

1              MR. GORDON:  Thank you, Your Honor.  I'm sorry,

2      Judge Leary.

3              JUDGE LEARY:  The follow-up questions is with

4      regard to the number of cases.  I'm particularly interested

5      in the State Court cases.  They seem to be fairly flat at

6      this time.  There's been an mild increase in the MDL

7      litigation.  Is there any trends that can be gathered from

8      those numbers in the relative flatness of those numbers as

9      to what we're looking for in the future?

10             MR. BLACKWELL:  Let me look to the plaintiffs,

11     Your Honor.  Of course, we hope so, but.

12             MR. GORDON:  My impression has been quite some

13     time, Your Honor, I think we spoke to this last time, but

14     I'll defer to Genevieve, that most of the cases will likely

15     be filed in the MDL.  I think it will continue to be

16     relatively flat in State Court, but I can't speak for

17     everyone so.

18             MS. ZIMMERMAN:  Yes, Your Honor.  And as I think

19     that we've represented the cases that we filed in Ramsey

20     County are on behalf of Ramsey County or Minnesota

21     residents, and so that's the forum that they have available

22     to them.  I think that the filings in Ramsey County have

23     been relatively flat, and I think we're right around 50

24     cases or so.

25             With respect to what we expect both in Ramsey

1    County and the MDL, it's hard to know.  I do know just

2    within the plaintiff's steering committee that has been

3    appointed by this Court, that we're certainly vetting and

4    trying to be very careful about the cases we file, but we

5    expect there to be well over a thousand cases probably by

6    the end of the summer.

7           JUDGE LEARY:  Okay, very good.  That's all I have

8    for now Judge Ericksen.  Thank you.

9           THE COURT:  Thank you.  What an efficient -- that

10   makes me feel very vindicated in having put the two cases

11   together because if you hadn't been here, you would have had

12   to contact them, and there would be all kinds of

13   coordination.  So that was good.  I like that.

14          JUDGE LEARY:  Yes, indeed.

15          THE COURT:  All right.  Overview of related state

16   proceedings, there's nothing more that we need to talk about

17   there, I don't think.

18          Okay.  So isn't this April?

19          MR. GORDON:  Yes, Your Honor.

20          MR. CIRESI:  Not much longer, Your Honor.

21          MS. ZIMMERMAN:  And perhaps Your Honor is

22   referring to our failure to provide to you the common

23   benefit order prior to arriving today because we are on

24   number 5.

25          THE COURT:  This is in advance of the April 2016

1     status conference.

2              MR. GORDON:  Mr. Gordon has something.  He's got a

3     blank piece of paper that he's waiving.

4              MS. ZIMMERMAN:  We actually do have the order

5     done, and we just wanted to read through it one more time

6     and submit it to the Court right after this.

7              THE COURT:  Sure, okay.  Great.

8              MAGISTRATE NOEL:  It's the name of 57 communists

9     in the State Department.

10             THE COURT:  Yeah, right.  You, sir.

11             MS. ZIMMERMAN:  Your Honor, if we could, we do

12    have some questions just briefly with respect to procedures

13    in terms of how the Court would like to receive these.  I

14    think it changes from MDL to MDL in terms of what the Court

15    would like.  If you would like proposed orders submitted by

16    e-mail in chambers, which is what we have done thus far in

17    this MDL.  If you would like something filed on the ECF

18    system, we can do that as well, and we just want to defer to

19    what your preference is.

20             THE COURT:  The reason our local rules call for

21    e-mailing proposed orders as opposed to filing on ECF, I

22    think it's a good one, and I can't immediately think of any

23    reason that it wouldn't apply here.  The basic reason is

24    that for people who go on ECF, there's a chance that they'd

25    be confused because they'd see something that says order,

1    and nothing has got a hard signature on it anyway.

2              So it's easier for public -- it's easier for the

3    public if there aren't things called "orders" on ECF that

4    aren't actually orders.  So in other MDLs, what's the

5    reasoning behind filing the proposed orders on ECF?

6              MS. ZIMMERMAN:  Your Honor, I wish I could speak

7    to that, but I know from a previous experience in the last

8    MDL across the river, we just e-mailed everything into the

9    Court chambers and wanted to make sure that that was your

10   preference before we did that.

11             THE COURT:  Having been involved in writing our

12   local rule in that regard, I'm really kind of attached to

13   it.

14             MS. ZIMMERMAN:  Excellent.

15             THE COURT:  You were too.

16             MAGISTRATE NOEL:  Yes, indeed.  It's a good rule.

17             THE COURT:  And that was our reasoning, wasn't it?

18             MAGISTRATE NOEL:  That is the reasoning.  We

19   didn't want a proposed order thinking that it's an order

20   when it's just not.

21             THE COURT:  Right.  All right, and I have some

22   confidentiality orders.  I think that point number 6 we

23   might have, but we will be discussing the ESI protocol, I

24   believe.  And the official website, and we do have that.

25   The amended or supplemental agenda point has to do with the

1    ESI protocol.  Discovery in Europe.  All right.  We consider

2    ourselves to be on notice that there will be discussion of

3    discovery in Europe.

4          MR. GORDON:  Your Honor, if I may, before we leave

5    the ESI protocol.  We did have a meet and confer as

6    indicated here, A very thorough and productive meet and

7    confer with defense yesterday.  However, there are some

8    unresolved issues.  My prediction is there will continue to

9    be unresolved issues next week, but we're going to try.  I

10   don't want to presume failure, but we're not there yet, and

11   I would hope, and we've talked about this before, that we

12   could have the opportunity before May 19th to come back

13   before the Court for telephone or otherwise to address

14   those, and I think the defense is in agreement.

15         MR. BLACKWELL:  Our thought would be that we could

16   find time, particularly for Judge Noel, we may have issues

17   on the discovery in Europe, which we want to get going right

18   away on, the ESI protocol, but we figured once we reach that

19   point of impasse, we might be able to contact Your Honor and

20   find a time.

21         MAGISTRATE NOEL:  The only caution I would have is

22   all of next week, I think both Judge Ericksen and I are

23   going to be in, wait for it, Rodgers, Arkansas, for the

24   Eighth Circuit Judicial Conference.

25         THE COURT:  Maybe they'd like to come down there.

1          MAGISTRATE NOEL:  The following week I will be

2     available, but district judges -- are you going to Brainerd?

3     There's an in-court seminar that the judges are doing, but

4     I'm holding down the fort for criminal duty, so I am

5     available on Tuesday, Wednesday, Thursday, Friday.  I'm not

6     here on Monday, the 9th, but I am here the rest of that

7     week, so.

8          MR. GORDON:  So maybe the 11th or 12th, perhaps?

9          MR. BLACKWELL:  To the extent we are here, it

10    would be that week anyway.

11         MAGISTRATE NOEL:  Call my chambers, and I can

12    certainly make a decision if I am designated by the district

13    judge to do so.

14         THE COURT:  All right.  And I would like to

15    participate, and I'm happy to do so by telephone, even if

16    I'm down in Rodgers, Arkansas, I think I could break away.

17    When do you think these problems are going to crop up?

18         MR. HULSE:  Your Honor, I think we've got a

19    productive discussion going, and I think it's possible by

20    the end of the week following next week we'll have pretty

21    concretely what the disagreements are and hopefully pretty

22    narrow.  I think plaintiffs are probably right to predict

23    that there will be some disagreements, but given what ESI

24    protocols are like, I don't think it's in anybody's interest

25    to having the Court wade through it line by line when we

1      could take the time to reach agreement.

2                  MR. GORDON:  I might differ just a little bit --

3                  THE COURT:  Okay, just a second, I thought that

4      this ESI protocol business would be a little bit more of a

5      discussion, so I'm just running through the proposed agenda

6      right now, and then when we talk about how to resolve the

7      ESI issues, I want to have a little more sense of where you

8      are right now and what the general parameters are likely to

9      be with respect to the disagreements, so that when you call

10     or come in, we're not hit completely cold with that.

11                 So if we could just get back to that after we

12     finish the agenda, which is basically over, because there's

13     the Med Watch reports matter.

14                 So those are the items that are on the agenda.  Is

15     there anything else that we're going have to cover or should

16     cover or you'd like to cover today while we're all together?

17                 MR. GORDON:  I don't think so, Your Honor, for the

18     plaintiffs.

19                 THE COURT:  Okay.  Let's go through the things

20     that you agree on, if we could.  I have the proposed

21     pretrial order about direct filing.  I didn't have any

22     problem with that.  Is that a joint proposal?

23                 MS. YOUNG:  Yes, Your Honor.

24                 THE COURT:  Okay.  That looked good to me.

25                 The E-Service proposal also.  Nothing jumped out

1    at me as being problematic.  That's a joint proposal as

2    well?

3                    MR. BLACKWELL:  Yes, Your Honor.

4                    THE COURT:  All right.  Now, the protective order

5    seemed all right.  I didn't like the use of the word

6    "strictly" with "strictly construed wherever possible."  And

7    that is in paragraph 1, the scope.  It says, "as there is a

8    presumption in favor of open and public judicial proceedings

9    in Federal Court, this order will be strictly construed in

10   favor of public disclosure and open proceedings wherever

11   possible."  I have no quarrel with the concept.  It's just

12   that "strict construction" has its own --

13                   MR. HULSE:  Your Honor, we certainly have no great

14   attachment to the word "strictly".  We're fine with it being

15   stricken.

16                   MR. GORDON:  "Just construed" is fine with us,

17   Your Honor.

18                   THE COURT:  Holley, we can make that change,

19   right?  Okay.  All right.  So the protective order seems

20   fine.

21                   And thank you very much, everyone, for your

22   revised introduction for the website.  Short, clean, clear.

23   Looked really good.

24                   The master short and long forms for the

25   complaints, I don't think that -- I couldn't tell if those

```
 1    are joint submissions or if they are just from plaintiff.

 2    Mr. Blackwell?

 3              MR. BLACKWELL:  Your Honor, if I may, we just

 4    received that this morning, so I haven't even seen it yet.

 5    So I know it's there, and we'd like a chance to see if

 6    there's anything that we'd like to talk about with respect

 7    to it.

 8              THE COURT:  You know, what I learned in law school

 9    is sign it without reading it.

10              (Laughter.)

11              THE COURT:  But if you want to read it first.

12              MR. BLACKWELL:  I'll read it, Your Honor.  Only my

13    clients tell me to sign it without reading it.

14              MR. GORDON:  Your Honor, I would only say that

15    these are plaintiff's complaints.  There's no representation

16    that they're joint.  I'm sure they'll have things they don't

17    like about them, but --

18              MR. BLACKWELL:  Well, there's a proposed order

19    also, Your Honor, that has language in it that we'd like to

20    read to see what is proposed to the order with respect to

21    the complaint, and so we'd just like to read it.

22              MR. GORDON:  Fair enough.

23              THE COURT:  Right.

24              MR. GORDON:  No objection to that.

25              MAGISTRATE NOEL:  I'm in favor of lawyers reading
```

 1   everything.

 2                (Laughter.)

 3                THE COURT:  Just an informal either yes or no or

 4   I guess an informal yes to chambers.  And if there's any

 5   sort of problem with the order, talk to Mr. Gordon, and let

 6   us know if there's anything we need to do.

 7                MR. BLACKWELL:  I'll do that, Your Honor.

 8                THE COURT:  Okay, that sounds great.  Now, talk

 9   about the ESI.  So Mr. Gordon?

10                MR. GORDON:  Yes, Your Honor.

11                THE COURT:  Talk to me about where you are on the

12   ESI protocols.  What's going on?  What do you anticipate?

13                MR. GORDON:  Well, I'll tell you generally, Your

14   Honor, and, obviously, answer any questions you wish me to.

15   If we get too far down to the weeds on this, I might suggest

16   to Your Honor that you hear from Behram Parekh, the chair of

17   our ESI committee, because he's been more involved in the

18   minutia of the details than I have, but I was in a lengthy

19   meet and confer yesterday with Ben Hulse for the defense and

20   others.  And I would say that while we had a bumpy road

21   initially, as we talked through things, we got a much better

22   sense of what has been done thus far by the defendants in

23   terms of the review and collection process, in terms of the

24   data sources that they have looked at for discoverable

25   information.

1              We have retained for the steering committee an

2       outside consultant, an ESI consultant who is very familiar

3       with the Sedona principles and the modern way of doing

4       e-discovery, which I know the Court is very familiar with.

5       And our concern in a nutshell, Your Honor, is that some of

6       what has been done to this point and, of course, I don't

7       want to prejudge it because we haven't seen what they intend

8       to produce with regard to our discovery requests, but may

9       not be from our point of view reasonably calculated to lead

10      to the full panoply of discovery information we think we're

11      entitled to.

12              THE COURT:  And that was a nice pause there

13      recognizing the change to Rule 26.

14              MR. GORDON:  Yes, Your Honor.  And, obviously,

15      with the proportionality rules in place that occurred in

16      December, we're cognizant of the rules and the

17      interpretation of those rules, and we want the Court's input

18      on that, and we certainly want to be fair and reasonable and

19      not seek discovery of information that is superfluous or

20      inefficient and a waste of everyone's time.

21              That said, the discovery that I'm familiar with

22      from the predecessor cases, as co-counsel with Mr. Hodges

23      and Mr. Assaad from Walton & Johnson, is a word I've used

24      before here "anemic."  I mean there is a lot of information

25      that we believe must exist in the form of e-mail servers and

1   other electronic data sources, that I believe Mr. Hulse has

2   given us very good indications, is robust, is

3   thorough-going, but exactly what the universe of documents

4   and the universe of ESI is, we don't know yet.  We don't

5   have a really good understanding of how large this data

6   collection may be and whether or not it needs to be reviewed

7   sort of in a joint fashion, which we talked about, and may

8   be a company.

9        We've got an ESI company we're working with.

10  They've worked with others in the past, but I think what

11  we've talked about and what we're making progress on is the

12  idea that we might push the Court with a joint proposal to

13  do predictive coding.

14       Type of review once we fully understand what's

15  been done already and what the world or universe of

16  documents and the ESI data are.

17       Now, are we going to be able to agree on

18  everything?  Are we even going to be able to agree on a

19  joint, you know, company that we would share the expense of

20  to promote efficiency?  I'm not sure yet.  I think that's

21  part of what we really want to explore next Wednesday in an

22  in person meet and confer.  And depending on how that goes,

23  I think our prediction is there will be lingering issues

24  that we would want to come back to the Court with the

25  following week if Judge Noel is back and Your Honor is able

1   to dial in that.  That would be kind of my general synopsis.

2              THE COURT:  But you are meeting in person next

3   Wednesday?

4              MR. GORDON:  Yes, Your Honor.

5              MR. HULSE:  That's correct, Your Honor.

6              THE COURT:  Here?

7              MR. HULSE:  Yes.

8              THE COURT:  Okay, Mr. Hulse, what do you --

9              MR. HULSE:  Yeah, just a few more things, I should

10  say initially that we, of course, dispute that there was an

11  "anemic" production using Mr. Gordon's word.  There was a

12  production that was appropriate for those cases.  We've got

13  a lot more cases, and we've got more issues implicated here.

14             We started out with competing ESI protocols and

15  certainly from our perspective what they proposed to us was

16  kind of a plaintiff's wish list dream protocol.  I'm sure

17  they had a similar reaction to ours.

18             Our proposal to them was to follow the ESI

19  protocol that Judge Nelson adopted in the NHL MDL, which was

20  a kind of a middle of the road sort of thing.  But it's

21  plaintiff's desire to really get down to the nitty gritty in

22  the protocol rather than having the protocol create a

23  framework for settling some of these individual issues.  And

24  that's fine, but it just means that it takes us a little bit

25  longer to get to a proposed order.

1          The other thing too is they are very eager to

2     explore something that is still pretty rare today, which is

3     collaborative predictive coding.  And it's something that we

4     actually did not anticipate that they would be so interested

5     in doing, so we're exploring that and seeing if we can find

6     a way to make that happen, but that is still a very unusual

7     thing to do today.  Maybe it will be more typical in the

8     future, but to the extent we're doing it, it really is going

9     to require a lot of work and engagement from the Court to

10    figure out a way to do it that doesn't abridge the

11    defendant's confidentiality and privilege, which is always

12    the risk of these things.

13          (Whereupon, Judge Ericksen and Magistrate Judge

14    Noel have a private discussion off the record.)

15          (In open court.)

16          MR. HULSE:  A couple things I would add is that

17    this is not -- the discovery is progressing, nonetheless,

18    there is certainly discovery that we can do without

19    agreement on the ESI protocol.  Plaintiff served us about

20    250 requests for production last month, and we're going to

21    be responding to those.  We're going to be making

22    productions of things that we can produce without agreement

23    on key words and custodians and that sort of thing, but it's

24    still, of course, our desire to reach agreement on key words

25    and custodians because that's what will avoid the fights

 1    down the line.

 2          THE COURT:  Do you have an ESI consultant?

 3          MR. HULSE:  Well 3M actually has very robust

 4    internal resources on this that they've developed over the

 5    years too, but we do work with consultants as well.

 6          THE COURT:  Is there a chance that you and the

 7    plaintiffs could agree on a consultant bearing in mind that

 8    maybe, I don't know, maybe your percentage would be less

 9    because you would provide more in-house?

10          MR. HULSE:  I think that's precisely the sort of

11    thing that we're going to be discussing and striving towards

12    because in order to do the collaborative predictive coding,

13    that would be a necessary step.  And the plaintiffs have

14    been very open to that discussion that we've been having

15    over the last few days.

16          MAGISTRATE NOEL:  Let me ask you this because

17    between the lines of what Mr. Gordon was saying, it sounded

18    like there was some suggestion that maybe after discovery

19    begins, there may be some need to tweak the ESI protocol.

20    Is that something that's the topic of conversation in your

21    Wednesday meeting?

22          MR. HULSE:  Very much, Your Honor, the approach

23    that we've suggested, for one thing, there is a production

24    set from the Walton and Johnson cases.  With the entry now

25    of the protective order, everybody, all the plaintiff's

1       counsel will have access to it.  And our suggestion had been

2       that plaintiffs should get their arms around that and use

3       that set to help them develop their list of additional

4       custodians beyond the ones that we've already suggested to

5       them.  In fact, the whole approach that we suggested was a

6       key words and custodians using that set as a starting point.

7       But no matter what, it's going to have to be iterative.  And

8       what we've proposed to them is we keep coming back over the

9       course of the case.  And, of course, we've got a general

10      causation focus right now.  Everybody is given priority to

11      that.  As we get to other issues in the case, then there may

12      be additional custodians that we want to get and additional

13      data sources at that point.  So in an MDL situation like

14      this, it's got to be iterative or it can't work.

15              THE COURT:  So, so far what are the data sources

16      so far that --

17              MR. HULSE:  Right, so we have individual

18      custodians.

19              THE COURT:  Like where are they?  How many?

20              MR. HULSE:  Three.  So we have proposed a set of

21      custodians who are the key people in research and

22      development to start out with because of the general

23      causation focus, asked plaintiff to propose additional

24      custodians too.  That and then, you know, we've got

25      regulatory documents.  We have testing documents, and so

1    forth.  These are all the primarily sources in the first

2    instance of documents that would be responsive to these

3    requests that are focused on general causation.

4         But I also want to be clear that we are not -- our

5    approach to discovery is not to say we are only responding

6    to general causation discovery.  We understand that the

7    Court hasn't limited discovery that way at this point.  It's

8    a matter of prioritizing given that we have some deadlines

9    that we need to meet.

10        THE COURT:  Okay.

11        MR. HULSE:  Like I said, I think we've sort of

12   reached a turning point in the discussion where we've gone

13   from our polar opposite ESI protocols to try and see if we

14   can find a way to make this collaborative predictive coding

15   work.  But it is, like I said, still a pretty unusual thing

16   to do today.

17        THE COURT:  But you are proceeding with electronic

18   discovery even in the absence of a formal ESI protocol.

19        MR. HULSE:  That's right, for the sources that

20   don't require, you know, the application of key words or

21   predictive coding.  There are things like, you know, 510K

22   submissions, regulatory submissions.  They're getting

23   produced no matter what regardless of key word or custodial

24   identification.

25        THE COURT:  But you're not doing any searching

 1    within the sources?

 2              MR. HULSE:  We have done that in the past.  And

 3    the prior production in Johnson and Walton do reflect that

 4    kind of effort, but we, of course, would prefer not to have

 5    to do it twice.  I'm sure that if we applied our own set of

 6    key words to the documents that we have right now, the

 7    plaintiffs would probably think they were insufficient.  So

 8    it's in everybody's interest to get agreement on that if we

 9    can.

10              THE COURT:  Well, and that would be an advantage

11    of having a joint ESI consultant, I suppose.

12              MR. HULSE:  Certainly, if we can reach agreement

13    there.

14              THE COURT:  Mr. Gordon, could we hear from your

15    technology person?

16              MR. GORDON:  Yes, Your Honor, of course.  And I

17    think Mr. Ciresi would like to be heard as well.  Mr. Parekh

18    can address this in more substance, but I would say just in

19    complete agreement and touching on the Court's points very

20    briefly as Mr. Ciresi and Mr. Parekh come up, that is really

21    the heart of the issue is what's been done so far and what

22    needs to be done in hopefully a collaborative way.

23              So if you look, for example, at what they've done

24    so far on the Walton and Johnson production, they candidly

25    told us that a list of key words was used.  And after these

1    key words were applied, key words that we didn't have any

2    input on, predictive coding was done to that.  So the

3    universe as they know it gets culled down even more

4    before --

5              THE COURT:  Yeah, let me hear from Mr. Parekh.

6              MR. GORDON:  And by the way --

7              THE COURT:  Yeah, I know --

8              MR. GORDON:  -- that's not accurate.

9              THE COURT:  I know.  Mr. Parekh?

10             MR. PAREKH:  Good morning.

11             THE COURT:  How's it going on the ESI?

12             MR. PAREKH:  I think we're making a lot of

13   progress compared to where we were a week ago where we were

14   sort of like we're over here and they're over here and never

15   the twain shall meet.

16             We've been trying to explore the possibility of

17   cooperative predictive coding, which in my view is sort of

18   the next step that litigation is going to take.  And we see

19   it a lot in patent cases.  We see it a lot in technology

20   cases out in California.  It's just not something that's

21   really been done in drug liability MDL-type litigation to

22   this point.

23             THE COURT:  Tell me about it.  How does it work?

24             MR. PAREKH:  So what it does is you have two

25   people from plaintiff's side or one person from plaintiff's

1    side and one person from defendant's side, and you do a

2    statistical sampling of the overall universe of documents,

3    about a thousand or so is considered a good statistical

4    sample.  And you both sit down in a room together, and you

5    go through those documents.  And you go relevant, not

6    relevant, relevant, not relevant.  If for some reason you

7    can't come to an agreement, you put those to the side for

8    the moment.

9         You go through this iterative process through that

10   entire set.  Whatever is left that's relevant versus not

11   relevant gets then fed into the computer system, and says,

12   okay, these are the things that we're looking for and these

13   are the things that the computer system should prioritize.

14   Here are the things that we aren't looking for, and these

15   are the ones that they should discard.

16        The computer system then goes through the entire

17   set of documents that's been collected and links them and

18   says these documents are, you know, a hundred percent

19   brilliant matches to the relevant documents.  These are 80

20   percent matches.  These are 60 percent matches, and it ranks

21   those documents in order.

22        You then come up with between the two parties

23   what's called a precision number, which is how narrowly

24   tailored you want those documents to be to your seed set,

25   and then you come up with a checking mechanism, which is you

1    go through and do a statistical sample of the documents that

2    the computer discarded and said they were 50 percent or

3    below, and you see whether or not, you know, in that sample

4    there actually were documents that should have been

5    included.  Hopefully, you're right on the first time, and

6    there aren't any, and you move on and then you just do a

7    production.  If there were some, then you do this iterated

8    process again and run it through again.

9         It usually, it's, you know, usually takes about a

10   week or so before you get a final agreed upon set.  And then

11   you say, okay, produce to us every document that hits an 80

12   percent threshold and above.  That's the way it works.

13        THE COURT:  So you have to agree on the initial

14   universe, right?

15        MR. PAREKH:  Correct.

16        THE COURT:  And how are you doing on that?

17        MR. PAREKH:  Well, right now we're still

18   discussing whether or not we're even going to use this

19   process.

20        THE COURT:  What else would you use?  Just kind of

21   people get together and figure out what the --

22        MR. PAREKH:  The old version is you agree on a set

23   of key words.  You run the key words through an engine and

24   then whatever it spits out, then you do a manual review on

25   those.

1          THE COURT:  So then you do the quality control and

2     you adjust as you go forward?

3          MR. PAREKH:  Right, exactly.  What we've found in,

4     you know, more complicated technology-related litigation is

5     that the predictive coding model provides a much better set

6     of documents for both sides and actually narrows the number

7     of documents that people have to manually review, which is

8     why we think it's a better system, and it allows the sides

9     to work cooperatively in order to get these documents.

10          Especially from the plaintiff's side, a lot of

11     times with key word searching, you don't know what you don't

12     know.  And so the internal name, you know, nickname for a

13     particular item could have been, you know, BH, or in -- I

14     can't remember the litigation.  There's a real estate

15     litigation recently where the securities and questions were

16     called "poopies."  Who would have thought, right?  It's just

17     not something that was considered.  And plaintiffs didn't

18     know and then they ran across one document and went, oh.

19     And then when we did the search on that, we got thousands

20     and thousands of documents that were now relevant to the

21     word "poopies."

22          THE COURT:  Here's what it sounds to me.  And I

23     realize now that I forgot that it was called "predictive

24     coding," but we did get trained on this.  So I learned how

25     to do it, but what it is, and where the pressure points are,

1      et cetera.

2              So it's another way to try to get to the same

3      place as the key word searches, because I don't know in the

4      real estate case whether the word was discovered as part of

5      the predictive coding or quality control and a word search.

6      Either way you get to the same place.

7              So some people, as far as I heard when I was being

8      educated on it, some people think that the predictive coding

9      works better, and it's cheaper because more can be done in

10     an automated way.  And some people point to statistics

11     showing that that's not necessarily true and that the

12     quality of the hand review or the quality of the people

13     either way makes more difference than anything else.

14             So they're all different ways of trying to get at

15     the same thing, but it's not a whole new world.  Predictive

16     coding is not some brand new completely different idea.

17             MAGISTRATE NOEL:  But I think the newness here is

18     their attempt to collaborate and come up with a joint

19     predictive coding process that not just the defendants are

20     using, but that they both agreed here's what we're going to

21     do.  And you all want to be on the cutting edge of

22     litigation science, so go forth.

23             MR. HULSE:  Yes, as they mentioned, 3M used

24     predictive coding for Walton and Johnson because it is

25     working -- it's developing the right key words can be

1    difficult.  The initial key words that the company came up

2    with, which have been shared with plaintiff's counsel, had a

3    50 percent hit rate on the electronic documents and that's

4    just not workable.

5              THE COURT:  It's not good enough.

6              MR. HULSE:  So you got two things you can do is

7    really work hard to develop some key words and search

8    strengths that are more targeted, which can very difficult

9    to do across the V or make use of the predictive coding.

10   What's tended to stop the collaboration is that the other

11   side gets access to a pre-review set.  Okay.  And you make

12   provisions for pulling out privilege documents in advance,

13   but still it's not the same as manually gone through it

14   before.  And so that's really what tends to lead to the

15   concerns and, ultimately, in many cases I think the

16   breakdown of this discussion.  But, you know, we appreciate

17   the sophistication of plaintiffs (inaudible) on this issue.

18   Mr. Parekh, in particular, so we're going to see if we can

19   take a run at this.

20             THE COURT:  So at the point that the pre-review

21   becomes problematic, and, of course, you've got 502, and

22   you've got the changes to the civil rules that are all

23   designed to try to make that not be a stick in the spokes of

24   your process.  It would be helpful possibly to have quick

25   access to the Court during that at that time?

```
 1                  MR. HULSE:  I think that would be the key, if we
 2        go down this path, yes.
 3                  MR. PAREKH:  Absolutely.
 4                  MR. GORDON:  Hundred percent agree.
 5                  THE COURT:  It all sounds very --
 6                  MAGISTRATE NOEL:  Cutting edge.
 7                  THE COURT:  And it all makes sense, doesn't it?
 8                  MAGISTRATE NOEL:  Yes.
 9                  MR. HULSE:  Like I said, we're going to see if we
10        can take a run at it, but it's absolutely possible despite
11        that there is no way that we may not be able to reach it
12        just in the same way.  Many have tried and not managed to
13        reach agreement, but there's always keywords and custodians,
14        if we don't make this approach work.
15                  THE COURT:  Okay.  So they're talking about next
16        week.
17                  MAGISTRATE NOEL:  They're meeting on Wednesday,
18        the fourth.
19                  THE COURT:  All right.  I am coming back from
20        Arkansas on the fourth.  And I get in at 1:30 in the
21        afternoon, so if you needed anything in the afternoon, I'm
22        leaving the conference early.  I'll be here on Thursday the
23        fifth; and Friday the sixth.
24                  MR. HULSE:  I would anticipate probably the
25        following week would be the more likely time for engaging
```

1    the Court on this.

2              THE COURT:  And the reason I'm looking is that I

3    think some of those -- there's really nothing about the

4    bench conference up in wherever it is that would inhibit

5    discussion about this, except actually especially the

6    morning of that Friday will be an active meeting, and I

7    would not be able to do anything that morning because of the

8    bench meeting, but --

9              MS. ZIMMERMAN:  The 13th, Your Honor?

10             THE COURT:  Friday the 13th.  I was trying all

11   kinds of ways not to call it Friday the 13th.

12             MR. PAREKH:  Would Thursday the 12th work?

13             THE COURT:  Thursday is the 12th.

14             MR. PAREKH:  Would that work?  Maybe we can set

15   something up.

16             THE COURT:  If you are going to set something up,

17   why don't you set it up for Wednesday the 11th, and then

18   it's less --

19             MR. PAREKH:  I'm in an all day mediation in San

20   Francisco, and it's just very hard for me to get here from

21   that by Wednesday just because of the way the flights work.

22             THE COURT:  You're talking about you will be here

23   personally.

24             MR. HULSE:  We can do that on the phone I think.

25   I would suggest that we confer and maybe talk to Cathy, and

1     we can circle back quickly.

2          MR. GORDON:  Your Honor, I might interject that as

3     Judge Noel may be aware, I think we're going to have a

4     hearing across the river on the 11th already in another MDL

5     matter I believe that's going to happen, and so it might be

6     better on the 12th, if that works for everyone else.

7          MR. HULSE:  Frankly, I couldn't say yet, Your

8     Honor.  I haven't checked my schedule.

9          THE COURT:  All right.  Well, Judge Noel will be

10    here on the 12th, and I will take some sort of a break and

11    listen in because I think this is a really interesting

12    topic.  I don't want to be left in the dust.  All right.  So

13    seems like a plan.  That's great.

14         MR. PAREKH:  Thank you.

15         MR. HULSE:  Thank you.

16         MR. GORDON:  Thank you, Your Honor.

17         THE COURT:  Okay.  Mr. Ciresi, did you want to

18    talk about ESI or anything?

19         MR. CIRESI:  I think you covered most of it, Your

20    Honor.  I just, a couple of the comments that Your Honor

21    made and that Mr. Hulse made I think sort of point to what

22    the issue is here, and that is he mentioned that there is a

23    production set already produced, but they had to come from

24    some universe of documents.

25              And I think that's the key is what is the universe

1    of documents that has been cataloged by these robust

2    internal resources of 3M?  Because as far as I can tell,

3    based on our work at our firm to this date, they had five

4    people that they identified as custodians.  And Ms. Conlin

5    and I have been through some depositions and documents, and

6    we've already identified 40 potential custodians.

7           So if the parties can arrive at what is this

8    universe that you have, then we can get to where you use

9    these algorithms and predictive abilities to say what within

10   that universe is needed, and I think that's where the

11   discussion should focus.

12          And as far as I can tell, that whole index, which

13   I assume they have because in other cases, and one that

14   really comes to mind to me is we went through nine orders of

15   the Court to get to what even the word "index" was, and

16   we're not going to do that here.  I understand that, Your

17   Honor.  But if we can at the outset find out what that

18   universe is that 3M has, I think that will go a long way to

19   expediting how we apply the ESI protocols and how we get to

20   proportionality.  So that's all I wanted to say.

21          MR. HULSE:  Your Honor, briefly, the number of

22   considerations is simply not --

23          THE COURT:  This is all something that you're

24   going to work on.  The identification of the universe is

25   always the first big step, and you're on it.  There's

```
1    nothing I can do to be of help at this point.  So just step

2    back, right?  Step away.

3              All right.  That's all helpful.  I think we're to

4    the end of what we can accomplish.

5              MR. GORDON:  Nothing further from the plaintiffs,

6    Your Honor.

7              MR. BLACKWELL:  We're good also, Your Honor.

8              THE COURT:  Well, pleasure to see everybody.

9              MR. GORDON:  Thank you, Your Honor.

10             MR. BLACKWELL:  Thank you, Your Honor.

11             THE COURT:  And thanks again for all the

12   submissions of yesterday.  I'll look forward to hearing

13   hopefully from you, Mr. Blackwell, that you don't have any

14   problem with the other.  Otherwise, I'll hear from the two

15   of you about what, if anything, on the complaints.

16             MR. GORDON:  And I do have one last question.  I

17   forgot, Your Honor.  We addressed this, I think, with the

18   Court indirectly by e-mail.  In terms of witnesses for

19   science day, is the Court okay with three?

20             THE COURT:  It's your number of hours.

21             MR. GORDON:  Okay.  We wanted to make sure, Your

22   Honor.

23             THE COURT:  That's it for me.  Anything else from

24   you?

25             MAGISTRATE NOEL:  No, I'm good.
```

```
 1              THE COURT:  All right.  Great.
 2                   (Court adjourned at 11:03 a.m.)
 3
 4                         *      *      *
 5
 6         I, Maria V. Weinbeck, certify that the foregoing is
 7    a correct transcript from the record of proceedings in the
 8    above-entitled matter.
 9                   Certified by:  s/ Maria V. Weinbeck
10                               Maria V. Weinbeck, RMR-FCRR
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```