```
 1                    UNITED STATES DISTRICT COURT

 2                       DISTRICT OF MINNESOTA

 3    ------------------------------------------------------------
                                     )
 4                                   )
       In Re: Bair Hugger Forced Air )   File No. 15-MD-2666
 5     Warming Devices Products      )   (JNE/FLN)
       Liability Litigation          )
 6                                   )   August 18, 2016
                                     )   Minneapolis, Minnesota
 7                                   )   Courtroom 12W
                                     )   2:14 p.m.
 8                                   )
                                     )
 9    ------------------------------------------------------------

10               BEFORE THE HONORABLE JOAN N. ERICKSEN
                  UNITED STATES DISTRICT COURT JUDGE
11
                 And THE HONORABLE FRANKLIN D. NOEL
12                UNITED STATES MAGISTRATE JUDGE

13
                        (STATUS CONFERENCE)
14
      APPEARANCES
15
      FOR THE PLAINTIFFS:        LEVIN PAPANTONIO
16                               Ben W. Gordon, Jr.
                                 316 S. Baylen Street
17                               Suite 600
                                 Pensacola, FL 32502
18
                                 MESHBESHER & SPENCE
19                               Genevieve M. Zimmerman
                                 1616 Park Avenue
20                               Minneapolis, MN  55404

21                               CIRESI CONLIN
                                 Jan Conlin
22                               225 South 6th Street
                                 Suite 4600
23                               Minneapolis, MN

24              (Appearances continued next page)

25
```

```
 1     FOR THE PLAINTIFFS (cont'd):
                                    KENNEDY HODGES, LLP
 2                                  Gabriel Assaad
                                    4409 Montrose Blvd
 3                                  Suite 200
                                    Houston, TX 77006
 4
                                    KIRTLAND AND PACKARD LLP
 5                                  Behram V. Parekh
                                    2041 Rosecreans Avenue
 6                                  Third Floor, Suite 300
                                    El Segundo, CA  90245
 7
                                    PENDLEY BAUDIN & COFFIN LLP
 8                                  Christopher L. Coffin
                                    PO Box 71
 9                                  Plaquemine, LA  70765

10                                  KENNEDY HODGES, LLP
                                    David W. Hodges
11                                  711 W. Alabama Street
                                    Houston, TX 77006
12
                                    BOWERSOX LAW FIRM P.C.
13                                  Jeffrey A. Bowersox
                                    6960 SW Varns Street
14                                  Suite 200
                                    Portland, OR  97223
15
                                    CHILDERS SCHLUETER & SMITH PA
16                                  Richard Schlueter
                                    1932 North Druid Hills Road
17                                  Suite 100
                                    Atlanta, GA  30319
18
                                    FARRAR & BALL, LLP
19                                  Mark Bankston
                                    1010 Lamar, Suite 1600
20                                  Houston, TX  77002

21     FOR THE PLAINTIFFS (APPEARING BY PHONE:)
                                    PRITZKER OLSEN, P.A.
22                                  David Szerlag
                                    45 South 7th Street, #2950
23                                  Minneapolis, MN  55402-1652

24                                  PETERSON & ASSOCIATES, P.C.
                                    Brian Emerson Tadtman
25                                  801 W. 47th Street, Suite 107
                                    Kansas City, MO  64112
```

```
 1      FOR THE PLAINTIFFS (APPEARING BY PHONE):

 2                              ANDREWS & THORNTON
                                Anne Andrews
 3                              John Thornton
                                Lauren Davis
 4                              Lila Razmara
                                2 Corporate Park, Suite 110
 5                              Irvine, CA 92606

 6                              BERNSTEIN LIEBHARD LLP
                                Dae Lee
 7                              10 East 40th Street
                                New York, NY  10016
 8
                                ENGLISH LUCAS PRIEST & OWSLEY
 9                              Jessica R. Surber
                                Bob Young
10                              1101 College Street
                                PO Box 770
11                              Bowling Green, KY 42102

12                              GOZA & HONNOLD, LLC
                                Kaitlyn Spring Neufeld
13                              11181 Overbrook Road, Suite 200
                                Leawood, KS 66211
14
                                GROSSMAN & MOORE, PLLC
15                              Emily A. DeVuono
                                Jennifer Moore
16                              401 W. Main Street
                                Suite 1810
17                              Louisville, KY  40202

18                              HARE WYNN NEWELL & NEWTON
                                Donald P. McKenna, Jr.
19                              Lynne Reed
                                Peggy Little
20                              Massey Building
                                2025 Third Avenue North
21                              Suite 800
                                Birmingham, AL  35203
22
                                ZELE HUBER TRIAL ATTORNEYS, PA
23                              Dean Xenick
                                303 Banyan Blvd
24                              West Palm Beach, FL 33401

25
```

```
 1              FOR THE PLAINTIFFS (APPEARING BY PHONE):

 2                              MCEWEN LAW FIRM, LTD
                                Gregory N. McEwen
 3                              5850 Blackshire Path
                                Inver Grove Heights, MN  55076
 4
                                MORGAN & MORGAN, PA
 5                              Michael S. Goetz
                                Joseph T. Waechter
 6                              201 N. Franklin St 7th Floor
                                Tampa, FL  33602
 7
                                HOLLIS LEGAL SOLUTIONS, PLLC
 8                              Scott Burnham Hollis
                                6814 Crumpler Blvd, Suite 101
 9                              Olive Branch, FMS 38654

10                              NEWMAN BRONSON & WALLIS
                                Lauren Bronson
11                              2300 West Port Plaza Dr.
                                Saint Louis, MO  63146
12
                                PAGLIALUNGA & HARRIS, PS
13                              Charles Paglialunga
                                James Humann
14                              1001 4th Avenue
                                Suite 3200
15                              Seattle, WA  98154

16                              RAIZNER SLANIA, LLP
                                Jeffrey L. Raizner
17                              2402 Dunlavy Street
                                Houston, TX  77006
18
                                RANDALL J. TROST, P.C.
19                              Randall T. Trost
                                Carrie Hancock
20                              Pam Rodriguez
                                801 Main Street, Suite 1001
21                              Lynchburg, VA  24504-1520

22                              RICHARDSON PATRICK WESTBROOK &
                                BRICKMAN LLC
23                              Dan Haltiwanger
                                1730 Jackson Street
24                              PO Box 1368
                                Barnwell, SC  29812
25
```

```
 1      FOR THE PLAINTIFFS:          APPEARING BY PHONE:

 2                                   SKIKOS CRAWFORD SKIKOS&
                                         JOSEPH, LLP
 3                                   Melissa Erin Mielke
                                     One Sansome Street
 4                                   Suite 2830
                                     San Francisco, CA  94104
 5
                                     THE OLINDE FIRM, LLC
 6                                   Alfred Olinde, Jr.
                                     400 Poydras Street
 7                                   Suite 1980
                                     New Orleans, LA  70130
 8
                                     THE RUTH TEAM
 9                                   Austin Grinder
                                     Steven C. Ruth
10                                   842 Ramond Avenue
                                     Suite 200
11                                   Saint Paul, MN  33733-5157

12                                   THE WHITEHEAD LAW FIRM
                                     Anna Katherine Higgins
13                                   3639 Ambassador Caffery
                                     Suite 303
14                                   Lafayette, LA  70503

15                                   ZIMMERMAN REED, PLLP
                                     Jacqueline A. Olson
16                                   1100 IDS Center
                                     80 South Eighth Street
17                                   Minneapolis, MN  55402

18                                   LOCKRIDGE GRINDAL NAUEN PLLP
                                     Yvonne M. Flaherty
19                                   100 Washington Avenue South
                                     Suite 2200
20                                   Minneapolis, MN  55401-2179

21                                   RILEY JACKSON, PC
                                     Jeremiah M. Mosley
22                                   3530 Independence Drive
                                     Birmingham, AL 35209
23
                                     TATE LAW GROUP, LLC
24                                   Mark Tate
                                     2 East Bryan Street, Suite 600
25                                   Savannah, GA  31328
```

```
 1     FOR THE PLAINTIFFS          APPEARING BY PHONE:

 2                                 PITTMAN DUTTON & HELLUMS
                                   Jonathan S. Mann
 3                                 2001 Park Pl #1100
                                   Birmingham, AL  35203
 4
                                   LAW OFFICES OF JAMES S. ROGERS
 5                                 James Rogers
                                   Annaliese Abbey
 6                                 Elizabeth J. McLafferty
                                   1500 4th Avenue #500
 7                                 Seattle, WA  98101

 8                                 LAW OFFICES OF BRIAN TIMOTHY
                                   MEYERS
 9                                 Laura Young
                                   1125 Grand Boulevard, Suite 1610
10                                 Kansas City, MO  64106

11                                 MURRAY LAW FIRM
                                   Caroline Whitney Thomas
12                                 650 Poydras Street
                                   Suite 2150
13                                 New Orleans, LA  70130

14                                 BROWN & CROUPPEN, PC
                                   Abby Cordray
15                                 211 North Broadway, Suite 1600
                                   St. Louis, MO  63102
16
                                   HAUSFELD LLP
17                                 Angel Dorsey
                                   1700 K St. NW, Suite 650
18                                 Washington, DC 20006

19                                 HURLEY MCKENNA & MERTZ
                                   Brian Holmes
20                                 Michael Mertz
                                   Molly Condon
21                                 33 North Dearborn Street
                                   Suite 1430
22                                 Chicago, IL  60602

23                                 JOHNSON BECKER, PLLC
                                   Rolf T. Fiebiger
24                                 33 South 6th Street
                                   Suite 4530
25                                 Minneapolis, MN  55402
```

```
 1      FOR THE PLAINTIFFS          APPEARING BY PHONE:

 2                                  KP LAW
                                    Rajesh Kanuru
 3                                  105 W. Adams
                                    Suite 2325
 4                                  Chicago, IL  60602

 5                                  LEWIS & CAPLAN
                                    Pete Lewis
 6                                  Sarah Delahoussaye Call
                                    3631 Canal Street
 7                                  New Or

 8
        FOR THE DEFENDANTS:         BLACKWELL BURKE P.A.
 9                                  Jerry W. Blackwell
                                    Mary S. Young
10                                  Ben Hulse
                                    431 South Seventh Street
11                                  Suite 2500
                                    Minneapolis, MN  55415
12

13                                  FAEGRE BAKER DANIELS
                                    Bridget M. Ahmann
14                                  90 South Seventh Street
                                    Suite 2200
15                                  Minneapolis, MN  55402

16
        Court Reporter:            MARIA V. WEINBECK, RMR-FCRR
17                                  1005 U.S. Courthouse
                                    300 South Fourth Street
18                                  Minneapolis, Minnesota 55415

19
                 Proceedings recorded by mechanical stenography;
20      transcript produced by computer.

21

22              *       *       *       *       *       *       *

23

24

25
```

```
 1                    P R O C E E D I N G S

 2                        (2:14 p.m.)

 3              THE COURT:  Good afternoon, everybody.  Please be

 4     seated.  We were back in chambers and nobody showed asking

 5     -- please be seated -- nobody came back saying they needed

 6     an advance meeting, so here we are and welcome very much.

 7              We have a number of people on the telephone.

 8     Telephone people, would one person at least just say

 9     something so we know you're there?

10              MR. GORDON:  We heard them a minute ago.

11              UNIDENTIFIED SPEAKER ON TELEPHONE:  We're here.

12              THE COURT:  All right.  Thank you.  You've given

13     your appearances to the court reporter, so I don't think we

14     need to spend our time on that, do you, Judge Noel?

15              MAGISTRATE JUDGE NOEL:  No.

16              THE COURT:  All right.  Does anyone have a thought

17     other than that we move through the joint agenda?

18              MR. GORDON:  Your Honor, I might just briefly, Ben

19     Gordon for the record, address the point you made as you

20     came in about chambers.  We were delighted, would have been

21     delighted to have come to chambers and thought it might be

22     useful.  We showed up early, but the door was locked, so we

23     didn't want to intrude.  We didn't know what the protocol

24     might be, so for future reference, if the Court --

25              THE COURT:  -- would unlock the door, it would be
```

1    easier to get in?

2              Well, it's a good thing you came all the way up

3    here to tell us that.  I did not realize that the door was

4    locked.  I'm sorry.

5              MR. GORDON:  No, I just if you want us here

6    earlier, we will be here earlier, Your Honor.

7              MR. BLACKWELL:  And good afternoon, Your Honors.

8              THE COURT:  Good afternoon.

9              MR. BLACKWELL:  And what we have to say in that

10   regard, Jerry Blackwell for the record for 3M, is plaintiffs

11   had come here early.  We didn't know what exactly they might

12   want to take up early, so if we're going to come early to

13   have an early discussion with the Court, then it will be

14   helpful to know what we're going to discuss with the Court,

15   so that we know what we're coming early for.

16             THE COURT:  Okay.  Well, we're here now, and if it

17   turns out that we would like to have a discussion in

18   chambers, we can do that, but then everybody will have a

19   chance to know what we're doing.  And I will get a little

20   out of order here with the pretrial.

21             You know, before we get to agenda item number 1,

22   while it's on my mind, we had a discovery conference, and at

23   that time, I understand that a number of counsel who were

24   not directly involved in the discovery dispute were

25   uncertain about whether they were supposed to be available

1    for that conference.  And I anticipate that we will have

2    conferences like that in the future, and it was our thought

3    that we didn't need all 50 or 60 lawyers on the phone for

4    that.  That it would be only the counsel from each side who

5    were actually working on the discovery issue that would be

6    discussed.  And so I know that's out of order, but I did not

7    want to forget to mention that so that everybody knows

8    what's going on.

9              MR. GORDON:  Understood, Your Honor.  Thank you.

10             MR. BLACKWELL:  Thank you, Judge.

11             MAGISTRATE JUDGE NOEL:  I would just add to that,

12   certainly you're welcome to have whoever -- both sides are

13   welcome to have whoever they think they need at such a

14   conference, but I don't think it's one of those things like

15   this conference where people can call in and participate by

16   phone and listen and do whatever.  It would just be the

17   folks who are directly engaged in the discovery dispute that

18   we're trying to resolve.

19             MR. GORDON:  That's good with us, Your Honor.

20             THE COURT:  I don't know how much of a problem it

21   was last time.  I think my chambers, maybe Judge Noel's

22   chambers got at least a few phone calls from people saying

23   are we supposed to be there?  Are we supposed to be on, et

24   cetera, so that is that.

25             Well, to get right to it, there are requests to

1    modify the pretrial order, which, of course, sets our dates.

2    Judge Noel, do you think we ought to hear from them or tell

3    them what our inclination is?

4             MAGISTRATE JUDGE NOEL:  No, let's hear, I would

5    suggest we hear from them if whatever both sides wish to add

6    to what is set forth in the agenda regarding their

7    respective positions and why we should adopt one position

8    over the other and then we can question them and then figure

9    out what to do.

10            THE COURT:  Okay.

11            MR. GORDON:  Do you want us to jointly approach

12   Your Honor or how do you want it?

13            THE COURT:  One at a time.

14            MAGISTRATE JUDGE NOEL:  One at a time.  Let's

15   start with the plaintiffs.  Mr. Gordon, are you the

16   spokesman on this issue?

17            MR. GORDON:  I will be initially, although others

18   may wish to weigh in if it pleases the Court, Your Honor.

19            MAGISTRATE JUDGE NOEL:  Okay.

20            MR. GORDON:  I would say that because of the

21   enormous discovery burden, particularly for the defendants

22   and the amount of discovery that remains to be done, the

23   dates for some of the items as we've outlined in our

24   respective papers probably need to slide with the Court's

25   blessing.  We don't think the trial date, in a nutshell, we

1    think there's plenty of time to do the discovery still in

2    keeping with the Court's ultimate order for the trial date

3    at the end of next year.

4         But there are a number of things because of

5    written discovery and ESI discovery that have not been

6    completed yet that we had hoped would be finished by the end

7    of July that necessarily require some of the discovery dates

8    to move forward in about three to four months we think.

9         We've laid that out in our proposed Exhibit B.  I

10   think the defendants agree with some of that.  Some of the

11   dates may be a little bit different, but we jointly we're

12   requesting for the Court to extend some of those discovery

13   deadlines so that we can get those items outlined by the

14   Court finished within a reasonable time span, and we think

15   given that the Court set the trial at the end of next year,

16   that still leaves us plenty of time to live up to those

17   dates for trial and expert disclosures and so forth.

18        And I would say, Your Honor, our thinking we've

19   done some, you know, had some meetings on this is that the

20   trial in this case probably based on the experts that we

21   have and the discovery we've seen can probably be done in

22   two to three weeks.  We think a trial will be, you know, we

23   haven't talked to the defendant about this, but that's our

24   view that we could have it inside of three weeks.

25        And I think Mr. Ciresi and Ms. Conlin in

1    particular may have some comments in the way that can be

2    managed in terms of past trials in this district with Your

3    Honor's obvious decision on that.  But given that and given

4    the fact that the Court has set that time aside already, we

5    would like to not lose the trial date at the end of next

6    year.

7              MAGISTRATE JUDGE NOEL:  So one of the things that

8    the defendants have requested in their proposed schedule, as

9    I understand it, is a separate period of time to do

10   bellwether specific experts, do the plaintiffs have a

11   position on whether, first, if there need to be bellwether

12   specific experts?  And if so, what dates should be included?

13             MR. GORDON:  Your Honor, I might ask Ms. Zimmerman

14   if she wants to address that specifically.  I would say

15   generally we've laid out the times in our papers, and I

16   don't believe that we've laid out specific different times

17   for -- in fact, I think we've stuck to the times for the

18   bellwether process essentially that the Court has enunciated

19   already other than maybe a slight delay in December for the

20   selection of the bellwether cases.  But, Ms. Zimmerman,

21   would you like to address that?

22             THE COURT:  Well, right, the defendants have got

23   basically another year in there.  And our question is what's

24   the plaintiff's view on whether there will be a need for

25   expert witnesses specifically related to the bellwether

 1    cases?

 2              MS. ZIMMERMAN:  Thank you, Your Honor.  I think

 3    that the plaintiffs intended to modify the scheduling order

 4    that the Court entered to begin with, and we don't envision

 5    a requirement that we build in a separate track for expert

 6    discovery specific to individual plaintiffs.

 7              Now, certainly, we envision that there will be

 8    discovery from treating physicians and other folks who took

 9    care of the individual plaintiff in particular, but we would

10    expect that, for example, the infectious disease expert that

11    we bring in is going to be the same in the general causation

12    phase as would be, you know, for any particular plaintiff

13    that comes to trial.

14              THE COURT:  Okay.

15              MS. ZIMMERMAN:  You know, there are a few

16    additional issues that the defendants have requested to

17    build in that, you know, I think we make clear or I hope

18    that we make clear we oppose.

19              So, for example, with respect to both the proposed

20    expert discovery in general causation and for the bellwether

21    causation, the defendants have requested or added in a

22    subpart B wherein there would be depositions of experts

23    prior to rebuttal reports and then additional depositions.

24    We oppose that.  We think that there should be one round of

25    reports, one round of rebuttal reports, and then there

1   should be depositions, but there shouldn't be depositions in

2   the interim.

3          And as Mr. Gordon indicated, we do believe that

4   while the discovery, despite the best efforts of the

5   defendants, has taken a little bit longer than anyone had

6   potentially hoped, that we have waited a little bit to

7   notice our depositions going forward, but we have now

8   started to notice depositions.  And it is our expectation

9   that we will conduct those depositions, and if discovery

10  hasn't been completed, we'll leave them open such that we

11  can re-depose witnesses if there is additional documents

12  produced down the road.

13         So we certainly believe that we're in a position

14  to continue to adhere to the trial date and the deadline set

15  forth by the Court.

16         MAGISTRATE JUDGE NOEL:  So I don't want to get out

17  of order or jump ahead, but there is this lengthy list that

18  plaintiffs have prepared of discovery disputes.  Is there a

19  general dispute about the defendant's discovery production

20  or is everybody satisfied they're doing the best they can

21  under the circumstances?  And it's just more of it than had

22  been alotted for timewise?

23         MS. ZIMMERMAN:  Your Honor, I think that there is

24  a broad dispute or concern on behalf of the plaintiffs with

25  respect to the identified custodians.

1          And by way of brief background, I think in the

2     initial disclosures, defendants identified five potential

3     custodians.  After review of the documents produced in the

4     Walton and Johnson matters, which the Court may remember

5     were the previous cases we identified 39 potential

6     custodians.  That was reduced to I think 37.  And from our

7     list of 39, the defendants have identified 24 potential

8     custodians for whom they would have electronic documents.

9          We have noticed a 30(b)(6) deposition to

10    understand why is there a disparity in these numbers and

11    what happened to the documents, if anything, between the 24

12    that they agree are custodians that they need to produce and

13    the 39 we had identified.  As of this morning, there are now

14    55 custodians, I think, on Mr. Hulse's e-mail.  We had added

15    three additional folks yesterday.

16         So there's a concern just to make sure we're

17    capturing all of the relevant discovery, and we have an

18    opportunity to get through that discovery in advance of the

19    deadline set forth by the Court.

20         So that, I think, is broadly speaking if you look

21    at the chart that we've prepared, that is a frequent in

22    almost every single chart entry, it really has to do with

23    the custodians identified by defendants.  It's plaintiff's

24    position that we serve discovery, and they have the

25    obligation to figure out which custodians may have documents

```
1    responsive to the discovery we propounded, and that it is

2    not the plaintiff's burden to identify these are the 24 or

3    39 or however many that you should be looking for.  We think

4    they need to look for anybody that's responsive.  And I

5    think that that is one dispute in a very general way that

6    addresses a lot of the issues in the chart.  There are also

7    some additional discreet issues, but I think that that's the

8    broadest issue at this point.

9              MAGISTRATE JUDGE NOEL:  Thank you.

10             THE COURT:  Mr. Blackwell, did you want to talk

11   about the schedule?

12             MR. BLACKWELL:  Thank you, Your Honor.

13             And pardon if I'm a little bit discursive in

14   addressing the various issues that were just discussed with

15   the Court, but since Your Honor Judge Noel was on the

16   discovery question just as counsel sat down, I did want to

17   make sure the Court was aware that as of April of this year,

18   we got served seven requests for production of documents

19   that spans some 250 different categories, not just general

20   causation.  It was fairly expansive.

21             And we've responded now with nine different

22   productions I think to date; 65,000 different documents, and

23   close to a million pages in terms of what we've produced to

24   the plaintiffs spanning some 25 years even.  And so at this

25   point, all of the documents, you know, plus or minus some
```

1      stragglers that relate to general causation, not necessarily

2      all of the e-mails, but all of the documents, the R&D, the

3      testing, et cetera, we've produced.  We've done that.

4              We are having an ongoing discussion with

5      plaintiffs as to discovery because to date we've gotten a

6      thousand pages worth of discovery in response to our request

7      to plaintiffs, so we have a lot to talk about there.  And we

8      are very concerned, as I raised with Your Honors at the

9      start of this case, that this is a science case.

10             They have made the claim to have a product that

11     causes surgical site infections, and we wanted to know what

12     the basis is for making that claim day one, there is

13     supposed to have been a good faith basis based upon a

14     reasonable investigation.  And we're going to try and work

15     it out with them, but also all of our responses are to the

16     effect of we're going to tell you the basis for having made

17     these assertions when you get our expert reports somewhere

18     down the road whenever that is.

19             So being able to prepare a defense based upon what

20     the basis is for the plaintiffs' claims, they believe we're

21     supposed to wait until we get expert reports, which we think

22     is improper, and the number of very discreet things we've

23     asked about and asked them for that they basically just

24     pushed off as premature.

25             So we're going to continue on meet and confer, but

1    we may well be back in front of Your Honors because I think

2    it's fair to say at this point to use the phrase the

3    plaintiffs used at the first hearing, their response has

4    been somewhat anemic at this point, and we're not satisfied

5    with it.

6              As to the discovery schedule itself, we do agree

7    that the issue of the predictive coating itself is going to

8    take more time than anybody anticipated.  That alone will

9    take, we think, probably an additional 90 or so days, and

10   pushing the schedule back out in respect of that, we think,

11   frankly, is largely unavoidable.  I think everybody has been

12   working fairly hard at that.

13             MAGISTRATE JUDGE NOEL:  What is the status of the

14   predictive coating?  Right now, as I understand it, after

15   our last discovery conference that Judge Ericksen was

16   referring to, I understand the parties reached an agreement

17   on how that's going to play out.  Where in that process are

18   we?

19             MR. BLACKWELL:  Right.  If I may, Judge, ask if

20   Mr. Hulse wants to speak to that, he can walk up here or

21   Behram, also I think probably knows.

22             MR. HULSE:  Thank you, Your Honors.

23             So, yes, we did reach agreement on this process,

24   and the process called for both parties to contribute to the

25   set of training documents; in addition, for the defendants

1    to do a random set review of documents just from our pool of

2    over a million e-mails in order to develop an adequate set

3    of relevant and nonrelevant documents for training.  We are

4    just about done with that.

5           And what that means is then a log, the documents

6    deemed relevant for the training set plus a log of the

7    nonrelevant documents are going to go to the plaintiffs

8    within a few days.  There's been a two-week period for them

9    to evaluate it, for the parties to meet and confer, and if

10   they have any disputes to potentially address them to the

11   Court.

12          Once we're in agreement on that, then we go

13   through the various iterations of actually applying the

14   predictive coating to the pool of documents until we get to

15   the point where we're hitting the appropriate rate, the

16   accuracy rate, basically.

17          MAGISTRATE JUDGE NOEL:  Okay.

18          MR. HULSE:  And that could, we could be done with

19   that in a month if all works well or it could take two

20   months easily to do.  And it depends just about how quickly

21   the parties can reach agreement on essentially what's

22   relevant and nonrelevant.

23          THE COURT:  But you've started, and so far you

24   haven't hit a bump in the road in terms of, gee, this isn't

25   going the way you thought it would be, at least at this

1    stage.

2              MR. HULSE:  Right.  It is, you know, it did, I

3    think we had different expectations about just if you take

4    this random set and review how many relevant documents

5    you're going to get, we found a relatively low number.  So I

6    think where we might hit -- well, I'm optimistic about this

7    still where we might hit our first disputes is when the

8    plaintiffs see the sets, the training set that we propose to

9    use, and whether we have different views at the end of the

10   day about what is in the scope of relevance and what's not.

11             MAGISTRATE JUDGE NOEL:  Okay, thank you.

12             MR. HULSE:  Thank you, Your Honors.

13             THE COURT:  That's always the case, I think, so.

14             MR. BLACKWELL:  And, Your Honors, with respect to

15   the rest of the schedule, especially as it relates to case

16   specific experts, I mean there is an over-arching general

17   causation question in the case which Your Honors heard a

18   great deal about on science day, both as to whether or not

19   the science supports the Bair Hugger as a cause of surgical

20   site infections generally, and then whether there's a

21   reasonable scientific methodology for ruling out other known

22   causes of surgical site infections generally.

23             If that question is resolved in plaintiff's favor,

24   there still remains the question of how it is plaintiffs

25   establish that in this specific case that the Bair Hugger

 1   was the cause, which is a different form of expert

 2   testimony, and whether that's going to be reasonably

 3   reliable, and who says so?

 4          And the fact that they have for sake of argument

 5   established that generally it can cause and generally

 6   there's a methodology for ruling out other causes, does not

 7   mean that there was reliable expert testimony for assessing

 8   that it was done in this case.  And that is the question

 9   with respect to any expert testimony at a bellwether trial,

10   which can't be glossed over and would not be satisfied just

11   by putting on general causation experts.  And we're entitled

12   to know what those opinions are with respect to a specific

13   cause, to understand the basis for those opinions, to

14   examine them and ferret them and even challenge them on

15   Daubert grounds and even summary judgment to the extent

16   there's a specific case there's not a reliable basis for

17   having determined in the instance of this specific plaintiff

18   that the cause was the Bair Hugger.  Even if there is a

19   general scientific causation finding that has not yet been

20   translated to a specific case.  And so for that reason we

21   built into the schedule the need to be able to address the

22   question of specific cause, which is different from general

23   causes, as Your Honor well knows.

24          MAGISTRATE JUDGE NOEL:  Do you envision those

25   being different experts?  Or the same expert saying, "Okay,

1    now that I've testified to X, Y, and Z, looking at Ms. Jones

2    records, here's what I think."

3          MR. BLACKWELL:  It may be.  I mean that would be

4    for the plaintiffs to determine in their specific case,

5    whether they are going to try and rely on treaters in a

6    given case or if the treater cannot connect all the dots,

7    whether there's some combination of treater or some general

8    experts that they may happen to use.

9          MAGISTRATE JUDGE NOEL:  In any event, your vision

10   of this bellwether specific expert is still experts focused

11   on the issue of causation from the plaintiff's side as

12   opposed to experts that you might want to call to say, oh,

13   gee, I think in Ms. Jones case we can show that the

14   infection came from X, Y or Z.

15         MR. BLACKWELL:  Your Honor, it may be obviously a

16   combination of both of those because we would certainly

17   reserve the right to put on whatever the proper expert

18   testimony that disproves the plaintiffs' experts' testimony

19   on specific causation, and whether that's the same experts

20   or different ones may to some extent depend on how the

21   discovery and testimony unfolds in the discovery period.

22         MAGISTRATE JUDGE NOEL:  Thank you.

23         MR. BLACKWELL:  And so, Your Honor, we built in

24   some other features into the schedule such as the experts

25   for selected bellwether cases based upon the Court's

1   invitation that once we lived with the PTO4 for a while,

2   maybe there could be tweakings kind of here or there and

3   this is one of them.

4        We also, if Your Honors will see in paragraph

5   number 18, tried to build in some date for fact discovery on

6   bellwether, on issues that don't relate to bellwether

7   specific issues and also don't relate to general causation,

8   if you look at number 18 inartfully described just now.  But

9   and so this may relate to things such as marketing, you

10  know, more general advertising and that sort of thing that

11  aren't related to general causation, aren't related to the

12  question of whether the Bair Hugger can generally cause

13  surgical site infections, but may be related to other issues

14  in the case that are not specific to bellwether issues and

15  not specific to general causation.

16       THE COURT:  So is this, I have my own summary

17  here, so is this the date that you have after the bellwether

18  cases are selected?  So you're suggesting August 4th of 2017

19  to select the bellwether cases?

20       MR. BLACKWELL:  Yes, Your Honor.

21       THE COURT:  And then January 2 of 2018, to start

22  bellwether specific fact discovery is that what you're

23  talking about now?

24       MR. BLACKWELL:  Your Honor, this is actually for

25  discovery that does not pertain specifically to the

1    bellwether cases.  It's general discovery but not related to

2    general causation.  And presuming there are other issues in

3    the case that aren't general causation issues, and what we

4    had envisioned, Judge Ericksen, was a period of time, a

5    window, where the parties would essentially brief and have

6    argument and presentations on the over-arching question of

7    general causation.  And if that is answered affirmatively

8    for the plaintiffs, then to us it makes then sense to delve

9    head long into case specific discovery bellwether issues.

10           And so we have tried to build into this both some

11   opportunity for the plaintiffs to undertake discovery not

12   related to general causation, but related to perhaps an

13   overarching general case since at this stage we're focused

14   on general causation.  And there may be issues that the

15   plaintiffs want additional discovery on that aren't general

16   causation issues but may be liability kinds of issues apart

17   from causation.

18           And so we tried to build this in here, but we did

19   try to build into the schedule, Your Honors, some period of

20   time after the Daubert arguments and summary judgment

21   arguments pertaining to Daubert for the Court to consider

22   those arguments and to make a ruling on it before we jump

23   head long into the case specific bellwether discovery since

24   that may be mooted should the Court find that the plaintiffs

25   haven't met the general causation threshold.

 1          And so that was part of the reasoning that went

 2   into the dates that we selected here too was that it's from

 3   an efficiency point of view just makes more sense given what

 4   Your Honors have heard already about the over-arching

 5   science issues in the case, to have a question answered as

 6   to whether or not the initial threshold is met with respect

 7   to scientific general causation before we go head on into

 8   preparing for trial, the more specific causation issues are

 9   going to be addressed.  So, if --

10          THE COURT:  So that must be in here.

11          (Off the record discussion between Magistrate

12   Judge Noel and Judge Ericksen.)

13                      IN OPEN COURT

14          THE COURT:  What discovery, non-bellwether

15   specific fact discovery would be undertaken after the

16   dispositive motion date?

17          MR. BLACKWELL:  Your Honor, an example of such

18   discovery might be depositions they want to take of

19   marketing people that want to ask them about things

20   unrelated to general scientific causation that would not

21   need to be done before that penultimate question gets

22   answered would be one type of discovery they may want to do.

23          So we were simply presuming that with the

24   streamline case schedule we have at this point and

25   addressing issues of general causation, that there will be

1   other issues in the case that go to more kinds of general

2   liability questions that may be broader.

3           We have not been very restrictive in kind of how

4   we're going about our document productions and things, but

5   nonetheless there is a threshold question in the case that

6   we are trying to make sure that we produce to the plaintiffs

7   the types of information that would serve as expert reliance

8   materials that they have experts who are going to give

9   opinions about general causation.  And so to the extent that

10  comes from 3M, we're trying to make sure they have that, and

11  that's what's in the 65,000 documents and close to a million

12  pages.

13          MAGISTRATE JUDGE NOEL:  But are there document

14  requests that you are responding to limited to general

15  causation or are they already now addressing some of these

16  broader things like marketing or other non-general causation

17  but not case specific?

18          MR. BLACKWELL:  You know, probably, Judge Noel,

19  and Mr. Hulse maybe can speak to this more directly, but I

20  would answer that probably obliquely.  I mean we have really

21  focused on producing to plaintiffs --

22          MAGISTRATE JUDGE NOEL:  That's scary.

23          THE COURT:  Yeah, we'll hear from Mr. Hulse then.

24          MR. BLACKWELL:  Very well, Your Honor.

25          THE COURT:  I was under the impression that there

1    some time ago had been discussion about whether you were

2    going to turn over marketing materials and that sort of

3    thing and that you had been, so that's why I guess I thought

4    that the discovery was proceeding apace on that as well.

5              MR. HULSE:  Absolutely, and it is, Your Honor.  We

6    haven't restricted or said we are only producing on general

7    causation.

8              THE COURT:  And they're asking.

9              MR. HULSE:  That's right.  You know, we think that

10   half of the discovery they've served as you can't connect it

11   up to general causation anyway.  What we've told the

12   plaintiffs, and I think I said to the Court last time, is

13   we've prioritized, however, in the review and the production

14   of the documents that we think everybody can agree are the

15   most germane to general causation, and that is the

16   regulatory documents, the testing documents, the R&D, but at

17   the same token, we've produced thousands and thousands of

18   marketing documents too.

19             THE COURT:  Well, and you're producing e-mails.

20             MR. HULSE:  Yes, absolutely.

21             THE COURT:  You don't have all of those done yet

22   but you're on the --

23             MR. HULSE:  No, exactly, so the 24 custodians who

24   are subject to the predictive coating, many of them are

25   marketing people, but I think -- so while document

 1    production goes apace, we also have a lot of depositions to

 2    do on the topic of general causation, and the thought is

 3    that the parties shouldn't have to also get done all these

 4    depositions, which I expect that they want to do, of

 5    marketing people who are not going to be the people who are

 6    giving the testimony that their experts are then going to

 7    rely on in terms of whether the Bair Hugger was capable of

 8    causing a surgical site infection.  Those may be appropriate

 9    to be deferred rather than jammed in, and those are outside

10    the scope of general causation.

11         But, yeah, to be absolutely definitive, we have

12    not restricted our production.  We are not restricting our

13    production to exclude marketing or any other type of

14    documents responsive to their request.

15         MAGISTRATE JUDGE NOEL:  Okay.

16         MR. BLACKWELL:  So, Your Honors, that's it on the

17    schedule.  I do have a request I would make with respect to

18    the 45-page or so chart on discovery issues that I could

19    wait until --

20         MAGISTRATE JUDGE NOEL:  I think we're coming back

21    to that.  That's a different line item on our agenda.

22         THE COURT:  Forty-five pages of documents

23    deserves, we thought, its own line item.

24         MR. BLACKWELL:  Right.  And, Your Honor, once you

25    hear about it, I think it does not.  So I'll sit down.  I'll

1      explain why, I should say.  Thank you, Your Honor.

2             MS. ZIMMERMAN:  Your Honor, may I address the

3      Courts just briefly on one piece, the scheduling piece?

4      With the Courts' pleasure, so I think that it's not a secret

5      to the Court that we have a disagreement about the

6      definition of general causation, but because the defendants

7      have represented multiple times to the Court that there are

8      no documents being withheld based on that definition and

9      because we still expect all of the documents are going to be

10     produced by the end of September or October, we do believe

11     that we'll be in a position to conduct discovery and

12     complete it.

13            I do want to address though the issue of marketing

14     specific as an example of how our general causation

15     definition differs, so we certainly think that marketing is

16     going to be relevant because included within marketing, as I

17     understand it, 3M includes post-market surveillance

18     information.  They believe that reports that their folks

19     received from the field fits into the category of marketing.

20     Our experts certainly think that that is going be very

21     relevant information and potentially should maybe be

22     classified as regulatory, but we certainly think that even

23     under the defendant's understanding of a general causation

24     definition, that those are key and important subjects and

25     documents that we'll have, so.

 1          MAGISTRATE JUDGE NOEL:  Just to be sure I'm clear

 2     though then in terms of the defendant's request that the

 3     schedule include a time for fact discovery on non-bellwether

 4     case specific issues and other than general causation, there

 5     doesn't need to be such a period, is that your position?

 6          MS. ZIMMERMAN:  That is our position, Your Honor.

 7          MAGISTRATE JUDGE NOEL:  Okay.  Thank you.

 8          MS. ZIMMERMAN:  Thank you.

 9          THE COURT:  Mr. Blackwell, did you want to say

10     anything about the request that you have on depositions of

11     experts, pre-expert disclosures that Ms. Zimmerman touched

12     on?  You're asking for -- or Mr. Hulse -- let's see, you've

13     got a deadline for deposing initial experts of May, initial

14     expert reports March, rebuttal experts June.  I guess I

15     don't know what she was referring to, do you?  And if so, do

16     you have a response?

17          MR. HULSE:  I can speak to the two of them.

18          MAGISTRATE JUDGE NOEL:  Let me tell you what I

19     understand, if it helps.  So what I understood her to say is

20     that your schedule suggests that after the initial expert

21     reports are disclosed, there would be a period of

22     depositions for those experts before any rebuttal reports

23     get served.

24          MR. HULSE:  That's exactly right.  The idea is --

25          MAGISTRATE JUDGE NOEL:  And that's what's they are

1    opposing and that's what you want, and I guess our question

2    is explain that.

3            MR. HULSE:  So, you know, our experience certainly

4    in this court is that typically the party with the burden of

5    proof has to go first on expert disclosures, and we think

6    that would certainly make sense here.  And the issues that

7    matter the most, the plaintiff has got the burden of proof,

8    and then we should have an opportunity to examine their

9    expert witnesses on their opinions so that our rebuttal

10   experts can address that full understanding of their

11   opinions.  And that seems to me, to us to be a pretty

12   typical sequence for staging it.  And then, of course, we

13   disclose our experts in response, and they have an

14   opportunity to depose them too.  So that's exactly what

15   we're getting at, Your Honor.

16           THE COURT:  Okay, I understand.

17           THE COURT:  We'll move on to the next plaintiff's

18   fact sheets.

19           MR. GORDON:  Your Honor, if I may, do you want me

20   to address that?

21           THE COURT:  Yep.

22           MAGISTRATE JUDGE NOEL:  You have to be at the

23   microphone before you speak out loud or the people on the

24   phones won't hear you.

25           MR. GORDON:  Thank you, Your Honor.  Ben Gordon

1     for the plaintiffs.

2          I had the opportunity a few minutes before we

3     started, along with Mr. Parekh to speak with Ms. Ahmann, and

4     we asked them if they would be willing to agree to give us,

5     the plaintiffs, an extra week with the Court's permission.

6     We're supposed to produce the PFS tomorrow.  We've been

7     through this, and we've had meet and confers, and we've gone

8     back and forth.  And our view is that a more simplified,

9     streamlined PFS preliminarily initially to give them

10    everything they need, along with all of the medical

11    authorizations they need to gather their independent

12    information would make everything go faster and be better

13    for both parties.

14         Your Honor, Judge Noel may recall during Stryker

15    MDL, we had an issue with the breadth and the complexity of

16    the PFS, and our goal is generally to resolve that ahead of

17    time.  And so what I propose to Ms. Ahmann is an extra week

18    for us to propose that to them and see if we can work it

19    out, and we'll give that to them, our proposal, by tomorrow.

20    And if we can't work it out, then I would propose to the

21    Court that a week from tomorrow we submit our opposing

22    views.

23         MAGISTRATE JUDGE NOEL:  And what did she say?

24         MS. AHMANN:  I have to say yes, I did say I was

25    agreeable, but I didn't know that all of the colloquy in the

1     background would go with it.  We gave them, the plaintiff,

2     our proposed plaintiff fact sheet about ten days ago.  And

3     our meet and confer consisted of one e-mail saying we'll get

4     back to you, and then this morning saying, you know, we're

5     looking at this and this and this.

6                 So we will continue to confer with them.  We

7     haven't so far, and we certainly will get something to the

8     Court.  And it may well be this is what we propose, and this

9     is what they propose.  But we will work on it, and we'll get

10    it to that point.

11                THE COURT:  And you're okay with them having an

12    extra week?

13                MS. AHMANN:  As long as we get to meet and confer,

14    and I get it before Friday afternoon, I would appreciate

15    that.

16                MR. GORDON:  We would have them something early

17    tomorrow.

18                MS. AHMANN:  Yes, they did say they would give me

19    something tomorrow or early next week, so we're good.

20                MR. GORDON:  Thank you, Your Honor.

21                MAGISTRATE JUDGE NOEL:  Thank you.

22                THE COURT:  Now, the foreign discovery, I've

23    signed some documents indicating my profound respect for

24    various foreign countries.

25                MS. AHMANN:  And I have to lead it off by saying I

1    apologize if you got confused.  We had to file something

2    again yesterday because one of the people that we thought

3    that was going to appear voluntarily has decided not to.  So

4    we did file some materials yesterday and sent another

5    proposed order to the Court relative to one particular

6    person in the UK.

7              THE COURT:  I haven't seen those yet and,

8    therefore, I'm not confused yet.

9              MS. AHMANN:  Oh, well, so you don't need to be

10   confused because now you know.

11             THE COURT:  Okay.

12             MS. AHMANN:  Yes, and that is an additional

13   person.  But this is a process that it's like herding cats,

14   but we're working on it, and we're getting it there.  And we

15   had a meet and confer this morning on some things that we're

16   trying to work through with regard to the foreign discovery,

17   and we're working through, and it may come a point where we

18   have to ask the Court's involvement, but right now I think

19   we're really doing pretty well.

20             THE COURT:  Okay.

21             MR. GORDON:  Could I add one thing to that, Your

22   Honor?

23             THE COURT:  Yes.

24             MS. AHMANN:  I'm not surprised.

25             MR. GORDON:  Sorry.  Your Honors, I agree we had a

1    productive meet and confer on those issues today, including

2    the guidelines or the protocols or how these foreign

3    depositions may take place.  I do anticipate there may be

4    some sticky issues that we have a little trouble working

5    out, hopefully not, but I don't want to surprise the Court

6    with that on the eve of those depos, which begin around

7    September 14th, I think, if things go as we expect.

8         So I would want to make sure the Court is on

9    notice that we may need some help with this before the next

10   status conference, including potentially the Court's

11   indulgence if there are disputes at the depositions, which

12   will be taking place in the UK, which I think is seven hours

13   ahead.  And one of them, in fact, I think, is slated to be

14   on a Saturday, so we wanted to at least let the Court know

15   we might be coming to the Court asking for help with that.

16        THE COURT:  I'll be in Europe on the 15th through

17   the --

18        MR. GORDON:  That might work out perfectly.  Would

19   you like to come to London?

20        THE COURT:  I love London.  I'll be in Portugal.

21        MR. GORDON:  I love Portugal.  But I think we can

22   let you know better in the next couple of weeks if we'll

23   need some time with the Court.  I just don't want to push it

24   until the day before the depositions and have blind-sided.

25        THE COURT:  But the letters that we've signed, the

1    process that we go through has been working all right.  I

2    sign it, then it goes down and Rich Sletten signs it, then

3    he comes back, then I sign it again.

4              MS. AHMANN:  All is good.

5              THE COURT:  Okay.  So do we have the revised

6    master short form complaint?

7              MS. ZIMMERMAN:  I'll wait to address until I

8    approach.  Yes, Your Honor, we do have the revised short

9    form Complaint.  And Ms. Young and I had been working

10   together and wanted to approach the Court on the best way to

11   submit this document to the Court.  If it would be helpful

12   to feel have an adopting order, which is what we provided to

13   you last time.  Or if it's something that perhaps we should

14   file in the master docket, and I think that's where we left

15   things, and we thought we would approach the Court for

16   guidance on how you prefer it.

17             THE COURT:  Okay, good.  I did want to talk to

18   both of you about this, and the clerk's office would be

19   appreciative of that as well.  So do you want to come on up

20   and both of you tell me what you think makes the most sense

21   here?

22             MS. YOUNG:  Yes, Your Honor.  Mary Young for 3M.

23   As you know, when we went to file our answer, it was

24   somewhat confusing that there isn't a master complaint in

25   the docket, so we agree that it makes sense if the Court is

1    willing just to allow plaintiffs to go ahead now and file

2    their master long form to which we will file our master long

3    form answer, as well as the revised master short form.

4              MS. ZIMMERMAN:  Perfect.  We're happy to do that.

5              THE COURT:  That's what makes sense.  What I don't

6    know is if you need anything from me, if the clerk's office

7    will accept that.  I didn't see why they wouldn't, but.

8              MS. ZIMMERMAN:  Perhaps we'll try and --

9              THE COURT:  Just try it and then --

10             MS. ZIMMERMAN:  And if there's something we can do

11   to fix it, we're happy to do so.

12             THE COURT:  Yes, and if I need to do something, I

13   will.

14             MS. YOUNG:  All right.  Thank you.

15             THE COURT:  That was easy.  Update on the number

16   of cases?

17             MS. ZIMMERMAN:  I don't know if Mr. Szerlag is on

18   the phone.  I do know that he sent information that we are I

19   think it's 612 cases that are on file before Your Honor as

20   of this morning.  And I believe that he has provided an

21   updated contact list to your chambers and the clerk.

22             MR. SZERLAG:  Your Honor, it is David Szerlag on

23   the phone.

24             THE COURT:  Hi.

25             MR. SZERLAG:  I believe that was Ms. Zimmerman

1    speaking.

2              THE COURT:  Correct.

3              MR. SZERLAG:  That's correct.  The updated list is

4    (inaudible) 612 cases currently filed, and I believe my

5    assistant did mail over the updated master list this

6    morning.

7              THE COURT:  Do you think -- by what kind of mail?

8              MR. SZERLAG:  I believe it was by e-mail, Your

9    Honor.

10             THE COURT:  Would that be to chambers?

11             MR. SZERLAG:  I believe so, yes.

12             THE COURT:  Okay.

13             MS. ZIMMERMAN:  If there's some problem, I'm sure

14   we can get you an updated list.

15             THE COURT:  Okay.  Thank you very much,

16   Mr. Szerlag.

17             MR. SZERLAG:  Thank you, Your Honor.

18             THE COURT:  State cases?

19             MS. ZIMMERMAN:  Your Honor, I believe that the

20   report here is accurate.  There are about 45, 46 cases

21   pending before Judge Leary, and we have submitted I believe

22   all of the orders that he has requested, and we're waiting

23   for entry of some of those.  But it is my understanding, and

24   I believe it's Ms. Young's understanding that Judge Leary

25   intends to follow closely behind the MDL.

1          MS. YOUNG:  With one exception, Your Honors, we

2     have not submitted a case scheduling order to Ramsey County

3     because as we started through that process, we recognize

4     that that may be not the right forum to be talking about the

5     modifications that both parties were seeking, and so with

6     that exception, we have submitted the other proposed orders.

7          THE COURT:  I don't think Judge Leary anticipated

8     that you would have a different schedule over there, so that

9     makes sense from what I understand about what's going on

10    there.  How is Canada?

11         MS. YOUNG:  There's not much going on in Canada.

12    So we have retained counsel in Canada, and otherwise there's

13    no case activity yet.

14         THE COURT:  Other orders.

15         MS. ZIMMERMAN:  Your Honors, we have just recently

16    started to work together with respect to a potential

17    deposition protocol that we'll try to work on reducing to

18    writing and presenting and proposing to Your Honors.

19         I think the other issues that the plaintiffs have

20    identified as probably meriting proposal to the Court in the

21    next 30 days or so include a preservation order and

22    potentially an order on how and when to conduct depositions

23    in extremis in the event that there are plaintiffs that may

24    require that.

25         THE COURT:  What's a deposition in extremis?  One

 1    taken when somebody's phone is going off?

 2              MS. ZIMMERMAN:  I suspect that feels extremis.  I

 3    think if someone is ill and expected not to survive to the

 4    conclusion of their case.

 5              THE COURT:  We've talked about the status of

 6    discovery.  I believe that's done.

 7              MAGISTRATE JUDGE NOEL:  That's the 45-page thing.

 8              THE COURT:  Oh, that's the 45 page, yeah.

 9              MAGISTRATE JUDGE NOEL:  So I think we're up to

10    there now.  I was intrigued --

11              THE COURT:  Ms. Zimmerman, why don't you be seated

12    because we're about to say something.

13              MAGISTRATE JUDGE NOEL:  I was intrigued by

14    Mr. Blackwell's last remarks before he sat down, so I'm

15    going to ask him to start.

16              MR. BLACKWELL:  Your Honors, I styled this as

17    having a request around the 45 pages.  And I take it Your

18    Honor, Judge Ericksen, felt this deserved its own place on

19    the agenda item, and I said, well, I didn't think so, and I

20    wanted to explain why I didn't.  And I have a bone to pick

21    with it and a request to make around it.

22              And that 45 pages that landed on Your Honors' desk

23    just days before we were to come here involved a myriad of

24    discovery issues that we spent hours and hours and hours

25    having worked through with the plaintiffs last June and had

1    reached agreement on the whole majority of it.  What Your

2    Honors received made no reference to the agreements that had

3    been reached on the items -- that even included a

4    substantial portion of it were items where they met and

5    conferred about.  And we felt that for the Court to spend

6    inordinate amounts of time, if Your Honors were to do that,

7    to actually read through the 45 pages would not have been

8    the most efficient use of the Court's time nor our's either.

9         And the request to make around that is if the

10   parties have spent many hours reaching agreement on

11   discovery issues, if any party thereafter decides to change

12   their minds on the agreements, that we first meet and confer

13   again.

14        Mr. Hulse, as you probably have surmised, is

15   driving the discovery efforts on our side, so it's their

16   person and work through these things.  And so we felt to do

17   a tit for tat, back and forth, over here's what we agreed,

18   no, we didn't, and so on when this wasn't even referenced to

19   the Court and what was submitted, is not the most efficient

20   way to handle it.  It creates undue angst that's

21   unnecessary, and we ought to meet and confer and only

22   present to the Court those issues that really do require the

23   Court's attention, as opposed to giving some sort of

24   historic recitation for whatever the reason that the Court

25   would spend a bunch of time reading and then find ultimately

1   there may be only a couple of issues out of it, the 45 pages

2   that the Court even needs to address.

3        And discovery matters for which there has not even

4   been a meet and confer ought not be set before the Court in

5   this fashion in the first place, and there are rules that

6   address that.

7        So, you know, my request with respect to this is

8   that there are a lot of lawyers involved.  And, you know,

9   and this is an instance where there are infinitely more

10  plaintiff's lawyers than there are defense counsel involved

11  in the case, and we can do better than that.  And my request

12  is that we make the effort to do so with respect to the 45

13  pages.

14       And, Mr. Hulse, if I've spoken out of school with

15  respect to anything since you were there, you know, say so,

16  but our concern really was that we had worked through these

17  issues.  And the way it was presented would not have given

18  the Court any indication of it and that we should have had

19  another meet and confer, if the plaintiffs were deciding to

20  take different positions than the ones we had agreed on from

21  the meet and confer.

22       THE COURT:  Did you meet on Monday?

23       MR. BLACKWELL:  Ben can speak to this, but we met

24  starting back last June with them for hours and hours, but

25  why don't you go ahead and speak to it?

1          THE COURT:  But there was a proposal that you were

2     going to meet with plaintiffs on Monday, August 12th?

3          MR. HULSE:  So what I did instead is I met their

4     deadline.  They had given me a Monday morning deadline to

5     fill in our positions in this chart, and I met the deadline.

6     And I put into it our understanding based on my notes from

7     the meet and confer of where we had ended up.  And where my

8     understanding was and from June and from all the subsequent

9     e-mails first and running the document production, the

10    understandings that I had.

11         The plaintiff's positions reflected in column 2

12    were positions that they sent me overwhelmingly before our

13    meet and confers in June and did not reflect in any way the

14    discussions we had had, and the compromises to our

15    positions.

16         So we did then meet yesterday, and I think my

17    take-away from that is it turned out just as I believed and

18    then said in my e-mail to Your Honors that we really don't

19    have very many open disputes.  Mentioned the one about the

20    custodians, that seems to be an open dispute, and then

21    there's another dispute on some sales documents.

22         But by and large, we were able to work through

23    these things, and that was our understanding.  And twice we

24    cancelled conferences with Your Honor with representations

25    from both sides that we'd work through these issues.  And it

1    was difficult for us to fathom why all of a sudden a hundred

2    percent of these issues plus a bunch of new ones were being

3    presented with an ultimatum that get us your inserts, and

4    this is all going to the Court.  And when we strenuously

5    objected to it being presented this way, it was submitted

6    anyway.  And we, you know, we've worked well together and so

7    this really didn't seem consistent with that approach.

8         And the meet and confer we had yesterday was

9    another productive conference.  We should have gone back to

10   that approach instead of this thing being submitted, this

11   behemoth being submitted, Your Honors.

12        THE COURT:  I wonder if the plaintiffs were

13   concerned that when we cancelled this meeting for last month

14   and said get a chart, that there was some intention that

15   every potential issue be listed, otherwise it would be

16   waived or something.

17        So I thought, and, Judge Noel, maybe you could do

18   this and talk about what sort of a chart we had in mind, but

19   we can hear from the plaintiffs.

20        MAGISTRATE JUDGE NOEL:  Yes, again, let's first

21   hear from the plaintiffs on it.  Who is speaking,

22   Ms. Zimmerman?

23        MS. ZIMMERMAN:  Yes, thank you, Your Honors.

24   Unsurprisingly, we take issue with much of what defendants

25   have said.  This chart was provided in substantially similar

1    form back in May.  And the meet and confers that took place

2    in June were predicated on us providing and preparing a

3    chart that outlined the requests we made, and why we thought

4    we were entitled to the documents.

5         Now, I do think that we have had some productive

6    meet and confers, but the outlying issues remain, and we've

7    had these significant issues with respect to custodians.

8    We've had ongoing issues with respect to production of

9    exemplars and some other things that we could go through on

10   a line by line item basis.

11        But there are a number of issues that we really do

12   need to get addressed, and we felt that the best way to do

13   it was to propose the same exact chart that we provided to

14   them in May at their request.  We provided it to Mr. Hulse

15   at the beginning of August, and we have kind of alluded to

16   the Court on the telephone the last two months about our

17   need to potentially get in front of the Court on these

18   discovery issues.  And we have consistently been told we can

19   get it done, we can get it done, you know, give us the

20   information, but none of these documents are actually being

21   produced.

22        We had requested from defense counsel the

23   opportunity to bring the issues before the Court in advance

24   of this status conference, hopefully, the first week of

25   August, and were assured instead that they would get the

1    comments on the chart back to us in time to have it before

2    the Court today.

3              And then on Friday, we were told that despite the

4    assurances that we would have the chart filled in by the

5    defendant in time to have it before Your Honors, that they

6    would not be providing those information to us such that it

7    could be presented to Your Honors.

8              So I don't want the Court to be in a position of

9    back and forth, and I'd prefer to avoid that, but we do have

10   discovery disputes.  We think that they're significant and

11   that we need to get resolution to these issues to move the

12   case forward.

13             So while we did have a meet and confer yesterday,

14   the issues with respect to this chart that we're just

15   provided took less than 45 minutes before there was a hard

16   stop, and we're just in a position where our ability to

17   communicate a meet and confer is truncated, and we need to

18   come to the Court with some indication of what our issues

19   are.

20             THE COURT:  Okay.  Thank you.

21             MAGISTRATE JUDGE NOEL:  So have I heard everybody

22   on this chart?

23             MR. BLACKWELL:  Sufficiently so, Your Honor.

24             MAGISTRATE JUDGE NOEL:  Okay.  So here's my view,

25   by my count there's over 90 discovery disputes, and my view

1    is that they're not ripe for resolution in the form that

2    they have been submitted.

3            Back in June, the Court proposed to assist the

4    parties, and we had the conference on the phone by which we

5    indicated how we would likely rule on discreet and limited

6    number of specific discovery disputes based on a spreadsheet

7    such as this.  This list of 90-plus disputes are kind of

8    amorphous and not well-defined, and their sheer number make

9    it unwieldy to try to resolve.

10            And it sounds to me like based on what you both

11    said about meeting yesterday, that progress was made.  Let

12    me go back, I do have another question for Ms. Zimmerman, if

13    you would come back.

14            MS. ZIMMERMAN:  Yes, Your Honor.

15            MAGISTRATE JUDGE NOEL:  So Mr. Hulse tells us as

16    does Mr. Blackwell that a number of these matters, on a

17    number of these matters the plaintiff had agreed with the

18    defendant's proposed resolution.  Is it that you never

19    agreed to any of these?  Or you did agree to some but not

20    others?

21            MS. ZIMMERMAN:  I don't know which request that he

22    was referring to, and if we have mischaracterized the

23    situation or gone back on our word, I would welcome being

24    told by them.

25            MAGISTRATE JUDGE NOEL:  Well, I heard him say that

1     basically this chart of 90-plus items is a recitation of

2     90-plus discovery disputes that you identified back in May,

3     is that correct or incorrect?

4              MS. ZIMMERMAN:  Largely correct, yes, Your Honor.

5              MAGISTRATE JUDGE NOEL:  And had any of them been

6     resolved between May and now?

7              MS. ZIMMERMAN:  No, Your Honor.  And the principle

8     issue is that the vast majority of the disputes are related

9     to this issue of the custodians because the limitation from

10    the defendants is that they are searching these 24

11    custodians that they have agreed from our list they should

12    be searching.  I guess we're concerned that there may be

13    other custodians out there that have not been identified by

14    plaintiffs and are not part of the production.

15              Now, if we're assured either that they have

16    completely canvassed the entire 3M and Arizant and previous

17    entities and identified every potential witness and combed

18    through their files, and we either know that everything is

19    complete or that they have identified some new people.  And

20    as we said yesterday, there were new people identified, and

21    there were new names that were identified this morning.

22              Once we have assurance that everybody's files are

23    being searched and that we're going to have a complete

24    production, we'll have resolved the vast majority of the

25    disputes, and we can get into exemplars and sales documents

 1    and that sort of thing.

 2              MAGISTRATE JUDGE NOEL:  Okay.  Let me just make

 3    sure I understood what you just told me.  If there is a

 4    resolution of this issue regarding custodians, and I'm not

 5    sure I fully understand exactly how that issue would be

 6    framed.  But if that issue is resolved, most of these

 7    90-plus line items in the chart would go away?

 8              MS. ZIMMERMAN:  I think that's correct, Your

 9    Honor.

10              MAGISTRATE JUDGE NOEL:  Okay.  Okay, thank you.

11              THE COURT:  Could I just reframe that so I

12    understand it, just to make sure I understand.  You have

13    been receiving documents from 3M responsive to these 90-plus

14    other requests, right?

15              MS. ZIMMERMAN:  To some of them, yes.

16              THE COURT:  And you're just not sure if they're

17    looking in all the right places?

18              MS. ZIMMERMAN:  Correct.

19              THE COURT:  And you think it's not your job to

20    identify the custodians.  It's your job to identify the

21    information that you want.

22              MS. ZIMMERMAN:  Correct.

23              THE COURT:  And it's their job to look for it.

24              MS. ZIMMERMAN:  Correct.

25              THE COURT:  And because you've had a somewhat

1      collateral discussion about who the custodians are, you are

2      left with some unease about whether the research for

3      responsive documents is adequate.

4              THE WITNESS:  Correct, Your Honor.

5              THE COURT:  So framing it as finding the

6      custodians is just a, that's a proxy for the lack of

7      confidence that they are truly in good faith responding to

8      the document requests.

9              MS. ZIMMERMAN:  That's correct, Your Honor.  And

10     really the objections are that they have searched these 24,

11     and so it's because of the objection that we raised the

12     issue.

13             THE COURT:  Okay.  So what needs to be resolved is

14     are they absolved from looking any place else by virtue of

15     arriving at those 24, is that an agreement that is

16     reasonable?  Or do you have a basis that you can show that

17     that's not a reasonable way to look?  Or do you not want to

18     be involved in the number of custodians?  You just want to

19     say, look, you said at first you were going to search five

20     people, now you're searching 24 people.  How are we supposed

21     to know you're giving us everything?

22             MS. ZIMMERMAN:  Precisely, Your Honor.

23             THE COURT:  All right.  I can understand that.

24     That's all I have.

25             MAGISTRATE JUDGE NOEL:  I see Mr. Blackwell and

1      Mr. Hulse staring at one another.

2              MR. HULSE:  Right.  I'll only speak if you want to

3      hear from me.  I can be brief.  I promise.

4              MAGISTRATE JUDGE NOEL:  Go ahead.

5              MR. HULSE:  Given the size of 3M and even the size

6      of Arizant, it's not practical, it's not realistic,

7      particularly with the general causation discovery cut-off,

8      to search the documents of every single person who might

9      potentially have discoverable information.  And so the way

10     that we typically approach this is we try to reach agreement

11     on a group of custodians.

12              So it's true that the group of fact witnesses that

13     we thought that we might potentially call on to testify on

14     the issue of general causation is pretty small because we

15     think it's an expert issue.  So what we did is we took

16     plaintiff's list of I think it's over 50 custodians coming

17     into the MDL, they already had the productions from Walton

18     and Johnson.

19              So what they did is they put together a very

20     lengthy list of people current, former employees.  So what

21     we did is we took that list of custodians, and we went and

22     searched 3M or Arizant files for can we find custodial

23     documents for any of these people?  And we identified 24 on

24     the list who we were able to find custodial documents for.

25     And so we said we agree that we will produce documents from

1      those people, a very comprehensive list.  We will also

2      search the central files, the noncustodial files.

3              And in addition to that, what we have done when

4      there are requests for specific things that we know are not

5      necessarily in the custodial files, we've gone and gotten

6      them from additional custodians.  So to this day, we have

7      actually produced documents from the files of about 55

8      different custodians.

9              But for the purposes of comprehensive review of

10     custodial files and e-mail, we did think that a limitation

11     in the zone of under 30 was a realistic and reasonable

12     limitation especially given that the group of custodians

13     that we had identified together encompassed the entire

14     relevant period of time going back to the late 80's, and

15     also all of the issues, the regulatory, the testing, the

16     marketing, the sales and so forth.  And plaintiffs have

17     never said that these custodians don't cover the whole area.

18              The other thing that we've always said is if based

19     on all these documents that we've produced to you, you see a

20     name and you say, "do you have custodial files?"  We think

21     this is an important person who is not on the list.  Tell

22     us, and if we have documents from them, we can add them as

23     custodian.  And yesterday they gave us two more names, and

24     we're going to look and make sure that we've got the

25     custodial files for them, and we can add them to the list.

1     That's been the approach that we've taken.

2              My experience is that's consistent with how things

3     are done.  The plaintiffs approach has been you just have to

4     produce everything from 3M, and you have to look every

5     where.  I didn't think that's where we were at in our June

6     conversations.  I thought that they had agreed to our

7     approach of these are our initial custodians, and we can do

8     more if you give us more names.

9              But we think that this group is more than adequate

10    to address the discovery needs and the requests that we have

11    plus the additional targeted custodial collections that

12    we've done now for around 30 additional custodians.  So we

13    just don't think that there's been any kind of showing at

14    this point of the inadequacy of the document production, the

15    inadequacy of this group of custodians.

16             I'm sorry, I said I'd be brief, and I went on far

17    too long.  Thank you.

18             Okay.  Yes, and Mr. Blackwell reminds me, we came

19    out of those meetings in June, and I think this is still the

20    case, agreed on just about every other issue.  And I think

21    when we've talked with them and corresponded with them over

22    the following months, we kept coming back to there are two

23    or three other specific focused issues that might be ripe to

24    tee up to the Court, but we could have been doing that

25    today, but instead that's really lost in the document that

1     was presented to Your Honors.

2              MR. BLACKWELL:  And could I just add one point

3     which Your Honors may find to be somewhat of a non sequitur,

4     but there's a goose/gander kind of aspect to this when we

5     ask plaintiffs, for example, for which we have 1,000 pages,

6     period, to produce all documents and communications they

7     sent to any governmental agency that relate in any way to

8     surgical site infection data and surgical site infection

9     rates, so what do you, the plaintiff's attorneys have?

10    Their response is to object because this will be viewed as

11    overbroad and unduly burdensome to even write to the other

12    plaintiff's lawyers.

13             Subject to that objection, no such communications

14    exist from members of the plaintiff's executive committee.

15    They can't even send an e-mail out to a list serve, and

16    they're combing all over 3M.  And so we're going to have

17    some issues to discuss with respect to their responses which

18    are, Your Honor, anemic is an understatement.

19             MAGISTRATE JUDGE NOEL:  I just want to make sure

20    I'm clear, so the two things that are before us right now

21    are, one, what to do about adjusting the pretrial order

22    number 4, the scheduling order; and, two, what to do about

23    these discovery disputes?  Everything else on our joint

24    agenda is the parties are working on or have agreed; is that

25    a correct statement, Mr. Blackwell?

 1              MR. BLACKWELL:  That's correct, Your Honor.

 2              MAGISTRATE JUDGE NOEL:  Ms. Zimmerman?

 3              MS. ZIMMERMAN:  Yes, Your Honor.

 4              THE COURT:  We'll take about a 10 minute break.

 5              MAGISTRATE JUDGE NOEL:  Don't leave.  We're just

 6      taking a brief recess, and we'll be back.

 7                       (Short recess at 3:21 p.m.)

 8                            (3:32 p.m.)

 9                          IN OPEN COURT

10              THE COURT:  Go ahead and be seated.  Thank you.

11              All right.  I've got a couple housekeeping matters

12      and I can bring those up after.  Why don't you go ahead?

13              MAGISTRATE JUDGE NOEL:  Okay.  So on pretrial

14      order number 4, here is what we have decided:

15              The date set forth in pretrial order number 4 for

16      the first bellwether trial, as I understand it, is November

17      6, 2017.  That date will remain unchanged.  As to every date

18      in between, the Court will adopt whatever schedule the

19      parties can agree to.  And if you cannot agree -- we should

20      have done this before -- on or before, let's say on or

21      before next Friday, is that enough time to try to work that

22      out between you?

23              MR. GORDON:  Yes, Your Honor.

24              MR. BLACKWELL:  Yes, Your Honor.

25              THE COURT:  So if you don't agree by August 26th

1    on adjusting the interim dates, each side should submit your

2    last best final suggestion as to what the schedule should

3    be, and the Court will pick one or the other to be the

4    schedule that governs between now and the first bellwether

5    trial of November 6th 2017.

6             MR. GORDON:  Without any substantive changes

7    otherwise, Your Honor.

8             MAGISTRATE JUDGE NOEL:  Excuse me?

9             MR. GORDON:  Without any other substantive

10   changes, just dates not any changes to the schedule

11   otherwise.

12            MAGISTRATE JUDGE NOEL:  Any whatever you can agree

13   to, whatever agreements you reach regarding the schedule

14   that should exist between today and November 6, 2017, that's

15   what you're to discuss between now and August 26th and

16   hopefully reach agreement.  If you can't reach agreement,

17   that's the date on which you are to submit your last best

18   final proposal as to what you think the schedule should be,

19   and the Court will pick one or the other to be the schedule.

20            MR. GORDON:  And I don't want to be dense, Your

21   Honor, I want to make sure we're perfectly clear when we

22   come back to you, but that encompasses not adding or

23   drafting any additional layers or requirements or --

24            MAGISTRATE JUDGE NOEL:  Everything is on the

25   table.

1            MS. ZIMMERMAN:  Everything is on the table.

2            MR. GORDON:  All right.  Thank you, Your Honor.

3            MAGISTRATE JUDGE NOEL:  So then as to the 90-plus

4       items on the 45-page chart, the Court is not going to decide

5       those today.  And here's what we're going to do:

6            It's my understanding based on what the parties

7       have told us today that if a decision is rendered regarding

8       an issue regarding the custodians, the number of custodians

9       and the identity of the custodians, that many if not all of

10      these items would go away.

11           I'm going to ask the parties to take about five to

12      ten minutes, we'll take another break, and try to reach

13      agreement right now today on the formulation of exactly what

14      that issue is.  What is the custodian issue?  What's the

15      question presented regarding custodians?  And then I will

16      give each side an opportunity to submit a memo on that

17      issue.  They would be simultaneous memos.  In other words,

18      once you've identified and agreed upon the question

19      presented, you will each present a single memo of some

20      finite number of pages that I'll figure out between now and

21      then arguing that issue, and then if you want to have an

22      oral argument about that, we can either do that on the

23      telephone much like we did with the discovery conference

24      before, and then the Court will issue an order regarding the

25      custodians, and then actually it's maybe simultaneous as

1     well.  But if there are other issues in here, and by "other

2     issues" I'm thinking of a finite number of four or five or

3     six at the most, certainly less than ten, that are separate

4     and apart from this custodian issue, set those forth in a

5     chart, and we can have that kind of informal discovery

6     conference as we did in June where we can try to help the

7     parties resolve that.

8           And just to be clear, when we have those kinds of

9     things, it's my understanding, and Judge Ericksen can

10    correct me if my understanding is incorrect, but it's my

11    understanding that the Court's participation in those is in

12    the spirit of Federal Rule of Civil Procedure

13    16(b)(3)(b)(iv), which is the new rule about requesting an

14    informal conference with the Court before making a formal

15    discovery motion.  And that when I am talking to you on the

16    phone under those circumstances, I am attempting to assist

17    the parties in informally resolving the discovery disputes.

18          If I fail, if we can't help you resolve things,

19    ultimately somebody is going to need to make a formal

20    motion.  And if you need an Order of the Court, that will be

21    down the road.  But the purpose of the phone conference is

22    to assist the parties in trying to reach agreement.

23          Now, maybe the way I assist the parties is to tell

24    you how I'm going to rule if this motion comes before me,

25    but that's what I have in mind.  Is that consistent with the

1    Court's?

2              THE COURT:  That's exactly right.

3              MAGISTRATE JUDGE NOEL:  Okay.  So with all of that

4    said, what I would suggest is we take -- how long do you

5    think you it will -- do you think you can agree on what the

6    actual question presented is on this custodian issue, Mr.

7    Hulse?

8              MR. HULSE:  We can try, but I'm skeptical that it

9    would by five to ten minutes, Your Honor.

10             MR. BLACKWELL:  If I may, Your Honor, if maybe

11   once Your Honors step out, we also go into the hall and let

12   plaintiffs talks amongst themselves and just come and get

13   us.

14             MR. GORDON:  That's fair, Your Honor.  It might

15   take 10 or 15 minutes to see if we can reach an agreement.

16             THE COURT:  It might be something where we would

17   want to have a brief chambers conference as well.

18             MR. GORDON:  Agreed.

19             MAGISTRATE JUDGE NOEL:  Let's do this.  Let's us

20   break until 3:55.

21             THE COURT:  Just a second, I'm going to do my

22   housekeeping because I don't want to forget it.  We'll do

23   that and figure out how long that takes.

24             Okay.  There are a number of outstanding motions

25   that at least the docket believes are undecided.  Two

1    categories, one has to do with motions to dismiss that were

2    filed before the MDL, and nothing has been done.  They

3    haven't been withdrawn.

4            There was some conversation with the defense, I

5    think maybe by the clerk's office some time ago, but the

6    docket still indicates that they're open.  So one way to

7    resolve that is I could just go ahead and deny them all, but

8    we can't just have them appear --

9            MS. AHMANN:  We'll go ahead and file, Your Honors,

10   we'll go ahead and file withdrawals.

11           THE COURT:  And can you do that soon?

12           MS. AHMANN:  Early next week?

13           THE COURT:  That's fine.  Do you need a list of

14   the cases?

15           MS. AHMANN:  If you have them, that would be

16   great.

17           THE COURT:  Okay, here's what I have.  You can

18   come on up and get them.  You can do your own check, but at

19   least that's something to get started on.

20           And then there are also a number of old pro hac

21   vice motions that are actually moot because, so I'm going to

22   deny those as moot.  Okay, so now that's it.

23           MAGISTRATE JUDGE NOEL:  So let's break until 3:55.

24   Hold on one second.  So we're going to break until 3:55 and

25   at 3:55, whether you've reached agreement or not, come back

1    to chambers, and we'll be waiting for you.

2              MS. ZIMMERMAN:  Could I ask the Court's brief

3    indulgence, my co-counsel just mentioned that if Your Honor

4    perhaps is going to be out of the country on the 15th, I

5    think that might be the date of our next status conference,

6    if we've counted correct.

7              MR. GORDON:  It might be good to go ahead and move

8    that.

9              MR. HULSE:  Move it to Portugal.

10             THE COURT:  My flight is not until after.  I

11   scheduled that in mind.  I think I did.  I tried to.

12             So 3:55, and then we'll see you back in chambers,

13   and then we're done.  Then everything that's to be done in

14   open court I believe is finished.

15             THE CLERK:  All rise.

16                  (Court adjourned at 3:42 p.m.)

17

18                        *      *      *

19

20             I, Maria V. Weinbeck, certify that the foregoing is

21   a correct transcript from the record of proceedings in the

22   above-entitled matter.

23

24                  Certified by:  *s/ Maria V. Weinbeck*

25                            Maria V. Weinbeck, RMR-FCRR