```
 1                    UNITED STATES DISTRICT COURT

 2                       DISTRICT OF MINNESOTA

 3     -----------------------------------------------------------
                                    )
 4                                  )
        In Re: Bair Hugger Forced Air  )   File No. 15-MD-2666
 5      Warming Devices Products     )   (JNE/FLN)
        Liability Litigation         )
 6                                  )   September 8, 2016
                                    )   Minneapolis, Minnesota
 7                                  )   Courtroom 12W
                                    )   1:37 p.m.
 8                                  )
                                    )
 9     -----------------------------------------------------------

10             BEFORE THE HONORABLE JOAN N. ERICKSEN
                 UNITED STATES DISTRICT COURT JUDGE
11
                And THE HONORABLE FRANKLIN D. NOEL
12                UNITED STATES MAGISTRATE JUDGE

13
              (HEARING ON CUSTODIAN DISCOVERY DISPUTE)
14
       APPEARANCES
15
       FOR THE PLAINTIFFS:        LEVIN PAPANTONIO
16                                Ben W. Gordon, Jr.
                                  316 S. Baylen Street
17                                Suite 600
                                  Pensacola, FL 32502
18
                                  MESHBESHER & SPENCE
19                                Genevieve M. Zimmerman
                                  1616 Park Avenue
20                                Minneapolis, MN  55404

21                                CIRESI CONLIN
                                  Michael Ciresi
22                                Michael Sacchet
                                  225 South 6th Street
23                                Suite 4600
                                  Minneapolis, MN
24
                       (Appearances continued next page)
25
```

```
 1        FOR THE PLAINTIFFS (cont'd):

 2
                                    KIRTLAND AND PACKARD LLP
 3                                  Behram V. Parekh
                                    2041 Rosecreans Avenue
 4                                  Third Floor, Suite 300
                                    El Segundo, CA  90245
 5
                                    PRITZKER OLSEN, P.A.
 6                                  David Szerlag
                                    Plaza Seven Building
 7                                  Suite 2950
                                    45 South Seventh Street
 8                                  Minneapolis, MN  55402-1652

 9                                  KENNEDY HODGES, LLP
                                    David W. Hodges
10                                  711 W. Alabama Street
                                    Houston, TX 77006
11
                                    FARRAR & BALL, LLP
12                                  Kyle Farrar
                                    1010 Lamar, Suite 1600
13                                  Houston, TX  77002

14

15        FOR THE DEFENDANTS:
                                    BLACKWELL BURKE P.A.
16                                  Jerry W. Blackwell
                                    Ben Hulse
17                                  431 South Seventh Street
                                    Suite 2500
18                                  Minneapolis, MN  55415

19                                  FAEGRE BAKER DANIELS
                                    Bridget M. Ahmann
20                                  90 South Seventh Street
                                    Suite 2200
21                                  Minneapolis, MN  55402

22        COURT REPORTER:           MARIA V. WEINBECK, RMR-FCRR
                                    1005 U.S. Courthouse
23                                  300 South Fourth Street
                                    Minneapolis, Minnesota 55415
24
                  Proceedings recorded by mechanical stenography;
25        transcript produced by computer.
```

```
 1                        P R O C E E D I N G S

 2                            (1:37 p.m.)

 3              THE COURT:  Good afternoon.  Please be seated.

 4     Judge Noel will be talking to you primarily on the discovery

 5     issues.  That's no surprise.

 6              MAGISTRATE JUDGE NOEL:  Okay.  Shall I just go?

 7              THE COURT:  Go ahead.

 8              MAGISTRATE JUDGE NOEL:  Good afternoon.  Welcome.

 9              We're here for some argument on the issue of

10     whether the defendants have or have not done all they need

11     to with regard to identifying custodians for the purpose of

12     responding to discovery.  So let's start with who is

13     speaking for whom?  Who is on the plaintiff's side?

14     Ms. Zimmerman, let's start with you.

15              MS. ZIMMERMAN:  Thank you, Your Honor.  Genevieve

16     Zimmerman for the plaintiffs.

17              May it please the Court, there were three issues

18     that were presented to the Court, and the Court assisted us

19     in framing.  And those three questions were:

20              First, whether the defendant's process was

21     consistent with the regulations or the requirements under

22     the federal rules.

23              Second, if not, what more needs to be done to

24     identify the custodians?

25              And then, third, regardless of what process the
```

1    defendants have used to identify the custodians, whether

2    they have in fact fully met their obligations under the

3    federal rules.

4         Respectfully, I think that from a plaintiff's

5    perspective, the answers to the first and third are no.

6    Regardless of the process, the defendants have not met their

7    burden under the Federal Rules of Civil Procedure.  And I'll

8    take the Court briefly through that from a legal

9    perspective, and then my co-counsel, Mr. Parekh, will deal

10   with the technical aspects about the answer to the second

11   question, what more needs to be done.

12        THE COURT:  Okay.  Let me just, for whatever it's

13   worth observe that to me that second question in light of

14   your response to one and three is the most important

15   question.  So what is it we're supposed to do?  But I don't

16   want to cut you off.

17        MS. ZIMMERMAN:  Certainly.  Mr. Parekh could

18   certainly come up and address some of the technical aspects

19   of what has happened already, and why we think that there is

20   a deficiency in what has been done by the defendants thus

21   far.  That would be helpful to jump to those questions.

22        THE COURT:  I understand.  The more important

23   question is not why you think they haven't fulfilled their

24   obligation, but what do they need to do going forward now to

25   do that?  What more should we -- what is it you want us to

1      order them to do that they haven't done?  Is that him or is

2      that you?

3              MS. ZIMMERMAN:  I think that it may be Mr. Parekh.

4      To segueway there --

5              THE COURT:  But I don't want to cut you off, so go

6      ahead.

7              MS. ZIMMERMAN:  Sure, thank you.  We identified in

8      our papers at least eight different custodians and provided

9      some examples of documents that support our belief that the

10     defendant's identification of both custodians and documents

11     are insufficient under the Federal Rules of Civil Procedure.

12             The examples that we provide demonstrate just by

13     brief way of example different documents that should have

14     been identified and custodians that should have been

15     identified on filtration issues, on design issues, on

16     contamination issues, on whether or not to conduct a hazard

17     team analysis, about the kinds of complaints that they were

18     receiving from the field from various customers, and the

19     certain kinds of complaints that they saw in hearing back

20     from the hospitals across the country.

21             So I think that probably with those specific

22     examples in mind and those documents attached to the Court's

23     reference, I'll have Mr. Parekh come up and talk about what

24     more we should do going forward to ensure that a robust and

25     complete production is made by the defendants.

1          MAGISTRATE JUDGE NOEL:  Okay.

2          MR. PAREKH:  Good afternoon, Your Honors, Behram

3     Parekh on behalf of plaintiffs.

4          To get to the point of saying what more they

5     should do, we need to at least look very briefly at what

6     they have done.  And the key items that come through from

7     what they have done is that they have limited their

8     interviews to approximately 25 custodians given the fact

9     that plaintiffs identified 39 custodians of which they said

10    24 they have responsive documents for and the rest of them

11    they don't.

12         We're not sure what the overlap is between the 24

13    and the 25 that they interviewed, but my guess is they're

14    pretty much the same people.  And so there doesn't appear to

15    have been anything the defendants did above and beyond the

16    people that plaintiff identified in order to determine

17    whether or not there were additional individuals for whom

18    custodial documents existed that were responsive to the

19    RFPs, and that is an obligation that defendants have in the

20    first instance not plaintiffs.

21         So the first thing that we would ask that the

22    Court order defendants to do is to do a thorough

23    investigation of individuals at 3M including interviews to

24    determine what additional people do exist that may have

25    responsive documents to the RFPs.  So that's number one.

1            Number two is they need to actually look for

2    sources of documents that contain information that may have

3    been sent to or received from at least the 24 custodians and

4    the 39 custodians that the plaintiffs have identified

5    outside of just the individual e-mail box for that

6    particular custodian.

7            The eleven custodians that defendants say they

8    have no e-mails for, they don't say they actually don't have

9    any e-mails for them.  They say they don't have a specific

10   e-mail box that was their e-mail box.  But they do have this

11   e-mail server that has lots of e-mails of lots of other

12   custodians.  They have chosen not to look through those

13   e-mails and just even do a cursory look to see whether or

14   not e-mails from or to that person exists that plaintiffs

15   identified in their list of 39.

16           So at the very least, they need to go back and

17   look for those e-mails.  But what we would actually suggest

18   is that they need to do a search of the entire e-mail server

19   and look for responsive documents regardless of custodians,

20   because of the fact that there are so many custodians who

21   plaintiffs have identified who they claim they don't have

22   e-mails for.  So that is number two.

23           Number three, they have to make clear to

24   plaintiffs what it is that they've actually done so that

25   when we run across e-mails or we run across certain items,

1    we can go, oh, okay, we likely believe that additional

2    e-mails of this type or additional documents of this type

3    will still be coming on a going-forward basis.

4            And defendants do a lot of talking about how many

5    documents they've produced and how many millions of pages

6    and things like that, but when it comes down to it, they

7    actually have not produced very much in terms of actual

8    individual e-mails and documents and things where the

9    information would exist.

10           Out of the 1.3 million odd pages that they

11   produced, over 500,000 of those pages come from just a

12   little under 500 documents, and these documents consist of

13   thousands and thousands of pages of Excel files with streams

14   of data that really are meaningless in terms of the page

15   count.

16           The fact that you have, you know, a 2,000 page or

17   a 10,000 page in one instance, Excel file that has data that

18   was produced from a computer during testing does not mean

19   that it's 10,000 pages of relevant information.

20

21

22           The other thing that they have is about 35,000 of

23   the 90 or so thousand documents that they produced so far

24   are simply either studies that were generated in the public

25   domain and kept by 3M or testing data on things like how

1   much heat does the Bair Hugger generate, how much air flow

2   does it generate, what's the volume, testing on different

3   types of motors that they use?  Well, all of that data may

4   be interesting, none of it really goes to the heart of the

5   case.  None of it really talks about whether or not they

6   looked for contaminants or whether they look for whether or

7   not contaminants were blowing.

8        If negative data, plaintiffs need that data in

9   order to show, look, you did, you know, 3,000 tests and not

10  a single one of them look for contaminants, but the fact

11  that they produced it doesn't mean that it's actually stuff

12  that's useful to us.

13       So when you actually come down to it, there's not

14  a whole lot of stuff that they've produced today that really

15  consists of substantive information about what it is they

16  did and didn't do that advance and actually respond to

17  plaintiff's RFPs.  And so what we need for defendants to do

18  is identify as we put in our papers what exactly they have

19  looked at and what else is out there.

20       Another example of what they haven't done is there

21  are archived tapes that exist at Iron Mountain, and

22  defendants didn't identify those archived tapes until a meet

23  and confer that was about a month or so ago.  So we ask for

24  more information about the archived tapes.  And we asked

25  will you look at them?  Will you figure out what is on them

1    or at least tell us what they are?  We only got that data

2    today.  And their position currently is if you want to do

3    anything with the archived tapes, you have to pay for it.

4    You have to pay for attorneys to review anything that comes

5    out of the archived tapes, and you have to pay for the

6    production of that.

7              And while we're okay with sharing costs in terms

8    of the actual, you know, taking the tape and making it

9    accessible, there's nothing that says that we should be

10   paying for attorney review of that data.  I mean it just

11   doesn't make any sense.  If they want to review it, great,

12   they can review it.  If they don't want to review it, they

13   don't have to review it.  They can just produce it to us

14   wholesale.  We'll take it.

15             But it's that kind of thing where they won't even

16   tell us, you know, they're not even taking that first step

17   to say, okay, here we have these tapes.  We don't know

18   what's on them other than, you know, certain labels but, you

19   know, we're willing to take a look and see what's actually

20   on the tapes.  Some of those tapes are labelled things like

21   "potential e-mails."  And given the fact that they claim we

22   have no e-mails from 11 of these custodians, perhaps some of

23   those e-mails are on those tapes.  We don't know.

24             But it's those kinds of things where we're

25   concerned that they're not taking their obligations to

1    respond to our discovery and doing it affirmatively unless

2    we find out about it and call them on it, and that in a

3    nutshell is what we want defendants to do.

4            THE COURT:  So let me ask you this question:

5    Throughout the defendant's memo, they keep referring to this

6    what they call an agreement on the 25 or 24 custodians and

7    that the plaintiffs have reneged on the agreement.  Was

8    there an agreement?  And why did the defendants think there

9    was if there wasn't?

10           MR. PAREKH:  Respectfully, Your Honor, I don't

11   believe that there was an agreement, and I was the primary

12   attorney involved in talking to Mr. Hulse about the

13   custodians' issue.  What we said was we think it's your

14   obligation to identify custodians, but in order to get the

15   process moving, here's the 39 that we've identified in our

16   Rule 26 disclosure.  You've only identified five.  We think

17   you need to identify more.  And they said, well, we think

18   your 39 is good, but we have this time crunch.  And so we

19   said, okay, fine, let's start with the 39, which you and I

20   both agree to are at least at the bare minimum people that

21   you're willing to search.

22           We never said they don't have to go out and search

23   more.  In fact, we always maintained the position that it

24   was their obligation in the first instance to identify

25   custodians, but we have a short time schedule.  We needed to

1     get the process moving.  And so that was the agreement.  The

2     agreement was this is the initial list.  Let's get started

3     with this.  Let's get documents being produced, so that we

4     can at least -- we need time to review the documents before

5     we can take depositions, so at least we get this stuff out

6     of the way.

7              It was never an agreement or even an

8     acknowledgement that they did not have a burden in the first

9     instance to identify the relevant custodians and produce

10    documents.

11             THE COURT:  Let me ask this question then:

12             So as I understand the defendant's memo, also they

13    say by whatever method we got here, whether it's overly

14    reliant on the plaintiff to identify people or whatever,

15    we've covered the waterfront now.  We've got finance.  We've

16    got R&D.  We've got marketing.  We've got sales.  Whatever

17    the different categories of departments within 3M and

18    Arizant.  We've got the representative people from each of

19    those departments.  Do you have a sense that they don't?

20             MR. PAREKH:  I think the e-mails that we

21    identified and the documents we identified attached to our

22    memo are examples of why we think they don't.  Is those

23    memos or those e-mails, some of them were just forwarded to

24    one of the custodians that we've identified.  Other ones,

25    you know, they were cc'd on somewhere.  And some of them, if

13

1      you look further down the chain, those custodians don't

2      exist.  They weren't on the initial chain of e-mails.  They

3      only ended up with, you know, the e-mail in their memo

4      because somebody decided to forward it to them.

5              So other than by happenstance of that particular

6      e-mail being forwarded or cc'd, we would have never seen

7      that e-mail.  And so that's why we do believe that there are

8      people out there who 3M should know and should be able to

9      find through interviews and a real process of going through

10     and finding answers that they have missed and that we only

11     find out by happenstance exists.

12             MAGISTRATE JUDGE NOEL:  Okay.  Thank you.

13             Ms. Zimmerman, I'm feeling really bad that I cut

14     you off because you had prepared so well.  Is there

15     something else you want to say to add before I go to

16     defendants?

17             MS. ZIMMERMAN:  Not at this time, Your Honor.

18     Thank you though.

19             MAGISTRATE JUDGE NOEL:  Mr. Hulse?

20             MR. HULSE:  Your Honors, if I may, and thank you

21     for the time on this issue, I'd like to start just briefly

22     on the agreement and then proceed to what plaintiffs are

23     asking to be done here.  Also, their characterization of our

24     review, which frankly just indicates to me with due respect

25     that they haven't really reviewed our documents and what

1    we've produced.

2              So the agreement they don't deny that it existed.

3    It's documented.  We mentioned the --

4              THE COURT:  They did deny it existed.  I asked

5    him, and he said there wasn't an agreement.  The agreement

6    to the extent there is an agreement, it's a floor not a

7    ceiling.  If this is the minimum, because so we can get

8    started, but they never agreed this is the universe.  And as

9    I read your memo, your vision is that this is the universe

10   of custodians.

11             MR. HULSE:  Well, it was certainly an open-ended

12   agreement, and we made clear from the beginning that we

13   understood that as they review, they started with a hundred

14   thousand pages of our documents and 20 depositions.  And as

15   they went forward, they could identify additional custodians

16   for us, which is something that they went despite our

17   production for months before they identified any more.  When

18   they did identify two more, we agreed to that.  This list

19   that's in the submission, that was never a list that they

20   gave us.

21             And what's interesting, by the way, is seven of

22   eight of the documents that they point to and sent to the

23   Court are documents that were produced in the Walton and

24   Johnson case and certain of plaintiffs executive committee

25   have had for over a year and sometimes two years.  And

1      they've certainly been available to all of plaintiff's

2      counsel for a year.  That's seven of eight.

3              The last one was simply a meeting invite that we

4      produced back in July.  But none of the rest of the

5      documents that they brought to the Court's attention are

6      from our more recent production.  So those are all e-mails

7      they had absolutely the capability if they thought that

8      there was a deficiency in custodians to identify to us

9      during this process that we contemplated.  And we didn't

10     hear from them that they no longer saw this process as

11     sufficient until this August meet and confer, which was the

12     day that they -- the day before the Court's hearing.

13             And the reason why this agreement was so essential

14     is because they had 230 document requests.  And if you sum

15     all of those 230 up together, it's essentially all documents

16     related to Bair Hugger and forced air warming for a 25 year

17     period.  That's what they sum up to.  We had, of course,

18     breadth, burden, and relevance objections to nearly every

19     single one of those because each one was written very

20     expansively.  Obviously, we could have become bogged down

21     interminably in those 230 issues.

22             But what we saw that we could do, and Mr. Parekh

23     and Ms. Zimmerman, who were my counterparts in this

24     negotiation, saw that we could do is we could get past those

25     issues if we had agreement on custodians.  If we had a world

1    of custodians that we could focus on, then we could produce

2    much more expansively and not have to bring these issues

3    about breadth and burden to Your Honors.  That was

4    foundational.

5            If we had not had that agreement on custodians, we

6    would have spent the last two months in telephone

7    conferences and Court conferences dealing with those 230

8    issues.  And I think that --

9            MAGISTRATE JUDGE NOEL:  Where do we find in the

10   record this agreement that the plaintiffs agreed to what you

11   think you agreed to?

12           MR. HULSE:  And, Your Honors, by the way, there

13   are a couple of places.  One is in the submission to Your

14   Honor, Judge Noel, that we made for our first discovery

15   conference.  It's referenced in our position statement with

16   no rebuttal from the plaintiffs, and there was never a

17   dispute when we had that status conference that it existed.

18           It's reflected in Ms. Zimmerman's e-mail, which is

19   quoted, where she says they reserve the right based on our

20   document production to identify additional custodians.  It

21   is also in my work product notes from our meet and confer

22   clearly reflected, which I'm happy to offer Your Honors for

23   in camera inspection if there really is an inspection about

24   the existence of this agreement.

25           So we operated, and they knew that we were

1    operating for several months under this agreement, and it

2    was a good agreement, and it was an agreement that worked.

3    And the proof of it is again that the eight documents that

4    were shared with Your Honor not only were documents they've

5    had a long time, but each and every one of those documents

6    had at least two and in some cases three or four of our

7    custodians on it.

8           So for each one, we were catching the documents in

9    an e-mail sent by a non-custodian, two, three, four other

10   ways, and that's just the ones they provided.  There will be

11   many others where we will have ten of our custodians copied

12   on it.

13          And we also provided the plaintiffs, and there's

14   certainly a group that were on their initial disclosures,

15   people who left Arizant, the predecessor company, back in

16   2005, 2004, who we don't have e-mail archives for.

17          However, the plaintiffs have through the

18   production of people who continued as Arizant employees and

19   then 3M employees, thousands upon thousands of e-mails that

20   were sent by those individuals.  And we provided to the

21   plaintiffs a listing for each of those individuals of the

22   number, thousands of e-mails, thousands of e-mails for each

23   of those individuals who we did not have document

24   repositories for.

25          And another point, they've got their list of 16

1 custodians who they say should be added as custodians.  So,

2 of course, we saw that in their submission, of course, we

3 took a look at that.  Several of those individuals we don't

4 have e-mail for, some we do.

5    But what we did is we looked in our document

6 database, and we said, okay, how many e-mails do we have

7 from each of those individuals to, from, received?  Some are

8 an existing group of custodians.  And in all cases but one,

9 it's thousands and as high as 25,000 e-mails to, from a

10 non-custodian.  In the one case where it's a smaller number,

11 it's a guy who moonlighted on the Bair Hugger project for

12 about a month in 2015.

13    So what the custodians have done here is they have

14 really covered the waterfront.  And plaintiff's submissions

15 and these e-mails that they offered Your Honors only confirm

16 the sufficiency of it.  And so, and that's what's after all

17 of the argument back in chambers about this is frustrating

18 to us, because when it came to actually showing a

19 deficiency, all they showed is that this group of custodians

20 worked and that it was sufficient.  And they know that it

21 was the foundation of not having to belabor and waste Your

22 Honor's time with a whole bunch of other discovery disputes.

23    MAGISTRATE JUDGE NOEL:  So let me ask this

24 question:

25    As I read your memo, and I'm particularly looking

1      at the heading "C," under the relevant background where you

2      described 3M's own investigation of validated the agreed

3      list of custodians, of the things that you list there, it

4      appears to me that most of them of the four things, the one

5      that sounds most like an independent thing you did on your

6      own as opposed to just checking what plaintiffs have given

7      you is number two, where you say, "3M conducted 25 custodian

8      interviews."

9              Are those the custodian interviews you conducted

10     of the, include the 24 folks that plaintiffs have identified

11     or that you came to what you're calling the agreement on?

12             MR. HULSE:  Yes and no.  And I want to clarify

13     that many, in fact, the majority of those custodial

14     interviews actually predate the agreement.  So we went in to

15     the meet and confer knowing from the custodial interviews

16     that we had conducted that plaintiffs actually, and no

17     surprise, I mean some of them have been litigating this for

18     two years and had our documents and 20 deposition, they done

19     a good job of figuring out who the custodians should be.

20             And so what we did, and I want to be clear too

21     that 3M has a formal process for multi-hour document

22     collection interviews.  Okay.  And we've done 25.  It's

23     actually now a little higher than that of those.  They are,

24     some were custodials --

25             MAGISTRATE JUDGE NOEL:  Let me make sure I'm

```
1     clear on --

2              MR. HULSE:  I'm sorry, I didn't answer your

3     question, Your Honor --

4              MAGISTRATE JUDGE NOEL:  No, just on that point

5     though, so this process, this multi-hour thing is like a

6     standard operating procedure that --

7              MR. HULSE:  It is indeed.

8              MAGISTRATE JUDGE NOEL:  -- 3M legal goes through

9     whenever it gets sued in a major case.

10             MR. HULSE:  It is, Your Honor, yes.

11             MAGISTRATE JUDGE NOEL:  And you did that for these

12    25 people?

13             MR. HULSE:  Some of them are former employees who

14    ewe just happen to have documents for.  So we did it for

15    some formers.  Mostly, they were current, okay, but they

16    helped lead us to the right group.  Some people we

17    interviewed and they clearly weren't the right person.  Or

18    they had a subset of documents that we then made targeted

19    collections of.

20             One thing that plaintiffs didn't mention is we

21    actually have in addition to the 26 now agreed custodians,

22    we have 30 other sources of documents.  Most of which are

23    custodial that we have done targeted collections for.  Most

24    people, I mean there are hundreds and hundreds of people who

25    have touched some aspect of the Bair Hugger forced air
```

1    warming over the course of the last 25 years, but many of

2    them have only an incidental role.  That doesn't make them a

3    all purpose custodian that we go and collect and review all

4    of their documents for.  It means we know they have a

5    specific thing.  They've got this document or work charts,

6    whatever it is, and so we consider them a special purpose

7    custodian, go collect from them.  We have 30 of those --

8              MAGISTRATE JUDGE NOEL:  That's what you're calling

9    or they're describing in their memo as what you've described

10   as a limited custodian?

11             MR. HULSE:  Yes, exactly.  Exactly.

12             MAGISTRATE JUDGE NOEL:  So if we were to ask you

13   to identify by name, title, and job description who these 25

14   are, is that something that can be done fairly readily?

15             MR. HULSE:  It is.  It can be done fairly readily,

16   and that's in addition to, I mean we consider all of this,

17   of course, to be work product and prefer not to wreck

18   privilege on it, but whatever Your Honors require you

19   require.

20             And in addition to that, we have, I mean I

21   personally can say I've conducted many, many, many

22   custodian-type interviews or employee interviews that don't

23   fall under that formal multi-hour process in order to

24   identify documents.  I mean I speak to this personally

25   because I did it.

 1          And so it's, but what we again don't have here,

 2     Your Honors, is a demonstration that this comprehensive,

 3     robust production is in fact deficient.  And I want to say

 4     that I have been, and my colleagues have been extremely

 5     transparent through the process.  We have answered dozens

 6     and dozens and dozens of e-mails inquiring if we're, you

 7     know, some litigants would say now send me an interrogatory.

 8     We answer them informally all the time.  We answer them in

 9     phone calls.  We have tried to answer everything they have

10     asked.

11          MAGISTRATE JUDGE NOEL:  Right, but I guess where

12     they are coming from and to some degree me, it appears to me

13     that you've been overly reliant on them to show where you're

14     deficient.  In other words, as I understand it, you came up

15     with five or less custodians, and they said, wait a minute,

16     there are at least 39.  And then you had this meet and

17     confer process, and you came to what you're now calling an

18     agreement on 24.  And so how could you start with only five?

19          MR. HULSE:  Well, with respect, the initial

20     disclosures, I mean we all know what initial disclosures

21     are, right?  They require you to disclose the people who you

22     may rely upon for the defense of your claims or in support

23     -- defense of claims or support.  It's not list all

24     custodians.  Okay.  And so what we were required to do under

25     PTO4 was make initial disclosures on the issue of general

1     causation, and we have always been explicit about including

2     in our initial disclosures about what we understood general

3     causation to mean.  It's a science issue.  It's whether the

4     Bair Hugger system is capable of causing surgical site

5     infections, the type of infections that plaintiffs are

6     alleging, and whether there's a methodology for ruling out

7     other causes that we know to be possibilities.  That's a

8     science issue.  And so we see that general causation as an

9     expert issue fundamentally, one that will be resolved by

10    experts.

11          But we said, okay, well, if we need fact witnesses

12    to authenticate our testing documents, R&D documents,

13    regulatory documents, which are the only kind of documents

14    upon which a scientific expert could rely.  They're not

15    going to rely on e-mails.  Then who are those people?  And

16    those are the five we listed.

17          They never served us with an interrogatory or to

18    identify every possible custodian.  They never did, and

19    essentially they may regret that.  They've actually now

20    served it in the last couple of days, that interrogatory

21    that I suppose they wished they had served.  But they didn't

22    serve it, and they are essentially now asking the Court to

23    just to order us to answer that interrogatory immediately.

24          But it's -- let me I want to make sure I answered

25    your question, Your Honor.  But that explains the initial

1    disclosures.

2              MAGISTRATE JUDGE NOEL:  Okay.

3              MR. HULSE:  Okay.  However, I want to be clear

4    that this validation did not happen exclusively after the

5    fact, that we knew from the prior litigation and then also

6    from the preparation and internal diligence that we did

7    leading up to the receipt of the plaintiff's discovery who

8    the appropriate custodians were.  And when we got

9    plaintiff's list, it was, again, perhaps partially by

10   coincidence a good list, but I don't think it's coincidence

11   because they knew the case and have been litigating it.

12             However, there are also people that we knew, and

13   we had already collected from or continue to collect from

14   documents on a limited basis.  So it was not purely a let's

15   see list and then we'll figure out if that looks okay.  It's

16   not that at all.  Most of the work was done before we ever

17   got their initial disclosures.

18             And I'll say the process could have worked.  And

19   in fact, this list that plaintiffs gave us is a list that if

20   it had come in a meet and confer instead of a court

21   submission could have been the foundation for a resolution.

22   But it either was a decision for whatever reason to

23   repudiate the process that we had agreed to that we sat

24   there in that room and agreed to on this.

25             I also want to be clear about our production, our

1    document production.  Again, this is a science case.  We all

2    know it's a science case.  And Mr. Parekh may run down the

3    fact that we have produced reams of testing data, data that

4    they requested, but that is precisely the most important

5    information in the case.  Research and development,

6    regulatory and testing is the documents that the experts are

7    going to look at.

8              This case is not going to be made one way or the

9    other by that extra, that millionth e-mail that gets

10   produced.  And I want to be clear that we have produced

11   400,000 pages of e-mails and attachments at this point.  And

12   the representations in their submissions that we have not

13   produced e-mail are just wrong.  They're not right.  And it

14   stands in incredible contrast to plaintiff's own approach to

15   discovery, which is to produce very little and maintain that

16   it's too burdensome for them to produce documents beyond

17   those documents held by the plaintiff's executive committee.

18   That's too burdensome.

19             And so this expansive approach, which is more than

20   any court in a comparable case has ever required that you go

21   and search and produce from anybody who can conceivably

22   have, anybody who can conceivably have a relevant document,

23   it's not only not supported by the law, it's a striking

24   contrast to their own approach.

25             MAGISTRATE JUDGE NOEL:  Okay.  Thank you.

1          MR. HULSE:  Thank you.

2          MAGISTRATE JUDGE NOEL:  Since we had simultaneous

3    memos, and I just chose who went first, I don't think we

4    need rebuttal.  I think I have a sense, unless you have a

5    different view.

6          So with that, we'll take our break to get the

7    folks on the phone.  Or is there other stuff?

8          THE COURT:  The people on the phone are expected

9    to be call in at 2:30.

10          MAGISTRATE JUDGE NOEL:  Okay.  We'll be in recess

11    until 2:30.

12                    (Recess at 2:10 p.m.)

13

14

15                      *     *     *

16

17

18          I, Maria V. Weinbeck, certify that the foregoing is

19    a correct transcript from the record of proceedings in the

20    above-entitled matter.

21

22                Certified by:  *s/ Maria V. Weinbeck*

23                          Maria V. Weinbeck, RMR-FCRR

24

25