<pre>
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MINNESOTA
 2
      ------------------------------------------------------------
 3                                )
      In Re: Bair Hugger Forced Air  )  File No. 15-MD-2666
 4    Warming Devices Products      )           (JNE/FLN)
      Liability Litigation          )
 5                                )
                                  )  Minneapolis, Minnesota
 6                                )  October 6, 2016
                                  )  1:06 p.m.
 7                                )
                                  )
 8                                )
      ------------------------------------------------------------
 9
                   BEFORE THE HONORABLE FRANKLIN L. NOEL
10            UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
                            (IDR HEARING)
11
      APPEARANCES
12      For the Plaintiffs:        LEVIN PAPANTONIO
                                   Ben W. Gordon, Jr., ESQ.
13                                 316 S. Baylen Street
                                   Suite 600
14                                 Pensacola, FL 32502

15                                 MESHBESHER & SPENCE
                                   Genevieve M. Zimmerman, ESQ.
16                                 1616 Park Avenue
                                   Minneapolis, MN 55404
17
                                   CIRESI CONLIN
18                                 Jan Conlin, ESQ.
                                   225 South Sixth Street
19                                 Suite 4600
                                   Minneapolis, MN 55402
20
                                   KIRTLAND & PACKARD LLP
21                                 Behram V. Parekh, ESQ.
                                   2041 Rosecreans Avenue
22                                 Third Floor, Suite 300
                                   El Segundo, CA 90245
23
                                   KENNEDY HODGES, LLP
24                                 Gabriel Assaad, ESQ.
                                   4409 Montrose Blvd.
25                                 Suite 200
                                   Houston, TX 77006
</pre>

```
 1      For the Defendants:          BLACKWELL BURKE P.A.
                                     Benjamin W. Hulse, ESQ.
 2                                   Corey L. Gordon, ESQ.
                                     431 South Seventh Street
 3                                   Suite 2500
                                     Minneapolis, MN 55415
 4
                                     FAEGRE BAKER DANIELS
 5                                   Bridget M. Ahmann, ESQ.
                                     90 South Seventh Street
 6                                   Suite 2200
                                     Minneapolis, MN 55402
 7
        Court Reporter:              STACI A. HEICHERT
 8                                   RDR, CRR, CRC
                                     1005 U.S. Courthouse
 9                                   300 South Fourth Street
                                     Minneapolis, Minnesota 55415
10

11          Proceedings recorded by mechanical stenography;
        transcript produced by computer.
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1               **P R O C E E D I N G S**

2                 **IN OPEN COURT**

3               THE COURT:  Okay.  This is the Bair Hugger MDL;

4       MDL No. 2666.  Let's get everybody's appearance on the

5       record.  For the plaintiffs.

6               MR. BEN GORDON:  Your Honor, Ben Gordon for the

7       plaintiffs.

8               MS. ZIMMERMAN:  Your Honor, Genevieve Zimmerman,

9       also for plaintiffs.

10              MS. CONLIN:  Jan Conlin, Your Honor, on behalf of

11      plaintiffs.

12              MR. ASSAAD:  Gabriel Assaad on behalf of

13      palintiffs.

14              MR. PAREKH:  Behram Parekh on behalf of

15      plaintiffs.

16              MR. HULSE:  Good afternoon, Your Honor.  Ben Hulse

17      on behalf of the defendants.

18              MR. COREY GORDON:  Your Honor, Corey Gordon on

19      behalf of the defendants.

20              MS. AHMANN:  Bridget Ahmann for the defendants.

21              THE COURT:  Okay.  And is there anybody on the

22      telephone?

23              MS. ZIMMERMAN:  No.

24              THE COURT:  No, okay.  Sometimes I can tell from

25      my little screen when they are on the phone, but I don't

 1    really know how to read it so.  Okay.

 2            So we are here to follow-up on the list of, as I

 3    count them, initially were eight issues, four identified by

 4    defendants and four identified by plaintiffs, related to

 5    discovery, and the purpose of this conversation is to see if

 6    we can assist the parties in resolving their disputes and if

 7    not, which might require formal briefing, because all I have

 8    before me is a spreadsheet, as requested, identifying the

 9    issue and a brief statement from each side as to their

10    positions regarding it.

11            Do the parties have a particular order in which

12    they want to proceed or are you leaving that all up to me?

13            MR. HULSE:  I'd be happy to just proceed in the

14    order of the chart, Your Honor.

15            THE COURT:  Okay.

16            MR. BEN GORDON:  That's fine with us, Your Honor.

17            THE COURT:  All right.  So let's start with 3M's

18    issue No. 1 which is that plaintiffs' objection to

19    interrogatories are premature.  Mr. Hulse.

20            MR. HULSE:  All right, Your Honor.  So this

21    relates specifically to -- and by the way, Your Honor, you

22    probably don't have plaintiffs' actual substantive discovery

23    responses.  Would it be helpful to have a copy of those?

24            THE COURT:  I'll let you know as you go through

25    this.

1                    MR. HULSE:  All right.  Fair enough.

2                    THE COURT:  If I need it.

3                    MR. HULSE:  And I'll do my best to just recite

4      them.  So we asked a couple of interrogatories to get at the

5      key allegations underlying the complaints that relate to

6      general causation.  One of them was Interrogatory No. 2

7      which requested that plaintiffs identify any scientific

8      methodology for ruling out possible causes of infections

9      other than the Bair Hugger system and then in Interrogatory

10     No. 6 we asked them to identify and tell us about any tests

11     or inspections of the Bair Hugger system that are relevant

12     to the issue of causation, general causation.  In both cases

13     they did not provide any substantive response, objected to

14     those interrogatories as premature and getting into attorney

15     work product relating to -- and that they would disclose

16     experts at the appropriate time.  Clearly we're not entitled

17     to matters that are protected from disclosure at this time

18     in their expert materials, but -- but both concern factual

19     issues that presumably they had facts on at the time that

20     they filed the Complaint.

21                    Now, if they don't have supporting facts for -- in

22     response to Interrogatories No. 2 and 6, they should just

23     say so and we can move on.  But right now it seems that they

24     are simply just deferring substantive answers to these

25     critical questions until the time of expert discovery.  We

1    may have additional fact discovery that we would want to do

2    based on those answers; that's why the answers can't wait.

3              THE COURT:  So the interrogatories, and maybe I do

4    need to look at them.

5              MR. HULSE:  Sure.

6              THE COURT:  But just looking from your spreadsheet

7    here, your interrogatories simply ask them to identify

8    scientific methodology, that is, they don't have to explain

9    it or go into it or try to persuade you or anything, just

10   say there is a scientific methodology that we employed, it

11   is X?

12             MR. HULSE:  Right.  And I think it identifies a

13   defined term.  But it is basically requiring them to provide

14   some information so that we know what they're talking about.

15             THE COURT:  Okay.

16             MR. HULSE:  Would you like copies, Your Honor?

17             THE COURT:  Sure.

18             MR. HULSE:  All right.  Would you like an extra

19   copy?  Okay.

20             THE COURT:  Ms. Zimmerman.

21             MS. ZIMMERMAN:  Thank you, Your Honor.  To begin

22   with, the plaintiffs would like to emphasize for the Court

23   that the obligation the plaintiffs have in these cases and

24   before Your Honor is to prove more likely than not that the

25   allegations that we've made are true.  They are not to rule

1    out all other possible causes -- pardon me -- causes of

2    plaintiffs' theories other than the Bair Hugger system.  So

3    to extent that the burden of proof continues to be

4    misstated, we want to make that clarification.

5            Secondly, we think that the Court's scheduling

6    orders, first in Pre-trial Order No. 4 and more recently as

7    clarified in Pre-trial Order No. 13, govern the disclosure

8    of expert opinions and the methodology underlying those

9    opinions, and we are certainly prepared to, we have retained

10   experts and we will be preparing detailed reports explaining

11   their methodology and the facts supporting the opinions that

12   they offered to this Court.  But those -- those disclosures

13   will be provided pursuant to the Court's order, and I

14   believe that the expert reports are then do February 2nd,

15   not now in October.

16           THE COURT:  So what, as I understand the issue,

17   then, before me is whether or not these interrogatories are

18   actually asking for the disclosure of expert opinions?

19           MS. ZIMMERMAN:  That may be, Your Honor.

20           THE COURT:  And you say that it is and the

21   defendants say no, we just want you to identify as a matter

22   of fact any scientific methodology to rule out blah, blah,

23   blah and if you don't have any, as you've observed, that's

24   not the burden of proof the plaintiff has, maybe that's the

25   answer to the interrogatory, but I assume from what

 1    Mr. Hulse says, that's not what you've said.  Is that a

 2    fair --

 3              MS. ZIMMERMAN:  I think that that's fair, Your

 4    Honor.  I think to the extent that there are two main

 5    interrogatory responses that Mr. Hulse identified as

 6    problematic, first, the methodology to rule out all other

 7    potential causes and then, secondly, whether there are any

 8    tests or inspections that we've done, those are two separate

 9    issues.  I think, in plaintiffs' view, both really get at

10    and are an attempt to conduct expert discovery in an

11    expedited fashion in advance of what the pre-trial

12    scheduling order sets forth.  But -- but, you know, to the

13    extent that defendants are asking for something much more

14    general about how this might possibly be done, that, I

15    guess, is not the way the plaintiffs read the request.

16              THE COURT:  Okay.

17              MR. HULSE:  Your Honor, may I clarify one thing

18    about Interrogatory No. 6?  That's the one that relates to

19    tests?

20              THE COURT:  Okay.

21              MR. HULSE:  It's not restricted to tests or

22    inspections that have been performed by plaintiffs

23    themselves.  It is meant to get at any test or inspections,

24    and that's the way it's written.  It does ask about any

25    costs or fees that the plaintiffs have incurred relating to

 1    any tests, that's part of it, but it relates to any tests or

 2    inspections.

 3              THE COURT:  I got lost there.  Say it again.

 4              MR. HULSE:  I'm sorry, Your Honor.  So

 5    Interrogatory 6 states -- it says state whether any tests or

 6    inspections have been formed at any time to evaluate, not

 7    specifically whether they've been performed by the

 8    plaintiffs.  So presumably they're aware of tests.  You

 9    know, they cite studies in their Complaint.

10              THE COURT:  But it doesn't exclude tests performed

11    by plaintiffs?

12              MR. HULSE:  Certainly not.  Certainly not.  But

13    it's meant to be broader than that.

14              THE COURT:  Okay.

15              MR. HULSE:  Yeah, so.

16              THE COURT:  And I mean, technically, as worded, if

17    they were aware of any testing that 3M has done, they should

18    answer by saying 3M did the following things.

19              MR. HULSE:  Absolutely, Your Honor.

20              THE COURT:  Not that --

21              MR. HULSE:  I understand that, of course, you

22    know, they are reviewing our discovery, including tests that

23    we've produced, and so that may be something they

24    supplement, but to the extent at this point they are aware

25    of tests that are -- they view as relevant to this issue of

1    general causation in particular, then that's -- ought to be

2    part of their interrogatory response.

3              THE COURT:  Okay.

4              MS. ZIMMERMAN:  And, Your Honor --

5              THE COURT:  Anything else on that point,

6    Ms. Zimmerman?

7              MS. ZIMMERMAN:  If I may, I think that perhaps we

8    would benefit from some additional clarification on what the

9    defendants are seeking from us in this regard.  I mean, to

10   the extent the interrogatory is requesting that plaintiffs

11   identify every test not just that we've conducted or that

12   we're aware of but that perhaps that 3M has done or somebody

13   unaffiliated with either 3M or the, you know, any of the

14   other study authors, we just wouldn't be aware of that, so I

15   think that would be both premature and overbroad.

16        To the extent that defendants are trying to get at

17   some testing we've done, I think that the Court is aware

18   from the presentation we made on science day that we've done

19   some preliminary computation fluids dynamics testing, for

20   example.  That testing is going to be detailed further with

21   respect to expert reports.  And it is not the instance, at

22   least with respect to our experts, that any of our experts

23   have put something on the internet or on YouTube, for

24   example, that would open them up to an early, premature

25   disclosure of publically shared opinions that may weigh in

1    on this case or be relevant to discovery in this matter.

2            THE COURT:  Okay.  All right.  Well, it appears to

3    me that the interrogatory, and just to make sure I'm clear,

4    we're talking about Interrogatories Nos.  2 and 6, correct?

5            MR. HULSE:  That's correct, Your Honor.

6            THE COURT:  Okay.  It appears to me that

7    Interrogatory Nos. 2 and 6 do not, in and of themselves,

8    call for the disclosure of expert information.  They simply

9    ask the plaintiffs to identify any scientific methodology

10   they contend can be employed to rule out all other possible

11   causes of the injuries you allege other than the Bair Hugger

12   system, and it would seem to me that if the plaintiffs can

13   answer that question if there is such a methodology, they

14   can include in their answer that the answer is irrelevant

15   because that's not a standard that anybody needs to meet,

16   but I think the objection that they're premature is

17   overruled.  The plaintiff should answer each of these

18   questions.  As to what the answer is, is up to the

19   plaintiffs' lawyers to figure out how to answer them.  I

20   don't think it requires them to disclose the content of any

21   such tests or methodology, simply to identify what their

22   position is with regard to that and whether they exist.

23           Okay.  The next matter is 3M's issue No. 2 is

24   plaintiffs' restriction of their discovery responses to

25   documents and information in the possession of the

```
 1        Plaintiff's Executive Committee.  Mr. Hulse.

 2                 MR. HULSE:  Thank you, Your Honor.  We're actually

 3        not clear, this is -- objection is spelled out in a number

 4        of responses to 3M's request, but it may be one that is

 5        applied to all of plaintiffs' responses, both to document

 6        production and interrogatories.  Plaintiffs' position is

 7        that it is too burdensome for them to respond to the

 8        interrogatories and document requests which are focussed on

 9        this issue of general causation other than from the

10        Plaintiff's Executive Committee.  You know, of course, our

11        viewpoint is this is really, they've got an e-mail list,

12        they know who the other plaintiffs' counsel are, it's not

13        that difficult a thing to reach out to the other plaintiffs'

14        counsel in this MDL, all of whom are maintaining the same

15        claims, and say do you have -- and ask them if they have

16        information or documents that are responsive to these

17        interrogatories, and there's no reason they couldn't verify

18        interrogatories as in a position of colead counsel on behalf

19        of everybody .

20                 The reason this is particularly concerning to us,

21        Your Honor may remember this issue of these MedWatch

22        reports.  These are medical complaints, adverse event

23        complaints that are being filed with the FDA.  They appear

24        to be authored by attorneys.  We learned through deposition

25        that at least one of them was apparently authored by
```

1    Dr. Scott Augustine who has sort of fomented this litigation

2    and is a competitor of 3M.  And so we know that, you know,

3    that plaintiffs have sought extensive discovery on medical

4    complaints and presumably are going to rely on the existence

5    of complaints to say that 3M was on notice and, you know,

6    and didn't do what it should have done and the complaints

7    cumulatively help establish the severity of the issue that

8    they're alleging, and yet the Plaintiff's Executive

9    Committee individually say, you know, that they have no idea

10   where these complaints came from.  They clearly are coming,

11   from what we can tell, from lawyers, likely lawyers who are

12   in the mix in these cases, but that's not something we can

13   get at to challenge the credibility of these reports without

14   being able to get discovery from the other plaintiffs'

15   counsel.

16          And, in fact, there doesn't appear to be any

17   mechanism right now for us to get discovery other than from

18   the Plaintiff's Executive Committee in the general causation

19   phase.  And waiting until the bellwether phase is not going

20   to be adequate because that's only going to be able to get

21   us discovery for, you know, for whatever it is going to be

22   for 10, 20, whatever it is, individual cases.

23          So essentially we have a -- the counsel for a

24   large swath of cases here who appear to be insulated from

25   discovery by this objection, and that's why we're raising

1      the issue.

2              THE COURT:  Do we have specific discovery requests

3      as to which this is the objection asserted?

4              MR. HULSE:  Yes, Your Honor.  And it's, in

5      particular, the request that concern communications with

6      Dr. Scott -- I'll get you the numbers here, Your Honor, of

7      the requests, Interrogatories No. 3 and 8.  One, 3 is

8      identify communications with the U.S. Food and Drug

9      Administration and any MedWatch reports submitted by you,

10     defined as all plaintiffs, and your attorneys.  And 8 gets

11     at communications with Dr. Augustine and his various

12     affiliated entities.

13             And we know, and I -- I'll say that the plaintiffs

14     have not produced any communications with Dr. Augustine.

15     They have not logged any communications with Dr. Augustine

16     to the extent they are asserting a privilege.  And, Your

17     Honor, of course, was involved in the motion to compel

18     against Augustine back in winter of last year, and

19     Dr. Augustine and his attorney produced a privilege log that

20     showed extensive communications between plaintiffs' counsel,

21     including, including, members of Plaintiff's Executive

22     Committee and Dr. Augustine, his lawyers and other people at

23     Augustine's businesses, and we haven't seen any reflection

24     of that either in production or privilege log, so that's

25     another reason why we're concerned about the narrow approach

 1     that's being taken on these issues.

 2              THE COURT:  So it's just Interrogatories 3 and 8,

 3     dealing --

 4              MR. HULSE:  Yep.

 5              THE COURT:  None of the document requests?

 6              MR. HULSE:  Yeah, those are interrogatories, and

 7     there are associated document requests.  Your Honor, but

 8     it's not clear to us whether this is also an implicit

 9     objection to the other document requests and

10     interrogatories.  Because plaintiffs have said, essentially,

11     in these instances, that it's too burdensome.  We know they

12     haven't gone out and gotten discovery from other plaintiffs'

13     counsel or other plaintiffs because they've said that's too

14     burdensome, so there's no reason to believe that doesn't

15     apply to all of their responses here.

16              THE COURT:  Okay.  Ms. Zimmerman.

17              MS. ZIMMERMAN:  Thank you, Your Honor.  As a

18     starting number -- or as a starting point, I think that to

19     the extent that the requests are for information that may

20     have been submitted to the FDA by some unknown party, the

21     defendants could certainly obtain that through a FOIA

22     request.

23              And to the extent that there is another request,

24     and that's for information from Dr. Augustine, they

25     certainly have demonstrated their ability and interest to

1    conduct third-party discovery in this instance, and as I

2    understand it, Mr. -- or pardon me, Dr. Augustine has indeed

3    provided a privilege log, and as we understand it, that

4    would be his privilege to invoke.

5            Now, plaintiffs' lead counsel, and, to my

6    knowledge, everybody on the Plaintiff's Steering Committee,

7    with the exception of one firm, have had no interactions in

8    any regard with Dr. Scott Augustine.  There is one firm on

9    the Plaintiff's Executive Committee that was hired by

10   Dr. Scott Augustine, and so to the extent there were

11   communications at one point, that would be something that

12   would be produced on a privilege log, I would assume, by

13   Dr. Augustine.

14           Now, as a policy matter, the FDA and the

15   regulations governing MedWatch reports actually encourage

16   doctors, members of the public, patients that are harmed,

17   lawyers, manufacturers of defective products to make these

18   reports on a voluntary basis, and the reason for that is so

19   that the FDA and the public can continue to monitor

20   potentially defective products and try to seek out trends.

21           Now, we have gone to this Court, and we have made

22   many representations, both to defense counsel and before

23   this Court, as officers of this court, that we were not

24   involved in this, and we stand on that.  We have not been

25   involved in these MedWatch reports.  But to the extent that

1     the defendants are interested in seeking that information,

2     we think that they could get that from the FDA through a

3     FOIA request.

4             Secondly, with respect to the defendant's request

5     that they have this information in advance of bellwether

6     cases -- and actually, before I even get there, we have also

7     represented, both to the defendants and in the charts

8     submitted to the Court, that we are willing, and in fact,

9     the e-mail will go out to all counsel of record tomorrow,

10    and we will seek this information to see if there are people

11    beyond the Plaintiff's Steering Committee that have somehow

12    had MedWatch reports or some involvement with that, and we

13    will report back to the Court and defense counsel no later

14    than the status conference next week.

15            But to the extent that the defendants are asking

16    for or seeking discovery that is going to be relevant in

17    some way to individual cases and bellwether selection, the

18    Court's pretrial scheduling order does not allow case

19    specific discovery to happen until March 2nd.  So, again,

20    while we are absolutely willing to and have indicated our

21    interest or willingness to -- to poll the plaintiffs and to

22    report back and to produce any documents that we become

23    aware of, this is, again, premature because this is case

24    specific discovery that is not intended to commence pursuant

25    to the scheduling order until next spring.

 1              MR. BEN GORDON:  And Your Honor, if I could add

 2       one thing to that just briefly?

 3              THE COURT:  Sure.

 4              MR. BEN GORDON:  I have spoken to Mr. Blackwell at

 5       length about this issue for months and told him explicitly

 6       that we have, as the Plaintiff's Executive Committee, talked

 7       to counsel around the country in various meetings.  Everyone

 8       we have had the opportunity to talk to has told us, as we

 9       represented to the Court, that they have not made these

10       reports, and the defense knows that.  We have not -- no

11       plaintiffs' lawyer we're aware of has made any of these MDR

12       reports to the FDA.  They know that.  And I think this is a

13       fishing expedition.  I think they know who has made these

14       reports.  They brought it up at a deposition yesterday.

15              MR. HULSE:  I'm not sure what that means,

16       honestly.

17              Your Honor, first off, requests, document requests

18       4 and 25 are the ones where the --

19              THE COURT:  So those are the documents requests

20       that are related to Interrogatories 3 and 8?

21              MR. HULSE:  Correct.  4 relates to communications

22       with regulators and 25 relates to communications with

23       Dr. Augustine.  And, again, I want to emphasize the issue

24       here is the objection.  If plaintiffs' position is that they

25       have gone to the other plaintiffs' counsel and asked them to

1      produce, respond to colead counsel responsive documents and

2      responsive information and are satisfied under their

3      discovery obligations that they have done so, that's one

4      thing, but what we have right here is simply an objection.

5              And also, it is simply not a proper objection that

6      we can go out and subpoena Dr. Augustine for documents that

7      are in the possession of plaintiffs' counsel.  Your Honor is

8      aware that we have struggled with Dr. Augustine and his

9      companies and his counsel in getting documents, and it will

10     be -- that issue will be in front of you again in due time.

11             So it is simply not a proper objection under the

12     federal rules or the case law of this district or any

13     district I've ever seen that you can withhold documents that

14     are reasonably within your possession, custody, control,

15     particularly given the obligations of colead counsel to

16     stand in for all the other plaintiffs' counsel in the case,

17     and you can withhold those documents just because, in

18     theory, the defendants might be able to get them from a

19     third party who has objected strenuously to discovery.  And

20     though it's acknowledged and it is right there in the

21     privilege log that we have from Dr. Augustine that there

22     were extensive communications between the Kennedy and Hodges

23     firm and Dr. Augustine and others, we still don't have a

24     privilege log from the plaintiffs as they are obligated to

25     give us in this case.  We don't have a single entry on any

 1   privilege log.

 2          But anyway, I've spoken enough on this, Your

 3   Honor, and we think that the objection, the burden objection

 4   should be overruled.

 5          THE COURT:  Okay.  It appears to me that as to

 6   Interrogatories 3 and 8 and documents 4 and 25 -- I'm sorry,

 7   I have one other question for you, Ms. Zimmerman.  As I read

 8   the response, the last sentence says, "Subject to that

 9   objection, please see FOIA requests attached."  So have the

10   plaintiffs' counsel made Freedom of Information Act requests

11   to the FDA?

12          MS. ZIMMERMAN:  We did, Your Honor, and we

13   provided those to defendants.

14          THE COURT:  Okay.  But have you received anything

15   back yet?

16          MS. ZIMMERMAN:  Yes, we did, and we provided the

17   response.  It's a very brief response.

18          THE COURT:  I was going to say.

19          MR. HULSE:  And it was --

20          THE COURT:  Is it a listing of all of these

21   notifications, or what exactly is the -- what did the FDA

22   give you in response to your Freedom of Information Act

23   request?

24          MS. ZIMMERMAN:  Your Honor, that I think what we

25   have from -- we submitted two different FOIA requests.  The

```
 1    first response is I think four or five pangs long and it's
 2    not a list of all the MedWatch.  I don't think that that is
 3    specifically what we asked for.  So I guess what our
 4    suggestion would be is that to the extent that that's what
 5    the defendants are getting at or wanting to get from us,
 6    they could submit their own FOIA requests to the FDA
 7    requesting MedWatch reports.
 8                THE COURT:  Okay.
 9                MR. HULSE:  Could I briefly explain what the
10    limitation is on that, Your Honor, is, and a FOIA request
11    is, first off, what you get back is redacted, it doesn't
12    contain information about the submitter and so forth, and
13    what really goes to the credibility of these complaints
14    being submitted to the federal government is the background
15    behind them.
16                I mean, what we've learned through this deposition
17    yesterday and other discovery is that, you know,
18    Dr. Augustine was behind one of these, and, you know, we're
19    going to be pursuing additional discovery behind that.
20    That's something that we wouldn't have been able to tell
21    merely from getting the documents through a FOIA request
22    from the federal government.
23                THE COURT:  Okay.  So it would appear to me that
24    to the extent that plaintiffs' request to Interrogatories
25    No. 3 and 8 and Document Requests Nos. 4 and 25 is that the
```

 1    requests are overbroad and unduly burdensome, that objection

 2    should be overruled.

 3              To the extent that plaintiffs' counsel have only

 4    answered those interrogatories and/or document requests as

 5    they relate to Plaintiff's Executive Committee, it would

 6    appear, to me, that that response is inadequate and that

 7    Interrogatories 3 and 8, 4 and -- and Document Requests 4

 8    and 25 should be communicated to all counsel for all

 9    plaintiffs, and that, I believe, would fall within the job

10    description of your liaison counsel.

11              MS. ZIMMERMAN:  Sure.

12              THE COURT:  Is that the correct person to

13    communicate -- to coordinate the communication with all of

14    the individual plaintiffs' lawyers and respond on behalf of

15    each of the plaintiffs.

16              To the extent there are privilege objections

17    asserted, I don't think I have enough information in front

18    of me to actually rule on a privilege.  I understand that at

19    least some of these responses include assertion of work

20    product and attorney-client privilege, and I simply don't

21    think there is adequate record for me to render an opinion

22    on that one way or the other.

23              And as to the -- and as I understand it, what

24    I -- my opinion that I've just expressed is not inconsistent

25    with the plaintiffs' willingness to poll all of plaintiffs'

```
1    counsel and to pass on the document requests and

2    interrogatories and produce whatever documents are

3    identified by counsel for all of the plaintiffs and

4    communicate their answers to interrogatories.

5            Which brings us to 3M's issue No. 3, plaintiffs'

6    objection to disclosing or producing communications with

7    Dr. Augustine on the basis of burden and privilege.

8            MR. HULSE:  And, Your Honor, may I ask --

9            THE COURT:  Do you have more on that?

10           MR. HULSE:  Do you have -- and we've covered

11   probably part of that issue.  Whether Your Honor has any

12   direction around when the -- those responses to 3M's

13   requests should be made by?

14           MS. ZIMMERMAN:  Your Honor, as I stated, we're

15   prepared to have that information or the e-mail circulated

16   tomorrow, and we will provide everything that we get back

17   from Mr. Szerlag by when we're in court next Thursday.

18           MR. HULSE:  Absolutely acceptable.

19           MR. BEN GORDON:  With understanding that we can't

20   guarantee we'll get 100 percent response, but we'll do our

21   best.

22           MR. HULSE:  I think it might be helpful to their

23   efforts if there were a deadline is my thought on this.

24           THE COURT:  Okay.  So let's -- we'll take

25   Ms. Zimmerman's and Mr. Gordon's undertaking to get the
```

 1    e-mail circulated within a day and then hopefully the

 2    responses will be available by our next Thursday, you're

 3    referring to our status conference?

 4              MS. ZIMMERMAN:  Yes, Your Honor.

 5              THE COURT:  And we'll see where we are at that

 6    point.

 7              MR. BEN GORDON:  I just might add, Your Honor,

 8    just so I'm clear, there are about a hundred counsel I think

 9    and 760 cases or so filed, so we will produce everything

10    that we have by next week and the report to the Court,

11    knowing that we will probably have some people who may have

12    not responded yet, but we'll use all our best efforts to get

13    them to respond immediately.

14              THE COURT:  Okay.  All right.  So now we're on to

15    the next one which is related and overlaps to some degree.

16              MR. HULSE:  And that's correct because it concerns

17    Document Request No. 25 and Interrogatory No. 8, and the

18    only thing that I think it remains, because the burden

19    objection, as we understood it, was the going beyond

20    Plaintiff's Executive Committee is that there is a privilege

21    objection, and what we understand is that there may be, may

22    be, a privilege assertion here over communications between

23    plaintiffs' counsel and Dr. Augustine and his corporate

24    entities.  And as I've mentioned and have with me here

25    today, we have a privilege log, we think it's an adequate

1    log, but a privilege log from Dr. Augustine that does

2    reflect quite a few communications between plaintiffs'

3    counsel and Dr. Augustine, yet we have not received any kind

4    of privilege log from plaintiffs' --

5              THE COURT:  Does the log identify which

6    plaintiffs' counsel he has communicated with?

7              MR. HULSE:  It does.  Mr. Assaad and Mr. Hodges.

8              THE COURT:  And it's the same in every case?

9              MR. HULSE:  Yes, indeed.

10             MR. BEN GORDON:  It's just one lawyer, Your Honor.

11             MR. HULSE:  Yes.

12             THE COURT:  And that is the Kennedy firm you

13   reference, Ms. Zimmerman?

14             MR. BEN GORDON:  Yes, Your Honor.  Kennedy Hodges.

15             MR. HULSE:  Your Honor, may I hand up copies?

16             THE COURT:  Sure.

17             MR. BEN GORDON:  And by the way, Your Honor, just

18   so it's clear, I think it is, because as Mr. Hulse said, you

19   spoke to this last year, this all happened long before the

20   MDL.  This was --

21             THE COURT:  Anything else, then, on this issue,

22   Mr. Hulse?

23             MR. HULSE:  Your Honor, it's just -- it's

24   obviously not only relevant itself but it's important to us

25   in evaluating the sufficiency of Dr. Augustine's responses

1    to our subpoenas to also get a privilege log from the

2    plaintiffs and to see whether they, in fact, agree with each

3    other on the communications that occurred, and there is no

4    exemption in the privilege log protocol which is PTO-11 for

5    these communications.

6              THE COURT:  Okay.  Ms. Zimmerman.

7              MS. ZIMMERMAN:  Thank you, Your Honor.  I think

8    that, again, I'd like to emphasize that the vast majority of

9    the lawyers involved for the plaintiffs have had no

10   communication of any kind with Dr. Augustine.  And as I've

11   heard this Court remind us before, to the extent that we

12   want the Court to do something, we need to bring a motion.

13   To the extent that defendants have a problem with

14   Dr. Augustine, if they have a problem, I'm sure that they

15   can avail themselves of the Court by bringing a motion to

16   compel, whether it be about the privilege log or something

17   else with respect to the discovery sought from him, but that

18   we are not Dr. Augustine's counsel and we are not

19   responsible for that production.

20             Further, the Pre-trial Order No. 11 specifically

21   addresses exactly this, and it says that parties do not need

22   to list on a privilege log any documents generated after the

23   filing of the original Complaint in *Walton* that were sent

24   only to or received only from plaintiffs' counsel.  So it is

25   plaintiffs' position that we are not required to log any

1    such communications to the extent that they exist with one

2    firm.

3              And as this Court was I think presented last year

4    about this time, two courts had previously ruled on this

5    issue with respect to privilege logs and the obligation

6    being on Dr. Augustine.  So in addition to the agreement

7    that we reached with respect to pre-trial order No. 11, we

8    think that it would be unnecessary, duplicative to order the

9    plaintiffs to produce -- to manufacture and produce a

10   privilege log here as well.

11             THE COURT:  So just to make sure I'm clear,

12   though, is there -- is it the plaintiffs' position that

13   there are no pre-*Walton* communications between Dr. Augustine

14   and the one lawyer that is on your committee?

15             MS. ZIMMERMAN:  No, Your Honor.  I do believe that

16   there are some communications between Dr. Augustine and

17   attorneys at the Kennedy Hodges firm prior to the filing of

18   *Walton*.  I -- I am not familiar personally with the extent

19   of those communications.  It is my understanding that they

20   appear on a privilege log or that they would appear on a

21   privilege log.  I certainly wouldn't be in a position to

22   make such a privilege log, but I believe that Dr. Augustine

23   or his attorney would have done so.

24             THE COURT:  And you haven't, as I understand it,

25   polled counsel across the MDL for any communications they

1    may have had with Dr. Augustine prior to the filing of the

2    *Walton* case?

3                MS. ZIMMERMAN:  No, we have not.  And if the Court

4    would so order that we, in addition to the e-mail from Mr.,

5    the liaison counsel, on the interrogatories, if it would be

6    the Court's preference that we formally request information

7    about any such communications with Dr. Augustine, we're

8    certainly happy to include that.

9                THE COURT:  Well, that is one of the ones we just

10   talked about, right?

11               MS. ZIMMERMAN:  Yes.

12               THE COURT:  Isn't that Interrogatory No. 8?

13               MS. ZIMMERMAN:  Yes.

14               THE COURT:  And so that will be in your e-mail?

15               MS. ZIMMERMAN:  Correct.

16               THE COURT:  All right.  So anything else you want

17   to tell me?

18               MS. ZIMMERMAN:  No.

19               THE COURT:  All right.  So it appears to me that I

20   simply don't have an adequate record to determine whether

21   anything or isn't privileged, and if either party -- if any

22   party wants the Court to rule that something is privileged

23   or is not privileged, that does need to be the subject of

24   formal motion practice with a fuller record and a fuller

25   argument on the issue of privilege.

1          It does appear to me, however, that any such

2     communications prior to the filing of *Walton* from any lawyer

3     in the MDL should be identified on a privilege log to the

4     extent that the plaintiffs are asserting that there is an

5     attorney-client privilege that covers any particular answer

6     to interrogatory or any particular document that is sought.

7     So if there are any such communications that predate the

8     first filing of the *Walton* case, they should be included on

9     a privilege log.  But the Court is unprepared and will not

10    render any opinion on the issue of whether documents are or

11    are not or communications are or are not privileged.

12          MR. HULSE:  Your Honor, may I speak to the point

13    about post -*Walton* communications with Dr. Augustine?  Thank

14    you.  Plaintiffs' counsel have taken the position that any

15    communications between plaintiffs' counsel and Dr. Augustine

16    post filing of *Walton* are exempted from logging under PT-11.

17    That's definitely not the case.  And we -- when we

18    negotiated this, we negotiated specific language in mind

19    that it wouldn't include that.

20          And if you simply read the paragraph B, it has a

21    very narrow exemption for logging for post-*Walton*

22    communications, and those have to be sent only to or

23    received only from plaintiffs' counsel, and you can look at

24    that log that Dr. Augustine produced and see that none of

25    those communications fall into that exemption.

```
 1              If that exemption -- if this were written

 2    differently, half of the documents on our privilege log

 3    wouldn't be there, because we have logged, per the language

 4    that plaintiffs negotiated with us, many, many, many

 5    documents, hundreds and hundreds of documents, where an

 6    attorney is copied or an attorney is the --

 7              THE COURT:  I'm sorry.

 8              MR. HULSE:  I'm sorry?

 9              THE COURT:  Do you have the -- what, it's

10    paragraph 11?

11              MR. HULSE:  Yes, Your Honor.

12              THE COURT:  It's Pre-trial Order No. 11?

13              MR. HULSE:  11.

14              THE COURT:  11.

15              MR. HULSE:  Correct.

16              THE COURT:  Do you have that handy?

17              MR. HULSE:  Yes.  Just one copy, I'm afraid.

18              THE COURT:  All right.  Well, it appears to me

19    that paragraph B certainly covers this.  Read in its

20    entirety, "The parties need not list on a privilege log

21    documents generated after the filing of the original

22    Complaint in Tommy Walton versus 3M Company, et al., that

23    were sent only to or received only from plaintiffs' counsel,

24    the legal departments of the defendants or the outside

25    counsel for the defendants in this litigation except for
```

1    specific categories of documents agreed to by the parties or

2    as required by court order.

3              "The parties reserve their rights, however, to

4    request that certain subcategories of privileged documents

5    in these categories be logged.  If the parties are not able

6    to reach an agreement on whether such subcategories of

7    documents should be logged, within ten court days of the

8    request, either party may present the issue to the court for

9    resolution using the procedures prescribed by the local

10   rules or by order of the court."

11             So if there's still a dispute about whether these

12   Augustine communications are or are not covered by this

13   paragraph, it sounds to me like you've got ten court days to

14   do something about it.  And I don't know what a court day

15   is, by the way.  And the Court issued this order and it is

16   signed by the Court, so I won't say anything other than to

17   observe that the entire United States legal establishment

18   went through a big thing a few years back to change all of

19   the rules and all of the statutes and everything in the

20   world to simply say that a day is a day, whether it's a

21   Saturday, Sunday, holiday, or anything else, it is just a

22   day and it gets counted, so I'll leave that where it is --

23             MR. HULSE:  And I guarantee you, you will not see

24   the phrase "court days" in any further filings.

25             THE COURT:  Well, it is in the Court's order, so

1    I'm taking responsibility for it.

2            MR. HULSE:  And I just say, Your Honor, that under

3    that definition, certainly as we've applied it to our own

4    privilege log, none of these communications that are on

5    Augustine's log would fall into that category.  You have,

6    you know, author Scott Augustine sending communications to

7    David Hodges and Randy Benham.  Randy Benham is not counsel

8    for the parties here, he's counsel for Dr. Augustine.  So

9    that doesn't fall -- get exempted from logging under this

10   provision.  That applies to each and everything under that

11   log.

12           And plaintiffs phrased this carefully too when we

13   were working on this because what they were very concerned

14   about is just because something was copied to an attorney at

15   3M, they didn't want to necessarily have it exempted from

16   logging if it was also copied -- you know, you've got ten

17   business people who get sent an e-mail and an attorney gets

18   copied, they wanted that logged.  They didn't want it

19   exempted from logging.  And so this provision has the same

20   effect on the other side of meaning that their

21   communications with Dr. Augustine also have to be logged.

22   And that's -- it's not the easiest language to parse, but

23   that was basically the reciprocal meaning of this.

24           THE COURT:  I will just leave it here which is

25   what I said before is my opinion that clearly any

1    communications pre-*Walton* should be logged, because, as I

2    understand it, plaintiffs concede that's the reading, at

3    least that.  To the extent you want to argue the need for

4    further logging of communications of Dr. Augustine, that's

5    what the rest of this paragraph is about, and you can make a

6    motion as well as the whatever motion practice is necessary

7    for the actual determination of whether there is any

8    privilege or no privilege governing all of this.

9              MR. HULSE:  Understood, Your Honor.  Thank you.

10             THE COURT:  And you can return this to Mr. Hulse.

11   I notice it does have his work product on it so.

12             MR. HULSE:  Thank you.

13             THE COURT:  Thank you.  All right.  The last item

14   on the 3M issues is issue No. 4 which is plaintiffs'

15   objection to producing documents that are, quote, equally

16   available to defendants, end quote.  Mr. Hulse.

17             MR. HULSE:  Thank you, Your Honor.  We've

18   specified here in the chart the particular request where

19   this objection is made that where we're concerned.  We've

20   touched on some of them already.  We've got requests for

21   production No. 22, No. 24, No. 31.  Plaintiffs' position is

22   basically if you can go to a regulator or subpoena a third

23   party, then even if it's in the -- the documents are in the

24   plaintiffs' possession, custody or control, they don't have

25   to produce them.

 1             It's not supported by any rule.  It's not

 2    supported by any case law.  We have not taken that position

 3    in responding to discovery from plaintiffs.  I can't swear

 4    we never made the objection, but we have not maintained that

 5    objection.  Our viewpoint is if you've got a responsive

 6    document and it's not privileged, you have to produce it.

 7             THE COURT:  What about if they have documents that

 8    they got from you?

 9             MR. HULSE:  Oh, well, then I -- that's just fine.

10    Nobody would need to produce our own documents back to us.

11    But if they got them from a third party, even if, in theory,

12    we could go get them from the third party, they're in their

13    possession, custody or control and they ought to be

14    produced.

15             We also don't have here any real specification

16    about what exactly they have so we don't know if we could or

17    could not go get it.  So if you're going to say something is

18    equally available, you ought to tell us what it is and where

19    you got it from.  But like I said, it seems like the far

20    less burdensome thing is reduce the FOIA requests, reduce

21    the litigation, the third-party subpoenas and practice and

22    give us what you've got.

23             THE COURT:  Okay.

24             MR. BEN GORDON:  Your Honor, we'll make this one

25    easy, I think, as well.  We certainly contend that a lot of

1    the information is redundant, duplicative and not only

2    readily available to 3M but 3M has it.  For example, these

3    videos they talk about that are on YouTube are clearly

4    publically available.  In fact, they reference some of them

5    on the Blackwell Burke website.  These studies and all, they

6    have these copies.  But it doesn't seem to me to be

7    consistent with the practice of promoting the efficiency.

8    But if they want us to send them hard copies of things they

9    already have, including videos of these things that they

10   talk about on their website and publically available medical

11   articles, we'll do it if that's what the Court wants.

12            THE COURT:  Okay.  And it's part of your position

13   on this was that there are some documents that you actually

14   have already -- that you actually received from 3M.  I think

15   we just heard Mr. Hulse says he's not asking you to give

16   those back or --

17            MR. BEN GORDON:  I made note of that.

18            THE COURT:  -- to copy those otherwise identify

19   them, so it is simply anything you got from anywhere else

20   that is responsive to the requests will be produced.

21            MR. BEN GORDON:  We've talked it over, Your Honor,

22   and if that's the Court's order, that's what -- we can do

23   that.

24            THE COURT:  Just to be clear, by the way, before

25   we move on to the next set of issues, when I say this is

```
 1    what I'm thinking, this is my thing, it's technically not an

 2    order of the Court.  It's my assist -- my attempt at

 3    assisting the parties, and to the extent everybody agrees to

 4    do what I've said, it's because you've voluntarily agreed to

 5    do what I said.  It's not a court order in the sense that if

 6    you need to object to it, appeal it, that's not going to

 7    happen.  It's simply that will -- the consequence of not

 8    doing what I say is that somebody needs to make a formal

 9    motion and then we'll go through the whole rigamarole.

10              MR. BEN GORDON:  Understood, Your Honor.  I think

11    this process has been helpful to us, both sides, and that's

12    one of the reasons we appreciate you taking the time to do

13    this on an informal basis.  And based on that, we've evolved

14    in our thinking a little, and we'll produce these documents

15    that we think they already have.

16              THE COURT:  All right.

17              MR. BEN GORDON:  Thank you.

18              THE COURT:  That takes us to the plaintiffs'

19    issues.  Plaintiffs' issue No. 1 is CFR/QAV/AIS query

20    streams.  Who is speaking to that one?

21              MR. PAREKH:  Good afternoon, Your Honor.  Behram

22    Parekh.  And there's actually CRM.  It's another alphabet

23    soup item that got left off that list.  Essentially the

24    dispute is what part of this database they need to review

25    and produce to us, and there's multiple databases.  But the
```

1    CRM database is the essentially the customer relations

2    system where complaints, queries, things, things from

3    customers come back into 3M.  And I believe that also

4    includes sales rep information that's put in there.

5           MR. HULSE:  Correct.

6           MR. PAREKH:  And so our view is if it relates to

7    Bair Hugger, they should be producing it, because it is

8    almost impossible for us to tell what language anybody was

9    using to talk about things related to this case versus

10   things unrelated to this case.

11          THE COURT:  Let me interrupt for a second and ask

12   this question which is I thought, and maybe I -- I guess

13   obviously I did, maybe erroneously, that's what this whole

14   Pre-trial Order No. 12 was about, the whole

15   computer-assisted protocol whereby you're going to teach the

16   machine how to look for documents and then the machine is

17   going to look for them, isn't this the kind of database that

18   you would be running through that protocol?

19          MR. PAREKH:  No.  Unfortunately that protocol does

20   not work well for things like database records.  That works

21   for documents, e-mails, things like that.  When it comes to

22   database records, the way that protocol works is it looks

23   for similarities in language and structure with documents

24   and that algorithm does not carry over into databases.  It

25   just doesn't work properly from a technical perspective.

```
1              THE COURT:  Okay.

2              MR. PAREKH:  So --

3              THE COURT:  So you're still left with doing

4    keyword searches?

5              MR. PAREKH:  You're either left with doing keyword

6    searches or you're left with doing searches based upon the

7    way the database is structured.  And in this instance, we

8    just have -- we just found out today the CRM database has a

9    total number of records of 3 to 4 million.  But in terms of

10   the ones just related to Bair Hugger, we still don't have a

11   number as to how many records are just related to Bair

12   Hugger.

13             THE COURT:  But is the database sliceable as to

14   Bair Hugger, in other words, Bair Hugger is a category you

15   can look for in this database, just show me Bair Hugger

16   documents?

17             MR. HULSE:  Not really, Your Honor.

18             THE COURT:  Okay.

19             MR. HULSE:  It's a pretty archaic database.

20             THE COURT:  All right.

21             MR. HULSE:  So this is one where, you know, and

22   deferring to Mr. Parekh's argument here, where sort of a

23   freer dialogue might end up helping assisting.  These are

24   ones --

25             THE COURT:  Is that agreeable to you to have this
```

1    sort of back and forth?

2            MR. PAREKH:  It is, except that we've been asking

3    for information for awhile now.

4            THE COURT:  Okay.

5            MR. PAREKH:  And, you know, essentially just got

6    today some of that information that we've been asking for,

7    for two months.

8            THE COURT:  Okay.

9            MR. PAREKH:  And given the timeframe, you know,

10   for discovery to be completed --

11           THE COURT:  We'll just keep it going.  He's got

12   his time and we'll get your time.  Go ahead.  You're still

13   up.  You have the floor, as they say.

14           MR. PAREKH:  So the AIS, we found out, has roughly

15   about 140,000 records related strictly to patient warming

16   devices.  The CFR database also has roughly the same number

17   of records.  Both of those, we believe, are manageable

18   numbers that they should simply be produced to us.  And if

19   the defendants want to go through and, you know, redact out

20   things that they believe are unrelated, that's their burden

21   to do so.  But we're perfectly willing to take the entire

22   140,000 and then do our own searches on them.  And until we

23   can do that, we can't agree that, you know, the half a dozen

24   keywords that they think are relevant are going to be the

25   right keywords because these aren't structured in a way

1    where, you know, there's a set of keywords that people who,

2    you know, must select from.  These were free form entries

3    based on people's calls, you know, what a consumer put in,

4    what a doctor called and said and put in.  Some of these

5    are, you know, from call centers.  Some of these are from

6    sales reps.  And nobody was using consistent language.

7    There's nothing that says that consistent language is being

8    used.

9         And this is incredibly important information for

10    us because it goes to a key issue in the case which is what

11    did 3M know, what did Arizant know and when did they know it

12    and when, you know, when was this available to them, and if

13    we miss records because the keywords don't show up and those

14    records don't show up but they show that, you know, we

15    missed records from 2008, that can make or break issues in

16    the case.

17         THE COURT:  So just to be sure I'm clear, what

18    you're asking, though, is, as I read your requests for

19    relief, it is that the defendant be ordered to produce all

20    communications and complaints in these various databases

21    related to the Bair Hugger system, and I guess that's the

22    question, I'm not sure I understand how they isolate the

23    Bair Hugger system documents from any other documents given

24    what I've just heard about what these databases are.

25         MR. PAREKH:  It's our understanding that the AIS

1    and CFR databases that can be done with and, therefore, for

2    those two databases, they should produce all the records

3    related to Bair Hugger.

4         The CRM database, it's our understanding from our

5    view that we can actually do that, I think the parties have

6    a question as to how feasible it is, but our view of the CRM

7    database and the software that they're using says we should

8    be able to isolate out the Bair Hugger-related complaints,

9    either through just a search for bair, a search for hugger

10   and a search for patient warming and a search for product

11   numbers, but those kinds of searches are okay, we think

12   those are fine.  It's searches where you're looking for

13   things like filter, germ, bug, those are the keywords that

14   we don't want to have narrowed with.

15        THE COURT:  And what is -- what -- what precise

16   document or discovery requests are governed by -- or covered

17   by this issue?  In other words, what is it you've asked for?

18        MR. PAREKH:  I don't have the RFP number, but it

19   was a request --

20        THE COURT:  A document request?

21        MR. PAREKH:  It's a document request.  I don't

22   have the document request number.  But we asked for all

23   complaints and communications related to the Bair Hugger

24   unit with consumers, and I don't think there's any actual

25   dispute of whether or not --

1          MR. HULSE:  They also had a request for all

2    sources of data relating to Bair Hugger.

3          THE COURT:  Okay.

4          MR. HULSE:  Within the company.

5          THE COURT:  Are you done?

6          MR. PAREKH:  Yes.

7          THE COURT:  Okay.  It is this yours, Mr. Hulse?

8          MR. HULSE:  Yep.  So this really -- this really

9    has been a question of approach.  What we've kept in mind is

10   that under Rule 26(b), what's discoverable is relevant

11   information, and we all agree that a huge proportion of

12   what's in these databases I think we all agree is not

13   relevant, and the customer communications database with it's

14   4 million entries --

15         THE COURT:  But you agree that some of it is?

16         MR. HULSE:  I absolutely do agree some of it is

17   responsive.  And so, I mean, I would suggest based on what I

18   have seen from polling data is that it is 99 percent

19   nonrelevant.  So what we have proposed to plaintiffs is

20   essentially given their concern about us manually reviewing

21   for relevance is to take a keyword-based approach.  So what

22   we --

23         THE COURT:  Let me interrupt there and ask.

24         MR. HULSE:  Yeah, absolutely.

25         THE COURT:  Do you agree as well that the protocol

```
 1    identified in Pre-trial Order No. 12 doesn't --

 2              MR. HULSE:  Yeah.

 3              THE COURT:  -- work for this -- these databases?

 4              MR. HULSE:  Yeah, we actually expressly exempted

 5    from that protocol.

 6              THE COURT:  These kind of things.

 7              MR. HULSE:  These kind of things and completely

 8    agree it would be unworkable.  Would love if it worked, it

 9    would make this all simpler.  So what we asked plaintiffs

10    for is, hey, just we really don't even care what the

11    keywords are, just, you know, give us a list and here are

12    some ideas and we'll give you the results of that and then

13    take a look of the results of that and decide, well, here

14    are some additional keywords that we want or we're concerned

15    this kind of thing isn't coming up.  And it's really -- it's

16    like the pre-predictive coding approach to ESI.  So

17    to -- and the -- the only real response we've gotten from

18    this is just give us everything, including the nonrelevant

19    stuff, and we just don't think they're entitled to that.

20    And so we think, and hopefully with the Court's direction,

21    if we can take a keyword-based approach here that we are

22    going to have a successful result that's going to be

23    satisfactory to the parties.  We just want plaintiffs to

24    participate in it.

25              THE COURT:  What about plaintiffs' suggestion that
```

1     at least with regard to, as I understand it, three of these

2     databases, CFR, AIS and CRM, you can segregate out Bair

3     Hugger related things?

4                MR. HULSE:  We can do that.  And with more or less

5     effort depending on the database.  That's not really

6     the -- the biggest obstacle.  The biggest obstacle is the

7     fact that even isolating to Bair Hugger, I mean, I could

8     give you examples of what the irrelevant stuff is, but it's

9     the, you know, 99 percent of it is going to have nothing to

10    do with the filtration, the airflow, infection issues that

11    are alleged in the case.  It's, you know, for customer

12    communications is, you know, I want more -- I want more

13    blankets.  A complaint thing could be, you know, the hose is

14    broken and I want another hose.  That's overwhelmingly what

15    it is.

16                And so given the sheer percentage of this that is

17    not relevant but given plaintiffs' legitimate concerns

18    about, like, a manual attorney review of this information

19    and then the burden associated with it, it seems like

20    keywords is the way to go.  And we are very open to both a

21    iterative approach to that, that's what we've offered.  And

22    also essentially whatever keywords the plaintiff wants us to

23    run, we'll run them.

24                THE COURT:  Okay.  I'm sorry, who -- what about

25    the thing that you just -- you come up with the keywords,

1   why is that not a sufficient?

2           MR. PAREKH:  The problem with coming up with our

3   own keywords is that we don't know how people wrote these

4   things up, and without actually reviewing the records, we

5   don't know what keywords to use.  We don't know what --

6           THE COURT:  So what would you do, let's assume

7   that you -- you win the point and they have to produce the

8   entire database, what would you do with it then?  You'd --

9           MR. PAREKH:  We'd have --

10          THE COURT:  -- manually read every one?

11          MR. PAREKH:  We'd have paralegals sit through and

12  go through and scan the records and then try and come up

13  with ideas based upon scanning those records of how to

14  maybe, you know, take that 4 million or -- and it's not

15  going to be 4 million because that's the entire CRM

16  database, related to Bair Hugger it's going to be a fraction

17  of that, but we'd scan the 140,000 records, for example, in

18  the AIS database and just scan them one by one.  I mean,

19  that's what we do.

20          THE COURT:  I think I understand why the

21  predictive coding may not -- so let me ask a few questions

22  before I embarrass myself.  So these databases, I understand

23  it, have a number of fields presumably, correct?

24          MR. PAREKH:  Correct.

25          THE COURT:  But what you're interested in is the

```
 1    field where somebody types in some narrative words about a

 2    Bair Hugger?

 3              MR. PAREKH:  Correct.

 4              THE COURT:  So why is not that particular field

 5    that has the narrative description subject to this

 6    predictive coding protocol?  Isn't it just like e-mails or

 7    any other document where people write things down that the

 8    computer can learn?  And it sounds to me like what you're

 9    saying you're going to manually do what the computer does in

10    the predictive coding world.

11              MR. PAREKH:  It would be great if we could, but in

12    order to do predictive coding, you generally need a longer

13    set of documents, you know, a document that's multiple

14    pages, in order for the computer system to learn.  Most of

15    these records are going to be a sentence, maybe, and the

16    computer is not sophisticated enough to really be able to

17    pick that up and sort it that way at this stage of the

18    technology.  Five years from now we probably will be there,

19    but we're not there yet.

20              THE COURT:  Okay.  All right.  Anything else on

21    this issue, then?

22              MR. PAREKH:  No, Your Honor.

23              MR. HULSE:  No, Your Honor.

24              THE COURT:  Well, here's what I would suggest we

25    do.  Well, let me, before I go any further, one more
```

1    question for --

2              MR. PAREKH:  Sure.

3              THE COURT:  How many manual documents would you

4    and your staff need to review to come up with concepts as to

5    what kind of searches you would want to do?  Would a hundred

6    be enough?

7              MR. PAREKH:  I don't think --

8              THE COURT:  A thousand?

9              MR. PAREKH:  -- a hundred would be -- probably a

10   thousand to 2,000 records per database, and we'd want them

11   randomized through a period of time.  Some of these

12   databases cover many, many years.  CRM I think is, I mean,

13   it's, like, ten years or something like that, and so the

14   language that people use changes between, you know, what

15   people were using in 2008 versus 2010 versus 2014.

16             THE COURT:  Okay.

17             MR. PAREKH:  But, I mean, the basic objection is

18   that we will be getting records that aren't relevant to the

19   case, and we just don't feel that there's any real basis for

20   that to be --- you know, I mean, they don't have a

21   obligation --

22             THE COURT:  But the rule --

23             MR. PAREKH:  -- to produce them.

24             THE COURT:  The rule says you're only entitled to

25   relevant evidence.

1          MR. PAREKH:  Correct.  But we don't think that in

2     a burden analysis, the fact that we're getting some records

3     that are irrelevant I don't think really matters.

4          THE COURT:  Okay.  Question for 3M.

5          MR. HULSE:  Mm-hmm.

6          THE COURT:  What is -- is it possible to generate

7     a dataset of a thousand documents that are responsive,

8     meaning not technically responsive but responsive to the

9     broader request, so that yes, these all are Bair Hugger

10    related entries, what's entailed in doing that?

11         MR. HULSE:  It's possible.  The random part is the

12    tricky part.  What you could do is, you know, export the

13    whole dataset and then you could take, in theory, like the

14    first X number of entries which should be essentially random

15    but otherwise to -- there's no way the system can randomize

16    it.  Otherwise you could have a person who simply just pick

17    a certain number of entries kind of blind.  Maybe you can

18    even use a random generator number to do it.  But it's

19    doable.

20         I would suggest if that's the approach Your Honor

21    is going to suggest that that would be an excessive number

22    given the quantity of nonresponsive and nonrelevant

23    information that would be produced, but I think -- I

24    think general -- I mean, we'd certainly be open to providing

25    a sample set from these databases that would allow

```
 1    plaintiffs to come up with their keywords.
 2              THE COURT:  Okay.  So let me ask one last
 3    question.  As to the plaintiffs' last point that if the only
 4    objection is that they're going to get documents that are
 5    not relevant so they're going to get a bunch of my pipe is
 6    broke or whatever it is.
 7              MR. HULSE:  Yep.
 8              THE COURT:  Hose is broken or I need more blanket
 9    kind of requests, why is that so burdensome?  Why is that a
10    thing?
11              MR. HULSE:  Well, why is it burdensome?  It's --
12    and the objection is relevance to it, and the way I
13    understand Rule 26(b) is that you don't get into
14    that -- that weighing for nonrelevant information, so
15    it's -- you consider --
16              THE COURT:  Right.  But that's --
17              MR. HULSE:  -- burden against degree of relevance.
18              THE COURT:  As I understand it, the problem is
19    your problem; in other words, they've requested relevant
20    documents.
21              MR. HULSE:  Right.
22              THE COURT:  So you're saying, okay, well, we've
23    got this database of stuff.
24              MR. HULSE:  Right.
25              THE COURT:  That contains some relevant documents
```

1    but it also contains a lot of non-relevant documents.

2              MR. HULSE:  Overwhelmingly.

3              THE COURT:  And so in the olden days that would

4    mean you would have to assign an army of paralegals to sit

5    there in the warehouse and go through the file cabinet and

6    pull out each of those documents that is relevant and not

7    produce those that are not relevant, but now we don't have

8    warehouses and we don't have paper, we have these databases.

9              MR. HULSE:  Right.

10              THE COURT:  So isn't it now your burden to figure

11    out how to separate the relevant from the not relevant in

12    the database and if the answer is, gee, it's going to -- the

13    easy answer for us, the cheap answer, the more efficient

14    answer is we might have to disclose some nonrelevant

15    information, is that -- isn't that your problem, not the

16    plaintiffs?

17              MR. HULSE:  I -- I think that's a fair point, Your

18    Honor.  I would say that in the world, of course, of ESI

19    where you can't do predictive coding, keyword is the next

20    best approach typically when we're dealing with vast troves

21    of information like that, and keywords has been an accepted

22    approach for combing through ESI.

23              I think, you know, and we actually for the CRM

24    database did run a search term and provide some examples,

25    and I think it is -- the keywords are quite effective at

1    getting at the relevant information.  And if the, you know,

2    when the plaintiffs see the output of the keywords, I think

3    they'll agree with that.  You know, the issue here is, in

4    this litigation, is -- is surgical infections, efficacy of

5    filtration, disruption of operating room airflow.  It's not

6    that obscure set of issues that can't be reached with

7    keywords for this dataset.

8              THE COURT:  Okay.  So here's what I would suggest

9    we do.  That the defendants produce to the plaintiffs 1,000

10   documents per database at issue, select it however you

11   select them, and then the plaintiffs will use those 1,000

12   documents per database to come up with their list of

13   keywords that should be run against the entire database.  If

14   that works, great.  If it doesn't, someone make a motion and

15   we'll come up with a smarter solution.

16             MR. PAREKH:  Your Honor, can we get a deadline, so

17   same --

18             THE COURT:  Sure.  How long does it take to

19   generate a thousand documents per database?

20             MR. HULSE:  I -- I think we can do this on a

21   rolling basis over the course of two weeks.  I think some

22   are just easier than others to do this for.

23             THE COURT:  Two weeks okay?

24             MR. PAREKH:  That should be fine.

25             THE COURT:  Okay.  Two weeks.  All right.

1    Plaintiffs' second issue was the confidential documents used

2    at the depositions.  We're going to come back to London in a

3    moment so we're going to skip that and go straight to

4    plaintiffs' issue No. 3 which is customer list 2006 to the

5    present.  Who's got that issue?  Ms. Zimmerman?

6            MS. ZIMMERMAN:  Thank you, Your Honor.  We believe

7    that there's kind of two parts to this, so I'm going to

8    start and then hand this off to Mr. Gordon.

9            And even before I start, I would like to say this

10   has been very productive from our perspective and I assume

11   from defendant's perspective as well, and we very much

12   appreciate the Court's availability and in working with us

13   on this.

14           It would be plaintiffs' request that if we do this

15   maybe more often, these in person get-togethers on discovery

16   issues, at least through the close of the general causation

17   discovery because, you know, as Mr. Parekh alluded to and on

18   a couple of other issues, these are things we've been trying

19   to get at for many, many months, and this customer list is a

20   good example.

21           So what we have requested is to have documents

22   produced to us sufficient to identify each hospital or

23   healthcare facility where the Bair Hugger blankets or

24   devices are either sold or placed for the past ten years.

25   And we know that it's -- documents are available, and I can

1    give you an example of one, and I don't have a Baits number

2    because these are -- these are spreadsheets, they're Excel

3    files, but this is just the very first page, and this is a

4    customer list from 2014.

5              MR. HULSE:  That's okay.  Seen it.

6              MS. ZIMMERMAN:  Okay.  So this is, if the Court

7    would like this, it's just the first page of a very long

8    document.  Plaintiffs are not requesting that the defendants

9    assemble or otherwise gather together and produce to us a

10   new document for our use in this litigation.  We know that

11   these documents already exist because we have them for at

12   least two years.  But what we would like to have, and what

13   we had requested in our discovery, was to have them dating

14   back ten years.

15             There are multiple issues that -- or multiple

16   reasons that the plaintiffs have requested this information.

17   First, as we identify in the chart, this information is

18   helpful for purposes of confirming that the Bair Hugger was,

19   in fact, used.  And while I understand and agree that it is

20   plaintiffs' burden to have done due diligence prior to

21   filing a Complaint, this kind of information is certainly in

22   the defendant's hands, and it is going to be helpful to the

23   plaintiffs and especially to the plaintiffs' lead counsel as

24   we help serve as gatekeepers to, you know, inappropriate

25   filings.

1          Second, and more appropriate -- or more relevant

2    for us, our experts have requested this information because

3    there are a variety of different government databases or

4    other databases maintained by various health insurance

5    companies or healthcare facility chains, and the information

6    about which facilities are, in fact, customers of Bair

7    Hugger and when is very relevant as they use this, for

8    example, the NIS, which is the National Inpatient Sample,

9    it's a database that's put forth by the government, the data

10   that's available there is very, very relevant to our

11   experts, and these particular documents about which

12   hospitals and healthcare facilities use Bair Hugger at what

13   times is necessary for their purposes so --

14          THE COURT:  Well, for what, I guess?  How -- what

15   is it relevant to?  What is your expert going to do with

16   this database -- or these government databases that you're

17   talking about and how is what you're looking for here going

18   to relate to what they're doing with the government

19   database?

20          MS. ZIMMERMAN:  Well, for example, Your Honor,

21   from an epidemiologist standpoint, to the extent that their

22   report may track trends and infections nationally speaking

23   and then drill down on particular hospitals to see are the

24   infection rates at one hospital going up or going down, what

25   are the different factors that come into play, and the fact

```
 1        that they're -- that that particular hospital is a Bair

 2        Hugger user is very relevant to the epidemiologists that

 3        we're working with as they try to understand one of the

 4        potentially relevant factors that might explain that.  So

 5        that is one of the reasons.

 6              And we have been seeking, I guess, that this

 7        discovery was initially served April 1st.  And I guess

 8        circling back to the point that to the extent we're able to

 9        leverage the Court's availability, we appreciate the

10        opportunity.

11              Mr. Gordon had some remarks as well about this

12        request.

13              MR. BEN GORDON:  And just related to this, Your

14        Honor, and it may not be articulated as such in our chart,

15        and I hope you'll indulge me just for a moment in spite of

16        that, but it is something that has come up in relation to

17        the locations of these Bair Hugger machines with the Court,

18        both in chambers back as far as April with Mr. Blackwell

19        saying that he needed a formal request to get the Bair

20        Hugger machines which we then gave him first by letter and

21        then by two successive specific formal requests for

22        different models, including models of Bair Hugger machines

23        that were used machines, machines that had real life

24        experience in operating rooms for testing, inspection and

25        testing by our experts.  To this date, they have stymied our
```

1    efforts to get those.

2              And they have complete unilateral access to these

3    machines.  The hospitals tell us that they don't own the

4    machines; that they either lease them or they sell them to

5    them with some kind of provision that they cannot, you know,

6    if they get rid of them, they have to return them to 3M.  So

7    the machines they did respond to and produce, were, we

8    presume, we believe, were virgin machines or refurbished

9    machines that do not have any real world experience in the

10   operating rooms.  And so both for purposes of understanding

11   where the hospitals are that were using their machines,

12   which models of machines, because there are different models

13   of machines at issues at different points in time for

14   different plaintiffs in this MDL, and when they stopped

15   using the machines and what happened to those machines that

16   were removed from the hospitals, we are completely at their

17   mercy to give us that information so that the experts can

18   evaluate where the machine -- where the Bair Hugger machines

19   were in use, when that changed, why it changed, and how can

20   we, for our experts, receive machines that actually were in

21   hospital settings that were in use.

22              And, again, Your Honor, timing for us -- for this

23   last request is of the essence because if we don't have the

24   machines for testing, our experts cannot complete the

25   process that they're going to be required to complete for

1        their reports, as you know, by I think it's February 1st.

2                THE COURT:  Are there outstanding requests for

3        precisely that?

4                MR. BEN GORDON:  Yes, Your Honor.

5                THE COURT:  And that's not part of this --

6                MR. BEN GORDON:  I believe -- I guess I'm trying

7        to bootstrap it to this, to be frank, Your Honor.  I do

8        believe it is related, and we have -- but I suppose a motion

9        to compel would be in order.

10               THE COURT:  But you anticipate a dispute about the

11       other request because you're not getting -- nobody is

12       showing up at your door with a bunch of machines for you to

13       test.

14               MR. BEN GORDON:  Right, Your Honor.  And they, in

15       fact, to the contrary, have told us that they either don't

16       have them or don't have access to the used machines, I

17       presume because they're in hospitals.  But we have no way to

18       get them.  If anybody can get them, they can.  And, in fact,

19       we know of specific hospitals I could name that have stopped

20       using the Bair Hugger machines, and those machines have gone

21       somewhere, presumably back to 3M, and what -- the point is

22       we don't want our experts to just get a bunch of scrubbed or

23       brand new machines.  I think we have a right and an

24       obligation to test actual machines that were in hospitals.

25               THE COURT:  Okay.  Mr. Hulse.

1          MR. HULSE:  Well, it sounds like this is a

2     different issue than the one that was presented to the

3     Court, and I would prefer to address it when it is ripe.  We

4     have given --

5          THE COURT:  So address the one that's presented.

6          MR. HULSE:  We have given them for free a number

7     of Bair Huggers.

8          So the customer lists, and I'd actually like to do

9     my own hand off to my own Mr. Gordon over here after my

10    initial comments, there's sort of two -- two criteria

11    that -- or two arguments plaintiffs make here.  One is that

12    they need a complete comprehensive customer list for case

13    vetting purposes.  I don't -- I don't think that rationale

14    really holds up.  Each and every one of these plaintiffs has

15    pled that the Bair Hugger system was used in their

16    surgeries, presumably that was based upon due diligence by

17    counsel and review of medical records.

18         To the extent that plaintiffs really have an open

19    question about a particular case, they are absolutely

20    welcome and free to approach us and say, you know, and ask

21    us, was the Bair Hugger system used in this specific

22    hospital, and I'm sure we could oblige such a request, but a

23    request for comprehensive back to 2006 customer lists is

24    simply not needed for case vetting, nor are plaintiffs

25    taking the position that it's relevant for any other issue

 1    other than expert reliance.  And that's --

 2              THE COURT:  What about that, what about

 3    epidemiology?

 4              MR. HULSE:  That's where I turn it over to my

 5    science counsel here.

 6              THE COURT:  Okay.

 7              MR. COREY GORDON:  Thank you, Your Honor.  I'm the

 8    other Mr. Gordon.  I -- he's from Florida.  I'm from

 9    Minnesota.

10              THE COURT:  We've got Gordons.  We've got Jerrys.

11              MR. COREY GORDON:  We have two Bens, two Gordons.

12    It gets confusing.

13              MR. BEN GORDON:  Ben and Jerry.

14              MR. COREY GORDON:  And we have Ben and Jerry.  Ben

15    and Jerrys.  I just want to address the epidemiological

16    question.  To the extent that plaintiffs are arguing that,

17    boy, if they had this data, the sales data, they could then

18    use that for an epidemiological calculation of the

19    percentage of Bair Hugger procedures that results in

20    infections, the problem is, they're overselling the extent

21    to which they can gather information about the denominator

22    from government or other databases, but more importantly,

23    there's no way that they can gather the numerator from our

24    sales records.

25              Now, I'll just briefly explain those two things.

1    The United States does not collect robust, detailed,

2    surgical site infection data by hospitals by procedures.  As

3    some countries do, we don't do it.  I wish we did.

4    We -- our data collection system is the subject of lots of

5    discussion and scholarly articles and scholarly handering.

6    It's not very robust.  It's very -- it's in gross.  So we do

7    have, you know, gross figures.  The CDC tracks SSI trends

8    and relies on state collection efforts, but it's -- there's

9    no database you can go to and say, okay, let's see what

10   Abbot Northwestern Hospital is -- how many total hip

11   replacements they did in 2014 and how many surgical site

12   infections they had.  Those -- the hospital may have those

13   data and in certain circumstances there may be those data

14   available publically, not very much, but it just doesn't

15   exist on a comprehensive and robust basis.

16        But even if it did, even if, for example, we could

17   say we know that Abbot Northwestern did a thousand total

18   hips in 2014 and they had four surgical site infections,

19   then the plaintiffs are saying, well, gee, if we had that

20   information, all we need to match it up is to find out if

21   Abbot Northwestern was a customer of 3M and bought Bair

22   Huggers or not.  The problem is that sales data from 3M of

23   Bair Huggers, and even Bair Hugger blankets, doesn't tell

24   you which procedures they were used in or not.  Individual

25   hospitals, individual surgeons or anesthesiologists may or

1    may not use the Bair Hugger or the Bair Hugger blanket in

2    every single procedure.  Some hospital -- hospital X might

3    buy a thousand blankets and use them at every single

4    procedure.  Hospital Y might buy a thousand blankets in a

5    given year but they've -- half of their orthopedic surgeons

6    prefer not to use the Bair Hugger in their hips, the other

7    half do.  There's -- there's --

8              THE COURT:  But --

9              MR. COREY GORDON:  Those data just do not exist.

10             THE COURT:  But are hospitals like pubs in the

11   sense that you either are a Budweiser house or you're a

12   Miller house and so you're either a Bair Hugger house or

13   you're some other warming system house or is Bair Hugger

14   kind of the thing and either you use a Bair Hugger or you

15   don't use a Bair Hugger?

16             MR. COREY GORDON:  There are certainly hospitals

17   where it's the hospital practice to be a Bair Hugger

18   facility and that's expected and that's the standard of

19   care, but there are other hospitals where some doctors may

20   order a Budweiser or some may order a --

21             THE COURT:  A HotDog.

22             MR. COREY GORDON:  Yeah, a different type -- some

23   may be teetotalers and not -- fortunately it's getting rarer

24   and rarer, but there are still some surgeons who prefer to

25   do their surgeries without active warming devices.  So the

```
1    mere fact -- and we -- this is an area I've spent a lot of

2    time in.  We know that we cannot say with certainty, just

3    looking at sales records, okay, you know, we sold, you know,

4    5,000 blankets to Abbot Northwestern, well, therefore, they

5    necessarily used them in all of their arthroplasties.

6    It -- we -- we have to go to Abbot Northwestern or the sales

7    representative has to go to Abbot Northwestern and say, are

8    you using these in all of your arthroplasties?  And the

9    hospital may not even be able to say definitively yes,

10   because, you know, a research hospital, you know, an

11   institution has a very strict protocols maybe but a private

12   hospital, that, you know, that has different private docs

13   with admitting privileges, it just --

14           The point is, these data do not allow for that

15   kind of straightforward analysis.  And I, frankly, I wish

16   they did.  It would make things a lot easier.  But they

17   don't.  And so providing this information, this robust

18   discovery of all the hospitals we sell to, that -- that's

19   not going to help their experts in deriving a number that

20   means anything.

21           THE COURT:  Is part of your defense going to

22   entail any epidemiologic studies showing the widespread use

23   of Bair Huggers and some minuscule amount of infections or

24   is that not part of your defense?

25           MR. COREY GORDON:  Only -- well, only in gross,
```

1    and that's precisely the problem I'm talking about.  For

2    example, the CDC has fairly good data where they account for

3    a lot of the important confounding factors, and so, for

4    example, we know that from 2008 to 2014, the SSI rates in

5    total knees went down 41 percent.  We also know that between

6    2008 and 2014, sales of Bair Hugger, in gross, went, you

7    know, way up.  Is that -- it's very crude epidemiology, but

8    it's --

9              THE COURT:  Is it epidemiology on which you intend

10   to rely?

11             MR. COREY GORDON:  It's hard to say because

12   it -- we know that -- we have expert reports disclosed in

13   *Walton* and *Johnson* cases, and one of the experts disclosed

14   there tried to do that kind of crude analysis to show that

15   the -- as Bair Hugger rates -- sales went up, so did SSI

16   rates, and, in fact, the opposite is true, so it would be

17   more in the nature of rebuttal.

18             The problem is, as I'm saying, it is -- it's

19   gross.  It's -- it's a crude -- the numbers are fairly

20   crude.  There are epidemiological studies that have looked

21   at various aspects, and, as you're going to hear, they're,

22   in England, they are undertaking a what will be a robust

23   randomized clinical trial that will really look at these

24   things in a rigorous and scientific way.  That doesn't exist

25   right now.  So the --

1          THE COURT:  Okay.

2          MR. COREY GORDON:  The data on -- the gross sales

3     data, how many blankets that we've sold, I believe we've

4     already provided that.  But to the extent that that's what

5     they're seeking, that's not a problem.  It's the hospital by

6     hospital stuff that they're asking, and that --

7          THE COURT:  Right.  But it's -- I guess where I'm

8     coming from with my question is if you're going to say as

9     Bair Hugger sales went up, infections went down, it seems to

10    me it's fair for the other side to say oh, wait a minute,

11    let's look at hospital by hospital, let's see where

12    these -- if it turns out yeah, you're selling a lot of Bair

13    Huggers but the infection rates are actually come down in

14    the HotDog houses, not in the Bair Hugger houses.

15         MR. COREY GORDON:  That -- and I totally agree, if

16    there was a way to do that.  Those data don't exist.  They

17    don't exist on either side of the equation, on the hospital

18    by hospital infection rates or the Bair -- you know, again,

19    just -- obviously to the extent that Bair Hugger -- that 3M

20    sells a lot of Bair Hugger blankets to hospital X, there's

21    certainly an inference that they use those blankets in all

22    of their procedures and including their hip and knee.  And I

23    guess the one exclusionary thing is if hospital Y didn't buy

24    a thing from 3M, you could probably say, well, then they're

25    probably not using Bair Huggers so their infection rate

```
 1    would be of some interest, but, remember, the -- much of the

 2    literature upon which the plaintiffs rely says the problem

 3    is with forced air warming.  Bair Hugger is not the only

 4    forced air warming unit in the marketplace.  It's the

 5    dominant one, but it's not the only one.  So the fact that

 6    we don't sell to hospital Y doesn't mean that it doesn't use

 7    a forced air warming device.  And to say, well, see, they

 8    have a low rate and, you know, that's lower than, it

 9    just --

10             THE COURT:  Okay.  Thank you.

11             MR. COREY GORDON:  Thank you.

12             THE COURT:  Ms. Zimmerman or who wants the last

13    word on this?

14             MS. ZIMMERMAN:  I hope I can --

15             MR. ASSAAD:  Me.

16             MS. ZIMMERMAN:  You know, I think that to draw the

17    Court's attention back to the way we framed the issue, the

18    plaintiffs are asking for documents sufficient to identify

19    the customers, and when we say "customers," sometimes these

20    units, as we understand it, are sold, sometimes they're

21    placed.  What we're not asking for is the actual sales data,

22    although we don't believe that's confidential and some of it

23    has been produced.  Rather, what we're asking for is the

24    customer list by year, so not the number of blankets but the

25    actual, in 2009, HCMC, Regions, you know, Fairview Ridges,
```

1      and when Fairview Ridges stopped using it or Ridgeview or

2      whichever the hospital is locally, but so, you know --

3               THE COURT:  What about standalone outpatient

4      surgical clinical things, are those customers or is it

5      individual doctors --

6               MS. ZIMMERMAN:  Yes.

7               THE COURT:  -- or is it always going to be some

8      institution?

9               MS. ZIMMERMAN:  Your Honor, I think it depends.  I

10     mean, I think it's usually an institution, but there are

11     certainly day surgery centers and I think that there are

12     also individual clinics where they may do an outpatient

13     procedure where, whether it's a Bair Hugger blanket or a

14     Bair Paws gown that's used, that these are used in a variety

15     of different healthcare facility settings.

16               So I think that to the extent that defendants

17     disagree with what we think the -- can be extrapolated from

18     the data, they will have the opportunity to challenge that

19     through the Daubert process.  Our experts tell us that

20     they -- that there are databases that are going to be

21     helpful and that this information is critical for them.

22               And I think that that's -- and the last thing I

23     would say is that to the extent that we could go serve

24     third-party discovery requests on 760-odd hospitals for the

25     plaintiffs that have filed so far, that would be cumbersome

1    and terribly inefficient when we know that this data already

2    exists in the defendant's hands, and so we would suggest

3    that that burden not be placed on hospitals across the

4    country.

5              THE COURT:  Okay.  Well, it appears, to me, I am

6    unpersuaded that the information regarding customer lists is

7    relevant to claims or defenses in the case and therefore I

8    would not order its production, which is not to say that on

9    a more robust record and perhaps with some more hard data

10   regarding what plaintiffs' experts really want to do with

11   this information that I might not reach a different

12   conclusion, but right now it would appear to me that

13   defendant's objection is well-founded.

14             Which brings us to plaintiffs' statement No. 4

15   which is the restoration of tapes.  Mr. Parekh.

16             MR. PAREKH:  So this is changed as of this morning

17   when I got an e-mail from Mr. Hulse, and Mr. Hulse has now

18   stated that 3M is in the process of going through these

19   tapes with a vendor and extracting, at least determining

20   what is on them.

21             Again, we have an issue of timing where, you know,

22   we've known about the existence of these tapes since August

23   and 3M has just apparently started this process.  I think

24   you said two weeks?

25             MR. HULSE:  About a month ago.  After this --

 1          MR. PAREKH:  No, I'm sorry, in order to get the

 2    results.

 3          MR. HULSE:  Right.  Our vendor tells us one to two

 4    weeks to get the index.

 5          MR. PAREKH:  To get the index.  I mean, we would

 6    respectfully request that that be a deadline and that we get

 7    a copy of the index so that we can see what's on them and

 8    then that we can make a determination on whether or not that

 9    information is relevant.

10          THE COURT:  Okay.

11          MR. HULSE:  And it's true, Your Honor, after we

12    submitted this issue, we went to our vendor to do a further

13    cost evaluation of what would be involved.  We actually have

14    some doubts that there's anything on these tapes.  But

15    anyway, because it was less costly than we thought, we just

16    told them to go ahead.  This vendor, Iron Mountain, of Iron

17    Mountain fame, has been slow, slower than we would like, but

18    we're now at the point where they tell us it will take one

19    to two weeks to get the index.

20          We believe that what the index will show is that

21    this is duplicative of the other e-mail sources that we've

22    already produced, including restoring Arizant's e-mail

23    server, but then clearly the parties can have a more

24    informed discussion about it based on the index.  So all I'd

25    ask is not to impose a date, just because it's not in my

```
 1    control, but we are keeping the fire lit under this vendor.

 2              THE COURT:  All right.  So I guess where I would

 3    leave this one is report back next week when we meet for our

 4    status conference if you've got your index, or if not, we'll

 5    figure out what more the Court collectively needs to do.

 6              MR. HULSE:  I'll tell them, Your Honor, that the

 7    Court is eagerly awaiting this index.

 8              THE COURT:  And the --

 9              MR. HULSE:  See what difference that makes.

10              THE COURT:  And tell them you're going to be

11    compelled to report something --

12              MR. HULSE:  I will indeed.

13              THE COURT:  -- on next week.  Okay.

14              That brings us back to London.  Who went to

15    London?  Okay.  So as I understand it, the plaintiffs'

16    request, as we sit here, is for costs and fees, together

17    with travel expenses, for the two of you to go to London for

18    the depositions, none of which occurred.  Who wants to speak

19    to that?

20              MS. CONLIN:  I will.

21              THE COURT:  One who wasn't there.

22              MS. CONLIN:  No.  And I was happy to see that Your

23    Honor had received the stipulation because it was the first

24    time I had e-mailed the Court and was worried about whether

25    it would actually get through.  So I think that the
```

1   stipulation that has been submitted by both parties with

2   respect to the U.K. depositions sort of spells it out, and I

3   would just add a couple of other things.  We have let 3M

4   take the lead in communicating with these third-party

5   witnesses, and we even talked with them about the fact that

6   they came to us and said would you split fees, you know, if

7   the witness wants any, you know, costs or fees associated

8   with testifying, would you split those with us.  We said

9   absolutely but we want equal time as well, which was agreed

10  to.

11          So the -- and, you know, I understand what they

12  said about the three depositions that were beyond their

13  control, but our folks wouldn't have been in the U.K. at all

14  if they hadn't scheduled Dr. Harper for Wednesday which

15  caused them to fly in Tuesday night and 3M made the

16  strategic decision to cancel that deposition.  That was a

17  deposition where they had agreed in advance that we would

18  have equal time and we had agreed in advance that we would

19  split any costs associated with that particular witness.  So

20  the fact that they made a strategic decision to cancel that

21  deposition on the, you know, literally when counsel for

22  plaintiff showed up at Faegre & Benson was about when they

23  found out about this, we feel like our folks wouldn't have

24  been there at all, because, taking them at their word, and

25  I'm not disputing that these other witnesses ended up just

```
 1    bailing for various reasons, but we wouldn't have been there

 2    in the first place and we would have at least had

 3    Dr. Harper, whom we've now learned is working with 3M on

 4    this robust randomized trial that they're talking about now.

 5              THE COURT:  So is it the plaintiffs' position that

 6    there's something untoward or nefarious about these

 7    witnesses who presumably before now were just thought to be

 8    scholars who were doing their thing and publishing these

 9    articles and now are retained by 3M to do studies for 3M?

10    Is there something wrong with that or is that allowed?

11              MS. CONLIN:  I think that knowing that now, it

12    would have been very helpful to have an opportunity to

13    depose Dr. Harper about what the relationship is and what

14    he's up to, and we didn't have that ability because of what

15    happened.  So I'm not going to cast aspersions or suggest

16    that there's anything nefarious going on, I don't know, but

17    certainly the fact that people flew over and were prepared

18    to depose this doctor about what a -- a study on the Bair

19    Hugger is important to us.

20              THE COURT:  And is there -- it's my understanding

21    if, as I'm not sure I'm reading it correctly, but if I am

22    reading your stipulation correctly, it is that at least

23    these other three depositions are now going to be

24    rescheduled pursuant to letters rogatory as opposed to them

25    showing up voluntarily.  Is that correct?
```

```
 1              MS. CONLIN:  Well, yes and no.  With respect to

 2    Dr. Reed, we haven't communicated with him.  We've got the

 3    communication from 3M that he's retained counsel and has

 4    said he's not going to go forward voluntarily so that's

 5    going to go through the letters rogatory.

 6              Dr. Harper, I don't know if he's willing to

 7    reappear or not.  3M has now said they don't intend to

 8    reschedule his deposition.

 9              With respect to Dr. Dasari, he's the doctor from

10    Australia who had indicated that he was willing to appear

11    voluntarily and then, you know, was in the U.K. at the time

12    of these depositions and had apparently some child care

13    issues, so it may be that we have to go through letters

14    rogatory with him as well.

15              I'm not particularly sanguine on the outcome of

16    the letters rogatory process and whether a court in England

17    is going to order anyone to appear, which is why the fact

18    that the Dr. Harper deposition was strategically canceled is

19    particularly problematic.

20              THE COURT:  Okay.  Who wants to speak to this?

21              MR. COREY GORDON:  Thank you, Your Honor.  First

22    of all, I want to make a couple of things really clear.  The

23    only deposition we canceled was Dr. Harper, and I'll explain

24    the circumstances behind that, because I think it's

25    important to understand that the word "strategic" sounds
```

1    like we, you know, devious and calculating ah, ha, ha, ha,

2    we got them over to England, now we'll cancel it, but that

3    wasn't the case at all.  But the more important thing is

4    that the other three depositions, they were voluntary

5    witnesses.  We had no way of forcing them to abide by their

6    agreement to show up.

7            THE COURT:  Yeah, but I guess my curiosity is what

8    did you tell them in the first place and why do you think

9    they changed their mind?  Do they know that the purpose of a

10   deposition is for lawyers to sort of rip into them or did

11   they think that they were just going to have a high-level

12   conversation about the importance of their work?

13           MR. COREY GORDON:  No, we explained that

14   the -- there was litigation in the United States; that the

15   study or studies that they had been coauthors on were

16   important -- were being relied upon as underlying scientific

17   evidence in these cases; that lawyers from both sides,

18   the -- they call them claimants, we call them plaintiffs,

19   the plaintiffs and the defendants both wanted to ask

20   questions about the studies, the underlying data, the

21   methodology, and I think we -- you know, we also

22   communicated that we wanted any communications that they

23   might have had with Dr. Augustine or his companies regarding

24   the studies, so they were -- they knew, generally, what it

25   was we were expecting to examine them about.

```
1            And I learned a new word.  I was totally
2      gob-smacked when the other three witnesses just canceled,
3      particularly Dr. Reed who on Friday -- or Thursday evening
4      sent me an e-mail at about 8:00 p.m. London time saying,
5      just, you know, confirming 9:00 a.m. Saturday at the Faegre
6      Baker Daniels offices, 7 Pilgrim Street, you know, here,
7      these are my rates, and I confirmed it.  I cc'ed the
8      plaintiffs too, and I think I cc'd the plaintiffs, but in
9      any event, Thursday evening he's confirming it.  Friday
10     noon, the solicitor in the Faegre office in London, gets
11     notified by lawyers who had previously surfaced for one of
12     the other study authors we had sought a voluntary appearance
13     but he declined, they said we're now representing Dr. Reed
14     and he's not showing up for deposition.  Wow, okay.
15     We -- I -- we immediately let --
16              THE COURT:  Were you in London at the time?
17              MR. COREY GORDON:  Yeah, I was sitting in a hotel
18     surrounded by boxes of documents getting prepared to take
19     these depositions.  So my God, we lost Reed.  Then, I get an
20     e-mail from Faegre's, I'm refer to him by his name, Stephen
21     Llewellyn is the solicitor in the Faegre office in London,
22     he said I just got a -- I can't remember a call or an
23     e-mail, from Dr. Dasari who said he may have some child care
24     problems, he's trying to work it out.  Again, we let the
25     plaintiffs know, just FYI, Dasari is saying he's got
```

1    potential child care issues.  Friday, Friday late afternoon,

2    Dasari is out.

3         McGovern is a little bit different because we --

4    and by "we," I mean both the plaintiffs and us -- had been

5    in ongoing negotiations with his solicitor about

6    compensation for him and the solicitor, and we went over

7    there with the understanding that they had blocked out the

8    22nd of September and they were -- we went over there with

9    the expectation that there's a pretty good chance we'll work

10   out the details and the fees and we'll go forward with that,

11   but we also knew that there was -- there was a fair chance

12   that they would say -- or that we would end up not being

13   able to work out an agreement in time to do September 22nd,

14   and that's what happened, and that actually happened fairly

15   early on.

16        We're still negotiating with Dr. McGovern's

17   solicitors.  We still are optimistic that we will get to

18   take his deposition voluntarily, although I have to tell you

19   at this point I want to see something in writing with some

20   sort of a liquidated damages clause before I want

21   to -- before I get on a plane and fly over there to take

22   another voluntary witness.

23        But the point is that both sides went over there

24   expecting to take four depositions -- at least three

25   depositions, knowing that McGovern was a possible but not a

```
1     certain and there was a fair chance that we weren't going to

2     do McGovern on this run.  And when Reed and Dasari collapsed

3     on us, it was just -- it was, as I say, I was gob-smacked.

4     It was very frustrating to travel over there.

5              And I -- I understand plaintiffs' frustration.  I

6     want to -- so but they're kind of lumping this all together,

7     and I don't really think that the -- that Ms. Conlin was

8     meaning to say that if we had said we're not going to

9     do -- we're not going to do Harper but we're -- we're still

10    going to go forward with Reed and Dasari and McGovern, I

11    don't think she's really saying that their folks wouldn't

12    have been over there at all.  I suspect they would have been

13    over there for those three depositions but they just

14    wouldn't have come two days earlier.  And I think

15    that's -- that point is fair.  You know, under Rule 30(g),

16    you know, we didn't give timely notice.  You know, we -- we

17    take responsibility for that.  We canceled Harper the night

18    before, and had we canceled him --

19              THE COURT:  What was the -- I'm sorry, I might

20    have just missed it, why did we cancel Harper?

21              MR. COREY GORDON:  I haven't -- you didn't miss

22    it.

23              THE COURT:  You haven't gotten there yet.

24              MR. COREY GORDON:  I haven't told you yet.  What

25    I'm doing is I'm conceding that our cancelation of Harper
```

1    the night before resulted in them being in England two days

2    earlier than they would have otherwise been.  But I -- I

3    really don't think that the plaintiffs are taking the

4    position that the only reason they flew over there was

5    Harper and that if we were just doing Reed and Dasari and

6    McGovern they would have stayed in the United States, but

7    I'll let them address that.  But the point is yes, we

8    canceled Dasari -- excuse me, Harper.

9              THE COURT:  Harper.

10             MR. COREY GORDON:  Harper canceled the night

11   before.  Here's why.  The only reason we were taking Harper

12   is he was a coauthor with Dasari and Mark Albrecht, he's a

13   U.S.-based person, an Augustine employee, he's a coauthor on

14   six of the eight studies at issue.  Harper is only a

15   coauthor on this one study along with Dasari.  And it's,

16   frankly, in the greater scheme of things, it's a pretty

17   insignificant study.  There's some interesting aspects to

18   it.  The only reason we were taking Harper's deposition is

19   because he -- he was -- I think he was the first one, he or

20   another doctor who then did back out well before we went

21   over there, said yeah, I'll make myself available for

22   deposition.  So Harper was -- Harper said he'd -- he'd show

23   up, you know, if we paid him his fees so we'll ask

24   him -- we'll go and ask him the questions about his studies.

25             He also produced some -- he produced the

 1   underlying data for this study, which was really important,

 2   and that was really more important almost than his

 3   deposition.  But in the process of preparing for the

 4   deposition, and, as I was in England, I was able to talk to

 5   some of the U.K. 3M people, just to get a better

 6   understanding of, frankly, the national health service or

 7   the national health system in England, and it just -- it was

 8   almost a casual conversation, there was some mention about

 9   how Harper had expressed some interest in getting some

10   funding for a study that he was doing.

11        I hadn't heard anything about it.  I contacted

12   people in the United States.  We weren't aware of it.  So

13   we -- we scrambled in a matter of hours to find out what is

14   this about.  And yeah, it turns out that a couple of -- I

15   think sometime in May, Dr. Harper had approached a 3M

16   salesperson at a conference in Europe and said I'm involved

17   and we're thinking about doing this study that will really

18   look prospectively at, you know, comparing forced air

19   warming to resistible blankets and infection rate, might 3M

20   have any interest in helping to support this study, helping

21   to provide funds for it, and the person he talked to handed

22   him off, if you will, to the various powers that be.  And

23   there's a whole research group within 3M that funds lots of

24   research, and that group took control, if you will, and

25   was -- and it wasn't Dr. Harper who was -- who became the

1    prime person, it was another professor at the University of

2    Oxford who became the principal investigator, and 3M agreed

3    to, yeah, we'll provide some funding for the pilot study,

4    not for the larger study that this was going forward on, but

5    this is an investigator-initiated, institution controlled

6    study as opposed to a study that 3M is funding or -- so I

7    want to make it clear, we -- 3M has not retained Dr. Harper

8    or any of the other investigators, just 3M has agreed to

9    participate --

10            THE COURT:  But why does all of that compel the

11   cancelation of the deposition?

12            MR. COREY GORDON:  Okay.  Here's the dilemma with

13   which I was faced.  This -- I literally found this out

14   Wednesday night or -- Tuesday night before the Wednesday

15   deposition.  And it -- and the timing, I was literally

16   finding this out while you were having a conference call

17   with the parties on the confidentiality issues.  So I found

18   this out, and I was going, trying to say, well, what

19   documents do we have, and people back here were scrambling

20   to see if we could quickly find documents that would relate

21   to this.  And, you know, there wasn't much that we came up

22   instantly, but we came up with a couple communications, and

23   we were like, okay, should we just, you know, turn what we

24   have over to the plaintiffs this evening and, you know, go

25   take the deposition or, you know, do we -- I -- I was in

1  a -- I was in a damned if you do, damned if you don't.  If

2  we went forward with that deposition and they didn't have

3  all the documents, which we -- which I didn't have, which no

4  one here had seen, they would have had legitimately a

5  complaint that, you know, how can they participate in this

6  deposition without the full documents?  So that was -- that

7  was one factor.

8          Then I'm thinking -- and part of the -- my thought

9  process too was, okay, well, we -- really my only interest

10  in Dr. Harper was this particular study.  He had provided us

11  with his underlying data, and, hey, he's -- his coauthors,

12  Dr. Dasari, Mr. Albrecht, they're coming up for deposition,

13  and Dasari's case, he, you know, we're deposing him in three

14  days, got the data.  My -- my prep for Harper was identical

15  to my prep for Dasari.  It's only the one study.  So, you

16  know, I was prepared.  So Harper isn't that big of a deal in

17  the greater scheme of things.  Got his data, I can ask all

18  the questions about this study with Dr. Dasari, partly why I

19  was so disappointed about Dr. Dasari's failure to appear.

20          But then we were, the third author, it was

21  Dr. -- or Mr. Albrecht, we're deposing him tomorrow,

22  hopefully we'll get some information out of him, but in the

23  meantime, and it is a good thing that we did this, when we

24  decided, you know what, the better course of action here is

25  to just cancel the Harper deposition, now, I -- you know

1    what, we could have gone forward and taken his deposition,

2    you know, just limited it to questions about the study and

3    we wouldn't be here arguing about costs, but they would have

4    seen the documents and then I would have

5    been -- that -- that would have been kind of a slimy thing

6    to do.  I didn't have the documents.  I literally

7    didn't -- and no one was able to pull them together fast

8    enough before the deposition.

9         And it is remarkably good that we did because what

10   we discovered then on Friday, the day after his deposition

11   was scheduled, in the week before, the principal

12   investigator, this professor at Oxford, had added to the

13   list of investigators that he wanted to use Mike Reed.  So

14   at that point we still thought Reed was going to be a

15   deponent, so we quickly got that documents over to the

16   plaintiffs and said, hey, this -- now you know everything we

17   know, literally, but then within minutes, I think less than

18   an hour, Dr. Reed had canceled so that one went away.  But

19   the point is --

20        THE COURT:  So let me ask this about the ones that

21   canceled for child care.  They knew that there was like four

22   lawyers coming from the United States to take their

23   deposition and he hadn't made arrangements to have somebody

24   take care of his kid?

25        MR. HULSE:  I would love to know what really

1    happened.  I mean, it -- I -- I'll be candid with the court,

2    my -- my suspicion antenna was quivering.  I don't know what

3    happened.  But when Reed sends me an e-mail on Thursday

4    night, you know, just confirming everything and less than

5    12 hours later he's lawyered up and the same lawyers that

6    now represent Dr. Leaper and Dr. Hamer, all opposing the

7    letters rogatory, well, what's the deal here, and, you know,

8    it's a close -- it's a small community.  This group of

9    people who do the -- that kind of research, they -- they are

10   in close contact with each other.  I don't know who talked

11   to whom, what the story was.  And I don't want to -- I mean,

12   I -- I don't want to engage in conspiracy theories, but it

13   was pretty remarkable that it suddenly collapsed.

14           And by the way, this is a news flash, I guess.  We

15   just heard this afternoon that the senior master in the high

16   court of London who hears the letters rogatory issues has

17   set a hearing for November 8th on our letters rogatory.

18   We're told it's very unusual for them to -- for the court to

19   actually have a hearing at all, it's ordinarily all done on

20   paper, so the fact that there is going to be a hearing.

21           THE COURT:  And that hearing, are these letters

22   rogatory now are for the other three witnesses for --

23           MR. COREY GORDON:  They're not for Dasari because

24   Dasari lives in Australia.  They are for McGovern, although

25   we're still trying to work things out with McGovern, Hamer

1    who had originally said he -- he would show up and then

2    awhile ago said no, Legg, a coauthor with Hamer, Reed, and

3    Dr. -- did I say Leaper?

4              MR. BEN GORDON:  Leaper, yeah.  No, you didn't.

5              MR. COREY GORDON:  Now I said it.

6              MR. BEN GORDON:  Now you said it.

7              MR. COREY GORDON:  Okay.  At my age, I get --

8              THE COURT:  That was five.

9              MR. COREY GORDON:  Yes, so those five.

10             THE COURT:  Okay.  All right.  Anything else?

11             MR. COREY GORDON:  No, I just -- but I just want

12   to point out we, you know, it -- we take responsibility for

13   them being over there two days earlier.  I was going to do

14   them all by myself.  They sent two lawyers.  Okay,

15   that's -- they sent two.  3M offered -- has offered to pay

16   the travel expenses a -- one fourth of the travel, the food,

17   the lodging expenses for both the lawyers for the whole

18   time, and we submit that that, under the circumstances, is

19   more than reasonable.  Thank you, Your Honor.

20             THE COURT:  Okay.

21             MS. CONLIN:  Briefly, Your Honor, just a couple of

22   points.  And I think Mr. Gordon made it clear, my point to

23   the Court was that our group would not have been in London

24   on Tuesday.  They wouldn't have been in London until Friday.

25   By Friday, the other ones were canceled so the trip over

1    there wouldn't have happened but for the cancelation of

2    Dr. Harper.

3              If you look at the stipulation on page 4 --

4              THE COURT:  And when would you have gone?

5              MS. CONLIN:  They went the day before.

6              THE COURT:  Putting aside Dr. Harper's deposition,

7    when would you have gone?

8              MS. CONLIN:  So they came in Tuesday for a

9    Wednesday deposition, so just assuming, it's a hypothetical,

10   assuming that they would have come in on Friday for the

11   Saturday depositions.

12             THE COURT:  So let's get these days straight, by

13   the way, because my recollection is the days are different,

14   so in the stipulation Dr. Harper was scheduled for

15   September 15th, correct?  September 15th is a Thursday,

16   right?

17             MS. CONLIN:  Right.

18             THE COURT:  So you came in on Tuesday for a

19   Thursday deposition?  Is that a correct statement?

20             MS. CONLIN:  They came in Tuesday night, landed in

21   London Wednesday morning, Wednesday noon.

22             THE COURT:  Okay.  And if Dr. Harper's deposition

23   had not been scheduled and the first deposition was --

24             MS. CONLIN:  Saturday.

25             THE COURT:  Dr. Whoever, Dr. Reed on the 17th,

1    which is Saturday, you would have left here at 9:10 on

2    Thursday night and arrived in London on Friday morning?

3            MS. CONLIN:  Correct.

4            THE COURT:  But the depositions for Saturday

5    weren't canceled until Friday afternoon London time.  Is

6    that correct or incorrect?

7            MS. ZIMMERMAN:  I think that's right, Your Honor.

8    We would have stepped off the plane to receive the e-mails.

9            MS. CONLIN:  Fair enough.

10           THE COURT:  Okay.

11           MS. CONLIN:  The other point I wanted to make is

12   if you look at page 4 of the stipulation, the 3M has said

13   that they learned on Thursday, September 15th based on a

14   document September 9th that Harper and Reed were involved in

15   the new study.  My only point is this.  They -- they

16   canceled Dr. Harper because they determined he wasn't

17   important, but we went into this with an expectation that

18   regardless of what they felt, there were questions we wanted

19   to answer him -- or ask him, and that's why we were willing

20   to split the time and split the costs on it.  They

21   unilaterally took that away from us.  If they were concerned

22   because Dr. Harper and Dr. Reed had surfaced in this new

23   study, they were fully prepared to go forward with the

24   deposition of Dr. Harper -- I mean Dr. Reed.  They didn't

25   cancel Dr. Harper and Dr. Reed.  They canceled Harper.

 1    Dr. Reed is the one who pulled out of the other one.  So I

 2    don't think that that makes sense that they felt like they

 3    needed to cancel Dr. Harper because these -- because this

 4    new information, because Dr. Reed is in the new study as

 5    well.

 6            THE COURT:  And I'm taking it, if I'm reading this

 7    stipulation correctly and hearing your argument correctly,

 8    plaintiffs' lawyers have had no communication with the

 9    individual witnesses?

10            MS. CONLIN:  That's correct, Your Honor.

11            THE COURT:  So you have no more insight into this

12    child care issue than anybody else?

13            MS. ZIMMERMAN:  We do not.  We have not talked

14    with any of these third-party witnesses in advance of their

15    depositions.  We have been, after Harper was canceled, we

16    sent an e-mail asking if he canceled or who canceled, and

17    that's when we got the e-mail saying we would have to

18    contact defense counsel to get to the bottom of that.

19            MS. CONLIN:  I was going to say we did reach out

20    to Dr. Harper to say can you illuminate for us, would not

21    accept a call from us, said you'll have to talk to 3M to get

22    to the bottom of it.

23            The other exception that, as Mr. Gordon talked

24    about, with respect to Dr. McGovern who has lawyers, we have

25    been on, most recently, on a phone call with counsel for 3M

1    and us talking to Dr. McGovern's lawyers trying to negotiate

2    something on that, but we -- again, that was with the lawyer

3    and not with the individual witnesses.

4          THE COURT:  All right.  All right.  Well, I guess

5    my view of these London depositions is it's not a foregone

6    conclusion that they're not going to happen, so it would

7    seem to me to be premature to order that anybody pay costs

8    and/or pay attorneys' fees incurred in preparing for

9    depositions.

10         The travel to London appears, to me, is something

11   that should be compensated to some degree.  As I understand

12   it, 3M has volunteered to cover one quarter of the travel

13   expenses for the two lawyers that were there.  It would

14   appear, to me, that fairness would dictate that 3M pay for,

15   I don't know if this works out mathematically the same or

16   different because my brain doesn't work that way, but that

17   3M cover the entire travel expenses for one lawyer and that

18   as the other -- as the depositions may well be taken, that

19   the preparation is not all wasted and therefore there's no

20   need for 3M to pay the attorney's fees associated with the

21   depositions.

22         Does that make sense?  No?  Everybody's looking at

23   me sceptically.

24         MS. CONLIN:  I understand, Your Honor.

25         THE COURT:  Okay.

```
 1                    MR. COREY GORDON:  Sure.  Oh, yes.

 2                    THE COURT:  Anything else on any of these issues

 3        that anybody wants to bring to my attention?

 4                    And I guess to just to make sure I'm clear on what

 5        I'm planning, I'm going to be -- there will be minutes that

 6        will summarize what I've said.  Those things that I have

 7        offered opinions on is I would assume the lawyers will

 8        either do what I said or not as they choose, but if they

 9        don't that they will take some formal action to get some

10        formal ruling from the Court on those things that you're not

11        going to following my advice on.

12                    MR. HULSE:  Yes.  That's understood.

13                    MR. BEN GORDON:  Your Honor, could we

14        ask -- sorry.  Could we ask that -- and understanding that

15        this is in that capacity you just expressed, if these

16        depositions for any reason do not go forward, could we ask

17        that the Court re-entertain our request for fees associated

18        with preparing for the depositions?

19                    THE COURT:  We will cross that bridge when we get

20        to it.

21                    MR. BEN GORDON:  Okay.

22                    THE COURT:  Anything else for 3M?

23                    MR. HULSE:  No, Your Honor.

24                    THE COURT:  Anything else for plaintiff?

25                    MS. ZIMMERMAN:  No, thank you.
```

 1          THE COURT:  Okay.  Thank you all for coming.  We

 2     are in recess.

 3          MR. HULSE:  Thank you for your time.

 4          MR. BEN GORDON:  See you next week.  Thank you.

 5       (Proceedings concluded at 3:07 p.m.)

 6

 7                          *     *     *

 8

 9

10          I, Staci A. Heichert, certify that the foregoing is

11     a correct transcript from the record of proceedings in the

12     above-entitled matter.

13

14          Certified by:   *s/ Staci A. Heichert*

15                          Staci A. Heichert,
                            RDR, CRR, CRC
16

17

18

19

20

21

22

23

24

25