## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

In re: BAIR HUGGER FORCED AIR
WARMING DEVICES PRODUCTS
LIABILITY LITIGATION

This Document Relates To:
All Actions

MDL No. 15-2666 (JNE/FLN)

**DEFENDANTS' MEMORANDUM IN
SUPPORT OF MOTION TO
COMPEL THIRD-PARTY
AUGUSTINE ENTITIES TO
PRODUCE DOCUMENTS IN
RESPONSE TO SUBPOENAS**

## I.    INTRODUCTION

Defendants 3M Company and Arizant Healthcare Inc. (collectively "Defendants")

are before this Court a second time to seek a second order compelling Dr. Scott

Augustine and his related entities (collectively "Augustine")[1] to comply with their

discovery obligations.

Augustine is the central figure in this litigation.  He invented and developed the

Bair Hugger™ warming system that is the target of this litigation.  After being forced to

leave the company he founded in 2003 while being investigated for Medicare fraud,[2]

---

[1] Defendants issued identical subpoenas to several Augustine-related entities, including
Augustine Biomedical and Design, Augustine Temperature Management, Hot Dog
International, Hot Dog USA, Orthopedic Infection Advisory, and Stop Surgical
Infections.  Except for the entity name, the subpoenas are identical in substance, so
Defendants will cite the subpoena served on Scott Augustine as exemplary of all the
subpoenas. During the meet-and-confer process, Augustine's counsel noted that many of
the named entities are not separate legal entities; for those entities that are separate legal
entities, which counsel would not identify specifically, Augustine's counsel confirmed
that Scott Augustine is the CEO.

[2] Dr. Augustine's company was called Augustine Medical; after his departure, the
company name was changed to Arizant Healthcare.

Augustine developed a competing warming system called "HotDog" and immediately began a prolific, sustained, and deceptively hidden campaign to attack the Bair Hugger system. As part of the campaign, Augustine orchestrated – as a financial sponsor, author, or undisclosed contributor – the studies on which the MDL Plaintiffs rely.

Because of Augustine's central role, Defendants served him with subpoenas—first in the predicate lawsuits to this MDL, and then in the MDL itself—to discover the relevant information in his possession. He failed to comply with his discovery obligations in the predicate lawsuits, leading this Court to issue an order compelling him to respond. [Exh. A, *3M Company v. Augustine*, Nos. 15-mc-64 & 15-mc-65, Order (11/4/15)]. Now, he is failing to comply with his obligations in the MDL. A second order is required, this time with an accompanying award of fees and costs to compensate Defendants for the costs of this motion and to deter future misconduct.

Defendants tried to resolve this dispute before approaching the Court, with little success. Augustine refuses to produce directly responsive documents about his surreptitious campaign to undermine the Bair Hugger system—documents that third-party discovery proves exist, documents that reveal Augustine has lied about his role ghost-writing reports that attack the Bair Hugger system, and documents that Augustine and his counsel have either withheld without providing any explanation or claiming any privilege, or have listed on a privilege log without complying with this Court's rules for specificity. Augustine has also refused to produce documents about his competing HotDog warming system based on trade-secret claims that can be adequately addressed through a protective order.

Defendants therefore respectfully request that the Court enter an order compelling Augustine to produce documents in response to Defendants' subpoenas, as provided by Federal Rules of Civil Procedure 37(a)(3)(B)(i) and 45.  Specifically, Defendants urge the Court to issue an Order:

1. Ordering Augustine to produce documents, Electronically Stored Information (ESI), and emails that are responsive to Requests 4 , 6, 10-12, 14, 15, 17, 18,29, 31, 32, 35, 38-41, 44-49, 51-55, and 58 in Defendants' subpoenas and to document his efforts to find that ESI;[3]

2. Ordering Augustine to provide additional detail to his privilege log sufficient to permit Defendants and the Court to evaluate his claim of privilege;[4]

3. Ordering Augustine to produce all documents responsive to Requests 39, 41, 49 and 52 of Defendants' subpoena relating to the performance of Augustine's competing HotDog warming system; and

---

[3] Specifically, the Court should order Augustine (a) to identify and produce documents, emails and other ESI responsive to the listed requests, (b) to list any documents, emails or ESI withheld from production on a privilege log, and (c) to provide a sworn statement identifying all record custodians whose documents, emails and other electronic documents he searched, which files and electronic files he searched (i.e., personal emails, company emails, desktop files and/or computer drives), and what keywords or other methods he used to identify responsive documents.

[4] This information would include as to each document the parties to the communication, the date of the communications, the specific litigation addressed by the communication, the basis for the claim of privilege or other protection, and a sworn statement identifying the beginning and ending dates of any periods during which Augustine claims he had either an attorney-client relationship or a litigation consultant relationship with the Kennedy Hodges law firm.

4.   Awarding Defendants their costs and reasonable attorneys' fees incurred in connection with bringing this Motion.

## II.   BACKGROUND

Dr. Scott Augustine was the original inventor and developer of the Bair Hugger patient warming system.  After being forced out of his own company, he pled guilty to Medicare fraud,[5] developed a competing "HotDog" warming system, and immediately began a prolific, sustained, and often concealed campaign to attack the Bair Hugger system.  His systematic misinformation campaign about the Bair Hugger system caused and continues to drive this litigation.[6]

Initially, Augustine's efforts generated individual suits against Defendants.  In two of those suits, Defendants served subpoenas on Augustine seeking his testimony and documents.  *See Timothy Johnson v. 3M Company and Arizant Healthcare Inc.,* No. 2-14-cv-02044 KIN-TJJ  (D. Kan.) (*"Johnson"*); *Tommy Walton v. 3M Company, Arizant Healthcare Inc., and Robert Prestera,* No. 4:13-cv-01164 (S.D. Tex.).  When Augustine refused to comply with his discovery obligations, Defendants filed a motion to compel in

---

[5] Augustine and his current counsel, Randy Benham, both pled guilty to Medicare fraud on June 29, 2004, and the United States Department of Health and Human Services barred Augustine from participation in any federal healthcare system from 2005-2010. [Exh. B Stipulation of Facts Signed by R. Benham; Exh. B-1 Stipulation of Facts Signed by S. Augustine; Exh. C, February 3, 2006,  Dept. of Health and Human Services Appeals Board Decision].

[6] Augustine has threatened both Arizant and 3M that if they did not buy his "Hot Dog" system to replace the Bair Hugger patient warming system, they would be facing product liability lawsuits involving the Bair Hugger device. [Exh. D, July 9, 2010 Letter to K. Hilzinger; Exh. E, June 2, 2011, Letter to D. Rectenwald; Exh. F, January 4, 2012, Letter to D. Rectenwald].

this District, where Augustine is located.  This Court granted the motion in substantial part, overruling Augustine's claims of undue burden and ordering him to produce documents.  [Exh. A, 11/4/15 Order at 8-9.] He did so slowly and incompletely.

When the Judicial Panel on Multidistrict Litigation formed the present MDL, the *Johnson* and *Walton* discovery deadlines were suspended so discovery could be conducted in a coordinated fashion for all cases.  Defendants therefore served Augustine on June 7, 2016, with subpoenas *duces tecum* in the MDL requiring him (and his various entities) to produce documents that are relevant in these proceedings.  [Exh. G, June 7, 2016 Subpoena to S. Augustine].

The MDL subpoenas at issue in this motion partially overlap with, but are broader than, the *Johnson* and *Walton* subpoenas because of the increased scope of the MDL.  As relevant to this motion, the MDL subpoenas seek documents regarding:

- Augustine's hidden connections to and involvement with the studies and study authors attacking the Bair Hugger system that Plaintiffs are relying on in these proceedings;

- Augustine's efforts to smear the Bair Hugger system, including his videos, research, social media activities, and communications with healthcare entities, healthcare providers, journals regulatory agencies and key individuals; and

- Augustine's (and Plaintiffs') claims that the HotDog patient warming system is a safer alternative design.

5

The specific subpoena requests at issue are the requests numbered 4, 6, 10-12, 14, 15, 17, 18, 29, 31, 32, 35, 38-41, 44-49, 51-55, and 58.  Those requests ask for:

4.   Any social media content (including but not limited to any post, blog, tweet, website and/or email) drafted, created and/or sent by You, any person or entity You sponsor/sponsored, and/or any person who acts/acted on Your behalf or at Your direction, concerning the Bair Hugger warming system, forced air warming, the Bair Hugger warming system litigation, and/or the Defendants.
***

6.   All documents relating to any presentations funded, sponsored, given or supported by You and/or Scott Augustine concerning the Bair Hugger warming system, forced air warming, the Bair Hugger warming system litigation, the Defendants and/or the HotDog Patient Warming System.
***

10.   All documents relating to any communication and/or correspondence between (i) You and (ii) any current or former patients of any healthcare entity or healthcare provider concerning the Bair Hugger warming system, forced air warming, the Bair Hugger warming system litigation, the Defendants, the HotDog Patient Warming System and/or surgical site infections.

11.   All documents sent to or received from any consultant or third party relating to the Bair Hugger warming system, forced air warming, the Bair Hugger warming system litigation, the Defendants or performance and/or testing of the Bair Hugger warming system or its components, including but not limited to the intake filter.

12.   All documents sent to or received from any consultant or third party relating to the HotDog Patient Warming System, conductive warming, and/or performance or testing of the HotDog Patient Warming System.
***

14.   All documents relating to the following individual and entities, and/or any of their divisions, representatives, affiliates, employees, partners, and/or agents (including communications sent to and received from the following entities) which concern the Bair Hugger warming system, forced air warming, the Bair Hugger warming system litigation, the Defendants, the HotDog Patient Warming System, and/or conductive warming:
a.   Surgical Care Improvement Project (SCIP)

b.      Royal College of Surgeons
c.      United Kingdom Medicines and Healthcare Products Regulatory Agency (MHRA)
d.      United States Department of Health & Human Services
e.      United States Food & Drug Administration
f.      ECRI Institute
g.      Health Canada
h.      National Health Service (NHS)
i.      National Institute for Health and Care Excellence (NICE)
j.      Association of perioperative Registered Nurses (AORN)
k.      Centers for Medicare & Medicaid Services (CMS)
l.      Institute for Healthcare Improvement (IHI)
m.      Association for Professionals in Infection Control and Epidemiology (APIC)
n.      Association of Surgical Technologists (AST)
o.      American Society of PeriAnesthesia Nurses (ASPAN)
p.      Agency for Healthcare Research and Quality (AHRQ)
q.      American Society of Anesthesiologists (ASA)
r.      The Joint Commission
s.      Dr. Farhad Memarzadeh
t.      Court Square Capital Partners and or/Kurt Hilzinger

15.   All documents You have sent to or received from any newspaper, blog, internet domain, media outlet, media entity, social media outlet (including Twitter, Facebook and Instagram) or social media entity concerning the Bair Hugger warming system, forced air warming and/or the Bair Hugger warming system litigation.
***

17.   All documents, communications and correspondence relating to any healthcare entity or healthcare provider (including but not limited to communications and correspondence You sent to and/or received from any healthcare entity or healthcare provider) which concern the Bair Hugger warming system, forced air warming, the Bair Hugger warming system litigation and/or the Defendants.

18.   All communications, correspondence and other documents relating to any journal or publication (including but not limited to communications and correspondence You sent to and/or received from any journal or publication) which concern the Bair Hugger warming system, forced air warming, the Bair Hugger warming system litigation and/or the Defendants.
***

29.     All documents relating to any engagement letters, retainer agreements, retention agreements or other agreements between (i) Scott Augustine, You, and/or any other person or entity acting on Your behalf and/or at Your direction, and (ii) the law firms of Kennedy Hodges, LLP, Farrar & Ball, and/or any Plaintiff's attorney.

\*\*\*

31.     All documents relating to any alleged defects, problems or risks concerning the Bair Hugger warming system and/or forced air warming.

32.     All documents relating to complaints concerning the Bair Hugger warming system, including but not limited to correspondence and communications received from and sent to Bair Hugger warming system users (past and present), HotDog Patient Warming System users (past and present), healthcare providers, healthcare entities, patients, and/or any other persons.

\*\*\*

35.     All documents (including photographs and videos) relating to the following videos and/or any subsequent or related videos, including but not limited to documents relating to test conditions, test footage, results, protocols, materials, methods, experiment, set-up, persons present, persons involved, scripts and results:

    a.    "Forced-air Patient Warming Causes Vortex that Deposits Contaminants within Surgical Field," which includes video found at https://www.youtube.com/watch?v=3b9BF54apsY

    b.    "Airborne Contamination in the Operating Room," which includes video found at https://www.youtube.com/watch?v=31jz3P3eHDU and https://www.youtube.com/watch?annotation_id=annotation_912099&feature=iv&src_vid=31jz3P3eHDU&v=BKFl2rINa9g#t=1s

    c.    "Forced-Air Warming Destroys Laminar Air-flow," which includes video found at https://www.youtube.com/watch?v=hdtiBgUFzdc

    d.    "Effect of Forced Air Warming on Laminar Airflow" which includes video found at http://www.bing.com/videos/search?q=forced+air+warming+videos&qpvt=forced+air+warming+videos&view=detail&mid=71F79862792D0197E36B71F79862792D0197E36B&FORM=VRDGAR

    e.    "Forced Air Warming Compared with Conductive Warming Blanket" which includes video found at

http://www.bing.com/videos/search?q=forced+air+warming+
videos&qpvt=forced+air+warming+videos&view=detail&mi
d=7C9DE47388DFC985E2617C9DE47388DFC985E261&rv
smid=71F79862792D0197E36B71F79862792D0197E36B&f
sscr=-1485&FORM=VDFSRV

f.    "FAW v. CWB"
      https://www.youtube.com/watch?v=tfhQe8d8sM8

g.    Any videos posted (at any date and time, whether or not still
      posted) to http://heat-rises.blogspot.com,
      hotdogwarming.com, orthopedicinfectionadvisory.org,
      stopsurgicalinfections.org and/or any other website, web
      domain and/or internet site that You sponsor, sponsored,
      financially support, have financially supported, control and/or
      controlled

h.    Any other videos or photos of any demonstrations or tests of
      the Bair Hugger warming system, the HotDog Patient
      Warming System, or any other warming device using smoke,
      bubbles, steam, or any other airflow tracking mechanism

i.    Any other videos and/or video footage You participated in,
      funded, sponsored, financially support, control and/or
      consulted on, whether or not they were completed and/or
      posted

38.   All documents relating to any person, healthcare entity or healthcare
      provider's use, possible use, decision not to use, and/or decision to
      stop using the Bair Hugger warming system.

39.   All documents relating to any person, healthcare entity or healthcare
      provider's use, possible use, decision not to use, and/or decision to
      stop using the HotDog Patient Warming System.

40.   All documents evidencing any person or entity that uses the HotDog
      Patient Warming System now or has used the HotDog Patient
      Warming System in the past, including information concerning the
      years that each person or entity uses and/or has used the HotDog
      Patient Warming System.

41.   All documents relating to Your claim that the HotDog Patient
      Warming System is superior to, more effective, equally effective,
      less risky and/or safer than the Bair Hugger warming system and/or
      forced air warming.
      ***

44.   All documents relating to the Heat Rises/Hot Air Rising campaign,
      including but not limited to test data, test results, underlying data,

videos, communications to third parties, internal communications, brochures and publications. Your response should include, but not be limited to, documents posted on and/or related to http://heat-rises.blogspot.com/ and campaign exemplar attached as Exhibit G.

45.   All documents relating to the 2010 MedWatch report attached as Exhibit H.

46.   All documents relating to the intake filters used in and filtration concepts for the Bair Hugger warming system.

47.   All documents (including but not limited to any underlying data, communications, funding, payments, materials supplied, test design documents, test results, tests, experiments, photomgraphs, videos and analysis) relating to the following studies:
   a.   Albrecht, M., et al. Forced-air warming blowers: An evaluation of filtration adequacy and airborne contamination emissions in the operating room. *Am J Infect Control* 2011;39:321-28
   b.   Leaper, D., et al. Forced-air warming: A source of airborne contamination in the operating room? *Orthopedic Rev.* 2009;1(2):e28
   c.   McGovern, P., et al. Forced-air warming and ultra-clean ventilation do not mix. *J Bone and Joint Surg-Br.* 2011;93(11):1537-44
   d.   Legg, A., et al. Do forced air patient-warming devices disrupt unidirectional downward airflow? *J Bone and Joint Surg-Br.* 2012;94-B:254-56
   e.   Legg, A., et al. Forced-air patient warming blankets disrupt unidirectional airflow. *Bone Joint J.* 2013;95-B:407-10
   f.   Belani, K., et al. Patient warming excess heat: The effects on orthopedic operating room ventilation performance. *Anesth Analg.* 2013;117(2):406-11
   g.   Dasari, K., et al. Effect of forced air warming on the performance of operating theatre laminar flow ventilation. *Anaesthesia* 2012;67:244-49
   h.   Reed, M., et al. Forced-air warming design: evaluation of intake filtration, internal microbial buildup, and airborne-contamination emissions. *Am Assoc Nurse Anesth. J* 2013;81:275-80
   i.   Wood, A., et al. Infection control hazards associated with the use of forced-air warming in operating theatres. *J Hosp Infect.* 2014;1-9

j.  Bernards, A., et al. Persistent *Acinetobacter baumannii*? Look inside your medical equipment. *Infect Control Hosp Epidemiol.* 2004;25:1002-04

k.  Brandt, S., et al. Resistive-polymer versus forced-air warming: comparable efficacy in orthopedic patients. *Anesth Analg.* 2010;110:834-38

l.  Kimberger, O., et al. Resistive polymer versus forced-air warming: comparable heat transfer and core rewarming rates in volunteers. *Anesth Analg.* 2008;107:1621-26

m.  Matsuzaki, Y., et al. Warming by resistive heating maintains perioperative normothermia as well as forced air heating. *Bn J Anaesth.* 2003;90:689-91

48.  All documents, including but not limited to any underlying data, communications, funding, payments, materials supplied, design, results, conduct and analysis, relating to any study, test, trial, experiment, research and/or data analysis You sponsored, conducted, performed  proposed, attempted, considered, discussed, planned, in process, arranged and/or performed on the Bair Hugger and/or any forced air warming device or product.

49.  All documents, including but not limited to any underlying data, communications, funding, payments, materials supplied, design, results, conduct and analysis, relating to any study, test, trial, experiment, research and/or data analysis You sponsored, conducted, performed, proposed, attempted, considered, discussed, planned, in process, arranged and/or performed on the HotDog Patient Warming System and/or any conductive warming device or product.
***

51.  All documents sent to or received from the following individuals relating to the Bair Hugger warming system, forced air warming, conductive warming, the HotDog Patient Warming System, Defendants and/or the Bair Hugger litigation:

a.  Mark Albrecht
b.  Kiran Dasari
c.  Robert Gauthier
d.  Kumar Belani
e.  Christopher Natscheim
f.  Mark Litchy
g.  Mike Reed
h.  Paul McGovern
i.  Andrew Legg
j.  David Leaper

k. Andrew Hamer
l. Mark Harper
m. Keith Leland
n. Randy Arnold
o. Scott Entenman
p. Mark Albrecht
q. Andreas Deibel
r. Any other person who authored, sponsored and/or published a study concerning the Bair Hugger warming system, forced air warming, a forced air warming device or product and/or the HotDog Patient Warming System

52. All documents relating to the following:
 a. Any published study, unpublished study, test, testing performed, trial, experiment, research and/or data analysis You participated in, commissioned, performed, conducted, sponsored, authorized, directed and/or for which You provided any funding, support, personnel or materials concerning the Bair Hugger warming system, forced air warming, and/or any forced air warming device and/or product
 b. Any other study, test, testing performed, trial, experiment, research and/or data analysis concerning the Bair Hugger warming system, forced air warming, and/or any forced air warming device and/or product.
 c. Any other study, test, testing performed, trial, experiment and/or data analysis concerning the HotDog Patient Warming System and/or any conductive warming device and/or product.

53. All documents relating to any calculations, suggested and/or made, to determine any effect on the operating room environment from use of the Bair Hugger warming system, forced air warming, any forced air warming device or product, and/or the HotDog Patient Warming System.

54. All documents relating to any research, experiments, or tests conducted by You, on Your behalf and/or at Your direction, concerning potential contamination of the airflow paths of Bair Hugger warming system, the creation of convection currents in the operating room, and/or any other alleged safety risk or concern.

55.  Any photographic and/or videographic documentation from smoke and/or bubble studies concerning the Bair Hugger warming system, and/or forced air warming.

\*\*\*

58.  Produce any and all tests and/or trials, including set-up documents, protocols, videotapes of testing, analysis of tests, summaries of tests, and/or test results themselves, conducted to evaluate the comparative safety and/or performance of the Bair Hugger warming system and the HotDog Patient Warming System.

[Exh. G, June 7, 2016 Subpoena].

After Augustine initially produced little information in response to the MDL subpoenas and did not explain what he was withholding or why, Defendants met and conferred with him.  [November 3, 2016 Declaration of M. Hines ¶ 5, 7-8]  These efforts were partially successful.  In response to them, Augustine produced a large volume of documents, primarily related to studies on which he and Plaintiffs rely, as well as an amended privilege log.  [Exh. H, S. Augustine Privilege Log]. Even with those supplements, however, Augustine's discovery responses are materially incomplete.

In particular, Augustine's responses suffer the following key deficiencies:

**First**, Augustine has produced no more than a few dozen emails, even though third-party discovery and Augustine's own past practices show that he sent and received a great number of highly responsive communications by email.

**Second,** Augustine has not adequately described the documents he has listed on his privilege log.  In addition, he is apparently claiming privilege over communications that Plaintiffs' attorneys previously insisted were not made as part of a consulting arrangement or as part of an attorney client relationship.

13

**Finally,** Augustine has failed to produce documents relating to (1) his testing of the Bair Hugger system that found no evidence of the bacterial issues he claims, (2) his involvement with other reports and studies attacking the Bair Hugger system, including supposedly "independent" studies in which Augustine's role was concealed, and (3) the performance of his competing HotDog warming system, despite its central role in this litigation as a claimed safer, reasonable alternative to the Bair Hugger system.

## III.   ARGUMENT

### A.   Standard Applicable to Third-Party Discovery

Discovery under the Federal Rules of Civil Procedure is permissive, authorizing parties to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(l).  A non-party served with a subpoena, like Augustine here, is subject to the same scope of discovery as a party.  *See* Fed. R.  Civ. P. 34(c); *see also* Fed. R. Civ. P. 45(d)(l) Advisory  Comm. Note (1991 amendment).  Motions to compel non-party production based on a Rule 45 subpoena are subject to the standards of Rule 26.  *See Shukh v. Seagate Tech., LLC,* 295 F.R.D. 228, 236 (D. Minn. 2013).  "[A]n evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer or respond."  Fed. R. Civ. P. 37(a)(4).

### B.   Augustine has failed to produce documents, email and other Electronically Stored Information showing his involvement in so-called independent studies and critiques attacking the Bair Hugger system.

The most glaring deficiency in Augustine's production is his failure to produce documents, emails, and ESI that he and other company leaders wrote, sent, and received.

Defendants requested these documents through the subpoena requests listed above, including relevant documents showing how Augustine supported and secretly influenced and then lied about his role in the so-called independent studies[7] and the 2010 MedWatch report critiquing the Bair Hugger system.   To date, Augustine has produced few documents and few emails addressing these issues, [November 3, 2016 Declaration of M. Hines], and he has listed a total of only 23 emails on his privilege log.   Common sense compels the conclusion that such study documents and such emails to and from Augustine and third parties must exist.   More importantly, Augustine's past practices and third-party disclosures demonstrate that key, relevant documents, including emails to and from Augustine, do in fact exist.   Yet Augustine has not produced these documents and emails.   The Court should compel the production of these documents.

---

[7] Mark Albrecht, a former employee of Augustine Biomedical and Design, authored six of the studies upon which the Plaintiffs rely.  Some of the studies contain disclosures indicating financial support by Augustine and/or Augustine Biomedical and Design.  A recent revelation, however, also puts the Augustine-Albrecht taint on other studies. According to his own testimony, Albrecht had his hand in the two Legg studies on which Plaintiffs rely, even though the published articles did not list him as an author or otherwise note his contributions.  [Exh. I, October 7, 2016 Mark Albrecht Dep. at 232:20-234:3]; *see also* Legg, A.J.; Cannon, T; Hammer, A.J., Do forced air patient-warming devices disrupt unidirectional downward airflow? Journal of Bone and Joint Surgery Br. 2012;94-B:244-256; Legg, A.J.; Hammer, A.J., Forced-air patient warming blankets disrupt unidirectional airflow. Bone and Joint Journal, March 2013 vol. 95-B no. 3 407-410.  Significantly, Albrecht was an employee of Augustine at the time that he wrote these articles.  [*Id*., at 13:9-22, 15:10-20; 86:13-87:17]

### 1. Discovery shows that Augustine likely possesses a great volume of relevant, responsive documents, ESI, and email that he has not produced.

Plaintiffs brought the cases in this MDL claiming that independent studies show that the Bair Hugger system is dangerous and defective. Augustine himself has likewise publicly asserted that others have independently raised concerns about the safety of the Bair Hugger system. These statements are untrue, the documents and email Defendants seek will show them to be untrue, and Augustine is refusing without justification to produce those materials.

On their own and through discovery from third parties, Defendants have learned that Augustine sent and received emails and documents that are directly responsive to Defendants' subpoenas. Augustine has sent emails through proxy companies disparaging the Bair Hugger warming system and concerning the litigation; has sent or received emails about the various studies relied on by Plaintiffs here, including his unsuccessful testing to try to prove microbial contamination by the Bair Hugger system; and a variety of other documents and communications more fully detailed below. Moreover, common sense dictates that additional documents and emails concerning other such projects and articles must exist.

Take the example of the 2010 MedWatch report. Augustine has repeatedly claimed, both to industry figures and to courts, that this report is "a long and detailed MDR complaint about Bair Hugger warming" that "an *independent* anesthesiologist"— Dr. Robert Gauthier—filed with the FDA. [*See* Exh. D, Augustine's July 9, 2010 letter to Arizant Healthcare, Inc. board member Kurt Hilziger (emphasis added); *see also* Exh. J,

July 1, 2010 Affidavit of S. Augustine ¶ 3 ("Many of the problems [with the Bair Hugger system] are detailed in the MDR *filed by Dr. Robert Gauthier*." (emphasis added)), ¶ 8 ("the MDR filed by Dr. Gauthier"); Exh. K, July 7, 2010 Letter from R. Benham (stating "we are pleased that a clinician in the US has filed an adverse event report regarding Bair Hugger blowers with the Food and Drug Administration")].

In fact, the MedWatch report was not independent at all because *Augustine and his lawyer Randy Benham directed and wrote it.* Defendants only recently discovered this when they deposed Dr. Gauthier. In his testimony, Dr. Gauthier agreed that nothing in the submission to the FDA revealed that Augustine had any role in its preparation:

> Q. And would you agree that when you're submitting something to the FDA and when you've got -- first of all, when it was ultimately signed, you were the only one who signed it, right?
> A. Correct.
> Q. There was no indication in what was actually submitted to the FDA that Dr. Augustine had anything to do with authoring it, correct?
> A. Correct.

[Exh. L, October 4, 2016 Robert Gauthier Dep. at 116:5-14]. But in fact, Dr. Gauthier was *not* the sole author of the report, because Augustine and Benham were also authors:

> Q. Dr. Gauthier, I handed you what's been marked now as Exhibit [4] [the MedWatch report].
>           ***
> Q. This is a document you authored, correct?
> A. Along with others, yes.
> Q. Tell me who the others were.
> A. Well, I believe Randy Benham had a lot to do with the formation, or he and Scott Augustine.

[*Id.* at 96:9-10, 17-22].

Augustine and Benham apparently not only drafted the report, they also provided the "research" underlying the report's attacks on Bair Hugger:

> Q. On the fourth page of Exhibit 4, at the top this letter that you coauthored references a letter from N. Baker and D. King about – and it quotes them saying that, "All of the blowers resulted in heavy growth of bacteria." Do you see that?
> A. Yes.
> Q. Now, again, would that have been something that Mr. Benham and Dr. Augustine came up with and --
> A. They -- they put together the research on it, yes.

[*Id.* at 111:25-112:12]. Dr. Gauthier testified that, in fact, he had to "tone[] down" Augustine's and Benham's rhetoric in the report:

> Q. Did you -- were you the person who actually decided how to write this and how to excerpt this particular quote?
> A. They [Augustine and Benham] wrote it, I edited it. I toned it down, if you will.

[*Id.* at 107:23-108:3].

In addition, contrary to Augustine's sworn statement that Dr. Gauthier filed the MedWatch report, Dr. Gauthier testified that although he signed the report, he did ***not*** file it but instead gave it to Augustine and Benham for ***them*** to submit to the FDA:

> [B]y the way, Exhibit 4 was intended to be submitted to the FDA, correct?
> A. Correct.
> Q. Was any version of this ever submitted to the FDA?
> A. I believe it was. I signed it to send it to there, I gave it to them [Augustine and Benham]. I don't know if they submitted it.

[*Id.* at 106:24-107:8].

Both in the predicate litigation to the MDL and in the MDL subpoenas at issue in this motion, Defendants have tried to obtain the documents that Augustine and Benham

possess showing their covert role in the MedWatch report.  But Augustine has refused to comply with his discovery obligations, engaging in evasions and delays.

In the subpoenas Defendants served in the *Johnson* and *Walton* cases, Defendants specifically asked for "[a]ny and all documents, including correspondence and draft correspondence related to the MedWatch report referenced in your July 9, 2010 letter to Kurt Hilziger, Court Square Capital Partners." [Exh. M, July 23, 2015 Notice of Third party Subpoena of S. Augustine]. Even though Augustine had sent the letter, he pretended not to know what it was.  Defendants therefore moved to compel him to produce his documents regarding the letter.  [Exh. N, Defendants' August 21, 2015 Motion to Compel]. At the hearing on the motion to compel, Augustine's lawyer Randy Benham continued the charade and pretended that he did not know what the letter was.  [*See* Exh. O, October 26, 2016 Hearing Transcript at 33:5-9 (Benham: "I looked through his [Augustine's] files and attempted to find a letter to that gentleman [Hilziger] at any time, and I could not find it.  Absent looking at the letter and reading the reference that they are talking about, I have to make a guess as to what they are talking about.")].  The Court saw through the subterfuge and ordered Augustine to produce the documents.  [Exh. A, November 4, 2015 Order]. Augustine then produced *only* the MedWatch report itself and its attachments, [Exh. P MedWatch Report and attachments]; Augustine **has never produced any emails, correspondence, drafts, or other ESI regarding the report**.[8]

---

[8] One of the few emails Augustine did produce illustrates his campaign against the Bair Hugger system.  In a March 25, 2013 email, Augustine tried to persuade a St. Paul reporter to publicize the first Bair Hugger lawsuit.  [Exh. Q, March 23, 2015 S. Augustine

Defendants continued to pursue the highly relevant MedWatch and related Medical Device Reporting (MDR)[9] discovery in the MDL subpoenas at issue in this motion. Request 14, for example, seeks all documents concerning the Bair Hugger system that relate to the FDA and other entities, and Request 45 seeks documents concerning the specific July 2010 MedWatch report concerning the Bair Hugger system. [*See* Exh. G, June 7, 2016 Subpoena]. **Yet to this day, Augustine still has not produced any correspondence, drafts, emails, or other ESI regarding the July 2010 MedWatch report that he coauthored or other MDR reports**.

Augustine's discovery abuses are not limited to the 2010 MedWatch report; they are pervasive. For example:

- Defendants know from independent sources that Augustine regularly blasts out emails under the guise of one of his many entities or related associations, critiquing the Bair Hugger system and providing information regarding this very litigation. [Exh. R, August 18, 2016 Email to R. Mont]. **But Augustine has not produced these emails.**

---

Email to J. Welbes ("The Walton case may be the beginning of the next product liability tsunami which could be big enough to sink 3M.").

[9] Medical Device Reporting (MDR) refers to reports filed with the FDA regarding alleged adverse events or problems associated with a medical device. As the Court is aware, many MDRs have been filed since the inception of MDL-2666 and parrot language from various MDL individual complaints. Thus far, Plaintiffs' counsel have denied knowledge of the source(s) of those filings. The Court recently ordered that **all** Plaintiffs' counsel (not just the Plaintiffs' Steering Committee) must respond to 3M's discovery concerning MDRs. *See* Dkt. 121 (Minute Order, 10/16/16) (ordering all Plaintiffs' counsel to respond to interrogatory 8 and RFPs 4 and 25, which seek Plaintiffs' and their attorneys' communications with FDA, including MDRs).

- Defendants have learned through third-party discovery that Augustine corresponded by email with the authors of several of the supposedly independently scientific studies that Plaintiffs are relying on.  Defendants have obtained multiple emails between and among various study authors, Augustine, and Mark Albrecht, who was Augustine's former employee and a co-author on many of the studies on which Plaintiffs rely.  These emails reveal many aspects of Augustine's campaign against the Bair Hugger system—manipulation of scientific literature to try to discredit the product, deception as to the independence of the scientific literature, and promotion and exaggeration of litigation.  [*See* Exh. S-X, Emails Produced by M. Albrecht (Albrecht_0004779, 0003510, 0003579, 0018365, 0018369, and 002078) and Exh. Y-AA, Documents Produced by C. Nachtsheim (Nachtsheim_0000269, 0000278, and 0001012)].  Indeed, Augustine and Albrecht refer to their orchestrated campaign as a "Publication Factory." [Exh. BB, July 9, 2010 E-mail to C. Nachtsheim].  ***Yet Augustine himself did not produce any of this email correspondence or other documents relating to his role in these studies.***

- Defendants have learned through third-party discovery that Augustine was originally listed as a ***coauthor*** of a study comparing forced-air warming (e.g., the Bair Hugger system) and conductive fabric blankets (e.g., Augustine's competing HotDog product (see section D below)).  That study ultimately was published as purportedly being independent, but concealed any aspect of Augustine's involvement.  [*See* Exh. Y; Exh. Z].  ***Augustine has failed to produce any emails***

*or other documents relating to his participation in this study.*  This failure is particularly egregious, given that Augustine's lawyer, Randy Benham, is himself personally copied on the emails.  [*See* Exh. Y; Exh. AA].

• Augustine's former employee Albrecht revealed at his deposition that he and Augustine actually performed operating-room testing on the Bair Hugger system at Regina Surgical Center in Hastings, Minnesota, to try to prove their theory of bacterial contamination, but that they were unable to generate any significant contamination.  [Exh. I, October 7, 2016 Mark Albrecht Dep. at 23:23-24:10, 26:14-19, 39:24-40:25, and 73:16-22]  *Augustine has not produced emails relating to this testing: and given this failure, as well as his history of less than full disclosure, there is reason to believe he has not produced full data, results or other documents or ESI relative to this testing.*

• Documents from third parties show that Augustine also financed and supplied equipment for a microbiology study at Northumbria Healthcare in the United Kingdom[10], again to try to culture bacteria from the Bair Hugger system. Again, the effort failed to produce the bacterial contamination Augustine hoped for.  [*See* Exh. CC December 2, 2011 E-mail from M. Reed].  And again, *Augustine has not produced email relating to this testing, and there is reason to believe he likewise has not produced all data, results or other documents or ESI as to this testing.*

---

[10] Significantly, this microbiology study involved the same facility and same author as the McGovern study which the Plaintiffs have touted to the Court in this MDL litigation.

- Augustine has sent out emails to anesthesiologists promoting investment in his competing HotDog warming system and condemning forced-air systems like the Bair Hugger system, citing and relying an article by Scott Augustine entitled "Forced-air warming is associated with periprosthetic total joint replacement infections" and described as "Submitted for publication." [Exh. DD, October 4, 2016 Email from S. Augustine]. Yet despite citing the article in his own external communications, Augustine has neither produced this article, produced any documents or ESI related to the article, or listed any document related to the study on his privilege log.[11]

- An email from Albrecht to Augustine discussing their joint efforts to respond to discovery identifies "the email trail with pace labs microbe culturing discussions we want to capture," [Exh. X, July 19, 2016 M. Albrecht Email to S. Augustine], but Augustine's production includes no such email trail.

Finally, Augustine's production and privilege log include scarcely any correspondence or emails to or from President Brent Augustine or any of the other principals and key leaders of Augustine's many entities. Rarely does a discovery record contain such clear evidence of such pervasive evasion and concealment.

---

[11] When Defendants asked Augustine directly for a copy of the article, his attorney Benham did not deny that the article exists and did not assert any legal basis for refusing to product it. Instead, he simply stated:

> No article entitled "Forced-air warming is associated with periprosthetic total joint replacement infections" has been published. It is unlikely, I believe, that the Court will allow your client to review articles containing your competitor's research prior to publication.

[Exh. EE, October 19, 2016 R. Benham Email to M. Hines]

## 2. Augustine has neither produced the responsive documents nor listed them on a privilege log nor stated any justifiable basis for not producing them.

In responding to the MDL subpoenas, Augustine had three options under the rules: produce the documents, adequately preserve a claim of privilege on a log, or specifically disclose that documents were being withheld and state the bases for the objections justifying that position. Augustine has complied with none of these three options. He has not produced the documents. He has not claimed privilege. And he has not preserved any proper objections. The first two points are self-apparent: Augustine has neither produced nor claimed privilege for the many responsive documents, going to the very heart of the Plaintiffs' claims, that third-party discovery shows to exist.

As to the lack of proper objections, Rule 34 requires a person from whom documents are sought to "state with specificity the grounds for objecting to the request, including the reasons." Fed. R. Civ. P. 34(b)(2)(B). If a custodian claims that he has no responsive documents, he must affirmatively say so; he cannot passively refuse to respond to the request. *See In re Control Data Corp. Sec. Litig.*, No. 3-85-1241, 1988 WL 92085, at *6 (D. Minn. Feb. 22, 1988) ("[I]n a manner which it can be legally bound, it must formally answer that no such documents exist. Therefore, even if there are document requests where nothing is produced, PMM must serve proper formal responses, so stating.") (citing *Laker Airways Ltd. v. Pan American World Airways,* 103 F.R.D. 42, 46 (D.D.C.1984); *Alexander v. Parsons,* 75 F.R.D. 536, 538 (W.D.Mich.1977)).

If Augustine intends to oppose this motion on the basis that he does not possess any undisclosed, responsive documents, ESI or emails, the Court should require him to

make that claim under penalty of perjury.  *See Wagner v. Dryvit Sys.*, 208 F.R.D. 606, 610 (D. Neb. 2001) ("While this requirement [of signing interrogatory response under oath] does not exist for document production requests, when appropriate, the court may order a party to formally verify under oath that either no responsive documents exist, or if they exist, that all responsive documents have been disclosed."); *Liguria Foods, Inc. v. Griffith Labs., Inc.*, 309 F.R.D. 476, 479 (N.D. Iowa 2015) (same).

If Augustine is unwilling to attest to his complete production under oath, then the Court should require him to either produce the documents or list them on a privilege log.[12]  In addition, because of Augustine's repeated demonstration that he cannot be trusted to comply with his discovery obligations, the Court should order Augustine to identify all of the custodians whose documents and ESI he searched and all of the keywords or other methods he used to identify responsive ESI and email.  Defendants asked for this information, but Augustine refused to provide it.  [Exh. EE, October 19, 2016 R. Benham Email to M. Hines].

---

[12] If, in the face of this Court's order, Augustine withholds responsive documents without claiming privilege, he will waive the privilege. *See United States v. Rosenblum*, No. CRIM. 07-294 JRT/FLN, 2007 WL 4969140, at *6 (D. Minn. Dec. 21, 2007), *decision supplemented*, No. CRIM 07-294 JRT/FLN, 2008 WL 608297 (D. Minn. Jan. 16, 2008), and *report and recommendation adopted as modified*, No. CRIM. 07-294 JRT/FLN, 2008 WL 582356 (D. Minn. Mar. 3, 2008) ("To the extent that the Defendant seeks a ruling that documents he did not previously list on its October 2006 privilege log are privileged, the Court recommends that the motion be denied on the basis that the privilege has been waived."); *In re Universal Serv. Fund Tel. Billing Practices Litig.,* 232 F.R.D. 669, 674 (D.Kan.2005) ("The court strongly encourages counsel, in the preparation of future privilege logs, to list each e-mail within a strand as a separate entry. Otherwise, the client may suffer a waiver of attorney-client privilege or work product protection.").

In recent correspondence, Augustine claimed that he could not produce in this litigation documents related to FDA filings he made, instigated, or contributed to— including MDRs—because of federal privacy laws.  Defendants asked Augustine either to produce the documents or confirm that they do not exist.  [Exh. FF, October 27, 2016 Email chain between M. Hines and R. Benham].  In response, Augustine's counsel took the following position:

> It is my understanding that the confidentiality of reports filed in the Medwatch system are protected by federal privacy laws.  Although I have not done a great deal of legal research on this topic, I did find an article by former FDA Commissioner David Kessler informative.  You may read it at http://www.fda.gov/downloads/Safety/MedWatch/UCM201419.pdf.
> Apparently the FDA has intervened several times regarding this issue.
> Assuming my understanding of the law is correct, it would not be appropriate for me to respond to your question.

*[Id.]*.

This is a spurious position. Augustine felt free to circulate FDA filings when he sent the  2010 MedWatch report to an Arizant board member in an attempt to attack the Bair Hugger system and to encourage the board member to withdraw his investment in Arizant.  [Exh. D] There is absolutely no basis for his refusal to produce the same type of information in this litigation.  Moreover, if any concerns about privacy truly existed, this Court could eliminate them by ordering Augustine to make the production subject to a protective order.  *See, e.g., Cardenas v. Prudential Ins. Co. of Am.*, No. CIV.99-1421(JRT/FLN), 2003 WL 244640, at *2 (D. Minn. Jan. 29, 2003) ("Discovery of [non-party employee personnel] files clearly implicates privacy concerns, but the Court finds that such concerns can be addressed through a protective order agreed to by the parties

and imposed by the Magistrate Judge."); *In re RFC & RESCAP Liquidating Trust Actions*, No. CIV. 13-3451 SRN/JJK, 2015 WL 3408120, at *4 (D. Minn. May 27, 2015).

In sum, 3M urges the Court to grant its motion and to order Augustine to identify and produce documents, emails, and other ESI responsive to Defendants' requests, including (but not limited to[13]) materials addressing:

1. The 2010 MedWatch report and any subsequent MDRs concerning the Bair Hugger System;

2. The two studies that  Albrecht testified he authored while employed by Augustine, but that nevertheless do not list Albrecht as an author or contributor (Legg, A.J.; Cannon, T; Hammer, A.J., Do forced air patient-warming devices disrupt unidirectional downward airflow? Journal of Bone and Joint Surgery Br. 2012;94-B:244-256 and Legg, A.J.; Hammer, A.J. Forced-air patient warming blankets disrupt unidirectional airflow. Bone and Joint Journal, March 2013 vol. 95-B no. 3 407-410);

3. Any other studies, articles, or reports concerning the Bair Hugger system or any other forced-air warming system that Augustine or any of his staff or former staff authored, financed, or otherwise contributed to, regardless of

---

[13] These examples represent only the documents, emails and ESI topics that Defendants have learned of to date from other sources.  Defendants believe Augustine has undisclosed documents, emails and ESI on many other topics that are responsive to Defendants' subpoenas.

whether any of their names appeared in any publication of the study, article, or report;[14]

4. Communications with Pace Laboratories concerning the Bair Hugger system, any other forced-air warming system, or microbial culturing;

5. Communications distributed by Orthopedic Infection Advisory, Stop Surgical Infections, or any other companies associated with Augustine that address claimed flaws in the Bair Hugger system or forced-air warming systems generally; and

6. Any testing to culture bacteria using a forced-air warming system or other testing of forced air systems, including but not limited to the testing performed at Regina Surgery Center in Hastings, Minnesota, and Northumbria Healthcare NHS Foundation Trust in the United Kingdom, including the data and results from these studies.

Defendants also ask that the Court order Augustine to list on a privilege log and fully describe any responsive documents, emails, or other ESI that he withholds on any

---

[14] Such articles would include but not be limited to McGovern, P.D.; Reed, M.R., et al. Forced-air Warming and Ultra-clean Ventilation Do Not Mix. J. Bone and Joint Surgery Br, 93B:11. 1537-44. Nov 2011; Dasari, K.B.; Albrecht, M; Harper, M. Effect of forced-air warming on the performance of theatre laminar flow ventilation. Anaesthesia. Vol. 67; 2012: 244-249; Belani, K; et al. Patient Warming Excess Heat: Effects on Orthopedic Operating Room Ventilation Performance. Anesth Analg. 2013 Aug;117(2):406-11; Albrecht M, Leaper D, et al. Forced Air Warming Blowers: An Evaluation of Filtration Adequacy and Airborne Contamination Emissions in the Operating Room. American Journal of Infection Control, 2011; 39:321-8; Reed M, et al. Forced Air Warming Design: An Evaluation of Intake Filtration, Internal Microbial Build-Up, and Airborne-Contamination Emissions. 2013;81(4):275-280; Wood A.M., et al., Infection control hazards associated with the use of forced air warming in operating theatres, Journal of Hospital Infection. 2014 Nov;88(3):132-40.

basis, and to provide a sworn statement (1) identifying all record custodians whose emails and other electronic documents he searched and all keywords or other methods he used to identify responsive documents, and (2) attesting that he has no undisclosed responsive ESI other than ESI listed on his privilege log.

### C. Augustine has not sufficiently established either attorney-client privilege or work-product protection for many of the documents listed on his privilege log, and the Court should compel production of those documents.

Until now, this motion has addressed documents that Augustine has neither produced nor listed on his privilege log. Turning now to the much smaller body of documents on Augustine's privilege log, Augustine failed to provide an adequate factual basis to withhold the documents as privileged, opting instead for vague and consuming descriptions. He should therefore be ordered to produce the documents on the log.

A person seeking to withhold documents based on either the attorney-client privilege or the work-product doctrine bears the burden of establishing the factual basis for the claim:

> The party asserting the attorney-client privilege or the work product doctrine bears the burden to provide a factual basis for its assertions. This burden is met when the party produces "a detailed privilege log stating the basis of the claimed privilege for each document in question, together with an accompanying explanatory affidavit" from counsel.

*Triple Five of Minnesota, Inc. v. Simon*, 212 F.R.D. 523, 527–28 (D. Minn. 2002), *aff'd*, No. CIV.99-1894 PAM/JGL, 2002 WL 1303025 (D. Minn. June 6, 2002) (citations omitted). Under Fed. R. Civ. P. 26(b)(5)(A), a privilege claim must "describe the nature of the documents, communications, or tangible things not produced or disclosed—and do

so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." "A blanket statement that a privilege applies simply will not suffice; Defendants must provide this Court with enough information to determine whether the privilege truly applies to each individual document." *In re Milk Prod. Antitrust Litig.*, 84 F. Supp. 2d 1016, 1028 (D. Minn. 1997), *aff'd,* 195 F.3d 430 (8th Cir. 1999). The Court has made a similar observation in this very litigation. [citation to Court's prior order to Augustine in the Walton and Johnson cases in 2015].

Augustine's privilege log's descriptions do not provide enough detail or clarity to satisfy Rule 26. To the contrary, the log obscures information in several ways. First, every document on the privilege log—*every single one*—lists the same people as both authors *and* recipients, creating the impression that these people are writing to themselves. [*See* Exh. H]. If these are email series going back and forth between or among individuals, the log must provide the necessary information for each separate email in the exchange (e.g., number of exchanges, etc.). To permit evaluation of the claimed privilege, Augustine must identify the dates, the number of exchanges and the parties to each exchange.

Second, *every* entry on the log asserts both attorney-client privilege for all the parties to the communication and work product protection for "all attorneys," [Exh. H], conflating the distinct protections of the privilege and the work-product doctrine and lumping together all information and advice in each document. To permit evaluation of the claimed privilege, Augustine must identify the specific claimed basis for each of these documents.

Third, *every* one of Augustine's assertions of privilege asserts that the communication relates to "potential product liability, unfair competition, and/or other claims." This vague and indefinite description omits the information necessary to evaluate the claim of privilege, including what particular litigation is at issue. *Cf. Triple Five of Minnesota, Inc.*, 212 F.R.D. at 527–28 (upholding claims in privilege log based on "comprehensive, sworn statement" from attorney). This level of specificity matters, because there are some pending claims for which Augustine has no possible claim of privilege because his former attorneys (certain of Plaintiffs' attorneys here) have disclaimed any attorney-client relationship. To permit evaluation of the claimed privilege, Augustine must identify the specific litigation supposedly addressed by the communication.

To be specific, all of the entries on Augustine's privilege log involve 2013-2015 communications with attorneys at the Kennedy Hodges firm, and specifically with attorneys David Hodges, Gabriel Assad, and John Neuman. [Exh. H]. (The Kennedy Hodges firm represents multiple plaintiffs in the Bair Hugger MDL litigation.) Augustine cannot claim attorney-client privilege as to these communications, however, because he had no attorney-client relationship with Kennedy Hodges in connection with the Bair Hugger litigation.

The 2013 entries on Augustine's privilege log are dated just before and just after the commencement of the *Walton* Bair Hugger system case in Texas. In connection with the discovery Defendants sought from Plaintiff in the *Walton* case, Plaintiff and his attorneys at Kennedy Hodges objected to Defendants' request that they prepare a

31

privilege log of Augustine's communications with Kennedy Hodges.  Kennedy Hodges argued that Augustine had retained Kennedy Hodges on unrelated matters in 2009, "years before" the *Walton* lawsuit began, and submitted an affidavit from attorney David Hodges to support his argument.  [*See* Exh. GG, David Hodges May 6, 2015 Affidavit, filed in *Walton v. 3M Company*, No. 4:13-cv-01164 (S.D. Tex.) ("On July 6, 2009, Kennedy Hodges, LLP was retained by Dr. Scott Augustine to provide legal representation to his company, Augustine Biomedical+ Design, LLC."); *see also* Exh. HH, Plaintiff's Response to Defendants' Motion to Compel Plaintiff's Responses To Discovery in *Walton* (May 6, 2015) ("[O]n July 6, 2009, **years before** the instant litigation [the *Walton* case], Dr. Augustine retained Kennedy Hodges, LLP to represent his company, Augustine Biomedical + Design, LLC.") (emphasis added)].  The Texas federal judge expressly relied on these representations in relieving Plaintiff Walton of any obligation to prepare a privilege log for Augustine communications.  [*See* Exh. II, *Walton v. 3M Company*, Order at 1-2 (Dkt. 120, No. 4:13-cv-01164, S.D. Tex., May 19, 2015) ("In response to the motion, Plaintiff and his counsel represent that they have had no contact or communications with Dr. Augustine relative to this case…").]

These representations in the *Walton* case that Augustine had no attorney-client communications with Kennedy Hodges relating to the Bair Hugger litigation belie Augustine's claim here of attorney-client privilege with respect to communications responsive to Defendants' document request in the MDL.  Nothing in the Hodges affidavit or anywhere else in the record suggests that Kennedy Hodges' representation of Augustine's company continued beyond 2009, or (more importantly) that Kennedy

Hodges ever represented Augustine or any related entity in connection with the Bair Hugger litigation.   The evidence thus disproves Augustine's claim of attorney-client privilege.

Augustine's assertion of work-product protection likewise fails as a matter of law as to any communications relating to product liability claims.   The work-product doctrine is intended to protect the work of attorneys, their staffs, and their consultants in preparing to prosecute or defend litigation.   *See, e.g., United States v. Nobles*, 422 U.S. 225, 238–39, 95 S. Ct. 2160, 2170, 45 L. Ed. 2d 141 (1975).   This rationale extends to the protection of the litigation-related work of testifying and non-testifying experts.   *Karsjens v. Jesson*, 6 F. Supp. 3d 916, 958 (D. Minn. 2014) ("To facilitate the integrity and effectiveness of the experts' work, their communications with one another and work product (such as draft documents, correspondence, e-mails, and conversations) shall be privileged, confidential, and not admissible.").

Here, however, Augustine was not a testifying or non-testifying expert.   Kennedy Hodges expressly represented in their submissions in the *Walton* case that Augustine had no role as an expert or consultant, [*see* Exh. HH, Plaintiff's Response to Defendants' Motion to Compel Plaintiff's Responses To Discovery in *Walton* (May 6, 2015)],[15] and again the court in Texas expressly relied on that representation in denying Defendants' motion to compel Plaintiff to prepare a privilege log concerning his attorneys' communications with Augustine.   [*See* Exh. II, *Walton v. 3M Company*, Order at 1-2

---

[15] The Walton plaintiffs had originally disclosed Augustine as a consulting expert but later withdrew that designation.  [Exh. HH, at 2-3].

(Dkt. 120, No. 4:13-cv-01164, S.D. Tex., May 19, 2015) (relying on "the fact that Dr. Augustine is not a consulting or testifying expert for Plaintiff in this case")]. Augustine cannot claim work-product protection for documents relating to litigation in which he was neither a party nor a retained expert. *In re California Pub. Utilities Comm'n*, 892 F.2d 778, 781 (9th Cir. 1989) ("the rule, on its face, limits its protection to one who is a party (or a party's representative) to the litigation in which discovery is sought.") (citations omitted); *In re Polypropylene Carpet Antitrust Litig.*, 181 F.R.D. 680, 691 (N.D. Ga. 1998) ("By its very terms, Rule 26(b)(3) applies only to documents created by or for a party, or by or for a representative acting on behalf of a party.").

   In sum, Augustine has failed to offer factual support for his claims of privilege and work-product protection, and the evidence available contradicts those claims. The Court should require Augustine to fix these problems and provide a privilege log that includes as to each document:

1. the parties to the communication,

2. the date and time(s) of the communication(s),

3. the specific litigation addressed by the communication, and

4. the basis for the claim of privilege or other protection.

If Augustine continues to claim any privilege or protection concerning communications with any attorney at the Kennedy Hodges firm, the Court should also require Augustine to submit a sworn statement identifying (1) the beginning and ending dates of any periods during which Augustine claims he had either an attorney-client relationship or a litigation

consultant relationship with the Kennedy Hodges law firm and (2) the general nature of the representation or consultancy.

### D. Augustine has failed to produce documents relating to the HotDog patient warming device.

Finally, the Court should compel Augustine to produce documents relating to the performance of HotDog, the device Augustine developed to compete with the Bair Hugger system, and which he claims is a safer alternative.  As the central figure in this litigation, Augustine is subject to discovery regarding both the Bair Hugger system and his competing technology to show bias and to assess his scientific and general credibility. In addition, because some of the applicable state laws require a showing of a safer, alternative technology, Defendants are entitled to discovery into HotDog to be prepared to rebut any argument that HotDog is such a technology.

Defendants' subpoenas to Augustine included the following requests relating to the HotDog focusing on the performance of the HotDog system:

> Req. 39: All documents relating to any person, healthcare entity or healthcare provider's use, possible use, decision not to use, and/or decision to stop using the HotDog Patient Warming System.
> \*\*\*
> Req. 41: All documents relating to your claim that the HotDog Patient Warming System is superior to, more effective, equally effective, less risky and/or safer than the Bair Hugger warming system and/or forced air warming.
> \*\*\*
> Req. 49:  All documents, including but not limited to any underlying data, communications, funding, payments, materials supplied, design, results, conduct and analysis, relating to any study, test, trial, experiment, research and/or data analysis You sponsored, conducted, performed, proposed, attempted, considered, discussed, planned, in process, arranged and/or performed on the HotDog Patient Warming System and/or any conductive warming device or product.
> \*\*\*

52.  All documents relating to the following:  (c)  any other study, test, testing performed, trial, experiment and/or data analysis concerning the HotDog Patient Warming System and/or any conductive warming device or product.

[*See* Exh. G].  Augustine refused to produce any documents responsive to these requests.

[Exh. JJ, June 28, 2016 E-mail from R. Benham][16]

**1.  The documents that Defendants seek regarding HotDog are relevant to the elements of Plaintiffs' claims, and they are also necessary to assess the bias and credibility of Augustine.**

Augustine's documents and information concerning the HotDog are discoverable because they bear directly on the issue of reasonable alternative design, a crucial aspect of Plaintiffs' claims of design defect and negligent design.  *See* Long Form Complaint ¶¶ 16, 52, 61 (all alleging the existence of "safer alternative designs"), Dkt. 97.  Under the laws of some states, Plaintiffs must demonstrate a reasonable alternative design as an element of their *prima facie* case based on defective or negligent design.  *See, e.g.,* Wis. Stat. § 895.047(1)(a) ("A product is defective in design if the foreseeable risks of harm

---

[16] Augustine incorporated the following objections for requests 39, 41, 49 and 52:
1.  The demands are overly broad, vague and ambiguous.
2.  The demands are unreasonable and oppressive.
3.  The demands require disclosure of confidential and trade-secret documents and information.
4.  The demands require disclosure of documents and information that is not relevant to the litigation under Rule 26.
6.  The demands require disclosure of documents and information the production of which would be unduly burdensome and expensive.
7.  The demands require disclosure of documents and information that are privileged of otherwise protected from disclosure.  To fully comply with FRCP 45(e)(2)(A) at  this point would itself be unduly burdensome and expensive, but further elaboration will be forthcoming.
8.  This is an attempt to seek information from a competitor.
[Exh. JJ]

posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the manufacturer….").   In other jurisdictions, the existence or absence of such a reasonable alternative design is not mandatory but is nevertheless a significant factor a jury considers in evaluating a claim of product defect.   *See, e.g., Kallio v. Ford Motor Co.*, 407 N.W.2d 92, 96 (Minn. 1987) (noting that "the plaintiff ordinarily has the burden of showing the existence of an alternative design that was safer").

The only specific type of product that Plaintiffs' complaint identifies as a "safer alternative design" is "airflow-free warming technologies." Long Form Compl. ¶ 95. That is precisely how the HotDog product describes itself on its website:

> HotDog® Patient Warming is an air-free, water-free, state-of-the-art perioperative warming system.   Efficient warming is delivered by a flexible, lightweight conductive polymer fabric inside of HotDog blankets and mattresses.

http://hotdogwarming.com/ (last accessed October 17, 2016).   To date, Plaintiffs have refused to identify in discovery the specific product they are going to set forth as an alternative.   [*See* Exh. KK, Plaintiffs' Responses To Defendants' First Requests For Production of Documents To Plaintiffs at 9 (July 1, 2016)].   But regardless of what they ultimately claim, the document requests to Augustine regarding HotDog are appropriate now.

First, if Plaintiffs eventually identify the HotDog as a supposed reasonable safer alternative product to the Bair Hugger system, then this discovery will be at the core of case.   This seems by far the most likely scenario, given that the original impetus for this

litigation was Augustine's strategy of promoting HotDog by denouncing the Bair Hugger system.  Plaintiffs have also cited Augustine's opinions about the Bair Hugger system repeatedly in their submissions to this Court.  Moreover, Augustine's own website for the HotDog has an entire "Research" page featuring a "Review" by Augustine that *compares the supposed risks of the Bair Hugger system with the supposed safety of the HotDog*, and that appends a list of other anti-Bair Hugger system articles, including several that Augustine ghost-wrote or contributed to.  *See* http://hotdogwarming.com/research/ (last accessed 10/17/2016).

But even if Plaintiffs for some reason do not claim that Augustine's HotDog is a reasonable and safer alternative to the Bair Hugger system, documents concerning the safety and performance of the HotDog system is nevertheless discoverable because they go to Augustine's competence, integrity, and bias.  Given Augustine's central role in this litigation, Defendants expect that Plaintiffs will continue to rely on his work to claim some defect in the Bair Hugger system.  That puts his credibility directly at issue, and Defendants are entitled to test that credibility by proving that Augustine is attacking a better, safer system in Bair Hugger in order to promote his own inferior HotDog system.

To move the discovery phase of this MDL to a close, Defendants need to complete their HotDog discovery now.  The discovery deadline for general issues in the MDL is January 20, 2017, and Augustine's deposition is scheduled for December 13, 2016.  Defendants need to obtain the documents relating to the HotDog's performance sufficiently in advance of the December deposition to allow their attorneys to review the documents and prepare to question Augustine about them.

### 2. Augustine's claims of trade-secret concerns do not provide a basis for withholding the discovery because they can be addressed with appropriate restrictions in a protective order.

Augustine's main objection to producing the HotDog documents appears to be based on concerns about trade secrets. [*See* Exh. JJ]. Although claiming this privilege-like protection, however, Augustine fails to list any of the HotDog documents on his privilege log, and he does not in any other way identify the responsive documents he is withholding on this ground.

An invocation of trade secrets is not a talisman that blocks discovery. *See, e.g., Burris v. Versa Prod., Inc.*, No. CIV. 07-3938 JRT/JJK, 2013 WL 608742, at *2 (D. Minn. Feb. 19, 2013) ("Although Gulf claims that many of the redactions were necessary to avoid disclosure of trade secrets, 'there is no absolute privilege [against disclosure] for trade secrets and similar confidential information.'").

Instead, the proper approach is to address any trade-secret concerns through suitable limitations in a protective order. *See, e.g., Sedlock by Sedlock v. Bic Corp.*, 926 F.2d 757, 759 (8th Cir. 1991) ("Dissemination of the discovery is limited to other attorneys and their experts in similar cases against Bic. … Thus, none of the protected discovery will become public knowledge under the terms of this order."); *Minnesota Mining & Mfg. Co. v. Nippon Carbide Indus. Co.*, 171 F.R.D. 246, 250 (D. Minn. 1997) ("we are persuaded that NCI's trade secrets will be properly preserved by the provisions of the Protective Order that the parties have negotiated"). The Court should therefore order Augustine to identify and produce the requested documents concerning the performance of the HotDog warming system.

### E.    The Court Should Award Defendants Their Attorneys' Fees And Costs.

In addition to granting this motion to compel, the Court should award Defendants the fees and costs they have incurred in bringing it because Augustine has no substantial justification for his failure to comply with the subpoenas.

The Federal Rules of Civil Procedure provide for an award of reasonable expenses and attorney's fees to the successful party, except in the following limited circumstances: (i) the successful party did not confer in good faith before the motion; (ii) the opposing party's position was substantially justified; or (iii) other circumstances would make an award unjust.  Fed. R. Civ. P. 37(a)(5)(A).

None of the exceptions for deciding to award fees is present on this record.  First, Defendants satisfied their meet and confer obligations under Rule 37(a)(l) and Local Rule 7.1.  Indeed, as detailed above, Defendants' counsel acted in good faith by meeting and conferring with counsel for Augustine on multiple occasions in an attempt to resolve the differences in the parties' respective positions as to Defendants' subpoenas.

Second, Augustine's positions are not substantially justified.  On the contrary, Augustine has used misdirection, delay, and outright misrepresentation to avoid having to provide responsive documents to Defendants.  His assertions that he has provided all responsive ESI defies common sense, and evidence from third parties puts the lie to Augustine's assertions that he had no role in or influence over the 2010 MedWatch Report and other supposedly "independent" studies and reports.  And he has concealed data and results from testing he sponsored that ***contradict*** his and Plaintiffs' claims that the Bair Hugger system creates bacterial contamination—the heart of this litigation.

Augustine's conduct in failing to comply with Defendants' subpoenas and this Court's prior Order directing him to provide a "detailed privilege log" has been dilatory, egregious, and in direct contravention of the Court's directive. *See Cargill, Inc. v. Ron Burge Trucking, Inc.*, 284 F.R.D. 421, 424–28 (D. Minn. 2012) (sanctioning party that failed to make a timely response to a request for production of documents). And his uncompromising refusal to produce documents concerning the performance of the HotDog system—his competitive product, the marketing of which appears to be the primary motivation for Augustine's campaign against the Bair Hugger system—is unjustified and unjustifiable.

No other circumstances make it unjust to award costs and fees to Defendants. An award is necessary to compensate Defendants for the costs Augustine's misconduct has imposed and to deter further misconduct.

## IV.   CONCLUSION

For the reasons set forth above, Defendants 3M Company and Arizant Healthcare, Inc. respectfully request the Court enter an order: Specifically, Defendants urge the Court to issue an Order:

- Ordering Augustine (a) to identify and produce documents, ESI, and emails responsive to requests 4, 6, 10-12, 14, 15, 17, 18, 29, 31, 32, 35, 38-41, 44-49, 51-55, and 58 in Defendants' subpoenas, (b) to list on a privilege log any documents, ESI, or emails withheld from production, and (c) to provide a sworn statement identifying all record custodians whose documents and ESI he searched, which hard-copy and electronic files he searched (i.e., personal emails, company emails,

desktop files and/or computer drives), and what keywords or other methods he used to identify responsive ESI and emails;

- Ordering Augustine to provide additional detail sufficient to permit Defendants and the Court to evaluate his claim of privilege, specifically including as to each document:

    1. the parties to the communication,

    2. the date and time(s) of the communication(s),

    3. the specific litigation addressed by the communication,  and

    4. the basis for the claim of privilege or other protection.

If Augustine continues to claim any privilege or protection concerning communications with any attorney at the Kennedy Hodges firm, the Court should also require Augustine to submit a sworn statement identifying (1) the beginning and ending dates of any periods during which Augustine claims he had either an attorney-client relationship or a litigation consultant relationship with the Kennedy Hodges law firm and (2) the general nature of the representation or consultancy;

- Ordering Augustine to produce documents responsive to Defendants' subpoena requests 39, 41, 49 and 52 relating to the performance of the HotDog product; and

- Awarding Defendants the costs and reasonable attorneys' fees incurred in connection with bringing this Motion.

Dated:  November 3, 2016

Respectfully submitted,

*s/Bridget M. Ahmann*

Bridget M. Ahmann
MN Atty ID No. 016611x
M. Joseph Winebrenner
MN Atty ID No. 0387889
**Attorneys for Defendants 3M Company
and Arizant Healthcare Inc.**
FAEGRE BAKER DANIELS LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
T: (612) 766-7000   F:  (612) 766-1600
bridget.ahmann@faegrebd.com
joe.winebrenner@faegrebd.com


Jerry W. Blackwell
MN Atty ID No. 0186867
Benjamin W. Hulse
MN Atty ID No. 0390952
Mary S. Young
MN Atty ID No. 0392781
**Attorneys for Defendants 3M Company
and Arizant Healthcare Inc.**
BLACKWELL BURKE P.A.
431 South Seventh Street, Suite 2500
Minneapolis, MN  55415
T: (612) 343-3200    F:  (612) 343-3205
blackwell@blackwellburke.com
bhulse@blackwellburke.com
myoung@blackwellburke.com

US.108582453.34

43