# Exhibit H

**Privilege  Log**

**Identification:**
**S. Augustine, CEO Augustine Temperature Management**
**B. Augustine, President, Augustine Temperature Management**
**R. Benham, General Counsel Augustine Temperature Management**
**D. Hodges, attorney**
**G. Assaad, attorney**
**J. Neuman, attorney**
**D. Grewe, executive employee of Augustine Temperature Management**

| | | Document Type | Date of Document | Author(s) | Recipient(s) | Persons Copied | Subject Matter | Category of Privilege |
|---|---|---|---|---|---|---|---|---|
| | | Email series | 2/1/13 | S. Augustine, D. Hodges | D. Hodges, S. Augustine | R. Benham | Litigation: consulting relationship and potential product liability, unfair competition and/or other claims. | Attorney/Client: Benham/Augustine; Hodges/Benham-Augustine.<br><br>Work product: all attorneys. |
| | | Email series | 4/8/13 | R. Benham, D. Hodges | R. Benham, D. Hodges | S. Augustine | Litigation: sharing information regarding scheduling of communications and other information re potential product liability, unfair competition and/or other claims. | Attorney/Client: Benham/Augustine; Hodges/Benham-Augustine.<br><br>Work product: all attorneys |
| | | Email series | 4/29/13 | R. Benham, D. Hodges | R. Benham, D. Hodges | G. Assaad, S. Augustine | Litigation: sharing information regarding scheduling of communications and facts re potential product liability, unfair | Attorney/Client: Benham/Augustine; Hodges-Assaad/Benham-Augustine.<br><br>Work product: all attorneys |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | competition and/or other claims. |
| | | Email series | 4/30/13 | R. Benham, D. Hodges | R. Benham, D. Hodges | G. Assaad, S. Augustine | Litigation: sharing information regarding scheduling of communications and facts re potential product liability, unfair competition and/or other claims. | Attorney/Client: Benham/Augustine; Hodges-Assaad/Benham-Augustine.

Work product: all attorneys |
| | | Email series | 5/1/13 | R. Benham, D. Hodges | R. Benham, D. Hodges | G. Assaad, S. Augustine | Litigation: sharing information regarding scheduling of communications and facts re potential product liability, unfair competition and/or other claims. | Attorney/Client: Benham/Augustine; Hodges-Assaad/Benham-Augustine.

Work product: all attorneys |
| | | Email series | 5/15/13 | R. Benham, D. Hodges | R. Benham, D. Hodges | G. Assaad, S. Augustine | Litigation: sharing information regarding potential product liability, unfair competition and/or other claims. | Attorney/Client: Benham/Augustine; Hodges-Assaad/Benham-Augustine.

Work product: all attorneys |
| | | Email series | 5/21/13 | R. Benham, D. Hodges | R. Benham, D. Hodges | G. Assaad, S. Augustine | Litigation: sharing information regarding potential product liability, unfair competition and/or other claims | Attorney/Client: Benham/Augustine; Hodges-Assaad/Benham-Augustine.

Work product: all attorneys |
| | | Email series | 5/22/13 | R. Benham, D. Hodges | R. Benham, D. Hodges | G. Assaad, S. Augustine | Litigation: sharing information regarding potential product liability, unfair competition and/or other claims | Attorney/Client: Benham/Augustine; Hodges-Assaad/Benham-Augustine.

Work product: all attorneys |

| | | Email series | 5/28/13 | R. Benham, D. Hodges | R. Benham, D. Hodges | G. Assaad, S. Augustine | Litigation: sharing information regarding potential product liability, unfair competition and/or other claims | Attorney/Client: Benham/Augustine; Hodges-Assaad/Benham-Augustine.

Work product: all attorneys |
| | | Email series | 5/29/13 | R. Benham, D. Hodges | R. Benham, D. Hodges | G. Assaad, S. Augustine | Litigation: sharing information regarding scheduling of communications and facts re potential product liability, unfair competition and/or other claims. | Attorney/Client: Benham/Augustine; Hodges-Assaad/Benham-Augustine.

Work product: all attorneys |
| | | Email series | 5/31/13 | R. Benham, D. Hodges | R. Benham, D. Hodges | G. Assaad, S. Augustine | Litigation: sharing information regarding scheduling of communications and facts re potential product liability, unfair competition and/or other claims. | Attorney/Client: Benham/Augustine; Hodges-Assaad/Benham-Augustine.

Work product: all attorneys |
| | | Email series | 6/6/13 | R. Benham, D. Hodges | R. Benham, D. Hodges | G. Assaad, S. Augustine, B. Augustine | Litigation: sharing information regarding scheduling of communications and facts re potential product liability, unfair competition and/or other claims. | Attorney/Client: Benham/S.Augustine-B. Augustine; Hodges-Assaad/Benham-S. Augustine-B. Augustine

Work product: all attorneys |
| | | Email series | 6/7/13 | R. Benham, D. Hodges | R. Benham, D. Hodges | G. Assaad, S. Augustine, B. Augustine | Litigation: sharing information regarding potential product liability, unfair competition | Attorney/Client: Benham/S.Augustine-B. Augustine; Hodges-Assaad/Benham-S. Augustine-B. Augustine |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | and/or other claims | Work product: all attorneys |
| | | Email series | 6/27/13 | R. Benham, D. Hodges | R. Benham, D. Hodges | S. Augustine, D. Grewe | Litigation: sharing information regarding potential product liability, unfair competition and/or other claims | Attorney/Client: Benham/Augustine; Hodges-Assaad/Benham-Augustine.<br><br>Work product: all attorneys |
| | | Email series | 7/18/13 | R. Benham, D. Hodges | R. Benham, D. Hodges | S. Augustine, D. Grewe, G. Assaad | Litigation: sharing information regarding potential product liability, unfair competition and/or other claims | Attorney/Client: Benham/S.Augustine-D. Grewe; Hodges-Assaad/Benham-S. Augustine-D. Grewe<br><br>Work product: all attorneys |
| | | Email series | 8/1/13 | R. Benham, D. Hodges | R. Benham, D. Hodges | S. Augustine, D. Grewe, G. Assaad | Litigation: sharing information regarding potential product liability, unfair competition and/or other claims | Attorney/Client: Benham/S.Augustine-D. Grewe; Hodges-Assaad/Benham-S. Augustine-D. Grewe<br><br>Work product: all attorneys |
| | | Email series | 9/23/13 | R. Benham, D. Hodges, G. Assaad | R. Benham, D. Hodges, G. Assaad | S. Augustine, B. Augustine | Litigation: sharing information regarding potential product liability, unfair competition and/or other claims | Attorney/Client: Benham/S.Augustine-B. Augustine; Hodges-Assaad/Benham-S. Augustine-B. Augustine<br><br>Work product: all attorneys |
| | | Email series | 11/20/13 | R. Benham, D. Hodges | R. Benham, D. Hodges | G. Assaad, J. Neuman, S. Augustine | Litigation: sharing information regarding potential product liability, unfair competition and/or other claims | Attorney/Client: Benham/S.Augustine ; Hodges-Assaad-Neuman/Benham-S. Augustine<br><br>Work product: all attorneys |
| | | Email series | 12/3/13 | R. Benham, D. Hodges | R. Benham, D. Hodges | G. Assaad, J. Neuman, S. Augustine | Litigation: sharing information regarding potential | Attorney/Client: Benham/S.Augustine ; Hodges-Assaad- |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | product liability, unfair competition and/or other claims | Neuman/Benham-S. Augustine<br><br>Work product: all attorneys |
| | | Email series | 2/6/14 | R. Benham, D. Hodges, G. Assaad | R. Benham, D. Hodges, G. Assaad | S. Augustine | Litigation: sharing information regarding potential product liability, unfair competition and/or other claims | Attorney/Client: Benham/S.Augustine ; Hodges-Assaad-/Benham-S. Augustine<br><br>Work product: all attorneys |
| | | Email series | 5/14/14 | R. Benham, D. Hodges, G. Assaad | R. Benham, D. Hodges, G. Assaad | S. Augustine | Litigation: sharing information regarding potential product liability, unfair competition and/or other claims | Attorney/Client: Benham/S.Augustine ; Hodges-Assaad-/Benham-S. Augustine<br><br>Work product: all attorneys |
| | | Email series | 1/26/15 | G. Assaad, R. Benham, D. Hodges | G. Assaad, R. Benham, D. Hodges | S. Augustine | Litigation: sharing information regarding potential product liability, unfair competition and/or other claims | Attorney/Client: Benham/S.Augustine ; Hodges-Assaad-/Benham-S. Augustine<br><br>Work product: all attorneys |
| | | Email series | 2/9/15 | G. Assaad, R. Benham | G. Assaad, R. Benham | D. Hodges, S. Augustine | Litigation: sharing information regarding scheduling of communications and facts re potential product liability, unfair competition and/or other claims. | Attorney/Client: Benham/S.Augustine ; Hodges-Assaad-/Benham-S. Augustine<br><br>Work product: all attorneys |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

# Exhibit I

Page 1

1           UNITED STATES DISTRICT COURT
              DISTRICT OF MINNESOTA
2    --------------------------------------------------
3    In Re:
4    Bair Hugger Forced Air Warming
     Products Liability Litigation
5
     This Document Relates To:
6
     All Actions                    MDL No.
7                                    15-2666 (JNE/FLM)
8    --------------------------------------------------
9

               VIDEOTAPED DEPOSITION
10

                        OF
11

               MARK ALBRECHT
12

                    VOLUME 1
13

             Minneapolis, Minnesota
14

            Friday, October 7th, 2016
15
16   --------------------------------------------------
17
18
19
20
21
22
23
24   Reported by:
     Amy L. Larson, RPR
25   Job No. 112502

```
 1   APPEARANCES:
 2       ON BEHALF OF 3M:
 3       COREY GORDON, ESQ.
         PETER GOSS, ESQ.
 4       BLACKWELL BURKE
         431 South Seventh Street
 5       Minneapolis, MN 55415
 6
 7
 8       FOR THE PLAINTIFF:
 9       BEN GORDON, ESQ.
         LEVIN PAPANTONIO THOMAS MITCHELL
10       RAFFERTY & PROCTOR
         316 S Baylen Street
11       Pensacola, FL 32502
12
13       GENEVIEVE ZIMMERMAN, ESQ.
         MESHBESHER & SPENCE
14       1616 Park Avenue South
         Minneapolis, MN 55404
15
16       GABRIEL ASSAAD, ESQ.
         KENNEDY HODGES
17       4409 Montrose Boulevard
         Houston, TX 77006
18
19       BEHRAM PAREKH, ESQ.
         Kirtland & Packard
20       2041 Rosecrans Avenue
         El Segundo, CA 90245
21
22
23       ALSO PRESENT:  Kraig Hildahl, Videographer
24
25
```

1                           ALBRECHT

2    Q.  At the U of M?

3    A.  Yes.

4    Q.  So now you're a Gopher?

5    A.  Yeah, well, it's hard to cheer for anything,

6        but -- sports are...

7    Q.  Okay.  So you have a master's of statistics,

8        a master's of business administration --

9    A.  I do.

10   Q.  -- and a BS in mechanical engineering?

11   A.  Yup.

12   Q.  Any other degrees --

13   A.  Nope.

14   Q.  -- that I missed?  Okay.

15              Let's go back now and sort of

16       summarize your work history.

17   A.  Uh-huh.

18   Q.  Did you work while you were in college?

19   A.  Just internships.  So I had a couple at

20       Arizant Healthcare, which you guys own.  Not

21       you, but 3M.

22   Q.  3M wouldn't have owned it at the time, right?

23   A.  No, no.

24   Q.  Okay.  And so we'll -- we'll get some details

25       on that.  But then anything else that you did

1                    ALBRECHT

2        while you were in college?

3    A.  That relates to this, I don't know.  I ran

4        sailboat races during the summers, it was a

5        part-time job too on Lake Minnetonka, had a

6        one year internship at Entegris, which used

7        to be Fluoroware, so that's like a

8        semi-conductor company, and that was it.

9    Q.  Okay.  And then after you graduated from the

10       University of Wisconsin what was your first

11       full-time job?

12   A.  It was as a research and development engineer

13       at Arizant Healthcare.

14   Q.  Was that essentially immediately after

15       graduation?

16   A.  Yeah.

17   Q.  So starting in two thousand -- early -- early

18       2003?

19   A.  Yeah, that sounds right.

20   Q.  And at that point was Scott Augustine still

21       involved in the company?

22   A.  Yeah.

23   Q.  He was a CEO?

24   A.  Yeah, he would have been.

25   Q.  How long have you known Scott Augustine?

1                          ALBRECHT

2    A.   I only knew him from the internship on.

3    Q.   How had you gotten connected with Arizant for

4         the internship?

5    A.   Sure.  My dad was -- shared a dorm with him

6         in college.  And they weren't close or

7         anything, he just saw this guy in the paper

8         that he used to know and said hey, if you're

9         looking for internships, why don't you throw

10        a resume in there and see if you get an

11        internship.  So I was given a tour of the

12        company by Scott, and that was about it for a

13        while of seeing him.

14   Q.   And your internship, was that in the research

15        and development area?

16   A.   Yes, it was.

17   Q.   Okay.  So you -- you started in 2003 as a

18        full-time employee.  What was your title?

19   A.   Research and development engineer.

20   Q.   Okay.  And how long did you work in that

21        capacity for Arizant?

22   A.   It was two-and-a-half years probably.  I'd

23        have to figure out the exact dates.  It was

24        two to three years, somewhere in there.

25   Q.   And was -- did Scott Augustine remain the CEO

1                          ALBRECHT

2        the entire time you were there?

3    A.  No.

4    Q.  Approximately what time did Dr. Augustine

5        leave Arizant?

6    A.  It would have been a little over a year

7        before I took off, so I was only there for

8        maybe a year and a half while he was CEO,

9        year, year and a half.

10   Q.  And then how long were you there when -- how

11       long were you part of Arizant when

12       Dr. Augustine was no longer part of Arizant?

13   A.  I think a little over a year, maybe a year

14       and a half.  So somewhere in the two- to

15       three-year range all that stuff happened

16       before I switched jobs and went to work for

17       him.

18   Q.  Okay.  And you stayed at Arizant in the --

19       after Dr. Augustine left in the same

20       capacity?

21   A.  Yup.

22   Q.  Okay.

23   A.  Yup.

24   Q.  When you left Arizant, what was your next

25       employment?

1                           ALBRECHT

2    A.   It was at Augustine Biomedical & Design, so

3         that was with Scott Augustine.

4    Q.   And how did it -- how did it come to pass

5         that you went from Arizant to working for

6         Augustine Biomedical?

7    A.   I sought him out.  He was recruiting

8         engineers once his noncompete was up in terms

9         of working with people from the company, so

10        we had some discussions and it seemed like a

11        fit.

12   Q.   So when did you start at Augustine

13        Biomedical?

14   A.   I would have to look at dates on a resume if

15        you have one.  I think I provided one.  But

16        it would have been, I don't know, let's see

17        here, 2002 -- '05, '06, somewhere in there, I

18        believe.

19   Q.   And what was your first position?

20   A.   It was an engineer.

21   Q.   In research and development?

22            MR. B. GORDON:  And, Mark, you

23        don't have to guess on things.  If at any

24        point you need to see a document to answer a

25        question, just let us know.

1                          ALBRECHT

2                  THE WITNESS:  Sure.

3                  MR. C. GORDON:  -- discrepancy to

4        my attention.

5    BY MR. C. GORDON:

6    Q.  So the table -- it still says table 2, right?

7    A.  Yes.

8    Q.  And those are the -- that -- that table 2

9        there is the -- reflects the results of the

10       impaction testing from what was actually

11       coming out of the Bair Hugger, right?

12   A.  Yes.

13   Q.  And in describing the impaction results --

14       first of all, who -- strike that.

15              Who actually authored the -- the --

16       the text that's in here?

17   A.  Well, my name is on it, so it's probably

18       myself.

19   Q.  Okay.  So in describing what's shown in table

20       2, you -- you said, "Little or no growth

21       occurred on the agar plates"; is that

22       correct?

23   A.  In this situation it appears that way.  There

24       are standards you can reference for what they

25       allow for impaction, I believe.  It's been a

ALBRECHT

1
2    while since I've looked at the standards for
3    the European ventilation tests.  Most of
4    these tests come from European sources.
5  Q.  Why is that?
6  A.  Because the NHS, they have stricter
7    guidelines on their operating construction
8    and testing there, I believe, than here.
9  Q.  So when you say the NHS, you're talking
10    about the National Health Service in the
11    United Kingdom?
12  A.  I believe so.
13  Q.  Okay.  So and in -- were the impaction -- was
14    the impaction testing that you did on the --
15    the Bair Hugger airstream, was that an
16    attempt to find out if the -- the air coming
17    out of the Bair Hugger would -- would comply
18    with NHS standards?
19  A.  I don't believe there are NHS standards for
20    convective-warming equipment, but we were
21    just observing what would be there.  This is
22    one of the earlier studies and we were unsure
23    as what would even be found.
24  Q.  And -- so, basically, to -- to kind of put it
25    in simplistic terms, you're looking at three

                            ALBRECHT

1       things with respect to the Bair Hugger,

2       particles that were coming out of it, bugs

3       that were resident inside of it, and bugs

4       that were coming out of it?

5                   MR. B. GORDON:   Object to form.

6   BY MR. C. GORDON:

7   Q.  Is that accurate?

8   A.  We were assessing filtration efficiency and

9       that dealt with particles on the in and out

10      stream, because that's very important in case

11      there are resident airborne microbes that

12      could be sucked in and delivered through.

13                  We were looking to see if there were

14      resident bacteria in the Bair Hugger or

15      anything pathogenic.  And we were interested

16      in whether or not those were on the surfaces

17      or whether we could detect them in the

18      airflow.

19  Q.  Okay.  And, basically, you couldn't detect

20      them in the airflow, correct?

21  A.  In this study I don't see high counts, so,

22      yes, it looks like they were -- well, we did

23      have one or two counts, it looks like, but

24      the control also had a count.

```
 1                          ALBRECHT
 2   Q.   Okay.  So there were -- it looks like there
 3        were three Bair Huggers sampled?
 4   A.   Yup.
 5   Q.   Tell me what the -- the different sampling
 6        things mean there.  There are -- for example,
 7        on the first one there's three actives and
 8        then there's a control.  What's -- what do
 9        those mean?
10   A.   So one would be sampling the air out of the
11        Bair Hugger three times, and then the control
12        I think would be an ambient sample of the
13        operating theater air.
14   Q.   Okay.
15   A.   And I'd have to read carefully if you want a
16        very precise answer.
17   Q.   Actually, I do on this, yeah.
18   A.   All right.  (Reviews document.)
19             Okay.  Go ahead and reask me the
20        question.
21   Q.   I'm just trying to understand the different
22        counting lines.  For example, in the first
23        one for the Bair Hugger 505 CW 19808, the
24        first line says, "Active," and under, "Sample
25        start time," it says, "Zero," in brackets,
```

1                          ALBRECHT

2        changes in the experimental setup, maybe

3        there's something different with what's going

4        on in the room, you just don't know.

5                Again, these studies were not

6        designed to detect statistical differences

7        necessarily on this set of them.  This

8        doesn't have, like, a sampling plan or

9        anything in place that's a stat plan, other

10       ones do.

11  Q.   You did that, yeah, we'll get to -- that was

12       done later.

13                So, basically, you were just looking

14       to see are there any particles coming out

15       and, you know, what -- in the -- in the -- in

16       the three different size ranges?

17  A.   Correct.

18  Q.   And that's what you looked at in the OR

19       ventilation system as well, right?

20  A.   You do, but the source of particles are

21       anticipated to be a little different.  You

22       know, the OR ventilation system is filtering

23       out largely atmospheric dust as it comes from

24       the outside.

25                The operating room has a very

ALBRECHT

2      different particle source that would be

3      pulled into these units and put through, and

4      that is -- a lot of the dust matter that you

5      find in the actual operating theater after

6      the atmospheric stuff has been cleaned

7      relates to shed skin cells.

8              So the sources of the dust that the

9      filters are acting on is different and so

10     it's hard to draw conclusions and draw

11     parallels between atmospheric dust when one

12     system is intended to filter that out and

13     skin cells and another system that's kind of

14     pointed at a different kind of dust that it's

15     assuming would be in the environment.

16  Q.  Okay.  Did -- so you -- you found that there

17     were particles of various sizes, various

18     counts coming out of the Bair Hugger?

19  A.  We did.

20  Q.  But you really didn't find much in the way of

21     bacteria coming out?

22  A.  We did not.

23              MR. B. GORDON:  Object to the

24     form.

25              MR. C. GORDON:  Okay.

1                          ALBRECHT

2    BY MR. C. GORDON:

3    Q.   Did that surprise you?

4    A.   No.  We were unsure what we were looking for.

5         We had no prior assumptions on what we should

6         even expect.

7    Q.   So --

8    A.   What surprised me was the operating theater

9         counts that we saw here that they needed to

10        do a corrective action.

11   Q.   Sure.

12   A.   That was the surprising finding.

13   Q.   So on this, which was probably the first

14        study you did on Bair Huggers, you found

15        particle emissions, but not much in the way

16        of bacteria, virtually no bacteria?

17   A.   In this study the counts were not elevated.

18   Q.   Okay.  With all that -- well, let me -- let

19        me just actually -- actually ask you,

20        Exhibit 2, the Hastings ventilation

21        assessment, I'm -- I'm wondering about that

22        second line.  It says, "To get conclusive

23        data, we analyzed three interrelated areas,

24        the operating room's ventilation system air

25        quality, the Bair Hugger unit's quality, and

1                            ALBRECHT

2    Q.   And some of the research you did looked at

3         filtration efficiency, particles going in,

4         particles going out, right?

5    A.   Yeah, and it was not this data for the

6         efficiency measures, yes.

7    Q.   I understand.  But that was one of the

8         measurements that you published on --

9    A.   Correct.

10   Q.   -- particles?

11   A.   I was a coauthor on a paper that was involved

12        in that, yes.

13   Q.   And one of the things you published on was

14        bacterial CFUs that you were able to swab or

15        rinse out of the internal surfaces of the

16        Bair Hugger, right?

17   A.   Correct.

18   Q.   But you've never published anything about the

19        presence or absence of bacteria in the actual

20        airstream of the Bair Hugger, right?

21   A.   I'm unsure.  I'd have to look through our

22        body of publications to confirm that.

23   Q.   And as you sit here today, Mr. Albrecht, do

24        you recall of any discussions after you had

25        done these -- done these studies and gotten

ALBRECHT

1
2    these results where somebody suggested, you

3    know, let's not look at the actual bacteria

4    coming out of the Bair Hugger anymore?

5              MR. B. GORDON:  Object to form,

6    lack of foundation, calls for speculation.

7              THE WITNESS:  I'm unsure.  There

8    may be discussions that were had.  My

9    memory -- it's a long time ago, I'm not sure.

10   If you have something to help me pinpoint

11   something, I'd be happy to discuss it.

12  BY MR. C. GORDON:

13  Q.  Well, you were -- when you were doing the --

14      the studies on the Bair Hugger, that was at

15      a -- that was at a time when

16      Augustine Biomedical & Design was launching

17      and trying to sell its -- its warming device

18      in the marketplace, right?

19              MR. B. GORDON:  Objection to form,

20   vague as to time what studies you're

21   referring to.

22  BY MR. C. GORDON:

23  Q.  All the studies you've done on Bair Hugger.

24  A.  Yes --

25  Q.  I'm -- that's a good point.  All the studies

ALBRECHT

1
2      you've done on Bair Hugger when you were

3      employed by Augustine Biomedical & Design,

4      not when you were at Arizant.

5   A.  There was a market launch and there was a

6      product on the market at the time these

7      studies were done, yes.

8   Q.  And that product was HotDog, right?

9   A.  Correct.

10  Q.  Which is a competitive product to the

11     Bair Hugger, right?

12  A.  Correct.

13  Q.  And any research that you might have done

14     that raised any kind of questions about

15     the -- either the safety or the efficacy of

16     the Bair Hugger, that kind of research would

17     have the potential to help out HotDog sales,

18     wouldn't it?

19              MR. B. GORDON:  Objection to form.

20              THE WITNESS:  It's a promotional

21     tool as to sales, yes.

22  BY MR. C. GORDON:

23  Q.  And, certainly, you're aware that

24     Augustine Biomedical and Dr. Augustine has

25     promoted the HotDog as a safer alternative to

Page 88

1                        ALBRECHT
2        the Bair Hugger, correct?
3                    MR. B. GORDON:  Object to form.
4                    THE WITNESS:  Yes.
5     BY MR. C. GORDON:
6     Q.  And one of the arguments that has been
7         advanced by Augustine Biomedical and
8         Dr. Augustine as to why the HotDog is safer
9         than the Bair Hugger, is because the
10        Bair Hugger emits a lot of particles --
11                   MR. B. GORDON:  Object to form.
12    BY MR. C. GORDON:
13    Q.  -- and that doesn't -- there's no -- nothing
14        that can emit particles from the HotDog
15        system, right?
16                   MR. B. GORDON:  Object to form.
17                   THE WITNESS:  If you could show me
18        the marketing research you're referring to
19        for that or the advertisement, I'd feel free
20        to comment, but that's kind of an open-ended
21        statement.
22    BY MR. C. GORDON:
23    Q.  So just as a general proposition, as you sit
24        here today, you can't remember any kind of
25        marketing activities undertaken by

1                         ALBRECHT

2        that goes down, up a little bit --

3   A.   I do.

4   Q.   -- and then goes down?  Would you agree that

5        that conveys more information about what

6        might have been happening in terms of SSI

7        trends than an average -- an arithmetic mean

8        average of SSI rates over whatever that time

9        period is?

10                       MR. B. GORDON:  I'm going to

11       object to the fact that you can't read

12       anything on this except for the very first

13       top line.  I have no idea what you're talking

14       about.

15                       THE WITNESS:  I understand the

16       trendline and the series of events that

17       follow with it that are showing on the graph.

18       And from a graphic like this, one can look at

19       a trendline from their eye on the top, it's

20       hard to see on the bottom what's going on,

21       though, in terms of the data.

22                       I don't know.  If you group

23       everything at a very small granular level,

24       things get kind of wonky too up and down.  I

25       think that adding to this paper those other

1                           ALBRECHT

2       two effects would be reasonable, but other

3       than that, I don't know if I would change

4       anything based on that.

5   BY MR. C. GORDON:

6   Q.  Well, I -- and I -- to Mr. Ben Gordon's

7       point, you can't tell what those

8       interventions --

9   A.  It's observational data too.  None of these

10      are tested interventions.  And because the

11      rate went down may not be due to the fact

12      that that happened there, and that's the

13      devil of the details with these kind of

14      things, they're observational.  You don't

15      know if that did it or something else, so,

16      really, you need that randomized trial.  And

17      this data suffers from the same problem, it

18      is observational.  It is not controlled in a

19      randomized trial.

20  Q.  When did you first meet Andrew Legg?

21  A.  It would have had to have been in the UK when

22      I was there.  I don't think he was stateside

23      when I first met him.  I think it was

24      correspondence by e-mail maybe.

25  Q.  How did you first get in touch with him?

1                          ALBRECHT

2    A.   Similar to McGovern and Paul, I'm sure it

3         would be that same channel.  So it was either

4         through Scott Augustine, maybe David Leaper.

5         I'm not sure who kind of hooked us up.

6    Q.   And you went to Sheffield where --

7    A.   Yes.

8    Q.   -- where he was, right?

9    A.   Uh-huh.  Yes.

10   Q.   And you met Dr. Hamer as well?

11   A.   Yes.  I don't remember if I shook his hand or

12        if I just met him over e-mails.

13   Q.   Okay.  But you and Legg collaborated on -- on

14        research involving forced-air warming?

15   A.   We did.  I was not a listed author in those

16        studies.

17   Q.   And by, "Those studies," I just want to be

18        clear, there's Legg and Hamer, and then

19        there's Legg, Cannon and Hamer.

20   A.   Yes.

21   Q.   You collaborated on both of those, right?

22   A.   I collaborated, I believe, on one of the two.

23        You'd have to show me the studies so I can

24        look at the setup on them, if you have them.

25        I could tell you then which elements I was

Page 234

                            ALBRECHT

1

2      involved in and not.  We did provide them

3      with some research materials.

4  Q.  And -- in the interest of time, I'm not going

5      to looking for them so we can delay this, but

6      did the -- well, strike that.

7                   MR. C. GORDON:  We'll suspend for

8      now.

9                   MR. B. GORDON:  Okay.  We're going

10     to reserve questions for another day.  Thank

11     you very much.

12                  MR. C. GORDON:  Do you want to try

13     and schedule now or --

14                  THE WITNESS:  Yeah, I think now

15     would be best just so we know.

16                  THE VIDEOGRAPHER:  We're going off

17     the record at 3:11 p.m.

18                  (Whereupon, the foregoing

19                  deposition adjourned at 3:11 p.m.)

20

21

22

23

24

25

# Exhibit J

**AFFIDAVIT**

| | |
|---|---|
| STATE OF MINNESOTA | ) |
| | ) |
| COUNTY OF HENNEPIN | ) |

Scott Douglas Augustine, being duly sworn on his oath, states as follows:

1. My name is Scott Douglas Augustine. I am a medical doctor specializing in anesthesiology.

2. In 1984 I invented the medical device that came to be known as Bair Hugger patient warming. Through my company (initially called Augustine Medical, Inc. but now called Arizant, Inc.), I introduced forced-air patient warming ("FAW") to America and the world. Through our support of clinical research, medical professionals have come to understand the importance of maintaining the patient's core body temperature during surgery.

3. In 2004 I sold my interest in Arizant. I no longer have any affiliation with the company or with the Bair Hugger product. Subsequent to selling my interest in Arizant, however, I learned of several significant problems with FAW and with the Bair Hugger system in particular. Many of the problems are detailed in the MDR filed by Dr. Robert Gauthier.

4. At the 2007 meeting of the American Association of Anesthesiologists, I communicated to several employees of Arizant the information contained in the brochure entitled "Blowing Air Is Risky!" Such information included the following:

- A department of public health in the U.S. called Bair Hugger blowers "reservoirs of infection."
- Particle counters measured more than 50 million bacteria-sized particles per hours spewing from Bair Hugger blowers.
- An outbreak of multi-drug resistant *Acinetobacter* had been traced to the inside of Bair Hugger blowers, as reported in *Infection Control and Hospital Epidemiology.*
- Germ colonies could be cultured by swabbing inside Bair Hugger units and by impacting the air blown from the hose on a culture plate.

CONFIDENTIAL                                                      AUGUSTINES_000985

Copies of the brochure were provided to several Arizant employees, including senior management.

5.  In 2009, in order to determine the extent of contamination of Bair Hugger blowers, doctors arranged to sample the blowers used in the University Hospital in Caen, France.  The day before the sampling of the blowers was to begin, however, I learned that all 80 of the blowers had been removed from service by Arizant and replaced with new blowers.  The contamination testing, of course, was cancelled.  Based on an approximate retail cost of $1,400,  the effort to avoid disclosure of the contamination cost Arizant $112,000.

6.  A similar event occurred in Engand in 2010.  There, orthopedic surgeon Michael Reed was scheduled to begin sampling Bair Hugger blowers for contamination at a National Health Service hospital in Northumbria.  Shortly before the sampling could begin, however, the blowers were removed from the hospital by Arizant.

7.  Beginning in 2009, UK surgeon Prof. David Leaper lead a team conducting research regarding bacterial contamination of Bair Hugger blowers  and the impact of waste hot air from FAW blowers on laminar flow.  Dr. Leaper's research was published in *Orthopedic Reviews*  and has been accepted for publication in the *American Journal of Infection Control*.  In 2010, however,  I began receiving reports that Dr. Leaper had been verbally abused by Arizant employees  because of his research.  I also learned that Dr. Leaper met with Arizant executive Robert Buehler and was asked, among other things,  to conduct research for Arizant. Shortly thereafter, in June, 2010, Dr. Leaper informed me that he was withdrawing from all further research regarding the contamination of FAW blowers and laminar flow disruption.

8.  At the 2009 meeting of the American Society of Anesthesiologists I communicated to several executive employees of Arizant that the waste heat from FAW destroys the protection of the laminar flow ventilation used in ultra-clean operating rooms.  Several watched the video that is attached to the MDR filed by Dr. Gauthier as Annex L.   Arizant Chief Scientist Al Van Duren watched the video several times, commenting only, "I didn't know that, " and "I didn't think the air would do that."

9.  Because of my years as CEO of Arizant, I am aware of the company's practice of removing FAW blowers from the field after several years of use, "refurbishing" them by replacing filters and hoses, checking electronics, and

Copies of the brochure were provided to several Arizant employees, including senior management.

5. In 2009, in order to determine the extent of contamination of Bair Hugger blowers, doctors arranged to sample the blowers used in the University Hospital in Caen, France. The day before the sampling of the blowers was to begin, however, I learned that all 80 of the blowers had been removed from service by Arizant and replaced with new blowers. The contamination testing, of course, was cancelled. Based on an approximate retail cost of $1,400, the effort to avoid disclosure of the contamination cost Arizant $112,000.

6. A similar event occurred in Engand in 2010. There, orthopedic surgeon Michael Reed was scheduled to begin sampling Bair Hugger blowers for contamination at a National Health Service hospital in Northumbria. Shortly before the sampling could begin, however, the blowers were removed from the hospital by Arizant.

7. Beginning in 2009, UK surgeon Prof. David Leaper lead a team conducting research regarding bacterial contamination of Bair Hugger blowers and the impact of waste hot air from FAW blowers on laminar flow. Dr. Leaper's research was published in *Orthopedic Reviews* and has been accepted for publication in the *American Journal of Infection Control*. In 2010, however, I began receiving reports that Dr. Leaper had been verbally abused by Arizant employees because of his research. I also learned that Dr. Leaper met with Arizant executive Robert Buehler and was asked, among other things, to conduct research for Arizant. Shortly thereafter, in June, 2010, Dr. Leaper informed me that he was withdrawing from all further research regarding the contamination of FAW blowers and laminar flow disruption.

8. At the 2009 meeting of the American Society of Anesthesiologists I communicated to several executive employees of Arizant that the waste heat from FAW destroys the protection of the laminar flow ventilation used in ultra-clean operating rooms. Several watched the video that is attached to the MDR filed by Dr. Gauthier as Annex L. Arizant Chief Scientist Al Van Duren watched the video several times, commenting only, "I didn't know that, " and "I didn't think the air would do that."

9. Because of my years as CEO of Arizant, I am aware of the company's practice of removing FAW blowers from the field after several years of use, "refurbishing" them by replacing filters and hoses, checking electronics, and

cleaning the exterior of the blower—and then returning the blowers to the field, often to a different hospital. To my knowledge, the interior air-flow path of the blower is not cleaned during this "refurbishment" process. While I cannot be precise, I estimate that a significant percentage of the blowers in use in the United States are "refurbished."

Dated: _July 1, 2010_

_Scott M ___ MD_
Signature
Name: _Scott Augustine_
Address: _9017 Cavell Cir._
City/State/Zip: _Bloomington, MN 55438_
Telephone: _912-465-3502_

Subscribed and sworn to before me, this _____ 1 st _____ [day of month]
day of _July_ [month], 20 _10_ .

_Susan Elaine Schaef_

NOTARY PUBLIC    My commission expires: _1/31_ , 20 _15_ .

[Notary Seal]
[signature of Notary]
[typed name of Notary]

SUSAN ELAINE SCHAEFER
Notary Public
State of Minnesota
My Commission Expires
January 31, 2015

CONFIDENTIAL

# Exhibit K



**INTERNATIONAL**

To:    Dechert LLP

Fax:  +44 (0) 20 7184 7001

From:  J. Randall Benham

Date:  July 07, 2010

Re:  Your letter to Nordic Surgical Ltd   Ref:  960337/348875

Dear Sirs:

As general counsel of Hot Dog International, I am writing on behalf of Nordic Surgical Ltd. and Steve Hammant-Stacy in response to your letter dated June 23, 2010.

After thorough review of each of the statements to which you have objected, we have concluded that no clarification or retraction is required. Although some of the characterizations in your letter do not accurately reflect the statements actually made, each of the actual statements is accurate.

Your threatening letter, moreover, is merely another attempt by your client to suppress the facts. They have been aware of the bacterial contamination of their blowers for more than two years. They were informed in October 2009 of the disruption to laminar flow ventilation caused by waste heat from Bair Hugger blowers. Rather than deal with these problems straightforwardly, they have chosen threats, denial and obfuscation. These responses are inappropriate. This is not a marketing issue; it is a question of patient safety.

We do agree, however, that the facts underlying the statements should be reviewed by the appropriate regulators. For that reason, we are pleased that a clinician in the United States has filed an adverse event report regarding Bair Hugger blowers with the Food and Drug Administration, providing full support for each of the statements. We anticipate that a similar report will be filed with appropriate regulators the UK  and elsewhere within the next few days.

Sincerely,

J. Randall Benham,
General Counsel
Hot Dog International LLC

Hot Dog International
6581 City West Parkway
Eden Prairie, MN  55344
U.S.A.

3MBH00052914

# Exhibit L

Page 1

1            UNITED STATES DISTRICT COURT
             DISTRICT OF MINNESOTA
2    ------------------------------------------------
3    In Re:
4    Bair Hugger Forced Air Warming
     Products Liability Litigation
5
     This Document Relates To:
6
     All Actions                    MDL No.
7                                    15-2666 (JNE/FLM)
8    ------------------------------------------------
9

             VIDEOTAPED DEPOSITION
10
                       OF
11
            ROBERT L. GAUTHIER, M.D.
12
                   VOLUME 1
13
           Minneapolis, Minnesota
14
          Tuesday, October 4th, 2016
15
16    ------------------------------------------------
17
18
19
20
21
22
23
24    Reported by:
      Amy L. Larson, RPR
25    Job No. 112501

```
 1
 2    APPEARANCES:
 3         ON BEHALF OF 3M:
 4         COREY GORDON, ESQUIRE
           PETER GOSS, ESQUIRE
 5         BLACKWELL BURKE
           431 South Seventh Street
 6         Minneapolis, MN  55415
 7

 8

 9         FOR THE PLAINTIFF:
10         JAN CONLIN, ESQUIRE
           CIRESI CONLIN
11         225 South 6th Street
           Minneapolis, MN  55402
12

13

14         ALSO PRESENT:  Dean Hibben, Videographer
                          Katie O'Brien
15                        (via teleconference)
                          Gabriel A. Assaad, Esq.
16                        Ben Gordon, Esq.
17

18

19

20

21

22

23

24

25
```

                          GAUTHIER

1
2     inflating and the deflating sit relative to
3     the patient?
4  A.  They're all on the anesthesia, if you will,
5     tower.  It kind of depends from OR to OR.
6     Usually, they're either integrated into the
7     gas machine, a lot of them these days, or if
8     you have separate unit it sits on a shelf
9     away from the patient, again.
10              MS. CONLIN:  When you're ready to
11    take a break, we've been going a couple of
12    hours.
13              MR. GORDON:  Thank you.  I tend to
14    be the energizer bunny who just keeps going
15    and going, so --
16              MS. CONLIN:  Yeah --
17              MR. GORDON:  You can -- you can --
18    you can say --
19              THE WITNESS:  You know what, a
20    bathroom break would be really good for all
21    parties.
22              THE VIDEOGRAPHER:  We're going off
23    the record at 11:14 a.m.
24              (Whereupon, a brief recess
25                   was taken.)

1              GAUTHIER

2         (Whereupon, Exhibit 4 was

3         marked for identification.)

4         THE VIDEOGRAPHER:  This is

5    video number 2 in the deposition of

6    Dr. Robert Gauthier taken on October 4th,

7    2016.  The time now is 11:25 a.m.

8  BY MR. GORDON:

9  Q.  Dr. Gauthier, I handed you what's been marked

10      now as Exhibit 5.

11  A.  Mine says 4.

12  Q.  Yes.  Thank you.

13  A.  Okay.

14  Q.  I'm not too good with numbers.

15  A.  Come on, you are supposed to be the guys that

16      are on the details.  I'm not a detail guy.

17  Q.  This is a document you authored, correct?

18  A.  Along with others, yes.

19  Q.  Tell me who the others were.

20  A.  Well, I believe Randy Benham had a lot to do

21      with the formation, or he and Scott

22      Augustine.

23  Q.  When was that that you -- you and Mr. Benham

24      and Mr. Augustine wrote Exhibit 4?

25         MS. CONLIN:  It's Exhibit 5, isn't

1                          GAUTHIER

2        it?

3                      THE WITNESS:  No, 4.

4                      MR. GORDON:  He was right, I was

5        wrong.

6                      THE WITNESS:  Pay attention.

7                      MR. GORDON:  Pay no attention to

8        me.

9                      MS. CONLIN:  I apologize.  You

10       might want to restate the question so you

11       have a clean record.

12                     MR. GORDON:  Okay.

13       BY MR. GORDON:

14       Q.  When did you and Mr. Benham and Mr. Augustine

15           first undertake to author Exhibit 4?

16       A.  I don't recall exactly.  Generally, I think

17           it was after the smoke study, sometime after

18           that.

19       Q.  What do you mean by the smoke study?

20       A.  The -- the disruption of the -- I refer to

21           the studies by how we did them, and the

22           disruption by hot air of the operating room,

23           that was essentially incensed smoke, a

24           HotDog -- or, I mean, a Bair Hugger and, you

25           know, a mannequin and then a person standing

```
1                    GAUTHIER
2    A.  Correct, although --
3              MS. CONLIN:  Objection; calls for
4        speculation.
5              THE WITNESS:  Okay.  Well, here's
6        what I'd say on that.  More stuff blew out of
7        the -- there was more stuff in that air when
8        that hose was blowing than there wasn't, so
9        something was getting in the air.
10   BY MR. GORDON:
11   Q.  Okay.  When you say stuff, you're talking
12       about --
13   A.  Particles.  Particles.
14   Q.  And you say they tried to somehow measure
15       whether there was any colony-forming units
16       coming out, but for some reason they weren't
17       able to measure that?
18   A.  It's hard to come up with a scientifically
19       valid way to distribute it from the blower to
20       the -- to the film.  I think swabbing was our
21       first step.  Particles was our first step.
22       To be honest, at that time we weren't even
23       sure what we were going to find.
24   Q.  Okay.  In this document you created you along
25       with Mr. Benham and Mr. Augustine, if you'd
```

1                              GAUTHIER

2        turn to page 3.

3    A.   Okay.

4                    (Whereupon, Exhibit 5 was

5                    marked for identification.)

6    BY MR. GORDON:

7    Q.   Now I'm going to show you Exhibit 5.

8    A.   Okay.

9    Q.   This is a -- this is a study that you

10       actually quoted in this letter, right?

11   A.   Uh-huh.

12   Q.   On page 3?

13   A.   Yes, yes.  Sorry.

14   Q.   Page 3 of Exhibit 4, the document that you

15       and Mr. Benham and Mr. --

16   A.   Yeah.  I'm just reading it right now again.

17   Q.   Fair enough.

18   A.   (Reviews document.)  Yes.

19   Q.   Okay.  So if you look at page 3 of -- of

20       Exhibit 4 --

21   A.   Yes.

22   Q.   -- the Gauthier/Benham/Augustine document --

23   A.   Yes.

24   Q.   -- this was intended -- by the way, Exhibit 4

25       was intended to be submitted to the FDA,

1                              GAUTHIER

2          correct?

3     A.   Correct.

4     Q.   Was any version of this ever submitted to the

5          FDA?

6     A.   I believe it was.  I signed it to send it to

7          there, I gave it to them.  I don't know if

8          they submitted it.

9     Q.   Okay.  More than one?  Have you submitted

10         more than one of these --

11    A.   Me personally, no.

12    Q.   -- MedWatch reports?

13    A.   Me personally, no.

14    Q.   All right.  So --

15    A.   Not that I'm aware of.

16    Q.   So on page 3 under, Early Research, it talks

17         about, "In 1997 M.S. Avidan cultured pathogen

18         organisms from the air blown from 40 percent

19         of 40" -- "of forced air warm" -- "forced air

20         blowers, stating as follows," then there's a

21         quote there, right?

22    A.   Yeah.

23    Q.   Did you -- were you the person who actually

24         decided how to write this and how to excerpt

25         this particular quote?

1                          GAUTHIER

2    A.   They wrote it, I edited it.   I toned it down,

3         if you will.

4    Q.   Did you actually compare what -- how they

5         quoted it, the Avidan study to what was

6         actually said in the Avidan study?

7    A.   I can't recall --

8    Q.   Okay.

9    A.   -- to be honest.

10   Q.   Well, let's -- let's take a look at it.   I

11        want you to compare the quote --

12   A.   Okay.

13   Q.   -- on page 3 of Exhibit 4 --

14   A.   Okay.

15   Q.   -- where it starts, "We conclude that these

16        warming devices are a potential source of

17        nosocomial infections."

18   A.   Okay.

19   Q.   And if you look at the --

20   A.   Yeah, it's in the Summary.

21   Q.   -- Summary of page 3, there's that same line,

22        "We conclude that these warming devices are a

23        potential source of nosocomial infections" --

24        "of infection."

25                  Now, on the quote that is in your

```
 1                        GAUTHIER
 2        letter to the FDA, after that sentence there
 3        are three ellipses --
 4   A.   Yes.
 5   Q.   -- and in parenthesis, "And suggesting that
 6        a," three more ellipses, "microbial filter
 7        fitted to the nozzle of the hose could be
 8        incorporated into the design of the warmer to
 9        reduce the risk of contamination."
10   A.   Correct.
11   Q.   Looking at the actual Avidan paper, could you
12        read the -- the language that was -- that was
13        omitted --
14   A.   Okay.
15   Q.   -- by these ellipses?
16   A.   Yes.  "We conclude that these warming devices
17        are a potential source of nosocomial
18        inflammation," that's already in there.
19        "They should only be used in conjunction with
20        perforated blankets, should have their
21        microbial filters changed regularly and their
22        hoses sterilized."
23   Q.   That doesn't say or even in --
24   A.   Correct.
25   Q.   -- rough paraphrase, "And suggesting that,"
```

1                          GAUTHIER

2       which is how this is -- that omitted sentence

3       is characterized --

4    A.  Correct.

5    Q.  -- correct?

6             And, in fact, the Avidan study

7       concluded, although they were able to culture

8       some CFUs from some of the airstreams from

9       the hose itself, once they put the blanket

10      on, they couldn't culture out any

11      colony-forming units, correct?

12   A.  And the question I -- yes.  And I would raise

13      the question, because this is why -- one of

14      the reasons we raise this is nobody changes

15      the hoses, nobody changes the filters.  We

16      asked at the hospitals we went to when is the

17      last time you changed the hoses and they said

18      we weren't aware you needed to do that.

19   Q.  Okay.  But in this letter that -- that you

20      coauthored for the FDA, you reference the --

21      this 1997 Avidan study, Exhibit 5, as having

22      cultured pathogen organisms from the air

23      blown from 40 percent of forced air blowers,

24      and then there's this quote that omits that

25      sentence about they should only be used in

1                         GAUTHIER

2         conjunction with perforated blankets, and

3         there's no indication in the FDA letter that

4         the Avidan study actually showed that

5         although they did culture organisms from

6         40 percent of the blowers, once they put the

7         blanket on they got zero bugs?

8    A.   Yes.

9    Q.   That doesn't -- nowhere does that appear in

10        the FDA letter?

11   A.   Right.  And you are aware that there are a

12        number of places that use the blowers without

13        the blankets, it's called hosing.

14   Q.   And that --

15   A.   It's out of your control, it's out of

16        everybody's control.  We have told them

17        multiple times don't do that.

18   Q.   And, in fact, the instructions for use

19        repeatedly --

20   A.   Say don't do that, yes.  We all agree on

21        that.  But as we say in manufacturing, if you

22        make it idiot proof, they'll make a better

23        idiot, and people do stupid things with these

24        things.

25   Q.   On the fourth page of Exhibit 4, at the top

GAUTHIER

1
2     this letter that you coauthored references a
3     letter from N. Baker and D. King about -- and
4     it quotes them saying that, "All of the
5     blowers resulted in heavy growth of
6     bacteria."  Do you see that?
7  A.  Yes.
8  Q.  Now, again, would that have been something
9     that Mr. Benham and Dr. Augustine came up
10    with and --
11 A.  They -- they put together the research on it,
12    yes.
13 Q.  Are you aware of the fact that the Baker and
14    King letter was about the WarmTouch and not
15    about Bair Hugger?
16 A.  No, I'm not aware of that.
17 Q.  Would you agree that when you look at the
18    page 3, this early research, and it says,
19    "Several researchers raised issues regarding
20    the safety of Bair Hugger blowers and
21    demanded a design change," and then the
22    second study that is referenced is Baker,
23    King?
24 A.  The Baker, King?  I was going to see if
25    they -- because they used one --

1                          GAUTHIER

2    Q.   You're looking at Avidan.   I'll --

3    A.   Oh, okay.

4    Q.   I'll give you Baker.

5    A.   Okay.   But in the Avidan there was -- wasn't

6         there one WarmTouch in that study too?

7    Q.   There was, in fact.

8    A.   Yeah, yeah.

9    Q.   But there were Bair Huggers in the Avidan

10        one.

11   A.   Yeah.

12   Q.   But there were no Bair Huggers --

13   A.   Well, yeah, there were nine Bair Huggers and

14        one WarmTouch.

15                  (Whereupon, Exhibit 6 was

16                  marked for identification.)

17   BY MR. GORDON:

18   Q.   I'll show you now Exhibit 6.

19   A.   Okay.

20   Q.   And that -- that is in fact the 2002 Baker

21        and King study that's referenced on page 4 of

22        Exhibit 4, correct?

23   A.   Uh-huh.

24   Q.   And would you agree that the study that

25        the -- or the -- the review that was

Page 115

1                         GAUTHIER

2       different blower, technically right.  Kind of

3       in the spirit of worrying about this, I would

4       disagree, because we've looked at these

5       units, they're all roughly the same, they all

6       get contaminated.  And, again, the issue of

7       writing the letter had more to do with

8       somebody changing the filter.

9   Q.  Well, the letter was specifically about

10      Bair Hugger, correct?

11  A.  Right, because Bair Hugger changed the

12      filter.

13  Q.  And if the FDA had taken any action in

14      response to this letter that you and

15      Mr. Benham and Dr. Augustine authored, that

16      would have been -- that could have enured to

17      Dr. Augustine's benefit in terms of increased

18      sales of his competing product, right?

19              MS. CONLIN:  Objection; calls for

20      speculation.

21              THE WITNESS:  I was just going to

22      say yes, and it would have hurt the only

23      stock I held at that time, which was 3M.

24  BY MR. GORDON:

25  Q.  And given --

GAUTHIER

1

2      THE WITNESS:  It would have been

3      to his benefit though, in all fairness.

4  BY MR. GORDON:

5  Q.  And would you agree that when you're

6      submitting something to the FDA and when

7      you've got -- first of all, when it was

8      ultimately signed, you were the only one who

9      signed it, right?

10  A.  Correct.

11  Q.  There was no indication in what was actually

12      submitted to the FDA that Dr. Augustine had

13      anything to do with authoring it, correct?

14  A.  Correct.

15  Q.  Nor was there any indication that

16      Randy Benham had anything to do with it,

17      correct?

18  A.  Correct.  Although, I believe the form is

19      only one persons signs it, isn't it?  I

20      believe that's how it went, that's why.

21  Q.  Who is Benham?

22  A.  Randy is legal counsel part-time with the

23      company.  He works within the company.  He's

24      been with Scott a long time.

25  Q.  What's your understanding as to why

1                           GAUTHIER

2          Randy Benham was participating in authoring

3          this MDA watch report -- MedWatch report?

4                    MS. CONLIN:   Objection; calls for

5          speculation.

6                    THE WITNESS:   Yeah, I would be

7          speculating why.

8     BY MR. GORDON:

9     Q.   Did it surprise you that a lawyer would be

10         participating in writing this?

11    A.   Actually, it would give me more comfort,

12         because it would seem that he would make sure

13         that we didn't make any stupid claims.

14    Q.   Well --

15    A.   I trust the legal profession.

16    Q.   Let's look at the next claim in this MedWatch

17         report.

18                    (Whereupon, Exhibit 7 was

19                    marked for identification.)

20    BY MR. GORDON:

21    Q.   Let me show you now Exhibit 7.

22    A.   Okay.

23    Q.   The -- the next study that's included in this

24         Gauthier/Benham/Augustine letter to the FDA

25         is the 2003 Scherrer, et al., paper, correct?

# Exhibit M

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  | |  |
|---|---|---|
| | § | |
| | § | |
| TIMOTHY JOHNSON, | § | |
| | § | |
| *Plaintiff,* | § | Civil Action No. 2:14-cv-02044-KHV-KGS |
| | § | |
| v. | § | |
| | § | |
| 3M COMPANY; AND ARIZANT | § | |
| HEALTHCARE, INC. | § | |
| | § | |
| *Defendants.* | § | |

## NOTICE OF THIRD-PARTY SUBPOENA AND VIDEOTAPED DEPOSITION OF
## SCOTT AUGUSTINE, M.D.

TO:                ALL COUNSEL OF RECORD

DEPONENT:      Scott Augustine, M.D.

DATE & TIME:    October 13, 2015 at 9:00 am (CST)

PLACE:          Blackwell Burke P.A.
                    431 South Seventh Street, Suite 2500
                    Minneapolis, MN 55415

PLEASE TAKE NOTICE that pursuant to Fed. R. Civ. P. 45(b)(1), Defendants 3M

Company and Arizant Healthcare, Inc. hereby give notice that they intend to serve a subpoena to

testify at a deposition and to produce documents on Third-Party, Scott Augustine, M.D.

Attached hereto is a true and correct copy of the subpoena that is being served.  The deposition

will be recorded stenographically and videographically and will continue from day-to-day until

completed.  You are notified to appear and take such part in the examination as may be fit and

proper.

1

PLEASE TAKE FURTHER NOTICE, the deponent is asked to bring to the deposition the documents in his possession as described in the attached Exhibit "A" regarding the above-referenced case.

This 23rd day of July, 2015.

Respectfully submitted,

By: _____

Lori G. Cohen*
Christiana C. Jacxsens*
Evan C. Holden*
GREENBERG TRAURIG, LLP
Terminus 200
3333 Piedmont Road N.E., Suite 2500
Atlanta, GA 30305
(678) 553-2385
(678) 553-2386 Facsimile
cohenl@gtlaw.com
jacxsensc@gtlaw.com
holdene@gtlaw.com
* Admitted *pro hac vice*

Stephen J. Torline    KS #18292
Michael T. Crabb     KS #24395
KUCKELMAN TORLINE KIRKLAND & LEWIS
10740 Nall Ave., Suite 250
Overland Park, KS 66211
Telephone: (913) 948-8610
Facsimile: (913) 948-8611
storline@ktklattorneys.com
mcrabb@ktklattorneys.com

COUNSEL FOR DEFENDANTS 3M COMPANY, AND ARIZANT HEALTHCARE INC.

2

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing has been served on all counsel of record via email and first class mail on July 23, 2015.

Michael L. Sexton, Esq.
Sexton & Shelor
6901 Shawnee Mission Parkway, Suite 111
Shawnee Mission, KS 66202

David W. Hodges
Gabriel Assaad
Kennedy Hodges, LLP
711 W. Alabama Street
Houston, Texas 77006

Kyle Farrar
Mark Bankston
Farrar & Ball, LLP
1010 Lamar Street, Suite 1600
Houston, Texas 77002

*Attorneys for Plaintiff*

Evan C. Holden

3

## EXHIBIT "A"

## DEFINITIONS

1.    "Person" as used in these Requests means all natural persons, corporations, partnerships, trusts, or other associations, and all other entities.

2.    "You" and "your" as used in these Requests means Scott Augustine, M.D., his representatives, administrative or personal assistants, agents, legal representatives, and all other persons acting on his behalf or under his direction or supervision.

3.    "Timothy Johnson" as used in these Requests means Timothy Johnson, his representatives, administrative or personal assistants, agents, legal representatives, and all other persons acting on his behalf or under his direction or supervision.

5.    "Communication" means and includes any and all direct or indirect transmissions of information by any means, written, oral or otherwise.

6.    "Correspondence" means and includes all letters, notes, e-mails, text messages, memoranda or other written, typewritten, printed or reproduced material.

7.    "Document" as used in these Requests includes without limitation, all written, printed, typed, photostatic, photographed, recorded, telecopied, photocopied or graphic materials of any kind, whether comprised of letters, words, numbers, pictures, sounds or symbols or any combination thereof. Without limiting the generality of the foregoing, the term "Document" includes without limitation, any book, pamphlet, binder, periodical, letter, email, text message, blog, memorandum, telegram, telex, report, envelope, intraoffice or interoffice communication, handwritten or other notes, working papers, transcription, draft, account, ledger, chart, paper, study, survey, index, tape, disc, photograph, computer printout, computer program and data files, microfilm, microfiche, correspondence, mailers, ledger cards, business cards, diaries, calendars, address and telephone records, drawings and charts and other data compilations. The term "other data compilations" includes information stored in, or accessible through, computer or other information retrieval systems, whether or not in hard copy form, together with instructions and all other materials necessary to use or interpret such data compilations. If more than one copy of any document exists, and if as a result of handwritten additions and notations, or for any other reason, the copies are not identical, each non-identical copy is a separate document and should be separately identified.

8.    "Related to" or "relating to" shall mean directly or indirectly embodying, mentioning or describing, pertaining to, referring to, consisting of, being connected with or reflecting upon a stated subject matter.

9.    "The Case" shall mean the lawsuit *Timothy Johnson v. 3M Company and Arizant Healthcare Inc.*, currently pending in the U.S. District Court for the District of Kansas, Docket No. 2:14-cv-02044-KHV-KGS.

4

10. "Defendants" shall be deemed to include, but without limitation, Defendants 3M Company and/or Arizant Healthcare Inc., including their predecessor companies, and each of their employees, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who served in any such capacity at ANY time.

11. "Augustine Biomedical" shall be deemed to include, but without limitation, Augustine Biomedical & Design, LLC, Augustine Temperature Management LLC, Hot Dog USA, LLC, and Hot Dog International, including their predecessor companies, parent and/or subsidiary companies, and each of their employees, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who served in any such capacity at ANY time.

12. "And" means "and/or" and "or" means "and/or." The plural of any word used herein includes the singular and the singular includes the plural. The masculine gender of any word used here includes the feminine. The past tense of a verb used herein includes the present tense, and the present tense includes the past tense.

## REQUESTS

Unless otherwise specified below, the relevant time period for each Request is the period beginning on January 1, 2005 to the present.

1. Any and all documents, transcripts, medical records, court filings, discovery, or other documents from the lawsuit *Timothy Johnson v. 3M Company and Arizant Healthcare Inc.* that you have received or reviewed.

2. Any and all documents constituting, relating or referring to any communications, meetings, interactions, services or payments exchanged, or agreements between (a) You, Augustine Biomedical, or any other person or entity acting on Your behalf; and (b) the law firms Kennedy Hodges, LLP and/or Farrar & Ball, LLP and/or Sexton & Shelor, including but not limited to calendar entries, invoices, emails, letters, documents exchanged, and meeting notes.

3. Any and all communications regarding forced air warming between (a) You, Augustine Biomedical, or any other person or entity acting on Your behalf; and (b) the U.S. Food and Drug Administration (FDA).

4. Any and all communications regarding forced air warming between (a) You, Augustine Biomedical, or any other person or entity acting on Your behalf; and (b) the Office of Inspector General, U.S. Department of Health & Human Services.

5. Any and all communications regarding forced air warming and/or the Defendants between (a) You, Augustine Biomedical, or any other person or entity acting on Your behalf; and (b) the ECRI Institute.

6. Any and all communications regarding forced air warming and/or Dr. Farhad Memarzadeh between (a) You, Augustine Biomedical, or any other person or entity acting on Your behalf; and (b) the National Institutes of Health (NIH).

5

7.      Any and all communications regarding forced air warming and/or the Defendants between (a) You, Augustine Biomedical, or any other person or entity acting on Your behalf; and (b) the United Kingdom Medicines and Healthcare Products Regulatory (MHRA).

8.      Any and all communications regarding forced air warming between (a) You, Augustine Biomedical, or any other person or entity acting on Your behalf; and (b) any newspapers.

9.      Any and all communications regarding the article "Forced-air warming does not worsen air quality in laminar flow operating rooms," Sessler DI, Olmsted RN, Kuelpmann R. (Anesth Analg. 2011 Sep 29), between (a) You, Augustine Biomedical, or any other person or entity acting on Your behalf; and (b) any editors, employees, or other persons affiliated with the journal *Anesthesia & Analgesia*.

10.     Any and all documents, including correspondence and draft correspondence, related to the MedWatch report referenced in Your July 9, 2010 letter to Kurt Hilzinger, Court Square Capital Partners.

11.     Any and all documents, data, photographs, or video relating to the production of any videos posted to http://heat-rises.blogspot.com that claim to show disruption of operating room airflow by forced-air warming, including footage taken but not posted online, documentation regarding the test protocols, documentation regarding all aspects of the ventilation system of the operating room and its performance, and documentation regarding the forced air warming blower and blankets used and any adjustments made to the devices.

12.     Any and all social media postings, messages, and blog entries, posted by You, Augustine Biomedical, or any other person or entity acting on Your behalf, that reference or relate to forced-air warming or to the lawsuit *Timothy Johnson v. 3M Company and Arizant Healthcare Inc*, from January 1, 2013 to today.

13.     Any and all electronic or paper files and file folders related to the lawsuit *Timothy Johnson v. 3M Company and Arizant Healthcare Inc.*

14.     Any and all documents reviewed by you in preparation for this deposition.

15.     Your current and up-to-date resume or Curriculum Vitae.

6

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
for the

District of Kansas

| | | |
|---|---|---|
| TIMOTHY JOHNSON | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   2:14-cv-02044-KHV-TJJ |
| 3M COMPANY and ARIZANT HEALTHCARE, INC. | ) | |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                                         Scott Augustine, M.D.

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: | Blackwell Burke P.A.<br>431 South Seventh Street, Suite 2500<br>Minneapolis, MN 55415 | Date and Time:<br>10/13/2015 9:00 am |
|---|---|---|

The deposition will be recorded by this method: ___Audio & Video___

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material: See attached Exhibit "A"

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  ___7/23/15___

CLERK OF COURT

                                                                    OR

_____                      _____
*Signature of Clerk or Deputy Clerk*                      *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*  3M COMPANY and ARIZANT HEALTHCARE, INC. _____ , who issues or requests this subpoena, are:

Evan C. Holden, Greenberg Traurig, 3333 Piedmont Road NE, Atlanta, GA 30305, holdene@gtlaw.com, (678) 553-7320

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.   2:14-cv-02044-KHV-TJJ

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____                    _____
                                                              *Server's signature*

                                                _____
                                                              *Printed name and title*

                                                _____
                                                              *Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| TOMMY WALTON, | § § § § |
| *Plaintiff,* | § § | Civil Action No. 4:13-cv-1164 |
| v. | § § |
| 3M COMPANY; ARIZANT HEALTHCARE, INC.; AND ROBERT PRESTERA | § § § § |
| *Defendants.* | § |

## NOTICE OF THIRD-PARTY SUBPOENA AND VIDEOTAPED DEPOSITION OF SCOTT AUGUSTINE, M.D.

TO:                    ALL COUNSEL OF RECORD

DEPONENT:       Scott Augustine, M.D.

DATE & TIME:    October 15, 2015 at 9:00 am (CST)

PLACE:             Blackwell Burke P.A.
                        431 South Seventh Street, Suite 2500
                        Minneapolis, MN 55415

PLEASE TAKE NOTICE that pursuant to Fed. R. Civ. P. 45(b)(1), Defendants 3M

Company, Arizant Healthcare, Inc. and Robert Prestera hereby give notice that they intend to

serve a subpoena to testify at a deposition and to produce documents on Third-Party, Scott

Augustine, M.D. Attached hereto is a true and correct copy of the subpoena that is being served.

The deposition will be recorded stenographically and videographically and will continue from

day-to-day until completed. You are notified to appear and take such part in the examination as

may be fit and proper.

1

PLEASE TAKE FURTHER NOTICE, the deponent is asked to bring to the deposition the documents in his possession as described in the attached Exhibit "A" regarding the above-referenced case.

This 23rd day of July, 2015.

Respectfully submitted,

By: _____

Lori G. Cohen*
Christiana C. Jacxsens*
Evan C. Holden*
GREENBERG TRAURIG, LLP
Terminus 200
3333 Piedmont Road N.E., Suite 2500
Atlanta, GA 30305
(678) 553-2385
(678) 553-2386 Facsimile
cohenl@gtlaw.com
jacxsensc@gtlaw.com
holdene@gtlaw.com
* Admitted *pro hac vice*

Brian P. Johnson
State Bar No. 10685700
Kealy C. Sehic
State Bar No. 24040688
JOHNSON, TRENT, WEST, & TAYLOR, LLP
919 Milam, Suite 1700
Houston, Texas 77002
(713) 222-2323 (Telephone)
(713) 222-2226 (Facsimile)
BJohnson@johnsontrent.com
KSehic@johnsontrent.com

COUNSEL FOR DEFENDANTS 3M COMPANY, ARIZANT HEALTHCARE INC., and ROBERT PRESTERA

2

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing has been served on all counsel of record via first class mail on July 23, 2015.

David W. Hodges                         Kyle Farrar
Gabriel Assaad                          Mark Bankston
Kennedy Hodges, LLP                     Farrar & Ball, LLP
711 W. Alabama Street                   1010 Lamar Street, Suite 1600
Houston, Texas 77006                    Houston, Texas 77002


                                        Evan C. Holden

3

**EXHIBIT "A"**

## DEFINITIONS

1.   "Person" as used in these Requests means all natural persons, corporations, partnerships, trusts, or other associations, and all other entities.

2.   "You" and "your" as used in these Requests means Scott Augustine, M.D., his representatives, administrative or personal assistants, agents, legal representatives, and all other persons acting on his behalf or under his direction or supervision.

3.   "Tommy Walton" as used in these Requests means Tommy Walton, his representatives, administrative or personal assistants, agents, legal representatives, and all other persons acting on his behalf or under his direction or supervision.

5.   "Communication" means and includes any and all direct or indirect transmissions of information by any means, written, oral or otherwise.

6.   "Correspondence" means and includes all letters, notes, e-mails, text messages, memoranda or other written, typewritten, printed or reproduced material.

7.   "Document" as used in these Requests includes without limitation, all written, printed, typed, photostatic, photographed, recorded, telecopied, photocopied or graphic materials of any kind, whether comprised of letters, words, numbers, pictures, sounds or symbols or any combination thereof. Without limiting the generality of the foregoing, the term "Document" includes without limitation, any book, pamphlet, binder, periodical, letter, email, text message, blog, memorandum, telegram, telex, report, envelope, intraoffice or interoffice communication, handwritten or other notes, working papers, transcription, draft, account, ledger, chart, paper, study, survey, index, tape, disc, photograph, computer printout, computer program and data files, microfilm, microfiche, correspondence, mailers, ledger cards, business cards, diaries, calendars, address and telephone records, drawings and charts and other data compilations. The term "other data compilations" includes information stored in, or accessible through, computer or other information retrieval systems, whether or not in hard copy form, together with instructions and all other materials necessary to use or interpret such data compilations. If more than one copy of any document exists, and if as a result of handwritten additions and notations, or for any other reason, the copies are not identical, each non-identical copy is a separate document and should be separately identified.

8.   "Related to" or "relating to" shall mean directly or indirectly embodying, mentioning or describing, pertaining to, referring to, consisting of, being connected with or reflecting upon a stated subject matter.

9.   "The Case" shall mean the lawsuit *Tommy Walton v. 3M Company, Arizant Healthcare Inc., and Robert Prestera*, currently pending in the U.S. District Court for the Southern District of Texas, Docket No. 4:13-cv-1164.

4

10. "Defendants" shall be deemed to include, but without limitation, Defendants 3M Company and/or Arizant Healthcare Inc., including their predecessor companies, and each of their employees, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who served in any such capacity at ANY time.

11. "Augustine Biomedical" shall be deemed to include, but without limitation, Augustine Biomedical & Design, LLC, Augustine Temperature Management LLC, Hot Dog USA, LLC, and Hot Dog International, including their predecessor companies, parent and/or subsidiary companies, and each of their employees, agents, officers, directors, representatives, consultants, accountants, and attorneys, including any person who served in any such capacity at ANY time.

12. "And" means "and/or" and "or" means "and/or." The plural of any word used herein includes the singular and the singular includes the plural. The masculine gender of any word used here includes the feminine. The past tense of a verb used herein includes the present tense, and the present tense includes the past tense.

## REQUESTS

Unless otherwise specified below, the relevant time period for each Request is the period beginning on January 1, 2005 to the present.

1. Any and all documents, transcripts, medical records, court filings, discovery, or other documents from the lawsuit *Tommy Walton v. 3M Company, Arizant Healthcare Inc., and Robert Prestera*, that you have received or reviewed.

2. Any and all documents constituting, relating or referring to any communications, meetings, interactions, services or payments exchanged, or agreements between (a) You, Augustine Biomedical, or any other person or entity acting on Your behalf; and (b) the law firms Kennedy Hodges, LLP and/or Farrar & Ball, LLP, including but not limited to calendar entries, invoices, emails, letters, documents exchanged, and meeting notes.

3. Any and all communications regarding forced air warming between (a) You, Augustine Biomedical, or any other person or entity acting on Your behalf; and (b) the U.S. Food and Drug Administration (FDA).

4. Any and all communications regarding forced air warming between (a) You, Augustine Biomedical, or any other person or entity acting on Your behalf; and (b) the Office of Inspector General, U.S. Department of Health & Human Services.

5. Any and all communications regarding forced air warming and/or the Defendants between (a) You, Augustine Biomedical, or any other person or entity acting on Your behalf; and (b) the ECRI Institute.

6. Any and all communications regarding forced air warming and/or Dr. Farhad Memarzadeh between (a) You, Augustine Biomedical, or any other person or entity acting on Your behalf; and (b) the National Institutes of Health (NIH).

7. Any and all communications regarding forced air warming and/or the Defendants between (a) You, Augustine Biomedical, or any other person or entity acting on Your

5

behalf; and (b) the United Kingdom Medicines and Healthcare Products Regulatory (MHRA).

8.    Any and all communications regarding forced air warming between (a) You, Augustine Biomedical, or any other person or entity acting on Your behalf; and (b) any newspapers.

9.    Any and all communications regarding the article "Forced-air warming does not worsen air quality in laminar flow operating rooms," Sessler DI, Olmsted RN, Kuelpmann R. (Anesth Analg. 2011 Sep 29), between (a) You, Augustine Biomedical, or any other person or entity acting on Your behalf; and (b) any editors, employees, or other persons affiliated with the journal *Anesthesia & Analgesia*.

10.    Any and all documents, including correspondence and draft correspondence, related to the MedWatch report referenced in Your July 9, 2010 letter to Kurt Hilzinger, Court Square Capital Partners.

11.    Any and all documents, data, photographs, or video relating to the production of any videos posted to http://heat-rises.blogspot.com that claim to show disruption of operating room airflow by forced-air warming, including footage taken but not posted online, documentation regarding the test protocols, documentation regarding all aspects of the ventilation system of the operating room and its performance, and documentation regarding the forced air warming blower and blankets used and any adjustments made to the devices.

12.    Any and all social media postings, messages, and blog entries, posted by You, Augustine Biomedical, or any other person or entity acting on Your behalf, that reference or relate to forced-air warming or to the lawsuit *Tommy Walton v. 3M Company, Arizant Healthcare Inc., and Robert Prestera*, from January 1, 2013 to today.

13.    Any and all electronic or paper files and file folders related to the lawsuit *Tommy Walton v. 3M Company, Arizant Healthcare Inc., and Robert Prestera*.

14.    Any and all documents reviewed by you in preparation for this deposition.

15.    Your current and up-to-date resume or Curriculum Vitae.

6

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Southern District of Texas

| | |
|---|---|
| TOMMY WALTON | ) |
| *Plaintiff* | ) |
| v. | ) |
| 3M COMPANY, ARIZANT HEALTHCARE, INC., and ROBERT PRESTERA | ) |
| *Defendant* | ) |

Civil Action No.    4:13-cv-1164

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                         Scott Augustine, M.D.

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place:  Blackwell Burke P.A.<br>431 South Seventh Street, Suite 2500<br>Minneapolis, MN 55415 | Date and Time:<br>10/15/2015 9:00 am |
|---|---|

The deposition will be recorded by this method:    Audio & Video

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material: See attached Exhibit "A"

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   7/23/15

CLERK OF COURT

OR

_____          _____
*Signature of Clerk or Deputy Clerk*                   *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*    3M COMPANY, ARIZANT HEALTHCARE, INC., and ROBERT PRESTERA _____ , who issues or requests this subpoena, are:

Evan C. Holden, Greenberg Traurig, 3333 Piedmont Road NE, Atlanta, GA 30305, holdene@gtlaw.com, (678) 553-7320

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.   4:13-cv-1164

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____          _____
                                                    *Server's signature*

                                        _____
                                                    *Printed name and title*

                                        _____
                                                    *Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# Exhibit N

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

TOMMY WALTON,

               Plaintiff,

v.

3M COMPANY; ARIZANT
HEALTHCARE, INC.; AND
ROBERT PRESTERA

               Defendants.

Civil Action No. 4:13-cv-01164

**DEFENDANTS' MOTION TO
COMPEL THIRD PARTIES DR.
SCOTT AUGUSTINE, AUGUSTINE
BIOMEDICAL + DESIGN,
AUGUSTINE TEMPERATURE
MANAGEMENT, HOT DOG USA,
AND AUGUSTINE TEAM, LLC TO
PRODUCE DOCUMENTS IN
RESPONSE TO SUBPOENAS**

## I.  INTRODUCTION

3M Company ("3M") and Arizant Healthcare Inc. ("Arizant") (collectively, "Defendants"), through their undersigned counsel, respectfully move pursuant to Fed. R. Civ. P. 37(a)(3)(B)(i) for an order compelling the production of documents and a privilege log in response to Defendants' subpoenas sent to key third party witness Dr. Scott Augustine ("Dr. Augustine"), and his companies, Augustine Biomedical + Design, Augustine Temperature Management, Hot Dog USA, and Augustine Team, LLC (collectively, the "Augustine Companies"), in connection with a personal injury products liability action in the United States District Court for the Southern District of Texas, *Tommy Walton v. 3M Company; Arizant Healthcare Inc.; and Robert Prestera*, No. 4:13-cv-01164 (S.D. Tex.) ("*Walton*"). As detailed below, Defendants have properly subpoenaed Dr. Augustine, and the Augustine companies, as Dr. Augustine is a citizen of the State of Minnesota, and the Augustine Companies are headquartered in Minnesota.



SCANNED
AUG 21 2015
U.S. DISTRICT COURT MPLS

Thus, this matter is properly before this Court. In support of this Motion, Defendants state as follows:

## II.   BACKGROUND

In *Walton*, Plaintiff Tommy Walton ("Plaintiff") alleges claims for strict liability (defects in design, manufacture, and warnings), negligence, and fraud relating to an FDA-cleared medical device known as the Bair Hugger Forced Air Warming unit ("Bair Hugger FAW"), manufactured and distributed by Defendants. The Bair Hugger FAW is used to warm patients before and during surgery, in order to maintain a patient's normal body temperature. Maintaining normal body temperature, or normothermia, is clinically proven to help reduce the risk of infections and improve surgical outcomes. Since its inception in 1987, the Bair Hugger FAW has safely warmed more than 200 million surgical patients in hospitals around the world. It is used in more than 80 percent of U.S. hospitals. The technology is supported by more than 170 clinical studies, including 60 randomized controlled trials. Few medical devices have been as well-studied and successfully employed in real-world operating rooms as the Bair Hugger FAW. Nonetheless, Plaintiff asserts the Bair Hugger FAW used in his orthopedic surgery caused his infection. Defendants deny these allegations. Post-operative infections of the type Plaintiff alleges are well-known complications of any surgery, especially those related to orthopedic implants, which tend to be more extensive and lengthier. Such post-operative infections are known to be caused by patient factors, physician factors, and environmental factors including hospital-based infections, and indeed are more likely to occur in the absence of any warming device maintaining normal body temperature

The reason Plaintiff blames his infection on the Bair Hugger FAW is because one of Defendants' current competitors in the patient warming industry has been engaged in a fear-mongering campaign against the Bair Hugger FAW device in an effort to jump-start the sales of its competing product. *See* Affidavit of Mark Scott at 8-12, filed in *Walton v. 3M*, attached as Exhibit "A." The Chief Executive Officer of this competitor, Dr. Augustine of Augustine Biomedical & Design, was the original inventor and developer of the Bair Hugger FAW device. *Id.* at 8. Yet, Dr. Augustine has since developed a new patient warming device with a different design. *Id.* at 9. His new device (the "HotDog") works much like an electric blanket by providing warmth to the patient through direct contact between the patient and the device, as opposed to the Bair Hugger's forced air method of warming. *Id.* In a misguided attempt to drive sales of the HotDog, beginning in 2009, Dr. Augustine and the Augustine Companies have launched a misinformation campaign falsely claiming that the use of forced air warming may increase airborne contamination in operating rooms. The misinformation campaign is driven by ulterior motives and Augustine-sponsored junk science, and is contradicted by decades of research and clinical experience. Now, in cases like this one, it has spilled over into the courts.

Dr. Augustine and the Augustine Companies clearly have a vested interest in the litigation against Defendants. They have used the filing of various lawsuits, and even the affirmative defenses pled by defendants, in marketing materials and on their company website in an effort to convince potential customers that the Bair Hugger is unsafe or could lead to liability. Dr. Augustine cites *Walton* in communications to 3M's customers

3

in an effort to create concern about the Bair Hugger FAW. *See*, e.g., April 23, 2013 e-mail from Stop Surgical Infections[1] to Sharon R. Brandt. R.N., CNRA, a copy of which is attached as Exhibit "B." In his communications, Dr. Augustine includes information entitled "Litigation News" in which he attempts to describe the proceedings in *Walton*. *Id.* at pp. 2-3. Defendants anticipate that Dr. Augustine and the Augustine Companies will continue their campaign throughout the proceedings in *Walton* and the other litigation against Defendants and the Bair Hugger FAW.

Dr. Augustine is also expected to be an important witness in this case. As the leading critic of the Bair Hugger FAW, the driving force behind the misinformation campaign directed against the Bair Hugger FAW, and the sponsor (through his companies) of most of the literature attacking the Bair Hugger FAW, Dr. Augustine is all but certain to offer key testimony in this case regarding liability and causation. Indeed, in *Walton*, Plaintiff has served supplemental interrogatory responses in May 2015, a copy of which is attached as Exhibit "C", stating that Dr. Augustine is expected to testify about his supposed concerns about the safety of the Bair Hugger FAW and his efforts to inform Defendants of supposed risks associated with the device. Communications and agreements between Plaintiff's counsel, Dr. Augustine, and the Augustine Companies are thus directly relevant, because they could show that Dr. Augustine was motivated by competitive interests and not by any legitimate safety concerns.

---

[1] Stop Surgical Infections is underwritten by Augustine Temperature Management. *See* www.stopsurgicalinfections.org.

Defendants served a subpoena on Dr. Augustine on April 6, 2015, noticing his deposition for May 6, 2015 and including document requests (the "Subpoena Requests"). *See* Subpoena Requests to Dr. Augustine, attached hereto as Exhibit "D." The Subpoena Requests seek documents directly and unquestionably relevant to the allegations in *Walton*, including: "Any and all documents, transcripts, medical records, court filings, discovery, or other documents from the lawsuit *Tommy Walton v. 3M Company, Arizant Healthcare Inc., and Robert Prestera*, that you have received or reviewed;" "Any and all communications regarding forced air warming between [Dr. Augustine] ...and the U.S. Food and Drug Administration;" "Any and all communications regarding forced air warming between [Augustine]...and any newspapers."

On April 15, 2015, Dr. Augustine's attorney served boilerplate objections to the Subpoena Requests. With regard to those requests seeking communications between Dr. Augustine and Plaintiff's attorneys, Dr. Augustine's counsel further objected on the grounds that, "To the extent such documents, if any, exist, they would be protected from disclosure by attorney-client privilege and as attorney work product." *See* April 15, 2015 letter from Randy Benham, counsel for Dr. Augustine, to Evan Holden ("E. Holden"), counsel for Defendants, a copy of which is attached as Exhibit "E."

On April 24, 2015, Defendants responded to Dr. Augustine's counsel regarding Plaintiff's improper objections and demanded a privilege log. *See* Exhibit "F," April 24, 2015 e-mail from E. Holden to R. Benham. On April 28, 2015, Defendants issued subpoenas to the Augustine Companies, again including Subpoena Requests seeking documents from these entities. Like the very similar Subpoena Requests on Dr.

5

Augustine, the requests to the Augustine Companies seek documents directly and unquestionably relevant to the allegations in *Walton*. *See* Subpoena Requests sent to Augustine Companies, attached hereto as Exhibit "G." On May 11, 2015, Dr. Augustine's counsel responded to Defendants' subpoenas by once again asserting boilerplate objections and objections on attorney-client privilege grounds. *See* Exhibit "H."

It is undisputed that Dr. Augustine has been in communication with Plaintiff's counsel, Kennedy Hodges LLP, from the very onset of the *Walton* litigation. Defendants issued discovery upon Plaintiff seeking these communications between Plaintiff's counsel and Dr. Augustine. Plaintiff's counsel initially argued that these communications were privileged, as Dr. Augustine was a potential testifying or consulting expert. Yet on January 8, 2015, Plaintiff withdrew Dr. Augustine as a consulting expert. *See* January 8, 2015 e-mail from Gabriel Assaad, Plaintiff's counsel, to Evan Holden, Defendants' counsel, a copy of which is attached as Exhibit "I." Defendants subsequently filed a Motion to Compel against Plaintiff in the *Walton* case, seeking these communications between Dr. Augustine and Plaintiff's counsel. In his response to Defendants' Motion to Compel, Plaintiff's counsel argued that communications between Kennedy Hodges and Dr. Augustine were protected from disclosure by the attorney-client privilege because Dr. Augustine had retained Kennedy Hodges as his attorney to represent him in connection with potential commercial litigation between Dr. Augustine and Arizant/3M in July, 2009. *See* Affidavit of David Hodges, filed in *Walton v. 3M*, attached as Exhibit "J."

6

On May 19, 2015, the *Walton* court denied Defendants' Motion to Compel, but held that Defendants "may, of course, seek discovery directly from Dr. Augustine, who has been identified by Plaintiff as a fact witness, through a deposition and/or a subpoena. *See* Exhibit "K" (May 19, 2015 Order in *Walton v. 3M*). The Walton Court did not rule on the production of a privilege log, the retainer agreement, or non-privileged documents. Defendants are moving to compel these documents from Plaintiff and Plaintiff's counsel in the Walton case.

Defendants have engaged in continuous attempts to meet and confer with counsel for Dr. Augustine and the Augustine Companies, Randy Benham. Defendants' counsel has repeatedly contacted Mr. Benham regarding the long overdue documents from Dr. Augustine and the Augustine Companies, which are responsive to the subpoenas, and demanded a privilege log for any documents that are allegedly privileged. *See* Group Exhibit "L" July 23, 2015 e-mail from Lori Cohen, Defendants' counsel to Randy Benham, Dr. Augustine's counsel; July 28, 2015 e-mail from Evan Holden, Defendants' counsel to Randy Benham, Dr. Augustine's counsel; August 11, 2015 e-mail from Evan Holden to Randy Benham. Rather than setting aside thirty minutes at any time in the last month to meet and confer with Defendants' counsel, Dr. Augustine's counsel has instead repeatedly promised, delayed, and postponed the requested meet and confer for weeks.

Finally, on August 17, 2015—four months after Defendants served the Subpoena Requests—Dr. Augustine's counsel finally sent an email to Defendants' counsel in which he belatedly agreed to produce certain categories of documents and to search for others, without explaining why the search had not already occurred in the preceding four months.

Dr. Augustine's counsel did not offer a date certain on which the production would occur, stating only that it would take "a couple of weeks." Dr. Augustine's counsel continued to assert attorney-client privilege objections with regard to communications with Plaintiff's counsel, but did not agree to provide a privilege log, as Defendants' counsel had repeatedly requested. And Dr. Augustine's counsel raised new objections to a handful of requests, again without explaining why these objections had not been forthcoming in the preceding four months. Lastly, Dr. Augustine's counsel expressed his view that this email would stand in lieu of the meet and confer requested by Defendants' counsel. A copy of the August 17, 2015 email from Dr. Augustine's counsel is attached hereto as Exhibit "M."

Defendants' counsel promptly responded by email on August 18, 2015, asking for Dr. Augustine's commitment by the end of the day to a date certain (Defendants proposed August 25, 2015) for the production of documents by Dr. Augustine and his companies, and requesting confirmation by the end of the day that Dr. Augustine and his companies would provide a privilege log. *See* Exhibit "N." Dr. Augustine's counsel did not respond, and still has not responded.

Dr. Augustine's depositions are set by properly issued subpoenas for October 13, 2015 and October 15, 2015, and cannot be moved from these dates in light of the difficulties scheduling the deposition and the Court's pending scheduling order, under which discovery closes on November 30, 2015. Thus, it is urgent that Dr. Augustine and the Augustine Companies produce the responsive documents in advance of Dr. Augustine's deposition.

## III.  ARGUMENT

Discovery under the Federal Rules of Civil Procedure is permissive, authorizing parties to obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party. *See* Fed. R. Civ. P. 26 (b)(1). A non-party served with a subpoena is subject to the same scope of discovery as a party. *See* Fed. R. Civ. P. 45(d)(1), Advisory Comm. Note (1991 amendment) (stating that the scope of discovery through a subpoena is the same as that applicable to Rule 34). Motions to compel non-party production based on a Rule 45 subpoena are subject to the standards of Rule 26. *See Shukh v. Seagate Tech., LLC*, 295 F.R.D. 228, 236 (D. Minn. 2013) (stating that "subpoenas issued under Rule 45 are subject to the same 'constraints that apply to all of the other methods of formal discovery'") (quoting *Marvin Lumber & Cedar Co. v. PPG Indus., Inc.*, 177 F.R.D. 443, 443 (D. Minn. 1997)). "[A]n evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer or respond." Fed. R. Civ. P. 37(a)(4).

Dr. Augustine and the Augustine Companies have failed to respond at all to Defendants' Subpoena Requests, and their counsel has not been cooperative in working with Defendants' counsel to supplement their responses as requested and required. The documents requested in Defendants' Subpoena Requests are highly relevant to the litigation against Defendants in *Walton*, and it is crucial that Defendants obtain these documents prior to Dr. Augustine's deposition. The objections of Dr. Augustine and the Augustine Companies to Defendants' requests are mere boilerplate, and their assertions of privilege have no basis and are improper. Dr. Augustine and the Augustine Companies

should be compelled to produce the responsive documents immediately, and in all events at least a month prior to Dr. Augustine's deposition on October 13, 2015 and October 15, 2015.

**A.    The Court Should Order Dr. Augustine and the Augustine Companies to Produce All Non-Privileged Documents Responsive to Defendants' Subpoena Requests.**

Dr. Augustine and the Augustine Companies have offered no basis whatsoever to withhold non-privileged documents responsive to Defendants' Subpoena Requests, and should be compelled to produce them promptly. In response to the subpoenas served upon Dr. Augustine and the Augustine Companies, Dr. Augustine's counsel transmitted letters containing nothing more than boilerplate objections to Defendants' Subpoena Requests (as well as baseless assertions of attorney-client privilege, discussed in § II.B, *infra*), unaccompanied by any responsive documents or any indication that such documents would be forthcoming. Under Fed. R. Civ. P. 45(c)(2)(B), where a recipient of a subpoena responds only with objections, a serving party may move the issuing court for an order compelling production of the requested documents. Defendants have repeatedly attempted to meet and confer with counsel for Dr. Augustine and the Augustine Companies, and have requested on numerous occasions that Dr. Augustine and the Augustine Companies better explain the basis for their objections. *See, e.g.,* Exhibit "F," April 24, 2015 e-mail from Evan. Holden, Defendants' counsel, to Randy Benham, Dr. Augustine's counsel. Yet counsel has failed and refused to meet and confer, instead repeatedly proclaiming his unavailability, promising to schedule a meet and confer, failing to do so, and then repeating the cycle when confronted with his failure to

cooperate. *See, e.g.* Group Exhibit "O," July 29 e-mail from Randy Benham, Dr. Augustine's counsel to Evan Holden and Lori Cohen, Defendants' counsel; August 1, 2015 e-mail from Randy Benham, Dr. Augustine's counsel to Evan Holden, Defendants' counsel; August 12, 2015 e-mail from Randy Benham, Dr. Augustine's counsel to Evan Holden, Defendants' counsel.

The belated email from Dr. Augustine's counsel on August 17, 2015, offered in lieu of a meet and confer, does not resolve this issue. Though Dr. Augustine and the Augustine Companies now concede that they must produce certain categories of documents sought in the Subpoena Requests, the August 17 email reveals that they have not even begun to search for the requested documents, does not set a date certain for the production of non-privileged documents, belatedly offers new objections to several Subpoena Requests—including one seeking emails regarding forced-air warming, the key issue in the *Walton* litigation—and yet again declines Defendants' request to meet and confer. In light of the contumacious history of Dr. Augustine and the Augustine Companies in failing and refusing to respond to the Subpoena Requests, and further refusing to meet and confer, for more than four months, this email can only be seen as another tactical gambit to further delay the production and to evade certain of the Subpoena Requests indefinitely. With Dr. Augustine's deposition rapidly approaching, these delay tactics should no longer be countenanced.

Defendants' Subpoena Requests are reasonably calculated to seek documents in the possession of Dr. Augustine and the Augustine Companies which relate to Plaintiff's claims against Defendants in *Walton*. Dr. Augustine and the Augustine Companies have

11

failed to show that any of Defendants' requests are "not relevant," "overly broad, vague and ambiguous," or "unreasonable and oppressive," as their counsel states in his objections to Defendants' Subpoena Requests. *See* April 15, 2015 letter from Randy Benham, Dr. Augustine's counsel to Evan Holden, Defendants' counsel, attached as Exhibit "E;" May 11, 2015 e-mail from Randy Benham, Dr. Augustine's counsel to Evan Holden, Defendants' counsel, attached as Exhibit "H." These form objections, unaccompanied by any explanation, are invalid. Indeed, the August 17 email concedes as much, dropping these objections as to most of the Subpoena Requests even while failing to produce responsive documents or to set a date certain to do so, and continuing to refuse production of certain categories of relevant, non-privileged documents. The Court has previously cautioned that "routine boilerplate responses" are "inappropriate." *Lubrication Technologies, Inc. v. Lee's Oil Serv., LLC*, No. CIV. 11-2226 DSD/LIB, 2012 WL 1633259, at *5 (D. Minn. Apr. 10, 2012). "Boilerplate objections, without more specific explanations for any refusal to provide information, are not consistent with the Federal Rules of Civil Procedure." *Id.* "To the extent that the Defendants object to a discovery request, they cannot rely upon boilerplate objections, but rather they must specify how each interrogatory or request for production is deficient and articulate the particular harm that would accrue if they were required to respond to the discovery request." *Id.* Dr. Augustine and the Augustine Companies have not done so.

Dr. Augustine and the Augustine Companies have been afforded every opportunity to explain, to the extent they can, whatever grounds they assert to withhold non-privileged documents from production. They have not done so, and their counsel has

dodged all efforts to meet and confer, evidently hoping to kick the can down the road far enough that Dr. Augustine's deposition will come and go before Dr. Augustine and the Augustine Companies respond to the Subpoena Requests. The August 17 email, far from resolving this pattern of delay, merely perpetuates it. To this day, Dr. Augustine and the Augustine Companies have provided no date certain by which they intend to comply with Defendants' Subpoena Requests, and their counsel still declines to confer with Defendants regarding this issue. Defendants have gone above and beyond the call of diligence and good faith in their efforts to satisfy the meet and confer requirements of Rule 37(a)(l) and Local Rule 7.1. This issue is ripe for resolution by this Court, and the outcome is clear. For the reasons set forth above, Defendants respectfully request that the Court compel Dr. Augustine and the Augustine Companies to produce immediately, and in all events no later than September 1, 2015 (a date that should pose no burden for Dr. Augustine's counsel, as he represented in his August 17 email that he could assemble the responsive documents in "a couple of weeks"), all non-privileged documents within their possession, custody or control which are responsive to Defendants' Subpoena Requests.

**B.      The Court Should Order Dr. Augustine and the Augustine Companies to Produce a Privilege Log**

In addition to producing all non-privilege documents, Defendants also request that the Court order Dr. Augustine and the Augustine Companies to produce a privilege log detailing any documents responsive to Defendants' subpoenas which Dr. Augustine and the Augustine Companies are withholding based on an assertion of privilege. Dr. Augustine and the Augustine Companies are required to produce such a log. *See* Fed. R.

Civ. P. 45(e)(2)(A) ("A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must: (i) expressly make the claim; and (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.").

Dr. Augustine and the Augustine Companies object to producing unspecified documents responsive to Defendants' Subpoena Requests, and in particular those requests pertaining to communications between Dr. Augustine or his companies and Plaintiff's counsel, on the grounds that the unidentified documents are protected by the attorney-client privilege. *See* April 15, 2015 letter from Randy Benham, Dr. Augustine's counsel, to Evan Holden, Defendants' counsel, attached as Exhibit "E;" May 11, 2015 e-mail from Randy Benham, Dr. Augustine's counsel, to Evan Holden, Defendants' counsel, attached as Exhibit "H." Yet, Dr. Augustine and the Augustine Companies fail to describe the nature of the withheld documents and communications. On multiple occasions, Defendants have requested a privilege log that would describe these details. *See* April 24, 2015 e-mail from Evan Holden, Defendants' counsel, to Randy Benham, Dr. Augustine's counsel, attached hereto as Exhibit "F;" July 23, 2014 e-mail from Lori Cohen, Defendants' counsel to Randy Benham, Dr. Augustine's counsel, attached hereto as Exhibit "L." To date, Dr. Augustine and the Augustine Defendants have never produced such a privilege log, even though Defendants' subpoenas were served more than four months ago. The August 17 email, too, is silent on this issue.

The production of a privilege log is essential to evaluate the assertion of privilege made by Dr. Augustine and the Augustine Companies. Attorney-client privilege does not indiscriminately protect all communications between Dr. Augustine, the Augustine Companies, and Plaintiff's counsel. Based on Plaintiff's response to Defendants' motion to compel in *Walton*, the asserted attorney-client relationship between Dr. Augustine and Plaintiff's counsel pertains to Dr. Augustine's purported retention of one of Plaintiff's law firms, Kennedy Hodges, as his attorney in connection with representing Dr. Augustine in connection with potential commercial litigation against Defendants in July 2009.[2] Consequently, even if this retention could be demonstrated, the assertion of attorney-client privilege would be limited solely to the scope of the representation, and not subsequent communications between Dr. Augustine, the Augustine Companies, and Plaintiff's counsel regarding Bair Hugger product liability personal injury litigation, such as *Walton*. It further would not cover any communications prior to the entry of the retainer agreement in July 2009.

The essential elements of attorney-client privilege in Minnesota are: "(1) where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications *relating to that purpose*, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or the legal advisor, (8) except the privilege may be waived." *PETCO Animal Supplies Stores,*

---

[2] Plaintiff's counsel has not yet produced the retainer agreement despite Defendants' multiple requests. Defendants are moving to compel the production of the retainer agreement in the *Walton* case. To the extent that Dr. Augustine is also in possession of the retainer agreement, Defendants request that the Court compel Dr. Augustine to produce that document as well.

*Inc. v. Ins. Co. of N. Am.*, No. CIV. 10-682 SRN/JSM, 2011 WL 2490298, at *9 (D. Minn. June 10, 2011) (emphasis added) (citing Minn. Stat. § 595.02(b); *Kobluk v. University of Minn.*, 574 N.W.2d 436, 440 (Minn.1998)). To the extent Dr. Augustine or the Augustine Companies engaged in communications with Plaintiff's counsel regarding the Bair Hugger product liability litigation, such as the *Walton* case, commenced years after Dr. Augustine's purported retention of Kennedy Hodges in July 2009 regarding potential commercial litigation that never came to pass, such communications are outside the scope of the alleged representation, and are unrelated to its purpose. Attorney-client privilege also would not extend to communications between Dr. Augustine and Plaintiff's counsel prior to the entry of the retainer agreement and communications between Dr. Augustine and those law firms other than Kennedy Hodges involved in Plaintiff's representation. Only a privilege log setting forth the communications Dr. Augustine and the Augustine Companies seek to shield from disclosure, the dates of those communications, the senders and recipients of the communications, and the subject matter of the communications (in sufficient detail to determine whether they related to the purported 2009 "potential litigation," to the *Walton* case, or to some other matter), will enable the parties and the Court to determine which communications might be withheld and which must be produced.

Until Dr. Augustine and the Augustine Companies produce a privilege log for the communications they allege are privileged, it is impossible for Defendants to evaluate their claim of privilege and to determine whether the communications are protected by the attorney-client privilege. Accordingly, the Court should order Augustine to produce a

privilege log immediately, and in all events no later than August 31, 2015, so that Defendants can promptly evaluate the assertion of privilege and, if necessary, seek relief from the Court with respect to non-privileged communications for which a claim of privilege has been improperly asserted.

**C.     The Court Should Award Defendants Their Costs and Attorneys' Fees**

If the Court grants Defendants' motion to compel, then the Federal Rules of Civil Procedure provide for an award of reasonable expenses and attorney's fees to the successful party, except in the following limited circumstances: (i) the successful party did not confer in good faith before the motion; (ii) the opposing party's position was substantially justified; or (iii) other circumstances would make an award unjust. Fed. R. Civ. P. 37(a)(5)(A). Because none of these limited exceptions apply here, and because the behavior of Dr. Augustine and the Augustine Companies in failing to comply with Defendants' Subpoena Requests has been egregious, the Court should require that Dr. Augustine and the Augustine Companies pay Defendants their costs and reasonable attorney's fees in bringing this motion to compel.

First, Defendants satisfied their meet and confer obligations under Rule 37(a)(1) and Local Rule 7.1. Indeed, as detailed above, Defendants' counsel acted in good faith by contacting counsel for Dr. Augustine and the Augustine Companies on numerous occasions in an attempt to resolve the discovery disputes described above, only to be met with a wall of avoidance and indifference preventing every effort to resolve this matter.

Second, the failure of Dr. Augustine and the Augustine Companies to respond appropriately and adequately to Defendants' Subpoena Requests was not substantially

17

justified. Defendants' Subpoena Requests are clearly relevant to the claims against Defendants in *Walton*. As explained above, rather than meet their discovery obligations, Dr. Augustine and the Augustine Companies have chosen instead to withhold clearly discoverable information. The end result is the unreasonable obstruction of Defendant's efforts to take full and fair discovery.

Third, there are no other circumstances that would make it unjust to award costs and fees to Defendants. On the contrary, Defendants have attempted to obtain complete and accurate responses to their subpoenas and have worked in good faith to try to address the unfounded objections asserted by Dr. Augustine and the Augustine Companies, all at considerable time and expense to Defendants, ultimately necessitating this motion. Accordingly, there are no circumstances that would make an award of expenses unjust.

## IV.  CONCLUSION

For the reasons set forth above, Defendants 3M Company and Arizant Healthcare, Inc. respectfully request the Court enter an order (a) compelling Dr. Augustine and the Augustine Companies to produce all non-privileged documents responsive to Defendants' Subpoena Requests; (b) compelling Dr. Augustine and the Augustine Companies to produce a privilege log for any documents withheld from production on grounds of attorney-client privilege, setting forth the communications Dr. Augustine and the Augustine Companies seek to shield from disclosure, the dates of those communications, the senders and recipients of the communications, and the subject matter of the communications in sufficient detail to determine the basis for the assertion of privilege; (c) granting an award of costs and reasonable attorneys' fees to Defendants

for expenses incurred in connection with bringing this Motion; and (d) granting all other

relief that the Court deems just and proper.


Respectfully submitted this 21st day of August, 2015.

FAEGRE BAKER DANIELS LLP

/s/Bridget M. Ahmann
Bridget M. Ahmann
(MN Atty ID No. 016611X)
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402
Telephone (612) 766-7000
Facsimile: (612) 766-1600
Bridget.Ahmann@FaegreBD.com

Lori G. Cohen (Ga. Bar No. 174455)
(pro hac vice application forthcoming)
GREENBERG TRAURIG LLP
3333 Piedmont Road NE – Suite 2500
Atlanta, GA 30305
(678) 553-2100 (telephone)
(678) 553-2212 (fax)
cohenl@gtlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2015, I caused the foregoing Defendants' Motion to Compel Third Parties Dr. Scott Augustine, Augustine Biomedical + Design, Augustine Temperature Management, Hot Dog USA, and Augustine Team, LLC to Produce Documents in Response to Subpoenas, to be served on the following parties via United States Mail, postage prepaid:

David W. Hodges
Gabriel Assaad
Kennedy Hodges, LLP
711 W. Alabama Street
Houston, Texas 77006

Kyle Farrar
Mark Bankston
Farrar & Ball, LLP
1010 Lamar Street, Suite 1600
Houston, Texas 77002

J. Randall Benham
General Counsel
Augustine Biomedical + Design LLC
6581 City West Parkway
Eden Prairie, MN 55344

**FAEGRE BAKER DANIELS LLP**

*/s/Bridget M. Ahmann*
Bridget M. Ahmann
(MN Atty ID No. 016611X)
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402
Telephone (612) 766-7000
Facsimile: (612) 766-1600
Bridget.Ahmann@FaegreBD.com

Lori G. Cohen (Ga. Bar No. 174455)
(*pro hac vice* application forthcoming)
GREENBERG TRAURIG LLP
3333 Piedmont Road NE – Suite 2500
Atlanta, GA 30305
(678) 553-2100 (telephone)
(678) 553-2212 (fax)
cohenl@gtlaw.com

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Tommy Walton

### DEFENDANTS
3M Company; Arizant Healthcare Inc.; and Robert Prestera

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
David W. Hodges
Gabriel Assaad
Kennedy Hodges, LLP
711 W. Alabama Street
Houston, Texas 77006

Attorneys *(If Known)*
Bridget M. Ahmann
(MN Atty ID No. 016611X)
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

### CONTRACT
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

### REAL PROPERTY
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
- [x] 365 Personal Injury - Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

### CIVIL RIGHTS
- [ ] 440 Other Civil Rights
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 445 Amer. w/Disabilities Employment
- [ ] 446 Amer. w/Disabilities Other
- [ ] 448 Education

### PRISONER PETITIONS
**Habeas Corpus:**
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty

**Other:**
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee - Conditions of Confinement

### FORFEITURE/PENALTY
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

### LABOR
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Retirement Income Security Act

### IMMIGRATION
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

### BANKRUPTCY
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 840 Trademark

### SOCIAL SECURITY
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

### FEDERAL TAX SUITS
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- [ ] 375 False Claims Act
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit
- [ ] 490 Cable/Sat TV
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

SCANNED
AUG 21 2015
U.S. DISTRICT COURT MPLS

## V. ORIGIN *(Place an "X" in One Box Only)*
- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):*

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:
- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: [ ] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____ DOCKET NUMBER _____

DATE 8-21-15

SIGNATURE OF ATTORNEY OF RECORD
*Bridget M Ahmann*

### FOR OFFICE USE ONLY

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

FaegreBD.com

**FAEGRE BAKER DANIELS**

RECEIVED
15 AUG 21  AM 11: 31

CLERK OF COURT
MINNEAPOLIS

USA ▾ UK ▾ CHINA

Bridget M. Ahmann
+1 612 766 8055
bridget.ahmann@FaegreBD.com

Faegre Baker Daniels LLP
2200 Wells Fargo Center ▾ 90 South Seventh Street
Minneapolis ▾ Minnesota 55402-3901
Phone +1 612 766 7000
Fax +1 612 766 1600

August 20, 2015

Clerk of Court
United States District Court
202 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN  55415

**HAND DELIVERED**

15 MC 64
RHK/BRT

Re:  ***Walton v. 3M, et al.***
     **TX Court File No. 4-13-cv-01164**

Dear Sir or Madam:

Pursuant to your instructions, enclosed for filing in the above-referenced matter are the following documents:

1. Civil Coversheet;

2. Defendants' Notice of Motion to Compel Third Parties Dr. Scott Augustine, Augustine Biomedical + Design, Augustine Temperature Management, Hot Dog USA, and Augustine Team, LLC to Produce Documents in Response to Subpoenas;

3. Defendants' Motion to Compel Third Parties Dr. Scott Augustine, Augustine Biomedical + Design, Augustine Temperature Management, Hot Dog USA, and Augustine Team, LLC to Produce Documents in Response to Subpoenas;

4. Exhibit Index to Defendants' Motion to Compel Third Parties Dr. Scott Augustine, Augustine Biomedical + Design, Augustine Temperature Management, Hot Dog USA, and Augustine Team, LLC to Produce Documents in Response to Subpoenas (with Exhibits A – 0); and

5. Affidavit of Evan C. Holden in Support of Defendants' Motion to Compel Third Parties Dr. Scott Augustine, Augustine Biomedical + Design, Augustine Temperature

SCANNED
AUG 21 2015
U.S. DISTRICT COURT MPLS

Clerk of Court                          Page 2                          August 21, 2015

Management, Hot Dog USA, and Augustine Team, LLC to Produce Documents in
Response to Subpoenas (with Exhibits A – 0).

A check in the amount of $46 for the applicable filing fee is also enclosed.  By copy of
this letter, counsel are being served with copies of the same.  Please do not hesitate to contact
me if you have any questions.

Very truly yours,

Bridget M. Ahmann

BMA:djb

Enclosures

cc:     David W. Hodges (w/encl. by U.S. mail)
        Kyle Farrar (w/encl. by U.S. mail)
        J. Randall Benham (w/encl by U.S. mail)
        Lori G. Cohen (w/o encl. by email)

# Exhibit O

1                 UNITED STATES DISTRICT COURT

2                     DISTRICT OF MINNESOTA

3    ------------------------------------------------------
                                    )
4    Timothy Johnson,               )   Case No. 15-mc-65(JNE/FLN)
                                    )
5              Plaintiff,           )
                                    )
6       vs.                         )   Minneapolis, Minnesota
                                    )   October 26, 2015
7    3M Company; and                )   9:21 a.m.
     Arizant Healthcare, Inc.,      )
8                                    )
               Defendants.          )
9                                    )
     ------------------------------------------------------

10

           BEFORE **THE HONORABLE FRANKLIN L. NOEL**
11       UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

12             **HEARING ON MOTION TO COMPEL AND**
                **MOTION FOR A PROTECTIVE ORDER**

13

14   **APPEARANCES:**

     **For the Plaintiffs:**        Levin-Papantonio, P.A.
15                                  BEN W. GORDON, JR., ESQ.
                                   316 S. Baylen Street - Suite 600
16                                  Pensacola, Florida 32502

17                                  Kennedy Hodges, L.L.P.
                                   DAVID W. HODGES, ESQ.
18                                  GABRIEL ASSAAD, ESQ.
                                   711 W. Alabama Street
19                                  Houston, Texas 77006

20                                  Meshbesher & Spence
                                   GENEVIEVE M. ZIMMERMAN, ESQ.
21                                  1616 Park Avenue
                                   Minneapolis, Minnesota 55404

22

23   **DIGITAL RECORDING TRANSCRIBED BY:**

24   Official Court Reporter:  JEANNE M. ANDERSON, RMR-RPR
                               Suite 146 U.S. Courthouse
25                              316 North Robert Street
                               St. Paul, Minnesota 55101

                   JEANNE M. ANDERSON, RMR, RPR
                         (651) 848-1221

1    **APPEARANCES (Continued):**

2

3    For the Petitioner 3M:   Blackwell Burke, P.A.
                              JERRY W. BLACKWELL, ESQ.
4                             431 South 7th Street, Suite 2500
                              Minneapolis, Minnesota 55415
5

6
     For the Petitioner 3M and
7    Arizant Healthcare, Inc.:

8                             Greenberg Traurig, LLP
                              LORI G. COHEN, ESQ.
9                             3333 Piedmont Road NE, Suite 2500
                              Atlanta, Georgia 30305
10

11
     For Respondent
12   Scott Augustine:        Augustine Biomedical & Design LLC
                             JAMES RANDALL BENHAM, ESQ.
13                           6581 City West Parkway
                             Eden Prairie, Minnesota 55344
14

15

16

17

18

19

20

21

22

23

24

25

 1    talking about and we will attempt to find the document that

 2    is referenced in it.  I have not been able to find the

 3    letter they are talking about in our files.  I don't doubt

 4    that it exists, I just would like to see it before I make

 5    some suppositions and go out searching for other documents.

 6              The second relates to this social media and --

 7              THE COURT:  Come on, how many letters -- are we

 8    talking about item No. 10 on their subpoena list?  The July

 9    9th letter to Kurt Hilzinger?

10              MR. BENHAM:  Yes.

11              THE COURT:  How many letters did he write to Kurt

12    Hilzinger on that date?

13              MR. BENHAM:  I don't have any idea.  I do know --

14              THE COURT:  Do you have reason to believe he wrote

15    more than one?

16              MR. BENHAM:  I don't have any reason to believe

17    one way or the other.  But, I don't believe I have an

18    obligation to make suppositions and guesses as to what they

19    are talking about.

20              THE COURT:  Well, what's to suppose or guess about

21    a letter dated July 9th, 2010 to Kurt Hilzinger?  Couldn't

22    you ask your client:  Did you write a letter on that date to

23    Kurt Hilzinger?  Look at the letter and then ask him if he

24    wrote 10 letters or 20 letters or 30 letters?  And then I

25    would say:  Okay, I guess we don't know which of those

1    letters he is talking about.  But, if they give you the date

2    and the addressee, what more specificity do you need to know

3    what letter they are talking about?

4              MR. BENHAM:  I went far beyond that, Your Honor.

5    I looked through his files and attempted to find a letter to

6    that gentleman at any time, and I could not find it.  Absent

7    looking at the letter and reading the reference that they

8    are talking about, I have to make a guess as to what they

9    are talking about.

10             On the other hand, if they have the document and

11   they will show it to me, I will see if I can find what they

12   are looking for.

13             THE COURT:  Okay.

14             MR. BENHAM:  Beyond that, the Request No. 12 asked

15   about every message relating to forced-air warming.  My

16   client is a company that produces a product that is intended

17   to replace forced-air warming.

18             Over the last six or seven years of the companies'

19   existence, there have been tens, if not hundreds of

20   thousands of messages, internal and external, about forced

21   air.  It is essentially the only thing my company -- my

22   client's company talks about.

23             I would urge that they need to narrow that a bit.

24   Now, beyond that, Your Honor, even though I produced all of

25   these documents, produced everything we had, in retrospect I

1    wonder if I should have in fact produced any of it, because

2    we are not a party to this case.  This is a product

3    liability case.  And what is there about a product liability

4    case that let's the manufacturer of the accused product go

5    rummaging through the files of their competition?  This is

6    largely irrelevant.

7           And what difference does it make what Dr.

8    Augustine said to his co-workers, or what the director of

9    engineering said to the director of quality control about

10   forced air, or that was said to the public at large about

11   forced air?  This is not a business defamation case, but

12   they want to take discovery of my client as if it were such

13   a case.  Of course, if they filed a business defamation

14   case, my client would get the discovery back to establish

15   the truth of what they are saying.

16          Now, they are trying to do discovery on us, a

17   non-party -- but their only significant competitor -- as if

18   there was litigation going on between 3M and Augustine, and

19   there is none.

20          So, I would urge you to shut this down and make

21   them stop taking depositions, and make them stop taking

22   discovery of their competitor as if it had anything to do

23   with this case at all.

24          If you choose not to do that, I would ask that you

25   have them show me the document in response to No. 10, vastly