UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: BAIR HUGGER FORCED AIR WARMING DEVICES PRODUCTS LIABILITY LITIGATION | MDL No 15-2666 (JNE/FLN) |
| This Document Relates to: All Actions | THIRD PARTIES' MEMORANDUM IN OPPOSITION TO MOTION TO COMPEL |

Third Parties Dr. Scott Augustine and the related Augustine entities offer this Memorandum in Opposition to the Motion to Compel filed by 3M Company and Arizant Healthcare Inc.

**Introduction**

If one gets past the venomous attacks on the character of Dr. Augustine, counsel for 3M Company and Arizant Healthcare ("3M") make four arguments:

1. The search for documents in response to 3M's discovery was inadequate…and (through insinuation) possibly corrupt.
2. Dr. Augustine and the Augustine entities ("Augustine") should produce documents relating to the marketing, testing, effectiveness and customer-relations of HotDog patient warming, an Augustine product that competes with Bair Hugger, the 3M medical device accused of causing surgical infections.
3. Augustine should produce documents related to alleged MedWatch filing regarding injures attributed to Bair Hugger.
4. Augustine should provide more information in its privilege log.

Each of these issues will be discussed below.

I.  The Search for Documents Was Conducted Properly

The attached affidavits of J. Randall Benham, Dr. Scott Augustine, Brent Augustine, and Dan Grewe establish the facts set forth below.

When Augustine was served with document discovery in 2015 and 2016, it quickly determined that it could not afford to engage outside counsel to locate, review and produce responsive documents. J. Randall Benham, general counsel of the various Augustine

entities, was tasked with this duty.  After determining which document demands would be objected to and which would be accepted, Mr. Benham took the following actions:

- Advised his colleagues of their obligation to preserve documents.
- Collected Dr. Augustine's paper files, reviewed them personally, and produced all responsive documents.
- Reviewed all of the electronic files identified by Mr. Deibel regarding the construction and use of the "laminar flow" laboratory involved in the videos and research referenced by 3M's discovery and produced all responsive documents.
- Supervised the restoration by an outside IT consultant of a computer returned to Augustine unsolicited by former employee Mark Albrecht and worked with Brent Augustine to review and produce all responsive documents.
- Based on his position as general counsel, determined which persons employed by Augustine could conceivably possess documents responsive to the dozens of document demands from 3M. For example, only Mr. Grewe (and former employee Elaina Reinke, whose files Mr. Grewe possessed) would possess marketing emails, social media posts and other communications demanded by 3M.  Mr. Deibel would have access to engineering documents.
- As regards emails to the many individuals and organizations identified by 3M, Mr. Benham admittedly did not personally search every computer of every Augustine employee.  Instead, using his knowledge of the business and the roles of the various employees, he discussed the matter with employees who might potentially possess emails and requested that they search their computers and provide any documents discovered.

Some emails, albeit few, were found and produced.  This is unsurprising since many of the activities in question (research involving Mr. Albrecht and others and marketing communications in particular) occurred 5 or 6 years in the past.  As regards research, to the extent any such emails ever existed, they most likely would have been sent or received by Dr. Augustine.  As Dr. Augustine explains in his affidavit:

1. He does not routinely maintain emails on his computer after they are no longer useful, but periodically purges them from a certain date backwards into time.
2. One computer used by Dr. Augustine was stolen in a burglary perpetrated on the Augustine business involving entry through a smashed window.  (A police report was filed at the time.)
3. A second computer was stolen from Dr. Augustine while he was traveling on a train in Holland. (No US police report was filed, but the Dutch authorities recovered Dr. Augustine's briefcase—but not the computer.)
4. Neither stolen computer had been backed-up onto the Augustine computer network.  This oversight, as well as other issues, ultimately led to the termination of the employee responsible for such precautions.

Since discovery was served on Augustine by 3M in 2015, Mr. Benham estimates that he has spent at least 100 hours collecting documents, reviewing documents, negotiating with 3M's counsel and producing documents.  Given that he works an abbreviated schedule as general counsel of the Augustine entities, this constitutes more than three weeks of his time.

Mr. Benham has attempted to comply with the parameters of discovery specified in the Court's 2015 order, as well as to produce documents related to any published research and to other non-objectionable requests.

Counsel for 3M's admission that Mr. Benham produced a "large amount" of documents is a significant understatement. A stack of paper documents at least 12 inches high was produced in 2015. Subsequently, Mr. Benham uploaded documents to Greenberg Taurig, 3M's previous counsel, in a quantity sufficient that the upload had to be sent to the firm's server rather than simply included in emails. Documents continued to be produced as they were located in 2016. The Blackwell firm, which replaced Greenberg Taurig, was initially unwilling to allow files to be uploaded directly to its computer, so Mr. Benham was forced to break the production into 74 separate emails, each of which took many minutes to upload. Finally Blackwell allowed Mr. Benham direct access to their server, and even more documents were produced.

Because Augustine had no ability to stamp Bates numbers or confidentiality designations on the documents it produced, all documents were initially designated as confidential. When 3M's counsel requested more precise designations and provided the previously produced documents (now Bates-stamped) to Mr. Benham for review, he examined more than 15,000 documents and de-designated them appropriately.

Despite these extensive efforts to cooperate in discovery, 3M's counsel insists that Augustine has been uncooperative and insinuates that Augustine is actively withholding documents. It is unlikely that an assurance by Augustine or Mr. Benham will satisfy 3M—since 3M's principal defense in the underlying product liability cases seems to be to attack Dr. Augustine. 3M must, therefore, manufacture non-compliance in discovery to support its argument that Dr. Augustine is generally a bad person.

In an attempt to resolve this situation, Augustine has offered 3M a solution that, were 3M actually interested in discovery—and not just in attacking the character of Dr. Augustine—it would find attractive. Augustine has offered to engage an outside counsel, David Marshall of Fredrikson and Byron, to essentially "re-do" the document production conducted by Mr. Benham. As before, however, Augustine cannot afford the cost of this effort—which has been estimated to be as high as $50,000. 3M has not agreed to this proposal.

It is important to the integrity of the underlying litigation to make certain that 3M has access to all of the documents to which it is entitled—and to make certain that 3M does not inappropriately argue that Dr. Augustine was involved in some nefarious conspiracy to hide documents. Augustine requests, therefore, that the Court order 3M to accept Augustine's offer to have outside counsel review and "re-do" Mr. Benham's document production—or to accept the adequacy of such production.

II.   <u>Augustine Should Not be Required to Produce Documents Related Solely to HotDog Patient Warming—Augustine's Own Product.</u>

As noted, Augustine has attempted to produce documents covered by the Court's 2015 Order, as well as documents related to any published research regarding the safety of Bair Hugger patient warming. Augustine has refused to produce documents related solely to HotDog patient warming, for example:

- Req. Nos. 10, 12, 32-- generally all communications with anyone regarding HotDog
- Req. No.39 – documents related to anyone's decision to use or not use HotDog
- Req. No. 40–documents relating to anyone who has every used the HotDog system
- Req. No. 41—documents relating to any claim that HotDog is better in any way than Bair Hugger

3M and Augustine are involved in a life-or-death (at least for Augustine) competitive struggle.  Why should 3M, through its legal counsel, we allowed to learn about product specifications, product problems, customer likes and dislikes, marketing strategies, successes and failures?   This is information that no competitor should have.  3M should not be allowed to use its product liability litigation with 800+ injured victims of orthopedic infections to gain information that could help it destroy a competitor.

In ordinary circumstances, one might conclude that a confidentiality order would be sufficient to protect Augustine—but here, the risk is just too great.  The Court files in the *Walton* case, originally docketed in Texas, contains several sealed transcripts, sealed motions and sealed Orders by the Court.  Contemporaneously with all this secretive activity, 3M's prior counsel, Greenberg Taurig, suddenly resigned from 3M's cases all around the United States and was replaced by Blackwell.

Obviously, neither Augustine nor its counsel knows what occurred…but the Court does.  Augustine, therefore, asks the Court:  Has 3M's behavior been such that it can be trusted?

Moreover, the Blackwell firm is not just 3M's lawyer; it also serves as a marketing arm of 3M, publicly attacking Augustine and HotDog patient warming in its Internet blogs.  For example: the website http://www.bairhuggerfacts.com  promotes Bair Hugger forced-air warming, assures  patients and clinicians of safety, and attacks both the peer-reviewed research revealing the dangers of forced-air warming and Dr. Augustine. However, it apparently is not a 3M website at all.  It is copyrighted by Blackwell Burke:


PATIENT Q&A

LEARN THE TRUTH

RESOURCES

© Copyright 2016. Blackwell Burke P.A. All Rights Reserved.

3M argues that some if the claims brought by injured plaintiffs require proof of an acceptable alternative to the Bair Hugger device.  HotDog is definitely an alternative, but only one of many.  There are other electrical devices, including Pintler and Vita-Heat (an

air-free device for which 3M recently became exclusive distributor).  There are circulating-water devices manufactured by Cincinnati Sub-Zero, Kimberly-Clark and others.  There are devices utilizing activated iron filings and "space blankets" that reflect heat back on to patients.  If the effectiveness of HotDog or any of the other technologies is the issue, 3M can look to the published research.  3M's right to defend itself does not justify intrusion into the secret files of its competitors.  Its arguments to the contrary are bogus.

Augustine has produced all of the documents that it has located regarding Reg. Nos. 4, 6, 10-12, 14, 15, 17, 18, 29, 31, 32, 35, 38-41, 44-55 and 58—<u>except to the extent that such documents relate to HotDog warming.</u>

Augustine begs (and this is not merely drama) that it not be forced to reveal its most secret information to its most significant and aggressive competitor.  3M is a mammoth; its political and financial influence invades every hospital, every association and every regulatory agency.  Augustine is apparently annoying 3M significantly, and if the Court gives 3M the opportunity, 3M will do whatever damage to Augustine that it can.

 If, nevertheless, the Court determines that Augustine must produce documents related to HotDog, Augustine requests that 3M and its counsel be severely admonished as to the significant consequences if the information is revealed to 3M's business people.

III.     <u>MedWatch Filings Are Confidential</u>

Federal law <u>requires</u> medical device manufacturers to report injuries possibly caused by their products within 30 days of becoming aware of the situation.   The requirement is not discretionary; it is absolute.  A full explanation of the obligation may be found at http://www.fda.gov/downloads/medicaldevices/deviceregulationandguidance/guidancedocuments/ucm359566.pdf

Specifically, FDA guidance dated July 9, 2013 provides that legal documents (like a law suit) constitutes a "complaint" requiring the manufacturer to report to the FDA, as follows:

**"2.11 Where will device-related complaints come from? You may receive complaint information from many different sources, including telephone calls or other verbal communication, FAX transmissions, written correspondence, sales representative reports, service representative reports, scientific articles (literature), internal analyses, and <u>legal documents."</u>** (emphasis added)

Each of the 800+ lawsuits that have been filed against 3M's Bair Hugger alleges that the device harmed a patient.  Many allege that the infection caused by Bair Hugger led to amputation.  A few allege wrongful death.  3M has an absolute obligation to file MedWatch reports on each of these alleged injuries.

It has filed none.

The FDA also allows for voluntary filings in the MedWatch system.  Anyone who is aware that a medical device may have caused injury to a patient is encouraged to report.  The system only works if the FDA is made aware of what is happening within the legal and healthcare communities.  For that reason, the FDA provides for and protects the anonymity of anyone who makes such a filing.  See, http://www.fda.gov/Safety/MedWatch/

In response to a query from counsel for 3M regarding whether Augustine was responsible for the MedWatch filings relating to the Bair Hugger lawsuits, Mr. Benham neither denied nor affirmed.  He simply stated his understanding that the sources of such filings were protected by federal law and regulations—and asked to be corrected if his understanding of the law was inaccurate.

3M's counsel did not respond.  In fact, 3M's counsel has not cited any law or regulation rebutting the fact that such authorship of filings should remain anonymous.  3M merely cited to the fact that Augustine previously referenced a MedWatch report filed by Dr. Robert Gauthier.  That fact is irrelevant.

Mr. Benham's communication with 3M's attorney on this issue was an honest attempt to understand Augustine's obligation.  3M chose to file this motion rather than enter into a dialog that might have resolved the matter.

Augustine defers to the Court on this issue.  If the Court determines that the anonymity provided by and protected by the FDA should be breached, Augustine will immediately comply.  Irrespective of the Court's decision, however, Augustine requests that 3M be ordered to comply with its obligation to report to the FDA all allegations of injury caused by Bair Hugger.

IV. The Information Provided in the Privilege Log is Sufficient

Augustine provided an initial privilege log to 3M's counsel shortly after being ordered to do so by this Court in 2015.  After many months of silence, 3M suddenly determined that the log was insufficient.

Augustine and its counsel admit to some uncertainty as to what information must be included in a privilege log.  The rule, of course, requires that sufficient information be provided  so that opposing counsel can make an analysis of the validity of the claim.  While linguistically clear, the rule provides little practical guidance as to how to provide information sufficient to satisfy opposing counsel without actually destroying privilege.

Mr. Benham repeatedly requested guidance from 3M's counsel as to what specific information would satisfy them.  Little was offered other than repeated recitations of the rule.  In an email dated August 8, 2016, however, 3M attorney Micah Hines specified as follows:

We maintain our positions set forth in our August 1 correspondence. Although you are in the best position to know what it would take to give us sufficient information to assess your clients' claims of privilege as required by Rule 26, we believe that supplementing your privilege log with the following information would help us assess your claimed privilege: D. Grewe's full name, title and the companies where he worked during the dates of the documents where his name appears; Dr. Scott Augustine and Brent Augustine's titles and the companies where they worked during the applicable periods; whether the asserted privilege is attorney-client, work product or both for each entry; the nature and name of the specific litigation you reference; the nature of the relationship/asserted privilege (whether Scott or Brent Augustine served as a consulting expert, testifying expert and/or client); and which entities this privilege log covers.

During our meet and confer tomorrow, we would like to have a discussion concerning the grounds upon which you are withholding documents.

Best,

Micah

**Micah Hines**
Blackwell Burke P.A.

Mr. Benham provided exactly such information in a revised privilege log. 3M remains unsatisfied, however.

The communications among Augustine, Augustine's General Counsel Benham and the Kennedy Hodges firm involve several layers of privilege: attorney-client privilege based on the relationship between Mr. Benham and Augustine, attorney-client privilege based on the relationship between Kennedy Hodges and Augustine, joint-representation privilege based on both of these relationships, Mr. Benham's work product privilege, Kennedy Hodges's work product privilege, and privilege relating to Dr. Augustine's status (albeit temporary) as a non-testifying expert.

Explaining in open court the exact nature of these communications and the relationships between and among the individuals would destroy the privilege. If the Court desires, however, Mr. Benham would be provide an affidavit for the Court's eyes only. In the alternative, Augustine requests guidance from the Court as to what additional information, if any, should be included in the privilege log.

V.   An Issue Relating to Timing

If 3M agrees to pay for outside counsel's review and "re-do" of the Augustine's document production (or the Court makes such an order), the effort could begin immediately—subject only to the availability of outside counsel. Similarly, if the Court orders that the FDA's promise of anonymity should not be kept, Augustine would be able to respond promptly.

If, however, an Order of the Court requires any significant involvement of Mr. Benham, Augustine respectfully requests forbearance. Approximately 18 hours after the hearing on this matter, Mr. Benham and his wife will be on a plane to New Zealand to celebrate 40 years of marriage. The trip has been planned for more than 18 months, and at least $12,000 has been expended in advance. The trip includes the three business days of Thanksgiving week and the two weeks following. Mr. Benham and his wife return to Minnesota on December 10.

Mr. Benham first informed 3M's counsel of his travel plans by email on September 13, 2016 and has reminded them on several occasions since. Counsel graciously scheduled this

hearing on the day before the Benhams' flight and scheduled the deposition of Dr. Augustine so that it would not conflict with the plan. Such courtesy is deeply appreciated: 40th wedding anniversaries come only once, if at all.

If the Court orders Augustine to take any actions other than those mentioned above, Augustine respectfully requests that the timing be such that Mr. Benham can perform the actions after he returns on December 10.

Respectfully submitted,

s/ J. Randall Benham

J. Randall Benham
MN Bar No. 0154726
6581 City West Parkway
Eden Prairie, MN 55127

**CERTIFICATE OF SERVICE**

This is to certify that on November 10, 2016 a copy of the forgoing instrument was served on all parties via the Court's electronic filing system.

By: /s/ J. Randall Benham