```
 1                   UNITED STATES DISTRICT COURT

 2                     DISTRICT OF MINNESOTA

 3    ------------------------------------------------------------
                                        )
 4                                      )
       In Re: Bair Hugger Forced Air    )   File No. 15-MD-2666
 5     Warming Devices Products         )   (JNE/FLN)
       Liability Litigation             )
 6                                      )   November 17, 2016
                                        )   Minneapolis, Minnesota
 7                                      )   Courtroom 12W
                                        )   1:00 p.m.
 8                                      )
                                        )
 9    ------------------------------------------------------------

10
                   THE HONORABLE FRANKLIN D. NOEL
11                 UNITED STATES MAGISTRATE JUDGE

12                        (MOTIONS HEARING)

13    APPEARANCES

14    FOR THE PLAINTIFFS:
                                  MESHBESHER & SPENCE
15                                Genevieve M. Zimmerman
                                  1616 Park Avenue
16                                Minneapolis, MN  55404

17                                CIRESI CONLIN
                                  Jan Conlin
18                                225 South 6th Street
                                  Suite 4600
19                                Minneapolis, MN

20                                KIRTLAND AND PACKARD LLP
                                  Behram V. Parekh
21                                2041 Rosecreans Avenue
                                  Third Floor, Suite 300
22                                El Segundo, CA  90245

23
                                  KENNEDY HODGES, LLP
24                                Gabriel Assaad
                                  4409 Montrose Blvd
25                                Suite 200
                                  Houston, TX 77006
```

```
 1    FOR THE PLAINTIFFS:

 2                                 KENNEDY HODGES, LLP
                                   David W. Hodges
 3                                 711 W. Alabama Street
                                   Houston, TX 77006
 4
                                   PRITZKER HAGEMAN, P.A.
 5                                 Ryan Osterholm
                                   45 South 7th Street, #2950
 6                                 Minneapolis, MN  55402-1652

 7    FOR DR. AUGUSTINE:           J. RANDALL BENHAM
                                   J. Randall Benham
 8                                 13 Robb Farm Road
                                   St. Paul, MN  55110-2526
 9


10    FOR THE DEFENDANTS 3M:       BLACKWELL BURKE P.A.
                                   Jerry W. Blackwell
11                                 Ben Hulse
                                   Mary Young
12                                 Micah Hines
                                   431 South Seventh Street
13                                 Suite 2500
                                   Minneapolis, MN  55415
14
                                   FAEGRE BAKER DANIELS
15                                 Bridget M. Ahmann
                                   90 South Seventh Street
16                                 Suite 2200
                                   Minneapolis, MN  55402
17
      COURT REPORTER:              MARIA V. WEINBECK, RMR-FCRR
18                                 1005 U.S. Courthouse
                                   300 South Fourth Street
19                                 Minneapolis, Minnesota 55415

20

21              *        *        *        *        *

22

23
                Proceedings recorded by mechanical stenography;
24    transcript produced by computer.

25
                *      *      *      *      *      *      *
```

```
 1                          P R O C E E D I N G S
 2                              (1:06 p.m.)
 3              THE COURT:  Good afternoon.  Please be seated.
 4      Okay.  We are here in connection with the motion of 3M in
 5      the Bair Hugger Forced Air Warming Device Products Liability
 6      Litigation.  Let's get everybody's appearance on the record.
 7      Starting with 3M.
 8              MR. BLACKWELL:  Jerry Blackwell for 3M, Your
 9      Honor.
10              MS. AHMANN:  Bridget Ahmann for 3M.
11              THE COURT:  We'll get all of 3M who is here.
12              MR. HULSE:  Ben Hulse, Your Honor.
13              MS. YOUNG:  Mary Young.
14              THE COURT:  Okay.  And for Dr. Augustine?
15              MR. BENHAM:  For Dr. Augustine and the Augustine
16      entities, J. Randall Benham.
17              THE COURT:  And for plaintiffs in the MDL?
18              MS. ZIMMERMAN:  Thank you, Your Honor.  Genevieve
19      Zimmerman.
20              MS. CONLIN:  Jan Conlin.
21              MS. ASSAAD:  Gabriel Assaad.
22              MR. PAREKH:  Behram Parekh.
23              MR. ORIBELLO:  Noel Oribello.
24              THE COURT:  We're getting everybody's appearance
25      on the record.  Do you want to speak up?
```

1              MS. HINES:  My apologies.  Micah Hines, Your

2      Honor.

3              MR. BLACKWELL:  For 3M.

4              THE COURT:  Thank you.  Welcome.  Okay, so we're

5      here on 3M's motion to compel discovery from third party

6      witness Scott Augustine and Augustine Entities.  Who is up?

7      Mr. Blackwell?

8              MR. BLACKWELL:  Yes, Your Honor, thank you.

9              Good afternoon again, Your Honor.  Jerry Blackwell

10     for 3M.  We're here on the July 2016 subpoena that we served

11     on Dr. Augustine and his various entities requesting various

12     documents related to this litigation.  I want to take just a

13     second to talk about why it is that Dr. Augustine and his

14     documents are relevant at all to what we're trying to do.

15             THE COURT:  Let me just start by saying I have

16     this feeling of dejavu all over again.  Just about a year

17     ago, we were here before there was an MDL, correct?  Just in

18     the Johnson case?

19             MR. BLACKWELL:  That's right, Your Honor.  And

20     that was back in 2015.  I think Your Honor's order was in

21     November 2, 2015.  And this will in part relate to rulings

22     that Your Honor gave even then prior to the MDL.  This then

23     went into the MDL, and the restart button, the reset button

24     was pushed then so we served another subpoena that in some

25     ways overlap, but in some ways is broader than that

1   subpoena.

2           THE COURT:  Okay.

3           MR. BLACKWELL:  But we are interested in these

4   documents in part for what we discussed just this morning.

5   That is that plaintiffs are relying on Augustine-related

6   Bair Hugger studies, and they even cite them in a long form

7   Complaint.  And they have brought these cases in the MDL

8   against 3M for the Bair Hugger, and they claim that there

9   are independent scientific studies that show that the Bair

10  Hugger system is dangerous and defective.  So that's the one

11  reason.

12          They also contend that there's a safer alternative

13  design, which is a part of the plaintiffs' burden in a

14  number of jurisdictions, according to various jurisdictions

15  of law.  They identify what they refer to in quotes as an

16  "air flow free warming technology" in their long from

17  Complaint at paragraph 95, which they say is a safe

18  alternative design.  And this is exactly how the HotDog is

19  described as this air flow free warming technology, and we

20  refer to that in our brief at page 37,

21          THE COURT:  Did they refer to the HotDog by name

22  in the Complaint?

23          MR. BLACKWELL:  No, Your Honor.

24          THE COURT:  Just reference a safer design.

25          MR. BLACKWELL:  An air flow free warming

1    technology with which is descriptive of the HotDog, perhaps

2    amongst others.

3         The third reason is that the plaintiffs have

4    adopted lock, stock and barrel the theories of the Bair

5    Hugger defect that were espoused by Dr. Augustine before

6    there was any litigation.  So he said it first, then they

7    said the same thing second, whether it is disruption of

8    laminer or air flow contamination of internal components of

9    the machine equal surgical site infections in the operating

10   room or improper filtration equals causation of surgical

11   site infection.  So he said it first.

12        The plaintiffs' lawyer said it second in their

13   Complaint.  And then in between, there were discussions of

14   some kind between either Dr. Scott Augustine or his cohorts

15   with the Kennedy Hodges Law Firm here.  That's a firm that's

16   on the plaintiffs' steering committee before this litigation

17   began.  And we've not been able to get any documents related

18   to that nexus, those discussions, to find out what exactly

19   was said, took place, shared, et cetera, in that regard.

20        So we feel we're entitled to show through

21   Dr. Augustine, given the plaintiffs' reliance upon him, his

22   studies, his work that he either funded, supported or did

23   himself at ground zero for the plaintiffs' case, that he

24   developed this alternative technology to HotDog, and then he

25   immediately launched into this campaign that's been prolific

1    and in many ways hidden and deceptive in attacking the Bair

2    Hugger.

3              We, in Exhibit D in our papers, attach, include a

4    copy of a letter where he in fact threatened 3M and Arizant

5    that if we did not buy his HotDog technology to replace the

6    Bair Hugger, that we would be facing this product liability

7    lawsuit if we didn't do that.

8              And, number 3, we believe we'll be able to show

9    that he then orchestrated the very science from which the

10   plaintiffs are relying that there's highly relevant research

11   that goes directly to the issue of whether the Bair Hugger

12   can in fact cause surgical site infections that's been

13   hidden.  There were manufactured medical device reporting

14   reports at one of the hearings.  Your Honor may recall I

15   asked whether any of the plaintiffs' lawyers in the

16   courtroom knew where these MDR reports were coming from

17   because they looked amazingly like the plaintiffs'

18   Complaints all of a sudden when there have been next to none

19   before this lawsuit started, which they're waiting for that

20   discovery.  But we did learn that Dr. Augustine's hand was

21   in some of those that I want to talk about.

22             And we learned also that Dr. Augustine has even

23   tainted the so-called independent scientific research that

24   the plaintiffs have referred to early on in this litigation,

25   and this was not revealed, and it was in fact concealed from

1    this litigation until now.

2              So why is it that we're here?  It's because, Your

3    Honor, we've gotten totally incomplete discovery responses.

4    We've had five meet and confers with Mr. Benham going back

5    to the summer, July 20th, the 21st, August 9th,

6    October 20th, and October 24th.  And we could see that we

7    weren't receiving all of the documents, but we weren't

8    getting explanations as to what was being withheld or why.

9    So we have requested discovery on 29 of our requests in the

10   current motion to compel, and we set those out in our motion

11   papers.

12             Between July 20th and August 2nd, Mr. Benham made

13   production, some production to us, it was sort of rolling

14   that came in via e-mail.  They were all labelled "Responses

15   To Requests Number 47," which related to information on the

16   plaintiffs' studies with the exception of four pages that

17   responded to request number 15, which related to documents

18   sent to any media outlet regarding the Bair Hugger system.

19             So for the various other categories, we didn't

20   receive anything that expressly provided documents in

21   response to those with the exception of objections, with

22   respect to those.

23             So we served our discovery on all of the various

24   Augustine entities, and there are six of them that we set

25   forth.  The -- well, Mr. Benham and Dr. Augustine are

1      claiming that they have responded to all of our requests,

2      but as I pointed out to Your Honor, they specifically

3      responded to just two, and I want to point out why it is

4      that we know that we're not getting fulsome responses with

5      respect to any of them.

6           So what we know we've gotten is we've got next to

7      nothing in response to most of these requests.  We did hear

8      from Mr. Benham that Mr. -- sorry, Dr. Augustine's computer

9      was stolen and then we heard that his computer was stolen

10     again.  It was stolen twice, and so this is part of the

11     reason that we don't have complete disclosures of documents.

12          There is no discussion as to what happened to the

13     e-mails that would have been on the company server and

14     documents, and what about all of the other e-mails and

15     documents that pertain to all of the other principles in the

16     Augustine entities, including Mr. Benham and the president

17     of the Augustine's company, President Brent Augustine, and

18     there are other principles and key leaders from whom we have

19     again next to nothing.  So there are 23 e-mails that are

20     listed on the plaintiffs' privilege log, and by and large we

21     haven't gotten them.

22          So the number one reason we're here is because we

23     have incomplete discovery responses; and number 2 is because

24     we're here once again on the whole issue of the privilege

25     log.  When we were here back here in October of 2015, the

1    problem was that there was no privilege log created, which

2    is not going to give you the documents and didn't create a

3    published log.  Now, there's been one created, but it

4    doesn't comport with the rules.  There's not sufficient

5    information in the privilege log to be able to assess

6    whether a privilege applies or not, which is the minimum

7    that's required under Rule 26 for privilege log.

8         So, Judge Noel, I want to take a few minutes to

9    talk about how it is that we absolutely know that we've

10   received incomplete discovery, and that is apart from the

11   fact that we only had documents produced in two categories

12   in the first place.  And the reason relates to the third

13   party discovery that we have gotten and what it shows us.

14        There is no more fundamental question in this

15   entire litigation than whether the Bair Hugger system

16   releases bacteria, sufficient bacteria in its exhaust air to

17   cause surgical site infections.  We learned from third party

18   discovery essentially that Dr. Augustine had in fact been

19   involved in studies on two different occasions where the

20   goal was to attempt to colonize bacteria from a properly

21   functioning assembled Bair Hugger system.

22        There was one done in 2007 right here in Minnesota

23   down at the Regina Surgical Center in 2007.  And this was

24   done in the operating room.  It tested whether the Bair

25   Hugger system could cause this type of bacterial

1    contamination.  It's cited as Exhibit I in our papers, and

2    the brief at page 22.  They weren't able to generate any

3    significant contamination when the system was used and

4    assembled properly.

5              THE COURT:  Is this a published study?

6              MR. BLACKWELL:  It's not a published study.

7              THE COURT:  When you say it's cited in your

8    things, where is it cited to?

9              MR. BLACKWELL:  To e-mails that we've gotten from

10   third parties that relate to the fact that this testing was

11   done.

12             THE COURT:  Okay.

13             MR. BLACKWELL:  And so we don't have e-mails at

14   least from Dr. Augustine.  We don't have the particulars

15   around that testing that was done.  And no reason to believe

16   that we received either full data documents, results or any

17   electronically stored information around it.

18             THE COURT:  And the third party from which you got

19   this information doesn't have or wouldn't have the full data

20   and stuff that you're looking for?

21             MR. BLACKWELL:  No, I'm looking here that we only

22   got the e-mail from the third party, but didn't have the

23   full data.  And, Judge Noel, actually I'm just recalling a

24   different instance where one of the third parties was saying

25   that his data was being sought after by 3M, and he was

1    actually writing to Dr. Augustine saying you've got all of

2    this data stuff as Augustine Medical, so could you help me

3    with this?

4            But the point here being we didn't know this

5    existed at all but for the fact it came up through a third

6    party, and that was in 2007.  It was a fail.  They weren't

7    able to get conde-forming (phonetic) units from the Bair

8    Hugger when it was assembled in the operating room at Regina

9    Surgical Center in Hastings.  Well, they tried again in

10   2009, and this was at that North Umbria in the UK, at that

11   hospital.

12           And you, again, might remember from the very first

13   hearing we had where the plaintiffs brought up a certain

14   study McGovern, and I asked the Judge, "put a red circle

15   around that and wait until you hear about McGovern."  And

16   they haven't said much about it since since it ultimately

17   concluded that this study doesn't establish causation.

18           Well, at that same hospital, Dr. Augustine was

19   involved in a study there also where he financed and

20   supplied equipment for a microbiology study at North Umbria

21   Health Care in the UK.  And, again, the goal was to try to

22   culture bacteria from the Bair Hugger system.  Again, the

23   effort failed to produce the bacterial contamination that he

24   hoped for.  And it was insufficient data to even have been

25   accepted for publication anywhere.

1          So we failed to receive the e-mails related to

2    that testing.  And, again, given that it wasn't even

3    referenced, we have no reason to believe that we've gotten

4    any fulsome data, results, or other documents of ESI related

5    to that either.  And if we had known about this, we would

6    have discussed it during the science day.  We only talked

7    about the Avedon study in 1997 in South Africa where they

8    tried to do the same thing with the Bair Hugger and got the

9    same result, but we didn't get documents related to that.

10          So not stopping there.  There is an issue about

11    the medical device reporting.  And Your Honor might remember

12    that these medical device reports are reports that are filed

13    with the FDA that are concerning alleged adverse events or

14    problems associated with the medical device.

15          THE COURT:  This is what the paper you referred to

16    as a Med Watch report?

17          MR. BLACKWELL:  Yes, that's right, Your Honor.

18    It's referred to the Med Watch report from 2010.  And what

19    we learned, and I'll put this in just for the record, that

20    Exhibits D, J, and K of our papers refer to this Med Watch

21    reporting and how it was utilized by Dr. Augustine and

22    Mr. Benham.  And it's referred to in our brief on pages 16

23    and 17.

24          And so Augustine there repeatedly claimed to both

25    industry figures and maybe even the Court given that there's

 1    an affidavit, that this Med Watch report from 2010 is a long

 2    and detailed MDR Complaint about Bair Hugger warming that in

 3    quotes "an independent anesthesiologist Dr. Robert Gauthier

 4    filed with the FDA."

 5            Well, I deposed Dr. Robert Gauthier, and we're

 6    surprised at what we learned.  And he told us that he in

 7    fact, number one, was not the person who filed the Med Watch

 8    report that's attributed to him.  And, number 2, he wasn't

 9    really the person who wrote the Med Watch report that was

10    attributed to him.  He says this report that is touted as

11    having his name was in fact drafted by Mr. Benham himself

12    and Dr. Augustine.

13            THE COURT:  I don't think you were really

14    surprised when you learned that, were you?

15            MR. BLACKWELL:  Well, I like to say I was, but I

16    should have been, but I wasn't, Your Honor.  So we learned

17    that in fact this had been written by Dr. Augustine and

18    Mr. Benham, that he had put edits on it, and the tenor of

19    his edits were to tone down the language that Dr. Augustine

20    and he says Mr. Benham had put into this report.

21            It's significant here because this particular Med

22    Watch report was circulated to an Arizant board member in an

23    attempt to encourage this board member to withdraw their

24    investment in Arizant and claiming that this was an

25    independent report, that was a report from the independent

1    anesthesiologist.  And we set forth here in Exhibit D a copy

2    of that reference that where they claim that there was this

3    independent Med Watch report when it was really kind of a

4    puppet scenario where the head was Dr. Augustine and

5    Mr. Benham.

6              So we haven't been able to obtain documents that

7    Dr. Augustine or Mr. Benham have showing their involvement

8    in this Med Watch report, no e-mails, documents, don't know

9    of this correspondence, but we just don't have the data or

10   the information surrounding it, and it should have been

11   produced in response to our request.

12             So when we had asked to produce documents related

13   to FDA filings, they claim confidentiality and privacy.  And

14   Your Honor may not recall, but this very issue was brought

15   up when we were here last October, the issue of this Med

16   Watch report.  And what was told to the Court then, first

17   off, Dr. Augustine pretended not to know what the letter was

18   we're talking about that went to Med Watch, though he was

19   the one who sent it.  And we had to move to compel to

20   produce documents regarding that letter, and that motion,

21   that's at Exhibit N in our papers.

22             And then at the hearing on October 26, 2015, on

23   the motion to compel, the charade continued, and Mr. Benham

24   told this Court that -- and this is a quote -- "absent

25   looking at the letter and reading the references they are

1    talking about, I have to make a guess as to what they're

2    talking about."  And what we were talking about is a letter

3    he wrote with Dr. Augustine and a letter he sent with

4    Dr. Augustine.  He claimed he couldn't find the letter and

5    didn't even know what we were talking about, and that's

6    referred to in our brief on page 19.  The Court rightly saw

7    through this and ordered him to produce the document.

8            He then produced only the Med Watch report itself

9    and attachments, which you'll see at Exhibit P, and never

10   produced e-mails, correspondence, drafts or anything else

11   regarding the report, which we learned from Dr. Gauthier.

12   And at the end of this, Judge Noel, I will say that there

13   are certain aspects of this that are worthy of consideration

14   for some form of a sanction because getting discovery ought

15   not be this hard, frankly.

16           So that's the Med Watch report.  But then in

17   addition, they failed to produce documents related to

18   Dr. Augustine or his employees' involvement in the so-called

19   independent studies that I made reference to in starting

20   this.  And what we learned in relation to Mark Albrecht, a

21   person whose name came up this morning, Mark Albrecht.  And

22   so he's a former Augustine employee.  He's not only that,

23   Dr. Augustine helped to pay his way through college.  He is

24   one of his researchers.

25           Dr. Albrecht, I think he's a doctor, authored six

1    of the studies upon which plaintiffs rely.  Some of those

2    studies contained disclosures indicating financial report by

3    Augustine or his company, but two of the studies purported

4    to be independent ones, and we discussed these at footnote 7

5    on page 15 of our brief.

6              We learned in fact that this Augustine-Albrecht

7    taint is also only so-called independent studies.  When we

8    deposed Dr. Albrecht, he testified that he had his hand in

9    both of those so-called independent studies, the Legg

10   studies, L-E-G-G, Legg studies, and that he was an employee

11   of Dr. Augustine at the time.  There's nothing in those

12   studies that would indicate Dr. Albrecht's involvement, but

13   he said he was involved, and there's no way to know that.

14   But we know it from third party discovery.

15             We also know that Dr. Augustine was communicating

16   with the authors of the so-called independent scientific

17   studies that the plaintiff is relying on.  And if you look

18   at Exhibits S-X, as in Sam through X, these are e-mails that

19   reveal that Dr. Augustine was also involved in a campaign to

20   involve himself in the scientific literature to try to

21   discredit the Bair Hugger.  And there wasn't any disclosure

22   about his involvement in the so-called independent studies

23   either.  We found this from third party e-mails, but we

24   didn't get anything from Dr. Augustine that shows his

25   involvement or that of his cohort Mark Albrecht.

1          So the other two areas Your Honor relate to this

2     an e-mail campaign that Dr. Augustine has been involved in.

3     He has a number of web entities, www.entities.  That he is

4     really the hand again behind the puppet in these, and he

5     uses those to send out blast mails, primarily on the Bair

6     Hugger and in commenting on the litigation, et cetera, with

7     a real agenda and an ax to grind.  And he sent these out

8     again for his proxy companies.  And they've included from

9     time to time videos, very social media activities,

10    communications with health care entities.  But he sent it

11    out all these e-mails.  And under the one guise or another

12    of these various entities criticizing the Bair Hugger and

13    characterizing the litigation.

14         If you look at Exhibit R, as in Ralph is an

15    example of those, we haven't had those produced yet.  They

16    are related to this campaign that he's been engaged in.  He

17    sent these out to anesthesiologists promoting investment in

18    his competing HotDog system.  And in one instance, he

19    claimed to rely on an article that he wrote that's called,

20    "Forced Air Warming Is Associated With Periprosthetic Total

21    Joint Replacement Infections."  And it was described as

22    submitted for publication.  And you'll see that at Exhibit

23    DD.  And this was just weeks ago, October 4, 2016.

24         We asked where is the study?  You sent it around

25    to these anesthesiologists, produce it.  They refused.  No

1    explanation given other than we don't think the Court is

2    going to let you have it.  And we didn't get it.  And they

3    wouldn't produce it to us, though he's been sending it about

4    without stating any legal basis for it.

5            And last but not least, Your Honor, are the

6    documents that relate to the HotDog warming system itself,

7    and we believe those documents will show bias and that is

8    this bias that underlies the plaintiffs' very science case.

9    They essentially took the poisoned bait or the tainted bait.

10   And while at this point they may be kind of cutting the ties

11   with Dr. Augustine.  When we hear back in October 2015, we

12   pointed out to the Court that at one point it listed him as

13   an expert of their's.  Then there was a letter that we

14   showed where they said they withdrew that, that he was not

15   an expert of their's.

16           But you want to see documents that relate to this

17   HotDog system for the reasons that we referred to earlier

18   about the alternative design and to what extent his

19   statements about an error-free technology and its relevance

20   to this litigation is part of the underpinning for the

21   plaintiffs' case factually.  We want to know what's been

22   communicated in that regard and have an opportunity to

23   explore that too.  It goes to issues of credibility and bias

24   for the plaintiffs' case given that he has a very

25   significant ax to grind with his competitor.

1          So that's the ball of wax with respect to what we

2     know we have not gotten, but in terms of by way of the third

3     party discovery that revealed to us what we haven't gotten.

4     The issues with respect to the privilege log, I think are

5     more straightforward.  It's pretty clear that the obligation

6     under the rules, Rule 26, it's clear that a privilege log

7     has to contain enough information to determine whether the

8     privilege truly applies to each individual document, and

9     that is not what we've gotten.  There are, if you look at

10    Exhibit H, which contains the privilege log, there are a

11    number of deficiencies and problems with it that are fairly

12    obvious in just even looking at the rule.

13          For example, every single document on the

14    privilege log presently lists the same people as both

15    authors and recipients as though they are somehow writing to

16    themselves.  We need to know the dates, the number of

17    exchanges, and parties to each exchange to evaluate a claim

18    of privilege.

19          Your Honor can see that every entry now everyone

20    also search both attorney-client privilege for all parties

21    to the communication and work product protection for all

22    attorneys lumping together all information and advice in

23    each document.  Again, that's not sufficient information for

24    us to determine with respect to a given document if a

25    privilege applies or not.  We need to know the specific

1    claimed basis for each of the documents.

2            And then, last, every assertion of privilege

3    asserts that the communications relate to "potential product

4    liability, unfair competition, and/or other claims."  Now,

5    this is a vague and indefinite description that omits the

6    information necessary to evaluate the claim of privilege

7    including what particular litigation is even at issue.

8            So, Judge Noel, what we want with respect to the

9    privilege log is, first and foremost, an order that would

10   require Dr. Augustine to provide additional detail for each

11   document such that we know the parties to the communication,

12   the date of the communications, the specific litigation

13   addressed by the communication, the basis for the claim of

14   privilege or other protection, and a sworn statement

15   identifying the beginning and ending dates during which

16   Dr. Augustine claims he had an attorney-client or litigation

17   consultant relationship with the Kennedy Hodges firm.

18           And that last part is important.  I just want to

19   bring back to Your Honor's recollection from our last

20   hearing, we had quite a discussion about whether there was

21   an attorney-client relationship between Dr. Augustine and

22   the Kennedy Hodges firm.  And there we had pointed out to

23   the Court that the Kennedy Hodges that represented in the

24   *Walton* case, that Dr. Augustine had no attorney-client

25   communications with the firm related to the Bair Hugger.

1        And we talk about this at pages 31 and 32 of our brief, 31

2    and 32.  And at the same time, Dr. Augustine is invoking the

3    attorney-client privilege with respect to communications

4    with the firm that Kennedy Hodges says doesn't exist.  So

5    there's no indication that they represented him beyond the

6    time period of 2009 anyway much less that they had anything

7    to do with the representation related to the Bair Hugger.

8    And not only that, they also were clear that they didn't

9    have a role as an expert or a consultant, which knocks out

10   any claim of the work product protection, unless he is

11   claiming that he is now working with another one of the

12   lawyers on the plaintiffs' side, which we haven't heard.  So

13   there ought not be the claim or privilege based on

14   attorney-client privilege.

15        And what we want with respect to the other

16   discovery we've talked about, and it may be by the time this

17   is done, Judge Noel, we'll just end up having to have some

18   discovery on discovery, which is not the most fun thing to

19   do, but sometimes it's necessary to get at what was done

20   since they are making the claim that we haven't completely

21   responded.  And so to get at what was done to come up with

22   this complete response, we knew at the very least that we'd

23   like to have an order requiring Dr. Augustine to identify

24   and produce documents, e-mails, other electronically stored

25   information responsive to our list of requests.  The ones

1        that we've set forth in our motion papers.

2                And then for number 2, which is the real punch

3        line here, this is the part that we don't know that we may

4        need discovery on discovery at deposition to get at.  But

5        failing that, deposition would want a sworn statement that

6        identifies all the records custodians whose documents,

7        e-mails or other electronic documents were searched, which

8        files and electronic files were searched, such as personal

9        e-mails, company e-mails, computer drives, and what key

10       words or other methods were used to identify responsive

11       documents.  The same sorts of things that we have spent much

12       time in the MDL status hearings on a monthly basis talking

13       about generally with respect to discovery on discovery.  And

14       it would help us then to be clearer about what was searched,

15       what wasn't, and what still remains outstanding.

16                And, finally, Judge Noel, I'll sit down after

17       this.  As I mentioned to Your Honor, I do think there are

18       grounds here for sanctions.  You know, the MDR reporting in

19       and of and by itself, the fact that, first, there had to be

20       a motion to compel brought around the Med Watch report

21       first.  We got in front of Your Honor, and it was clear then

22       that they should produce those documents.  They were in

23       front of this Court and on the record on behalf of

24       Dr. Augustine and Mr. Benham, essentially said we don't know

25       what they're referring to when they're the ones who wrote

1    it, when they're the ones who sent it.  And I point out,

2    Your Honor, as far as we know, they haven't sent a hundred

3    such reports to the FDA, so it isn't hard to remember this

4    one, and they said they didn't do it.  And so now we're here

5    again on another motion to compel, because now we have

6    complete discovery around that.  And so how many times is

7    enough time is the question?

8           The issue of the article that Dr. Augustine

9    drafted in October and sent around to these

10   anesthesiologists they refused to produce.  There's no

11   justification or basis for that, when he says that it is

12   going to be released for publication.  He's already

13   communicated to the anesthesiologists about it.  They have

14   it, and have no good faith basis for not having given it up.

15          Third, the privilege log, it's not that hard to

16   read the rules about what's required for a proper privilege

17   log, and this wasn't making a minimal effort.  And if I may,

18   Your Honor, just point out, and I won't belabor this, but I

19   wanted to hand it up to the Court for whatever it's worth.

20   What this is, if I may, Your Honor, just approach and

21   explain.

22          THE COURT:  Tell me what it is.

23          MR. BLACKWELL:  I will.  This just simply

24   chronicles our many discussions with Mr. Benham on our meet

25   and confers in an effort, so it just puts them all on a

1    chart.  And, Your Honor, they can see how much work we've

2    put into it.

3                THE COURT:  Let me ask this question, so when we

4    were here before in October of 2015, one of the items being

5    sought and one of the things I ordered was that

6    Dr. Augustine sit for a deposition.  And I understand that

7    did not happen or that did happen?

8                MR. BLACKWELL:  Your Honor, it did not happen.  It

9    was right at the lip of going into the MDL.

10               THE COURT:  And that's not part of the relief

11   you're seeking here today, is that correct or incorrect?

12               MR. BLACKWELL:  That's correct.  And I will point

13   out to Your Honor, that's not part of the relief.  We have

14   currently a deposition date set for Dr. Augustine of

15   December 13th, which depending on what happens to the

16   document we'd like to have the documents before there's a

17   deposition.  And the discovery deadline for general issues

18   as Your Honor knows is January 20th.

19               THE COURT:  Okay.

20               MR. BLACKWELL:  Thank you, Your Honor.

21               THE COURT:  Thank you.  Mr. Benham?

22               MR. BENHAM:  Thank you, Your Honor.  I think

23   there's something unusual happening here.  I think there's

24   an agenda that's being pursued which goes beyond discovery.

25   I'm completely confident that no matter what my client

1    produced in response to the discovery that I would still be

2    standing here today.  And the reason is clear, there are 900

3    or so cases out there.  The research is strong.  The

4    journals are renowned.  The scientists are real scientists.

5    And so 3M has apparently decided that it's only hope of

6    success is to destroy the credibility of Dr. Augustine, who

7    was the inspiration for some of this discovery.  And rather

8    than actually attacking the research, it attacks

9    Dr. Augustine to cast doubt in your eyes, cast doubt in

10   Judge Ericksen's eyes and, ultimately, to cast doubt in the

11   eyes of the jury.  That's background.  So let me address the

12   issue.

13          As I said in the affidavit I'll put into the

14   Court, I put a hundred hours or so, although I don't keep

15   track of my hours.  Maybe it's 80, maybe it's 120.  I put a

16   lot of time finding, producing documents, and dealing with

17   these issues.  But 3M alleges that my client and I have not

18   properly searched for and produced documents.  They

19   apparently have a fantasy of what documents they think exist

20   even though some of them are seven or eight or nine years

21   old.  And because those fantasy documents weren't produced,

22   they believe that they're sitting under some chair someplace

23   smoking, and I'm refusing to produce them.  Well, that's

24   just not true.

25          On the other hand, if they really did believe

1    that, they would have taken me up on the offer that I made

2    last week or slightly longer to engage outside counsel,

3    start all over, confirm and redo what I did, and all I ask

4    is that they pay for it rather than me.  I'm perfectly

5    willing to step aside and get the Fredrikson law firm

6    involved, redo the whole discovery from scratch,

7    electronically compare what they find with what we've

8    already produced, and let them produce whatever is new.

9    That offer remains open.  Otherwise, I urge that they accept

10   what I've produced because I've produced what I found.

11             THE COURT:  Let's take one example that was just

12   mentioned.  So apparently there was some e-mails sent out to

13   anesthesiologists within the last month or so referencing

14   some research that's about to be published, and

15   Mr. Blackwell says that hasn't been produced, yet it came

16   from Dr. Augustine.  So why would that not have been

17   produced?

18             MR. BENHAM:  There was an e-mail that was sent to

19   potential investors, some of whom were anesthesiologists,

20   and it addressed a large number of things.  You know, I'm

21   uncertain.  I heard him say that the article was attached to

22   it.  I'm uncertain if that's true.  I don't want to tell you

23   it's not just because I don't know.  But I do know that

24   there was a reference to an unpublished article, and it said

25   it was submitted for publication.  And I urge you that an

1    article, what you told me was tell them what Dr. Augustine

2    is communicating to the world out there.  An unpublished

3    article is not something that he's communicated to the

4    world.  It's got to go through peer review.  It's got, you

5    know, maybe it will be accepted or rejected.  It's going to

6    be edited by the journal.  It may be rewritten.  And if 3M

7    gets to see research before it's published, how far back do

8    they get to go?  If Dr. Augustine has an idea for another

9    article --

10              THE COURT:  Well, except that their request isn't

11   anything that he tells the world.  The request was any

12   social media content, which is defined to include blah,

13   blah, blah and/or e-mail, drafted, created and/or sent by

14   you, any person or entity you sponsor, sponsored or any

15   other -- or and/or any person who acts, acted on your behalf

16   or at your direction concerning the Bair Hugger warming

17   system, forced air warming, the Bair Hugger warming system

18   litigation and/or the defendants.  Isn't this the e-mail

19   that we're talking about fall precisely in that request?

20              MR. BENHAM:  Until this instant, my understanding

21   that their interest was in the underlying article that was

22   referenced, not the e-mail itself.  If it's the e-mail there

23   itself that is the issue, I have to ask is this an ongoing

24   obligation forever, any e-mail not the date of discovery

25   back, but forward into the future?  Every e-mail that my

1    company sends to anybody about our number one competitor has

2    to be shared with our number one competitor?  Is that really

3    the obligation?  Because I understood that it was the

4    communications from the date of discovery, first discovery

5    back from the date of the second discovery back, and

6    anything related to the safety or effectiveness of Bair

7    Hugger, and that's what I produced.  That's my

8    understanding.

9         My hope is research that's inchoate, research

10   that's being thought of, research that's being negotiated

11   with researchers, communications with universities around

12   the world, that should not be revealed to our number one

13   competitor for several reasons, including the fact that 3M

14   is a behemoth out there.  They have the power to thwart our

15   ability to do research, and so sharing that sort of

16   information with them in advance will effectively thwart it.

17        The next question I'd like to address is documents

18   concerning HotDog itself.  Now, their argument is they have

19   to deal with whether there's a reasonable alternative out

20   there.  I understand a little bit about that area of the

21   law, not much, but I know that that's true.  But does that

22   actually mean that they get to look at all the

23   communications with our customers?  They get to find out

24   what our customers like and didn't like?  If we had a

25   product that failed because of an electrical reason, and we

1      do internal work and improvement it, they get to see that.

2      That's a level of detail, which I would argue is not

3      necessary to deal with the question of whether there's an

4      alternative product.  They know from their own sales force

5      that there are alternative products.  As I put in my papers,

6      there are several alternative products, and the Bair Hugger

7      product loses business to them sometimes.  That in itself is

8      proof that there's an alternative product.

9            There's a product out there called buy heat, which

10     is very similar to a significant part of the HotDog product,

11     and 3M must know that it's an alternative product because

12     they just acquired the rights to exclusively distribute it.

13     So 3M is now distributing its own error-free product out

14     there.  How can there be any doubt that there's an

15     alternative product that's out there that's acceptable?

16           And, you know, under ordinary circumstances, no

17     company should be required to reveal that sort of private

18     confidential information about its relationship with its

19     customers, but especially to its behemoth of a competitor.

20     A competitor whose goal is to destroy it, and especially to

21     the Blackwell firm.  I mean they're not just a law firm

22     representing 3M.  They host a website that attacks

23     Dr. Augustine and promotes 3M products.  There is a

24     difference between being a litigation firm in support of a

25     client and being an advertising and PR firm in support of a

1    client.  I submit that you would not ask us to reveal my

2    clients inner most secrets to 3M's PR firm.  That seems a

3    bit too far.

4            The Med Watch issue, I mean they asked for the

5    documents.  I wrote back to them and said the FDA says this

6    is anonymous.  The FDA requires filings in Med Watch of a

7    medical device manufacturer who has any reason to believe

8    that its product has hurt someone.  It doesn't make any

9    difference whether they agreed with it or not.  They have to

10   file.  And there's nothing quite as clear that someone

11   thinks your product has hurt someone.  It's when they sue

12   you, and the documents that I filed give language in the

13   FDA, which makes that clear.  There have been 900 or so of

14   those filings, and 3M has not filed a single Med Watch

15   report in violation of their obligations to the FDA.

16           The FDA also encourages others to anonymously file

17   Med Watch reports if they have reason to believe that a

18   product has hurt someone, and they protect the anonymity of

19   those filers.

20           Your Honor, if you decide that FDA rule should be

21   violated, breached, circumvented, I'll respond promptly.

22   But I do need to tell you I've looked at the Med Watch

23   website, and I know that it is an electronic website.  One

24   fills it out, hits a button, it goes to the FDA, and it's

25   gone.  So I'm not exactly certain what documents they think

1    exist.  But they are going to take --

2           THE COURT:  I told you what documents they're

3    looking for.  They said they talked to this other guy

4    Gauthier who said I got a draft written by Augustine.  I

5    edited it, sent it back to Augustine, and I assume that

6    draft then becomes the content that you're describing going

7    into the website.  Are you telling me that the drafts don't

8    exist?

9           MR. BENHAM:  No, we're talking about two different

10   things.  There is the initial 2010 or so Med Watch report

11   that was submitted by Dr. Gauthier.  I submitted what -- I

12   produced what documents I found related to that.  If they

13   think there are other documents, let them take me up on my

14   offer and bring the Fredrikson firm in and look for them.  I

15   can't find them.

16          They are going to take Dr. Augustine's deposition

17   on the 13th of December.  And when asked what role did you

18   have in the Med Watch report filed by Dr. Gauthier, he's

19   going to answer it fully and honestly and with not the

20   slightest embarrassment about what his role was.  You know,

21   there's no hiding there.  I mean there are things in that

22   Med Watch report that on their face of it, it would be

23   impossible for Dr. Gauthier to know.  There's really not

24   much argument about that, that Dr. Augustine had a role in

25   creating that.  I mean if they want to talk about what my

1   role is, our view, I'll certainly answer that question, but

2   I mean there's nothing being hidden there.

3         The Med Watch reports that I was referring to were

4   related to the hundreds of Med Watch reports that 3M should

5   have filed, didn't file, and have been filed by a voluntary

6   filer.  I think the FDA allows that voluntary filer to

7   remain anonymous.  I'm not certain that I deeply care.  But

8   if you require that anonymity to be breached, we'll respond

9   appropriately.

10        The privilege log is a complicated issue for me.

11  I mean I sought guidance from the Faegre firm and the

12  Blackwell firm from the very beginning about what should be

13  on the privilege log.  I did readings and I submitted an

14  initial privilege log.  I had several conversations with

15  them on the phone and said, "what do you think should be on

16  it?  What do you think should be on it?  And I won't produce

17  it until you send me an e-mail confirming what you think

18  should be on it."  I put on it what they said should be on

19  it, and that was apparently insufficient.

20        Now, as I wrote to the Court, there are facts

21  surrounding the various claims of privilege, which neither

22  side on this case has a right to see.  But I would be happy

23  to provide the Court with the Court's Eyes Only affidavit

24  explaining it all.  In fact, I have a hard copy of the

25  affidavit right here with me.  And if you would accept it, I

1    would hand it in at this very minute.

2              THE COURT:  I'm sorry.  I'm confused.  You have an

3    affidavit doing what?

4              MR. BENHAM:  An affidavit from me explaining the

5    various legal relationships and support for the privileges

6    claimed in the privilege log.  There's a level of detail

7    that I don't -- that I can't share with either of these

8    parties without destroying the privilege.  And so I offer it

9    to share it with you.

10             MR. BLACKWELL:  And we would object to that at

11   this time.  There's not a proper foundation for it, Your

12   Honor.

13             THE COURT:  All right.  I'll ponder that before I

14   decide about it, so.

15             MR. BENHAM:  A foundation objection for something

16   that I will purport that I wrote seems a little odd.

17             So, Your Honor, my client has complied as well as

18   it can 80, 100, 120 hours of time has been put into it.  We

19   have produced the documents that we have found.  The only

20   documents we haven't produced are those to which we have

21   objected.  If they don't believe me, let them pay for the

22   Fredrikson firm to come in and do it all over again.  Thank

23   you, sir.

24             THE COURT:  Okay.

25             MR. BLACKWELL:  May I respond briefly, Your Honor?

1              THE COURT:  Yes, let me ask you this:  What about

2      this anonymity law that Mr. Benham says the FDA provides to

3      the Med Watch filers?

4              MR. BLACKWELL:  Well, Your Honor, there's no such

5      thing, even if you accept it as true, which I don't.  I just

6      heard Mr. Benham refer to that.  Any anonymity law or rights

7      to it can be waived by a party.  They can choose to make it

8      not anonymous, which is exactly what Dr. Augustine and

9      Mr. Benham did.

10             And you'll look at Exhibit D in our papers where I

11     quote from the Augustine Biomedical and Design letter dated

12     July 9, 2010, signed by Dr. Scott Augustine, where he writes

13     to an anesthesiologist for funding purposes,

14     "Coincidentally, last week an independent anesthesiologist

15     filed a long and detailed MDR Complaint about Bair Hugger

16     warming and Arizant to the FDA.  A copy of the Complaint is

17     enclosed for your review."

18             So here they are out touting this as independent,

19     first of all, when it was written by the two of these.  And

20     it's only considered confidential and protected when we seek

21     discovery of what it is they're in fact sending out to the

22     public with respect to this, and they have made it public.

23     They have put it in contention.  They have put it at issue.

24     And to the extent they are now using this --

25             THE COURT:  Right, I understand that, and then

 1    we'll get -- as I understand Mr. Benham, when Dr. Augustine

 2    is deposed, he's going to tell you all about that 2010

 3    Gauthier filing, but he says there is all of these hundreds

 4    of others that are protected by the anonymity protection

 5    that the FDA provides.  And I'm asking you what is your

 6    position regarding whether there is anonymity provided for

 7    in the law.  And if it is, do I have the power in the

 8    context of the discovery dispute between a defendant and a

 9    third party witness in a multi-district litigation to

10    overrule it?

11              MR. BLACKWELL:  And, Your Honor, I don't want to

12    misstate the law in that regard.  I take Your Honor's

13    question to heart.  We would request leave to submit a

14    supplement that addresses that because I want to make sure

15    we get it right.  But I think to the extent it relates to

16    the Bair Hugger that they've put at issue, that that

17    privilege, number one, is not inviolate, and that it can be

18    protected by a proper protective order with respect to it.

19    But we would like Judge Noel to be able to submit just

20    something brief and supplemental in that regard to address

21    that issue.

22              THE COURT:  All right.  I'll let you know if I

23    need that.

24              MR. BENHAM:  Your Honor, would you allow me to

25    address that?

1          THE COURT:  Hold on, one second.  One at a time.

2          MR. BLACKWELL:  And so, Your Honor, with respect

3     to these other matters to the extent that there have been

4     again e-mails sent out related to the article that

5     Dr. Augustine is referring to, and he is sending this out to

6     investors for purposes of a spawning or encouraging funding

7     and it exists, it's a fact that's relevant.  And to the

8     extent he's concerned about it being properly protected and

9     privileged, again, that can be addressed through a proper

10    protective order also.

11         THE COURT:  And what about his argument that the

12    discovery requests, as I understand it, were served back in

13    July.  And the thing we're talking about right now and that

14    I asked that you mentioned in your argument, and that I

15    asked Mr. Benham about is something that has occurred since

16    those discovery requests are served.  Is it your contention

17    that he has an ongoing obligation to continue to update

18    discovery just as a party would in litigation?

19         MR. BLACKWELL:  Yes, Your Honor, but the fact is

20    with respect to our negotiations with Mr. Benham, these

21    discussions have been ongoing with respect to all of these

22    requests.  And so it isn't as though in July there was a

23    production in August, there was a production, and we had

24    everything.  So he has been given us a rolling production

25    ever since has never said that this is all there is as of

1    July 2016.  And it is in a way it's a bit of gamesmanship in

2    that that's never been raised until now is an issue.  And if

3    it's related to the case, there is still time to go and get

4    it in a supplemental way, but it just seems to be an

5    unnecessary loop if it exists, and he knows what we're

6    seeking --

7                    THE COURT:  Okay.

8                    MR. BLACKWELL:  -- if it exists.  With respect to

9    the HotDog and communication about the HotDog, Your Honor,

10   we'd be content to have what, if anything, has been sent to

11   consultants, experts, Kennedy Hodges firm, et cetera,

12   related to the HotDog, that may be informing the kinds of

13   claims and positions taken by plaintiffs in the litigation.

14   We should be able to explore that, and to that extent that

15   is relevant.

16              I do want to address he had thrown out this idea

17   of bringing in the Fredrikson & Byron firm and saying we can

18   use Fredrikson, and he would use Fredrikson, but we'll send

19   you the bill.  And at this point, there's just really no

20   explanation for what's happened up to this point, that have

21   e-mails been properly searched, what custodians did you look

22   to?  What terms did you use?  It's not that we didn't get a

23   production.  We just don't know what went into it.

24              And before we decide that discovery is somehow

25   inaccessible, and it needs to be some form of a

1    cost-sharing, a cost-shifting, we first have to know if that

2    is indeed the fact.

3              And there was in fact a case that Your Honor was

4    involved in, *Lindsay v. Clear Wireless LLC* in 2014, where

5    there was some issues that came up around whether there

6    should be some cost-shifting sort of thing, and it turns on

7    whether or not the evidence is in fact inaccessible, whether

8    the alleged difficulty is that it was so costly have been

9    created by the producing party itself.

10             THE COURT:  Well I don't accept it here, and the

11   issue, I have no recollection of the issue you're talking

12   about, although, I do remember that case quite well.  But

13   as I understand Mr. Benham's position, it is we're a third

14   party witness.  We're here under Rule 45, not under any of

15   the discovery rules that govern parties.  And we have

16   certain rights and protections that parties don't have in

17   discovery.  Namely, we are protected by the rule that says

18   you have to do something to minimize burden.  And I forget

19   the precise words, but they have -- they're in a better

20   place than a party would be in terms of not being compelled

21   to spend a whole bunch of time, money and effort, and

22   especially in this case, attorney's fees, responding to

23   discovery in a case to which they're not a party.

24             MR. BLACKWELL:  I'd say, first and foremost, Your

25   Honor, under Rule 45(d)(1), and the advisory committee notes

1      in the 1991 amendment, a nonparty served with a subpoena is

2      subject to the same scope of discovery as a party, first

3      off.

4               And, second, invoking a rule that speaks to the

5      undue burden of a third party hardly justifies the third

6      party simply producing inadequate and slip shod discovery,

7      passing it off as a complete response, and then when called

8      to account for it in the motion to compel, either claiming

9      at that point undue hardship or as they did in the papers I

10     just read from Dr. Augustine, crying almost poverty.  We

11     can't afford to do it, and we would get Fredrikson & Byron,

12     except we can't afford to do it.  And that's the first time

13     we've heard anything about there being an issue about cost

14     involved or cost issue since this was served I think back in

15     June.  I think it was served in June.

16               So and, Your Honor, it hadn't been a showing yet

17     that there's anything that's unduly burdensome about this.

18     From all accounts, it simply looks like they just simply did

19     not do the proper job in canvassing the company to get

20     responsive documents, and we've been subject to delay.

21     We've been here on repeated motions before Your Honor in

22     this Court to compel to get these responses.  It's been

23     delay, delay, delay.  And suggesting that another firm be

24     brought in, and then claiming undue hardship is simply the

25     last round in this kind of behavior.

1          And sure enough, there are things we can ask

2     Dr. Augustine at his deposition, but the point is to have

3     the documents before the deposition, so you know what you

4     want to ask about, and this has been a long train at this

5     point.  And there's one thing if they're not end this kind

6     of undertaking that we found out was incomplete when they

7     purported for it to have been complete and then we learned

8     we didn't get the e-mails, and we learned all kinds of

9     things that existed that they never admitted existed before,

10    and then when called to account for it, undue hardship,

11    unduly burdensome, can't afford it, et cetera.  And I think

12    in the context of the facts as they're presented here, that

13    argument may not be well taken, Your Honor.

14          THE COURT:  Okay.  Is there something in

15    particular you wanted to respond to, Mr. Benham?

16          MR. BENHAM:  Well, there are three quick comments

17    on each of them.  I'll be less than a minute.

18          THE COURT:  Tell me first before each one what it

19    is you are responding before you give the response.

20          MR. BENHAM:  Whether you have the power or not to

21    breach the anonymity.

22          THE COURT:  Okay.

23          MR. BENHAM:  I'm not asserting that you don't have

24    the power.  I've seen citations or suggestions in articles

25    that the FDA has intervened in some circumstances, but I

1    don't know what those circumstances are.  I simply say that

2    you shouldn't.

3              As regards whether we have an obligation to share

4    all ongoing communications with anyone about Bair Hugger or

5    not, I hope you understand that this is our only significant

6    competitor.  What 3M might well accomplish here is that we

7    essentially stop talking about them.  That would be the very

8    best thing they could ever hope for coming out of this case,

9    and it would do us tremendous harm.

10             I mean we shouldn't have to -- I mean this is not

11   a Lanham Act case.  This is not an unfair competition case

12   in which they're saying we said wrong things about their

13   product.  And I think it's too much of a burden to ask us to

14   share with them every communication we ever have in the

15   future about their product.

16             And, finally, I want to make sure I understand as

17   regards information about the HotDog.  They have revised

18   their incredibly expansive demands and said all they want is

19   anything we've shared with plaintiff's counsel or

20   consultants.  Is that correct?  I mean is that what you

21   heard, Your Honor?

22             THE COURT:  Don't look to me to answer your

23   questions.

24             MR. BENHAM:  But I will represent to you that that

25   means nothing because there have been none.  I'll go look

1   when I get back from my 40th anniversary trip.  But short of

2   that, I believe they just walked away from that entire area

3   of discovery.  Thank you, sir.

4          THE COURT:  I'll just make this closing

5   observation that apparently both Mr. Blackwell and

6   Mr. Benham have made wise choices in choosing their wives

7   over the Court in terms of their obligations to do whatever

8   they need to do in the future.  Mr. Blackwell told us this

9   morning he's not going to be here for the next status

10  conference because he's going to be visiting the birth place

11  of Alexander Hamilton, I believe he said, correct?

12          MR. BLACKWELL:  I didn't characterize it that way.

13  Saint Kitts.

14          THE COURT:  Okay.

15          MR. BENHAM:  Thank you.

16          THE COURT:  Thank you.  And just to complete the

17  record, I assume by reason of the state of the docket, the

18  plaintiffs have no dog in this fight.  Is that correct,

19  Ms. Zimmerman or, I'm sorry, Ms. Conlin?

20          MS. CONLIN:  You're correct, Your Honor.  I mean

21  I'd be happy to respond briefly.

22          THE COURT:  No, I don't want to encourage more

23  argument.  I want to make sure the record was clear I wasn't

24  rejecting something you wanted to offer.

25          MS. CONLIN:  We have no dog in this fight.  We

1    have been very clear with the Court since day one.  With

2    respect to inadequate filtration and disruption of air flow,

3    we are making those claims, but we're not making them

4    because Dr. Augustine has said them.  We've made them

5    because we've independently verified them to be true, and

6    that's our position.

7              THE COURT:  All right.  Thank you very much.  I

8    will issue an order shortly.  We are in recess.

9                   (Court adjourned at 2:08 p.m.).

10

11                    *      *      *      *      *

12

13

14                      REPORTER'S CERTIFICATE

15         I, Maria V. Weinbeck, certify that the foregoing is

16   a correct transcript from the record of proceedings in the

17   above-entitled matter.

18

19              Certified by:   *s/ Maria V. Weinbeck*

20                              Maria V. Weinbeck, RMR-FCRR

21

22

23

24

25