```
 1                    UNITED STATES DISTRICT COURT

 2                      DISTRICT OF MINNESOTA

 3     ------------------------------------------------------------
                                     )
 4                                   )
        In Re: Bair Hugger Forced Air  )  File No. 15-MD-2666
 5      Warming Devices Products      )  (JNE/FLN)
        Liability Litigation          )
 6                                   )  December 15, 2016
                                     )  Minneapolis, Minnesota
 7                                   )  Courtroom 12W
                                     )  9:45 a.m.
 8                                   )
                                     )
 9     ------------------------------------------------------------

10              BEFORE THE HONORABLE JOAN N. ERICKSEN
                 UNITED STATES DISTRICT COURT JUDGE
11
                 THE HONORABLE FRANKLIN D. NOEL
12                UNITED STATES MAGISTRATE JUDGE

13
                        (STATUS CONFERENCE)
14
       APPEARANCES
15
       FOR THE PLAINTIFFS:
16                                   MESHBESHER & SPENCE
                                     Genevieve M. Zimmerman
17                                   1616 Park Avenue
                                     Minneapolis, MN  55404
18
                                     LEVIN PAPANTONIO
19                                   Ben W. Gordon, Jr.
                                     316 S. Baylen Street
20                                   Suite 600
                                     Pensacola, FL 32502
21
                                     CIRESI CONLIN
22                                   Michael V. Ciresi
                                     Michael A. Sacchet
23                                   225 South 6th Street
                                     Suite 4600
24                                   Minneapolis, MN

25                (Appearances continued next page)
```

```
 1      FOR THE PLAINTIFFS (cont'd):
                                 KIRTLAND AND PACKARD LLP
 2                               Behram V. Parekh
                                 2041 Rosecreans Avenue
 3                               Third Floor, Suite 300
                                 El Segundo, CA  90245
 4

 5                               KENNEDY HODGES, LLP
                                 Gabriel Assaad
 6                               4409 Montrose Blvd
                                 Suite 200
 7                               Houston, TX 77006

 8                               KENNEDY HODGES, LLP
                                 David W. Hodges
 9                               711 W. Alabama Street
                                 Houston, TX 77006
10
                                 PRITZKER HAGEMAN, P.A.
11                               David Szerlag
                                 45 South 7th Street, #2950
12                               Minneapolis, MN  55402-1652

13                               PENDLEY BAUDIN & COFFIN
                                 Chris Coffin
14                               1515 Poydras Street
                                 Suite 1400
15                               New Orleans, LA  70112

16                               FARRAR & BALL, LLP
                                 Mark Bankston
17                               1010 Lamar, Suite 1600
                                 Houston, TX  77002
18
        FOR THE PLAINTIFFS (APPEARING BY PHONE:)
19
                                 PETERSON & ASSOCIATES, P.C.
20                               Brian Emerson Tadtman
                                 801 W. 47th Street, Suite 107
21                               Kansas City, MO  64112

22                               BERNSTEIN LIEBHARD LLP
                                 Dae Lee
23                               10 East 40th Street
                                 New York, NY  10016
24

25              Telephone Appearances cont'd next page:
```

```
 1      FOR THE PLAINTIFFS(appearing by phone):

 2                              PAPPAS & HEALY LLC
                                John J. Pappas
 3                              221 No. LaSalle Street, #3410
                                Chicago, IL  60601
 4
                                THE LANIER LAW FIRM, PLLC
 5                              Jason Goldstein
                                Erika Mohabir
 6                              126 East 56th Street, 6th Floor
                                New York, NY 10022
 7
                                THE OLINDE FIRM, LLC
 8                              Wesley G. Barr
                                400 Poydras Street
 9                              Suite 1980
                                New Orleans, LA  70130
10
                                ZIMMERMAN REED, PLLP
11                              Jacqueline A. Olson
                                1100 IDS Center
12                              80 South Eighth Street
                                Minneapolis, MN  55402
13
                                SIDNEY P. COMINSKY, LLC
14                              Amy Tao
                                109 S. Warren Street, #1500
15                              Syracuse, NY  13202

16                              GROSSMAN & MOORE, PLLC
                                Emily A. DeVuono
17                              Jennifer Moore
                                Kara Lane
18                              401 W. Main Street
                                Suite 1810
19                              Louisville, KY  40202

20                              HARE WYNN NEWELL & NEWTON
                                Peggy Little
21                              Massey Building
                                2025 Third Avenue North
22                              Suite 800
                                Birmingham, AL  35203
23
                                MCEWEN LAW FIRM, LTD
24                              Melissa Schmid
                                5850 Blackshire Path
25                              Inver Grove Heights, MN  55076
```

```
1        FOR THE PLAINTIFFS APPEARING BY PHONE:

2                                   MORGAN & MORGAN, PA
                                    Michael S. Goetz
3                                   Joseph T. Waechter
                                    Heather Cullen
4                                   201 N. Franklin St 7th Floor
                                    Tampa, FL  33602
5
                                    RAIZNER SLANIA, LLP
6                                   Jeffrey L. Raizner
                                    Amy Hargis
7                                   Erin Stacener
                                    Alejandrina Lopez
8                                   Jane Munoz
                                    Rica Rinosa
9                                   2402 Dunlavy Street
                                    Houston, TX  77006
10
                                    LONCAR & ASSOCIATES
11                                  John L. Coveney
                                    424 S. Cesar Chavez Blvd
12                                  Dallas, TX  75201

13                                  CAPRETZ & ASSOCIATES
                                    Don K. Ledgard
14                                  5000 Birch St, Suite 2500
                                    Newport Beach, ca  92660
15
                                    MICHAEL HINGLE & ASSOCIATES
16                                  Bruce Brown
                                    220 Gause Blvd
17                                  Slidell, LA  70005

18                                  HOUSSIERE DURANT & HOUSSIERE
                                    Randall A. Kauffman
19                                  Monica Vaughan
                                    1990 Post Oak Blvd Suite 800
20                                  Houston, TX  77056

21                                  DAVIS & CRUMP, PC
                                    Martin D. Crump
22                                  Robert D. Cain, Jr.
                                    2601 Fourteenth Street
23                                  Gulfpost, MS 39507

24

25              Appearances continued on next page:
```

```
1     FOR THE PLAINTIFFS APPEARING BY PHONE:
                              LEWIS & CAPLAN
2                             Pete Lewis
                              Sarah Delahoussaye Call
3                             Amy Webster
                              3631 Canal Street
4                             New Orleans, LA  70119

5                             SKIKOS CRAWFORD SKIKOS&
                                 JOSEPH, LLP
6                             Melissa Erin Mielke
                              One Sansome Street, Suite 2830
7                             San Francisco, CA  94104

8                             THE RUTH TEAM
                              Austin Grinder
9                             Steven C. Ruth
                              842 Ramond Avenue
10                            Suite 200
                              Saint Paul, MN  33733-5157
11
                              TATE LAW GROUP, LLC
12                            Mark Tate
                              Arlene Nicole
13                            2 East Bryan Street, Suite 600
                              Savannah, GA  31328
14
                              LAW OFFICES OF TRAVIS R. WALKER
15                            Travis R. Walker
                              1235 SE Indian Street
16                            Suite 101
                              Stuart, FL  34997
17
                              LAW OFFICES OF JAMES S. ROGERS
18                            Elizabeth J. McLafferty
                              1500 4th Avenue #500
19                            Seattle, WA  98101

20                            ANDREWS & THORNTON
                              Anne Andrews
21                            John Thornton
                              Lauren Davis
22                            2 Corporate Park, Suite 110
                              Irvine, CA 92606
23
                              GOZA & HONNOLD, LLC
24                            Kaitlyn Neufeld
                              11181 Overbrook Road
25                            Suite 200
                              Leawood, KS  66211
```

```
 1        FOR THE PLAINTIFFS APPEARING BY PHONE:
                                JOHNSON BECKER PLLC
 2                              Rolf T. Fiebiger
                                444 Cedar Street
 3                              Suite 1800
                                Saint Paul, MN  55101
 4
                                HAUSFELD, LLP
 5                              Angel Dorsey
                                1700 K St NW Suite 650
 6                              Washington, DC  20006

 7                              JOHNSON JOHNSON & SCHALLER PC
                                Leslie O'Leary
 8                              975 Oak Street
                                Citizens Building, Suite 1050
 9                              Eugene, OR  97401

10                              JONES WARD PLC
                                Alex C. Davis
11                              Marion E. Taylor Building
                                312 S. Fourth Street, 6th Floor
12                              Louisville, KY  40202

13                              LORD & ASSOCIATES
                                Priscilla Lord
14                              309 Clifton Avenue
                                Minneapolis, MN 55403
15
                                MURRAY LAW FIRM
16                              Caroline Whitney Thomas
                                650 Poydras Street
17                              Suite 2150
                                New Orleans, LA  70130
18
                                BROWN & CROUPPEN, PC
19                              Abby Cordray
                                211 North Broadway, Suite 1600
20                              St. Louis, MO  63102

21                              HURLEY MCKENNA & MERTZ
                                Molly Condon
22                              33 North Dearborn Street
                                Suite 1430
23                              Chicago, IL  60602

24

25
```

```
1     FOR THE PLAINTIFFS          APPEARING BY PHONE:

2
                                  PAGLIALUNGA & HARRIS, PS
3                                 James Humann
                                  Charles T. Paglialunga
4                                 1001 4th Avenue, Suite 3200
                                  Seattle, WA  98154
5
                                  BEASLEY ALLEN
6                                 Megan Robinson
                                  218 Commerce Street
7                                 Montgomery, AL  36104

8
                                  CARR & CARR ATTORNEYS
9                                 Patrick E. Carr
                                  4416 S. Harvard Avenue
10                                Tulsa, OK  74135

11
                                  HOLLIS LEGAL SOLUTIONS, PPLC
12                                Scott Hollis
                                  6814 Crumpler Boulevard,
13                                Suite 101
                                  Olive Branch, MS  38654
14
                                  THE LAW OFFICES OF PETER
15                                ANGELOS, P.C.
                                  Nicholas Bonadino
16                                100 North Charles Street
                                  Baltimore, MD  21201
17

18                                MCGARTLAND LAW FIRM, PLLC
                                  Lee Ann McGartland
19                                1300 South University Drive #500
                                  Fort Worth, TX  76107
20
                                  MESHBESHER & SPENCE, LTD
21                                Holly Sternquist
                                  1616 Park Avenue
22                                Minneapolis, MN  55404

23                                PARKER WAICHMAN, LLP
                                  Nicole Eisner
24                                59 Maiden Lane
                                  6th Floor
25                                New York, NY  10038
```

```
 1      FOR THE PLAINTIFFS          APPEARING BY PHONE:

 2                                  PRITZKER HAGEMAN, PA
                                    Wendy Thayer
 3                                  PWC Plaza Building
                                    Suite 2950
 4                                  45 South Seventh Street
                                    Minneapolis, MN  55402-1652
 5
                                    RANDALL J. TROST, P.C.
 6                                  Carrie Hancock
                                    Pam Rodriguez
 7                                  Randall T. Trost
                                    801 Main Street
 8                                  Lynchburg, VA  24504

 9                                  SCHNEIDER SCHNEIDER & SCHNEIDER
                                    Scott Haider
10                                  815 Third Avenue South
                                    Fargo, ND  58103
11

12                                  SHELTON LAW GROUP
                                    Rob Shelton
13                                  9300 Shelbyville Road #215C
                                    Louisville, KY  40222
14
                                    THE MILLER FIRM, LLC
15                                  Tayjes M. Shah
                                    The Sherman Building
16                                  108 Railroad Avenue
                                    Orange, VA  22960
17
                                    POGUST BRASLOW & MILLROOD, LLC
18                                  Matt Leckman
                                    Jessica Lowe
19                                  8 Tower Bridge, Suite 940
                                    161 Washington Street
20                                  Conshohocken, PA  19428

21                                  DEGARIS LAW GROUP, LLC
                                    Wayne Rogers, Jr.
22                                  2 North 20th Street
                                    Suite 1030
23                                  Birmingham, AL  35223

24                                  NEAL R. ELLIOTT, JR.
                                    P.O. Box 80136
25                                  Baton Rouge, LA  70898
```

```
 1
          FOR THE DEFENDANTS 3M:    BLACKWELL BURKE P.A.
 2                                  Ben Hulse
                                    Mary Young
 3                                  431 South Seventh Street
                                    Suite 2500
 4                                  Minneapolis, MN  55415

 5                                  FAEGRE BAKER DANIELS
                                    Bridget M. Ahmann
 6                                  90 South Seventh Street
                                    Suite 2200
 7                                  Minneapolis, MN  55402

 8

 9      Court Reporter:
                                    MARIA V. WEINBECK, RMR-FCRR
10                                  1005 U.S. Courthouse
                                    300 South Fourth Street
11                                  Minneapolis, Minnesota 55415

12

13

14

15

16

17

18             Proceedings recorded by mechanical stenography;
        transcript produced by computer.
19

20

21

22

23

24             *      *      *      *      *      *      *
25
```

1              P R O C E E D I N G S

2                   (9:45 a.m.)

3              THE COURT:  Good morning.  Please be seated.

4    Welcome to Minnesota.  It's minus 2.

5              All right.  We have your appearances.  Are the

6    people on the telephone?

7              THE CLERK:  They should be able to hear and talk.

8              THE COURT:  Okay.  And talk?  All right, somebody

9    on the phone say something?

10             UNIDENTIFIED VOICE:  Good morning, Your Honor.

11             THE COURT:  Okay.

12             MAGISTRATE JUDGE NOEL:  Thank you.

13             THE COURT:  All right.  I think I know what we're

14   going to be spending most of our time talking about this

15   morning, but we'll go through the joint agenda.  Someone is

16   missing on your side.

17             MR. HULSE:  Mr. Blackwell is.

18             THE COURT:  Oh, right, doesn't he have some kind

19   of anniversary?

20             MR. HULSE:  Yes, he's got a trip to Saint Kitts.

21             THE COURT:  Some kind of romantic thing.  All

22   right.  Well, plaintiffs will try and take advantage of you.

23             MR. HULSE:  We're ready for it.

24             THE COURT:  Okay.  There's nothing to say about

25   the pretrial order.

1     The plaintiff fact sheets?  Anything to say about

2  that?

3          MS. ZIMMERMAN:  Good morning, Your Honors.  With

4  respect to the plaintiff fact sheets, I think that we have a

5  near agreement.  The plaintiffs have proposed that the

6  service protocol be done through an FTP website, which is

7  how we have done all other productions thus far in this

8  case, wherein the defendants are provided a log-in and a

9  password and then they will then get an e-mail every time a

10  plaintiff fact sheet is uploaded.  I believe that we have

11  basic agreement, but we're waiting for final confirmation

12  for 3M with respect to that proposal.

13          THE COURT:  Ms. Young?

14          MS. YOUNG:  Yes, Your Honor, we expect to be able

15  to reach an agreement.  And we were also proposed just

16  yesterday the Ramsey County plaintiff fact sheet, and we

17  just do have one concern because it requires a due date

18  within 45 days of entry of that order, and how we'll put

19  that cases into the bellwether pool as contemplated in

20  PTO-15, if they're not due until early February.

21          THE COURT:  Well, they might have to be separate

22  then.  We might have to just pick a few.

23          MS. YOUNG:  Okay.

24          THE COURT:  Anyway, we won't let that hold up the

25  whole process of selecting the bellwethers.  And Judge Leary

1       is not here, so we can't do much about that.

2                Okay.  Plaintiffs' additional statement.

3                MAGISTRATE JUDGE NOEL:  This is bellwhether.

4       There is nothing to say about that.

5                THE COURT:  Nothing to say, yeah.

6                MAGISTRATE JUDGE NOEL:  I think you may have

7       skipped a page.

8                THE COURT:  Oh, yes, that's why it didn't make any

9       sense.  The foreign discovery?

10               MS. ZIMMERMAN:  Thank you, Your Honor.  And I

11      think that some of the relevant facts have been outlined for

12      the Court in our submission, but just for completeness of

13      Your Honors' information, we did want to take at least a

14      somewhat brief journey through what has happened with

15      respect to the United Kingdom depositions.

16               The plaintiffs have cooperated at every angle at

17      every turn with allowing the defendants to go forward with

18      this discovery that we really didn't think was necessary of

19      these UK authors.  And as you know, there was letters

20      rogatory that were submitted for Your Honor's review and

21      signature, and they were presented to the High Court in the

22      United Kingdom.  Those were eventually signed somewhere

23      around about November 8th.

24               We did have one aborted trip, I guess, to the

25      United Kingdom back in September.  There were the four

1    depositions that were supposed to go forward.  One was

2    cancelled by 3M, the others were cancelled by the witnesses.

3    And during that trip, we were scheduled to be deposing

4    Dr. McGovern then as well.  And as the Court is certainly

5    aware, we returned and no depositions were taken in

6    September.

7           We then went forward.  We had the United Kingdom

8    issue the order on I think the 8th of November.  The

9    plaintiffs again throughout the process have really said

10   we're not going to stand in your way, so long as we're

11   provided equal access, we're provided copies of

12   communications with any of those solicitors or barristers or

13   the witnesses that were included in all of this, that we

14   share equally in time, and we were expected to share equally

15   in costs.

16          Unfortunately, we learned over the course of the

17   last month that that has not been the case.  We have not

18   been copied on the communications.  We have not been copied

19   on orders that have been submitted to the High Court for

20   signature.  We learned when we got to Manchester in the

21   United Kingdom to take the first deposition of Mr. Legg that

22   the orders that had been prepared by 3M and submitted and

23   ultimately sealed by the High Court were actually a

24   departure from what is typically done in a very atypical

25   process.

1              As I think you know, depositions are not typically

2      done in the United Kingdom the same way that they are done

3      here, but we were informed by the examiner, who is as I

4      guess I would say the referee for the process, that there

5      was some atypical language wherein the plaintiffs were

6      denied equal access in terms of time.  And we were also

7      denied the ability to cross examine the witness.  And these

8      were departures from a standard order as we were advised by

9      the examiner.  He said he's done a couple hundred of these.

10     He's never seen this kind of language in these orders, and

11     they were orders prepared and drafted by 3M.

12             We brought that issue to the examiner's attention.

13     The examiner noted the discrepancy from standard protocol

14     and said that he did not have authority to overrule the

15     Court, but did say that this was inconsistent with certainly

16     the process in the UK and his understanding of American law

17     as well.  And so we had an emergency hearing, a telephone

18     hearing before the High Court and Senior Master Fontaine

19     actually appeared, perhaps without a license, on the phone

20     with Senior Master Fontaine to outline our issues.  And,

21     ultimately, Senior Master Fontaine agreed that this was a

22     departure from general practice and issued new sealed

23     orders, and ordered that 3M pay the study authors both

24     additional time for sitting there.  This was a six hour

25     delay in Manchester where we all waited to get this sorted

1       out.  They had to pay the barrister and the solicitor their

2       additional time for being involved.

3              So the deposition then of Mr. Legg went forward,

4       and we were informed that in the UK when you become a

5       surgeon, you're not a doctor anymore, you're a mister, so I

6       guess that's a promotion.  But so Mr. Legg's deposition went

7       forward.  We traveled down to London.  We conducted back to

8       back depositions on Sunday of Mr. Hamer and Mr. Reed.  We

9       learned in the course of that discovery that Mr. Reed was

10      really the primary author on the main McGovern studies that

11      have been the subject to some discussion before the Court

12      throughout the course of this MDL.

13             We had a deposition later that week of Professor

14      Leaper, and then we were scheduled to have the deposition of

15      Dr. McGovern on Friday.  I concluded the questioning of

16      Professor Leaper around 4:00 on Thursday, and we were

17      advised around about 5:45 that Mr. Gordon, Mr. Corey Gordon

18      had a sudden onset illness, and he was going to be

19      postponing the deposition of Dr. McGovern set for the

20      following day.  We, and I should also say that about 36

21      hours before the start of the deposition, we were presented

22      with around about 10 three-inch binders full of materials

23      from Dr. McGovern along with a flash drive with 45 videos,

24      so we were seeing these for the first time.  And I trust

25      that the defense counsel was also seeing this for the first

1    time.  And so we stayed up, we prepared for these

2    depositions and expected them to go forward and then they

3    were postponed.  We hoped to try to get it rescheduled while

4    were all in the UK given this was our second trip, and this

5    is a significant expenditure of both time and resources for

6    all parties involved, and our requests were flatly rejected.

7         They have now over our objection rescheduled this

8    deposition to happen in the first week of January, after

9    already being advised that those were dates that were not

10   going to work for the plaintiffs' side given long standing

11   travel that had been arranged last April.

12        And so at this point the plaintiffs would request,

13   first of all, that it is not necessary that we go all the

14   way back over to the United Kingdom to have Dr. McGovern's

15   deposition taken.  And we would request that to the extent

16   that the defendants continue to seek the testimony of

17   Dr. McGovern, that they make a proffer to this Court about

18   what they expect to learn that would be different from the

19   discovery that they have already conducted on the authors of

20   the various studies.

21        We have already deposed Dr. Nachsheim here in

22   Minneapolis.  Mr. Albrecht has already been deposed.  Dr.

23   Reed or Mr. Reed has been deposed.  While his name appears

24   not as the first listed author, he is the main author,

25   according to his testimony, and according to the e-mails

1    that we have now received from Dr. McGovern.  And so we --

2    and then Dr. Augustine also will be scheduled for deposition

3    I believe on January 9th.

4         So from the plaintiffs' perspective, the

5    defendants have come in and said to this Court that this is

6    some sort of -- that all of these studies are some sort of

7    Dr. Augustine conspiracy, that all of the authors are

8    somehow financially tied to Dr. Augustine and his company,

9    and/or that the science behind the relative risk of 3.8 in

10   the McGovern and Reed study is somehow unreliable.

11        Well, the, testimony that they have received in

12   depositions both in the United Kingdom and here in the

13   United States is not consistent with that.  That is not what

14   these witnesses have testified, and the plaintiffs would

15   gladly offer the deposition transcripts from these witnesses

16   for the Court to review.  But at this point, we would

17   request that the defendants make a proffer about what

18   additional information they expect to learn from this

19   witness that justifies a third trip across the Atlantic

20   Ocean to depose Dr. McGovern.

21        We just think that at this point it is unduly

22   burdensome and, alternatively, perhaps given that the

23   defense counsel had arranged to pay Dr. McGovern and his

24   lawyers $50,000 in connection with his testimony that was

25   scheduled and then cancelled last week, that perhaps the

1    more efficient approach if this is to go forward is to have

2    Dr. McGovern and his lawyers flown to the United States

3    rather than having a team of lawyers from here fly over for

4    a third time.

5              So I think that that is at least a brief

6    explanation of some of the issues that came up as we were in

7    the United Kingdom last week and returned on Saturday, and

8    we appreciate having the opportunity to update the Court on

9    that.

10             THE COURT:  Mr. Hulse.

11             MR. HULSE:  Good morning, Your Honors, first off,

12   Corey Gordon can't be here today to address this because he

13   is still in the hospital.  He developed a fever shortly

14   before the McGovern deposition.  He was put on bed rest.  He

15   did come back to the United States on Monday, but then

16   shortly thereafter was admitted to hospital where last I

17   heard last night he remains.

18             And so there was no question with Mr. Gordon being

19   the only 3M of the U.S. counsel there that it couldn't

20   proceed, and it certainly wouldn't have been able to proceed

21   while the counsel were over there given his serious health

22   condition.

23             Dr. McGovern's counsel, who we've worked with on

24   securing his voluntary appearance, offered the dates of

25   January 4th through 6th as the next available option for him

1     to be deposed.  Those are the only available dates that they

2     have in January before the discovery cut-off.  They have

3     offered also to present Dr. McGovern for two full days so

4     that each of the parties can have a full day of examination.

5           As to the importance of Dr. McGovern, I don't

6     think that really is something that is worthy of further

7     discussion.  On the very first appearance that was made by

8     plaintiffs' counsel before this Court when the issue of

9     general causation came up, plaintiffs' counsel handed up and

10    delivered the Court a copy of the McGovern study and said

11    this is what was established in general causation.  He is

12    true one of several authors.  Dr. Reed is also an author

13    too, but he is a vitally important person to the litigation.

14          What we have suggested to plaintiffs, if they

15    don't want to make another trip over there, is that we can

16    set up for them to participate by video as is often done

17    with overseas depositions.  We can certainly make that

18    accommodation.  But, basically, at this point, we have a

19    very important deposition.  We have been, contrary to

20    plaintiffs' counsel's statements, establishing conclusively

21    the ties between these study authors and Dr. Augustine and

22    his surrogates as we expected to do, and Dr. McGovern, the

23    deposition of Dr. McGovern will continue that.

24          What we don't understand is why on four weeks of

25    notice the plaintiffs cannot identify a single member of

20

```
 1          their team, and I note that there are several counsel

 2          present here, who can do this deposition on December 4th,

 3          5h, or 6th.

 4                    THE COURT:  January.

 5                    MR. HULSE:  I'm sorry, yes, Your Honor.  January

 6          4th, 5th, 6th.  We don't think any further proffer is

 7          needed.  We think we should just proceed on those dates, and

 8          plaintiff should identify somebody who can take the

 9          deposition whether it's overseas or by video conference.

10                    THE COURT:  Okay.  We're going to come back to

11          that.  We'll go through the remaining matters on the agenda

12          here.

13                    Cases?  Almost to a thousand?  Like the stocks

14          going almost to?

15                    MR. SZERLAG:  Good morning, Your Honor.

16                    THE COURT:  The psychological emotional barrier,

17          is it?

18                    MR. SZERLAG:  Currently in the MDL, we have

19          961 cases that are on file.  I think in the agenda in the

20          joint report, there are still a number of state court cases.

21          I believe there were four or five in state court.  I'm

22          sorry, five that are filed in State Courts other than Ramsey

23          County, and I believe the Ramsey County still stands at 45.

24                    THE COURT:  And it doesn't look like anything is

25          happening in the non-Ramsey State cases that we have to be
```

1        concerned about at this point?

2                    MR. SZERLAG:  That seems to be the case.  Yes,

3        Your Honor.

4                    THE COURT:  Okay.  And same anything with Canada?

5                    MR. SZERLAG:  Canada, I -- it doesn't appear that

6        anything has happened, and I have to say I think that

7        information was provided by defense counsel.

8                    THE COURT:  All right.  Ms. Young?

9                    MS. YOUNG:  Your Honor, just two brief points on

10       the state court case.  One is the Patita case filed in

11       Hidalgo County, Texas.  Those claims are joined with medical

12       malpractice claims, include a Bair Hugger claim, and it is

13       duplicative of a previously filed MDL claim.  And I spoke

14       with plaintiffs' state court counsel last week, and he

15       related, his assistant related to me that he's having

16       trouble getting in touch with MDL Counsel so that they can

17       resolve the duplicate filing and whether his federal case or

18       his state case would go forward.  So that is one we just

19       would like to have resolved by the two plaintiffs' counsel

20       that are involved in that case.  The federal case was filed

21       first, and I believe it's Mr. Gordon's firm that is on that

22       file.

23                   And then second, just last week 3M received a city

24       of St. Louis, Missouri, case that names 52 plaintiffs and

25       joining their Bair Hugger claims together.  3M's initial

 1    reaction to that Complaint is that it's an issue of

 2    fraudulent joinder.  There's one Minnesota plaintiff, and 13

 3    Missouri plaintiffs, and then plaintiffs from a wide variety

 4    of cases.  We understand that jurisdiction is a place where

 5    joinder is done to defeat diversity jurisdiction, so we are

 6    looking into all of our options and intend to pursue removal

 7    and transfer to the MDL.

 8              THE COURT:  Okay.  We'll just have to wait on that

 9    then.  Isn't that funny that the plaintiff in the Texas case

10    doesn't know who he or she is represented by?

11              MS. YOUNG:  I would probably have to ask

12    Mr. Gordon that.

13              MR. GORDON:  Your Honor, we haven't heard from --

14    are you talking about the Martinez firm?  Garcia Martinez,

15    isn't that the case?

16              MS. YOUNG:  I e-mailed a couple times all counsel,

17    and the last e-mail I did speak with state court counsel

18    last Friday.  His assistant said we understand the issue.

19    We're trying to get a call back from MDL counsel.  Perhaps,

20    he's reaching out to the wrong --

21              MR. GORDON:  Yeah, it must be, because I've seen

22    the e-mails, but I haven't received any phone calls or

23    messages.  I don't think any of us have from that law firm.

24              MR. SZERLAG:  I'll reach out to them.  I have not

25    heard anything from them.

1          THE COURT:  You'll liaise with them.

2          MR. GORDON:  You'll liaise.  Thank you, Judge.

3          MS. YOUNG:  Okay, thank you.

4          THE COURT:  Thank you.  All right, discovery?

5          MR. HULSE:  Your Honors, just briefly on

6    Dr. Augustine and the motion that we had.  We have received

7    the first two installments that were due from Dr. Augustine,

8    the two declarations that were ordered.  We believe that

9    they are not consistent with the Court's Orders.  There's

10   the document production that's forthcoming on the 20th.

11   It's our expectation that will probably not be in compliance

12   either, so we expect that we will be bringing a further

13   motion based on the Court's prior discovery motion within

14   this month.

15          I don't know that there's anything to spend much

16   time on here other than the predictive coding issue, which

17   I'm happy to address first.

18          THE COURT:  Why don't we move to that?

19          MR. HULSE:  So, and this has been of course an

20   ongoing discussion between us and plaintiffs' counsel.  The

21   basic result having gone through five rounds of training on

22   the predictive coding is that at the recall rate that we've

23   been targeting, which is 80 percent, we cannot achieve an

24   acceptable precision rate.  And precision is basically the

25   number that tells you of the documents that have been

1    identified as relevant by the system, what percentage of

2    them are actually relevant?  And so we are stuck after

3    multiple trainings at a precision rate that's roughly

4    20 percent.

5         The prior predictive coding that was done for the

6    Walton and Johnson cases ended up with a precision that was

7    far higher than that.  But in that case, 3M and its counsel

8    trained on their own.  We were basically able to be very

9    focused on telling the system what was relevant.

10        Here, we used a random set and applied broad

11   relevance criteria, and the bottom line is that the computer

12   cannot figure out a good rule for determining what is and is

13   not relevant.

14        So the approach that we are taking to this is that

15   there is another criterion that predictive, that predictive

16   coding uses, which is called threshold, which is essentially

17   rates the relevance of documents in the pool.  And so up to,

18   you know, a hundred percent likelihood that the document is

19   going to be relevant.

20        And so what we have told plaintiffs' counsel that

21   we intend to do is take the top two tiers of documents on

22   that relevance ranking, which is over 200,000 documents,

23   which is consistent with a number that we believe based on

24   our training is going to be actually relevant, and we are

25   accelerating them for production over the next several

1      weeks, and that review is underway.

2            Our proposal for the remainder of the documents

3      given the low precision rating here is to apply a set of key

4      words and other screening criteria to get directly at the

5      documents most likely to be relevant.

6            I want to reiterate that we have produced a large

7      quantity of e-mail already in the case both through the

8      prior use of predictive coding and through the use of key

9      words, and plaintiffs have been able to use those e-mails

10     throughout.  And it remains our expectation that

11     overwhelmingly what would be produced through the remainder

12     of this process by the close of discovery is going to be of

13     minimal relevance, and so, and we continue to believe that

14     we will be able to accomplish this so long as we can proceed

15     along with the plan I've outlined by the close of fact

16     discovery.

17            THE COURT:  What do you think should happen?

18            MR. HULSE:  I'm sorry, Your Honor?

19            THE COURT:  What do you propose?

20            MR. HULSE:  So what we propose is that we proceed

21     as I've just outlined and have shared with plaintiffs'

22     counsel.  And if plaintiffs reach the conclusion at the

23     close of fact discovery that based on documents that have

24     come in in January, that there is additional discovery that

25     they need to take or that they need to do re-deposition of

1   witnesses, that they should make a showing on that, and we

2   will cooperate with them based on the showing that they

3   make.

4           But, of course, we recognize that there's going to

5   be a substantial quantity of e-mails that are still produced

6   in January.

7           MAGISTRATE JUDGE NOEL:  So what -- I guess I'm not

8   sure I'm following exactly what is your plan for getting to

9   this?

10          MR. HULSE:  So our plan is we take the 200,000

11  e-mails that our system tells us are the most likely to be

12  relevant, and we have got those prioritized for review and

13  production.  For the remainder, what we propose to do is

14  apply key words and other screening criteria to identify the

15  relevant documents within that group because we know that

16  they, that group, even though the system has flagged them as

17  particularly relevant, we know from the training that they

18  are in fact likely to be 80 to 90 percent nonrelevant.

19          It's just that the system after all of this

20  training cannot figure out a good rule for deciding what is

21  and is not a relevant e-mail.  And, again, we were able to

22  achieve in the predictive coding that was done in Walton and

23  Johnson, an acceptable precision rate by this point, and we

24  couldn't accomplish it here.

25          THE COURT:  Okay.  Do you have a 502 Order in your

1    protective order?

2             MAGISTRATE JUDGE NOEL:  A clawback thing?  A

3    Rule 502 protection for clawback of --

4             MR. HULSE:  Yes, we do, yes.

5             THE COURT:  Could you turn over all those 20,000,

6    all those 200 million over to them, and let them see if they

7    can do a better job?

8             MR. HULSE:  Your Honors, we -- no.  No, and

9    especially given, again, that we know from the training

10   which was done on a random set, that the relevance rate is

11   about, is probably about 16 percent of the whole.  So,

12   obviously, Rule 26 limits discovery to relevance documents.

13   We're talking about turning over a massive quantity of

14   irrelevant documents, not to mention that privilege, we've

15   got privilege too that we need to go through.

16            THE COURT:  Which is why I asked about the 502

17   Order.

18            MR. HULSE:  Right, we do, but we're talking about

19   massive, massive quantities of privileged and irrelevant

20   documents.

21            MAGISTRATE JUDGE NOEL:  Okay.

22            THE COURT:  All right.

23            MR. HULSE:  And here's what I suggest if the Court

24   is contemplating anything along these lines, we've had no --

25   this is being raised in a status report.  We haven't had

1    motion practice on it, and we would suggest that we go to

2    full briefing.  I think it's a better use of our time to

3    follow this plan.  It's an acceptable plan.  It will get at

4    the most relevant documents within the time frame left for

5    discovery.

6              MAGISTRATE JUDGE NOEL:  Okay.

7              MR. PAREKH:  Your Honors, we obviously do not have

8    an agreement on this and what Mr. Hulse has represented, to

9    date, 3M has produced 131,000 documents total to date.

10   They're talking about an additional 200,000 documents just

11   in the top 20 percent.  If you look at the total number of

12   documents that reach the recall rate of 80 percent, which

13   was the agreed to recall rate in July between us and

14   defendants, we're talking at least 1.2 million documents,

15   not pages, 1.2 million additional documents, and possibly up

16   to 1.9 million additional documents.

17             This is not something that we contemplated when we

18   entered into the CAR protocol.  We did not anticipate this

19   kind of delay from 3M.  And 3M only started, only started

20   the training process in November.  There was no reason for

21   them to have waited from July to November to start this

22   training process.  All of this could have been avoided had

23   3M diligently pursued its training process and diligently

24   pursued its course.  We have an agreed to order that says 3M

25   must produce documents that reach an 80 percent recall rate.

1          MAGISTRATE JUDGE NOEL:  As I understand it,

2     whatever they're using isn't generating it.  You're not

3     getting 80 percent, so how do you make the computer get

4     there?

5          MR. PAREKH:  Your Honor, we are getting

6     80 percent.  What we're not getting is a precision rate.

7     The CAR protocol does not have a threshold for precision.

8     We wanted to negotiate one.  Defendant said, you know, we

9     don't need a precision threshold, as long as we have a

10    recall threshold.  So the difference between, if I may for

11    just a moment.

12         THE COURT:  I mean it's like having a grid with

13    only an X axis.

14         MR. PAREKH:  Well, you do need both, but if you

15    have an 80 percent recall rate, that means we're already

16    losing 20 percent of relevant documents.  We're not even

17    seeing those.  What they want to do is effectively reduce

18    that recall rate to about 20 percent.  So 80 percent of the

19    relevant documents will be missed.  If they can't get their

20    CAR to work properly, what they need to do is turn over the

21    entire 1.9 or 1.2 million e-mails.  It's not clear because

22    of the way the data was presented which number that is that

23    hit the 80 percent recall rate, which is the agreed to rate

24    in the CAR protocol, and let us deal with trying to get the

25    precision rate down for purposes of our review.

1          We have a robust clawback provision.  They can

2     review for privilege if they want.  They don't have to.

3     They can review for relevance if they want.  They don't have

4     to.  But at this point, we're stuck, and we don't even have

5     half the documents.

6          Like I said, even taking their number of 200,000

7     additional documents, that's more documents than they have

8     produced to date.  And they're saying that they can only get

9     those 200,000 documents produced by January 20th.  That

10     leaves us no time to review the documents, no time to

11     analyze the documents, and no time to take depositions at

12     the end of discovery.  I mean it's just, it's just, it's not

13     possible to do it that way.

14          THE COURT:  Well, what do you suggest short of

15     turning over everything?

16          MR. PAREKH:  We're not asking them to turn over

17     everything.  Everything would be approximately 2.5 million

18     documents.  We're saying do what you said you were going to

19     do, which is turn over all the documents that using your own

20     system hit the 80 percent recall rate.

21          THE COURT:  But they don't.  I mean they don't

22     have their own -- they can't reach an 80 percent recall

23     rate.

24          MR. PAREKH:  No, they can.  They can reach an

25     80 percent recall rate.  What they can't reach is a

1     precision rate that's acceptable to them.  It's acceptable

2     to us.  We'll take the 17.1 percent precision rate.

3               THE COURT:  Mr. Hulse?  You can both be up there.

4               MR. HULSE:  Let me clarify, Your Honor.  And so

5     the issue here is not that they were ever entitled under the

6     CAR protocol to simply get everything that hits the

7     80 percent recall.  We still are entitled to review for

8     privilege and relevance.  This is a system to get to that

9     set.

10              What we agreed on is that because it's very, very

11    difficult to achieve an 80 percent precision rate without

12    training forever months and months and months and months of

13    training, is that we would leave that blank and see if we

14    could simply reach agreement on an acceptable precision.

15              Now, what's happened here is we've trained, and

16    this is not, we've litigated several times here why the

17    timing is what it is.  And this is a collaborative process

18    that the plaintiffs insisted on, and the reason we got

19    started when we did is because of them not because of us.

20              But once we went through the training and

21    following the process that was prescribed by the protocol,

22    it simply couldn't get to a point where the system could

23    effectively at the 80 percent recall rate distinguish

24    garbage from non-garbage.  And so what that means --

25              THE COURT:  Let me just ask one question, and I

32

1    think Judge Noel has a question too.

2             Suppose you turn over what you do have even though

3    it's not, you know, you've got the subset that meets the --

4    and you haven't had a chance to review it for everything

5    else, but you work with them, those documents are all out

6    there.  You've got your clawback, you've got your 502

7    protection, and use that evidentiary and discovery tool to

8    work together using that set of documents.  And there will

9    be some privilege information in there, and there will be a

10   lot of irrelevant information because you haven't been able

11   to narrow it down.  But at least it would be, then you could

12   work collaboratively with a universe of documents and, you

13   know, maybe we have to bring in a discovery expert or

14   something.

15             MR. HULSE:  I suggest, Your Honors, there's no

16   need for that because we already have the tools here to get

17   where we need to go.  And while there's been a lot of

18   resistance on the other side to use of a keyword type

19   approach, that can help us get where we want to get.

20             What we're struggling with here is we have an

21   extremely broad set of relevance criteria that the parties

22   have worked out.  That means that, you know, much of what

23   just relates to Bair Hugger in some sense gets deemed

24   relevant.  So all that we would -- there's no magic in here

25   in all of a sudden working with the plaintiffs' counsel on

1    predictive coding.  All we would end up doing is more

2    training and taking more time.  What makes more sense is for

3    us to just get through these documents, get through the top

4    tier, apply key words to the lower tier, and get those

5    reviewed and get to them, but otherwise I think that if we

6    try to go back and retrain collaboratively, we're just going

7    to end up taking more time.

8                THE COURT:  How long is it going to take you to do

9    that?

10               MR. HULSE:  Well, we will accomplish it by the

11   close of discovery in the first tier.

12               THE COURT:  What was the qualifier?

13               MR. HULSE:  I'm sorry?

14               THE COURT:  You said the first tier you'd be done

15   by January?

16               MR. HULSE:  Yes, so what we are trying to do is we

17   are trying to get the first two tiers reviewed and produced

18   by the end of the first week of January.  And, again, I want

19   to reiterate, there has been substantial e-mail production.

20   It was the product of predictive coding in the first

21   instance, and we ran agreed key words per agreement with the

22   plaintiffs' lawyers, so this is -- we've captured a lot of

23   stuff.

24               MAGISTRATE JUDGE NOEL:  Is it a fair evaluation to

25   say that the predictive coding process that you have agreed

1        upon simply isn't working or is that an overstatement?

2               MR. HULSE:  It's only overstated in this regard,

3        Judge Noel, that the threshold ranking that I mentioned that

4        comes out of this that we have allows us to identify the

5        documents that are most likely to be relevant, and so that

6        is very useful for us.  It allows us to prioritize and focus

7        on the documents that have the highest probability to be

8        relevant.

9               THE COURT:  Same question for you, Mr. Parekh.

10              MR. PAREKH:  I think the system isn't working for

11       a couple of different reasons.  One is that the system that

12       they're using for predictive coding Clearwell is essentially

13       outdated at this point in terms of current technology versus

14       the system that we would be using internally to do our

15       review of these documents.

16              THE COURT:  What system is that?

17              MR. PAREKH:  It's a system called "Relativity,"

18       but we would also be using a system called "Catalyst" on the

19       back end to do some of the predictive coding, which allows

20       you as you review documents to in real time have the system

21       learn, and it's called "Continuous Learning."  That's the

22       system that works much, much better than the Clearwell

23       system that 3M insisted they wanted to use.

24              Number two, the relevance criteria, we had no

25       input into in terms of the total way it was defined.  We

1    were allowed under the protocol, despite our initial

2    suggestion that we collaboratively both of us in a same room

3    work to define what is a relevant and nonrelevant document.

4    3M refused to do that, and said we agree to a set of quality

5    control criteria.

6          At the last status conference, in order to

7    expedite this process, plaintiffs waived all of their

8    protections.  All of the quality control criteria that we

9    had painfully negotiated, we agreed to give up so that we

10   could get this process done faster, and yet we're still here

11   today.  We bent over backwards to do what we can to get this

12   to work, and we've been stymied at every point.  And we just

13   think at this point they need to do what they were going to

14   do, which is turn over the documents that their system has

15   marked as being relevant, and let us deal with that.  And

16   then we can come back to the Court once we see those and say

17   this is how much additional time we need based upon what

18   we're finding.

19         MR. HULSE:  What predictive coding has never meant

20   in any case that I've ever seen is that once you hit the

21   recall criteria, you turn everything over, Maybe minus

22   privilege.  That's not what it means.

23         What it means is it's a methodology that can be

24   more or less successful for identifying, for getting more

25   quickly to the set of documents that are then going to be

1     reviewed for relevance.  That's the process.

2              THE COURT:  So, Mr. Hulse, do you need more time

3     or not, if you are going to do it your way?

4              MR. HULSE:  If we do it our way, we do not need

5     more time, Your Honor.

6              MR. PAREKH:  But, Your Honor, their way leaves

7     80 percent of the documents that the system has marked

8     relevant out of the equation.

9              MR. HULSE:  It would not.  It would simply use

10    another methodology, which is keywords, which is what we've

11    all used up until the error of predictive coding, to cut

12    through that mass of irrelevant documents and hone in on the

13    relevant ones.

14             MR. PAREKH:  Which would result in a negotiation

15    on keywords that would again take a period of time.

16             THE COURT:  What about the information that the

17    plaintiffs have gotten so far?  What themes have emerged

18    from that discovery?  What do you see in that?

19             MR. HULSE:  What themes?

20             THE COURT:  From the plaintiffs' point of view.

21             MR. HULSE:  I would be hard pressed to articulate

22    their themes.  I could try.

23             THE COURT:  No, I'm asking them.

24             MR. PAREKH:  I'm probably not the best person to

25    answer it, but I will give it a shot.  The themes that we're

1    seeing are primarily the fact that 3M put their head in the

2    sand and intentionally chose not to do testing on the Bair

3    Hugger system in terms of error and contamination, despite

4    the fact that there were things that were brought to the

5    attention of 3M on that process.

6              THE COURT:  Okay, so what you've seen is

7    information that was transmitted to 3M that you allege

8    should have alerted them that there was a potential problem?

9              MR. PAREKH:  Right, in fact the model --

10             THE COURT:  So you have those things?  Or you have

11   some of those?

12             MR. PAREKH:  We have some.  We don't, I mean we

13   obviously don't have everything, but we've seen some of

14   that.  One of the things that we recently found on the

15   production that was actually just produced a couple of weeks

16   ago was the label for the Bair Hugger 500, one of the older

17   ones, and that label specifically states on it, "please

18   don't use this over a wound site because there is the

19   possibility of airborne contamination."  That warning did

20   not make it to any of the subsequent devices.

21             So, I mean, yes, we found things where it shows

22   that 3M had knowledge of the possibility of airborne

23   contamination as we've been saying from day one, and they

24   either didn't do it or took it off or took steps to hide it.

25             We also have a lot of stuff that we've seen where

1    any time anyone criticized the Bair Hugger system in any

2    way, 3M aggressively went through and tried to attack them

3    both personally and professionally.  And they had an entire

4    team that's entire job was let's take anything that possibly

5    discredits the Bair Hugger and do whatever we can to stop it

6    including Dear Doctor letters and other things like that.

7    Those are the themes that we're seeing underlying the --

8         MR. HULSE:  I think what I was referring to is us

9    responding to Dr. Augustine, but --

10        THE COURT:  So, no, I just was asking if there

11   were themes that had emerged for the purpose of asking a

12   followup question, which is does the information that the

13   plaintiffs have received so far give you an idea of how you

14   might be more specific in what you're asking for?

15        Can you go deeper on some of the warnings or the

16   complaints or the attack, the complainer, are you following

17   up in that way?

18        MR. PAREKH:  Yes, absolutely.

19        THE COURT:  Okay.

20        MR. PAREKH:  And we've been doing that in depos,

21   but we've also been what one of the things that we would be

22   doing if we get them to turn over the documents to us is

23   using the documents that we've currently identified as being

24   hot or, you know, important to the case and using that to

25   then use predictive coding to evaluate those additional

1      documents that would be produced to us and rank them and

2      review them that way as well, which is also one of the

3      reasons why we think that, you know, having 3M turn over the

4      80 percent criteria documents makes sense.  Let us do the

5      work to figure out what's good and what's not because they

6      can't.

7                  MR. HULSE:  It would be remarkable if this

8      process, which they insisted on and then did not work as

9      well as they like, that because it did not work as well as

10     they'd like --

11                 THE COURT:  Yeah, we're not listening.

12                 MR. HULSE:  I'm sorry, Your Honor.  I couldn't

13     help myself.

14                 MAGISTRATE JUDGE NOEL:  And I apologize for not

15     listening.  It was my fault that I engaged Judge Ericksen in

16     a private conversation.

17                 MR. HULSE:  You're entitled not to listen, Your

18     Honors.

19                 THE COURT:  Is there anything on the depositions

20     to discuss?  Enough on this predictive coding business for

21     the moment.

22                 MR. CIRESI:  Good morning, Your Honors.

23                 THE COURT:  Good morning.

24                 MR. CIRESI:  As one of the individuals who has

25     taken many of the depositions, and Your Honor asked would

1    they need more time?  I think there has been some

2    discussions among those who are dealing with this issue

3    about extending some of the discovery deadlines, but let me

4    just give one example.

5            I think it's 10 days after the documents have to

6    be produced, we need to submit expert reports.  Documents

7    are critical in this case.  I know that from taking the

8    depositions.  They are suggesting that, and I'm not going to

9    get into the granularity of what they've been discussing,

10   but I think it's impossible for the plaintiffs to take the

11   types of depositions that need to be taken without a robust

12   production of documents.

13           THE COURT:  So that would be the ones that are

14   scheduled that are listed here the --

15           MR. CIRESI:  Your Honor, yes, none of the ones

16   listed.  I have one coming up Monday, the ones we've taken,

17   I mean I've taken the director of R&D.

18           THE COURT:  Is that Michelle Holt Stevens?

19           MR. CIRESI:  Stevens, yes, that's Monday, Your

20   Honor.  And I don't have the whole schedule in front of me

21   right now, but that is one.  I have another one in January,

22   but what's being suggested here is that at least two times

23   the amount of documents that have already been produced are

24   going to be produced.  I have no idea as I stand here today,

25   and I don't think anybody does, how relevant and critical

1     some of those documents may be to the depositions that we've

2     already taken, let alone that we need to take.

3              So we have to get all of these documents, review

4     them, and then use them in the depositions.  And there is a

5     list here of the depositions.  And I believe, Your Honor,

6     it's on the joint agenda and report for this conference on

7     page 11.  So that shows the ones that have been completed

8     and the ones that are still noticed.  And we have some

9     30(b)(6) that we haven't yet noticed so, and that would

10    depend upon what documents we see.

11             I say this because I know there's been some

12    discussion about extending the deadlines, and everybody has

13    got schedules, and I know the Court has an extremely heavy

14    schedule in this district.  So I'm just forewarning that

15    we're probably going to request an extension.  We're going

16    to have to.  And if the defense wasn't want to admit that,

17    I'm going to tell you that that might be necessary.

18             We're working as diligently and as hard as we can

19    to comply with the discovery orders that exist today, but to

20    suggest that you're going to come in with double the

21    documents and then we have to get to our experts, evaluate

22    them, let them evaluate them, and get it to them within

23    10 days after the production comes in, it's impossible, let

24    alone to take the depositions, which the experts would also

25    need to compile their reports.  So I don't know how this

1     addresses the granularity of what the protocol should be.

2                 THE COURT:  No, we're done talking about that.

3                 MR. CIRESI:  Yeah, but we need to find some

4     rational way that we can get these documents and that we

5     have a workable schedule that gives us an ability to take

6     the depositions that need to be done.  And for that matter,

7     for the defense to be able to ask whatever questions they

8     have to to get this prepared without prejudice to either

9     party.

10                THE COURT:  Okay, thank you.

11                MR. HULSE:  Your Honors, there has not been any

12    discussion that I'm aware of between lead counsel about what

13    a discovery extension would be.  From my role, what I can

14    speak to is that just simply that we have a plan to get the

15    documents produced within the current schedule, and that our

16    viewpoint is that to the extent that plaintiffs view that

17    they need more time for particular things, whether it's

18    specific depositions or re-depositions and so forth, then

19    they should make the case for that.

20                Certainly, however, from our perspective, it is

21    preferable to have an extension of discovery than a

22    procedure, which would infringe on our rights under Rule 26

23    not to have to turn over nonrelevant and privileged

24    documents to the other side.

25                THE COURT:  Okay.  Well, I think we're going to go

43

```
1    confer here momentarily, but while I have you, you said with
2    respect to Dr. McGovern that the dates that were given
3    within the current schedule were these first week of January
4    dates.
5              MR. HULSE:  Right, Your Honor.
6              THE COURT:  Were there dates that were later in
7    which the doctor would be available, but they just weren't
8    before January 20th?
9              MR. HULSE:  We do not.  We haven't discussed later
10   dates with Dr. McGovern's counsel, so I couldn't speak to
11   that.
12             MR. GORDON:  Your Honor, they've addressed that --
13             MR. CIRESI:  I believe, Your Honor, on the joint
14   agenda report that's submitted at page 4, it says that it
15   might be more problematical to find available consecutive
16   dates later in January, so I don't think it's been fully
17   explored with respect to whether those dates are or are not
18   available.
19             MR. HULSE:  It might be more problematical, our
20   British solicitor informs us.
21             THE COURT:  I know, I lived there for two years.
22   I know what that means.
23             MR. HULSE:  We have revisited it with them, with
24   Dr. McGovern's counsel, Your Honor, and they've said that's
25   it for January.  And we have not explored later months.
```

```
 1                THE COURT:  Well, I suppose the reason

 2    Dr. McGovern is available those days might be the same

 3    reason that at least some, I mean I'm sure the whole

 4    plaintiffs' team isn't taking the week off.

 5                MR. HULSE:  It has to do with the academic

 6    calendar, I believe actually, Your Honor.

 7                THE COURT:  Oh, does it?

 8                MR. HULSE:  Yes.

 9                THE COURT:  But they have those short -- then they

10    must have another break at the end of February or something.

11                MR. HULSE:  I admit it's a bit arcane to me but.

12                THE COURT:  Michaelmas and --

13                MR. HULSE:  Michaelmas, yes.

14                MR. ASSAAD:  Your Honor, on the e-mail from

15    Dr. McGovern's solicitor, those were the only two dates

16    available, if they want to do two days of depositions back

17    to back.  He did indicate that they had days available for

18    one day for deposition in January, and I don't think his

19    deposition needs two days.  I think one day would be plenty

20    of time that we'll agree to as to when, and now after they

21    cancelled another one --

22                THE COURT:  Yeah, we understand how they

23    cancelled.  I mean the guy is sick.  You're not questioning

24    that he's sick.

25                MR. ASSAAD:  Yes, I understand that --
```

1          MR. HULSE:  Well, they did question it, Your

2    Honor, and he's in the hospital.

3          THE COURT:  Okay.  We'll take a 10-minute recess.

4               (Morning Recess at 10:35 a.m.)

5                     (10:49 a.m.)

6                   (In open court)

7          THE COURT:  Go ahead and be seated, thank you.

8          We've heard plenty, I think, this morning, and you

9    need a decision like now so here it is.

10         MAGISTRATE JUDGE NOEL:  And with that

11   introduction, so on the first issue, which is this

12   predictive coding thing, we've concluded that the

13   defendant's proposal to, as I understand it, essentially do

14   a traditional ESI search of the relevant universe of

15   documents and produce what you come up with is what should

16   happen, and you should go forth and do that as quickly and

17   as efficiently as you can within the current schedule.

18         Then it appears that there will also be some need

19   to adjust dates in the schedule to allow all of the

20   discovery that needs to be done to be completed.  And for

21   that, we're going to order that each side submit to us a

22   proposed amended scheduling order.  And you should get those

23   competing proposals to us by the first of January.

24         As to the deposition of Dr. McGovern, we are of a

25   mind that it should remain on the dates that it is currently

1    scheduled and that the plaintiffs should be permitted to

2    participate by video conference, if that's what they choose

3    to do as opposed to sending a lawyer to the United Kingdom

4    for a third time.

5           And then once we get your competing proposals as

6    to what the amended scheduling order should look like, we

7    will issue an amended scheduling order that will either pick

8    one or the other.  And I guess we're not eliminating, which

9    sometimes I will do, the potential to pick and choose and/or

10   cut and paste.  But bear in mind as you're preparing your

11   proposed competing schedules, that we may well just pick one

12   or the other, so you want to make yours the most reasonable

13   and most likely for the Court to pick.

14          THE COURT:  I think that's everything.

15          MR. GORDON:  One housekeeping question, Your

16   Honor, if I may.  I noticed that January 1st is a Sunday,

17   and I maybe will just throw this out there without having

18   conferred yet.  I wonder whether I mean you said no later,

19   then maybe we could do it before January 1st, given a couple

20   of dates that occur in December, I wonder if we should talk

21   about something a little sooner perhaps.

22          MR. HULSE:  I think that makes sense from our

23   perspective, Your Honor.

24          THE COURT:  Okay.  Mr. Gordon, pick a date.

25          MAGISTRATE JUDGE NOEL:  If you want to agree on an

1   earlier date, agree on whatever date you want to agree to,

2   but we want it by the first of January.  And if it is in

3   fact a Sunday, what that means is whatever Rule 6 or

4   whatever the rule is that tells you how to count days, I

5   think it would be the next day that's not a Saturday, Sunday

6   or holiday, which I believe would be Tuesday the 3rd,

7   because I believe the 2nd is the day we celebrate if the 1st

8   is a Sunday.  But if you want to agree to an earlier date,

9   we'll be happy to receive it on whatever day you agree upon.

10           MR. HULSE:  We'll confer with Mr. Gordon and his

11  co-counsel.

12           MR. GORDON:  Thank you, Your Honor.

13           THE COURT:  All right.

14           MAGISTRATE JUDGE NOEL:  Anything else?

15           MR. HULSE:  No, Your Honors.

16           MR. CIRESI:  Nothing, Your Honor.

17           THE COURT:  All right.  Thank you all very much.

18               (Court adjourned at 10:53 a.m.)

19                     *      *      *

20                   REPORTER'S CERTIFICATE

21        I, Maria V. Weinbeck, certify that the foregoing is

22  a correct transcript from the record of proceedings in the

23  above-entitled matter.

24           Certified by:  *s/ Maria V. Weinbeck*

25                       Maria V. Weinbeck, RMR-FCRR