# EXHIBIT 34

Page 1

1             UNITED STATES DISTRICT COURT
                 DISTRICT OF MINNESOTA
2    ------------------------------------------------------
3    In Re:
4    Bair Hugger Forced Air Warming
     Products Liability Litigation
5
     This Document Relates To:
6
     All Actions                            MDL No.
7                                           15-2666 (JNE/FLM)
8    ------------------------------------------------------
9
                     VIDEOTAPED DEPOSITION
10
                             OF
11
                    CHRISTOPHER NACHTSHEIM
12
                    Minneapolis, Minnesota
13
                 Tuesday, November 29, 2016
14
15   ------------------------------------------------------
16
17
18
19
20
21
22
23
24   Reported by:
     Amy L. Larson, RPR
25   Job No. 113495

Page 326

1  NACHTSHEIM
2  the question.
3      THE WITNESS: That would be the
4  next best alternative.
5  BY MR. SACCHET:
6  Q. Why is that?
7  A. Here what we're doing with the -- with the
8     randomized -- with a clinical trial is that
9     we're going to actually put both -- both
10    types of blankets in practice and we can look
11    at -- look directly at infection rates that
12    result from the two different conditions, and
13    that's the -- that's the clinical study. If
14    you're looking at -- if you want to know
15    about infections, I think you're limited to
16    looking at observational studies such as --
17    such as the one that we report on.
18        We did -- we did experimental
19    studies on bubbles, but we can't do
20    experimental studies on infections without --
21    without resorting to a clinical trial of some
22    kind.
23        So I think that, yeah, I think you
24    probably -- if you want to look at
25    infections, I think you're -- I think you're

Page 327

1  NACHTSHEIM
2  probably limited to observational data.
3  Q. Isn't it true that a well-designed
4     observational study can render results
5     extremely similar to a properly conducted
6     randomized trial --
7        MS. GARCIA: Object --
8  BY MR. SACCHET:
9  Q. -- on the same subject matter?
10       MS. GARCIA: Object to the form of
11    the question.
12       THE WITNESS: I think that can
13    happen, but I don't believe that the level of
14    proof reaches the same -- I don't think that
15    the proof reaches the same level of rigor.
16    There's just always that chance in
17    observational studies that -- I mean, I think
18    there's a greater chance that something -- a
19    confounding factor might be present,
20    something you just hadn't thought of.
21 BY MR. SACCHET:
22 Q. But it is possible that if statistical
23    significance is found based on observational
24    data, that that significance may be
25    replicated in a randomized control trial?

Page 328

1  NACHTSHEIM
2  A. Yes.
3  Q. So the observational data that is presented
4     in the McGovern study is certainly valuable,
5     is it not?
6        MS. GARCIA: Object to the form of
7     the question.
8        THE WITNESS: I think it's
9     valuable.
10 BY MR. SACCHET:
11 Q. That's why you published the observational
12    data, correct?
13 A. Yes.
14 Q. You were previously asked about potentially
15    confounding factors with respect to the
16    observational data that was presented in the
17    McGovern study, correct?
18 A. Correct.
19 Q. And some of those potentially confounding
20    factors dealt with infection control
21    measures, correct?
22 A. Correct.
23 Q. If we could turn to page 1540 of Exhibit 4,
24    the McGovern study.
25 A. (Complies.)

Page 329

1  NACHTSHEIM
2  Q. I want to make sure that we are on the same
3     page with respect to the change that occurred
4     as to the antibiotic regime. Would you agree
5     that an antibiotic called Gentamycin was
6     applied during the forced-air warming period
7     from July 1st, 2008, to the end of February
8     2009? It's about halfway down the paragraph.
9  A. I see it. From July 2008 to February 2009 a
10    single dose of Gentamicin 4.5 was given at --
11    at induction.
12 Q. Whereas, a combination of Gentamycin and
13    Teicoplanin -- and I'd be surprised if any of
14    us know how to pronounce it, but that's how
15    I'm going to say it -- was applied during the
16    end of the forced-air warming period and
17    throughout the entire conductive fabric
18    warming period, which would namely be
19    March 1st, 2009, until January 2011, correct?
20       MS. GARCIA: Can you please point
21    to where you're reading from?
22       MR. SACCHET: So I am interpreting
23    what's said in this paragraph and based on
24    what's presented in Figure 7 so --
25       MS. GARCIA: Okay. Then I'll

Page 330

1  NACHTSHEIM
2  object to the form of the question.
3       THE WITNESS:  I -- I read this --
4       MR. SACCHET:  I can walk through
5  it slower.
6       THE WITNESS:  Well, I read this to
7  say that in March 2009 there was a change to
8  the combination of the two drugs you've
9  pronounced, and I don't believe there were
10 any changes until the end of the study.
11      MR. SACCHET:  Okay.
12 BY MR. SACCHET:
13 Q. So -- so we're clear, there was a period in
14    which Gentamycin was applied to some
15    forced-air warming patients, and then the
16    antibiotic changed to a combination of
17    Gentamycin and Teicoplanin that applied to
18    some forced-air warming patients and all of
19    the conductive fabric warming patients,
20    correct?
21 A. Correct.
22 Q. Assuming the change in antibiotic did not
23    affect infection rates between warming
24    devices, would you still consider the
25    antibiotic a confounding variable?

Page 331

1  NACHTSHEIM
2       MS. GARCIA:  Object to the form of
3  the question.
4       THE WITNESS:  I'm going to assume
5  that it has -- the change had no effect?
6  BY MR. SACCHET:
7  Q. Yeah, assume that the antibiotic had no
8     effect on the infection rate.  Would it still
9     be a confounding variable?
10      MS. GARCIA:  Object to the form of
11 the question.
12      THE WITNESS:  I don't think it
13 would be -- I don't think it would be
14 considered a confounding variable.  I'm
15 trying to think of how else it might have an
16 impact, if it's not having an effect.  I
17 guess it -- no, I don't think it would be,
18 yeah.
19 BY MR. SACCHET:
20 Q. One way that we could control for the -- let
21    me strike that.
22      In order to determine whether the
23 antibiotic had an effect on infection rates,
24 we could control for the warming device --
25 A. Yes.

Page 332

1  NACHTSHEIM
2  Q. -- and evaluate whether infection rates
3     between the changed antibiotic stayed the
4     same or went up or down --
5  A. Correct.
6  Q. -- with that control device, correct?
7  A. (Nods head.)
8       MS. GARCIA:  I'm going to object
9  to the form of the question.
10 BY MR. SACCHET:
11 Q. Did you understand it?
12 A. Yes.
13 Q. If infection rates between the two groups
14    were similar, that would tend to show that
15    the antibiotic was not a confounding factor?
16 A. Correct.
17      MS. GARCIA:  Object to the form of
18 the question.
19 BY MR. SACCHET:
20 Q. Assume that Mr. Albrecht, who you previously
21    mentioned was an expert in statistics and you
22    had full confidence in his ability to analyze
23    data presented in this article, informed you
24    that he found a 2.8 percent infection rate in
25    those who received Gentamycin, a single drug,

Page 333

1  NACHTSHEIM
2  but 3.1 percent of patients who received the
3  combination of antibiotics, but also
4  forced-air warming patients, with a nearly
5  identical infection rate, would you determine
6  that the antibiotic was a confounding factor?
7       MS. GARCIA:  Object to the form of
8  the question.
9       THE WITNESS:  That would be strong
10 evidence that it was not a confounding
11 factor.
12      MR. SACCHET:  Let's mark this.
13      (Whereupon, Exhibit 27 was
14      marked for identification.)
15 BY MR. SACCHET:
16 Q. So just to be clear, if we look at this table
17    that's presented here, we can see in the
18    first line it presents antibiotic protocol 1
19    versus 2 for FAW, does it not?
20 A. It does.
21 Q. Assume that protocol 1 is the singular
22    antibiotic, i.e. Gentamycin, and that
23    protocol 2 is the combination of Gentamycin
24    and Teicoplanin.
25 A. Uh-huh.  Yes.

Page 334

NACHTSHEIM

Q. In this particular analysis, forced-air warming is held constant, correct?
A. Correct.
Q. And for forced air, protocol 1, the percent of patients developing infection was 2.8?
A. Correct.
Q. And for forced air, protocol 2, involving patients who received both Gentamycin and Teicoplanin, the infection rate was 3.1, correct?
A. Correct.
Q. And the p-value was 0.839, correct?
A. That's what's reported here.
Q. That's what's reported here. We could conclude, based on this data set of these numbers, that when the patient-warming device is held constant, that the change in antibiotic had no effect on infection rates, correct?
  MS. GARCIA: Object to the form of the question.
  THE WITNESS: Assuming there's sufficient power in those sample sizes, although they look fairly large to me, yes.

Page 335

NACHTSHEIM

BY MR. SACCHET:
Q. The patient population for forced-air protocol 1 was 389 patients, correct?
A. Correct.
Q. And the patient population for those receiving the combination was 678, correct?
A. Correct.
Q. Those are fairly large patient populations, correct?
A. Correct.
  MS. GARCIA: Object to the form of the question.
BY MR. SACCHET:
Q. Another way to determine whether the antibiotic was a confounding variable would be to control the antibiotic, but evaluate different infection rates between different forced-air -- or different warming devices, correct?
A. Yes.
  MS. GARCIA: Object to the form of that question also.
BY MR. SACCHET:
Q. And if the infection rates were still higher

Page 336

NACHTSHEIM

among those who received forced-air warming compared to those who received conductive fabric warming, that would tend to show the antibiotic did not substantially affect infection rates, correct?
A. Correct.
  MS. GARCIA: Object to the form of the question.
BY MR. SACCHET:
Q. And if that's true, the change in antibiotic would also not be a confounding factor, correct?
A. Correct.
  MS. GARCIA: Object to the form of the question.
BY MR. SACCHET:
Q. If I could --
  MR. SACCHET: Could I ask your basis for the objection?
  MS. GARCIA: I'm sorry?
  MR. SACCHET: Could I ask your basis for the objection on form?
  MS. GARCIA: Yes. You keep using the word, "determine," and you keep using the

Page 337

NACHTSHEIM

word, "show," and you keep using the word, "establish," and I'm objecting to the form of the question based on those terms.
  MR. SACCHET: That's not going to pass muster in the court.
BY MR. SACCHET:
Q. As to the hypothetical I just presented, if you could turn your attention to the second line of the table.
  MS. GARCIA: I'm sorry, to just be complete with my form objection, it's also an incomplete hypothetical.
  MR. SACCHET: Fair enough.
BY MR. SACCHET:
Q. Antibiotic protocol 2 involved a combination have Gentamycin and Teicoplanin, correct?
  MS. GARCIA: Object to foundation --
BY MR. SACCHET:
Q. -- for the sake of --
A. Yes.
  MS. GARCIA: Excuse me. Object to foundation for that.
BY MR. SACCHET:

Page 338

1    NACHTSHEIM
2  Q. And the data here shows that 3.1 percent of
3     patients who received forced-air warming in
4     the combination antibiotic developed joint
5     infections, correct?
6  A. Correct.
7  Q. Whereas, .9 percent of patients who received
8     conductive fabric warming and the combination
9     of antibiotics developed joint infections,
10    correct?
11 A. Correct.
12 Q. By holding the antibiotic constant and
13    discontinuing the use of forced-air warming,
14    that resulted in a 71 percent decrease in
15    joint infections, did it not?
16         MS. GARCIA: Object to the form of
17    the question.
18         THE WITNESS: Yes, it did.
19 BY MR. SACCHET:
20 Q. That essentially matches the 73 percent
21    decrease in infections that was noted in the
22    McGovern article itself, does it not?
23 A. Correct.
24         MS. GARCIA: Object to the form of
25    the question.

Page 339

1    NACHTSHEIM
2  BY MR. SACCHET:
3  Q. And based on the p-value of .0008, which is
4     far less than .05, you would determine that
5     difference to be statistically significant,
6     would you not?
7  A. I would.
8  Q. So whether we control for the device or
9     control for the antibiotic, based on this
10    data set in Exhibit 27, would you determine
11    that the antibiotic was not a confounding
12    factor?
13         MS. GARCIA: Object to the form of
14    the question, it's a lack of foundation, it's
15    an incomplete hypothetical.
16         THE WITNESS: This data certainly
17    supports that hypothesis.
18 BY MR. SACCHET:
19 Q. And if it were not a confounding factor,
20    would there be any reason to deselect
21    patients from the population of 1,437
22    accounted for in the McGovern study in order
23    to exclude those who received a single
24    antibiotic?
25 A. No.

Page 340

1    NACHTSHEIM
2          MS. GARCIA: Object to the form of
3     the question.
4  BY MR. SACCHET:
5  Q. And if we were to do that and reduce the
6     population, let's say, from the 1,473, or 37,
7     I've forgotten which number it is, down to a
8     number of let's say 500 patients, there could
9     be concern about the powering of that
10    population?
11 A. There could. There could be.
12 Q. Another confounding factor that was discussed
13    this afternoon was a change in the
14    thromboprophylaxis protocol, correct?
15 A. Yes. Can -- can you just remind me where
16    that --
17 Q. Yeah, if we could turn to page 1540.
18 A. (Complies.)
19 Q. If you look at the bottom of the first full
20    paragraph in the left-hand column, it states
21    the thromboprophylaxis regimen from
22    July 2008 to the end of July 2009 was
23    Tinzaparin.
24 A. Uh-huh.
25 Q. Then it says from August 2009 to February

Page 341

1    NACHTSHEIM
2     2010, Rivaroxaban, which I'll represent is
3     otherwise known as Xarelto, was provided from
4     day one, but in February 2010 to the end of
5     this study, patients were reverted to
6     Tinzaparin, correct?
7  A. Yes.
8  Q. Assuming the change in the prophylaxis did
9     not affect infection rates during the time of
10    this study, i.e., Exhibit 4, would you still
11    consider it a confounding variable?
12 A. No.
13         MS. GARCIA: Object to the form of
14    the question.
15         (Whereupon, Exhibit 28 was
16    marked for identification.)
17         MS. GARCIA: What number are we
18 on?
19         MR. SACCHET: Twenty-eight, I
20 believe.
21         THE COURT REPORTER: Correct.
22         MS. GARCIA: Thank you.
23 BY MR. SACCHET:
24 Q. Have you seen this document before,
25    Professor?

Page 342

NACHTSHEIM

A. No, I have not.
Q. Was this document produced with the set of documents that you provided to 3M in response to the subpoena?
A. No.
Q. Does the bottom right-hand label of this document bear a Bates number of Nachtsheim --
A. It does.
Q. -- space 0000451?
A. It must have been attached to one of my e-mails. I -- I -- I don't remember seeing the document.
Q. Since you don't remember receiving or reading the document, let's go through it.
A. Okay.
Q. If you'd turn to the second page of text that bears the heading, "Introduction"; do you see that?
A. I do.
Q. Do you see the last paragraph at the bottom of that page?
A. "This multicenter study"?
Q. Correct. I'll read it out loud and you just confirm that we're on the same page. "This

Page 343

NACHTSHEIM

multicenter study based on prospectively collected national data aims to evaluate the surgically relevant complications of using either Rivaroxaban, or LMWH," which I'll represent means low molecular weight heparins, "as thromboprophylaxis, including wound complications, readmission and return to theater for deep infection, in addition to the incidents of major bleeds and EVT," correct?
A. Correct.
Q. Based on that statement, do you agree that at least two or three outcomes were measured, one being wound complications, another being return to theater for deep infection, and another being major bleeds?
A. I agree.
    MS. GARCIA: I object to lack of foundation.
BY MR. SACCHET:
Q. If you could turn to the next page under, "Methods," in the third paragraph it states, "The primary outcome measure was wound complications," parens, "Including hematoma,

Page 344

NACHTSHEIM

superficial wound infection and deep infection requiring return to theater, RTT, within 30 days of procedure"; do you see that?
A. I do.
Q. And you see the designation that RTT involves a deep infection requiring a return to theater, correct?
A. Correct.
Q. Which is one of the independent variables that was mentioned in the prior paragraph that we read, correct?
    MS. GARCIA: Object to the form of the question.
    THE WITNESS: Correct. I think dependent variables.
    MR. SACCHET: Okay. Noted.
BY MR. SACCHET:
Q. If we can now turn to the next page under, "Results," do you see that heading?
A. Yes, 456.
Q. It says, "During the study period, 2,762 patients received Rivaroxaban, and 10,361 received LMWH. Patient demographics are

Page 345

NACHTSHEIM

shown in table 1. There were significantly fewer wound complications in the LMWH group," parens, "2.81 percent versus 2.85 percent, OR equals .72, 95 percent confidence intervals between 0.58 to 0.90 with a p-value of .005. However, rates of RTT for infected wound washout were not significantly different." Do you see that?
A. I do.
Q. Assuming the truth of this study in what we just read, would you agree that Rivaroxaban, otherwise known as Xarelto, increased wound complications compared to low weight molecular heparins like Tinzaparin?
    MS. GARCIA: Object to the form of the question, to an incomplete hypothetical and to a lack of foundation for this witness to opine about the meaning of this article.
    THE WITNESS: It says there were significantly fewer wound complications in the LMH -- LMWH group. Is that what you're referring to?
BY MR. SACCHET:
Q. That's what I'm referring to. And the

|  |  |
|---|---|
| Page 346 | Page 347 |

Page 346

1   NACHTSHEIM
2     p-value was a statistically significant
3     value, correct?
4   A. Yes, correct.
5   Q. So there were fewer wound complications as a
6     result of the use of a low weight molecular
7     heparin --
8   A. Correct.
9   Q. -- compared to Rivaroxaban, correct?
10  A. Yeah, correct.
11        MS. GARCIA: Object to the form of
12    the question.
13  BY MR. SACCHET:
14  Q. However, the study notes that rates for RTT,
15    which we established to be a return to
16    theater for --
17  A. Uh-huh.
18  Q. -- infections, were not significantly
19    different; do you see that?
20  A. Correct. Yes, I do.
21  Q. Assuming the truth -- well, let me back up.
22        Would you also agree that the
23    McGovern study, Exhibit --
24        MS. GARCIA: Four.
25  BY MR. SACCHET:

Page 347

1   NACHTSHEIM
2   Q. -- 4, evaluated joint infections?
3   A. Yes.
4   Q. It did not evaluate wound complications, did
5     it?
6   A. Correct, it did not.
7   Q. Assuming the truth of this study, would you
8     ultimately agree that the change in protocol
9     from Tinzaparin, which is an LMWH, to
10    Xarelto, otherwise known as Rivaroxaban, and
11    then back to Tinzaparin, did not
12    significantly affect the infection rate?
13        MS. GARCIA: Object to the form of
14    the question, to lack of foundation, and it's
15    an incomplete hypothetical.
16        THE WITNESS: Assuming the study
17    was carefully done and generalizable, yes.
18  BY MR. SACCHET:
19  Q. And assuming the study was well done and
20    generalizable, would you agree that the
21    change in thromboprophylaxis noted in the
22    McGovern study, Exhibit 4, did not confound
23    the infection rates?
24        MS. GARCIA: Object to the form of
25    the question.

Page 348

1   NACHTSHEIM
2        THE WITNESS: Assuming -- yes.
3   BY MR. SACCHET:
4   Q. And would you also conclude that, assuming
5     the truth of this study, it would be improper
6     to deselect all of the patients who received
7     Xarelto, otherwise known as Rivaroxaban, from
8     the patient population if the
9     thromboprophylaxis was not a confounding
10    variable?
11        MS. GARCIA: Object to the form of
12    the question.
13        THE WITNESS: It doesn't seem
14    justified in -- on the basis of these
15    results.
16  BY MR. SACCHET:
17  Q. And, in fact, when the coauthors of the
18    McGovern study were in the process of
19    publication, are you aware that at numerous
20    times they sought to collect additional data
21    in support of the study?
22  A. I was not aware of that. I knew that -- I
23    knew that they sought to run this study out
24    in time.
25  Q. Are you aware that when Mr. Albrecht and

Page 349

1   NACHTSHEIM
2     Dr. Reed collected additional data that went
3     beyond January 2011 in the conductive fabric
4     warming population, that the data still
5     showed a significant decrease in infections
6     when conductive fabric warming was used?
7   A. I'm aware of that.
8   Q. Assuming that --
9         MS. GARCIA: Can we take a break
10    shortly?
11        MR. SACCHET: Yeah, give me two
12    minutes.
13  BY MR. SACCHET:
14  Q. Assuming that neither the antibiotic nor the
15    thromboprophylaxis protocol required control
16    because they were not confounding factors as
17    we discussed, you would be confident in the
18    results of the observational study presented
19    in the McGovern data?
20        MS. GARCIA: Object to the form of
21    the question.
22        THE WITNESS: I'm confident that
23    those weren't confounding factors, that those
24    studies are well done. It doesn't rule out
25    the potential for other confounding factors.