# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| | § | |
| TOMMY WALTON, | § | |
| | § | |
| *Plaintiff,* | § | Civil Action No. 4:13-cv-01164 |
| | § | |
| v. | § | |
| | § | |
| 3M COMPANY; ARIZANT | § | |
| HEALTHCARE, INC.; AND | § | |
| ROBERT PRESTERA | § | |
| | § | |
| *Defendants.* | § | |

## DEFENDANTS' MOTION FOR PROTECTIVE ORDER PROHIBITING THE DISCLOSURE OF CONFIDENTIAL INFORMATION TO PLAINTIFF'S PROPOSED EXPERT WITNESSES AFFILIATED WITH DEFENDANTS' COMPETITORS

Brian P. Johnson
State Bar No. 10685700
Kealy C. Sehic
State Bar No. 24040688
JOHNSON, TRENT, WEST, & TAYLOR, LLP
919 Milam, Suite 1700
Houston, Texas 77002
(713) 222-2323 (Telephone)
(713) 222-2226 (Facsimile)
BJohnson@johnsontrent.com
KSehic@johnsontrent.com

**EXHIBIT E**

Lori G. Cohen
Christiana C. Jacxsens
Evan C. Holden
GREENBERG TRAURIG, LLP
Terminus 200
3333 Piedmont Road N.E., Suite 2500
Atlanta, GA 30305
(678) 553-2385
(678) 553-2386 Facsimile
cohenl@gtlaw.com
jacxsensc@gtlaw.com
holdene@gtlaw.com

COUNSEL FOR DEFENDANTS 3M COMPANY,
ARIZANT HEALTHCARE INC., and ROBERT
PRESTERA

ii

## TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDING ..................................................................1

ISSUES TO BE RULED UPON BY THE COURT...............................................................2

    A.    PLAINTIFF SHOULD IDENTIFY WITH WHICH 3M COMPETITORS EACH OF HIS POTENTIAL EXPERTS IS AFFILIATED, OR BE PROHIBITED FROM DISCLOSING TO ALL COMPETITOR WITNESSES IDENTIFIED. ...................................................................................2

    B.    PLAINTIFF SHOULD BE PROHIBITED FROM DISCLOSING DEFENDANTS' CONFIDENTIAL INFORMATION TO DR. SCOTT AUGUSTINE ...........................................................................................................5

ARGUMENT...........................................................................................................................5

    A.    PLAINTIFF HAS NOT COMPLIED WITH THE PROTECTIVE ORDER .5

    B.    PLAINTIFF SHOULD BE PROHIBITED FROM DISCLOSING DEFENDANTS' CONFIDENTIAL INFORMATION TO DR. AUGUSTINE................................................................................................................8

        1.    Background of Dr. Augustine's Campaign Against Arizant and 3M ...........................................................................................................8

        2.    Disclosure of 3M Confidential Information to Dr. Augustine or Other Experts Affiliated with Dr. Augustine's Companies Could Harm Defendants and Should be Prohibited ...................................................12

    C.    PLAINTIFF'S PROPOSED USE OF CURRENT 3M EMPLOYEES AND CONSULTANTS AS EXPERT WITNESSES IS IMPROPER .....................15

CONCLUSION ......................................................................................................................17

ATL 20274432v1

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Avance v. Kerr-McGee Chem. LLC,*
    No. 5:04-CV-209, 2005 WL 5315658 (E.D. Tex. July 1, 2005) .................................6

*BASF Corp. v. United States,*
    321 F. Supp. 2d 1373 (C.I.T. 2004) .................................16

*Koch Refining Co. v. Jennifer L. Boudreau M/V,*
    85 F.3d 1178 (5th Cir.1996) .................................12

*Phillips v. Frey,*
    20 F.3d 623 (5th Cir. 1994) .................................6

*Suture Exp., Inc. v. Cardinal Health,*
    200, LLC, 12-2760-RDR, 2013 WL 6909158 (D. Kan. Dec. 31, 2013) .................................6

*Zhou v. Pittsburg State Univ.,*
    01-2493-KHV, 2002 WL 1932538 (D. Kan. July 25, 2002) .................................6

**State Cases**

*Eli Lilly & Co. v. Marshall,*
    829 S.W.2d 157 (Tex. 1992) (per curiam) .................................6

**Federal Statutes**

Federal Food Drug and Cosmetic Act. .................................12

**Federal Rules**

Fed. R. Civ. P. 26(c) .................................6, 12

Fed. R. Civ. P. 26(c)(1) and (G) .................................12

Fed. R. Civ. P. 26(c)(7) .................................6

**Other Authorities**

Barry Meier, *Doctor Says a Device He Invented Poses Risks,* THE NEW YORK
    TIMES, Dec. 24, 2010 .................................9

iv

Defendants 3M Company ("3M"), Arizant Healthcare Inc. ("Arizant") and Robert Prestera (collectively "Defendants") move this Court for entry of a protective order prohibiting disclosure of their confidential information to Plaintiff's proposed expert witnesses who own, are employed by, or consult for patient warming companies in competition with 3M. As Plaintiff has not provided any information regarding the 25 witnesses he has identified as potential experts that allegedly are affiliated with 3M competitors, Defendants move for a protective order prohibiting the disclosure of confidential materials to any of these witnesses. Defendants specifically move for an order prohibiting the disclosure of confidential materials to Plaintiff's proposed expert Scott Augustine, M.D.

## NATURE AND STAGE OF THE PROCEEDING

The Protective Order entered by this Court on December 16, 2013 includes a mechanism for Defendants to object to Plaintiff's disclosure of confidential information to expert witnesses or deponents who are affiliated with 3M's competitors.[1] *See* **Exhibit A** at ¶ 9(e). On October 1, 2014, Plaintiff disclosed 25 potential expert witnesses who allegedly are currently employed by or consult for competitors of 3M. Yet Plaintiff's "identification" of these potential experts consisted of nothing more than providing a list of 25 names. As a result, Defendants have little idea who these potential experts are and do not know with which competitors of 3M each expert is currently affiliated.[2] Defendants objected to Plaintiff's disclosure of confidential information to any of these potential experts until Plaintiff provided additional information regarding these experts.

---

[1] A copy of the Protective Order is attached hereto as **Exhibit A** for the Court's convenience.
[2] Indeed, several of the individuals listed by Plaintiff appear to be current employees of 3M, such that they are not current competitors and would not fall within the provisions of Paragraph 9(e). In addition, Defendants specifically object to Plaintiff identifying these individuals as his experts or contacting directly any of Defendants' employees.

Defendants have attempted to informally resolve this disagreement by requesting that Plaintiff inform Defendants of which competitor patient warming company each of the 25 potential experts allegedly is an owner, employee, or consultant of. Plaintiff has agreed to attempt to locate this information and Defendants have agreed to provide a list of potential competitors. However, as this dispute has not been resolved in the time frame provided by the Protective Order, Defendants have no choice but to move this Court to issue an order prohibiting Plaintiff's disclosure of their confidential information to any of Plaintiff's potential experts.

Further, Defendants specifically object to Plaintiff's proposed disclosure of confidential information to Scott Augustine, M.D., one of the 25 potential experts disclosed by Plaintiff, and move this Court for an order prohibiting such disclosure. As discussed herein, there is abundant evidence that Dr. Augustine would attempt to use Defendants' confidential information to gain unfair advantages for his competing patient warming company and competing patient warming device, potentially causing significant harm to 3M.

## ISSUES TO BE RULED UPON BY THE COURT

### A. PLAINTIFF SHOULD IDENTIFY WITH WHICH 3M COMPETITORS EACH OF HIS POTENTIAL EXPERTS IS AFFILIATED, OR BE PROHIBITED FROM DISCLOSING TO ALL COMPETITOR WITNESSES IDENTIFIED.

This Court entered a Protective Order on December 16, 2013. *See* **Exhibit A.** Paragraph 9(e) of the Protective Order addresses the circumstances in which confidential information may be revealed, disclosed, summarized, or otherwise made known to expert witnesses or consultants. It provides a mechanism for Defendants to object to Plaintiff's disclosure of confidential information to proposed experts who <u>currently</u> are affiliated with competitor patient warming companies:

(e) Expert witnesses or consultants, whether expected to testify at trial or not, who

2

are employed or retained by a party in connection with the prosecution or defense of this action......

However, in the event that any such expert witness or consultant described in subparagraph (e) .... is a current principal, owner and/or employee of, or has a continuous, regular, ongoing, or current consulting arrangement of any kind with, any entity involved in the design, manufacture, or distribution of patient warming products or medical devices in competition with the one at issue in his [sic] action, the party seeking to distribute or show the designated "Confidential – Subject to Protective Order" information to such expert or consultant shall not disclose such information to such expert or consultant unless:

(i)     The party wishing to disclose the designated Confidential Information promptly identifies such expert, consultant, deponent or witness to counsel for the Producing Party in writing prior to disclosure of information to such expert, consultant, deponent or witness;

(ii)    The Producing Party does not object to such disclosure in writing to the identifying party within ten (10) days from the receipt of written notice;

(iii)   The Producing Party does not attempt to meet and confer to resolve the issue within ten (10) days from the mailing of the written objection; and

(iv)    The Producing Party does not move for a protective order prohibiting disclosure to the expert, consultant, deponent or witness within ten (10) days after the required attempt to meet and confer. The party wishing to disclose the designated material shall not disclose said material to the expert, consultant, deponent, or witness prior to the Court's disposition of a Producing Party's motion for protective order.

Key to this provision is the concept that Defendants will have the opportunity to review with which competitor patient warming company Plaintiff's proposed experts currently are affiliated, and make a determination whether they object to the potential disclosure of their confidential information to these competitors vis-à-vis Plaintiff's proposed experts.

In a letter dated October 1, 2014, Plaintiff's counsel identified a list of 25 potential expert witnesses pursuant to Paragraph 9(e) of the Protective Order.  **Exhibit B**.  Plaintiff provided no information regarding these potential witnesses other than their names – Plaintiff did not provide their titles, addresses, current employers, or resumes/CVs, and did not identify for which

3

competitor of 3M each witness was currently an owner, employee or consultant. On October 10, 2014, Defendants sent Plaintiff a letter timely objecting under Paragraph 9(e)(ii) of the Protective Order to Plaintiff's disclosure of confidential information to any of the 25 witnesses listed, requesting that Plaintiff provide basic information regarding each of the experts he identified, and requesting a meet and confer to discuss Defendants' objections. **Exhibit C.**

On October 20, 2014, counsel for Plaintiff and Defendants participated in a meet and confer teleconference. Counsel for Defendants informed Plaintiff's counsel that if Plaintiff would simply identify which competitor patient warming company each of the 25 potential experts was an owner of, employed by, or consulted for, Defendants would be able to determine for which experts they would object. Defendants also informed Plaintiff's counsel that, without more information regarding these potential experts, Defendants had no choice but to object to disclosure to all of them. Plaintiff's counsel agreed to provide any additional information they could locate regarding their potential experts, but have still not done so to date. In addition, Defendants agreed to provide Plaintiff with a list of competitors. However, as this dispute has not been resolved to date, Defendants are left to guess as to whether any of these potential experts are affiliated with patient warming companies for which 3M would have significant competitive concerns.

Counsel for Defendants informed Plaintiff's counsel during the meet and confer that Defendants had no objection to any experts who were *former* employees or *former* consultants of patient warming companies that compete with 3M, as the Protective Order governs current employees and consultants. If Plaintiff informs Defendants of the patient warming companies of his potential experts, 3M will timely inform Plaintiff whether it has any additional objections beyond Dr. Scott Augustine (or other experts affiliated with Dr. Augustine's companies). Until

4

Plaintiff provides this basic information for each of his potential experts, Defendants must object to his disclosure of confidential information to all of the experts listed in Plaintiff's October 1, 2014 letter.

## B. PLAINTIFF SHOULD BE PROHIBITED FROM DISCLOSING DEFENDANTS' CONFIDENTIAL INFORMATION TO DR. SCOTT AUGUSTINE

Counsel for Defendants has informed Plaintiff's counsel that Defendants will certainly object to the disclosure of confidential information to one of Plaintiff's proposed experts, Dr. Scott Augustine. As discussed in Defendants' Motion for Entry of Protective Order of Confidentiality (Dkt. 23), Dr. Augustine is the Chief Executive Officer of one of 3M's current competitors in the patient warming industry, Augustine Biomedical & Design. Dr. Augustine, who founded Arizant[3] before leaving the company on unpleasant terms, has mounted a vocal campaign against the Bair Hugger forced-air warming ("FAW") device and Arizant/3M in an effort to jump-start the sales of his new company's competing patient warming product. As described herein, Defendants have legitimate concerns that Dr. Augustine would improperly attempt to use any confidential information that is disclosed to him in connection with this litigation to further his campaign against his former company and the Bair Hugger FAW device.

Plaintiff's counsel has not agreed to withdraw Dr. Augustine as a potential expert. Defendants therefore move this Court to issue a protective order prohibiting Plaintiff from disclosing any confidential information to Dr. Augustine.

## ARGUMENT

## A. PLAINTIFF HAS NOT COMPLIED WITH THE PROTECTIVE ORDER

Fed. R. Civ. P. 26(c) allows a party to seek a protective order for good cause, including orders to prevent or limit the disclosure of commercially sensitive information and trade secrets.

---

[3] 3M acquired Arizant in 2011.

ATL 20274432v1

This Court has broad discretion to enter such a protective order to protect parties and to prevent discovery abuse. *See* Fed. R. Civ. P. Rule 26(c)(7); *Avance v. Kerr-McGee Chem. LLC*, No. 5:04-CV-209, 2005 WL 5315658, at *2 (E.D. Tex. July 1, 2005); *Phillips v. Frey*, 20 F.3d 623, 628 (5th Cir. 1994); *Eli Lilly & Co. v. Marshall*, 829 S.W.2d 157, 158 (Tex. 1992) (per curiam) (finding that a properly proven trade secret interest may constitute a specific serious and substantial interest justifying restrictions to access). A court may, "for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including…requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way." *Suture Exp., Inc. v. Cardinal Health*, 200, LLC, 12-2760-RDR, 2013 WL 6909158 (D. Kan. Dec. 31, 2013). A party may request the court enter a protective order pursuant to Fed. R. Civ. P. 26(c) as a means to protect the confidential information from disclosure to individuals or entities not connected with the litigation. *Zhou v. Pittsburg State Univ.*, 01-2493-KHV, 2002 WL 1932538 (D. Kan. July 25, 2002).

Paragraph 9(e) of the Protective Order entered in this case provides that Plaintiff may not disclose Defendants' confidential information to an expert witness or consultant who is a current principal, owner, employee or consultant of any entity involved in the design, manufacture, or distribution of patient warming products or medical devices in competition with 3M's Bair Hugger FAW device, unless Plaintiff first identifies such competitor witnesses and provides Defendants an opportunity to object to the disclosure of confidential information to the witness.

Here, Plaintiff's counsel provided a list of 25 experts and represented that this list of potential experts constituted Plaintiff's identification of competitor experts pursuant to Paragraph 9(e) of the Protective Order. Thus, presumably any witness on Plaintiff's list is a

current owner, employee, or consultant of one of 3M's competitors in the patient warming industry; otherwise, Plaintiff would not be required by Paragraph 9(e) to disclose these witnesses. However, Defendants have confirmed that certain of these individuals are current employees or consultants of 3M.[4] Defendants specifically object to Plaintiff's identification of these individuals as his potential experts and object to any attempt by Plaintiff to contact them directly.

Other than the individuals who are current employees of 3M, Defendants are currently unable to determine for which of their competitors the witnesses disclosed by Plaintiff are employees or consultants, in part because many of the names on Plaintiff's list are so generic that there are likely literally hundreds of individuals with such names in the United States alone.[5] For Plaintiff to provide a list of names and nothing more would allow Plaintiff to effectively circumvent the goal of Paragraph 9(e) of the Protective Order: giving Defendants an opportunity to decide whether they need to object to the disclosure of confidential information to experts affiliated with certain competitors. Defendants are simply unable to determine whether these individuals are affiliated with a company such as Augustine Biomedical & Design, a competitor for whom Defendants are extremely concerned about receiving their confidential information. Without more information regarding Plaintiff's potential experts at this time, in an abundance of caution, Defendants must move for an order prohibiting Plaintiff's disclosure of confidential information to any of these experts.

Of note, there are certain patient warming companies who are competitors of 3M that, in the spirit of cooperation, Defendants would not object to Plaintiff's use of their employees/consultants as experts. While Defendants would have concerns about any competitor

---

[4] Thomas Anderson, Simon Fung, Albert Van Duren, and Allen Ziamehr are 3M employees or consultants.
[5] Included on Plaintiff's list are "Brian Doherty," "Kent Ellis," "Colin Dunlop," and "Nicholas Baumann."

7

being given access to their confidential information, Defendants would be willing to allow experts affiliated with certain competitors to have access to its confidential information for purposes of this litigation only, provided that the expert sign and comply with the written Agreement to Abide by Protective Order that is attached as Exhibit A to the Protective Order. Further, Defendants would not object to any of Plaintiff's proposed experts who are *former* owners, *former* employees or *former* consultants of competitor patient warming companies; Defendants are only potentially concerned about current owners, employees, or consultants of certain competitors.

Although Plaintiff's counsel should have already been aware of which competitors of 3M each of Plaintiff's proposed experts is currently affiliated in order to comply in good faith with the Protective Order, in an effort to avoid a formal dispute, Plaintiff agreed to search for this information and Defendants agreed to provide a list of competitors. As this dispute has not been informally resolved by the deadlines provided in the Protective Order, this Court should enter an order prohibiting Plaintiff's disclosure of confidential information to any of these proposed experts until Plaintiff identifies all current competitors each of the experts is affiliated with.

## B. PLAINTIFF SHOULD BE PROHIBITED FROM DISCLOSING DEFENDANTS' CONFIDENTIAL INFORMATION TO DR. AUGUSTINE

### 1. <u>Background of Dr. Augustine's Campaign Against Arizant and 3M</u>

Defendants are certain that they will continue to object to Plaintiff's proposed disclosure of their confidential information to Dr. Scott Augustine, who is the Chief Executive Officer of Augustine Biomedical & Design, one of 3M's current competitors in the patient warming industry. Dr. Augustine was the original inventor of the Bair Hugger FAW device. (**Exhibit D**, Declaration of Mark Scott ("Scott Decl.") at ¶8). However, he has since developed a new

8

patient warming device with a different design that does not include forced-air like the Bair Hugger FAW device. (Ex. D, Scott Decl. at ¶9). *See also* Barry Meier, *Doctor Says a Device He Invented Poses Risks,* THE NEW YORK TIMES, Dec. 24, 2010, a copy of which is attached hereto as **Exhibit E**. For several years, Dr. Augustine and his companies[6] have been on a campaign against the Bair Hugger FAW device in an effort to jump-start the sales of its competing product. (Ex. D, Scott Decl. at ¶7). Dr. Augustine's device (the "HotDog" device) works much like an electric blanket by providing warmth to the patient through direct contact between the patient and the device, as opposed to the Bair Hugger FAW device's forced-air method of warming. (Ex. D, Scott Decl. at ¶9).

Dr. Augustine's campaign against the product he invented began after a significant dispute arose between him and Defendant Arizant Healthcare Inc. In 2002, Dr. Augustine resigned as Chairman and Chief Executive of Arizant and subsequently pleaded guilty to a misdemeanor charge arising out of a Medicare fraud investigation in 2004. (Ex. D, Scott Decl. at ¶10). As noted in the attached article, "Dr. Augustine's campaign against the Bair Hugger has taken various forms. He has spoken out against the device at professional meetings and has underwritten studies intended to show that it may pose a bacterial threat." **Exhibit E**. Indeed, one anesthesiologist at the Cleveland Clinic described Dr. Augustine's efforts this way:

> "He simply has a new device now and wants to promote it," said Dr. Andrea Kurz, an anesthesiologist at the Cleveland Clinic, who has studied the HotDog. "And when you promote a new device by making something old look bad, it doesn't work well in our community." *Id.*

Throughout his campaign to disparage the Bair Hugger FAW device, Dr. Augustine has repeatedly contacted Arizant and 3M, regulatory bodies, key opinion leaders, and Arizant/3M's

---

[6] Companies which Dr. Augustine appears to own, run, or be affiliated with include Augustine Biomedical and Design, LLC, Augustine Temperature Management LLC, Hot Dog USA, LLC, and Stop Surgical Infections.org.

9

customers to report purported safety issues with the Bair Hugger FAW device that he claims to have discovered, or purported improprieties by Arizant or 3M's leadership, employees or consultants that he claims to have uncovered. In addition to attempting to boost the sales of his competing product, Dr. Augustine has repeatedly used these tactics in an apparent attempt to pressure Arizant and now 3M into purchasing his HotDog device or other technology that he purports to have developed. Dr. Augustine also appears to have been intimately involved with promoting to personal injury attorneys the idea of bringing product liability lawsuits against 3M, and has then repeatedly attempted to use the threat of impending litigation to support his proposals to sell his technology to 3M. Recently, Dr. Augustine has suggested that 3M license the HotDog device in order to surreptitiously avoid having to perform a recall of the Bair Hugger FAW device and to limit its exposure to product liability litigation.[7] The following is a summary of a non-inclusive list of some of the various actions that Dr. Augustine has taken since his departure from Arizant:

- Soon after Dr. Augustine started his new company, he began his attacks on Arizant and the safety of the Bair Hugger FAW device in November of 2005 by writing to Arizant's CEO to claim that Bair Hugger was causing burns for patients, while proposing to partner with Arizant to develop a burn avoidance technology to address the purported issue.[8] (Ex. D, Scott Decl. at ¶11).

- In July of 2008, Dr. Augustine wrote to the National Institute for Health and Care Excellence ("NICE"), a body of the United Kingdom's Department of Health, to claim that forced-air warming devices had been reported in literature to be contaminated by pathogenic organisms, and to encourage NICE to re-evaluate their recommendation of forced-air warming, because this recommendation purportedly caused healthcare providers to violate the law. Dr. Augustine urged NICE to substitute air-free warming such as his HotDog device. (Ex. D, Scott Decl. at ¶12).

---

[7] Of course, if Arizant or 3M ever believed that there was a safety issue with the Bair Hugger FAW device, they would have taken necessary steps to remediate the issue, up to and including corrective actions or recalls, rather than partake in Dr. Augustine's proposed stratagems.

[8] For the sake of brevity and because they are not germane to the instant motion, Defendants are not attaching as exhibits the multiple responses to Dr. Augustine's communications that Arizant and 3M have sent over the years in which they responded to and disputed varied allegations, reported his accusations to relevant organizations, and refused his unsolicited proposals to engage in various business relationships.

- In April of 2010, Dr. Augustine wrote to the CEO of Arizant to ask if Arizant was interested in acquiring Augustine's patents regarding hose-end filters. Dr. Augustine claimed the survival of the Bair Hugger FAW device was dependent on the adoption of these filters, and concluded that he had no doubt that the HotDog device would replace forced-air warming, either by a mandatory recall or through a voluntary recall. (Ex. D, Scott Decl. at ¶13).

- In July of 2010, Dr. Augustine wrote a letter to the Managing Partner of the private equity firm that owned Arizant at the time to claim that Bair Hugger FAW devices were contaminated with germs and destroyed laminar flow ventilation in operating rooms, and to claim that the solutions to both of Arizant's problems were in his control and request a meeting to discuss his proposal. (Ex. D, Scott Decl. at ¶14).

- In March of 2013, just weeks after Plaintiff's Complaint was filed in the instant case, Dr. Augustine began emailing 3M customers to forward Plaintiff's counsel's press release that accompanied their filing, and claiming that Plaintiff's case had broken the ice and that possibly thousands of others lawsuits could follow. (Ex. D, Scott Decl. at ¶15).

- In April of 2014, Dr. Augustine wrote to 3M to again claim that a Bair Hugger recall was imminent, and to propose that 3M avoid having to do a recall by instead entering into a licensing agreement with Dr. Augustine's company and substituting the HotDog device for the Bair Hugger FAW device with its customers, in order to create a "win-win" situation where 3M limited its purported liability and Augustine accomplished his mission of getting HotDog into all orthopedic operating rooms. (Ex. D, Scott Decl. at ¶16).

Notably, Dr. Augustine's efforts to undermine the Bair Hugger FAW device in the marketplace have drawn the attention of the FDA. (Ex. D, Scott Decl. at ¶17). After a review of the Augustine Biomedical & Design website in 2012, the agency sent Dr. Augustine a Warning Letter about, *inter alia,* the comparative safety claims his company was making between the HotDog device and the Bair Hugger FAW device.[9] The FDA advised Dr. Augustine that due to the statements made on his company's website, the HotDog device was "being marketed without the required clearance or approval in violation of the Federal Food Drug and Cosmetic Act." *Id.*

---

[9] *See* July 24, 2012 Warning Letter from Damia Jackson, Food and Drug Administration, Center for Devices and Radiological Health, Office of Compliance to Scott Augustine, M.D., a copy of which is attached as **Exhibit F**.

11

## 2. Disclosure of 3M Confidential Information to Dr. Augustine or Other Experts Affiliated with Dr. Augustine's Companies Could Harm Defendants and Should be Prohibited

"Federal courts have the inherent power to disqualify experts, although cases that grant disqualification are rare." *Koch Refining Co. v. Jennifer L. Boudreau M/V,* 85 F.3d 1178, 1181 (5th Cir.1996) (citations omitted). Federal Rule of Civil Procedure 26(c) also permits a court "for good cause" to "issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense" by "requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way." Fed. R. Civ. P. 26(c)(1) and (G).

Given the long and troubling history of Dr. Augustine's attempts to create issues for Arizant and 3M in order to benefit his new company, Defendants are understandably very concerned about the potential for Dr. Augustine, or any other experts who are affiliated with Dr. Augustine's companies, to obtain any of 3M's confidential information. These above select examples of Dr. Augustine's actions over the years illustrate his intention to issue baseless attacks on the safety of the Bair Hugger FAW device, and Arizant/3M, in any possible manner, including bringing unsubstantiated claims to Arizant and 3M's leadership, regulatory bodies, key opinion leaders, and customers. Dr. Augustine's efforts appear to have the goals of boosting the sales of his competing device and/or of forcing Arizant/3M into some type of business arrangement with his new companies.

Given the varied forms that Dr. Augustine's campaign has taken, it is impossible to know exactly how Dr. Augustine would attempt to use 3M's confidential information to his or his companies' benefit if such information were made available to him. The history of Dr. Augustine's campaign, however, clearly suggests that he would try to gain any advantage

12

possible from 3M's sensitive information. A substantial number of the confidential documents produced by Defendants are internal communications discussing strategy for responding to either direct or indirect communications from Dr. Augustine, or strategy for responding to claims drummed up by Dr. Augustine. To allow Dr. Augustine access to these materials would allow him to view very sensitive strategic business communications and attempt to use them to his or his companies' benefit. Further, even though Augustine Biomedical & Design markets a patient warming device that uses a different warming technology than the Bair Hugger FAW device's forced-air warming technology, there can be little doubt that Dr. Augustine would attempt to find ways to use Defendants' confidential design, testing, and regulatory submission information to come up with new theories to attack the Bair Hugger FAW device or Arizant/3M or new theories to support his claims that his new device is superior.

There is also the more familiar danger for competitors such as Dr. Augustine to use Defendants' confidential information to improve his competing company or his competing product. 3M invests substantial sums of money in medical device research, testing, development, design, analysis, and evaluation. (Ex. D, Scott Decl. at ¶18). If the information Defendants have developed over the years pertaining to the Bair Hugger FAW device was obtained by their competitors, it would give an unfair economic advantage to those competitors and cause immediate and irreparable harm to 3M. (Ex. D, Scott Decl. at ¶18). If competitors obtain the results of Defendants' work without having to incur similar expenditures in time and money since it would potentially allow them to market products at a lesser price. (Ex. D, Scott Decl. at ¶19). If provided with Defendants' documents relating to medical device research, testing, development, design, manufacturing, analysis, evaluation, and regulatory submissions, competitors could use that information to improve their design and manufacturing processes and

13

procedures in order to become more competitive with 3M. (Ex. D, Scott Decl. at ¶20). [10]

Without any effort on their part, competitors would be able to determine which approaches to design, manufacturing, testing, marketing, and regulatory submissions are proven to be successful and which approaches have not. (Ex. D, Scott Decl. at ¶20).

Defendants' confidential information regarding design, testing, manufacturing, regulatory submissions, and marketing would be useful not only to competitor forced-air warming companies, but to any competitor in the patient warming industry. (Ex. D, Scott Decl. at ¶21). While Plaintiff may argue that Dr. Augustine knows "all there is to know" about the Bair Hugger FAW device because he invented it, Arizant and 3M have in fact spent considerable sums of money on research and development of their forced-air warming products in the decade-plus since Dr. Augustine left Arizant.

While Dr. Augustine would be required to sign and abide by the Agreement to Abide by Protective Order, courts in other jurisdictions that have addressed a similar issue have found that, even if an expert affiliated with a company's competitor attempts to abide by the terms of a protective order and not use confidential information improperly, the likelihood that the review

---

[10] Defendants incorporate by reference their recently filed Motion in Support of Confidential Designations Under the Protective Order (Dkt. 48). As noted in that motion, the confidential documents produced by Defendants fall into the following categories:

(1) Design documents for the Bair Hugger Model 750, including the design history file, and internal communications related to design;

(2) 510K submissions to the FDA for the Bair Hugger Model 750, including related internal communications and memoranda;

(3) Testing, studies, and research documents related to allegations concerning site infection, alleged waste heat, and alleged contamination of blowers, including internal communications, memoranda, draft letters, and internal notes related to published articles;

(4) Draft memoranda, letters, brochures, packaging, warning, manuals, instructions and marketing materials, internal notes, internal communications concerning the Bair Hugger FAW device or responses to claims regarding Bair Hugger and the alleged risk of infection;

(5) Internal communications and investigation documents related to alleged infection risk and alleged injuries; and

(6) Organizational charts detailing Defendants' internal business organization.

14

of confidential materials by such a witness would be used improperly warrants prohibiting the disclosure of confidential materials:

> While in no way trying to impugn Dr. Larkin's character or his commitment to abiding by the terms of the protective order, this Court is concerned with Dr. Larkin acquiring knowledge based upon BASF's confidential information that could be used to assist a BASF competitor at BASF's expense. "It is very difficult for the human mind to compartmentalize and selectively suppress information once learned, no matter how well-intentioned the effort may be to do so." *A. Hirsh, Inc.,* 657 F.Supp. at 1302. **In particular, if Dr. Larkin were granted access to BASF's confidential materials, he would most likely closely study BASF's sensitive commercial information and this information would become a part of his general knowledge. This knowledge may be inadvertently disclosed to Huntsman during the course of Dr. Larkin's on-going relationship with this BASF competitor....** Given the likelihood of inadvertent disclosure of highly confidential commercial information to a direct competitor of BASF because of Dr. Larkin's on-going relationship with Huntsman... the Court denies Defendant's motion for leave to show BASF's confidential documents to Dr. Larkin.

*BASF Corp. v. United States,* 321 F. Supp. 2d 1373, 1380-81 (C.I.T. 2004) (emphasis added). Here, Defendants are legitimately concerned that Dr. Augustine's agreement to abide by the Protective Order would do little to prevent him from putting to use any knowledge or information that he would gain from his review of Defendants' confidential information.

Given the competitive tactics employed by Dr. Augustine in recent years in his role as the owner, inventor, spokesman, and marketer for a competing patient warming company with a competing patient warming device, Defendants are very concerned about the potential harm that would result from Dr. Augustine, or any of Plaintiff's potential experts who are affiliated with Dr. Augustine's companies, being given access to their confidential information. Defendants therefore move for an order prohibiting disclosure of confidential information to Dr. Augustine, and to any other experts affiliated with Dr. Augustine's companies.

### C. PLAINTIFF'S PROPOSED USE OF CURRENT 3M EMPLOYEES AND CONSULTANTS AS EXPERT WITNESSES IS IMPROPER

ATL 20274432v1

Included within Plaintiff's list of 25 names of potential competitor expert witnesses were four individuals who appear to be current employees or consultants for 3M: Thomas Anderson, Simon Fung, Albert Van Duren, and Allen Ziamehr. It is unclear why these individuals would be included on Plaintiff's list of potential experts who are affiliated with *competitor* patient warming companies, and unclear how Plaintiff intends to use them as experts or disclose Defendants' confidential information to these individuals. Assuming that the names on Plaintiff's list are indeed the same individuals who are currently employed by or consult for 3M, Defendants object to Plaintiff's counsel having any contact with these potential witnesses.

16

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request this Court enter the attached Order prohibiting the disclosure of any of Defendants' confidential information to Plaintiff's proposed competitor expert witnesses.

In addition, given the complexity of these issues, Defendants respectfully request a hearing on these issues for the benefit of the Court.

Respectfully submitted this 30th day of October, 2014.

By:    /s/ Brian P. Johnson
        Brian P. Johnson
        State Bar No. 10685700
        Kealy C. Sehic
        State Bar No. 24040688
        JOHNSON, TRENT, WEST, & TAYLOR, LLP
        919 Milam, Suite 1700
        Houston, Texas 77002
        (713) 222-2323 (Telephone)
        (713) 222-2226 (Facsimile)
        BJohnson@johnsontrent.com
        KSehic@johnsontrent.com

ATL 20274432v1

/s/ Lori G. Cohen
Lori G. Cohen
Christiana C. Jacxsens
Evan C. Holden
GREENBERG TRAURIG, LLP
Terminus 200
3333 Piedmont Road N.E., Suite 2500
Atlanta, GA 30305
(678) 553-2385
(678) 553-2386 Facsimile
cohenl@gtlaw.com
jacxsensc@gtlaw.com
holdene@gtlaw.com

COUNSEL FOR DEFENDANTS 3M COMPANY,
ARIZANT HEALTHCARE INC., and ROBERT
PRESTERA

## CERTIFICATE OF CONFERENCE

I certify that on October 20, 2014, Christiana Jacxsens and Evan Holden, counsel for Defendants, conferred telephonically with Plaintiff's counsel, Gabriel A. Assaad and John Neuman, at 9:30 a.m. CST to discuss Defendants' objection to Plaintiff's list of potential competitor expert witnesses. The parties have conferred in good faith to resolve the matters in dispute but are unable to reach an agreement.

/s/ Brian P. Johnson
Brian P. Johnson

ATL 20274432v1

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on October 30, 2014.

David W. Hodges
Kennedy Hodges, LLP
711 W. Alabama Street
Houston, Texas 77006

_____ /s/ Brian P. Johnson _____
Brian P. Johnson

19

*TOMMY WALTON v. 3M COMPANY, ET AL.*
USDC Southern District of Texas – Houston Division Civil Action No. 4:13-cv-001164

**DEFENDANTS' MOTION FOR PROTECTIVE ORDER PROHIBITING THE
DISCLOSURE OF CONFIDENTIAL INFORMATION TO PLAINTIFF'S PROPOSED
EXPERT WITNESSES AFFILIATED WITH DEFENDANTS' COMPETITORS**

<u>**APPENDICES TABLE OF CONTENTS**</u>

| Title | Description |
|---|---|
| Exhibit A | Protective Order (December 16, 2013) |
| Exhibit B | Letter from J. Neuman to L. Cohen (October 1, 2014) |
| Exhibit C | Letter from L. Cohen to D. Hodges, G. Assaad, and J. Neuman (October 10, 2014) |
| Exhibit D | Declaration of Mark Scott |
| Exhibit E | Barry Meier, *Doctor Says a Device He Invented Poses Risks,* THE NEW YORK TIMES (December 24, 2010) |
| Exhibit F | Letter from Damia Jackson, Food and Drug Administration, Center for Devices and Radiological Health, Office of Compliance to Scott Augustine, M.D. (July 24, 2012) |

# EXHIBIT "A"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| TOMMY WALTON | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 4:13-cv-01164 |
| | § | |
| 3M COMPANY; | § | JURY DEMANDED |
| ARIZANT HEALTHCARE, INC.; | § | |
| AND ROBERT PRESTERA | § | |
| | § | |

### PROTECTIVE ORDER

Pursuant to a stipulation between the parties, Plaintiff Tommy Walton, and Defendants 3M Company, Arizant Healthcare Inc., and Robert Prestera, and for good cause, the Court enters the following Agreed Protective Order pursuant to FED. R. CIV. P. 26(c). The purpose of this Order is to facilitate discovery and to prevent unnecessary disclosure of proprietary or confidential information and documents.

### TERMS OF THE PROTECTIVE ORDER

1. The parties anticipate that this action may involve discovery and production of documents and testimony that may contain confidential information, such as non-public proprietary information, individually identifiable, or non-public commercial and financial data ("confidential discovery material" or "discovery material"). The party or other person from whom confidential discovery material may be sought (the "Producing Party") may designate such materials as "Confidential – Subject to Protective Order."

2. Any Producing Party may designate discovery material as "Confidential – Subject to Protective Order" any non-public discovery material that counsel for the Producing Party has determined in good faith contains, reflects, or reveals: (a) trade secret information (which is a formula, pattern, device, or compilation of information which is used in one's business, and

RECEIVED DEC 2 7 2013

which gives the business an opportunity to obtain an advantage over competitors who do not know or use the trade secret information); (b) proprietary confidential information such as research or development information, or commercially or competitively sensitive information that would more likely than not cause competitive harm to the business operations of the Producing Party including, but not limited to: (i) business/strategic plans; (ii) sales, cost, and price information, including sales/financial projections; (iii) non-public marketing information; (iv) non-public detailed sales and financial data; (v) customer lists; (vi) non-public technical information; or (vii) other non-public information of competitive, financial, or commercial significance comparable to the items listed in this subparagraph; or (c) confidential, non-public personal information concerning individuals.

    3.    Any Producing Party may designate as "Confidential – Subject to Protective Order" any materials or portions of materials that it produces. "Materials" includes documents, testimony, and non-paper media (*e.g.*, video, audio, discs, CD-roms, DVDs, electronic information).

    4.    To designate material as "Confidential -- Subject to Protective Order" (other than deposition or hearing transcripts) the Producing Party must place on the document or other materials the words "Confidential -- Subject to Protective Order." This Order collectively refers to these methods as a "designation of confidentiality." All copies made by the non-Producing Party must either (A) contain the original designation of confidentiality, or (B) clearly state that the document or material is "Confidential -- Subject to Protective Order."

    5.    In the case of multi-page documents, the designation of confidentiality, whether "Confidential -- Subject to Protective Order" must be stamped on each page of each document that the Producing Party intends to designate as confidential. Any "Confidential -- Subject to

Protective Order" material produced on magnetic discs or other computer-related media shall be designated as such by labeling each disc or other computer-related media "Confidential -- Subject to Protective Order" before production, as well as by labeling -- to the extent possible depending on the type of file -- every page of the document on the disc or computer-related media as "Confidential -- Subject to Protective Order.". In the event that a "hard copy" is generated from any disc or other computer-related medium, each page of the hard copy must be immediately stamped as "Confidential -- Subject to Protective Order" and treated as such, pursuant to the terms of this Protective Order.

6. Inadvertent failure to designate material as "Confidential -- Subject to Protective Order" at the time of production may be remedied if, within 30 days after such discovery material was produced without the appropriate confidentiality stamp, the Producing Party notifies all parties that such discovery material had previously been produced without the appropriate confidentiality stamp. The Producing Party shall then stamp such newly designated material as "Confidential -- Subject to Protective Order." All parties shall return to the Producing Party, or destroy, any unstamped copies of such discovery material upon receipt of such discovery material bearing the appropriate confidentiality stamp.

7. A party may designate material as "Confidential -- Subject to Protective Order" regardless of whether the information is produced pursuant to the disclosure requirements of FED. R. CIV. P. 26; produced in response to an Interrogatory, Request for Admission, Request for Production, or court order; or contained in deposition testimony, pleadings, or briefs.

8. Any party may designate as "Confidential -- Subject to Protective Order" any portion of a deposition transcript deemed to contain such information by advising each party in writing, within 30 days of receipt of the deposition transcript, of the portions so designated by

citation to the specific pages and lines and by providing each party a copy of the transcript of the deposition with the pages containing confidential material marked with the words "Confidential -- Subject to Protective Order" as appropriate. Until expiration of that 30-day period, all parties shall maintain testimony as "Confidential – Subject to Protective Order." If a "Confidential -- Subject to Protective Order" designation is made, the court reporter shall be directed to affix the appropriate legend on the cover page and on all designated pages of the transcript, and to each copy thereof. The parties may modify this procedure for any particular deposition or hearing through agreement on the record, without further order of the Court.

9.      Under no circumstances other than those specifically provided for in this Order or subsequent Court orders, or other than with the written consent of the Producing Party, shall discovery material designated as "Confidential -- Subject to Protective Order" in any way be revealed, disclosed, summarized, or otherwise made known to any person or entity except the following:

(a)      Outside counsel for any party to this action who are engaged in the prosecution or defense of this action, and such counsel's secretaries, paralegals, and clerical assistants to the extent necessary to assist such counsel;

(b)      In-house counsel for any party to this action who are actively engaged in connection with the prosecution or defense of this action, and other company representatives of such party to the extent necessary for such representatives to assist counsel in the prosecution or defense of this action;

(c)      Authors and recipients of the "Confidential -- Subject to Protective Order" discovery material, whose review is necessary for the prosecution or defense of this action;

(d)     Persons being deposed or testifying at trial in this action and prospective deponents or witnesses, and their counsel, during the course of depositions or testimony in this action or, to the extent necessary, in preparation for such depositions or testimony in this action, provided, however, that a person identified solely in this subparagraph shall not be permitted to retain copies of such "Confidential -- Subject to Protective Order" discovery material;

(e)     Expert witnesses or consultants, whether expected to testify at trial or not, who are employed or retained by a party in connection with the prosecution or defense of this action, provided that counsel, in good faith, requires their assistance in connection with this action, and further provided that any report or document created by such expert or consultant relying on or incorporating "Confidential -- Subject to Protective Order" discovery material in whole or in part shall be designated as "Confidential -- Subject to Protective Order" by the party responsible for its creation.

However, in the event that any such expert witness or consultant described in subparagraph (e), or any deponent or witness described in subparagraph (d) above, is a current principal, owner and/or employee of, or has a continuous, regular, ongoing, or current consulting arrangement of any kind with, any entity involved in the design, manufacture, or distribution of patient warming products or medical devices in competition with the one at issue in his action, the party seeking to distribute or show the designated "Confidential -- Subject to Protective Order" information to such expert or consultant shall not disclose such information to such expert or consultant unless:

(i)     The party wishing to disclose the designated "Confidential -- Subject to Protective Order" information promptly identifies such expert,

5

consultant, deponent or witness to counsel for the Producing Party in writing prior to disclosure of information to such expert, consultant, deponent or witness;

(ii)     The Producing Party does not object to such disclosure in writing to the identifying party within ten (10) days from the receipt of written notice.;

(iii)     The Producing Party does not attempt to meet and confer to resolve the issue within ten (10) days from the mailing of the written objection; and

(iv)     The Producing Party does not move for a protective order prohibiting disclosure to the expert, consultant, deponent or witness within ten (10) days after the required attempt to meet and confer.  The party wishing to disclose the designated material shall not disclose said material to the expert, consultant, deponent or witness prior to the Court's disposition of a Producing Party's motion for protective order.

(f)     The Court having jurisdiction over discovery procedures in this Action.

(g)     Outside vendors, such as court reporters, duplicating services and translation services, to the extent necessary for the prosecution or defense of this action;

(h)     The Court and its support personnel and/or any person that the court may order, provided that such access is required in the interest of justice and upon terms that the Court deems proper, and the jury; and

(i)     The parties and their officers, directors, and employees who have a need to review such material in connection with the prosecution or defense of this action.

10.     In addition to the restrictions imposed in Paragraph 9, each person given access to material designated "Confidential -- Subject to Protective Order" pursuant to Paragraph 9 of this

Order shall be advised by counsel for the party providing access that such discovery material is being disclosed pursuant and subject to the terms of this Order and must be handled strictly in accordance with its terms by the person receiving such discovery material. Prior to and as a condition of disclosure of "Confidential -- Subject to Protective Order" discovery material to any person described in the foregoing Paragraphs 9, except those persons described in Paragraphs 9(f) and 9(h), such person shall sign and execute a written acknowledgement in the form annexed hereto as **Exhibit A**, the original of which shall be maintained by counsel making the disclosure to such person.

11.     The parties and their attorneys may disclose "Confidential -- Subject to Protective Order" materials to a person not designated in Paragraph 9 only with the Producing Party's consent, or by obtaining a court order as described in Paragraph 15. The Producing Party's consent is not effective unless it is in writing and specifically identifies the documents or information that may be disclosed.

12.     Materials designated "Confidential -- Subject to Protective Order" may not be used for any purpose other than the prosecution or defense of this action. No person to whom materials designated "Confidential -- Subject to Protective Order" are made available shall disclose the contents of such materials to any other person or entity, except as permitted by this Order. The attorneys of record are responsible for employing reasonable measures, consistent with this Order, to control access to, duplication of, and distribution of copies of discovery material stamped "Confidential -- Subject to Protective Order."

13.     If a party or counsel for a party receives a subpoena or discovery request for materials designated "Confidential -- Subject to Protective Order" produced in this action, the party receiving the subpoena shall not produce any such documents unless required by a court to

7

do so. Further, the party receiving the subpoena or discovery request shall give prompt notice to counsel for the Producing Party who produced the materials in this action. "Prompt notice" means notice sufficient to allow the party who disclosed the materials to file a motion to quash or to take other lawful action to prevent disclosure. At a minimum, "prompt notice" means an e-mail or fax to the Producing Party's counsel within two business days of receiving the subpoena or discovery request.

14. In the event a party wishes to submit or refer to any material designated "Confidential -- Subject to Protective Order" in any affidavit, motion, response, reply, brief, memoranda of law, application or any other paper filed with the Court, the party desiring to use the material designated "Confidential -- Subject to Protective Order" shall file such material designated "Confidential -- Subject to Protective Order" under seal as provided for in the Federal Rules of Civil Procedure UNLESS the Producing Party has agreed that the material designated "Confidential -- Subject to Protective Order" does not need to be filed under seal.

15. A party may object to the designation of materials as "Confidential -- Subject to Protective Order" (the "Objecting Party"). The Objecting Party may notify the Producing Party in writing at any time after the production of materials designated as "Confidential -- Subject to Protective Order" of its objection. The written notice of objection must state the specific document or material at issue and the specific basis for the objection. The parties shall first try to resolve the disagreement in good faith and on an informal basis within 15 days of receipt of the written notice of objection. If the disagreement cannot be resolved on an informal basis within those 15 days, the Producing Party must move the Court within 10 days after the end of the 15-day period for a ruling as to whether the disputed material is confidential. The Producing Party shall have the burden of proving that the disputed materials are entitled to the protections

set forth above for materials designated as "Confidential -- Subject to Protective Order" under this Order. Pending the Court's ruling, the Objecting Party shall treat the disputed documents as "Confidential -- Subject to Protective Order."

16.     Nothing in this Order, or any designation of discovery material as "Confidential -- Subject to Protective Order" hereunder, or any failure to make such designation shall be used or characterized by any party as an admission.

17.     Neither this Order nor any designation of discovery material as "Confidential -- Subject to Protective Order" shall affect the admissibility into evidence of the information so designated, including, without limitation, the authenticity or relevance of the discovery material.

18.     Neither this Order, nor the fact of its existence, nor any designation of discovery material as "Confidential -- Subject to Protective Order" shall be offered or admitted into evidence at trial or used as argument in this litigation.

19.     The provisions of this Order shall survive the termination of this action. Within 30 days of the termination of this action (including any appeals), the parties shall: (i) return all confidential materials to counsel for the Producing Party, without keeping any copies (paper, electronic, or otherwise) unless such copies were included in Court filings; or (ii) destroy all confidential materials, unless such copies were included in Court filings, and advising counsel for the Producing Party in writing that said materials have been destroyed. Counsel for the parties are responsible for retrieving all confidential materials from their retained experts and consultants; returning those materials to the Producing Party or destroying and certifying to the Producing Party in writing the destruction of such materials; and assuring that their retained experts and consultants do not keep any copies. Further, Defense Counsel agrees to maintain in

9

CASE 0:15-md-02666-JNE-DTS  Doc. 198  Filed 01/26/17  Page 35 of 61
Case 4:13-cv-01164  Document 29-2  Filed in TXSD on 10/30/14  Page 10 of 13
Case 4:13-cv-011  Document 23-2  Filed in TXSD on __/19/13  Page 10 of 12

its files a complete and Bates labeled copy of all documents Defendants produced in this action, including privileged and confidential documents.

Dated this ~~December 16~~ 2013.

_Frances H. Stacy_

Exhibit A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| TOMMY WALTON | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 4:13-cv-01164 |
| | § | |
| 3M COMPANY; | § | JURY DEMANDED |
| ARIZANT HEALTHCARE, INC.; | § | |
| AND ROBERT PRESTERA | § | |
| | § | |

## AGREEMENT TO ABIDE BY PROTECTIVE ORDER

I hereby acknowledge that I:  (i) have been given an opportunity to read the Protective Order entered by the United States District Court for the Southern District of Texas (the "Court") in the above-captioned case; (ii) understand the Protective Order; and (iii) agree to be bound by its terms.

I agree that I will not at any time reveal or discuss the contents of documents, materials or information ("Discovery Material") furnished to me in the course of the above-captioned case that are designated as "Confidential -- Subject to Protective Order" (as defined in the Protective Order) with anyone, except as expressly authorized by the Protective Order or as otherwise required by the Court in the above-captioned case.  I agree that I will use any Discovery Material furnished to me only for the purposes of the above-captioned case, except as expressly authorized by the Protective Order or as otherwise required by the Court.

I further agree that in the event I cease to have any involvement in the above-captioned case:  (i) I will promptly return all Discovery Material that is Confidential to the party or counsel from whom I received that Discovery Material; and (ii) I will maintain the confidentiality of all "Confidential – Subject to Protective Order" Discovery Material that is disclosed to me.

11

I hereby consent to the jurisdiction of the United States District Court for the Southern District of Texas for the limited purposes of any proceedings to enforce the terms of the Protective Order, including any sanctions the Court may deem appropriate for violation of the Protective Order.

Dated: _____

_____
(Signature)
(Printed Name)

269358.1-11192013

# EXHIBIT "B"

# KENNEDY HODGES, L.L.P.

711 W Alabama St
Houston, TX 77006

TELEPHONE: 713.523.0001
FACSIMILE: 713.523.1116

## Fax

| | |
|---|---|
| **To:** Evan Holden | **From:** John Neuman |
| **Fax:** 678-553-2212 | **Pages:** 2 + Cover |
| **Phone:** | **Date:** October 1, 2014 |
| **Re:** Walton v. 3M | **CC:** |

☐ **Urgent**   ☐ **For Review**   ☐ **Please Comment**   ☐ **Please Reply**   ☐ **Please Recycle**

# KENNEDY HODGES, L.L.P.

### ATTORNEYS

GALVIN B. KENNEDY*†
DAVID W. HODGES*†
DON J. FOTY*†
GABRIEL A. ASSAAD‡†
JOHN A. NEUMAN
SARAI H. SANCHEZ
BEATRIZ A. SOSA-MORRIS

711 WEST ALABAMA STREET
HOUSTON, TEXAS 77006-5005
TELEPHONE: (713) 523-0001
FACSIMILE: (713) 523-1116
TOLL FREE: (877) 342-2020
KENNEDYHODGES.COM
TEXASOVERTIMEATTORNEY.COM

*Board Certified. Personal Injury Trial Law –
Texas Board of Legal Specialization
† Partner
‡ Also Licensed in Virginia and
District of Columbia

October 1, 2014

**Via Facsimile: 678-553-2212**
Lori G. Cohen
cohenl@gtlaw.com
Evan C. Holden
holdene@gtlaw.com
Greenberg Traurig, LLP
3333 Piedmont Rd NE, Suite 2500
Atlanta, Georgia 30327

**Via Facsimile: 713-222-2226**
Brian P. Johnson
bjohnson@johnsontrent.com
Kealy C. Sehic
Ksehic@johnsontrent.com
Johnson, Trent, West & Taylor, LLP
919 Milam, Suite 1700
Houston, Texas 77002

Re: Civil Action No. 4:13-cv-001164; Tommy Walton v. 3M Company, et al., in the United
States District Court for the Southern District of Texas

Dear Counsel,

I am following up from my email last week addressing the deposition schedule for Mr.
Walton's case. We intend to take the following depositions in the following order:

1. David Westlin
2. Albert Van Duren
3. Gary Hansen
4. Karl Zagoda
5. Troy Bergstrom
6. Terri Woodwick-Sales
7. Gary Maharaj
8. John Rock
9. Daniel Sessler

As far as our availability, we could take these depositions on 10/27, 10/29-10/31, 11/3-
11/7, 11/10-11/4, 11/17-11/19, 11/24, and 11/25. Please let me know what dates in this time
frame work for you and we will send you the deposition notices. If I do not have a response by
Friday, we will unilaterally notice these depositions.

1

Also, our expert designation deadline is approaching and I wanted to give you a list of experts we are considering to provide you the opportunity to object per the protective order. Please let me know whether you object to the disclosure of confidential information to any of the following individuals:

1. Christopher M. Varga
2. Andrew James Giles
3. Francis A. Czajka
4. David Ellsworth Cassidy
5. Simon S. Fung
6. Nicholas Baumann
7. Colin Dunlop
8. Scott D. Dickerhoff
9. Bruce Banner
10. Kenneth Diller
11. Michael M. Donnelly
12. Kent Douglas Ellis
13. Scott Augustine

14. Brian Doherty
15. Raymond G. Ragan
16. Thomas P. Anderson
17. Kent D. Ellis
18. Michael Vardenega
19. Allen Hamid Ziaimehr
20. Albert P. Van Duren
21. Carol J. Panser
22. Mark Bieberich
23. Thomas H. Philipot
24. Joseph Blase Vergona
25. Martin Stryker

Please accept this list of potential experts as our disclosure pursuant to paragraph 9(e) of the protective order. We will assume you have no objection to disclosure to any of these individuals if you do not lodge an objection within 10 days.

Finally, upon review of the 40,000 plus pages of documents which have been designated confidential, it is apparent that Defendants' use of the confidential designation was not in good faith within the definition of the protective order and that instead you have merely committed mass, indiscriminate designations. Please resubmit your production and only utilize the confidential stamp for documents that are actually confidential within the definition of the protective order. Please consider this our notice, under paragraph 15 of the protective, that we object to all of your confidential designations for the failure to make any effort to exercise restraint in so designating your production.

Sincerely,

John A. Neuman

# EXHIBIT "C"

Case 4:13-cv-01164 Document 49-4 Filed in TXSD on 10/30/14 Page 2 of 3

# GT GreenbergTraurig

Lori G. Cohen
Tel 678.553.2385
Fax 678.553.2386
cohenl@gtlaw.com

October 10, 2014

**VIA ELECTRONIC MAIL AND UPS**

David W. Hodges, Esq.
Gabriel A. Assaad, Esq.
John A. Neuman, Esq.
Kennedy Hodges, L.L.P.
711 W. Alabama Street
Suite 1700
Houston, TX 77006

Re:   ***Tommy Walton v. 3M Company, Arizant Healthcare Inc., and Robert Prestera***
      **USDC – Southern District of Texas, Docket No. 4:13-cv-1164**

Dear Counsel:

  We are writing to provide Defendants' written objection pursuant to Paragraph 9(e) of the Protective Order to Plaintiff's disclosure of 25 potential expert witnesses with whom you wish to share unspecified confidential information. Plaintiff, however, has not complied with the terms of Paragraph 9(e), as simply providing the names of these potential witnesses does not constitute "identification" of the witnesses pursuant to the Protective Order in order to enable Defendants to determine the relationship these individuals currently have with entities involved in the design, manufacture, or distribution of patient warming products. Please provide the current employer or the name of the patient warming product company with whom these individuals have a relationship, the contact information for these individuals, and a current resume or curriculum vitae.

  Also, it appears that the "Michael Vardenega" on your list may refer to "Michael Vardanega" – please confirm the correct spelling. Further, you listed both a "Kent Douglas Ellis" and a "Kent D. Ellis" – please confirm that these names refer to the same individual.

  Given these issues, we must object at this time to Plaintiff's disclosure of Defendants' confidential information to <u>any</u> of the individuals identified in your letter. We also specifically object to the disclosure of confidential information to Scott Augustine, as well as to any other individual who is a current principal, owner and/or

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BOCA RATON
BOSTON
CHICAGO
DALLAS
DELAWARE
DENVER
FORT LAUDERDALE
HOUSTON
LAS VEGAS
LONDON¹
LOS ANGELES
MEXICO CITY²
MIAMI
MILAN³⁺
NEW JERSEY
NEW YORK
NORTHERN VIRGINIA
ORANGE COUNTY
ORLANDO
PHILADELPHIA
PHOENIX
ROME³⁺
SACRAMENTO
SAN FRANCISCO
SEOUL⁴
SHANGHAI
SILICON VALLEY
TALLAHASSEE
TAMPA
TEL AVIV⁴
WARSAW³⁺
WASHINGTON, D.C.
WESTCHESTER COUNTY
WEST PALM BEACH

⁺ OPERATES AS
  GREENBERG TRAURIG MAHER LLP
³ OPERATES AS
  GREENBERG TRAURIG, S.C.
⁺ STRATEGIC ALLIANCE
⁴ OPERATES AS
  GREENBERG TRAURIG, LLP
  FOREIGN LEGAL CONSULTANT OFFICE
³ A BRANCH OF
  GREENBERG TRAURIG, P.A.,
  FLORIDA, USA
⁴ OPERATES AS
  GREENBERG TRAURIG MYTOCENA, sp.k.

David W. Hodges, Esq.
Gabriel A. Assaad, Esq.
John A. Neuman, Esq.
October 10, 2014
Page 2

_____

employee of or who has a continuous, regular, ongoing, or current consulting arrangement of any kind with Augustine Biomedical and Design, LLC, Augustine Temperature Management LLC, Hot Dog USA, LLC, or any related entities.

Please note that the following individuals on your list are current 3M employees/contractors - as such, they may only be contacted through Greenberg Traurig:

- Simon S. Fung
- Thomas P. Anderson
- Allen Hamid Ziaimehr
- Al Van Duren

We would like to meet and confer to discuss these issues further. Please let us know your availability for a meeting next week. Thank you.

With kind regards,

Lori G. Cohen

cc:     Brian P. Johnson, Esq.
        Christian C. Jacxsens, Esq.
        Evan C. Holden, Esq.

# EXHIBIT "D"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| TOMMY WALTON, | § § § § | |
| *Plaintiff,* | § § | Civil Action No. 4:13-cv-01164 |
| v. | § § | |
| 3M COMPANY; ARIZANT HEALTHCARE, INC.; AND ROBERT PRESTERA | § § § § | |
| *Defendants.* | § § | |

**DECLARATION OF MARK SCOTT IN SUPPORT OF DEFENDANTS' MOTION FOR
PROTECTIVE ORDER PROHIBITING THE DISCLOSURE OF CONFIDENTIAL
INFORMATION TO PLAINTIFF'S PROPOSED EXPERT WITNESSES AFFILIATED
WITH DEFENDANTS' COMPETITORS**

I, Mark Scott, being duly sworn upon my oath and having personal knowledge of the following

facts, do hereby state and affirm, under the penalties for perjury, that in support of Defendants'

Motion for Protective Order Prohibiting the Disclosure of Confidential Information to Plaintiff's

Proposed Expert Witnesses Affiliated with Defendants' Competitors, the following

representations are true to the best of my knowledge, information, and belief:

1. I am at least twenty-one (21) years of age and mentally competent to make this affidavit.

2. I am currently the Global Marketing Manager, New Product Introduction for 3M

   Company, a position I have held since January 1, 2014. From 2006 through 2013, I had

   product and marketing management responsibilities for Bair Hugger™ therapy for

   Arizant Healthcare Inc. Most recently, I held the position of Global Marketing Manager,

   Bair Hugger™ therapy for Arizant Healthcare Inc. and then for 3M Company. In my

   current role I manage the new product marketing work for various 3M patient warming

products.

3. I am familiar with the underlying facts alleged in Tommy Walton's Complaint, and with the representations set forth in Defendants' Motion for Protective Order Prohibiting the Disclosure of Confidential Information to Plaintiff's Proposed Expert Witnesses Affiliated with Defendants' Competitors, filed contemporaneously herewith.

4. 3M manufactures and distributes a line of medical devices known as Bair Hugger Forced Air Warming ("FAW") units, which are designed to help surgeons maintain a patient's normal body temperature during a surgical procedure.

5. 3M competes in the healthcare marketplace with numerous other manufacturers of patient warming devices and related equipment.

6. Preservation of 3M's confidential product information and trade secrets is an essential component of its business operations.

7. For several years, one of 3M's current competitors in the patient warming industry has been on a campaign against the Bair Hugger FAW device in an effort to jump-start the sales of its competing product.

8. The Chief Executive Officer of this competitor, Dr. Scott Augustine of Augustine Biomedical & Design, was the original inventor and developer of the Bair Hugger FAW device.

9. Dr. Scott Augustine has since developed a new patient warming device with a different design that does not include "forced air" like the Bair Hugger FAW. His new device (the "HotDog") works much like an electric blanket by providing warmth to the patient through direct contact between the patient and the device, as opposed to the Bair Hugger's forced air method of warming.

10. In 2002, Dr. Augustine resigned as Chairman and Chief Executive of Arizant Healthcare, Inc., and subsequently pleaded guilty to a misdemeanor charge arising out of a Medicare fraud investigation in 2004.

11. In November of 2005 Dr. Augustine wrote a letter to Arizant's CEO to claim that the Bair Hugger was causing burns for patients, while proposing to partner with Arizant to develop a burn avoidance technology to address the purported issue.

12. In July of 2008, Dr. Augustine wrote to the National Institute for Health and Care Excellence ("NICE"), to claim that forced-air warming devices had been reported in literature to be contaminated by pathogenic organisms, and to encourage NICE to re-evaluate their recommendation of forced air warming, because this recommendation purportedly caused healthcare providers to violate the law. Dr. Augustine urged NICE to substitute air-free warming such as his HotDog device.

13. In April of 2010, Dr. Augustine wrote to the CEO of Arizant to ask if Arizant was interested in acquiring Augustine's patents regarding hose-end filters. Dr. Augustine claimed the survival of Bair Hugger was dependent on the adoption of these filters, and concluded that he had no doubt that the HotDog would replace forced-air warming, either by a mandatory recall or through a voluntary recall.

14. In July of 2010, Dr. Augustine wrote a letter to the Managing Partner of the private equity firm that owned Arizant at the time to claim that Bair Huggers were contaminated with germs and destroyed laminar flow ventilation in operating rooms, and to claim that the solutions to both of Arizant's problems were in his control and request a meeting to discuss his proposal.

15. In March of 2013, Dr. Augustine began emailing 3M customers to forward Plaintiff's

3

counsel's press release that accompanied their filing, and claiming that Plaintiff's case had broken the ice and that possibly thousands of other lawsuits could follow.

16. In April of 2014, Dr. Augustine wrote to 3M to claim that a Bair Hugger recall was imminent, and to propose that 3M avoid having to do a recall by instead entering into a licensing agreement with Dr. Augustine's company and substituting the HotDog for the Bair Hugger with its customers, in order to create a "win-win" situation where 3M limited its purported liability and Augustine accomplished his mission of getting HotDog into all orthopedic operating rooms.

17. Dr. Augustine's efforts to undermine the Bair Hugger FAW device in the marketplace have drawn the attention of the FDA.

18. 3M invests substantial sums of money in research, testing, development, design, analysis, and evaluation of its patient warming products. If the information Defendants have developed over the years pertaining to the Bair Hugger FAW device was obtained by their competitors, including Dr. Augustine, it would give an unfair economic advantage to those competitors and cause immediate and irreparable harm to 3M.

19. There is no valid reason for competitors to obtain the results of Defendants' work without having to incur similar expenditures in time and money, since it would potentially allow them to market products at a lesser price.

20. If competitors were provided with Defendants' documents relating to research, testing, development, design, manufacturing, analysis, and evaluation, and regulatory submissions, the competitors could use that information to improve their design and manufacturing processes and procedures in order to become more competitive with Defendants. Without any effort on their part, Defendants' competitors would be able to

4

determine which approaches to design, research, manufacturing, testing, marketing, and regulatory submissions are proven to be successful and which approaches have not.

21. Defendants' confidential information regarding design, testing, manufacturing, regulatory submissions, and marketing would be useful not only to competitor forced-air warming companies, but to any competitor in the patient warming industry.

The undersigned certifies, under penalty of perjury pursuant to 28 U.S.C. § 1746, that the statements set forth herein are true and correct.

Executed on October 30th, 2014

Mark Scott

ATL 20272574v1

# EXHIBIT "E"

**The New York Times** Reprints

This copy is for your personal, noncommercial use only. You can order presentation-ready copies for distribution to your colleagues, clients or customers here or use the "Reprints" tool that appears next to any article. Visit www.nytreprints.com for samples and additional information. Order a reprint of this article now.

December 24, 2010

# Doctor Says a Device He Invented Poses Risks

By BARRY MEIER

Dr. Scott D. Augustine, the inventor of a widely used piece of surgical equipment, now has a better idea — he wants hospitals to stop using the device during certain operations, asserting that it poses a danger to patients.

Two decades ago, Dr. Augustine, an anesthesiologist in Minnesota, helped pioneer the idea of keeping a patient warm during surgery. Doing so, studies have shown, produces benefits like less bleeding and a faster recovery.

Dr. Augustine's invention, the Bair Hugger, changed surgical practices and made him a fortune. The device, which works like a forced-air heater, carries warmed air through a hose to a special blanket that is draped over a patient.

These days, Dr. Augustine asserts that his invention is a danger to surgical patients receiving implant devices like artificial heart valves and joints. The forced air, he says, can spread bacteria associated with hospital-acquired infections.

Coincidentally, Dr. Augustine, who no longer has a financial stake in the Bair Hugger, also says he has a safer alternative, a warming device that works more like an electric blanket and does not use forced air.

"I am very proud of the old technology," he said. "But I am also proud to spread the word that there is a problem."

It is not unusual for a developer or a company to assert that a new device is safer, more efficient or cheaper than an existing one. But Dr. Augustine's campaign against his own creation is notable for several reasons.

For one, some specialists in patient warming say that Dr. Augustine has yet to produce clear evidence that devices like the Bair Hugger pose a threat, a position that an independent testing laboratory sought out by Dr. Augustine also reached. But that has not stopped the

inventor from lashing out against the Bair Hugger, the company that sells it, Arizant Inc., and even some researchers who do not share his views.

His campaign also comes amid the backdrop of a long-running feud between him and Arizant. Dr. Augustine resigned in 2002 as chairman and chief executive of the company, which used to be known as Augustine Medical, after a dispute with other board members, court papers show. Arizant was acquired this fall by 3M for $810 million.

Last year, Dr. Augustine and Arizant settled a court battle arising in part out of a Medicare fraud investigation involving a different device that Dr. Augustine invented.

In 2004, the inventor pleaded guilty to a single misdemeanor charge stemming from that inquiry, paid a $2 million fine and was subsequently barred for five years from participating in federal health care programs.

Dr. Augustine then sued Arizant in a Minnesota state court asserting that it owed him, under an indemnification agreement, that $2 million fine plus millions of dollars more in salary. Under a settlement, Dr. Augustine received about $5 million, the company and the doctor said.

Dr. Augustine's campaign against the Bair Hugger has taken various forms. He has spoken out against the device at professional medical meetings and has underwritten studies intended to show that it may pose a bacterial threat.

Videos on a Web site promoting his new device, which is called the HotDog, suggests that heat generated by a Bair Hugger can redirect circulation in specialized rooms where joint implant surgeries are performed. That change in air flow can bring airborne contaminants in contact with patients, the videos assert.

Last April, the inventor also wrote to Arizant executives, accusing the company of a cover-up of the device's problems, according to a copy of that letter which Dr. Augustine provided to The New York Times.

"The question for you to answer is the following; is Bair Hugger going to be replaced quickly and catastrophically by a mandatory recall, or do you survive a voluntary recall and live to fight another day?" he wrote.

Arizant executives declined to be interviewed about their interactions with Dr. Augustine. However, Arizant has sued the inventor's new company, Augustine Biomedical and Design, in Germany, charging it is distributing information there that falsely disparages the Bair Hugger.

3M, Arizant's new owner, said in a statement: "We believe Mr. Augustine's allegations against forced-air warming stem from a personal vendetta and are baseless."

Several researchers in the area of patient warming said they respected the contributions that Dr. Augustine, who has some 150 patents to his credit, had made. And they added that the HotDog, which acts like an electric blanket rather than an air blower, appears to work as well as the Bair Hugger.

But they also said that there did not seem to be enough science to back his assertion that the Bair Hugger was dangerous.

"He simply has a new device now and wants to promote it," said Dr. Andrea Kurz, an anesthesiologist at the Cleveland Clinic, who has studied the HotDog. "And when you promote a new device by making something old look bad, it doesn't work well in our community."

Not long ago, Dr. Augustine presented data to the ECRI Institute, a group in Plymouth Meeting, Pa., that evaluates medical devices, to support his contention that bacteria generated by the Bair Hugger might be linked to hospital infections, said Dr. Jeffrey Lerner, the group's executive director.

Dr. Lerner added that the group concluded that current data was inadequate to prove that link.

Along with Arizant, Dr. Augustine has turned his sights on other experts. For example, he filed an ethics complaint this year with the Cleveland Clinic, charging that a leading specialist there on patient warming, Dr. Daniel Sessler, was biased against him.

In an interview, Dr. Sessler said that Dr. Augustine, whom he has long known, approached him several years ago to be a consultant on the HotDog. Dr. Sessler said that he told the inventor he would need a sizable payment to consider the position because he would no longer be able to accept research financing from competitors like Arizant.

The men did not reach an agreement and soon, Dr. Sessler said, Dr. Augustine turned on him.

"He started getting on my case, sending me funny notes saying I was biased," he said.

For his part, Dr. Augustine said he filed his ethics complaint after Dr. Sessler made a speech at a recent professional meeting that discussed only forced-air warmers like the Bair Hugger and did not mention devices like the HotDog.

A spokesman for the Cleveland Clinic said that its legal department had looked into Dr. Augustine's charge that Dr. Sessler was biased and determined that it was unfounded.

Dr. Jeffrey P. Gumprecht, an infectious disease expert in New York, said that he was hired by Dr. Augustine's company to review its data. He said he found the inventor's theory about the potential dangers of forced-air warming compelling, but added that proving such a link might be impossible because it would require mounting a huge clinical study.

# EXHIBIT "F"

Home Inspections, Compliance, Enforcement, and Criminal Investigations Enforcement Actions Warning Letters

**Inspections, Compliance, Enforcement, and Criminal Investigations**

## Augustine Biomedical & Design, LLC 7/24/12



Department of Health and Human Services

Public Health Service
Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993

JUL 24, 2012

<strong>WARNING LETTER</strong>

Via United Parcel Service
Scott Augustine, M.D.
Chief Executive Officer
Augustine Biomedical & Design, LLC
6581 City West Parkway
Eden Prairie, Minnesota 55344
Refer to CPT1 200003 when replying to this letter.

Dear Dr. Augustine:

The Food and Drug Administration (FDA) has learned that your firm is marketing the Hot Dog Patient Warming System in the United States. The product is a device within the meaning of section 201(h) of the Federal Food, Drug and Cosmetic Act (the Act), 21 U.S.C.§ 321 (h), because it is intended for use in the diagnosis of disease or other conditions or in cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body. As explained below, this device is being marketed without the required clearance or approval in violation of the Act.

Your firm obtained the following clearances for this system under section 510(k) of the Act, 21 U.S.C. § 360(k): the Hot Dog Patient Warming System (K052392), the Hot Dog Patient Warming Mattress System (K092807), the Hot Dog Multifunction Controller (K094056), and the Hot Dog Patient Warming System (K112488), each of which is " intended to prevent or treat hypothermia and to provide warmth to patients," and is " intended primarily for use in hospitals and surgical centers including, without limitation, operating, recovery and emergency rooms and on medical/surgical floors." The Hot Dog Patient Warming System was most recently cleared in K112488 for use with adult and pediatric patients.

The Office of Compliance in FDA's Center for Devices and Radiological Health, reviewed your firm's website, www.hotdog-usa.com on May 24, 2012. Although none of your firm's 510(k)s for the Hot Dog Patient Warming System are cleared to reduce infection rates, your firm's web site includes several claims of infection reduction from use of this device during surgical procedures. For example, a page on your firm's website, www.hotdog-usa.com/guarantee.php, titled "REFUND GUARANTEE," contains statements about air-free Hot Dog warming being associated with infection reduction. On this page, your firm states that, " unlike forced-air, air-free HotDog warming doesn't generate waste heat that can contaminate the sterile field (even with laminar flow ventilation). Hospitals that have switched to HotDog report significant reduction in deep joint SSIs. For

example, a # 1 rated hospital in Minnesota experienced an 81% reduction after switching to air-free warming." The claim of reduced infection is a clinical claim; submission of clinical data would be needed to support such a claim.

On your web site there is another page, www.hotdog-usa.com/safer.php, titled "HOTDOG IS SAFER." Below that caption is a summary of an article from the November 2011 issue of the Journal of Bone and Joint Surgery Br. Your firm's web page summarizes the article as concluding, "74% reduction in implant infections: Orthopedic surgeons reduced infections after switching to air-free Hot Dog patient warming (1437 patients over 2.5 years). Bair Hugger contaminates sterile field: Waste hot air convection currents transport contaminated air into the surgical site. Air-free warming has no such effect. Researchers concluded: 'Airfree warming, therefore, is recommended over forced-air warming for orthopedic procedures.'"

Statements such as the ones cited above represent a major change or modification in the intended use of your firm's device, which requires a new premarket notification. 21 CFR 807.81(a)(3)(ii). Therefore, the Hot Dog Patient Warming System is adulterated under section 501(f)(1)(B) of the Act, 21 U.S.C. § 351(f)(1)(B), because your firm does not have an approved application for premarket approval (PMA) in effect pursuant to section 515(a) of the Act, 21 U.S.C. § 360(e)(a), or an approved application for an investigational device exemption (IDE) under section 520(b) of the Act, 21 U.S.C. § 360j (g). The Hot Dog Patient Warming System is also misbranded under section 502(o) of the Act, 21 U.S.C. § 352(o), because your firm did not notify the agency of its intent to introduce the device into commercial distribution for infection reduction, as required by section 510 (k) of the Act, 21 U.S.C. § 360(k). For a device requiring premarket approval, the notification required by section 510(k) of the Act, 21 U.S.C. § 360(k), is deemed satisfied when a PMA is pending before the agency, 21 CFR 807.81(b). The kind of information that your firm needs to submit in order to obtain approval or clearance for its device is described on the Internet at http://www.fda.gov/cdrh/devadvice/3122.html.

The FDA will evaluate the information you submit and decide whether your product may be legally marketed.

Please notify this office in writing within fifteen business days from the date you receive this letter of the specific steps that your firm has taken to correct the noted violations, as well as an explanation of how your firm plans to prevent these violations, or similar violations, from occurring again. Include documentation of the corrections and/or corrective actions (including any systemic corrective actions) that your firm has taken. If your firm's planned corrections and/or corrective actions will occur over time, please include a timetable for implementation of those activities. If corrections and/or corrective actions cannot be completed within fifteen business days, state the reason for the delay and the time within which these activities will be completed. Your firm's response should be comprehensive and address all violations included in this Warning Letter.

Your firm's response should be sent to:

Damia Jackson
Food and Drug Administration
Center for Devices and Radiological Health
Office of Compliance
10903 New Hampshire A venue
W066-3500
Silver Spring, MD 20993

Finally, you should know that the violations discussed in this letter do not necessarily constitute and exhaustive list. It is your firm's responsibility to ensure compliance with each applicable requirement of the Act and FDA implementing regulations.

Sincerely,

/S/

Steven D. Silverman
Director
Office of Compliance

Center for Devices and
Radiological Health


Page Last Updated: 08/20/2012
Note: If you need help accessing Information In different file formats, see Instructions for
Downloading Viewers and Players.

Accessibility Contact FDA Careers FDA Basics FOIA No Fear Act Site Map Transparency
Website Policies


U.S. Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
Ph. 1-888-INFO-FDA (1-888-463-6332)
Email FDA

For Government For Press

Combination Products Advisory Committees Science & Research Regulatory Information Safety
Emergency Preparedness International Programs News & Events Training and Continuing
Education Inspections/Compliance State & Local Officials Consumers Industry Health
Professionals

U.S. Department of **Health & Human Services**

**Links on this page:**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| | § | |
| TOMMY WALTON, | § | |
| | § | |
| *Plaintiff,* | § | Civil Action No. 4:13-cv-01164 |
| | § | |
| v. | § | |
| | § | |
| 3M COMPANY; ARIZANT | § | |
| HEALTHCARE, INC.; AND | § | |
| ROBERT PRESTERA | § | |
| | § | |
| *Defendants.* | § | |

## ORDER GRANTING DEFENDANTS' MOTION FOR PROTECTIVE ORDER

Having considered Defendants' motion, Defendants' legitimate confidentiality and competition concerns, and the terms of the Protective Order, it is

ORDERED that Defendants' Motion for Protective Order Prohibiting the Disclosure of Confidential Information to Plaintiff's Proposed Expert Witnesses Affiliated with Defendants' Competitors is GRANTED, and further ORDERED that Plaintiff is prohibited from disclosing any of Defendants' confidential information to Plaintiff's proposed competitor expert witnesses.

Signed on _____, 2014

_____