UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------
                              )
                              )
 In Re: Bair Hugger Forced-Air   )   File No. 15-MD-2666
 Warming Devices Products        )   (JNE/FLN)
 Liability Litigation            )
                              )
                              )   February 7, 2017
                              )   Minneapolis, Minnesota
                              )   Courtroom 9 West
                              )   2:00 P.M.
                              )
------------------------------------------------------------


**( HEARING ON MOTIONS )**


BEFORE THE HONORABLE FRANKLIN L. NOEL
UNITED STATES MAGISTRATE JUDGE












**TIMOTHY J. WILLETTE, RDR, CRR, CRC**
Official Court Reporter - United States District Court
1005 U.S. Courthouse - 300 South Fourth Street
Minneapolis, Minnesota  55415
612.664.5108

**A P P E A R A N C E S:**


**For the Plaintiffs:**          **MESHBESHER & SPENCE, LTD.**
                                 By:  GENEVIEVE M. ZIMMERMAN, ESQUIRE
                                 1616 Park Avenue South
                                 Minneapolis, Minnesota  55404


                                 **CIRESI CONLIN, LLP**
                                 By:  JAN M. CONLIN, ESQUIRE
                                      MICHAEL A. SACCHET, ESQUIRE
                                 225 South Sixth Street - Suite 4600
                                 Minneapolis, Minnesota  55402


**For the Defendant 3M:**        **BLACKWELL BURKE, P.A.**
                                 By:  JERRY W. BLACKWELL, ESQUIRE
                                      MARY S. YOUNG, ESQUIRE
                                 431 South Seventh Street - Suite 2500
                                 Minneapolis, Minnesota  55402


                                 **FAEGRE BAKER DANIELS, LLP**
                                 By:  BRIDGET M. AHMANN, ESQUIRE
                                 2200 Wells Fargo Center
                                 90 South Seventh Street
                                 Minneapolis, Minnesota  55402


**For Respondent**
  **Augustine:**                 J. RANDALL BENHAM, ESQUIRE
                                 6581 City West Parkway
                                 Eden Prairie, Minnesota  55127


**For Respondent**
  **Kennedy Hodges, LLP:**       **KENNEDY HODGES, LLP**
                                 By:  DAVID W. HODGES, ESQUIRE
                                      GABRIEL A. ASSAAD, ESQUIRE
                                 4409 Montrose Boulevard
                                 Houston, Texas  77006

 1          (2:00 p.m.)

 2                        P R O C E E D I N G S

 3                          IN OPEN COURT

 4          THE COURT:  Good afternoon.  Please be seated.

 5          Okay.  So this is In Re:  Bair Hugger Forced-Air

 6     Warming Devices Products Liability Litigation, MDL Number

 7     15-2666.  We're here for a hearing on the defendant's motion

 8     to compel documents from Augustine, and there's also a

 9     defendant's request to strike Plaintiffs' submission in

10     response to Defendant's motion.

11          So let's get everybody's appearance on the record

12     first and then we'll talk about how we're going to proceed.

13          For Defendants?

14          MR. BLACKWELL:  Jerry Blackwell speaking for 3M,

15     Your Honor.

16          MS. YOUNG:  Mary Young here for 3M as well.

17          MS. AHMANN:  Bridget Ahmann for 3M.

18          MR. BENHAM:  And representing Dr. Augustine and

19     Augustine-related companies, J. Randall Benham.

20          MR. HODGES:  And David Hodges, Your Honor, on

21     behalf of Kennedy Hodges.

22          MS. ZIMMERMAN:  Genevieve Zimmerman for

23     Plaintiffs.

24          MS. CONLIN:  Jan Conlin for Plaintiffs.

25          MR. SACCHET:  Mike Sacchet for Plaintiffs.

 1          MR. ASSAAD:  Gabriel Assaad for Plaintiffs.

 2          THE COURT:  So let me start with the defendant's

 3   request to strike Plaintiffs' submission.  That request is

 4   denied, but in terms of oral argument here today, I believe

 5   we've already communicated that it's going to be 20 minutes

 6   for Defendant -- you can split it up however you want

 7   between opening and rebuttal -- 20 minutes for Augustine, 20

 8   minutes for Kennedy Hodges, and the plaintiffs by my reading

 9   of their memo concede that they don't really have a dog in

10   this fight.

11          MS. CONLIN:  That's correct, Your Honor.

12          THE COURT:  Okay.  So with that, Mr. Blackwell,

13   you're up.

14          MR. BLACKWELL:  Your Honor, on the motion to

15   strike or the other motion?

16          THE COURT:  On the motion -- the substantive

17   motion that we're here for, to compel the documents from

18   Augustine.

19          MR. BLACKWELL:  Thank you, Your Honor.

20          First of all, Happy New Year.  I think this is the

21   first time I've seen Your Honor since we started this year.

22          THE COURT:  Welcome back.  I trust everything was

23   warm and sunny in Nevis or --

24          MR. BLACKWELL:  Nevis and St. Kitts.  And so I did

25   get to see where Hamilton was from and where Thomas

1    Jefferson's granddaddy was from in St. Kitts.

2              But here we are again, Your Honor, to some extent,

3    the third verse same as the first.  We are still attempting

4    to get documents from Dr. Augustine.  We've now had two

5    orders from Your Honor.  The first order was issued because

6    there was no privilege log issued at all, and the second

7    order was because the privilege log was insufficient to be

8    able to assess the nature of the privilege claimed.

9              Your Honor I think was very clear in this Court's

10   November 23rd order in terms of what Dr. Augustine was

11   required to provide by way of a privilege log, and I want to

12   hone in on what's I think most significant for the time I'll

13   take today.  I will rely heavily on my papers and I'll take

14   up all the time I have and save the rest whatever the

15   rebuttal.

16             But Your Honor was clear that Dr. Augustine's

17   privilege log had to contain details sufficient to permit

18   Defendants and the Court to evaluate his claim of privilege

19   specifically as to each document, amongst other things,

20   number four, the basis for the claim of privilege or other

21   protection, and that was very clear.

22             What we received, Your Honor, was not a log that

23   set forth a particular document that's claimed to be

24   privileged with a specific claim for privilege.  We set

25   forth in our papers many instances where there is simply a

1    number of communications lumped together and then a number

2    of claimed privileges simply lumped together and no way to

3    sort out which is related to what and which is not what Rule

4    26 permits and what's not the intent of Your Honor's order

5    either.  It simply obfuscated the issue once again as to

6    which privilege applied to which particular document.

7            In addition, if Your Honor has had an opportunity

8    to peruse that privilege log, a number of the subject matter

9    descriptions are just completely vague.  You will see

10    references such as a reference to meeting on the filter, for

11    example.  It was very vague one-liners.  And I've got some

12    examples of that should Your Honor like to discuss it, but

13    we do set it out in our papers.  But it wasn't what Your

14    Honor ordered.  It wasn't what Rule 26 requires.  And where

15    the law is clear is that where the privilege has not been

16    established by the party claiming that privilege, then the

17    documents have to be produced and the claimed privilege

18    ought to be waived.  From 3M's point of view, the analysis

19    could stop right there.  There's been one order, there's

20    been two orders, and the rule itself required there be the

21    production of a proper privilege log and it hasn't happened.

22    The question is how many orders, Your Honor, does it take.

23            So what we are seeking here today is, first of

24    all, all 23 documents that were on the Augustine August 17th

25    log, which would be contained at Exhibit J in our papers,

1   and then the first 84 documents that are on the

2   December 22nd log, which is Exhibit H.

3           THE COURT:  Let me stop right there, because I

4   have some questions about both of those statements.

5           So first of all, as I understand it, am I correct,

6   that as to privilege log entries 84 through 115 on the

7   December log, that you're not seeking those, correct?

8           MR. BLACKWELL:  That's right, Your Honor.

9           THE COURT:  And do you concede that they're

10  privileged or you just decided not to argue about it?

11          MR. BLACKWELL:  We decided not to argue about it.

12          THE COURT:  Okay.  But you don't want them.  I

13  don't have to make any decisions about them.

14          MR. BLACKWELL:  That's right, Your Honor.

15          THE COURT:  Okay.  So then the second question is,

16  to what degree, if at all -- and maybe your answer is going

17  to be you don't know because you can't tell, but I'll ask it

18  anyway -- to what degree do these two logs, the 23 documents

19  on the first one --

20          MR. BLACKWELL:  Yes, Your Honor.

21          THE COURT:  -- and the 115 on the second, to what

22  degree do they overlap, if at all, or are they cumulative?

23          MR. BLACKWELL:  They appear to be cumulative, Your

24  Honor, and to the extent they do overlap, it is as Your

25  Honor states.  We can't tell from the descriptions given,

1    but they appear to be cumulative.

2                THE COURT:  Okay.

3                MR. BLACKWELL:  So that's the relief we're

4    seeking.  We want the documents.

5                Alternatively, if Your Honor feels that it's not

6    really possible to determine whether the documents are

7    privileged in total or not, then we request an *in camera*

8    review.  Your Honor may want to assess whether parts of

9    documents are privileged and protected, but not the entire

10   document.  We think the Court need not reach that position

11   because there's not been compliance in the first instance

12   and the privilege should be deemed waived.

13               Now, to the extent -- to the extent that

14   Dr. Augustine or now Kennedy Hodges want to assert that

15   there is some kind of attorney-client relationship or

16   work-product protection, the burning questions are

17   fundamental to what is attorney-client privilege and what is

18   work product.  Attorney-client privilege is only going to

19   apply to communications made for the purposes of determining

20   legal advice and only those that are necessary to obtain

21   answers to legal questions, attorney-client privilege.

22               What we know from Dr. Augustine in terms of what

23   the nature of the relationship was, he was very clear at

24   Exhibit A to our papers, which is his affidavit, and he

25   lists three purposes for which he says all of his

1     communications to Kennedy Hodges, they were all subsumed in

2     these three purposes:

3              Number one, to learn about product liability

4     litigation.  That might be the stuff of a high school civics

5     class, certainly not protected.

6              Number two, to understand why personal injury

7     firms virtually never file cases on behalf of patients

8     injured by surgical infections.  There's nothing

9     particularly privileged about that inquiry either.

10             And then the third one was the fact to educate

11    Kennedy Hodges about forced-air warming, was the third

12    purpose.

13             So none of those purposes have anything to do with

14    seeking advice or to get answers to legal questions, Your

15    Honor, but to make it abundantly clear that the true

16    motivation for Dr. Augustine contacting Kennedy Hodges was a

17    business purpose.

18             He makes it clear also in that same affidavit at

19    Exhibit A when he says that his communications with Kennedy

20    Hodges were all, I quote, consistent with his two goals:

21    Number one, to stop Bair Hugger, number one, and number two,

22    to promote the use of his competing product, the Hot Dog.

23    He says that in paragraph 8 of his own affidavit that that's

24    what he's up to.  So he has decided that he's going to

25    pursue a litigation strategy to find plaintiffs lawyers to

1    sue his competitor, to essentially chop off their head to

2    make his product look taller, and that's what he was up to.

3            And he didn't just stop there.  If Your Honor

4    reads on in the papers, you can see exactly how he's

5    carrying this out.  The last time we were before Your Honor

6    we were here talking about MedWatch reports to the FDA and

7    Dr. Gauthier that we learned wasn't the person submitting

8    these MedWatch reports.  It was Mr. Benham and Dr. Augustine

9    behind them.

10           He didn't stop there.  I think Your Honor will see

11   that at Exhibit K we have 80 pages of letters that

12   Dr. Augustine and Mr. Benham are sending to hospitals and

13   other healthcare professionals around the country touting

14   the MDL litigation as a reason to switch to the Hot Dog.

15           And so he didn't stop there.  If Your Honor looks

16   at Exhibit B, this is a presentation that Dr. Augustine has

17   given all over the country when he wants to talk about all

18   the dangers of forced-air warming compared to his product,

19   the Hot Dog.

20           And the very last page of this was really

21   interesting, because the last page of it is a slide that

22   says, you know, "New Wave of Litigation," and here he is

23   calling for these health professionals, these healthcare

24   professionals, to get engaged in the new wave of litigation,

25   and there's a shilling there for the Kennedy Hodges law firm

1    to end that presentation at Exhibit B in our papers.

2              So he is not only, Your Honor, interested in

3    learning about product liability litigation.  He is actively

4    fomenting and encouraging product liability litigation.

5              The story of Rosie Bartel, Your Honor will see in

6    our papers, was a woman who didn't even know that she used a

7    Bair Hugger or not, and she had been in contact with

8    Mr. Benham and Scott Augustine, and they asked her to write

9    a story telling her story about surgical site infection.

10   And Your Honor will see that what came of that is her story

11   apparently wasn't sufficiently detailed enough because it

12   didn't disparage the Bair Hugger.  So, being very helpful

13   persons, Dr. Augustine and Mr. Benham offered to write the

14   statement for her such that it would be a fair

15   characterization in the view of the Bair Hugger.  And as

16   they said, we care about personal safety, or patient safety,

17   but this has to make sense for our business too, they said,

18   and pointed out to her that her tragedy, her tragedy, was

19   the business of the Kennedy Hodges law firm is what they

20   said in the paper.

21             And so the point to all of this is that the mere

22   fact that a competitor, 3M, decides as a business strategy

23   to foment litigation against 3M and its product -- and it's

24   a win-win for them; he gets to promote his product and the

25   plaintiffs' lawyers, they're able to get a case and

1    presumably come out on it -- doesn't make the by-product of

2    that meeting either work product, since it's not prepared by

3    or for another party as required under 26(b)(3)(A), and it

4    doesn't make it attorney-client privilege, either one.

5              THE COURT:  Well, let me ask you this, though:

6              Isn't it possible that you can have a business

7    purpose and at the same time engage a lawyer to give you

8    advice about your business purpose?  And I notice in your

9    papers you talk about they haven't produced any engagement

10   letter or attorney-client contract thing.  If there were

11   such a document, would that change your argument in any way?

12             MR. BLACKWELL:  Your Honor, it wouldn't for a

13   couple of reasons, and these are the facts that we know.

14             And first, again, from Dr. Augustine's affidavit,

15   he makes it very clear that it has been several years, he

16   says in Exhibit A, since there was any attorney-client

17   relationship between Kennedy Hodges, if there ever was one,

18   and that was in December of 2016.

19             THE COURT:  But if there is one, the

20   attorney-client privilege and work product to the extent it

21   exists during the time that that is there, the privilege

22   doesn't disappear when the relationship ends, right?  The

23   lawyer still has an obligation to keep the confidences of

24   the client and to not disclose privileged information that

25   he learned during the course of the relationship, correct or

1    incorrect?

2              MR. BLACKWELL:  Your Honor, I think that's

3    incorrect in this sense, and I believe the case, Your Honor,

4    *Simon vs. Searle* that the Eighth Circuit decided was a

5    question of whether or not the involvement of in-house

6    counsel was *per se* protected or privileged simply because,

7    for example, there's some type of relationship involving a

8    lawyer.  And what the court came to was really kind of a

9    commonsense conclusion, that you have to look to what is the

10   essence or nature of that particular engagement.  Did it

11   sound primarily in business, or was it really seeking advice

12   for purposes of getting legal advice?  In this instance,

13   Scott Augustine has been clear when he says:  All of my

14   communications with Kennedy Hodges were directed toward two

15   goals, and one was to stop Bair Hugger, which is a business

16   purpose, and number two was to promote his product, the Hot

17   Dog.

18             THE COURT:  Right.  But do you agree or disagree

19   that it's possible to have those purposes and at the same

20   time retain a lawyer to give you advice about what you can

21   do, what you can't do, how do I go about achieving these

22   business purposes, what's legal, what's not legal, how do I

23   impose a Muslim ban without legally or illegally doing that?

24   Often you consult the lawyer for the purpose of finding a

25   lawful way to do what you want to do, correct?

1          MR. BLACKWELL:  Your Honor, obviously that's

2     correct, that's possible, and what we have here now is no

3     evidence that took place.  There's no indicia of a typical

4     attorney-client relationship.

5          The retainer agreement which we've been told

6     exists and we've asked for and never gotten, it's not itself

7     privileged, so we ought to be able to see what it is, what

8     the scope of it was, et cetera.  What time period did it

9     apply to?  And so to the extent any of this work product --

10    we have plenty of instances in the privilege log where

11    Mr. Benham claims that he was a consulting expert and it

12    related to the *Walton* and *Johnson* cases.

13         And Your Honor will see in the papers where the

14    *Walton* court itself represented in its order, which is one

15    of the exhibits to our papers, that the Kennedy Hodges firm

16    had indicated that they'd only had one discussion with

17    Dr. Augustine with respect to *Walton* and none about the

18    second filed case, *Johnson*, zero.  Mr. Benham himself makes

19    the same statement, Your Honor, that one discussion about

20    *Walton* and none at all about the *Johnson* case, and you'll

21    find that in our papers, the Benham affidavit, Exhibit M at

22    paragraph 13.

23         So, Your Honor, I'm going to stop there because I

24    do want to leave a couple minutes to respond to what it is

25    they have to say, but we'll rely on everything that is said

1    in our papers on the issue.  I think being able to establish

2    just an attorney-client relationship across the board in the

3    absence of any indicia of one, no proof that the documents

4    for which the privilege is invoked arose out of seeking

5    advice, legal advice, that's not there.  There's no work

6    product because it's not in relation to any specific case

7    that we know of that's been identified.

8              And in terms of Mr. Augustine being an expert, the

9    best they could say is that he was a non-retained,

10   non-testifying consulting expert.  I'm not sure that annal

11   exists in the law, Your Honor.  Non-retained means not

12   retained, means not my expert, and they were very clear that

13   he was never consulted for any specific case.

14             So I'll sit down, Your Honor.

15             THE COURT:  Okay.  Thank you.

16             Mr. Benham?

17             MR. BENHAM:  Thank you, Your Honor.

18             I had hoped not to be standing here again,

19   especially standing here listening to Mr. Blackwell demonize

20   my client and complain about what is essentially aggressive

21   business competition as if it were somehow improper.

22   Aggressively competing against 3M is not improper, putting

23   on legal educational seminars is not improper.  So -- after

24   all, my client is not a plaintiff, is not a defendant.  It's

25   a third party.

1          And given that, what 3M is asking for is

2     extraordinary.  They're asking for communications between

3     the lawyer for their chief competitor and the lawyer for the

4     attorneys representing a hundred or maybe hundreds of

5     plaintiffs out there, lawyer-to-lawyer communications.

6     Virtually none of these communications involve

7     Dr. Augustine, although he's copied on some of them.

8          THE COURT:  So the argument as I understood from

9     what Mr. Blackwell said, it's not that there's anything

10    necessarily improper about what your client is doing, simply

11    that what he's doing doesn't shroud the documents with the

12    privilege, that the privilege is not there and therefore

13    they should be able to look at them because they're relevant

14    to these cases.

15          MR. BENHAM:  In the descriptions of what the

16    general reasons were that Kennedy Hodges was retained,

17    Dr. Augustine, obviously with my advice, has had to walk a

18    very fine line for not violating the very privilege we're

19    trying to protect.  So when one says --

20          THE COURT:  So tell me, whose privilege is it?

21    What privilege is being asserted as to these documents?  Is

22    it the privilege that Dr. Augustine has with you?  Is it a

23    privilege that you and the Kennedy Hodges lawyers somehow

24    have?  Is it Kennedy Hodges' work product?  Is it your work

25    product?  What exactly is the privilege --

1          MR. BENHAM:  That is an extraordinary question and

2     the answer is yes, varying between document to document.

3          When Mr. Blackwell says there's a lump mixture of

4     all sorts of privileges put on there -- and that's not

5     because it's a lump.  It's because there are multiple

6     privileges involved.

7          I am the Augustine lawyer.  In some cases Kennedy

8     Hodges was the Augustine lawyer.  In some cases I was acting

9     in my own stead, as I explain in the affidavit.  In some

10    cases I was sharing my work product with Kennedy Hodges.  In

11    some cases it's Kennedy Hodges' work product because

12    Dr. Augustine was the consultant.  And not just

13    Dr. Augustine the consultant.  The Augustine companies were

14    the consultant and I'm an employee of the Augustine

15    companies.  So it's a mishmash of different privileges, all

16    of which have to be looked through, I believe.  I did not

17    see a way to explain that other than the way that I did it

18    in the privilege log.

19         Now, they argue that this was a business

20    relationship and not an attorney-client relationship, and

21    their evidence for that is Rosie Bartel.  And as I expressed

22    briefly in my affidavit, Rosie and David Bartel are my

23    friends.  We got to know each other because Rosie is an MSRA

24    advocate.  I gave her some information, the research that's

25    out there.  I've been in their home.  We have had meals

1    together.  I have pushed her wheelchair.  She's amputated up

2    through one hip.  And, you know, we share a lot of

3    background and we are friends.

4           And after some time she asked me for a referral.

5    I referred her to David Hodges.  She rejected David Hodges,

6    and I learned that she had filed a lawsuit ultimately when I

7    read about it on the federal court website.  There have been

8    no other referrals.  The suggestion that this is a *quid pro*

9    *quo* business relationship is just false.

10          THE COURT:  Is there a retainer agreement between

11   Dr. Augustine and Kennedy Hodges?

12          MR. BENHAM:  A retainer agreement was signed.

13   Dollars were paid.  It was a long time ago.  I don't have

14   it.  I don't know whether Kennedy Hodges has it or not.

15          THE COURT:  You don't have it.  Does Dr. Augustine

16   have it?

17          MR. BENHAM:  No.  When I say "I" --

18          THE COURT:  When you said "you," you mean your

19   client.

20          MR. BENHAM:  I as general counsel.  You know, this

21   was years ago and we're simply not well organized enough to

22   have that document.

23          THE COURT:  Well, let me ask you this question

24   which I just asked Mr. Blackwell:

25          As between the first privilege log with the 23

1    documents and the 115 on the second privilege log, is there

2    overlap between those two or are they cumulative?

3              MR. BENHAM:  My belief is there is 100 percent

4    overlap between those two.  And the reason that there's 23

5    in the first one and whatever number there is in the second

6    one is because you told me how to do it properly.

7              The first time I did the privilege log, I listed

8    it by strings of e-mails.  So, if there were a half dozen of

9    them going back and forth, I listed recipient and sender on

10   each side because sometimes one was the recipient and the

11   other was the sender.  Your order made it clear that I had

12   to do it iteration by iteration by iteration, even if it was

13   one-word responses.  So, that's how 23 turned into whatever

14   number that there was.  And it might be -- I don't know; I'm

15   not going to reveal anything -- "Can we meet on Thursday?"

16   "What time?"  "Yes, two."  "Two won't work."  And you get it

17   over and over and over again.  That's how a few turn into a

18   lot.

19             The vast majority of the documents and the

20   privilege being asserted here is Kennedy Hodges' work

21   product.  Some of it is mine and I talked about that.  The

22   part that's mine I shared with Kennedy Hodges, so there are

23   other levels of protection there as well.

24             I'm standing here because my client is in

25   possession of the documents that I identified as being

1    Kennedy Hodges' work product.  At that point my
2    responsibility was to reveal it through the privilege log
3    and to avoid accidentally destroying the privilege until
4    Kennedy Hodges and the 3M attorneys could be standing here
5    arguing on their own behalf what was appropriate and what
6    wasn't.  That was very difficult, because 3M was unwilling
7    to include Kennedy Hodges on communications and rejected my
8    invitation to involve Kennedy Hodges in a meet-and-confer.
9    They simply didn't want to get Kennedy Hodges involved in
10   this.  They wanted to come through me through the back door
11   to get work product which wasn't mine in a lot of cases, was
12   Kennedy Hodges', and I didn't exactly have standing to
13   defend.
14         In the other times we've stood before you -- I
15   mean, I don't know if you recall, but I do -- I attempted to
16   offer you an *in camera* affidavit which would have explained
17   this, and you said, "No, let's not do that," but now we're
18   here talking about that.  It was my job to get us to this
19   point so that Kennedy Hodges can defend its own work
20   product.
21         Now, if --
22         THE COURT:  Work product on behalf of whom?  Is it
23   work product that Kennedy Hodges did on behalf of
24   Dr. Augustine, or work product that Kennedy Hodges did on
25   behalf of plaintiffs that ultimately filed lawsuits in this

1    MDL?

2            MR. BENHAM:  Well, I'll let David Hodges make his

3    own arguments on that, but my belief is that it's his work

4    product representing his client related to communications

5    with a consultant, an outside consultant, non-testifying

6    consultant apparently, that they had retained to understand

7    the research, understand the world of patient warming, all

8    of the things that Dr. Augustine and the Augustine companies

9    and the Augustine employees, me included, were retained to

10   do.

11           Mr. Blackwell complains about the quality of the

12   summaries that I put into the privilege log.  When last I

13   stood before you, I admitted that I didn't fully understand

14   the obligations under the privilege log and you cited that

15   back to me in an order.  That's not quite what I meant.

16           What I meant was, the federal rules don't give

17   explicit instructions as to what you should say and what you

18   shouldn't say.  They just say explain enough so that people

19   can tell what the scope is and whether the document is

20   privileged or not.

21           I repeatedly asked for samples, I repeatedly asked

22   for case citations, and ultimately I asked to get Kennedy

23   Hodges involved in the meet-and-confer.  And my goal was to

24   say:  "3M attorneys, if you don't like my summaries of them,

25   let me give all the documents to Kennedy Hodges, because

1    it's their privilege.  It's their work product.  If they

2    want to rewrite new summaries for you" -- I mean, I have to

3    stay far back in the line, because I fear accidentally

4    destroying the privilege that's not mine.

5            So I would have been perfectly happy for the

6    meet-and-confer to have led to Kennedy Hodges redoing my

7    summaries, because I really don't care.  I mean, I have a

8    favorite in these cases, we're interested in the cases, but

9    in this particular aspect of it, I -- as they say, I don't

10   have a dog in this fight and my intention is to perform my

11   responsibility in my own eyes as well as in your eyes and

12   escape unscathed.

13           So with that I'll defer to Mr. Hodges.

14           THE COURT:  Okay.  Thank you.

15           MR. HODGES:  Good afternoon, Your Honor.

16           To answer your question, there is a fee agreement,

17   a retainer agreement.  It was submitted *in camera*.  We also

18   submitted a copy of the retainer receipt.  That's not at

19   issue.  If the Court doesn't have it --

20           THE COURT:  Why is that *in camera*?

21           MR. HODGES:  Well, as you know, the privilege

22   belongs to the client.  I didn't feel comfortable without

23   the client giving me authority to reveal the contents of the

24   retainer agreement or the retainer receipt.  Of course, if

25   you order its production, then we'll produce it.

1          THE COURT:  Do you contend that it's privileged?

2          MR. HODGES:  I don't know that anything in there

3     is privileged *per se*, but again, because it was not my

4     privilege to waive, I felt uncomfortable not submitting it

5     *in camera*.  And the three previous times that we had this

6     issue come before three different judges, it was submitted

7     *in camera* and was never ordered produced, so this fourth

8     time I went ahead and produced it *in camera*.  But if the

9     Court doesn't have it -- I assume the Court is in possession

10    of it.  If not, then we're happy to resubmit it.

11         THE COURT:  I am in possession of it, I have seen

12    it, and I couched my question in terms of "Is there one?"

13    because you had submitted it *in camera*.  I didn't know

14    whether or not -- so I do not believe it's privileged and I

15    see no reason why you shouldn't share it with Defendants.

16         MR. HODGES:  And we can do that, Your Honor.

17         And then I also wanted to point out that I

18    believe, you know, Mr. Blackwell took Dr. Augustine's

19    affidavit out of context when he left out portions where he

20    was talking about a potential *qui tam* action or False Claims

21    Act.  He also mentioned Lanham Act claims.

22         But I think the key here, Your Honor, is,

23    listening to Mr. Blackwell, you would think that this is a

24    lawsuit between 3M and Dr. Augustine, and it's not, okay?

25    We are in Multi-District Litigation involving tort claims

1    surrounding the product known as the Bair Hugger.  The issue

2    is whether this Court should issue an order granting

3    extraordinary relief and allow 3M's -- its chief

4    competitor's attorneys' communications with another lawyer

5    who's currently suing it.  And as we've stated in our brief,

6    Your Honor, the case law on this is clear.  The answer is

7    no, they are not entitled to these documents.

8              And I also want to make it very clear.  As you go

9    through the privilege log, none of these communications are

10   with Dr. Augustine.  I know they say Dr. Augustine has his

11   personal campaign against 3M.  He's copied -- and I counted

12   them -- on that December privilege log, I think there's a

13   total of 12 e-mails or e-mail strings where he's copied, but

14   he never says anything.  There's no indication that this was

15   designed as some sort of pure business relationship.  And as

16   even you yourself, Your Honor, had recognized, you can have

17   a strategic interest and work-product privilege will apply.

18             The one thing, though, that I think that we've

19   gotten away from -- and this issue hasn't come before the

20   Court, even though I believe that 3M is punting on it -- is

21   really the question of is this information relevant to this

22   case.  And to be very clear, 3M's plan is to use this

23   information against my clients and the other 1100 plaintiffs

24   in this litigation.  Their plan is not to use it against

25   Dr. Augustine.  And so if we look at the test for relevant

1    evidence, it has a tendency to make any fact more or less

2    probable than it would be without the evidence, and the fact

3    is of consequence in determining the action.  The action in

4    this case is the tort claims against 3M.

5            Now, though invited, 3M has repeatedly failed to

6    offer any explanation whatsoever, any credible argument, how

7    this makes any MDL fact more or less probable and case

8    determinative.

9            But, Your Honor, let's assume that 3M is correct.

10   Let's assume that Dr. Augustine came up with this idea of

11   litigation.  He worked over eight years to recruit lawyers

12   and got all these cases on file and talked to a hundred

13   different law firms across the country.  So what, okay?  How

14   does that make anything of what he said wrong, and the

15   answer is it doesn't.  And again, they've not given us any

16   argument at all how this is relevant.

17           And I know that there's -- the issues in this case

18   were spelled out in our brief -- that I don't know if the

19   Court had the opportunity to review -- by the PSC in this

20   case.  But I think if we distill this down to, you know,

21   what is this case about, and 3M's own paid consultant on the

22   topic of normothermia was asked:  Have you ever told them

23   that there is evidence that maintaining normothermia reduces

24   the incidence of paraprosthetic joint infection?  She said

25   no.  Have you ever informed them that there's no evidence

1    that paraprosthetic -- maintaining normothermia reduces the

2    incidence of paraprosthetic joint infection?  And she says

3    yes.  So she's informed 3M, look, there's no evidence of

4    this, yet they use this to promote the product.

5            These are the issues in this case, Your Honor.

6    Whether or not Dr. Augustine, who had left the company --

7    it's been over 14 years now since he left the company -- are

8    not issues in this case.

9            That's one example of --

10           THE COURT:  Let me interrupt for a quick second --

11           MR. HODGES:  Yes, Your Honor.

12           THE COURT:  -- to make sure I'm going to get to a

13   point where it's more logical.

14           Do you have a view on my question as to whether

15   these two different privilege logs are cumulative or

16   overlapping?

17           MR. HODGES:  I take Mr. Benham at his word that

18   it's the same e-mails.  He just broke down the e-mail

19   strings into separate e-mails, which is why the second one

20   is so much longer than the first.

21           THE COURT:  Okay.

22           MR. HODGES:  Now, I want to address **Walton** since

23   it was brought up by Mr. Blackwell.

24           3M in the very first case that was filed was a

25   **Walton** case.

1          THE COURT:  Before you get to that, what was the

2     agreement between Dr. Augustine and Kennedy Hodges?  Why was

3     the law firm retained?  Is that spelled out in the retention

4     agreement?

5          MR. HODGES:  I think it's relatively broad, but I

6     also take Dr. Augustine at his word that he was thinking

7     along the lines initially of a False Claims Act claim, which

8     I have prosecuted those types of claims before.  My

9     understanding is he was referred to me.  And I don't know.

10    I guess that would be a good question for him as far as why

11    he first approached us.  And again, this was nine years ago,

12    but that I believe is consistent with the purposes for which

13    we were first contacted and retained.

14          THE COURT:  All right.  Go back to where you were.

15          MR. HODGES:  Okay.  So, going back to the *Walton*

16    case, 3M did a pretty good job arguing for a very broad

17    protective order in the *Walton* case.  And pursuant to the

18    protective order, if we were going to give any information

19    to any expert that had ever worked not just in forced-air

20    warming, but had ever consulted on any patient-warming

21    modality, we had to disclose the identity to 3M.

22          And so we sent a letter to 3M.  We identified 25

23    potential experts that were potential consulting at that

24    point because we didn't have our deadline yet to designate

25    experts, and one of them was Dr. Augustine.

1          3M was very upset with the idea that any of their

2     information would go to Dr. Augustine, so they filed a

3     motion for a protective order and we indicated -- and if you

4     look at what we actually represented to the Court, we said

5     for this case we are not going to give him any of the

6     documents.  We're not retaining him for this case.  The

7     order makes it clear we're talking about the *Walton* case.

8     It says "in this case" in two or three different places.

9     Our briefing and representations to the Court say the same

10    thing.

11          The documents that are at issue here are very

12    broad in nature and at this point Kennedy Hodges represents

13    I believe it's 125 clients in the MDL.  The fact that the

14    documents are protected by the work-product protection,

15    which is what we've argued in our briefing, and the

16    attorney-client privilege are not clearly inconsistent, as

17    they're arguing that we're somehow judicially estopped to

18    argue that these are -- that the work-product protection

19    doesn't exist.

20          So the real issue here is -- there's about six

21    different reasons how this information can be protected,

22    Your Honor, contained in our briefing.

23          First, the attorney client privilege.  Second, the

24    consulting expert privilege.

25          THE COURT:  Let's take those one at a time.

 1            MR. HODGES:  Sure.

 2            THE COURT:  First of all, does there have to be --

 3    I'm just going to focus on the 84 documents on the

 4    December privilege log, because as I understand both you and

 5    Mr. Benham, they encompass the 23 documents that were on the

 6    earlier privilege log.

 7            Does there need to be an attorney-client

 8    relationship between Kennedy Hodges and Dr. Augustine in

 9    order for your work product to be protected?

10            MR. HODGES:  No, Your Honor.

11            THE COURT:  Okay.  And if the answer to that is

12    no, why does -- why is not your work-product protection

13    waived by disclosing this information to Dr. Augustine?

14            MR. HODGES:  Okay.  And again, this is in our

15    brief as well.  Disclosure to a non-adversarial party

16    doesn't waive that and disclosure to someone who has common

17    interest does not waive it either.

18            And, Your Honor, you've actually wrote yourself on

19    this issue in the *Transunion Intelligence* case.  And as you

20    indicated, controlling Eighth Circuit law on the

21    common-interest doctrine is broader in scope than what some

22    circuits have adopted, and you cite the compare *In re Grand*

23    *Jury Subpoena Duces Tecum*, holding that the common interest

24    between two parties may be legal, factual, or strategic.

25            And this is important, because if we take

1    Mr. Blackwell at his word and that he's accurate that this

2    is some sort of common business interest, as you've pointed

3    out, can it not be more than that?  And the answer is

4    absolutely.  You could have a strategic.  You could have a

5    legal interest.  You could have a factual interest as well.

6    Any one of those three, Your Honor, brings it under this

7    rubric.  And as you indicated:  Thus, in this district, the

8    common-interest doctrine protects already privileged

9    information when it is shared amongst two or more parties

10   who are both represented by counsel and share a common

11   legal, factual, or strategic interest.

12            THE COURT:  That wasn't the one where I was

13   reversed by the Eighth Circuit, was it?

14        (Laughter)

15            MR. HODGES:  I don't think you were, Judge.  You

16   were actually quoting the Eighth Circuit here, so --

17            THE COURT:  On more than one of these subject

18   issues, I have been reversed by the Eighth Circuit.

19            MR. HODGES:  Well, and there's other Eighth

20   Circuit case law that also supports that, Judge.  Your

21   statements there are not outside of what the Eighth Circuit

22   has pronounced.

23            So, you know, the Court is well aware, obviously,

24   of the attorney-client privilege.  I'm not going to belabor

25   that.

1              The question as far as whether or not 3M's

2      entitled to this falls under Rule 26 and 26(b)(4)(D), which

3      protects against another party's discovery of facts and

4      opinions of consulting experts.  3M wouldn't be entitled to

5      it under that doctrine either.  Under Rule 26(b)(3), the

6      work-product doctrine protects against disclosure of the

7      mental impressions, conclusions, opinions, or legal theories

8      of an attorney.

9              And again, to be clear, Your Honor, this is

10     attorney-to-attorney communications that we're talking here.

11     Under 3M's theory, an attorney can draft an opinion letter

12     and it's not work product.  Anticipation of litigation is

13     broad and we're talking about the attorney's anticipation of

14     litigation here.  It doesn't have to be a case that's

15     already on file.  It doesn't have to be a specific case

16     that's on file.  It's anticipation of litigation.  And

17     again, as this Court is aware, my firm has filed over a

18     hundred of these cases.

19              THE COURT:  And what is the anticipated

20     litigation?  Is it what you just mentioned, the hundred-plus

21     cases that you have in the MDL, or the anticipation that

22     maybe you'd be suing 3M on behalf of Augustine over some

23     Lanham Act violation?

24              MR. HODGES:  I think that these documents are in

25     anticipation of litigation of my clients in this MDL.

1              The Eighth Circuit recognizes two different kinds

2       of work product.  It's ordinary and opinion work product.

3       Because we're not talking about notes that I made or

4       something like that.  It's going to take it out of ordinary

5       work product to opinion work product.  And pursuant to the

6       Eighth Circuit's opinions in both **Baker** and **Murphy** that are

7       again cited in our briefing, the documents on that privilege

8       enjoy, quote, almost absolute protection against disclosure.

9       So 3M can only get these documents in only very rare and

10      extraordinary circumstances.  They've made absolutely no

11      showing on either one of those.  And because this was

12      disclosed to Mr. Benham does not waive that privilege.  His

13      company is a non-adversarial third party.  And as Mr. Benham

14      indicated and as he testified in his affidavit, he also

15      stepped aside from his role as general counsel and is

16      thinking about bringing some of these cases himself.  Some

17      of these documents deal with things such as the law in

18      Minnesota, statute of limitations --

19              THE COURT:  Let me ask this question while you're

20      on that point.

21              As I understand it, the privilege log that we're

22      talking about, whether it's one or two, were all prepared by

23      Mr. Benham; isn't that a correct statement?

24              MR. HODGES:  The privilege log?

25              THE COURT:  Yes.

 1              MR. HODGES:  Yes, Your Honor.

 2              THE COURT:  And have you or someone at -- a lawyer

 3     at Kennedy Hodges reviewed independently and made an

 4     independent legal determination that each of the documents

 5     on the privilege log is in fact privileged?

 6              MR. HODGES:  The documents --

 7              THE COURT:  Or the flip side of that is --

 8              MR. HODGES:  Sure.

 9              THE COURT:  -- are you just relying on

10     Mr. Benham's work in that regard?

11              MR. HODGES:  No, Your Honor.  We conducted our own

12     review and determined that there were a number of these

13     documents that we did not believe would be our work product

14     and those documents have been produced to 3M.

15              THE COURT:  Okay.

16              MR. HODGES:  So I think we've produced about 31

17     pages' worth of these e-mails to 3M and however many

18     documents that entails, so they've gotten a chunk of these

19     documents already.

20              THE COURT:  As to the first 84, which are the only

21     ones at issue here today, I believe every single one of them

22     has at least in part Kennedy Hodges work product as the

23     asserted basis for withholding, is that correct?

24              MR. HODGES:  The log says what it says.  I'm not

25     sure, Your Honor, whether it's asserted for every one or

1    not.

2              THE COURT:  Okay.  If I'm right about that, your

3    answer to my earlier question is that the work product

4    that's being asserted is the work product that Kennedy

5    Hodges has done on behalf of Plaintiffs in the

6    Multi-District Litigation case here in Minnesota.

7              MR. HODGES:  Or it's Mr. Benham's work product,

8    because he started his own work-product objections as well.

9              THE COURT:  Right.  But I guess the log does

10   identify -- hold on one second.

11             (Court confers with the clerk)

12             THE COURT:  So, as I'm looking through my notes

13   that I made on the Exhibit H to whoever affidavit this is,

14   which is the 115-document log, under the basis for claim of

15   privilege, it identifies both:  "Hodges' work product

16   related to Augustine role as non-testifying expert."

17             That's just your work product, correct?

18             MR. HODGES:  If that's the only entry, I

19   assume that --

20             THE COURT:  It goes on to say:  "Benham work

21   product related to same."  So for entries such as that

22   you're asserting both your work product and Mr. Benham's

23   work product.  And I would assume then as I go through this,

24   if there are any documents as to which only Mr. Benham's

25   work product is being asserted, it would say that.

1          MR. HODGES:  I assume that's correct, Your Honor.

2          THE COURT:  And my recollection is -- and I guess

3     don't anybody rely on my recollection, but as I look through

4     all 84 documents, every one begins with "Hodges' work

5     product."

6          MR. BLACKWELL:  That is right, Your Honor.

7          THE COURT:  Okay.

8          MR. HODGES:  Your Honor, we were talking about

9     relevancy and the fact 3M hasn't established that this is

10    relevant, assuming it is producible.

11         THE COURT:  You've got about a minute left.

12         MR. HODGES:  Okay.  They've asserted 51

13    affirmative defenses.  None of them apply to this.

14         3M's global marketing manager, Mark Scott,

15    testified -- the affidavit that's also included in the

16    briefing from one of the previous cases -- that if 3M

17    confidential information was shared with Dr. Augustine, it

18    would, you know, be catastrophic or whatever to 3M.

19    However, they seek the same thing from Dr. Augustine and his

20    attorney now.  They subpoenaed Dr. Augustine's customer list

21    and they received it.  We've asked for the customer list in

22    this litigation, have not received it.

23         I guess my point is, Judge, maybe a little bit of

24    the goose/gander rule here.  They've gotten a lot of

25    documents out of Dr. Augustine is my understanding, all

1    right?  There's a small subset that they haven't gotten, all

2    right, that's my work product.  And as we've indicated,

3    under any of those six reasons, all right, if one of them

4    applies, it is not producible.  As Your Honor said yourself,

5    the fact that it's work product by and between two attorneys

6    adverse to 3M doesn't waive that privilege.

7              THE COURT:  Okay.  Thank you.

8              MR. HODGES:  Thank you, Your Honor.

9              THE COURT:  Just to be sure I'm clear, the cases

10    you were reading back there that you say I wrote, they're in

11    your memo so I can find them?

12             MR. HODGES:  Yes, Your Honor.

13             THE COURT:  Okay.  Thank you.

14             MR. BLACKWELL:  Two minutes.

15             THE COURT:  You actually have five, I'm told.

16             MR. BLACKWELL:  Thank you, Your Honor.

17             Your Honor, I think I'm going to start with the

18    case from Your Honor that Mr. Hodges was referring to, the

19    ***Transunion Intelligence, LLC vs. Search America, Inc.***

20    Westlaw case, but I think what's important about the opinion

21    from Your Honor is this quote from Your Honor:

22             "The common-interest doctrine protects already

23    privileged information when it is shared among two or more

24    parties who are represented by counsel and share a common

25    legal, factual, or strategic interest."

1          So the question here is what is the privilege in

2     the first place.  And so before there's going to be a

3     common-interest privilege that applies, it only applies to a

4     pre-existing privilege.  So to cite it as a reason that the

5     documents can't be discovered because they've got this joint

6     business interest begs the question of what is the

7     privilege.

8          Mr. Hodges in his papers went on at some length

9     about the work product protection, but in his papers he

10     wasn't specific as to which documents he felt the

11     work-product protection applied to.  Mr. Benham slapped it

12     on everything that we saw, but where does it apply?  And

13     more to the point, the critical question is for what party

14     was this work product supposedly prepared?

15          THE COURT:  He just told us it's the plaintiffs in

16     this litigation.  That was the question I had and --

17          MR. BLACKWELL:  And here is the problem.  This

18     litigation, as it's known, did not exist in 2013.  There was

19     a case called *Walton*.  There was a case called *Johnson*.  We

20     were focused on, for example, the 2013 to 2015 time period.

21     This litigation, as it's known, didn't exist.

22          THE COURT:  Right, but it doesn't have to exist

23     for the work product to apply.  It simply has to be the work

24     has to have been done by the lawyer in anticipation of

25     litigation.  You don't deny that because there were two

1      cases pending and the lawyers are out there beating the

2      bushes looking for more clients that they're anticipating

3      suing you more than once?

4              MR. BLACKWELL:  Your Honor, as relates to the

5      specific communications, not just a memo that David Hodges

6      and his office has done, Mr. Hodges has done, with his

7      theories of the case, the communications specifically

8      between Scott Augustine and his various entities, the

9      lawyers, and Mr. Hodges' law firm.  To the extent he's

10     invoking work-product protection around those

11     communications, it is then begging the question for what

12     matter?  It almost requires an *in camera* review to see what

13     the nature of the discussions were.

14              The fundamental relevance of all of this to 3M

15     since Mr. Hodges raised that issue is, if this is a case

16     that at bottom is fueled by a competitor for 3M who fed,

17     manufactured a fraudulent science hook, line and sinker to

18     the plaintiffs' lawyers who simply repeated it to instigate

19     this litigation, that goes to the credibility of the

20     plaintiffs' case generally, Your Honor, and it's a fact that

21     impugns the credibility of the case.  And we're I think

22     entitled to be able to show that to explore that, if this

23     case ultimately was based upon either faulty science,

24     miscited science, and is simply backfilled with paid experts

25     later during the discovery period.

1        I wanted to point out one other thing to Your

2    Honor also with the couple minutes that I have.

3        On the common-interest privilege, Your Honor, I

4    wanted you to see, the Court to see, just how often we have

5    been in front of various courts on this issue.

6        You can see the dates here on the left where this

7    issue has been addressed by all kinds of courts, and this is

8    the first time after one, two, three, four, five, six, seven

9    junctures over the course of a year and a half there's been

10    a common-interest privilege invoked.

11        So, they've never claimed there was a

12    common-interest privilege until we got in here today.  And

13    it's like a kaleidoscope.  It just keeps shifting and

14    changing and moving.  And so our interest in getting at this

15    is what is the real nature of this relationship.  If there

16    are facts that would support this being manufactured

17    litigation, we just simply want to know about it and see it,

18    and it's hard to see through what we've gotten.

19        THE COURT:  I guess I'm not sure why that is.  So

20    you do have documents, correct?  Augustine has produced some

21    documents to you; is that a correct statement?

22        MR. BLACKWELL:  Your Honor, he's produced enough

23    documents.  We've got the 15 documents from Mr. Hodges last

24    night and we've got some other documents from him as well,

25    but it's not sufficient for us to see into what was the

1    nature of the business relationship.  We don't have that.

2         THE COURT:  Well, you've told me a number of times

3    and you cited to various things about these documents that

4    are being sent to the FDA it turns out weren't written by

5    Dr. X, but in fact were written by Mr. Benham and

6    Dr. Augustine.  You got that information from somewhere, I

7    assume.

8         MR. BLACKWELL:  We got that information from

9    deposing Dr. Gauthier himself, Your Honor.  And there's

10   more, we believe, where that comes from, and we can't get at

11   it if we're getting stonewalled.

12        And so what we would invite Your Honor to do if

13   need be -- and I have been advised by Ms. Ahmann that the

14   two tranches of documents are not identical, that there are

15   some documents in the 23 that are not in the 84.  And if it

16   matters to Your Honor to know or see which ones, we'd ask

17   for leave to be able to identify those for Your Honor.  I

18   don't know that as I stand here.

19        THE COURT:  Okay.  All right.  Anything else?

20        MR. BLACKWELL:  No.  So, Your Honor, that's all we

21   have on this issue and we'll await the Court's decision.

22        THE COURT:  So let me ask this question:

23        If there is -- I am told there is and indeed I

24   have seen something that purports to be a retainer agreement

25   between Dr. Augustine and Kennedy Hodges, and I understand

1    Mr. Hodges says he's going to disclose it to you.  When you

2    get that -- well, you haven't seen it, so it's an unfair

3    question to say, "Okay.  So tell me now what will it say?"

4         But I asked the question earlier and I guess your

5    answer was -- and I just want to make sure it's clear now,

6    that it's not just hypothetical and in the abstract, but a

7    concrete question about a concrete fact:

8         Does the fact that there is a relationship between

9    Dr. Augustine and Kennedy Hodges, and assuming it is as

10   Mr. Hodges was describing in part related to this

11   consultancy and in part perhaps to sue 3M over some Lanham

12   Act or other kinds of competition matters, that doesn't

13   change anything is what your answer was before.  Is that

14   still your answer?

15        MR. BLACKWELL:  Your Honor, I think the answer is,

16   in fairness to 3M, we'd have to understand exactly what is

17   the nature of that relationship, what is the time period of

18   the relationship, and what it did or didn't accomplish.  And

19   our concern is that it shouldn't be just the facile matter

20   of Mr. Benham and Mr. Hodges picking the right words and we

21   just simply give it a pass.

22        As you heard from Mr. Benham standing here, they

23   purport to be wearing a great number of different hats in

24   these various communications.  And whether or not something

25   will or will not be privileged depends on which hat is

 1     predominant at a given point in time, and that requires I

 2     think a case-by-case assessment or document by document.

 3                Thank you, Your Honor.

 4                THE COURT:  One more question for this side.  I

 5     don't know if it's Mr. Benham or Mr. Hodges.

 6                But as I look through the privilege log, at the

 7     very beginning of it there is a glossary or an index of

 8     who's who with initials or names and their title, but

 9     there's a name that recurs on the log that I don't see on

10     the list, and that name is simply Green.

11                Anybody know who Green is?  Is it a Mr. Green, a

12     Ms. Green, Colonel Green --

13                MR. HODGES:  That's my associate, Your Honor.

14     He's an attorney.

15                THE COURT:  Okay.  So he's a Kennedy Hodges

16     lawyer.

17                MR. HODGES:  Yes, Your Honor.

18                THE COURT:  Okay.  All right.  I --

19                MR. BENHAM:  Could I have just a few seconds?

20                THE COURT:  I think you exceeded your -- or you

21     used up all -- oh, he didn't finish his time.  All right.

22                MR. BENHAM:  First, in response to your question

23     of has Augustine produced documents, the answer is thousands

24     and thousands and thousands of pages have been produced.

25     Maybe that was not heard correctly.

1          I also want to make certain that I spoke clearly

2     regarding the 23 items on the privilege log and the 87.  My

3     belief is that all of the 23 are within the whatever number

4     there is, secondly.  If I'm wrong, then it's inadvertence.

5     And if we had actually had a meet-and-confer and they would

6     have told me where the discrepancy is, I would have looked

7     for them and tried to reconcile it.

8          But I do not intend to assert that all of the

9     documents in the second privilege log were also in the first

10    log, because you made clear to me that I didn't do a very

11    good job on the first privilege log and I went back and

12    looked much carefully and found some others.  So I don't

13    want to suggest that the two logs are identical, but the

14    second has exploded because the second log has some

15    additional documents in it.

16              THE COURT:  Okay.

17              MR. BENHAM:  Thank you.

18              THE COURT:  So one thing for sure we're going to

19    do here before I adjourn, Mr. Blackwell or Ms. Ahmann,

20    whoever on this side of the table, get to me, say, by Friday

21    any non-overlap documents.  Just identify for me on what is

22    Exhibit J, which is the 23 documents, I believe, that are

23    not on Exhibit H, which is the 115 documents.  And I don't

24    want any argumentation.  I don't want to hear from them that

25    they argue or somehow need to argue.  I just want you to

1    identify which entries on those two logs are not overlapping

2    from your observation.

3              MR. BLACKWELL:  We'll provide just the facts, Your

4    Honor.

5              THE COURT:  In the meantime, I'll take it all

6    under advisement and issue a ruling shortly, and we are in

7    recess.  Thank you very much.  We made it within precisely

8    the hour and I'm very impressed.

9         (Laughter)

10             MR. BLACKWELL:  Thank you, Your Honor.

11             (Proceedings concluded at 3:00 p.m.)

12                  *     *     *     *

13            **C  E  R  T  I  F  I  C  A  T  E**

14

15       **I, TIMOTHY J. WILLETTE,** Official Court Reporter

16       for the United States District Court, do hereby

17       certify that the foregoing pages are a true and

18       accurate transcription of my shorthand notes,

19       taken in the aforementioned matter, to the best

20       of my skill and ability.

21                  */s/ Timothy J. Willette*

22

23            **TIMOTHY J. WILLETTE, RDR, CRR, CRC**
          Official Court Reporter - U.S. District Court
               1005 United States Courthouse
24                 300 South Fourth Street
          Minneapolis, Minnesota  55415-2247
25                     612.664.5108