1          UNITED STATES DISTRICT COURT

2            DISTRICT OF MINNESOTA

3    ------------------------------------------------------------
                                    )
4                                   )
     In Re: Bair Hugger Forced Air  )  File No. 15-MD-2666
5    Warming Devices Products       )  (JNE/FLN)
     Liability Litigation           )
6                                   )  February 27, 2017
                                    )  Minneapolis, Minnesota
7                                   )  Courtroom 9W
                                    )  11:00 a.m.
8                                   )
                                    )
9    ------------------------------------------------------------
             THE HONORABLE FRANKLIN L. NOEL
10           UNITED STATES MAGISTRATE JUDGE

11     **(PLAINTIFFS' MOTION TO OVERRULE VITAHEAT MEDICAL, LLC'S
                RELEVANCY OBJECTION SO SUBPOENA)**

12     **APPEARANCES**

13

14     **FOR THE PLAINTIFFS:**        MESHBESHER & SPENCE
                                  Genevieve M. Zimmerman
                                  1616 Park Avenue
15                                Minneapolis, MN  55404

16                                CIRESI CONLIN
                                  Michael A. Sacchet
17                                225 South 6th Street
                                  Suite 4600
18                                Minneapolis, MN 55402
     **FOR THE DEFENDANT 3M:**
19                                BLACKWELL BURKE P.A.
                                  Ben Hulse
20                                Deborah Lewis
                                  431 South Seventh Street
21                                Suite 2500
                                  Minneapolis, MN  5541
22
                                  MARIA V. WEINBECK, RMR-FCRR
23                                1005 U.S. Courthouse
                                  300 South Fourth Street
24                                Minneapolis, Minnesota 55415
            Proceedings recorded by mechanical stenography;
25     transcript produced by computer.

1                      P R O C E E D I N G S

2                         (10:59 a.m.)

3              THE COURT:  So this is the plaintiff's motion to

4     overrule VitaHEAT Medical, LLC's, relevancy objection to

5     subpoena.  Let's get everybody's appearance on the record.

6     For the plaintiffs?

7              MR. SACCHET:  Michael Sacchet for plaintiffs.

8              MR. HULSE:  Ben Hulse speaking for both 3M and

9     VitaHEAT, and with me is Deborah Lewis who is also

10    separately representing VitaHEAT.

11             THE COURT:  Okay.  And also at plaintiff's table

12    is?

13             MS. ZIMMERMAN:  Yes, Your Honor.  Genevieve

14    Zimmerman for plaintiffs as well.

15             THE COURT:  Let me make sure I'm understanding the

16    procedural posture.  So plaintiffs have served a subpoena on

17    VitaHEAT for a bunch of documents?

18             MR. SACCHET:  That's correct.

19             THE COURT:  And they have not provided any and

20    instead objected to your document description attached to

21    the subpoena?

22             MR. SACCHET:  That is correct, Your Honor.

23             THE COURT:  So this is, I would have used the

24    vocabulary of a motion to compel them to produce the

25    documents?

1          MR. SACCHET:  I think that's correct in part,

2     although there are some outstanding issues that plaintiffs

3     have not necessarily briefed regarding the issues of the

4     burdensomeness, and the confidentiality concerns that

5     VitaHEAT has, so we did stylize the motion --

6          THE COURT:  So even if I do overrule the

7     objection, it doesn't mean that they're going to produce the

8     documents?  That's what you stood up for.

9          MR. HULSE:  That's correct, Your Honor.

10         THE COURT:  Never mind then, have a seat.  I think

11    I've got it.

12         MR. HULSE:  All right.

13         THE COURT:  Go.

14         MR. SACCHET:  Good afternoon, Your Honor.  We

15    appreciate your time in hearing this motion today regarding

16    plaintiffs' motion to overrule VitaHEAT's relevancy

17    objection.  Before I delve into the doctrinal framework by

18    which I believe the Court should analyze the legal question

19    as to whether the UB3 manufactured by VitaHEAT is an

20    alternative design to the Bair Hugger, I'd like to present

21    two very important facts for the Court's consideration and

22    which should be kept in mind as we discuss these issues this

23    afternoon.

24         The first of those facts is this, and one that

25    plaintiffs made clear in their submission to the Court.  The

1    510(k) predicate device of the UB3 is the HotDog patient

2    warming device.  The very device that 3M at virtually every

3    step of this litigation has attempted to seek discovery of.

4    In fact as you're aware, 3M brought a motion to compel with

5    respect to documents pertaining to the HotDog.

6              THE COURT:  Which was denied.

7              MR. SACCHET:  Which was denied, you're correct,

8    Your Honor.  However, the Court's Order as to that

9    particular issue denied discovery as to the HotDog because

10   plaintiffs had not alleged or represented to the Court that

11   the HotDog was in fact an alternative design to the Bair

12   Hugger.  That is not the case now in light of plaintiff's

13   submission to the Court in which we maintain that the UB3 is

14   an alternative design to the Bair Hugger, and I represent to

15   you that today as an officer of this court that that is in

16   plaintiffs' position.

17             THE COURT:  And you've produced all of the

18   documents that I denied the motion to compel about?

19             MR. SACCHET:  We have discussed your Order on

20   November 23rd with VitaHEAT's counsel as to your basis for

21   the denial of the motion to compel, but we don't believe

22   that it's apposite with respect to the circumstance now

23   before the Court.

24             THE COURT:  So if I grant your motion today, I

25   would need to revisit the order I entered in November.

1           MR. SACCHET:  I don't think that you would

2     necessarily need to do that, Your Honor, because we have not

3     maintained that the HotDog is an alternative design to the

4     Bair Hugger.  We are simply maintaining that the UB3 at this

5     point among other conductive fabric forming devices,

6     including one produced and manufactured by other companies

7     such as Gaymar and Medline, which are not Augustine

8     Biomedical in design, follows our alternative design to the

9     Bair Hugger.

10          So we do not believe in fact that you would need

11    to revisit that Order, although you could.  At bottom, we

12    believe that in light of your Order, you had represented

13    that plaintiffs had not alleged that the HotDog was an

14    alternative design, that's why discovery was denied as to

15    the Bair Hugger, but that is not the case today with respect

16    to the UB3.  And this is one of the reasons why we believe

17    that the UB3 is an alternative design to the Bair Hugger.

18          In our papers, we had described that the 510(k)

19    predicate device of the UB3 is the HotDog.  One fact that we

20    did not make clear in our papers and which we did not have

21    an opportunity to present in a reply brief given the local

22    rules is that the 510(k) predicate device of the HotDog is

23    the Bair Hugger 750.  So to the extent that VitaHEAT and 3M

24    are arguing that the UB3 is a substantially different

25    product that uses a substantially different technology, we

1    believe that that's belied by the submissions to the FDA and

2    the FDA's conclusion that the Bair Hugger is substantially

3    equivalent to the HotDog, and the HotDog is substantially

4    equivalent to the UB3, because all share the same intended

5    use, and all share similar technological characteristics,

6    and that is one fact that not a single case that 3M or

7    VitaHEAT have cited in their papers attacks or deals with.

8            In fact, In Re: Mentor Corp., which is a case that

9    we have cited in our papers in which an MDL court confronted

10   the question as to whether two devices that were

11   substantially equivalent were relevant to discovery, and in

12   3M's words as they say in their papers, the Court quickly

13   moved past the issue of relevance because the two devices

14   were substantially equivalent.  In plaintiffs' view, that

15   proves the point, and the Court need not even go any further

16   as a matter of Rule 26(b)(1), and the threshold showing of

17   relevance that plaintiffs must meet in order to obtain

18   discovery as to this device.

19           Moreover, and back to your original question, Your

20   Honor, 3M maintained when conducting discovery about the

21   HotDog that had plaintiffs alleged that the HotDog was an

22   alternative design, that discovery as to conductive warming

23   devices would be at the core of this case.  That's precisely

24   that's occurred here.  Plaintiffs maintain that the UB3 is

25   an alternative design to the Bair Hugger, and thus in 3M's

1    worries, we believe that such discovery is at the core of

2    this case.

3              THE COURT:  I'm sorry, at the core of is a quote

4    from my Order or a quote from some other case?

5              MR. SACCHET:  It is actually a quote that was used

6    in 3M's motion to compel with respect to the Augustine's

7    documents that can be found at docket number 130 on page 37.

8              THE COURT:  What's the most I said in my Order?

9              MR. SACCHET:  So in your Order, Your Honor, you

10   cite Mr. Blackwell's representation at the November 17th

11   hearing that something to the extent of had plaintiffs

12   identified the Bair Hugger, that that discovery would be at

13   the core of the case.  So you have a mirroring parenthetical

14   cite to that representation in your Order, but you denied

15   that Order because you used the conditional if clause

16   because plaintiff had not yet made that representation.

17             THE COURT:  About the Bair -- about the HotDog?

18             MR. SACCHET:  About the HotDog, not as to the UB3.

19   So those are the critical facts that I'd like the Court to

20   keep in mind.  And in terms of the doctrinal framework,

21   based on my review of the cases, I believe that there are

22   three buckets of cases, if you will, as to how a court might

23   analyze an alleged alternative design.

24             In 3M and VitaHEAT's view, in order for an

25   alternative design to exist, it must exist in what I'll

1    "bucket one," which is essentially a minor modification to

2    an existing product.  And they further maintain that

3    plaintiffs' representation that the UB3 is an alternative

4    design to the Bair Hugger fits in what I'll call the third

5    bucket of cases, which deals with substantially different

6    products.  And then there's a second bucket of cases, which

7    I'll describe in a moment.

8            With respect to the first bucket, I don't think

9    there's a dispute that a modification to the Bair Hugger in

10   terms of adding a HEPA filter, let's say, to the current

11   filtration of the device, which scientific studies show are

12   only capable of filtering approximately 50 to 60 percent of

13   particulates at .2 microns could be improved by a HEPA

14   filter, and that would be a type of minor modification in

15   plaintiffs' view that fits in bucket one because it's the

16   same product and a minor modification to that product.

17           In terms of the third bucket of cases, and those

18   are the cases that are filled in 3M's brief, those involved

19   circumstances such as the *Caterpillar* case out of Texas when

20   the Court mused, well, let's talk about a motorcycle.  Would

21   adding two wheels to a motorcycle still render the vehicle a

22   motorcycle, a quad motorcycle?  Of course not.  The

23   essential characteristic of the motorcycle is easily lost by

24   the addition of two wheels rendering it just a four wheel

25   automobile, and the other cases follow suit.

1              So, for example, they cite *Massa*, another case out

2     of Texas, for the proposition that federal and state courts

3     across the country have consistently held that plaintiffs

4     cannot demonstrate the existence of a safer alternative

5     design by pointing to a substantially different product.

6              Now, I want to dissect *Massa* just very briefly.

7     In *Massa*, the plaintiff alleged that a biologic medication

8     called Raptiva, which is used to treat a skin disease called

9     psoriasis, was defective because it led to various

10    externalities.  As an alternative design, the plaintiffs

11    there alleged that other conventional treatment, such as

12    topical cream and UV light treatments could be an alleged

13    alternative design.  Those are entirely different products,

14    and it's not surprising that the Court there held as much.

15             The same applies to *Tersigni*, which is the First

16    Circuit case that 3M cited there, just like in *Massa*, the

17    plaintiff alleged that a weight loss drug called Pondimin

18    was defective and that an alleged alternative design

19    involving unrelated "methods of weight loss", were the

20    alternative design.  I mean those could range from diet,

21    exercise, don't even involve products.  So, again, there it

22    is unsurprising that the Court found that those alternatives

23    were not alleged alternative design.  And I should also add

24    that that was on summary judgment, not a Rule 26(b)(1)

25    determination of relevancy.

1           Moreover, in *Theriot*, the Fifth Circuit case,

2    which is a per curiam decision, it does not hold

3    precedential weight, analyzed whether a system of pedicle

4    screws in plates used during a back surgery could be an

5    alternative design to a system of neck braces.  Again, an

6    entirely different product or a hook and wire system, which

7    again is a different product.

8           So when 3M uses the term "substantially different"

9    on virtually every page of their submission, that means

10   something.  They cannot walk away from the idea that an

11   alleged alternative design can and in fact does exist in

12   numerous cases involving other products.  And, indeed, some

13   of the cases that we cited in our first submission and a few

14   additional cases that I'd like to discuss this afternoon

15   prove that point.

16          THE COURT:  You're going to be done this morning.

17          MR. SACCHET:  Oh, I apologize.  I was treating

18   11:00 as afternoon, but in any case, I respect that.

19          So one such case, which we did discuss in our

20   papers, was *Security National Bank of Sioux City v. Abbott*

21   *Laboratories*.  And in that case, Judge O'Brien, who was the

22   District Court Judge from the Southern District of Iowa,

23   considered whether a liquid baby formula versus a solid baby

24   formula were alternative designs.  And just like here, in

25   that case, the defendant cited *Burks*, an opinion authored by

1    Judge Tunheim, for the proposition that different products

2    can't be an alternative design.

3            Judge O'Brien readily dispensed with that argument

4    reasoning that the measure of similarity of two products

5    when determining whether an alternative design exists is

6    inexorably related to the purposes for which the products

7    are used, and the judge refused to draw what he said to be a

8    magic line of demarcation separating an alternative product

9    from an alternative design; and, therefore, denied the

10   defendant's motion to dismiss on the ground that the issue

11   should be discoverable and dealt with on summary judgment.

12           Other cases even in this district have made

13   similar declarations.  So, for example, in *Block v. Toyota*,

14   I realize that the factual underpinnings of that case

15   involve a 1996 Camry and a 2000 Camry, and 3M makes it clear

16   that it's the same type of model car.  However, Judge

17   Montgomery was very clear in stating when a safer

18   alternative design has been implemented in other products,

19   the jury may consider the other products in determining

20   feasibility and safety.

21           Other district courts across the country have come

22   to the same conclusion.  For example, a case *Sisk*, which can

23   be found at 2012 Westlaw 3155586, the Western District of

24   North Carolina; along with *Newman* at 2013 Westlaw 7217197,

25   out of the Northern District of Illinois.  Those are just a

1    sampling of the cases that I've found that other products

2    can be alternative designs.

3            What I do want to focus on for a minute, however,

4    is an Eighth Circuit case, and we did not have an

5    opportunity to present this under the local rules, excluding

6    us from filing a reply, which we respect.  However, for the

7    sake of argument today, this opinion is entitled *Lauzon v.*

8    *Senco Products*.  This can be found at 270 F.3d 681.  It's an

9    opinion authored by Judge Lay.

10            In that opinion, the plaintiffs alleged that what

11   was called a bottom fired nail gun was defective because it

12   fired when the user did not attempt to fire the gun.  The

13   way a bottom-fire nail gun works is you depress the trigger,

14   and you simply tap the bottom of the nail gun on a flat

15   surface, and it automatically fires nails.  In alleging an

16   alternative design, the plaintiff claimed that what's called

17   a sequential-fire nail gun could be an alternative design.

18            And the way that a sequential-fire nail gun works

19   is you must be contrast to a bottom-fire nail gun manually

20   depress the trigger every time you want a nail to be

21   deployed.  The district court in that case granted summary

22   judgment to the defendant and excluded the plaintiffs'

23   expert on Daubert grounds.

24            Judge Lay on behalf of the panel reversed the

25   district court and found that the expert had an appropriate

1   methodology and expertise to declare that the bottom-fire

2   nail gun was an alternative design to the sequential-fire

3   nail gun, notwithstanding the technological differences

4   between the two guns.  They both fired nails.  That's a case

5   that we believe is controlling here and would run head long

6   into 3M's argument and VitaHEAT's argument.

7           But at bottom, Your Honor, a number of facts here

8   in light of those cases we believe do prove as a matter of

9   law that the UB3 is an alternative design.  And those facts

10  again include, one, the substantial equivalence under the

11  510(k) filing linking the Bair Hugger to the HotDog and the

12  UB3, notwithstanding the fact that the Bair Hugger uses

13  convection warming, whereas the HotDog and the UB3 uses

14  conductive warming.  That's the determination that's been

15  made by the FDA.

16          And in fact, in the FDA filing, all of these

17  products are deemed thermal regulation systems.  They're not

18  deemed thermal convective systems or thermal conductive

19  systems.  They're just thermal regulation systems used for

20  patient warming.

21          Another fact to keep in mind, on 3M's website to

22  this very day, and if you go on it, the Bair Hugger is not

23  advertised as a conductive convective warming system.

24  Quoting from their website, it's a therapy temperature

25  management unit or just a warming unit.  Nothing

1    distinguishes it technologically from other units.  I

2    suppose if you go on the web page and you dig deep, you'll

3    find some mention to convective technology.  But on the face

4    of the page, that's how it's presented, and the same goes

5    for the UB3.

6         Again, there are mentions in, you know, subsequent

7    tabs that it's a conductive warming, but on the face of the

8    representation, it's a warming device, and both devices

9    share that representation.

10        Moreover, as I've mentioned and as our papers show

11   show, numerous 3M employees have referred to for over two

12   decades the intent to develop an air-free alternative to the

13   Bair Hugger, and that's been a constant refrain by employees

14   of the company since well before 2000, and our exhibits to

15   our submission make that clear.

16        In addition to those facts, we have taken numerous

17   depositions of 3M employees, and we've attempted to ask

18   those employees about the VitaHEAT and the UB3, and on not

19   one occasion has 3M objected to the relevance in questions

20   as they appear to do now with respect to our discovery

21   requests.

22        Finally, there are a number of scientific studies

23   that have even been conducted by 3M's key opinion leaders,

24   namely, Dr. Sessler and Dr. Kurz, who have published some of

25   the most monumental studies in the field on these topics.

1    And many of those studies directly compare the Bair Hugger

2    to other conductive warming devices.  And in fact, one such

3    study authored by Dr. Sessler entitled, "A Randomized

4    Comparison of Intraoperative PerfecTemp and Forced Air

5    Warming During Open Abdominal Surgery," refers to the

6    conductive warming device as an alternative to the Bair

7    Hugger.

8         Now, I realize that Dr. Sessler's representations

9    are not legal representations.  However, it would be curious

10   indeed if all of these authors were comparing apples and

11   oranges as opposed to apples and apples, and that's part of

12   the reason why we believe that the UB3 is an alternative

13   device to the Bair Hugger.

14        And one other fact to keep in mind, both the UB3

15   and the Bair Hugger use blankets to maintain patient

16   normothermia.  These are not devices that use intravenous

17   blood warming or that use passive insulation or that use

18   humidification or that use UV light treatment, which are

19   found in other products on the market to maintain patient

20   normothermia.  Both of these products have a device

21   connected by a cord or a tube to a blanket and that blanket

22   is either put on top of the patient or under the patient in

23   order to warm the patient.  So in terms of the usability of

24   the product, that goes to why they're substantially

25   equivalent and the FDA found the same.

1          Now, I'd like to have a few more words on the

2     procedural posture of this case.

3          THE COURT:  You have about three seconds.  So in

4     five minutes, you need to be done.

5          MR. SACCHET:  Okay, five minutes.

6          As the Court knows, this is a matter of a

7     discovery request under Rule 26(b)(1), this Court's prior

8     opinion, namely, in Coleman have made that standard clear by

9     noting that relevancy should be broadly construed.  The

10    sentence directly from your opinion reads, "relevancy means

11    any matter that bears on or that reasonably could lead to

12    other matters that could bear on any issue that is or may be

13    in the case."

14          Clearly, this is an issue that plaintiffs believe

15    is at issue, let alone it certainly may be at issue in this

16    case given plaintiffs' burden under many state laws to prove

17    an alternative design and the law and the facts that we've

18    raised today at argument.  And I would also like to mention

19    that essentially all of defendant's cases, every single one

20    of them does not deal with a discovery dispute.  They all

21    deal with dispositive motions.  Many of them even recognize

22    such as *Tingle v. Reynolds Tobacco*.  That what constitutes a

23    feasible alternative design, and what constitutes an

24    entirely different product should be left to the jury.

25          So that determination need not be made by the

1    Court if it does not wish to.  It's a question of law that

2    we believe we can prove at summary judgment.  But in terms

3    of this dispute, even the cases that they rely on like

4    *Burks*, Judge Tunheim there was concerned whether the two

5    products were alternative design, but he nonetheless denied

6    the motion to dismiss and left it for discovery and summary

7    judgment to make that call.

8            So defendant's reliance on Al Van Duren's

9    declaration is well outside the pleadings and introduces

10   facts that we have not had an opportunity to investigate nor

11   discuss.  And under their statement curative tort section F,

12   plaintiffs quote, "should have an opportunity to conduct

13   reasonable discovery so as to ascertain whether an

14   alternative design is practical."

15           So that's really the landscape of our relevancy,

16   and I respect the Court's time.  And to the extent that

17   proportionality and confidentiality concerns come up by 3M,

18   I do have things to say on that.  I do very quickly note

19   that we don't believe it's ripe.  We do believe our requests

20   are similar in nature to the requests that 3M served on

21   Augustine.  We are willing to narrow our requests and work

22   with 3M to cut down on the scope of any concerns that they

23   might have and continue to meet and confer on them.

24           We also note that Augustine Biomedical is just as

25   small of a company as VitaHEAT, but they've been subject to

1    numerous special discovery requests.  The only difference is

2    that we're not relying on Augustine Biomedical anymore, and

3    we've made that very clear to the Court, whereas 3M has an

4    ongoing relationship with VitaHEAT.

5              And, finally, as to confidentiality concerns, 3M

6    has a blanket statement that says the protective order does

7    not protect or preserve these documents to the extent that

8    they would be marked confidential by VitaHEAT.  I don't

9    understand paragraph 7C 1-4 expressly provides for the

10   protections that are given to documents that could involve

11   competitive witnesses, so I think that objection is

12   baseless.

13             So for those reasons, Your Honor, we request that

14   the Court overrule VitaHEAT's relevancy objection.

15             THE COURT:  Okay.  Thank you.  Mr. Hulse?

16             MR. HULSE:  I'm speaking on behalf of both

17   VitaHEAT and 3M on this relevance issue.  And my colleague

18   Ms. Lewis also from my firm but specifically represents

19   VitaHEAT with respect to the burden issues, and with Your

20   Honor's permission, she would speak on those.

21             Just a quick word on the posture.  We did not

22   agree to this relevance issue being brought ala carte to the

23   Court.  As Your Honor knows, 26(b)(1), there is the

24   threshold relevance requirement.  We don't believe it's met,

25   but there's also the balancing test between relevance and

1     burden.

2              Two, and the point that we made to the plaintiffs

3     in the meet and confer is even if you are able to prevail on

4     relevance, and we don't think you do, you still have to

5     overcome these burden objections too.  And they're very

6     serious burden objections given that they're asking for

7     virtually every document from a 11-employee company within a

8     very short time frame.  And so we just don't think it was

9     proper to bring this motion in this posture, and we made

10    that clear in the meet and confer.  That's one thing.

11             Another thing, too, that Your Honor should know is

12    that this is just the tsunami on the horizon of third party

13    discovery issues that are likely to come before the Court.

14    In addition to this subpoena, the plaintiffs last week sent

15    out five subpoenas to other manufacturers of patient warming

16    devices, some of whom are some of the biggest medical device

17    companies.  And, of course, asking them to produce

18    essentially all of their design, testing, marketing,

19    regulatory communications, provider communications within

20    the next two weeks.  And so we've objected to that on the

21    same relevance grounds, and I'm sure they will have

22    objections to it too, these other manufacturers.

23             So what the Court does here will obviously have

24    some impact on those fights to come that apparently will

25    need to happen within the next three weeks given the general

1    causation fact discovery cut-off.

2            But turning to this relevance argument, Your

3    Honor, I would just mostly refer you to the pages 10

4    through 16 of our brief, where we go through the very, very

5    long list of cases, overwhelming authority from

6    jurisdictions throughout the country including this one that

7    all come to the same point, which is that a different

8    product doesn't legally qualify as a feasible, safer

9    alternative design.

10           What the case law from across the country makes

11   clear is what you need to do legally to meet that standard

12   is have a modification to the existing product.  And the

13   cases that the plaintiffs cite overwhelmingly just support

14   that point and certainly all the cases that we've cited

15   support it too.

16           Why are these substantially different products?

17   So, first off, let me explain to you briefly who VitaHEAT

18   is, what the UB3 is, and what this relationship is with 3M.

19   So for years, 3M has been looking to develop on its own or

20   to enter into a partnership with a medical device that could

21   be used in mobile settings, a warming device that could be

22   used in mobile settings.  The 3M Bair Hugger system requires

23   being connected to an AC power source, and so it's

24   restricted to the operating room.

25           So, obviously, you might want to have patient

1    warming when you're moving in the hospital.  You might want

2    to have it in the ambulance.  You might want to have it in

3    the helicopter, so you have to have a patient warming system

4    that can run on batteries.

5         And so 3M identified the VitaHEAT UB3 system as a

6    system that could run on batteries and, therefore, entered

7    into a distributor agreement with the VitaHEAT system.  It's

8    not an acquisition.  3M doesn't own this product but a

9    distribution agreement to distribute this product.  And as

10   the company said in their public statement announcing this

11   near the end of last year, it was as a compliment to the

12   Bair Hugger system, a mobile offering that could be used by

13   health care providers when they're transporting patients.

14        THE COURT:  But 3M is the exclusive distributor

15   for this?

16        MR. HULSE:  It is the exclusive distributor,

17   exactly, Your Honor.  So but the Bair Hugger system and the

18   VitaHEAT UB3 use fundamentally different types of warming.

19   Like the HotDog, the VitaHEAT UB3 is a conductive warming

20   technology.  And what basically it does is it uses a heating

21   element powered by electricity to then conduct heat through

22   a mattress and then the mattress glides under the patient.

23        THE COURT:  But you asked for this exact same

24   information from them, correct?

25        MR. HULSE:  Yes.

1         THE COURT:  And is your footnote to your mea

2    culpa?  Sorry, I didn't mean it.  Just forgot.

3         MR. HULSE:  It is our mea culpa, Your Honor, yes.

4    I want to point out that our main justification for seeking

5    HotDog related information from Dr. Augustine had to do with

6    bias, but we did separately also say alternative design

7    because we believed that the plaintiffs were seeking that.

8         As we looked at the case law more closely in

9    response to this subpoena, it was clear that we were wrong

10   to articulate alternative design as a basis.  And,

11   frankly --

12        THE COURT:  But that was the basis that I bought,

13   right?  And I agreed with you that they haven't said that,

14   therefore, it's not relevant.  Therefore, you don't get it.

15        MR. HULSE:  That's true, Your Honor.  And in fact

16   when Mr. Blackwell argued, he set aside that argument at the

17   hearing too because even at that point, we were seeing that

18   it didn't seem like a very strong argument.  We dug in more

19   to the case law afterwards, and it was clear to us that

20   legally we were not right to pursue that.

21        So we think that Your Honor not only was correct

22   to say that there shouldn't be discovery on the HotDog on

23   the basis of them not identifying it as a feasible safer

24   alternative design, but also if they had identified it as a

25   feasible safer alternative design, discovery wasn't proper

1    on that basis.

2              We still thought that discovery should, their

3    alternative bases for discovery having to do with bias.

4    Here the only basis that plaintiffs have articulated for the

5    discovery is feasible safer alternative design.  And so the

6    VitaHEAT system, as I said, is a conductive warming

7    technology.  The 3M Bair Hugger system is convective, and it

8    uses temperature controlled air that then goes into the

9    blanket and warms the patient through heat distribution

10   through the perforations in the blanket.

11             And the declaration of Al Van Duren, the Director

12   of Scientific Affairs at 3M and is also trained and familiar

13   with the design of the VitaHEAT UB3 is straightforward.

14   There's not only fundamentally different types of

15   technology, you cannot integrate the conductive warming

16   technology of the VitaHEAT or the HotDog for that matter

17   into the Bair Hugger system without just simply turning it

18   into the VitaHEAT UB3.  It's substituting one product for

19   another.  And what the cases say over and over and over and

20   over again is that a feasible safer alternative design is

21   not an argument that the defendant should have just sold a

22   different product.  And that is essentially what the

23   plaintiffs are arguing here.  And, in fact, is what the

24   plaintiffs are arguing here is that the Bair Hugger instead

25   of selling the Bair Hugger, 3M should sell the VitaHEAT UB3.

1          I also want to point out that given that the

2     VitaHEAT UB3's predicate device is the HotDog, it is in fact

3     puzzling to figure out why the plaintiffs took no position

4     on that when we were seeking discovery from Augustine but

5     now have decided that every other conductive device, this

6     and the other one that they've sought discovery from are

7     safer alternative designs.

8          But, Your Honor, it comes down to the point that

9     as a matter of law, the plaintiffs cannot show because of

10    these fundamentally different technologies that the VitaHEAT

11    UB3 is a feasible safer alternative device.  It is not a

12    matter of factual dispute.  It is simply a matter of law.

13    And that is why many of these cases as we've cited have

14    granted motions to dismiss where other products that served

15    the same purpose and here they clearly serve the same

16    general purpose of warming, but other products were

17    identified as feasible safer alternative designs.  Courts

18    have frequently granted motions to dismiss and that, I

19    think, strongly leads, supports also denying discovery

20    because discovery must be relevant.  If something can get

21    you -- gets tossed out on a motion to dismiss, also there

22    shouldn't be discovery on it.

23          And I want to be very clear about what we do agree

24    would be a feasible safer alternative design.  Consistent

25    with the *Bar Maid* case that Judge Ericksen decided and that

1   plaintiffs cited.  A modification to the defendant's product

2   that is being challenged, the plaintiffs can say this change

3   should have been made to the product.  This feasible change

4   should have been made to the product to make it safer, then

5   they have a legally viable basis to go forward.

6          But, here, they have come forward with no

7   evidence, not an expert affidavit, not any testimony from 3M

8   witnesses or anybody else that could establish -- and they

9   can't -- that could establish that the 3M Bair Hugger system

10   could be re-engineered to become a conductive warming device

11   like the UB3.

12          So that's the legal point.  I'm not -- we've

13   distinguished all of their cases readily.  In fact, I've

14   rarely seen a discovery motion that was so weakly supported

15   by case law as the ones here.  They did not cite the *Lauzon*

16   case in their opening brief, and if it was so important, I

17   would have thought they would.  But if the Court would like,

18   we'd be happy to submit a supplement on the *Lauzon* case that

19   was from the Eighth Circuit.

20          And with that, unless Your Honor has questions

21   about the legal relevance issues, I would turn over to my

22   colleague Ms. Lewis to talk about the burden issues.

23          THE COURT:  You got about 30 seconds to talk about

24   burden, I guess.  Go ahead, but make it quick.

25          MS. LEWIS:  Thank you, Your Honor.  I think I can

1    be pretty short and to the point.  The burden in this case

2    for VitaHEAT is real, and let me reiterate those facts.  It

3    is a nonparty.  It has nothing to do with this lawsuit.  It

4    has no connection to the lawsuit.  It knew nothing about the

5    lawsuit before plaintiffs sent the subpoena to them.

6           The declaration of Mr. Renwick, which is a part of

7    our materials, goes into detail on why there would be a

8    serious impact on VitaHEAT if it were required to produce.

9    It would take 30 percent, nearly 30 percent of their work

10   force to respond to it over a two to three week time period.

11   That means Mr. Renwick, who would be in charge, would not

12   then be able to do his normal responsibilities at the

13   company.

14          VitaHEAT is a very small company.  It was only

15   formed in 2012.  It has very few employees.  It doesn't have

16   in-house attorneys who could help.  A lot of their documents

17   are even not housed within the company.  They would have to

18   engage their outside partners to bring those documents

19   together.  But the fact that they would have to abandon

20   their work, put nearly 30 percent of their work force to do

21   this for a device that's not even relevant to the case, that

22   is a completely different medical device than the Bair

23   Hugger seems to be too much of a burden for a nonparty to

24   respond to.

25          And the subpoena that was sent to Augustine being

 1    a small company is nowhere -- they're night and day.  The

 2    subpoena with Augustine, Augustine is connected all through

 3    this lawsuit.  VitaHEAT is not.  So it's not fair to make a

 4    comparison between the subpoena that was sent to Augustine's

 5    companies and the subpoena that plaintiff sent to VitaHEAT.

 6            The competitive harm, Mr. Renwick also describes

 7    in his declaration.  The most important one for Your Honor

 8    to consider is the fact that it is plaintiff's co-lead

 9    counsel who submitted or signed the subpoena.  He is the

10    either continuing or former counsel for Scott Augustine.

11    VitaHEAT is extremely concerned about the risk of its

12    documents, design documents, testing documents, research

13    documents in this highly competitive medical device market.

14            THE COURT:  But that's covered by the protective

15    order, right?  Don't we have a section that deals with

16    precisely that issue?

17            MS. LEWIS:  I don't believe that my interpretation

18    of the protective order would cover VitaHEAT.  The

19    protective order talks about forced air warming devices, and

20    it talks about Augustine.  But it says, there's no remedy

21    for a nonparty like VitaHEAT that is discussed in this

22    protective order at all.  And just the extreme concern how

23    aggressive Dr. Augustine is with respect to competitors,

24    they're extremely concerned being such a small new company

25    to be at risk for what might happen to their documents,

1     whether they were inadvertently disclosed or not, for them

2     to get into the hands of such an aggressive competitor.

3                    THE COURT:  Okay.  Thank you.

4                    MS. LEWIS:  Thank you.

5                    THE COURT:  Anything else for the plaintiff?

6                    MR. SACCHET:  I don't want to take much of your

7     time, Your Honor.  I believe I used most of mine, but I

8     would like to bring the Court just back to the fact that

9     again this is a relevancy issue under Rule 26(b)(1).

10    Plaintiffs must satisfy a threshold burden of relevancy,

11    which the case law makes clear is an issue that may be or

12    could be relevant to the case.  Clearly under most state

13    law, the issue of an alternative design is one that

14    plaintiffs must meet, and defendants in this case are likely

15    alleging that there is no alternative design to the Bair

16    Hugger that would have been safer than the accident product.

17    So it's not only an issue that will need resolution, but

18    it's one that their statement expressly allows for discovery

19    upon in order for plaintiffs in this case to be able to

20    truly evaluate whether the technological features of the UB3

21    are something that is an alternative design, and whether

22    Mr. Van Duren's "expert testimony" live up to what it says

23    in the declaration that was filed in 3M's papers.

24                    THE COURT:  So just answer this for me, so as I

25    understood when you first stood up, you talked about three

1    buckets of cases.  And you said those that are just

2    modifications are clearly discoverable stuff because they

3    are modifying an existing product for purposes of making it

4    a safer design.

5              MS. SACCHET:  Yep.

6              THE COURT:  And then you talked about the third

7    bucket, which is a whole new product, motorcycle, car, so

8    talk to me, what are the cases that are in this second

9    bucket?

10             MR. SACCHET:  So in the second bucket of cases,

11   these do involve circumstances in which there could be a

12   different manufacturer of another product, so it's not a

13   minor modification of the same product by the same

14   manufacturer.  And in those circumstances, the product has

15   the exact same intended use of those products, and it likely

16   has some differences.

17             So, for example, convective versus conductive in

18   this case, but they share the same intent for use, the same

19   purpose, usability, customer demand, appearance, all these

20   things come together to say these products really aren't

21   that different even though it's from a different

22   manufacturer as opposed to a minor tweak of an existing

23   product from the same manufacturer.

24             THE COURT:  And why are -- okay, I think I got

25   that.  All right.  Anything else?

1          MR. HULSE:  No.

2          THE COURT:  Anything else?

3          MR. SACCHET:  That's it, Your Honor.  I appreciate

4     it.

5          THE COURT:  All right.  I'll take the matter under

6     advisement, issue an order shortly, and we are in recess.

7               (Court adjourned at 11:39 a.m.)

8

9                         *     *     *

10

11                    REPORTER'S CERTIFICATE

12          I, Maria V. Weinbeck, certify that the foregoing is

13     a correct transcript from the record of proceedings in the

14     above-entitled matter.

15

16          Certified by:   *s/ Maria V. Weinbeck*

17                          Maria V. Weinbeck, RMR-FCRR

18

19

20

21

22

23

24

25