# EXHIBIT 5

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - -

In Re:

Bair Hugger Forced Air Warming

Products Liability Litigation

This Document Relates To:

All Actions                MDL No. 15-2666 (JNE/FLM)

- - - - - - - - - - - - - - - - - - -

DEPOSITION OF ALBERT P. VAN DUREN

VOLUME I, PAGES 1 - 326

MARCH 7, 2017

(The following is the deposition of ALBERT
P. VAN DUREN, taken pursuant to Notice of Taking
Deposition pursuant to Rule 30(b)(6) of the Federal
Rules of Civil Procedure, via videotape, at the
offices of Ciresi Conlin L.L.P., 225 South 6th Street,
Suite 4600, Minneapolis, Minnesota, commencing at
approximately 9:00 o'clock a.m., March 7, 2017.)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
 1    APPEARANCES:

 2         On Behalf of the Plaintiffs:

 3              Mark D. Bankston
                KASTER, LYNCH, FARRAR & BALL LLP
 4              1010 Lamar, Suite 1600
                Houston, Texas    77002
 5
                Genevieve M. Zimmerman
 6              MESHBESHER & SPENCE, LTD.
                1616 Park Avenue
 7              Minneapolis, Minnesota    55404

 8              Gabriel Assaad
                KENNEDY HODGES
 9              4409 Montrose Boulevard, Suite 200
                Houston, Texas    77006
10
                Michael A. Sacchet
11              CIRESI CONLIN L.L.P.
                225 South 6th Street, Suite 4600
12              Minneapolis, Minnesota    55402

13         On Behalf of Defendants:

14              Jerry W. Blackwell and Peter J. Goss
                BLACKWELL BURKE P.A.
15              432 South Seventh Street, Suite 2500
                Minneapolis, Minnesota    55415
16
      ALSO APPEARING:
17
                Ryan M. Stirewalt, Videographer
18

19

20

21

22

23

24

25
```

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Page 4

1                    P R O C E E D I N G S

2              (Witness sworn.)

3                    ALBERT P. VAN DUREN

4              called as a witness, being first duly sworn,

5              was examined and testified as follows:

6                    ADVERSE EXAMINATION

7    BY MR. BANKSTON:

8         Q.   Good morning, Mr. Van Duren.

9         A.   Good morning.

10        Q.   We're going to skip some of the formalities

11   because I know you've been in that chair before, done

12   some depositions, so we won't go over all of that

13   today; I'm sure you're up to speed.  But before we

14   dive in, I did want to talk to you, make sure that you

15   understood exactly what kind of deposition it is we're

16   taking today, and -- and by that I mean that today you

17   are appearing as a corporate representative for 3M.

18   Do you feel like you have an understanding of what

19   that is and what your purpose is here today?

20        A.   I believe so.

21        Q.   Okay.  I'm going to be asking you questions,

22   and in response to these questions today you're going

23   to be giving testimony as though you're the voice of

24   3M.  Obviously, I can't put 3M in that chair, so

25   somebody has to be chosen.  I've been informed that

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 25

1  difference between the 500 and the OR, is the changes

2  you talked about making it suitable for operating room

3  use?

4      A.    That was -- that was one among many changes

5  that were made in that series of warming units to

6  distinguish them from warming units that were

7  specifically designed for use in the PACU or the ICU.

8      Q.    Okay.  What is the purpose of having a

9  filter on the Bair Hugger?

10     A.    Well it had several purposes:  one purpose

11 is to prevent the fouling of the internal components

12 of the Bair Hugger; the other is to reduce the

13 particulates that enter and exit the Bair Hugger.

14     Q.    As -- in the field of --

15           When designing the Bair Hugger, why did the

16 company care about particulates coming in and out of

17 the Bair Hugger?

18     A.    To keep the electronics and the sensors, the

19 fans and the heat exchangers from gathering debris and

20 fouling.

21     Q.    Okay.  When -- when -- I'm --

22           What I'm specifically referring to is that

23 when I asked you for the purpose, you gave me two

24 purposes, one being to foul -- not to foul up the

25 motor and the other to reduce particulates in and out

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 49

1      A.    Okay.

2      Q.    The filter plays a safety function; right?

3            MR. BLACKWELL:  Object as asked and

4      answered, but you can go ahead.

5      A.    Well again, I think that the filter serves

6      two purposes:  one is to prevent the fouling of the

7      internal components of the warming unit; and the other

8      is to minimize the amount of particulates that are

9      exhausted into the -- into the blanket.

10     Q.    And that's a safety function; correct?

11     A.    We -- we could view that as a safety

12     function.

13     Q.    Okay.  When the 505 was being validated in

14     its design, can you tell me what safety validation was

15     done with respect to the filter?

16     A.    I do not believe that any particulate

17     filtration efficiency studies were completed at that

18     time.

19     Q.    Okay.

20     A.    And I should just point out, I guess

21     quickly, that the -- the filter media in the 505 was

22     again designated as 0.2-micron level.  The filters

23     that were in the previous warming units, the previous

24     model 200s and the 250s and the 275s, were somewhere

25     around two microns, so 10 times less efficient or

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 51

1   for the 505's filter?

2           MR. BLACKWELL:  I object to the form of the

3   question.

4       A.   Well again, the -- to --

5           To my knowledge, and based on my review of

6   the records that I have available to me, I didn't see

7   any testing related to particulate efficiency of the

8   filter media.

9       Q.   Okay.  And so I take it by that same token

10  there was no biological testing of the filter.

11          MR. BLACKWELL:  I object to the form of the

12  question.

13      A.   I'm unaware --

14          The company is unaware of any biological

15  testing conducted on the -- during the design of the

16  505.

17      Q.   Okay.  Let's talk a little bit, then, about

18  the new media that comes into play, the M20 media that

19  was introduced sometime in the 2000s period.  Can you

20  tell me:  When that design change was made, what did

21  the company do to ensure it was safe for the patients

22  it would be used on?

23      A.   Well the --

24          When the media was replaced, the design

25  requirements specifications were again reviewed to

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 87

1                    With respect to the safety validation for

2          filter design, what requirements were -- there were

3          and what was actually done on the model 750, that's

4          not something you're prepared to talk about today.

5                    MR. BLACKWELL:  Object to the form of the

6          question.

7               A.    Well I mean I -- again, I can tell you that

8          the -- there is a -- a control document, a design

9          requirement specification, and it's controlled in the

10         sense that it's like an ECO, that any requirement

11         that's on that document is approved and signed off and

12         it doesn't change without some sort of tracking

13         occurring, that all of those specifications were met

14         in -- in a -- or validated finally before the product

15         was put on the market.

16              Q.    Okay.  But in terms of what was done

17         pursuant to those specifications to validate the

18         safety of this product with respect to airborne

19         contamination, you don't know that.

20              A.    I don't know that a specific requirement for

21         airborne contamination exists on that document.

22              Q.    Okay.  Certainly, before the development of

23         the model 750, the company was aware of the potential

24         for airborne contamination and the necessity to take

25         steps to mitigate that.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 88

1              MR. BLACKWELL:  I object to the form of the

2    question.

3         A.   We were aware that customers had concerns or

4    perceptions about the level of particulates that might

5    be ejected from a -- a forced-air warming system.

6         Q.   Well in fact if we --

7              When we looked at Exhibit 47 today in front

8    of you, in talking about the safety concerns that were

9    addressed in the 510(k), one of those was airborne

10   contamination; correct?

11        A.   Yes.

12        Q.   In other words, when the company was

13   designing the 505 and making filter decisions, it

14   understood that one risk that needed to be mitigated

15   was the potential for airborne contamination.

16        A.   Yes.

17        Q.   So the same can be said true of the model

18   750.  During that time of development, the company

19   also understood that the product needed to take into

20   consideration the potential for airborne contamination

21   and take reasonable steps to mitigate that.

22        A.   And it -- yes.  And it did by including a

23   filter --

24        Q.   Okay.

25        A.   -- as one component of that system.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 89

1      Q.   Okay.  So as we saw, there was a certain

2   kind of filter on the model 505, and we talked about

3   how that was validated and all of those sorts of

4   things, so I'm --

5           With respect to the model 750 and its

6   filter, can you tell me specifically what was done to

7   ensure that that product was safe in terms of airborne

8   contamination?

9           MR. BLACKWELL:  I object to the form of the

10  question.

11     A.   You know, I mean I think I've answered it

12  the best I can.  The -- the design requirements that

13  dictate how the product is designed are tested to

14  validate that the -- that those -- that the product

15  meets those requirements specifications, so that was

16  the -- in -- in total the amount of testing that was

17  completed to validate the model 750.  Specifically, I

18  don't -- I do not think or do not recall that --

19  whether any safety testing, as you call it, was

20  conducted.

21     Q.   And that would be because, at this point

22  anyway -- and I'm talking about the two thousand --

23  1999-to-2002 timeframe -- the company did not have an

24  appreciation of the importance of particulate matter

25  that could be ejected into the operating room from the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 90

1   Bair Hugger.

2           MR. BLACKWELL:  I object to the form of the

3   question.

4       A.   Well I -- I --

5           The company certainly had an indication that

6   it was important to the customers regarding the level

7   of particulate loading that might occur from a

8   forced-air warming unit.

9       Q.   Okay.  Now part of the reason that dictated

10  a choice of filter in the model 750 was an airflow

11  concern; correct?

12      A.   Part of what, yes.

13      Q.   In fact, it was a goal of the project of the

14  750 to create a device which delivered more air than

15  the previous device.

16      A.   Yes.

17      Q.   Okay.  So the air-output specifications of

18  the unit changed and that in turn dictated some of the

19  choice for the filter.

20      A.   One -- one of the many design considerations

21  that dictated that, yes.

22      Q.   Okay.  Before the 750 was ever released and

23  sold and used on a patient, what was done to ensure

24  that that change in air out -- output had no adverse

25  effect on airborne contamination issues?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 213

1   inconclusive as to whether or not the Bair Hugger unit

2   750 disrupts the sterile surgical field.

3        A.   Well the 750 wasn't used in that study.

4        Q.   Neither was the 505; correct?

5        A.   No, I think it was the 505 in that study.

6        Q.   505E.

7        A.   Well 505E, yes.

8        Q.   Which has lower airflow than the 505.

9        A.   Yes.

10       Q.   Okay.  And the 505E is not used in the

11   United States.

12       A.   No, it is not.

13       Q.   Okay.  With respect to surgical site --

14   disruption of the -- of the sterile field, you do not

15   mention any CFD analysis.  Did 3M do a CFD analysis,

16   third party?

17       A.   Yes.

18       Q.   Okay.  Would that fall under this category

19   as well?

20       A.   Well it's -- it's not a test, it's a -- it's

21   a computational analysis.

22       Q.   Okay.  Well I take testing and analysis and

23   calculations as all being tests in some way or other,

24   whether a physical test or a calculation test.  Is

25   that fair?  Is that the definition of testing?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 217

1      Q.   What are the flaws of the Huang study when
2  you analyzed it?
3      A.   I don't have my data here in front of me,
4  but I'm sure that I've written extensively on that
5  study.
6      Q.   Do you agree the sample size was small?
7      A.   Yes, I believe the sample size was pretty
8  small in the Huang study.
9      Q.   It was only 16 people; correct?
10     A.   Yeah, I think so.
11     Q.   It used the Bair Hugger 505; correct?
12     A.   I believe that's the unit that was used.
13     Q.   And that has less airflow than the 750;
14  correct?
15     A.   Yes.
16     Q.   And Huang even acknowledges, and I think you
17  acknowledged it in the Moretti study, that there's a
18  higher count of particles or bacteria in the beginning
19  of surgery in room air because of unrestricted
20  movement of personnel in and out of an operating room.
21     A.   Yes.
22     Q.   So taking a sample size of CFUs or particles
23  when you first lay down the patient is really not a
24  good indicator of particles or CFUs with respect to
25  what's really going on in an operating room during

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 258

1    coming from.  Okay?  Because particles are all over

2    the operating room and underneath the operating room

3    table and everywhere.  Do you agree?

4         A.    Yes.

5         Q.    Okay.  Based on the data that we have today,

6    including the study funded by 3M as well as other

7    studies, every single study indicates that the Bair

8    Hugger increases the particle count over the sterile

9    field; correct?

10        A.    In absolute numbers, yes.

11        Q.    Yes.  Okay.  And you have no internal

12   studies to refute that; correct?

13        A.    No, we don't.

14        Q.    What's defendants' knowledge and analysis of

15   third-party testing regarding whether or not the Bair

16   Hugger causes surgical-site infection?

17        A.    Well again, the analysis that I showed you

18   that was done with the CDC data, for example.  And the

19   secular trend of deep joint infection over the last

20   decade or so has generally declined in hip and knee

21   implant surgery, so at a -- at a macro level there

22   doesn't appear to be an increase in the number of

23   these infections despite the fact that patients are

24   generally older and sicker and there are more of them

25   now than there were a decade ago.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 283

1   analyzed or has knowledge of with respect to

2   disruption of the sterile field.  Is that a study that

3   3M has -- has knowledge and analyzed?

4       A.   Yes.

5       Q.   It is a study funded by Augustine Medical;

6   correct?

7       A.   Yes.

8       Q.   And that study is flawed as well; isn't it?

9            MR. BLACKWELL:  Object to the form of the

10  question.

11      A.   I mean I -- in --

12           In what way?

13      Q.   Well is it flawed?

14      A.   Perhaps it could be flawed.

15      Q.   Well --

16      A.   It may have limitations.

17      Q.   You -- you -- you -- you -- you stated that

18  all -- all studies are -- have some sort of flaws.

19  Are you saying this study does not have any flaws?

20      A.   All -- all -- all clinical trials have

21  limitations in some way.  There is no perfectly

22  conducted trial, which is why we have to do many of

23  them.

24      Q.   Well Zink wasn't a clinical trial; was it?

25      A.   It was a --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 291

1     A.    Limitations.

2     Q.    Limitations, flaws.

3           Based on this analysis and knowledge, has 3M

4     publicized these limitations of these studies of Zink

5     and Kurz and Huang and Avidan to the public, to the

6     consumers?

7           MR. BLACKWELL:  Object to the question as

8     beyond the scope of the 30(b)(6) designation.

9     A.    No, we have not.

10    Q.    Switching subjects, you would agree that the

11    studies of third-party testing indicate that the Bair

12    Hugger unit harbors bacteria inside the device.

13    A.    Well I would -- I would agree that bacteria

14    can be recovered from the interior of the device.

15    Q.    Because the device is not sterile.

16    A.    It's not sterile.

17    Q.    And in fact, you're not -- 3M is not

18    disputing that the Bair Hugger blower and hose can

19    harbor bacteria inside the device.

20    A.    We are not disputing that.

21    Q.    Okay.

22    A.    It's not sterile.

23    Q.    Okay.

24          MR. ASSAAD:  Take a five-minute break.

25          THE REPORTER:  Off the record, please.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 300

1      A.    That's one of its purposes.

2      Q.    All right.  And you had some questions posed

3  to you earlier today, or 3M did, that -- that shows --

4  pardon me -- with respect to knowledge about studies

5  and increased particle counts.  Do you recall that

6  line of questioning?

7      A.    Yes.

8      Q.    And you testified on behalf of 3M that the

9  company is aware that -- that studies show increased

10  particle count when the Bair Hugger machine is turned

11  to warm setting in operating rooms; correct?

12          MR. BLACKWELL:  Object to the form of the

13  question.

14      A.    Trivial increases, yes.

15      Q.    They --

16          But you are aware that the studies do show

17  increased rate of particle count in operating rooms

18  with the Bair Hugger set to warm; correct?

19          MR. BLACKWELL:  Same objection.

20      A.    Yes.

21      Q.    And you'd agree that increased particle

22  count is something that 3M has never warned orthopedic

23  surgeons about; correct?

24      A.    Not to my knowledge.

25      Q.    So my question is -- is accurate?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 313

1    asked him about changes that were made to the

2    predicate device, which was the 200, which is what

3    this is a picture of.

4          MR. BLACKWELL:  So Exhibit 351 relates to

5    the predicate device, the 200.

6          MS. ZIMMERMAN:  Exactly.  And the question

7    ultimately is:  Why was the warning removed when we

8    got to the 500 series?

9      A.   Well there's another difference, too, and

10   that is that the 200 was not intended to be used in

11   the operating room.

12     Q.   Right.  And -- and I'm aware of that, Mr.

13   Van Duren.  My question really is -- has to do with

14   the knowledge that was available to the company

15   broadly at that time.

16          There -- there was some knowledge, based on

17   the fact that there is a warning of airborne

18   contamination, that contamination could be airborne;

19   correct?

20     A.   Yes.

21     Q.   Okay.  And -- and despite that fact, there

22   is no warning on the 500 series of the Bair Hugger

23   device about risk of airborne contamination; correct?

24     A.   That's correct.

25     Q.   And that's despite the fact that the medical

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 314

1  care professionals rely on the company to warn about

2  risks; correct?

3          MR. BLACKWELL:  I object to the form of the

4  question.

5      A.   The risks that are known of, known about,

6  yes.

7      Q.   All right.  And -- and -- and al --

8          That's also despite the fact that medical

9  care professionals rely on the company to provide

10  rules for safe use of a device; correct?

11          MR. BLACKWELL:  I object to the form of the

12  question.

13      A.   Yes.

14          And it's very likely that the hazard

15  analysis that occurred subsequent to the development

16  of this device recognized that the risk index was

17  either too low or zero and removed that warning from

18  the labeling.

19          MS. ZIMMERMAN:  I'm going to move to strike

20  as non-responsive.

21      Q.   Are you aware of any testing that -- that

22  showed that there was not airborne risk of

23  contamination --

24      A.   I'm not.

25      Q.   -- conducted by this study?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 315

1      A.   I'm not.

2      Q.   Or I'm sorry, conducted by the company.

3      A.   No, I am not.

4      Q.   Okay.  So it's pure speculation on your

5    part.

6           Turning to the 700 series Bair Hugger,

7    was -- was there any changes on the warnings as

8    between the 700 series and the 500 series Bair

9    Huggers?

10     A.   I believe there were some changes.

11     Q.   And what were those changes?

12     A.   I believe the recommendation not to hose

13   patients with the -- with the end of the nozzle was

14   added.

15     Q.   And hose --

16          And hosing is a practice of essentially

17   using the machine without the disposable blanket

18   attached; correct?

19     A.   That's right.

20     Q.   All right.  Were there any other changes?

21     A.   I'm -- I'm --

22          I suspect there are.  I don't -- I don't

23   know which ones changed between the two models though.

24     Q.   So as you sit here today, the only change

25   that you are aware of between the 500 and 700 series

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 316

1   with respect to the warnings has to do with the

2   warning not to engage in hosing; correct?

3        A.   That's correct.

4        Q.   All right.  And you'd agree that there's no

5   warning on the 700 series, again, regarding the risk

6   of airborne contamination; correct?

7        A.   That's correct.

8        Q.   And again, that's despite the fact that the

9   risk of airborne contamination was in fact known to

10  the company at that time; correct?

11            MR. BLACKWELL:  I object to the form of the

12  question.

13       A.   It --

14            Well, it was included as a warning on the

15  model 200, yes.

16       Q.   Okay.  I'm going to turn to topic number

17  eight, which is data or research supporting the claim

18  that the Bair Hugger blankets act as an additional

19  filter or otherwise reduce the potential for

20  contamination in the operating room.  You're prepared

21  to testify about that today as well; correct?

22       A.   Yes.

23       Q.   And I think you had some questions posed to

24  you earlier today by my colleague, Mr. Assaad,

25  regarding the Avidan study.  Do you recall that?