# EXHIBIT 6

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - -

In Re:
Bair Hugger Forced Air Warming
Products Liability Litigation

This Document Relates To:
All Actions         MDL No. 15-2666 (JNE/FLM)

- - - - - - - - - - - - - - - - -

DEPOSITION OF TERI L. W. WOODWICK-SIDES
VOLUME I, PAGES 1 - 244
DECEMBER 8, 2016

(The following is the deposition of TERI L. W. WOODWICK-SIDES, taken pursuant to Notice of Taking Deposition, via videotape, at the offices of Ciresi Conlin L.L.P., 225 South 6th Street, Suite 4600, Minneapolis, Minnesota, commencing at approximately 9:15 o'clock a.m., December 8, 2016.)

Page 2

1  APPEARANCES:
2  On Behalf of the Plaintiffs:
3    Mark D. Bankston and Kyle W. Farrar
     KASTER, LYNCH, FARRAR & BALL LLP
4    1010 Lamar, Suite 1600
     Houston, Texas   77002
5
   On Behalf of the Defendants:
6
     Mary S. Young
7    BLACKWELL BURKE
     431 South Seventh Street, Suite 2500
8    Minneapolis, Minnesota   55415
9  On Behalf of the Deponent:
10   Dale O. Fresch
     BREWER ATTORNEYS & COUNSELORS
11   1717 Main Street, Suite 5900
     Dallas, Texas   75201
12
   ALSO APPEARING:
13
     Ronald M. Huber, Videographer

Page 3

                    I N D E X
EXHIBITS        DESCRIPTION          PAGE MARKED
Ex 168  Woodwick-Sides consultant
        agreement in Walton,
        SIDES00000016                7
   169  Amendment 02 to Consulting
        Services Agreement,
        SIDES00012252-3              18
   170  Litigation Consulting Agreement
        for Teri Woodwick Sides,
        SIDES00000027                23
   171  E-mail string, 3MBH00024824  65
   172  Bair Hugger Filtration Project,
        August 3, 2008, SIDES00006993  67
   173  E-mail, 3MBH00022366         73
   174  Letter dated November 17, 2010,
        Berg to Maharaj, with attached
        Establishment Inspection Report,
        3MBH00048067-85              86
   175  E-mail string, 3MBH00024633-5  113
   176  Filtration Topics, 3MBH00022877  124
   177  Ducky Phase 1, Final Concepts,
        Dated May 20, 2009,
        3MBH00022625-62              132
   178  IonArmour Antimicrobial Assess-

Page 4

        ment Report for Arizant,
        3MBH00025006-8               141
   179  Arizant Healthcare Spray
        Application Request for Proposal,
        3MBH00548459-73              147
   180  E-mail string, 3MBH00053493-4  164
   181  E-mail string, 3MBH00024733-4  167
   182  E-mail string, 3M00575107-12   225
   183  E-mail string, 3M00575251-2    228

Page 5

```
 1          PROCEEDINGS
 2       (Witness sworn.)
 3          TERI L. W. WOODWICK-SIDES
 4       called as a witness, being first duly sworn,
 5       was examined and testified as follows:
 6          ADVERSE EXAMINATION
 7   BY MR. BANKSTON:
 8     Q.  Good morning, Mrs. Sides.
 9     A.  Good morning.
10     Q.  We've met on a couple of occasions; correct?
11     A.  I believe we've --
12         Yes.
13     Q.  Yeah.
14     A.  Once at least.
15     Q.  I ought to make more of an impression;
16   right?
17         Yeah, at least one time.
18         In fact, you've given depositions in --
19   regarding Bair Hugger matters before.
20     A.  Correct.
21     Q.  Okay.  I take it I don't need to go over any
22   deposition rules; you're an old pro at doing this.
23   There's nothing --
24     A.  I think I'm good.
25     Q.  Okay.  Let's just dive right in.
```

Page 6

```
 1         Prior to leaving the company in 2011 you had
 2   been the vice president of marketing, product
 3   development and consumer relations.
 4     A.  Customer service, yes.
 5     Q.  Okay.  Let's go ahead and have you state the
 6   full title.
 7     A.  Okay.  Vice president of marketing, product
 8   development and customer service.
 9     Q.  Okay.  And then you left the company in 2011
10   or 2012?
11     A.  2011.
12     Q.  Okay.  Then you worked on your own in your
13   own business since that time; correct?
14     A.  That's correct.
15     Q.  Okay.  In late 2004, as a result of the
16   first Bair Hugger lawsuit, 3M approached you; correct?
17     A.  I don't recall a lawsuit in 2004.
18     Q.  Two -- excuse me, 2014.
19     A.  Oh.
20     Q.  In late 2014, --
21     A.  Okay.
22     Q.  -- as a result of the first Bair Hugger
23   lawsuit, 3M approached you.
24     A.  Initially, yes.
25     Q.  Okay.  And when you say initially they
```

Page 7

```
 1   approached you, was there another point at which you
 2   approached them, or how did that work?
 3     A.  Oh, no.
 4     Q.  Okay.
 5     A.  Just received a call.
 6     Q.  Okay.  And they let you know a subpoena
 7   would be issued for your testimony; correct?
 8     A.  I believe at some point, yes.
 9     Q.  Okay.  And then at that point, when the
10   subpoena was issued for your testimony, you negotiated
11   an agreement with 3M.
12     A.  I don't recall that being the order of
13   events.  I am not sure.
14     Q.  Okay.  And which --
15         What sequence of that may seem out of order
16   to you?
17     A.  I am not sure if the litigation consulting
18   agreement came first.
19     Q.  Be -- before or prior to the subpoena?
20     A.  Yes.
21     Q.  Okay.
22     A.  I'm not sure.
23     Q.  Okay.
24         (Discussion off the stenographic record.)
25         (Exhibit 168 was marked for
```

Page 8

```
 1       identification.)
 2   BY MR. BANKSTON:
 3     Q.  Mrs. Sides, I've handed you what's been
 4   marked as Exhibit 168.  Do you remember signing this
 5   agreement?
 6     A.  Yes, I do.
 7     Q.  Okay.  And this is the agreement that you
 8   made with respect to the first Bair Hugger lawsuit,
 9   the Walton matter; correct?
10     A.  Yes, it is.
11     Q.  Okay.  And as a part of this agreement you
12   agreed with 3M, negotiating an agreement in which you
13   would be compensated $500 an hour for any time spent
14   in connection with that lawsuit; correct?
15     A.  That is correct.
16     Q.  Okay.  And then for out-of-state travel you
17   would be reimbursed at $5,000 per day; correct?
18     A.  That is correct.
19     Q.  Okay.  Under this agreement you made certain
20   promises of confidentiality to 3M.
21     A.  Yes.
22     Q.  Okay.  Now another thing that happened at
23   this same moment is that you came to be represented by
24   3M's attorneys; correct?
25     A.  Yes, I would assume so.
```

Page 57

1  brought in -- you know, when you arrived in that
2  position, I take it you made efforts to assure
3  yourself about the safety of your products.
4      A.  I would say that was an ongoing situation,
5  yes.
6      Q.  Okay.  So you -- in other words, you looked
7  in --
8          I'm sure you looked into how the device was
9  developed and its history; correct?
10     A.  I -- no.  Specifically, I can't say that I
11 did.
12     Q.  Okay.  For instance, do you know about what
13 the company may or may not have done before they put
14 the product on the market?
15     A.  And when you say "the product," are you --
16     Q.  Oh, yeah.  That's fair.
17     A.  -- talking about the original Bair Hugger?
18     Q.  Sure, first Bair Hugger warming unit.
19     A.  No, I don't.
20     Q.  Okay.  In terms of the Bair Hugger 505 and
21 later models, you did know that, before those products
22 were sold, that the company had itself conducted no
23 clinical studies with regard to airborne
24 contamination.
25         MR. FRESCH:  Objection to the form.

Page 58

1      A.  I don't believe there were studies.
2      Q.  Okay.  And in fact there was no internal
3  testing of airborne contamination.
4      A.  I don't believe so.
5      Q.  Okay.  Certainly never -- none ever crossed
6  your desk; correct?
7      A.  Not in the early years as you're referring
8  to.
9      Q.  Well I'm talking about with regard to
10 clinical studies.  Let's talk about that one first.
11 The company's never done a clinical study with regard
12 to Bair Hugger and airborne infection; correct?
13     A.  I can't say for sure.
14     Q.  Okay.  Now regarding internal testing
15 regarding airborne infection, the company has never
16 done that either; right?
17     A.  What do you mean by "internal testing?"
18     Q.  Well I'm --
19         You were overseeing product development;
20 correct?
21     A.  Correct.
22     Q.  You understood product testing occurred;
23 right?
24     A.  Uh-huh.
25     Q.  What does "product testing" --

Page 59

1          THE REPORTER:  Your answer?
2          THE WITNESS:  Yes.
3      Q.  What does "product testing" mean?
4      A.  Testing of products.
5      Q.  Okay.  There we go.  So has that ever
6  happened in terms of airborne contamination internally
7  at the company?
8      A.  There was internal testing related to
9  airflow and dynamics, which -- but I don't recall
10 specifically anything regarding contamination.
11     Q.  Ultimately, you had responsibility for
12 assuring the device was developed and marketed safely;
13 right?
14     A.  I would say ultimately the CEO has that
15 responsibility.
16     Q.  Okay.  That was certainly in the -- in the
17 area of your job responsibility, though; correct?
18     A.  As it relates to product development,
19 correct.
20     Q.  Okay.  And -- and -- and in terms of
21 marketing, too; right?  And you're --
22         Let's back up.  You're the vice president.
23 Your areas include both product development and
24 marketing; right?
25     A.  Correct.

Page 60

1      Q.  So you have responsibility to make sure that
2  the product is marketed and developed safely.
3      A.  Yes.
4      Q.  Okay.  Did you inquire about what assurances
5  had been made to the U.S. government regarding safety?
6      A.  I guess I'm not sure what the question is.
7      Q.  Well, you certainly are aware that Arizant,
8  as a company who sells medical devices in this
9  company, has to communicate with the federal
10 government about what they're doing.
11     A.  Correct.
12     Q.  And some of those take place under a
13 regulatory regime, and one of those would be 510(k);
14 correct?
15     A.  Correct.
16     Q.  You know what I mean when I say that.
17     A.  Yes.
18     Q.  So you understand in a 510(k), assurances
19 are made to the federal government.
20     A.  Yes.
21     Q.  Okay.  Do you know what assurances were made
22 with respect to the safety of the unit?
23     A.  Not specifically --
24     Q.  Okay.
25     A.  -- today.

Page 125

1  development department entitled "Filtration Topics."
2      Do you recall reviewing this document at any
3  point reviewing for your depositions?
4      A. No.
5          May I read it?
6      Q. You sure can.
7      A. Okay.
8      Q. Now this document shows us that in the
9  product development department there were engineers
10 within the company who were having a specific focus on
11 the filtration of bacteria; correct?
12     A. I -- I'm not sure of the origin of this
13 document. It doesn't look familiar to me.
14     Q. Okay.
15     A. So what was the second part of your
16 question?
17     Q. I think there was just one, which is that
18 this document shows that engineers had an interest in
19 bacterial filtration.
20     A. Okay. So I would --
21         Again, I'm not sure if this is an
22 engineering document, but I would say there are
23 questions related to filtration and a variety of
24 options.
25     Q. In fact, one of those questions is "How much

Page 126

1  bacteria can be allowed to pass through?" and "How
2  much is dangerous?"
3      You would agree with me that at this stage
4  in time the company doesn't know how much is
5  dangerous.
6          MR. FRESCH: Objection to the form, lacks
7  foundation.
8      A. I don't know if that's how I would interpret
9  that. I -- I'm not sure --
10     Q. Well certainly --
11     A. -- who drafted this.
12     Q. Certainly, you have engineers working on
13 filtration topics who want to answer the question of
14 how much is dangerous; correct?
15         MR. FRESCH: Objection to the form.
16     A. Again, I -- I -- I can't say. I don't
17 recall what --
18     Q. Well you can definitely say that there's
19 somebody in the company who is asking the question how
20 much is dangerous; right?
21     A. Again, if this --
22         You're telling me this is a company
23 document, so I assume it is.
24     Q. Well you can look at the bottom and tell;
25 can't you?

Page 127

1      A. Okay. I -- I'm sorry, I don't -- I don't
2  know if those are things that are added because
3  they've been part of depositions.
4      Q. Sure. Okay.
5          Well let's go ahead and try it the easy way.
6  Assume with me this is a company document.
7      A. Okay.
8      Q. Okay? You may not be the who can tell me
9  who wrote it; right?
10     A. Correct.
11     Q. But you can tell me that somebody in your
12 company was asking how much is dangerous when it comes
13 to how much bacteria can pass through the filter.
14     A. I would agree that's what this says.
15     Q. Okay. The last question is about your media
16 company, the one who provides your filters, Porous
17 Media, and it asks if they're familiar with any OR
18 bacterial standards.
19         Did you ever do anything while you were at
20 Arizant to make yourself familiar with OR bacterial
21 standards?
22     A. Aside from relying on people like Gary
23 Hansen and Al Van Duren and them doing research to
24 identify whether or not standards existed.
25     Q. Okay. So in terms of making decisions about

Page 128

1  filtration on the product, that's something you would
2  defer to your director of research and development and
3  your clinical director.
4      A. Yeah. Most likely this would have been more
5  of an engineering-type decision, and so you do lean on
6  the people with the expertise to make those decisions.
7      Q. Okay.
8          MR. BANKSTON: This is a great -- nice --
9  not a bad place to stop if y'all want to do lunch.
10         MS. YOUNG: Sure.
11         THE REPORTER: Off the record, please.
12         (Luncheon recess taken.)

Page 133

1  Ducky presentation discusses the project addressing
2  the perception as well as the presence of bacteria;
3  correct?
4     A.  Okay.  I see where you're reading that.
5     Q.  You don't have any reason to disagree with
6  me that a technological goal of this program was to
7  address the presence of bacteria.
8     A.  It seemed, from what I've seen so far in
9  this document, that the goal was to address the
10 perception of the presence of bacteria.
11    Q.  Well that's not what the document says
12 though; right?
13    A.  Yeah, the document says "to address the
14 presence as well as the presence" -- I'm sorry -- "to
15 address the perception as well as the presence of
16 bacteria."
17    Q.  So you'd agree with me that this isn't
18 simply addressing the perception of bacteria, there
19 were technological solutions investigated to address
20 the presence of bacteria.
21    A.  It looks like that's what IDEO did.
22    Q.  And in fact, there were discussions between
23 IDEO and the company about solutions that might just
24 achieve perceived cleanness versus solutions that
25 might achieve perceived cleanness.  Do you understand

Page 134

1  the difference between those two things?
2     A.  Well I understand the difference between
3  perceived and achieved.
4     Q.  And in terms --
5         And in fact this discussion was over
6  differing solutions which might either achieve
7  perceived cleanliness or reach achieved cleanliness.
8  You understand that; right?
9     A.  It looks like they've mapped out concepts
10 that might fall within a spectrum.
11    Q.  Okay.  I'd like to ask you a question about
12 page 11 of this document.  Do you see the picture on
13 the bottom right-hand part of the page?
14    A.  Yes.
15    Q.  Okay.  So that is the blower unit on that.
16 That's a Bair Hugger 750?
17    A.  It looks like it.
18    Q.  Okay.  That hose on the end is not the hose
19 that is typically on the Bair Hugger 750; right?
20    A.  I would guess it's the hose.  It looks like
21 there's something in between the warming unit and the
22 hose.
23    Q.  Okay.  Sure.  So let's -- let's focus on
24 that.  There seems to be a semi-transparent canister
25 with a filter inside between the blower end and the

Page 135

1  hose; correct?
2     A.  I -- I can't really tell from the image what
3  it is, but there's a cylinder of something in between
4  the hose and the -- the unit.
5     Q.  Okay.  And it then says in the document that
6  they're going to "move the high efficiency filter to
7  the blower outlet, at the entrance of the air hose."
8  Do you remember that being the goal of Project Ducky?
9     A.  Do you mind if I read it?
10    Q.  Sure.
11    A.  Okay.
12    Q.  Okay.  Do you recall my question?
13    A.  No, I don't.
14    Q.  Okay.  Let's go ahead and try that one
15 again.
16        The document describes an effort to move the
17 high-efficiency filter to the blower outlet; correct?
18 In the second paragraph.
19    A.  Yeah.  I see that, yes.
20    Q.  Okay.  That document describes that -- it
21 describes moving it to the entrance of the air hose;
22 correct?
23    A.  Correct.
24    Q.  That's what we see pictured in that
25 photograph.

Page 136

1     A.  Yes.
2     Q.  That refreshes your recollection as to one
3  of the goals of Project Ducky was to create a feasible
4  design for an -- a filter at the blower outlet.
5        MR. FRESCH:  Objection to the form.
6     A.  As I said, I believe the goals were to
7  generate different concepts and -- and IP related to
8  filtration, especially in light of a competitor who
9  had told us that they were working on filing IP around
10 our equipment.
11    Q.  Okay.  And that IP would have been designed
12 to reduce bacterial contamination; correct?
13        MR. FRESCH:  Objection to the form.
14    A.  Which IP, that the competitor was filing
15 or --
16    Q.  No, the one you're making right here.
17    A.  Well I'm not sure this is actual IP.  It
18 looks like just a -- a concept.
19    Q.  All right.  Let's not be pedantic about it.
20 There's a prototype being developed; correct?
21        MR. FRESCH:  Objection to the form.
22    Q.  You see a picture of it.
23    A.  Okay.  So it looks like it.
24    Q.  Now you don't know if the company ever did
25 anything in terms of IP; do you?