# EXHIBIT 7

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - -

In Re:
Bair Hugger Forced Air Warming
Products Liability Litigation

This Document Relates To:
All Actions        MDL No. 15-2666 (JNE/FLM)

- - - - - - - - - - - - - - - - - -

DEPOSITION OF DAVID A. WESTLIN
VOLUME I, PAGES 1 - 189
DECEMBER 16, 2016

(The following is the deposition of DAVID A. WESTLIN, taken pursuant to Notice of Taking Deposition, via videotape, at the offices of Ciresi Conlin L.L.P., 225 South 6th Street, Suite 4600, Minneapolis, Minnesota, commencing at approximately 10:02 o'clock a.m., December 16, 2016.)

Page 2

1   APPEARANCES:
2       On Behalf of the Plaintiffs:
3           Mark D. Bankston and William R. Ogden
            KASTER, LYNCH, FARRAR & BALL LLP
4           1010 Lamar, Suite 1600
            Houston, Texas   77002
5
            Noah Lauricella
6           GOLDENBERG LAW
            800 LaSalle Avenue, Suite 2150
7           Minneapolis, Minnesota   55402
8       On Behalf of the Defendants:
9           Peter J. Goss
            BLACKWELL BURKE P.A.
10          432 South Seventh Street, Suite 2500
            Minneapolis, Minnesota   55415
11
            Christin Eaton Garcia
12          FAEGRE BAKER DANIELS
            2200 Wells Fargo Center
13          90 South Seventh Street
            Minneapolis, Minnesota   55402-3901
14
        On Behalf of the Deponent:
15
            Dale O. Fresch and Michael L. Smith
16          BREWER ATTORNEYS & COUNSELORS
            1717 Main Street, Suite 5900
17          Dallas, Texas   75201
18  ALSO APPEARING:
19      Ronald M. Huber, Videographer

Page 3

1           I N D E X
2   EXHIBITS       DESCRIPTION        PAGE MARKED
3   Ex  200  FDA cleared claims [(510(k)]
4        for the Bair Hugger Temperature
5        Management System,
6        3MBH00000002-7
7   201  E-mail string, 3MBH00018314-5
8   202  Customer Q&A:  Filtration of the
9        Bair Hugger warming unit,
10       3MBH00008025-6
11  203  E-mail string, 3MBH00024592-6

Page 4

1           P R O C E E D I N G S
2       (Witness sworn.)
3           DAVID A. WESTLIN
4   called as a witness, being first duly sworn,
5   was examined and testified as follows:
6           ADVERSE EXAMINATION
7   BY MR. BANKSTON:
8       Q.  Mr. Westlin, good morning.
9       A.  Good morning.
10      Q.  We've done this a couple times, given --
11  done deposition; right?  You're familiar with this
12  process?
13      A.  That's correct.
14      Q.  Okay.  I'm just going to dive right in,
15  assuming that you are up to speed on what we're here
16  to do today.
17      A.  Okay.
18      Q.  Okay.  You were the senior director of
19  regulatory affairs and the chief compliance officer at
20  Arizant?
21      A.  That's correct.
22      Q.  Okay.  You also served as a chief of
23  regulatory affairs and compliance manager for 3M?
24      A.  No.
25      Q.  Okay.  Tell me what your 3M position was.

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

Page 113

1  you keep copies of scientific research relating to the
2  Bair Hugger?
3      A. No.
4      Q. Okay. Where --
5          What department is that kept in?
6      A. Clinical.
7      Q. Okay. So Al Van Duren would be the best
8  custodian ultimately responsible for maintaining a
9  collection of scientific literature?
10         MR. SMITH: Object to form.
11     A. That's correct.
12     Q. Okay. Now you would agree with me that
13 Arizant has not --
14         Well no, let's -- yeah, let's stick with
15 Arizant for this question. Okay?
16     A. Okay.
17     Q. So am I correct that the time period for
18 Arizant is roughly 2003 to 2010?
19     A. That's generally correct, yes.
20     Q. Okay.
21     A. Close enough.
22     Q. So during that time period, you would agree
23 with me that Arizant has not done any appropriately
24 powered research to prove there is no risk of
25 infection.

Page 114

1          MR. SMITH: Object to form.
2          MS. GARCIA: Join.
3      A. I would not say that because I don't know
4  that -- I don't know that that's a true statement.
5      Q. Okay.
6          (Discussion off the stenographic record.)
7      Q. Do you remember testifying to me in the
8  Timothy Johnson matter pending in Kansas that you
9  would agree that Arizant has not done any
10 appropriately powered research to prove there is no
11 risk of infection?
12         MR. SMITH: Object to form.
13     A. I don't remember that. I mean if you show
14 me something, I might be able to refresh my memory, --
15     Q. Sure. And how about I --
16     A. -- but I -- I don't remember saying that.
17     Q. Okay. Let me hand you a copy of your
18 deposition that you gave in the Timothy Johnson matter
19 in Kansas, and I would like to direct your attention
20 to page 54, line seven -- sixteen where the question
21 is: "The next sentence states, 'Arizant has not done
22 any appropriately powered research to prove there is
23 no risk of infection,' would you agree or disagree
24 with that statement as of 2008?"
25         And then there you said: "I don't know that

Page 115

1  we did any. I guess I'd have to agree with that
2  statement. But I don't know. Again, I'm not an
3  expert in the clinical area to say what it would take
4  to do that."
5          Do you remember giving that testimony?
6      A. Not specifically, no.
7      Q. Okay.
8          MS. GARCIA: I'll just object to that as
9  improper impeachment. Again, that's exactly what he
10 just said.
11     Q. Okay. So what we are talking about now is
12 that when you gave your testimony back in the Johnson
13 case, you would agree with that statement, but you
14 were not the expert; right?
15         MR. SMITH: Object to form.
16         MS. GARCIA: Join.
17     A. I guess at this point I wouldn't --
18         Well could you ask the question again? I'm
19 sorry.
20     Q. Sure. Sure.
21         It would be a fair summary of what your
22 testimony was in the Johnson matter that you would
23 have agreed with the statement given, but you're not
24 the expert.
25         MS. GARCIA: Object to form.

Page 116

1      A. At this point I don't feel I'd agree with
2  what I said at that point either, --
3      Q. Okay.
4      A. -- so --
5      Q. So in terms of your testimony regarding
6  whether Arizant has done appropriately powered
7  research, your testimony today is more accurate than
8  your testimony back in the Johnson matter.
9          MR. SMITH: Objection to form.
10     A. It's --
11         I'm evaluating it a little differently,
12 looking at "appropriately powered research" for one
13 thing. I'm in no position to -- then or now to make a
14 determination of what's an appropriately powered
15 research study, so from that standpoint I'd say I'm
16 more accurate today than then.
17     Q. Okay. And if you needed to make a
18 determination about whether a certain study was
19 appropriately powered, that would be something again
20 you would have to rely on the clinical department.
21     A. Correct.
22     Q. Okay. So in your history with Arizant and
23 continuing into your history with 3M, do you remember
24 anybody from clinical ever advising you that an
25 appropriately powered research project has occurred

C O N F I D E N T I A L

Page 117

1  with respect to airborne contamination?
2      MR. SMITH: Object to the form.
3      A. I don't remember anybody telling me we did
4  or did not do that, no.
5      Q. Okay. Do you know sitting here today,
6  before the release of the product -- and by "the
7  product" I mean the very first Bair Hugger -- was
8  there any clinical testing done?
9      A. That was before my time at Arizant, so I
10 couldn't tell you one way or the other.
11     Q. All right. Let's move forward to the Bair
12 Hugger 505 model. Do you know if, at the time the 505
13 was released, had the company done any internal
14 testing with regard to airborne contamination?
15     A. None that I can think of.
16     Q. Okay.
17     A. I don't remember any, no.
18     Q. In all of the years that the 505 has been on
19 the market, has the company ever done any internal
20 testing with regard to airborne contamination?
21     MR. SMITH: Object to form.
22     A. To my recollection, no, but there were
23 multiple clinical studies that had been published
24 outside of the company that demonstrated that.
25     Q. Correct. And -- and I think one of -- two

Page 118

1  of those we looked at today were Hall and Zink;
2  correct?
3      A. Correct.
4      Q. Okay. And so you know about studies that
5  were performed on the Bair Hugger 500 unit; right?
6      A. Correct.
7      Q. Okay. Do you know of any studies that were
8  performed on the Bair Hugger 505 unit?
9      A. I don't, no.
10     Q. Okay. Do you know of any studies that were
11 performed on the Bair Hugger 750 unit?
12         Excuse me. Let me actually rephrase.
13         Do you know of any studies performed on the
14 Bair Hugger 750 unit by someone outside of Arizant?
15     A. I don't know of any, no.
16     Q. Okay.
17     A. I mean --
18     Q. With regard to the development of and sale
19 of the 750, do you know if, prior to the sale of the
20 750, the company did any internal testing with regard
21 to airborne contamination?
22     A. I don't know that they did or not, no.
23     Q. Okay. With regards to after the 750 has
24 been saled -- sold up to the time that you left the
25 company, do you -- were you aware of any internal

Page 119

1  testing on the Bair Hugger 750 with respect to
2  airborne contamination?
3      A. I was not aware of any. That didn't mean it
4  wasn't done, but I wasn't aware of any, no.
5      MS. GARCIA: I'm sorry. Can I have that
6  question back?
7      (Record read by the court reporter.)
8      MS. GARCIA: Thank you.
9      Q. When you were making decisions about
10 ensuring a product that goes out into the field is
11 safe or effective, do you not want to see confirmation
12 of internal testing for airborne contamination?
13     MS. GARCIA: Object to the form of the
14 question.
15     MR. SMITH: Object to form.
16     A. I'm sorry, could you repeat it?
17     Q. Sure.
18     A. I'm sorry.
19     Q. When it comes to your job responsibilities
20 of making sure that this product is safe for the
21 patients it will be used on, do you not want to see
22 internal testing with regards to airborne
23 contamination?
24     A. I don't know that I want to see specifically
25 the testing. I would like to have an understanding if

Page 120

1  there's any concerns.
2      Q. Sure.
3      A. You know, we --
4         There have been no concerns raised with it
5  at any point. As a result, you know, it -- I don't
6  know of any specific studies that were done, so --
7      Q. When you say no concerns were raised, what
8  do you mean by that?
9      A. Well prior to the allegations raised by Dr.
10 Augustine and even up to the point where I was
11 involved with the Bair Hugger products, we had never
12 received a single report or allegation or request for
13 infor -- or I shouldn't say -- but any reports of an
14 infection related to the Bair Hugger product.
15     Q. Okay. But it is very true that you received
16 numerous concerns about the potential for airborne
17 contamination.
18     A. We received questions after there were
19 published articles. I wouldn't suggest that they were
20 concerns more than questions about it.
21     Q. Well certainly you were aware that there
22 were orthopedic surgeons who were refusing to use the
23 Bair Hugger because of the potential for airborne
24 contamination.
25     A. I heard that there was --