# EXHIBIT 8

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1

1  UNITED STATES DISTRICT COURT
2  DISTRICT OF MINNESOTA
3  - - - - - - - - - - - - - - - - - - - - - - -
4  In Re:
5  Bair Hugger Forced Air Warming
6  Products Liability Litigation
7
8  This Document Relates To:
9  All Actions          MDL No. 15-2666 (JNE/FLM)
10 - - - - - - - - - - - - - - - - - - - - - - -
11
12 DEPOSITION OF KARL D. ZGODA
13 VOLUME I, PAGES 1 - 238
14 FEBRUARY 24, 2017
15
16
17       (The following is the deposition of KARL D.
18 ZGODA, taken pursuant to Notice of Taking Deposition,
19 via videotape, at the offices of Ciresi Conlin
20 L.L.P., 225 South 6th Street, Suite 4600, in the City
21 of Minneapolis, State of Minnesota, commencing at
22 approximately 9:08 o'clock a.m., February 24, 2017.)
23
24
25

STIREWALT & ASSOCIATES
1-800-553-1953   info@stirewalt.com

---

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

3

| | | | |
|---|---|---|---|
| 1 | 279 | Cobra Logic Meeting 5/24/00, 3MBH00025543 | 57 |
| 2 | 280 | email, Zgoda to Hanging Cobra's, June 07, 2000, 3MBH00497304 | 58 |
| 3 | 281 | Filter - Test Report, 3MBH00022367 to 2370 | 65 |
| 4 | 282 | PowerPoint, Bair Hugger Therapy, Model 750 Technical/Service Training, Aug. 27-28, 2003, 3MBH00017229 to 7257 | 75 |
| 5-6 | 283 | email, Zgoda to Lastovich, 7/27/2008, 3MBH00026490 | 85 |
| 7 | 284 | email string, Lastovich to Zgoda, 7/29/2008, 3MBH00026492 | 87 |
| 8 | 285 | email string, Zgoda to list, 8/4/2008, 3MBH00026515 to 6516 | 89 |
| 9 | 286 | email string, Collins to list, 12/19/2008, 3MBH00026708 to 6709 | 95 |
| 10 | 287 | email string, Eickhoff to list, 1/16/2009, 3MBH00026724 to 6725 | 103 |
| 11 | 288 | Arizant Research and Development TEST REPORT, 3MBH00018311 to 8313 | 108 |
| 12 | 289 | email, Zgoda to Barrows/Hansen, 7/31/2008, 3MBH00026496 | 141 |
| 13 | 290 | email string, Poppen to list, 1/27/2009, 3MBH01807381 | 146 |
| 14 | 291 | PowerPoint, Ducky/Phase 1, Final Concepts, May 20, 2009, 3MBH00022625 to 2662 | 156 |
| 15 | 292 | email, Card to Woodwick-Sides/Gary Maharaj, July 1, 2009, 3MBH00024947 | 166 |
| 16 | 293 | email string, Lastovich to Zgoda, 8/12/2008, 3MBH00026595 to 6596 | 169 |
| 17 | 294 | email string, Hansen to Lastovich, 11/24/2008, 3MBH00024569 | 172 |
| 18 | 295 | email string, Scott to list, 10/2/2009, 3MBH00024682 | 175 |
| 19 | 296 | email string, Parthasarathy to Oster, 8/26/2013, 3MBH00542396 to 2398 | 182 |
| 20 | 297 | email string, Maharaj to Mark J, 10/07/2013, 3MBH00126140 to 6142 | 188 |
| 21 | 298 | email, Hulse Stevens to list, 8/24/2013, 3MBH00000826 | 198 |
| 22 | 299 | untitled, 3MBH01617179 | 201 |

STIREWALT & ASSOCIATES
1-800-553-1953   info@stirewalt.com

---

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

2

1  APPEARANCES:
2  On Behalf of the Plaintiffs:
3     Mark D. Bankston
       Kyle W. Farrar
4     William R. Ogden
       KASTER, LYNCH, FARRAR & BALL, LLP
5     1010 Lamar
       Suite 1600
6     Houston, Texas   77002
7     Noah Lauricella
       GOLDENBERG LAW
8     800 LaSalle Avenue
       Suite 2150
9     Minneapolis, Minnesota   55402
10 On Behalf of the Defendants:
11    Peter J. Goss
       BLACKWELL BURKE P.A.
12    432 South Seventh Street
       Suite 2500
13    Minneapolis, Minnesota   55415
14 On Behalf of the Deponent:
15    William A. Brewer III
       Dale O. Fresch
16    BREWER ATTORNEYS & COUNSELORS
       1717 Main Street
17    Suite 5900
       Dallas, Texas   75201
18
   ALSO PRESENT:
19
       Jason L. Przymus, Videographer
20
                    EXAMINATION INDEX
21 WITNESS           EXAMINED BY            PAGE
   Karl D. Zgoda    Mr. Bankston             4
22
                     EXHIBIT INDEX
23 EXHIBIT   DESCRIPTION                    PAGE
    277    Memo, Zgoda to Lastovich, 3/15/99,   49
24         3MBH01735994
    278    Cobra Filtration Meeting 5/23/00,    54
25         3MBH00025527

STIREWALT & ASSOCIATES
1-800-553-1953   info@stirewalt.com

---

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

4

|  |  |  |
|---|---|---|
| 09:08:25 | 1 | P R O C E E D I N G S |
| 09:08:25 | 2 | (Witness sworn.) |
|  | 3 | KARL D. ZGODA, |
|  | 4 | Called as a witness, being first |
|  | 5 | duly sworn, was examined and |
|  | 6 | testified as follows: |
|  | 7 | EXAMINATION |
|  | 8 | BY MR. BANKSTON: |
| 09:08:39 | 9 | Q.   All right, sir.  Can you state the name for |
| 09:08:41 | 10 | the record? |
| 09:08:41 | 11 | A.   Karl Zgoda. |
| 09:08:42 | 12 | Q.   All right.  Mr. Zgoda, you understand we're |
| 09:08:43 | 13 | here today to talk about a medical device made by 3M |
| 09:08:46 | 14 | known as the Bair Hugger; correct? |
| 09:08:47 | 15 | A.   Correct. |
| 09:08:48 | 16 | Q.   Okay.  You've given a couple depositions |
| 09:08:50 | 17 | before regarding the Bair Hugger. |
| 09:08:52 | 18 | A.   Correct. |
| 09:08:52 | 19 | Q.   Okay.  This -- I believe this will be your |
| 09:08:54 | 20 | third deposition? |
| 09:08:54 | 21 | A.   Yes. |
| 09:08:55 | 22 | Q.   I'm going to go ahead and assume, then, |
| 09:08:56 | 23 | after going over the ground rules in those depos and |
| 09:08:59 | 24 | talking to your lawyers, nothing's unfamiliar about |
| 09:09:02 | 25 | what's going on today.  You understand why you're here |

STIREWALT & ASSOCIATES
1-800-553-1953   info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

37

```
09:38:45  1   A.   They are a firm that's representing me, yes.
09:38:47  2   Q.   Okay. So that's your lawyer. You
09:38:49  3   understand that means you have a relationship with
09:38:49  4   them. You have --
09:38:51  5   A.   If you want --
09:38:52  6   Q.   Okay.
09:38:53  7   A.   If you want to make that connection, sure.
09:38:55  8   Q.   So you're not like a person off the street
09:38:56  9   asking for documents, you're in a collaborative
09:38:59 10   relationship with these folks; right?
09:39:02 11        MR. GOSS:  Object to form.
09:39:07 12   A.   I'd say that's probably an accurate
09:39:10 13   statement.
09:39:11 14   Q.   Right.
09:39:11 15        They're paying you money for you to help
09:39:13 16   them defend the case.
09:39:16 17        MR. GOSS:  Object to form.
09:39:16 18        MR. BREWER:  Objection, assumes facts not
09:39:18 19   in evidence.
09:39:19 20   A.   I would --
09:39:20 21        MR. BREWER:  I think it misstates -- Well
09:39:21 22   anyway. Objection to form.
09:39:23 23   A.   I would say that they have compensated me
09:39:25 24   for my time in preparation for this case.
09:39:31 25   Q.   And you're providing a consulting service to
```

38

```
09:39:32  1   them.
09:39:34  2        MR. GOSS:  Object to form.
09:39:35  3        MR. BREWER:  Objection, assumes facts not
09:39:36  4   in evidence.
09:39:36  5   A.   Yeah, I don't know if I'd call it a
09:39:38  6   consulting service, but I have met with them and went
09:39:42  7   through documents and answered questions related to
09:39:45  8   the timing and development of the 750.
09:39:47  9   Q.   Right. That's the nature of your
09:39:49 10   consulting, right, that you're reviewing technical
09:39:51 11   documents and sharing information with them?
09:39:53 12        MR. BREWER:  Object to the form. I think
09:39:54 13   it misstates the testimony.
09:39:56 14   Q.   Right?
09:39:56 15   A.   I don't have any consulting agreement, and
09:39:57 16   so I'm not sure if "consulting" is the proper term.
09:40:01 17   Q.   Any more; right? You've had a consulting
09:40:03 18   agreement for this litigation, for these Bair Hugger
09:40:06 19   cases.
09:40:06 20   A.   In the previous two depositions, yes.
09:40:09 21   Q.   Okay. So you've been doing consulting, you
09:40:12 22   -- that consulting has included reviewing technical
09:40:14 23   documents and sharing information with the defense.
09:40:18 24   A.   In previous depositions, yes.
09:40:20 25   Q.   Okay. No longer discussing technical
```

39

```
09:40:23  1   documents or sharing information with them?
09:40:25  2   A.   No. We -- We discussed documents, but I
09:40:27  3   didn't have a formal consulting agreement.
09:40:30  4   Q.   Oh, I see. So the difference now is just
09:40:32  5   there's nothing on paper.
09:40:34  6        MR. BREWER:  Objection, --
09:40:34  7        MR. GOSS:  Object to form.
09:40:35  8        MR. BREWER:  -- improper hypothetical.
09:40:39  9   A.   Yeah, I'm not sure I agree with that
09:40:42 10   characterization, but there is no signed document for
09:40:44 11   a legal consulting agreement.
09:40:47 12   Q.   Okay. Let's jump back to where we kind of
09:40:49 13   went off onto a side road there.
09:40:51 14   A.   Okay.
09:40:52 15   Q.   Where we had left off was that you were not
09:40:54 16   personally aware of any testing that had been done
09:40:56 17   with respect to the effect of the Model 750 on the
09:40:58 18   operating room airflow during the development of that
09:41:00 19   product.
09:41:00 20        Do you remember that?
09:41:01 21   A.   Correct.
09:41:02 22   Q.   Okay. And in fact not just -- when it comes
09:41:04 23   down to it, not just testing, but you'll agree with me
09:41:07 24   that during the development of the Model 750, you
09:41:11 25   didn't have any kind of discussions at all with
```

40

```
09:41:14  1   respect to whether it would have an effect on the
09:41:16  2   operating room airflow.
09:41:17  3        MR. GOSS:  Object to form.
09:41:20  4   A.   I don't personally recall any discussions
09:41:23  5   that I had with anyone related to that -- to the
09:41:26  6   impact it would have on the airflow in the OR.
09:41:31  7   Q.   And that means you, as project lead, in
09:41:33  8   discussions with your engineers; correct?
09:41:38  9   A.   Engineers and other team members. But I
09:41:40 10   guess the point I'm trying to make is there may have
09:41:42 11   been discussion between other individual team members
09:41:44 12   that I wasn't present or participating in, so I can't
09:41:47 13   exclude that.
09:41:48 14   Q.   Sure.
09:41:49 15        And this would include you've never had any
09:41:51 16   of kind of those discussions with anybody in the
09:41:53 17   clinical department; correct?
09:41:55 18   A.   I do not recall any discussions, no.
09:41:57 19   Q.   You've never had those kind of discussions
09:41:59 20   with anybody in upper management; correct?
09:42:03 21   A.   Correct. I don't recall any discussions
09:42:04 22   like that.
09:42:05 23   Q.   Okay. Now flow of air in the operating
09:42:07 24   room, airborne contamination, these are important
09:42:09 25   issues; right?
```

STIREWALT & ASSOCIATES
1-800-553-1953   info@stirewalt.com

## Page 41

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1  A. I'm not a surgeon and I'm not an OR expert,
2  but yes, I would agree with that.
3  Q. Well you are the project lead of a medical
4  device that's going to be placed in an operating room
5  with thousands and thousands of patients. You think
6  it's important that you should understand, right, that
7  airborne contamination is an issue to be taken
8  seriously. Am I -- Do you agree with that?
9       MR. GOSS: Object to form.
10 A. I would think that it's important that the
11 company understand that.
12 Q. But not you as the project lead.
13 A. Not necessarily explicitly me, no.
14 Q. Well again, you're the one who has to make
15 sure the product is safe and that the right
16 verification testing has been done in doing that.
17 A. Making sure that the -- the verification
18 testing that was identified is done properly.
19 Q. Okay. It seems to me, then, that the main
20 job of the project lead is basically to just check
21 that other people did their job?
22 A. I think that's an oversimplification, but
23 you're basically the person that's orchestrating the
24 project and making sure that all the tasks that are
25 identified in the product development system are done

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

## Page 42

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1  satisfactorily.
2  Q. Now when we talk about flow of air in the
3  operating room, airborne contamination, --
4  A. Umm-hmm.
5  Q. -- that's an issue the company knew could be
6  a potential hazard if the design of the device didn't
7  account for it.
8       MR. BREWER: Objection, foundation.
9       MR. GOSS: Same objection.
10 A. I'm sorry. Can you repeat it again?
11 Q. Sure.
12      Flow of air in the operating room, airborne
13 contamination, that's an issue the company knew could
14 be a potential hazard if the design of the device did
15 not account for it.
16      MR. BREWER: Objection, --
17      MR. GOSS: Same objection.
18      MR. BREWER: -- foundation.
19 A. I would say some segments of the company
20 would know that, yes.
21 Q. In fact if we look -- Exhibit 47, right,
22 where it talks airborne contaminants can be blown
23 around the room and it lists two ways to mitigate it,
24 and then they had their published testing on units
25 with the same filter and same air output when they

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

## Page 43

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1  validated the device.
2       MR. GOSS: Object to form.
3  Q. In validating the 750, what testing did you
4  rely on?
5  A. As far as validating the device?
6  Q. As far as this, prevention of airborne
7  contamination. What testing did you rely on to assure
8  us that the unit is safe?
9       MR. GOSS: Object to form.
10      MR. BREWER: Objection, assumes facts.
11 A. I would say --
12      I'm not aware of any verification testing
13 that was done internal to the company to verify this,
14 but as far as clinical tests or studies that might
15 have been done after launch of the product, I'm not
16 aware of any of that having been done.
17 Q. Sure. Well let's stick with the
18 development, because as I remember you telling me, if
19 something changes that could impact the safety
20 assurances made in the federal government filings,
21 that needs to be validated and verified.
22      Remember telling me that?
23      MR. GOSS: Object to form.
24 A. I don't know what the filing for the 750
25 said. I a --

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

## Page 44

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1  Q. Sure. Let me just back you up.
2  A. Okay.
3  Q. All I asked you is do you remember telling
4  me that if something changes that could impact the
5  safety assurances in the federal filing it needed to
6  be verified?
7  A. Yes. I recall saying that.
8  Q. Okay. And you will agree with me that
9  something has changed. The air output in this unit
10 has changed.
11 A. Yes, the air output has changed.
12 Q. And the air output is something that is
13 specifically discussed in the safety claims for the
14 unit, the 505.
15 A. Correct.
16 Q. So it would require verification testing
17 that was not performed; correct?
18      MR. GOSS: Object to form.
19 A. Verification testing was performed to verify
20 the increased airflow of the device and the heat
21 transfer rate, but that -- but not anything dealing
22 with OR airflow.
23 Q. Or safety.
24      MR. GOSS: Object to form.
25 A. Well no. I mean there's plenty of safety

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

## Page 205

```
14:03:27  1      You can now acknowledge that that change
14:03:29  2  that you made in airflow may be a cause of the
14:03:32  3  increased particulate counts being observed in
14:03:34  4  studies.
14:03:35  5           MR. GOSS:  Object to form.
14:03:36  6           MR. BREWER:  Objection, foundation.
14:03:39  7      A.  And I don't think I really have the
14:03:42  8  background in those studies or the testing that was
14:03:43  9  done and how they did it, and so I think any opinion I
14:03:47 10  would interject is not of great value.
14:03:51 11      Q.  If you had to do it over again, if we could
14:03:55 12  turn back the hands of time and go back to developing
14:03:58 13  the 750 again, you'd want to make sure these tests
14:04:00 14  were done; wouldn't you?
14:04:04 15      A.  A lot of things are obvious in hindsight,
14:04:07 16  but given where we're sitting today, yes, it probably
14:04:10 17  would have been prudent to do them.  But they were not
14:04:14 18  on my radar to do, so.
14:04:16 19      Q.  As the person who was responsible for the
14:04:18 20  safety and to make sure all the val -- verification
14:04:20 21  testing had been done, that hadn't --
14:04:21 22      A.  Once again --
14:04:22 23      Q.  I'm sorry.  I gotta finish my question
14:04:25 24  before.  She can only take down one of us at a time.
14:04:27 25           As the person who was being responsible for
```

## Page 206

```
14:04:29  1  the safety and verification testing, you could only
14:04:31  2  verify what had been put on your list to verify;
14:04:34  3  correct?
14:04:34  4      A.  Yes.  I'm sorry.
14:04:35  5           I would say that was accurate.  It was my
14:04:37  6  responsibility to make sure that all the verification
14:04:39  7  testing that was identified by the team was executed
14:04:42  8  satisfactorily.
14:04:42  9      Q.  And if that safety issue wasn't put on your
14:04:45 10  radar by somebody, it wasn't going to get checked.
14:04:50 11      A.  I would say that's likely, yes.
14:04:53 12      Q.  Who should have put it on the list?
14:04:59 13      A.  That would just be conjecture on my part.
14:05:05 14  I'm not sure I could say who would be responsible for
14:05:07 15  that.
14:05:09 16      Q.  I've sat in this room many hours and I've
14:05:12 17  talked to many of your colleagues, and I have been
14:05:14 18  looking for a long time for the person who can tell me
14:05:17 19  who's responsible for getting all of the testing done
14:05:19 20  on the 750, making sure that the right things were
14:05:23 21  tested.  And if there is anything you can tell me
14:05:25 22  today about who that person might have been, is there
14:05:28 23  any information that you can have that can lead me to
14:05:31 24  that right person?
14:05:32 25           MR. GOSS:  Object to the preamble.
```

## Page 207

```
14:05:34  1           MR. BANKSTON:  I'll allow it.
14:05:35  2           MR. BREWER:  Objection, foundation.
14:05:37  3      A.  I'm sorry.  Can you either rephrase it or
14:05:41  4  repeat it based on their objections?
14:05:42  5      Q.  Yeah.
14:05:43  6           I've been hoping for a long time to find out
14:05:45  7  who that person is.  You know what I mean when I say
14:05:47  8  "who that person is."
14:05:49  9      A.  Yep.
14:05:49 10      Q.  Is there anything you can tell that tells me
14:05:51 11  who the person is who should have put that information
14:05:53 12  on the list or should have come up with the things
14:05:55 13  that needed to be tested on the Bair Hugger?
14:05:58 14      A.  I'm not sure who that individual would be,
14:06:01 15  and once again, it's a -- you know, it's a team
14:06:04 16  effort, every department is represented.  As part of
14:06:07 17  the effort we identified whatever testing needed to be
14:06:10 18  done to verify and validate the device, and we did
14:06:12 19  that.
14:06:13 20           Now whether you say it's, you know,
14:06:15 21  regulatory because they knew what was filed with the
14:06:18 22  FDA or, you know, clinical because of the
14:06:21 23  applications.  I'm not equipped to say it was one
14:06:24 24  person.
14:06:28 25      Q.  Sometime after you left 3M someone contacted
```

## Page 208

```
14:06:32  1  you to let you know about the existence of a lawsuit
14:06:36  2  involving the Bair Hugger; right?
14:06:38  3      A.  I don't know about the timing of that.  I
14:06:42  4  don't know if I knew about the existence of the
14:06:44  5  lawsuit before I left or not.
14:06:47  6      Q.  Okay.  I see what you're saying.  Okay.
14:06:49  7           But somewhere in the recent timeframe you
14:06:53  8  were informed that there was a lawsuit with the Bair
14:06:55  9  Hugger.
14:06:55 10      A.  Yes.
14:06:56 11      Q.  Who was that who told you; do you remember?
14:06:59 12      A.  I don't recall.  I think it was somebody
14:07:01 13  internal to 3M and not out of the blue, but I can't
14:07:06 14  say definitively who told me.
14:07:07 15      Q.  Okay.  And at that time you negotiated an
14:07:09 16  agreement with a law firm in which they would pay to
14:07:12 17  act you as their consultant.
14:07:15 18      A.  I had an LCA with --
14:07:18 19           So when I left the company 3M made the law
14:07:24 20  firm available to me as part of the litigation
14:07:28 21  arrangement.
14:07:30 22      Q.  No.  What I'm asking is you negotiated an
14:07:34 23  agreement with that law firm in which that law firm
14:07:36 24  would pay you money to consult with them on the
14:07:38 25  lawsuit.
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER (pages 205-208)
STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com