# EXHIBIT 16

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

## Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
- - - - - - - - - - - - - - - - - - -
In Re:
Bair Hugger Forced Air Warming
Products Liability Litigation

This Document Relates To:
All Actions          MDL No. 15-2666 (JNE/FLM)
- - - - - - - - - - - - - - - - - - -

DEPOSITION OF DR. DANIEL SESSLER
VOLUME I, PAGES 1 - 152
JANUARY 11, 2017

(The following is the deposition of DR. DANIEL SESSLER, taken pursuant to Notice of Taking Deposition, via videotape, at the Cleveland Clinic, P Building, Conference Room P77-013, 2070 East 90th Street, Cleveland, Ohio, commencing at approximately 10:11 o'clock a.m., January 11, 2017.)

## Page 2

```
 1  APPEARANCES:
 2     On Behalf of the Plaintiffs:
 3        Jan M. Conlin
          CIRESI CONLIN L.L.P.
 4        225 South 6th Street, Suite 4600
          Minneapolis, Minnesota  55402
 5
          Gabriel Assaad
 6        KENNEDY HODGES
          4409 Montrose Boulevard, Suite 200
 7        Houston, Texas  77006
 8     On Behalf of Defendants:
 9        Corey L. Gordon and Peter J. Goss
          BLACKWELL BURKE P.A.
10        432 South Seventh Street, Suite 2500
          Minneapolis, Minnesota  55415
11
       On Behalf of the Deponent:
12
          Sandra M. DiFranco
13        Cleveland Clinic Law Department
          2070 East 90th Street
14        Cleveland, Ohio  44195
```

## Page 3

```
 1              I N D E X
 2   EXHIBITS     DESCRIPTION       PAGE MARKED
 3   Ex  226  Excel spreadsheet of data,
 4            3MBH00049711-3            39
 5   227  E-mail string, 3MBH00024866   95
 6   228  E-mail string, 3MBH01054232-4  121
 7   229  E-mail with attachment,
 8        3MBH01621689-95              123
 9   230  E-mail, 3MBH01486024         125
10   231  E-mail string, 3MBH01534469-71  131
11   232  E-mail string, 3M00585482-3  143
12   233  E-mail, 3MBH00518536         145
13   234  Sessler deposition transcript
14        dated November 20, 2015      150
15   235  Sessler deposition transcript
16        dated July 9, 2015           150
17   236  Sessler deposition transcript
18        dated May 27, 2015           150
```

## Page 4

```
 1              PROCEEDINGS
 2        (Witness sworn.)
 3           DR. DANIEL SESSLER
 4   called as a witness, being first duly sworn,
 5   was examined and testified as follows:
 6           ADVERSE EXAMINATION
 7   BY MS. CONLIN:
 8      Q.  Good morning, Dr. Sessler.  We've not met
 9   before; correct?
10      A.  Correct.
11      Q.  Okay.  I represent plaintiffs in an action
12   that's been brought against 3M involving the Bair
13   Hugger device.  Do you understand that?
14      A.  Yes.
15      Q.  Okay.  And you, in fact, were deposed a
16   number of times in connection with this Bair Hugger
17   device in connection with the Walton and Johnson Texas
18   litigations; correct?
19      A.  I was deposed a number of times.  I am not
20   sure what it was about.
21      Q.  Okay.  But you did --
22          You were deposed three times as it relates
23   to your work and advice regarding the Bair Hugger
24   device; correct?
25      A.  Correct.
```

1 (Pages 1 to 4)

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN   1-800-553-1953   info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 37

1  from moving downstream from the filter into the hose
2  and into the blanket?
3       MR. GORDON: Object to the form of the
4  question.
5       A. Yes.
6       Q. Okay. Have you ever seen anything where 3M
7  or Arizant have advised publicly that if a machine is
8  con -- found to be contaminated, that the filter
9  should be scrapped and treated as biohazardous waste?
10      A. No.
11      Q. Okay. Have you seen any documents or had
12 any discussions with 3M regarding advice they have
13 given to people who have called in, users of the Bair
14 Hugger, that you should not blow the dust out of the
15 machine?
16      A. No.
17      Q. Would that be something that you'd want to
18 know?
19      A. That -- that sounds pretty technical.
20 I'm -- I'm not sure how to interpret that.
21      Q. Okay. If we look back at your study --
22      Well let me ask it a different way. Let me
23 ask you another question on that. Do you know
24 whether, as these machines are used in surgery, after
25 surgery, whether the pathogens build up inside?

Page 38

1       A. No.
2       Q. And you've just assumed that the filter is
3  going to do its job; right?
4       A. Yes.
5       Q. Why do you think the Bair Hugger had a HEPA
6  filter?
7       A. Presumably, I was told that at some point,
8  but I don't remember how.
9       Q. Okay. Now if we can look under the
10 "RESULTS" section of this study, which is on Bates
11 page 985630, under the "RESULTS" section you say,
12 "With the Arizant 522 upper body cover, background
13 par -- particle Cx were reduced to approximately 5 log
14 by the laminar flow system, and there were no
15 statistically significant or clinically important
16 differences among the 3 blower settings: off, ambient
17 air, and high." Do you see that?
18      A. Yes.
19      Q. And how did you go about arriving at the
20 conclusion that there was no clinical -- clinically
21 important differences between the three settings?
22      A. If you look at Figure 2, the columns for no
23 air, ambient air and warm air are virtually the same
24 height, and they're all way below the two log
25 reduction line.

Page 39

1       Q. Well you understand the two log reduction
2  line --
3       I mean the DIN standard isn't designed to
4  evaluate Bair Hugger; right? What you were doing was
5  saying you can use the Bair Hugger and still meet the
6  DIN standard; right, doctor?
7       A. The question was whether forced-air warming;
8  that is, warm air disturbs laminar flow and makes it
9  substantially less effective than it would be
10 otherwise, so the DIN standard is highly relevant. In
11 any case, whether or not you believe that, there's no
12 important difference here.
13      Q. Okay. And if we look at Figure 2, you've
14 got -- the scale goes from 1, 10, 100 to 1000; right?
15      A. It's a log scale.
16      Q. And then 10,000; right?
17      A. Yes.
18      Q. All right.
19      (Exhibit 226 was marked for
20      identification.)
21 BY MS. CONLIN:
22      Q. I've handed you, Dr. Sessler, what's been
23 marked as Exhibit 226, which is the raw data that Gary
24 Hansen produced regarding the study which is reflected
25 in (Belani) Exhibit 16, your paper.

Page 40

1       MS. DIFRANCO: Have you a chance to look at
2  it?
3       THE WITNESS: Yes.
4       Q. Now this is the data that went into the
5  paper that you authored with Dr. Olmstead and Dr.
6  Kuelpmann; correct?
7       A. I -- I assume.
8       Q. Okay. And there were five runs both with
9  the 522 blanket and five runs with the 635 blanket;
10 right?
11      A. Looks like it.
12      Q. Okay. And if we take a look at the 635
13 blanket, which is on the right-hand side of Exhibit
14 226, --
15      A. Yes.
16      Q. -- the 625 is the underbody blanket;
17 correct, doctor?
18      A. I'll take your word for it.
19      Q. Okay. If you want to look back at the front
20 of your article, it indicates that it's the underbody
21 blanket, so --
22      A. I'll take your word for it.
23      Q. All right. So in the last run there were 28
24 particles measured over the -- the hypothetical
25 surgical site with the Bair Hugger off; correct?

Page 53

1    Q. And what did you understand that to be
2    reference to?
3    A. Well, doing a bunch of t-tests comparing
4    different average results.
5    Q. Well isn't he noting there, Mr. Hansen, that
6    if you use the t-test on the data that was generated
7    in connection with the Amersfoort and Utrecht testing,
8    that none of the differences are significant to within
9    a 95-percent confidence?
10   A. That's what the note says, yes.
11   Q. Okay. And then he writes, "It won't escape
12   notice that the number of samples is small;" correct?
13   A. Yes.
14   Q. Meaning that there were five runs for five
15   minutes each; correct?
16   A. Correct.
17      MR. GORDON: Object to the form.
18   Q. Are you aware of surgeries that take place
19   over five minutes?
20   A. That's completely irrelevant.
21   Q. My question is: Are you aware of any
22   surgeries that take place over five minutes?
23   A. Sure.
24   Q. Okay. What?
25   A. D&C.

Page 54

1    Q. Okay. Anything else?
2    A. Ear tubes.
3    Q. I'd say that you're right on that one. I've
4    had -- my kids have had a few.
5       You would agree with me that most surgeries
6    are not five minutes or less; correct?
7    A. I agree.
8    Q. And an orthopedic surgery might take an hour
9    as an example; correct?
10   A. Correct.
11   Q. Now you've actually also stated that the --
12   whether forced-air warming is effective or necessary
13   in the first hour of a surgery is sort of an open
14   question; right?
15   A. Depends how you define efficacy.
16   Q. Okay. But you've in fact stated that
17   previously; correct?
18   A. Depends how you define efficacy, but yes.
19   Q. Okay. And you don't have any information to
20   suggest that a Bair Hugger in use for an orthopedic
21   surgery is somehow more effective than, say, a
22   resistive blanket; correct?
23   A. We've tested two resistive blankets and they
24   had comparable efficacy.
25   Q. Okay. There -- there would be no medical

Page 55

1    reason why you'd need to use a Bair Hugger as opposed
2    to one of these resistive blankets; correct?
3    A. Resistive blankets can cause burns. And
4    they haven't been used that much. How safe they are
5    in terms of thermal injury remains to be determined.
6    Q. Okay. Setting aside thermal injury and
7    assuming you have a safe blanket, there would be no
8    medical reason to choose a Bair Hugger over a
9    resistive therapy; correct?
10      MR. GORDON: Object to the form of the
11   question.
12   A. Well if you stipulate that safety is the
13   same, the efficacy is comparable.
14   Q. Okay. What if the safety of the Bair Hugger
15   was less because it increased the possibility that
16   bacterial pathogens could enter the surgical site?
17      MR. GORDON: Object to the form of the
18   question.
19   A. If -- if forced air causes harm, causes
20   complications, and you stipulate, based on nothing,
21   that some other tech -- technique doesn't, sure.
22   But -- but there's no basis for either of those
23   assumptions.
24   Q. Okay. And in fact one of the things that
25   you're on record as saying is that the Bair Hugger has

Page 56

1    been used in lots of surgeries with no evidence of
2    injury or infections; correct?
3    A. As far as I know, forced air has not caused
4    thermal injury, used correctly.
5    Q. Well I meant --
6       My question was a little different.
7    A. I'm sorry.
8    Q. You're on record as stating you think
9    forced-air warming, Bair Hugger, is safe in surgeries
10   and doesn't increase the risk of infection; correct?
11   A. I believe it reduces the risk of infection.
12   Q. And in --
13   A. Based -- based on available data, that's
14   what you have to conclude.
15   Q. Okay. And in fact, one of the reasons you
16   say that is because you say it's been used in lots of
17   surgeries and there haven't been complaints; correct?
18   A. No.
19   Q. You haven't said that?
20   A. That isn't the reason.
21   Q. What isn't the reason, doctor?
22   A. I -- I believe you said that I've said
23   that --
24      Let -- let's go back to your question
25   because it was a two-part question and you -- you

Page 61

1   Q.  Okay.  Now in the next paragraph you say,
2   "What clinicians will want to see is basically
3   particle counts under three test circumstances (Off,
4   Ambient, and Warm)."  Do you see that?
5   A.  Yup.
6   Q.  Then you write, "Any substantial increase
7   will still concern them and basically validate Scott's
8   point that forced-air warming increases risk.  We can
9   try to convince them that the increase isn't important
10  or that operating rooms still meet DIN standards, but
11  that will be a bit tricky."  Do you see that?
12  A.  Yup.
13  Q.  You knew that physicians would want to see
14  whether, in an individual case such as the 65 -- or
15  635 testing in Amersfoort, that there was a
16  substantial increase in particulates; correct?
17  A.  No, that's not what that means.
18  Q.  Okay.  What -- what -- what were you saying
19  there?
20  A.  That first it --
21      Note the third paragraph where I correct the
22  statistical approach.  You need to look at all the
23  data; you can't just pick one piece of data, one line,
24  one run, and say this characterizes the results.
25  Q.  Okay.

Page 62

1   A.  That's -- that's called data selection; it's
2   a type of research fraud.
3   Q.  Would you agree --
4   A.  You have to look at all the data.
5   Q.  Would you agree with me that any substantial
6   increase would concern clin -- clinicians?
7   A.  Average increase, not -- not results from
8   one run and one circumstance.
9   Q.  Would you agree with me that any substantial
10  increase would concern clinicians?
11      MR. GORDON:  Object to the form of the
12  question, also lack of foundation.
13  A.  Any substantial increase in average values
14  over all conditions would concern people.
15  Q.  Okay.  And then you say in the third
16  paragraph, "Possibly the best statistical approach
17  would be an ANOVA with cover type...;" correct?
18  A.  Yes.
19  Q.  And that's in fact what you guys have ended
20  up doing; correct?
21  A.  Correct.
22  Q.  Okay.  And ANOVA is basically analysis of
23  variance; right?
24  A.  Yes.
25  Q.  And then you say, "But perhaps it would be

Page 63

1   best to consider the hospitals together since that
2   isn't really a factor of interest; and the cover type
3   could be unpaired."  Do you see that?
4   A.  Uh-huh.  Yes.
5   Q.  And in fact what you were describing there
6   is rather than show the results from the two hospitals
7   separately, you were going to group them together for
8   the purposes of the paper; right?
9   A.  Yes, because it -- that's the way it should
10  have been done.  That's -- that's the correct way of
11  handling these data.
12  Q.  Why is it the correct way of handling these
13  data?
14  A.  Because the two hospitals together
15  characterize the general case better than either
16  hospital alone.
17  Q.  Well you know that ORs are different; right?
18  A.  Sure.
19  Q.  Okay.  That can be a confounding factor;
20  right?
21  A.  Could be.
22      MR. GORDON:  Object to the form of the
23  question.
24  Q.  Could be a confounding factor.
25      Did you do any investigation as to whether

Page 64

1   the machine that was used in Amersfoort might have
2   been a used one versus a new one?
3   A.  No.
4   Q.  Or that there was different protocols for
5   how they clean the OR?
6   A.  No.  But it's not relevant to this study,
7   which used artificial particles.  This had nothing to
8   do with bacteria.
9   Q.  Well I think we've already established you
10  don't know whether the Bair Hugger sucks in
11  particulates from off the floor and spews them out
12  into the surgical site; right?
13      MR. GORDON:  Object to the form of the
14  question.
15  A.  I don't think that's relevant to this study
16  where there are 20 million particles floating around
17  that are deliberately introduced.
18  Q.  So it wouldn't be of clinical interest to
19  you.
20  A.  You -- you're confusing two different
21  circumstances.  One is whether forced-air warmers pick
22  up bacteria, retain bacteria or somehow eject
23  bacteria.  If they do, that's a problem.  A second
24  issue, which is what this paper is about, is whether
25  warm air interferes with the laminar flow column.  Has

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 65

1 nothing to do with bacteria.
2 Q. Okay. And you -- you --
3    I think we've established this. You're not
4 an expert on laminar flow or how particulates move in
5 the environment; right?
6 A. I'm not.
7 Q. So you -- you basic --
8    Did you ask anybody why it was that the
9 Amersfoort data appeared so different in terms of the
10 particulate counts?
11    MR. GORDON: Object to the form of the
12 question.
13 A. I don't remember.
14 Q. Was it of interest to you?
15 A. Absolutely.
16 Q. What do you recall doing in connection with
17 that data?
18 A. When you do multicenter studies, it's
19 absolutely routine and normal for the results to
20 differ in the various centers. You -- you expect that
21 just by random motion. And it's also true that the
22 centers are truly different; they have different
23 operating rooms, different anesthesia, different
24 protocols, so you expect real differences among sites
25 in a multicenter study. But you do a multicenter

Page 66

1 study to enhance generalizability. You take all the
2 results you have and you put them together and you
3 present the average because that best characterizes
4 what you know, and that's what we did here.
5 Q. And in this case you did five samples, five
6 runs five minutes each in two hospitals; correct?
7 A. Yes.
8 Q. And in fact you noted here that there were
9 only five measurements; right?
10 A. Correct.
11 Q. So you're standing behind your proposition
12 that this is not an under -- underpowered study;
13 correct?
14    MR. GORDON: Object to the form of the
15 question.
16 A. Correct.
17 Q. Could pooling the data from Amersfoort and
18 Utrecht confound the data?
19 A. No.
20 Q. Why not?
21 A. "Confounding" has a specific meaning, has to
22 be something that's related to exposure and outcome.
23 I don't see how pooling induces confounding.
24 Q. Now I think we talked about this before, but
25 Gary Hansen did the first draft; is that right?

Page 67

1 A. Yes.
2 Q. And then Dr. Olmstead took a crack at it; is
3 that right?
4 A. Yes.
5 Q. And then you edited it; correct?
6 A. "Edited" is a generous term. Virtually
7 every word in the published manuscript was mine.
8 Q. I've handed you, Dr. Sessler, what's been
9 previously marked as Deposition Exhibit 79, which is a
10 marked-up draft of your study which eventually was
11 published and has been previously marked as (Belani)
12 Exhibit 16; correct?
13 A. Yes.
14 Q. Okay. And you were part of this editing
15 process; correct?
16 A. Yes.
17 Q. If we can take a look at draft -- the draft
18 page seven, which bears Bates number 50592, and if we
19 can look at the middle paragraph starting with "We
20 found..."
21 A. Yes.
22 Q. Okay. Midway down there there is a section
23 which in this draft reads, "There were noticeable
24 differences in the results between the two operating
25 rooms, probably the result of small differences in

Page 68

1 draping around the OR table, and also perhaps due to
2 differences in the laminar flow systems." Do you see
3 that?
4 A. I do.
5 Q. And there was a deleted box beside that, and
6 what was deleted is "The significantly higher counts
7 seen with the blanket model 635 reflected conditions
8 at OR Amersfoort" or "A..." Do you see that?
9 A. I see it, yes.
10 Q. Okay. Who made the decision to delete from
11 this transcript that there had been significantly
12 higher counts seen with the underbody blanket at the
13 Amersfoort hospital?
14 A. Well, whoever edited the document.
15 Q. Do you know if that was Mr. Hansen at 3M?
16 A. I have no idea who was editing at this
17 point.
18 Q. Okay. Was that something that you had
19 drafted originally, that you had found significantly
20 higher counts seen with the blanket model 635 in
21 Amersfoort?
22 A. I'm not sure I understand the question.
23 Q. My question is: Do you know whether you
24 were the person who originally put in the draft that
25 there had been significantly higher counts seen with

17 (Pages 65 to 68)