EXHIBIT 32

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
- - - - - - - - - - - - - - - - -
In Re:
Bair Hugger Forced Air Warming
Products Liability Litigation

This Document Relates To:
All Actions          MDL No. 15-2666 (JNE/FLM)
- - - - - - - - - - - - - - - - -

DEPOSITION OF TROY W. BERGSTROM
VOLUME I, PAGES 1 - 259
NOVEMBER 18, 2016

(The following is the deposition of TROY W. BERGSTROM, taken pursuant to Notice of Taking Deposition, via videotape, at the offices of Ciresi Conlin L.L.P., 225 South 6th Street, Suite 4600, Minneapolis, Minnesota, commencing at approximately 9:04 o'clock a.m., November 18, 2016.)

Page 2

1  APPEARANCES:
2    On Behalf of the Plaintiffs:
3      Mark D. Bankston
       KASTER, LYNCH, FARRAR & BALL LLP
4      1010 Lamar, Suite 1600
       Houston, Texas  77002
5
       Gabriel Assaad
6      KENNEDY HODGES
       4409 Montrose Boulevard, Suite 200
7      Houston, Texas  77006
8      Noah Lauricella
       GOLDENBERG LAW
9      800 LaSalle Avenue, Suite 2150
       Minneapolis, Minnesota  55402
10
     On Behalf of Defendants:
11
       Mary S. Young
12     BLACKWELL BURKE
       431 South Seventh Street, Suite 2500
13     Minneapolis, Minnesota  55415
14     Bridget M. Ahmann
       FAEGRE BAKER DANIELS
15     2200 Wells Fargo Center
       90 South Seventh Street
16     Minneapolis, Minnesota  55402-3901
17   ALSO APPEARING:
18     Ronald M. Huber, Videographer

Page 3

INDEX
EXHIBITS    DESCRIPTION           PAGE MARKED
Ex 79  Forced-Air Warming Does Not Worsen
       Air Quality in Laminar-Flow
       Operating Rooms, by Olmstead, et al,
       3MBH00050586-610            24
   80  E-mail chain, 3M00575233-6    26
   81  E-mail chain, 3MBH01224622    29
   82  E-mail chain, 3MBH00130429-32  31
   83  Routing & Approval Form       36
   84  E-mail chain, 3M00574121-3    38
   85  E-mail chain, 3MBH00083780    43
   86  E-mail chain, 3MBH01211442    45
   87  E-mail chain, 3MBH00549464-8  47
   88  E-mail chain with attached
       Parvisi article, no Bates numbers  50
   89  E-mail chain, 3MBH01223897    59
   90  E-mail chain, 3MBH00024733-4  62
   91  Forced-air warming: a source
       of airborne contamination in
       the operating room, by Albrecht,
       et al                          66
   92  Forced-air warming blowers:
       An evaluation of filtration
       adequacy and airborne contamination

Page 4

       emissions in the operating room,
       by Albrecht, et al             68
   93  Forced-air warming and ultra-
       clean ventilation do not mix, by
       McGovern, et al                68
   94  Do forced air patient-warming
       devices disrupt unidirectional
       downward airflow, by Legg, et al  69
   95  Effect of forced-air warming
       on the performance of operating
       theatre laminar flow ventilation,
       by Dasari, et al               70
   96  Forced-air patient warming
       blankets disrupt unidirectional
       airflow, by Legg, et al        70
   97  Patient Warming Excess Heat: The
       Effects on Orthopedic Operating
       Room Ventilation Performance, by
       Belani, et al                  71
   98  Forced-air Warming Design:
       Evaluation of Intake Filtration,
       Internal Microbial Buildup, and
       Airborne-Contamination Emissions,
       by Reed, et al                 71
   99  Infection control hazards

Page 5

       associated with the use of forced-
       air warming in operating
       theatres, by Wood, et al         72
100   Persistent Acinetobacter
       baumannii? Look Inside Your
       Medical Equipment, by Bernards,
       et al                            73
101   E-mail chain, 3MBH00002412-4     74
102   Brainerd Ventilation Assessment,
       3MBH00054326-31                 76
103   Valued Customers letter dated
       November 1, 2006, 3MBH00008941  78
104   E-mail chain, 3MBH00038981-2    80
105   BAIR Argument Brainstorm -
       August 5, 2008, 3MBH00038989    83
106   Talking Points, Kimberger et
       al, 2008, 3MBH00002455-7        93
107   Arizant forced-air warming and
       SSI prevention: Talking points
       for sales, 3MBH00005575-6       100
108   E-mail chain, 3M00555835-9      110
109   Side-by-side comparison of two
       recent studies examining the
       impact of forced-air warming
       in laminar flow ORs,

Page 6

       3M00555646-9                   117
110   Draft response document,
       3M00555635                     124
111   Infection Control Today
       Responses 1.14.13, 3M00555406  129
112   Request for Research dated
       April 29, 2010, 3MBH00024193-6 132
113   Talking points: New HotDog
       study in the Journal of Bone
       & Joint Surgery, 3M00556378-9  136
114   E-mail, 3MBH01191980            142
115   E-mail, 3M00580524-7            148
116   FAQs, 3MBH01192634-5            153
117   Proceedings of the International
       Concensus Meeting on
       Periprosthetic Joint Infection 156
118   Response Communication Plan,
       3MBH00005744-62                162
119   E-mail chain, 3MBH00107443-5   180
120   E-mail chain, 3MBH00022366     182
121   E-mail chain, 3MBH00126140-2   186
122   Marketing Routing Form (MRF),
       3MBH00007500-9                 188
123   Concept Prototype, 3MBH00022658 195
124   E-mail chain, 3MBH00542396-8   197

Page 7

125   E-mail chain, 3MBH00051009-10   214
126   E-mail, 3MBH01253823            217
127   E-mail, 3MBH00051040            220
128   E-mail chain, 3M00577468-70    224
129   CRM Weekly Report for Sunday,
       January 02, 2011, 3MBH00052987 229
130   E-mail chain, 3MBH00544754-5   233
131   E-mail chain, 3MBH01285217     236
132   E-mail chain, 3MBH00042660-1   237
133   E-mail chain, 3MBH00134035-9   243
134   E-mail chain, 3MBH01330587-92  244

Page 8

            PROCEEDINGS
         (Witness sworn.)
            TROY W. BERGSTROM
    called as a witness, being first duly sworn,
    was examined and testified as follows:
            ADVERSE EXAMINATION
    BY MR. BANKSTON:
       Q.  Good morning, Mr. Bergstrom.
       A.  **Good morning.**
       Q.  I think we mentioned when we came in the
    room this is our third time together; correct?
       A.  **Yes, correct.**
       Q.  Okay. Just to kind of give you a reminder,
    the first time we met I was representing a gentleman
    from Texas named Mr. Walton who filed a lawsuit
    alleging a surgical-site infection. Do you remember
    that deposition?
       A.  **I do, yes.**
       Q.  Okay. And then the next time we met I was
    representing a man named Timothy Johnson from Kansas
    who had filed a similar lawsuit, and I think I told
    you at the time even though I'm the same person, I
    might be asking you a lot of the same questions, there
    might be some overlap, consider me a new lawyer even
    though I'm the same face.

Page 65

1  A. Did I instruct the sales managers? I don't
2  think I instructed. I know it was one tool they
3  were -- were provided.
4  Q. Did you have regular contact with
5  salespeople inside the company?
6  A. Periodically. Not -- not frequently.
7  Q. Okay. When Ms. Tullis says, "This issue is
8  everywhere," what did you take that to mean?
9  A. I take it to mean that -- that it's -- she's
10 faced questions from more than one account in her
11 territory.
12 Q. Okay. And in fact this one that she's
13 forwarded you talks about literature that seems to
14 support the idea that there is a -- a potential hazard
15 here. You were aware of such literature; correct?
16     MS. AHMANN: Object to form.
17 A. I guess I'm not sure on the specific
18 literature she's referring to. It could have been
19 some of the early research that was done in
20 conjunction with Augustine Temperature Management or
21 it could have been his Blowing Air Is Risky campaign.
22 Q. Okay. I want to talk to you a little bit
23 about some of that specific literature and -- and
24 your -- maybe your familiarity with it, how you've
25 ever worked with it, some questions like that. So I'd

Page 66

1  like to go over some of those, kind of switch topics.
2  A. Okay.
3  Q. And I'm going to be handing you some
4  scientific studies, and we can go ahead and mark them
5  as exhibits. I'm -- I'm really only giving you for --
6  to refresh your --
7     You need to understand what study I'm
8  talking about.
9  A. Okay.
10 Q. And I want you to understand I'm not trying
11 to go at you with science or any of those sorts of
12 things. I just want to understand your familiarity.
13 And so the first one is -- that I'm going to hand
14 you --
15    MR. BANKSTON: Go ahead and mark that.
16    MS. AHMANN: And again, do you have any
17 copies of these?
18    MR. BANKSTON: I do not. I just have one.
19 I hadn't -- really didn't intend to mark these in as
20 an exhibit. If you'd like me to make copies of each
21 of these, I can.
22    (Exhibit 91 was marked for
23    identification.)
24    MR. BANKSTON: But I really only have one
25 question on it.

Page 67

1     MS. AHMANN: Let me take a look.
2  BY MR. BANKSTON:
3  Q. And Mr. Bergstrom, I'm just wondering,
4  have -- do you have memory of ever seeing this?
5  A. I would have seen it, yes.
6  Q. And do you remember ever being instructed to
7  draft talking points discrediting this study?
8     MS. AHMANN: Object to form.
9  A. I don't remember being asked to develop
10 talking points specifically to discredit. We would
11 have developed talking points that the sales used --
12 our sales team could use in response to the article.
13 Q. You would agree with me that, with regard to
14 literature that was critical of forced-air warming
15 from the standpoint of orthopedic infections, it was a
16 goal of the marketing department to discredit those
17 studies.
18 A. I don't believe "discredit" is the right
19 word, no.
20 Q. Okay.
21 A. I believe the goal of the marketing
22 department was to review those papers, as we would any
23 paper, examine the strengths and weaknesses and then
24 provide the responses that our -- our sales force
25 could use.

Page 68

1  Q. Okay.
2     (Exhibit 92 was marked for
3     identification.)
4  BY MR. BANKSTON:
5  Q. Mr. Bergstrom, I've handed you Exhibit 92,
6  which is entitled "Forced-Air warming blowers: An
7  evaluation of filtration adequacy and airborne
8  contamination emissions in the operating room." Do
9  you recall ever seeing this study?
10 A. I would have seen it and I would have read
11 through it, yes.
12 Q. Were --
13    Did you ever recall being given instructions
14 to draft talking points on this study?
15 A. Yes, we would have -- our team would have
16 drafted talking points.
17 Q. And again, on this question again, was it a
18 goal of your department to discredit this study?
19 A. It was to provide our sales reps with
20 responses on how to address concerns about the
21 misinformation.
22 Q. Okay.
23    (Exhibit 93 was marked for
24    identification.)
25 BY MR. BANKSTON:

Page 69

1    Q. Mr. Bergstrom, I've handed you another
2 study, Exhibit 93. This study is entitled "Forced-Air
3 warming and ultra-clean ventilation do not mix." Do
4 you recall ever seeing this study?
5    A. Yes, I would have seen this.
6    Q. Do you recall being instructed to draft
7 talking points to your customers about this study?
8    A. Myself and the team would have drafted
9 talking points again to -- to address the
10 misinformation.
11   Q. Okay. When you say "misinformation," those
12 talking points would have been critical of this study.
13   A. There are some that are critical in terms of
14 the -- the way this study was set up and things that
15 were -- were overlooked and not -- not included, yes.
16   Q. Okay.
17       (Exhibit 94 was marked for
18       identification.)
19 BY MR. BANKSTON:
20   Q. Mr. Bergstrom, I've handed you Exhibit 94, a
21 scientific study entitled "Do forced air patient-
22 warming devices disrupt unidirectional downward
23 airflow?" Do you recall ever seeing this study?
24   A. Yes, I would have read this study.
25   Q. Okay. Do you recall being instructed to

Page 70

1 draft talking points critical of this study?
2    A. I likely would have directed talking points
3 the sales reps could use to respond to concerns about
4 the misinformation.
5    Q. Okay.
6       (Exhibit 95 was marked for
7       identification.)
8 BY MR. BANKSTON:
9    Q. I have handed you what's been marked as
10 Exhibit 95. This is a scientific study entitled
11 "Effect of forced-air warming on the performance of
12 operating theatre laminar flow ventilation." Do you
13 recall receiving this study?
14   A. Yes, I would have read it.
15   Q. Were you also instructed on this study to
16 draft talking points critical of the study?
17   A. I would have drafted -- myself and the team
18 would have drafted talking points again for the sales
19 reps to use to address this study's shortcomings and
20 misinformation provided.
21   Q. Okay.
22       (Exhibit 96 was marked for
23       identification.)
24 BY MR. BANKSTON:
25   Q. Mr. Bergstrom, I've handed you Exhibit 96,

Page 71

1 another scientific study entitled "Forced-air patient
2 warming blankets disrupt unidirectional airflow."
3 Were you provided a copy of this study at any time?
4    A. I would have read this study, yes.
5    Q. And likewise, you were also instructed to
6 draft talking points critical of this study.
7    A. I would have addressed talking points to
8 address misinformation, yes.
9    Q. Okay.
10      (Exhibit 97 was marked for
11      identification.)
12 BY MR. BANKSTON:
13   Q. I've now handed you Exhibit 97, a scientific
14 study entitled "Patient Warming Excess Heat: The
15 Effects of Orthopedic Operating Room Ventilation
16 Performance." Do you recall ever receiving a copy of
17 this study?
18   A. Yes, I would have reviewed this study.
19   Q. And you were instructed to draft talking
20 points critical of this study; correct?
21   A. I would have addressed talk -- or addressed
22 talking points -- provided talking points to, again,
23 address the misinformation that's included.
24      (Exhibit 98 was marked for
25      identification.)

Page 72

1 BY MR. BANKSTON:
2    Q. Mr. Bergstrom, I've handed you Exhibit 98, a
3 scientific study entitled "Forced-Air Warming Design:
4 Evaluation of Intake Filtration, Internal Microbial
5 Buildup, and Airborne-Contamination Emissions." Were
6 you provided a copy of this study?
7    A. I was provided a copy of this study --
8    Q. And --
9    A. -- and would have -- would have prep -- done
10 talking points to address the misinformation.
11   Q. I'm glad you're already anticipating here.
12 Let's move on to our final one.
13      (Exhibit 99 was marked for
14      identification.)
15 BY MR. BANKSTON:
16   Q. I have now handed you Exhibit 99, a
17 scientific study entitled "Infection control hazards
18 associated with the use of forced-air warming in
19 operating theatres." Were you provided a copy of this
20 study?
21   A. Yes, I would have reviewed this study.
22   Q. Okay. And with this study, you would have
23 also drafted talking points critical of the study.
24   A. Yes, I believe we drafted talking points.
25   Q. Okay. You now have in front of you --

Page 93

1  Q. Okay. What does that word mean to you, that
2  phrase "burden of proof?"
3  A. I believe it means that he needs to find
4  evidence to support his accusations.
5  Q. Okay. In other words --
6  A. That doesn't mean we're going to disregard
7  concerns that are raised by customers.
8  Q. So would you agree with me that Arizant also
9  has the burden of proof?
10  A. And we've --
11     Bair Hugger is -- is safe and effective.
12  That's been proven by the literature over the years,
13  the two hundred clinical studies -- two hundred
14  million patients warmed.
15  Q. We'll get back to that in a second.
16     (Discussion off the stenographic record.)
17     (Exhibit 106 was marked for
18     identification.)
19  BY MR. BANKSTON:
20  Q. Mr. Bergstrom, I'm going start talking about
21  the term "talking points." Can you tell us what that
22  term means?
23  A. Talking points are developed to help the
24  audience, it could be a -- an executive team, it could
25  be our sales reps, prepare them some key points that

Page 94

1  they can share with customers.
2  Q. Okay. Now the exhibit I have handed you now
3  is a November 4th, 2008 set of talking points that
4  came out of your department. I'm wondering if you
5  remember this Kimberger study?
6  A. I don't remember the study. I don't
7  remember actually developing these talking points
8  either.
9  Q. Okay. Do you see where it has a discussion
10  of authorship and sponsorship?
11  A. Yes, I do.
12  Q. Okay. And it says there in the middle of
13  that paragraph, "ABAD was not listed as a sponsor..."
14     Who is ABAD?
15  A. That's Augustine Biomedical + Design.
16  Q. Okay. That is your competitor.
17  A. Dr. Augustine.
18  Q. Dr. Augustine. Okay.
19     And it states here that they were not a
20  sponsor, they had donated some equipment, "...and the
21  authors disclaim any involvement of the sponsors in
22  the preparation of the paper..." The next sentence in
23  bold says, "Certain portions of the paper read like
24  ABAD talking points; could they have assisted as
25  non-sponsors?" Do you see that?

Page 95

1  A. I do.
2  Q. Okay. Can you tell me why that might be
3  relevant or important?
4     MS. AHMANN: Object to the form.
5  A. It seems like a question that is -- is being
6  asked. I don't know that these are final talking
7  points. Perhaps they were submitted for review and
8  that's a question that they wanted to rectify.
9  Q. So at this point there's no real indication
10  that your competitor was a sponsor of this paper, but
11  there's still some concern that they could have
12  assisted in the drafting or creation of this study.
13  Does that raise any concern to you?
14     MS. AHMANN: Does what? Does what raise a
15  concern?
16  Q. The statement I just made, that they are not
17  listed as a sponsor but could have potentially
18  assisted in the preparation of the paper. Does that
19  raise any concern to you?
20  A. With me, not necessarily. But again, it's
21  not my -- this isn't my -- clinical studies and what's
22  involved in conducting a clinical study isn't -- isn't
23  in my arena and scope.
24  Q. Would you agree with me that what is being
25  communicated here is that there may be questions about

Page 96

1  the independence of the study's authors and the
2  company that may or may not have been involved in it?
3  A. I think the question as written is saying
4  it's an area to look into further.
5  Q. And why would you want to look into that?
6     MS. AHMANN: Object to form.
7  A. You know, these -- I'm --
8     It's not my area of expertise. I don't
9  know.
10  Q. Well if the sponsor participated in the
11  drafting of the paper, --
12  A. Uh-huh.
13  Q. -- could that raise questions about the
14  independence of the scientists from the company?
15  A. Potentially, yes.
16  Q. Okay.
17     THE REPORTER: We have to change disks. Off
18  the record, please.
19     (Recess taken.)
20  BY MR. BANKSTON:
21  Q. Mr. Bergstrom, before we went on break we
22  had been talking about various studies, and I
23  believe -- you know, you've told me numerous times it
24  was never your intention to discredit this -- these
25  studies, it's always been your intention to prevent

24 (Pages 93 to 96)

Page 169

1    Q. Or -- or you didn't.
2    A. I didn't, and I don't believe anyone in the
3  company did.
4    Q. Of these possible participants to
5  objectively review the data, not a single one of the
6  20-plus authors in that stack of studies who were
7  involved in studying forced-air warming were
8  considered to be invited to this group; correct?
9       MS. AHMANN: Object to form.
10   A. I honestly don't know if -- if others were
11 considered and just not added. I don't see their
12 names on the list, that's as specific as I can get.
13   Q. Well, I mean y'all have zero interest in
14 having any of those people involved; correct?
15   A. Again, I --
16      It's not my call as to who gets put in.
17 It's to be determined by the clinical team.
18   Q. If you could flip to page five for me, and
19 under the "Positioning" section here, can you go up to
20 the fifth bullet from the bottom.
21   A. Okay.
22   Q. Do you see where it says, "Research is weak
23 and would not meet scrutiny of scientifically valid
24 research," in parentheses "(why?)" Do you see that
25 portion?

Page 170

1    A. Yes.
2    Q. Okay. This here is talking about research
3  that was unfavorable to forced-air warming; correct?
4    A. That is my belief, yes.
5    Q. And at that time the group had pretty much
6  posed the question of why does this not meet
7  scientifically valid research; correct?
8       MS. AHMANN: Object to form.
9    A. That could mean --
10      I mean it could mean any number of different
11 things. It could mean do we disclose the reasons why
12 it's weak? Do we --
13      You know, I can't speak as to the -- the
14 why.
15   Q. Did you ever ask?
16   A. There may have been -- been clarification
17 during the meeting. I don't -- don't have specific
18 recollection.
19   Q. Okay. So there was some -- some ideas of
20 maybe communicating to the public why y'all didn't
21 think the studies were good. This is back to that
22 misinformation thing we were talking about earlier;
23 correct? You want to correct the misinformation.
24   A. That's the goal, yes.
25   Q. Okay. Was not the goal to just set out to

Page 171

1  discredit research and researchers?
2    A. Not to my knowledge, no.
3    Q. Okay. Let's go to page six. Do you see the
4  third initiative?
5    A. Yes.
6    Q. It says "Discredit ABAD research."
7    A. Yup.
8    Q. That's something that occurred; didn't it?
9    A. Let me read through the --
10      I don't know that that occurred, no.
11   Q. Well most of these ideas here, those
12 occurred; right?
13   A. I don't know that most of those did occur.
14   Q. Okay. But according to you, sitting here
15 today, this initiative to discredit ABAD research,
16 that was something that was never followed through on.
17   A. That's correct, yes.
18   Q. Now in the "Positioning" again we see "Cite
19 why the ABAD research doesn't meet the standard
20 scientific scrutiny," and then there's a question
21 mark.
22      It's true that there was some significant
23 doubt about how the company could possibly position
24 that research as not meeting scientific scrutiny;
25 isn't that true?

Page 172

1       MS. AHMANN: Object to form, lack of
2  foundation.
3    A. I don't believe that's accurate, no.
4    Q. Okay. Well you know these studies were peer
5  reviewed; correct?
6    A. Yes.
7    Q. And they were published by their editors;
8  correct?
9    A. Yes.
10   Q. And we saw from the Sessler study that when
11 editors find significant problems in a paper, they
12 reject the paper and make a change; correct?
13   A. Yes.
14   Q. And in this case these studies were accepted
15 by their editors.
16   A. We don't know that they were accepted on the
17 first pass, --
18   Q. Sure.
19   A. -- we know they were eventually published.
20   Q. Right. And so we have the final manuscript,
21 and at least according to those editors, according to
22 those peer reviewers, those studies did meet
23 scientific scrutiny; correct?
24   A. As did the -- the Olmstead and Sessler
25 paper, yes.