# EXHIBIT 58

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - -

In Re:
Bair Hugger Forced Air Warming
Products Liability Litigation

This Document Relates To:
All Actions          MDL No. 15-2666 (JNE/FLM)

- - - - - - - - - - - - - - - - -

DEPOSITION OF JOHN P. ROCK
VOLUME I, PAGES 1 - 291
NOVEMBER 4, 2016

(The following is the deposition of JOHN P. ROCK, taken pursuant to Notice of Taking Deposition, via videotape, at the offices of Ciresi Conlin L.L.P., 225 South 6th Street, Suite 4600, Minneapolis, Minnesota, commencing at approximately 9:14 o'clock a.m., November 4, 2016.)

Page 2

1  APPEARANCES:
2    On Behalf of the Plaintiffs:
3      Michael V. Ciresi and Michael A. Sacchet
       CIRESI CONLIN L.L.P.
4      225 South 6th Street, Suite 4600
       Minneapolis, Minnesota  55402
5
       Genevieve M. Zimmerman
6      MESHBESHER & SPENCE, LTD.
       1616 Park Avenue
7      Minneapolis, Minnesota  55404
8      Gabriel Assaad
       KENNEDY HODGES
9      4409 Montrose Boulevard, Suite 200
       Houston, Texas  77006
10
     On Behalf of Defendants:
11
       William A. Brewer III
12     BREWER ATTORNEYS & COUNSELORS
       1717 Main Street, Suite 5900
13     Dallas, Texas  75201
14     Bridget M. Ahmann
       FAEGRE BAKER DANIELS
15     2200 Wells Fargo Center
       90 South Seventh Street
16     Minneapolis, Minnesota  55402-3901
17  ALSO APPEARING:
18     Ronald M. Huber, Videographer
19
20
21
22
23
24
25

Page 3

1                I N D E X
2   EXHIBITS       DESCRIPTION        PAGE MARKED
3   Ex 28  E-mail with attachment,
4          3MBH00053467-72              84
5       29  E-mail, 3MBH00134263        116
6       30  E-mail, 3MBH00134267        125
7       31  E-mail string, 3MBH00053497-8   137
8       32  Filtration Topics, 3MBH00031248  146
9       33  Ducky Preliminary Concepts,
10          check-in/5.13.2009,
11          3MBH00031134-58             171
12      34  Letter dated October 23, 2008,
13          Augustine to Westlin,
14          3MBH00007763-72             184
15      35  E-mail string, 3MBH00050729-30  208
16      36  War Games v2, 3MBH00139635    227
17      37  E-mail string, 3MBH00054315-22  230
18      38  E-mail string, 3MBH0024678-9   232
19      39  E-mail string, 3MBH00002619-20  239
20      40  Arizant forced-air warming and
21          SSI prevention: Talking points
22          for sales, June 2010 HG rev. 1,
23          3MBH00529215-6              250
24      41  E-mail string, 3MBH01034121-2   253
25      42  E-mail string, 3MBH00033850-1   260

Page 4

1       43  E-mail string, 3MBH00577468-70   265
2       44  E-mail string, 3MBH0051736-8    282
3       45  E-mail, 3MBH00552833           284

1 (Pages 1 to 4)

Page 5

1    PROCEEDINGS
2    (Witness sworn.)
3        JOHN P. ROCK
4    called as a witness, being first duly sworn,
5    was examined and testified as follows:
6        ADVERSE EXAMINATION
7    BY MR. CIRESI:
8        Q.  Can you state your full name and the
9    spelling of your last name for the record.
10       A.  John Rock, R-o-c-k.
11       Q.  Mr. Rock, my name is Mike Ciresi and I'm one
12   of the lawyers representing the plaintiffs in this
13   matter.  You have had your deposition taken before,
14   sir?
15       A.  Yes, I have.
16       Q.  Okay.  So you understand the process?
17       A.  Yes, I do.
18       Q.  I'll be asking you questions under oath and
19   you -- I'll be asking you questions and you will be
20   responding under oath.  Do you understand that?
21       A.  Yes, I do.
22       Q.  Okay.  If at any time during the questioning
23   you do not hear or understand a question that I ask
24   you, please tell me.  Is that agreeable?
25       A.  Yes, it is.

Page 6

1        Q.  Okay.  If you do not so advise me, I'm going
2    to assume that you have both heard and understood the
3    question.  Is that also agreeable?
4        A.  Yes.
5        Q.  Okay.  Are you on any medications of any
6    kind?
7        A.  No.
8        Q.  Okay.  Is there any other impairment of your
9    ability to testify?
10       A.  Actually, I have had medications.  I've had
11   Xanax over the last couple of months -- well --
12       Q.  Okay.
13       A.  -- weeks, you know, here and there, but --
14       Q.  You're not on any medication that would
15   affect your ability to testify.
16       A.  No.
17       Q.  How many times have you had your deposition
18   taken before, sir?
19       A.  I believe it's four.
20       Q.  Okay.
21       A.  Did -- did you say deposition in -- in this
22   case or did -- I'm sorry.
23       Q.  Depositions period.
24       A.  Oh, yeah.  Just four.
25       Q.  Four?

Page 7

1        A.  I think it's four.
2        Q.  And how many were involving the Bair Hugger
3    device?
4        A.  Three.
5            I'm sorry.  By "the Bair Hugger device," is
6    that the system or is that just the warming unit?
7    What -- what do you mean by "the Bair Hugger device?"
8        Q.  The entire device, any part of it.
9        A.  Three that would be.
10       Q.  Okay.  Do you know --
11           Do you recall what the other deposition was
12   in?
13       A.  I had a patent case that was tried in the
14   '90s, I believe mid-90's, the Walton case and the
15   Johnson case.
16       Q.  Okay.  Can you give us your educational
17   background, please, commencing with college.
18       A.  I went to Creighton University in Omaha,
19   Nebraska, graduated with a bachelor of arts.
20       Q.  When did you graduate from Creighton?
21       A.  In 1980.
22       Q.  Upon your graduation from Creighton what did
23   you do?
24       A.  I went to work in Glacier National Park in
25   Montana.

Page 8

1        Q.  What was your job in Glacier National Park?
2        A.  I worked first in the -- kind of the gear
3    shop, and then --
4        Q.  In the what shop?
5        A.  Gear shop, so hiking gear and things like
6    that.  And then I worked in the finance area of the
7    lodge at St. -- I think it's St. Mary's on the east
8    side of Glacier.
9        Q.  What were your duties and responsibilities
10   in the gear shop?
11       A.  Serve customers that came in, tourists that
12   were coming through.
13       Q.  Wanted to rent gear?
14       A.  Retail -- retail sales pretty much, if I
15   remember.
16       Q.  So you were a salesperson in the retail --
17   in the gear shop.
18       A.  For a very short period, yes.
19       Q.  How long?
20       A.  That's -- that's my recollection.  That was
21   a long time ago.
22           Just -- I don't -- I don't really recall.
23   It couldn't -- couldn't have been more than a couple
24   of weeks.
25       Q.  Okay.  And then you said you worked in the

Page 217

1  Q. Okay. Which ones?
2  A. I read an article in the New England Journal
3  where an 80-some-year-old woman had an infection in
4  her leg that they tied to a break when it -- when she
5  was in her -- I think below 10 years old or in her
6  teens.
7  Q. Okay. Now do you know of any studies in the
8  medical journals dealing with the Bair Hugger and
9  infection that dealt with infections manifesting
10 themselves beyond one week post operation?
11 A. I don't remember exactly what the colorectal
12 study follow-up period was, if that was --
13 Q. Orthopedic hip or knee joints.
14 A. I don't.
15 Q. You can't point to one; can you?
16 A. I -- I just don't recall.
17 Q. And you would agree that as of April of 2010
18 the company could neither prove nor disprove the fact
19 that the Bair Hugger causes surgical-site infections,
20 could neither prove nor disprove the fact.
21 A. I think that's an accurate statement.
22 Q. And did you ever -- and by "you" I mean the
23 company -- ever state publicly or in your warnings
24 accompanying the device that the company could not
25 disprove that the Bair Hugger causes surgical-site

Page 218

1  infections?
2  A. I don't believe that was a warning in our
3  materials.
4  Q. Did anyone ever suggest to you -- and I'm
5  excluding legal advice -- that you should warn with
6  the operating instructions that the company has no way
7  of knowing whether its device does or does not cause
8  surgical-site infections?
9  A. Not to my recollection.
10 Q. So no one internally ever said, "We don't
11 know whether our device does or does not cause
12 infections. Shouldn't we say that?"
13 A. Not to my recollection. That would just
14 confuse customers, but --
15 Q. It would just confuse them?
16 A. I do.
17 Q. It wouldn't give them the opportunity to say
18 maybe they should use an alternative way of warming?
19 A. They already have that opportunity.
20 Q. But you have put out a campaign that it
21 doesn't cause infections; isn't that right?
22 A. That there's no proof that there was ever an
23 infection I believe was the --
24 Q. No.
25 A. -- campaign, but I don't recall exactly what

Page 219

1  it said.
2  Q. The campaign was that you do not believe the
3  Bair Hugger causes any surgical-site infections; isn't
4  that right?
5  A. We do not believe that.
6  Q. And do --
7     Yet you have no proof one way or the other.
8  A. Oh, we -- I don't know if --
9     We have no proof they do.
10 Q. And you have no proof that they don't.
11 A. Correct.
12 Q. So you don't know one way or the other, and
13 yet you tell people that they don't.
14 A. We don't believe they do.
15 Q. And you have no --
16 A. And the science -- and the science that we
17 have seems to indicate otherwise. And not just
18 science but --
19 Q. What science?
20 A. Well all the articles that have been
21 examined by us and all the outside agencies --
22 Q. Excuse me.
23 A. -- that have looked at this and at -- by the
24 FDA and everybody else that has looked at this issue.
25 Q. The FDA has said there should be no device

Page 220

1  that blows air in the operating room; hasn't it?
2  A. I am not aware of that.
3  Q. You're not?
4  A. I have not seen that.
5  Q. Well would that make a difference to you?
6  A. I don't -- I would ask --
7     I would put that in the scientists' hands.
8  Q. So if the FDA said, "There should be no
9  device that blows air in the operating room," you'd
10 say, "Well, we won't follow the FDA in that regard."
11 Is that right?
12 A. I would --
13    MS. AHMANN: Lack of foundation.
14 A. I would --
15    I assume if the FDA told 3 -- well I'm not
16 3M any more, but if they told my company that we can't
17 market a device because it blows air, that we would
18 not market that device.
19 Q. If the FDA said that nothing that blows air
20 should be in an operating room, if possible, would
21 that make a difference to you?
22    MR. BREWER: Pardon me. Objection,
23 foundation, assumes facts not in evidence.
24    MR. CIRESI: You may answer.
25    MR. BREWER: Improper hypothetical.