# EXHIBIT 68

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - -

In Re:
Bair Hugger Forced Air Warming
Products Liability Litigation

This Document Relates To:
All Actions         MDL No. 15-2666 (JNE/FLM)

- - - - - - - - - - - - - - - - -

DEPOSITION OF MICHELLE HULSE-STEVENS
VOLUME I, PAGES 1 - 299
DECEMBER 19, 2016

(The following is the deposition of MICHELLE HULSE-STEVENS, taken pursuant to Notice of Taking Deposition, via videotape, at the offices of Ciresi Conlin L.L.P., 225 South 6th Street, Suite 4600, Minneapolis, Minnesota, commencing at approximately 8:59 o'clock a.m., December 19, 2016.)

Page 2

1  APPEARANCES:
2      On Behalf of the Plaintiffs:
3          Michael V. Ciresi and Michael A. Sacchet
           CIRESI CONLIN L.L.P.
4          225 South 6th Street, Suite 4600
           Minneapolis, Minnesota   55402
5
       On Behalf of Defendants:
6
           Peter J. Goss and Charmaine K. Harris
7          BLACKWELL BURKE P.A.
           432 South Seventh Street, Suite 2500
8          Minneapolis, Minnesota   55415
9  ALSO APPEARING:
10         Ronald M. Huber, Videographer

Page 3

              I N D E X
EXHIBITS         DESCRIPTION            PAGE MARKED
Ex  204  E-mail string, 3MBH00544550-2        23
    205  Dear Health Care Leader letter
         from Hulse-Stevens, 3MBH00819201-2   37
    206  E-mail string, 3MBH00544674          52
    207  E-mail, 3M00580475                   60
    208  CDC Healthcare Infection Control
         Practices Advisory Committee,
         November 5-6, 2015, Atlanta,
         Georgia, Record of Proceedings,
         3MBH01344612-85                      71
    209  Letter dated February 25, 2013,
         Hulse-Stevens to Groah,
         3MBH01251937-44                      76
    210  E-mail string, 3MBH01642075-6,
         and 3MBH01642092-115                 88
    211  E-mail string, 3MBH00130834-41      119
    212  E-mail string, 3MBH01619270-4       121
    213  E-mail string, 3MBH00052796-7       175
    214  Deck, The Perioperative Process
         and Risk Reduction for Surgical
         Site Infection dated 3/11/210,
         3MBH01688147-228                    181
    215  Article, The Bair Hugger patient

Page 4

         warming system in prolonged vascular
         surgery: an infection risk? by
         Huang, et al                        195
    216  E-mail string, 3M00577966-9         227
    217  E-mail string, BHJP0000028-36       235
    218  Minutes, October 18, 2012
         Global Patient Warming Advisory
         Board meeting, 3MBH01242440-48      238
    219  E-mail string, 3MBH01220680-4       245
    220  E-mail, 3MBH01534354                259
    221  E-mail string, 3MBH01629634-7       264
    222  E-mail string, 3MBH00541794-6       273
    223  E-mail, 3MBH01532028                283
    224  E-mail, 3MBH00109116                291
    225  Arizant forced-air warming and
         SSI prevention:  Talking points
         for sales, June 2010,
         3MBH00001336-7                      295

Page 5

1      PROCEEDINGS
2      (Witness sworn.)
3          MICHELLE HULSE-STEVENS
4      called as a witness, being first duly sworn,
5      was examined and testified as follows:
6          ADVERSE EXAMINATION
7  BY MR. CIRESI:
8      Q.  Good morning, doctor.
9      A.  Good morning.
10     Q.  My name is Mike Ciresi and I'm one of the
11 attorneys representing the plaintiffs in this matter.
12         Have you had your deposition taken before?
13     A.  No.
14     Q.  Okay.  Let me explain a couple ground rules.
15 As you know, I'll be asking you questions and you'll
16 be responding to those questions under oath.  If at
17 any time I ask a question that you don't understand or
18 hear, please tell me.  Is that agreeable?
19     A.  Yes.
20     Q.  Otherwise, I'm going to assume that you've
21 both heard and understood the question.  Is that also
22 agreeable?
23     A.  Yes.
24     Q.  Couple other things.  The court reporter is
25 very, very good, but if we talk over each other, it

Page 6

1  gives us a disjointed record and it's hard to put it
2  together.  All right?  So let me finish with my
3  question before you respond, and I will do the same.
4  Okay?
5      A.  Okay.
6      Q.  And one other thing: make sure you always
7  give an audible response, a "yes" or a "no" rather
8  than a nodding or shaking of the head.  All right?
9      A.  Okay.
10     Q.  When did you start with 3M?
11     A.  I started in October of 2009.
12     Q.  And prior to that you were at Children's
13 Hospital?
14     A.  Correct.
15     Q.  In the Minneapolis or St. Paul campus?
16     A.  Both.
17     Q.  Okay.  Now you were the hospital
18 epidemiologist or 10 years?
19     A.  I started as a hospital epidemiologist in
20 2 -- let's see, 1994, and that was before the merger
21 of the two hospitals so it would have been for
22 Minneapolis, and then after the merger was for the
23 system.
24     Q.  Okay.  So you were the epidemiologist for
25 the Minneapolis hospital first, --

Page 7

1      A.  Uh-huh.
2      Q.  -- and after the merger you were the
3  epidemiologist for the two hospitals.
4      A.  Correct, uh-huh.
5      Q.  Okay.  And how long were you the
6  epidemiologist?
7      A.  Until I transitioned to 3M in 2009.
8      Q.  All right.  And prior to being the
9  epidemiologist at Minneapolis Children's, were you the
10 medical director of infectious diseases and
11 immunology?
12     A.  No.  I took on those responsibilities in
13 2006.
14     Q.  2006.
15     A.  Uh-huh.
16     Q.  All right.  As the epidemiologist, can you
17 describe your responsibilities and duties at
18 Children's.
19     A.  Well a hospital epidemiologist would have
20 oversight over usually the technical -- technical
21 aspects of the infection control program.
22     Q.  What do you mean by that?
23     A.  So if -- if there's an epidemiologically
24 important organism that needs to have a certain
25 approach taken for patient-care purposes, it would be

Page 8

1  informing the staff, who are the infection control
2  practitioners, and working with them on developing the
3  appropriate policy and procedure that needs to take
4  place.
5      Q.  All right.  So if a special situation arose
6  with regard to patient care, you would be involved
7  from an epidemiological standpoint.
8      A.  It would depend on the issue, but this was
9  at a higher level, so broad -- more broadly applied.
10 So I'm --
11         If you can clarify what you're --
12     Q.  Can you give us an example?
13     A.  So, for example, for respiratory infections,
14 what kind of precautions are necessary for patients to
15 be in -- if they come in with symptoms of a
16 respiratory illness.
17     Q.  So, for example, during the flu season you
18 would set certain policies with respect to certain
19 procedures that should be followed by the hospital
20 staff?
21     A.  Right.
22     Q.  Did you have any responsibility for
23 evaluating medical devices?
24     A.  No.  I can't think of a --
25         The only thing that comes to mind was when

Page 257

1 would have been within the division. I don't know if
2 our senior management was involved with that decision.
3    Q. What's a high level?
4    A. Our senior management in the division.
5    Q. And who would that be at that time?
6    A. At that --
7       In 2015?
8    Q. Correct. Last year.
9    A. The general manager would have been Mojdeh
10 Poul.
11    Q. Pardon me?
12    A. Mojdeh Poul would have been the general
13 manager.
14    Q. Can you spell his name?
15    A. First name is M-o-j-d-e-h, Poul is P-o-u-l.
16    Q. Okay. Who else?
17    A. I'm sorry, our senior management team
18 changes over fairly regularly.
19    Q. I appreciate that. Who do you think it was
20 at that time?
21    A. So I think the technical director at the
22 time was -- was Belen, B-e-l-e-n --
23    Q. B-e-l --
24    A. e-n.
25    Q. e-n. First name?

Page 258

1    A. Urq --
2       That's her first name. Urquiola,
3 U-r-q-u-i-o-l-i-a.
4    Q. Okay.
5    A. I think our marketing director changed in
6 that time period. So those two I think would have
7 been in place in terms of the senior management team.
8 And then --
9       I don't know if legal weighed in on that
10 decision.
11    Q. Yes, right. I don't want to know what the
12 lawyers told you.
13    A. Yeah. I -- so --
14    Q. I would like to know, but I can't.
15    A. Yeah, yeah, yeah. So I -- I think -- I
16 think this was a -- a decision that was made with
17 input from our legal --
18    Q. From your legal department.
19    A. -- legal counsel, yeah.
20    Q. Okay. Now the legal situation was what, the
21 lawsuits --
22    A. Yes.
23    Q. -- that were brought --
24       MR. GOSS: Let him finish before you answer.
25       THE WITNESS: Oh, I'm sorry.

Page 259

1    Q. -- the lawsuits brought alleging that the
2 Bair Hugger causes surgical-site infections?
3    A. Correct. Yeah.
4    Q. Okay. And by whom were you told that that
5 decision had been made?
6    A. Oh boy. I don't remember. I just --
7       I remember discussions about doing the study
8 just stopped after -- after we had this -- this input
9 from our legal team.
10    Q. Okay. Now the Harper study will not answer
11 this question; will it?
12    A. No.
13       MR. GOSS: I want to insert a belated
14 objection to form to the last question.
15       (Discussion off the stenographic record.)
16       (Exhibit 220 was marked for
17       identification.)
18 BY MR. CIRESI:
19    Q. Exhibit 220 is an e-mail from Dan Sessler to
20 Mark Morken with a copy to you dated February 25th,
21 2016. Do you see that, ma'am?
22    A. Yes.
23    Q. "Subject: Re: Follow-up;" correct?
24    A. Yes.
25    Q. And in this, Dr. Sessler includes protocols,

Page 260

1 which are not attached to the document that we
2 received, for a "...retrospective surgical site
3 infection analysis and myocardial injury randomized
4 clinical trial;" correct?
5    A. Yes.
6    Q. And then it sets forth that the
7 retrospective analysis cost would be 75,000 plus
8 clinic overhead; correct?
9    A. That's right.
10    Q. And that the randomized clinical trial would
11 be 1.2 million plus overhead; correct?
12    A. That's right.
13    Q. Now the randomized clinical trial, that's
14 the one being conducted in China?
15    A. Yes.
16    Q. Okay. That's Project Protect; correct?
17    A. Yes.
18    Q. Okay. The retrospective analysis, was that
19 done?
20    A. It's in process.
21    Q. Where is it being done?
22    A. It's a retrospective analysis of data from
23 the clinic, from the Cleveland Clinic.
24    Q. From the Cleveland Clinic?
25    A. Yes.

CONFIDENTIAL

Page 289

1  A. Teicoplanin would be effective in -- as
2  prophylaxis.
3  Q. As a prophylaxis. Okay.
4  A. Yes.
5  Q. So teicoplanin may be effective and
6  gentamicin would not be --
7     MR. GOSS: Objection, mischaracterizes.
8  Q. -- prophylactically; is that what you're
9  saying?
10  A. Prophylactic --
11     Gentamicin is not usually used in isolation.
12  Q. Well I'm just asking you if it would be
13  effective. If you know. If you don't know, just say
14  "I don't know."
15  A. I -- I -- I don't know.
16  Q. Thank you.
17     Now other than Dr. Sessler, you heard from
18  others that conductive warming was equally effective
19  as convective; did you not? And I'm -- other than
20  Reed and the people that are doing the Harper study.
21     (Discussion off the stenographic record.)
22  A. Yes, that's correct.
23  Q. That's generally accepted in the medical
24  profession; --
25     MR. GOSS: Object to form.

Page 290

1  Q. -- correct?
2  A. I don't know. I -- I can't comment on
3  whether --
4  Q. If -- if you don't know, just --
5  A. -- it's generally accepted.
6  Q. Okay. So you don't know.
7  A. No.
8     MR. CIRESI: If you'll give me a minute,
9  doctor, I'm going to check my notes, but until we get
10  that protocol, I may be done.
11     THE WITNESS: Hmm.
12     MR. CIRESI: Just finally.
13     MR. GOSS: You're talking about the Protect
14  protocol?
15     MR. CIRESI: Yes.
16     MR. GOSS: Okay.
17     MR. CIRESI: And the other protocol which
18  was not attached. I forget which one that was right
19  now. But we'll give you those.
20     (Discussion off the stenographic record.)
21  BY MR. CIRESI:
22  Q. You had various discussions with Mr. Van
23  Duren and Mr. Hansen regarding prospective randomized
24  trials between modalities of warming to determine
25  infection rates; did you not?

Page 291

1  A. I --
2     We had a number of conversations around a
3  variety of clinical study topics, so I would include
4  that in with everything else that we would have talked
5  about.
6  Q. And in those discussions you talked about
7  the size of the study that you would have to have to
8  have adequate power to show differences in modalities
9  with regard to the incidence of infection?
10  A. For surgical-site infections in clean
11  procedures particularly, it's very challenging to
12  power a study, so yeah, that would have been part of
13  any discussion.
14     (Discussion off the stenographic record.)
15     (Exhibit 224 was marked for
16     identification.)
17  BY MR. CIRESI:
18  Q. Exhibit 224 is an e-mail from Mr. Van Duren
19  to you, with a carbon copy to Gary Hansen, dated June
20  24th, 2011; correct?
21  A. Yes.
22  Q. This is roughly eight months after the
23  acquisition of Arizant?
24  A. Correct.
25  Q. And this reflects the concept that we just

Page 292

1  discussed, and that is the power of a study; correct?
2  A. Let me just take a look at this e-mail.
3  Q. If you look at number two on this exhibit.
4  A. Okay.
5  Q. Do you see it, ma'am?
6  A. Yes.
7  Q. Okay. Mr. Van Duren states, "Prospective
8  clinical studies designed to show increases in SSI
9  rates are notoriously difficult to conduct in part
10  because of the large sample sizes needed to pro --
11  provide adequate power;" correct?
12  A. Yes.
13  Q. Okay. "Are there other types of studies
14  that you believe provide adequate evidence for the
15  adoption of particular interventions which could be
16  less difficult to conduct?"
17     Do you see that?
18  A. Yes.
19  Q. And one of them would be an aerobiology
20  study; correct?
21     MR. GOSS: Object to form.
22  A. That's a possibility, yes.
23  Q. That's the one that hasn't been conducted;
24  correct?
25  A. We have not conducted that study.

CONFIDENTIAL

Page 293

1  Q. And decisions have been made at the highest
2  levels not to conduct it; correct?
3      MR. GOSS: Object to form, foundation.
4  A. Yes.
5  Q. You saw the document.
6  A. Yes.
7      (Discussion off the stenographic record.)
8  Q. Now Mr. Van Duren advised you that there was
9  evidence that forced-air warming use increases the
10 risk of surgical-site infections; didn't he?
11 A. I don't recall that --
12 Q. Well you --
13 A. -- conversation.
14 Q. You've said publicly that there is no
15 evidence; right? You're on the internet saying that;
16 aren't you?
17 A. Yes. Your --
18 Q. And Mr. Van --
19     MR. GOSS: Wait. Let him --
20     Let her finish, please.
21 A. Your question was --
22     I just want to clarify what your question
23 was originally.
24 Q. But you're on the internet saying there is
25 no evidence; correct?

Page 294

1  A. Correct.
2  Q. And --
3  A. Prior to that you -- I wanted to clarify
4  what you said about my conversation with Al Van Duren.
5  Q. Okay. I didn't say your conversation. I
6  said has Mr. Van Duren ever told you there is evidence
7  that forced-air warming uses -- use increases the risk
8  of surgical-site infection?
9  A. No, not that --
10 Q. Did Mr. Hansen --
11 A. Not that I recall.
12 Q. Okay.
13 A. Yeah.
14 Q. Did Mr. Hansen tell you that there were
15 other people at Arizant that felt that to be the case?
16 A. Not that I recall.
17 Q. Have you read Mr. --
18    You haven't read Mr. Hansen's deposition;
19 have you?
20 A. No.
21 Q. Okay. Is there a process at 3M where
22 position statements that are forwarded around can be
23 revised and people put their initials on the revision
24 that they suggest?
25 A. So if it's a document that's generated like

Page 295

1  in Word, --
2  Q. Right.
3  A. -- yeah.
4  Q. Okay.
5      (Exhibit 225 was marked for
6      identification.)
7  BY MR. CIRESI:
8  Q. Exhibit 225 is a position statement shortly
9  before acquisition of Arizant, June of 2010. Do you
10 see that?
11 A. Yes.
12 Q. And then it says "Our position
13    "There is no evidence that forced-air
14 warming (FAW) increases risk of surgical site
15 infections (SSIs)..." Do you see that?
16 A. Yes.
17 Q. Do you see the comment over on the
18 right-hand side?
19 A. Yes.
20 Q. "AVD," do you know who that is?
21 A. If it was in our system with -- post-
22 acquisition, it would be Al Van Duren.
23 Q. Al Van Duren.
24    Do you know any other AVDs that were at
25 Arizant?

Page 296

1  A. I don't.
2  Q. Okay. And he makes a notation, "Actually,
3  there is evidence that forced-air warming use
4  increases risk - This evidence was the motivation for
5  Dr. Memarzadeh's work." Do you see that?
6  A. Yes.
7  Q. Did he ever tell you that?
8  A. No.
9     MR. GOSS: Object to form, document speaks
10 for itself.
11 Q. If he had told you that, would you have made
12 a statement to the public that there is no evidence,
13 since he has more expertise in this area than you?
14    MR. GOSS: Objection to form.
15 A. I would have --
16    It would have generated a lot of questions
17 on my part.
18 Q. You would have withdrawn the statement;
19 wouldn't you, --
20    MR. GOSS: Object to form.
21 Q. -- doctor?
22 A. I would have needed to have evidence that
23 there was no risk --
24 Q. He has --
25 A. -- of --

74 (Pages 293 to 296)