# EXHIBIT A

1                           AUGUSTINE

2    Q.  If you turn to the second page of Exhibit 2,

3        the headline is, "Reservoirs of Infection."

4        You wrote the -- the text here, correct?

5    A.  I don't recall.

6    Q.  Do you recall if you -- if you did write any

7        of this text?

8    A.  I mean, most of what we write is a group

9        effort, so I probably participated.

10   Q.  Okay.  Who else might -- would have

11       participated in this group effort?

12   A.  It could be Brent Augustine, it could be

13       Garrett Augustine.  This was written back

14       when Mark Albrecht was still there.  It was

15       probably proofed by Mr. Benham.

16   Q.  Anyone else who might have participated in

17       the group process of writing Exhibit

18       Number 2?

19   A.  I can't think of anybody else.

20   Q.  Brent and Garrett Augustine are your sons; is

21       that right?

22   A.  That's correct.

23   Q.  Do either one of them have any medical

24       training?

25   A.  No.

1                         AUGUSTINE

2              (Whereupon, Exhibit 16 was

3              marked for identification.)

4    BY MR. COREY GORDON:

5    Q.   I'm going to show you Exhibit 16.  It's a

6         chain of e-mails.  The top page is -- the top

7         e-mail is from you to J. Randall Benham, "Re:

8         Guide."  J. Randall Benham is your -- your

9         lawyer, right?

10   A.   Yes.

11   Q.   He's the Augustine in-house lawyer, right?

12   A.   That's correct.

13   Q.   And if you drop down to the bottom of the

14        first page, it says -- the part of this

15        e-mail chain from J. Randall Benham, he

16        wrote, "David and Gabe, Scott and I are" --

17        let me start again.

18              "David and Gabe, Scott and I are

19        preparing a detailed guide to suing 3M

20        Bair Hugger for orthopedic implant

21        infections.  It will contain background

22        summaries of and links to scientific

23        articles, explanations of the idealogy of

24        joint infections, a timeline of 3M's

25        knowledge and failure to warn, discovery

1                               AUGUSTINE

2          suggestions, and a half dozen other useful

3          things."

4                 "We intend to offer it to other

5          plaintiffs' firms around the country who

6          expressed an interest in jumping on this

7          bandwagon.  Our staff is preparing a list of

8          the e-mail addresses of AAJ members who do

9          this work, and we may do an e-mail blast.

10         Communications in the AAJ publications may

11         also be a good idea."

12                "My question:  Would you like KH to

13         be the author of this guide?  It would help

14         establish KH as the leader in this area.  Of

15         course, if KH is the listed author, you guys

16         will want to be comfortable with the content

17         and I will run everything past you."

18                "We are going forward either way,

19         but I wanted to give you the opportunity if

20         you are interested.  Randy."

21                Did I read that correctly?

22    A.   Yes.

23    Q.   So whether Kennedy Hodges was going to agree

24         to be listed as the author of this guide or

25         not, you and Mr. Benham were preparing a

1                        AUGUSTINE

2        detailed guide to suing 3M Bair Hugger for

3        orthopedic implant infections, right?

4   A.   Yes, we were.

5   Q.   And if Kennedy Hodges didn't want to sign on,

6        you were going to send it directly to

7        plaintiffs' lawyers yourself, right?

8   A.   I -- that's what it says, so I assume we

9        were.

10  Q.   Okay.  And you're part of -- you're on this

11       e-mail chain, right?  This isn't the first

12       time you've seen this, right?

13  A.   Well, I don't recall this, but...

14  Q.   Okay.  Well, do you recall David Hodges

15       saying, Yes, we would like to be lead on

16       this, let's discuss next week?

17  A.   No.

18  Q.   Okay.  Do you remember that David Hodges

19       agreed to have his firm appear as the author

20       of this Exhibit 15, this Guide to Product

21       Liability Litigation?

22                 MR. BENHAM:  Objection to form.

23                 THE WITNESS:  And I don't know any

24       details about that.

25  BY MR. COREY GORDON:

1                         AUGUSTINE

2   Q.  Who would?

3   A.  Randy would be the -- the main guy there.

4   Q.  Mr. Benham?

5   A.  Correct.

6   Q.  Okay.  And by the way, on Exhibit 16 where

7       it says, "David and Gabe," the David is

8       David Hodges, right?

9   A.  I presume.  I don't know.

10  Q.  And Gabe is Gabriel Assaad, right?

11  A.  Again, I presume.  I don't know.  I didn't

12      write the e-mail.

13  Q.  Who is Dan Grewe?

14  A.  He's our marketing manager.

15                  (Whereupon, Exhibit 17 was

16                  marked for identification.)

17  BY MR. COREY GORDON:

18  Q.  I'll show you what's been marked as

19      Exhibit 17.

20                  MR. ASSAAD:  Do you have a copy

21      for me?

22                  MR. COREY GORDON:  I think I --

23                  MR. GOSS:  (Hands document.)

24                  MR. COREY GORDON:  Oh, sorry.

25  BY MR. COREY GORDON:

1                        AUGUSTINE

2        Hodges was, "Looks good, thanks."

3               Do you see that?

4    A.  Where -- where is the, "Looks good"?

5    Q.  On the first page?

6    A.  Okay, yes.

7    Q.  Why was your marketing manager sending out a

8        guide to products liability litigation to

9        plaintiffs' lawyers ostensibly written by

10       Kennedy Hodges, LLP?

11               MR. BENHAM:  Objection to form.

12               THE WITNESS:  I don't know.

13   BY MR. COREY GORDON:

14   Q.  Do you recall any discussions internally at

15       your company as to whether it was appropriate

16       for your company to be communicating with

17       plaintiffs' lawyers and sending out a

18       document that you wrote but had Kennedy

19       Hodges' name on it?

20               MR. BENHAM:  Objection; assumes

21       facts not in evidence, form of the question.

22               THE WITNESS:  No, I don't recall.

23   BY MR. COREY GORDON:

24   Q.  Did you know that that happened, that --

25       that -- strike that.

1                          AUGUSTINE

2              Were you aware that your company was

3        involved in sending out a guide to how to sue

4        3M to plaintiffs' lawyers?

5   A.   That we were involved in the sending of it?

6   Q.   Yes.

7   A.   No, I was not.

8                  (Whereupon, Exhibit 18 was

9                  marked for identification.)

10  BY MR. COREY GORDON:

11  Q.   I'll show you what's been marked as

12       Exhibit 18.  Begin at the second page at the

13       bottom.  This is an e-mail chain working

14       backwards.  The first e-mail in this chain is

15       from your company attorney J. Randall Benham

16       to David W. Hodges and Gabriel Assaad with a

17       cc to you, and the subject is, "Guide,"

18       right?

19  A.   Correct.

20  Q.   Do you have any reason to think you didn't

21       get this?

22  A.   No, I probably got it.

23  Q.   Okay.  And Mr. Benham says to David Hodges

24       and Gabriel Assaad, "David and Gabe, The

25       guide that we propose sending to interested

1                          AUGUSTINE

2        Bair Hugger off using his hospital standard

3        microbiological testing protocols?

4    A.  No.

5    Q.  No one ever told you that Legg also tried to

6        culture bacteria with a Bair Hugger on and

7        couldn't; is that right?

8                  MS. CONLIN:  Objection as to form.

9                  THE WITNESS:  I was not aware that

10       he did anything like that.

11                 MR. COREY GORDON:  Okay.

12                 (Whereupon, Exhibit 22 was

13                 marked for identification.)

14   BY MR. COREY GORDON:

15   Q.  I'll show you now what's marked as

16       Exhibit 22.  It's a series of e-mails, and I

17       want to start with the one on the second page

18       from J. Randall Benham to David Hodges and

19       Gabriel Assaad with a carbon copy to

20       Scott Augustine and Brent Augustine, the

21       subject is, "The guide" -- or just, "Subject:

22       Guide."

23                 And Mr. Benham says, "I have revised

24       the e-mail to indicate that the Walton cases

25       at a very" -- " in a very early stage and

```
 1                      AUGUSTINE
 2       that the guide is a work in progress.
 3       Changes are in red.  You offered to send the
 4       scientific portion of the guide."  Did I read
 5       that correctly?
 6  A.   Yes.
 7  Q.   Why was ABD's in-house lawyer revising an
 8       e-mail ostensibly from David Hodges and
 9       Gabriel Assaad?
10  A.   I don't know.
11  Q.   Okay.  Further down in this same e-mail
12       Mr. Benham says, "As you know, our goal is to
13       get this information to as many PI attorneys
14       as possible" -- "as quickly as possible."
15       Did I read that correctly?
16  A.   Yes.
17  Q.   Do you know why it was your goal to get the
18       roadmap to suing 3M to as many personal
19       injury lawyers as quickly as possible?
20                 MS. CONLIN:  Objection as to form.
21                 MR. BENHAM:  Objection; form.
22                 THE WITNESS:  I guess because I
23       had told him that we were going to help in
24       any way we could to accomplish this.
25  BY MR. COREY GORDON:
```

1                          AUGUSTINE

2    Q.   Why -- well, strike that.   Okay.

3              In the first numbered point he

4         comments on the Walton case and having -- and

5         generate -- that generating valuable

6         experience to share with other attorneys.

7         And Mr. Benham says, "This, however, could

8         take many months and we can't wait that long

9         to engage other attorneys."

10             Why couldn't you wait that long?

11   A.   I didn't write this, I don't know.

12   Q.   You have -- and when you saw this you didn't

13        go down to Mr. Benham's office and say, Hey,

14        why -- why do -- why are we in such a hurry

15        to engage other attorneys?

16   A.   No, I didn't go down to his office and ask

17        him that.

18   Q.   Okay.   And then in the end of the second

19        point he says, "Again, we don't want to wait

20        months to share this information with

21        others."   Did I read that correctly?

22   A.   That's correct.

23   Q.   And if you continue now on to the first page,

24        a follow-up exchange of e-mails.   Again, you

25        were copy -- copied on it.