# EXHIBIT 25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 1

1            UNITED STATES DISTRICT COURT

2              DISTRICT OF MINNESOTA

3    - - - - - - - - - - - - - - - - - - - - -

4    In Re:

5    Bair Hugger Forced Air Warming

6    Products Liability Litigation

7

8    This Document Relates To:

9    All Actions         MDL No. 15-2666 (JNE/FLM)

10   - - - - - - - - - - - - - - - - - - - - -

11

12

13            DEPOSITION OF WINSTON T. TAN

14              VOLUME I, PAGES 1 - 117

15                MARCH 10, 2017

16

17

18            (The following is the deposition of WINSTON

19   T. TAN, taken pursuant to Notice of Taking Deposition,

20   via videotape, at the offices of Ciresi Conlin L.L.P.,

21   225 South 6th Street, Suite 4600, Minneapolis,

22   Minnesota, commencing at approximately 9:10 o'clock

23   a.m., March 10, 2017.)

24

25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 94

1    If any of your answers require you to relay
2 conversations you had with counsel, I'm objecting on
3 behalf of 3M as privileged.
4    Q.  Did you have any conversations with your
5 supervisor -- not with any attorneys, but your
6 supervisor -- regarding the claims in the litigation
7 and any testing that needs to be performed?
8    A.  Not without the presence of an attorney.
9    Q.  Did you meet with anybody within the
10 company -- and I'm not talking about with an attorney
11 present -- without an attorney present regarding the
12 claims in the litigation and whether or not any
13 testing needs to be performed?
14    A.  I don't believe so.
15       (Exhibit 368 was marked for
16       identification.)
17       THE WITNESS:  Is there a particular page?
18       MR. FARRAR:  I want to go through a lot of
19 this, so if you want to read it real quick --
20       THE WITNESS:  Sure.
21       MR. FARRAR:  -- so we can ask questions
22 while we go through it.
23       THE WITNESS:  Okay.
24 BY MR. FARRAR:
25    Q.  Do you recall --

Page 95

1    The first e-mail -- and this is in April of
2 2015 -- you send to folks at Pentair.  You say, "Would
3 you -- Would you have any updates on the filter
4 discussion we had on April 10th?"
5    Do you recall what filter discussions you
6 had with the folks at Pentair in April 2015?
7    A.  I'm sorry.  Where was that sentence?
8    Q.  The very -- the second page, the very last
9 par -- the very last sentence of the second page.
10    A.  Probably --
11    Perhaps we were developing this new warming
12 unit and we were looking at a filter for this new
13 warming unit we were developing.
14    Q.  Okay.  Is it your testimony that in April
15 2015 you weren't looking -- that the conversations
16 with Pentair didn't have anything to do with the
17 filters on the 750 or 775?
18    A.  I don't believe so.
19    Q.  All right.  And Craig --
20    Is it Cuta, C-u-t-a?
21    A.  Yes.
22    Q.  -- at Pentair responds to you and he says,
23 "Our efforts so far have been around a design using
24 HEPA grade media."
25    Do you know why Pentair was using HEPA grade

Page 96

1 media?
2    A.  For the -- once again, for the new warming
3 unit.  We were looking at the competitive landscape,
4 if we wanted to put one in when we released the
5 warming unit.
6    Q.  So it would have been at your directive or
7 at least the company's directive to use HEPA grade;
8 correct?
9    A.  As exploratory.
10    Q.  Okay.  And Mr. Cuta says, "...the cost of
11 the filter will be more than what you're paying for
12 the current production filter."  That would be the
13 filters used in the 750 or 775; correct?
14    A.  Not for certain if he meant -- if he used
15 the -- you know, this new design, the difference in
16 media, I'm -- I can't --
17    Q.  Okay.
18    A.  -- recall for --
19    Q.  I don't mean to interrupt.
20    A.  Yeah.
21    Q.  He says "current production filter," which
22 would indicate the ones being produced.  Does that
23 mean something essentially different to you?
24    A.  It could be like pilot, you know, some
25 samples.  It could have been.  He probably used some

Page 97

1 prototype samples, "production," if he meant --
2    Yeah.
3    Q.  Do you know if you ever got a cost estimate
4 of what it would cost per filter for a HEPA grade
5 filter?
6    A.  Let me --
7    I don't recall if I -- if he let us know the
8 rough size, estimate --
9    I can't recall --
10    Q.  Okay.
11    A.  -- if I received it.
12    Q.  We saw earlier in the document that the M20
13 was -- I think it was $12.83.  Do you recall that?
14       MR. GOSS:  Eighty-one.
15       MR. FARRAR:  Eighty-one.
16    Q.  Little under 13 bucks.
17    A.  Yes.  Yes.
18    Q.  Do you recall any estimate that you got on
19 how much a HEPA filter would cost?
20    A.  I can't recall.
21    Q.  Okay.  You don't recall any ballpark numbers
22 at all?
23    A.  I don't really recall.  Unless there is an
24 e-mail in front of me that lists it, I can't recall --
25    Q.  Okay.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 98

1     A.  -- if I received it.  I don't recall.
2     Q.  You e-mailed Mr. Cuta back and you said,
3  "Yes, please continue with this path," meaning --
4     A.  Uh-huh.
5     Q.  -- continue using the HEPA grade media;
6  correct?
7     A.  Let me see.  As exploratory for the new
8  warning unit, --
9     Q.  Sure.
10    A.  -- that's correct.
11    Q.  If we go to the first page, four days later
12  you e-mail Mr. Cuta gain, you say, "Sorry for the
13  change in project scope.  Management would rather have
14  us look into how we can take costs out of the current
15  rectangular filter."
16        I read that correctly?
17    A.  Yes.  Yes.  Yes.
18    Q.  Okay.  So who did you speak with at
19  management who told you that they want to take costs
20  out of the current rectangular filter?
21    A.  Yeah.  So the cost always --
22        Probably to the frame that Chris Miller, the
23  project manager, and probably my supervisor at the
24  time, --
25    Q.  Okay.

Page 99

1     A.  -- so we were looking at the -- the -- the
2  frame of the -- the filter.
3     Q.  Does the "take cost out" also relate to the
4  efficiency of the filter?
5     A.  No.
6     Q.  All right.  On --
7        So that was on April 27th.  On July 15th you
8  forward that same e-mail to Daniel Doran; correct?
9     A.  Yes.  At the time I was moving on and he was
10  taking over.
11    Q.  And he takes over and he -- he e-mails Craig
12  and he says, "I -- I received your contact information
13  from Winston Tan (see below)."
14        What happened between April 28th and July
15  15th where you were no longer in the filter section of
16  the warning unit?
17    A.  I believe I moved on to a different project.
18    Q.  What project, do you recall?
19    A.  It was just front-end work.
20    Q.  Sorry?
21    A.  I'm sorry.  Front-end.
22    Q.  What does that mean?
23    A.  Front-end engineering, front-end innovation,
24  looking at --
25    Q.  New products.

Page 100

1     A.  Correct.
2     Q.  Okay.  Did you have any disagreements with
3  management regarding the filter selection that
4  prompted this move?
5     A.  I don't believe so, no.
6     Q.  What prompted the move from where you were
7  with the warming unit to the front-end area?
8     A.  Oh.  I believe we hired Dan Doran, and that
9  was his -- that was -- the intent was that was his
10  role, he was going to be the engineer on it, and --
11  because it's always been my preference to work on
12  front-end.
13    Q.  Okay.  So this was a choice that you made.
14    A.  Correct.
15    Q.  Do you remember what type of products you
16  worked on from July 2015 to when you left the company
17  a year later or so?
18    A.  Yeah.  We looked at automating fluid-warming
19  lines, looked at some core temperature monitoring
20  devices, and some prewarming, like warming in the pre-
21  op.
22    Q.  Was that forced air or a different type of
23  modality?
24    A.  In white space.  We looked at everything.
25    Q.  Okay.

Page 101

1        (Exhibit 369 was marked for
2  identification.)
3        THE WITNESS:  Okay.
4  BY MR. FARRAR:
5     Q.  I'm looking at an e-mail marked as Exhibit
6  369 from July of 2015, and specifically the one July
7  23rd from Mr. Balthazor to you and Jennifer Yi.  Do
8  you see that?
9     A.  Yes.
10    Q.  And Jared says, "I informed Sarah we are no
11  longer interested in changing the filter at this
12  time."  And they're referring to the Porous Media M20;
13  correct?
14    A.  Yes.
15    Q.  Do you know why the decision was made in
16  July 23rd, 2015 to stop looking at different filters
17  to be used in the Bair Huggers?
18    A.  I do not recall.
19    Q.  Was it related to litigation?
20        MR. FRESCH:  Object to form.
21        MR. GOSS:  And again, if your answer
22  requires you to relay any conversations you had with
23  3M counsel, we would assert privilege over that.
24    A.  It was -- I had --
25        We had conversations with Maureen Harms,

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 106

1  my supervisor.
2      Q.  Okay.  So the --
3          In other words, what's happening in
4  marketing isn't necessarily always relayed to you;
5  correct?  Different -- different unit.
6      A.  Yes.
7      Q.  So what's happening with the competitors in
8  the marketplace you might or may not be aware of.
9  Fair enough?
10     A.  That would be fair.
11     Q.  So it would not be unusual for either your
12  supervisor or the folks in marketing to come to you
13  and say, "Why don't you guys try to design a way to
14  keep the hose clean," without you having the full
15  information or knowledge as to why you're doing that.
16  Is that fair?
17     A.  Yes.  Fair.
18     Q.  Same way, your supervisor or somebody else
19  could come to you and say, "Let's look at a way that
20  we could increase the efficiency of the filter," and
21  you may or may not know exactly why you're doing that,
22  you're just going to go do it; right?
23     A.  For that situation, I don't believe anybody
24  has --
25          That one I was told for.  That was

Page 107

1  competitive landscape.
2      Q.  Okay.  That one was specifically told to
3  you, but in terms of why keeping the hose clean, you
4  didn't have a specific reason as to why you were doing
5  it, just doing it.
6      A.  Other than there was competitors that had --
7      Q.  Okay.  And the --
8          You and your team came up with three
9  concepts:  an insertable filter, modular disposable
10  hose, or self-cleaning system; correct?
11     A.  And these were really-out-of-this-world type
12  of exploratory.
13     Q.  Okay.  These are just -- yeah.  These are
14  ideas that smart guys in a room come up with; right?
15     A.  Yeah.  This was just white space.
16     Q.  Right.
17         But these are ideas that are feasible;
18  right?  I mean you -- you could design -- design these
19  types of systems; correct?
20         MR. GOSS:  Object to form.
21     A.  No, not all.
22     Q.  Okay.  Well let's talk about the --
23         I'm not going to go through this in -- in
24  detail, but the insertable filter --
25         And you've got a handful of pages here of

Page 108

1  different filter ideas; correct?
2      A.  Yes.
3      Q.  Okay.  And these filters, insertable filters
4  into the hose, these are all ideas that you -- were
5  technologically feasible at the time.  Fair enough?
6          MR. GOSS:  Object to form.
7          MR. FRESCH:  Object to form.
8      A.  Yes.
9      Q.  Have you ever heard discussions within the
10  company about a distal filter on the hose?
11     A.  I do not recall.
12     Q.  If I talked to you about Project Ducky, is
13  that something that you would have any familiarity
14  with?
15     A.  I know the name, but I was not involved.
16     Q.  Do you know what Project Ducky was, what it
17  involved?
18     A.  Not really.
19     Q.  Okay.  If we turn to page seven --
20         And the number on the bottom left is really
21  faint.
22     A.  Oh, yes.  Yes.
23     Q.  This is kind of where we get to the second
24  idea of modular; correct?  Second ideation.
25     A.  Yes.

Page 109

1      Q.  What --
2          Can you define what "modular" meant in terms
3  of a way to attempt to try to keep the hose clean?
4      A.  I think "modular" would then coincide with
5  "insertable," how -- if you had an insertable filter,
6  how would you insert it into the hose, which is to say
7  mechanical way to do it.
8      Q.  How would --
9          So modular is just really a -- way to get
10  the filter into the hose?
11     A.  I believe so.
12     Q.  Okay.  And -- and feel free to flip through.
13     A.  I believe so.  From --
14         It's been a while since I've seen these
15  drawings, so --
16         Yeah.  Possibly.  Yeah.
17     Q.  Okay.  And if we flip over to page -- I
18  believe it starts -- 13, starts the "Self-Cleaning/
19  Contained System."
20     A.  Yes.
21     Q.  And you have number "9. Check Engine Light."
22  Do you see that?
23     A.  Yes.
24     Q.  That means basically when the filter is --
25  needs to be changed, some light comes on that tells

28 (Pages 106 to 109)

# EXHIBIT 26

C O N F I D E N T I A L

Page 1

1              UNITED STATES DISTRICT COURT

2                 DISTRICT OF MINNESOTA

3  - - - - - - - - - - - - - - - - - - - - - -

4  In Re:

5  Bair Hugger Forced Air Warming

6  Products Liability Litigation

7

8  This Document Relates To:

9  All Actions          MDL No. 15-2666 (JNE/FLM)

10 - - - - - - - - - - - - - - - - - - - - - -

11

12

13            DEPOSITION OF GARY L. HANSEN

14              VOLUME I, PAGES 1 - 316

15                 NOVEMBER 2, 2016

16

17

18          (The following is the deposition of GARY L.

19 HANSEN, taken pursuant to Notice of Taking Deposition,

20 via videotape, at the offices of Ciresi Conlin L.L.P.,

21 225 South 6th Street, Suite 4600, Minneapolis,

22 Minnesota, commencing at approximately 9:30 o'clock

23 a.m., November 2, 2016.)

24

25

Page 198

1 statistically significant; correct?
2    A.  According to the paper.
3    Q.  Okay.  Now the study that was done in -- was
4 it Sweden?  Where was the study done that Sessler --
5    A.  Netherlands.
6    Q.  Netherlands.  That's right.  Netherlands.
7       That had a smaller sample size too; didn't
8 it?
9    A.  We used the sample size which was consistent
10 with the DIN standard.
11    Q.  I didn't ask that.  It was a small sample
12 size; wasn't it?
13       MR. GORDON:  Object to the form of the
14 question, argumentative.
15    A.  I think "small" is subjective.
16    Q.  Five data points?
17    A.  Yes.
18    Q.  Isn't that right?
19    A.  Yes.
20    Q.  And Dr. Sessler said that it looks to him
21 like if you'd used more, it would have been
22 statistically significant, the difference.
23       MR. GORDON:  Object to the form of the
24 question.
25    Q.  Didn't he?

Page 199

1    A.  He may have said that in an e-mail.
2    Q.  Yes.  And the difference was somewhere
3 around five to one; wasn't it?
4       MR. GORDON:  Object to the form of the
5 question, lack of foundation.
6    Q.  If you recall.  Something like a hundred
7 and --
8    A.  Are we talking about the relative
9 difference --
10    Q.  Yes.
11    A.  -- between --
12    Q.  A hundred -- a hundred and eighty-six to --
13       The average of the five data points was
14 something like 186 to 28 or something like that.
15    A.  The important thing was that there was a
16 large log reduction of both to a highly significant
17 degree so that the differences between them were less
18 important.
19    Q.  What he said was that if there had been more
20 tests -- more data points, it would have been
21 statistically significant.
22       MR. GORDON:  Object to the form of the
23 question.
24    Q.  And that's what he said; isn't that right?
25    A.  And that's hard to predict even for him.

Page 200

1    Q.  But that's what he said.
2    A.  He --
3       That's what he said.
4    Q.  Thank you.
5       MR. GORDON:  Object to the form of the
6 question.
7    Q.  And the reason that study was done was for a
8 legal strategy; isn't that right?
9    A.  I disagree.  It was done to have a direct
10 scientific answer to the charges of air filtra -- or
11 of particulates in the operating room.
12       (Exhibit 11 was marked for
13        identification.)
14 BY MR. CIRESI:
15    Q.  Now this is a series of e-mails that have
16 been marked as Exhibit 11.  The last is from Teri
17 Woodwick-Sides to you with carbon copies to the top
18 guy, Mr. Maharaj, to Bob Buehler, to Jana Stender.
19       Who is Jana Stender?
20    A.  She was the director of marketing.
21    Q.  Director of marketing.  Okay.
22       And Bob Gagne, who is that?
23    A.  He was a consultant to the company.
24    Q.  What kind of consultant?
25    A.  I think he was a marketing consultant.

Page 201

1    Q.  Marketing.  Okay.  So you had two marketing
2 people.
3       Bob Buehler, what was his title?
4    A.  He was in charge of the sales force.  I
5 don't know --
6    Q.  Sales.
7    A.  I don't know what his title was.
8    Q.  Okay.  So you got sales, marketing,
9 marketing, the CEO.
10       And Teri Sides -- or Woodwick-Sides was who?
11    A.  She was the vice president of --
12    Q.  International sales?
13    A.  -- product development and marketing, if I
14 get it right.
15    Q.  Vice president of --
16    A.  Product development and marketing.
17    Q.  Product development and marketing.
18       And then you as head of research and
19 development; correct?
20    A.  Yes.
21    Q.  Date, 4-23-2010; correct?
22    A.  Yes.
23    Q.  Okay.  Was Teri Woodwick-Sides a forthright
24 person?
25    A.  Yes, I would say so.

C O N F I D E N T I A L

Page 226

1    Q.   How long does an operation take for hip
2  replacement?
3    A.   An hour or more.
4    Q.   An hour or more.
5        How about for a knee replacement?
6    A.   Again, a lengthy period of time.
7    Q.   An hour or more; right?  Isn't that right?
8    A.   To the best of my knowledge.
9    Q.   So this test that you did was one-60th of
10  the time that it would take for an operation with no
11  complications.
12    A.   May I explain why we chose that -- that
13  interval?
14    Q.   I just want to know if the ans -- if I'm
15  correct.
16    A.   Repeat the question.
17    Q.   One-60th of the time it takes --
18    A.   According to the math --
19    Q.   -- for an operation without any
20  complications.
21    A.   If the operation took an hour, then that's
22  what the math says.
23    Q.   Okay.  Now you want to tell me why you chose
24  one minute --
25    A.   Right.

Page 227

1    Q.   -- for the measurement.
2    A.   The five successive one-minute measurements
3  were part of the DIN standard, which had been used in
4  multiple operating rooms throughout the world for
5  validating operating room quality, so they had
6  determined ahead of time that five measurements were
7  sufficient to get a good sample of particulate
8  measurements in an operating room that wasn't being
9  occupied by people at the time, and that's how they
10  test operating rooms under the standard.
11    Q.   That's for an operating room.  Here we're
12  talking about a machine in the operating room which is
13  sucking up air from the floor which is dirty, as
14  you've acknowledged, is going through the machine
15  heated, out the hose, deposited on the person during
16  an operation that takes an hour and it's going
17  continuously.
18        MR. GORDON:  Object to the form of the
19  question, move to strike counsel's commentary.
20    Q.   This doesn't relate to the one-minute
21  intervals to see whether or not the air quality is
22  good in the operating room with people doing nothing.
23    A.   That's not a question.
24        MR. GORDON:  Same objection, move to strike
25  counsel's speech.

Page 228

1    Q.   Is that -- is that the difference?
2    A.   The test was a controlled test under
3  controlled circumstances.  If you wanted to do a
4  realistic test with multiple people moving around the
5  operating room under actual conditions of surgery, it
6  would have been a different study.  It isn't the study
7  we chose to do.
8    Q.   Right, I know you didn't.  Because the DIN
9  standard doesn't consider statistical standards; does
10  it?
11        MR. GORDON:  Object to the form of the
12  question, move to strike counsel's commentary.
13        MR. BREWER:  Objection, foundation.
14    A.   It does --
15    Q.   If you know.
16    A.   It does consider statistical treatment of
17  the data.
18        I did recall asking Dr. Kuelpmann why five
19  standards, and I believe he told me that five was
20  sufficient to get a decent variance in the data for
21  their test purposes.
22    Q.   Let's look at your e-mail to the doctors on
23  Exhibit 12, the last paragraph.  "Bear in mind the DIN
24  1946 is intended to verify the effectiveness of
25  operating room filtration.  Therefore, it's cut-and-

Page 229

1  dried in its requirements; either an OR meets the
2  standard or it does not.  The authors did not envision
3  making comparisons, so a -- so a statistical treatment
4  is missing from the document.  For the purposes of
5  pass/fail, PE is calculated using the single worst
6  one-minute sample of the collection."
7        Did I read that correctly?
8    A.   From memory, I think that's what the
9  standard said.
10    Q.   And -- and -- and I read it correctly;
11  correct?
12    A.   Yes, you did.
13    Q.   And that is the standard; isn't it?
14    A.   Yes.
15    Q.   Thank you.
16        And your e-mail to Drs. Olmstead and
17  Sessler, which is Exhibit No. 12, was in November, and
18  it would have been after you had had other discussions
19  with Mis -- or Dr. Kuelpmann; correct?
20    A.   April to November, yes.
21    Q.   And you had been talking to Kuelpmann and
22  trying to figure out what the DIN was up to that point
23  in time; weren't you?
24    A.   Yes, trying to understand the data and also
25  to get the report written, which took a long period of

58 (Pages 226 to 229)

# EXHIBIT 27

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 1

1                    UNITED STATES DISTRICT COURT

2                     DISTRICT OF MINNESOTA

3      - - - - - - - - - - - - - - - - - - - -

4      In Re:

5      Bair Hugger Forced Air Warming

6      Products Liability Litigation

7

8      This Document Relates To:

9      All Actions            MDL No. 15-2666 (JNE/FLM)

10     - - - - - - - - - - - - - - - - - - - -

11

12

13              DEPOSITION OF DR. DANIEL SESSLER

14                 VOLUME I, PAGES 1 - 152

15                    JANUARY 11, 2017

16

17

18            (The following is the deposition of DR.

19     DANIEL SESSLER, taken pursuant to Notice of Taking

20     Deposition, via videotape, at the Cleveland Clinic,

21     P Building, Conference Room P77-013, 2070 East 90th

22     Street, Cleveland, Ohio, commencing at approximately

23     10:11 o'clock a.m., January 11, 2017.)

24

25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 62

1    A.  That's -- that's called data selection; it's
2  a type of research fraud.
3    Q.  Would you agree --
4    A.  You have to look at all the data.
5    Q.  Would you agree with me that any substantial
6  increase would concern clin -- clinicians?
7    A.  Average increase, not -- not results from
8  one run and one circumstance.
9    Q.  Would you agree with me that any substantial
10 increase would concern clinicians?
11       MR. GORDON:  Object to the form of the
12 question, also lack of foundation.
13   A.  Any substantial increase in average values
14 over all conditions would concern people.
15   Q.  Okay.  And then you say in the third
16 paragraph, "Possibly the best statistical approach
17 would be an ANOVA with cover type...;" correct?
18   A.  Yes.
19   Q.  And that's in fact what you guys have ended
20 up doing; correct?
21   A.  Correct.
22   Q.  Okay.  And ANOVA is basically analysis of
23 variance; right?
24   A.  Yes.
25   Q.  And then you say, "But perhaps it would be

Page 63

1  best to consider the hospitals together since that
2  isn't really a factor of interest; and the cover type
3  could be unpaired."  Do you see that?
4    A.  Uh-huh.  Yes.
5    Q.  And in fact what you were describing there
6  is rather than show the results from the two hospitals
7  separately, you were going to group them together for
8  the purposes of the paper; right?
9    A.  Yes, because it -- that's the way it should
10 have been done.  That's -- that's the correct way of
11 handling these data.
12   Q.  Why is it the correct way of handling these
13 data?
14   A.  Because the two hospitals together
15 characterize the general case better than either
16 hospital alone.
17   Q.  Well you know that ORs are different; right?
18   A.  Sure.
19   Q.  Okay.  That can be a confounding factor;
20 right?
21   A.  Could be.
22       MR. GORDON:  Object to the form of the
23 question.
24   Q.  Could be a confounding factor.
25       Did you do any investigation as to whether

Page 64

1  the machine that was used in Amersfoort might have
2  been a used one versus a new one?
3    A.  No.
4    Q.  Or that there was different protocols for
5  how they clean the OR?
6    A.  No.  But it's not relevant to this study,
7  which used artificial particles.  This had nothing to
8  do with bacteria.
9    Q.  Well I think we've already established you
10 don't know whether the Bair Hugger sucks in
11 particulates from off the floor and spews them out
12 into the surgical site; right?
13       MR. GORDON:  Object to the form of the
14 question.
15   A.  I don't think that's relevant to this study
16 where there are 20 million particles floating around
17 that are deliberately introduced.
18   Q.  So it wouldn't be of clinical interest to
19 you.
20   A.  You -- you're confusing two different
21 circumstances.  One is whether forced-air warmers pick
22 up bacteria, retain bacteria or somehow eject
23 bacteria.  If they do, that's a problem.  A second
24 issue, which is what this paper is about, is whether
25 warm air interferes with the laminar flow column.  Has

Page 65

1  nothing to do with bacteria.
2    Q.  Okay.  And you -- you --
3        I think we've established this.  You're not
4  an expert on laminar flow or how particulates move in
5  the environment; right?
6    A.  I'm not.
7    Q.  So you -- you basic --
8        Did you ask anybody why it was that the
9  Amersfoort data appeared so different in terms of the
10 particulate counts?
11       MR. GORDON:  Object to the form of the
12 question.
13   A.  I don't remember.
14   Q.  Was it of interest to you?
15   A.  Absolutely.
16   Q.  What do you recall doing in connection with
17 that data?
18   A.  When you do multicenter studies, it's
19 absolutely routine and normal for the results to
20 differ in the various centers.  You -- you expect that
21 just by random motion.  And it's also true that the
22 centers are truly different; they have different
23 operating rooms, different anesthesia, different
24 protocols, so you expect real differences among sites
25 in a multicenter study.  But you do a multicenter

17 (Pages 62 to 65)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 66

1  study to enhance generalizability.  You take all the
2  results you have and you put them together and you
3  present the average because that best characterizes
4  what you know, and that's what we did here.
5      Q.  And in this case you did five samples, five
6  runs five minutes each in two hospitals; correct?
7      A.  Yes.
8      Q.  And in fact you noted here that there were
9  only five measurements; right?
10     A.  Correct.
11     Q.  So you're standing behind your proposition
12  that this is not an under -- underpowered study;
13  correct?
14         MR. GORDON:  Object to the form of the
15  question.
16     A.  Correct.
17     Q.  Could pooling the data from Amersfoort and
18  Utrecht confound the data?
19     A.  No.
20     Q.  Why not?
21     A.  "Confounding" has a specific meaning, has to
22  be something that's related to exposure and outcome.
23  I don't see how pooling induces confounding.
24     Q.  Now I think we talked about this before, but
25  Gary Hansen did the first draft; is that right?

Page 67

1      A.  Yes.
2      Q.  And then Dr. Olmstead took a crack at it; is
3  that right?
4      A.  Yes.
5      Q.  And then you edited it; correct?
6      A.  "Edited" is a generous term.  Virtually
7  every word in the published manuscript was mine.
8      Q.  I've handed you, Dr. Sessler, what's been
9  previously marked as Deposition Exhibit 79, which is a
10  marked-up draft of your study which eventually was
11  published and has been previously marked as (Belani)
12  Exhibit 16; correct?
13     A.  Yes.
14     Q.  Okay.  And you were part of this editing
15  process; correct?
16     A.  Yes.
17     Q.  If we can take a look at draft -- the draft
18  page seven, which bears Bates number 50592, and if we
19  can look at the middle paragraph starting with "We
20  found..."
21     A.  Yes.
22     Q.  Okay.  Midway down there there is a section
23  which in this draft reads, "There were noticeable
24  differences in the results between the two operating
25  rooms, probably the result of small differences in

Page 68

1  draping around the OR table, and also perhaps due to
2  differences in the laminar flow systems."  Do you see
3  that?
4      A.  I do.
5      Q.  And there was a deleted box beside that, and
6  what was deleted is "The significantly higher counts
7  seen with the blanket model 635 reflected conditions
8  at OR Amersfoort" or "A..."  Do you see that?
9      A.  I see it, yes.
10     Q.  Okay.  Who made the decision to delete from
11  this transcript that there had been significantly
12  higher counts seen with the underbody blanket at the
13  Amersfoort hospital?
14     A.  Well, whoever edited the document.
15     Q.  Do you know if that was Mr. Hansen at 3M?
16     A.  I have no idea who was editing at this
17  point.
18     Q.  Okay.  Was that something that you had
19  drafted originally, that you had found significantly
20  higher counts seen with the blanket model 635 in
21  Amersfoort?
22     A.  I'm not sure I understand the question.
23     Q.  My question is:  Do you know whether you
24  were the person who originally put in the draft that
25  there had been significantly higher counts seen with

Page 69

1  the underbody blanket at Amersfoort hospital?
2      A.  I have no idea.  Sorry.
3      Q.  You don't recall.
4      A.  Not even vaguely.  This is from when, 2011,
5  and this was years before that.
6      Q.  Well if you were the one who put it in,
7  presumably you -- you put it in originally because you
8  thought that would be of interest to clinicians;
9  correct?
10         MR. GORDON:  Object to the form of the
11  question, lack of foundation.
12     A.  We don't know that I put it in.
13     Q.  Well it's consistent with the e-mail
14  exchange we just went through; correct?
15         MR. GORDON:  Object to the form of the
16  question.
17     A.  It requires supposition.
18     Q.  Well would you agree that this statement is
19  consistent with your -- the deleted statement is
20  consistent with your statement as reflected in the
21  e-mails we just went through, Exhibit 12?
22         MS. DIFRANCO:  Here.
23         (Document handed to the witness.)
24     A.  The statement seems consistent with the
25  data.  Who put it in, who took it out, I have no idea.

18 (Pages 66 to 69)

# EXHIBIT 28

C O N F I D E N T I A L

1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF MINNESOTA

3      - - - - - - - - - - - - - - - - - - - - -

4      In Re:

5      Bair Hugger Forced Air Warming

6      Products Liability Litigation

7

8      This Document Relates To:

9      All Actions            MDL No. 15-2666 (JNE/FLM)

10     - - - - - - - - - - - - - - - - - - - - -

11

12

13                   DEPOSITION OF JANA M. STENDER

14                     VOLUME I, PAGES 1 - 182

15                        DECEMBER 9, 2016

16

17

18            (The following is the deposition of JANA M.

19     STENDER, taken pursuant to Notice of Taking

20     Deposition, via videotape, at the offices of Ciresi

21     Conlin L.L.P., 225 South 6th Street, Suite 4600,

22     Minneapolis, Minnesota, commencing at approximately

23     9:08 o'clock a.m., December 9, 2016.)

24

25

Page 174

1    Q.  I've handed you what's been marked as 199.
2  It's Bates labeled 575251.
3        Did you have a chance to review that?
4    A.  I did.
5    Q.  All right.  And you see where -- where Dr.
6  Sessler is e-mailing Gary Hansen in July of 2011;
7  correct?
8    A.  Yes.
9    Q.  It's talking about the manuscript being
10  submitted, but it's the next paragraph that I'm
11  interested in.  Do you see where he says, "I'm glad 3M
12  is seriously considering a true contamination study.
13  That is the only type of study that will put this
14  issue to bed."
15        Did I read that correctly?
16    A.  Yes.
17    Q.  And that was eventually forwarded on to you
18  by Mr. -- or Dr. Hansen; correct?
19    A.  Yes.
20    Q.  So in 2011 you knew what you considered a
21  KOL in this area, in this topic, his opinion was there
22  has never been a true contamination study; correct?
23        MS. GASE:  Objection, form, mischaracterizes
24  the document.
25    A.  He doesn't say there's never been a true

Page 175

1  contamination study.  He said, "I -- I'm glad 3M is
2  seriously considering a true contamination study."
3    Q.  Because it's the only type of study that
4  will put the issue to bed.
5    A.  That's what this note says, yes.
6    Q.  So if there had already been one done, well,
7  we would have already put this issue to bed; right?
8        MS. GASE:  Object to form.
9    A.  He says this -- you know, this is the only
10  type of study this will push -- put the issue to bed.
11    Q.  As your personal knowledge, no true
12  contamination study has ever been done; correct?  3M
13  didn't do that; correct?
14    A.  I don't personally know if a true
15  contamination study --
16        I don't know what "true contamination"
17  entails, but I -- I don't personally know.
18    Q.  Did you ask Dr. Hansen, "What does Dr.
19  Sessler mean by 'a true contamination study?'"
20    A.  I don't know that I did.  I don't recall.
21    Q.  If we would, Exhibit 28, please.
22        Do you recall drafting and sending the war
23  game notes on March 17th, 2011?
24        MS. GASE:  Could we go off the record a
25  second?

Page 176

1        MR. FARRAR:  Yeah.
2        (Discussion off the record.)
3  BY MR. FARRAR:
4    Q.  Did you draft the war games notes?
5    A.  I don't know.  I know John Rock was in
6  charge of that.  He had led the war games exercises.
7    Q.  You just don't know who actually drafted it?
8    A.  It's a recap.
9    Q.  Okay.
10    A.  I -- I don't know who recapped everything.
11    Q.  Would this be like a brainstorming session
12  where people would be in a room together and
13  discussing the different issues?
14    A.  Again, this was part of the 3M strategic
15  planning process, and so they specifically asked us to
16  look at any factors that would affect the business
17  going forward.
18    Q.  Okay.  Were you involved in the meetings or
19  whatever took place to create the war games document?
20    A.  I was involved in some war games sessions.
21  I can't speak if I was involved in this particular
22  session.
23    Q.  Okay.  If we look at it, the very first
24  section is "Overall Nightmares;" correct?
25    A.  That's correct.

Page 177

1    Q.  So that was --
2        This would be things that would be overall,
3  in the grand scheme of things, detrimental to the Bair
4  Hugger business.  Fair enough?
5    A.  That's the way we characterized it.
6    Q.  The next one is "Contamination/ABAD;"
7  correct?
8    A.  That's the header, yes.
9    Q.  This would be stuff that is negative to Bair
10  Hugger, not in an overall sense but much more specific
11  to issues relating to contamination or ABAD; correct?
12        MS. GASE:  Objection, form.
13    A.  I don't know for certain given what I read
14  here, but presumably, yes, contamination and Augustine
15  Biomedical + Design.
16    Q.  And if we go down towards the bottom, four
17  up from the top -- from the bottom I mean, "Someone
18  does a real study on FAW & contamination;" correct?
19    A.  That's what it says.
20    Q.  So that would be a nightmare scenario for
21  3M, is if somebody actually conducted a real study on
22  forced-air warming and contamination.
23        MS. GASE:  Objection, mischaracterizes the
24  document.
25    A.  It's not listed as a nightmare scenario,

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL

Page 178

1    it's listed as a Contamination/Augustine Biomedical
2    scenario.
3        Q.   Right.  These are all negative things that
4    come out of contamination.  We have the overall
5    nightmares and the nightmares that come out of things
6    related to contamination and ABAD; correct?
7        A.   Not correct.
8        Q.   All right.
9        A.   It's not listed as nightmares.  These are
10   factors that are related to contamination and
11   Augustine Biomedical, not nightmares.
12       Q.   Everything under Contamination/ABAD would be
13   bad for 3M; correct?
14       A.   I would have to read every item.
15       Q.   Please do.
16           Are they all negative things that could
17   happen to the company?
18       A.   I wouldn't characterize them as negative,
19   but I do characterize them as scenarios that could
20   impact, yes.
21       Q.   These are all things that could happen that
22   would negatively impact the sale of Bair Hugger;
23   correct?
24       A.   I don't know, again, that I would
25   characterize everything as negative, but certainly

Page 179

1    could have impact on the business.
2        Q.   Which ones would you not characterize as
3    negative?
4        A.   I -- I think --
5            You know, I can give you an example.
6    "Impact of champions in market," that wouldn't
7    necessarily be negative, it would just be something
8    that happens.
9        Q.   Okay.  So that's one.  Any others?
10       A.   So let me -- let me understand.  You want me
11   to articulate in my perspective --
12       Q.   Any -- anything under Contamination/ABAD
13   that you believe is not necessarily a negative, would
14   not have a negative impact on the company.
15       A.   I would characterize these as areas of
16   concern, certainly.  They're all possibilities, and
17   that's what this exercise was intended to do.
18       Q.   Okay.  So one area of concern would be "ABAD
19   issues contamination test kits to orthos around the
20   country;" correct?
21       A.   That is something that's stated here in the
22   recap.
23       Q.   Obviously, a -- a negative would be a
24   "Definitive study showing FAW as source of SSI;"
25   correct?

Page 180

1        A.   I'm sorry, what was --
2            Okay.  What was your question again?  I'm
3    sorry.
4        Q.   A definitive study showing forced-air
5    warming as a source of surgical-site infection, that
6    would be a negative outcome; correct?
7        A.   That would have potential impact on the
8    business, yes.
9        Q.   Okay.  And that's the point, is everything
10   under Contamination/ABAD are things that could have
11   potential negative impact on the sales of Bair Huggers
12   or the company; correct?
13           MS. GASE:  Objection, form.
14       A.   Potential impact, yes.
15           MR. FARRAR:  Okay.  Okay, Ms. Stender, I
16   think I'm done, but let me take a quick break and
17   confer real quick.
18           THE WITNESS:  Okay.
19           THE REPORTER:  Off the record, please.
20           (Recess taken.)
21           MR. FARRAR:  All right, Ms. Stender, I don't
22   have any more questions.  I appreciate your time.
23           THE WITNESS:  Thank you.
24           THE REPORTER:  Off the record, please.
25           (Deposition concluded.)

Page 181

1                C E R T I F I C A T E
2        I, Richard G. Stirewalt, hereby certify that
3    I am qualified as a verbatim shorthand reporter, that
4    I took in stenographic shorthand the deposition of
5    JANA M. STENDER at the time and place aforesaid, and
6    that the foregoing transcript is a true and correct,
7    full and complete transcription of said shorthand
8    notes, to the best of my ability.
9        Dated at Minneapolis, Minnesota, this 15th
10   day of December, 2016.
11
12
13
14
15
16
17           RICHARD G. STIREWALT
18           Registered Professional Reporter
19           Notary Public
20
21
22
23
24
25

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

# EXHIBIT 29

C O N F I D E N T I A L

Page 1

```
 1                UNITED STATES DISTRICT COURT

 2                   DISTRICT OF MINNESOTA

 3    - - - - - - - - - - - - - - - - - - - -

 4    In Re:

 5    Bair Hugger Forced Air Warming

 6    Products Liability Litigation

 7

 8    This Document Relates To:

 9    All Actions            MDL No. 15-2666 (JNE/FLM)

10    - - - - - - - - - - - - - - - - - - - -

11

12

13            DEPOSITION OF TROY W. BERGSTROM

14               VOLUME I, PAGES 1 - 259

15                  NOVEMBER 18, 2016

16

17

18            (The following is the deposition of TROY W.

19    BERGSTROM, taken pursuant to Notice of Taking

20    Deposition, via videotape, at the offices of Ciresi

21    Conlin L.L.P., 225 South 6th Street, Suite 4600,

22    Minneapolis, Minnesota, commencing at approximately

23    9:04 o'clock a.m., November 18, 2016.)

24

25
```

CONFIDENTIAL

Page 66

1  like to go over some of those, kind of switch topics.
2      A.  Okay.
3      Q.  And I'm going to be handing you some
4  scientific studies, and we can go ahead and mark them
5  as exhibits.  I'm -- I'm really only giving you for --
6  to refresh your --
7          You need to understand what study I'm
8  talking about.
9      A.  Okay.
10     Q.  And I want you to understand I'm not trying
11  to go at you with science or any of those sorts of
12  things.  I just want to understand your familiarity.
13  And so the first one is -- that I'm going to hand
14  you --
15         MR. BANKSTON:  Go ahead and mark that.
16         MS. AHMANN:  And again, do you have any
17  copies of these?
18         MR. BANKSTON:  I do not.  I just have one.
19  I hadn't -- really didn't intend to mark these in as
20  an exhibit.  If you'd like me to make copies of each
21  of these, I can.
22         (Exhibit 91 was marked for
23         identification.)
24         MR. BANKSTON:  But I really only have one
25  question on it.

Page 67

1          MS. AHMANN:  Let me take a look.
2  BY MR. BANKSTON:
3      Q.  And Mr. Bergstrom, I'm just wondering,
4  have -- do you have memory of ever seeing this?
5      A.  I would have seen it, yes.
6      Q.  And do you remember ever being instructed to
7  draft talking points discrediting this study?
8          MS. AHMANN:  Object to form.
9      A.  I don't remember being asked to develop
10  talking points specifically to discredit.  We would
11  have developed talking points that the sales used --
12  our sales team could use in response to the article.
13     Q.  You would agree with me that, with regard to
14  literature that was critical of forced-air warming
15  from the standpoint of orthopedic infections, it was a
16  goal of the marketing department to discredit those
17  studies.
18     A.  I don't believe "discredit" is the right
19  word, no.
20     Q.  Okay.
21     A.  I believe the goal of the marketing
22  department was to review those papers, as we would any
23  paper, examine the strengths and weaknesses and then
24  provide the responses that our -- our sales force
25  could use.

Page 68

1      Q.  Okay.
2          (Exhibit 92 was marked for
3          identification.)
4  BY MR. BANKSTON:
5      Q.  Mr. Bergstrom, I've handed you Exhibit 92,
6  which is entitled "Forced-Air warming blowers:  An
7  evaluation of filtration adequacy and airborne
8  contamination emissions in the operating room."  Do
9  you recall ever seeing this study?
10     A.  I would have seen it and I would have read
11  through it, yes.
12     Q.  Were --
13         Did you ever recall being given instructions
14  to draft talking points on this study?
15     A.  Yes, we would have -- our team would have
16  drafted talking points.
17     Q.  And again, on this question again, was it a
18  goal of your department to discredit this study?
19     A.  It was to provide our sales reps with
20  responses on how to address concerns about the
21  misinformation.
22     Q.  Okay.
23         (Exhibit 93 was marked for
24         identification.)
25  BY MR. BANKSTON:

Page 69

1      Q.  Mr. Bergstrom, I've handed you another
2  study, Exhibit 93.  This study is entitled "Forced-Air
3  warming and ultra-clean ventilation do not mix."  Do
4  you recall ever seeing this study?
5      A.  Yes, I would have seen this.
6      Q.  Do you recall being instructed to draft
7  talking points to your customers about this study?
8      A.  Myself and the team would have drafted
9  talking points again to -- to address the
10  misinformation.
11     Q.  Okay.  When you say "misinformation," those
12  talking points would have been critical of this study.
13     A.  There are some that are critical in terms of
14  the -- the way this study was set up and things that
15  were -- were overlooked and not -- not included, yes.
16     Q.  Okay.
17         (Exhibit 94 was marked for
18         identification.)
19  BY MR. BANKSTON:
20     Q.  Mr. Bergstrom, I've handed you Exhibit 94, a
21  scientific study entitled "Do forced air patient-
22  warming devices disrupt unidirectional downward
23  airflow?"  Do you recall ever seeing this study?
24     A.  Yes, I would have read this study.
25     Q.  Okay.  Do you recall being instructed to

18 (Pages 66 to 69)

CONFIDENTIAL

Page 70

1  draft talking points critical of this study?
2      A.  I likely would have directed talking points
3  the sales reps could use to respond to concerns about
4  the misinformation.
5      Q.  Okay.
6          (Exhibit 95 was marked for
7          identification.)
8  BY MR. BANKSTON:
9      Q.  I have handed you what's been marked as
10 Exhibit 95.  This is a scientific study entitled
11 "Effect of forced-air warming on the performance of
12 operating theatre laminar flow ventilation."  Do you
13 recall receiving this study?
14     A.  Yes, I would have read it.
15     Q.  Were you also instructed on this study to
16 draft talking points critical of the study?
17     A.  I would have drafted -- myself and the team
18 would have drafted talking points again for the sales
19 reps to use to address this study's shortcomings and
20 misinformation provided.
21     Q.  Okay.
22         (Exhibit 96 was marked for
23         identification.)
24 BY MR. BANKSTON:
25     Q.  Mr. Bergstrom, I've handed you Exhibit 96,

Page 71

1  another scientific study entitled "Forced-air patient
2  warming blankets disrupt unidirectional airflow."
3  Were you provided a copy of this study at any time?
4      A.  I would have read this study, yes.
5      Q.  And likewise, you were also instructed to
6  draft talking points critical of this study.
7      A.  I would have addressed talking points to
8  address misinformation, yes.
9      Q.  Okay.
10         (Exhibit 97 was marked for
11         identification.)
12 BY MR. BANKSTON:
13     Q.  I've now handed you Exhibit 97, a scientific
14 study entitled "Patient Warming Excess Heat:  The
15 Effects of Orthopedic Operating Room Ventilation
16 Performance."  Do you recall ever receiving a copy of
17 this study?
18     A.  Yes, I would have reviewed this study.
19     Q.  And you were instructed to draft talking
20 points critical of this study; correct?
21     A.  I would have addressed talk -- or addressed
22 talking points -- provided talking points to, again,
23 address the misinformation that's included.
24         (Exhibit 98 was marked for
25         identification.)

Page 72

1  BY MR. BANKSTON:
2      Q.  Mr. Bergstrom, I've handed you Exhibit 98, a
3  scientific study entitled "Forced-Air Warming Design:
4  Evaluation of Intake Filtration, Internal Microbial
5  Buildup, and Airborne-Contamination Emissions."  Were
6  you provided a copy of this study?
7      A.  I was provided a copy of this study --
8      Q.  And --
9      A.  -- and would have -- would have prep -- done
10 talking points to address the misinformation.
11     Q.  I'm glad you're already anticipating here.
12 Let's move on to our final one.
13         (Exhibit 99 was marked for
14         identification.)
15 BY MR. BANKSTON:
16     Q.  I have now handed you Exhibit 99, a
17 scientific study entitled "Infection control hazards
18 associated with the use of forced-air warming in
19 operating theatres."  Were you provided a copy of this
20 study?
21     A.  Yes, I would have reviewed this study.
22     Q.  Okay.  And with this study, you would have
23 also drafted talking points critical of the study.
24     A.  Yes, I believe we drafted talking points.
25     Q.  Okay.  You now have in front of you --

Page 73

1      A.  Not to be critical, to address
2  misinformation.
3      Q.  Okay.  I believe you now have nine published
4  scientific studies in front of you; correct?
5      A.  There are nine, yes.
6      Q.  From your testimony, I take it it is -- you
7  have been led to the conclusion that all nine of these
8  studies contain misinformation about your product.
9          MS. AHMANN:  Object to form.
10     A.  Our clinic -- our clinical team has gone
11 through these papers, identified various points of
12 weakness, and made me aware of those, yes.
13     Q.  Okay.  So your clinical team would make you
14 aware of weaknesses in these papers, but you have no
15 independent memory of being made of weaknesses in
16 Huang, Moretti or Zink.
17     A.  It may have been in, like I said, the study
18 summary sheets that were -- were issued.  I don't
19 recall seeing that, but --
20     Q.  Okay.
21         (Discussion off the stenographic record.)
22         (Exhibit 100 was marked for
23         identification.)
24 BY MR. BANKSTON:
25     Q.  Mr. Bergstrom, I've handed you Exhibit 100,

19 (Pages 70 to 73)

CONFIDENTIAL

Page 94

1  they can share with customers.
2      Q.  Okay.  Now the exhibit I have handed you now
3  is a November 4th, 2008 set of talking points that
4  came out of your department.  I'm wondering if you
5  remember this Kimberger study?
6      A.  I don't remember the study.  I don't
7  remember actually developing these talking points
8  either.
9      Q.  Okay.  Do you see where it has a discussion
10 of authorship and sponsorship?
11     A.  Yes, I do.
12     Q.  Okay.  And it says there in the middle of
13 that paragraph, "ABAD was not listed as a sponsor..."
14         Who is ABAD?
15     A.  That's Augustine Biomedical + Design.
16     Q.  Okay.  That is your competitor.
17     A.  Dr. Augustine.
18     Q.  Dr. Augustine.  Okay.
19         And it states here that they were not a
20 sponsor, they had donated some equipment, "...and the
21 authors disclaim any involvement of the sponsors in
22 the preparation of the paper..."  The next sentence in
23 bold says, "Certain portions of the paper read like
24 ABAD talking points; could they have assisted as
25 non-sponsors?"  Do you see that?

Page 95

1      A.  I do.
2      Q.  Okay.  Can you tell me why that might be
3  relevant or important?
4          MS. AHMANN:  Object to the form.
5      A.  It seems like a question that is -- is being
6  asked.  I don't know that these are final talking
7  points.  Perhaps they were submitted for review and
8  that's a question that they wanted to rectify.
9      Q.  So at this point there's no real indication
10 that your competitor was a sponsor of this paper, but
11 there's still some concern that they could have
12 assisted in the drafting or creation of this study.
13 Does that raise any concern to you?
14         MS. AHMANN:  Does what?  Does what raise a
15 concern?
16     Q.  The statement I just made, that they are not
17 listed as a sponsor but could have potentially
18 assisted in the preparation of the paper.  Does that
19 raise any concern to you?
20     A.  With me, not necessarily.  But again, it's
21 not my -- this isn't my -- clinical studies and what's
22 involved in conducting a clinical study isn't -- isn't
23 in my arena and scope.
24     Q.  Would you agree with me that what is being
25 communicated here is that there may be questions about

Page 96

1  the independence of the study's authors and the
2  company that may or may not have been involved in it?
3      A.  I think the question as written has been saying
4  it's an area to look into further.
5      Q.  And why would you want to look into that?
6          MS. AHMANN:  Object to form.
7      A.  You know, these -- I'm --
8          It's not my area of expertise.  I don't
9  know.
10     Q.  Well if the sponsor participated in the
11 drafting of the paper, --
12     A.  Uh-huh.
13     Q.  -- could that raise questions about the
14 independence of the scientists from the company?
15     A.  Potentially, yes.
16     Q.  Okay.
17         THE REPORTER:  We have to change disks.  Off
18 the record, please.
19         (Recess taken.)
20 BY MR. BANKSTON:
21     Q.  Mr. Bergstrom, before we went on break we
22 had been talking about various studies, and I
23 believe -- you know, you've told me numerous times it
24 was never your intention to discredit this -- these
25 studies, it's always been your intention to prevent

Page 97

1  misinformation.  Is that right?
2      A.  That is accurate, yes.
3      Q.  All right.  Can -- can you define for me
4  what you mean when you say "misinformation?"  What --
5  what does that include?
6      A.  I would include in that some of the -- the
7  shortcomings of the study.  And it's not necessarily
8  the studies themselves or even the authors, it's the
9  way the studies were used.  A lot of times what was
10 being promoted out into the -- into the hospitals
11 and -- and clinicians was inaccurate and not supported
12 by the studies.
13     Q.  In other words, taking stuff out of context,
14 giving less than the full story, that's a form of
15 misinformation; right?
16     A.  It can be when part of a larger -- in a
17 larger campaign that -- that --
18         Yes.
19     Q.  Omitting pertinent details of a study, that
20 would be a form of misinformation.
21     A.  Depending on the relevance.  I mean it
22 depends on what, I suppose, is included, so --
23     Q.  Or, for instance, misrepresenting weaknesses
24 in study design, things like that, that could be
25 misinformation.

Page 98

1    A.   Potentially, yes.
2    Q.   Okay.  Picking and choosing only the parts
3  that support your views, that could be a form of
4  misinformation.
5    A.   I'd have to see examples --
6    Q.   Okay.
7    A.   -- before I could speak to that.
8    Q.   Not disclosing things about the authors and
9  their independence, that would also be a form of
10 misinformation that should be avoided.
11   A.   Again, potentially.  I would need to see
12 examples.
13   Q.   Okay.  And customers should never be given
14 misinformation; correct?
15   A.   I would say it's not an ideal way to go
16 about your business.
17   Q.   Sure.  And tell me why that is.
18   A.   It doesn't -- I mean it doesn't serve a -- a
19 benefit to the business to not -- to provide
20 information that's incorrect.
21   Q.   Well apart from the benefit or advantage or
22 disadvantage to the benefit, there are patients out
23 there; right?
24   A.   Yes.
25   Q.   Those patients could get hurt if there's

Page 99

1  misinformation; right?
2    A.   Potentially, yes.
3    Q.   That's not something the company would ever
4  want to have happen.
5    A.   No.  Patient safety is our top priority.
6    Q.   And in -- and in some ways, your role is
7  kind of to protect customers from misinformation;
8  is -- wouldn't you agree?
9        MS. AHMANN:  Object to form.
10   A.   I --
11       In the information we communicate, yes.
12   Q.   I mean, in other words, you see a lot of
13 information in your day-to-day job and you can't
14 communicate all of it to the customer; correct?
15       MS. AHMANN:  Object to form.
16   A.   Yes.  I mean we certainly can't communicate
17 everything.
18   Q.   You -- you'd agree with me that the customer
19 relies on you to a certain extent to find them what is
20 pertinent and relevant and clear up misinformation.
21 That's part of your job; right?
22   A.   It would probably be part, yes.
23   Q.   And -- and in that job, 3M would never want
24 to provide misinformation.
25   A.   I -- yeah.  I can't think of a reason why we

Page 100

1  would intentionally provide misinformation.
2    Q.   Okay.  I'm going to talk a little bit more
3  about talking points and how those get created, and so
4  I'd like to show you something here.
5        (Discussion off the stenographic record.)
6        (Exhibit 107 was marked for
7        identification.)
8  BY MR. BANKSTON:
9    Q.   Mr. Bergstrom, I've handed you a February
10 25th, 2010 document entitled "Arizant forced-air
11 warming and SSI prevention:  Talking points for
12 sales."  This document begins with a description of
13 "Our position (please know this word for word)," and
14 I'm taking this is information that you want your
15 salespeople to be able to communicate to their
16 customers.
17       MS. AHMANN:  Objection, lack of foundation.
18   A.   Potentially that's what they were developed
19 for.  I'm --
20       I know this was developed by Hal Gray, I
21 believe, who is our international -- was in our
22 international business.
23   Q.   Okay.
24   A.   And I don't know that these were released or
25 if this is a draft or -- or --

Page 101

1    Q.   Okay.  In that first sentence where it says,
2  "There is no evidence that forced-air warming
3  increases the risk of surgical site infections (SSIs),
4  increases bacterial contamination in operating
5  theaters, or interferes with laminar flow in operating
6  theaters," do you see that sentence?
7    A.   I do.
8    Q.   Okay.  And I kind of want to concentrate on
9  the last little bit of it where it says "interferes
10 with laminar flow," that there's no evidence that
11 forced-air warming increases the risk of interference
12 with laminar flow.  Do you agree with that statement?
13   A.   I think I would have probably made the claim
14 that it --
15       "Interferes" is a challenging word because
16 ev -- everything -- a lot of things in the OR will
17 cause minor disruptions in laminar flow, --
18   Q.   Okay.
19   A.   -- from the lamps to the personnel to any
20 number of things.  So whether that disruption is
21 significant or not, that hasn't been proven.
22   Q.   Okay.  You remember when we went through the
23 stack of studies that you had been seeing and directed
24 to draft talking points on.
25   A.   Yes.

26 (Pages 98 to 101)

CONFIDENTIAL

Page 162

1  patients warmed, all the clinical studies and
2  research.
3      Q.   To be fair, of those 200 million patients
4  warmed, not all 200 million are orthopedic patients;
5  are they?
6      A.   No, they're not.
7      Q.   And of those orthopedic patients, a
8  substantial number, enough to be statistically
9  significant, developed post-surgical infections while
10 the Bair Hugger was being used.
11     A.   I couldn't tell you how many or if it was
12 statistically significant.
13         (Discussion off the stenographic record.)
14     Q.   Let's move on.  I just want to know, sitting
15 here today now, 2016, does the company recognize the
16 theoretical risks from forced-air warming devices?
17     A.   I believe the theoretical risks come from
18 the Augustine campaign, and it's -- it's theoretical,
19 it hasn't been proven, it's been promoted that way by
20 a competitor.
21     Q.   Okay.
22         (Exhibit 118 was marked for
23          identification.)
24 BY MR. BANKSTON:
25     Q.   I have handed you Exhibit 118, which is

Page 163

1  marked as a Response Communication Plan.
2      A.   Yes.
3      Q.   Are you familiar with how this process
4  works, developing a Response Communication Plan?
5      A.   I mean I think -- at this point I think this
6  was more of a -- an initial brainstorm or at least a
7  collection of ideas in different ways we could --
8  could proceed.
9      Q.   I'm -- I'm wondering where we're getting the
10 idea that this was a brainstorm rather than a plan.
11     A.   Just from knowledge that a lot of these --
12 these tactics weren't ever implemented, so it's more
13 of a collection of -- of possible tactics --
14     Q.   Okay.
15     A.   -- than any kind of plan on what we're
16 doing.
17     Q.   See the very first line of this document, it
18 has it separated out into "Initiative," "Goals,"
19 "Ideas," "Positioning" in each of these columns.
20     A.   Yes.
21     Q.   And the first column, the first initiative
22 says "Leaper."  Do you -- am --
23         Am I correct that this is referring to
24 Professor David Leaper?
25     A.   Yes, I believe that's accurate.

Page 164

1      Q.   Okay.  Professor Leaper over the years has
2  been involved in some published literature that has
3  implicated a risk from forced-air warming; correct?
4      A.   He has published papers on that topic, yes.
5      Q.   Okay.  Now in the "Positioning" section
6  under that second bullet it says, "Professor Leaper is
7  using his stature to promote unsubstantiated and
8  erroneous claims with the intent to mislead
9  customers..."  Do you agree with that statement?
10     A.   I'm not familiar enough with Professor
11 Leaper to make a call one way or another on him.
12     Q.   When that was brought up in this meeting,
13 was that something you wanted to look further into?
14     A.   It wasn't -- I don't -- don't believe it was
15 my idea.  I think it was, again, just something that
16 was added to the list.
17     Q.   It's in fact the very first thing on the
18 list; right?
19     A.   He's the first topic, yes.
20     Q.   And in fact, part of the plan here is to try
21 to tarnish his reputation; correct?
22     A.   It was a tactic that was considered.  Again,
23 I go -- I go back to the "Ideas" column, which to me
24 says these are more of a collection of ideas than any
25 kind of action list.

Page 165

1      Q.   Okay.  That was certainly an idea y'all had
2  then; right?
3      A.   We have had many, many, many different
4  ideas.  That doesn't mean we acted on them.
5      Q.   And I think part of the reason you would
6  want to make clear that you didn't act on them is
7  because this is not exactly the most tasteful thing to
8  do; --
9          MS. AHMANN:  Object to form.
10     Q.   -- correct?
11     A.   I think we just chose a different direction.
12     Q.   I mean --
13         And that different direction was not to go
14 out and attempt to tarnish a man's professional
15 reputation.  Is that what you're saying?
16         MS. AHMANN:  Object to form.
17     A.   I'm saying that ultimately we decided not to
18 proceed with that.
19     Q.   I'm asking you here today, apart from Dr.
20 Leaper, in a general sense --
21         You remember we talked about that positive,
22 high-road message?
23     A.   Uh-huh.
24     Q.   Is it -- is it generally a thing that you
25 would want to pursue, to go after somebody's

42 (Pages 162 to 165)

# EXHIBIT 30

St. Paul, MN 55144-1000
651 733 1110

December 1, 2016



**Via E-Mail and Overnight Delivery**

Dr. Michael Dutcher
District Director
Food and Drug Administration, Minneapolis District Office
250 Marquette Avenue South, Suite 600
Minneapolis, MN 55401

Dear Dr. Dutcher:

I am writing to clarify a statement made by the investigator in FDA's Establishment Inspection Report (EIR) following an inspection of Arizant between November 30, 2009 and January 6, 2010. (Arizant was the company manufacturing the Bair Hugger system at the time. 3M acquired the Bair Hugger product line in October 2010.)

We recently reviewed FDA's EIR from that inspection investigating a trade complaint regarding potential microbial contamination. In that inspection, FDA examined complaints from January 2006 through the time of the inspection, and found none that revealed any reports of microbial air contamination. FDA also reviewed several independently conducted studies which conclude that forced air warming systems do not increase bacterial contamination in the operating room. FDA found no evidence to support the complaint allegations.

We notice, however, that the EIR, p. 4, describes the Bair Hugger devices as having a "0.2 μm HEPA filter." The Bair Hugger units have never had a "HEPA" filter as that term is defined by industry standards. It is accurate to say that the Bair Hugger units have filters that perform consistently with the American Society of Heating Refrigeration and Air Conditioning Engineers (ASHRAE) standards for operating room ventilation systems (MERV rating 14-16). 3M reviewed the documents Arizant provided to the FDA during the 2009 – 2010 inspection and at prior inspections, and did not find documents indicating that the Bair Hugger devices have a HEPA filter. Records provided during the inspection, within product literature and documenting internal product specifications describe the filter as "0.2 μm" with no "HEPA" designation.

Your correction of the record is appreciated. Please let me know if you have any questions regarding this request.

Sincerely,

*Suzanne M. Danielson*

Suzanne M. Danielson, Director
Regulatory Affairs and Quality Compliance
3M Health Care Business Group
3M Center, Bldg. 275-05W-06 Room 5B09
Saint Paul, MN 55144-1000

SMD/ljl