```
 1                    UNITED STATES DISTRICT COURT

 2                      DISTRICT OF MINNESOTA

 3    ------------------------------------------------------------
                                     )
 4                                   )
      In Re: Bair Hugger Forced Air  )   File No. 15-MD-2666
 5    Warming Devices Products       )   (JNE/FLN)
      Liability Litigation           )
 6                                   )   March 27, 2017
                                     )   Minneapolis, Minnesota
 7                                   )   Courtroom 9W
                                     )   9:06 a.m.
 8                                   )
                                     )
 9    ------------------------------------------------------------

10

11             BEFORE THE HONORABLE FRANKLIN L. NOEL
                UNITED STATES MAGISTRATE JUDGE

12

13                       (MOTIONS HEARING)

14    APPEARANCES

      FOR THE PLAINTIFFS:
15
                                MESHBESHER & SPENCE
16                              Genevieve M. Zimmerman
                                1616 Park Avenue
17                              Minneapolis, MN  55404

18                              CIRESI CONLIN
                                Michael A. Sacchet
19                              225 South 6th Street
                                Suite 4600
20                              Minneapolis, MN

21                              KENNEDY HODGES, LLP
                                Gabriel Assaad
22                              4409 Montrose Blvd
                                Suite 200
23                              Houston, TX 77006

24            (Appearances continued next page)

25
```

```
 1    FOR THE PLAINTIFFS:
                                     KENNEDY HODGES, LLP
 2                                   David W. Hodges
                                     711 W. Alabama Street
 3                                   Houston, TX 77006

 4                                   FARRAR & BALL, LLP
                                     Kyle Farrar
 5                                   1010 Lamar, Suite 1600
                                     Houston, TX  77002

 6

 7    FOR THE DEFENDANT:             BLACKWELL BURKE P.A.
                                     Ben Hulse
 8                                   431 South Seventh Street
                                     Suite 2500
 9                                   Minneapolis, MN  55415

10
      COURT REPORTER:                Maria V. Weinbeck, RMR, FCRR
11                                   Official Court Reporter
                                     United States Courthouse
12                                   300 South Fourth Street
                                     Suite 1005
13                                   Minneapolis, MN  55415

14

15
              Proceedings recorded by mechanical stenography;
16    transcript produced by computer.

17

18

19

20

21

22

23

24              *       *       *       *       *       *       *

25
```

```
 1                      P R O C E E D I N G S
 2            THE COURT:  Okay.  This is In Re Bair Hugger
 3     Forced Air Warming Devices Products Liability Litigation,
 4     and we have two motions.  The first is the Defendant's
 5     motion to compel, and second is the Defendant's motion for a
 6     protective order.  Let's get everybody's appearance on the
 7     record.  For the plaintiffs?
 8            MR. HODGES:  David Hodges here from Kennedy
 9     Hodges.
10            MR. FARRAR:  Kyle Farrar for the plaintiffs.
11            MS. ZIMMERMAN:  Genevieve Zimmerman for the
12     plaintiffs.
13            MR. ASSAAD:  Gabriel Assaad for plaintiffs.
14            MR. SACCHET:  Michael Sacchet, plaintiffs.
15            MR. HULSE:  Good morning, Your Honor.  Ben Hulse
16     for the defendants.
17            THE COURT:  Okay.  Mr. Hulse, you're up.
18            MR. HULSE:  All right.  Thank you, Judge Noel.
19     Good morning.
20            First, is the defendant's motion to compel against
21     Kennedy Hodges.  We're here on this motion, Your Honor,
22     because we have learned through the production that was
23     ordered by the Court from Augustine of the documents that
24     were on Augustine's privilege log, that Augustine's
25     privilege log was radically incomplete with respect to
```

1    communications with the Kennedy Hodges firm and was also

2    deceptive.

3              And what do I mean by "deceptive?"  What I mean is

4    that the information that was contained on the log was in

5    several instances false making it difficult for both us and

6    the Court to assess the privilege.  We have filed this

7    motion against Kennedy Hodges because our viewpoint is that

8    they had an obligation as both the other side of the

9    correspondence as having been held out as counsel for

10   Augustine, having been held out as being in a consulting

11   relationship with Augustine, and having also intervened in

12   these proceedings in the motion against Augustine to confirm

13   that Augustine's privilege logs were in fact complete and

14   accurate.  Something they did not do.

15             How do we know that Augustine's privilege logs

16   were incomplete and deceptive?  Well, one thing that we've

17   learned, Your Honor, and I'll use the Elmo here, is that

18   Mr. Benham set up an e-mail address or used an email

19   address, a Gmail address called kennedyhodgesllp@gmail.com,

20   under the name David Hodges.  And I've highlighted, this is

21   one of the documents that was ordered produced to us.  This

22   purports to be from David Hodges to David Hodges, which is a

23   little puzzling in itself, but then it is signed by Brandy.

24   There are multiple instances in the documents --

25             THE COURT:  Let me just interrupt for a second and

1    say I do that all the time.  That's how I keep my to-do

2    lists.

3              MR. HULSE:  Is that right?

4              THE COURT:  But go ahead.

5              MR. HULSE:  You set up a Gmail address?

6              THE COURT:  No, I send myself e-mails from the to

7    me.

8              MR. HULSE:  Well, the interesting thing though,

9    Your Honor, is that this e-mail address, the name of the

10   e-mail address is David Hodges, kennedyhodgesllp@gmail.com,

11   but these are e-mails that are being sent by Randy Benham,

12   so it's unclear to us why this was done.  And there are

13   multiple instances of this in the documents that were

14   produced to us, Your Honor.  So why Randy Benham from

15   Augustine is using an e-mail address under the name of David

16   Hodges to send e-mails to David Hodges.  But those e-mails

17   then appear, Your Honor, on Augustine's privilege log as

18   e-mails from David Hodges to David Hodges rather than

19   e-mails from Randy Benham to David Hodges, and this is a

20   recurring issue.

21             THE COURT:  So let me ask you this though, are

22   there discovery requests that you have made to Kennedy

23   Hodges?

24             MR. HULSE:  Absolutely, Your Honor.  In fact, we

25   asked both an interrogatory and a document request to all

1    plaintiffs' counsel to produce communications with

2    Augustine.  The Plaintiffs' Executive Committee, which

3    includes the Kennedy Hodges firm objected wholesale, based

4    on privilege to that.  Your Honor actually gave an advisory

5    Order after a hearing that all plaintiffs' counsel needed to

6    respond to these.  And so there clearly is a document

7    request that encompasses this.  But this is just one of four

8    reasons why we know that the Augustine privilege log was

9    both inaccurate.  And, again, putting aside this puzzle of

10    why Augustine's counsel is using the e-mail address David

11    Hodges, kennedyhodgesllp@gmail.com.

12           Second, as the Court knows, Augustine provided 12

13    documents to the Court for in camera review that were never

14    on the logs that were provided to 3M, the 12 mystery

15    documents.

16           Third, Kennedy Hodges, after we filed our motion

17    has disclosed on a new privilege log another ten documents

18    and produced one document that should have been on

19    Augustine's privilege logs.  Now, the only way we were able

20    to get this after repeatedly trying to meet and confer was

21    filing this motion, which is something that we should not

22    have had to do.

23           And, fourth, the documents that the Court ordered

24    produced by Augustine reference or reveal the existence of

25    dozens of other documents, including e-mail attachments that

1    should have been produced or at least put on Augustine's

2    privilege log.  We notified Mr. Benham and Kennedy Hodges of

3    these dozens of missing documents and to date we have no

4    response from Kennedy Hodges.

5           THE COURT:  I'm sorry, say that again?  How did

6    these documents come to light?

7           MR. HULSE:  Sure, they're referenced in the

8    documents that the Court ordered produced.

9           THE COURT:  Okay.

10          MR. HULSE:  And if Your Honor would like, I

11   actually have a listing of these documents, but they range

12   all over time.  Many of the e-mails will say, for example, I

13   sent you earlier my notes on this or I sent you a

14   presentation or I sent you a draft or I sent you a video.

15   None of that was logged.  None of its been produced to us.

16          So our sense here is that the, more than our

17   sense, what is clear to us from what's now come out is that

18   there are probably double the number of communications

19   between Kennedy Hodges and Augustine than have actually been

20   revealed to us on a log or through the documents that were

21   produced in camera.

22          So it's clear to us that either by production or

23   privilege log that only a subset of the documents reflected

24   in the communications between Augustine and Kennedy Hodges

25   have been disclosed, and that what has been disclosed,

1    again, pointing to this instance of Mr. Benham puzzlingly

2    using that Kennedy Hodges e-mail address is that the

3    information that we've been receiving is not correct.

4         We shouldn't have to keep doing this.  We

5    shouldn't have to keep coming back to the Court to get a

6    full disclosure of these communications that the Court has

7    repeatedly determined to be relevant.  We believe that we

8    and the Court are entitled to a complete record of the

9    communications between Kennedy Hodges and Augustine.

10         What we are asking for here is that the Court

11    first take the ten documents that Kennedy Hodges has now put

12    on a privilege log, and I'm not certain whether that

13    privilege log has been provided to the Court; otherwise, I

14    have it here and undertake an in camera review of those

15    documents.

16         The second thing that we are asking for is that

17    Kennedy Hodges undertake a full diligent search of its

18    documents to identify any communications with Augustine and

19    either produce them or put them on a log and provide them to

20    the Court for in camera review.

21         We also ask that Kennedy Hodges be ordered to

22    provide a sworn declaration that they have not -- that they

23    have done so, that they have undertaken this comprehensive

24    search, along the lines of what the Court ordered Mr. Benham

25    to do.

1          Kennedy Hodges in its response says that it has

2     conducted a review, apparently in response to our motion,

3     but it's clear to us that that review was not thorough, and

4     it was not comprehensive.  It does not include the

5     documents, the dozens of documents that we have identified

6     to them and Mr. Benham that we know exist based on the

7     documents the Court has ordered to be produced.  And it by

8     coincidence, 10 of the 11 documents that they additional

9     documents that they have now disclosed to us are privilege,

10    we know there are significant numbers of nonprivilege

11    documents that exist.

12         Kennedy Hodges doesn't say whether this review

13    they undertook was comprehensive.  They don't explain what

14    they did to conduct this review, and they certainly don't

15    explain why the Court should have any faith that they have

16    identified all communications with Augustine.

17         As I noted, all plaintiff's counsel, including

18    Kennedy Hodges, also have an affirmative duty in light of

19    the Court's March 7th Order on privilege to go back and look

20    at their responses to interrogatories, our interrogatories

21    and document requests, and to produce any communications

22    with Augustine that are not subject to privilege under the

23    terms of the Court's Order.

24         The Court's Order spells out several categories of

25    communications that are not privileged.  These include

1    documents that, "reflect Augustine's thoughts or suggested

2    strategies about specific cases or potential cases."

3    Another is, "the initiative to publicize the *Walton* cases

4    and to solicit other lawyers to bring similar cases."  The

5    Court concluded that any work product privilege was waived.

6           The only way to know whether documents that are in

7    Kennedy Hodges' possession fall into either of these

8    categories is to either provide a detailed privilege log or

9    for the Court to undertake an in camera review, and we

10   suspect that in camera review is really going to be the only

11   way to do this.

12          So just to round this out, Your Honor, the relief

13   we're asking for here is that the Court undertake an in

14   camera review of the ten newly listed documents on the

15   Kennedy Hodges' privilege log.  The Court order Kennedy

16   Hodges to undertake a comprehensive search for

17   communications with Augustine and produce those that are not

18   privileged or disclose a privilege log of those it believes

19   are privileged, and also to provide a sworn declaration

20   explaining what it did to ensure that this search was

21   complete.

22          Lastly, less the Court think that this is the end

23   of the road, there will be more with Augustine to come.

24   Mr. Benham has not produced to us all of the documents that

25   the Court ordered him to produce.  He has designated all or

1    most of the documents as confidential, despite the fact that

2    the Court has found that that confidentiality was waived by

3    disclosed to the public.

4            And, furthermore, of course, the documents that we

5    are seeking from Kennedy Hodges, we are also seeking from

6    Augustine.  Thank you, Your Honor.

7            THE COURT:  Okay.  Mr. Hodges?

8            MR. HODGES:  Your Honor, there's an old saying

9    that pigs get fat and hogs get slaughtered, and I think

10   that's applicable here.  I want to be clear, Your Honor,

11   they're asking for documents from opposing counsel

12   concerning current litigation.  My firm was under no duty to

13   go compare what had been produced from Mr. Benham, which, by

14   the way, I wasn't privy to many of these conversations that

15   Mr. Hulse and Mr. Benham had regarding these documents.  I

16   was brought in later on towards the tail end and only by

17   Mr. Benham when I was copied by e-mail, and I asked for a

18   meet and confer so we can walk through this, and I was

19   denied that opportunity, and here we are.

20           The Court held in its order, the March 7th Order,

21   that there was an attorney-client privilege, and I respect

22   that it didn't apply.  So no duty attached to me as an

23   attorney for Dr. Augustine to produce anything.  There's

24   been no subpoena that's been issued to Kennedy Hodges.

25           There was a request for production that we

1    responded to, we complied with, and it's asking for

2    communications regarding the Bair Hugger Warming System or

3    HotDog, and we have complied with that, and the Court's

4    Protective Order that was entered in this case.

5         Mr. Hulse makes an assumption that there's this

6    whole litany of documents that have not been produced,

7    assuming that they even exist.  These documents go back

8    years.  Your Honor, as you will recall, a lot of this goes

9    back to 2008, I mean nine years.  So documents don't exist.

10        There was a piece meal approach from what I could

11   glean from Mr. Benham's attempts to comply with the request.

12   And did he do a perfect job on that?  Apparently not, but

13   that doesn't mean he was being deceptive in producing his

14   privilege log.

15        THE COURT:  No, but clearly there are lots of

16   documents that appear to be communications between

17   Mr. Benham on behalf of Dr. Augustine and Kennedy Hodges

18   over a significant period of time, correct?

19        MR. HODGES:  There was from 2008 forward.

20        THE COURT:  And my question to Mr. Hulse was is

21   there a document request out there to either the plaintiffs

22   in this action or to Kennedy Hodges generally for those

23   documents?  And your answer to that question is what?

24        MR. HODGES:  I don't believe there's a request

25   specifically asking for those documents, Your Honor.  There

1      was never other than a general request that was sent out to

2      all the plaintiffs and to all of the plaintiffs' law firms

3      that we then did do our own search.  We put together --

4                 THE COURT:  And that document request asked for

5      what, documents?

6                 MR. HODGES:  It's documents, communications per

7      you and your attorneys and any person including but not

8      limited to current and former patients of any health care

9      provider regarding the Bair Hugger Warming System, Forced

10     Air Warming, the HotDog and/or SSIs.  That's the request.

11                THE COURT:  Okay.  Is there a specific request for

12     communications between Kennedy Hodges and Dr. Augustine?

13                MR. HODGES:  No, Your Honor.

14                THE COURT:  Okay.  And these ten documents that

15     you've put on a privilege log that Mr. Hulse was

16     referencing, is this the first privilege log that Kennedy

17     Hodges has produced?

18                MR. HODGES:  It is.

19                THE COURT:  Okay.  Everything else that we've been

20     grappling with are all Benham-produced or Augustine-produced

21     logs, correct?

22                MR. HODGES:  That's correct.

23                THE COURT:  Okay.  Go ahead.  Anything else?

24                MR. HODGES:  Your Honor, I'm going to point out,

25     and I think there is a distinction to be made here, and I

1    know we have argued about other courts entertaining this,

2    but these were requests that were specific to my law firm,

3    and 3M was denied relief by Judge Stacy in May of 2015 and

4    said you can go get these documents or go take a deposition

5    of Dr. Augustine.

6              Again, in September of 2015, then Judge Hoyt also

7    denied the very same motion to compel in this case.  And

8    then Judge James also in October of 2015 also ruled that in

9    denying the relief that you can go get these documents

10   directly from Dr. Augustine or take his deposition, and

11   that's what they've done, Your Honor.  I mean we are fully

12   in compliance.

13             I've never been involved in a case where my

14   opposing counsel wants me to go examine my e-mail server for

15   communications related to the litigation that we're in, and

16   I think it's highly inappropriate.  And they've been denied

17   relief three times.  There should be a stop from seeking it

18   once again a fourth time.

19             I've read the Order a couple of times, Your Honor,

20   and I do want to once again state at least for the record

21   there's again been absolutely no showing of relevancy

22   whatsoever by 3M on this.  They've made no showing of

23   substantial need or undue hardship, that this was a rare or

24   extraordinary circumstances.

25             The documents that we have are those that I think

1       that within the Court's Order of March 7th, about thoughts,

2       legal analysis or strategy regarding the litigation or

3       potential litigation.

4              So, Your Honor, I ask that the Court deny the

5       motion to compel with respect to seeking documents or

6       anything further from my law firm.

7              THE COURT:  Okay.  Anything else, Mr. Hulse?

8              MR. HULSE:  Right to your point, Your Honor.  As

9       we pointed out in our submission, defendant's document

10      request number 25 says, "produce all documents relating or

11      referring to any communication between you or your attorneys

12      and the following entities and/or their owners, officers,

13      employees, agents, affiliates or representatives including

14      but not limited to Dr. Scott Augustine."  And then we list

15      the various Augustine-affiliated entities.

16             We had also a copy cat interrogatory, so we asked

17      for all communications between plaintiffs, plaintiffs'

18      counsel, Dr. Augustine, and the Augustine entities both by

19      document requests and by interrogatory.  And the response

20      came on behalf of the Plaintiffs' Executive Committee, which

21      includes the Kennedy Hodges firm, and Plaintiffs objected

22      and asserted the attorney-client and work product privilege

23      and stated no nonprivilege responsive documents exist.

24      That's what they said.  They said there were no nonprivilege

25      responsive documents that reflected communications between

1    them and Dr. Augustine.  That was not accurate.

2              There is no question that we have requested these,

3    and there is also no question that the Court on October 6th

4    advised all plaintiffs' counsel, all plaintiffs' counsel,

5    including the ones on the executive committee, but beyond

6    that too, to respond to these specific document requests.

7              We are here pursuing these from Kennedy Hodges

8    because every time we shake the tree with Mr. Benham, more

9    documents fall out.  We have no confidence that we will ever

10   be getting a complete disclosure from Mr. Benham no matter

11   how many times we return.

12             THE COURT:  Wait a minute.  The privilege analysis

13   as it relates to Kennedy Hodges, who does represent

14   plaintiffs in this MDL, unlike Mr. Benham and unlike

15   Dr. Augustine, who is not a party to this litigation, the

16   privilege analysis as to Kennedy Hodges is different than

17   the privilege analysis as set forth in our Order from

18   earlier this month, correct or incorrect?

19             MR. HULSE:  Not necessarily, Your Honor.  We're

20   talking about the same communications here, the

21   communications between Kennedy Hodges and Augustine were the

22   subject of the Court's Order.  So the problem is that there

23   are additional communications that clearly exist here that

24   we would have challenged and would have been subject to the

25   Court's in camera review.

1          THE COURT:  Except Rule 26 talks about documents

2      and things prepared in anticipation for litigation by a

3      party or the party's representative, and we concluded in our

4      March Order, I believe -- there were many iterations of that

5      Order -- we concluded that Dr. Augustine, neither

6      Dr. Augustine nor Randy Benham were party representatives of

7      parties in the multidistrict litigation.

8          MR. HULSE:  Right.

9          THE COURT:  So our analysis of work product as it

10     related to them was one thing.  Clearly, Mr. Hodges and his

11     firm are party representatives.  Their lawyers for

12     plaintiffs in the MDL.  So documents that they prepare in

13     anticipation of litigation are going to be treated

14     differently than documents that Dr. Augustine prepared, even

15     if they're communicated between the two people, correct or

16     incorrect?

17         MR. HULSE:  That is absolutely what Your Honor

18     said.  The issue here is that there are additional documents

19     that fall into the nonprivilege categories that the Court

20     has identified that are in the possession of Kennedy Hodges.

21     We just got produced one of them.  We know those documents

22     exist.  We believe based on the documents that were produced

23     that there are dozens of other documents.  We presume that

24     Kennedy Hodges has kept these communications with Augustine

25     that are missing right now.  And so the key is it's the

1   nonprivilege documents.

2          But we would also say that to the extent there are

3   privilege documents, those ought to go on a log, so that we

4   and the Court can assess the privilege too.  The privilege

5   analysis that the Court has set out is detailed and

6   thorough, and it requires parsing of what the purpose was of

7   the communication and also whether there was an expectation

8   of disclosure as there was with the litigation guide that

9   was prepared by Augustine and then edited by Kennedy Hodges.

10  And the only way to know that is to get the documents on a

11  log.

12          So as I said, these are documents that we should

13  have gotten from Augustine, assuming Augustine has kept

14  them.  We did not get a complete privilege log.  We did not

15  get an accurate privilege log.  We did not get a complete

16  production, so we're going to the other side of the

17  communications.  Kennedy Hodges, which is the recipient or

18  sender of communications, and saying, "can we please get

19  these from you?"  And the response has been "no, you can't

20  have them."

21          And so we're asking for the Court today to order

22  that these documents to the extent not privilege be

23  produced, and to the extent they're asserting privilege be

24  logged, so that we can ask the Court for an in camera

25  review.

1          THE COURT:  All right.  Thank you.

2          MR. HODGES:  Your Honor, may I have a couple more

3     minutes?

4          THE COURT:  You can have 30 seconds.

5          MR. HODGES:  Thirty seconds, all right.

6          Your Honor, he's right.  There was another

7     request, I guess, that I didn't know.  I do note that it was

8     objected to, and that we responded that there were no

9     nonprivilege responsive documents.  That is accurate.  We've

10    given the log of what we have, Your Honor.

11         THE COURT:  That's the ten documents we're talking

12    about.  The log that you've just produced.

13         MR. HODGES:  He has it.  He has it.  Most of those

14    documents, the vast majority of those documents that

15    Mr. Benham have I did not have.  His is the most complete

16    set that exists, Your Honor.

17         THE COURT:  What about this business of Benham

18    having an e-mail account at Kennedy Hodges?  Are those

19    documents --

20         MR. HODGES:  I don't have those documents.

21         THE COURT:  Are you claiming those are Benham

22    documents not Hodges' documents?

23         MR. HODGES:  I don't have those documents, period.

24    In fact, I didn't even recall that those documents existed

25    until they were brought up in connection with this.  Those,

1   as I recall, that was in connection with distributing the

2   guide.  It came from that address.

3          And I also want to point out, Your Honor, because

4   reading the Order, I don't know that the Court had a full

5   understanding of what happened.  There was an e-mail that

6   had gone out saying, hey, here's -- there's a litigation

7   guide out here.  Let us know if you want this guide or

8   whatever.  It went out kind of like, you know, to a list.

9   However, it was only those people that affirmatively

10  responded and said, yeah, I want to get this, and I believe

11  that number was very, very low.  I mean it could be counted

12  on one, maybe two hands of people that got that, and that

13  was only an abridged guide.

14         The full guide that was my understanding it never

15  went out to anybody, and I don't have a copy of that either.

16  And that e-mail address isn't on my server.  It's not a

17  document that I have.

18         The other thing I wanted to point out, Your Honor,

19  that the Court did not have the benefit of and after going

20  through these documents or looking, we were able to find is

21  that we actually found the consulting agreement dated

22  January 29, 2013, with Dr. Augustine's companies.  And I

23  think it's important because the Court held in the March 7th

24  Order that there was no consulting privilege.  That's been

25  produced to the Court.  That is the document that was

1    produced to 3M in connection with all of this.

2           So I would actually ask the Court to revisit this

3    issue as far as any communications after January 29th of

4    2013 that Mr. Benham produced because they were clearly

5    privileged under the consulting expert privilege as well.

6           I think that's all I have.

7           THE COURT:  Okay.

8           MR. HULSE:  Your Honor, if I may, just to speak to

9    a factual assertion.  I promise it will take 10 seconds.

10          THE COURT:  Ten seconds, and if you want to hear

11   your other motion, you better start talking.

12          MR. HULSE:  I'll be quick.  Mr. Hodges says he's

13   not the recipient of e-mails sent from this Gmail account.

14   Well, yes, he is.  Here is an e-mail sent from this Gmail

15   account that is used by Mr. Benham, and it's forwarded to

16   dhodges@kennedyhodges.com.  That's Mr. Hodges.  There are

17   clearly communications from the kennedyhodgesllp@gmail.com

18   used by Mr. Benham --

19          THE COURT:  What about this January 29th document?

20   Does that change the Court's analysis of whether or not

21   Benham is or is not a party representative under Rule 26?

22          MR. HULSE:  No, no, Your Honor.  First off, that

23   document is only dribbled off after extensive motion

24   practice on this.  But Kennedy Hodges ended up telling us

25   and the *Walton* Court that he was not a consultant, so

1      whatever that e-mail says, he didn't end up being a

2      consultant.

3                And, again, this fact that we again having to

4      shake the tree and shake the tree, and here's another new

5      document after all this briefing and motion practice, we

6      think the Court should take that with a grain of salt.

7                THE COURT:  All right.  Let's move on to the next

8      motion.

9                MR. HULSE:  All right.  Thank you, Your Honor.

10               This is defendant's motion for a protective order

11     regarding subpoenas sent to five third-party manufacturers

12     of patient warming systems.  I would just note today that

13     counsel for Stryker, Mr. Griffin, is present in the

14     courtroom.  Stryker is one of the targets of the third-party

15     subpoenas.

16               The basis for the motion was that despite us

17     pushing, plaintiffs would not articulate the reason that

18     they believed discovery from these five third-party

19     manufacturers was relevant.  We understand now that they are

20     not contesting relevance as to several of the subpoenas:

21               One is the Cincinnati Sub-Zero Blanketrol III, the

22     Medline PerfecTemp, the MTRE Allon, and the Medi-Therm

23     System by Stryker and Gaymar.  These are conductive systems.

24     That is electric blanket-type systems, and thus, under the

25     terms of the Court's decision on the VitaHEAT subpoena,

1      those aren't relevant.

2            We are troubled that the subpoena targets

3      apparently were not notified of the VitaHEAT decision and

4      nor have these subpoenas ever been withdrawn, despite their

5      lack of relevance, but we have informed Stryker and Gaymar

6      and CSC.  We are not certain.  We've had no contact with

7      MTRE or Medline and don't even know what the status of those

8      subpoenas are.

9            There are two devices that are the subject of

10     plaintiff's subpoena:  The Stryker Mistral-Air, and CSZ Warm

11     Air that use convective technology.  Convective is

12     essentially forced air technology like the Bair Hugger.  The

13     problem that we still here, Your Honor, is that the

14     plaintiffs' relevance showing is incredibly cursory.  They

15     fail to explain what they think the discovery will gain them

16     beyond what they already know from public marketing

17     materials.

18           THE COURT:  Let me interrupt for a second and just

19     make sure I've got the sort of outline correct.  Unlike

20     VitaHEAT, as you stand here, you're not representing these

21     third-party --

22           MR. HULSE:  No, Your Honor.

23           THE COURT:  -- targets of the subpoena, correct?

24           MR. HULSE:  That's correct.

25           THE COURT:  You're here on behalf of 3M seeking a

1     Protective Order saying those subpoenas to these other folks

2     that I don't represent are irrelevant?

3              MR. HULSE:  Right.  Exactly, Your Honor.  And

4     under some case law that we've cited as a party to the

5     litigation that will be burdened with this discovery if it

6     goes forward, we have standing to object to it.

7              Separately, Stryker, Gaymar, and Cincinnati

8     Sub-Zero have objected to this discovery.  They have

9     objected based on relevance, but they also have additional

10    burden and breadth objections which are there to assert, and

11    they play out in some separate hearing whether in this

12    courtroom or some other courtroom that's local to their

13    operations.

14             THE COURT:  And just to be clear, there's nothing

15    in the papers before me other than a letter from

16    Mr. Griffin.

17             MR. HULSE:  That's correct, Your Honor.

18             THE COURT:  Dated March 24th that -- strike that.

19    A letter from Mr. Griffin and a letter from Stryker itself,

20    it looks like, Ethan York.  Is he in-house counsel at

21    Stryker?

22             MR. HULSE:  He is, Your Honor.

23             THE COURT:  So I have those two letters.

24             MR. HULSE:  I also have the honor -- the honor,

25    apologies -- I have the letter that was sent by counsel for

 1    CSZ to plaintiffs' counsel, if the Court would like a copy.

 2              THE COURT:  Okay.  I don't.

 3              MR. HULSE:  Okay.

 4              THE COURT:  But just to be sure I'm clear though,

 5    and Mr. Griffin I see is sitting here in the courtroom but

 6    hasn't entered an appearance, and you don't intend to make

 7    any argument regarding this motion, correct, Mr. Griffin?

 8              MR. GRIFFIN:  Correct, Your Honor.

 9              THE COURT:  You're just observing?

10              MR. GRIFFIN:  I'm here in case there's a question

11    I can help.

12              THE COURT:  Okay.  I think I have the outline.  Go

13    ahead, Mr. Hulse.

14              MR. HULSE:  Thank you, Your Honor.

15              So, as I said, where we're left here is that for

16    four of the six third-party devices that are the subject of

17    the plaintiffs' subpoenas, those are conductive devices,

18    electric blanket-type devices like the VitaHEAT, doesn't

19    appear to be contested here, that those fall within the same

20    logic as the VitaHEAT ruling, and so we ask for the motion

21    for Protective Order to be granted with respect to those.

22              We also on separate grounds ask for the motion to

23    be granted with respect to the two convective devices, the

24    Stryker Mistral Air, and the Cincinnati Subzero Warm Air,

25    because the plaintiffs for two reasons, one is that the

1    plaintiffs' relevant showing is cursory and inadequate.

2    And, two, is because what they have not explained is how,

3    now that we are past the close of general causation

4    discovery.  This discovery can be taken consistent with the

5    current case schedule.  And that's really where I'd like to

6    focus my argument, Your Honor.

7         The cut-off for general causation discovery was

8    March 20th.  That's last week.  There are a handful of

9    things that by agreement we're getting done by March 31st

10   like Augustine's deposition, but the Court's Scheduling

11   Order said that discovery must be issued in time to be

12   completed by March 20th.

13        As of this date, there has been no discovery from

14   Stryker or Cincinnati Subzero.  The plaintiffs have not

15   moved to compel against them.  If the Court were to

16   authorize discovery, it's fair to say that Cincinnati

17   Sub-Zero and Stryker would also play out their other

18   objections, which could take quite a while, and we would not

19   be seeing production for likely several months to come.

20        Meanwhile, the plaintiffs' expert disclosures are

21   due March 31.  Ours are due a few months after that.  And it

22   is, and this discovery is clearly being sought under the

23   auspices of general causation discovery.  Plaintiffs haven't

24   requested an extension of the discovery schedule, so it is

25   impossible to see how extensive discovery of these third

1    parties can be done within the scope of the existing

2    schedule.  And we think that's something that ought to be

3    taken into consideration here and is further grounds for

4    granting the motion for a protective order.

5            Separately, what plaintiffs are pointing to here

6    in articulating for the first time in their papers the

7    relevance of this discovery of these two convective devices

8    is, first and foremost, that the two devices employ,

9    according their marketing materials, HEPA filters.

10   Plaintiffs since May of last year at Science Day have been

11   arguing that a HEPA filter should be used in the Bair Hugger

12   Forced Air Warming System.  The Court has heard this many

13   times.  It's been a refrain from the beginning.

14           Yet, they did not seek this discovery from Stryker

15   and Cincinnati Sub-Zero apparently relating to the use of a

16   HEPA filter until here at the very end of the fact discovery

17   period.  They've known about this.  This has been their

18   argument for nine months, and yet, and they had ample

19   opportunity to seek this discovery, and they didn't until

20   the end, and that also militates in favor of granting our

21   motion for protective order.

22           The one other thing that I'd like to add, Your

23   Honor, is that if the Court is going to let any of this

24   discovery go forward, it needs to be narrowly tailored to

25   the case -- in accordance with the case law about feasible

28

1    safer alternative designs.  What plaintiffs have said is if

2    we get this discovery, we shouldn't be limited in any way,

3    shape, or form, and the discovery they served is similar in

4    scope to the discovery that they served on 3M.  That

5    discovery must be narrowly tailored to deal with the

6    specific components that they allege should be incorporated

7    into the 3M Bair Hugger system.

8         And so we'd ask to the extent Your Honor allows

9    that discovery to go forward, that it also direct that it be

10   narrowly tailored on that basis.  If so, that might allow

11   for the discovery to be done sometime three or four months

12   from now.  Certainly, the blunder bust discovery that they

13   sought right now can't be done any time soon.

14        But our baseline concern here with those remaining

15   convective devices is it's just too late.  This discovery

16   cannot be done in a way that can -- it's certainly past the

17   discovery deadline for general causation, and it can't be

18   done consistent with the expert schedule.

19        THE COURT:  But it is relevant, correct?  You

20   don't object?

21        MR. HULSE:  Well, we don't think it's relevant,

22   Your Honor, because our viewpoint of the case law is that a

23   different device cannot be relevant, but we understand the

24   Court's VitaHEAT Order to contemplate that another

25   convective device, a component of another convective device

1     might meet the relevance standard for the purpose of

2     discovery, at least.  That's at least how we understood Your

3     Honor's Order.  And so that's, you know, while we preserve

4     our general position that other devices can't be relevant.

5     We recognize that's the lay of the land.

6                THE COURT:  Okay.  Thank you.

7                MR. FARRAR:  Your Honor, excuse me, Kyle Farrar

8     for the plaintiffs, and I don't believe I've had a chance to

9     speak in front of you yet.

10               Additionally, I'm struck by the irony of the two

11    motions 3M brought.  They want discovery from plaintiff's

12    counsel on a device that has conductive in a company that

13    does conductive warming and prohibit discovery from the

14    plaintiffs of a company that does convective warming.

15    Obviously, companies that do convective warming are

16    relevant.  The case law is clear that safer alternative

17    designs are always relevant.  And I think Mr. Hulse conceded

18    relevancy to some extent, but it's not limited as their

19    papers say, and as I think as Mr. Hulse was trying to allude

20    to a specific component.  He wants to limit it to the HEPA

21    filter, for instance.

22               But there's more because Mistral talks about in

23    their marketing materials how the blanket has a diffusion so

24    it doesn't disrupt the flow of the air in the operating

25    room.  The Warm Air talks about how it has two filters.  The

1    blanket itself serves as a filter.  So these are safer

2    alternative designs.  They're things that we pled in our

3    master form on paragraph 81, and we're entitled to discovery

4    of it.

5              The case I think that is probably the most on

6    point for the issue is the *In Re: Mentor*.  It's a Westlaw

7    cite.  It's out of the Middle District of Georgia regarding

8    the transvaginal mesh.  And it talks about what the

9    threshold showing of relevance is.

10             And it says, "if plaintiff's request are

11   reasonably calculated to lead to the discovery of evidence

12   regarding a feasible design that is safer than the subject

13   design, then those requests satisfy plaintiff's threshold

14   burden of establishing relevance."

15             Clearly, the stuff that we're asking for is

16   relevant.  We're asking for the exact same things that were

17   asked for in the *In Re: Mentor* case.  It is the 510(k)

18   submissions, the design documents, and the testing.  And *In*

19   *Re: Mentor* is directly on point.  It says, look, you have to

20   not only produce the outside testing, the literature that

21   you're aware of that supports your safety condition, but

22   also your internal, your 55 internal tests that were done.

23   So I don't think there's a credible argument as to the

24   relevance of the information we sought.

25             As to the timing, it's the first time I heard in

1   the argument it's not in their papers.  But the subpoenas

2   were served, and the answers were due before the end of the

3   discovery period.  It's the discovery period.  We don't have

4   to do all of the discovery in the front of it.  We get the

5   full-time of the discovery period.  So the fact that the

6   answers were due before the discovery period ended means

7   they're timely subpoenas.

8          And I think the last argument, Your Honor, is

9   getting back to the relevancy, but if the documents aren't

10  relevant, I'm not positive why 3M is complaining about it.

11  I mean we're going to review some documents.  It's not

12  significant.  If they're not relevant, then don't review

13  them at all if you don't want to, if you know they're not

14  relevant.

15         Obviously, the issues go to the heart of our

16  design defect claim and relevant, and we think we're

17  entitled to them, Your Honor.

18         THE COURT:  All right.  Thank you.  Anything else,

19  Mr. Hulse?

20         MR. HULSE:  No, Your Honor.

21         THE COURT:  All right.  Thank you all very much.

22  I will take both motions under advisement and issue a ruling

23  shortly, and we are in recess.  Thank you.

24         (Proceedings concluded.)

25

```
 1
 2
 3                        *      *      *
 4
 5                   REPORTER'S CERTIFICATE
 6
 7        I, Maria V. Weinbeck, certify that the foregoing is
 8   a correct transcript from the record of proceedings in the
 9   above-entitled matter.
10
11             Certified by:  s/ Maria V. Weinbeck
12                            Maria V. Weinbeck, RMR-FCRR
13
14
15
16
17
18
19
20
21
22
23
24
25
```