```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MINNESOTA

----------------------------------------------------------
                             )
                             )
  In Re: Bair Hugger Forced-Air   )   File No. 15-MD-2666
  Warming Devices Products    )   (JNE/FLN)
  Liability Litigation        )
                             )
                             )
                             )   Thursday, May 18, 2017
                             )   Minneapolis, Minnesota
                             )   Courtroom 9 West
                             )   9:30 A.M.
                             )
----------------------------------------------------------
```

**( HEARING ON MOTIONS )**


BEFORE THE HONORABLE FRANKLIN L. NOEL
UNITED STATES MAGISTRATE JUDGE

- and -

THE HONORABLE WILLIAM H. LEARY, III
RAMSEY COUNTY DISTRICT COURT JUDGE


**TIMOTHY J. WILLETTE, RDR, CRR, CRC**
Official Court Reporter - United States District Court
1005 U.S. Courthouse - 300 South Fourth Street
Minneapolis, Minnesota  55415
612.664.5108

**A P P E A R A N C E S:**


**For the Plaintiffs:**     **MESHBESHER & SPENCE, LTD.**
                        By:  GENEVIEVE M. ZIMMERMAN, ESQUIRE
                        1616 Park Avenue South
                        Minneapolis, Minnesota  55404

                        **CIRESI CONLIN, LLP**
                        By:  JAN M. CONLIN, ESQUIRE
                             MICHAEL A. SACCHET, ESQUIRE
                        225 South Sixth Street - Suite 4600
                        Minneapolis, Minnesota  55402

                        **KIRTLAND and PACKARD, LLP**
                        By:  BEHRAM V. PAREKH, ESQUIRE
                        2041 Rosecreans Avenue - Third Floor
                        Suite 300
                        El Segundo, California  90245

                        **KENNEDY HODGES, LLP**
                        By:  GABRIEL A. ASSAAD, ESQUIRE
                        4409 Montrose Boulevard
                        Houston, Texas  77006

                        **FARRAR & BALL, LLP**
                        By:  KYLE W. FARRAR, ESQUIRE
                        1010 Lamar - Suite 1600
                        Houston, Texas  77002


**For the Defendant 3M:**   **BLACKWELL BURKE, P.A.**
                        By:  JERRY W. BLACKWELL, ESQUIRE
                             MONICA L. DAVIES, ESQUIRE
                             BENJAMIN W. HULSE, ESQUIRE
                             COREY L. GORDON, ESQUIRE
                        431 South Seventh Street - Suite 2500
                        Minneapolis, Minnesota  55402


                        **FAEGRE BAKER DANIELS, LLP**
                        By:  BRIDGET M. AHMANN, ESQUIRE
                        2200 Wells Fargo Center
                        90 South Seventh Street
                        Minneapolis, Minnesota  55402

**A P P E A R A N C E S:   (Continued)**


**For Dr. Scott Augustine:**

                 J. RANDALL BENHAM, ESQUIRE
                 6581 City West Parkway
                 Eden Prairie, Minnesota  55127


**For movant Ridgeview Medical Center:**

                 **MELCHERT HUBERT SJODIN, PLLP**
                 By:  KELLY C. DOHM, ESQUIRE
                 121 West Main Street - Suite 200
                 Waconia, Minnesota  55387



         ( *Various participants via telephone* )



              *       *       *       *

```
1          (9:30 a.m.)

2                        P R O C E E D I N G S

3                          IN OPEN COURT

4          MAGISTRATE JUDGE NOEL:  Good morning.  Please be

5     seated.

6          JUDGE LEARY:  Good morning, everyone.

7          MAGISTRATE JUDGE NOEL:  Okay.  So this is In Re:

8     Bair Hugger Forced-Air Warming Devices Products Litigation.

9     Judge Leary and I are both presiding over this hearing which

10    will be a joint proceeding between the MDL and the Ramsey

11    County cases that are proceeding.

12         We're here for a hearing on three things.  The

13    first is the plaintiffs' motion to add a claim for punitive

14    damages, which is ECF number 307 in the MDL; the defendants'

15    motion to de-designate documents under the protective order,

16    which is ECF number 393 in the MDL; and the defendants'

17    motion for additional deposition time, which is docket entry

18    number 411 in the MDL.

19         So let's start with the plaintiffs' motion to add

20    the claim for punitive damages.  I'm sorry.  Let's start by

21    getting everybody's appearance on the record.

22         MR. HULSE:  Your Honor -- Ben Hulse, by the way,

23    for Defendants.

24         As a housekeeping thing, we reached out yesterday

25    raising a request to exclude third parties from the
```

1    courtroom for this motion given that there's going to be

2    discussion of under-seal materials, and so we're making that

3    request formally on the record today.

4            MAGISTRATE JUDGE NOEL:  Okay.  Bear with me one

5    second.

6        (Discussion off the record between Magistrate Judge

7          Noel and Judge Leary)

8                        IN OPEN COURT

9            MAGISTRATE JUDGE NOEL:  First, let me observe we

10   have all these folks on the telephone.  The courtroom is the

11   property of the people of the United States.

12           What authority do you rely on -- actually, before

13   we even get to that, let's get everybody's appearance on the

14   record so that we're -- and then I'll come back to

15   Mr. Hulse.

16           MS. CONLIN:  Good morning, Your Honors.  Jan

17   Conlin from Ciresi Conlin on behalf of the plaintiffs.

18           MS. ZIMMERMAN:  Good morning, Your Honors.

19   Genevieve Zimmerman from Meshbesher & Spence, also on behalf

20   of Plaintiffs.

21           MR. SACCHET:  Michael Sacchet on behalf of

22   Plaintiffs.

23           MS. DOHM:  Kelly Dohm on behalf of Ridgeview

24   Medical Center.

25           MR. BENHAM:  Representing Dr. Scott Augustine,

1    J. Randall Benham.

2              MAGISTRATE JUDGE NOEL:  Anybody else from the

3    plaintiffs want to --

4              MR. PAREKH:  Behram Parekh on behalf of

5    Plaintiffs.

6              MR. ASSAAD:  Gabriel Assaad on behalf of the

7    plaintiffs.

8              MR. FARRAR:  Kyle Farrar on behalf of Plaintiffs.

9              JUDGE LEARY:  I'm sorry.  Counsel for Ridgeview,

10   could you spell your last name, please.

11             MS. DOHM:  Yes, Your Honor.  It's D-O-H-M.  My

12   first name is Kelly, K-E-L-L-Y.  I'm with the firm of

13   Melchert Hubert Sjodin.

14             JUDGE LEARY:  Thank you.

15             MR. BLACKWELL:  Good morning, Your Honors.  Jerry

16   Blackwell, Blackwell Burke, speaking on behalf of 3M and

17   Arizant.

18             MS. DAVIES:  Good morning, Your Honors.  Monica

19   Davies, also with Blackwell Burke.  I'm here on behalf

20   Defendants.

21             MR. GORDON:  Good morning, Your Honors.  Corey

22   Gordon, Blackwell Burke, also for 3M and Arizant.

23             MR. HULSE:  Good morning, Your Honors.  Ben Hulse

24   on behalf of Defendants.

25             MS. AHMANN:  Bridget Ahmann, Faegre Baker Daniels,

1    on behalf of 3M and Arizant.

2              MAGISTRATE JUDGE NOEL:  All right.  And Mr. Hulse,

3    why don't you come to the podium.

4              MR. HULSE:  Yes.  (Approaches podium).

5              MAGISTRATE JUDGE NOEL:  Both Judge Leary and I had

6    a question as to what authority you're relying on for

7    excluding folks from the courtroom.

8              MR. HULSE:  Yes, Your Honor.  An Eighth Circuit

9    case, *In re Iowa Freedom of Information Council*, 724 F.2d

10   658, 664, recognizing that district courts can close

11   proceedings to protect a party's trade secrets or sensitive

12   business information; also *In re St. Jude Medical*, 2001

13   Westlaw 1663818 from 2001, similar authority.

14             There is information in some of the exhibits that

15   Plaintiffs have presented in support of this motion that

16   qualified for protection under the protective order entered

17   into in this case, in particular that it is competitively

18   sensitive:  planning information, internal research and

19   development information in particular.  And this is a

20   particularly significant concern because of the other motion

21   that we have here with Mr. Benham, who is counsel for

22   Augustine, Augustine being, of course, a competitor of 3M

23   and formerly Arizant in the patient warming market.

24             So that's our legal authority, the factual basis

25   for our request, too, and that's why we're asking for

1    counsel for Augustine and also counsel for Ridgeview to be

2    excluded, but in particular our concern has to do with

3    counsel for Augustine.

4              MAGISTRATE JUDGE NOEL:  Ms. Conlin?

5              MS. CONLIN:  Sure.  The case that Mr. Hulse just

6    cited is an Eighth Circuit case that deals with trade

7    secrets.  I don't know -- and you've seen the exhibits.

8    There's nothing in the exhibits themselves that is

9    suggestive of a trade secret.

10             I understand why they would like to have the

11   courtroom -- exclude anyone other than the parties, because

12   some of the information is quite damaging to 3M, but that

13   doesn't -- that's a separate issue than whether it gives

14   rise to trade secrets or not.

15             JUDGE LEARY:  Here's what my concern is given the

16   fact that this is a joint hearing with Ramsey County.

17             Court hearings are public events, and the last

18   time I looked at the rules that applied to court proceedings

19   in the state of Minnesota, it requires that notice be given

20   of an intent to request a closed hearing and that's not been

21   given in this case.  And regardless of whether or not that

22   rule with which I've been previously familiar applies in

23   this case, why wasn't prior notice of this request given?

24             MR. HULSE:  Well, Your Honor, pursuant to -- I

25   agree that the Ramsey County rule that you're citing, to the

 1    extent it required notice to yourself, Your Honor, we did

 2    not give it.

 3              JUDGE LEARY:  It requires public notice as well.

 4              MR. HULSE:  And the protective order in this

 5    case has a requirement to give -- to raise the issue with

 6    the court in advance, and we did contact Judge Noel's

 7    chambers in advance and were advised to raise it here at the

 8    hearing, for what that's worth.  But obviously, we

 9    appreciate fully the public's right to access to the

10    courtroom and this has nothing to do with information being

11    damaging.  We strongly dispute that.  It's simply that in

12    particular, as the Court is aware from the briefs and the

13    information submitted, there is internal R&D information

14    that would rise to the level of trade secret that is

15    presented in the plaintiffs' papers, and that really

16    shouldn't be disclosed to counsel for Augustine, a

17    competitor, simply because we happen to have another motion

18    up today.

19              JUDGE LEARY:  And I have a follow-up question.

20              The information that you're concerned about, is

21    that information that's already part of the court record?

22              MR. HULSE:  Under seal, Your Honor, yes.

23              JUDGE LEARY:  So these documents have been filed

24    under seal in Ramsey County?

25              MR. HULSE:  Correct, Your Honor.

1        MAGISTRATE JUDGE NOEL:  One last question on the

2   sealing thing, and I think I know the answer, but I'm going

3   to ask it anyway.

4        Under our new local rule about filing under seal,

5   is there already on file the follow-up joint motion to

6   continue the sealing or not?

7        MR. HULSE:  No, Your Honor, because it's not due

8   yet for another two weeks from today.  Because last Thursday

9   was the final filing in support of the motion and so it's

10   due in three weeks.  We recognize that there may be -- that

11   some of these materials will get unsealed through that

12   process.

13        MAGISTRATE JUDGE NOEL:  Okay.  So Judge Leary and

14   I have briefly talked about the request to exclude people

15   from the courtroom and to close the hearing, even if

16   partially, and that request is denied.

17        So let's move then to the plaintiffs' motion to

18   amend the claim for punitive damages.

19        Ms. Conlin, you're up.

20        MS. CONLIN:  Sure.  I've got a PowerPoint.  May I

21   pass up copies, Your Honor?

22      (Documents distributed to the Courts and counsel)

23        MS. CONLIN:  Good morning, Your Honor.

24        While my colleague gets the PowerPoint up on the

25   monitor, I'd like to start first with this issue of choice

1    of law.  And frankly, we thought in light of Chief Judge

2    Tunheim's decision in **Levaquin**, finding that the Minnesota

3    punitive damages statute is remedial and thus no

4    conflict-of-law analysis needs to be performed, Defendants

5    have raised it.  And I think the holding of that case makes

6    very clear that in Minnesota, the procedural rule requiring

7    filing of a motion before amending for punitive damages is a

8    procedural rule.

9            And in fact, in the **Levaquin** case, unlike this

10   case, the defendant was a New Jersey defendant, and the

11   court there found that in fact Minnesota's interest in

12   protecting people within its state by corporations who do

13   business in this state was sufficient for the Minnesota

14   punitive damages statute to apply.

15           The other issue I just raise is with respect to

16   the bellwether plaintiffs.  All of those plaintiffs have

17   consented to Minnesota jurisdiction, so this will be the

18   forum state for the purposes of those bellwether trials.

19           If the Court has other questions on that?

20           MAGISTRATE JUDGE NOEL:  Yeah.  How many states are

21   represented in the MDL?

22           MS. CONLIN:  I think virtually 36 or 38 states.

23           MAGISTRATE JUDGE NOEL:  And how many of those

24   states have a requirement that there be some level of

25   showing before permitting the pleading of a claim for

1   punitive damages?

2          MS. CONLIN:  Have not done that analysis, Your

3   Honor, but we did look at the eight bellwether cases.  Three

4   states implicated:  Minnesota, Wisconsin, and Florida.

5   Those all have the same statute as Minnesota, and in fact,

6   Your Honor found that in the *Mirapex* case.

7          South Carolina, Kentucky, and Idaho are the other

8   three.  South Carolina and Kentucky don't require any motion

9   to plead punitive damages.  In other words, you can do it

10  out of the gate.  And Idaho does require it, but it's

11  actually a less strict standard than in Minnesota.

12          MAGISTRATE JUDGE NOEL:  Okay.

13          JUDGE LEARY:  In terms of the state court action,

14  I assume that there is no conflict-of-law issue, is that

15  correct?

16          MS. CONLIN:  There is none, Your Honor.

17          JUDGE LEARY:  Okay.

18          MS. CONLIN:  So I'd like to talk a little bit

19  about the standard for making a motion to amend for punitive

20  damages.

21          And in fact, if you look at the brief that was

22  filed by 3M, it basically is:  We don't think the evidence

23  says what you say it is, and those are classic examples,

24  both in *Mirapex*, *Levaquin*, and *Prempro,* where the court has

25  said on the motion to amend for punitive damages, you can't

1    look at the rebuttal evidence or what spin a defendant wants

2    to put on it.  We think that's true here.  In **Levaquin** the

3    court makes no credibility rulings and does not consider any

4    challenge by cross-examination or otherwise to the

5    plaintiffs' proof, and that's in fact the case here.

6         So I would like to bring the Court back a little

7    bit to science day.  At science day we talked with this

8    Court about the chain of infection.

9         It's Plaintiffs' belief -- and we think the

10   evidence bears this out -- that the Bair Hugger is

11   defectively designed.  It sucks up microbes and bacteria.

12   In Dr. David's report it had the -- showed that if you put

13   paper by the machine and turn it on, it sucks the paper up

14   next to the vents on the machine.

15        So the chain of evidence for infection is that the

16   Bair Hugger doesn't adequately filter air, sucks it up off

17   the floor of the OR, spews it into the surgical site, and in

18   fact also creates because of the heat generated by the

19   machine, creates convective current which brings turbulent

20   air and dirty air from below the surgical table into the

21   surgical site.

22        And in this case we're alleging that particularly

23   in orthopedic surgeries where an implant is going to be put

24   into a patient -- and Dr. Jarvis talks about it in his

25   report; we presented it at science day -- it only takes one

1    or two microbes to land on that implant during surgery to

2    cause a surgical site infection or a deep prosthetic joint

3    infection.  No one knows it's there, the wound is closed up,

4    and some months later when the biofilm develops, the patient

5    develops a deep infection, and that's the case here.

6            So in this case what do we have by way of

7    *prima facie* evidence?  We submit to Your Honors that the

8    evidence that we submitted in connection with our briefs is

9    exactly within the types of buckets of evidence that courts

10   in Minnesota have said is sufficient to allow us to amend

11   for punitive damages.

12           Failure to warn about the risks.  I'm going to

13   show you some documents out of our brief where they knew

14   back in 1996 that there was a risk of airborne contamination

15   through use of the Bair Hugger.

16           JUDGE LEARY:  Was that when Dr. Augustine was

17   still involved with Arizant?

18           MS. CONLIN:  He would have been at that time.  And

19   what I'm referring to and I'll show you, Judge, is basically

20   the statements made to the FDA at the time that the 505 was

21   being approved and put on the market.

22           JUDGE LEARY:  So when you're critical of this

23   aspect of 3M and Arizant's performance, you are now talking

24   about a point in time in which Dr. Augustine was directing

25   that program, is that correct?

1          MS. CONLIN:  I am, Your Honor.

2          And it's ironic that, you know, for the purposes

3     of saying Bair Hugger is safe, they want to rely on the work

4     that was done by Dr. Augustine in the 1990s, but when

5     Dr. Augustine determined after further review it wasn't

6     safe, they're trying to say that you shouldn't rely on that.

7     In our mind, we are not relying on what Dr. Augustine has

8     said.  What we're relying on are the statements by Arizant

9     and 3M and what was told to the FDA, and I'll show you that.

10          They failed to heed recommendations to conduct

11     studies.  I'm going to show you evidence by Dr. Sessler,

12     who's a key opinion leader for 3M and on their advisory

13     board.  He was begging them for years to do studies and they

14     refused.

15          We've got manipulation of studies for commercial

16     gain.  I'm going to show you some of the evidence by Dr. --

17     the Sessler/Olmsted article, which was research conducted by

18     3M, edited by 3M, and their names were added to the

19     publication as part of a legal strategy, their words, not

20     ours.

21          And then minimizing the contrary evidence.  As

22     every single study -- just like in *Prempro* and the other

23     cases -- as every study came out, rather than look at and

24     ascertain whether that study was real and posed a real risk,

25     all of the internal documents show -- sometimes before the

1    study was even published -- that the intent was to go after

2    the authors, to go after the study, rather than look at

3    whether it was actually a legitimate study or not.

4           So I want to start -- and this goes to your point,

5    Judge Leary.

6           In 1996 when the 505 -- that's the earlier version

7    of Bair Hugger -- was going through the approval process at

8    the FDA under a 510(k), which just means they have to show

9    it's substantially equivalent to a prior device, they

10   actually raised this issue with the FDA.  They said:

11          "Contamination.  Airborne contamination from air

12   blown intraoperatively across the surgical wound may result

13   in airborne contamination," and then they cite two ways to

14   mitigate it.  One is a tape barrier which, by the way, 3M

15   doesn't tell doctors that they have to tape or how to tape

16   or a proper procedure for taping, and in fact they've got an

17   underbody blanket that they promote for use in all surgeries

18   which basically lays across the operating table, patient

19   goes on top of it and the air blows up, and it actually is a

20   problem.  I'll show you why.

21          But then they cite two studies.  Oh, and then they

22   say the air is filtered through a .2 micron filter.

23          One of the things and one of the most important

24   buckets of evidence in connection with this is this:

25          What happened was -- and it's laid out in

1    Dr. David's report, but basically, the filtration efficiency

2    originally in the 505 was about 93 percent.  And by 93

3    percent filtration efficiency, it means that as air flows

4    through that filter, it captures about 93 percent of the

5    particles, okay?  A HEPA filter captures about 99.97.  So

6    even this .2 micron filter in the 505 was orders of

7    magnitude less efficient in capturing particulates going

8    through.  But here's what happened.

9          When they went to introduce or get approval on the

10   750, they first told the FDA they were going to use a HEPA

11   filter.  Then afterwards they decided they weren't going to

12   use a HEPA filter and they went back to the FDA in June of

13   2000 and they said:  We're not going to use a HEPA filter,

14   but we're going to use a filter that has the same filtration

15   efficiency as the 505.  That wasn't true and it was never

16   true.

17         The filtration efficiency of the M20, which is the

18   filter that was used in the 750 when it came out, had an

19   efficiency rating of between 50 and 63 percent, meaning that

20   as that air passes through, the bugs are scooped up off of

21   the floor through the intake valve.  Upwards of 40 percent

22   of those can go through.  Nowhere between 2000 when they put

23   the 750 on the market and 2016 did 3M or Arizant ever do any

24   testing to ascertain what the filter efficiency was of the

25   M20.  They went out and they said that's a high-efficiency

1   filter, it screens out most of the microbes, but that in

2   fact is belied by the documents, which show they didn't do

3   the work.

4          If you look at --

5          JUDGE LEARY:  When did Dr. Augustine leave

6   Arizant/3M?

7          MS. CONLIN:  I want to say 2003 or 2002.

8          JUDGE LEARY:  Thank you.

9          MS. CONLIN:  Then if you take a look at slide 7 on

10  filtration efficiency -- well, first let's go to this on

11  PX 10.

12         Customers would call in from time to time and

13  they'd say, "What's the filter efficiency on your devices?"

14  And you can see that even in 2008 they still hadn't done any

15  testing on the M20, which they were using now at this point

16  in time both in connection with the Model 505 and the 750.

17         In the third paragraph down:

18         "The filter uses Porous Media's M20 grade.  We do

19  not have a published efficiency at .2 micron with this

20  media," meaning the filter media, "but expect it to be

21  significantly lower than 93 percent."

22         Meanwhile -- this is eight years later -- Arizant

23  is saying:  "Hey, we've got a high-efficiency filter."

24         If you look at an e-mail in 2007 -- I'm sorry,

25  2013 -- this is 13 years later after the product went on the

1    market -- they had a question from a customer about is it a

2    HEPA filter, does it clean out 99.97 percent, and they

3    respond with this:

4            "After much discussion here in R&D, here is our

5    response to [the question]:

6            "We have no documentation in regards to our 750

7    [and] 775 filter efficiency."

8            This is 13 years after they put it out on the

9    market and they told everyone that it adequately screens for

10   particles and bugs "and likely will not aim to obtain this.

11   We cannot claim HEPA efficiency ....  All we can do is stick

12   by our claim/statement of high efficiency."

13           They were saying that without even knowing whether

14   it was true or not, and the record is replete with those

15   types of statements.

16           Another one.  Gary Hansen to Mark Scott, both

17   directors, high-level officials in the company:

18           "Mark" -- this is in 2012 -- "We do not want to

19   disclose the actual filtration level, but it's sub-HEPA."

20           And then he says here's the talking points if they

21   push you on what the filtration efficiency is.  And again,

22   just simply refusing to look at the issue, and this is

23   against a backdrop of a lot of outside discussion on it.

24           So if you look at -- what happened was, in 2013,

25   Reed and others introduced, published a peer-reviewed

1   article that basically said the old filters in the old 505

2   had an efficiency rating or filter efficiency rating of

3   93.8, but in the new one it was 61.3.  So 3M didn't do the

4   testing, but outside researchers did.

5          And what happened was, internally at 3M, they

6   started to talk about this Reed article.  So in August of

7   2013, Al Van Duren -- you can see the "from Al V." --

8   says:

9          "The assertion that [the] old filters are more

10   efficient tha[n] newer ones is correct.  The change to new

11   filter material was dictated by engineering concerns prior

12   to widespread appreciation of the importance of particulates

13   discharged by the warming unit."

14          So this -- and notice he uses the word

15   "widespread."  So in other words, although people who were

16   studying it knew it was a problem, orthopedic surgeons and

17   others are understanding at this point in time in 2013 that

18   it matters.  It matters that particles are getting through

19   that filter and into the surgical site.  Then in red,

20   Michelle Hulse-Stevens, who's their head director, says:

21          "This implies then that the 750 does not have a

22   filtration efficiency that adequately mitigates particulates

23   in the air coming out after filtration."

24          2013.  They didn't do anything, they never told

25   anyone.  They stuck with their:  Just say it's a

1      high-efficiency filter.

2              MAGISTRATE JUDGE NOEL:  Does the phrase "high

3      efficiency" have any meaning in the industry or in the field

4      of science that we're talking about?

5              MS. CONLIN:  It's not uniform, but I will tell you

6      that what we've been told and what folks out in the field

7      say is people think of high efficiency as being equivalent

8      to HEPA, okay, and of course it wasn't.  It was a very

9      low-efficiency filter.

10             And they misled customers.  So look at this.  This

11     is a letter, a "Dear Customer" letter in November of 2006,

12     and this was actually after an article came out by Bernards

13     that said:  We had an Acinetobacter infection in our

14     hospital.  We found it in the Bair Hugger, they found it in

15     another machine as well in the OR, and they switched it out.

16     So Al Van Duren writes on here, you know, the hose isn't

17     sterile.  "None of the materials used in the warming

18     hose ... support the growth of any known bacteria."

19             They hadn't done any testing at that point to say

20     that.

21             "During use, the temperature and humidity

22     conditions within the warming hose are extremely

23     inhospitable to most microorganisms, as well."

24             They hadn't done any testing at this point to

25     ascertain whether that was true or not.  And:

1          "The warming unit air filter prevents aspiration

2     of the vast majority of infectious agents."

3          They didn't even know when they sent this out to

4     customers what the filtration efficiency of their machines

5     were.  It hadn't been tested.  And as we found out in 2013

6     when Reed and others did the work, it was about 63 percent.

7     They never warned.  They never went back and told anyone

8     about that.

9          So you don't have to take my word.  Here's Al Van

10    Duren, who testified as their 30(b)(6) witness:

11         "3M is not disputing that the Bair Hugger blower

12    and hose can harbor bacteria inside the device."

13         We're not disputing that.

14         They did -- as part of Project Ducky, they did --

15    and looked at can we coat the inside of the machines with

16    antimicrobial wash?  Can we put a filter at the end of the

17    hose to prevent particulates from getting out of the hose

18    and into the surgical area?  That was all abandoned, I

19    think, around the time that 3M acquired Arizant.  But

20    Project Ducky asked the questions back then:  How much

21    bacteria can be allowed to pass through the filter?  How

22    much is dangerous?  These are questions being asked by

23    people at the time and none of those questions were

24    answered.

25         Michelle Hulse-Stevens, the top executive in

1   connection with this unit that the Bair Hugger is marketed

2   out of, in 2013 goes to a forced-air warming aerobiology and

3   orthopedic surgeon convention on prosthetic joint

4   infections.  She said she sat in.  She says:

5           "There is amazing concern about any particulates

6   in the air during joint replacement surgery and almost

7   uniform comment that [forced-air warming] increases

8   particulates in the air."

9           This is 2013.  3M has still never acknowledged

10  this publicly, has never written a letter, has never warned

11  orthopedic surgeons about this, even though their key

12  director knows back in 2013 that this is a problem and

13  orthopedic surgeons are very concerned about it,

14  understandably.  It only takes one or two bugs to land on

15  that implant during the surgery to create an infection.

16          She goes on to say:

17          "They equate particulates with bacteria in the air

18  and cite studies (do not have the citations)" -- I assume it

19  means she didn't have the citations -- "that support this."

20          But 3M knows what studies are out there that say

21  if you've got more particulates circulating in the air in

22  the OR, it is a reasonable approximation for the bioburden

23  in the OR.

24          This is an e-mail between Gary Hansen and Russ

25  Olmsted, who was another one of 3M's -- Russ Olmsted,

1    another one of 3M's outside advisors, and he brings the

2    Stocks paper to Gary Hansen's attention again in 2010.

3            And if you look down at the last paragraph -- you

4    know, first of all, he says he thinks the methods in the

5    Stocks paper are very good and he likes the use of

6    electronic particle counts and bacteria air sampling.  But

7    then he says:

8            "For the one investigation I did, I used

9    electronic particle counts and it appears this group was

10   able to demonstrate particle counts serve as a reasonable

11   surrogate for bioburden of air in an OR," which is actually

12   what Michelle Hulse-Stevens also learned three years later.

13           They've never warned of this.  Al Van Duren

14   admitted as a corporate representative for 3M that every

15   single study that exists today shows that the particulate

16   counts in the OR are increased when the Bair Hugger is used.

17   They can get up and argue all they want about, well, we

18   don't think this study says this or that.

19           Their 30(b)(6) corporate representative says that

20   every single study shows that when you use the Bair Hugger,

21   it increases particulate counts.

22           They never warned orthopedic surgeons about

23   perhaps not using these.  They never warned orthopedic

24   surgeons that the filter wasn't high efficiency or that they

25   had no idea to even tell someone what the efficiency rating

1    was.  Their entire structure and their entire response to

2    all of this is, this is just more Augustine, another

3    article.  And that's exactly, if you look at the ***Prempro***

4    case, the type of evidence that gives rise to a punitive

5    damages claim.

6          He admitted that they never warned orthopedic

7    surgeons about the increased particle count.  They never

8    told customers what the actual filtration efficiency was.

9    They never warned about the fact that their filter wasn't

10   adequate or not high efficiency, and they basically said use

11   Bair Hugger in every surgery, Bair Hugger for everyone.

12         They didn't do any testing.  Aside from warning --

13   I mean, they admit they didn't have any warning about the

14   risk of airborne contamination in the 700 and they never

15   warned in connection with the 750.

16         So in other words, back in 1996 they told the FDA:

17   We think airborne contamination is a risk, but they never

18   carried those warnings or put those warnings on either the

19   700 or the 500 series, and we know why.  Because if you told

20   orthopedic surgeons that if you use the Bair Hugger during

21   orthopedic surgery and you're going to have exponentially

22   more particles circulating around the surgical site, people

23   probably wouldn't use it.  And we submitted the expert

24   reports both of Dr. Elghobashi, Mr. Buck, and others who

25   have done the testing and said it is exponentially more

1    problematic with the Bair Hugger on in terms of particulates

2    or bacteria circulating over that site.

3              JUDGE LEARY:  Doesn't the point that a forced-air

4    warming system increases particle counts, doesn't it still

5    beg the question as to whether or not that increases the

6    risk of infection?

7              MS. CONLIN:  No, and that's why I was showing you

8    both the Stocks paper -- and you can see it in both

9    Dr. Jarvis' and Dr. Samat's report, and as well as Michelle

10   Hulse-Stevens.  The consensus is that particulate counts

11   around the surgical site is a reasonable proxy for bacteria

12   or bioburden.  That's what the Stocks article says, it's in

13   our expert reports, but that's also in the e-mail I just

14   showed you from Gary Hansen and Russ Olmsted.

15             JUDGE LEARY:  But it does still strike me,

16   regardless -- and I don't profess to know any more than what

17   I'm hearing about this.  But it does strike me that -- let's

18   say you're talking about a knee and the operative site

19   around a knee.  That is well covered with antibiotics at the

20   time of the surgery.  So let's say you have increased

21   airborne particles and that may be a conduit for bacteria,

22   but that doesn't necessarily answer the question as given

23   the state of the surgical site with regard to intraoperative

24   antibiotics that that increases the risk of infections.

25             MS. CONLIN:  Well, you can look at Dr. Jarvis'

1    report and Dr. Samat's report and that, but absolutely it

2    does.  Because you can give antibiotics to a patient, you

3    can clean the outside, but when you're placing that implant

4    in the actual area, all it takes is a couple of bugs to land

5    on that implant as it goes in, and because it's a foreign

6    body, you don't have the ability to get rid of it like you

7    would if it was an appendectomy.  That's why in orthopedic

8    surgeries the issue of how clean the room needs to be is

9    really important, but --

10              JUDGE LEARY:  How do you distinguish between a

11   bacteria that might have entered the surgical site as a

12   result of forced-air warming from bacteria that might have

13   entered for other reasons?  And we know that that exists

14   because it has existed before the use of a forced-air

15   warming device.

16              MS. CONLIN:  And I would point you to Dr. Said

17   Elghobashi's CFD analysis which is part of our submission.

18   He's one of the top CFD experts in the world.  And he has

19   shown through his analysis that as soon as you turn that

20   machine on, it is creating turbulent air flow in the OR and

21   is actually creating a current which is pulling up dirty air

22   from --

23              JUDGE LEARY:  I understand all of that, but my

24   question is:  When you have a surgical site that becomes

25   infected with bacteria, how does one draw the conclusion

1    that that bacteria was the result of forced-air warming as

2    opposed to any other possibility for introduction of that

3    bacteria?

4              MS. CONLIN:  Well, I mean, it's twofold.  One is

5    that the CFD analysis shows us that when you're in a

6    unidirectional operating room, the particles and the bugs

7    quite correctly stay below the surgical table, go out, all

8    right?

9              The second thing I'd say to you is, you know that

10   with a PJI you got it during the surgery because it's landed

11   on the implant.  You're closed up.  It's not like you can

12   assume that there was some sort of, like, changing the

13   bandages or whatever.  These infections occurred during the

14   surgery because something has landed on the actual implant.

15             JUDGE LEARY:  My question, though, is, how do you

16   know the source?

17             MS. CONLIN:  And I'm going there next, Your Honor.

18             The McGovern study, in hip -- in the implants, a

19   randomized study of 1500 people.  They found that when Bair

20   Hugger was used it increased the chance of infection -- or

21   increased infection rates by 3.8 times.  That under any law

22   anywhere is sufficient to show it's a substantial

23   contributing cause.

24             JUDGE LEARY:  So you believe that the evidence

25   that you've discussed so far and other evidence that you

1    will discuss constitutes clear and convincing evidence of a

2    deliberate disregard --

3              MS. CONLIN:  I do, Your Honor.

4              JUDGE LEARY:  -- is that correct?

5              MS. CONLIN:  Right.

6              JUDGE LEARY:  And assuming that, then why has

7    there never been a recall with regard to the Bair Hugger?

8              MS. CONLIN:  Well, I'll tell you what my belief of

9    it is.  As these infections and issues have come up, they

10   have had, I would argue, a dishonest but very effective

11   campaign to say every time a study comes out -- you can see

12   their internal documents -- you know, argue this, argue

13   that, argue this.  Argue that particulates isn't equivalent

14   to bacteria, which we know they know is not true, but that

15   was some of their talking points.

16             The other thing --

17             JUDGE LEARY:  Let me interrupt.  It's concerning

18   to me that it seems that you concede the point that if it is

19   a dangerous product that is otherwise subject to government

20   approval, that the Government hasn't withdrawn its approval

21   because essentially they've been hoodwinked by 3M.  I think

22   that kind of argument also begs the question of, well, what

23   is the value of the FDA or any other governmental authority

24   in vetting medical devices if your argument is basically any

25   manufacturer of those devices could hoodwink the Government?

1          MS. CONLIN:  The FDA, particularly with respect to

2    Class II devices -- and keep in mind these were devices

3    where they basically start out saying it's a substantial

4    equivalent to something that's on the market.  And as we

5    point out in our brief, the original substantial equivalent

6    was something from 1938 that was used for --

7          JUDGE LEARY:  I want you to get back to my

8    question, though, with regard to why there hasn't been a

9    recall.

10          MS. CONLIN:  Well, and my point is there may be

11   one coming.  So one of the things that we showed you was

12   where they're going with the warming/cooling units and the

13   fact that they have figured out that pathogens from that

14   machine can be aerosolized and create infections in the OR.

15   The FDA -- and you can look on the website -- they've

16   started talking about Bair Hugger is part of that same

17   problem, and there's been some on the panel that said:  We

18   think Bair Hugger causes infections in cardiac patients.

19          So you can't assume that because there hasn't been

20   something that the evidence isn't there.  We believe that

21   this case was the reason that some of these things are

22   happening.  And all of the information that we've got,

23   nobody else has seen.

24          JUDGE LEARY:  Well, it may be that the FDA has

25   done nothing because there's -- a large number of studies

1    indicate that there's no causal relationship between Bair

2    Hugger and risk of infection.

3             MS. CONLIN:  And that's going to be an argument at

4    trial.  Our position is -- and we've got one of the leading

5    epidemiologists in the world that has looked at this,

6    analyzed the evidence under the Bradford Hill criteria, and

7    determined that both -- I mean, one of the things that 3M

8    has been saying is the McGovern study was just Augustine.

9    That's not true.

10            JUDGE LEARY:  Okay.  I'll let you move on.  I

11   don't want to exhaust any more court time over this issue.

12   I just want to express my questions.

13            MS. CONLIN:  And the only study that's actually

14   looked at this thoroughly has found a three-point times rate

15   of infection when the Bair Hugger is used versus a

16   nonforced-air warming method of warming a patient.

17            JUDGE LEARY:  I'm sorry.  Which study is that?

18            MS. CONLIN:  That's the McGovern study, Your

19   Honor.  And we've got people on that study like Dr. Belani,

20   who's chief anesthesiologist at the U of M; Mark Albrecht,

21   who's one of the leading statisticians in the case.  And

22   Yuri Rekine (ph) stated, said, "Oh, it's just an Augustine

23   study."  All these authors have been deposed.  All the

24   evidence and underlying raw data from McGovern has been

25   produced to us.  Dr. McGovern was deposed for two days and

1    he stands behind it.  We've had an epidemiologist,

2    Dr. Samet, look at it, look at all the evidence, all the

3    underlying raw data that hasn't been made available to

4    anyone, and he says it's absolutely a valid study.

5              JUDGE LEARY:  Let's see if we can be clear about

6    that.  You mentioned the University of Minnesota and Mark

7    Albrecht.  The University of Minnesota, particularly with

8    regard to its engineering medical devices, was a department

9    with which Dr. Augustine worked, is that correct?

10             MS. CONLIN:  There is some affiliation there,

11   but --

12             JUDGE LEARY:  And also Mr. Albrecht worked with 3M

13   for a period of time and then with Dr. Augustine's own

14   company.  And if I recall the testimony of Mr. Albrecht, he

15   very directly said Scott Augustine -- and I think that this

16   may very well implicate the McGovern study, which I haven't

17   read and I will -- that Albrecht expressed the opinion that

18   Augustine thought there was a relationship between

19   forced-air warming and increased risk of infection, and

20   Albrecht commented:  But that's the difference between

21   research and marketing, and he dismissed Dr. Augustine's

22   conclusion.  And Mr. Albrecht himself, getting back directly

23   to your reference to him with regard to the McGovern study,

24   says there is no causal connection.

25             MS. CONLIN:  Well, keep in mind causal connection

1       written in that study is in connection with a U.K. doctor.

2       There is a different issue between what a scientist might

3       say causal connection is and epidemiology and research that

4       supports a finding of a substantial contributing cause under

5       Minnesota law.

6               JUDGE LEARY:  My only point is this:  Mr. Albrecht

7       was part of that very same process that relates to the

8       McGovern study, and he said -- and he seemed to be -- it's

9       my assumption he was familiar with the research and he says

10      there's no connection.

11              MS. CONLIN:  He didn't say there was no -- I would

12      beg to differ with that.  That's not what he said.  What

13      they said was it was a 3.8 increased risk, which under

14      Minnesota law is a substantial contributing factor under any

15      case.

16              JUDGE LEARY:  Well, this is what Mr. Albrecht

17      said:

18              "Unfortunately, Scott likes to say that he's

19      convinced of such a relationship, even though I tell him it

20      is unsupported and I do not agree.  Well, that is the

21      difference between research and marketing," end quote.

22              That's what he said.

23              MS. CONLIN:  Well, I mean, we've cited other

24      portions in the Albrecht deposition, but it's very clear

25      that he stands behind that 3.8 increased risk.  I mean,

1   that'll be an issue, Your Honor.  3M has indicated that they

2   plan on bringing a **Daubert** motion on Dr. Samet and

3   Dr. Jarvis, but the evidence is very clear that there is a

4   problem with using Bair Hugger, particularly --

5          JUDGE LEARY:  My only point is this, Ms. Conlin:

6   The standard at least as applies in Minnesota again relates

7   to clear and convincing evidence, and it has to be clear and

8   convincing.  The plaintiffs only have to make a *prima facie*

9   showing of that, but a *prima facie* showing of clear and

10  convincing evidence.  And when you cite the McGovern study

11  for a particular proposition and you cite Mr. Albrecht as

12  essentially vouching for that, that's what makes me

13  concerned about that piece of the argument, because I think

14  I need to focus on the clear and convincing evidence that

15  you have, and clear and convincing should not be subject to

16  a lawyer's interpretation.

17         MS. CONLIN:  Well, I would agree with that if we

18  were making a decision today on whether we can succeed in

19  front of a jury on punitive damages.  For the purposes of

20  making an amendment on a *prima facie* case, the evidence goes

21  in unrebutted.  And we'll have Mark Albrecht at trial, we'll

22  have Dr. Belani at trial.  We will have these people that

23  will testify.

24         JUDGE LEARY:  I'm not talking about rebuttal.  I'm

25  talking about the argument that's being made on behalf of

1      plaintiffs who claim that there's clear and convincing

2      evidence of a deliberate disregard for the rights and safety

3      of individuals.  That's what I'm saying.  And you're relying

4      on the evidence -- strike that -- you're relying on certain

5      research, but you're also interpreting that research and

6      whether or not you're accurately interpreting that research,

7      that is an issue for consideration.

8              MS. CONLIN:  Well, and that's why we put in the

9      full reports of Dr. Jarvis and Dr. Samet, who have opined to

10     a reasonable degree of scientific certainty based on their

11     years of work in infectious disease and epidemiology that

12     there is a causal link.  And they looked at, by the way, a

13     lot more evidence.  I mean, you asked me about the FDA.

14             JUDGE LEARY:  I don't want to go there.  I'm just

15     talking about McGovern.  I'm talking about the McGovern

16     report and how you characterize it.  That's what I'm

17     concerned about.  Again, I haven't read it, so, you know,

18     maybe the gloss that you put on is absolutely accurate, but

19     it has to be accurate and it cannot be subject to a gloss

20     that a lawyer puts on it that otherwise isn't contained

21     within the article.  That's all I'm going to say about it.

22             MS. CONLIN:  And I hear you and I would just

23     direct you back to those reports that were submitted in

24     their entirety.

25             The other thing I would tell you is, our claim for

1    punitive damages and a *prima facie* showing of a deliberate

2    disregard to the rights and safety of others is not just

3    premised on McGovern.  It's premised on the fact that they

4    changed the filter, never told the FDA.  I mean, Dr. David

5    says --

6                JUDGE LEARY:  I've heard that part of it.

7                MS. CONLIN:  Okay.

8                JUDGE LEARY:  If you told something new, I'd be

9    interested in it, but I've heard that part.

10                MS. CONLIN:  So one of the things that 3M says in

11    their brief is no doctor or healthcare provider has ever

12    reported that the Bair Hugger system caused one of their

13    patients to develop a surgical site infection.

14                In point of fact, if they're saying that Jane Doe

15    was injured on June 6th through the Bair Hugger, if that's

16    what they're talking about, that's true, but there's all

17    sorts of internal documents, this one in particular, where

18    they had people writing them from the field.  They said

19    Dr. Bratzer won't use the Bair Hugger because he thinks --

20    "Their position is that they contribute to post-op wound

21    infections because of the circulating air (air turbulence,

22    et cetera)."

23                And 3M writes to Mark Scott, who's head of the

24    group, and says:  "This issue is everywhere.  We have got to

25    develop a better strategy besides the Zink article."  That

1    was the article from Augustine in 1996.  That was the one

2    that 3M had been writing.  And this is all the way up to

3    2010.  They had numerous orthopedic surgeons contact the

4    company, both at Arizant and 3M -- this is just one

5    example -- and say:  We think Bair Hugger is creating

6    post-surgical prosthetic joint infections.  We're not going

7    to use it anymore.

8            And in fact, people would say:  What is the filter

9    efficiency?  They'd say:  Just tell them it's high

10   efficiency.  And that went on over and over again.

11           Some people wrote in to them and said:  Hey, we've

12   had an Acinetobacter outbreak at the hospital.  What do we

13   do?  3M would quietly tell them -- or Arizant before 3M --

14   that they would remove and discard the filter and deposit it

15   in biohazardous waste.  They only told that to people if

16   they were calling in.  They never told anyone that the

17   filter could be a problem and that you need to change it if

18   you've had an outbreak at the hospital.  They never did it.

19   This is the same Al Van Duren who signed the "Dear Valued

20   Customer" letter in 2006 saying:  Don't worry about it.  Our

21   filter is really good.

22           And at this point in time they hadn't done any

23   testing.  They never studied.  They never did any validation

24   tests on the 750.  They never did any testing to see whether

25   anything that they were doing would prevent airborne

1    contamination.

2         Same thing on the 505.  They never did any

3    validation.  They never did any biological testing.  They

4    never did any airborne particulate testing, none.  And they

5    never did any testing on the filter either.  They put it out

6    into the marketplace, and as the evidence, you know,

7    basically accumulated, they stayed on the same path.

8         Michelle Hulse-Stevens' deposition this year, you

9    know, that -- basically saying, you know, there's "types of

10   studies that you believe provide adequate evidence for the

11   adoption of particular interventions which could be less

12   difficult to conduct" rather than a randomized trial.  And

13   she agrees one of them would be an aerobiology study and it

14   hasn't been conducted.  And she goes on to admit that that

15   decision was made at the highest levels of the company.

16        The reason why they didn't want to do it -- and

17   you've seen this document before, the war games and the

18   nightmare scenario -- they were concerned about someone

19   doing a study.  So rather than go forward and do an

20   appropriate study if they wanted to, you know, claim that

21   this wasn't a problem, they had the areas of concern in

22   front of them, a definitive study showing forced-air warming

23   as a source of SSI.  Someone does a study on forced-air

24   warming and contamination, a study on forced-air warming

25   versus HotDog in orthopedics.

1          And you had the FDA come and inspect at Arizant in

2    2009 and came up with -- or believed when they left,

3    probably because of the high-efficiency -- and that goes to

4    the point you were asking me about:  Does high efficiency

5    equate with HEPA in the minds of people in the field?  Yes.

6    Clearly it did here, because the FDA thought that they had a

7    HEPA filter on their device.  That wasn't corrected until

8    December 1st of last year, 2016, 16 years after it went on

9    the market.

10          And what's interesting is, they want to correct

11    that misimpression from the FDA in 2009, so six years later,

12    seven years later, and apparently they think it's so urgent

13    that they sent it via e-mail and overnight delivery, and

14    they claim they just recently realized it when in fact that

15    was pointed out to them at the outset of the litigation in

16    Texas.

17          And so they hadn't done any verification testing

18    on their filter until 2016, and they never told the public.

19          Reluctance to study, another example of what can

20    give rise to a *prima facie* case of punitive damages.

21          ECRI wanted to do -- an outside group wanted to do

22    a study.  First thing they say is:  "Our first step with

23    ECRI should be preventing them from doing their own testing,

24    but rather to rely on published data."

25          If you look midway down, some of the talking

1    points:  "The Albrecht paper does not actually measure

2    [colony forming units] CFUs, but rather leads the user to

3    conflate particles with germs."  They knew that's a

4    reasonable proximation, but these are their talking points

5    in response to people wanting to do a study.

6            JUDGE LEARY:  Isn't that a risk, that a person

7    might conflate particles with germs in coming to a decision

8    as to whether or not there's a risk?

9            MS. CONLIN:  The way I read it was that this was a

10   reason to tell ECRI not to -- to dismiss the Albrecht paper

11   because it was dealing with particulates rather than germs.

12   But as you've seen from the other documents, they know and

13   have known since the Stocks paper and others came out years

14   and years earlier that it is a reasonable -- particulates is

15   a reasonable equivalent for bacteria.

16           Dan Sessler, one of their -- a doctor, one of

17   their outside experts, 2011, says we got to do a study.  We

18   have to do a study.  "Waiting much longer seems like a

19   dangerous strategy."  Michelle Hulse-Stevens weighs in not

20   on this, but in the same time frame, and says:  We're not

21   going to go forward with any study.

22           "However, with the Legg study, and the limitations

23   of the Sessler study, before we proceed with any further

24   engagement it would be helpful for Carol and I to have the

25   opportuntiy to meet with the core stakeholders on the

1      strategy here to make sure we are fully informed ...."

2              And you saw from her deposition testimony they

3      made the decision at the highest levels of the company not

4      to do any testing.

5              Dan Sessler, Dr. Sessler, again in response to

6      criticisms of the Sessler/Olmsted study they had just

7      published, writes to Gary Hansen.  He says:

8              "I'm pretty unhappy.  I took this project on as a

9      favor and it has ended up costing a huge amount of

10     time ... [and] may damage my reputation.

11             Then he says:

12             "This was completely preventable.  As I've been

13     saying for a year, only a bacterial sampling study will

14     adequately deal with this issue."

15             And we know that they didn't do anything.

16             Now, why would Dan Sessler, Dr. Sessler, a 3M key

17     opinion leader and someone who's on their medical advisory

18     board, think doing a bacterial study would be important

19     while 3M at the highest levels was saying don't do it?

20             This (indicating) is why.  Dr. Sessler thought

21     that the air coming out of the Bair Hugger was sterile.

22     He's one of 3M's key opinion leaders.  He's on their medical

23     advisory board.  He's saying:  We've got to do a bacterial

24     sampling.  We have to show that this product is safe.  3M at

25     the highest levels of the company said:  We are not going to

1    do it.  And the reason why Dan Sessler thought it would be a

2    good study is because he thought the air was sterile.

3           If people on 3M's medical advisory board and key

4    opinion leaders think that the air coming out of the Bair

5    Hugger is sterile, can you imagine what people out in the

6    field think and orthopedic surgeons who aren't enmeshed and

7    do have access to all these internal studies?  That's the

8    problem.  Everybody thinks the air is sterile and I think

9    the FDA thinks that too.  They never told the FDA that they

10   had changed their filter.  They haven't told the FDA about

11   the number of pathogens that have been cultured in the

12   machines and people have called in and said:  We've got

13   problems.  They haven't told the FDA about the Acinetobacter

14   outbreak in Kentucky where they changed the filter in the

15   Bair Hugger and it stopped.  They haven't told the FDA any

16   of that.

17          And on a Class II device, the FDA relies on the

18   manufacturer to do the right thing.  It's not like a Class

19   III drug, that it's gone through and there's clinical

20   trials.  The FDA gets what you get.  And there was never a

21   letter to file done when they changed the filter out, any of

22   the steps -- and you can see it in Dr. David's report -- any

23   of the steps a reasonable manufacturer would have done and

24   should have done in connection with this.

25          So finally, you know, again, just another example

1    of the reluctance to study.  And in fact, in this document

2    they're basically referencing one of the reasons they were

3    not doing it is because of the ongoing legal situation.

4                   And then I want to talk just briefly --

5                   JUDGE LEARY:  Let me stop you there, Ms. Conlin.

6                   MS. CONLIN:  Yes.

7                   JUDGE LEARY:  Just a point of clarification.

8                   With regard to slide 53, the Sessler letter to

9    Hansen, there's a reference --

10                  MS. CONLIN:  I'm sorry.  Which slide, Your Honor?

11                  JUDGE LEARY:  53.

12                  MS. CONLIN:  Slide 53?

13                  JUDGE LEARY:  And it's a Sessler letter to Hansen.

14   Sessler says to Hansen at the end of the first full

15   paragraph:  "[J]ust the fact that a complaint was filed

16   already has to some extent."

17                  What is the complaint there he's referencing?

18                  MS. CONLIN:  So there was -- after the

19   Sessler/Olmsted study was published -- and it had problems

20   with it, and even 3M internally says it's got some problems

21   with it.

22                  It was a study that basically Gary Hansen did, and

23   then as part of their legal strategy -- and we put it in the

24   documents that we submitted -- added -- got Sessler,

25   Dr. Sessler and Russ Olmsted to be the authors even though

1    they didn't do any of the work.  And people had issues with

2    how it was done, what the reporting was, and I'll explain --

3              JUDGE LEARY:  And my question was, what is the

4    complaint --

5              MS. CONLIN:  So the complaint was that the data

6    that's presented in the paper is misleading, essentially.

7              JUDGE LEARY:  Who made the complaint and to whom?

8              MS. CONLIN:  It was -- I'd have to pull that out,

9    Your Honor.

10             JUDGE LEARY:  If you don't know, that's fine.

11             MS. CONLIN:  I did know at one point when I took

12   Dr. Sessler's depo, but I don't.  But anyway -- so he didn't

13   know the answers to the questions that were coming in and

14   therefore, you know, went on to 3M.

15             So the Sessler/Olmsted study was basically saying

16   that you can use the Bair Hugger in a laminar flow operating

17   room, what's known in the U.K. or Europe as a DIN, and that

18   even with the Bair Hugger on, you still meet these DIN

19   standards.

20             One of the things that happened in connection with

21   this study is that one of the study sites at Amersfoort

22   where an underbody blanket was used, they found a five to

23   tenfold increase in particulates over the surgical site,

24   which is statistically significant.  And so what they talked

25   about was combining that data and averaging that data with

1    the other sites so that it wouldn't be statistically

2    significant.

3           And, you know, basically you've got Dan Sessler

4    writing to Gary Hansen, who did the study, the 3M employee,

5    and it says:  "The increase with the 635 cover on ambient or

6    warm in Amersfoort seems substantial, roughly a factor of

7    five to ten."  It goes on:  "What clinicians will want to

8    see is basically particle counts under the three test

9    circumstances ....  Any substantial increase will concern

10   them and basically validate Scott's point that forced-air

11   warming increases risk."

12          And they had the data.  They had the data as a

13   result of this.  And what they did was, they not only moved

14   Amersfoort into basically an amalgamation of all the sites,

15   but they -- if you look at the next slide, they actually

16   deleted from the text of the study, which was -- this is

17   part of the draft -- "The significantly higher counts seen

18   with the blanket model 635 reflected conditions at

19   [operating room] Amersfoort."  They deleted that.  The

20   reason why they deleted that is because they know that if

21   anybody understands that the use of the Bair Hugger

22   increases the particulate counts around the surgical site,

23   they will have a problem with it, or to quote Dr. Sessler,

24   "Any substantial increase will concern them."  And so that

25   was deleted from it.

1          And again, straight out of the cases from *Mirapex*

2    to *Levaquin* to *Prempro* where you are manipulating scientific

3    data for your own commercial gain, that is *prima facie*

4    evidence of a punitive damages claim.

5          So finally we have this, and you saw what 3M's

6    reply to it was, but it was talking points on forced-air

7    warming and SSI prevention.  "June 2010, Our position.

8          "There is no evidence that forced-air warming

9    increases surgical site infections."

10         Al Van Duren weighs in and says:  "Actually, there

11   is evidence that [forced-air warming] use increases risk --

12   This evidence was the motivation for Dr. Memarzadeh's work,"

13   and that was a guy who did an unpublished study.

14         So they've tried to spin it in their brief.

15   They've tried to say, well, that's not what he meant.  He

16   made a careless mistake.  But you can't look at their spin

17   on this for the purposes of ascertaining whether we've met

18   our *prima facie* case.

19         So we've showed they failed to warn about the

20   risks.  They failed to warn that their filter -- they had

21   changed their filter.  They had failed to even test whether

22   they had an efficient filter.  They failed to warn about the

23   risks in increased particulate counts in orthopedic

24   surgeries.  They failed to study the risks.  They had people

25   saying we should do this and at the highest levels of the

 1      company they decided not to.  They failed to heed

 2      recommendations by people all over the place saying we

 3      should do a study, and of course those people thought the

 4      air out of the Bair Hugger was sterile.  They didn't provide

 5      any information to the FDA that they had changed their

 6      filter media and now they had an efficiency of only 63

 7      percent, meaning that 40 percent of whatever gets sucked up

 8      off that floor is going through that.  They manipulated the

 9      Sessler and Olmsted study for commercial gain and in fact

10      added them as part of their legal strategy.

11              And they basically -- and it gets to the point you

12      made, Judge, which is, they have worked assiduously hard to

13      tamp down any legitimate scientific inquiry into this, and

14      the FDA and others -- you know, the shoe hasn't dropped yet,

15      but they're talking about the Bair Hugger like they are

16      talking about the warming/cooling units, and we've got the

17      expert reports that demonstrate and show by top scientists

18      in the world that what I presented today is true.

19              MAGISTRATE JUDGE NOEL:  Let me just ask this

20      question:  I understand that we're only looking at the *prima*

21      *facie* evidence and the evidence that you present to

22      determine if it -- whether it is clear and convincing

23      evidence of a deliberate disregard, but your evidence itself

24      are these studies, correct, some of your evidence?

25              MS. CONLIN:  Some of our evidence is the studies

1    themselves as well as our expert reports which are based on

2    additional underlying data from the studies that was

3    produced in discovery and reviewed by our experts.

4         MAGISTRATE JUDGE NOEL:  Okay.  And then how do you

5    address the table that the defendants have in their brief at

6    pages 7 and 8 where they list -- go through all the studies

7    and quote from them that the study did not evaluate the link

8    between forced-air warming and surgical site infection, or

9    do not establish a direct --

10        MS. CONLIN:  I mean, I would just go back to the

11   fact that our experts have looked at all of that.  There is

12   a difference between what an author may conclude in a study

13   and what the actual data shows.  But, you know, in the

14   *Mirapex* case in front of Your Honor, the defendants asserted

15   there had been no evidence of a cause-and-effect

16   relationship between *Mirapex* use and pathological gambling.

17   Same thing.  There wasn't a study that said absolutely there

18   is a definitive causal link.  It was accumulation of

19   evidence just like here.  And, you know, basically they said

20   that scientific evidence to date has shown merely an

21   association between *Mirapex* and impulse disorders.

22        And that was sufficient based on the cumulative

23   evidence to say a jury may not agree with us, but we've

24   certainly presented enough evidence to meet the *prima facie*

25   showing, which is unrebutted.  You can't make credibility

1    determinations.  They can put Al Van Duren on the stand and

2    he can say, you know, "I didn't mean what I said," but a

3    jury under these cases is entitled to take a different view

4    of it, and that's consistent with *Levaquin* as well.

5            MAGISTRATE JUDGE NOEL:  Okay.  Thank you very

6    much.

7            MR. BLACKWELL:  Your Honor, Mr. Hulse will be

8    arguing.

9            MAGISTRATE JUDGE NOEL:  Okay.  All right.

10           MR. HULSE:  We've been going for awhile.  If

11   either of Your Honors wants to take a short break, or

12   otherwise I'll proceed.

13           MAGISTRATE JUDGE NOEL:  I think the more important

14   question is whether Tim needs a quick break.

15       (Discussion off the record between Judge Noel and the

16        court reporter)

17           MAGISTRATE JUDGE NOEL:  We'll take ten minutes and

18   we'll be back.

19       (Recess taken at 10:40 a.m.)

20                         *      *      *      *

21       (10:50 a.m.)

22                        IN OPEN COURT

23           MAGISTRATE JUDGE NOEL:  Good morning.  Please be

24   seated.

25           Mr. Hulse?

 1          MR. HULSE:  Good morning again, Your Honors, Judge

 2     Noel, Judge Leary.  Ben Hulse for the defendants.

 3          I'd like to before I get into the meat just

 4     address some of Judge Leary's questions from the last

 5     session.

 6          MAGISTRATE JUDGE NOEL:  I'm sorry.  Before you

 7     start --

 8          MR. HULSE:  Of course.

 9          MAGISTRATE JUDGE NOEL:  Judge Leary and I both

10     have a concern about timing.  How much time do you think

11     you're going to be going?

12          MR. HULSE:  Fifteen minutes.

13          JUDGE LEARY:  How long?

14          MR. HULSE:  Fifteen minutes.

15          JUDGE LEARY:  Fifteen.

16          MR. HULSE:  Yes.

17          MAGISTRATE JUDGE NOEL:  Okay.  You're up.

18          JUDGE LEARY:  You're on the clock.

19          MR. HULSE:  Thank you, Your Honors.  I think I can

20     be quick.

21          Judge Leary asked who that complaint that was

22     referred to by Dr. Sessler came from in 2010, and as we

23     pointed out in our brief, that complaint came from Dr. Scott

24     Augustine.  That was the complaint that Counsel couldn't

25     recall.

1          And I also wanted to note that, of course, as has

2    been mentioned here, there hasn't been an FDA recall warning

3    letter and nor have the plaintiffs put in any evidence of

4    any kind that there is any kind of probability of an

5    FDA action.  They mention --

6          MAGISTRATE JUDGE NOEL:  What about this HEPA

7    thing, though?  I'm just -- HEPA is an acronym, correct?

8          MR. HULSE:  HEPA is an acronym.

9          MAGISTRATE JUDGE NOEL:  High Efficiency Particle

10   something or other, right?

11         MR. HULSE:  That's right.

12         MAGISTRATE JUDGE NOEL:  So what is the meaning of

13   high efficiency?  And it appears that for at least six years

14   the FDA thought you had a HEPA filter.

15         MR. HULSE:  Well, the FDA made a mistake and the

16   plaintiffs don't put in any evidence that anybody from

17   Arizant -- it was Arizant at the time -- ever told anybody

18   at the FDA that it was a HEPA filter.  High efficiency is

19   a -- and we've put in the ASHRAE evidence on it -- is a much

20   broader category than just HEPA.  Obviously this -- you

21   know, it can lead to some confusion, but the ASHRAE

22   standards are clear.  ASHRAE uses a standard called MERV.

23   ASHRAE is the society of engineers that comes up with these

24   standards.

25         Plaintiffs have said here that we never tested the

1    filter.  Obviously you're not supposed to consider our

2    rebuttal, but when a plaintiff's lawyer makes an argument

3    that something never happened and it did, I think the

4    standards would allow for some rebuttal there.

5         We did put in the evidence of the testing that

6    occurred on the filter.  The filter shows a rating of MERV

7    14, and MERV 14 is the recommended efficiency standard by

8    ASHRAE, which again is the organization that sets these

9    standards for general surgery in the operating room.  It is

10   the same type of efficiency that is used for the hospital

11   filtration system.  And I'd add that the Bair Hugger system

12   is the only device in the operating room that includes a

13   filter.  The only other filter in the operating room is in

14   the filtration system.

15        And so like in the **Beniek** case, the fact that 3M

16   has added an additional feature to the Bair Hugger system

17   despite the utter lack of scientific evidence of causation

18   of surgical site infections cannot be a basis for punitive

19   damages.

20        But, Your Honors, just to get back to it, to the

21   FDA, Ms. Conlin made the statement that all the info we've

22   got the FDA hasn't seen.  That is, of course, not true.

23   They rely on studies that are fully available to the FDA.

24   The FDA has -- McGovern, of course, is a published study and

25   the FDA has inspection rights and conducts audits and we've

1    produced the documentation from the audits.  There's no

2    secrecy here.  And the FDA has conducted no -- there's been

3    no warning letter, no enforcement, and so forth.

4         The standard here, as Judge Leary has recited, for

5    Minnesota law, to the extent Minnesota law applies to any

6    case, is basically it can't be a close call.  There has to

7    be clear and convincing evidence that 3M and Arizant had

8    knowledge of facts or intentionally disregarded facts

9    creating -- and these are words that the plaintiffs never

10   use -- a high probability of injury.  That is a standard

11   that doesn't appear in every state's law, a high probability

12   of injury, and then deliberately acted in conscious or

13   intentional disregard of that high probability of injury.

14        And as was said in the *Ulrich* case, the mere

15   existence of negligence or gross negligence doesn't meet the

16   standard.

17        Another piece of the statute that Plaintiffs don't

18   talk about is Section (c) and (d) of 549.20, which is that

19   acts of employees can only be imputed to 3M and Arizant if

20   they're done by a manager with authority to establish policy

21   and make planning level decisions.  That's not more clearly

22   defined, but it implies essentially a C-Suite manager, or an

23   employee whose acts are ratified or approved by a person in

24   that position.  And there are multiple cases from the

25   District of Minnesota that deny leave to amend or grant

1       motions for judgment as a matter of law based on the fact

2       that the plaintiffs haven't provided evidence that the

3       statements or acts by the employee were either by an

4       employee who had managerial authority or were ratified or

5       approved.

6               And this gets to the heart of it, that we have

7       here a -- snippets from a whole bunch of documents from 3M's

8       internal files, and that what Plaintiffs have done is

9       essentially appended them to each other, welded them

10      together with lawyer argument, to create some kind of a

11      shadow of misconduct.  But the statute and the intent of the

12      legislature is clear.  This is not about shadows.  The

13      misconduct that gives rise to punitive damages should be as

14      obvious as an elephant that's painted fuschia.  It should be

15      clear and convincing.  And that's -- and this is not a close

16      call here.

17              MAGISTRATE JUDGE NOEL:  I'm sorry.  Your metaphor,

18      is that in a case?

19              (Laughter)

20              MR. HULSE:  I was debating which color to paint

21      the elephant, Your Honor.

22              So I think, as the Court has deduced, what this

23      really comes down to is the McGovern study.  Plaintiffs have

24      to prove that 3M or Arizant had knowledge of facts of a

25      high -- constituting a high probability of injury to the

1    plaintiffs.  Now, we don't concede at all that there is a

2    high probability of injury that's established by the

3    McGovern study, but more to the point is what the McGovern

4    study itself says.

5            As we point out in the chart that Judge Leary

6    alluded to, every single one of the studies that Plaintiffs

7    rely on and their experts rely on disclaims any finding of

8    causation, but I've pulled out McGovern here specifically.

9    McGovern and his co-authors, including Mark Albrecht, an

10   employee of Scott Augustine, say:

11           "This study does not establish a causal basis for

12   this association.  Although the demographics were similar

13   between the patient groups in terms of risk factors for

14   infection, the data are observational [only] and may be

15   confounded by other infection control measures instituted by

16   the hospital."

17           Now, what does observational mean?  In scientific

18   research, that means you didn't control.  It's a

19   noncontrolled study.  And then they give an example:

20           "For example, changes were made to the antibiotic

21   and thromboprophylaxis protocols used during the study,

22   although no infection controls were made after February

23   2010."

24           So in other words, the antibiotic regimen was

25   changed in the midst of the study, and of course the

1    antibiotic regimen is going to have some significance for

2    the development of surgical site infections.  And this is

3    why, as was shown in Mark Albrecht's testimony that Judge

4    Leary was alluding to, it is wrong to draw a causal

5    conclusion from this observational study.  And yet

6    Plaintiffs would say, despite the disclaimers in the study

7    itself and the statements of its co-author, Mr. Albrecht,

8    who works for Scott Augustine and has had every incentive in

9    the world to support the boss, they say this is clear and

10    convincing evidence of a deliberate disregard of a high

11    probability of injury to the plaintiffs.  It's not a close

12    call.

13            MAGISTRATE JUDGE NOEL:  But isn't this precisely

14    what the statute says we're not supposed to do?  In other

15    words, this is rebuttal.

16            MR. HULSE:  No, it's not, Your Honor.  It's the

17    plaintiffs' own evidence that's been presented.

18            MAGISTRATE JUDGE NOEL:  Well, the study, and then

19    the evidence is the experts they have who they say they go

20    beyond the study by looking at the data upon which the study

21    is based and reach different conclusions.

22            MR. HULSE:  Indeed.  The plaintiffs' experts reach

23    different conclusions than the authors of the studies on

24    which they rely.  We agree with that.

25            I'd say as an initial point that --

 1                MAGISTRATE JUDGE NOEL:  But isn't that the

 2      evidence that we have to look at?  That's the *prima facie*

 3      evidence.  That's what the plaintiff wants to present to the

 4      jury, and now you're going to come in and say, "Well, no,

 5      let's look at the study and let's look at what the study

 6      authors said, and now I'm going to poke some holes in what

 7      your expert says."  And all of that is fodder for the issue

 8      of whether they get punitive damages, but at this stage,

 9      don't we only look at what their expert said?

10                MR. HULSE:  And they have presented these studies

11      and the studies say what the studies say, and that is part

12      of what the Court must weigh in determining whether there is

13      in fact clear and convincing evidence submitted.  When those

14      studies that the plaintiffs submit to the Court, which are

15      the same studies their experts are citing, say something

16      that doesn't support the standard, that's something

17      certainly the Court can take into account.  That's not our

18      rebuttal.  That's just if we didn't say anything at all and

19      I never stood up, the Court would look at those documents

20      and see this.

21                And also, in terms of the plaintiffs' expert

22      reports, there are -- the two cases out of this district,

23      **Berczyk** and **Healey**, that have addressed whether an expert

24      report can be considered by the court on this motion have

25      both concluded it cannot.  Both courts have concluded that

1    an expert report that is not submitted as an affidavit under

2    oath cannot be considered under the statute.

3              And these cases aren't hard to find.  There are

4    only, you know, about 20 cases total out of the District of

5    Minnesota and the Minnesota state courts about motions for

6    leave to amend, and that's at this point the universal

7    holding, conclusion of the courts about whether you can

8    consider expert reports.  And again, all that these expert

9    reports are doing is taking the same evidence and drawing a

10   different conclusion.

11             And I'd like to add something else.  Here's

12   another --

13             JUDGE LEARY:  And Judge Noel's question that the

14   representations by a lawyer what is contained in a report is

15   not the evidence to be considered, but it's rather the

16   report itself --

17             MR. HULSE:  It's neither, Your Honor.  Of course,

18   the case law is clear that lawyer representations about the

19   evidence are not to be considered, just the evidence itself,

20   in determining whether the plaintiffs have made a

21   *prima facie* case, but the expert reports are in this sense

22   equivalent to lawyer argument --

23             JUDGE LEARY:  I'm not talking about expert

24   reports.  I'm talking about the articles themselves.

25             MR. HULSE:  The articles themselves --

1          JUDGE LEARY:  The calculation as to whether or not

2     the standard that's been met depends on what the articles --

3     I may have said reports -- what the articles say as to how

4     counsel characterizes it.

5          MR. HULSE:  I couldn't agree more.

6          JUDGE LEARY:  Okay.

7          MR. HULSE:  And here's -- just to get to the heart

8     of it here, the plaintiffs submitted the Proceedings of the

9     International Consensus Meeting on Periprosthetic Joint

10    Infection.  This was a gathering in 2013 of 400 of the

11    world's leading experts in surgical site infections, joint

12    infections, from 52 countries.  They came together to see

13    whether they could make some consensus statements on issues

14    of SSIs.  The plaintiffs put this in, but they omitted a

15    couple pages at the end, and I don't think this is rebuttal,

16    Your Honor, to introduce the pages that they omitted from

17    what they supplied to the Court.  This is just principles of

18    evidentiary completeness.

19         So they submitted these proceedings -- and again,

20    a gathering of 400 of the world's leading experts on

21    surgical site infections, and they looked at the question --

22    this is in 2013 -- "Do FAW" -- that is, forced-air warming

23    blankets -- "increase the risk of SSI?" -- that's surgical

24    site infections -- and they reached this statement:

25              "We recognize the theoretical risk posed by

1     FAW" -- forced-air warming blankets -- "and that no studies

2     have shown an increase in SSI related to the use of these

3     devices.  We recommend further study but no change to

4     current practice."

5            That was agreed upon, that statement, by 89

6     percent of the attendees representing a strong consensus.

7     Five percent disagreed.  We don't know why.  But I want to

8     be very clear what they looked at.

9            They looked at exactly the same studies that the

10    plaintiffs are putting in front of the Court as evidence of

11    deliberate disregard for a high probability of injury.  I'm

12    sorry.  I wish I could blow this up a little bit more.

13           But the first reference at the top is the McGovern

14    and Albrecht studies.  Also, they cite here the Legg study.

15           JUDGE LEARY:  I assume that the full article is

16    part of the record, and if so, could you cite us to that?

17           MR. HULSE:  Yes, Your Honor.  So we submitted the

18    missing pages at Defendant's Exhibit 4, and it was -- I'm

19    sorry -- it was Plaintiff's Exhibit 4, Defendant's Exhibit

20    18.

21           JUDGE LEARY:  Thank you.

22           MR. HULSE:  Right.  And so what Plaintiffs'

23    position is, that a statement here, that no studies -- and

24    that includes McGovern -- have shown an increase in SSI

25    related to the use of forced-air warming devices and

1    recommending no change to current practice, agreed upon by

2    89 percent of experts who attend, these 400 experts in

3    orthopedic surgery and surgical site infections, disagreed

4    with by only five percent.  What the plaintiffs are saying

5    is that your failure to agree with this five percent is a

6    deliberate disregard of a high probability of injury to

7    Plaintiffs.  Again, Your Honors, this isn't a close call.

8                MAGISTRATE JUDGE NOEL:  What was the total

9    universe of attendees at this event?

10               MR. HULSE:  Sure.  I'll just pull it right up.

11               Four hundred delegates from 52 countries and over

12   160 societies, also referred to here as 400 of the world's

13   experts in musculoskeletal infections from 52 countries.

14               So what you have here is -- and I understand that

15   the plaintiffs didn't put it into the record, but we did

16   introduce for the Court's potential consideration a number

17   of other studies from respected -- statements from respected

18   independent groups, like the Association of Perioperative

19   Nurses and ECRI, which represents thousands of healthcare

20   providers around the country, all reaching the same

21   conclusion based on review of the plaintiffs' literature.

22               Back at science day of last year, all that

23   Plaintiffs were able to present is, again, the McGovern

24   study.  Today too, a year later after all this discovery,

25   the only thing they can point to -- that they're pointing to

1    as proof of causation is the McGovern study, but the

2    McGovern study disclaims causation and the community of

3    people in the field overwhelmingly reject exactly the

4    conclusion that the plaintiffs are reaching.

5           And in order to keep to my 15 minutes, I'm going

6    to proceed just quickly through some other items here.

7           The plaintiffs rely very heavily on both **Levaquin**

8    and **Mirapex.**  They fail to note that **Levaquin** was reversed

9    on punitive damages by the Eighth Circuit.   **Mirapex**

10   certainly was not.

11          Unlike -- in **Mirapex**, Judge Noel, you may recall

12   that the corporate parent of BIPI, the defendant, actually

13   issued a statement on the topic of pathological gambling and

14   whether warnings were needed, and they issued the statement

15   that the data strongly suggests a pharmacodynamic effect of

16   Mirapex on pathological gambling, and then the evidence that

17   the plaintiffs put on was that they repeatedly told the U.S.

18   subsidiary, who was the defendant:  You need to warn about

19   this.

20          In addition, there were clinical trials for years

21   where people developed pathological behavior, clinical

22   trials that were run by the defendants, and then there were

23   multiple reports that came in from doctors saying:  Your

24   drug caused compulsive gambling that were then not reported

25   to the FDA.  That was the evidence in **Mirapex**.

1          We have nothing like that here.  We have no

2     statements by 3M or Arizant executives, the people who need

3     to make these kind of statements under the statute, that the

4     Bair Hugger system causes surgical site infections.  We

5     don't actually have statements to that effect at all from

6     anybody.  And unlike *Mirapex*, we have no doctors reporting

7     to 3M or Arizant that their patients developed surgical site

8     infections caused by the Bair Hugger system.  And I

9     mentioned here just on this piece of paper the *Healey* and

10    *Mack* cases that are cited in our briefs, both from the

11    District of Minnesota, that denied leave to amend where that

12    evidence was lacking.

13          The plaintiffs pointed and -- and this was on

14    their slide 21 -- to an e-mail from a hospital to a sales

15    rep at 3M reporting that some orthopedic surgeons are

16    refusing to use forced-air warming devices, and the

17    plaintiffs say:  Ah-ha.  This is evidence that surgical site

18    infections -- that doctors were complaining about infections

19    caused by the Bair Hugger system.

20          Well, first off, that's not what the document

21    says.  And in fact, what the hospital representative relates

22    is that their concern is based on, quote, literature they

23    have.  So based on the record in front of the Court, what is

24    the literature that the doctors would have had on

25    January 20th, 2010?  Well, the only thing that was out at

1     that point was the first Albrecht study from 2009 which,

2     like McGovern, disclaimed any causation.  So this evidence

3     of a doctor report that they're pointing you to appears to

4     just be a report that some doctors were concerned based on a

5     study that was authored by an employee of Augustine that

6     disclaimed causation.  If they had evidence of a doctor

7     coming to 3M or Arizant and saying, "My patient developed a

8     surgical site infection because of your device," you could

9     be sure you would have heard about it.

10              MAGISTRATE JUDGE NOEL:  So just on that point, who

11    are these folks?  Let me start at the bottom.

12              So Vicki Jones is a hospital person?

13              MR. HULSE:  Yes, a hospital rep at -- yes.

14              MAGISTRATE JUDGE NOEL:  And she's writing to

15    Dr. Bratzer, who is an Arizant person?

16              MR. HULSE:  No.

17              MAGISTRATE JUDGE NOEL:  A 3M person?

18              MR. HULSE:  No.  I don't know who Dr. Bratzer is.

19              MAGISTRATE JUDGE NOEL:  Okay.

20              MR. HULSE:  But it clearly is forwarded to a

21    district sales manager at Arizant.

22              MAGISTRATE JUDGE NOEL:  Okay.  And then there is

23    the e-mail immediately above that from Suzanne Tullis.  Who

24    is she?

25              MR. HULSE:  She is a sales representative for

 1  Arizant.

 2              MAGISTRATE JUDGE NOEL:  And who are Mark Scott,

 3  Jami Collins, and Julie Wick-Powell?

 4              MR. HULSE:  They're marketing employees at Arizant

 5  at the time.

 6              MAGISTRATE JUDGE NOEL:  And marketing employees

 7  meaning, like, just marketing managers?

 8              MR. HULSE:  Marketing managers, exactly.

 9              MAGISTRATE JUDGE NOEL:  Some high-level executive

10  in the marketing department --

11              MR. HULSE:  No, not executives.  I'd add that of

12  course it's Plaintiffs' burden to establish that any of

13  these people -- they call everybody executives in their

14  briefing, but they don't put in evidence that they are.

15              MAGISTRATE JUDGE NOEL:  Okay.

16              MR. HULSE:  The only person I think who might meet

17  that criterion who they quote from is Gary Maharaj, who is

18  the former CEO of Arizant, but all they quote him for is,

19  they said:  Do you remember any studies being done during a

20  time period that he wasn't working on the Bair Hugger 505,

21  and he says:  I don't recall.  So that doesn't seem like

22  clear and convincing evidence of deliberate disregard.

23              And also, Plaintiffs' cite very heavily to

24  *Prempro*, the Eighth Circuit decision, their position being

25  like this is just like *Prempro* in that there was no research

1     to back up 3M's claims about the safety of the Bair Hugger

2     device.  Well, all you have to do is look to Plaintiffs'

3     brief where they spent pages quibbling with our studies or

4     the citations.

5            In the studies that they submitted, you just have

6     to go through the references and the dozens of references to

7     see the extensive academic literature that was out there and

8     has been out there and that has only grown that establishes

9     the safety of the device.  So the fact that a lawyer argues

10    3M didn't study, or Arizant didn't study, or there are no

11    tests is not something that the Court can take as evidence,

12    when the evidence in front of the Court, including the

13    evidence submitted by the plaintiffs, is that there's

14    extensive research done that establishes the safety of the

15    Bair Hugger device.

16           And the bottom line -- and this was the basis --

17    one of the stated bases of the Eighth Circuit for reversing

18    punitives in **Prempro** -- is that there's no dispute that the

19    Bair Hugger system has been used in 200 million surgeries,

20    thousands every day, and remains the standard of care today.

21           I'd like to just -- I'm probably over 15, but I'd

22    like to talk about choice of law for a few minutes.  Choice

23    of law is always a gnarly area.

24           Judge Noel, in **Mirapex** you treated the entire

25    punitives regime as substantive and therefore looked to each

1   state -- and of course, that was just -- there were 15

2   bellwethers -- to determine whether a *prima facie* case even

3   needed to be made, and then, of course, looked subsequently

4   to those states for the standard.

5          Since **Mirapex**, cases in the District of Minnesota

6   have uniformly concluded that the *prima facie* case

7   requirement is procedural rather than substantive, so that

8   applies no matter what.

9          However, the actual substantive requirements, like

10  the deliberate disregard standard, is substantive, and so

11  you have to look to the state -- you have to apply

12  choice-of-law principles.

13         Now, something that got missed in the briefing on

14  both sides -- Plaintiffs don't talk about choice of law at

15  all, but we should have noticed this at the time -- is that

16  the Court actually has an order that speaks to this.  This

17  is Pretrial Order Number 5.

18         And Judge Leary, I won't forget about Ramsey

19  County here, but this is just for the MDL.

20         And what it said is, with regard to the

21  determination of applicable procedural law for any action

22  directly filed in this district -- most actions are directly

23  filed -- Minnesota's procedural law should apply.  So that

24  would proscribe under this order that a procedural

25  requirement like the *prima facie* you have to seek leave to

1    amend, *prima facie* case, applies to all cases.

2              But then it goes on to say that for the

3    determination of the applicable substantive law for any

4    action filed in this district -- that is, direct filed -- in

5    the event of a dispute between the parties concerning the

6    applicable substantive law, the Court will apply Minnesota

7    choice-of-law rules unless the plaintiff clearly identifies

8    the following information in the initial complaint:  current

9    residence, date and location of surgery, and the appropriate

10   venue where the action would have been filed if direct

11   filing in this district were not available.

12             And in fact, the short-form complaint that every

13   plaintiff has had to submit provides exactly that

14   information.  So what that means is, for all direct-filed

15   plaintiffs, the Court actually has to apply the choice -- in

16   determining the substantive law -- apply the choice of law

17   of whatever venue the case would have been filed in

18   originally.

19             MAGISTRATE JUDGE NOEL:  Which means, just to make

20   sure I'm understanding, even after whatever you say the

21   district has done since ***Mirapex***, any state -- any plaintiff

22   whose case would otherwise have been venued in a state that

23   has no requirement for any pre-plea showing of any kind gets

24   to allege punitive damages right off the bat, correct?

25             MR. HULSE:  The opposite, Your Honor.  So it's

1      actually that everybody has to seek leave to amend

2      regardless of their state.  This is the difference from

3      *Mirapex.*

4              MAGISTRATE JUDGE NOEL:  I'll grant you that.

5              MR. HULSE:  Right.

6              MAGISTRATE JUDGE NOEL:  But then once they make

7      that motion, that motion is granted if their state doesn't

8      have a requirement that there be any heightened level of

9      pre-plea review, correct?

10             MR. HULSE:  No, Your Honor.  They have to make a

11     *prima facie* showing that they have met that state's

12     substantive standard.

13             MAGISTRATE JUDGE NOEL:  Right.  And if there is

14     no standard in that state --

15             MR. HULSE:  Oh.  If there was no standard --

16             MAGISTRATE JUDGE NOEL:  I don't know what any

17     states are.  That's why I asked the question.  I seem to

18     have this recollection of Florida and whatever one

19     Ms. Conlin mentioned from *Mirapex*, but I'm assuming there

20     are some states out there that don't have this.

21             MR. HULSE:  Right.

22             MAGISTRATE JUDGE NOEL:  Minnesota appears for

23     whatever reason to sort of been a leader in tort reform back

24     in whatever year this statute was adopted.

25             MR. HULSE:  Right.  But today it's sort of middle

1    of the road, actually.  It was an early tort reformer, but

2    there's been a lot more and more extensive tort reform in

3    other states since this was adopted in 1986.

4         So we gave some examples in our brief.  There

5    certainly are states that just don't allow punitive damages,

6    there are those that require criminal conduct, establishing

7    criminal conduct, and then there are those that don't have

8    clear and convincing evidence, but have a criminal conduct

9    requirement, like Illinois, then there are those who have

10   clear and convincing evidence, but not high probability of

11   injury.  So there's a whole range of different state

12   standards and they would have different requirements,

13   potentially, about, you know, whether -- how you impute a

14   statement or an act to a corporation, like we've got our own

15   rules about that, and their own case law around it.

16        Our position is the plaintiffs can't meet even the

17   most minimum of those standards, which would be maybe a

18   gross negligence standard, with the evidence they've put

19   forward, but their premise that Minnesota law would apply to

20   all cases is just wrong.

21        MAGISTRATE JUDGE NOEL:  Okay.  But I'm not sure I

22   got the concession from you that I was trying to get.

23        MR. HULSE:  I'll see if I can give it.

24        MAGISTRATE JUDGE NOEL:  But there are states that

25   do not have a substantive requirement.  There are states

1     where you can just file a complaint and allege you want the

2     following relief:  injunctive relief, compensatory damages,

3     punitive damages.  In those states, presuming they go

4     through the motions of making the motion to amend to add a

5     claim for punitive damages, those motions from plaintiffs

6     who reside in those states, their motions would be granted.

7          MR. HULSE:  Disagree still, Your Honor, sorry, and

8     that's because every state just based on our research has

9     some elevated requirement for alleging punitive damages.

10    Many states, of course, wouldn't require you to seek leave

11    to amend, but in this MDL because of this pretrial order and

12    the precedent, the post-*Mirapex* precedent, everybody still

13    has got to make a *prima facie* showing.  It may or may not be

14    deliberate disregard, high probability, all those pieces.

15    So it's complicated, which is why I'd like to turn to

16    Ramsey.

17          JUDGE LEARY:  So what are the cases that -- where

18    you believe that conflict-of-law analysis is not at issue

19    and the federal court can reach its merits?  Are they only

20    those that have been filed directly in Minnesota?

21          MR. HULSE:  Conflict of laws is an issue for every

22    single case in the federal MDL.

23          MAGISTRATE JUDGE NOEL:  But not for Judge Leary.

24          MR. HULSE:  Right.  Judge Leary, it's simpler.

25    There are cases, including two out of the three bellwether

1    nominees, where plaintiff's in Minnesota, obviously

2    defendant's in Minnesota, surgery was in Minnesota.  I think

3    Minnesota law is going to apply there.

4          However, there are cases where the surgery at

5    issue is not in Minnesota.  One of the three bellwether

6    nominees, the surgery is in South Dakota.  And so there I

7    don't think you can take for granted that Minnesota law is

8    necessarily going to apply.  There's going to be a

9    fact-intensive look at whether when you apply Minnesota

10   choice-of-law rules it's going to choose South Dakota law in

11   that instance.

12         JUDGE LEARY:  So what are you suggesting?  Are you

13   suggesting that there's any cases in Ramsey County?  I think

14   you are.

15         MR. HULSE:  Yes.

16         JUDGE LEARY:  That there are some cases in Ramsey

17   County where I can reach the merits of the motion to

18   amend --

19         MR. HULSE:  Yes.

20         JUDGE LEARY:  But there are also cases where I may

21   not be able to because of choice of law.

22         MR. HULSE:  Yes, a choice-of-law analysis would

23   have to be conducted.

24         JUDGE LEARY:  Before allowing --

25         MR. HULSE:  Right.  And it's possible if the

1    parties worked on it together, maybe we could find some

2    agreement about ones that we think Minnesota law

3    definitively applies to, but we might have disputes about

4    others.

5              JUDGE LEARY:  Well, wouldn't it make sense to

6    identify those cases where any order that I might issue does

7    in fact apply and allow Plaintiffs to amend the complaint?

8              MR. HULSE:  Well, we don't think they should be

9    allowed to amend the complaint, but putting that aside --

10             JUDGE LEARY:  No, but I'm just talking about

11   reaching the merits of the argument.

12             MR. HULSE:  Right.  Yes.

13             JUDGE LEARY:  So I've got 55 cases.  I take this

14   under advisement.  You're saying that if in fact the law

15   could be applied as Minnesota's law, what are those cases

16   for which my order is going to have application?

17             MR. HULSE:  Right.  We don't have those ready

18   today to identify to you, and I would suggest that's

19   something perhaps the parties could confer on and provide to

20   you to see where we have disputes and where we don't have

21   disputes.

22             JUDGE LEARY:  It would seem to me that it's

23   important that you first identify that before this Court

24   begins to consider the merits of the application.

25             MR. HULSE:  My submission is that the plaintiffs

1     made this motion and that they should have addressed the

2     choice-of-law issues up front.  But being that as it may,

3     certainly we have to address them now if the Court's going

4     to consider this.  Our submission is, of course, that this

5     is not a close call and that these motions can be denied for

6     both the MDL and for Ramsey County.

7          JUDGE LEARY:  I guess I'm still struggling with

8     the idea -- I mean, theoretically, it may be that because of

9     considerations of conflicts of law we don't reach the merits

10    on any case, but maybe there is a subset of cases where

11    Minnesota law does apply and then we can reach the merits.

12    But until we know that, we don't know where we stand.  I

13    mean, I'm not going to issue an order saying -- I'm not

14    going to give, frankly, an advisory opinion as to what I

15    think the law is as applied to the conduct of 3M if I don't

16    have a case to which I can attach that.

17         MR. HULSE:  Right.  And, Your Honor, this speaks

18    to this unusual posture of this motion that in *Mirapex*, for

19    example, *Levaquin* -- *Levaquin* was about a single bellwether,

20    *Mirapex* was about 15.  There was a choice-of-law analysis up

21    front.  It's a small subset of cases, not 2,000, not 55.

22    You're dealing with a smaller group of cases that presented

23    more manageable conflict-of-laws issues.

24         MAGISTRATE JUDGE NOEL:  So let me ask this

25    question:  I'm not sure I'm following what the parties think

1    we're doing here today.

2            Is this motion only directed to the bellwether

3    nominees, or is it directed to the entire universe of 2,000

4    or whatever we're up to in the MDL?

5            MR. HULSE:  It's -- and I'll let Ms. Conlin speak,

6    but it's all, and Plaintiffs argued in page 2 of their brief

7    that Minnesota law applies to all 1800, 2,000 cases in the

8    MDL.

9            MS. CONLIN:  And just to clarify, what we're

10   attempting to do is amend the master complaint.  Minnesota

11   is the forum state for that master complaint, and as a

12   result the Minnesota procedural requirements apply to the

13   amendment of that complaint.

14           If you look at the *Levaquin* case, Judge Tunheim

15   said that is a procedural issue and can be governed by

16   Minnesota law.

17           MAGISTRATE JUDGE NOEL:  Okay.

18           MS. CONLIN:  We don't need to get into this

19   conflict-of-laws analysis with respect to individual cases

20   for the purposes of amending the master complaint.

21           MAGISTRATE JUDGE NOEL:  Thank you.

22           Were you done, Mr. Hulse?

23           MR. HULSE:  I was going to say that's not what

24   *Levaquin* said at all.  *Levaquin* said -- and this is -- and

25   we pointed this out in our brief.  But the plaintiffs put in

1    some bracketed text in their citation to **Levaquin** to say

2    that Judge Tunheim's holding was in this MDL or in this

3    litigation.  They excised the words "in this case."  It was

4    a one-case bellwether determination, and that's what went up

5    to the Court of Appeals and got reversed.

6                MS. CONLIN:  May I just take --

7                MAGISTRATE JUDGE NOEL:  Hold on one second.

8                MR. HULSE:  Yes, Your Honor.

9                MAGISTRATE JUDGE NOEL:  Okay.  Thank you.  It was

10   more than 15 minutes --

11               MR. HULSE:  And I apologize.

12               MAGISTRATE JUDGE NOEL:  -- but shorter than what

13   Plaintiff did, so you're good to go.

14               MS. CONLIN:  I'll stand by my comments on

15   **Levaquin**.  Just a couple of follow-up points.

16               On the expert reports, they cite **Healey** and

17   **Berczyk**.  In **Berczyk**, that was a case in which there wasn't

18   any evidence.  The lawyer put in an affidavit arguing

19   punitive damages.  That's not what's happened here.  We've

20   put in the full expert reports for the Court's view.  And

21   even in **Levaquin** they tried to do that and Judge Tunheim

22   said **Berczyk** does not, as Defendants suggest, stand for the

23   proposition that an expert cannot be considered evidence

24   warranting a right to assert punitive damages.

25               Second -- and I just want to go back to what Judge

1    Leary was asking about.  We're not relying on a single study

2    for the purposes of this amendment.  We are relying on the

3    cumulative, total body of evidence that has been amassed in

4    this case.  And in **Prempro** there is a direct quote.  A jury

5    could find that although each study added to the evidence

6    suggesting a risk of injury, the defendant nevertheless

7    continued to engage in a practice of both inaction and

8    mitigation.  That's what we're alleging here.

9         As to whether these are top officials at 3M, you

10   asked about Mark Scott who was on that e-mail.  He's not a

11   guy who works in marketing.  He's 3M's global marketing

12   manager.  Every single one of the people on our documents --

13   and we've put the titles in -- are directors or vice

14   presidents or somebody.  This isn't a clerk that saw a spill

15   in aisle eight.  These are key people at 3M with the ability

16   to make that decision.

17        Finally, to the point that you made, Judge Leary,

18   about that the FDA hasn't done anything.  In **Mirapex**, in

19   Your Honor's order allowing an amendment on punitive

20   damages, the defendants there pointed out that the FDA has

21   concluded based on information available there is not enough

22   evidence to conclude Mirapex causes compulsive gambling.

23   The inaction by the FDA cannot be the measure by which a

24   motion to grant punitive damages or leave to amend to assert

25   punitive damages can be found, and in fact the documents

1    speak for themselves.  The spin they've put on them is an

2    issue for another day.

3              JUDGE LEARY:  Thank you.

4              MAGISTRATE JUDGE NOEL:  Thank you.  Let's move --

5              MR. HULSE:  Your Honors, may I briefly speak to

6    Mark Scott's promotion?

7              MAGISTRATE JUDGE NOEL:  We'll go back and forth a

8    million times.

9              MR. HULSE:  All right.  He's --

10             MAGISTRATE JUDGE NOEL:  So the next thing I have

11   is the defendants' motion to de-designate documents.  Who's

12   up for that?

13             MS. DAVIES:  That would be me, Your Honor.

14             JUDGE LEARY:  Before we go on to the next

15   presentation, I'm going to request that both sides prepare

16   Minnesota state court litigation findings of fact,

17   conclusions of law and proposed order of judgment.  I want

18   you to specifically address the issue with regard to

19   conflicts of law and to what extent there are any cases to

20   which the state court decision would apply to a case and

21   identify those cases.  And also, I want the law on what is

22   rebuttable evidence and what is not under the law.

23             And if I may, Judge Noel, how much time do you

24   need to do that?

25             MR. HULSE:  Your Honor, given the choice-of-law

 1    analysis, I'd request two weeks to do it.

 2              MS. CONLIN:  Two weeks is fine with us.

 3              JUDGE LEARY:  Simultaneous submissions then?

 4              MS. CONLIN:  Sure.

 5              JUDGE LEARY:  Okay.  Whatever it is two weeks from

 6    today's date, May 18th, that's the due date.

 7              MR. HULSE:  Very good, Your Honor.

 8              JUDGE LEARY:  Thank you.

 9              MAGISTRATE JUDGE NOEL:  Give me those too, what he

10    said.

11         (Laughter)

12              MS. DOHM:  Your Honor, if we could -- before you

13    start, if I could just have a couple minutes to open up my

14    briefcase and put my papers down before she would start

15    talking, I would appreciate that.

16              MAGISTRATE JUDGE NOEL:  If you do it quickly.

17         (Pause)

18              MAGISTRATE JUDGE NOEL:  Okay.

19              MS. DAVIES:  Good morning again.  Monica Davies on

20    behalf of defendant 3M.  I'm sensitive to the time

21    constraints here this morning.  There's obviously a lot

22    going on, so I'm going to try to be as brief as possible.

23              The issue before the Court here in our view is

24    very simple.  Ridgeview has produced documents in this

25    litigation subject to the requirements of the protective

1     order that it's designated as confidential.  3M doesn't take

2     issue with the vast majority of their designations, but as

3     to the small subset of documents that we're dealing with in

4     this motion, we submit that the confidential designation is

5     inappropriate.

6            First off, the protective order requires that any

7     party seeking confidentiality has the burden of articulating

8     a good-faith basis for that designation.  Ridgeview didn't

9     do that and in the first instance even included e-mails that

10    were sent to the *Star Tribune* for publication in the

11    documents it designated as confidential.  We were able to

12    eventually work that out through our meet-and-confer efforts

13    and those documents are not part of our motion.  But as to

14    the remainder, they stood by their confidential designation

15    and in our view just did not really articulate a reason why.

16           Ridgeview in the face of 3M's motion now takes the

17    position that it routinely keeps its documents and

18    confidential health information confidential and that it

19    considers all of the documents at issue in 3M's motion to be

20    confidential business records.  But calling the documents

21    confidential isn't enough.  Simply having a policy to

22    maintain them as confidential also isn't enough.  It doesn't

23    bring them within the definition of confidentiality for

24    purposes of the protective order or for Rule 26(c) of the

25    Rules of Civil Procedure.

1              We're not talking about patient health

2      information.  We're not talking about sensitive corporate or

3      financial data for the hospital or other sorts of

4      competitive or proprietary information that would typically

5      be entitled to protection.  We're talking about Ridgeview's

6      use of Dr. Augustine's HotDog warming system, its switch to

7      that product from the Bair Hugger warming system, and public

8      representations that have been made about that switch and

9      about Ridgeview's experience with the products.  Those

10     representations have been made in certain instances with

11     Ridgeview's full knowledge and participation; for example,

12     the *Star Tribune* article that was published in 2011.

13             And the documents also include explanations and

14     indications about the relationship between Dr. Augustine and

15     Ridgeview underlying all of this.  The information has

16     already been disclosed and discussed publicly in numerous

17     forums and it has not been kept confidential in the past.

18     Ridgeview has failed to articulate a basis to drop a cloak

19     of confidentiality now.

20             The fact that both Ridgeview and Dr. Augustine

21     have commented on these issues -- the fact is that both

22     Dr. Augustine and Ridgeview have commented on these issues

23     in the press.  Augustine in particular reported to the *Star*

24     *Tribune* that Ridgeview's use of the HotDog product and its

25     switch to that product from the 3M Bair Hugger system

1     resulted in a drastically reduced infection rate for the

2     hospital.  To this day he claims that that is the case and

3     believes a causal relationship exists and continues to

4     maintain that's a fact, and says that Ridgeview simply

5     doesn't know what it's talking about to the extent that it

6     claims otherwise.

7             Ridgeview's documents confirm that, yes, they had

8     a positive experience with the HotDog system, but similar to

9     what you saw with the discussion of the McGovern study

10    earlier, there were several factors that went into play with

11    the reduction in infection rates and several initiatives

12    that the hospital took in order to maintain its level of

13    patient care.  To say that the HotDog product versus the

14    Bair Hugger product, which is the claim that Dr. Augustine

15    has made repeatedly and the claim that underlies many of the

16    theories that Plaintiffs are advancing in this litigation,

17    is simply not accurate, and that's borne out by the

18    Ridgeview documents that are at issue in this motion.

19            Ridgeview also claims that it hasn't participated

20    in any kind of study with Dr. Augustine with respect to

21    these issues.  Dr. Augustine recently testified, though,

22    that he has submitted the Ridgeview results for publication.

23    We don't know in what journal and it remains to be seen.  He

24    was asked about that, but did not want to identify it.  This

25    is the same data that Dr. Augustine initially relied upon

1    when he created a litigation guide for purposes of

2    encouraging Plaintiffs' attorneys to sign on and pursue

3    litigation against 3M, and in that guide he actually refers

4    to and compares this Ridgeview data to the McGovern study

5    that as we've all heard this morning is a critical aspect of

6    this case.  And again, similar to what the McGovern study

7    actually says about there being a number of factors that

8    resulted in a drop in infections, the Ridgeview documents

9    show the same thing.

10              In our view, these are just a few of the examples

11    of the ways in which these documents and their contents have

12    already been made public, which under the terms of the

13    protective order mean that there's no confidentiality to

14    attach.  And even aside from the public disclosure, we would

15    submit that the documents themselves simply don't fit the

16    criteria for the protection that's afforded by the order or

17    Rule 26(c).  There's no presumption of confidentiality here;

18    in fact, it's just the opposite, and in our view Ridgeview

19    has not offered a sufficient basis why these documents

20    should be protected in this instance.

21              For that reason, 3M's motion should be granted.

22              Plaintiffs don't appear to oppose the motion.

23    They certainly haven't filed anything in opposition.

24              And as for Dr. Augustine, he does oppose 3M's

25    motion.  He echoes Ridgeview's interest in keeping its

1    documents confidential as a general matter, but has taken

2    the position that 3M is somehow improperly trying to take or

3    seek discovery from Dr. Augustine through this motion while

4    Dr. Augustine sits idle, leaving aside the fact that 3M is

5    not seeking anything from Dr. Augustine through this motion

6    and anything we need or are seeking the Court's leave for

7    from Dr. Augustine will be addressed separately.

8            Your Honors have been living with this case a lot

9    longer than I have, but I think it's safe to say

10   Dr. Augustine has been anything but idle when it comes to

11   the issues in this litigation.  He's been a factor

12   throughout.  And the connection here with the documents that

13   we are discussing for purposes of our motion here today

14   underscores the reasons why 3M's motion should be granted.

15           With that, absent any questions, I will take my

16   seat.

17           MAGISTRATE JUDGE NOEL:  Okay.  Thank you.

18           MS. DAVIES:  Thank you.

19           JUDGE LEARY:  Thank you.

20           MS. DOHM:  Well, Your Honors, first I'd like to

21   state that obviously Ridgeview --

22           MAGISTRATE JUDGE NOEL:  Hold on one second.

23   There's a button on the front of the podium and there's an

24   arrow that goes down, and if you would lower that so your

25   microphone is -- there you go.  Thank you.

1              MS. DOHM:  Thank you.

2              MAGISTRATE JUDGE NOEL:  Keep your voice up.

3              MS. DOHM:  Thank you for that.

4              MR. LEARY:  We don't have that in state court --

5         (Laughter)

6              MS. DOHM:  Thank you, Your Honor.

7              And as you both know, Ridgeview Medical Center is

8    not a party to this litigation nor are we privy to any of

9    the proceedings of this litigation.  We were served with a

10   subpoena and we met and conferred significantly with 3M to

11   comply with that subpoena and to produce documents that

12   would not be overly burdensome and broad on Ridgeview.  We

13   were happy that 3M worked with Ridgeview as it related to

14   allowing us to narrow the scope of the documents that had

15   been originally subpoenaed.

16             And we thought that that was really the end of it.

17   We went through significant expense and time to gather those

18   documents.  We went through significant expense and time to

19   sift through the documents.  And we were very thoughtful

20   about those documents that we designated as confidential and

21   those documents that were not designated as confidential.

22             3M is not Ridgeview.  That sounds like an obvious

23   statement, but they're not Ridgeview.  They can't tell

24   Ridgeview that documents that are kept in the normal course

25   of their business on their computer systems cannot be kept

1    as confidential.  Their counsel can't make that argument.

2    Their counsel doesn't know how Ridgeview operates.

3              Ridgeview is a large, complex healthcare

4    organization.  There are two hospitals, there are multiple

5    clinics, there are multiple other partnerships, joint

6    ventures, other types of arrangements that Ridgeview has

7    within its organization.  It is a very large community

8    hospital organization.  It has many, many, many policies and

9    procedures as far as complying with HIPAA and complying with

10   its obligation to keep its documents as confidential.

11             JUDGE LEARY:  There isn't any health information

12   at issue with regard to this motion?

13             MS. DOHM:  There is not.  They did allow us to not

14   have to produce protected health information --

15             JUDGE LEARY:  So HIPPA doesn't apply.

16             MS. DOHM:  HIPPA is not an issue here.

17             What is an issue here is its business dealings,

18   its confidential documents as running its business of

19   Ridgeview.  The documents that have been marked as

20   confidential are internal documents within its business

21   organization just like every business in our country has a

22   right to run and have documents kept on its computer system,

23   e-mail within its organization, that is not subject to

24   public disclosure.

25             Ridgeview produced documents responsive to the

1   subpoena and designating them as confidential with the

2   understanding that they would understand, basically, that

3   this is a business that runs.  Bob Stevens, those

4   individuals that are -- the e-mails that are at issue have

5   to do with the CEO or president of the company and other

6   individuals within the management organization.  Any

7   business in our country cannot be opened up for disclosure.

8   If this motion is granted, it's no different than going into

9   any business --

10        JUDGE LEARY:  And for me you don't have to make

11   the larger argument.

12        MS. DOHM:  Okay.

13        JUDGE LEARY:  I'm more interested in the specific

14   argument.  The argument is made that information in which

15   Dr. Augustine and Ridgeview collaborated has been placed

16   into the public forum because of that.  There's no objection

17   from Ridgeview as to Dr. Augustine doing that.  That

18   information should lose its confidentiality.  That's what

19   I'd like to hear from you.

20        MS. DOHM:  Okay.  Thank you, Your Honor, for that

21   clarification.

22        So I think we do have some dispute here as to

23   Ridgeview's agreement to put anything into the public forum.

24   I think there's a dispute here as to what Ridgeview's

25   participation or lack of participation was.

1       There was not a study.  There was -- I'm not even

2   sure what she's exactly referring to, but Ridgeview never

3   did participate in a study.  So --

4       JUDGE LEARY:  What was the relationship between

5   Dr. Augustine and -- him personally or his company and

6   Ridgeview?  They engaged in a project together.  I think

7   there's been a reference that had something to do with the

8   HotDog, Dr. Augustine's product.  And Dr. Augustine publicly

9   used information gathered from this collaboration for the

10  purpose of touting the HotDog and attempting to undercut the

11  Bair Hugger.  I mean, that's the way I understand it's been

12  teed up.  If I'm wrong --

13      MS. DOHM:  Yes.  I don't believe that there was

14  the collaboration that you may think that there was a

15  collaboration of, as there was never a study.  There was

16  discussion of it, but it was never entered into.

17      JUDGE LEARY:  You're looking to somebody.  Who's

18  the person --

19      MS. DOHM:  So Ms. Hauser is a representative of

20  Ridgeview Medical Center that is here.

21      JUDGE LEARY:  Well, unless you state it for the

22  record, don't rely on anybody else for the comments that

23  you're making.  I need to hear from you.

24      MS. DOHM:  Yes, and my understanding is there was

25  not a collaboration as far as any study ever being entered

 1     into.

 2             MAGISTRATE JUDGE NOEL:  Well, let me ask this

 3     question, because it appears that your answer seems to be

 4     turning on interpreting the phrase "collaboration."

 5             Did you disclose to Dr. Augustine any of the data,

 6     any -- as I understand it, there's a total of 50 documents

 7     that are at issue.  Is that a correct reading of your

 8     papers?

 9             MS. DOHM:  Yes, I believe that there are a total

10     of about 50 documents.

11             MAGISTRATE JUDGE NOEL:  Did you disclose any of

12     those documents to Dr. Augustine that you have designated as

13     confidential and are therefore limiting what 3M can do with

14     them?

15             MS. DOHM:  To go through each one of these

16     specifically, I believe that certainly certain documents,

17     such as the field advisory agreement, which is marked RMC

18     50, between Augustine and Ridgeview would have been

19     disclosed to him.  Other documents that have been marked as

20     confidential, such as RMC 39, I cannot answer that

21     specifically, but I do not believe that that was disclosed

22     to him.

23             MAGISTRATE JUDGE NOEL:  I have the same concern

24     that Judge Leary does, which is if you -- whether you're

25     collaborating or whatever, if you are disclosing documents

1     to Dr. Augustine that are not available to the public and

2     that are being designated as confidential because you don't

3     want them to be made public, that's a problem for me I've

4     got to work through, is there a rational basis for

5     disclosing things to Dr. Augustine that you're not being

6     allowed -- that you are not allowing to be disclosed to

7     others.

8            MS. DOHM:  Yes.  So addressing that issue, any

9     business in our country may have relationships with third

10    parties that they don't want disclosed to the public.  In

11    this case the issue is Scott Augustine, but I would take it

12    to a broader context of any business that operates in this

13    country with vendors or other relationships.

14           MAGISTRATE JUDGE NOEL:  I'm not interested in any

15    business in the country.

16           MS. DOHM:  Yes.

17           MAGISTRATE JUDGE NOEL:  I'm interested in

18    Ridgeview Medical Center's designation of these documents as

19    confidential at the same time that you are disclosing them

20    to Dr. Augustine and, so far as I can tell, not limiting

21    what he can do with them, and maybe that's a mistaken

22    impression I have.

23           When you disclosed some of these 50 documents to

24    Dr. Augustine, did you limit what he can do with them in the

25    same way that you're seeking to limit what 3M can do with

91

1      them?

2              MS. DOHM:  My understanding was that these

3      documents were confidential with that relationship and that

4      he was not to use any of Ridgeview's confidential medical

5      information.  Ridgeview has policies --

6              JUDGE LEARY:  Well, when you say "my

7      understanding," I mean, that's -- I don't know what that

8      means.  What's --

9              MAGISTRATE JUDGE NOEL:  What's your understanding

10     based on?

11             MS. DOHM:  My understanding would be based on how

12     Ridgeview operates its business.  If you look at documents

13     that we submitted in support of the opposition to this

14     motion, there are documents such as vendor policies, other

15     documents, that talk about Ridgeview maintaining the

16     confidentiality of its business documents with third

17     parties.  That's Ridgeview's intent.

18             As far as Mr. Augustine's intent, I can't speak as

19     to that.  I can only speak as to my client's intent, but my

20     client's intent is that when it does do business with

21     vendors such as Mr. Augustine, that those documents would be

22     kept confidential.

23             JUDGE LEARY:  Well, all you're telling us is your

24     understanding as to the way Ridgeview generally does

25     business.  You're not telling us anything with regard to how

1    Ridgeview was doing business with Dr. Augustine with regard

2    to the information you seek to keep protected.  You're not

3    telling us that.

4          MS. DOHM:  I don't believe that there's an e-mail

5    that exists specifically with that direction to him, if

6    that's what you're asking me.

7          JUDGE LEARY:  I'm just asking for what is

8    Ridgeview's position with regard to claiming that this

9    information should be protected.  That's all I'm saying.

10   I'm not going to give you the universe of possibilities or

11   hypotheticals that I can present.  I want to know the

12   information upon which Ridgeview is relying, and I'm not

13   hearing that you know that.

14         MS. DOHM:  Well, I think one issue that I would

15   like to bring up is, I don't believe -- at least I'm not

16   aware of all of these 50 documents that he did use.  I

17   haven't been presented with that evidence, that he has all

18   of these documents in his possession from a former

19   relationship with Ridgeview going back at the time of this

20   issue.  So I disagree that Mr. Augustine has all of these

21   documents in his possession from a previous time period.

22         MAGISTRATE JUDGE NOEL:  But as I understood your

23   answer to my earlier question, at least some of the

24   documents, some of the 50, have been disclosed to

25   Dr. Augustine.  Is that a correct statement?

 1          MS. DOHM:  I would agree with that.  To the extent

 2     that there are e-mails between the two, to the extent that

 3     there are signatures of contracts, I would agree that that

 4     would be logical, that yes, they would have been disclosed

 5     to him.

 6          JUDGE LEARY:  And do they all relate to the same

 7     subject matter?  And if so, what is the subject matter that

 8     they relate to?

 9          MS. DOHM:  There was discussion of a relationship

10     between those parties.

11          JUDGE LEARY:  Ridgeview and Dr. Augustine.

12          MS. DOHM:  Yes, that did not -- regarding a study

13     that never came to fruition.

14          JUDGE LEARY:  And what study was that?

15          MS. DOHM:  Honestly, I can't speak and answer that

16     question without Ms. Hauser answering that question.

17          (Discussion off the record between the judges)

18                          IN OPEN COURT

19          THE COURT:  Okay.  Thank you.  Anything else?

20          MS. DOHM:  We believe that under Pretrial Order

21     Number 7 that the documents that Ridgeview has designated as

22     confidential do meet the definition of confidential under

23     Provision 2 of the order.

24          To the extent that the Court would decide to

25     publicly disclose confidential business documents of

1    Ridgeview, that would harm Ridgeview Medical Center.

2    Ridgeview Medical Center holds all of its business

3    documents, its dealings with its vendors, in confidence.

4    That is how it operates its business.

5              MAGISTRATE JUDGE NOEL:  Okay.  Thank you.

6              Anything else?

7              MS. DAVIES:  Can I be heard very briefly?

8              MAGISTRATE JUDGE NOEL:  Thirty seconds.

9              MS. DAVIES:  I'd like to just address a couple of

10   the questions that were raised by Your Honors.

11             First of all, with respect to your question, Judge

12   Leary, our position is yes, all of the documents that are at

13   issue in our motion do relate to the same subject matter,

14   and that is Ridgeview's use of the HotDog warming product,

15   its experience with that versus Bair Hugger, the reasons why

16   it was engaged in this exchange with Dr. Augustine in the

17   first place.

18             With respect to Counsel's reference to RMC 39,

19   which is a document attached as Exhibit E to the Hulse

20   declaration, that is the infection data that has been --

21   that's comprised much of the discussion publicly.  Whether

22   that specific physical document was turned over to

23   Dr. Augustine I don't know, but the information contained in

24   that document certainly was, because that is the subject

25   matter of the *Star Tribune* article about which there were

1    many exchanges between Ridgeview and Dr. Augustine, and in

2    that article there is a specific reference to Ridgeview's

3    experience going from 1.55 percent to 0.29 percent infection

4    rate, which is an 81 percent reduction.

5            The *Star Tribune* reached out to Ridgeview for

6    comment.  Ridgeview indicated that it had a positive

7    experience with the HotDog product.  However, there is no

8    data to support a direct correlation to that product and our

9    reduced infection rates.

10           Dr. Augustine contacted Ridgeview, said he wasn't

11   happy with that comment, thought it undermined his

12   credibility, thought it cost Ridgeview a chance for good PR.

13   And internally, again, at issue in the documents here and

14   those I believe you can find at Exhibit D to the Hulse

15   declaration is a series of exchange and discussion and I

16   would say collaboration as to how that experience should be

17   publicly represented.

18           MAGISTRATE JUDGE NOEL:  Okay.

19           MS. DAVIES:  With that I am done unless you have

20   any questions.

21           JUDGE LEARY:  I'm good.  Thank you.

22           MS. DAVIES:  Thank you.

23           MR. BENHAM:  Did you want me to speak, Your Honor?

24           MAGISTRATE JUDGE NOEL:  Not on this issue.  I will

25   take your -- you filed a memo, correct?

1          MR. BENHAM:  I did.

2          MAGISTRATE JUDGE NOEL:  So we need your memo, but

3     I don't want to prolong -- I think I understand everybody's

4     position and we'll get to you when the next motion comes up,

5     which is the motion to take longer or more depositions of

6     Dr. Augustine, et al.  And who's this one --

7          MR. BLACKWELL:  That will be Mr. Gordon, Your

8     Honor.

9          MAGISTRATE JUDGE NOEL:  You're just the general

10    manager.

11       (Laughter)

12         MR. BLACKWELL:  Yes.  That was awkward.

13         MR. GORDON:  Good morning for the moment, Your

14    Honors.  And because it is almost noon, I will try to be as

15    brief as possible.

16         First let me address the Scott Augustine

17    additional deposition time issue.

18         The federal rules have a presumptive seven-hour

19    time limit and that can be extended basically under two

20    circumstances.  One is if there's been obstruction or

21    unnecessary delay.  That is not a basis of our argument.

22    Actually, this is one of the few depositions I've been in

23    where I can't say that there was any filibustering.

24         MAGISTRATE JUDGE NOEL:  Do me a favor real quick.

25    You're a taller man and --

1          MR. GORDON:  Oh.  Yeah, you're right.

2          MAGISTRATE JUDGE NOEL:  Just raise that up a tad.

3      (Lectern raised)

4          MR. GORDON:  Oh, that's cool.  Thank you.

5          MAGISTRATE JUDGE NOEL:  Thank you.

6          MR. GORDON:  The basis of our motion for some

7   additional time with Dr. Augustine is based on the need to

8   fairly examine the deponent.  I don't think it would -- I

9   don't think there's any hyperbole I could come up with that

10  would be inaccurate in describing the centrality of

11  Dr. Scott Augustine to virtually every issue extant in these

12  thousands of cases pending before each of your courts.

13          Dr. Augustine, because his involvement with the

14  Bair Hugger goes back more than 30 years to the development

15  of it, to the early testing, that 510(k) that we heard about

16  earlier this morning, well, that was Dr. Augustine.  We

17  didn't even get to that in the seven hours.  There's so many

18  other issues that are more current and more central, but

19  it's one of the issues that we would have liked to at least

20  explored a little bit of -- taken a little bit of time

21  exploring with him.

22          Fast forward to the last 15 years or so when

23  Dr. Augustine shifted his focus to achieving a competitive

24  advantage for his product, the HotDog, and the intense

25  involvement of Dr. Scott Augustine personally as the

1    architect not just of the science -- and his hands are on

2    every single one of the studies that Plaintiffs rely on

3    heavily -- but as we learned shortly before his deposition

4    was taken, of his direct and heavy involvement in

5    orchestrating and being the architect of the litigation

6    front, weaponizing lawyers and lawsuits as a competitive

7    marketing tool.

8              We covered a lot of areas with Dr. Augustine in

9    seven hours.  We covered 314 or 317 pages of transcript.  We

10   got through 70 exhibits.  It's an average of six minutes per

11   exhibit.  We didn't waste any time.  We didn't venture into

12   frivolous areas or irrelevant stuff, but he's just -- he's

13   involved in so much and there's so many documents, so many

14   things that involve him, that seven hours just wasn't enough

15   as expeditiously as we tried to do it, in addition to some

16   of the early stuff that we just, you know, put to the end,

17   the 510(k).  A lot of the stuff about his orchestration of

18   those studies we didn't drill down on, a lot of the stuff

19   about his heavy involvement in deciding, okay, well, this

20   study's been --

21             MAGISTRATE JUDGE NOEL:  How much time are you

22   asking for?

23             MR. GORDON:  We suggested four hours.  Three

24   probably would be sufficient.  And --

25             JUDGE LEARY:  You better ask for enough so you

1    don't come back again.

2            MR. GORDON:  I'd rather have four.  I would rather

3    have four.

4            And before tummies start growling, I'll stop,

5    because I don't want to belabor the point.  And I don't know

6    if Your Honors would prefer a response to this, or if I

7    should just go right into the two additional depositions.

8            JUDGE LEARY:  Go ahead.

9            MR. GORDON:  I will do that.

10           The two additional depositions are Mr. Benham,

11   Randall Benham, Mr. Augustine's attorney -- Dr. Augustine's

12   attorney, and Brent Augustine, who's Dr. Augustine's son.

13           We did not make an effort to take their

14   depositions earlier in the discovery phase for a couple

15   reasons.

16           Number one, as a general rule, I try to avoid

17   taking depositions of lawyers, because a lot of times you

18   run into attorney-client privilege issues and it becomes a

19   waste of time, so if you can get the information some other

20   way, it seems to be a lot more effective.

21           And number two, we just -- earlier in the

22   litigation we didn't have documents that clearly linked

23   Mr. Benham and Brent Augustine to critical issues in the

24   case -- and particularly in the case of Mr. Benham -- in a

25   way that clearly would not be subject to attorney-client

1    privilege objections.

2         Once we got those documents -- literally, I think

3    it was five business days before the close of discovery --

4    we went through them quickly and we thought, well, we

5    probably ought to take their deposition.  So we did send out

6    a notice for the last day of the discovery period knowing

7    that -- we already knew that that date wasn't going to work

8    for the parties because we had tried to schedule Dr. Scott

9    Augustine's deposition that day.  That didn't work and by

10   agreement we continued that a few days and we hoped to do

11   the same.

12        And the other reason I want to just briefly

13   address, because there's I guess a criticism that we didn't

14   try to take their depositions earlier.

15        I'm actually -- I believe in Federal Rule of Civil

16   Procedure 1.  That's one of the -- the prime directive.  I

17   feel like I'm Star Trek here anyway with this module.  But

18   if there's no need to take somebody's deposition, if you

19   can get -- if we can get the information from someone else

20   or through some other means, it's a waste of time, money,

21   and imposition, particularly on a nonparty, although to

22   characterize Dr. Augustine and his employees as nonparties

23   is stretching the term a little bit.

24        But the point is that we didn't just immediately

25   start trying to depose everybody connected to Dr. Augustine.

1    We deposed Dr. Augustine with a good-faith expectation that

2    he would be able to answer essentially all of the questions

3    that we would have otherwise directed to Mr. Benham and to

4    his son Brent Augustine.  And in several instances he

5    surprisingly would say, "Well, I had nothing to do with

6    that," you know, "That was Mr. Benham" or, "You'd have to

7    ask Mr. Benham that" or, "You'd have to ask Brent."  He

8    didn't do a lot of that with Brent.

9           And in candor to the Court, if Your Honors decide

10   that, you know, Brent Augustine is not a crucial witness

11   and, you know, we missed our opportunity, I would accept

12   that.

13          Mr. Benham is a different story, integrally

14   involved in the orchestration of litigation and writing the

15   handbook to lawyers, working with plaintiffs' lawyers and

16   scoping out questions for 3M employees before their

17   depositions, things like that.  Again, we thought

18   Dr. Augustine would know -- the website, all those sorts of

19   things.  We thought Dr. Augustine would be able to answer a

20   lot of those questions.  He did many of them, but many of

21   them he laid it at the doorstep of Mr. Benham.

22          And I'll anticipate a question.  I guess we would

23   like three hours with Mr. Benham since he has been

24   defending -- he defended Dr. Augustine's deposition.  I

25   presume if we are granted leave to take additional time with

 1    Dr. Augustine, he'll be there for that.  Could probably

 2    knock it down in one day, four hours with Dr. Augustine in

 3    the morning, three hours with Mr. Benham in the afternoon or

 4    vice versa, whatever works.

 5              Rather than go too far into the lunch hour, I'm

 6    going to stop unless Your Honors have any questions.

 7              JUDGE LEARY:  So are you withdrawing your request

 8    to depose Dr. Augustine's son?

 9              MR. GORDON:  We would like an hour with Dr. -- I

10    mean with Brent Augustine.  And I'm just trying to be

11    practical.  I can say that the questions we have for him

12    would be fairly limited.

13              MAGISTRATE JUDGE NOEL:  Okay.  Thank you.

14              MR. GORDON:  Thank you.

15              MAGISTRATE JUDGE NOEL:  Mr. Benham?

16              MR. BENHAM:  Addressing the question of allowing

17    additional time for Dr. Augustine first, I'd just like to

18    point out that it was 18 months, maybe two years ago that

19    you issued the order that one hour of Dr. -- excuse me --

20    one day, seven hours, of Dr. Augustine was all that was

21    allowed when they were asking for additional time at that

22    amount.

23              Since then Dr. Augustine has been available for

24    deposition.  His deposition was scheduled at least six

25    times.  We prepared for it.  We made him available at least

1   six times, and each time counsel for 3M cancelled it,

2   sometimes on very short notice.  That, I presume, is a

3   strategy.  The strategy of waiting until the last day or in

4   fact a week after the last day to take Dr. Augustine's

5   deposition I presume was also a strategy, as was the largely

6   wasted seven hours that they spent.

7           As I pointed out, on 89 separate occasions counsel

8   for 3M read and read and read and read from technical papers

9   and from research papers and had simply the question:  "Did

10  I read that correctly?" at the end of it.  While counsel

11  certainly has the right to use their time any way they want,

12  I suggest that in this case it was largely wasted and I hope

13  you'll take that into consideration.

14          As regards the extension of discovery to take my

15  deposition and the deposition of Mr. Augustine, I wonder

16  whether I really have standing to even have an opinion on

17  that.  That's largely something between the Court and the

18  parties.

19          I would just point out that, again, Mr. Augustine

20  and I have been available to be deposed for the last two

21  years and were available to be deposed that last week in

22  which the parties determined that they would extend

23  discovery by a week by my consent.

24          Other than that, I don't have anything else to

25  add.

1            MAGISTRATE JUDGE NOEL:  All right.  Thank you.

2            Do the plaintiffs have a position on any of this?

3            MR. SACCHET:  We do.

4            Good afternoon, Your Honors.  Michael Sacchet on

5    behalf of Plaintiffs.

6            Under all the authority that we've cited in our

7    memorandum in opposition to 3M's motion, 3M has failed to

8    show good cause for the relief that it seeks in seeking to

9    depose Dr. Augustine beyond the seven-hour maximum and after

10   the discovery deadline.  And the same holds true with

11   respect to the additional depositions of Mr. Benham and

12   Mr. Brent Augustine.

13           For example, in *Jensen vs. AstraZenica*, Your

14   Honor, the defendant Bayer moved to depose the plaintiff

15   beyond the seven-hour maximum and you denied that request,

16   and Judge Tunheim affirmed it.  And the rationale behind

17   that decision was:  All of the questions that could have

18   been asked at the initial deposition or during the

19   subsequent deposition could have been asked at the initial

20   deposition.  And when that's the case, a party does not have

21   good cause to simply just redepose that same witness.

22           And I've listened to Mr. Gordon's argument and the

23   argument essentially boils down to:  We had more documents

24   and we had more questions.  Those documents, those

25   questions, have been known since the very beginning of this

1      case, if not well before it.  Mr. Gordon cited a 510(k)

2      document that dates back to the 1980s or 1990s.  That was

3      one of the first documents that 3M produced to Plaintiffs in

4      this litigation.  If it was so paramount, in Plaintiffs'

5      view, it should have been part of the set of questioning

6      that was asked of Dr. Augustine during his first deposition.

7              As to the other witnesses, there's also law to

8      support the fact that when a party attempts a wait-and-see

9      strategy of essentially asking some questions, seeing what

10     comes out and then asking to redepose a witness, that too

11     does not constitute good cause.

12             And here, in 3M's brief they expressly argue that

13     it was reasonable for it to expect that Dr. Augustine would

14     have the requisite knowledge to answer all of the questions

15     that were put to him at the deposition, and just because he

16     was unable to answer some of those questions, to now ask for

17     Mr. Benham's deposition and Mr. Brent Augustine's deposition

18     months after the discovery deadline doesn't show a good

19     cause.  And a number of district court cases that we've

20     cited along with the Eighth Circuit have held that the

21     wait-and-see approach is simply a tactical failure, and as

22     such it does not constitute good cause.

23             The last thing I would like to note -- and I am

24     doing my best to be brief -- is that 3M has cited just two

25     cases in its memorandum, only two cases, neither one of

1     which is from this district.  One is from the Court of

2     Federal Claims, the other is from the United States District

3     Court for the District Court of Columbia.  In both such

4     cases, they're plainly distinguishable on their face.  I

5     could talk about 30 minutes about how they are

6     distinguishable, but there's one key point, one key point:

7          In neither case, in neither one of them, did the

8     moving party ask to depose a witness after the close of

9     discovery.  3M's motion is not just noted under Rule 30(d),

10    it is also brought under Rule 16(b)(4), and neither one of

11    the cases that they've cited has anything to do with it.

12         So, in light of those two things, we ask that 3M's

13    motion be denied.  To the extent that it is granted, we have

14    noted in our papers a request to depose two other witnesses,

15    Al Van Duren and Mr. Mark Albrecht.  We realize we have not

16    filed a formal motion to that effect, but even in the case

17    that 3M has cited in support of its motion recognized that

18    proposition that an oral request to depose a witness at a

19    hearing such as this may be granted by a court in its

20    discretion.

21         Thank you.

22         JUDGE LEARY:  Let me ask you:  Why was

23    Dr. Augustine's deposition concluded?  Was it because they

24    had run up against seven hours, or did Mr. Gordon represent

25    that he --

1            MR. SACCHET:  No.  That is a good question, Your

2     Honor, and Mr. Gordon did in fact express the sentiment that

3     he was not done questioning.  I will represent to you that I

4     do believe the deposition even did surpass seven hours.

5     Both Mr. Benham and Plaintiffs' counsel let Mr. Gordon go a

6     few more minutes than the seven-hour maximum, and now

7     they've brought this motion.

8            One last point is that in light of what Mr. Benham

9     said earlier about the scheduling of Mr. Augustine's

10    deposition, it was rescheduled numerous times and there's

11    one part I want to make note of.

12           The deposition was amended -- an amended notice

13    was sent by 3M to depose Dr. Augustine on January 9th.  3M

14    cancelled the deposition on December 30th.  It did not

15    renotice the deposition until sometime in February and set

16    that date for March 10th.  I mean, a two and a half month

17    delay to renotice the deposition that it ended up taking on

18    an extension of the discovery deadline, and then now to come

19    back and ask for four more hours or perhaps three I think

20    strains credulity.

21           MAGISTRATE JUDGE NOEL:  Thank you.

22           JUDGE LEARY:  Thank you.

23           MAGISTRATE JUDGE NOEL:  Mr. Gordon, anything else?

24           MR. GORDON:  Very briefly, Your Honor.

25           The order that Your Honor Judge Noel issued a year

1    and a half ago was in connection with one or two individual

2    cases that had been filed at that point.  Virtually no or

3    very limited written discovery had been -- had occurred.

4    Virtually no written discovery --

5                MAGISTRATE JUDGE NOEL:  What about the six

6    cancellations, though?

7                MR. GORDON:  There were a lot of scheduling issues

8    and they were also related -- this is an important point --

9    they were related to production of documents.  We were

10   getting -- the document production process from

11   Dr. Augustine and his related companies was not a smooth

12   process, as I think Your Honor some insight into.  So we

13   have the expectation that the documents would be available,

14   we'd try to schedule depositions because, you know, this is

15   like herding cats trying to get something scheduled with all

16   the various lawyers involved.  The document production would

17   be incomplete.  We'd go have meet-and-confers.  You get the

18   picture.

19               As to the seven-hour limit, one thing I've learned

20   is that the plaintiffs are extraordinarily good timekeepers,

21   because this wasn't the first deposition where they were at

22   the -- you know, towards the end saying, "Mr. Court

23   Reporter, what time are we at?"  "Six hours and 47 minutes."

24   "What time are we at?"  "Six hours and 52 minutes."

25   Literally, when we got to 6:59 -- maybe not this deposition,

 1    but they were saying, "Okay.  You got one minute left."

 2    They're very, very good at keeping time.  And so it was

 3    terminated.  Mr. Benham did allow Ms. Conlin to ask a few

 4    questions because she hadn't had any chance.

 5            I don't know if -- I don't think there's a motion

 6    before Your Honors with respect to the additional

 7    deposition, so I'm not -- all I will say is Mr. Van Duren

 8    has been deposed five times already.

 9            Thank you, Your Honor.

10            MAGISTRATE JUDGE NOEL:  Okay.  Thank you all very

11    much.  There's one more statement that Judge Ericksen has

12    asked me to make for the record.

13            On May 10th, the defendants filed a motion to

14    dismiss for failure to comply with Pretrial Order Number 14,

15    and she asked me to confirm on the record that that motion

16    will be heard at the June status conference.

17            Everybody got that?

18            MR. BLACKWELL:  Yes, Your Honor.

19            MAGISTRATE JUDGE NOEL:  Now, give me two minutes

20    to chat with Judge Leary.

21        (Discussion off the record between Judge Leary and

22         Magistrate Judge Noel)

23                            IN OPEN COURT

24            THE COURT:  So we're going to take everything

25    under advisement except for the last motion.  The motion on

1     the depositions, we're going to rule right now.

2              We will order that Dr. Scott Augustine be deposed

3     for an additional four hours, Mr. Benham will be deposed for

4     three hours, and Brent Augustine for one hour.  Everything

5     else is under advisement and we will be entering orders in

6     due course.

7              Thank you all very much for a fascinating and

8     interesting argument and we are in recess.

9              JUDGE LEARY:  Thank you.

10             (Proceedings concluded at 12:13 p.m.)

11                  *     *     *     *

12          C   E   R   T   I   F   I   C   A   T   E

13

14        I, **TIMOTHY J. WILLETTE,** Official Court Reporter

         for the United States District Court, do hereby

15       certify that the foregoing pages are a true and

16       accurate transcription of my shorthand notes,

17       taken in the aforementioned matter, to the best

18       of my skill and ability.

19

20

21            */s/ Timothy J. Willette*

22

         **TIMOTHY J. WILLETTE, RDR, CRR, CRC**
23       Official Court Reporter - U.S. District Court
              1005 United States Courthouse
24                300 South Fourth Street
            Minneapolis, Minnesota  55415-2247
25                   612.664.5108