# EXHIBIT A

Page 1

1              UNITED STATES DISTRICT COURT
2                 DISTRICT OF MINNESOTA
3
4   In re Bair Hugger Forced Air    )   MDL No. 15-2666
    Warming Products Liability      )           (JNE/FLN)
5   Litigation,                     )   VOLUME I
                                    )   PAGES 1-210
6
7
8
9
10
11
12
13     VIDEOTAPED DEPOSITION OF JONATHAN SAMET, M.D.
14              LOS ANGELES, CALIFORNIA
15              TUESDAY, JULY 11, 2017
16
17
18
19
20
21
22
23
24   Job No. 124786
25   DORIEN SAITO, CSR 12568, CLR

Page 6

```
1       I N D E X (continued)
2    EXHIBITS:
3    NUMBER          DESCRIPTION              PAGE
4    Exhibit 14   Article entitled "Patient        182
                  Warming Excess Heat: The Effects
5                 on Orthopedic Operating Room
                  Ventilation Performance" by
6                 Kumar G. Belani, Mark Albrecht,
                  Paul McGovern and Christopher
7                 Nachtsheim, Ph.D.
8    Exhibit 15   Article entitled "Forced-air     184
                  warming blowers: An evaluation
9                 of filtration adequacy and
                  airborne contamination emissions
10                in the operating room" by Mark
                  Albrecht, Robert L. Gauthier,
11                M.D., Kumar Belani, Mark Litchy,
                  M.E. and David Leaper, M.D.
12
     Exhibit 16   Article entitled "Arthroplasty,  186
13                Do forced air patient-warming
                  devices disrupt unidirectional
14                downward airflow? By A.J. Legg,
                  T. Cannon and A.J. Hamer
15
     Exhibit 17   Article entitled "Arthroplasty,  188
16                Forced-air patient warming
                  blankets disrupt unidirectional
17                airflow" by A.J. Legg and A.J.
                  Hamer
18
     Exhibit 18   Email from Mark Albrecht to      189
19                Andrew Legg, M.D., Scott
                  Augustine and Christopher
20                Nachtsheim dated
                  September 10, 2010
21
     Exhibit 19   Email from Mark Albrecht to Mike 197
22                Reed and Paul McGovern dated
                  July 9, 2010
23
24
25
```

Page 7

1       LOS ANGELES, CALIFORNIA; TUESDAY, JULY 11, 2017
2                    10:57 A.M.
3                      -oOo-
4                       ***
5       THE VIDEOGRAPHER: This is the start of
6   tape labelled Number 1 of the videotaped
7   deposition of Dr. Jonathan Samet in re Bair Hugger
8   Forced Air Warming Products Liability Litigation
9   in the United States District Court, District of
10  Minnesota, Case Number 15-2666(JNE/FLN).
11      This deposition is being held at
12  601 South Figueroa Street, Suite 2500,
13  Los Angeles, California, on Tuesday, July 11 of
14  2017 at approximately 10:58 a.m.
15      My name is Jordan Leads from TSG
16  Reporting, Incorporated, and I'm the legal video
17  specialist.
18      The court reporter is Dorien Saito in
19  association with TSG Reporting.
20      Will counsel please introduce yourselves.
21      MR. GORDON: Corey Gordon on behalf of
22  the defendants 3M Alizant. Also with me today is
23  Mordecai Boone, the in-house counsel #M as well as
24  Professor Jonathan Borak, experts.
25      MS. CONLIN: Jan Conlin and Mike Sacchet

Page 8

1   on behalf of the plaintiffs from Ciresi Conlin.
2       THE VIDEOGRAPHER: Thank you.
3       THE REPORTER: Would you raise your right
4   hand.
5       THE WITNESS: (Complies.)
6       THE REPORTER: Do you so state under
7   penalty of perjury that the testimony you shall
8   give in your deposition shall be the truth, the
9   whole truth, and nothing but the truth?
10      THE WITNESS: Yes, I do.
11                      ***
12          JONATHAN SAMET, M.D.,
13      having been duly administered an oath
14      in accordance with CCP 2094, was
15      examined and testified as follows:
16                      ***
17              EXAMINATION
18  BY MR. GORDON:
19      Q   Good morning, Dr. Samet.
20      A   Good morning.
21      Q   As you know from our brief introduction a
22  moment ago, my name is Corey Gordon. And I'll be
23  asking you some questions today about the expert
24  opinions you proffered in the multidistrict litigation
25  pending.

Page 9

1       So you've had your deposition taken several
2   times before; is that correct?
3       A   I have in the past, yes.
4       Q   And you've testified as an expert witness in
5   litigation before; is that correct?
6       A   That's correct.
7       Q   Now, I know you've testified as an expert in
8   several cases involving the claims being made against
9   the tobacco industry.
10      Is that correct?
11      A   That's correct.
12      Q   Have you testified as an expert or offered --
13  well, strike that.
14      Have you testified as an expert in any cases
15  involving anything other than tobacco-related claims?
16      A   To my recollection, solely tobacco.
17      Q   And have you offered opinions maybe that
18  didn't lead to you ever having to give a deposition or
19  testimony in court outside of the tobacco arena?
20      A   I would suspect if I looked back across a
21  long career, I've had lawyers contact me about a
22  variety of matters. At most these resulted in
23  conversations but nothing further.
24      Q   I'm guessing that you've probably been
25  frequently asked by lawyers to serve as a consultant

Page 34

1  Q  Did you -- do you know if you had occasion to
2  look at any of the exhibits that were marked at the
3  Augustine deposition?
4  A  I don't know.
5  Q  Well, let me be more specific.
6     Do you recall when you saw this Augustine
7  paper that you brought up that you said you saw maybe
8  ten days ago, when you looked at it, did -- did you
9  look -- did anything trigger a thought in your mind
10 that "Gee, this looks like something I've already" --
11 "at least part of something that I've already seen
12 before"?
13 A  Not specifically, no.
14 Q  That appeared to be like brand-new material?
15 A  (Nodding head.) Yes.
16 Q  So as you sit here today, do you have any
17 information about the background of how that Augustine
18 study came to be prepared, the underlying data, any --
19 any -- any information about it other than what was
20 represented by Dr. Augustine in the publication
21 itself?
22 A  To my -- to my memory, my -- my
23 understanding, that paper is based on reading it.
24 Q  Has that paper had any impact on your
25 opinions?

Page 35

1  A  I regard the paper as another piece of
2  observational evidence that provides an estimate of
3  risk of deep joint infection associated with the Bair
4  Hugger device versus the comparison.
5  Q  You -- ultimately, your opinion in -- the --
6  the sort of the bottom line general opinion was that
7  you concluded that the -- based on your
8  epidemiological expertise, that the Bair Hugger -- use
9  of the Bair Hugger in orthopedic surgery is a
10 substantial contributing cause to the development of
11 periprosthetic joint infection; is that right?
12 A  That's the last sentence of my report,
13 page 17.
14 Q  I want to ask about this phrase "substantial
15 contributing cause."
16    Is that a concept that's used in the field of
17 epidemiology?
18 A  Well, I think there are a number of different
19 approaches taken to describe causation, strength of
20 causation, contribution to cause. There's -- so I --
21 it's -- it's a word that I have seen used or a phrase
22 that I've seen.
23 Q  It's not a phrase that you use, though;
24 right?
25 A  I think it would depend on the context.

Page 36

1  If -- this refers to the magnitude of excess risk. So
2  it's a description based on the odds ratio of the
3  strength of association.
4  Q  You've written or co-authored hundreds of --
5  of papers and studies that looked at odds ratios,
6  attributable risk, and things like that, and drawn
7  causal conclusions; right?
8  A  In -- in -- in various activities and not
9  specifically in the context of my papers. I've worked
10 on reports and other expert documents that had causal
11 conditions.
12 Q  Would it surprise you that not one of your
13 publications has ever used the phrase "substantial
14 contributing cause"?
15 A  I -- I'm not sure what the basis for your
16 statement is, but...
17 Q  Would you -- would it surprise you that if
18 you were to search everything that you've written,
19 that the phrase "substantial contributing cause," that
20 exact phrase, never appears in anything that you've
21 authored or co-authored?
22 A  I really don't -- don't -- just don't have an
23 opinion.
24 Q  Well, wouldn't you agree that -- that the
25 notion of something being a substantial contributing

Page 37

1  cause is not something that -- that you, at least in
2  your professional activities as an epidemiologist,
3  have looked at or -- or used as a reference point?
4     MS. CONLIN: Objection as to form --
5     THE WITNESS: Well --
6     MS. CONLIN: -- it mischaracterizes his
7  testimony.
8     THE WITNESS: Well, again, I think in
9  terms of the question of causation, there are
10 two -- two issues.
11    One is, Does an agent cause whatever the
12 outcome is that's being considered?
13    And the second is, What's the magnitude
14 of its contribution to causation?
15    So certainly I've written about both
16 aspects of causation; the question of Is an agent
17 causal? And then second, What is its
18 contribution?
19 BY MR. GORDON:
20 Q  Well, what constitutes a substantial
21 contributing cause as opposed to a contributing cause
22 that isn't substantial?
23 A  Well, you know, again, I don't have strict
24 numerical criteria.
25    But here I think the basis for the