# EXHIBIT C

1
2           IN THE UNITED STATES DISTRICT COURT
                    DISTRICT OF MINNESOTA
3
    - - - - - - - - - - - - - - - - - - -
4   IN THE MATTER OF                        )
                                             )
5   IN RE BAIR HUGGER FORCED AIR            )
    WARMING                                  )
6   PRODUCTS LIABILITY LITIGATION           )
                                             )
7                     Plaintiff,            )
                                             )PRETRIAL ORDER NO: 7
8   v.                                      )Protective Order
                                             )MDL No. 15-2666
9   3M COMPANY AND ARIZANT                  )(JNE/FLN)
    HEALTHCARE INC.                          )
10                    Defendant.            )
    - - - - - - - - - - - - - - - - - - -
11              DEPOSITION OF PAUL MCGOVERN
12                      VOLUME II
13              Thursday, January 5, 2017
14           AT:  FAEGRE BAKER DANIELS LLP
15                    Taken at:
16                 7 Pilgrim Street
                   London EC4V 6LB
17                 United Kingdom
18
19
20  Court Reporter:
21  Louise Pepper: Accredited Real-time Reporter
22  Videographer: Simon Addinsell
23
24
25  JOB NO. 117121

## Page 238

1  Exhibit 23 Email chain between ............410
2       Mark Albrecht and Mike Reed,
        "Full workup of stats you
3       requested", dated 29 November,
        2011.
4
   Exhibit 24 Email from Mark ..................416
5       Albrecht to Scott Augustine,
        with attachment, dated
6       11/22/2015, Bates stamped
        Albrecht_0002079-0002086
7
   Exhibit 25 Anesthesia & Analgesia ..........445
8       document entitled "Patient
        Warming Excess Heat: Effects
9       on OR Ventilation Performance
        During Total Knee
10      Replacement", Bates stamped
        Belani_000002-000039
11
   Exhibit 26 Email from Mark ..................454
12      Albrecht to Paul McGovern and
        others, "Fwd: A&A Decision for
13      MS#: AA-D-11-01334", dated 25
        October 2011
14
   Exhibit 27 Email chain between ............455
15      Mark ALbrecht, Mike Reed and
        others, "Fwd: A&A DEcision for
16      MS#: AA-D-11-01334R1", dated
        11 January 2012.
17
   Exhibit 28 Spreadsheet, Bates ................461
18      stamped
        AUGUSTINE_0005193-0005487
19
   Exhibit 29 Printout of spreadsheet ..........463
20      data
   Exhibit 30 Screenshots of FAW v ............500
21      CWB YouTube video
22
23
24
25

## Page 239

1           DR. PAUL MCGOVERN
2              PROCEEDINGS
3       THE VIDEOGRAPHER: This is Day 2 of the deposition
4  of Dr. Paul McGovern. The deposition started yesterday
5  4 January, today is 5 January 2017, and it is 9:24 a.m.
6  This is the beginning of DVD 1 in volume 2 of Dr. McGovern's
7  deposition. Everybody who was in the room yesterday is here
8  today.
9       Can I remind the witness he was sworn in
10 yesterday and is still under oath. Can you --
11      THE WITNESS: Yes.
12      THE VIDEOGRAPHER: You're on the record, counsel.
13 It is 25 past 9.
14 EXAMINATION BY MR. SACCHET:
15 BY MR. SACCHET:
16    Q. Good morning, Dr. McGovern.
17    A. Good morning.
18    Q. As I mentioned yesterday, my name is Mr. Sacchet,
19 and I represent the plaintiffs 3M. Yesterday my learned
20 friend on the other side reviewed some of the ground rules
21 for the deposition. I'm going to go through few more today,
22 just to make sure we're on the same page with respect to the
23 procedures for our conversation. As you know, I'll be
24 asking you questions under oath and you'll be responding to
25 them. If at any time you don't understand a question or if

## Page 240

1           DR. PAUL MCGOVERN
2  you don't hear the question, please let me know, okay?
3     A. Yes.
4     Q. As was mentioned yesterday, it's best for the
5  record and the court reporter, if I ask a question, that you
6  let me finish asking the question before you answer, and
7  I'll do the same with respect to you in refraining from
8  asking a question before you've finished your answer.
9  Please provide audible "Yes" or "No" answers with respect to
10 the questions as opposed to a nodding or shaking of the
11 head. Is that agreeable?
12    A. Yes.
13    Q. And if at any time you need a break, just let me
14 know, and I'll find an appropriate spot to pause.
15    A. Sure.
16    Q. Before we jump into your background, with respect
17 to your educational and professional history, just a few
18 preliminary items. You've never met me before, have you?
19    A. Not before yesterday, no.
20    Q. And prior to yesterday, you'd never spoken to me
21 before, be it via e-mail or phone?
22    A. That is correct.
23    Q. You've never spoken to any members of the
24 plaintiff's counsel in this matter, have you?
25    A. That is correct.

## Page 241

1           DR. PAUL MCGOVERN
2     Q. Have you ever spoken to anyone on the side of the
3  defense, prior to yesterday?
4     A. I'd received communications from various people on
5  the side of the defense. I have only communicated with them
6  through my lawyers.
7     Q. Okay. Do you recall who those individuals were
8  that attended the --
9     A. Stephen Llewellyn, from Faeger Baker Daniels.
10 I received a Linkedin message from a lawyer in the United
11 States, but I don't remember their name.
12    Q. Do you recall the content of the message?
13    A. It was similar to the initial contact from Stephen
14 Llewellyn, saying that 3M would like to depose me, and
15 asking me to get back in touch to arrange that.
16    Q. And did you get back in touch to arrange that?
17    A. I did not reply to the Linkedin message at all, and
18 I replied to Stephen Llewellyn through my lawyers when
19 I arranged legal representation.
20    Q. Okay. So other than contact via your attorney,
21 you've had no personal contact with anyone on the other
22 side?
23    A. That is correct.
24    Q. I know you spoke a little bit yesterday about your
25 background as well, and I'm going to review some of that

Page 354

DR. PAUL MCGOVERN

Q. If you could please turn to internal page 409, the last paragraph. The last full paragraph, I should say, in the right-hand column. The sentence states:

"These concerns are most relevant for smaller airborne particles, less than or equal to 10 microns, such as free-floating bacteria and skin cell fragments, having similar airborne characteristics to the neutrally buoyant detergent bubbles studied ..."

Do you see that?

A. I do see that.

Q. This paper was authored by you and others; correct?

A. Correct.

Q. Do you stand by that statement?

A. That statement is reasonable me. It does not have a reference for the relationship between free-floating bacteria, skin cell fragments and helium bubbles having similar airborne characteristics. I believe that to be the case, but it would be preferable, in my opinion, for that statement to be referenced to a peer-reviewed paper. And although I believe that to be the case, I could not say that that is fact without further evidence.

Q. This paper, namely Patient Warming Excess Heat by you and Mr. Belani and others, was peer-reviewed; correct?

A. It was peer-reviewed, yes.

Page 355

DR. PAUL MCGOVERN

Q. It was published in Anesthesia & Analgesia; correct?

A. Analgesia, yes.

Q. So had this statement been of great concern to the editors, they would have asked for a revision of that statement; correct?

A. I think that would probably -- (overspeaking) --
(Reporter clarification.)

MR. C. GORDON: The objection again? Both form and lack of foundation.

A. Could you just repeat the question, please?

BY MR. SACCHET:

Q. Sure. Had there been a great issue with this particular statement, the editors may have required you to alter it in some way; correct?

A. The action of the editors would be their decision, but I would expect that a statement which, were I reviewing a paper, if I had identified a statement which I felt to be questionable, I would have challenged it and expected it to be justified or removed.

Q. And in other papers you have co-authored and participated in the peer-review process, editors have asked for revisions of particular sentences?

A. Yes, that's absolutely true.

Page 356

DR. PAUL MCGOVERN

Q. And this particular sentence was published in final form, as it says in this paper?

A. This sentence, as part of this paper, was peer-reviewed and approved for publication.

Q. Do you have any reason to doubt the bubble count results of the McGovern paper?

A. I do not.

Q. You did not receive any compensation from Augustine Biomedical & Design, or any of its predecessor entities, with respect to conducting this study?

A. No.

Q. In fact, it cost you a sum of money to conduct this study?

A. Overall, this study -- the conducting of this study involved me working at weekends in my own hours, traveling to and from the hospital on my own time, and at my own expense. There were -- some equipment was purchased, and at the time, I received expenses for that equipment to be purchased, I did -- but I received that from the healthcare trust that I worked for. I did not receive any money directly from Augustine at this time for this paper, to my knowledge.

Q. The fact that Mr. Albrecht may have been employed by Augustine Biomedical & Design, or any of its predecessor

Page 357

DR. PAUL MCGOVERN

entities at this time, had no influence on your participation in this study?

A. It had no influence on my participation in this study.

Q. Let's now move to the observational aspect of the study. Were you involved in the collection of any of the data with respect to the observational information present in this study?

A. I was not.

Q. Were you aware that other co-authors of this study, such as Mr. Reed, made great efforts to collect as much data as possible before publishing the paper?

A. Yes.

MR. C. GORDON: Object to the form of the question.

BY MR. SACCHET:

Q. For example, in prior manuscripts of this study, one of which you looked at yesterday, the period of time in which infection rates were analyzed was from September 2008 to September 2010, a two-year period; correct?

A. Yes.

Q. Whereas the published paper, as shown in figure 7 of the study, the date range was July 2008 to January 2011; correct?