# EXHIBIT F

Page 1

1        UNITED STATES DISTRICT COURT
2           DISTRICT OF MINNESOTA
3

4   In Re:  Bair Hugger Forced  )
    Air Warming Products        )
5   Liability Litigation:       )
                                )
6                               )  MDL No.:  15-2666
                                )         (JNE/FLN)
7   This Document Relates To:   )
                                )
8        All Actions.           )
    _____)

9
10
11
12
13
14
15

16   VIDEOTAPED DEPOSITION OF WILLIAM R. JARVIS, M.D.
17              San Francisco, California
18              Tuesday, July 25, 2017
19
20
21
22

23   BY:  HEIDI BELTON, CSR, RPR, CRR, CCRR, CLR
24   CSR LICENSE NO. 12885
25   JOB NO. 124789

Page 6

1  of plaintiffs.
2     THE VIDEOGRAPHER: Will the court reporter
3  please swear in the witness and we can proceed.
4     (Whereupon, the witness, WILLIAM JARVIS, M.D.,
5     having been duly sworn, testified as follows:)
6          EXAMINATION
7  BY MR. C. GORDON:
8     Q. Good morning, Dr. Jarvis.
9     A. Good morning.
10    Q. We met briefly before. I'm Corey Gordon.
11 I represent 3M in this litigation.
12        My understanding is you have been hired by
13 the plaintiffs in the multi-district litigation
14 involving Bair Hugger to offer an expert report; is
15 that correct?
16    A. Correct.
17          (Exhibit 1 marked.)
18 BY MR. C. GORDON:
19    Q. I'd like to show you what I've marked as
20 Jarvis Exhibit 1 and ask you to confirm that that is
21 a copy of your expert report.
22    A. Looks like it.
23    Q. Okay. And you want to keep that in front
24 of you because we'll refer back to that from time to
25 time.

Page 7

1        Now, this is -- it doesn't appear to be
2  dated, but my understanding was that you would have
3  signed this or -- that this became your final report
4  somewhere around March 31, 2017; is that correct?
5     A. I believe that's correct.
6     Q. And on this Exhibit 1, starting at page --
7  well, I guess Attachment A. I'm sorry. That is
8  your curriculum vitae; is that right?
9     A. Yes, sir.
10    Q. And is that -- is that essentially
11 current? Is there anything that's changed since the
12 end of March that -- of note?
13    A. No.
14    Q. Okay. And in addition there's a -- I'm
15 looking for an Attachment B. That would be the list
16 of lawsuits in which you've given expert testimony
17 in the past four years. That's -- I think starts on
18 page 32 at the end. Is that -- is it correct?
19    A. Yes.
20    Q. And again since March 31, 2017, any
21 additions to this?
22    A. I believe there is [sic] two depositions.
23    Q. Do you remember the names of the cases or
24 just generally what they were about?
25    A. Both were methicillin-resistant

Page 8

1  Staphylococcus aureus infections.
2     Q. Were you offering expert opinions on
3  behalf of the plaintiffs in those cases?
4     A. Yes.
5     Q. Were they product liability cases medical
6  malpractice cases? How --
7     A. Medical malpractice.
8     MR. C. GORDON: We'll come back to your
9  report. But I just want to get some housekeeping
10 stuff out of the way.
11          (Exhibit 2 marked.)
12 BY MR. C. GORDON:
13    Q. Now the -- let me show you what's been
14 marked as Exhibit 2 which is a set of invoices. I
15 will just go through them. These were provided to
16 me by Mr. Ben Gordon and Exhibit 2 should contain
17 invoices from April 13, 2016; May 11, 2016; May 21,
18 2016; August 4, 2016; December 28, 2016; March 18,
19 2017; and March 23, 2017?
20    A. Yes, sir.
21    Q. Okay. Let's start with the beginning.
22 Is -- would the April 13, 2016 be your -- the very
23 first invoice for any work you've done in connection
24 with the Bair Hugger litigation?
25    A. I believe that's correct.

Page 9

1     Q. And this meeting or this invoice reflects
2  a meeting in Atlanta, Georgia on April 11 and 12 of
3  2016; is that correct?
4     A. That's correct.
5     Q. So that was your very first touch point,
6  if you will, with this litigation?
7     A. I'm not sure what you mean by "touch
8  point."
9     Q. Obviously you had --
10    A. That was the first meeting --
11    Q. Yes --
12    A. -- but we had conversations before this.
13    Q. When you say "we," what -- with whom did
14 you have conversations prior to April 11 and 12,
15 2016?
16    A. I couldn't tell you everyone, but
17 certainly Mr. Gordon.
18    Q. Mr. Ben Gordon?
19    A. Yes.
20    MR. B. GORDON: Not Mr. Corey Gordon?
21    MR. C. GORDON: It's going to confuse the
22 heck out of me if --
23    THE WITNESS: Mr. Ben Gordon.
24    MR. C. GORDON: The good-looking one. Let
25 the record reflect the good looking one -- I don't

Page 46

1  articles listed on Exhibit 3 you may have reviewed
2  after your report; is that right?
3        A.   Correct.
4        Q.   Are there any articles that you reviewed
5  after you issued your opinion that in any way made
6  you think well, gee, if I had been aware of this
7  before I issued my opinion, I would have maybe
8  changed a conclusion or at least noted some
9  disagreement?
10       A.   I don't think so.
11       Q.   One of the conclusions -- well, strike
12 that.
13            Beginning on the bottom of page 14 of your
14 report, Exhibit 1, you talk about airborne
15 particulates and CFUs; is that right?
16       A.   Yes.
17       Q.   And you quote -- or you -- you cite to
18 five different papers there; right?
19       A.   Correct.
20       Q.   And you say, "Cumulatively these studies
21 show that airborne particle counts and microbial
22 CFUs can be elevated near or at the operative
23 incision site and that activities that increase the
24 particle counts, microbial CFUs increase the risk of
25 SSI."  Correct?