```
 1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF MINNESOTA
 2
      ------------------------------------------------------------
 3                               )
      In Re: Bair Hugger Forced Air   )  File No. 15-MD-2666
 4    Warming Devices Products        )           (JNE/FLN)
      Liability Litigation            )
 5                               )
                                 )  Minneapolis, Minnesota
 6                               )  August 28, 2017
                                 )  9:59 a.m.
 7                               )
                                 )
 8                               )
      ------------------------------------------------------------
 9
                  BEFORE THE HONORABLE FRANKLIN L. NOEL
10           UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
                          (MOTION HEARING)
11
      APPEARANCES
12     For the Plaintiffs:        MESHBESHER & SPENCE
                                  Genevieve M. Zimmerman, ESQ.
13                                1616 Park Avenue
                                  Minneapolis, MN 55404
14
                                  LEVIN PAPANTONIO, P.A.
15                                Ben W. Gordon, Jr.
                                  316 S. Baylen Street
16                                Suite 600
                                  Pensacola, FL 32505
17
       For the Defendant:         BLACKWELL BURKE P.A.
18                                Monica Davies, ESQ.
                                  Bridget Ahmann, ESQ.
19                                431 South Seventh Street
                                  Suite 2500
20                                Minneapolis, MN 55415
21     Court Reporter:            STACI A. HEICHERT
                                  RDR, CRR, CRC
22                                1005 U.S. Courthouse
                                  300 South Fourth Street
23                                Minneapolis, Minnesota 55415
24
          Proceedings recorded by mechanical stenography;
25    transcript produced by computer.
```

1          **P R O C E E D I N G S**

2                **IN OPEN COURT**

3                THE COURT:  Okay.  This is in Re. Bairhugger

4     Forced Air Warming Device Product Liability Litigation;

5     15-2666.  Let's get everybody's appearance on the record.

6     For the plaintiff.

7                MR. GORDON:  Your Honor, Ben Gordon for the

8     plaintiffs.

9                MS. ZIMMERMAN:  Good morning, Your Honor.

10    Genevieve Zimmerman for the plaintiffs.

11               THE COURT:  Defendants.

12               MS. DAVIES:  Good morning, Your Honor.  Monica

13    Davies on behalf of defendants.

14               MS. AHMANN:  Bridget Ahmann on behalf of

15    defendants.

16               THE COURT:  Okay.  So we're here for a hearing on

17    the defendant's motion for disclosure of confidential

18    communications with treating physicians.  The moving party

19    is defendant, correct?

20               MS. DAVIES:  That's correct.

21               THE COURT:  Who's up, Ms. Davies?

22               MS. DAVIES:  Yes.  Thank you, Your Honor.  I would

23    like to begin by addressing any confusion that there may be

24    regarding what it is we're seeking, the context in which it

25    arose, and the parties meet and confer efforts in that

1    regard.  As the Court is aware, there has been a fair amount

2    of discussion between the parties, as well as with the

3    Court, in the context of questions regarding what

4    communications or what contact defendants are allowed to

5    have with treaters, whether they should be able to

6    communicate with plaintiffs' treating physicians, whether

7    for purposes of scheduling depositions or more substantive

8    discussions.

9            Plaintiffs have maintained from the beginning, and

10    my understanding is that they continue to maintain, that the

11    treaters are basically off-limits for defendants outside the

12    context of a formal deposition.  We disagree, and we've had

13    discussions about the legal application of whether it be

14    under the physician-patient privilege or the Court's

15    analysis of *Shady* Grove and the extent to which the

16    Minnesota specific statute would apply here.  We recognize

17    that those are difficult issues and sensitive issues in

18    light of the plaintiffs' medical conditions.

19            So in preparing to bring this motion before the

20    Court, we've attempted to narrow what we're looking for so

21    that we can best prepare, efficiently prepare for the

22    depositions that we're going to have coming up in a very

23    short amount of time, and that is simply what documents and

24    information have the treaters been provided by plaintiffs or

25    their counsel.  We're not looking for substantive contact

1    with the treaters.  We're not looking to get into any

2    specifics regarding the plaintiffs' medical condition

3    outside of what would normally be appropriate in the context

4    of a deposition in this type of case.

5              We know from the *Walton* litigation that

6    plaintiffs' counsel has previously at least attempted to

7    educate treaters regarding their theories of the case and

8    has worked with Dr. Augustine to try to find documents and

9    literature that would be helpful to those theories.  We can

10   only assume that they would attempt to do the same thing

11   here.  We simply want to know what -- we want a level

12   playing field.  We want to know what it is that they've been

13   provided so that we can adequately prepare for depositions

14   going in.

15             Leaving aside other disputes that we may have over

16   over the scope or the applicability of the physician-patient

17   privilege and proceedings such as this, we don't think

18   there's any basis to claim that it would apply to those

19   sorts of communications.  As I mentioned, and as the Court

20   is well aware, we have a lot of discovery and a lot of

21   depositions to get done in a very short timeframe and the

22   treaters are on that list and of anybody who have the

23   limit -- the most limited schedules in terms of what time

24   we're going to be allowed to have with them.

25             We've asked for the information before, despite

 1     plaintiffs' claim in their opposition that we haven't --

 2               THE COURT:  So where -- so let's talk about that.

 3               MS. DAVIES:  Sure.

 4               THE COURT:  Because that does appear to be a major

 5     dispute.  What -- where do I find or what document requests

 6     or what interrogatory or what discovery device were these

 7     items requested?

 8               MS. DAVIES:  In our bellwether case-specific

 9     document request to each plaintiff.  And substantially

10     identical requests were served on everybody.  There might be

11     some differences in numbering between each different case,

12     but I have, for example, the requests that were served upon

13     Julie Kamke, and we asked produce all documents and/or

14     communications, including correspondence or other written

15     records, provided by you, your agents, or your attorneys to

16     any witness in this litigation, including expert witnesses

17     and nontestifying experts who are consultants, but it

18     clearly encompasses any witness, and we would certainly

19     maintain that that would include their treating physicians

20     who were very likely to testify here.

21               THE COURT:  So what were you reading from again,

22     so that's the interrogatory -- or the document request to

23     who?

24               MS. DAVIES:  Julie Kamke, the first bellwether

25     case that's teed up.

1              THE COURT:  Okay.  And what document request no.

2      was it?

3              MS. DAVIES:  It is request No. 15.

4              THE COURT:  Okay.

5              MS. DAVIES:  And I brought with me, just in case,

6      I brought with me copies of our response -- or our requests

7      as well as the responses served by Ms. Kamke.

8              THE COURT:  Okay.  And what was the response?

9              MS. DAVIES:  They objected on the grounds of -- or

10     she objected on the grounds of work product privilege and

11     referred us to expert reports.

12             THE COURT:  Okay.

13             MS. DAVIES:  And, you know, quite frankly, we

14     recognize, as is the case with so many of these issues and

15     these motions, there are probably lot a different procedural

16     mechanisms that we could use to bring these issues before

17     the Court.  We were in the context of discussions about the

18     applicability of the, you know, the privilege that applies

19     to plaintiffs' treaters and the extent to which we can

20     communicate with them.  We wanted to talk to them ourselves.

21     The plaintiffs have taken the position we can't.  We

22     disagree, but we are trying to find a way through it.  We're

23     not going to talk to them ourselves and ask for this

24     information, then you give it to us, plaintiffs, please.

25             We're -- we didn't -- we weren't looking to tee up

1   any kind of discovery fight or motion to compel.  We can

2   certainly go down that road if we have to.  But the issue

3   that we're here before the Court on we think is very

4   discrete and can be dealt with in a much more efficient

5   manner, and that's simply whether we're entitled to at least

6   know what documents and information are being provided to

7   these witnesses in advance of their depositions.

8           And with that, unless Your Honor has any other

9   questions, I think --

10          THE COURT:  I guess the only other question I have

11  is --

12          MS. DAVIES:  Sure.

13          THE COURT:  -- if we do get into the question of

14  privilege, why doesn't Rule -- Federal Rule 501 govern this

15  whole thing?

16          MS. DAVIES:  I would submit that -- I -- we're

17  talking about discovery versus evidence and the

18  admissibility of it.  I mean, regarding the privilege

19  itself, we would maintain that because of the nature of

20  these cases and the fact that it is the plaintiffs' medical

21  condition that is at the heart of it that they have waived

22  that privilege.

23          And from a procedural standpoint, we're simply

24  looking for the same access that Rule 26 would otherwise

25  provide.  So our position with respect to the confluence of

1     the federal rules and the Minnesota physician privilege

2     statute is that, procedurally, we should be looking at Rule

3     26 in terms of what access to discovery and information we

4     have, and to the extent that we need to have evidentiary

5     fights based on what information is discovered, we could

6     cross that bridge when we come to it.

7                THE COURT:  Okay.  Thank you.

8                MS. DAVIES:  Thank you.

9                MR. GORDON:  Good morning, Your Honor.

10               THE COURT:  Mr. Gordan.

11               MR. GORDON:  Ben Gordan for the plaintiffs.  Thank

12    you.  Let me say first, Your Honor, I'm -- counsel for

13    defense indicated that they were -- there was some confusion

14    that she was hoping to clear up over this matter, and I

15    remain a little confused, although I understand, based on

16    her comments, that it seems to be a little narrower,

17    perhaps, than some of the statements in their memorandum.

18    But if I can just cut right to the -- well, let me say

19    preliminary, in terms of the meet and confer statement,

20    which I understand to be a rule that is required that we

21    meet and confer on these issues, I assume or I infer from

22    her comments, counsel's comments, that the meet and confer

23    is to be inferred here from the request to produce on case

24    specific matters to Ms. Kamke that she mentioned relating to

25    other witnesses, information from other witnesses.

9

1          I'm not sure that's a fair characterization, I'm

2     not sure it's a fair inference, and the statement that was

3     filed in the court was very clear that there was a meet and

4     conferral on this specific issue of disclosure, specifically

5     of documents that counsel may have given to plaintiffs'

6     treating physicians.  That hasn't happened.  There's been no

7     such meet and confer.  I checked the transcript last week

8     carefully and cited in my response memorandum to portions of

9     it that might seem to cover that area, and I didn't see

10    anything that could obliquely be construed to ask us for

11    that information.  I don't believe there's been an

12    appropriate request.

13         But to the extent that the request, No. 15, that

14    Ms. Davies mentioned is construed to include treating

15    physicians, I would argue, Your Honor, that those witnesses,

16    as case law in this district has pointed out, including the

17    *Baycol* MDL decision, are very different from ordinary fact

18    witnesses and the fact that Minnesota statutes specifically

19    and Minnesota Rules of Civil Procedure specifically create

20    that substantive right to privilege of those conversations

21    and those discussions between plaintiffs' counsel and

22    treating physicians for the plaintiffs in the case and the

23    procedure that defines the parameters of any such waiver.

24    And to that point, there has been a limited waiver in Kamke

25    and Nugier and the other cases, but it is very definite and

1    very limited, and, of course, prescribed.  And given

2    Minnesota rules on that, I don't believe it can be

3    reasonably said that plaintiffs have waived their rights

4    under Minnesota substantive law.

5           And so while I'm happy to get into the question of

6    whether Federal Rule of Evidence 501 should govern here and

7    whether Minnesota law creates a rule of decision that I

8    believe it does, Your Honor, that's been recognized by this

9    district, I believe preliminarily the defendant's motion is

10   improper and that there hasn't been a proper meet and confer

11   that's happened and we haven't been given an appropriate

12   opportunity to respond to a specific request for such

13   communications.

14          But that said, given expediency and the

15   efficiencies that we all know and talk about with MDLs, I'm

16   certainly prepared to say, Your Honor, while I don't know

17   that it's a fair assumption, as counsel said, she said we

18   only can assume that conversations that took place in the

19   underlying *Walton* case have -- or conduct that may have

20   taken place in that case may have taken place in this case,

21   I think if we want to, you know, jump that hurdle and talk

22   about the substance of that, it's important to recognize on

23   the merits that any conversations that counsel has with

24   treating physicians are substantively protected under

25   Minnesota privilege law, under Statute 595.02.

1          And that counsel talked about wanting to be able

2    to be on an even playing field, the fact is, and the cases

3    talk about this, it's not an even playing field with respect

4    to whether or not Minnesota law recognizes a statutory

5    privilege for these conversations, and that right is in

6    violate, and our -- the duties for that, the reasons for

7    that law and that duty are talked about in great detail in

8    the *Baycol* decision and in other decisions.

9          And if we get into talking about other MDLs and

10   other minority positions like the *Zimmer NexGen* case, those

11   cases are very specifically limited to the confines and the

12   specific facts of those cases in terms of trying to find

13   treating physicians for -- or talk about physicians for

14   expert witnesses.  I don't think we're there yet.

15         But my basic, you know, concluding response, Your

16   Honor, at this point is that Minnesota law governs here and

17   that there shouldn't be any encouraging under *Shady Grove*

18   into that law.

19         THE COURT:  So why, other than the cases in Ramsey

20   County that are assigned to Judge Leary, why does Minnesota

21   law apply to any of these cases?  In other words, as I

22   understand Rule 501, it says in a civil case where state law

23   provides the rule of decision, that's the privilege rule

24   that would apply, and so don't we have to look at all

25   3,500 cases and figure out what state law is going to govern

1      in each of those cases to determine what the privilege law

2      is in each of those cases?

3              MR. GORDON:  I think ultimately that's true, Your

4      Honor.  I think it is a state by state analysis, and --

5              THE COURT:  And I would assume every state has

6      some kind of waiver notion for privilege, and why hasn't it

7      been waived in every state by reason of the fact that you've

8      put your clients' medical condition at issue and therefore a

9      treating physicians' opinion about that has to be explored,

10     doesn't it?

11             MR. GORDON:  Well, the opportunity to explore it,

12     Your Honor, as the cases discuss, is at -- is in the

13     deposition setting, and those states like Minnesota

14     specifically define what the limits of such limited waivers

15     are.  And in this instance, it is very clear and specific

16     what the plaintiffs have waived and what they have not

17     waived.

18             And, again, those decisions, including the *Baycol*

19     decision, the *NHL* decision in this district, talk about the

20     policy reasons for that, and it's bound up in the sanctity

21     of the privacy of the patients' medical records and the

22     relationship with the patient and the physician and the

23     protections built in, both for the patient and the physician

24     under that law.  And yes, that varies state by state.  And

25     that is -- I realize we are in an MDL setting, but there

1    have been many decisions, Your Honor, from *Vioxx* and others

2    forward, all the way most recently with the *Xarelto*

3    decision, that speak specifically to how that can be

4    handled.  And if there are situations where there need to be

5    conversations between defense counsel and the plaintiffs'

6    treating physicians, number one, they should be limited to

7    the deposition setting.  But number two, if there is a

8    stated reason by the defendants of need for something beyond

9    that, that can be done in a way that comports with state

10   law.  That's something the Court can look at and other

11   courts have.

12        And specifically, in the *NextGen* case by Judge

13   Pallmeyer, the judge very carefully limited to the specific

14   facts of that case what the basis for her opinion was that

15   there should be these limited conversations with plaintiffs'

16   treating physicians on an ex parte basis.  And Your Honor,

17   factually it's important there because they were looking at

18   a case where there were knee surgeons who were very few in

19   number, I think she mentioned 250 perhaps the defendants

20   argued might be the total number of available specialists in

21   knee surgery.  So the defense argument there, very

22   specifically, which 3M has not made here, was that they had

23   to have some ability to reach out to treating physicians who

24   could be potential experts for them; whereas here, Your

25   Honor, there are thousands of an anesthesiologists,

1    biosafety engineers, orthopedic surgeons, and others who 3M

2    could reach out to and, in fact, has, to be experts in this

3    case.   In fact, Your Honor, 3M has named almost twice the

4    number of expert witnesses that plaintiffs have in this

5    case.

6          There's been no claim, I don't think there can be

7    a claim, that 3M has some necessity to have to reach out to

8    plaintiffs' treating physicians that would give them -- you

9    know, that they have a need for expert witnesses that would

10   give them a reason to ask the Court to create an exception

11   or to limit the scope of the physician-patient privilege

12   recognized by Minnesota Statute 595.

13          THE COURT:  And document request 15 in the Kamke

14   case, in your estimation, only goes to what?

15          MR. GORDON:  Your Honor, I don't have the specific

16   language in front of me.  I tried to write it down.  And I

17   would perhaps have to take a look at it if counsel has an

18   extra copy.

19      (Counsel conferred.)

20          MR. GORDON:  As I recalled, let me -- if you may

21   indulge me for one moment, Your Honor.

22          THE COURT:  Sure.

23          MR. GORDON:  All communications, including

24   correspondence, other written records provided by you, your

25   agents, or attorneys to any witness in this litigation.  I

1    would -- including expert witnesses and nontestifying

2    experts or consultants.  The fact that plaintiffs' treating

3    physicians are a special, unique type of witness in this

4    case, as recognized by Minnesota substantive law -- and I

5    forget which case it is, Your Honor.  I have to go back and

6    look.  I believe it's *Baycol*, probably others, that

7    discussed that and the rationale for those witnesses not

8    being treated as ordinary fact witnesses.  So in the case of

9    other third-party witnesses, this privilege wouldn't apply.

10           The reason that we believe this is -- this request

11   doesn't apply to plaintiffs' treating physicians is that

12   they have this privilege recognized by the law and that is

13   to be protected in violate under the case law, unless there

14   is some reason for them to get around that privilege.

15           And, again, we would argue that *Shady Grove* is

16   inapplicable here, that under Erie analysis, that if this is

17   not outcome determinative, Your Honor, it is at least

18   outcome influential or impactful.  And the fact that in the

19   case law, including the Erie analysis under the *NextGen*

20   decision, talks at great length about the reasons that it

21   should be -- determined to be outcome determinative or not,

22   here, Your Honor, it is bound up in the patients' treatment

23   and core medical claims in this case.  And so to say that

24   federal procedure is all that we're talking about here I

25   think misses the gravamen of the discussion in the *Baycol*

1    cases or the other cases.  I think the core discussion

2    concerning Minnesota procedure makes clear when they talk

3    about 35.04, Minnesota Rule of Civil Procedure, that it's

4    more than mere procedure.  It's more than routine procedure.

5    We're talking about a procedure that goes to the very heart

6    of the plaintiffs' medical treatment which is fundamentally

7    where their claims live and die.

8              THE COURT:  But as I understand it, the request

9    and plaintiff -- and defendant contend that this request

10   No. 15 encompasses what they're looking for here, which is

11   simply communications from plaintiffs' lawyer to the

12   treating physician witness, so it doesn't really have

13   anything to do communications between the patient and their

14   physician or between the physician and the plaintiff.  It's

15   simply the lawyer's communication to the witness.  And by my

16   reading of the whole Erie line of cases and the Federal

17   Rules of Civil Procedure and the Federal Rules of Evidence,

18   this is all governed by Rule 501, which, by its terms, then

19   says you go look at the state law to determine what the

20   privilege is.  And so what law governs Kamke and Newger?

21             MR. GORDON:  Well, Your Honor, I -- obviously

22   I -- the state law for those plaintiffs would be the states

23   from which they hail, and in the case of Ms. Kamke it's

24   Wisconsin and in the case of Mr. Newger it's Florida.  And I

25   agree that the laws of those states would govern under Rule

17

1     501 and create the rule of decision -- pardon me -- for

2     those states, and, you know, so to the extent that we need

3     to look at Florida, I think we can look at the Florida

4     analysis.  The statute I think is substantially similar in

5     terms of the protection to patients' communications through

6     agents or otherwise but physicians.

7              And on that point, Your Honor, I think to the

8     extent that this request, and, again, I'm not sure I read it

9     as broadly or specifically as requesting communications

10    between patients and their agents and physicians, but in

11    this case, we, as attorneys, who may have had -- and without

12    admitting for the moment, Your Honor, that we've had any

13    such written communications with any doctor in the Kamke or

14    Newger cases, if we have or if we had, I -- our argument

15    would be that we -- those would be protected, and to the

16    extent that they are concerning the patient and their

17    relationship with that physician, the communications would

18    be protected just as though they were communications by the

19    -- from the patient to the physician themselves.

20             THE COURT:  And is it your contention that the

21    only -- or that the extent of any waiver is set forth fully

22    in the HIPAA authorizations that each client signed with

23    their plaintiff fact sheets?

24             MR. GORDON:  Yes, Your Honor.  I mean, unless,

25    without knowing as I stand here now, there's any additional

1    room for discussion of waiver under Wisconsin or Florida

2    law, then yes, I believe those waivers are limited on their

3    face, they were agreed to by the parties, and that counsel

4    should not be allowed to seek discussions between patients

5    and their physicians or patients' representatives and their

6    physicians outside of the deposition context.

7         THE COURT:  And where do I find the text of these

8    authorizations?

9         MR. GORDON:  I, Your Honor, I have those, and I

10   don't believe I brought hard copies, but I can

11   certainly -- they were --

12        THE COURT:  Or they're all the same, correct, for

13   each plaintiff?  I mean, it's a form thing that is part of a

14   pre-trial order?

15        MR. GORDON:  Yes, Your Honor.  I'm trying to

16   recall.  My inclination is to say yes, Ms. Zimmerman is

17   helping, but I thought I recalled on Newger and Ms. Kamke

18   there was some difference, am I mistaken?

19        MS. ZIMMERMAN:  I don't believe so.  Sometimes

20   individual hospitals require, for example, the Mayo Clinic

21   has its own mandated authorization, but the authorizations

22   mandated in this MDL I believe appear as exhibits to

23   pre-trial order No. 14.  I think that's the pretrial order.

24        MR. GORDON:  That's right.

25        THE COURT:  Okay.

1          MR. GORDON:  And I have copies, Your Honor,

2     electronically that we can pull up and e-mail to the Court

3     if you wish.

4          THE COURT:  And -- no, that's okay.  If it's an

5     exhibit to pre-trial order 14, I can find that.  I'll confer

6     with defense counsel and see if she agrees.

7          And what is the Florida statute section that's the

8     equivalent of the Minnesota statute that we were talking

9     about?

10         MR. GORDON:  One moment, Your Honor.  I can give

11    that to you.  And then you're going to ask me for Wisconsin

12    next, and I'm --

13         THE COURT:  Probably.  But since you're from

14    Florida, I assumed you might have had this one on the tip of

15    your tongue.

16         MR. GORDON:  And I should have, Your Honor.  It's

17    sad that I'm more familiar with Minnesota law on this right

18    now than I am Florida.  But because of analysis that was

19    recently done, I do recall the discussion on Florida, but

20    the statute number is escaping me right at this moment.  I

21    can have it for you.  It's, I'm sorry, 456.057, paren 8.

22         THE COURT:  456.057, paren 8?

23         MR. GORDON:  Yes, Your Honor.

24         THE COURT:  Okay.  Okay.  Anything else?

25         MR. GORDON:  Not at this time, Your Honor.  Other

1    than to say that, again, I realize time is of the essence.

2    You know, I do think it's a bit of an unusual position for

3    us to be in procedurally when I don't believe we've truly

4    had a request.  If you look at just the language of their

5    motions, they ask for disclosure of documents that they

6    haven't specifically requested in our view.

7              THE COURT:  And in response to, for example,

8    Kamke, No. 15, was anything produced or was it just an

9    assertion of the privilege and no further documents or was

10   one of those --

11             MR. GORDON:  I'm going look to Ms. Zimmerman.

12             THE COURT:  -- despite the warning or despite the

13   privilege, blah, blah, blah, we now give you these?

14             MR. GORDON:  With respect to 15 specifically, I'm

15   hoping Ms. Zimmerman knows, Your Honor.

16             MS. ZIMMERMAN:  Your Honor, we asserted a broad

17   objection at the beginning of all of the responses that we

18   made.  We answered and we referred to the expert reports

19   that were produced prior to the production of these

20   particular discovery responses.

21             And again, we haven't met and conferred such that

22   a motion to compel would be appropriate here.  I mean, we

23   didn't know until this morning which requests it was they

24   thought that we had not been appropriately responsive to.

25             THE COURT:  Okay.

1          MR. GORDON:  And that's really -- thank you,

2     Ms. Zimmerman.  The point is that if we'd had a real

3     opportunity to meet and confer specifically on the requests

4     they were talking about, I wasn't sure where that was coming

5     from.  We didn't talk about it last week leading up to this

6     so I didn't know exactly.  And that request, 15, I mean, I

7     think our response is that there's nothing that's not

8     non-privileged that's responsive to that request.

9          THE COURT:  Okay.

10          MR. GORDON:  Thank you, Your Honor.

11          THE COURT:  Ms. Davies, anything else?

12          MS. DAVIES:  Yes, just very briefly, if I could.

13     I'll start at the end.  The reason that we brought up the

14     discovery request in the first place is only because in

15     responding to our motion, plaintiffs took the position that

16     this -- that we had never asked for this in discovery.  As I

17     mentioned, we're not looking for a discovery fight.  We're

18     hoping to avoid one.  And we think this issue is much more

19     discrete than maybe what we've even been talking about here.

20     So at the risk -- you know, to the extent that our motion

21     papers were not clear, I apologize to the extent that's the

22     case.  The parties have different interpretations of the

23     scope of the privilege, and we recognize those are

24     sensitive, difficult issues and that time is of the essence.

25          What we're trying to do now, and what we've

1    requested in our motion, is, in our view, a much narrower

2    request than what we originally asked for and met and

3    conferred on with respect to contact with treaters.  And at

4    this point, we're not looking to reach out to treaters

5    directly.  We won't contact them without -- outside of

6    getting depositions on the calendar and communicating with

7    them in the deposition, we're not looking to have any kind

8    of substantive communication with them.  We're not even

9    asking for documents or information relating to any specific

10   plaintiff or their medical condition as it might relate to

11   communications with a particular treater.

12          What we want to know before we go into depositions

13   is what, if any, documents that plaintiffs' counsel have

14   provided these treaters, whether in an attempt to educate

15   them or otherwise; for example, if plaintiff's counsel were

16   to, and I'm using this only as an example, I have no reason

17   to believe this is or is not the case, but if plaintiffs'

18   counsel were to hand a copy of the McGovern study to one of

19   these treaters or any number of the articles or other

20   literature put together by Dr. Augustine, I can't fathom a

21   basis on which the physician-client privilege -- the

22   physician-patient privilege would even come into play, and I

23   can't imagine any reason why that wouldn't be information

24   that we would be entitled to prior to going to the

25   deposition and potentially run the risk of being back before

1   Your Honor in the context of additional deposition time or

2   discovery.

3            THE COURT:  Is it your contention that the waiver

4   of whatever physician-patient privilege might exist is

5   broader than the HIPAA authorizations that each plaintiff

6   signed in connection with their plaintiff fact sheets?

7            MS. DAVIES:  I have to confess, I'm not -- I don't

8   have the language of the HIPAA authorization top of mind,

9   but our position is that because the plaintiffs have put

10  their medical condition at issue in these proceedings that

11  the privilege is waived, we're entitled to take discovery

12  from physicians, from treaters, from the hospitals, from

13  anestheologists, and we have -- we've got the plaintiff's

14  medical records.  That, in our view, is not what the issue

15  is here.  It's simply, you know -- and again, we're taking a

16  step back from our position that we should be able to have

17  conversations with these treaters, and we would view that

18  because of the plaintiffs putting their medical condition at

19  issue in this case, we would take the position that we would

20  otherwise be entitled to speak with those treating

21  physicians regarding plaintiffs' medical condition and the

22  facts and factors relevant to the damages that they're

23  claiming in these proceedings, but we're

24  not -- we've -- we've stepped back from that.  We're not

25  asking for that.  We're not asking for any patient specific

24

1     or plaintiff specific information at all at this point.

2             THE COURT:  Is Ms. Zimmerman correct that the

3     HIPAA authorization is found attached to pre-trial order No.

4     14?

5             MS. DAVIES:  I believe that is the case.  I

6     can't -- I have no reason to disagree with it at this point,

7     but I would have to confirm.

8             THE COURT:  And do you happen to know what the

9     Wisconsin statute is that's equivalent, if there is one, to

10    Minnesota 595.02?

11            MS. DAVIES:  I do not.

12            THE COURT:  And do you whether Mr. Gordon has

13    correctly identified the Florida statute?

14            MS. DAVIES:  I have -- again, I have not looked

15    into the Florida -- that provision, but I have no reason to

16    dispute that he did.

17            THE COURT:  Okay.  Anything else?

18            MS. DAVIES:  No.

19            THE COURT:  Okay.

20            MS. DAVIES:  Thank you.

21            THE COURT:  Thank you.

22            MR. GORDON:  Can I respond briefly, Your Honor?

23            THE COURT:  Only if you're going to give me the

24    Wisconsin statute.

25            MR. GORDON:  We are working on it as we speak,

1    Your Honor.

2              THE COURT:  All right.  Here's what we're going to

3    do.  Before the day is out, meet and confer and see if you

4    can reach agreement now that you know what document requests

5    they say you haven't complied with and let me know by close

6    of business if you've reached an agreement, and if you have

7    not, I will issue an order ruling on the motion that is

8    before me.

9              MR. GORDON:  Your Honor, if I may, thank you.  In

10   anticipation of possibly not being able to work it out and

11   while we're waiting for the Wisconsin statute, can I give

12   you one more citation to consider when you make your ruling?

13             THE COURT:  One more citation to what?

14             MR. GORDON:  For the proposition in response to

15   what Ms. Davies just said a moment ago about their -- it

16   being unfair essentially for them not being able to speak

17   with the physicians and know what the physicians --

18             THE COURT:  I think I understand that issue and

19   understand everybody's position.  What I'm more interested

20   in is exactly what state's privilege laws might actually I

21   might have to learn and talk about.

22             MR. GORDON:  Understood, Your Honor.  We'll find

23   that for you hopefully momentarily.

24             THE COURT:  All right.  We are in recess.

25             MR. GORDON:  Thank you, Your Honor.

1          MS. DAVIES:  Thank you, Your Honor.

2       (Proceedings concluded at 10:31 a.m.)

3

4                          *      *      *

5

6

7          I, Staci A. Heichert, certify that the foregoing is

8    a correct transcript from the record of proceedings in the

9    above-entitled matter.

10

11                 Certified by:   *s/ Staci A. Heichert*

12                                Staci A. Heichert,
                                  RDR, CRR, CRC
13

14

15

16

17

18

19

20

21

22

23

24

25