1          UNITED STATES DISTRICT COURT
               DISTRICT OF MINNESOTA
2

   ------------------------------------------------------------
3                                     )
   IN RE:  BAIR HUGGER FORCED         ) File No. 15-md-2666
4  AIR WARMING DEVICES PRODUCTS       )      (JNE/FLN)
   LIABILITY LITIGATION               )
5                                     )
                                      ) Courtroom 9W
6                                     ) Minneapolis, Minnesota
                                      ) Thursday, August 17, 2017
7                                     ) 1:30 p.m.
                                      )
8  ------------------------------------------------------------

9

          BEFORE THE HONORABLE FRANKLIN L. NOEL
10    UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

11

          **(MOTIONS HEARING - DOCKET ENTRY 623)**

12

13

14

15

16

17

18

              RENEE A. ROGGE, RMR-CRR
19   Official Court Reporter - United States District Court
                1005 United States Courthouse
20                300 South Fourth Street
                Minneapolis, Minnesota 55415
21                   (612)664-5107

22

23

24

          Proceedings recorded by mechanical stenography;
25           Transcript produced by computer.

```
 1    APPEARANCES:
        For the Plaintiffs:      MESHBESHER & SPENCE, LTD.
 2                               BY:  GENEVIEVE M. ZIMMERMAN, ESQ.
                                 1616 Park Avenue South
 3                               Minneapolis, Minnesota 55404

 4
        For the Defendants:      BLACKWELL BURKE P.A.
 5                               BY:  COREY L. GORDON, ESQ.
                                      MONICA L. DAVIES, ESQ.
 6                               431 South Seventh Street, #2500
                                 Minneapolis, Minnesota 55415
 7

 8      For Third-Party          BY:  J. RANDALL BENHAM, ESQ.
        Dr. Scott Augustine:     6581 City West Parkway
 9                               Eden Prairie, Minnesota 55127

10

11                            *   *   *

12                    P R O C E E D I N G S

13                        IN OPEN COURT

14              THE COURT:  Good afternoon.  Please be seated.

15              Okay.  This is In Re Bair Hugger Forced Air

16    Warming Devices Products Liability Litigation, 15-2666.

17    We're here for a hearing on the defendants' motion for

18    further discovery from Dr. Augustine.

19              Let's get everybody's appearance on the record.

20    Let's go -- the moving party is 3M.

21              MR. GORDON:  Corey Gordon and Monica Davies on

22    behalf of 3M.

23              MR. BENHAM:  Representing Dr. Augustine and the

24    Augustine entities, J. Randall Benham.

25              MS. ZIMMERMAN:  And representing the MDL
```

1    plaintiffs, Your Honor, Genevieve Zimmerman.

2            THE COURT:  Okay.  Mr. Gordon, you are up.

3            MR. GORDON:  Thank you, Your Honor.

4            And to expand a little better, to clarify, what we

5    are seeking is additional discovery not only from Dr.

6    Augustine and his companies, but from three hospitals that

7    were part of a -- or that comprise the basis of a

8    publication that Dr. Augustine is responsible for that came

9    out either at the very end of June or the very beginning of

10   July.

11           Just to tee it up, I -- I'm still old.  I use the

12   ELMO.  This is a publication that Dr. Augustine authored.

13   It came out the end of June, beginning of July, in kind of a

14   pay-for-play publication.  It's an online thing.  You pay

15   600 euros and it gets published.

16           And the significance of this -- I can understand

17   why the plaintiffs have gone to great lengths in their

18   moving papers to say, ah, nothing to see here, just move

19   along, it's really not important, but I will explain why

20   that's -- that is not an accurate depiction of how the

21   plaintiffs have used it and clearly will intend to use it.

22           But what -- in this paper Dr. Augustine purports

23   to summarize infection joint -- joint infection data from

24   three unidentified hospitals, Center 1, Center 2 and Center

25   3, and compares their joint infection rates when they were

1  using Bair Hugger versus when they were using HotDog.  And,

2  remarkably enough, the infection rates with the Bair Hugger

3  are much higher, you know, almost three -- say three times

4  or four times as high as when they switched to HotDog,

5  which, of course, would be pretty compelling evidence.

6       I want to address the, first of all, the issue

7  that the plaintiffs' experts don't care about this, this is

8  just one more piece of the puzzle, just, you know, how they

9  have tried to minimize it.  After we made this motion, we

10  had the opportunity to complete the deposition of Jonathan

11  Samet.  Dr. Samet is their -- plaintiffs' epidemiologist and

12  sort of their key witness on the increased risk, the

13  quantification of increased risk.  And Dr. Samet was

14  talking -- in his first deposition he had brought up the

15  Augustine paper, but in the second deposition he left no

16  ambiguity as to -- as to its centrality to how he views the

17  case and the opinions he intends to offer.

18       I would -- and if I may read to the court, this

19  was from his deposition on August 8th, 2017.  Again, this is

20  after the motion was made.  We had been talking about a

21  commentary he had written in response to an article

22  suggesting that the observational studies were prone to

23  false positives.  And my question was, "And correct me if I

24  am wrong, but part of your opinion is based on your

25  conclusion that the McGovern paper does not represent a

1  false positive, is that correct," to which he replied,

2  "Well, the McGovern paper is certainly part of the evidence

3  that I considered.  To the extent that the P value is less

4  than .05, that's a helpful indication that the results are

5  not arrived by chance alone.  And then, of course, since the

6  McGovern paper, there's been a second report that

7  essentially corroborates the findings in other hospitals."

8  And I said, "You're talking about exhibit -- the Augustine

9  publication?"  He said, "Yes, I am.  Yes."  "Okay," I said,

10  "so" --

11          THE COURT:  Which at the time the Augustine

12  publication had not been published or it had been?

13          MR. GORDON:  As of the time of the deposition it

14  had been published.

15          THE COURT:  It had been published?

16          MR. GORDON:  Yes.

17          THE COURT:  Okay.

18          MR. GORDON:  And so this is Dr. Samet saying so --

19  I said to him, "So specifically my question with McGovern is

20  your opinion is predicated at least in part on your

21  determination the McGovern findings do not represent a false

22  positive; is that correct?"  He said, "That's correct,

23  essentially."  I said, "Have you similarly concluded that

24  the Augustine publication is not based on false or is not a

25  false positive?"  He says, "Well, again, yes.  And with two

1    papers that corroborate each other I think the likelihood

2    that both are, quote, 'false positive' diminishes.  And

3    there's, you know, with P values and assessment of the role

4    of chance, there are other ways to generate false positives,

5    but with two papers with quite -- quite similar findings I

6    think the strength of evidence from the epidemiological side

7    has -- has grown."

8           So the notion that their expert don't think --

9    it's not that important, it's just one more, you know, one

10   little pine cone in this forest of scientific trees, not the

11   case.  The Augustine paper is clearly central at least to

12   Dr. Samet's opinion.  I could read you some excerpts from

13   some of the other depositions, but the point is that before

14   Dr. Augustine published his so-called study he -- the only

15   thing the plaintiffs had to point to that actually they can

16   say that's real evidence of an actual increased risk was the

17   McGovern paper.  At the very outset of this litigation they

18   were saying McGovern, McGovern, McGovern.  My partner Mr.

19   Blackwell said, you know, write that down, Your Honor's --

20   underline it, you are going to hear a lot about McGovern.

21   Well, we have spent a lot of time addressing McGovern, and

22   we feel pretty confident we will be able to demonstrate to

23   the court that, as the authors of the McGovern paper

24   themselves conclude, you can't draw any causal conclusions

25   from it.  One could be said a little bit more strongly than

1    that, but the point is that the McGovern paper by itself is

2    -- is not going to be very valuable.

3           Along comes this Augustine study with supposedly

4    showing very similar numbers, almost, actually, almost

5    identical numbers to the McGovern paper, the huge decrease

6    in periprosthetic joint infections when they switch from

7    Bair Hugger to HotDog.

8           Now, this actually isn't the first we have seen of

9    Dr. Augustine's paper.  Dr. Augustine is a prolific ghost

10   writer, kind of in the style of Dalton Trumbo.  The first

11   time he, to our knowledge from what we have seen --

12           THE COURT:  I'm not sure who should be insulted by

13   that.  Mr. Trumbo or Mr. Augustine.

14           MR. GORDON:  Mr. Trumbo absolutely should be

15   insulted.

16           THE COURT:  Go ahead.

17           MR. GORDON:  And for the benefit of those younger

18   folks in the courtroom, Google it.

19           THE COURT:  It's a movie.  Go see it.

20           MR. GORDON:  But this was -- to our knowledge, the

21   first time he tried writing this up he ghost-wrote it for

22   Dr. Gauthier.  And the reason I want to draw the court's

23   attention to this is for whatever reason in this draft he

24   specifically called out Center 1 as being Ridgeview Medical

25   Center, Waconia, Minnesota.  And I'm just going to do a

1    side-by-side.  I don't know if this is going to work very

2    well.  But the numbers are absolutely identical with the

3    exception of there's little change in the calculated odds

4    ratio, but the actual broad, broad data, the raw numbers for

5    the infection rates were the same there.  So we had talked

6    to Dr. Gauthier about that.  Of course, he said I don't know

7    anything about Ridgeview, I didn't have anything to do with

8    that.

9              The second, well, again, the second one we were

10   aware of where Dr. Augustine ghost-wrote, at least he

11   included his name this time, but he ghost-wrote it for

12   Augustine and McGovern.  Now, both McGovern and Augustine

13   have testified that McGovern had absolutely nothing to do --

14   to do with this.  Augustine sent it to McGovern and said

15   will you, you know, hey, you can add your name on another

16   publication here.  McGovern kind of slow walked it and said,

17   well, I'm not really doing orthopedics anymore, I'm not so

18   sure.  But, again, you have the same raw data, but this time

19   the numbers become identical.  Why?  Well, the statistical

20   analysis was done by a name that might be familiar to the

21   court as well.  Mark Albrecht, who had been an employee of

22   Augustine's, but at this time is no longer an employee, but

23   he was still under kind of a repayment contract, because

24   Augustine had funded some of his education as part of a

25   negotiated exit deal.  To deal with paying back the tuition,

1    he agreed to undertake some additional work, including this

2    study.  So Albrecht is the statistical analyst, again, a

3    name that is familiar to you.  He was the statistical

4    analyst in McGovern.  He's actually kind of the key behind

5    all of the studies that the plaintiffs use.  But now let's

6    circle back to this.  We didn't -- we weren't --

7              THE COURT:  Let me interrupt for a second and ask

8    what is --

9              MR. GORDON:  Sure.

10             THE COURT:  So you've talked about this being an

11   online publication.  Orthopedic Reviews.  Is it peer

12   reviewed?  Is it like a medical journal or --

13             MR. GORDON:  It is a medical journal.  It is peer

14   reviewed in the sense that, when you submit your paper, you

15   are required apparently to identify the names of two people

16   that you recommend as reviewers.

17             It's purely coincidental, Your Honor, but I

18   received yesterday in the mail my monthly issue of *Skeptical*

19   *Inquirer* magazine.  I recognize it's probably not as -- not

20   a commonly-known magazine, but I am literally leafing

21   through it.  There's an article on predatory journals.

22   What's this?  So I start reading it.  There is this whole

23   world out there of online publications that this particular

24   author and several others refer to as predatory journals,

25   that they -- they prey on people who want to get their

1    papers published and for a fee they will run it through a,

2    quote, peer-review process.  It will be published online.

3    And some of them are legitimate.  Some of them are -- it's a

4    spectrum.

5            But the point is whether -- whether it was a

6    legitimate publication or kind of a fly-by-night, whatever,

7    it is a -- it does purport to be a peer-reviewed

8    publication.  And to your point, I kept hearing that from

9    Dr. Samet.  He kept -- when I tried to challenge him or I

10   tried to challenge the -- the underlying bona fides of this

11   study, both he and I should point out Dr. Jarvis, their

12   infectious disease expert, kept pointing out, well, this is

13   peer-reviewed, it's peer-reviewed.  Well, peer reviewers can

14   only review what's in front of them, even if they're acting

15   in the best of faith.  What wasn't in front of the peer

16   reviewers we presume are the actual underlying data for --

17   and we only have underlying data for Richard.  And that's

18   the whole point of this motion.  We can only debunk one

19   prong of this -- this multicenter so-called study.

20           In the study Dr. Augustine published he claims

21   this is -- these are hip and joint infections -- or hip and

22   knee joint infections.  And the protocol for his so-called

23   study was one year of Bair Hugger followed by a 60-day

24   washout period and however many months of data were

25   available for the HotDog.  Okay?  So from that you would

1    expect, well, we're going to see both hip and knees and

2    we're going to see a continuous period of time where, you

3    know, year one is Bair Hugger, years two and/or three are

4    HotDog with a 60-day buffer.  When we actually got the raw

5    data from, pursuant to a subpoena to Ridgeview, well, it

6    turns out, if you -- if you look at the numbers -- I can

7    take the court through this.  I would actually love to take

8    the court through this, but I am guessing you probably don't

9    want to have me go into detail on this.  What Dr. Augustine

10   did was he ignored the hip data and he took the knee data

11   only from -- from 2006, disregarded the -- completely

12   ignored the 2007 data, and then lumped together '08 and '09

13   to come up with the numbers that he puts here.  Trust --

14   well, you don't have to trust me.  They match and I would be

15   happy to show you why they do.  But the significance of this

16   is several -- several-fold.  Number one, 2007 was still a

17   Bair Hugger year.  The switch didn't occur till 2008.  So

18   what he did was take these data.  Okay.  Knee -- the worst

19   -- worst period for knee in the Bair Hugger period was 2006.

20   So he used that as his Bair Hugger period, completely

21   disregarded a full year of Bair Hugger use where there was

22   zero infections.  Then he looks at the two years of HotDog,

23   again, knee infections only.

24          Now, if he had just looked at -- if he had

25   followed the protocol of one year, the 60-day washout and

1    then the remainder of time with HotDog, he would have

2    started with 2007 being the Bair Hugger year, zero

3    infections, and that would have been compared against two

4    years of HotDog infections where there were, you know, a

5    couple.  In other words, it certainly wouldn't have shown --

6         THE COURT:  Well, couldn't he also have combined

7    2006-2007?  You still would have had six infections against

8    the 2008-2009 two infections.

9         MR. GORDON:  And we would certainly have no

10   quarrel if he had done that and said that's what he was

11   doing.  And if he had said we're only looking at knees and

12   we're combining two years of one and two years of another,

13   the statistical significance would -- would evaporate under

14   those circumstances.

15        But then take a look at hip.  If you look at just

16   hips, there's certainly no statistical significance and Dr.

17   Samet conceded this in cross-examination, but if anything --

18   well, quite literally, the numbers are slightly higher in

19   the HotDog period, if you include hips.  Now, if you just

20   look at combined, the numbers are pretty close.  The point

21   is this is the classic cherry-picking of data to support

22   your conclusion or what might be referred to as the Texas

23   sharpshooter, the fallacy.

24        Dr. Augustine clearly wanted to bolster the

25   McGovern paper.  Dr. Augustine clearly wanted to show that,

 1    hey, his HotDog, you know, that dramatically reduces

 2    infections, so he took these data from Ridgeview.  There's

 3    only one way you can present these in a way that shows a

 4    dramatic drop switching from Bair Hugger to HotDog.  That's

 5    by ignoring your own protocol and skipping a year and using

 6    only knee data.  Any other way and, if anything, it makes --

 7    it shows the HotDog is better.

 8              Okay.  That's what he did with Ridgeview.  We know

 9    that because we had the advantage of knowing that he had

10    done this with Ridgeview and we had subpoenaed them, and we

11    were, you know, satisfied that this was sufficient.

12              THE COURT:  And what did you get from Ridgeview in

13    terms -- you haven't deposed anybody at Ridgeview, correct?

14              MR. GORDON:  That's exactly right.  And that's

15    part of our motion, is --

16              THE COURT:  Okay.

17              MR. GORDON:  -- I think we need at this point now

18    we need to depose somebody.

19              THE COURT:  We will see.  But this is data that

20    you were able to pull from documents that Ridgeview produced

21    pursuant to a subpoena?

22              MR. GORDON:  That's correct.

23              THE COURT:  Okay.

24              MR. GORDON:  That's exactly right.  And to that

25    point, part of our motion -- we're not asking for additional

1    documents from Ridgeview.  We just want a chance to depose

2    somebody to lay the foundation for this and make sure it

3    says what we believe it says.

4         But there are two other -- two other centers here.

5    And the importance of this is that -- now, when plaintiffs

6    were examining, cross-examining one of our experts, Yale

7    epidemiology professor Jonathan Borak, and this is -- this

8    testimony is Tab 3 to Monica Davies' affidavit -- he

9    actually, truth be told, he was the one who kind of finally

10   noticed this and correlated the numbers and showed what --

11   well, he, being the scientist that he is, he didn't say that

12   it was fraudulent, but it's fraudulent, but he, you know, he

13   explained that this was cherry-picked data.  And plaintiffs

14   asked him, well, what do you mean by the cherry-picking?

15   And he went through a very elaborate discussion explaining

16   this, to which the very next question from plaintiffs'

17   counsel was how about the other two centers?  Answer, I

18   don't have any data on them.  And that's why we are here.

19   We don't have any data on them.  We didn't -- we didn't know

20   this was being published.  We didn't think it was going to

21   be relied upon by plaintiffs' experts and certainly not to

22   the extent it is clearly being relied upon.

23        THE COURT:  I thought you did know it was going to

24   be published and for a while there was the tease back and

25   forth about where it was going to be published.  You didn't

1    know where, but you knew it was going to be.  Is that --

2              MR. GORDON:  Towards the end of discovery, that's

3    right.

4              THE COURT:  Okay.

5              MR. GORDON:  Yeah.  When we deposed Dr. Augustine,

6    yes, he said it was going to be published and he refused to

7    tell us where or when.  You know, we didn't know when, but,

8    yes, but that was at the end of discovery and at that point,

9    you know, we, you know, we -- I don't think we would have

10   had time -- that, by the way, was the first time we -- of

11   the three centers, the second one we -- we have reason to

12   believe that it is, as Dr. Augustine confirmed in his

13   deposition, the free-standing day surgery center in

14   Wisconsin, Fox Valley.  And we learned for the first time at

15   his deposition that the third center is a Nassau Community

16   Hospital on Long Island in New York.

17             But, again, you know, if plaintiffs' experts, who

18   said nothing about it in their initial expert reports, if

19   they had not brought it up, had said nothing about it, had

20   no impact whatsoever, you know, we wouldn't -- it wouldn't

21   be a litigation issue.  And, you know, they keep wanting to

22   hammer us that we're trying to use the litigation for

23   nefarious purposes, for marketing, for intimidation,

24   whatever.  No.  Then we would have -- then we would have

25   gone after these immediately.  This became a litigation

```
1    issue when it was injected into it by plaintiffs, by their

2    experts, particularly Dr. Samet, a key expert, clearly using

3    it, viewing it as something to bolster his testimony and by

4    using it to cross-examine our experts.  You know, at that

5    point it became, okay, we got to, you know, we need

6    something on this.

7                THE COURT:  Okay.  Anything else?

8                MR. GORDON:  I think that's it, Your Honor.

9                THE COURT:  Okay.  Mr. Benham.

10               MR. BENHAM:  Good afternoon, Your Honor.

11               It seems to me that the reopening of discovery is

12   largely a mechanics of the MDL issue, so I'm generally going

13   to rely on what I've submitted to the court and defer to

14   plaintiffs to make their own arguments here, particularly

15   since nearly everything we just heard related to them and

16   their experts rather than to my client, but I will make a

17   couple of points.  One is --

18               THE COURT:  But it is your client's publication,

19   correct?

20               MR. BENHAM:  Absolutely.

21               THE COURT:  And what is your understanding of what

22   Orthopedic Reviews is and is it a genuine peer-reviewed

23   journal?

24               MR. BENHAM:  Well, I can tell you the little bit

25   that I personally know through conversations with Dr.
```

1    Augustine and others in the office, and I hope you will

2    understand that that might be imperfect and not take it as

3    evidence.

4            My understanding is that it's a legitimate

5    peer-review publication, which does in fact ask for

6    suggestions as who in the field might be appropriate people

7    to review it.  I'm not certain if those suggestions are

8    taken or if they were taken in this case.  It's been spoken

9    of as a pay-for-play publication.  My understanding is that

10   600 or so euros is the fee that is charged to make it open

11   access, rather than to cause people to have to purchase

12   copies of it or go through some service that they belong to.

13   So my understanding is that it's an open-access fee, not,

14   you know, get your name in the

15   top-thousand-lawyers-in-the-country sort of deal.

16           THE COURT:  Okay.

17           MR. BENHAM:  But I will admit my personal

18   knowledge of that is pretty limited and that's -- that's

19   what I understand.

20           I think the key point is that this publication,

21   which had not yet occurred, but the article was in fact a

22   topic in Dr. Augustine's deposition.  They could have asked

23   him virtually any questions they wanted to, other than where

24   is it going to be published.  That was not answered, as Dr.

25   Augustine said, out of fear that they would somehow squelch

1   the publication of it, 3M would, but apparently they asked

2   the wrong questions or spent their time in the wrong way.

3   And even if they did use their time badly in the first seven

4   hours, they have still got four hours left that you gave

5   them a couple of months ago and have chosen not to use.  So

6   one would think that they could use some portion of those

7   four hours and get these questions asked.

8           THE COURT:  But those four hours are going to be

9   used?  Has that been scheduled or is it --

10          MR. BENHAM:  No.  Nothing.

11          THE COURT:  -- that you're thinking they are done?

12          MR. BENHAM:  The only communication I have had --

13  excuse me -- about the four hours was -- excuse me --

14  several weeks ago there was an inquiry from the defense

15  counsel saying tell me what dates you are available, with no

16  beginning and end or, you know, for the rest of your lives.

17  I wrote back to them and said maybe plaintiffs and defense

18  counsel should talk to each other and come up with a range

19  of dates and our schedules are probably a lot more open than

20  yours are.  And I didn't get an answer to that email or any

21  other dates.  So my belief is that there's no hurry on 3M's

22  part.  They would like to stretch this out as long as they

23  can, because intimidation is the purpose.

24          Dr. Augustine has stated that he hopes to gather

25  additional information from HotDog customers about what

```
1   their experiences were with Bair Hugger previously and what

2   their experiences are with my client's product now and

3   publish them, if he is able to, or encourage them to publish

4   it, if they are able to.  But what 3M is shouting to the

5   world is cooperate with Augustine and 3M will make your life

6   miserable.  You will have to do document discovery; there

7   will be depositions; you will have to hire attorneys.

8   Ridgeview is an example.  This was not a pleasant experience

9   for them and stressful on what had been a very cooperative

10  relationship between Ridgeview and my client.

11        So, you know, I think it's interesting that the

12  word "intimidation" should come from Mr. Gordon's mouth

13  other -- before even mine, but that is an underlying factor

14  here.  If they wanted to get this discovery done, it could

15  have been done by now; or if they wanted to ask these

16  questions, they could have asked them in the first

17  deposition.

18        So I would request that the court bring this to an

19  end and not allow 3M to continue to have a chilling effect

20  on future research in this area, other than research that

21  they sponsor and pay for and publish themselves.

22        THE COURT:  Okay.

23        MR. BENHAM:  Thank you.

24        THE COURT:  Thank you.

25        Ms. Zimmerman.
```

1    MS. ZIMMERMAN:  Thank you, Your Honor.  Good

2    afternoon.  May it please the court.

3         As the court is aware, what 3M has really brought

4    here is a motion not just for additional discovery from

5    Augustine, but what the motion is is a motion to reopen

6    discovery, not just with respect to the deposition that this

7    court has already granted I think four additional hours on.

8    Of course, that's not been taken up or has not been

9    scheduled at this point.  But it is -- it's a motion to

10   reopen discovery unilaterally.  And I think that this court

11   is aware that Rule 16 and Rule 30 addressed these, but I

12   think that Judge Schiltz really outlined the issue in a very

13   complicated case that was before him I think in 2012.  Land

14   O'Lakes, which is cited in our papers, involved a very

15   complicated environmental case, multiple defendants,

16   conflict-of-law analysis, and at one point there was a

17   motion for to reopen discovery.  And Judge Schiltz said that

18   "In every case, and particularly in every case involving an

19   ongoing environmental cleanup, evidence that one side or the

20   other might find helpful may come to light after the close

21   of discovery.  But for courts to adjudicate cases with some

22   semblance of efficiency, the record cannot be an ever-moving

23   target.  At some point the record must hold still and a

24   court must be able to decide the case based on the record

25   before it."

1            Now, I would like to point the court to what is

2    likely to happen here if defendants' motion is carried.  We

3    are going to delay Daubert motions that we are three weeks

4    away from filing, because we are just not going to be in a

5    position for either side to be making fulsome challenges to

6    the experts that have been disclosed who may or may not need

7    to update their reports.  We have motions.  We have

8    responses.  We have replies.  I think that we have got three

9    days now set aside on three different court calendars to

10    here these motions in October.  There is almost no way that

11    the trial date of February 26 can possibly stick if

12    defendants are allowed to unilaterally reopen discovery, not

13    just for additional time for deposing Dr. Augustine, but to

14    do this additional discovery of these additional hospitals.

15            Now, Your Honor had some questions about the

16    nature of the -- of this Orthopedic Review journal.  I do

17    know a few things I think that may provide some additional

18    information.  It is my understanding that the Orthopedic

19    Review journal has a board of editors and reviewers, all of

20    them have medical degrees and specialty in orthopedic

21    surgery, and, as I understand it, the acceptance rate for

22    publication even in the online journal is less than

23    80 percent.  So most of the time these articles are

24    declined.  Now --

25            THE COURT:  I'm sorry.

1            MS. ZIMMERMAN:  They decline 80 percent of the

2       articles that are submitted.

3            THE COURT:  Okay.  So the accepted -- the

4       declination rate history is 80 percent.

5            MS. ZIMMERMAN:  Declination rate is 80 percent.  I

6       apologize if I misspoke.

7            THE COURT:  Not the acceptance rate is an 80

8       percent.

9            MS. ZIMMERMAN:  Exactly.  So there are many times

10      during the year that --

11           THE COURT:  So something just over 20 percent --

12           MS. ZIMMERMAN:  Are accepted.

13           THE COURT:  -- are accepted.

14           MS. ZIMMERMAN:  That's correct.

15           THE COURT:  Okay.

16           MS. ZIMMERMAN:  And I can't represent to the court

17      what a peer-review acceptance rate might be for other

18      journals, but that's my understanding with respect to this

19      Orthopedic Review.

20           Now, I will also say that at the beginning of this

21      and during the meet-and-confer process the plaintiffs said

22      that we would take a position of not opposing at least the

23      additional time with Augustine on the condition of a couple

24      things.  One, the plaintiffs want to have the opportunity to

25      cross-examine Dr. Augustine as well.  We have questions

1    about this article.  It was just published for the first

2    time at the end of June.  We have questions about how it was

3    that this device that had a warning on it in the late '80s

4    and early '90s about airborne contamination and the risk of

5    infection, why was that warning taken off.  The plaintiffs

6    want to know that.  And we have had a total of about two

7    minutes to depose Dr. Augustine at this point, because the

8    seven hours expired.  At this point the only time that's

9    been allotted has been allotted for 3M.  But we had said,

10   look, if you guys want to reopen this, as long as you are

11   going to give us open time, equal time with Augustine, with

12   any of these other folks, we won't oppose your motion.

13            But another thing that's come up in the course of

14   the depositions that have happened in the last six weeks, we

15   have learned that one of the key scientists or experts that

16   defendants have proffered, Dr. Abraham from St. Thomas, he

17   is not able to disclose to us any of the underlying data for

18   his report.  It's apparently been destroyed, was not

19   provided with his report, but he does say that some version

20   of that report has been submitted to and accepted for

21   publication some unknown place.  And so -- and I have

22   mentioned this to Your Honor because it's clear that this

23   process has kind of just a self-fulfilling prophesy.  I

24   mean, plaintiffs are certainly going to want to know what

25   exactly is this new version of Dr. Abraham's report, what

1    are the facts that are underlying that report, if they can

2    be discovered or have those been destroyed as well.  And

3    that's certainly going to be relevant for, again, Daubert on

4    general causation.  I assume that Dr. Abraham will be

5    disclosed on specific causation as well.  And all this to be

6    done in the next six months.  So I think that it's really

7    important that we just think about what the impact is on the

8    scheduling order here.

9        A couple of comments with respect to comments that

10   opposing counsel had about the data that's been provided by

11   Ridgeview.  Ridgeview has not provided the raw data.  So

12   there is no debunking that has happened by 3M at this point.

13   This is just their speculation that it's flawed.  And

14   plaintiffs, as I said, have questions about this article as

15   well.  But to the extent that the court has been told that

16   this is in fact the raw data that they have obtained from

17   Ridgeview, that is not the case.  The table that Mr. Gordon

18   put up on the ELMO, that is not the raw data.  Additionally,

19   3M has had a draft --

20       THE COURT:  So wait a minute.  What is it?

21       MS. ZIMMERMAN:  As I understand it, the table that

22   he prepared or that he presented is their kind of conclusion

23   about what the data shows.  It's not the raw data that's

24   come in from Ridgeview.  That has not been produced pursuant

25   to the subpoena.  This is -- these are tables --

1    THE COURT:  What did Ridgeview -- what did

2    Ridgeview produce?

3    MS. ZIMMERMAN:  So Ridgeview produced a number of

4    different tables and other information, but not the full raw

5    data of all the trials that were -- that were conducted by

6    Augustine and by Ridgeview.  So, I mean -- and that's my

7    understanding.  If the court is interested in additional

8    information on specifically what Ridgeview has produced thus

9    far, we are happy to provide that, but it is my

10   understanding that they do not have the raw data at this

11   point.

12   3M has had a draft of the paper at issue.  Dr.

13   Augustine's new paper has been in their possession for

14   nearly two years.  They did ask questions of Dr. McGovern at

15   his two-day-long deposition in early January.  Dr. McGovern

16   absolutely stood by the published paper that we have cited

17   to and that plaintiffs' experts have cited to in their

18   prepared written expert reports.  But Dr. Augustine --

19   pardon me.  Dr. McGovern had some questions posed to him

20   about this potential draft paper, that Dr. Augustine wanted

21   him to join him on as a coauthor and Dr. McGovern declined,

22   but that doesn't -- that doesn't impact the viability or the

23   reliability of the testimony that was provided by Dr.

24   McGovern under oath about the results of his study.

25   Now, Dr. Samet did not agree to any of the

1   conclusions that Mr. Gordon has offered to the court today

2   with respect to dependency on his -- or on this new

3   Augustine article in offering his opinions.  Plaintiffs'

4   experts were all disclosed on March 31st, including Dr.

5   Samet.  None of them have provided supplemental reports.

6   They all stand by the reports that they submitted.  This

7   publication was only --

8            THE COURT:  Which does not include this

9   publication because it didn't exist.

10           MS. ZIMMERMAN:  Exactly.  It couldn't have.

11           And, certainly, the plaintiffs' experts reviewed

12   it in passing.  I think that it had been available at the

13   time of Dr. Samet's initial deposition for something like 12

14   or 13 days.  He was deposed I think on the 11th of July.

15   But somewhere around there.  So he read it in passing and he

16   had some questions posed to him, but as the portion of

17   the --

18           THE COURT:  So when you get to trial, are you

19   going to be offering this study?

20           MS. ZIMMERMAN:  No, we won't.  I would like to

21   know some more about this study, but our experts have said

22   they've read it, it's interesting to them, but they stand by

23   the opinions that they offered in their report that they've

24   been deposed about.

25           THE COURT:  And will your experts have anything to

1   say about this in their testimony?

2         MS. ZIMMERMAN:  At this point they -- no.  I don't

3   know enough about the study, but what I do know is that our

4   experts offered their opinions in writing on the 31st of

5   March.  They stand by those opinions.  They do not include

6   this new Augustine study, and they -- they have remained

7   unwavering in the opinions that they offered supportive of

8   plaintiffs' claims.

9         THE COURT:  Well, right, which, as I understand

10  it, there's nothing inconsistent between this study and

11  their opinions.  So my question, though, is let's say for a

12  moment that I deny the defendants' motion.  Will they be

13  sandbagged at trial when your expert gets up and says, oh,

14  by the way, this other study that came out after my

15  March 31st report --

16        MS. ZIMMERMAN:  No.

17        THE COURT:  -- supports what I said 100 percent,

18  and now not only is it this McGovern study, but we have got

19  Augustine, and the two together prove beyond all doubt that

20  this is the case?

21        MS. ZIMMERMAN:  Right.

22        THE COURT:  Will that happen?

23        MS. ZIMMERMAN:  No, it will not happen.  As an

24  officer of the court and as a member of the co-lead for the

25  plaintiffs in this case, we are not going to be offering

1   this study, particularly given when it's been disclosed in

2   this process.

3           Now, it's possible that there could be some new,

4   you know, Center for Disease Control or if there was a

5   recall or there's many things that could happen.  And I

6   think that Judge Schiltz in his Land O'Lakes' opinion

7   recognized as much and said, look, this is kind of a moving

8   target and science is something that is always developing.

9   There may be things that come up along the way, but

10  plaintiffs are certainly prepared to stipulate right now

11  that we are not going to rely -- our experts have not relied

12  on this study up to this point.  We will not be offering

13  testimony about Dr. Augustine's new publication that came

14  out in June.

15          You know, the last few remarks that I would have,

16  and then unless the court has additional questions, you

17  know, I think that it's pretty rich to hear a ghost-writing

18  allegation from 3M given the, I mean -- and Your Honor is

19  aware that this is perhaps something that happens from time

20  to time, but one of the big focuses of the depositions over

21  the last six weeks has been, well, and really the

22  depositions for the last two years, has been 3M's

23  involvement with the Sessler/Olmsted study, because this is

24  a study that 3M has pointed to for the past six years,

25  walking around the country telling all the doctors this

```
 1    device is super, super safe, everything is tested.  And then
 2    you know how many of their 13 experts point to the
 3    Sessler/Olmsted study?  One.  Now, that's because 3M
 4    ghost-wrote it and it's because there is flaws in their
 5    study, and we will get to that I suspect at trial, but this
 6    is a thing that -- this process is going to be evolving.
 7    There are people that -- you know, industry gets interested
 8    in researching and supporting studies that look into the
 9    safety and efficacy of their devices.  I assume that that's
10    what Dr. Augustine is doing.  Certainly, that's what 3M
11    represents that they have done.  But particularly given that
12    Your Honor has said we don't get to talk about HotDog, we
13    continue to have sideshows about this Augustine issue, you
14    know, two years I think from the very first time I was in
15    front of you on an Augustine deposition motion and we are
16    still not done with it.  And the plaintiffs would just like
17    to get past this.  We have good solid experts who have done
18    particle testing, who have done computational fluid dynamics
19    analysis, who are prepared to stand on the reports that they
20    have offered, that they have been deposed on, and they are
21    supportive of plaintiffs' claims in this case.
22            So we would respectfully submit that the
23    defendants' motion be denied and that if it is granted that
24    plaintiffs be granted equal time at any of the depositions
25    that are scheduled by defense counsel such that we are not
```

1    prejudiced.

2              THE COURT:  Let me just make sure I am

3    understanding exactly what you are saying.  So when Mr.

4    Gordon tells me that the study has been injected into the

5    evidence, you are saying it's only by reason of questions

6    that he asked?

7              MS. ZIMMERMAN:  That's correct.

8              THE COURT:  Okay.  Anything else?

9              MS. ZIMMERMAN:  That's all, Your Honor.

10             THE COURT:  Thank you.

11             Anything else, Mr. Gordon?

12             MR. GORDON:  Yeah.

13             I am sorry to do this, Your Honor, but I must

14   correct -- Ms. Zimmerman was not present at the Samet

15   deposition.  She may be unaware.  It was not injected by

16   questions that I asked.  It was injected by the plaintiffs.

17   The plaintiffs, according to Dr. Samet's testimony,

18   plaintiffs' counsel provided Dr. Samet prior to the

19   deposition with a copy of the publication.  Dr. Samet

20   brought it up first.  Dr. Samet -- and I -- you know, the

21   idea that plaintiffs aren't going to -- aren't going to go

22   there, I think that we will not be offering testimony, how

23   do you unring the bell?  Unprompted, I was asking him about

24   the McGovern paper and he says, "And then, of course, since

25   the McGovern paper there has been a second report that

1     essentially corroborates the findings in other hospitals.

2     With two papers that corroborate each other, I think the

3     likelihood that both are false positives diminishes."

4             THE COURT:  What about Ms. Zimmerman's offer to

5     stipulate that they are not going to rely on this at trial?

6             MR. GORDON:  Unless they are withdrawing Dr.

7     Samet, Dr. Jarvis and Dr. Stonnington, all of whom brought

8     it up --

9             THE COURT:  Sua sponte all three of them?

10            MR. GORDON:  Yes.  Well, in Jarvis' case it was on

11    his list of additional materials considered and we went

12    through that.  I don't know if that would suap it, but --

13    and I wasn't at Stonnington's, so I shouldn't be making

14    representations about how it first came up.  My

15    understanding is that he's the one who brought -- but I may

16    be mistaken.  But I was at Samet's and I know, because I was

17    really, you are really going to go there, Dr. Samet.  I

18    mean, that was my reaction.  You are kidding me.

19            This notion -- I think counsel said that these are

20    not the raw data from Ridgeview or some such thing.  That's

21    a Ridgeview Bates number.  RMC.  RMC total joint infection

22    rates.  I don't know what -- why these aren't the raw data.

23    These are the numbers.  These are the exact numbers that Dr.

24    Augustine used in his publication.  By the way, Dr.

25    Augustine has had this on his website for, you know, a year

1    or two, again, using the exact same numbers, although at

2    least he was honest enough on the website to say that it was

3    knee infection only.  Those are the Ridgeview data.  But

4    that underscores my point.  If they are going to get up and

5    tell this court those aren't the data, we don't know what

6    these are, we don't know where these are coming from, okay,

7    that's why now it becomes critical we take a deposition of

8    somebody, you know, a 30(b)(6) of Ridgeview, to find out

9    what this document is, where, you know, where this came

10   from, lay the foundation.

11            We are not asking for a delay.  We don't believe

12   there needs to be a delay in the Daubert hearing.  If we

13   can't get the discovery done in time to present it to the

14   court for consideration in a timely manner, well, then we

15   don't.  Frankly, I think we have enough -- ample evidence to

16   demonstrate the frailty of the plaintiffs' experts'

17   opinions.  But if we get past -- if Daubert is denied and we

18   are going to trial, we need the evidence.  We need to be

19   able to -- and this isn't just some sort of peripheral, you

20   know, non-party study that came out.

21            THE COURT:  But I guess I'm not following why a

22   stipulation or even an order of the court that this

23   Augustine study is simply not in evidence, it's not a --

24   it's not a thing, it's not admissible, it's not going to be

25   relied upon, can't ask about it, it's not going to be an

 1    issue at trial, why isn't that enough to give you whatever

 2    you need regarding the Augustine study?

 3              MR. GORDON:  There are two -- there are two

 4    aspects to that.  One is the aspect of how do you unring the

 5    bell with Dr. Samet?  He's already --

 6              THE COURT:  You are not unringing anything.  The

 7    jury hasn't heard the testimony.  And the order will

 8    presumably cover or the stipulation would cover that that

 9    part of Samet's testimony will not be presented to the jury.

10    Period.  End of sentence.

11              MR. GORDON:  I understand -- well, I understand

12    what you are saying, but what would be in effect asking Dr.

13    Samet to ignore something that he has already read,

14    considered and volunteered as being strong corroboration for

15    the essence of his opinion, the essence of his opinion.

16    And, frankly, the essence of this case is that the McGovern

17    study shows, you know, an increased odds ratio of 3.8 when

18    you switch from Bair Hugger to HotDog.  That's the

19    underpinning of this entire case.  It's the underpinning of

20    Dr. Samet's testimony.  He's already read it.  He's already

21    said this strongly, you know, this provides strong

22    corroboration.  It's, you know, it makes -- one

23    observational study.  I mean, he concedes not very -- it's

24    not very strong data.  Two, now you got strong.  So you are

25    asking him to --

 1          But the flip side of the coin is we need to use

 2     the Augustine study.  Why?  Because Dr. Augustine is the

 3     epicenter of this case.  Dr. Augustine is the raison d'être

 4     of this case.  Dr. Augustine is the one who went to

 5     plaintiffs' lawyers and said, hey, let's get going on a

 6     lawsuit, I will write it, I will ghost-write a guide for

 7     you, you can put your name on it.  Dr. Augustine is the one

 8     who fomented these, all the studies upon which they rely.

 9     He has -- Mark Albrecht had his hand in them.  Mark Albrecht

10     wrote them.  Mark Albrecht did the statistical analysis.

11     And of critical importance, not only will we -- what these

12     Ridgeview data show and what I suspect the other two

13     hospitals will show is the extent to which Dr. Augustine and

14     Mr. Albrecht will go to manipulate the data, to cherry-pick

15     it, to manipulate -- to twist it and manipulate it to come

16     up with a result that looks pretty compelling, and they did

17     the same thing in McGovern.

18          THE COURT:  Let me ask this question.  When was

19     the first time that you knew the identities of Centers 1, 2

20     and 3?

21          MR. GORDON:  Centers 1 and 2 would have been

22     relatively early on, because it was in a draft -- draft

23     paper that appeared to be by Dr. Gauthier.  So we knew those

24     identities.  In fact, that's why we began pursuing discovery

25     from Ridgeview, because that was specifically one of the

1       things -- one of the tasks that Mr. Albrecht agreed to

2       perform after his -- after he left Augustine's employment,

3       was completing the -- I think it was referred to as the

4       Waconia study.

5              THE COURT:  And so when you started seeking or

6       pursuing discovery from Ridgeview, could you not have also

7       sought it from the Nassau Hospital and whatever the third

8       one was?

9              MR. GORDON:  Knowing, yes.  We didn't learn the

10      identity of Nassau until -- well, that's a long story, if

11      you are interested in it.  The Nassau didn't became --

12      didn't become -- first of all, that first draft, there were

13      three -- three centers.  It was Ridgeview, the St. Croix

14      Valley and then Wansbeck General Hospital.  Wansbeck General

15      Hospital.  Does that name ring a bell?  That's actually Dr.

16      McGovern's, the hospital there, but in the McGovern papers

17      it's described as Northumbria Hospital Trust.  The specific

18      hospital within the trust was Wansbeck General.  So what

19      Augustine was doing was taking the data from McGovern and by

20      changing the name of the center it makes it look like, wow,

21      now there are three big, you know, big centers completely

22      different than Northumbria that are coming with up these

23      same numbers.  But he dropped Wansbeck.  And by the time he

24      had ghost-written it for himself and Dr. McGovern, it was

25      just unidentified Centers 1, 2 and 3.  We already knew by

1    correlating the numbers what 1 and 2 were.  We had no idea

2    what 3 was until Augustine's deposition.

3             But the point of all this, Your Honor, this isn't

4    stuff that's peripheral.  This isn't, you know, this isn't a

5    groundwater contamination case where, you know, a public

6    entity, you know, periodically is doing additional

7    groundwater testing and somebody wants to do more discovery

8    about that.  This is -- at the heart of this case is

9    scientific fraud.  At the heart of this case is scientific

10   fraud done by Dr. Augustine and his minions.  For -- for

11   competitive purposes he weaponized litigation, he weaponized

12   science, and it is central to this litigation.

13             THE COURT:  All right.  Well, let me -- whether it

14   is or isn't, you have known that since before there was an

15   MDL, because I had the issue as a miscellaneous case with

16   Walton and Johnson.  Before there was an MDL, you knew that

17   it was Dr. Augustine at the epicenter of whatever it is that

18   became the MDL.  And that's why I asked about when you knew

19   about these other centers.  Why has that discovery not been

20   pursued until now after discovery is closed?

21             MR. GORDON:  Well, two simple reasons.  First of

22   all, I was very happy with the discovery we had going into

23   the expert deposition, particularly, Dr. Samet's deposition.

24   It was plaintiffs who injected that.  I was, honestly, Your

25   Honor, I was stunned.

 1            THE COURT:  Gobsmacked?  Were you gobsmacked?

 2            MR. GORDON:  I was gobsmacked.  Indeed I was, Your

 3     Honor.

 4            I mean, seriously, we had had a discussion amongst

 5     ourselves about it.  Do you think they are -- they are going

 6     to use Augustine.  And I was wrong.  My -- my view was no,

 7     there's no way.  They know what a fraudulent study it is.

 8     There is no way they are going to show it to their experts.

 9     There is no way their experts are going to say one word

10     about it.  And when out of nowhere Dr. Samet starts talking

11     about this new study, I was gobsmacked.  And there's no --

12     well, they are not -- they are the ones who gave it to him,

13     and he's the one who said this.  Now, you know --

14            THE COURT:  Okay.

15            MR. GORDON:  So it -- it really is a central

16     issue.  And, A, it can't be cured just by, you know, well,

17     we won't talk about it.  We need to talk about it, because

18     it's part of -- it's the whole modus operandi of Dr.

19     Augustine.  And, two, I mean, how do, well --

20            THE COURT:  Okay.  I think I --

21            MR. GORDON:  Thank you, Your Honor.

22            THE COURT:  I think I got all the points.

23            MS. ZIMMERMAN:  Your Honor, if I may, just one.

24            Mr. Gordon has now showed, again, this -- the idea

25     that this document from Ridgeview -- it is certainly a

 1   Ridgeview document, but raw data is like -- it is like an

 2   Excel spreadsheet, where there is entries for every single

 3   patient.  So that's not what he is showing you.  That's a

 4   summary of raw data, perhaps.

 5          THE COURT:  But prepared by Ridgeview, correct?

 6          MS. ZIMMERMAN:  Exactly.

 7          THE COURT:  Not by the lawyers?

 8          MS. ZIMMERMAN:  I think that that's right.  And so

 9   I may have mispoken.

10          THE COURT:  Okay.

11          MS. ZIMMERMAN:  I apologize.  But we do not have

12   the raw data yet.

13          And, again, with respect to Dr. Samet, he said a

14   strong corroboration, but it's for the opinion that he had

15   already formed and provided in this case, so --

16          THE COURT:  And do you have any information

17   regarding who brought it up first?  Whether Dr. Samet or Mr.

18   Gordon?

19          MR. BENHAM:  I don't.  I don't, Your Honor.  I was

20   at a different deposition that day.

21          THE COURT:  Okay.  And the deposition transcript

22   is or isn't something that's before me or in the record

23   somewhere?

24          MS. ZIMMERMAN:  I believe portions of it are

25   attached to our response, and I think portions of it are

 1    also attached to Mr. Gordon's response.  I mean, I think the

 2    issue is that the plaintiffs' experts are kind of damned if

 3    they do and damned if they don't, if you will pardon my

 4    language.  I mean, if we don't -- if we don't provide them,

 5    you know, these collective experts with the new study or

 6    whatever it is, then they will say that it's not a complete

 7    or, you know, they don't have a complete picture of what's

 8    out there; and if we do provide it, then they say, well, you

 9    relied on it and, you know, now the bell can't be unrung.

10              THE COURT:  Okay.

11              MS. ZIMMERMAN:  So, you know, from the plaintiffs'

12    perspective they put off this Augustine deposition till the

13    very last day of discovery and this is a risk that they

14    took, so --

15              THE COURT:  Okay.

16              MS. ZIMMERMAN:  Thank you.

17              THE COURT:  Which reminds me.  I'm sorry.  One

18    more question for you, Mr. Gordon.  What's the story on

19    these other four hours that haven't been taken yet?  They

20    are going to get taken?

21              MR. GORDON:  Yes, Your Honor.

22              MS. ZIMMERMAN:  Not scheduled.

23              MR. GORDON:  Part of the reason they weren't taken

24    immediately was we had 20 expert depositions to get done in

25    a very short period of time.  But, more importantly, once we

```
1    found out, once we saw that it was actually published, we

2    saw what was going -- oh, and the third thing was we were

3    trying to resolve the confidentiality designation of the

4    Ridgeview issue.  It was a motion before Your Honor.  So

5    we -- we delayed --

6              THE COURT:  All right.

7              MR. GORDON:  -- so we could have our ducks in a

8    row before we did that.

9              To Your Honor's question about the -- about the

10   Samet transcript, there's only a portion of it -- I believe

11   it's Exhibit 2 to Ms. Davies' affidavit, but beginning on

12   page 30 I asked him --

13             THE COURT:  Okay.  I just wanted to know if I had

14   it and, if so, where.  You just answered that.

15             MR. GORDON:  Okay.  I'm not sure it's the full

16   context.

17             THE COURT:  Okay.

18             MR. GORDON:  So we would be happy to submit the

19   full transcript.

20             THE COURT:  All right.  So let's talk for a moment

21   about scheduling a hearing on the issue regarding contact

22   with treating physicians.  I have two dates that Theresa has

23   given me.  One is Monday, August 28th at 10:00 a.m. or

24   Friday, September 1st at 10:30 a.m.

25             Do the parties have a preference?
```

1          MS. DAVIES:  Either would work for defendants,

2     Your Honor.  We prefer the 28th, if that's possible.

3          MS. ZIMMERMAN:  And I think that works for us as

4     well, Your Honor.

5          THE COURT:  The 28th?

6          MS. ZIMMERMAN:  Yes.

7          THE COURT:  Okay.  The 28th it is at 10:00 a.m.

8          Now, what -- I don't know.  What's today's date?

9     Today is the 17th?

10          MS. ZIMMERMAN:  Yes.

11          THE COURT:  Does that give us enough time to

12     actually let the rules play out, or do you need a scheduling

13     -- a briefing schedule of some sort that's different than

14     what the local rule provides?

15          MS. ZIMMERMAN:  I think we need a departure

16     because we have only got, what, 11 days.

17          THE COURT:  Right.  So that would be 14th, and

18     today is already the 17th.  Okay.  So who is -- who wants to

19     do what?

20          This is your motion to allow contact with treating

21     physicians?  Is that a correct statement?

22          MS. DAVIES:  Yes, we are the parties that are

23     seeking that relief.

24          THE COURT:  Okay.  And when can you get a memo

25     done?

```
 1              MS. DAVIES:  By the end of next week or middle of
 2     next week?
 3              THE COURT:  Well, let's put it this way.  There
 4     are 11 days now between today and the 28th.  Correct?  Have
 5     I counted that correctly?  So if we cut that in half, you
 6     get five and a half.
 7              MS. DAVIES:  Okay.
 8              MS. ZIMMERMAN:  So if it was like noon on the
 9     23rd, maybe?
10              MS. DAVIES:  We will get the memo in whenever Your
11     Honor needs it.
12              THE COURT:  Let's say you get your memo in by the
13     22nd and the plaintiffs get theirs in by the 25th.  Does
14     that work?
15              MS. ZIMMERMAN:  Yes, Your Honor.
16              THE COURT:  Does that work for you, Ms. Davies?
17              MS. DAVIES:  Yes.  Thank you.
18              THE COURT:  Okay.  And that will mean Chad will be
19     working on the weekend to be prepared to prepare me for a
20     hearing on Monday the 28th at 10:00 a.m.
21              MS. ZIMMERMAN:  Thank you, Your Honor.
22              THE COURT:  Okay.  Thank you.
23              MS. ZIMMERMAN:  Sorry about that.
24              THE COURT:  As to the current motion that's Docket
25     Entry 623, I will take that under advisement.  I will issue
```

1      an order shortly, hopefully very shortly.

2               And we are in recess.

3               MS. DAVIES:  Thank you, Your Honor.

4               MR. GORDON:  Thank you, Your Honor.

5               THE COURT:  Thank you.

6           (Court adjourned at 2:25 p.m., 08-17-2017.)

7                        *  *  *

8           I, Renee A. Rogge, certify that the foregoing is a

9      correct transcript from the record of proceedings in the

10     above-entitled matter.

11                    Certified by:  /s/Renee A. Rogge
                                    Renee A. Rogge, RMR-CRR
12

13

14

15

16

17

18

19

20

21

22

23

24

25