EXHIBIT C

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1

1              UNITED STATES DISTRICT COURT

2              DISTRICT OF MINNESOTA

3    - - - - - - - - - - - - - - - - - - - -

4    In Re:

5    Bair Hugger Forced Air Warming

6    Products Liability Litigation

7

8    This Document Relates To:

9    All Actions          MDL No. 15-2666 (JNE/FLM)

10   - - - - - - - - - - - - - - - - - - - -

11

12

13         DEPOSITION OF ALEXANDER A. HANNENBERG

14              VOLUME I, PAGES 1 - 306

15                 AUGUST 8, 2017

16

17

18         (The following is the deposition of

19   ALEXANDER A. HANNENBERG, taken pursuant to Notice of

20   Taking Deposition, via videotape, at the Aloft

21   Boston Seaport Hotel, 401-403 D Street, Boston,

22   Massachusetts, commencing at approximately 9:16

23   o'clock a.m., August 8, 2017.)

24

25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

5

1                  P R O C E E D I N G S

2              (Witness sworn.)

3              ALEXANDER A. HANNENBERG

4              called as a witness, being first duly sworn,

5              was examined and testified as follows:

6                    ADVERSE EXAMINATION

7  BY MR. ASSAAD:

8      Q.   Please state your name.

9      A.   Alexander Hannenberg.

10     Q.   You may need to speak up a little bit.

11     A.   Okay.

12     Q.   My name's Gabriel Assaad and I represent

13  thousands of plaintiffs in the multidistrict

14  litigation.  I'm here to ask you numerous questions

15  regarding your expert opinions today.  Do you

16  understand that?

17     A.   Yes, I do.

18     Q.   Okay.  Have you had your deposition taken

19  before?

20     A.   Yes.

21     Q.   Approximately how many times?

22     A.   Once.

23     Q.   And was that a medical malpractice case?

24     A.   It was.

25     Q.   And what were the allegations in that case?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

9

1          No, only -- only in this matter, in which

2    case I guess I consult for the law firm.

3         Q.   Do you -- do you know anyone at -- that

4    works for 3M?

5         A.   I don't believe so, no.

6         Q.   Okay.

7              (Exhibit 1 was marked for

8              identification.)

9    BY MR. ASSAAD:

10        Q.   Have you ever been --

11             Before I talk about Exhibit 1, have you ever

12   been -- or done any research that was funded by 3M?

13        A.   No.

14        Q.   Okay.  Do you know Scott Augustine?

15        A.   I have met him.

16        Q.   How long ago?

17        A.   More than five years ago.

18        Q.   Okay.  You just met him once?

19        A.   I believe so.

20        Q.   Did you have a conversation with him?

21        A.   Yes.

22        Q.   And what was the conversation about?

23        A.   It was about the content of a scientific

24   panel at the anesthesia annual meeting at which I had

25   presented.  He approached me at the end of the -- end

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

12

1    incomplete?

2        A.   Yes, I did.

3        Q.   Okay.

4             (Exhibit 2 was marked for

5             identification.)

6    BY MR. ASSAAD:

7        Q.   I'm still on Exhibit 1.  With respect to

8    Exhibit 1, are all the materials that you considered,

9    do you consider them authoritative?

10       A.   What do you mean by "authoritative?"

11       Q.   Reliable.

12       A.   No.  There are -- there are some items in

13   this report who -- that offers conclusions I'm not

14   sure are valid.

15       Q.   Okay.  This is just stuff that you've

16   considered; correct?

17       A.   Yes.

18       Q.   And is this --

19            And what's been marked as Exhibit 2 is a

20   document that was provided to plaintiffs' counsel this

21   morning that is titled "Materials Considered;"

22   correct?

23       A.   Yes.

24       Q.   Okay.  And this is different than Exhibit 1;

25   correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

14

1      Q.   Okay.  Is it fair to say that these four

2  items, which are Legg, Wood, Melling and Scott, are

3  not cited in your expert report?

4      A.   It's easy enough to check if I can see my

5  expert report.

6           (Exhibit 3 was marked for

7           identification.)

8      A.   That is correct, they are not cited.

9      Q.   Okay.  You've been asked to be an expert in

10  this case; correct?

11      A.   Yes.

12      Q.   And you agree that an expert should be --

13  should be objective; correct?

14      A.   Yes.

15      Q.   Should not be an advocate for either side;

16  correct?

17      A.   Yes.

18      Q.   Should be accurate; --

19      A.   Yes.

20      Q.   -- correct?

21           So I'm trying to understand what was it

22  yesterday that made you think of these four documents.

23      A.   I was ref -- reflecting on the conversation

24  that we were going to have today and realized that my

25  thinking about the matter at hand was informed by

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

15

1   material other than those that were on the Materials

2   Considered list.

3        Q.    Okay.  Did you review any depositions?

4        A.    Did I --

5              Yes, I reviewed depositions.

6        Q.    That's not on Exhibit 2; correct?

7        A.    That is on --

8              I'm sorry, I -- I -- I stand corrected.  The

9   expert reports.

10       Q.    So you haven't looked at any depositions?

11       A.    Have I looked at any dep --

12             Hon -- honestly, to make a distinction

13  between the depositions and the expert reports, I'm

14  not totally clear on --

15       Q.    You don't know what a deposition is?

16       A.    I know what a deposition is, but when I

17  think -- think about the opinions of those who have

18  been deposed and those who have submitted expert

19  reports, in my mind I'm not clear on in what format I

20  considered the material from those individuals.

21       Q.    So sitting here today you don't know what

22  depositions you reviewed, if any.

23       A.    I believe I have reviewed depositions.

24  Which ones, and which ones I relied on the expert

25  reports, I'm not able to say.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

20

1      A.   I don't know.

2      Q.   You don't know.

3      A.   I don't -- I -- I -- I don't know.  As I

4  said, the -- my impression -- my impressions are

5  related to the content, not so much the format; that

6  is to say, if an individual is deposed and offered an

7  expert opinion, whether I reviewed their expert

8  opinion or the deposition is hazy in my mind as I sit

9  here today.

10     Q.   Let's -- maybe we can make it sim -- be

11 simplified.  Did you rely on anything you read in the

12 depositions in formulating your opinions?

13     A.   That -- that is possible.

14     Q.   Well I don't want "possible," I want to know

15 one way or the other.

16     A.   Okay.  I am unable to tell -- to tell you

17 what I was --

18          What I've been saying is that I've reviewed

19 materials in various -- in various formats from

20 various sources.  My -- whatever opinion I

21 hold -- hold today is the result of the sum of that

22 information, and I have not really made an effort to

23 connect an opinion with whether it is directly derived

24 from a particular document.

25     Q.   So if I understand --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

26

1    counsel.

2         Q.   Okay.  So Jarvis and Stonnington.

3         A.   The video that we discussed was provided to

4    me by counsel.

5         Q.   Anything else?

6         A.   A test -- testing report on filters.

7         Q.   Is that listed in Exhibit 2?

8         A.   No, it is not.

9         Q.   Why not?

10        A.   Because I hadn't thought of it at the time I

11   created Exhibit -- Exhibit 2.

12        Q.   As of yesterday.

13        A.   Correct.

14        Q.   Okay.  What else?

15        A.   I can't say.

16        Q.   When did you receive the depositions?

17        A.   In the last several months.

18        Q.   Did you receive the deposition of Al Van

19   Duren?

20        A.   I'm sorry?

21        Q.   Al Van Duren.  Do you know who he is?

22        A.   Al Van -- Al Van Duren.  Al Van Duren, that

23   name sounds -- that sounds familiar.  And again,

24   whether the name sounds familiar because of seeing a

25   paper of his, whether he was referenced in the expert

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

27

1    reports that I did -- did read -- read, I don't know,

2    but the name sounds -- sounds familiar.

3         Q.   Did you read his deposition?  Simple "yes"

4    or "no" or "I don't know."

5         A.   I don't know.

6         Q.   Okay.  Did you read the deposition of Dr.

7    Wenzel?

8         A.   No.

9         Q.   Did you read the deposition of Dr. Kuehn?

10        A.   No.  I believe I read their expert reports.

11        Q.   Did you read the deposition of Dr. Mont?

12        A.   I don't know.

13        Q.   Okay.  Can you tell me any dep -- any

14   deposition that you've read from what subject matter

15   it was dealing with, if it was a doctor, anything

16   today?

17        A.   I read -- I read parts of Dr. Kurz.

18        Q.   Kurz?

19        A.   Yes.

20        Q.   Who is Dr. Kurz?

21        A.   Dr. Andrea Kurz is a scientist and the

22   author of an important paper in the area of surgical

23   normothermia.

24        Q.   Are you talking about the 1996 paper on

25   thermoregulation --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

28

1      A.    Yes.

2      Q.    -- and infection, surgical-site infection?

3      A.    Yes.

4      Q.    Do you consider her an expert in the field?

5      A.    I consider her an expert in the field.

6      Q.    Do you consider Dr. Sessler an expert in the

7   field?

8      A.    Yes.

9      Q.    Have they done more research on normothermia

10  than you have?

11     A.    Yes.

12     Q.    In fact, you have done no research on

13  normothermia; have you?

14     A.    Correct, except to the extent that I have to

15  make decisions about how I manage the temperature of

16  the patients I anesthetize.

17     Q.    Let me ask my question again.  And this is

18  going to go a lot quicker if you answer my question.

19  Okay?

20            I understand you're a treating physician.  I

21  understand what anesthesiologists do.  We don't need

22  to go there.  My question is you, Dr. Hannenberg, have

23  not done any research on normothermia; correct?

24     A.    Well are you -- are you talking about

25  laboratory re -- research, clinical studies, or are

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

29

1   you talking about re -- research in the sense of

2   evaluating the available science in order to make a

3   clinical decision?

4        Q.   I'm --

5             Let's talk about clinical studies.  Have you

6   done any clinical studies?

7        A.   No.

8        Q.   Have you done any laboratory research?

9        A.   No.

10       Q.   Okay.  You've read papers; correct?

11       A.   Correct.

12       Q.   Okay.  And some of the papers we'll be

13   talking about today; correct?

14       A.   Yes.

15       Q.   But you haven't done what Dr. Kurz or Dr.

16   Sessler has done; correct?

17       A.   Correct.

18       Q.   Or any other people out in -- in -- who have

19   published papers on normothermia; correct?

20       A.   Correct.  Other than an edit -- an editorial

21   on the subject of surgical normothermia, I have not

22   published on this subject.

23       Q.   And you read the paper of Dr. Sessler;

24   correct?

25       A.   Correct.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

30

1      Q.    And how do you know Dr. Sessler?

2      A.    Dr. Sessler and I served on a committee that

3  developed a performance measure on perioperative

4  normothermia.

5      Q.    Okay.  So we're going to get to that, but I

6  just want to understand what is the universe of

7  information you used to formulate your opinions, and

8  my understanding right now is Exhibit 2, Dr. Wenzel,

9  Dr. Kuehn and Dr. Mont's expert reports, a video of

10  airflow, a testing report regarding filtration, and

11  parts of Dr. Kurz's deposition; correct?

12          MS. LEWIS:  Object to the form of the

13  question.

14      A.    Those materials did serve as the basis for

15  my opinions, --

16      Q.    Anything else?

17      A.    -- but I think I've already out -- outlined

18  the fact that I have seen trade press publications, --

19      Q.    Which ones?

20      A.    -- an e-mail --

21          I -- I cannot -- I cannot cite -- cite them.

22  I haven't kept a record of those publications that

23  I've seen over the course of a decade.

24      Q.    But did you use them and look at them in

25  creating Exhibit 3, your expert report?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

31

1      A.    With respect to what is in my expert report,

2   my expert report has the citations of the materials

3   that I point to in the text of the expert report.  So

4   the content of the expert rep -- report is one -- is

5   one thing, the full range of my opinions on the sub --

6   on the subject is something else.

7      Q.    Okay.  But with respect to all the materials

8   you used in formulating the opinions in your

9   Exhibit -- in Exhibit 3, your -- your expert report,

10  we've discussed those today; correct?

11     A.    I'm -- I'm sorry.  Say again.

12     Q.    With respect to Exhibit 3, --

13     A.    Yes.

14     Q.    -- we have discussed all the materials that

15  you have reviewed or looked at or considered in

16  formulating your opinions that are in Exhibit 3, your

17  expert report; correct?

18     A.    Yes.

19     Q.    Okay.  I understand you have education,

20  training and experience, but I'm talking about

21  documents that you've looked at or considered.  You

22  understand that; correct?

23     A.    Yes.

24     Q.    Okay.  Did you look at the Huang paper?

25     A.    If you can show it to me I can --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

                                                    32

1        Q.    Well it's not listed here, so if it's not

2   listed in Exhibit 2, have you -- did you look at it or

3   consider it in formulating your opinion for your

4   expert report?

5        A.    No.

6        Q.    What about the Zink paper?

7        A.    I --

8              No, it did not factor into my expert report.

9        Q.    What about the Moretti paper?

10       A.    I probably have seen -- have seen it, but I

11  would not say that it is part of the content of my

12  expert report.

13       Q.    What about the Sun paper.  Do you know what

14  the Sun paper is?

15       A.    No.

16       Q.    Okay.  Sun with -- with Andrea Kurz, do you

17  know what paper that is?

18       A.    No.

19       Q.    Okay.  What about the Sessler/Olmstead/

20  Kuplinger paper, do you know what paper that is?

21       A.    No.

22       Q.    Okay.  What about Belani, does that name

23  sound familiar?

24       A.    Yes, it does.

25       Q.    Did you review that paper?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

33

1        A.    I prob -- I probably did.

2        Q.    Did you review that paper in formulating

3    your opinions in Exhibit 3?

4        A.    No.

5        Q.    What about the Reed paper, "Evaluation of

6    Intake Filtration:  Internal Microbial Buildup in

7    Airborne Contamination Emissions," did you review that

8    paper in formulating your opinions in Exhibit 3?

9        A.    No.

10       Q.    You added Legg, Cannon, Hamer, "Do forced

11   air patient-warming devices disrupt unidirectional

12   downward airflow?"  Did you look at any other Legg

13   paper in formulating your opinions on Exhibit 3?

14       A.    No.

15       Q.    Okay.  Did you find this Legg paper on your

16   own or did -- was that provided to you by counsel?

17       A.    That was, I believe, provided to me -- to me

18   by stopsurgicalinfections.org.

19       Q.    Okay.  Did you review the Desari paper,

20   "Effect of forced-air warming on the performance of

21   operating theatre laminar flow ventilation?"

22       A.    Yes, I think I did.

23       Q.    In formulating your opinions in -- in

24   Exhibit 3?

25       A.    Well in -- in Ex -- in Exhibit 3 I address

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

34

1   the proposition that forced-air warming devices

2   disrupt laminar -- laminar flow.  There are multiple

3   sources of that proposition; I believe that is one --

4   is one of them.  So that I was -- did not refer

5   specifically to that paper but to the -- the opinion

6   about forced-air warming and laminar flow --

7        Q.   Does the Desari paper --

8        A.   -- more generally.

9        Q.   Does the Desari paper have to be

10  included --

11            MS. LEWIS:  Wait.  Did you finish your

12  answer?

13            THE WITNESS:  Yes.

14       Q.   Does the Desari paper have to be included in

15  Exhibit 2 now?  Would you include it?

16       A.   I -- I -- I don't -- I don't see why not.

17       Q.   Okay.  So it should be another document -- a

18  document that you considered in formulating your

19  opinions of Exhibit 3?

20       A.   Yes.

21       Q.   Okay.  So do you recall the paper written by

22  Sessler, "Forced-air warming does not worsen air

23  quality in laminar flow operating rooms?"  Did you

24  ever read that paper?

25       A.   I recall -- I recall the title.  Whether

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

35

1    I've read it or not, I don't know.

2        Q.    Okay.  So you didn't -- you didn't consider

3    that paper in formulating your opinions in Exhibit 3;

4    correct?

5        A.    Correct.

6        Q.    Okay.  Do you recall reading the paper by

7    Belani, "Patient warming excess heat:  The effects on

8    orthopedic operating room ventilation performance?"

9        A.    No.

10        Q.    Do you know who Dr. Belani is?

11        A.    No.

12        Q.    He was -- he was the Chair of Anesthesiology

13    at the University of Minnesota.

14        A.    No.

15        Q.    Did you read the Stocks paper on particles?

16        A.    Did I read the Stocks paper?  I don't

17    recall.

18        Q.    What about the Darouiche paper on particles

19    and bacterial load?

20        A.    No.

21        Q.    I understand that on Exhibit 2 you looked at

22    the letter to the editor -- well strike that.

23            Did you read the Albrecht paper, "Forced air

24    warming:  A source of airborne contamination in the

25    operating room?"

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

36

1     A.   I believe I did.

2     Q.   Okay.  But you didn't put that in something

3  that you considered in your ex -- for your expert

4  report; correct?

5     A.   Correct.

6     Q.   Let -- let me ask you a question.  Exhibit 2

7  is not in alphabetical order; correct?

8     A.   Correct.

9     Q.   So why would you stick four more items in

10  the middle -- or not even in the middle, like randomly

11  into Exhibit 2 and just -- instead of putting it at

12  the end to make it easy for everyone to know what you

13  added to your -- your Materials Considered?

14     A.   That's where the curs -- cursor was -- was

15  when I pulled the citation.

16     Q.   Yeah.  But then you -- you went from Melling

17  to Scott and you jumped over Leitjens, so it's not

18  like you continued writing four -- four directly in a

19  row.

20     A.   Well --

21     Q.   I mean you put Legg, Wood, then you

22  skipped -- then you -- then you put your cursor again

23  and you went to Melling and you moved your cursor

24  again and went to Scott.  Why would you do that?

25     A.   In order to look at what was already in

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

41

1          MS. LEWIS:  Object to the form.

2     A.    I don't know that he says that -- that he

3 says that publicly, but I've just told you what my

4 opinion about patient warming is.

5     Q.    Have you ever seen Dr. Sessler lecture on

6 maintaining normothermia?

7     A.    I -- I am sure I have.  I can't recall when

8 and where.

9     Q.    So sitting here today, you don't remember.

10    A.    Correct.

11    Q.    Okay.  Have you --

12          When was the last time you took a CLE on

13 maintaining -- or CME on maintaining normothermia, if

14 any?

15    A.    I can't -- I can't recall taking a CME

16 specifically on that subject.

17    Q.    When is the last time you've attended any

18 lecture -- CME, talk, anything -- on maintaining

19 normothermia?

20    A.    I don't -- I don't -- I don't recall.

21    Q.    When was the last time you went to the ASA

22 conference?

23    A.    Last October.

24    Q.    Okay.  With respect to Exhibit 2, is this

25 something that you drafted?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

42

1      A.    Yes.

2      Q.    Okay.  Did you ever review the deposition of

3  Dr. Sessler?

4      A.    I have reviewed a deposition of Dr. Sessler.

5      Q.    Okay.  Why wasn't that included in Exhibit

6  2?

7      A.    Because I can't identi -- identify what

8  content of that deposition informed my opinion.

9      Q.    Exhibit 2 says "Materials Considered;"

10  correct?

11      A.    Yes.

12      Q.    Correct?

13      A.    Yes.

14      Q.    It doesn't say "Materials Relied Upon;"

15  correct?

16      A.    Correct.

17      Q.    Okay.  So now we have Dr. Sessler's

18  deposition.  When did you review his deposition?

19      A.    I don't recall.

20      Q.    This year?

21      A.    Most probably.

22      Q.    Okay.  Have you reviewed the deposition of

23  Gary Maharaj?

24      A.    No.

25      Q.    Have you reviewed the deposition of --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

43

1   ever --

2           Have you ever reviewed the deposition of

3   Teri Sides?

4       A.   No.

5       Q.   Have you ever reviewed the deposition of

6   Karl Zgoda?

7       A.   No.

8       Q.   Have you ever reviewed the deposition of

9   Gary Hansen?

10      A.   No, I don't think so.

11      Q.   Have you ever reviewed the deposition of

12  Troy Bergstrom?

13      A.   No.

14      Q.   Have you ever reviewed the deposition of

15  Gary Maharaj?

16      A.   I don't recall.

17      Q.   Okay.  Have you ever reviewed the deposition

18  of Dave Westlin?

19      A.   No.

20      Q.   Have you ever reviewed the deposition of Dr.

21  Elghabashi?

22      A.   No.

23      Q.   Do you know who Dr. Elghabashi is?

24      A.   No.

25      Q.   What about Mike Buck?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

44

1    A.   No.

2    Q.   Do you know who Mike Buck is?

3    A.   No.

4    Q.   What about Dan Koenigshofer?

5    A.   Other than the name sounding familiar, no.

6    Q.   What about --

7         Did you review the deposition of Dr. Jarvis?

8    A.   I don't believe I read his deposition.  I --

9    Q.   Have you read the deposition of Dr.

10   Stonnington?

11   A.   No.  I read -- I read their expert reports.

12   Q.   I understand that.  I -- I know that's on

13   Exhibit 2.

14   A.   Yes.

15   Q.   I'm asking about depositions.

16   A.   Yes.

17   Q.   Have you reviewed any medical records in

18   this case?

19   A.   In this case.  In this case.

20   Q.   Yes.

21   A.   I reviewed medical records of Walton and

22   Johnson.

23   Q.   Okay.  But you haven't reviewed any of

24   the -- the upcoming trials and the medical records of

25   those cases.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

48

1              I don't understand that question.

2       Q.    I mean did he give you --

3              Did he coach you on how to become an expert

4    witness and how to answer questions, defense counsel?

5       A.    Yes.

6       Q.    Okay.  What did he tell you?

7       A.    To ans -- answer truthfully and completely

8    and to be sure I understood the question.

9       Q.    Okay.  I mean as a doctor you take a lot of

10   notes, don't you, in your practice?

11      A.    Yes.

12      Q.    Okay.  Because that's how you can keep track

13   of what you did and -- and what was done in the past;

14   correct?

15      A.    Correct.

16      Q.    Okay.  And not only do you take notes, but

17   every other doctor takes notes and nurses take notes.

18   It's just general practice to take notes; correct?

19      A.    Correct.

20      Q.    And there's actually a section that says

21   "Progress Notes" in most medical records; correct?

22      A.    Correct.

23      Q.    But for acting as an expert, you don't take

24   notes.

25      A.    Correct.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

49

1      Q.   Okay.  Is there something you're trying to

2  hide?

3      A.   No.

4      Q.   Okay.  Then why not take notes?

5      A.   Because I was advised by counsel not to.

6      Q.   Okay.  I mean if you took notes about what

7  you reviewed, then we would have a list of what you

8  reviewed in this case; correct?

9      A.   Presumably.

10     Q.   You think we'd have a more accurate picture

11  of what you reviewed?

12     A.   We might.

13     Q.   We might or most likely we would?

14     A.   We -- we would have an additional resource

15  to -- to consult.

16     Q.   Well you don't even remember the depositions

17  you've read; correct?

18     A.   Correct.

19     Q.   If you took notes as to what depositions you

20  read, we'd have a record of what you read; correct?

21     A.   Correct.

22     Q.   And if you took notes of what documents you

23  reviewed, we'd have all the documents that you

24  reviewed; correct?

25     A.   Correct.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

50

1      Q.   Okay.  Note-taking is a good thing; isn't

2  it?

3      A.   I have been told that in this context it is

4  not -- it is not.

5      Q.   By defense attorneys?

6      A.   Correct.

7      Q.   Okay.  I mean you teach your residents to

8  take notes; correct?

9      A.   I don't teach -- I don't teach residents

10  now, but when I did -- when I did, yes.

11      Q.   Yeah.  I mean it would be almost malpractice

12  if you didn't take notes; correct?

13      A.   I'm not sure what medical practice and

14  medical malpractice has to -- has to do with conduct

15  as an expert wit -- expert witness, but it is

16  certainly standard practice among physicians to make

17  notes.

18      Q.   I mean you -- you understand that there's

19  almost 3,000 people that have filed cases in this

20  litigation.  Are you aware of that?

21      A.   I'm aware of that.

22      Q.   Okay.  That's 3,000 people that had severe

23  periprosthetic joint infections.  Do you understand

24  that?

25              MS. LEWIS:  Object to the form.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

55

1     Q.    Going back to Exhibit No. 2, I don't see any

2  internal 3M documents that you reviewed.  Have you

3  ever reviewed any internal 3M documents in formulating

4  your opinions?

5     A.    I don't recall that I have.

6     Q.    Well if it's not listed in Exhibit 2, that

7  means you never reviewed any internal 3M document,

8  correct, in formulating your opinions?

9     A.    In formulating my opinions, that's -- that's

10  correct.

11     Q.    So you have reviewed internal 3M documents?

12     A.    I -- I don't -- I -- I just said I didn't

13  recall whether I had or not, but if I -- if I did,

14  they were not material to creating my opinions.

15     Q.    But you considered them.

16     A.    I'm not sure what -- I --

17          So some things I may consider and dismiss as

18  not important in creating an opin -- an opinion on a

19  matter, so it's -- so I'm not -- I'm not sure whether

20  that counts as considered in -- in your view or in the

21  context of your question.

22     Q.    Well you -- you saw --

23          You mentioned there was a filtration study

24  that you looked at; correct?

25     A.    Correct.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

56

1      Q.   Okay.  And it was an internal 3M document?

2      A.   I don't -- I don't know whether it was or --

3   was or not.

4      Q.   You don't know?

5      A.   I don't know.

6      Q.   Do you have it here with you today?

7      A.   No, I don't.

8      Q.   Did you bring anything with you today?

9      A.   No.

10      Q.   Do you think if you brought your documents

11   you would be able -- you brought your documents you

12   would be able to answer these questions?

13      A.   If I looked at that particular document, it

14   might tell me whether it was an internal 3M document

15   or not, but I don't know that for sure.

16      Q.   Have you ever done a case study as a doctor?

17      A.   I'm not sure what you mean by "a case

18   study."

19      Q.   Like where you talk about a patient in front

20   of a bunch of students.

21      A.   Yes.

22      Q.   Okay.  Do you go into the case study and

23   discuss with your students about the case without any

24   of the medical records?

25      A.   Seldom.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

68

1      A.    Safety is paramount with respect to

2  patients.

3      Q.    And physicians should do everything --

4  strike that.

5            Do you have any experience designing a

6  medical device?

7      A.    Many -- many years ago I began the

8  process -- and quickly abandoned it -- of developing a

9  tooth guard, a tooth guard for intubation, but it

10  was -- the design was never completed.  It was never

11  brought to market or patented.  So that is the limit

12  of my experience.

13      Q.    Do you have any patents?

14      A.    No.

15      Q.    Have you ever dealt with the FDA?

16      A.    Have I ever dealt with the --

17      Q.    With a medical device issue or --

18      A.    No.

19      Q.    Okay.  You mention in your expert report

20  that you've acted as an anesthesiologist on

21  approximately 400 total joint arthroplasties.  Does

22  that sound about right?

23      A.    Yes, it does.

24      Q.    And that's over your career of -- since

25  1983?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

75

1      Q.    Now in looking at Exhibit 5, can you direct

2   me to any article in which you have discussed

3   thermoregulation?

4      A.    I think the only -- the only one is

5   Anesthesia & Analgesia in 2008.

6      Q.    2008.  Was it a peer-reviewed article?

7      A.    It's an invited editorial.

8      Q.    Is it under "PUBLICATIONS?"

9      A.    Yes.  Page 15, about halfway down.

10      Q.    Okay.  And that was an editorial that you

11   wrote with Sessler -- Dr. Sessler.

12      A.    Yes.

13      Q.    And it wasn't peer-reviewed; correct?

14      A.    Correct.

15      Q.    Okay.  Because it was an editorial.

16      A.    Correct.

17      Q.    Okay.  And that really had nothing to do

18   with the science of maintaining normothermia, it was

19   more with the -- with the -- whatchumacallit -- the --

20   I'll get the right word in a second -- pay for

21   performance; correct?

22      A.    Correct.

23      Q.    Would you agree with me that most of your

24   talks and literature deal with pay for performance or

25   the economics of anesthesiology?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

76

1      A.   I -- I haven't done the math, but I have

2    spoken frequently on those subjects.

3      Q.   I mean let's go through your -- your talks

4    starting on page six.

5           Oh, before I get there, what is this medical

6    malpractice committee that you're on?

7      A.   Committee?

8      Q.   Yes.  Hold on.  The Massachusetts --

9      A.   Medical malpractice tribunal?

10     Q.   Yes.

11     A.   The law in Massachusetts requires that

12   medical malpractice cases be heard by a three-member

13   tri -- tribunal before they're allowed to go --

14   allowed to go forward.  The three-member tribunal is

15   constituted by a physician, a judge, and an attorney.

16   I think there is a requirement that it be a physician

17   of the same specialty.  So from time to time over many

18   years -- although not recently -- I've been asked to

19   serve on those -- those tribunals as the

20   anesthesiologist member.

21     Q.   When -- when -- when a -- someone wants to

22   sue an anesthesiologist?

23     A.   Yes.

24     Q.   How many times did you sit on the panel?

25     A.   Probably eight or 10, roughly.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

78

1    numerous times in your CV.  What is relative value

2    with respect to anesthesiology?

3         A.    Relative value refers to a -- a -- a payment

4    system of aligning different physician services

5    according to their relative value.  The relative

6    val -- value itself reflects three components:  the

7    physician work involved, the practice expenses

8    involved, and the cost of professional liability

9    insurance for those providing that service.

10        Q.    And would it be fair to say that a lot of

11   your work done in the past dealt with trying to

12   educate and work to increase the payments made to

13   anesthesiologists?

14        A.    Yes.

15        Q.    Okay.  So in other words, a lot of your

16   lectures dealt with the money.

17        A.    They dealt with the relative value payment

18   system.

19        Q.    The money.

20        A.    Okay.

21        Q.    All right.  Again today it's about the

22   money; right?

23        A.    If you say.

24        Q.    I'm asking what you say.  I mean we could go

25   one by one and I could go and ask you, but a lot of it

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

79

1    has to do with the money.

2        A.   Sure.

3        Q.   Okay.

4        A.   Yeah.

5        Q.   Like, for example, number one on page six,

6    invited lecture, presentation, "Anesthes -- Anesthesia

7    Reimbursement...;" correct?

8        A.   Yes.

9        Q.   That's about the money; correct?

10       A.   It's about the mon -- money and the

11   methodology underlying the money.

12       Q.   Okay.  Next one, "Basics of Anesthesia

13   Economics," that's about the money as well; correct?

14       A.   Yes.

15       Q.   Next one, "Basics of an Anesthesia

16   Agreement," that's about creating agreements with

17   hospitals to make more money; correct?

18       A.   It's not about agreements with hospital --

19   with hospitals, it's about agreements with payers.

20       Q.   With payers.

21            I mean it's about how to get paid the most

22   for your services; correct?

23       A.   It's about how to get -- get paid an

24   equitable amount for our services.

25       Q.   "The Changing Business of Anesthesia,"

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

80

1   that's about the economics of anesthesia; correct?

2       A.   Yes.

3       Q.   "The Economics of Private Practice" again is

4   about the economics of anesthesia and how to increase

5   your profits; correct?

6       A.   The -- that is --

7            That one is not so much about increasing

8   your profits, it's more methodological, it -- it being

9   a presentation for residents.

10      Q.   I mean the next two down, "Ins and Outs of

11  Anesthesia Reimbursements," that's about the money;

12  correct?

13      A.   It is about the method of payments from

14  payers to anesthesiology practices, from

15  anesthesiology practices to the employees of those

16  practices, so it is financially oriented.

17      Q.   It's about the money; correct?

18      A.   Yes.

19      Q.   Okay.  Two more down, "The Perils of RBRVS

20  Payment in Anesthesia."  What's RBRVS?

21      A.   Resource Based Relative Value System.

22      Q.   So it's about the money; correct?

23      A.   Yes.

24      Q.   "The Perils of Medicare RBRVS," that's about

25  the money; correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

81

1      A.   Yes.

2      Q.   And then "Anesthesia and Medicare," that's

3  also about reimbursement from Medicare; correct?

4      A.   Yes.

5      Q.   It's about the money; correct?

6           Yes?

7      A.   Yes.

8      Q.   Okay.  "Basics of Anesthesia Reimbursement,"

9  that's also about the money; correct?

10     A.   Yes.

11     Q.   "Emerging Trends in Reimbursement...,"

12  that's about the money, correct?

13     A.   Yes.

14     Q.   Let's go a couple down, "Analyzing the

15  Profitability of Anesthesia Fee Schedules," that's

16  about the money; correct?

17     A.   Yes.

18     Q.   "New Trends in Anesthesia Reimbursement,"

19  that's about the money; correct?

20     A.   Yes.

21     Q.   Okay.  So you agree that most of these are

22  about the money; correct?

23     A.   Yes.

24     Q.   Okay.  Very little science, scientific

25  research, all about the money; correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

82

1     A.    Yes.

2           MS. LEWIS:  Objection to form.

3     Q.    In fact, there's very little scientific

4  research in these invited presentations; correct?

5     A.    In that -- in that period of time, yes.

6     Q.    We go to page seven, number two, "Commercial

7  Payments Based on the Medicare Fee Schedule," that's

8  about the money; correct?

9     A.    Yes.

10    Q.    Next one, "Introduction to Anesthesia

11 Economics," that's about the money; correct?

12    A.    Yes.

13    Q.    I mean I --

14          Almost every single one of these is

15 something to do about the money; correct?

16    A.    In that period of time, yes.

17    Q.    Okay.  So would you agree with me that most

18 if not all invited lectures on page seven is about the

19 money?

20    A.    On page seven?

21    Q.    Yes.

22    A.    Sure.

23    Q.    Okay.  Let's go to page eight.  Number two,

24 "Medicare Forecast 2004," that's about the money;

25 correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

83

1      A.   Yes.

2      Q.   "Anesthesia Reimbursement...," that's about

3  the money; correct?

4      A.   Yes.

5      Q.   "Payment for MAC and Conscious Sedation,"

6  that's about the money; correct?

7      A.   Yes.

8      Q.   "Coding and Compliance Considerations in

9  Monitored Anesthesia Care," that's about the money;

10  correct?

11      A.   Yes.

12      Q.   "Professional Fees and Other Departmental

13  Financial Support," that's about the money; correct?

14      A.   Yes.

15      Q.   "Anesthesia Economics...," that's about the

16  money; correct?

17      A.   Yes.

18      Q.   Okay.  You agree with me that most if not

19  all on page eight are invited lec -- presentations

20  about the money?

21      A.   Yes.

22      Q.   Okay.  Let's go to page nine.  First one,

23  "Perioperative Temperature Management," 2005, is that

24  about the money?

25      A.   No.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

84

1      Q.   Was it not --

2           Wasn't part of that pay for performance?

3      A.   A part of that lecture?  No.

4      Q.   Are you sure about that?

5      A.   Yes.

6      Q.   Okay.  Is that the one where you saw Dr.

7  Scott Augustine?

8      A.   No.

9      Q.   Okay.  But the next one is "Pay For

10 Performance...;" correct?

11     A.   Correct.

12     Q.   That's about the money.

13     A.   Yes.

14     Q.   "The Hospital Stipend Goldrush," that is

15 about the money?

16     A.   Yes.

17     Q.   "Pay For Performance...," next one, is that

18 about the money?

19     A.   In part.

20     Q.   Okay.  And the next two or three are about

21 pay for performance; correct?

22     A.   In part.

23     Q.   Okay.  You have "Malignant Hypo --

24 Hyperthermia;" correct?

25     A.   Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

85

1     Q.   That's not any --

2          That doesn't deal with any issues in this

3     case; correct?

4     A.   Correct.

5     Q.   All right.  Would you agree with me that

6     except for one or two on page nine, that most of these

7     invited presentations are about the money?

8     A.   Yes.

9     Q.   Okay.  And also the politics to -- to -- to

10    deal with reimbursement; correct?

11    A.   What are you referencing?

12    Q.   "Science, Politics, Press and Money."

13    A.   That is about the activities of the American

14    Society.

15    Q.   Of --

16    A.   Anesthesiologists.

17    Q.   -- anesthesiologists; correct?

18    A.   Yes.

19    Q.   Which at one time you were the president;

20    correct?

21    A.   Correct.

22    Q.   And it's a -- and it has -- it's a lobb --

23         They have a lobbying group; correct?

24    A.   Yes.

25    Q.   Okay.  And you donate to the lobbying group

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

86

1   for the ASA; correct?

2       A.   Correct.

3       Q.   Okay.  So page 10, first one, "Pay For

4   Performance and the Anesthesiologist," that's about

5   the money; correct?

6       A.   It's about the mon -- money, but like all

7   the discussions of pay for performance, it is about

8   managing clinical care to meet the pay-for-performance

9   standards, so it's both about the mon -- money and

10  clinical be -- and clinical behavior.

11      Q.   Now pay for performance is where you get

12  additional money for certain measures; correct?

13      A.   For certain measures.

14      Q.   They don't deduct money from you; correct?

15      A.   Well it depends when, when you're -- when

16  you're talking about, because in the current program,

17  yes, they -- yes, they do deduct money -- deduct

18  money.

19      Q.   Okay.  But during this time, pay for

20  performance in 2017, it would add additional money;

21  correct?

22      A.   Correct.

23      Q.   Okay.

24      A.   Correct, for those physicians who achieved

25  the benchmarks established in the pay-for-performance

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

87

1    program.

2        Q.    When did they start -- when did they start

3    deducting money for not meeting the pay-for-

4    performance standards?

5        A.    Well they --

6              Based on this year's performance, they will

7    deduct mon -- money in the 2019 payments, so there's a

8    two-year-cycle lag.

9        Q.    Oh.  And how long has that been going on?

10       A.    This year.

11       Q.    This is the first time this year they're

12   doing that?

13       A.    Correct.

14       Q.    Okay.  So up until 2017, pay for performance

15   was additional money to meet certain outcomes.

16       A.    Certain outcomes or re -- or reporting

17   standards.

18       Q.    Reporting standards.  Okay.

19             So let's go to page 10.  You have "The

20   Hospital Stipend Goldrush."  That's about the money;

21   correct?

22       A.    Correct.

23       Q.    "The Future of Anesthesia Practice...,"

24   that's about the money; correct?

25       A.    I don't recall the content of that.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

88

1      Q.   "Pay For Performance...," that's about the

2 money; correct?

3      A.   As I have said before, it's about the -- the

4 money and the clinical practice required.

5      Q.   It has a money component.

6      A.   It has a money component.

7      Q.   Okay.  Let's go down.  "Medicare Reform,

8 Quality and Pay For Performance," that has to do with

9 money; correct?

10      A.   That has something to do with the money.

11      Q.   Would you agree with me that most on page 10

12 is dealing with the money issues and practice issues

13 of anesthesiology?

14      A.   Yes.

15      Q.   Okay.  Nothing scientific on -- on page 10;

16 correct?

17      A.   That's right.

18      Q.   Okay.  No research on page 10; correct?

19      A.   In the sense that I was not presenting my

20 original research -- research, that is -- that is

21 true.

22      Q.   And when I say "research," I'm talking about

23 scientific research dealing with patient care.

24      A.   Well the curr --

25           The pay-for-performance standards are

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

89

1    grounded in scientific -- in scientific research, so

2    in that -- in that sense it is not devoid of -- of

3    science.

4        Q.    I guess my question is:  No research with

5    respect to like clinical studies or research on

6    patient care, it was more of how certain standards and

7    pay for performance were going to be met.

8        A.    In explain -- in explaining what the

9    pay-for-performance standards are -- are, particularly

10   with respect to process measures; that is, a standard

11   for a particular activity of care, explaining the

12   science that links that activity and care -- care to a

13   patient outcome is based on scientific studies.  So

14   frequently, in describing the pay-for-performance

15   stan -- standards, it would be important to explain

16   why do we have this measure about perioperative

17   temperature, for example, and what is the link --

18   linkage between warming a patient and an important

19   outcome, why do we have -- why do we have a measure on

20   this, and to some extent the editorial that we talked

21   about a moment ago was meant to answer -- answer that

22   question.  But in all of the pay-for-performance talks

23   that you have been referencing, that was, in most

24   instances, a component of the presentation.

25       Q.    But you're referencing articles, you're not

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

90

1   discuss --

2           You're referencing research articles, you're

3   not presenting research articles; correct?

4       A.   I don't understand the difference between --

5       Q.   For example --

6       A.   -- referencing and presenting --

7       Q.   Okay.

8       A.   -- a research article.

9       Q.   Well -- well, for example, I'm Andrea Kurz

10  and I just came out with my 1996 study, "I'm going to

11  talk about it, and here's my study and this is the

12  basis of my study."  That's presenting a research

13  paper; correct?

14      A.   That's presenting my own research paper.

15      Q.   Yes.

16      A.   Is that the distinction you're trying to

17  make?

18      Q.   Yes, or -- yes, or compared to --

19      A.   Okay.  Correct.

20      Q.   -- "Hey, we have this - these outcome

21  measures for thermoregulation.  And by the way, look

22  at Andrea Kurz's article of 1996."  That's what you

23  do; correct?

24      A.   Yes.

25      Q.   Okay.  Let's go down -- more down page 15 --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

91

1   or I'm sorry, page 10.  You have, you know, six from

2   the bottom, "Payment Issues Update."  That's about the

3   money; correct?

4        A.   Yes.

5        Q.   "Pay For Performance," that's about the

6   money; correct?

7        A.   Well I'll say -- I'll -- I'll -- I'll say it

8   again:  The discussions about pay for performance have

9   a financial aspect to -- to them, but the explanation

10  of the basis of the performance mea -- measures has a

11  scientific component to it.

12       Q.   I understand that, doctor.  But people are

13  not --

14            You're not giving a lecture on the benefits

15  of normothermia and its scientific basis behind it,

16  you're saying maintaining normothermia and it's going

17  to affect pay for performance; correct?

18       A.   It's -- it's both.  I mean the reason we

19  have these performance measures and created them was

20  to drive improvements in care, and that is, as much as

21  anything, the message of the presentations on pay for

22  per -- pay for performance.

23       Q.   By the way, SCIP-10 is no longer in

24  existence; correct?

25       A.   SCIP-10 -- SCIP-10 is no longer in

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

92

1   existence, but the physician quality measures that is

2   analogous is still in existence.

3        Q.   But SCIP-10 is no longer in existence;

4   correct?

5        A.   Correct.

6        Q.   And that was dealing with thermoregulation;

7   correct?

8        A.   Correct.

9        Q.   Go to page 11.

10       Well, you agree with me that most of page 10

11   deals with some issue about pay for performance or

12   money of anesthesiologists.

13       A.   That's correct.

14       Q.   Okay.  "A Visit to the Sausage Factory,"

15   what's that about?

16       A.   That was a pre -- presentation made in

17   Great -- in Great Britain about American healthcare

18   reform and The Affordable Care Act.

19       Q.   By the way, you agree with me that 3M -- or

20   Arizant at the time -- was involved with the, quote,

21   unquote, lobbying to get the SCIP measures passed;

22   correct?

23       A.   I don't know that.

24       Q.   Were you involved with the SCIP measures?

25       A.   Not -- not directly.  I was involved with

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

93

1    the physician measures and --

2            I was involved with the SCIP measures only

3    insofar as we were asked to harmonize the physician

4    normothermia measure with the SCIP-10.

5        Q.   Where is the physician normothermia?  Where

6    can I find that?

7        A.   You can find it on the second and third

8    items in Materials Considered.

9        Q.   Oh, the Centers for Medicare & Medicaid?

10       A.   Yes.

11       Q.   Okay.  Now you agree with me that there's

12   nothing on page 11 that deals with maintaining

13   normothermia, the actual research.

14       A.   There's talk on performance measur --

15   measurement in anesthesiology, which, as I have

16   previously said, would include -- include the

17   scientific basis of the performance measures.

18       Q.   I understand that.  But you -- you're

19   referring to other people's research in the pay for

20   performance; correct?

21       A.   Yes.

22       Q.   There's nothing on page 11 that deals with

23   any type of research that you've done on maintaining

24   normothermia.

25       A.   I think we've previously esta -- established

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

94

1    that I have not personally conducted basic clinical

2    science research on temperature management.

3         Q.    I just like to be a little bit thorough just

4    in case something might trigger your brain later on to

5    saying, "Oh, actually I did something."

6              So let's look at page 12.  There's nothing

7    on page 12 that deals with any type of research that

8    you did regarding maintaining normothermia; correct?

9         A.    Correct.

10        Q.    Okay.  And the same thing for page 13,

11   there's nothing in there that deals with maintaining

12   normothermia, any research that you did; correct?

13        A.    Correct.

14        Q.    Okay.  When you were a visiting professor or

15   named lecturer, did you do any research under that

16   section with respect to maintaining normothermia?

17        A.    No.

18        Q.    Now you agree that many of your publications

19   deal with the actual practice of anesthesia with

20   respect to fee schedules or profitability or relative

21   value.

22        A.    I did not hear the question.

23        Q.    With respect to publications, would you

24   agree with me that most if not all of those

25   publications deal with -- let's just say most deal

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

95

1    with the anesthesia practice itself, you know,

2    Medicare fee schedule, profitability, payments?

3         A.    Most.

4         Q.    Okay.  And sitting here today, based on

5    pages -- on 11, there's nothing -- or on page -- I'm

6    sorry, page 14, there's nothing on page 14 that

7    describes any type of research that you've done on

8    maintaining normothermia; correct?

9         A.    Correct.

10        Q.    And the same thing with page 15, there's

11   nothing on page 15 that you've done that deals with

12   maintaining normothermia; correct?

13             Research.

14        A.    There's nothing that presents original

15   clinical or basic science research by myself.

16        Q.    Okay.  And on page 16 as well, there's

17   nothing on page 16 that deals with anything that

18   describes any research that you've done on maintaining

19   normothermia; correct?

20        A.    Correct.

21        Q.    So basically with all your --

22             Would it be fair to say that with respect to

23   your knowledge of maintaining normothermia, you would

24   defer to people such as Andrea Kurz and Dr. Sessler?

25        A.    People such as those.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

96

1       Q.   Okay.  Who else would you defer to?

2       A.   Well I think, for example, Scott -- the

3  Hopkins -- Hopkins group, Dr. Scott and coll -- and

4  colleagues.

5       Q.   Okay.  The Hopkins group was just a single-

6  institution study; correct?

7       A.   Correct.  I believe so.

8       Q.   Okay.  So anyone else besides Dr. Scott?

9       A.   I can't -- I can't off -- off the top of my

10  head say -- say -- say, but I think it is fair to say

11  that the original research on the subject, Drs.

12  Sessler and Kurz are prominent.

13      Q.   I mean you would agree with me that no one

14  knows more about the 1996 study than Andrea Kurz.

15      A.   That's correct.

16      Q.   Okay.  The New England Journal of Medicine.

17  You know which one I'm referring to.

18      A.   I know which one you're referring to.

19      Q.   As well as Dr. Sessler; correct?

20      A.   Correct.

21           (Discussion off the stenographic record.)

22      Q.   So would it be fair to say that all the

23  opinions you're going to give today on maintaining

24  normothermia are based on other people's work?

25      A.   On other people's re -- research and my

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

97

1    clinical experience.

2        Q.    Okay.  Well let's talk about your clinical

3    experience.  Have you looked at your patients and

4    determined the effectiveness of maintaining

5    normothermia and done a comparison?

6        A.    And done -- and done a compar -- comparison?

7    No, no, I haven't.  But I look at my patient's

8    temperature constantly and on every case.

9        Q.    I understand that.  That's part of your job;

10   correct?

11       A.    Correct.

12       Q.    Okay.  But have you -- you --

13             You've only used the Bair Hugger; correct?

14       A.    Correct.

15       Q.    You've never used the Mistral?

16       A.    Correct.

17       Q.    Have you ever used the Hot Dog?

18       A.    Correct.

19       Q.    Have you ever used VitaHEAT?

20       A.    No.

21       Q.    Okay.  Have you ever used Warmtouch?

22       A.    No.

23       Q.    Have you ever used just warm blankets?

24       A.    In the remote past.

25       Q.    Okay.  Have you ever used reflective

98

1    blankets?

2         A.    No, I don't believe I have.

3         Q.    Okay.  So your -- your -- your entire

4    experience of the effectiveness of Bair Hugger is

5    based on the fact that you used Bair Hugger for the

6    past 25 years.

7         A.    Correct.

8         Q.    Okay.

9         A.    My personal experience is based on --

10        Q.    You -- you -- you haven't compared it

11   yourself with any other patient warming device;

12   correct?

13        A.    That's correct.

14        Q.    You know what a patient warming device is;

15   correct?

16        A.    Well if you want to --

17              A patient war -- warming device could be

18   many -- it could be many things.

19        Q.    I mean there's fluid warming; correct?

20        A.    There is fluid warming.

21        Q.    When I'm talking about patient warming, I'm

22   talking about something that actually warms the core

23   of the body externally.

24        A.    Yes.

25        Q.    Okay.  And -- and there's many different

107

1  anesthesiologist has very little in common with the

2  actual operating room --

3       Q.   Okay.

4       A.   -- and thus its relevance to the discussion

5  of what's important in harming my patients is limited

6  or nil.

7       Q.   Okay.  But --

8            So if there's a study that was funded by 3M

9  discussing particle counts, you don't believe you need

10  to look at that?

11      A.   Particle -- particle counts mean little to

12  me compared to surgical-site infection frequency.

13      Q.   Okay.  What research have you done on

14  surgical-site infection?

15      A.   I have not done original research on

16  surgical-site infection.

17      Q.   You're not an infectious disease expert;

18  correct?

19      A.   Correct.

20      Q.   You're not an orthopedic expert; correct?

21      A.   Correct.

22      Q.   You're not an airflow expert; correct?

23      A.   Correct.

24      Q.   You're not an internal medicine expert;

25  correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

108

1      A.    Correct.

2      Q.    Okay.  You're not -- you're not an engineer;

3  correct?

4      A.    Correct.

5      Q.    Okay.  You're not going to opine anything --

6            You're not a filtration expert; correct?

7      A.    Correct.

8      Q.    You're not going to offer any opinions on

9  the operating room environment; correct?

10     A.    That --

11           You'll have to be more specific about that.

12     Q.    Okay.  You agree with me --

13           Can we agree at least that periprosthetic

14  joint infections are caused by bacteria?

15     A.    Yes.

16     Q.    Okay.  Anything else that could cause a

17  periprosthetic joint infection?

18     A.    I -- I don't -- I don't know, but it

19  might -- there might be such a thing as a fungal

20  infection, but that is again not my expertise.

21     Q.    What about a virus?

22     A.    I have never heard of that.

23     Q.    Okay.  And you agree with me that -- that --

24  withdraw that.

25           So just so I understand, you were provided

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

109

1   documents by 3M or their attorneys and you didn't

2   review them all.

3        A.   Correct.

4        Q.   Okay.  How many documents did they provide

5   to you?

6        A.   Prob -- probably more than a hundred.

7        Q.   They provided you more than a hundred

8   documents and you didn't review --

9             How many did you review?

10       A.   I -- I don't -- I don't know.

11       Q.   Why aren't they on your list of materials

12   considered?

13       A.   Well I reviewed -- I reviewed those, but

14   there's a difference be -- between looking at a doc --

15   looking at a document and saying this is, you know, in

16   an -- in an area that is not going to contribute to

17   something I'm going to have -- express an opinion

18   about and considering it in developing my opinion.

19       Q.   Well you're discussing particles and helium

20   bubbles, and you just told me that you reviewed the

21   Dr. Sessler article that you -- that you seem to going

22   to be discussing about today.

23       A.   That I --

24       Q.   That you said you were going to discuss --

25   today you said -- strike that.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

110

1          You said today you're going to discuss

2    particles and helium and it's not representative of

3    what's going on in the operating room; correct?  The

4    setup.

5       A.   I -- right.  I'm going to comment on the

6    important differences between the experimental models

7    in several -- not all -- of the -- of the studies

8    relating to particle counts, et cetera, and my opinion

9    that the experimental mod -- model is substantially

10   different from a real operating room environment,

11   which casts doubt on its relevance to the risk of

12   infection.

13      Q.   I understand that.  My question is:  What --

14          Do you think having people in the models,

15   the particle or helium models, would make it better or

16   worse for particle counts over the surgical site, if

17   you know?

18      A.   I -- I don't -- I don't know.  But the

19   experimental model would be more important if it -- if

20   it had people and equipment and so forth.

21      Q.   So you don't know, sitting here today,

22   whether or not adding people or equipment to the

23   operative -- operating room model would increase or

24   decrease the amount of particles shown in these tests;

25   correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

111

1      A.    Correct.

2      Q.    Okay.  Do you know how many skin squames are

3 shed in a one-hour or two-hour surgery in the

4 operating room?

5      A.    I don't know the number.

6      Q.    Okay.  Do you know it's in the millions?

7      A.    If you say so.

8      Q.    You don't know?

9      A.    I don't know.

10     Q.    Okay.  You mentioned in your report that

11 your infection rate for your institution is .6

12 percent; is that correct?

13     A.    It was at the time I last inquire --

14 inquired, which was earlier this year.

15     Q.    Earlier this year?

16     A.    Yes.

17     Q.    Okay.  And what type of infections are we

18 referring to?

19     A.    Total joint arthroplasty infections.

20     Q.    Total joint?

21     A.    Yes.

22     Q.    Okay.  And where does that information come

23 from?

24     A.    The Direct -- Director of the Joint Center

25 at the hospital.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

119

1  existing evidence in other settings demonstrates that,

2  the -- risk of surgical infections, and there's no

3  reason to believe that orthopedic surgery would be

4  different from the surgeries that have been studied

5  and in which a reduction in the risk of infection has

6  been documented would be different.

7       Q.   You -- you think a colorectal surgery where

8  you cut the gut open and it's a dirty surgery is the

9  same as placing an implant?

10      A.   No, I don't think it's -- I --

11           I don't think the surgery is the same.

12  Obviously, it's not.

13      Q.   You understand that an implant deals with

14  bacteria different than human tissue.

15      A.   Yes.

16      Q.   You understand that; correct?

17      A.   Yes.

18      Q.   I mean I know you're not an infectious

19  disease expert, but you learned that in medical

20  school; correct?

21      A.   Yes.

22      Q.   Okay.  By the way, you only deal with the

23  patient in the anesthesia or -- like pre-op,

24  perioperatively and post-op; correct?

25      A.   Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

120

1      Q.    You don't deal with the patients later on

2   when they actually get the infection; correct?

3      A.    Correct, except for those who require

4   additional surgery.

5      Q.    I understand that.  For an infection;

6   correct?

7      A.    Or dislocation or a variety of indications

8   for reoperation.

9      Q.    But you don't -- you don't follow your --

10          You don't follow the patient after they

11   leave the post-op; correct?

12     A.    Briefly.

13     Q.    Okay.  Okay.  But whether or not they obtain

14   a periprosthetic joint infection, there's no way for

15   you to even know that unless they came back in and you

16   remembered them being in the hospital before.

17     A.    In -- in general, that's true.

18     Q.    Okay.  So with respect to -- you agree with

19   me that there's no -- you know what -- strike that.

20          Do you know what evidence-based medicine is?

21     A.    Yes.

22     Q.    Okay.  And that's where you have evidence of

23   a certain -- evidence to support a position; correct?

24     A.    Well, to support a practice, yes.

25     Q.    Okay.  So what evidence is there, scientific

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

125

1      Q.    Okay.  And again, if the -- if the -- if the

2  implant is contaminated with bacteria and there's no

3  blood flow, would you agree with me that the

4  mechanisms in which maintaining normothermia assists

5  in surgical-site reduction don't apply?

6      A.    I'm not able to answer that question.

7      Q.    You can't answer that question.

8      A.    Correct.

9            MR. ASSAAD:  Okay.  Let's take a break.

10           THE REPORTER:  Off the record, please.

11           (Recess taken.)

12  BY MR. ASSAAD:

13     Q.    With respect to the International Concensus

14  that you referred to in Exhibit No. 2, did you read

15  the entire thing?

16     A.    I -- I scanned it.

17     Q.    Do you know how long it is?

18     A.    I seem to remember about 40 pages, but I'm

19  guessing.

20     Q.    Forty pages?

21     A.    Yes.

22     Q.    Okay.  Now with respect to the infection

23  rates in your hospital --

24           That's the Newton-Wellesley Hospital;

25  correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

126

1     A.    Newton-Wellesley, yes.

2           (Exhibit 6 was marked for

3           identification.)

4  BY MR. ASSAAD:

5     Q.    Have you heard of Hospital Compare?

6     A.    Yes, I have.

7     Q.    And that's done by the Medic -- by Medicare;

8  correct?

9     A.    Yes.

10    Q.    Do you see where on page one of Exhibit 6 it

11  says, "National complication rate for hip/knee

12  replacement patients was 2.8 percent?"

13    A.    Yes, I do.

14    Q.    See that?

15    A.    Yes.

16    Q.    Okay.  And then under "Hospital name" it has

17  "NEWTON-WELLESLEY HOSPITAL?"

18    A.    Yeah.

19    Q.    Correct?

20    A.    Yes.

21    Q.    And it's check marked "No different than the

22  national rate;" correct?

23    A.    That is what it says, yes.

24    Q.    That's opposite of what you put in your

25  report; correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

127

1      A.    Uh-huh.

2      Q.    Yes?

3      A.    Yes.

4      Q.    Okay.  Now with respect to Andrea Kurz's

5   deposition, what did you read in her deposition?

6      A.    There was a discussion about the differences

7   in how she would design the study today as compared to

8   what she did in 1996.

9      Q.    Okay.  Did you read the entire deposition?

10     A.    I scanned it.

11     Q.    You scanned it?

12     A.    Yes.

13     Q.    Okay.  Did you have a limit on the amount of

14   time that you could spend working on this case?

15     A.    No.

16     Q.    Were you -- were you --

17           Were there any constraints on how many hours

18   you could review materials?

19     A.    No.

20     Q.    Okay.  You -- you understand that 3M was

21   paying your bill; correct?

22     A.    Was paying whose bill?

23     Q.    Your bill.

24     A.    Yes.

25     Q.    Okay.  And 3M is a multi-billion-dollar

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

134

1      A.    No, that's not correct.

2      Q.    Okay.  So if your opinion is whether or not

3  the Bair Hugger is safe for use, wouldn't internal

4  testing be relevant to determine the safety of the

5  Bair Hugger device?

6      A.    Well intern -- internal testing, to the

7  extent that it address -- addresses particles, air

8  bubbles and other surrogates, are neither my expertise

9  nor the basis on which I would make a clinical

10  judgment about choosing to use the Bair Hugger or not.

11      Q.    So if there were documents that exist that

12  indicate that the Bair Hugger increases the bacterial

13  load over the surgical site, that would be irrelevant

14  to the safety of the Bair Hugger to you?

15      MS. LEWIS:  Objection, form.

16      A.    A, I am not qualif -- qualified to draw the

17  connection between that finding and the risk of using

18  the Bair -- Bair Hugger, and this is, you know, a very

19  high -- high-volume operation and the rate of surgical

20  infections with it is amen -- amenable to study.  So

21  my expectation, what I am looking for and what I've

22  been looking for ever since I first heard allegations

23  of its hazard, has been documentation that more pa --

24  more patients have surgical-site infections when Bair

25  Huggers are used than when it is not used.  I don't

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

135

1    believe such a thing exists.

2        Q.    Okay.  Do you know the difference between a

3    surgical-site infection and a periprosthetic joint

4    infection?

5        A.    I'm -- I'm sorry?

6        Q.    Do you know the difference between a

7    superficial -- a surgical-site infection and a

8    periprosthetic joint infection?

9        A.    Well surgical-site infection is kind of an

10   all-encompassing term, of which periprosthetic joint

11   infections is one variety.

12       Q.    Are there any allegations that you're aware

13   of that the Bair Hugger increases the incidence of

14   superficial surgical-site infections?

15       A.    I -- I think the -- the action is about

16   peri -- periprosthetic joint -- joint infections.

17       Q.    Do you know how many bacteria or CFUs are

18   needed to cause a periprosthetic joint infection?

19       A.    No.

20       Q.    Do you know if it's more or less than a

21   superficial surgical-site infection?

22       A.    No.

23       Q.    Are you aware -- strike that.

24             You agree with me that a study could be

25   conducted to determine whether or not the Bair Hugger

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

136

1  increases the incidence of periprosthetic joint

2  infections; correct?

3      A.   Yes, I believe that's true.  But study --

4  study design is not my area of expertise.

5      Q.   Okay.

6      A.   But all right.

7      Q.   Your area of expertise is to just criticize

8  the literature in this case; correct?

9      A.   My area of expertise is making clinical

10 decisions about caring for my patients.

11     Q.   And your clinical decisions are based on

12 literature that you have read; correct?

13     A.   Yes.

14     Q.   Okay.

15     A.   Well let -- let me --

16     Q.   Yes.

17     A.   Let me, if I may, continue.

18     Q.   Sure.

19     A.   My clinical decision-making is based on --

20 not only on literature I have read but, when you look

21 at the list of materials, the systematic analyses that

22 groups like ECRI and NICE -- and NICE and others have

23 done, and those groups, because they are thor --

24 thorough, impartial and have advanced methodological

25 skills, the conclusions they draw from their analyses

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

140

1          Do you know what a 510(k) clearance is?

2     A.   I -- I -- I heard the term.

3     Q.   Okay.  You understand that, with respect to

4   the safety of medical devices or even drugs, that the

5   government relies on information provided by the

6   manufacturer?

7     A.   If you say so.  I have no experience in

8   the --

9     Q.   Okay.

10     A.   -- 510(k) process.

11     Q.   Okay.  And you're not going to be providing

12   any opinions on warnings since you don't understand

13   the FDA process; correct?

14     A.   Well I'm not going to give an opinion about

15   what the FDA requires or not -- doesn't require.  I

16   can give -- give an opinion about the warnings that

17   I -- I see as a user of the -- of the device if you

18   have questions about that.

19     Q.   Well what is your expertise in medical

20   device warnings, if any?

21          I'll withdraw the question.  Have you

22   yourself --

23          You've never created a medical device;

24   correct?

25     A.   Correct.  Correct.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

141

1      Q.    You've never been advised on --

2            You've never been consulted on what warnings

3      should be on a medical device; correct?

4      A.    Correct.

5      Q.    You've never actually written warnings in

6      your entire life; correct?

7      A.    Correct.

8      Q.    Okay.  You -- you -- you don't know --

9            You've never had any discussions with

10     respect with orthopedic surgeons and whether or not

11     they look unfavorably with respect to particles;

12     correct?

13     A.    Correct.

14     Q.    You're not an expert in airborne

15     contamination; correct?

16     A.    Correct.

17     Q.    You're not an expert in infectious disease;

18     correct?

19     A.    Correct.

20     Q.    You're not an expert in -- in -- in forced-

21     air warming; correct?

22           The device itself.

23     A.    Correct.

24     Q.    Okay.  Do you even know how much heat comes

25     out of the Bair Hugger?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

151

1      A.   We talked a little bit earl -- earlier,

2  again -- again I need to look at the statistics in

3  Frisch, but there was a diff -- a difference in the

4  frequency of infections in those patients.

5      Q.   Well you're --

6           You hold yourself out as an expert in

7  maintaining normothermia; correct?

8      A.   I hold myself out as a -- yeah, somebody who

9  has made that a clinical goal.

10     Q.   That's not my question of making a clinical

11 goal.

12     A.   Yeah.

13     Q.   Okay?  I -- I make many goals in my life but

14 I'm not an expert in.  Okay?

15          My question is:  Do you consider yourself an

16 expert in the risks and benefits of maintaining

17 normothermia?

18     A.   Yes.

19     Q.   Okay.  So you should know the studies that

20 you're going to rely upon because you yourself have

21 done no research on the issue; correct?

22     A.   I have, as I said previously, heavily re --

23 relied on systematic analyses of groups expert in

24 summarizing the available findings, such as ECRI,

25 NICE, and the physician consortium and the others I've

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

152

1   identified.

2       Q.   Okay.  And they're relying on Kurz, Melling

3   and --

4       A.   Well they're -- they're -- they're look --

5   they're looking at McGovern and Legg and everybody who

6   has published on this.  Right?

7       Q.   Well here -- here's the unfortunate thing,

8   sir.  Okay?  You've been designated an expert in this

9   case as to maintaining normothermia; correct?

10      A.   I -- that's why --

11      Q.   Okay.

12      A.   That's why I'm here.

13      Q.   So you can't rely on other groups that have

14  done reviews --

15      A.   No, I -- I disagree with that.  I certainly

16  can.

17      Q.   Okay.  So you're going to rely on -- on --

18  on other people, so I could just read what they say

19  and that's what you're going to say.

20      A.   To a -- to a degree.

21      Q.   Okay.

22      A.   They have very -- they have --

23           They are very persuasive in my decision-

24  making.

25      Q.   Okay.  So sitting here today, besides Kurz,

155

1   maintaining normothermia reduces the incidence of

2   surgical-site infections?

3       A.   It reduces the in -- incidence of infectious

4   complications of all -- of any kind.

5       Q.   That wasn't my question, sir.

6       A.   Correct.  No difference in surgical --

7   surgical-site infections to the extent that the study

8   methodology would distinguish between those infections

9   and the others.

10      Q.   Well they actually did distinguish it;

11  didn't they?

12      A.   Well they said they did.

13      Q.   Have you looked at the data?

14      A.   I -- I looked at the source of the data,

15  which is administrative data, which depends on -- on

16  coding for the purpose of -- of billing.

17              (Exhibit 7 was marked for

18              identification.)

19              MR. ASSAAD:  No.  I'm sorry.  I gave you the

20  Sun article.  We'll get to this in a second.  Sorry.

21  BY MR. ASSAAD:

22      Q.   Are you familiar with this article, sir, the

23  Sun article?

24      A.   No, I don't think I am.

25      Q.   With Dr. Sessler and Andrea Kurz?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

156

1      A.    No, I don't think I am.

2      Q.    Okay.  Why don't you look at the

3    conclusions, tell me if you agree with this.

4      A.    Which one?

5      Q.    "Even in actively warmed patients,

6    hypothermia is routine during the first hour of

7    anesthesia."  Do you agree with that statement?

8      A.    Yes, temperatures drop in the first hour of

9    anesthesia.

10     Q.    Okay.

11          (Exhibit 8 was marked for

12          identification.)

13   BY MR. ASSAAD:

14     Q.    Exhibit 8 is titled "Compliance with

15   Surgical Care Improvement Project for Body Temperature

16   Management (SCIP-10) Is Associated with Improved

17   Clinical Outcomes" by Andrew V. Scott et al.  Is this

18   the article you're referring to?

19     A.    Yes, it is.

20     Q.    Okay.  Let's turn to page five.  Under

21   "Wound infection" --

22          That's a surgical-site infection, correct,

23   on -- on Table 4?

24     A.    Yes.  Yeah.

25     Q.    Do you agree with me that SCIP non-

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

157

1  compliant has a lower infection rate than SCIP

2  compliant?

3      A.   Not in a significant way -- way.

4      Q.   That wasn't my question.

5      A.   Yes.

6      Q.   It's lower; correct?

7      A.   The raw -- the raw numbers are lower.

8      Q.   Okay.  It's not statistically significant --

9      A.   So I would characterize it as no difference.

10     Q.   Okay.  And this is 2015; correct?

11     A.   Correct.

12     Q.   Published in Anesthesiology; correct?

13     A.   Correct.

14     Q.   And you subscribe to Anesthesiology;

15  correct?

16     A.   Yes.

17     Q.   And you believe that's an authoritative

18  journal; correct?

19     A.   It's a reputable journal.

20     Q.   You -- you think it's authoritative.

21     A.   I believe it has -- has a robust editorial

22  process.

23     Q.   And you've cited to this article in your

24  Materials Considered; correct?

25     A.   Yes, I have.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

158

1      Q.   So you believe it's authoritative.

2      A.   I believe -- I -- it is --

3           It is there because it influenced my opinion

4    on the safety of the Bair Hugger.

5      Q.   Okay.  Well it doesn't really talk about the

6    safety of the Bair Hugger, it talks about the efficacy

7    of the Bair Hugger.

8      A.   No.  I think the frequency of the

9    complications stud -- studied goes directly to the

10   question of safety.

11     Q.   Is there anything in Scott that discusses

12   whether or not the Bair Hugger contaminates the

13   sterile field through either being contaminated itself

14   or by disrupting laminar flow?

15     A.   No.  That's the beauty of the Scott paper,

16   is that it talks about clinical outcomes and what

17   matters to patients.

18     Q.   Well the beauty is, then, that there's no

19   difference in wound infections between maintaining

20   normothermia and not maintaining normothermia;

21   correct?

22     A.   Normothermia in this study was maintained --

23   maintained with the use of the Bair Hugger.  There

24   being no difference in wound infections and a dramatic

25   difference in all infections, in addition to the other

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

159

1   complications, tells me that it is a safe -- a safe

2   device and is good practice to -- to use.

3        Q.   What -- what percentage of patients that

4   have peri -- total knee or total hip actually have --

5   get sepsis?

6        A.   I don't know.

7        Q.   Okay.  What -- what percentage of patients

8   that have total hip or total knee actually have a

9   drug-resistant infection?

10       A.   I did not -- I don't --

11            I don't know.

12       Q.   Okay.  What percentage of patients have some

13  sort of an ischemic cardiac -- cardiovascular event,

14  of total hip or total knee patients, arthroplasty

15  patients?

16       A.   I don't know.

17       Q.   Okay.

18       A.   I don't know that they are different --

19  different from this diverse group of surgical

20  patients.

21       Q.   You agree with me that this article does not

22  talk about whether or not the Bair Hugger contaminates

23  the sterile field by its use.

24            MS. LEWIS:  Objection, form.

25       A.   It dis -- it discusses the out -- outcomes

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

160

1  that would make that finding relevant but doesn't

2  discuss the contamination of the surgical wound --

3  wound directly, only the clinical marker of that

4  event.

5      Q.   Well it --

6           I mean you believe maintaining normothermia

7  reduces the risks of surgical-site infection; don't

8  you?

9      A.   Yes.

10     Q.   You do.  But this study says the opposite

11 with respect to wound infections; correct?

12     A.   No, it says there's no difference.

13     Q.   Well SCIP non-compliant means either, one,

14 they --

15          Well SCIP non-compliant means they didn't

16 use any type of maintain -- forced-air warming or

17 patient warming.

18     A.   Or didn't achieve the target temperature.

19     Q.   No.  You could still be SCIP compliant as

20 long as you --

21          As long as you're using a forced-air

22 warming --

23     A.   Correct.

24     Q.   -- device you're SCIP compliant; correct?

25     A.   Right, but --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

161

1          And if you don't use it and meet the target

2   temperature, you're also SCIP compliant.

3          Q.   Yes.  So the ones that they did not --

4          SCIP non-compliant means that you weren't at

5   the target temperature and you did not use a patient

6   warming device; correct?

7          A.   Correct.

8          Q.   Okay.  So we could agree, for the SCIP

9   non-compliant, no patient warming device was used.

10          A.   Or a patient warming device was used -- was

11   used --

12          No.  I'm sorry.  Correct.

13          Q.   I'm correct.

14          A.   Okay.

15          Q.   Right?

16          A.   You are.

17          Q.   Okay.  So we have here on page five 1,240

18   patients that no patient warming device was used on;

19   correct?  Correct?

20          A.   Correct.

21          Q.   Okay.  And then you have the SCIP compliant,

22   which has 44,000 patients that warming was used;

23   correct?

24          A.   Correct.

25          Q.   And it was forced-air warming in this case;

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

162

1    correct?

2         A.    Yes.

3         Q.    Now since you believe that forced-air

4    warming or patient warming reduces the incidence of

5    surgical-site infection, why is there no difference

6    for wound infections?

7              If you know.

8         A.    Well I don't -- I don't know, I don't know,

9    but the -- the size of the two -- two groups may

10   produce a statistical effect that produces this.  But

11   as I said, this informs my opinion, because if

12   forced-air warming were dangerous, I would expect to

13   see the SCIP compliant group have a substantially

14   higher rate of wound infection and other -- and other

15   infectious complications than the group in which it

16   wasn't used, --

17        Q.    Did you ever think --

18        A.    -- and that is not the case.

19        Q.    Did you ever think of this possibility, sir,

20   that maintaining normothermia reduces the incidence of

21   wound infection but it's been offset because of the

22   risk of the Bair Hugger and that's why you get equal

23   numbers?  Isn't that -- isn't that a possibility?

24        A.    Well if this were the on -- were the only

25   study in existence addressing this and the others

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

163

1  didn't -- didn't exist, that would -- might be an

2  attractive theory to explain the result.

3      Q.   And you need further research; correct?

4      A.   Well I have several -- several other studies

5  that show a reduction in infections.

6      Q.   Okay.  But with respect to Sun, that -- if

7  that -- that's a possibility --

8      A.   We're talking about Scott; right?

9      Q.   Or Scott.  That's a study that you would

10  maybe require further research to determine whether or

11  not the Bair Hugger is increasing the infection rate

12  but at the same time reducing the wound infection rate

13  so you get a non-statistically significant between use

14  and non-use.  It's a possibility; correct?

15      A.   I -- I suppose it's a possibility.

16      Q.   Okay.  So what study do you want to talk

17  about next, Kurz or Melling?

18      A.   You're -- you're asking the questions.

19      Q.   Okay.  Let's talk about Melling.  Is Melling

20  perioperative warming?

21      A.   Melling is perioperative warming.

22      Q.   Is that what you believe?

23      A.   It's perioperative warming.

24      Q.   Are you sure about that?

25      A.   Yeah.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

164

1    Q.   Okay.  And you believe Melling supports the

2  safety of the Bair Hugger perioperatively.

3    A.   Well the Bair -- in this --

4         In this case, this is about hypother --

5  hypothermia and the frequency of infections in

6  clean -- in clean surgery.  There were two modalities

7  used, neither in the operating room, but the patient's

8  temper -- temperatures or the surgical-field

9  temperature -- temperatures in some of the cases was

10  managed with local warming or body -- body warming

11  perioperatively.

12    Q.   You understand that Melling is -- is

13  preoperative warming.

14    A.   Yes.

15    Q.   Okay.  When --

16    A.   And when you said -- when you said

17  "perioperative warming," in my mind that includes

18  preoperative.

19    Q.   Okay.

20    A.   But the point here is the effect of warming.

21    Q.   You agree with me that prewarming lasts for

22  about three hours based on the science.

23    A.   Yeah.  I don't -- I don't know about that,

24  but these patients --

25    Q.   Okay.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

165

1      A.    The warmed patients were not surprisingly

2   warmer.

3      Q.    Melling wasn't --

4            Bair Hugger wasn't used from incision to

5   incision.

6      A.    Correct.

7      Q.    Okay.  So Melling was not used

8   intraoperatively; correct?

9      A.    Correct.

10     Q.    Okay.  So Melling wouldn't indicate whether

11  or not the use of Bair Hugger would contaminate the

12  sterile field because the Bair Hugger wasn't used

13  intraoperatively; correct?

14     A.    Correct.  Melling speak -- speaks to the

15  importance of normothermia in reducing the risk of

16  surgical infection.

17     Q.    The effect of prewarming on normothermia.

18     A.    Norm --

19     Q.    Okay.

20     A.    Normothermia.

21     Q.    Okay.  Let's talk about Kurz.  Do you recall

22  reading any -- anything in the deposition of Andrea

23  Kurz where she stated that, with -- let me get the

24  exact words --

25           MS. LEWIS:  Are you going to have a copy for

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

166

1  Dr. Hannenberg?

2          MR. ASSAAD:  No.

3          MS. LEWIS:  Okay.  I just want the record to

4  so reflect.

5          MR. ASSAAD:  Next time maybe if you instruct

6  your witnesses to come with information so they can

7  answer questions --

8          MS. LEWIS:  Since they don't know what

9  question you're going to ask, --

10          MR. ASSAAD:  That's why they should bring

11  everything.

12          MS. LEWIS:  -- they're supposed to guess?

13          MR. ASSAAD:  I mean you go to trial with all

14  the files; don't you?  I don't know if you go to

15  trial, but if you do, you should bring all the files.

16      Q.   So do you recall when Dr. Kurz indicated

17  that Kurz would not meet current research guidelines

18  and -- and scientific reliability in -- in -- in

19  today's world?

20          MS. LEWIS:  Dr. Hannenberg, if you remember,

21  that's fine; if you don't, if you want to see the

22  document --

23          THE WITNESS:  Seeing the document would be

24  helpful.

25          (Exhibit 9 was marked for

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

168

1                    AFTERNOON SESSION

2    BY MR. ASSAAD:

3        Q.    Are you ready to continue, doctor?

4        A.    Yes, I am.

5        Q.    Before I get to the Kurz deposition, we were

6    talking about some of the articles that support your

7    opinion that maintaining normothermia reduces the

8    incidence of infection.  You -- you haven't been

9    provided any internal documents or minutes regarding

10   conversations with Andrea Kurz or Dr. Sessler within

11   3M; have you?

12       A.    I don't believe so.

13       Q.    Okay.

14             (Exhibit 10 was marked for

15             identification.)

16   BY MR. ASSAAD:

17       Q.    Exhibit 10 is a document provided to the

18   plaintiffs from defendants talking about the Global

19   Patient Warming Advisory meeting on October 18th,

20   2012.  Do you see that as the heading?

21       A.    Yes, I do.

22       Q.    And you see that the board members are Dan

23   Sessler, Pedro Barbieri, Andrea Kurz, Claude LaFlamme

24   and Berthold Bein.  Do you see that?

25       A.    Yes, I do.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

173

1    infection was not defined, core temperature not

2    recorded(!)"

3            Were you aware of the significant and

4    serious flaws of the Melling paper?

5        A.   I think the Melling paper is also infor --

6    informative despite -- despite these comments.

7        Q.   Okay.  But you would agree with me,

8    especially with the Kurz paper, that Andrea Kurz knows

9    more about her paper and the limitations than you do.

10       A.   She does.

11       Q.   Okay.  Let's go to the deposition of Andrea

12   Kurz.  I'd like you to turn to page 179.  If you look

13   at page 179 of Andrea Kurz's deposition, which is

14   marked as Exhibit No. 9, line 16:

15            "Question:  In today's scientific standards,

16   there is no reliable evidence that supports that

17   maintaining normothermia reduces the incidence of

18   infection.

19            "Answer:  That is correct."

20            Do you agree with that statement and answer?

21       A.   No.

22       Q.   Okay.  So you disagree with Andrea Kurz.

23       A.   Yes.

24       Q.   Okay.

25            MS. LEWIS:  I'm sorry, tell me what page

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

174

1    number we are again.

2              MR. ASSAAD:  179.

3              MS. LEWIS:  Okay.  Thank you.

4         Q.   So Andrea Kurz, who has done more research

5    than most people in the world on maintaining

6    normothermia and its effects, you, as a person who's

7    never done research on maintaining normothermia,

8    disagree with Dr. Kurz.

9         A.   Yes.

10        Q.   Okay.

11        A.   I disagree with that -- with that statement.

12   I'm sure there are many things Dr. Kurz has said that

13   I agree with, but with respect to that statement, yes,

14   I disagree.

15        Q.   You disagree with that statement.  Okay.

16        A.   I disagree with that statement.

17        Q.   And what's your basis to disagree with that

18   statement?

19        A.   Because her research is not the -- the only

20   evidence that addresses this -- this question, and

21   we've already talked about oth -- others and other

22   more recent research.

23        Q.   Well, with respect to surgical-site

24   infections, what valid scientific evidence is there

25   that indicates that maintaining normothermia reduces

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

175

1    the incidence of surgical-site infections?

2         A.    Kurz, Melling.

3         Q.    Okay.  Anything else?

4         A.    The --

5               No, I would say I would point to those.

6         Q.    Okay.  So you disagree with Dr. Kurz's

7    opinions on her own study that you're citing to

8    support maintaining normothermia reduces the incidence

9    of infections.

10        A.    Well I'm not --

11              So this statement of hers is conditioned by

12   the phrase "In today's scientific standards," and I

13   don't know what she means by -- by that.

14        Q.    Well if you read the deposition --

15        A.    Or that's your -- that's your ques -- that's

16   your question.  I'm not sure what -- what you mean by

17   that.

18        Q.    And you've had a copy of this deposition;

19   right?

20        A.    I had a copy of this deposition.

21        Q.    Okay.  And you had a chance to read it;

22   correct?

23        A.    I did.

24        Q.    Okay.  And you were never provided a -- a

25   copy of Exhibit No. 10; were you?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

176

1      A.   Which is Exhibit No. 10?

2      Q.   The minutes.

3      A.   I don't believe I was, --

4      Q.   Okay.

5      A.   -- no.

6      Q.   Were you ever informed that Dr. Sessler

7  indicated in 2016 saying that knowing what he knows

8  now, that he would have never published the 1996

9  Sessler paper with Dr. Kurz?

10     A.   I'm not aware of that statement.

11     Q.   Would that affect your opinion with respect

12 to the quality of the 1996 study?

13     A.   I -- I -- I don't know why he said -- why he

14 would say that.

15     Q.   So you're not aware that he's made that

16 statement in the past; correct?

17     A.   I am not aware of that.

18     Q.   And if he did make that statement, would it

19 change your opinion?

20     A.   Again, it would depend why he was saying it,

21 what he was thinking.

22          (Exhibit 11 was marked for

23          identification.)

24 BY MR. ASSAAD:

25     Q.   What's been marked as Exhibit 11 is an

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

196

1   outcomes leading to patient morbidity and mortality

2   beyond surgical wound infections, and the inescapable

3   conclusion from looking at Scott is that -- is that

4   managing patient temperature with forced-air warming

5   benefits the patient.

6       Q.   But you can't say that with re -- with

7   respect to total hip and total knee arthroplasties

8   because you don't know, the surgeries that occurred,

9   which ones applied to orthopedic surgeries, correct,

10  with Scott?

11      A.   Scott does not iden -- identify which

12  orthopedic procedures.

13      Q.   But what we can say for sure in Scott is

14  that with respect to wound infections in orthopedic

15  procedures, there is no difference between SCIP

16  compliant and SCIP non-compliant.

17      A.   I don't think Scott broke out wound

18  infections for separate analy -- for separate

19  analysis.

20      Q.   Okay.  Are you familiar with the Clarissa

21  Tjoakarfa study --

22      A.   Does not sound familiar to me.

23      Q.   -- entitled "Reflective Blankets Are as

24  Effective as Forced Air Warmers in Maintaining Patient

25  Normothermia During Hip and Knee Arthroplasty

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

197

1   Surgery?"

2        A.   No, I'm not familiar with that.  No.

3        Q.   Okay.  Do you know why they are not --

4             Do you have an opinion whether or not

5   reflective blankets are as efficacious as forced-air

6   warmers in total hip and total knee arthroplasty

7   surgeries?

8        A.   Do I have an opinion?

9        Q.   Yes.

10       A.   Yes, I have an opinion about that.

11       Q.   What's your opinion?

12       A.   They are not as effective as active warming.

13       Q.   What study have you performed to determine

14   that?

15       A.   You asked for my opinion, not for the result

16   of a study.

17       Q.   Well I'm hoping --

18            I don't want you to guess.  Your opinion is

19   based on some sort of fact or science.  Do you have

20   any fact or science to support your opinion that

21   forced-air warming is more effective than reflective

22   blankets?

23       A.   No, I can't -- I can't --

24       Q.   Okay.

25       A.   -- point to that study.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

198

1      Q.    You're familiar with the studies comparing

2   forced-air warming to the Hot Dog device; are you --

3   are you not?

4      A.    I -- I have not -- I -- I have not

5   studied -- studied them.  My interest in this has not

6   been so much about the comparative efficacy but the

7   safety of the Bair Hugger, --

8      Q.    Okay.

9      A.    -- and so those are somewhat off point.

10     Q.    Okay.  Just so I understand, your opinion is

11  that since there's no article that you agree with or

12  you think is credible that the Bair Hugger is unsafe,

13  that it must be safe.

14     A.    That is in -- in part true, but it is

15  also -- my opinion is also based on the fact that

16  there is evidence that the risk of infections declines

17  with the use of the Bair -- Bair Hugger, and that

18  un -- unless I saw a clinical outcome study showing

19  me -- showing me that the Bair Hugger was unsafe in

20  that respect, I would continue to support its use and

21  advocate for its safety.

22     Q.    Can you --

23            And -- and try to get out for a second

24  the -- the fact that you honestly believe that

25  maintaining normothermia reduces the risk of

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

200

1    non-responsive.

2        Q.    Listen to my question.  Are you aware of any

3    study that indicates that the Bair Hugger does not

4    increase the bacterial load over the surgical site?

5        A.    I -- I am not aware of it.

6        Q.    Okay.  Do you know what the Mistral warmer

7    is?

8        A.    I've heard -- I've heard of it.

9        Q.    You know it's a forced-air warming device?

10       A.    Yes, I know that.

11       Q.    You know it's made by Stryker?

12       A.    I didn't know that.

13       Q.    Okay.  Are you aware that Mistral, which is

14   a forced-air warming device, warns the doctors

15   regarding potential airborne contamination by its

16   product?

17           MS. LEWIS:  Objection, form.

18           MR. ASSAAD:  Basis.

19           MS. LEWIS:  It mischaracterizes the

20   evidence, it's not a warning, and y'all have talked

21   about that in other depositions.

22           MR. ASSAAD:  Not a warning?

23           MS. LEWIS:  No.

24           MR. ASSAAD:  Okay.

25       A.    I'm not aware of the non-warning.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

201

1      Q.   It is a warning.  Your counsel is wrong.

2  So --

3      A.   I'm not --

4           I -- I -- I have a passing familiarity --

5      Q.   Okay.

6      A.   -- and recognition of the brand name and

7  nothing -- know nothing more about Mistral.

8      Q.   Are you aware that the older models of Bair

9  Hugger --

10          Have you ever seen a model 200 series Bair

11  Hugger?

12     A.   I doubt -- I doubt it.  I think the models I

13  use are 500 series plus.

14     Q.   And 700 series?

15     A.   That I don't know about.

16     Q.   Have you looked at the warning labels on the

17  200 series?

18     A.   No, I don't think I've seen the 200.

19     Q.   Has counsel showed you those labels -- I'm

20  sorry.

21          Has counsel showed you those labels?

22     A.   No, I don't believe so.

23     Q.   Okay.  Do you understand there was no

24  verification testing on the Bair Hugger?

25     A.   What does "verification testing" mean?

203

1      A.   It's mixing with the very substantially cool

2  air in the room.

3      Q.   You think it could change the temperature in

4  the room by a few degrees?

5      A.   No.

6      Q.   Okay.

7           (Exhibit 14 was marked for

8           identification.)

9  BY MR. ASSAAD:

10     Q.   Exhibit 14 is a peer-reviewed article titled

11  "Resistive-Polymer Versus Forced-Air Warming:

12  Comparable Efficacy in Orthopedic Patients," and it's

13  authored by Brandt, among others, including Oguz, Kurz

14  and Kimberger.

15          Have you seen this article before?

16     A.   No, I don't have.

17     Q.   Okay.  Under the conclusion it says,

18  "Resistive-polymer warming performs as efficiently as

19  forced-air warming in patients undergoing orthopedic

20  surgery."  Do you have any disa -- do you have any

21  disagreement with that conclusion?

22     A.   I have no basis to agree or disagree.

23     Q.   Because whether or not you think maintaining

24  normothermia is real science or junk science, it

25  doesn't matter which way you warm, correct, as long as

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

204

1  you warm the patient?

2      A.   As long as you warm the patient safe --

3  safely and effectively.

4      Q.   I'd like you to turn to page 836,

5  "Environment" -- I want you to look under Table 1,

6  "Environmental temperature at 1 meter distance to

7  warming device (after 30 minutes)," and do you see

8  where it says 24.4 degrees plus or minus 5.2 degrees

9  for Bair Hugger and 22.6 degrees plus or minus 1.9

10 degrees for Hot Dog?

11     A.   Yeah.

12     Q.   Huh?

13     A.   Yes, I do.

14     Q.   Okay.  And you see that the OR temperature

15 started at 19.5 degrees --

16     A.   Uh-huh.  Yeah.

17     Q.   -- and it ended at 19.4?  Do you see that?

18     A.   Yeah.

19     Q.   And around the warming device, at a one-

20 meter distance around it, the temperature raised five

21 degrees.  Do you see that?

22     A.   I -- I see that.

23     Q.   And up -- and at some point up -- up over 10

24 degrees Celsius for the Bair Hugger based on the

25 standard deviation.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

205

1        Were you aware of this article, sir?

2   A.   I said no.

3   Q.   Has counsel -- has -- has counsel --

4        Would you be surprised if you were provided

5   this article in the hundreds of articles that you

6   received from --

7   A.   It's poss -- it's possible it's --

8   Q.   Okay.

9   A.   -- it's -- it's in there.

10  Q.   You just didn't review it before; correct?

11  A.   As I said and you said your -- yourself, the

12  point -- the point here is that we want to achieve

13  normothermia safely, so my focus in reviewing the

14  articles has been on the safety more than the

15  efficacy.

16  Q.   Would it be --

17  A.   The other point -- the other point I make

18  about this is that if -- if the Bair Hugger serves to

19  warm the up -- rise -- raise the temperature around

20  the patient, is that -- is that bad?

21  Q.   Do you know if it's bad or not?

22  A.   I don't think it's bad.  I think we try very

23  hard to warm the area around the patient.  I think

24  operating rooms are -- are too -- too cold.

25  Q.   Do you know what the effect of heat is

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

206

1   around the operating room table on the sterility of

2   the surgical site?

3           "Yes" or "no."

4       A.   No.

5       Q.   Okay.  Move on then.

6           Do you think the data with respect to

7   cardiac morbidity and thermoregulation is strong or

8   weak?

9       A.   It is strong.

10      Q.   Have you done any research on it?

11      A.   No, I haven't.

12      Q.   Who has done research on it that you're

13  aware of?

14      A.   The original study we cited in the

15  performance measure was -- was Frank, but I think that

16  that was one of the endpoints also studied in -- in

17  Scott.  Wherever Scott is.  Yeah.

18      Q.   It's what?

19      A.   It says Scott showed a reduction by 50

20  percent in the frequency of ischemic cardiovascular

21  events, but the Frank, which is -- is also an older

22  paper, also studied vascular patients and showed a

23  lower frequency of morbid cardiovascular events in

24  warmed patients.

25      Q.   But you don't know what percentage of total

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

208

1            THE REPORTER:  Off the record, please.

2            (Recess taken.)

3    BY MR. ASSAAD:

4        Q.   Ready to continue?

5        A.   Yes, sir.

6        Q.   So doctor, we talked about the Kurz study,

7    the Melling study and the Scott study; correct?

8        A.   We have.

9        Q.   And the one study that we haven't talked

10   about that you believe is authoritative is Frisch;

11   correct?

12       A.   I believe Frisch has influenced my opinion

13   about the safety of the Bair Hugger --

14       Q.   Okay.

15       A.   -- and the -- and the efficacy of

16   normothermia.

17       Q.   All right.

18            (Exhibit 15 was marked for

19            identification.)

20   BY MR. ASSAAD:

21       Q.   Is Exhibit 15 the Frisch article you're

22   referring to?

23       A.   No, it's not.

24       Q.   Okay.  So you're looking at the one on hip

25   fractures, not on hip and knee arthroplasty.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

209

1      A.   Correct.

2      Q.   Would you agree with me that the one dealing

3  with hip and knee arthoplasty are more relevant to

4  this case than hip fractures?

5      A.   Ever so slightly.

6      Q.   What do you mean "ever so slightly?"

7      A.   Because the nature of hip-fra -- hip-

8  fracture surgery is very similar to hip arthro --

9  arthroplasty, so I think, even more so than the other

10 studies, we're talking about the conclusions one would

11 draw from that have special bearing on at least hip

12 arthroplasty if not knee arthroplasty also.

13     Q.   Well do hip fractures all have implants?

14     A.   They have -- all have some kind of hard --

15 hardware.

16     Q.   Okay.

17     A.   Whether --

18          Some of them are repaired with a

19 hemiarthroplasty, which, as its name implies, is very

20 similar to a total hip arthroplasty.

21     Q.   Okay.  But you --

22          I mean this is the same Frisch though;

23 correct?

24     A.   I believe it is.

25     Q.   Okay.  Had you seen this article before?

210

1      A.    No, I don't believe I have.

2      Q.    You have?

3      A.    No, I don't believe so.

4      Q.    You haven't.  Okay.

5            I'd like you to go to page 60 of the

6      article.  And this was published in 2016.  Are you

7      aware of that?

8      A.    It says 2017, but if you say it was

9      published in 2016 --

10     Q.    Oh, I'm sorry, you're right, 2017.  It

11     was -- it was submitted in 2016.

12     A.    Okay.

13     Q.    Do you see Table 3 where it indicates

14     "Univariate Analysis of Complications Associated With

15     Hypothermia?"

16     A.    Yes, I do.

17     Q.    And you see it says at the top TJA, and then

18     halfway down -- a little more than halfway has TKA, do

19     you see that?

20     A.    Yes.

21     Q.    And then if you go to the second -- other

22     column it has THA on the right-hand side.

23     A.    Yes.

24     Q.    Okay.  And also has p-values.

25     A.    Yeah.  So I infer from that that TJA is the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

212

1    there; correct?

2         A.   Yes.

3         Q.   Okay.  And this is dealing with the same

4    type of surgeries that are involved in this multi-

5    district litigation.

6         A.   Yes, it is.

7         Q.   So based on this article and this raw

8    data -- this data, you would agree with me that

9    whether a patient is normothermic or hypothermic

10   doesn't have an effect on total knee and total hip

11   arthroplasties for an MI, a stroke, a DVT -- DVT, a

12   PE, a DSSI, an SSI, an NSSI and an LOS, which is

13   length of surgery.

14        A.   I would agree that this study fails to

15   demonstrate that difference.

16        Q.   Or demonstrates that there is no difference.

17        A.   Correct.

18        Q.   Okay.  And this is 2017; correct?

19        A.   Correct.

20        Q.   You were not provided this article by the

21   defendant; were you?

22        A.   I don't --

23             It does not look familiar to me.

24        Q.   Okay.  And this is one year --

25             This is an article that's dated one year

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

213

1   after the Frisch article that you cited; correct?

2        A.   The Frisch article I cited was 2016.

3        Q.   Okay.  And it's the same author.

4        A.   I believe it is.

5        Q.   Okay.

6        A.   N.B. Frisch, yeah.

7        Q.   I'd like you to go to Exhibit 7, which is

8   the Sun study.

9        A.   Sun, yes.

10       Q.   This was Anesthesiology, a peer-reviewed

11   ar -- journal.  Are you familiar with Anesthesiology?

12       A.   Yes, I am.

13       Q.   Do you subscribe to it?

14       A.   Yes, I do.

15       Q.   Do you recall ever seeing this article?

16       A.   No.

17       Q.   Do you keep up to date with the literature

18   in intraoperative core temperature management?

19       A.   No more so than other clinical topics.

20       Q.   No --

21       A.   No more -- no more so to -- today than other

22   clinical topics.

23       Q.   Well do you focus on like maintaining

24   normothermia and the literature out there on it?

25       A.   Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

245

1      Q.   Okay.

2      A.   And it said nine trials, each of -- each of

3   which had an array of culture -- culture media.  And

4   again, my recollection is that in the nine trials,

5   none of the arrays of culture media grew any bacteria.

6           MR. ASSAAD:  Move to strike as

7   non-responsive to a non-existent question.

8      Q.   You next talk about the body heat emanating

9   from the surgical staff.  Do you know how many BTUs

10  per hour the Bair Hugger produces?

11     A.   No.

12     Q.   Do you know how many BTU -- BTUs per hour

13  a -- a person produces?

14     A.   No, I don't.

15     Q.   Okay.  Do you know --

16          I mean you're not an expert in heat

17  transfer; correct?

18     A.   Correct.

19     Q.   You're not an expert in fluid dynamics;

20  correct?

21     A.   Correct.

22     Q.   So you have no opinion with respect to how

23  the Bair Hugger blanket may affect the OR environment

24  by the heat it produces or the airflow it produces.

25     A.   Correct.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

246

1          The commentary here is questioning the

2    studies that claim to describe how the Bair Hugger

3    influences those factors.

4          Q.   Excuse me.  I didn't understand you.

5          A.   The commentary in this letter are meant to

6    address the shortcomings in the studies that purport

7    to address the disruption in laminar flow and

8    related -- related factors; that is, as we've

9    discussed previous -- previously, the -- the

10   experimental mod -- model either having no per --

11   personnel, mannequins, no instruments, no Bo -- no

12   Bovies, et cetera, so in looking at -- at those, my

13   conclusion was they -- for me, not being a particle or

14   airflow expert -- they still lacked face validity on

15   that basis.

16         Q.   Well hypothetically speaking, if by adding

17   individuals would make the effect of the Bair Hugger

18   worse, would that affect your opinions regarding those

19   studies?

20         A.   Regarding these studies.  But what I would

21   say is that the studies of particle counts and air --

22   airflow patt -- patterns, their relevance to the risk

23   of infection is un -- is -- is unproven, so that even

24   if the particle counts --

25         Q.   I'm not talking about infection, I'm talking

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

247

1  about particle counts and bubbles.

2      A.   Well --

3      Q.   Okay?  If --

4      A.   And I'm -- I'm going to -- I'm going to

5  say -- say that from my point -- point of view,

6  particle counts and bubbles are poor proxies or

7  surrogates.

8      Q.   And what's your basis?

9      A.   Because I have not seen any evidence

10  connecting them with the risk of infection.

11      Q.   Have you not looked at the Darouiche study?

12      A.   Show me the Darouiche study.

13      Q.   Have you looked at it?  "Yes" or "no."

14      A.   That doesn't sound familiar.

15      Q.   Okay.  Defense are very -- all aware of the

16  Darouiche study and the Stocks study.  Have they not

17  shown that to you?

18      A.   Stocks --

19          MS. LEWIS:  Objection to the form of the

20  question.

21      A.   Stocks sounds familiar.  Rouiche --

22  Rouiche -- Rouiche does not.

23      Q.   Do you know who Rabih -- do you know who

24  Rabih Darouiche is?

25      A.   No.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

248

1      Q.    So you're not aware of his study that --

2   that correlated bacterial load over the surgical site

3   with periprosthetic joint infections.

4      A.    No.

5      Q.    And in fact not --

6            He even went further and said the bacterial

7   load had an effect on periprosthetic joint infections

8   but not superficial wound infections.  Are you aware

9   of that study?

10           MS. LEWIS:  Objection to the form.

11     A.    Are you talking about the same study?

12     Q.    Yeah.

13     A.    Same study?  No, I'm still not aware of.

14     Q.    Would that affect your opinions if those

15  statements are true?

16     A.    The --

17           MS. LEWIS:  Objection to the form of the

18  question.

19     A.    Yeah.  Repeat the question.

20     Q.    Darouiche --

21           In the Darouiche study, he correlated

22  bacterial load with periprosthetic joint infections

23  and also showed there was no relation between

24  bacterial load over the surgical site and superficial

25  wound infection.  If -- if that study is accurate,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

249

1   would that change your opinion with respect to

2   bacterial load causing periprosthetic joint infection?

3           MS. LEWIS:  Object to the form.

4       A.   It -- it might, but I would not make any

5   conclusion about that without the opportunity to

6   review it in -- in detail --

7       Q.   Okay.

8       A.   -- and presuming that the details of the

9   study -- study were i -- i -- items with which I could

10  intelligently, based on my background and experience,

11  assess.

12      Q.   Let me ask you this, doctor:  Hypothetically

13  speaking, if the Bair Hugger increased particles over

14  the surgical site, and assuming that the increased

15  particles over the sur -- over the surgical site

16  indicated increased bacterial load over the surgical

17  site, and there was also a study that indicated

18  increased bacterial load over the surgical site

19  increases the risk of total hip and total arthroplasty

20  periprosthetic joint infections, would that change

21  your opinion with respect to whether or not the Bair

22  Hugger significantly increases the risk of

23  periprosthetic joint infections in total hip or total

24  knee arthroplasty --

25          MS. LEWIS:  Objection --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

250

1       Q.    -- if all the statements are true?

2             MS. LEWIS:  Objection to form.

3       A.    Perhaps, but not to the extent that a

4  clinical outcome study, Bair Hugger/no Bair -- Bair

5  Hugger, would -- would have.

6       Q.    Who do you think would fund a study with

7  respect to the clinical outcomes on total hip and

8  total knee arthroplasty periprosthetic joint

9  infections with the use of the Bair Hugger or the use

10 of a different warming device?

11      A.    I'm not able to speculate on who might fund

12 that.

13      Q.    Do you know how much that study would cost?

14      A.    I don't know.

15      Q.    Would you be surprised it would be millions

16 of dollars?

17      A.    Would I be -- would I be surprised?  No, I

18 wouldn't be surprised.

19      Q.    I mean just say assuming that the

20 periprosthetic joint infection rate for total hip and

21 total knee is two percent, do you know how many

22 patients you would need to conduct a study to show a

23 difference in an infection rate that's only two

24 percent?

25      A.    No, I don't know the number.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

251

1        Q.    Okay.  More than 10; right?

2        A.    Yeah.  Presumably, yes.

3        Q.    Probably more than a thousand.

4        A.    I -- I -- I don't know.

5        Q.    With respect to McGovern, you criticize

6   McGovern because of the change in infection prevention

7   practices during the study period; correct?

8        A.    Among other things, yes.

9        Q.    Well that's what you put here.  Oh,

10  motionless.  But with regard --

11            With respect to the clinical data, it's the

12  change in infection prevention practices; correct?

13       A.    And the anticoagulation practices.

14       Q.    Well that's not in here; is it?

15       A.    No, but it's true.

16       Q.    Well I'm looking at your report.  It's not

17  in your report; correct?

18       A.    Yes, that's true.

19       Q.    Okay.  So let's just talk about the

20  infection prevention practices.  Are you talking about

21  the prophylactic antibiotics?

22       A.    Yes.

23       Q.    Do you know whether or not the change in

24  the pro -- that the prophylactic antibiotics -- strike

25  that.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

252

1            Are you aware of any study that compares the

2    two anti -- different antibiotics that were used to

3    determine whether or not any one of them had a -- a

4    better or worse effect on periprosthetic joint

5    infections?

6        A.   I -- I -- I don't know.

7        Q.   Okay.  If there was a study that indicated

8    that the prophylactic antibiotics were -- they -- they

9    were not inferior to each other, would that affect

10   your opinion of whether or not the change in

11   antibiotics had an effect on the results?

12       A.   I -- I -- I think the results of this --

13   this study should control -- controlled for that.

14       Q.   Well why don't you answer my question.

15       A.   If there were effectively no change in the

16   anti -- antibiotic --

17       Q.   That wasn't my question, sir.  Why don't you

18   listen to my question.  We'll -- we could get out of

19   here really soon.  If there is --

20            If there was a study that indicated that the

21   two antibiotic -- the two different antibiotic

22   regimens used in the McGovern study were non-inferior

23   to each other, means there was no difference, would

24   that affect your opinion of whether or not the change

25   in the prophylactic antibiotics used had an effect on

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

253

1    the McGovern results?

2            MS. LEWIS:  Object to the form.

3        A.    I would be -- I would be less -- less

4    concerned --

5        Q.    Okay.

6        A.    -- but not unconcerned.

7        Q.    Okay.  You say that more than 5,000 public

8    and private institutions rely on ECRI.  Is that

9    correct?

10       A.    Yes.

11       Q.    What's your basis?

12       A.    ECRI.

13       Q.    So you rely on ECRI to tell you who relies

14   on ECRI?

15       A.    ECRI -- yeah.  I think that came from ECRI's

16   annual -- annual report.

17       Q.    Well there's a difference of public and

18   private institutions relying on ECRI or them -- or

19   people subscribing to the ECRI website.  Do you

20   understand the difference?

21       A.    Okay.  Okay.

22       Q.    I mean you subscribe to the Anesthesiology

23   Journal; correct?

24       A.    Yes.

25       Q.    You don't rely on every article that's

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

254

1  published in the Anesthesiology Journal; correct?

2      A.   But to a degree I rely on it; otherwise, why

3  would I subscribe to it?

4      Q.   Because there might be some good parts,

5  there might be some bad parts; correct?

6      A.   Correct.

7      Q.   I mean there's some articles that I assume

8  an independent doctor would read and be like I just

9  disagree with -- with the research or disagree with

10  the conclusion; correct?

11     A.   Yes.

12     Q.   Even though you subscribe to Anesthesiology;

13  correct?

14     A.   Yes.

15     Q.   So you really can't sit here and say that

16  more than 5,000 public and private institutions rely

17  on ECRI for evidence, reports and assessments of

18  healthcare technology, but what you can say is there's

19  probably 5,000 people that subscribe to it.  Fair?

20     A.   Yeah.  I'm not sure that it's people as much

21  as institutions.

22     Q.   Okay.  You don't know whether or not the

23  institutions are relying on the data that ECRI

24  provides; correct?

25     A.   I don't -- I don't know the extent to which

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

255

1   they do so.

2        Q.   That would be pure speculation; correct?

3        A.   Correct.

4        Q.   Okay.  Now you'll agree, with respect to the

5   heater-cooler devices, that the bacteria was

6   aerosolized on water vapor and traveled to the

7   patients; correct?

8        A.   That is -- that is what was reported.

9        Q.   Okay.  And you have no reason to disagree

10  with that; correct?

11       A.   I have no reason to disagree.

12       Q.   It wasn't by direct contamination but by

13  indirect contamination.

14       A.   I'm not sure what you mean by "direct

15  contamination" or "indirect contamination."

16       Q.   You don't know the difference?

17       A.   I don't know what you mean.

18       Q.   Okay.  When you say it's been aero --

19  aerosolized, it traveled through the air; correct?

20       A.   In -- in -- in liquid.

21       Q.   Okay.

22       A.   In water.

23       Q.   In water vapor.

24       A.   In water vapor.

25       Q.   Okay.  Do you know how small a water vapor

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

256

1    is?

2        A.    I don't know.

3        Q.    Do you know whether water vapor is

4    equivalent in travel -- in the way it travels in the

5    air to neutrally buoyant bubbles?

6        A.    I don't know.

7        Q.    Do you know whether or not it is similar to

8    the way it travels with squames?

9        A.    I don't know.

10       Q.    Okay.  But we do know that water vapor could

11   travel from where the heater-cooler is and -- and

12   blown by the fan of the heater-cooler to the surgical

13   site; correct?

14       A.    That is what the alert implied.

15       Q.    Okay.  And you're aware that the heater-

16   cooler unit is much further away from the sterile

17   field than the Bair Hugger is.

18       A.    I don't know that.

19       Q.    Okay.  You've never used a heater-cooler

20   unit?

21       A.    Well I've been many -- many years ago in a

22   cardiac opera -- operating room, but it depends where

23   the pump -- where the pump and the heater-cooler sit.

24       Q.    And you're not disputing that an implant can

25   be contaminated by airborne contamination; are you?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

257

1      A.    I think it is -- I think it is possible.   I

2  think contamination of sur -- of surgical wounds is

3  principally from the skin and subcutaneous flora of

4  the patient.

5      Q.    Except when the heater-cooler is involved,

6  then it can be contaminated by the heater-cooler.

7      A.    I --

8            Again, I think that's the implication of the

9  FDA alert.

10     Q.    I mean you're citing it.  Do you agree with

11 it or not?

12     A.    Yes.

13     Q.    Okay.

14     A.    Yeah.

15     Q.    So -- so a wound could be contaminated by

16 airborne contamination.

17     A.    Right.

18     Q.    Okay.

19     A.    A -- a wound -- a wound can.

20     Q.    Okay.  I mean that's why you have

21 unidirectional flow or laminar flow and filters and

22 HVAC systems, to provide the cleanest air possible at

23 the OR; correct?

24     A.    Yes.

25     Q.    I mean that's why you have positive pressure

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

258

1  in the OR; correct?

2      A.   Yes.  Yes.

3      Q.   To keep contaminants out.

4      A.   To keep contaminants out.  What the relative

5  risk of those contaminants are in surgical in --

6  infections is less clear.  As I said, the -- what I

7  have been taught is that it is about the skin -- skin

8  and subcutaneous flora as the source of surgical

9  contamination.  And while it may be possible that the

10 air is a contributor, I am unable to describe its

11 relative contribution and therefore risk.

12     Q.   But you're basing this on what you were

13 taught 25 years ago and not on any scientific journal

14 or article at -- at this point in time.

15          MS. LEWIS:  Objection, form.

16     A.   I'm base -- basing it on what is -- has been

17 taught continually since -- since my training.

18     Q.   But you're not an infectious disease expert;

19 correct?

20     A.   I'm not an --

21     Q.   Okay.

22     A.   -- infectious disease expert.

23     Q.   And you've never studied or researched the

24 causes of periprosthetic joint infections; correct?

25     A.   Correct.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

273

1      MS. LEWIS:  Okay.  Gabe, is this a good time

2  for a break or --

3      MR. ASSAAD:  Couple minutes on the warning.

4  BY MR. ASSAAD:

5      Q.   The only warning that you're referring to is

6  the hosing warning in your report; correct?

7          Page six.

8      A.   Well I can -- I can -- I can read it to you,

9  but it does comment on the hosing -- hosing warning

10  and says -- it says that with respect to risk of

11  contamination or infection, that I don't believe a

12  warning -- a warning was warranted.

13     Q.   Okay.  But you're not an infectious disease

14  expert; correct?

15     A.   I am not an infectious disease expert.

16     Q.   And you don't know what concerns orthopedic

17  surgeons have with particles; do you?

18     A.   I can't speak for orthopedic --

19     Q.   Okay.

20     A.   -- orthopedic surgeons.

21     Q.   And you've never ever once in your life

22  created any type of warning for a medical device;

23  correct?

24     A.   Correct.

25     Q.   And you offer that opinion without having

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

274

1  seen the warnings provided on the original device, the

2  200 series, the 500 model, or the 700 series; correct?

3      A.   I'm sorry?

4      Q.   You haven't seen the warnings on any of the

5  devices besides the 505.

6      A.   That's probably true.

7      Q.   Okay.  You haven't looked at the operating

8  room man -- operating manual; correct?

9      A.   Not since -- not since they first originally

10 put them into use.

11     Q.   You haven't looked at any of the warnings of

12 any other forced-air warming devices; have you?

13     A.   I haven't seen in person any other forced-

14 air warming devices.

15     Q.   You haven't looked at the 510(k); have you?

16     A.   No.

17          MR. ASSAAD:  Okay.  Let's take a break.

18          THE REPORTER:  Off the record, please.

19          (Recess taken.)

20 BY MR. ASSAAD:

21     Q.   Doctor, are you aware that the 1996 -- 1996

22 Kurz study was funded by Augustine?

23     A.   I'm not aware of that.

24     Q.   Would that affect your interpretation of --

25 or -- or your opinion of the 1996 article?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

278

1     A.   I'm unable to comm -- comment on Dr. Reed's

2   competence as a researcher.

3     Q.   So besides doing a literature review in your

4   expert report, Exhibit No. 3, what methodology did you

5   use to come up with your conclusions on pages six and

6   seven?

7     A.   I looked at the literature, including the

8   systematic rev -- reviews, and my own clinical

9   experience.

10    Q.   Okay.  I said besides the literature what

11  did you do.  Just your own clinical experience?

12    A.   Yes.  I did not undertake any primary

13  research.

14    Q.   So what in your clinical experience that you

15  did to indicate that maintaining normothermia improves

16  outcomes in surgical patients?

17    A.   That I don't see pa -- patients often --

18  often shiver, that I don't see pa -- patients who are

19  warm -- warm become dangerously hypertensive, and that

20  I believe that the rate of surgical infect --

21  infections is at least at bench -- benchmark or

22  better.

23    Q.   Well you don't follow patients after they

24  leave the PACU on a regular basis; do you?

25    A.   No.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

279

1      Q.   Okay.  And if they did get a surgical-site

2  infection, such as a superficial wound infection that

3  didn't -- that didn't require surgery, that you

4  wouldn't know about it; would you?

5      A.   I would -- I -- I would not perhaps know

6  about an individual patient, but in aggregate the

7  performance of our surgical service I would be aware

8  of.

9      Q.   By the data.

10     A.   By the -- by the data or by our tracking.

11     Q.   But what have you done, I mean clinically,

12  to show that maintaining normothermia improves the

13  outcomes in surgical patients?  What tests have you

14  done?  What data have you looked at?

15     A.   I've looked -- looked at -- I -- I've

16  looked -- looked at my -- my own patients and I've

17  looked at the aggregate da -- data from our

18  institution against various -- against various

19  benchmarks.

20     Q.   That could have been caused --

21          A reduction in infection rates could have

22  been caused by skin prep; right?

23     A.   It could be.  All -- all of these things

24  have many -- many cause -- many causes.

25     Q.   It could have been caused by prophylactic

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

280

1    antibiotics' timing; correct?

2        A.    It could -- it could have.

3        Q.    So what have you done in your clinical

4    practice to show that maintaining normothermia

5    improves the outcome in surgical patients?

6              MS. LEWIS:  Objection, asked and answered.

7        A.    As I said, the -- the --

8              In aggregate, I can look at the rate of

9    surgical infections in my institution being at -- at

10   benchmark or bett -- or better, and I look at the --

11   at the literature and in particular the systematic

12   reviews.

13       Q.    Take the literature out of it.

14       A.    Well the literature is --

15       Q.    Take the lit --

16             I'm saying in your clinical practice, what

17   have you done to say, "Aha, maintaining normothermia

18   reduces the incidence of surgical-site infection?"

19       A.    I would say maintaining normother --

20   normothermia is one of a number of practices that lead

21   to that, and we adhere closely enough to those

22   practices to produce good results.

23       Q.    If you have prophylactic antibiotics, skin

24   prep, HVAC system, surgical procedure and technique,

25   okay, and maintaining normothermia, and you have an

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

281

1 infection rate that meets benchmark or a little bit

2 better, how did you determine that this one,

3 maintaining normothermia, had an effect on surgical

4 patients -- outcomes of surgical patients and the

5 other four --

6     A.   I didn't say that the other four didn't.

7     Q.   Okay.  So it may -- it may or may not have

8 an effect.  You don't know; do you?

9     A.   So on the -- on -- on the basis of my

10 person -- of my personal exper -- experience, I have

11 not done a study to isolate temperature management

12 from other techniques to optimize patient outcomes.

13     Q.   So you're solely relying on the literature

14 to support --

15     A.   I am principally relying on the -- on the

16 literature.

17     Q.   Solely relying on the literature.

18          MS. LEWIS:  Objection, misstates the

19 testimony.

20     A.   No, I -- I disa -- I disagree.  I look at --

21          If -- if our performance on infections or

22 other important complications, cardiovascular

23 mortal -- morbidity and -- and so forth, were

24 outliers, then I would be looking at are we

25 maintaining normothermia, are we giving antibiotics at

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

282

1   the -- and -- and -- and take it apart.  So I fully

2   recognize that these things are all multifactorial.

3        Q.   If I ask you to give me evidence outside the

4   literature in your clinical practice that indicates

5   maintaining normothermia im --

6        A.   In isolation?

7        Q.   -- improves outcomes in surgical patients in

8   your clinical practice, --

9        A.   No.

10       Q.   -- what evidence do you have?

11       A.   If you're talking about that as the sole

12   factor?

13       Q.   Yes.

14       A.   No.

15       Q.   Okay.  You have none; correct?

16       A.   Correct.

17       Q.   Okay.  Going to page four, halfway through

18   you write, "The opinions of plaintiffs' experts Drs.

19   Stonnington and Jarvis largely rely on this entirely

20   unproven relationship.  In addition, these experts

21   also attribute the alleged risk of the Bair Hugger

22   device to the bacterial content of the internal and

23   external surfaces of the device and the output of the

24   Bair Hugger hose."

25            Did I read that correctly?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

288

1      A.   My credentials have no -- say nothing -- say

2  nothing about the bacterial load.  I'm not sure how my

3  credentials could say anything about the bacterial

4  load or --

5      Q.   I'm just asking.  So you agree with me that

6  there's nothing --

7      A.   My creden -- my credentials say something --

8      Q.   Your experience.  Experience, education,

9  training.

10      A.   Okay.

11      Q.   What about your experience, education,

12  training, about you, doctor, gives you the expertise

13  to determine whether or not the Bair Hugger has any

14  effect on the airflow that could increase the

15  bacterial load over the surgical site?

16           MS. LEWIS:  Asked and answered.

17      A.   I have said multiple times that I am not an

18  expert in bacterial load over the --  over the

19  surgical site.

20      Q.   So I'm just trying to figure out --

21           Forget about the literature.  Without the

22  literature, you actually have no methodology to offer

23  the opinion that the Bair Hugger does not increase the

24  bacterial load over the surgical site and is safe.

25           MS. LEWIS:  Objection, form.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

289

1      A.    Without the literature.

2      Q.    Without the literature.

3      A.    That's -- that's -- that's corr -- correct.

4  I've already said that.

5            MR. ASSAAD:  Okay.  That's all I have.

6  Thank you.

7            MS. LEWIS:  We'll switch place -- places.

8            THE REPORTER:  Off the record, please.

9            (Discussion off the record.)

10                   REDIRECT EXAMINATION

11  BY MS. LEWIS:

12      Q.    Dr. Hannenberg, you were asked questions

13  about a study called Darouiche and you mentioned that

14  you had not seen that study and that study wasn't

15  presented for you to review today; correct?

16      A.    That is correct.

17      Q.    Did Mr. Assaad mention to you that -- in

18  that study, whether the Bair Hugger was even studied

19  in that study?

20      A.    I think he said that the Bair Hugger

21  increased bacterial load and infections.

22      Q.    But did he tell you --

23            MR. ASSAAD:  Objection, misstates.

24      Q.    But did he tell you that the Bair Hugger was

25  even tested in that study?  I mean do you even know if

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

297

1        A.    I -- I read it some time -- some time ago

2    and I need to refresh my memory.

3        Q.    You prepared for today's deposition;

4    correct?

5        A.    Yes.

6        Q.    You spent about 15 hours in preparation of

7    today's deposition.

8        A.    Well if you say -- if you say.

9        Q.    Well that's what -- that's what you said.

10   You approximated 15 hours since June 15th and today in

11   preparation of today's deposition.

12       A.    Okay.

13       Q.    How did you prepare?  Did you look at the

14   studies in preparation?

15       A.    I looked at -- I looked at some of the

16   studies.  I did not look -- apparently look at all of

17   the studies.

18       Q.    Okay.  Did you look at the underlying CFD

19   analysis Memarzadeh did that -- in that letter to the

20   editor?

21       A.    In most of these instances, as I -- as I've

22   said, my expertise in statistical analysis and

23   methodologic design puts me in a position where I

24   re -- rely on methodol -- methodologists and -- and

25   editorial boards.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

298

1    Q.   So you're relying on Memarzadeh on a CFD

2    study that you don't even understand; isn't that

3    correct?

4    A.   I am relying on the conclu -- the conclusion

5    that he and -- he drew.

6    Q.   But you're not an engineer.  You don't

7    understand the methodology he used, do you, to come to

8    that conclusion?  Do you?

9    A.   Well if he is rep -- repre --

10   Q.   "Yes" or "no."  Do you understand the CFD

11   analysis?

12        MS. LEWIS:  Stop interrupting him, Gabe.

13   Q.   "Yes" or "no."

14   A.   Do I --

15        No.  That is not my expertise, --

16   Q.   Do you know what the Navier-Stokes equations

17   are?

18   A.   -- that's correct.

19   Q.   Do you know what the Navier-Stokes equations

20   are?

21   A.   No, I don't.

22   Q.   Okay.  So you just take the conclusions of

23   Memarzadeh without even understanding how he got to

24   his conclusions; do you?  Isn't that correct?

25   A.   Correct.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

303

1    Q.   No.  They're just saying there's not enough

2  evidence at this point in time.

3    A.   No, they did --

4    Q.   Okay.

5    A.   -- they did not say that.

6    Q.   Okay.  International Concensus says further

7  research is warranted.  Are you aware of that?

8    A.   Yes.

9    Q.   Okay.  ECRI says they're going to monitor

10  it; correct?

11    A.   Yes.

12    Q.   Okay.

13         (Discussion off the stenographic record.)

14    Q.   Do you even acknowledge there's a

15  theoretical risk that the Bair Hugger can cause a

16  surgical-site infection?

17         MS. LEWIS:  Objection to form.

18    A.   I know no basis for that theory.

19    Q.   So even though the International Concensus

20  has a basis for that statement, you have no basis.

21    A.   I --

22         Correct, I have no -- I have no basis.

23         MR. ASSAAD:  That's all I have.

24         THE REPORTER:  Anything further?

25         MS. LEWIS:  No.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

305

1              C E R T I F I C A T E

2              I, Richard G. Stirewalt, hereby certify that

3    I am qualified as a verbatim shorthand reporter, that

4    I took in stenographic shorthand the deposition of

5    ALEXANDER A. HANNENBERG at the time and place

6    aforesaid, and that the foregoing transcript is a true

7    and correct, full and complete transcription of said

8    shorthand notes, to the best of my ability.

9              Dated at Deerwood, Minnesota, this 14th day

10   of August, 2017.

11

12

13

14

15

16

17                   RICHARD G. STIREWALT

18                   Registered Professional Reporter

19                   Notary Public

20

21

22

23

24

25