# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

In re Bair Hugger Forced Air Warming
Products Liability Litigation

MDL No.  15-2666 (JNE/FLN)

This Document Relates to All Actions

**PLAINTIFFS' MOTION TO
EXCLUDE DEFENDANTS' EXPERT
JIM HO**

---

Plaintiffs move this Court to exclude Defendants' expert Jim Ho. Mr. Ho specializes in the detection of airborne biological matter, and his career has been "spent as a researcher for the Canada's Department of National Defense."[1] His career since 1990 has been "primarily in the development of biological detection systems."[2] Mr. Ho's job has been "to develop the hardware and the software technology for military applications" in the field of biological detection.[3] In terms of his role in the case, Mr. Ho stated, "I'm simply here to provide you with insight into bio-aerosol technologies."[4]

However, Mr. Ho's opinions are variously unreliable, unhelpful, and unqualified. Mr. Ho's first opinion is that airborne particles do not correlate with airborne bioburden, but this opinion is Mr. Ho's *ipse dixit*, and it is contradicted by the body of peer-reviewed studies which Mr. Ho never even considered. Mr. Ho's second opinion concerns airborne particle size and the adequacy of the Bair Hugger filter, but the basis for his opinion is

---

[1] Exhibit 1, Ho Deposition, at 9:23.
[2] *Id.* at 10:21.
[3] *Id.* at 12:8.
[4] *Id.* at 56:18-20.

contradicted by internal 3M filter efficiency testing which with was withheld from Mr. Ho. Moreover, Mr. Ho admitted that he cannot give any opinion about the filter relative to patient safety, and that he can only conclude that the filter is adequate for the mechanical function of the device. The remainder of Mr. Ho's opinions relate to his review of studies relating to Bair Hugger safety generally, covering subject matters in which Mr. Ho admits he is not qualified to opine. Finally, Mr. Ho's testimony reveals that he has impermissibly strayed into the role of partisan advocate rather than objective expert. For these reasons, Plaintiffs move the Court to exclude Mr. Ho.

## LEGAL STANDARD

Rule 702 permits a qualified expert to provide opinions if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *See* Fed. R. Evid. 702. "A trial judge must make a preliminary assessment of whether the proffered expert's methodology is both scientifically valid and applicable to the case." *Ahlberg v. Chrysler Corp.*, 481 F.3d 630, 635 (8th Cir. 2007). "To be deemed reliable, the methodology underlying an expert's conclusions must be scientifically valid." *Junk v. Terminix Intern. Co.*, 628 F.3d 439, 448 (8th Cir. 2010).

In discussing the character and behavior of airborne particles, Mr. Ho abjectly failed to review the body of relevant literature relating to his opinions, and he provided unsupportable conclusions based on assumptions at odds with the record in this case. Moreover, Mr. Ho admits he is unqualified or unable to give testimony on numerous areas implicated by his report. "The proponent of the expert testimony has the burden of

establishing by a preponderance of the evidence that the expert is qualified, that his methodology is scientifically valid, and that the reasoning or methodology in question is applied properly to the facts in issue." *Marmo v. Tyson Fresh Meats, Inc*., 457 F.3d 748, 758 (8th Cir. 2006). For the reasons set forth below, Mr. Ho should be excluded under these standards.

## ARGUMENT

### I.    Mr. Ho's Poor Methodology Creates an Analytical Gap in his Opinion that Particles do not Correlate with Bioburden.

Mr. Ho opines that "[p]article counts are not a proxy for microbial bioburden."[5] In other words, Mr. Ho does not "believe that particle counting can be predictive of microbiological contamination of air in an operating room.[6] However, Mr. Ho failed review nearly all of the relevant literature on this subject, and his *ipse dixit* opinion is flatly contradicted by the scientific consensus. In recent years, a significant number of independent peer-reviewed studies have been undertaken to study the correlation between particles and airborne pathogens, and their conclusions directly contradict Mr. Ho's opinion. When he was asked to review these studies during his deposition, he quickly dismissed all of the findings, and he raised strange and unfounded speculations regarding the integrity of the various results and the credibility of independent scientists.

During his deposition, Mr. Ho first discussed a paper by a team led by Dr. Gregory Stocks entitled "Predicting bacterial populations based on airborne particulates: A study performed in nonlaminar flow operating rooms during joint arthroplasty surgery,"

---

[5] Exhibit 2, Ho Report, p. 23.
[6] Exhibit 1, Ho Deposition, at 170:18-21.

published in 2010 in the *American Journal of Infection Control*.[7] Like all of the studies discussed below, there were no conflicts of interest, and the study has no connection to the events of this case. Dr. Stocks and his colleagues conducted laser particle counting and bacterial collection during actual orthopedic procedures. They found that the "relationship between the density of airborne particulate and the presence of viable microorganisms supports the notion that an airborne particle counter may serve as a real-time proxy for airborne bacterial contamination during surgery."[8] However, Mr. Ho concluded that the study was invalid:

> Q.   So if somebody was to say Stocks and his colleagues were able to demonstrate that particles are a reasonable surrogate for bioburden, you would say no, that's a wrong opinion?
>
> A.   Correct.[9]

Mr. Ho claimed it was obvious the findings were wrong, and that "if you have any training in measurements, particle analysis…you would look at that *Figure 1*, right away would say that this is scattered data all over the map."[10] Mr. Ho claimed that "[a]nybody who has done particle counting would immediately recognize" that the Stocks findings were false,[11] and they would know that it was "very bad" data.[12] However, 3M's document production shows that when the Stocks study was published, the company asked its retained consultant on these issues, Russel Olmstead of the National Institute of

---

[7] Exhibit 3, Predicting bacterial populations based on airborne particulates: A study performed in nonlaminar flow operating rooms during joint arthroplasty surgery. 3MBH00134090-5.
[8] *Id.* at 3MBH00134094.
[9] Exhibit 1, Ho Deposition, at 173:9-14.
[10] *Id.* at 174:17-21.
[11] *Id.* at 186:22-25.
[12] *Id.* at 175:4-8.

Health, to examine the study and comment on its findings. Mr. Olmstead conveyed his high regard of the authors' methods and findings:

> [F]airly remarkable paper given an ability to be present during actual procedures … It is difficult to get IRB approval for such investigations. I don't know the authors but the methods employed are very good and I like the use of electronic particle counts AND bacterial air sampling … For the one investigation I did I used electronic particle counts, and it appears this group was able to demonstrate particle counts serve as a reasonable surrogate for bioburden of air in an OR.[13]

During his deposition, Mr. Ho was also shown a study conducted by a team led by Dr. Rabih Darouiche entitled "Association of Airborne Microorganisms in the Operating Room With Implant Infections: A Randomized Controlled Trial," published in *Infection Control & Hospital Epidemiology* in 2017.[14] Mr. Ho did not review this study in coming to his opinions that particles are not proxies for bioburden.[15] The authors performed particle counting and bacterial collection during implant surgeries. The authors found that "CFU density was positively related to total particulate density...in the control group, indicating that airborne [particulate] counts may be used as a proxy for ambient CFU density."[16] Upon review, Mr. Ho disagreed that the findings of this study are valid.[17] Mr. Ho was dismissive of the study, arguing that Dr. Darouiche must have been biased and manipulated the study to fit some unspecified goal:

> Q.    Why are they wrong?

---

[13] Exhibit 4, 3M Internal Email, 3MBH00050770.
[14] Exhibit 5, Association of Airborne Microorganisms in the Operating Room With Implant Infections: A Randomized Controlled Trial.
[15] Exhibit 1, Ho Deposition, at 201:5-8.
[16] *Id.* at 206:24 to 207:4.
[17] *Id.* at 208:13-15.

> A.   Authors always wish to say things that they set out to say.  You know that.
>
> Q.   Hold on. Are you -- are you claiming that Dr. Darouiche set out to prove a certain proposition in this report?
>
> A.   Well, maybe --
>
> Q.   What evidence do you have of that, sir?
>
> A.   I'll let you in on a dirty little secret in that the purpose of somebody going to do a bunch of experiments is to hopefully get data to back up his expectation in the first place.[18]

However, Mr. Ho admitted that he had no support for his accusations of bias against Dr. Darouiche and his team, but nonetheless assumed that the authors must have rigged the study with a conclusion in mind:

> Q.   You don't know Dr. Darouiche?
>
> A.   No.
>
> Q.   You don't know what his motivations were in doing this study?
>
> A.   No.
>
> …
>
> Q.   Where does it say that he wanted to prove that this was true?
>
> A.   Well, if that's not what he wants to show, then why bother to do any work?

---

[18] *Id.* at 212:6-17.

Q.    So we don't do science unless we have an agenda? Is that what you're saying, sir?

A.    Well, look at the title. The whole title says that's what he intends to do.

Q.    You think that the title --

A.    Yeah.

Q.    -- which represents the findings of this study --

A.    Yeah.

Q.    -- represents what his agenda was in doing this study?

A.    Exactly.[19]

During Mr. Ho's deposition, he was also shown a study by *Raval et al* entitled "Real-time monitoring of non-viable airborne particles correlates with airborne colonies and represents an acceptable surrogate for daily assessment of cell-processing cleanroom performance," published in *Cytotherapy* in 2012.[20] The authors performed laser particle measurements and bacterial sampling.   The authors found that "viable and nonviable particles were well correlated,"[21] and that "reduced airborne particulates appear to correlate with a decreased risk of nosocomial infections in high-risk patient populations."[22] Mr. Ho had not reviewed the study prior to his deposition,[23] but again he quickly concluded that the study must be wrong.[24]

---

[19] *Id.* at 214:1 to 215:7.
[20] Exhibit 6, Real-time monitoring of non-viable airborne particles correlates with airborne colonies and represents an acceptable surrogate for daily assessment of cell-processing cleanroom performance.
[21] Exhibit 1, Ho Deposition, at 189:1-2.
[22] *Id.* at 196:22 to 197:1
[23] *Id.* at 188:20-22.
[24] *Id.* at 197:19-22.

During his deposition, Mr. Ho was also dismissive when shown a joint paper between scientists at Iowa State University and the China Agricultural University entitled "Concentrations and Size Distributions of Airborne Particulate Matter and Bacteria in an Experimental Aviary Laying-Hen Chamber," published in the *Journal of the American Society of Agricultural and Biological Engineers* in 2013. Mr. Ho did not review this study when preparing his report. The authors performed airborne bacterial sampling and particle counting of chicken housing in the Livestock Lab at the University of Iowa. They found that:

> The airborne bacteria concentration and PM mass concentration followed linear relationships for all the [size] ranges. No significant differences in such relationships were detected among the subranges … The more PM suspends in the air, the more bacteria exists in the air.[25]

Yet another study, one actually cited by Mr. Ho,[26] reached the same conclusion. This study conducted by Seal and Clark, entitled "Electronic Particle Counting for Evaluating the Quality of Air in Operating-Theaters - a Potential Basis for Standards," was published in the Journal of Applied Bacteriology. Mr. Ho disagreed with the findings of this study by Seal and Clark, just as he disagreed with Dr. Stock's team, Dr. Raval's team, Dr. Darouiche's team, the joint University of Iowa and China Agricultural University team, and 3M's own consultant Russel Olmstead.

Mr. Ho has almost no support for his contrary opinion. Mr. Ho claims he has performed experiments proving these studies wrong, but he said that "the data was so

---

[25] Exhibit 7, Concentrations and Size Distributions of Airborne Particulate Matter and Bacteria in an Experimental Aviary Laying-Hen Chamber.
[26] Exhibit 2, Ho Report, p. 34.

ridiculous that it's not worth publishing."[27] Mr. Ho's report cites only one piece of literature addressing this issue, in which Landrin *et al* conducted an experiment in 2005 with "impaction agar plates" and did not find a definitive correlation.[28] Those authors merely "suggested there was no reason to replace microbiological sampling with particle counting for routine evaluation of microbiological contamination."[29] In fact, the existence of this outlying study, which failed to align with earlier findings, was an impetus for the numerous studies conducted during the last decade discussed above. For example, Stocks *et al* discussed the unusual results found in Landrin study. In addition to its unusual findings, Stocks et. al. noted that "[t]he study of Landrin *et al* was conducted in an empty operating room, which does not represent the movements of the equipment, operating room staff, and patient typically occurring during orthopedic surgery."[30] Since the time of the Stocks study, several additional studies, using more modern methods and equipment, have also confirmed that Landrin *et al* was an aberrant study.

Mr. Ho has no reliable basis to conclude with reasonable scientific probability that particles cannot act as a representational surrogate for bioburden, especially given that he did not account for the weight of contrary evidence. Under the application of a reasonable methodology, Mr. Ho would have been aware of these numerous studies and would have explained why he could reliably ignore their consensus in coming to his opinions. While

---

[27] Exhibit 1, Ho Deposition, at 222:3-4.
[28] Exhibit 2, Ho Report, p. 12.
[29] *Id.*
[30] Exhibit 3, Predicting bacterial populations based on airborne particulates: A study performed in nonlaminar flow operating rooms during joint arthroplasty surgery. 3MBH00134090-95.

an expert need not review every applicable study, he cannot simply ignore the great weight of published authority on the subject matter.

The goal of *Daubert* is to require that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). In this case, Mr. Ho failed to review a relevant body of scientific findings relating to his opinion. Moreover, his use of a single tepid and dubious study against a consensus of data to the contrary creates too large of an analytical gap between his support and his ultimate opinion. "With respect to the reliability, a difference of opinion regarding an expert's conclusions is usually a topic for cross-examination and competing testimony, not a reason to exclude testimony. However, there are limits to this principle." *Huggins v. Stryker Corp.*, 932 F.Supp.2d 972, 993–94 (D.Minn. 2013). Mr. Ho's testimony regarding this issue crossed that line when he abjectly failed to consider and account for the current state of scientific study on this subject.

## II. Mr. Ho's Opinions Regarding the Bair Hugger Filter are Contradicted by Confidential Testing, and Mr. Ho Admits an Inability to Discuss the Filter's Safety.

Mr. Ho opines in his report that "MERV 14 filtration is effective at filtering bacterial pathogens,"[31] and he "believe[s] that a MERV 14 filter is adequate inside the Bair Hugger."[32] As a basis for his opinion, Mr. Ho states that the MERV 14 specification is adequate because it provides for the "removal of all bacterial particles sized within .3

---

[31] Exhibit 2, Report of Dr. Ho, p. 25.
[32] Exhibit 1, Ho Deposition, at 49:8-10.

to 1 micron."[33] However, during his deposition, Mr. Ho was shown confidential testing conducted by 3M to provide an "assessment of the filter efficiency on the Bair Hugger system."[34] This testing revealed that the Bair Hugger's filter was not actually capable of removing all bacterial particles up to 1 micron, as Mr. Ho relied upon:

Q.    Remember when you told me that a MERV 14 filter by specification will remove all particles sized .3 to 1 micron?  Do you remember telling me that?

A.    Right.

Q.    Now, this Bair Hugger filter test that you have in front of you, that does not meet that standard, does it?

A.    It does appear to be slightly different.

Q.    In other words, from this chart we can see -- let's go down all four lots that were tested.  In the first lot it only removed 83 percent of those particles; correct?

A.    Yeah.

Q.    In the second test it only removed 82 percent; correct?

A.    Yeah.

Q.    In the next test it only removed 75 percent; correct?

A.    Yeah.

Q.    And in the next test it only removed 78 percent; correct?

A.    Correct.

Q.    So it does not meet the standard in which you expressed in your report, correct?

---

[33] *Id.* at 57:22-23; *see also* Exhibit 2, Report of Dr. Ho, at p. 25.
[34] *Id.* at 63:2-9.

A.    Right.[35]

Mr. Ho also acknowledged that 3% of staph aureus organisms will pass through the Bair Hugger filter.[36] In the wake of this discussion, Mr. Ho admitted that he could not conclude that the Bair Hugger filter was adequate from a patient safety perspective, but only that it was adequate for the mechanical function of the device:

> Q.    When you say in your report, your words, a MERV 14 filter is adequate in this Bair Hugger --
>
> A.    Yeah.
>
> Q.    -- do you mean from a patient safety point of view?
>
> A.    A patient safety could be interpreted in a variety of directions. So in this case you are -- you're really trying to equate filter X, safety, yes; filter Y, safety no, and I can't answer that question.
>
> Q.    Okay. So you cannot give the opinion that the Bair Hugger filter is adequate from a patient safety perspective?
>
> A.    I -- I can say that the filter selected is adequate for the performance of the instrument. And I want to take safety out of it because -- because safety is a whole different issue.[37]
>
> …
>
> Q.    In terms of is that filter sufficient to provide reasonable assurance that a patient will not suffer peri-prosthetic joint infection, that's probably not something you can talk about today?

---

[35] *Id.* at 66:18 to 67:17.
[36] *Id.* at 69:10 to 69:13.
[37] *Id.* at 72:16 to 73:8.

A.      No.[38]

This Court should exclude Mr. Ho's testimony on this topic because his opinions about the filter's specifications are contradicted by 3M's internal testing, and because Mr. Ho is unqualified to give an opinion about the filter's adequacy relative to the patient safety or the risk alleged by plaintiff, making his opinions unhelpful to the jury. "The expert's scientific, technical, or specialized knowledge must also assist the trier of fact to understand the evidence or determine a fact in issue." *American Home Assur. Co. v. Greater Omaha Packing Co., Inc*., 819 F.3d 417, 425 (8th Cir. 2016).

## III.   Dr. Ho is Unqualified to Give Opinions on Studies Regarding Bair Hugger Safety Generally.

This Court should also exclude Mr. Ho from testifying outside his designated expertise – the study and measurement of biological aerosols. Although Mr. Ho's report contains sections discussing and criticizing a wide variety of literature regarding the Bair Hugger, Mr. Ho lacks the necessary qualifications or support to opine on this literature or provide an endorsement of the Bair Hugger's safety, as he readily admitted in deposition.

First, Mr. Ho has never reviewed Plaintiffs' complaint.[39] His opinions are not based on any understanding of the theory of liability, and he lacks knowledge of the basic allegations and medical disputes of the case:

Q.      Do you have an understanding of how the plaintiffs believe the Bair Hugger caused their infections?

A.      I don't -- I don't think so.[40]

---

[38] *Id.* at 74:25 to 75:5.
[39] *Id.* at 26:25 to 27:3.
[40] *Id.* at 27:4-7.

...

> Q.   Can you describe to me what a peri-prosthetic joint infection is?
>
> A.   No.[41]

Mr. Ho did not know anything about the Bair Hugger before accepting work in this case,[42] and he has never seen or touched the device up to present.[43] Mr. Ho is not a medical doctor, nor is he an engineer, biomedical or otherwise. He testified that he is not an expert in evaluating clinical outcomes,[44] orthopedic surgery,[45] anesthesiology,[46] or operating rooms.[47] Mr. Ho also testified that he did not "have any expertise on the levels of bioburden within an operating room."[48] Counsel further stipulated that Mr. Ho will not be offered to give opinions about disruption of operating room ventilation.[49] As such, this Court should exclude Mr. Ho from these subjects as well. Mr. Ho is not qualified to testify beyond his field of bio-aerosol detection.

## IV.   Dr. Ho's Misunderstands his Role as an Expert and Instead Acts as a Biased Advocate.

Instead of acting as objective source of information, Mr. Ho's deposition was characterized by naked advocacy for his client, a fact Mr. Ho freely acknowledged. Mr. Ho admitted that he believed his role was to be critical of findings which were unfavorable to 3M, while refraining from criticizing findings that 3M found helpful. For

---

[41] *Id.* at 23:3-5.
[42] *Id.* at 23:11-15.
[43] *Id.* at 24:1.
[44] *Id.* at 17:11.
[45] *Id.* at 22:3.
[46] *Id.* at 22:23.
[47] *Id.* at 21:8.
[48] *Id.* at 21:11.
[49] *Id.* at 163:12.

example, Dr. Ho's report relies on a study by Huang *et al* concerning bacterial contamination. Mr. Ho was questioned about the fact that this study was not controlled:

> Q.      You knew that from reading Dr. Yadin David's report; correct?
>
> A.      Yeah.
>
> Q.      That Huang study was not controlled?
>
> A.      Right.
>
> Q.      All right. Now let me ask you something about controlled experiments. The Huang study is still useful to you; right?  You still find it to be a useful study?
>
> A.      Yeah, I would say that.
>
> Q.      Yeah. You cited it as support for some of your opinions you're giving; correct?
>
> A.      Right.
>
> Q.      Now, what I want to know is…does the fact that he didn't do a controlled study, does that mean that he's not familiar with microbiological concepts?
>
> A.      I can't state that. I can't say that.
>
> Q.      Okay. So just because somebody doesn't use a control, that doesn't necessarily mean that they're not familiar with how to do a proper microbiological study? Is that your testimony?
>
> A.      That's fair.[50]

However, Mr. Ho's report devotes a section to criticizing a study performed by Albrecht *et al* regarding bacterial contamination. Mr. Ho's report states, "it would appear

---

[50] *Id.* at 250:13 to 251:14.

the authors were not familiar with microbiological concepts as the experimental design had no control." Mr. Ho ultimately admitted to a bias towards his client when reviewing data, and that he believed that given his role, he should not be criticizing studies which may be favorable to 3M:

> Q.    Do you remember when we talked about the Huang study and it not having a control?
>
> A.    You -- you mentioned that, yes.
>
> Q.    Yes.  And you told me that the fact that it didn't have a control doesn't mean that they weren't unfamiliar with microbiological concepts. Do you remember telling me that?
>
> A.    I might have said that.
>
> Q.    Yeah.   And you're saying the exact opposite here about Mr. Albrecht, aren't you? You're saying the fact that he didn't have a control means that he's unfamiliar with biological concepts. Correct?
>
> A.    Yes.
>
> Q.    So when it comes to literature that hurts 3M's case, you make what's essentially a criticism of this author. You attack his qualifications and his credibility saying he's not familiar with microbiological concepts because he had no control. But when you had a study that was favorable to the client who has hired you, you didn't mention that it wasn't controlled, nor did you criticize those authors, did you?
>
> A.    No.
>
> Q.    And you knew when you wrote your report that Huang was not controlled?
>
> A.    No.

> Q.    You did know that; correct?
>
> A.    Well, it might have -- I might have noted that, but it wasn't something that I jumped on.
>
> Q.    Right. Because you're only going to insult an author if he's critical of 3M, not if he's in favor of 3M; right?
>
> A.    Right.
>
> Q.    Yeah. You're not going to criticize authors that are favorable of 3M; correct?
>
> A.    Right.[51]

"An expert does not advocate during litigation but acts as a source of information and opinion." *Deadwood Canyon Ranch, LLP v. Fidelity Exploration & Production Company*, 2013 WL 11971254, at *3 (D.N.D., 2013). Mr. Ho failed to understand this role. Indeed, throughout his deposition, Mr. Ho clearly showed a "tendency to assume the role of an advocate rather than that of an objective expert on scientific matters." *Vekamaf Holland B.V. v. Pepe Benders, Inc.*, 1981 WL 40557, at *20 (D.Minn. 1981). One continuing problem in Mr. Ho's deposition is that he refused to answer many of the questions, instead demanding to know what point was trying to be made so that he could answer accordingly:

> Q.    Do you agree that in selecting a filter for use in a healthcare setting you need to know the environment in which it's going to be used?
>
> A.    There is a "but" to that question?
>
> Q.    A "but?"

---

[51] *Id.* at 294:14 to 296:6.

> A.    Yeah. Do you have some follow-up to that question?
>
> Q.    I'm sure I'll have more questions, yeah.
>
> A.    Yeah. So what is the question again?
>
> Q.    When you're selecting a filter for use in a healthcare setting, do you need to know the environment of use?
>
> A.    If I were designing an instrument? Is that what you're saying?
>
> Q.    No. I'm actually asking if you're selecting a type of filter for use in a healthcare setting. Not if you're making a device. Like just if you're picking a filter. If you're going to pick a filter, do you need to know the environment it's going to be used in?
>
> A.    That's sort of a vague question, though, because it's hard to really answer that question unless I know what is it that you really want to point at.
>
> Q.    Okay.
>
> A.    There seems to be a second part to that question, depending on whether the answer is yes or no.
>
> Q.    Okay. So in terms of –
>
> A.    Come right out to the question and see.[52]

This problem kept repeating to such an extent that even 3M's counsel attempted to instruct the witness as best he could:

> Q.    If there's no bacteria, there might be particles; right? You can have non-bacterial particles; correct?
>
> A.    Where are you going with this one?
>
> MR. GORDON:    Don't ask him where he's going.[53]

---

[52] *Id.* at 69:14 to 71:2.

However, the instructions by 3M's counsel had little effect, and Mr. Ho continued to guard his answers:

> Q.    If that stuff gets into the surgical site, that's not a good thing; right?
>
> A.    Are you -- are you leading somewhere?
>
> MR. GORDON:    He's not going to tell you whether he is or isn't. Just answer his questions.[54]

Despite counsel's efforts, Mr. Ho was determined to act as a partisan advocate rather than objectively answer questions, leading to frustrating exchanges such as the following:

> Q.    When we talk about natural biological presentation, do you agree with me that in a natural biological presentation there will be particles smaller than 2 microns?
>
> A.    If you were to tell me what is it that you really want to know, then it would be a lot easier for me to give you an answer.  In this case I don't really know what you're really attempting to establish.
>
> Q.    What I really want to know, Mr. Ho, is in a natural presentation of biological aerosol, will there be particles less than 2 microns big? Do you have the expertise to know if there will be or not?
>
> A.    Again, I'm hesitant to give you simple yes, no, absolute type answers without truly knowing what is it that you're trying to learn. Are you trying to learn something? Are you trying to -- are you trying to...
>
> Q.    So unless you know why I want to know --

---

[53] *Id.* at 209:21 to 210:1.
[54] *Id.* at 156:12 to 156:21.

> A.    Yeah.
>
> Q.    -- you aren't able to answer whether there will be particles under 2 microns, unless you know why I want to know that information?
>
> A.    Yeah. Well, what is it that you are really trying to comprehend here?[55]

Mr. Ho's evasions and advocacy plagued his deposition. "When expert witnesses become partisans, objectivity is sacrificed to the need to win." *Cacciola v. Selco Balers, Inc.*, 127 F.Supp.2d 175, 184 (E.D.N.Y. 2001). Here, Mr. Ho approached his work as "an advocate, presented with the trappings of an expert but with no expectation or intention of abiding by the opinion constraints of Rule 702." *In re Trasylol Products Liability Litigation*, 709 F.Supp.2d 1323, 1351 (S.D.Fla. 2010). Mr. Ho's attitude is yet another factor weighing in favor of his exclusion, because "the expert's role is not to be an advocate." *Just Enterprises, Inc. v. (888) Justice, Inc.*, 2008 WL 2625520, at *4 (W.D.Mo. 2008).

## CONCLUSION

Mr. Ho's testimony will not be helpful to the jury. His opinion concerning the relationship between particles and bioburden suffers from poor methodology, and it is contradicted by a wealth of scientific consensus which he refused to consider. His opinion concerning particle sizes and filtration is not helpful to the jury because it is based on a flawed assumption which is disproved by 3M's internal testing. Moreover, he admits he cannot give an opinion relative to patient safety. Also, his opinions concerning

---

[55] *Id.* at 41:23 to 43:9.

general literature on Bair Hugger safety are unqualified, by his own admission. Finally, Mr. Ho approached this case as advocate, not an objective witness. For all of these reasons, he should be excluded from testifying.

Respectfully submitted,

Dated: September 12, 2017

CIRESI CONLIN L.L.P.

/s/Michael V. Ciresi
Michael V. Ciresi (MN #0016949)
Jan M. Conlin (MN #0192697)
Michael Sacchet (MN # 395817)
Ciresi Conlin LLP
225 S. 6th St., Suite 4600
Minneapolis, MN 55402
Phone: 612.361.8202
Email: MVC@CiresiConlin.com
          JMC@CiresiConlin.com
          MAS@ciresiconlin.com

MESHBESHER & SPENCE LTD.

/s/ Genevieve M. Zimmerman
Genevieve M. Zimmerman (MN #330292)
1616 Park Avenue South
Minneapolis, MN 55404
Phone: (612) 339-9121
Fax: (612) 339-9188
Email: gzimmerman@meshbesher.com

LEVIN PAPANTONIO, P.A.

/s/ Ben W. Gordon, Jr.
Ben W. Gordon (FL # 882836) – *Pro Hac Vice*
J. Michael Papantonio (FL # 335924)
316 S. Baylen Street, Suite 600
Pensacola, FL 32502-5996
Phone: (850) 435-7090
Fax: (850) 436-6090
Email: bgordon@levinlaw.com

FARRAR & BALL, LLP

  s/ Mark D. Bankston
Mark D. Bankston
State Bar No. 24071066
1010 Lamar, Suite 1600
Houston, Texas 77002
713.221.8300 Telephone
713.221.8301 Fax
Email: mark@fbtrial.com

*Plaintiffs Co-Lead Counsel*