# EXHIBIT 1

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

|  |  |
|---|---|
| | ) |
| In Re:  Bair Hugger | ) |
| Forced Air Warming | ) |
| Products Liability | ) |
| Litigation | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| This document relates | ) MDL No. 15-2666 |
| to all actions | ) |

------------------------------------------------------

The videotaped deposition of JIM HO, in the

above-styled suit, was taken pursuant to notice for

discovery and/or evidentiary purposes, before Donna

Gerbrandt CSR(A), at the offices of Borden Ladner

Gervais LLP, Calgary, Alberta, Canada, on the 28th

day of June, 2017.

------------------------------------------------------

1             (Proceedings commenced at 8:14 a.m.)

2             THE VIDEOGRAPHER:    Here begins the

3     videotaped deposition of Jim Ho in the matter of

4     Re:   Bair Hugger forced air warming products

5     liability litigation, in the United States District

6     Court, District of Minnesota, MPL No. 15-2666.

7                     Today's date is June 28th, 2017.

8     The time on the video monitor is 8:15 a.m.   We are

9     on the record.

10                     The videographer today is

11    Bernice Dubon on behalf of Amicus Reporting Group.

12    The video deposition is taking place at the offices

13    of Borden Ladner Gervais of Calgary, Alberta.

14                     Would counsel please voice identify

15    themselves and state whom they represent.

16             MR. BANKSTON:        Mark Bankston on

17    behalf of the plaintiffs.

18             MR. ASSAAD:         Gabriel Assaad on

19    behalf of the plaintiffs.

20             MR. GORDON:         Corey Gordon on

21    behalf of the defendants 3M and Arizant.

22             THE VIDEOGRAPHER:    The court reporter

23    today is Donna Gerbrandt on behalf of

24    Amicus Reporting Group.   Would the reporter please

25    swear in the witness.

1                    JIM HO, sworn

2              BY MR. BANKSTON

3         Q.    Good morning, Mr. Ho.

4         A.    Good morning.

5         Q.    I'm going to be talking to you today

6    about some opinions that you gave in this case.   I

7    understand -- you've given a deposition before;

8    right?

9         A.    That's true.

10        Q.    Okay.  How many times do you think

11   you've been deposed before?

12        A.    Once.

13        Q.    One time.  Okay.  Then just as a little

14   refresher, I know you don't do this all the time,

15   it's just like we're in a courtroom, just there's

16   no judge here.  We're going to be asking each

17   other -- I'm going to be asking you questions,

18   you'll be giving me answers.  We need to be really

19   careful not to talk over each other.  She's writing

20   everything down.  So we'll try to pause between

21   each other.  You know, sometimes in natural

22   conversation you tend to interrupt each other,

23   finish each other's sentences.  It's tough to do

24   that for her so we'll try to avoid that.

25                    I also know, not being an

1   your education.  I know you have a bachelors and a

2   masters in microbiology?

3           A.    True.

4           Q.    Okay.   The PhD is in microbial

5   chemistry?

6           A.    Right.

7           Q.    Do you have any other advanced

8   education?

9           A.    Yes.   I spent a lot of time

10  understanding aerosol technology.  The nature of

11  the work I was doing required that I understand

12  all -- all the subjects involved with aerosol

13  technology.

14          Q.    Okay.  Is that -- is that knowledge you

15  acquired at the Department of National Defence?

16          A.    It's mostly through attaining --

17  attending conferences --

18          Q.    Okay.

19          A.    -- working with colleagues, and mostly

20  hands-on, intending to use instrumentation to

21  characterize and define aerosol characteristics.

22          Q.    Okay.   You would agree that your career

23  has been spent as a researcher for the Canada's

24  Department of National Defence?

25          A.    That's correct.

1         Q.    In your report you divided your career
2    up into pre 1990s and post 1990s.  Is that a good
3    way to divide your career, you think?
4         A.    Yeah, yes.
5         Q.    Okay.  I understand that the first part
6    of your career was what we were just talking about,
7    correct, the understanding of biological aerosols?
8         A.    Yeah.
9         Q.    Okay.  And you would agree an aerosol is
10   either a solid or a liquid particle suspended in
11   the air?
12        A.    Say again.
13        Q.    An aerosol is a solid or a liquid
14   particle suspended in the air?
15        A.    That's right.
16        Q.    Okay.  You would agree that aerosols
17   travel along the current of the air?
18        A.    True.
19        Q.    Okay.  Now, your career post 1990s has
20   been primarily of the development of biological
21   detection systems; correct?
22        A.    Yes, but the -- but the mandate from the
23   very beginning of my career was to develop
24   biological detection technologies.
25        Q.    Okay.

Page 12

1    developing the technology.

2         Q.   Okay.  And would you agree that for

3    nearly 30 years you've been in the practice of

4    developing devices and using -- using or selling

5    them to various clients and the government and

6    others?

7         A.   That's not exactly true.  My job is to

8    develop the hardware and the software technology

9    for military applications, which is Canadian

10   military, and -- and selling it really was not my

11   job.

12        Q.   Okay.  What hardware and software

13   technologies did you use in this case?

14        A.   Well, the final instrument that

15   performed the task of detecting the presence of

16   live agents was what we would call -- it's an

17   abbreviation, F-L-A-P-S, FLAPS.

18        Q.   Okay.

19        A.   So I found that it is not just good

20   enough to develop an instrument that you think is

21   good enough.  You actually have to go out --

22   outside of the laboratory and demonstrate that it

23   works in the -- in the environment it was -- it was

24   set for, which is military -- military conditions,

25   which is outdoors.

1    to determine what the name of the microorganism is.

2    And then once you discover that, then you know

3    whether it is going to be disease causing or not.

4                        Does that go along with what you're

5    expecting?

6         Q.    Not exactly, but let's get more

7    specific.   And I think that will help us, if we get

8    a little more specific.   For instance, are you an

9    expert in evaluating clinical outcomes in

10   healthcare settings?

11        A.    No.

12        Q.    Okay.

13        A.    Yeah.

14        Q.    Are you an expert in hospital air

15   quality?

16                   MR. GORDON:        I object to the form

17   of the question.

18        A.    I -- I'm not sure what you're trying to

19   understand from that question, but you would notice

20   that we have done some experiments with the -- with

21   the wind tunnel to determine how you may be able to

22   detect presence of biological particles in a clean

23   room condition.   So if you could -- if you could

24   transpose that into what you're asking, then the

25   answer would be yes.   If you don't accept that,

Page 21

1          jury of 12 Americans that you're an expert in the

2          field of microbiology; correct?

3                  A.    I -- I would say that if that's what

4          they consider having spent 30 years in -- in bio

5          aerosol as an expert, then that is fair enough.

6                  Q.    Okay.  Are you an expert in operating

7          rooms?

8                  A.    No.

9                  Q.    Okay.

10                 A.    No.

11                 Q.    Are you -- do you have any expertise on

12         the levels of bioburden within an operating room?

13                 A.    No.

14                 Q.    Okay.  So you wouldn't be able to tell

15         me, for instance, does every area in an operating

16         room have equivalent levels of bioburden?

17                 A.    I -- I cannot say with a blanket

18         statement.

19                 Q.    Okay.

20                 A.    Nor can anybody else really.

21                 Q.    Well, would you agree with me -- do you

22         have any expertise to say whether the area

23         underneath the surgical table has more bioburden

24         than other parts of the room?

25                 A.    No.  Yeah.

Page 22

1          Q.   You're not an expert in orthopedic

2     surgery, are you?

3          A.   No.  Apart from the fact that I'm the

4     son of an orthopedic surgeon.  Does that help any?

5          Q.   Again, I'm not -- I'm not answering

6     questions today.

7          A.   Yeah.

8          Q.   I can't -- I can't help you along.  You

9     know, that's -- I can let you answer questions is

10    what I can do.

11         A.   Yeah.  Yeah.

12         Q.   But do you -- do you think that you

13    could comfortably represent to a jury of 12

14    Americans that you being the son of an orthopedic

15    surgeon makes you an expert qualified to give

16    opinions in a lawsuit?

17         A.   That would be a bit far fetched.

18         Q.   I would think so.  Okay.  You're not an

19    expert in anesthesiology, are you?

20         A.   No.

21         Q.   You're not an expert in infectious

22    disease?

23         A.   It would be safe to say no, but in the

24    work area that I'm in I have to be aware of what

25    are the threat agents for the Canadian military,

Page 23

1     and for that matter we need to know a lot about

2     infectivity, if that's what you're driving at.

3          Q.    Can you describe to me what a

4     peri-prosthetic joint infection is?

5          A.    No.

6          Q.    Okay.  So do you have any -- I mean, I

7     assume since not giving a definition, you wouldn't

8     consider yourself as having specific expertise in

9     peri-prosthetic joint infections?

10         A.    No.

11         Q.    Okay.  Did you know anything about the

12    device before accepting work in this case?  And by

13    "the device" I mean the Bair Hugger surgical

14    warming unit.

15         A.    No.

16         Q.    You're not an engineer; correct?

17         A.    That's correct.

18         Q.    You're not a biomedical engineer?

19         A.    No.

20         Q.    What do you understand the device to do,

21    the Bair Hugger?

22         A.    From the description that was -- that I

23    read and what was told to me, it's a technology or

24    a device that provides warming features for a

25    patient under -- under operation.

Page 24

1          Q.    Okay.  Have you ever seen the device?

2          A.    No.

3          Q.    You would agree with me that as an

4    expert you need to understand the nature of the

5    problem being claimed in order to investigate it?

6               MR. GORDON:          I object to the form

7    of the question.

8          A.    I -- I need to -- to know exactly

9    what -- what is the -- the issues at hand.

10          BY MR. BANKSTON

11          Q.    Yeah, that's a good way to put it.

12    Like, for instance, in a lawsuit the issues at hand

13    is what the plaintiff is claiming happened to him

14    because of this device; right?

15               MR. GORDON:          I object to the form

16    of the question, also lack of foundation.

17          BY MR. BANKSTON

18          Q.    Would you agree with that?

19          A.    Well, if I -- if I were to give -- give

20    an impression of what biological aerosols are,

21    would I need to know any of the things that you say

22    I need to know?

23          Q.    Well, I haven't even said anything.  I'm

24    wondering what do you think the issue is that

25    you're here to address?

1          Q.    Okay.   For instance, do you understand

2     what the plaintiffs are claiming happened to them

3     in this case?

4          A.    If I understand correctly, they claim

5     that the air coming from a Bair Hugger has the

6     potential to cause infections.

7          Q.    You mean -- and you mean the air being

8     exhausted out of the Bair Hugger?

9               MR. GORDON:         I object to the form

10    of the question.

11         A.    I -- I -- I wouldn't know if it is

12    exhausted or coming from it, but that's the overall

13    impression.

14              BY MR. BANKSTON

15         Q.    Have you seen the plaintiffs' complaint

16    before?

17         A.    What do you mean?

18         Q.    Oh, okay.   I forget.   I'm asking you

19    questions like you're an expert who comes to

20    depositions every week.   When I say "complaint" --

21         A.    Yeah.

22         Q.    -- actually that's a legal term --

23         A.    Yeah.

24         Q.    -- meaning the initiating document of a

25    lawsuit.   Have you ever seen that document where

Page 27

1    the plaintiff sets forth why they think 3M is

2    responsible for something?

3           A.   I don't believe so.

4           Q.   Okay.  Do you have an understanding of

5    how the plaintiffs believe the Bair Hugger caused

6    their infections?

7           A.   I don't -- I don't think so.

8           Q.   Okay.  The first topic I really want to

9    talk to you about in your report is regarding the

10   size of particles.  You know that there's a

11   discussion about the size of particles and the size

12   of biological aerosols?

13          A.   Right.

14          Q.   Okay.  Did you bring a copy of your

15   report with you today?

16          A.   I did.

17          Q.   Okay.  Do you want to get that out for

18   me and we'll take a look at it together.

19               Now, Mr. Ho, before we dive into

20   the report itself, I want to talk generally in

21   terms of what you reviewed to create this report.

22   From what I understand, everything that you

23   reviewed is cited somewhere in the report?

24          A.   Yeah.  It's open literature material.

25          Q.   Okay.  So you would agree with me that

1          A.    I don't think I say that.

2          Q.    Okay.  You gave opinions about filters;

3    right?

4          A.    Yeah.

5          Q.    Okay.  You know what I mean when I talk

6    about a MERV 14 filter?

7          A.    Yes.

8          Q.    Okay.  You believe that a MERV 14 filter

9    is adequate inside the Bair Hugger; correct?

10         A.    Yes.

11         Q.    You believe that HEPA filters are

12   overkill for this application?

13         A.    That is a quotation from a source.

14         Q.    Do you believe that HEPA filters are

15   overkill in this application?

16         A.    Are you wanting an opinion right here

17   now?

18         Q.    Hmm hmm.  That's what you're here for,

19   sir.

20         A.    Yeah, I think HEPA filters are more than

21   what would be required.

22         Q.    Required for what?

23         A.    For the -- the purpose of what the

24   instrument is supposed to do.

25         Q.    Okay.  And in terms of the filter, what

1      correct?

2          A.   That's right.

3          Q.   Okay.  You will agree with me, though,

4      that the reason you want to keep particles out of

5      an operating room to an absolute minimum is to

6      prevent the incident of surgical infection;

7      correct?

8          A.   Now, where are we going with this one

9      again?  You already said that I'm not -- I'm not an

10     expert in clean-room facilities.

11         Q.   Okay.

12         A.   And why are you asking me that question

13     again?

14         Q.   So you can tell me that's not a question

15     you're qualified to answer?

16         A.   Yeah.

17         Q.   Okay.

18         A.   I'm simply -- I'm simply here to provide

19     you with insight into -- into bio aerosol

20     technologies.

21         Q.   Okay.  And I appreciate that.  I want

22     you to tell me whenever that's true.

23         A.   Yeah.  Yeah.

24         Q.   Whenever I'm talking or asking you a

25     question about something you're not qualified to

Page 57

1        talk about, tell me "That's not why I'm here,

2        Mr. Bankston.  I'm here for a totally different

3        reason."

4            A.    Yeah.

5            Q.    That's totally fine.  I don't have any

6        problems with that.  Let's talk a little bit more

7        about this MERV 14 filter.  You say -- let's go to

8        page 25 of your report.

9            A.    Got it.

10           Q.    Okay.

11                 MR. GORDON:         Did you say 24?

12                 MR. BANKSTON:       25.

13           Q.    All right.  Do you see the section that

14       starts with D. --

15           A.    Hmm hmm.

16           Q.    -- MERV 14 filtration?

17           A.    Yeah.

18           Q.    Okay.  You see the second sentence in

19       that paragraph?

20           A.    Yeah.

21           Q.    It says:  "Standard charts list this

22       specification:  removal of all bacterial particles

23       sized within .3 to 1 micron."

24           A.    Yeah.

25           Q.    Do you see that?

Page 63

1          Q.    Yes.   Yes.   So you understand that this

2     purpose is to provide an assessment of the filter

3     efficiency on the Bair Hugger system and the

4     efficiency level of the current filters?   Do you

5     see that's what this document says?

6          A.    Right.

7          Q.    And you see how there is a

8     "3M Confidential" up at the top of the document?

9          A.    Hmm hmm.

10         Q.    Okay.   On the bottom of -- the bottom

11    corner of this document you'll see a number that

12    starts with 3MBH; correct?

13         A.    Right.

14         Q.    Okay.   And the number here starts with

15    89.   The part of this document that I would like to

16    ask you about today is going to be -- the final

17    numbers are going to be 96.   So if you can flip to

18    96 for me.   That's the part I would like to ask you

19    a question about.

20               Okay.   Perfect.   Now, you see that

21    there's been a portion of that document that's been

22    highlighted that reads "Table 3.   No load (initial)

23    tests for Model 775 filter."   Do you see where that

24    is?

25         A.    Yeah.

Page 66

1    this table, the Bair Hugger filter does not remove

2    all particle sizes within .3 to 1 micron?

3         A.    That's what it says.

4         Q.    Correct.   In fact you would also agree

5    with me that the Bair Hugger filter does not even

6    remove all particles between 1 and 3 microns;

7    correct?

8         A.    Right.

9         Q.    Now, that's a little bit different than

10   the standard specification that you discussed in

11   your report; correct?

12              MR. GORDON:        I object to the form

13   of the question.   It misstates the evidence.

14        A.    Are you referring to the 99 percent

15   numbers?

16              BY MR. BANKSTON

17        Q.    No.   What I'm actually referring to is

18   remember when you told me that a MERV 14 filter by

19   specification will remove all particles sized .3 to

20   1 micron?   Do you remember telling me that?

21        A.    Right.

22        Q.    Now, that is not -- this Bair Hugger

23   filter test that you have in front of you, that

24   does not meet that standard, does it?

25        A.    It does appear to be slightly different.

1          Q.   In other words, from this chart we can
2     see -- let's go down all four lots that were
3     tested.   In the first lot it only removed
4     83 percent of those particles; correct?
5          A.   Yeah.
6          Q.   In the second test it only removed
7     82 percent; correct?
8          A.   Yeah.
9          Q.   In the next test it only removed
10    75 percent; correct?
11         A.   Yeah.
12         Q.   And in the next test it only removed
13    78 percent; correct?
14         A.   Correct.
15         Q.   So it does not meet the standard in
16    which you expressed in your report; correct?
17         A.   Right.
18         Q.   Okay.   Thanks.   Are you familiar with
19    what a HEPA filter is?
20         A.   Yes.
21         Q.   Okay.   Are you familiar with the
22    specifications for a HEPA filter?
23         A.   I don't have the numbers handy, but in
24    general.
25         Q.   Let me throw out a number and see if it

Page 69

1          MR. GORDON:          I object to the form

2     of the question.   That is not -- you misread it.

3          BY MR. BANKSTON

4          Q.   All right.   Let's read the whole thing.

5     "According to table 8.2 of Kowalski, a MERV 14

6     filter will remove Staph. aureus with

7     97% efficiency..."   Is that a correct reading of

8     that?

9          A.   Yeah.

10          Q.   So by some fairly simple subtraction we

11     know that 3 percent of staph aureus organisms will

12     pass through this filter; correct?

13          A.   You can assume that.

14          Q.   Okay.   Do you agree that in selecting a

15     filter for use in a healthcare setting you need to

16     know the environment in which it's going to be

17     used?

18          MR. GORDON:          I object to the form

19     of the question.   Vague, ambiguous, lack of

20     foundation, incomplete hypothetical.

21          A.   There is a "but" to that question?

22          BY MR. BANKSTON

23          Q.   A "but?"

24          A.   Yeah.   Do you have some follow-up to

25     that question?

```
1          Q.    I'm sure I'll have more questions, yeah.

2          A.    Yeah.  So what is the question again?

3          Q.    When you're selecting a filter for use

4    in a healthcare setting, do you need to know the

5    environment of use?

6               MR. GORDON:           I object to the form

7    of the question.

8          A.    If I were designing an instrument?  Is

9    that what you're saying.

10              BY MR. BANKSTON

11         Q.    No.  I'm actually asking if you're

12   selecting a type of filter for use in a healthcare

13   setting.  Not if you're making a device.  Like just

14   if you're picking a filter.  If you're going to

15   pick a filter, do you need to know the environment

16   it's going to be used in?

17         A.    That's sort of a vague question, though,

18   because it's hard to really answer that question

19   unless I know what is it that you really want to

20   point at.

21         Q.    Okay.

22         A.    There seems to be a second part to that

23   question, depending on whether the answer is yes or

24   no.

25         Q.    Okay.  So in terms of --
```

1          A.    Come right out to the question and

2     see --

3          Q.    That's my question.  I'm wondering --

4     let's say I have a job, and my job is to pick a

5     filter.

6          A.    Pick a filter.

7          Q.    I'm going to pick a filter for an

8     application.

9          A.    Yeah.

10          Q.    Do I need to know where the filter is

11     going to be used if I'm going to pick that filter

12     safely?

13          A.    It would be helpful.

14          Q.    In order to determine if a filter is

15     safe in a given application, you might need to know

16     the environment of use; correct?

17          A.    When you say "safe," how would -- how

18     would that mean?  Is that an absolute term or is it

19     a --

20          Q.    That's a good point.

21          A.    -- is it something that is adequate for

22     the job?

23          Q.    Yeah.  Let's phrase it in the way it's

24     done in your report, for instance.  You say that a

25     MERV 14 filter is adequate for this application?

Page 72

1          A.     Yeah.

2          Q.     I would assume when you speak of

3     "adequate," that means reasonable in terms of

4     patient safety as well; right?

5          A.     Yeah.   That's a bit of a stretch,

6     though.

7          Q.     So let me make sure I have this clear.

8     When you say that a MERV 14 filter is adequate,

9     you're not talking about patient safety?

10          A.     You -- you really want to narrow it down

11     to what -- what the issue is at hand.

12          Q.     That's absolutely why we're here, yeah.

13          A.     Yeah.

14          Q.     Right.   Okay.   So let me ask it again.

15          A.     Right.

16          Q.     Okay.   When you say in your report, your

17     words, a MERV 14 filter is adequate in this

18     Bair Hugger --

19          A.     Yeah.

20          Q.     -- do you mean from a patient safety

21     point of view?

22          A.     A patient safety could be interpreted in

23     a variety of directions.   So in this case you

24     are -- you're really trying to equate filter X,

25     safety, yes; filter Y, safety no, and I can't

Page 73

1      answer that question.

2              Q.    Okay.  So you cannot give the opinion

3      that the Bair Hugger filter is adequate from a

4      patient safety perspective?

5              A.    I -- I can say that the filter selected

6      is adequate for the performance of the instrument.

7      And I want to take safety out of it because --

8      because safety is a whole different issue.

9              Q.    Okay.  So in terms of -- you're a

10     designer of devices; correct?

11             A.    I do some of that, yeah.

12             Q.    Okay.  And so sometimes when making a

13     device you have to understand if a component that

14     you're using in the device is going to have a

15     negative effect and make your device not work or

16     whether it will work fine with that component.  Is

17     that simple enough?

18             A.    Hmm hmm.

19             Q.    Okay.  So what I -- oh, is that a yes?

20             A.    Yes.

21             Q.    And I don't mean to be rude about it.

22             A.    Yeah.  Yeah.

23             Q.    She can't take down --

24             A.    Right.  Right.  Sorry.

25             Q.    No problem.  So am I correct, when you

1      say the Bair Hugger filter is adequate, that's in

2      terms of the function of the device?

3           A.    Yes.

4           Q.    Okay.

5           A.    Yeah.

6           Q.    So what I want to make sure, so when one

7      day if we get to trial, is you're not making any

8      representations to this jury about whether that

9      Bair Hugger filter is adequate from a patient

10     safety standpoint?

11          A.    Again I like to emphasize the fact that

12     when you -- when you attach safety and -- and

13     selection of material, then you are making a very

14     huge leap in faith in saying that.  So -- so I'm

15     only speaking from the standpoint of an aerobiology

16     technical person.  So the future that is selected

17     is adequate for what the instrument is supposed to

18     do.

19          Q.    You mean it's adequate for the device to

20     be able to blow hot air on the patient to warm them

21     for surgery?

22          A.    It's adequate to provide the airflow

23     characteristics that -- that the end result is

24     called for.

25          Q.    Okay.  In terms of is that filter

Page 75

1    sufficient to provide reasonable assurance that a

2    patient will not suffer peri-prosthetic joint

3    infection, that's probably not something you can

4    talk about today?

5         A.   No.

6         Q.   Okay.  Let me ask that in another way

7    because I want to be very specific, not just about

8    peri-prosthetic joint infection.  You would agree

9    with me you do not have the necessary

10   qualifications and expertise to state the level of

11   filtration that is needed in the Bair Hugger to

12   maintain clinically safe levels of air quality in

13   an ultra clean operating room during an orthopedic

14   procedure?

15        MR. GORDON:          I object to the form

16   of the question.

17        BY MR. BANKSTON

18        Q.   Do you agree with that?  And if you need

19   to, I can repeat it and we can do it again.

20        A.   You're saying if I do or do not have an

21   expertise in designing something?

22        Q.   No, no, no.  This is very, very specific

23   so let's go one -- let's go real slow.

24        A.   Okay.

25        Q.   Okay.  What I'm asking is are you

Page 170

```
 1    that Elghobashi relied upon and that counsel was
 2    incorrect.
 3              MR. BANKSTON:      I thought it was
 4    Kalliomaki, but I guess not.  I guess he could
 5    have.
 6              MR. ASSAAD:        No.  No.  Elghobashi
 7    went in a different.
 8              MR. GORDON:        Yeah, Villafruela.
 9              MR. BANKSTON:      Yeah.  It was an
10    isolation room, yeah, but performed before an
11    operating room.  We'll still get some mileage out
12    of Kalliomaki, though.  Don't worry about that.
13              BY MR. BANKSTON
14         Q.   All right.  Let's talk a little bit
15    about particle count.  You're familiar with the
16    practice of particle counting; right.
17         A.   Yes.
18         Q.   You don't believe that particle counting
19    can be predictive of microbiological contamination
20    of air in an operating room, do you?
21         A.   I do not.
22         Q.   Okay.  A lot of people disagree with you
23    about that.  Do you recognize that?
24              MR. GORDON:        I object to the form
25    of the question, lack of foundation, assumes facts
```

Page 173

1                    Now, you would agree with me that

2        the conclusion of Mr. Stocks -- excuse me, of

3        Dr. Stocks and his team is that particles are a

4        reasonable surrogate for bioburden?

5                A.    Why do I have to agree with you?

6                Q.    You don't have to.  I'm asking if you

7        do.

8                A.    Yeah.  The answer is no.

9                Q.    No, you don't agree with that.  So if

10       somebody was to say Stocks and his colleagues were

11       able to demonstrate that particles are a reasonable

12       surrogate for bioburden, you would say no, that's a

13       wrong opinion?

14               A.    Correct.

15               Q.    Okay.  Are you familiar with a

16       Russell Olmsted with the National Institute of

17       Health?

18               A.    What is this in relation to?

19               Q.    I'm just wondering if you know the man.

20               A.    No.

21               Q.    Okay.

22               A.    Yeah.

23                    MR. BANKSTON:        4.

24               Q.    Okay.  So one of the things we had

25       talked about with Stocks, right, is the people who

1   have studied this, is they haven't really followed

2   the right methodology to really measure this.  Is

3   that part of your contention?

4           MR. GORDON:          Objection, form of

5   the question.

6           A.    If you were to look at one of the figure

7   studies he's presented --

8           BY MR. BANKSTON

9           Q.    Hmm hmm.

10          A.    His Figure 1.  Do you see it?

11          Q.    Sure.  Yeah.  Let's look at Figure 1.

12          A.    Yeah.

13          Q.    Okay.

14          A.    Okay.  He's based all his conclusions on

15   Figure 1.

16          Q.    Okay.  So --

17          A.    And if you -- if you have any training

18   in measurements, particle analysis, and all the

19   other good things that one would have to have, you

20   would look at that Figure 1, right away would say

21   that this is scattered data all over the map.

22          Q.    Okay.

23          A.    Wouldn't you agree?

24          Q.    I don't have any expertise to -- I would

25   rely on somebody who is an expert.

Page 175

1          A.    Okay.   So as a person who has measured

2     particles, live agent, everything else, that's

3     definitely bad data.

4          Q.    Anybody who has measured particles for a

5     living would know that's bad data?

6          A.    Yeah.

7          Q.    Okay.

8          A.    Very bad.

9          Q.    Very bad?   Okay.

10         A.    And his whole conclusion is based on

11    that observation.

12         Q.    Okay.  So there's, according to you,

13    some methodological problems and this is not good

14    stuff?

15         A.    On top of that the data was fudged.

16         Q.    Okay.   The data was fudged?

17         A.    Yeah.

18         Q.    What do you mean by that?

19         A.    Well, somewhere along the way his raw

20    data did not fit his expectations so he took it

21    upon himself to do a data transform.

22         Q.    Why do you say that?   Where do you get

23    that from?

24         A.    He said that.

25         Q.    Okay.   Where is that in his -- oh,

1               BY MR. BANKSTON

2          Q.   Now let's move on.

3          MR. GORDON:      It misstates the

4   evidence.

5             BY MR. BANKSTON

6          Q.   The second -- the second paragraph of

7   that email.

8          A.   Yeah.

9          Q.   Do you have Exhibit 26 in front of you?

10         A.   Yeah.

11         Q.   Now, Mr. Olmsted says that he has done

12  investigations where he used electronic particle

13  counts; correct?

14         A.   He said that, yeah.

15         Q.   Okay.  And then he says:  "...it appears

16  this group was able to demonstrate particle counts

17  serve as a reasonable surrogate for bioburden of

18  air in an OR."

19         A.   Yeah.

20         Q.   You disagree with that?

21         A.   Totally.

22         Q.   Okay.  And I believe you also told me

23  that anybody who has done particle counting would

24  immediately recognize that that's not true?

25         A.   Correct.

1              correlates with airborne colonies

2              and represents an acceptable

3              surrogate for daily assessment of

4              cell-processing cleanroom

5              performance"

6         A.    So are we done with the Stocks paper?

7         BY MR. BANKSTON

8         Q.    Yeah, we're done with that.  You can put

9    that away.

10             I've handed you, sir, what has been

11   marked for the purposes of this deposition as Ho

12   Exhibit 1.  Do you see in front of you a paper by

13   Raval et al, and I'm going to read the title.

14   "Real-time monitoring of non-viable airborne

15   particles correlates with airborne colonies and

16   represents an acceptable surrogate for daily

17   assessment of cell-processing cleanroom

18   performance."  Did I read that title correctly?

19        A.    You read the title correctly.

20        Q.    This is not something that you reviewed

21   in coming to your opinions in this case; correct?

22        A.    That's correct.

23        Q.    Have you ever seen this study before?

24        A.    No.

25        Q.    Okay.  Do you see on the results where

Page 189

1        it says "viable and nonviable particles were well

2        correlated?"

3            A.    It says that.

4            Q.    Describe what it means to me if those

5        particles are well correlated?  What does "well

6        correlated" mean?

7                  MR. GORDON:        Well, you're going

8        to have to give him the opportunity to read the

9        study if you want him to comment on specifics.

10                 BY MR. BANKSTON

11           Q.    Well, I just want to know what

12       "correlation" is.  Do you know what it means when

13       things are correlated, two different findings are

14       correlated?

15           A.    Let me -- can I flip through some of the

16       results and interpretation --

17           Q.    Yeah.  I'm not going to stop you.

18           A.    -- before I -- before I get too deep

19       into this thing?

20           Q.    Hmm hmm.  Dr. Ho, if you just want to

21       read the whole thing, I'm going to take a little --

22           A.    Yeah, sure.

23                 MR. BANKSTON:        Go off the record

24       for a second.

25                 THE VIDEOGRAPHER:    We are going off the

Page 196

1        A.   Yeah.  Yeah.

2        Q.   So when it comes to whether forced air

3    warmers affect the risk of surgical site infection

4    in operating rooms, you don't have an opinion?

5        A.   No.

6        Q.   Thank you, sir.

7        A.   Yeah.

8        Q.   The next sentence states:

9            "Other areas of the hospital

10           caring --"

11              Excuse me.

12           "Other areas of the hospital caring

13           for high-risk patients with

14           increased risk of nosocomial

15           infection, such as burn units and

16           hematology/oncology wards, have put

17           air monitoring and quality systems

18           into place..."

19              Do you see that?

20        A.   I see that.

21        Q.   Okay.  The final sentence states:

22           "Thus reduced airborne particulates

23           appear to correlate with a

24           decreased risk of nosocomial

25           infections in high-risk patient

1           populations."

2               Do you have any opinions about whether

3       that statement is scientifically valid or not?

4           A.   That statement came out of the blue.   It

5       has got no real backing to it.

6           Q.   Okay.  So your opinion is that statement

7       has no support and is not true?

8           A.   No.

9           Q.   Okay.  Yes?  I'm sorry, it's --

10          A.   No.  No.  No.

11          Q.   And the question asked is you said it

12      was not true.  There's the negative thing, and I

13      think you're saying the opposite of what the

14      transcript is going to reflect.

15          A.   It's not -- it's not true.

16          Q.   So you're saying this statement is not

17      true?

18          A.   Yeah.

19          Q.   So this is another piece of

20      peer-reviewed literature which disagrees with you,

21      which you say is wrong?

22          A.   Correct.

23          Q.   Okay.  These -- these authors here, I

24      take it you also say that they don't know what

25      they're doing either; right?

1           Q.    Okay.   So this is not something that you

2      relied on when coming to your opinions about

3      whether particles are proxies for bioburden?

4           A.    Come again.

5           Q.    This is not something that you reviewed

6      when coming to your opinion that particles are not

7      proxies for bioburden?

8           A.    Yeah, I haven't seen this paper before.

9           Q.    Okay.   I'll tell you what?   You want to

10     take -- this one isn't too long, actually.   This

11     one only has about -- it looks like eight pages of

12     text.   If you want to review this to see if there's

13     anything you want to look at before I start asking

14     you questions, I'm going to ask you a few questions

15     about this before we go to lunch.

16          A.    Okay.

17               MR. GORDON:          Did you say

18     Darouiche was a microbiologist?

19               MR. BANKSTON:        No.   That him being

20     in microbiology, I thought he might be familiar

21     with his work in microbiology.   Because, as you

22     see, it's a study of airborne microorganisms.   I

23     thought it might have hit his Google alerts.

24          A.    Do you have a copy that is not smeared?

25          Q.    Yeah.   That I sure don't, unfortunately.

Page 206

1          Q.   In this lawsuit --

2          A.   Yeah.

3          Q.   -- what you're here to testify about --

4          A.   Right.

5          Q.   -- is implant infections?

6          A.   Right.

7          Q.   Okay.  You understand that the

8     mechanisms, the biological, the physiological

9     mechanisms by which an infection happens

10    incisionally versus peri-prosthetically are

11    different mechanisms?  Do you have enough expertise

12    to know that?

13         A.   I don't --

14              MR. GORDON:        I object to the form

15    of the question.

16         A.   Yeah.  I think it's a bit technical for

17    me here.

18              BY MR. BANKSTON

19         Q.   Okay.  Let's move on then to -- into

20    that paragraph.  That first part we were talking

21    about was one of their findings.  Another finding

22    that they had was -- you see right after it says

23    "Figure 4" there's a new sentence.  And it says:

24              "CFU density was positively related

25              to total particulate density ... in

Page 207

1            the control group, indicating that

2            airborne [particulate] counts may

3            be used as a proxy for ambient CFU

4            density."

5                I want to ask you about some terms that

6     are used in there.  First, because I don't think

7     we've defined it so far, a CFU is a colony-forming

8     unit; correct?

9            A.    Yeah.

10           Q.    Okay.

11           A.    Yeah.

12           Q.    And in this case, when they talk about

13    CFU density, we can think about that as the amount

14    of -- the total amount and concentration of

15    airborne biological mass that they're measuring;

16    correct?

17           A.    Right.

18           Q.    Okay.  And their conclusion is, is that

19    airborne particle counts correlate well and can be

20    used as a proxy for the CFUs.

21           A.    What do you make of the following

22    sentence after that?

23           Q.    We're going to keep going.  Lets stay

24    one step at a time.

25           A.    Yeah.

Page 208

1          Q.    Stop trying to figure out where we're

2      going here, Mr. Ho.  Let's try to answer the

3      questions that are in front of you.

4                    You understand that they found that

5      airborne particle counts may be used as a proxy for

6      ambient CFU density?  That's what their statement

7      there says?

8                    MR. GORDON:          I object to the form

9      of the question.

10                   BY MR. BANKSTON

11         Q.    Correct?

12         A.    That's what they say here.

13         Q.    And that's something that you disagree

14     with?

15         A.    Right.

16         Q.    Right.  So much like the study by Stocks

17     and his team, which you say you don't agree with --

18         A.    Right.

19         Q.    -- much like the study of Dr. Raval and

20     his team, which you don't agree with; much like the

21     statements of Mr. Olmstead, 3M's retained

22     consultant, you don't agree with, you also don't

23     agree with the seven researchers in this study that

24     that can be used as a proxy between particulates

25     and airborne biological matter?

Page 212

1              A.    -- the interpretation of data is so

2        important.

3              Q.    I'm not asking you if it's important.

4        Why --

5              A.    Authors --

6              Q.    Why are they wrong?

7              A.    Authors always wish to say things that

8        they set out to say.  You know that.

9              Q.    Hold on.  Are you -- are you claiming

10       that Dr. Darouiche set out to prove a certain

11       proposition in this report?

12             A.    Well, maybe --

13             Q.    What evidence do you have of that, sir?

14             A.    I'll let you in on a dirty little secret

15       in that the purpose of somebody going to do a bunch

16       of experiments is to hopefully get data to back up

17       his expectation in the first place.

18             Q.    So you're saying --

19             A.    Are you surprised --

20             Q.    -- that you believe --

21             A.    -- to hear that?

22             Q.    I'm not -- I'm not surprised to hear

23       anything from you today.

24             A.    Because --

25             Q.    What I'm -- what I'm asking you is do

Page 214

1               You don't know Dr. Darouiche?

2          A.   No.

3          Q.   You don't know what his motivations were

4     in doing this study?

5          A.   No.

6          Q.   Do you know what his hypothesis was?

7          A.   Well --

8          Q.   Do you know?

9          A.   He thinks that first and foremost he

10    could connect the infections that he saw with the

11    concentration of culturable particles in the air.

12         Q.   That's his conclusion; right?

13         A.   He set out to show that.

14         Q.   Where do you see that he set out to do

15    that?  Where is his hypothesis, sir?

16         A.   Well, it's in the introduction.

17         Q.   Where does it say that he wanted to

18    prove that this was true?

19         A.   Well, if that's not what he wants to

20    show, then why bother to do any work?

21         Q.   So we don't do science unless we have an

22    agenda?  Is that what you're saying, sir?

23         A.   Well, look at the title.  The whole

24    title says that's what he intends to do.

25         Q.   You think that the title --

1          A.    Yeah.

2          Q.    -- which represents the findings of this

3     study --

4          A.    Yeah.

5          Q.    -- represents what his agenda was in

6     doing this study?

7          A.    Exactly.

8               MR. GORDON:          Objection,

9     argumentative.

10              MR. BANKSTON:        All right.

11         Q.    So according to you, Dr. Darouiche's

12    work and the work of his entire team is tainted

13    because apparently they had some sort of agenda or

14    motivation?

15         A.    I didn't say that.  I simply say that

16    the data that is presented does not support the

17    statement they are making.

18         Q.    Why not?

19         A.    Well, as I've said, look at the --

20         Q.    I'm looking at it.  Tell me why.

21         A.    Look at Figure 4 and 5 in particular.

22    Look at the -- are you familiar with the 95 percent

23    confident interval?

24         Q.    Pretend I'm not.

25         A.    Okay.  Look at -- look at Y Figure 4.

Page 250

1           Q.   Okay.  You knew that study is not

2       controlled; right?

3           A.   What do you mean by "controlled?"

4           Q.   I mean, it has -- it's not a controlled

5       study.  You understand that?

6           A.   You mean they did not use a control

7       experiment?

8           Q.   Correct.

9           A.   Okay.

10          Q.   Right.  And you knew that from reading

11      Dr. Yadin David's report; correct?

12          A.   Yeah.

13          Q.   That that Huang study was not

14      controlled?

15          A.   Right.

16          Q.   All right.  Now let me ask you something

17      about controlled experiments.  The Huang study is

18      still useful to you; right?  You still find it to

19      be a useful study?

20          A.   Come again.

21          Q.   The Huang study --

22          A.   Right.

23          Q.   -- is a useful study to you?  You find

24      it to be a useful piece of literature?

25          A.   Yeah, I would say that.

Page 251

1          Q.   Yeah.   You cited it as support for some

2     of your opinions you're giving; correct?

3          A.   Right.

4          Q.   Now, what I want to know is does the

5     fact that Huang in his biological study, does the

6     fact that he didn't do a controlled study, does

7     that mean that he's not familiar with

8     microbiological concepts?

9          A.   I can't state that.  I can't say that.

10         Q.   Okay.  So just because somebody doesn't

11    use a control, that doesn't necessarily mean that

12    they're not familiar with how to do a proper

13    microbiological study?  Is that your testimony?

14         A.   That's fair.

15         Q.   Okay.  Thank you, sir.  You know, again,

16    and I'll just circle back because we're going to

17    cover them again, Huang is one of these studies

18    that involved a predecessor model Bair Hugger in

19    2002; correct?

20         A.   If you say so, yes.

21         Q.   Well, you reviewed -- you're

22    responding -- one of the things you're doing in

23    this case is responding to the report of Dr. Yadin

24    David; right?

25         A.   You see, I -- when I was starting to

Page 294

1              Q.    Did you have any assistance in the
2         writing of your report?
3              A.    No.
4              Q.    So this section here, you wrote this?
5              A.    Yeah.
6              Q.    Okay.  Let's talk about page 18.  Do you
7         see where the first full paragraph talks about
8         Albrecht and his colleagues?
9              A.    Right.
10             Q.    Okay.  You talked -- you make one point,
11        but what I want to go to is your second point here.
12        Do you see where you say "On their second aim..."?
13             A.    Right.
14             Q.    Okay.  It says:  "On their second aim,
15        it would appear [that] the authors were not
16        familiar with microbiological concepts as the
17        experimental design had no control."  Correct?
18             A.    Right.
19             Q.    Do you remember when we talked about the
20        Huang study and it not having a control?
21             A.    You -- you mentioned that, yes.
22             Q.    Yes.  And you told me that the fact that
23        it didn't have a control doesn't mean that they
24        weren't unfamiliar with microbiological concepts.
25        Do you remember telling me that?

Page 295

1          A.   I might have said that.

2          Q.   Yeah.  And you're saying the exact

3     opposite here about Mr. Albrecht, aren't you?

4     You're saying the fact that he didn't have a

5     control means that he's unfamiliar with biological

6     concepts.  Correct?

7          A.   Yes.

8          Q.   So when it comes to literature that

9     hurts 3M's case, you make what's essentially a

10    criticism of this author.  You attack his

11    qualifications and his credibility saying he's not

12    familiar with microbiological concepts because he

13    had no control.  But when you had a study that was

14    favorable to the client who has hired you, you

15    didn't mention that it wasn't controlled, nor did

16    you criticise those authors, did you?

17         A.   No.

18         Q.   And you knew when you wrote your report

19    that Huang was not controlled?

20         A.   No.

21         Q.   You did know that; correct?

22         A.   Well, it might have -- I might have

23    noted that, but it wasn't something that I jumped

24    on.

25         Q.   Right.  Because you're only going to

Page 296

1        insult an author if he's critical of 3M, not if

2        he's in favor of 3M; right?

3                A.    Right.

4                Q.    Yeah.   You're not going to criticise

5        authors that are favorable of 3M; correct?

6                A.    Right.

7                Q.    Understood.   So you remember back when

8        we were talking about are you writing an objective

9        independent report or are you doing a report to

10       advocate for 3M, this is a report which is bias in

11       favour of 3M, isn't it?

12               A.    Are you saying that?

13               Q.    I'm asking you if you believe it.

14       Considering that you criticized one author for

15       something, told us he wasn't familiar with

16       microbiological concepts, but knowingly didn't even

17       include the fact that this other author had no

18       control and didn't criticise him at all, that's a

19       form of bias, isn't it?

20               A.    No.

21               Q.    You don't think that's bias?

22               A.    No.

23               Q.    You don't think it's a little bit unfair

24       to insult Mr. Albrecht and accuse him of having no

25       familiarity of microbiological concepts --