# EXHIBIT D

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

SM/lms

In re: Bair Hugger Forced Air Warming          MDL No. 2666
Products Liability Litigation.                    (JNE/FLN)

- - - - - - - - -

This is the Deposition of MICHAEL KEEN in the
above-noted matter, taken at the offices of VICTORY VERBATIM
REPORTING SERVICES, Suite 900, Ernst & Young Tower, 222 Bay
Street, Toronto, Ontario, on the 14th day of July, 2017.

- - - - - - - - - - - - - -

A P P E A R A N C E S:
GENEVIEVE M. ZIMMERMAN                -- for the Plaintiffs
Meshbesher & Spence, Ltd.
1616 Park Avenue South
Minneapolis, MN 55404
PETER J. GOSS                         -- for 3M Company and
VINITA BANTHIA                           Arizant Inc.
Blackwell Burke P.A.
431 South Seventh Street
Suite 2500
Minneapolis, MN 55415

ALSO PRESENT:
Gabriel Assaad
Kate A. Crawford

1      ---   upon convening at 10:00 a.m.

2      ---   upon commencing at 10:01 a.m.

3

4      MICHAEL KEEN, sworn

5      EXAMINATION BY MS. ZIMMERMAN:

6                    Q.    Good morning, Mr. Keen.  My name is

7             Genevieve Zimmerman, and we just had an opportunity

8             to meet a few minutes ago.  I am one of the attorneys

9             that represents a little over 2,600 people in the

10            United States that have filed lawsuits against 3M and

11            Arizant related to the Bair Hugger product, and I am

12            here to ask you some questions about the expert

13            report that you provided in this matter.

14                    As we go forward today, I am going to be

15            asking you some questions and the court reporter will

16            be taking down some...taking down both my questions

17            and your answers.  So if we can do our best to make

18            sure to let the other complete the question or

19            complete the answer, that will make the court

20            reporter's job easier.  Is that fair?

21                    A.    Yes.

22                    Q.    All right.  And you seem to be doing

23            a good job to begin with, but one thing we do, just

24            in normal speaking with one another, is do incomplete

25            verbal answers like m'hmms and uh-huhs.  That doesn't

1    rooms; is that right?

2              A.    Yes, that is correct.

3              Q.    All right.  And, specifically, you

4    wanted to know whether the hospital uses warming

5    blankets or forced air heaters; is that right?

6              A.    Yes.

7              Q.    And Ms. Hogan responded to your

8    initial e-mail on April 21st, and her response says:

9                    "...In more than just ortho, we use both

10                   types, depending on the length of the

11                   expected surgery..."

12   Is that her response?

13             A.    Yes.

14             Q.    Okay.  And then you then responded to

15   her, it seems shortly thereafter also, on April 21st,

16   and you say:

17                   "...Okay.  Thanks.  I am doing a review of

18                   the forced air type in relation to infection

19                   control.  Perhaps I could witness one in

20                   operation at some point?..."

21   Is it fair to say that you had not seen a forced air

22   warming system during...in use in an operation prior

23   to the time of this e-mail?

24             A.    No.  I had...I had been in...I had

25   been in surgeries to witness before, but was not

1          give that testimony, as we sit here today?

2                    A.    I am prepared to give testimony on my

3          report, yes.

4                    Q.    All right.  And, really, I think

5          what...from the plaintiffs' perspective, what we're

6          getting at is whether or not the conclusions that you

7          have reached or the opinions that you have offered in

8          this matter are supportable, okay?

9                    A.    I understand.

10                   Q.    All right.  And we are here to

11         determine whether or not those opinions are

12         reasonable as well, okay?

13                   A.    I understand.

14              MR. GOSS:      Object to form.

15

16    BY MS. ZIMMERMAN:

17                   Q.    Now, as I understand it, you have not

18         done any biological testing in connection with your

19         work in this matter, have you?

20                   A.    I have not.

21                   Q.    Okay.  And you have done no

22         filtration testing in connection with your work on

23         this matter, have you?

24                   A.    I have not.

25                   Q.    All right.  You have conducted no

1    particle count testing on this case, have you?

2            A.    I have conducted no particle count

3    testing on this case.

4            Q.    And, in fact, you haven't personally

5    done any original testing in connection with your

6    work on the Bair Hugger matter; is that fair?

7            A.    That is correct.

8            Q.    All right.  And would you agree that

9    you have done no...do you know what CFD is?

10           A.    I know what CFD is.

11           Q.    Computational fluid dynamics; is that

12    right?

13           A.    That is correct.

14           Q.    You have done no computational fluid

15    dynamics work or analysis in this matter; is that

16    correct?

17           A.    I have reviewed CFD papers, but I

18    have done no original CFD analysis of my own in this

19    case.

20           Q.    Okay.  You have done no calculations

21    of your own in this case, correct?

22           A.    I don't believe I have done any

23    calculations related to this case, other than some

24    conversions between units of measure.

25           Q.    And would that be something like

1           A.      I have had experience in design

2    engineering work.

3           Q.      All right.  And you are a licensed

4    engineer in Canada?

5           A.      I am a licensed professional engineer

6    in the province of Ontario within Canada.

7           Q.      And you are a member of the

8    professional engineering community in Canada; is that

9    fair?

10          A.      I am a member of the Professional

11   Engineers of Ontario, as referenced on my resume.

12          Q.      Okay.  Have you had any experience

13   ever in designing a medical device?

14          A.      I have not had experience in

15   designing a medical device.

16          Q.      Did your education, in connection

17   with your bachelor's degree, involve any courses on

18   ethics?

19          A.      Yes.

20          Q.      What did you learn about ethics in

21   your undergraduate degree?

22          A.      Do you have a specific question?  It

23   was a big course.

24          Q.      It was a large course?  Was it a

25   required course?

1    screen.  So it may well be a window screen that is

2    high efficiency for mosquitoes, but that doesn't mean

3    it's impervious to other things.  Do you understand

4    that as well?

5           A.    I understand that, and I am sorry for

6    your mosquitoes.

7           Q.    Yes.  We're all sorry for mosquitoes.

8    I suspect you have some of the problems that we have.

9           A.    We also have mosquitoes.

10          Q.    So the purpose of providing those

11   perhaps cumbersome examples is to focus in on the

12   words "high efficiency".  Would you agree with me

13   that saying "high efficiency" without additional

14   qualifiers is not meaningful in discussing a

15   filtration level?

16          A.    Again, I would say that the term

17   "high efficiency" I have seen commonly used as a

18   generic layman's term for describing a filter, but it

19   is not an official term that is used in the rating of

20   filters.

21          Q.    And someone that would be making

22   decisions about whether to use a filter or which type

23   of filter might...ought to be selected would need

24   information probably beyond what a layman would need

25   about the efficiency of a filter; does that seem

1           fair?

2                      MR. GOSS:      Objection, form, calls for

3                      speculation.

4                      THE DEPONENT:      The specification of a

5                      filter should rely on the official ratings.

6

7       BY MS. ZIMMERMAN:

8                      Q.      All right.  And official ratings are

9           determined...MERV puts out official ratings for

10          filters; is that right?

11                     A.      MERV is a procedure for rating

12          filters.

13                     Q.      Right.  And what MERV does in rating

14          filters is it talks both about the size of the

15          particulate that will be filtered and the

16          effectiveness of the filter at removing that size

17          particle; is that right?

18                     A.      That is correct.

19                     Q.      Okay.  And would you agree with me

20          that, without either one of those modifiers, either

21          the size of the particle or the effectiveness of the

22          filter, the terms "high efficiency" on their own are

23          not going to provide a professional with adequate

24          information to make a decision pursuant to the MERV

25          guidelines, for example?

M. Keen - 96

1          A.      I would agree that the term "high

2     efficiency" does not provide adequate guidance as to

3     the MERV rating of a filter.

4          Q.      All right.  And would you agree with

5     me that "high efficiency" could tend to confuse a

6     consumer who may not be as educated in the MERV

7     ratings as someone such as yourself?

8          MR. GOSS:     I am just going to object, we

9          went from professional to consumer.

10         THE DEPONENT:     I don't know if it would

11         confuse a consumer.

12

13    BY MS. ZIMMERMAN:

14         Q.      Are you familiar with the term

15    "HEPA"?

16         A.      I am familiar with the term "HEPA".

17         Q.      And what does HEPA stand for?

18         A.      You are going to test my memory.  I

19    am trying to remember the acronym.  No, I don't want

20    to hazard a guess right now.  I have seen it many

21    times, but I don't recall right now the acronym.

22         Q.      But you would agree that HEPA is

23    actually a term of art in filtration, correct?

24         A.      HEPA is a term of a filter, yes.

25         Q.      All right.  And it describes a

1    opinions on filtration.

2              Q.    Okay.  Is there anything else that

3    you can think of, as you are sitting here, that you

4    did to independently research the issues presented?

5              A.    The Price document listed in (k) is

6    another one that I found through my research that

7    found...that had some relevant information that I

8    relied upon for my opinions.

9              Q.    The Critical Environments Engineering

10   Guide?

11             A.    That is correct.

12             Q.    Okay.  Is that a peer-reviewed

13   journal?

14             A.    No, it is not.

15             Q.    Did you ever Google Bair Hugger?

16             A.    Yes, I did.

17             Q.    And what did you learn from your

18   Google search?

19             A.    I can't recall all that I have

20   learned from that.  I looked at various websites on

21   Bair Hugger, images of Bair Hugger.  There were some

22   YouTube videos on Bair Hugger that I looked at in

23   that search.

24             Q.    Can you recall who...were they videos

25   that were put out by the Blackwell Burke law firm, or

1        do you know who produced the videos?

2              A.    I don't recall who produced the

3        videos that I looked at.

4              Q.    Were they associated...you don't know

5        if they were associated with Dr. Scott Augustine?

6              A.    I do not recall.

7              Q.    Okay.  Have you spoken with any of

8        the employees at 3M about the Bair Hugger product?

9              A.    I have not.

10             Q.    All right.  Have you done any...I

11       mean, we talked a little about PubMed.  Have you done

12       any other searches for peer-reviewed studies about

13       the Bair Hugger?

14             A.    In my search, I have looked at other

15       studies.  The studies that I found relevant have been

16       included in my...that I have used to refer to my

17       opinion have been included in my reference listing.

18       I know that some of those blanks, and I can't

19       remember which ones exactly, are ones that I have

20       found as part of that search.

21             Q.    All right.  You would agree with me

22       that operating room ventilation systems and designs

23       for healthcare facilities are intended to provide a

24       comfortable environment for patients, healthcare

25       workers and visitors, while at the same time

1       system, to know?

2              A.     Yes.   The heat sources would be

3       important to know.

4              Q.     All right.  And you agree with me

5       that it would be important to know the heat sources

6       specifically, and also how much heat is being

7       produced by each of those sources, right?

8              A.     I'm sorry, what is the context of

9       your question?

10             Q.     All right.  So in designing an HVAC

11      system...let's start just very basically.  You have

12      designed HVAC systems before for an operating room?

13             A.     I have participated in design for

14      HVAC system, yes.

15             Q.     Have you ever done...been solely

16      responsible for such a design?

17             A.     No.

18             Q.     All right.  Do you rely on others to

19      assist you in making determinations about the

20      appropriate HVAC design in a hospital operating room?

21             A.     I do.

22             Q.     Who do you defer to?

23             A.     I defer to our mechanical engineering

24      design consultants.

25             Q.     Okay.  Do you know if, for example,

1      Dan Koenigshofer has designed HVAC systems in an

2      operating room before?

3             A.      Yes, I believe he has.

4             Q.      All right.  And would he be an

5      appropriate person for you to collaborate with with

6      respect to designing the HVAC system in an operating

7      room?

8             A.      Yes.

9             Q.      He would.  Would you feel comfortable

10     designing an HVAC system for an operating room on

11     your own?

12            A.      No.

13            Q.      And, as I understand it, ASHRAE

14     contemplates that the HVAC system has two filters,

15     correct, prior to having the air arrive in the

16     operating room; is that right?

17            A.      That is correct.

18            Q.      All right.  And what are those

19     filters; do you know?

20            A.      Yes.  There is a pre-filter and a

21     secondary filter.

22            Q.      Do you know what MERV rating the

23     pre-filter has?

24            A.      Yes.  The table requires a MERV 7 for

25     the pre-filter for an operating room.

1       There is no one standard for what the diffuser

2       arrangement must be; is that right?

3                   A.      No.   There is standard minimum

4       requirement for the design of the diffuser

5       arrangement, which allows further flexibility beyond

6       that standard.

7                   Q.      All right.  And have you been

8       involved with designing an HVAC system and these

9       diffusers in operating rooms in the United States?

10                  A.      Yes, I have.

11                  Q.      Which ones?

12                  A.      I believe there was a facility in

13      Georgia that I assisted the design on.

14                  Q.      Any others?

15                  A.      I don't believe there are any other

16      U.S. ones, to my recollection.

17                  Q.      And who did you work with on the

18      Georgia project?

19                  A.      There was an engineer from H.H. Angus

20      & Associates.

21                  Q.      Do you happen to remember who the

22      engineer was?

23                  A.      I don't remember the name, sorry.

24                  Q.      About how long ago was that?

25                  A.      That was approximately 22 years ago.

1      Celsius and 20 to 24 Celsius.  The discussion of

2      those ranges, that discussion takes into

3      consideration the ability for bacterial growth to

4      happen in those environments.

5                Q.     And, at any rate, you are not a

6      microbiologist, correct?

7                A.     I am not a microbiologist.

8                Q.     All right.  And you don't have any

9      training in aerobiology either, do you ?

10               A.     I don't have training in aerobiology.

11               Q.     And you're not going to be offering

12     any opinions to the court in the Bair Hugger MDL case

13     about issues touching on microbiology or aerobiology,

14     are you?

15               A.     I am not understanding the

16     limitations to that question, so...I certainly speak

17     about...in my report about different types of

18     bacteria and microbiological particles as part of my

19     report.

20               Q.     Okay.  And part of the purpose of

21     both the deposition today and motion practice that

22     will almost certainly follow as we approach trial

23     next year, is a determination by the court about what

24     the scope of your testimony properly may be.  And, to

25     that extent, that includes discussion and argument

1          based in fact or in reasonable science or in good

2          engineering practice, so that we can determine

3          whether they are reliable, okay?

4                    A.    Okay.

5                    Q.    All right.  And that is the purpose

6          for preparing a report and that is the purpose for

7          the deposition today, to understand what it is that

8          is the underlying support for the opinions you intend

9          to offer in this case, all right?

10                   A.    Okay.

11                   Q.    And so what we are entitled to do

12         today is to examine the full scope of what it is you

13         intend to testify to, which means you don't get to

14         come back next week or next month or on February 26th

15         and change the numbers that you have offered in your

16         expert report.  You understand that?

17                   A.    I understand it, as you have just

18         told me.

19                   Q.    Okay.  And, at any rate, with respect

20         to the transmission of pathogens and particularly

21         with respect to bacteria, you would rely on a

22         microbiologist to quantify the risk to patients,

23         correct?

24                   A.    I would, yes.

25                   Q.    All right.  Your report goes on to

1        sure.

2                Q.      Okay.  And do you have any idea, as

3        you're sitting here, why that test was done several

4        months after the tests in April of 2016?

5                A.      I do not know why the time difference

6        in that one.

7                Q.      Have you been produced or provided

8        with any copies of any tests on filtration done prior

9        to 2016?

10               A.      So the fourth test that I mentioned

11       to you that was inconclusive, I don't know what the

12       date of that test was.

13               Q.      Okay.  Would you expect that there

14       would be tests on filters done throughout the course

15       of the life cycle of the Bair Hugger products?

16               A.      I would only be guessing, so, no, I

17       wouldn't presume that.

18               Q.      Okay.  As an engineer, were you

19       taught that it was important to test the products

20       that you would develop or market or use?

21               MR. GOSS:      Objection, vague.

22               THE DEPONENT:      Yes.  I didn't develop

23               products.

24

25       BY MS. ZIMMERMAN:

1    months.

2              Q.    Okay.  Are any of them...were you...

3    were any of them provided to you very recently?

4              A.    No.  This would be prior to the

5    completion of my report.

6              Q.    Okay.  And did you rely upon those

7    animations in reaching your opinions?

8              A.    I would say that those videos were a

9    component of what led to my final opinions.

10             Q.    And are they reflected in the list of

11   references in your report?

12             A.    No, they are not.

13             Q.    Why not?

14             A.    Again, I don't...some of these videos

15   I have seen but do not have official copies to be

16   able to provide a reference to.

17             Q.    All right.  And where have you seen

18   the videos, online?

19             A.    Some of them have been online, yes.

20             Q.    Were they provided to you by Dropbox

21   or an FTP site or...where did you find them?

22             A.    I think...I can't recall, to be

23   honest.

24             Q.    Okay.  But you viewed these videos

25   at some point as you were drafting your report and

1          relied on them in some way in reaching your ultimate

2          opinions?

3                    A.      That is correct.

4                    Q.      All right.  But they are not listed

5          in the reference materials?

6                    A.      That is correct.

7                    Q.      Okay.  And do you know, as you sit

8          here right now, whether they were online publicly

9          available or...

10                   A.      I know that for sure some of them

11         were on YouTube and publicly available.

12                   Q.      Okay.  There is a lot of stuff on

13         YouTube, and I suspect that none of us rely on

14         everything we see on YouTube.  But the purpose of

15         this deposition is to figure out what you have relied

16         upon in reaching the opinions that you are prepared

17         to offer in this case, and I am struggling because I

18         don't...you know, I see a reference to Settles'

19         report.  But, to the extent that you are directed to

20         or discovering videos on YouTube and relying on those

21         in reaching your opinions, they are not disclosed

22         here, and that makes the opportunity to investigate

23         your reliance on those very difficult.  What was it

24         about the videos that you relied on?

25                   A.      I think, in general, the videos were

M. Keen - 224

1     an animated depiction of what were described in some

2     of the reports that I referenced.  And so, again,

3     they provided just additional dynamic visual context

4     to support my research in coming up with opinions.

5              Q.    So the videos supported your

6     research.  So, looking again at the references that

7     you have listed...it is not an ASHRAE video, I trust;

8     is that correct?

9              A.    I do not believe there are any ASHRAE

10    videos in what I saw.

11             Q.    And there is no CSA standard video

12    that you are relying upon, I assume?

13             A.    No.

14             Q.    Okay.  Did you see any video put

15    forth by the authors of this article number (c) and

16    published in the Journal of Bone and Joint Surgery on

17    "Intraoperative bacterial contamination in operations

18    for joint replacement"?

19             A.    Again, I will say right now that I do

20    not recall exactly which reference documents the

21    videos related to.

22             Q.    So we could go through this entire

23    list and, as you sit here today, you are not going to

24    be able to tell me which one of these studies and/or

25    articles and/or reports had a video that you relied

1      upon in forming your opinions but did not cite to?

2              A.      Yes, I do not have the recollection

3      at this time.

4              Q.      Okay.  What would refresh your

5      recollection?

6              A.      I imagine watching the video and

7      understanding what study that it related to would

8      refresh my memory.

9              Q.      All right.  Have you been provided

10     the depositions of the study authors in these cases?

11     I see, for example, that you have been provided a

12     copy of an article written by Belani, Albrecht,

13     McGovern, Mike Reed and Christopher Nachtsheim.  It

14     is listed as Exhibit number...pardon me, reference

15     number (n), provided to you by counsel.  Do you see

16     that one?

17             A.      Yes.

18             Q.      Do you know that every one of those

19     authors has been deposed in connection with this

20     litigation?

21             A.      No, I am not aware of that.

22             Q.      And they have not produced any of

23     these depositions to you for your review in this

24     matter, have they?

25             A.      The depositions that have been

M. Keen - 227

1       BY MS. ZIMMERMAN:

2                    Q.      All right.  Are you aware of whether

3               or not there were videos made in connection with any

4               of the published peer-reviewed studies?

5                    A.      Sorry, could you restate the

6               question?  I didn't get the first few words.

7                    Q.      Sure.  Are you aware whether or not

8               videos have been made in connection with any of these

9               published peer-reviewed studies?

10                   A.      So, yes, as I answered earlier, I am

11              aware that there are some videos related to some of

12              the referenced documents that are shown here.  I

13              don't recall which ones they were.

14                   Q.      Okay.  And I think...and, again, I am

15              trying to get at which videos might they be.  If they

16              are on YouTube, I don't think that they are connected

17              to any of the peer-reviewed journals that you have

18              cited to.

19                   A.       I am sorry, on current reflection...

20                   MR. GOSS:      Wait for her to ask a

21              question.

22

23      BY MS. ZIMMERMAN:

24                   Q.      Do you have any knowledge, as you sit

25              here, about whether or not videos that you have been

1          provided access to or directed to may have been

2          videos of experiments performed by Mr. Albrecht?

3                    A.     It is possible.  I can't recall.

4                    Q.     And, as you sit here right now, do

5          you have any sense or knowledge about whether they

6          might be videos of experiments conducted by Mr.

7          McGovern?

8                    A.     I can't recall.

9                    Q.     Do you know if you have been provided

10         any of the videos prepared in connection with Dr.

11         Sessler and Dr. Olmsted's publication?

12                   A.     I do not recall.

13                   Q.     And you don't recall, as you sit

14         here, whether it may have been videos connected to

15         this Belani, Albrecht, McGovern, Reed, Nachtsheim

16         paper either, correct?

17                   A.     I do not recall.

18                   Q.     In fact, as you sit here, you have no

19         idea what the videos are; is that right?

20                   A.     I do not recall the authors connected

21         with the videos.

22                   Q.     All right.  Can you describe the

23         videos in detail?

24                   A.     I cannot describe the videos in

25         detail.

1          Q.      But you rely upon them in reaching

2      and rendering the conclusions you have outlined in

3      your report?

4          A.      In watching the videos, they did

5      provide a visual aid that helped me in forming my

6      opinions.

7      MR. GOSS:      I could use a bathroom break

8          whenever you're ready.

9      MS. ZIMMERMAN:      You can take a bathroom

10         break.

11     MR. GOSS:      Okay.

12

13   ---   upon recessing at 3:56 p.m.

14   ---   A BRIEF RECESS

15   ---   upon resuming at 4:03 p.m.

16

17   MICHAEL KEEN, resumed

18   CONTINUED EXAMINATION BY MS. ZIMMERMAN:

19         Q.      All right.  Turning back to both

20     Figure...the kind of hypothetical Figure 6 and

21     Figure 7 in your report, Mr. Keen, it talks

22     about...it attempts to depict the laminar airflow in

23     the operating room, right?

24         A.      Yes.

25         Q.      Okay.  And that laminar airflow,

M. Keen - 251

1          Q.      Are you on that page?  Okay.  You say
2     here the air...the second sentence says:
3               "...[The] Air eventually escapes primarily
4               through the head and neck area of the
5               patient..."
6     What is your basis for that statement?
7          A.      The basis for that statement has to
8     do with descriptive images and video that I have seen
9     on the draping of the Bair Hugger blanket.
10         Q.      So you are able to tell where the air
11    is escaping based on photographs?
12         A.      Photographs, description and video,
13    yes.
14         Q.      Do you recall...you weren't provided
15    a copy of Michael Stonnington's report?
16         A.      That name is not familiar to me.
17         Q.      Okay.  Are you aware of reports from
18    surgeons and orthopaedics that airflow may be
19    escaping not just from the head and neck?
20         A.      I am not aware of that.
21         Q.      Okay.  Were you told that you should
22    assume that the air eventually escapes primarily
23    through the head and neck area of the patient?  Were
24    you told to assume that by counsel?
25         A.      That was information that was from

1        the documentation and video that I reviewed.

2              Q.      Okay.  So this also comes from the

3        video that we don't know whose video it is?

4              A.      No, sorry, in this case, I have

5        seen...and this refers to a 3M video that...is it a

6        3M video...a video on YouTube that describes the

7        application of the blanket and the ceiling and the

8        draping.  And that is different from the videos I was

9        talking about before the break.

10             Q.      All right.  So that is another

11       separate video that is not identified on your list of

12       references; is that right?

13             A.      Correct.  That was one that I saw

14       from YouTube.

15             Q.      So, just so I understand, are there

16       multiple videos on YouTube that you're relying on

17       that aren't listed on the references?

18             MR. GOSS:      Object to form.

19             THE DEPONENT:      Some...

20             MS. ZIMMERMAN:      I don't know how to fix

21             that.

22             MR. GOSS:      Well, I think what I am

23             struggling with is, what "relying on" means

24             may be different from his Canadian

25             understanding than what we use in American

M. Keen - 256

1        videos that certainly I saw.  But, again, they did

2        not provide any new independent information that I

3        wasn't...that I had to rely upon to provide the

4        opinions in my report, but were more visualizations

5        of information I had already read.

6                Q.      So the question or the statement that

7        I was asking you about is:

8                        "...Air eventually escapes primarily through

9                        the head and neck area of the patient..."

10       And I have asked you what the basis is for that

11       statement, and you have directed me to a 3M video on

12       YouTube about draping.  How do you know from that

13       video that the air eventually escapes primarily

14       through the head and neck area of the patient?

15               A.      Based on how the description of how

16       the adhesives are applied, how different ports are

17       closed off, and how...where it is left open, that

18       shows where the air would primarily escape from.

19               Q.      All right.  How long is the video?

20               A.      If I had...approximately four

21       minutes.

22               Q.      Have you seen or touched a Bair

23       Hugger blanket itself?

24               A.      I have not.

25               Q.      All right.  Can you describe a Bair

1          Q.      Memarzadeh.  Okay.  You know him in

2      some regard?

3          A.      Yes, I do.

4          Q.      And how do you know him?

5          A.      I know him from my ASHRAE committee

6      work.

7          Q.      All right.  And would you agree that

8      he holds himself out as an expert in airflow?

9          A.      Yes.

10          Q.      And you would, I assume, defer to him

11      on matters regarding airflow in an operating room?

12          A.      Yes.

13          Q.      And you understand from some of the

14      materials that you have been provided in this case

15      that Dr. Memarzadeh, that his work...that he agrees

16      that the Bair Hugger disrupts laminar airflow,

17      correct?

18          MR. GOSS:      Object to form, foundation.

19          THE DEPONENT:      I don't recall it saying

20              the exact wording like that, but there is

21              some wording in the...in Memarzadeh's paper

22              that talks about the buoyant force that

23              affects the airflow.

24

25      BY MS. ZIMMERMAN:

1        Kerho's experiments talking about the natural...the

2        different buoyancy of the bubbles, to me, did not, in

3        my opinion, form a representation that was accurate

4        of the particles.

5              Q.    Is it your testimony that bubbles are

6        more or less than dense than particles in the air?

7              A.    Of different density.

8              Q.    Of different density?

9              A.    Yes.

10             Q.    But greater density or less density?

11             A.    It depends on the particle or the

12       groupings of particles or what the particles are

13       attached to.

14             Q.    All right.  Are there any bubbles

15       that you think could be appropriate proxies for

16       particles in the air?

17             A.    Not in my opinion.

18             Q.    All right.  Have you ever done any

19       particle measurement?

20             A.    I have not personally done particle

21       measurement, but I have contracted for particle

22       measurement to be conducted.

23             Q.    So you have hired other people to do

24       particle sampling and...

25             A.    Yes, I have.

 1            Q.     All right.  But you have never

 2     personally done particle sampling?

 3            A.     No, I have not.

 4            Q.     You are not familiar with any of the

 5     tools that are used to measure particles in the air?

 6            A.     I am familiar and seen some of the

 7     tools that were used by some of these contracted

 8     individuals, but I have not used them myself.

 9            Q.     All right.  And it is not something

10     that you are personally trained to use?

11            A.     It is not something I am personally

12     trained to use.

13            Q.     All right.  And it is not something

14     that you would be in a position to offer any

15     testimony about calibration or accuracy of

16     measurements, or anything like that, because you

17     don't have training in that field, correct?

18            A.     I would not offer any testimony on

19     the calibration of such equipment.

20            Q.     All right.  And harkening back then,

21     I think that you were provided the deposition of

22     Michael Buck in this matter; is that right?

23            A.     Yes.

24            Q.     I know the names all probably start

25     to run together for all of us, especially at this

1      time.  He is a plaintiffs' expert who conducted an

2      experiment with respect to particles coming out of

3      the Bair Hugger.  Does that ring a bell?

4              A.    I did not get the opportunity to read

5      Buck's deposition.

6              Q.    Okay.  Were you ever provided a copy

7      of his report?

8              A.    No.

9              Q.    So you're not going to be offering

10     any opinions with respect to the particle

11     measurements that Mr. Buck did in his experiment?

12             A.    I am not offering any opinions about

13     Buck's experiments.

14             Q.    Okay.  And with respect to the

15     criticisms that you offer about the use of bubbles in

16     studying particles in airflow, you refer heavily to

17     this Kerho article at letter (q), the "Neutrally

18     buoyant bubbles used as flow tracers in air"; is that

19     right?

20             A.    Yes.  Kerho, I rely on, yes.

21             Q.    Okay.  And that was one of those

22     articles where you weren't sure if you had it...if it

23     was produced to you by counsel, or if you happened to

24     come across that in your own research; is that right?

25             A.    That is correct.

1        carry another contaminant in combination with it.

2              Q.     And did you have any experience with

3        characterizing particles prior to involvement in this

4        case?

5              A.     Yes.

6              Q.     When?

7              A.     I have been involved with...in

8        the...in the design and application of isolation

9        rooms, we have worked on understanding the

10       characteristics of airborne versus droplet versus

11       contact infection transmission toward the

12       determination of what should be in the standards for

13       design of these isolation rooms, and which

14       application applies to which.

15             Q.     And when you have been a part of

16       those conversations, it has been a group

17       conversation, I gather?

18             A.     Yes.

19             Q.     All right.  And who else has

20       participated in those conversations with you?

21             A.     Members of the two committees...

22       multiple committees between CSA and ASHRAE, actually,

23       as well as in infection control practitioners,

24       epidemiologists, directors of infection control.

25             Q.     And with respect to particles

1         particle's ability to remain airborne and potentially

2         carry microorganisms that could cause an infection,

3         what is that based on; your experience?

4                  A.      Just these two sentences?

5                  Q.      Well, I mean, that is what you have

6         identified in your report about what you are, I

7         gather, about what you are prepared to say to a court

8         or a jury in this case, correct?

9                  A.      Sorry, I'm confused.  There is more

10        than two sentences I talk about particles in the

11        report.  So I am not sure if you're referring to just

12        the two sentences or the entirety of the report or...

13                 Q.      Well, this, we're talking about

14        particle characteristics.  And I have asked you about

15        these two particular sentences.  I mean,

16        unfortunately, we are slogging through this whole

17        thing, as you can see.  But, to the extent that you

18        are offering testimony or attempting to offer

19        testimony in this matter...

20                 A.      Yes.

21                 Q.      ...about a particle's ability to

22        remain airborne and whether or not a particle has the

23        capacity to carry microorganisms, which potentially

24        cause infections...

25                 A.      Right.

M. Keen - 290

1             Q.      ...I want to know what that is based

2        on.

3             A.      So that is based on, again, my review

4        of relevant documentation and my experience to do

5        with, as I mentioned, the characteristics of

6        different infections and transmission of infections

7        by either droplet, contact or airborne.

8             Q.      Okay.  And so, I asked about

9        citations, at least, and that is the Noble piece that

10       you have here?

11            A.      Right.

12            Q.      And then I asked you about

13       experience, and you said, I think, that you sit on

14       some committees that have addressed these issues.  Is

15       that fair so far?

16            A.      Yes.

17            Q.      We are on the same page.  Okay.

18       So, I said, "Who else is involved in those

19       committees?"  And I assumed that you would defer to

20       a microbiologist or an infectious disease specialist

21       with respect to...

22            A.      And a number of them are on the

23       committee, yes, as I mentioned.

24            Q.      All right.  And, in any event, if

25       microbiologists and/or infectious disease physicians

1         come to trial in this case and offer testimony about

2         particulates and their propensity to carry

3         microorganisms, you're going to defer to their

4         testimony in that regard?

5              A.    Yes.

6              Q.    Okay.   Now, you list in Figure

7         11...it's a list of a number of different nosocomial

8         pathogens that can become aerosolized; is that right?

9              A.    Yes.

10             Q.    And that comes from Kowalski, right,

11        in 2012?

12             A.    That is correct.

13             Q.    All right.   And what was the purpose,

14        in your mind, of including this particular table?

15             A.    It represents the various relative

16        sizes of a number of different viruses, bacteria and

17        fungi, and other pathogens to have an understanding

18        of what the size of concern that we are dealing with

19        in this matter here.

20             Q.    Okay.   And you understand that

21        Kowalski's publication here has been cited by Dan

22        Koenigshofer and I believe also Michael Buck as well,

23        although you wouldn't know that because you didn't

24        have his report.   But you did see it, however, in Dan

25        Koenigshofer's report, correct?

1          Q.     Okay.  And, similarly, you are not a

2     physician, correct?

3          A.     That is correct.

4          Q.     So you are not going to be offering

5     any testimony in this case with respect to issues

6     regarding medicine, correct?

7          A.     That is correct.

8          Q.     All right.  Similarly, with respect

9     to particle physics, I think that you've said that

10    you're going to defer to the particle physics experts

11    in computational fluid dynamics; is that right?

12         A.     That is correct.

13         Q.     Okay.  And with respect to

14    engineering, you would defer to, I assume, folks that

15    have gone about in designing an HVAC system for a

16    hospital, correct?

17         MR. GOSS:     Object to form.

18         THE DEPONENT:     I would also rely upon my

19              own opinions when it comes to engineering of

20              hospital design.

21

22    BY MS. ZIMMERMAN:

23         Q.     Okay.  But you have testified already

24    this afternoon that you would not feel comfortable

25    designing an HVAC system for an operating room alone,

1    correct?

2           A.      I don't recall the earlier testimony,

3    but I am not...my current profession is not one of

4    design.   I certainly lead design activities for the

5    hospital, and I am involved in design...making

6    decisions as part of the standard activities I am

7    involved with.   But I am not employed today, in my

8    role, as a design engineer.   Despite my training as a

9    mechanical engineer, that is not my current role.

10          Q.      Okay.   And you have not personally

11   designed an HVAC system for an operating room by

12   yourself before, correct?

13          A.      Correct.

14          Q.      All right.   And you only, to this

15   point, assisted in the design of one HVAC system that

16   was used in a hospital in the United States at this

17   point, correct?

18          A.      No.   That is one that I assisted in

19   the design in the United States when you asked about

20   facilities in the United States.   I certainly have

21   been involved in assisting with the design of systems

22   at my own hospital.

23          Q.      Okay.   And let's break that into two

24   pieces.   With respect to designing HVAC systems for

25   use in ORs in the United States, you have done that

1          once before, correct?
2                    A.     That is correct.
3                    Q.     All right.  But you have done some
4          other HVAC design work in teams in Canada, right?
5                    A.     Yes.
6                    Q.     Okay.  And so, with respect to the
7          next kind of paragraph that talks about what I would
8          characterize as particle physics, talking about how
9          particles settle over time, is it fair to say that
10         you would defer to a particle physics specialist in
11         matters of this regard?
12                   MR. GOSS:     Object to form.
13                   THE DEPONENT:     Yes, I would.
14

15    BY MS. ZIMMERMAN:
16                   Q.     And so, while you offered criticisms
17         of what conclusions and methods Albrecht and Legg may
18         have conducted and ultimately reached, you would
19         defer to other folks on whether or not those were
20         appropriate methods and conclusions, correct?
21                   MR. GOSS:     Object to form.
22                   THE DEPONENT:     I offered opinions related
23                   to those articles, and I felt qualified to
24                   offer those opinions.  Where it related to
25                   particle physics, as you ask, then I would

1          A.      That is correct.

2          Q.      And that lists out the size in

3     micrometres of various viruses and bacteria; is that

4     right?

5          A.      That is correct.

6          Q.      And you would agree that, at least

7     the staphylococcus aureus...are you aware that that

8     is a bacteria?

9          A.      Yes.

10         Q.      All right.  And the Kowalski chart

11    that you cited in your report lists that as a

12    .866 micrometre size, correct?

13         A.      Yes.

14         Q.      All right.  And there are some

15    additional bacteria that are listed in this Kowalski

16    chart, but just, as it is getting to be a long day,

17    we won't go through every one of the bacteria; is

18    that fair?  What is your basis for saying that the

19    bacteria travel in clumps?

20         A.      That is through my experience in

21    understanding how the bacteria travels, and in also

22    my review of the documentation that I reviewed as

23    part of this case.

24         Q.      All right.  Do you know how many

25    bacteria or pathogens it takes to cause a surgical

1        site infection?

2                 A.     No.

3                 Q.     Could it be as low as one

4        colony-forming unit?

5                 MR. GOSS:     Objection, lack of foundation.

6                 THE DEPONENT:     I would defer to a...I

7                 would defer to an epidemiologist,

8                 microbiologist on the number of particles.

9

10       BY MS. ZIMMERMAN:

11                Q.     Okay.  At any rate, you are not going

12       to be offering any testimony at trial in this matter

13       about how many particles is required?

14                A.     That is correct.

15                Q.     All right.  Or how many pathogens, I

16       should say.

17                MR. GOSS:     You can answer that one.

18                THE DEPONENT:     Sorry, no, I won't be.

19

20       BY MS. ZIMMERMAN:

21                Q.     All right.  So you characterize the

22       change in particle counts of 5.0 micrometre size as

23       negligible in the Legg 2012 report; is that right?

24                A.     I actually just, I believe, reported

25       what Legg reported as a negligible change in particle

1      Q.    And creating a cocoon.  Okay.  In any

2      event, you would not think it is prudent to have a

3      laminar flow system that was sufficiently powerful to

4      overcome that protective cocoon, correct?

5            A.    Correct.

6            Q.    As you sit here today, besides

7      Memarzadeh...and by the way, with the thermal plume

8      section that is listed as subsection d), there's no

9      citations to this.  I see that this Figure 12 and 13,

10     as I understand it, are your drawings to visualize

11     the effect of this thermal plume, or the protective

12     cocoon, as you call it.  Are you aware of any

13     scientific peer-reviewed evidence to support this

14     thermal plume theory, besides Memarzadeh?

15           A.    Besides Memarzadeh?

16           Q.    Yes.

17           A.    No, I am not.

18           Q.    And have you heard others criticize

19     the thermal plume theory in the past?

20           A.    Yes, I have.

21           Q.    And have you personally ever

22     calculated the buoyancy or the force of this

23     protective cocoon, or this thermal plume, however you

24     describe it?

25           A.    I have not done personal calculations

M. Keen - 308

1           on that.

2                   Q.      Do you know if anyone else has?

3                   A.      I know that Farhad Memarzadeh has.

4                   Q.      At any rate, you haven't done that in

5           connection with this case, correct?

6                   A.      I have not done the calculations, no.

7                   Q.      All right.  And you're not going to

8           be offering any testimony in court or trial at this

9           matter about the forces involved in the thermal plume

10          and the protective cocoon?

11                  MR. GOSS:      Object to form.

12

13      BY MS. ZIMMERMAN:

14                  Q.      Are you going to be doing the

15          calculations...

16                  MR. GOSS:      Okay.  That...

17                  THE DEPONENT:     It's a different question,

18                  yes.

19

20      BY MS. ZIMMERMAN:

21                  Q.      Have you been asked to do the

22          calculations?

23                  A.      No.  You asked two different

24          questions there.  I am not going to be testifying on

25          any calculations on the thermal plume, but I am

1    providing opinion on the thermal plume, yes.

2         Q.    All right.  And, to your knowledge,

3    the only person who has published in a peer-reviewed

4    journal on the thermal plume theory is Dr.

5    Memarzadeh, correct?

6         A.    That is the only one that I am

7    relying on, yes.

8         Q.    All right.  And Dr. Memarzadeh has,

9    in fact, himself conducted or performed the

10   mathematical calculations to represent the forces of

11   this thermal plume, correct?

12        A.    Yes.

13        Q.    And that is not a calculation that

14   you have done at this point in this case, correct?

15        A.    I have not done that calculation.

16        Q.    Okay.  Have you been asked to do that

17   calculation?

18        A.    I have not been asked to do that

19   calculation.

20        Q.    All right.  Turning to the Settles

21   report, which I think you cite at number (w)...letter

22   (w), not number (w)...that was another one that was

23   provided to you by counsel, I presume?

24        A.    Yes, it was.

25        Q.    All right.  And you understand that

1    what I intended to do, whether both needed to be

2    referenced or if it was only one and the other one

3    wasn't, and that this was part of the report.  I

4    couldn't tell you right now.  It was an omission of

5    mine to clarify the reference in here.

6            Q.    Okay.  I appreciate that.  In any

7    event, this Landrin article from 2005 seems to be

8    something that you considered in forming your

9    opinions that you reflect in your report; is that

10   right?

11           A.    I don't recall...sorry, I would have

12   considered it.  Whether it actually was a basis for

13   any of the opinions in this section, I don't recall

14   at this time.

15           Q.    Okay.  And (x), at any rate, the

16   Maria Luisa Cristina article, "Can particulate air

17   sample predict microbial load in operating theatres

18   for arthroplasty?", that was one of the articles that

19   was, in fact, produced to you or provided to you by

20   counsel, correct?

21           A.    Correct.

22           Q.    All right.  And, again, while you

23   have a section about appropriate or...about the use

24   of particle counting to predict bacterial

25   contamination, actually doing particle counting is

M. Keen - 316

1           not something that you personally do, correct?

2                   A.      I have initiated particle counting

3           studies in my role, but I have not done any actual

4           particle counting myself.

5                   Q.      Okay.  And that is not something that

6           you are trained to do?

7                   A.      I am not trained to do that.

8                   Q.      Okay.  Yet you offer opinions about

9           interpretation of particle counting, correct?

10                  A.      Yes.

11                  MS. ZIMMERMAN:      Mr. Keen, I am showing

12                  you now what has been marked as Exhibit 11

13                  to your deposition today.

14

15      ---  EXHIBIT NO. 11:    Article by Birgand et al., from the

16                              American Journal of Infection

17                              Control, 2015

18

19      BY MS. ZIMMERMAN:

20                  Q.      Do you recognize this article?  And

21          if it would help, given the time of day, I think it

22          may be...

23                  A.      Reference (i).

24                  Q.      ...reference (i).

25                  A.      Yes, I do recognize this article.

1    your opinion offered in letter e) is in contrast with

2    that conclusion?

3              A.    I would say that the generality of,

4    taking beyond this study, that particle count could

5    be a surrogate for microbial contamination should not

6    be extended, and I would continue to support my

7    statement that it is not a good surrogate.

8              Q.    Okay.   Jumping ahead to the other

9    conclusions of summaries of your opinions offered on

10   pages 22 and 23, at letter a), you are prepared to

11   opine to the court in this case that, given that the

12   Bair Hugger unit contains an intake filter, which you

13   believe is tested to perform at a MERV 14 rating,

14   that that would be effective at controlling airborne

15   bacteria; is that right?

16             A.    Yes.

17             Q.    And from there you also extrapolate

18   or opine that the ASHRAE standard of 170, which

19   requires a MERV 14 filtration on supply air, would

20   also be an appropriate filter to include on the unit;

21   is that right?

22             A.    Yes.

23             Q.    And you would agree that ASHRAE

24   standards do not apply to medical devices, correct?

25             A.    I would agree.

1    devices.

2              Q.    All right.  You're not aware of a

3    standard for filtration of medical devices, and you

4    have no experience in designing filters for medical

5    devices, correct?

6              A.    That is correct.

7              Q.    And you have no experience in

8    evaluating filters for medical devices, correct?

9              A.    No.  I have experience in

10   interpreting the rating of filters under the ASHRAE

11   52.2 method, and so...and interpreting the results of

12   an ASHRAE 52.2 test.

13             Q.    Is it your testimony that ASHRAE 52.2

14   governs filters on medical devices?

15             A.    No.  It is my testimony that the

16   filter in this case was measured to the standard of

17   ASHRAE 52.2 testing.

18             Q.    All right.  And before today, you

19   were not aware that other forced air warming products

20   use MERV filtration, correct?

21             A.    That is correct.

22             Q.    All right.  But, at any rate, you

23   have not personally designed a medical device before,

24   ever, correct?

25             A.    I have not.