# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: BAIR HUGGER FORCED AIR WARMING DEVICES PRODUCTS LIABILITY LITIGATION | MDL No. 15-2666 (JNE/FLN) |
| This Document Relates To:<br>All *Cases* | **PLAINTIFFS' MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF SAMSUN LAMPOTANG, PH.D.** |

# TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................1

II.  LEGAL STANDARD ..............................................................................3

III.  ARGUMENT...........................................................................................5

A.  Lampotang is Not Qualified to Testify on the Subjects on Which He
    Seeks to Give Opinions ..........................................................................5

B.  Lampotang Fails To Identify And/Or Adhere To Any Scientific
    Methodology...........................................................................................6

C.  Lampotang Does Not Provide Any Scientific Support for His
    Opinions and Therefore Should be Excluded..................................8

    1.  The Bair Hugger Warming Unit is a Safe and Efficacious
        Medical Device....................................................................9

    2.  Arizant and 3M Acted Reasonably in Designing, Developing,
        and Marketing the Bair Hugger.......................................10

    3.  The Bair Hugger Does Not Contaminate the Surgical Field ............11

    4.  Real World Data From an Actual Infection Outbreak: Bair
        Hugger Filter is Effective at Trapping Acinetobacter Baumannii .....12

    5.  There is No Indication that Surgical Site Infections are Caused
        by the Bair Hugger .........................................................13

    6.  Numerous Potential Causes/Risk Factors of Surgical Site
        Infections .........................................................................14

    7.  Sources of dust, heat and gas outflows in OR...................................14

    8.  Latest CDC Guidelines....................................................16

    9.  Alternative Designs .........................................................17

    10.  Do Not Blow Air in the OR – Implications .................................18

    11.  Fire in the Bair Hugger...................................................19

IV.  CONCLUSION....................................................................................20

i

## <u>TABLE OF AUTHORITIES</u>

<u>Federal Cases</u>

*Allison v. McGhan Med. Corp.,*
  184 F.3d 1300 (11th Cir. 1999) ............................................................... 9

*Belk, Inc. v. Meyer Corp., U.S.,*
  679 F.3d 146 (4th Cir. 2012) ................................................................... 1

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
  509 U.S. 579 (1993) ......................................................................... 1, 3, 4

*Daubert v. Merrell Dow Pharms., Inc.,*
  43 F.3d 1311 (9th Cir. 1995) ................................................................... 4

*Gen. Elec. Co. v. Joiner,*
  522 U.S. 136 (1997) ................................................................................ 4

*Groobert v. President and Directors of Georgetown College,*
  219 F. Supp. 2d 1 (D.D.C. 2002) ........................................................... 4

*In re Baycol Prods. Litig.,*
  532 F. Supp. 2d 1029 (D. Minn. 2007) ................................................... 3

*Kumho Tire Co., Ltd. v. Carmichael,*
  526 U.S. 137 (1999) ....................................................................... *passim*

*Polski v. Quigley Corp.,*
  538 F.3d 836 (8th Cir. 2008) ................................................................... 3

<u>Federal Rules</u>

Federal Rules of Evidence 702 ...................................................... 1, 3, 17

<u>Other Authorities</u>

Ladd, Expert Testimony,
  5 Vand.L.Rev. 414 (1952) ..................................................................... 17

Pursuant to Federal Rules of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), Plaintiffs respectfully move this Court to exclude the report and testimony of Defendants' expert witness Samsun Lampotang.

## I.  <u>INTRODUCTION</u>

"[T]he district court must decide whether the expert has 'sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case.'" *Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146, 162 (4th Cir. 2012), *as amended* (May 9, 2012) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 156 (1999)).

Lampotang is a mechanical engineer with a specialization in anesthesiology and biomedical engineering.  Despite this, however, Lampotang did absolutely no testing in connection with this litigation or his report. Exhibit C, Deposition of Samsun Lampotang ("Lampotang Dep.") at 58:11-13  In fact, as he states in his expert report, his charge was to solely "review expert reports, and other materials concerning the use of forced air warming devices such as the Bair Hugger during surgery and any associated risks of surgical site infections (SSI)."  (Ex. A, p.3 - Expert Report of Samsun Lampotang).[1] Lampotang offers no methodology, however, much less an accepted scientific methodology, for his opinions.  As Lampotang admits, his report consists of his background, his qualifications, followed essentially by a recitation of critiques that he has

---

[1] All references to Ex. __ are references to exhibits to the Declaration of Genevieve M. Zimmerman in Support of Plaintiffs' Motion to Exclude the Opinions and Testimony of Samsun Lampotang, Ph.D., filed concurrently herewith.

with respect to various peer-reviewed studies and expert reports offered by plaintiffs in the matter. (Lampotang Dep. 60:14-19)[2]

The trial court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *See Kumho Tire Co.*, *Ltd. v. Carmichael,*526 U.S. 137, 152 (1999).  Here, however, Lampotang failed to have actually reviewed or considered studies, depositions, and internal documents that are relevant to his opinions, nor, even for those documents he did review, to be able to recall the details of those documents.  To make matters worse, Lampotang's list of materials reviewed and relied on was woefully incomplete, leaving no method to determine what materials Lampotang actually reviewed, considered, relied on, failed to review, and/or discarded in reaching the opinions he intends to offer in this case.

Although Lampotang claims to render numerous opinions, he does not establish his qualifications to render such opinions, nor does he describe the methodology used to arrive at those opinions. Lampotang admitted that "I was not writing a paper, in my mind, *so I didn't apply the same approach that I would use for an academic paper*." (Lampotang Dep. 249:8-15) (emphasis added)

---

[2] All references to "Dep. [page]:[line]" are to page and line numbers of the Deposition of Samsun Lampotang, Ph.D., taken on August 11, 2017, relevant excerpts of which are attached as Ex. C to the Zimmerman Declaration in Support filed concurrently herewith.

Lampotang clearly and admittedly did not arrive at the opinions expressed in his report with the "same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *See Kumho Tire Co., Ltd.*, 526 U.S. at 152. For those reasons, and others, Plaintiffs respectfully request that opinions proffered by Lampotang be excluded.

## II.   <u>LEGAL STANDARD</u>

Federal Rule of Evidence 702 permits expert witnesses to testify if the subject of their testimony is relevant, the witnesses are qualified to express their opinions, and the proposed evidence upon which they base their testimony is reliable or trustworthy. *Polski v. Quigley Corp.,* 538 F.3d 836, 839 (8th Cir. 2008).

Courts are the gatekeeper of evidence proffered under Rule 702, "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd.,* 526 U.S. at 152.

Expert testimony must be trustworthy for it to be reliable. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 590 (1993). The Eighth Circuit considers additional factors as well, including: "whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case. *Polski,* 538 F.3d at 839. The party seeking admission of expert testimony has the burden of demonstrating its reliability. *In re Baycol Prods. Litig.,* 532 F. Supp. 2d 1029, 1042 (D. Minn. 2007).

A "very significant" criterion for reliability is whether the expert's testimony is based on research independent of litigation. *Daubert v. Merrell Dow Pharms., Inc.,,* 43 F.3d 1311, 1317 (9th Cir. 1995) (*Daubert II*). "If the proffered expert testimony is not based on independent research, the party proffering it must come forward with other objective, verifiable evidence and explain precisely how they went about reaching their conclusions and point to some objective source – a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like – to show that they have followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field." *Id.,* 43 F.3d at 1317-19.

Where the factual basis, data, or the methodology employed by the expert are sufficiently called into question, the court must determine not only if the testimony is reliable, but also whether it has a valid connection to the pertinent inquiry. *Kumho Tire Co., Ltd.,* 526 U.S. at 149. Expert testimony must therefore "logically advance[] a material aspect of the proposing party's case." *Daubert,* 509 U.S. at 597. The court should not admit opinion evidence "that is connected to existing data only by the *ipse dixit* of the expert," *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997), or that is based on his own unique methodology rather than a respected methodology. *Groobert v. President and Directors of Georgetown College,* 219 F. Supp. 2d 1 (D.D.C. 2002). Under these circumstances, a court may conclude there is simply too great an analytical gap between the data and the opinion." *Gen. Elec. Co.,* 522 U.S. at 146.

4

III.   **ARGUMENT**

Lampotang's opinions are scientifically unsupported criticisms.   Lampotang takes a shotgun approach, largely taking a position regarding a particular subject and then citing to just a single article or sometimes two articles that support his position Lampotang ignores relevant evidence in the literature as well as materials and depositions that have been produced in this case.   Plaintiffs respectfully submit that Lampotang should be excluded because his methodology is nonexistent and because he admitted that he failed to follow the same approach he that he would practice in his field.   *See Kumho Tire Co., Ltd.*, 526 U.S. at 152.

A.   **Lampotang is Not Qualified to Testify on the Subjects on Which He Seeks to Give Opinions**

Lampotang has done no testing whatsoever with relation to this case.   *Id.* at 58:11-60:6)   He did not do any biological testing. *Id.*   He did not do any filtration testing. *Id.* He did not do any particle counting. *Id.*   He did not perform any computational fluid dynamics analysis. *Id.*   In fact, Lampotang has no personal expertise with regard to the subject of this litigation other than what he reviewed in Plaintiffs' experts' reports and certain articles and depositions.   Lampotang admits that he is not a medical doctor, and with respect to issues of infectious disease, would defer to an infectious diseases doctor. *Id.* at. 114:6-114:24.   Lampotang admits that he is not an expert in aerobiology. *Id.* Lampotang admits that he is not an expert in microbiology. *Id.*   Lampotang admits that he would defer to an orthopedic surgeon with regard to orthopedic issues. *Id.*   Lampotang admits with respect to the differences between a superficial surgical site infection and a

5

periprosthetic joint infection, he would defer to an infectious diseases doctor. *Id.* at 117:10-117:15.  Lampotang admits he is not an expert in computational fluid dynamics. *Id.* at 200:1-200:20.  Lampotang also admits he is not a statistician capable of judging whether particular studies are underpowered or have other limitations, yet, proceeds to do just that with regard to studies that support Plaintiffs' positions. Id. at 258:5-259:17.

Lampotang seeks to offer numerous opinions on subjects outside his field of mechanical engineering. His admitted lack of expertise, alone, should exclude Lampotang's report and opinions in their entirety.

### B.   Lampotang Fails To Identify And/Or Adhere To Any Scientific Methodology

More important than his lack of qualifications is that Lampotang never identifies his methodology.  (Ex. A)  During his deposition, Lampotang repeatedly failed to demonstrate whether he actually reviewed studies, depositions, or internal documents relevant to his proffered opinions.  Even for those materials he did claim to review, Lampotang was unable to remember the details of those documents, frequently claiming at deposition that he could not remember details because he read those materials "a long time ago," despite the fact that his expert report was issued just two months prior to his deposition. See, *e.g.*, *id.* at 160:15-22; 165:24-166:10. Lampotang's list of materials considered was admittedly and woefully incomplete, leaving no method of determining what materials Lampotang actually reviewed, relied on, failed to review, and/or discarded, and providing no reliability in support of his opinions.  *Id.* at 160:17-166:10. In addition, Lampotang testified that he considered materials that were neither identified

6

in his expert report nor in his list of materials considered.  Ex. A pp. 15-16 at Footnotes i-xvi; Ex. B – Materials Considered; Dep. 160:17-166:10.  The failure to provide a complete disclosure of documents considered and relied upon in forming expert opinions would alone, make any opinions he intends to render methodologically unsound.

Lampotang did admit, however, there were numerous relevant materials that he did *not* consider in arriving at his opinions, namely, the depositions of the authors of many of the studies which Lampotang critiques:

- Lampotang failed to review the deposition of Mr. Legg Lampotang Dep. 162:19-163:18;

- Lampotang failed to review the deposition of Dr. Belani. *Id.* at 162:19-163:18;

- Lampotang failed to review the deposition of Prof. Leaper. *Id.* at 162:19-163:18;

- Lampotang failed to review the deposition of Dr. Reed. *Id.* at 162:19-163:18;

- Lampotang failed to review the deposition of Dr. McGovern. *Id.* at 164:6-166:10;

- Lampotang failed to review the deposition of Prof. Nachtsheim. *Id.* at 164:6-166:10;

- Lampotang failed to review the deposition of Robert Gauthier. *Id.* at 164:6-166:10;

- Lampotang failed to review the deposition of Dr. Kurz. *Id.* at 164:6-166:10; and

- Lampotang only read one of the three depositions of Dr. Sessler, but could not identify which one he read. *Id.* at 164:6-166:10.

Although Lampotang agrees that research papers such as ones he has written in the past should include complete references to all of the underlying materials that he relied upon in writing such papers, Lampotang failed to do this when writing his expert report. *Id.* at 247:9-248:15.  Lampotang testimony sums up his approach by his statement: "***I was not writing a paper, in my mind, so I didn't apply the same approach that I would use for an academic paper.***" *Id.* at 249:8-15.

Lampotang admittedly did not arrive at the opinions expressed in his report with the "same level of intellectual rigor that characterizes the practice of an expert in the relevant field," and therefore his opinions should be excluded. *See Kumho Tire Co., Ltd.*, 526 U.S. at 152.

**C.** **Lampotang Does Not Provide Any Scientific Support for His Opinions and Therefore Should be Excluded**

Lampotang proffers what appear to be eleven "opinions" in his report. (Ex. A) Many of his opinions are a regurgitation of the details and conclusions of individual studies or editorials, with no expert gloss.  Many opinions are unsupported by any citations to any underlying basis for those opinions.  Each of these opinions also suffers from the same lack of expertise and methodology described above.   Under the relevant case law, unreliable and irrelevant information must be kept from the trier of fact because

8

of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value. *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999).

### 1.      The Bair Hugger Warming Unit is a Safe and Efficacious Medical Device

Lampotang's opinions that the Bair Hugger is a "reasonable, safe, easy to use and efficacious device" is not supported with *a single citation to any underlying material.* Ex. A pp. 3-4.  Although never mentioned in his report, when asked at deposition, Lampotang stated that the bases for his opinion were that he was not personally aware of any case where the Bair Hugger had been directly linked as a cause of infection, that the Bair Hugger's filter was effective, and that Phase I, II, and III clinical trials and post-market surveillance have not shown a risk, however, Lampotang could not even recall that there were *no* Phase I, Phase II, and Phase III clinical trials for the Bair Hugger. Lampotang Dep. at 213:10-214:24)  Further, Lampotang's personal awareness or non-awareness regarding the infection risk of the Bair Hugger is irrelevant when unsupported by any description of the methodology he used to establish his awareness or non-awareness.   Lampotang's opinion regarding the effectiveness of the filter is also unsupported and unreliable as well.

Lampotang relies on the Surgical Care Improvement Project (SCIP) metric SCIP-Inf-10 for his opinion that maintaining normothermia is "recommended and required." *Id*.  However, the SCIP-Inf-10 metric that he relies on has been retracted and is no longer

9

in force.  *Id.* at 62:13-63:22.  Further, Lampotang's reliance on the CDC guidelines do not discuss the Bair Hugger and its safety or efficacy.

> **2.** **Arizant and 3M Acted Reasonably in Designing, Developing, and Marketing the Bair Hugger**

Without a single specific citation, Lampotang states that "Arizant/3M, and their employees and agents, acted reasonably, prudently, and within industry standards in the design, testing, evaluation and development of the Bair Hugger." Ex. A at p. 4. Lampotang is not in the industry of patient warming and offers no basis to opine on the industry standard.  He offers no industry standard that he is relying upon.  Lampotang provided no basis for his knowledge of designing, developing, and marketing of patient warming devices and thus his opinions should be excluded due to his lack of qualifications.

Lampotang claims to have reviewed the design and development history file as well as the 510(k) for the Bair Hugger Models 505, 750, and 775, as well as other documents related to the design and testing of the Bair Hugger, which consists of tens of thousands of pages of material.  He then claims, without a single citation to any pages or specific sections of documents to support his views, that "Arizant/3M, and their employees and agents, acted reasonably, prudently, and within industry standards in the design, testing, evaluation and development of the Bair Hugger." Ex. A p. 4.  Just for example, not only does he not cite to any specific testing, but he does not even cite to examples of the types of testing which he believes 3M undertook to appropriately evaluate the safety of the Bair Hugger.

Further, when asked in more detail about these materials at this deposition, Lampotang showed a lack of knowledge about both the testing and the design history of the very products on which he seeks to give opinions. For example, Lampotang only had a vague recollection of the devices that constituted the predicate products for the Bair Hugger models at issue in this litigation and could not recall seeing the warnings on the 200 series Bair Hugger unit regarding the risk of airborne contamination.  Lampotang Dep. at 215:3-221:15.  Also, when specifically pressed to describe what tests he reviewed, he could not do so other than vague reference to a test that may have been done by a Winston Tan, which, again, was not listed in his list of material reviewed. *Id.* at 237:18-240:14.  Further showing the lack of intellectual rigor, Lampotang also admitted that he had not reviewed the deposition of Winston Tan. *Id.*

Lampotang then discusses the Bair Hugger filter media as indicating that it meets MERV 14, which he claims, again without citation, is the same rating acceptable for general surgery. Ex. A p. 4.  That, even if true and supported, is irrelevant because the surgeries at issue in this litigation are not general surgeries but *clean surgeries*.  Thus, this specific opinion by Lampotang should be excluded because it is not only unsupported, but is also irrelevant and likely to mislead the trier of fact.

### 3.      The Bair Hugger Does Not Contaminate the Surgical Field

Lampotang, in this section, simply restates opinions he discusses elsewhere, again with little to no support.  Lampotang mentions one study where samples of air exiting Bair Hugger blankets did not culture any organisms without discussing the limitations of that study, including the fact that it *did* find that bacteria were found to exit the Bair

11

Hugger hose.[3] Ex. A, p. 5.  He then briefly mentions the same infection outbreak he discusses in the next section of this report, the Bernards study. [4]  In fact, the Bernards study *does* indicate that the Bair Hugger as a source of the bacteria that was observed in an outbreak.  *Id*.  Neither of these brief references is sufficient to support Lampotang's blanket opinion that the Bair Hugger does not contaminate the sterile field. *Id.*  Further, Lampotang did not consider the many other studies cited to by Plaintiffs' experts.  Such an cursory and incomplete review of the literature by Lampotang cannot meet the "level of intellectual rigor that characterizes the practice of an expert in the relevant field," and therefore his opinion in this section opinions should be excluded. *See Kumho Tire Co., Ltd.*, 526 U.S. at 152.

### 4.    Real World Data From an Actual Infection Outbreak: Bair Hugger Filter is Effective at Trapping Acinetobacter Baumannii

The specific question is whether the Bair Hugger filter is adequate to prevent contamination of the sterile site, not whether it "traps" a certain type of bacteria. Lampotang's incorrectly interprets the Bernards paper as evidence that the Bair Hugger's filter is effective. Ex. A, p. 5-6.  The effectiveness of the Bair Hugger filter was not discussed or mentioned in the Bernards article.  In fact, the Bernards paper indicated that

---

[3] Avidan M., et al., *Convection warmers – not just hot air*. ANAESTHESIA. 1997 Nov;52(11):1073-6.

[4] Bernards AT, et al. *Persistent Acinetobacter baumannii? Look inside your medical equipment*, INFECTION CONTROL & HOSPITAL EPIDEMIOLOGY 25.11 (2004): 1002- 1004.

the bacteria responsible for the outbreak was found in the Bair Hugger device. [5] Lampotang admitted that he has not had any discussions with the authors of the Bernards study, so he has better insight into the study than anyone else who reads the article.  Dep. 273:15-274:1; 279:5-280:1.  Lampotang's opinion that because the Bair Hugger filter was found to be contaminated with one type of bacteria means that it is effective based on the Bernards article constitutes too large of an analytical gap to be reliable. [6] Further, his conclusion that the filter is effective at trapping all types of bacteria is completely opposite to the only other authority he previously cited, Avidan, which showed that bacteria *do* pass through the filter and come out the hose end of the Bair Hugger.

> ### 5.    There is No Indication that Surgical Site Infections are Caused by the Bair Hugger

As a preliminary matter, the issue in this case is whether the Bair Hugger increases the risk of periprosthetic joint infections, not surgical site infections in general.  Thus, Lampotang's opinion that there is no indication that surgical site infections are caused by the Bair Hugger is both irrelevant, and is likely to confuse the finder of fact.

Further, Lampotang admits that he is not an infectious diseases specialist, would defer to an infectious diseases specialist with regard to the difference between surgical

---

[5] Bernards AT, et al. *Persistent Acinetobacter baumannii? Look inside your medical equipment.* INFECTION CONTROL & HOSPITAL EPIDEMIOLOGY 25.11 (2004): 1002- 1004.

[6] The Acinetobacter Baumannii bacteria in the article are rod shaped and significantly larger (0.9                                                                    - 1.6 micromete the round or oval shaped Staphylococcus Aureus bacteria primarily at issue in this litigation, which are only about 0.9 micrometers in diameter. (Ex. D p. 5 - Expert Report of Michael W. Buck)

site infections and periprosthetic joint infections, is not a statistician, and has no particular expertise with evaluation of studies. Lampotang Dep. 117:10-117:15; 114:6-114:24; 258:5-259:17. Thus, Lampotang's opinions in this section are unreliable, as his opinions are based solely upon review of limited medical studies, for which he has no particular expertise at reviewing. *Id*.

Lampotang's statement that "[t]here are studies (some using surrogates like bubbles for infectious organisms) and mathematical models that have been produced, but no study has proven a direct cause and effect chain" is just that, a statement, not an opinion that will assist the trier of fact. Ex. A, p. 7.

### 6. Numerous Potential Causes/Risk Factors of Surgical Site Infections

There are no actual opinions by Lampotang with regard to the potential causes of infections, he just compiled a list of potential causes of surgical site infections. Ex. A, pp. 7-8. None of the issues raised by Lampotang, however, are unique, and the fact that there are other causes and risk factors associated with surgical site infections is acknowledged by all experts, both plaintiffs' and defendants'. Lampotang's list is without any expert gloss or opinion, Lampotang's list is unlikely to assist the jury regarding the issue they must decide, whether the Bair Hugger is the ***most likely cause*** of the periprosthetic joint infection.

### 7. Sources of dust, heat and gas outflows in OR

Lampotang's discussion in this section, that there are other sources of gas and heat in the operating room, again, is unlikely to assists the jury as he simply lists other sources

of potential airflow disruption.  Importantly, however, during his deposition when discussing this section, and belying other sections of this report, Lampotang admitted the following:

Q.   So you would agree that air blown in an operating room may contain infectious organisms; correct?

A.   Yes.

*      *      *

Q.   And all of the machines that you've listed at the bottom of page 8 and the top of page 9, if they blow air they can contaminate the sterile field; correct?

A.   They can contaminate which field?

Q.   The sterile field.

A.   If they blow air with infectious organisms, yes.

Q.   Right. And that in -- the sterile field includes the surgical site; correct?

A.   Yes.

Q.   And you agree that the Bair Hugger device blows air; correct?

A.   Yes.

Lampotang Dep. 175:8-11; 176:17-177:8.

In this same section, Lampotang then proceeds to discuss alternate sources of heat in the operating room.  Showing the lack of intellectual rigor Lampotang applied to his

15

report, this section of the report is replete with problems.  For example, Lampotang cites to a figure of 500 watts for the heat dissipation from a forced air warming device, but, at his deposition, he admitted that the citation in his report for that figure did not, in fact, contain any information related to the amount of heat dissipation.  *Id.* at 182:17-185:9.

Further, the "study" that Lampotang then claims that number actually came from, along with the remainder of his discussion regarding that "study," Lampotang admits is just a reference to a letter to the editor, and not the actual study itself.  *Id.* at 188:19-191:6.  Although Lampotang claims to have reviewed the underlying study, when asked about more detail, he, again, could not recall details, did not list the actual study in his list of materials considered, did not know whether the study was published or unpublished, and professed to have read the actual study "a long time ago."  *Id.* at 189:24-190:3; 190:23-191:6.  Lampotang admitted that his entire discussion of alternate sources of heat in the operating room comes solely from this one "study" that he failed to cite to as even having considered, and, further, that he has no independent knowledge of any of that information.  *Id.* at 191:7-195:1.  Finally, when asked, Lampotang could not even recall that the Memarzadeh study on which he basis his entire discussion found that the Bair Hugger 505 actually disrupted the airflow in the operating room, again claiming that "it's been a long time since I – I read it."  *Id.* at 199:9-200:4.

### 8.    Latest CDC Guidelines

This section is simply a citation to and quotations from the 2017 CDC guidelines with no expert gloss whatsoever.  Ex. A p. 10.  Under such circumstances, Lampotang's "opinions" in this section contain information that does not require expert gloss, and

16

should be excluded. *See*, Fed. R. Evid. 702 Advisory Committee Notes ("There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." Ladd, Expert Testimony, 5 Vand.L.Rev. 414, 418 (1952).)

Further, although Lampotang cites to the CDC guidelines, he completely fails to acknowledge or disclose that the CDC guidelines do not actually discuss forced-air warming at all, again, making his discussion in this section unreliable. Ex. A, p. 10.

### 9.   Alternative Designs

Several of Defendants' experts make references and/or comparisons to the HotDog. Lampotang discusses some alternative products to the Bair Hugger and claims that because those products use a different technology, they cannot be alternative designs. Ex. A pp. 11-12.  However, other than simply stating that they are different products using a different heat transfer mechanism, Lampotang, again, provides no support for his opinion.  *Id*. He never explains why using conduction versus convection makes these products non-alternative designs, does not explain why they cannot be compared, and why, in practice, these products are not alternatives to each other.  *Id*.  Lampotang admits that he, personally, did not testing at all with regard to the Bair Hugger or any alternative designs.  Lampotang Dep. 58:11-60:6.  He further never cites to a single study actually comparing conductive versus convective warming mechanisms, nor any comparison to any other warmings mechanism, such as reflective blankets, which were found to be

found to be as effective as forced-air warming in at least one study.[7]  Ex. A, pp. 11-12.
Nor does Lampotang ever discuss or consider studies showing preoperative warming in
the context of clean surgeries, such as the ones at issue here.[8]  *Id.*

Yet again, Lampotang shows that he did not approach his work as an expert in this
litigation with the same intellectual rigor as that of an expert in the field, failing to
support his opinions with either citations to studies or his own research, and failing to
consider studies clearly relevant to his opinions.  As such, his opinions in this section
should be excluded.

### 10.   Do Not Blow Air in the OR – Implications

Lampotang's discussion in this section can essentially be boiled down to the
opinion, because the Bair Hugger does not use water, the comparison to the heater-cooler
unit contamination, and the warning from the CDC regarding limiting devices that blow
air in operating rooms is inapplicable.  Ex. A, pp. 12-13.  First, Lampotang, again, does
not support his opinions with any citations to anything other than the opinion expressed
by Robert Crowder at a deposition. *Id*. As Lampotang admitted, he is not an expert in
infectious diseases or aerobiology, and, as his citation to Crowder demonstrates, has no
independent knowledge or basis for his opinion.  *Id*.; Lampotang Dep. 114:6-114:24.

---

[7] Tjoakarfa C., *Reflective Blankets Are as Effective as Forced Air Warmers in Maintaining Patient Normothermia During Hip and Knee Arthroplasty Surgery*. J ARTHROPLASTY, 2017 Feb;32(2):624-627

[8] Melling A., et al., *Effects of preoperative warming on the incidence of wound infection after clean surgery: a randomised controlled trial*, LANCET. 2001 Sep. 15;358(9285):876-80

### 11.    Fire in the Bair Hugger

Lampotang's opinions are characterized by unsupported assumptions and lack of proper care.  Lampotang starts by a basic, straightforward recitation of the report where soot generated by a fire in a Bair Hugger unit was not trapped by the pores in the Bair Hugger warming blanket and, instead, was expelled from the blanket, resulting in it being found, amongst other places, on the draping and the patient's skin.  Ex. A, 13-14.  He next quotes from an exhibit to another expert's report, Koenigshofer, that combustion smoke is less than 0.3 microns and that most smoke is 0.3 – 1 micron.  *Id*.  That is where Lampotang makes his first unsupported and unwarranted assumption, that the type of smoke generated by the fire in the Bair Hugger was combustion smoke rather than a different type of smoke.[9]  *Id*.  He then goes even further, and assumes, *with absolutely no basis or support whatsoever*, that the soot formed in the Bair Hugger fire is similar in size to Diesel Particulate Matter.  *Id*.  Everything Lampotang discusses after this point is completely baseless, because not only does Lampotang not provide any basis for his assumption that the soot generated from an electrical fire in the Bair Hugger can be equated to the emissions from the burning of diesel fuel in an internal combustion engine, but even from a common sense perspective, it belies belief that the byproducts generated

---

[9]  The likelihood that the smoke was combustion smoke is incredibly unlikely, given the fact that the fire was an electrical fire and that the smoke was likely produced as a result of burning wiring and circuit boards, whereas combustion smoke is the result of the relatively clean burning of a fuel source, but that is beside the point, as Lampotang provides no support for his viewpoint to begin with.

by the burning of liquid diesel fuel in a high-temperature, high-compression environment, such as a diesel engine, can be equated with the smoke produced from an electrical fire.

Lampotang clearly shows in this section, as he does throughout his entire report, that his opinions are unsupported, are based upon assumptions that are similarly unsupported, are unreliable, lack intellectual rigor, and should be excluded.

## IV.   <u>CONCLUSION</u>

Lampotang's entire report is characterized by a complete lack of intellectual rigor, failing to provide support for his opinions, making completely unsupported and unwarranted assumptions, failing to appropriately consider all relevant materials, failing to provide any ability for anyone to determine exactly what materials he considered in formulating his opinions, claiming at his deposition to be unable to discuss materials he claims support his opinions because he reviewed them "a long time ago" despite there only being two months between the issuance of his report and his deposition, and failing to provide any methodology at all, much less a scientific methodology, for his conclusions.

Further, Lampotang, despite not being a medical doctor, and despite having disclaimed expertise in infectious diseases, aerobiology, microbiology, orthopedics, computational fluid dynamics, and even statistics, seeks to render opinions regarding all of these fields of expertise.

For these reasons, and those discussed in more detail above, Plaintiffs respectfully submit that Lampotang, his report, and any testimony that he seeks to offer, be excluded in their entirety.

Dated: September 12, 2017

Respectfully submitted,

CIRESI CONLIN L.L.P.

/s/Michael V. Ciresi
Michael V. Ciresi (MN #0016949)
Jan M. Conlin (MN #0192697)
Michael Sacchet (MN # 395817)
Ciresi Conlin LLP
225 S. 6th St., Suite 4600
Minneapolis, MN 55402
Phone: 612.361.8202
Email: MVC@CiresiConlin.com
       JMC@CiresiConlin.com
       MAS@ciresiconlin.com

LEVIN PAPANTONIO, P.A.

/s/ Ben W. Gordon, Jr.
Ben W. Gordon (FL # 882836) – *Pro Hac
Vice*
J. Michael Papantonio (FL # 335924)
316 S. Baylen Street, Suite 600
Pensacola, FL 32502-5996
Phone: 850.435.7090
Fax: 850.436.6090
Email: bgordon@levinlaw.com

**Plaintiffs Co-Lead Counsel**

KIRTLAND & PACKARD LLP

/s/ Behram V. Parekh
Behram V. Parekh (Cal. Bar. 180361) (*Pro Hac Vice*)
2041 Rosecrans Ave., 3rd Floor
El Segundo, CA 90245
Phone:310.536.1000
Fax:310.536.1001
E-mail: bvp@kirtlandpackard.com

**Plaintiffs Executive Committee**

MESHBESHER & SPENCE LTD.

/s/ Genevieve M. Zimmerman
Genevieve M. Zimmerman (MN #330292)
1616 Park Avenue South
Minneapolis, MN 55404
Phone: 612.339.9121
Fax: 612.339.9188
Email: gzimmerman@meshbesher.com

21