# EXHIBIT C

Confidential - Subject to Protective Order

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

In Re:

Bair Hugger Forced Air Warming

Products Liability Litigation


This Document Relates To:

All Actions                    MDL No. 15-2666 (JNE/FLM)

- - - - - - - - - - - - - - - - - - - - - - - - - - - -



DEPOSITION OF SAMSUN LAMPOTANG, Ph.D.

VOLUME I, PAGES 1 - 310

AUGUST 11, 2017



(The following is the deposition of SAMSUN

LAMPOTANG, Ph.D., taken pursuant to Notice of Taking

Deposition, via videotape, at the DoubleTree by

Hilton, 2101 Dixie Clipper Drive, in the City of

Jacksonville, State of Florida, commencing at

approximately 8:35 o'clock a.m., August 11, 2017.)

Confidential - Subject to Protective Order

Page 4

1                  P R O C E E D I N G S

2              (Lampotang Exhibit 1 marked for

3              identification.)

4       (Witness sworn.)

5                    SAMSUN LAMPOTANG,

6              Called as a witness, being first

7              duly sworn, was examined and

8              testified as follows:

9                         EXAMINATION

10   BY MS. ZIMMERMAN:

11       Q.   Good morning, Dr. Lampotang.

12       A.   Good morning.

13       Q.   My name is Genevieve Zimmerman, we met just

14   a moment ago.  I'm one of the lawyers that has been

15   appointed by the Court to represent the nearly 3,000

16   people who have brought claims in -- in this

17   multidistrict litigation proceeding.  We're going to

18   go over some kind of ground rule -- ground rules to

19   begin with.

20              First of all, did I pronounce your name

21   correctly?

22       A.   Yes.

23       Q.   Dr. Lampotang?  And is that what you prefer

24   to be addressed as?

25       A.   You can call me Sam.

Confidential - Subject to Protective Order

Page 58

1    interested in the methodologies on how you reached

2    your opinions?

3         A.   Yes.

4         Q.   Okay.  And -- And that's really so that we

5    can -- we can test and understand whether your

6    methodologies and conclusions are reliable, okay?  Do

7    you understand that?

8         A.   Yes.

9         Q.   Whether they're reasonable and supportable?

10        A.   Yes.

11        Q.   Now you didn't personally do any -- any

12   testing in this case; did you?

13        A.   No.

14        Q.   So you didn't do any biological testing in

15   connection with your work on this case; correct?

16        A.   No.

17        Q.   And you didn't do any filtration testing in

18   connection with your work on this Bair Hugger case;

19   have you?

20        A.   No.

21        Q.   All right.  And you didn't do any particle

22   counting in connection with your work on this matter;

23   have you?

24        A.   No.

25        Q.   All right.  And you haven't done any

Confidential - Subject to Protective Order

Page 59

1    compu -- computational fluid dynamics analysis in this

2    matter; have you?

3         A.    Can you clarify what you mean by

4    "computational fluid dynamics analysis"?

5         Q.    Do you know what computational fluid

6    dynamics is?

7         A.    Yes, I do.

8         Q.    All right.

9         A.    I have actually used it.

10        Q.    Yes, you have, from time to time.

11               Have you been asked to use computational

12   fluid dynamics in this matter?

13        A.    No.

14        Q.    Okay.  And so you --

15               Pardon me.

16        A.    Yeah, you -- because I -- I was wondering

17   what you meant by "analysis."  I did -- I did look at

18   the Elghobashi report, which is a CFD analysis.

19        Q.    Okay.  Right.

20        A.    As well as the Memarzadeh.

21        Q.    Okay.  So you looked at Dr. Elghobashi's

22   report and Dr. Memarzadeh's re -- article?

23        A.    Yes, article.

24        Q.    But you haven't personally performed a

25   computational fluid dynamics analysis in connection

Confidential - Subject to Protective Order

Page 60

1    with this case; have you?

2         A.   No, I have not.

3         Q.   Okay.  In fact you'd agree that you haven't

4    personally done any original testing with respect to

5    the Bair Hugger matter at all; is that correct?

6         A.   Correct.

7         Q.   So what your -- your report is really kind

8    of a recitation of critiques that you have with

9    respect to various peer-reviewed studies and expert

10   reports offered by the plaintiffs in this matter; is

11   that fair?

12        A.   Can you repeat the question, please?

13        Q.   Sure.

14             I said:  Your report is really a recitation

15   of critiques that you have with respect to various

16   peer-reviewed studies and also expert reports offered

17   by the plaintiffs in this matter; is that fair?

18        A.   I think it also includes what I've done, my

19   background, my qualifications, the expert report.

20        Q.   Yes.

21        A.   So it's -- there's a little bit more than

22   what you described.

23        Q.   Okay.  And your expert report, there's a

24   report, there's your -- your curriculum vitae, and

25   there's a lists of materials considered; is that

Confidential - Subject to Protective Order

Page 61

1    correct?

2         A.   Yes.

3         Q.   Three separate documents?  Okay.

4              And I guess the question I was getting at is

5    -- is really this:  You didn't do any original testing

6    yourself in offering the opinions that you offered in

7    your report; correct?

8         A.   I did not do original testing.

9         Q.   Okay.  Now with respect to the report --

10             (Discussion off the stenographic record.)

11             (Lampotang Exhibit 3 marked for

12             identification.)

13             (Discussion off the stenographic

14             record.)

15             (Recess taken from 9:52 to 10:00 a.m.)

16   BY MS. ZIMMERMAN:

17        Q.   Doctor, just before we took a break we

18   marked a copy of the report that you prepared and

19   submitted in connection with this litigation.  Is this

20   a -- a complete and accurate copy of the report that

21   you provided?

22        A.   I believe so.

23        Q.   Okay.

24        A.   I mean, you gave me the copy, so...

25        Q.   All right.  And I'll represent to you it's

Confidential - Subject to Protective Order

Page 62

1    what we were provided by counsel.

2            Did you review this document in preparation

3    for your deposition today?

4        A.   Yes.

5        Q.   All right.  And are there any corrections or

6    changes that you wish to make at this time?

7        A.   I don't know that it's a correction, but it

8    was ambiguous, so the part about the -- can't remember

9    now, let me see where it is.  The SCIP measure.

10       Q.   Yep.

11       A.   So that is -- it's not -- it's not -- it's

12   not in force any more.

13       Q.   You under -- And so we are -- you're

14   referring to the top --

15           It's towards the top of page 4; is that

16   right?

17       A.   Yes.

18       Q.   Surgical Care Improvement Project, and you

19   mentioned SCIP 10?

20       A.   Yes.

21       Q.   And you understand that the SCIP 10 protocol

22   is no longer in place?

23       A.   Correct.

24       Q.   All right.  And so that's the correction

25   that you wish to make?

Confidential - Subject to Protective Order

Page 63

1      A.   That's one.

2      Q.   All right.  And so with respect to the SCIP

3  10, do you just -- what -- what precisely is the

4  correction that you intend to make there, that --

5      A.   Well that's --

6      Q.   -- just essentially remove that?

7      A.   It's not really a correction.  I just want

8  to clarify the way it's written it's a bit ambiguous.

9  It may be misconstrued as saying it is in force, --

10     Q.   Right.

11     A.   -- and --

12     Q.   And -- And that's not the case any more;

13  correct?  All right.

14          THE REPORTER:  I'm sorry.  I did not get an

15  answer.

16     Q.   The SCIP 10 protocol has been retracted; is

17  that fair?

18     A.   Oh, I'm sorry.

19          I didn't answer.

20     Q.   I think the court reporter just wanted a

21  confirmation of that.

22     A.   Okay.  Yes.

23     Q.   The SCIP 10 has been retracted, okay.

24          Good.  I think we have a good record there.

25          All right.  Is there another change that you

Confidential - Subject to Protective Order

Page 65

1          A.    Nothing that comes to mind right now.

2          Q.    Okay.  And -- And you spent yesterday

3     reviewing your report and otherwise preparing for the

4     deposition today?

5          A.    Yes.

6          Q.    Okay.  And you identified a couple of errors

7     or changes that you wanted to make and you have

8     notified me of those; correct?

9          A.    I've notified who?

10         Q.    Notified me, just now, --

11         A.    Yes.

12         Q.    -- of the errors or changes you'd like to

13    make.

14         A.    Yes.

15         Q.    And you do that because it's important to be

16    accurate; correct?

17         A.    Yes.

18         Q.    All right.  And so you've reviewed your

19    report and you stand by the report with those

20    modifications we've just discussed; correct?

21         A.    Yes.

22         Q.    Okay.  I'm going to ask you to turn to the

23    end of your report, pages 16 and 17.  And is this a --

24    a complete list of references upon which you rely with

25    respect to the opinions you offer in your report?

Confidential - Subject to Protective Order

Page 66

1       A.    "This" being pages 16 and 17?

2       Q.    Yes.

3             And so it looks like they're end notes

4    beginning at "i" and going through Roman numeral

5    "xvi"; is that correct?

6       A.    There was this other list.

7       Q.    And we'll get to that in just a minute.

8             So this is -- these are the citations upon

9    which you rely as supportive of the opinions you offer

10   in your report; is that correct?

11      A.    Yes.

12      Q.    And this is complete?

13      A.    Yes.

14      Q.    All right.  And then, in addition --

15            MS. ZIMMERMAN:  I'll mark -- Is this

16   Exhibit 4?

17            THE REPORTER:  Correct.

18            (Lampotang Exhibit 4 marked for

19            identification.)

20   BY MS. ZIMMERMAN:

21      Q.    And Exhibit 4 is -- was also provided to us

22   in connection with your report.

23      A.    Umm-hmm.

24      Q.    I believe that this is Exhibit B, and these

25   are the other materials you considered but perhaps did

Confidential - Subject to Protective Order

Page 91

1    notes because I -- when I look at them I had no idea

2    what "789" means.

3         Q.   So again there's more handwritten notes on

4    stuff that hasn't been produced?

5         A.   But I was intend -- I was intending to give

6    it to you.  This is just, if you tell me did you

7    review "2647," --

8         Q.   Umm-hmm?

9         A.   -- I would --

10        Q.   So you know what the document is.

11        A.   -- I would just say, to the best of my

12   knowledge I assume I did, but.

13             So this is just a very quick reminder so

14   this -- so I knew what -- what those numbers, those

15   codes mean.

16        Q.   Okay.  When did you prepare the handwritten

17   notations on this document?

18        A.   Yesterday.

19        Q.   All right.

20             MS. ZIMMERMAN:  Why don't we go ahead and

21   mark the handwritten version so that we have that for

22   the record.

23             That's Exhibit 5, I think?

24             THE REPORTER:  Correct.

25             (Lampotang Exhibit 5 marked for

Confidential - Subject to Protective Order

Page 97

1   significant difference in core body temperature.

2       Q.   All right.  So the modalities that you and

3   your group worked on are effective at cooling the --

4   the athletes; is that right?

5       A.   That is correct.

6       Q.   All right.  And I'm sure that they're very

7   appreciative of that because they get to be very hot

8   in the -- even in Minnesota, in the summer.

9       A.   Actually the first team that adopted it was

10  the Green Bay Packers.

11      Q.   Well in Minnesota we would say that's

12  because the Green Bay Packers are weak.

13           (Laughter.)

14           (Discussion off the stenographic record.)

15           (Lampotang Exhibit 6 marked for

16           identification.)

17  BY MS. ZIMMERMAN:

18      Q.   Is this --

19           Is Exhibit 6 a correct and complete copy of

20  your curriculum vitae as -- as produced in connection

21  with your expert report in this matter, doctor?

22      A.   I believe so.  You handed it to me and I

23  will accept it -- it's what was given to you, yeah.

24      Q.   All right.  So you -- you've -- you've

25  personally done computer modeling in the past; is that

Confidential - Subject to Protective Order

Page 114

1    understanding if Dr. Mont is in fact an infectious

2    disease doctor, and then we got this clarification

3    about whether it's infectious disease doctors or any

4    physician.  So that's kind of how we got to where we

5    are.

6              You're not a medical doctor; correct?

7         A.   No, I'm not, but I teach medical doctors.  I

8    actually write guidelines for them.

9         Q.   Yes.  And with respect to issues of

10   infectious disease, you would defer to an infectious

11   disease doctor; correct?

12        A.   Yes.

13        Q.   All right.  And you're not an expert in

14   aerobiology; is that correct?

15        A.   No, I'm not.

16        Q.   All right.  And you're not an expert in

17   microbiology; is that correct?

18        A.   No, I'm not.

19        Q.   And with respect to issues concerning

20   orthopedic surgery, you'd defer to an orthopedic

21   surgeon on proper practice and procedure; is that

22   fair?

23        A.   Yes.  I would defer to an orthopedic surgeon

24   regarding orthopedic issues.

25        Q.   All right.  And you would agree that -- that

Confidential - Subject to Protective Order

Page 117

1     Q.   All right.  And how is that different than a

2  surgical-site infection, if you know?

3     A.   It's --

4          It's deeper, in general.

5     Q.   Is that the only difference?

6     A.   Well, as you said, I'm not a medical expert.

7  I -- I know they are two different types of

8  infections, and I know what's -- was in this case was

9  the -- the joint infections.

10     Q.   Okay.  And at any rate, with respect to the

11  difference between a SSI and a PJI, if there is a

12  difference you would defer to an infectious disease

13  doctor on definitions and that sort of thing; is that

14  fair?

15     A.   Yes.

16     Q.   All right.  You'd also defer to them, I

17  trust, on the mechanism of how it is that infection

18  came to be.  Is that fair?

19     A.   For the prevention part I think I -- I have

20  created some materials, prior to this case, that may

21  -- that may be relevant.

22     Q.   All right.  What -- What materials are you

23  --

24          What materials have you created?

25     A.   There are at least two, and actually there's

Confidential - Subject to Protective Order

Page 160

1       Q.   All right.  And what about the Belani paper?

2   That's not listed either on the list of references or

3   on the list of materials you've considered.  Why is

4   that?

5       A.   The -- Those papers, the authors, at the end

6   they -- not "at the end."

7            The authors, as discussed earlier, they

8   explained some of the limitations of what they did --

9       Q.   So that's not quite my question, though,

10  doctor --

11           MS. LEWIS:  Well he didn't finish,

12  Genevieve.  At least let him finish what he was

13  saying.

14           MS. ZIMMERMAN:  No thanks, counsel.  I'll

15  ask the questions here.

16  BY MS. ZIMMERMAN:

17      Q.   So my questions are:  You do not cite

18  anywhere on your report of materials that you rely

19  upon, Legg, Dasari Belani, Reed, Leaper, many other

20  forced-air warming studies.  Likewise, and it seems

21  from -- from your response to my question before

22  counsel interrupted, you're familiar with these

23  studies; is that fair?  You've read them before?

24      A.   Yes.

25      Q.   All right.  So at some point you have been

Confidential - Subject to Protective Order

Page 161

1    provided or found the Legg study; is that fair?

2        A.   Yes.

3        Q.   All right.  The Dasari study, you've seen

4    that before?

5        A.   Yes.

6        Q.   You've read it?

7        A.   Yes.

8        Q.   It was provided to you?

9        A.   I can't remember, but yes, I --

10       Q.   All right.  Same thing with the Belani

11   study.  That's something that you've read before;

12   correct?

13       A.   Yes.

14       Q.   And you've read the Reed study before;

15   correct?

16       A.   Yes.

17       Q.   And are you aware that -- that 3M -- 3M has

18   recently hired as a -- or funded research with respect

19   to -- to Mr. Reed and the issues around forced-air

20   warming?

21       A.   What was the question?

22       Q.   Are you aware that 3M has -- has, in 2016,

23   retained and funded Dr. Reed's studies going forward

24   with respect to forced-air warming?

25       A.   I was not aware of that.

Confidential - Subject to Protective Order

Page 162

1    Q.   All right.  And the Leaper study, have you

2  seen the Leaper study?

3    A.   Yes.

4    Q.   All right.  And none of these studies are

5  listed in -- in the references at the end of your

6  report; correct?

7    A.   (Witness reviewing exhibits.)

8    Q.   And we'll get to -- we'll get to Exhibit 4

9  in just a minute, but --

10   A.   Yeah.

11   Q.   -- none of those studies are listed as

12  references to your report; correct?

13   A.   Yes.

14   Q.   And -- And none of these studies are listed

15  on Exhibit 4, the materials you've considered, either;

16  are they?

17   A.   (Witness reviewing exhibit.)  No, but I do

18  mention the Albrecht study.

19   Q.   And are you aware that Dr. Legg has been

20  deposed in this case?  Mr. Legg, I should say.

21   A.   I'm -- I don't recall.  I think I'm -- No, I

22  don't know.

23   Q.   All right.  Do you know whether or not Dr.

24  Belani has been deposed in this case?

25   A.   I don't know.

Confidential - Subject to Protective Order

Page 163

1    Q.   All right.  And you -- you have not been

2   provided with and have no knowledge until now, maybe,

3   that Mr. Reed has also been deposed in this case;

4   correct?

5    A.   I don't know.

6    Q.   All right.  Professor Leaper has also been

7   deposed in this case.  Have you been provided a copy

8   of his deposition?

9    A.   I -- I don't know.  I don't think so.

10    Q.   All right.  And they were all -- there were

11   several trips over to the United Kingdom to depose

12   these study authors with respect to studies that they

13   wrote and -- and their methodology and conclusions

14   with respect to forced-air warming.

15         You have not been provided any of those

16   depositions in connection with your work on this case;

17   have you?

18    A.   I don't believe so.

19    Q.   And in fact you don't cite them even as

20   materials that you've considered, despite the fact

21   that you have in fact read them at some point; is that

22   fair?

23    A.   What do you mean by "them"?

24    Q.   The studies; Legg, Dasari, --

25    A.   Okay.

Confidential - Subject to Protective Order

Page 164

1      Q.   -- Belani, Reed, Leaper.

2      A.   Yes.

3      Q.   All right.  Those are studies that you've

4  read in the past.

5      A.   Yes.

6      Q.   All right.  And you understand that Dr.

7  McGovern has also been deposed in this case?

8      A.   I was not aware of that.

9      Q.   All right.  Have you been provided his

10  deposition?  I take it "no"?

11     A.   I don't believe so.

12     Q.   All right.  Have you been provided the

13  deposition of Professor Nachtsheim from the University

14  of Minnesota?

15     A.   Can you spell the name, please?

16     Q.   I'll try.  N-A-C-H-S-H-T-E-I-M, I think.

17  He's a professor of statistics.

18     A.   No, I don't believe so.

19     Q.   All right.  Have you been provided the

20  deposition of Robert Gauthier?

21     A.   I don't recall.  It's possible, but I -- I

22  don't know.

23     Q.   All right.  But in any event, there are a

24  number of studies that -- on -- on forced-air warming

25  and Bair Huggers that you have read in the past but

Confidential - Subject to Protective Order

Page 165

1    have not been disclosed as part of the materials

2    you've considered on this Exhibit 4; correct?

3         A.   Yes.

4         Q.   And similarly there's no disclosure either

5    in your report or on the Materials Considered of

6    articles authored by Kurz or Sessler; correct?

7         A.   Yes.

8         Q.   And do you understand that both Dr. Kurz and

9    Dr. Sessler have been deposed in this case as well;

10   correct?

11        A.   I didn't know Kurz had been deposed.  I knew

12   Sessler had been deposed.

13        Q.   All right.  And have you been provided

14   copies of Kurz and Sessler?

15        A.   I was provided a copy of Sessler.

16        Q.   All right.  And did you read it?

17        A.   Yes.

18        Q.   When?

19        A.   I don't remember.

20        Q.   But --

21             Was that with respect to Walton; do you have

22   any idea?

23        A.   I -- I can't remember.

24        Q.   All right.  So in any event you've been

25   provided a copy of one of the depositions of Dr.

Confidential - Subject to Protective Order

Page 166

1    Sessler, we don't know which one, and it doesn't

2    appear anywhere on the Materials Considered on Exhibit

3    4; correct?

4         A.   No.

5         Q.   Correct?

6         A.   Yes.

7         Q.   Okay.  And as you sit here today, you don't

8    know why that is.

9         A.   It's -- It's material I looked at a long

10   time ago, and.

11        Q.   And they didn't -- they didn't merit

12   inclusion on the Materials Considered?

13        A.   I -- It's --

14             As I said, it's a -- it's an omission.  I --

15   I was focusing on the report, and I -- I was

16   transmitting to counsel what I was reading at the

17   time, and I didn't go back and say, well, these are

18   all the other things I have read, too.

19        Q.   Okay.  But you did cite, in the Materials

20   Considered, two orders from Magistrate -- Magistrate

21   Noel, and also from Judge Ericksen, with respect to

22   VitaHEAT; is that right?

23        A.   Which exhibit?

24        Q.   Page 3 of Exhibit 4.

25        A.   Yes.

Confidential - Subject to Protective Order

Page 174

1    for a minute.

2         Q.   Because this is a yes-or-no question.

3              Can it contaminate it or can it not

4    contaminate it?  I'm happy to hear your explanation

5    about why it may or may not after you've answered

6    whether it is -- you agree it's possible.

7              MS. LEWIS:  Objection, argumentative on how

8    he's to answer a question.  He can answer the

9    question the way he believes he needs to answer the

10   question.

11             MS. ZIMMERMAN:  The question calls for a

12   yes-no answer.

13             MS. LEWIS:  Not necessarily.

14        A.   It's not amenable to a yes-no answer.

15        Q.   All right.  So you're not capable of or not

16   willing to answer it "yes" or "no"?

17        A.   I -- I didn't say I am not capable.  I said

18   it's not --

19        Q.   No.  That's what your counsel said.

20        A.   No.  I'm -- I'm saying to you it's not

21   amenable, as the transcript shows, to a yes-or-no

22   answer.

23        Q.   So your Section 7 in your report talk about

24   a number of different sources of dust, heat and gas in

25   an operating room; correct?

Confidential - Subject to Protective Order

Page 175

1    A.   Yes.

2    Q.   And you say, in the third sentence:  "In

3   some cases, the air blown into the operating room's

4   ambient environment may also contain infectious

5   organisms or droplets from the patient's respiratory

6   system"; correct?

7    A.   Yes.

8    Q.   So you would agree that air blown in an

9   operating room may contain infectious organisms;

10   correct?

11    A.   Yes.

12    Q.   And you list a number of different devices

13   in an operating room that may -- may blow air;

14   correct?

15    A.   Yes.

16    Q.   And you list physiological monitors.  That's

17   one; correct?  One of the items that you list at the

18   bottom of age 8?

19    A.   Yes.

20    Q.   You list an anesthesia machine as something

21   that may blow air; correct?

22    A.   Yes.

23    Q.   You list an x-ray machine as something that

24   may blow air; correct?

25    A.   Yes.

Confidential - Subject to Protective Order

Page 176

1       Q.   You list a CVVH machine as something that

2   may blow air; correct?

3       A.   Yes.   That's a central venous venous

4   hemodialysis machine, yes.

5       Q.   Yes.

6            You list the OR computers as something that

7   may blow heated air into a operating room; correct?

8       A.   Yes.

9       Q.   You also list ceiling-hung display monitors

10  as something that may blow air into an operating room;

11  correct?

12      A.   Yes.

13      Q.   And you go on on the next page to explain

14  that dust inside these kinds of machines can contain

15  bacteria; correct?

16      A.   Yes.

17      Q.   And all of the machines that you've listed

18  at the bottom of page 8 and the top of page 9, if they

19  blow air they can contaminate the sterile field;

20  correct?

21           MS. LEWIS:  Objection, form.

22      A.   They can contaminate which field?

23      Q.   The sterile field.

24      A.   If they blow air with infectious organisms,

25  yes.

Confidential - Subject to Protective Order

Page 177

1     Q.    Right.

2           And that in -- the sterile field includes

3     the surgical site; correct?

4     A.    Yes.

5           MS. LEWIS:  Same objection.

6     Q.    And you agree that the Bair Hugger device

7     blows air; correct?

8     A.    Yes.

9     Q.    Now you go on, towards the bottom of page 9

10    you talk about multiple sources of heat besides just

11    the -- the forced-air warming blanket.  Do you see

12    that?  It's the last full paragraph on page 9?

13    A.    Oh yes.  Umm-hmm.

14    Q.    All right.  And you -- you provide a number

15    of examples, including high-intensity surgical lights;

16    right?  As a source of heat?

17    A.    Yes.

18    Q.    Also endoscopic lights; right?

19    A.    I don't see endoscopic lights in there, but.

20    Q.    So it says, "including but not limited to

21    high intensity surgical lights and endoscopic

22    lights..."

23    A.    Oh, I must have a different version then, of

24    the -- of the report.

25           MR. ASSAAD:  Mark it.

Confidential - Subject to Protective Order

Page 182

1    out of the machine at the end of the hose you may have

2    one measurement; is that correct?

3        A.   Yes.

4        Q.   And when you attach the blanket then to that

5    hose will the temperature remain the same coming out

6    of the -- the jets on the bottom of the blanket?

7        A.   I have not done that measurement.

8        Q.   So you don't know.

9        A.   Yeah.

10       Q.   Okay.  So the 43-degree setting, is that the

11   temperature that comes out of the machine, or at the

12   distal end of the -- out of the blower itself or the

13   distal end of the hose?  If you know.

14       A.   I -- I don't know which -- which temperature

15   they're referring to, whether it's at the hose or at

16   the -- at the heater unit.

17       Q.   Okay.  Do you know how many watts come out

18   of a Bair Hugger?  Say the 750.

19       A.   Yeah.  I've seen a figure of 500 watts

20   mentioned.

21       Q.   Where did you see that?

22       A.   I can't remember.

23       Q.   Yeah.  And did you cite to it in your

24   materials?

25            Yes, I think you do.

Confidential - Subject to Protective Order

Page 183

1       A.    Yes.

2       Q.    You list it in your materials, and then you

3    have a citation to "xi," that's a 3M document?

4       A.    No.

5       Q.    "No"?

6       A.    No.

7       Q.    What do you cite to?

8       A.    It's "xii."

9       Q.    Isn't that Memarzadeh?

10      A.    Yes.

11      Q.    So that's the study about the forced-air

12   warmer being on or off for a zero percent deposition

13   of contaminant sources on the patient.

14            My question was about 500 watts.  So you

15   say, in the sentence before your citation to

16   Memarzadeh, "there's 500 watts heat dissipation from a

17   forced air warming device," and you cite to "xi."  Is

18   that correct?

19      A.    Yes.  That's what it shows on the report.

20      Q.    Okay.

21      A.    I'm not sure whether the references got

22   crossed, but -- Oh.  Yeah.  I think the 500 was from

23   Memarzadeh.

24      Q.    Okay.  So this "xi" reference at the end is

25   incorrect?

Confidential - Subject to Protective Order

Page 184

1      A.   Because it just has a number, I cannot tell

2   you one way or another.  So if you produce the actual

3   document I may be able to tell you whether it's -- it

4   too, is correct.

5      Q.   Well I can represent to you that one of the

6   questions I had was why were you citing to this,

7   because it doesn't support what --

8      A.   Then it's a -- it's a typographical error.

9      Q.   Okay.

10     A.   I think this was meant to be "xii,"

11  Memarzadeh.

12     Q.   So both "xi" and -- so "xi" and "xii" should

13  both be citing to Memarzadeh?

14     A.   Correct.  I believe so, --

15     Q.   All right.

16     A.   -- yes.  Without having seen what "7132"

17  refers to.

18     Q.   I don't have a paper copy of this, but

19  3MBH00007132 [handing laptop to the witness] you can

20  see the Bates label up on the right-hand --

21     A.   Umm-hmm.

22     Q.   -- side.

23          I'm sure counsel can --

24     A.   Yeah.

25     Q.   -- verify that's the number.

Confidential - Subject to Protective Order

Page 185

1        A.   Yeah.

2        Q.   This particular document doesn't say

3   anything about 500 watts of heat dissipation; does it?

4        A.   That's --

5             This is one page?

6        Q.   Yes.

7        A.   (Witness reviewing laptop.)  No.

8        Q.   So that citation is another error; correct?

9        A.   Yes.

10        Q.   All right.  Assuming that the 500 watts is

11   correct for a Bair Hugger device, do you know how many

12   BTUs that is?

13        A.   I can make the calculation.  I don't have

14   the conversion table in front of me.

15        Q.   Well you'd agree that you -- that someone

16   who's studying the impact of any particular device in

17   the operating room needs to account for the heat

18   dissipated from the various devices in order to

19   understand that impact; correct?

20        A.   Please repeat the question.

21        Q.   I will try.

22             Someone who's studying the impact of a

23   particular device in the operating room needs to

24   account for the heat dissipated from various devices

25   in the operating room in order to understand the

Confidential - Subject to Protective Order

Page 188

1     Q.   So are the -- are the patients losing heat

2   because the operating room is cold, or because --

3   because of the redistribution of heat as a result of

4   anesthesia?

5     A.   There are --

6          There are multiple mechanisms of -- of heat,

7   so anesthesia is one of them.  There's also exposure

8   of the internal organs if there is an open incision.

9     Q.   So getting back to you cite to Memarzadeh

10   talking about a computational fluid dynamics model and

11   particle-tracking methodology.

12          Do you see that part in the last full

13   paragraph on page 9?

14     A.   Page 9.

15     Q.   Yes.

16     A.   Memarzadeh?

17     Q.   Yes.

18     A.   I don't see that.  On page 9?

19     Q.   So you say:  "In one study" -- The last full

20   paragraph on page 9.  You're on the right page.  The

21   last --

22     A.   So the last full paragraph.

23     Q.   Yes.  "In one study" --

24     A.   Yes.

25     Q.   -- "employing computational fluid

Confidential - Subject to Protective Order

Page 189

1  dynamics" --

2      A.    Yes, umm-hmm.

3      Q.    -- "and particle-tracking methodology, the

4  total heat emission from these sources, as well as the

5  patient, accounted for more than four times the 500

6  watts heat dissipation from a forced air warming

7  device."

8          You'd agree, to have an appropriate model

9  each of these potential sources of heat needs to be

10  included in the model; correct?

11      A.    Yes.

12      Q.    With respect to Memarzadeh, did you review

13  the entire study?

14      A.    I believe so.

15      Q.    All right.  Because there's also a letter to

16  the edit -- a letter to the editor.

17      A.    Yes.

18      Q.    Have you read that?

19      A.    So let me check.  (Witness reviewing

20  exhibit.)  Yes, because that's -- that's what I -- I

21  -- It's the letter to the editor, Journal of Hospital

22  Infection.

23      Q.    Right.

24          So you cite to the letter to the editor, not

25  to his actual study.  Fair?

Confidential - Subject to Protective Order

Page 190

1      A.   I also read the study, so I think -- it's --

2  it's a long time ago.  I think the 500 was in the --

3  the study.

4      Q.   Is it your testimony, as you sit here today,

5  that you -- that this citation is to the study itself?

6      A.   If you put the two documents in front of me

7  I can tell you which one it is.  I --

8      Q.   Well what you cite in "xii" is Memarzadeh,

9  "Active warming systems to maintain perioperative

10  normothermia in hip replacement surgery.  Letters to

11  the Editor - Journal of Hospital Infection."

12          Does that help refresh your recollection as

13  to whether this is a letter to the editor or the

14  actual study itself?

15     A.   Well clearly this is the letter to the

16  editor you had asked me, that is why I went back to

17  the reference to see whether it was the letter to the

18  editor.

19          What I am saying, sitting here now without

20  having the study and the letter to the editor, I

21  cannot say either way whether the 500 watts came from

22  the letter to the editor or the study.

23     Q.   Okay.  And is it your belief, as you sit

24  here, that you have seen Memarzadeh's study?

25     A.   Yes.

Confidential - Subject to Protective Order

Page 191

1    Q.   But it's not cited on Exhibit 4 or at the

2  end of your report either; is it?

3    A.   (Witness reviewing exhibits.)  No.

4    Q.   Do you know whether or not Dr. Memarzadeh's

5  study is published or unpublished?

6    A.   I don't know.

7    Q.   Do you know how many -- Do you know how many

8  --

9         Well you talked about you could calculate

10  the number of BTUs from a Bair Hugger assuming it was

11  500 watts; is that right?

12    A.   Yes.

13    Q.   Do you know how many BTUs a patient in an

14  operating room may generate?

15    A.   Not off -- Not off the top of my head.

16  That's easily available.

17    Q.   All right.  Would 160 BTUs an hour sound

18  like an appropriate approximation?  If you know.

19    A.   I don't know.  I would have to look at, you

20  know -- I usually don't work with BTUs.

21    Q.   Okay.  Do you know how many BTUs an hour a

22  surgical team might generate?  Assume a surgical team

23  of four.

24    A.   I don't know, but I can find out.

25    Q.   Do you know how many BTUs the surgical

Confidential - Subject to Protective Order

Page 192

1    lights generate?

2         A.   It's -- I -- I don't know off the top of my

3    head, but it's -- it's something I can find, and I --

4    if I recollect, I believe Memarzadeh touched on that

5    because when I say it's four times, what I remember

6    doing was I added all the different sources of heat

7    that he had enumerated.

8         Q.   But you'd agree that the anesthesia

9    equipment may also be generating, it's a source of

10   heat in the operating room; right?

11        A.   Yes.

12        Q.   And as you sit here today, do you have any

13   idea how many BTUs per hour the anesthesia equipment

14   would gen -- produce in an operating room?

15        A.   It's -- It's something that can be measured.

16   I didn't measure it.

17        Q.   All right.  And you'd agree --

18        A.   And I believe Memarzadeh did give that

19   number.

20        Q.   Okay.

21        A.   But I'm going from memory.  I may be wrong.

22        Q.   All right.  And you'd agree that the LCD

23   monitors that are typically in an operating room are

24   also a potential source of heat; correct?

25        A.   Yes.

Confidential - Subject to Protective Order

1      Q.   And as you sit here, you don't have any idea

2   how much heat they're generating per hour; do you?

3      A.   I've -- I -- I cannot put a number to it as

4   I'm sitting here, but I can find out, and I -- I know

5   they generate heat because I've worked with them.

6      Q.   All right.  And the same can be said for

7   surgical lights and overhead lighting, that they are

8   -- both surgical lights and overhead lighting are

9   sources of heat in an operating room.  You'd agree

10  with that?

11     A.   Yes.

12     Q.   All right.  And, as you sit here today, you

13  -- I presume you don't know how many watts or BTUs the

14  surgical lights or the overhead lights contribute to

15  the operating room per hour; do you?

16     A.   Again, this is -- this is knowledge that I

17  can acquire -- not "acquire."  I already have it, but

18  I don't remember off the top of my head.  So it is --

19  a lot of it is in the Memarzadeh study.

20     Q.   Okay.  And Memarzadeh is in fact the only

21  citation that you provide with respect to heat -- heat

22  dissipated in the operating room; right?  There's the

23  cite number "xi," which was an error, and then cite

24  number "xii" is to Memarzadeh's letter to the editor;

25  correct?

Confidential - Subject to Protective Order

Page 194

1      A.   Yes.

2      Q.   Is it your testimony that the information

3   about heat generated and dissipated is in -- is

4   included as part of the letter to the editor cited at

5   number "xii"?

6      A.   Without looking at the letter to the editor

7   I cannot make any statement.

8      Q.   Okay.

9      A.   I'm sorry.

10     Q.   But at any rate, you'd agreed that it's

11  important to know all the different heat sources to

12  understand their respective impact on the operating

13  room; correct?

14     A.   Yes.  Some heat sources may be

15  insignificant, and if that's determined to be the case

16  then they could be considered negligible and not

17  factored in, and --

18     Q.   But you'd agree that it's important to know

19  the objective quantifiable amount of heat generated in

20  order to decide whether it's negligible or not.  Fair?

21     A.   Yes.  And it also depends on the location,

22  yes.

23     Q.   Right.

24          And all of that is something that is

25  objectively measurable; correct?

Confidential - Subject to Protective Order

Page 195

1       A.   Yes.

2       Q.   All right.  Now you'd agree that no

3   operating room has true laminar flow; correct?

4       A.   Yes.

5       Q.   And so you'd agree that when you model

6   airflow in an operating room, turbulence must be

7   considered; correct?

8       A.   Can you repeat the question, please?

9       Q.   Yes.

10           So you'd agree when -- when airflow inside

11  of an operating room is modeled, turbulence must be

12  considered; correct?

13      A.   If in -- in -- in the model that's being

14  considered there is known to be turbulence, yes.

15      Q.   And you'd agree that all operating rooms are

16  going to be turbulent flows; correct?

17      A.   There are some operating rooms that are

18  described as laminar flow, but they may not live up to

19  that description.

20      Q.   And you agree and understand as a mechanical

21  engineer that true laminar flow is just not possible

22  in an operating room; correct?

23      A.   It is very difficult.

24      Q.   All right.  And because of that, turbulence

25  must be considered; fair?

Confidential - Subject to Protective Order

Page 199

1      Q.   All right.   Is that something that the

2   resident typically does, or the nurse, or who, if you

3   know?

4      A.   Actually, thank you for making that

5   correction.   That was not a resident, that was a

6   nurse.   A Certified Registered Nurse Anesthetist, to

7   be exact.   Nurses don't -- don't do anesthesia.   CRNA.

8      Q.   Yes.

9           Do you know Dr. Memarzadeh, by the way?

10     A.   No.

11     Q.   And you've looked at the letter to the

12   editor at least; right?

13     A.   Yes.

14     Q.   And -- And you --

15     A.   Actually I looked at the study, too.

16     Q.   You looked at the study, too, even though

17   it's not on Exhibit 4.

18     A.   Yes.

19     Q.   And so you're aware, then, from looking at

20   -- at his study, that -- that even Dr. Memarzadeh

21   found that the 505 disrupted the airflow in the

22   operating room; correct?

23          MS. LEWIS:   Objection, form.

24     A.   I -- I don't -- I don't recall that, and

25   it's been a long time since I -- I read it.

Confidential - Subject to Protective Order

Page 200

1      Q.   All right.  Do you know, as you sit here

2  today, whether Dr. Memarzadeh used RANS or LES in his

3  model?

4      A.   I don't recall.

5      Q.   Do you know what the difference is between

6  the two?

7      A.   Superficially.  I saw that in the Elghobashi

8  report, and -- and in the Elghobashi deposition.

9      Q.   All right.  And -- And what is your

10 understanding of the difference between RANS and LES?

11     A.   Well they are two different methodolo --

12 methodologies, and...  So as I said, it's superficial,

13 and there was the -- you know, I -- I don't -- what I

14 mean by that is I don't present myself as an expert in

15 computational fluid dynamics.

16     Q.   Okay.  And you would defer to an expert in

17 computational fluid dynamics to explain the difference

18 between RANS and LES and when one approach is better

19 than another.  Fair?

20     A.   Yes.

21          (Discussion off the stenographic record.)

22          (Recess taken from 1:47 to 1:54 p.m.)

23 BY MS. ZIMMERMAN:

24     Q.   Doctor, you've spent most of, if not all of

25 your professional life working on issues involving

Confidential - Subject to Protective Order

Page 213

1           MS. LEWIS:  Objection, form.

2      A.   I believe I already answered.  I said it is

3  possible, but in some -- in some instances you may not

4  get -- because I'm assuming what you mean by "buoyant

5  force" is the air will rise.

6      Q.   Yes.  And there may be some instances where

7  other parts of the environment work to counteract

8  those buoyant forces.  Fair?

9      A.   That's correct.

10     Q.   Okay.  I want to turn to the very first

11  opinion that you offer on page 3 in your report.  You

12  say that:  "The Bair Hugger is a forced air warming

13  device, it is a reasonable, safe, easy to

14  use...efficacious device."

15          What is the basis for your opinion that it

16  is a safe device for use in orthopedic implant

17  surgery?

18     A.   There has been no case that I'm aware of

19  where the Bair Hugger has been directly linked as a

20  cause of an infection.

21     Q.   And that's the basis for your assertion that

22  it's safe?

23     A.   That's one.  The -- The filter is effective

24  in addressing capture of the organisms that are

25  relevant to infection.

Confidential - Subject to Protective Order

Page 214

1     Q.   Any other --

2          Any other basis for your claim that this

3    machine is safe for use in orthopedic implant surgery?

4     A.   Yes.  Because when you have a -- a new

5    device you look -- initially you do your Phase I,

6    Phase II, Phase III clinical trials.

7     Q.   You understand there were no clinical trials

8    in this; correct?

9     A.   Well I was trying to explain another basis

10   for saying it's safe.

11        And then after the clinical trials are over

12   you get into what's called post-market surveillance

13   where we look at how does this product, after the

14   clinical trials, so you're right, behave when used

15   over time.  And the Bair Hugger has a long track

16   record of being safe.  There were -- There is that

17   incident with Moon where there was a fire.

18    Q.   So I'm going to -- I'm going to stop you

19   there because to the extent that you have started your

20   answer by saying anything about clinical trials, you

21   do understand there were no clinical trials with

22   respect to the Bair Hugger; correct?

23    A.   I don't -- I don't --

24         I don't recall one way or another.

25    Q.   All right.

Confidential - Subject to Protective Order

Page 215

1      A.    I mentioned clinical trials as an example to

2   set up the post-surveillance context.

3      Q.    Well you -- you do say, in your -- in your

4   report, that you reviewed the regulatory submissions;

5   right?

6           Oh, that's in the "materials considered" on

7   Exhibit 4.  You reviewed the design history file,

8   correct, for the 505?

9      A.    Yes.

10     Q.    And also for the 750; right?

11     A.    Yes.

12     Q.    And also for the -- the 750 redesign history

13  file; right?

14     A.    Yes.

15     Q.    So you know, then, from reviewing these

16  documents, that -- that this Bair Hugger was a -- was

17  cleared for marketing through what's called the

18  Premarket Approval process in the FDA.  You know that?

19     A.    Yes, that's right.

20     Q.    And you know then that the -- the predicate

21  product, the pre-1976 Food and Drug Cosmetic Act

22  Amendment that Bair Hugger relates to is the Sweetland

23  Bed Warmer manufactured beginning in 1937 to warm

24  surgical or hospital beds and to dry casts; right?

25     A.    I recall seeing something like that, yes.

Confidential - Subject to Protective Order

Page 216

1    Q.   And you've seen the hand-drawn schematics

2  for the -- this product manufactured before the start

3  of World War II?

4    A.   I don't recall that.

5    Q.   Okay.  And do you know, then, that -- that

6  the original 200 series of the Bair Hugger was not for

7  use in an operating room?

8    A.   I recall seeing that, yes.

9    Q.   And similarly do you recall, or have you

10  been provided by counsel, previous warnings about the

11  risk of airborne contamination in connection with the

12  use of the 200 series Bair Hugger?

13    A.   Can you repeat your question, please?

14    Q.   I'll try.

15       Have you been provided by counsel, or found

16  during your own independent research, the warnings

17  contained on the Bair Hugger 200 series?

18    A.   I don't recall.

19    Q.   All right.  So you don't know that that

20  device was specifically warned not to be used in an

21  operating room?

22    A.   I don't recall.

23    Q.   All right.  And you don't, as you sit here

24  today, don't recall that there was a warning about the

25  risk of airborne contamination in certain instances on

Confidential - Subject to Protective Order

Page 217

1    that -- on that device?

2         A.   Was that the --

3              MS. LEWIS:  Objection, form.

4         A.   Was that the exact word for the warning?

5              (Lampotang Exhibit 7 marked for

6              identification.)

7    BY MS. ZIMMERMAN:

8         Q.   I'll represent to you that this is a

9    photograph of the outside of the 200 series of the

10   Bair Hugger, and you'll see at the bottom it says:

11   "CAUTION:  THIS MACHINE NOT INTENDED FOR USE IN THE

12   OPERATING ROOM."

13             Do you see that?

14        A.   Yes.

15        Q.   And is this the first time that you've seen

16   any of the labels for the 200 series?

17        A.   I can't -- I --

18             I don't know.  I could have seen it before

19   when I was in the operating room years ago.

20        Q.   All right.  Well hopefully you wouldn't have

21   seen this one in the operating room, right, since it

22   says not for -- intended -- not intended for use in

23   the operating room?

24        A.   The -- The environment has changed a lot,

25   clinical environment.

Confidential - Subject to Protective Order

Page 218

1      Q.    And I appreciate that that's true, doctor,

2  but I don't have a question pending about how the

3  environment has changed.  I just asked if --

4            You haven't seen --

5      A.    What I'm trying to say in response to your

6  question, it's not -- because it says it's not

7  intended for use in the operating room that it implies

8  I would never have seen it.

9      Q.    Okay.

10      A.    It is possible people were doing it off

11  label, especially at an academic health center.

12      Q.    And at any rate, because you've seen the --

13  you've seen the -- the documents with respect to the

14  design history file, you've seen some of the warnings

15  about the 750 -- the 750 and 505; correct?

16      A.    Yes.

17      Q.    All right.  And you know that those -- those

18  machines are used in an operating room; correct?

19      A.    Yes.

20      Q.    But also that they relate back and they used

21  this 200 series product as the predicate product.  You

22  understand that?

23      A.    That's likely.  I don't have direct

24  knowledge of it, but that would seem to be the likely

25  path.

Confidential - Subject to Protective Order

Page 219

1        Q.    And as you were evaluating materials

2   provided to you to offer commentary about the

3   appropriateness of the warnings contained, did you see

4   warnings for the 700 ser -- the 700 and 750 series

5   Bair Hugger?

6        A.    Yes.

7        Q.    All right.  Did you see the warnings for the

8   505?

9        A.    Yes.

10       Q.    And were you provided with copies of the

11  warnings that were contained on the outside of the 200

12  series?

13       A.    I don't remember.

14       Q.    All right.  So you haven't -- at least at

15  this point you don't remember whether or not you saw a

16  warning about the possibility of airborne

17  contamination, that it should be considered if

18  patients with infected wounds are treated with the

19  Bair Hugger?

20            MS. LEWIS:  Objection, form.

21       A.    That was a long question.  Could you please

22  repeat it?

23       Q.    Right.

24            You, as you sit here today, have no memory

25  one way or the other about whether you were -- you

Confidential - Subject to Protective Order

Page 220

1    have seen the warnings contained on the 200 series

2    machine; is that fair?

3        A.   Yeah.  I cannot remember whether I did or

4    did not.

5        Q.   All right.  So you don't have any specific

6    memory of warning number 5, the possibility of

7    airborne contamination should be considered if

8    patients with infected wounds are treated with the

9    Bair Hugger?  Is that the first time you've heard that

10   before?

11            MS. LEWIS:  Objection, form.

12       A.   I -- I can't recall.

13       Q.   All right.  Does that impact --

14            Well let me ask you this:  Does it seem fair

15   that the possibility of airborne contamination must be

16   known if it's warned about?

17            MS. LEWIS:  Objection, form.

18       Q.   You can't warn about something you don't

19   know about; right?

20       A.   Well when you say "known," do you mean that

21   it happened, or do you mean that it's a -- it's a --

22   it's a possibility, --

23       Q.   It's a known --

24       A.   -- however remote?

25       Q.   It's a known possibility, which is why it's

Confidential - Subject to Protective Order

Page 221

1   on the warning.

2           MS. LEWIS:  Same objection.

3       A.   Well I think sometimes the warnings are

4   provided as -- as a safety mechanism to -- to be on

5   the safe side.

6       Q.   And in fact doctors and healthcare providers

7   rely on product manufacturers to provide appropriate

8   warnings about the use of drugs and devices; correct?

9       A.   The question again, please?

10      Q.   I said:  And in fact doctors and healthcare

11  providers rely on product manufacturers to provide

12  appropriate warnings about the use of drugs and

13  medical devices; correct?

14      A.   They do, and sometimes they overrule them,

15  but yes.

16      Q.   All right.  And that's because safety is

17  important; right?

18      A.   Safety is important, efficacy is also

19  important, and sometimes -- I've seen a lot of things,

20  like the manufacturers say you should not modify it, I

21  see my colleagues modify equipment all the time

22  because --

23      Q.   And I understand, doctor.  There -- You

24  probably see a lot in supervising and interacting with

25  various healthcare providers, but the question is

Confidential - Subject to Protective Order

Page 222

1    about the warnings that you have seen and been

2    provided by counsel, and how those may potentially

3    impact the opinions that you have offered in this case

4    about known risks associated with this product and the

5    adequacy of warnings.

6            Do you have any basis to support your

7    statement that Bair Hugger is efficacious to reduce

8    periprosthetic joint infection?

9        A.   Did I write this in the -- I -- I --

10           Did I write these words verbatim?

11       Q.   Well the issues in this case are about use

12   of this particular product in orthopedic surgery;

13   right?

14       A.   Yes.

15       Q.   Okay.  And --

16       A.   Oh, you're talking of normothermia.

17       Q.   No.

18       A.   Okay.  I'm sorry.

19       Q.   Not just normothermia.

20           I'm asking, and the question was

21   specifically:  "Do you have any basis to support your

22   statement that Bair Hugger is efficacious to reduce

23   periprosthetic joint infection?"

24       A.   The -- The Kurz study is one of them.

25       Q.   So that's one of the -- that's one of your

Confidential - Subject to Protective Order

Page 223

1    --

2              That's something that you rely on for that

3    statement?

4         A.   Yes.

5         Q.   But of course that's not cited in your

6    paper.

7         A.   I am sorry if it's not.

8         Q.   Anything else?

9         A.   Sitting here, I can't recall.  I'm sorry.

10        Q.   All right.  Turning to the second --

11             Turning the page, I guess, it's a

12   continuation of your first opinion, top of page 4.

13   You cite to the Center for Disease Control updated

14   guidelines, and talk about the importance of

15   maintaining normothermia.

16             Does the CDC make a recommendation one way

17   or another about whether normothermia must be achieved

18   through preoperative or intraoperative warming?

19        A.   In this document, or in general?

20        Q.   In the document that you cited to.

21        A.   I believe they didn't specify the route, the

22   method.

23        Q.   All right.  And while we're talking about

24   that, what are the methods for maintaining

25   normothermia?

Confidential - Subject to Protective Order

Page 226

1       Q.   Okay.  And from an anesthesia -- an

2  anesthesia perspective, would you agree that it

3  doesn't matter which modality is used to achieve

4  normothermia so long as normo -- normothermia is

5  achieved?

6            MS. LEWIS:  Objection, form.

7       A.   From an anesthesia modality?

8       Q.   From an anesthesia perspective, would you

9  agree it doesn't matter which modality is used to

10  achieve normothermia so long as normothermia is

11  achieved?

12            MS. LEWIS:  Same objection.

13       A.   There is an element of time involved.  So if

14  you achieve normothermia, but towards the end of the

15  case and the patient has been shivering, that would

16  not be a good situation.  So you do want to have a

17  rapid transient phase where you achieve normothermia

18  and reach a, as fast possible, steady state in -- in

19  patient temperature.

20       Q.   All right.  But you're not, sitting here

21  today or in your work at a hospital, advocating for --

22  for a particular brand of patient warming, you care

23  about the patient being normothermic.  Is that fair?

24       A.   Within -- Within the parameters of the

25  clinical environment, so in our University, and that's

Confidential - Subject to Protective Order

Page 227

1    what I'm experienced with, we use the Bair Hugger.

2    And a lot of our cases now are getting shorter and

3    shorter, and -- and being able to get to normothermia

4    quickly is -- is clinically relevant and indicated.

5         Q.    All right.  And in preparing for this case

6    or perhaps in your practice, are you aware that there

7    are studies that say that forced-air warming is not

8    effective for the first hour?

9         A.    I believe I've seen something like that,

10   yes.

11        Q.    Okay.

12        A.    I've also seen other studies that say it's

13   -- it's quicker to get the patient to normothermia

14   than other methods.

15        Q.    Would you agree that normothermia and the

16   study of normothermia has been essentially Dr.

17   Sessler's life work?

18        A.    He's done a lot of publication in that

19   field, yes.

20        Q.    And publication and independent research as

21   well; correct?

22        A.    Yes.

23        Q.    And you believe he's an expert on issues

24   related to normothermia?

25        A.    Yes.

Confidential - Subject to Protective Order

Page 231

1    that then, based on the studies it -- it says there is

2    this possibility, but some of the studies also in the

3    conclusion or discussion section acknowledge that

4    there are limitations to how those studies could or

5    should be interpreted.

6        Q.   Which are those studies?

7             And if you want to flip back to the end of

8    your report, you can just tell me which ones you're

9    talking about.

10       A.   I -- I think Belani is one.  It's difficult

11   for me to remember all of these from the top of my

12   head.

13       Q.   Right.  But you have your references at the

14   end of the report right in front of you, and also the

15   Materials Considered on Exhibit 4; right?

16       A.   Yeah, but I don't have -- I don't believe I

17   brought Belani or...

18       Q.   Yeah.  So there's -- But there's -- So --

19            The end of your first opinion in this report

20   you talk about essentially balancing risk between

21   certain warming modalities and forced-air warming; is

22   that right?  "Other warming modalities may have risks

23   not present in forced-air warming"?

24       A.   Which -- Which page, please?

25       Q.   Page 4.  Immediately prior to number 2.  The

Confidential - Subject to Protective Order

Page 232

1    last sentence.

2         A.    Yes.

3         Q.    So in order to -- to conclude "other warming

4    modalities may have risks not present in forced-air

5    warming," you'd agree with me you need to know what

6    the risks are that are associated with forced-air

7    warming.  Fair?

8         A.    Yes.

9         Q.    Okay.  And you talked about the practice of

10   hosing and potentially of burns.  And then you said

11   that there are some studies that may use, "surrogates"

12   was your word, they use surrogates and say there is a

13   possibility of an increased risk of infection.  Is

14   that right?

15            MS. LEWIS:  Objection, form.

16        Q.    So which studies are those?

17        A.    Albrecht, I believe, and -- If I had the

18   studies in front of me I could tell you.  I -- I --

19        Q.    You have your citations in front of you, and

20   I don't know if --

21        A.    I think Albrecht, Reed.

22        Q.    So Albrecht, Reed.

23        A.    Belani.

24        Q.    Right, Belani.

25        A.    Dasari maybe.

Confidential - Subject to Protective Order

Page 233

1      Q.   Dasari, Legg, Leaper.  Those all sound

2  familiar?

3      A.   Yes.

4      Q.   And these are the ones we talked about

5  before that are not in your list of materials

6  considered or on the list of citations at the end of

7  your report; right?

8      A.   Yes.

9      Q.   What --

10         What are the risks, as you understand them,

11 present in non-forced-air warming technologies?

12     A.   In the case of the electric heating

13 blanket --

14     Q.   Right, the conductive blankets like VitaHEAT

15 and HotDog, for example.

16     A.   Right.  You could -- You could get a -- If

17 the electrical element is exposed, there is a risk of

18 -- of a short-circuit.

19     Q.   And do you have evidence of that, or are you

20 just guessing that that could be a problem?

21     A.   I don't have evidence.  The evidence may be

22 out there, but it --

23     Q.   But as you sit here today you're not

24 pointing to, like, a case report or something about

25 dangers associated with VitaHEAT or HotDog.

Confidential - Subject to Protective Order

Page 234

1      A.   No.  I cannot point to anything specific.

2      Q.   All right.

3      A.   Yeah.

4      Q.   Do you know of any other risks that may be

5   present in these conductive-warming modalities?

6      A.   There is a potential risk for...

7           I'm not sure whether the -- the electric

8   blanket is reused or disposable.

9      Q.   All right.

10      A.   So if it -- if it is reused, then that's --

11   there's an infection risk there from -- from reusing

12   it.

13      Q.   But as you sit here right now you don't know

14   if it's a single-use item or a reusable; is that

15   right?

16      A.   Yeah.  I was considering mostly forced-air

17   warming, so.

18      Q.   Well but if we're talking about conductive

19   modalities, right, like the VitaHEAT and the HotDog,

20   I'm just trying to understand, when you say that these

21   other warming modalities may have risks not present in

22   forced-air warming, what are those risks.

23           So in conductive warming you said that

24   there's a possibility for short-circuit, but to your

25   knowledge as you sit here there's no evidence you can

Confidential - Subject to Protective Order

Page 235

1    point to specifically about that; correct?

2         A.   That's correct.

3         Q.   All right.  And then the next thing you said

4    is if they're multiple-use modalities --

5         A.   Umm-hmm?

6         Q.   -- that there's a possibility that there

7    could be infection or contamination risk; right?

8         A.   Right.

9         Q.   But you don't know, as you sit here, if

10   these are single-use products or multiple-use

11   products; correct?

12        A.   Yes, but with the understanding also that

13   even if it's a single use, sometimes it is reused.

14   Off label, but it is reused.

15        Q.   Okay.  But we're going to go and we're going

16   to try to assume accepted standards of medical

17   practice, and that would be a departure from accepted

18   standards of medical practice.  Do you think that

19   that's fair, if you know?

20        A.   I don't -- I don't know if that's a legal

21   term, "accepted."  What I know is I've seen single-use

22   product reused.

23        Q.   At your hospital?

24        A.   I don't want to go there.

25        Q.   I suspect not.

Confidential - Subject to Protective Order

Page 237

1    A.    That's correct.

2    Q.    And you'd expect that the relationship

3    between 3M and your hospital, given the prominence of

4    the University of Florida, is likely significant.  Is

5    that fair?

6         MS. LEWIS:  Objection, form.

7    A.    I don't know what you mean by "significant."

8    Q.    Okay.  You expect that your hospital orders

9    a great many of things from 3M.  Fair?

10        MS. LEWIS:  Objection, form.

11   A.    I -- I'm not in the purchasing department.

12   What I see is the -- So I don't know what they order.

13   What I see is the end result.  I see a lot of Bair

14   Huggers, I see a lot of Bair Hugger blankets, so I

15   assume somebody ordered it.

16   Q.    Does your hospital use Bair Paws as well?

17   A.    Yes, I believe so.

18   Q.    All right.  Turning to the second opinion

19   you have here, you're talking about your opinion that

20   "Arizant and 3M acted reasonably in designing,

21   developing, and marketing the Bair Hugger," and that's

22   a summary of your opinion; is that right?

23   A.    Yes.

24   Q.    And you base that on your review of the

25   510(k); is that right?

Confidential - Subject to Protective Order

Page 238

1       A.    Yes.

2       Q.    Okay.  And I don't see the actual 510(k)

3   itself listed on either the materials -- the

4   references at the end of your report or on the

5   Materials Considered.  Is that another omission?

6       A.    Yes.  I'm sorry.

7       Q.    Okay.  Do you have any idea why that's

8   missing?

9       A.    Most likely because I reviewed it a long

10  time ago.

11      Q.    And then you -- you say you reviewed the

12  design and development history file, as well as other

13  documents related to the design and testing of the

14  Bair Hugger.

15            What other testing documents have you looked

16  at?

17      A.    I've looked at the filtration tests.

18      Q.    And are those the documents that you

19  reference that are attached to -- or exhibits to Mr.

20  Crowder's deposition?

21      A.    Some of them, yes.

22      Q.    All right.  And now at the end of your

23  actual report there's no inter -- there's no reference

24  to internal tests of the Bair Hugger; is there?

25      A.    Which tests?  Which internal tests?

Confidential - Subject to Protective Order

Page 239

1      Q.   I don't know.  I'm trying to figure that

2  out.

3      A.   Okay.

4      Q.   So, you know, on page 4 you say you have

5  reviewed the design and development history file, as

6  well as other documents related to the design and

7  testing of the Bair Hugger.  But there are no -- We've

8  already established that footnote number 11 is

9  incorrect, there's no other internal document that's

10  listed as a reference in your report.  Is that fair?

11      A.   I -- Without looking at it, I can't --

12      Q.   Well you can look at it.

13           If there's something that you can point me

14  to, I'd be glad to look at it.

15      A.   (Witness reviewing exhibit.)

16      Q.   Your references appear at pages fif -- 16

17  and 17.

18      A.   And the question was?

19      Q.   What testing did you review?

20           I see no internal documents or testing

21  referenced on pages 15 and 16.

22      A.   Right.  Yea, I don't -- Actually I think Mr.

23  Assaad gave the 7132, so that's not -- that's not it.

24      Q.   Right.  Yep.

25      A.   (Witness reviewing exhibits.)

Confidential - Subject to Protective Order

Page 240

1           MS. LEWIS:  Look at the one with your notes

2    on it, because that would tell you.

3           THE WITNESS:  Yes, that's right.  (Witness

4    reviewing Exhibit 5.)

5      A.    Yeah, I believe there was one that Winston

6    Tan did.

7      Q.    Did you see Mr. Tan's deposition, by the

8    way?

9      A.    No.  I don't think so.

10     Q.    All right.  Do you have any idea why that

11   wasn't provided to you?

12     A.    No.  Well I don't know whether it was -- I

13   don't know.  It's -- You're asking me a lot of things

14   out of memory.  I don't know.

15     Q.    All right.  And I understand that that can

16   be frustrating, but this is my one chance --

17     A.    Right.

18     Q.    -- to ask for seven hours what the basis of

19   your opinions is, and where it comes from.

20     A.    Right.

21     Q.    And when we don't have a complete list of

22   materials considered, and when there are errors in the

23   citations that limits our ability to ask questions to

24   fully understand your opinions and the basis for

25   those.  So what --

Confidential - Subject to Protective Order

Page 244

1          You've worked on design for a simulation, it

2    sounds like; is that right?

3          A.   No, an actual -- we built an actual

4    operating room --

5          Q.   All right.

6          A.   -- and actually manage a -- I'm struggling

7    with the word -- it's not a discarded, but an

8    operating room that was out -- not used, so I -- I now

9    manage that operating room.  It's a real operating

10   room, it's not a simulated operating room.

11         Q.   Umm-hmm.  Is it "outdated" maybe the word,

12   or?

13         A.   It was underused would be actually the

14   proper way to describe it.

15         Q.   All right.  And are patients -- are

16   operations actually conducted in this?

17         A.   They used to be.

18         Q.   But they're not now?

19         A.   Not now.

20         Q.   All right.  And with respect to the hospital

21   operating rooms at the University of Florida, you're

22   not the designer of the HVAC system, for example.

23         A.   No.

24         Q.   All right.  Somebody else did that at the

25   University of Florida.

Confidential - Subject to Protective Order

Page 245

1      A.    I believe it was probably the architect or

2  the people -- they probably did it in consult --

3  consultation with the physical plant personnel of the

4  hospital, as well as the infection people.

5      Q.    I have no doubt that there were a lot of

6  voices that would be heard in a meeting like that.

7            But at any rate, you're not one of the

8  people that would be consulted with respect to

9  designing the operating room air supply system at the

10 University of Florida; correct?

11     A.    Yes.

12     Q.    All right.  And you understand, you cite to

13 ASHRAE standard 52.2 from 2012 to offer the opinion

14 that the filter media in the Bair Hugger is -- is

15 reasonable; is that right?

16     A.    Yes.

17     Q.    Is there anything else that you are relying

18 upon for that opinion?

19     A.    The -- The tests.

20     Q.    Is there anything else that you're relying

21 on for the opinion that this MERV 14 or the ASHRAE

22 52.2 provide sufficient filtration for medical

23 devices?

24     A.    Yes.  Let me see if I --

25     Q.    And which citation are you --

Confidential - Subject to Protective Order

Page 246

1      A.   I'm trying to pull it up.  (Witness

2   reviewing documents.)

3           It's this one.  It's the MERV parameters,

4   and it basically says it will catch all bacteria.

5      Q.   And where is this from?

6      A.   This is -- I -- It's a table.

7           MS. LEWIS:  It says at the bottom, page

8   "7."  That came --

9           Does it say page 7 at the bottom?

10          MS. ZIMMERMAN:  It does say page 7 at the

11  bottom.

12          MS. LEWIS:  It came from Kuehn's report.

13          MS. ZIMMERMAN:  Michael Keen or Thomas

14  Kuehn?

15          MS. LEWIS:  Thomas.

16  BY MS. ZIMMERMAN:

17     Q.   So this is --

18          MS. LEWIS:  So it was an exhibit to

19  Kuehn -- or page 7 of his report.

20          MS. ZIMMERMAN:  All right.

21  BY MS. ZIMMERMAN:

22     Q.   And that's not also listed in the citations

23  at the end or the Materials Considered; fair?

24     A.   (Witness reviewing exhibits.)  No.

25     Q.   Correct?

Confidential - Subject to Protective Order

Page 247

1      A.   Yes.

2      Q.   Yeah.

3           MS. ZIMMERMAN:  I think I better mark this

4    just so we have it.

5           (Discussion off the stenographic record.)

6           (Lampotang Exhibit 8 marked for

7           identification.)

8    BY MS. ZIMMERMAN:

9      Q.   All right.  So doctor, you have an extensive

10   CV, I think that we marked that as Exhibit 6.  You've

11   written many, many papers; right?

12     A.   Yes.

13     Q.   And you -- you would agree that as you're

14   writing papers it's important that you provide

15   references; correct?

16     A.   Yes.

17     Q.   And you would agree with me, I hope, that as

18   we've gone through this deposition today that there

19   are many, many omissions in terms of things that have

20   been either relied upon by you or considered by you

21   that are not in the report.  Fair?

22          MS. LEWIS:  Objection, form.

23     A.   Please repeat the question.

24     Q.   As we've gone through this deposition today

25   we have discovered many omissions in terms of things

Confidential - Subject to Protective Order

Page 248

1    that you have either relied upon or materials

2    considered that are neither in your report, nor on

3    Exhibit -- Exhibit 4; correct?

4         MS. LEWIS:  Objection, form.

5    A.    There are --

6         There are some that I -- I read that I

7    didn't include.

8    Q.   Do you think that that is a -- is good

9    academic practice?

10        MS. LEWIS:  Objection, form.

11   A.    I -- I was not writing a paper, in my mind,

12   so I didn't apply the same approach that I would use

13   for an academic paper.  If I had known you were going

14   to ask me all these questions, I would have made sure

15   I was exhaustive in what I listed.

16   Q.   Well, and you were provided, by way of

17   example, and we won't get into the details of it, but

18   you were provided the report of Dr. Said Elghobashi;

19   correct?

20   A.    Yes.

21   Q.   Did it seem, upon your reading of that

22   report, that there were a significant number of

23   references and citations throughout the -- that paper?

24   A.    I don't recall.

25   Q.   Did you review the report of Dr. William

Confidential - Subject to Protective Order

Page 253

1      A.   Do you mean the specifications for medical

2  equipment?

3      Q.   What I mean is does ASHRAE standard 52.2

4  apply to medical devices in an operating room?

5      A.   There is a -- a -- It talks about

6  filtration, and -- and some equipment filtration is --

7  is relevant.  But to answer your question, ASHRAE is

8  about the air handling.

9      Q.   So ASHRAE --

10          You agree with me that ASHRAE standard 52.2

11  is about air handling; correct?

12     A.   Yes.  But in looking at -- at the -- for

13  example, it talks about what kind of bacteria the air

14  handling would trap, and they use the MERV parameter

15  as a metric to say this is what it will trap.  And --

16  And in ASHRAE this table, rather, says that if you use

17  14 you will trap all bacteria.

18     Q.   So I understand what MERV does, and what the

19  different ratings are.

20          But my question is whether ASHRAE standard

21  52.2, not the table in front of you, governs medical

22  devices.

23     A.   No.

24     Q.   Okay.  Thank you.

25          In the next paragraph you say that there is

Confidential - Subject to Protective Order

Page 258

1      Q.   Sometimes it's accepted in the literature,

2   and sometimes it's considered significantly

3   underpowered; is that fair?

4      A.   In some cases, yes.

5      Q.   Okay.  And would you agree that both Moretti

6   and Huang are significantly underpowered?

7           MS. LEWIS:  Objection, form.

8      A.   I'm not a statistician so, you know, it's --

9   it goes back again to the sample of convenience.  So I

10  don't know whether that's what they did, but --

11  because I didn't talk to them, but there -- there --

12  there is a -- a practical element, and I run into that

13  all the time when I do my studies, where I very often

14  cannot get what I would ideally like as a sample size.

15  So that's the reality of doing research and

16  publishing.

17     Q.   I understand that.

18          But given -- given that Huang and Moretti

19  are both -- they're two of the 16 citations to your

20  report, would you agree it's important to know if they

21  are significantly underpowered before you rely upon

22  them?

23     A.   When a paper is accepted usually there is a

24  statis -- a statistical review.  I'm not a statistical

25  reviewer.  I don't do that.  So the implicit

Confidential - Subject to Protective Order

Page 259

1    assumption is that when a paper is published that the

2    reviewers were able to talk about it, were able to --

3    to give feedback to the authors.

4         Q.   But as you were approaching the problem

5    here, and the citations that you offered in support of

6    your opinions and even the materials that you

7    considered, you did not list Belani and Albrecht and

8    Reed and Dasari and Legg and Leaper, and it seems --

9    it seems a big piece of that is because of what you

10   concluded to be limitations in those studies; is that

11   fair?

12        A.   Part of it was just an omission, as we

13   already went over.

14        Q.   Okay.  And partly because you think that

15   those -- those studies had limitations; right?

16        A.   Well I think we -- we just went over that

17   most studies have limitations, so.

18        Q.   But you disregard, it seems, the conclusions

19   reached by Belani and by Legg and, you know, these

20   other study authors, but you didn't disregard the

21   conclusions reached by Moretti and Huang, despite the

22   limitations to those studies.

23             MS. LEWIS:  Objection, form.

24        Q.   Is that a --

25             Is that the approach of an objective

Confidential - Subject to Protective Order

Page 260

1    researcher?

2         A.   I --

3              MS. LEWIS:  Objection, argumentative.

4         A.   I -- I reviewed those studies, and I am

5    going to repeat myself.  I made an honest mistake in

6    what I listed.  If I had known this was a issue I

7    would have listed everything.

8         Q.   So turning to page 5, you say that it's your

9    opinion that Arizant and 3M took the high road and

10   acted with poise and restraint in its official

11   response to allegations about forced-air warming

12   technology, sticking to the science and the facts, and

13   undertaking additional testing of the Bair Hugger.

14             You go on to say:  "I am not aware of any

15   misrepresentations of the safety of the Bair Hugger or

16   forced-air warming by Arizant/3M or any of its

17   employees."

18             Is that -- Does that remain your opinion

19   today?

20        A.   Yes.  There -- There --

21             There was some confusion, I believe, about

22   the filter.

23        Q.   Do you believe it was confusion?

24        A.   Well I don't know.  I don't work at 3M, so.

25   But from what I read, then when the -- when that --

Confidential - Subject to Protective Order

Page 261

1    that was realized, it was -- the FDA was informed.

2        Q.   Would it surprise you to know that 3M's

3    internal people, in response to customer questions,

4    say, quote, we do not want to disclose the actual

5    filtration level, but it's sub-HEPA, end quote?

6            Does that sound like it's taking the high

7    road, to you, doctor?

8        A.   I don't have enough context to reply to that

9    question.  I'm sorry.

10           (Discussion off the stenographic record.)

11           MS. ZIMMERMAN:  We can take a break if you

12   like.

13           THE REPORTER:  Off the record, please.

14           (Recess taken from 3:24 to 3:32 p.m.)

15   BY MS. ZIMMERMAN:

16       Q.   All right, doctor, I appreciate your

17   patience with the ventilation system and a long day,

18   and we'll try to get through this.

19       A.   Thank you.

20       Q.   Before we took the break we were -- we were

21   -- I was asking you some questions about your opinion

22   about Arizant and 3M taking the high road.  Have you

23   seen -- Have you been shown any documents about the

24   desire by Arizant and 3M to prevent ECRI from doing

25   their own study?

Confidential - Subject to Protective Order

Page 262

1        A.   I don't recall.  I don't -- I don't know.

2        Q.   So you haven't seen any documents that says

3   our first step with ECRI should be preventing them

4   from doing their own testing?  You haven't seen any of

5   those documents?

6        A.   No, I didn't see that.

7        Q.   You say that you're not aware of any

8   misrepresentations of the safety of the Bair Hugger or

9   the forced-air warming unit by Arizant or 3M or any of

10  its employees.

11          Have you been shown any of the documents

12  about the desire to represent that the filter was,

13  quote, high efficiency .2 micron, end quote?

14       A.   I think that's what I was referring to when

15  I said there was a mistake, and then the mistake was

16  shared or --

17       Q.   With the FDA?

18       A.   Yeah, with the FDA.

19       Q.   Right.

20          And that mistake arose out of a -- an

21  inspection done in somewhere around 2009/2010; does

22  that sound about right?

23       A.   I don't remember.

24       Q.   Okay.  And does it sound familiar that

25  perhaps they corrected that mistake by Federal Express

Confidential - Subject to Protective Order

Page 263

1    letter in December of 2016, six years later?

2            MS. LEWIS:  Objection, form.

3        A.   I don't remember.  I -- I don't know.  I

4    don't have material to respond.

5        Q.   All right.  And have you been shown any of

6    the documents evidencing desires by various

7    consultants and key opinion leaders for 3M requesting

8    that additional studies, especially bacterial sampling

9    studies, be done with respect to the Bair Hugger?

10       A.   I'm sorry.  It's been a long day.

11       Q.   It has.

12       A.   Can you repeat the question, please?

13       Q.   Have you been shown any of the documents

14   evidencing desires by various consultants and key

15   opinion leaders for 3M requesting that additional

16   studies, especially bacterial sampling studies, be

17   done with respect to the Bair Hugger?

18       A.   I don't recall.

19       Q.   Do you know, for example, that Dr. Sessler

20   had been urging additional study be done for many

21   years?

22       A.   Umm --

23       Q.   You haven't seen those documents?

24       A.   I don't think so.

25       Q.   Okay.  Are you aware of concerns by

Confidential - Subject to Protective Order

Page 266

1    titled "war games"?

2        A.   It's possible.  I -- It's been -- It's been

3    a long time ago.

4            MS. ZIMMERMAN:  And I will mark this as an

5    exhibit so you can see it.

6            (Lampotang Exhibit 9 marked for

7            identification.)

8    BY MS. ZIMMERMAN:

9        Q.   Is that a document that you've seen before?

10       A.   (Witness reviewing exhibit.)

11           MS. LEWIS:  Do I have one?

12           MS. ZIMMERMAN:  I wasn't going to use it.

13       Q.   And I'll represent to you, doctor, that the

14   orange highlighting is my highlighting, it's not

15   highlighting from --

16       A.   Umm-hmm.

17       Q.   -- Arizant or 3M?

18           Is this a document you've seen before?

19       A.   (Witness reviewing exhibit.)  I don't

20   believe so.

21       Q.   But the document evidences a concern that

22   somebody might do a real study on forced-air warming

23   and contamination; is that right?

24       A.   That's what it says, yes.

25       Q.   All right.  Do you think documents like this

Confidential - Subject to Protective Order

Page 268

1              MS. LEWIS:  Objection, form.

2         A.    Please repeat the question.

3         Q.    I said, you'd agree with me that whether it

4    was 3M that took the high road, or Augustine, that the

5    viewpoint about who is correct or taking the high road

6    may depend on which articles you believe are credible.

7    Is that fair?

8         A.    There is an element of that, but there's

9    also an element of, in my 30 years or more, 35 years I

10   guess, I can't remember, that I've been in this field

11   I've never received an email like that that basically

12   paints a product in negative light, and it -- it's

13   just something I've never seen, so I -- and part of

14   saying 3M took the high road is they -- they didn't go

15   to that level.

16        Q.    Have you seen or been provided any of the

17   marketing materials that 3M has circulated that

18   summarize 3M's criticisms of the -- of the various

19   studies, including Albrecht and Reed and Harper and

20   Dasani and Legg and Leaper and Belani?

21        A.    What is that docu --

22              Is that a document?

23        Q.    Yes.

24        A.    I don't believe so.

25        Q.    All right.  And you haven't seen any of the

Confidential - Subject to Protective Order

Page 273

1           MS. LEWIS:  What do you mean?

2           MS. ZIMMERMAN:  That you're looking for?

3           MS. LEWIS:  I'm looking for Bernards.

4           MS. ZIMMERMAN:  Right.  But the copy that

5      you're looking for in the Redrope is your copy of the

6      article, or the witness's copy?

7           MS. LEWIS:  This is my Redrope, if that's

8      what you're asking.

9           MS. ZIMMERMAN:  Yeah, that's what I'm

10     asking.

11          We have not marked Bernards at this point.

12          MS. LEWIS:  (Handing.)

13          THE WITNESS:  Thank you.

14     BY MS. ZIMMERMAN:

15          Q.   And can you underline where you see

16     confirmation that the Bair Hugger was not cleaned?

17          A.   What I wrote in the report is they

18     specifically mentioned cleaning, even saying they blew

19     the dust off the CVVH, they -- and they removed the

20     dust from the ventilator.  And as regards the Bair

21     Hugger all they said was, we changed the air filter.

22          Q.   All right.

23          A.   I'm sorry, the filter.

24          Q.   And that is the full basis by which you say

25     "we can assume that the Bair Hugger was not cleaned"?

Confidential - Subject to Protective Order

Page 274

1      A.   Yes.

2      Q.   All right.  Now in your -- in your expert

3  report you are critical of Dr. Jarvis for his citation

4  to, or I guess reliance upon Bernards.  That's the

5  only criticism that you include in your report with

6  respect to Dr. Jarvis's report.  Is that the sum total

7  of your rebuttal of his testimony?

8           I assume that it is the sum total of your

9  criticism of Dr. Jarvis's report, given there is no

10  other detailed rebuttal.  Is that fair?

11     A.   If you say so, yes.  Umm-hmm.

12     Q.   And just as I go down a list.  So that's Dr.

13  Jarvis.

14          With respect to Dan Koenigshofer, you've

15  been provided a copy of his report?

16     A.   Yes.

17     Q.   And you note, towards the bottom of page 13

18  of your report, that's the only place Dan

19  Koenigshofer's name even appears in your report, it

20  says, Table 8, the MERV Efficiency Parameters on page

21  12 of the Koenigshofer report states combustion smoke

22  is less than .3 microns and that most smoke is .3 to 1

23  micron.  And then, I would add, in size.

24          Would you agree that's not -- that's not a

25  criticism that you're making of Dr. Koenigshofer's

Confidential - Subject to Protective Order

Page 279

1  outbreak stopped, end parentheses.  And it seems from

2  your report the underscore is your emphasis added; is

3  that right?

4       A.   Yes.  I added the emphasis.

5       Q.   Have you spoken with the authors of the

6  Bernards study?

7       A.   No, I have not.

8       Q.   Okay.  And so it is your interpretation, or

9  it's your assumption, based on the reasons we talked

10  about earlier, that the Bair Hugger filter was

11  replaced but nothing else on the machine was cleaned;

12  is that right?

13       A.   That's what they -- they -- They were silent

14  about cleaning the machine.  They didn't say they --

15  they cleaned -- I'm sorry.  Let me take that again.

16            They didn't say they cleaned the Bair

17  Hugger, they said they cleaned the ventilator and the

18  CVVH.  So I would not understand why they went to

19  explicitly say they cleaned two pieces of equipment

20  but would not say that they cleaned the third piece.

21       Q.   Okay.

22       A.   They only say that they changed the filter.

23       Q.   All right.  And you'd agreed with me that

24  you have explained the basis of your assumption, but

25  that is your assumption of what the Bernards article

Confidential - Subject to Protective Order

Page 280

1  authors did; correct?

2       A.   That is correct.

3       Q.   All right.

4       A.   There is also another companion paper which

5  I believe I quoted.  I think it's Van den Broek or

6  something.  And it may be --

7            Yes, it's on page 2 of Exhibit 5.

8       Q.   Okay.  The epidemiology of multiple

9  Acinetobacter outbreaks in The Netherlands during the

10 period of 1999 through 2001?

11      A.   Yes.

12      Q.   All right.  And it's your understanding that

13 that is a companion to the Bernards study?

14      A.   It's not a companion.  I believe it

15 describes some of that same outbreak.

16      Q.   And so it's your understanding that the

17 authors in Van den Broek communicated or otherwise

18 made the same assumption you did with respect to what

19 was done in the Bernards study?

20      A.   Please repeat the question.

21      Q.   I will try.

22           It's your understanding that the authors in

23 Van den Broek communicated or otherwi -- communicated

24 with the Bernards study people, or otherwise they made

25 the same assumption that you did with respect to what

Confidential - Subject to Protective Order

Page 282

1    pretty sure.  It's -- It's -- It's in here, but I

2    can't -- I can't locate it right now.

3         Q.   So you think that there's a quote from Van

4    den Broek, but you're not sure where.

5         A.   It's in the report, yes.

6         Q.   Well I can't see it, and I won't pretend to

7    have read it more -- it's possible that I've missed

8    it, but I -- there's no citation to it, and with a

9    quick review that I just did I don't see it in here.

10        A.   Okay.

11        Q.   At any rate, it seems that you and Dr. David

12   have different assumptions about what happened in the

13   Bernards paper; is that correct?  With respect to

14   cleaning the Bair Hugger.

15        A.   A different interpretation.

16        Q.   Yes.  And that's your first criticism of Dr.

17   David; is that fair?

18        A.   If that's the first instance in this report,

19   yes.

20        Q.   All right.  Then the second is on page 11.

21   Again it says "The David report."  You see that right

22   in the middle of the page?  "The David report mentions

23   the Mistral convective forced air warming system that

24   uses HEPA filters"?

25        A.   Yes.

Confidential - Subject to Protective Order

Page 309

1                C E R T I F I C A T E

2              I, Debby J. Campeau, hereby certify that I

3   am qualified as a verbatim shorthand reporter; that I

4   took in stenographic shorthand the testimony of

5   SAMSUN LAMPOTANG, Ph.D. at the time and place

6   aforesaid; and that the foregoing transcript

7   consisting of 308 pages is a true and correct, full

8   and complete transcription of said shorthand notes,

9   to the best of my ability.

10             Dated at Lino Lakes, Minnesota, this 17th

11  day of August, 2017.

12

13

14

15                              DEBBY J. CAMPEAU

16                              Notary Public

17

18

19

20

21

22

23

24

25