CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1

1                    UNITED STATES DISTRICT COURT

2                       DISTRICT OF MINNESOTA

3    – – – – – – – – – – – – – – – – – – – – –

4    In Re:

5    Bair Hugger Forced Air Warming

6    Products Liability Litigation

7

8    This Document Relates To:

9    All Actions              MDL No. 15-2666 (JNE/FLM)

10   – – – – – – – – – – – – – – – – – – – – –

11

12

13             DEPOSITION OF TIMOTHY A. ULATOWSKI

14                  VOLUME I, PAGES 1 – 414

15                      JULY 7, 2017

16

17

18            (The following is the deposition of TIMOTHY

19   A. ULATOWSKI, taken pursuant to Notice of Taking

20   Deposition, via videotape, at the Renaissance

21   Arlington Capital View Hotel, 2800 Potomac Avenue,

22   Arlington, Virginia, commencing at approximately 9:02

23   o'clock a.m., July 7, 2017.)

24

25

                                                                2

1    APPEARANCES:

2         On Behalf of the Plaintiffs:

3             Mark D. Bankston
              KASTER, LYNCH, FARRAR & BALL LLP
4             1010 Lamar, Suite 1600
              Houston, Texas   77002
5
              Genevieve M. Zimmerman
6             MESHBESHER & SPENCE, LTD.
              1616 Park Avenue
7             Minneapolis, Minnesota   55404

8         On Behalf of Defendants:

9             Christin Jaye Eaton and Jeffrey M.
              Wojciechowski
10            FAEGRE BAKER DANIELS LLP
              2200 Wells Fargo Center
11            90 South Seventh Street
              Minneapolis, Minnesota   55415
12
     ALSO APPEARING:
13
              Ronald M. Huber, Videographer
14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

12

| | | |
|---|---|---|
| 09:07:40 | 1 | Q.   Okay.  And then you were also a director in |
| 09:07:40 | 2 | the Center for Devices and Radiological Health? |
| 09:07:43 | 3 | A.   I was -- I was one of half a dozen |
| 09:07:45 | 4 | directors, office directors. |
| 09:07:46 | 5 | Q.   Right.  A director? |
| 09:07:47 | 6 | A.   I was a director. |
| 09:07:48 | 7 | Q.   Okay.  After leaving the FDA, you started |
| 09:07:52 | 8 | testifying in numerous lawsuits relating to medical |
| 09:07:56 | 9 | devices. |
| 09:07:57 | 10 | A.   "Numerous" meaning -- |
| 09:07:59 | 11 | Q.   More than one. |
| 09:08:00 | 12 | A.   Yes. |
| 09:08:00 | 13 | Q.   Okay.  In fact, a significant source of your |
| 09:08:04 | 14 | income, to come to courtrooms and rooms like this and |
| 09:08:09 | 15 | give testimony that medical devices which are alleged |
| 09:08:12 | 16 | to be unsafe are in fact safe. |
| 09:08:14 | 17 | MS. EATON:  Object to the form of the |
| 09:08:15 | 18 | question. |
| 09:08:16 | 19 | A.   Well the -- the aspects of the case are -- |
| 09:08:19 | 20 | are unique in every instance in regard to what are the |
| 09:08:21 | 21 | issues at hand, and I testify for -- for defendants |
| 09:08:25 | 22 | and plaintiffs. |
| 09:08:26 | 23 | Q.   Well when you're on the plaintiff's side, |
| 09:08:27 | 24 | it's a medical device company though; right? |
| 09:08:29 | 25 | A.   Not always, no. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

28

| | | |
|---|---|---|
| 09:22:54 | 1 | "here" meaning in that case -- "to testify as an |
| 09:22:56 | 2 | expert in any sort of medical area," and I said, "No, |
| 09:22:59 | 3 | I am not." |
| 09:23:00 | 4 | Q.  Okay. |
| 09:23:00 | 5 | A.  Well that was that case under those |
| 09:23:03 | 6 | conditions, under that -- that set of evidence |
| 09:23:06 | 7 | with -- given my opinions that I expressed in that |
| 09:23:10 | 8 | case.  Today, here we are in July of -- of 2017, |
| 09:23:15 | 9 | different set of documents, different set of |
| 09:23:16 | 10 | experiences.  But I have my opinions expressed in my |
| 09:23:19 | 11 | report. |
| 09:23:19 | 12 | Q.  Okay.  So as opposed to in I-Flow, today in |
| 09:23:23 | 13 | this case with these documents, with your opinions |
| 09:23:25 | 14 | today, are you giving medical opinions? |
| 09:23:28 | 15 | A.  I don't have any medical opinions in my |
| 09:23:31 | 16 | report. |
| 09:23:32 | 17 | Q.  So that's a no; correct? |
| 09:23:34 | 18 | A.  That's -- |
| 09:23:35 | 19 | It's as what I stated. |
| 09:23:36 | 20 | Q.  I don't -- I don't understand because I |
| 09:23:38 | 21 | asked you if you were giving medical opinions here |
| 09:23:41 | 22 | today in this room -- you, individual, Ulatowski -- |
| 09:23:44 | 23 | and you told me about your report, which leads me to |
| 09:23:47 | 24 | suggest that there may be some disconnect between what |
| 09:23:50 | 25 | your report contains and what you plan to testify |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

30

09:24:57   1   today?  Are you going to be giving any opinions like

09:25:01   2   that?

09:25:01   3        A.   I -- none of my --

09:25:04   4             All my opinions are regulatory-focused.  I

09:25:08   5   don't provide comment on any particular engineering

09:25:15   6   test methodologies, except in Dr. David I provided an

09:25:19   7   overview comment of his approach in regard to his

09:25:22   8   report.  But other than that, certainly I think my

09:25:28   9   report discusses aspects of disinfection of medical

09:25:34   10  equipment which has a methodology to it, so it -- it's

09:25:37   11  kind of -- it depends as to what I'm asked and what's

09:25:43   12  reflected in my report.

09:25:44   13       Q.   So your expertise changes from the type of

09:25:47   14  questions you're asked is what you're saying.

09:25:48   15            MS. EATON:  Object to the form of the

09:25:49   16  question.

09:25:50   17       A.   No.  I have expertise in -- in areas that

09:25:53   18  questions may provoke an answer that rely upon my

09:25:57   19  expertise in those areas.

09:25:58   20       Q.   Okay.  For instance, one of the things that

09:26:00   21  is involved in this case you understand is a surgery;

09:26:02   22  right?

09:26:02   23       A.   Is -- is surgery.

09:26:04   24       Q.   Correct.  Surgeries are involved in this

09:26:06   25  case.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

31

09:26:06  1      A.    Yes.

09:26:07  2      Q.    Okay.  You don't hold yourself out as an

09:26:08  3  expert in any kind of surgical areas such as

09:26:12  4  orthopedic surgery.

09:26:13  5      A.    No.

09:26:13  6      Q.    You're not going to be giving the jury an

09:26:16  7  opinion within a reasonable degree of medical

09:26:20  8  certainty that there is valid scientific evidence of

09:26:22  9  probable health benefits from the use of the Bair

09:26:25 10  Hugger in orthopedic surgeries.

09:26:36 11      A.    Well I -- I allude to that in my report in

09:26:41 12  regard to benefit and risk, so inasmuch as my report

09:26:46 13  touches upon benefit aspects and -- and risk, which is

09:26:50 14  reflected in clinical studies, published data, my

09:26:55 15  report is what it is.

09:26:56 16      Q.    Well right.  And that report does not

09:26:58 17  contain an opinion to a reasonable degree of medical

09:27:02 18  certainty that there is valid scientific evidence of a

09:27:05 19  probable health benefit from the use of the Bair

09:27:08 20  Hugger in orthopedic surgeries.

09:27:11 21      A.    In orthopedic surgeries.  Well I guess I

09:27:13 22  have to look at my report because I do discuss valid

09:27:16 23  scientific evidence and I do discuss the relationship

09:27:21 24  with certain data submitted to FDA as consisting of

09:27:25 25  valid scientific evidence.  So again, it's a -- it's

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

32

09:27:28  1    the question, it's the specifics that you may ask.

09:27:30  2        Q.    Well let's dive into that.  In terms of you

09:27:33  3    giving opinions that there is, within a reasonable

09:27:35  4    degree of medical certainty, valid scientific evidence

09:27:38  5    of probable health benefits from the use of the Bair

09:27:40  6    Hugger in orthopedic surgeries, what is that

09:27:43  7    scientific evidence?

09:27:43  8        A.    Well it wouldn't be -- let me clarify.  It

09:27:46  9    wouldn't be --

09:27:48  10           I think in my report as I characterized it,

09:27:51  11   again, from a regulatory point of view, it was valid

09:27:54  12   scientif -- scientific evidence applied to the Bair

09:27:58  13   Hugger in regard to its regulatory significance, not

09:28:03  14   medical significance.

09:28:03  15       Q.    Okay.  So in other words, you may be giving

09:28:06  16   us opinions about whether or not the defendant

09:28:10  17   complied with the regulatory scheme that you oversaw

09:28:12  18   during your many years at the FDA, but at the same

09:28:15  19   time you will not be giving an opinion, a medical

09:28:18  20   opinion, about the benefits of a Bair Hugger in

09:28:20  21   orthopedic surgery.  Is that fair?

09:28:23  22       A.    Generally, no.

09:28:24  23       Q.    Okay.  Just because that may be a little --

09:28:28  24   on the record, are you -- are you disagreeing and

09:28:31  25   saying you will be giving medical opinions on the

09:28:33  1  benefits of the Bair Hugger in orthopedic surgery or

09:28:35  2  you will not be giving those medical opinions?

09:28:37  3      A.  I will not.  But it depends on -- again, on

09:28:41  4  the question asked and whether it touches upon

09:28:43  5  expertise I may have.

09:28:44  6      Q.  Okay.  Well in terms of the question I just

09:28:46  7  asked and when I asked you for the scientific

09:28:50  8  evidence, do you have a medical opinion about the

09:28:52  9  benefits of the Bair Hugger in orthopedic surgeries?

09:28:57  10      A.  No.  I've refer -- referenced other groups

09:29:02  11  and persons who have commented on that as a basis for

09:29:06  12  certain opinions I have.

09:29:06  13      Q.  And there are other experts in this case, I

09:29:08  14  assume you know from reading your reports, who have

09:29:11  15  given medical opinions and are giving medical opinions

09:29:14  16  on behalf of 3M; correct?

09:29:15  17      A.  Yes, I know that.

09:29:16  18      Q.  Okay.  You would agree with me that in terms

09:29:19  19  of whether the Bair Hugger has medical benefit in an

09:29:22  20  orthopedic surgery, witnesses such as that are far

09:29:26  21  better addressed to answer that question than somebody

09:29:30  22  with your lack of medical training.

09:29:30  23          MS. EATON:  Object to the form of that

09:29:32  24  question.

09:29:32  25      A.  I would -- I would defer to other defendant

34

09:29:35  1    experts that have more direct experience in that

09:29:38  2    regard.

09:29:39  3        Q.  Okay.  By the same token, you will not be

09:29:43  4    giving the jury an opinion to a reasonable degree of

09:29:46  5    medical certainty about the degree of medical risk

09:29:47  6    from the use of the Bair Hugger in orthopedic

09:29:49  7    surgeries.

09:29:50  8        A.  Medical risk?

09:29:52  9        Q.  Correct.

09:29:53  10       A.  I would defer to other defendant experts in

09:29:56  11   regard to that.

09:29:56  12       Q.  You don't hold yourself out as an expert in

09:29:59  13   statistics or statistical analysis; correct?

09:30:01  14       A.  No, I do not.

09:30:04  15       Q.  Okay.  Now before you accept any litigation

09:30:07  16   work, do you agree with me you have to make sure you

09:30:10  17   don't have any conflicts of interest relating to the

09:30:12  18   work?

09:30:12  19       A.  That's correct.

09:30:13  20       Q.  I'm wondering:  Did you contact anybody at

09:30:17  21   the FDA, like an ethics officer, about your testimony

09:30:19  22   in this case?

09:30:20  23       A.  I have.

09:30:20  24       Q.  Okay.  And can you tell me --

09:30:21  25       A.  In this case?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

43

| | | |
|---|---|---|
| 09:39:54 | 1 | that this product should not have cleared 510(k), both |
| 09:39:58 | 2 | as the Bair Hugger 500 and 750 series. |
| 09:40:02 | 3 | MS. EATON:  Object to the form of the |
| 09:40:02 | 4 | question. |
| 09:40:03 | 5 | A.  Well I don't think he comes out and says |
| 09:40:06 | 6 | that directly.  I think he says the -- the process |
| 09:40:08 | 7 | was -- was troubling in one respect or another.  Of |
| 09:40:11 | 8 | course I found otherwise, but -- but I -- I just -- I |
| 09:40:17 | 9 | just disagree with his perspective on the 510(k). |
| 09:40:21 | 10 | Q.  Sure.  We'll get to all of that. |
| 09:40:23 | 11 | A.  Sure. |
| 09:40:25 | 12 | Q.  All I'm trying to set up -- and I'm going to |
| 09:40:26 | 13 | use your word -- is you understand Dr. David is |
| 09:40:28 | 14 | critical in that he calls the regulatory history of |
| 09:40:31 | 15 | this product alarming; correct? |
| 09:40:32 | 16 | MS. EATON:  Object to the form of the |
| 09:40:33 | 17 | question.  That's not what he said. |
| 09:40:34 | 18 | A.  Well I mean "troubling" was -- |
| 09:40:35 | 19 | Q.  "Troubling," I'm sorry, your word was |
| 09:40:37 | 20 | "troubling."  Let's do it again, put it on the record |
| 09:40:41 | 21 | again. |
| 09:40:41 | 22 | You understand that Dr. David in his report |
| 09:40:41 | 23 | criticizes the regulatory process as troubling. |
| 09:40:44 | 24 | A.  Yes. |
| 09:40:45 | 25 | Q.  Okay.  But in this case we don't have the |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

44

| | | |
|---|---|---|
| 09:40:48 | 1 | kind of conflict we were just talking about because |
| 09:40:50 | 2 | you were never involved in any kind of 510(k) approval |
| 09:40:53 | 3 | for this product; right? |
| 09:40:54 | 4 | A.   Clearance for the product, no. |
| 09:40:56 | 5 | Q.   And again, let me go ahead and make that |
| 09:40:59 | 6 | clear for the record.  And please keep correcting me |
| 09:41:02 | 7 | if I use the wrong word today because eventually you |
| 09:41:06 | 8 | will probably drill it into my head.  But in terms -- |
| | 9 | we don't -- |
| 09:41:08 | 10 | In this case we don't have the same conflict |
| 09:41:10 | 11 | we had just been talking about where you may have a |
| 09:41:12 | 12 | plaintiff alleging something about 510(k) when you |
| 09:41:15 | 13 | were involved in it.  In this case you had no |
| 09:41:17 | 14 | involvement, did -- made no approvals in 510(k); |
| 09:41:19 | 15 | correct? |
| 09:41:20 | 16 | A.   510(k) clearances, yes. |
| 09:41:22 | 17 | Q.   510(k) clearances. |
| 09:41:23 | 18 | A.   Right. |
| 09:41:24 | 19 | Q.   Okay.  So the poten -- |
| 09:41:24 | 20 | According to you, there is no potential |
| 09:41:26 | 21 | conflict because there is no approval letter from |
| 09:41:31 | 22 | Timothy Ulatowski regarding the Bair Hugger. |
| 09:41:32 | 23 | Or excuse me. |
| 09:41:32 | 24 | MS. EATON:  Object to the form of the |
| 09:41:33 | 25 | question. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

51

| 09:46:50 | 1 | kind of action is that? |
|---|---|---|

09:46:50  1  kind of action is that?

09:46:51  2       A.   An advisory action.

09:46:52  3       Q.   Okay.  And -- and an advisory action is --

09:46:56  4            Those are actions that you had

09:46:57  5  responsibility at during what approximate time of your

09:47:00  6  tenure?

09:47:00  7       A.   2003 to 2011.

09:47:02  8       Q.   Okay.  During that entire period of that

09:47:04  9  space, you were involved in advising companies if they

09:47:09  10  were perhaps in violation or potential violation of

09:47:12  11  regulations.

09:47:13  12       A.   Correct.

09:47:13  13       Q.   Okay.  One of the people that you made an

09:47:17  14  advisory action to is your current client.

09:47:22  15       A.   Correct.

09:47:23  16       Q.   That --

09:47:25  17            And that advisory letter concerned adverse

09:47:28  18  events.

09:47:29  19       A.   Correct.

09:47:30  20       Q.   Those adverse events, those were burns;

09:47:33  21  right?

09:47:33  22       A.   That was associated, yes.  Right.

09:47:36  23       Q.   And there were burns that had not been

09:47:40  24  properly reported by the company.

09:47:41  25       A.   There were reporting issues that were

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

52

09:47:43  1  observed.

09:47:44  2      Q.   You're familiar with what I say when I say

09:47:47  3  MDR?

09:47:47  4      A.   Correct.

09:47:48  5      Q.   Can you explain to the jury real quick what

09:47:50  6  an MDR is.

09:47:51  7      A.   Medical device report.  It's a report made

09:47:54  8  to FDA by manufacturers, by healthcare facilities, by

09:47:59  9  importers related to deaths or serious injuries

09:48:02  10 that -- or malfunctions that -- that may be related or

09:48:06  11 associated with a medical device.

09:48:08  12     Q.   That may be related; correct?

09:48:09  13     A.   Correct.

09:48:10  14     Q.   Okay.  In other words, if a -- a

09:48:13  15 manufacturer has information in its possession that a

09:48:16  16 device is potentially involved in an adverse event,

09:48:20  17 under certain circumstances that has to be reported.

09:48:23  18     A.   If there's reasonable evidence to that fact,

09:48:25  19 yes.

09:48:25  20     Q.   Okay.  In the case of your advisory letter,

09:48:30  21 there were adverse events that legally should have

09:48:33  22 been reported to the FDA but were not reported to the

09:48:35  23 FDA by Arizant; correct?

09:48:38  24     A.   As I recall, there were observations related

09:48:40  25 to late reports or non-reports, yes.  A few.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

53

| | | |
|---|---|---|
| 09:48:46 | 1 | Q. You would agree with me that the bulk of |
| 09:48:49 | 2 | your opinions in this case focus on FDA regulations, |
| 09:48:51 | 3 | FDA procedures such as the 510(k) clearance process, |
| 09:48:55 | 4 | FDA communications, defendants' compliance with |
| 09:49:00 | 5 | regulatory duties, these are the general things you're |
| 09:49:04 | 6 | testifying about. |
| 09:49:04 | 7 | A. That's the bulk of it, although there's a -- |
| 09:49:08 | 8 | a -- I'll call it a smattering of -- of expertise I -- |
| 09:49:13 | 9 | I offer in regard to a particular area of expertise I |
| 09:49:16 | 10 | have in regard to disinfection, sterilization for |
| 09:49:19 | 11 | example. |
| 09:49:19 | 12 | Q. Okay. For my next series of questions I |
| 09:49:22 | 13 | want to limit us to the parts and opinions of your |
| 09:49:24 | 14 | report that deal with the 510(k) process. Okay? |
| 09:49:28 | 15 | A. Okay. |
| 09:49:29 | 16 | Q. From the way I understand it, 510(k) is a |
| 09:49:32 | 17 | determination by the FDA that a product being offered |
| 09:49:36 | 18 | in the application is substantially equivalent to a |
| 09:49:40 | 19 | previously-legally-marketed product. |
| 09:49:42 | 20 | A. That's correct. |
| 09:49:43 | 21 | Q. Okay. |
| 09:49:43 | 22 | A. That is also Class II and subject to legal |
| 09:49:47 | 23 | marketing, as you said. |
| 09:49:49 | 24 | Q. Okay. |
| 09:49:49 | 25 | A. For classification number. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

54

| | | |
|---|---|---|
| 09:49:51 | 1 | Q.  You would agree that your opinions in this |
| 09:49:53 | 2 | case both implicate the 510(k) clearance process in |
| 09:49:56 | 3 | general and with respect to Bair Hugger specifically. |
| 09:49:59 | 4 | A.  Correct. |
| 09:49:59 | 5 | Q.  Okay.  You would also say that the 510(k) |
| 09:50:05 | 6 | process speaks to or relates to safety and efficacy. |
| 09:50:10 | 7 | A.  Yes.  It must. |
| 09:50:11 | 8 | Q.  Okay.  In fact, you have testified before |
| 09:50:17 | 9 | and I believe you'll be testifying today that 510(k) |
| 09:50:19 | 10 | clearance is a determination of safety and |
| 09:50:21 | 11 | effectiveness. |
| 09:50:22 | 12 | A.  No, I am not. |
| 09:50:23 | 13 | Q.  Okay.  That's not going to be your opinion |
| 09:50:25 | 14 | today. |
| 09:50:25 | 15 | A.  No. |
| 09:50:26 | 16 | Q.  Okay.  I notice your report provides a |
| 09:50:31 | 17 | narrative description of the FDA processes for |
| 09:50:33 | 18 | regulating medical devices; is that correct? |
| 09:50:35 | 19 | A.  Correct. |
| 09:50:36 | 20 | Q.  It has an overview of forced-air warming |
| 09:50:40 | 21 | devices generally? |
| 09:50:41 | 22 | A.  Generally, yes. |
| 09:50:42 | 23 | Q.  Okay.  It has -- discusses a history of |
| 09:50:45 | 24 | Arizant's 510(k) submissions? |
| 09:50:47 | 25 | A.  Right, to the degree that I could discover |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

55

| | | |
|---|---|---|
| 09:50:49 | 1 | that on FDA's website. |
| 09:50:50 | 2 | Q.   Okay.   Now all of those things we just |
| 09:50:57 | 3 | talked about, these opinions that you hold, you will |
| 09:50:59 | 4 | agree with me multiple federal courts have excluded |
| 09:51:03 | 5 | those opinions as improper. |
| 09:51:04 | 6 | MS. EATON:   Object to the form of the |
| 09:51:05 | 7 | question. |
| 09:51:05 | 8 | A.   No, that's incorrect. |
| 09:51:07 | 9 | Q.   Okay.   Do you remember in -- |
| 09:51:08 | 10 | You remember the Bellew versus Ethicon case? |
| 09:51:11 | 11 | A.   Well let me -- let me try and clarify what I |
| 09:51:16 | 12 | just said.   I know that certain judges have excluded |
| 09:51:21 | 13 | testimony on 510(k)s simply because they -- they don't |
| 09:51:25 | 14 | want to talk about federal regulations and 510(k)s. |
| 09:51:28 | 15 | It's not me, it's not my report, it's just an overall |
| 09:51:32 | 16 | decision that we're not going to talk about this |
| 09:51:35 | 17 | topic. |
| 09:51:36 | 18 | Q.   You don't believe that federal courts have |
| 09:51:38 | 19 | stated that you have stated the law incorrectly? |
| 09:51:40 | 20 | A.   Well if you let me finish -- you jumped in. |
| 09:51:44 | 21 | The other half has been in a case people |
| 09:51:49 | 22 | have brought up, Medtronic/Lohr, for example, and the |
| 09:51:54 | 23 | Supreme Court's decision on PMAs, premarket approval |
| 09:51:58 | 24 | applications versus 510(k)s, although the fact is that |
| 09:52:03 | 25 | I've recognized the regulatory standard for PMAs |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

58

| | | |
|---|---|---|
| 09:54:20 | 1 | question. |
| 09:54:20 | 2 | A.   I -- I don't recall that specific wording, |
| 09:54:22 | 3 | but that sounds like a legal approach. |
| 09:54:27 | 4 | Q.   Today we're not going to have that kind of |
| 09:54:30 | 5 | opinion. |
| 09:54:31 | 6 | A.   I'm not a lawyer.  I'm not going to -- |
| 09:54:33 | 7 | I haven't proposed my opinions in those |
| 09:54:35 | 8 | in -- in the framework of a -- of a -- of a |
| 09:54:38 | 9 | litigation -- legally-based litigation aspect. |
| 09:54:42 | 10 | Q.   And therefore you're not going to be giving |
| 09:54:44 | 11 | an opinion about whether the design of the Bair Hugger |
| 09:54:46 | 12 | device was negligent or non-negligent. |
| 09:54:54 | 13 | A.   Well I guess I have to understand the |
| 09:54:56 | 14 | parameters of the definition and what that entails. |
| 09:55:00 | 15 | You know, I understand that from a -- from a -- |
| 09:55:04 | 16 | I understand at least that from a -- from a |
| 09:55:06 | 17 | legal position that there's -- one has to be very |
| 09:55:10 | 18 | careful in how one approaches the negligence and |
| 09:55:12 | 19 | defect in regard to how that is defined in a |
| 09:55:16 | 20 | particular state or particular MDL versus as FDA may |
| 09:55:19 | 21 | define safety and effectiveness and how that -- those |
| 09:55:23 | 22 | things differ. |
| 09:55:23 | 23 | Q.   Okay.  Similarly, likewise -- because you |
| 09:55:26 | 24 | brought up the term, it's going to be my next |
| 09:55:29 | 25 | question -- is about the concept of defect.  And are |

59

| | | |
|---|---|---|
| 09:55:31 | 1 | you going to be giving an opinion in this case that |
| 09:55:33 | 2 | the Bair Hugger is or is not defective? |
| 09:55:36 | 3 | A.   I haven't rendered an opinion on that. |
| 09:55:38 | 4 | Q.   Okay. |
| 09:55:39 | 5 | A.   My position is, from a reg -- regulatory |
| 09:55:42 | 6 | perspective, were these products found substantially |
| 09:55:45 | 7 | equivalent or the basis for ---for those findings, so |
| 09:55:51 | 8 | on and so forth. |
| 09:55:52 | 9 | Q.   Okay.  We had talked a little bit earlier |
| 09:56:00 | 10 | about the 510(k) clearance process and about clearance |
| 09:56:04 | 11 | being granted when a product is found to be |
| 09:56:06 | 12 | substantially equivalent to a previously-legally- |
| 09:56:09 | 13 | marketed device.  Do you remember that? |
| 09:56:11 | 14 | A.   Yes. |
| 09:56:11 | 15 | Q.   Okay.  In terms of what "substantially |
| 09:56:15 | 16 | equivalent" means, you would agree that that means the |
| 09:56:18 | 17 | product has the same intended use and same |
| 09:56:22 | 18 | technological characteristics, or it may have |
| 09:56:25 | 19 | differences but those do not raise new questions of |
| 09:56:28 | 20 | safety or effectiveness. |
| 09:56:29 | 21 | A.   Yes.  That's how the statute and -- and -- |
| 09:56:32 | 22 | is embedded in the regulations. |
| 09:56:34 | 23 | Q.   Okay.  You would also agree with me that the |
| 09:56:36 | 24 | 510(k) process is a very liberal process in regards to |
| 09:56:40 | 25 | the uses of its products. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

65

| 10:02:50 | 1 | A. Right, yes. The IOM, yes. |

10:02:50    1       A.   Right, yes.  The IOM, yes.

10:02:52    2       Q.   And then as soon as IO --

10:02:55    3            Like when the IOM came out is roughly

10:02:57    4   concurrent with when you left the agency.

10:03:00    5       A.   When the report came out, yes.

10:03:01    6       Q.   Correct.  That report --

10:03:02    7            MS. EATON:  Can I just clarify?  You said

10:03:05    8   2001, and I think you meant 2011.

10:03:08    9            MR. BANKSTON:  That is true.

10:03:09   10            THE WITNESS:  Yeah.  I let that go by.

10:03:09   11            MS. EATON:  I just want that to be clear on

10:03:11   12   the record.

10:03:11   13       Q.   Yeah.  You left the agency in 2011.

10:03:14   14       A.   '11, yes.

10:03:14   15       Q.   That's when the IOM report was published.

10:03:17   16       A.   It was thereabouts, yes.

10:03:19   17       Q.   Okay.  That IOM report states/finds that the

10:03:21   18   510(k) process was not designed to determine whether a

10:03:23   19   new device provides a reasonable assurance of safety.

10:03:29   20       A.   Yeah.  The -- the IOM --

10:03:32   21            There's only two real conclusions in the IOM

10:03:36   22   report, and one of them is the 510(k) process was not

10:03:39   23   designed to evaluate safety and effectiveness in

10:03:44   24   certain cases, but the fact of the matter is, as FDA

10:03:49   25   has implemented the process, it certainly had to

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

72

| | | |
|---|---|---|
| 10:10:16 | 1 | A.   Yes. |
| 10:10:16 | 2 | Q.   Okay.  You'll agree -- and I have some |
| 10:10:19 | 3 | language there I believe you'll see there on page |
| 10:10:21 | 4 | 65 -- and you'll agree that the working group found |
| 10:10:26 | 5 | that the Center for Devices and Radiological Health |
| 10:10:29 | 6 | does not have an adequate mechanism to regularly |
| 10:10:32 | 7 | assess the quality, the consistency, and the |
| 10:10:35 | 8 | effectiveness of the 510(k) program.  I'm assuming you |
| 10:10:39 | 9 | were made aware of that. |
| 10:10:40 | 10 | A.   Yeah.  Let me just read it.  I -- I recall |
| 10:10:42 | 11 | it. |
| 10:10:50 | 12 | Yes, I understand this.  I -- I think it's |
| 10:10:53 | 13 | not quite accurate in that CDRH actually had gone |
| 10:11:01 | 14 | through -- |
| 10:11:01 | 15 | If you were there long enough -- you know, |
| 10:11:04 | 16 | 37 years -- you would have been aware, and these -- I |
| 10:11:09 | 17 | don't think these people have awareness of it, but FDA |
| 10:11:12 | 18 | had -- had been through previous cycles of analysis of |
| 10:11:16 | 19 | the 510(k) program, had undergone a -- an intensive |
| 10:11:22 | 20 | evaluation of the 510(k) program and consistency in |
| 10:11:26 | 21 | the 510(k) program and retrospective analysis of prior |
| 10:11:31 | 22 | 510(k) decisions, one of them is called the Temple |
| 10:11:34 | 23 | Report, and I think what this group was saying, we |
| 10:11:38 | 24 | need to build in that sort of review process more |
| 10:11:42 | 25 | frequently and more systematically than what we've |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

76

10:14:48  1      Q.   Sure.  I mean the FDA is rigorous about

10:14:50  2   this.  It values that support.

10:14:52  3      A.   Correct.

10:14:52  4      Q.   And one of those people would be Dr. Yadin

10:14:56  5   David.

10:14:57  6      A.   I comment on my understanding of

10:15:00  7   his, based on his CV that he produced and my fading

10:15:05  8   knowledge of my interaction with him, what his

10:15:08  9   experience was.

10:15:08  10      Q.   Uh-huh.  He was a private-sector consultant

10:15:10  11   that was engaged by the FDA.

10:15:13  12           MS. EATON:  Object to the form of the

10:15:15  13   question.

10:15:15  14      A.   Well he attests to the fact that he's on the

10:15:20  15   GMP committee.  I don't think he attests to anything

10:15:22  16   more.

10:15:22  17      Q.   He's on several committees according to his

10:15:25  18   CV; isn't he?

10:15:26  19      A.   Not FDA committees --

10:15:27  20      Q.   Okay.

10:15:28  21      A.   -- is my understanding from his CV.

10:15:32  22      Q.   Okay.  You'll agree with me that it's the

10:15:34  23   manufacturer, not the FDA, who is primarily

10:15:37  24   responsible for the assurance of safety of medical

10:15:39  25   devices.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

77

| | | |
|---|---|---|
| 10:15:45 | 1 | A.   Yes.  The regulations are geared to the fact |
| 10:15:47 | 2 | that the manufacturer must follow regulations in order |
| 10:15:52 | 3 | to design and manufacture and monitor the devices, |
| 10:15:56 | 4 | with the surveillance and oversight of FDA. |
| 10:15:58 | 5 | Q.   Right.  The FDA can't monitor each and every |
| 10:16:01 | 6 | manufacturer and the marketing of each and every |
| 10:16:04 | 7 | product; can it? |
| 10:16:04 | 8 | A.   No.  That's why FDA prioritizes its |
| 10:16:07 | 9 | monitoring and its evaluation of devices. |
| 10:16:20 | 10 | Q.   One of the opinions you give in your report |
| 10:16:24 | 11 | is that the FDA must consider issues of safety and |
| 10:16:26 | 12 | effectiveness when comparing any differences in |
| 10:16:31 | 13 | indications for use in claims.  You'd agree with that? |
| 10:16:33 | 14 | A.   Correct. |
| 10:16:33 | 15 | Q.   Okay.  And -- and I think, as we saw from |
| 10:16:36 | 16 | your I-Flow testimony, you'll agree that prior |
| 10:16:38 | 17 | clearances have just as much importance and effect as |
| 10:16:41 | 18 | current clearances. |
| 10:16:42 | 19 | MS. EATON:  Object to the form of the |
| 10:16:44 | 20 | question. |
| 10:16:44 | 21 | A.   Yes.  They have an impact on assessing |
| 10:16:47 | 22 | indications and intended use. |
| 10:16:48 | 23 | Q.   The prior clearances have just as much |
| 10:16:54 | 24 | importance as the current submission. |
| 10:16:56 | 25 | MS. EATON:  Object to the form of the |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

87

10:26:24  1  ████████████████████████████████████████

10:26:27  2  █████████████████

10:26:29  3  ███████████████████████████████████████

10:26:32  4  ████████████████████████████████████████

10:26:37  5  ██████████████████████████

10:26:38  6  ███  ████████  ██████████████  OR, do you know

10:26:41  7  anything about that product?

10:26:42  8      A.   Yeah.  Variation of the 500 probably, yes.

10:26:47  9      Q.   Okay.  When the FDA became aware that the

10:26:49  10  IFUs were being expanded to include OR usage, part of

10:26:55  11  the job then of the FDA would be to determine if that

10:27:00  12  expansion of IFUs presented any new questions of

10:27:04  13  safety.

10:27:04  14           MS. EATON:  Object --

10:27:05  15      A.   Right.

10:27:05  16           MS. EATON:  -- to the form of the question.

10:27:06  17      A.   Yes.  That would be an element for FDA to

10:27:09  18  consider.  And we know that in the 505 they actually

10:27:12  19  considered the flip side, which was home use, as being

10:27:15  20  potentially significant.  So yes, FDA was analyzing

10:27:20  21  the -- the -- the -- the possibilities for use of the

10:27:24  22  product.

10:27:24  23      Q.   Okay.  What did the FDA do to determine that

10:27:29  24  the Bair Hugger's expansion of use into the OR did not

10:27:33  25  pose any new questions of safety?

| | | |
|---|---|---|
| 10:27:37 | 1 | A.   Well we don't have available to us the |
| 10:27:40 | 2 | reviews by FDA, so we don't -- we cannot benefit from |
| 10:27:46 | 3 | that, but as a -- as a matter of policy and procedure, |
| 10:27:49 | 4 | FDA would be required to evaluate that, bring to -- to |
| 10:27:53 | 5 | bring to bear not only what's been submitted but also |
| 10:27:56 | 6 | any other information it may bring to bear in its |
| 10:28:00 | 7 | knowledge of patient warming devices being used in the |
| 10:28:03 | 8 | OR.  So -- so FDA can bring to bear, as I did numerous |
| 10:28:08 | 9 | times over many years and as I trained people to do, |
| 10:28:11 | 10 | other submissions, literature, expert opinion of -- of |
| 10:28:16 | 11 | individuals on staff or advisory committee members. |
| 10:28:19 | 12 | So it's -- it's a very -- it's a more comprehensive |
| 10:28:23 | 13 | input source than just a submission. |
| 10:28:25 | 14 | Q.   I -- I'm guessing from your comments that |
| 10:28:28 | 15 | it -- it would be difficult for you to talk about what |
| 10:28:32 | 16 | happened in terms of the 500 series in terms of its |
| 10:28:35 | 17 | 510(k) clearance process because, according to you, we |
| 10:28:38 | 18 | don't have the decision-making documentation produced |
| 10:28:42 | 19 | in this case or available for your review for you to |
| 10:28:46 | 20 | be able to discuss those matters. |
| 10:28:47 | 21 | MS. EATON:  Object to the form of the |
| 10:28:48 | 22 | question. |
| 10:28:48 | 23 | A.   Well I can't discuss the reviews without |
| 10:28:50 | 24 | having them, and having them would shed more light on |
| 10:28:54 | 25 | FDA's foundation for their finding of substantial |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

89

10:28:57    1    equivalence, but in the absence of that I certainly

10:29:00    2    understand the review process and what's brought to

10:29:03    3    bear.





CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

134

11:31:33  1  document, and what he's asked you to do is provide him

11:31:35  2  the article cited within the document so that he could

11:31:36  3  review that.

11:31:36  4       MR. BANKSTON:  Okay.  First of all, that's

11:31:38  5  not an objection.  Second of all, I've already said

11:31:41  6  three times put that document over there, I don't want

11:31:43  7  to talk about that document any more.

11:31:45  8       Q.   What we are talking about is what you came

11:31:47  9  to in your report, which is a statement that there is

11:31:48  10  valid scientific evidence of the Bair Hugger's use in

11:31:51  11  operating rooms and that that evidence existed at the

11:31:55  12  time of the Bair Hugger's clearance, and what I think

11:31:57  13  I'm understanding from you is that when I am here

11:32:00  14  today to ask you what evidence that is, what evidence

11:32:03  15  you're relying on to make that opinion, you are

11:32:05  16  telling me today in deposition you will not be able to

11:32:07  17  give me that answer.

11:32:08  18       A.   I'm not prepared to give you that answer --

11:32:10  19       Q.   Okay.

11:32:11  20       A.   -- today.

11:32:11  21       Q.   Thank you, sir.

11:32:12  22       A.   Not to say it does not exist.

11:32:14  23       Q.   Sure.  Just not going to disclose that today

11:32:17  24  in the deposition that we are here to talk about.

11:32:20  25       A.   Right.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

143

| | | |
|---|---|---|
| 11:39:37 | 1 | Q.  I'm glad that -- |
| 11:39:37 | 2 | Interesting, because that's exactly where I |
| 11:39:40 | 3 | was going to be going, is that there are other things |
| 11:39:42 | 4 | with the device that can change besides technological |
| 11:39:45 | 5 | characteristics that would require the FDA to ask that |
| 11:39:48 | 6 | question again, is there a possible effect on the |
| 11:39:49 | 7 | safety, and one of those things that could change is |
| 11:39:52 | 8 | the indications for use. |
| 11:39:53 | 9 | A.  Right.  It may -- |
| 11:39:54 | 10 | But those are typically very significant |
| 11:39:56 | 11 | changes. |
| 11:39:56 | 12 | Q.  Sure.  So, for instance, say you had a |
| 11:39:59 | 13 | device and it had a -- a very significant change in |
| 11:40:02 | 14 | the indications for use.  One day it's being used to |
| 11:40:05 | 15 | treat bunions, the next day it's in brain surgery. |
| 11:40:09 | 16 | Right?  If you have that kind of significant change, |
| 11:40:13 | 17 | there's going to need to be the question asked does it |
| 11:40:13 | 18 | raise any safety or effectiveness questions. |
| 11:40:13 | 19 | A.  Correct. |
| 11:40:14 | 20 | Q.  If the IFUs are not changed, there's no |
| 11:40:17 | 21 | change in the IFUs, you don't have to ask if there's |
| 11:40:21 | 22 | any changes in safety and effectiveness for the IFUs |
| 11:40:23 | 23 | because those IFUs haven't changed. |
| 11:40:25 | 24 | A.  Correct. |
| 11:40:25 | 25 | Q.  You might have to ask it for other things |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

156

| Time | Line | Text |
|---|---|---|
| 11:50:44 | 1 | to PMA.  You have to figure out what kind of device it |
| | 2 | is.  That would be your first step -- |
| 11:50:52 | 3 | A.   Well in -- in a very -- |
| 11:50:52 | 4 | THE REPORTER:  Just a moment. |
| | 5 | THE WITNESS:  We're stepping on each other. |
| 11:50:52 | 6 | THE REPORTER:  You are.  One at a time, |
| 11:50:54 | 7 | please. |
| 11:50:54 | 8 | Q.   Let's -- let's -- let's do it real simply in |
| 11:50:55 | 9 | little chunks from this doc. |
| 11:50:56 | 10 | A.   I'll slow up as well.  Right. |
| 11:51:00 | 11 | Q.   How about this way?  Is the product -- |
| 11:51:00 | 12 | The first thing you have to determine is is |
| 11:51:02 | 13 | the product a device. |
| 11:51:05 | 14 | A.   Yes, generally, in a -- in a very general |
| 11:51:08 | 15 | manner. |
| 11:51:08 | 16 | Q.   Now devices can be subject to different FDA |
| 11:51:11 | 17 | regulations. |
| 11:51:12 | 18 | A.   Correct. |
| 11:51:12 | 19 | Q.   One of those regulations is 510(k). |
| 11:51:15 | 20 | A.   Correct. |
| 11:51:16 | 21 | Q.   One -- |
| 11:51:17 | 22 | So then one of the next things you have to |
| 11:51:18 | 23 | determine, is the device subject to 510(k)? |
| 11:51:22 | 24 | A.   Yes.  You may -- |
| 11:51:24 | 25 | That may be a front-end decision or will |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

157

11:51:26  1    have to remain as a back-end determination.

11:51:29  2         Q.    Right.  Okay.  And then one of the next

11:51:32  3    things you might do when actually looking at the

11:51:34  4    product -- and I'm not sure what order you might do

11:51:38  5    this, so if this is out of order, you know, I know --

11:51:39  6    but one of the steps might be does the product have

11:51:41  7    the same indication statement.

11:51:44  8         A.    Right.

11:51:45  9         Q.    And in this case you would conclude, no, it

11:51:49  10   doesn't, and then that would trigger you to ask the

11:51:51  11   question does that new indication for use present any

11:51:55  12   safety questions.

11:51:57  13        A.    Yes.

11:51:57  14        Q.    That would be the proper way for a 510(k)

11:52:00  15   reviewer to go about looking at this product.

11:52:02  16        A.    Yes.

11:52:02  17        Q.    Okay.

11:52:08  18             MR. BANKSTON:  Are we at --

11:52:09  19             I'm not sure if my time is off of Central or

11:52:12  20   not.  Are we near --

          21             Are we at noon?  Is that where we're at, or

11:52:15  22   are we at 11:00?

11:52:15  23             (Discussion off the stenographic record.)

11:52:16  24             (Luncheon recess taken.)

          25

164

12:55:10   1   that would have to be answered is do those differences

12:55:13   2   pose any new questions of safety and effectiveness,

12:55:15   3   and the answer to that would be no; correct?

12:55:18   4        A.   Well I think we're saying are the

12:55:22   5   indications different.  Well I think there's different

12:55:24   6   wording, but within FDA's evaluation of devices, FDA

12:55:29   7   may be more allowing, if I can use that word, in

12:55:37   8   regard to differences in words or conditions than you

12:55:42   9   might think.  For example, I said is this still used

12:55:47  10   in hospital?  Yes/no.  Is this outside of hospital

12:55:50  11   use?  So it depends to what degree and level the FDA

12:55:54  12   evaluator considered those factors.

12:55:56  13        Q.   ████   ███████████████████████████

12:55:58  14   ████████████████████████████████████████████████

12:56:01  15   ████  ██████████████████████████████████████

12:56:05  16   ████████████████████████████████████████████████

12:56:08  17   ██████████████████████████████████████████████████

12:56:11  18   ███████████████████████████████████████

12:56:15  19   ████████

12:56:16  20        ████████████   ████████████████████████

12:56:16  21   ████████

12:56:17  22     ██   ██████████████████

12:56:18  23     ██   ████

12:56:35  24        ████████████████████████

12:56:37  25        ████████████

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

169

| | | |
|---|---|---|
| 12:59:53 | 1 |  |
| 12:59:56 | 2 | |
| 12:59:57 | 3 | Q.   I -- I just want to make sure I'm clear on |
| 12:59:59 | 4 | your testimony because I was pretty sure you had told |
| 13:00:04 | 5 | me that from your review of materials in this case and |
| 13:00:04 | 6 | from your review of materials like what's in front of |
| 13:00:06 | 7 | you, that the indications statement and the |
| 13:00:08 | 8 | indications for use on the Bair Hugger fif -- 500 |
| 13:00:11 | 9 | versus the 200 had changed and that that would require |
| 13:00:14 | 10 | the FDA to ask if that raised new safety of -- safe -- |
| 13:00:18 | 11 | new questions of safety and effectiveness.  Do you |
| 13:00:22 | 12 | agree with that or not? |
| 13:00:22 | 13 | A.   Well I don't think I expressed that in my |
| 13:00:24 | 14 | report, but as I view this here now, that could be my |
| 13:00:29 | 15 | approach.  But it doesn't mean his approach is |
| 13:00:33 | 16 | invalid. |
| 13:00:33 | 17 | Q. |
| 13:00:35 | 18 | |
| 13:00:38 | 19 | |
| 13:00:40 | 20 | |
| 13:00:41 | 21 | |
| 13:00:43 | 22 | |
| 13:00:45 | 23 | |
| 13:00:47 | 24 | |
| 13:00:49 | 25 | |

13:22:09    1       Q.    Correct.  So by your definition, you are not

13:22:13    2   going to be testifying in this case that there is a

13:22:17    3   reasonable assurance from a medical point of view that

13:22:18    4   the device is safe.

13:22:22    5       A.    I don't think I address that in my report

13:22:24    6   head on.

13:22:25    7       Q.    And I -- uh-huh.  And so I just want to

13:22:28    8   confirm that's not an opinion you're going to be

13:22:31    9   giving.

13:22:31   10       A.    That's correct.

13:22:31   11       Q.    Okay.  I want to talk to you about your

13:22:35   12   opinion that 3M was appropriate in not considering the

13:22:42   13   MDR reports that were based on litigation because they

13:22:46   14   would not reasonably suggest to the company that there

13:22:48   15   was an event, in basic shorthand.  Do you agree that's

13:22:52   16   essentially your opinion?

13:22:53   17            MS. EATON:  Let me object to the form of the

13:22:54   18   question.

13:22:55   19            MR. BANKSTON:  What's wrong on that one?

13:22:58   20            MS. EATON:  The word "considering."

13:22:58   21            MR. BANKSTON:  Okay.

13:22:58   22            MS. EATON:  I object to that word.  I don't

13:23:00   23   think it's accurate.

13:23:00   24            MR. BANKSTON:  Okay.  Let's -- let's get

13:23:02   25   that from your report.  That's in your report.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

224

| | | |
|---|---|---|
| 14:05:40 | 1 | involvement in regulating the product line being |
| 14:05:43 | 2 | litigated. |
| 14:05:48 | 3 | A.   Yes.  I've done so before, and I have not |
| 14:05:50 | 4 | been prevented from doing so upon the opinion of the |
| 14:05:53 | 5 | Ethics Office.  And again, I know it may be a big deal |
| 14:05:59 | 6 | to you, but this is even -- not even the subject of |
| 14:06:02 | 7 | this litigation for this particular device. |
| 14:06:04 | 8 | Q.   Well let's -- let's just go ahead and focus |
| 14:06:07 | 9 | like a laser in on that, then, not just the device but |
| 14:06:10 | 10 | the issues we're talking about today. |
| 14:06:11 | 11 | When it comes to the allegations of airborne |
| 14:06:14 | 12 | contamination, did you have any personal involvement |
| 14:06:15 | 13 | at all at the FDA to reviewing those allegations? |
| 14:06:19 | 14 | A.   No. |
| 14:06:20 | 15 | Q.   Okay. |
| 14:06:20 | 16 | A.   Well let me take that back.  You know, it |
| 14:06:24 | 17 | was the subject of evaluation of FDA inspection, but I |
| 14:06:29 | 18 | believe that came along after I had departed from FDA. |
| 14:06:31 | 19 | Q.   What I guess I'm asking you is:  Have you |
| 14:06:34 | 20 | been involved in written communications between, say, |
| 14:06:37 | 21 | either Augustine or with your current client about |
| 14:06:40 | 22 | airborne contamination issues while you were |
| 14:06:43 | 23 | responsible for compliance at the FDA? |
| 14:06:46 | 24 | A.   Airborne compliance -- |
| 14:06:48 | 25 | Airborne contamination generally or |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

231

| | | |
|---|---|---|
| 14:12:09 | 1 | A. █████████████████████████ |
| 14:12:11 | 2 | ████████ |
| 14:12:43 | 3 | ██████████ |
| 14:12:45 | 4 | ██ ████ █████ |
| 14:12:46 | 5 | ██ ██████████ |
| 14:12:47 | 6 | ██ ██████████████ |
| 14:12:49 | 7 | ██ ███████████ |
| 14:12:49 | 8 | ██ ███████████████████ ██████ |
| 14:12:51 | 9 | ██████████████████████████████ |
| 14:12:55 | 10 | █████████████████████████ |
| 14:12:58 | 11 | ███████████████████████ |
| 14:13:00 | 12 | ██ ███ █████████████ |
| 14:13:01 | 13 | ██ █████ |
| 14:13:02 | 14 | ██ ██████████ ███████████ |
| 14:13:07 | 15 | █ |
| 14:13:07 | 16 | ██ █████████████████ ██ |
| 14:13:07 | 17 | ██████████████████████████████ |
| 14:13:09 | 18 | ████████████████████████████ |
| 14:13:12 | 19 | █ |
| 14:13:12 | 20 | ██ █████████████████████████ |
| 14:13:14 | 21 | ████████ |
| 14:13:14 | 22 | ██ ████████ ██████████████ |
| 14:13:18 | 23 | ████████████████████████████ |
| 14:13:21 | 24 | ██████████ |
| 14:13:22 | 25 | ██ ██████████████████████ |

241



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

247

| | | |
|---|---|---|
| 14:28:44 | 1 | A.   Well it's all within the -- |
| 14:28:47 | 2 | Perhaps, perhaps not, because it's all |
| 14:28:49 | 3 | within the context of the company's risk analysis, |
| 14:28:54 | 4 | risk management analysis whether or not there's a |
| 14:28:58 | 5 | credible association of the device to -- to the event. |
| 14:29:06 | 6 | So if the company has conducted analysis or has |
| 14:29:10 | 7 | otherwise assessed that and they've decided, no, it |
| 14:29:14 | 8 | really doesn't apply at this point in time, you know, |
| 14:29:16 | 9 | we don't have enough data, you know, they may decide |
| 14:29:19 | 10 | it's not yet time for a warning. |
| 14:29:20 | 11 | Q.   Okay.  And that kind of analysis that you're |
| 14:29:23 | 12 | talking about, that has to be done irrespective of if |
| 14:29:26 | 13 | there are MDR reports or not. |
| 14:29:28 | 14 | A.   Well the whole -- the -- |
| 14:29:30 | 15 | Right.  Well, a device that's not yet |
| 14:29:33 | 16 | marketed, there is no experience, there are no MDR |
| 14:29:35 | 17 | reports, so the labeling is based upon those factors I |
| 14:29:38 | 18 | mentioned before:  prior similar devices, literature |
| 14:29:43 | 19 | related to the device, the risk management analysis |
| 14:29:47 | 20 | which may lead to labeling of the device.  So it's a |
| 14:29:51 | 21 | number of things. |
| 14:29:51 | 22 | Q.   ████████   ████████████████████████████ |
| 14:29:54 | 23 | ████████████████████████████████████████████ |
| 14:29:57 | 24 | ████████████████████████████████████████ |
| 14:30:01 | 25 | ████████████████████████████████████ |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

248



| 14:30:40 | 16 | Q.   I mean a company is not going to give a |
| 14:30:43 | 17 | warning for a condition that hasn't been proved. |
| 14:30:45 | 18 | MS. EATON:  Object to the form of the |
| 14:30:46 | 19 | question. |
| 14:30:46 | 20 | Q.   A causal -- |
| 14:30:47 | 21 | Excuse me.  Let me rephrase that.  A company |
| 14:30:50 | 22 | is not going to give a warning regarding a causal |
| 14:30:51 | 23 | relationship between a condition and a product that |
| 14:30:53 | 24 | hasn't been proved. |
| 14:30:54 | 25 | A.   Well a warning -- |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

252



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

271

15:00:47   1   studies, --

15:00:48   2        Q.   Okay.

15:00:49   3        A.   -- and -- and that's simply the case.   I

15:00:52   4   just, for example, comment on Dr. David's approach to

15:00:58   5   analyzing the literature indicating that he appeared

15:01:01   6   to be very selective in what he looked at.

15:01:04   7        Q.   All right.   You have -- you have no training

15:01:07   8   as an orthopedic physician; correct?

15:01:08   9        A.   No.

15:01:09  10        Q.   Okay.   You have no training or --

15:01:13  11             Not an infectious disease doctor; right?

15:01:15  12        A.   I'm not an infectious disease doctor.

15:01:18  13        Q.   All right.   One of --

15:01:19  14             You've got an opinion in your case

15:01:20  15   addressing Dr. William Jarvis, right, and his

15:01:23  16   opinions?

15:01:24  17        A.   Related to HICPAC.

15:01:27  18        Q.   Right.   Do you feel qualified to address Dr.

15:01:32  19   Jarvis's opinions as -- his clinical conclusions as an

15:01:32  20   infectious disease doctor?

15:01:34  21        A.   No.

15:01:34  22        Q.   Okay.   You're not an expert in filtration.

15:01:37  23        A.   No, I wouldn't call myself an expert.   I

15:01:40  24   used it in the course of my laboratory work.   But no.

15:01:43  25        Q.   You're not an expert in what we would call

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

364

| | | |
|---|---|---|
| 16:48:41 | 1 | A.   No. |
| 16:48:41 | 2 | Q.   Okay. |
| 16:48:41 | 3 | A.   No. |
| 16:48:41 | 4 | Q.   For instance, you're not a biomedical |
| 16:48:43 | 5 | engineer; are you? |
| 16:48:44 | 6 | A.   No.  No.  My -- my master's degree is in |
| 16:48:47 | 7 | physiology with an emphasis in biomedical |
| 16:48:51 | 8 | engineering, -- |
| 16:48:51 | 9 | Q.   Okay. |
| 16:48:51 | 10 | A.   -- but it's not an engineering degree. |
| 16:48:53 | 11 | Q.   Now Dr.  David, who is a biomedical |
| 16:48:55 | 12 | engineer, gave an opinion that for each of these |
| 16:48:57 | 13 | devices, they are most likely safer and as effective |
| 16:49:00 | 14 | as the Bair Hugger.  You aren't going to be giving |
| 16:49:03 | 15 | opinions to the contrary based on reasonable |
| 16:49:06 | 16 | engineering certainty; are you? |
| 16:49:08 | 17 | A.   No.  But he provides no foundation for his |
| 16:49:11 | 18 | statement. |
| 16:49:11 | 19 | Q.   I understand you have criticisms.  I'm not |
| 16:49:15 | 20 | asking you that.  What I'm asking is a very simple |
| 16:49:18 | 21 | question, is if you can give me an opinion to a degree |
| 16:49:19 | 22 | of medical or scientific certainty that these devices |
| 16:49:22 | 23 | are not safer and as effective than the Bair Hugger. |
| 16:49:28 | 24 | A.   I have -- don't have that in my report. |
| 16:49:30 | 25 | Q.   Okay.  You -- you understand what the |