# EXHIBIT I

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

### Page 1

UNITED STATES DISTRICT COURT
DISTRICT of MINNESOTA

- - - - - - - - - - - - - - - - - -

In Re:
Bair Hugger Forced Air Warming
Products Liability Litigation

This Document Relates To:
All Actions          MDL No. 15-2666 (JNE/FLM)

- - - - - - - - - - - - - - - - - -

DEPOSITION of THEODORE R. HOLFORD
VOLUME I, PAGES 1 - 386
JULY 18, 2017

(The following is the deposition of THEODORE R. HOLFORD, taken pursuant to Notice of Taking Deposition, via videotape, at the Marriott Hartford Downtown, 200 Columbus Boulevard, Hartford, Connecticut, commencing at approximately 9:20 o'clock a.m., July 18, 2017.)

### Page 2

APPEARANCES:

On Behalf of the Plaintiffs:

Michael A. Sachet and Jan M. Conlin
CIRESI CONLIN L.L.P.
225 South 6th Street, Suite 4600
Minneapolis, Minnesota  55402

On Behalf of Defendants:

Corey L. Gordon
BLACKWELL BURKE P.A.
432 South Seventh Street, Suite 2500
Minneapolis, Minnesota  55415

ALSO APPEARING:
Ronald M. Huber, Videotechnician

### Page 3

I N D E X

| EXHIBITS | DESCRIPTION | PAGE MARKED |
|---|---|---|
| Ex 1 | Expert Report of Theodore R. Holford, PhD | 11 |
| 2 | Holford curriculum vitae | 11 |
| 3 | Expert report of Jonathan M. Samet | 11 |
| 4 | Albrecht October 7, 2016 deposition excerpts | 23 |
| 5 | Augustine Biomedical + Design Research and Development Report, 9/14/2007 | 24 |
| 6 | Article, Forced-Air Warming Design: Evaluation of Intake Filtration, Internal Microbial Buildup, and Airborne-Contamination Emissions, by Reed, et al | 28 |
| 7 | Article, Predicting bacterial populations based on airborne particulates: A study performed in nonlaminar flow operating rooms during joint arthroplasty surgery, by Stocks, et al | 46 |
| 8 | E-mail string, 3MBH00050770-1 | 50 |

### Page 4

| | | |
|---|---|---|
| 9 | Article, Association of Airborne Microorganisms in the Operating Room With Implant Infections: A Randomized Controlled Trial, by Darouiche, et al | 54 |
| 10 | Proceedings of the International Concensus Meeting on Peri-prosthetic Joint Infection | 67 |
| 11 | Van Duren March 7, 2017 transcript excerpt | 77 |
| 12 | Article, Convection warmers -- a possible source of contamination in laminar airflow operating theatres? by Tumia, et al | 80 |
| 13 | Article, Forced-air warming and ultra-clean ventilation do not mix, by McGovern, et al | 94 |
| 14 | Computer printout, AUGUSTINE_ 0005193-487 | 104 |
| 15 | Albrecht October 7, 2016 deposition excerpt | 123 |
| 16 | LogisticRegression analysis, Albrecht, March 11, 2016, Albrecht_0002275-8 | 135 |
| 17 | Gmail string | 140 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 5

| | | |
|---|---|---|
| 18 | Computer printout | 148 |
| 19 | Article, Return to theatre following total hip and knee replacement, before and after the introduction of rivaroxaban, by Jensen, et al | 179 |
| 20 | Fisher's exact test of independence article | 198 |
| 21 | Article, Levels of Household Mold Associated with Respiratory Symptoms in the First Year of Life in a Cohort at Risk for Asthma, by Gent, et al | 201 |
| 22 | Chi-square test of goodness-of-fit article | 208 |
| 23 | Graph, 3M00554267 | 229 |
| 24 | Article, Infection Control in Orthopaedic Surgery | 249 |
| 25 | Article, Implementing effective SSI surveillance, by Gillson et al | 251 |
| 26 | Article, Confounding in Epidemiologic Studies, by Greenland, et al | 283 |
| 27 | Article, Statistical Methods in |  |

Page 6

| | | |
|---|---|---|
|  | Cancer Research, by Breslow et al | 297 |
| 28 | Article, Forced-air warming discontinued: periprosthetic joint infection rates drop, by Augustine | 329 |
| 29 | Jonathan Borak expert report | 362 |
| 30 | Record of Proceedings, Healthcare Infection Control Practices Advisory Committee, November 5-6, 2015 | 368 |
| 31 | Record of Proceedings, Healthcare Infection Control Practices Advisory Committee, March 31, 2016 | 376 |
| 32 | Arizant forced-air warming and SSI prevention: Talking points for sales, 3MBH00001336-7 | 381 |

Page 7

PROCEEDINGS
(Witness sworn.)
THEODORE R. HOLFORD
called as a witness, being first duly sworn, was examined and testified as follows:
ADVERSE EXAMINATION
BY MR. SACCHET:
 Q. Good afternoon, Professor Holford. My name is Michael Sacchet and I represent the plaintiffs in this litigation.
  Could you please state your full name for the record.
 A. Theodore Richard Holford.
 Q. And Professor Holford, have you had your deposition taken before?
 A. Not on this.
 Q. In the past?
 A. Yes, I have.
 Q. What was the subject matter of that deposition?
 A. Cigarette smoking.
 Q. How long ago?
 A. Ooh. It was probably eight years ago, something like that, eight, 10 years ago.
 Q. And were you called to offer opinion as to

Page 8

biostatistics?
 A. Yes.
 Q. Epidemiology?
 A. It was in regard to a statistical review that I did of an epidemiology calculation paper -- or chapter of a book, actually.
 Q. What was the chapter of that book?
 A. It was a chapter dealing with lung cancer trends, and they were relating it to smoking.
 Q. Okay. And were the studies that you relied on in that chapter of the book observational studies?
 A. Yes.
 Q. What --
  How many studies were there?
 A. I don't recall. It was a -- quite a long -- quite a long time ago. I think some of it was population data as I recall, but it's been -- been quite a long time; I've forgotten the details of it.
 Q. And who retained you to provide expert testimony in that litigation?
 A. It was the tobacco companies. They -- they -- I was -- I -- they de -- deposed me. They subpoenaed me and wanted me to be a witness.
  MR. GORDON: I -- I think he's not understanding -- he's not tracking what you mean by

Page 217

1  A. Is that --
2     Is the Supreme Court talking about a matter
3  of -- matter of law, or you were -- you were stating
4  it as -- as scientific -- as a scientific -- statement
5  of scientific fact?
6  Q. Quote, "A lack of statistically significant
7  data does not mean that a medical expert has no
8  reliable basis for inferring a causal link between a
9  product and an adverse event," end quote.
10  A. The lack of -- I -- I --
11     I don't know.
12     MR. GORDON: I'll object to the form of the
13  question.
14  A. Yeah. I don't really understand what --
15  what they're -- what they're getting at. I would have
16  to --
17  Q. Would it help to see the statement?
18  A. I'd have to review the statement. I mean
19  how --
20     What is it, a whole report?
21  Q. It's a case, and we don't have time for you
22  to read the whole case, but --
23  A. I mean that's --
24     I'd have to figure out what the case is
25  talking about. It -- it's --

Page 218

1     I'm not a lawyer, obviously, and so I'm --
2  I'm not sure what distinctions that they're -- that
3  they're making. Their language is sometimes a little
4  different.
5     MR. SACCHET: Okay. Let's take a break.
6     THE REPORTER: Off the record, please.
7     (Recess taken.)
8  BY MR. SACCHET:
9  Q. Professor Holford, in your report you also
10  note that applying Fisher's exact test on the data
11  derived from Albrecht Exhibit 10 and McGovern Exhibit
12  16 yields a confidence interval of .97 to 10.82;
13  correct?
14  A. Yes.
15  Q. And essentially that .97 is just .03 away
16  from the null value of one; correct?
17  A. That's right.
18  Q. So it's subject to this same debate about
19  just over/just under.
20  A. It's just -- it's just under the critical
21  value.
22  Q. Yes.
23  A. I mean it corresponds --
24     It's a little less because the p-value is a
25  little high.

Page 219

1  Q. And you conclude that one of the issues with
2  that confidence interval is it's essentially 10 points
3  and therefore there's -- there could be unreliability
4  to the data; correct?
5  A. Well the estimate of the -- of the odds
6  ratio is -- is not precise at all. I mean it's a
7  ten-fold difference, ten-fold range.
8  Q. So I was confused because when I read your
9  report and I saw your real analysis of the Jensen
10  data --
11     Which you did applying Albrecht Exhibit 10;
12  correct?
13  A. Yes.
14  Q. -- the confidence interval of your
15  calculation is 25 points wide.
16  A. I forget what the range was. It was pretty
17  wide.
18     Where was it?
19  Q. It's on page five.
20  A. Page five. So you're referring to the 1.37
21  to 25.49.
22  Q. Yeah.
23  A. Yeah. Yeah. It's not a very good estimate.
24  Q. It's double the size of the confidence
25  interval that you critique with respect to the

Page 220

1  McGovern study; correct?
2  A. That's right. It's statistically
3  significant, but the -- but the -- but it's not a good
4  estimate of what the risk is.
5  Q. So it has double the variance as the
6  confidence interval in the McGovern study.
7  A. Well it's -- it seems to be double the --
8  the range, the -- the -- the length of the -- of the
9  confidence interval.
10  Q. But you rely on this calculation with
11  respect to arguing whether or not the
12  thromboprophylaxis that was used in the McGovern study
13  is in fact a confounding factor; correct?
14  A. Well I'm --
15     I was looking at the p-value. The p-value
16  that I get associated with that is .006 --
17  Q. Uh-huh.
18  A. -- 4, so it's quite a small p-value. The
19  estimate of what that effect is is quite imprecise
20  because of -- you know, because of the range that we
21  were just talking about.
22  Q. It's more imprecise than the McGovern
23  study's confidence interval that you critique.
24  A. Well it's more imprecise in --
25     In general what happens with the -- with

Page 221

1 the -- with the confidence interval is it kind of
2 depends on the logarithm, so it's more on the log
3 scale, so that's part of what happens. I mean this
4 odds ratio is 4.77, so it's quite a bit bigger than
5 the odds ratios we were finding associated with Bair
6 Hugger use. So that's -- that's of course just a
7 point estimate, and so we're talking about a higher
8 range, so the range is going to be -- going to tend to
9 be somewhat wider because -- because we're up there.
10 And of course the -- the total sample size, total
11 number of individuals involved is -- is quite a bit
12 smaller than -- than -- because it -- it's just
13 based --
14    It comes out to be a subset of the -- of the
15 Bair Hugger study because it's only the Bair Hugger
16 period, so it's reduced in that way, and then the
17 other thing is that it's not the entire period, it's
18 just part of it, so we -- you're splitting that data
19 set up. And so your total sample size has gone down,
20 and that increases the -- that decreases the sample
21 size and in general makes the estimates less precise.
22    Q. But there's no doubt that the confidence
23 interval in this Jensen reanalysis, which is in your
24 report on page five, is double the width of the
25 McGovern confidence interval; correct?

Page 222

1    A. That seems to be what it is, yes.
2    Q. That is what it is.
3    A. Okay. Yeah.
4    Q. Your report also states that when applying
5 Albrecht Exhibit 10 and McGovern Exhibit 16, that the
6 p-value -- or that the odds ratio is 2.76 when using
7 Fisher's exact; correct?
8    A. Well that -- that -- yeah. And that --
9 that's not --
10    The -- the test, the Fisher's exact, has to
11 do with the p-value, not the -- not the estimate of
12 what the odds ratio is.
13    Q. So on page two of your report when you say
14 the odds ratio for this comparison is 2.76, where did
15 you get that from?
16    A. That's just a cross-product ratio for that
17 table.
18    Q. And is that -- okay.
19    So the 2.76 derives from Albrecht Exhibit 10
20 and McGovern Exhibit 16.
21    A. That's right. It's a tabulation of those
22 data. I mean it's --
23    Yeah.
24    Q. And it's only accurate insofar as those
25 exhibits are accurate; correct?

Page 223

1    A. Well the accuracy depends on -- on the -- on
2 the --
3    Q. Cross product.
4    A. Well the point estimate is the cross
5 product. The -- the confidence interval depends on
6 this Fisher-like distribution. It's not --
7    It's an exact kind of calculation that --
8 that -- that's involved, but it's kind of a lengthy
9 calculation that roughly depends on the standard
10 error.
11    Q. So I might need to back up because I don't
12 know if I'm fully understanding what you're saying.
13 But the odds ratio reported in the McGovern study was
14 3.8; correct?
15    A. Yes.
16    Q. And then in your report on page two you say
17 the odds ratio for this comparison is 2.76, and
18 what --
19    A. That's in the tabulation I used, yes.
20    Q. -- what data are you using to derive that
21 odds ratio?
22    A. The --
23    MR. GORDON: Arithmetically, or the
24 underlying data?
25    MR. SACCHET: Arithmetically.

Page 224

1    A. Well it's the -- it's the -- two point --
2    Where is that? Oh, here we are. Okay.
3 Yeah. That's based on this -- this table that is the
4 four out of 372 and 31 out of 1065.
5    Q. And where did you get that data?
6    A. That's from -- from --
7    Was it Albrecht 10?
8    Q. Okay. You would agree that that odds ratio
9 is still above 2.0; correct?
10    A. Yes.
11    Q. Would you agree that an odds ratio of 2.0 is
12 often referred to as a doubling of the risk?
13    A. It -- it is, yeah.
14    Q. And -- and that means you're 50 percent more
15 likely to experience the outcome after exposure to the
16 variable than the count as actual?
17    MR. GORDON: Object to the form of the
18 question.
19    A. Well if -- what it would imply, if -- if --
20 if the odds ratio was -- if the --
21    The odds ratio is actually a ratio of odds.
22 The statement that you made as -- is re -- is
23 related -- you state it as a ratio of -- of risks,
24 which would typically mean a ratio of the -- of the
25 incidence rates.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 245

1     A. That's -- that's -- that's what he reported.
2     Q. Are you aware that Dr. Reed also testified
3 that to rely on data prior to July 1st, 2008 would be,
4 quote, very unreliable, end quote?
5     A. That's what he reported.
6         I mean related to this, I mean there's a --
7 there was a review of -- of the procedures that they
8 were using that's referred to in one of the other
9 papers --
10         What is the author? Starts with a G.
11 Gissell?
12     Q. Gillson.
13     A. Gillson. Thank you.
14         -- that this was all not reviewed until
15 December, so I'm not sure where -- what Reed is
16 referring to.
17     Q. So you don't believe Dr. Reed's testimony
18 that full surveillance began on Septem -- on July 1st,
19 2008.
20     A. Well he's -- he's depending on his
21 recollection, --
22     Q. Okay.
23     A. -- I assume, in his deposition.
24     Q. Uh-huh.
25     A. And I mean that's what he's -- what -- what

Page 246

1 he said in his -- in his deposition; however, that
2 seems to not correspond in a peer-reviewed paper what
3 was said about when this was all reviewed.
4     Q. So is your statement that in the Gillson
5 article the authors there represented that the full
6 surveillance began in December of 2008?
7     A. It was reviewed in December.
8     Q. Reviewed in December. But you have no
9 knowledge --
10     A. I don't --
11     Q. -- as to whether --
12     A. It doesn't say when it was implemented, --
13     Q. Okay.
14     A. -- but that would imply, if it was not
15 reviewed until December, that it would have been not
16 implemented until maybe January. Right? I mean if
17 it's not --
18     Q. January '09?
19     A. '09. Yeah.
20     Q. Okay. So if full surveillance wasn't
21 implemented until January '09, --
22     A. Yes.
23     Q. -- you're relying on data from July -- prior
24 to July 2008.
25     A. These were the data that were -- were

Page 247

1 provided. These were the data that I had available to
2 me.
3     Q. But --
4         So I just want to be clear. Based on what
5 you just said, it's either possible that full
6 surveillance began on July 1st, 2008 or --
7     A. Yes.
8     Q. -- perhaps even January 1st, 2009, --
9     A. So what --
10         Yeah.
11     Q. -- but you nonetheless constructed your
12 model on data that was prior to that time; correct?
13     A. That's -- that's right.
14     Q. And that data --
15     A. And --
16     Q. -- may or may not be complete.
17     A. And --
18     Q. Answer the question, please.
19     A. Well according to Reed's testimony, if
20 Reed's correct, if -- if -- if this is correct, that
21 might be true.
22     Q. Okay.
23     A. The other thing that's true, then, if that's
24 what in fact took place, is that six months -- or
25 whatever it is -- six months or so of McGovern is not

Page 248

1 reporting appropriately.
2     Q. So if this document from the NHS says that
3 since July 2008 hospitals are required to have sys --
4 systems in place to identify patients who are included
5 in the surveillance and later admitted to hospitals
6 with an SSI, would that clarify any doubt as to when
7 full surveillance began in the NHS?
8         MR. GORDON: Object to the form of the
9 question, lack of foundation.
10     A. Well there is --
11         I mean you're -- you're raising questions
12 about how accurate the data were recorded, but I mean
13 all of these change -- changes took place during the
14 McGovern study.
15     Q. If Mr. Reed's testimony is true -- if Dr.
16 Reed's testimony is true --
17         MR. SACCHET: I just said "mister,"
18 but I --
19         (Discussion off the stenographic record.)
20     Q. Okay. If Mr. Reed's testimony is that full
21 surveillance began on July 1st, 2008, that is the
22 start of the Bair Hugger period in the McGovern study;
23 correct?
24     A. That's --
25         According to his deposition, that -- that's

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 249

1  what it corresponds to, yes.
2     Q.  And you have no evidence to doubt that, do
3  you, Professor Holford?
4     MR. GORDON:  Object to the form of the
5  question.
6     A.  I mean the evidence to doubt it is that
7  seems to be somewhat contradictory to what Gillson
8  says, but I mean I -- I'm not going to -- you know, I
9  don't -- I'm -- I'm --
10    I'll -- I'll take -- I'll take him at his
11 word.
12    Q.  Okay.  And taking him at his word, full
13 surveillance starts on July 1st, 2008.
14    A.  That's what he said.
15    Q.  Yes.
16    (Exhibit 24 was marked for
17    identification.)
18 BY MR. SACCHET:
19    Q.  Professor Holford, is this the Gillson
20 article that you are referring to that was cited in
21 your report?
22    A.  Is this it?  I don't think it is.
23    Q.  Okay.  Let me --
24    A.  I -- let's see.
25    MR. SACCHET:  I may have marked the wrong

Page 250

1  document, professor.  Is it -- I just --
2     I'll shortcut this because I think I might
3  have.  Is the first line of the document you're
4  looking at actually from Brister, not Gillson?
5     MR. GORDON:  Yeah.
6     MR. SACCHET:  I may have given you the wrong
7  one.
8     MR. GORDON:  That's what you want to give
9  him.
10    MR. SACCHET:  Okay.
11    THE WITNESS:  Yeah.  I think this is one of
12 the ones that --
13    MR. SACCHET:  Yeah.  That's my fault.
14    THE WITNESS:  Yeah.  It's strange, because
15 the author is not -- doesn't appear on it, which is
16 kind of a --
17    MR. SACCHET:  The author is there on the
18 top, it's just --
19    It's my fault.
20    THE WITNESS:  Okay.  Yeah.  It was hard to
21 find the author on this one, that's what -- yeah.
22 Anyway --
23    MR. GORDON:  This is al --
24    This Exhibit 24 is on his list of
25 references, it's just --

Page 251

1     MR. SACCHET:  Yeah, it's the Brister
2  article.
3     THE WITNESS:  Yeah, okay.  Yeah.  I didn't
4  think this was Gillson, that's all.  See, Gillson
5  is -- where are we -- same journal, 2014, June '17.
6  Is that true?  That was --
7     Oh, no.  It was published in 21 -- 2011.
8  Yeah, that's Brister.
9     MR. SACCHET:  Yeah.
10    THE WITNESS:  Yeah.
11    (Exhibit 25 was marked for
12    identification.)
13 BY MR. SACCHET:
14    Q.  Is this the Gillson article that you were
15 referring to?
16    A.  Yes, it is.
17    Q.  Okay.
18    A.  Yes.
19    Q.  Can you point me to any particular statement
20 in this article where there's information that
21 contradicts Mr. Reed's testimony?
22    A.  Oh.  There's a figure somewhere in there,
23 which is practically illegible in this copy --
24    Q.  I don't want to spend tons of time on this,
25 professor, but --

Page 252

1     A.  I've got a --
2     Q.  -- one thing that might be helpful is you
3  would agree, wouldn't you, that this particular
4  document relates to Northumbria Healthcare; correct?
5     A.  That includes Wansbeck, yeah.
6     Q.  But it's not specific to Wansbeck; correct?
7     A.  That -- that's correct.
8     Q.  So even if, for the sake of argument, this
9  document said something to the effect that there was a
10 different time in which full surveillance occurred,
11 that may or may not be specific to Wansbeck.
12    A.  Well I assume it would include Wansbeck.
13 I -- I don't know how they operate, but -- yeah.
14    Q.  It's possible that Wansbeck may have been
15 ahead of the curve with respect to what NHS did as a
16 trust; correct?
17    A.  I -- I guess that's possible.
18    Q.  Okay.  So even if there's a date in this
19 document that's specific to NHS, it does not
20 contradict Mr. Reed's testimony.
21    A.  Not necessarily.
22    MR. GORDON:  Object to the form of the
23 question, --
24    A.  Well --
25    MR. GORDON:  -- assumes facts not in

63 (Pages 249 to 252)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 301

1  Q.  Are you aware that the record studies found
2  that Xarelto is not related to infection?
3      MR. GORDON:  Objection, asked and answered,
4  lack of foundation.
5      A.  I think I said I had not looked at the
6  record studies.
7      Q.  Would it be helpful to look at one?
8      A.  I mean I -- it --
9          When I was looking within the Albright 10
10  data set, I found the association that I reported.
11  Now I think the premise of your question is:  Is the
12  association that I found, is that a causal association
13  or not?  The way this study was designed, is this
14  temporal?  You know, these time periods are changing.
15  And as I show in Fig. 2 --
16     Q.  Okay.
17     A.  -- show in Fig. 2 and I present the --
18  related to that I show in figure -- I'm sorry, on
19  page -- ah, where is that?  On page four, the last
20  paragraph, it compares the infection rates by
21  quarter --
22     Q.  Yeah.
23     A.  -- and we got a chi-square of 15.5 on six
24  degrees of freedom, p-value of .0167.  So what that
25  suggests is that the incidence rates during the Bair

Page 302

1  Hugger period were changing quite a lot, and those
2  differences were statistically significant.
3     Q.  Okay.
4     A.  So this is not a period where things were
5  just under well controlled.
6     Q.  Are you aware of whether deep joint
7  infections are always constant or whether there is
8  variability in deep joint infections more generally?
9     A.  Well if there is variability more generally,
10  then that needs to be taken into account in the
11  analysis, and this analysis does not do that.
12     Q.  When you conducted --
13     A.  I did not do that, and McGovern certainly
14  didn't do it either.
15     Q.  When you construct a statistical model, the
16  confidence interval accounts for the variance of the
17  data; correct?
18     A.  Well it should.  But the confidence
19  intervals that I computed and the confidence intervals
20  that McGovern computed don't take that -- that
21  variability into account.
22     Q.  Okay.
23     A.  The expected value of this chi-square
24  statistic is equal to the degrees of freedom, so you
25  expect it to be six, in fact it's 15.5, so there's,

Page 303

1  what, two and a half times as much variability as what
2  I would expect to see if the only variation that was
3  taking place was just a random fluctuation based on,
4  you know, what's going on with the use of -- of -- of
5  these surgical procedures at Wansbeck.
6     Q.  You didn't do that calculation with respect
7  to the reanalysis of the Jensen data; correct?
8     A.  I -- I didn't -- I didn't allow for random
9  variability other than the binomial variability --
10    Q.  Okay.
11    A.  -- that -- that we assumed.  No, I -- I took
12  that at a face value.  And -- and it could be random.
13  My assumption is it's not random.  My assumption is
14  it's due to other factors that are -- that were
15  affecting risk at Wansbeck during this time period.
16    Q.  That's an assumption.
17    A.  It is.
18    Q.  Okay.  I want to go back to the -- what we
19  were talking about with respect --
20        Did you do any investigation to determine
21  whether your assumption was correct or not?
22    A.  I -- I have no further --
23        I have not been in contact with Wansbeck or
24  anyone else involved with this to know that for
25  certain.  I guess a part of my -- my -- my reasons for

Page 304

1  thinking there were other things going on is the
2  Gillson paper, for example, enumerates such a huge
3  array of things that were taking place at -- what is
4  it -- Northumbria group of hospitals, --
5     Q.  Okay.
6     A.  -- so they were having a problem.
7  Obviously, NHS was -- was calling them on having a
8  high infection rate that they needed to do something
9  about, and the -- the Gissell paper elaborates on all
10  the things that they were trying to do to bring this
11  thing under control, and there were a lot of other
12  things other than switching to Hot Dog.
13    Q.  Okay.  Did you ask 3M for any info with
14  respect to this issue?
15    A.  No.
16        MR. GORDON:  Object to the form of the
17  question.
18    Q.  Okay.  Are you aware that in the Gillson
19  article the descriptor for infection is SSI?
20        MR. GORDON:  Object to the form of the
21  question.
22    Q.  The title of the article is SSI.
23    A.  Which paper are you talking about?
24    Q.  You just referenced the Gillson article, --
25    A.  Gillson, okay.

76 (Pages 301 to 304)

Page 305

1  Q. -- "Implementing Effective SSI Measures."
2  A. Right. Yes.
3  Q. Do you know what "SSI" stands for?
4  A. Ahh, oh --
5     I've forgotten.
6  Q. Surgical-site infection ring a bell?
7  A. Surgical-site infection. Exactly, yeah.
8  Q. Surgical-site infections are not the same
9  thing as deep joint infections.
10    MR. GORDON: Object to the form of the
11 question, lack of foundation, misconstrues the
12 evidence and assumes facts not in evidence.
13 Q. Do you know whether an SSI is the same as a
14 DJI?
15    MR. GORDON: Same objection.
16 A. It's -- it's not the same, it's not the same
17 thing. They are -- they would be --
18    Are you saying -- suggesting they are not
19 related?
20 Q. I'm suggesting that --
21    Do you know whether the measures that were
22 implemented in the Northumbria trust were specific to
23 SSI or DJI?
24 A. I think --
25    Well the paper is entitled for SSI.

Page 306

1  Q. So you don't know whether they were specific
2  to deep joint infection.
3  A. Well I would assume that they would -- they
4  would be effective on affecting both. I mean
5  orthopedic surgery appears to be one of the things
6  that they are in fact looking at.
7  Q. Can you define SSI?
8  A. I don't know the --
9    I don't know. I'm -- it's not a -- an area
10 that I've particularly done -- done work -- work on.
11 I --
12 Q. Can you define DJI?
13 A. It's -- it's again the --
14    It's joint -- joint infections --
15 Q. Okay.
16 A. -- that -- that you're looking at.
17 Q. But you have no scientific basis or
18 expertise to conclude whether or not the inter --
19 interventions that are mentioned in the Gillson
20 article which relate to SSI would have an impact on
21 deep joint infection; correct?
22 A. It's --
23    They're not areas that I have -- that I
24 have -- that I have personally done research on.
25 My -- my --

Page 307

1  But I -- I believe that they would be
2  related to each other. And things that you're doing
3  to control SSI, my understanding is you would have --
4  you would have effects on -- on PJI as well.
5  Q. What's your understanding based on?
6  A. Well looking at -- well I mean the -- one --
7    This is from the -- from the Gillson paper.
8  Q. What is?
9  A. A patient with a -- with a -- with surgery
10 on his knee.
11 Q. Do you see the implant?
12 A. I see the surgery on his knee.
13 Q. Do you know whether that would result in
14 either a superficial wound infection on the skin or
15 whether it would result in a deep infection on a
16 prosthetic?
17 A. I don't know. If it was a deep infection, I
18 think that would be something they would -- they would
19 be interested in.
20    You don't think that -- you don't think they
21 would be interested in that as -- as respect to the
22 surgery?
23 Q. Are you asking me?
24 A. Yeah.
25 Q. I'm --

Page 308

1  A. I mean you -- you seem to be suggesting that
2  there's no effect. Why -- why what you're asking
3  me --
4  Q. I would let --
5    Your -- your report concludes that the SSI
6  bundle may have had an effect on deep joint infection
7  rates; correct?
8  A. Yes. The things that they were doing to
9  control SSI may have had an effect.
10 Q. You have no scientific basis to make that
11 conclusion.
12 A. I'm -- no, no. I'm just -- just assuming
13 that it does.
14 Q. Thank you.
15    Do you know if any articles that you're
16 relying on relate to SSI versus DJI?
17 A. No.
18 Q. So you're not sure whether the publications
19 that you've cited on page 14 of your report are
20 specific to deep joint infection or a surgical-site
21 infection.
22 A. Oh. Some of them --
23    I'm not sure which articles you're -- you're
24 talking about.
25 Q. Well do you know offhand? I don't want to

Page 321

1  the McGovern study or whether it decreased,
2  correct, --
3      A.  Which odds --
4      Q.  -- when com --
5      A.  -- ratio are you talking about?
6      Q.  Either the 3.8 or the 2.76 that you
7  calculated based on Albrecht 10.  You have no basis to
8  compare those odds ratios to this calculation.
9      A.  Well I compared the odds -- I mean I
10 didn't --
11         I don't report the odds ratio, but you can
12 pretty good -- get a pretty good idea of what -- about
13 what it's going to be --
14     Q.  You told me --
15     A.  -- because the infection rate -- let's see.
16        "In order to control for the...one must use
17 the Bair Hugger period that -- that shares the
18 antibiotic and thromboprophylaxis regimen used in the
19 Hot Dog period," so -- which had an infection rate of
20 three out of 270, 1.1 percent, and compare that with
21 four out of 372, which is 1.08 percent.
22     Q.  You're looking at controlling for both
23 variables, correct, right now?
24     A.  That is correct.
25     Q.  I want to go back to when you just

Page 322

1  controlled for the antibiotic, which is what we're
2  talking about.  You did not provide an odds ratio.
3      A.  I did not --
4         That's right, I didn't provide it.
5      Q.  You did not determine how or whether the
6  antibiotic by itself is a confounding variable.
7      A.  By -- by itself, no.  By itself, no.
8      Q.  And you have --
9      A.  But I've controlled for both of them --
10     Q.  We'll get there.  I'm just talking about
11 this calculation.
12        You do not know the degree of confounding,
13 if any, caused by only the antibiotic.
14     A.  That's right.  I didn't do that.
15     Q.  And you have not reviewed any literature to
16 suggest that an antibiotic is a confounding factor on
17 deep joint infections.
18        MR. GORDON:  Object to the form of the
19 question.
20     A.  I don't see -- understand that -- understand
21 your -- your question.  To be a confounding variable,
22 as we've said, it has to be associated with -- with
23 the -- with the outcome --
24     Q.  Okay.
25     A.  -- and the variable you're looking at.

Page 323

1      Q.  Yeah.  And you haven't done --
2      A.  So whether or not it's associated with --
3         Well in this study it -- it certainly is
4  associated with -- with whether or not the Bair Hugger
5  or the Hot Dog was used.  In general, who knows?
6      Q.  You don't know whether --
7      A.  Well --
8      Q.  -- the Gentamic --
9      A.  -- it depends on what -- what -- what is
10 done by the institution.
11     Q.  You don't know whether Gentamicin is more or
12 less effective than Gentamicin plus Teicoplanin --
13     A.  Well that's a different question.
14     Q.  -- in terms of deep joint infection.  That's
15 the question right now.  Do you know?
16     A.  Well there is the --
17        The analysis based on these data --
18     Q.  That shows --
19     A.  -- found -- found the -- the result was not
20 statistically significant, the difference of 2.19
21 percent versus 3.1, but -- but --
22     Q.  And the infection rate went up with
23 Gentamicin plus Teicoplanin.
24     A.  That's right.
25     Q.  Okay.

Page 324

1      A.  The one -- the one is higher.  It's not --
2         That difference is not statistically
3  significant.
4      Q.  Okay.  Based on that --
5      A.  When I -- when I added that into the
6  analysis and controlled for that after I had already
7  controlled from thromboprophylaxis, the -- any
8  association that -- an association that was 2.1 --
9  six was it? -- com -- disappeared effectively
10 completely, I mean 1 -- 1. -- 1.11 percent versus
11 1.08.
12     Q.  Okay. Let's talk about --
13     A.  So they're basically -- I mean it -- as --
14        It would, I -- I -- I suggest, be an
15 indication that this is a confounding variable because
16 the odds ratio is bas -- basically eliminated.
17     Q.  Have you done a powering analysis of this
18 double-control calculation?
19     A.  A power analysis, no.
20     Q.  You have no idea whether this is adequately
21 powered.
22     A.  Oh, it's -- I -- there's --
23        There's never been a power analysis of
24 anything related to McGovern.
25     Q.  You don't know whether this calculation --

Page 325

1  A. I don't -- I mean why are --
2     What is the issue? The power to do what? I
3  don't know what you're asking.
4  Q. You're analyzing a population of 270 persons
5  and 372 persons, totaling approximately 600 people;
6  correct?
7  A. So what's your -- what's your hypothesis?
8  Q. My question is: If the McGovern study was,
9  in your words, a relatively small population based on
10 the incidence of infection and was therefore
11 unreliable, --
12 A. Yeah.
13 Q. -- you've cut the population in half.
14 A. Okay.
15 Q. Doubly unreliable.
16 A. Well whether it's double or not, I -- it's
17 not -- it's un -- it's unclear.
18 Q. More unreliable.
19 A. It -- it will be more -- more -- it will
20 have less --
21    The study would have -- would have even less
22 power, that's true.
23 Q. More unreliable.
24 A. What do you mean by "reliable?"
25 Q. More variance.

Page 326

1  A. More variance, yes.
2  Q. If anything, the best way to figure out
3  whether the thromboprophylaxis and the antibiotic
4  confounded the results in a population of patients who
5  were subjected to Bair Hugger warming versus Hot Dog
6  warming would be to look at a larger sample size when
7  both of those variables are controlled; correct?
8  A. Well one would have to look at what the --
9     What I think is needed is a proper
10 protocol --
11 Q. Okay.
12 A. -- which would address the issue of power,
13 and you would have to specify what magnitude of effect
14 you wanted -- wanted to detect, --
15 Q. Okay.
16 A. -- and this, as far as I can tell, was never
17 done by this group.
18 Q. Okay. I'm going to ask the question again
19 because that didn't respond to it.
20    A better analysis than what you have done
21 here with respect to controlling for both var --
22 variables would be to look at a larger population of
23 patients who received the same thromboprophylaxis and
24 the same antibiotic; correct?
25 A. Well --

Page 327

1  Q. There would be less variance.
2  A. Oh, if you -- if you -- if you restricted
3  both of those, but I mean that's not your only option.
4  If you restricted it to those groups and had an
5  increased sample size, that would -- that would
6  certainly give you more power.
7  Q. Yeah. It would -- it would be a more
8  accurate representation of whether those two variables
9  were confounders or not; correct?
10 A. If that's what you were interested in.
11 Q. Okay. It would be a more accurate
12 representation as to whether there in fact is an
13 increased odds ratio; correct?
14 A. For -- for --
15 Q. The use of the device and the outcome of
16 infection.
17 A. The use of the device. It would give a
18 better estimate of that, yes.
19 Q. Okay. The recent Augustine study does that;
20 correct?
21 A. The -- this is the published -- the one that
22 was just published?
23 Q. Yeah.
24 A. Well, I mean the recent study has its own --
25 has a -- has the potential for bias that is also in

Page 328

1  McGovern.
2  Q. Okay. But my question is different. The
3  recent Augustine article has a larger patient
4  population; --
5  A. It's a larger patient population.
6  Q. -- correct?
7  A. It is a larger patient population. I think
8  it is, yes.
9  Q. And the article notes that there was no
10 change in the thromboprophylaxis or the antibiotic
11 regimen; correct?
12    MR. GORDON: Object to the form of the
13 question, assumes facts -- mis -- it completely
14 misstates the evidence.
15 A. I -- the -- the --
16    The paper says very little about -- very --
17 very little detailed about -- about -- about the
18 population. I think it says that, yes.
19 Q. Okay. So we've established that it's a
20 larger population and that the study does say that
21 there was not a change in the thromboprophylaxis or
22 antibiotic; is that correct?
23    MR. GORDON: Counsel, it doesn't -- it
24 doesn't say that. Let him read it if you're going to,
25 you know, make it up, make up stuff.

82 (Pages 325 to 328)

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN   1-800-553-1953   info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 365

1    THE VIDEOGRAPHER: We have 20 -- 21 minutes
2  remaining.
3    Q.  With respect to making causal inferences,
4  mechanistic studies may be helpful; correct?
5    MR. GORDON: Object to the form of the
6  question.
7    A.  What type of mechanistic studies are you --
8  are you indicating?
9    Q.  So a study or a document that shows the
10 biological plausibility or the mechanism of infection
11 by which either a drug or a device or --
12   A.  Okay.
13   Q.  -- some entity might result in an increased
14 outcome at issue.
15   A.  That can help, yes.
16   Q.  That can help.
17   A.  Yes.
18   Q.  And in the event of two products, for
19 example, --
20   A.  Uh-huh.
21   Q.  -- would it be helpful if one particular
22 product, albeit a different product, had the same
23 mechanism of infection as a different product?
24   MR. GORDON: Object to the form of the
25 question.

Page 366

1    A.  I guess I would have to know exactly what
2  the -- what -- what was -- what -- what you're -- what
3  was involved in the two products and which was --
4    Q.  So in the event that there is one product
5  like the Bair Hugger where Dr. Samet opines that one
6  of the causal mechanisms is the disruption of airflow
7  currents in the operating room that then deposit
8  bacteria on the surgical site, if that's the mechanism
9  of the Bair Hugger for the sake of an example --
10      Do you understand?
11   A.  Okay.
12   Q.  -- and if there were another product that
13 involved the same mechanism of infection of creating
14 currents of air in an operating room that caused
15 bacteria to be deposited at the surgical site, those
16 are the same mechanisms of infection; correct?
17   A.  Uh-huh.
18   Q.  But they're different products, for example.
19   A.  Okay.
20   Q.  Because the mechanism is the same, would
21 that contribute to coherency of drawing an inference
22 about causation?
23   MR. GORDON: Object to the form of the
24 question, incomplete hypothetical, assumes facts not
25 in evidence, lack of foundation.

Page 367

1    A.  Well it -- I mean I think if -- if --
2        It depends a lot, I think, on what the --
3  what the outcome is on -- on the -- the study that
4  you're --
5    Q.  Same outcome. Let's say --
6    A.  Infection?
7    Q.  -- infection and that --
8    A.  Deep infection?
9    Q.  -- that's the one you've always been worried
10 about.
11   A.  Okay.  So if you're looking at a deep
12 infection, if that is the outcome that you're
13 measuring with these -- with these two different
14 devices, then -- then I think it would be helpful.
15   Q.  What if it was SSI versus DJI?
16   MR. GORDON: Same objection.
17   A.  It -- there it --
18       I mean when you start getting away from it,
19 then you really have to get into the details of what
20 it is that -- that you're -- what -- what it is you're
21 looking at and where the -- where the potential
22 differences could be.
23   Q.  You need to look into those details with
24 respect to whether the SSI intervention measures have
25 an impact on deep joint infection; correct?

Page 368

1    A.  I was not separately studying the -- the SSI
2  and -- and DJI, yeah.
3    Q.  Okay. But with respect to the two devices
4  that share the same exact mechanism of infection that
5  would both increase the risk of infection, that would
6  be helpful in determining whether there was biological
7  plausibility or coherency to whether there was an
8  increased risk of infection; correct?
9    MR. GORDON: Same objection.
10   A.  It -- it -- it could be.
11   Q.  Okay.
12   A.  I don't know.
13   Q.  Okay.
14   A.  It depends on the details.
15       (Exhibit 30 was marked for
16       identification.)
17 BY MR. SACCHET:
18   Q.  This is a document from the CDC; correct,
19 Dr. Holford?
20   A.  It appears to be.
21   Q.  Are you familiar with HICPAC?
22   A.  I'm not familiar with it, no.
23   Q.  Okay.  If you could please turn to page 24
24 of that document, there is a title that says
25 "Nontuberculosis Mycobacterium Infections Associated