# EXHIBIT N

Page 1

1         UNITED STATES DISTRICT COURT
               DISTRICT OF MINNESOTA
2  ------------------------------------------------
3  In Re:
4  Bair Hugger Forced Air Warming
   Products Liability Litigation
5
   This Document Relates To:
6
   All Actions                         MDL No.
7                                      15-2666 (JNE/FLM)
8  ------------------------------------------------
9
              VIDEOTAPED DEPOSITION
10
                        OF
11
              CHRISTOPHER NACHTSHEIM
12
              Minneapolis, Minnesota
13
            Tuesday, November 29, 2016
14
15 ------------------------------------------------
16
17
18
19
20
21
22
23
24 Reported by:
   Amy L. Larson, RPR
25 Job No. 113495

```
                                             Page 2
 1                   NACHTSHEIM
 2     APPEARANCES:
 3        ON BEHALF OF 3M:
 4        CHRISTIN GARCIA, ESQUIRE
          FAEGRE BAKER DANIELS
 5        2200 Wells Fargo Center
          90 South Seventh Street
 6        Minneapolis, MN 55402
 7
          DEBORAH LEWIS, ESQUIRE
 8        BLACKWELL BURKE
          431 South Seventh Street
 9        Minneapolis, MN 55415
10
11
          FOR THE PLAINTIFF:
12
          MICHAEL SACCHET, ESQUIRE
13        CIRESI CONLIN
          225 South Sixth Street
14        Minneapolis, MN 55402
15
16
17     ALSO PRESENT:  Kraig Hildahl, Videographer
18
19
20
21
22
23
24
25
```

```
                                             Page 3
 1                   NACHTSHEIM
 2     INDEX:
 3     EXAMINATION BY:                PAGE
 4     Ms. Garcia.....................8, 372
 5     Mr. Sacchet....................254
 6     EXHIBITS MARKED FOR IDENTIFICATION:
 7     Exhibit 1......................10
       Acknowledgment and Agreement to be Bound
 8     No Bates
 9     Exhibit 2......................10
       Notice of Videotaped Deposition of
10     Christopher Nachtsheim
       No Bates
11
       Exhibit 3......................12
12     Christopher Nachtsheim, Ph.D.,
       Curriculum Vitae
13     No Bates
14     Exhibit 4......................15
       Forced-Air warming and ultra-clean
15     ventilation do not mix
       No Bates
16
       Exhibit 5......................15
17     Patient Warming Excess Heat:
       The Effects on Orthopedic Operating
18     Room Ventilation Performance
       No Bates
19
       Exhibit 6......................29
20     Statistical Analysis for HPS Protocol 003
       Bates Albrecht_0016008 - Albrecht_0016012
21
       Exhibit 7......................34
22     Research Agreement
       Bates Belani_000054 - Belani_000061
23
       Exhibit 8......................37
24     Logistic Regression -
       Mark Albrecht - March 11, 2016
25     Bates Albrecht_0002275 - Albrecht_0002278
```

```
                                             Page 4
 1                   NACHTSHEIM
 2     INDEX: (Cont'd.)
 3     EXHIBITS MARKED FOR IDENTIFICATION:    PAGE
 4     Exhibit 9......................38
       11/1/2013 E-mail Chain
 5     Subject: Re: Analytically speaking
       Bates Albrecht_0000101 - Albrecht_0000102
 6
       Exhibit 10.................53
 7     3/24/10 E-mail Chain
       Subject: First Publication I'd Like to
 8     Include you on
       Bates Nachtsheim_0000364 - Nachtsheim_0000382
 9
       Exhibit 11.................58
10     April 2010 E-mail Chain
       Subject: Testing
11     Bates Nachtsheim_0001408 - Nachtsheim_0001410
12     Exhibit 12.................62
       4/8/10 E-mail
13     Subject: Update on testing
       Bates Nachtsheim_0001571
14
       Exhibit 13.................78
15     4/9/10 E-mail
       Subject: Problem with laminar flow lab
16     Bates Nachtsheim_0000832 - Nachtsheim_0000833
17     Exhibit 14.................84
       April 2010 E-mail Chain
18     Subject: Update
       Bates Nachtsheim_0001545 - Nachtsheim_0001547
19
       Exhibit 15.................95
20     May 2010 E-mail Chain
       Subject: Abstract "crud and bug"
21     !!Important!!
       Bates Nachtsheim_0000118 - Nachtsheim_0000120
22
       Exhibit 16.................100
23     5/29/10 E-mail
       Subject: Both abstracts,
24     Statistical files and data files
       Bates Nachtsheim_0000191 - Nachtsheim_0000192,
25     Nachtsheim_0000211 - Nachtsheim_0000223
```

```
                                             Page 5
 1                   NACHTSHEIM
 2     INDEX:
 3     EXHIBITS MARKED FOR IDENTIFICATION:    PAGE
 4     Exhibit 17.................114
       July 2010 E-mail Chain
 5     Subject: Manuscript drafts for meeting
       Bates Nachtsheim_0000548 - Nachtsheim_0000549,
 6     Nachtsheim_0000556 - Nachtsheim_0000576,
       Nachtsheim_0000600 - Nachtsheim_0000608,
 7     Nachtsheim_0000577 - Nachtsheim_0000599,
       Nachtsheim_0000613 - Nachtsheim_0000615
 8
       Exhibit 18.................146
 9     7/8/10 E-mail
       Subject: Arizant FDA Warning Ltr
10     Bates Nachtsheim_00000385
11     Exhibit 19.................188
       1/4/11 E-mail Chain
12     Subject: Article I was talking about
       Bates Nachtsheim_0000177 - Nachtsheim_0000179
13
       Exhibit 20.................192
14     December 2010/January 2011 E-mail Chain
       Subject: Rough Copy
15     Bates Nachtsheim_0001110 - Nachtsheim_0001115,
       Nachtsheim_000127 - Nachtsheim_000130,
16     Nachtsheim_0001199 - Nachtsheim_0001201,
       Nachtsheim_0001206
17
       Exhibit 21.................195
18     Forced Air Warming versus Conductive
       Fabric Warming - An Evaluation of
19     Laminar Operating Room Ventilation Disruption
       Bates Nachtsheim_0001206 - Nachtsheim_0001229
20
       Exhibit 22.................205
21     Implementing Effective SSI Surveillance
       No Bates
22
       Exhibit 23.................226
23     1/25/11 E-mail Chain
       Subject: Minor Changes and a Query
24     Bates Nachtsheim_0000750 - Nachtsheim_0000751,
       Nachtsheim_0000727 - Nachtsheim_0000749
25
```

```
                                              Page 6
 1                NACHTSHEIM
 2   INDEX: (Cont'd.)
 3   EXHIBITS MARKED FOR IDENTIFICATION:        PAGE
 4   Exhibit 24................................231
     January 2011 E-mail Chain
 5   Subject: Papers you are involved in
     Bates Nachtsheim_0000819 - Nachtsheim_0000821
 6
     Exhibit 25................................277
 7   April 2015 E-mail Chain
     Subject: Statistical Practitioners Forum:
 8   Advanced DOE Class
     Bates 3MBH01293497 - 3MBH01293499
 9
     Exhibit 26................................322
10   Doctor Says a Device He Invented
     Poses Risks
11   No Bates
12   Exhibit 27................................333
     Table
13   Bates Albrecht_0002298
14   Exhibit 28................................341
     Would Complications Following Rivaroxaban
15   Administration - A Multi-Centre Comparison
     with Low Molecular Weight Heparin for
16   Thromboprophylaxis in Lower Limb
     Arthroplasty
17   Bates Nachtsheim_0000451 - Nachtsheim_0000466
18   Exhibit 29................................369
     Forced-Air Warming Does Not Worsen Air
19   Quality in Laminar Flow Operating Rooms
     Bates 3MBH00985628 - 3MBH00985633
20
     Exhibit 30................................377
21   Curriculum Vitae
22
23
24
25
```

```
                                              Page 7
 1                NACHTSHEIM
 2         THE VIDEOTAPED DEPOSITION OF CHRISTOPHER
 3   NACHTSHEIM, taken on this 29th day of November,
 4   2016, at the Law Offices of Faegre Baker
 5   Daniels, LLP, 2200 Wells Fargo Center, 90 South
 6   Seventh Street, Minneapolis, Minnesota, commencing
 7   at approximately 9:11 a.m.
 8
 9            P R O C E E D I N G S
10
11         THE VIDEOGRAPHER:  This is the
12   Start of tape labeled number 1 of the
13   videotaped deposition of Christopher
14   Nachtsheim in the matter of In Re:  Bair
15   Hugger Forced Air Warming Products Liability
16   Litigation in the U.S. District Court for the
17   District of Minnesota, Case Number 15-2666
18   (JNE/FLM).
19         This deposition is being held at the
20   Faegre Baker law firm in Minneapolis,
21   Minnesota, on November 29th, 2016.  We are
22   going on the record at 9:11 a.m.  My name is
23   Kraig Hildahl, I'm the legal video specialist
24   from TSG Reporting.  The court reporter is
25   Amy Larson also in association with
```

```
                                              Page 8
 1                NACHTSHEIM
 2   TSG Reporting.
 3         Will counsel please introduce
 4   themselves for the record.
 5         MS. GARCIA:  Christin Garcia,
 6   counsel for defendants 3M and Arizant.
 7         MS. LEWIS:  Deborah Lewis also
 8   counsel for defendants 3M and Arizant.
 9         MR. SACCHET:  Michael Sacchet for
10   plaintiffs.
11         THE VIDEOGRAPHER:  Will the court
12   reporter please swear in the witness and then
13   we can proceed.
14
15         CHRISTOPHER NACHTSHEIM,
16      a witness in the above-entitled action,
17      after having been first duly sworn, was
18         deposed and says as follows:
19
20             EXAMINATION
21   BY MS. GARCIA:
22   Q. Hello, Professor Nachtsheim.
23   A. Hello.
24   Q. Thank you for coming here today.  Could you
25      start by, for the record, just providing your
```

```
                                              Page 9
 1                NACHTSHEIM
 2      full name and spell your last name and let us
 3      know your address.
 4   A. Christopher John Nachtsheim.  And it's N as
 5      in north, A-C-H-T, S as in Sam, H-E-I-M.
 6      Address is 1789 Summit Avenue, St. Paul,
 7      Minnesota 55105.
 8   Q. Thank you.  Have you ever been deposed
 9      before?
10   A. Yes.
11   Q. Okay.  The one rule of deposition I just want
12      to reinforce today is if you have any
13      difficulty understanding -- well, if you
14      don't understand my question, if you would
15      like me to clarify something, will you please
16      let me know that?
17   A. Uh-huh.  Yes.
18   Q. Yes?
19   A. Yes.
20   Q. There's rule number 2.
21   A. That's rule number 2, I knew that.
22   Q. You will need to say things out loud so that
23      we can get an accurate transcription of the
24      record in writing where your head movements
25      can't be taken down, and then we will try not
```

Page 330

NACHTSHEIM
object to the form of the question.
    THE WITNESS: I -- I read this --
    MR. SACCHET: I can walk through it slower.
    THE WITNESS: Well, I read this to say that in March 2009 there was a change to the combination of the two drugs you've pronounced, and I don't believe there were any changes until the end of the study.
    MR. SACCHET: Okay.
BY MR. SACCHET:
Q. So -- so we're clear, there was a period in which Gentamycin was applied to some forced-air warming patients, and then the antibiotic changed to a combination of Gentamycin and Teicoplanin that applied to some forced-air warming patients and all of the conductive fabric warming patients, correct?
A. Correct.
Q. Assuming the change in antibiotic did not affect infection rates between warming devices, would you still consider the antibiotic a confounding variable?

Page 331

NACHTSHEIM
    MS. GARCIA: Object to the form of the question.
    THE WITNESS: I'm going to assume that it has -- the change had no effect?
BY MR. SACCHET:
Q. Yeah, assume that the antibiotic had no effect on the infection rate. Would it still be a confounding variable?
    MS. GARCIA: Object to the form of the question.
    THE WITNESS: I don't think it would be -- I don't think it would be considered a confounding variable. I'm trying to think of how else it might have an impact, if it's not having an effect. I guess it -- no, I don't think it would be, yeah.
BY MR. SACCHET:
Q. One way that we could control for the -- let me strike that.
    In order to determine whether the antibiotic had an effect on infection rates, we could control for the warming device --
A. Yes.

Page 332

NACHTSHEIM
Q. -- and evaluate whether infection rates between the changed antibiotic stayed the same or went up or down --
A. Correct.
Q. -- with that control device, correct?
A. (Nods head.)
    MS. GARCIA: I'm going to object to the form of the question.
BY MR. SACCHET:
Q. Did you understand it?
A. Yes.
Q. If infection rates between the two groups were similar, that would tend to show that the antibiotic was not a confounding factor?
A. Correct.
    MS. GARCIA: Object to the form of the question.
BY MR. SACCHET:
Q. Assume that Mr. Albrecht, who you previously mentioned was an expert in statistics and you had full confidence in his ability to analyze data presented in this article, informed you that he found a 2.8 percent infection rate in those who received Gentamycin, a single drug,

Page 333

NACHTSHEIM
but 3.1 percent of patients who received the combination of antibiotics, but also forced-air warming patients, with a nearly identical infection rate, would you determine that the antibiotic was a confounding factor?
    MS. GARCIA: Object to the form of the question.
    THE WITNESS: That would be strong evidence that it was not a confounding factor.
    MR. SACCHET: Let's mark this.
    (Whereupon, Exhibit 27 was marked for identification.)
BY MR. SACCHET:
Q. So just to be clear, if we look at this table that's presented here, we can see in the first line it presents antibiotic protocol 1 versus 2 for FAW, does it not?
A. It does.
Q. Assume that protocol 1 is the singular antibiotic, i.e. Gentamycin, and that protocol 2 is the combination of Gentamycin and Teicoplanin.
A. Uh-huh. Yes.

Page 334

1 NACHTSHEIM
2 Q. In this particular analysis, forced-air
3 warming is held constant, correct?
4 A. Correct.
5 Q. And for forced air, protocol 1, the percent
6 of patients developing infection was 2.8?
7 A. Correct.
8 Q. And for forced air, protocol 2, involving
9 patients who received both Gentamycin and
10 Teicoplanin, the infection rate was 3.1,
11 correct?
12 A. Correct.
13 Q. And the p-value was 0.839, correct?
14 A. That's what's reported here.
15 Q. That's what's reported here. We could
16 conclude, based on this data set of these
17 numbers, that when the patient-warming device
18 is held constant, that the change in
19 antibiotic had no effect on infection rates,
20 correct?
21     MS. GARCIA: Object to the form of
22 the question.
23     THE WITNESS: Assuming there's
24 sufficient power in those sample sizes,
25 although they look fairly large to me, yes.

Page 335

1 NACHTSHEIM
2 BY MR. SACCHET:
3 Q. The patient population for forced-air
4 protocol 1 was 389 patients, correct?
5 A. Correct.
6 Q. And the patient population for those
7 receiving the combination was 678, correct?
8 A. Correct.
9 Q. Those are fairly large patient populations,
10 correct?
11 A. Correct.
12     MS. GARCIA: Object to the form of
13 the question.
14 BY MR. SACCHET:
15 Q. Another way to determine whether the
16 antibiotic was a confounding variable would
17 be to control the antibiotic, but evaluate
18 different infection rates between different
19 forced-air -- or different warming devices,
20 correct?
21 A. Yes.
22     MS. GARCIA: Object to the form of
23 that question also.
24 BY MR. SACCHET:
25 Q. And if the infection rates were still higher

Page 336

1 NACHTSHEIM
2 among those who received forced-air warming
3 compared to those who received conductive
4 fabric warming, that would tend to show the
5 antibiotic did not substantially affect
6 infection rates, correct?
7 A. Correct.
8     MS. GARCIA: Object to the form of
9 the question.
10 BY MR. SACCHET:
11 Q. And if that's true, the change in antibiotic
12 would also not be a confounding factor,
13 correct?
14 A. Correct.
15     MS. GARCIA: Object to the form of
16 the question.
17 BY MR. SACCHET:
18 Q. If I could --
19     MR. SACCHET: Could I ask your
20 basis for the objection?
21     MS. GARCIA: I'm sorry?
22     MR. SACCHET: Could I ask your
23 basis for the objection on form?
24     MS. GARCIA: Yes. You keep using
25 the word, "determine," and you keep using the

Page 337

1 NACHTSHEIM
2 word, "show," and you keep using the word,
3 "establish," and I'm objecting to the form of
4 the question based on those terms.
5     MR. SACCHET: That's not going to
6 pass muster in the court.
7 BY MR. SACCHET:
8 Q. As to the hypothetical I just presented, if
9 you could turn your attention to the second
10 line of the table.
11     MS. GARCIA: I'm sorry, to just be
12 complete with my form objection, it's also an
13 incomplete hypothetical.
14     MR. SACCHET: Fair enough.
15 BY MR. SACCHET:
16 Q. Antibiotic protocol 2 involved a combination
17 have Gentamycin and Teicoplanin, correct?
18     MS. GARCIA: Object to
19 foundation --
20 BY MR. SACCHET:
21 Q. -- for the sake of --
22 A. Yes.
23     MS. GARCIA: Excuse me. Object to
24 foundation for that.
25 BY MR. SACCHET:

Page 338

1           NACHTSHEIM
2   Q. And the data here shows that 3.1 percent of
3      patients who received forced-air warming in
4      the combination antibiotic developed joint
5      infections, correct?
6   A. Correct.
7   Q. Whereas, .9 percent of patients who received
8      conductive fabric warming and the combination
9      of antibiotics developed joint infections,
10     correct?
11  A. Correct.
12  Q. By holding the antibiotic constant and
13     discontinuing the use of forced-air warming,
14     that resulted in a 71 percent decrease in
15     joint infections, did it not?
16          MS. GARCIA: Object to the form of
17     the question.
18          THE WITNESS: Yes, it did.
19  BY MR. SACCHET:
20  Q. That essentially matches the 73 percent
21     decrease in infections that was noted in the
22     McGovern article itself, does it not?
23  A. Correct.
24          MS. GARCIA: Object to the form of
25     the question.

Page 339

1           NACHTSHEIM
2   BY MR. SACCHET:
3   Q. And based on the p-value of .0008, which is
4      far less than .05, you would determine that
5      difference to be statistically significant,
6      would you not?
7   A. I would.
8   Q. So whether we control for the device or
9      control for the antibiotic, based on this
10     data set in Exhibit 27, would you determine
11     that the antibiotic was not a confounding
12     factor?
13          MS. GARCIA: Object to the form of
14     the question, it's a lack of foundation, it's
15     an incomplete hypothetical.
16          THE WITNESS: This data certainly
17     supports that hypothesis.
18  BY MR. SACCHET:
19  Q. And if it were not a confounding factor,
20     would there be any reason to deselect
21     patients from the population of 1,437
22     accounted for in the McGovern study in order
23     to exclude those who received a single
24     antibiotic?
25  A. No.

Page 340

1           NACHTSHEIM
2          MS. GARCIA: Object to the form of
3      the question.
4   BY MR. SACCHET:
5   Q. And if we were to do that and reduce the
6      population, let's say, from the 1,473, or 37,
7      I've forgotten which number it is, down to a
8      number of let's say 500 patients, there could
9      be concern about the powering of that
10     population?
11  A. There could. There could be.
12  Q. Another confounding factor that was discussed
13     this afternoon was a change in the
14     thromboprophylaxis protocol, correct?
15  A. Yes. Can -- can you just remind me where
16     that --
17  Q. Yeah, if we could turn to page 1540.
18  A. (Complies.)
19  Q. If you look at the bottom of the first full
20     paragraph in the left-hand column, it states
21     the thromboprophylaxis regimen from
22     July 2008 to the end of July 2009 was
23     Tinzaparin.
24  A. Uh-huh.
25  Q. Then it says from August 2009 to February

Page 341

1           NACHTSHEIM
2      2010, Rivaroxaban, which I'll represent is
3      otherwise known as Xarelto, was provided from
4      day one, but in February 2010 to the end of
5      this study, patients were reverted to
6      Tinzaparin, correct?
7   A. Yes.
8   Q. Assuming the change in the prophylaxis did
9      not affect infection rates during the time of
10     this study, i.e., Exhibit 4, would you still
11     consider it a confounding variable?
12  A. No.
13          MS. GARCIA: Object to the form of
14     the question.
15          (Whereupon, Exhibit 28 was
16     marked for identification.)
17          MS. GARCIA: What number are we
18  on?
19          MR. SACCHET: Twenty-eight, I
20  believe.
21          THE COURT REPORTER: Correct.
22          MS. GARCIA: Thank you.
23  BY MR. SACCHET:
24  Q. Have you seen this document before,
25     Professor?

Page 346

NACHTSHEIM

1
2  p-value was a statistically significant
3  value, correct?
4  A. Yes, correct.
5  Q. So there were fewer wound complications as a
6     result of the use of a low weight molecular
7     heparin --
8  A. Correct.
9  Q. -- compared to Rivaroxaban, correct?
10 A. Yeah, correct.
11        MS. GARCIA: Object to the form of
12    the question.
13 BY MR. SACCHET:
14 Q. However, the study notes that rates for RTT,
15    which we established to be a return to
16    theater for --
17 A. Uh-huh.
18 Q. -- infections, were not significantly
19    different; do you see that?
20 A. Correct. Yes, I do.
21 Q. Assuming the truth -- well, let me back up.
22        Would you also agree that the
23    McGovern study, Exhibit --
24        MS. GARCIA: Four.
25 BY MR. SACCHET:

Page 347

NACHTSHEIM

1
2  Q. -- 4, evaluated joint infections?
3  A. Yes.
4  Q. It did not evaluate wound complications, did
5     it?
6  A. Correct, it did not.
7  Q. Assuming the truth of this study, would you
8     ultimately agree that the change in protocol
9     from Tinzaparin, which is an LMWH, to
10    Xarelto, otherwise known as Rivaroxaban, and
11    then back to Tinzaparin, did not
12    significantly affect the infection rate?
13        MS. GARCIA: Object to the form of
14    the question, to lack of foundation, and it's
15    an incomplete hypothetical.
16        THE WITNESS: Assuming the study
17    was carefully done and generalizable, yes.
18 BY MR. SACCHET:
19 Q. And assuming the study was well done and
20    generalizable, would you agree that the
21    change in thromboprophylaxis noted in the
22    McGovern study, Exhibit 4, did not confound
23    the infection rates?
24        MS. GARCIA: Object to the form of
25    the question.

Page 348

NACHTSHEIM

1
2        THE WITNESS: Assuming -- yes.
3  BY MR. SACCHET:
4  Q. And would you also conclude that, assuming
5     the truth of this study, it would be improper
6     to deselect all of the patients who received
7     Xarelto, otherwise known as Rivaroxaban, from
8     the patient population if the
9     thromboprophylaxis was not a confounding
10    variable?
11        MS. GARCIA: Object to the form of
12    the question.
13        THE WITNESS: It doesn't seem
14    justified in -- on the basis of these
15    results.
16 BY MR. SACCHET:
17 Q. And, in fact, when the coauthors of the
18    McGovern study were in the process of
19    publication, are you aware that at numerous
20    times they sought to collect additional data
21    in support of the study?
22 A. I was not aware of that. I knew that -- I
23    knew that they sought to run this study out
24    in time.
25 Q. Are you aware that when Mr. Albrecht and

Page 349

NACHTSHEIM

1
2     Dr. Reed collected additional data that went
3     beyond January 2011 in the conductive fabric
4     warming population, that the data still
5     showed a significant decrease in infections
6     when conductive fabric warming was used?
7  A. I'm aware of that.
8  Q. Assuming that --
9         MS. GARCIA: Can we take a break
10    shortly?
11        MR. SACCHET: Yeah, give me two
12    minutes.
13 BY MR. SACCHET:
14 Q. Assuming that neither the antibiotic nor the
15    thromboprophylaxis protocol required control
16    because they were not confounding factors as
17    we discussed, you would be confident in the
18    results of the observational study presented
19    in the McGovern data?
20        MS. GARCIA: Object to the form of
21    the question.
22        THE WITNESS: I'm confident that
23    those weren't confounding factors, that those
24    studies are well done. It doesn't rule out
25    the potential for other confounding factors.