# EXHIBIT E

Page 1

1         UNITED STATES DISTRICT COURT
            DISTRICT OF MINNESOTA
2     -------------------------------------------------
3     In Re:
4     Bair Hugger Forced Air Warming
      Products Liability Litigation
5
      This Document Relates To:
6
      All Actions                          MDL No.
7                                       15-2666 (JNE/FLM)
8     -------------------------------------------------
9
                    VIDEOTAPED DEPOSITION
10
                            OF
11
                      MARK ALBRECHT
12
                         VOLUME 1
13
                  Minneapolis, Minnesota
14
                Friday, October 7th, 2016
15
16    -------------------------------------------------
17
18
19
20
21
22
23
24    Reported by:
      Amy L. Larson, RPR
25    Job No. 112502

### Page 2

```
 1      APPEARANCES:
 2        ON BEHALF OF 3M:
 3        COREY GORDON, ESQ.
          PETER GOSS, ESQ.
 4        BLACKWELL BURKE
          431 South Seventh Street
 5        Minneapolis, MN 55415
 6
 7
 8        FOR THE PLAINTIFF:
 9        BEN GORDON, ESQ.
          LEVIN PAPANTONIO THOMAS MITCHELL
10        RAFFERTY & PROCTOR
          316 S Baylen Street
11        Pensacola, FL 32502
12
13        GENEVIEVE ZIMMERMAN, ESQ.
          MESHBESHER & SPENCE
14        1616 Park Avenue South
          Minneapolis, MN 55404
15
16        GABRIEL ASSAAD, ESQ.
          KENNEDY HODGES
17        4409 Montrose Boulevard
          Houston, TX 77006
18
19        BEHRAM PAREKH, ESQ.
          Kirtland & Packard
20        2041 Rosecrans Avenue
          El Segundo, CA 90245
21
22
23      ALSO PRESENT:  Kraig Hildahl, Videographer
24
25
```

### Page 3

```
 1                    ALBRECHT
 2      INDEX:
 3      EXAMINATION BY:                    PAGE
 4      Mr. Gordon...........................6
 5      EXHIBITS MARKED FOR IDENTIFICATION:
 6      Exhibit 1...........................22
        Augustine Biomedical & Design
 7      Research and Development Report
        Dated 9/14/07
 8      Bates AUGUSTINE_0001577 - AUGUSTINE_0001588
 9      Exhibit 2...........................30
        Hastings Ventilation Assessment
10      Bates AUGUSTINE_0010948 - AUGUSTINE_0010952
11      Exhibit 3...........................76
        Augustine Biomedical & Design
12      Research and Development Report
        Dated 10/12/2007
13
        Exhibit 4...........................95
14      Forced-Air Warming:  A Source of Airborne
        Contamination in the Operating Room?
15      No Bates
        Exhibit 5...........................95
16      Forced-Air Warming Design:
17      Evaluation of Intake Filtration, Internal
        Microbial Buildup, and Airborne-Contamination
18      Emissions
        No Bates
19
        Exhibit 6...........................95
20      Forced-Air Warming Blowers:  An
        Evaluation of Filtration Adequacy and Airborne
21      Contamination Emissions in the Operating Room
        No Bates
22
        Exhibit 7...........................95
23      Patient Warming Excess Heat:  The Effects
        On Orthopedic Operating Room Ventilation
24      Performance
25
```

### Page 4

```
 1                    ALBRECHT
 2      INDEX:  (Cont'd.)
 3      EXHIBITS MARKED FOR IDENTIFICATION:    PAGE
 4      Exhibit 8...........................95
        Forced-Air Warming and Ultraclean
 5      Ventilation Do Not Mix
        No Bates
 6
        Exhibit 9...........................95
 7      Effect of Forced-Air Warming on the
        Performance of Operating Theatre Laminar
 8      Flow Ventilation
        No Bates
 9
        Exhibit 10.........................141
10      Data
        Bates AUGUSTINE_0005193 - AUGUSTINE_0005487
11
        Exhibit 11.........................144
12      Data
        No Bates
13
        Exhibit 12.........................160
14      May 2012 E-mail Chain
        Subject:  Further Infection Data
15      Bates Albrecht_0003579 - Albrecht_0003580,
        Albrecht_0003576 - Albrecht_0003578
16
        Exhibit 13.........................213
17      HotDog Patient Warming Website Screenshot
        No Bates
18
        Exhibit 14.........................229
19      Color Photograph
        No Bates
20
21
22
23
24
25
```

### Page 5

```
 1                    ALBRECHT
 2          THE VIDEOTAPED DEPOSITION OF MARK ALBRECHT,
 3      VOLUME 1, taken on this 7th day of October, 2016,
 4      at the Law Offices of Blackwell, Burke, LLP,
 5      431 South Seventh Street, Suite 2500, Minneapolis,
 6      Minnesota, commencing at approximately 9:17 a.m.
 7
 8              P R O C E E D I N G S
 9
10          THE VIDEOGRAPHER:  This is the
11      start of tape labeled number 1 in the
12      videotaped deposition of Mark Albrecht in the
13      matter of In Re:  Bair Hugger Forced Air
14      Warming Products Liability Litigation, in the
15      U.S. District Court, District of Minnesota.
16      The MDL case number is 15-2666 (JNE/FLN).
17          This deposition is being held at
18      Blackwell, Burke law firm in Minneapolis,
19      Minnesota on October 7th, 2016.  The time is
20      9:18 a.m.  My name is Kraig Hildahl, I'm a
21      legal video specialist from TSG Reporting.
22      The court reporter is Amy Larson also with
23      TSG Reporting.
24          Will counsel please introduce
25      themselves for the record.
```

Page 138

ALBRECHT
Q. Absolutely.
    MR. C. GORDON: What we'll do is we'll take a break and print out clean copies.
    THE VIDEOGRAPHER: We're going off the record at 12:34 p.m.
    (Whereupon, a brief recess was taken.)
    THE VIDEOGRAPHER: This is video number 3 in the deposition of Mark Albrecht. Today is October 7th, 2016. We're going back on the record at 1:02 p.m.
BY MR. C. GORDON:
Q. Before we went off the record we were starting to talk about the Exhibit 8, which was one of your papers and the one that had the observational study component to it --
A. Yup.
Q. -- right?
    And I want to focus on the observational component right now --
A. Okay.
Q. -- and talk about the other stuff later.
    You -- you obtained the data from

Page 139

ALBRECHT
Dr. Reed, right?
A. The hospital he's at, yes.
Q. Okay. When -- when did you first meet Dr. Reed?
A. I can tell by the papers here what a date would be, but I'm guessing around 2010 would the first time we met up, something like that, 2009. I wish I could tell you exactly. That stuff is kind of fuzzy for people. I'm not a big date rememberer --
Q. And -- and --
A. You probably figured that out by now.
Q. I'm not looking for precision, just how did -- how you meet him?
A. Well, there's a network of folks that do research in patient warming and people have interest in it, so just kind of pinging around here and there and people know each other and he got introduced to us. Maybe it was through Scott Augustine, I believe. That's probably who made the introduction. But I could be wrong, it could have been some other path too. It's kind of one community.
Q. Where -- where did you first meet him, in

Page 140

ALBRECHT
England, the U.S.?
A. Probably the U.S. I think -- boy, I'm trying to get the order of events, did I go out there first to meet with him or did he come here. I would guess he probably came here first.
Q. The -- the study that's in Exhibit 8, that's got the two components to it --
A. It does.
Q. -- from the outset was it planned that there would be two components or did it start out as one and the other one was added?
A. That's a great question. As we were kind of embracing the problem and thinking it through wondering what would we need in terms of data that's available and what would we like to assess, this was brought up as something that was of interest, the observational component.
    We definite -- definitely planned to look at the airflow characteristics in a laminar theater in some of the higher-performing ones like the UK has, so that was thought of. And I think -- I -- I think Mike Reed brought the infection data to

Page 141

ALBRECHT
the table that he had, some of that available, and he would like to look at that too just to see how it kind of all painted together in a picture.
Q. Did you go over to England for the actual -- the airflow study part of it?
A. Yes.
Q. At -- at that point when you were in England for that part, was it already contemplated that you would be doing the observational study on the infection data?
A. In all truthfulness, I don't know when that came in.
Q. Okay.
A. That's a big e-mail log, huh?
Q. It is.
    (Whereupon, Exhibit 10 was marked for identification.)
BY MR. C. GORDON:
Q. Exhibit, what is that, 10?
    MR. B. GORDON: Ten.
    THE WITNESS: What is this? Oh, this is the data, okay.
    MR. B. GORDON: So you can read

Page 150

1  ALBRECHT
2  Q. -- whatever you need to consult to --
3  A. Looking here, yes, July.
4  Q. The data you had available to you started in
5     October of 2007, right?
6  A. I don't know, because I don't have the exact
7     data in front of me that was used. I've been
8     given this table telling me that this is it.
9  Q. The Exhibit 10, I will represent to you was
10    produced by Augustine -- I don't know if it
11    was Dr. Augustine personally, but I think it
12    was Augustine Medical, pursuant to a
13    subpoena.
14 A. Uh-huh. Did that come from the test report
15    folders, was that the actual analysis file?
16 Q. Electronically I have no idea.
17 A. Because that's very important to know,
18    because that would govern why the decisions
19    for the time periods are what they are.
20 Q. Tell me the two different files you said.
21 A. So there was a file that was used for
22    analysis that was agreed upon by the group.
23    So there's -- there's actual statistical code
24    that runs this and there's data that
25    underlies that. And for me to be certain on

Page 151

1  ALBRECHT
2  anything that's going on, I would need access
3  to that.
4      MR. B. GORDON: Well, and I -- for
5  that reason I'm going to interpose an
6  objection to the reliability of this chart,
7  Exhibit 11, prepared by your paralegal and
8  you, as being an adequate and fair
9  representation of the statistical data that
10 would be comprised in Exhibit 10. I just
11 want a standing objection to the use of this,
12 because I don't know that it's the same
13 thing.
14     THE WITNESS: That's -- I see the
15 date in this and I'm not sure what that's
16 about.
17     MR. C. GORDON: I think we're
18 talking about two different things.
19     Ben, to the extent you -- you know,
20 I mean, we prepared Exhibit 11, and if there
21 are any discrepancies between it and --
22     MR. B. GORDON: Right, because he
23 can't authenticate anything in --
24     MR. C. GORDON: He can't
25 authenticate Exhibit 11, clearly.

Page 152

1  ALBRECHT
2  BY MR. C. GORDON:
3  Q. Do you recall looking at data in the form of
4     an Excel spreadsheet?
5  A. Yeah, at some point something came over as an
6     Excel spreadsheet that we started from.
7  Q. And as you sit here today, you don't have any
8     recollection of whether there was or was not
9     data provided to you prior to July 1st, 2008?
10 A. I don't know. I have no recollection on that
11    detail.
12 Q. Okay. So would it be -- let's see if this
13    jogs your memory. If you -- if you -- if you
14    look at either Exhibit 10 or 11, although 11
15    is a lot easier --
16     MR. B. GORDON: Just give me a
17 standing objection to 11 and then you can use
18 it, if he can make sense of it, that's fine.
19 BY MR. C. GORDON:
20 Q. Yeah, and -- and -- what I'm going to -- all
21    I'm doing this is to -- to -- to jog your
22    memory, you know, I'm not -- I'm not asking
23    you to authenticate about what I'm about to
24    say. But if you were to count the number
25    of -- of infections that arose within 60 days

Page 153

1  ALBRECHT
2     of the operating procedure, which was the
3     criteria used, right?
4  A. I believe so. I'd have to look through here
5     and what was sent to me for the data and the
6     definitions. Hold tight. Again, without the
7     exact code in front of me, it's very hard for
8     me to faithfully answer some of these
9     questions, because if they're very detail
10    oriented, I sometimes won't be able to tell
11    you because I just simply don't know the
12    detail. Let's see here. (Reviews document.)
13    Okay. "In order to standardize a duration of
14    follow-up, only infections presenting within
15    60 days of surgery were included," okay.
16    Yup.
17 Q. And, again, I'm not asking you to -- to
18    verify this or refute it or anything, but if
19    you were to count from Exhibit 10 --
20 A. Okay.
21 Q. -- which it's a lot easier to do on
22    Exhibit 11, the number of procedures
23    performed at Wansbeck between October 1st,
24    2007, and June 30th, 2008, the total number
25    of -- of hip and knee prostheses -- or joint

Page 158

ALBRECHT

1
2  there were three infections that -- that met
3  the criteria, correct?
4         MR. B. GORDON: Could you reread
5  that? I'm sorry, I missed it. I can read it
6  right here, that's okay.
7         THE WITNESS: It's based on the
8  table, yes, I have three infections.
9         MR. C. GORDON: Okay.
10 BY MR. C. GORDON:
11 Q. Now, if you would look at Exhibit 11.
12 A. Okay.
13 Q. And, again, feel free to cross-reference to
14    Exhibit 10.
15        MR. B. GORDON: Standing
16    objection.
17 BY MR. C. GORDON:
18 Q. If you count the infections for that time
19    period --
20 A. Okay.
21 Q. -- June 1st, 2010, to 12/31/2010, there are
22    actually four, correct?
23 A. I would have to physically count these, but
24    that's not what our data says here. The data
25    set that was analyzed there was three.

Page 159

ALBRECHT

1
2  Q. Go ahead and count.
3  A. I see one in this article --
4  Q. Be sure you look at the --
5         MR. B. GORDON: June --
6  BY MR. C. GORDON:
7  Q. I think there's -- I -- I start at the very
8     end of the study period, so look --
9  A. Okay. I've got one here on 10/30/07.
10 Q. No --
11 A. I'm sorry.
12 Q. -- I'm sorry, we'll get to those. If you
13    jump ahead to -- I guess they're not
14    page-numbered, but way in where it's -- where
15    sort of towards the very bottom of the page
16    it starts with 6/1/2010 there.
17 A. Okay.
18        MR. B. GORDON: Unfortunately, the
19    pages aren't numbered.
20        THE WITNESS: Okay. So 6/1. So
21    we got one, two, three. Yeah, I count four,
22    and the fourth one occurring on 11/22/10.
23        MR. B. GORDON: Just, again, I
24    want to object to the extent that we can't
25    know definitively that this is an accurate

Page 160

ALBRECHT

1
2  reflection of what's actually in the data
3  set, because it's not from the data set or
4  it's an extraction from counsel from the data
5  set.
6  BY MR. C. GORDON:
7  Q. Yeah, and for the four infections, if you --
8     you know, go ahead and look at --
9  A. Well, that's what I was going to say, because
10    there may have been a reason --
11 Q. Yeah, and that's exactly why -- if there's a
12    reason, I'd like to know. That's --
13 A. And I -- honestly, in those calls I probably
14    sent the e-mail to Mike or Paul about someone
15    on this and there was a determination, but
16    it's so long ago you can't tell.
17    (Reviews document.)
18        Yeah, I don't know. I can't tell if
19    anything on here gives me any insight into
20    this.
21 Q. Let's see if this jogs your memory about --
22 A. Please.
23 Q. -- issues.
24        (Whereupon, Exhibit 12 was
25        marked for identification.)

Page 161

ALBRECHT

1
2  BY MR. C. GORDON:
3  Q. I'm showing you Exhibit 12. And this is
4     some -- a document you produced, a series of
5     e-mails between you and Dr. Reed from 2012,
6     right?
7  A. Yeah.
8  Q. Or two -- so I guess 2011, 2012.
9  A. So we start at the back, forward here.
10 Q. It looks like it. In fact, let's start at
11    the -- at the back page, which --
12 A. Yeah, please.
13 Q. -- the first e-mail where -- and the subject
14    says, "Hi, Mike. Say, the data file you sent
15    me doesn't match the earlier one for
16    overlapping cases"; do you see that?
17        MR. B. GORDON: Which page are you
18    on?
19        MR. ASSAAD: Which page are you
20    looking at?
21        MR. C. GORDON: The Bates number
22    3576.
23        MR. ASSAAD: Which e-mail? The
24    last page?
25        MR. C. GORDON: It's the last

Page 162

1  ALBRECHT
2  e-mail, but it starts at the bottom of the
3  second page or second to last page.
4      MR. B. GORDON:  The subject says,
5  "Hi, Mike."
6      THE WITNESS:  "Mike, I've done a
7  quick analysis of the new data trends"; is
8  that what you're looking at?
9      MR. C. GORDON:  Yes.
10 BY MR. C. GORDON:
11 Q. And you say, "The data files are not totally
12    consistent in regards to the data that the
13    BR, JB, JS article was based upon."
14    That -- that's a reference to Exhibit 8,
15    right?
16 A. Okay.  So this e-mail is after the analysis
17    of this, yes.
18 Q. Okay.  And the second to the last paragraph
19    of your first e-mail that starts this chain
20    is you -- you tell Dr. Reed, "So I'm giving
21    you a graphic for the Wansbeck data, but do
22    not distribute it for it," quote, "Slightly,"
23    close quote, "Conflicts with study data due
24    to different reporting practices in your
25    data.  The relevant info supported in your

Page 163

1  ALBRECHT
2  figure is," and then you go on to give odds
3  ratios, confidence intervals.
4      Does this reflect -- refresh your
5  recollection that you had seen data that you
6  thought slightly conflicted with the study
7  data?
8  A. Well, we did an analysis on the file that
9     went into here, right, and then we got a new
10    file that he wanted updated statistics on
11    after the article was published and
12    everything was done.  And it looks like it
13    didn't line up a hundred percent, so I ran
14    the analysis, I'm not sure what's going on,
15    and that's kind of where this thread comes
16    from.
17 Q. And I want to make it very clear, I have no
18    idea if Exhibit 10 is the original data --
19 A. I don't either.
20 Q. -- or the -- the newer data that's slightly
21    conflicted.
22 A. It's probably the slightly conflicted,
23    because this one would match up, whatever it
24    is.
25 Q. Okay.  Going back to what you report for the

Page 164

1  ALBRECHT
2  number of infections of Bair Hugger only
3  study period --
4  A. Okay.
5  Q. -- in -- on Exhibit 8, and I think that's on
6     page 1542, you report 31 -- 32, correct?
7  A. Excuse me.  Okay.  So patient-warming device,
8     infections, developing infection for forced
9     air, 32.
10 Q. Okay.  And you're more than welcome to take
11    the time to do that, but my -- I -- I count
12    in that Bair Hugger only period on the data
13    on Exhibit 10 that there were actually 31
14    infections in -- at Wansbeck.
15 A. All right.
16 Q. As you -- again, as you sit here today --
17 A. I don't know.
18 Q. I guess -- well, number one, you can go back
19    and look at Exhibit 12.  You did a
20    recalculation of the odds ratio --
21 A. With the updated data, yes.
22 Q. Yeah, and --
23 A. That would be different than the data here.
24 Q. Right.  What was the odds -- what was the
25    odds ratio as you reported in the paper?

Page 165

1  ALBRECHT
2  A. Okay.  So the paper odds ratio was 3.8 with a
3     confidence interval of 1.2 to 12.5.
4  Q. Okay.
5  A. And the updated one here had an odds ratio of
6     2.98, and a confidence interval that's still
7     significant.
8  Q. So the odds ratio going down --
9  A. It did.
10 Q. -- would be -- would be consistent with too
11    high a number on the Bair Hugger side and too
12    low a number on the HotDog only side, right?
13 A. There's not too high a number, too low a
14    number.  The data file that was assessed that
15    was screened by the clinicians, these are the
16    numbers that represent it.
17 Q. I -- right.  I didn't mean to say a mistake
18    was made.  I'm saying that the -- the
19    difference between 3.8 and 2.9 --
20     MR. B. GORDON:  Eight.
21 BY MR. C. GORDON:
22 Q. -- 8, could be accounted for by having
23    lesser infections in the forced -- in the
24    Bair Hugger only period and more infections
25    in the HotDog period, correct?

Page 166

ALBRECHT

A. It could be due to a reduction in Bair Hugger infections, HotDog stays the same. It could be due to an increase in HotDog infections, Bair Hugger stays the same. You know, there's many ways to get an odds way to move.

Q. And but the odds -- if -- if in fact there were -- the data you analyzed the second time around had fewer infections in the HotDog period and more infections in the Bair Hugger -- sorry. Strike that.

A. The infections could have been the same, the number of controls could have changed, so we have fewer -- more non-infections and that's going to push it down, because you're looking at odds ratios.

Q. But one way that the odds ratio might have changed is if the total number of infections attributed to the Bair Hugger only period went -- was lower and the total number of infections attributed to the HotDog only period was higher?

    MR. B. GORDON: Objection to form, calls for speculation, not supported by the facts in evidence.

Page 167

ALBRECHT

    THE WITNESS: If you add infections to the one group and not to the other, you will move the odds ratio.
    MR. C. GORDON: Okay.
    THE WITNESS: There's about four different mechanisms to push it in different directions.
    MR. C. GORDON: Right.

BY MR. C. GORDON:

Q. And I -- I don't want to spend a lot of time, you know, on 31 versus 32 or 3 versus 4, I just --

A. Sure.

Q. -- does that --

A. Yeah, they paid me to -- this is after my time. I was out at a new job. They wanted the file updated, so I did that for them using the same methods with the new data file, and this is what was returned.

Q. Okay. Are you aware of any letters to the editor or any efforts undertaken to correct the odds ratio that was reported?

    MR. B. GORDON: Object to form.
    THE WITNESS: This isn't a

Page 168

ALBRECHT

correction needed, because the new data was added, so the cohort is different in this versus what's in the paper. So the new data and the trend does persist. So Mike is asking, "I'm keen to see what's happened since we looked at this last, so there's an old file attached in case you don't have it and the new data." So he augmented the data set and that's why there's the different number.

    MR. C. GORDON: Okay.

BY MR. C. GORDON:

Q. So what -- what was it that's slightly conflicted with the study data?

A. I have no clue. I've got to look at this very carefully. (Reviews document.)
    So it looks like in the new file they sent me there was that 60 days concern. He didn't have a date, so he couldn't clip it in the same manner, and I think that was part of it.
    So he sent me a file that wasn't as complete as the one we initially used and it was missing one of the fields we did to

Page 169

ALBRECHT

figure out the number of infections, and so this was just an internal update for him.
    This wasn't reanalysis of the original study. This was just, Hey, Mark, I've got a data file here, I wanted to see for my own knowledge if this trend is persisting given a little more data, could you help me out.

Q. Did you write up a paper that had a revised analysis or an updated analysis of the additional data?

A. Yeah, and it was in my -- let's see here. You guys should have got that somewhere. In my Gmail dump I would have expected it, but this might not have come from Gmail, this might have been from my U of M account, which is toast.

Q. What do you mean it's toast?

A. It doesn't exist anymore, so in doing the document pull I couldn't get anything from there.

Q. Okay. Well --

A. Do you have that updated study document? I would be happy to walk you through it and try

Page 214

ALBRECHT

Q. That -- and it's your study that's cited there, right?
A. Uh-huh.
Q. Do you -- you said people can do what they want with the data, but do you think that what you see here in Exhibit 13 is scientifically supported by your study?
A. In an observational sense, yes, it is, those are the numbers for the periods. This isn't the result of a randomized clinical trial. I don't know what constitutes sufficient data for marketing. A lot of people use data in different ways.
Q. Can you -- do you believe your study can in any way be used to support the conclusion that switching from Bair Hugger to HotDog will reduce surgical site infections?
       MR. B. GORDON: Objection to form, asked and answered, calls for a medical conclusion.
       THE WITNESS: There's observational data in here that shows a decrease in infection rates with the switch between devices, that is true, that is

Page 215

ALBRECHT

confounded with antibiotics.
BY MR. C. GORDON:
Q. It's also confounded with prophylaxis -- thromboprophylaxis?
A. Yes. It's observational in nature.
Q. And if you eliminate just those two confounders, there is no statistical -- statistically meaningful difference --
       MR. B. GORDON: Objection to form.
BY MR. C. GORDON:
Q. -- between Bair Hugger and HotDog, right?
A. This is not a randomized clinical trial. I don't know what effect led to what.
       MR. B. GORDON: Object to form, misstates his testimony.
       THE WITNESS: This is observational data.
BY MR. C. GORDON:
Q. Why do observational data? What's -- what's the purpose?
A. It's to identify trends that you may suspect in the data and bring it to question so someone can do a proper experiment further on, like a randomized trial.

Page 216

ALBRECHT

Q. Your trendline was just an arithmetic mean across 23 months --
A. Uh-huh.
Q. -- right?
   What -- having gone through the exercise that you've gone through now to compare one time period, just the Rivaroxaban versus the no Rivaroxaban, would you agree that a trendline that shows an arithmetic mean across the -- that entire time period is pretty misleading?
       MR. B. GORDON: Objection to form.
       THE WITNESS: I would have liked to have added that to the effects here so it's more clear what that did over the time period. Having you make me drill into it a little more clearly like that and not treat it as just a confounder that, well, it's there, so you can't truly trust this, you know, I would have dug in a little deeper and put an effect in the table, I think.
BY MR. C. GORDON:
Q. And if you had done that, tell me what -- would that -- would you have been able to do

Page 217

ALBRECHT

a multivariate analysis with that, is that the right term?
A. I still don't think we would have. I think we would have presented it that we looked for this effect, saw nothing, we looked for that effect, saw nothing, oh, antibiotics had an effect, forced air had an effect, now we need to figure this out with a trial.
   So you'd do this in a univariate fashion still with observational data, in my opinion.
Q. If you were to analyze the data factor -- taking into consideration antibiotics and the -- the Rivaroxaban, and -- and, in effect, factored those out, do you still think that there would -- even with observational data it would show a difference between Bair Hugger and HotDog?
       MR. B. GORDON: Objection to form, misstates his earlier testimony.
       THE WITNESS: I don't know. I would have to run a model. There's a period of time here which comes into play. This data, there's possibly not enough

Page 218

ALBRECHT

1  
2  infections -- infections to do a multivariate
3  analysis like that where it's properly
4  powered, just kind of looking at this. I'm
5  not so sure we'd be able to tease out the
6  effect of multiple factors at the same time
7  with a data set that has, you know, few
8  infections like that over multiple cuts of
9  variables. So that can be difficult. You'd
10 have to try.
11 BY MR. C. GORDON:
12 Q. Well, you'd agree with me that what we just
13   teased out with just those two -- two
14   variables, the antibiotics and the
15   anti-thrombophylaxis -- thromboprophylaxis,
16   resulted in two periods that were pretty
17   comparable in both in duration and in number
18   of procedures, right?
19 A. Yeah. I'd like to add that to a table as a
20   univariate effect and do further
21   experimentation to see what led to what.
22 Q. One of my associates grew up in California.
23 A. Sure.
24 Q. And in his -- his fond young -- young
25   childhood memory is his family going to

Page 219

ALBRECHT

1  
2  Disneyland and his brother leaning over to
3  him as they were driving to Disneyland and
4  said, "Everybody who goes to Disneyland
5  dies."
6  A. Okay.
7  Q. That's actually true, right?
8  A. All right. How is that relevant to this?
9        MR. B. GORDON: Object to the form
10 of the question.
11 BY MR. C. GORDON:
12 Q. Well, you'd agree that it would be absurd to
13   conclude from the fact that everybody who
14   goes to Disneyland dies, that Disneyland has
15   anything to do with people dying?
16        MR. B. GORDON: Object to form,
17 calls for speculation, improper hypothetical.
18        THE WITNESS: I can't tell you
19 from observational data if it's in change in
20 device or if it's a change in antibiotics
21 clearly, because other things are going on
22 behind the scenes. This is a hypothesis.
23 It's presented as such that there are these
24 factors and if you compare the data in the
25 way presented from here to here, you get that

Page 220

ALBRECHT

1  
2  effect.
3        I agree that an antibiotic effect
4  would be nice to add to this graph and help
5  explain the challenge a little more clearly
6  that we're facing here.
7  BY MR. C. GORDON:
8  Q. Well, not just the antibiotic fact, but the
9    anti-thromboprophylaxis fact, right?
10        MR. B. GORDON: That's just blood
11 thinner.
12        THE WITNESS: Yeah. And a
13 clinician would have to tell you what's
14 relevant. I mean, you could put a lot of
15 things in here too and say, Well, Larry was
16 mopping the floors in this room for these
17 days and that, and you can make this data so
18 high dimensional you'll find all sorts of
19 things that relate.
20        But I agree that the antibiotic
21 piece is a real thing and some kind of an
22 effect here, univariate effect presented in
23 the same way as the other effects would be
24 nice to have.
25 BY MR. C. GORDON:

Page 221

ALBRECHT

1  
2  Q. Were you ever made aware that at the
3    beginning of the Bair Hugger period the
4    laminar airflow system in one of the Wansbeck
5    operating theaters was not functioning
6    properly?
7  A. Not that I recall. I may have or may not, I
8    don't know.
9  Q. Were you ever made aware of the fact that in
10   2008 and 2009 the Northumbria Trusts were
11   repeatedly advised by the National Health
12   Service that their SSI rates for orthopedic
13   procedures made them a high outlier compared
14   to other trusts in the -- in the UK?
15 A. I had heard they were having infection
16   problems, I was not sure of the details.
17 Q. Did anyone ever tell you that as a result of
18   those infection problems, they instituted a
19   wide range of infection controlled
20   procedures?
21        MR. B. GORDON: Object to form,
22 lack of foundation, calls for speculation.
23        THE WITNESS: No, I don't know the
24 exact procedures they implemented.
25 BY MR. C. GORDON: