# EXHIBIT F

Page 1

1               UNITED STATES DISTRICT COURT
                  DISTRICT OF MINNESOTA
2    -------------------------------------------------
3    In Re:
4    Bair Hugger Forced Air Warming
     Products Liability Litigation
5
     This Document Relates To:
6
     All Actions                         MDL No.
7                                        15-2666 (JNE/FLM)
8    -------------------------------------------------
9
                     VIDEOTAPED DEPOSITION
10
                              OF
11
                    CHRISTOPHER NACHTSHEIM
12
                     Minneapolis, Minnesota
13
                  Tuesday, November 29, 2016
14
15   -------------------------------------------------
16
17
18
19
20
21
22
23
24   Reported by:
     Amy L. Larson, RPR
25   Job No. 113495

## Page 2

```
 1                  NACHTSHEIM
 2    APPEARANCES:
 3      ON BEHALF OF 3M:
 4      CHRISTIN GARCIA, ESQUIRE
        FAEGRE BAKER DANIELS
 5      2200 Wells Fargo Center
        90 South Seventh Street
 6      Minneapolis, MN 55402
 7
        DEBORAH LEWIS, ESQUIRE
 8      BLACKWELL BURKE
        431 South Seventh Street
 9      Minneapolis, MN 55415
10
11
        FOR THE PLAINTIFF:
12
        MICHAEL SACCHET, ESQUIRE
13      CIRESI CONLIN
        225 South Sixth Street
14      Minneapolis, MN 55402
15
16
17    ALSO PRESENT:  Kraig Hildahl, Videographer
18
19
20
21
22
23
24
25
```

## Page 3

```
 1                  NACHTSHEIM
 2    INDEX:
 3    EXAMINATION BY:                PAGE
 4    Ms. Garcia.............8, 372
 5    Mr. Sacchet................254
 6    EXHIBITS MARKED FOR IDENTIFICATION:
 7    Exhibit 1....................10
      Acknowledgment and Agreement to be Bound
 8    No Bates
 9    Exhibit 2....................10
      Notice of Videotaped Deposition of
10    Christopher Nachtsheim
      No Bates
11
      Exhibit 3....................12
12    Christopher Nachtsheim, Ph.D.,
      Curriculum Vitae
13    No Bates
14    Exhibit 4....................15
      Forced-Air warming and ultra-clean
15    ventilation do not mix
      No Bates
16
      Exhibit 5....................15
17    Patient Warming Excess Heat:
      The Effects on Orthopedic Operating
18    Room Ventilation Performance
      No Bates
19
      Exhibit 6....................29
20    Statistical Analysis for HPS Protocol 003
      Bates Albrecht_0016008 - Albrecht_0016012
21
      Exhibit 7....................34
22    Research Agreement
      Bates Belani_000054 - Belani_000061
23
      Exhibit 8....................37
24    Logistic Regression -
      Mark Albrecht - March 11, 2016
25    Bates Albrecht_0002275 - Albrecht_0002278
```

## Page 4

```
 1                  NACHTSHEIM
 2    INDEX: (Cont'd.)
 3    EXHIBITS MARKED FOR IDENTIFICATION:     PAGE
 4    Exhibit 9....................38
      11/1/2013 E-mail Chain
 5    Subject: Re: Analytically speaking
      Bates Albrecht_0000101 - Albrecht_0000102
 6
      Exhibit 10...................53
 7    3/24/10 E-mail Chain
      Subject: First Publication I'd Like to
 8    Include you on
      Bates Nachtsheim_0000364 - Nachtsheim_0000382
 9
      Exhibit 11...................58
10    April 2010 E-mail Chain
      Subject: Testing
11    Bates Nachtsheim_0001408 - Nachtsheim_0001410
12    Exhibit 12...................62
      4/8/10 E-mail
13    Subject: Update on testing
      Bates Nachtsheim_0001571
14
      Exhibit 13...................78
15    4/9/10 E-mail
      Subject: Problem with laminar flow lab
16    Bates Nachtsheim_0000832 - Nachtsheim_0000833
17    Exhibit 14...................84
      April 2010 E-mail Chain
18    Subject: Update
      Bates Nachtsheim_0001545 - Nachtsheim_0001547
19
      Exhibit 15...................95
20    May 2010 E-mail Chain
      Subject: Abstract "crud and bug"
21    !!Important!!
      Bates Nachtsheim_0000118 - Nachtsheim_0000120
22
      Exhibit 16..................100
23    5/29/10 E-mail
      Subject: Both abstracts,
24    Statistical files and data files
      Bates Nachtsheim_0000191 - Nachtsheim_0000192,
25    Nachtsheim_0000211 - Nachtsheim_0000223
```

## Page 5

```
 1                  NACHTSHEIM
 2    INDEX:
 3    EXHIBITS MARKED FOR IDENTIFICATION:     PAGE
 4    Exhibit 17..................114
      July 2010 E-mail Chain
 5    Subject: Manuscript drafts for meeting
      Bates Nachtsheim_0000548 - Nachtsheim_0000549,
 6    Nachtsheim_0000556 - Nachtsheim_0000576,
      Nachtsheim_0000600 - Nachtsheim_0000608,
 7    Nachtsheim_0000577 - Nachtsheim_0000599,
      Nachtsheim_0000613 - Nachtsheim_0000615
 8
      Exhibit 18..................146
 9    7/8/10 E-mail
      Subject: Arizant FDA Warning Ltr
10    Bates Nachtsheim_00000385
11    Exhibit 19..................188
      1/4/11 E-mail Chain
12    Subject: Article I was talking about
      Bates Nachtsheim_0000177 - Nachtsheim_0000179
13
      Exhibit 20..................192
14    December 2010/January 2011 E-mail Chain
      Subject: Rough Copy
15    Bates Nachtsheim_0001110 - Nachtsheim_0001115,
      Nachtsheim_000127 - Nachtsheim_000130,
16    Nachtsheim_0001199 - Nachtsheim_0001201,
      Nachtsheim_0001206
17
      Exhibit 21..................195
18    Forced Air Warming versus Conductive
      Fabric Warming - An Evaluation of
19    Laminar Operating Room Ventilation Disruption
      Bates Nachtsheim_0001206 - Nachtsheim_0001229
20
      Exhibit 22..................205
21    Implementing Effective SSI Surveillance
      No Bates
22
      Exhibit 23..................226
23    1/25/11 E-mail Chain
      Subject: Minor Changes and a Query
24    Bates Nachtsheim_0000750 - Nachtsheim_0000751,
      Nachtsheim_0000727 - Nachtsheim_0000749
25
```

Page 6

```
 1                NACHTSHEIM
 2    INDEX: (Cont'd.)
 3    EXHIBITS MARKED FOR IDENTIFICATION:     PAGE
 4    Exhibit 24................................231
      January 2011 E-mail Chain
 5    Subject:  Papers you are involved in
      Bates Nachtsheim_0000819 - Nachtsheim_0000821
 6
      Exhibit 25................................277
 7    April 2015 E-mail Chain
      Subject:  Statistical Practitioners Forum:
 8    Advanced DOE Class
      Bates 3MBH01293497 - 3MBH01293499
 9
      Exhibit 26................................322
10    Doctor Says a Device He Invented
      Poses Risks
11    No Bates
12    Exhibit 27................................333
      Table
13    Bates Albrecht_0002298
14    Exhibit 28................................341
      Would Complications Following Rivaroxaban
15    Administration - A Multi-Centre Comparison
      with Low Molecular Weight Heparin for
16    Thromboprophylaxis in Lower Limb
      Arthroplasty
17    Bates Nachtsheim_0000451 - Nachtsheim_0000466
18    Exhibit 29................................369
      Forced-Air Warming Does Not Worsen Air
19    Quality in Laminar Flow Operating Rooms
      Bates 3MBH00985628 - 3MBH00985633
20
      Exhibit 30................................377
21    Curriculum Vitae
22
23
24
25
```

Page 7

```
 1                NACHTSHEIM
 2       THE VIDEOTAPED DEPOSITION OF CHRISTOPHER
 3    NACHTSHEIM, taken on this 29th day of November,
 4    2016, at the Law Offices of Faegre Baker
 5    Daniels, LLP, 2200 Wells Fargo Center, 90 South
 6    Seventh Street, Minneapolis, Minnesota, commencing
 7    at approximately 9:11 a.m.
 8
 9             P R O C E E D I N G S
10
11          THE VIDEOGRAPHER:  This is the
12    Start of tape labeled number 1 of the
13    videotaped deposition of Christopher
14    Nachtsheim in the matter of In Re:  Bair
15    Hugger Forced Air Warming Products Liability
16    Litigation in the U.S. District Court for the
17    District of Minnesota, Case Number 15-2666
18    (JNE/FLM).
19          This deposition is being held at the
20    Faegre Baker law firm in Minneapolis,
21    Minnesota, on November 29th, 2016.  We are
22    going on the record at 9:11 a.m.  My name is
23    Kraig Hildahl, I'm the legal video specialist
24    from TSG Reporting.  The court reporter is
25    Amy Larson also in association with
```

Page 8

```
 1                NACHTSHEIM
 2    TSG Reporting.
 3          Will counsel please introduce
 4    themselves for the record.
 5          MS. GARCIA:  Christin Garcia,
 6    counsel for defendants 3M and Arizant.
 7          MS. LEWIS:  Deborah Lewis also
 8    counsel for defendants 3M and Arizant.
 9          MR. SACCHET:  Michael Sacchet for
10    plaintiffs.
11          THE VIDEOGRAPHER:  Will the court
12    reporter please swear in the witness and then
13    we can proceed.
14
15          CHRISTOPHER NACHTSHEIM,
16       a witness in the above-entitled action,
17       after having been first duly sworn, was
18       deposed and says as follows:
19
20             EXAMINATION
21    BY MS. GARCIA:
22    Q.  Hello, Professor Nachtsheim.
23    A.  Hello.
24    Q.  Thank you for coming here today.  Could you
25       start by, for the record, just providing your
```

Page 9

```
 1                NACHTSHEIM
 2       full name and spell your last name and let us
 3       know your address.
 4    A.  Christopher John Nachtsheim.  And it's N as
 5       in north, A-C-H-T, S as in Sam, H-E-I-M.
 6       Address is 1789 Summit Avenue, St. Paul,
 7       Minnesota 55105.
 8    Q.  Thank you.  Have you ever been deposed
 9       before?
10    A.  Yes.
11    Q.  Okay.  The one rule of deposition I just want
12       to reinforce today is if you have any
13       difficulty understanding -- well, if you
14       don't understand my question, if you would
15       like me to clarify something, will you please
16       let me know that?
17    A.  Uh-huh.  Yes.
18    Q.  Yes?
19    A.  Yes.
20    Q.  There's rule number 2.
21    A.  That's rule number 2, I knew that.
22    Q.  You will need to say things out loud so that
23       we can get an accurate transcription of the
24       record in writing where your head movements
25       can't be taken down, and then we will try not
```

Page 330

NACHTSHEIM

object to the form of the question.
    THE WITNESS: I -- I read this --
    MR. SACCHET: I can walk through it slower.
    THE WITNESS: Well, I read this to say that in March 2009 there was a change to the combination of the two drugs you've pronounced, and I don't believe there were any changes until the end of the study.
    MR. SACCHET: Okay.
BY MR. SACCHET:
Q. So -- so we're clear, there was a period in which Gentamycin was applied to some forced-air warming patients, and then the antibiotic changed to a combination of Gentamycin and Teicoplanin that applied to some forced-air warming patients and all of the conductive fabric warming patients, correct?
A. Correct.
Q. Assuming the change in antibiotic did not affect infection rates between warming devices, would you still consider the antibiotic a confounding variable?

Page 331

NACHTSHEIM

    MS. GARCIA: Object to the form of the question.
    THE WITNESS: I'm going to assume that it has -- the change had no effect?
BY MR. SACCHET:
Q. Yeah, assume that the antibiotic had no effect on the infection rate. Would it still be a confounding variable?
    MS. GARCIA: Object to the form of the question.
    THE WITNESS: I don't think it would be -- I don't think it would be considered a confounding variable. I'm trying to think of how else it might have an impact, if it's not having an effect. I guess it -- no, I don't think it would be, yeah.
BY MR. SACCHET:
Q. One way that we could control for the -- let me strike that.
    In order to determine whether the antibiotic had an effect on infection rates, we could control for the warming device --
A. Yes.

Page 332

NACHTSHEIM

Q. -- and evaluate whether infection rates between the changed antibiotic stayed the same or went up or down --
A. Correct.
Q. -- with that control device, correct?
A. (Nods head.)
    MS. GARCIA: I'm going to object to the form of the question.
BY MR. SACCHET:
Q. Did you understand it?
A. Yes.
Q. If infection rates between the two groups were similar, that would tend to show that the antibiotic was not a confounding factor?
A. Correct.
    MS. GARCIA: Object to the form of the question.
BY MR. SACCHET:
Q. Assume that Mr. Albrecht, who you previously mentioned was an expert in statistics and you had full confidence in his ability to analyze data presented in this article, informed you that he found a 2.8 percent infection rate in those who received Gentamycin, a single drug,

Page 333

NACHTSHEIM

but 3.1 percent of patients who received the combination of antibiotics, but also forced-air warming patients, with a nearly identical infection rate, would you determine that the antibiotic was a confounding factor?
    MS. GARCIA: Object to the form of the question.
    THE WITNESS: That would be strong evidence that it was not a confounding factor.
    MR. SACCHET: Let's mark this.
    (Whereupon, Exhibit 27 was marked for identification.)
BY MR. SACCHET:
Q. So just to be clear, if we look at this table that's presented here, we can see in the first line it presents antibiotic protocol 1 versus 2 for FAW, does it not?
A. It does.
Q. Assume that protocol 1 is the singular antibiotic, i.e. Gentamycin, and that protocol 2 is the combination of Gentamycin and Teicoplanin.
A. Uh-huh. Yes.

Page 334

1  NACHTSHEIM
2  Q. In this particular analysis, forced-air
3     warming is held constant, correct?
4  A. Correct.
5  Q. And for forced air, protocol 1, the percent
6     of patients developing infection was 2.8?
7  A. Correct.
8  Q. And for forced air, protocol 2, involving
9     patients who received both Gentamycin and
10    Teicoplanin, the infection rate was 3.1,
11    correct?
12 A. Correct.
13 Q. And the p-value was 0.839, correct?
14 A. That's what's reported here.
15 Q. That's what's reported here. We could
16    conclude, based on this data set of these
17    numbers, that when the patient-warming device
18    is held constant, that the change in
19    antibiotic had no effect on infection rates,
20    correct?
21         MS. GARCIA: Object to the form of
22    the question.
23         THE WITNESS: Assuming there's
24    sufficient power in those sample sizes,
25    although they look fairly large to me, yes.

Page 335

1  NACHTSHEIM
2  BY MR. SACCHET:
3  Q. The patient population for forced-air
4     protocol 1 was 389 patients, correct?
5  A. Correct.
6  Q. And the patient population for those
7     receiving the combination was 678, correct?
8  A. Correct.
9  Q. Those are fairly large patient populations,
10    correct?
11 A. Correct.
12         MS. GARCIA: Object to the form of
13    the question.
14 BY MR. SACCHET:
15 Q. Another way to determine whether the
16    antibiotic was a confounding variable would
17    be to control the antibiotic, but evaluate
18    different infection rates between different
19    forced-air -- or different warming devices,
20    correct?
21 A. Yes.
22         MS. GARCIA: Object to the form of
23    that question also.
24 BY MR. SACCHET:
25 Q. And if the infection rates were still higher

Page 336

1  NACHTSHEIM
2     among those who received forced-air warming
3     compared to those who received conductive
4     fabric warming, that would tend to show the
5     antibiotic did not substantially affect
6     infection rates, correct?
7  A. Correct.
8          MS. GARCIA: Object to the form of
9     the question.
10 BY MR. SACCHET:
11 Q. And if that's true, the change in antibiotic
12    would also not be a confounding factor,
13    correct?
14 A. Correct.
15         MS. GARCIA: Object to the form of
16    the question.
17 BY MR. SACCHET:
18 Q. If I could --
19         MR. SACCHET: Could I ask your
20    basis for the objection?
21         MS. GARCIA: I'm sorry?
22         MR. SACCHET: Could I ask your
23    basis for the objection on form?
24         MS. GARCIA: Yes. You keep using
25    the word, "determine," and you keep using the

Page 337

1  NACHTSHEIM
2     word, "show," and you keep using the word,
3     "establish," and I'm objecting to the form of
4     the question based on those terms.
5          MR. SACCHET: That's not going to
6     pass muster in the court.
7  BY MR. SACCHET:
8  Q. As to the hypothetical I just presented, if
9     you could turn your attention to the second
10    line of the table.
11         MS. GARCIA: I'm sorry, to just be
12    complete with my form objection, it's also an
13    incomplete hypothetical.
14         MR. SACCHET: Fair enough.
15 BY MR. SACCHET:
16 Q. Antibiotic protocol 2 involved a combination
17    have Gentamycin and Teicoplanin, correct?
18         MS. GARCIA: Object to
19    foundation --
20 BY MR. SACCHET:
21 Q. -- for the sake of --
22 A. Yes.
23         MS. GARCIA: Excuse me. Object to
24    foundation for that.
25 BY MR. SACCHET:

Page 338

NACHTSHEIM

Q. And the data here shows that 3.1 percent of patients who received forced-air warming in the combination antibiotic developed joint infections, correct?
A. Correct.
Q. Whereas, .9 percent of patients who received conductive fabric warming and the combination of antibiotics developed joint infections, correct?
A. Correct.
Q. By holding the antibiotic constant and discontinuing the use of forced-air warming, that resulted in a 71 percent decrease in joint infections, did it not?
        MS. GARCIA: Object to the form of the question.
        THE WITNESS: Yes, it did.
BY MR. SACCHET:
Q. That essentially matches the 73 percent decrease in infections that was noted in the McGovern article itself, does it not?
A. Correct.
        MS. GARCIA: Object to the form of the question.

Page 339

NACHTSHEIM
BY MR. SACCHET:
Q. And based on the p-value of .0008, which is far less than .05, you would determine that difference to be statistically significant, would you not?
A. I would.
Q. So whether we control for the device or control for the antibiotic, based on this data set in Exhibit 27, would you determine that the antibiotic was not a confounding factor?
        MS. GARCIA: Object to the form of the question, it's a lack of foundation, it's an incomplete hypothetical.
        THE WITNESS: This data certainly supports that hypothesis.
BY MR. SACCHET:
Q. And if it were not a confounding factor, would there be any reason to deselect patients from the population of 1,437 accounted for in the McGovern study in order to exclude those who received a single antibiotic?
A. No.

Page 340

NACHTSHEIM
        MS. GARCIA: Object to the form of the question.
BY MR. SACCHET:
Q. And if we were to do that and reduce the population, let's say, from the 1,473, or 37, I've forgotten which number it is, down to a number of let's say 500 patients, there could be concern about the powering of that population?
A. There could. There could be.
Q. Another confounding factor that was discussed this afternoon was a change in the thromboprophylaxis protocol, correct?
A. Yes. Can -- can you just remind me where that --
Q. Yeah, if we could turn to page 1540.
A. (Complies.)
Q. If you look at the bottom of the first full paragraph in the left-hand column, it states the thromboprophylaxis regimen from July 2008 to the end of July 2009 was Tinzaparin.
A. Uh-huh.
Q. Then it says from August 2009 to February

Page 341

NACHTSHEIM
2010, Rivaroxaban, which I'll represent is otherwise known as Xarelto, was provided from day one, but in February 2010 to the end of this study, patients were reverted to Tinzaparin, correct?
A. Yes.
Q. Assuming the change in the prophylaxis did not affect infection rates during the time of this study, i.e., Exhibit 4, would you still consider it a confounding variable?
A. No.
        MS. GARCIA: Object to the form of the question.
        (Whereupon, Exhibit 28 was marked for identification.)
        MS. GARCIA: What number are we on?
        MR. SACCHET: Twenty-eight, I believe.
        THE COURT REPORTER: Correct.
        MS. GARCIA: Thank you.
BY MR. SACCHET:
Q. Have you seen this document before, Professor?

```
                                                Page 346
 1                  NACHTSHEIM
 2     p-value was a statistically significant
 3     value, correct?
 4  A. Yes, correct.
 5  Q. So there were fewer wound complications as a
 6     result of the use of a low weight molecular
 7     heparin --
 8  A. Correct.
 9  Q. -- compared to Rivaroxaban, correct?
10  A. Yeah, correct.
11          MS. GARCIA:  Object to the form of
12     the question.
13  BY MR. SACCHET:
14  Q. However, the study notes that rates for RTT,
15     which we established to be a return to
16     theater for --
17  A. Uh-huh.
18  Q. -- infections, were not significantly
19     different; do you see that?
20  A. Correct.  Yes, I do.
21  Q. Assuming the truth -- well, let me back up.
22          Would you also agree that the
23     McGovern study, Exhibit --
24          MS. GARCIA:  Four.
25  BY MR. SACCHET:
```

```
                                                Page 347
 1                  NACHTSHEIM
 2  Q. -- 4, evaluated joint infections?
 3  A. Yes.
 4  Q. It did not evaluate wound complications, did
 5     it?
 6  A. Correct, it did not.
 7  Q. Assuming the truth of this study, would you
 8     ultimately agree that the change in protocol
 9     from Tinzaparin, which is an LMWH, to
10     Xarelto, otherwise known as Rivaroxaban, and
11     then back to Tinzaparin, did not
12     significantly affect the infection rate?
13          MS. GARCIA:  Object to the form of
14     the question, to lack of foundation, and it's
15     an incomplete hypothetical.
16          THE WITNESS:  Assuming the study
17     was carefully done and generalizable, yes.
18  BY MR. SACCHET:
19  Q. And assuming the study was well done and
20     generalizable, would you agree that the
21     change in thromboprophylaxis noted in the
22     McGovern study, Exhibit 4, did not confound
23     the infection rates?
24          MS. GARCIA:  Object to the form of
25     the question.
```

```
                                                Page 348
 1                  NACHTSHEIM
 2          THE WITNESS:  Assuming -- yes.
 3  BY MR. SACCHET:
 4  Q. And would you also conclude that, assuming
 5     the truth of this study, it would be improper
 6     to deselect all of the patients who received
 7     Xarelto, otherwise known as Rivaroxaban, from
 8     the patient population if the
 9     thromboprophylaxis was not a confounding
10     variable?
11          MS. GARCIA:  Object to the form of
12     the question.
13          THE WITNESS:  It doesn't seem
14     justified in -- on the basis of these
15     results.
16  BY MR. SACCHET:
17  Q. And, in fact, when the coauthors of the
18     McGovern study were in the process of
19     publication, are you aware that at numerous
20     times they sought to collect additional data
21     in support of the study?
22  A. I was not aware of that.  I knew that -- I
23     knew that they sought to run this study out
24     in time.
25  Q. Are you aware that when Mr. Albrecht and
```

```
                                                Page 349
 1                  NACHTSHEIM
 2     Dr. Reed collected additional data that went
 3     beyond January 2011 in the conductive fabric
 4     warming population, that the data still
 5     showed a significant decrease in infections
 6     when conductive fabric warming was used?
 7  A. I'm aware of that.
 8  Q. Assuming that --
 9          MS. GARCIA:  Can we take a break
10     shortly?
11          MR. SACCHET:  Yeah, give me two
12     minutes.
13  BY MR. SACCHET:
14  Q. Assuming that neither the antibiotic nor the
15     thromboprophylaxis protocol required control
16     because they were not confounding factors as
17     we discussed, you would be confident in the
18     results of the observational study presented
19     in the McGovern data?
20          MS. GARCIA:  Object to the form of
21     the question.
22          THE WITNESS:  I'm confident that
23     those weren't confounding factors, that those
24     studies are well done.  It doesn't rule out
25     the potential for other confounding factors.
```

Page 350

1  NACHTSHEIM
2       MR. SACCHET: Fair enough.
3  BY MR. SACCHET:
4  Q. And you continue to stand by the results of
5     the observational studies --
6  A. Yes.
7  Q. -- in the McGovern publication?
8  A. I do.
9       MR. SACCHET: Let's take a break.
10      THE VIDEOGRAPHER: We're going off
11     the record at 5:07 p.m.
12     (Whereupon, a brief recess
13     was taken.)
14      THE VIDEOGRAPHER: This is video
15     number 6 in the deposition of Christopher
16     Nachtsheim. Today is November 29th, 2016.
17     We're going back on the record at 5:18 p.m.
18  BY MR. SACCHET:
19  Q. Professor Nachtsheim, if we could turn to
20     Exhibit 5, which is the Belani study.
21  A. I have it.
22  Q. Great. And as to this study, your role was
23     to exclusively review the statistical portion
24     of this study, correct?
25  A. Correct.

Page 351

1  NACHTSHEIM
2  Q. You had no involvement in the setup of the
3     experiment?
4  A. I did not.
5  Q. You had no role in the execution of the
6     physical experiment?
7  A. I did not.
8  Q. You had seen, whether by video or in person,
9     disruption of laminar flow caused by the
10    Bair Hugger before, correct?
11 A. I had, yes.
12      MS. GARCIA: I'm sorry, can I hear
13    that question again? I was thinking and I
14    did not hear the question.
15      MR. SACCHET: Can you -- do you
16    mind repeating it.
17     (Whereupon, the last question
18     was read by the court reporter.)
19      MS. GARCIA: Object to the form of
20    the question, asked and answered.
21 BY MR. SACCHET:
22 Q. So you were familiar with the possibility,
23    based on your personal experience, that the
24    Bair Hugger could disrupt laminar airflow,
25    correct?

Page 352

1  NACHTSHEIM
2       MS. GARCIA: Object to the form of
3     the question, misstates the record and lack
4     of foundation.
5       THE WITNESS: Correct.
6  BY MR. SACCHET:
7  Q. If we could turn to the third page of the
8     study.
9  A. (Complies.) 408?
10 Q. Yes. Do you see the header entitled,
11    "Statistical Analysis"?
12 A. I do.
13 Q. And it reads, "A Poisson regression model for
14    overdispersed data was fit having the sum of
15    bubble counts for each experimental run,"
16    paren, "ten pictures," end parens, "as the
17    response, and the factors identified in the
18    experimental design as predictors plus an
19    interaction term." Do you see that?
20 A. I do, yes.
21 Q. Did you determine that a Poisson regression
22    was the most appropriate statistical model to
23    employ because you were dealing with counts
24    data -- or data counts?
25 A. Yes.

Page 353

1  NACHTSHEIM
2       MS. GARCIA: Object to the form of
3     the question, previously asked and answered.
4  BY MR. SACCHET:
5  Q. And that Poisson regression was a better
6     model to use than, let's say, an ANOVA model?
7       MS. GARCIA: Object to the form of
8     the question, previously asked and answered.
9       THE WITNESS: Yes.
10 BY MR. SACCHET:
11 Q. And if we could just turn our attention one
12    paragraph above that, it says, "For the
13    experimental design, a replicated and equals
14    to 2 by 3 full factorial design was used to
15    assess changes in bubble counts over the
16    surgical site," correct?
17 A. Correct.
18 Q. And what were the factors?
19 A. So the first factor is the anesthesia screen,
20    low grade/high grade, those are the two
21    levels, and then there were three
22    patient-warming devices, conductive fabric,
23    forced-air or no warming device, and that
24    would -- that was considered a control.
25 Q. Does Figure 3, directly above that paragraph,