# EXHIBIT G

Page 1

1        MICHAEL R. REED

2     UNITED STATES DISTRICT COURT

      DISTRICT OF MINNESOTA

3

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - -

5        In re Bair Hugger Forced

         Air Warming Products

6        Liability Litigation,

7                    MDL No. 14-2666 (JNE/FLN)

8   - - - - - - - - - - - - - - - - - - - - - - - - - - - -

9   - - - - - - - - - - - - - - - - - - - - - - - - - - - -

10

11          VIDEOTAPED DEPOSITION OF

12              MICHAEL R. REED

13  - - - - - - - - - - - - - - - - - - - - - - - - - - - -

14

15

16          London, United Kingdom

17

18

19

20

21

22

23

24     Taken December 4th, 2016    By Rose Kay

25  Job No. 115951

```
                                                          Page 2
 1              MICHAEL R. REED
 2
 3
 4   APPEARANCES:
 5
 6
 7
 8   THE EXAMINER
     Allen Dyer
 9
10
11
     SERJEANTS' INN CHAMBERS
12   85 Fleet Street
     London EC4Y 1AE, United Kingdom
13   By: Jonathan Holl-Allen, Esq.
         For the witness
14
15
16   - and -
     MDU SERVICES LIMITED
17   One Canada Square
     London E14 5GS, United Kingdom
18   By:  Ediri Okonedo, Esq.
          For the witness
19
20
21
     BLACKWELL BURKE
22   431 South Seventh Street
     Minneapolis, Minnesota 55415
23   By: Corey Gordon, Esq.
         For 3M Company and Arizant Healthcare, Inc.
24
25
```

```
                                                          Page 3
 1              MICHAEL R. REED
 2
 3   APPEARANCES (CONT'D):
 4
 5
 6
     KENNEDY HODGES
 7   4409 Montrose Blvd.
     Houston, Texas 77006
 8   By: Gabriel Assaad, Esq.
         For Plaintiffs
 9
10
11
     - and -
12   MESHBESHER & SPENCE
     1616 Park Avenue
13   Minneapolis, Minnesota 55404
     By: Genevieve Zimmerman, Esq.
14       For Plaintiffs
15
16
17   Also Present: Gerlando Scaffidi, videographer
18
19
20
21
22
23
24
25
```

```
                                                          Page 4
 1              MICHAEL R. REED
 2                 I N D E X
 3
 4
 5
 6
     MR. MICHAEL R. REED .. ... ... ... ... ... ... ..7
 7
     EXAMINATION BY MR. GORDON: ... ... ... ... ... ..7
 8
     EXAMINATION BY MR. ASSAAD: ... ... ... ... ... 154
 9
     FURTHER EXAMINATION BY MR. ... ... ... ... ... 219
10       GORDON:
11
12
13   INDEX OF EXHIBITS
14   NUMBER        DESCRIPTION
15
16
17
     [Exhibit 1]   Binder of documents  ... ... ... ... .18
18
     [Exhibit 2]   Binder of documents  ... ... ... ... .19
19
     [Exhibit 3]   Binder of documents  ... ... ... ... .50
20
     [Exhibit 5]   Colour flow chart .. ... ... ... ... .78
21
     [Exhibit 6]   Page 1543 of Reed 7  ... ... ... ... .97
22
     [Exhibit 4]   Binder of documents  ... ... ... ... 117
23
     [Exhibit 7]   CV of Michael Reed . ... ... ... ... 157
24
     [Exhibit 8]   Document entitled "Forced-air .. ... 189
25       warming and ultra-clean ventilation
```

```
                                                          Page 5
 1              MICHAEL R. REED
 2
     [Exhibit 9]   E-mail chain, Bates numbered ... ... 192
 3       Reed 115
 4   [Exhibit 10]  One page of Reed 118 ... ... ... ... 195
 5   [Exhibit 11]  Article, Bates numbered Reed 84  ... 204
         through Reed 99
 6
     [Exhibit 12]  Article titled "Wound .. ... ... ... 205
 7       Complications Following Rivaroxaban
         Administration"
 8
     [Exhibit 13]  Document entitled "RIIO Pilot .. ... 211
 9       Study"
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 42

MICHAEL R. REED

communications about published studies.

MR. GORDON: The communications about published studies relate to criticisms of the published studies and the way to respond to and address those criticisms and why things were or were not done on a particular --

THE EXAMINER: Let's look at the e-mails.

MR. GORDON: That is what we are --

THE EXAMINER: Let's get to the e-mails. I am not persuaded at the moment. If you show me relevant e-mails, I may be persuaded.

MR. GORDON: I will get to it, but you know --

THE EXAMINER: No, I am not going to allow this type of questioning to continue, unless you lay a basis with proper e-mail references to this witness. I am simply not going to allow it to continue.

MR. GORDON: That is fine. I appreciate that Mr. Reed is kind of cutting to the chase and getting things out, that I will get to eventually. So I will stick to the documents. I apologize. This is going to take a little bit longer this way.

BY MR. GORDON:

Q. Let's go to the McGovern paper, and I want to focus on the second part of the study, the comparison or the -- what you described as the clinical component.

Page 43

MICHAEL R. REED

A. Yes. I would like to speak to you about that.

THE EXAMINER: Well, let's get to it first, where it is; so that those of us who are not familiar with this document can identify it.

A. So 540.

THE EXAMINER: Yes, I have got that. Where in the document are you talking about?

MR. GORDON: I think the discussion begins on page 543 and it kind of intertwines a little bit, but --

THE EXAMINER: Can I suggest, Mr. Reed, that you allow Mr. Gordon to ask his questions and answer them and then before we leave this document, you can make any point you wish to make about it, unless you think it is essential for you to lay down your marker before you answer questions about it.

A. I would prefer to do that, if that is okay.

THE EXAMINER: Fine. Do it that way.

A. So when I was reading this documentation yesterday and going through e-mails, it's clear to me that some of the data on the clinical side of the paper is wrong, slightly wrong. It doesn't affect the conclusion of the paper and there's still a significant difference. But there is, in fact, one more infection in each group.

Now, this was e-mailed to Mark Albrecht and he did

Page 44

MICHAEL R. REED

reply to it and, in fact, it's in your documents; the e-mail correspondence. And he says he will put it into the main paper and, in fact, he then says he has put it in the main paper, but unfortunately it's slightly old data that is in the main paper. It does not affect the conclusion in any way, but nevertheless it is not the latest data they have got in there, and I don't know why that is.

THE EXAMINER: If Mr. Gordon points you to that specific section, then you can identify it for us.

A. I will ...

BY MR. GORDON:

Q. I am sure we will get to those details.

Just broadly speaking, the clinical component of it was a retrospective observation analysis of infection data; is that correct?

A. So I mean, the data is collected prospectively. So it is not that we look back. It is collected live. So it is prospective in that sense, but I would say it is opportunistic, because we had made the change and then we looked to see what happened. The data is prospective.

Q. Was the data being collected -- were the data being collected for purposes of doing this study?

Page 45

MICHAEL R. REED

A. No. We collect data routinely and we have a surveillance team, so that is essentially nursing staff, of which I think we had three at that time, whose job it is purely to look at infection rates, if you like.

Q. Okay. So just again, in broadbrush terms. You had and have a body of infection data and what this study did was to look back at a particular time period; is that correct?

A. Well, we collect --

MR. ASSAAD: Objection, misstates the prior testimony.

THE EXAMINER: You may answer.

A. We collect the data as we go, if you like, and we have done since probably, I think, 2007/2008.

BY MR. GORDON:

Q. What is the reference on page 533 to --

THE EXAMINER: 543?

BY MR. GORDON:

Q. 543, thank you. For demographic information on relevant risk factors for surgical site infections, SSI, collected for primary hip and knee replacement procedures performed at our hospitals -- hospital during a 2.5-year period starting 1st July, 2008?

MR. ASSAAD: Where are you reading? I am sorry.

Page 46

MICHAEL R. REED

THE EXAMINER: At the top of --
MR. GORDON: At the beginning of the text on page --
MR. ASSAAD: Oh, thank you.
THE EXAMINER: Sorry, what was the question arising out of that?
BY MR. GORDON:
Q. What does that refer to?
A. Well, that's essentially the data that we collect on patients as they come in and have a joint replacement.
Q. Did you just start collecting that data on 1st July, 2008?
A. I think that's probably about right, yes. That's when we went to full-time surveillance. We didn't have a surveillance team. We had part-time surveillance. So in England, there's the -- the NHS law is that you have to submit the one quarter every year, one operation infection rates. And we moved to full-time surveillance in that time. So we had a complete handle on infection rates from that point.
Q. And at the end of that 2.5-year period, did you stop collecting data?
A. No. We still collect data.
Q. The 2.5-year period is the -- would be the time period of the McGovern paper; right? That's -- it's just

Page 47

MICHAEL R. REED

a finding that what -- the book-ends of the study?
A. Yes.
Q. Okay.
   So when you -- at the start date of 1st July, 2008, patients were being warmed with the Bair Hugger; is that correct?
A. Yes.
Q. And at some point, you transitioned over from warming patients with the Bair Hugger to warming them with the Hot Dog; is that correct?
A. Yes.
Q. And at some point, you were fully transitioned and only had -- were only using the Hot Dog?
A. Yes.
Q. Is that correct?
A. Yes.
Q. So there were really three periods in that 2.5 years. The first period being Bair Hugger only; the second period being transition; and the third period being Hot Dog; is that correct?
A. Yes.
Q. What was the period of Hot Dog only use?
A. So that's in the paper. It's from -- it was something like June till -- until the end of December.

Page 48

MICHAEL R. REED

Q. Of ...?
THE EXAMINER: Where is this?
A. So this is page 546. And it's the chart which has been written on.
THE EXAMINER: Oh, I see.
BY MR. GORDON:
Q. So June to December 2010?
A. Yes, I think it's June.
MS. ZIMMERMAN: What page was this?
MR. HOLL-ALLEN: 546. This is the table ...
BY MR. GORDON:
Q. Would that be seven months?
A. It feels about right. Six or seven months.
MR. ASSAAD: There's markings on this page. Did you mark ...
THE EXAMINER: I am a bit confused to where the proper lines are, in the light of all these ...
   So you used the Bair Hugger from July 2008 to March -- February/March 2010?
A. No. So the -- what's the best way to explain this chart? So if you can try and ignore the scribbles.
THE EXAMINER: Yes, I am trying to.
MR. HOLL-ALLEN: Sir, I am sorry to interrupt. In the plaintiffs' file, there is a clean copy of the same

Page 49

MICHAEL R. REED

document.
THE EXAMINER: Thank you. I don't have the plaintiffs' file.
MR. ASSAAD: And I would prefer to use that, because it seems that this document was used during the Albrecht deposition that was taken in October(?) 2016 and I had to have -- these markings could influence the witness's testimony today. So I would rather have a clean copy.
THE EXAMINER: That is another reason. The principal reason is that it's virtually impossible to understand, with all these markings on it.
MR. HOLL-ALLEN: Would you like to use my copy, sir?
THE EXAMINER: No, it is more important that you have it than I do.
BY MR. GORDON:
Q. Well, let's skip that chart. If you go back to page 543 --
MR. ASSAAD: Are you moving on to the ...
MR. GORDON: No, that was the ...
THE EXAMINER: Which one of these is ...?
A. I think --
BY MR. GORDON:
Q. Under "Joint infection data", there is a reference to: a transition of warming -- forced air warming to

Page 62

MICHAEL R. REED

1
2  THE EXAMINER: Okay.
3  A. I mean, there is an enormous amount of operations that
4     fall into those groups. You are probably right, but
5     I don't -- I think a coder wouldn't rely on that to say
6     whether it was trauma or not.
7  BY MR. GORDON:
8  Q. When you initially saw a printout of data for use in the
9     McGovern study, did you limit it to non-trauma, hip and
10    knee surgeries?
11 MR. ASSAAD: Objection, misstates the prior testimony. Lack
12    of foundation. He never stated he saw a printout.
13 THE EXAMINER: You can answer.
14 A. So normally, the patients you get on here are elective.
15    So there will be some that come on, that are not
16    elective, and then they will be removed by the
17    surveillance team and put -- not actually removed, but
18    put into a different category of joint replacement.
19 BY MR. GORDON:
20 Q. When you compiled the data for the McGovern study, did
21    you in any way try to separate the trauma and the
22    non-trauma patients?
23 MR. ASSAAD: Objection, misstates the prior testimony.
24 THE EXAMINER: You may answer.
25 A. I mean, we definitely attempted to do that, because this

Page 63

MICHAEL R. REED

1
2     database is meant to be just planned cases, just
3     elective cases.
4  BY MR. GORDON:
5  Q. Okay. And by --
6  A. But we do know that other ones get in through coding and
7     then they will be taken out in the sort of data cleaning
8     process.
9  Q. By this database, you mean the 788 through 1050 -- 1081?
10 A. So you know, before we would publish, if you like, on
11    infection rates, then we would go through it, we would
12    check every case is as -- you know, every case, whether
13    the infection is trauma or not. You might by chance end
14    up pulling one out, you might not. I am not aware
15    whether we did with this study.
16 Q. Okay. The data here, on 788 through 1081, as Mr. Dyer
17    pointed out, began on 1st October, 2007. What was your
18    reasoning for commencing the Bair Hugger only period on
19    1st July, 2008?
20 A. So my recollection is that we got a full-time
21    surveillance team at that point. So as I said,
22    previously in the U.K. you only have to do a quarter.
23    Actually, you can choose which operation you do. So you
24    might not have full-time surveillance prior to that.
25 THE EXAMINER: So one operation, one quartile, per annum?

Page 64

MICHAEL R. REED

1
2  A. Correct. That's the national standard. But we have
3     moved to doing every operation full-time; and that's why
4     we have got that reliable data. So there would be big
5     gaps in the period. If you looked at 2006, you might
6     only have a quarter of the year populated, which would
7     be very unreliable data.
8  THE EXAMINER: Yes.
9  BY MR. GORDON:
10 Q. So I really want to drill down on the timing; and that
11    is critical. I am going to ask you to take a look at
12    volume 2, pages 487 through 490.
13 A. Okay.
14 Q. Have you seen this before?
15 A. I saw it yesterday.
16 Q. Is that the first time you saw it?
17 A. I'm not sure.
18 MR. ASSAAD: I am going to object for lack of foundation for
19    any questions being asked, if he hasn't established
20    foundation. He has written this document -- the
21    authorship of this document --
22 THE EXAMINER: You have made your objection. Keep
23    objections short.
24 MR. ASSAAD: Well, I need to put all the objections for the
25    U.S. court.

Page 65

MICHAEL R. REED

1
2  THE EXAMINER: I know.
3  MR. GORDON: They are all preserved.
4  THE EXAMINER: I am familiar with how U.S. attorneys --
5  MR. ASSAAD: They are --
6  MR. GORDON: The only objection is: waives form or
7     foundation.
8  MR. ASSAAD: I am only doing it for trial --
9  BY MR. GORDON:
10 Q. Do you know who Julie Gillson is?
11 A. Yes. Julie Gillson was one of our matrons.
12 Q. What is a matron?
13 A. So it is a senior nurse, essentially.
14 Q. Was she one of the SSI surveillance nurses?
15 A. No. So Julie is a matron, so the senior nurse within
16    surgery, if you like. Gail Lowdon leads the surgical
17    site infection surveillance team.
18 Q. And if you look at the front page of this document. At
19    page 71, the very last paragraph, it says during --
20 THE EXAMINER: Where are you?
21 BY MR. GORDON:
22 Q. Page 71. Oh, I am sorry.
23 THE EXAMINER: 487.
24 MR. GORDON: 487, thank you. Page 487, the last full
25    paragraph on the page:

Page 66

1 MICHAEL R. REED
2 "During the last two quarters of 2008/2009,
3 Northumbria Healthcare NHS Foundation Trust was
4 reporting SSI rates in the combined total of surgeries
5 in the THR/TKR and repair neck of femur between
6 3.5 percent and 5.7 percent and was regularly receiving
7 letters from the HPA informing the trust of its high
8 outlier status for SSI."
9 First of all, did I read that correctly?
10 A. Yes.
11 MR. ASSAAD: Objection. Move to strike for hearsay.
12 BY MR. GORDON:
13 Q. Did --
14 THE EXAMINER: (Overspeaking.) ... moving on to
15 a question --
16 MR. ASSAAD: He can't read evidence in, without establishing
17 a foundation. I am saying this is hearsay. He is
18 reading someone else's words into the record. He is
19 basically advocating this point. Objection for hearsay.
20 BY MR. GORDON:
21 Q. Do you recall there being a period of time when the
22 Northumbria Healthcare Trust was getting letters from
23 the HPA about SSI rates?
24 A. Yes.
25 Q. And what were those -- first of all, what is the HPA?

Page 67

1 MICHAEL R. REED
2 A. So the HPA is the Health Protection Agency and they are
3 the group that collate the national database, based on
4 people collecting it locally. So Gail Lowdon who leads
5 our surgical site infection surveillance team, a member
6 of her team will be uploading that information
7 nationally, if you like, to the Health Protection
8 Agency.
9 The issue with that is that not every trust puts in
10 the data as we have established; and the infection rates
11 that they quote are very low and, in fact, they have --
12 I mean, the government advisers on infection have
13 publicly written to say that their quotes -- they quote
14 very low infection rates, unrealistically low, because
15 the surveillance system is poor in many trusts?
16 THE EXAMINER: Do you have a recollection of these letters
17 being received?
18 A. Yes.
19 THE EXAMINER: Okay.
20 BY MR. GORDON:
21 Q. And what did Northumbria do in response to those
22 letters?
23 A. So I mean, we have done lots of things, as I think has
24 become clear. We have made loads of changes over
25 a period, a sustained period, to try and reduce the

Page 68

1 MICHAEL R. REED
2 infection rates.
3 Q. Was there any type of a committee or a working group
4 formed?
5 A. Yes. So there was a surgical site infection prevention
6 committee, which I chair.
7 Q. And when was that formed?
8 A. It may actually even be on here. About 2008, maybe even
9 2007. That sort of timescale.
10 Q. And that's your independent recollection?
11 A. Yes.
12 Q. So the reason I say that is that on page 548, it says
13 that the multiple -- a multi-disciplinary team formed
14 the trust SSI group and the first meeting took place in
15 December 2008.
16 A. There you go then.
17 Q. Well, if you --
18 THE EXAMINER: What is the --
19 BY MR. GORDON:
20 Q. If your recollection is different than what is here --
21 A. Yes, I think that feels right and she would know. What
22 I would say is that we may have been doing stuff before
23 that, before we did a formal meeting, but it would not
24 have been long before that.
25 Q. And there is a reference in the next paragraph to:

Page 69

1 MICHAEL R. REED
2 "The first action point of this meeting was to place
3 a successful bid to appoint two full-time SSI nurses on
4 a 12-month secondment."
5 MR. ASSAAD: Objection, hearsay.
6 BY MR. GORDON:
7 Q. And my question is: was there -- were there full-time
8 SSI nurses prior to whenever this multi-disciplinary
9 group first met?
10 A. Yes, so the -- the surveillance was done -- I mean, we
11 should probably go back one step.
12 So we were named in the paper, based on the 2007
13 data, as having a high infection rate. And after that,
14 we went to full-time surveillance, some time probably in
15 early 2008, but we didn't have the business case and
16 people -- and people formally appointed to those rules.
17 They were being done, I think, by infection control,
18 rather than by a surveillance team. Same methodology.
19 MR. ASSAAD: I am going to object again to those line of
20 questions. It is not part of the subject matter of the
21 sealed order. It has nothing to do with the studies
22 that he has been performing, that it has been limited
23 to -- by the Senior Master.
24 THE EXAMINER: He is still in the --
25 MR. ASSAAD: I mean, we -- well, it really isn't. It is

Page 182

MICHAEL R. REED

A. Rarely, but to get to that point, there is a huge number of surgeries normally as well.
Q. And potentially it could cause death?
A. Yes. Well, it does cause death. I mean, there is a definite association with mortality. It reduces your life span.
Q. Do you consider yourself an expert in peri-prosthetic joint infections?
A. Well, in, you know, the view that I have been invited to the international consensus perhaps, and I do speak frequently on it at meetings. I spoke yesterday in Manchester on it. So yes, I speak quite frequently on it.
THE EXAMINER: And my understanding is that it is not that there is a significant percentage or proportion of infections in this surgery. It is because of the severity of the cost to --
A. Exactly. So it is the severity of the complication which is just game changing for most patients. It is a terrible, terrible complication.
BY MR. ASSAAD:
Q. And do you consider yourself an expert with respect to the causation of peri-prosthetic joint infections?
A. I think "expert" is maybe for someone else to judge, but

Page 183

MICHAEL R. REED

I do know a lot about it and I have spent a lot of time researching it.
MR. ASSAAD: We need to go off the record, because of the change of CD.
THE VIDEOGRAPHER: This is the end of tape number 2 in the deposition of Michael Reed. Going off the record at 4:44.
(4:44 pm)
    (Break taken.)
(4:49 pm)
THE VIDEOGRAPHER: This is the beginning of tape number 3 in the deposition of Michael Reed. Going on the record at 4:48.
BY MR. ASSAAD:
Q. Mr. Reed, we can agree that you need a bacteria to cause a peri-prosthetic joint infection; correct?
A. Yes.
Q. And we can agree that because of the implant, you need very few bacteria to cause a peri-prosthetic joint infection; correct?
A. Correct.
Q. Contrary to a wound infection, where you might need millions; correct?
A. So if you don't have an implant in situ, then you can

Page 184

MICHAEL R. REED

have many, many more bacteria on the wound without getting an infection. So yes, it is much more important when you have got an implant.
Q. So an implant is highly susceptible to a bacteria and the cause of a peri-prosthetic joint infection mainly because of biofilm; correct?
A. Yes, so biofilm is a slime that the bacteria produce that protect it from antibiotics and other mechanisms the body might have to rid the infection. So yes, it is very -- it is driven by biofilm, we think, the difficulties in getting rid of the infection.
Q. And you would agree with me that as a result -- strike that.
    You would agree with me that most, if not all of the peri-prosthetic joint infections occur when bacteria gets to the implant during the perioperative period; correct?
A. I am not sure we know that. That's -- but that is sort of an accepted philosophy. But I don't think we know that for sure, in actual fact. But that is the dogma.
THE EXAMINER: You referred to the peri ...?
BY MR. ASSAAD:
Q. Peri, during the surgery.
THE EXAMINER: I see, during the operation.

Page 185

MICHAEL R. REED

BY MR. ASSAAD:
Q. When you say that is the accepted philosophy, that is the main consensus among most orthopaedic surgeons; correct?
A. Yes.
Q. And because of the biofilm, it is very difficult to treat these peri-prosthetic joint infections through medication; correct, such as antibiotics?
A. Yes. Essentially you can't get rid of an infection with antibiotics alone.
Q. Because there is no vascularity to the joint?
A. Yes, because -- because bacteria and biofilm become very protected by the slime, and so you need about a thousand times the dose of the antibiotic for it to work, and you can't deliver that much antibiotic to the patient.
Q. Have you heard of the term "chain of infection"?
A. Can you -- can you rephrase that?
Q. Yes, I can actually. Basically, for an infection to occur, you have to have an infectious agent, a reservoir, a portal of exit, a mode of transportation, a portal of entry and a susceptible host. Have you heard that described before?
A. Yes.
Q. And for example, so with respect to the infectious

Page 214

MICHAEL R. REED

THE EXAMINER: They were at that time?

A. Yes. So this -- briefly, this is a paper where we asked other hospitals around the country that had changed similarly to us, to get in touch; and then we analyzed their data remotely to see what the complications had been.

BY MR. ASSAAD:

Q. And xarelto does not increase increased particles or bacteria to the surgical site; correct?

A. Correct.

Q. I would like you to refer to page 1556.

(Off the record remarks.)

Q. Now, Mr. Reed, you would agree with me that if someone has a peri-prosthetic joint infection, they would have to be returned to the operating room; correct?

A. Almost certainly. Very rarely not.

Q. Okay. So if you look at this document, you have wound complications using xarelto, as compared to a low molecular weight heparin. And then you have, two below it, return to surgery from infection. Do you see that?

A. Yes.

Q. And do you agree with me that if we are looking at PJIs, we should be looking at the differences between xarelto and the low molecular weight heparin for returning to

Page 215

MICHAEL R. REED

surgery for infection; correct?

A. Yes, correct. I just have the caveat that I don't know what timescale this looks at. But it is probably within 30 days, which would be a reasonable thing to look at.

(Off the record remarks.)

Q. So would you agree with me that the change from the low molecular weight heparin in the McGovern study to xarelto in the return had no effect; it was not a confounding factor with respect to the infection rates?

A. So based on this study of 12,000 patients, I would say there was no effect on return to surgery from infection.

Q. So would you agree with me that based on this study, that you are an author of, that looking at the date of the McGovern paper, that now we can exclude xarelto as a confounding factor for infection rates?

A. I think that's what this paper says.

THE EXAMINER: Because you nevertheless thought it appropriate to refer to the change in the McGovern paper.

A. Yes, because in our paper, there wasn't a significant difference in infection rates. But there was a signal; that was -- so that's why I put it in. It is safer to be upfront and fair about it.

Page 216

MICHAEL R. REED

BY MR. ASSAAD:

Q. And we had a discussion today about the unidirectional airflow in the operating rooms; correct?

A. Yes.

Q. And you believe that it prevents -- using unidirectional flow prevents peri-prosthetic joint infections?

A. Yes.

Q. Because it reduces the particles in the operating room; correct?

A. Yes.

Q. There is an argument that has been made with respect to critiquing your McGovern article, that laminar flow actually increases peri-prosthetic joint infections. Have you heard that argument before, regarding your article?

A. Yes.

Q. And you are of the opinion that, in fact, that needs to be looked at, because you think the forced air warming has an effect on the laminar unidirectional airflow; correct?

A. Yes. I think it may have an effect on that data.

Q. And actually you have written about that in the book chapter published in 2016; correct?

A. Yes, very likely.

Page 217

MICHAEL R. REED

Q. We have also discussed keeping patients warm during the preoperative and perioperative period; correct?

A. Yes.

Q. And you believe one or the other is fine; correct? Or I could have misunderstood you.

A. Well, it's not -- you haven't misunderstood me, but I think in terms of where the evidence is, I think that's possibly where the evidence is; one or the other is fine. But I would say the best practice now is to do both. And in fact, the NICE guidance draft, which has just come out, will be to do pre-warming and warming during surgery.

Q. But you agree that there's no evidence, scientific evidence, that indicates that keeping a patient warm during surgery and before surgery reduces peri-prosthetic joint infections?

A. So do -- okay. So there's definitely evidence that in colorectal surgery, that keeping people warm reduces their infection rate. And there is evidence from David Leaper's study, who you are going to meet, that pre-warming patients reduces infection rates in their clean surgery. But that is not during the operation. That is before.

    I would say there isn't any evidence that doing