# EXHIBIT E

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1

1          UNITED STATES DISTRICT COURT

2            DISTRICT OF MINNESOTA

3   - - - - - - - - - - - - - - - - - - - -

4   In Re:

5   Bair Hugger Forced Air Warming

6   Products Liability Litigation

7

8   This Document Relates To:

9   All Actions          MDL No. 15-2666 (JNE/FLM)

10  - - - - - - - - - - - - - - - - - - - -

11

12

13          DEPOSITION OF THOMAS H. KUEHN

14            VOLUME I, PAGES 1 - 351

15               JULY 10, 2017

16

17

18          (The following is the deposition of THOMAS

19  H. KUEHN, taken pursuant to Notice of Taking

20  Deposition, via videotape, at the offices of Ciresi

21  Conlin L.L.P., 225 South 6th Street, Suite 4600,

22  Minneapolis, Minnesota, commencing at approximately

23  9:25 o'clock a.m., July 10, 2017.)

24

25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

2

1   APPEARANCES:

2       On Behalf of the Plaintiffs:

3           Gabriel Assaad
            KENNEDY HODGES
4           4409 Montrose Boulevard, Suite 200
            Houston, Texas    77006
5
            Genevieve M. Zimmerman
6           MESHBESHER & SPENCE, LTD.
            1616 Park Avenue
7           Minneapolis, Minnesota   55404

8       On Behalf of Defendants:

9           Peter J. Goss and Vinita Banthia
            BLACKWELL BURKE P.A.
10          432 South Seventh Street, Suite 2500
            Minneapolis, Minnesota   55415
11
    ALSO PRESENT:
12
            Ronald M. Huber, Videographer
13
            Kansaa Nadeem, Summer Associate, Blackwell
14          Burke

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

3

1                           I N D E X

2    EXHIBITS                DESCRIPTION         PAGE MARKED

3    Ex   1    Expert report of Thomas H.

4               Kuehn                              33

5         2    Corrected Exhibit C to Kuehn

6               expert report                      33

7         3    Subpoena to Produce Documents,

8               Information, or Objects, or to

9               Permit Inspection of Premises in

10              a Civil Action                     37

11        4    Kuehn invoices                      49

12        5    University of Minnesota website

13              download re ANSYS                  71

14        6    ME 4054:  Ethics in Design

15              PowerPoints                        106

16        7    E-mail string, 3MBH01330587-92      159

17        8    E-mail string, 3MBH00544754-5       164

18        9    E-mail string, 3MBH00132501-2       168

19        10   E-mail string, 3MBH00050932-3       170

20        11   E-mail with attachment,

21              3MBH00053467-72                     183

22        12   Kuehn invoices                      187

23        13   HVAC Design Manual for Hospitals

24              and Clinics, Second Edition        253

25        14   CFD image                           267

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

4

1      15   Article in Journal of Solar Energy,

2           Airborne Infection Control in

3           Health Care Facilities, by

4           Kuehn                                292

5

6

7

8

9   WITNESS              EXAMINATION BY          PAGE

10  Thomas H. Kuehn       Mr. Assaad               5

11                        Mr. Goss               328

12                        Mr. Assaad             339

13                        Mr. Goss               348

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

5

1                    P R O C E E D I N G S

2              (Witness sworn.)

3                    THOMAS H. KUEHN

4              called as a witness, being first duly sworn,

5              was examined and testified as follows:

09:24:57    6                    ADVERSE EXAMINATION

09:24:57    7    BY MR. ASSAAD:

09:25:03    8         Q.    Good morning.  Can you please state your

09:25:04    9    name.

09:25:04   10         A.    Yes.  My name is Thomas Howard Kuehn.

09:25:07   11         Q.    Do you go by Mr. Kuehn or Dr. Kuehn?

09:25:11   12         A.    Dr. Kuehn is just -- is fine.

09:25:14   13         Q.    Okay.  My name's Gabriel Assaad and I'm here

09:25:19   14    with Genevieve Zimmerman, and we represent over 2,000

09:25:24   15    plaintiffs in this multi-district litigation.  Now

09:25:27   16    before I begin I just want to go over a few

09:25:29   17    instructions.

09:25:29   18              Have you ever had your deposition taken?

09:25:30   19         A.    I have.

09:25:30   20         Q.    Approximately how many times?

09:25:31   21         A.    Twice.

09:25:32   22         Q.    Well I'm going to go through a couple of the

09:25:36   23    ground rules.  I'm going to ask you numerous

09:25:40   24    questions.  If you don't understand my question,

09:25:41   25    please let me know.  Fair?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

6

09:25:42   1      A.    Yes.

09:25:42   2      Q.    If you answer the question, I'll assume --

09:25:45   3   I'll assume that understood the question.  Fair?

09:25:46   4      A.    Yes.

09:25:47   5      Q.    Any time you want to take a break, please

09:25:49   6   let me know.  I just ask that if you request a break,

09:25:53   7   let it be after you answer a pending question.  Fair?

09:25:55   8      A.    Okay.

09:25:57   9      Q.    Also, with respect to any of your testimony

09:26:01  10   today, I would not like you to guess.  If you don't

09:26:04  11   know the answer, just say "I don't know."  Fair?

09:26:06  12      A.    Yes.

09:26:07  13      Q.    I don't think any side here wants any

09:26:09  14   guessing.  Fair?

09:26:10  15      A.    Yes.

09:26:11  16      Q.    Okay.  Now the two depositions that you took

09:26:17  17   previously, were they as an expert witness?

09:26:20  18      A.    Yes, they were.

09:26:21  19      Q.    Okay.  Can you please describe the two.

09:26:24  20      A.    The first one was a case involving a hotel

09:26:28  21   fire in International Falls, Minnesota.  The power

09:26:31  22   company had cut power to the building, this was in

09:26:35  23   winter, so my expertise was requested to determine how

09:26:42  24   fast the building would cool off and how fast the

09:26:45  25   water in the sprinkler-system pipes would freeze such

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

7

| | | |
|---|---|---|
| 09:26:48 | 1 | that the sprinkler system would be inoperable prior to |
| 09:26:51 | 2 | the fire breaking out. |
| 09:26:52 | 3 | Q.    And were you an expert for the plaintiff or |
| 09:26:54 | 4 | the defendant? |
| 09:26:54 | 5 | A.    That was the plaintiff. |
| 09:26:55 | 6 | Q.    Okay.  And do you recall the name of the |
| 09:26:57 | 7 | attorney you worked for? |
| 09:26:58 | 8 | A.    Yeah.  That was about 25, 30 years ago. |
| 09:27:00 | 9 | I -- I do not recall. |
| 09:27:01 | 10 | Q.    Okay.  Was it here in Minnesota? |
| 09:27:03 | 11 | A.    Yes. |
| 09:27:04 | 12 | Q.    And do you recall any of the attorneys on |
| 09:27:09 | 13 | the defense side? |
| 09:27:09 | 14 | A.    That was so long ago, no, I don't recall. |
| 09:27:12 | 15 | Q.    Okay.  So 25 years ago, so looking at about |
| 09:27:14 | 16 | early '90s? |
| 09:27:15 | 17 | A.    Probably maybe late '80s, early '90s. |
| 09:27:18 | 18 | Q.    And you -- you did a deposition; correct? |
| 09:27:21 | 19 | A.    Yes. |
| 09:27:21 | 20 | Q.    Did you testify at trial? |
| 09:27:23 | 21 | A.    Yes. |
| 09:27:24 | 22 | Q.    And what was the verdict? |
| 09:27:26 | 23 | A.    The plaintiffs did not prevail. |
| 09:27:29 | 24 | Q.    Okay.  So it was a defense verdict. |
| 09:27:31 | 25 | A.    Yes. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

8

09:27:33  1     Q.   Okay.  And during that --

09:27:36  2          During your time being an expert for the

09:27:39  3  plaintiff in that case, were any of your opinions

09:27:43  4  limited by the court?

09:27:46  5     A.   It was so long ago, I really don't -- don't

09:27:49  6  remember.

09:27:50  7     Q.   Okay.  Now you said you were an expert -- or

09:27:53  8  you testified in another case.

09:27:54  9     A.   Yeah.  The second case was with Rochester

09:27:58  10  Meat & Provision Company in Rochester, Minnesota.

09:28:01  11  They -- they are a provider of hamburger patties to

09:28:04  12  restaurant chains.  They had recently purchased and

09:28:09  13  installed a large spiral blast freezer to improve

09:28:12  14  their productivity, their output.  The blast freezer

09:28:16  15  did not perform according to the specifications

09:28:20  16  supplied by the vendor, so Professor Ramsey and I and

09:28:25  17  a graduate student were initially contacted to just

09:28:28  18  serve as consultants to see if we couldn't resolve the

09:28:31  19  problems.  We actually did measurements in their

09:28:36  20  freezer, temperature of patty measurements versus

09:28:38  21  time, freezer temperature, airflow measurements.  They

09:28:41  22  adjusted their production to the best they could, they

09:28:43  23  still could not meet production as specified in the

09:28:47  24  requirements, so it went into litigation and I was

09:28:50  25  retained as an expert witness on behalf of Rochester

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

9

09:28:53  1  Meat.

09:28:53  2       Q.   For the defendant.

09:28:55  3       A.   For the plaintiff.

09:28:55  4       Q.   For the plaintiff.  Okay.  And what was the

09:28:59  5  outcome of that case?

09:29:00  6       A.   Outcome of that case was a settlement.

09:29:03  7       Q.   And did you -- did you --

09:29:06  8            If it was a settlement, you didn't testify

09:29:09  9  at trial; correct?

09:29:10  10      A.   Actually, I was on the stand when there was

09:29:13  11  a recess, and then I was told shortly after that that

09:29:13  12  a settlement had been reached.

09:29:13  13      Q.   Okay.  So you did a deposition and testimony

09:29:16  14  and --

09:29:16  15      A.   Yes.

09:29:17  16      Q.   -- trial testimony.

09:29:18  17      A.   Yes.

09:29:18  18      Q.   One more instruction.  Wait until I finish

09:29:20  19  the question before you answer, and I'll trying to do

09:29:22  20  the same, I'll try to wait until you finish your

09:29:25  21  answer.  It's better for the court reporter, it's a

09:29:28  22  cleaner transcript.  Fair?

09:29:29  23      A.   Yes.

09:29:29  24      Q.   And I understand many times you will predict

09:29:31  25  what my question is going to be; just wait just until

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

10

09:29:34    1    I finish the question.  And I will usually look up at

09:29:36    2    you and wait for an answer.

09:29:38    3         A.    Okay.

09:29:39    4         Q.    Do you have copies of any of the

09:29:44    5    transcripts, deposition transcripts in your previous

09:29:46    6    cases where you acted as an expert?

09:29:49    7         A.    Again, this was also 25, 30 years ago.  I --

09:29:53    8    I certainly do not have anything in my possession at

09:29:55    9    present.

09:29:55   10         Q.    So --

09:29:57   11         And that would have been in the late '80s

09:29:59   12    for Rochester Meat?

09:30:00   13         A.    Again, either late '80s or early '90s.

09:30:03   14         Q.    Okay.  Fair enough.

09:30:04   15         Besides those two cases in which you

09:30:08   16    testified either in a deposition or trial, were you

09:30:10   17    ever retained by a law firm as a consulting expert?

09:30:15   18         A.    Not that I can recall.

09:30:20   19         Q.    And so my understanding with respect to the

09:30:31   20    first case dealing with the pipes freezing, that dealt

09:30:39   21    with mostly, you know, how fast a building would cool

09:30:44   22    down and how fast the pipes would get down to below

09:30:47   23    freezing and freeze.

09:30:48   24         A.    That's correct.  It was really a heat-

09:30:50   25    transfer study.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

11

09:30:51  1      Q.    Okay.  And that would be the same thing with

09:30:55  2   the Rochester Meat, it was more of a heat-transfer

09:31:00  3   problem.

09:31:00  4      A.    Yes, that's correct.

09:31:01  5      Q.    And nothing to do with fluid flow or

09:31:04  6   particle flow; correct?

09:31:06  7      A.    Nothing to do with particle flow, although

09:31:09  8   there was fluid flow involved in the hamburger-

09:31:13  9   freezing blast freezer.

09:31:14  10     Q.    Fair enough.

09:31:15  11           Have you ever consulted for 3M before?

09:31:29  12     A.    No, I have not.

09:31:31  13     Q.    What about Arizant?

09:31:32  14     A.    No, I have not.

09:31:34  15     Q.    Before this litigation were you aware of a

09:31:37  16   company called Arizant?

09:31:39  17     A.    Not that I recall, no.

09:31:43  18     Q.    What about Augustine Medical, had you ever

09:31:45  19   heard about Augustine Medical before this litigation?

09:31:48  20     A.    No.

09:31:49  21     Q.    Do you know who Scott Augustine is?

09:31:52  22     A.    I did not before this litigation began.

09:31:55  23     Q.    Fair enough.

09:31:56  24           So you've been retained as an expert in this

09:31:58  25   case; correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

12

09:31:59   1        A.    That's correct.

09:31:59   2        Q.    And as an expert you would agree that when

09:32:01   3   you look at a problem, you should be objective;

09:32:04   4   correct?

09:32:04   5        A.    That's correct.

09:32:04   6        Q.    You're not here to be an advocate for 3M or

09:32:08   7   the plaintiffs; correct?

09:32:09   8        A.    I'm just trying to deliver my expertise

09:32:15   9   and -- and be as accurate and honest as possible.

09:32:18   10       Q.    To be objective and be impartial; correct?

09:32:22   11       A.    That's correct.

09:32:24   12       Q.    And you're aware that you're under oath;

09:32:30   13   correct?

09:32:30   14       A.    Yes.

09:32:31   15       Q.    And that means that here today it's like

09:32:34   16   being in trial; correct?

09:32:35   17       A.    I -- I assume that's correct.

09:32:37   18       Q.    Okay.  And you understand that your

09:32:42   19   testimony should be -- should be truthful.

09:32:44   20       A.    Yes.

09:32:45   21       Q.    And objective.

09:32:46   22       A.    Yes.

09:32:47   23       Q.    And it's under the penalty of perjury if

09:32:50   24   you're not truthful.  Do you understand that?

09:32:53   25       A.    Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

13

09:32:56  1      Q.    Now what's your current status at the

09:32:59  2   University of Minnesota?

09:33:00  3      A.    I retired approximately one year ago, so I'm

09:33:04  4   officially a professor emeritus.

09:33:08  5      Q.    And you understand as a professor in an

09:33:12  6   academic institution, providing false data or false

09:33:18  7   results would be considered fraudulent; correct?

09:33:21  8            MR. GOSS:  Object to form.

09:33:22  9      A.    That's certainly not according to the

09:33:24  10  ethical standards I was -- I was raised to believe in.

09:33:29  11     Q.    Okay.  When you talk about ethical

09:33:30  12  standards, you're talking about engineering ethics?

09:33:32  13     A.    Yes.

09:33:33  14     Q.    And such, you know, providing false data or

09:33:36  15  false results would be considered fraudulent; correct?

09:33:39  16            MR. GOSS:  Object to form.

09:33:40  17     A.    I -- I would believe so.

09:33:43  18     Q.    Okay.  And sitting here today, you wouldn't

09:33:47  19  put -- you would never commit -- strike that.

09:33:49  20            It's my understanding that you recently went

09:34:00  21  over your report and checked all your calculations;

09:34:02  22  correct?

09:34:02  23     A.    That's correct.

09:34:06  24     Q.    Okay.  And you did that on Friday; correct?

09:34:06  25     A.    One of the exhibits, not the entire report.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

14

09:34:11  1    Q.    Okay.  But you have checked your report for

09:34:13  2  accuracy; correct?

09:34:14  3    A.    Yes.

09:34:15  4    Q.    And being a pro -- professor emeritus, you

09:34:19  5  would never -- you would never commit research fraud

09:34:21  6  or put your name on a court document that you do not

09:34:27  7  believe in; correct?

09:34:28  8    A.    I would say that's correct.

09:34:33  9    Q.    And I assume when you checked all your work

09:34:36  10  prior to -- in preparation of this deposition, that

09:34:40  11  all your calculations made engineering sense; correct?

09:34:42  12    A.    They -- they certainly made engineering

09:34:46  13  sense when I was developing them initially.  Of course

09:34:50  14  all engineering calculations are subject to some level

09:34:52  15  of uncertainty in some of the values that are -- that

09:34:57  16  are put in.  But within engineering judgment, I

09:35:03  17  believe they to be -- them to be correct.

09:35:05  18    Q.    So are there some --

09:35:07  19         Are you sitting here today to say that some

09:35:11  20  of the numbers that were used in your calculations

09:35:13  21  you're uncertain about?

09:35:15  22    A.    I would say the precision of some of the

09:35:17  23  numbers I -- I do not know very precisely.

09:35:21  24    Q.    Can you elaborate on that a little bit?

09:35:25  25    A.    I would say my definition of "precision"

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

15

09:35:28  1  would be, for example, how many significant figures of

09:35:30  2  a number you believe are absolutely correct, and in

09:35:36  3  many cases an engineer needs to make a -- a judgment

09:35:39  4  call in terms of how many significant digits are --

09:35:43  5  are defensible and -- and how many are perhaps digging

09:35:49  6  a little bit too keep into the details.

09:35:51  7      Q.  Are any of the numbers that you have

09:35:56  8  measured or used -- strike that.

09:36:00  9          Now we're going to go through your report

09:36:06  10  today.  If any time you realize that any of your

09:36:08  11  calculations are wrong or your statements are wrong,

09:36:11  12  can you please let me know?

09:36:12  13      A.  I will let you know, yes.

09:36:14  14      Q.  Because right now this is my only chance to

09:36:17  15  take your deposition in this case, and my goal is to

09:36:21  16  find out what your opinions are.  Do you understand

09:36:23  17  that?

09:36:24  18      A.  Yes.

09:36:24  19      Q.  Okay.  And if there is a mistake or you

09:36:27  20  realize there needs to be another correction, this is

09:36:28  21  the time to do it.  You understand that?

09:36:30  22      A.  Yes.

09:36:32  23      Q.  Okay.  You were retained back in February of

09:36:59  24  this year by the defense in this case; correct?

09:37:01  25      A.  That's correct.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

16

09:37:04  1      Q.   Did you obtain any other students or

09:37:08  2  graduate students or anyone else to assist you with

09:37:10  3  your report?

09:37:12  4      A.   No.  This is entirely my own work.

09:37:15  5      Q.   Okay.  So no one assisted you at all.

09:37:18  6      A.   That's correct.

09:37:19  7      Q.   So when you --

09:37:23  8           Was there a -- a written agreement between

09:37:27  9  you and Blackwell Burke or 3M with respect to the

09:37:32  10  scope of your work?

09:37:32  11     A.   I think it was primarily verbal.

09:37:34  12     Q.   Okay.  And do you know how 3M obtained your

09:37:43  13  information to contact you?

09:37:47  14     A.   I do not know that.

09:37:48  15     Q.   Okay.  Do you know who contacted you from 3M

09:37:51  16  or Blackwell Burke?

09:37:52  17     A.   Yes.  It was a woman lawyer that --

09:37:56  18           I can't remember her first name off the top

09:37:59  19  of my head.

09:38:00  20     Q.   What was her last name?

09:38:04  21     A.   The name escapes me.  I'm sorry, I can't --

09:38:08  22  I can't come up with that at the moment.

09:38:10  23     Q.   Was it by e-mail or was it by telephone?

09:38:13  24     A.   By phone contact.

09:38:14  25     Q.   Okay.  Are you still teaching classes at the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

17

```
09:38:18   1   University of Minnesota?

09:38:19   2        A.   Not regular classes.  I'm still involved in

09:38:21   3   a summer short course.

09:38:23   4        Q.   Is that the one this August?

09:38:25   5        A.   Yes.

09:38:25   6        Q.   Okay.  With Professor -- with -- with Jim

09:38:28   7   Ho?

09:38:28   8        A.   Yes.

09:38:30   9        Q.   Okay.  I take it you know Jim Ho personally.

09:38:32  10        A.   I do.

09:38:32  11        Q.   Okay.  And you've actually written papers

09:38:36  12   with him.

09:38:36  13        A.   One paper.

09:38:37  14        Q.   Okay.  When was the last time you talked to

09:38:41  15   Jim Ho?

09:38:41  16        A.   I think that my last correspondence with him

09:38:44  17   was e-mail, probably sometime last fall.

09:38:47  18        Q.   So you have not discussed this case with Jim

09:38:50  19   Ho.

09:38:50  20        A.   I have not.

09:38:51  21        Q.   Okay.  Have you discussed this case with

09:38:52  22   anyone outside Blackwell Burke or 3M?

09:38:55  23        A.   I have not.

09:38:56  24        Q.   Now prior to conducting your work in this

09:39:45  25   case, did you prepare any protocols or methodologies
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

18

09:39:49    1   with respect to how you're going to attack the issue?

09:39:56    2            MR. GOSS:  Object to form.

09:39:58    3       A.   Your -- your question was prior to my --

09:40:01    4       Q.   Well let's back up.  I'll -- that's a good

09:40:03    5   objection.  What was your --

09:40:05    6            What was the scope of your work in this

09:40:09    7   case?

09:40:09    8       A.   The scope of my work was to address issues

09:40:11    9   involving filtration and particle movement primarily.

09:40:19   10       Q.   Were those the only two issues?

09:40:21   11       A.   Also did some work with temperature

09:40:24   12   measurements and velocity measurements.

09:40:29   13       Q.   Anything else?

09:40:31   14       A.   Those were the main -- main topic areas.

09:40:36   15       Q.   And what are the minor topic areas?

09:40:39   16       A.   Well there's -- there's aerosol science

09:40:45   17   which -- which underlies -- its principles underlie

09:40:50   18   particle motion and particle attachment/detachment,

09:40:53   19   aerosol measurement technology instrumentation.

09:40:58   20       Q.   Anything else?

09:40:59   21       A.   Also computational fluid mechanics and --

09:41:03   22   and the particle motion predicted by computational

09:41:07   23   fluid dynamics.

09:41:08   24       Q.   Did you do any type of computational fluid

09:41:11   25   dynamics?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

19

09:41:13    1        A.    Not --

            2        Q.    Not in this case?

09:41:13    3        A.    Not associated with this case.

09:41:15    4        Q.    Okay.  Have you ever done that in the past?

09:41:17    5        A.    I have.

09:41:19    6        Q.    And what program do you usually use?

09:41:19    7        A.    I started back in the '80s actually writing

09:41:21    8    my own from -- from scratch, and more recently my

09:41:24    9    students have used a program called Fluent or --

09:41:31   10    trying to think of the more current name -- CFX.

09:41:35   11        Q.    ANSYS?

09:41:36   12        A.    Not --

           13        Q.    CFX.

09:41:37   14        A.    CFX, yes.

09:41:37   15        Q.    Okay.  And is that the academic version of

09:41:48   16    Fluent and CFX?

09:41:49   17        A.    They're available through our Supercomputer

09:41:51   18    Institute on campus, so I -- I -- I'm not sure of the

09:41:55   19    actual --

09:41:55   20        Q.    Okay.

09:41:56   21        A.    -- designations.

09:41:57   22        Q.    Are students allowed to use that for

09:41:59   23    commercial activities?

09:42:00   24        A.    Um --

09:42:01   25        Q.    Do you know one way or the other?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

20

09:42:03  1      A.    Yes.  The -- the license agreement is

09:42:05  2  different, but -- but yes, they are allowed to do

09:42:07  3  that.

09:42:07  4      Q.    They're allowed to use its for commercial

09:42:10  5  purposes?

09:42:10  6      A.    Yes.

09:42:10  7      Q.    And for research?

09:42:12  8      A.    Yes.

09:42:12  9      Q.    And that's a license with -- between the

09:42:15  10  University of Minnesota and ANSYS?

09:42:16  11      A.    Or -- or --

09:42:18  12            Yes.  Or the -- or the parent company of the

09:42:21  13  software.

09:42:24  14      Q.    Well you understand that Fluent and CFX is

09:42:26  15  owned by ANSYS.  Do you understand that?

16      A.    I -- I --

09:42:29  17      Q.    A-N-S-Y-S.

09:42:29  18      A.    If you say so.  I'm not aware of the

09:42:32  19  details.

09:42:32  20      Q.    When is the last time you used ANSYS?

09:42:34  21      A.    I have never used ANSYS personally.

09:42:36  22      Q.    When was the last time you performed a

09:42:38  23  computational fluid dynamic using a supercomputer?

09:42:41  24      A.    Personally, it was probably 20 years ago.

09:42:46  25      Q.    Okay.  So you agree with me that you're not

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

21

09:42:48  1  up to date with respect to the current capabilities

09:42:51  2  with respect to ANSYS, Fluent, or CFX; correct?

09:42:57  3      A.    I would not agree with that.  I think I am

09:42:59  4  aware of the capabilities, I've just not done that

09:43:03  5  type of simulation work myself.

09:43:04  6      Q.    Okay.  So you're aware of the -- the code

09:43:14  7  that ANSYS uses with respect to CFX or Fluent?

09:43:18  8      A.    I'm aware of the basic fundamental code that

09:43:23  9  began with Professor Patankar that then became Fluent,

09:43:26  10  that then became CFX.

09:43:29  11      Q.    I understand that.  But there are many

09:43:32  12  versions that have occurred since 20 years ago.  You

09:43:34  13  understand that; correct?

09:43:34  14      A.    Yes, I understand that.

09:43:36  15      Q.    Okay.  And you understand that the output is

09:43:38  16  usually only as good as the code; correct?

09:43:40  17      A.    Well the -- the code itself and the user

09:43:44  18  inputs, including boundary conditions.

09:43:46  19      Q.    But the code is very important.

09:43:48  20      A.    The code has been well validated, yes.

09:43:51  21      Q.    Okay.  So it's the code that's validated;

09:43:53  22  correct?

09:43:53  23      A.    Yes.

09:43:55  24      Q.    Okay.  So when -- when an engineer such as

09:44:00  25  yourself performs a CFD analysis and says it's

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

22

09:44:05  1  validated, it means that the code is validated;

09:44:08  2  correct?

09:44:08  3      MR. GOSS:  Object to form.

09:44:09  4      A.  I -- I would think that's what it would

09:44:11  5  represent.

09:44:11  6      Q.  As someone in your field, as a doctor in

09:44:13  7  engineering that has done CFD, that is the term of art

09:44:17  8  used.  When you say this -- this -- this CFD analysis

09:44:26  9  is validated, you mean the code is validated; correct?

09:44:28  10      MR. GOSS:  Same objection.

09:44:29  11      MR. ASSAAD:  Basis.

09:44:30  12      MR. GOSS:  Vague.

09:44:32  13      Q.  Do you understand my question?

09:44:33  14      A.  I would -- I would respond and say that

09:44:36  15  the -- the code itself has been validated, but not any

09:44:39  16  particular results derived from that.

09:44:41  17      Q.  But to validate a code --

09:44:49  18      The code is used for very complex questions

09:44:56  19  or analysis; correct?

09:44:58  20      A.  It -- it can be.

09:44:59  21      Q.  Okay.  And if it's -- if it's validated for

09:45:02  22  a very complex model, then it would be validated for

09:45:08  23  less-complex models looking for the same type of

09:45:11  24  results; correct?

09:45:13  25      A.  It really depends what type of validation is

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

23

09:45:17  1  performed and how that's done.

09:45:18  2      Q.   Well what do you mean by that?

09:45:19  3      A.   Some type of evaluation are -- is

09:45:23  4  corresponding -- or comparing results for fluid

09:45:27  5  mechanics flow measurements, velocity measurements to

09:45:31  6  experimental data, sometimes it's comparing one set of

09:45:34  7  -- one type of code to another -- another type of

09:45:37  8  code.  So there's -- there are numerical comparisons

09:45:40  9  code to code and also comparisons with experiments.

09:45:42  10      Q.   For example, if a code has been validated

09:45:49  11  for jet-engine combustion, by comparing the CFD

09:45:58  12  results to experimental data, you would agree that

09:46:04  13  that code now is validated for other types of jet-

09:46:08  14  engine combustion that are less complex than what the

09:46:10  15  validation scenario was provided.

09:46:18  16      A.   As long as the same code is used, the same

09:46:21  17  subroutines.  There are also issues; for example,

09:46:24  18  turbulent modeling and what parameters to put in

09:46:27  19  there.

09:46:27  20      Q.   For turbulence, for flow, for combustion, if

09:46:30  21  it's been validated experimentally, the code is

09:46:33  22  validated for less-complex modeling; correct?

09:46:36  23      A.   I would --

09:46:37  24          MR. GOSS:  Object to form.

09:46:39  25      A.   I would -- I would think it would be

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

24

09:46:40  1  accurate for less-complex flows.

09:46:42  2      Q.   Okay.  And so when an engineer such as

09:46:45  3  yourself that has used CFD analysis, when a code is

09:46:50  4  validated for a complex model, that means that less-

09:46:55  5  complex models could be used with the same CFD code

09:46:59  6  and obtain accurate results; correct?

09:47:01  7      A.   Again, it depends on the user.  If they're

09:47:05  8  using the code accurately and if the boundary

09:47:08  9  conditions are correct.

09:47:08  10     Q.   Okay.  I understand there's a boundary

09:47:10  11 question and whether or not you've input the

09:47:12  12 information correctly, but for the actual mathematical

09:47:14  13 results depend -- based on correct boundary

09:47:20  14 conditions, the computational analysis performed by

09:47:26  15 the CFD is validated; --

09:47:27  16          MR. GOSS:  Object --

09:47:27  17     Q.   -- correct?

09:47:28  18          MR. GOSS:  Object to form.

09:47:29  19     A.   I would -- I would not say validated.

09:47:31  20     Q.   You would not say validated?

09:47:32  21     A.   No.

09:47:32  22     Q.   What would you say?

09:47:34  23     A.   I would say it's most likely correct, but to

09:47:40  24 me validation means there's some other means of

09:47:43  25 checking the results.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

25

09:47:44    1        Q.   Okay.  Well that's different.  That's

09:47:45    2    verification; correct?

09:47:46    3        A.   I -- I guess if we define that to be

09:47:50    4    verification, yes.

09:47:53    5        Q.   Well you're the doctor in engineering.  Do

09:47:53    6    you understand the difference between validation with

09:47:55    7    the CFD code and verification?

09:47:56    8        A.   I'm not sure I -- I --

09:47:59    9        Q.   You've never heard --

09:48:01   10        A.   -- know the difference.

09:48:03   11        Q.   You've never heard those terms?

09:48:04   12        A.   I've heard the terms, but I'm not sure I

09:48:08   13    ever distinguished between the two.

09:48:15   14        Q.   What do you teach your students with respect

09:48:18   15    to validation?

09:48:20   16        A.   I really don't teach any -- any CFD in my

09:48:24   17    course work.

09:48:24   18        Q.   Okay.  Are you familiar with any other CFD

09:48:45   19    programs besides ANSYS?

09:48:49   20        A.   I'm familiar with older ones I used to work

09:48:52   21    with; for example, Fluent and -- and the Patankar

09:48:56   22    original code.

09:48:57   23        Q.   Okay.  Are you familiar with STAR-CCM?

09:49:01   24        A.   I am not.

09:49:01   25        Q.   Have you heard of STAR-CCM?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

26

09:49:04 | 1    A.   I don't think I have.

09:49:09 | 2    Q.   Okay.  Now with respect to the issues that

09:49:13 | 3  you were asked to address by the defense in this case,

09:49:16 | 4  which is the filter particle movement with a

09:49:19 | 5  subcategory of aerosols, temperature increase,

09:49:25 | 6  velocity, and a little bit of computational fluid

09:49:31 | 7  analysis --

09:49:31 | 8         Is that the word you used?

09:49:33 | 9    A.   I -- I believe that's the word I used.

09:49:35 | 10   Q.   Okay.  Is there anything else that you were

09:49:37 | 11 asked to do in this case?

09:49:39 | 12   A.   Not that I can recollect.

09:49:42 | 13   Q.   Okay.  Prior to doing any work, did you

09:49:44 | 14 prepare any protocols or methodologies with respect to

09:49:49 | 15 your analysis of these issues?

09:49:53 | 16   A.   Prior to being retained, is that the

09:49:55 | 17 question?

09:49:55 | 18   Q.   No.  After you had been retained but prior

09:49:58 | 19 to doing any testing or formulating your opinions.

09:50:03 | 20   A.   Could you repeat question, please?

09:50:05 | 21   Q.   Prior to formulating your opinions, did you

09:50:09 | 22 prepare any type of protocol or analysis on how you

09:50:20 | 23 would solve these issues?

09:50:23 | 24   A.   I did some literature review and also

09:50:26 | 25 reviewed some material provided by counsel.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

27

| | | |
|---|---|---|
| 09:50:28 | 1 | Q.  And you -- and also what? |
| 09:50:29 | 2 | A.  Provided by counsel. |
| 09:50:30 | 3 | Q.  So you did a literature review -- review? |
| 09:50:33 | 4 | A.  Yes. |
| 09:50:33 | 5 | Q.  On your own? |
| 09:50:34 | 6 | A.  Yes. |
| 09:50:35 | 7 | Q.  Okay.  And where did you do the literature |
| 09:50:37 | 8 | review? |
| 09:50:38 | 9 | A.  On my laptop. |
| 09:50:41 | 10 | Q.  Okay.  Did you Google or did you go to some |
| 09:50:45 | 11 | sort of a -- |
| 09:50:45 | 12 | A.  I used -- used Google. |
| 09:50:46 | 13 | Q.  Okay.  And how long did you spend doing |
| 09:50:47 | 14 | literature review? |
| 09:50:48 | 15 | A.  Probably not very long.  Maybe -- maybe an |
| 09:50:52 | 16 | hour or so. |
| 09:50:53 | 17 | Q.  One hour. |
| 09:50:54 | 18 | And what were your search terms, do you |
| 09:50:56 | 19 | recall? |
| 09:50:56 | 20 | A.  I'm -- I'm trying to recall what I was |
| 09:50:58 | 21 | searching for at that time. |
| 09:51:00 | 22 | Q.  Sitting here today, do you recall what you |
| 09:51:02 | 23 | were searching for at that time? |
| 09:51:02 | 24 | A.  Not off the top of my head. |
| 09:51:08 | 25 | Q.  Okay.  Did you print any of the research |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

28

09:51:13  1  that you found?

09:51:16  2      A.   I did not, because I don't have a printer at

09:51:19  3  home.

09:51:19  4      Q.   Okay.  Did you save any of them?

09:51:20  5      A.   Yes, I did.

09:51:21  6      Q.   Okay.  And you --

09:51:23  7           And do you recall any of the articles that

09:51:25  8  you saved?

09:51:25  9      A.   One of them was an article by Dr. Tsai and

09:51:30  10  Dr. Pui dealing with particle adhesion on surfaces.

09:51:36  11  Another one was a study done by some researchers in

09:51:42  12  the Netherlands on particle removal from surfaces.

09:51:47  13      Q.   Anything else?

09:51:49  14      A.   Those are the two that come to mind.

09:51:51  15      Q.   All the articles that you saved, are they

09:51:54  16  listed in your report under Exhibit E?

09:52:05  17      A.   They are -- I'm -- I'm --

09:52:07  18           They should be listed in the report

09:52:09  19  somewhere, whether -- which exhibit I -- I can't say.

09:52:11  20      Q.   Okay.

09:52:13  21      A.   They may be in the main -- main body of the

09:52:16  22  report, they may be in one of the exhibits, or maybe

09:52:19  23  both.

09:52:19  24      Q.   Did you do any literature search with

09:52:21  25  respect to Bair Hugger?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

29

09:52:21  1    A.    I think I did, just to get a -- a look --

09:52:27  2    look at the -- essentially the user's manual.

09:52:29  3    Q.    Did you look at anything else?

09:52:31  4    A.    Regarding Bair Hugger, that -- that's all

09:52:33  5    I -- I was looking at.

09:52:35  6    Q.    And the -- the three articles listed in

09:52:37  7    Exhibit E with respect to peer-reviewed literature

09:52:42  8    regarding the Bair Hugger, that was provided to you by

09:52:45  9    counsel; correct?

09:52:45  10   A.    I would have to see what they are to respond

09:52:47  11   to that.

09:52:48  12   Q.    The two Albrecht articles and the Reed

09:52:50  13   article.

09:52:51  14   A.    I believe they were all provided by counsel.

09:52:53  15   Q.    Okay.  Any other documents or literature

09:52:55  16   provided by counsel?

09:52:56  17   A.    Yes.

09:52:56  18   Q.    What?

09:52:57  19   A.    There was a report by -- filter testing that

09:53:02  20   3M had done.

09:53:03  21   Q.    I'm talking about peer-reviewed literature.

09:53:06  22   A.    Oh, peer-reviewed literature.  Not that I

09:53:21  23   can think of off the top of my head.

24   Q.    Okay.

09:53:28  25   A.    Well there -- there was a -- I should --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

30

09:53:31  1            There was a study that attempted to

09:53:35  2    correlate particle concentration versus biological

09:53:40  3    particle correlation.

09:53:40  4        Q.    Is that the DeRue study?

09:53:43  5        A.    That's not the first author I'm thinking of.

09:53:46  6        Q.    Stocks?

09:53:46  7        A.    Stocks, yes.

09:53:47  8        Q.    Okay.  When was that provided to you?

09:53:49  9        A.    I think it was on Friday.

09:53:51  10       Q.    This Friday?

09:53:52  11       A.    (Nodding.)

09:53:54  12       Q.    Okay.  Have you reviewed any of the expert

09:53:55  13   reports, defense expert reports?

09:53:57  14       A.    I have.

09:53:57  15       Q.    Okay.  Which ones?

09:54:03  16       A.    I'm sorry, you said defense expert reports.

09:54:06  17       Q.    Yes.

09:54:13  18       A.    I have reviewed some of the plaintiffs'

09:54:16  19   reports.

09:54:17  20       Q.    And I have a list in Exhibit E of what you

09:54:19  21   reviewed.

09:54:19  22       A.    Yeah.

09:54:19  23       Q.    I'm talking about defense experts.

09:54:26  24       A.    Not that I can recall right -- right at the

09:54:28  25   moment.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

31

| | | |
|---|---|---|
| 09:54:28 | 1 | Q.   Okay.  Do you know who -- |
| 09:54:30 | 2 | Do you know Jim Ho is an expert in this |
| 09:54:32 | 3 | case? |
| 09:54:32 | 4 | A.   Yes. |
| 09:54:32 | 5 | Q.   He's a friend of yours; correct? |
| 09:54:34 | 6 | A.   Yes. |
| 09:54:34 | 7 | Q.   Did you review his report? |
| 09:54:36 | 8 | A.   I have not seen his report. |
| 09:54:38 | 9 | Q.   Do you know who John Abraham is? |
| 09:54:40 | 10 | A.   Yes. |
| 09:54:41 | 11 | Q.   Do you know him personally? |
| 09:54:42 | 12 | A.   Yes. |
| 09:54:43 | 13 | Q.   He was a student at the University of |
| 09:54:45 | 14 | Minnesota; correct? |
| 09:54:45 | 15 | A.   Yes. |
| 09:54:46 | 16 | Q.   Did you ever teach any of his classes? |
| 09:54:48 | 17 | A.   I don't believe so. |
| 09:54:49 | 18 | Q.   Okay.  His focus was on heat transfer just |
| 09:54:52 | 19 | like you; correct? |
| 09:54:53 | 20 | A.   That's what I've been told by counsel. |
| 09:54:55 | 21 | Q.   Okay.  When was the last time you spoke with |
| 09:55:01 | 22 | John Abraham? |
| 09:55:05 | 23 | A.   Probably several years ago. |
| 09:55:05 | 24 | Q.   Did you teach -- |
| 09:55:06 | 25 | Do you recall teaching any of his classes? |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

32

| | | |
|---|---|---|
| 09:55:08 | 1 | A.   No, I do not. |
| 09:55:08 | 2 | Q.   Okay.  Do you know if he was an A student, B |
| 09:55:11 | 3 | student, C student? |
| 09:55:13 | 4 | A.   I -- I cannot recall that. |
| 09:55:14 | 5 | Q.   Okay.  Do you know who Gary Settles is? |
| 09:55:17 | 6 | A.   I do. |
| 09:55:18 | 7 | Q.   Personally? |
| 09:55:19 | 8 | A.   I -- I know of him.  I don't think I know |
| 09:55:21 | 9 | him personally. |
| 09:55:22 | 10 | Q.   Have you read his report? |
| 09:55:23 | 11 | A.   I have not. |
| 09:55:24 | 12 | Q.   Okay.  Do you know who Michael Keen is? |
| 09:55:40 | 13 | A.   I do not. |
| 09:55:41 | 14 | Q.   Okay.  Have you read his report? |
| 09:55:43 | 15 | A.   I have not. |
| 09:55:47 | 16 | Q.   So do any of these names sound familiar with |
| 09:55:52 | 17 | respect to reports that you've seen:  Abraham, Borak, |
| 09:55:59 | 18 | Hannenberg, Ho, Hulford, Hughes, Keen, Lampotang, |
| 09:56:06 | 19 | Mont, Settles, Ulatowski or Wenzel?  Have you seen any |
| 09:56:10 | 20 | of -- any of their reports? |
| 09:56:12 | 21 | A.   I have not seen any of those reports. |
| 09:56:14 | 22 | MR. ASSAAD:  Okay.  I'd like to mark your |
| 09:56:51 | 23 | report as -- |
| 09:56:54 | 24 | THE REPORTER:  Exhibit 1. |
| 09:56:55 | 25 | MR. ASSAAD:  -- 1. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

33

| | | |
|---|---|---|
| 09:57:11 | 1 | (Kuehn Exhibit 1 was marked for |
| 09:57:13 | 2 | identification.) |
| 09:57:13 | 3 | MR. ASSAAD:  And I'd like to mark as Exhibit |
| 09:57:19 | 4 | 2 the corrected version of Exhibit C. |
| 09:57:32 | 5 | (Kuehn Exhibit 2 was marked for |
| 09:57:41 | 6 | identification.) |
| 09:57:41 | 7 | BY MR. ASSAAD: |
| 09:57:41 | 8 | Q.   Now Dr. Kuehn, I represent to you that this |
| 09:57:43 | 9 | is an exact copy of the report that was provided to us |
| 09:57:47 | 10 | by counsel, as well -- which includes the report |
| 09:57:51 | 11 | Exhibits A, B, C, D and E as Exhibit 1, and Exhibit 2 |
| 09:57:57 | 12 | is the corrected Exhibit C.  Do you agree with me? |
| 09:58:00 | 13 | A.   Well I'll take your word for it. |
| 09:58:02 | 14 | Q.   Well I don't want you to take your word -- |
| 09:58:05 | 15 | my word for it.  I want it on the record that you |
| 09:58:08 | 16 | agree with me that Exhibit 1 and 2 is your report, |
| 09:58:09 | 17 | unless your counsel wants to stipulate to that. |
| 09:58:12 | 18 | MR. GOSS:  Do you want to just take a minute |
| 09:58:13 | 19 | to flip through it? |
| 09:58:14 | 20 | THE WITNESS:  Yeah.  I'd ask to take a look |
| 09:58:16 | 21 | to verify that. |
| 09:58:17 | 22 | MR. GOSS:  I have no reason to think it's |
| 09:58:19 | 23 | not a bad -- that it's not an accurate copy, but if |
| 09:58:22 | 24 | you want him on the record, he might as well take a |
| 09:58:24 | 25 | look. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

34

10:01:00   1        A.    Okay.  Yes, I agree this is an accurate

10:01:03   2   copy.

10:01:03   3        Q.    For the record, Exhibit 1 and Exhibit 2 is

10:01:06   4   an accurate copy of your report, Exhibits A, B, C, D

10:01:12   5   and E of your report; correct?  For Exhibit 1;

10:01:15   6   correct?

10:01:15   7        A.    With Exhibit 2 being the corrected Exhibit

10:01:18   8   C.

10:01:18   9        Q.    And Exhibit 2 is a corrected version of

10:01:21  10   Exhibit C that was provided to counsel on Friday, July

10:01:26  11   7th, 2017; correct?

10:01:27  12        A.    I believe that's when it was provided.

10:01:30  13        Q.    Okay.

10:01:30  14        A.    I do -- I do not know that.

10:01:32  15        Q.    Well when did you correct your report?

10:01:35  16        A.    Friday.

10:01:35  17        Q.    Okay.  So it couldn't have been provided --

10:01:37  18   provided to us earlier than Friday; correct?

10:01:40  19        A.    No.  Right.

10:01:40  20        Q.    Okay.  And therefore I assume that you

10:01:43  21   recently reviewed your entire report; correct?

10:01:45  22        A.    I -- I did look through it, yes.

10:01:47  23        Q.    Are there any other corrections, sitting

10:01:51  24   here today, that you'd want to inform me before we get

10:01:52  25   into your report?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

35

10:01:53  1     A.   No.

10:01:53  2     Q.   Okay.  So you believe at this point in time

10:01:55  3  that the report reflects all the opinions you intend

10:01:59  4  to offer to the court and to the jury in this matter;

10:02:03  5  correct?

10:02:03  6          MR. GOSS:  Object to form.

10:02:05  7          MR. ASSAAD:  Basis.

10:02:06  8          MR. GOSS:  Well, I think he left it open

10:02:09  9  that he may address new information as it becomes

10:02:14  10  available to him, as all the experts have.

10:02:22  11          MR. ASSAAD:  So what's your objection?

10:02:24  12          MR. GOSS:  Well, that you're closing the

10:02:28  13  door on him, and I think we intended to leave it open.

10:02:31  14     Q.   Dr. Kuehn, would you agree with me that your

10:02:34  15  report contains all the opinions you intend to offer

10:02:37  16  to the court and to the jury in this matter that

10:02:41  17  you're aware of at this time on the day of your

10:02:43  18  deposition?

10:02:46  19     A.   At this time of day, yes.

10:02:48  20     Q.   Okay.  Sitting here today at this point in

10:02:52  21  time, on July 10th, 2017 at 10:02 a.m., is there

10:02:57  22  anything that you want to add to your report or delete

10:03:00  23  from your report with respect to your opinions that

10:03:02  24  you will give in this case?

10:03:03  25     A.   Not at this time.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

36

10:03:04   1       Q.   Okay.  And you understand that I'm one of

10:03:08   2   the attorneys working on behalf of over 2,000 people

10:03:10   3   who have filed lawsuits alleging that they have been

10:03:13   4   harmed by the Bair Hugger.  You understand that;

10:03:16   5   correct?

10:03:16   6       A.   I have heard that, yes.

10:03:18   7       Q.   Okay.  And --

10:03:18   8            But you understand that; correct?

10:03:19   9       A.   Yes.

10:03:20  10       Q.   Okay.  And you understand that the

10:03:21  11   plaintiffs have a legal right to understand the full

10:03:24  12   scope of your opinions in this case.

10:03:26  13       A.   I believe so, yes.

10:03:27  14       Q.   Okay.  We also have the right to know all

10:03:30  15   the methodologies as to how you reached your opinions.

10:03:35  16   Do you understand that?

10:03:35  17       A.   Yes.

10:03:36  18       Q.   Now in reading your report, my understanding

10:03:56  19   is that your two main opinions are that the filter

10:04:03  20   that was selected for the Bair Hugger is appropriate

10:04:05  21   and that the Bair Hugger does not disrupt the airflow

10:04:08  22   in the operating room; is that correct?

10:04:10  23       A.   Those are two main opinions, yes.

10:04:14  24       Q.   Okay.  And now looking at your report, you

10:04:21  25   reviewed the -- the reports of Dan Koenigshofer, Said

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

37

10:04:33   1   Elghobashi, Michael Buck, Yadin David, William Jarvis

10:04:41   2   and Michael Stonnington; correct?

10:04:42   3        A.    That's correct.

10:04:43   4        Q.    And your rebuttal to those expert reports of

10:04:47   5   the plaintiffs' experts are contained from page nine

10:04:58   6   to page 16; correct?

10:05:03   7        A.    That's correct.

10:05:21   8        Q.    And with respect to pages one through eight,

10:05:50   9   those were the issues that you were asked to address

10:05:53  10   by the defendant that we talked about earlier;

10:05:56  11   correct?

10:05:56  12        A.    Including the top of page nine, yes.

10:05:59  13        Q.    Okay.   Do you recall receiving a subpoena in

10:06:19  14   this case?

10:06:19  15        A.    Yes, I do.

10:06:21  16        Q.    Okay.   Did you produce all the documents

10:06:32  17   requested in the subpoena to Blackwell Burke?

10:06:39  18        A.    If I could take a look at the subpoena

10:06:41  19   again, I could answer that.

10:06:52  20             (Kuehn Exhibit 3 was marked for

10:06:53  21             identification.)

10:06:54  22   BY MR. ASSAAD:

10:06:57  23        Q.    Exhibit 3 is a subpoena issued on June 7th,

10:07:03  24   2017 to Dr. Kuehn in this case.   Do you recall

10:07:09  25   receiving this subpoena?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

38

10:07:10   1      A.   Yes, I do.

10:07:15   2      Q.   Now before we get to the subpoena, did you

10:07:17   3   create any notes, handwritten notes in this case?

10:07:21   4      A.   I did.

10:07:22   5      Q.   Okay.  Were they notes that you created

10:07:29   6   while you were formulating your opinions?

10:07:31   7      A.   Yes.

10:07:32   8      Q.   Did you also create notes with regard --

10:07:35   9   with respect to conversations you had with counsel?

10:07:39  10      A.   Yes.

10:07:40  11      Q.   Okay.  Are they on a separate notebook or on

10:07:43  12   the same notebook?

10:07:44  13      A.   Same notebook.

10:07:45  14      Q.   Okay.  Do you have that notebook here with

10:07:47  15   you today?

10:07:47  16      A.   I do not, no.

10:07:48  17      Q.   Did you bring anything with you today?

10:07:50  18      A.   I did not.

10:07:51  19      Q.   Why not?

10:07:52  20      A.   My impression was that the opposing attorney

10:07:57  21   would provide all the documents necessary.

10:08:01  22      Q.   Well if -- if you have an article that may

10:08:05  23   support your opinion that you want to refer to,

10:08:08  24   wouldn't it be helpful if you had it here today when

10:08:11  25   you're expressing all your opinions today?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

39

| | | |
|---|---|---|
| 10:08:13 | 1 | MR. GOSS:  Object to form. |
| 10:08:14 | 2 | A.   If I had to dig down into the details and -- |
| 10:08:18 | 3 | and go back and look at where I obtained some of my |
| 10:08:22 | 4 | information, that would be helpful. |
| 10:08:23 | 5 | Q.   Okay.  So you agree with me it would be |
| 10:08:29 | 6 | helpful. |
| 10:08:29 | 7 | A.   Yes. |
| 10:08:30 | 8 | Q.   Okay.  So it's clear that you have -- |
| 10:08:48 | 9 | Do you have notes that you created on a |
| 10:08:50 | 10 | computer, like on a Word document or Excel sheet? |
| 10:08:52 | 11 | A.   I do not. |
| 10:08:53 | 12 | Q.   Okay.  They're all handwritten notes -- |
| 10:08:56 | 13 | A.   Yeah. |
| 10:08:57 | 14 | Q.   -- that you created? |
| 10:08:58 | 15 | Okay.  Let's go through the subpoena.  If |
| 10:09:01 | 16 | you go to page four of Exhibit 3, -- |
| 10:09:25 | 17 | Page four. |
| 10:09:30 | 18 | A.   Uh-huh. |
| 10:09:31 | 19 | Q.   -- do you recall seeing this list of |
| 10:09:33 | 20 | documents to be produced, items one through 18? |
| 10:09:37 | 21 | A.   I have. |
| 10:09:38 | 22 | Q.   Did you go through all the list and produce |
| 10:09:41 | 23 | documents to your counsel? |
| 10:09:42 | 24 | A.   I did. |
| 10:09:43 | 25 | Q.   Okay.  Did you produce your notes to your |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

40

10:09:46    1    counsel?

10:09:46    2         A.    I did.

10:09:47    3         Q.    You produced your invoices; correct?

10:09:50    4         A.    Yes.

10:09:50    5         Q.    Number one, "All documents reviewed by the

10:09:54    6    deponent in anticipation or in preparation for this

10:09:56    7    deposition."  Did you produce those to your counselor?

10:09:59    8         A.    I did.

10:10:00    9         Q.    What documents were those?

10:10:02   10         A.    Those include the -- some of the papers I

10:10:10   11    found online that I mentioned before, the books I used

10:10:14   12    as reference books, and also the -- the documents

10:10:22   13    provided by -- by counsel.

10:10:24   14         Q.    Okay.  If you go to Exhibit E of Exhibit 1,

10:10:32   15    which is a list of the materials considered, is there

10:10:50   16    anything on that list that you provided to -- that are

10:10:54   17    responsive to item number one of Exhibit 3 that is not

10:11:02   18    on this list?

10:11:06   19         A.    Anything I provided that's not on the list,

10:11:08   20    is that the question?

10:11:08   21         Q.    Yes.

10:11:37   22         A.    I think that covers everything.

10:11:38   23         Q.    Okay.  So you haven't reviewed anything

10:11:42   24    besides what's on this list in preparation for your

10:11:48   25    deposition or anticipation of litigation.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

41

| | | | |
|---|---|---|---|
| 10:11:51 | 1 | A. | I don't believe so. |
| 10:11:52 | 2 | Q. | Okay. |
| 10:11:53 | 3 | | MR. GOSS:  I think he said -- |
| 10:11:56 | 4 | | MR. ASSAAD:  I'm going to get there in a |
| 10:11:56 | 5 | second.  We're going. |

10:11:51   1      A.   I don't believe so.

10:11:52   2      Q.   Okay.

10:11:53   3           MR. GOSS:  I think he said --

10:11:56   4           MR. ASSAAD:  I'm going to get there in a

10:11:56   5   second.  We're going.

10:11:57   6           MR. GOSS:  Okay.

10:11:57   7      Q.   Besides the Stocks document; correct?

10:11:59   8      A.   Yes.

10:12:00   9      Q.   Okay.  Any other documents that were

10:12:03   10  provided to you by counsel except the Stocks document

10:12:06   11  provided on Friday that you reviewed?

10:12:08   12     A.   That's -- that's not on this list; --

10:12:11   13     Q.   Yes.

10:12:11   14     A.   -- correct?

10:12:12   15          That's the only one I can think of.

10:12:14   16     Q.   Did --

10:12:14   17          Were there any documents that you reviewed

10:12:16   18  on Friday that's on this list?

10:12:21   19     A.   I think there was a 3M data test report by

10:12:25   20  Winston Tan, which is about midway down on the first

10:12:28   21  page of Exhibit E.

10:12:29   22     Q.   And that's the filter testing; correct?

10:12:30   23     A.   Yes.

10:12:31   24     Q.   Okay.  Anything else?

10:12:32   25     A.   Those were the two that we looked at on --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

42

10:12:37    1    on Friday.

10:12:37    2         Q.   Have you ever designed a filter?

10:12:40    3         A.   I have not designed a filter from scratch,

10:12:43    4    no.

10:12:43    5         Q.   Okay.  Well when you say you haven't

10:13:11    6    designed a filter from scratch, have you done any type

10:13:14    7    of design of a filter?

10:13:15    8         A.   Yes.

10:13:21    9         Q.   What?

10:13:23   10         A.   I helped design a device that would behave

10:13:26   11    as a filter but is not using normal fibrous media, but

10:13:30   12    the output would be the same or very similar to a

10:13:32   13    fibrous-media filter.

10:13:33   14         Q.   What was that, a synthetic media?

10:13:35   15         A.   It was actually using three parallel-stage

10:13:38   16    impactors that could be put into an ASHRAE 52.2 test

10:13:44   17    facility such that it could be replicated very

10:13:48   18    precisely, used in different laboratories to help

10:13:54   19    inter -- interlaboratory test results to assume they

10:13:57   20    were more uniform -- to make them more uniform.

10:14:00   21         Q.   You need to speak up a bit for the camera

10:14:04   22    though.

10:14:04   23         A.   Okay.

10:14:04   24         Q.   Because I'm having trouble hearing you,

10:14:05   25    so --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

43

10:14:06   1        A.    Okay.

10:14:07   2        Q.    Is that the only time you've ever designed a

10:14:10   3   filter-type like device?

10:14:11   4        A.    That's my recollection, yes.

10:14:12   5        Q.    Okay.  With respect to number two, are there

10:14:26   6   any correspondence between you and anyone besides

10:14:29   7   Blackwell Burke or any of the attorneys from 3M?

10:14:33   8        A.    No.

10:14:33   9        Q.    Okay.  How many pages of notes do you have?

10:14:40  10        A.    Perhaps 30 or 40.

10:14:42  11        Q.    Thirty or 40 pages.  And you gave them to

10:14:46  12   Mr. Goss?

10:14:46  13        A.    I did.

10:14:47  14        Q.    When did you give it to him?

10:14:49  15        A.    A few weeks ago.

10:14:50  16        Q.    Okay.  And out of those 30 or 40 pages, how

10:14:55  17   many pages dealt with actual conversations you had

10:14:57  18   with Mr. Goss?

10:14:59  19        A.    Maybe one or two.

10:15:02  20        Q.    One or two pages.  Okay.

10:15:04  21              With respect to the conversations you had

10:15:11  22   with Mr. Goss, were there any facts that you relied

10:15:16  23   upon in formulating your opinions?

10:15:21  24        A.    I would -- I would answer that as -- as no.

10:15:24  25   All -- all the facts I developed myself --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

44

```
10:15:28   1        Q.    Okay.
10:15:29   2        A.    -- or -- or found in the literature or
10:15:31   3   other -- other materials provided to me.
10:15:33   4        Q.    So all the facts that you relied upon are
10:15:36   5   contained in your report and in Exhibit E of
10:15:39   6   Exhibit 1.
10:15:40   7        A.    That's correct.
10:15:40   8        Q.    Okay.  There's nothing that Mr. Goss --
10:15:44   9        You never asked Mr. Goss a question with
10:15:46  10   respect to a certain issue that you relied upon.
10:15:50  11        A.    Not without getting some other documentation
10:15:52  12   that would satisfy my question.
10:15:53  13        Q.    Such as?
10:15:55  14        Did you ask a question of Mr. Goss and he
10:15:57  15   provided you information through a document?
10:15:59  16        A.    I asked about how a typical Bair Hugger
10:16:03  17   setup would -- would be used in a -- or how it would
10:16:06  18   be set up in an operating room, and I was provided
10:16:09  19   photographs of how -- how the Bair Hugger would be set
10:16:11  20   up in a typical patient.
10:16:12  21        Q.    So he provided you photographs.
10:16:14  22        A.    Yes.
10:16:14  23        Q.    Okay.  Where are those photographs?  Are
10:16:16  24   they listed in Exhibit E?
10:16:17  25        A.    No, they're not.
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

45

10:16:20  1       Q.    Okay.  Did you produce them back to Doc --

10:16:24  2   Mr. Goss in response to your exhibit -- or in response

10:16:28  3   to the subpoena, Exhibit 3?

10:16:29  4       A.    They were provided me on Friday.

10:16:31  5       Q.    They were provided to you on Friday.

10:16:34  6       A.    On Friday, yes.

10:16:34  7       Q.    So it's my understanding that you did -- you

10:16:36  8   did not know how a Bair Hugger was set up in an

10:16:38  9   operating room before this Friday, July 8th -- July

10:16:43  10  7th, 2017.

10:16:45  11      A.    I wanted to have additional documentation

10:16:51  12  that I had reviewed prior to coming here today that I

10:16:54  13  could say, yes, I understand how a Bair Hugger is to

10:16:56  14  be set up properly in an operating room.

10:16:58  15      Q.    And how many pictures did he send over to

10:17:01  16  you?

10:17:01  17      A.    Approximately six.

10:17:02  18      Q.    Okay.  And where were those pictures taken?

10:17:04  19      A.    I do not know.

10:17:05  20           MR. GOSS:  These are the draping pictures

10:17:09  21  that Dr. Mont used in his Science Day presentation,

10:17:14  22  and we can send them over.

10:17:16  23           MR. ASSAAD:  Can you please send over the

10:17:17  24  notes as well?

10:17:19  25           MR. GOSS:  I will review that with the team.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

46

10:17:21  1   That call was made when I was out of the country.

10:17:26  2       Q.   Did you rely on those notes to prepare

10:17:28  3   your -- your report?

10:17:30  4       A.   I -- I did the background work in the -- in

10:17:34  5   the notes and then used those to prepare the report,

10:17:38  6   yes.

10:17:38  7       Q.   Okay.  Now your report is -- your report is

10:17:41  8   only 16 pages; correct?

10:17:50  9       A.   Well I should say the report and exhibits.

10:17:53  10      Q.   Okay.  And you have 30 pages of notes at

10:17:58  11  least.

10:17:58  12      A.   That's my approximation.

10:18:00  13      Q.   Was it on an engineering notebook pad or was

10:18:03  14  it a regular like legal pad?

10:18:06  15      A.   It's on a bound engineering notebook.

10:18:09  16      Q.   Okay.  Did you make any marks on any of the

10:18:27  17  documents you reviewed in Exhibit E of Exhibit 1?

10:18:31  18      A.   Some of the documents provided by counsel I

10:18:34  19  did.

10:18:34  20      Q.   Okay.  Did you provide those to your

10:18:37  21  counsel?

10:18:37  22      A.   I did.

10:18:38  23      Q.   Okay.  By the way, are you being represented

10:18:40  24  by Blackwell Burke today?

10:18:43  25      A.   My understanding is I'm here serving as an

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

47

10:18:46  1   expert witness on the case and not -- not being

10:18:52  2   personally represented.

10:18:52  3        Q.    Okay.  So now we know you have notes on --

10:19:00  4   with respect to the item number four of Exhibit 3.

10:19:03  5   There's notes -- there's handwritten notes on

10:19:05  6   documents that you reviewed that you provided to

10:19:06  7   counsel; correct?

10:19:07  8        A.    That's correct.

10:19:08  9        Q.    With respect to item number five, do you

10:19:16  10  have any documents responsive to number five?

10:19:19  11       A.    You're referring back to the subpoena?

10:19:20  12       Q.    Yes.

10:19:48  13       A.    The -- the two papers I referred to earlier

10:19:51  14  by Tsai and the -- the Dutch researchers, I have an

10:20:03  15  electronic form on my computer.  I do not recall if I

10:20:08  16  have provided copies to counsel of those.

10:20:13  17       Q.    With respect to six and seven, "A list of

10:20:18  18  all books" -- well strike that.

10:20:21  19            With respect to item six of Exhibit 3, "A

10:20:23  20  list of all books, treatises, and arti -- articles

10:20:26  21  authored or co-authored by the deponent," that would

10:20:29  22  be in your CV; correct?

10:20:31  23       A.    That's correct.

10:20:31  24       Q.    Okay.  With respect to number seven, "A list

10:20:34  25  of all books, treatises, articles, publications, or

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

48

10:20:38  1  materials which the deponent considers authoritative

10:20:42  2  with regard to the deponent's opinions in this case,"

10:20:45  3  would that be in Exhibit E of your report?

10:20:47  4       A.   I'm -- I'm sorry, I'm trying to follow

10:20:50  5  where -- where you are.

10:20:51  6       Q.   Number seven.

10:20:52  7       A.   On which --

10:20:53  8       Q.   Page four of Exhibit 3, number seven.  I'm

10:21:00  9  going down the list.

10:21:09  10       A.   Okay, number seven.  I provided everything

10:21:21  11  that I used in preparing my -- my report, yes.

10:21:24  12       Q.   And you consider all those items

10:21:26  13  authoritative.

10:21:26  14       A.   Yes.

10:21:27  15       Q.   Do you consider the ASHRAE manuals and --

10:21:30  16  and papers authoritative?

10:21:31  17       A.   As engineering best practice, yes.

10:21:36  18       Q.   So you consider it authoritative.

10:21:37  19       A.   Yes.

10:21:38  20       Q.   Number 10 states, "An itemized list of time,

10:21:49  21  charges, and expenses for services or opinions

10:21:52  22  rendered in this case, including an itemization for

10:21:55  23  said services performed by any person employed by the

10:21:58  24  deponent in this case."  Did you produce all those to

10:22:02  25  your -- to counsel?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

49

| | | |
|---|---|---|
| 10:22:03 | 1 | A.  As of early June I did, yes. |
| 10:22:05 | 2 | Q.  Okay. |
| 10:22:06 | 3 | A.  Not since then. |
| 10:22:22 | 4 | (Kuehn Exhibit 4 was marked for |
| | 5 | identification.) |
| | 6 | BY MR. ASSAAD: |
| 10:22:26 | 7 | Q.  Exhibit 4 I represent are three invoices |
| 10:22:29 | 8 | provided to the plaintiffs in response to our subpoena |
| 10:22:35 | 9 | to you.  Do you recognize these three pages? |
| 10:22:59 | 10 | A.  Yes, I do. |
| 10:23:00 | 11 | Q.  You guess you do? |
| 10:23:01 | 12 | A.  Yes, I do. |
| 10:23:03 | 13 | Q.  Oh, yes, you do.  I'm sorry.  I thought you |
| 10:23:06 | 14 | said "I guess I do." |
| 10:23:07 | 15 | Okay.  Are you aware that out of all the |
| 10:23:09 | 16 | documents that we have been talk -- discussing, that |
| 10:23:14 | 17 | these are the only three pages provided by your |
| 10:23:17 | 18 | counsel in response to the subpoena to plaintiffs? |
| 10:23:19 | 19 | A.  I have no idea of that. |
| 10:23:21 | 20 | Q.  Okay.  All right.  You mentioned you spent |
| 10:23:32 | 21 | an hour doing independent research.  Where is that on |
| 10:23:38 | 22 | any of these invoices that you did in the beginning of |
| 10:23:41 | 23 | the case? |
| 10:23:52 | 24 | A.  I think I submitted an invoice for the month |
| 10:23:57 | 25 | of March, which is not included in here, which may |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

50

10:24:02  1   have in -- included that.  Or perhaps when I'm saying

10:24:06  2   "Continue work on expert report," that may have

10:24:08  3   included some -- some online searching for

10:24:11  4   documents --

10:24:11  5        Q.   Okay.

10:24:11  6        A.   -- in the -- in the April invoice.

10:24:28  7        Q.   So these are not all the invoices you -- you

10:24:41  8   have created in this case.

10:24:43  9        A.   I recall submitting one for the month of

10:24:46  10  March, which I do not see here.

10:24:48  11       Q.   Do you remember how many hours that was?

10:24:49  12       A.   I do not remember off the top of my head.

10:24:51  13       Q.   Okay.  And the last invoice you have is

10:24:55  14  invoice date of July 12th for the month of June;

10:24:58  15  correct?

10:24:58  16       A.   I think that may be a -- an incorrect date.

10:25:06  17  That may have been June 12th --

10:25:07  18       Q.   Okay.

10:25:09  19       A.   -- instead of --

10:25:10  20            Yeah.  If you look up in the first line it

10:25:12  21  says 6/1/2017.

10:25:15  22       Q.   Okay.  Have you provided any other invoices

10:25:20  23  since then?

10:25:20  24       A.   I have not.

10:25:21  25       Q.   How many hours have you billed for the month

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

51

10:25:25   1   of July, to your recollection?

10:25:28   2       A.   I have not billed anything since this.

10:25:29   3       Q.   How many hours have you worked on this case

10:25:31   4   in the month of July?

10:25:32   5       A.   I would estimate maybe 15 to 20.

10:25:36   6       Q.   Fifteen.  And that was in the preparation of

10:25:39   7   your deposition; correct?

10:25:40   8       A.   I don't recall when I actually submitted

10:25:44   9   the -- the expert report, if that included July or if

10:25:47   10  that was done in June.  I do not know if the July time

10:25:51   11  included any expert-report preparation or if it's

10:25:55   12  simply preparing for the deposition.

10:25:56   13      Q.   Well I state for the record that your

10:25:58   14  expert re --

10:25:59   15           Well if you look at Exhibit 1, your expert

10:26:01   16  report was signed on June 1st, 2017.

10:26:03   17      A.   Okay.  Then -- then I did not spend time on

10:26:08   18  the expert report in July.  I was simply preparing for

10:26:09   19  the deposition.

10:26:09   20      Q.   Okay.  So the whole time in July, all the

10:26:12   21  hours you worked on this case and will submit to

10:26:15   22  defense counsel was in preparation of your deposition;

10:26:18   23  correct?

10:26:18   24      A.   And also reviewing the report and -- yes.

10:26:22   25      Q.   Your report.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

52

| | | |
|---|---|---|
| 10:26:23 | 1 | A.   Yes. |
| 10:26:25 | 2 | Q.   You haven't read any other reports in |
| 10:26:29 | 3 | preparation for this deposition; correct? |
| 10:26:29 | 4 | A.   Yes.  I -- |
| 10:26:30 | 5 | Well no -- no defense reports. |
| 10:26:33 | 6 | Q.   You reviewed some of the plaintiffs' |
| 10:26:35 | 7 | reports? |
| 10:26:35 | 8 | A.   Yes. |
| 10:26:35 | 9 | Q.   Whose? |
| 10:26:36 | 10 | A.   Koenigshofer's, I don't remember when I did |
| 10:26:42 | 11 | that, Buck, Elghobashi.  Those are the main three. |
| 10:26:47 | 12 | Also reviewed a few others. |
| 10:26:50 | 13 | MR. GOSS:  Are you asking just in July? |
| 10:26:53 | 14 | MR. ASSAAD:  In preparation for today's |
| 10:26:55 | 15 | deposition. |
| 10:26:56 | 16 | A.   I think there's a total of maybe six or |
| 10:27:00 | 17 | seven I looked at altogether. |
| 10:27:02 | 18 | Q.   Do you know Dr. Elghobashi? |
| 10:27:04 | 19 | A.   I've heard of him.  I do not know him. |
| 10:27:08 | 20 | Q.   Okay.  Have you ever heard of the Elghobashi |
| 10:27:10 | 21 | Map? |
| 10:27:11 | 22 | A.   I have not heard of that. |
| 10:27:13 | 23 | Q.   Okay.  Do you know what coupling is with |
| 10:27:15 | 24 | respect to particle movement? |
| 10:27:16 | 25 | A.   I -- I would say I -- prob -- |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

53

| | | |
|---|---|---|
| 10:27:24 | 1 | Probably not. |
| 10:27:24 | 2 | Q.   Okay.  Do you know who Lagrange is? |
| 10:27:28 | 3 | A.   Yes. |
| 10:27:30 | 4 | Q.   And Mueller? |
| 10:27:30 | 5 | A.   Yes. |
| 10:27:30 | 6 | Q.   Have you ever heard the term boussinesq? |
| 10:27:34 | 7 | A.   Yes. |
| 10:27:34 | 8 | Q.   What's your understan -- what's your |
| 10:27:36 | 9 | understanding of boussinesq? |
| 10:27:37 | 10 | A.   It's a simplified approximation for -- for |
| 10:27:40 | 11 | fluid mechanics. |
| 10:27:41 | 12 | Q.   With respect to what? |
| 10:27:42 | 13 | A.   I believe it's assuming the fluid properties |
| 10:27:48 | 14 | are constant. |
| 10:27:49 | 15 | Q.   Excuse me? |
| 10:27:50 | 16 | A.   Assuming the fluid properties are constant. |
| 10:27:52 | 17 | Q.   What property of fluids? |
| 10:27:54 | 18 | A.   I think it's both density and viscosity. |
| 10:28:00 | 19 | Q.   When is the last time you used the |
| 10:28:05 | 20 | boussinesq approach in solving problems? |
| 10:28:07 | 21 | A.   It's probably a long time ago, maybe 20 -- |
| 10:28:09 | 22 | 20 years ago. |
| 10:28:10 | 23 | Q.   Do you know the limitations of the |
| 10:28:12 | 24 | boussinesq approach? |
| 10:28:14 | 25 | A.   I know they're not valid when there's large |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

54

10:28:17  1  temperature gradients, which -- which changes both

10:28:19  2  density and viscosity.

10:28:20  3      Q.  What would you consider a large temperature

10:28:23  4  gradient?

10:28:23  5      A.  In -- in -- mostly in -- in liquids, because

10:28:27  6  the viscosity is much stronger a function of

10:28:30  7  temperature than it is of, say, gases.

10:28:32  8      Q.  I understand.  But what would you consider a

10:28:34  9  large temperature gradient?

10:28:36  10     A.  In liquids, for example in water, maybe

10:28:39  11  something more than 20 or 30 degrees Fahrenheit.

10:28:41  12     Q.  How about gas?

10:28:43  13     A.  Gas is a probably much higher temperature

10:28:48  14  because the viscosity and density are not nearly as --

10:28:51  15  as temperature-dependent.  I would say maybe 50 to a

10:28:55  16  hundred.

10:28:56  17     Q.  Okay.  Is that a guess or is that based

10:29:02  18  on --

10:29:02  19     A.  That's --

10:29:03  20     Q.  -- any document or research that you've

10:29:06  21  done?

10:29:06  22     A.  That's -- that's an estimate based on my

10:29:11  23  experience.

10:29:11  24     Q.  Can you point me to a literature or

10:29:13  25  peer-reviewed article that supports that statement?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

55

10:29:15  1       A.   I could probably find documentation of that

10:29:22  2   in a -- a good fluid mechanics textbook.

10:29:25  3       Q.   Okay.

10:29:39  4            MR. GOSS:  We've been going about an hour.

10:29:41  5   Do you want to take a quick break?

10:29:43  6            MR. ASSAAD:  Give me five minutes.

10:29:45  7            MR. GOSS:  No problem.

10:29:47  8       Q.   Do you know Dan Koenigshofer?

10:29:49  9       A.   I do not.

10:29:50  10      Q.   Do you know Michael Buck?

10:29:52  11      A.   I may have run across him at the university,

10:29:55  12  but no, I really don't know him.

10:29:57  13      Q.   He works with Andy Streifel.  Do you know

10:30:01  14  him?

10:30:03  15      A.   I do know Andy, yes.

10:30:03  16      Q.   Do you know him very well?

10:30:04  17      A.   Reasonably well.  We've worked together from

10:30:06  18  time to time in the past.

10:30:07  19      Q.   Okay.  With respect to using the boussinesq

10:30:23  20  approach, are you aware of what ANSYS, Fluent or CFX

10:30:29  21  states in their manuals with respect to using that

10:30:32  22  approach?

10:30:32  23      A.   I do not know that.

10:30:33  24      Q.   Okay.  Would you be surprised that they

10:30:36  25  consider a gradient greater than three or four degrees

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

56

| | | |
|---|---|---|
| 10:30:40 | 1 | Celsius with respect to using particle flow, that that |
| 10:30:43 | 2 | would be too large of a gradient with respect to using |
| 10:30:47 | 3 | the boussinesq approach? |
| 10:30:49 | 4 | A.   Based on my experience, that seems to be |
| 10:30:51 | 5 | overly restrictive. |
| 10:30:53 | 6 | Q.   Okay.  When is the last -- |
| 10:30:56 | 7 | Well your experience has been over 25 years |
| 10:30:59 | 8 | using the boussinesq approach; correct? |
| 10:31:01 | 9 | A.   Yes. |
| 10:31:04 | 10 | Q.   With respect to item number nine on Exhibit |
| 10:31:11 | 11 | 3, the subpoena, there's no engagement agreement |
| 10:31:15 | 12 | between you and Blackwell Burke or 3M; correct? |
| 10:31:18 | 13 | A.   Can you define "engagement agreement?" |
| 10:31:22 | 14 | Q.   No written document or contract between you |
| 10:31:24 | 15 | two. |
| 10:31:24 | 16 | A.   It's -- it's a verbal agreement. |
| 10:31:26 | 17 | Q.   Okay.  Do you have any correspondence at all |
| 10:31:33 | 18 | with either defense counsel or anyone else in this |
| 10:31:36 | 19 | case?  And that includes e-mails. |
| 10:31:40 | 20 | A.   There are some e-mail correspondence between |
| 10:31:41 | 21 | myself and counsel. |
| 10:31:43 | 22 | Q.   Okay.  But no one else besides counsel. |
| 10:31:47 | 23 | A.   No. |
| 10:31:47 | 24 | Q.   Besides the six photographs that were |
| 10:31:57 | 25 | provided to you on Friday, five or six photographs, |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

57

| | | |
|---|---|---|
| 10:31:59 | 1 | any other photographs provided to you? |
| 10:32:01 | 2 | A.  Not other than the ones that are included in |
| 10:32:07 | 3 | one of my exhibits. |
| 10:32:08 | 4 | Q.  Okay.  Who took those pictures in the |
| 10:32:11 | 5 | exhibits? |
| 10:32:11 | 6 | A.  Oh, it was either Peter or -- or Vinita. |
| 10:32:16 | 7 | Q.  Who is Vinita? |
| 10:32:17 | 8 | A.  Vinita is one of the lawyers in Blackwell |
| 10:32:20 | 9 | Burke's office. |
| 10:32:21 | 10 | MR. GOSS:  She's an associate in my office. |
| 10:32:23 | 11 | MR. ASSAAD:  Okay. |
| 10:32:23 | 12 | MR. GOSS:  She will be here later, after |
| 10:32:26 | 13 | lunch. |
| 10:32:26 | 14 | MR. ASSAAD:  Okay. |
| 10:32:27 | 15 | Q.  Was anyone else in the room in Exhibit D? |
| 10:32:30 | 16 | A.  No, just the three of us. |
| 10:32:30 | 17 | Q.  Okay.  Where -- where did that Exhibit D, |
| 10:32:32 | 18 | where did that occur? |
| 10:32:34 | 19 | A.  That occurred in the 3M laboratory. |
| 10:32:36 | 20 | Q.  Okay.  So it happened in a 3M laboratory |
| 10:32:38 | 21 | in -- |
| 10:32:38 | 22 | A.  Yes. |
| 10:32:39 | 23 | Q.  -- St. Paul? |
| 10:32:39 | 24 | A.  Yes. |
| 10:32:43 | 25 | Q.  Okay.  I take it you had no communications |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

58

10:32:48  1  with any other experts in this case, defense experts.

10:32:53  2      A.  I have not communicated with anybody other

10:32:55  3  than defense -- other than counsel I should say.

10:32:59  4      Q.  Is there any agreements for you to perform

10:33:01  5  any other work in this case besides formulating your

10:33:04  6  opinions that are outlined in Exhibit 1 and 2?

10:33:10  7      A.  I would anticipate as additional information

10:33:13  8  becomes available I would be asked to perform

10:33:15  9  additional services.

10:33:17  10      Q.  Such as what additional information?

10:33:19  11      A.  Perhaps reviewing additional depositions or

10:33:21  12  other -- other documents that may come forward.

10:33:34  13      Q.  Are you aware that general causation

10:33:37  14  discovery is closed in this case?

10:33:40  15          Do you know what that means?

10:33:41  16      A.  I -- I'm not -- not aware of that.

10:33:44  17      Q.  You know what general --

10:33:45  18          You know what discovery is; correct?

10:33:46  19      A.  Yes.

10:33:47  20      Q.  You're familiar with lawsuits; correct?

10:33:48  21      A.  Yes.

10:33:50  22      Q.  Have you ever been sued yourself?

10:33:51  23      A.  No.

10:33:51  24      Q.  Have you ever sued anybody?

10:33:52  25      A.  No.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

59

10:33:53 1    Q.   Okay.  Discovery has been closed in this

10:33:56 2  case for a few months now; correct?  Are you aware of

10:33:58 3  that?

10:33:59 4    A.   I -- I'm not aware of the legal terms, no.

10:34:01 5    Q.   Okay.  Is there anything specific with

10:34:11 6  respect to patients that would change your opinions in

10:34:14 7  this case?

10:34:18 8    A.   Could you re -- repeat the question?

10:34:21 9    Q.   Well you talked about getting new

10:34:22 10 information, you know, you might ask to be -- offered

10:34:27 11 some potential new information, so I'm trying to

10:34:27 12 figure out what type of information might affect your

10:34:30 13 opinions.  So my first question is:  Anything specific

10:34:34 14 to a patient's medical records that might affect or

10:34:37 15 change your opinions in this case?

10:34:38 16   A.   I -- I'm going under the assumption that the

10:34:41 17 only additional information provided would be, for

10:34:44 18 example, a deposition from someone.

10:34:45 19   Q.   Okay.  What in a deposition might affect

10:34:49 20 your opinions in this case?

10:34:50 21   A.   It's difficult for me to say without reading

10:34:54 22 the deposition.

10:34:54 23   Q.   Okay.  Do you feel that you have all the

10:35:02 24 information necessary to support your opinions in this

10:35:09 25 case?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

60

10:35:10    1        A.    I think I do.

10:35:11    2        Q.    Okay.  You -- you agree that the good

10:35:33    3    engineering approach in attacking an issue is to study

10:35:37    4    the issue extensively; correct?

10:35:43    5        A.    Engineers always have restrictions on time

10:35:46    6    and resources, so one does the best one can under the

10:35:50    7    existing circumstances.

10:35:51    8        Q.    Did you have any restrictions on your time

10:35:53    9    by 3M or Blackwell Burke?

10:35:55   10        A.    I did not.

10:35:57   11        Q.    So you could have spent as much time as you

10:35:59   12    want or you felt necessary to research the issues in

10:36:02   13    this case; correct?

10:36:03   14        A.    That's correct.

10:36:04   15        Q.    Okay.  Could you -- would --

10:36:06   16              Could you have asked a graduate student or

10:36:09   17    a -- a researcher to assist you in this case?

10:36:11   18        A.    I didn't think that was appropriate.

10:36:13   19        Q.    Why not?

10:36:14   20        A.    Because I was the one retained as an expert

10:36:16   21    witness and not a -- not a graduate student.

10:36:18   22        Q.    I understand that.  But you've also written

10:36:21   23    many papers and used graduate students to help you do

10:36:24   24    the research; correct?

10:36:25   25        A.    Yes, but that's not a litigation process.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

61

10:36:27  1      Q.   But you rely on -- on your graduate

10:36:29  2  students; correct?

10:36:30  3      A.   For the research they do in the laboratory,

10:36:31  4  yes.

10:36:31  5      Q.   Or to do any type of research review;

10:36:35  6  correct?

10:36:35  7      A.   Under my direction, yes.

10:36:38  8      Q.   For example, when you attack a new problem,

10:36:41  9  you want to review and obtain all the peer-reviewed

10:36:45  10  literature, relevant literature on that issue to see

10:36:47  11  what other people have done; correct?

10:36:49  12      A.   As much as is reasonably possible, yes.

10:36:52  13      Q.   Did you do that in this case?

10:36:54  14      A.   Other than some keyword searches, I did not

10:36:59  15  do a very exhaustive search, no.

10:37:00  16      Q.   You relied on what 3M provided you; correct?

10:37:03  17      A.   That, and some of the work -- some of the

10:37:05  18  searching I did on my own.

10:37:07  19      Q.   Well what we talked about today, those two

10:37:09  20  articles; correct?

10:37:10  21      A.   Those were the two that I thought were the

10:37:12  22  most relevant to support my opinions.

10:37:14  23      Q.   What other articles did you think that were

10:37:16  24  relevant but not the most relevant?

10:37:18  25      A.   There were a number of articles on particle

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

62

10:37:21  1  deposition, particle removal, filtration that I didn't

10:37:25  2  think were as relevant, so I did not include them.

10:37:27  3       Q.   With respect to the use of the Bair Hugger

10:37:29  4  and its effect on the environment, did you review any

10:37:32  5  articles of that nature?

10:37:33  6       A.   I don't believe I did, other than what was

10:37:37  7  provided.

10:37:37  8       Q.   Okay.  You relied on 3M to provide you those

10:37:40  9  articles; correct?

10:37:40  10      A.   I relied on counsel to provide the articles.

10:37:43  11      Q.   Well counsel represents 3M in this case.

10:37:45  12  You understand that; correct?

10:37:46  13      A.   Yes.

10:37:48  14      Q.   Okay.  And you would expect that, being

10:37:51  15  retained as an expert in this case and being a

10:37:54  16  professor at the University of Minnesota, that 3M

10:37:57  17  would provide you with all the information necessary

10:37:59  18  to formulate your opinions; correct?

10:38:03  19      A.   I --

10:38:04  20           That -- that's not the case.  They provided

10:38:05  21  some of the material and I obtained other material

10:38:08  22  myself, some background material.

10:38:10  23      Q.   Yeah.  But if they were aware of information

10:38:12  24  that might be relevant to your opinions or could

10:38:13  25  affect your opinions, you'd expect 3M to provide you

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

63

| | | |
|---|---|---|
| 10:38:16 | 1 | that information; correct? |
| 10:38:17 | 2 | A.   I would expect that to be the case, yes. |
| 10:38:19 | 3 | Q.   Okay.  Because that would be -- |
| 10:38:23 | 4 | I mean for you to be objective, you want to |
| 10:38:26 | 5 | know the good and the bad with respect to an issue |
| 10:38:29 | 6 | that is known in the scientific community; correct? |
| 10:38:32 | 7 | A.   You want to know as much as possible, yes. |
| 10:38:35 | 8 | Q.   To be objective. |
| 10:38:36 | 9 | A.   Yes. |
| 10:38:39 | 10 | Q.   Okay.  Because you're not here to be an |
| 10:38:42 | 11 | advocate, you're here to be objective as an engineer |
| 10:38:44 | 12 | and pretty much black and white on the science; |
| 10:38:47 | 13 | correct? |
| 10:38:47 | 14 | A.   I am -- |
| 10:38:48 | 15 | MR. GOSS:  Object to form. |
| 10:38:49 | 16 | A.   -- here -- I'm here to defend the positions |
| 10:38:51 | 17 | that I have set forth. |
| 10:38:53 | 18 | Q.   You're here to defend 3M's positions; |
| 10:38:57 | 19 | correct? |
| 10:38:57 | 20 | MR. GOSS:  Object to form. |
| 10:38:58 | 21 | Q.   Correct? |
| 10:38:59 | 22 | A.   These are my positions I have put forth. |
| 10:39:03 | 23 | MR. ASSAAD:  I think it's time for a break. |
| 10:39:05 | 24 | THE REPORTER:  Off the record, please. |
| 10:50:12 | 25 | (Recess taken.) |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

64

10:50:12    1    BY MR. ASSAAD:

10:50:16    2        Q.    Dr. Kuehn, did you meet with anyone at 3M to

10:50:22    3    discuss this issue?

10:50:24    4        A.    No, I did not.

10:50:26    5        Q.    So you never met with like Michelle Stevens,

10:50:29    6    Al Van Duren, any one of --

10:50:31    7              Any of those names sound familiar?

10:50:33    8        A.    No.

10:50:35    9        Q.    Okay.  Going back to Exhibit 4, my

10:50:45   10    understanding is that you believe there's a March

10:50:49   11    invoice and a May invoice that is not reflected in

10:50:53   12    Exhibit 4; correct?

10:50:54   13        A.    That's my recollection.  I thought I

10:50:56   14    submitted invoices every month up until the 1st of

10:51:00   15    June.

10:51:00   16        Q.    Okay.  Besides --

10:51:10   17              If you look at page three, besides your work

10:51:12   18    on June 1st, 2017 for one hour, do you recall any

10:51:16   19    other work you performed on this case in the month of

10:51:19   20    June?

10:51:20   21        A.    Yes, yes, there was work done after this.  I

10:51:26   22    believe the expert report, as -- as you mentioned, was

10:51:29   23    submitted about June 1st, so I was told to submit all

10:51:32   24    my invoices, all my time up to that date, which I did.

10:51:35   25        Q.    Okay.  My question is:  Was there any other

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

65

10:51:38  1  work you performed on this case in the whole entire

10:51:41  2  month of June?

10:51:41  3      A.  After June 1st, yes.

10:51:43  4      Q.  What work?

10:51:44  5      A.  I would say probably reading -- reading

10:51:50  6  depositions that were provided by counsel.

10:51:54  7      Q.  My understanding is that the deposition of

10:51:57  8  Jim Ho was provided to you on Friday; correct?

10:52:00  9      A.  That's correct.

10:52:00  10     Q.  Okay.  So you didn't do that work in June;

10:52:03  11  correct?

10:52:03  12     A.  No.

10:52:03  13     Q.  Okay.  I'm asking for the month of June, --

10:52:05  14     A.  Yes.

10:52:06  15     Q.  -- any other work that was performed on this

10:52:08  16  case.

10:52:08  17     A.  I -- I can't recall specifics off the top of

10:52:13  18  my head.

10:52:13  19     Q.  Okay.  What other depositions besides Jim

10:52:17  20  Ho's deposition was provided to you?

10:52:19  21     A.  Koenigshofer's and Zgoda's, Karl Zgoda,

10:52:32  22  Elghobashi's.  Those are the ones that come to mind.

10:52:37  23     Q.  Okay.  And also Mr. Crowder?

10:52:38  24     A.  I think I reviewed his expert report, but I

10:52:43  25  don't think I recall seeing his --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

66

10:52:44  1      Q.   Well he's not an expert in this case.  He

10:52:48  2  was deposed.  He's the person with Pentair.

10:52:49  3      A.   Then -- then I must have seen his -- his

10:52:52  4  deposition.

10:52:56  5      Q.   I believe you put it -- you put it down on

10:52:58  6  Exhibit E of Exhibit 1.

10:53:00  7      A.   Okay.  Then -- then that must be correct.

10:53:03  8      Q.   Okay.  So when did you receive Dr.

10:53:08  9  Elghobashi's deposition?

10:53:10  10     A.   I can't say for sure.  Probably maybe six

10:53:18  11 weeks ago.

10:53:21  12     Q.   Okay.  Well his deposition was taken on June

10:53:28  13 15th, --

10:53:29  14     A.   Okay.

10:53:29  15     Q.   -- so it had to have been after that.

10:53:31  16     A.   Okay.

10:53:32  17     Q.   Okay.  You said you also received Dan

10:53:36  18 Koenigshofer's deposition; correct?

10:53:38  19     A.   Yes.

10:53:40  20     Q.   And did you receive Michael Buck's

10:53:43  21 deposition?

10:53:43  22     A.   Yes.

10:53:44  23     Q.   Okay.  Did you receive Dr. Ulatowski's

10:53:52  24 deposition?

10:53:52  25     A.   No.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

67

10:53:52   1        Q.   Did you read the entire deposition of Dr.

10:53:56   2   Elghobashi?

10:53:56   3        A.   I have not read the entire deposition, no.

10:53:58   4        Q.   Have you read the entire deposition of -- of

10:54:01   5   Dan Koenigshofer?

10:54:02   6        A.   Yes, I have.

10:54:03   7        Q.   Have you read the entire deposition of

10:54:05   8   Michael Buck?

10:54:06   9        A.   Yes, I have.

10:54:06   10       Q.   Have you read the entire deposition of Jim

10:54:09   11  Ho?

10:54:09   12       A.   Yes, I have.

10:54:10   13       Q.   Were there any parts of the deposition that

10:54:13   14  you were asked to review?

10:54:16   15       A.   Not specifically.  I was asked --

10:54:18   16            Well, I took it upon myself to read the

10:54:20   17  entire deposition of those -- those four.

10:54:22   18       Q.   Okay.  And I assume you've read the entire

10:54:29   19  reports of Dr. Elghobashi, Dr. David, Dr. Stonnington

10:54:36   20  and Dr. Samet; correct?

10:54:39   21       A.   There were a number of reports given to me

10:54:42   22  several months ago, so I -- I can't recall exactly

10:54:45   23  which ones.

10:54:46   24       Q.   Okay.

10:54:46   25       A.   But those -- those sound correct.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

68

10:54:48  1      Q.   When you received the report, did you read

10:54:50  2  the entire report?

10:54:51  3      A.   Reviewed, at least -- at least glanced

10:54:55  4  through the entire report, yes.

10:54:56  5      Q.   When you use the term "glance," what -- what

10:54:59  6  does "glance" mean to you?

10:55:01  7      A.   Take a -- a first look through all of it,

10:55:04  8  and then some of them I went back and -- and read in

10:55:06  9  more detail.

10:55:07  10     Q.   Okay.  And -- and are the hours spent with

10:55:13  11 respect to your work on Exhibit 4 accurate?

10:55:16  12     A.   With -- with the exception of the perhaps

10:55:21  13 two missing invoices, yes.

10:55:23  14     Q.   I understand that.  But when you say you

10:55:28  15 spent one hour doing something, it was actually an

10:55:31  16 hour and not two hours, three hours.

10:55:33  17     A.   I try to be very -- very correct about that.

10:55:35  18     Q.   Because that's what engineers do, they -- we

10:55:38  19 try to be accurate; correct?

10:55:39  20     A.   That's correct.

10:55:40  21     Q.   Okay.  You're a member the American Society

10:55:46  22 of Mechanical Engineers; correct?

10:55:46  23     A.   Yes.

10:55:47  24     Q.   And you're also a member of ASHRAE; correct?

10:55:49  25     A.   Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

69

10:55:50  1      Q.   Okay.  So just to be clear, on page two of

10:55:56  2  Exhibit 4, on April 8th it states that you spent one

10:56:09  3  hour on the expert reports from Samet, Stonnington,

10:56:13  4  Jarvis and David.  Do you see that?

10:56:15  5      A.   I see that.

10:56:16  6      Q.   Okay.  So it's my understanding you spent

10:56:17  7  one hour reviewing those four expert reports; correct?

10:56:20  8      A.   As I said, I -- I did not -- probably did

10:56:23  9  not read any of them in -- in great detail.

10:56:25  10      Q.   Okay.  On April 8th it also states "expert

10:56:29  11  report from Elghobashi and drafted rebuttal," one

10:56:33  12  hour; correct?

10:56:33  13      A.   Yes.

10:56:34  14      Q.   What part of his report -- is the --

10:56:38  15           Is the rebuttal aspect of Elghobashi what

10:56:42  16  you have in your report here in Exhibit 1?

10:56:46  17      A.   That -- that was the beginning of that, yes.

10:56:48  18      Q.   Okay.  Do you agree that Dr. Elghobashi is

10:56:56  19  an expert in the field of particle flow?

10:56:58  20      A.   I --

10:57:02  21           Again, I don't know him very well, so I -- I

10:57:05  22  really have no opinion on that.

10:57:06  23      Q.   Have you read any of his papers?

10:57:08  24      A.   I don't believe I have.

10:57:08  25      Q.   Okay.  You've never heard of the Elghobashi

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

70

| | | |
|---|---|---|
| 10:57:16 | 1 | Map; correct? |
| 10:57:17 | 2 | A.   I -- |
| 10:57:19 | 3 | No, I have not. |
| 10:57:19 | 4 | Q.   So sitting here today you have no idea what |
| 10:57:21 | 5 | the Elghobashi Map refers to. |
| 10:57:24 | 6 | MR. GOSS:  Are you saying "map?" |
| 10:57:26 | 7 | MR. ASSAAD:  Map. |
| 10:57:26 | 8 | MR. GOSS:  Okay. |
| 10:57:26 | 9 | A.   I do not. |
| 10:57:28 | 10 | Q.   Okay.  Do you know what DNS is? |
| 10:57:30 | 11 | A.   Yes. |
| 10:57:31 | 12 | Q.   What's DNS? |
| 10:57:33 | 13 | A.   Direct Numerical Simulation. |
| 10:57:35 | 14 | Q.   Do you have access to any DNS software? |
| 10:57:38 | 15 | A.   I think at the University I probably do. |
| 10:57:40 | 16 | Q.   Okay.  What software would that be? |
| 10:57:43 | 17 | A.   I -- I do not know. |
| 10:57:43 | 18 | Q.   Okay.  Have you used any DNS software? |
| 10:57:46 | 19 | A.   I have not used any myself, no. |
| 10:57:48 | 20 | Q.   Do you agree that DNS software is more |
| 10:57:52 | 21 | advanced than ANSYS, Fluent or CFX? |
| 10:57:57 | 22 | A.   That -- that's my understanding. |
| 10:57:58 | 23 | Q.   Okay.  And it's also your understanding that |
| 10:58:00 | 24 | very few supercomputers in the world could actually |
| 10:58:04 | 25 | use DNS. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

71

10:58:05   1        A.   I have no opinion on that.

10:58:07   2        Q.   Okay.  Are you familiar with the

10:58:09   3   supercomputer at the University of Minnesota?

10:58:11   4        A.   Yes.

10:58:11   5        Q.   How many cores does it have?

10:58:13   6        A.   I -- I don't know.  I have not used that for

10:58:15   7   many years.

10:58:15   8        Q.   Okay.  Are you aware that the license that

10:58:44   9   the University of Minnesota has for ANSYS is not

10:58:48  10   licensed for research work?

10:58:51  11        A.   Could you repeat the question?

10:58:53  12        Q.   Are you aware that the license for --

10:58:57  13   that -- the license as used at -- that the University

10:59:00  14   of Minnesota has for the use of ANSYS is not licensed

10:59:05  15   for research work?

10:59:05  16        A.   I -- I'm not aware of that, no.

10:59:07  17        Q.   Okay.  And in fact it's also supposed to be

10:59:10  18   used for students enrolled in classes that use ANSYS,

10:59:15  19   or instructors and TAs involved in the course that

10:59:16  20   makes use of ANSYS software products.

10:59:19  21        A.   That -- that could be the case.  I do not

10:59:21  22   know.

10:59:31  23             (Kuehn Exhibit 5 was marked for

10:59:33  24             identification.)

10:59:33  25   BY MR. ASSAAD:

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

72

| | | |
|---|---|---|
| 10:59:37 | 1 | Q.   What's been marked as Exhibit 5 is a copy of |
| 10:59:39 | 2 | a page of the website.  If you look at the bottom |
| 10:59:43 | 3 | page, left, it gives you the web address, and if you |
| 10:59:47 | 4 | look at the upper left-hand corner it says the date |
| 10:59:50 | 5 | that this was copied off of the website.  Do you |
| 10:59:56 | 6 | recognize Exhibit 5? |
| 10:59:59 | 7 | A.   I have not seen this before, no. |
| 11:00:01 | 8 | Q.   Do you know what CSE-IT stands for? |
| 11:00:06 | 9 | A.   I believe CSE stands for College of Science |
| 11:00:09 | 10 | and Engineering -- |
| 11:00:09 | 11 | Q.   Yes. |
| 11:00:10 | 12 | A.   -- and IT is probably Information |
| 11:00:14 | 13 | Technology.  But that's -- |
| 11:00:17 | 14 | I'm fairly sure about CSE; I'm making a |
| 11:00:20 | 15 | guess at IT. |
| 11:00:20 | 16 | Q.   Do you agree with me that, based on your |
| 11:00:25 | 17 | knowledge today, that this is a page taken from the |
| 11:00:27 | 18 | University of Minnesota website? |
| 11:00:31 | 19 | A.   It appears to be, yes. |
| 11:00:32 | 20 | Q.   Okay.  And on top it talks about "ANSYS |
| 11:00:36 | 21 | License." |
| 11:00:37 | 22 | A.   Yes. |
| 11:00:37 | 23 | Q.   Okay.  Do you see where it says under "ANSYS |
| 11:00:42 | 24 | License," "This copy of Ansys is NOT LICENSED FOR |
| 11:00:44 | 25 | RESEARCH WORK?" |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

73

| | | |
|---|---|---|
| 11:00:45 | 1 | A.    I see that. |
| 11:00:46 | 2 | Q.    And if you look at the bottom paragraph, it |
| 11:00:49 | 3 | says, "Access can be granted for use by students |
| 11:00:51 | 4 | enrolled in classes that use ANSYS or instructors and |
| 11:00:55 | 5 | TAs involved in the courses that make use of the ANSYS |
| 11:00:59 | 6 | software products?" |
| 11:01:00 | 7 | A.    I see that. |
| 11:01:01 | 8 | Q.    So you agree with me that under the license |
| 11:01:03 | 9 | agreement, based on this document, that no one should |
| 11:01:05 | 10 | be able to use ANSYS for any type of commercial work; |
| 11:01:09 | 11 | correct? |
| 11:01:09 | 12 | MR. GOSS:  Object to form, lacks foundation. |
| 11:01:16 | 13 | A.    Repeat the question. |
| 11:01:17 | 14 | Q.    Well let's back up.  I mean you've been in |
| 11:01:21 | 15 | academia for how many years, 30, 40 years? |
| 11:01:24 | 16 | A.    About 40 years. |
| 11:01:25 | 17 | Q.    Okay.  And you're aware that companies will |
| 11:01:27 | 18 | give academic licenses to the university for -- for a |
| 11:01:31 | 19 | reduced rate to -- to train students; correct? |
| 11:01:34 | 20 | A.    That's correct. |
| 11:01:35 | 21 | Q.    Okay.  And part of the -- |
| 11:01:38 | 22 | And many of the licenses that are granted to |
| 11:01:41 | 23 | the university are -- are not to be used for |
| 11:01:44 | 24 | commercial purposes; correct? |
| 11:01:45 | 25 | A.    That -- that's probably some license- |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

74

11:01:49  1  agreement language, yes.

11:01:50  2      Q.   I mean you're familiar with that being in

11:01:52  3  academia for so many years; correct?

11:01:54  4      A.   Yes.

11:01:54  5      Q.   Okay.  And companies do that because they

11:01:58  6  want students to become familiar with their products,

11:02:01  7  to use their products when they go out into the real

11:02:04  8  world; correct?

11:02:05  9      A.   I agree with that.

11:02:06  10      Q.   Okay.  Because the cost for the license

11:02:12  11  for -- for an academic institution is much less than

11:02:16  12  the cost it would be for a private corporation.

11:02:19  13      A.   That -- that's what I have heard.

11:02:20  14      Q.   And in fact, when you --

11:02:22  15          When I was a student, and I'm sure your

11:02:28  16  students know, the cost of even getting Micro --

11:02:28  17  Microsoft Office as a student is much cheaper than

11:02:31  18  when you're not a student any more.

11:02:32  19      A.   There again, they're student versions, too,

11:02:35  20  that are much cheaper.

11:02:36  21      Q.   Yeah.  So you agree with me that if anyone

11:02:41  22  used ANSYS for a commercial purpose, that would be in

11:02:43  23  violation of the ANSYS license with the University of

11:02:46  24  Minnesota; correct?

11:02:47  25          MR. GOSS:  Object to form.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

75

| | | |
|---|---|---|
| 11:02:48 | 1 | A.   Well it says "LICENSED" -- "NOT LICENSED FOR |
| 11:02:50 | 2 | RESEARCH WORK."  I -- I would imagine one would have |
| 11:02:53 | 3 | to interpret what that would mean. |
| 11:02:55 | 4 | Q.   Well it also says, "Access can be granted |
| 11:02:57 | 5 | for use by students enrolled in classes..."  It -- |
| 11:03:01 | 6 | it's not access for any type of commercial use. |
| 11:03:03 | 7 | A.   It says, "Access can be granted..."  It says |
| 11:03:08 | 8 | access is restricted to. |
| 11:03:15 | 9 | Q.   Well let me ask you this:  If you -- would |
| 11:03:17 | 10 | this license -- |
| 11:03:18 | 11 | Based on your reading of this license, would |
| 11:03:20 | 12 | a -- would a professor or a student be allowed to do |
| 11:03:23 | 13 | research for 3M under this license? |
| 11:03:26 | 14 | A.   If -- if one were to define the term |
| 11:03:33 | 15 | "research" as indicated under here, then I would |
| 11:03:37 | 16 | agree. |
| 11:03:37 | 17 | Q.   Well how do you define "research?" |
| 11:03:40 | 18 | A.   Research is -- I would define as generating |
| 11:03:43 | 19 | new knowledge. |
| 11:03:47 | 20 | Q.   In formulating your report, did you read any |
| 11:04:03 | 21 | of the depositions of any of the fact witnesses? |
| 11:04:08 | 22 | A.   I'm not sure who the fact witnesses are. |
| 11:04:10 | 23 | If -- if you could identify -- |
| 11:04:12 | 24 | Q.   Did you read any of the depositions by any |
| 11:04:15 | 25 | of the engineers at 3M? |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

76

11:04:19  1       A.   I don't believe so.  But if you were to name

11:04:21  2  them, I could tell -- tell you "yes" or "no."

11:04:23  3       Q.   Karl Zgoda.

11:04:24  4       A.   Yes.

11:04:25  5       Q.   You've read his deposition.

11:04:26  6       A.   Yes.

11:04:27  7       Q.   Okay.  What about Gary Hansen?

11:04:29  8       A.   I do not believe so.

11:04:32  9       Q.   What about Al Van Duren?

11:04:34  10      A.   No.

11:04:35  11      Q.   What about Michelle Hulse Stevens?

11:04:38  12      A.   No.

11:04:39  13      Q.   Are the only depositions you have read are

11:04:41  14  the ones outlined in Exhibit 1 on your report, as well

11:04:47  15  as the depositions that -- of -- of the plaintiffs'

11:04:50  16  experts provided to you by defense counsel?

11:04:52  17      A.   I believe that to be correct.

11:04:53  18      Q.   And Jim Ho, who is a defense expert.

11:04:55  19      A.   Yes.

11:04:56  20      Q.   Okay.  Did you -- were you provided --

11:05:07  21  strike that.

11:05:08  22           Are you aware that there are about five to

11:05:19  23  eight peer-reviewed articles that discuss either

11:05:31  24  particle flow or disruption of the operating room

11:05:38  25  environment or filtration with respect to the Bair

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

77

11:05:43  1  Hugger?

11:05:44  2      A.  I do not know the exact number, but I -- I

11:05:47  3  know there are some peer-reviewed publications, yes.

11:05:49  4      Q.  And the ones that you know about are the

11:05:51  5  ones provided to you by defense counsel.

11:05:53  6      A.  I think that's correct.

11:06:00  7      Q.  Do you know who Dr. Sessler is?

11:06:02  8      A.  I have heard the name.

11:06:04  9      Q.  Before this litigation?

11:06:06  10     A.  No.

11:06:07  11     Q.  Okay.  How have you heard the name?

11:06:09  12     A.  Just through discussions with counsel.

11:06:12  13     Q.  Okay.  Have you read any of his peer-

11:06:16  14  reviewed articles?

11:06:16  15     A.  I do not believe I have.

11:06:17  16     Q.  Do you know who Dr. McGovern is?

11:06:21  17     A.  I do not.

11:06:22  18     Q.  Do you know who Dr. Reed is?

11:06:24  19     A.  I have read one of his papers, but other

11:06:27  20  than that, I do not know who he is.

11:06:28  21     Q.  The paper that was provided to you; correct?

11:06:30  22     A.  Yes.

11:06:31  23     Q.  Do you know who Mark Albrecht is?

11:06:32  24     A.  I --

11:06:34  25        Prior to this --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

78

11:06:36  1      Q.    Litigation.

11:06:37  2      A.    -- litigation, no.

11:06:39  3      Q.    But you've read some of his articles.

11:06:41  4      A.    Yes.

11:06:41  5      Q.    Do you know who Dr. Belani is?

11:06:43  6      A.    No.

11:06:44  7      Q.    Do you know Dr. Belani used to be the chair

11:06:46  8  of anesthesiology at the University of Minnesota?

11:06:49  9      A.    I was not aware of that, no.

11:06:50  10      Q.    Did you --

11:06:53  11          Were you provided with a deposition -- the

11:06:55  12  corporate representative deposition of 3M in which it

11:07:02  13  was 3M's -- well strike that.

11:07:03  14          Do you know what a corporate deposition is?

11:07:05  15      A.    I -- I do not.  Please educate me.

11:07:07  16      Q.    Okay.  In litigation there's a deposition

11:07:11  17  which you actually take the deposition of 3M and they

11:07:15  18  provide a person to speak on behalf of 3M.

11:07:19  19      A.    Okay.

11:07:19  20      Q.    Did you read any of the depositions of any

11:07:21  21  of the corporate representative depositions?

11:07:24  22      A.    Other than the one that I mentioned by Karl

11:07:27  23  Zgoda, I don't believe I have.

11:07:28  24      Q.    Okay.  Do you know who Nachtsheim is?

11:07:33  25      A.    I do not.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

79

| | | |
|---|---|---|
| 11:07:38 | 1 | Q.   Okay.  Did you review any of the depositions |
| 11:07:51 | 2 | with respect to any of the study authors in this case? |
| 11:07:56 | 3 | A.   Could -- could you repeat that? |
| 11:07:59 | 4 | Q.   Are you aware that 3M took the depositions |
| 11:08:04 | 5 | of many of the authors that had peer-reviewed |
| 11:08:08 | 6 | literature that questioned the safety of the Bair |
| 11:08:11 | 7 | Hugger device? |
| 11:08:13 | 8 | A.   I was not aware of those depositions, no. |
| 11:08:15 | 9 | Q.   Do you think reading those depositions would |
| 11:08:18 | 10 | have been helpful in formulating your opinions? |
| 11:08:20 | 11 | A.   Possibly. |
| 11:08:21 | 12 | Q.   Do you know who Farhad Memarzadeh is? |
| 11:08:35 | 13 | A.   Again, I have heard the name.  I do not know |
| 11:08:37 | 14 | him personally. |
| 11:08:39 | 15 | MR. GOSS:  Memarzadeh. |
| 11:08:41 | 16 | Q.   Memarzadeh.  Does that refresh your |
| 11:08:43 | 17 | recollection when it's Memarzadeh? |
| 11:08:44 | 18 | A.   I still do not know him. |
| 11:08:47 | 19 | Q.   Okay.  Are you aware that he's done |
| 11:08:50 | 20 | computational fluid dynamic work with respect to |
| 11:08:53 | 21 | operating rooms? |
| 11:08:55 | 22 | A.   I do not recall that. |
| 11:08:56 | 23 | Q.   Are you a member of the -- are you a member |
| 11:09:00 | 24 | of the ASHRAE Rule 72 Committee? |
| 11:09:02 | 25 | A.   I'm not. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

80

| | | |
|---|---|---|
| 11:09:03 | 1 | Q.   Okay.  Do you know what the Rule 72 |
| 11:09:06 | 2 | Committee is? |
| 11:09:06 | 3 | A.   I'm -- I'm not sure what the title of that |
| 11:09:09 | 4 | would be. |
| 11:09:09 | 5 | Q.   Dealing with hospital rooms or -- and hos -- |
| 11:09:10 | 6 | and air -- hos -- healthcare facilities. |
| 11:09:13 | 7 | A.   That -- that's not -- |
| 11:09:14 | 8 | 170 you say? |
| 11:09:15 | 9 | Q.   I'm sorry, 172. |
| 11:09:17 | 10 | A.   Yeah.  No, I'm not a member of that. |
| 11:09:19 | 11 | Q.   Okay.  You're a member of the 52 Committee; |
| 11:09:22 | 12 | right? |
| 11:09:22 | 13 | A.   Actually, I'm not a member of 52, I'm a |
| 11:09:24 | 14 | member of the technical committee that oversees |
| 11:09:26 | 15 | Standards Committee 52.2. |
| 11:09:39 | 16 | Q.   Okay. |
| 11:09:39 | 17 | (Discussion off the stenographic record.) |
| 11:09:47 | 18 | Q.   Now in reading your report, I just want to |
| 11:10:08 | 19 | be clear so I understand you.  Is -- is it your |
| 11:10:15 | 20 | opinion that the Bair Hugger has no impact on the |
| 11:10:24 | 21 | airflow environment of an operating room? |
| 11:10:28 | 22 | A.   I think my opinion would be somewhat more |
| 11:10:31 | 23 | restrictive than that, that it has negligible effect |
| 11:10:35 | 24 | on the airflow near the surgical site. |
| 11:10:37 | 25 | Q.   On the surgical -- |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

81

11:10:37  1          And when you say "negligible," what do you

11:10:44  2   mean by "negligible?"

11:10:44  3       A.   One would not be able to measure the

11:10:44  4   difference whether the Bair Hugger was being used or

11:10:47  5   not at the surgical site, everything else being equal.

11:10:51  6       Q.   Okay.  Does it have an impact on the

11:10:52  7   unidirectional airflow?

11:10:54  8       A.   I would say no.

11:10:55  9       Q.   Okay.  Does it have any impact in the

11:11:07  10  operating room with respect to airflow?

11:11:11  11      A.   I guess we would have to define "impact."  I

11:11:19  12  would say it does circulate some of the air in one

11:11:24  13  portion of the operating room, behind the anesthesia

11:11:27  14  drape, but as -- as I said, I do not believe it would

11:11:31  15  have any significant effect of the airflow near the

11:11:35  16  surgical site.

11:11:36  17      Q.   And with respect to your filtration opinion,

11:11:46  18  it's your understanding that the filters used by 3M

11:11:49  19  are -- have a MERV 14 rating; correct?

11:11:52  20      A.   That's my understanding, yes.

11:11:53  21      Q.   Okay.  And have you yourself done any

11:12:03  22  biological sampling of the bioburden in an operating

11:12:07  23  room?

11:12:07  24      A.   No, I have not.

11:12:09  25      Q.   Do you know what the bioburden in an

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

82

11:12:12  1  operating room is?

11:12:13  2      A.   Not having worked in that area, I do not

11:12:15  3  know that.

11:12:15  4      Q.   Okay.  Do you agree with me that to

11:12:18  5  determine the type of filter to be used and to

11:12:24  6  formulate an opinion on that, knowing what the

11:12:27  7  bioburden in an operating room is necessary?

11:12:30  8      A.   Well I do know this case is really focused

11:12:34  9  on bacteria-containing particles, and therefore my

11:12:37  10  opinion is based on the filter performance at that

11:12:41  11  type of particle and that particle size.

11:12:43  12      Q.   Okay.  We'll get to that later on.

11:12:47  13           Did you request to see the expert reports

11:13:18  14  provided by the defense in this case?

11:13:21  15      A.   I -- I did not know what expert reports

11:13:24  16  there were, so they were provided to me by counsel.

11:13:26  17      Q.   So until you were provided the expert report

11:13:29  18  of Jim -- or the expert deposition of Jim Ho, you had

11:13:32  19  no idea that Jim Ho was retained by the defense in

11:13:35  20  this case?

11:13:35  21      A.   I had no idea.

11:13:36  22      Q.   And with respect to Gary Settles, you had no

11:13:47  23  idea that Gary Settles was an expert in this case?

11:13:50  24      A.   Prior to counsel mentioning that, no.

11:13:55  25      Q.   Sitting here today -- well strike that.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

83

11:14:06  1        Are you aware that Gary Settles took

11:14:09  2  temperature measurements when the Bair Hugger was in

11:14:11  3  use?

11:14:11  4        A.   I -- I do not recall that.

11:14:15  5        Q.   When you say you don't recall that, were

11:14:18  6  you --

11:14:18  7             You haven't seen his report; correct?

11:14:20  8        A.   I have not seen his report.

11:14:22  9        Q.   Were you ever informed that Gary Settles

11:14:24  10  took temperature measurements of the Bair Hugger

11:14:27  11  similar to what you did?

11:14:28  12        A.   I -- I do not remember that.

11:14:31  13        Q.   When you say you do not remember that, I

11:14:33  14  mean did you or did you not see it?

11:14:36  15        A.   I -- I can't recall.

11:14:36  16        Q.   Okay.  Have you looked at Dr. Abraham's

11:14:43  17  report?

11:14:44  18        A.   I have not seen that.

11:14:44  19        Q.   Have you looked at his CFD analysis at all?

11:14:48  20        A.   I have not seen anything from John related

11:14:50  21  to this case.

11:14:51  22        Q.   Okay.  Have you ever authored anything with

11:14:55  23  Dr. Abraham?

11:14:55  24        A.   I do not believe so, no.

11:15:01  25        Q.   Have you looked at any comments or materials

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

84

| Time | Line | Text |
|---|---|---|
| 11:15:06 | 1 | from the CDC with respect to this case? |
| 11:15:12 | 2 | A.   I -- I do not believe I have, no. |
| 11:15:14 | 3 | Q.   Do you know what Schlieren testing is? |
| 11:15:22 | 4 | A.   I do. |
| 11:15:24 | 5 | MR. ASSAAD:  And Schlieren is spelled |
| 11:15:26 | 6 | S-c-h -- |
| 11:15:28 | 7 | THE REPORTER:  I know it. |
| 11:15:29 | 8 | MR. ASSAAD:  Okay. |
| 11:15:29 | 9 | Q.   Have you ever used Schlieren testing? |
| 11:15:34 | 10 | A.   Yes, I have. |
| 11:15:34 | 11 | Q.   When is the last time you used Schlieren |
| 11:15:35 | 12 | testing? |
| 11:15:35 | 13 | A.   Probably during my Ph.D. thesis work, maybe |
| 11:15:39 | 14 | 40 years ago. |
| 11:15:40 | 15 | Q.   Okay.  Have you seen any Schlieren testing |
| 11:15:51 | 16 | done by 3M? |
| 11:15:52 | 17 | A.   I have not. |
| 11:15:55 | 18 | Q.   Have you seen any Schlieren testing by any |
| 11:15:58 | 19 | of the defense experts? |
| 11:15:58 | 20 | A.   I have not seen any -- any Schlieren work |
| 11:16:01 | 21 | regarding this -- this case. |
| 11:16:02 | 22 | Q.   Do you know many people -- do you know -- |
| 11:16:05 | 23 | Do you know whether or not many engineers |
| 11:16:06 | 24 | still use Schlieren testing? |
| 11:16:07 | 25 | A.   My understanding is that not very many. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

85

11:16:09    1        Q.    They give you more of a qualitative result,

11:16:18    2    not a quantitative result; correct?

11:16:20    3        A.    You can actually get quantitative results

11:16:25    4    from Schlieren if it's set up properly.

11:16:29    5        Q.    Well when you say if it's set up -- set up

11:16:35    6    properly, what do you mean?

11:16:36    7        A.    I helped author a chapter in a textbook on

11:16:40    8    optical methods of temperature measurement, which

11:16:42    9    includes Schlieren method -- measurements.

11:16:44   10        Q.    So you can measure temperature by looking at

11:16:47   11    a Schlieren image?

11:16:49   12        A.    You can, yes.

11:16:50   13        Q.    Does it have to be a color image?

11:16:53   14        A.    Doesn't necessarily have to be color, it

11:16:55   15    could be gray scale.

11:16:57   16        Q.    Okay.  Is it a -- is it a very complicated

11:16:59   17    mathematical equation?

11:17:00   18        A.    The procedure for getting the image is very

11:17:03   19    straightforward.  Again, it would have to be

11:17:05   20    calibrated to actually back out appropriate

11:17:07   21    temperature data.

11:17:08   22        Q.    So it has to be set up properly; correct?

11:17:10   23        A.    Yes.

11:17:11   24        Q.    Does it use a different type of camera?

11:17:14   25        A.    You can use a standard optical camera.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

86

11:17:17  1      Q.   Okay.  Are you surprised, sitting here

11:17:33  2   today, that these other expert reports and testing

11:17:35  3   done of the Bair Hugger, they were not provided to

11:17:38  4   you?

11:17:39  5      A.   I -- I guess not knowing everything that's

11:17:42  6   out there, I -- no, I'm not surprised.

11:17:44  7      Q.   Well do you think it's strange that Gary

11:17:47  8   Settles did temperature measurements as well and that

11:17:50  9   information wasn't provided to you?

11:17:51  10        MR. GOSS:  Object to form.

11:17:53  11      A.   Actually, I think that may have been a -- a

11:17:58  12   wise decision to have two completely independent

11:18:02  13   people try to measure similar things.

11:18:03  14      Q.   And if they came up with the same result,

11:18:05  15   that would validate each other; correct?

11:18:07  16      A.   I think that would -- that would certainly

11:18:08  17   support each other, yeah.

11:18:09  18      Q.   What if they came up with different results?

11:18:12  19      A.   Then we'd have to look in -- in more detail

11:18:15  20   as to what the differences were in the setup or the

11:18:17  21   measurements.

11:18:18  22      Q.   Because the setup makes a difference;

11:18:20  23   correct?  The way the experiment is set up; correct?

11:18:22  24      A.   And the -- and the instruments used, yes.

11:18:24  25      Q.   Okay.  Sitting here today, do you believe

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

87

11:19:15  1  that 3M gave you all the information necessary to

11:19:19  2  formulate your opinions?

11:19:23  3      A.   I would -- I would say they hopefully did

11:19:27  4  not withhold anything to support my opinion.

11:19:29  5      Q.   Well you haven't received any of the

11:19:31  6  depositions of the fact witnesses; correct?

11:19:33  7           MR. GOSS:  Object to form.

11:19:34  8      Q.   Except for Karl Zgoda.

11:19:38  9           MR. GOSS:  Object to form.

11:19:38  10     A.   As -- as -- as you outlined, yes.

11:19:40  11     Q.   Let's say it this way:  There's many

11:19:43  12  depositions you have not reviewed in this case from

11:19:45  13  any of the fact witnesses in this case; correct?

11:19:47  14     A.   The fact witnesses that -- that you listed,

11:19:50  15  yes.

11:19:50  16     Q.   Yes.  And you haven't received any of those

11:19:52  17  depositions of any of the study authors in this case;

11:19:55  18  correct?

11:19:55  19     A.   And the study authors are --

11:19:57  20     Q.   Albrecht, Reed, McGovern, Nachtsheim,

11:20:02  21  Belani.

11:20:02  22     A.   That's correct.

11:20:05  23     Q.   You haven't received any of the depositions

11:20:08  24  of -- the corporate representative depositions.

11:20:11  25     A.   Other than if you include Karl Zgoda's, no.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

88

11:20:15    1       Q.   That's not a corporate --

11:20:16    2            I'm talking about the one done by Al Van

11:20:19    3    Duren.

11:20:19    4       A.   No, I have not seen those.

11:20:20    5       Q.   Do you think that if 3M admits that the Bair

11:20:27    6    Hugger -- every study that looked at whether or not

11:20:31    7    particles are increased over the surgical site by the

11:20:35    8    Bair Hugger, that it actually occurred, that would be

11:20:38    9    something important to know?

11:20:39   10            MR. GOSS:  Object to form.

11:20:42   11       A.   I don't know how they would approach that or

11:20:45   12    attribute that.

11:20:46   13       Q.   Well if 3M did a study and many other people

11:20:49   14    did a study and all the studies indicated that when

11:20:51   15    the Bair Hugger is turned on there were increased

11:20:53   16    particles over the surgical site, isn't that

11:20:55   17    information you would think would be relevant in

11:20:57   18    formulating your opinions?

11:20:58   19            MR. GOSS:  Same objection.

11:21:00   20       A.   I'm -- I'm -- I'm not sure I would agree

11:21:02   21    with that.

11:21:05   22       Q.   Well whether or not you agree with it or

11:21:05   23    not, do you agree that if peer-reviewed literature

11:21:08   24    done by 3M as well as others all indicate that

11:21:13   25    particles increase over the surgical site when the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

89

| | | |
|---|---|---|
| 11:21:16 | 1 | Bair Hugger is turned on, that would be relevant |
| 11:21:19 | 2 | information and necessary information for you to know |
| 11:21:23 | 3 | in formulating your opinions? |
| 11:21:24 | 4 | MR. GOSS:  Same objection. |
| 11:21:25 | 5 | A.  I am not sure that would be necessary |
| 11:21:27 | 6 | opinion -- or necessary information. |
| 11:21:29 | 7 | Q.  It would be relevant; correct? |
| 11:21:30 | 8 | A.  It would be relevant. |
| 11:21:33 | 9 | Q.  Okay.  I mean you would want to look at the |
| 11:21:35 | 10 | test to see why the particles increased and what their |
| 11:21:39 | 11 | setup was and how the test was performed; correct? |
| 11:21:41 | 12 | MR. GOSS:  Same objection. |
| 11:21:44 | 13 | A.  And in terms of measuring particles, there |
| 11:21:45 | 14 | are a lot of pitfalls involved with that. |
| 11:21:49 | 15 | Q.  Okay.  So you don't believe in particle |
| 11:21:52 | 16 | testing? |
| 11:21:53 | 17 | A.  I believe in particle testing if -- if it's |
| 11:21:56 | 18 | done appropriately, but as I mentioned, there are many |
| 11:21:59 | 19 | pitfalls involved in performing correct aerosol |
| 11:22:02 | 20 | measurements. |
| 11:22:03 | 21 | Q.  I mean in fact you -- you -- you recommend |
| 11:22:05 | 22 | particle testing as an alternative in clean rooms; |
| 11:22:09 | 23 | correct? |
| 11:22:09 | 24 | MR. GOSS:  Objection, vague. |
| 11:22:11 | 25 | A.  Say that again. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

90

11:22:12   1      Q.   Well you recommend, in -- in -- in -- in

11:22:19   2   determining whether or not a clean room is working

11:22:22   3   properly, as an alternative to doing biological

11:22:25   4   testing, that you could do particle testing.

11:22:29   5      A.   That's a protocol that's often used by some

11:22:32   6   manufacturers, yes.

11:22:33   7      Q.   And it's something that you've actually

11:22:34   8   recommended in papers before; isn't it?

11:22:36   9      A.   Yes.

11:22:36   10      Q.   Okay.  Because I think you --

11:22:40   11      If I recall correctly, a room is not static,

11:22:47   12   it's dynamic; correct?

11:22:49   13      A.   Yes.  Air is moving.

11:22:50   14      Q.   Okay.  And there could be bursts in

11:22:55   15   particles that, even if you did a biological sampling,

11:22:57   16   you're not going to get any changes because of the

11:23:00   17   possible bursts in particles or -- as well as

11:23:03   18   biological bursts; correct?

11:23:04   19      A.   You -- you may miss a burst event.

11:23:06   20      Q.   And that's why particle monitoring is a good

11:23:11   21   alternative to biological sampling which takes days to

11:23:15   22   obtain the results.

11:23:16   23      A.   Well again, biological sampling gives you,

11:23:19   24   if it's done correctly, very good information, it's

11:23:22   25   just that the information is provided in a delayed

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

91

11:23:24  1   manner.

11:23:25  2        Q.   At least one day.

11:23:27  3        A.   Usually at least one day for culturing, yes.

11:23:30  4        Q.   Exactly.  And that's why an alternative

11:23:32  5   would be particle sampling, which could give you

11:23:34  6   real-time data, and you could actually set it up to

11:23:36  7   give you an alarm if it goes over a certain amount;

11:23:40  8   correct?

11:23:40  9        A.   You could do that, yes.

11:23:40  10       Q.   And that's something you've recommended in

11:23:42  11  the past.

11:23:43  12       A.   I'm not sure I have recommended that.

11:23:45  13  Certainly not for operating rooms.

11:23:46  14       Q.   Well you --

11:23:46  15            Well for clean rooms.

11:23:48  16       A.   That -- that's possible, yes.

11:23:52  17       Q.   Okay.  Well you've actually written on it.

11:23:55  18       A.   Well I --

11:23:56  19            You'd have to refresh my memory going --

11:23:58  20  going back.

11:23:58  21       Q.   And we will later on, but --

11:24:00  22       A.   Okay.

11:24:01  23       Q.   -- you don't deny that you've written on it.

11:24:03  24       A.   Not at this point, no.

11:24:04  25       Q.   And you would agree with me that as an

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

92

11:24:40  1  engineer, as a professor of engineering, that you

11:24:48  2  would expect to be provided by 3M in this case all the

11:24:59  3  testing that was done and -- all the testing that was

11:25:07  4  done by 3M or others so that at least you can compare

11:25:10  5  your results with what other people did; correct?

11:25:15  6          MR. GOSS:  Object -- objection.

11:25:16  7      A.   I would expect that would be the case.

11:25:21  8      Q.   Assuming that all tests that were done with

11:25:34  9  the Bair Hugger, including particle tests, all showed

11:25:41  10  an increase in the particles when the Bair Hugger was

11:25:44  11  turned on, would that in any way affect your opinions?

11:25:50  12          MR. GOSS:  Object to form.

11:25:52  13      A.   I'd have to look at those -- all those --

11:25:55  14  those reports and then evaluate them.

11:25:58  15      Q.   Excuse me?

11:25:59  16      A.   I would have to look at all the reports and

11:26:02  17  then evaluate them.

11:26:03  18      Q.   Okay.  So it may affect your opinion.

11:26:05  19      A.   It's possible.

11:26:06  20      Q.   Okay.  And if someone, such as someone at

11:26:44  21  the NIH, did a CFD analysis of the Bair Hugger and

11:26:49  22  showed that there was a disruption in the airflow when

11:26:53  23  the Bair Hugger was turned on, that may be relevant

11:26:57  24  information in formulating your opinions; correct?

11:27:02  25          MR. GOSS:  Object to form.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

93

11:27:03  1      A.   Possibly.  I'd have to look at the study and

11:27:08  2  make my own judgment.

11:27:08  3      Q.   Okay.  And, for example, if there was a

11:27:19  4  peer-reviewed article out there that indicate -- that

11:27:22  5  did temperature measurements around the operating room

11:27:25  6  table that showed a significant increase in -- a

11:27:34  7  statistically significant increase in the temperature

11:27:36  8  above the operating room table when the Bair Hugger

11:27:38  9  was on compared to when the Bair Hugger was off, that

11:27:42  10  may be relevant to you in formulating your opinions;

11:27:45  11  correct?

11:27:45  12      A.   It's possible.

11:27:46  13      Q.   Okay.  But at least it would be a place for

11:27:50  14  you to compare your results to other peer-reviewed

11:27:55  15  literature in the field; correct?

11:27:56  16      A.   Yes, I could do that.

11:28:00  17      Q.   And by the way, your expert opinion is not

11:28:03  18  peer-reviewed; correct?

11:28:04  19      A.   That's correct.

11:28:05  20      Q.   Okay.  It hasn't been tested or -- or

11:28:08  21  checked by any of the colleagues in your field;

11:28:10  22  correct?

11:28:10  23      A.   It's -- it's my own personal opinion.

11:28:12  24      Q.   Okay.  Do you know -- do you know what peer

11:28:19  25  review is?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

94

11:28:19   1        A.   I do.

11:28:19   2        Q.   What is peer review?

11:28:21   3        A.   It's a review by colleagues who are familiar

11:28:24   4   with the -- in the engineering world, the technology

11:28:28   5   that you're working with.

11:28:29   6        Q.   Okay.  And it's like a checks and balances

11:28:32   7   to make sure there's no junk science published in the

11:28:36   8   literature; correct?

11:28:37   9        A.   Assuming the -- the reviewers have

11:28:40  10   appropriate credentials and appropriate expertise to

11:28:43  11   evaluate your -- your publication or your -- your

11:28:47  12   report, then yes.  That's not always the case.

11:28:50  13        Q.   There is some junk science out there;

11:28:53  14   correct?

11:28:53  15        A.   Yeah.

11:28:53  16        Q.   And you will agree with me that there's

11:28:56  17   actually some dangerous products out there; correct?

11:28:59  18        A.   I don't know how you would --

11:29:01  19             That seems to be a very broad --

11:29:03  20        Q.   Well --

11:29:03  21        A.   -- categorization.

11:29:04  22        Q.   There -- there are devices out there that

11:29:07  23   end up being a risk to -- to humans, correct, that are

11:29:10  24   manufactured?

11:29:11  25             MR. GOSS:  Object to form.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

95

11:29:12   1       A.   Well I can think of a car is a risk to

11:29:15   2   humans, too, if you get in an accident.

11:29:17   3       Q.   Yeah.  But there's, for example, the Pinto.

11:29:19   4   The Pinto was a dangerous device; correct?

11:29:21   5       A.   Well it was a car that had a lot of

11:29:23   6   accidents associated with it.

11:29:24   7       Q.   Yeah.  And it caused severe injuries as a

11:29:27   8   result of a design error; correct?

11:29:29   9       A.   Well I'm not sure if you'd say design error,

11:29:32  10   but based on the product.

11:29:34  11       Q.   Well the product was designed; correct?

11:29:37  12       A.   It was designed.

11:29:38  13       Q.   Okay.  And there was an error in the design

11:29:41  14   that could have been fixed that wasn't fixed; correct?

11:29:44  15           MR. GOSS:  I'm just going to object to

11:29:45  16   foundation on this.

11:29:46  17       Q.   You're aware of the Pinto case; correct?

11:29:48  18       A.   Yes.

11:29:48  19       Q.   Okay.  And you actually --

11:29:52  20           I mean in most engineering schools you're

11:29:55  21   taught about that case; correct?

11:29:56  22       A.   I -- I'm not aware of that.  I'm not in that

11:29:58  23   area.

11:29:59  24       Q.   You're not in engineering ethics?

11:30:01  25       A.   Well I'm in engin --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

96

| | | |
|---|---|---|
| 11:30:04 | 1 | I've never taught a class in engineering |
| 11:30:06 | 2 | ethics and I don't -- would not work with the Pinto, |
| 11:30:08 | 3 | for example, in any -- any of my examples. |
| 11:30:11 | 4 | Q.   You've never taught -- taught a class on |
| 11:30:14 | 5 | engineering ethics? |
| 11:30:15 | 6 | A.   I've never -- never taught a class on |
| 11:30:18 | 7 | engineering ethics, no. |
| 11:30:27 | 8 | Q.   Have you ever taken a class in engineering |
| 11:30:31 | 9 | ethics? |
| 11:30:32 | 10 | A.   I've taken some -- I wouldn't call it a -- a |
| 11:30:36 | 11 | class or a -- |
| 11:30:38 | 12 | Training I would say. |
| 11:30:51 | 13 | Q.   Are there any other Kuehns that teach at the |
| 11:31:10 | 14 | University of Minnesota in the engineering department? |
| 11:31:13 | 15 | A.   Not with the same spelling of my name that |
| 11:31:15 | 16 | I'm aware of. |
| 11:31:16 | 17 | Q.   Okay. |
| 11:31:24 | 18 | A.   I couldn't rule it out, but I don't know of |
| 11:31:26 | 19 | any personally. |
| 11:31:28 | 20 | Q.   Do you agree that engineers should uphold |
| 11:31:32 | 21 | and advance the integrity, honor and dignity of the |
| 11:31:35 | 22 | engineering profession? |
| 11:31:38 | 23 | A.   I will agree with that. |
| 11:31:38 | 24 | Q.   Do you agree that engineers should be |
| 11:31:41 | 25 | objective? |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

97

| | | |
|---|---|---|
| 11:31:42 | 1 | A.    Yes. |
| 11:31:46 | 2 | Q.    Do you agree that engineers should have -- |
| 11:31:49 | 3 | should be honest? |
| 11:31:50 | 4 | A.    Yes. |
| 11:31:50 | 5 | Q.    Do you believe that engineers should have |
| 11:31:53 | 6 | integrity? |
| 11:31:54 | 7 | A.    Yes. |
| 11:31:54 | 8 | Q.    Do you believe that they need all those |
| 11:31:57 | 9 | things in formulating their opinions? |
| 11:32:01 | 10 | A.    Yes, that would be -- |
| 11:32:01 | 11 | Q.    Honesty, integrity and objectivity. |
| 11:32:04 | 12 | A.    I -- I would agree with that. |
| 11:32:06 | 13 | Q.    Okay.  Do you believe that engineers of 3M |
| 11:32:09 | 14 | should be held to the same standard? |
| 11:32:11 | 15 | A.    Well I think all engineers should be held to |
| 11:32:13 | 16 | the same standard. |
| 11:32:14 | 17 | Q.    Okay.  Do you agree that engineers must use |
| 11:32:27 | 18 | their knowledge and skill for enhancement of human |
| 11:32:31 | 19 | welfare? |
| 11:32:32 | 20 | A.    I -- I would agree with that. |
| 11:32:34 | 21 | Q.    Do you agree that human safety should always |
| 11:32:36 | 22 | come first? |
| 11:32:38 | 23 | A.    I'm not sure I would agree with that. |
| 11:32:41 | 24 | Q.    You don't believe safety should come first? |
| 11:32:44 | 25 | A.    If -- if a product doesn't do what it's |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

98

11:32:48    1    supposed to, then -- then the safety is -- is

11:32:50    2    immaterial.

11:32:51    3        Q.    Okay.  Do you believe, with respect to

11:33:01    4    designing a medical device that goes in an operating

11:33:03    5    room, that the medical device should not increase the

11:33:11    6    risk of harm to a patient?

11:33:14    7            MR. GOSS:  Object to form, --

11:33:14    8        A.    I --

11:33:16    9            MR. GOSS:  -- foundation.

11:33:17   10        A.    I -- I would agree.

11:33:19   11        Q.    I mean I'm not sure you're aware of this,

11:33:23   12    but I'm an engineer as well, mechanical engineer,

11:33:25   13    graduate from the University of Florida, and I was

11:33:29   14    always taught that engineering is a profession, not

11:33:32   15    just a job.  You have a duty to the public.  Do you

11:33:34   16    agree with that?

11:33:35   17        A.    I -- I agree with that.

11:33:36   18        Q.    So engineering is -- is -- is a profession.

11:33:38   19        A.    Yes.

11:33:39   20        Q.    You have a duty to the public; correct?

11:33:41   21        A.    Yes.

11:33:41   22        Q.    And as a professor of engineering, you have

11:33:46   23    a duty to teach ethical behavior to your students;

11:33:50   24    correct?

11:33:50   25        A.    It's included in our curriculum, yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

99

11:33:52  1      Q.   Okay.  You guys actually have a class on

11:33:55  2  that; correct?

11:33:56  3      A.   Yes.

11:33:57  4      Q.   And you teach your students that engineers

11:34:02  5  need to be honest.

11:34:03  6      A.   Yes.

11:34:04  7      Q.   To be impartial.

11:34:04  8      A.   Yes.

11:34:05  9      Q.   To serve with fidelity to the public.

11:34:11  10      A.   Sounds like you're reading from something,

11:34:13  11  but --

11:34:14  12          It sounds like a -- like in the ASME Code of

11:34:17  13  Ethics or something.  So --

11:34:18  14      Q.   And that's a code of ethics by the American

11:34:22  15  Society of Mechanical Engineers; correct?

11:34:22  16      A.   That's where I thought it was coming from,

11:34:24  17  yes.

11:34:24  18      Q.   And it should be applied to all engineers;

11:34:26  19  correct?

11:34:26  20      A.   Yes.

11:34:27  21      Q.   Even 3M engineers; correct?

11:34:29  22      A.   As I said before, all engineers.

11:34:30  23      Q.   So you agree that 3M -- 3M's engineers

11:34:33  24  should be honest, impartial, and serve with fidelity.

11:34:38  25      A.   Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

100

11:34:38  1      Q.   Okay.  And as an expert in this case and as

11:34:50  2   a member of ASME, you must follow engineering ethics;

11:34:55  3   correct?

11:34:55  4      A.   Yes.

11:34:55  5      Q.   And to do that and to do that in formulating

11:34:59  6   your opinion, you should have all the information --

11:35:03  7   reasonable information available to you in formulating

11:35:04  8   your opinion; correct?

11:35:06  9      A.   I think all reasonable information, yes.

11:35:08  10     Q.   Okay.  You should have all the relevant

11:35:10  11  studies that were done to review before formulating

11:35:15  12  your opinions; correct?

11:35:16  13     A.   All that I think are relevant, yes.

11:35:19  14     Q.   Okay.  And you should have the opinions --

11:35:22  15  all the relevant studies, whether or not they're

11:35:26  16  supportive or critical of the Bair Hugger in this

11:35:29  17  case, correct, before formulating your opinion;

11:35:30  18  correct?

11:35:30  19     A.   That would be ideal.

11:35:32  20     Q.   Well as an engineer, before you solve a

11:35:36  21  problem, you have to research the problem; correct?

11:35:38  22     A.   Yes.

11:35:40  23     Q.   Okay.  That -- that goes to the integrity of

11:35:44  24  your opinions; correct?

11:35:45  25     A.   Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

101

| | | |
|---|---|---|
| 11:35:45 | 1 | Q.   Okay.  And you would expect that 3M would |
| 11:35:56 | 2 | provide you with all the information they had |
| 11:35:59 | 3 | available to educate you on the issues in this case; |
| 11:36:09 | 4 | correct? |
| 11:36:09 | 5 | A.   That would be my assumption. |
| 11:36:10 | 6 | Q.   Because at the end of the day when it comes |
| 11:36:14 | 7 | to engineering and formulating your opinion, integrity |
| 11:36:17 | 8 | and honesty are the most important things; correct? |
| 11:36:20 | 9 | A.   I think personally, yes. |
| 11:36:23 | 10 | Q.   Well as an engineer dealing with people's |
| 11:36:26 | 11 | lives and -- and coming to conclusions, you have to be |
| 11:36:30 | 12 | objective, honest, and have integrity. |
| 11:36:33 | 13 | MR. GOSS:  Object to form, asked and |
| 11:36:34 | 14 | answered. |
| 11:36:37 | 15 | A.   Yeah, I -- as I say, I think I've answered |
| 11:36:39 | 16 | that already. |
| 11:36:43 | 17 | Q.   And these principles we're talking about, |
| 11:36:47 | 18 | engineering ethics, that's a required class for all |
| 11:36:49 | 19 | mechanical engineering students at the University of |
| 11:36:53 | 20 | Minnesota; correct? |
| 11:36:54 | 21 | A.   It is. |
| 11:36:55 | 22 | Q.   And I believe it's a required class for all |
| 11:36:57 | 23 | mechanical engineering students at any accredited |
| 11:37:00 | 24 | university; correct? |
| 11:37:00 | 25 | A.   I believe it's an ABET requirement. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

102

11:37:03    1      Q.   Okay.  And in fact you can't become a member

11:37:05    2   of the American Society of Mechanical Engineers unless

11:37:08    3   you've taken engineering ethics; correct?

11:37:10    4      A.   I -- I -- I don't know about that level of

11:37:12    5   detail.

11:37:15    6      Q.   Okay.  You agree with me that engineers

11:37:24    7   should solve a potential problem instead of ignoring

11:37:27    8   it; correct?

11:37:29    9      A.   Yes.

11:37:30   10      Q.   I mean engineers are problem-solvers; right?

11:37:34   11      A.   Yes.

11:37:34   12      Q.   They're not problem-hiders.  They don't hide

11:37:37   13   problems, they should solve problems; correct?

11:37:39   14           MR. GOSS:  Object to form.

11:37:40   15      A.   Well that's what -- what engineers are

11:37:41   16   trained to do.

11:37:41   17      Q.   Okay.  And if an engineer is aware of a

11:37:44   18   problem, it would be unethical to try to hide it

11:37:48   19   publicly; correct?

11:37:49   20           MR. GOSS:  Object to form.

11:37:50   21      A.   Possibly.

11:37:55   22      Q.   That was a big issue with the Pinto, is that

11:37:58   23   the engineers, they looked at it and they tried to

11:38:00   24   hide it publicly instead of solving the problem

11:38:03   25   because the bean counters came up and said it would be

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

103

11:38:05  1  cheaper to pay off people in lawsuits than fix the

11:38:07  2  problem; correct?

11:38:08  3      A.   I do not recall that level of detail on that

11:38:11  4  particular case.

11:38:11  5      Q.   We'll get to that in a second then.

11:38:13  6           Are you aware of the Citibank case, Citibank

11:38:16  7  Building?

11:38:17  8      A.   You'll have to educate me or remind me.

11:38:20  9      Q.   The Citibank Building in New York City where

11:38:23  10  it was built and some graduate student came in later

11:38:26  11  on and realized that if the wind hit it at a certain

11:38:29  12  angle, the -- the skyscraper would fail.  Does that

11:38:33  13  refresh your recollection?

11:38:34  14      A.   I don't recall that, no.

11:38:35  15      Q.   Okay.  Now you agree with me that there's a

11:38:39  16  certain process that -- that engineers are taught when

11:38:42  17  there is a problem in a design.

11:38:46  18      A.   I'm -- I'm not sure that's actually part of

11:38:49  19  the education.

11:38:49  20      Q.   Okay.  Well you agree with me when there is

11:38:57  21  a problem in a design, the first thing to look at is

11:39:02  22  to determine who are the stakeholders.  Does that

11:39:08  23  sound familiar?

11:39:09  24      A.   Well if there's a problem in the -- in the

11:39:12  25  design, it's usually the design does not meet the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

104

11:39:15  1  expect -- expected requirements or expected outcome.

11:39:47  2      Q.   What do you teach engineers when -- of what

11:39:55  3  to do when a potential problem is identified?

11:40:00  4      A.   I'm not sure I actually teach that in any of

11:40:03  5  my courses.

11:40:21  6      Q.   Were you ever taught what to do if and when

11:40:24  7  a problem is identified in the design that's out in

11:40:28  8  the -- in the market?

11:40:31  9      A.   I do not recall that, no.

11:40:32  10     Q.   Would you agree with me that an engineer who

11:41:14  11  has a potential problem identified to them should

11:41:19  12  identify a potential solution before they consider the

11:41:22  13  impact on potential stakeholders?

11:41:25  14           MR. GOSS:   Object to form.

11:41:28  15     A.   I -- I think an engineer would look at the

11:41:30  16  entire scenario and -- and determine what -- what a

11:41:36  17  possible path forward would be.

11:41:37  18     Q.   So they would look at the cost of the

11:41:40  19  path -- the cost of the time when they're trying to

11:41:42  20  solve the problem?

11:41:43  21     A.   That would be part of it.

11:41:44  22     Q.   You think they should look at -- if

11:41:46  23  there's --

11:41:47  24           If there's a product out there that has

11:41:49  25  potential to injure people, that in finding a

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

105

| | | |
|---|---|---|
| 11:41:56 | 1 | solution, they should look at the cost of the |
| 11:41:58 | 2 | solution; is that your testimony today? |
| 11:42:01 | 3 | MR. GOSS:  Objection, incomplete |
| 11:42:02 | 4 | hypothetical. |
| 11:42:03 | 5 | A.  Again, an en -- |
| 11:42:05 | 6 | Any engineering decisions, that's -- that's |
| 11:42:07 | 7 | always part of the final solution. |
| 11:42:09 | 8 | Q.  I'm not talking about the final solution, |
| 11:42:11 | 9 | I'm talking about finding the initial solution. |
| 11:42:14 | 10 | Should they look at the cost? |
| 11:42:16 | 11 | MR. GOSS:  Same objection. |
| 11:42:17 | 12 | A.  It -- it's part of the path to the approach |
| 11:42:20 | 13 | of the final solution.  It's one of the considerations |
| 11:42:23 | 14 | along the way. |
| 11:42:24 | 15 | Q.  Is that what you teach your students? |
| 11:42:31 | 16 | MR. GOSS:  Objection, form, asked and |
| 11:42:32 | 17 | answered. |
| 11:42:34 | 18 | Q.  So sitting here today, you don't believe |
| 11:42:37 | 19 | you've ever taught a case -- a class in ethics. |
| 11:42:40 | 20 | A.  As I said before, I've not taught -- taught |
| 11:42:42 | 21 | a class in ethics, no. |
| 11:42:47 | 22 | Q.  Did you ever lecture on ethics? |
| 11:42:58 | 23 | A.  I think as part of a training program for |
| 11:43:03 | 24 | graduate students, yes. |
| 11:43:05 | 25 | Q.  Can you elaborate on that a little bit more. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

106

11:43:09  1      A.   Our -- our department has a separate you

11:43:15  2  might call it short course for -- for providing ethics

11:43:18  3  training for graduate students, and at one time I was

11:43:21  4  involved in -- in that course.  And it was, again,

11:43:25  5  many years ago, so I don't remember the -- the details

11:43:27  6  of my -- my involvement.

11:43:29  7      Q.   How long ago?

11:43:29  8      A.   Probably 15 years ago.

11:43:31  9      Q.   Okay.  Would that be a 5000- or 6000-level

11:43:40  10  class?

11:43:41  11     A.   No, it's a separate --

11:43:42  12          It -- it's not listed in the class schedule.

11:43:44  13  It's a separate simply ethics required course that all

11:43:48  14  graduate students must attend.  Or I shouldn't say

11:43:51  15  course, a training.

11:44:19  16          MR. ASSAAD:  Let's take a five-minute break.

11:44:22  17          THE REPORTER:  Off the record, please.

          18          (Recess taken.)

11:53:28  19          (Kuehn Exhibit 6 was marked for

11:53:30  20          identification.)

11:53:30  21  BY MR. ASSAAD:

11:53:30  22     Q.   So marked as Exhibit 6 is a PowerPoint

11:53:34  23  presentation obtained from the University of Minnesota

11:53:39  24  in the fall of 2010 titled "ME 4054:  Ethics in

11:53:45  25  Design."  Do you see that?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

107

11:53:45    1        A.    I see that.

11:53:46    2        Q.    And it says "Prof. Kuehn" at the bottom.

11:53:49    3        A.    And also was 17 years ago, which is close to

11:53:52    4    my estimate of 15 years ago.

11:53:54    5        Q.    It says fall of 2010.

11:53:57    6        A.    Seven years ago.  Okay.

11:53:58    7        Q.    Okay.

11:53:59    8        A.    My mistake.

11:54:00    9        Q.    Okay.  Does this refresh your recollection

11:54:03   10    of teaching a course on ethics in design?

11:54:07   11        A.    This course ME 4054 is a -- is our senior

11:54:11   12    design course, and I apparently taught that course, it

11:54:16   13    must have been in fall of 2010, and --

11:54:19   14        Q.    And --

11:54:19   15        A.    -- this was the -- looks like the set of

11:54:22   16    notes I gave for that particular lecture.

11:54:25   17        Q.    And it was on ethics; correct?

11:54:27   18        A.    Yes.

11:54:27   19        Q.    Okay.  I'd like you to turn to page six.  Do

11:54:50   20    you recall teaching your students about case study

11:54:53   21    number one, the Ford Pinto in the 1970s?

11:54:56   22        A.    Apparently I must have.

11:54:57   23        Q.    Okay.  And you had some group discussion

11:55:01   24    items with respect to the case study of the Ford

11:55:05   25    Pinto, which is the slide on the bottom of the page;

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

108

11:55:07    1    correct?

11:55:07    2        A.    Yes.

11:55:07    3        Q.    It says, "Ford knows there's a problem.

11:55:10    4    What should they do?

11:55:11    5              "Group Discussion Items."

11:55:12    6              Do you see that?

11:55:13    7        A.    I -- I don't -- do not see that.

11:55:26    8        Q.    "Ford knows there's a problem."

11:55:28    9        A.    Oh.

11:55:29   10        Q.    "What should they do?"

11:55:31   11        A.    Yes, okay.

11:55:32   12        Q.    "Group Discussion Items."

11:55:34   13        A.    Okay.

11:55:34   14        Q.    And -- and this is what you're teaching your

11:55:37   15    students; correct?

11:55:38   16        A.    This was a set of notes that was generic to

11:55:40   17    the course that -- that I used when I was facilitating

11:55:43   18    the -- the course at that time.

11:55:44   19        Q.    And you were with a bunch of other

11:55:47   20    professors in that course; correct?

11:55:48   21        A.    Yes.

11:55:48   22        Q.    Okay.  But you yourself taught this lecture

11:55:52   23    to your students; correct?

11:55:53   24        A.    Apparently I did, yes.

11:55:55   25        Q.    Okay.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

109

11:55:55    1           MR. GOSS:  I'm just going to state an

11:55:57    2   objection that he's not being offered to provide any

11:56:01    3   opinions on engineering ethics.  That's my objection.

11:56:05    4           MR. ASSAAD:  Okay.

11:56:08    5       Q.  The first one are --

11:56:10    6           The first question is "Who are the

11:56:11    7   stakeholders?"  What did you mean by that?

11:56:19    8       A.  I guess going back and thinking about this

11:56:22    9   again, I mean I haven't looked at this for a long

11:56:26   10   time, it probably would include the -- the company,

11:56:30   11   the people who bought the product, and maybe other

11:56:35   12   service personnel.

11:56:36   13       Q.  So basically the manufacturer and the

11:56:40   14   consumers; correct?

11:56:40   15       A.  Well those would be the two main

11:56:43   16   stakeholders.

11:56:44   17       Q.  So with respect to the Ford Pinto, the

11:56:46   18   stakeholders would be the -- the manufacturer, Ford;

11:56:51   19   correct?

11:56:51   20       A.  Yes.

11:56:52   21       Q.  The consumers that bought the Ford Pinto;

11:56:58   22   correct?

11:56:58   23       A.  Yes.

11:56:58   24       Q.  As well as, if there's a car accident, other

11:57:02   25   individuals that might be involved in the accident;

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

110

11:57:04   1   correct?

11:57:04   2       A.   That's -- that's potentially correct, yes.

11:57:07   3       Q.   Okay.  But just to refresh your

11:57:08   4   recollection, you remember the Pinto had a problem

11:57:10   5   with the -- with the gas tank; correct?

11:57:12   6       A.   Yes.

11:57:12   7       Q.   Okay.  And in certain rear-end collisions it

11:57:18   8   could cause it to catch on fire and explode.

11:57:20   9       A.   That -- that's what I recall.

11:57:21  10       Q.   Okay.  And Ford knew about this problem but

11:57:24  11   decided not to do anything about it; correct?

11:57:26  12       A.   That's what I had read.

11:57:27  13       Q.   Okay.  And in fact, based on this case

11:57:31  14   study, I'm sure that you taught your students what

11:57:35  15   Ford did was unethical; correct?

11:57:37  16       A.   Yes.

11:57:37  17       Q.   Okay.  Because they put profits over safety;

11:57:41  18   correct?

11:57:41  19       A.   Again --

11:57:44  20            MR. GOSS:  Object to form.

11:57:45  21       A.   Well, their approach to the problem was

11:57:47  22   perhaps not as expedient as -- as might be

11:57:51  23   anticipated --

11:57:51  24       Q.   They ignored the problem.

11:57:52  25       A.   -- or expected.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

111

11:57:53  1      Q.    They ignored the problem.

11:57:55  2      A.    I can't speak for Ford, but --

11:57:58  3      Q.    Okay.  Under "Group Discussion Items,"

11:58:05  4   number two, you teach your students "Propose as many

11:58:09  5   different alternative solutions as you can think of;"

11:58:12  6   correct?

11:58:12  7      A.    That's what it says.

11:58:14  8      Q.    And you agree with that; correct?

11:58:16  9      A.    Yes.

11:58:17  10     Q.    Okay.  It says, "Do not assign any value or

11:58:20  11  determine the implications of this proposed solution

11:58:23  12  for now;" correct?

11:58:24  13     A.    That's the brainstorming part, yes.

11:58:27  14     Q.    So you find a solution and you don't take

11:58:29  15  into account, at this time of -- of -- of the problem

11:58:32  16  solving, the implications of cost.

11:58:35  17     A.    I believe that to be correct.

11:58:36  18     Q.    Okay.  And that's ethical; correct?

11:58:38  19     A.    This is the first stage, the brainstorming-

11:58:42  20  potential-problem part of the solution, yes.

11:58:45  21     Q.    Okay.  So the first stage is propose

11:58:46  22  solutions, you know, and not to consider cost.  Agree?

11:58:50  23     A.    I would agree with that.

11:58:53  24     Q.    Okay.  And this is an outline that you

11:58:56  25  created; correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

112

11:58:57  1      A.   I did not, actually.  This was an outline

11:59:00  2  provided to me by the overall course instructor for

11:59:03  3  the design course that I then used in this particular

11:59:06  4  lecture.

11:59:06  5      Q.   But you don't disagree with this outline;

11:59:09  6  correct?

11:59:09  7      A.   I do not disagree with it, no.

11:59:11  8      Q.   And this is also taught by the American

11:59:14  9  Society of Mechanical Engineers; correct?

11:59:15  10     A.   Yes.

11:59:15  11     Q.   Okay.  Once you come up with a solution, you

11:59:22  12  go to number three and it states, "Now try to predict

11:59:25  13  each option's impact on the stakeholders;" correct?

11:59:28  14     A.   That's what it says.

11:59:29  15     Q.   So, for example, in the Ford Pinto case you

11:59:31  16  look at what the cost would be to Ford as well as the

11:59:34  17  effect they put on the safety of the consumer as well

11:59:39  18  as other people that are on the road; correct?

11:59:40  19     A.   I would think you would include all

11:59:42  20  stakeholders involved, yes.

11:59:44  21     Q.   Okay.  Number four is "Determine the best

11:59:49  22  possible course of action and explain the reasons for

11:59:51  23  your choice;" correct?

11:59:52  24     A.   That's what it says.

11:59:53  25     Q.   Okay.  And that would be a -- similar to a

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

113

| Time | Line | Text |
|------|------|------|
| 11:59:57 | 1 | cost/benefit analysis; correct? |
| 11:59:59 | 2 | A.    That would probably include cost, but this |
| 12:00:05 | 3 | is more than that. |
| 12:00:05 | 4 | Q.    Well what else would it include? |
| 12:00:06 | 5 | A.    Potential time to make potential |
| 12:00:10 | 6 | modifications, could it be done quickly or if it would |
| 12:00:13 | 7 | take mult -- multiple years, for example. |
| 12:00:16 | 8 | Q.    Are you familiar with the Takata litigation? |
| 12:00:20 | 9 | A.    Say that again. |
| 12:00:21 | 10 | Q.    The Takata -- Takata/Takata litigation |
| 12:00:24 | 11 | regarding airbags? |
| 12:00:25 | 12 | A.    I have heard of that.  I'm not very familiar |
| 12:00:27 | 13 | with that. |
| 12:00:27 | 14 | Q.    Okay.  Do you know whether or not you have a |
| 12:00:34 | 15 | Takata airbag in your car? |
| 12:00:36 | 16 | A.    I do not know. |
| 12:00:37 | 17 | MR. GOSS:  I got a notice last week. |
| 12:00:41 | 18 | MR. ASSAAD:  Off the record. |
| 12:00:43 | 19 | THE REPORTER:  Off the record, please. |
| 12:01:19 | 20 | (Discussion off the record.) |
| 12:01:19 | 21 | BY MR. ASSAAD: |
| 12:01:23 | 22 | Q.    Number five states, "Are your answers to the |
| 12:01:25 | 23 | above questions the same regardless of whom you |
| 12:01:28 | 24 | represent?  In other words, does one's response change |
| 12:01:32 | 25 | depending on one's stake in the solution?"  Did I read |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

114

12:01:34  1   that correctly?

12:01:35  2        A.   I believe you read it correctly.

12:01:36  3        Q.   When you taught that to your students, what

12:01:39  4   did you mean by that?

12:01:41  5        A.   In what it says here, and I guess I would

12:01:49  6   agree with that, is whether you represent the -- let's

12:01:52  7   take two stakeholders, the manufacturer or the owners

12:01:56  8   of vehicles, that the solution should be acceptable to

12:01:59  9   both sides.

12:02:00  10       Q.   Okay.  So basically, if you're a consumer

12:02:04  11  that owns a Pinto, the solution should be I should

12:02:07  12  have a car that doesn't blow up and catch on fire.

12:02:10  13       A.   Well the solution hopefully would be

12:02:12  14  whatever -- whatever would mitigate the problem in the

12:02:15  15  first place.

12:02:15  16       Q.   Okay.  So you're --

12:02:17  17            If you're the consumer, you want to drive a

12:02:20  18  car that's safe; correct?

12:02:21  19       A.   You want to make sure the problem that was

12:02:23  20  identified had been corrected.

12:02:24  21       Q.   And by "corrected," you mean driving a safe

12:02:28  22  car that the gas tank doesn't blow up.

12:02:30  23       A.   I guess I would agree with that.

12:02:31  24       Q.   Okay.  And that's what you taught your

12:02:32  25  students as well.  You should have a car --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

115

12:02:34  1        In this case the solution should be a car

12:02:36  2   that's driven that doesn't blow up; correct?

12:02:38  3        A.   I guess one could come to that conclusion,

12:02:40  4   yes.

12:02:42  5        Q.   Well what's your conclusion?

12:02:43  6        A.   Well that -- that would -- I would --

12:02:47  7             I would agree with that.

12:02:58  8        Q.   Because as an engineer you have a

12:03:01  9   fidelity, you have a fidelity to the public; correct?

12:03:03  10       A.   Yes.

12:03:12  11       Q.   Go to page eight.  Do you agree with respect

12:03:18  12  to the Ford Pinto that Ford decided not to change the

12:03:22  13  design?

12:03:24  14       A.   That -- that didn't seem to be a wise

12:03:27  15  decision.

12:03:41  16       Q.   And you write down, "An internal Ford memo

12:03:44  17  stated that it would be cheaper to pay off possible

12:03:46  18  lawsuits for resulting deaths than recall the

12:03:50  19  vehicles.  A cost-benefit analysis compared the cost

12:03:52  20  of a $13 repair against the monetary value of a human

12:03:56  21  life."  Did I read that correctly?

12:03:57  22       A.   I --

12:03:58  23            You read that correctly.

12:03:58  24       Q.   And you agree with me that the engineers and

12:04:01  25  the people at Ford that decided to go along that

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

116

12:04:04    1    course of action, you consider that to be unethical.

12:04:07    2         A.   I do.

12:04:08    3         Q.   Go to page 14.  You're familiar with the

12:04:50    4    Challenger explosion; correct?

12:04:51    5         A.   Yes.

12:04:52    6         Q.   And it was a faulty O-ring, do you recall

12:04:55    7    that?

12:04:55    8         A.   I recall that.

12:04:56    9         Q.   Okay.  And in fact the potential for failure

12:05:22   10    was identified in the failure mode and effects

12:05:24   11    analysis process, but NASA management pushed for

12:05:29   12    launch.  Do you recall -- recall --

12:05:31   13              Do you see that at the bottom?

12:05:31   14         A.   I see that at the bottom, yes.

12:05:33   15         Q.   And you recall that; correct?

12:05:35   16         A.   I don't recall that detail at the time.

12:05:37   17    Again, someone else put these notes together, so I --

12:05:39   18    I would agree that's correct.

12:05:40   19         Q.   But you were aware of the Challenger, and

12:05:42   20    later on they found out that they pushed for launch

12:05:44   21    even though they were aware of the possible failure of

12:05:47   22    the O-ring; correct?

12:05:48   23         A.   I do recall that.

12:05:48   24         Q.   And so they ignored -- they ignored the --

12:05:51   25    the -- the potential failure and decided to go for the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

117

12:05:55  1   launch, and that was a big criticism, and determined

12:05:59  2   that that behavior was unethical according to

12:06:01  3   engineering standards; correct?

12:06:03  4            MR. GOSS:  Objection, form, foundation.

12:06:04  5       A.   I -- I don't -- I don't recall the

12:06:05  6   engineering-ethics part, but I do recall the -- the --

12:06:09  7   the issue.

12:06:12  8       Q.   If you go to page 18 -- or 16, you teach

12:06:20  9   your students, "Compromise is not an option."  Do you

12:06:24  10  agree with that?

12:06:25  11      A.   That's what it says, and --

12:06:29  12      Q.   That's what you taught your students.

12:06:31  13      A.   Yes.

12:06:31  14      Q.   Okay.

12:06:32  15      A.   Uh-huh.

12:06:32  16      Q.   It states, "Most engineers never encounter

12:06:34  17  an ethical dilemma during your career.  If you do,

12:06:38  18  think it through and take advice as appropriate."  Do

12:06:41  19  you agree with that?

12:06:42  20      A.   Yes, I do.

12:06:43  21      Q.   And then you teach your students, "Nine of

12:06:47  22  the most dangerous words in the English language are:

12:06:51  23  'If I ignore it, maybe it will go away.'"  Do you

12:06:55  24  agree those are dangerous words as an engineer?

12:06:56  25      A.   Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

118

12:06:57    1        Q.    And that's not something you would teach

12:06:59    2    your students to do, to ignore potential problems.

12:07:02    3        A.    Not -- not if you're certainly made aware of

12:07:06    4    it, no.

12:07:06    5        Q.    Okay.  And then you write down, "Most large

12:07:11    6    companies and organizations have an ethics or

12:07:14    7    ombudsman office that allows employees to report or

12:07:17    8    discuss ethics concerns confidentially."  Do you know

12:07:19    9    whether or not 3M has such an office?

12:07:21   10        A.    I have no idea.

12:07:26   11        Q.    You agree that lack of due diligence could

12:07:35   12    create an ethical dilemma; correct?

12:07:37   13              MR. GOSS:  Objection, vague.

12:07:43   14        A.    Say that again.

12:07:45   15        Q.    Lack of due diligence by ignoring something

12:07:48   16    could cause an ethical dilemma.

12:07:51   17        A.    Potentially, yes.

12:07:52   18        Q.    Okay.  You agree that engineers and the

12:08:14   19    corporations they work for should not manipulate

12:08:17   20    research.

12:08:19   21        A.    I -- I should think they would -- should not

12:08:22   22    manipulate research results or research data.

12:08:24   23        Q.    Yeah.  They should not manipulate the

12:08:27   24    results of the data; correct?

12:08:28   25        A.    Correct.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

119

12:08:30  1     Q.   Okay.  You agree that engineers and

12:08:32  2  corporations they work for should not suppress

12:08:35  3  research.

12:08:42  4     A.   I think --

12:08:43  5          Well by suppressing research, do you mean

12:08:47  6  suppressing release of information?

12:08:49  7     Q.   No.  Let's put it this way:  If a

12:08:56  8  corporation has a product in the market and the

12:09:02  9  organization or researchers want to do research on the

12:09:08  10  safety of that product, you agree with me that the

12:09:10  11  corporation should not suppress the research on that

12:09:15  12  product dealing with the safety of the product.

12:09:17  13          MR. GOSS:  Objection, incomplete

12:09:19  14  hypothetical.

12:09:20  15     A.   Well I -- I would hope that would be the

12:09:22  16  case.

12:09:22  17     Q.   So you agree with that statement.

12:09:23  18     A.   Yes.

12:09:24  19     Q.   Okay.  You would expect a reasonable,

12:09:36  20  prudent company to identify solutions to potential

12:09:39  21  problems with their products; correct?

12:09:40  22          MR. GOSS:  Objection, form.

12:09:41  23     A.   I would -- I would expect that.

12:09:44  24          MR. ASSAAD:  Basis.

12:09:45  25          MR. GOSS:  Vague.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

120

12:09:47   1      Q.   Did you understand my question?

12:09:48   2      A.   Could you repeat it?

12:09:52   3      Q.   You would expect a reasonable, prudent

12:09:55   4   corporation to identify solutions to potential

12:09:59   5   problems with their products; correct?

12:10:02   6      A.   Yes.

12:10:02   7      Q.   You understood the question; correct?

12:10:04   8      A.   Yes.

12:10:04   9      Q.   And you agree with that statement; correct?

12:10:06   10     A.   Yes.

12:10:07   11     Q.   And then we just discussed before, in

12:10:14   12  identifying solutions in the initial brainstorming you

12:10:18   13  should not consider cost.

12:10:19   14     A.   That's what I said, and I still agree with

12:10:21   15  that.

12:10:21   16     Q.   Okay.  Engineers and corporations should not

12:10:26   17  ignore research conducted by other scientists with

12:10:29   18  respect to the safety of the company's product.  Do

12:10:33   19  you agree with that?

12:10:34   20          MR. GOSS:  Object to form, incomplete

12:10:36   21  hypothetical.

12:10:36   22     A.   I would think that would be prudent.

12:10:39   23     Q.   So you agree with that statement.

12:10:41   24     A.   Yes.

12:10:44   25     Q.   An engineer should not ignore apparent

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

121

| | |
|---|---|
| 12:10:53 | 1  problems; correct? |
| 12:10:58 | 2        MR. GOSS:  Objection, vague. |
| 12:11:00 | 3    A.    Could you define "apparent?" |
| 12:11:01 | 4    Q.    Well if there's a problem they're aware of, |
| 12:11:04 | 5  an apparent problem, they know of a problem or a |
| 12:11:07 | 6  potential problem, they should not ignore it. |
| 12:11:09 | 7    A.    Potential problems are difficult to |
| 12:11:11 | 8  anticipate, so I would -- I would think they should be |
| 12:11:14 | 9  aware of actual problems that are brought to their |
| 12:11:18 | 10  attention. |
| 12:11:19 | 11    Q.    So apparent.  They should be -- |
| 12:11:21 | 12        They should not ignore an apparent problem. |
| 12:11:23 | 13    A.    If they're aware of a real problem that |
| 12:11:26 | 14  exists. |
| 12:11:26 | 15    Q.    Okay.  Do you agree with me that engineers |
| 12:11:35 | 16  and corporations should not ignore apparent problems |
| 12:11:44 | 17  by dismissing or criticizing safety issues raised by |
| 12:11:49 | 18  peer-reviewed studies? |
| 12:11:51 | 19        MR. GOSS:  Object to form, incomplete |
| 12:11:54 | 20  hypothetical. |
| 12:11:54 | 21    A.    Can you repeat that, please? |
| 12:11:56 | 22    Q.    Engineers should not ignore apparent |
| 12:11:59 | 23  problems by dismissing or criticizing safety issues |
| 12:12:04 | 24  raised by peer-reviewed studies. |
| 12:12:06 | 25        MR. GOSS:  Same objection. |

122

| | | |
|---|---|---|
| 12:12:08 | 1 | Q.  Do you understand that question? |
| 12:12:09 | 2 | A.  I -- I think I do. |
| 12:12:10 | 3 | I think like an engineer should take those |
| 12:12:13 | 4 | into consideration when making any -- any judgments. |
| 12:12:16 | 5 | Q.  Well, for example, if a study comes out and |
| 12:12:20 | 6 | states that a company's product is defective or |
| 12:12:31 | 7 | unsafe, a company should not ignore that study. |
| 12:12:37 | 8 | MR. GOSS:  Objection, incomplete |
| 12:12:38 | 9 | hypothetical. |
| 12:12:39 | 10 | A.  Again, if they're made aware of it, I -- I |
| 12:12:42 | 11 | would agree with that. |
| 12:12:47 | 12 | Q.  Now when designing a device, engineers |
| 12:12:59 | 13 | should take into account warnings of other similar |
| 12:13:03 | 14 | devices that are in the market; correct? |
| 12:13:07 | 15 | MR. GOSS:  Same objection. |
| 12:13:08 | 16 | A.  I think one -- I think one -- one should be |
| 12:13:10 | 17 | aware of potential similar products -- |
| 12:13:14 | 18 | Q.  Okay. |
| 12:13:14 | 19 | A.  -- and -- and issues associated with them. |
| 12:13:16 | 20 | Q.  And the warnings of those products given by |
| 12:13:20 | 21 | out -- by those products; correct? |
| 12:13:21 | 22 | A.  Again, the -- |
| 12:13:21 | 23 | MR. GOSS:  Objection to form and lack of |
| 12:13:22 | 24 | foundation.  I'd also object that he's not being |
| 12:13:24 | 25 | offered to provide opinions on warnings. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

123

12:13:27    1            You can answer if you can.

12:13:29    2        A.    Repeat that, please.

12:13:31    3        Q.    Engineers should take into account warnings

12:13:33    4    of other similar devices in the field.

12:13:35    5            MR. GOSS:  Same objection.

12:13:37    6        A.    If they're --

12:13:39    7            It depends how -- how close the other

12:13:41    8    devices are to their device, and again, being aware of

12:13:45    9    any issues that have resulted -- that have developed.

12:13:46   10        Q.    Well if you have a forced-air warming device

12:13:49   11    made by 3M and a similar device made by another

12:13:53   12    company that warns of a certain risk, the 3M engineers

12:13:56   13    should be aware of the other device's warnings and

12:13:59   14    determine whether or not they're typical to the device

12:14:04   15    that they're manufacturing; correct?

12:14:06   16            MR. GOSS:  Same objection, beyond the scope

12:14:08   17    of what he's being offered to testify to.

12:14:09   18        A.    I think a prudent engineer should be aware

12:14:11   19    of that, and whether that makes --

12:14:13   20            The decision has to be made by somebody

12:14:15   21    whether it's really going to affect their product or

12:14:19   22    not.

12:14:19   23        Q.    Were you provided any warnings in your

12:14:20   24    review or in the formulation of your opinions with

12:14:23   25    respect to other patient warming devices that are used

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

124

12:14:26   1   in the -- that are sold in the -- in the market?

12:14:30   2        A.   I may have.  I can't recall.

12:14:33   3        Q.   Okay.  But if you had been provided, that

12:14:38   4   would be on the list of Exhibit E of Exhibit 1 of this

12:14:41   5   deposition; correct?

12:14:42   6        A.   It may have just been discussions with

12:14:45   7   counsel.

12:14:45   8        Q.   Okay.  Well do you recall any type of

12:14:48   9   warnings provided by other manufacturers, sitting here

12:14:50  10   today?

12:14:50  11        A.   Not off the top of my head, no.

12:14:54  12        Q.   You agree with me that when engineers

12:15:02  13   determine the safety of a device, they should not

12:15:09  14   consider potential litigation.

12:15:14  15        A.   I -- I think an engineer should -- should do

12:15:16  16   that, yes.

12:15:17  17        Q.   Should not consider potential litigation

12:15:19  18   when determining the safety of a device; correct?

12:15:22  19        A.   I think they should make the device as safe

12:15:25  20   as -- as is feasible from an engineering standpoint.

12:15:27  21        Q.   Litigation should have nothing to do with

12:15:29  22   that situation; correct?

12:15:31  23        A.   I would think not.

12:15:32  24        Q.   Okay.  Now my understanding is you've only

12:15:42  25   reviewed three articles with respect to the Bair

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

125

12:15:50  1  Hugger -- with respect to the Bair Hugger; correct?

12:15:51  2      A.  I -- I believe that's correct.

12:15:53  3      Q.  Okay.  And that is going to be the three --

12:15:57  4  the last three items on Exhibit E, correct, of

12:16:01  5  Exhibit 1?

12:16:02  6      A.  Let me look at Exhibit 1 here.

12:16:18  7          I believe that's correct.

12:16:22  8      Q.  You have not reviewed any of the Andrew Legg

12:16:41  9  studies; correct?

12:16:42  10     A.  I have not.

12:16:43  11     Q.  And are you aware that Andrew Legg did the

12:16:46  12  particle testing and -- and -- on the Bair Hugger?

12:16:50  13     A.  I was not aware of that, no.

12:16:52  14     Q.  Okay.  You have not reviewed the published

12:16:58  15  literature by Dr. McGovern and Dr. Reed; have you?

12:17:03  16     A.  The Reed article at the very end I have.

12:17:05  17     Q.  Okay.  But that dealt with the -- with the

12:17:12  18  evaluation of the intake filtration; correct?

12:17:14  19     A.  Yes.

12:17:16  20     Q.  Okay.  But you haven't read the McGovern

12:17:19  21  article dealing with neutral buoyancy bubbles as well

12:17:24  22  as infection rates; have you?

12:17:25  23     A.  I -- I do not believe so, no.

12:17:27  24     Q.  Okay.  You have not read an article by

12:17:34  25  Dasari with respect to temperature measurements around

126

12:17:37    1    the operating room or above the surgical table when

12:17:40    2    the Bair Hugger was turned on as compared to when it

12:17:42    3    was turned off; correct?

12:17:43    4        A.    I have not.

12:17:44    5        Q.    You have not looked at the Sessler article

12:17:50    6    regarding particle tested -- particle testing in a

12:17:59    7    unidirectional operating room in Holland that was

12:18:03    8    actually done, conducted by 3M.

12:18:06    9            MR. GOSS:  Object to form.

12:18:07   10        A.    I don't -- don't recall that, no.

12:18:13   11        Q.    You haven't read the Brandt article;

12:18:17   12    correct?

12:18:17   13        A.    No.

12:18:17   14        Q.    You haven't read -- have you -- were you

12:18:18   15    provided --

12:18:19   16            Have you read the Huang article on bacteria

12:18:22   17    testing in an operating room when the Bair Hugger is

12:18:24   18    on as compared to when the Bair Hugger is off?

12:18:27   19        A.    No, I have not.

12:18:27   20        Q.    Have you read the Moretti article, which is

12:18:30   21    a similar article doing bacterial testing -- or

           22    biological testing in an operating room when the Bair

           23    Hugger is on as compared to when the Bair Hugger is

12:18:36   24    off?

12:18:36   25        A.    No, I have not.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

127

12:18:38  1      Q.   By the way, these were all peer-reviewed

12:18:41  2   literature.  You're aware of that; correct?

12:18:42  3      A.   If you say that.  I'm not aware of the

12:18:44  4   citations.

12:18:45  5      Q.   Have -- have you reviewed the letter by

12:18:48  6   Farhad Memarzadeh --

12:18:50  7           MS. ZIMMERMAN:  Memarzadeh.

12:18:51  8           MR. GOSS:  Memarzadeh.

12:18:52  9      Q.   -- Memarzadeh that was a letter to the

12:18:54  10  editor of the Moretti article talking about his CFD

12:18:58  11  analysis?

12:18:58  12     A.   No, I have not.

12:18:59  13     Q.   Have you --

12:19:01  14          Were you provided with an e -- an internal

12:19:03  15  e-mail by 3M talking about whether or not air goes

12:19:08  16  through -- gets into the system or bypasses the filter

12:19:14  17  when it gets into the -- to the Bair Hugger system?

12:19:17  18  Are you aware of that e-mail?

12:19:18  19     A.   I do not recall that, no.

12:19:19  20     Q.   Okay.  Were you provided schematics of -- of

12:19:22  21  the Bair Hugger and the tolerances of where the filter

12:19:26  22  fits in, where the seat of the filter is?

12:19:28  23     A.   I do not recall seeing tolerances of the

12:19:31  24  filter, filter fit or -- no.

12:19:33  25     Q.   So when you're determining whether or not

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

128

12:19:35  1   the filter is appropriate for the Bair Hugger in your

12:19:38  2   opinions, you're not taking into account whether or

12:19:40  3   not the filter is seated well into the Bair Hugger;

12:19:43  4   correct?

12:19:43  5       A.   I've actually looked at -- at both models of

12:19:46  6   Bair Hugger, the earlier one and the later one, and

12:19:49  7   I've taken the filters out and put them back in, so I

12:19:51  8   know what the seals are like, and in my best

12:19:54  9   professional opinion they are well sealed.

12:19:56  10      Q.   So you -- so you believe -- it's your

12:19:57  11  opinion that the 505 --

12:19:59  12           You looked at the 505 and the 750?

12:20:01  13      A.   I believe it was the 775.

12:20:03  14      Q.   775, which has similar indications with the

12:20:06  15  750.

12:20:06  16      A.   Yes.

12:20:07  17      Q.   So you looked at the 505 filter?

12:20:10  18      A.   Yes.

12:20:11  19      Q.   And it's your opinion that the -- the --

12:20:11  20  all the air that goes -- that comes out of the Bair

12:20:14  21  Hugger is filtered through the filter?

12:20:15  22      A.   In the 505 there's some other holes near the

12:20:18  23  top of the case which may communicate between the

12:20:24  24  out -- outside air and in -- inside of the case.  I'm

12:20:27  25  not prepared to -- to state definitively everything

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

129

12:20:31  1  goes through the filter.

12:20:32  2      Q.   Well if -- if air that is blown through the

12:20:36  3  Bair Hugger device is not 100 percent filtered through

12:20:45  4  the filter, would you agree with me that that's a

12:20:47  5  design defect?

12:20:50  6      A.   Not necessarily.

12:20:51  7      Q.   Why not?

12:20:52  8      A.   Because filters are lost in other parts of

12:20:56  9  the system even if they do pass the filter.

12:20:59  10      Q.   You said filter is lost in other --

12:21:01  11      A.   Par -- particles are lost in other parts of

12:21:05  12  the airflow path before they leave the system through

12:21:09  13  the holes in the blankets.

12:21:10  14      Q.   When you say they're lost to the air --

12:21:12  15  airflow path, what do you mean by that?

12:21:14  16      A.   They're deposited on various surfaces as

12:21:18  17  they're carried along by the airflow if they were to

12:21:21  18  pass the filter.

12:21:31  19      Q.   Can you -- did you test --

12:21:32  20          Did you take apart the Bair Hugger, or just

12:21:35  21  took off the filter?

12:21:36  22      A.   I took off the filter.

12:21:38  23      Q.   Okay.  And that's both the 750 and the 775?

12:21:41  24      A.   That's correct.

12:21:41  25      Q.   Okay.  And did you test to see whether or

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

130

12:21:46  1  not there was any leakage in the 775?

12:21:49  2        A.   I did no tests for leakage, no.

12:21:59  3        Q.   Okay.  Have you looked at other patient

12:22:01  4  warming devices?

12:22:02  5        A.   I have not.

12:22:03  6        Q.   Have you -- have you looked at the older

12:22:04  7  models of the Bair Hugger, the 200 series?

12:22:07  8        A.   No, I have not.

12:22:08  9        Q.   Have you looked at the Mistral that uses a

12:22:10  10  HEPA filter?

12:22:11  11        A.   I have not.

12:22:12  12        Q.   Are you aware that other patient warming

12:22:15  13  devices use a HEPA filter?

12:22:16  14        A.   I have heard that that -- that unit does.

12:22:19  15        Q.   So you're aware that the Mistral uses a HEPA

12:22:21  16  filter.

12:22:22  17        A.   I -- I've -- I've been told by counsel.

12:22:24  18        Q.   Okay.  Are you aware that the Warmtouch --

12:22:26  19             Are you aware of the Warmtouch device?

12:22:29  20        A.   I am not.

12:22:30  21        Q.   Are you aware that that device uses a HEPA

12:22:32  22  filter?

12:22:32  23        A.   I'm not aware of that.

12:22:52  24        Q.   In your results, would you agree with me

12:23:06  25  that you did not perform a -- an analysis to determine

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

131

12:23:10   1   whether or not the values that you've obtained were

12:23:13   2   statistically significant; correct?

12:23:14   3       A.   I did not do a statistical analysis, that --

12:23:19   4   that's correct.

12:23:20   5       Q.   So would you agree with me that a -- a peer-

12:23:23   6   reviewed article that actually did calculations to see

12:23:26   7   whether the results are statistically significant have

12:23:29   8   more weight than your expert report on the same

12:23:32   9   issues?

12:23:34  10       A.   It really depends on the expertise of the

12:23:36  11   researchers and the reviewers as to whether the

12:23:40  12   methodology was correct, the results are -- are

12:23:43  13   correct.

12:23:43  14       Q.   But you don't know one way or the other

12:23:45  15   sitting here today; correct?

12:23:46  16       A.   Without -- without looking at the -- at

12:23:49  17   actual reports and reviewing them myself, no.

12:23:51  18       Q.   And you were not provided any of those

12:23:53  19   reports or literature by 3M; correct?

12:23:55  20       A.   Other than what's listed in my list, no.

12:24:03  21       Q.   Were you aware that in the older models of

12:24:13  22   Bair Hugger, that they actually warned for airborne

12:24:18  23   contamination when using the Bair Hugger?

12:24:19  24       A.   I was not aware of that.

12:24:20  25       Q.   Would that affect your opinions in this

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

132

| | | |
|---|---|---|
| 12:24:22 | 1 | case? |
| 12:24:22 | 2 | A.    I do not think so. |
| 12:24:30 | 3 | Q.    Did you re -- did you review the 510(k) |
| 12:24:35 | 4 | application for the 505 that was submitted to the FDA? |
| 12:24:38 | 5 | A.    I have not seen that, no. |
| 12:24:40 | 6 | Q.    Would it surprise you that in the 510(k) |
| 12:24:43 | 7 | application they actually warned, as one of the |
| 12:24:46 | 8 | warnings of the device, that there was a risk of |
| 12:24:49 | 9 | airborne contamination? |
| 12:24:51 | 10 | A.    I -- I have -- I have no opinion on that.  I |
| 12:24:54 | 11 | have not read the document. |
| 12:24:55 | 12 | Q.    I understand that.  But would you be -- |
| 12:24:57 | 13 | Would that affect your opinions in any way? |
| 12:24:59 | 14 | A.    No. |
| 12:25:01 | 15 | Q.    Okay.  So the mere fact that 3M admits that |
| 12:25:09 | 16 | when the Bair Hugger is on, every single study |
| 12:25:13 | 17 | indicate more particles and that they've warned about |
| 12:25:15 | 18 | airborne contamination in older devices as well as the |
| 12:25:19 | 19 | 505 to the FDA, that would have no bearing on your |
| 12:25:22 | 20 | opinions in this case. |
| 12:25:23 | 21 | MR. GOSS:  Objection to form. |
| 12:25:24 | 22 | A.    Not -- not based on the -- the information |
| 12:25:28 | 23 | I've reviewed. |
| 12:25:29 | 24 | Q.    And it is possible that your methodology is |
| 12:25:33 | 25 | incorrect and the other ones are correct in -- |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

133

12:25:35  1          MR. GOSS:  Objection.

12:25:36  2      Q.   -- in getting the results; correct?

12:25:38  3          MR. GOSS:  Object to form.

12:25:39  4      A.   It -- it's possible.

12:25:40  5      Q.   I mean you did not perform any statistical

12:25:43  6  analysis to see whether or not your results were even

12:25:46  7  statistically significant; correct?

12:25:47  8      A.   As I said before, I did not do any

12:25:49  9  statistical analysis.

12:25:50  10     Q.   You only -- you only took one temperature

12:25:55  11  measurement for each of the times listed on Exhibit B;

12:25:57  12  correct?

12:25:57  13     A.   That's not correct.  I took multiple

12:25:59  14  temperature measurements at some locations.

12:26:03  15     Q.   Yeah.  But you listed the different times of

12:26:03  16  those temperature measurements; correct?

12:26:05  17     A.   Yes.

12:26:06  18     Q.   Okay.  And you did not --

12:26:07  19          You only did one test; correct?  You didn't

12:26:09  20  do this multiple times; correct?

12:26:11  21     A.   One -- one day.

12:26:12  22     Q.   One day.  Okay.

12:26:13  23          By the way, who is the patient who was

12:26:16  24  laying down on the -- on the -- in -- on the table?

12:26:18  25     A.   It's a mannequin.  I don't remember his

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

134

12:26:20    1    name.

12:26:20    2         Q.    Okay.  So it was a mannequin?

12:26:22    3         A.    Yes.

12:26:23    4         Q.    Okay.  Now according to your results, you

12:26:38    5    would not expect increased particles over the surgical

12:26:42    6    site when the Bair Hugger is turned on; correct?

12:26:44    7         A.    That's correct.

12:26:50    8         Q.    You understand that particles are very

12:26:58    9    important to surgeons in an operating room; correct?

12:27:01   10         A.    I would think a subcategory of particles

12:27:04   11    would be if they're carrying bacteria, yes.

12:27:06   12         Q.    I understand that.  But if you have zero

12:27:08   13    particles, you're going to have zero bacteria.

12:27:11   14              MR. GOSS:  Objection.

12:27:12   15         Q.    A bacteria is a particle; correct?

12:27:13   16              MR. GOSS:  Object to form.

12:27:14   17         A.    Well aerosolized bacteria is an aerosol

12:27:18   18    particle, yes.

12:27:18   19         Q.    Okay.  And -- and I mean even in a clean

12:27:21   20    room, that's why you check for particles because

12:27:23   21    you -- you know, you might not know what the particle

12:27:26   22    is, but it may -- may or may not be something bad;

12:27:29   23    correct?

12:27:29   24         A.    Yes.

12:27:29   25         Q.    Okay.  Same thing in an operating room.  You

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

135

12:27:31   1   want to reduce the --

12:27:32   2           The purpose of an operating room is to

12:27:34   3   reduce the number of particles over the surgical site

12:27:36   4   because that's the belief, that if you reduce

12:27:38   5   particles, you're going to reduce colony-forming units

12:27:41   6   over the surgical site; correct?

12:27:43   7           MR. GOSS: Object to form.

12:27:43   8       A.   That -- that's one of the intents of a

12:27:45   9   clean -- of an operating room, yes.

12:27:47   10       Q.   What's the other?

12:27:48   11       A.   To maintain surfaces as -- as clean as

12:27:51   12   possible in addition just to the air.

12:27:54   13       Q.   Okay. And the -- the surface of the air,

12:27:57   14   you want to reduce particles because particles carry

12:27:59   15   bacteria.

12:28:00   16       A.   Air can contain bacteria-laden particles,

12:28:03   17   yes.

12:28:05   18       Q.   Okay. And do you agree that if an engineer

12:28:18   19   is aware that the Bair Hugger device can -- has -- has

12:28:27   20   a risk of airborne contamination in the operating

12:28:30   21   room, it would be unethical for the engineer not to

12:28:32   22   warn the doctors of the potential airborne

12:28:34   23   contamination?

12:28:35   24           MR. GOSS: Objection to form, beyond the

12:28:38   25   scope of his opinions in this case.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

136

| | | |
|---|---|---|
| 12:28:40 | 1 | A.   Again, the engineer is working in a group, |
| 12:28:45 | 2 | typically a design group with management, safety |
| 12:28:49 | 3 | people.  I'm not sure how much information would |
| 12:28:52 | 4 | actually be obtained by the -- by the engineer and how |
| 12:28:55 | 5 | the engineer would -- would know how to respond. |
| 12:28:57 | 6 | Q.   Well let's take it as a corporation then.  A |
| 12:29:01 | 7 | corporation -- |
| 12:29:01 | 8 | It would be unethical for a corporation not |
| 12:29:03 | 9 | to warn a consumer of a device of potential risks; |
| 12:29:08 | 10 | correct? |
| 12:29:08 | 11 | MR. GOSS:  Same objections. |
| 12:29:09 | 12 | A.   Depends on what the perceived risks would be |
| 12:29:12 | 13 | and -- and how important they would be to the -- to |
| 12:29:16 | 14 | the product. |
| 12:29:16 | 15 | Q.   Well, so if 3M informs the FDA that there's |
| 12:29:19 | 16 | a potential for airborne contamination in using the |
| 12:29:22 | 17 | device but they didn't warn the consumers, the doctors |
| 12:29:26 | 18 | of the hospitals, of the potential risk, that would be |
| 12:29:28 | 19 | unethical; correct? |
| 12:29:30 | 20 | MR. GOSS:  Same objection, lack of |
| 12:29:32 | 21 | foundation, -- |
| 12:29:33 | 22 | A.   Again, it -- |
| 12:29:34 | 23 | MR. GOSS:  -- assumes facts. |
| 12:29:35 | 24 | A.   It would depend on the level of risk. |
| 12:29:37 | 25 | Q.   Okay.  And to understand the level of risk, |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

137

12:29:47  1   you would have to understand the requirements of the

12:30:09  2   orthopedic surgeon in this case with respect to what

12:30:14  3   would be a risk that would be acceptable.

12:30:15  4        MR. GOSS:  Same objection.

12:30:18  5   A.   Again, I'm not sure who would make the

12:30:20  6   judgment call as to what -- what risk would be

12:30:23  7   acceptable or not.

12:30:37  8   Q.   Well you agree with me that engineers and --

12:30:41  9   and the corporations they work for should not hide

12:30:46  10  danger from the customers that purchase their

12:30:50  11  products; correct?

12:30:53  12  A.   Again, as -- as with danger, I think it

12:30:55  13  would be what level of -- of danger.  There is almost

12:30:58  14  danger in every product, so it's a question of what --

12:31:01  15  what's sufficient to alert potential users.

12:31:03  16  Q.   And that's why we have warnings; correct?

12:31:05  17  A.   Yes.

12:31:15  18       (Ms. Banthia enters the deposition room.)

12:31:15  19       MR. GOSS:  Do you want to go off the record

12:31:16  20  for just a second?

12:31:17  21       MR. ASSAAD:  Sure.

12:31:18  22       THE REPORTER:  Off the record, please.

13:25:28  23       (Luncheon recess taken.)

24

25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

138

13:25:28    1                    AFTERNOON SESSION

13:25:29    2    BY MR. ASSAAD:

13:25:32    3         Q.   Are you ready to continue?

13:25:33    4         A.   I am.

13:25:34    5         Q.   Before we begin, is there anything that you

13:25:40    6    want to change in your testimony that's been given to

13:25:44    7    date -- given to date at this time?

13:25:46    8         A.   Not that I know of, no.

13:25:50    9         Q.   Okay.  Now you agree with me that an

13:26:06   10    engineer or a company should not hide relevant

13:26:09   11    information from customers; correct?

13:26:12   12         A.   Well I guess it depends on what you mean by

13:26:14   13    "relevant."

13:26:16   14         Q.   Well if -- if there's certain information

13:26:19   15    that a customer wants regarding, say, for example,

13:26:22   16    filtration efficiency of the Bair Hugger filter, 3M

13:26:29   17    should not hide that information from them; correct?

13:26:31   18              MR. GOSS:  Objection, form.

13:26:32   19         A.   It would de -- it would depend on whether

13:26:39   20    there's competitive issues between different product

13:26:42   21    manufacturers; for example, one would not want to

13:26:45   22    release proprietary information that may give them a

13:26:49   23    competitive disadvantage.

13:26:50   24         Q.   Are you aware of any situation where a

13:26:52   25    filter efficiency used in a product is proprietary

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

139

13:26:54  1  information?

13:26:55  2          MR. GOSS:  Objection to form, foundation.

13:26:58  3      A.   I -- I cannot think of anything, no.

13:27:00  4      Q.   Okay.  And you agree with me that hospitals,

13:27:17  5  when they use medical devices in their operating

13:27:20  6  rooms, might want to know the filter efficiency of a

13:27:23  7  Bair Hugger device; correct?

13:27:24  8          MR. GOSS:  Objection to form, foundation.

13:27:26  9  He doesn't work in a hospital.

13:27:28  10     A.   I -- I -- again, I don't -- I don't know how

13:27:31  11  to answer that.

13:27:32  12     Q.   You've worked on clean rooms before;

13:27:34  13  correct?

13:27:34  14     A.   Semiconductor-manufacturing clean rooms.

13:27:38  15     Q.   And actually, one of the students

16  actually --

13:27:42  17          You worked -- worked on a case for doing

13:27:43  18  numerical -- a numerical simulation of airflow and

13:27:53  19  airborne pathogen transport in a -- in a operating

13:27:56  20  room; correct?

13:27:56  21     A.   It may have been a patient isolation room or

13:28:00  22  patient protection room.

13:28:01  23     Q.   Okay.  And you're aware -- you're aware

13:28:03  24  that, especially for clean rooms, that filtration and

13:28:06  25  particle -- particle flow are relevant to the company

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

140

13:28:10  1  that's using the clean room; correct?

13:28:12  2       A.   That's the purpose of the clean room, yes.

13:28:14  3       Q.   Okay.  And the same thing for an operating

13:28:16  4  room, it's relevant information of how well the

13:28:18  5  filtration is and the quality of the filters being

13:28:22  6  used.

13:28:22  7            MR. GOSS:  Object to form.

13:28:24  8       A.   I'm not --

13:28:25  9            I can't comment on all equipment in the --

13:28:27  10  in the hospital.  I can comment on the filters

13:28:30  11  supplying the air to the room.

13:28:31  12       Q.   But you understand --

13:28:35  13            Well how does a clean room work?

13:28:37  14       A.   Well a clean room tries to provide clean air

13:28:42  15  that meets minimum requirements, and that clean air

13:28:46  16  then passes through the critical areas of -- of the

13:28:48  17  room and hopefully pretense -- prevents contamination.

13:28:52  18       Q.   And what would be the critical area in an

13:28:56  19  op -- in a clean room?

13:28:56  20       A.   In a semiconductor-manufacturing clean room

13:28:58  21  I'm most familiar with, it's the top surface of the

13:29:01  22  clean bench where wafers are being processed.

13:29:03  23       Q.   Okay.  And based on your work on this case,

13:29:05  24  what do you consider the critical areas in an

13:29:08  25  operating room?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

141

| | | |
|---|---|---|
| 13:29:09 | 1 | A.   I would say the most critical area is |
| 13:29:10 | 2 | probably the surgical zone. |
| 13:29:13 | 3 | Q.   What about the table where the equipment |
| 13:29:16 | 4 | sits and the instruments? |
| 13:29:19 | 5 | A.   I would say that's not as important as -- as |
| 13:29:21 | 6 | the -- the surgical site. |
| 13:29:24 | 7 | Q.   But you believe it's important though. |
| 13:29:26 | 8 | A.   I think everything in an OR should be as -- |
| 13:29:29 | 9 | as clean as -- as minimum requirements dictate. |
| 13:29:40 | 10 | Q.   Now as a manufacturer of -- of the Bair |
| 13:29:43 | 11 | Hugger device, if a customer is evaluating a device to |
| 13:30:00 | 12 | be used in the operating room, such as the Bair |
| 13:30:04 | 13 | Hugger, and wants to know what the filter efficiency |
| 13:30:06 | 14 | is, do you think the company should provide that |
| 13:30:09 | 15 | information to the customer? |
| 13:30:10 | 16 | MR. GOSS:  Objection to form, beyond the |
| 13:30:12 | 17 | scope of his opinions. |
| 13:30:15 | 18 | A.   As I said before, it depends on what the |
| 13:30:16 | 19 | company perceives to be proprietary information and |
| 13:30:18 | 20 | whether that -- they should divulge that or not. |
| 13:30:21 | 21 | Q.   Do you know whether or not 3M perceives the |
| 13:30:25 | 22 | filter efficiency as proprietary? |
| 13:30:28 | 23 | A.   I cannot comment on that. |
| 13:30:29 | 24 | Q.   Do you know that 3M -- |
| 13:30:31 | 25 | You've read the manual for the 775; correct? |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

142

13:30:34  1      A.   Yes.

13:30:34  2      Q.   And it states it uses a .2 high-efficiency

13:30:37  3  filter; correct?

13:30:38  4      A.   I do not recall that level of detail without

13:30:42  5  seeing a document in front of me.

13:30:45  6      Q.   Well in the -- you -- you work --

13:30:49  7           You've worked with ASHRAE 52.2; correct?

13:30:52  8      A.   That's correct.

13:30:52  9      Q.   And you've actually -- you actually have a

13:30:54  10  test lab for ASHRAE 52.2 that meets the standards of

13:30:58  11  that -- of the testing for the filtration; right?

13:30:59  12      A.   That's correct.

13:31:02  13      Q.   Okay.  When you say "a high-efficiency

13:31:03  14  filter," does that have any meaning in the engineering

13:31:05  15  world?

13:31:07  16      A.   In terms of the filtration I'm most familiar

13:31:10  17  with, which is building ventilation filtration, it

13:31:12  18  means a fairly high MERV number.

13:31:14  19      Q.   When you say "high MERV number," can you

13:31:17  20  give me a range?

13:31:17  21      A.   Probably 13, 14.

13:31:20  22      Q.   Okay.  And when you say it's a .2

13:31:25  23  high-efficiency filter, what does that mean?

13:31:27  24      A.   I am not quite sure what that means.  It

13:31:29  25  doesn't relate to the ASHRAE Standard 52.2 that I base

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

143

13:31:33  1   most of my research on.

13:31:34  2        Q.   So you agree with me that the term "high

13:31:36  3   efficiency" is meaningless without the specification

13:31:38  4   of the size of the particle and the efficiency -- the

13:31:41  5   filtration efficiency for that size; correct?

13:31:43  6             MR. GOSS:  Object to form.

13:31:44  7        A.   That -- that would be very useful

13:31:50  8   information to have.

13:31:50  9        Q.   What?

13:31:51  10       A.   That would be very useful information to

13:31:53  11  have.

13:31:53  12       Q.   Well if I told you this filter here is high

13:31:56  13  efficiency without knowing for what particle size I'm

13:32:00  14  referring to or the efficiency level for that particle

13:32:02  15  size, "high" -- "high efficiency" is meaningless.

13:32:05  16       A.   It's -- it's -- it's not quantitative, yes.

13:32:07  17       Q.   Okay.  So you agree with me that it's

13:32:10  18  meaningless --

13:32:10  19            MR. GOSS:  Object to form.

13:32:11  20       Q.   -- for people in the field.

13:32:12  21       A.   I -- I would say it's not meaningless, it's

13:32:14  22  just not -- not quantified so it could be compared

13:32:17  23  with another filter type.

13:32:19  24       Q.   I mean you could be high efficiency for --

13:32:21  25  for particles size -- the size of tennis balls but not

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

144

13:32:24   1   high efficiency for bacteria; correct?

13:32:27   2        A.   That's --

13:32:28   3             Yes.

13:32:28   4        Q.   Okay.  So there's no really --

13:32:32   5             There's no information, technical

13:32:34   6   information you could get from the term "high

13:32:36   7   efficiency" unless you know for what particle size and

13:32:39   8   the percentage of efficiency; isn't that correct?

13:32:43   9        A.   I would need that information to -- to

13:32:47  10   quantify the performance, yes.

13:32:48  11        Q.   And you need to quantify it before you could

13:32:53  12   deem it as high efficiency; correct?

13:32:54  13             MR. GOSS:  Object to form.

13:32:55  14        A.   I would think so, yes.

13:33:00  15        Q.   So if you hear the term ".2 high

13:33:06  16   efficiency," does that give you any information -- "a

13:33:09  17   .2 micron high efficiency filter," does that give you

13:33:12  18   any information as to what the efficiency is at .2

13:33:15  19   microns?

13:33:16  20        A.   It -- it does not give me any quantitative

13:33:19  21   information, no.

13:33:20  22        Q.   Would you consider a filter that only has a

13:33:26  23   60-percent filter efficiency for -- for .2 microns

13:33:31  24   high efficiency?

13:33:33  25        A.   Again, the "high efficiency" term depends

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

145

13:33:35    1    on -- on the size particle it's being used against and

13:33:39    2    what the application is.

13:33:40    3        Q.   I'm asking you, a .2 micron filter,

13:33:44    4    high-efficiency filter that only has a 60-percent

13:33:46    5    filter efficiency for .2 microns, do you consider that

13:33:49    6    high efficiency?

13:33:50    7        A.   It could be in other ranges of particle

13:33:54    8    sizes, yes.

13:33:54    9        Q.   I'm saying for .2 micron.

13:33:56   10        A.   Well for only .2 micron, .63 seems a bit

13:34:00   11    low.

13:34:01   12        Q.   When you say .63, that's what you've seen in

13:34:04   13    the documents for 3M; correct?

13:34:05   14        A.   Yes.

13:34:06   15        Q.   Okay.  And in fact, that is why ASHRAE came

13:34:26   16    up with the MERV rating, so you could determine the

13:34:30   17    efficiencies for different-size particles based on the

13:34:33   18    MERV rating; correct?

13:34:35   19        A.   Yes.  The MERV --

13:34:37   20             The Standard 52.2 was developed to

13:34:40   21    determine -- to provide filter efficiency versus

13:34:42   22    particle size, yes.

13:34:43   23        Q.   Because that would be important in

13:34:50   24    determining what type of filter would be needed for a

13:34:52   25    certain application when an engineer decides in the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

146

13:34:55  1   design what type of filter to use; correct?

13:34:57  2        A.   That's correct.

13:35:01  3        Q.   Assuming that 3M admits that every single

13:35:26  4   study performed by 3M or other researchers indicate

13:35:35  5   that when the Bair Hugger is turned on it increases

13:35:40  6   the particles over the surgical site, do you believe

13:35:45  7   that is relevant information that a consumer of the

13:35:49  8   Bair Hugger should know?

13:35:51  9             MR. GOSS:  Object to form.

13:35:54  10       A.   Just saying the particle concentration is

13:35:57  11  increased does not -- does not infer potential

13:36:04  12  hazards; for example, biological particle-number

13:36:07  13  increase.

13:36:09  14       Q.   That wasn't my question, sir.  Do you

13:36:13  15  believe the --

13:36:14  16            Do you agree that the consumer of the Bair

13:36:17  17  Hugger is going -- is -- is --

13:36:20  18            3M knows that it's going to be used in an

13:36:22  19  operating room; correct?

13:36:24  20       A.   Yes.

13:36:24  21       Q.   And the purpose of the operating room as

13:36:25  22  well as the clean room is to reduce the particle

13:36:27  23  counts over the critical areas; correct?

13:36:29  24            MR. GOSS:  Object to form.

13:36:29  25       A.   You're saying infectious particle counts.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

147

13:36:32   1        Q.   Yes.  But infections travel on particles;

13:36:36   2   correct?

13:36:36   3        A.   Yes.

13:36:36   4        Q.   Okay.  And that's something relevant to

13:36:40   5   people that design operating rooms and people that use

13:36:44   6   operating rooms; correct?

13:36:45   7        A.   Yes.

13:36:45   8        Q.   Okay.  And the fact that increased

13:36:48   9   particles -- strike that.

13:36:51   10            You would agree with me that surgeons as

13:37:09   11   well as hospitals do not want to increase particles

13:37:13   12   over a surgical site; correct?

13:37:16   13            MR. GOSS:  Lack of foundation.

13:37:18   14        A.   I -- I really don't -- I --

13:37:21   15            I'm not a surgeon.  I don't have an opinion

13:37:23   16   on that.

13:37:23   17        Q.   You agree that in clean rooms, the

13:37:30   18   manufacturers that use the clean rooms do not want

13:37:36   19   increased particles over the critical areas; correct?

13:37:40   20        A.   That statement is correct, because almost

13:37:41   21   any particle of any size would be detrimental.

13:37:44   22        Q.   Okay.  Do you know whether or not orthopedic

13:37:53   23   surgeons consider increased particles over the

13:37:58   24   surgical site relevant?

13:38:04   25        A.   I -- I have no direct information on that.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

148

13:38:06　1　I'm not an orthopedic surgeon.

13:38:38　2　　　Q.　Well let's assume that orthopedic surgeons

13:38:44　3　care about particles and any increase in particles

13:38:48　4　over the surgical site for this question.  Fair

13:38:50　5　enough?

13:38:50　6　　　A.　We'll make that assumption, yes.

13:38:52　7　　　Q.　Okay.  Do you agree with me that if 3M is

13:38:55　8　aware that the Bair Hugger increases particles over

13:38:58　9　the surgical site, that that's relevant information

13:39:02　10　they should inform their customers?

13:39:04　11　　　MR. GOSS:  Objection to form.

13:39:05　12　　　A.　Again, following the assumption we've made

13:39:08　13　earlier, yes.

13:39:09　14　　　Q.　Okay.  And did you ever look into the

13:39:25　15　issue -- well you've never heard about the --

13:39:27　16　　　3M never provided any of these studies,

13:39:29　17　correct, --

13:39:29　18　　　MR. GOSS:  Objection, vague.

13:39:30　19　　　Q.　-- regarding particle counts?

13:39:32　20　　　A.　None other than what I've listed in my -- in

13:39:37　21　my report.

13:39:37　22　　　Q.　Well none of the studies listed in your

13:39:39　23　report deal with particle counts over the surgical

13:39:42　24　site; correct?

13:39:42　25　　　A.　I'd have to go back and -- and look to make

149

13:39:43  1  sure.

13:39:44  2      Q.   Well are you aware sitting here today that

13:39:46  3  there are any studies --

13:39:47  4          I mean you haven't read the McGovern study;

13:39:50  5  correct?

13:39:50  6      A.   That's correct.

13:39:53  7      Q.   And you haven't read any of the Legg

13:39:54  8  studies; correct?

13:39:54  9      A.   That's correct.

13:39:55  10     Q.   Okay.  And are you aware that 3M has done no

13:39:57  11  studies internally with respect to whether or not the

13:39:59  12  Bair Hugger increases particle counts?

13:40:01  13     A.   I have no information on that.

13:40:02  14     Q.   Assuming that when the Bair Hugger is turned

13:40:08  15  on there is an increase in particle counts over the

13:40:13  16  surgical site, does that have any relevance to your

13:40:18  17  opinions?

13:40:20  18     A.   Again, as I said, increase of particles

13:40:23  19  could represent a particle that has nothing to do with

13:40:26  20  surgical infections.

13:40:27  21     Q.   I'm not talking about surgical infections,

13:40:30  22  I'm talking about the fact that when the Bair Hugger

13:40:32  23  is off there is X amount of particles and when the

13:40:35  24  Bair Hugger is turned on there is X plus Y particles

13:40:38  25  over the surgical site, an increase.  Does that have

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

150

13:40:42    1    any relevance to your opinions today?

13:40:44    2        A.    I'd have to look at the reports and the --

13:40:48    3    and the data collected in order to evaluate whether it

13:40:51    4    would be important or not.

13:40:52    5        Q.    Well what would you need to look at?

13:40:57    6        A.    I would need to look at their methodology

13:40:59    7    and their data-collection techniques and -- and data

13:41:04    8    reduction.

13:41:05    9        Q.    Are you familiar with TSI?

13:41:07   10        A.    I am.

13:41:07   11        Q.    Are you -- are you -- are you familiar with

13:41:09   12    their particle counters?

13:41:10   13        A.    Yes.

13:41:13   14        Q.    Do you think they're accurate particle

13:41:13   15    counters?

13:41:14   16        A.    When they're used appropriately and --

13:41:17   17              Yes.

13:41:17   18        Q.    Okay.  And if -- you agree --

13:41:19   19              And if the setup is identically --  is

13:41:21   20    identical, so the particle counter is in the same

13:41:27   21    place, same setup in an operating room, the only

13:41:28   22    difference is Bair Hugger off and Bair Hugger on, and

13:41:30   23    you see an increase, would that -- would that affect

13:41:36   24    your opinions in this case?

13:41:38   25        A.    No.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

151

13:41:39    1        Q.    Why not?

13:41:41    2        A.    Because I don't think it has -- has a

13:41:43    bearing on the infectious particles that are going to

13:41:47    be causing the concern associated with this case.

13:41:50    5        Q.    But sitting --

13:41:50    6              Why do you say it doesn't have a bearing on

13:41:53    7    the infectious particles?  What's your basis behind

13:41:56    8    that?

13:41:57    9        A.    Because an increase in particle size -- or

13:41:59    10   increase in particle numbers, again not being defined

13:42:01    11   at this point, could be just increases in very small

13:42:05    12   particles, which is perhaps the case, with -- with

13:42:08    13   nothing -- nothing correlated to hospital infections.

13:42:11    14       Q.    But you're not a hospitalist or an

13:42:13    15   infectious disease expert; correct?

13:42:15    16       A.    I'm not, yes.

13:42:16    17       Q.    But would it at least indicate to you that

13:42:18    18   the Bair Hugger has an effect on the HVAC system in

13:42:22    19   the operating room?

13:42:23    20            MR. GOSS:  Object to form, --

13:42:25    21       A.    It --

13:42:26    22            MR. GOSS:  -- calls for speculation.

13:42:27    23       A.    It may have.

13:42:28    24       Q.    Well from an engineering standpoint, I have

13:42:33    25   X amount of particles with the Bair Hugger off over

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

152

13:42:35   1   the surgical site, I turn the Bair Hugger on and there

13:42:37   2   is a significant increase in particles, statistically

13:42:40   3   significant, --

13:42:41   4        Okay?

13:42:41   5        A.   Okay.

13:42:42   6        Q.   -- what would be the cause of that?

13:42:44   7        A.   Again, if it's a carefully controlled study,

13:42:49   8   it -- it could be sole -- solely due to the Bair

13:42:51   9   Hugger.

13:42:51  10        Q.   Well if the only difference is Bair Hugger

13:42:54  11   off, Bair Hugger on, that's the only thing that's

13:42:56  12   changed, what other cause could it be?

13:42:58  13        MR. GOSS:  Objection, incomplete

13:42:59  14   hypothetical.

13:43:00  15        A.   Again, it could be differences in other --

13:43:03  16   other conditions.

13:43:05  17        Q.   Well the only condition that's changed is

13:43:07  18   the Bair Hugger on and Bair Hugger off.  What other

13:43:11  19   conditions could change in an operating room?

13:43:11  20        A.   Again --

13:43:13  21        MR. GOSS:  Object to the form.

13:43:14  22        A.   Again, the methodology used could bias the

13:43:20  23   particle counts towards -- towards one size or

13:43:22  24   another.  So total particle counts coming into the

13:43:27  25   sampler could remain the same, but their size is

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

153

13:43:30  1  different.  That could result in different outputs

13:43:32  2  from the -- from the instrument.

13:43:34  3      Q.   Have you ever heard of a DIN standard?

13:43:39  4      A.   Yes.

13:43:39  5      Q.   Have you -- have you heard of the DIN

13:43:39  6  standard before today -- before getting involved in

13:43:42  7  this case?

13:43:42  8      A.   Yes.

13:43:43  9      Q.   How do you know about the DIN standard?

13:43:45  10      A.   I'm -- I'm peripherally aware of it.  I

13:43:47  11  don't know very much about the details.

13:43:48  12      Q.   Okay.  Have you reviewed the DIN standard

13:43:51  13  before?

13:43:51  14      A.   I don't believe I have.

13:43:52  15      Q.   Well do you have any reason to disagree with

13:43:55  16  its methodology?

13:43:57  17      A.   Not having looked at it, no.

13:43:58  18      Q.   Okay.  And that's a standard that -- that

13:44:02  19  evaluates operating rooms and its effect -- its

13:44:08  20  protective effect of removing particles; correct?

13:44:11  21      A.   Again, not --

13:44:12  22          MR. GOSS:  Object to form.

13:44:13  23      A.   -- having read the document, I don't know.

13:44:17  24      Q.   Well assuming the study was properly done

13:44:21  25  and there was an increase in particles as a result of

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

154

13:44:24  1   the Bair Hugger, is it your testimony today that that

13:44:30  2   has no effect on your opinion that the Bair Hugger has

13:44:32  3   no effect on the airflow in an operating room?

13:44:36  4            MR. GOSS:  Asked and answered.

13:44:38  5       A.   And I think I've already answered that.

13:44:40  6       Q.   Please answer it again.

13:44:42  7       A.   I -- I -- I will stand by my opinion.

13:44:45  8       Q.   Which is?

13:44:45  9       A.   Which is the Bair Hugger has negligible

13:44:48  10  influence on the airflow near the surgical site.

13:44:50  11      Q.   That wasn't -- that wasn't my question, sir.

13:44:52  12  Please answer my question.

13:44:54  13           My question is:  Assuming that the

13:44:55  14  methodology and the peer-reviewed studies are correct

13:44:58  15  and that there is an increase in particles over the

13:45:03  16  surgical site when the Bair Hugger is on as compared

13:45:05  17  to when it's off, are you saying, your testimony

13:45:09  18  today, that it has no effect on your opinion that the

13:45:12  19  Bair Hugger has a negligible effect on the surgical

13:45:14  20  site?

13:45:15  21           MR. GOSS:  Objection to form, calls for

13:45:17  22  speculation without seeing the study.

13:45:19  23      A.   Again, I would stand by my -- my testimony.

13:45:22  24      Q.   Which is?

13:45:22  25      A.   Which is -- which is no.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

155

13:45:25  1      Q.   Okay.  So it will have no effect on your

13:45:28  2  testimony.

13:45:28  3      A.   Yes.

13:45:28  4      Q.   Okay.  Are you aware that 3M did not want to

13:46:02  5  disclose the filtration level of its filters to its

13:46:04  6  customers?

13:46:05  7           MR. GOSS:  Objection to form.

13:46:06  8      A.   I -- I did not know that.

13:46:08  9      Q.   Do you think that's ethical?

13:46:09  10          MR. GOSS:  Objection to form, beyond the

13:46:11  11  scope of his opinions in this case.

13:46:14  12     A.   As I mentioned before, it depends on a

13:46:16  13  number of factors, including any proprietary

13:46:18  14  information.

13:46:18  15     Q.   You don't think a hospital has a right to

13:46:22  16  know what the filtration of a filter is in a medical

13:46:24  17  device that's used in the operating room?

13:46:26  18          MR. GOSS:  Objection to form.  He's not here

13:46:28  19  to testify about anybody's rights.

13:46:30  20     Q.   Is that what you're saying here?

13:46:34  21     A.   Again, I -- I -- I cannot comment on a

13:46:34  22  hospital's position.

13:46:36  23     Q.   As a patient, do you think a patient would

13:46:50  24  want to know whether or not a filter is fil --

13:46:53  25  filtering bacteria from a device that blows air on

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

156

13:46:58  1  their body during a surgical operation?

13:47:01  2      A.   I don't think a patient would have any idea

13:47:04  3  of that, unless they're involved in the procedure

13:47:06  4  somehow.

13:47:58  5      Q.   The fact that 3M admits that every study

13:48:02  6  indicates that the Bair Hugger increases the particle

13:48:08  7  count over the sterile -- ster -- sterile field and

13:48:10  8  that they have no internal studies to refute that has

13:48:14  9  no bearing on your opinion today?

13:48:15  10         MR. GOSS:  Object to form.

13:48:17  11      A.   Not having seen all the studies, no, I can't

13:48:19  12  comment on that.

13:48:20  13      Q.   Well this is what 3M admits in a 30(b)(6)

13:48:23  14  corporate representative deposition.  They admit that

13:48:26  15  all the studies --

13:48:26  16         They didn't say they're incorrect.  They

13:48:29  17  said all the studies indicate this and they have no

13:48:32  18  data to refute that.  That has no bearing on your

13:48:34  19  opinion today?

13:48:34  20         MR. GOSS:  Objection to form, lack of

13:48:36  21  foundation.

13:48:36  22      A.   Again, not having seen the data, I -- I do

13:48:40  23  not want to comment.

13:48:41  24         MR. ASSAAD:  I'm not going to mark this, but

13:48:43  25  can we put this on the screen?

157

13:48:45  1          THE VIDEOGRAPHER:  Put it in front of the

13:48:48  2   witness.

13:48:48  3      Q.   Take a look at the highlighted area and read

13:48:54  4   it aloud for the record.

13:48:59  5      A.   Okay.  I'm reading what -- what it says,

13:49:01  6   page 258.  It says:

13:49:05  7          "Q.   Okay.  Based on the data that we have

13:49:07  8   today, including the study funded by 3M as well as

13:49:12  9   other studies, every single study indicates that the

13:49:14  10  Bair Hugger increases the particle count over the

13:49:16  11  sterile field; correct?"

13:49:20  12          This is A. in bold:  "In absolute numbers,

13:49:25  13  yes."

13:49:26  14          And then:  "Q.  Yes.  Okay.  And you have no

13:49:31  15  internal studies to refute that; correct?"

13:49:34  16          And there's "A.  No, we don't."

13:49:36  17      Q.   And you're sitting here today and your

13:49:38  18  testimony is that as a corporate statement by 3M under

13:49:44  19  penalty of perjury in this litigation, that in -- that

13:49:48  20  information would have no effect on your opinion today

13:49:50  21  whether or not the Bair Hugger has any effect on the

13:49:55  22  airflow in an operating room.

13:49:56  23          MR. GOSS:  Asked and answered.

13:49:59  24      A.   I would request to see the actual results

13:50:01  25  myself.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

158

13:50:05    1       Q.   Did you ask for the -- any data?

13:50:07    2       A.   I did not know they existed, so no, I did

13:50:11    3   not ask for them.

13:50:15    4       Q.   It's not enough for you that 3M admits it

13:50:19    5   in a -- in a -- under penalty of perjury?

13:50:21    6            MR. GOSS:   Objection to form, asked and

13:50:22    7   answered.

13:50:23    8       A.   I think I've answered that already.

13:50:26    9       Q.   So it's not important that 3M admits it to

13:50:         10   you?

13:50:31   11            Well is there anything that -- let --

13:50:32   12            Let's be honest, doctor.  It's quite clear

13:50:35   13   that you're finding out for the first time other

13:50:38   14   studies and other information regarding the issues in

13:50:42   15   this case that have not been provided to you; correct?

13:50:46   16            MR. GOSS:   You can answer.

13:50:48   17       A.   Yes.

13:50:48   18       Q.   And you agree that to be objective in

13:50:58   19   formulating opinions, that you should have all the

13:51:02   20   studies and all the information relevant to the issues

13:51:04   21   of your opinions; correct?

13:51:07   22       A.   All the information that -- that I think is

13:51:10   23   important, yes.

13:51:11   24       Q.   And other studies by 3M as well as other

13:51:15   25   researchers regarding the effect of the Bair Hugger on

159

13:51:19   1   the airflow in an operating room is relevant in this

13:51:22   2   case; isn't it?

13:51:23   3       A.   Yes.

13:51:24   4       Q.   Especially ones done by 3M, which you can't

13:51:29   5   even claim any bias towards because it was conducted

13:51:32   6   and funded by 3M.

13:51:32   7            MR. GOSS:  Objection to form.

13:51:33   8       Q.   Do you agree?

13:51:34   9       A.   I agree there's -- there's no bias

13:51:38  10   associated with that.

13:51:38  11       Q.   Okay.

13:51:47  12            (Kuehn Exhibit 7 was marked for

13:52:22  13            identification.)

13:52:22  14   BY MR. ASSAAD:

13:52:25  15       Q.   Marked as Exhibit 7 is an e-mail chain

13:52:28  16   between Michelle Stevens, Mark Scott, Ms. Soria, Scott

13:52:35  17   Waite, and Mark Morken.

13:52:36  18            I -- I assume, Dr. Kuehn, that you've never

13:52:39  19   seen this document before; correct?

13:52:40  20       A.   That's correct.

13:52:41  21       Q.   Okay.  If you want a --

13:52:57  22            Do you want a minute to review this

13:52:59  23   document, or I'll just ask you some questions?

13:53:02  24       A.   Let me just quickly page through it.

13:53:17  25            MR. GOSS:  Looks like it starts on --

160

13:53:19  1          The first message is on page 89, the one

13:53:24  2   ending in 89.

13:53:35  3       A.   Okay.

13:53:40  4       Q.   I want you to read the sentence regarding --

13:54:00  5   from Mark Morken to Scott Waite and Michelle Stevens.

13:54:04  6   It states on the second line --

13:54:06  7       A.   Wait.  Where are you?

13:54:07  8       Q.   First page.

13:54:13  9          Well first of all, if you look at the

13:54:15  10  subject, it states "Message to address safety and

13:54:17  11  efficacy of forced air warming."  Do you see that?

13:54:19  12      A.   At the top of the first page, yes.

13:54:22  13      Q.   Yes.  And I -- and I -- and I represent this

13:54:26  14  is --

13:54:26  15         They're discussing whether or not to do the

13:54:28  16  study to determine the safety and efficacy of forced-

13:54:31  17  air warming in this e-mail, based on the subject.

13:54:35  18      A.   Something dealing with safety and efficacy,

13:54:38  19  yes.

13:54:38  20      Q.   And the response by 3M is, "What are -- What

13:54:40  21  are his findings and own data?  Also we would need to

13:54:43  22  really understand what type of study is being

13:54:46  23  proposed.  Giving -- Given the ongoing legal

13:54:52  24  situation, decisions were made previously (at a high

13:54:53  25  level) not to pursue clinical research work on this

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

161

13:54:56  1   topic."

13:54:57  2        A.   I see that.

13:54:57  3        Q.   Did I read that correctly?

13:55:00  4        A.   Yes.

13:55:00  5        Q.   Remember we talked about previously that it

13:55:02  6   would be unethical for an engineer to -- to not do

13:55:09  7   research regarding the safety of a device solely based

13:55:14  8   on litigation?

13:55:15  9             MR. GOSS:  I'm going to object to form on

13:55:18  10  the ground that he's not offering any opinions on

13:55:19  11  clinical research or research ethics or engineering

13:55:23  12  ethics.

13:55:25  13       Q.   Do you recall that conversation?

13:55:27  14       A.   I do.

13:55:28  15       Q.   Do you agree with me that for a company to

13:55:33  16  allow litigation to -- to prevent them from doing

13:55:36  17  research on the safety and efficacy of a device is

13:55:39  18  unethical?

13:55:40  19            MR. GOSS:  Also going to object to lack of

13:55:42  20  foundation with this document.

13:55:45  21       A.   Well again, "decisions were made...(at a

13:55:47  22  high level)...," I don't -- I don't see the direct

13:55:50  23  correlation to any engineers there.

13:55:54  24       Q.   So if it's not an engineer it could be

13:55:58  25  ethical, but if it's an engineer it could be

162

13:56:02  1  unethical; is that your testimony?

13:56:05  2        MR. GOSS:  Same objection, it's also

13:56:05  3  argumentative.

13:56:05  4        A.   I thought you were referring to engineering

13:56:06  5  ethics.

13:56:07  6        Q.   Well engineers make devices; correct?

13:56:09  7        A.   Yes.

13:56:09  8        Q.   Okay.  So assuming that there are engineers

13:56:16  9  at a higher level, do you agree that it would be

13:56:19  10  unethical to -- to not pursue research on the safety

13:56:23  11  and efficacy of a device based on -- on an ongoing

13:56:27  12  legal situation?

13:56:28  13        MR. GOSS:  Same objections.

13:56:30  14        A.   The last sentence says, "Given the ongoing

13:56:32  15  legal situation..."  I'm not aware of the legal issues

13:56:37  16  that would be involved in this and how that would play

13:56:41  17  into the -- the decision.

13:56:42  18        Q.   It's this case.  That's the legal situation.

13:56:44  19  Okay?

13:56:44  20        A.   Yes.

13:56:45  21        Q.   Assume that.  And assume it says "not to

13:56:47  22  pursue clinical research work on this topic," and we

13:56:51  23  could agree that the topic is "Message to address

13:56:53  24  safety and efficacy of forced air warming."

13:56:55  25        MR. GOSS:  Object to the witness's complete

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

163

13:56:57    1    lack of foundation with this issue.

13:57:03    2        Q.    Do you believe such a course of action is

13:57:05    3    ethical?  "Yes" or "no."

13:57:13    4        A.    Again, without any information on the legal

13:57:16    5    ramifications and the decisions made, I -- I really

13:57:19    6    don't know.

13:57:21    7        Q.    So sitting here today, you don't know

13:57:23    8    whether or not, when -- when decisions are made at a

13:57:25    9    higher level not to pursue research on the safety of a

13:57:28   10    device as a result of a legal situation, you have no

13:57:33   11    opinion whether or not that's ethical or not, ethical

13:57:36   12    based on your testimony before?

13:57:37   13            MR. GOSS:  Objection, assumes facts not in

13:57:41   14    evidence, in fact contrary to evidence, and lack of

13:57:46   15    foundation.

13:57:54   16            MR. ASSAAD:  You can answer the question.

13:57:56   17        A.    Again, I have no information on what was

13:57:57   18    being discussed legally regarding this case and how

13:58:01   19    that impacted their decision.

13:58:06   20        Q.    Well isn't that contrary to what you stated

13:58:09   21    previously in this deposition?

13:58:11   22            MR. GOSS:  Objection, form, mischaracterizes

13:58:13   23    his testimony.

13:58:14   24        Q.    Do you want to go to your testimony?  Would

13:58:16   25    that be helpful?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

164

13:58:18    1            MR. GOSS:  What's -- what's the question?

13:58:20    2       A.   Yes.  What --

13:58:21    3       Q.   Remember the question I asked you:

13:58:40    4   Engineers should not take into account -- oh,

13:58:44    5   strike -- strike that.

13:58:45    6            Engineers, in determining the safety of a

13:58:47    7   device, should not consider potential litigation, and

13:58:49    8   you agreed with that statement?

13:58:51    9       A.   I -- I -- I may have.

13:58:53   10            MR. GOSS:  Improper impeachment.

13:58:58   11       A.   I -- I -- I --

13:59:00   12            If it was a statement I made earlier today,

13:59:02   13   I would have to go back and look at the record.

13:59:06   14       Q.   Do you think your answer is different now

13:59:08   15   since you've seen this document?

13:59:09   16            MR. GOSS:  Objection to form, improper

13:59:11   17   impeachment.

13:59:12   18       A.   I don't -- I don't think my answer would be

13:59:15   19   different.

13:59:21   20       Q.   Do you remember testifying earlier that a

13:59:47   21   company -- engineers and their company should not

13:59:49   22   suppress research regarding the safety of a device?

13:59:53   23       A.   I believe I said that, yes.

13:59:54   24       Q.   Okay.

14:00:07   25            (Kuehn Exhibit 8 was marked for

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

165

14:00:09   1              identification.)

14:00:09   2    BY MR. ASSAAD:

14:00:20   3         Q.    Exhibit 8 is an e-mail from Gary Hansen to

14:00:24   4    Dave Westlin, Teri Woodwick-Sides, Jana Stender and

14:00:28   5    John Rock.

14:00:28   6              Do you know any of these people?

14:00:29   7         A.    I do not, no.

14:00:35   8         Q.    Do you know who ECRI is, E-C-R-I?

14:00:38   9         A.    I do not think I know that.

14:00:41   10        Q.    I'm just going to read the first line.  "Our

14:00:45   11   first step with ECRI should be preventing them from

14:00:49   12   doing their own testing, but rather to rely on

14:00:52   13   published data."  Did I read that correctly?

14:00:54   14        A.    You read that correctly.

14:00:54   15        Q.    Do you think it's good for a company to try

14:00:58   16   to prevent the gaining of knowledge of devices from

14:01:07   17   outside companies that want to do research?

14:01:10   18              MR. GOSS:  Objection to form, I don't think

14:01:13   19   that's what this sentence said, and beyond the scope

14:01:16   20   of any opinions he's going to offer in this case.

14:01:19   21        A.    I -- I don't know what ECRI refers to.

14:01:21   22        Q.    And you weren't provided any documents from

14:01:25   23   the defendant regarding ECRI or the history of -- of

14:01:29   24   the situation with ECRI; correct?

14:01:31   25        A.    I was not.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

166

14:01:31  1      Q.   I'm going to have you assume that ECRI is an

14:01:45  2  independent organization.  Do you agree -- assuming

14:01:52  3  that fact, do you agree that one of the goals of 3M in

14:01:56  4  this -- in -- in this e-mail is to prevent ECRI from

14:01:59  5  doing their own testing?

14:02:00  6           MR. GOSS:  Objection to form, lack of

14:02:01  7  foundation, assumes facts not in evidence, beyond the

14:02:06  8  scope of any opinions he's going to offer in this

14:02:08  9  case.

14:02:09  10     A.   Well I'd -- I'd have to do some

14:02:12  11  interpretation.  "Our first step" with this

14:02:14  12  organization that I'm not familiar with, "should be

14:02:15  13  preventing them" -- I'm assuming it's the

14:02:19  14  organization -- "from doing their own testing, but

14:02:23  15  rely on published data," so -- so it sounds to me like

14:02:29  16  they're trying to prevent ECRI from doing some -- some

14:02:34  17  testing; rather, rely on published data.

14:02:38  18           MR. GOSS:  You don't have to speculate about

14:02:40  19  what the document says.

14:02:42  20           MR. ASSAAD:  Well the document speaks for

14:02:43  21  itself I believe.

14:02:43  22           MR. GOSS:  That's right.

14:02:55  23     Q.   As -- as an engineer, you agree that -- well

14:03:01  24  strike that.

14:03:01  25           What do you know about Dr. Sessler?

167

14:03:51    1        A.    Not very much I would say.  I certainly

14:03:59    2    don't know him personally.  I've heard the name.

14:04:03    3        Q.    Are you aware that Dr. Sessler has done a

14:04:07    4    lot of work in the area of normothermia?

14:04:11    5        A.    I -- I was not aware of that.

14:04:13    6        Q.    So what do you --

14:04:14    7              You've heard the name Dr. Sessler before.

14:04:16    8        A.    I think perhaps from counsel in this

14:04:18    9    litigation.

14:04:18   10        Q.    So what is your knowledge of him besides

14:04:20   11    knowing the name?

14:04:21   12        A.    That -- that's about it.

14:04:23   13        Q.    Are you aware that Dr. Sessler is on the

14:04:28   14    advisory council for 3M?

14:04:29   15        A.    I did not know that.

14:04:30   16        Q.    Do you know what an advisory council does?

14:04:33   17        A.    Basically, yes.

14:04:34   18        Q.    What do they do?

14:04:35   19        A.    Provides advice to the company on generally

14:04:38   20    broad issues, broad topics.

14:04:41   21        Q.    And companies hire advise -- advisory

14:04:48   22    counsels to offer advice; correct?

14:04:50   23        A.    Yes.

14:04:52   24        Q.    Okay.  Were you aware that -- that Dr.

14:04:56   25    Sessler advised 3M on numerous occasions to perform

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

168

14:05:00  1  more studies on the safety of the Bair Hugger device?

14:05:04  2      A.   I was not aware of that, no.

14:05:05  3      Q.   And are you aware that 3M disregarded all

14:05:09  4  the advice that Dr. Sessler has given them regarding

14:05:11  5  that issue?

14:05:12  6          MR. GOSS:  Objection to form, contrary to

14:05:13  7  evidence.

14:05:14  8      A.   Since I'm not aware of the -- of his

14:05:17  9  comments in the first place, I -- I can't comment on

14:05:20  10  3M's response.

14:05:32  11          (Kuehn Exhibit 9 was marked for

14:05:36  12          identification.)

14:05:36  13          MR. GOSS:  Do you have another copy?

14:05:37  14          MR. ASSAAD:  Oh, I'm sorry.

14:05:54  15          (Discussion off the stenographic record.)

14:05:59  16  BY MR. ASSAAD:

14:06:06  17      Q.   This is an e-mail -- this is --

14:06:11  18          Exhibit 9 is an e-mail from Gary Hansen to

14:06:15  19  Dan Sessler -- or an e-mail chain between Gary Hansen

14:06:20  20  and Daniel -- and Dr. Sessler.  Have you seen this

14:06:22  21  document before?

14:06:23  22      A.   I have not.

14:06:24  23      Q.   Dr. Sessler writes to -- Dr. Sessler writes

14:06:48  24  to Gary Hansen, talks about Scott's paper, and that's

14:06:53  25  Scott Augustine just for the record, "We were lucky

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

169

14:06:56  1   that this was published at almost the same time as

14:06:59  2   Scott's paper.  We may not have warning of his next

14:07:02  3   effort though.  There is a very real possibility that

14:07:04  4   he will do some sort of bacterial sampling study (the

14:07:07  5   idea is obvious) and that the first we will know of it

14:07:10  6   is a published paper.  If that happens, whatever Scott

14:07:13  7   reports will be un-opposed for one or two years while

14:07:16  8   we do a catch-up study, analysis, and get through the

14:07:19  9   publication process.  Waiting much longer seems like a

14:07:22  10  dangerous strategy."  And I represent they're talking

14:07:25  11  about doing an aerobiology study.

14:07:29  12          Do you know whether or not 3M has done an

14:07:32  13  aerobiology study on the Bair Hugger?

14:07:34  14          MR. GOSS:  Objection to form, foundation.

14:07:36  15      A.   I -- I have no idea.

14:07:38  16      Q.   Are you aware of any study that indicates

14:07:51  17  that the Bair Hugger device -- peer-reviewed study --

14:07:56  18  does not disrupt the airflow in an operating room?

14:08:01  19      A.   Off the top of my head, no.

14:08:08  20      Q.   Have you reviewed any articles, were

14:08:12  21  provided any articles of that nature?

14:08:14  22      A.   No.

14:08:15  23      Q.   Have you been -- have you been provided the

14:08:16  24  compendium created by 3M for marketing its Bair Hugger

14:08:21  25  device discussing all the research available?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

170

| | | |
|---|---|---|
| 14:08:23 | 1 | MR. GOSS:  Object to form. |
| 14:08:25 | 2 | A.   No. |
| 14:08:25 | 3 | Q.   Are you aware that 3M has manipulated |
| 14:08:34 | 4 | studies? |
| 14:08:34 | 5 | MR. GOSS:  Objection, form, assumes facts. |
| 14:08:37 | 6 | A.   I have -- have no idea.  I have not seen |
| 14:08:38 | 7 | the -- the report. |
| 14:09:08 | 8 | (Kuehn Exhibit 10 was marked for |
| | 9 | identification.) |
| 14:09:11 | 10 | BY MR. ASSAAD: |
| 14:09:11 | 11 | Q.   What's been marked as Exhibit 10 is an |
| 14:09:13 | 12 | e-mail chain between Dr. Sessler, Gary Hansen and Russ |
| 14:09:16 | 13 | Olmstead. |
| 14:09:17 | 14 | Do you know who Russ Olmstead is? |
| 14:09:20 | 15 | A.   I do not. |
| 14:09:22 | 16 | Q.   The first sentence of the top e-mail chain |
| 14:09:48 | 17 | of the second -- the second paragraph, first sentence |
| 14:09:50 | 18 | says, "What clinicians will want to see is basically |
| 14:09:53 | 19 | particle counts under the three test circumstances |
| 14:09:56 | 20 | (Off, Ambient and Warm)."  Do you see that? |
| 14:09:59 | 21 | A.   I see that. |
| 14:10:00 | 22 | Q.   Do you disagree with that statement at all? |
| 14:10:04 | 23 | MR. GOSS:  Objection to form, lack of |
| 14:10:05 | 24 | foundation.  He's not a clinician. |
| 14:10:08 | 25 | A.   I -- I'm not sure what clinicians would want |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

171

14:10:11  1  to see.

14:10:13  2      Q.   Well you've formulated your opinions to see

14:10:24  3  whether or not the Bair Hugger has an effect on the

14:10:28  4  sterile field in an operating room; correct?

14:10:30  5      A.   That's correct.

14:10:31  6      Q.   So I assume you have to understand what the

14:10:33  7  issues in this case are; correct?

14:10:34  8      A.   Yes.

14:10:35  9      Q.   Which is the sterility of the sterile field

14:10:38  10  of an operating room; correct?

14:10:39  11     A.   Yes.

14:10:40  12     Q.   Okay.  So you do agree that physicians want

14:10:44  13  to keep the sterile field as particle-free as

14:10:48  14  possible.

14:10:48  15     A.   I would assume so.

14:10:49  16     Q.   Okay.  And that's not rocket science.

14:10:52  17  That's basically the issues in this case; correct?

14:10:54  18     A.   Yes.

14:10:55  19     Q.   Okay.  I mean you didn't perform your study

14:11:01  20  or your -- your eval -- your opinion in a vacuum.  You

14:11:05  21  understood the issues in this case before you

14:11:07  22  performed your study; correct?

14:11:09  23     A.   Yes.

14:11:09  24     Q.   And you were sent out to prove that the Bair

14:11:12  25  Hugger has a negligible effect on the sterile field in

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

172

14:11:15    1    an operating room; correct?

14:11:17    2              MR. GOSS:  Objection to form.

14:11:18    3        A.    I actually determined that based on my

14:11:21    4    experimental measurements from the Bair Hugger oper --

14:11:24    5    in operation.

14:11:24    6        Q.    But that was your working hypothesis;

14:11:27    7    correct?

14:11:27    8              MR. GOSS:  Objection to form.

14:11:28    9        A.    I was open to whatever the results were

14:11:31    10   that -- that I measured in the lab.

14:11:33    11       Q.    But as a scientist, you agree that before

14:11:36    12   you perform any scientific study, you usually have a

14:11:39    13   working hypothesis; correct?

14:11:40    14       A.    There's usually some -- some goal that

14:11:42    15   you're working towards.

14:11:45    16       Q.    Okay.  What was your working hypothesis in

14:11:48    17   this case?

14:11:50    18       A.    To measure the actual -- in the lab, measure

14:11:53    19   the actual temperature and airflow rates out of the

14:11:56    20   Bair Hugger and determine if they were significant or

14:12:00    21   strong enough to go around the anesthesial -- anes --

14:12:04    22   anesthesical drape to get to the surgical site.

14:12:09    23       Q.    Okay.  That's not your hypothesis, that's

14:12:12    24   what you did.  What was your hypothesis?

14:12:14    25       A.    My hypothesis was that the airflow delivered

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

173

14:12:17  1  would have negligible effect on the airflow of the

14:12:20  2  surgical site.

14:12:20  3      Q.   Fair enough.  So your hypothesis was that

14:12:23  4  the airflow had a negligible effect, and you did your

14:12:26  5  study to prove your hypothesis; correct?

14:12:28  6          MR. GOSS:  Object to form.

14:12:31  7      A.   The results I think showed that to be

14:12:31  8  correct.

14:12:31  9      Q.   I understand that.  But now we're both

14:12:33  10  engineers, we've both written papers.  You have a

14:12:35  11  hypothesis and then you do your study to prove your

14:12:39  12  hypothesis to see if your hypothesis is correct or

14:12:41  13  not; correct?

14:12:42  14          MR. GOSS:  Objection to form.

14:12:43  15      A.   I -- I would say I was not -- I was not

14:12:49  16  proving a hypothesis set up ahead of time.  I was

14:12:51  17  looking at the data that I collected and then, based

14:12:53  18  on that, determining my -- my position.

14:12:57  19      Q.   So you never formulated a hypothesis before

14:12:59  20  you obtained your data.

14:13:01  21      A.   I was open-minded in terms of what -- what

14:13:04  22  would happen.

14:13:08  23      Q.   So the answer to my question is "correct."

14:13:10  24          MR. GOSS:  Objection to form.  He answered

14:13:12  25  the question.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

174

14:13:12    1        A.    I -- I did not have a goal in mind.  I -- I

14:13:18    2    did the measurements I -- I performed, and based on

14:13:18    3    the results of the measurements, I used that to

14:13:21    4    support my --

14:13:22    5        Q.    And that's --

14:13:22    6              I'm asking you:  In your methodology, you

14:13:24    7    did not have a hypothesis before you started taking

14:13:27    8    measurements; correct?

14:13:28    9        A.    Yes.

14:13:39   10        Q.    I'll represent that Exhibit 10 is discussion

14:13:54   11    between Gary Hansen and Dr. Sessler and Russ Olmstead

14:14:00   12    discussing the Sessler paper of 2011 that 3M funded

14:14:06   13    and performed and which was published regarding

14:14:11   14    particle count using the DIN standard.

14:14:13   15              MR. GOSS:  Objection to form.

14:14:14   16              MR. ASSAAD:  Basis.

14:14:16   17              MR. GOSS:  3M didn't perform it.  3M

14:14:22   18    definitely funded it.

14:14:29   19              Arizant funded it.  Sorry.  Arizant funded

14:14:32   20    it.

14:14:35   21        Q.    Do you see on the second line of the first

14:14:38   22    paragraph, "The increase with the 635 cover on ambient

14:14:42   23    or warm in Amersfoort seemed substantial, roughly a

14:14:47   24    factor-of-five-to-ten?"

14:14:48   25        A.    Where -- where are you again?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

175

14:14:50    1        Q.    First paragraph, second sentence.

14:14:52    2        A.    Okay.

14:14:53    3        Q.    "The increase with the 635 cover on ambient

14:14:57    4    or warm in Amersfoort seemed substantial, roughly a

14:15:00    5    factor-of-five-to-ten."

14:15:03    6        A.    I -- I think you --

14:15:05    7        Q.    Talking about particles here.

14:15:06    8        A.    Well --

14:15:07    9              MR. GOSS:  Wait for a question.

14:15:08    10       Q.    Do you agree that --

14:15:12    11             Well let me ask you this:  The effect

14:15:13    12   that -- withdraw that question.

14:15:20    13             Since you've never read the Sessler article

14:15:24    14   regarding particle counts funded by 3M, you have no

14:15:28    15   idea sitting here today what actually made it into the

14:15:31    16   published paper; do you?

14:15:33    17       A.    That's correct.

14:15:38    18       Q.    Do you think that if you obtained data that

14:15:41    19   showed that particle counts increased on a factor of

14:15:44    20   five to 10 when the Bair Hugger was ambient or warm,

14:15:46    21   that is a finding that should be published in an

14:15:51    22   objective, impartial study to be peer-reviewed?

14:15:56    23             MR. GOSS:  Object to form.

14:15:57    24       A.    Potentially, uh-huh.

14:16:04    25       Q.    Do you think it's ethical for a company to

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

176

14:16:20  1  fund research, analyze the data, and then give it to a

14:16:32  2  researcher to publish it?

14:16:33  3        MR. GOSS:  Objection to form.  He's not an

14:16:35  4  ethicist and he's not offering opinions on ethics.

14:16:38  5        MR. ASSAAD:  This whole case is about

14:16:40  6  ethics.

14:16:41  7      A.   It -- it's not uncommon for a company to

14:16:44  8  support research that then is sent back to the

14:16:48  9  corporation prior to publication, not for changing any

14:16:54  10  information per se, but there may be again some

14:16:57  11  proprietary issues with something that was -- was used

14:16:59  12  in the study that the company does not want released.

14:17:03  13      Q.   But if I understand you correctly, it's okay

14:17:07  14  for the -- the researchers to send back the manuscript

14:17:13  15  to the corporation for them to change --

14:17:16  16        MR. GOSS:  Object to form, assumes facts.

14:17:19  17      Q.   -- or edit?

14:17:20  18      A.   I would say edit.

14:17:21  19      Q.   So a corporation is allowed to edit the

14:17:23  20  substance of a research paper that they fund?

14:17:27  21        MR. GOSS:  Objection to form.

14:17:27  22      A.   Again, in my experience it's very common for

14:17:31  23  a researcher who is funded by a company to have an

14:17:35  24  agreement in writing before that project starts that

14:17:37  25  any information release would have to be approved by

177

14:17:42  1   the -- the funding agency or the company.

14:17:45  2       Q.   I understand the release, but what about

14:17:48  3   editing, editing the content of -- of a manuscript?

14:17:51  4       A.   I would say not changing the results.  There

14:17:54  5   may be --

14:17:55  6            Again, something proprietary could be in

14:17:57  7   there that the company does not want released, but

14:17:59  8   that should not change the overall results of the

14:18:01  9   study.

14:18:02  10      Q.   Okay.  So -- so you'll agree with me that

14:18:05  11  a -- a researcher should not send back the manuscript

14:18:09  12  to the corporation that funded the research and give

14:18:12  13  them free reign to do any type of edit they want to

14:18:15  14  do; correct?

14:18:16  15           MR. GOSS:  Objection, form, beyond the scope

14:18:18  16  of the opinions.

14:18:18  17      A.   That -- that would be my --

14:18:19  18           Yes, I would agree with that.

14:18:21  19      Q.   Because if it was done, that would lack

14:18:23  20  integrity in that paper; correct?

14:18:25  21           MR. GOSS:  Same objection.

14:18:26  22      A.   Well the original researchers would

14:18:29  23  hopefully have integrity.  It's a question of what

14:18:32  24  happens after that.  I would say that's not a -- that

14:18:35  25  would be a non -- a non-ethical decision.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

178

14:18:39  1      Q.   It would not be ethical.

14:18:40  2      A.   I agree.

14:18:41  3      Q.   Okay.  Have you heard of Hybeta?

14:19:08  4      A.   I do not believe I have.

14:19:21  5      Q.   Does the fact that Dr. Sessler indicated the

14:19:23  6  results show a factor of five to 10 increase in

14:19:26  7  particle counts when the Bair Hugger was on ambient or

14:19:28  8  on high -- or on warm, would that have any effect on

14:19:33  9  your opinions in this case?

14:19:35  10           MR. GOSS:  Objection, assumes facts not in

14:19:37  11  evidence.

14:19:37  12     A.   Without --

14:19:39  13           Not without having read the article.

14:19:40  14     Q.   Okay.  Going back to the last exhibit

14:21:29  15  talking about the particle counts being five to 10

14:21:32  16  times, --

14:21:32  17     A.   Okay.

14:21:33  18     Q.   -- are you aware that 3M deleted that

14:21:37  19  information from the final manuscript submitted for

14:21:40  20  publication?

14:21:40  21           MR. GOSS:  Objection to form.

14:21:41  22     A.   I have no information on that.

14:21:43  23     Q.   Would you -- would that --

14:21:45  24           If that is the case, assuming that's the

14:21:47  25  case, do you agree that's unethical?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

179

14:21:49  1      MR. GOSS:  Objection to form, beyond the

14:21:51  2  scope of his opinions.  He's not an ethicist.

14:21:53  3      A.    Well, I would probably agree with that.

14:21:56  4      Q.    Sitting here today, do you have any

14:22:20  5  understanding or -- or -- or knowledge as to why you

14:22:23  6  were not provided most of the relevant peer-reviewed

14:22:30  7  literature in this case?

14:22:30  8      MR. GOSS:  Objection, argumentative, calls

14:22:33  9  for speculation.

14:22:35  10      A.    I was given a task that was fairly narrow in

14:22:38  11  scope, and that may have limited the amount of

14:22:41  12  information I was given.

14:22:42  13      Q.    So your task was narrow in scope?

14:22:44  14      A.    Yes, to look -- look at primarily the

14:22:49  15  filter -- filtration issues and -- and particle

14:22:52  16  movement on surfaces, and transport issues.

14:22:57  17      Q.    Well you also calculated bouyancy using the

14:23:00  18  Archimedes number to see whether or not there would be

14:23:03  19  any effect on -- on air movement in the operating

14:23:06  20  room; correct?

14:23:06  21      A.    That was in response to one of the expert

14:23:09  22  reports.

14:23:10  23      Q.    So what -- what analysis did you do with

14:23:13  24  respect for you to come to your conclusion that the

14:23:16  25  Bair Hugger has a negligible effect on the airflow in

180

14:23:19   1   the operating room?

14:23:21   2       A.   Based on my measurements of the velocity

14:23:23   3   leaving the blanket primarily.

14:23:25   4       Q.   Okay.  So it's solely based on your Exhibit

14:23:28   5   B then.

14:23:28   6       A.   Yes.

14:23:29   7       Q.   That's it.

14:23:29   8       A.   And knowledge of how operating rooms

14:23:34   9   typically work with air coming down through the

14:23:37  10   filters in the ceiling towards the surgical wound site

14:23:40  11   and the air from the blanket being emitted, I would

14:23:45  12   say, down -- on the downstream side of the surgical

14:23:49  13   drape.

14:23:49  14       Q.   Okay.  And we'll get to that in a little

14:23:53  15   bit.  But let's talk about operating rooms.  So you

14:23:54  16   understand that the --

14:23:55  17            Do you know what the term "environment of

14:23:58  18   use" is?

14:23:58  19       A.   Yes.

14:23:59  20       Q.   Have you ever used that term before?

14:24:02  21       A.   I do not believe I have.

14:24:02  22       Q.   Have you ever heard of it before?

14:24:02  23       A.   I have heard of it before.

14:24:04  24       Q.   And would you agree with me that when

14:24:06  25   designing any device, you have to look at what

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

181

14:24:11  1  environment the device is going to be used in;

14:24:13  2  correct?

14:24:13  3      A.   That's correct.

14:24:13  4      Q.   And you understand that the -- the Bair

14:24:14  5  Hugger is being used in an operating room as well as

14:24:16  6  other areas, but it's also being used in an operating

14:24:19  7  room; correct?

14:24:20  8      A.   Correct.

14:24:20  9      Q.   Okay.  And have you looked at the

14:24:22  10  environment of an operating room with respect to the

14:24:26  11  bacterial load in an operating room?

14:24:28  12      A.   I've not personally, no.

14:24:31  13      Q.   Could you agree with me that the bacterial

14:24:34  14  load, if we're talking about CFUs per meter cubed, is

14:24:39  15  not uniform throughout the operating room?

14:24:40  16      A.   I would agree with that.

14:24:42  17      Q.   A certain area is going to have a higher

14:24:45  18  bioburden than other areas; correct?

14:24:46  19      A.   Yes.

14:24:46  20      Q.   Could you agree with me that probably the

14:24:49  21  most -- the -- the area with the greatest bioburden is

14:24:54  22  probably around the surgical table?

14:25:01  23      A.   I --

14:25:02  24          Not having seen any data, I'm -- I'm

14:25:05  25  offering speculation, so I would not have a basis to

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

182

14:25:09   1    agree with that.

14:25:09   2         Q.   Well will you agree that the bioburden,

14:25:15   3    which is bacteria, are usually coming off of

14:25:20   4    individuals, off their skin, as well as it could have

14:25:25   5    been not cleaned properly before, some areas of the

14:25:28   6    operating room; correct?

14:25:28   7         A.   And also coming through the filters in the

14:25:30   8    ceiling.

14:25:31   9         Q.   Okay.

          10         A.   Other --

14:25:33  11         Q.   What do you think has a larger bioburden,

14:25:36  12    the air coming out of the ceiling or the air

14:25:41  13    underneath the operating room table?

14:25:45  14         A.   I have no basis to make an opinion on that.

14:25:48  15         Q.   Okay.  So sitting here today, you can't use

14:25:51  16    your -- you can't use science and your engineering

14:25:57  17    education to determine, based on the airflow in an

14:26:01  18    operating room, whether or not the air coming out of

14:26:04  19    the ventilation system has a greater or lesser

14:26:08  20    bioburden than the air where there are a patient and

14:26:16  21    three or four people standing around a surgical table.

14:26:19  22         A.   Well I -- I cannot rely on any data, but I

14:26:23  23    can speculate that it would be -- the concentration

14:26:25  24    would be higher under the table.

14:26:26  25         Q.   And that would be because air is blowing

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

183

14:26:28  1   down through the ventilation and it's moving the

14:26:33  2   bacteria and the squames on a downward motion to the

14:26:37  3   floor; correct?

14:26:37  4       A.   Yes.

14:26:38  5       Q.   Okay.  So you agree with me that from

14:26:42  6   engineering common sense, that the area with the least

14:26:46  7   amount of bioburden is probably the air coming from

14:26:49  8   the vents in an operating room.

14:26:53  9       A.   That's certainly one of the areas of low

14:26:56  10  bioburden.

14:26:56  11      Q.   Okay.  Have you heard the term "war games"

14:27:36  12  used by 3M?

14:27:38  13      A.   No.

14:28:35  14          (Kuehn Exhibit 11 was marked for

14:28:41  15           identification.)

14:28:41  16  BY MR. ASSAAD:

14:28:51  17      Q.   Exhibit 11 is an e-mail from Jana Stender to

14:28:53  18  John Rock, and attached to it is something called "war

14:28:57  19  games notes.docx."  I assume you've never seen this

14:29:04  20  document before; correct?

14:29:04  21      A.   That's correct, I have not -- I have not

14:29:06  22  seen this before.

14:29:07  23      Q.   Were you aware -- if you look at the bottom

14:29:39  24  of page two, the fifth line up -- that 3M had a

14:29:46  25  concern that someone was going to do a real study on

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

184

14:29:49  1   forced-air warming and contamination?

14:29:51  2       A.   That -- that's what it says here.

14:29:52  3       Q.   Okay.  Do you agree with me that, based on

14:30:06  4   the information that you've been provided today, that

14:30:12  5   there's no evidence that 3M performed any study to

14:30:23  6   determine whether or not the Bair Hugger contaminates

14:30:26  7   a sterile field?

14:30:27  8            MR. GOSS:  Objection to form, lack of

14:30:29  9   foundation, beyond the scope of his opinions.

14:30:33  10      A.   Nothing that I've seen today, no.

14:30:35  11      Q.   And I assume that information is not

14:30:41  12  important to your opinions; correct?

14:30:43  13      A.   Not -- not based on how I developed my

14:30:46  14  opinions.

14:30:51  15      Q.   So if your opinions and your calculations

14:30:54  16  are contrary to peer-reviewed studies, you would still

14:30:57  17  stand by your opinions?

14:31:00  18      A.   I would say some peer-reviewed studies,

14:31:02  19  especially those dealing with particle measurements,

14:31:05  20  are often flawed because of a poor -- poor methodology

14:31:12  21  or -- or --

14:31:14  22      Q.   You're speculating though; correct?

14:31:16  23           MR. GOSS:  Objection to form.

14:31:17  24      A.   Without -- well, without -- without reading

14:31:20  25  them, I'm speculating, yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

185

| | | |
|---|---|---|
| 14:31:21 | 1 | Q.   I mean you can't sit here today and say |
| 14:31:23 | 2 | whether or not the Legg study had poor methodology; |
| 14:31:25 | 3 | can you? |
| 14:31:26 | 4 | A.   Not -- |
| 14:31:26 | 5 | MR. GOSS:  Show him the study. |
| 14:31:28 | 6 | MR. ASSAAD:  I'm not going to show it to |
| 14:31:29 | 7 | him.  You can show it to him.  3M could show it to |
| 14:31:33 | 8 | him. |
| 14:31:33 | 9 | MR. GOSS:  Well you're asking him questions |
| 14:31:35 | 10 | about the study and he can only -- he can only |
| | 11 | speculate -- |
| | 12 | MR. ASSAAD:  No. |
| 14:31:36 | 13 | MR. GOSS:  -- if you're not going to show |
| 14:31:38 | 14 | him. |
| 14:31:38 | 15 | Q.   Sitting here today you cold not state -- |
| 14:31:38 | 16 | MR. ASSAAD:  I'm sorry, Dick. |
| 14:31:39 | 17 | Q.   Sitting here today you could not state |
| 14:31:41 | 18 | whether or not the 3M -- or the Legg study had poor |
| 14:31:43 | 19 | methodology; can you? |
| 14:31:44 | 20 | A.   I cannot state that because I've not seen |
| 14:31:46 | 21 | it. |
| 14:31:46 | 22 | Q.   Okay.  And you -- |
| 14:31:48 | 23 | Sitting here today, you could not say |
| 14:31:51 | 24 | whether or not the Sessler study funded by 3M had poor |
| 14:31:53 | 25 | methodology; correct? |

186

14:31:54    1        A.    Having not seen it, I could not say that,

14:31:57    2    yes.

14:31:59    3        Q.    And you can't sit here today and say the

14:32:01    4    McGovern study that had neutral-buoyant bubbles had

14:32:06    5    poor methodology; can you?

14:32:07    6        A.    Not having seen it, no, I cannot say that.

14:32:10    7        Q.    Are you aware that Gary Hansen stated in an

14:32:32    8    edit on a paper that there actually is evidence that

14:32:35    9    forced-air warming increases the risk of infection?

14:32:38   10            MR. GOSS:  I think she's going to correct

14:32:40   11    you.

14:32:40   12            MR. ASSAAD:  I'm sorry, Al Van Duren.

14:32:43   13            MR. GOSS:  Object to form.

14:32:44   14        A.    I -- I -- I have not seen that.

14:32:46   15        Q.    You know Al Van Duren is still with the

14:32:48   16    company 3M; correct?

14:32:49   17        A.    I -- I did not know that.

14:32:51   18        Q.    Okay.  Assuming that Al Van Duren, who is

14:33:13   19    upper-level management at 3M, stated, "Actually, there

14:33:18   20    is evidence that forced-air warming use increases

14:33:22   21    risk -- this evidence was the motivation behind Dr.

14:33:26   22    Memarzadeh's work," assuming that's correct, would

14:33:30   23    that affect your opinions in this case?

14:33:32   24            MR. GOSS:  Objection to form.

14:33:33   25        A.    Could you repeat that again?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

187

14:33:37  1      Q.    Okay.  Assuming that Al Van Duren, who is

14:33:40  2  upper-level management at 3M stated, "Actually, there

14:33:44  3  is evidence that forced-air warming use increases

14:33:47  4  risk" -- and they're talking about infections -- "this

14:33:51  5  evidence" -- dash "this evidence was the motivation

14:33:55  6  behind Dr. Memarzadeh's work."  Assuming that's

14:33:58  7  correct, would that affect your opinions in this case?

14:34:00  8           MR. GOSS:  Same objection.

14:34:01  9      A.    I would say no.

14:34:17  10          MR. ASSAAD:  Take a five-minute break?

14:34:20  11          MR. GOSS:  Sure.

14:42:47  12          (Kuehn Exhibit 12 was marked for

14:42:49  13          identification.)

14:42:49  14  BY MR. ASSAAD:

14:42:54  15     Q.    What's been marked as Exhibit 12 are

14:42:56  16  invoices that have been provided to me today which are

14:43:00  17  your March and May invoices to Blackwell Burke; is

14:43:07  18  that correct?

14:43:07  19     A.    Yes, that's correct.

14:43:08  20     Q.    And with respect to the invoices that we --

14:43:15  21  have been marked in today's deposition, that's all the

14:43:17  22  invoices that you have prepared so far in this case.

14:43:19  23     A.    That's correct, February through the first

14:43:21  24  of June.

14:43:22  25     Q.    Okay.  On May 16th you indicate you

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

188

14:43:38   1   "Reviewed 3M report, read ASHRAE HVAC design guide and

14:43:44   2   52.2."

14:43:45   3        A.   Yes, I believe that's what it says.

14:43:47   4        Q.   What's the ASHRAE HVAC design guide?  Is

14:43:50   5   that for hospitals?

14:43:51   6        A.   Yes.  Yes.

14:43:52   7        Q.   Is that the 2007 I think it was?

14:43:55   8        A.   I don't remember what version it was, but --

14:43:58   9        Q.   Second version?

14:43:59   10       A.   It's probably the most recent hospital

14:44:02   11  design guide.

14:44:02   12       Q.   Now let's go to your report, which is

14:44:11   13  Exhibit 1.  I want to go to Exhibit 1 -- Exhibit A of

14:44:19   14  Exhibit 1, which is your curriculum vitae.

14:44:38   15       A.   Okay.

14:44:39   16       Q.   Is this the most-up-to-date CV available?

14:44:43   17       A.   It was when I submitted it, yes.

14:44:46   18       Q.   So back in June?

14:44:47   19       A.   I -- I don't recall when I actually

14:44:50   20  submitted it.

14:44:50   21       Q.   Okay.  Well your expert report is dated June

14:44:53   22  1st, so would that be when you submitted this CV?

14:44:57   23       A.   I think I may have as part of the report,

14:45:00   24  yes.  Yes.

14:45:01   25       Q.   Well have you consulted with anyone that's

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

189

14:45:04    1    not on the list that you would add to the CV?

14:45:13    2        A.    Certainly not since '87, no.

14:45:18    3        Q.    Okay.  Under your honors and awards you put

14:45:22    4    down "Minnesota Supercomputer Institute, Associate

14:45:27    5    Fellow 1994."

14:45:27    6        A.    Yes.

14:45:28    7        Q.    Is there any other supercomputers in

14:45:32    8    Minnesota besides the one at the University of

14:45:34    9    Minnesota that you're aware of?

14:45:37    10       A.    That's the only one I'm aware of.

14:45:39    11       Q.    Does St. Thomas have a supercomputer?

14:45:43    12       A.    I do not --

14:45:44    13             I'm not aware of that, no.

14:45:45    14       Q.    Okay.  And you have listed here patents, you

14:45:50    15   have three patents on page two.  Have those all been

14:45:55    16   assigned to the University of Minnesota?

14:45:56    17       A.    The first one was in -- let's see.  First

14:46:02    18   one was actually developed when I was at Iowa State

14:46:05    19   University.

14:46:05    20       Q.    Okay.  So that was assigned to Iowa State?

14:46:08    21       A.    That was assigned to Iowa State.  The others

14:46:11    22   are the University of Minnesota.

14:46:12    23       Q.    Okay.  Now you don't hold yourself out as an

14:46:31    24   expert in internal medicine; do you?

14:46:34    25       A.    That's correct, I do not.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

190

14:46:36    1        Q.    And you don't hold yourself out as an expert

14:46:37    2    in infectious diseases; correct?

14:46:39    3        A.    That's true.

14:46:40    4        Q.    Sitting here today, you have no opinion of

14:46:42    5    how many CFUs would cause a periprosthetic joint

14:46:49    6    infection; correct?

14:46:50    7        A.    I'm not an expert in that area, so yes, I

14:46:52    8    have no opinion on that.

14:46:53    9        Q.    Do you know the difference between a

14:46:55    10   periprosthetic joint infection and a superficial wound

14:46:59    11   infection?

14:47:00    12       A.    I do not.

14:47:00    13       Q.    Okay.  You don't hold yourself out as an

14:47:02    14   expert in orthopedics; correct?

14:47:04    15       A.    That's -- that's true, I'm not an

14:47:06    16   orthopedics expert.

14:47:06    17       Q.    You don't hold yourself out as an expert

14:47:07    18   in -- in nursing; correct?

14:47:08    19       A.    That's correct.

14:47:09    20       Q.    You don't hold yourself out as an expert in

14:47:11    21   the manufacturing of filters; correct?

14:47:12    22       A.    Manufacturing, that's probably correct.

14:47:19    23       Q.    Okay.  You don't hold yourself out as an

14:47:21    24   expert in medical device design; correct?

14:47:24    25       A.    That's correct.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

191

14:47:24  1     Q.    You don't hold yourself out as an expert

14:47:27  2   with -- with respect to medical device warnings;

14:47:29  3   correct?

14:47:29  4     A.    That's correct.

14:47:31  5     Q.    You don't hold yourself out as an expert in

14:47:33  6   anesthesiology; correct?

14:47:35  7     A.    That's correct.

14:47:35  8     Q.    You don't hold yourself out as an expert in

14:47:39  9   patient warming devices; correct?

14:47:40  10    A.    Other than this, the work I've done here,

14:47:45  11  I've -- I've not done any other work in other patient

14:47:50  12  warming devices.

14:47:51  13    Q.    Do you know what other patient warming

14:47:53  14  devices are out there in the market?

14:47:54  15    A.    You, I think, alluded to some earlier today,

14:47:56  16  but I -- I cannot repeat their names.

14:47:58  17    Q.    Have you heard of the Mistral?

14:48:00  18    A.    Yes.

14:48:00  19    Q.    Have you heard of Warmtouch?

14:48:02  20    A.    Yes.

14:48:02  21    Q.    Have you heard of the Hot Dog?

14:48:05  22    A.    Yes.

14:48:05  23    Q.    Have you heard of VitaHEAT?

          24    A.    I am not --

14:48:05  25    Q.    A 3M product.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

192

14:48:06  1     A.   I'm not -- not sure I have.

14:48:08  2     Q.   Okay.  You're not an expert in operating

14:48:10  3  room design; are you?

14:48:11  4     A.   No.

14:48:12  5     Q.   And you agree that an operating room is

14:48:16  6  different than other areas in the hospital; correct?

14:48:19  7     A.   Yes.

14:48:19  8     Q.   It's not the same as a PACU; correct?

14:48:21  9     A.   Same as -- come again.

14:48:26  10    Q.   It's not the same as a PACU.

14:48:27  11         Do you know what a PACU is?

14:48:28  12    A.   Will you spell it out?

14:48:30  13    Q.   Post Anesthesia Care Unit.

14:48:33  14    A.   Oh.  Yes, it's different, yes.

14:48:34  15    Q.   It's different than an ER -- ER triage

14:48:36  16  center; correct?

14:48:37  17    A.   Yes.

14:48:39  18    Q.   Do you agree that ASHRAE has different

14:48:41  19  standards for air exchanges in different types of a

14:48:45  20  hospital?

14:48:46  21    A.   Yes.

14:48:48  22    Q.   Like the OR requires a different air

14:48:51  23  exchange than, say, a patient's room.

14:48:54  24    A.   Right.  Patient isolation room or some other

14:48:57  25  room, yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

193

14:48:58   1      Q.   Or regular patient room like a --

14:49:00   2      A.   Yes.

14:49:01   3      Q.   And also the filtration requirements are

14:49:03   4  different for an OR than other parts of the hospital;

14:49:06   5  correct?

14:49:06   6      A.   That's correct.

14:49:07   7      Q.   Okay.  Because when you determine filtration

14:49:10   8  for a certain room, you have to determine the

14:49:14   9  environment of use of that room; correct?

14:49:16  10      A.   That's correct.

14:49:18  11      Q.   In an operation --

14:49:19  12           In an operating room, a -- a person's very

14:49:23  13  susceptible to infection because he at that time is

14:49:26  14  immunosuppressed because he basically has a wound

14:49:29  15  that's open to the air; correct?

14:49:30  16           MR. GOSS:  Object to form.

14:49:31  17      A.   I'm not aware of the details of that.

14:49:34  18      Q.   Well you agree with me that you want an

14:49:37  19  operating room to be clean as possible to prevent

14:49:42  20  infections of open wounds; correct?

14:49:44  21      A.   Yes.

14:49:48  22      Q.   And you don't hold yourself out as an expert

14:49:57  23  in operating room airflow; correct?

14:49:59  24      A.   That's correct.

14:50:02  25      Q.   Do you know the difference between laminar

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

194

14:50:09  1    flow and turbulent flow?

14:50:10  2         A.    Yes.

14:50:11  3         Q.    Do you hold yourself out as an expert

14:50:13  4    between laminar flow and turbulent flow with respect

14:50:17  5    to an operating room?

14:50:18  6         A.    As applied to an operating room, probably

14:50:20  7    not.

14:50:21  8         Q.    Okay.  Do you know whether or not you could

14:50:22  9    get true laminar flow in an operating room?

14:50:24  10        A.    I would suspect that would be highly

14:50:27  11   unlikely.

14:50:32  12        Q.    You don't hold yourself out as an expert in

14:50:36  13   particle flow in an operating room; correct?

14:50:37  14        A.    Not that I've worked in.  I've never

14:50:43  15   measured particle flows in an operating room, so I do

14:50:47  16   not consider myself to be an expert.

14:50:56  17        Q.    Are you able to calculate how turbulent flow

14:51:00  18   affects particle movement in an operating room?

14:51:04  19        A.    I -- I know how to do that in -- in general.

14:51:07  20   I would assume it would be applied to airflow in an

14:51:09  21   operating room also.

14:51:10  22        Q.    Can you do that by hand, or do you need to

14:51:19  23   use the Navier-Stokes equation?

          24             THE REPORTER:   "...do you need to use" --

          25        Q.    Can you do that by hand, or do you need to

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

195

14:51:20  1  use some sort of computational modeling?

14:51:20  2      A.   For realistic applications that are fairly

14:51:23  3  complex, you would need to use some software.

14:51:25  4      Q.   Okay.  Such as ANSYS?

14:51:27  5      A.   Yes.

14:51:27  6      Q.   Okay.  And have you ever used ANSYS or any

14:51:34  7  type of computer program to determine how particles

14:51:44  8  move in a turbulent environment?

14:51:46  9      A.   Yes.

14:51:47  10     Q.   When?

14:51:47  11     A.   I gave a short course for the American

14:51:50  12  Association of Aerosol Research probably 20 years ago

14:51:55  13  which included stochastic particle modeling, effect of

14:52:01  14  turbulence, turbulent kinetic energy, and basically

14:52:05  15  using Lagrange in particle tracking.

14:52:10  16     Q.   And you agree with me that you have to use

14:52:18  17  Lagrange in particle tracking to actually track

14:52:21  18  particles in a turbulent environment; correct?

14:52:22  19     A.   It turns out that if your particles are

14:52:24  20  small enough and the airflow does not change direction

14:52:27  21  very quickly, you could actually use a streamline, the

14:52:32  22  time-average streamlines, and predict the most

14:52:36  23  probable particle trajectory in a turbulent

14:52:40  24  environment.

14:52:40  25     Q.   And when you say "small enough," usually one

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

196

14:52:43    1    micron or less; correct?

14:52:44    2        A.    Yes.

14:52:44    3        Q.    Anything larger than one micron actually has

14:52:47    4    inertia; correct?

14:52:49    5        A.    As I said, it depends on the -- the

14:52:50    6    direction-of-flow change.  If there's no significant

14:52:52    7    acceleration or direction-of-flow change, then you can

14:52:55    8    actually use larger particles.

14:52:55    9        Q.    Well how large?

14:52:56   10        A.    Again, depends on the -- the direction-of-

14:53:01   11    flow change.

14:53:01   12        Q.    But you agree with me that even in a filter,

14:53:04   13    that particles larger than one micron do not follow

14:53:10   14    the -- the -- the airflow stream; correct?

14:53:11   15        A.    Because of the -- the sharp transition of

14:53:13   16    air -- air streamlines around the fibers of the filter

14:53:17   17    material.

14:53:17   18        Q.    And that's when you -- you -- you collect

14:53:20   19    particles by impaction during -- for larger particles;

14:53:22   20    correct?

14:53:22   21        A.    That's correct.

14:53:22   22        Q.    Because larger particles have inertia;

14:53:25   23    correct?

14:53:25   24        A.    Yes.

14:53:25   25        Q.    If there's a -- if there's a change in the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

197

14:53:28  1  direction of the air stream, it's no longer going to

14:53:30  2  follow -- the particle is no longer going to follow

14:53:34  3  the air stream, it has inertia and will get away from

14:53:36  4  the air stream; correct?

14:53:38  5      A.   And it depends on the ratio of the particle

14:53:42  6  inertia and the -- the acceleration.

14:53:42  7      Q.   And in fact, when you add turbulence to the

14:53:50  8  equation, that also affects the airflow when the

14:53:56  9  intensity of the turbulence increases; correct?  Or

14:54:00  10  particle movement.

14:54:00  11     A.   Yes, it definitely affects particle

14:54:01  12  movement.

14:54:01  13     Q.   Okay.  You could have a general air stream,

14:54:04  14  but once you add turbulence to that air stream, you

14:54:08  15  really can't use the -- the mean average with respect

14:54:11  16  to particle movement any more because you have

14:54:13  17  turbulence.

14:54:13  18     A.   That would still be the most probable

14:54:15  19  particle path.  The turbulence dispersion would be

14:54:18  20  about that streamline.

14:54:24  21     Q.   Okay.  Do you have any articles to support

14:54:26  22  that opinion?

14:54:27  23     A.   I'm -- I'm trying to think if -- if we

14:54:34  24  published something like that back in the early 1990s,

14:54:37  25  and I -- I'd have to go back and look at my

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

198

14:54:40   1   publication record.

14:54:41   2       Q.   And there has been a lot of advancement in

14:54:44   3   computational fluid dynamics software since the 1990s;

14:54:47   4   hasn't there?

14:54:48   5       A.   Yes.

14:54:48   6       Q.   More-powerful computers; correct?

14:54:50   7       A.   Yes.

14:54:51   8       Q.   The technical limitation is actually the

14:54:54   9   computer.

14:54:54   10      A.   That's probably correct.

14:54:56   11      Q.   Might be other limitations, but the most

14:54:59   12  significant limitation in performing these

14:55:01   13  calculations are the ability of computers to actually

14:55:04   14  compute all the data.

14:55:06   15      A.   It's -- it's the refinement of the grid

14:55:08   16  essentially.

14:55:16   17      Q.   When is the last time you constructed a grid

14:55:20   18  for a CFD analysis?

14:55:23   19      A.   Personally?

14:55:24   20      Q.   Yes.

14:55:26   21      A.   Probably -- it's been probably about 20

14:55:30   22  years ago.

14:55:37   23      Q.   You've read Elghabashi's expert report;

14:55:43   24  correct?

14:55:43   25      A.   I have.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

199

14:55:43  1      Q.   Do you agree that Elghabashi is an expert in
14:55:46  2  particle movement?
14:55:47  3      A.   I would say he probably is, yes.
14:55:52  4      Q.   Are you aware that --
14:56:04  5           You also looked at his deposition, correct,
14:56:08  6  Dr. Elghabashi's deposition?
14:56:08  7      A.   I -- I was given his deposition.  I did not
14:56:10  8  have a chance to read through it.
14:56:11  9      Q.   Are you aware that he's doing work for the
14:56:13  10  military with aircraft-carrier design?
14:56:15  11     A.   I was not aware of that.
14:56:17  12     Q.   Okay.  Are you aware that he has access to
14:56:20  13  the military supercomputer that most people don't have
14:56:23  14  access to?
14:56:23  15     A.   I was not aware of that.
14:56:24  16     Q.   Are you aware of the military supercomputer
14:56:27  17  that the military uses for aviation?
14:56:28  18     A.   Not specifically, no.
14:56:31  19     Q.   Are you familiar with the Navier-Stokes
14:57:06  20  equation?
14:57:07  21          (Discussion off the stenographic record.)
14:57:07  22     A.   Yes.
14:57:09  23     Q.   If I asked you to write the equation out,
14:57:12  24  could you do that today?
14:57:13  25     A.   I could probably give it a good -- good

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

200

14:57:15   1   shot.

14:57:20   2        Q.   So the answer to that would be maybe, but

14:57:22   3   not -- you're not a hundred percent sure you could do

14:57:25   4   it.

14:57:25   5        A.   I -- I'm probably 90 percent sure I could do

14:57:27   6   it.

14:57:28   7        Q.   Could you write out the boussinesq approach

14:57:36   8   with -- incorporating that into the Navier-Stokes

14:57:39   9   equation today?

14:57:42   10       A.   I could probably do that.

14:57:47   11       Q.   Have you reviewed the videos of Dr.

14:57:52   12   Elghabashi regarding his CFD analysis?

14:57:56   13       A.   The videos, no.

14:57:59   14       Q.   Did you ever consider doing your

14:58:12   15   measurements with a PIV?

14:58:14   16       A.   Which -- which measurements?

14:58:16   17       Q.   The measurements you did for Exhibit B with

14   18   a --

14:58:18   19            Do you know what a PIV is?

14:58:20   20       A.   Yes.

14:58:21   21       Q.   What's a PIV?

14:58:22   22       A.   Particle Image Velocimetry.

14:58:27   23       Q.   And that's the most accurate way to measure

14:58:28   24   velocity of the air today; correct?

14:58:28   25       A.   It's a non-intrusive method.  It's also a

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

201

14:58:34    1    very expensive piece of equipment and requires a lot

14:58:37    2    of data -- data analysis.

14:58:40    3        Q.   Did you consider using that in your

14:58:40    4    analysis?

14:58:40    5        A.   No, because of the --

14:58:44    6             I wasn't sure I had avail -- that type of

14:58:48    7    instrumentation available to me and how much effort it

14:58:52    8    would require to set it up and -- and reduce the data.

14:58:55    9        Q.   And it's very expensive.

14:58:56   10        A.   And it's very expensive, yes.

14:58:57   11        Q.   Could be in -- in -- in the millions.

14:59:00   12        A.   I don't think it's quite that much, but

14:59:02   13    certainly hundreds of thousands.

14:59:03   14        Q.   Okay.  Did you ever consider using ANSYS to

14:59:20   15    model the Bair Hugger in an operating room?

14:59:24   16        A.   I did not really consider that.  I really

14:59:27   17    have not done CFD work myself for -- for many years.

14:59:31   18        Q.   But you consider yourself an expert in CFD.

14:59:35   19        A.   I -- I know the protocol, the limitations,

14:59:39   20    yes.

14:59:39   21        Q.   What are the limitations?

14:59:41   22        A.   Limitations are associated with time steps,

14:59:45   23    with grid resolution, with the turbulent model that

14:59:49   24    you use if you're using a turbulent model, surface

14:59:53   25    conditions, any thermal bouyancy involved.  And of

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

202

14:59:58    1    course particle modeling adds another way of

15:00:00    2    complexity.

15:00:01    3        Q.   Do you think you're capable sitting here

15:00:03    4    today to perform a CFD analysis, without anyone else's

15:00:06    5    help, on an operating room?

15:00:08    6        A.   It would take me quite a while to go back

15:00:11    7    and review the manual and get up -- up to speed.  I

15:00:14    8    could probably do it, but it would take me quite a

15:00:16    9    while.

15:00:18   10        Q.   So you'll agree with me that with respect to

15:00:19   11    computational fluid dynamics in the present, you're

15:00:23   12    not an expert in it as of right now.

15:00:25   13        A.   In terms of actually personally performing

15:00:27   14    the results, --

15:00:27   15        Q.   Yes.

15:00:27   16        A.   -- no.

15:00:29   17        Q.   So you'll agree that you're not an expert at

15:00:32   18    this point in time in your career.

15:00:34   19        A.   In terms of analyzing other people's

15:00:37   20    results, I think I am.  In terms of generating my own

15:00:39   21    results, no.

15:00:43   22        Q.   Do you know the difference between a RANS

15:00:58   23    model and an LES model?  R-A-N-S and L-E-S.

15:01:04   24        A.   It's been a long time since I've thought

15:01:06   25    about that, but it's Reynolds Averaging Navier-Stokes

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

203

15:01:10    1    versus Large Eddy Simulation.

15:01:11    2         Q.   When you performed CFD analysis, did you

15:01:14    3    ever use LES?

15:01:17    4         A.   I did not personally.  It was the Reynolds

15:01:21    5    Averaging.

15:01:21    6         Q.   Okay.  And -- and the purpose of the

15:01:25    7    boussinesq and the RANS is to reduce the computational

15:01:29    8    time when you use computational fluid dynamics;

15:01:35    9    correct?

15:01:35   10         A.   That's correct, using a simplified set of

15:01:38   11    equations.

15:01:38   12         Q.   Okay.  When was the first time you saw a

15:01:51   13    Bair Hugger?

15:01:51   14         A.   Probably in the -- the office, maybe in

15:01:58   15    March or April.

15:02:00   16         Q.   Okay.  And which Bair Hugger model was it?

15:02:03   17         A.   I believe it was the -- we may have looked

15:02:06   18    at both the 505 and the 750 or 755, or --

15:02:15   19              There was an earlier version and at least

15:02:16   20    one of the later versions.

15:02:17   21         Q.   Okay.  Going -- going back, and I might have

15:02:22   22    asked you this before, you haven't seen Abraham's

15:02:25   23    report; correct?

15:02:25   24         A.   I have not, yes.

15:02:26   25         Q.   Okay.  So you haven't seen whether or not he

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

204

15:02:29  1  used R -- RANS or LES or the type of turbulent

15:02:32  2  modeling.

15:02:33  3      A.   Having not seen his report, I have no idea.

15:02:36  4      Q.   Would you agree that when you -- when you

15:02:37  5  model an operating room and you have people in it as

15:02:41  6  well as lights and the flow is not turbulent -- or the

15:02:43  7  flow is turbulent, that you should have some sort of

15:02:46  8  turbulent modeling in your CFD analysis?

15:02:49  9      A.   It depends what your ultimate objective is.

15:02:53  10      Q.   To follow particles.

15:02:56  11      A.   As I said before, if the streamlines had not

15:03:00  12  changed direction very rapidly and the particles are

15:03:03  13  small enough, they would simply follow the time-

15:03:06  14  average streamline without using a turbulence model.

15:03:08  15      Q.   Okay.  When you say they're not -- they

15:03:11  16  don't change direction very rapidly, what would that

15:03:13  17  mean?  What does that mean to you?

15:03:14  18      A.   I -- I go back to impactor technology where

15:03:18  19  you're purposely trying to extract particles from the

15:03:22  20  airflow by changing the direction very rapidly, and so

15:03:26  21  it depends on the velocity of the particle and -- and

15:03:28  22  the -- well basically the velocity of the particle

15:03:32  23  heading towards the surface, so impaction technology.

15:03:38  24      Q.   Are you saying the change of airflow like 90

15:03:41  25  degrees, or are you saying five degrees, three

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

205

15:03:43  1  degrees?

15:03:43  2      A.   It -- it --

15:03:44  3           Really, it depends on the rate of change of

15:03:46  4  airflow, the -- the acceleration I would -- I should

15:03:50  5  say, perpendicular to the mean flow direction.

15:03:54  6      Q.   And in analyzing --

15:03:56  7           And in determining whether or not to use a

15:03:58  8  turbulent model in the CFD, how do you determine

15:04:00  9  whether or not you should assume that the particles

15:04:04  10  travel along the air streams or not?

15:04:08  11      A.   Again, depends on whether your flow is

15:04:10  12  essentially unidirectional or there's a lot of

15:04:12  13  accelerations associated with it, and -- and the

15:04:14  14  directional changes.

15:04:15  15      Q.   Well you agree with me that when you have

15:04:18  16  obstructions such as the patient, surgeon, table,

15:04:27  17  lights, you're going to have significant changes in

15:04:30  18  the airflow direction when the air hits that; correct?

15:04:33  19      A.   Yes.

15:04:33  20      Q.   Okay.  Knowing what an operating room is, do

15:04:39  21  you agree with me that you should have some sort of

15:04:40  22  turbulence modeling in an operating room if you're

15:04:44  23  going to have a -- a valid CFD analysis?

15:04:46  24           MR. GOSS:  Objection.

15:04:47  25      A.   I think that would be the most appropriate,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

206

15:04:51   1    but I wouldn't necessarily start there.

15:04:53   2         Q.   Well it would be the better approach.

15:04:55   3         A.   Actually, I would start with the first

15:04:57   4    approach of a time-averaged laminar-flow approach and

15:05:01   5    then do analysis on that and then see what would need

15:05:04   6    to be changed to -- if you -- if one would -- if one

15:05:09   7    needs to go to a turbulent approach.

15:05:11   8         Q.   Why would you use a laminar-flow approach

15:05:13   9    when you -- when we just discussed that most likely

15:05:15  10    the air in an operating room is not laminar?

15:05:18  11         A.   It's -- it's a much easier, straightforward,

15:05:21  12    simpler code to run.

15:05:24  13         Q.   But it's not accurate.

15:05:26  14         A.   It's not as completely accurate as -- as a

15:05:29  15    fully turbulent model, that's correct, but it's a good

15:05:32  16    starting point.

15:05:46  17         Q.   When you first saw a Bair Hugger, did you

15:05:55  18    take it apart?

15:05:57  19         A.   The first time, no, I don't think I did.

15:05:59  20         Q.   Well did you ever take apart the Bair Hugger

15:06:01  21    and look at the internal components?

15:06:03  22         A.   The only thing I've taken apart is the --

15:06:05  23    the filter in the -- the bottom.

15:06:07  24         Q.   Do you believe that the Bair Hugger is a

15:06:08  25    sterile device internally?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

207

15:06:11  1       A.   I -- I have no knowledge of that.

15:06:13  2       Q.   Okay.  So you, sitting here today, you have

15:06:16  3   no opinion on whether or not there's any -- whether or

15:06:18  4   not the Bair Hugger hose harbors contaminants or

15:06:22  5   bacteria.

15:06:22  6       A.   I would say it probably does.

15:06:24  7       Q.   Okay.  Do you understand the plaintiffs'

15:06:36  8   claims in this case?

15:06:41  9       A.   Not -- not without hearing them again very

15:06:43  10  explicitly.

15:06:47  11      Q.   What's your understanding of the mechanism

15:06:49  12  of injury the plaintiffs claim in this case?

15:06:53  13      A.   I think the plaintiffs are claiming that the

15:06:55  14  Bair Hugger increases surgical-site infections.

15:07:01  15      Q.   In what way?

15:07:02  16      A.   By providing --

15:07:08  17           Could be disturbing airflow near the

15:07:11  18  surgical site, it could be providing additional

15:07:15  19  particles into the surgical site.

15:07:17  20      Q.   And how would those particles get to the

15:07:19  21  surgical site?

15:07:20  22      A.   If they're airborne, they have to be

15:07:24  23  convected there.

15:07:25  24      Q.   Excuse me?

15:07:26  25      A.   If they're airborne, they'd have to be

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

208

15:07:28  1    convected there.

15:07:29  2         Q.    By conduction?

15:07:31  3         A.    By convection.

15:07:33  4         Q.    And do you know what pathway the par -- the

15:07:37  5    plaintiffs allege that particles get to the surgical

15:07:40  6    site when the Bair Hugger is on?

15:07:42  7         A.    Not specifically, no.

15:07:43  8         Q.    Okay.  Did you make any assumption in -- in

15:07:48  9    formulating your test or testing?

15:07:50  10        A.    Assumptions of what the plaintiffs'

15:07:53  11   arguments are?

15:07:54  12        Q.    Yes.

15:07:54  13        A.    None other than -- than maintaining as -- as

15:08:01  14   clean a wound area as possible.

15:08:18  15        Q.    You agree with me that the Bair Hugger

15:08:20  16   produces more watts of energy than any other device in

15:08:26  17   the operating room; correct?

15:08:27  18              MR. GOSS:  Objection, lacks foundation.

15:08:28  19        A.    I -- I'm not aware of what other equipment

15:08:32  20   would -- what -- what the heat loads of other

15:08:35  21   equipment in the operating room would be.

15:08:40  22        Q.    On page 11 of your report you indicate, "As

15:09:08  23   the Bair Hugger uses the power to provide heat, it may

15:09:11  24   be the most energy intensive piece of equipment in the

15:09:14  25   OR."

209

15:09:14   1      A.    That's what I said, yes.

15:09:16   2      Q.    So you agree with me that --

15:09:19   3            Well do you mean "the most intensive energy

15:09:21   4   piece," like it absorbs the most en -- uses the most

15:09:24   5   energy?

15:09:24   6      A.    Uses the most energy, yes.

15:09:26   7      Q.    Okay.  To create heat, which is energy;

15:09:30   8   correct?

15:09:30   9      A.    Yes.

15:09:30  10      Q.    Okay.  Are you aware of any other device in

15:09:34  11   the OR that produces more watts of heat around the

15:09:41  12   patient than the Bair Hugger?

15:09:44  13      A.    No, I'm not aware of that.

15:09:51  14      Q.    When the Bair Hugger exits the blanket, did

15:09:57  15   you determine where most of the heat goes?

15:10:02  16      A.    When the Bair Hugger exits the blanket?

15:10:04  17      Q.    When the heat -- I'm sorry.  When the heat

15:10:07  18   of the --

15:10:07  19            When the Bair Hugger blows and heat exits

15:10:10  20   the blanket, you know, the Bair Hugger blanket --

15:10:13  21      A.    Yes.

15:10:13  22      Q.    Okay.  By the way, do you know what type of

15:10:15  23   blanket you used in your testing?

15:10:17  24      A.    It was an over -- over-body blanket.

15:10:19  25      Q.    Was it the 522?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

210

15:10:21  1      A.   I don't remember the exact number.

15:10:23  2      Q.   Okay.  Did you inspect the blanket or study

15:10:26  3  the blanket in any way?

15:10:27  4      A.   It was installed before I arrived.  I looked

15:10:31  5  at the entire installation.

15:10:32  6      Q.   Who installed it?

15:10:34  7      A.   Two nurses.

15:10:35  8      Q.   What nurses?

15:10:36  9      A.   I was told nurses from 3M.

15:10:39  10     Q.   3M has in-house nurses?

15:10:42  11     A.   That was what I was led -- led to believe.

15:10:46  12     Q.   So sitting here today, you don't know how

15:10:47  13  the setup was -- what was under the drapes?

15:10:52  14     A.   I didn't remove the -- the drape to look

15:10:56  15  underneath, no.

15:10:58  16     Q.   Have you seen the -- have you seen the Bair

15:11:04  17  Hugger upperbody blanket by itself?

15:11:06  18     A.   Yes.

15:11:07  19     Q.   And did you look at how many perforations

15:11:10  20  occur or how many are on the blanket?

15:11:13  21     A.   A lot of them.

15:11:13  22     Q.   How many?

15:11:14  23     A.   I -- I couldn't hazard --

15:11:16  24          I don't want to hazard a guess.  It's a lot

15:11:18  25  of holes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

211

| | | |
|---|---|---|
| 15:11:18 | 1 | Q.  Over 10? |
| 15:11:19 | 2 | A.  Oh, yes. |
| 15:11:20 | 3 | Q.  Over a hundred? |
| 15:11:21 | 4 | A.  Probably. |
| 15:11:21 | 5 | Q.  Over a thousand? |
| 15:11:22 | 6 | A.  Maybe. |
| 15:11:23 | 7 | Q.  Okay.  When the Bair Hugger -- |
| 15:11:26 | 8 | Do you know what position the patient was in |
| 15:11:27 | 9 | when you did your testing? |
| 15:11:29 | 10 | A.  It was set up to be a -- a hip surgery. |
| 15:11:33 | 11 | Q.  Okay.  So the patient was to the side. |
| 15:11:35 | 12 | A.  Yes. |
| 15:11:35 | 13 | Q.  Okay.  And how was the Bair Hugger blanket |
| 15:11:38 | 14 | on the patient? |
| 15:11:38 | 15 | A.  It was wrapped around his upper body so his |
| 15:11:45 | 16 | head was protruding at -- at one end, and a blanket |
| 15:11:47 | 17 | over the whole thing, and then there was an anesthesia |
| 15:11:51 | 18 | drape over that. |
| 15:11:52 | 19 | Q.  Okay.  And how far did the drape go down? |
| 15:11:55 | 20 | A.  The photographs in my report would -- would |
| 15:11:57 | 21 | show that. |
| 15:11:57 | 22 | Q.  Are all the photographs taken are in your |
| 15:11:59 | 23 | report? |
| 15:12:00 | 24 | A.  I believe so, yeah. |
| 15:12:01 | 25 | Q.  So there are no other photographs that you |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

212

15:12:02  1   took.

15:12:03  2       A.   No.

15:12:03  3       Q.   Okay.  Who took the photographs, you or Mr.

15:12:05  4   Goss?

15:12:06  5       A.   It was either Peter or Vinita.

15:12:08  6       Q.   Is that Vinita right there?

15:12:10  7       A.   Yes.

15:12:11  8       Q.   Okay.  So you go to 3M, okay, to do this

15:12:30  9   testing, and when you get there it's already set up;

15:12:34  10  correct?

15:12:34  11      A.   That's correct.

15:12:34  12      Q.   Okay.  And where in 3M was this testing,

15:12:42  13  what room?

15:12:43  14      A.   It was in a lab room.  I don't remember the

15:12:45  15  exact room number or building number.

15:12:47  16      Q.   Was it a simulated operating room?

15:12:49  17      A.   No, it was not an operating room.

15:12:51  18      Q.   Okay.  How big was the room?

15:12:52  19      A.   It was roughly maybe 12 feet wide by maybe

15:12:59  20  15 feet deep with maybe a nine-foot ceiling.

15:13:04  21      Q.   Okay.  And how many doors to this room?

15:13:12  22      A.   Just one.

15:13:13  23      Q.   Okay.  And so you get there and it's already

15:13:16  24  set up; correct?

15:13:17  25      A.   Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

213

15:13:17   1       Q.   So you don't -- you don't know in what

15:13:20   2   position the -- the blanket is in, the -- the Bair

15:13:22   3   Hugger blanket; correct?

15:13:23   4       A.   Other than looking at the edges that are

15:13:26   5   sticking out from the blanket above.

15:13:27   6       Q.   Okay.  Was it laid all the way across the

15:13:30   7   patient?

15:13:30   8            The patient wasn't like in the crucifix

15:13:33   9   position; was he?

15:13:34   10      A.   No.  No.

15:13:35   11      Q.   Okay.

15:13:35   12      A.   Laying --

15:13:36   13      Q.   Patient was to the side; correct?

15:13:38   14      A.   Yeah.  Yeah.

15:13:39   15      Q.   Was the blanket -- was the blanket wrapped

15:13:41   16   around like in a -- in a -- circular over the patient,

15:13:43   17   was it only over -- was only half the blanket over the

15:13:47   18   patient, do you know?

15:13:47   19      A.   It was over the entire upper body of the

15:13:50   20   mannequin and then it draped down somewhat on both

15:13:55   21   sides.

15:13:55   22      Q.   Well if the patient's to the side like this,

15:13:57   23   was there part of the blanket that didn't cover the

15:13:59   24   patient, if you know?

15:14:01   25      A.   I'd have to go back to the photos to look.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

214

15:14:04  1      Q.   Feel free.

15:14:05  2      A.   Okay.  I guess the first and last photos

15:14:50  3  show the majority of the blanket setup.

15:14:56  4      Q.   I don't see the Bair Hugger in any of these

15:14:58  5  blankets.  Can you tell me how you can look at

15:15:00  6  photos -- the first page and the last page of

15:15:03  7  pictures --

15:15:04  8           Well, the last page is a picture of the Bair

15:15:07  9  Hugger on a -- on a -- on a stand.  Are you talking

15:15:11  10  about the second-to-last picture?

15:15:13  11      A.   I think it was second-to-the-last, yes.

15:15:14  12      Q.   Okay.  So it's clear from the -- the picture

15:15:17  13  that is entitled "3 Inches Over Hip," you can't see

15:15:20  14  the Bair Hugger blanket in this picture; correct?

15:15:22  15      A.   Probably not.

15:15:26  16      Q.   Well "yes" or "no?"

15:15:27  17      A.   I -- I -- I cannot see it, no.

15:15:29  18      Q.   Okay.  So you can't see the blanket in this

15:15:32  19  picture; correct?

15:15:33  20      A.   Except perhaps maybe over my hand.  That may

15:15:35  21  be part of the blanket coming down on one side.

15:15:38  22      Q.   You think the Bair Hugger blanket is coming

15:15:40  23  over your hand?

15:15:41  24      A.   Behind, behind my hand.  If you look at the

15:15:44  25  top of my hand and -- and what's behind my hand, that

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

215

15:15:48  1  appears to be part of the blanket coming down on one

15:15:50  2  side.

15:15:52  3      Q.  Can you circle that for me on that report

15:15:53  4  where you see the Bair Hugger blanket.

15:15:55  5        MR. GOSS:  I think you're looking at

15:15:56  6  different pictures.

15:15:57  7        MR. ASSAAD:  I'm looking at the one that

15:15:59  8  says "3 Inches Over Hip."

15:16:01  9        MR. GOSS:  Yeah.

15:16:02  10       THE WITNESS:  Yeah.  And I'm --

15:16:03  11       MR. GOSS:  So he --

15:16:04  12       MR. ASSAAD:  Wait, wait, wait.  I don't want

15:16:06  13  any instruction here.  I don't want any coaching.

15:16:09  14      A.  I'm referring to this.

15:16:10  15      Q.  Okay.  I'm talking about the one that says

15:16:12  16  "3 Inches Over Hip," the second-to-last picture of

15:16:15  17  Exhibit B.  That picture right there.  You just passed

15:16:20  18  it.  See where it says "3 Inches Over Hip?"

15:16:22  19      A.  Yeah.

15:16:22  20      Q.  Do you agree that you can't see the Bair

15:16:24  21  Hugger blanket in this picture?

15:16:25  22      A.  I agree with that.

15:16:26  23      Q.  Okay.  Wanted to make sure.

15:16:28  24        So you're looking at the first page where it

15:16:31  25  says "3 inches from blanket edge."

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

216

15:16:32  1      A.    Yes.

15:16:33  2      Q.    Okay.  And where do you see the Bair Hugger

15:16:35  3  blanket?

15:16:35  4      A.    Just to the --

15:16:38  5            I'll circle it here.

15:16:39  6      Q.    Circle it, please.

15:16:41  7      A.    (Complying.)  Okay.

15:16:50  8      Q.    Can I see Exhibit 1, please?

          9            (Exhibit 1 handed to Mr. Assaad.)

15:16:54  10     Q.    Okay.  Fair enough.  And I -- I see what

15:16:58  11  you're -- you're pointing to.

15:16:59  12           Now you can't see how this blanket is set up

15:17:03  13  underneath, what part of the body it's covering;

15:17:05  14  correct?

15:17:05  15     A.    Not except for where it's extending out

15:17:08  16  under the blanket.

15:17:09  17     Q.    Do you know whether or not the Bair Hugger

15:17:12  18  blanket was taped down to the patient?

15:17:14  19     A.    I assume it was.

15:17:15  20     Q.    I'm not asking you to assume anything.  I

15:17:17  21  don't want any guesses.

15:17:18  22           Sitting here today, do you know whether or

15:17:20  23  not it was taped down or not?

15:17:21  24     A.    I did not investigate that, no.

15:17:22  25     Q.    Okay.  I mean this is your experiment;

217

15:17:25    1    correct?

15:17:25    2         A.    Yes.

15:17:26    3         Q.    You're the doc --

15:17:27    4               You're the engineer; correct?

15:17:29    5         A.    Right.

15:17:29    6         Q.    You're in charge.  You got to make sure that

15:17:30    7    everything is done properly because you're relying on

15:17:32    8    the setup to conduct your testing; correct?

15:17:35    9         A.    That's correct.

15:17:35   10         Q.    You did not check to see whether or not the

15:17:37   11    Bair Hugger blanket was taped; did you?

15:17:39   12         A.    I did not.

15:17:39   13         Q.    Okay.  So sitting here, focused, you cannot

15:17:49   14    tell me whether or not air is escaping downward of the

15:17:52   15    body as compared to coming out of, like, the head or

15:17:55   16    the arms; correct?

15:17:57   17               MR. GOSS:  Object to form.

15:17:58   18         A.    Not having checked the taping, that -- I

15:18:02   19    cannot guarantee that.

15:18:04   20         Q.    Do you know whether or not the taping

15:18:06   21    actually sticks well to a mannequin?

15:18:08   22         A.    I -- I do not know that.

15:18:10   23         Q.    That would be something important to know;

15:18:12   24    wouldn't it?

15:18:12   25         A.    It would be useful, yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

218

15:18:14  1      Q.   Yeah.  Because you might actually have

15:18:16  2  leakage of air going where it doesn't happily --

15:18:19  3  doesn't normally go during normal operation; correct?

15:18:22  4           MR. GOSS:  Objection, form.

15:18:25  5      A.   It's possible.

15:18:25  6      Q.   And it could affect your results; correct?

15:18:29  7           MR. GOSS:  Same objection.

15:18:30  8      A.   Potentially.

15:18:30  9      Q.   Did you talk to these nurses at all that set

15:18:32  10  up the operating room?

15:18:35  11      A.   I did not.

15:18:35  12      Q.   Okay.  So sitting here today, you don't even

15:18:36  13  know their names; do you?

15:18:37  14      A.   I do not know their names.

15:18:39  15      Q.   Did you write their names down anywhere on

15:18:41  16  your -- on your pad?

15:18:42  17      A.   No, because I do not know their names.

15:18:45  18      Q.   You relied on 3M to do the setup; correct?

15:18:46  19      A.   Yes.

15:18:46  20      Q.   Okay.  The same -- the same attorneys that

15:18:48  21  provided you the plethora of information that's out

15:18:51  22  there; correct?

15:18:52  23           MR. GOSS:  Objection, argumentative, asked

15:18:54  24  and answered.

15:19:02  25      Q.   And I assume you never measured the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

219

15:19:04  1  temperature of the air coming out of the -- out of the

15:19:07  2  holes, correct, the perforations?

15:19:09  3      A.   That's correct, I did not do that.

15:19:10  4      Q.   Okay.  Would you agree with me that the air

15:19:19  5  coming out of the perforations is roughly 40 to 41

15:19:22  6  degrees Celsius?

15:19:23  7      A.   That sounds much higher than what I was

15:19:27  8  measuring right near the discharge of the air coming

15:19:29  9  out the edge of the blanket.

15:19:30  10      Q.   Well let's talk about heat transfer for a

15:19:33  11  second.

15:19:37  12          By the way, what's the first law of

15:19:42  13  thermodynamics?

15:19:42  14      A.   First law of thermodynamics is conservation

15:19:43  15  of energy.

15:19:44  16      Q.   Energy is neither created or destroyed;

15:19:47  17  correct?

15:19:47  18      A.   Yes.

15:19:48  19      Q.   Heat transfer is a transfer of heat from a

15:19:53  20  higher heat content to a lower heat content; correct?

15:19:56  21      A.   Higher temperature to a lower temperature.

15:19:58  22      Q.   Yes.  You're not going to transfer heat from

15:20:00  23  a -- you know, from a lower temperature to a higher

15:20:03  24  temperature.  Heat transfer goes from highest to

15:20:05  25  lowest; correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

220

15:20:06    1        A.    Yes.

15:20:06    2        Q.    That -- that's a fundamental engineering

15:20:09    3   principle; correct?

15:20:10    4        A.    Yes.

15:20:10    5        Q.    Okay.  What's the temperature of a human

15:20:12    6   body?

15:20:13    7        A.    Skin temp --

15:20:16    8              Well core temperature and then there's skin

15:20:18    9   temperature.

15:20:19   10        Q.    Just skin temperature.

15:20:20   11        A.    Skin temperature really depends on clothing

15:20:24   12   and the environment.

15:20:25   13        Q.    Well what's the core temperature?

15:20:28   14        A.    Core temperature is averaged around 98.6

15:20:31   15   Fahrenheit.

15:20:32   16        Q.    Which would be what in Celsius?  Thirty-six

15:20:36   17   and a half?

15:20:36   18        A.    That sounds reasonable, yes.

15:20:38   19        Q.    Okay.  So you agree with me that to warm a

15:20:43   20   patient, the temperature has to be above 36.5 degrees

15:20:46   21   Celsius.

15:20:46   22        A.    Not necessarily, because the skin

15:20:49   23   temperature could be much lower than that.

15:20:52   24        Q.    Well what do you think the skin temperature

15:20:55   25   is?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

221

| | | |
|---|---|---|
| 15:20:56 | 1 | A.   As I said, it depends on -- on clothing |
| 15:20:58 | 2 | and -- and the ambient environment. |
| 15:21:00 | 3 | Q.   So if 3M has done research and done studies |
| 15:21:05 | 4 | and indicated the temperature coming out of the Bair |
| 15:21:07 | 5 | Hugger blanket is between 40 to 41 degrees Celsius |
| 15:21:10 | 6 | when a Bair Hugger 775 is used on a 522 blanket, would |
| 15:21:14 | 7 | you disagree with that? |
| 15:21:16 | 8 | A.   Say that again. |
| 15:21:19 | 9 | Q.   Would you dis -- would you disagree with |
| 15:21:21 | 10 | 3M's own studies that indicates that the temperature |
| 15:21:24 | 11 | coming out of a Bair Hugger blanket from the |
| 15:21:27 | 12 | perforations when a 775 blower is used and a 522 |
| 15:21:34 | 13 | blanket is used is between 40 to 41 Celsius, would you |
| 15:21:38 | 14 | disagree with that? |
| 15:21:40 | 15 | A.   If that's their measurements, I would not |
| 15:21:42 | 16 | disagree with that. |
| 15:21:43 | 17 | Q.   Do your measurements reflect that? |
| 15:21:45 | 18 | A.   My measurements were taken at a different |
| 15:21:47 | 19 | location. |
| 15:21:47 | 20 | Q.   Okay.  So sitting here today, you have no |
| 15:21:51 | 21 | idea what the temperature out of the blanket -- the |
| 15:21:58 | 22 | air temperature out of the blanket is. |
| 15:22:00 | 23 | MR. GOSS:  Objection to form. |
| 15:22:01 | 24 | A.   I -- I do in the locations that I measured. |
| 15:22:04 | 25 | Q.   I'm talking about right directly out of the |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

222

15:22:06  1  blanket.  You don't know what that is; do you?

15:22:07  2      A.    There was a discharge right out of the

15:22:11  3  blanket right near the first figure where I'm

15:22:13  4  measuring the temperature and velocity.

15:22:17  5      Q.    That's three inches from the blanket edge;

15:22:20  6  correct?

15:22:21  7      A.    Yes, I think that's right.

15:22:23  8      Q.    Okay.  And you measured it at, when the Bair

15:22:26  9  Hugger was off, at 66.2 degrees; correct?

15:22:29  10     A.    Yes.

15:22:29  11     Q.    Okay.  Now let's talk about this room some

15:22:31  12  more.  Okay?  Did the room have ventilation?

15:22:37  13     A.    Yes.

15:22:38  14     Q.    What was the ventilation?

15:22:40  15     A.    It was provided through a ceiling supply and

15:22:43  16  ceiling return.

15:22:44  17     Q.    Okay.  One ceiling supply, one ceiling

15:22:47  18  return?

15:22:47  19     A.    It was a -- a slot supply at one end of the

15:22:50  20  room and a slot return at the other.

15:22:52  21     Q.    Okay.  Was it positive pressure or negative

15:22:54  22  pressure or neutral pressure?

15:22:56  23     A.    I did not measure that.

15:22:58  24     Q.    Well wouldn't that be something important to

15:22:59  25  know?

223

15:22:59   1      A.   Not necessarily, because if -- if -- unless

15:23:02   2   there was significant leakage between the room and the

15:23:05   3   surrounding areas.

15:23:06   4      Q.   Well can we assume that there was no

15:23:07   5   leakage?

15:23:07   6      A.   That would be a good assumption.

15:23:08   7      Q.   Okay.  What was the temperature of the

15:23:10   8   walls?

15:23:10   9      A.   Temperature of the walls were probably near

15:23:14   10  the initial temperature when we started the test,

15:23:16   11  so --

15:23:17   12     Q.   Sixty-six degrees?

15:23:18   13     A.   -- probably about 66.

15:23:19   14     Q.   Okay.  What was the temperature of the --

15:23:24   15  was --

15:23:24   16          Was it an operating room table that was

15:23:24   17  used?

15:23:25   18     A.   I believe so, yes.

15:23:26   19     Q.   They actually had a real operating table in

15:23:29   20  this random room at 3M.

15:23:30   21          MR. GOSS:  Objection to form.

15:23:31   22     A.   Well what -- what do you mean by "real

15:23:34   23  operating table?"

15:23:35   24     Q.   Did you see the table, or was it covered

15:23:37   25  with drapes?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

224

15:23:39  1      A.    It was covered with drapes.

15:23:39  2      Q.    So you don't know what was underneath; do

15:23:41  3  you?

15:23:41  4            MR. GOSS:  Objection to form.

15:23:41  5      A.    Not --not really.

15:23:45  6            MR. ASSAAD:  Basis.

15:23:46  7            MR. GOSS:  Well, it was set up by nurses, so

15:23:49  8  he's assuming that they set it up in a way they would

15:23:52  9  have done for a real operation.  That's my basis.

15:23:58  10           MR. ASSAAD:  Do you have a legal -- do you

15:24:00  11  have a legal basis?

15:24:01  12           MR. GOSS:  You're -- you are -- you are

15:24:04  13  expressing the idea that he knew absolutely nothing.

15:24:06  14  He's not a nurse.  He relied on the nurses to set

15:24:10  15  everything up and use the proper equipment.

          16      Q.    So you relied on --

15:24:14  17           MR. GOSS:  That's my basis.

15:24:14  18      Q.    You relied on nurses; correct?

15:24:16  19      A.    Yes.

15:24:16  20      Q.    Nurses you don't know; correct?

15:24:18  21      A.    Yes.

15:24:18  22      Q.    Nurses hired by 3M; correct?

15:24:20  23      A.    Probably, yes.

15:24:21  24      Q.    They were 3M nurses; correct?

15:24:23  25      A.    I do not know who they were.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

225

| | | |
|---|---|---|
| 15:24:24 | 1 | Q.  I mean does 3M have a hospital inside its |
| 15:24:27 | 2 | facility? |
| 15:24:27 | 3 | A.  Not that I'm aware of. |
| 15:24:28 | 4 | Q.  Okay.  Do you know if any of the attorneys |
| 15:24:33 | 5 | were involved in the setup? |
| 15:24:34 | 6 | (Discussion off the stenographic record.) |
| 15:24:34 | 7 | A.  I don't think so.  I think we met there |
| 15:24:37 | 8 | together. |
| 15:24:38 | 9 | Q.  How did you get into the building?  Did you |
| 15:24:40 | 10 | meet Mr. Goss and his associate at -- at the front of |
| 15:24:43 | 11 | the building? |
| 15:24:43 | 12 | A.  Yes. |
| 15:24:44 | 13 | Q.  Okay.  Do you know whether or not Mr. Goss |
| 15:24:48 | 14 | or his associate was involved in the setup? |
| 15:24:50 | 15 | A.  I do not know that. |
| 15:24:59 | 16 | Q.  You agree that people emit energy that -- or |
| 15:25:39 | 17 | heat in a -- in a room; correct?  The heating load. |
| 15:25:42 | 18 | A.  People give off energy, yes. |
| 15:25:44 | 19 | Q.  Okay. |
| 15:25:45 | 20 | A.  Yeah. |
| 15:25:45 | 21 | Q.  That's why people -- |
| 15:25:46 | 22 | If the room is really crowded, if you get |
| 15:25:49 | 23 | really warm, you have to turn up the air conditioning; |
| 15:25:53 | 24 | correct? |
| 15:25:53 | 25 | A.  Yes. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

226

| | | |
|---|---|---|
| 15:25:54 | 1 | Q.   To increase the cooling load; correct? |
| | 2 | A.   Right. |
| 15:25:57 | 3 | Q.   Okay.  Do you agree that the setup that you |
| 15:25:59 | 4 | have here is not similar to what actually occurs in an |
| 15:26:01 | 5 | operating room? |
| 15:26:02 | 6 | A.   I would agree that the room configuration is |
| 15:26:05 | 7 | not a typical operating room, yes. |
| 15:26:07 | 8 | Q.   Well you don't have surgical lights; |
| 15:26:09 | 9 | correct? |
| 15:26:09 | 10 | A.   Yes. |
| 15:26:10 | 11 | Q.   You don't have surgeons and -- and an |
| 15:26:15 | 12 | anesthesiologist around the surgical table; correct? |
| 15:26:17 | 13 | A.   Right. |
| 15:26:17 | 14 | Q.   And you agree that's going to affect airflow |
| 15:26:20 | 15 | as well as turbulence as well as heat transfer; |
| 15:26:23 | 16 | correct? |
| 15:26:23 | 17 | A.   Yes. |
| 15:26:24 | 18 | Q.   Okay.  Now did the room have its own |
| 15:26:37 | 19 | thermostat? |
| 15:26:39 | 20 | A.   I believe it did. |
| 15:26:40 | 21 | Q.   Well "yes" or "no." |
| 15:26:42 | 22 | A.   Yes. |
| 15:26:43 | 23 | Q.   Okay.  Did you change the thermostat at all |
| 15:26:45 | 24 | during the -- during the testing? |
| 15:26:47 | 25 | A.   Yes. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

227

15:26:48  1    Q.   You did?

15:26:49  2    A.   Yes.

15:26:49  3    Q.   What did you change it from?

15:26:50  4    A.   Increased it, I don't remember the exact

15:26:58  5  number, from -- it may have been set something like

15:27:02  6  65, maybe up to 70, something like that.

15:27:04  7    Q.   Why did you change it?

15:27:05  8    A.   Just seemed to be extremely cold in there.

15:27:09  9    Q.   Did you change it in the middle of the test

15:27:11  10  or before the testing?

15:27:12  11   A.   Before the testing.

15:27:13  12   Q.   Okay.  How much longer before the testing?

15:27:17  13   A.   Maybe a half hour.

15:27:19  14   Q.   Half hour.  Okay.

15:27:20  15        So by the 30 minutes, the room should have

15:27:23  16  been at equilibrium; correct?

15:27:24  17   A.   That's a good assumption.

15:27:25  18   Q.   Okay.  So if you changed it to 70, okay, why

15:27:28  19  am I seeing results of 66.6 degrees here?

15:27:31  20   A.   It -- it may have just taken -- taken longer

15:27:39  21  than I --

15:27:42  22   Q.   You just told me it was at equilibrium.

15:27:44  23   A.   Well may -- maybe it did not reach

15:27:45  24  equilibrium yet.

15:27:46  25   Q.   We don't know.  We could --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

228

15:27:48   1          So now we don't know if these numbers are

15:27:51   2   correct; do we?

15:27:52   3          MR. GOSS:  Objection to form.

15:27:53   4      A.   The numbers are -- are correct as I measured

15:27:54   5   them in the location I measured them.

15:27:54   6      Q.   Well now add another variable.  You added --

15:27:56   7   you changed the room temperature.

15:27:57   8      A.   Yes.

15:27:57   9      Q.   You then -- now --

15:27:59  10          You said it was at equilibrium and now

15:28:00  11   you're saying it might not be at equilibrium.  Which

15:28:02  12   one it is, doctor?

15:28:03  13          MR. GOSS:  Wait for a question.

15:28:04  14      Q.   Which one is it?

15:28:06  15      A.   May not be in equilibrium.

15:28:07  16      Q.   Okay.  So now you have a variable that

15:28:09  17   you're not accounting for in your results; isn't that

15:28:12  18   correct?

15:28:12  19      A.   Yes.

15:28:13  20      Q.   And you call that good engineering?

15:28:16  21          MR. GOSS:  Objection to form, argumentative.

15:28:20  22      A.   If I had more time to develop a better test

15:28:23  23   method, I would probably take that into consideration.

15:28:26  24      Q.   Well are you saying this is not a good test

15:28:28  25   method?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

229

15:28:28  1      A.   It -- it was set up to do some temperature

15:28:37  2  and flow measurements leaving the Bair Hugger blanket,

15:28:41  3  primarily, and entering the Bair Hugger filter.

15:28:43  4      Q.   That wasn't my question.  Is this a good

15:28:45  5  test method, "yes" or "no?"

15:28:47  6      A.   Yes.

15:28:47  7      Q.   Okay.  So you have an operating room that's

15:28:49  8  not at --

15:28:50  9           You have a room that's not at equilibrium;

15:28:51  10  correct?

15:28:51  11     A.   Yes.

15:28:53  12     Q.   You don't know how the Bair Hugger is set up

15:28:56  13  underneath the blanket; correct?

15:28:57  14     A.   Yes.

15:28:58  15     Q.   Okay.  You have --

15:29:00  16          You changed the temperature at some point

15:29:03  17  because you were cold; correct?

15:29:04  18     A.   Yes.

15:29:05  19          MR. GOSS:  Objection to form.

15:29:06  20     Q.   Okay.

15:29:10  21          MR. ASSAAD:  Basis.

15:29:11  22          MR. GOSS:  He didn't say because he was

15:29:12  23  cold.

15:29:14  24     Q.   Why did you change the temperature then?

15:29:17  25     A.   I'm not sure I actually feel like I did

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

230

15:29:20  1   change the temperature.

15:29:21  2        Q.   Who did?

15:29:23  3        A.   May have been one of -- Peter or -- or

15:29:27  4   Vinita.

15:29:28  5        Q.   I mean we have the law of thermodynamics.

15:29:31  6   We're not going to break that law; correct?

15:29:32  7        A.   Right.

15:29:35  8        Q.   Okay.  You have the temperature coming out

15:29:35  9   at 70 degrees; correct?  Seventy-two degrees.

15:29:40  10       A.   Seventy-two degrees from what?

15:29:41  11       Q.   It's coming out the diffuser.

15:29:44  12       A.   It -- it may take a while for the thermostat

15:29:46  13   to --

15:29:51  14            Well, it may take a while for the air to

15:29:53  15   reach the temperature that the thermostat is set at.

15:29:55  16       Q.   But you have the diffuser air coming out at

15:29:57  17   72 degrees and you did that 30 -- 30 minutes before

15:30:00  18   you started taking these tests; correct?

15:30:02  19       A.   That's what I recall.

15:30:02  20       Q.   Okay.  And the room is only 12 by nine;

          21   correct?

15:30:08  22            MR. GOSS:  Objection.

15:30:08  23       A.   Roughly 12 by 15 but with a nine-foot

15:30:10  24   ceiling.

15:30:11  25       Q.   Nine feet high.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

231

| | | |
|---|---|---|
| 15:30:14 | 1 | What's that volume? |
| 15:30:15 | 2 | A.   I'd -- I'd have to calculate it. |
| 15:30:17 | 3 | Q.   Are you sure about those numbers? |
| 15:30:19 | 4 | A.   I'm not absolutely certain. |
| 15:30:21 | 5 | Q.   Wouldn't that be important to know? |
| 15:30:23 | 6 | A.   If I was looking at air-change rate, yes. |
| 15:30:31 | 7 | Q.   So you're looking at about 10,000 cubic |
| 15:30:34 | 8 | feet.  Does that sound about right? |
| 15:30:36 | 9 | A.   That's probably about right. |
| 15:30:37 | 10 | Q.   Eleven thousand. |
| 15:30:39 | 11 | Do you stand by these numbers, doctor, in |
| 15:31:20 | 12 | Exhibit B?  Are they accurate?  Are they reliable? |
| 15:31:25 | 13 | A.   Based on the test configuration we had or |
| 15:31:29 | 14 | the conditions, yes. |
| 15:31:30 | 15 | Q.   Well doctor, let's go to page -- the one |
| 15:31:36 | 16 | that says "3 Inches Over Hip." |
| 15:31:41 | 17 | Well before we get to that, let's go to the |
| 15:31:43 | 18 | last page of Exhibit B.  That's the calibration by TSI |
| 15:31:54 | 19 | of the device; correct? |
| 15:31:56 | 20 | A.   The very last page, yes. |
| 15:31:57 | 21 | Q.   Okay.  And on May 8th, 2017, this device was |
| 15:32:00 | 22 | calibrated; correct? |
| 15:32:01 | 23 | A.   That's what it says, yes. |
| 15:32:02 | 24 | Q.   Okay.  And you -- you -- you agree with |
| 15:32:06 | 25 | this, that the device used was calibrated; correct? |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

232

15:32:08　　1　　A.　Yes.

15:32:08　　2　　Q.　Who provided the device?

15:32:10　　3　　A.　Device was provided by 3M.

15:32:12　　4　　Q.　Okay.　So 3M provided the device and 3M

15:32:15　　5　provided the room and 3M provided the setup; correct?

15:32:19　　6　　A.　Well that's my understanding.

15:32:20　　7　　Q.　Okay.　Whose idea was it to do this testing?

15:32:23　　8　　A.　I think it was mine.

15:32:24　　9　　Q.　Okay.　Why didn't you do it at the

15:32:25　10　University of Minnesota?

15:32:26　11　　A.　I am no longer a faculty member there, I'm

15:32:30　12　retired, so I did not have access to a facility.

15:32:31　13　　Q.　Okay.　Let's go to the page that says "3

15:32:34　14　Inches Over Hip" where it was "Under linear slot

15:32:42　15　diffuser air supply on ceiling (Front) - half inch

15:32:45　16　from supply."　Do you see that?

15:32:47　17　　A.　Wait a minute.

15:32:49　18　　Q.　It's the pic -- it's -- it's the picture --

15:32:51　19　　A.　Oh.

15:32:53　20　　Q.　You measured the temperature coming out of

15:32:55　21　the air supply; correct?

15:32:58　22　　A.　Yes.

15:32:59　23　　Q.　And this was done 30 minutes --

15:33:00　24　　You changed the temperature 30 minutes

15:33:02　25　before you started doing any testing; correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

233

15:33:04    1        A.    That -- that's my recollection.

15:33:06    2        Q.    I mean that's an important fact when you're

15:33:09    3   going to start taking temperature measurements, that

15:33:10    4   you actually changed the temperature of the air

15:33:13    5   supply; don't you agree?

15:33:15    6        A.    Yes, it would be important to document that.

15:33:17    7        Q.    Very important.  Is it documented anywhere

15:33:19    8   in your report?

15:33:20    9        A.    No.

15:33:20   10        Q.    Okay.  So we see, depending on where you're

15:33:27   11   measuring, you see anywhere between 330 feet per

15:33:30   12   minute to 1550 feet per minute; correct?

15:33:34   13        A.    That's correct.

15:33:34   14        Q.    Are those numbers accurate?

15:33:35   15        A.    I believe they -- I believe they're

15:33:37   16   accurate.

15:33:37   17        Q.    Okay.  So you tried --

15:33:38   18              In the same diffuser, you're getting a range

15:33:41   19   of 330 to 1550 feet out of the same duct.

15:33:46   20        A.    There are actually three separate diffusers

15:33:47   21   end to end.

15:33:48   22        Q.    Okay.  So three diffusers.  So I should add

15:33:51   23   all these up for the amount of air entering the room;

15:33:55   24   correct?

15:33:55   25        A.    That's --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

234

1     Q.   Sounds good since that is --

15:33:55   2     A.   That's not going to be volumetric flow rate.

15:33:58   3          MR. GOSS:  Just let him finish, please.  Let

4     him finish.

15:34:00   5     Q.   Huh?

15:34:00   6     A.   That's not volumetric flow rate.  Those are

7     just velocity measurements in the center of the

8     diffuser.

15:34:04   9     Q.   Okay.  So that's the velocity of the air

15:34:04  10     coming in; correct?

15:34:04  11     A.   Yes.

15:34:04  12     Q.   Do you know what the flow rate is?

15:34:05  13     A.   I did not calculate that.

15:34:06  14     Q.   Would that be important to know?

15:34:08  15     A.   Perhaps.

15:34:09  16     Q.   Perhaps or yes?

15:34:10  17     A.   Yes.

15:34:10  18     Q.   That's a -- that's a pretty high velocity;

15:34:25  19     isn't it?

15:34:25  20     A.   It is, yes.

15:34:26  21     Q.   Okay.  So in a room that small, you would

15:34:30  22     agree that within 30 minutes you should reach

15:34:33  23     equilibrium.

15:34:35  24     A.   I'd have to look at the -- the wall

15:34:37  25     structure and the thermal mass in the room, and --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

235

15:34:39  1  and I -- I can't -- I can't speculate at this point.

15:34:42  2       Q.    Okay.  But that would be important to know;

15:34:44  3  wouldn't it?

15:34:45  4       A.    It -- it would.

15:34:45  5       Q.    And sitting here today we don't know that;

15:34:47  6  do we?

15:34:48  7       A.    We do not.

15:34:49  8       Q.    Okay.  But what we do know is this, okay,

15:34:52  9  that the air is coming in at 72 degrees, it's been on

15:34:55  10  for 30 minutes, and you're getting temperatures below

15:34:59  11  72 degrees in the -- in the room; correct?

15:35:01  12       A.    Yes.

15:35:02  13       Q.    Okay.  And in fact, according to your

15:35:12  14  calculations, when the Bair Hugger is on, it actually

15:35:16  15  cools the area over the head; correct?

15:35:20  16            MR. GOSS:  Objection to form.

15:35:21  17       A.    I don't think I have temperature

15:35:24  18  measurements into the inlet of the Bair Hugger and out

15:35:28  19  at the same time, so --

15:35:29  20       Q.    Well let's look at this page right here,

15:35:31  21  let's look at three inches over the hip.  Bair Hugger

15:35:33  22  off, 70.7 degrees; correct?

15:35:35  23       A.    Yes.

15:35:36  24       Q.    That's parallel and perpendicular, that's

15:35:38  25  just giving you different flow rates; correct?

236

15:35:40  1       A.   Yes.

15:35:41  2       Q.   Okay.  And then you turn the -- you turn --

15:35:45  3  you turn the Bair Hugger on and all of a sudden the

15:35:48  4  temperature is 64.9 degrees.  Does that make sense?

15:35:52  5       A.   That's what it says.

15:35:53  6       Q.   Does that make engineering sense?

15:35:57  7       A.   Unless there was something going on with

15:36:00  8  temperature fluctuations in the room, I -- I -- I

15:36:02  9  don't know.

15:36:02  10      Q.   That does not make sense; does it, doctor?

15:36:07  11      A.   Again, I don't know how the HVAC system

15:36:10  12  temperature was controlled.

15:36:13  13      Q.   We're talking about a six- -- a five-degree

15:36:14  14  drop, almost six degrees once you turn the Bair Hugger

15:36:16  15  on.

15:36:19  16           Let me back up a second.  Doctor, did you do

15:36:21  17  these tests in a continuous fashion or did you go take

15:36:27  18  measurements, then change the thermostat and take

15:36:31  19  measurements with the Bair Hugger on?

15:36:34  20      A.   No.  The thermostat was changed before we

15:36:34  21  did any of the measurements.

15:36:35  22      Q.   Okay.  And you took them in continuous

15:36:37  23  fashion.  You turned the Bair Hugger --

15:36:39  24           It was off and then you turned it on to see

15:36:40  25  what the change was; correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

237

15:36:42    1        A.    Yes.

15:36:43    2        Q.    How long did you wait?

15:36:44    3        A.    It probably took, I would guess, maybe an

15:36:48    4   hour for the measurements with the Bair Hugger off

15:36:49    5   before we turned it on.

15:36:51    6        Q.    So you spent an hour with the Bair Hugger

15:36:52    7   off and then you turned it on.

15:36:54    8        A.    Yes.

15:36:55    9        Q.    So you did all the measurements off first

15:36:56   10   and then all the measurements on later?

15:36:58   11        A.    I'm -- I'm trying to recollect the -- the

15:37:06   12   sequence of -- of measurements.

15:37:08   13        Q.    Well I mean part of writing a scientific

15:37:11   14   report is that someone else could reproduce the

15:37:15   15   results; correct?

15:37:15   16        A.    Yes.

15:37:16   17        Q.    Okay.  None of that is in this report;

15:37:19   18   correct?

15:37:19   19        A.    Without additional information, that's

15:37:22   20   correct.

15:37:22   21        Q.    I'm asking you in this report is there

15:37:25   22   any --

15:37:25   23              Is there a methodology written out in this

15:37:27   24   report how this was done?

15:37:28   25        A.    No, there's no methodology.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

238

15:37:30  1      Q.    There's no methodology in this report; is

2  there?

15:37:32  3      A.    No.

15:37:33  4            MR. GOSS:  Asked and answered.

15:37:38  5      Q.    So how is it that when you have the first

15:37:43  6  law of thermodynamics and you turn on a device that

15:37:47  7  blows 40-degree heat into an operating room -- or into

15:37:50  8  a room that's only 12 by 15, that you see a reduction

15:37:57  9  in air temperature?  Can you answer that question?

15:38:00  10     A.    I'm -- I'm trying to recollect the actual

15:38:03  11 sequence of measurements.

15:38:05  12     Q.    Forget about the sequence.  I'm looking at

15:38:08  13 the data here.  This is your data.  You say one

15:38:10  14 minute, two minutes, three minutes, four minutes.  How

15:38:14  15 is adding heat to a room, and you have the first law

15:38:18  16 of thermodynamics, Engineering 101, --

15:38:21  17           MR. GOSS:  You don't have to yell.

15:38:22  18     Q.    -- and you have to get a reduction in

15:38:24  19 temperature, could you please answer that question?

15:38:26  20           MR. GOSS:  You don't -- you don't have to

15:38:27  21 yell at him.

15:38:31  22     A.    I -- I would have to give that more thought

15:38:34  23 to explain why the --

15:38:35  24     Q.    Now is your time for an answer.  I'm not

15:38:38  25 coming back another day.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

239

15:38:39    1        A.    Okay.

15:38:39    2        Q.    Do you know the answer to that?  "Yes" or
15:38:42    3    "no."

15:38:42    4        A.    Not at the moment without further thought.

15:38:44    5        Q.    What further thought?  Would it violate the
15:38:46    6    first law of thermodynamics?

15:38:47    7        A.    I'd have to think about other aspects of the
15:38:51    8    airflow in the room that may have affected that.

15:38:54    9        Q.    What other aspects are there?  We have the
15:38:55   10    ventilation that we have accounted for.  That's been
15:38:57   11    constant.  Okay?  What -- what other aspects?

15:39:00   12        A.    I am not sure the ventilation rate was
15:39:02   13    constant.

15:39:03   14        Q.    Well do you know one way or the other?

15:39:04   15        A.    I do not know.

15:39:05   16        Q.    Okay.  Well if it wasn't constant, that's
15:39:09   17    going to affect all your results; correct?

15:39:11   18        A.    I would not think it would affect the
15:39:13   19    results right near the Bair Hugger blanket or right
15:39:16   20    near the inlet to the filter.

15:39:20   21        Q.    Well it's affecting the area right above the
15:39:21   22    hip.

15:39:21   23        A.    That's not near the Bair Hugger blanket
15:39:24   24    discharge or the filter inlet.

15:39:26   25        Q.    We're measuring above the hip here.  We're

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

240

15:39:28  1  seeing a change for no apparent reason when the Bair

15:39:32  2  Hugger is on to a lower level.

15:39:36  3       A.   Again --

15:39:36  4       Q.   What -- what -- what's the second law of

15:39:39  5  thermodynamics?

15:39:42  6       A.   Can't destroy entropy.

15:39:44  7       Q.   Okay.  What's entropy?

15:39:47  8       A.   It's a natural direction of disorder.

15:39:53  9       Q.   You go from order to disorder; correct?

15:39:54  10      A.   Yes.

15:39:56  11      Q.   Such as, in this case, as heat leaves an

15:39:58  12  area, it's going to dissipate in an orderly fashion;

15:40:03  13  correct?

15:40:03  14      A.   That's correct.

15:40:03  15      Q.   Okay.  Entropy applies to this case;

15:40:08  16  correct?

15:40:08  17      A.   That should apply to every case.

15:40:10  18      Q.   And in a room of this confinement, 12 by

15:40:13  19  15 --

15:40:13  20           Which is not a large room; correct?

15:40:16  21      A.   That's not very large, yes.

15:40:17  22      Q.   Okay.  So you have the first law of

15:40:19  23  thermodynamics and the second law of thermodynamics,

15:40:22  24  it's going to increase the average temperature in the

15:40:25  25  room if you turn on the Bair Hugger; correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

241

15:40:27   1        A.   Say that again.

15:40:30   2        Q.   The Bair Hugger is going to increase the

15:40:32   3   temperature of the room.  You have another heat source

15:40:34   4   of -- of -- of a device blowing 40-degree Celsius air

15:40:38   5   at 43 to 45 cfm.  It's going to --

15:40:42   6             It's a heater, it's a space heater.

15:40:44   7        A.   Yes, it's a heater.

15:40:46   8        Q.   Okay.  It's going to affect the temperature

15:40:48   9   of the room.  It's not going to decrease the

15:40:49  10   temperature; correct?

15:40:50  11        A.   Right.

15:40:52  12        Q.   Okay.  But we have a decrease here; correct?

15:40:53  13        A.   That -- that's what it shows.

15:40:55  14        Q.   Okay.  You agree that these numbers are not

15:40:58  15   reliable.

15:40:58  16             MR. GOSS:  Objection to form.

15:41:05  17        A.   I would -- I would argue with not being

15:41:08  18   reliable.  Those -- those are the measurements that we

15:41:10  19   made at the time.

15:41:12  20        Q.   Part of your job as an engineer is to look

15:41:13  21   at the reliability of the data you obtain; correct?

15:41:16  22        A.   Yes.

15:41:16  23        Q.   Okay.  As a scientist, you have to look at

15:41:19  24   its reliability; correct?

15:41:20  25        A.   Yes.

242

15:41:20  1      Q.   You have a project --

15:41:22  2           And this is where the hypothesis is very

15:41:24  3  important.  Okay?  Hypothesis:  I have a Bair Hugger

15:41:27  4  in a room.  I turn it on.  It's going to increase the

15:41:30  5  temperature.  That would be a correct hypothesis in

15:41:33  6  that situation; correct?

15:41:35  7      A.   Yes.

15:41:35  8      Q.   Okay.  And all of a sudden you turn it on

15:41:36  9  and you get something against the hypothesis, it

15:41:39  10  decreases the temperature according to your data;

15:41:42  11  correct?

15:41:42  12           MR. GOSS:  Objection to form.

15:41:42  13      A.   That -- that's what it appears, yes.

15:41:45  14      Q.   That's the measurements you took; correct?

15:41:47  15      A.   Yes.

15:41:47  16      Q.   Not only does this violate the first and

15:41:50  17  second laws of thermodynamics, it doesn't make sense;

15:41:53  18  correct?

15:41:57  19      A.   Can I interject something here?

15:41:59  20      Q.   "Yes" or "no," then you can do that.

15:42:01  21           MR. GOSS:  You can -- you can answer his

15:42:03  22  question.

15:42:04  23      A.   It -- in --

15:42:05  24           From a straight heat-transfer standpoint,

15:42:08  25  no, it does not make sense.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

243

| | | |
|---|---|---|
| 15:42:09 | 1 | Q.   Okay.  Therefore it's not reliable. |
| 15:42:10 | 2 | MR. GOSS:  Object to form. |
| 15:42:11 | 3 | A.   I guess -- I guess one could come to that |
| 15:42:16 | 4 | conclusion. |
| 15:42:16 | 5 | Q.   Well what do you come to?  Do you believe |
| 15:42:18 | 6 | this data here is reliable with respect to the |
| 15:42:20 | 7 | measurements on Exhibit B of your Exhibit 1 of your |
| 15:42:23 | 8 | report, which is three inches over the hip, and when |
| 15:42:28 | 9 | the Bair Hugger is turned on the temperature above the |
| 15:42:28 | 10 | hip goes down?  Does that make engineering sense? |
| 15:42:31 | 11 | A.   It may not. |
| 15:42:38 | 12 | Q.   You agree with me, doctor, that this is not |
| 15:42:40 | 13 | reliable data with this set of data points; correct? |
| 15:42:44 | 14 | MR. GOSS:  Objection to form, asked and |
| 15:42:45 | 15 | answered. |
| 15:42:46 | 16 | MR. ASSAAD:  He hasn't answered the |
| 15:42:48 | 17 | question. |
| 15:42:48 | 18 | MR. GOSS:  Yeah, I think he has. |
| 15:42:49 | 19 | A.   I'll -- I'll agree with you. |
| 15:42:50 | 20 | Q.   It's not reliable; correct? |
| 15:42:52 | 21 | MR. GOSS:  Objection to form. |
| 15:42:53 | 22 | A.   It -- it's not reproducible probably. |
| 15:42:55 | 23 | Q.   Or reliable; correct? |
| 15:42:57 | 24 | MR. GOSS:  Objection to form. |
| 15:42:58 | 25 | A.   Again, how do you define "reliable?" |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

244

15:43:03  1      Q.   Show me an engineering calculation in which

15:43:06  2   you add a heat source to a room and the -- and the

15:43:09  3   temperature of the room -- that's the only change in

15:43:12  4   the room, you add a heat source, okay, above the

15:43:17  5   ambient temperature, that the temperature actually

15:43:17  6   goes below ambient.  Can you give me a calculation and

15:43:20  7   engineering principles that could solve that equation?

15:43:25  8      A.   It may have to do with the initial

15:43:27  9   temperature of the room being -- being low and the

15:43:31  10  heat being ab -- absorbed by those low-temperature

15:43:34  11  surfaces.

15:43:35  12     Q.   You turn on the Bair Hugger and the

15:43:37  13  temperature started going down.  The room was

15:43:40  14  constant.  Okay?  How does this result occur unless

15:43:45  15  these are wrong results and therefore not reliable?

15:43:47  16          MR. GOSS:  Objection to form, misstates the

15:43:50  17  experiment.

15:43:50  18          MR. ASSAAD:  I just want him to answer the

15:43:52  19  question.

15:43:54  20     Q.   Do we need to go back to engineering ethics

15:43:57  21  about honesty, integrity, fidelity?

15:43:59  22          MR. GOSS:  Badgering.

15:44:02  23     Q.   It's a simple question, doctor.  You know

15:44:05  24  these -- these are not reliable.  Just admit to it.

15:44:07  25          MR. GOSS:  No.  Objection to form,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

245

15:44:09    1    argumentative, badgering.

15:44:12    2        A.   I -- I stand by the results as -- as

15:44:16    3    obtained.

15:44:16    4        Q.   I don't care if you stand by them or not.  I

15:44:18    5    want to know if these are reliable.  Answer the

15:44:19    6    question.

15:44:20    7             MR. GOSS:  He answered the question.

15:44:21    8             MR. ASSAAD:  No, he hasn't.

15:44:22    9             MR. GOSS:  You don't have to say anything

15:44:23   10    further on this.  You answered the question.

15:44:23   11        Q.   Then I'm going assume that it's not reliable

15:44:25   12    according to your testimony.  Fair enough?

15:44:27   13             MR. GOSS:  You can assume whatever you want.

15:44:30   14    He testified that he stands by the results.

15:44:32   15        Q.   How are these temperatures higher or lower

15:44:34   16    than the air going into the air return?

15:44:50   17        A.   I -- I can't answer that.  I don't have a

15:45:03   18    good explanation for that.

15:45:09   19        Q.   Go to the page before that.  "Over center of

15:45:13   20    anesthesia screen, 3 inches above top (Center)."  Now

15:45:21   21    the diffuser's on the ceiling; correct?

15:45:23   22        A.   That's correct.

15:45:23   23        Q.   And there's three of them; correct?

15:45:25   24        A.   Yes.

15:45:25   25        Q.   Okay.  Are they all spread evenly in the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

246

15:45:28　1　ceiling?

15:45:28　2　　　A.　Yes, they're -- they're lined up.

15:45:30　3　　　Q.　Okay.  Did you take any pictures?

15:45:32　4　　　A.　Not of those, no.

15:45:33　5　　　Q.　Okay.  That would be something important

15:45:35　6　to -- to have today; wouldn't it?

15:45:37　7　　　A.　If this was set up as a simulated OR, yes,

15:45:41　8　but I admit it's not a typical OR setup.

15:45:44　9　　　Q.　So you have air coming out at 72 degrees

15:45:46　10　except you read when the -- when the Bair Hugger is on

15:45:51　11　but on ambient it's 64.9 degrees.  How do you get that

15:45:55　12　temperature?

15:45:59　13　　　　　Not only is it below the 66 degrees that you

15:46:02　14　think the room is at or you stated was in the report,

15:46:05　15　but it's below the 72.

15:46:09　16　　　A.　That does strike me as unusual.

15:46:11　17　　　Q.　Is that a reliable number?

15:46:13　18　　　A.　I would say probably not.

15:46:15　19　　　Q.　Okay.  Did you determine where most of the

15:47:24　20　air --

15:47:26　21　　　　　I asked you this before; I don't think I had

15:47:27　22　an answer.  Do you know where most of the air goes

15:47:29　23　when it comes out of the blanket, where it escapes

15:47:32　24　from?

15:47:32　25　　　A.　I did not determine that.

247

15:47:33    1        Q.    Would that be important to know where to

15:47:36    2    make measurements?

15:47:38    3        A.    I was assuming that the blanket was -- was

15:47:40    4    taped as it should be on the lower-body end, and so

15:47:44    5    the air would be coming out near the head and shoulder

15:47:47    6    area.

15:47:47    7        Q.    Why would you assume it comes out near the

15:47:50    8    head and shoulder?

15:47:50    9        A.    Because of the blanket that's put over the

15:47:54   10    Bair Hugger blanket.

15:47:56   11        Q.    Yeah.  But it's also going over the arm;

15:47:58   12    correct?

15:47:58   13        A.    Yes.  Yes.

15:47:59   14        Q.    That's not the head and shoulder.

15:48:02   15        A.    Well I -- I should include that then.

15:48:04   16        Q.    Okay.  So now we got the head and shoulder,

15:48:07   17    the arm.  Do you know where the air escaped?  Does it

15:48:11   18    escape --

15:48:13   19             Do you know how it's set up in an operating

15:48:13   20    room?

15:48:13   21        A.    None other than the way observed here.

15:48:16   22        Q.    Well doctor, you -- you -- you're here as an

15:48:19   23    expert to say, hey, look at this report, this is what

15:48:22   24    happens in an operating room.  You agree with me this

15:48:26   25    is nowhere near what happens in an operating room;

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

248

15:48:28    1   correct?

15:48:28    2          MR. GOSS:  Object to the form.

15:48:29    3      A.   I'm not claiming this is what happens in an

15:48:31    4   actual operating room.

15:48:34    5      Q.   Okay.  What's the longest time you had the

15:48:36    6   Bair Hugger on?  How long did you have the Bair Hugger

15:48:38    7   on?

15:48:41    8      A.   Maybe an hour, hour and a half.

15:48:42    9      Q.   It was on continuously for an hour, hour and

15:48:45   10   a half.

15:48:45   11      A.   Yes.

15:48:45   12      Q.   Where -- where does it say that in the

15:48:47   13   report?

15:48:47   14      A.   It doesn't.

15:48:48   15      Q.   So how do I know that?

15:48:50   16          MR. GOSS:  He just testified to it.

15:48:52   17      Q.   Besides your testimony, how do I know that?

15:48:54   18      A.   Not other than my testimony.

15:48:57   19      Q.   At what time -- how long was the Bair Hugger

15:48:59   20   on when you --

15:49:01   21          If you go to the "3 Inches Over Hip" where

15:49:05   22   it says "Off -- par -- Off -- parallel, Off --

15:49:09   23   perpendicular, On -- parallel, On -- perpendicular, On

15:49:12   24   -- parallel, parallel, parallel," how long was the

15:49:15   25   Bair Hugger on before you started taking those

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

249

```
15:49:17   1   measurements?
15:49:18   2        A.    Where are you?  Back on the hip page?
15:49:20   3        Q.    Uh-huh.
15:49:25   4        A.    I do not record that information, so I -- I
15:49:30   5   do not recall.
15:49:31   6        Q.    So I -- I -- I mean you don't recall, so
15:49:33   7   sitting here today I cannot determine the methodology
15:49:36   8   used and reproduce what you did in this case; correct?
15:49:39   9             MR. GOSS:  Objection to form.
15:49:40  10        Q.    Because you don't know.
15:49:43  11             MR. GOSS:  Wait for him to ask a question.
15:49:48  12        Q.    You don't know, do you, what you did
15:49:53  13   sitting here today?
15:49:53  14             MR. GOSS:  Object to form.
15:49:57  15        A.    I do, but not some of the details you're
15:49:59  16   asking about.
15:50:01  17        Q.    Well details are important; isn't it?
15:50:05  18        A.    Yes.
15:50:05  19        Q.    I mean would you accept a report like this
15:50:07  20   from one of your students doing a thesis for a Ph.D.?
15:50:13  21        A.    Not solely, no.
15:50:14  22        Q.    I mean you'd expect some sort of methodology
15:50:18  23   and some way to determine that the data is reliable;
15:50:22  24   correct?  Correct?
15:50:22  25        A.    Yes.
```

15:50:22 Q. Okay. There's definitely no methodology here that's indicated in this report; correct?
15:50:27 A. Yes.
15:50:28 Q. And as of right now, the reliability is very questionable; correct?
15:50:32 MR. GOSS: Objection to form, asked and answered.
15:50:36 A. I would -- I would say reproducing the results here would -- would be difficult.
15:50:41 Q. And therefore, if you can't reproduce the results, not reliable.
15:50:45 MR. GOSS: Objection to form, asked and answered.
15:50:47 Q. Correct?
15:50:48 A. I think I answered that.
15:50:50 Q. Correct?
15:50:52 MR. GOSS: Objection to form, asked and answered.
15:50:54 A. I think I answered that.
15:50:56 Q. Are you afraid to answer this question again? It's a simple question.
15:50:59 MR. GOSS: Objection, argumentative, badgering.
15:51:01 MR. ASSAAD: Counsel, tell him to answer the question.

15:51:03 MR. GOSS: No.
15:51:03 MR. ASSAD: Tell your expert to answer the question.
15:51:06 MR. GOSS: No, I'm not going to.
15:51:06 MR. ASSAAD: Oh, really?
15:51:07 MR. GOSS: I'm not going to tell him to answer the question. He's already answered it.
15:51:11 MR. ASSAAD: No, he hasn't.
15:51:13 Q. I'm asking as a --
15:51:13 I didn't ask for one specific data, I'm asking data as a whole. Since there's no methodology and it's not reproducible, therefore it can't be reliable; correct?
15:51:21 MR. GOSS: You can't --
15:51:21 You haven't gone over all the data.
15:51:22 MR. ASSAAD: I don't need to go over --
15:51:24 Q. Exhibit B of your report, there's no methodology, can't be reproducible, therefore it's not reliable; correct?
15:51:33 MR. GOSS: Objection, asked and answered.
15:51:35 A. If -- if that's how you define "reliable," I will agree with that.
15:51:40 Q. Well how do you define "reliable?"
15:51:46 A. I think I would say something that -- that could be reproduced.

15:52:05 Q. We can't reproduce this; can we?
15:52:07 A. Not with what's here, no.
15:52:09 Q. Okay. So therefore this report, based on
15:52:12 what's here, is not reliable.
15:52:13 MR. GOSS: Objection to form.
15:52:15 A. By inference, yes, I agree.
15:52:19 MR. ASSAAD: Let's take a break.
15:52:19 THE REPORTER: Off the record, please.
16:01:46 (Recess taken.)
16:01:46 BY MR. ASSAAD:
16:01:58 Q. You don't consider yourself an expert with
16:02:01 respect to how skin squames are transported in an
16:02:06 operating room; correct?
16:02:07 A. That's true.
16:02:12 Q. You are aware that skin squames carry
16:02:20 bacteria; correct?
16:02:21 A. Yes.
16:02:22 Q. And are you aware that between one million
16:02:26 to 900 million skin squames are shed during a typical
16:02:31 surgery?
16:02:31 A. I do not -- have not heard that number
16:02:33 before.
16:02:52 Q. Are you familiar with the HVAC Design Manual
16:02:54 for Hospitals and Clinics?
16:02:55 A. The ASHRAE --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

253

```
         1      Q.   Yes.
16:02:57 2      A.   -- Hospital Design Guide?  Yes, I am.
16:03:00 3      Q.   And actually one of the contributors was Dan
16:03:05 4  Koenigshofer?
16:03:06 5      A.   Yes.
16:03:09 6      Q.   Have you read the HVAC Design Manual for
16:03:30 7  Hospitals and Clinics recently?
16:03:31 8      A.   I have --
16:03:32 9           I don't think I'd read it prior to this --
16:03:35 10 this case, no.
16:03:35 11     Q.   But you agree to -- for it to be
16:03:38 12 authoritative, correct, in your -- in your field of
16:03:41 13 work?
16:03:42 14     A.   In my opinion, yes, sir.
16:03:44 15     Q.   Okay.
16:03:52 16          (Kuehn Exhibit 13 was marked for
16:03:57 17          identification.)
16:03:57 18          MR. ASSAAD:  Did you say 13?
16:04:01 19          THE REPORTER:  Yes.
16:04:03 20 BY MR. ASSAAD:
16:04:04 21     Q.   Now if you look on page v or five, Table of
16:04:10 22 Contents --
16:04:12 23          And I represent to you that I -- that I did
16:04:15 24 not print out the entire manual, just some relevant
16:04:18 25 parts.  Fair enough?
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

254

16:04:19    1        A.    Yes.

16:04:19    2        Q.    I'd like you to turn to page 27.  And it's

16:04:31    3   not in order, actually.  The page after that.

16:04:37    4        A.    Okay.

16:04:39    5        Q.    If you look at the highlighted section, it

16:04:42    6   states here, "Between 1 million and 900 million

16:04:45    7   squames are shed during surgery."  Do you see that?

16:04:49    8        A.    That's what it says.

16:04:49    9        Q.    Okay.  Do you disagree with that?

16:04:52   10        A.    I do not disagree with that.

16:04:53   11        Q.    And actually, since you agreed this is

16:04:56   12   authoritative, you must agree with it; correct?

16:04:58   13        A.    Yes.

16:05:01   14        Q.    Go to page 26, last paragraph.  States,

16:05:12   15   "Operating rooms are one of the most critical areas

16:05:15   16   for infection control..."  Do you agree with that?

16:05:17   17        A.    I do.

16:05:18   18        Q.    Continues, "...this is where patients are

16:05:20   19   opened to the surrounding environment while in an

16:05:22   20   immune-suppressed condition."  Do you agree with that?

16:05:25   21        A.    Yes.

16:05:26   22        Q.    "The patient is vulnerable to attack from

16:05:29   23   any infectious agents that get into the room and into

16:05:31   24   the surgical site."  Do you agree with that?

16:05:35   25        A.    Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

255

16:05:38    1        Q.    Also like you to turn to page 154, upper

16:05:56    2    left-hand corner.  Are you there?

16:05:58    3        A.    Yes.

16:05:58    4        Q.    Under 8.3 it discusses operating rooms.

16:06:00    5    Have you read this section before?

16:06:01    6        A.    I believe I have.

16:06:02    7        Q.    First sentence, "The purposes of the HVAC

16:06:04    8    system in an operating room are to minimize infection,

16:06:08    9    maintain staff comfort, and maintain patient comfort."

16:06:12   10    Did I read that correctly?

16:06:13   11        A.    You did read that correctly.

16:06:15   12        Q.    Do you agree with that?

16:06:16   13        A.    I do.

16:06:16   14        Q.    Now you agree with me that ASHRAE is a

16:06:21   15    standard -- a -- a minimum standard; correct?

16:06:25   16             MR. GOSS:  Objection, form.

16:06:26   17        A.    It's intended to be a minimum standard, yes.

16:06:28   18        Q.    Okay.  It doesn't mean it's the best

16:06:31   19    practice, it's just a minimum standard; correct?

16:06:33   20             MR. GOSS:  Objection to form, vague.

16:06:34   21        A.    That's typically the way -- well, this is

16:06:41   22    a --

16:06:42   23             This is not an ASHRAE standard, it's an HVAC

16:06:45   24    Design Manual for Hospitals and Clinics, so I would

16:06:47   25    say this would be best practice.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

256

16:06:48    1       Q.   Okay.  And you agree that ASHRAE, any of the

16:06:56    2  standards or best practices do not apply to medical

16:07:00    3  devices; correct?

16:07:01    4       A.   I believe that's a correct statement.

16:07:04    5       Q.   So to determine or to select a filter for a

16:07:13    6  medical device, you have to look at how the medical

16:07:19    7  device is used and the environment of use; correct?

16:07:22    8       A.   That's correct.

16:07:23    9       Q.   Okay.  The ASHRAE standard has -- is not

16:07:28   10  applicable at all to medical devices such as the Bair

16:07:32   11  Hugger; correct?

16:07:33   12       A.   It was not intended to be used for medical

16:07:36   13  devices.

16:07:36   14       Q.   Go to page 157.  There's a diagram that's

16:07:51   15  highlighted.  That's an operating room, --

16:07:54   16       A.   Yes.

16:07:55   17       Q.   -- a schematic of an operating room;

16:07:57   18  correct?

16:07:57   19       A.   Yes.

16:07:58   20       Q.   Are you familiar with how an HVAC system

16:08:00   21  works in an operating room?

16:08:01   22       A.   Not having worked with operating rooms

16:08:03   23  personally, I rely on documents such as this.

16:08:06   24       Q.   How many filters does -- does the air go

16:08:08   25  through before it enters an operating room?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

257

16:08:10  1     A.   I would -- as --

16:08:11  2          As what I have read, it's typically two.

16:08:13  3     Q.   Okay.  There's a -- there's a prefilter,

16:08:16  4  which is usually like a MERV 7, and then the MERV 14

16:08:20  5  filter; correct?

16:08:20  6     A.   Yes.

16:08:21  7     Q.   Okay.  And you agree with me that an

16:08:26  8  operating room ventilation system is not drawing from

16:08:30  9  air below the operating room table; correct?

16:08:36  10    A.   Say that again.

16:08:37  11    Q.   It's not drawing -- the intake that --

16:08:40  12         The air where it's drawing from is not from

16:08:42  13 below the operating room table; correct?

16:08:45  14    A.   It's -- it's not from below the table, it's

16:08:45  15 from below sidewall return grilles.

16:08:48  16    Q.   And it's usually about 75 percent recycled

16:08:51  17 air and 25 percent fresh air; correct?

16:08:53  18    A.   I recall 80/20, but you may be correct.

16:08:57  19    Q.   80/20, depending on the system.

16:08:59  20    A.   Yes.

16:08:59  21    Q.   Okay.  And you agree with me that in this

16:09:02  22 picture here it talks about the heat sources that are

16:09:08  23 typical in an operating room; correct?

16:09:09  24    A.   It does, yeah.

16:09:10  25    Q.   Talks about the equipment of one kilowatt;

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

258

16:09:13  1  correct?

16:09:13  2      A.   Yes.

16:09:14  3      Q.   All right.  And how many watts is the Bair

16:09:18  4  Hugger for producing -- how much --

16:09:19  5           How many watts of heat is it producing?

16:09:23  6      A.   Off the top of my head I -- I --

16:09:26  7           I could hazard a guess, but I don't want to

16:09:28  8  give you an exact number.  I don't recall.

16:09:30  9      Q.   Would that be something important to know,

16:09:33  10  the effect of --

11      A.   It -- it -- it --

12           Yes.

16:09:35  13      Q.   -- of a unit in an operating room?

16:09:36  14      A.   Yes.

16:09:36  15      Q.   But you don't know that information sitting

16:09:39  16  here today.

16:09:41  17      A.   I could -- I could hazard a guess, but I

16:09:42  18  don't know the exact number.

16:09:43  19      Q.   Again, I don't want guessing, I want your

16:09:45  20  expert opinion.

16:09:46  21      A.   Okay.  I cannot give you an exact number at

16:09:48  22  this point.

16:09:48  23      Q.   You agree that people produce heat; correct?

16:09:52  24      A.   Yes.

16:09:53  25      Q.   And that should be taken into account of --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

259

1    of --

16:09:57    2         Well let's put it this way:  When you look

16:09:57    3    at a problem, you have to look at the whole picture;

16:10:00    4    correct?

16:10:00    5         A.   Yes.

16:10:01    6         Q.   You can't just take a -- a Bair Hugger and

16:10:06    7    put it in isolation and not take into account the

16:10:12    8    barriers in airflow of the operating room and how many

16:10:15    9    people are in the operating room and the devices in

16:10:17   10    the operating room; correct?

16:10:18   11         A.   That would be my assumption, yes.

16:10:20   12         Q.   Okay.  And you did not do that in this case;

16:10:23   13    correct?  You didn't take into account the people in

16:10:25   14    the operating room; correct?

16:10:27   15              MR. GOSS:  With respect to what part of the

16:10:29   16    report?

16:10:29   17              MR. ASSAAD:  Any of the studies he's done,

16:10:31   18    any of the testing he did.

16:10:32   19         A.   The only testing I did was with -- with the

16:10:34   20    Bair Hugger.

16:10:36   21         Q.   So you didn't take any of the people into

16:10:37   22    account; correct?

16:10:38   23         A.   Not with those tests, no.

16:10:48   24         Q.   Do you know why medical devices are --

16:11:07   25    strike that.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

260

16:11:08  1            Do you know why prosthetic surgeries or

16:11:13  2    orthopedic surgeries have a higher risk of surgical-

16:11:17  3    site infection?

16:11:17  4        A.   Not being a surgeon, I really can't answer

16:11:21  5    that.

16:11:21  6        Q.   Do you know whether or not the number of --

16:11:25  7    number of bacteria required to cause a periprosthetic

16:11:28  8    joint infection is the same as a superficial knee

16:11:31  9    infection?

16:11:32  10       A.   I --

16:11:33  11           Again, not being a surgeon or

16:11:39  12   microbiologist, I -- I cannot comment on that.

16:11:43  13       Q.   Now you've read Dr. Elghabashi's report;

16:11:50  14   correct?

16:11:50  15       A.   His report, yes.

16:11:53  16       Q.   Okay.  Do you understand his report?

16:11:53  17       A.   I do.

16:11:54  18       Q.   Okay.  You've gone through all the

16:11:55  19   calculations or the equations?

16:11:58  20       A.   Not in sufficient detail, but I -- I get

16:12:01  21   them, that he's done it correctly.

16:12:03  22       Q.   Okay.  So you agree with me that all the

16:12:05  23   calculations that Elghabashi has done with respect to

16:12:09  24   the analysis of an operating room was done correctly.

16:12:12  25       A.   With the exception of the assumption of 106-

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

261

16:12:15  1  degree Fahrenheit air leaving the blanket, which I

16:12:18  2  don't think is correct.

16:12:19  3      Q.   Okay.  That's the only criticism you have of

16:12:21  4  his report.

16:12:22  5      A.   No.  I also criticized the number of

16:12:24  6  particles he assumed was getting at the -- into the

16:12:29  7  critical-care area, the infection box.

16:12:31  8      Q.   And why do you criticize that?

16:12:33  9      A.   He lists very large numbers of particles

16:12:39  10  originating near the floor ending up near the -- near

16:12:44  11  the critical-care area when the Bair Hugger was on,

16:12:47  12  and my criticism of that was the -- it's approximately

16:12:53  13  a million particles near the floor that he's using in

16:12:56  14  his calculations to arrive at his number near the

16:12:59  15  critical-air area.

16:13:00  16      Q.   Okay.  What number should he have used?

16:13:03  17      A.   I -- I suggest he use the most appropriate

16:13:09  18  value of CFU of bacteria aerosols per cubic meter per

16:13:15  19  cubic foot that's available in the literature.

16:13:17  20      Q.   And that you found was 10 CFU's per cubic --

16:13:21  21  per cubic meter?

16:13:22  22      A.   I went back to Galson and Goddard, the

16:13:27  23  number I included in my report, which I think is -- is

16:13:30  24  high, but I used that as a starting point.

16:13:32  25      Q.   Which was what?

262

16:13:33    1        A.    I have to look in my report.

16:13:36    2        Q.    Please do.

16:15:23    3              Let me help you out here.  Let's go to page

16:15:25    4   13 of your report.

16:15:26    5        A.    I -- I -- yes.  Thank you.  I found page 13.

16:15:28    6   I was looking at the exhibits and it wasn't there.

16:15:42    7              I see the number four CFU per cubic foot.

16:15:46    8        Q.    Okay.  What would that be per cubic meter?

16:15:48    9        A.    Roughly -- it would be roughly 10 times

16:15:57   10   that.

16:15:58   11        Q.    So about 40?

16:16:00   12        A.    Roughly 40, yes.

16:16:01   13        Q.    Okay.  And you got this number from where?

16:16:08   14        A.    From --

16:16:10   15              This was published years ago by a reference,

16:16:14   16   Galson and Goddard, an ASHRAE journal article.

16:16:17   17        Q.    So we just read ASHRAE, which you consider

16:16:20   18   authoritative, that said between 100 and 900 million

16:16:25   19   skin squames fall during a typical surgery; correct?

16:16:28   20        A.    That's what it said, yes.

16:16:29   21        Q.    Okay.  And you don't disagree with that;

16:16:32   22   correct?

16:16:32   23        A.    No.

16:16:32   24        Q.    Okay.  And Elghabashi used three million,

16:16:36   25   correct, skin squames?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

263

16:16:36  1      A.   His total particle count, yes, I think it

16:16:39  2  was three.

16:16:39  3      Q.   One -- one million in each section; correct?

16:16:43  4      A.   That's -- that's my understanding.

16:16:45  5      Q.   That's on the lower side of 900 million;

16:16:48  6  correct?

16:16:48  7      A.   Repeat the question.

16:16:49  8      Q.   I mean three million is much lower than 900

16:16:53  9  million.

16:16:53  10      A.   Yes.

16:16:53  11      Q.   Okay.  And the squim -- the squib scale --

16:16:57  12           The skin squames, they fall from the patient

16:17:01  13  as well as the surgical staff; correct?

16:17:01  14      A.   Yes.

16:17:02  15      Q.   They're around the operating room; correct?

16:17:04  16      A.   Yes.

16:17:04  17      Q.   Do you know whether or not the value taken

16:17:07  18  by Galson and Goddard were underneath the operating

16:17:09  19  room table around the surgical site, or just the

16:17:13  20  average in an OR?

16:17:14  21      A.   I -- I do not know the precise location for

16:17:16  22  their measurement.

16:17:17  23      Q.   That would be kind of important, wouldn't

16:17:18  24  it, before you criticize another expert in this case?

16:17:23  25           MR. GOSS:  Objection to form.

264

16:17:25    1        A.    Well yes.

16:17:27    2        Q.    I mean -- I mean we know at least one

16:17:30    3    million skin squames fall during a typical surgery

16:17:33    4    according to authoritative ASHRAE.

16:17:35    5        A.    Yes.

16:17:35    6        Q.    Okay.  So --

16:17:40    7             And Dr. Elghabashi has never stated in his

16:17:43    8    report that those were colony-forming units, he just

16:17:49    9    said they were skin squames; correct?

16:17:51   10        A.    I think he defined them as 10-micron

16:17:55   11    particles.

16:17:55   12        Q.    Okay.  He didn't say they were bacteria or

16:17:56   13    CFUs, he just said they were skin squames; correct?

16:17:59   14        A.    Well as I recall he called them 10-micron

16:18:01   15    particles.

16:18:01   16        Q.    Do you understand how he calculated them to

16:18:05   17    be 10-micron particles?

16:18:06   18        A.    I -- I don't know how he arrived at it.

16:18:07   19        Q.    Did you not look at his appendix in -- in

16:18:10   20    his report?

16:18:10   21        A.    I cannot recall that at the moment.

16:18:12   22        Q.    Okay.  And are you aware that Farhad

16:18:21   23    Memarzadeh, as I like to call him, also used a 10-

16:18:23   24    micron sphere as a shape that would be equivalent to a

16:18:29   25    skin squame?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

265

16:18:31  1      A.   I don't recall seeing that article.  I can't

16:18:33  2  comment on that.

16:18:34  3      Q.   Are you aware that 3M cites that article on

16:18:37  4  numerous letters that they send to their valued

16:18:43  5  customers, doctors?

16:18:44  6      A.   I -- I am not aware of that, no.

16:18:46  7      Q.   You haven't seen any of those documents;

8  have you?

16:18:49  9      A.   I have not.

16:18:49  10      Q.   Okay.  And do you understand why he used a

16:18:53  11  10-micron particle?

16:18:55  12      A.   Yes.

16:18:55  13      Q.   Why?

16:18:56  14      A.   That -- that's a particle that could contain

16:19:00  15  infectious bacteria.

16:19:01  16      Q.   Do you know why he used a spherical particle

16:19:05  17  instead of the shape of a skin squame?

16:19:07  18      A.   It's much easier to calculate in terms of

16:19:10  19  the numerical methodology.

16:19:14  20      Q.   Are -- are you --

16:19:17  21           Can CFD calculate particle movements that

16:19:19  22  are not spheres?

16:19:20  23      A.   It's very difficult.  Typically, what one

16:19:24  24  does is use what's called aerodynamic diameters, which

16:19:28  25  takes into a account the particle shape, density, and

266

16:19:31    1    that sort of thing.

16:19:31    2        Q.    Exactly.  And that's why you use a 10-micron

16:19:35    3    sphere.  And if you look at his calculation, that's

16:19:37    4    how he calcu -- that's the aerodynamic diameter of a

16:19:40    5    skin squame, of an average skin squame.  Do you agree

16:19:44    6    with that?

16:19:44    7        A.    I -- I don't -- I don't know that I've seen

16:19:46    8    that information, but that seems reasonable.

16:19:48    9        Q.    Okay.  You don't disagree with the 10-micron

16:19:50    10   size.

16:19:50    11       A.    I don't disagree with it.

16:19:53    12       Q.    Okay.  So the two things that you disagree

16:19:54    13   with Elghabashi are the amount of skin squames -- or

16:19:58    14   particles on the floor --

16:20:00    15            Were they on the floor or above the floor?

16:20:01    16       A.    Above the floor.  They were in a given

16:20:03    17   volume.

16:20:03    18       Q.    Huh?

16:20:04    19       A.    They were in a specified volume above the

16:20:06    20   floor.

16:20:06    21       Q.    But they weren't on the floor.

16:20:10    22       A.    No.

16:20:10    23       Q.    Do you know why he didn't put them on the

16:20:10    24   floor?

16:20:10    25       A.    I -- I -- I do not know his reasoning, no.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

267

16:20:13   1      Q.   Okay.  And the other criticism is the

16:20:16   2   temperature coming out of the blanket.

16:20:17   3      A.   Yes.

16:20:18   4      Q.   Okay.  And that's based on your own

16:20:23   5   measurements that you did in Exhibit B; correct?

16:20:25   6      A.   Yes.

16:20:25   7      Q.   Okay.  So what's your basis, if we're just

16:20:42   8   talking about particles or skin squames -- squames,

16:20:46   9   that using three million around the operating table is

16:20:52   10  unreasonable when ASHRAE states that between one --

16:20:57   11  one million to 900 million are shed during surgery?

16:21:02   12     A.   Well "shed during surgery" means the entire

16:21:04   13  duration of the surgical procedure I would assume, you

16:21:06   14  know, so therefore, since the room air is changing

16:21:09   15  every -- or there's 15 to 20 air changes per hour,

16:21:14   16  then most of these would follow airflow out of the

16:21:16   17  room or be deposited on surfaces.

16:21:19   18     Q.   What's the airflow underneath the operating

16:21:23   19  room table?

16:21:23   20     A.   The air change rate's probably quite low.

16:21:28   21     Q.   Is there any change -- air-change rate?

16:21:30   22     A.   There's probably some.

16:21:32   23     Q.   Very minimal; would you agree?

16:21:34   24     A.   That's -- that's -- that's probably true.

16:22:07   25          (Kuehn Exhibit 14 was marked for

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

268

16:22:09    1                    identification.)

16:22:09    2    BY MR. ASSAAD:

16:22:10    3        Q.   Dr. Kuehn, I represent that Exhibit 14 is a

16:22:15    4    CFD image -- or an image produced by CFD by defense

16:22:20    5    expert Dr. Abraham.  Have you seen this document

16:22:23    6    before?

16:22:23    7        A.   I have not.

16:22:26    8        Q.   Do you understand what this document is by

16:22:28    9    looking at it as a -- as an engineer?

16:22:31   10        A.   I have a rough idea, yes.

16:22:34   11        Q.   Would you agree with me that's airflow based

16:22:37   12    on a CFD analysis of an operating room?  Correct?

16:22:40   13        A.   I'm not sure I have the entire image here.

16:22:45   14    Looks like the walls are missing on the left- and

16:22:49   15    right-hand sides.

16:22:49   16        Q.   But it's airflow in an operating room with

16:22:52   17    there being a surgical table and a patient and lights

16:22:54   18    and everything.

16:22:55   19        A.   That's what it looks like, yeah.

16:22:57   20        Q.   And that's what I represent to you, that

16:22:58   21    this was produced to us by defense in this case.

16:23:01   22             Do you see the -- the vectors of air

16:23:05   23    underneath the operating room table?

16:23:08   24        A.   Yes.

16:23:08   25        Q.   You see that it's very turbulent underneath

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

269

16:23:11  1  there; correct?

16:23:12  2       A.   A lot of recirculation, yes.

16:23:14  3       Q.   And this supports your opinion that there's

16:23:16  4  probably very little air exchange underneath the

16:23:19  5  operating room table; correct?

16:23:20  6       A.   Well less than the other parts of the room.

16:23:24  7       Q.   Much less.

16:23:24  8       A.   It would also depend on the -- the drapes

16:23:26  9  hanging down, how -- how far the edge of the drapes

16:23:29  10  are above the floor.

16:23:30  11       Q.   The longer the drapes, the less --

16:23:33  12       A.   Less --

16:23:33  13       Q.   -- air exchange; correct?

16:23:35  14       A.   Yes.

16:23:35  15       Q.   And it creates more of an insulation from

16:23:37  16  the air.

16:23:38  17       A.   Yes.

16:23:38  18       Q.   Okay.  And when you have insulation, you

16:23:40  19  have less airflow going in and out of the area

16:23:42  20  underneath the drapes; correct?

16:23:44  21       A.   Yes.

16:23:44  22       Q.   Okay.  And since you have less airflow going

16:23:48  23  in and out of the drapes, you have less of a cooling

16:23:51  24  effect; correct?

16:23:51  25       A.   Less --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

270

16:23:53  1    Q.   Well the air is pretty -- pretty stagnant

16:23:57  2  underneath the operating room table if the drapes are

16:23:59  3  long; correct?

16:23:59  4    A.   Yes.

16:24:00  5    Q.   Okay.  And you have the Bair Hugger that's

16:24:01  6  underneath the drapes that's heating up that area;

16:24:03  7  correct?

16:24:04  8        MR. GOSS:  Objection, form.

16:24:05  9    A.   That's not the way we set our Bair Hugger

16:24:07  10  up.

16:24:08  11    Q.   Oh, it isn't?

16:24:09  12    A.   No.

16:24:09  13    Q.   Why not?

16:24:10  14        MR. GOSS:  Are you talking about the blanket

16:24:11  15  or the warming unit?

16:24:13  16        MR. ASSAAD:  The blanket.

16:24:15  17    A.   Oh, the blanket.  I'm sorry.  I thought you

16:24:16  18  meant the -- the warming unit.

16:24:17  19    Q.   No.  The blanket's underneath the drapes;

16:24:20  20  correct?

16:24:20  21    A.   Yes.

16:24:20  22    Q.   Okay.  And you agree with me at some point,

16:24:23  23  you know, the Bair Hugger blanket is going to warm the

16:24:27  24  actual drapes on top through conduction; correct?

16:24:31  25    A.   Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

271

16:24:31  1      Q.  Okay.  And by convection it's going to warm

16:24:35  2  the patient as well as underneath the drapes; correct?

16:24:39  3      A.  Yes.

16:24:43  4      Q.  Okay.  And over time the air underneath the

16:24:47  5  drapes is going to increase; correct?

16:24:49  6      A.  That's possible.

16:24:54  7      Q.  Well if you have the drapes around the

16:24:58  8  table, okay, and you're getting very little air

16:25:01  9  movement underneath the table, by the first law of

16:25:04  10  thermodynamics, the conservation of energy, okay, the

16:25:10  11  heat has to warm up something; correct?

16:25:12  12      A.  Well it depends on where the air is actually

16:25:15  13  leaving the blanket with respect to the drapes.

16:25:17  14      Q.  Do you think the air could pass through the

16:25:19  15  drapes?

16:25:20  16      A.  No.

16:25:21  17      Q.  Okay.  So we know the air is not leaving

16:25:23  18  through the drapes; correct?

16:25:24  19      A.  Yes.

16:25:24  20      Q.  And the drapes act like some sort of

16:25:27  21  insulation, kind of like when you all have blankets on

16:25:31  22  us at night, it acts like an insulation; correct?

16:25:34  23      A.  Yes.

16:25:35  24      Q.  That's why --

16:25:35  25            I mean when you sleep at night, the blankets

272

16:25:39   1   don't warm you up, your own body heat warms you up, it

16:25:41   2   just acts as an insulator to keep you warm; correct?

16:25:43   3        A.   Yes.

16:25:43   4        Q.   The same concept applies here with the Bair

16:25:46   5   Hugger, correct, and the drapes?

16:25:47   6        A.   Yes.  The Bair Hugger is providing warmth to

16:25:50   7   the patient, yes.

16:25:51   8        Q.   And the drape is keeping all the -- it's --

16:25:52   9   it's insulating the patient and the area underneath

16:25:56  10   the drapes from the cold air up top; correct?

16:26:00  11        A.   Yes.

16:26:02  12        Q.   Okay.  The only way that that cold air

16:26:05  13   coming in from the ceiling could warm up the air

16:26:10  14   underneath the operating room table is either by

16:26:13  15   having air coming in from the sides underneath the

16:26:17  16   drapes --

16:26:17  17             Correct?

16:26:19  18        A.   Yes.

16:26:19  19        Q.   -- or it warms the air -- warms the blanket

16:26:21  20   by convection and then the blanket -- the drape, I'm

16:26:25  21   sorry, warmed by con -- convection, and then the drape

16:26:29  22   warms the Bair Hugger blanket by convection and cools

16:26:37  23   it down to blow cold air, which doesn't happen in real

16:26:40  24   life; correct?

16:26:40  25        A.   Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

273

| 16:26:41 | 1 | Q. Okay. So over time energy has -- |
| 16:26:48 | 2 | Energy, first law of thermodynamics, is |

conserved, and the area underneath the operating room

table, which is -- doesn't have a significant amount

of air exchanges, gets warmer and warmer, correct,

until it reaches an equilibrium?

A. I'll agree with that.

Q. Okay. And sitting here today, you don't

disagree with Dr. Abraham's CFD analysis as shown in

Exhibit 14; correct?

A. Well not having looked at any of the other

background information or boundary conditions, just

given this one figure, this figure's results look

reasonable, but I'd really like to look at the other

part of his report before I answered that question.

Q. And you never asked for his report from 3M;

have you?

A. I --

No, I did not.

Q. Do you know how much heat -- what's the

right term?

Do you know how much heat is absorbed by a

human body in the torso region?

A. I do not know that.

Q. Okay. Would that be something important to

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

273

16:26:41  1      Q.   Okay.  So over time energy has --

16:26:48  2           Energy, first law of thermodynamics, is

16:26:51  3  conserved, and the area underneath the operating room

16:26:54  4  table, which is -- doesn't have a significant amount

16:26:57  5  of air exchanges, gets warmer and warmer, correct,

16:27:01  6  until it reaches an equilibrium?

16:27:02  7      A.   I'll agree with that.

16:27:03  8      Q.   Okay.  And sitting here today, you don't

16:27:31  9  disagree with Dr. Abraham's CFD analysis as shown in

16:27:36  10  Exhibit 14; correct?

16:27:38  11      A.   Well not having looked at any of the other

16:27:41  12  background information or boundary conditions, just

16:27:44  13  given this one figure, this figure's results look

16:27:48  14  reasonable, but I'd really like to look at the other

16:27:50  15  part of his report before I answered that question.

16:27:52  16      Q.   And you never asked for his report from 3M;

17  have you?

16:27:56  18      A.   I --

16:27:57  19           No, I did not.

16:28:07  20      Q.   Do you know how much heat -- what's the

16:28:17  21  right term?

16:28:26  22           Do you know how much heat is absorbed by a

16:28:28  23  human body in the torso region?

16:28:31  24      A.   I do not know that.

16:28:33  25      Q.   Okay.  Would that be something important to

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

274

16:28:37    1    know to determine how much of the heat produced by the

16:28:39    2    Bair Hugger is actually absorbed by the body and how

16:28:42    3    much of it's waste heat?

16:28:44    4            MR. GOSS:  I don't think he's offering any

16:28:46    5    opinions on that, but you can answer.

16:28:49    6        A.   If -- if I was in the design area, I think

16:28:52    7    that would be something I would want to know.

16:29:11    8        Q.   You're aware that there's different patient

16:29:15    9    warming products --

16:29:17   10        A.   Yes.

16:29:17   11        Q.   -- as we discussed previously.

16:29:19   12        A.   Yes.

16:29:20   13        Q.   They're just different designs; correct?

16:29:23   14        A.   Yes.

16:29:24   15        Q.   One design might be forced-air warming;

16:29:26   16    correct?

16:29:26   17        A.   Yes.

16:29:26   18        Q.   Another design might be conductive warming;

16:29:29   19    correct?

16:29:29   20        A.   Yes.

16:29:30   21        Q.   You've heard of conductive warming

16:29:32   22    mattresses; correct?

16:29:33   23        A.   I believe so, yes.

16:29:33   24        Q.   Okay.  They're all patient warming products;

16:29:37   25    correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

275

| | | |
|---|---|---|
| 16:29:37 | 1 | A.   Yes. |
| 16:29:38 | 2 | Q.   Just a different design; correct? |
| 16:29:39 | 3 | A.   Right. |
| 16:29:39 | 4 | Q.   And that's based -- and -- and that's an |
| 16:29:41 | 5 | engineer -- that's that they're -- |
| 16:29:43 | 6 | They're the same product with different |
| 16:29:44 | 7 | design; correct? |
| 16:29:45 | 8 | A.   Same -- |
| 16:29:46 | 9 | Q.   Product.  They're both pat -- |
| 16:29:48 | 10 | They're all patient warming products; |
| 16:29:49 | 11 | correct? |
| 16:29:49 | 12 | A.   Same -- same application -- |
| | 13 | Q.   Yes. |
| | 14 | A.   -- but just different products. |
| 16:29:56 | 15 | Q.   Different products or different designs? |
| 16:29:56 | 16 | A.   Well different designs and different |
| 16:29:58 | 17 | products. |
| 16:29:58 | 18 | Q.   What's different between the Mistral and the |
| 16:30:00 | 19 | Bair Hugger? |
| 16:30:01 | 20 | A.   I have not looked at the Mistral in any |
| 16:30:03 | 21 | amount of detail, so I -- I can't answer that. |
| 16:30:07 | 22 | Q.   There's three modes of heating:  convective, |
| 16:30:11 | 23 | conductive, and radiation; correct? |
| 16:30:13 | 24 | A.   Yes. |
| 16:30:23 | 25 | Q.   Do you know a Dr. Sparrow? |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

276

16:30:24   1        A.   I do.

16:30:25   2        Q.   Are you friends with him?

16:30:26   3        A.   We're colleagues, yeah.

16:30:29   4        Q.   Have you done any work with him?

16:30:30   5        A.   No, not -- not really, other than I may have

16:30:36   6   served on some of his graduate students' final exam

16:30:39   7   committees.

16:30:42   8        Q.   And he focuses on heat transfer as well;

16:30:43   9   correct?

16:30:43  10        A.   Yes.

16:30:46  11        Q.   Is there anyone at the University of

16:30:47  12   Minnesota that focuses on particle movement through

16:30:53  13   turbulent airflow?

16:30:57  14        A.   I could think of Mike Zacharia probably,

16:31:00  15   does a lot of modeling work in that area.

16:31:02  16        Q.   Is he from Stanford?

16:31:04  17        A.   No, I think he's from the University of New

16:31:09  18   York - Buffalo.

16:31:10  19        Q.   Okay.

16:31:42  20        A.   What name did I give you?  I just want to

16:31:45  21   make sure I gave you the correct --

16:31:47  22        Q.   Zacharia.

16:31:47  23        A.   That's -- that's not correct.

16:31:52  24             MS. ZIMMERMAN:   University of Minnesota is a

16:31:53  25   big school.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

277

16:31:54   1              THE WITNESS:  Yeah.

16:31:55   2       A.   I'm just having a mental --

16:31:58   3            I'll -- I'll -- I'll come up with it.

16:32:00   4       Q.   Not important.

16:32:01   5       A.   I'll come up with it.

16:32:03   6       Q.   It's not important.

16:32:04   7       A.   Oh.  Sean Garrick is -- G-a-r-r-i-c-k, I

16:32:09   8   believe.  Sean Garrick.

16:32:10   9       Q.   And he went to SUNY Buffalo?

16:32:13  10       A.   Yes.

16:32:15  11       Q.   Okay.  Do you know whether or not the

16:32:17  12   University of Minnesota has their own CFD code?

16:32:21  13       A.   I don't think so, but I'm not -- not aware

16:32:25  14   of that.

16:32:25  15       Q.   Are you aware that like universities such as

16:32:28  16   Stanford have their own code?

16:32:30  17       A.   Yes.

16:32:31  18       Q.   Okay.

16:32:32  19       A.   I -- not --

16:32:33  20            Not that I'm aware of.

          21       Q.   Okay.

16:32:37  22       A.   I mean individual researchers have their own

16:32:40  23   code, but whether there's a blanket University of

16:32:44  24   Minnesota code, I am not aware of any such thing.

16:33:04  25       Q.   Now you agree with me that in selecting a

278

16:33:16  1  filter to be used in a -- in a device during the

16:33:19  2  design process, you have to know how that device is

16:33:23  3  going to be used; correct?

16:33:24  4      A.  Yes.

16:33:25  5      Q.  And you agree with me that that -- that

16:33:29  6  that -- the air that the bacteria -- strike that --

16:33:32  7  the air that the Bair Hugger is filtering has a higher

16:33:37  8  bacterial load than the air coming out of that

16:33:40  9  ventilation system; correct?

16:33:43  10     A.  That -- that may be the case.  I have not

16:33:46  11  seen data that supports that, I don't believe.

16:33:50  12     Q.  Let's just use common sense.  You have

16:33:53  13  squames from people and the patient and blood and

16:34:01  14  other stuff during the surgical procedure that's going

16:34:07  15  down to the floor of the operating room; correct?

16:34:09  16     A.  Okay.

16:34:10  17     Q.  Okay.  I mean it would be a -- a reasonable

16:34:15  18  conclusion that the bacterial load in that area around

16:34:18  19  the surgical table is much greater than coming out of

16:34:22  20  the ventilation system, which has 25 percent air

16:34:25  21  coming from the outside as well as being filtered

16:34:28  22  twice through a -- through a HEPA -- a MERV -- a MERV

16:34:32  23  7 filter and a MERV 14 filter; correct?

16:34:34  24     A.  That would be a logical assumption, yes.

16:34:37  25     Q.  And that needs to be taken into account in

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

279

16:34:41   1   determining the filtration to be used by the device;

16:34:44   2   correct?

16:34:44   3        A.   Yes.  The -- the challenge aerosol into the

16:34:50   4   device would have to be taken into account, into the

16:34:51   5   filter.

16:34:51   6        Q.   Because using a MERV 14 that removes 95

16:34:56   7   percent of the part -- of particles the size of -- or

16:35:07   8   90 percent -- 90 percent of the particles larger than

16:35:10   9   three to 10 microns means that some get through;

16:35:15  10   correct?

16:35:15  11        A.   And the numbers you're referring to appear

16:35:17  12   to be from the ASHRAE Standard 52.2.  Those are

16:35:20  13   minimum values for that particle-size range.

16:35:23  14        Q.   That's fine.  But --

16:35:28  15             It's a percentage; correct?

16:35:29  16        A.   Yes.

16:35:30  17        Q.   Okay.  And you have to take into account in

16:35:34  18   designing a device, when you're putting a filter in

16:35:36  19   it, is what is the bacterial load, because allowing 10

16:35:43  20   percent of a low number to get through is different

16:35:45  21   than allowing 10 percent of a large number to get

16:35:48  22   through; correct?

16:35:49  23        A.   Yes.

16:35:49  24             MR. GOSS:  Object to form.

16:35:51  25        Q.   And the bacterial load underneath the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

280

16:35:55    1    operating room table is much greater than coming out

16:36:00    2    of the HVAC system; correct?

16:36:01    3         A.    I think we could probably assume that.

16:36:03    4         Q.    And you have to take that into consideration

16:36:06    5    in choosing the correct filter for the device;

16:36:11    6    correct?

16:36:11    7         A.    Depends where the device is located.

16:36:13    8         Q.    Well where is the Bair Hugger located?

16:36:16    9         A.    Sometimes it's on an IV pole, sometimes it's

16:36:19   10    mounted on a cart.

16:36:20   11         Q.    Either/or.  Why does it make a difference?

16:36:22   12         A.    The location of the air coming in will be

16:36:25   13    different than, for example, under the operating

16:36:28   14    table.

16:36:42   15         Q.    Do you know how high, when you use it -- put

16:36:45   16    on a pole, how high it's off the ground, the Bair

16:36:48   17    Hugger?

16:36:49   18         A.    Typically, the bottom I've heard is between

16:36:52   19    18 inches and two feet.

16:36:53   20         Q.    Okay.  And that's still below the operating

16:36:55   21    room table; correct?

16:36:56   22         A.    Below the top of the table, yes.

16:36:58   23         Q.    Okay.  And as we discussed before from

16:36:59   24    Exhibit 14, the air is very turbulent underneath that

16:37:02   25    area; correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

281

| 16:37:03 | 1 | A. Yes. |

16:37:03  2     Q.   So particles are all over the place in that

16:37:07  3  area; correct?

16:37:07  4     A.   Yes.

16:37:07  5     Q.   We could agree that the concen -- the

16:37:09  6  bacterial load concentration is probably pretty

16:37:10  7  uniform underneath the operating room table due to the

16:37:13  8  turbulence; correct?

16:37:14  9     A.   Under the table, yes.

16:37:15  10     Q.   Okay.  So it really doesn't matter if it's

16:37:18  11  on the floor, you know, on a stand or -- or on a pole

16:37:20  12  which is below the operating table, it's still drawing

16:37:24  13  from the same amount of bacterial load; correct?

16:37:26  14     A.   But it's not under the operating table.

16:37:28  15     Q.   It isn't?

16:37:29  16     A.   The unit when it's -- when it's placed, no.

16:37:33  17     Q.   Where is it placed?

16:37:33  18     A.   It's placed behind the anesthetic screen.

16:37:37  19     Q.   Behind the screen.

16:37:38  20     A.   Yes.

16:37:38  21     Q.   Well just --

16:37:39  22         And -- and the screen is not above the

16:37:40  23  operating room table?

16:37:41  24     A.   The screen is above the table, yes.

16:37:43  25     Q.   Okay.  So it's placed -- and -- and when

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

282

16:37:46  1  you -- and who told you --

16:37:48  2         Where did you come up with this assumption?

16:37:50  3  Who told you that?

16:37:51  4     A.   Well based on the photos I've -- I've seen

16:37:54  5  as how a typical Bair Hugger unit would be set up, and

16:37:57  6  the setup in the 3M lab.

16:37:58  7     Q.   How long is the hose?

16:38:00  8     A.   I'm guessing --

16:38:04  9         Well, I don't know the exact number.

16:38:09  10    Q.   So it's your belief that the area where the

16:38:13  11  Bair Hugger is placed has the same bacterial load as

16:38:17  12  the areas coming out from the HVAC.

16:38:20  13    A.   I did not say that.

16:38:21  14    Q.   Okay.  That's --

16:38:22  15        I just want to make sure.  So what are you

16:38:25  16  saying?

16:38:25  17    A.   I'm saying it's -- it's -- it could be

16:38:27  18  significantly different than what's under the table.

16:38:29  19    Q.   Okay.  But you agree it's still

16:38:31  20  significantly more than what's coming out of the HVAC

16:38:34  21  system.

16:38:34  22    A.   It could be, depending on where the unit is

16:38:36  23  located.

16:38:36  24    Q.   Well the hose is only so long.

16:38:39  25    A.   But there could be airflow from the ceiling

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

283

16:38:42  1   coming over the table near the floor where the unit is

16:38:46  2   located, which would still be very clean air.

16:38:48  3        Q.   But sitting here today, you don't know

16:38:50  4   either way; do you?

16:38:51  5        A.   Say it again.

16:38:53  6        Q.   Sitting here today, you don't know either

16:38:54  7   way what the bacterial load is, whether or not the

16:38:56  8   area where the Bair Hugger sits has air from the

16:38:59  9   ceiling clearing out the bacteria.

16:39:02  10       A.   Not -- not without seeing actual

16:39:04  11  applications.

16:39:04  12       Q.   Okay.  Assuming that it is underneath the

16:39:08  13  operating room table --

16:39:10  14            Okay?

16:39:10  15       A.   Okay.

16:39:11  16       Q.   -- or an area where there is turbulence, and

16:39:14  17  the HVAC system can't clear out the bacterial load, --

16:39:20  18       A.   Okay.

16:39:23  19       Q.   -- would you agree with me that a MERV 14

16:39:31  20  filter -- strike that.

16:39:34  21            You agree with me that just because a

16:39:39  22  hospital operating room uses a MERV 14 filter, that is

16:39:43  23  a sufficient reason to use a MERV 14 filter in the

16:39:45  24  Bair Hugger?

16:39:47  25       A.   I would say it's not a sufficient reason.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

284

16:39:49    1        Q.    Okay.  And you agree with me that you have

16:40:02    2    been provided no data with respect to the bacterial

16:40:10    3    load underneath the operating room table.

16:40:12    4        A.    I believe that's a correct statement.

16:40:14    5        Q.    Okay.  And to choose a filter, a reasonable

16:40:19    6    and prudent engineer should know the bioburden of the

16:40:24    7    air that the bacter -- that the Bair Hugger is drawing

16:40:27    8    from in selection of a filter; correct?

16:40:31    9        A.    That would be prudent, yes.

16:40:32   10        Q.    Okay.  Do you have any reason to believe

16:40:36   11    that -- that 3M or Arizant considered that in

16:40:39   12    selecting the MERV 14 -- selecting their filter?

16:40:42   13        A.    I cannot point to a document that says that,

16:40:46   14    no.

16:40:46   15        Q.    Okay.  Do you know what the efficiency is

16:40:59   16    for one to three microns of the Bair Hugger filter?

16:41:06   17        A.    I have seen a test report where the filters

16:41:09   18    have been sent to an external test lab for -- for

16:41:13   19    measurements and --

16:41:13   20        Q.    So what is it?

16:41:14   21        A.    It's from -- from .3 to one.

16:41:17   22        Q.    From one to three.

16:41:18   23        A.    From one to three.  I think it's in the

16:41:21   24    nineties.

16:41:21   25        Q.    In the nineties.  Okay.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

285

16:41:28  1        And your opinion in this case is that's an

16:41:35  2  acceptable choice; correct?

16:41:36  3        A.   Yes.

16:41:37  4        Q.   Did you take into account in formulating

16:41:39  5  your opinions the -- the -- the bioburden of the air

16:41:43  6  that the Bair Hugger is drawing from?

16:41:46  7        A.   Not specifically.

16:41:53  8        Q.   What does that mean, "not specifically?"

16:41:55  9        A.   I was looking at the most probable particle

16:41:59  10  size containing a -- a bacteria and how the filter

16:42:03  11  would -- would perform against that particle size.

16:42:06  12        Q.   And what's that?  What size?

16:42:09  13        A.   Size between five and 10 microns.

16:42:12  14        Q.   Okay.  What's the efficiency for five to 10

16:42:17  15  microns?

16:42:17  16        A.   The data I show, it's high nineties, close

16:42:20  17  to a hundred percent.

16:42:24  18        Q.   Were you aware that they performed a test on

16:42:27  19  the filter --

16:42:28  20        You've read Winston Tan's report; correct?

16:42:30  21        A.   That's what I'm referring to, yes.

16:42:32  22        Q.   Okay.  And actually, they ran initial tests

16:42:35  23  and the first -- first test results were not good

16:42:39  24  because of a manufacturing defect.  Do you recall

16:42:41  25  that?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

286

16:42:42  1      A.   There were three batches that were tested,

16:42:44  2   and one of the batches, I -- I believe, did not meet

16:42:48  3   the requirements.

16:42:50  4      Q.   Had a manufacturing defect; correct?

16:42:51  5      A.   That -- that's what I read.

16:42:52  6      Q.   Okay.  And knowing where the --

16:43:01  7           Assuming that the Bair Hugger is drawing air

16:43:06  8   that has a large bioburden, did you take into account

16:43:14  9   whether the device had any leakage?

16:43:19  10          MR. GOSS:  Object to the predicate.

16:43:23  11     A.   I didn't --

16:43:24  12     Q.   Do you know what I mean by "leakage?"

16:43:25  13     A.   Yes.

16:43:26  14     Q.   Okay.

16:43:26  15     A.   Yes.  Yes, I did.

16:43:28  16     Q.   But you didn't test for leakage; correct?

16:43:38  17     A.   I did no testing, no.

16:43:40  18     Q.   And the Bair Hugger filter has a seal on it;

16:43:43  19   correct?

16:43:43  20     A.   Which -- which Bair Hugger are you referring

16:43:47  21   to?

16:43:47  22     Q.   The 750 or 775.

16:43:49  23     A.   775, yes.

16:43:50  24     Q.   Did you -- did you check to see whether or

16:43:52  25   not, when the Bair Hugger is turned on, that it forms

287

16:43:55    1   a good seal so that no air could bypass the filter

16:43:59    2   through the sides?

16:44:00    3        A.   It has what appeared to me to be a black

16:44:03    4   foam-rubber gasket, that when the filter is placed in

16:44:06    5   the bottom of the unit with the cover over it and the

16:44:09    6   bolts tightened down, that the gasket is compressed,

16:44:13    7   which indicates to me that there would be a good seal.

16:44:17    8        Q.   But you don't know one way or the other;

16:44:18    9   correct?

16:44:18   10        A.   I have not measured for leakage, no.

16:44:20   11        Q.   Okay.  By the way, you're aware that in

16:44:31   12   Elghabashi's study, that he assumed that the filter

16:44:36   13   stopped 100 percent of the particles?

16:44:37   14        A.   I would have to go back and check that level

16:44:39   15   of detail.  I don't recall at the moment.

16:44:41   16        Q.   All right.  Now you've done research on

16:44:53   17   actual bacterial growth that occurs within a filter;

16:44:57   18   correct?

16:44:57   19        A.   That's correct.

16:44:57   20        Q.   Okay.  And as long as there are nutrients

16:45:02   21   provided to the bacteria, it actually could go -- grow

16:45:05   22   in the filter and -- and grow all the way through the

16:45:08   23   filter and then be released on the other side;

16:45:10   24   correct?

16:45:10   25        A.   With appropriate environmental temperature

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

288

16:45:12　1　and humidity conditions, yes.

16:45:13　2　　　　Q.　Okay.　What --

16:45:15　3　　　　　　　Do you know what the humidity is in -- in an

16:45:17　4　OR?

16:45:18　5　　　　A.　From what the design I have read, I think

16:45:21　6　it's supposed to be 50 percent.

16:45:22　7　　　　Q.　Okay.　And that would be an ideal situation

16:45:24　8　for bacterial growth; correct?

16:45:26　9　　　　A.　I think --

16:45:27　10　　　　　　Again, I'm not a microbiologist, but from

16:45:31　11　what I've heard from others, I think that's lower than

16:45:32　12　what's required to grow and propagate bacteria.

16:45:37　13　　　　Q.　Do you think --

16:45:38　14　　　　　　What do you think the humidity should be?

16:45:40　15　　　　A.　I'm -- I'm thinking --

16:45:42　16　　　　Q.　If you know.

16:45:43　17　　　　A.　Again, I'm not a microbiologist.　I don't

16:45:46　18　want to hazard a guess.

16:45:47　19　　　　Q.　Okay.　And why does --

16:45:57　20　　　　　　Why is humidity a factor?

16:46:01　21　　　　A.　Again, I'm not a microbiologist, but

16:46:04　22　humid --

16:46:06　23　　　　　　Bacteria needs -- needs moisture to grow.

16:46:10　24　　　　Q.　What's a loaded filter?

16:46:35　25　　　　A.　The common term "loaded filter" typically

289

16:46:39  1   refers to a -- in -- in my area of expertise of

16:46:45  2   ventilation, an HVAC filter that has captured ambient

16:46:50  3   aerosol and dust over a fairly long period of time so

16:46:55  4   that it affects the filter performance both in

16:46:57  5   pressure drop and -- and capture efficiency.

16:46:59  6        Q.   And what's a long period of time?

16:47:01  7        A.   It really depends on the -- the loading.  It

16:47:04  8   could be years if it's lightly loaded, it could be in

16:47:08  9   a matter of weeks or months.

16:47:09  10       Q.   Okay.  Do you agree that a filter with

16:47:18  11  sufficient dust loading will contain the nutrients

16:47:21  12  necessary to support mi -- microbial growth?

16:47:25  13       A.   Our tests on a hundred percent outside air

16:47:29  14  confirmed that, provided the humidity was high enough.

16:47:33  15       Q.   Well what's high enough?

16:47:35  16       A.   We -- we did not --

16:47:37  17            We tested two media filters for one year,

16:47:40  18  hundred percent outside air.  We did not find any

16:47:43  19  bacterial or fungal growth on those filters for the

16:47:47  20  whole year.  We then put them in a test facility that

16:47:49  21  maintained 90 percent relative humidity, then we did

16:47:56  22  find growth.

16:47:56  23       Q.   Okay.  So you know 90 percent, growth, --

16:47:57  24       A.   Yes.

16:47:58  25       Q.   -- zero percent, no growth.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

290

16:47:59  1    A.    Well I didn't say zero percent.  I said just

16:48:03  2  natural outdoor --

16:48:04  3    Q.    Where were -- where were you?

16:48:05  4    A.    It could range anywhere from in the

16:48:09  5  wintertime --

16:48:09  6          Well even in the summer, the early morning,

16:48:11  7  it could be close to 70, 80 percent, and then during

16:48:15  8  the hot afternoon it might drop down to 30 or 40.

16:48:16  9    Q.    Okay.  You agree with me that skin squames

16:48:38  10  would be good nutrients for bacteria; correct?

16:48:40  11          MR. GOSS:  Objection, lack of foundation.

16:48:42  12    A.    Again, I'm not a microbiologist.  I would --

16:48:45  13  I would -- I -- I --

16:48:46  14          I don't want to answer that.

16:48:47  15    Q.    Well you say here in one of your report --

16:48:49  16  your articles, "Atmospheric dust contains 30 to 40

16:48:52  17  percent organic matter by mass."  Do you remember

16:48:55  18  that?

16:48:56  19    A.    I think I remember that, yes.

16:48:57  20    Q.    Would you consider skin -- skin squames

16:49:00  21  organic matter?

16:49:01  22    A.    Yes.  I think that was referring to outside

16:49:03  23  air in that case.

16:49:04  24    Q.    I understand that, but I was talking about

16:49:07  25  skin squames.  Do you consider that organic matter?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

291

16:49:09    1        A.    Skin squames is organic matter, I -- I agree

16:49:15    2   with that.

16:49:15    3        Q.    Do you know --

16:49:15    4              Have you done any testing to see whether or

16:49:18    5   not bacteria could grow in the Bair Hugger over time

16:49:20    6   and come out the other end?

16:49:22    7        A.    I have not done anything like that, no.

16:49:24    8        Q.    Do you have any reason to believe that it

16:49:25    9   wouldn't occur in the Bair Hugger filter?

16:49:28   10              MR. GOSS:  Object to form.

16:49:29   11        A.    Again, we need two -- well, we need --

16:49:35   12              We need sufficient nutrients, number one --

16:49:37   13        Q.    Which we know we have; correct?

16:49:39   14              MR. GOSS:  Object to form.

16:49:40   15        A.    -- which could be -- could be -- could be

16:49:41   16   the skin squames, but we also need the appropriate

16:49:44   17   humidity level, and with ORs controlled about 50

16:49:47   18   percent humidity, I think that's too low.

16:49:49   19        Q.    Okay.  But if some ORs are up to 70 percent

16:49:54   20   humidity, then there's potential for growth?

16:49:56   21              MR. GOSS:  Calls for speculation.

16:49:57   22        A.    I would speculate it has to be higher than

16:50:00   23   that.

16:50:00   24        Q.    Okay.  But you're speculating; correct?

16:50:03   25        A.    Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

292

16:50:30    1              (Kuehn Exhibit 15 was marked

16:50:32    2              for identification.)

16:50:32    3    BY MR. ASSAAD:

16:50:44    4         Q.   What's been marked as Exhibit 15 is an

16:50:46    5    article titled "Airborne Infection Control in Health

16:50:49    6    Care Facilities," authored by you; correct?

16:50:51    7         A.   That's correct.

16:50:52    8         Q.   And it's published in an August 2003 -- I

16:50:58    9    guess in the Journal of Solar Energy Engineering?

16:51:01   10         A.   That's correct.

16:51:02   11         Q.   Okay.  Is that a publication put out by

16:51:06   12    ASME?

16:51:06   13         A.   It is.

16:51:09   14         Q.   I want you to turn to page 369 under

16:51:24   15    "Monitoring."  Do you see that?

16:51:25   16         A.   I see that.

16:51:26   17         Q.   Okay.  Do you recall writing this article?

16:51:30   18         A.   I do.

16:51:31   19         Q.   What was the purpose of writing this

16:51:33   20    article?

16:51:33   21         A.   Professor Jane Davidson asked me for a

16:51:39   22    contributed article in one of these issues of the

16:51:41   23    Solar Energy Journal, so I -- I complied with her

16:51:44   24    request.

16:51:44   25         Q.   Okay.  And in "Monitoring" you're talking

293

16:51:48    1   about monitoring the -- the critical areas in a clean

16:51:54    2   room and as well as a healthcare facility; correct?

16:51:57    3       A.   As I'm reading "Monitoring," it starts out

16:52:01    4   with pressure difference --

            5       Q.   But --

16:52:04    6       A.   -- between clean zones.

16:52:05    7       Q.   But this is "Airborne Infection Control in

16:52:08    8   Health Care Facilities;" correct?

16:52:10    9       A.   Yes.

16:52:10   10       Q.   So this is talking about monitoring in those

16:52:12   11   types of facilities; correct?

16:52:13   12       A.   Yes.

16:52:13   13       Q.   Okay.

16:52:14   14       A.   Uh-huh.

16:52:14   15       Q.   If you go to the last page -- or the last --

16:52:18   16   before the --

16:52:18   17            The next page, it says, "An alternative is

16:52:23   18   to use a continuous particle counter for the

16:52:26   19   measurement of total aerosol concentrations versus

16:52:29   20   time with periodic sampling of bioaerosols."  Do you

16:52:33   21   agree with that statement?

16:52:34   22       A.   Yes.

16:52:35   23       Q.   And if you read two lines before that, it

16:52:43   24   talks about there could be elevated concentrations

16:52:47   25   that could occur as short-term bursts; correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

294

16:52:51  1        A.    Yes.

16:52:57  2        Q.    So do you agree that you could use particle

16:52:59  3   counting to measure the total aerosol concentration in

16:53:06  4   an operating room?

16:53:08  5        A.    Within the range of the instrument, yes.

16:53:11  6        Q.    Okay.  And if you used --

16:53:14  7              Most instruments, they could go from .3 to

16:53:16  8   10 microns; correct?

16:53:17  9        A.    Optical particle counters can, yes.  There

16:53:19 10   are other instruments that could go much lower and

16:53:21 11   much higher.

16:53:22 12        Q.    But for the purposes of an operating room,

16:53:24 13   .3 to 10 microns would be appropriate; correct?

16:53:27 14        A.    That's a reasonable particle-size range.

16:53:28 15        Q.    You don't need nanometers at all.

16:53:31 16        A.    Not -- not --

16:53:32 17              No.

16:53:32 18        Q.    Yeah.  Bacteria are -- are not that small;

16:53:43 19   correct?

16:53:43 20              THE REPORTER:  Was there an answer?

16:53:46 21              MR. ASSAAD:  I thought he said yes.

16:53:47 22        Q.    But bacteria are not that small; correct?

16:53:49 23        A.    Yes.

16:53:54 24        Q.    When a Bair Hugger is turned on, how long do

16:54:59 25   you think it takes for equilibrium to reach?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

295

16:55:06   1        A.    How do you define "equilibrium?"

16:55:08   2        Q.    Well, the Bair Hugger's turned on, the, you

16:55:14   3   know, Bair Hugger blanket's at room temperature, --

16:55:16   4        A.    Yes.

16:55:18   5        Q.    -- the blankets are at room temperature, the

16:55:19   6   drape is at room temperature, the table is at room

16:55:23   7   temperature.  How long do you think it takes for the

16:55:25   8   Bair Hugger, when you turn it on, to actually heat up

16:55:30   9   itself to get to, you know, where it could eject air

16:55:36  10   at -- at 40 to 41 degrees Celsius and then warm up the

16:55:42  11   drapes around it and to get to like -- to equilibrium?

16:55:46  12        A.    The only basis I can reply to that would be

16:55:49  13   the tests we did in the test room.

16:55:52  14        Q.    And -- and --

16:55:53  15        A.    And I --

16:55:55  16        Q.    -- what's your answer?  How long?

16:55:56  17        A.    I recall the --

16:55:58  18              It took a matter of a few minutes before the

16:56:02  19   supply-air temperature was up -- up to design values,

16:56:07  20   and then I -- I don't know how long it would take for

16:56:09  21   the entire hose and the blanket to reach equilibrium.

16:56:13  22        Q.    Now did you look at the temperature on the

16:56:17  23   Bair Hugger, of what the exit temperature is?

16:56:20  24        A.    Not while I was doing my measurements, no.

16:56:23  25        Q.    Do you know whether or not it was on high or

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

296

16:56:25   1   low or medium?

16:56:26   2        A.   It was on high.  We did --

16:56:30   3             Yes, it was on high.

16:56:31   4        Q.   And the temperature that it comes out of the

16:56:33   5   blower, do you know if that temperature being measured

16:56:36   6   is out of the exit end -- end of the hose or at where

16:56:40   7   the blower -- where the air comes out of the blower

16:56:43   8   itself?

16:56:43   9        A.   I don't recall that level of detail.

16:56:46  10        Q.   Well you agree with me that that would be

16:56:52  11   important information to know, to know the actual air

16:56:55  12   entering into the Bair Hugger blanket, what

16:56:57  13   temperature it is; correct?

16:56:59  14        A.   Yes.

16:56:59  15        Q.   Okay.  And -- strike that.

16:57:36  16             Doctor, assuming that when you did the

16:58:04  17   temperature in the testing with the Bair Hugger and

16:58:07  18   you saw an increase of five degrees Celsius over the

16:58:14  19   assumed surgical site, would that be significant?

16:58:19  20        A.   Frankly, I was focusing on the velocity

16:58:21  21   measurements, not -- not the temperature measurements,

16:58:23  22   so those were -- that was considered to be secondary

16:58:26  23   measurements in the -- in the study we did.  So I was

16:58:29  24   not paying much attention to those, I was paying more

16:58:32  25   attention to the velocity.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

297

16:58:33    1        Q.    Well you used your temperature measurements

16:58:36    2    to criticize Elghabashi.

16:58:39    3        A.    I did.

16:58:41    4        Q.    Okay.  And to do your Archimedes

16:58:42    5    calculation; correct?

16:58:43    6        A.    Yes.

16:58:43    7        Q.    Okay.  And to do your -- whether or not --

16:58:47    8            The adhesion forces with respect to

16:58:50    9    particles, you used temperature; correct?  Used

16:58:53    10    temperature, those temperatures measurements you did

16:58:55    11    in those calculations; correct?

16:58:56    12        A.    I don't recall using them in adhesion

16:59:00    13    calculations.

16:59:03    14        Q.    You're right.  Well -- no, you're right.  My

16:59:06    15    fault.

16:59:09    16            If the temperature rose by five degrees over

16:59:13    17    the surgical site, would that be significant to you?

16:59:19    18            MR. GOSS:  With the Bair Hugger on.

16:59:20    19            MR. ASSAAD:  With the Bair Hugger on.

16:59:24    20        A.    If that's the only thing that changed and

16:59:26    21    the airflow did not change at all, I would say

16:59:29    22    that's -- that's not significant.

16:59:30    23        Q.    Well how would you think the heat increased?

16:59:37    24        A.    Could be from the lights or from personnel.

16:59:41    25        Q.    Lights are constant, personnel are constant.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

298

16:59:44  1        Say the Bair Hugger turns on, that's the

16:59:46  2  only change, it goes up five degrees.  Would that be

16:59:50  3  significant to you, having everything else constant?

16:59:52  4        A.   If everything else is constant, that would

16:59:54  5  be the logical choice.

16:59:55  6        Q.   Okay.  Would that be significant with

16:59:57  7  respect to airflow disruption?

17:00:05  8        A.   It -- it -- it possibly could be.

17:00:07  9        Q.   Okay.  Do you know who Professor Kurz is --

17:00:25  10 or Dr. Kurz?

17:00:27  11       A.   I do not think I know him.

17:00:29  12       Q.   I'll represent that she is on the advisory

17:00:34  13 panel for 3M.  Have you seen any literature that she's

17:00:39  14 produced?

17:00:40  15       A.   No.

17:00:44  16       Q.   If the temperature around the surgical

17:01:00  17 table -- surgical site increased by five degrees when

17:01:03  18 the Bair Hugger was on, would you agree with me that

17:01:07  19 there's going to be a bouyancy force around the

17:01:10  20 surgical table?

17:01:13  21       A.   There -- there's a bouyancy force anyway

17:01:15  22 because of the patient temperature and the wound

17:01:19  23 temperature, and that buoyant force is typically very

17:01:23  24 weak compared to the forced-air pressure force coming

17:01:27  25 down from the flow from the ceiling.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

299

17:01:29  1      Q.    So you have the flow coming down from the

17:01:31  2  ceiling at whatever, 59 degrees Celsius, correct, with

17:01:37  3  a certain velocity; correct?

17:01:37  4      A.    Yes.

17:01:37  5      Q.    But all of a sudden the Bair Hugger is on

17:01:39  6  and there's a five-degree increase in temperature over

17:01:42  7  the surgical site.

17:01:44  8      A.    Yes.

17:01:44  9      Q.    What's causing that heat to get up to

17:01:46  10  that -- to that area?

17:01:48  11              MR. GOSS:  I'm going to object to 59 degrees

17:01:50  12  Celsius, counsel.  It sounds a little hot.

17:01:53  13              MR. ASSAAD:  Or 59 degrees Farenheit.  I'm

17:01:55  14  sorry.

         15              MR. GOSS:  All right.

17:01:57  16              MR. ASSAAD:  Thank you.

17:01:57  17      A.    It sounds like it would be coming somewhere

17:01:58  18  from the Bair Hugger.

17:01:59  19      Q.    So the heat would be com --

17:02:01  20              It would be from the waste heat of the Bair

17:02:02  21  Hugger; correct?

17:02:03  22      A.    That sounds like a logical conclusion, yes.

17:02:08  23      Q.    Okay.  Let's go to Exhibit D of your report,

17:03:03  24  of Exhibit 1.

17:03:19  25      A.    Okay.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

300

| | | |
|---|---|---|
| 17:03:20 | 1 | Q.   And that has to deal with the Archimedes |
| 17:03:23 | 2 | number; correct? |
| 17:03:24 | 3 | A.   Yes. |
| 17:03:25 | 4 | Q.   Have you ever calculated the Archimedes |
| 17:03:28 | 5 | number in the past 20 years? |
| 17:03:31 | 6 | A.   Yes. |
| 17:03:33 | 7 | Q.   For what purpose? |
| 17:03:37 | 8 | A.   We were looking at the ventilation in hog |
| 17:03:44 | 9 | barns, the air coming in through the slot in one side |
| 17:03:49 | 10 | of the barn and then out through the fans on the other |
| 17:03:53 | 11 | side, exhausted on the other side. |
| 17:03:55 | 12 | Q.   Okay.  Now let's go through the equation. |
| 17:03:57 | 13 | You know the Archimedes number -- |
| 17:04:00 | 14 |      Which is dimensionless; correct? |
| 17:04:02 | 15 | A.   Yes. |
| 17:04:02 | 16 | Q.   -- equals the gravity, which is g. |
| 17:04:04 | 17 | A.   Yes. |
| 17:04:04 | 18 | Q.   And that's a constant; correct? |
| 17:04:07 | 19 | A.   Yes. |
| 17:04:07 | 20 | Q.   L, what's L? |
| 17:04:08 | 21 | A.   It's a -- a length scale, which typically |
| 17:04:11 | 22 | this is applied to air jets, so it would be the -- say |
| 17:04:14 | 23 | the width from the diameter of that air jet. |
| 17:04:16 | 24 | Q.   Okay.  And you take one inch. |
| 17:04:18 | 25 | A.   Yes, because I was based that -- basing that |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

301

17:04:22  1   on the measurements we made of the velocity leaving

17:04:25  2   the Bair Hugger blanket that we did.

17:04:27  3       Q.   But where did you make the demens --

17:04:28  4            Where did you get a length scale of one

17:04:33  5   inch?

17:04:33  6       A.   Well based on moving the probe around as the

17:04:37  7   flow is coming out the edge of the blanket, that

17:04:40  8   seemed to be the width of the jet roughly three inches

17:04:42  9   from the blanket edge.

17:04:44  10      Q.   Three inches from the blanket edge?

17:04:47  11      A.   Yes.

17:04:55  12      Q.   So you're saying the jet was only one inch

17:05:00  13  wide?

17:05:00  14      A.   Approximately, yes.

17:05:01  15      Q.   That's all you measured coming out of the

17:05:03  16  blanket edge.

17:05:05  17      A.   Well I was measuring the velocities and

17:05:07  18  the -- and the temperature there, and by measuring the

17:05:09  19  velocities I would move the probe up and down and try

17:05:14  20  to determine the width of the jet and where the

17:05:15  21  centerline was.

17:05:16  22      Q.   Let's talk about engineering common sense

17:05:18  23  here.  Okay?  You have a blanket with over a thousand

17:05:22  24  holes blowing 43- to 45-cubic-feet-per-minute air.  Do

17:05:26  25  you agree?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

302

17:05:26    1        A.    Yes.

17:05:27    2        Q.    And you're saying that the length of the air

17:05:30    3   coming out of that area is only one inch?

17:05:32    4        A.    That's the width of the air jet that I

17:05:35    5   measured coming out of the blanket.

17:05:36    6        Q.    Okay.  Is that the only place the air did

17:05:39    7   come out of the blanket?

17:05:40    8        A.    No.

17:05:41    9        Q.    Okay.  Why didn't you use the length of

17:05:44   10   where all the air was coming out of the blanket?

17:05:48   11        A.    You could think of the air coming out of the

17:05:50   12   blanket as -- as being with a certain height and a

17:05:55   13   certain length along the length of the blanket, so

17:05:57   14   it's the width of the jet, not the length of the jet

17:06:00   15   that's important.

17:06:01   16        Q.    So the width as in --

           17        A.    Think of --

17:06:04   18        Q.    -- an X axis?

17:06:04   19        A.    Think of a slot.  So air coming out of a

17:06:08   20   slot, which would be coming out the edge of the

17:06:11   21   blanket.

17:06:13   22        Q.    What would -- is it the hydraulic width

17:06:16   23   or -- or --

17:06:18   24              Like what's the width of -- of the air

17:06:20   25   coming out of this slot here, this air, or

303

17:06:24   1   these -- or these slots over here, the air supply?

17:06:29   2        A.   If one looked at an individual slot, it

17:06:31   3   would be about a half inch.

17:06:32   4        Q.   A half inch?

17:06:33   5        A.   Yeah, for -- for an individual slot.

17:06:36   6        Q.   So you're looking at the width, not the

17:06:38   7   length.

17:06:38   8        A.   Yes.

17:06:39   9        Q.   Okay.  And you're saying when you move the

17:06:45   10  temperature -- or the -- the measurement device, you

17:06:51   11  moved it up and down one inch; correct?

17:06:53   12       A.   Moved it up and down sufficient to -- to map

17:06:56   13  out the approximate width of the jet to be about one

17:06:59   14  inch.

17:06:59   15       Q.   And did --

17:07:00   16            How did you measure that?

17:07:01   17       A.   Just by monitoring the velocities,

17:07:04   18  primarily, as I was moving the probe up and down.

17:07:08   19       Q.   Okay.  So you did it by looking at it by

17:07:09   20  eye.  You didn't get a measurement you needed to

17:07:15   21  scale.

17:07:15   22       A.   No.  No.

17:07:16   23       Q.   Okay.  So -- so it's your -- it's your

17:07:18   24  testimony today that the width of the air coming out

17:07:22   25  of the Bair Hugger blanket three inches from the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

304

17:07:25  1    blanket is only one inch.

17:07:27  2         A.    Again, that was the representative

17:07:30  3    measurement I took to try to put a reasonable value

17:07:34  4    into this Archimedes equation.

17:07:37  5         Q.    Okay.  Have you looked at other areas of how

17:07:41  6    to calculate the length, what other people use in the

17:07:46  7    field?

17:07:46  8              MR. GOSS:  The width or length?

17:07:47  9              MR. ASSAAD:  The width, so L.

17:07:51  10        A.    Typically, for a -- a slot, it -- it's

17:07:55  11   always the width.

17:07:56  12        Q.    You do understand, when you're looking at

17:07:59  13   air jets, length is the distance of how far the air

17:08:07  14   pene -- jets out from the hole in a perpen -- like a

17:08:13  15   perpendicular -- if the hole is -- parallel to the

17:08:16  16   hole; correct?

17:08:17  17        A.    Again, the Archimedes number is the ratio of

17:08:20  18   Reynolds number and Grashof number.

17:08:22  19        Q.    I understand that.  But when --

17:08:25  20              If you look at other studies, as you look at

17:08:27  21   act -- the Handbook of Fundamentals, Chapter 20, did

17:08:31  22   you actually go and look at it?

17:08:33  23        A.    I don't believe I did.  Well act --

17:08:35  24   actually, I may have done that to get this Archimedes

17:08:37  25   equation.  I think I referenced that here.

305

17:08:39  1      Q.   And did you look at what they -- when they

17:08:43  2   used L, what they were referring to?

17:08:48  3      A.   I don't, again, recall that level of detail.

17:08:52  4      Q.   Well that's kind of an important detail to

17:08:54  5   know what numbers to put into the equation; isn't it?

17:08:56  6      A.   Again, this is a ratio of Reynolds number to

17:08:59  7   Grashof number where L is the same for both.

17:09:03  8      Q.   Well L is very important when it comes to

17:09:06  9   calculating the numerator here; correct?

17:09:08  10     A.   Yes.

17:09:09  11     Q.   Because if L increases, your Archi -- your

17:09:10  12  Archimedes numbers increase; correct?

17:09:13  13     A.   Yes.

17:09:13  14     Q.   Okay.  And if your delta T increases, your

17:09:16  15  Arch -- Archimedes number increases; correct?

17:09:19  16     A.   Yes.

17:09:19  17     Q.   Okay.  These are important numbers; correct?

17:09:21  18     A.   Yes.

17:09:21  19     Q.   And ambient you used -- you used 70 degrees.

17:09:30  20  Why is that?

17:09:32  21     A.   I was trying to estimate the value of the

17:09:34  22  Archimedes number and determine if it's near one, much

17:09:40  23  larger than one, or much less than one to determine if

17:09:43  24  the force convection or natural convection was

17:09:47  25  dominant, so I wasn't paying too much attention to the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

306

17:09:49  1  absolute numbers here and the precision of the

17:09:51  2  numbers.

17:09:51  3      Q.   So you're saying these numbers aren't

17:09:53  4  precise?

17:09:54  5      A.   They're not very precise, they're -- they're

17:09:56  6  estimates.

17:09:56  7      Q.   Okay.

17:09:57  8      A.   Order -- order-of-magnitude estimates.

17:09:59  9      Q.   Okay.  So if length increases or the delta T

17:10:01  10  increases, you could actually get an Archimedes number

17:10:06  11  greater than one.

17:10:08  12      A.   Yes.

17:10:34  13          THE REPORTER:  Let's take a five, please.

17:10:36  14  Off the record.

17:21:09  15          (Recess taken.)

17:21:09  16  BY MR. ASSAAD:

17:21:12  17      Q.   2013 ASHRAE Handbook Fundamentals, Chapter

17:21:16  18  20, what is that titled?

17:21:19  19      A.   I -- I don't remember offhand the exact

17:21:23  20  title.

17:21:23  21      Q.   Is it titled "Space Air Diffusion?"

17:21:26  22      A.   It sounds correct.

17:21:27  23      Q.   Okay.  And do you understand what a

17:21:33  24  hydraulic diameter is?

17:21:34  25      A.   Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

307

| 17:21:35 | 1 | Q. What's a hydraulic diameter? |

17:21:37  2      A.   It's the area divided by the perimeter.

17:21:43  3      Q.   Okay.  And -- and that's for a square;

17:21:49  4   correct?  Or a rectangle.

17:21:51  5      A.   For any -- any flow area.

17:21:53  6      Q.   Okay.  And would you agree that, according

17:21:55  7   to Chapter 20, that L should be -- is equal to the

17:22:02  8   length scale of the diffuser outlet equal to the

17:22:06  9   hydraulic diameter of the outlet?

17:22:07  10      A.   I guess that seems reasonable.

17:22:12  11      Q.   Okay.  Is that --

17:22:13  12           Did you calculate the hydraulic diameter?

17:22:15  13      A.   Not of the Bair Hugger blanket, no.

17:22:17  14      Q.   Okay.  So you agree with me if that's the

17:22:20  15   correct definition of what L should be, the number you

17:22:24  16   used is incorrect.

17:22:26  17      A.   Again, I was just trying to get a rough

17:22:29  18   order-of-magnitude estimate of the ratio between the

17:22:31  19   buoyant force and the inertia force.

17:22:36  20      Q.   That wasn't my question.

17:22:38  21      A.   So if I have misread the definition of L,

17:22:45  22   then so be it.

17:22:46  23      Q.   So these numbers are incorrect.

17:22:49  24      A.   They could be not entirely accurate.

17:22:52  25      Q.   Well if something --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

308

| | | |
|---|---|---|
| 17:22:53 | 1 | I mean engineering is a profession of |
| 17:22:56 | 2 | accuracy when it comes to calculations; correct? |
| 17:22:58 | 3 | A.   Yes. |
| 17:23:00 | 4 | Q.   Okay.  And if you used the wrong formula to |
| 17:23:01 | 5 | calculate -- or if you used the wrong definition of -- |
| 17:23:06 | 6 | of length to calculate the Archimedes number, then the |
| 17:23:09 | 7 | Archimedes number is incorrect. |
| 17:23:11 | 8 | A.   So the number I have here may be incorrect, |
| 17:23:13 | 9 | yes. |
| 17:23:14 | 10 | Q.   Okay.  And the delta T, that 75 degrees for |
| 17:23:27 | 11 | delta T is the difference between -- is -- is the |
| 17:23:33 | 12 | temperature you measured in Exhibit B; correct? |
| 17:23:39 | 13 | Seventy-five degrees. |
| 17:23:39 | 14 | A.   Yes, it is. |
| 17:23:41 | 15 | Q.   And let me ask you another question:  Delta |
| 17:23:44 | 16 | T, according to your definition, is the temperature |
| 17:23:46 | 17 | difference between the jet and ambient; correct? |
| 17:23:48 | 18 | A.   Yes. |
| 17:23:48 | 19 | Q.   And then in the denominator you're supposed |
| 17:23:54 | 20 | to go temperature ambient times velocity square; |
| 17:23:58 | 21 | correct? |
| 17:23:58 | 22 | A.   Yes. |
| 17:23:59 | 23 | Q.   And you used two different temperatures for |
| 17:24:01 | 24 | ambient here; isn't that correct?  One is 66, the |
| 17:24:06 | 25 | other is 70. |

309

17:24:09  1      A.   Yes.  Because the temperature in the

17:24:12  2  denominator I took to be the -- the mean of the two,

17:24:15  3  the -- the jet temperature of 75 and the room

17:24:17  4  temperature of 66.

17:24:18  5      Q.   Well isn't the room temperature the ambient

17:24:21  6  temperature?

17:24:21  7      A.   I guess one -- one -- one could use that

17:24:25  8  definition, yes.

17:24:26  9      Q.   Well --

17:24:27  10      A.   It's --

17:24:28  11      Q.   -- it's your definition here, doctor.

17:24:30  12      A.   Yes.

17:24:30  13      Q.   T ambient is the mean absolute temperature

17:24:33  14  of the jet and its surroundings.

17:24:35  15      A.   Yes.

17:24:35  16      Q.   Okay.  And how did you calculate 70?

17:24:39  17      A.   Seventy was -- was an estimate, as I said,

17:24:43  18  between the 75 we measured and the 66 we measured.

17:24:46  19      Q.   Okay.  And -- and the 460 is just to make it

17:24:51  20  absolute; correct?

17:24:52  21      A.   That's correct.

17:24:56  22      Q.   So if you would --

17:24:57  23           Would you agree with me that the hydraulic

17:25:00  24  diameter of the Bair Hugger blanket is much larger

17:25:02  25  than one inch?  Correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

310

17:25:05  1    A.   For --

17:25:05  2         MR. GOSS:  Object to form.

17:25:06  3    A.   For the blanket, yes.

17:25:07  4    Q.   Okay.

17:25:09  5    A.   For the entire blanket.

17:25:10  6    Q.   Okay.  So you would agree with me that if

17:25:15  7  you actually used the hydraulic temperature of the

17:25:18  8  blanket, that that would significantly increase the

17:25:23  9  Archimedes number.

17:25:26  10   A.   Say that again.

17:25:26  11   Q.   If you used the actual hydraulic temper --

17:25:30  12  hydraulic diameter of the blanket, that would

17:25:34  13  significantly increase the Archimedes number; correct?

17:25:37  14   A.   It would change it from the value of one

17:25:39  15  inch I used to perhaps 10, 15 inches.

17:25:44  16   Q.   Ten, 15 inches.

17:25:46  17        What's the dimension of the Bair Hugger

17:25:47  18  blanket?

17:25:47  19   A.   I'm -- I'm talking about an edge -- one of

17:25:50  20  the edges of the blanket since the air is blowing

17:25:52  21  different directions on different edges.

17:25:54  22   Q.   Well you can't use an edge because you're

17:25:56  23  looking at area divided by perimeter; correct?  An

17:26:00  24  edge doesn't have an area.

17:26:01  25   A.   But the air is coming out between the --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

311

17:26:04  1   what I'll call the blanket over the Bair Hugger

17:26:07  2   blanket and the Bair Hugger blanket itself along an

17:26:10  3   edge someplace.

17:26:14  4        Q.   You don't know what the Arch --

17:26:16  5             You don't know what the length is; do you?

17:26:20  6   You're just using a number.

17:26:21  7        A.   I can estimate it based on the dimensions of

17:26:23  8   the blanket.

17:26:23  9        Q.   What are the dimensions of the blanket?

17:26:26  10       A.   I -- I could hazard a guess.  I don't know

17:26:28  11  the exact numbers.

17:26:29  12       Q.   Okay.  So sitting here today, you agree with

17:26:35  13  me that based on the definition provided by the ASHRAE

17:26:38  14  Handbook of Fundamentals as to what length is supposed

17:26:40  15  to be, that the numbers that you have given for the

17:26:44  16  Archimedes number is incorrect.

17:26:47  17       A.   That appears to be the case.

17:26:55  18       Q.   Let's go to Exhibit C of your report.

17:27:13  19  Exhibit C is titled "Calculation of potential particle

17:27:16  20  removal between the bottom of the Bair Hugger and the

17:27:19  21  floor which would also be the case when the Bair

17:27:22  22  Hugger is sitting on a cart with a flat top."  Did I

17:27:24  23  read that correctly?

17:27:25  24       A.   That's correct.

17:27:25  25       Q.   And you are calculating the forces needed to

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

312

17:27:38  1  basically move a particle that's on a floor; correct?

17:27:43  2      A.   On a flat surface, yes.

17:27:45  3      Q.   On a flat surface.  Okay.

17:27:47  4           Do you know whether or not Corn and Stein

17:27:50  5  were looking at -- strike that.

17:28:05  6           Did you actually read the article that was

17:28:16  7  authored by Corn and Stein in 1965?

17:28:19  8      A.   I don't believe I did, no.

17:28:20  9      Q.   You just looked at the diagram; didn't you?

17:28:22  10      A.   In the textbook by Hinds, yes.

17:28:24  11      Q.   Okay.  And they're talking about what force

17:28:30  12  would be required to begin to basically move a

17:28:34  13  particle on a flat surface; correct?

17:28:35  14      A.   Yes.

17:28:36  15      Q.   And the forces is --

17:28:40  16           Do you know what the direction of the force

17:28:41  17  was?

17:28:43  18      A.   Force would have to be horizontal to the

17:28:46  19  surface.

17:28:47  20      Q.   Okay.  So parallel with the surface;

17:28:49  21  correct?

17:28:49  22      A.   Yes.

17:28:49  23      Q.   Okay.  So that's not this case here; is it?

17:28:53  24  There's a vertical component of that force; correct?

17:28:55  25      A.   Could you clarify "vertical component?"

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

313

17:29:03  1       Q.   Well, you have a particle on -- on the

17:29:06  2   surface; correct?

17:29:06  3       A.   Yes.

17:29:07  4       Q.   And you have a velocity of air going against

17:29:11  5   gravity up; correct?  So there's a force, a suction

17:29:17  6   force on the particle; correct?

17:29:19  7       A.   I think it's strictly a -- a shear-force

17:29:22  8   issue where the flow is blowing parallel to the

17:29:25  9   surface the particle is attached to.

17:29:29  10      Q.   So you don't think that the upward force has

17:29:32  11  any effect on whether or not a particle is going to

17:29:35  12  move with a certain amount of force?

17:29:37  13      A.   I --

17:29:38  14           My understanding of this data, it's based on

17:29:40  15  a horizontal --

17:29:41  16      Q.   I under -- I understand that.

17:29:44  17      A.   Uh-huh.

17:29:44  18      Q.   But we're not just looking at a horizontal

17:29:47  19  force with the -- with the effect of a Bair Hugger

17:29:49  20  sucking in air from the floor; correct?

17:29:51  21      A.   If we're looking at particles attached to a

17:29:54  22  horizontal surface, there is no vertical velocity at

17:29:57  23  the surface.

17:29:58  24      Q.   Of the particle; correct?

17:29:59  25      A.   And the surface.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

314

17:30:00    1        Q.    And the surface.  But there's a -- there's

17:30:02    2    a -- there's a force -- there's a force that's -- that

17:30:13    3    the Bair Hugger is exerting on the particles, which is

17:30:15    4    an upward force from suction.

17:30:18    5        A.    If you're talking about a particle attached

17:30:21    6    to a surface, --

17:30:21    7        Q.    Yes.

17:30:22    8        A.    -- I -- I disagree with that.

17:30:25    9        Q.    Okay.  So you're saying all the -- when --

17:30:29   10    when a --

17:30:30   11            When a Bair Hugger is turned on and it's on

17:30:31   12    the floor and it's -- it is .626 inches above the

17:30:43   13    floor, that the force it exerts on the particle is

17:30:45   14    only horizontal?

17:30:46   15        A.    I'm looking at the most likely scenario to

17:30:50   16    dislodge particles attached to the surface.

17:30:53   17        Q.    Now what was the point of you performing

17:30:56   18    this calculation?

17:30:56   19        A.    I was responding to -- I believe it was

17:31:04   20    Koenigstofer's report.

17:31:07   21        Q.    What part of his report?

17:31:09   22        A.    Re -- report where he said --

17:31:13   23            If I could go back to my report here.  On

17:31:33   24    page nine of Exhibit 1 there's items two and three.

17:31:45   25    "The Bair Hugger draws particles off the floor into

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

315

17:31:48  1  the unit.  It functions much like a household vacuum

17:31:52  2  cleaner," and number three, "The air velocity at the

17:31:53  3  floor under the Bair Hugger is sufficient to entrain

17:31:55  4  particles from the floor."

17:31:57  5       Q.    Okay.  But with respect to Dr. Elghabashi's

17:32:01  6  report, this -- this Exhibit C has nothing to do with

17:32:04  7  his report; correct?

17:32:05  8       A.    He's not assuming particles are attached to

17:32:08  9  the floor.  They're in a volume.

17:32:12  10      Q.    So you agree with me that Exhibit C, the

17:32:16  11 calculations in this report, has nothing to do with

17:32:18  12 Dr. Elghabashi's report; correct?

17:32:21  13      A.    That's correct.

17:32:23  14      Q.    And it seems here that you calculated the

17:32:35  15 area for a cylinder; correct?  The outside area of the

17:32:40  16 cylinder, not the --

17:32:42  17      A.    For a sphere.

17:32:43  18      Q.    Huh?  For a sphere?

17:32:45  19      A.    Yes.

17:32:47  20            Where -- where are you looking at?

17:32:48  21      Q.    Part of Exhibit C.  Under A.

17:33:02  22      A.    Oh, under A.

17:33:03  23      Q.    PiDH.

17:33:05  24      A.    Yes, that -- that's the -- the cylindrical

17:33:09  25 passage between the edge of the filter and the bottom

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

316

17:33:13  1   of the -- I think it was a 505 Bair Hugger model and

17:33:17  2   the edge of the case.  That was the --

17:33:22  3       Q.   And -- and PiDH is the calculation -- the

17:33:25  4   calculation of the area of a sphere -- or of a -- of a

17:33:29  5   cylinder; correct?

17:33:29  6       A.   Yes.

17:33:29  7       Q.   Okay.  Not a sphere.

17:33:31  8       A.   Yes.

17:33:32  9       Q.   Okay.  And for the velocity of 27 CFM, where

17:33:40  10  did you get that number from?

17:33:41  11      A.   I believe that was provided by counsel.

17:33:45  12      Q.   They actually gave you 27 CFM for the 505?

17:33:50  13      A.   I believe that was correct.

17:33:51  14      Q.   And so you relied upon that number; correct?

17:33:53  15      A.   Yes.

17:33:54  16      Q.   Is there any document they provided to you

17:33:56  17  to give you that number?

17:33:57  18      A.   There -- there may have been.  I -- I cannot

17:34:01  19  recall.

17:34:01  20      Q.   In Exhibit E, what were you look -- what

17:34:07  21  document in here did you use to rely on that 27 CFM?

17:34:12  22      A.   Exhibit D?

17:34:13  23      Q.   E.

17:34:13  24      A.   Oh, E.

17:34:14  25      Q.   Under "Materials Considered."

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

317

17:34:28  1       A.    I don't -- I don't think it was a document,

17:34:30  2  it was probably discussion with -- with counsel.

17:34:32  3       Q.    So when I asked you are there any facts that

17:34:35  4  you relied upon from counsel and you told me "no"

17:34:38  5  earlier in this deposition, that wasn't correct.

17:34:40  6       A.    Apparently you -- you found one that was not

17:34:42  7  in my list.

17:34:43  8       Q.    Any other facts or -- or information that is

17:34:47  9  in your report that you obtained from counsel and you

17:34:51  10  rely upon?

17:34:52  11      A.    Not that I can think of offhand.

17:34:54  12      Q.    And with respect to Fig. 6.4 of Exhibit C,

17:34:58  13  do you know what type of floor or -- or the surface

17:35:01  14  that the glass beads were on?

17:35:06  15      A.    Fig. 6.4, those are smooth surfaces.

17:35:09  16      Q.    Okay.  Do you know what the surface is like

17:35:11  17  in an operating room?

17:35:12  18      A.    It's, I would assume, not as smooth as the

17:35:17  19  surface as used for these measurements.

17:35:18  20      Q.    And that would change --

17:35:20  21            And -- and when the surface is not smooth,

17:35:22  22  the adhesion force is less; correct?

17:35:24  23      A.    It's more.

17:35:25  24      Q.    More?

17:35:25  25      A.    Yes.  Because there's more contact areas

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

318

17:35:28  1  between the particles and the surface.

17:35:30  2      Q.  When it's smooth or not smooth?

17:35:34  3      A.  When it's not smooth.

17:35:36  4      Q.  More contact --

17:35:36  5      A.  Yes.

17:35:37  6      Q.  -- with the sphere and the surface?

17:35:39  7      A.  Yes, because of the irregularities in the

17:35:42  8  surface.

17:35:43  9      Q.  You have facilities at the University of

17:36:47  10 Minnesota to test the Bair Hugger filtration; correct?

17:36:49  11     A.  There probably are.  But as I said, I'm a

17:36:53  12 retired faculty member and do not really have access

17:36:56  13 to that.

17:36:57  14     Q.  Okay.  But you have colleagues that have

17:37:01  15 access to it; correct?

17:37:03  16     A.  Yes.

17:37:04  17     Q.  Did you ask any of them to -- to do an

17:37:07  18 efficiency testing on the filter?

17:37:08  19     A.  No, I have not.

17:37:12  20     Q.  And you have a clean room in the University

17:37:26  21 of Minnesota?

17:37:26  22     A.  Actually, two.

17:37:28  23     Q.  Two.

17:37:28  24     A.  Yes.  One in the Electrical Engineering

17:37:31  25 Building that was built in the, I think, mid-'80s, and

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

319

17:37:34    1    there's a newer one in the -- it's actually a new

17:37:37    2    physics building.

17:37:41    3         Q.    And they're both still working?

17:37:43    4         A.    As far as I know, yes.

17:37:45    5         Q.    And you've used before neutrally buoyant

17:38:05    6    helium bubbles in your -- in your testing; correct?

17:38:08    7         A.    I have, yes.

17:38:09    8         Q.    And that's a -- a reasonable methodology to

17:38:13    9    follow an airflow; correct?

17:38:14   10         A.    For low-velocity airflows, yes, in -- in

17:38:20   11    room environments.

17:38:20   12         Q.    In a what?

17:38:20   13         A.    In room environments.

17:38:20   14         Q.    Such as an operating room?

17:38:21   15         A.    I would think so, yes.

17:38:23   16         Q.    Okay.  Do you know whether or not the Bair

17:38:36   17    Hugger filters have binders in them, uses binders?

17:38:39   18         A.    I do not know for certain, but I would

17:38:41   19    assume they did.

17:38:43   20         Q.    But you would be guessing.

17:38:44   21         A.    I would be guessing.

17:38:48   22         Q.    Go to page four of your report.  And -- and

17:39:01   23    with respect to the filter testing, do you know if 3M

17:39:03   24    has asked anyone at the University of Minnesota to do

17:39:08   25    any filter efficiency tests?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

320

17:39:11  1      A.   Regarding the Bair Hugger?

17:39:12  2      Q.   Yes.

17:39:13  3      A.   Not that I'm aware of.

17:39:16  4      Q.   So looking at the diagram of impaction, it

17:39:21  5  states, "Impaction occurs when the momentum of a large

17:39:24  6  particle causes it to deviate from a streamline and

17:39:26  7  collide with a filter fiber..."  Did I read that

17:39:29  8  correctly?

17:39:29  9      A.   Yes.

17:39:29  10     Q.   Okay.  We talked about this earlier;

17:39:31  11  correct?

17:39:31  12     A.   Yes.

17:39:32  13     Q.   Okay.  So looking at this picture here,

17:39:35  14  that -- would you consider that deviation of a

17:39:37  15  streamline significant?

17:39:38  16     A.   Yes.

17:39:40  17     Q.   Okay.

17:39:40  18     A.   Uh-huh.

17:39:50  19     Q.   Then if you go to page five, do you agree

17:40:00  20  that, based on page five, any particle size greater

17:40:03  21  than one micron, that its primary source of filtration

17:40:08  22  is impaction?

17:40:10  23     A.   I think that's -- as --

17:40:13  24          As the figure indicates here, that would be

17:40:14  25  correct.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

321

17:40:14  1      Q.   Okay.  Would that indicate that particles

17:40:25  2  over one micron rarely follow air streams unless the

17:40:29  3  air stream is not changing?

17:40:32  4      A.   Well with -- within the filtration media,

17:40:35  5  they do not follow the streamlines.

17:40:39  6      Q.   And that would --

17:40:41  7           I mean if they don't follow the streamlines,

17:40:44  8  then the filtration media --

17:40:45  9           If there's a change in the streamline in the

17:40:47  10  regular environment, inertia is going to cause it to

17:40:50  11  deviate from the streamline; correct?

17:40:51  12      A.   As I said before, it depends on the

17:40:53  13  magnitude of the acceleration perpendicular to the

17:40:57  14  direction of flow.

17:40:58  15      Q.   And as well as how intense the turbulence

17:41:02  16  is; correct?

17:41:03  17      A.   Yes.

17:41:10  18      Q.   Do you think it's possible to use a HEPA

17:41:27  19  filter in the Bair Hugger 775?

17:41:31  20      A.   I would say yes, it's possible.

17:41:33  21      Q.   But sitting here today you don't think it's

17:41:40  22  necessary.

17:41:41  23      A.   I do not, no.

17:41:50  24           (Discussion off the stenographic record.)

17:41:57  25      Q.   But since the Mistral and WarmAir uses a

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

322

17:42:02  1  HEPA filter, there should be no reason from an

17:42:05  2  engineering standpoint that a HEPA filter cannot be

17:42:07  3  used in the Bair Hugger; correct?

17:42:08  4        MR. GOSS:  Objection to form.

17:42:09  5     A.  There are a lot of other variables to

17:42:12  6  consider; you know, the flow rate, the motor size,

17:42:15  7  leakage issues.  There would have to be some redesign.

17:42:18  8     Q.  Of course you have to change the motor.  You

17:42:20  9  need a more powerful motor; correct?

17:42:23  10    A.  Yes.

17:42:27  11    Q.  You write on paragraph nine -- or page nine,

17:42:47  12 the first paragraph, "The Bair Hugger's incorporation

17:42:49  13 of a MERV 14 filter -- the same minimum filtration

17:42:53  14 level that ASHRAE recommends for air supplied to

17:42:55  15 operating rooms -- provides additional protection from

17:42:59  16 airborne bacteria for patients undergoing surgery."

17:43:03  17       What basis do you have that the filter

17:43:06  18 that's used in the Bair Hugger provides additional

17:43:08  19 protection from airborne bacteria for patients

17:43:11  20 undergoing surgery?

17:43:12  21    A.  So I was referring to the filter in the

17:43:17  22 incoming air into the operating room itself being

17:43:20  23 filtered, as we've talked about, twice, the prefilter

17:43:25  24 and -- and the final filter, and then that air going

17:43:28  25 through a third filter, really, through -- through the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

323

17:43:30    1    Bair Hugger.

17:43:32    2        Q.    And you don't think that air picks up any

17:43:34    3    bacteria or -- or -- or particles between the HVAC

17:43:39    4    system as it goes over the patient and the surgical

17:43:42    5    staff?

17:43:44    6        A.    It certainly could and probably does.

17:43:45    7        Q.    You -- you really have no basis for that

17:43:47    8    statement; isn't that correct?

17:43:48    9              MR. GOSS:  Objection, form, argumentative.

17:43:49   10        Q.    It's pure speculation; correct?

17:43:51   11              MR. GOSS:  Object to form.

17:43:58   12        A.    Again, I was referring to the secondary --

17:44:00   13    the filtration after the filter -- filtered air

17:44:05   14    entering the room.

17:44:05   15        Q.    So you have a fil -- air coming out after

17:44:08   16    it's been filtered twice, and it picks up a lot of

17:44:11   17    junk by the time it gets to the floor, and the Bair

17:44:15   18    Hugger filters that, you consider that additional

17:44:17   19    filtration?

17:44:17   20        A.    Yes.

17:44:18   21        Q.    Okay.

17:44:18   22        A.    Uh-huh.

17:44:19   23        Q.    Okay.  Additional protection?

17:44:20   24        A.    It's removing particles from the air, yes.

17:44:23   25        Q.    Well why do you consider it to have

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

324

17:44:26　1　additional protection from the airborne bacteria for

17:44:30　2　patients undergoing surgery?  What's additional?

17:44:33　3　　　A.　It -- it's -- it's an additional removal

17:44:35　4　mechanism of particles in the OR.

17:44:38　5　　　Q.　Why were you concerned about the particles

17:44:41　6　on the floor or below the operating room table?

17:44:43　7　　　A.　Again, they -- they could be transported to

17:44:46　8　the surgical site for some reason.

17:44:48　9　　　Q.　Such as use of the Bair Hugger?

17:44:51　10　　　MR. GOSS:  Object to form.

17:44:52　11　　　Q.　Maybe; correct?

17:44:53　12　　　A.　Well, possibly.

17:44:55　13　　　MR. GOSS:  Calls for speculation.

17:46:02　14　　　Q.　Are you aware that --

17:46:04　15　　　You've read Michael Buck's report; correct?

17:46:06　16　　　A.　Yes.

17:46:06　17　　　Q.　And he conducted some of those tests in the

17:46:08　18　clean room at the University of Minnesota.  Are you

17:46:10　19　aware of that?

17:46:11　20　　　A.　Yes.

17:46:11　21　　　Q.　Have you ever used that clean room?

17:46:14　22　　　A.　I have, actually.  I -- I think so.

17:46:15　23　　　Q.　Okay.  The small one, it's like on the

17:46:18　24　bottom floor of a building.

17:46:19　25　　　A.　Yeah, the basement floor of the Boynton

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

325

17:46:24   1   Health Service Building.

17:46:25   2        Q.   Okay.  When was the last time you used that?

17:46:27   3        A.   Probably early '90s.

17:46:30   4        Q.   Okay.  Do you disagree with his report that

17:46:41   5   when the Bair Hugger was turned on, that there was an

17:46:44   6   increase in particles found in the clean room

17:46:47   7   irregardless of size?

17:46:49   8        A.   I would have to look at his report.

17:46:52   9        Q.   Well you've criticized his report, so do you

17:46:57  10   have the report with you today?

17:46:58  11        A.   I did not bring it, no.

17:47:00  12        Q.   Okay.

17:47:04  13        A.   By the way, I -- I was not provided the

17:47:10  14   tableted results until Friday.  All I was able to

17:47:12  15   comment on was his plots up to -- up to Friday.

17:47:16  16        Q.   So on Friday you also received his -- his --

17:47:20  17   his results, his numerical results; correct?

17:47:22  18        A.   Yes.  Yes.

17:47:23  19        Q.   Do you agree, based on what you've seen on

17:47:25  20   Friday, that there was an increase in particles when

17:47:28  21   the Bair Hugger was turned on?

17:47:29  22        A.   Again, I'd have to go back and look at

17:47:31  23   the -- look at the data.

17:47:32  24        Q.   Okay.  Do you know who Andy Streifel is?

17:47:37  25        A.   I do.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

326

17:47:40  1    Q.   We talked about that before; right?

17:47:40  2    A.   Yes.

17:47:40  3    Q.   Do you know what he does for a living?

17:47:42  4    A.   He's basically a hospital infection-control

17:47:45  5  specialist.

17:47:46  6    Q.   Environmentalist; correct?

17:47:47  7    A.   Yes.

17:47:48  8    Q.   Okay.  And he goes around testing air

17:47:51  9  quality in hospital rooms; correct?

17:47:52  10   A.   Yes.

17:47:53  11   Q.   Do you agree he's an expert in that field?

17:47:55  12   A.   Yes.

17:48:04  13   Q.   Have you read an article authored by Ativan?

17:48:08  14   A.   I --

17:48:09  15        MR. GOSS:  Avidan?

17:48:10  16        MR. ASSAAD:  Avidan, yes.

17:48:12  17   A.   I do not recall that I have.

17:48:15  18   Q.   Do you believe a filter is required on the

17:48:41  19  Bair Hugger device?

17:48:43  20        MR. GOSS:  Objection, vague.

17:48:47  21   A.   I would -- I would say it certainly makes

17:48:50  22  intuitive sense to include a filter, yeah.

17:48:53  23   Q.   Why?

17:48:56  24   A.   Several reasons.  You want to --

17:48:58  25   Q.   Well for -- forget about --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

327

17:48:59  1         I'm talking with respect to patient safety.

17:49:01  2   I understand that every motor needs a filter in front

17:49:04  3   of it so you don't destroy the motor, like most cars

17:49:08  4   do and everything like that.

17:49:09  5         A.   Right.

17:49:10  6         Q.   Okay.  Forget the reasons for protection of

17:49:12  7   the device.  Do you believe that it needs a filter to

17:49:15  8   protect contamination of the operating room?

17:49:19  9         A.   It would certainly help protect the -- or

17:49:24  10  ensure the air leaving the blanket is -- is -- has

17:49:30  11  lower concentrations than if the filter was not there.

17:49:34  12        Q.   Do you believe that the blanket can

17:49:36  13  prevent --

17:49:40  14        Is there anything within the blanket that

17:49:42  15  protects bacteria from coming out of the -- the

17:49:45  16  perforations?

17:49:47  17        A.   Because the blanket is made of a

17:49:50  18  non-metallic -- I'm not sure the exact material, and

17:49:54  19  there's a large surface area within the blanket, I

17:49:57  20  would think there would be some -- some deposits

17:49:59  21  within the blanket itself before the particle leaves

17:50:02  22  the holes, yes.

17:50:03  23        Q.   Okay.  But some particles will leave the

17:50:05  24  holes.

17:50:06  25        A.   Some particles will leave the holes, yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

328

17:50:08  1     Q.    And some of that will contain bacteria;

17:50:10  2  correct?

17:50:10  3     A.    Most likely, yes.

17:50:11  4     Q.    Okay.

17:50:12  5     A.    Uh-huh.

17:50:48  6           MR. ASSAAD:  At this time, doctor, I have no

17:50:49  7  more questions.  I think your counsel might have some

17:50:52  8  questions.

17:50:54  9           Thank you.

17:50:55  10          THE WITNESS:  You're welcome.

17:50:57  11          MR. ASSAAD:  Oh.  Before I forget, I'm going

17:51:00  12  to leave this deposition open based on his notes, his

17:51:04  13  30-page notes we may receive, as well as the photos

17:51:07  14  that -- we requested some of the photos he's also

17:51:11  15  received from you.

17:51:12  16          MR. GOSS:  All right.  I have a few

17:51:13  17  questions.

17:51:15  18          THE REPORTER:  Let's go off the record a

17:51:17  19  moment, please.

          20          (Discussion off the record.)

17:54:46  21               REDIRECT EXAMINATION

17:54:48  22  BY MR. GOSS:

17:54:49  23     Q.    Dr. Kuehn, you were asked questions about

17:54:52  24  notes that you had in connection with your work on

17:54:56  25  this case.  Do you recall that testimony?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

329

17:55:00    1    A.    Yes, I do.

17:55:05    2          (Discussion off the stenographic record.)

17:55:06    3    Q.    All right.  And those notes included some of

17:55:13    4    the calculations that are reflected in your report;

17:55:15    5    correct?

17:55:15    6    A.    Yes.  They were the preliminary calculations

17:55:18    7    I did that ended up in the report.

17:55:19    8    Q.    Okay.  And those notes also included notes

17:55:22    9    on conversations that you had with me; correct?

17:55:25   10    A.    Yes.

17:55:25   11    Q.    All right.  Is there anything substantive in

17:55:30   12    those notes, setting aside the notes on conversations

17:55:35   13    you had with me, is there any -- any substance in

17:55:38   14    those notes that -- different from or in addition to

17:55:41   15    what ended up in your report?

17:55:43   16    A.    Nothing substantive, no.

17:55:46   17    Q.    Okay.  If you would turn to your report,

17:55:51   18    please, Exhibit 1, and in particular let's look at

17:56:02   19    Exhibit B, which is the document -- or it's the

17:56:10   20    exhibit entitled "3M Lab Measurements," and I believe

17:56:19   21    you testified earlier that -- that it was your idea to

17:56:23   22    take some measurements of temperature and velocity

17:56:28   23    coming from the -- from a setup Bair Hugger; is that

17:56:32   24    right?

17:56:32   25    A.    That's correct.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

330

17:56:32   1      Q.   All right.  Why did you want to do that?

17:56:34   2      A.   I wanted to have first-hand experience

17:56:37   3   rather than relying on second- or third-hand

17:56:40   4   information.

17:56:41   5      Q.   Okay.  And what --

17:56:42   6           Why did you want the information?  What was

17:56:45   7   it about the information that was pertinent to your

17:56:49   8   work in the formulation of your opinions?

17:56:51   9      A.   It was primarily the velocity both leaving

17:56:54   10   the Bair Hugger blanket and near the filter or the

17:56:58   11   intake of the Bair Hugger to address the issues of

17:57:01   12   particle dislodgement and -- and the -- where the air

17:57:05   13   would go once leaving the blanket.

17:57:07   14      Q.   Okay.  And if you'll look at that first page

17:57:15   15   of the exhibit, these are the measurements that were

17:57:18   16   taken three inches from the blanket edge where the

17:57:24   17   picture is shown; is that right?

17:57:25   18      A.   That's correct.

17:57:26   19      Q.   All right.  And if you compare from a

17:57:34   20   velocity standpoint the numbers for that measurement

17:57:41   21   to the -- the numbers taken in other places, can you

17:57:49   22   comment on any differences there in terms of the

17:57:53   23   velocity?

17:57:55   24           MR. ASSAAD:  Objection, vague.

17:57:57   25      Q.   I guess what I would ask you is:  What does

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

331

17:58:02    1    the -- the first page of the exhibit show you in terms

17:58:06    2    of the velocity relative to velocity measurements

17:58:09    3    elsewhere around --

17:58:11    4          MR. ASSAAD: Objection, vague.

17:58:13    5       Q. -- elsewhere around the setup that's

17:58:16    6    depicted here?

17:58:17    7          MR. ASSAAD: Objection, vague and leading.

17:58:20    8       A. I was looking at the -- the --

17:58:24    9          The question arose as what impact the

17:58:27   10    velocity would have leaving the Bair Hugger blanket on

17:58:31   11    the surgical site, air movement through the surgical

17:58:35   12    site, so I was looking at velocities leaving the

17:58:38   13    blanket, as best as I can measure with the setup

17:58:41   14    provided, and determine that these -- these velocities

17:58:47   15    were -- near the blanket were -- were quite high, but

17:58:51   16    then they diminished rapidly as the air mixed with air

17:58:54   17    in the room.

17:58:54   18       Q. Okay. You testified earlier about your

17:59:00   19    efforts to measure the width of the jet from the Bair

17:59:06   20    Hugger blanket. Do you recall that testimony?

17:59:07   21       A. Yes.

17:59:08   22       Q. All right. Does this picture on the first

17:59:14   23    page of -- of Appendix B, is -- is this where you were

17:59:22   24    placing the probe to try to measure the jet?

17:59:26   25       A. Yes, it was.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

332

17:59:27  1        Q.   Okay.  And you'll see the temperature

17:59:32  2    measurements here begin with the Bair Hugger off, and

17:59:36  3    it's 66.2 degrees; correct?

17:59:38  4        A.   Yes.

17:59:40  5        Q.   All right.  And then what happens to the

17:59:44  6    temperatures subsequently?

17:59:46  7        A.   The temperatures tend -- tended to rise.

17:59:49  8             And I should probably point out that the

17:59:51  9    order of data shown in the table does not necessarily

17:59:55  10   represent the order the data was taken in the -- in

17:59:58  11   the facility.

18:00:00  12       Q.   Okay.  So the -- the -- the measurements or

18:00:04  13   the -- the part of the table that counsel was asking

18:00:07  14   you questions about, the three inches over the hip,

18:00:12  15   the first two lines of that --

18:00:15  16             Do you want to flip to that, the three

18:00:17  17   inches over the hip?

18:00:29  18       A.   Yes.

18:00:31  19       Q.   Okay.  So the first two rows of the chart

18:00:34  20   show temperatures at 70.7 degrees Fahrenheit and 71.4

18:00:39  21   degrees Fahrenheit; correct?

18:00:40  22       A.   That's correct.

18:00:43  23       Q.   And that's with the Bair Hugger off.

18:00:43  24       A.   Yes.

18:00:43  25       Q.   All right.  And then there are two

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

333

18:00:46  1  subsequent measures, 64.9 degrees and 64.6 degrees

18:00:52  2  with the Bair Hugger on; correct?

18:00:54  3       A.   Yes.

18:00:55  4       Q.   And I think you testified earlier that it

18:00:58  5  didn't make sense to have those values in sequence; in

18:01:03  6  other words, to have the temperature drop by five

18:01:05  7  degrees; correct?

18:01:06  8       A.   That's correct.

18:01:07  9       Q.   All right.  So how would you explain what's

18:01:12  10  reported on this chart?

18:01:12  11            MR. ASSAAD:  Objection, lack of foundation,

18:01:14  12  calls for speculation.

18:01:17  13       A.   As I mentioned before, we do not have a

18:01:21  14  timestamp on any of the data here, so the data

18:01:25  15  presented in a given area were probably taken at

18:01:28  16  different times.

18:01:30  17       Q.   Okay.  What was your overall goal in taking

18:01:45  18  the measurements reflected in Appendix B to your

18:01:49  19  report?  What was -- what was the purpose of doing it?

18:01:51  20       A.   I wanted some first-hand experience myself

18:01:59  21  of what the -- primarily the velocities were near the

18:02:03  22  entrance to the filter near the floor and near the

18:02:07  23  edge of the blanket, so the -- and it was really --

18:02:12  24            Obviously, it's not an OR, I appreciate

18:02:14  25  that, so it's not going to be a -- a purely totally

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

334

18:02:19  1    accurate, reproducible set of results that one would

18:02:23  2    obtain in an OR.  It was intended to be a preliminary

18:02:26  3    study to get some reasonable data in terms of the --

18:02:29  4    mainly velocity, and since we had temperature

18:02:31  5    capability, we also included the temperature

18:02:34  6    measurements.

18:02:34  7        Q.    So in your review of the plaintiffs' expert

18:02:39  8    reports, did you -- did you see any measurements of

18:02:43  9    temperature or velocity around a Bair Hugger in any of

18:02:45  10   their reports?

18:02:46  11       A.    No, I did not.

18:02:48  12       Q.    And was your intent for this preliminary

18:02:53  13   exhibit to be of publishable quality?

18:02:56  14       A.    Certainly not.

18:02:57  15       Q.    Okay.  Okay.  With respect to your

18:03:40  16   calculation of the Archimedes number, you were asked

18:03:43  17   questions about the proper value for L in that

18:03:50  18   equation.  Do you recall that?

18:03:51  19       A.    I recall that.

18:03:52  20       Q.    Okay.  If the L were a different value, how

18:04:03  21   would that affect your opinions in this case, if at

18:04:05  22   all?

18:04:06  23            MR. ASSAAD:  Objection, calls for

18:04:07  24   speculation.

18:04:08  25       A.    I don't think it would affect my opinions if

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

335

18:04:11  1  we increased L to make it the distance from the edge

18:04:15  2  where the jet was emanated to someplace in the jet.

18:04:19  3  The delta T would also diminish, and so since the

18:04:22  4  Archimedes number is a very low value now, I don't

18:04:25  5  think it would change my opinion.

18:04:27  6      Q.   Okay.  If you look at Exhibit 15, which is

18:04:34  7  your article that was published in the Journal of

18:04:40  8  Solar Energy Engineering, pages 369 and the top of

18:04:56  9  370, and you were asked questions about your

18:05:02  10  statements about monitoring particles in -- in a

18:05:11  11  healthcare environment; correct?

18:05:12  12      A.   Yes.

18:05:13  13      Q.   All right.  And you were asked about the use

18:05:19  14  of a particle counter to measure the total aerosol

18:05:23  15  concentration; correct?

18:05:24  16      A.   Yes.

18:05:24  17      Q.   All right.  Is a particle counter alone

18:05:29  18  sufficient to measure a bioaerosol concentration in a

18:05:33  19  healthcare environment?

18:05:34  20      A.   A particle counter is not capable of

18:05:38  21  measuring -- or distinguishing between a --

18:05:40  22      Q.   Okay.

18:05:40  23      A.   -- biological particle and a non-biological

18:05:42  24  particle.

18:05:42  25      Q.   So what you say here is an alternative is to

336

18:05:45   1   use a continuous particle counter for the measurement

18:05:49   2   of total aerosol concentration versus time with

18:05:52   3   periodic sampling for bioaerosol.  What were you

18:05:55   4   referring to when you mentioned "periodic sampling for

18:05:59   5   bioaerosol?"

18:06:01   6        A.    That periodic sampling for bioaerosols could

18:06:05   7   be done using a -- a sled impactor, for example, or an

18:06:08   8   Andersen impactor.

18:06:09   9        Q.    And would you need to use those in order to

18:06:11  10   have a real understanding of the bioburden in that

18:06:13  11   room or environment?

18:06:15  12        A.    Yes, because an optical particle counter

18:06:18  13   does not provide information on the biological nature

18:06:21  14   of the particle.

18:06:21  15        Q.    Okay.  I believe counsel asked you

18:06:35  16   whether -- whether the Bair Hugger use could transport

18:06:41  17   particles to the surgical site.  Do you recall that

18:06:43  18   question?

18:06:43  19        A.    I do.

18:06:44  20        Q.    Okay.  What -- what is your -- and --

18:06:47  21              And I think your answer was "Well,

18:06:49  22   possibly."

18:06:50  23        A.    I -- I think that was my response.

18:06:52  24        Q.    And what did you mean by that or what was

18:06:54  25   the basis for that response?

337

18:06:56  1      A.   I don't think it's very likely, but there

18:06:58  2  are various factors in an operating room that may

18:07:02  3  change, so under certain conditions it -- it could be

18:07:04  4  possible.

18:07:05  5      Q.   So there are other pieces of equipment in

18:07:11  6  the OR that move air; fair?

18:07:16  7      A.   Yes.

18:07:16  8      Q.   All right.  And there are people in the --

18:07:21  9          MR. ASSAAD:  Objection.

18:07:21  10          MR. GOSS:  Sorry, I'm -- I'm leading.

18:07:23  11          MR. ASSAAD:  Object to the form.

18:07:24  12      Q.   Let me -- let me try it this way:  What --

18:07:26  13  what are the different things in an operating room

18:07:29  14  that could cause the movement of -- of particles to

18:07:33  15  the surgical site or anywhere else?

18:07:35  16      A.   Well number one --

18:07:37  17          MR. ASSAAD:  Objection, outside the scope of

18:07:39  18  his report, outside -- it's outside the scope of my

18:07:43  19  direct, and --

18:07:49  20      A.   Could you repeat the question again?

18:07:50  21      Q.   Sure.  My question was -- hold on a second.

18:08:10  22          So you said there are various factors in an

18:08:12  23  operating room that may change.  What are -- what are

18:08:15  24  some of the factors you have in mind there?

18:08:18  25          MR. ASSAAD:  Objection, lack of foundation,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

338

18:08:19    1    object to form.

18:08:20    2         A.    Again, I would envision an operating room

18:08:24    3    has several personnel, surgeons, anesthesiologists,

18:08:30    4    other -- other personnel that would be moving tools

18:08:34    5    that would -- that would be in operation, tools being

18:08:38    6    handed to the surgeon and -- and -- and vice versa, so

18:08:41    7    quite a bit of movement around the surgical site.

18:08:44    8         Q.    All right.  You were asked some questions

18:08:51    9    about a couple of other patient warming products, one

18:08:57   10    was the Mistral and the other was Warmtouch.  Both of

18:09:02   11    those incorporate HEPA filters, or so you were told

18:09:05   12    by -- by plaintiffs' counsel.  Do you recall that?

18:09:08   13         A.    Yes, I do.

18:09:09   14         Q.    All right.  Does -- does a HEPA filter

18:09:12   15    remove 100 percent of particles from the air?

18:09:17   16         A.    No.  Even a HEPA filter allows some

18:09:19   17    particles through.

18:09:21   18         Q.    And are there potential disadvantages to

18:09:25   19    using a HEPA filter from an engineering standpoint?

18:09:30   20         A.    Well a HEPA filter generally creates a

18:09:33   21    higher pressure drop to the filter, which would mean a

18:09:36   22    lower pressure drop on the downstream side of the

18:09:39   23    filter around the fan, which could potentially

18:09:41   24    aggravate any leaks between the filter and the housing

18:09:45   25    or leaks between the filter media and the filter

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

339

18:09:46    1    frame.

18:09:49    2                MR. GOSS:  Okay.  That's all I have for now.

18:09:51    3                MR. ASSAAD:  A few follow-up.

            4                        RECROSS-EXAMINATION

18:09:53    5    BY MR. ASSAAD:

18:09:53    6        Q.    What's the definition of a HEPA filter?

18:09:55    7        A.    A HEPA filter is typically --

18:10:01    8        Q.    Let me make it quick.  Do you agree that

18:10:06    9    it's a MERV 17 or above?

18:10:08   10            (Discussion off the stenographic record.)

18:10:08   11                MR. GOSS:  Object to form.

18:10:09   12        A.    I believe that was in the -- in the ASHRAE

18:10:13   13    table I included in my -- my report.

18:10:16   14        Q.    And ASHRAE is authoritative; correct?

18:10:18   15        A.    Yes.

18:10:18   16        Q.    Okay.  So a HEPA filter removes 99.97

18:10:22   17    percent of .3 microns to one micron; correct?

18:10:26   18        A.    That's what it states here, although they

18:10:33   19    are typically measured at just 0.3 microns, but then

18:10:37   20    the efficiency actually increases for particle sizes

18:10:40   21    larger than .3.

18:10:41   22        Q.    So higher than 99.97; correct?

18:10:43   23        A.    Yes.

18:10:44   24        Q.    Almost to a hundred percent; correct?

18:10:45   25        A.    In some particle sizes, yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

340

18:10:47  1      Q.   Well between three to 10 particles, what's

18:10:52  2  the efficiency rating for a HEPA filter?

18:10:52  3      A.   I don't have a -- a precise number I can

18:10:56  4  give you.

18:10:57  5      Q.   Would agree with me that it's larger than

18:11:00  6  99.999 percent?

18:11:00  7      A.   I --

18:11:02  8           Again, without looking at -- at the

18:11:06  9  evidence, I -- I -- I could not agree with that.

18:11:08  10     Q.   Well .3 to .1 for a MERV 17 is 99.97;

18:11:12  11  correct?

18:11:12  12     A.   Say that again.

18:11:16  13     Q.   The efficiency for a HEPA filter at -- at

18:11:20  14  MERV 17 is greater than or equal to 99.97 percent

18:11:25  15  efficiency for .3 to one micron; correct?

18:11:27  16     A.   Yes, that's correct.

18:11:28  17     Q.   Okay.  And when you go from one to three or

18:11:30  18  three to 10, it will be greater than 99.97; correct?

18:11:35  19     A.   That's correct.

18:11:35  20     Q.   Okay.  So sitting here today, you are purely

18:11:40  21  speculating as to whether particle -- particles that

18:11:45  22  could carry bacteria could pass through a -- a HEPA

18:11:47  23  filter; correct?

18:11:49  24          MR. GOSS:  Object to form.

18:11:49  25     A.   Again, HEPA filters are not a hundred

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

341

18:11:52  1  percent efficient.  It's possible that some very small

18:11:56  2  number could get through at larger particle sizes.

18:11:58  3      Q.   Well it's definitely less than .03 percent

18:12:02  4  of the particles, correct, for that size?

18:12:05  5      A.   Depending on the particle size of interest,

18:12:07  6  that could be true.

18:12:09  7      Q.   Okay.  And you agree with me that a HEPA

18:12:12  8  filter is going to filter out more bacteria than a

18:12:16  9  MERV 14 filter.

18:12:17  10          MR. GOSS:  Objection, form.

18:12:17  11     A.   Yes, I --

18:12:20  12          Yes.

18:12:21  13     Q.   Okay.  Let's think about other --

18:12:27  14          You mentioned other -- there might be other

18:12:31  15  factors that could cause contamination of the surgical

18:12:38  16  site.  I think you mentioned people moving, stuff like

18:12:40  17  that.  Is that correct?

18:12:41  18     A.   Yes.

18:12:41  19     Q.   Okay.  When did you formulate that opinion?

18:12:53  20  Just outside now when you spoke with counsel?

18:12:56  21          MR. GOSS:  Object to the form.

18:12:58  22     A.   No.  I think I -- I may have read that in

18:13:01  23  some of the ASHRAE documentation on the -- the

18:13:03  24  hospital design guide or somewhere else.

18:13:05  25     Q.   Where?  Is it in your report?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

342

18:13:09  1      A.    That specific statement is probably not in

18:13:12  2  my report.

18:13:12  3      Q.    What's your basis to support that statement

18:13:14  4  that -- that -- that people moving in the operating

18:13:21  5  room could cause surgical-site infections?

18:13:23  6           MR. GOSS:  Object to the form.  I don't

18:13:25  7  think that was his testimony.

18:13:28  8      Q.    Did I misstate your testimony?

18:13:32  9      A.    Without going back and -- and reviewing what

18:13:35 10  I said, it may have.

18:13:40 11      Q.    Now you also mentioned with the Archimedes

18:13:43 12  equation that if you change the L, it would change the

18:13:46 13  delta T.  What's your basis behind that?

18:13:50 14      A.    Because as a heated jet propagates through

18:13:56 15  air, it's going to be losing the temperature

18:14:01 16  difference -- the maximum temperature difference

18:14:02 17  between the -- the jet and at ambient as it gets

18:14:06 18  further away from the -- the source of the jet.

18:14:08 19      Q.    Well we're not just talking about one jet

18:14:10 20  here, we're talking about thousands of jets.

18:14:13 21      A.    I'm talking about the combined air leaving

18:14:15 22  the edge of the blanket entering the room, not that --

18:14:19 23  not individual holes in the blanket.

18:14:20 24      Q.    And you -- and you are assuming that delta T

18:14:22 25  would change?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

343

18:14:23    1        A.    Yes.

18:14:23    2        Q.    And what's your basis behind that?

18:14:26    3        A.    I think that's -- that's engineering

18:14:28    4    knowledge about thermal jets as they propagate into --

18:14:33    5    into room air.

18:14:34    6        Q.    Okay.  So you're saying --

18:14:35    7              But the delta change might actually increase

18:14:38    8    depending on where you take the measurement.

18:14:40    9        A.    I have -- I have never seen that.

18:14:41   10        Q.    Okay.  With respect to Exhibit B, you have

18:15:16   11    no idea sitting here today in what order you took

18:15:19   12    those measurements; correct?

18:15:20   13        A.    Not based on what's provided in Exhibit B,

18:15:24   14    no.

18:15:24   15        Q.    Are they in your notes anywhere?

18:15:26   16        A.    I was not the one taking the notes.

18:15:28   17        Q.    Oh.  Who took the notes?

18:15:30   18        A.    Peter and Vinita.

18:15:31   19        Q.    Okay.

18:16:07   20              (Discussion off the record.)

18:16:29   21    BY MR. ASSAAD:

18:16:29   22        Q.    Do you agree that in a typical orthopedic

18:16:38   23    surgery you're going to have people moving --

18:16:39   24              You're going to have surgeons; correct?

18:16:41   25        A.    Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

344

| | | |
|---|---|---|
| 18:16:42 | 1 | Q.   And they'll be moving; correct? |
| 18:16:43 | 2 | A.   Yes. |
| 18:16:43 | 3 | Q.   And you'll have other staff in the operating |
| 18:16:45 | 4 | room; correct? |
| 18:16:46 | 5 | A.   Yes. |
| 18:16:46 | 6 | Q.   And the devices, like the anesthesia machine |
| 18:16:51 | 7 | as well as any other device; correct? |
| 18:16:53 | 8 | A.   Yes. |
| 18:16:53 | 9 | Q.   Okay.  There's a constant set of people and |
| 18:16:58 | 10 | devices in an operating room; correct? |
| 18:16:59 | 11 | A.   I don't know about constant set, but there's |
| 18:17:03 | 12 | certainly a -- a -- a variety of human operations -- |
| 18:17:06 | 13 | operators, typically, and equipment. |
| 18:17:08 | 14 | Q.   And you agree with me that in Elghabashi's |
| 18:17:13 | 15 | report, that he looked at the impact of the Bair |
| 18:17:19 | 16 | Hugger with all those -- with people in the room; |
| 18:17:23 | 17 | correct? |
| 18:17:23 | 18 | A.   Yes. |
| 18:17:24 | 19 | Q.   With lights; -- |
| 18:17:25 | 20 | A.   Yes. |
| 18:17:25 | 21 | Q.   -- correct? |
| 18:17:26 | 22 | With the back tables. |
| 18:17:27 | 23 | A.   Yes. |
| 18:17:28 | 24 | Q.   Okay.  And it's because that people are |
| 18:17:32 | 25 | going to affect the airflow in a room; correct? |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

345

18:17:37    1        A.    Yes.

18:17:38    2        Q.    And there's going to be some thermal plumes

18:17:42    3   that come off from people; correct?

18:17:44    4        A.    Right.

18:17:44    5        Q.    Okay.  And when you want to model something

18:17:50    6   in CFD, in a CFD model, you want to be as precise as

18:17:56    7   possible; correct?

18:17:56    8        A.    Yes.

18:17:57    9        Q.    If you want to model whether or not

18:17:59   10   particles get to the surgical site, you'd want to have

18:18:03   11   a heat source from the lights; correct?

18:18:05   12        A.    Yes.

18:18:06   13        Q.    You'd want to have people in the room;

18:18:09   14   correct?

18:18:09   15        A.    And they really should be moving as they are

18:18:11   16   in an actual OR.

18:18:12   17        Q.    Well have you ever tried to do a dynamic

18:18:15   18   model of a CFD?

18:18:16   19        A.    Very difficult with motion, but that -- that

18:18:18   20   would be required to do an actual analysis.

18:18:20   21        Q.    I understand that, but -- but -- but say you

18:18:22   22   want to do a static model, you still would want to

18:18:25   23   have people in there with a heat source; correct?

18:18:27   24        A.    Yes.

18:18:27   25        Q.    Okay.  And you'd want to have the heat

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

346

18:18:31    1    source -- you'd want to have the heat source coming

18:18:35    2    from the walls; correct?

18:18:36    3         A.    If -- if there is any heat transfer, yes.

18:18:39    4         Q.    All right.  And you agree with me that the

18:18:46    5    more accurate a static model is in the -- in its

18:18:50    6    modeling, the more accurate the CFD results; correct?

18:18:53    7         A.    If it's set up correctly and the boundary

18:18:57    8    conditions are done correctly.  Again, I'll go back to

18:18:59    9    the lack of motion of anything in the OR.

18:19:02   10         Q.    Say again.

18:19:03   11         A.    I go back to the lack of motion of anything

18:19:05   12    in the OR.  That's -- that's a major contributor to

18:19:08   13    mixing of particles.

18:19:09   14         Q.    Okay.  Now let's talk about that for a

18:19:12   15    second.  Okay?  You agree with me that in a

18:19:17   16    unidirectional OR such as what's used mostly in --

18:19:23   17    in -- in orthopedic surgeries, that the purpose of

18:19:32   18    having diffusers above the surgical table is to offer

18:19:37   19    a protective effect to help prevent bacteria from

18:19:42   20    getting into the critical site, the surgical site;

18:19:45   21    correct?

18:19:45   22         A.    That -- that's the idea, yes.

18:19:47   23         Q.    Okay.  And you don't want to have a device

18:19:49   24    in the operating room that's going to reduce the

18:19:53   25    protective effect of the ventilation system in an

347

18:19:57  1  operating room; correct?

18:19:58  2       A.   You would not want that, yes.

18:20:01  3       Q.   Okay.  Because if you reduce the protective

18:20:06  4  effect of the ventilation system, then you increase

18:20:12  5  the risks of bacteria entering into the surgical site

18:20:16  6  from other sources in the operating room; correct?

18:20:18  7            MR. GOSS:  Objection to form, it's beyond

18:20:20  8  the scope of his opinions, and it is an incomplete

18:20:26  9  hypothetical.

18:20:28  10      A.   Say that again.

18:20:50  11      Q.   If you reduce the protective effect in the

18:21:06  12 ventilation system, then you increase the risk of

18:21:10  13 bacteria entering into the surgical site from other

18:21:13  14 sources in the operating room; correct?

18:21:15  15           MR. GOSS:  Object to form, beyond the scope

18:21:18  16 of his opinions, incomplete hypothetical.

18:21:20  17      A.   That -- that could be possibly correct.

18:21:22  18      Q.   Well you have unidirectional flow coming

18:21:26  19 down; correct?

18:21:27  20      A.   Except the wake regions under the surgeon's

18:21:33  21 arms and tools and other things are blocking the

18:21:35  22 airflow.

18:21:35  23      Q.   I understand that.  But if you affect the --

18:21:37  24 the intensity of the protective effect, you basically

18:21:40  25 decrease the force field around the patient that the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

348

18:21:42    1   ventilation system is meant to -- to attain; correct?

18:21:45    2           MR. GOSS:  Asked and answered, beyond the

18:21:48    3   scope of his opinions.

18:21:49    4       A.   Again, I think the full recirculary -- full

18:21:51    5   recirculation regions under a surgeon's arms and hands

18:21:56    6   and -- and tools also disrupt the flow.

18:21:59    7       Q.   I understand that.  But you don't want to

18:22:01    8   disrupt the flow even more with another device;

18:22:04    9   correct?

18:22:04   10           MR. GOSS:  Object to form, beyond the scope

18:22:06   11   of his opinions.

18:22:08   12       A.   I think that disruption of the flow would be

18:22:09   13   much more than a small change in temperature.

18:23:02   14           MR. ASSAAD:  Okay.  That's all I have.

18:23:03   15   Thank you.

18:23:05   16           MR. GOSS:  It's been a long day.  I just

18:23:07   17   have one question.  Well, one -- one theme.

18:23:08   18                   RE-REDIRECT EXAMINATION

18:23:08   19   BY MR. GOSS:

18:23:13   20       Q.   So you --

18:23:17   21           Counsel asked you whether a HEPA filter

18:23:20   22   would capture more bacteria than a MERV 14 filter.  Do

18:23:25   23   you -- do you recall that?

18:23:26   24       A.   Yes.

18:23:26   25       Q.   Okay.  Have you done any experimental work

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

349

18:23:30  1  yourself to try to quantify the difference in

18:23:34  2  bacterial capture between MERV 14 and HEPA?

18:23:38  3      A.   I have not.  That's strictly based on the

18:23:41  4  published efficiency value versus the particle size of

18:23:45  5  HEPA filters and MERV 14 filters.

18:23:47  6              MR. GOSS:  And I'll leave it at that.

18:23:54  7              MR. ASSAAD:  That's all I have.  Thank you.

18:23:56  8              THE REPORTER:  Off the record, please.

18:23:59  9              (Deposition concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

350

1              C E R T I F I C A T E

2              I, Richard G. Stirewalt, hereby certify that

3    I am qualified as a verbatim shorthand reporter, that

4    I took in stenographic shorthand the deposition of

5    THOMAS H. KUEHN at the time and place aforesaid, and

6    that the foregoing transcript is a true and correct,

7    full and complete transcription of said shorthand

8    notes, to the best of my ability.

9              Dated at Minneapolis, Minnesota, this 16th

10   day of July, 2017.

11

12

13

14

15

16

17                   RICHARD G. STIREWALT

18                   Registered Professional Reporter

19                   Notary Public

20

21

22

23

24

25

351

1              C E R T I F I C A T E

2          I, THOMAS H. KUEHN, hereby certify that I

3   have carefully read the foregoing transcript, and that

4   the same is a true and complete, full and correct

5   transcription of my deposition, except:

6   PAGE/LINE                CHANGE                REASON

7

8

9

10

11

12

13

14

15

16

17                          THOMAS H. KUEHN

18                          Deponent

19

20      Signed and sworn to before me this _____ day of

21   August, 2017.

22

23                  _____

24                  Notary Public

25