UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

In re: BAIR HUGGER FORCED AIR            MDL No. 15-2666 (JNE/FLN)
WARMING PRODUCTS LIABILITY
LITIGATION


_____

This Document Relates To:
*All Cases*


_____


**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO
EXCLUDE OPINIONS AND TESTIMONY OF GARY SETTLES, PHD**

## TABLE OF CONTENTS

I.    **Introduction** ............................................................................................. **3**

II.   **Factual Background** ............................................................................... **4**

A.   Settles Agrees With Plaintiffs' Experts On Many Important Facts and Principles .... 5

B.   Settles Agrees Elghobashi In An Expert .................................................... 7

C.   Settles Agrees with Koenigshofer's Report Summarizing Environment of Use: the Operating Room ................................................................................. 8

III.  **Legal Standards** ...................................................................................... **9**

IV.  **Argument** ................................................................................................ **11**

A.   Settles Disclaims Expertise in Areas Key To His Conclusions ................................ 13

    1.   Settles Is Unqualified To Opine On Movement Of Particles In Operating Rooms 14

    2.   Settles is Unqualified to Render Opinions on Alternative Sources of Infection 15

    3.   No Foundation to Testify to Thermal Plume or Potential Positive Impact of Bair Hugger on Operating Room ....................................................................... 17

B.   Settles Failed To Follow Recognized Scientific Methods In Conducting His Experiment And Admits His Results Are Unreliable ............................................. 17

    1.   Lack of Methodology Makes Settles' Measurements Unreliable ..................... 17

    2.   Schlieren Imaging is Inapplicable to the Assessing Particle Movement and Fluid Dynamics in an Operating Room ............................................................... 19

    3.   Settles' Conclusions are Unsupported ........................................................ 20

C.   Settles Had Insufficient Information to Offer Expert Opinions ............................... 21

D.   Settles' Comparison Of Bair Hugger To Hotdog Should Be Excluded ................... 22

E.   Settles Attempt to Reserve the Right to Conduct New Schlieren Testing Should be Precluded ......................................................................................... 24

V.   **Conclusion** ............................................................................................. **25**

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Daubert v. Merrell Dow Pharmacueticals, Inc.*,
 509 U.S. 570 (1993) ...................................................................................passim
*Daubert v. Merrell Dow Pharms., Inc.*,
 43 F.3d 1311 (9th Cir. 1995) .................................................................... 11
*Gen. Elec. Co. v. Joiner*,
 522 U.S. 136 (1997) .................................................................................. 12
*Glastetter v. Novartis*,
 107 F. Supp. 2d 1015 (E.D. Mo. 2000) ...................................................... 16
*Groobert v. President and Directors of Georgetown College*,
 219 F. Supp. 2d 1 (D.D.C. 2002) ................................................................ 12
*In re Baycol Prods. Litig.*,
 532 F. Supp. 2d 1029 (D. Minn. 2007) ...................................................... 11
*In re TMI Litig.*,
 193 F.3d 613 (3d Cir. 1999) ...................................................................... 17
*Johnson v. Mead Johnson Co.*,
 754 F.3d 557 (8th Cir. 2014) ...................................................................... 11
*Junk v. Terminix Intern. Co.*,
 628 F.3d 439 (8th Cir. 2010) ...................................................................... 21
*Kumho Tire Co., Ltd. v. Carmichael*,
 526 U.S. 137 (1999) .................................................................. 10, 12, 26
*Polski v. Quigley Corp.*,
 538 F.3d 836 (8th Cir. 2008) ...................................................................... 10
*Tyree v. Boston Scientific Corp.*,
 54 F. Supp. 3d 501 (S.D.W.Va. 2014) ........................................................ 23
*Wheeling Pitts. Steel v. Beelman River Terminals*,
 254 F.3d 706 (8th Cir. 2001) ...................................................................... 15

### <u>Rules</u>

Federal Rule of Evidence 702 ................................................................................ 1, 3
Federal Rule of Evidence 703 ................................................................................ 18, 19

Pursuant to Federal Rules of Evidence 702 and *Daubert v. Merrell Dow Pharmacueticals, Inc.*, 509 U.S. 570 (1993), Plaintiffs respectfully move this Court for an Order excluding the report and testimony of Defendants' expert witness Gary Settles, Ph.D. ("Settles"), who intends to offer expert opinions on issues of general causation. Specifically, Dr. Settles used a technique known as "schlierin" imaging to attempt to visualize airflow patterns and behaviors associated with the Bair Hugger system in a laminar-downflow operating room.  Expert Report of Gary Settles (Settles Rpt.), attached as Ex. A, at 3. The "schlierin" technique is extremely limited in application, a reality attested to even by Settles, particularly when flow in question is complicated and, importantly, three-dimensional. Settles Rpt. at 3.

Fundamentally, general causation concerning the claims Plaintiffs have asserted in this MDL boil down to two questions potentially relevant to the Settles report: (1) do particles correlate with bacterial load, also known as bioburden, in the air; and (2) does the Bair Hugger system increase the number of particles in the operating room and over the surgical site during an operation?

The answer to the second question is uncontroverted: 3M admits that every single study done to date, both peer reviewed studies and internal company testing, demonstrate an increase in particles over the surgical site when the Bair Hugger system is on and set to warm. *See* Deposition of 3M 30(b)(6) Designee Al Van Duren at 258:5-13, attached as Ex. B.

Thus the relevant question to be considered by the jury is whether particles correlate with bacteria. Experts proffered by both Plaintiffs and Defendants agree that

particle counts are a reliable method of approximating the bioburden in the air. The International Consensus answers the first question an unequivocal yes as well: a "strong consensus" of 93% of the Delegates agree that "bacteria can be considered as part of the total mass of particulates in the air," and note studies have concluded that "airborne particulate count should be considered as a potential surrogate for airborne microbial density." Ex. C (International Consensus) Even Settles recognizes "hospital operating rooms (ORs) [are] designed to maintain particle-free airflow patterns in order to minimize patient infection by airborne pathogens, especially bacteria-bearing human skin flakes or squames." Ex. A (Settles Rep. at 3). Despite that agreement, Settles offers numerous opinions that are neither reliable nor within the scope of his expertise.

Other 3M experts testified that very few engineers use schlieren testing. See Ex. D (Deposition of Thomas Kuehn ("Kuehn Dep.") at 84:11-25). As a dispositive matter, Settles conducted his schlierin experiment in an open warehouse space he concedes does not represent the size or shape of an actual operating room, nor did his mock-up include outflow vents or the air changes per hour required in any operating room. Settles Rpt. 4-5. During the experiment the simulated patient and the surgical table were elevated or moved to the side, which is unrepresentative of real life conditions. *Id.* at 4. The critical omissions and moving elements fundamentally change the nature of the simulation. Any attempt to graft conclusions reached in a room so divorced from the environment of use known in this case cannot meet Rule 702's reliability standards. While testing the parameters of an expert's opinions may generally be fodder for cross examination, when a technical expert attempts to offer an opinion which is utterly lacking in proper

2

methodology, the Court has an obligation to exercise the gate-keeping function outlined by *Daubert*.

Ultimately, Dr. Settles admitted in deposition that his testing failed to follow a methodology. He testified that his results were unreliable. Given those admissions and the additional shortcomings described below, Dr. Settles' opinions and testimony fail to meet the requirements of Rule 702 and should therefore be excluded.

## I.     INTRODUCTION

Although the Supreme Court has construed Rule 702 in favor of admitting expert testimony, there are limits. The proponent of the testimony, whether plaintiff or defendant, has the burden of establishing that the expert's testimony is based on a reliable methodology. Failure to show the reliability of each step in an expert's methodology is fatal under Rule 702 and *Daubert*.

Settles is a mechanical engineer who, prior to his retirement, specialized in fluid-dynamics experiments and the application of optical flow diagnostics. Defendants offer him as an expert on fluid dynamics to partially rebut testimony offered by two of Plaintiffs' experts: Said Elghobashi, M.Sc., Ph.D., D.Sc., (CFD) and Dan Koenigshofer, PE, MSPH (HVAC).

Settles' opinions and testimony should be excluded for several reasons. Defendants cannot meet their burden of showing that Settles' testimony is reliable or relevant. His failure to follow a recognized methodology and speculation permeate Settles' opinions at every step. His work in this case was largely limited to taking

specialized photographs to visualize heat around the Bair Hugger system, as well as measurements of temperature leaving the Bair Hugger.

Settles' proffered opinions lack basic hallmarks of reliability including: collecting measurements without confirming various key conditions in the testing environment; failing to control variables in his experiment; attempting to apply results from a faulty experiment to a completely different environment; ignoring peer-reviewed literature that contradicts his opinion; and failing to follow the kind of methodology he would use if he were publishing an academic paper on this subject. Because his opinions are neither reliable nor helpful to the jury, it should be excluded.

## II.    FACTUAL BACKGROUND

On March 30, 2017, Plaintiffs disclosed the Rule 26 reports of seven experts on general causation issues, including Elghobashi and Koenigshofer. Ex. E (Elghobashi Report), Ex. F (Koeningshofer Report). Plaintiffs' experts offer various opinions related to the Bair Hugger Forced Air Warming system ("Bair Hugger"), and ultimately conclude the Bair Hugger can cause deep joint infections ("DJI") in exposed patients. Plaintiffs' experts' opinions are each based on relevant recognized methodologies, including comprehensive search of relevant literature, experiments, review of combination of numerous sources of evidence, internal 3M documents, and/or published peer-reviewed studies describing the mechanisms by which the Bair Hugger transmits particles and bacteria to the surgical site in hip and knee arthroplasties.

On June 2, Defendants disclosed the expert report of Gary Settles, Ph.D., a mechanical engineer, to oppose plaintiffs' expert opinions on filtration and airflow with

4

respect to general causation issues.  Ex. A (Settles Rpt.).  Unlike Elghobashi, Settles is not an expert in performing large-scale computational fluid dynamics.  Deposition of Gary Settles (Settles Dep), attached as Ex. G, at 85:17-86:1, 160:17-20. Settles has no professional experience in the hospital or surgical setting. Settles failed to perform a routine search of the relevant literature in developing his opinions. *Id.* at 93:11-94:15. Settles concedes he lacks expertise to opine on medicine, anesthesiology, infectious disease, orthopedics, microbiology, medical device design, medical device warnings, patient warming, operating room airflow, particle flow in an operating room, computational fluid dynamics or how airborne particles cause PJI.

### A.    Settles Agrees With Plaintiffs' Experts On Many Important Facts and Principles

Dr. Settles agrees Plaintiffs and Plaintiffs' experts on many uncontroversial facts and principles:

- Settles agrees hospital operating rooms are designed to maintain particle-free airflow patterns in order to minimize patient infection by airborne pathogens, especially bacteria-bearing human skin flakes or squames. (Settles Report p. 3);

- Settles agrees particles in an airstream have inertia and therefore do not always follow the streamlines of the flow. (Settles Report p. 3), (Settles Dep. 89:9-90:22);

- Agrees turbulence has an effect on particles (Settles Dep. 90:18-22);

5

- Settles agrees the 'laminar' downflow directly counteracts the buoyant rise of thermal currents in the OR. (Settles Report p. 6);

- Absent adequate protection from the downflow, contaminated air may rise from thermal sources, spread, and reach the surgical site.  (Settles Report p. 6);

- Agrees with Plaintiffs' experts that not all the air from the Bair Hugger blanket leaves at the head and neck area (Settles Depo 94:23-96:7);

- Agrees that the temperature increases when the Bair Hugger blanket is turned on (Settles Dep. 125:19-24);

- Agrees people in a room affect the airflow in a room (Settles Dep. 38:2-6);

- Agrees heat sources affect the airflow in a room (Settles Dep. 38:7-8);

- Agrees that the walls of a room constrain, and therefore affect, the airflow in a room (Settles Dep. 40:11-20);

- Agrees room dimensions will have an effect on airflow (Settles Dep. 43:22-24);

- Agrees room pressure will have an effect on airflow in a room (Settles Dep. 44:4-13);

- Agrees temperature will have an effect on airflow (Settles Dep. 44:23-45:3);

- Agrees the mass flow of the air supply is going to have an effect on airflow (Settles Dep. 45:11-23);

- Agrees the people in a room will have an effect on airflow (Settles Dep. 46:3-5);

- Agrees surgical lights will have an effect on airflow (Settles Dep. 46:6-8);

- Settles agrees the area under the operating table that is contained within the drapes is going to be affected by the drapes (Settles Dep. 52:9-14);

- Settles agrees that engineers and the corporations they work for should not suppress research regarding human safety (Settles Dep. 80:18-22);

- Settles agrees with Plaintiffs and their experts that it is "important to explore" claims in technical literature that "forced-air warming generate(s) convection currents that mobalise [sic] floor air into the surgical site area" leading to contamination and increased risk of infection. (Settles Rep. p. 9);

- The air leaving the Bair Hugger blanket is turbulent within 1cm of leaving the blanket (Settles Rep. 9);

- The Bair Hugger blower releases heat into the OR environment (Settles Rep. p. 14-15 & Fig. 12);

- Squames are likely to be found in areas of air recirculation, and there is a high potential such squames can be deposited into a surgical site (Settles Rep. p.16)

**B.    Settles Agrees Elghobashi Is An Expert**

Settles agrees Elghobashi is an expert in computational fluid dynamics. (Settles Dep. 88:9-10) Elghobashi's report reflects a "very elaborate CFD solution of a simulated OR with staff, overhead lights, side tables, and a patient fitted with a forced-air warming

7

blanket." (Settles Report, p. 18) He confirms Elghobashi's CFD solution used Large-Eddy Simulation (LES) to represent turbulent air motion, and to calculate the trajectories of 10-micron spheres entrained in the flow. *Id*.

In his report, Settles notes four criticisms of Elghobashi: (1) lack of validation experiment; (2) only a single OR set-up is simulated (two CFD solutions are discussed: one with Bair Hugger blanket turned to 'warm', one with Bair Hugger 'off'); (3) placement of 10-micro particles near the floor; and (4) the temperature discharge leaving the Bair Hugger blanket at 41°C instead of Settles' measured temperature of 32-33°C. Settles concedes that Defendants' proffered CFD expert, Dr. Abraham, also used 41°C leaving the Bair Hugger blanket. (Settles Dep. 67:3-17) Settles testified at deposition that the code Elghobashi used for his LES CFD has been appropriately verified, and that he has no criticism of the code. (Settles Dep. 102:14-23) Ultimately at deposition, Settles admitted he has never done LES, (Settles Dep. 87:17-18), he disclaimed expertise in particles as well (Settles Dep. 88:21), and affirmed he is not holding himself out as a CFD expert in this case.

### C.   Settles Agrees with Koenigshofer's Report Summarizing Environment of Use: the Operating Room

Settles notes Koenigshofer provides a tutorial on hospital ventilation and conveys general information on HVAC issues through a literature review.  Settles takes no issue with Koenigshofer's explanation of the HVAC system for the environment of use: the operating room. Next, Settles turns to criticize Koenigshofer's report.  Settles' principle concern is that Koenigshofer did not conduct an original experiment in connection with

rendering his opinions in this case. (Settles Rep. 19) Settles is also critical that Koenighofer (1) concludes the Bair Hugger will create turbulence at the floor; (2) that the Bair Hugger draws particles off the floor into the unit, (3) the estimates of velocity leaving the Bair Hugger; and (4) assumptions with respect to the temperature at which the air leaves the Bair Hugger blanket; (5) whether hot air add to physician discomfort; and (6) the conclusion that the Bair Hugger will add to the cooling load in the operating room. Settles Rep. p. 20.

Both Koenighofer and Settles are members of the American Society of Refrigeration and Cooling Engineers (ASHRAE). Settles Dep. 14:12-13. Unlike Koenighofer, Settles does not design HVAC systems, does not work in hospital environments, and does not conclude heating or cooling loads for an operating room. Settles has never conducted a study in an operating room. *Id.* at 14:9-11.

## III.   LEGAL STANDARDS

Federal Rule of Evidence 702 permits expert witnesses to testify if the subject of their testimony is relevant, the witnesses are qualified to express their opinions, and the proposed evidence upon which they base their testimony is reliable or trustworthy. *Polski v. Quigley Corp.*, 538 F.3d 836, 839 (8th Cir. 2008).

Courts are the gatekeeper of evidence proffered under Rule 702, "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

Expert testimony must be trustworthy for it to be reliable. *Daubert*, 509 U.S. at 590. That is, the testimony must be supported by appropriate validation. *Id.* Four nonexclusive factors control the reliability of expert testimony: "(1) whether the theory or technique can be and has been tested; (2) whether the technique has been subject to peer review and publication; (3) the technique's known or potential rate of error; and (4) the level of the theory or technique's acceptance within the relevant discipline." *Id.* at 593-94.

The Eighth Circuit considers additional factors as well, including: "whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case. *Polski*, 538 F.3d at 839. The party seeking admission of expert testimony has the burden of demonstrating its reliability. *In re Baycol Prods. Litig.*, 532 F. Supp. 2d 1029, 1042 (D. Minn. 2007).

A "very significant" criterion for reliability is whether the expert's testimony is based on research independent of litigation. *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) (Daubert II). "If the proffered expert testimony is not based on independent research, the party proffering it must come forward with other objective, verifiable evidence and explain precisely how they went about reaching their conclusions and point to some objective source—a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the

like—to show that they have followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field." *Id.*, 43 F.3d at 1317-19.

Expert testimony that "rests upon "good grounds, based on what is known" […] should be tested by the adversary process with competing expert testimony and cross–examination, rather than excluded by the court at the outset. *Johnson v. Mead Johnson Co.*, 754 F.3d 557, 562 (8th Cir. 2014)(*quoting Daubert*, 509 U.S. at 590, 596)). Where the factual basis, data, or the methodology employed by the expert are sufficiently called into question, the court must determine not only if the testimony is reliable, but also whether it has a valid connection to the pertinent inquiry. *Kumho Tire Co.*, 526 U.S.at 149. Expert testimony must therefore "logically advance[] a material aspect of the proposing party's case." *Daubert*, 509 U.S. at 597. The court should not admit opinion evidence "that is connected to existing data only by the *ipse dixit* of the expert," *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 157 (1997), or that is based on his own unique methodology rather than a respected methodology. *Groobert v. President and Directors of Georgetown College*, 219 F. Supp. 2d 1 (D.D.C. 2002). Under these circumstances, a court may conclude there is simply too great an analytical gap between the data and the opinion." *Gen. Elec. Co.*, 522 U.S. at 146. Because Settles' opinions are fundamentally unsupported, they must be excluded.

## IV.   ARGUMENT

Dr. Settles discloses the following opinions:

1. Present experimental data show the Bair Hugger exhaust is only a few centimeters, which is far shorter than what would be required to reach the OR floor.

2. Exhaust temperature from Bair Hugger is measured at 32.5°C, rather than 41°C previously measured by 3M consultants.

3. Even if the Bair Hugger exhaust air did reach the OR floor, it would be completely mixed out with room air, and would have little or no residual buoyancy sufficient to carry bacteria-laden particles to the surgical site.

4. Schlieren testing shows no "great differences" in the visible thermal behavior between the Bair Hugger and HotDog blankets in OR laminar downflow conditions.

5. Schlieren optics reflect little air motion near the floor of a "simulated OR".

6. Temperatures measured under the Bair Hugger blankets range from "room temperature" to 28°C, which is lower than the temperature Elghobashi used.

7. The power units of Bair Hugger and HotDog systems both release heat into the OR environment.  The differences in the local flow patterns of these two power units, as visualized by schlierin optics, are unremarkable.

8. While Settles found no evidence that either Bair Hugger and HotDog warming systems produce airflows that promote contamination of the surgical wound, the same cannot be said for OR personnel and some OR equipment.  Based on his investigation, those sources are much more likely

to carry bacteria-laden particles to the surgical wound than are patient-warming blankets.

None of these opinions and conclusions, however, are supported by any special expertise that Settles has, nor are they supported by any scientific methodology. Indeed, several of the opinions Settles includes in his written report are inconsistent with testimony he provided at deposition. Because they are unreliable and unsupported, Settles' opinions should be excluded at trial.

A.   **Settles Disclaims Expertise in Areas Key To His Conclusions**

Settles seeks to testify on issues that would require expertise he does not possess. In deposition Settles conceded that he is not an expert in the following subjects:

- Not an expert in CFD for this case (Settles Dep. 87:19-24);

- Not an expert in particles (Settles Dep. 88:21);

- Not an expert in operating room design (Settles Dep. 13:6-11);

- Not an expert in anesthesiology (Settles Dep. 128:25-129:2);

- Not an expert in infectious disease (Settles Dep. 129:3-5);

- Not an expert in orthopedic surgery (Settles Dep. 129:5-8);

- Not an expert in internal medicine (Settles Dep 129:9-11);

- Not an expert in nursing (Settles Dep. 129:13-15);

- Not an expert in filter media (Settles Dep. 129:16-18);

- Not an expert in medical device design (Settles Dep. 129:19-21);

- Not an expert in medical device warnings (Settles Dep. 129:22-24);

- Not an expert in patient warming (Settles Dep. 129:25-130:2);

- Not an expert in operating room design (Settles Dep. 130:3-5);

- Not an expert in operating room airflow (Settles Dep. 130:13-18);

Settles should be excluded from testifying on any topic within the areas in which he has conceded a lack of expertise, and in particular on the topics described below.

### 1.    Settles Is Unqualified To Opine On Movement Of Particles In Operating Rooms

Having disclaimed necessary expertise, Settles nevertheless seeks to opine on "ultimate" issues such as, so for example, whether Bair Hugger creates convective currents that carry bacteria-laden particles from near the floor to the surgical site. *See* Settles Rpt. at 21.  But Settles lacks qualifications of offer such testimony.  The opinion is clearly not based on first-hand knowledge, because Settles admitted that his schlieren imaging study did not track particle movement. Settles Dep. 328:11-329:14. Nor did he use any other method of modeling or tracking the movement of particles, experimentally or otherwise. *Id.* at 307:1-3.

Experience in schlieren imaging does not give Settles the qualifications to testify about particle movement or OR airflows.  An expert's qualifications of a witness are necessarily contextual, such that an expert who is qualified in one field may not necessarily be an expert in a different field. *See Wheeling Pitts. Steel v. Beelman River Terminals*, 254 F.3d 706, 716 (8th Cir. 2001) (reversing district court's admission of testimony where expert was qualified in one subject matter but not qualified by "knowledge, skill, experience, training, or education" in another subject area).  Settles

14

confesses he is not an expert in CFD in this case. *Id.* at 87:19-24. He identified no qualifications that would enable him to reach these conclusions.  Settles' opinion that warm, turbulent air cannot transport bacteria from the OR floor to the surgical site is a classic example of a conclusory opinion outside of the expert's area of expertise that should be excluded under *Daubert*. An opinion based on unsupported speculation is unreliable. *See Glastetter v. Novartis*, 107 F. Supp. 2d 1015, 1045 (E.D. Mo. 2000).

Settles was conspicuously unaware of key peer-reviewed publications that reach conclusions opposite to his, and he summarily dismissed the few studies he was made aware of that contradict his opinion. He does not describe, much less cite, an objectively verifiable source for his speculative assertion that Bair Hugger has no meaningful impact on airflow in an operating room.  Because Settles lacks the requisite qualifications, he should be excluded from offering testimony on particle movement.

### 2.    Settles is Unqualified to Render Opinions on Alternative Sources of Infection

Despite his utter lack on qualifications on the subject, Settles opines that OR staff are likely the source of Plaintiffs' deep joint infections. Settles lacks anything approaching the level of expertise required to support this alternative mode of infection. While he may be an expert in schlieren, that field is a far cry from expertise in infectious disease, bacteriology, OR airflow, particle movement, surgical infection-control protocols, or any other field that might reasonably be required to make such a determination. Settles specifically disclaimed any expertise in infectious disease,

orthopedic surgery, particles, and operating room airflow. *Id.* at 88:21, 129:3-8, 130:13-18.  Without expertise Settles is unqualified to offer his opinion.  See Rule 702.

The lack of experience and qualifications are highlighted by several images in his report.  One, which Settles describes as an "OR staff member," is portrayed as operating or assisting in an operation with ungloved hands and bare arms. Settles Rep., p. 15, Figs. 15 & 16. Settles offers no basis for this visual depiction of a member of a surgical team operating in a clean surgery such as a total hip or total knee replacement.  He agreed that they made no effort to use the "space suits" that could more accurately depict OR garb.

Settles testified that his draping setup was based entirely on a 3M video. Settles Dep. 53:2-6. But that video depicts surgical staff in full surgical gowns; arms are covered by long-sleeved scrubs and surgical gloves extend over the lower portion of the sleeves. Settles does not support his images with reference to any surgical staff standards or best practices or protocols—perhaps because those are areas far outside of his qualifications.

Defense counsel participated in Settles experiment, and in fact was on the simulated operating room table for schlieren imaging *Id.* at 53:7-55:1. One of the perils of acting as a litigation expert is relying on information spoon-fed by counsel. *In re TMI Litig.*, 193 F.3d 613, 698 (3d Cir. 1999). It may be that Settles relied entirely on defense counsel to establish the conditions under which he took these pictures. To the extent he did, Settles relied on information that lacks reliability. In any event, because Settles had neither personal experience nor sought reliable information from qualified experts, as required under Federal Rule of Evidence 703, Settles' testimony on alternative modes of infection should be excluded.

### 3.    No Foundation to Testify to Thermal Plume or Potential Positive Impact of Bair Hugger on Operating Room

Settles notes that Memarzadeh and Manning have a thermal plume theory and if that's true, the patient warming blankets should have a positive rather than negative effect on the rate of surgical site infection "since they add warm air to the naturally-rising thermal plume of the patient without disrupting the airflow" Settles Rpt. at 11-12.  That opinion should be excluded.  Settles repeatedly stated that "[p]articles were not a part of our study."  *See*, *e.g.*, Settles Dep. 328:22.  He conceded that he is not a particle expert. *Id*. at 117:1-2.  Having disqualified himself from offering opinions on particles, he cannot offer an expert opinion on the potential impact of a thermal plume on particles.

### B.    <u>Settles Failed To Follow Recognized Scientific Methods In Conducting His Experiment And Admits His Results Are Unreliable</u>

### 1.    Lack of Methodology Makes Settles' Measurements Unreliable

Settles readily admits his experiments were not conducted in an operating room or even a hospital. Settles Rpt. at 3. He intentionally declined to "simulate the shape, size, outflow vents, or air changes of an actual OR." (Report p. 4) The experiment was conducted in an open warehouse building, (Settles Report p. 5), and the warehouse space was ventilated to the outside. (Settles Dep. 211:9-18) The mannequin and the surgical table were elevated and/or moved to the side at various unspecified times during the experiment.   (Report p. 4) No authentic OR overhead lamp was used in Settles' experiment, and no information about the watts produced by the substitute lamp was provided in Settles' report. (Report p. 5) Settles includes several images in his report,

including an "OR staff member" who appears to be operating or assisting in an operation with ungloved hands and bare arms. Settles Rep., p. 15 Fig. 15 & 16.

Indeed, the set up that Settles' team did was based entirely on a 3M video about draping. (Settles Dep. 53:2-6) The draping used during his experiments was changed at unspecified times during the experiment, without explanation of even notation about the modification.   Settles Dep. 265:25-267:15. Defense counsel participated in Settles experiment, and in fact was on the simulated operating room table for schlieren imaging (Settles Dep. 53:7-55:1). Because Settles apparently relied entirely on defense counsel to validate the experimental design, rather than seeking and relying on information from a reliable source under Rule 703, Settles' testimony should be excluded.

Settles readily admits he did not account for everything associated with an operating room that could affect airflow (Settles Dep. 43:2-10).  Settles agrees it is important to confirm calibration before doing a scientific test, (Settles Dep. 146:16-18), and he tested some of the other instruments he used in this experiment before he started, (Settles Dep. 146:2-13), but Settles did not check the calibration on the Bair Hugger blower when he started his experiment to determine whether the machine was blowing air at the anticipated temperature.  *Id.* at 143:22-24.

Settles further explained at his deposition that height of the mock operating table was raised by three to four feet to allow Settles to try to capture images under the table. *Id.* at 169:21-170:10. Raising the table, however, brought the airflow generator and the table much closer together than would be the case in a real-life operating room. Conditions changed during various parts of the experiments; at some points the garage

door was open, and at other points the garage door may have been closed. *Id.* at 211:16-212:13. Settles confessed the "operating room" he constructed for the tests reflected in his report does not reflect any operating room he has ever seen. *Id.* at 213:14-24. As such, the results of this experiment and his attempt to graft his conclusions on to a real-life operating room are so disconnected from reality as to render them unreliable.

Testability is one of the recognized indicators of whether the expert's opinion is reliable under Rule 702. *Daubert,* 509 U.S. at 593. This method consists of repeating the experiment to determine whether it produces the same result. Given the lack of any recorded experimental protocol or controls, it would be impossible to even try to replicate the schlieren measurements conducted by Settles. Testimony reflecting conclusions and opinions based on this experiment should therefore be excluded.

### 2.    Schlieren Imaging is Inapplicable to the Assessing Particle Movement and Fluid Dynamics in an Operating Room

Schlieren imaging approach has significant limitations and Settles admitted as much. For example, schlieren imaging does not provide an actual temperature measurement; rather it shows the "gradient of the refractive index. *Id.* at 46:22-47:1. The refractive index is related to the density. *Id.* at 47:2-6. Settles concedes there are temperature gradients that schlieren will not capture. *Id.* at 47:11-14. The instruments used in his experiment will only capture temperature changes of certain gradients. *Id.* at 47:17-48:7. Settles estimated the gradient his system was capable of capturing was in excess of 1° per centimeter (*Id.* at 49:8-13), but the equipment doesn't have an objective

19

calibration system; the sensitivity of the equipment is determined by conducting a separate test and evaluating the results visually. *Id.* at 49:18-51:10.

Importantly, Settles concedes schlieren testing is an inappropriate instrument to measure particle flow. *Id.* at 59:4-18. Indeed, Settles made no attempt to track particle flow with his schlieren imaging. *Id.* at 59:19-22. Likewise, Settles made no attempt to detect or measure turbulence intensity. *Id.* at 60:14-16. No objective calculations were made. *Id.* at 148:14-19. Thus Settles should be prohibited from offering any testimony about the movement of particles in an OR or the intensity of turbulence in the OR.

### 3.      Settles' Conclusions are Unsupported

Settles confirms air leaving the Bair Hugger blanket is turbulent. (Settles Report p. 9) He concludes "the end of visible mixing with the atmosphere is observed to be about 3 cm" from the end of the blanket surface, and uses that measurement to aver any claim that convection currents "mobilise (sic) floor air into the surgical site area" is thereby refuted. Settles Report p. 10, 21. An expert's reliance on unfounded assumptions in comparative analysis creates "too great an analytical gap" between his opinion and the data on which it relies. *Junk v. Terminix Intern. Co.*, 628 F.3d 439, 448 (8th Cir. 2010). Reaching a conclusion based on a disfavored visualization technique, based on measurements taken in a simulation which even the author specifically disclaims as representative of conditions in a true OR takes too large a leap to be reliable and therefore should be excluded.

Settles confesses caution is required in interpreting schlieren imaging because the technique integrates all the features of a refractive flowfield into a single image; "if the

flow becomes very complicated and three-dimensional, the resulting schlieren image can be difficult or impossible to interpret." Settles Rpt. at 3. Basically, schlieren takes a three-dimensional phenomenon and makes it look two-dimensional.  Settles claims that he avoided any such problems (Settles Rpt. at 3), but offers no explanation or insights as to how or why he makes that assertion.  Given that the Bair Hugger blanket is a three-dimensional structure, applied to a three-dimensional patient on a three-dimensional operating table, Settles has provided no support for his conclusive assertion that he avoided the schlieren "integration" problems. Absent support from the expert to demonstrate that the expert's protocol was consistent with the methodologically-sound technique, 3M cannot establish that the results are reliable.

### C.   Settles Had Insufficient Information to Offer Expert Opinions

One of the perils of acting as a litigation expert is relying on information spoon-fed by counsel.  *In re TMI Litig.*, 193 F.3d 613, 698 (3d Cir. 1999).  Settles confessed his literature search was flawed. Settles Dep. 156:2-7.  Settles wasn't provided a single internal document from 3M. *Id.* at 78:11-13. Settles admitted his normal practice would be to gather as much information as is reasonably possible when an engineering problem presents itself. *Id.* at 75:12-17.  He readily agreed that he would want to know what studies were previously done by scientists with respect to the effect of the Bair Hugger on downward airflow in an OR, (Settles Dep. 76:20-24), yet he cited to only a single peer-reviewed journal that considered the Bair Hugger. Settles Rep. p. 22-23. His unexplained departure from his practice outside the courtroom reflects litigation bias, not sound science. Several MDL courts have cautioned that an expert's opinion is unreliable if the

expert fails to acknowledge or account for relevant scientific literature that tends to refute the expert's theory. *See Tyree v. Boston Scientific Corp.*, 54 F. Supp. 3d 501, 519 (S.D.W.Va. 2014) (collecting cases). Settles had no reliable basis to read and consider only the handful of studies provided to him by 3M. That alone should be a basis to exclude his testimony.

### D. Settles' Comparison Of Bair Hugger To Hotdog Should Be Excluded

Settles elected to perform comparative schlieren experiments on the Bair Hugger and the HotDog patient warming system. Early in his report, Settles' explains that schlieren imaging is able to reveal phenomena that may be invisible to the unaided eye. (Report p. 3) He includes side-by-side photos at Figure 10 of his report:



Fig. 10 – Schlieren images of a) Bair Hugger 52200 and b) HotDog REF B103 patient blankets on mannequin with downflow (see text for details). Corresponding videos are DSC_0171 and DSC_0181, respectively.

Despite what seems to be obvious discrepancies between the Bair Hugger photo on the left and the HotDog photo on the right, Settles concludes there are "no great differences in the visible thermal behavior" shown in these schlieren images. (Report p. 11)

22

Settles makes the same conclusion with respect to these images comparing the Bair Hugger and HotDog machines:



Fig. 14 - Schlieren images of the thermal convection patterns generated by a,b) the 3M Bair Hugger 775 Temperature Management Unit and c,d) the HotDog WC51 Power Unit. Downflow was operational when these images were taken. Corresponding videos for the Bair Hugger and HotDog units are DSC_0239 and DSC_0242, respectively.

Settles Report, Fig 12, p. 15. Contrary to Settles' conclusion, both Figs. 10 and 12 demonstrate obvious differences in heat generated by the Bair Hugger blanket, as well as the Bair Hugger blower, both documented in the top two photos, as compared to the HotDog blanket and the HotDog heater reflected in the bottom two photos.

More pointedly, and in spite of the Court's rulings with respect to the relevancy of HotDog to this litigation, Settles' Report is replete with comparisons between the Bair Hugger and the HotDog.  It is axiomatic that expert testimony is admissible only if is "relevant to the task at hand." *Kumho Tire Co.*, 526 U.S. at 141. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591. As much as 3M has re-cast this case into a dispute between Augustine's HotDog and 3M's Bair Hugger, that is not what this case is about.  It is about men and women suffering PJIs caused by Bair Hugger.

There are no references to HotDog in any of Plaintiffs' expert reports. Settles testified that he knew that. Settles Dep. 19:8-20. Given this Court's rulings with respect to conductive warming systems as a reasonable alternative design to the Bair Hugger, there is no way comparisons between Bair Hugger and HotDog could help the jury in this case. Accordingly, any testimony, conclusions, or opinions Settles disclosed about HotDog should be excluded.

### E.   Settles Attempt to Reserve the Right to Conduct New Schlieren Testing Should be Precluded

Settles explicitly "reserves the right" to conduct a "Background-Oriented Schlieren" experiment between now and the time of trial, and purports to reserve the right to use the results of this "BOS" experiment at trial. Settles Rpt. at 17.

Litigation against 3M for Bair Hugger surgical site infections has been pending for years. Expert deadlines were set by the Court long ago. Defendants and Dr. Settles have

had ample time to conduct schlieren imaging. Any new testing would be untimely, and Plaintiffs respectfully request it be excluded.

## V.   CONCLUSION

For the reasons stated above, Plaintiffs ask the Court to Exclude the Deficient Portions of the Testimony of Gary Settles, Ph.D.

Dated: September 12, 2017

CIRESI CONLIN L.L.P.

/s/Michael V. Ciresi_____
Michael V. Ciresi (MN #0016949)
Jan M. Conlin (MN #0192697)
Michael Sacchet (MN # 395817)
Ciresi Conlin LLP
225 S. 6th St., Suite 4600
Minneapolis, MN 55402
Phone: 612.361.8202
Email: MVC@CiresiConlin.com
        JMC@CiresiConlin.com
        MAS@ciresiconlin.com

LEVIN PAPANTONIO, P.A.

/s/ Ben W. Gordon, Jr.
Ben W. Gordon (FL # 882836) – *Pro Hac Vice*
J. Michael Papantonio (FL # 335924)
316 S. Baylen Street, Suite 600
Pensacola, FL 32502-5996
Phone: (850) 435-7090
Fax: (850) 436-6090
Email: bgordon@levinlaw.com

MESHBESHER & SPENCE LTD.

/s/ Genevieve M. Zimmerman
Genevieve M. Zimmerman (MN #330292)
1616 Park Avenue South
Minneapolis, MN 55404
Phone: (612) 339-9121
Fax: (612) 339-9188
Email: gzimmerman@meshbesher.com

***Plaintiffs Co-Lead Counsel***