1          UNITED STATES DISTRICT COURT

2               DISTRICT OF MINNESOTA

3    ------------------------------------------------------
                                    )
4                                   )
        In Re: Bair Hugger Forced Air    )   File No. 15-MD-2666
5       Warming Devices Products         )   (JNE/FLN)
        Liability Litigation             )
6                                   )   September 18, 2017
                                    )   Minneapolis, Minnesota
7                                   )   Courtroom 9W
                                    )   9:30 a.m.
8                                   )
                                    )
9    ------------------------------------------------------

10

          THE HONORABLE FRANKLIN L. NOEL
11           UNITED STATES MAGISTRATE JUDGE

12

                    **(MOTIONS HEARING)**
13

     APPEARANCES
14

15   FOR THE UNITED STATES:
                              ASSISTANT UNITED STATES ATTORNEY
16                            Andrew Fuller
                              600 United States Courthouse
17                            300 South Fourth Street
                              Minneapolis, MN  55415
18
     FOR THE PLAINTIFFS:      MESHBESHER & SPENCE
19                            Genevieve M. Zimmerman
                              1616 Park Avenue
20                            Minneapolis, MN  55404

21
     FOR THE DEFENDANTS:      BLACKWELL BURKE P.A.
22                            Deborah Lewis
                              431 South Seventh Street
23                            Suite 2500
                              Minneapolis, MN  55415
24

25
               (Appearances continued on next page)

1    APPEARANCES:

2    FOR DEFENDANT 3M:          FAEGRE BAKER DANIELS
                                Bridget M. Ahmann
3                               90 South Seventh Street
                                Suite 2200
4                               Minneapolis, MN  55402

5    COURT REPORTER:            MARIA V. WEINBECK, RMR-FCRR
                                1005 U.S. Courthouse
6                               300 South Fourth Street
                                Minneapolis, Minnesota 55415

7

8

9

10

11

12

13

14

15

16

17

18

19

20
              Proceedings recorded by mechanical stenography;
21   transcript produced by computer.

22

23

24
              *      *      *      *      *      *      *
25

```
 1                    P R O C E E D I N G S

 2                       (9:33 a.m.)

 3            THE COURT:  Good morning.  Please be seated.

 4    Okay, this is In Re: Bair Hugger Forced Air Warming Devices

 5    Products Liability Litigation.  And we're here for a hearing

 6    on the Defendant's motion to compel Miami VA Medical Center,

 7    and the government's motion to quash that subpoena.  So

 8    let's first get everybody's appearance on the record.  For

 9    the defendants?

10            MS. LEWIS:  Good morning, Your Honor.  Deborah

11    Lewis on behalf of defendants 3M Company and Arizant

12    Healthcare.

13            MS. AHMANN:  Bridget Ahmann on behalf of the

14    defendants.

15            MR. FULLER:  Good morning, Your Honor.  David

16    Fuller on behalf of the United States and Department of

17    Veterans Affairs.

18            THE COURT:  Okay.  Let's start with -- well, have

19    you folks talked among yourselves about who wants to go

20    first?  These motions are the flip sides of one another,

21    correct?

22            MS. LEWIS:  It is.

23            MR. FULLER:  Correct.  I would assume that the

24    defendants would go first.

25            MS. LEWIS:  Yes, Your Honor.
```

4

```
1           THE COURT:  You assume the same?

2           MS. LEWIS:  Yes.

3           THE COURT:  All right.  Ms. Lewis?

4           MS. LEWIS:  Thank you, Your Honor.  Good morning.

5           THE COURT:  Good morning.

6           MS. LEWIS:  This is defendant's motion to compel

7    asking the Court for an order for the --

8           THE COURT:  Time out one second, we didn't get you

9    on the record, did we, Ms. Zimmerman?

10          MS. ZIMMERMAN:  No, officially you did not, Your

11   Honor.  Genevieve Zimmerman for the MDL plaintiffs.  We have

12   not filed position papers here --

13          THE COURT:  You're just here to observe, and you

14   represent the plaintiffs.

15          MS. ZIMMERMAN:  That's correct, Your Honor.

16          THE COURT:  I'm sorry to interrupt.  Go ahead,

17   Ms. Lewis.

18          MS. LEWIS:  Thank you, Your Honor.  Again, on

19   behalf of defendants 3M Company and Arizant Healthcare,

20   defendants are asking for an Order for the Miami Veterans

21   Administration Medical Center for an Order for three things,

22   as we have in our papers:

23          One, we want, in response to our subpoena,

24   relevant documents produced that are germane to the Veterans

25   Administration's Medical Center's procedures.
```

1          Two, we are asking for the depositions of two key

2     witnesses, two treating physicians.  One is the surgeon who

3     actually performed all three surgeries on Mr. Nugier.  The

4     other treating physician is the infectious disease

5     physician.

6          The third thing we are asking for is a deposition

7     of a hospital representative who can answer questions that

8     are central to the case.  For example, information about

9     Bair Hugger use at the hospital, information about service

10    and maintenance on the Bair Hugger warming system,

11    information about infection control since infection and

12    surgical site infections are a key issue in this case.

13         We also want information about the ventilation

14    system in the operating room, again, because one of

15    plaintiff's central themes is air flow and disruption of air

16    flow.  So those are some of the key issues that are central

17    to the case in which we want information from the hospital.

18         This particular case involves Mr. Nugier, who is

19    one of the two bellwether cases that have been selected for

20    trial.  Mr. Nugier had his surgeries, all three surgeries at

21    the actual VA Medical Center.  His surgery was performed in

22    2012.  I know that is some time ago, but that's what we have

23    before us.

24         As Your Honor is well aware, our discovery cut-off

25    is middle of October, October 16th, and so time is of the

1    essence, and we have been working on this since early

2    August, since August 4th trying to get started getting some

3    documents and getting depositions scheduled for the treating

4    physicians.

5            But because this is a bellwether case and

6    bellwether trial, discovery must be thorough and fair

7    because, as we know, the trial outcome will have a

8    substantial impact on future cases.  And so if this

9    discovery is not accurate, complete, and fair, at least to

10   defendants, and probably to both parties, it will have a

11   significant impact on the future.  And so that's why this is

12   extremely important for this discovery to go forward.

13           We don't believe there's any other means to obtain

14   the relevant data, for example, for the surgeon.  He was the

15   only surgeon who performed all three surgeries.

16   Unfortunately, based on my years of experience, medical

17   records don't provide sufficient information in detail

18   that's needed in order to prepare for a trial on the actual

19   surgery and circumstances surrounding the surgery.

20           So we believe that a deposition of the treating

21   physician is necessary because there is no other means in

22   order to obtain data about the surgery and the details of

23   the surgery.

24           THE COURT:  Do you think this guy is going to

25   remember something that happened five years ago?

1              MS. LEWIS:  He may not, but at least we asked.

2              THE COURT:  It's the VA.  It's not like he doesn't

3       have a volume of cases presumably.

4              MS. LEWIS:  Completely understandable, but all we

5       can do is ask.  It's better to ask and have him say no then

6       to question whether he may have remembered, and we didn't

7       get the opportunity to ask him.

8              The same is true for the infectious disease

9       physician.  Again, Lichtenberger is the infectious disease

10      physician.  It's the physician who was the attending

11      physician and also made the diagnosis of the joint

12      infection.  So, again, we don't believe there is another

13      means to obtain that relevant data other than to ask that

14      particular physician questions.  Again, we hope that the

15      medical records may prompt something that they may remember

16      even though it may be five years ago.

17             We have been in communications with Mr. Fuller.

18      We had a conversation just this morning.  We also spoke this

19      last Friday, and there was some discussion on what could be

20      done as some sort of compromise.  The discussion heretofore

21      was whether a FOIA request was appropriate.  We don't

22      believe so for several reasons:

23             Number one, we believe it would take too much time

24      to get a response to a FOIA request.  And we believe if

25      you're going to ask for a FOIA request, why couldn't you do

1    the same document production in response to a subpoena?

2              So timing, again, is super critical.  We just

3    believe it would take way too much time to get a FOIA, at

4    least with respect to the documents.

5              I'll inform the Court, and Mr. Fuller will

6    probably talk about it more fully, but this past Friday we

7    learned for the first time, we had a conversation with

8    Mr. Fuller, as well as Ms. Barbara Kehoe, who is in Florida

9    who informed us that, number one, she is looking for

10   documents but at this point has not found any.  And, of

11   course, we know Hurricane Irma has occurred since we filed

12   this.  She said that the hospital is sort of in clean-up

13   mode, but at this point we still don't have any documents,

14   and she hasn't given a definitive answer on if there in fact

15   documents.  She is checking.

16             We had discussions on whether it would be

17   appropriate for deposition or written questions to the

18   treating physicians and to the hospital representative, and

19   we were discussing that this morning.  Mr. Fuller mentioned

20   that Ms. Kehoe may be willing to allow a deposition of

21   written questions, followed up with a one hour maybe

22   deposition by phone.  Again, based on my years of

23   experience, and the experience in this particular MDL, we

24   don't believe one hour would be sufficient because both

25   parties would be entitled to ask questions of the treating

1   physician.  So although we're trying to work some things

2   out, at this point, we haven't worked it out where it's

3   satisfactory, at least to defendants.

4          The other thing that's important to bring to the

5   Court's attention is that on Friday, Mr. Fuller and

6   Ms. Kehoe informed us that Mr. Nugier's surgery was not

7   actually performed in the medical center's regular operating

8   room.  Instead his surgery was performed in a temporary

9   trailer that was brought on to the facility at the hospital

10  because the operating room is under construction or

11  renovation.

12         So that raises even more questions for us since

13  the theories, several theories of plaintiff has to do with

14  the environment within the OR.  So now that we know there's

15  this temporary trailer, we know nothing about it, and

16  there's so many questions that we need answered.  How large

17  is it?  What's the operating room look like?  How long has

18  it been there?  Was anything differently done with respect

19  to this particular surgery that would not have been done in

20  the regular OR?  So this new revelation is all the more

21  reason that we really need to ask questions.

22         Ms. Kehoe also mentioned with respect to these

23  trailers that she does not believe they still have documents

24  with respect to who are the vendors for these trailers, and

25  so we don't even know that there are documents about it.  So

1     again --

2             THE COURT:  When you say that Ms. Kehoe is looking

3     for documents, is she looking for paper documents or is she

4     searching electronic records somehow?  Or don't we know the

5     answer to that?

6             MS. LEWIS:  I'm not sure which.  According to Mr.

7      Fuller, and he can explain more fully, at least -- I don't

8     know, again, if they're electronic or not.  My guess is they

9     may be paper.  Some may be paper documents.

10            THE COURT:  And this trailer business, was that

11    for all three surgeries?  Or was that just for the first

12    surgery, the last surgery, the middle surgery or?

13            MS. LEWIS:  That's what we need to find out.  I

14    believe Ms. Kehoe mentioned the first surgery, and, again,

15    Mr. Fuller may have a better recollection of whether it was

16    all three or not.  But the first surgery, of course, was the

17    surgery on his knee.

18            THE COURT:  The one that resulted in the

19    infection.

20            MS. LEWIS:  Correct.  The other two surgeries were

21    treatment for the infection, so sort of revision surgeries.

22            So, again, although we have been in discussions

23    trying to work things out, at this point, we still aren't at

24    a point where we believe there would be sufficient discovery

25    on behalf of defendants to find out as much information as

1    we really need in order to have a fair trial.  And so as our

2    papers mentioned, we believe, you know, outright denial is

3    sort of arbitrary and capricious based on several cases that

4    we've cited.

5         We've cited the *Ohio Health v. The Veterans*

6    *Administration*, as well as the *Rhoads* case, which we believe

7    both talk about the fact that in cases similar to ours where

8    it involved physicians, and the work, whether it was surgery

9    or otherwise, but treatment provided by our physician.  It

10   was determined in those two cases that it was arbitrary and

11   capricious to outright deny access to the documents and the

12   data and to talk to the physicians.

13        THE COURT:  But you do concede, do you not, that

14   the VA and the government agency is different than a private

15   entity that you might be seeking documents from?

16        MS. LEWIS:  We understand, and we did put in our

17   papers.  We know about the *Touhy* regulations, and we believe

18   that we complied with them and comported to what they

19   required and the various factors that need to be considered.

20   But because this is a bellwether case that will

21   significantly impact all future cases, because we don't have

22   any other means to gather that data, and that was one of the

23   things that was mentioned in the *Rhoads* case, the treating

24   physicians had personal knowledge of what happened during

25   the treatment of the patient, and there was no other place

1    to get that data.  In other words, to obtain that relevant

2    data.

3              So even though, yes, the Veterans Administration

4    does have some protections, the courts have not said

5    outright that they are not required to do anything, that

6    they can totally deny and refuse any discovery whatsoever.

7              THE COURT:  Okay.  Thank you.  Mr. Fuller?

8              MR. FULLER:  Thank you, Your Honor.  Good morning.

9    I probably have a somewhat different perspective of the

10   paradigm here.  I think that we're in a little bit of a

11   different world when we're talking about discovery against

12   the federal government or federal agency.  Certainly,

13   understandably, counsel focuses on relevance and importance

14   to the case that is an ongoing private litigation here, but

15   this is not a typical discovery request where you have a

16   sovereign immunity backdrop and the government has not

17   waived its immunity where it's not a party in a situation

18   like this.  You have to look to the regulatory context.  So

19   it's not simply that these regulations happen to be out

20   there and provide some additional protections, but that

21   becomes the framework through which to view the request, and

22   so the subpoenas don't directly apply and that's why we move

23   to quash them.

24             What's controlling is counsel's letters to the

25   deciding official at the agency explaining how the

1   regulatory factors are met here, and those letters hardly

2   addressed the *Touhy* factors, the VA's regulatory factors.

3           By contrast, the response was based on the

4   applicable factors, and looking at the particular

5   regulations that apply here under the VA, the main duty of

6   the deciding official, I would submit, is to advance the

7   mission of the agency in particular by preserving the time

8   of the busy doctors here and to ensure that the vets get

9   served.

10          Now, there are also special protections in place

11  such as a prohibition, unless there's extraordinary

12  circumstances against expert testimony, and the so-called

13  quality assurance privilege.  All those things are thrown

14  into the mix, and we're sort of bumping up against these

15  sort of problematic issues as --

16          THE COURT:  Do you agree or disagree with

17  Ms. Lewis that these cases that she cites stand for the

18  proposition that the outright denial of any discovery at all

19  would be arbitrary and capricious?

20          MR. FULLER:  Well, I apologize if there's

21  something that I missed, but I don't recall that there was a

22  *Touhy* decision cited that was on point in that sense, so I'm

23  actually unfamiliar with the details of those particular

24  cases.

25          THE COURT:  Okay.  And it's your contention that

1    quashing the subpoena outright in saying they get nothing

2    would be an appropriate outcome and that's the relief you're

3    seeking?

4              MR. FULLER:  That is correct.  And on the other

5    hand, I don't disagree with the factual information that was

6    provided here at the end of the discussion by Ms. Lewis.

7    And I would also submit that, or I just wanted to remind the

8    Court and all of us that Ms. Kehoe at the very outset, you

9    know, the circumstances are set forth in our brief, but she

10   offered an alternative from the start, which was

11   entertaining written questions.  And from my perspective, it

12   would be wise of the defendants to get moving and get those

13   questions submitted.  The denial decision was not arbitrary

14   and capricious, and our position is that the motion to

15   compel should be denied and that the subpoenas should be

16   quashed.

17             THE COURT:  Does the offer of written questions

18   factor into the analysis of whether the denial is arbitrary

19   and capricious?  In other words, is it a different question

20   if the facts were subpoena served, Kehoe says, no, screw

21   off, leave us alone, we're too busy.  Or -- that's one

22   scenario.

23             Or, second, is it a different question or the same

24   question if the response to the subpoena is, oh, gee, we

25   don't really have to do this, recognize you've got some

1    issues.  Hey, how about the written question thing?  We'd be

2    willing to do that.  And then no agreement is reached, so

3    it's denied.

4            Are those two different questions or is the legal

5    analysis the same, they're just denials of requests for

6    discovery?

7            MR. FULLER:  In my view, the fact of the deciding

8    official having offered the written question option is a

9    factor that the Court should consider, and so I think it's a

10   different question in light of the full circumstances here.

11           THE COURT:  Okay.

12           MR. FULLER:  And I'm happy to speak to any of the

13   back and forth that we've had or any of the information that

14   might be helpful again to the Court.

15           THE COURT:  What is the last offer that the

16   government has made?  Is it the written questions plus the

17   one hour telephonic deposition?

18           MR. FULLER:  Yes.  And the way I would

19   characterize that is that that would be the offer.  Well,

20   let me back up to clarify.

21           The deciding official at the agency has not yet

22   agreed that the one-hour followup could be in the form of a

23   deposition testimony under oath.  At the very least though,

24   she is willing to agree that depending on how things go with

25   these written questions, that there would be an opportunity

 1    with respect to both doctors and, hopefully and presumably,

 2    someone at the agency who could speak to the issues of

 3    concern in the 30(b)(6) subpoena.  That there would be an

 4    opportunity for counsel to get on the phone, probably with

 5    agency lawyer, probably with myself or someone at the local

 6    U.S. Attorney's Office, and have a direct back and forth

 7    with the --

 8              THE COURT:  With each of the three witnesses, two

 9    doctors and 30(b)(6) person?

10              MR. FULLER:  That is my understanding, yes.

11              THE COURT:  So it would be three hours worth of

12    testimony?

13              MR. FULLER:  That's my understanding, yes.

14              THE COURT:  Okay.

15              MR. FULLER:  And the weather has not helped in the

16    last 10 days for obvious reasons.

17              THE COURT:  Where is the VA again?  What city?

18              MR. FULLER:  This is in Miami.  We did have a

19    discussion, telephonic on Friday, as well as a followup few

20    discussions that I had this morning.  I would just say that

21    Ms. Kehoe is making progress on trying to be helpful

22    including tracking down documents, and my understanding is

23    that they are paper documents as well as electronic

24    documents.  She's undertaking a search for at least certain

25    of the documents that the defendant has requested, but it's

1    in flux, and I would say the same thing about the

2    information about where the surgery took place.  I don't

3    have a complete understanding of that.  That was new

4    information given to me on Friday.  I understand that it did

5    relate to the first surgery that has been mentioned.

6              THE COURT:  Only the first surgery or to the first

7    surgery and the other two?

8              MR. FULLER:  I don't know the answer to that.

9              THE COURT:  Okay.

10             MR. FULLER:  We're all sort of learning as we go.

11             THE COURT:  And the time lag between the first

12    surgery, which as I understand it, is the one where the

13    infection is alleged to have been contracted, and the middle

14    surgery, which was to treat the infection, and then the

15    third surgery was to re-do the knee, is that --

16             MR. FULLER:  I don't know the timing.  I don't

17    remember.

18             THE COURT:  Okay.  Anything else?

19             MR. FULLER:  I'm sure counsel who has been

20    involved in the case would know more.

21             THE COURT:  Okay.

22             MR. FULLER:  No, I just reiterate though that the

23    written questions are probably going to be very helpful to

24    all involved, but it's unclear what would happen if there

25    were a Court Order to compel anyone to do anything and that

1    may just drag things out more.

2          THE COURT:  Okay.  Ms. Zimmerman, is Nugier your

3    client or is that a Florida lawyer involved in all of this?

4          MS. ZIMMERMAN:  There is a Texas law firm involved

5    in representing Mr. Nugier, and I was hoping that I would

6    not have to address the Court at all as we kind of find

7    ourselves a little bit in the middle of the position here.

8    We agree with the defendants, and we're prepared to join in

9    the motion to a certain extent, as we think that the

10   information is in fact necessary to work up these cases for

11   bellwether.

12          I will say that given what I've heard this

13   morning, I would reiterate our position and what I thought

14   was our agreement about contracting treaters because it

15   sounds like there's been a great deal of information that's

16   been learned about Mr. Nugier's surgeries, particularly on

17   Friday, that I'm hearing for the first time in this court.

18          So to the extent that there are ongoing

19   conversations with defense counsel and with the government

20   about the plaintiff at issue and his medical care, the

21   plaintiff certainly reiterate their request that they be

22   involved in those conversations because this is not mere

23   scheduling.  This is really quite substantive.

24          At the same time, the plaintiff find themselves

25   aligned with the government to a certain extent as well,

1    because, and I think that the government articulates this in

2    the briefing, there are federal limitations with respect to

3    this, what I think is an attempt by defendants to cross over

4    from understanding what kind of treatment Mr. Nugier

5    required at the VA, because the actual requests from 3M ask

6    about experience with the Bair Hugger, efficacy, things that

7    touch on expert issues.  And I do think that there's a line

8    that this Court can and should draw with respect to the

9    information sought from the treaters down in Miami when we

10   get there.

11           Now, I think that probably there's a middle ground

12   that we could meet if the parties, both the plaintiffs and

13   the defendants and the government, were to work together to

14   see if we could reach agreement on obtaining documents,

15   obtaining depositions partially perhaps by a written

16   question and partially by a telephone deposition, but it

17   seems to me based on some of the information that was gained

18   on Friday, we may need to discuss representativeness and

19   some other issues with respect to bellwether status from

20   Mr. Nugier as well.

21           THE COURT:  Okay.

22           MS. ZIMMERMAN:  Thank you.

23           THE COURT:  Thank you.  Anything else?  I'm going

24   to go over here, but, Mr. Fuller, do you have anything?

25           MR. FULLER:  I just wanted to add for the record

1      that to me the comments of plaintiff's counsel just now

2      underscore the reasonableness of the denial here because one

3      of the factors involved is an appearance of favoritism in a

4      lawsuit such as this, and where one of the parties happens

5      to be a veteran, there's a heightened concern that the

6      veteran may feel slighted or may be hesitant avail himself

7      of the VA services, and so that was one of the factors that

8      went into the decision here.

9              THE COURT:  Is there any -- one of the

10     complicating factors that's not present, as I understand it,

11     that both of these doctors are still employed by the VA and

12     are accessible and within the control of the United States?

13             MR. FULLER:  That is accurate.

14             THE COURT:  Thank you.  Ms. Lewis, anything else?

15             MS. LEWIS:  Just short, Your Honor.  With respect

16     to the deposition of written questions and a follow-up time,

17     we believe the amount of time it would take to prepare

18     answers to the questions plus prepare for the deposition

19     would be about the same amount of time that we would want

20     for the deposition itself.  So I'm not sure it saves those

21     physicians additional time to do both.

22             Our suggestion and request is that we just go

23     forward with a deposition.  We could limit it to four hours.

24     That would give both parties a chance to ask questions that

25     they deem important.  And so, and with respect to the

1    conversation with Mr. Fuller, it was strictly

2    administrative.  We were trying to negotiate what we were

3    going to do.  It was Ms. Kehoe who mentioned that he was in

4    a trailer, so nothing beyond that was unfold, so there was

5    no substantive discussion about Mr. Nugier's treatment

6    during that conversation.

7                   THE COURT:  Okay.  Thank you.

8                   MR. FULLER:  I'm sorry, is it acceptable for me to

9    add one more point, Your Honor?

10                   THE COURT:  Go ahead.

11                   MR. FULLER:  Just to be clear, I have raised this

12    exact question with the agency counsel and Ms. Kehoe, who

13    knows how things work within the VA.  It is very clear that

14    written questions with followup in her experience will be

15    much more efficient from the doctor's perspective.

16                   THE COURT:  Let me ask you this about one of the

17    government's positions, as I understand it, with respect to

18    the production of documents at least is that there should be

19    a Freedom of Information Act request.  Is it the

20    government's position that when that comes in it would sort

21    of get to the end of the line of all of the other Freedom of

22    Information Act requests that the VA might be responding to

23    and go through the ordinary course?  Or is there -- I guess

24    I'm trying to figure out what's the distinction between

25    responding to a request for documents as opposed to a

1    Freedom of Information Act request as a practical matter?

2              MR. FULLER:  As a practical matter, the FOIA

3    request gets processed by a certain, you know, a specific

4    office that is for that purpose, and they're very familiar

5    with the exceptions and what can and can't go out and what

6    needs to be redacted under the FOIA law.  And I haven't dug

7    in and had much of a detailed conversation with Ms. Kehoe

8    about that avenue.  But in my experience with other

9    situations, other agencies, at least, it's sometimes

10   possible to reach an agreement that a FOIA request can be

11   expedited.  So that's just something I'll put out there not

12   as an offer, but just as information.

13             THE COURT:  All right.  Anything else from

14   anybody?  Ms. Zimmerman?

15             MS. ZIMMERMAN:  No, Your Honor.

16             MS. LEWIS:  No, Your Honor.

17             THE COURT:  All right.  Well, here's what I'm

18   going to do.  First, I'm going to take the matter under

19   advisement.  And today is September 18th.  I plan to enter

20   an order no later than Friday, September 22nd.  And I would

21   urge all three lawyers who are in the courtroom, as well,

22   Ms. Zimmerman, if you need to engage the Texas firm who is

23   Mr. Nugier's counsel, to chat amongst yourselves and see if

24   you cannot reach an agreement.  And I would urge you all to

25   try to reach an agreement, because as I read the law, it

1    strikes me that the government's position is largely in some

2    ways supported by the law, whether the law is just or not is

3    a different question.  So if you can reach some agreement,

4    it would be in the interest of all concerned, I think, to

5    reach an agreement and move forward with it.

6         Notify me by e-mail to the chambers e-mail account

7    by Friday, the 22nd, if you have reached an agreement.  And

8    if you have not, I will issue an Order.  Actually, notify me

9    by Thursday night, close of business Thursday the 21st, and

10   if you have not reached agreement, I will enter an Order on

11   Friday.  Anything else?

12        MS. LEWIS:  No.  Thank you, Your Honor.

13        MS. AHMANN:  Thank you.

14        MR. FULLER:  Thank you, Your Honor.

15        THE COURT:  Okay.  We are in recess.

16        (Court adjourned at 10:03 a.m.)

17

18                    *     *     *

19        I, Maria V. Weinbeck, certify that the foregoing is

20   a correct transcript from the record of proceedings in the

21   above-entitled matter.

22

23        Certified by:  *s/ Maria V. Weinbeck*

24                       Maria V. Weinbeck, RMR-FCRR

25