# EXHIBIT 3

1              UNITED STATES DISTRICT COURT

                 DISTRICT OF MINNESOTA

2

3     In re: Bair Hugger Forced Air

      Warming Products Liability

4     Litigation                      MDL No. 2666

      _____

5

6

7

8              VIDEOTAPED DEPOSITION OF

9          YADIN DAVID, Ed.D., P.E., C.C.E.

10                 Houston, Texas

11             Tuesday, August 1, 2017

12

13

14

15

16

17

18

19     Reported by:

20     SUSAN PERRY MILLER, RDR, CRR, CRC

21     JOB NO. 124787

22

23

24

25

1                    August 1, 2017

2                    9:16 a.m.

3

4          VIDEOTAPED DEPOSITION of YADIN DAVID,

5    Ed.D., P.E., C.C.E., held at the offices of

6    Thompson Coe LLP, One Riverway, Suite 1400,

7    Houston, Texas, pursuant to Subpoena and the

8    Federal Rules of Civil Procedure, before Susan

9    Perry Miller, Registered Diplomate Reporter,

10   Certified Realtime Reporter, Certified

11   Realtime Captioner, and Notary Public in and

12   for the State of Texas.

13

14

15

16

17

18

19

20

21

22

23

24

25

Y. DAVID

1
2  specifically was to see device operation and
3  the inside of the device after it was used in
4  the field.  So on purposely, I wanted to get a
5  device that had some field experience with it.
6       Q.   Why?
7       A.   Because it gives me a view of what
8  the device's capability to sustain its
9  features in the field after it's been used for
10 a period of hours.  For example -- and I
11 pointed that in my report -- is that I looked
12 at the four feet on the bottom of the device
13 and gave -- and realized that this device was
14 used much on the floor because you could see
15 the wear and tear on those four points at the
16 base of the device.
17          So a device sitting on the floor
18 has different performance on its enclosure
19 than a device that would be up on the shelf or
20 on an IV pole.
21      Q.   What do you mean, it has a
22 difference in the enclosure?
23      A.   The performance of the
24 characteristics of the physical enclosure, the
25 box that covered the whole internal operation

                         Y. DAVID

2           Do you believe that the operation

3    of the Bair Hugger device you examined

4    resulted in any difference in the inside of

5    the compartment than would have occurred if

6    the device had been operated in a different

7    manner?

8              MR. BANKSTON:  Object to the form.

9        Object to the preamble.

10       A.   I need to very simply clarify the

11   purpose of my examination of the device.  I

12   wanted to see how the device is built, how

13   it's put together, where the components

14   physically sit, where is the intake, where is

15   the output, how you connect the blanket to it,

16   and I did not seek to make any performance

17   comparison or derive any clinical outcome of

18   the device use.

19   BY MS. EATON:

20       Q.   When I asked you why you wanted a

21   used device, you said you preferred one so

22   that you could see its characteristics after

23   use.  Now that you describe the purpose here,

24   let me ask a different question.

25              Would a new device have provided

1                          Y. DAVID

2              Does that business involve any work

3    other than litigation consulting?

4         A.   Yes.

5         Q.   What else do you do?

6         A.   I provide biomedical engineering

7    services to healthcare providers, meaning to

8    hospitals that would like to improve their

9    medical technology management program.  I

10   provide professional services to manufacturers

11   of medical devices that would like to start or

12   improve their field biomedical services.

13        Q.   Field?

14        A.   Correct.

15        Q.   Do you mean servicing devices in

16   the field?

17        A.   Correct.

18        Q.   Okay.

19        A.   I provide regulatory services to

20   startup companies in the medical device field.

21        Q.   What does that mean, "regulatory

22   services"?

23        A.   Advise them on how to be ready for

24   510(k) submission and the appropriate

25   information to be included in such.  And

```
1                    Y. DAVID
2  finally, I am -- develop and implement
3  telemedicine programs.
4       Q.   For the regulatory advice that you
5  provide, is it advice about the -- I would
6  like more detail about that.  What aspect of a
7  510(k) submission is it that you're advising
8  people about?
9       A.   Sure.  I'll be happy to help you
10 with that.  The 510(k) submission has a
11 process that is looking for how to classify
12 the device, how to identify a predicate
13 device, what is the substantial equivalency
14 criteria that one can use, and specifically to
15 include studies and testing in a way that
16 supports the submission.
17      Q.   What training or education did you
18 have that allows you to do that work, or that
19 you draw upon when you do that work?
20      A.   Sure.  I've been working in the
21 biomedical devices field for four decades and
22 use my expertise to understand how a device
23 works safely and what risk is associated with
24 them, seeing it from the clinical side.
25           I have obtained education and
```

                              Y. DAVID

1    training throughout my career and have been

2    working with a consultant to the Food and Drug

3    Administration on several panels and have been

4    trained by the Food and Drug Administration to

5    fulfill that role.  And I recently have been

6    asked to become a regulatory advisor to the

7    Innovation Institute of the Texas Medical

8    Center based on my experience and training.

9        Q.   What regulatory training -- you

10   mentioned training, I think, regulatory

11   training.  What regulatory training have you

12   had?  Has it been part of any formal program

13   that you can identify?

14       A.   At the master level when I was at

15   the university pursuing my degree, I took a

16   regulatory course that was taught by a

17   biomedical engineering professor.  I continued

18   at the doctorate level to obtain training in

19   the field.  I think it was a nurse who taught

20   the course at the doctorate level, but

21   regulatory principles.  And I continuously

22   attend the annual meeting of biomedical

23   product and instrumentation and take a seminar

24   and lectures as well as reading books that are

                              Y. DAVID

1    published as well as contributing to

2    regulatory books myself.  So I'm doing

3    research to write my chapter for that.

4         Q.   Okay.  That's something ongoing

5    right now?

6         A.   No.  That has been submitted,

7    complete.  The book has been published, I

8    think end of last year.

9         Q.   Is that on your CV?

10        A.   Yes.

11        Q.   Can you show me which one you're

12   referring to?  If you know the title off the

13   top of your head, you can just tell me.

14             (Document review by witness.)

15        A.   It looks like we don't have the

16   recent year here on the copy I'm holding.

17   BY MS. EATON:

18        Q.   Do you know the title of the book?

19        A.   No.

20        Q.   Are you able to provide me with an

21   updated CV?

22        A.   Sure.

23        Q.   What was your chapter about?

24        A.   I don't remember the title.  It was

                         Y. DAVID

1   about risk processes of medical devices

2   subject to regulation.

3        Q.   Of the regulation?  What

4   regulation?

5        A.   Global medical device regulations.

6   FDA, EU, others.

7             MR. BANKSTON:  Is now a good time

8        for a bathroom break?  Should we do

9        that?

10            MS. EATON:  Sure.

11            THE VIDEOGRAPHER:  We are going off

12       the record at 10:42.

13            (Recess, 10:42 a.m. to 10:57 a.m.)

14            THE VIDEOGRAPHER:  We are back on

15       the record at 10:57.

16   BY MS. EATON:

17       Q.   Dr. David, how many times have you

18   met with attorneys that you understand to

19   represent the plaintiffs in this Bair Hugger

20   litigation, in person?

21       A.   I don't keep count.  Whatever is in

22   my invoices, that would reflect it.

23            MS. EATON:  And to be clear, I was

24       hoping to get the remaining invoice

1                          Y. DAVID

2     training, I went to seminars.  I educated

3     myself as to what the standard's purpose and

4     what the principle of the categories that it

5     addresses, and how one will use it as contrast

6     with other risk assessment programs.

7          Q.   What is ISO 14971?  What is it

8     intended -- what is it?  What does it apply

9     to?

10         A.   It's basically quality system

11    organization.

12         Q.   I'm sorry.  ISO Standard

13    specifically 14971, do you know what that

14    addresses?

15         A.   It's addressed risk management.

16         Q.   For what?

17         A.   For medical devices.

18         Q.   Did you consult that in connection

19    with your work in this case?

20         A.   No, I don't believe so.

21         Q.   You are aware of it?

22         A.   I am.

23         Q.   You're aware that the risk in that

24    standard is evaluated in connection with

25    benefit?

1                        Y. DAVID

2          A.    That is correct.

3          Q.    Have you ever worked within the

4    Office of Compliance?

5          A.    I did not.

6          Q.    Have you ever taken part in

7    reviewing a 510(k) application for clearance?

8          A.    Yes.

9          Q.    On behalf of the FDA?

10         A.    Yes.

11         Q.    In what context?

12         A.    As a member of the advisory panel.

13         Q.    Okay.  When did you do that work?

14         A.    It's a public record when the panel

15   is called to admitting.  You can find them

16   online.  I don't recall when it was done.

17         Q.    Was it once or more than once?

18         A.    More than once.

19         Q.    How many devices -- you're saying

20   as part of your work on the panel, you've

21   reviewed a 510(k) application?

22         A.    Yes.

23         Q.    Okay.  For how many devices?

24         A.    I don't know, four, five.

25         Q.    Do you recall what the devices are?

1                    Y. DAVID

2    questions the panel was being asked at the

3    times that you met?

4         A.   The specific question?  No, I don't

5    remember.

6         Q.   Do you remember the scope of the

7    review you were asked to make?

8         A.   The scope of the review was to

9    determine if the instructions for use are

10   sufficiently covering the risk associated with

11   the use.

12        Q.   In all of the cases that you

13   recall, that was your scope?

14        A.   In all the cases?

15        Q.   I'm sorry.  I believe I heard you

16   say you thought -- I should -- I should say

17   that differently.

18             You said you recalled that you

19   reviewed perhaps four or five devices.  Did

20   that occur in one panel meeting or over

21   several panel meetings?

22        A.   Over several.

23        Q.   In each situation where you were

24   asked to review something for this panel that

25   you've identified, was the scope of the review

1                          Y. DAVID

2    to determine if IFUs sufficiently covered the

3    risks?

4         A.   No.  There were additional charges

5    for the panel.  A second one was to determine

6    if the submitter identified sufficient risk

7    that might be existing in the clinical

8    environment when the device is in use.

9         Q.   Any other scope of review you could

10   recall?

11        A.   Is there sufficient -- if there is

12   sufficient content in the classification of

13   the device to ensure safety when this device

14   is deployed, or there is a need for special

15   control to be added.

16        Q.   Do you recall what device that was?

17        A.   That was some kind of injector.

18        Q.   Injector?

19        A.   Yes.

20        Q.   Do you recall what kind of devices

21   you reviewed IFUs for?

22        A.   No.

23        Q.   Any other scope of review you can

24   recall?

25        A.   There is another panel on the same

                        Y. DAVID

1

2       A.    Biomedical engineering, trained and

3    practice in the largest medical center in the

4    country so I am bringing the engineering and

5    the clinical exposure and appreciation for

6    processes involve technology in patient care

7    environment.   It's a unique combination.

8       Q.    Have you ever been involved in

9    reviewing a question of whether a device was

10   substantially equivalent to a predicate

11   device?

12      A.    During the panel convening that the

13   question would come up, yes.

14      Q.    You have a specific recollection

15   that you've been asked to review that

16   question?

17      A.    I have specific recollection that

18   that was one of the subjects that we're asked

19   to consult upon.   I don't have a specific

20   recollection what device was involved.

21      Q.    Do you have a specific recollection

22   of what types of information were consulted or

23   considered in that, in connection with that

24   question?

25      A.    From my angle, what I remember are

1               Y. DAVID

2    questions relating to biomedical engineering

3    in the clinical environment.  So if I'm not

4    mistaken, one of the devices was a cleaning

5    and sterilizing equipment for proctoscopes,

6    scopes that are used in the rectum, and how

7    you clean it between uses.  And this cleaner

8    has a predicate device that said here is why

9    we are substantially equivalent.

10              The question was relating to how in

11   the real world, in a clinical environment,

12   this other device is being used.

13        Q.   Any other instance you can recall

14   being asked to evaluate a substantial

15   equivalence question?

16        A.   No.

17        Q.   Have you ever inspected a

18   manufacturer on behalf of FDA?

19        A.   No.

20        Q.   Have you ever had any input into

21   any FDA compliance decision?

22        A.   No.

23        Q.   Have you ever been consulted in any

24   of these panels with respect to whether a

25   device was adulterated or misbranded?

1                      Y. DAVID

2       Q.   In your professional capacity

3  outside of litigation, have you ever had

4  reason to review an inspection report from the

5  agency?

6       A.   Outside litigation, no.

7       Q.   And have you ever consulted with

8  FDA in the preparation of an Establishment

9  Inspection Report?

10      A.   No.

11      Q.   You said that you have consulted

12  with -- I'm sorry, let me just ask a better

13  question.

14           Have you ever consulted with

15  medical device companies about regulatory

16  topics?

17      A.   Yes.

18      Q.   Are you able to identify any of the

19  companies for me?

20      A.   On page 2 of my CV under

21  "Professional Experience," you have "Interim

22  CEO, Canopy Edge."  That's specifically

23  involved with preparing the product for

24  regulatory submission.

25      Q.   What is that product?

                            Y. DAVID

1

2          A.    It is a vascular catheter.

3          Q.    Has a 510(k) -- I'm sorry.  Will

4    that be submitted as a 510(k) or a PMA, do you

5    know?

6          A.    It is still being reviewed.

7          Q.    Any other medical device for which

8    you've provided consulting on regulatory

9    topics?

10         A.    There are two other companies.  One

11   is called, I believe, Carmel Industries,

12   C-A-R-M-E-L.  And the other one is Begamed,

13   B-E-G-A-M-E-D.

14         Q.    What products?

15         A.    Begamed.

16         Q.    Were there specific products?

17         A.    Begamed's product is laparoscopic

18   suture, surgical instrument.  And Carmel

19   Industry is a software-based labor and

20   delivery package.

21         Q.    With respect to these three

22   products that you've just identified, what is

23   your role?  What type of regulatory advice are

24   you providing?

25         A.    Wait a second.  There is one more.

1                        Y. DAVID

2    There is one more and I can't remember the

3    name.  But their product, this additional

4    entity, their product is a brain stimulator.

5    And let me answer your question about what

6    they asked me to do.  The brain stimulator was

7    going to submit a 510(k) and wanted to know

8    what are the electrical safety terms and

9    conditions that their testing needed to

10   demonstrate compliance with.

11        Q.    Okay.

12        A.    IEC 60601-1.

13              The Carmel Industry, they wanted to

14   know if there is a predicate device to their

15   product that they can use for substantial

16   equivalency.

17              The Begamed wanted to understand if

18   their product will be qualified for 510(k) if

19   there are substantial equivalent predicate

20   devices and if there is a requirement for

21   animal testing.

22        Q.    Are sutures what class?

23        A.    Class 2.

24        Q.    What about the software-based labor

25   and delivery package?

                    Y. DAVID

1

2        A.    I don't remember.

3        Q.    Do you remember for the brain

4   stimulator?

5        A.    Class 2.

6        Q.    And the vascular catheter is still

7   under evaluation?

8        A.    Correct.

9        Q.    For the vascular catheter, what is

10  the advice you're being asked about to

11  provide?

12       A.    What type of testing and

13  information will be required for submission.

14             Whenever we can take a break...

15       Q.    Pardon?  Sure.

16             THE VIDEOGRAPHER:  We are going off

17        the record at 15:20.

18             (Recess, 3:20 p.m. to 3:32 p.m.)

19             THE VIDEOGRAPHER:  We are back on

20        the record at 15:32.

21  BY MS. EATON:

22       Q.    Dr. David, have you ever designed a

23  patient warming device?

24       A.    No.

25       Q.    Have you ever made or published any

1                    Y. DAVID

2    presentation on Bair Hugger devices?

3         A.   No.

4         Q.   Before your work in this case, had

5    you ever read any studies related to Bair

6    Hugger devices?

7         A.   No.

8         Q.   At any time, have you performed

9    testing related to Bair Hugger devices other

10   than what we have discussed today?

11        A.   No.

12        Q.   At any time, have you performed

13   research related to Bair Hugger devices that

14   is not either reflected in your report or in

15   what we have discussed today?

16        A.   No.

17        Q.   Have you undertaken any effort --

18   sorry, let me ask that differently.

19             Before your work in this case, had

20   you reviewed any hospital practices with

21   respect to Bair Hugger devices?

22        A.   A specific brand name Bair Hugger,

23   no.  But relating to patient warming, yes.

24        Q.   What had you reviewed related to

25   patient warming prior to your work in this

                    Y. DAVID

1

2    case?

3         A.   Patient warming is a very important

4    part of maintaining patient condition during

5    disease management and following surgery or

6    during trauma, so as part of my responsibility

7    as director of biomedical engineering, for

8    over 30 years I was involved in reviewing

9    warming devices for adult and pediatric

10   patients using either a literally oven-warmed

11   blanket or devices that use fluids to warm

12   patients or cool them or radiation-based

13   devices that they are used in different

14   environments.

15            The specific sensitivity that I

16   became very familiar with the warming

17   technology of patients is the one involving

18   pediatrics, and we were having a very

19   interesting project where we were trying to

20   put warming devices in the emergency room, in

21   the trauma center where the ambulances would

22   bring babies, and determine how fast we can

23   bring their body temperature up in those

24   trauma situations.

25            And we were putting an infrared

                        Y. DAVID

1
2    warming device in the ceiling of the trauma
3    center and making testing and examination of
4    mannequin, small size, having ice cube on
5    them, and determine the temperature change of
6    the body.  And this specific example that I
7    became intimately familiar with the issue of
8    maintaining or warming patients under trauma
9    situations.
10             The other example that I would like
11   to bring in front of you is the neonatology
12   arena where premature babies are born and are
13   not able to maintain their body temperature,
14   not because of trauma or disease, just because
15   of their stage in early life.  And those
16   babies are tremendously sensitive to body core
17   temperatures and it's very difficult to warm
18   them up without causing skin damage.
19             So infant warmers, Isolettes, those
20   are warm air, forced warm air contraption
21   boxes that you put babies in and need to have
22   specific monitoring for the humidity and the
23   temperature inside to make sure that the
24   babies are not drying up and not being
25   basically cooked.

1                          Y. DAVID

2              And we did many studies and

3    published several research papers on that, and

4    I developed a protocol to -- how to test those

5    devices later on in their life.  So once we

6    developed it, we learned how to use it and how

7    to maintain and service it.

8         Q.   Did you mean later on in the life

9    of the device or --

10        A.   Correct, yes.  Thank you.

11        Q.   That's what I thought in context as

12   opposed to the life of the babies.

13             Did you do -- you meant the device?

14        A.   Yes.

15        Q.   Okay.  Did any aspect of your

16   testing or evaluation with respect to the

17   Isolettes used for premature babies relate to

18   contamination or infection risk?

19        A.   It has that aspect and we have

20   epidemiologists that were part of the study

21   and that was their responsibility to collect

22   the data and look at the statistics.  So it

23   was not something that I would do.

24        Q.   Okay.  Are you familiar with any of

25   their determinations or the results of their

1                       Y. DAVID

2    radiating panel were absorbing more heat than

3    the patient him or herself.  That was a

4    drawback.

5         Q.   Was a consideration of

6    contamination or infection risk any part of

7    the evaluation in that trauma setting?

8         A.   Not in that study, no.

9         Q.   Any other time in your work outside

10   of litigation that you have been personally

11   involved in evaluating patient warming?

12        A.   Yes.  The other example would be in

13   the cardiovascular theater, cardiovascular

14   operating room.  I don't know, Counsel, if

15   you're aware, but the St. Luke's Episcopal

16   Hospital that I was involved with is the home

17   of the Texas Heart Institute, which is the

18   highest-volume heart surgery hospital --

19   institution in the country, maybe in the

20   world.

21             So they are having significant

22   amount of large volume of heart surgery with

23   patients that are being cooled down on

24   purposely to slow the metabolism and

25   blood-brain barrier.

1                        Y. DAVID

2              Those patients are expected to be

3      well monitored and controlled as far as where

4      their core temperature is, and when they are

5      being brought back, there should be a certain

6      rate of core temperature rising that one

7      should expect to see, no faster, no slower.

8      You do that with what the CDC meeting was here

9      about, fluid warming and cooling devices.  And

10     you circulate the blood through a cooler

11     element or a heating element, and these

12     heating or cooling elements are devices that I

13     was responsible for and participated in the

14     study.

15              We published a couple of studies on

16     those -- I don't think that they are on my

17     CV -- at the Texas Heart Institute Journal

18     about the temperature control devices for

19     postcardiac surgery, and I think there is one

20     study that is in my list that is looking at

21     outcome of patient that underwent cardiac

22     surgery and their scalp temperature did not

23     rise fast enough to predict their outcome.

24          Q.   Did any of the studies that you

25     took part in or the publications have anything

Y. DAVID

1   Medical Center and, again, the cardiovascular

2   program was at the time developed and I worked

3   with Dr. Tarnay, who was a cardiovascular

4   surgeon, about cooling and warming patients

5   with particular devices at the time.

6           But I don't believe that my

7   involvement was in the area of infections or

8   infection prevention.

9       Q.   Do you recall any discussion, in

10  any of your work outside of litigation, where

11  a hospital was considering removing devices

12  from the operating room because of air blowing

13  from the devices?

14      A.   Not exactly what you are asking,

15  but I was involved in reviewing and evaluating

16  operating room pollutions from

17  anesthesia-based gases that are expelled from

18  a patient after they breathe it.  And the

19  records are suggesting that a minute amount of

20  those gases, if exposed by operating room

21  staff, that person, people, would lead to

22  miscarriages and other undesirable outcome.

23          So I was involved in study to

24  monitor the influence of air exchanges in the

1                         Y. DAVID
2    surgical theater and the amount of gas coming
3    from the end of the anesthesia machine when
4    mannequins were connected with simulated lungs
5    to them.  That probably is as close as I can
6    come to your question.
7         Q.   Have you ever been involved in
8    designing a cleaning protocol for an operating
9    room or for the equipment in it?
10        A.   There is equipment that is being
11   circulated through the operating room, not
12   necessarily you would call it operating room
13   fixed equipment, but the specific example I
14   have in mind for you is infusion pump, and
15   drug administration medical devices such as
16   infusion pump are probably in the thousands in
17   quantity in hospitals around the country and
18   they are being used in the emergency room, on
19   the general floor, in the operating room, and
20   they are circulating through various
21   environments.
22             I was involved with the central
23   processing supply team that looked at means to
24   clean and disinfect those pumps once they come
25   out of the patient arena, areas.  And that's

Page 216

Y. DAVID

1

2 were selected, do you recall?

3      A.   No, I don't recall because they

4 have brand name, germicide -- germicide or --

5 they have a specific brand name at the time

6 that were picked up, and I don't remember.

7      Q.   And do you remember what the

8 chemicals were, separate from the brand names?

9      A.   Those were agents that were -- that

10 are able to penetrate biofilm and kill

11 bacteria.  I don't remember the names.

12      Q.   Were these agents for use on the

13 outside of medical equipment or on the inside

14 of medical equipment?

15      A.   By a majority, they were on the

16 outside.  However, some equipment like the

17 warming/cooling circulating device in

18 cardiovascular operating room has tanks that

19 you have accessibility to the inside of their

20 container, so it was used inside as well.

21      Q.   Were you part of determining the

22 cleaning protocol for the heater/cooler units?

23      A.   I was part of the team.  I wouldn't

24 say that I determined how it should be done,

25 but I was part of the team and my expertise

1                    Y. DAVID

2   came from the biomedical engineering, for

3   example, to make sure that the agent is not

4   damaging the equipment.

5        Q.   With respect to hoses used in

6   operating rooms, that would be an important

7   consideration, right?  Not damaging the

8   equipment with the cleaning agent?

9        A.   Right.

10        Q.   Were you involved in determining

11   the interval of cleaning for any of the

12   equipment you've identified?

13        A.   I would bring my recommendation

14   after I consulted with the manufacturers on

15   that, so we will present specific scenario.

16   That's how many patients a day we expect this

17   device to be used on, these are the agents we

18   would like to use, and this is the process we

19   will use them.  And I would expect the

20   manufacturer to tell me what will be the

21   impact on the device.

22        Q.   So once the team you were working

23   on -- let me just make sure I understood that.

24   The team you were working with would determine

25   what they would wish to do and then consult

1                    Y. DAVID

2  developed in connection with this case?

3       A.   I believe that I described several

4  times today that it's been much beyond that.

5  In the areas of operating room design, cardiac

6  catheterization room design, I was involved

7  with probably 50 or 60 of those facilities and

8  equipment planning and discussion about

9  filtration and filters were part of the team

10  discussion.

11            I did not select filters, as I said

12  before, but that's where my working knowledge

13  comes from.

14       Q.   Have you ever conducted testing of

15  a filter, any kind of testing of a filter?

16       A.   I don't believe that I did.

17       Q.   Have any of your work

18  responsibilities outside of litigation

19  involved filtration on medical devices

20  specifically as opposed to rooms?

21       A.   The examples that come to my mind

22  as we sit here today are involvements that I

23  have with mechanical ventilators and bedside

24  monitors.  Those two product categories

25  involve both protection of the device from

1                    Y. DAVID

2    penetration of bacteria from the outside as

3    well as protection of the device from

4    developing pathogens in the internal cavities.

5         Q.   In what context have you worked

6    with those two devices?

7         A.   With the ventilators, I was invited

8    to travel to Travemünde in Germany.  That's

9    where Dräger Medical is located and doing

10   their research and manufacturing, and they

11   were developing a new pediatric ventilator and

12   wanted to have an opinion about how the

13   clinicians and the biomedical engineers and

14   the hospital will review their product

15   features.

16             So they took the medical director

17   of the neonatology ICU, a respiratory

18   therapist director and myself, and we were

19   participating in brainstorming session that

20   looked at how the device is going to be

21   maintained, its cleanliness, in face of some

22   challenging environment, challenging in regard

23   to pathogens.

24             The other example involved bedside

25   monitoring, and on that product I was invited

1                        Y. DAVID

2         A.   In the McGovern study, they have

3    the Bair Hugger and when they removed it and

4    used another patient warming device, there was

5    81% reduction in infection.  With the Bair

6    Hugger, there was 3.8 index increased

7    probability of infection.

8              At the incident with the literature

9    review that I cited in my report, looking at

10   all the studies, the conclusion was simple

11   that a HEPA filter is one of the ways to

12   mitigate infection.  The CDC article that I

13   have in my publication also talks about

14   filtering level efficiency.  They -- the

15   literature from orthopedics, Bone & Joint

16   Journal, is talking about one of the solution

17   is increase filter efficiency.

18              So there's ample evidence out there

19   that there is a relationship between filter

20   efficiency and the potential risk of infection

21   at the surgical site.

22   BY MS. EATON:

23        Q.   Would a 75% capture of .2-micron

24   particles change the clinical risk as opposed

25   to a 90% capture of .2-micron particles?

                        Y. DAVID

1   infection and it did not.

2       A.   I don't think so.

3       Q.   Did you locate any articles that

4   concluded specifically that the Bair Hugger

5   device decreased the risk of surgical site

6   infection?

7           (Document review by witness.)

8       A.   One of the articles that I indicate

9   and consider is the review article of existing

10  literature by Wood, Moss and Keenan, and I'm

11  not sure, I need to read the study again, but

12  maybe one of the articles there was saying

13  there was no difference.  I don't think that

14  there was decrease, but no difference.  I just

15  need to read that paper again.

16  BY MS. EATON:

17      Q.   If there were articles that

18  established that the -- I'm sorry.  If there

19  were articles that reported that the use of a

20  forced-air warming device during surgery

21  decreased the risk of surgical site infection,

22  would that be relevant to your consideration?

23      A.   It would.

24      Q.   If there were articles

1                     Y. DAVID

2    BY MS. EATON:

3         Q.   Will contribute a higher risk than

4    if it were not used?

5         A.   Correct.

6         Q.   Is the interpretation of clinical

7    study data about infection risk something that

8    you have ever done outside of your work in a

9    lawsuit?

10        A.   Can you ask it again?

11        Q.   Outside of your work for a lawsuit,

12   is the interpretation of clinical study data

13   concerning infection risk something that you

14   do?

15        A.   In my work, I'm expected to read

16   clinical literature and scientific

17   publication.  I am educated, trained, and have

18   the experience to understand the study

19   structure and the strength of the conclusions.

20             And in my evaluation of various

21   medical devices, at the hospital I worked for

22   for over 25, 30 years, part of the process was

23   to review current medical and scientific

24   literature relating to device performance and

25   bring that to what in my report describe as

1                        Y. DAVID

2    MTEC, M-T-E-C, Medical Technology Evaluation

3    Committee, that looked at the overall what you

4    asked earlier, benefit-to-risk ratios and

5    understand what the product risk based on the

6    information from the manufacturers, but also

7    based on experience that comes from clinical

8    studies that published in peer-reviewed

9    journals.

10        Q.   If the use of a forced-air warming

11   device decreases infection risk, would that be

12   relevant to a clinical benefit-risk

13   assessment?

14        A.   Yes.

15        Q.   Okay.  In your work -- well, you --

16   have you ever -- more probable than not, is

17   that a scientific standard?

18        A.   Yes.

19        Q.   Okay.  Is there anyplace in an

20   engineering standard that you say more

21   probable than not is the criteria?

22        A.   Many times.

23        Q.   Can you identify one?

24        A.   Can I make a joke in a casino?

25             Yes.  For example, when the Space

1                         Y. DAVID

2    supplement the product that they have.  And

3    when you do not have warm air circulating but

4    it's a closed loop, I don't think that you

5    need to be an expert to realize that you're

6    removing a threat.  You therefore are reducing

7    exposure to the risk.

8         Q.   Are you familiar with the concept

9    that direct contact with a surface can pose an

10   infection risk?

11        A.   That makes sense.

12        Q.   Is that something that you're

13   familiar with in your work in the hospitals?

14        A.   Well, hand hygiene is a typical

15   example.  Very, very known in hospitals.

16        Q.   And reusable medical equipment that

17   directly touches patients, that's also an

18   example?

19        A.   Well, it's not the same because

20   most of the accessories that will touch

21   patients will be disposable, single use, and

22   probably sterile.  So that's not the same as

23   hands touching surfaces.

24        Q.   Have you provided in your report

25   all of the data that you reviewed with respect

1                     Y. DAVID

2   to the alternative products that you've

3   identified?

4        A.   Yes, I did.

5             MS. EATON:  Do I have any time

6        left?

7             THE REPORTER:  You're at 6:48.

8             MS. EATON:  Okay.  I'm going to

9        reserve.

10            MR. BANKSTON:  Yeah, I'm a little

11       hot so we'll take a literally two- or

12       three-minute break.

13            THE VIDEOGRAPHER:  We're going off

14       the record at 18:08.

15            (Recess, 6:08 p.m. to 6:17 p.m.)

16            THE VIDEOGRAPHER:  We are back on

17       the record at 18:17.

18                    EXAMINATION

19   BY MR. BANKSTON:

20       Q.   Dr. David, you were asked some

21   questions about risk-benefit.  Do you remember

22   those questions?

23       A.   I do.

24       Q.   Okay.  First of all, is it your

25   opinion that the Bair Hugger should be taken

Y. DAVID

1

2  out of rooms and not replaced with any form of

3  patient warming?

4       A.   No.

5       Q.   Okay.  Are there other devices

6  available, other design concepts which are

7  feasible to be made without the same risk

8  mechanism that you identified in your report?

9            MS. EATON:  Object to the form of

10       the question.

11       A.   Right.  I indicated in my report

12  and so is my opinion that I identify specific

13  product with different features that remove

14  the risk introduced by the Bair Hugger 750 and

15  yet serve the purpose of controlling patient

16  temperature environment.

17  BY MR. BANKSTON:

18       Q.   Does the literature you reviewed

19  contain any studies or any opinions concerning

20  whether any of these devices are similar in

21  effectiveness to the Bair Hugger at

22  maintaining patient temperature?

23       A.   I was trying to scan in my memory

24  where that might be in my report.

25       Q.   Let me know.

1                        Y. DAVID

2      supportive is that resistant heating

3      mattresses are of equal efficiency to the Bair

4      Hugger forced-air blanket in maintaining

5      temperature, and that's why I incorporate that

6      study here.

7           Q.   Okay.  From your engineering

8      background and experience, do you have any

9      opinion on whether, apart from these four

10     devices, just from an engineering concept

11     standpoint, is it possible, more likely than

12     not, to design a device that does not pose the

13     risks you've identified but warms patients as

14     effectively?

15          MS. EATON:  Object to the form of

16          the question.

17          A.   These devices that I show as

18     alternatives are demonstrating that.  3M

19     engineers have several concepts that they came

20     up with.  One of them is the, I believe,

21     recirculating, is basically what I have in my

22     alternative design, so it is feasible.

23     BY MR. BANKSTON:

24          Q.   Okay.  You were asked some

25     questions about speaking to hospitals about

1                       Y. DAVID

2    infection, and there's no correlation between

3    colorectal procedures and orthopedic surgical

4    procedure.

5    BY MR. BANKSTON:

6         Q.   Okay.   There was some testimony

7    today about the literature review conducted by

8    Dr. Wood and his associates.   Do you know

9    which study I'm referring to there?

10        A.   Yes.

11        Q.   Okay.   In that review, was there

12   information -- did it simply include studies

13   that were unfavorable to the Bair Hugger or

14   did it also include some studies that claimed

15   to be favorable to the Bair Hugger?

16             MS. EATON:   Objection to the form.

17        A.   As I sit here today, I don't

18   remember all the studies.   There are probably

19   15.   He looked at what's available in the

20   literature at the time he conducted his study,

21   but those are the -- representative of the

22   knowledge that was in the field at that time.

23   BY MR. BANKSTON:

24        Q.   Okay.   You're familiar -- we've

25   discussed much today -- there are multiple

1                         Y. DAVID

2    models of the Bair Hugger?

3         A.    Yes.

4         Q.    Okay.  If there are articles out

5    there discussing bacterial sampling with a

6    previous model 500 series instead of a model

7    700 series, can you tell me if or if not that

8    would have any direct engineering application

9    to your opinions about the model 700 series in

10   this case?

11             MS. EATON:  Objection to the form.

12        A.    It's very important because the

13   features of those two families of product, the

14   750 and the 500, are different from

15   engineering perspectives in that the filter

16   characteristic is different and the volume of

17   flow air pushed through them is also greatly

18   different.

19   BY MR. BANKSTON:

20        Q.    Dr. David, can you pull out your

21   report for me and flip to page 20?

22        A.    I'm there.

23        Q.    Do you see at the top references to

24   some scientific work by Hall and by Zink?

25        A.    Yes, I do.

1                        Y. DAVID

2          Q.   Are you familiar with what these

3     studies are?

4          A.   Yes.

5          Q.   Okay.  Can you briefly explain what

6     the context of these studies are?

7          A.   Yes.  I read those articles.  Hall

8     is talking about, I believe, eight volunteers

9     that were subjected to a culture count, and

10    Zink is talking about, I believe, 16 patients

11    that were in a completely different

12    environment than orthopedics procedure.

13         Q.   Dr. David, can you tell -- can you

14    tell the jury generally what your impression

15    of your task in this case was?

16         A.   Absolutely.  And I actually put it

17    as the first paragraph in my report, that my

18    task was to review the hazards and risk

19    associated with the Bair Hugger 750 family and

20    to opine about if that would contribute to

21    unreasonable dangerous biomedical engineering

22    device that increase the probability of

23    infection in orthopedics procedure or not.

24         Q.   Okay.  Can you tell me a little

25    bit -- no, let me take that back.  In coming

                         Y. DAVID

1
2    supplies.

3             So the committee was representing

4    so many expertise and I was in the position

5    where I had to receive their input and derive

6    recommendation to the hospital management if a

7    device is beneficial with lower risk than what

8    is being used today or until that product

9    come.

10            So I believe that I have the

11   qualification based on academic training and

12   experience working with these stakeholders and

13   with this group to specifically evaluate and

14   assess risk-benefit ratios.

15        Q.   Do you feel like you have enough

16   materials to give yourself an informed and

17   helpful opinion that you can communicate to

18   the jury?

19        A.   I do.  And when I felt that I don't

20   have enough material, I approached you,

21   Counsel, and requested specific documents or

22   information.  So I'm comfortable that I

23   received the material that I need to arrive at

24   the opinions.

25        Q.   And do you feel confident today

Page 310

                         Y. DAVID

1

2          A.   I'm trying to understand your

3     question.   Prohibition on published

4     hospital...

5          Q.   If you had an interpretation of

6     published literature about a forced-air

7     warming device or any other device, would you

8     be free to talk to a hospital about that?

9          A.   During this litigation, I don't

10    feel so.

11         Q.   You simply can't speak at all about

12    patient warming devices, to your

13    interpretation?

14              MR. BANKSTON:   Object to the form.

15         A.   As it relates to the condition of

16    this litigation, yes, that's the way I feel.

17    BY MS. EATON:

18         Q.   Okay.   Did you review an ECRI

19    evaluation of the potential risk of infection

20    with Bair Hugger use?

21         A.   Yes.

22         Q.   Did you cite that in your report?

23         A.   Good question.   I don't think so.

24         Q.   Do you believe you reviewed it

25    before you wrote your report or after?

1                           Y. DAVID

2          A.    After.

3          Q.    Okay.  Do you believe you reviewed

4     it -- can you tell me when you reviewed it?

5          A.    I became aware that they made a

6     report and wanted to understand what they

7     considered, so I would say probably in the

8     last month or so.

9          Q.    Are there any other materials

10    related to this case that you reviewed in the

11    last month that we haven't discussed here

12    today and have not been identified for me

13    today?

14         A.    No.

15         Q.    Okay.  Did you agree with the

16    conclusion of ECRI?

17         A.    I believe they attempted to

18    understand the condition.  They're operating

19    in a different environment than I am, and they

20    concluded that what I believe is that

21    additional studies are needed.

22         Q.    They concluded that there was not

23    sufficient evidence to determine that there

24    was an increased risk with the Bair Hugger

25    device, right?

1                    Y. DAVID

2          MR. BANKSTON:  Object to the form.

3     A.   The way I understand their document

4  or what I read is that they have not find

5  material to recommend the discontinued use of

6  the Bair Hugger and that additional studies

7  are required to better address that issue.

8  BY MS. EATON:

9     Q.   Did you disagree with anything

10  about the method they used to identify

11  information they reviewed?

12     A.   No.

13     Q.   Did they use a more comprehensive

14  method than you used to identify literature?

15     A.   Counsel, they are doing different

16  things than I'm doing.  I think that I

17  mentioned that this is a different

18  environment.  They have a relationship with

19  industry, with hospital as customers, and

20  they're looking at an overall.

21          I have specific charge to my work.

22  I'm not studying the complete concept of what

23  is patient warming is all about.  I have

24  specifically charge as mentioned in the

25  opening of my report.