# EXHIBIT DX1

TO DECLARATION OF PETER J. GOSS IN
SUPPORT OF DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION TO EXCLUDE THE
OPINIONS AND TESTIMONY OF

JIM HO, PH.D

```
1              UNITED STATES DISTRICT COURT

2                  DISTRICT OF MINNESOTA

3

4

5                                 )

6    In Re:  Bair Hugger          )

7    Forced Air Warming           )

8    Products Liability           )

9    Litigation                   )

10                                )

11                                )

12                                )

13                                )

14   This document relates        ) MDL No. 15-2666

15    to all actions              )

16

17   ----------------------------------------------------

18   The videotaped deposition of JIM HO, in the

19   above-styled suit, was taken pursuant to notice for

20   discovery and/or evidentiary purposes, before Donna

21   Gerbrandt CSR(A), at the offices of Borden Ladner

22   Gervais LLP, Calgary, Alberta, Canada, on the 28th

23   day of June, 2017.

24   ----------------------------------------------------

25
```



```
 1    Attorney for the Plaintiffs:

 2    M.D. Bankston, Esq.
      Farrar & Ball LLP
 3    1010 Lamar, Suite 1600
      Houston, TX  77002
 4    713-221-8300
      mark@fbtrial.com

 5

 6    Attorney for the Plaintiffs:

 7    G. Assaad, Esq.
      Kennedy Hodges
 8    4409 Montrose Blvd., Suite 200
      Houston, TX  77006
 9    713-523-0001
      gassaad@kennedyhodges.com

10

11    Attorney for the Defendants 3M and Arizant:

12    C.L. Gordon, Esq.
      Blackwell Burke P.A.
13    431 South Seventh Street, Suite 2500
      Minneapolis, Minnesota  55415
14    612-343-3200
      cgordon@blackwellburke.com

15

16
      B. Dubon                  Videographer
17

18    D. Gerbrandt, CSR(A)      Official Court Reporter

19    ---------------------------------------------------

20

21

22

23

24

25
```



AMICUS
REPORTING GROUP

3

```
1                    - I N D E X -

2

3

4    WITNESS                                    EXAMINATION

5    JIM HO

6    By MR. BANKSTON                                 3

7    By MR. GORDON                                 381

8

9

10                      EXHIBITS

11

12   EXHIBIT HO 1 - Paper by Raval et al titled      187

13   "Real-Time monitoring of non-viable airborne

14   particles correlates with airborne colonies and

15   represents an acceptable surrogate for daily

16   assessment of cell-processing cleanroom

17   performance"

18

19   EXHIBIT HO 2 - Report by Dr. Darouiche et al     200

20   titled "Association of Airborne Microorganisms in

21   the Operating Room With Implant Infections:  A

22   Randomized Controlled Trial"

23

24

25
```



1    EXHIBIT HO 3 - Coloured photograph of surgeons        265

2    operating

3

4    EXHIBIT HO 4 - Email chain dated January 24, 2007      303

5

6    EXHIBIT HO 5 - Email chain between January 12,         308

7    2007, and January 24, 2007

8

9    EXHIBIT HO 6 - Expert report of Michael W. Buck        335

10

11   EXHIBIT HO 7 - Internal document from 3M               348

12

13   EXHIBIT HO 8 - Study of a joint project between        356

14   the Iowa State University and the China

15   Agricultural University

16

17

18

19

20

21

22

23

24

25



1              (Proceedings commenced at 8:14 a.m.)

2              THE VIDEOGRAPHER:   Here begins the

3    videotaped deposition of Jim Ho in the matter of

4    Re:  Bair Hugger forced air warming products

5    liability litigation, in the United States District

6    Court, District of Minnesota, MPL No. 15-2666.

7                    Today's date is June 28th, 2017.

8    The time on the video monitor is 8:15 a.m.  We are

9    on the record.

10                    The videographer today is

11   Bernice Dubon on behalf of Amicus Reporting Group.

12   The video deposition is taking place at the offices

13   of Borden Ladner Gervais of Calgary, Alberta.

14                    Would counsel please voice identify

15   themselves and state whom they represent.

16             MR. BANKSTON:      Mark Bankston on

17   behalf of the plaintiffs.

18             MR. ASSAAD:        Gabriel Assaad on

19   behalf of the plaintiffs.

20             MR. GORDON:        Corey Gordon on

21   behalf of the defendants 3M and Arizant.

22             THE VIDEOGRAPHER:   The court reporter

23   today is Donna Gerbrandt on behalf of

24   Amicus Reporting Group.  Would the reporter please

25   swear in the witness.



AMICUS
REPORTING GROUP

1              __JIM HO__, sworn

2          BY MR. BANKSTON

3      Q.   Good morning, Mr. Ho.

4      A.   Good morning.

5      Q.   I'm going to be talking to you today

6  about some opinions that you gave in this case.  I

7  understand -- you've given a deposition before;

8  right?

9      A.   That's true.

10     Q.   Okay.  How many times do you think

11 you've been deposed before?

12     A.   Once.

13     Q.   One time.  Okay.  Then just as a little

14 refresher, I know you don't do this all the time,

15 it's just like we're in a courtroom, just there's

16 no judge here.  We're going to be asking each

17 other -- I'm going to be asking you questions,

18 you'll be giving me answers.  We need to be really

19 careful not to talk over each other.  She's writing

20 everything down.  So we'll try to pause between

21 each other.  You know, sometimes in natural

22 conversation you tend to interrupt each other,

23 finish each other's sentences.  It's tough to do

24 that for her so we'll try to avoid that.

25                 I also know, not being an



1    experienced witness, I know maybe your lawyer has

2    talked to you, but I want to make it really clear,

3    I may ask you some questions during this deposition

4    where the answer may involve discussions you've had

5    with your attorney.  I don't want you to just

6    volunteer me things that you said with your

7    attorney.  If there's anything like that that's

8    privileged with your attorney and I ask you a

9    question that implicates a discussion with counsel,

10   I want you to tell me that, "Sorry, that implicates

11   a discussion with counsel."

12              You previously testified in a case

13   called TSI Incorporated; is that right?

14        A.    That's true.

15        Q.    Okay.  What was your role in that case?

16        A.    I was the inventor of an instrument.

17        Q.    Okay.  What kind of suit was that?

18        A.    The -- there was a company that was

19   attempting to make a copy of the invention.

20        Q.    Which would have violated intellectual

21   property or a patent or something?

22        A.    A patent.  A patent, right.  Yeah.

23        Q.    Okay.

24              MR. GORDON:        Excuse me for

25   interrupting.  Does he need to have the



AMICUS
REPORTING GROUP

1    microphone --

2              MR. BANKSTON:      They let us know --

3    I think -- is the sound level okay?

4              THE VIDEOGRAPHER:   It is, yes.

5              MR. GORDON:        It's okay.

6          BY MR. BANKSTON

7          Q.   All right, sir.  Is that the -- is that

8    the only case you've appeared in?

9          A.   That's right.

10         Q.   Okay.  And so that would be the case you

11   were deposed in as well; right?

12         A.   That's right.

13         Q.   Okay.  I understand that you are being

14   compensated $600 an hour for general consultation

15   and $750 an hour when you're in a room testifying

16   like today?

17         A.   That's true.

18         Q.   Okay.  Now, your role in this case,

19   would you agree with me that your role is to

20   provide an independent objective analysis?

21         A.   That's right.

22         Q.   In other words, you're not here to be an

23   advocate for the defendant?

24         A.   That's right.

25         Q.   Okay.  Let's talk a little bit about



1    your education.  I know you have a bachelors and a

2    masters in microbiology?

3        A.    True.

4        Q.    Okay.  The PhD is in microbial

5    chemistry?

6        A.    Right.

7        Q.    Do you have any other advanced

8    education?

9        A.    Yes.  I spent a lot of time

10   understanding aerosol technology.  The nature of

11   the work I was doing required that I understand

12   all -- all the subjects involved with aerosol

13   technology.

14       Q.    Okay.  Is that -- is that knowledge you

15   acquired at the Department of National Defence?

16       A.    It's mostly through attaining --

17   attending conferences --

18       Q.    Okay.

19       A.    -- working with colleagues, and mostly

20   hands-on, intending to use instrumentation to

21   characterize and define aerosol characteristics.

22       Q.    Okay.  You would agree that your career

23   has been spent as a researcher for the Canada's

24   Department of National Defence?

25       A.    That's correct.



AMICUS
REPORTING GROUP

1        Q.    In your report you divided your career
2    up into pre 1990s and post 1990s.  Is that a good
3    way to divide your career, you think?
4        A.    Yeah, yes.
5        Q.    Okay.  I understand that the first part
6    of your career was what we were just talking about,
7    correct, the understanding of biological aerosols?
8        A.    Yeah.
9        Q.    Okay.  And you would agree an aerosol is
10   either a solid or a liquid particle suspended in
11   the air?
12       A.    Say again.
13       Q.    An aerosol is a solid or a liquid
14   particle suspended in the air?
15       A.    That's right.
16       Q.    Okay.  You would agree that aerosols
17   travel along the current of the air?
18       A.    True.
19       Q.    Okay.  Now, your career post 1990s has
20   been primarily of the development of biological
21   detection systems; correct?
22       A.    Yes, but the -- but the mandate from the
23   very beginning of my career was to develop
24   biological detection technologies.
25       Q.    Okay.



1       A.   So at the time there wasn't a lot of

2    technology available that you could either buy off

3    the shelf or adopt.  I noted that I had to go and

4    learn all I need to learn about what the problem

5    was with respect to aerosols and technologies.  And

6    then having achieved that I can then actually go

7    and develop the technology.

8       Q.   So you have become an expert in making

9    machines which can see biological agents?

10      A.   To be correct, I was an expert in the

11   inherent signs in how do you detect live biological

12   agents.

13      Q.   Okay.

14      A.   So once I understood that, then I could

15   then conceive of an instrument or a method to go

16   about doing it.

17      Q.   Okay.  And you do have expertise in

18   performing biological detection and biological

19   sampling studies?

20      A.   Say that again.

21      Q.   Do you have any expertise in performing

22   biological detection and biological sampling

23   studies?

24      A.   Yeah.  That was the skill set that I had

25   to acquire and learn to be -- to be functional in



AMICUS
REPORTING GROUP

1    developing the technology.

2        Q.    Okay.  And would you agree that for

3    nearly 30 years you've been in the practice of

4    developing devices and using -- using or selling

5    them to various clients and the government and

6    others?

7        A.    That's not exactly true.  My job is to

8    develop the hardware and the software technology

9    for military applications, which is Canadian

10   military, and -- and selling it really was not my

11   job.

12       Q.    Okay.  What hardware and software

13   technologies did you use in this case?

14       A.    Well, the final instrument that

15   performed the task of detecting the presence of

16   live agents was what we would call -- it's an

17   abbreviation, F-L-A-P-S, FLAPS.

18       Q.    Okay.

19       A.    So I found that it is not just good

20   enough to develop an instrument that you think is

21   good enough.  You actually have to go out --

22   outside of the laboratory and demonstrate that it

23   works in the -- in the environment it was -- it was

24   set for, which is military -- military conditions,

25   which is outdoors.



1       Q.   Okay.  My question was more -- let's

2  back up a bit.  You were retained in this case to

3  perform work; correct?

4       A.   This is with the National Defence?

5       Q.   No, no, no.  In this case --

6       A.   Oh, in this case.

7       Q.   -- this lawsuit that we're here for

8  today.

9       A.   Okay.

10       Q.   Let me start over then.

11       A.   Yeah.

12       Q.   In this lawsuit --

13       A.   Yeah.

14       Q.   -- 3M approached you to retain you to

15  perform work in this case?

16       A.   What do you mean by "work?"  I'm...

17       Q.   You have been hired as an expert;

18  correct?

19       A.   Right.

20       Q.   Okay.

21       A.   Yeah.

22       Q.   In performing those expert duties you

23  have executed certain work and been paid for that

24  work; correct?

25       A.   Yeah.



1        Q.    Okay.

2        A.    Okay.

3        Q.    So my question is, when talking about

4    those hardware and software technologies for

5    biological detection --

6        A.    Right.

7        Q.    -- what hardware and software systems

8    did you use in this lawsuit?

9             MR. GORDON:        Objection.  It

10   assumes facts not in evidence.

11       A.    That -- that wasn't the -- the intent.

12            BY MR. BANKSTON

13       Q.    Okay.  So these things we've been

14   talking about, the development of biological

15   detection systems, performing biological sampling

16   studies --

17       A.    Yeah.

18       Q.    -- those are things you did not do in

19   this case?

20       A.    No.  It wasn't the intent.

21       Q.    What exactly did you do in this case?

22       A.    The...  I provided a lot of insight into

23   what biological agents are.  In this particular

24   example the controversy was -- was on biological

25   aerosol particles.  And I noted that there was a



1    great deal of misconception about what biological

2    particles are, what the characteristics are.  And

3    so I provided what I had learned over my career to

4    impress upon whoever is interested in what

5    biological particles really are and how they

6    behave.

7             Q.    Okay.  So would it be fair to say that

8    what you did in this case is you wrote a report?

9             A.    I did, yeah.

10            Q.    Okay.  Is there any other work that you

11   performed?  Any testing?  Any other sort of

12   abstract, outside-of-the-report type of work?

13            A.    No.

14            Q.    Okay.  That report contains the outline

15   of your opinions in this case?

16            A.    That's correct.

17            Q.    Okay.  You would agree with me that in

18   your report there is considerable discussion of

19   clinical issues, clinical medicine, and clinical

20   outcomes?

21            MR. GORDON:          I object to the

22   form of the question.

23            A.    Well, the -- when you appreciate

24   biological particles, biological agents, it always

25   would have inherent indirection with the people,



AMICUS
REPORTING GROUP

1   animals, and all the other biological entities.  So

2   I'm not sure what you're really asking me when you

3   say "clinical."  So it's just inherent with the --

4   with biological particles.

5            BY MR. BANKSTON

6       Q.    Okay.  Your report, for example,

7   discusses orthopedic surgeons; correct?

8       A.    It was mentioned as an example.

9       Q.    Your report discusses nurses; correct?

10      A.    That's mentioned, yeah.

11      Q.    Your report discusses the features of an

12  operating room?

13      A.    That's true too.

14      Q.    Your report discusses surgeries?

15      A.    Yeah, that was mentioned.

16      Q.    Your report discusses retrospective

17  clinical analysis?

18      A.    That's true too.

19      Q.    Okay.  Describe to me what your

20  education is in clinical medicine.

21      A.    As a microbiologist, one of the things

22  you do is to understand what kind of diseases that

23  microorganisms cause you.  So one of the training

24  you do as a -- as a microbiologist is to learn from

25  basic principles how do you define and have a way



1    to determine what the name of the microorganism is.

2    And then once you discover that, then you know

3    whether it is going to be disease causing or not.

4                    Does that go along with what you're

5    expecting?

6        Q.    Not exactly, but let's get more

7    specific.  And I think that will help us, if we get

8    a little more specific.  For instance, are you an

9    expert in evaluating clinical outcomes in

10   healthcare settings?

11       A.    No.

12       Q.    Okay.

13       A.    Yeah.

14       Q.    Are you an expert in hospital air

15   quality?

16             MR. GORDON:         I object to the form

17   of the question.

18       A.    I -- I'm not sure what you're trying to

19   understand from that question, but you would notice

20   that we have done some experiments with the -- with

21   the wind tunnel to determine how you may be able to

22   detect presence of biological particles in a clean

23   room condition.  So if you could -- if you could

24   transpose that into what you're asking, then the

25   answer would be yes.  If you don't accept that,



AMICUS
REPORTING GROUP

1   then the answer would be no.

2          BY MR. BANKSTON

3     Q.    Okay.  For instance, have you ever

4   performed biological sampling inside of a hospital?

5     A.    Yes.

6     Q.    Okay.  Where was that?

7     A.    This would be in the mid '90s, where

8   there was a SARS infection problem with the

9   hospitals in Canada.  Specifically the Sunnybrook

10   Hospital.

11     Q.    Okay.

12     A.    At that time people were dying from it,

13   doctors were dying, and they didn't know where the

14   infection was coming from.

15     Q.    Okay.  Are you familiar with the term

16   "H-V-A-C," or HVAC?

17     A.    Yes.

18     Q.    Okay.  Are you an expert in HVAC or

19   ventilation issues?

20     A.    If I say yes, will you want to -- want

21   me to explain why I say yes?

22     Q.    I mean, we can follow up on that, but

23   I'm -- let me summarize it this way.  I understand

24   that you're going to be giving opinions to the

25   jury; correct?



AMICUS
REPORTING GROUP

1        A.    Maybe yes, maybe no.  It depends on how
2   far this thing goes.
3        Q.    Sure.  But, in other words, you have a
4   camera in front of us right now.
5        A.    Yeah.
6        Q.    You're giving opinions in the lawsuit;
7   right?
8        A.    Yeah.
9        Q.    Okay.  And I need to know before we get
10  down to the courthouse --
11       A.    Yeah.
12       Q.    -- I need to know exactly what you're
13  going to be talking about, what fields you think
14  you're going to be addressing, what fields you
15  consider yourself to be an expert in.
16             So what I want to know is --
17       A.    Yeah.
18       Q.    -- are you claiming to be an expert in
19  HVAC ventilation?
20       A.    I'll give you the example of my
21  expertise and you tell me whether I'm an expert or
22  not.
23       Q.    I can't tell you anything.  I need -- I
24  need -- I need an answer from you.  Do you consider
25  yourself to be an expert in HVAC ventilation?



1          A.    Well, as a scientist, we are very

2    careful not to claim expertise in everything under

3    the sun.  So I can only tell you what my experience

4    has been and what I've learned from my experience.

5    So you tell me whether I'm an expert or not.

6    I'm -- I'm a -- we are -- we are trained to be

7    modest by nature.  We don't go around and tell

8    everybody that we know everything under the sun.

9          Q.    Okay.   Object as nonresponsive.

10         A.    Yeah.

11         Q.    You're currently charging 3M in this

12   room $750 an hour because you are an expert;

13   correct?

14         A.    I am here because 3M, or whoever is part

15   of 3M, think I have something to contribute.

16         Q.    Okay.

17         A.    In the -- at the end of the day they

18   could say, yeah, what he has provided me labels him

19   as an expert.  That is the opinion.  I did not jump

20   up and down and say, "Look, I'm an expert.  Why

21   didn't you hire me?"

22         Q.    Okay.

23         A.    So what they pay me is really immaterial

24   to whether I'm an expert or not.

25         Q.    Okay.  You feel comfortable telling a



1    jury of 12 Americans that you're an expert in the

2    field of microbiology; correct?

3         A.   I -- I would say that if that's what

4    they consider having spent 30 years in -- in bio

5    aerosol as an expert, then that is fair enough.

6         Q.   Okay.  Are you an expert in operating

7    rooms?

8         A.   No.

9         Q.   Okay.

10        A.   No.

11        Q.   Are you -- do you have any expertise on

12   the levels of bioburden within an operating room?

13        A.   No.

14        Q.   Okay.  So you wouldn't be able to tell

15   me, for instance, does every area in an operating

16   room have equivalent levels of bioburden?

17        A.   I -- I cannot say with a blanket

18   statement.

19        Q.   Okay.

20        A.   Nor can anybody else really.

21        Q.   Well, would you agree with me -- do you

22   have any expertise to say whether the area

23   underneath the surgical table has more bioburden

24   than other parts of the room?

25        A.   No.  Yeah.



AMICUS
REPORTING GROUP

1          Q.   You're not an expert in orthopedic

2     surgery, are you?

3          A.   No.  Apart from the fact that I'm the

4     son of an orthopedic surgeon.  Does that help any?

5          Q.   Again, I'm not -- I'm not answering

6     questions today.

7          A.   Yeah.

8          Q.   I can't -- I can't help you along.  You

9     know, that's -- I can let you answer questions is

10    what I can do.

11         A.   Yeah.  Yeah.

12         Q.   But do you -- do you think that you

13    could comfortably represent to a jury of 12

14    Americans that you being the son of an orthopedic

15    surgeon makes you an expert qualified to give

16    opinions in a lawsuit?

17         A.   That would be a bit far fetched.

18         Q.   I would think so.  Okay.  You're not an

19    expert in anesthesiology, are you?

20         A.   No.

21         Q.   You're not an expert in infectious

22    disease?

23         A.   It would be safe to say no, but in the

24    work area that I'm in I have to be aware of what

25    are the threat agents for the Canadian military,



AMICUS
REPORTING GROUP

1    and for that matter we need to know a lot about

2    infectivity, if that's what you're driving at.

3         Q.   Can you describe to me what a

4    peri-prosthetic joint infection is?

5         A.   No.

6         Q.   Okay.  So do you have any -- I mean, I

7    assume since not giving a definition, you wouldn't

8    consider yourself as having specific expertise in

9    peri-prosthetic joint infections?

10        A.   No.

11        Q.   Okay.  Did you know anything about the

12   device before accepting work in this case?  And by

13   "the device" I mean the Bair Hugger surgical

14   warming unit.

15        A.   No.

16        Q.   You're not an engineer; correct?

17        A.   That's correct.

18        Q.   You're not a biomedical engineer?

19        A.   No.

20        Q.   What do you understand the device to do,

21   the Bair Hugger?

22        A.   From the description that was -- that I

23   read and what was told to me, it's a technology or

24   a device that provides warming features for a

25   patient under -- under operation.



1       Q.    Okay.  Have you ever seen the device?

2       A.    No.

3       Q.    You would agree with me that as an

4  expert you need to understand the nature of the

5  problem being claimed in order to investigate it?

6           MR. GORDON:        I object to the form

7  of the question.

8       A.   I -- I need to -- to know exactly

9  what -- what is the -- the issues at hand.

10          BY MR. BANKSTON

11      Q.    Yeah, that's a good way to put it.

12 Like, for instance, in a lawsuit the issues at hand

13 is what the plaintiff is claiming happened to him

14 because of this device; right?

15          MR. GORDON:        I object to the form

16 of the question, also lack of foundation.

17          BY MR. BANKSTON

18      Q.    Would you agree with that?

19      A.    Well, if I -- if I were to give -- give

20 an impression of what biological aerosols are,

21 would I need to know any of the things that you say

22 I need to know?

23      Q.    Well, I haven't even said anything.  I'm

24 wondering what do you think the issue is that

25 you're here to address?



AMICUS
REPORTING GROUP

1              MR. GORDON:          I object to the form

2    of the question.

3         A.    What -- what are the issues?

4           BY MR. BANKSTON

5         Q.    Right.  Well, I take it -- let me back

6    up.

7         A.    Yeah.

8         Q.    You wrote a report?

9         A.    Right.

10        Q.    That didn't come out a whole cloth, that

11   you just -- that you were addressing something with

12   that report; right?

13        A.    Yeah.  The report essentially tries to

14   illuminate lack of knowledge or knowledge you get

15   in aerobiology.

16        Q.    Okay.  That report covers a lot more

17   topics than aerobiology, though, doesn't it?

18              MR. GORDON:          I object to the form

19   of the question.

20        A.    Well, I'm not sure exactly what you mean

21   by "a lot."  Aerobiology is a complex topic.  It

22   cannot be answered with one sentence alone.  So if

23   I am guilty of saying more than one sentence, yes,

24   you're right.

25           BY MR. BANKSTON



AMICUS

REPORTING GROUP

1        Q.    Okay.   For instance, do you understand

2    what the plaintiffs are claiming happened to them

3    in this case?

4        A.    If I understand correctly, they claim

5    that the air coming from a Bair Hugger has the

6    potential to cause infections.

7        Q.    You mean -- and you mean the air being

8    exhausted out of the Bair Hugger?

9            MR. GORDON:            I object to the form

10    of the question.

11        A.    I -- I -- I wouldn't know if it is

12    exhausted or coming from it, but that's the overall

13    impression.

14            BY MR. BANKSTON

15        Q.    Have you seen the plaintiffs' complaint

16    before?

17        A.    What do you mean?

18        Q.    Oh, okay.   I forget.   I'm asking you

19    questions like you're an expert who comes to

20    depositions every week.   When I say "complaint" --

21        A.    Yeah.

22        Q.    -- actually that's a legal term --

23        A.    Yeah.

24        Q.    -- meaning the initiating document of a

25    lawsuit.   Have you ever seen that document where



AMICUS
REPORTING GROUP

1   the plaintiff sets forth why they think 3M is

2   responsible for something?

3        A.   I don't believe so.

4        Q.   Okay.  Do you have an understanding of

5   how the plaintiffs believe the Bair Hugger caused

6   their infections?

7        A.   I don't -- I don't think so.

8        Q.   Okay.  The first topic I really want to

9   talk to you about in your report is regarding the

10  size of particles.  You know that there's a

11  discussion about the size of particles and the size

12  of biological aerosols?

13       A.   Right.

14       Q.   Okay.  Did you bring a copy of your

15  report with you today?

16       A.   I did.

17       Q.   Okay.  Do you want to get that out for

18  me and we'll take a look at it together.

19            Now, Mr. Ho, before we dive into

20  the report itself, I want to talk generally in

21  terms of what you reviewed to create this report.

22  From what I understand, everything that you

23  reviewed is cited somewhere in the report?

24       A.   Yeah.  It's open literature material.

25       Q.   Okay.  So you would agree with me that



1    the things that you have reviewed consist of

2    third-parties' published literature?

3            MR. GORDON:        I object to the form

4    of the question.

5        A.   Well, what's your objection about that?

6            BY MR. BANKSTON

7        Q.   I don't have any objection, sir.  I'm

8    just asking you what you reviewed.  Did you review

9    third-party literature?

10       A.   Well, if that's a criticism, then all

11   science is -- is -- is to be -- to be criticised

12   because we build on top of each other's knowledge

13   and shoulders.

14       Q.   Okay.  Let me --

15       A.   So no man is an island.  You don't put

16   out facts and information out of thin air.

17       Q.   Okay.  Let me -- let me maybe help speed

18   the deposition a little bit along by letting you

19   know this.  I agree wholeheartedly with everything

20   you just said.  I am not in any way --

21       A.   Yeah.

22       Q.   I think literature is great.

23       A.   Yeah.

24       Q.   I love literature.  I love scientific

25   publications.



1        A.    Yeah.

2        Q.    I am -- I'm going through a protocol

3   right now --

4        A.    Yeah.

5        Q.    -- where I have to figure out what it is

6   exactly that is in your report, what we're relying

7   on.

8        A.    Yeah.

9        Q.    I'm not coming at you to attack you;

10  right?

11       A.    I'm just saying, but the fact that I

12  put -- I very carefully put in the citations would

13  give you an indication that, yes, all the

14  information that is derived was obtained from

15  legitimate peer-reviewed sources.

16       Q.    Okay.  So let's -- what I want to get is

17  get all the different kinds of things you reviewed

18  in this case.

19       A.    Yeah.

20       Q.    So the first category of things you

21  would have reviewed is published peer-reviewed

22  literature?

23       A.    Correct.

24       Q.    Okay.  What other things might you have

25  reviewed in this case?  Do you know if there's



1   anything that doesn't fit in that category?

2        A.   I -- as a professional, I would avoid

3   using nonpeer-reviewed sources.  And so it is

4   correct for you to think that all the citations are

5   peer-reviewed.

6        Q.   Okay.  So let's talk about some things

7   and whether you reviewed them.  Have you reviewed

8   any document produced by 3M?

9        A.   3M-published documents?  Is that what

10  you're saying?

11       Q.   Let's go back one more question.  Were

12  you aware, sir, that 3M has produced millions of

13  pages of documents in this lawsuit?

14       A.   No.  I haven't seen any of those.

15       Q.   Nobody provided those to you?

16       A.   No.

17       Q.   Were you aware of the number of

18  witnesses who have been -- had their deposition

19  taken in this case?

20       A.   No.  The number of witnesses or who they

21  are?

22       Q.   Yeah.  Do you know any of them?

23       A.   No, not really.  I came into this thing

24  relatively new.  My -- my involvement is not much

25  more than three weeks really.



```
 1          Q.    Three weeks?
 2          A.    Yeah.
 3          Q.    Okay.  With respect -- so, for instance,
 4   you weren't aware that some of the publishers,
 5   scientific authors that you cite in your paper --
 6          A.    Yeah.
 7          Q.    -- in your report, were you aware that
 8   they have been deposed in this case?
 9          A.    Not really.
10          Q.    So it would be fair to say that you have
11   not reviewed any testimony relating to this
12   lawsuit?
13          A.    That's correct.
14          Q.    Okay.
15          MR. GORDON:        Mark, you've
16   already, obviously, picked up on the fact that
17   Dr. Ho is not an experienced witness --
18          MR. BANKSTON:      Right.  Right.
19          MR. GORDON:        -- and particularly
20   when it comes to American litigation.  I'm thinking
21   when you said "testimony," I'm -- could you
22   maybe -- it's just a suggestion.  Would you break
23   it down into little bite-sized categories like, you
24   know, did we provide him with any expert reports or
25   did we provide him with any deposition transcripts
```



1    or --

2              MR. BANKSTON:      Oh, I see.

3              MR. GORDON:        Things like that.

4              MR. BANKSTON:      You're saying that

5    testimony can mean multiple things?

6              MR. GORDON:        He might be thinking

7    testimony in court.

8              MR. BANKSTON:      Got you.  Okay.

9              MR. GORDON:        Because I --

10             MR. BANKSTON:      Let's go back and

11   make sure we do this correct, because I think I

12   know what you're getting at there.

13        Q.   One of -- we talked about the first

14   category of things you reviewed, which is

15   scientific literature?

16        A.   Right.

17        Q.   Right.  And then we had talked about

18   deposition testimony, which would be on a page with

19   numbers down the line and people asking questions

20   back and forth.  You've never reviewed any of that

21   kind of testimony, have you?

22        A.   I saw one yesterday, but it was just a

23   quick reference.

24        Q.   What did you see yesterday?

25        A.   I think it was one on Andrew Jones Legg.



AMICUS
REPORTING GROUP

1        Q.    Oh, okay.  Dr. Legg?

2        A.    Yeah.

3        Q.    Okay.

4        A.    Yeah.

5        Q.    And who do you understand Dr. Legg to

6    be?

7        A.    Well, he had published some papers.  I

8    think it was something I cited in my report.  So

9    the -- the actual material I saw was questions

10   being asked of Dr. Legg.

11       Q.    Did you review the entire deposition?

12       A.    No.

13       Q.    Okay.  What did you review?

14       A.    Mostly starting from page 52 and a few

15   pages after that.

16       Q.    Okay.  What specifically were you

17   reviewing?  What were you looking for?

18       A.    It was something about measuring

19   biological aerosols.

20       Q.    It was your understanding that Dr. Legg

21   did some sort of measurement of biological

22   aerosols?

23       A.    Well, that's the trouble with this

24   business.  All kinds of people claim to know how to

25   measure biological aerosols, but almost every one



1    of them either do it in the wrong way, interpret

2    the data in the wrong way, and, even worse, present

3    the data in a misleading way.

4                    So I don't know if that answers

5    your question.  If it doesn't answer your

6    question...

7         Q.   It does not.  Objection, nonresponsive.

8                    All I'm asking you is do you

9    understand if Dr. Legg did some sort of biological

10   measurements?

11        A.   Well, as I've said, they all -- they all

12   claim to do that.

13        Q.   So Dr. Legg performed biological

14   sampling studies?  That's what I'm trying to ask

15   you.

16        A.   Well, he says so.  He thinks he done it.

17        Q.   Okay.

18        A.   So what I'm really trying to get at is

19   that there are a proper way to do things and there

20   are improper way to do things.

21        Q.   Now, another thing you reviewed that we

22   haven't talked about yet is you reviewed expert

23   reports; correct?

24        A.   Yes.

25        Q.   Okay.  Whose expert reports have you



AMICUS
REPORTING GROUP

1    reviewed?

2         A.    I don't -- I'm not good at names --

3         Q.    Okay.

4         A.    -- but some which were given to me

5    were -- I think Buck was one of them.  And then

6    another one was Konis -- Konisberger (verbatim), or

7    somebody.  Yeah.  And then there may have been --

8    there may have been another one.

9         Q.    Dr. Yadin David --

10        A.    Yeah.

11        Q.    -- does that ring a bell?

12        A.    That's right.

13        Q.    Okay.  Do you think you've reviewed

14   anything else besides that?

15        A.    Those were the ones that were shown --

16   given to me.

17        Q.    Okay.  Besides expert reports, besides

18   the little bit of testimony that you reviewed

19   yesterday, and besides scientific literature, is

20   there anything else you reviewed?

21        A.    That's about it.

22        Q.    Okay.  All right.  Let's talk a little

23   bit about particles and sizes of particles.  On

24   page 16 of your report there's a discussion about

25   biological aerosols; correct?

1        A.    Page 16, yeah.

2        Q.    Okay.

3        A.    Yeah.

4        Q.    You would agree with me that one of the

5   contentions of your report is that "particles in

6   the 1 to 2.5 micron size range are representative

7   of naturally occurring biological aerosol..."

8   correct?

9        A.    Are you quoting from --

10       Q.    I'm directly quoting.  Yes, sir.  Do you

11   agree that that's accurate?

12       A.    Okay.  Let's hear that again.

13       Q.    Sure.  "Particles in the 1 to 2.5 micron

14   size range are representative of naturally

15   occurring biological aerosol..."

16       A.    Right.

17       Q.    Okay.  Why is that important to your

18   opinion in this case?

19       A.    What do you mean?

20       Q.    Why is that consequential to this

21   lawsuit whatsoever?

22            MR. GORDON:        Well, I object on

23   foundation of grounds, at least.

24       A.    I'm not truly following the --

25            BY MR. BANKSTON



AMICUS
REPORTING GROUP

1          Q.   Well, you put it in your report; right?
2     The statement's in your report?  Why is it in your
3     report?  What are you trying to prove?  What are
4     you trying to -- what's the significance of that
5     statement?
6          A.   Well, that wasn't the only thing I said.
7          Q.   I understand that.  We'll talk about a
8     lot of other things you said too.
9          A.   Yeah.
10         Q.   We're not going to spend all deposition
11    on this sentence, I guarantee you.  But I'm
12    wondering for this sentence, why is it -- why is
13    that important to you?
14         A.   I'm not sure it was said with any
15    specific importance at all.
16         Q.   Okay.  You also give the opinion that
17    "artificial biological aerosols generated as
18    significant threats contained particles mostly in
19    the 2 to 10 micron size range...", correct?
20         A.   Correct.
21         Q.   Okay.  When you talk about biological
22    aerosols that generate --
23              MR. GORDON:        I'm sorry.  Were you
24    reading from his report?
25              MR. BANKSTON:      I sure was.  I was



AMICUS
REPORTING GROUP

1    there, yeah.

2              MR. GORDON:         I may have mis -- I

3    apologize.  I may have misheard.  I didn't see what

4    you were -- if that was reading.

5                   Madam court reporter, could you

6    just read the question back?  I'll see if I can

7    find it.

8              COURT REPORTER (By reading):

9         "Q. You also give the opinion that

10             'artificial biological aerosols

11             generated as significant threats

12             contained particles mostly in the 2 to

13             10 micron size range'?"

14             MR. GORDON:         Okay.  I object to

15   the form of the question.  It misstates the

16   testimony.  It is not in fact a reading from his

17   report.

18             MR. BANKSTON:       Hold on.  Let me

19   check.  I'm pretty sure I got it verbatim.  Let me

20   check.  I'll pull it up.

21             MR. GORDON:         The difference is

22   you injected the word "artificial."

23             MR. BANKSTON:       Let's see.  No, I

24   sure didn't.

25        Q.   Look at page 1 of your report, Mr. Ho.



1       A.    Yeah.

2       Q.    Okay.  You see the bottom paragraph?

3       A.    Yeah.

4       Q.    You see the second line?  Are you with
5  me?

6       A.    Yeah.

7       Q.    Okay.  So this is when talking about
8  some of those early studies you were performing;
9  correct?

10      A.    Yeah.

11      Q.    And where "it was found that artificial
12 biological aerosols generated as significant
13 threats contained particles mostly in the 2 to 10
14 micron size range..."  That's correct?

15      A.    This is in reference to biological
16 threat agents in the military context.

17      Q.    Okay.  So when it talks about
18 "biological aerosols generated as significant
19 threats," what does that mean, "generated as
20 significant threats?"

21      A.    In the battlefield, because it's such a
22 wide open space, you would -- you would need to
23 produce enough material to go downwind to become a
24 threat to your -- to your enemy.  That's what it
25 meant.



1       Q.    Okay.  Now, this sentence -- when you

2    see the word "mostly" in this sentence, "mostly" in

3    this context means there are biological aerosols

4    outside of this size range?

5       A.    What -- what area are you referring to

6    outside?

7       Q.    Let's look at the -- let's look at the

8    sentence together, okay?

9       A.    Yeah, yeah.

10      Q.    On your second line.

11      A.    Yeah.

12      Q.    And your sentence says that those

13   aerosols contained particles mostly in the 2 to

14   10 micron size range?

15      A.    Yeah.

16      Q.    So "mostly" in that context means there

17   are biological aerosols outside of that size range?

18      A.    You mean naturally occurring or --

19      Q.    Sure.

20      A.    Well, sure, if you -- if you consider

21   fungal agents.  Fungal agents are traditionally

22   larger than the 10 micron size range.  So if you

23   were allergic to fungal spores or you were

24   susceptible to fungal infectivity, then there would

25   be big particles, bigger than the 10 micron size



1    range.

2         Q.    And there will be particles smaller than

3    2 microns, won't there?

4         A.    Pardon?

5         Q.    There will be particles smaller than

6    2 microns?

7         A.    So?

8         Q.    I'm asking you if you agree with that.

9    Do you agree that there will be natural biological

10   presentation of airborne bacteria that involves

11   particles smaller than 2 microns?

12             MR. GORDON:        Now you're talking

13   about natural?

14             MR. BANKSTON:      Hmm hmm.

15        A.    Well, are you pointing at absolutism?

16   Like here you are -- I'm not saying that there is

17   absolutely nothing else below 2 1/2.

18             BY MR. BANKSTON

19        Q.    That's what mostly means; right?  When

20   you say there are mostly 2 to 10 in that sentence,

21   the artificials are mostly in 2 to 10; right?

22        A.    Okay.

23        Q.    So when we talk about -- what I'm asking

24   is when we talk about natural biological

25   presentation, do you agree with me that in a



1   natural biological presentation there will be

2   particles smaller than 2 microns?

3        A.   If you were to tell me what is it that

4   you really want to know, then it would be a lot

5   easier for me to give you an answer.  In this case

6   I don't really know what you're really attempting

7   to establish.

8        Q.   Objection, nonresponsive.

9             What I really want to know,

10  Mr. Ho --

11       A.   Yeah.

12       Q.   -- is in a natural presentation of

13  biological aerosol --

14       A.   Yeah.

15       Q.   -- will there be particles less than

16  2 microns big?  Do you have the expertise to know

17  if there will be or not?

18       MR. GORDON:        I'll object to the

19  form of the question.

20       A.   Again, I'm hesitant to give you simple

21  yes, no, absolute type answers without truly

22  knowing what is it that you're trying to learn.

23  Are you trying to learn something?  Are you trying

24  to -- are you trying to...

25       BY MR. BANKSTON



AMICUS
REPORTING GROUP

1      Q.    So unless you know why I want to know --

2      A.    Yeah.

3      Q.    -- you aren't able to answer whether

4  there will be particles under 2 microns, unless you

5  know why I want to know that information?

6      A.    Yeah.  Well, what is it that you are

7  really trying to --

8      Q.    I'm curious, super curious.

9      A.    -- comprehend here?

10     MR. GORDON:        You know, you've

11  been going -- you just went back and forth between

12  one page where he's talking about naturally

13  occurring, where he says 1 to 2.5.  Then you,

14  without alerting us, you switch to where he was

15  talking about manufactured biological agents.

16     MR. BANKSTON:        Hold on.  I'm

17  alerting people.  I'm saying natural versus

18  biological, and I suddenly switched, we're going to

19  natural.  I mean, is that an objection or is

20  this -- are we just going to talk?

21     MR. GORDON:        I think you're --

22  particularly given that Dr. Ho is not a skilled

23  expert witness who, you know, regularly deals with

24  lawyers, you know, just ask -- try and ask him

25  some --



AMICUS
REPORTING GROUP

1          MR. BANKSTON:        I asked him a

2     question.

3          MR. GORDON:          -- straightforward

4     questions.

5          MR. BANKSTON:        How is it not a

6     straightforward question -- come on, Corey -- to

7     ask him --

8          MR. GORDON:          Before you -- before

9     you went back to the --

10          MR. BANKSTON:        Lets forget every --

11          MR. GORDON:          -- you know,

12     biowarfare stuff, you just read him -- read his own

13     statement where he said 1 to 2.5.  So now you're

14     trying to ask him, you know, do things occur less

15     than 2.  Well, he already said that they did

16     naturally.

17          MR. BANKSTON:        Then I have no idea

18     why we're having such a hang-up over this.

19          MR. GORDON:          Well, because

20     you're --

21          MR. BANKSTON:        Let's go back.

22          MR. GORDON:          That's what I'm

23     trying to find out, Mark.

24          MR. BANKSTON:        Let me ask -- let me

25     ask questions.



1          MR. GORDON:        That's fine.

2          MR. BANKSTON:        Please, let's not do

3    this all day.  I don't want this colloquy back and

4    forth.  We're talking about stuff.  I don't want to

5    do that.  If he's not a prepared witness, he's not

6    a super expert witness, I don't consider that my

7    problem today.

8          Q.   What I want to know Dr. Ho, or Mr. Ho,

9    is when you said on page 16 of your report that

10   particles in the 1 to 2.5 micron size range are

11   representative of naturally occurring biological

12   aerosol, that is a correct statement; correct?

13         A.   Well, in -- in the way it is written,

14   yes.

15         Q.   What do you mean by "the way it's

16   written?"  What does that mean?

17         A.   Okay, let me try to answer your question

18   in a more technical way so that -- so that we don't

19   all go around in circles, if I may.

20         Q.   Well, if it's the answer how does -- how

21   is it written -- how does it change it how it's

22   written?

23         A.   Well --

24         Q.   Is there a way you can write it where

25   it's not true and it's true, or..?



1          A.   -- I'm making the assumption that you
2    are actually trying to understand how biological
3    aerosols present themselves in air.
4          Q.   Hmm hmm.
5          A.   I'm just pretending that you really want
6    to know that.
7          Q.   Right.
8          A.   Okay.  So the way aerosols exist in air,
9    they don't actually appear in convenient chunks.
10   So particles appear as a -- as a spectral
11   presentation.
12         Q.   Along different size ranges do you mean?
13         A.   Yeah.
14         Q.   Okay.
15         A.   It's a spectral array.  So -- so why is
16   it that you want to chop things up in a way that
17   would meet with whatever notions that you may have?
18         Q.   Well, what I'm wondering is why you
19   chopped it up that way.  You said particles --
20         A.   Ah.  Okay.
21         Q.   -- in the 1 to 2.5 micron --
22         A.   Yeah.
23         Q.   -- size range --
24         A.   Okay.
25         Q.   -- are representative --



1        A.    Okay.

2        Q.    -- of naturally occurring biological

3    aerosol.

4        A.    I'll --

5        Q.    You would agree with me, sir --

6        A.    I will give you the answer as to why

7    statements of that nature exist in the literature.

8        Q.    Okay.  That's not what --

9        A.    Are you ready?

10       Q.    I'm sorry, that's not at all what I'm

11   asking.  I'm asking you put a sentence in your

12   report.  Let's read that sentence together again.

13            MR. GORDON:        It's on page 16.

14          BY MR. BANKSTON

15       Q.    On page 16 of your report.  Let's go to

16   page 16.  I want to make sure we're both talking

17   about exactly the same thing.

18       A.    Okay.

19       Q.    Do you see where you say:  "...particles

20   in the 1 to 2.5 micron size range are

21   representative of naturally occurring biological

22   aerosol..."?  Do you see that?

23       A.    I see that.

24       Q.    Okay.  So if that statement is correct,

25   that means that in natural biological presentations



1    of aerosol there can be particles smaller than

2    2 microns; correct?

3         A.    Yes.

4         Q.    Okay.  That's it.  We're done there.

5               Now, your report in general

6    contains a long discussion of the size of particles

7    typically presented in aerosols; correct?

8         A.    Right.

9         Q.    Okay.  What was it about this case that

10   made you want to focus any attention on the size of

11   aerosol particles?

12              MR. GORDON:        I'm going to object

13   on foundation grounds.  Go ahead and answer, if you

14   can.

15        A.    Come again.

16        BY MR. BANKSTON

17        Q.    What was it about this case that made

18   you want to focus any attention on the size of

19   aerosol particles in your report?

20        A.    I was asked to illuminate the

21   characteristics of biological particles in air, and

22   that was what I have attempted to do.

23        Q.    You have provided an opinion in this

24   case that you think the Bair Hugger is safe for use

25   in terms of infection risk; correct?



1        A.    I don't think I say that.

2        Q.    Okay.  You gave opinions about filters;

3   right?

4        A.    Yeah.

5        Q.    Okay.  You know what I mean when I talk

6   about a MERV 14 filter?

7        A.    Yes.

8        Q.    Okay.  You believe that a MERV 14 filter

9   is adequate inside the Bair Hugger; correct?

10       A.    Yes.

11       Q.    You believe that HEPA filters are

12   overkill for this application?

13       A.    That is a quotation from a source.

14       Q.    Do you believe that HEPA filters are

15   overkill in this application?

16       A.    Are you wanting an opinion right here

17   now?

18       Q.    Hmm hmm.  That's what you're here for,

19   sir.

20       A.    Yeah, I think HEPA filters are more than

21   what would be required.

22       Q.    Required for what?

23       A.    For the -- the purpose of what the

24   instrument is supposed to do.

25       Q.    Okay.  And in terms of the filter, what



AMICUS
REPORTING GROUP

1    is the filter supposed to do?

2         A.   It's supposed to trap particles.

3         Q.   Okay.  And the reason why you would want

4    to trap particles in an operating room is what?

5         A.   Cut down on the number of particles

6    flying around.

7         Q.   Why would you not want particles flying

8    around an operating room?

9         A.   It's undesirable.

10        Q.   For what?  What bad would happen if

11   there was airborne particles in an operating room?

12        A.   It's just messy.

13        Q.   Why do I care if an operating room is

14   messy?

15        A.   Because that's a religion.

16        Q.   What do you mean it's a religion?

17        A.   Well, let's put it this way.  If you

18   were a patient going in for an operation --

19        Q.   Hmm hmm.

20        A.   -- and somebody were to tell you that

21   that operating room is messy, would you -- would

22   you submit yourself to -- to the operation?

23        Q.   I'm not an expert in any of these

24   issues, so I don't know.

25        A.   Yeah.



1          Q.    I'm asking you why is it important to
2     keep particles to a minimum in an operating room?
3          A.    Well, that has always been good
4     practice, to keep particles low.  It's the same
5     example as a -- as an electronic clean room
6     facility.
7          Q.    Okay.  So let's -- let me give you a
8     couple of examples.
9          A.    Yeah.
10         Q.    Let's -- I don't know anything about
11    particles.  I have a BA in English.  All right?  So
12    try to help me out here.
13         A.    Yeah.
14         Q.    If you got particles flying around an
15    operating room, let's talk about things that might
16    happen here.  It could stain the walls?  Is that a
17    problem?  Is that why you keep particles out?
18              MR. GORDON:          I object to the form
19    of the question.
20              BY MR. BANKSTON
21         Q.    That doesn't seem right, though; right?
22    Like it's not because the particles will stain the
23    walls or make them look un...  Is it because
24    there's a danger to the patient?
25         A.    Well, having a clean facility is always



AMICUS
REPORTING GROUP

1    desirable.  So that has always been the major

2    thrust to doing business.  So in so many of the

3    cases, if that is your wish, then you would -- you

4    would provide that environment.

5         Q.    All right.  Let's just get it really

6    simple.

7         A.    Yeah.

8         Q.    If you throw a bunch of particles into

9    the environment --

10        A.    Yeah.

11        Q.    -- the reason you don't want to do that,

12   the reason you would like to have a filter --

13        A.    Yeah.

14        Q.    -- the reason you would like to keep

15   your operating room clean --

16        A.    Yeah.

17        Q.    -- is because if you don't people get

18   infections; correct?

19             MR. GORDON:       I object to the form

20   of the question.

21        A.    Well, you're making the major leap, and

22   that's the kind of thing that would -- would cause

23   problems in that.  You can't say that.

24             BY MR. BANKSTON

25        Q.    Do you have any expertise in what



AMICUS
REPORTING GROUP

1    infection-control measures are taken within

2    orthopedic operating rooms?

3         A.    Do I have what?

4         Q.    Do you have expertise --

5         A.    Yeah.

6         Q.    -- to speak and give opinions about what

7    infection-control measures are taken within an

8    orthopedic operating room?

9         A.    I don't think anybody could claim that.

10        Q.    You don't think anybody could?

11        A.    Yeah.

12        Q.    You don't think orthopedic doctors, who

13   work with infectious disease people to keep their

14   operating rooms clean, could maybe talk about that?

15             MR. GORDON:         I object to the form

16   of the question, argumentative.

17             BY MR. BANKSTON

18        Q.    So your contention is that no one on the

19   planet can give opinions about procedures taken

20   within an orthopedic operating room to prevent

21   infection?

22        A.    I might be speaking out of turn here,

23   and slap me if I am, Corey, in the open literature

24   there has been controversy as to whether a laminar

25   flow clean air system actually help the -- cut down



AMICUS
REPORTING GROUP

1    on the number of infections.  The controversy is

2    still there.  So what is it that you're trying to

3    prove here?

4         Q.   Okay.  So let's talk about that; right?

5         A.   Yeah.

6         Q.   You recognize that there are experts who

7    discuss and study laminar flow?  That exists?

8    Those people exist?

9         A.   Well, I don't know -- you keep on

10   throwing out words like "experts."

11        Q.   Okay.  Let's not use "experts."

12        A.   Yeah.  God doesn't create experts.

13        Q.   There are scientists who spend a

14   significant part of their time examining laminar

15   flow?  Those people exist?

16        A.   Only -- only because it is -- it is

17   believed that maybe laminar clean air would do

18   things for you.  But as it turn out, so many of the

19   beliefs that most people have turn out to be wrong.

20   So you really don't want to make it like a black

21   and white issue here.

22        Q.   Okay.  Object, is nonresponsive.

23             I'm asking you a super simple

24   question, and I understand we're having trouble

25   hearing each other maybe a little bit.



AMICUS
REPORTING GROUP

1        A.    Yeah.

2        Q.    But all I'm asking you is -- let's break

3   it down by super simple steps.

4        A.    Yeah.

5        Q.    There are scientists in the world;

6   correct?  That's a thing that exists, scientists?

7   There are scientists.  Agree?

8        A.    Yeah, yeah.

9        Q.    There are scientists who study things.

10        A.    Yeah.

11        Q.    Agree?

12        A.    Yeah.

13        Q.    Some of those scientists study laminar

14   flow.  Agree?

15        A.    Yeah.

16        Q.    Some of those scientists argue back and

17   forth with each other about the effects of laminar

18   flow.  Agree?

19        A.    Right.  Yeah.

20        Q.    You're not one of those people, are you?

21        A.    No.

22        Q.    Okay.  So in terms about giving this

23   jury opinions about the effectiveness of whether

24   laminar flow, what it does or does not do, that's

25   not something you're qualified to give opinions on;



1   correct?

2        A.    That's right.

3        Q.    Okay.  You will agree with me, though,

4   that the reason you want to keep particles out of

5   an operating room to an absolute minimum is to

6   prevent the incident of surgical infection;

7   correct?

8        A.    Now, where are we going with this one

9   again?  You already said that I'm not -- I'm not an

10  expert in clean-room facilities.

11       Q.    Okay.

12       A.    And why are you asking me that question

13  again?

14       Q.    So you can tell me that's not a question

15  you're qualified to answer?

16       A.    Yeah.

17       Q.    Okay.

18       A.    I'm simply -- I'm simply here to provide

19  you with insight into -- into bio aerosol

20  technologies.

21       Q.    Okay.  And I appreciate that.  I want

22  you to tell me whenever that's true.

23       A.    Yeah.  Yeah.

24       Q.    Whenever I'm talking or asking you a

25  question about something you're not qualified to



AMICUS
REPORTING GROUP

1    talk about, tell me "That's not why I'm here,

2    Mr. Bankston.  I'm here for a totally different

3    reason."

4         A.   Yeah.

5         Q.   That's totally fine.  I don't have any

6    problems with that.  Let's talk a little bit more

7    about this MERV 14 filter.  You say -- let's go to

8    page 25 of your report.

9         A.   Got it.

10        Q.   Okay.

11             MR. GORDON:        Did you say 24?

12             MR. BANKSTON:       25.

13        Q.   All right.  Do you see the section that

14    starts with D. --

15        A.   Hmm hmm.

16        Q.   -- MERV 14 filtration?

17        A.   Yeah.

18        Q.   Okay.  You see the second sentence in

19    that paragraph?

20        A.   Yeah.

21        Q.   It says:  "Standard charts list this

22    specification:  removal of all bacterial particles

23    sized within .3 to 1 micron."

24        A.   Yeah.

25        Q.   Do you see that?



AMICUS
REPORTING GROUP

1      A.    Yeah.

2      Q.    That's what a MERV 14 filter is --

3      A.    Yeah.

4      Q.    -- correct?

5      A.    Right.

6      Q.    Okay.  So the Bair Hugger that we're

7    talking about in this case --

8      A.    Yeah.

9      Q.    -- does it have a MERV 14 filter?

10     A.    I was made to believe that it does.

11     Q.    Okay.  So if a Bair Hugger has a MERV 14

12    filter, according to your report in this paragraph,

13    that means that the Bair Hugger should be able to

14    remove all bacterial particles sized within .3 to

15    1 micron; correct?

16     A.    I would more rephrase that in saying

17    that particles.  We don't really know if they're

18    biological or not.  It's particles size range.

19     Q.    Okay.  So in your report here --

20     A.    Yeah.

21     Q.    -- where it says "removal of all

22    bacterial particles sized within .3 to 1 micron --"

23     A.    Yeah.

24     Q.    -- you're saying that we should take the

25    word "bacterial" out of that?



AMICUS
REPORTING GROUP

1        A.   Well, we should put more emphasis on

2   just raw particles, and bacteria, it's just an

3   example.

4        Q.   Okay.  I mean, I'm just quoting you

5   here.

6        A.   Yeah.

7        Q.   And I understand that you included

8   bacterial here --

9        A.   Yeah.

10       Q.   -- but that may not necessarily be the

11  right focus you're saying?  It's more about

12  particles?

13       A.   Well, there are a lot -- there are a lot

14  of particles out there of the size range that are

15  nonbacterial in origin.

16       Q.   Okay.

17       A.   Yeah.

18       Q.   So -- but let's get back to what a

19  MERV 14 filter is.  According to your report, a

20  MERV 14 filter -- and we'll take out the word

21  "bacterial" this time.

22       A.   Yeah.

23       Q.   A MERV 14 filter can remove all particle

24  sizes within .3 to 1 micron; correct?

25       A.   Yeah.



```
 1        Q.    Okay.
 2              MR. GORDON:          I think you said .1
 3    to 3 to 4.
 4              MR. BANKSTON:        Let's do that again
 5    for the record actually.
 6              MR. GORDON:          I think you said .3
 7    to .1.
 8              MR. ASSAAD:          He said...
 9              MR. BANKSTON:        Yeah, I think
10    you're -- I think you're exactly right.
11        Q.    So I'm going to ask you that again just
12    so we have it for the record, okay, which is that
13    if the Bair Hugger has a MERV 14 filter, that means
14    that filter should be capable of removing all
15    particles sized within .3 to 1 micron; correct?
16        A.    That's -- that's what the filter specs
17    claims to be.
18        Q.    Okay.  And, according to you, that
19    MERV 14 filter would be adequate?
20        A.    Hmm hmm.
21        Q.    Okay.
22              MR. GORDON:          For the
23    court reporter you need to answer "yes" or "no."
24        A.    Yes.
25              MR. BANKSTON:        Can you give me
```



AMICUS

REPORTING GROUP

1    Tab 10 out of here, man?  Oh, darn it, I don't have

2    my list in front of me.  No, I do.  I'm perfect.

3                     No, I have -- that's just for

4    Corey.  This one is for the witness.  And I have --

5    this one is premarked so I'm okay.

6                     Corey, that's for you.  And that's

7    360.  It's Tan's efficiency report.

8              MR. GORDON:        What's 360?

9              MR. BANKSTON:      It's Exhibit 360.

10             MR. ASSAAD:        It was previously

11   marked in another deposition.

12             MR. BANKSTON:      Yeah.  It's been in

13   another deposition.

14             MR. GORDON:        Oh.  Have you been

15   doing sequential numbering in other depositions?

16             MR. ASSAAD:        Yes.

17             MR. BANKSTON:      We had, and I'll --

18             MR. ASSAAD:        You guys have.

19             MR. BANKSTON:      Yeah.  And then --

20   and then you know what's weird is the plaintiffs

21   didn't in a couple of depositions.

22             MR. GORDON:        This is off the

23   record.

24             MR. BANKSTON:      Yeah, this is all

25   off the record.  I'm sorry.



AMICUS
REPORTING GROUP

```
 1              THE VIDEOGRAPHER:   We are going off the
 2    record.
 3              MR. BANKSTON:       Yeah, let's go off
 4    for just a second, actually.
 5              THE VIDEOGRAPHER:   The time is
 6    9:12 a.m.
 7    (DISCUSSION OFF THE RECORD)
 8    (ADJOURNMENT)
 9              THE VIDEOGRAPHER:   We are back on
10    record, and the time is 9:20 a.m.
11         BY MR. BANKSTON
12         Q.   All right, Mr. Ho.  I'm going to hand
13    you this document.  This document has been
14    previously marked in this litigation as
15    Exhibit 360, and I want to take a look at it with
16    you.  You'll see on the first page of this
17    document, correct, it has a document title?
18         A.   The title is "Test Report."
19         Q.   I'm sorry.  I believe you have the first
20    page in your other hand.
21         A.   Oh.
22         Q.   Do you see where we have "Document
23    Name," "Document Title" up at the top of the
24    report?
25         A.   "The purpose..."
```



1          Q.    Yes.  Yes.  So you understand that this
2    purpose is to provide an assessment of the filter
3    efficiency on the Bair Hugger system and the
4    efficiency level of the current filters?  Do you
5    see that's what this document says?
6          A.    Right.
7          Q.    And you see how there is a
8    "3M Confidential" up at the top of the document?
9          A.    Hmm hmm.
10         Q.    Okay.  On the bottom of -- the bottom
11   corner of this document you'll see a number that
12   starts with 3MBH; correct?
13         A.    Right.
14         Q.    Okay.  And the number here starts with
15   89.  The part of this document that I would like to
16   ask you about today is going to be -- the final
17   numbers are going to be 96.  So if you can flip to
18   96 for me.  That's the part I would like to ask you
19   a question about.
20               Okay.  Perfect.  Now, you see that
21   there's been a portion of that document that's been
22   highlighted that reads "Table 3.  No load (initial)
23   tests for Model 775 filter."  Do you see where that
24   is?
25         A.    Yeah.



1          Q.   Okay.  And you see that here is a table

2    that underneath that title says "775, % Efficiency,

3    48 cfm."  Do you see where it says that?  Directly

4    below where it says "Table 3."

5          A.   Yeah.

6          Q.   Okay.  You understand that 48 CFM is

7    cubic feet per metre?  Have you seen that

8    abbreviation before?

9          A.   Right.

10         Q.   Oh, excuse me.  That abbreviation being

11   cubic feet per minute?

12         A.   Right.

13         Q.   Okay.

14         A.   What did you first say?

15         Q.   I said "metre," actually.  And that

16   doesn't make any sense because cubic feet per metre

17   makes no sense at all.

18         A.   No.

19         Q.   But, yeah.  So what we're looking at

20   here is 48 cubic feet per minute.  Do you -- do you

21   know if that's the flow rate of the Bair Hugger

22   device?  Did you know that before seeing this

23   document?

24         A.   I got the impression that's what it is.

25         Q.   Okay.  Now, below that we see some



1    tables, and I want to talk about what would be the

2    Y axis -- axis of these tables.  And do you see

3    where there's micron measurements down the Y axis?

4         A.   Are you referring to the 1, 2, 3, 4, 5,

5    and so on?

6         Q.   No, sir.  No, sir.  I'm actually -- and

7    the "Y" meaning the vertical.  I mean the section

8    on the far left where there are micron

9    measurements.  Do you see, for instance, on each

10   test it is divided into three parts for .3 to

11   1 micron?

12        A.   Yeah.

13        Q.   1 to 3 microns?

14        A.   Yeah.

15        Q.   3 to 10 microns; right?

16        A.   Yeah.

17        Q.   These are three different categories of

18   particle sizes; correct?

19        A.   Right.

20        Q.   Okay.  And you see in the table there

21   are efficiency numbers expressed in percentage for

22   tests of filters.  Do you see those percentage

23   efficiencies?

24        A.   Yeah.

25        Q.   Would you agree with me that, reading



1    this table, the Bair Hugger filter does not remove

2    all particle sizes within .3 to 1 micron?

3         A.    That's what it says.

4         Q.    Correct.  In fact you would also agree

5    with me that the Bair Hugger filter does not even

6    remove all particles between 1 and 3 microns;

7    correct?

8         A.    Right.

9         Q.    Now, that's a little bit different than

10   the standard specification that you discussed in

11   your report; correct?

12        MR. GORDON:        I object to the form

13   of the question.  It misstates the evidence.

14        A.    Are you referring to the 99 percent

15   numbers?

16        BY MR. BANKSTON

17        Q.    No.  What I'm actually referring to is

18   remember when you told me that a MERV 14 filter by

19   specification will remove all particles sized .3 to

20   1 micron?  Do you remember telling me that?

21        A.    Right.

22        Q.    Now, that is not -- this Bair Hugger

23   filter test that you have in front of you, that

24   does not meet that standard, does it?

25        A.    It does appear to be slightly different.



AMICUS
REPORTING GROUP

1          Q.    In other words, from this chart we can
2     see -- let's go down all four lots that were
3     tested.  In the first lot it only removed
4     83 percent of those particles; correct?
5          A.    Yeah.
6          Q.    In the second test it only removed
7     82 percent; correct?
8          A.    Yeah.
9          Q.    In the next test it only removed
10    75 percent; correct?
11         A.    Yeah.
12         Q.    And in the next test it only removed
13    78 percent; correct?
14         A.    Correct.
15         Q.    So it does not meet the standard in
16    which you expressed in your report; correct?
17         A.    Right.
18         Q.    Okay.  Thanks.  Are you familiar with
19    what a HEPA filter is?
20         A.    Yes.
21         Q.    Okay.  Are you familiar with the
22    specifications for a HEPA filter?
23         A.    I don't have the numbers handy, but in
24    general.
25         Q.    Let me throw out a number and see if it



AMICUS
REPORTING GROUP

1    is something that you know about.  If I was to say

2    that a HEPA filter can filter out 99.97 percent of

3    particles at .3 microns, is that around the range

4    that you would expect a HEPA to perform or would

5    you have a different standard, or do you know?

6         A.    Maybe I don't.

7         Q.    Okay.  In terms of a MERV 14 filter, you

8    would also agree with me that a MERV 14 filter will

9    allow as much as 3 percent of all staph organisms

10   to pass through it?

11        A.    That's a very specific question.

12        Q.    It is.

13        A.    And I'm not exactly sure if I could

14   competently answer that question.

15        Q.    You might be able to if you look at

16   page 16 of your report.  Do you want to flip to

17   that with me, page 16?  All right.  I'm going to

18   direct you to the second paragraph on that page.

19        A.    Yeah.

20        Q.    Do you see the middle of the paragraph

21   where you cite a Table 8.2 of Kowalski?

22        A.    Hmm hmm.

23        Q.    And in that statement it says a MERV 14

24   filter will remove staph with 97 percent

25   efficiency; correct?



AMICUS
REPORTING GROUP

1        MR. GORDON:        I object to the form

2  of the question.  That is not -- you misread it.

3        BY MR. BANKSTON

4        Q.   All right.  Let's read the whole thing.

5  "According to table 8.2 of Kowalski, a MERV 14

6  filter will remove Staph. aureus with

7  97% efficiency..."  Is that a correct reading of

8  that?

9        A.   Yeah.

10       Q.   So by some fairly simple subtraction we

11 know that 3 percent of staph aureus organisms will

12 pass through this filter; correct?

13       A.   You can assume that.

14       Q.   Okay.  Do you agree that in selecting a

15 filter for use in a healthcare setting you need to

16 know the environment in which it's going to be

17 used?

18       MR. GORDON:        I object to the form

19 of the question.  Vague, ambiguous, lack of

20 foundation, incomplete hypothetical.

21       A.   There is a "but" to that question?

22       BY MR. BANKSTON

23       Q.   A "but?"

24       A.   Yeah.  Do you have some follow-up to

25 that question?



AMICUS
REPORTING GROUP

1      Q.    I'm sure I'll have more questions, yeah.

2      A.    Yeah.  So what is the question again?

3      Q.    When you're selecting a filter for use

4    in a healthcare setting, do you need to know the

5    environment of use?

6          MR. GORDON:          I object to the form

7    of the question.

8      A.    If I were designing an instrument?  Is

9    that what you're saying.

10          BY MR. BANKSTON

11      Q.    No.  I'm actually asking if you're

12    selecting a type of filter for use in a healthcare

13    setting.  Not if you're making a device.  Like just

14    if you're picking a filter.  If you're going to

15    pick a filter, do you need to know the environment

16    it's going to be used in?

17      A.    That's sort of a vague question, though,

18    because it's hard to really answer that question

19    unless I know what is it that you really want to

20    point at.

21      Q.    Okay.

22      A.    There seems to be a second part to that

23    question, depending on whether the answer is yes or

24    no.

25      Q.    Okay.  So in terms of --



1          A.    Come right out to the question and
2    see --
3          Q.    That's my question.  I'm wondering --
4    let's say I have a job, and my job is to pick a
5    filter.
6          A.    Pick a filter.
7          Q.    I'm going to pick a filter for an
8    application.
9          A.    Yeah.
10         Q.    Do I need to know where the filter is
11   going to be used if I'm going to pick that filter
12   safely?
13         A.    It would be helpful.
14         Q.    In order to determine if a filter is
15   safe in a given application, you might need to know
16   the environment of use; correct?
17         A.    When you say "safe," how would -- how
18   would that mean?  Is that an absolute term or is it
19   a --
20         Q.    That's a good point.
21         A.    -- is it something that is adequate for
22   the job?
23         Q.    Yeah.  Let's phrase it in the way it's
24   done in your report, for instance.  You say that a
25   MERV 14 filter is adequate for this application?



1          A.   Yeah.

2          Q.   I would assume when you speak of

3    "adequate," that means reasonable in terms of

4    patient safety as well; right?

5          A.   Yeah.  That's a bit of a stretch,

6    though.

7          Q.   So let me make sure I have this clear.

8    When you say that a MERV 14 filter is adequate,

9    you're not talking about patient safety?

10         A.   You -- you really want to narrow it down

11   to what -- what the issue is at hand.

12         Q.   That's absolutely why we're here, yeah.

13         A.   Yeah.

14         Q.   Right.  Okay.  So let me ask it again.

15         A.   Right.

16         Q.   Okay.  When you say in your report, your

17   words, a MERV 14 filter is adequate in this

18   Bair Hugger --

19         A.   Yeah.

20         Q.   -- do you mean from a patient safety

21   point of view?

22         A.   A patient safety could be interpreted in

23   a variety of directions.  So in this case you

24   are -- you're really trying to equate filter X,

25   safety, yes; filter Y, safety no, and I can't



AMICUS
REPORTING GROUP

1    answer that question.

2         Q.    Okay.  So you cannot give the opinion

3    that the Bair Hugger filter is adequate from a

4    patient safety perspective?

5         A.    I -- I can say that the filter selected

6    is adequate for the performance of the instrument.

7    And I want to take safety out of it because --

8    because safety is a whole different issue.

9         Q.    Okay.  So in terms of -- you're a

10   designer of devices; correct?

11        A.    I do some of that, yeah.

12        Q.    Okay.  And so sometimes when making a

13   device you have to understand if a component that

14   you're using in the device is going to have a

15   negative effect and make your device not work or

16   whether it will work fine with that component.  Is

17   that simple enough?

18        A.    Hmm hmm.

19        Q.    Okay.  So what I -- oh, is that a yes?

20        A.    Yes.

21        Q.    And I don't mean to be rude about it.

22        A.    Yeah.  Yeah.

23        Q.    She can't take down --

24        A.    Right.  Right.  Sorry.

25        Q.    No problem.  So am I correct, when you



1    say the Bair Hugger filter is adequate, that's in

2    terms of the function of the device?

3         A.    Yes.

4         Q.    Okay.

5         A.    Yeah.

6         Q.    So what I want to make sure, so when one

7    day if we get to trial, is you're not making any

8    representations to this jury about whether that

9    Bair Hugger filter is adequate from a patient

10   safety standpoint?

11        A.    Again I like to emphasize the fact that

12   when you -- when you attach safety and -- and

13   selection of material, then you are making a very

14   huge leap in faith in saying that.  So -- so I'm

15   only speaking from the standpoint of an aerobiology

16   technical person.  So the future that is selected

17   is adequate for what the instrument is supposed to

18   do.

19        Q.    You mean it's adequate for the device to

20   be able to blow hot air on the patient to warm them

21   for surgery?

22        A.    It's adequate to provide the airflow

23   characteristics that -- that the end result is

24   called for.

25        Q.    Okay.  In terms of is that filter



1   sufficient to provide reasonable assurance that a

2   patient will not suffer peri-prosthetic joint

3   infection, that's probably not something you can

4   talk about today?

5        A.   No.

6        Q.   Okay.  Let me ask that in another way

7   because I want to be very specific, not just about

8   peri-prosthetic joint infection.  You would agree

9   with me you do not have the necessary

10  qualifications and expertise to state the level of

11  filtration that is needed in the Bair Hugger to

12  maintain clinically safe levels of air quality in

13  an ultra clean operating room during an orthopedic

14  procedure?

15       MR. GORDON:         I object to the form

16  of the question.

17       BY MR. BANKSTON

18       Q.   Do you agree with that?  And if you need

19  to, I can repeat it and we can do it again.

20       A.   You're saying if I do or do not have an

21  expertise in designing something?

22       Q.   No, no, no.  This is very, very specific

23  so let's go one -- let's go real slow.

24       A.   Okay.

25       Q.   Okay.  What I'm asking is are you



AMICUS
REPORTING GROUP

 1    qualified -- would you agree with me that you are

 2    not qualified to state the level of filtration --

 3         A.    State?

 4         Q.    Yes.  To tell me right now what the

 5    level of filtration is that is needed to maintain

 6    clinically safe levels of air quality in an

 7    orthopedic ultra clean operating room?

 8         A.    You see, there you go.  You're attaching

 9    one concept with another --

10         Q.    Hmm hmm.

11         A.    -- that has got a lot of leaps of faith

12    in between.  So you are, like, attaching --

13    attaching two kites with some glue together.  So

14    you really --

15         Q.    Okay.

16         A.    -- can't ask a question like that.

17         Q.    All right.  So you would agree with me

18    that if a medical device maker is going to put

19    something in an operating room, an orthopedic

20    operating room --

21         A.    Yeah.

22         Q.    -- he needs to make sure it's clinically

23    safe, reasonably so?  You would agree with that?

24    Wow.  Okay.

25         A.    You see, you keep coming back with the



1    word "clinical safety."

2         Q.    Hmm hmm.  That's important; right?

3         A.    It's sort of a -- it's such a layman's

4    term that it could be taken in 50 directions.  So

5    suddenly you wake up one day and say, "Well, this

6    is what I mean by clinical safety."  And -- and I'm

7    not sure if that term contained a lot of content in

8    it.  You see, what -- what everybody wants really

9    in life is absolute perfection.

10        Q.    Well, somebody is going to need to make

11   sure this device is safe, aren't they?  You're not

12   going to put this device into thousands and

13   thousands and thousands of operating rooms,

14   millions of surgeries, and have no idea if it's

15   safe or not?  That's not going to happen; right?

16        A.    Well, supposing we look at safety in a

17   different direction.  How much safety do you -- do

18   you expect as a person when you -- when you seek

19   medical -- when you seek medical help?

20               And let me give you a simple

21   example.

22        Q.    Hmm hmm.

23        A.    When you go to a doctor's office and

24   say, "Well, I'm not feeling good" and the doctor

25   suspect it is some sort of a microbial or viral



1    infection.  Okay.  This is something he never tells

2    you.  He takes a sample from wherever it is that is

3    causing you problems and then he would -- he would

4    give you some -- some drugs.  And he would always

5    say, "Come back in three days if you don't feel

6    better."  Why does he say that?  Did you ever think

7    about that?  Why did he ask you to come back in

8    three days?

9         Q.    I object to the nonresponsive.  I object

10   to the narrative.

11              All right.

12        A.    And you don't want to know either.

13        Q.    So let's talk about what safe means

14   clinically.  Are you qualified to say what a device

15   has to do to assure a reasonable level of clinical

16   safety?  Okay.  Have you ever seen an orthopedic

17   implant surgery?

18        A.    Have I seen one?

19        Q.    Hmm hmm.

20        A.    No.

21        Q.    Okay.  Now, pathogens floating in the

22   air, biological aerosols floating in the air, they

23   don't have an indefinite survivability time?

24   They're going to have a limited survivability when

25   they're in the air; correct?



AMICUS
REPORTING GROUP

```
 1          A.    Agreed.
 2          Q.    They're going to need to find a surface
 3   to stick to; right?
 4          A.    Why do you say that?
 5          Q.    If they expect -- if a bacteria expects
 6   to have any good degree of survivability, it's
 7   going to need to find something to stick to, form a
 8   good degree of exopolysaccharides; correct?
 9              MR. GORDON:          I object to the form
10   of the question.
11          A.    That's not the intent of a -- of a
12   biological particle.
13              BY MR. BANKSTON
14          Q.    Biological particles have intent?
15          A.    No.
16          Q.    Yeah.  They don't have any agency;
17   right?  Like they don't make decisions?
18          A.    No.  You see, that was the way --
19          Q.    Okay.  So let me rephrase that a bit.
20          A.    -- your question was phrased.  Yeah.
21          Q.    Okay.  So biological particles, the ones
22   that attach to objects, such as nutrient particles,
23   such as surfaces, they have better survivability
24   than particles that float in air?
25          A.    Is that said somewhere?
```

1        Q.    Excuse me?

2        A.    Is that mentioned somewhere?

3        Q.    I'm asking you that.

4        A.    The survivability of a particle really

5    does not rely on sticking on surfaces per se.

6        Q.    Okay.  So free-floating particles in the

7    air, they don't have any different survivability,

8    say, than particles that have formed on an

9    orthopedic implant and have biofilm on them?

10            MR. GORDON:      I object to the form

11    of the question.

12        A.    I don't get --

13            BY MR. BANKSTON

14        Q.    What I want to know, because I don't

15    know --

16        A.    Yeah.

17        Q.    -- at all --

18        A.    Yeah.  I don't --

19        Q.    -- is, is there a difference in

20    survivability time --

21        A.    Yeah.

22        Q.    -- between a particle floating in air --

23        A.    Right.

24        Q.    -- and a particle attached to a surface

25    that is coated in exopolysaccharides?



AMICUS
REPORTING GROUP

1        A.   You are wanting to know if one would

2   survive longer than the other?

3        Q.   Hmm hmm.

4        A.   I don't think there's any data that

5   indicate one way or the other.

6        Q.   Okay.  When I talk about

7   exopolysaccharides, that's also referred to as

8   biofilm; correct?

9        A.   Did you read my little blurb about --

10        Q.   Oh, I sure did.

11        A.   -- about --

12        Q.   About -- yeah.  This guy called it that

13   but it wasn't really that and then there was the

14   PhD thesis and all that.

15        A.   Biofilm is -- is almost like a generic

16   term.  It doesn't actually specify what chemical

17   component it is made of.

18        Q.   Right.  So maybe we'll just keep

19   sticking with exopolysaccharides.

20        A.   Yeah.  ESP, yeah.

21        Q.   Our poor court reporter is going to have

22   to write that every time, but we'll just stick with

23   that word.  Luckily I gave her a spelling for it

24   before we started, so I knew we were going to talk

25   about it.



1          MR. GORDON:          You could use EPS.

2       BY MR. BANKSTON

3       Q.    Yeah, we could -- yeah, EPS.  Let's go

4    to that.

5       A.    Yeah.

6       Q.    Let's talk about EPS.

7       A.    Yeah.

8       Q.    You'll agree with me that EPS hampers

9    immune response?

10      A.    Oh, like jumping in, pretty technical.

11      Q.    Hmm hmm.

12      A.    Why do you say that?

13      Q.    Well, I said it because of page 7 of

14   your report.

15      A.    Yeah.

16      Q.    So if you go to page 7 of your report,

17   in the middle -- the very middle of the paragraph.

18      A.    Page 7?

19      Q.    Hmm hmm.  The very middle of the page.

20   In the very middle of that paragraph, on the very

21   left side of the paragraph --

22      A.    In the middle?

23      Q.    In the very middle --

24      A.    Yeah.

25      Q.    -- you'll see a word that says



AMICUS
REPORTING GROUP

1    "polysaccharides."  Do you see where it says

2    "polysaccharides" in the very middle of the

3    paragraph on the far left?

4         A.    Yeah.

5         Q.    Okay.  And it says polysaccharides can

6    also provide protection from a wide range of

7    stresses, such as desiccation and immune effectors.

8    Correct?

9         A.    Yeah.

10             MR. GORDON:        Well, it says other

11   things too.

12           BY MR. BANKSTON

13        Q.    Yeah, sure.  It says some other stuff

14   too; right?

15        A.    Yes.

16        Q.    Okay.  In terms of immune effectors, the

17   body's immune system produces what we could call

18   effectors that will attempt to attack bacteria;

19   correct?

20        A.    Yeah.

21        Q.    And EPS can hamper that process?

22        A.    Yes.

23        Q.    Okay.  Let's talk a little bit about the

24   environment that the Bair Hugger is used in.  And I

25   believe it's your opinion that there is unlikely to



1    be bacterial growth in this environment of the

2    Bair Hugger because there is a low humidity.  Is

3    that your opinion?

4         A.   Correct.

5         Q.   Okay.  And I believe that you believe

6    that that means the contaminant kill rate will be

7    enhanced what it would normally be above room

8    temperature, for example?

9         A.   Right.

10        Q.   Okay.  So because it's a dry

11   environment, that inhibits bacterial growth?

12        A.   Right.

13        Q.   What do you think the humidity of an

14   operating room is?

15        A.   Are you going to tell me?

16        Q.   No.  I want you to tell me.  You say

17   it's in a dry environment.  What kind of dry

18   environment are we talking about?

19             MR. GORDON:        Now you're -- come

20   on.  You're switching back and forth.  He's talking

21   about -- you just asked him about the Bair Hugger

22   itself.

23             MR. BANKSTON:      Hmm hmm.

24             MR. GORDON:        Now you're talking

25   about the OR environment?



1            MR. BANKSTON:        Yeah.  I want to

2     know -- I want to know what the air going into the

3     Bair Hugger, if it's wet or not.

4            MR. GORDON:        Going into?

5            MR. BANKSTON:        Yeah, yeah.

6        Q.    So the Bair Hugger is used in an

7     environment.  You understand that.  And that

8     environment, according to you, is a warm, dry

9     environment; correct?

10       A.    Right.

11       Q.    Okay.  So what I want to know is are you

12    familiar with the level of relative humidity in an

13    operating room?

14       A.    I don't have any numbers to pull out of

15    a hat.

16       Q.    Okay.  But it's dry?

17       A.    Yeah.

18            MR. GORDON:        The operating room

19    or the Bair Hugger?

20            MR. BANKSTON:        I'm -- I'm asking

21    the question very clearly, very, very clearly.  If

22    you have an objection, just state it.

23            MR. GORDON:        I'm literally

24    confused.

25            BY MR. BANKSTON



AMICUS
REPORTING GROUP

1          Q.    Let's go back to the previous question.

2     The Bair Hugger is used in an environment, and that

3     environment, according to you, is a dry

4     environment?

5               MR. GORDON:          Not the Bair Hugger

6     itself?

7               MR. BANKSTON:        I don't know if

8     the -- I mean, the surface of the Bair Hugger

9     might -- it could be dry.  Depending on the

10    environment it's in.  I'm dry when I'm in the

11    desert.  When I'm in the Amazon rainforest, I'm

12    wet.  I'm not -- these questions -- I don't want

13    questions from you anymore, Corey, I want

14    objections.

15              MR. GORDON:          I just -- well --

16    are you talking about the environment --

17              MR. BANKSTON:        I'm not going to --

18              MR. GORDON:          -- inside the

19    Bair Hugger --

20              MR. BANKSTON:        I'm not -- I'm not

21    being deposed.

22              MR. GORDON:          -- or the

23    environment in which the Bair Hugger --

24              MR. BANKSTON:        Corey --

25              MR. GORDON:          -- sits?



1        MR. BANKSTON:         -- stop asking me

2   questions, man.  I'm not under deposition.  If you

3   have an objection to the question that I just asked

4   the man, state your objection.

5        MR. GORDON:         I object.  It's

6   vague and ambiguous.

7        BY MR. BANKSTON

8        Q.   Okay.  Sir, the Bair Hugger is used in

9   an environment, and you contend that's a dry

10  environment?

11       MR. GORDON:         I object to the form

12  of the question.  It misstates his testimony.

13       A.   Okay.  Continue.

14       BY MR. BANKSTON

15       Q.   No, I need an answer.  Do you agree with

16  that?  Your opinion is that because it's a dry

17  environment the contaminant kill rate is enhanced?

18       MR. GORDON:         I object to the form

19  of the question, vague, ambiguous as to what "it"

20  is.

21       A.   Well, there must be a follow-up to this.

22  Just for the sake of argument --

23       BY MR. BANKSTON

24       Q.   Hmm hmm.

25       A.   -- the answer is yes.  What --



AMICUS

REPORTING GROUP

1        Q.   Right.  So when we talk about a dry
2   environment --
3        A.   Yeah.
4        Q.   -- does that mean -- okay.  For
5   instance, have you been outside today?
6        A.   We came in from the outside.
7        Q.   Okay.  Yeah.  We didn't -- you didn't --
8   there wasn't like a skyway thing or something like
9   that?  You went outdoors today?
10       A.   Right.
11       Q.   Okay.  Is the OR drier than outdoors
12   today?
13       A.   Come again.
14       Q.   Okay.  So you've been outdoors?
15       A.   Yeah.
16       Q.   You know how humid it was outdoors
17   today; right?  Like you felt -- you felt the
18   environment?
19       A.   That's your opinion.
20       Q.   Right.  Well, you could look it up.  But
21   I'm just saying generally you know what it is
22   outside.  You've been outside?
23       A.   Yeah, yeah.
24       Q.   Is an OR drier or wetter than that?
25       A.   Okay.  This is -- this is where we need



1    to define terminologies.

2         Q.    Hmm hmm.  What terminology?

3         A.    There's always a certain number of

4    molecules of water in the air.

5         Q.    Hmm hmm.

6         A.    And relative humidity is a function of

7    temperature.

8         Q.    Hmm hmm.

9         A.    So the percent of RH changes according

10   to temperature.

11        Q.    Okay.

12        A.    Do you follow?

13        Q.    Hmm hmm.

14        A.    So -- so if it is RH X in the -- in the

15   temperature of 25 degrees.  And -- and when you

16   change that temperature with the same liquid

17   content into 40 degrees --

18        Q.    Hmm hmm.

19        A.    -- the RH changes, the humidity changes.

20   So it becomes, in effect, drier.

21        Q.    Okay.

22        A.    So --

23        Q.    So is it -- is it wetter in an operating

24   room or is it wetter outside?

25        A.    Are we getting somewhere?



1    Q.   Not to my question.  Is it -- is it

2 wetter in an operating room or wetter outside

3 today?

4    A.   Well, I wouldn't be able to tell you

5 that because, again, you actually need to -- need

6 to go do some measurements.

7    Q.   All right.  Let's say we had some

8 measurements.  Let's say the --

9    A.   Some days the air in this area is pretty

10 dry.

11    Q.   Pretty dry, I know.  So let's --

12    A.   Yeah.  Yeah.

13    Q.   So let's go with the average relative

14 humidity of Calgary.  Do you know what that is?

15    A.   Not really.

16    Q.   Would it surprise you if it's

17 25 percent?

18    A.   No, I'm not surprised at all.

19    Q.   Yeah, that's not -- in fact we may have

20 some wetter environment.  I'm from Houston.

21 Houston is 60 percent.  It's super wet down there.

22    A.   Hmm hmm.

23    Q.   But Calgary, around 25 percent.

24    A.   Hmm hmm.

25    Q.   You wouldn't dispute with me if a



AMICUS
REPORTING GROUP

1    desert, like Arizona, is somewhere around

2    5 percent, something like that?

3         A.    Right.

4         Q.    An environment like Calgary --

5         A.    Yeah.

6         Q.    -- in general, in average --

7         A.    Right.

8         Q.    -- is it wetter or drier than an

9    operating room?

10             MR. GORDON:        I object to the form

11   of the question, lack of foundation.

12        A.    Again, I fail to see how I could give

13   you a meaningful answer if I haven't been to an

14   operating room and measured the numbers.  And,

15   also, I don't really know what the air conditioning

16   system is set for.

17            BY MR. BANKSTON

18        Q.    Sure.  So -- but you feel comfortable

19   enough to tell the jury that it's a dry

20   environment, aren't you?

21             MR. GORDON:        I object to the form

22   of the question.  That is not what he has stated.

23             MR. BANKSTON:      He can --

24             MR. GORDON:        That is not what his

25   opinions are.  He is not here -- he has not



AMICUS
REPORTING GROUP

1    expressed an opinion about the environment outside

2    the Bair Hugger.  His opinion, very clearly on

3    page 14, talks about the interior of the

4    Bair Hugger.

5                    And frankly, counsel --

6                MR. BANKSTON:      You know not to do

7    this.

8                MR. GORDON:        Frankly, counsel --

9    no, you're going --

10               MR. BANKSTON:      No, you do.

11               MR. GORDON:        -- back and forth

12   and twisting this --

13               MR. BANKSTON:      He can tell me.

14               MR. GORDON:        -- and that's really

15   not fair with this type of a witness.

16               MR. BANKSTON:      The one you're

17   paying to give opinions?  Yeah, it's totally fair.

18               MR. GORDON:        You can ask him

19   about the opinions he's given --

20               MR. BANKSTON:      How about --

21               MR. GORDON:        -- but you're

22   trying --

23               MR. BANKSTON:      -- we just give

24   evidentiary objections?

25               MR. GORDON:        -- to trick him.



1    You're trying to trick him.

2            MR. BANKSTON:        Seriously, Corey.

3    How about we just give evidentiary objections now?

4    Like let's not do the really unprofessional

5    speaking objection stuff.  Let's move on.

6            MR. GORDON:        It's not a speaking

7    objection.

8        A.   Well, let's turn it around.  If you --

9           BY MR. BANKSTON

10       Q.   There's not a question posed to you

11   right now, sir.  Hold on.  Let me ask you a

12   question.

13           MR. GORDON:        Let him ask you a

14   question.

15          BY MR. BANKSTON

16       Q.   There's not any -- there's no testimony

17   right now.

18               You've told me on a couple of

19   occasions in this deposition that an OR is a dry

20   environment, have you not?

21           MR. GORDON:        I object to the form

22   of the question.

23       A.   A number of occasions --

24          BY MR. BANKSTON

25       Q.   Let's do it this way because I don't



AMICUS
REPORTING GROUP

1    want the objection.

2         A.    Yeah.

3         Q.    Is an OR a dry environment?

4              MR. GORDON:        I object to the form

5    of the question, also lack of foundation.

6              BY MR. BANKSTON

7         Q.    Let's put it even more specific.  The

8    air that goes inside of a Bair Hugger --

9         A.    Yeah.

10        Q.    -- is it dry?  Is it wet?  Somewhere in

11   between?

12             MR. GORDON:        The same objections.

13        A.    Well, if you told me the ultimate aim of

14   where you want the answer to be, then it would make

15   some more sense for me to tell you one way or the

16   other.

17             BY MR. BANKSTON

18        Q.    So once you know what it is I'm trying

19   to prove and how you can avoid falling into that

20   trap, then you'll answer the question, but

21   otherwise you won't?

22             MR. GORDON:        Come on, counsel.

23   That's --

24             BY MR. BANKSTON

25        Q.    That's exactly what you're saying, isn't



AMICUS
REPORTING GROUP

1    it?

2            MR. GORDON:          Object.  Object.

3        A.   I can give you --

4            MR. GORDON:          Argumentative.

5        A.   -- a proper answer for what is it that

6    you intend to --

7            BY MR. BANKSTON

8        Q.   All I'm asking -- I'm asking a super

9    simple question that I would expect a scientist of

10   your calibre to either say "yes," "no," or "I don't

11   know," --

12       A.   Well, you see --

13       Q.   -- and that is do you consider the OR to

14   be a dry environment?

15       A.   And that's the thing, is that I already

16   explained to you what -- what dryness mean and what

17   RH numbers mean, and dryness is a degree.

18       Q.   Hmm hmm.

19       A.   When you change the temperature of

20   the -- of the environment, the RH changes.  So is

21   it dry or not dry?  You see, that's -- that's where

22   you have to put it in your head as to how you

23   define your terminology, dryness.

24       Q.   How do you define it?  Is it dry or not,

25   the OR --



1          MR. GORDON:        I object --

2      BY MR. BANKSTON

3      Q.   -- the air in the OR?

4          MR. GORDON:        I object to the form

5  of the question, lack of foundation, incomplete

6  hypothetical.

7          BY MR. BANKSTON

8      Q.   Let's put it this way:  Are you going to

9  be giving opinions in this case that the bacterial

10 growth or whether or not it occurred in that

11 operating room is affected by the level of humidity

12 in the operating room?

13     A.   Ah.  Now you're saying something that's

14 starting to make sense.

15     Q.   Hmm hmm.  I hope so.

16     A.   Bacterial growth --

17     Q.   Hmm hmm.

18     A.   -- you mentioned that.

19     Q.   Sure.

20     A.   Where are you referring to?  What --

21     Q.   The operating room.

22         MR. GORDON:        I object to the form

23 of the question.

24     A.   Why do you -- why are you interested in

25 bacterial growth in the operating room?



AMICUS
REPORTING GROUP

1           BY MR. BANKSTON

2           Q.    Because I have 2,000 clients who

3    suffered incredibly serious post surgical

4    infections in an operating room.

5           A.    Yeah.

6           Q.    And I'm interested if somebody is going

7    to come and say --

8           A.    Yeah.

9           Q.    -- that the device that I believe hurt

10   them couldn't have hurt them because there was low

11   relative humidity and it was dry.  If that's your

12   opinion, I want to know.  Is that your opinion?

13           MR. GORDON:         I object to the form

14   of the question, incomplete, vague.

15           A.    Are you giving me the impression that in

16   the operating room there is bacteria actively

17   growing in there?  Is that what you're saying?

18           BY MR. BANKSTON

19           Q.    I'm not giving you anything, sir.  I'm

20   asking you questions.

21           A.    Yeah.

22           Q.    I want to know -- I have clients --

23           A.    Yeah.

24           Q.    -- who were hurt bad in the operating

25   room.  And from what I understand, you're going to



1    be giving opinions about bacterial growth on

2    surfaces within that operating room, including the

3    Bair Hugger.  Correct?

4              MR. GORDON:          I object to the form

5    of the question --

6              MR. BANKSTON:        Okay.

7              MR. GORDON:          -- and that is not

8    what he is being offered for.

9              MR. BANKSTON:        So then that -- then

10   he can tell me that, Corey.  Exactly.  He just

11   shook his head no.

12        A.   No.

13             MR. BANKSTON:        Because what we said

14   is I said, "Are there going to be any testimony

15   about bacterial growth on surfaces or the Bair

16   Hugger from your opinions --"

17             MR. GORDON:          No, you didn't

18   ask --

19             MR. BANKSTON:        -- yes or no.

20             MR. GORDON:          -- for the

21   Bair Hugger.  You just -- you asked generally about

22   the operating room.  That's the problem.

23             MR. BANKSTON:        No, you're wrong

24   there, Corey, actually, but that's okay.

25        A.   Well, the impression I get from your



AMICUS
REPORTING GROUP

1   question was that bacteria will grow in the

2   operating room at whatever conditions you're

3   referring to.  Is that what you're saying?  You

4   see, you --

5        Q.    Not really.

6        A.    -- use the term "bacterial growth" --

7        Q.    Hmm hmm.

8        A.    -- sort of on and off.  So are you

9   really interested in bacteria multiplying,

10  increasing in numbers?

11       Q.    What I'm asking you is are you -- not

12  what I'm interested in, at all.  I'm asking are you

13  in that report, the opinions that you have set

14  forth in this case that are going to be submitted

15  to this jury, are you giving opinions about the

16  level of relative humidity and wetness and dryness

17  as relates to bacterial growth?  Do you have any

18  such opinions?  If you do, say "yes;" if you don't,

19  say "no."

20            MR. GORDON:        I object to the form

21  of the question, incomplete, vague.

22            BY MR. BANKSTON

23       Q.    You can answer, sir.  I'm just getting

24  some water.

25       A.    Well, I -- I don't remember saying or



AMICUS
REPORTING GROUP

1   speculating on bacterial growth in an operating

2   room under any RH conditions.

3          Q.   Okay.  That shortens our deposition a

4   lot.  That's all I'm asking.

5          A.   Yeah.

6          Q.   There are no opinions like that in this

7   case?  I don't need to ask you questions about

8   that?

9          A.   Yeah.

10          Q.   Okay.

11          A.   Yeah.

12          Q.   We're good.  You recognize that

13   researchers working with the Bair Hugger have

14   cultured colony-forming units from the hose of that

15   unit, from inside the hose?

16          A.   There -- there have been reports to that

17   effect.  Is that the answer you're looking for?

18          Q.   You -- well, reports.  You understand

19   researchers have found that?  There's published

20   literature on that; correct?

21          A.   Well, as I've said somewhere in my -- in

22   my summary was that the work was so poorly done

23   that it's very difficult to attach significance to

24   what was being said.

25          Q.   Okay.  I understand you don't think much



AMICUS
REPORTING GROUP

1    of it, but what I'm asking you is there are

2    publications in which researchers have cultured

3    CFUs from inside of a Bair Hugger hose.  You may be

4    critical of them, I understand that --

5         A.    Yeah.

6         Q.    -- but those papers exist?

7         A.    And -- and because I'm critical, I'm

8    very reluctant to say "yes" or "no" because the

9    work was badly executed.

10        Q.    So every single person who's published

11   that they found CFUs inside of a Bair Hugger, their

12   work was badly done?

13        A.    Correct.

14        Q.    Okay.  Yeah.  Yeah.  No, we're getting

15   there.  Don't worry about that.

16                  Did anybody tell you the company

17   had reports from hospitals that they were culturing

18   bacteria inside of the Bair Hugger?  Has anybody

19   told you that?

20        A.    If you were to tell me that?

21        Q.    No.  I'm asking if anybody has before I

22   ever told you that.  Has anybody told you that the

23   company was receiving reports from hospitals that

24   bacteria was cultured inside of Bair Huggers?

25                  MR. ASSAAD:       Is that a no?



```
 1          A.    No.
 2              BY MR. BANKSTON
 3          Q.    Thank you.  Give me Tab 3.
 4                  Sir, I'm going to hand you what's
 5     been marked as Exhibit 175.  This is an email chain
 6     produced by 3M inside -- in this case.  And I would
 7     like you to look at the top email for me.  Do you
 8     see where it says there was a unit in Texas that
 9     cultured positive?  At the very top?
10          A.    Yeah.
11          Q.    Okay.  I would like you to flip to the
12     very -- it's the second-to-last page.  There's a
13     bit of a part on the last page that hangs over.
14     It's just an address.  Right.  Exactly.  So if you
15     would go to the second-to-last page.
16                  And you'll see the first email in
17     this chain.  And that would be at the very bottom
18     of this page.
19          A.    Right.
20          Q.    Do you see an email from a man
21     (verbatim) named Judy Hodges?
22          A.    Judy Hodges, yeah.
23          Q.    Yes.  Ms. Hodges says that they have a
24     model 750 unit and that it's cultured positive for
25     Acinetobacter.
```



1        A.    Yeah.

2        Q.    Correct?

3        A.    Yeah.

4        Q.    And they say they're looking for

5   directions for properly cleansing and disinfecting

6   this machine, inside and out.

7        A.    Yeah.

8        Q.    Do you see that?

9        A.    Yeah.

10        Q.    In your opinion, as a microbiologist, if

11   you have a machine like this that's culturing

12   positive for Acinetobacter, is it a good idea to

13   disinfect that machine inside and out?

14        MR. GORDON:        I object to the form

15   of the question, lack of foundation, incomplete

16   hypothetical.

17        A.    Is it a good idea to disinfect the

18   machine inside and out?

19        BY MR. BANKSTON

20        Q.    Hmm hmm.

21        A.    How would you propose to do the

22   disinfection?

23        Q.    I'm not an expert in that.

24        A.    I'm asking -- I'm coming from the

25   standpoint from having disinfected instruments



1    before.

2          Q.    Hmm hmm.

3          A.    It's not an easy thing to do.

4          Q.    All right.  Okay.  Is it a good idea,

5    though?

6              MR. GORDON:        I object to the form

7    of the question, lack of foundation.

8           BY MR. BANKSTON

9          Q.    And I know it's not easy.  Some things

10   in life are difficult.  They're kind of important.

11   Is -- is making sure that your device isn't

12   culturing Acinetobacter inside of it, is that

13   important or not important?

14             MR. GORDON:        The same objections.

15         A.    It depends on what you intend to do with

16   the machine afterwards.

17           BY MR. BANKSTON

18         Q.    Let's say afterwards you intend to blow

19   on 48 cubic feet per minute of air and blow it at a

20   patient.  Is it a good idea then to disinfect the

21   machine inside and out?

22             MR. GORDON:        I object to the form

23   of the question, lack of foundation, incomplete

24   hypothetical.

25         A.    It might have been easier to use a



AMICUS
REPORTING GROUP

1    different machine.

2           BY MR. BANKSTON

3       Q.   Okay.   Such as?

4       A.   Get a new one.

5       Q.   Oh, a new Bair Hugger?

6       A.   Yeah.

7       Q.   Okay.

8       A.   Yeah.

9       Q.   So if you have Bair Huggers that have

10   internal growth in them, the easiest solution is

11   just swap out the machine?

12           MR. GORDON:        I object to the form

13   of the question, lack of foundation.

14       A.   Internal growth now.  Maybe you're

15   not -- you're not familiar with the terminology

16   so --

17           BY MR. BANKSTON

18       Q.   Okay.

19       A.   -- when you're describing things that

20   are growing, they are actually multiplying.

21       Q.   Okay.

22       A.   There is no indication that anything is

23   growing per se.

24       Q.   Okay.  Let's use the language in the

25   document we've been looking at then.



AMICUS
REPORTING GROUP

1        A.    Yeah.

2        Q.    If you have a device and you've cultured

3    it inside and you know it has Acinetobacter in it,

4    it's a good idea to just -- if it's difficult to

5    clean, the best idea might just be to switch out

6    the unit?

7        A.    Use a different machine.

8        Q.    Okay.

9        A.    Yeah.

10        Q.    And why would you want to do that?

11        A.    I suppose it's due diligence.

12        Q.    Correct.  Because Acinetobacter can hurt

13    people; right?

14            MR. GORDON:        I object to the form

15    of the question, strike counsel's comment.

16        A.    I don't know.  I don't know how it would

17    be used under -- under the conditions because

18    not -- you are just using the blanket assumption

19    that any -- the presence of any single bacterium

20    would eventually lead to some dire consequences,

21    and you cannot say that.

22            BY MR. BANKSTON

23        Q.    Do you know how much bacteria it will

24    take to lead to dire circumstances?

25        A.    Ha.  I knew somebody would ask those



1    questions like that.

2         Q.    Yeah.  You thought it might be.  It may

3    be in a case involving bacteria infecting patients

4    that could have come up.  Are you familiar with

5    what is a dangerous level of bacteria to be pumping

6    into the environment?

7              MR. GORDON:         I object to the form

8    of the question.

9         A.    There is no simple answer for that

10   question.

11         BY MR. BANKSTON

12        Q.    Okay.  You were not given any documents

13   related to something called ion armor, were you?

14        A.    No.

15        Q.    Okay.  Are you familiar with the use of

16   silver ion coatings to prevent bacterial growth?

17        A.    I heard about it, but I've done no work

18   on it.

19        Q.    Were you aware of proposals for a

20   Bair Hugger device which featured silver ion to

21   prevent bacterial contamination?

22        A.    No.

23        Q.    Were you aware of any proposals for a

24   design of this device that contained disinfected

25   aerosols incorporated into the device?



1        A.    No.

2        Q.    In your opinion -- do you have any

3    opinion about the Bair Hugger gets used, then it

4    sits idle between surgeries, it sits in a room.  Do

5    you have any opinion about whether bacterial growth

6    can occur in the Bair Hugger during those periods?

7            MR. GORDON:        I object to the form

8    of the question, incomplete hypothetical.

9        A.    Let me try to understand what is it that

10   you're asking here.

11         BY MR. BANKSTON

12       Q.    Hmm hmm.

13       A.    Do bacteria grow with no nutrients?  Is

14   that what you're saying?

15       Q.    No, I'm not saying that.  I'm wondering

16   do they grow in the Bair Hugger.

17            MR. GORDON:        The same objections.

18       A.    Bacteria don't grow by themselves.

19         BY MR. BANKSTON

20       Q.    Sure.  Okay.

21       A.    Yeah.

22       Q.    So do they grow in the Bair Hugger?

23   Well, let's start -- let's start simple.  Can

24   bacteria grow on this table?

25       A.    No.



1      Q.   No way -- there's no bacteria on this
2   table right now?
3      A.   I didn't say that.
4      Q.   Okay.  So there could be bacteria, but
5   it can't multiply while on this table?
6      A.   Correct.
7      Q.   Okay.  Because bacteria needs nutrients;
8   right?
9      A.   Correct.
10      Q.   Okay.  So what would be a nutrient for
11   bacteria?
12      A.   Sugar.
13      Q.   Organic matter generally?
14      A.   No.
15      Q.   So not all organic matter contains what
16   bacteria need, particularly glucose or sugar, to
17   grow; correct?
18      A.   Yeah, yeah.
19      Q.   Okay.  Is it your opinion that there is
20   no nutrients within the Bair Hugger for bacteria to
21   grow?
22      A.   You can make that assumption.
23      Q.   Okay.  So it is your opinion that
24   bacteria does not grow in the Bair Hugger between
25   uses?



1          A.    You can make that -- you can make that
2     assumption.
3          Q.    Okay.  Are you relying on anything in
4     particular to have that opinion or is that just a
5     general -- something --
6          A.    Come again.
7          Q.    Are you relying on anything in
8     particular for that opinion or is that just
9     generally something you know?
10                    Give me Tab 9.
11          A.    Well, that's a primary dog mark
12     (phonetic) of life systems, isn't it?  If you --
13     for yourself if you were given no nutrient for the
14     period of time, you will fail to reproduce
15     yourself.
16          Q.    What I'm more asking is what is your
17     opinion that there is no nutrient mass inside of a
18     Bair Hugger at any time, inside of its hose?
19          A.    There shouldn't be any.
20          Q.    Okay.  There shouldn't be; right?
21          A.    Yeah.
22          Q.    Okay.  Are you familiar with what
23     skin squames are?
24          A.    I've heard of the term.
25          Q.    Yeah.  And bacteria can attach to



AMICUS
REPORTING GROUP

1    skin squames?

2         A.    Right.

3         Q.    They can get nutrients from that?

4         A.    I wouldn't be able to expand on that

5    because...

6         Q.    You don't have the expertise to talk

7    about whether skin squames can support bacterial

8    growth?

9         A.    No.  You're going beyond my expertise.

10        Q.    Okay.  So in terms -- and let me make

11   sure I have that clear for the record.  In terms of

12   whether bacteria can multiply and grow on

13   skin squames, you have no opinion?

14                   Oh.  On our last question we had a

15   nod, so let me ask it one more time.  In terms of

16   whether bacteria can multiply and grow on

17   skin squames, you have no opinion?

18        A.    No opinions.

19        Q.    Okay.  All right, sir.  I'm going to

20   hand you this document here, which has been

21   previously marked in this litigation as

22   Exhibit 296.  I want to direct your attention to

23   the second page of the document, and you will see

24   an email by a man named Mr. Craig Oster.  Do you

25   see that?



1        A.    I see that.

2        Q.    Okay.  And you see here he's the senior

3   technical manager of the 3M infection prevention

4   division; correct?

5        A.    Right.

6        Q.    Okay.  Mr. Oster asks in his email:

7            "Could we put a antimicrobial

8            coating inside of our Bair Hugger

9            and Bair PAWS warming hoses?  I

10           suspect that bacterial grown may

11           occur between uses."

12           Do you see where he says that?

13       A.    Item 1?

14       Q.    Yes.

15       A.    I see that.

16       Q.    Okay.  You understand there's been a

17   following email on the first page, someone is

18   responding to him on the first page?  Do you see

19   that email?

20       A.    On the first page?

21       Q.    Yes, sir.

22       A.    Yeah.  There's some highlighted

23   material.

24       Q.    Sure.  So we have here an email from a

25   Ranjani Parthasarathy, who is listed here as a



1   senior research specialist; correct?

2        A.   Hmm hmm.

3        Q.   Okay.  And do you see where he says:  "I

4   think it's possible to do this, to put

5   antimicrobial coatings and put that on the

6   Bair Hugger."  Do you see where he says that?

7        A.   I see that.

8        Q.   Okay.  And he follows that by saying:

9             "...I think that realistically

10            speaking you would need [a]

11            reasonable residence time (at least

12            15 minutes) and humid air to do a

13            decent job of bacterial kill."

14            Do you agree with that statement?

15            MR. GORDON:         I object to the form

16   of the question, lack of foundation, an incomplete

17   hypothetical, it assumes facts not in evidence.

18        A.   Why do I need to agree with that

19   statement?

20            BY MR. BANKSTON

21        Q.   Because I asked you if you do or not.  I

22   mean, you don't have to agree.  I'm just asking you

23   if you do.

24        A.   It's an opinion made by somebody whose

25   expertise I'm not familiar with.



AMICUS
REPORTING GROUP

1      Q.   Sure.  Okay.

2      A.   I think I have a neutral opinion on it.

3      Q.   Okay.  So in terms of whether it's going

4   to take a reasonable residence time and humid air

5   to do a decent job of bacterial kill with an

6   antimicrobial, that's not something that you're

7   going to be talking to the jury about in this case?

8      A.   No.

9      Q.   Okay.  The next sentence says:  "It may

10  be that you really make a difference between uses,

11  like you suggested."  And you understand that the

12  difference he's talking about is inhibiting

13  bacterial growth; correct?

14          MR. GORDON:        Objection, lack of

15  foundation.

16     A.   Again, I cannot have an opinion on

17  something out of the blue.  It would be useful to

18  know exactly what kind of an expertise Ranjani

19  might have --

20     Q.   Hmm hmm.

21     A.   -- what -- what is his real intent and

22  thrust in saying things.

23          BY MR. BANKSTON

24     Q.   Well, what I guess I'm asking you is --

25     A.   Yeah.



AMICUS
REPORTING GROUP

1          Q.   -- these two gentlemen are working on
2    ways to inhibit bacterial growth on the
3    Bair Hugger; correct?
4               MR. GORDON:        Objection, lack of
5    foundation.
6          A.   It would appear to be so.  Why?
7             BY MR. BANKSTON
8          Q.   Okay.
9          A.   Yeah.
10         Q.   According to you that is a fruitless
11   enterprise, there is no reason to do that?
12         A.   I didn't say that.
13         Q.   I'm ask -- that's what I'm asking you.
14   You can tell me if that's okay.
15         A.   I'm simply saying that I'm neutral on
16   that opinion.  People could have a lot of idle
17   speculations, idle talks, and it is really unfair
18   for me to actually make an -- make an opinion on
19   that.
20         Q.   Okay.  So when we're talking about
21   bacterial growth inside of the Bair Hugger --
22         A.   Yeah.
23         Q.   -- which these two gentlemen are talking
24   about --
25         A.   Yeah.



1          Q.    -- is your opinion that it can happen?

2    It can't happen?  It might happen?  What is your

3    opinion on that?

4               MR. GORDON:         Objection,

5    incomplete hypothetical.

6          A.    I have no opinion on it.

7             BY MR. BANKSTON

8          Q.    Okay.  No opinion on that?

9          A.    Yeah.

10         Q.    Now, I do believe that one of your

11   opinions in this case is that after you've looked

12   at the evidence in this case that you believe that

13   few, if any, particles are going to be emitted from

14   the Bair Hugger during its operation?

15              MR. GORDON:         I object to the form

16   of the question, vague.

17         A.    It might be fair to say that, from what

18   I understand the situation to be, there would be

19   few, if any, particles would come out from the air

20   delivery hose.

21            BY MR. BANKSTON

22         Q.    You could have tested this with your

23   scientific instruments, couldn't you?

24         A.    I suppose.

25         Q.    In fact, plaintiffs' experts have tested



AMICUS
REPORTING GROUP

1    this.  You've reviewed that?

2         A.    And that -- it comes right back to what

3    my original assertion was.

4         Q.    Hmm hmm.

5         A.    That people who have made measurements

6    didn't do it correctly.

7         Q.    Okay.  I thought that was about

8    Mr. Albrecht in collecting colony-forming units.

9    Is that right?  Do you remember we were talking

10   about that?

11        A.    Yeah.

12        Q.    So you're also saying that also applies

13   to plaintiffs' experts who conducted particle

14   testing in this case?

15        A.    Hmm hmm.  Yes.

16        Q.    Okay.  They didn't do it right?

17        A.    No.

18        Q.    Okay.  They disagree with you.  There

19   are people who have tested this, and they have

20   results that disagree with you, and you criticize

21   their findings.  That's where we're at right now?

22             MR. GORDON:        I object to the form

23   of the question, vague.

24        A.    I come from a fairly rigorous regime

25   where in order to make a claim or an assertion, we



AMICUS
REPORTING GROUP

1    actually do a lot of work and serious work before

2    it is done.

3          BY MR. BANKSTON

4          Q.    Okay.

5          A.    So set by those standards, none of the

6    ones that have been demonstrated actually meet the

7    requirements of standards that we're used to.

8          Q.    Okay.  So let's walk through that really

9    quick.

10         A.    Yeah.

11         Q.    Before you give an opinion --

12         A.    Yeah.

13         Q.    You come from what I believe you said is

14   a rigorous background; right?

15         A.    Correct.

16         Q.    Before you give opinion there has to be

17   a lot of work done?  Maybe let's instead of work,

18   let's call it scientific methodology.  Are you

19   familiar with that phrase?  You've heard that

20   before?

21         A.    Yeah.  That's a nice fuzzy term used by

22   laymen.

23         Q.    Sure.  Okay.  Well, for my lay

24   purposes --

25         A.    Yeah.



1        Q.    -- for instance, you're critical of the
2    scientific methodology of some people who have done
3    work on the Bair Hugger; right?
4        A.    Yes, I'm critical.
5        Q.    But in terms of what you're saying,
6    you're saying that to give an opinion about
7    something you have to do some rigorous work to be
8    able to support that opinion.  And they didn't do
9    that rigorous work is what you're saying?
10       A.    I say that from what they have said they
11   have done they couldn't make the statements and the
12   claims that they did.
13       Q.    All right.  Now, you're making the claim
14   that few, if any, particles will be expelled from
15   the Bair Hugger?
16            MR. GORDON:         I object to the form
17   of the question, vague, misstates his testimony,
18   and you're confusing things.  And I know --
19            MR. BANKSTON:      That's not --
20            MR. GORDON:         -- you're
21   intentionally doing it.
22            MR. BANKSTON:      -- an objection.
23       Q.    I'm sorry.  Do you find that I'm
24   confusing you, sir?  Am I -- am I bamboozling you?
25       A.    Well, you -- you didn't give me a clear



1    indication as to where you are driving at when you

2    are asking a question because --

3        Q.    Yeah, I'm not going to do that.

4        A.    -- your questions are -- your questions

5    could form either of three directions.  So for me

6    to give you an answer that is truthful --

7        Q.    Okay.  So let's look at the question

8    again.

9        A.    -- your question cannot -- doesn't draw

10   that out.

11       Q.    Do you have the opinion that when

12   operating the Bair Hugger will expel few, if any,

13   particles?  Is that your opinion?

14           MR. GORDON:        In light of the

15   history I have to object on the grounds of

16   vagueness.

17           BY MR. BANKSTON

18       Q.    Is that your opinion or not?  I mean, is

19   that a confusing question to you?  Is there a way I

20   can make that question less confusing?  Because I

21   genuinely want to know is it your opinion that in

22   operation the Bair Hugger will expel few, if any,

23   particles?

24       A.    Let's for the sake of argument the

25   answer is yes.



1      Q.   I don't want argument.  I want what are

2   your opinions.  Is that one of your opinions in

3   this case?  I mean, you're here to provide expert

4   testimony to assist this jury.  As part of that

5   assistance are you going to be telling the jury

6   that few, if any, particles are expelled from the

7   Bair Hugger during its operation?

8            MR. GORDON:         Objection.  Vague as

9   to what "particles" are meant, because you've been

10  going back and forth on that.  You're reading from

11  his report.  He uses the word part -- he uses the

12  phrase -- the word "particles," but he uses it

13  differently than you've been going back and forth.

14           MR. BANKSTON:       One day maybe we'll

15  get an answer to here.

16      Q.   Do you have an opinion -- you understand

17  that there are experts on the other side that you

18  are critical of who say there are particles coming

19  out of the Bair Hugger and they provide size

20  distributions of those particles?  You understand

21  that that is one of the reports you reviewed;

22  correct?

23      A.   One of the -- one of the workers took an

24  optical particle counter --

25      Q.   Okay.



AMICUS
REPORTING GROUP

1      A.   -- and reported on high numbers of
2  particles coming out of the -- out of the output
3  hose.  That's what he reported.
4      Q.   Okay.  So you --
5      A.   So what is it that you're really wanting
6  to know?
7      Q.   So that -- so we have that.  He has that
8  opinion?
9      A.   Yeah.
10     Q.   He reported particles?
11     A.   Yeah.
12     Q.   And you've been critical of that report?
13     A.   Yeah.
14     Q.   My question is there can be two
15 different ways to approach that sort of thing.  You
16 can say, "No, he did that wrong.  You can't make
17 that finding.  And in fact I don't know, nobody
18 knows."  Or there could be a second way where you,
19 expert, Mr. Ho, are saying to this jury --
20     A.   Okay.
21     Q.   -- "I'm an expert and, trust me, folks,
22 few, if any, particles are going to be coming out
23 of the Bair Hugger."  Is that your --
24          MR. GORDON:          And there is
25 actually another option too.



AMICUS
REPORTING GROUP

1          BY MR. BANKSTON

2          Q.    And you can tell me that.

3          A.    If you were to allow me to deviate from

4     optical particle counter usage, I would tell you

5     how instruments of that nature are calibrated.

6          Q.    I have zero interest in that.

7          A.    Well, you --

8          Q.    I am trying to get a super simple

9     question.

10         A.    You got to -- you got to have some depth

11    of knowledge before --

12         Q.    Did you use an optical particle counter

13    in this case?

14         A.    I did not.

15         Q.    Then I do not care about an optical

16    particle counter.  What I'm asking, you, sir --

17         A.    Yeah.

18         Q.    -- is do you have the opinion?  And if

19    you do, tell me.  If you don't, tell me.  If it's

20    more complicated and you have something like an

21    opinion, tell me.

22         A.    I'm telling -- I'm going to try to tell

23    you but you didn't want to hear.

24         Q.    I don't want to hear about optical

25    particle counting because you didn't do it, did



AMICUS
REPORTING GROUP

1    you, sir?

2         A.    Because --

3         Q.    You could have, too.  Couldn't you have

4    done optical particle counting?

5         A.    Because one of the reports used OPC.

6    And I'm trying to tell you what are the pitfalls of

7    looking at raw data --

8         Q.    Once again we can save a lot of time by

9    first having the question of do you have this

10   opinion.  If you don't have this opinion, we don't

11   even have to talk about it.  We can -- we can skip

12   all of this.  And all I'm asking you -- let's make

13   it super simple.

14        A.    Yeah.

15        Q.    When it comes to do particles come out

16   of the Bair Hugger, do you have any opinion that's

17   in any way relevant to that?

18             MR. GORDON:         Objection, vague as

19   to what you mean by "particles."

20             BY MR. BANKSTON

21        Q.    I have to get super vague at this point.

22   I'm talking everything under the sun.  Because if I

23   get specific here, we're going down a different

24   road.

25                       What I'm saying is when it comes to



AMICUS
REPORTING GROUP

1    do particles come out of the Bair Hugger or not, do

2    you have any kind of opinion under the sun about

3    that?

4         A.   Well, if you're wanting to know if I

5    measured the Bair Hugger, the answer is no.

6         Q.   That's not what I'm asking.  I'm asking

7    do you have an opinion about whether particles come

8    out of it?

9              MR. GORDON:        Any kind of

10   particles?

11             MR. BANKSTON:      Yeah.

12             MR. GORDON:        Any size, whether

13   they're biologically active or not?

14             MR. BANKSTON:      Yeah.

15             MR. GORDON:        Okay.

16             MR. BANKSTON:      That's a fair

17   interpretation of when I say the word "particles."

18             MR. GORDON:        Well...  Okay.

19             MR. BANKSTON:      Because if --

20             MR. GORDON:        Then if that's what

21   you mean by "particles, then that's one thing.

22         BY MR. BANKSTON

23         Q.   It's your opinion, isn't it, sir, that

24   unless subjected to physical disturbance, few, if

25   any, particles will be emitted during operation?



AMICUS
REPORTING GROUP

1           MR. GORDON:          Using your

2    definition of "particles?"

3           MR. BANKSTON:          Using his because

4    that's from his report.  Let's go to page 15.  I

5    can't believe I'm pulling teeth like this.

6       Q.    Let's go to page 15, sir.

7       A.    Yeah.  I'm on page 15.

8       Q.    You're on page 15?

9       A.    Yeah.

10      Q.    Do you understand the part of that

11   page where you talk about whether particles will be

12   emitted during operation?

13      A.    The bottom paragraph or top?

14      Q.    The second paragraph, the final

15   sentence.  Do you see that sentence that says in

16   the second paragraph, final sentence:  "Unless

17   subjected to physical disturbance, few if any

18   particles will be emitted during operation."

19           I'm just trying to know, is that a

20   fair statement of your opinion as it's listed there

21   in your report?

22           MR. GORDON:          No.  You can't

23   impose your definition of particles onto what --

24           MR. BANKSTON:          I don't even --

25           MR. GORDON:          -- he's talking



AMICUS
REPORTING GROUP

1    about here.

2              MR. BANKSTON:        -- know what you're

3    talking about, Corey.  It says "particles."  To me

4    particles are particles.

5              MR. GORDON:         It may be what it is

6    to you, but in this section he is talking about

7    microbes.

8              MR. BANKSTON:       Don't testify for

9    him, Corey.  What are you doing?

10             MR. GORDON:         This whole section

11   is about microbes.

12             MR. BANKSTON:       That's what he's

13   supposed to tell me.  You're supposed to sit there

14   and give objections.  You're supposed to --

15             MR. GORDON:         Okay.

16             MR. BANKSTON:       -- not interfere

17   with testimony before a sworn tribunal.  And,

18   frankly, I find what you're doing to be really,

19   really distasteful.

20             MR. GORDON:         I want to believe

21   that you're asking in good faith.

22             MR. BANKSTON:       Look, you -- if you

23   want to look at --

24             MR. GORDON:         You're using a

25   definition of "particles," then taking the word out



1    of context and imposing your definition on it.

2              MR. BANKSTON:        That's the kind of

3    discussions me and this technical witness should

4    have.  And if you would look at the history of this

5    case --

6         A.   Okay.  Why do we --

7              MR. BANKSTON:        -- and see who has

8    been sanctioned for doing the exact same conduct

9    you're doing right now.  I will not hesitate to

10   have that happen again.

11        A.   Why don't you make it clear --

12             MR. BANKSTON:        Excuse me, sir.

13   Hold on.  You don't have a question to you right

14   now.

15                  I will state it for the record

16   right now I've tried to have extraordinary patience

17   of speaking objections generally in this case, but

18   I will not have any more tolerance for them.  That

19   is -- if this keeps on going on like this, where

20   we're instructing the witness and coaching the

21   witness, I will bring this up with the Court.

22        Q.   Mr. Ho, in that paragraph, what I'm

23   asking you is the final sentence of that paragraph,

24   is that an accurate statement of your opinion or do

25   you need to add something or change it?



1          A.    I would like it when you ask me a

2    question about particles, are you specifically

3    referring to biological particles?

4          Q.    You tell me that.

5          A.    Okay.

6          Q.    This is your sentence, sir.  You wrote

7    this.  You wrote this down.  "Unless subjected to

8    physical disturbance, few if any particles will be

9    emitted during operation."  Is that accurate?

10         A.    The -- the implication was that few, if

11   any, biological particles would come out.

12         Q.    All right.  So a more accurate statement

13   of your opinion would be to put the word

14   "biological" before "particles" in that sentence?

15         A.    Well, a lot of times when you write a

16   series of connected items, you don't always --

17         Q.    I get you.

18         A.    -- have to --

19         Q.    So when we pull this out in isolation,

20   in order to provide context, it would read better

21   if we put "biological" because this paragraph is

22   talking about bacteria and biological; correct?

23         A.    It would be nice if people could connect

24   the two phenomena.

25         Q.    All right.  So your opinion is that few,



AMICUS
REPORTING GROUP

1    if any, biological particles are going to be

2    emitted during operation?

3         A.    Yes.

4         Q.    Is that fair?

5         A.    Hmm hmm.

6         Q.    Okay.  What work did you do, what

7    rigorous methodology did you employ to arrive at

8    that opinion?

9         A.    Well, you already know that I haven't

10   worked with the Bair Hugger.  Correct?

11        Q.    I already know that you did what with

12   the Bair Hugger?

13        A.    That I hadn't worked with the

14   Bair Hugger.

15        Q.    Okay.  So you did no work with the

16   Bair Hugger?

17        A.    Yeah.

18        Q.    Okay.

19        A.    So -- so where is your question leading

20   to?

21        Q.    The fact that you -- so you haven't done

22   any work to support this opinion?

23        A.    To the Bair Hugger?

24        Q.    To the Bair Hugger, correct.

25        A.    Yeah.



1        Q.    Well, you're giving an opinion about the

2   Bair Hugger; right?

3        A.    I'm -- I'm giving you an opinion about

4   how particles would behave in a -- in a

5   hypothetical situation where there are tubings,

6   hoses, and other -- other intervening devices.

7        Q.    The word "operation" in that sentence,

8   what does that refer to?  Operation of what?  On

9   page -- on page 15 right here.  The final sentence

10  of that.  "...few if any particles will be emitted

11  during the operation" of the Bair Hugger; correct?

12  Correct?

13       A.    What is it you're driving at then?

14       Q.    That the word "operation" refers to the

15  Bair Hugger; correct?

16       A.    Yeah.  The Bair --

17       Q.    Okay.

18       A.    Yeah, yeah.

19       Q.    So when you say that "few if any

20  particles will be emitted during operation," this

21  is an opinion about the Bair Hugger device?

22       A.    That's an opinion.

23       Q.    You have never touched the Bair Hugger

24  device?

25       A.    That's right.



1          Q.    You have conducted no scientific testing
2     whatsoever to support that opinion?
3          A.    Right.
4          Q.    You are not citing any scientific
5     literature of people --
6          A.    No, no --
7          Q.    -- who have tested that?
8          A.    -- no, you are going too far now.
9          Q.    What piece of scientific literature
10     supports the proposition that few, if any,
11     particles will be emitted during operation of the
12     Bair Hugger?
13          A.    The...  There's a lot of evidence in
14     suggesting that -- that plastic hose and tubings
15     retain particles.
16          Q.    Where is that in your report?  What cite
17     are you talking about?
18          A.    I think it's somewhere regarding Tygon
19     tubings and PVC tubings.
20          Q.    Where is Tygon tubings and PVC tubings
21     discussed in your report?
22          A.    It says somewhere.  Hang on a second.
23          Q.    Yeah.  If you could find me this
24     discussion of Tybon tubings, I would appreciate
25     that.



AMICUS
REPORTING GROUP

```
 1          MR. GORDON:        Did you say Tybon?
 2          MR. BANKSTON:      Yeah.  I don't
 3  know --
 4          MR. GORDON:        It's Tygon.
 5          MR. BANKSTON:      I don't know what it
 6  is.  Yeah.
 7          MR. GORDON:        It's in that same
 8  paragraph.
 9          MR. BANKSTON:      Is it in that
10  paragraph?
11          MR. GORDON:        Yeah.
12      A.   Yeah.
13        BY MR. BANKSTON
14      Q.   All right, sir.  These Tygon tubings.
15      A.   Yeah.
16      Q.   All right.
17      A.   Yeah.  Yeah.
18      Q.   What does "electrostatic loss" mean?
19      A.   Well, particles have a habit of sticking
20  to plastic material.
21      Q.   Okay.
22      A.   And the sticking principle has always
23  been known to be electrostatic charges.  Particles
24  are charged either positively or negatively, and so
25  they have a tendency to stick to plastics.
```



1          Q.    Perfect.  Okay.  So this is what I was
2     trying to find.  This is what I was hoping to get
3     pointed to.
4          A.    Yeah.
5          Q.    That cites a reference by Asbach et al
6     in 2016; correct?
7          A.    You're referring to the --
8          Q.    The report.
9          A.    -- plastic tubing --
10         Q.    What you're talking about in plastic
11    tubings and Tygon and Teflon?
12         A.    Yeah.  Yeah.  Yeah.
13         Q.    Okay.  So that's Asbach et al.  Asbach
14    et al supports your opinion that few, if any,
15    particles would be emitted during operation?
16         A.    We didn't say that.  We're simply saying
17    that -- that --
18         Q.    Well, that's the following sentence,
19    sir.  Is that not the support for that?
20         A.    -- by nature there is a -- there is a
21    charge to particles and the tendency is to stick to
22    plastic tubings.
23         Q.    Right.  So that finding is what you're
24    citing in your report --
25         A.    Yeah.



1        Q.    -- for the next sentence?  Right?  You
2   give an opinion in the next sentence?
3        A.    That's right.
4        Q.    And that opinion is that few, if any,
5   particles will be emitted?
6        A.    That's right.
7        Q.    Asbach 2016 is your support for that?
8        A.    That's right.
9        Q.    Okay.  Thank you, sir.  Now, Asbach
10  et al, do you know if that concerned biological
11  particles?
12       A.    Were they using biological particles?
13       Q.    Hmm hmm.  In Asbach.
14       A.    I don't specifically remember.
15       Q.    Okay.
16            MR. BANKSTON:       Hand me 7 and 8.
17            MR. ASSAAD:         7 and 8?
18            MR. BANKSTON:       Yeah, both of them.
19  They're sequential exhibits.
20                   I'm going to offer these in order
21  so that you all can see that.
22            MR. GORDON:         The top one is what?
23            MR. BANKSTON:       This is 298 and 299.
24            MR. GORDON:         You know, could
25  you -- I think we should -- I don't think we've



AMICUS
REPORTING GROUP

1   done this.  Can you read the Bates Nos. in for the

2   record?

3           MR. BANKSTON:       Sure, I can do that.

4   Yeah.  Absolutely.

5       Q.   All right.  So the first document I put

6   in front of you, there's a -- they're basically

7   together.  They're two separate exhibits.  These

8   are Exhibits 298 and 299.  The first one is a one

9   page, and you see it's an email that's titled "Reed

10  publication review?"

11      A.   Yeah.

12      Q.   And do you see there's a woman who wrote

13  this email, Michelle Hulse Stevens, MD?

14      A.   Right.

15      Q.   Have you met her before?

16      A.   No.

17      Q.   Okay.  She's the medical director at

18  3M's infection prevention division, according to

19  this email; correct?

20      A.   Right.

21      Q.   Okay.  Do you see where she says in the

22  first sentence:  "I want to thank Al for taking a

23  look at this study and providing some preliminary

24  thoughts."  Correct?

25      A.   I read that.



1       Q.   Okay.  And then it says:  "I am
2   attaching my comments to Al's(mine are in red)."
3   Okay?
4       A.   Yeah.
5       Q.   And the reason I've included this, so
6   you can understand why there's black and red on the
7   document I'm going to show you.  Okay?
8       A.   Right.
9       Q.   If you'll flip to -- two pages in,
10   you'll see the red and black page, the one she's
11   talking about.
12       A.   Yeah.
13       Q.   Do you see that?
14       A.   I see that.
15           MR. GORDON:        Is that 299?
16       Q.   MR. BANKSTON:      Now we are in 299,
17   sir.  And I'm going to read you this Bates No.  Are
18   you looking at the page -- the page I'm referring
19   you is 3MBH01617180.
20       A.   I see that page.
21       Q.   Okay.  I would like to direct your
22   attention to the No. 1 point.  You understand that
23   Ms. Hulse Stevens, the medical director, her
24   comments are in red, correct, in response --
25       A.   Correct.



1        Q.    -- right?

2        A.    Right.

3        Q.    And here we see the statement:  "The

4    assertion that old filters are more efficient

5    [than] newer ones is correct."

6              Actually, let me read that again.

7    There's a typo, but I want to make sure we get the

8    typo right just because I'm reading it.  "The

9    assertion that old filters are more efficient that

10   newer ones is correct."

11             And I think we can both agree he

12   means to say "than newer ones;" right?

13       A.    Right.

14       Q.    The next sentence says:

15           "The change to new filter material

16           was dictated by engineering

17           concerns prior to widespread

18           appreciation of the importance of

19           [particles] discharged by the

20           warming unit."

21           I read that -- I read that correctly?

22       A.    Yeah.

23       Q.    Okay.  Here's the part I want to ask you

24   about.  Dr. Hulse Stevens of 3M writes in response:

25           "This implies then that the 750



1         does not have a filtration

2         efficiency that adequately

3         mitigates particulates in the air

4         coming out after filtration."

5              Did you see that sentence?

6    A.    I see that sentence.

7    Q.    Okay.  To you -- and I don't know if

8  this is a term of art or if there's any meaningful

9  difference, but is there any difference in your

10 mind between the word "particles" and

11 "particulates?"

12   A.    Do I see a difference?

13   Q.    Yeah.  Again, I don't know if there is.

14 That's just -- in your field of microbiology, is

15 the word "particle" and "particulate," do they have

16 separate and different meanings or are they the

17 same thing?

18   A.    Most of the time they're used

19 interchangeably.

20   Q.    Okay.  You would agree with me that it's

21 important that the Bair Hugger device has a

22 filtration efficiency that adequately mitigates

23 particulates in the air coming out after

24 filtration?  That's important?

25        MR. GORDON:       I object to the form



AMICUS
REPORTING GROUP

1   of the question, an incomplete hypothetical and

2   lack of foundation.

3        A.   And the question is?

4        BY MR. BANKSTON

5        Q.   Sure.  And you can read along with me

6   because it's what Dr. Hulse Stevens says right

7   here.

8        A.   Yeah.

9        Q.   You would agree with me it's important

10  for the 750, the Model 750 Bair Hugger, to have a

11  filtration efficiency that adequately mitigates

12  particulates in the air coming out after

13  filtration?

14        MR. GORDON:        I object to the form

15  of the question, lack of foundation, an incomplete

16  hypothetical.

17        BY MR. BANKSTON

18        Q.   Do you agree?  Do you not agree?  Do you

19  have no opinion?

20        A.   Well, this -- you're pointing to a very

21  complex set of statements and assertions.

22        Q.   All right.

23        A.   I don't think I have the -- I have the

24  background to either agree or disagree with what is

25  being said here.


AMICUS
REPORTING GROUP

1      Q.   Okay.  That's fine.  That's all I needed
2   to know.
3              Look really quickly on the final
4   page of that.  You'll see a number 7.
5      A.   This one?
6      Q.   Hmm hmm.  Do you see a number 7?  It
7   states:  "The apparently greater particulate
8   emissions from the 750 may simply be a function of
9   its airflow, which is 81% greater than the model
10  505E."
11             Have you ever heard about any
12  differences between the Bair Hugger units in terms
13  of their airflow before today?
14     A.   No.
15     Q.   Okay.
16             MR. BANKSTON:      And we're going to
17  do a little bit of this and then we'll have lunch.
18             MR. GORDON:      Are you done with
19  these?
20             MR. BANKSTON:      Oh, I'm done.  My
21  clock is off.  I'm still in Central.  All right.
22  Well, we got plenty of time.
23             MR. GORDON:      Are you done with
24  these?
25             MR. BANKSTON:      Yes, I sure am.



AMICUS
REPORTING GROUP

1          MR. ASSAAD:          Do you want to take

2     a break?

3          MR. BANKSTON:          Yeah.  Let's take a

4     five real quick.  I want to talk to you for a

5     second.

6          THE VIDEOGRAPHER:  We are going off the

7     record.  The time is 10:34 a.m.

8     (ADJOURNMENT)

9          THE VIDEOGRAPHER:  We are back on the

10    record.  The time is 10:51 a.m.

11         MR. BANKSTON:          Okay.

12    Q.    Mr. Ho, do you agree with me that all

13    other factors being equal an increase in bioburden

14    in an environment will increase the risk of

15    surgical infection?

16         MR. GORDON:          I object to the form

17    of the question, lack of foundation, incomplete

18    hypothetical.

19    A.    Whoa.

20       BY MR. BANKSTON

21    Q.    Hmm hmm.

22    A.    You're taking a very broad swath here.

23    Q.    Absolutely I am.  All other factors

24    being equal, an increase in bioburden will increase

25    the risk of infection in an operating room.  Will



1    you agree with that proposition?

2            MR. GORDON:           The same objections.

3        A.    Well, you're really asking if throwing a

4    handful of manure in the operating room would

5    increase infections.  Is that what you're asking?

6            BY MR. BANKSTON

7        Q.    I don't think that's what I asked, but

8    if that's -- if that's one of your interpretations

9    of an increase in bioburden in that environment --

10       A.    Yeah.

11       Q.    -- will that increase the risk of

12   infection?  I mean, live manure on the floor of an

13   operating room, will that increase the risk of

14   infection?

15       A.    Well, that is not necessarily true

16   either.

17       Q.    Okay.  So from Dr. Ho's perspective --

18       A.    Yeah.

19       Q.    -- from your advice as a microbiologist,

20   given an infection-control device in an operating

21   room, you have no problem with manure being on an

22   operating room floor from an infection-control

23   purpose; is that correct?

24       A.    I also didn't say that.

25       Q.    Okay.  Do you have a problem with live



1   manure being on the floor from an infection

2   standpoint?

3        A.   That is not something that ordinary

4   people would do.

5        Q.   No, it's not.  It's just something you

6   brought up.  I'm just wondering.

7        A.   Yeah.

8        Q.   Would you be okay with that?

9        A.   No.  It's just not something that any

10  sane person would do.

11       Q.   Absolutely.  Because it would

12  drastically increase the risk of infection in an

13  operating room; correct?

14       A.   No, it's just -- it's just not done.

15       Q.   Sure.  You would agree with me that an

16  increase in CFUs per metre cubed in an operating

17  room will increase the risk of surgical infection?

18            MR. GORDON:        I object to the form

19  of the question, incomplete hypothetical.

20       A.   I cannot agree with that because

21  infectivity is a very complex subject and issue,

22  and so you cannot tie up the equation in a

23  simple -- simple-minded formula.

24            BY MR. BANKSTON

25       Q.   If there is zero, functionally zero,



1   measured to be zero bacteria or biological

2   particles inside of an operating room, there is

3   zero risk of infection; correct?

4           MR. GORDON:        I object to the form

5   of the question, incomplete hypothetical.

6       A.   Are you talking about aerosol again?

7         BY MR. BANKSTON

8       Q.   I'm talking about aerosol and surface.

9   I'm talking about a completely, totally sterile

10  environment with zero bioburden, zero bacteria.

11  There is zero risk of infection in that room?

12          MR. GORDON:        Everything else

13  equal?

14          MR. BANKSTON:      Sure.  Yeah.

15      Q.   Because people have bioburden; right?

16      A.   You're referring to the skin of the

17  patient?

18      Q.   Hmm hmm.  No, I'm not.

19          MR. GORDON:        No, he's not.

20        BY MR. BANKSTON

21      Q.   I'm not at all, actually.  What I'm

22  trying to say is if you have zero bacteria in an

23  environment, there is no pathological agents to

24  cause an infection; correct?

25      A.   And you're not counting for the fact



1    that the human body --

2          Q.    Totally.  I'm saying --

3          A.    -- is covered with bacteria?

4          Q.    Let's say we all leave this room.

5          A.    Yeah.

6          Q.    Let's say it's completely disinfected.

7          A.    Yeah.

8          Q.    Totally sterile.

9          A.    Yeah.

10         Q.    There's no way an infection is going to

11   develop on that chair, is there?

12         A.    Chairs don't get infected.

13         Q.    Right.  Because there's no biological

14   matter there; right?  Like it's not an organism, is

15   it?

16         A.    Yeah.

17         Q.    A chair?

18         A.    Yeah, okay.

19         Q.    Okay.  So the chair won't get infected;

20   right?

21         A.    Right.

22         Q.    Because there's no biological activity

23   in the room?

24         A.    Right.

25         Q.    Okay.  Now, if you add a susceptible



AMICUS
REPORTING GROUP

1    host and you add bacteria and bioburden to that

2    room, the chance of infection suddenly appears;

3    correct?

4         A.   Again, you are stating a hypothetical

5    situation where in order to give you a "yes," "no"

6    answer --

7         Q.   Hmm hmm.

8         A.   -- you really would have to bring in a

9    lot of variables.  And life is just full of

10   variables that you cannot expect a "yes," "no"

11   answer like that.

12        Q.   All right.  I kind of thought it was a

13   simple proposition that if there's no host --

14        A.   Well, why --

15        Q.   Hold on.  Hold on.  I got to finish my

16   question before you can give testimony.  The only

17   way we can have testimony is if you're responding

18   to a question.  Okay?

19        A.   Yeah.  Yeah.

20        Q.   I thought it was a simple proposition

21   that if there was no host and no bacteria, there's

22   no infection risk.  Correct?  Nothing is there to

23   be infected?  There is nothing to infect; right?

24        A.   Yeah.

25        Q.   Empty room, no bacteria?



AMICUS
REPORTING GROUP

1          A.     Yeah.  We went along with that.

2          Q.     You put a person in the room, a host --

3          A.     Yeah.

4          Q.     -- any kind of organism --

5          A.     Yeah.

6          Q.     -- and you put bacteria in the room, now

7     there's a chance of infection; correct?

8          A.     You can't say that either.

9          Q.     You're saying that there's no chance of

10    infection?

11         A.     No.  I didn't say there's no chance.

12         Q.     So there is a chance of infection?

13         A.     I'm simply saying that -- that it's too

14    simplistic a proposition when you -- when you're

15    dealing with a very complex infectivity issue.

16         Q.     Right.  Okay.  And, for instance, human

17    infectivity is affected by various variables that

18    affect the room; right?

19         A.     Well, let me put it a different way that

20    you appreciate.

21         Q.     Okay.  I prefer you answer the

22    questions --

23         A.     Well, well --

24         Q.     -- but if you're answering the question,

25    that's fine.



1          A.    You will understand why it is so
2     difficult to answer a question that you are just
3     proposing --
4          Q.    Okay.  So let's go back to the question
5     firstly.
6          A.    -- if you do not understand infectivity,
7     which we don't.
8          Q.    Okay.  So --
9          A.    You use the word "infectivity" like it
10    was a God-given bolt of lightning, which it isn't.
11         Q.    Sir, what I'm trying to say is
12    infectivity in people is subject to lots of
13    variables?
14         A.    That's a fair enough thing to say it.
15         Q.    Fair.  Let's do it little pieces at a
16    time.
17         A.    Yeah.
18         Q.    We're not trying to get too complicated
19    here.
20         A.    Yeah.
21         Q.    Okay.  Those variables -- in other
22    words, you put a person in a room, you put bacteria
23    in a room, there are tons and tons of variables
24    that could affect whether that bacteria over there
25    gets to that person over there and whether it

1    actually infects them?  There are so many things

2    under the sun to consider; correct?

3         A.    Correct.

4         Q.    Okay.  If there is no bacteria and no

5    person, there is zero mathematical chance that

6    there can be an infection?

7         A.    Fair.

8         Q.    Okay.  If there is a person and there's

9    a bacteria, despite all the variables that may be

10   from transmission to infection to host, there is a

11   non, zero chance of infection?  It could be

12   ..0000001.  It could be you bathe inside of manure

13   and you got maybe like a 90 percent chance of

14   getting an infection.  But what I'm trying to get

15   to you is you agree with me that an infection

16   requires a bacteria and a susceptible host?

17        A.    I'm not --

18        Q.    Those two things must be present for an

19   infection?

20        A.    Now you are getting technical.  You are

21   trying to imply that one single bacterin would

22   cause an infection.  Is that what you're driving

23   at?

24        Q.    No.  I thought I used the word

25   "bacteria."  Is that not the plural?  How do you --



AMICUS
REPORTING GROUP

1    how do you pluralize that?

2         A.    A single bacterium.

3         Q.    Bacterium is singular.  Right.

4         A.    Yeah.

5         Q.    I'm talking about bacteria.

6         A.    A whole --

7         Q.    There's bacteria in the room, plural.

8         A.    Yeah.  Yeah.

9         Q.    So in order for there to be an infection

10   there must be bacteria, plural, and there must be a

11   person, a susceptible host?  Those two things are

12   required for an infection?

13        A.    And the organism has to be infectious.

14        Q.    Yes.  The bacteria has to be

15   pathological to the host; correct?

16        A.    Yeah.  Yeah.

17        Q.    Okay.  So if those things are there,

18   there is the potential for an infection?

19        A.    We'll go along with that.

20        Q.    Okay.  Thank you, sir.  Bacteria tend to

21   cluster, you would agree?  It is rare for bacteria

22   to be alone?

23        A.    We'll go along with that.

24        Q.    Okay.  Bacteria when they cluster, they

25   tend to form exopolysaccharides?



AMICUS
REPORTING GROUP

1        A.    No, that's backwards.  The way you say

2    it is backwards.

3        Q.    Okay.

4        A.    So the answer is no.

5        Q.    So backwards is when bacteria do not

6    cluster they form biofilm?  Or when they do cluster

7    they form biofilm?

8        A.    Bacteria form biofilm, and that induces

9    cluster.

10       Q.    Got you.  Okay.  So the individual

11   bacterium produces a biofilm around it?

12       A.    Yeah.

13       Q.    And that biofilm allows it to cluster to

14   other bacteria?

15       A.    Right.

16       Q.    Okay.  Do you have any opinion about how

17   many bacteria are needed to form a cluster on an

18   orthopedic implant?

19       A.    I can't say that.

20       Q.    Okay.  In your report you had talked

21   about an analogy about a popcorn machine.  Do you

22   remember that popcorn analogy?

23       A.    Hmm hmm.

24       Q.    Okay.

25              MR. ASSAAD:        Is that a yes?



1          BY MR. BANKSTON

2      Q.   Is that a yes, sir?

3          MR. GORDON:          You have to give a

4   verbal answer.

5      A.   Yeah.  Yes.

6          BY MR. BANKSTON

7      Q.   Okay.

8      A.   That's actually a quote.  It was quoted

9   from a paper.

10      Q.   Yes.  Some -- some other person came up

11   with this popcorn analogy.

12      A.   Right.

13      Q.   Going back to orthopedic implants, would

14   you disagree that a single bacterium can attach to

15   an orthopedic implant?

16          MR. GORDON:          I object to the form

17   of the question, lack of foundation.

18      A.   I can't -- I can't make a statement on

19   that.

20          BY MR. BANKSTON

21      Q.   Okay.  All right.  So this idea of a

22   popcorn maker, which is kind of a visual metaphor

23   for us, it sort of brings out the point that the

24   people in the operating room are a big source of

25   the bioburden in that operating room?  They're the



1    popcorn makers?

2            MR. GORDON:          I object to the form

3    of the question.

4            BY MR. BANKSTON

5        Q.    Is that correct?

6        A.    That's the -- that was the quotation.

7        Q.    Okay.  You agree with that, though?

8    That's why you put it in your report?

9        A.    Well, I thought it was an interesting

10   quotation, but it -- I didn't have to totally agree

11   or disagree with it.  It's an illustration.

12       Q.    It's a helpful metaphor?

13       A.    Yeah.

14       Q.    Right.  It helps people who maybe don't

15   have your background understand a little bit of

16   this problem; right?

17       A.    Right.

18       Q.    Okay.  So when we're talking about the

19   popcorn makers, which is kind of like the bacteria

20   makers, that's organic?  That's people?  Right?

21   That's where most of it comes from in an operating

22   room; correct?

23       A.    Yes.  Continue.

24       Q.    Okay.  Well, I need verbal answers from

25   you, sir.  That's why I have to stop and say that.



AMICUS
REPORTING GROUP

1                  Without those popcorn makers, those

2      people, there's no popcorn spilled into the

3      environment.  They're the ones who spill it into

4      the environment; correct?

5           A.    Yes.

6           Q.    Okay.  That applies to the patient and

7      the surgical staff and anybody who comes in and out

8      of that room; right?

9           A.    Yes.

10          Q.    And you understand -- we talked earlier

11     about skin squames; right?

12          A.    Yes.

13          Q.    And you understand that those people in

14     that room, they shed skin squames?

15          A.    Yes.

16          Q.    You understand they fall to the floor?

17          A.    Yes.

18          Q.    Okay.  You understand then that the

19     floor area of a surgical area and the air

20     underneath that table has more bioburden than other

21     parts of that room?

22                MR. GORDON:        I object to the form

23     of the question, lack of foundation, it assumes

24     facts not in evidence.

25          A.    Well, are you stating that from your



AMICUS
REPORTING GROUP

1    experience or are you just making a conjecture?

2            BY MR. BANKSTON

3        Q.   I'm just asking you a question.

4        A.   Well, you know that --

5        Q.   I don't have -- I'm not the expert here

6    deposing today.

7        A.   I have never sampled a floor of an

8    operating room, so I can't say that.

9        Q.   Okay.  If biomass of skin squames,

10   things like that, things that are shed from the

11   popcorn makers --

12       A.   Right.

13       Q.   -- if that stuff gets into the surgical

14   site, that's not a good thing; right?

15           MR. GORDON:       I object to the form

16   of the question, it assumes facts not in evidence,

17   incomplete hypothetical, and lack of foundation.

18       A.   Are you -- are you leading somewhere?

19           MR. GORDON:       He's not going to

20   tell you whether he is or isn't.  Just answer his

21   questions.

22           BY MR. BANKSTON

23       Q.   Yeah.  I don't -- I don't understand

24   these responses of like -- are you asking for our

25   litigation strategy, sir?  I don't understand.  Are



1    you asking for what I'm saying?  Because what I'm

2    asking you, and let me make it super clear --

3         A.    Yeah.

4         Q.    -- that popcorn that spills

5    everywhere --

6         A.    Yeah.

7         Q.    -- do you want to get it in the patient?

8    Is that good?

9              MR. GORDON:        I object to the form

10   of the question.

11         BY MR. BANKSTON

12        Q.    Is it good --

13             MR. GORDON:        The same objection.

14         BY MR. BANKSTON

15        Q.    -- popcorn goes in the patient?

16        A.    Is that a fair question to ask me?

17        Q.    That's the question.  Is it good if the

18   popcorn goes in the patient, Doctor?

19        A.    It certainly is not helpful.

20        Q.    Okay.  If you increase the bioburden in

21   the air over a surgical site, you will increase the

22   chance of surgical infection, won't you?

23        A.    I can't say that either.

24        Q.    Okay.  Do you have -- do you have any

25   qualifications to speak on that or...



1          A.    Not really.

2          Q.    Okay.  That's something that an

3     infectious disease expert would speak more to than

4     somebody in your field; right?

5          A.    That would be fair to say that.

6          Q.    Okay.  So, in other words, let's --

7     let's go back to what the plaintiffs are talking

8     about in this case.  And I know you haven't read

9     the complaint, but do you understand that the

10    plaintiffs have -- are claiming evidence, are

11    claiming that they have evidence that the heat and

12    air currents from the Bair Hugger are transporting

13    that popcorn up from below the table air to the

14    surgical site?  You understand that that's their

15    allegation?

16         A.    Are you saying that there is evidence?

17         Q.    I'm saying that they claim to have it,

18    yes.  I'm wanting to know if you understand that

19    that's what the plaintiffs are claiming.

20         A.    Well, I'm trying to figure out.  There's

21    claiming and actual evidence --

22         Q.    Sure.

23         A.    -- are they different things altogether?

24         Q.    I think it's up to you.  Didn't you

25    spend a significant part of your report criticizing



1    studies that have found this very phenomena?

2         A.   Well, I -- I notice that there were

3    papers describing bubble studies.

4         Q.   Okay.

5         A.   And I find that to be a unhelpful

6    illustration of how anything could be --

7         Q.   I got you.  Okay.

8         A.   Yeah.

9         Q.   So let's talk about those bubble studies

10   a bit, or some of the other -- there's some other

11   literature too, different kinds of literature --

12        A.   Right.

13        Q.   -- that the plaintiffs -- that you've

14   been provided.  Somebody gave it to you; right?

15        A.   Right.

16        Q.   And said:  "Hey, here's the stuff the

17   plaintiffs are relying on.  This is their

18   evidence."  And I understand you're pretty critical

19   of that evidence.  I get that.  But what I'm trying

20   to say is you understand the plaintiffs say, "We

21   think we have evidence, and we think that evidence

22   says the popcorn is getting transported through the

23   air currents up to the patient."  You understand

24   that that's the allegation?

25        A.   That's the allegation.



AMICUS
REPORTING GROUP

1      Q.   That's what you are here to address, in
2   part?
3      A.   Right.
4      Q.   Okay.  Do you have any expert opinions
5   about whether that is scientifically true or not?
6          MR. GORDON:        The plaintiffs'
7   allegations?
8          MR. BANKSTON:      Hmm hmm.
9      A.   You are asking me to speculate in this
10   case?
11       BY MR. BANKSTON
12      Q.   No.  I don't think I'm asking you to do
13   anything.  I think you've been retained to provide
14   opinions about the plaintiffs' case, and I'm
15   wondering if one of your opinions is "I, Dr. Ho,
16   have qualifications and expertise to speak about
17   the disruption of laminar flow in an orthopedic
18   surgical suite."
19          MR. GORDON:        Now you're just --
20   just asking about that?
21          MR. BANKSTON:      That's a new
22   question, yeah.
23          MR. GORDON:        Okay.
24      A.   What happened to the bubbles?
25       BY MR. BANKSTON



1          Q.    What's that?  Excuse me, sir?

2          A.    What happened to the bubble question?

3          Q.    You understand that those bubble

4    questions -- those bubble studies were designed to

5    investigate whether the Bair Hugger interrupts and

6    interferes with laminar flow in a surgical suite?

7    Do you understand that?

8          A.    Was that still a question?

9          Q.    That's a question.  Do you understand

10   that the bubble studies were meant to investigate

11   whether the Bair Hugger interrupts laminar flow in

12   a surgical suite?

13         A.    I know that that was the intent.

14         Q.    Okay.  So do you have expert opinions,

15   are you qualified to speak about the disruption of

16   laminar flow in an orthopedic surgical suite?

17         A.    So you're wanting to ask if I have the

18   expertise to interpret the data?

19         Q.    To comment and make opinions to this

20   jury that will decide the fate of 2,000 plaintiffs,

21   and maybe more.  Do you think you have the

22   expertise to -- and any education, in the

23   disruption of laminar flow in an orthopedic

24   surgical suite and the fluid dynamics that occurs

25   within it?



1          A.    And you want a "yes," "no" answer here?

2          Q.    Are you qualified?  Yeah.  Do you feel

3     ethically and morally comfortable telling this jury

4     that you have superior expertise in these issues?

5               MR. GORDON:        The issues of

6     disruption of laminar flow?

7               MR. BANKSTON:        Exactly.  The issues

8     of disruption of laminar flow in an orthopedic

9     surgical suite.

10         A.    And are you making the assumption that

11    there is laminar flow?

12             BY MR. BANKSTON

13         Q.    I just want an answer to my question is

14    what I want.

15         A.    You see, again, here -- here I have

16    issues with it, with the context of the question.

17         Q.    I want to know do you have expertise and

18    opinions sufficient to discuss whether the

19    Bair Hugger through fluid dynamics interrupts the

20    laminar flow of an orthopedic surgical suite.  I

21    don't think -- I'm trying to add --

22             MR. GORDON:        Mark, can I

23    stipulate for you that we're not offering him for

24    that?

25             MR. BANKSTON:        That's all I'm



AMICUS
REPORTING GROUP

1    asking him.  Yeah.  If you can help me out here and

2    offer me that.  Okay.

3                MR. GORDON:        He's not being

4    offered on laminar flow.

5                MR. BANKSTON:      He's not going to

6    discuss laminar flow --

7                MR. GORDON:        He's not being

8    offered on airflow disruption.

9                MR. BANKSTON:      Okay.  Because

10   there's a lot in his report about that.  You

11   understand that?

12               MR. GORDON:        Not about airflow

13   disruption.

14               MR. BANKSTON:      We're going to be

15   talking about a lot of it.  So when we get to that,

16   I'm going to ask you to stipulate again for me,

17   okay?  Let's move on.

18          BY MR. BANKSTON

19       Q.    On page 9 of your report, can you open

20   that up for me.

21       A.    Page 9?

22       Q.    Hmm hmm.  And I would like to direct you

23   into the second paragraph.

24       A.    Right.

25       Q.    Right about in the middle.  Do you see



AMICUS
REPORTING GROUP

1    where the word "OR" is in parentheses?

2         A.    Right.

3         Q.    That's about where I'm looking.  The

4    next sentence starts, and I'm going to quote for

5    you here:

6              "If [the] conditions outside an OR

7              were contaminated with any of these

8              bacterial pathogenic aerosol

9              particles, Kalliomaki et al. (2016)

10             predicted that passage of personnel

11             through doors would introduce

12             significant contaminants."

13             Did I read that correctly?

14        A.    You read it correctly.

15        Q.    From what I can take out of this

16   paragraph and that sentence --

17        A.    Right.

18        Q.    -- would you agree with me that people

19   who come into the OR, when they open the door and

20   they come in from a nonsterile environment --

21        A.    Right.

22        Q.    -- there's a good chance they're going

23   to bring bioburden into that room?

24        A.    You can say that.

25        Q.    Okay.  Now, first of all, can you tell



AMICUS
REPORTING GROUP

1    me why that -- is that proposition, is that -- does

2    that have any particular significance to your

3    opinions about the safety of the Bair Hugger?

4         A.    That statement was made to illustrate

5    that the contaminants that is alleged to be in the

6    air could come from all kinds of sources, and

7    people traipsing in and out would be one of them.

8         Q.    Right.  And those sources can get into

9    the air of an operating room; right?

10        A.    Yeah.  Yes.

11        Q.    Now, this Kalliomaki study, do you know

12   if that was an operating room that was being

13   studied?

14        A.    I think -- I believe it was.

15        Q.    All right.  Because it seems to me that

16   that was actually a negative pressure isolation

17   room.  Have you heard of that before?  Have you

18   heard of a negative pressure isolation room?

19        A.    Yes, yes.

20        Q.    It's not the same thing as an operating

21   room, is it?

22        A.    Okay.  Let's hear you define what a

23   negative pressure operating room is.

24        Q.    Actually, you're the expert, sir, and

25   you said you know what it is.  Why don't you tell



1  me what a negative pressure isolation room is?

2      A.   Well, why did you even mention that?

3      Q.   Because it's what the study was about

4  and you cited it.  So why don't you tell me why it

5  was important that you cited a study about a

6  negative pressure isolation room?

7      A.   Well, presumably the design of the

8  airflow system was to prevent particles from coming

9  back into the operating room as a -- by virtue of

10  the air pressure differential.

11     Q.   So is it your belief that ORs are

12  negative pressure rooms or positive pressure rooms?

13     A.   They will be positive with respect to

14  the outside.

15     Q.   And an isolation room, is that a

16  negative pressure room or a positive pressure room?

17     A.   I don't -- I don't think I can comment

18  on that.

19     Q.   Okay.  So in terms of whether these

20  rooms have the same force of airflow, the same

21  fluid dynamics --

22     A.   Right.

23     Q.   -- an isolation room, that's negative

24  pressure, or an operating theatre, that's not

25  something you can speak about today?



```
 1        A.    No.

 2        Q.    Okay.

 3              MR. GORDON:        Mark, do you want to

 4   stipulate that that study has absolutely nothing to

 5   do with operating rooms?

 6              MR. BANKSTON:        Sure, if you want

 7   to.  Yeah.  I mean, I don't -- you can stipulate to

 8   whatever you want to.

 9              MR. ASSAAD:        You can stipulate to

10   whatever you want to.

11              MR. BANKSTON:        Yeah.  You can

12   stipulate that I, you know, have nice looking hair

13   today.  I'm cool.

14              MR. GORDON:        No.  I mean, you'll

15   agree to that too?

16              MR. BANKSTON:        That that study has

17   nothing to do with operating rooms?  100 percent.

18   Negative pressure isolation rooms.  I agree with

19   that.

20        Q.    Let's talk about Romano.

21              MR. GORDON:        Dr. Elghobashi

22   relied on it.  That's why I'm --

23              MR. BANKSTON:        Yeah.

24              MR. GORDON:        I'm just kind of

25   teasing.
```



AMICUS
REPORTING GROUP

1          MR. BANKSTON:        Yeah.  No.  Yeah.
2    There's a -- it has importance.  Not as a model of
3    an operating room.
4          MR. GORDON:        I'll agree with
5    that.
6          MR. BANKSTON:        Yeah.  Yeah.  You're
7    all going to have fun with that one.
8          Q.   Romano et al.  Are you familiar with
9    this study about electrosurgical tools?  Right?
10   Produced contaminants into the environment?
11         A.   Right.
12         Q.   Are those particles -- do you know what
13   kind of particle sizes we're talking about from an
14   EST?
15         A.   Not specifically.
16         Q.   Okay.  Would you -- would you be
17   surprised if that study discusses particles that
18   are .2 to 1 micron?
19         A.   I wouldn't be surprised.
20         Q.   That's smaller than typical bacterial
21   presentation; correct?
22         MR. GORDON:        I object to the form
23   of the question, it assumes facts not in evidence,
24   incomplete hypothetical, vague.
25         A.   Is it safe to assume that there would be



AMICUS
REPORTING GROUP

1    a spectrum of particles without having to

2    specifically name size range?

3         BY MR. BANKSTON

4         Q.   Well, no, sir.  What I'm referring back

5    to is you remember the very beginning of this

6    deposition we started off with your proposition

7    that typical biological presentation of biological

8    aerosols were in the range of 1 to 2.5 microns.  Do

9    you remember that?

10        A.   Yeah.  That is said as kind of an

11   overall picture.

12        Q.   Okay.

13        A.   Yeah.

14        Q.   So your typical biological presentation

15   is going to be a very different size than the

16   particles that are expelled from an EST?

17        MR. GORDON:        I object to the form

18   of the question.

19        BY MR. BANKSTON

20        Q.   Would you agree to that?

21        A.   Well, as I've said, I haven't actually

22   measured those instrumentation.

23        Q.   Okay.

24        MR. ASSAAD:        Just for the record,

25   I'm going to stipulate that that is not the article



1    that Elghobashi relied upon and that counsel was

2    incorrect.

3         MR. BANKSTON:    I thought it was

4    Kalliomaki, but I guess not.  I guess he could

5    have.

6         MR. ASSAAD:    No.  No.  Elghobashi

7    went in a different.

8         MR. GORDON:    Yeah, Villafruela.

9         MR. BANKSTON:    Yeah.  It was an

10   isolation room, yeah, but performed before an

11   operating room.  We'll still get some mileage out

12   of Kalliomaki, though.  Don't worry about that.

13        BY MR. BANKSTON

14        Q.   All right.  Let's talk a little bit

15   about particle count.  You're familiar with the

16   practice of particle counting; right.

17        A.   Yes.

18        Q.   You don't believe that particle counting

19   can be predictive of microbiological contamination

20   of air in an operating room, do you?

21        A.   I do not.

22        Q.   Okay.  A lot of people disagree with you

23   about that.  Do you recognize that?

24        MR. GORDON:    I object to the form

25   of the question, lack of foundation, assumes facts



AMICUS
REPORTING GROUP

1    not in evidence, and vague.

2            BY MR. BANKSTON

3        Q.    Would you say that there's scientists

4    who disagree with you on that?

5        A.    Those people have not actually gone out

6    to measure particles in general --

7        Q.    Okay.

8        A.    -- and biological particles in specific.

9        Q.    Okay.  So if they went, they would need

10   to go specifically into an operating room during a

11   procedure, actually measure it?

12       A.    No --

13       Q.    They can't speculate?  Speculation is no

14   good?

15       A.    I would respectfully suggest they would

16   actually start out learning how to measure

17   particles in ambient air in nature, outdoors.

18       Q.    Okay.

19       A.    That's where they start.  And then after

20   they have done that they would -- and I

21   specifically mean that the person has to measure

22   biological particles, as well as raw nonbiological

23   particles.  Are you with me?

24       Q.    Yes, sir, I am.

25       A.    And have an understanding as to how the



1    two populations relate to each other.

2        Q.   And you contend that the people who have

3    studied this have not done that?

4        A.   That's correct.

5        Q.   Okay.  Are you familiar with Dr. Gregory

6    Stocks?

7        A.   Yeah.

8        Q.   Okay.

9        A.   I seen it.

10            MR. GORDON:        The person or the

11   paper?

12            MR. BANKSTON:      The person.

13       Q.   Dr. Gregory Stocks, you're familiar --

14       A.   I don't know him.  Yeah.  I'm familiar

15   with the paper.

16       Q.   You're familiar with who he is, though?

17   You never met the man, I take it?

18       A.   I never met the man.

19       Q.   Okay.  You're familiar with his study?

20   He's one of the people who studied this; right?

21       A.   Well, I'm familiar because he -- he has

22   a publication.

23       Q.   Sure.  I'm going to go ahead and hand it

24   to you.  This has been previously marked as

25   Exhibit 27 in this litigation.



1               Now, you would agree with me that

2     the conclusion of Mr. Stocks -- excuse me, of

3     Dr. Stocks and his team is that particles are a

4     reasonable surrogate for bioburden?

5          A.   Why do I have to agree with you?

6          Q.   You don't have to.  I'm asking if you

7     do.

8          A.   Yeah.  The answer is no.

9          Q.   No, you don't agree with that.  So if

10    somebody was to say Stocks and his colleagues were

11    able to demonstrate that particles are a reasonable

12    surrogate for bioburden, you would say no, that's a

13    wrong opinion?

14         A.   Correct.

15         Q.   Okay.  Are you familiar with a

16    Russell Olmsted with the National Institute of

17    Health?

18         A.   What is this in relation to?

19         Q.   I'm just wondering if you know the man.

20         A.   No.

21         Q.   Okay.

22         A.   Yeah.

23              MR. BANKSTON:        4.

24         Q.   Okay.  So one of the things we had

25    talked about with Stocks, right, is the people who



1   have studied this, is they haven't really followed

2   the right methodology to really measure this.  Is

3   that part of your contention?

4           MR. GORDON:          Objection, form of

5   the question.

6       A.   If you were to look at one of the figure

7   studies he's presented --

8           BY MR. BANKSTON

9       Q.   Hmm hmm.

10      A.   His Figure 1.  Do you see it?

11      Q.   Sure.  Yeah.  Let's look at Figure 1.

12      A.   Yeah.

13      Q.   Okay.

14      A.   Okay.  He's based all his conclusions on

15  Figure 1.

16      Q.   Okay.  So --

17      A.   And if you -- if you have any training

18  in measurements, particle analysis, and all the

19  other good things that one would have to have, you

20  would look at that Figure 1, right away would say

21  that this is scattered data all over the map.

22      Q.   Okay.

23      A.   Wouldn't you agree?

24      Q.   I don't have any expertise to -- I would

25  rely on somebody who is an expert.



1         A.    Okay.  So as a person who has measured

2    particles, live agent, everything else, that's

3    definitely bad data.

4         Q.    Anybody who has measured particles for a

5    living would know that's bad data?

6         A.    Yeah.

7         Q.    Okay.

8         A.    Very bad.

9         Q.    Very bad?  Okay.

10        A.    And his whole conclusion is based on

11    that observation.

12        Q.    Okay.  So there's, according to you,

13    some methodological problems and this is not good

14    stuff?

15        A.    On top of that the data was fudged.

16        Q.    Okay.  The data was fudged?

17        A.    Yeah.

18        Q.    What do you mean by that?

19        A.    Well, somewhere along the way his raw

20    data did not fit his expectations so he took it

21    upon himself to do a data transform.

22        Q.    Why do you say that?  Where do you get

23    that from?

24        A.    He said that.

25        Q.    Okay.  Where is that in his -- oh,



1    actually, we'll look at that after lunch.  That's

2    not important right now.

3              Let's get -- there we go.

4              MR. GORDON:         Are you done with

5    Stocks for now?

6         BY MR. BANKSTON

7         Q.   I am going to hand you what has been

8    previously marked in this litigation as Exhibit 26.

9    As you see on the bottom here, this is a 3M

10   confidential document.  Do you see that?

11        A.   Yeah.

12        Q.   Okay.  We have an email here between

13   Gary Hansen and Russell Olmsted.  I don't know if

14   you've read the -- I don't think you've read the

15   deposition testimonies on this so I'll help you out

16   here that Gary Hansen is an employee of Arizant.

17   At this time --

18             MR. GORDON:         Object to the form

19   of the question, misstates the evidence.

20        BY MR. BANKSTON

21        Q.   -- it might be 3M by this -- no, not 3M

22   by this point.  It's still Arizant, the makers of

23   the Bair Hugger.  That's who Gary Hansen is.  He's

24   at the time that this was written, in March of

25   2010.



AMICUS
REPORTING GROUP

1              Mr. Olmsted is the National

2    Institute of Health gentleman I was asking you

3    about.  Did you know that Mr. Olmsted was a

4    retained expert for the company?

5         MR. GORDON:        I object to the form

6    of the question.

7         A.   Am I supposed to know that?

8            BY MR. BANKSTON

9         Q.   I don't know what you're supposed to

10   know, sir.  How would I know what you're supposed

11   to know?

12        A.   Olmsted was retained as?

13        Q.   Did you know that?  Did you know that

14   Russell Olmsted is a retained consultant for 3M?

15        MR. GORDON:        I object to the form

16   of the question, it assumes facts not in evidence.

17        A.   I wouldn't know that.  Yeah.

18            BY MR. BANKSTON

19        Q.   Okay.  I would like to look at what

20   Mr. Olmsted says about the Stocks paper.  Okay?

21   And you'll agree with me that right off the bat he

22   calls it a fairly remarkable paper; correct?

23        A.   That's what he says.

24        Q.   Okay.  That is what he says?

25        A.   Yeah.



AMICUS
REPORTING GROUP

1        Q.    And then he says it's fairly remarkable

2    given an ability to be present during the actual

3    procedures; correct?  Do you see where it says

4    that?

5        A.    "The ability to be present."  What does

6    that mean?  Who was present?

7        Q.    That means Stocks was in the operating

8    room; correct?

9        A.    I don't know that.

10       Q.    Well, you know that from Stocks' paper,

11   don't you?

12       A.    Well, from what I see, Stocks' graduate

13   student could have done the work.

14       Q.    Okay.  So the measurements were done in

15   the actual procedure.  You'll agree with that?

16       A.    Well, it says that -- somebody has to do

17   some measurements.

18       Q.    Absolutely.  And these ones were done

19   during an actual surgical procedure; correct?

20       A.    Probably true.

21       Q.    Okay.  And definitely true; right?

22       A.    Well, again, without --

23       Q.    Are you saying they're lying in the

24   paper when they say they were in actual surgeries

25   and measured them?



1         A.    Well, when I start to see them fudging

2    the numbers and doing data transforms and --

3         Q.    So you're saying that they could be

4    lying and they weren't even in a surgery?

5         A.    I'm not using terms that a layman would

6    jump up and down over.  I'm simply saying that

7    based on the data that is presented in this paper,

8    it is very difficult to believe what is being said.

9         Q.    Sir, do you have any basis to believe

10   that these people made up the study and weren't

11   actually in surgeries?

12        A.    Well, again, there's a difference

13   between data taking in surgery and data not -- not

14   meeting their expectation.

15        Q.    So is that a yes or a no?  Do you have

16   any evidence that they're making this up and they

17   weren't in surgeries?

18        A.    You see, you're asking a very different

19   question.  I'm simply saying that they may have

20   taken the data wherever it is taking them, okay,

21   but it is poorly interpreted --

22        Q.    I get that.

23        A.    -- poorly treated.

24        Q.    Dr. Ho, I get that you don't like this

25   study.



```
 1        A.    Yeah.

 2        Q.    I get you think it's bad.

 3        A.    Yeah.

 4        Q.    I think you think that these people

 5  don't know what the heck they're doing.

 6        A.    Exactly.

 7        Q.    I get that.

 8        A.    Yeah.

 9        Q.    But are you disputing they were actually

10  in surgeries?

11        A.    I can't say that because how could I

12  even know exactly where the data was taken from.

13        Q.    All right, sir.

14        A.    Is it reasonable for me to even say

15  that?

16        Q.    To -- you understand these papers are

17  peer reviewed?

18        A.    Well, I suppose they would -- might have

19  been peer reviewed, but a lot of crummy stuff came

20  out --

21        Q.    I mean, let's --

22        A.    -- from peer-reviewed sources too.

23        Q.    Let's be really frank and honest.  Do

24  you really think that Dr. Stocks and his entire

25  team of doctors would fake they're being in
```



1    surgeries?  You would agree with me --

2         A.    I didn't say --

3         Q.    -- they were in surgeries?

4               MR. GORDON:        Mark, why would you

5    say that?

6         A.    Nobody is saying --

7               MR. BANKSTON:      Because it's an --

8    it's insane testimony.  That's why I'm doing it.

9         Q.    You would agree, sir --

10              MR. GORDON:        Oh, come on.

11         BY MR. BANKSTON

12        Q.    -- it is absolutely unconscionable that

13   you would even try to suggest to this jury that

14   they faked this data and weren't in an operating

15   room?

16        A.    I didn't say that --

17        Q.    All right.  Let's make sure --

18              MR. GORDON:        Wait, wait.

19         BY MR. BANKSTON

20        Q.    -- that's not what you're saying.

21              MR. GORDON:        I want to object.

22   That's argumentative, it's ad hominem, and he

23   didn't testify to that and you're wasting so much

24   time.

25              MR. BANKSTON:      All right.



1           MR. GORDON:        He's not -- why are

2    you -- why are you going down this rabbit trail?

3    He's -- his testimony is about the data.  Did it

4    happen in a surgery?  He says he doesn't know.

5    We've spent --

6           MR. BANKSTON:      He strongly

7    suggested that it might be fake, and you know he

8    did.

9        A.    I didn't say that.

10          MR. BANKSTON:      So let's go on.

11          MR. GORDON:        Not the collection.

12   He was talking about the --

13          MR. BANKSTON:      The question we were

14   asking about, Corey, was about the ability to be

15   present during actual procedures.

16       Q.    And you say you doubt that.  Do you

17   doubt that or do you not doubt that?

18       A.    Ask the question one more time.

19       Q.    Their ability to be present during

20   actual procedures in this study, do you doubt it or

21   do you not doubt it, sir?

22       A.    Again, you should have phrased the

23   question in saying was the instrumentation located

24   someplace in the surgery.  Why didn't you say that?

25       Q.    Do you agree to that?  Do you agree they



AMICUS

REPORTING GROUP

1    had instrumentation in the surgery?

2          A.    Yeah, I have no question that they

3    actually put instrumentation in the operating room.

4          Q.    Bingo.  That's all we needed.  All

5    right.

6          A.    You should come out and say what you

7    want to say, rather than make it in such a fuzzy

8    way that -- that it could be interpreted in

9    15 ways.

10         Q.    Okay.  I'll try to cut down on the

11   fuzziness.

12         A.    So are we still looking at the data?

13         Q.    Yeah.  We're still looking at this

14   document that I put in front of you that's --

15         A.    Yeah.

16         Q.    -- Exhibit 26.  Do you see Exhibit 26?

17         A.    Okay.  Yeah.

18         Q.    Do you see in that -- in that email --

19         A.    Yeah.

20         Q.    -- where Russell Olmsted --

21         A.    Yeah.

22         Q.    -- in direct contradiction to your

23   testimony --

24         A.    Yeah.

25         Q.    -- says that the methods employed are



1    very good.  Do you see where he says that?

2            A.    I see that.

3            Q.    You disagree with Mr. Olmsted, don't

4    you?

5            A.    I see what is being said.

6            Q.    He says he likes the use of electronic

7    particle counts and bacterial sampling?

8            A.    Right.

9            Q.    All right.

10           A.    He said that.  Yeah.

11           Q.    He says it's a very helpful picture;

12   correct?

13           A.    He said that, yeah.

14           Q.    Right?

15           A.    Yeah.

16           Q.    He says -- so from what Mr. Olmsted

17   says --

18           A.    Yeah.

19           Q.    -- remarkable paper --

20           A.    Yeah.

21           Q.    -- very good methods --

22           A.    Yeah.

23           Q.    -- very helpful.

24           A.    Yeah.

25           Q.    You disagree with all that?  Right?



AMICUS
REPORTING GROUP

1          A.    It's almost comical for anybody to say

2    that.  It's almost like he never actually looked at

3    the paper in detail.  He probably even just read

4    the abstract and then, "Yeah, yeah, this is -- this

5    is good stuff."

6          Q.    All right.  So these doctors who did the

7    study, they don't know what they're doing?

8          A.    Yeah.

9          Q.    Mr. Olmsted at the National Institute of

10   Health, apparently he doesn't know what he's doing

11   either?

12         A.    I'm willing to walk you through the data

13   to tell you where the stuff --

14         Q.    I'm just asking you if you disagree with

15   Russell Olmsted in this email.  Do you?

16         A.    I disagree with what he said.

17         Q.    Okay.

18         A.    And who is he again?

19         Q.    National Institute of Health.

20         A.    Yeah.

21         Q.    Retained expert for --

22         A.    Yeah.

23         Q.    -- the client who also retained you.

24               MR. GORDON:        I object to the form

25   of the question.



1          BY MR. BANKSTON

2      Q.   Now let's move on.

3          MR. GORDON:          It misstates the

4   evidence.

5          BY MR. BANKSTON

6      Q.   The second -- the second paragraph of

7   that email.

8      A.   Yeah.

9      Q.   Do you have Exhibit 26 in front of you?

10     A.   Yeah.

11     Q.   Now, Mr. Olmsted says that he has done

12  investigations where he used electronic particle

13  counts; correct?

14     A.   He said that, yeah.

15     Q.   Okay.  And then he says:  "...it appears

16  this group was able to demonstrate particle counts

17  serve as a reasonable surrogate for bioburden of

18  air in an OR."

19     A.   Yeah.

20     Q.   You disagree with that?

21     A.   Totally.

22     Q.   Okay.  And I believe you also told me

23  that anybody who has done particle counting would

24  immediately recognize that that's not true?

25     A.   Correct.



AMICUS
REPORTING GROUP

1        Q.    Okay.

2              MR. BANKSTON:      Give me 14.

3              MR. ASSAAD:        Are you going to

4    mark that, or not?

5              MR. BANKSTON:      Oh, this has been

6    in?

7              MR. ASSAAD:        No, no, it's not.

8              MR. BANKSTON:      Okay.  Yeah.  No.

9    Then we're going to have to start a Ho 1.  I think

10   that's what we're going to have to do.

11                   Can I get this marked --

12             COURT REPORTER:    Sure.

13             MR. BANKSTON:      -- as Ho 1.  Oh, I'm

14   sorry.  Actually, can you mark this guy, because

15   that's the one with the highlights.

16             MR. GORDON:        So this is a new

17   exhibit?

18             MR. BANKSTON:      This is a new

19   exhibit.  And unfortunately, because we haven't

20   been provided last sequentials, we're going to have

21   to do experts individually.  That's another reason

22   I don't like sequential.

23             **EXHIBIT HO 1 - Paper by Raval et al**

24             **titled "Real-Time monitoring of**

25             **non-viable airborne particles**



AMICUS
REPORTING GROUP

```
 1          correlates with airborne colonies

 2          and represents an acceptable

 3          surrogate for daily assessment of

 4          cell-processing cleanroom

 5          performance"

 6     A.   So are we done with the Stocks paper?

 7          BY MR. BANKSTON

 8     Q.   Yeah, we're done with that.  You can put

 9  that away.

10               I've handed you, sir, what has been

11  marked for the purposes of this deposition as Ho

12  Exhibit 1.  Do you see in front of you a paper by

13  Raval et al, and I'm going to read the title.

14  "Real-time monitoring of non-viable airborne

15  particles correlates with airborne colonies and

16  represents an acceptable surrogate for daily

17  assessment of cell-processing cleanroom

18  performance."  Did I read that title correctly?

19     A.   You read the title correctly.

20     Q.   This is not something that you reviewed

21  in coming to your opinions in this case; correct?

22     A.   That's correct.

23     Q.   Have you ever seen this study before?

24     A.   No.

25     Q.   Okay.  Do you see on the results where
```



1    it says "viable and nonviable particles were well

2    correlated?"

3        A.    It says that.

4        Q.    Describe what it means to me if those

5    particles are well correlated?  What does "well

6    correlated" mean?

7            MR. GORDON:        Well, you're going

8    to have to give him the opportunity to read the

9    study if you want him to comment on specifics.

10           BY MR. BANKSTON

11       Q.    Well, I just want to know what

12   "correlation" is.  Do you know what it means when

13   things are correlated, two different findings are

14   correlated?

15       A.    Let me -- can I flip through some of the

16   results and interpretation --

17       Q.    Yeah.  I'm not going to stop you.

18       A.    -- before I -- before I get too deep

19   into this thing?

20       Q.    Hmm hmm.  Dr. Ho, if you just want to

21   read the whole thing, I'm going to take a little --

22       A.    Yeah, sure.

23           MR. BANKSTON:        Go off the record

24   for a second.

25           THE VIDEOGRAPHER:   We are going off the



1    record.  The time is 11:32 a.m.

2    (ADJOURNMENT)

3           THE VIDEOGRAPHER:   We are back on the

4    record and the time is 11:53 a.m.

5           BY MR. BANKSTON

6      Q.   All right.  Before we took a break my

7    question to you was what does "correlated" mean?

8      A.   I'm glad you asked that.

9      Q.   Hmm hmm.

10     A.   And that's a common misconception for

11   people inexperienced with analyzing particle data,

12   when they throw a bunch of numbers onto a computer

13   program with a X, Y axis.

14     Q.   Okay.

15     A.   And the computer program always comes

16   back with a R square correlations.  And R square

17   correlations simply mean that if you throw things

18   on the wall, how many -- how -- how could you

19   define a linear relationship between all the

20   numbers that are thrown on the wall.

21           So in this case it just so happened

22   that the R square is at .78.  It appeared to be a

23   good number.

24     Q.   Mr. Ho, did I ask you anything about

25   this study?



AMICUS
REPORTING GROUP

1        A.    Well, you didn't, but --

2        Q.    I did not, did I?

3        A.    You simply asked --

4        Q.    And in fact I asked you what the word

5    "correlated" mean --

6        A.    Yeah.

7        Q.    -- and in giving me an answer you used

8    the word "correlations" three times, and we still

9    don't have a definition.

10       A.    Yeah.  You don't -- you never will.

11            MR. GORDON:         I object to the form

12   of the question --

13         BY MR. BANKSTON

14       Q.    Can you --

15            MR. GORDON:         -- argumentative.

16         BY MR. BANKSTON

17       Q.    Can you pretend for a moment that I'm a

18   grade school student --

19       A.    Right.

20       Q.    -- and tell me what "correlation" means.

21       A.    Yeah.  In the -- in the definite -- in

22   the definition of a -- of a true and correct

23   relationship, correlation means that does one

24   phenomenon affect the other or do the two phenomena

25   connect to each other.



1        Q.    In other words, do they have a
2   meaningful relationship, a connection with each
3   other?
4        A.    Right.
5        Q.    Is that correct?
6        A.    Right.
7        Q.    Okay.  This study is entitled, as we
8   discussed "Real-time monitoring of non-viable
9   airborne particles correlates with airborne
10  colonies and represents an acceptable surrogate for
11  daily assessment of cell-processing cleanroom
12  performance."
13       A.    Right.
14       Q.    The other word I need to understand out
15  of that --
16       A.    Yeah.
17       Q.    -- is "surrogate."  Do you know what
18  "surrogate" means in this context?  What does that
19  mean?
20       A.    Well, it's simply -- what the title
21  hopes to -- to convince people is that you don't
22  really need one to -- to measure the other.
23       Q.    In other words, a surrogate means I can
24  measure one and I have a good idea, a rough idea of
25  what the other is?



AMICUS
REPORTING GROUP

```
 1          A.    That's the pretense.
 2          Q.    Okay.  Now, this study claims that these
 3    viable and nonviable particles were well
 4    correlated; correct?  That's what they claim?
 5          A.    That's what they claim.
 6          Q.    Okay.  I would like you to flip with me
 7    to page 5.
 8          A.    Yeah, I'm here.
 9          Q.    Okay.  You see there's some highlighted
10    text there?
11          A.    Yeah.
12          Q.    That's what I want to ask you about.
13    There's going to be some things in here I want to
14    ask you about.  The first sentence states:
15                "Several groups have reported on
16                airborne contamination in the
17                setting of the operating room in
18                relation to the risk of surgical
19                wound contamination..."
20                Do you see that?
21          A.    I see that.
22          Q.    That's sort of the -- kind of the issue
23    we're talking about here today; correct?
24          A.    Yeah.  Yeah.
25          Q.    Okay.  The next sentence states:
```



AMICUS
REPORTING GROUP

1          "Environmental factors such as the
2          use of forced air-warming blowers,
3          and operating-room personnel
4          variables including skin exposure
5          and the number of people in the
6          surgical suite, have all been found
7          to affect the risk of surgical site
8          infections..."
9               Do you see that?
10     A.    That's what it says.
11     Q.    You understand that there's been some
12  studies on those issues?
13     A.    Yes.
14     Q.    Okay.
15     A.    Yeah.
16     Q.    Now, I think, if I'm not wrong, you
17  don't agree that forced air warmers have an affect
18  on surgical site infection?
19     A.    Haven't we been through that before?
20     Q.    If we have, I'm sorry, but it's in
21  connection with this and I'm asking in the context
22  of this.  Do you have an opinion about whether
23  forced air warmers have an effect on surgical site
24  infections?
25               MR. GORDON:        I object to the form



AMICUS
REPORTING GROUP

1  of the question.

2      A.   Are we still talking about the paper

3  itself?

4          BY MR. BANKSTON

5      Q.   The paper right here, this statement.

6      A.   Yeah.

7      Q.   Okay.  So let's look at the statement.

8  The use of forced air warmer blowers, does that

9  have an effect, a risk of surgical site infections?

10     A.   It says nothing about the paper.

11     Q.   I don't -- I'm not asking you what --

12     A.   Well, focus --

13     Q.   I'm asking if you agree with that

14  statement.

15     A.   Focus in on the paper at hand,

16  whether --

17     Q.   All right.  The paper in hand --

18     A.   -- the title that it claims is actually

19  supported by the data.

20     Q.   But I'm asking you about this.  I'm

21  asking you about this paragraph.

22     A.   I don't know anything about that.

23     Q.   That's what I want to know.  If you

24  don't know anything about it, tell me you don't

25  know anything about it.



```
1          A.    Yeah.  Yeah.
2          Q.    So when it comes to whether forced air
3    warmers affect the risk of surgical site infection
4    in operating rooms, you don't have an opinion?
5          A.    No.
6          Q.    Thank you, sir.
7          A.    Yeah.
8          Q.    The next sentence states:
9              "Other areas of the hospital
10             caring --"
11               Excuse me.
12             "Other areas of the hospital caring
13             for high-risk patients with
14             increased risk of nosocomial
15             infection, such as burn units and
16             hematology/oncology wards, have put
17             air monitoring and quality systems
18             into place..."
19               Do you see that?
20         A.    I see that.
21         Q.    Okay.  The final sentence states:
22             "Thus reduced airborne particulates
23             appear to correlate with a
24             decreased risk of nosocomial
25             infections in high-risk patient
```



AMICUS

REPORTING GROUP

1          populations."

2          Do you have any opinions about whether

3    that statement is scientifically valid or not?

4          A.   That statement came out of the blue.  It

5    has got no real backing to it.

6          Q.   Okay.  So your opinion is that statement

7    has no support and is not true?

8          A.   No.

9          Q.   Okay.  Yes?  I'm sorry, it's --

10         A.   No.  No.  No.

11         Q.   And the question asked is you said it

12   was not true.  There's the negative thing, and I

13   think you're saying the opposite of what the

14   transcript is going to reflect.

15         A.   It's not -- it's not true.

16         Q.   So you're saying this statement is not

17   true?

18         A.   Yeah.

19         Q.   So this is another piece of

20   peer-reviewed literature which disagrees with you,

21   which you say is wrong?

22         A.   Correct.

23         Q.   Okay.  These -- these authors here, I

24   take it you also say that they don't know what

25   they're doing either; right?

1       A.    Well, are you coming back to the data or
2   not?  Because you -- you're trying to --
3       Q.    No.  I'm just asking you do you -- do
4   you -- what do you feel?  Do you criticise this
5   paper or not?
6       A.    I'm upset --
7       Q.    We have to take it one step at a time.
8       A.    I'm upset by the fact that you
9   highlighted one correlated statement and then --
10  and then you are jumping away from it and not
11  wanting to know anything else about it.
12      Q.    Sure.  If he has questions, he might ask
13  you some.  It's all good.  Don't worry about it.
14      A.    Yeah.
15      Q.    If my highlighting upset you, I'm sorry
16  about my highlighting.  You can ignore my
17  highlighting?
18      A.    Well, it upset me --
19      Q.    It's okay.  Don't worry about it.
20      A.    -- because you are going from here --
21      Q.    Hmm hmm.
22      A.    -- into something else that has got no
23  connection to it.
24      Q.    Yeah.  I only have a limited amount of
25  time today, Mr. Ho --



1          A.    You brought the paper out here --

2          Q.    -- so I'm going to go pretty quick.

3          A.    -- for some purpose; right?

4          Q.    Hmm hmm.  To find out if you -- if you

5     think this is a bad paper or not.  Do you?

6          A.    It is a terrible paper.

7          Q.    Okay.  Thank you, sir.

8          A.    Yeah.

9          Q.    So this is -- so this is another

10    peer-reviewed paper that disagrees with you that

11    you say is a terrible paper?

12         A.    Are you not interested in knowing why

13    it's terrible?

14         Q.    No, I'm actually really not.

15                All right, sir, we're going to move

16    on to a different thing now.  Are you familiar with

17    Dr. Darouiche and his work in aerobiology?

18         A.    Remind me.

19         Q.    Rabih Darouiche.

20         A.    What did he do?

21         Q.    One of the things he does I'm about to

22    show you, but I was actually wondering if you had

23    any -- knowing that you're a microbiologist, I

24    thought you might know him personally.  You don't

25    know Dr. Darouiche?



1          A.    I'm afraid not.

2          Q.    And you're not familiar now, I take it,

3     with Dr. Darouiche's reputation?

4          A.    No.

5          Q.    Okay.

6               MR. BANKSTON:       This is the

7     Darouiche article.

8               MR. GORDON:         Is this going to be

9     a new exhibit?

10              MR. BANKSTON:       Yeah.  Let's mark

11    this as Ho 2.

12         A.    Are we done with this?

13         Q.    Yes, we are.

14              MR. BANKSTON:       Mark this as Ho 2.

15         **EXHIBIT HO 2 - Report by**

16         **Dr. Darouiche et al titled**

17         **"Association of Airborne**

18         **Microorganisms in the Operating**

19         **Room With Implant Infections:  A**

20         **Randomized Controlled Trial"**

21         BY MR. BANKSTON

22         Q.    I see you're reading the introduction

23    there, and I wanted to know, have you ever seen

24    this paper before?

25         A.    No.



AMICUS
REPORTING GROUP

1        Q.    Okay.  So this is not something that you

2    relied on when coming to your opinions about

3    whether particles are proxies for bioburden?

4        A.    Come again.

5        Q.    This is not something that you reviewed

6    when coming to your opinion that particles are not

7    proxies for bioburden?

8        A.    Yeah, I haven't seen this paper before.

9        Q.    Okay.  I'll tell you what?  You want to

10    take -- this one isn't too long, actually.  This

11    one only has about -- it looks like eight pages of

12    text.  If you want to review this to see if there's

13    anything you want to look at before I start asking

14    you questions, I'm going to ask you a few questions

15    about this before we go to lunch.

16        A.    Okay.

17             MR. GORDON:        Did you say

18    Darouiche was a microbiologist?

19             MR. BANKSTON:        No.  That him being

20    in microbiology, I thought he might be familiar

21    with his work in microbiology.  Because, as you

22    see, it's a study of airborne microorganisms.  I

23    thought it might have hit his Google alerts.

24        A.    Do you have a copy that is not smeared?

25        Q.    Yeah.  That I sure don't, unfortunately.



1          A.    They all turn out that way?

2          Q.    Yeah.  No, that's -- the original that I

3    have looks like that.

4          A.    I'm done.

5          Q.    All right, let's get going.

6                All right.  We are going to be

7    talking about Ho Exhibit 2, which has been marked

8    and put in front of you.  This is a 2016 study by

9    seven different researchers regarding the

10   association of airborne microorganisms --

11         A.    It was published in '017.

12         Q.    I'm sorry.  It says '16 on my copy.  Oh,

13   you're looking at the very top.  Yeah.  There's a

14   disclosure down here at the bottom.  It gives its

15   publication date as October 26, 2016.

16         A.    Okay.

17         Q.    So I want to make it for the record?

18         A.    Different from publishing date.

19         Q.    Yes, exactly.  Yes.  So the published

20   date is October 26, 2016.

21               MR. GORDON:          Electronically.

22         A.    No, '17 is the publish date.

23             BY MR. BANKSTON

24         Q.    Oh, I see.  So you're counting as when

25   it appeared in print --



AMICUS
REPORTING GROUP

1          A.    Yeah.

2          Q.    -- as opposed to when it was first

3     published?

4          A.    Yeah.

5          Q.    Right.  Okay.  Okay.  So we can get it

6     it was accepted in July 2016.  It was first

7     published electronically on October 26, 2016.  And

8     then published in the *Infection Control and*

9     *Hospital Epidemiological -- Epidemiology* journal in

10    January of 2017; is that correct?

11         A.    Right.

12         Q.    All right.  So we're all on the same

13    page on dates.  This study concerns the Association

14    of Airborne Microorganisms with implant infections;

15    correct?

16         A.    Correct.

17         Q.    Okay.  One of the things I think you'll

18    notice when you first read the study is that one of

19    the takeaways that they have is that the presence

20    of airborne CFUs above a surgical site correlates

21    well with infections in that surgical site;

22    correct?

23              MR. GORDON:        I object to the form

24    of the question.

25              BY MR. BANKSTON



AMICUS
REPORTING GROUP

1          Q.    That was one of their conclusions?

2          A.    That's one of the assertions that

3    they're making.

4          Q.    Okay.

5          A.    Yeah.

6          Q.    And I want to talk about another

7    discussion that they have.  And if you would flip

8    to me -- are these numbered?  I don't think they

9    are.  One, two, three, four.

10         A.    What four?

11         Q.    And I'll show you this page so you can

12   see what it looks like.  And it has a chart down

13   here.  It should be your fourth page.  We're

14   looking at the same page.  Excellent.

15              Do you see the section in the

16   right-hand column, in the bottom of the right-hand

17   column, entitled "CFU and Particulate Densities and

18   Infection."  I'm sorry, you may be looking at the

19   chart.  I can tell from your eyes.  I'm actually

20   talking about the text.

21         A.    Oh.

22         Q.    On the right-hand column do you see the

23   section entitled "CFU and Particulate Densities and

24   Infection?"

25         A.    Right.  Yeah.



1          Q.    Okay.   So that begins by saying that:
2     "CFU density at incision sites was significantly
3     related to [the] incident of implant infection ...
4     but not of incisional infection..."
5                    Do you understand the difference
6     between those two types of infection?
7          A.    Are you still looking at that first
8     paragraph underneath the heading --
9          Q.    The first sentence of the first
10    paragraph, yes, sir, where it talks about:   "CFU
11    density at incision sites was significantly related
12    to [the] incident of implant infection ... but not
13    of incisional infection..."   Do you understand the
14    difference between those two types of infection?
15         A.    Okay.   I think I do.
16         Q.    Okay.   Which one are we talking about in
17    this case, in this lawsuit?
18         A.    In this particular discussion?
19         Q.    In this lawsuit what kind of infections
20    are we talking about?
21         A.    They are not talking about incisional
22    infections.
23         Q.    Correct.   We're talking about implant
24    infections; right?
25         A.    In this case?

1        Q.    In this lawsuit --

2        A.    Yeah.

3        Q.    -- what you're here to testify about --

4        A.    Right.

5        Q.    -- is implant infections?

6        A.    Right.

7        Q.    Okay.  You understand that the

8    mechanisms, the biological, the physiological

9    mechanisms by which an infection happens

10   incisionally versus peri-prosthetically are

11   different mechanisms?  Do you have enough expertise

12   to know that?

13       A.    I don't --

14            MR. GORDON:        I object to the form

15   of the question.

16       A.    Yeah.  I think it's a bit technical for

17   me here.

18           BY MR. BANKSTON

19       Q.    Okay.  Let's move on then to -- into

20   that paragraph.  That first part we were talking

21   about was one of their findings.  Another finding

22   that they had was -- you see right after it says

23   "Figure 4" there's a new sentence.  And it says:

24           "CFU density was positively related

25               to total particulate density ... in



AMICUS
REPORTING GROUP

207

1              the control group, indicating that

2              airborne [particulate] counts may

3              be used as a proxy for ambient CFU

4              density."

5          I want to ask you about some terms that

6   are used in there.  First, because I don't think

7   we've defined it so far, a CFU is a colony-forming

8   unit; correct?

9       A.   Yeah.

10      Q.   Okay.

11      A.   Yeah.

12      Q.   And in this case, when they talk about

13  CFU density, we can think about that as the amount

14  of -- the total amount and concentration of

15  airborne biological mass that they're measuring;

16  correct?

17      A.   Right.

18      Q.   Okay.  And their conclusion is, is that

19  airborne particle counts correlate well and can be

20  used as a proxy for the CFUs.

21      A.   What do you make of the following

22  sentence after that?

23      Q.   We're going to keep going.  Lets stay

24  one step at a time.

25      A.   Yeah.



AMICUS
REPORTING GROUP

1          Q.   Stop trying to figure out where we're
2     going here, Mr. Ho.  Let's try to answer the
3     questions that are in front of you.
4               You understand that they found that
5     airborne particle counts may be used as a proxy for
6     ambient CFU density?  That's what their statement
7     there says?
8               MR. GORDON:        I object to the form
9     of the question.
10              BY MR. BANKSTON
11         Q.   Correct?
12         A.   That's what they say here.
13         Q.   And that's something that you disagree
14    with?
15         A.   Right.
16         Q.   Right.  So much like the study by Stocks
17    and his team, which you say you don't agree with --
18         A.   Right.
19         Q.   -- much like the study of Dr. Raval and
20    his team, which you don't agree with; much like the
21    statements of Mr. Olmstead, 3M's retained
22    consultant, you don't agree with, you also don't
23    agree with the seven researchers in this study that
24    that can be used as a proxy between particulates
25    and airborne biological matter?



1          A.    Right.

2               MR. GORDON:          I object to the form

3      of the question.

4               BY MR. BANKSTON

5          Q.    Okay.   The next sentence says that:   "No

6      association between particle density and CFU could

7      be determined in the intervention group --"

8          A.    Demonstrated.

9          Q.    Thank you, sir.   "...could be

10     demonstrated in the intervention group because

11     68.1% of the 10-minute intervals had 0 CFU..."   So

12     there was no significant variation in CFU levels;

13     correct?

14         A.    That's what it says.

15         Q.    It's impossible to measure something if

16     it's not there; right?

17         A.    That's what it says.

18         Q.    So, for instance, if there are no

19     particles, there will be no bacteria; correct?

20         A.    Right.

21         Q.    If there's no bacteria, there might be

22     particles; right?   You can have nonbacterial

23     particles; correct?

24         A.    Where are you going with this one?

25               MR. GORDON:          Don't ask him where



1   he's going.

2          BY MR. BANKSTON

3      Q.   No.  Why do you keep doing that, Mr. Ho?

4          MR. GORDON:       Just answer the

5   question.

6          BY MR. BANKSTON

7      Q.   It's a very simple question.

8          MR. GORDON:       He asks --

9          BY MR. BANKSTON

10     Q.   There can be particles that are non --

11         MR. GORDON:       He asks bite-sized

12   questions.  Just answer them.

13         BY MR. BANKSTON

14     Q.   To go us down a row.  There are

15   particles that are nonbiological?  Those exist?

16     A.   There are particles that are

17   nonbiological --

18     Q.   Yes.  And those exist?

19     A.   I suppose.

20     Q.   I mean, of course -- I don't mean --

21   what do you mean by "I suppose?"  Do you have any

22   doubt that those exist?

23     A.   Well, I don't know what is it that

24   you're trying to imply.

25     Q.   Again, I'm not trying to imply anything.



AMICUS
REPORTING GROUP

1    What I want to understand, are all particles

2    biological?  Every particle in the world that you

3    would consider an aerosol particle, are they

4    biological?

5         A.   No.

6         Q.   Okay.  That's what I'm trying to

7    understand.

8         A.   Yeah.

9         Q.   So in this situation they were able to

10   measure and they found that there were no

11   biological CFUs, correct, in the intervention

12   group?

13        A.   Right.

14        Q.   Okay.  So if there are no CFUs to

15   measure, you can't have a correlation measurement,

16   can you?

17        A.   Well, are you going to look at Figure 5

18   eventually?

19        Q.   I don't know what we're going to look

20   at.  It's going to depend a lot on what you say.

21        A.   Because what the author wishes to say

22   and what the data represents are different things.

23        Q.   Why do you say that?

24        A.   Because --

25        Q.   Please explain.  Go ahead.



AMICUS
REPORTING GROUP

1        A.    -- the interpretation of data is so
2   important.
3        Q.    I'm not asking you if it's important.
4   Why --
5        A.    Authors --
6        Q.    Why are they wrong?
7        A.    Authors always wish to say things that
8   they set out to say.  You know that.
9        Q.    Hold on.  Are you -- are you claiming
10  that Dr. Darouiche set out to prove a certain
11  proposition in this report?
12       A.    Well, maybe --
13       Q.    What evidence do you have of that, sir?
14       A.    I'll let you in on a dirty little secret
15  in that the purpose of somebody going to do a bunch
16  of experiments is to hopefully get data to back up
17  his expectation in the first place.
18       Q.    So you're saying --
19       A.    Are you surprised --
20       Q.    -- that you believe --
21       A.    -- to hear that?
22       Q.    I'm not -- I'm not surprised to hear
23  anything from you today.
24       A.    Because --
25       Q.    What I'm -- what I'm asking you is do



1    you say --

2          A.    All I'm trying to tell you is so much of

3    the papers that you have been presenting to us and

4    Albrecht's group and all the other people,

5    essentially we are -- we are looking at the same

6    old theme.  They all have expectations of what they

7    want to see from a bunch of data that they do.  And

8    then -- and then they go and make statements to the

9    effect.  And then when you look at so much of the

10   data, the data doesn't anywhere support --

11         Q.    Sir --

12         A.    It is easy for lay people to get taken

13   by statements that have been written, but when

14   you -- you don't even connect statements with data.

15   The reason why data is given as graphs and plots is

16   to -- is to actually try to convince the scientific

17   authority that such data will support the

18   statements being made.  If you don't look at the

19   data, you got nothing.

20         Q.    Done?

21         A.    Done.

22         Q.    Okay.

23         A.    Yeah.

24         Q.    Object as nonresponsive, object to the

25   narrative.

1                  You don't know Dr. Darouiche?

2         A.    No.

3         Q.    You don't know what his motivations were

4    in doing this study?

5         A.    No.

6         Q.    Do you know what his hypothesis was?

7         A.    Well --

8         Q.    Do you know?

9         A.    He thinks that first and foremost he

10   could connect the infections that he saw with the

11   concentration of culturable particles in the air.

12        Q.    That's his conclusion; right?

13        A.    He set out to show that.

14        Q.    Where do you see that he set out to do

15   that?  Where is his hypothesis, sir?

16        A.    Well, it's in the introduction.

17        Q.    Where does it say that he wanted to

18   prove that this was true?

19        A.    Well, if that's not what he wants to

20   show, then why bother to do any work?

21        Q.    So we don't do science unless we have an

22   agenda?  Is that what you're saying, sir?

23        A.    Well, look at the title.  The whole

24   title says that's what he intends to do.

25        Q.    You think that the title --



1        A.    Yeah.

2        Q.    -- which represents the findings of this

3    study --

4        A.    Yeah.

5        Q.    -- represents what his agenda was in

6    doing this study?

7        A.    Exactly.

8              MR. GORDON:          Objection,

9    argumentative.

10             MR. BANKSTON:        All right.

11        Q.    So according to you, Dr. Darouiche's

12    work and the work of his entire team is tainted

13    because apparently they had some sort of agenda or

14    motivation?

15        A.    I didn't say that.  I simply say that

16    the data that is presented does not support the

17    statement they are making.

18        Q.    Why not?

19        A.    Well, as I've said, look at the --

20        Q.    I'm looking at it.  Tell me why.

21        A.    Look at Figure 4 and 5 in particular.

22    Look at the -- are you familiar with the 95 percent

23    confident interval?

24        Q.    Pretend I'm not.

25        A.    Okay.  Look at -- look at Y Figure 4.



1    Look at the big gaping hole there.  It is the size

2    of a mile.  Look at it.

3         Q.   I don't know.  What do you mean it's the

4    size of a mile?

5         A.   Well, between the upper and lower dotted

6    traces --

7         Q.   Hmm hmm.  That are between .00 and .04?

8    Is that the ones you're talking about?

9         A.   Yeah.  Yeah.

10        Q.   Okay.

11        A.   Look at how broad that is.

12        Q.   How do I -- why is that broad?

13        A.   Well, that signifies that the data

14   excursion is very noisy.  And it is convenient to

15   convince people like you that the data is good

16   because they got a solid line in the middle to make

17   it look this nice, but you have to look at

18   confidence limits.  When your confidence limit is a

19   mile apart, okay, look at how many times excursion

20   the confidence intervals.

21        Q.   Yeah.  Yeah.

22        A.   Don't you --

23        Q.   Dr. Ho, both lines -- both of these

24   dotted lines increase over time, don't they?

25        A.   Well, look -- look as a simple example



AMICUS
REPORTING GROUP

1    the median --

2        Q.   Hold on.  I need you to answer my

3    questions, Dr. Ho.  Both of these dotted lines

4    increase over time, over the graph?

5            MR. ASSAAD:          Over mediancy.

6            BY MR. BANKSTON:

7        Q.   Yeah, over mediancy --

8        A.   This is not a -- this is not a time

9    measurement.

10       Q.   Right.  So what I'm saying is time being

11   the increase in median CFU per metre squared.

12       A.   You are --

13       Q.   You would agree with me that over the

14   X axis, over median CFU per metre squared, both of

15   these dotted lines increase?

16       A.   It means that the noise is even worse on

17   the higher concentration.

18       Q.   I'm not sure if that answers the

19   question if whether both of these dotted lines

20   increase, Mr. Ho.

21       A.   I'm trying to explain how you interpret

22   that --

23       Q.   I'm not asking you to explain how to

24   interpret it.

25       A.   If you --



AMICUS
REPORTING GROUP

1          Q.    I'm asking you if these dotted lines

2    increase over median CFUs per metre squared.

3          A.    Yeah.  And that's even worse than you

4    think.  They are increasing because --

5          Q.    And you think that's bad?

6          A.    -- there's noise.  Look at noise.  Look

7    at the -- let's say CFU at 7.05, which is at 0.2.

8    Okay.

9          Q.    Describe to me the noise on Figure 5.

10         A.    Well, in Figure 5, again, the noise is

11   always there.  It's over -- okay.  You have to look

12   at the total particle number concentration.

13         Q.    Hmm hmm.

14         A.    The upper limit is 1.2 million.

15         Q.    Okay.

16         A.    And that's a lot of particles.  Compare

17   that with the actual CFU per cubic metre.  Okay.

18   You are looking at not much more than 4, 5 -- 6 to

19   be charitable.

20         Q.    So you're saying it's a small, very tiny

21   amount of bacteria?

22              MR. ASSAAD:       6?  It goes to --

23         A.    Well, when you are looking at --

24              MR. BANKSTON:       Yeah, yeah, I know.

25   It doesn't matter.



AMICUS
REPORTING GROUP

```
 1          A.   You see, it's easy to fool the lay

 2   people when you -- when you do a graphical plot

 3   because they don't truly know how much noise there

 4   is.

 5          BY MR. BANKSTON

 6          Q.   Yeah, but that's not what I asked you,

 7   sir.  I'm trying to understand.  Your -- your point

 8   here is that there's not a lot of bacteria?

 9          A.   A lot of -- a little signal, a lot of

10   noise.

11          Q.   A tiny little bit of bacteria?

12          A.   Yeah.  Not much.

13          Q.   A lot of particles?

14          A.   A lot of particles.

15          Q.   A tiny amount of bacteria?

16          A.   Yeah.

17          Q.   Do you any idea how much bacteria it

18   takes to cause an orthopedic implant infection?

19          A.   Well, that's beside the point.

20          MR. GORDON:        Objection, lack of

21   foundation, asked and answered.

22          A.   You are trying to make the point --

23          BY MR. BANKSTON

24          Q.   I'm wanting -- what I'm trying to

25   understand --
```



1          A.    You are trying to make the point that

2     particle measuring is the proxy for --

3          Q.    Hmm hmm.

4          A.    -- biological content.

5          Q.    I am.

6          A.    And when you got so much noise in your

7     particle measurement, you cannot make a connection

8     between live particles.

9          Q.    Now, you understand -- so we see here

10    there's been some publications on the idea that

11    particles are proxies for bioburden, and that's not

12    something you agree with.  You understood that was

13    going on.  Did you ever write a letter to any

14    editor of any publication whoever published stuff

15    like this?

16         A.    Why would I do that?

17         Q.    Because you care about science, sir.

18         A.    Well --

19         Q.    And good science.  And if this is bad,

20    fudged --

21         A.    If I were --

22         Q.    -- faked, horrible science --

23         A.    If I were to spend my time exposing all

24    the bad science there is, there wouldn't be enough

25    time for me to have dinner.



1        Q.   Yeah.  You see, it doesn't seem like you
2    respect a lot of scientists.  I get that.
3             MR. GORDON:        I object to the form
4    of the question, argumentative, move to strike.
5          BY MR. BANKSTON
6        Q.   Have you published anything on this
7    issue?
8        A.   Pardon?
9        Q.   Have you published anything on this
10   issue?
11       A.   What issue?
12       Q.   Whether particles are a reasonable
13   surrogate for measuring the amount of biomass in
14   the air.
15       A.   Let me put it this way.
16       Q.   Have you published some or not?
17       A.   The answer -- you see, there you go
18   again.
19       Q.   All right.
20       A.   You want an actual answer --
21       Q.   So I'm taking it --
22       A.   -- but you don't --
23       Q.   -- you may have published something that
24   may have something to do with this?
25       A.   When I looked at the number of particles



1   in air versus the actual live agents --

2        Q.   Hmm hmm.

3        A.   -- the data was so ridiculous that it's

4   not worth publishing.

5        Q.   Oh, okay.  So you haven't published

6   anything?

7        A.   Exactly what I'm trying to say.

8        Q.   Correct?  Nothing you're saying on this

9   subject has ever been peer reviewed?

10       A.   That's right.

11       Q.   Okay.  Thank you, sir.

12       A.   Sometimes things are so bad you don't

13   want to publish them.

14       Q.   There's no question to you right now,

15   sir.

16            Did you know that 3M tried to study

17   the infection issue using particle count study

18   under laminar flow?  Were you aware of that?

19       A.   No.

20       Q.   You didn't rely on the study by

21   Dr. Sessler and Dr. Olmsted?  You haven't reviewed

22   that study?

23       A.   I don't think so.

24       Q.   Okay.  So you didn't know that 3M did a

25   study in which they measured particle counts on the



1    infection issue and found that the Bair Hugger

2    increases particles at the surgical site?

3                MR. GORDON:        I object to the

4    form --

5          BY MR. BANKSTON

6       Q.   Did you know that?

7                MR. GORDON:        I object to the form

8    of the question.  It completely mischaracterizes

9    the evidence.

10      A.   It's strange you should say things like

11   that.

12         BY MR. BANKSTON

13      Q.   Strange that I should ask you --

14      A.   Yeah.

15      Q.   -- if you're aware of a study that found

16   particle counts about the Bair Hugger increased?

17      A.   Yeah.

18      Q.   Why is that strange, sir?

19               MR. GORDON:        I object to the form

20   of the question.  It completely mischaracterizes,

21   misstates, and frankly fabricates evidence.

22               MR. BANKSTON:       Yeah.

23      A.   Ask me something useful.

24         BY MR. BANKSTON

25      Q.   Sir, you don't get to choose the



AMICUS
REPORTING GROUP

1    questions I ask you.  You don't.  You are here as a
2    paid privilege to be an expert in a U.S.
3    litigation.  Do you understand that?
4              MR. GORDON:        I object to the form
5    of the question --
6          BY MR. BANKSTON
7          Q.   Do you understand that there's --
8              MR. GORDON:        Argumentative.
9          BY MR. BANKSTON
10         Q.   You understand there's a solemn thing
11   about this?  It's a serious matter?
12             MR. GORDON:        Counsel, you know,
13   the disrespect that you and your colleague have
14   been showing with your sneers and your laughs and
15   your --
16             MR. BANKSTON:      This has been --
17             MR. GORDON:        -- and your --
18             MR. BANKSTON:      -- insane.
19             MR. GORDON:        -- and your
20   ad hominem -- you know --
21             MR. BANKSTON:      Sorry, it is.
22             MR. GORDON:        I'm sorry, but
23   accusing --
24             MR. BANKSTON:      It's ridiculous.
25             MR. GORDON:        -- an expert of



1    being insane is really --

2              MR. BANKSTON:      Some of the

3    testimony here has been insane.  I'm sorry.

4              MR. GORDON:        Well, that may be

5    your opinion, but --

6              MR. BANKSTON:      Hmm hmm.

7              MR. GORDON:        -- you know what --

8              MR. BANKSTON:      Thank God for

9    America where I can say it.

10             MR. GORDON:        In the District of

11   Minnesota we don't attack witnesses and we don't

12   characterize --

13             MR. BANKSTON:      Whoa, whoa, whoa.

14   Don't start that with me.

15             MR. GORDON:        -- their testimony

16   as --

17             MR. BANKSTON:      Don't start that

18   with me.

19             MR. GORDON:        -- insane on the

20   record.

21             MR. BANKSTON:      Like you haven't --

22   your team hasn't attacked witnesses in this case.

23   That's really funny.

24        BY MR. BANKSTON

25        Q.   I'm asking you a very simple question.



1          MR. GORDON:        I'm just asking you

2   to show a little bit of civility, Mr. Bankson.

3          MR. BANKSTON:      I'm fairly civil.

4          MR. GORDON:        This isn't Texas.

5   We're doing a District of Minnesota proceeding.

6          MR. BANKSTON:      Oh, okay.  There we

7   go.

8          MR. ASSAAD:        One request, Corey.

9   I think the issue here is, first of all, there has

10  been laughs and sneers.  I think you -- I'm not

11  saying it occurred, but you even atoned your own

12  witness to answer the question because he's asking

13  questions.  I think at lunchtime you need to

14  explain to your witness --

15         MR. GORDON:        And I intend to do

16  that, Gabriel.

17         MR. ASSAAD:        Okay.  And I think

18  that's -- I think that's --

19         MR. GORDON:        But in the

20  meantime -- in the meantime how about a little bit

21  of just civility?

22         MR. BANKSTON:      I don't --

23         MR. GORDON:        That's all I ask

24  for.

25         MR. BANKSTON:      Hey, I'm going to be



AMICUS
REPORTING GROUP

1   civil.  I'm not going to attack anybody.  Do I have

2   any respect for what's going on in this room?

3   Zero.  So I don't -- I'm not going to pretend to

4   respect what's going on in this room.  I'll be

5   civil.

6           MR. GORDON:        And I'll let --

7           MR. BANKSTON:      I'll shake

8   everybody's hands when we're done here.

9           MR. GORDON:        Whether you have any

10  respect --

11          MR. BANKSTON:      But I'm going to

12  keep asking questions --

13          MR. GORDON:         -- or not is really

14  your --

15          MR. BANKSTON:      -- and I would ask

16  you just to make your objections.

17          MR. GORDON:         -- is really

18  irrelevant, and that's something that you should be

19  either putting on the record --

20          MR. BANKSTON:      All that I'm saying

21  is you're asking --

22          MR. GORDON:         -- or --

23          MR. BANKSTON:      -- me to pretend to

24  do something?

25          MR. GORDON:         -- using your



```
1    personal feelings to --
2            MR. BANKSTON:      I can't believe --
3            MR. GORDON:        -- attack the
4    witness.
5            MR. BANKSTON:      -- we're just
6    burning --
7            MR. GORDON:        Just ask --
8            MR. BANKSTON:      -- all this time
9    with colloquy.
10            MR. GORDON:        -- the questions.
11            MR. BANKSTON:      Make your
12   objections, man.  That's it.
13            MR. GORDON:        I am.  I'm objecting
14   to your lack of civility.
15            MR. BANKSTON:      All right.
16            MR. GORDON:        This is not -- this
17   is not an inquisition.
18            MR. BANKSTON:      Noted.
19            MR. GORDON:        It is not an
20   opportunity for you to inflict your --
21            MR. BANKSTON:      It is absolutely an
22   inquisition.
23            MR. GORDON:        Not, it isn't.
24            MR. BANKSTON:      All right.  Noted.
25   I got your objection.
```



```
 1              BY MR. BANKSTON
 2         Q.    Let's get back to what we were talking
 3    about, which is I asked you if you were aware if
 4    there was -- do you know if there's such a study
 5    that exists that 3M conducted that shows particle
 6    counts increase above the surgical site.  Do you
 7    know if that exists?
 8         A.    No.
 9         Q.    Okay.
10         A.    I do not know.
11         Q.    And then do you have an opinion on why
12    it would be strange that I would ask you that?
13              MR. GORDON:      I object to the form
14    of the question, lack of foundation.
15         A.    You want to know why  --
16              BY MR. BANKSTON
17         Q.    Why you said it was strange that I asked
18    you that.  Yeah.
19         A.    Why?  Are you going to show me?
20         Q.    No.  No.  No.  You remember you told me
21    it was strange that I asked you that.  I was
22    wondering why -- I was just wondering why that was
23    strange.
24         A.    Well, most of the time if you have
25    evidence you pass it around.
```



1      Q.   Oh, okay.  From your legal education
2  you're talking about?
3      A.   Yeah.  Are you going to pass it around,
4  a 3M publication?
5      Q.   No, I'm not.  I'm wondering if you knew
6  about it or relied on it.  The purpose of this
7  deposition is so I can figure out what your
8  opinions are, what you relied on, et cetera.  I
9  don't want -- what I'm concerned about is if you
10 show up at trial and say, "Oh, yes, I have seen the
11 Sessler, Olmsted study."
12     A.   Well, 3M is a --
13     Q.   "Oh, yes, I am familiar with this."
14     A.   3M is a big company.
15     Q.   Hmm hmm.
16     A.   They can publish anything they want, and
17 I don't need to know everything they publish.
18     Q.   Okay, that's great.  And I don't
19 disagree with that.
20     A.   Yeah.
21     Q.   I'm not quarrelling with you on that.
22     A.   Yeah.
23     Q.   All I'm wondering -- I'm trying to make
24 sure you have not relied on any studies by 3M
25 regarding particle studies.



1      A.     No.

2      Q.     And you are not familiar with those

3  studies?

4      A.     I'm not familiar with them.

5      Q.     Okay.  And to your mind that's not

6  something you would want to look at or is that

7  something you want to look at?  Would you be

8  interested in them?

9      A.     You see, now you're getting into a --

10  into a situation that kind of starts to stray off

11  the boundary, so to speak.  Are you driving at

12  something here?

13      Q.     We have -- we have a judge who decides

14  that.

15      A.     Are you going to show us something?

16      Q.     I'm asking you -- I don't have anything

17  I'm specifically referring to.

18      A.     Yeah.  Yeah.

19      Q.     This is everything under the sun.

20      A.     Yeah.

21      Q.     If there is a study out there -- I don't

22  know if there's one.  You don't know if there's

23  one, apparently.  Like I don't know.

24      A.     Right.  Right.

25      Q.     I'm just saying if there's a study out



AMICUS
REPORTING GROUP

1    there --

2         A.    Right.

3         Q.    -- that measured particulates with the

4    Bair Hugger --

5         A.    Yeah.

6         Q.    -- are you interested in seeing it?

7    Would you like me to show it to you?  Is that

8    something you want to rely on?

9         A.    Are you going to show it to me?

10        Q.    I'm asking you if you want to rely on

11   it.  I'm not asking you do I want to show it to

12   you.  I'm saying if there's a study out there and

13   it involved the Bair Hugger and you're -- and it

14   involves particulate matter, and you're giving here

15   today opinions on particulates, is that the kind of

16   study you would want to see?

17        MR. GORDON:        I object to the form

18   of the question, vague.

19        A.    Well, that's an odd way to phrase the

20   question because what will you learn or gain from a

21   "yes," "no," "maybe" answer?

22        BY MR. BANKSTON

23        Q.    I want to know --

24        A.    Yeah.

25        Q.    -- if you think it would be helpful to



1    you to have for your review studies that 3M has

2    done concerning particulates?  Do you think that

3    would be helpful or do you think it would not be

4    helpful?

5             MR. GORDON:          The same objection.

6        A.    Helpful to do what?

7             BY MR. BANKSTON

8        Q.    To render your opinions in this case

9    concerning Bair Hugger and particulates.

10       A.    What -- let's say I would rather prefer

11   that I go out and find peer-reviewed papers that I

12   can actually look at and form a judgment --

13       Q.    Okay.

14       A.    -- rather than something that the

15   company maybe handed to me.

16       Q.    Okay.  So you don't want stuff the

17   company hands you?  You want to go out and do your

18   own research?  That's the good methodology; right?

19       A.    Yeah.

20       Q.    Okay.  And so if there was a

21   peer-reviewed study out there involving the

22   Bair Hugger and particulates, that might be

23   something you would want to look at, but not just

24   something the company hands you?  Is that fair?

25       A.    Yeah, that's fair.



AMICUS
REPORTING GROUP

1      Q.   Okay.  So if there is out there a

2  peer-reviewed study that deals with particulates in

3  the Bair Hugger and was sponsored by the company,

4  does the fact that it was sponsored by the company,

5  does that affect whether you would want to look at

6  it?

7      A.   I would certainly look at it very

8  carefully and determine if the sponsorship taints

9  the outcome.

10      Q.   That's a good answer.  Thank you, sir.

11          MR. GORDON:        Move to strike

12  counsel's commentary.

13          MR. BANKSTON:       I was trying to be

14  civil to -- let's go ahead and take lunch.

15          MR. GORDON:        You know, but

16  there's two sides of the coin --

17          MR. BANKSTON:       Hmm hmm.

18          MR. GORDON:        -- saying that's a

19  good answer.

20          MR. BANKSTON:       No, and I meant it

21  genuinely.  Like --

22          MR. GORDON:        You may have.  And

23  I'm sure you meant it genuinely --

24          MR. BANKSTON:       And I'm trying to

25  encourage --



1          MR. GORDON:          -- when you thought

2    it was insane.  Just don't comment.

3          THE VIDEOGRAPHER:  Are we to go off the

4    record?  We're going off the record.  The time is

5    12:33 p.m.

6    _____

7          Proceedings to recommence at 1:10 p.m.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



AMICUS
REPORTING GROUP

1          (Proceedings recommenced at 1:13 p.m.)

2          **JIM HO**, **previously sworn**

3          THE VIDEOGRAPHER:   We are back on the

4    record and the time is 1:13 p.m.

5          BY MR. BANKSTON

6          Q.   Dr. Ho, earlier in the deposition we

7    had -- we were discussing some issues in which you

8    had told me that you had been involved in this case

9    about three weeks or so?

10         A.   That's when I first got involved with

11   it.

12         Q.   Okay.  When you were first approached

13   about this case, about three weeks ago?

14         A.   Yeah.

15         Q.   Okay.  Today is the 28th of June?

16         A.   Well, okay, let me -- let me ratchet

17   back.  Today is the -- no, it would be more like

18   six weeks, though.  Sorry.

19         Q.   Okay.

20         A.   Yeah.

21         Q.   So you believe that you were retained

22   six weeks ago.  Do you know the date you were

23   retained?

24         A.   It would be like early May I would say.

25         Q.   Okay.



AMICUS
REPORTING GROUP

1          A.   Does it have to be exact?

2          Q.   No, it doesn't have to be exact.

3          A.   Early May.

4          Q.   You don't have a document today with you

5     that has that, do you?

6          A.   No.

7          Q.   Okay.  So sometime in May, between

8     May and June 1st, you formed all your opinions in

9     this case?

10         A.   Yes.

11         Q.   Okay.  So if your report was June 1st,

12    any review of materials and any drafting of this

13    report occurred in the approximate three weeks

14    before that report was issued?

15         A.   Right.

16         Q.   Okay.  How much have you charged 3M so

17    far?

18         A.   Nothing.

19         Q.   You -- you do plan on charging them,

20    don't you?

21         A.   Eventually.

22         Q.   Okay.

23         A.   Yeah.

24         Q.   You are keeping track of how much time

25    you spend on this case, aren't you?



AMICUS
REPORTING GROUP

1       A.   Well, the -- I keep track of it because

2    of the email correspondence that we have over the

3    time.  So I know roughly how much time I spend on

4    it.

5       Q.   How much time have you spent?

6       A.   I don't have an exact number, but...  I

7    don't know.  Do you need an exact number?

8       Q.   I would like to know how much you're

9    getting paid for producing this report, yeah.

10      A.   Yeah, that --

11           MR. GORDON:        And, counsel, we

12   will produce his invoices when he submits them.

13           MR. BANKSTON:      Okay.

14           MR. GORDON:        For now, you know,

15   if you can --

16      BY MR. BANKSTON

17      Q.   All right.  Well, do you have an --

18           MR. GORDON:        -- you can give an

19   approximation.

20      BY MR. BANKSTON

21      Q.   Yeah.  Do you have an approximation of

22   how long it took you to write this report?

23      A.   About 20, 30 hours.

24      Q.   Okay.  Have you spoken with any other

25   experts retained by 3M?



1          A.    Have I spoken to any other experts?

2          Q.    Hmm hmm.

3          A.    Regarding this issue?  No.

4          Q.    Okay.  Have you had conversations with

5     other experts with 3M not regarding these issues in

6     the case?

7          A.    I've never spoke to anybody at 3M.  Is

8     that what you meant?

9          Q.    No.  Let me make it a little more

10    clearer for you.  You understand -- you don't work

11    for 3M; right?

12         A.    Correct.

13         Q.    You're an independent expert?

14         A.    Right.

15         Q.    Who was hired in this case?

16         A.    Right.

17         Q.    To give opinions in this case?

18         A.    Correct.

19         Q.    You understand that there are other

20    people in this lawsuit that 3M has also hired to

21    give opinions in this case?

22         A.    Yeah.

23         Q.    Have you spoken with any of them?

24         A.    No.

25         Q.    Okay.



1          MR. GORDON:          And, counsel, he may

2    not be aware -- I think he's aware of it, but maybe

3    not.  He teaches a course with Thomas Kuehn, who is

4    one of our experts.

5          Q.   You know Thomas Kuehn?

6          A.   I know Tom, yeah.

7          Q.   Okay.  I don't know if you knew this,

8    but he's an expert in this case.

9          A.   I've never spoken to him about this

10   case.

11         Q.   Okay.  So you all have never had any

12   contacts about the substance of this case?

13         A.   No.

14         Q.   You've had some professional

15   conversations with him in the past?

16         A.   Only because we teach a course together.

17         Q.   Okay.  What course do you all teach

18   together?

19         A.   It's called aerosol short course offered

20   by the U of M.

21         Q.   Okay.

22         A.   You notice that one of my references was

23   a paper that I published with him.

24         Q.   So you've also published literature --

25         A.   Yeah.



AMICUS
REPORTING GROUP

1        Q.     -- together?

2        A.     Yeah.

3        Q.     Okay.  And now you're working in this

4   case, working on the same side together?

5        A.     Well, only by coincidence.  I wouldn't

6   know he was working on the same case.

7        Q.     So, for instance, you didn't refer him

8   to 3M and he didn't refer 3M to you?

9        A.     Well, I can't answer that.

10       Q.     Okay.  Well, at least with respect to

11   yourself, you didn't refer Dr. Kuehn to 3M?

12       A.     No.

13       Q.     Okay.  I want to talk to you now -- it

14   would probably help to flip to page 17 of your

15   report for this next little discussion.

16             MR. GORDON:        I'm sorry, page?

17             MR. BANKSTON:      17.

18       A.     I'm on it.

19          BY MR. BANKSTON

20       Q.     One of the things you did in this case

21   is review some literature relating to the

22   Bair Hugger; correct?

23       A.     Correct.

24       Q.     And I see in this section you have

25   several citations for published literature that you



AMICUS
REPORTING GROUP

1    discuss that you used to support your opinion;
2    correct?
3          A.    Right.
4          Q.    Okay.  I don't think we can get to all
5    of them, but I -- I am a little limited on time,
6    but I want to cover some of these.  And the first
7    one I want to talk about, you relied on a study by
8    Zink and Iaizzo in 1993?
9          A.    Yeah.
10         Q.    Okay.  And this was a study to try to
11    determine if a forced-air warming unit was a
12    bacterial risk; correct?
13         A.    I suppose so.
14         Q.    Well, do you understand that that was
15    the study, what it was about?  Or would you
16    characterize it a different way maybe?
17         A.    Well, let me go into the paragraph --
18         Q.    Hmm hmm.
19         A.    -- in a little deeper.  Well, they --
20    they use agar plates to measure airborne bacteria.
21         Q.    Okay.  So this is about an airborne
22    bacteria risk with the Bair Hugger and whether or
23    not it poses a risk; correct?
24         A.    Right.
25         Q.    Okay.  Do you know who sponsored that



AMICUS
REPORTING GROUP

1    study?

2          A.    Pardon?

3          Q.    Do you know who sponsored that study?

4          A.    I'm -- I'm guessing maybe it is

5    sponsored by somebody connected to the Bair Hugger.

6          Q.    Okay.

7          A.    Yeah.

8          Q.    That's a good guess.

9          A.    Yeah.

10         Q.    That's not something you had confirmed

11   before citing the study, though?

12         A.    Well, sometimes the connections are

13   obvious, other times not.

14         Q.    Okay.

15         A.    So --

16         Q.    You read Dr. David's report, correct,

17   Dr. Yadin David?

18         A.    Yeah.

19         Q.    Okay.  And he points out that this study

20   was sponsored by Dr. Augustine; correct?

21         A.    Okay.  Yeah.

22         Q.    Okay.  There's nothing necessarily wrong

23   with somebody sponsoring a study, is there?

24         A.    In the -- in most pure science, if the

25   sponsorship was specified above board, then there's



244

1    nothing wrong with it.

2          Q.   Hmm hmm.

3          A.   It's accepted that way.

4          Q.   Okay.

5          A.   Yeah.

6          Q.   So, for instance, it's totally fine --

7    well, first let's back up for a second.  In your

8    long career in dealing in published literature, I

9    would take it you have some sort of knowledge about

10   what constitutes proper research ethics and

11   sponsorship of papers, for example; correct?

12         A.   Correct.

13         Q.   Okay.  In your time that you've been

14   publishing, I take it most of your publications

15   have been sponsored by the Canadian government?

16         A.   Maybe sponsorship would be not an

17   appropriate term to use.  Yes, I was -- I was paid

18   a salary by National Defence to do what I was

19   supposed to do.

20         Q.   Oh, so it wasn't like there was specific

21   grants --

22         A.   Oh, no.

23         Q.   -- for specific studies?

24         A.   No, no.

25         Q.   You're working around the clock salaried



1   to do this stuff?

2        A.   Exactly.

3        Q.   Okay.  You understand that there are

4   some academic researchers who different groups will

5   sponsor a study.  Say a device manufacturer will

6   say, "We would like you to do a study and here's

7   some money to do a study."  That's not necessarily

8   problematic; right?

9        A.   It's not problematic if the sponsorship

10  did not impose a criteria on the publication

11  process.

12       Q.   So, for example, if a sponsor says,

13  "Researcher, we would like you to research this

14  issue, here's the funding to do it, but we don't

15  want to have anything to do with it and you go out

16  there and you get your own independent opinions and

17  we're not going to have anything to do with it,"

18  that's -- that's above board; right?

19       A.   That's fine.

20       Q.   Okay.  On the contrary, let's say that

21  there was a sponsor and a doctor and they were

22  collaborating together to put a positive spin on

23  what they knew was a negative clinical result.

24  That could pose problems, right, if there was

25  evidence of that with respect to the studies about



1    the Bair Hugger?

2         A.    Correct.

3         Q.    Likewise -- let me give you another

4    example.  If a sponsor and an author were working

5    together and that author said, "Well, you know,

6    sponsor, if you don't like something in my paper,

7    here's the manuscript, change whatever you want and

8    make it whatever you want it to say," that's also

9    could be problematic?  That's the kind of bad

10   research ethics we're talking about?

11        A.    That's correct.

12        Q.    Okay.  Now, with respect to Iaizzo and

13   Zink, did you have any evidence there was anything

14   not above board going on there?

15        A.    I would not be able to tell.

16        Q.    Okay.

17        A.    Yeah.

18        Q.    So there is a potential conflict of

19   interest whenever there's a sponsor, but in this

20   case you don't know too much about the relationship

21   between the sponsor and the study authors in this

22   particular instance?

23        A.    Right.

24        Q.    Okay.  Now, do you know what model

25   Bair Hugger was used in Zink and Iaizzo's study?



1          A.   I don't specifically recall, but it
2     might have been mentioned.
3          Q.   Okay.
4          A.   Yeah.
5          Q.   Do you remember the discussion in
6     Dr. Yadin David's report where he discussed that
7     these were a different model, a previous model of
8     Bair Hugger?  Do you remember that discussion?
9          A.   I -- I -- I vaguely know that there have
10    been different generations of machines that were in
11    existence.
12         Q.   Okay.  This study, do you think that
13    this study was done on the type of Bair Hugger
14    that's featured in this case, in this lawsuit?
15         A.   I wasn't aware of that.
16         Q.   Would you agree with me that if that
17    model of Bair Hugger was used, had different
18    performance characteristics, that could be
19    important?
20         A.   It would be.
21         Q.   So, for instance, if the Bair Hugger
22    that was used in the tests had, say, roughly half
23    as much airflow coming out of them, that could
24    affect the results; right?
25         A.   I'm not clear how I would respond to



AMICUS
REPORTING GROUP

1   that because --

2           Q.    Okay.

3           A.    Yeah.

4           Q.    Now, another thing we look at in these

5   studies, in Zink and a couple of others, is about

6   the Bair Hugger's filtration; right?

7           A.    Right.

8           Q.    Did you know that there was a completely

9   different kind of filter being used in those

10  studies than the ones that are featured in this

11  case?

12          A.    Yeah.   I wouldn't know it until somebody

13  specifies it in there.

14          Q.    Okay.

15          A.    Yeah.

16          Q.    And you saw that in Dr. David's report;

17  correct?

18          A.    Yeah.

19          Q.    So when you put these studies in your

20  report, you knew that they involved a different

21  Bair Hugger with different airflow and a different

22  filter; correct?

23          A.    Well, I suppose yes, but my -- my

24  response was to -- for what the paper was implying

25  at the time.   Yeah.

1      Q.   I'm not sure I understand what you mean

2   by that.

3      A.   Well, my judgment was according to what

4   the author had described at the time.

5      Q.   So you're making opinions about that

6   Bair Hugger, not --

7      A.   At the time.

8      Q.   -- the Bair Hugger in this case?

9      A.   Yeah.

10     Q.   Okay.  So your opinions here about Zink

11  and Huang and Moretti, those apply to the

12  Bair Hugger at the time they were studied?

13     A.   Right.

14     Q.   Not the Bair Hugger as it exists today?

15     A.   Yeah.

16     Q.   Okay.  Thank you, sir.

17          MR. GORDON:        I object to the form

18  of the question.

19          BY MR. BANKSTON

20     Q.   The next one I want to talk to you about

21  is the next paragraph, the Huang study.  Are you

22  familiar with that study?  Do you remember that?

23     A.   The Huang study?

24     Q.   Yeah.  It was a biological aerosol test.

25     A.   Yeah.



AMICUS
REPORTING GROUP

 1        Q.    Okay.  You knew that study is not
 2   controlled; right?
 3        A.    What do you mean by "controlled?"
 4        Q.    I mean, it has -- it's not a controlled
 5   study.  You understand that?
 6        A.    You mean they did not use a control
 7   experiment?
 8        Q.    Correct.
 9        A.    Okay.
10        Q.    Right.  And you knew that from reading
11   Dr. Yadin David's report; correct?
12        A.    Yeah.
13        Q.    That that Huang study was not
14   controlled?
15        A.    Right.
16        Q.    All right.  Now let me ask you something
17   about controlled experiments.  The Huang study is
18   still useful to you; right?  You still find it to
19   be a useful study?
20        A.    Come again.
21        Q.    The Huang study --
22        A.    Right.
23        Q.    -- is a useful study to you?  You find
24   it to be a useful piece of literature?
25        A.    Yeah, I would say that.



1        Q.    Yeah.   You cited it as support for some
2    of your opinions you're giving; correct?
3        A.    Right.
4        Q.    Now, what I want to know is does the
5    fact that Huang in his biological study, does the
6    fact that he didn't do a controlled study, does
7    that mean that he's not familiar with
8    microbiological concepts?
9        A.    I can't state that.   I can't say that.
10        Q.    Okay.   So just because somebody doesn't
11    use a control, that doesn't necessarily mean that
12    they're not familiar with how to do a proper
13    microbiological study?   Is that your testimony?
14        A.    That's fair.
15        Q.    Okay.   Thank you, sir.   You know, again,
16    and I'll just circle back because we're going to
17    cover them again, Huang is one of these studies
18    that involved a predecessor model Bair Hugger in
19    2002; correct?
20        A.    If you say so, yes.
21        Q.    Well, you reviewed -- you're
22    responding -- one of the things you're doing in
23    this case is responding to the report of Dr. Yadin
24    David; right?
25        A.    You see, I -- when I was starting to



1   look at the papers --

2        Q.   Hmm hmm.

3        A.   -- I -- I wasn't focusing on the

4   different models that different people were using.

5        Q.   Sure.

6        A.   Yeah.

7        Q.   I understand that.

8        A.   I saw --

9        Q.   When you read Dr. Yadin David's report,

10  you understood that it was a different model of

11  Bair Hugger with a different filter?

12       A.   Yeah.  Later -- much later I realized

13  they were different models.

14       Q.   Well, this is before you authored your

15  report, though.  You knew before you put Huang in

16  your report that it involved a different model of

17  Bair Hugger?

18       A.   Yeah.

19       Q.   Because you read Dr. Yadin David's

20  report before you wrote your report; right?

21       A.   Yeah.  Yeah.

22       Q.   Okay.  The same is true with Moretti,

23  correct, the Moretti study in 2009?  Did you know

24  that involved a predecessor model?  You knew that

25  from reading Dr. Yadin David's report; correct?



AMICUS
REPORTING GROUP

1        A.    Okay.

2        Q.    You agree; correct?

3        A.    Yeah.

4        Q.    Okay.   And, in fact, do you remember

5    from Dr. Yadin's report that it wasn't just the

6    predecessor 505, it was something called the 505E.

7    Do you remember the reference to the 505E?

8        A.    I don't remember that well.

9        Q.    Okay.   Maybe it will help if I describe

10   it this way.   Do you remember Dr. Yadin David

11   describing in his report the 505 European model,

12   which had even less air flow?

13       A.    No.   I don't remember that much detail.

14       Q.    Okay.   You wouldn't dispute, though,

15   that the Moretti study involved a predecessor model

16   with even less airflow than what we've been talking

17   about?

18       A.    No.

19       Q.    Okay.   Did you know -- you knew also

20   that Moretti wasn't randomized; right?

21       A.    Yeah.   Yeah.

22       Q.    These studies, Huang, 16 people, I

23   think, were involved in that study?   A 16-person

24   noncontrolled study; is that right?

25       A.    I don't remember the exact numbers.



1    Yeah.

2         Q.    Okay.

3         A.    Yeah.

4         Q.    Moretti, would you dispute to me that's

5    20 people, nonrandomized?

6         A.    Yeah.  If you say so.

7         Q.    You would agree with me those are pretty

8    small sample sizes?

9         A.    True.  Yeah.

10        Q.    Okay.  I want to talk to you about --

11   and let's see where I can direct you to it.  The

12   very bottom of page 18 is another study I want to

13   discuss.

14        A.    Yeah.

15        Q.    And that's the Yu study.  And this is a

16   study about -- about swabbing and showering.  Do

17   you remember this study?

18        A.    Yeah.  Yeah.

19        Q.    Okay.

20        A.    Yeah.

21        Q.    Now, from your report, what I'm taking

22   away from what you're saying here, and you can tell

23   me if I'm wrong, is that this swabbing for CFUs

24   showed it's not a concern -- let me start that

25   over.



1                    What you showed was that swabs of

2      skin near the surgical site that showed the

3      presence of potential pathogens, it's not a cause

4      for alarm because it didn't have any difference in

5      the incident of infection?

6          A.    Correct.

7          Q.    Okay.  Do you know what kind of

8      infections were being studied?

9          A.    Do I know what kind of infections were

10     being studied?

11         Q.    Yes.

12             MR. ASSAAD:        In the article.

13           BY MR. BANKSTON

14         Q.    In the article, in the Yu study.

15         A.    I'm not sure they were looking at any

16     specific infections.  They were just looking at

17     whether there was any.

18         Q.    So you... Well, from my reading of you,

19     this involves superficial wound infections.  Would

20     you agree with that?

21         A.    Well --

22             MR. GORDON:         Objection, lack of

23     foundation.

24         A.    They -- they were doing sampling on the

25     skin, yes.  Yes.  If that's what you mean.



AMICUS
REPORTING GROUP

```
 1            BY MR. BANKSTON
 2       Q.   Well, that's where they found the
 3   bacteria, right, is on the patient's skin?
 4       A.   Right.
 5       Q.   And what they were measuring, the
 6   outcome -- the clinical outcome they were measuring
 7   was superficial wound infections?
 8       A.   Yeah, from -- from shower or no shower.
 9       Q.   And you will agree with me that this
10   study doesn't have anything to do with
11   peri-prosthetic joint infections; right?
12       A.   Correct.
13            MR. GORDON:       I object to the form
14   of the question, lack of foundation.
15            BY MR. BANKSTON
16       Q.   And you've agreed with me before that
17   the mechanism of infection between superficial
18   wound infections and peri-prosthetic joint
19   infections are different?
20            MR. GORDON:       Objection, lack of
21   foundation.
22       A.   Probably true.
23            BY MR. BANKSTON
24       Q.   Okay.  You would agree with me that this
25   Yu article has no relevance to the type of
```



AMICUS
REPORTING GROUP

1    infection that the plaintiff suffered?

2         A.   The reason why that article was put in

3    was to illustrate that even though you are swabbing

4    bacteria off the skin, it has got no direct

5    connection to whether that would cause infections

6    or not.

7         Q.   Well, it certainly is saying that it

8    wouldn't have any effect on superficial wound

9    infections; right?  That's what it's saying?

10        A.   Yeah, but what else --

11        Q.   Is it -- is it --

12        A.   What else can you say about that?

13        Q.   Is it making any statement whatsoever on

14   the cause of peri-prosthetic joint infection?

15        A.   No.

16        Q.   And those two mechanisms are

17   different --

18        A.   Right.

19        Q.   -- correct?

20        A.   Yeah.

21        Q.   In fact, you remember when we looked at

22   the Darouiche article; right?  Do you remember

23   that?

24        A.   Yeah.  Yeah.

25        Q.   And you'll remember -- let's go back to



1    the page we were looking at, and I'll put it in

2    front of you.

3              MR. GORDON:        This is Exhibit 2,

4    Ho Exhibit 2?

5              MR. BANKSTON:       No.  Yeah, the Ho

6    Exhibit 2.

7         Q.   Do you have Ho Exhibit 2 in front of

8    you?

9         A.   Yeah.

10        Q.   All right.  Let's look at that

11   paragraph we looked at.  And that was a couple of

12   pages in.  I believe it will be page 4 for you.

13        A.   Yeah.

14        Q.   All right.  And you notice there at the

15   beginning it said that:  "CFU density at incision

16   sites was significantly related to [the incident]

17   of implant infection ... but not of incisional

18   infection..."  Do you see that?

19        A.   All right, I see that.

20        Q.   What we can conclude from all of this is

21   that what may or may not cause a superficial wound

22   infection is distinct from what may or may not

23   cause a peri-prosthetic joint infection.

24              MR. GORDON:        Objection --

25         BY MR. BANKSTON



AMICUS
REPORTING GROUP

1        Q.   Do you agree to that?

2             MR. GORDON:        Objection, lack of

3   foundation.

4        A.   I'm afraid I can't answer that question.

5   It's --

6             BY MR. BANKSTON

7        Q.   Is that a bit outside your field?

8        A.   Yeah.

9        Q.   Okay.

10       A.   Yeah.

11       Q.   Okay.  So in terms about whether the Yu

12  study is in any way relevant to the types of

13  infections that were suffered in this case, that's

14  also something that's going to be a little bit

15  outside your area?

16       A.   It wasn't implied anyway in the

17  discussion.  It wasn't implied.

18       Q.   What wasn't implied, sir?

19       A.   It was simply -- the implication was

20  just if you did swabbing of the -- of anything,

21  skin in particular, it has got no bearing on any

22  sort of infection.

23       Q.   Any sort of infection?  You believe

24  that?

25       A.   In this example.



1        Q.    Okay.

2        A.    That's what's reported.

3        Q.    So, according to your testimony, the Yu

4   study, you feel comfortable saying it applies to

5   the type of infections that were in this case?

6            MR. GORDON:        Well, objection,

7   lack of foundation.

8        A.    What was that question again?

9          BY MR. BANKSTON

10        Q.    According to your testimony, you feel --

11   oh, no, hold on.  That wasn't it.

12              So according to your testimony, the

13   Yu study, you feel comfortable saying that it

14   applies to the type of infections we have in this

15   case?

16        A.    No, I don't think I can make that jump

17   to say that.

18        Q.    Okay.  And in fact you cannot say

19   whether this study is relevant to the type of

20   infections in this case?

21        A.    Well, this study was only to illustrate

22   that by the mere presence of swabbing of the skin.

23   It does not imply anything else beyond that.  I'm

24   simply giving the example of swabbing doesn't

25   illustrate anything.



1         Q.   Okay.  So I guess the conclusion is if
2    you swab bacteria off of a person's skin --
3         A.   Yeah.
4         Q.   -- that doesn't necessarily mean they'll
5    get an incisional infection?
6         A.   Right.
7         Q.   What relevance does that have to a deep
8    joint infection?
9         A.   Nothing.
10        Q.   Okay.  Thank you, sir.  I want to talk
11   to you now on page 20 and stretching into 21.  So
12   that's going to be the bottom paragraph on page 20.
13   Are you with me now?
14        A.   Right.
15        Q.   Okay.  That talks about the Richard
16   study.  Do you remember this study, that used ATP
17   bioluminescence swabs?
18        A.   Right.
19        Q.   Okay.  You will agree with me that what
20   your interpretation of this study is, that the
21   authors considered the degree of bioburden as
22   relatively small compared with other OR surfaces?
23        A.   Yes.
24        Q.   Okay.  Can you tell me if there is any
25   OR surface that you can think of where 40 plus



1    cubic feet per minute of air is passing along it in

2    a tight narrow tube?

3              MR. GORDON:           Objection, lack of

4    foundation.

5         A.    You have to say that slowly.

6         BY MR. BANKSTON

7         Q.    Sure.  Can you think -- in fact I'll

8    make it a little more generic.

9         A.    Right.

10        Q.    Can you think of any OR surface used in

11   an orthopedic surface, any surface in the OR, in

12   which 40 cubic feet per minute of air are blown

13   across that surface towards the patient?

14             MR. GORDON:           Objection,

15   foundation.

16        A.    So what's the question?

17        BY MR. BANKSTON

18        Q.    Can you think of any OR surface -- all

19   right.  So that's the first part of the question --

20        A.    Yeah.

21        Q.    -- OR surfaces.

22        A.    Right.

23        Q.    Can you think of any OR surface used in

24   an orthopedic procedure in which 40 cubic feet a

25   minute of air are blown across that surface towards



1    the patient?

2         MR. GORDON:          Objection, lack of

3    foundation.

4         A.    The answer is no.

5         BY MR. BANKSTON

6         Q.    Okay.  Let's talk about some of the

7    nonsterile surfaces in an OR.  Like say -- I'm sure

8    you've seen some operating room -- I know you

9    haven't seen orthopedic surgery, but you've seen an

10   operating room on TV or something like that or been

11   in an operating room before?

12        A.    Yeah.

13        Q.    Okay.  You understand, for instance,

14   there's a surgical tray with instruments on it?

15        A.    Right.

16        Q.    It may not be sterile; right?

17        MR. GORDON:          Objection, lack of

18   foundation.

19        A.    Oh, I don't know.  Why do you say that?

20        BY MR. BANKSTON

21        Q.    I don't know.  I'm asking.  You're kind

22   of an expert on this.  Or are you an expert on

23   this?  Can you tell me what surfaces are or are not

24   sterile in an OR?

25        A.    I really can't tell you that because...



1    No, I can't tell you that.

2         Q.    Okay.  Do you understand what I mean

3    when I say the "sterile field" in an orthopedic

4    surgery?

5         A.    Sterile field?

6         Q.    Correct.

7              MR. GORDON:          Objection to the

8    form of the question.

9          BY MR. BANKSTON

10        Q.    Have you heard that term before?

11        A.    No.

12        Q.    Okay.  You understand that in orthopedic

13   surgery, when you're over the table there's a knee

14   or a hip exposed that you're working on?

15        A.    Right.

16        Q.    Okay.  The area immediately in and

17   around that area --

18        A.    Right.

19        Q.    -- you would agree that needs to stay

20   sterile?

21              MR. GORDON:          Objection, lack of

22   foundation, assumes facts not in evidence.

23        A.    Do I agree --

24          BY MR. BANKSTON

25        Q.    Hmm hmm.



AMICUS
REPORTING GROUP

1        A.    -- that it should be sterile?

2        Q.    There should be a sterile field above

3    that wound?

4            MR. GORDON:        Objection, lack of

5    foundation, vague.

6        A.    That would be helpful.

7          BY MR. BANKSTON

8        Q.    Okay.

9        A.    Yeah.  But not easily achievable.

10        Q.    You want to do everything possible to

11    try to make it as sterile as possible, though?

12    Would you agree that's a good practice?

13            MR. GORDON:        Objection, lack of

14    foundation.

15        A.    Yes and no.

16          BY MR. BANKSTON

17        Q.    Okay.

18          **EXHIBIT HO 3 - Coloured photograph**

19          **of surgeons operating**

20          BY MR. BANKSTON

21        Q.    Dr. Ho, I've handed you what's been

22    marked as Ho Exhibit 3.  Have you ever seen that

23    kind of surgical garb before?

24        A.    Have I seen one in real life?

25        Q.    No.  Have you seen that kind of garb,



AMICUS
REPORTING GROUP

1    that clothing, before.

2          A.    Yeah.

3          Q.    Okay.

4          A.    I've seen the design, yeah.

5          Q.    And that's -- that's the same kind of

6    clothing you would traditionally use in, say, a

7    clean room; correct?

8              MR. GORDON:          Objection, lack of

9    foundation.

10          A.    I can't -- I can't categorically say

11    that that's what you see everywhere.

12            BY MR. BANKSTON

13          Q.    Right.

14          A.    Yeah.

15          Q.    Okay.

16          A.    Yeah.

17          Q.    But, for instance, you've seen people --

18    I don't know if you've seen -- like, for instance,

19    in the field I grew up on, astronomy, putting

20    together the Voyageur space probe.  You see men in

21    rooms with suits that look something like that;

22    right?  Have you seen that before?

23          A.    Yeah, I've seen that before.  Yeah.

24          Q.    Okay.

25          A.    Yeah.



1    Q.   What I'm asking you is does that look
2    like a typical surgery to you?
3         MR. GORDON:          Objection, lack of
4    foundation.
5         A.   I wouldn't know how -- how to interpret
6    that because one would have to spend a lot of time
7    in the surgical ward to tell that.
8         BY MR. BANKSTON
9         Q.   Okay.  And I know you're not an expert
10   on this, and I'm not trying to, you know, hold you
11   to account on that, but you've seen some surgeries
12   before in your life?  You've seen how surgeons
13   dress?
14        A.   Well, not exactly.
15        Q.   Do you remember when that show -- I'm
16   sorry to interrupt you.  Do you remember that show
17   was on NBC called "ER" or when there was that TV
18   show called "M*A*S*H" or some of those shows?  We
19   see surgeons on TV from time to time; right?
20        A.   Well, I don't -- I don't -- I don't want
21   to claim that movie, fictional --
22        Q.   Sure.
23        A.   -- depictions are real life.
24        Q.   Okay.
25        A.   It's not fair, is it?



1          Q.    Have you seen -- I know you haven't seen
2   orthopedic surgeries before, but have you seen how
3   surgeons dress for other kinds of surgeries?
4          A.    Yeah.   Not any real live surgeons
5   because they usually do it in the background.
6          Q.    Sure.   Okay.   The surgeons that you've
7   seen dressed, have you seen them dressed like that?
8          A.    As I said, I haven't seen any real live
9   surgeons at work.
10          Q.    Okay.   The other thing I wanted to ask
11   you is in that picture do you see any exposed OR
12   surfaces in the immediate area of the surgery?   Or
13   are all the surgery -- is all of it draped and
14   wrapped?
15          MR. GORDON:          Objection, lack of
16   foundation.
17          A.    In this picture?
18          BY MR. BANKSTON
19          Q.    In that picture.
20          A.    Do I see any exposed surfaces?
21          Q.    Any exposed surgical tables, trays,
22   anything like that?
23          A.    Not shown in this picture.
24          Q.    Okay.   Nothing anywhere close to the
25   person's knee either; right?   There's no exposed



1    surfaces?

2        A.    No.

3        Q.    Let's say you had an uncovered,

4    nonsterile piece of equipment, right, in an

5    operating room and you took a hairdryer and you

6    blew it along the side of it towards the patient

7    who was having surgery.  Would that be of concern

8    to you?

9        A.    Okay.  Now you're offering me two

10   things.

11       Q.    Hmm hmm.

12       A.    A hairdryer --

13       Q.    Sure.

14       A.    -- and uncovered, exposed surface?

15       Q.    Sure.  Yeah.  Any piece -- any piece of

16   equipment in an OR that might not be sterile.

17       A.    Why are the two connected?

18       Q.    I'm asking you if you would be concerned

19   about that.  Well, let's back up to Richard's

20   study.  You understand that Richard's study, he

21   tested a lot of different surfaces in the OR?

22       A.    Hmm hmm.

23       Q.    A lot of them had bacteria on them?

24       A.    Yeah.

25       Q.    All right.  So if you went to one of



AMICUS
REPORTING GROUP

1    those surfaces -- say the surgical light.  Do you

2    remember how in Richard's study he tested the

3    surgical light?

4         A.    Hmm hmm.

5         Q.    All right.  Let's say you didn't have it

6    covered for an orthopedic procedure.  And instead

7    you went up to the surgical light above the patient

8    and took a blow dryer and blew it along its surface

9    during the surgery.  Is that in any -- is that

10   potentially problematic to you?

11        A.    First of all, that is an unlikely

12   occurrence --

13        Q.    Hmm hmm.

14        A.    -- because it's an unconventional thing

15   to do.

16        Q.    It is unconventional to blow hot air in

17   an operating room?

18        A.    No, no.  You don't take a hairdryer into

19   anyplace and blow with it.

20        Q.    Why not?

21        A.    Specifically a hairdryer.

22        Q.    Why wouldn't you want to do that?

23        A.    Well, you wouldn't be allowed to do that

24   in the first place.  You would be chased out of the

25   room.



1      Q.   Why is there a rule against that?

2           MR. GORDON:        Objection, lack of

3   foundation.

4      A.   I don't know.

5        BY MR. BANKSTON

6      Q.   What concerns might it pose to run a

7   hairdryer along a nonsterile surface?

8      A.   People, maybe nurses at least, to

9   regulate unnecessary activity in there.

10     Q.   Right.  But you would agree --

11     A.   It's not -- it's not something that they

12  do as a routine thing.

13     Q.   Sure.  And you would agree with me that

14  the introduction of a fast-moving fluid, in this

15  case hot air, moving at a high -- at a rate of

16  speed along a nonsterile surface could introduce

17  biological particles into the airflow?

18     A.   I -- I can't agree on that because it's

19  not something that has been done.

20     Q.   All right.  Let's talk a little bit

21  about page 21 of your report.  And there --

22          MR. GORDON:        We're done with

23  Exhibit 3?

24          MR. BANKSTON:      Yeah, we're done

25  with that.



1          Q.    And there in the first full paragraph is

2     the discussion of the Oguz study.  I think I'm

3     saying that right.  Oguz maybe.  We'll try to

4     figure out how to maybe say that, but I believe

5     it's Oguz.

6          A.    Yeah.

7          Q.    That is a study that you also cited in

8     your report concerning your opinions on the safety

9     of forced-air warming; right?

10         A.    Right.

11         Q.    Okay.  You understand that that study

12    explicitly states that it is not a safety statement

13    on forced-air warming?

14         A.    Come again.

15         Q.    That study that you are citing --

16         A.    Yeah.

17         Q.    -- states explicitly that it is not a

18    safety statement on forced-air warming?

19         A.    Are you saying that this is what the

20    author said or --

21         Q.    Yes.  In the text of the study, you

22    understand that it says -- it warns that this is

23    not a safety statement on forced-air warming?

24         A.    Okay.

25         Q.    Did you understand that?



1        A.   Yeah.  I don't exactly remember that

2   being mentioned, but...

3        Q.   Well, it's in your report, isn't it,

4   that statement?  In fact let's look in the middle

5   of the paragraph.  In about the middle of the

6   paragraph you're going to find a sentence that says

7   "The study may obviously..."  Do you see the start

8   of that sentence?

9        A.   I see that.

10       Q.   All right.  "The study may obviously not

11   be generalized for an overall safety statement on

12   forced air warming..."  Correct?

13       A.   Right.

14       Q.   And in fact it's only applicable

15   primarily in that particular surgical set-up;

16   correct?

17       A.   It says that, yeah.

18       Q.   Okay.  Nonetheless, you have cited it

19   here to support your opinion that the Bair Hugger

20   is safe; correct?

21       A.   Yeah.

22       Q.   Okay.  Despite that author's warning?

23            MR. GORDON:        Well, I object to

24   the form of the question.  Also an incomplete

25   reading of the author's statement.



AMICUS
REPORTING GROUP

1          BY MR. BANKSTON

2      Q.    Correct?

3          MR. GORDON:          I'm sure you know

4   how to read.

5      A.    Yeah.

6          BY MR. BANKSTON

7      Q.    Okay.  You know what kind of surgeries

8   were done in this study?

9      A.    No.

10     Q.    Would it surprise you that only two out

11  of the whole group, 5 percent, involve total knee

12  operations like we see in this kind of case?  Does

13  that surprise you, sir?

14     A.    Am I surprised?

15     Q.    Yes.

16     A.    No.

17     Q.    So, again, and this is another one of

18  those studies that may not be directly relevant to

19  the issues we're talking about in this case?

20         MR. GORDON:          Objection, lack of

21  foundation, assumes facts not in evidence.

22     A.    Why -- why are you saying that?

23         BY MR. BANKSTON

24     Q.    Because, one, sir, you'll agree with me,

25  it says it is not a safety statement on forced-air



AMICUS
REPORTING GROUP

1  warming; two, because it says that it is only

2  primarily applicable to that particular surgical

3  set-up; and, three, because that particular

4  surgical set-up is not what is at issue in this

5  case.

6           You would agree if those three

7  things were true this study has little, if any,

8  relevance to this case?

9           MR. GORDON:        Objection,

10  mischaracterizes the evidence.  It assumes facts

11  not in evidence.

12       A.   So the question then is?

13          BY MR. BANKSTON

14       Q.   Oh, yeah.  This is going to be a long

15  one.  Let's just try that again.

16           We have discussed three

17  propositions about this study.  The first

18  proposition being it is not a safety statement on

19  forced-air warming; correct?

20           MR. GORDON:        Objection --

21          BY MR. BANKSTON

22       Q.   Would you agree with that?

23           MR. GORDON:        Objection, lack of

24  foundation, mischaracterizes the statement in the

25  study.



1              BY MR. BANKSTON

2       Q.    Actually, we're not characterizing

3   statements in the study, are we, sir?  We are

4   characterizing the words you chose, which is:

5              "The study may obviously not be

6              generalized for an overall safety

7              statement on forced air warming,

8              and is primarily applicable [to]

9              the particular surgical setup."

10             Those are the words you chose to include

11   from this study?

12             MR. GORDON:       That is part of a

13   quote.  That's not his statement.

14             MR. BANKSTON:     That's what I just

15   said, Corey.

16             MR. GORDON:       No, you --

17             MR. BANKSTON:     I said, "Those are

18   the words that you chose from the study to include

19   in your report."

20             MR. GORDON:       Why don't you read

21   the rest of the quote?

22             MR. BANKSTON:     I don't -- you have

23   all the option of completeness you want.  I'm

24   asking him about a single statement.  If you make

25   me read every statement and everything, we're going



1    to be here all day.

2              MR. GORDON:          Yeah, but when you

3    take something clearly out of context, it's not --

4              MR. BANKSTON:        Make your objection,

5    Peter.

6              MR. GORDON:          -- it's not fair.

7              MR. BANKSTON:        Corey.  I'm sorry.

8    Make your objection.

9              MR. GORDON:          I object to the form

10   of the question.

11        BY MR. BANKSTON

12        Q.   All right.  So we have the words that

13   you had put in this paper from -- from the Richard

14   study, which is it is not a safety statement on

15   forced-air warming?  Do you agree you included

16   that?

17             MR. GORDON:          I think you meant

18   Oguz.

19        A.   That's what the author say.

20        BY MR. BANKSTON

21        Q.   Okay.  And that is what you've quoted

22   here in your report; correct?

23        A.   It's there, yeah.

24        Q.   The next thing they said, it was really

25   primarily applicable to that particular surgical



AMICUS
REPORTING GROUP

1   set-up; correct?

2           MR. GORDON:         Objection, lack of

3   foundation, mischaracterizes the --

4           BY MR. BANKSTON

5       Q.   That's what it says right there, doesn't

6   it?

7       A.   Yeah, it says that.

8           MR. GORDON:         You said "the next

9   thing."

10          BY MR. BANKSTON

11      Q.   Okay.  So that's the next part of that

12  sentence.

13              And then the third thing we

14  discussed is that the surgeries involved do not

15  involve the kind of surgeries we see in this case?

16          MR. GORDON:         Objection,

17  mischaracterizes -- assumes facts not in evidence.

18      A.   I didn't get the third part.

19          BY MR. BANKSTON

20      Q.   Okay.  Assume with me for a moment if

21  this study -- if this study did not focus on knee

22  operations, it was a totally different surgical

23  set-up, and it is only primarily applicable to that

24  surgical set-up, it has little relevance to this

25  case, doesn't it?



1        MR. GORDON:        I object to the form
2    of the question, it assumes facts not --
3        A.  I can't --
4        MR. GORDON:        -- in evidence, lack
5    of foundation.
6        A.  I can't extrapolate on that one.
7        BY MR. BANKSTON
8        Q.  Okay, be careful.  You need to let him
9    do his little thing before you start giving your
10   answers, all right?
11           Let me ask what you've just said
12   there so I can clarify because I'm not sure I
13   totally heard it.  But basically you say you cannot
14   offer an opinion about whether what I'm saying is
15   true or not?
16       A.  I'm getting the impression that you want
17   me to extrapolate on what is being done here to
18   everywhere else.
19       Q.  No, sir.  What I'm really asking is you
20   cited this work, as we agreed, in support of your
21   opinions on the safety of forced-air warming?
22       A.  Right.
23       Q.  Okay.  This study specifically says it's
24   not a statement on forced-air warming safety and
25   that it's primarily applicable only to that



1    particular surgical set-up.  Do you think it is

2    scientifically methodologically sound to use that

3    study for the purpose of which you want to use it

4    when the author has expressly disclaimed that

5    purpose?

6              MR. GORDON:        I object to the form

7    of the question, it mischaracterizes the

8    evidence --

9         A.   What --

10             MR. GORDON:        -- it assumes facts

11   not in evidence.  Wait, wait, wait --

12         BY MR. BANKSTON

13        Q.   You have to stop.

14             MR. GORDON:        -- until I'm through

15   with my objection.  Lack of foundation,

16   mischaracterizes the study, assumes facts not in

17   evidence.

18             BY MR. BANKSTON

19        Q.   Now you can go.  You're good now.

20        A.   I'm still a little confused as to what

21   is it that you think I'm trying to characterize.

22        Q.   You told me --

23        A.   Yeah.

24        Q.   -- you were citing this study --

25        A.   Right.



AMICUS
REPORTING GROUP

1        Q.    -- to support your opinion on the safety

2    of forced-air warming; correct?

3        A.    Right.

4        Q.    You will agree with me the authors

5    expressly disclaim that it is a statement on the

6    safety of forced-air warming; correct?

7            MR. GORDON:        Objection,

8    mischaracterizes his testimony, assumes facts not

9    in evidence, completely takes it out of context.

10   At this point you are badgering the witness, and

11   it's really unfair.

12           MR. BANKSTON:        If you think he's

13   being responsive, that is -- I don't know what to

14   say, because he's not being responsive.  He's

15   simply not being responsive.

16           MR. GORDON:        Well, because --

17           MR. BANKSTON:        We'll go ahead and

18   move on.

19           MR. GORDON:        Because you're just

20   making stuff up and then getting --

21           MR. BANKSTON:        I don't understand

22   why --

23           MR. GORDON:        -- trying to badger

24   him into agreeing with you.

25           BY MR. BANKSTON



1          Q.   Okay.  You know what, Dr. Ho?  Because
2     we have this big -- let's go ahead and read the
3     entire quote.
4               "In our study it was not possible
5               to detect any higher bacterial
6               counts on any plate in the forced
7               air warming group versus the
8               resistive warming group.  The study
9               may obviously not be generalized
10              for an overall safety statement on
11              forced air warming, and is
12              primarily applicable in the
13              particular surgical setup."
14          Is that a full reading of what that
15     phrase was?
16          A.   That's a quotation.
17          MR. GORDON:          No.
18          BY MR. BANKSTON
19          Q.   Now let's keep going.  We're going to
20     keep reading the whole thing because apparently we
21     have to.
22              "However with class action lawsuits
23              'judging' the scientific question
24              of forced air safety with
25              unsuitable, i.e. legal, means



```
 1              subsequent studies are all the more

 2              warranted."

 3              You would agree with me subsequent

 4    studies are warranted; right?

 5         A.   Is that a quote from here?

 6         Q.   Yeah.  Are you reading along with us,

 7    because that was the whole point of me reading

 8    this?  You would agree with me that the next part

 9    of this statement, the one Mr. Gordon really wanted

10    me to read, says that more studies are warranted on

11    this issue.  Correct?

12         A.   That's a quote taken from the paper.

13         Q.   Do you agree with it or not?

14         A.   Well...

15         Q.   You cited it to me, sir.  You quoted it

16    to support your opinion on the safety of forced-air

17    warming.  So do you agree more study needs to be

18    done?

19         A.    In science it never hurts to do more

20    studies.

21         Q.   Yeah, and that's -- it sure doesn't.  I

22    understand that, but that's not what I'm asking

23    you.  In terms of the safety statement on

24    forced-air warming, it's necessary to do more

25    studies, isn't it?  That's what these authors are
```



AMICUS

REPORTING GROUP

1    saying?

2         A.    If the authors say that, who am I to

3    argue with them?

4         Q.    Sure.  Okay.  Let's talk a little bit

5    about you having also a discussion, and not just

6    papers that you think support your opinions, but

7    you also have a discussion of scientific literature

8    which you criticise; correct?

9         A.    Yes.

10        Q.    Okay.  Let's look at that, and let's

11   first go to page 17.

12        A.    17?

13        Q.    Yes, sir.

14        A.    All right.

15        Q.    You see here there's a discussion of a

16   paper by Mark Albrecht; correct?

17        A.    Which part of the paragraph are you

18   looking at?

19        Q.    I'm looking right in the middle of the

20   page, on the part that says "C. Research on [the]

21   Bair Hugger and Microbes."

22        A.    Under C., yes.

23        Q.    Yes.  It begins with a discussion of a

24   study by Mark Albrecht?

25        A.    Right.



1        Q.   Okay.  First of all, why did you
2   highlight this section?
3             MR. GORDON:         He didn't highlight
4   it, counsel.  Come on.  This is highlighted.  It
5   says it's highlighted pursuant to the protective
6   order.  At the time --
7             MR. BANKSTON:       Oh, I didn't
8   actually see that.  That's why I was asking.  I
9   didn't actually see that.
10             MR. GORDON:         And -- and, by the
11   way, that can be disregarded now because the Court
12   has ruled that the material upon which this was
13   based are no longer --
14             MR. BANKSTON:       Are no longer.
15   Okay.  Okay.
16        Q.   You cite some exhibits; right?
17        A.   Right.
18        Q.   Exhibit -- Albrecht Exhibit 1, Albrecht
19   Exhibit 2, Albrecht Exhibit 3.  Do you see that?
20        A.   Yeah.
21        Q.   Okay.  Those are things that you went
22   out and found.  How did you find those?
23        A.   They were provided to me.
24        Q.   Okay.  The materials -- I had thought --
25   maybe I misunderstood, but I had thought that your



1    statement was "I don't like to rely on things that

2    attorneys give me, I like to go out and do my own

3    research?"

4           A.    Right.

5           Q.    Right.  With respect to the studies and

6    things that you've relied on in this case --

7           A.    Right.

8           Q.    -- were you provided them or did you go

9    out and find them?

10          A.    Well, when I went to look up Bair Hugger

11   on the search engines, you can't help but have a

12   lot of the Albrecht paper pop up.

13          Q.    Okay.  But not the -- these exhibits

14   refer to his deposition; right?

15          A.    Yeah.

16          Q.    Okay.  So we're obviously not talking

17   about that.  But what I'm talking about is all of

18   the papers that are cited in your report --

19          A.    Yeah.

20          Q.    -- did you go find them or did 3M give

21   them to you?

22          A.    All of the papers cited, I found them.

23          Q.    Okay.

24          A.    Yeah.

25          Q.    3M didn't give you studies and say,



AMICUS
REPORTING GROUP

1    "Rely on these?"

2          A.    No.

3          Q.    Okay.

4                MR. GORDON:        Just to be clear,

5    you're talking about the published stuff that he

6    lists in his references?

7                MR. BANKSTON:      Sure.  Exactly.

8          Q.    Now, with respect to Albrecht Exhibit 1,

9    2, and 3 --

10         A.    Yeah.

11         Q.    -- that was just given to you?

12         A.    Well, they were given to me, but they

13   also pop up in the literature.

14         Q.    No, sir.  Albrecht Exhibits 1, 2, and 3

15   are exhibits from a deposition taken in this case.

16         A.    Okay.

17         Q.    Those don't pop up in literature, do

18   they?

19         A.    Okay.

20         Q.    Those were selected by attorneys and

21   given to you to rely on; correct?

22         A.    Right.  Right.

23         Q.    Okay.  The same is true of Augustine

24   Exhibit 8; correct?

25         A.    Right.



AMICUS
REPORTING GROUP

1          Q.    You did not read those depositions, did

2     you?

3          A.    Why do you say that?

4          Q.    Because you've told me earlier in this

5     testimony that you haven't read any depositions,

6     besides the couple of pages of Mr. Legg that you

7     saw yesterday.  So it's correct you have not read

8     Mr. Albrecht's deposition and you have not read

9     Mr. Augustine's deposition?  Correct?

10         A.    No.

11         Q.    That's not correct?  You have read those

12    depositions?

13         A.    Yeah.  I read -- I read the things that

14    were given to me.

15         Q.    That's not what I'm asking you, sir.

16    What you're citing in your report is Exhibit 1, 2,

17    and 3 of Albrecht and Exhibit 8 of Augustine.

18              MR. GORDON:        Mark, can you

19    explain to him the difference between --

20              MR. BANKSTON:      Okay.

21              MR. GORDON:        -- a transcript and

22    an exhibit?

23              BY MR. BANKSTON

24         Q.    All right.  Let's do it this way,

25    because I think this is how it will explain it.



1    You see those in front of you?

2         A.    Yeah.

3         Q.    Those are exhibits.  Right?

4         A.    Yeah.

5         Q.    Do you see how they say Ho 1, Ho 2,

6    Ho 3?  You've seen exhibits from a deposition?

7         A.    Right.

8         Q.    Labelled Augustine 8, Albrecht 1,

9    Albrecht 2, Albrecht 3.

10        A.    Right.

11        Q.    Right?

12        A.    Yeah.

13        Q.    You understand you're giving testimony

14   to me and this court reporter right now?

15        A.    Right.

16        Q.    She's writing it all down.  It's on a

17   transcript.  You understand the difference between

18   an exhibit and testimony?  Do you get that now?

19               So all the things you're saying --

20   for instance, if I took Ho 1, 2, and 3 --

21        A.    Yeah.

22        Q.    -- and I took them home with me and I

23   looked at them, would I -- would I hear anything

24   that you said?  Let's look at them.  Ho 3 --

25        A.    Right.



AMICUS
REPORTING GROUP

1        Q.    -- are your words on here?

2        A.    No.

3             MR. GORDON:        Mark.  He saw that

4    yesterday.  So you can use that --

5             MR. BANKSTON:      Right.  Okay.

6             MR. GORDON:          -- just to show him

7    the difference.

8          BY MR. BANKSTON

9        Q.    Okay.  So, yeah.  So Ho 3, your words

10   aren't on this?  Ho 2, your words aren't on this?

11   Ho 1, your words aren't on this?

12       A.    Right.

13       Q.    If I just looked at these three

14   documents, would I see anything that Dr. Ho has to

15   think?  If I just read those three documents, am

16   I --

17       A.    Right.

18       Q.    -- am I getting anything that you're

19   saying or am I getting what those documents are

20   saying?

21       A.    No.

22       Q.    Right.  I'm getting the documents, not

23   your testimony; right?

24       A.    Right.

25       Q.    This is Mr. Legg's deposition.  This is



AMICUS
REPORTING GROUP

1    the thing you read?

2         A.    Right.

3         Q.    Right.  Or at least read parts of it?

4         A.    Right.

5         Q.    With respect to Mr. Albrecht and

6    Mr. Augustine -- or Dr. Augustine, you have not

7    read a transcript like that?

8         A.    I don't remember reading transcripts.

9         Q.    Okay.

10        A.    I always thought they were just

11   published papers.

12        Q.    All right.  So we're not talking about

13   published papers.

14        A.    Yeah.

15        Q.    We're talking about deposition

16   transcripts like the one you read from Mr. Legg.

17        A.    Yeah.

18        Q.    That's not a published paper, is it?

19        A.    No.

20        Q.    Okay.  So, in other words, you didn't

21   read Mr. Albrecht's testimony and decide yourself

22   "I want to use Exhibits 1, 2, and 3?"  Somebody

23   told you "Here are Exhibits 1, 2, and 3, use

24   those?"

25        A.    That's wrong.



1      Q.   How did you come across Exhibits 1, 2,

2   and 3 from the Albrecht deposition?

3      A.   I can't tell you exactly what it was

4   that I read, but I did read things pertaining to

5   Albrecht.

6      Q.   Okay.  Where did you get those exhibits,

7   sir?

8      A.   They were given to me.

9      Q.   Okay.  And you were not given any

10   testimony?

11      A.   Again, I -- I -- at the time I wouldn't

12   know what they were presented.

13      Q.   The same is true with Augustine

14   Exhibit 8?  Do you know who Dr. Augustine is?

15      A.   I came to know who he is --

16      Q.   Okay.

17      A.   -- over time.

18      Q.   And he's given testimony, just like

19   you're giving testimony today?

20      A.   Yeah.

21      Q.   You haven't read it?

22      A.   No.

23      Q.   No.  Somehow you have Augustine

24   Exhibit 8, right, because somebody told you

25   Augustine Exhibit 8 was important?  Correct?



1        A.   Well, for what I read, they were -- they
2   were experimental reports, as far as I can
3   remember.
4        Q.   I'm not sure that's what I asked you,
5   sir.  I said somebody gave you Augustine 8 and told
6   you it was important.  You should use it in your
7   report.
8             MR. GORDON:        Well, I'm going to
9   object and say you're calling for communications
10  between us and him.
11            MR. BANKSTON:      Yeah.  If that --
12            MR. GORDON:        Obviously we
13  provided those exhibits to him.
14            MR. BANKSTON:      Hmm hmm.
15            MR. GORDON:        But to
16  characterize --
17       A.   Yeah, I --
18            MR. BANKSTON:      I want to make sure.
19       Q.   It's lawyers who provided them; right?
20       A.   At the time I wasn't exactly
21  differentiating between just technical report
22  unpublished --
23       Q.   Okay.
24       A.   -- or something else that came through
25  in any other direction.



AMICUS
REPORTING GROUP

1      Q.    Did you have any assistance in the

2  writing of your report?

3      A.    No.

4      Q.    So this section here, you wrote this?

5      A.    Yeah.

6      Q.    Okay.  Let's talk about page 18.  Do you

7  see where the first full paragraph talks about

8  Albrecht and his colleagues?

9      A.    Right.

10     Q.    Okay.  You talked -- you make one point,

11  but what I want to go to is your second point here.

12  Do you see where you say "On their second aim..."?

13     A.    Right.

14     Q.    Okay.  It says:  "On their second aim,

15  it would appear [that] the authors were not

16  familiar with microbiological concepts as the

17  experimental design had no control."  Correct?

18     A.    Right.

19     Q.    Do you remember when we talked about the

20  Huang study and it not having a control?

21     A.    You -- you mentioned that, yes.

22     Q.    Yes.  And you told me that the fact that

23  it didn't have a control doesn't mean that they

24  weren't unfamiliar with microbiological concepts.

25  Do you remember telling me that?



AMICUS
REPORTING GROUP

1          A.    I might have said that.

2          Q.    Yeah.  And you're saying the exact

3     opposite here about Mr. Albrecht, aren't you?

4     You're saying the fact that he didn't have a

5     control means that he's unfamiliar with biological

6     concepts.  Correct?

7          A.    Yes.

8          Q.    So when it comes to literature that

9     hurts 3M's case, you make what's essentially a

10    criticism of this author.  You attack his

11    qualifications and his credibility saying he's not

12    familiar with microbiological concepts because he

13    had no control.  But when you had a study that was

14    favorable to the client who has hired you, you

15    didn't mention that it wasn't controlled, nor did

16    you criticise those authors, did you?

17         A.    No.

18         Q.    And you knew when you wrote your report

19    that Huang was not controlled?

20         A.    No.

21         Q.    You did know that; correct?

22         A.    Well, it might have -- I might have

23    noted that, but it wasn't something that I jumped

24    on.

25         Q.    Right.  Because you're only going to



1    insult an author if he's critical of 3M, not if

2    he's in favor of 3M; right?

3         A.    Right.

4         Q.    Yeah.  You're not going to criticise

5    authors that are favorable of 3M; correct?

6         A.    Right.

7         Q.    Understood.  So you remember back when

8    we were talking about are you writing an objective

9    independent report or are you doing a report to

10   advocate for 3M, this is a report which is bias in

11   favour of 3M, isn't it?

12        A.    Are you saying that?

13        Q.    I'm asking you if you believe it.

14   Considering that you criticized one author for

15   something, told us he wasn't familiar with

16   microbiological concepts, but knowingly didn't even

17   include the fact that this other author had no

18   control and didn't criticise him at all, that's a

19   form of bias, isn't it?

20        A.    No.

21        Q.    You don't think that's bias?

22        A.    No.

23        Q.    You don't think it's a little bit unfair

24   to insult Mr. Albrecht and accuse him of having no

25   familiarity of microbiological concepts --



```
 1         A.    Yes.
 2         Q.    -- while citing Huang with approval for
 3    safety of the Bair Hugger?
 4         A.    Yes.
 5         Q.    All right.  Let's talk a little bit
 6    about...  Let's talk a little bit now about page 26
 7    of your report.
 8         A.    Yeah, I'm on 26.
 9         Q.    You understand during this section, in
10    Section E., there's a discussion, and you have a
11    list here of several published pieces of
12    literature.
13         A.    Yeah.
14         Q.    It's about ten different studies; right?
15         A.    Right.
16         Q.    Okay.  And you're critical of all of
17    them?
18         A.    I was -- I was summarizing what the
19    review paper was -- was offering.  It was -- it was
20    more like an illustration of what a viewpoint was.
21         Q.    Okay.
22         A.    And those were the criticisms made on
23    those authors and papers, and it -- that does not
24    necessarily reflect my --
25         Q.    That's not necessarily your opinion?
```



```
 1          A.    Yeah.  They were quoted --

 2          Q.    Okay.  Let's --

 3          A.    -- quoted from the paper.

 4          Q.    Let's go to -- I'm sorry.  We started

 5    there on 25.  Look on 26, okay?

 6          A.    I'm on 26, yeah.

 7          Q.    The first full paragraph --

 8          A.    Yeah.

 9          Q.    -- the last sentence.  I'm sorry,

10    second-to-last sentence.

11          A.    The second-to-last sentence.

12          Q.    Hmm hmm.

13          A.    Yeah.

14          Q.    "In my opinion..?"

15          A.    Yeah.

16          Q.    That means you; right?

17          A.    Yeah.

18          Q.    "In my opinion these papers were of

19    uniformly low quality."

20          A.    Right.

21          Q.    That's your opinion?

22          A.    Yeah.

23          Q.    I'm going to talk about that in just a

24    minute.  Let's talk a little bit about something

25    first.  Because I want to talk about that next
```



1    sentence, the very following sentence to that in

2    that paragraph.  "The incidences of interest

3    conflict were also alarming."  That's your opinion?

4         A.   Yes, it was my opinion.

5         Q.   All right.  What exactly was alarming to

6    you?

7         A.   It was the people were funded by the

8    company.

9         Q.   Was that not alarming to you in the Zink

10   study?

11        A.   Wait a minute.  Wait a minute.  And the

12   results that they -- and the work they did and the

13   results did not reflect a fair handling of the

14   material.

15        Q.   I understand that you're critical of the

16   substance of these reports and these studies.  I

17   get that.  What I'm asking you about is the

18   statement that the incidence of interest conflict

19   were alarming.  So I want to tell you -- on these

20   studies can you tell me what the conflict of

21   interest was that alarmed you?

22            MR. GORDON:        I object to the form

23   of the question.

24        A.   Specify them?

25            BY MR. BANKSTON



AMICUS

REPORTING GROUP

1      Q.    Yeah, okay, let's go down.  Okay.  Let's

2   do it that way.

3      A.    Well, the --

4      Q.    Mr. Albrecht's 2009 study, what was

5   exactly alarming about that study to you --

6      A.    Well --

7      Q.    -- in terms of conflict of interest?

8      A.    -- in each of the examples that I have

9   cited --

10      Q.    Hmm hmm?

11      A.    -- the conflict of interest was pointed

12   out by the author of the review.

13      Q.    Well, we had just discussed, right, just

14   because there's a conflict, just because a study

15   was sponsored, that's not necessarily problematic;

16   right?

17      A.    The reviewer implied that, and I'm

18   only -- I'm only conveying the sentiment of the

19   reviewer of those papers.

20      Q.    You said, though, "in my opinion."

21      A.    Right.  After I had seen that, I agree

22   with the --

23      Q.    You agree with the --

24      A.    -- the author.

25      Q.    -- reviewer about what?  That the



AMICUS
REPORTING GROUP

1    incidences of conflict were alarming?

2          A.    He brought up the conflicts.  I didn't.

3    So he -- the reviewer brought it up.

4          Q.    You're talking about Sikka and Prielipp

5    in 2014?

6          A.    Yeah.

7          Q.    Okay.

8          A.    Yeah.

9          Q.    Did they call these conflicts of

10   interest alarming?

11         A.    They mentioned it.

12         Q.    They mentioned that there was --

13         A.    They mentioned there were --

14         Q.    -- conflicts; right?

15         A.    -- conflicts of interest.

16         Q.    You called them alarming; right?

17         A.    Well, yes.

18         Q.    Why are they alarming, sir?  I don't

19   understand.  Can you -- you remember we had a

20   discussion, and it was if you sponsor a paper, it

21   may not necessarily be bad, but there are certain

22   things you can do:  collaborating to put a positive

23   spin on a bad result or offering somebody your

24   manuscript to change it.  Those could be seriously

25   alarming.



302

1                    But what was it about these studies

2      that was alarming to you in the conflict of

3      interest?  Is there anything in particular or are

4      you just saying that "Well, they were sponsored so

5      you can't really trust them?"

6           A.    The papers did not reveal anything

7      useful for the -- for the reader.

8           Q.    That seems to be a criticism of their

9      content; right?  You have criticisms that the

10     content wasn't very good?

11          A.    Yeah.

12          Q.    What about their conflict of interest?

13     What about that was alarming?  You called these

14     studies alarming.  And that's a large group of

15     authors that you have said have presented finding

16     which are alarming, and I want to know if you have

17     anything specific whatsoever beyond the fact that

18     some of these studies were funded by different

19     groups and that some people used to work for

20     somebody.  Is there anything specific other than

21     they were sponsored?

22          A.     Well, let me put it this way.  I was

23     expecting them to have come up with better studies,

24     if they were more convincing studies.  And so it's

25     alarming that even though they were funded, they



1    still came up with such poor representations of

2    what they were doing.

3            Q.   All right.  Let's just make it real

4    clear.  Your criticisms of these reports are about

5    their content?  It's not about any conflicts.

6    There's not anything -- can you point to me

7    anything unethical going on with these papers at

8    all?

9            A.   I -- not -- I'm not able to comment on

10   ethics in this case.

11           Q.   Okay.  Okay.  So this whole part about

12   the incidence of interest conflict being

13   alarming --

14           A.   Yeah.

15           Q.   -- no specific evidence?  Nothing in

16   particular?  Correct?

17           A.   Yeah.

18           Q.   Okay.  All right, sir.  I am going to --

19   I hate to have to do this.  We're going to have to

20   mark these because I don't have exhibit numbers.

21   Let's call this Ho 4.

22           **EXHIBIT HO 4 - Email chain dated**

23           **January 24, 2007**

24           BY MR. BANKSTON

25           Q.   You know that the makers of the



1    Bair Hugger, Arizant, they sponsor studies from

2    time to time?  You knew that?

3         A.   If they have, I wasn't aware of them and

4    I wasn't looking for them.

5         Q.   The sponsorship of studies is discussed

6    in Dr. Yadin David's report, isn't it?

7         A.   I don't remember the exact samples.

8         Q.   Okay.  Let me hand you what I've marked

9    as Ho 4.  This is a 2007 email.  And let's read it

10   together from the bottom because that's how it

11   goes.

12        A.   2007 you mean?

13        Q.   2007.  Correct, sir.

14        A.   Yeah.  Yeah.

15        Q.   So we're going to read it from the

16   bottom.  So that's how the order goes.

17        A.   Right.

18        Q.   And you see we have an email, and the

19   signature line tells us it is Albert Van Duren,

20   Director of Clinical Affairs, Arizant Healthcare

21   Incorporated.

22        A.   Right.

23        Q.   Have you heard of Mr. Van Duren before?

24        A.   No.

25        Q.   Okay.  You haven't spoken to him or



1    anything like that?

2        A.   No.

3        Q.   Okay.  You haven't seen his deposition

4    either?

5        A.   No.

6        Q.   Okay.  Mr. Van Duren is communicating

7    with a man named Daniel Sessler.  And that was an

8    author that I had discussed earlier, but you

9    haven't reviewed any of his work in this case;

10   correct?

11       A.   If you say so.

12       Q.   No, if you say so.  Have you reviewed

13   Dr. Sessler, any of his work, Dr. Daniel Sessler?

14       A.   Well, are you asking me because you know

15   there are, so...

16       Q.   I mean, I don't think you have.  But if

17   you have -- I mean, you've told me some things that

18   aren't 100 percent listed in your report.

19       A.   Okay.

20       Q.   And since Dr. Legg's testimony is not in

21   your report, so I didn't know if you had --

22       A.   No.  He's not listed --

23       Q.   Okay.

24       A.   -- as a paper I saw.

25       Q.   Okay.  I want to read what Mr. Van Duren



1    says.

2         A.   All right.

3         Q.   It says:

4              "Good morning, Dan,

5                   Thanks for your cooperation.

6              Just to be clear, I understand that

7              you will not submit this paper for

8              publication until we have had time

9              to study it further.  If you are

10             under any specific time pressure,

11             would you please let me know.  We

12             are actively working on a reply

13             now, but I would like some more

14             time to develop our response.

15                   Thanks, Al."

16                   The next email, from Dr. Sessler, the

17   researcher who has been engaged by the company --

18        A.   Right.

19        Q.   -- says:

20             "Hi Al,

21                   Understood!  We regard this as

22             a collaborative effort to put the

23             best face on a disappointing

24             clinical result.  Rather than a

25             'response,' you can make



AMICUS
REPORTING GROUP

1           suggestions and necessary changes

2           right in the text of the

3           manuscript.  Change tracking is

4           activated so we'll be able to see

5           what you've done.

6               Regards, Dan."

7           Did I read that; correctly?

8      A.    Yeah.

9      Q.    Do you remember when we were talking

10   earlier about there could be problems if a sponsor

11   and an author collaborated to put a positive spin

12   on what they knew was a disappointing clinical

13   result?  Do you remember testifying to that?

14     A.    Hmm hmm.

15     Q.    So you --

16         MR. ASSAAD:        Is that a yes?

17         BY MR. BANKSTON

18     Q.    Is that a yes?

19     A.    Yes.

20     Q.    Okay.  So you would agree with me that

21   in this email that we're seeing about how Arizant

22   conducts its business with respect to a study

23   author, that's a problem?  That's not good?  You

24   would agree with me?

25     A.    Well...



AMICUS

REPORTING GROUP

1      Q.    That's alarming.

2      A.    I cannot comment on just one short

3   communication.  There might have been other things

4   that were said.

5      Q.    Absolutely.  That's a really good point.

6      A.    Yeah.

7            MR. BANKSTON:       Let's mark Ho 5.

8            **EXHIBIT HO 5 - Email chain between**

9            **January 12, 2007, and January 24,**

10           **2007**

11           BY MR. BANKSTON

12     Q.    I want to show you some additional

13   communication, and we'll read it out together.

14   We'll go straight from the bottom again.

15     A.    Is this after this first email?

16     Q.    No, let's see.  Check the time.

17     A.    January 24th and this is 1st, 24th.

18     Q.    And then there's apparently a message

19   here from the 12th.  It's around the same period,

20   in other words, you would agree?

21     A.    Okay.  Well, which one precedes which?

22     Q.    You can see that from the time.  I think

23   there's actually a little bit of conflict between

24   them because I think the exhibit you're looking at

25   now, which is Ho 5, begins on January 12th and ends



AMICUS
REPORTING GROUP

```
 1    on January 24th, but the other email you're looking
 2    at is also January 24th.  So they're in and about
 3    the same time.
 4            A.   Okay.  So this must have come first.
 5            Q.   Well, at least the first message there.
 6            A.   Right.
 7            Q.   It may be a little difficult to tell if
 8    the later message is on the 24th --
 9            A.   Okay.
10            Q.   -- given where people may be in the
11    country and time zones.  I'm not going to
12    definitively represent any of that.
13            A.   Go ahead.
14            Q.   But in terms of that, this is the first
15    initiating email.
16            A.   Right.
17            Q.   Dr. Sessler writes to Mr. Van Duren and
18    says:
19              "Hi Al,
20               I hope you enjoyed the holidays.
21               Best wishes for the New Year!
22               Please find enclosed a draft of the
23               Under-body manuscript.  I look
24               forward to your comments and
25               suggestions.  Change tracking is
```



AMICUS
REPORTING GROUP

1          activated so you can make

2          modifications directly in the text.

3          We also plan to present the

4          enclosed poster at the IARS.

5          Regards, Dan."

6            The next message is from Mr. Van Duren,

7 forwarding it on to other employees, saying:

8          "Gary,

9          Gary and Teri asked me to send this

10          to you for review.  The CRT will

11          meet on Tuesday morning to develop

12          a response strategy."

13            The final email is from Mr. Hansen, and

14 it is addressed to several members of the company.

15 And it states "Subject:  Another Approach with

16 Sessler."  He states:

17          "Al,

18          I was just rereading the email

19          chain and noticed Sessler's

20          original message to you.  He is

21          actually giving us permission to

22          word-smith his text.  This may be

23          the best approach [to take]:  take

24          him at his word and go after the

25          offending parts directly.  And



1           don't be shy about major changes.

2           This would be a good way to get our

3           point across, and he did invite us

4           to do it.  I have made a modest

5           attempt here.  Have at it!"

6       That is an incredibly problematic,

7   alarming email, isn't it, sir?

8       MR. GORDON:          Objection to the

9   form of the question, lack of foundation.

10      A.   Well, you're taking -- you're putting me

11  into a -- into a situation that I'm not familiar

12  with, and I have no familiarity of the work done or

13  the context of the material.  So, again, it's not

14  fair for me to judge, make --

15      BY MR. BANKSTON

16      Q.   So you can -- you are saying to me you

17  can imagine scenarios in which it's totally

18  appropriate for a sponsor of a peer-reviewed

19  scientific paper to take the manuscript from the

20  author and go after offending parts and just change

21  the text?  That's okay?

22      MR. GORDON:          I object to the --

23      BY MR. BANKSTON

24      Q.   That can be okay?

25      MR. GORDON:          I object to the form



1    of the question, it assumes facts not in evidence.

2          BY MR. BANKSTON

3          Q.   Is there any circumstance where that's

4    okay?

5          A.   I don't really know if this actually

6    applies to -- to discussions at hand.

7          Q.   You don't?

8          A.   No.

9          Q.   Okay.

10         A.   Yeah.

11         Q.   So you don't know anything about the

12   conflicts of interest on the nine, ten papers

13   you're criticizing in your report, but I can show

14   you two different emails showing you that Arizant

15   is willing to rewrite and directly edit the

16   manuscript of a peer-reviewed paper, and you don't

17   have any problem with that?

18         MR. GORDON:      I object to the form

19   of the question, argumentative --

20         A.   No.

21         MR. GORDON:         -- assumes facts not

22   in evidence, lack of foundation.

23         A.   Way outside of my area of understanding

24   here.

25         BY MR. BANKSTON



AMICUS
REPORTING GROUP

1        Q.    That is too bad.   Let's talk about...
2    You don't mention any of the conflicts of interest
3    in any of the papers that you cite; correct?
4        A.    Pardon?
5        Q.    Of all the papers that you cite in
6    support of your opinions --
7        A.    Right.
8        Q.    -- you don't cite a single one of the
9    conflicts of interest?   You don't even mention
10   them?
11       A.    Yeah.   I didn't mention it because it
12   was mentioned in the review itself.   And so I'm
13   just --
14       Q.    So you're just repeating --
15       A.    -- summarizing the review.
16       Q.    That's not opinions?   That's just
17   somebody else's opinion?
18       A.    Yeah.   As I've said, I have very little
19   to do with the players.
20       Q.    Let's talk about where you said -- hold
21   on.   No, let's do a little bit of this first.
22   Page 26 of your report.
23       A.    I'm there.
24       Q.    Okay.   The second full paragraph.
25       A.    Yeah.



AMICUS
REPORTING GROUP

1          Q.    It says:  "It can be assumed that in the

2    OR, the nurse is responsible for implementing the

3    Bair Hugger."  Why do you assume that?  How did you

4    come to that assumption?

5          A.    Well, okay, this is pure speculation on

6    my part.

7          Q.    Okay.

8          A.    No basis of fact for it.

9          Q.    Okay.

10         A.    I would assume that the surgeon will

11   be -- will be more interested in the actual

12   operation at hand and the deployment or the

13   implication of the Bair Hugger would not be of his

14   prime interest of concern and it would usually be

15   of somebody else who is more patient comfort

16   oriented.

17         Q.    Okay.  And so when you say that nurses

18   are responsible for implementing the Bair Hugger,

19   that wasn't based on any knowledge about how this

20   all goes down; right?

21         A.    Well, only because of the -- of the

22   paper that was written by the nurse, who sounded

23   like she had some authority over this whole --

24   whole matter.

25         Q.    So you didn't know that the



1    anesthesiologist is the one who has authority over

2    the Bair Hugger and implements its use?

3         MR. GORDON:        I object to the form

4    of the question, lack of foundation, assumes facts

5    not in evidence.

6         A.   I wouldn't know that.

7           BY MR. BANKSTON

8         Q.   Okay.  Part of -- as you go on here you

9    say that "... the literature on its use..." the

10   literature on the Bair Hugger's use, "...is written

11   mostly by personnel who appear to have little to no

12   real day to day contact with the device."  Correct?

13               What authors are you talking about

14   there?  Are you talking about the ones in this list

15   you have here?

16         MR. ASSAAD:        Is that a yes?

17           BY MR. BANKSTON

18         Q.   Is that a yes?

19         A.   Yes.

20         Q.   All right.  Let's talk about those

21   doctors in that list.  You read Dr. Legg's

22   deposition, or a part of it; right?

23         A.   Yeah.

24         Q.   Do you know what he does?

25         A.   What?



1        Q.    Do you know what he does?

2        A.    No.

3        Q.    You don't know what his job is?

4        A.    No.

5        Q.    You just read some deposition testimony

6    in isolation, but you don't have any idea what he

7    does?

8        A.    No.

9        Q.    So you don't know he's an orthopedic

10   surgeon who uses the Bair Hugger almost every day?

11       A.    You tell me.

12       Q.    I am telling you.

13       A.    Yeah.

14       Q.    Did you know who Dr. Hamer is when you

15   started to say about -- talking about Dr. Hamer's

16   study?  Do you know who Dr. Hamer is?

17       A.    No.

18       Q.    Do you know what he does?

19       A.    No.

20       Q.    An orthopedic surgeon.  Orthopedic

21   surgeons typically have some day-to-day

22   interactions with the Bair Hugger, don't they?

23       A.    Well, you're telling me.  I don't know

24   that.

25       Q.    All right.  Well, you're the one who



```
 1    told me that these personnel have little day-to-day
 2    contact with the device.
 3         A.    I'm just making that assumption.
 4         Q.    That's a big assumption, isn't it, sir?
 5    Let's keep going on these authors.  Dr. Reed.  He's
 6    an orthopedic surgeon; right?  Did you know that?
 7         A.    No.
 8         Q.    Did you know that Dr. Belani was an
 9    anesthesiologist?
10         A.    No.
11         Q.    Did you know that Dr. Gauthier
12    (phonetic) was an anesthesiologist?
13         A.    No.
14         Q.    Are you familiar with who Dr. David
15    Lieber (phonetic) is?
16         A.    No.
17         Q.    He's an orthopedic surgeon.  He's rather
18    well known.
19                    Mr. Albrecht --
20              MR. GORDON:        I object to the form
21    of the question.
22         BY MR. BANKSTON
23         Q.    -- you understand --
24              MR. GORDON:        Move to strike
25    counsel's commentary.
```



AMICUS

REPORTING GROUP

1        BY MR. BANKSTON

2        Q.    Mr. Albrecht, he's a statistician, but

3    he helped create the Bair Hugger.  You would agree

4    he probably had some day-to-day interactions with

5    the Bair Hugger; right?

6            MR. GORDON:        I object to the form

7    of the question, lack of foundation.

8            BY MR. BANKSTON

9        Q.    The person who helped create the

10   Bair Hugger probably had some day-to-day

11   interaction with the Bair Hugger?

12       A.    I didn't know he created it.

13       Q.    Yeah, I know.  Let's go to --

14           MR. GORDON:        I object to the form

15   of the question --

16           BY MR. BANKSTON

17       Q.    -- Dr. McGovern.

18           MR. GORDON:        -- argumentative.

19   It's actually snotty, and I move to --

20           MR. BANKSTON:      No.  What's snotty

21   is an expert who comes in here and tells me what

22   literature was written by a person and he doesn't

23   know what he's talking about.

24           MR. GORDON:        Move to strike

25   counsel's commentary and --



AMICUS
REPORTING GROUP

1          MR. BANKSTON:      It's disgusting.

2       BY MR. BANKSTON

3     Q.   Dr. Harper, do you know what he does?

4          MR. GORDON:        You know what?  Wait

5   a minute.  Wait a minute.  Mark, if you're going

6   to --

7          MR. BANKSTON:      This is totally

8   disgusting.

9          MR. GORDON:        -- if you're going

10  to talk about our witnesses being disgusting, this

11  deposition is over.

12         MR. BANKSTON:      All right.  I won't

13  do that anymore.

14         MR. GORDON:        This is not Texas,

15  sir.  This is -- this is being conducted in the

16  District --

17         MR. BANKSTON:      Definitely not.

18         MR. GORDON:        It's being conducted

19  in the District of Minnesota.  We don't -- we don't

20  insult witnesses in the District of Minnesota.

21         MR. BANKSTON:      Okay.

22         MR. GORDON:        And if you do it one

23  more time, this deposition is over.

24         MR. BANKSTON:      Okay.

25    Q.   Dr. McGovern, do you know what he does?



1    You wrote -- you wrote about the doc -- about --

2         A.    Yeah.   Yeah.

3         Q.    -- Dr. McGovern's study; right?

4         A.    Right.   Right.   Right.   Right.

5         Q.    Do you remember what McGovern -- first

6    of all, do you remember what the McGovern study was

7    about?

8         A.    Well, he was a -- a British doctor --

9         Q.    Hmm hmm.

10        A.    -- who report -- reported on using the

11   Bair Hugger.

12        Q.    Do you know what kind of doctor he is?

13        A.    No.

14        Q.    Okay.   He's an orthopedic surgeon.   And,

15   in fact, his study was a retrospective clinical

16   analysis of the use of the Bair Hugger in his own

17   facility.   Do you remember that study, the McGovern

18   study?

19             MR. GORDON:         I object to the form

20   of the question, move to strike counsel's --

21        A.    I read the study.

22           BY MR. BANKSTON

23        Q.    Okay.

24             MR. GORDON:         -- characterization.

25           BY MR. BANKSTON



AMICUS
REPORTING GROUP

 1          Q.    Mr. Harper, Dr. Harper, he's an
 2    anesthesiologist who uses the Bair Hugger.
 3          A.    Right.
 4          Q.    Did you know that?
 5          A.    No.
 6          Q.    Dr. Kimberger, that's an
 7    anesthesiologist who also uses the Bair Hugger.
 8    Did you know that?
 9          A.    Well, how do you know that?
10          Q.    Because I opened the study and it has
11    their names on it and it has what they do.  Do you
12    see here, for instance --
13          A.    Whoa, whoa, whoa.
14          Q.    And I'll just show you.  This is
15    scientific studies.  This is the Darouiche study;
16    right?
17          A.    Time out.  Time out.
18          Q.    I'm asking you a question, sir.
19          A.    Time out.
20          Q.    Okay.  Let's do a time out.
21          A.    When people put names on paper --
22          Q.    Hmm hmm.
23          A.    -- you are implying that they actually
24    put the Bair Hugger on the patient?
25          Q.    Yeah.  Yeah, these gentlemen do.



AMICUS
REPORTING GROUP

1    They're practising orthopedic surgeons.  Yes, sir,

2    that's what I'm saying.  And if you'll notice here

3    on this paper, in Darouiche, at the bottom, see how

4    each author has a point here and it says exactly

5    what they do.

6          A.   Is that the only thing you go by?

7          Q.   I'm sorry, I don't --

8          A.   You actually spoke to the person?

9          Q.   No, sir.  I actually had these people

10   appear for deposition.  And we read their

11   deposition testimony.  And that's something you

12   didn't do; correct?

13         A.   Well, did they actually say they draped

14   the Bair Hugger over the patient?

15         Q.   Sir, did you read the deposition

16   testimony?

17         A.   No.

18         Q.   You don't know, do you?

19         A.   No.

20              MR. GORDON:         Apparently you

21   didn't either, counsel.

22            BY MR. BANKSTON

23         Q.   All right.

24         A.   Well, I find it incredulous that you

25   just make the assumption that because his name



AMICUS
REPORTING GROUP

1    appears on the paper that he actually draped the

2    Bair Hugger over the patient.

3         Q.    No.  All I'm saying is he has day-to-day

4    contact with the device.

5         A.    So?

6         Q.    The orthopedic surgeon has day-to-day

7    contact with the device; right?

8         A.    So?  I got --

9         Q.    You said, sir, let's go back --

10        A.    When I went in an operation, the

11   anesthetic person came and talked to me and used

12   the usual "How are you doing?  Fine," and then he

13   walked away.  I didn't see anybody drape anything

14   over me when I had an operation.

15        Q.    All right.  You will agree with me that

16   every single one of those people that I've just

17   listed has had some day-to-day contact with the

18   device?

19        A.    Contact, okay.

20        Q.    You said in your report --

21        A.    I cannot say -- I cannot even agree with

22   that.

23        Q.    Okay.

24        A.    Because I -- I -- I would like to think

25   that if my job was to administer anesthetics, by



1    golly, I better make sure that all the volumetrics

2    are right, all the sensors are correct.

3         Q.    Do you know where the Bair Hugger is

4    placed in the OR?

5         A.    Well, I get -- I have some impression.

6         Q.    Where is the Bair Hugger?

7         A.    Well, it's placed on -- or close to the

8    patient.

9         Q.    Right.  Near the anesthesiologist;

10   right?

11        A.    Say again?

12        Q.    Near the anesthesiologist?

13        MR. GORDON:          I object, lack of

14   foundation.

15        A.    Probably, yeah.

16        BY MR. BANKSTON

17        Q.    Okay.

18        A.    Yeah.

19        Q.    So page 26, you state that the

20   literature on the Bair Hugger's use "...is written

21   mostly by personnel who appear to have little to no

22   real day to day contact with the device."

23        A.    Yeah.

24        Q.    You have zero basis to say that?

25        A.    I -- I only went along with what the



AMICUS
REPORTING GROUP

1    author, who explained how the Bair Hugger is used

2    in the hospital.

3         Q.    Okay.

4         A.    This lady is a nurse.

5         Q.    Okay.

6         A.    And her -- and her credibility, from my

7    reading, was pretty good.

8         Q.    Okay.  So you think it's refreshing to

9    come across a paper written by a nurse --

10        A.    Yeah.

11        Q.    -- as opposed to these orthopedic

12   surgeons and anesthesiologists who are publishing

13   peer-reviewed papers?

14        A.    Right.

15        Q.    You would rather go with a literature

16   review by a nurse than the actual primary papers --

17             MR. GORDON:        I object --

18          BY MR. BANKSTON

19        Q.    -- themselves?

20             MR. GORDON:        I object to the form

21   of the question, argumentative, it assumes facts

22   not in evidence.

23        A.    Is that a question?

24          BY MR. BANKSTON

25        Q.    It was.  Hmm hmm.



```
 1          A.    What was it?

 2          Q.    You would rather go by a literature

 3    review written by a nurse than primary published

 4    peer-reviewed research by orthopedic surgeons and

 5    anesthesiologists?

 6          A.    I find it useful to read from all

 7    directions, and nurses is one direction that I find

 8    useful.

 9          Q.    Okay.  You said also in your opinion

10    these papers were of uniformly low quality?

11          A.    Right.

12          Q.    Okay.  Let's talk first about

13    Dr. McGovern's study.  Okay?  Dr. McGovern had a

14    study, statistical analysis of clinical outcomes of

15    orthopedic surgeries in a clinical setting.

16          A.    Hmm hmm.

17          Q.    Do you have any expertise in those

18    areas?

19          A.    Say again.

20          Q.    Do you have any expertise in these

21    areas?

22          A.    Me?

23          Q.    Yeah.

24          A.    You know that I don't have it.

25          Q.    I'm then wondering why you think you
```



1    have expertise to evaluate whether that study was

2    low or high quality if you have never had any

3    expertise in performing that kind of study.

4         A.   Okay.

5              MR. GORDON:        Objection.  I object

6    to the form of the question, lack of foundation,

7    argumentative, also assumes facts not in evidence.

8    There were two parts to that study; as you know,

9    counsel.

10             MR. BANKSTON:       Hmm hmm.  And he

11   says it's uniformly --

12        A.   Yeah.

13             MR. BANKSTON:       -- low quality.

14        A.   Are you looking for a response from me?

15           BY MR. BANKSTON

16        Q.   Hmm hmm.

17        A.   Okay.  One of the -- in one of the

18   figures, I don't have it in front of me, he

19   specifically drew a straight line as through the

20   number of, I guess, infections using the

21   Bair Hugger.  Do you follow?

22        Q.   Not really, but that's okay.

23        A.   Well, I can't explain anything else to

24   you if you don't --

25        Q.   I know you're talking about a straight



AMICUS
REPORTING GROUP

1    line --

2         A.    -- if you never read the paper.

3         Q.    -- in his report.

4         A.    Have you read the paper?

5         Q.    Of course I have, sir.

6         A.    Okay.  So imagine it was one of the

7    figures --

8         Q.    Okay.

9         A.    -- that described the use of the

10   Bair Hugger, and then he switched over to another

11   device.

12        Q.    Hmm hmm.

13        A.    Got it?  So here -- here is my immediate

14   skeptical self asking the question in what

15   biological measurement do you ever see

16   straight-line responses.

17        Q.    You understand that that straight line

18   is an average?  It's not the actual data, it's an

19   average plot --

20        A.    Uh-huh.

21        Q.    -- that was created into a straight

22   line?

23        A.    I'm glad you mentioned that.

24        Q.    Hmm hmm.

25        A.    When you start to use data transformed,



1    you are in very shaky ground.

2          Q.    Okay.

3          A.    Data transform.

4          Q.    Let's --

5          A.    And when you put a straight line within

6    a particular time period, am I to believe that you

7    are actually shaping the data in a way that it

8    actually shows what you want to show?

9          Q.    Object as non --

10         A.    Answer me that question.

11         Q.    I don't answer questions, sir.  You

12   answer questions.

13         A.    Exactly.

14         Q.    Object as nonresponsive.

15               My question had nothing to do with

16   what your criticisms of the report were.

17         A.    You did say that.

18         Q.    That was not my question.  My question

19   is what expertise do you have, what expertise --

20         A.    My --

21         Q.    -- do you have to offer --

22         A.    -- expertise --

23         Q.    Sir, I have to finish the question.

24         A.    Yeah.

25         Q.    You can't start answering until I finish



1   the question.

2                     What expertise do you have in the

3   field of retrospective clinical analysis of

4   clinical outcomes to be able to criticise how this

5   paper was conducted and reported?

6        A.    Are you looking for an answer?

7        Q.    After I finish my question.  Yeah, of

8   course.

9        A.    Yeah.  So my response to you again is

10  the same thing.  You actually measure a biological

11  phenomenon, which is what it is in this case.  When

12  you show me a straight-line relationship, feathers

13  would fly.

14       Q.    Okay.  I understand you have criticisms

15  of the report.

16       A.    Yeah.

17       Q.    You have several probably substantive

18  criticisms of the content of the report.

19       A.    Right.

20       Q.    I understand you could probably talk for

21  hours about your criticisms of that report.

22       A.    Right.

23       Q.    What I want to know is not what your

24  criticisms are.

25       A.    Right.



1        Q.    I want to know what in your background
2   before you ever came to this case --
3        A.    Right.
4        Q.    -- made you qualify --
5        A.    Yeah.
6        Q.    -- to criticise a retrospective clinical
7   outcome study.
8        A.    As I've said before, I've mentioned to
9   you that I have experience in biological
10   measurements and responses.
11        Q.    There is no biological measurements in
12   this study, is there?
13              MR. GORDON:        I object to the form
14   of the question.
15        A.    You're measuring infectivity, aren't
16   you?
17           BY MR. BANKSTON
18        Q.    Clinical outcomes is what we're
19   measuring.
20        A.    Infectivity, clinical outcome.  Are you
21   infected, are you not.
22        Q.    You're not an expert in infectious
23   disease?
24        A.    No, but you're measuring a biological
25   phenomenon.



1        Q.    Okay.  So you're pretty much okay on all
2   biological phenomena?
3        A.    Well, there are certain --
4             MR. GORDON:        I object to the form
5   of the question.
6        A.    -- basic principles in biological
7   measurement, is that nothing is a straight line.
8   Take that with you.
9             BY MR. BANKSTON
10        Q.    Okay.  So that is why -- that's the
11   basis for your opinion that the McGovern paper is
12   uniformly --
13        A.    Yeah.
14        Q.    -- low quality, is it contains a
15   straight line?
16        A.    Check it out.  Check it out.
17        Q.    That's -- no.  I'm asking --
18        A.    Ask the man.
19        Q.    I'm not asking to check it out.  I'm
20   asking --
21        A.    Yeah.
22        Q.    -- your basis for saying --
23        A.    Yeah.
24        Q.    -- the McGovern paper --
25        A.    Yeah.



1        Q.    -- is uniformly low quality --

2        A.    Yeah.

3        Q.    -- has a straight line in it?

4        A.    Exactly.

5        Q.    Thank you, sir.

6              MR. GORDON:        I object to the form

7     of the question.

8        A.    And come back to me in five years.

9           BY MR. BANKSTON

10       Q.    You have no clinical background;

11    correct?  Correct?

12       A.    I have no --

13       Q.    Have you ever diagnosed a disease?

14       A.    Never.  I never had to.

15       Q.    Have you ever performed any kind of

16    hazard analysis for a clinical setting?

17       A.    No.

18             MR. GORDON:        I object to the form

19    of the question.

20          BY MR. BANKSTON

21       Q.    Let's talk about page 21.

22                Do you see on 21 you have a

23    Section IV?  It's titled "Observations on

24    Plaintiffs' Experts' Reports?"

25       A.    Yeah.



1          Q.    Now, this is the part of your report

2     devoted to contradicting or rebutting or addressing

3     the subjects identified in some of the plaintiffs'

4     experts' reports that you reviewed?

5          A.    Right.

6          Q.    Correct?

7          A.    Right.

8          Q.    All right.  So, in other words, as

9     opposed to like the earlier part of your report, is

10    Dr. Ho's opinions across the board, this part is

11    directly addressing certain findings that you want

12    to take issue with with the plaintiff?

13         A.    Right.

14         Q.    Okay.  So this is the rebuttal section?

15         A.    Right.

16         Q.    Okay.  Let's talk about Mr. Buck first.

17    I want to ask you a little bit about this first

18    part here, about his use of a certain kind of a

19    particle counter?

20         A.    Right.

21         Q.    And you say that that particle counter

22    measures .3 to 1.2 microns.  Is that what that

23    does?

24         A.    That's what the author claims.

25         Q.    Okay.  So you state on page 5 of his

1    report, he has a -- and I'm going to show you this

2    report.  He has a description of bacterial sizes?

3    Do you see right here, sir?  That's Mr. Buck's

4    report?

5              MR. ASSAAD:         Do you want to mark

6    it?

7         A.   So, so --

8              MR. BANKSTON:       Yeah, let's go ahead

9    and mark that.  Actually if you want to do that

10   real quick.

11        A.   What about it?

12             MR. BANKSTON:       Hold on one second.

13        A.   Yeah.

14             MR. BANKSTON:       Can you mark that

15   Exhibit Ho 6.

16             **EXHIBIT HO 6 - Expert report of**

17             **Michael W. Buck**

18             BY MR. BANKSTON

19        Q.   All right.  So here we have where he has

20   the bacteria chart?

21        A.   Right.

22        Q.   And at the top of the page he says

23   something about .3 to 1.2 microns; right?  What is

24   that -- what is that reference to .3 to

25   1.2 microns?  What is that?  What does he say?  The



1   very top of that page.  Can you read it for me?

2       A.   Yeah.  It says:  "...the vast majority

3   of bacteria range in size from .3 to 1.2 microns."

4       Q.   Okay.

5       A.   Yeah.

6       Q.   And that's -- he's talking about

7   individual bacterium; correct?

8       A.   Right.

9       Q.   He's not talking about clusters?

10      A.   No.

11      Q.   Okay.  So then he did some particle

12  measurements; right?

13      A.   Right.

14      Q.   Is it your contention that his particle

15  measurements were only .3 to 1.2?  Is that what

16  you're saying?

17      A.   No.  I think he had a whole size range

18  that his machine was indicating.

19      Q.   Right.  Well, what I don't understand is

20  it says in your report --

21      A.   Yeah.

22      Q.   -- ".3 to 1.2 micron is not the relevant

23  size range for detecting airborne viable bacteria;"

24  correct?

25      A.   Yeah, I said that.  Yeah.



AMICUS
REPORTING GROUP

1       Q.    Okay.

2       A.    Yeah.

3       Q.    But he did do detection of particles

4   over that size; correct?

5       A.    Yeah.

6       Q.    Okay.  Let's talk about

7   Mr. Koenigshofer.  Do you remember -- and that's on

8   the next page of your report.

9       A.    Are you done with this?

10      Q.    Yeah, sure.  Mr. Koenigshofer, you

11  disagree with his opinion that the Bair Hugger

12  contributes 30,000 CFUs per hour; right?

13      A.    Yeah.  Yeah.  Yeah.  Yeah.

14      Q.    Okay.  That's something -- you can test

15  that, can't you?

16      A.    What do you mean?

17      Q.    That's testable?  That proposition is

18  testable?

19      A.    You want to test what again?

20      Q.    Mr. Koenigshofer's opinion --

21      A.    Yeah.

22      Q.    -- that the Bair Hugger contributes

23  30,000 CFUs per hour.  Can you test that?

24      A.    Yeah.  You're asking me if I can test

25  it?



AMICUS
REPORTING GROUP

1          Q.    Or if one could test it?  If a human

2     being or a team of human beings are capable of

3     testing that.

4          A.    One could set up a measurement system to

5     do that, yes.

6          Q.    Okay.  Another opinion that you disagree

7     with is his opinion that the Bair Hugger filter

8     performance was inadequate with respect to that of

9     the OR.  You disagreed with that opinion; correct?

10         A.    He said that.

11         Q.    Excuse me?

12         A.    He said that.

13         Q.    Right.

14         A.    Yeah.

15         Q.    You disagree with his opinion that the

16    Bair Hugger filter performance was inadequate with

17    respect to the OR?

18         A.    Right.  Yeah.

19         Q.    Okay.

20         A.    Yeah.

21         Q.    And you base that on your assessment of

22    the MERV 14 filter; correct?

23         A.    It's based on my reading the

24    specifications of what a MERV 14 filter should be

25    doing.



1      Q.    Right.

2      A.    Yeah.

3      Q.    And when we looked earlier at the test

4  results, it wasn't doing that, was it?

5           MR. GORDON:       I object to the form

6  of the question.  It mischaracterizes his evidence.

7           BY MR. BANKSTON

8      Q.    Okay.  You remember we -- let's start

9  really basic so we cannot mischaracterize evidence.

10  Do you remember testifying to me that a MERV 14

11  filter is capable of removing all particles between

12  .3 and 1 microns?

13          MR. GORDON:       Objection.

14          BY MR. BANKSTON

15     Q.    You testified to that?

16          MR. GORDON:       Objection, it

17  mischaracterizes his evidence.

18          BY MR. BANKSTON

19     Q.    Sorry, sir, I have to clear up this

20  objection.

21               All right.  Sir, can you please go

22  back with me to page 25 of your report.

23     A.    25?

24     Q.    Are you there?

25     A.    Yeah.



AMICUS
REPORTING GROUP

1        Q.    All right.  Do you remember where we

2   talked about MERV 14 filtration, Section D.?

3        A.    Right.

4        Q.    All right.  Do you remember where it has

5   a standard charts, list the specification for

6   MERV 14?

7        A.    Yeah.

8        Q.    Do you remember that?

9        A.    Yeah.

10       Q.    And do you remember where it says

11  removal of all bacterial particles sized within .3

12  to 1 micron; correct?

13       A.    Right.

14       Q.    And you remember we looked at some

15  filter results?  Do you remember when I showed

16  you -- the first exhibit I showed you today?

17       A.    Yeah.

18       Q.    And do you remember it didn't filter

19  out, it did not stop all of those particles;

20  correct?

21       A.    Does -- does the data that you offered

22  me use bacterial aerosol challenge?  Aha.

23       Q.    Is that -- is that your testimony?  You

24  keep forgetting you don't ask questions here, you

25  just tell me what your opinions are.



1                   You admitted to me earlier --

2          A.    Yeah.

3          Q.    -- that that Bair Hugger filter does not

4     match the specifications you put forth here in your

5     report.  Correct?

6          A.    Well, are you talking about biological

7     particles or all particles?

8          Q.    Removal of all bacterial particles sized

9     within .3 to 1 micron.

10         A.    And the 3M paper that you cited --

11         Q.    Hmm hmm.

12         A.    -- were they using biological bacterial

13    particles?

14         Q.    You tell me.  Do you know?  Do you have

15    any idea?

16         A.    My guess -- if I'm allowed to.

17         Q.    I don't -- I mean, you can guess --

18         A.    Yeah.

19         Q.    -- but I don't know what it's worth.

20         A.    I don't think they were using bacterial

21    particles.

22         Q.    You have no idea, though?  You're just

23    guessing?

24         A.    Yeah.

25         Q.    Okay.  So it could have tested it, it



AMICUS
REPORTING GROUP

1    could have tested it, but we're just guessing

2    instead?

3         A.    Well, you have to compare apples to

4    apples.

5         Q.    I agree.  By testing them?

6         A.    Yeah.

7         Q.    Right.  Okay.  You also disagree with

8    Mr. Koenigshofer's opinion that the hot air from

9    the Bair Hugger will interfere with the downward

10   flow of clean air from the ceiling diffuser.  You

11   said that?

12        A.    I said that.

13             MR. BANKSTON:        Corey, can I get

14   that same stipulation?  He's not here to talk about

15   that, right, the interference of laminar flow?

16             MR. GORDON:        Correct.

17             MR. BANKSTON:        Correct.  Okay.  So

18   that's not going to be an opinion at trial?

19             MR. GORDON:        Correct.

20             MR. BANKSTON:        Okay.  That saves us

21   a little bit, Corey.  All right.  We've talked

22   about that.

23            BY MR. BANKSTON

24        Q.    Okay.  Let's talk about Dr. David,

25   Dr. Yadin David.  One of his opinions was that the



1    interior of the Bair Hugger could harbor bacteria

2    or it could introduce bacteria to the flow of the

3    air.  You disagree with that opinion?

4         A.   I do.

5         Q.   I believe is it -- tell me if this is

6    your opinion or not.  You believe that the interior

7    of the machine, that there's not sufficient liquid

8    or moisture content to maintain a growth

9    environment of microbial populations?

10        A.   That's correct.

11        Q.   Okay.  Do you know anything about the

12   liquid or moisture content inside of the

13   Bair Hugger?

14        A.   Do I know?

15        Q.   Hmm hmm.

16        A.   All I know is that it has no liquid.

17        Q.   Okay.  Let's talk about the Bair Hugger

18   gets used during the day, the surgery goes on, it's

19   blowing air, and then it gets turned off; right?

20        A.   Right.

21        Q.   And then it gets left overnight.

22        A.   Right.

23        Q.   The air inside that Bair Hugger, do you

24   know how humid it is?

25        A.   I don't know that.  I do not know that.



AMICUS
REPORTING GROUP

 1          Q.    Okay.

 2          A.    Do you?

 3          Q.    Page 26, let's talk a little bit about

 4   that Kellam study.  So this is going to go back to

 5   that nurse.  We have that nurse who did a

 6   literature review, remember?

 7          A.    Yeah, Kellam.

 8          Q.    Okay.  So before I go into this one --

 9   this is a 2013 study -- do you remember we talked

10   about 2017, the Oguz study?  Do you remember that

11   study?

12          A.    Yeah.

13          Q.    Do you remember where the authors made

14   the recommendation that a large-scale clinical

15   trial needed to be done?

16          A.    Yeah.

17          Q.    Okay.  Let's look at what Kellam says.

18   And let's see if this is quoted on here.  I believe

19   it is.  I'll try to get you where I'm talking

20   about.  All right, there we go.

21                 Towards the -- on 26, towards the

22   bottom of the last full paragraph.

23          A.    You're looking at my --

24          Q.    At your report, at 26.  Correct.

25          A.    26, yeah.



1    Q.    Towards the last couple of sentences --

2    A.    Right.

3    Q.    In fact this may be the last whole

4    sentence of Kellam's conclusion.

5    A.    Right.

6    Q.    Which is:

7         "Given the efficacy of these

8         devices in preventing inadvertent

9         perioperative hypothermia,

10        practitioners should continue to

11        use and clean forced-air warming

12        systems according to the

13        manufacturer's instructions until

14        large" --

15        Excuse me.

16        -- "... until well conducted,

17        large-scale trials can further

18        examine the issue."

19        Correct?

20    A.    That's a quote.

21    Q.    Right.  That's what Ms. Kellam said;

22    right?

23    A.    Right.

24    Q.    The nurse that you thought was very

25    credible?



AMICUS
REPORTING GROUP

1         A.    Right.

2         Q.    Okay.   That was four years ago; correct?

3         A.    Yeah.

4         Q.    You have a date in front of you, don't

5    you?

6         A.    Yeah.   It's right here.

7         Q.    Four years ago?

8         A.    Yeah.

9         Q.    Are you aware if there's ever been in

10   that time period a large-scale trial to examine

11   this issue?

12        A.    I'm not aware of it.

13        Q.    Okay.

14        A.    Do you?

15        Q.    Yeah.

16             MR. BANKSTON:      Go ahead and --

17   let's see.   Number 6.

18             MR. ASSAAD:       Do you need 6?

19             MR. BANKSTON:      Yeah, I need 6 right

20   now.

21          BY MR. BANKSTON

22        Q.    Sir, I understand that you haven't seen

23   3M internal documents in this case?

24        A.    That's correct.

25        Q.    And I know this isn't something that you



AMICUS
REPORTING GROUP

1    relied on?

2         A.    Correct.

3         Q.    And I know what I'm about to show you,

4    you have no idea what it is?

5         A.    Correct.

6         Q.    Okay.  But I want to ask you some

7    semi-hypothetical questions about some things that

8    I've seen in 3M documents, okay, and see if you

9    have any expertise on these issues.

10             MR. GORDON:        I just want to make

11   sure it's clear, he previously testified he had

12   seen test reports showing compliance with MERV 14.

13             MR. BANKSTON:        Where -- where was

14   that?  What did he see?  Do you know what he saw?

15             MR. GORDON:        I don't remember

16   what it was, but, I mean --

17             MR. BANKSTON:        Is it cited in the

18   report somewhere?

19             MR. GORDON:        Yeah, there's some

20   reference to it.

21             MR. BANKSTON:        Okay.  Yeah, I think

22   there is.  There's some sort of -- is there a Bates

23   No.?  I don't know if there is, though.

24             MR. GORDON:        I don't know.

25             MR. BANKSTON:        Yeah, okay.  So --



1          MR. GORDON:        To my knowledge,

2     Mark, that was the only three --

3          MR. BANKSTON:        The only thing.

4     Okay.

5          BY MR. BANKSTON

6     Q.    So, again, I know you didn't review

7     this.  And, again, I'm not holding you to

8     understanding everything you've seen in these

9     documents.  I'm just trying to figure out if I can

10    pick out some expertise out of it.  Okay.

11         MR. BANKSTON:        So let's go ahead

12    and mark this as Ho 6.

13         MR. GORDON:        That will be 7.

14         COURT REPORTER:        That will be 7.

15         MR. BANKSTON:        Oh, we're on 7.

16    Yeah, okay.  Ho 7.

17         **EXHIBIT HO 7 - Internal document**

18         **from 3M**

19         BY MR. BANKSTON

20    Q.    All right, Mr. Ho.  I have shown you a

21    document here.  It's an internal document from 3M

22    that was produced to us during this litigation.

23    And as you see here, there's some bullet points,

24    what I believe has been described to me as sort of

25    brainstorming.  And there's some points on here



AMICUS
REPORTING GROUP

1    that I want to ask some terms about with you and

2    see what you think about.

3              First of all, do you see the

4    section that says "Overall Nightmares?"

5        A.    I see that.

6        Q.    Okay.  And then there's a section that

7    says "Hose-end filtration;" right?

8        A.    Right.

9        Q.    And it says "seamless mitigation of

10   contamination concerns;" correct?

11       A.    I see that.

12       Q.    All right.  Do you have any opinions

13   about whether a filter on the hose end of the

14   Bair Hugger is feasible and/or desirable?

15       MR. GORDON:          Objection, lack of

16   foundation and also vague.

17       A.    Yeah, it's -- I can't answer a question

18   like that because, as I say, I haven't examined a

19   Bair Hugger.

20       BY MR. BANKSTON

21       Q.    Okay.

22       A.    I haven't measured characteristics from

23   it.

24       Q.    So from a device design standpoint, you

25   don't have opinions to offer in this case; correct?



AMICUS

REPORTING GROUP

```
 1         A.    No.
 2         Q.    Okay.  By the same token, I'm sure the
 3    answer is probably the same here, except it may be
 4    different because of some statements in your
 5    report.  And I want to direct you to the last
 6    bullet point of that nightmare section.
 7         A.    Right.
 8         Q.    And it says:  "Using HEPA filter."
 9         A.    Right.
10         Q.    Now, I do believe you do have the
11    opinion that a HEPA filter is not needed?
12         A.    That is echoed by Kowalski.
13         Q.    Right.
14         A.    Yeah.
15         Q.    So that was the Kowalski used to support
16    your theory that HEPA is overkill on this device in
17    this application?
18         A.    Correct.
19         Q.    Okay.  Do you see the next section that
20    says "Contamination/ABAD?"
21         A.    I see the title, yeah.
22         Q.    Okay.  Have you ever heard the term
23    "ABAD," the acronym ABAD?
24         A.    What does it mean?
25         Q.    Oh, it's Augustine biomedical and
```



```
 1    design.  It's the competitor.

 2          A.    Okay.

 3          Q.    Okay.  Do you see where it says:

 4    "Recall of units for contamination issues?"

 5          A.    I see that.

 6          Q.    Do you have any opinions about what a

 7    device manufacturer should do in terms of recalls

 8    or anything like that?

 9          A.    What are they recalling?  Are they

10    recalling something else outside of the

11    Bair Hugger?

12          Q.    No, this is a discussion of the

13    Bair Hugger, sir.  I'm not asking you if they

14    should or shouldn't recall the Bair Hugger or

15    anything like that.  What I'm trying to understand

16    is just narrow down what your topics are.  You're

17    not going to be testifying about when a company

18    should or should not recall a product?

19          A.    Right.

20          Q.    Okay.  The next --

21          MR. GORDON:        Foundation

22    objection, but you -- I know you --

23          MR. BANKSTON:      Yeah.  I cleared it

24    up.  Exactly.  That was the point of my question,

25    was to establish no foundation.
```



AMICUS

REPORTING GROUP

1          BY MR. BANKSTON

2          Q.    The next bullet point I want to ask you

3     about is do you see the one that says:  "Definitive

4     study showing FAW as source of SSI?"

5          A.    I see that.

6          Q.    Okay.  So in your mind now, you would

7     agree with me there is not currently a definitive

8     study that conclusively proves that forced-air

9     warming causes infections?  That doesn't exist

10    right now?

11         A.    Clarify --

12         Q.    One more time.  I'll say it one more

13    time.

14         A.    Yeah.

15         Q.    You would agree with me that currently

16    there does not exist a definitive study that

17    conclusively establishes that forced-air warming

18    causes infections?  That doesn't exist?

19         A.    It does not exist.  Nothing shows that

20    it causes infections.

21         Q.    In fact we've seen repeated urgings by

22    researchers that such studies needed to be

23    conducted?

24         A.    Right.

25         Q.    Okay.  Do you see then later on it says:

1    "Someone does a real study on FAW & contamination;"
2    correct?
3         A.   I see that.
4         Q.   Would you agree with me that nobody's
5    really done a real study on forced-air warming and
6    contamination yet?
7              MR. GORDON:      I object to the form
8    of the question, lack of foundation, assumes facts
9    not in evidence.
10        A.   Why do you say that?
11           BY MR. BANKSTON
12        Q.   I'm asking you if you agree.
13        A.   If I agree nobody has done a study?
14        Q.   Done a real study on forced-air warming
15   and contamination, yes, sir.  Do you agree with
16   that statement?
17        A.   I can't comment on that because it's --
18   I don't know what the implications are.  I can't
19   comment on it.
20        Q.   All right.  Assume for me in a moment in
21   a hypothetical this document, which talks about
22   overall nightmares and contamination and ABAD --
23        A.   Yeah.
24        Q.   -- assume for me for a moment --
25        A.   Yeah.



1        Q.    -- that this statement, someone does a

2   real study on forced-air warming and contamination,

3   assume with me for a moment that that means the

4   company is worried about that, is that problematic

5   to you?

6            MR. GORDON:        I object --

7          BY MR. BANKSTON

8        Q.    Would that be problematic to you?

9            MR. GORDON:        I object to the form

10  of the question, lack of foundation.

11       A.    That would be a stretch, isn't it?

12         BY MR. BANKSTON

13       Q.    What's that?

14       A.    That would be a stretch to say that.

15       Q.    It would be very strange, wouldn't you

16  agree, if the company wanted to avoid a real study

17  on forced-air warming and contamination?

18       A.    I can't -- I can't say you can make that

19  statement at all.

20       Q.    Okay.  Like let's -- just -- just from a

21  hypothetical, away from this document standpoint,

22  would you agree with me that if scientific

23  literature is urging scientific study on a product

24  and a manufacturer intentionally seeks to avoid

25  that, that's not necessarily a good thing, is it?



1          A.   Oh, I don't know.

2          Q.   Okay.

3          A.   It's just --

4          Q.   You're not going to have any opinions

5     about that?

6          A.   Yeah.  No.

7          Q.   I also wonder, in addition to the

8     published research that you cited, were you aware

9     that multiple experts -- multiple consultants

10    retained by the company had advised them also to do

11    bacterial sampling studies?

12               MR. GORDON:        I object to the form

13    of the question, lack of foundation, assumes facts

14    not in evidence.

15         A.   Am I aware of it?

16           BY MR. BANKSTON

17         Q.   Yeah.  Did you hear about that?

18         A.   No.

19         Q.   Okay.  Were you aware that 3M's medical

20    director testified in this case that there had been

21    a decision made at a high level not to do clinical

22    research on this topic?

23         A.   I wouldn't know that.

24               MR. GORDON:        I object to the form

25    of the question, it assumes facts not in evidence,



1    in fact contrary to the evidence.

2         A.   I wouldn't know that.

3              MR. BANKSTON:     Okay.  Let's take a

4    little break here.

5              THE VIDEOGRAPHER:  We are going off the

6    record.  The time is 2:53 p.m.

7    (ADJOURNMENT)

8              THE VIDEOGRAPHER:  We are back on

9    record and the time is 3:14 p.m.

10             BY MR. BANKSTON

11        Q.   All right.  I have now handed you what

12   has now been marked as --

13             Have we marked that yet?  No, we

14   need to stop and mark it.  All right.

15        **EXHIBIT HO 8 - Study of a joint**

16        **project between the Iowa State**

17        **University and the China**

18        **Agricultural University**

19        BY MR. BANKSTON

20        Q.   All right.  I have handed you what's

21   been marked as Ho Exhibit 9 (sic).  This is a study

22   of a joint project between Iowa State University

23   and the China Agricultural University.  Do you see

24   that?

25        A.   Right.



AMICUS
REPORTING GROUP

1          Q.    It's a study from 2013.  The title is

2    the "Concentrations and Size Distributions of

3    Airborne Particulate Matter and Bacteria in an

4    Experimental Aviary Laying-Hen Chamber;" correct?

5          A.    Correct.

6          Q.    Okay.  So basically what these

7    scientists did is examined an area that produces

8    natural biological presentation:  a chicken coop?

9          A.    Right.

10         Q.    And you would expect to find bacteria in

11    a chicken coop; correct?

12         A.    Right.  Right.  Right.

13         Q.    There's biological matter that chickens

14    are defecating in the coop itself.  So that

15    produces -- when we talk about the popcorn makers,

16    the chickens themselves are popcorn makers inside

17    this; correct?

18         A.    Right.

19         Q.    Okay.  Now, there's two things I want to

20    talk to you about in this study, and the first one

21    was regarding the size of airborne bacteria.  And

22    you'll notice that one of the findings was that the

23    majority, in fact 95 percent, of the particles were

24    carried by particles larger than 3 microns;

25    correct?



1      A.    Right.

2      Q.    That's not surprising to you; right?

3      A.    Hmm hmm.

4      Q.    And by extension that means that in this

5   study, when they did airborne sampling, they found

6   that 5 percent of the free-floating bacterial

7   particles were smaller than 3 microns; correct?

8      A.    That's what they claim.

9      Q.    Correct.  Okay.

10     A.    Yeah.

11     Q.    Now, they in this study used a

12   bioaerosol impactor.  You're familiar with that

13   device, I would assume?

14     A.    Am I allowed to comment on the material

15   after you ask questions?

16     Q.    Yeah, we'll get -- we'll get on there.

17     A.    Yeah.

18     Q.    Absolutely.

19     A.    Yeah.

20     Q.    I'm just going down the steps --

21     A.    Right.

22     Q.    -- of what this study is.  They used a

23   bioaerosol impactor.

24     A.    Right.

25     Q.    Correct?



1        A.    Right.

2        Q.    Okay.  Have you used that device before?

3        A.    Yes.

4        Q.    In general or have you actually used --

5        A.    It's called an Anderson impactor.

6        Q.    An Anderson impactor.  Okay.  That's

7    something you have experience with.  Okay.

8              Now, their claim is that they

9    sampled airborne microorganisms in several size

10   categories; correct?

11       A.    That's the feature of the Anderson

12   impactor.

13       Q.    Okay, great.  So, in other words, the

14   size distributions, the different sets of sizes,

15   and in this case I'm going to list them off really

16   quick.

17       A.    Don't do that because I already know

18   what they are.

19       Q.    You know what they are.  So my question

20   was --

21       A.    Yeah.

22       Q.    -- the size distribution sets --

23       A.    Right.

24       Q.    -- those are inherent to the impactor

25   itself?



1        A.    Yeah.

2        Q.    It always measures in those sets?

3        A.    Correct.

4        Q.    Okay.  Now, some of those size

5    measurements are submicron sized; correct?

6        A.    Well, the Anderson is really not

7    designed for measuring submicron size.

8        Q.    Okay.

9        A.    Yeah.

10        Q.    Then there's another size that's about 1

11    to 2 microns?

12        A.    Yeah.

13        Q.    Right.  And that was the size that we

14    had talked about that, before in your report, that

15    biological aerosols can present as 1 to 2 micron

16    sizes?

17        A.    Right.

18        Q.    Okay.  So --

19              MR. GORDON:        It's actually 1 to

20    2.5.

21          BY MR. BANKSTON

22        Q.    Sure.  Sure.  And so they could even go

23    up a little bit more.  And in fact what we're

24    seeing here is that when they start to really

25    cluster and accumulate, they can be considerably



AMICUS
REPORTING GROUP

1    bigger.  They can go to 3 to 4 or 4 to 7 or even
2    greater than 7?
3           A.    Right.
4           Q.    Right.  You would agree with me that in
5    a typical environment that has airborne bacteria in
6    it, there's a good chance you're going to find
7    biological particles that are 10 microns or
8    greater?
9           A.    Correct.
10          Q.    Okay.  So far, in terms of those things
11   that the study is saying, you don't have any
12   problem with any of that; right?
13          A.    As I've said, maybe I should get to it
14   sooner as to what errors they would have made in
15   coming to their data.
16          Q.    Okay.  Now, when we talk about the
17   errors that they made in coming to their data --
18          A.    Yeah.
19          Q.    -- let's separate out their different
20   data.  And one of the data points that they espouse
21   here --
22          A.    Yeah.
23          Q.    -- is that they collected and measured
24   concentrations of airborne bacteria by size?
25   That's one of the things they say they did?



AMICUS
REPORTING GROUP

1        A.    Right.  Yeah.

2        Q.    Can you tell me what, if any, you think

3   there are errors in the methods -- methodology on

4   which they measured the size of airborne bacteria?

5        A.    Number 1, they did all right when they

6   were using the APS to measure size distribution and

7   they did all right even to convert it into a mass

8   concentration.  Do you follow?

9        Q.    Hmm hmm.

10       A.    Okay.  Where they actually make a

11   mistake was to use the Anderson impactor -- instead

12   of using a traditional agar plate on each stage,

13   they did not.  They put liquid on each stage and

14   took the liquid and broke it up to measure

15   individual organisms.  That's not what an Anderson

16   is designed to do.

17       Q.    Okay.  So how would that affect the

18   results?  Can you explain how that would maybe skew

19   them, or whatever it did?

20       A.    I -- I don't really know how -- how it

21   would have skewed the data, but the actual design

22   of the instrument is for you to count how many

23   colonies are -- are impacted on the agar plate and

24   count actual colonies and then it's actually a

25   sizing instrument.  It sizes different stages.  So



AMICUS
REPORTING GROUP

1    the top stage will be one size, the second stage

2    and so on.  And that is what you interpret by

3    aerosol in different size groups, giving you

4    certain numbers.  And you can interpret the

5    probable numbers from how many positive hits you

6    got.

7          Q.   Okay.

8          A.   And you go to a standard table, it is a

9    statistical thing, you're just guessing now how

10   many positive Os.  You go down the table and you

11   say, oh, this would be what concentration of

12   particles there would be.  Again, it's an

13   estimation.

14         Q.   Okay.

15         A.   It wasn't designed for you to impact

16   particles onto a liquid surface and then mash it up

17   and then measure how many organisms there are in

18   the liquid.

19         Q.   Okay.

20         A.   And that's where they fall -- fell

21   apart.

22         Q.   When they were measuring the number of

23   organisms you're saying?

24         A.   Right.

25         Q.   Okay.



AMICUS
REPORTING GROUP

1          A.    Yeah.

2          Q.    Now, when it comes to size

3     distribution --

4          A.    Yeah, there's nothing wrong with the

5     size distribution.

6          Q.    That's what I was actually going to ask.

7          A.    With the different stages of the

8     Anderson, it does what it's supposed to do.

9          Q.    In other words, it produced results in

10    terms of size distribution that you would have

11    expected?

12         A.    Yeah.  If he actually -- if they

13    actually went in and talk about the size

14    distribution from the Anderson, fine, perfect.

15    That's the way you do it.

16         Q.    It's what they did after that that you

17    have a problem with?

18         A.    Right.

19         Q.    I figured that might be the case.  What

20    I want to talk about first, though, is when they

21    say that 5 percent of biological presentation can

22    be smaller than 3 microns and that 95 percent of

23    biological presentation is over 3 microns, that's

24    not terribly surprising?

25         A.    Yeah, that's fine.



1        Q.    Okay.  One of the things that I think

2    you're going to disagree with, and I would like you

3    to -- if you look at the bottoms of the pages, you

4    can see on the bottom right-hand corner there are

5    some numbers.  Can you go to 1499.

6        A.    Yeah, I'm on 99.

7        Q.    Okay.

8        A.    Yeah.

9        Q.    And you see this is where they talk

10   about the relationship of airborne particle mass

11   and bacteria; correct?

12       A.    Yeah.

13       Q.    We had talked earlier in this deposition

14   about several studies which you disagreed with that

15   found a relationship, a correlation, between the

16   existence of particles and the existence of biomass

17   in the air; right?

18       A.    Right.

19       Q.    Okay.  This study here under the section

20   that we're reading, and the section that's

21   highlighted, reads:  "The airborne [bacterial]

22   concentration...", CFU metres cubed, "...and..."

23   particle mass concentration -- or particulate mass

24   concentration maybe, which is measured by

25   milligrams to metres cubed, "...followed linear



1   relationships ... for all ranges.  No significant

2   differences in such relationships were detected

3   among the subranges."

4                    This conclusion here, is this the

5   conclusion that you contend is suspect because of

6   their use -- the way they use the machine?

7        A.   If I were a reviewer, I would -- I would

8   tell them that this statement cannot be made.

9        Q.   Okay.

10       A.   Because of the reasons I just gave you.

11       Q.   Okay.  So, according to you, this is --

12   these sets of authors, like the other studies that

13   we've seen --

14       A.   Yeah.

15       Q.   -- these are other ones where you're

16   saying they don't know what they're doing?

17       A.   They just make an error in assumption.

18       Q.   Right.  Okay.  So like Darouiche, like

19   Raval, like Stocks, like Mr. Olmsted, these authors

20   you also are saying are disagreeing with you

21   incorrectly?

22            MR. GORDON:        Well, he didn't read

23   Olmsted or comment on Olmsted.

24            BY MR. BANKSTON

25       Q.   Well, I mean, with respect, do you



1    remember Mr. Olmsted's email which described the

2    Stocks paper as fairly remarkable and all of that?

3         MR. GORDON:          I'm sorry.

4         A.    That's an opinion, isn't it?

5         BY MR. BANKSTON

6         Q.    Sure.  Yeah.  And you disagree with that

7    opinion?

8         A.    Yeah.

9         Q.    Okay.  This is another one of those

10   kinds of papers, but this one, your methodological

11   problem with it is it involves around the way in

12   which the impactor was used --

13        A.    Right.

14        Q.    -- is that correct?

15        A.    Right.

16        Q.    Okay.  I want to hand you again -- this

17   was previously marked as Exhibit 27.  This is the

18   Gregory Stocks and his team's research.  And I

19   think --

20        A.    We've seen this before?

21        Q.    We talked about this in the deposition

22   earlier.

23        A.    Right.

24        Q.    And the reason I'm handing it to you

25   again --



AMICUS
REPORTING GROUP

1        A.    Yeah.

2        Q.    -- is because I believe when we were

3   first talking about it we really didn't know if we

4   were going to have ample time to really go in depth

5   on this.  And it's my understanding that you have

6   several methodological criticisms of this paper.

7   Can you let me know what those are?

8        A.    Yeah.  It's the way they treated the

9   data.  They got the raw data, and it would appear

10  by the description they didn't -- the raw data

11  didn't fit the expectations.  So they did a square

12  root transform of -- of the data set.  That's

13  unconventional.  I'm not saying outright wrong, but

14  unconventional.

15       Q.    Okay.

16       A.    If one were to perform data transform

17  for biological numbers -- because biological

18  numbers are traditionally big numbers, like

19  100,000, a million -- you do a log transform.  Are

20  you familiar with log transform?

21       Q.    Hmm hmm.

22       A.    You log base ten.  So that way you

23  always bring those numbers back into what we call a

24  normal distribution.  And it is very important to

25  understand normal distributions because how you



AMICUS
REPORTING GROUP

1    treat normally or not normally distributed data
2    could -- could distort what you see.
3                    And so for reasons unknown, they
4    chose to square root the raw data so that things
5    would get squeezed together.
6         Q.    Okay.
7         A.    And -- and from so doing they managed to
8    squeeze things together rather than stretch out
9    that far.  And now they think that, okay, we can
10   fit everything within Figure 1.
11        Q.    And you're saying, in other words, there
12   was a manipulation in how the data was presented to
13   create a false impression?
14        A.    "Manipulation" is a strong term --
15        Q.    Okay.
16        A.    -- because data transform is a
17   legitimate thing to do.
18        Q.    Okay, sure.
19        A.    Everybody does that.  But you have to
20   respect the way that data transform is done.
21        Q.    Would you say it's more appropriate to
22   say that you have concerns because the data
23   transfer --
24        A.    Yeah.
25        Q.    -- was unconventional?



AMICUS
REPORTING GROUP

1          A.   The data transform was unconventional.

2          Q.   Okay.

3          A.   In my experience, I haven't come across

4    anybody doing a square root of biological data.

5          Q.   Okay.  So that's something that you're

6    not familiar with.  It seems to be unconventional

7    in the kind of studies that you know about?

8          A.   Right.

9          Q.   You can't tell me that that's

10   necessarily an error; correct?

11         A.   It's -- to be polite you don't want to

12   say it's an error, but it actually shows up on the

13   final results.

14         Q.   Okay.

15         A.   Figure 1.

16         Q.   Okay.

17         A.   You notice that in Figure 1 it

18   essentially had all scatter points within the

19   graph, but, as usual, when you supply the data into

20   any piece of software, it will always plot a line,

21   best-fit line, for you.

22         Q.   Okay.

23         A.   And look at, again, the 95 percent

24   confidence level is way out here.  And that tells

25   you right away that it's mostly random observations



 1   that you're seeing.

 2        Q.    Okay.  Is that a basic -- do you think

 3   that's a fair summary of what your basic

 4   methodological problems with this study are?

 5        A.    Yeah.

 6        Q.    Okay.  Let's talk a little bit -- I kind

 7   of want to conclude by understanding sort of your

 8   core opinions, and I want to make sure I understand

 9   them now that we've talked for a good amount of

10   time.  And one of those is you hold the opinion

11   that the Bair Hugger is reasonably safe for the

12   purpose that it's being used?

13        A.    Again, I didn't say that.

14        Q.    Okay.

15        A.    I simply say that there is no good

16   experimental data that suggests that there is

17   anything wrong with it.

18        Q.    Well, I guess really what I'm asking is

19   are you going to put your credentials on the line,

20   your sort of willful force and weight of your

21   expertise --

22        A.    Yeah.

23        Q.    -- to tell this jury --

24        A.    Right.

25        Q.    -- "I assure you this product is safe?"

372

1    Are you going to be saying that?

2         A.    I can say that.

3         Q.    Okay.  In other words, to make an

4    assurance in this case that you believe with

5    reasonable medical certainty or reasonable

6    scientific certainty, you believe that you can

7    assure the jury this product is safe?

8         A.    I can.

9         Q.    Okay.  With respect to the filter, you

10   also are going to be claiming that the filter is

11   adequate for its application?

12        A.    I can -- I can say that.

13        Q.    Okay.  And I think, just to summarize a

14   couple of other of your major opinions, one of the

15   other things we discussed very heavily today is

16   your belief that particles are not a proxy or a

17   surrogate for bioburden?

18        A.    That's correct.

19        Q.    Okay.  And then another sort of core end

20   of your opinions is we discussed the number of

21   studies which you either find helpful or of bad

22   quality.  And so a generous portion of your

23   opinions is an evaluation and judgment call on the

24   quality of the literature around the Bair Hugger?

25             MR. GORDON:       I object to the form



1    of the question.

2         BY MR. BANKSTON

3         Q.    Is that correct?

4         A.    Is that a question?

5         Q.    Yes, that is a question.  Your

6    opinion --

7         A.    Yeah.

8         Q.    -- a significant apportion of your

9    opinions in this case --

10        A.    Yeah.

11        Q.    -- revolve around an evaluation and a

12   judgment on the quality of the scientific

13   literature relating to the Bair Hugger?

14        A.    Correct.

15        Q.    Okay.  And that means not just -- for

16   instance, you know there's been biological sampling

17   testing done with the Bair Hugger?  That's one of

18   the studies that you would look at?

19        A.    There were some, yeah.

20        Q.    Okay.  And that's something you have

21   direct experience in doing?

22        A.    Right.

23        Q.    Okay.  You understand that there are

24   other studies that are clinical in nature; correct?

25   They involve patient outcomes rather than



AMICUS

REPORTING GROUP

1    biological sampling.

2         A.    Right.

3         Q.    Okay.  You understand that there are

4    other experiments going on with the Bair Hugger

5    that involve fluid dynamics and the movement of

6    air?

7         A.    There are, yeah.

8         Q.    Okay.  And you feel qualified to dispute

9    the findings of those studies as well?

10        A.    Yes, and I don't think you want to hear

11   my opinion either.

12        Q.    Oh, no, you might be mistaken there.  I

13   didn't actually think you had an opinion regarding

14   the disturbance of air, and we may have to work

15   that out later, but do you feel qualified to

16   discuss fluid dynamics?

17        A.    No.

18        Q.    Okay.  Now, I've covered some of the

19   main core opinions, and I'm not going to try to

20   hold you to this, I'm not meaning this to like box

21   you out, but do you think in my summary there, have

22   I missed a core proposition?  Is there a really

23   important proposition in your report that I didn't

24   just summarize?  Like is there some major theme

25   that I'm missing?



1          A.    You touched on everything.

2          Q.    Okay.  In coming to deliver those

3    opinions, can you briefly describe to me the

4    methodology that you used to come to those

5    opinions?

6          A.    Come again.

7          Q.    Scientists, people who deliver

8    scientific opinions --

9          A.    Right.

10         Q.    -- must apply a methodology to reach

11   those opinions; correct?

12         A.    Right.

13         Q.    Can you tell me, in reaching the

14   opinions that you delivered in this case, in your

15   report, can you describe for the jury what your

16   methodology consists of?

17         A.    Well, you look at the way the

18   experiments were done and you look at the way the

19   conclusions were drawn and you get the impression

20   that in all the studies very few of them were

21   credible.  In fact most of them were outright

22   wrong.  And so when you -- and you can also go to

23   look at other publications in the field, and we

24   found that a few of the claims were supported by

25   open literature publications.



1        Q.    Would it be correct then to say -- and I
2    understand those are your findings.
3        A.    Yeah.
4        Q.    Would it be correct to say that the
5    methodology that you employed in this case was
6    reading scientific literature and then coming to
7    your own personal opinion about whether that
8    scientific literature was credible or not?
9        A.    Well, that was the amount of time given
10   to me to perform the task.
11       Q.    Okay.
12       A.    So it would have to be yes.  But that's
13   the job --
14       Q.    That's -- that's the sum of the work
15   you've done in this --
16       A.    That's the job at hand.
17       Q.    Right.  That's the sum of the work
18   you've done in this case?
19       A.    Right.
20       Q.    Let's say that I am a person who wants
21   to figure out if you're right or wrong.  I want to
22   know is Dr. Ho correct about this stuff.  Is he
23   right about his opinions on this literature?
24       A.    Yeah.
25       Q.    How do I figure that out?  How can I



1    test if you're right?

2         A.    Very simple.  There are probably half a

3    dozen to ten people around the world who have done

4    by aerosol measurement like -- like we did.  I say

5    "we" meaning the community.  And we spent, as I've

6    said, 30 years at it.  So you can probably go pick

7    out my colleagues and check each one -- each one

8    out and say, "Okay, do you agree with this opinion

9    or based on your experience or what you have done

10   would this be correct?"

11        Q.    All right.  So the way to test your

12   opinion --

13        A.    Yeah.

14        Q.    -- and the truth or scientific validity

15   of it or not --

16        A.    Yeah.

17        Q.    -- is to go take your opinion and give

18   it to another expert?

19        A.    Yeah.  Remember now you are measuring

20   biological aerosols in all areas.  Like natural

21   resources, indoors, outdoors, chamber studies.  You

22   have to have experience in all those areas so that

23   it allows you to form the opinion as to what is

24   credible and what isn't.  Is that fair?

25        Q.    Yeah, sure.



1        A.    Yeah.

2        Q.    In other words, your opinions today are

3   not the result of testing or specific research that

4   you've done or published research you've done in

5   the past, it's more of a product of your general

6   expertise in the area?

7        A.    Well, you -- you would have done

8   measurements, you would have done studies, you

9   would have published on it.  And then all -- all

10  the experience that the person has would be

11  distilled into looking at what is being offered,

12  and that's how you make a judgment.

13       Q.    All right.  You understand that in

14  certain scientific endeavors you might have

15  something like a rate of error.  Like certain types

16  of studies have a rate of error.  Are you familiar

17  with that before?

18       A.    Hmm hmm.

19       Q.    When you're giving opinions to me

20  today --

21       A.    Yeah.

22       Q.    -- in your report --

23       A.    Yeah.

24       Q.    -- do you have any idea what the rate of

25  error on giving those kind of opinions might be, or



1   how I could figure that out?

2       A.   Well, I think you are being too clinical

3   in wishing for rate of error in numeric type

4   quotation, but you could find ten of my colleagues,

5   as I mentioned --

6       Q.   Hmm hmm.

7       A.   -- and find out how many of them

8   disagree with what I said.  You probably could find

9   one out of the ten that might say, "Oh, I don't

10  think I can agree with him 100 percent."  Nothing

11  in life is sure; right?

12      Q.   Sure.

13      A.   So I'll be very happy if I -- if I get

14  nine people going along with me.

15      Q.   Okay.  Another thing I wanted to ask, if

16  I wanted to see if your opinions were correct or

17  not, there are tests I could do for certain of your

18  opinions; right?

19      A.   Hmm hmm.

20      Q.   Like we could set up certain tests that

21  would address some of these issues?

22      A.   Yeah.

23      Q.   Okay.  One application of the technology

24  that you've developed for 30 years, one application

25  could be bacterial sampling in an orthopedic



1    implant surgery using different methods of patient

2    warming to study the risk of peri-prosthetic joint

3    infection?  That's one application you could make

4    of your technology?

5              MR. GORDON:          I'm going to object

6    to the form.

7         A.   Yeah, it's a bit of a stretch to say

8    that.

9              BY MR. BANKSTON

10        Q.   Okay.  What about just generically?

11   Could your application of your technology, could

12   you take it into an operating room and do bacterial

13   sampling?

14        A.   Well, I did cite one of our -- our

15   papers in which we simulated the environment of an

16   operating room using a wind tunnel.

17        Q.   Okay.

18        A.   So if you read that paper, you would get

19   the impression as how we would approach the

20   experiment --

21        Q.   Hmm hmm.

22        A.   -- how we analyzed the data, and how we

23   correlate the biological numbers with particle

24   numbers --

25        Q.   Hmm hmm.



1        A.    -- and actually submitted that to proper
2    statistical analysis.
3        Q.    Okay.  So you could do that same process
4    in an operating room using a -- using a dual test?
5    You could test with the Bair Hugger in the room and
6    you could test using another warming technology,
7    and you could perform bacterial sampling?  That's
8    something you're capable of doing?
9        A.    If one were to pursue that, it could be
10   done.
11       Q.    In fact you're one of the very few
12   people in the world who could do that?
13       A.    That might have been true.
14       Q.    And then you've been hired in this case,
15   but you have not done that in this case?
16       A.    That wasn't my mandate.
17            MR. BANKSTON:      Okay.  I think we
18   can let you get on your plane.  Hopefully I'll be
19   able to make mine too.
20       A.    Thank you very much.
21            MR. GORDON:      I want to ask just
22   about two quick questions.
23            MR. BANKSTON:      Oh, and I was going
24   to say, if you wanted to, I know -- I think --
25   isn't there a time when Dr. Ho has to be in



AMICUS
REPORTING GROUP

1    Minnesota coming up pretty soon?  If you wanted to
2    do an hour with him or something like that, I
3    wouldn't be opposed to that.
4              MR. GORDON:        I don't --
5              MR. BANKSTON:      Okay.  If you don't
6    need it, go for what you got, but...
7              MR. GORDON:        You're right,
8    though, he's going to be teaching his course at the
9    University of Minnesota --
10             MR. BANKSTON:      Yeah.  I was just
11   thinking in --
12             MR. GORDON:        -- in August?
13        A.   Yeah.  The third week in August.
14             MR. BANKSTON:      I would be -- I
15   would be happy to have somebody attend.  I wouldn't
16   mind that, if we needed to do it to get everybody
17   to their flight.  But if you just have a few
18   questions, I think we'll be all right.
19             MR. GORDON:        You know what?  I'm
20   going to take you up on that.
21             MR. BANKSTON:      Take me up on my
22   offer?  Yeah.
23             MR. GORDON:        Yeah, I think that's
24   a good offer.  So we'll continue this until -- if
25   we need to.



```
1          A.    What was the offer?
2                MR. BANKSTON:        The offer is maybe
3     when you're in Minnesota --
4          A.    Yeah.
5                MR. BANKSTON:        -- later this
6     year --
7          A.    Yeah.
8                MR. BANKSTON:        -- we'll spend
9     another hour in a room together.
10         A.    Oh, you'll fly --
11               MR. BANKSTON:        It might not be
12    me --
13         A.    Yeah.
14               MR. BANKSTON:        -- doing the -- but
15    it will be probably Corey asking you a couple of
16    more questions, something like that.
17         A.    That would be good if some of you sign
18    up for the course.
19               MR. BANKSTON:        We could do that.
20               MR. GORDON:          Actually, you know
21    what, this really shouldn't take --
22               MR. BANKSTON:        It's short?  Go for
23    it.
24               MR. GORDON:          -- it really
25    shouldn't take --
```



AMICUS
REPORTING GROUP

1          MR. BANKSTON:       All right.  Go for

2     it.

3          MR. GORDON:         -- more than five

4     minutes.

5        BY MR. GORDON:

6     Q.   I want to -- take a look at Exhibit 360.

7     A.   6-5?

8          MR. GORDON:         Did you take back

9     what was formerly marked as Exhibit 360?

10         MR. BANKSTON:       Yes, I have a copy.

11         MR. GORDON:         If you don't mind.

12         MR. BANKSTON:       Yeah.  There you go.

13        BY MR. GORDON

14     Q.   You looked at this earlier, I think it

15     was actually this morning.  This was a 3M test

16     report.  If you could turn to page 5 of 12.

17     A.   5 of 12, yeah.

18     Q.   Okay.  And that chart there, that MERV

19     parameters chart, do you see that Table 1?

20     A.   Yeah.

21     Q.   Have you previously reviewed any chart

22     that's set out MERV specifications?  Like would --

23     I honestly don't remember.  Is that same chart in

24     Kowalski?

25     A.   Yeah.  I saw the Kowalski chart, yeah.



AMICUS
REPORTING GROUP

1        Q.    Okay.

2        A.    Yeah.

3        Q.    If you look under MERV 14 --

4        A.    Right.

5        Q.    -- what's the percentage efficiency

6    required for particles of 0.3 to 1.0 microns?

7        A.    It says 75 here.

8        Q.    And what's that numeric symbol after 75?

9        A.    It's a little fuzzy.  Is that

10   efficiency?

11        Q.    Right.  But is it greater than or less

12   than or --

13        A.    Oh, greater than -- lesser than or equal

14   to.

15        Q.    Okay.  And for -- so the efficiency

16   should be greater than or less than 75 percent?

17        A.    Right.

18        Q.    No, that is the question.

19        A.    Lesser than or equal to.

20        Q.    The efficiency -- the efficiency is on

21   the right-hand side of the equation, so that's why

22   I'm -- is that saying --

23             MR. GORDON:        Thank you for not

24   objecting to my --

25             MR. BANKSTON:        I know.  I'm giving



```
 1   you a little latitude.
 2            MR. GORDON:        Yeah, you are.
 3            MR. BANKSTON:      I'm not going to do
 4   too much more.
 5        BY MR. GORDON
 6        Q.   For it to be MERV 14 it has to be
 7   greater than or equal to 75 percent efficiency;
 8   correct?
 9            MR. BANKSTON:      Objection, leading
10   to --
11        A.   No, I think that's a lesser --
12            MR. BANKSTON:      You're lucky.  I let
13   you have that one, Corey.
14            MR. GORDON:        I just wanted to ask
15   him.
16            MR. BANKSTON:      I know.  I know.
17        BY MR. GORDON
18        Q.   Okay.  I'm sorry?
19        A.   It's a lesser sign.
20        Q.   The 75 is less than the efficiency;
21   right?
22        A.   Okay.
23        Q.   So the efficiency -- the relationship of
24   efficiency to the 75 would be what?
25        A.   I'm not sure what you're looking for.
```



AMICUS
REPORTING GROUP

1        Q.    Greater or equal or lesser?  In other
2    words, we've got the 75 --
3        A.    Yeah.
4        Q.    -- then a symbol, and then efficiency?
5        A.    Lesser than or equal to.
6        Q.    Efficiency should be lesser than or
7    equal to 75 or greater than or equal to 75?
8        A.    It looks like it's equal to or less
9    than.
10       Q.    Well, so is it your understanding that
11   if a MERV filter doesn't -- filters 0 percent of
12   the particles in the size range, that that would be
13   what this is calling for?  Or does it need to
14   filter more than 75 percent of the filter -- of the
15   particles in the size range?
16       A.    I think it looks like it's up to
17   75 percent of the size range.
18       Q.    Okay.  Now, if you would look back to
19   the page that you looked at before, which is page 8
20   of 12.  The same document.  Turn to page 8 of 12.
21       A.    Yeah.
22       Q.    And in this -- oh, that wasn't the one
23   we looked at.  Yeah, I think it was.  For particle
24   size 0.3 to 1.0, what were the efficiency --
25   efficiencies in those --



AMICUS
REPORTING GROUP

1          A.    Average.

2          Q.    -- four different tasks?

3          A.    It's like 83.

4          Q.    That was the first one.  What about the

5    second one?

6          A.    83, 82, 75, 76, 78.

7          Q.    Oh, I'm sorry, you're looking -- are you

8    looking at the average?

9          A.    Yeah.

10         Q.    I was looking at the printout.  Okay.

11   So were any of those numbers less than 75 percent?

12         A.    No.

13         Q.    Okay.  Counsel asked you about your

14   ability to do tests, microbiological tests, going

15   into an operating room a couple of minutes ago.  Do

16   you remember that?

17         A.    Right.

18         Q.    What kind of equipment would that

19   involve?

20         A.    You mean what would be used to actually

21   measure the biological particles in the room?

22         Q.    Yes.

23         A.    A slit sampler would be appropriate.

24         Q.    Not the technology you developed for the

25   Canadian defence forces?



AMICUS
REPORTING GROUP

1         A.    My instrument measures viable,

2    potentially live particles in realtime.

3         Q.    Could that type of equipment be used in

4    an operating room?

5         A.    Yeah, it could tell you if you -- in

6    realtime if you have any live organisms floating

7    around.

8         Q.    I have no idea what this equipment looks

9    like.  Is it bigger than a bread box?  Is it --

10   could it fill a room?

11        A.    It's not unlike the coffee -- the coffee

12   urn, but twice -- twice the use.

13        Q.    Okay.  So it's fairly small?

14        A.    Yeah.  Yeah.

15        Q.    It's portable?

16        A.    Yeah, fairly small.  The footprint is

17   maybe one and a half times and the height is about

18   one and a half times.

19        Q.    Okay.  So if we were to ask you to do

20   that kind of testing between now and trial, that's

21   something you could do?

22        A.    Between now and trial?  Yeah.  Yeah, it

23   could be done.  Whereabouts would it be done?

24        Q.    I don't know.  I'm just...

25        A.    Yeah.



AMICUS
REPORTING GROUP

1        Q.   Mr. Bankston has planted the seed.

2        A.   It could be done.  Yeah.

3        MR. GORDON:        I know we didn't

4    have time to do that before, but maybe --

5        A.   Now, bear in mind you want to -- you

6    want to use that instrument in conjunction with a

7    real live slit sampler to capture the live agents

8    to correlate the two datasets.

9        Q.   Okay.

10       A.   Yeah.

11       MR. GORDON:        Okay, thank you.  I

12   have nothing further.

13       MR. BANKSTON:        All done.  The only

14   thing I would add at the end is I would request the

15   witness read and sign.

16       MR. GORDON:        Yes.

17       MR. BANKSTON:        All right.

18       A.   Are we done?

19       MR. BANKSTON:        We are all finished.

20   Off the record.

21       THE VIDEOGRAPHER:  We are going off the

22   record.  The time is 3:47 p.m.

23   _____

24       (Proceedings ended at 3:47 p.m.)

25   _____



AMICUS

REPORTING GROUP

1    Certificate of Transcript

2

3

4    I, the undersigned, hereby certify that the

5    foregoing pages 1 to 390 are a complete and

6    accurate transcript of the proceedings taken down

7    by me in shorthand and transcribed from my

8    shorthand notes to the best of my skill and

9    ability.

10                    Dated at the City of Calgary,

11   Province of Alberta, Canada, this 8th day of July,

12   2017.

13

14

15

16

17                        ___"D. Gerbrandt"_____

18                        D. Gerbrandt, CSR(A)

19                        Official Court Reporter

20

21

22

23

24

25



1                        ERRATA SHEET

| Page | Line | Change | Reason for Change |
|------|------|--------|-------------------|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

21    I, the witness herein, do hereby certify and declare
      under penalty of perjury the within and foregoing
22    transcription to be my deposition in said action;
      that I have read, corrected and do hereby affix my
23    signature to said deposition.

24                   _____
                     JIM HO
25                   Dated this ____ day of _____, 2017



AMICUS
REPORTING GROUP

**JIM HO – June 28, 2017**

**$**

**$600** [1] - 8:14
**$750** [2] - 8:15, 20:12

**'**

**'017** [1] - 202:11
**'16** [1] - 202:12
**'17** [1] - 202:22
**'90s** [1] - 18:7
**'artificial** [1] - 38:10
**'judging'** [1] - 282:23
**'response** [1] -
306:25

**0**

**0** [2] - 209:11, 387:11
**0.2** [1] - 218:7
**0.3** [2] - 385:6,
387:24
**00** [1] - 216:7
**0000001** [1] - 150:12
**04** [1] - 216:7

**1**

**1** [57] - 3:12, 36:6,
36:13, 38:25, 43:13,
44:13, 45:10, 46:21,
47:20, 57:23, 58:15,
58:22, 59:24, 60:2,
60:7, 60:15, 65:4,
65:11, 65:13, 66:2,
66:6, 66:20, 112:13,
137:22, 168:18,
169:8, 174:10,
174:11, 174:15,
174:20, 187:9,
187:13, 187:23,
188:12, 285:18,
287:8, 287:14,
288:16, 289:5, 289:8,
289:20, 290:11,
291:22, 291:23,
292:1, 339:12,
340:12, 341:9,
360:10, 360:15,
360:19, 362:5,
369:10, 370:15,
370:17, 384:19, 391:6
**1.0** [2] - 385:6,
387:24
**1.2** [7] - 218:14,
334:22, 335:23,
335:25, 336:3,
336:15, 336:22
**1/2** [1] - 41:17
**10** [11] - 37:19,
38:13, 39:13, 40:14,
40:22, 40:25, 41:20,
41:21, 61:1, 65:15,
361:7
**10-minute** [1] -
209:11
**100** [3] - 167:17,
305:18, 379:10
**100,000** [1] - 368:19
**1010** [1] - 2:3
**10:34** [1] - 142:7
**10:51** [1] - 142:10
**11:32** [1] - 190:1
**11:53** [1] - 190:4
**12** [8] - 4:6, 21:1,
22:13, 308:9, 384:16,
384:17, 387:20
**12:33** [1] - 235:5
**12th** [2] - 308:19,
308:25

**14** [30] - 49:6, 49:8,
57:7, 57:16, 58:2,
58:9, 58:11, 59:19,
59:20, 59:23, 60:13,
60:19, 66:18, 68:7,
68:8, 68:23, 69:5,
71:25, 72:8, 72:17,
92:3, 187:2, 338:22,
338:24, 339:10,
340:2, 340:6, 347:12,
385:3, 386:6
**1499** [1] - 365:5
**15** [7] - 113:12,
126:4, 126:6, 126:7,
126:8, 131:9, 183:9
**15-2666** [2] - 1:14,
5:6
**16** [9] - 35:24, 36:1,
45:9, 47:13, 47:15,
47:16, 68:16, 68:17,
253:22
**16-person** [1] -
253:23
**1600** [1] - 2:3
**17** [4] - 241:14,
241:17, 284:11,
284:12
**175** [1] - 102:5
**18** [2] - 254:12, 294:6
**187** [1] - 3:12
**1990s** [3] - 10:2,
10:19
**1993** [1] - 242:8
**1:10** [1] - 235:7
**1:13** [2] - 236:1,
236:4
**1st** [3] - 237:8,
237:11, 308:17

**2**

**2** [39] - 3:19, 37:19,
38:12, 39:13, 40:13,
41:3, 41:6, 41:11,
41:17, 41:20, 41:21,
42:2, 42:16, 43:4,
44:15, 48:2, 65:4,
168:18, 200:11,
200:14, 200:15,
200:17, 258:3, 258:4,
258:6, 258:7, 285:19,
287:9, 287:14,
288:16, 289:5, 289:9,
289:20, 290:10,
291:22, 291:23,
292:1, 360:11, 360:15
**2,000** [2] - 97:2,
161:20
**2.5** [9] - 36:6, 36:13,
43:13, 44:13, 45:10,
46:21, 47:20, 169:8,
360:20
**20** [4] - 238:23,
254:5, 261:11, 261:12
**200** [2] - 2:8, 3:19
**2002** [1] - 251:19
**2007** [9] - 4:4, 4:7,
303:23, 304:9,
304:12, 304:13,
308:9, 308:10
**2009** [2] - 252:23,
300:4
**2010** [1] - 176:25
**2013** [2] - 344:9,
357:1
**2014** [1] - 301:5
**2016** [8] - 134:6,
135:7, 164:9, 202:8,
202:15, 202:20,
203:6, 203:7

**2017** [5] - 1:23, 5:7,
203:10, 344:10,
391:12
**21** [4] - 261:11,
271:21, 333:21,
333:22
**24** [5] - 4:4, 4:7,
57:11, 303:23, 308:9
**24th** [5] - 308:17,
309:1, 309:2, 309:8
**25** [8] - 57:8, 57:12,
89:15, 90:17, 90:23,
298:5, 339:22, 339:23
**2500** [1] - 2:13
**26** [17] - 176:8,
183:16, 186:9,
202:15, 202:20,
203:7, 297:6, 297:8,
298:5, 298:6, 313:22,
324:19, 344:3,
344:21, 344:24,
344:25
**265** [1] - 4:1
**27** [2] - 172:25,
367:17
**28th** [3] - 1:22, 5:7,
236:15
**296** [1] - 111:22
**298** [2] - 135:23,
136:8
**299** [4] - 135:23,
136:8, 137:15, 137:16
**2:53** [1] - 356:6

**3**

**3** [51] - 3:6, 4:1,
57:23, 58:14, 58:22,
59:24, 60:3, 60:6,
60:15, 63:22, 64:4,
65:4, 65:10, 65:13,
65:15, 66:2, 66:6,
66:19, 68:3, 68:9,
69:11, 102:3, 265:18,
285:22, 271:23,
285:19, 287:9,
287:14, 288:17,
289:6, 289:9, 289:20,
289:24, 290:9,
291:22, 291:23,
292:2, 334:22,
335:23, 335:24,
336:3, 336:15,
336:22, 339:12,
340:11, 341:9,
357:24, 358:7, 361:1,
364:22, 364:23
**30** [5] - 12:3, 21:4,
238:23, 377:6, 379:24
**30,000** [2] - 337:12,
337:23
**303** [1] - 4:4
**308** [1] - 4:6
**335** [1] - 4:9
**348** [1] - 4:11
**356** [1] - 4:13
**360** [6] - 61:7, 61:8,
61:9, 62:15, 384:6,
384:9
**381** [1] - 3:7
**390** [1] - 391:6
**3:14** [1] - 356:9
**3:47** [2] - 390:22,
390:24
**3M** [49] - 2:11, 4:11,
5:21, 13:14, 20:11,
20:14, 20:15, 27:1,
30:8, 30:9, 30:12,
63:8, 102:6, 112:3,
138:24, 176:9,

176:21, 177:14,
222:16, 222:24,
229:5, 230:4, 230:12,
230:17, 230:24,
233:1, 237:16,
238:25, 239:5, 239:7,
239:11, 239:20,
241:8, 241:11,
286:20, 286:25,
296:1, 296:2, 296:5,
296:10, 296:11,
341:10, 346:23,
347:8, 348:18,
348:21, 384:15
**3M's** [4] - 136:18,
208:21, 295:9, 355:19
**3M-published** [1] -
30:9
**3MBH** [1] - 63:12
**3MBH01617180** [1] -
137:19

**4**

**4** [14] - 4:4, 60:3,
65:4, 173:23, 206:23,
215:21, 215:25,
218:18, 258:12,
303:21, 303:22,
304:9, 361:1
**40** [4] - 89:17,
261:25, 262:12,
262:24
**431** [1] - 2:13
**4409** [1] - 2:8
**48** [4] - 64:3, 64:6,
64:20, 104:19

**5**

**5** [18] - 4:6, 65:4,
91:2, 193:7, 211:17,
215:21, 218:9,
218:10, 218:18,
274:11, 308:7, 308:8,
308:25, 334:25,
358:6, 364:21,
384:16, 384:17
**50** [1] - 77:4
**505** [2] - 253:6,
253:11
**505E** [3] - 141:10,
253:6, 253:7
**52** [1] - 33:14
**55415** [1] - 2:13

**6**

**6** [9] - 4:9, 218:18,
218:22, 335:15,
335:16, 346:17,
346:18, 346:19,
348:12
**6-5** [1] - 384:7
**60** [1] - 90:21
**612-343-3200** [1] -
2:14
**68.1%** [1] - 209:11

**7**

**7** [15] - 4:11, 82:13,
82:16, 82:18, 135:16,
135:17, 141:4, 141:6,
348:13, 348:14,
348:15, 348:16,
348:17, 361:1, 361:2
**7.05** [1] - 218:7
**713-221-8300** [1] -
2:4

**713-523-0001** [1] -
2:9
**75** [14] - 67:10,
385:7, 385:8, 385:16,
386:7, 386:20,
386:24, 387:2, 387:7,
387:14, 387:17,
388:6, 388:11
**750** [5] - 102:24,
138:25, 140:10, 141:8
**76** [1] - 388:6
**77002** [1] - 2:3
**77006** [1] - 2:8
**775** [2] - 63:23, 64:2
**78** [3] - 67:13,
190:22, 388:6

**8**

**8** [13] - 4:13, 135:16,
135:17, 287:24,
288:17, 289:8,
292:14, 292:24,
292:25, 293:5,
356:15, 387:19,
387:20
**8.2** [2] - 68:21, 69:5
**81%** [1] - 141:9
**82** [2] - 67:7, 388:6
**83** [3] - 67:4, 388:3,
388:6
**89** [1] - 63:15
**8:14** [1] - 5:1
**8:15** [1] - 5:8
**8th** [1] - 391:12

**9**

**9** [4] - 110:10,
163:19, 163:21,
356:21
**90** [1] - 150:13
**95** [4] - 215:22,
357:23, 364:22,
370:23
**96** [2] - 63:17, 63:18
**97** [1] - 68:24
**97%** [1] - 69:7
**99** [2] - 66:14, 365:6
**99.97** [1] - 68:2
**9:12** [1] - 62:6
**9:20** [1] - 62:10

**A**

**a.m** [8] - 5:1, 5:8,
62:6, 62:10, 142:7,
142:10, 190:1, 190:4
**ABAD** [3] - 350:23,
353:22
**abbreviation** [3] -
12:17, 64:8, 64:10
**ability** [6] - 178:2,
178:5, 182:14,
182:19, 388:14,
391:10
**able** [17] - 17:21,
21:14, 43:3, 58:13,
68:15, 74:20, 90:4,
111:4, 119:8, 173:11,
186:16, 211:9,
246:15, 303:9, 307:4,
330:4, 381:19
**about..** [2] - 297:6,
313:1
**above-styled** [1] -
1:19
**absolute** [4] - 42:21,
56:5, 71:18, 77:9
**absolutely** [11] -

**JIM HO - June 28, 2017**

41:17, 72:12, 136:4,
142:23, 144:11,
167:4, 178:18,
181:12, 228:21,
308:5, 358:18
**absolutism** [1] -
41:15
**abstract** [2] - 15:12,
185:4
**academic** [1] - 245:4
**accept** [1] - 17:25
**acceptable** [4] -
3:15, 188:2, 188:16,
192:10
**accepted** [2] - 203:6,
244:3
**accepting** [1] - 23:12
**according** [17] -
58:12, 59:19, 60:18,
69:5, 85:8, 86:3, 89:9,
115:10, 136:18,
175:12, 215:11,
249:3, 260:3, 260:10,
260:12, 345:12,
366:11
**account** [1] - 267:11
**accumulate** [1] -
360:25
**accurate** [5] - 36:11,
128:24, 129:9,
129:12, 391:7
**accuse** [1] - 296:24
**accusing** [1] -
224:23
**achievable** [1] -
265:9
**achieved** [1] - 11:6
**Acinetobacter** [5] -
102:25, 103:12,
104:12, 106:3, 106:12
**acquire** [1] - 11:25
**acquired** [1] - 9:15
**acronym** [1] - 350:23
**actions** [1] - 1:15
**activated** [2] - 307:4,
310:1
**active** [1] - 125:13
**actively** [2] - 97:16,
306:12
**activity** [2] - 146:22,
271:9
**actual** [16] - 33:9,
158:21, 178:2,
178:15, 178:19,
178:24, 182:15,
182:20, 218:17,
221:20, 222:1,
314:11, 325:16,
328:18, 362:21,
362:24
**ad** [2] - 181:22,
224:20
**add** [5] - 128:25,
146:25, 147:1,
162:21, 390:14
**addition** [1] - 355:7
**additional** [1] -
308:12
**address** [4] - 24:25,
102:14, 160:1, 379:21
**addressed** [1] -
310:14
**addressing** [4] -
19:14, 25:11, 334:2,
334:11
**adequate** [15] - 49:9,
60:19, 71:21, 71:25,
72:3, 72:8, 72:17,
73:3, 73:6, 74:1, 74:9,

74:17, 74:19, 74:22,
372:11
**adequately** [3] -
139:2, 139:22, 140:11
**ADJOURNMENT** [4]
- 62:8, 142:8, 190:2,
356:7
**administer** [1] -
323:25
**admitted** [1] - 341:1
**adopt** [1] - 11:3
**advanced** [1] - 9:7
**advice** [1] - 143:19
**advisical** [1] - 355:10
**advocate** [2] - 8:23,
296:10
**aerobiology** [5] -
25:15, 25:17, 25:21,
74:15, 199:17
**aerosol** [23] - 9:10,
9:12, 9:21, 10:9,
10:13, 14:25, 21:5,
42:13, 45:12, 47:3,
48:1, 48:11, 48:19,
56:19, 145:6, 145:8,
164:8, 211:3, 240:19,
249:24, 340:22,
363:3, 377:4
**aerosol..** [3] - 36:7,
36:15, 47:22
**aerosols** [25] - 10:7,
10:16, 11:5, 24:20,
27:12, 33:19, 33:22,
33:25, 35:25, 37:17,
37:22, 38:10, 39:12,
39:18, 40:3, 40:13,
40:17, 46:3, 46:8,
48:7, 78:22, 107:25,
169:8, 360:15, 377:20
**Affairs** [1] - 304:20
**affect** [9] - 148:18,
149:24, 191:24,
194:7, 194:17, 196:3,
234:5, 247:24, 362:17
**affected** [2] - 96:11,
148:17
**afraid** [2] - 200:1,
259:4
**afterwards** [2] -
104:16, 104:18
**agar** [3] - 242:20,
362:12, 362:23
**agency** [1] - 79:16
**agenda** [2] - 214:22,
215:5, 215:13
**agent** [1] - 175:2
**agents** [13] - 11:9,
11:12, 12:16, 14:23,
15:24, 22:25, 39:16,
40:21, 43:15, 145:23,
222:1, 390:7
**ago** [5] - 236:13,
236:22, 346:2, 346:7,
388:15
**agree** [116] - 8:19,
9:22, 10:9, 10:16,
12:2, 15:17, 21:21,
24:3, 24:18, 27:25,
28:19, 36:4, 36:11,
41:8, 41:9, 41:25,
47:5, 55:7, 55:11,
55:14, 55:18, 56:3,
65:25, 66:4, 68:8,
69:14, 75:8, 75:18,
76:1, 76:17, 76:23,
82:8, 87:15, 113:14,
113:18, 113:22,
138:11, 139:20,
140:9, 140:18,
140:24, 142:12,

143:1, 144:15,
144:20, 150:15,
151:21, 154:7,
154:10, 164:18,
167:15, 167:18,
168:4, 169:20, 173:1,
173:5, 173:9, 174:23,
177:21, 178:15,
181:1, 181:9, 182:25,
194:17, 195:13,
208:17, 208:20,
208:22, 208:23,
217:13, 220:12,
247:16, 253:2, 254:7,
265:20, 256:9,
256:24, 259:1,
261:19, 264:19,
264:23, 265:12,
271:10, 271:13,
271:18, 274:24,
275:6, 275:22,
277:15, 281:4, 283:3,
283:8, 283:13,
283:17, 300:21,
300:23, 307:20,
307:24, 308:20,
318:3, 323:15,
323:21, 342:5, 352:7,
352:15, 353:4,
353:12, 353:13,
353:15, 354:16,
354:22, 361:4, 377:8,
379:10
**agreed** [3] - 79:1,
256:16, 279:20
**agreeing** [1] - 281:24
**Agricultural** [3] -
4:15, 356:18, 356:23
**aha** [1] - 340:22
**ahead** [10] - 48:13,
172:23, 211:25,
234:14, 281:17,
282:2, 309:13, 335:8,
346:16, 348:11
**aim** [2] - 94:13,
294:14
**aim..** [1] - 294:12
**Air** [1] - 1:7
**air** [95] - 5:4, 10:11,
10:14, 10:17, 17:14,
26:5, 26:7, 28:16,
46:3, 46:8, 48:21,
53:25, 54:17, 74:20,
75:12, 76:6, 78:22,
78:25, 79:24, 80:7,
80:22, 85:2, 89:4,
90:9, 91:15, 94:8,
96:3, 104:19, 113:12,
114:4, 116:19, 139:3,
139:23, 140:12,
155:19, 157:21,
158:12, 158:13,
159:23, 165:6, 165:9,
166:10, 170:20,
171:17, 186:18,
194:2, 194:17,
194:23, 195:8, 196:2,
196:17, 214:11,
221:14, 222:1,
242:11, 253:12,
262:1, 262:12,
262:25, 270:16,
271:15, 272:9,
272:13, 272:18,
272:23, 273:12,
274:25, 275:19,
276:7, 277:15,
279:21, 279:24,
281:2, 281:6, 282:7,
282:11, 282:24,

283:16, 283:24,
342:8, 342:10, 343:3,
343:19, 343:23,
345:11, 352:8,
352:17, 353:5,
353:14, 354:2,
354:17, 365:17,
374:6, 374:14
**air-warming** [1] -
194:2
**airborne** [31] - 3:13,
3:14, 41:10, 50:11,
187:25, 188:1,
188:14, 188:15,
192:9, 193:16,
196:22, 201:22,
202:10, 203:20,
207:2, 207:15,
207:19, 208:5,
208:25, 242:20,
242:21, 336:23,
357:21, 358:5, 359:9,
361:5, 361:24, 362:4,
365:10, 365:21
**Airborne** [4] - 3:20,
200:17, 203:14, 357:3
**airflow** [11] - 74:22,
141:9, 141:13, 163:8,
163:12, 166:8,
166:20, 247:23,
248:21, 253:16,
271:17
**AI** [5] - 136:22,
306:15, 306:20,
309:19, 310:17
**al** [11] - 3:12, 3:19,
134:5, 134:13,
134:14, 135:10,
164:9, 168:8, 187:23,
188:13, 200:16
**AI's(mine** [1] - 137:2
**alarm** [1] - 255:4
**alarmed** [1] - 299:21
**alarming** [18] -
299:3, 299:5, 299:9,
299:19, 300:5, 301:1,
301:10, 301:16,
301:18, 301:25,
302:2, 302:13,
302:14, 302:16,
302:25, 303:13,
308:1, 311:7
**Albert** [1] - 304:19
**Alberta** [1] - 1:22,
5:13, 391:12
**Albrecht** [21] - 117:8,
284:16, 284:24,
285:18, 285:19,
286:12, 287:8,
287:14, 288:17,
289:8, 289:9, 291:5,
292:2, 292:5, 294:8,
295:3, 296:24,
317:19, 318:2
**Albrecht's** [4] -
213:4, 288:8, 291:21,
300:4
**alerting** [2] - 43:14,
43:17
**alerts** [1] - 201:23
**allegation** [3] -
158:15, 159:24,
159:25
**allegations** [1] -
160:7
**alleged** [1] - 165:5
**allergic** [1] - 40:23
**allow** [2] - 68:9,
123:3
**allowed** [3] - 270:23,

341:16, 358:14
**allows** [2] - 152:13,
377:23
**almost** [5] - 33:25,
81:15, 185:1, 185:2,
316:10
**alone** [3] - 25:22,
151:22
**altogether** [1] -
158:23
**Amazon** [1] - 86:11
**ambient** [3] - 171:17,
207:3, 208:6
**ambiguous** [3] -
69:19, 87:6, 87:19
**America** [1] - 225:9
**American** [1] - 31:20
**Americans** [2] - 21:1,
22:14
**Amicus** [2] - 5:11,
5:24
**amount** [8] - 198:24,
207:13, 207:14,
218:21, 219:15,
221:13, 371:9, 376:9
**ample** [1] - 368:4
**analogy** [3] - 152:21,
152:22, 153:11
**analysis** [8] - 8:20,
16:17, 174:18,
320:16, 326:14,
330:3, 333:16, 381:2
**analyzed** [1] - 380:22
**analyzing** [1] -
190:11
**and..** [1] - 365:22
**Anderson** [7] -
359:5, 359:6, 359:11,
360:6, 362:11,
362:15, 364:8, 364:14
**Andrew** [1] - 32:25
**anesthesiologist** [7]
- 315:1, 317:9,
317:12, 321:2, 321:7,
324:9, 324:12
**anesthesiologists**
[2] - 325:12, 326:5
**anesthesiology** [1] -
22:19
**anesthetic** [1] -
323:11
**anesthetics** [1] -
323:25
**animals** [1] - 16:1
**answer** [61] - 7:4,
17:25, 18:1, 19:24,
22:9, 34:5, 42:5, 43:3,
45:17, 45:20, 47:6,
48:13, 56:15, 60:23,
68:14, 70:18, 70:23,
73:1, 87:15, 87:25,
91:13, 94:14, 94:20,
95:5, 99:23, 100:17,
107:9, 120:6, 120:25,
121:15, 125:5, 147:6,
147:11, 148:21,
149:2, 152:4, 153:4,
156:20, 162:1,
162:13, 173:8, 191:7,
208:2, 210:4, 210:12,
217:2, 221:17,
221:20, 226:12,
232:21, 234:10,
234:19, 241:9, 259:4,
263:4, 329:10,
329:11, 329:12,
330:6, 349:17, 350:3
**answered** [2] -
25:22, 219:21
**answering** [3] - 22:5,

**JIM HO - June 28, 2017**

148:24, 329:25
**answers** [6] - 6:18, 34:4, 42:21, 154:24, 217:18, 279:10
**antimicrobial** [3] - 112:7, 113:5, 114:6
**anyplace** [1] - 270:19
**anyway** [1] - 259:16
**apart** [3] - 22:3, 216:19, 363:21
**apologize** [1] - 38:3
**appear** [10] - 46:9, 46:10, 66:25, 115:6, 196:23, 294:15, 315:11, 322:10, 324:21, 368:9
**appeared** [3] - 8:8, 190:22, 202:25
**apples** [2] - 342:3, 342:4
**applicable** [7] - 273:14, 275:2, 276:8, 277:25, 278:23, 279:25, 282:12
**application** [11] - 49:12, 49:15, 71:8, 71:15, 71:25, 350:17, 372:11, 379:23, 379:24, 380:3, 380:11
**applications** [1] - 12:9
**applies** [5] - 117:12, 155:6, 260:4, 260:14, 312:6
**apply** [2] - 249:11, 375:10
**apportion** [1] - 373:8
**appreciate** [4] - 15:23, 56:21, 132:24, 148:20
**appreciation** [1] - 138:18
**Approach** [1] - 310:15
**approach** [3] - 122:15, 310:23, 380:19
**approached** [2] - 13:14, 236:12
**appropriate** [4] - 244:17, 311:18, 369:21, 388:23
**approval** [1] - 297:2
**approximate** [1] - 237:13
**approximation** [2] - 238:19, 238:21
**APS** [1] - 362:6
**area** [14] - 21:15, 21:22, 22:24, 40:5, 90:9, 155:19, 259:15, 264:16, 264:17, 268:12, 312:23, 357:7, 378:6
**areas** [6] - 196:9, 196:12, 326:18, 326:21, 377:20, 377:22
**argue** [2] - 55:16, 284:3
**argument** [3] - 87:22, 120:24, 121:1
**argumentative** [11] - 53:16, 55:4, 181:22, 191:15, 215:9, 221:4, 224:8, 312:19, 318:18, 325:21, 327:7
**Arizant** [8] - 2:11, 5:21, 176:16, 176:22, 304:1, 304:20,

307:21, 312:14
**Arizona** [1] - 91:1
**armor** [1] - 107:13
**array** [1] - 46:15
**arrive** [1] - 130:7
**art** [1] - 139:8
**article** [7] - 169:25, 200:7, 255:12, 255:14, 256:25, 257:2, 257:22
**artificial** [3] - 37:17, 38:22, 39:11
**artificials** [1] - 41:21
**Asbach** [6] - 134:5, 134:13, 135:7, 135:9, 135:13
**Assaad** [2] - 2:7, 5:18
**ASSAAD** [23] - 5:18, 60:8, 61:10, 61:16, 61:18, 101:25, 135:17, 142:1, 152:25, 167:9, 169:24, 170:6, 187:3, 187:7, 217:5, 218:22, 226:8, 226:17, 255:12, 307:16, 315:16, 335:5, 346:18
**assertion** [4] - 117:3, 117:25, 138:4, 138:9
**assertions** [2] - 140:21, 204:2
**assessment** [6] - 3:16, 63:2, 188:3, 188:17, 192:11, 338:21
**assist** [1] - 121:4
**assistance** [2] - 121:5, 294:1
**association** [2] - 202:10, 209:6
**Association** [3] - 3:20, 200:17, 203:13
**assume** [11] - 23:7, 69:13, 72:2, 168:25, 278:20, 314:3, 314:10, 353:20, 353:24, 354:3, 358:13
**assumed** [1] - 314:1
**assumes** [23] - 14:10, 113:17, 155:23, 156:16, 168:23, 170:25, 177:16, 264:22, 274:21, 275:10, 278:17, 279:2, 280:10, 280:16, 281:8, 312:1, 312:21, 315:4, 325:21, 327:7, 353:8, 355:13, 355:25
**assumption** [10] - 46:1, 106:18, 109:22, 110:2, 162:10, 314:4, 317:3, 317:4, 322:25, 366:17
**assurance** [2] - 75:1, 372:4
**assure** [3] - 78:15, 371:25, 372:7
**astronomy** [1] - 266:19
**atoned** [1] - 226:11
**ATP** [1] - 261:16
**attach** [5] - 74:12, 79:22, 100:23, 110:25, 153:14
**attached** [1] - 80:24
**attaching** [4] - 76:8, 76:12, 76:13, 137:2
**attack** [6] - 29:9,

83:18, 225:11, 227:1, 228:3, 295:10
**attacked** [1] - 225:22
**attaining** [1] - 9:16
**attempt** [2] - 83:18, 311:5
**attempted** [1] - 48:22
**attempting** [2] - 7:19, 42:6
**attend** [1] - 382:15
**attending** [1] - 9:17
**attention** [4] - 48:10, 48:18, 111:22, 137:22
**Attorney** [3] - 2:1, 2:6, 2:11
**attorney** [3] - 7:5, 7:7, 7:8
**attorneys** [2] - 286:2, 287:20
**August** [2] - 382:12, 382:13
**Augustine** [12] - 243:20, 287:23, 288:17, 289:8, 291:6, 292:13, 292:14, 292:23, 292:25, 293:5, 350:25
**Augustine's** [1] - 288:9
**aureus** [2] - 69:6, 69:11
**author** [20] - 211:21, 246:4, 246:5, 249:4, 272:20, 277:19, 280:4, 295:10, 296:1, 296:14, 296:17, 300:12, 300:24, 305:8, 307:11, 307:23, 311:20, 322:4, 325:1, 334:24
**author's** [2] - 273:22, 273:25
**authored** [1] - 252:14
**authority** [3] - 213:17, 314:23, 315:1
**authors** [19] - 31:5, 197:23, 212:5, 212:7, 246:21, 261:21, 281:4, 283:25, 284:2, 294:15, 295:16, 296:5, 297:23, 302:15, 315:13, 317:5, 344:13, 366:12, 366:19
**available** [1] - 11:2
**average** [6] - 90:13, 91:6, 328:18, 328:19, 388:1, 388:8
**Aviary** [1] - 357:4
**avoid** [6] - 6:24, 30:2, 94:19, 354:16, 354:24
**aware** [19] - 22:24, 30:12, 30:17, 31:4, 31:7, 107:19, 107:23, 222:18, 223:15, 229:3, 240:2, 247:15, 304:3, 346:9, 346:12, 355:8, 355:15, 355:19
**axis** [5] - 65:2, 65:3, 190:13, 217:14

---

**B**

---

**BA** [1] - 51:11
**bachelors** [1] - 9:1
**background** [6] - 118:14, 140:24, 154:15, 268:5, 331:1,

333:10
**backing** [1] - 197:5
**backwards** [3] - 152:1, 152:2, 152:5
**Bacteria** [1] - 357:3
**bacteria** [76] - 41:10, 59:2, 79:5, 83:18, 97:16, 99:1, 99:9, 101:18, 101:24, 106:23, 107:3, 107:5, 108:13, 108:18, 108:24, 109:1, 109:4, 109:7, 109:11, 109:16, 109:20, 109:24, 110:25, 111:12, 111:16, 129:22, 145:1, 145:10, 145:22, 146:3, 147:1, 147:21, 147:25, 148:6, 149:22, 149:24, 150:4, 150:9, 150:16, 150:25, 151:5, 151:7, 151:10, 151:14, 151:20, 151:21, 151:24, 152:5, 152:8, 152:14, 152:17, 154:19, 209:19, 209:21, 218:21, 219:8, 219:11, 219:15, 219:17, 242:20, 242:22, 256:3, 257:4, 261:2, 269:23, 335:20, 336:3, 336:23, 343:1, 343:2, 357:10, 357:21, 361:5, 361:24, 362:4, 365:11
**bacterial** [43] - 57:22, 58:14, 58:22, 58:25, 59:8, 59:21, 84:1, 84:11, 96:9, 96:16, 96:25, 98:1, 98:15, 99:6, 99:17, 100:1, 107:16, 107:21, 108:5, 111:7, 112:10, 113:13, 114:5, 114:13, 115:2, 115:21, 164:8, 168:20, 184:7, 242:12, 282:5, 335:2, 340:11, 340:22, 341:8, 341:12, 341:20, 355:11, 358:6, 365:21, 379:25, 380:12, 381:7
**bacterin** [1] - 150:21
**bacterium** [6] - 106:19, 151:2, 151:3, 152:11, 153:14, 336:7
**bad** [1] - 50:10, 97:24, 175:3, 175:5, 175:8, 175:9, 180:2, 199:5, 218:5, 220:19, 220:24, 222:12, 246:9, 301:21, 301:23, 313:1, 372:21
**badger** [1] - 281:23
**badgering** [1] - 281:10
**badly** [2] - 101:9, 101:12
**Bair** [169] - 1:6, 5:4, 23:13, 23:21, 26:5, 26:8, 27:5, 48:24, 49:9, 58:6, 58:11, 58:13, 60:13, 63:3, 64:21, 66:1, 66:5, 66:22, 72:18, 73:3, 74:1, 74:9, 75:11,

83:24, 84:2, 84:21, 85:3, 85:6, 85:19, 86:2, 86:5, 86:8, 86:19, 86:23, 87:8, 92:2, 92:4, 94:8, 98:3, 98:15, 98:21, 100:13, 101:3, 101:11, 101:18, 101:24, 105:5, 105:9, 107:20, 108:3, 108:6, 108:16, 108:22, 109:20, 109:24, 110:18, 112:8, 112:9, 113:6, 115:3, 115:21, 116:14, 119:3, 119:15, 120:12, 120:22, 121:7, 121:19, 122:23, 124:16, 125:1, 125:5, 130:10, 130:12, 130:14, 130:16, 130:23, 130:24, 131:2, 131:11, 131:15, 131:16, 131:21, 131:23, 132:12, 139:21, 140:10, 141:12, 158:12, 161:5, 161:11, 162:19, 165:3, 176:23, 223:1, 223:16, 232:4, 232:13, 233:9, 233:22, 234:3, 241:22, 242:22, 243:5, 246:1, 246:25, 247:8, 247:13, 247:17, 247:21, 248:6, 248:21, 249:6, 249:8, 249:12, 249:14, 251:18, 252:11, 252:17, 273:19, 284:21, 286:10, 297:3, 304:1, 314:3, 314:13, 314:18, 315:2, 315:10, 316:10, 316:22, 318:3, 318:5, 318:10, 318:11, 320:11, 320:16, 321:2, 321:7, 321:24, 322:14, 323:2, 324:3, 324:6, 324:20, 325:1, 327:21, 328:10, 337:11, 337:22, 338:7, 338:16, 341:3, 342:9, 343:1, 343:13, 343:17, 343:23, 349:14, 349:19, 351:11, 351:13, 351:14, 371:11, 372:24, 373:13, 373:17, 374:4, 381:5
**Ball** [1] - 2:2
**bamboozling** [1] - 119:24
**Bankson** [1] - 226:2
**BANKSTON** [439] - 3:6, 5:16, 6:2, 8:2, 8:6, 14:12, 16:5, 18:2, 24:10, 24:17, 25:4, 25:25, 26:14, 28:6, 31:18, 32:2, 32:4, 32:8, 32:10, 36:25, 37:25, 38:18, 38:23, 41:14, 41:18, 42:25, 43:16, 44:1, 44:5, 44:10, 44:17, 44:21, 44:24, 45:2, 47:14, 48:16, 51:20, 52:24, 53:17, 57:12, 60:4,

**JIM HO - June 28, 2017**

60:9, 60:25, 61:9,
61:12, 61:17, 61:19,
61:24, 62:3, 62:11,
66:16, 69:3, 69:22,
70:10, 75:17, 79:13,
80:13, 82:2, 83:12,
84:23, 85:1, 85:5,
85:20, 85:25, 86:7,
86:17, 86:20, 86:24,
87:1, 87:7, 87:14,
87:23, 91:17, 91:23,
92:6, 92:10, 92:13,
92:16, 92:20, 92:23,
93:2, 93:9, 93:15,
93:24, 94:6, 94:17,
94:24, 95:7, 96:2,
96:7, 97:1, 97:18,
98:6, 98:9, 98:13,
98:19, 98:23, 99:22,
102:2, 103:19, 104:8,
104:17, 105:2,
105:17, 106:22,
107:11, 108:11,
108:19, 113:20,
114:23, 115:7, 116:7,
116:21, 118:3,
119:19, 119:22,
120:17, 121:14,
123:1, 124:20,
125:11, 125:14,
125:16, 125:19,
125:22, 126:3,
126:24, 127:2, 127:8,
127:12, 127:16,
127:22, 128:2, 128:7,
128:12, 133:2, 133:5,
133:9, 133:13,
135:16, 135:18,
135:23, 136:3,
137:16, 140:4,
140:17, 141:16,
141:20, 141:25,
142:3, 142:11,
142:20, 143:6,
144:24, 145:7,
145:14, 145:20,
153:1, 153:6, 153:20,
154:4, 156:2, 156:22,
157:11, 157:14,
160:8, 160:11,
160:21, 160:25,
162:7, 162:12,
162:25, 163:5, 163:9,
163:14, 163:18,
167:6, 167:11,
167:16, 167:23,
168:1, 168:6, 169:3,
169:19, 170:3, 170:9,
170:13, 171:2,
172:12, 173:23,
174:8, 176:6, 176:20,
177:8, 177:18, 181:7,
181:11, 181:19,
181:25, 182:6,
182:10, 182:13,
186:1, 186:5, 187:2,
187:5, 187:8, 187:13,
187:18, 188:7,
189:10, 189:23,
190:5, 191:13,
191:16, 195:4, 200:6,
200:10, 200:14,
200:21, 201:19,
202:23, 203:25,
206:18, 208:10,
209:4, 210:2, 210:6,
210:9, 210:13,
215:10, 217:6,
218:24, 219:5,
219:23, 221:5, 223:5,

223:12, 223:22,
223:24, 224:6, 224:9,
224:16, 224:18,
224:21, 224:24,
225:2, 225:6, 225:8,
225:13, 225:17,
225:21, 225:24,
226:3, 226:6, 226:22,
226:25, 227:7,
227:11, 227:15,
227:20, 227:23,
228:2, 228:5, 228:8,
228:11, 228:15,
228:18, 228:21,
228:24, 229:1,
229:16, 232:22,
233:7, 234:13,
234:17, 234:20,
234:24, 236:5,
238:13, 238:16,
238:20, 241:17,
241:19, 249:19,
255:13, 256:1,
256:15, 256:23,
258:5, 258:25, 259:6,
260:9, 262:6, 262:17,
263:5, 263:20, 264:9,
264:24, 265:7,
265:16, 265:20,
266:12, 267:8,
268:18, 271:5,
271:24, 274:1, 274:6,
274:23, 275:13,
275:21, 276:1,
276:14, 276:17,
276:22, 277:4, 277:7,
277:11, 277:20,
278:4, 278:10,
278:19, 279:7,
280:12, 280:18,
281:12, 281:17,
281:21, 281:25,
282:18, 285:7,
285:14, 287:7,
288:20, 288:23,
290:5, 290:8, 293:11,
293:14, 293:18,
299:25, 303:24,
307:17, 308:7,
308:11, 311:15,
311:23, 312:2,
312:25, 315:7,
315:17, 317:22,
318:1, 318:8, 318:16,
318:20, 319:1, 319:2,
319:7, 319:12,
319:17, 319:21,
319:24, 320:22,
320:25, 322:22,
324:16, 325:18,
325:24, 327:10,
327:13, 327:15,
331:17, 332:9, 333:9,
333:20, 335:8,
335:12, 335:14,
335:18, 339:7,
339:14, 339:18,
342:13, 342:17,
342:20, 342:23,
346:16, 346:19,
346:21, 347:13,
347:17, 347:21,
347:25, 348:3, 348:5,
348:11, 348:15,
348:19, 349:20,
351:23, 352:1,
353:11, 354:7,
354:12, 355:16,
356:3, 356:10,
356:19, 360:21,

366:24, 367:5, 373:2,
380:9, 381:17,
381:23, 382:5,
382:10, 382:14,
382:21, 383:2, 383:5,
383:8, 383:11,
383:14, 383:19,
383:22, 384:1,
384:10, 384:12,
385:25, 386:3, 386:9,
386:12, 386:16,
390:13, 390:17,
390:19
   **Bankston** [4] - 2:2,
5:16, 57:2, 390:1
   **base** - 338:21,
368:22
   **based** [7] - 174:14,
175:10, 179:7,
285:13, 314:19,
338:23, 377:9
   **basic** [5] - 16:25,
332:6, 339:9, 371:2,
371:3
   **basis** [5] - 179:9,
314:8, 324:24,
332:11, 332:22
   **bat** [1] - 177:21
   **Bates** [3] - 136:1,
137:17, 347:22
   **bathe** [1] - 150:12
   **battlefield** [1] - 39:21
   **bear** [1] - 390:5
   **bearing** [1] - 259:21
   **because..** [2] -
11:15, 263:25
   **beginning** [1] -
10:23, 169:5, 258:15
   **begins** [4] - 5:2,
205:1, 284:23, 308:25
   **behalf** [5] - 5:11,
5:17, 5:19, 5:21, 5:23
   **behave** [2] - 15:6,
131:4
   **beings** [1] - 338:2
   **Belani** [1] - 317:8
   **belief** [2] - 166:11,
372:16
   **beliefs** [1] - 54:19
   **bell** [1] - 35:11
   **below** [4] - 41:17,
64:4, 64:25, 158:13
   **Bernice** [1] - 5:11
   **beside** [1] - 219:19
   **best** [6] - 106:5,
306:23, 309:21,
310:23, 370:21, 391:9
   **best-fit** [1] - 370:21
   **better** [5] - 78:6,
79:23, 129:20,
302:23, 324:1
   **between** [39] - 4:6,
41:3, 6:20, 43:11,
66:6, 76:12, 80:22,
94:11, 108:4, 109:24,
112:11, 114:10,
139:10, 141:12,
176:12, 179:13,
190:19, 205:6,
205:14, 208:24,
209:6, 216:5, 216:7,
220:8, 237:7, 246:21,
256:17, 288:19,
269:17, 293:10,
293:21, 308:8,
308:23, 339:11,
356:16, 356:22,
365:15, 389:20,
389:22
   **beyond** [3] - 111:9,

260:23, 302:17
   **bias** [3] - 296:10,
296:19, 296:21
   **big** [8] - 40:25,
42:16, 153:24, 216:1,
230:14, 282:2, 317:4,
368:18
   **bigger** [3] - 40:25,
361:1, 389:9
   **bingo** [1] - 183:4
   **bio** [2] - 21:4, 56:19
   **bioaerosol** [2] -
358:12, 358:23
   **bioburden** [21] -
21:12, 21:16, 21:23,
142:13, 142:24,
143:9, 145:10,
145:15, 147:1,
153:25, 155:20,
157:20, 164:23,
173:4, 173:12,
186:17, 201:3, 201:7,
220:11, 261:21,
372:17
   **biofilm** [8] - 80:9,
81:8, 81:15, 152:6,
152:7, 152:8, 152:11,
152:13
   **biological** [107] -
10:7, 10:20, 10:24,
11:9, 11:11, 11:18,
11:22, 14:5, 14:14,
14:15, 14:23, 14:24,
15:1, 15:5, 15:24,
16:1, 16:4, 17:22,
18:4, 24:20, 27:12,
33:19, 33:21, 33:25,
34:9, 34:13, 35:25,
36:7, 36:15, 37:17,
37:21, 38:10, 39:12,
39:15, 39:18, 40:3,
40:17, 41:9, 41:24,
42:1, 42:13, 43:15,
43:18, 45:11, 46:2,
47:2, 47:21, 47:25,
48:21, 58:18, 78:22,
79:12, 79:14, 79:21,
129:3, 129:11,
129:14, 129:21,
129:22, 130:1,
135:10, 135:12,
145:1, 146:13,
146:22, 169:7,
169:14, 171:8,
171:22, 206:8,
207:15, 208:25,
211:2, 211:4, 211:11,
220:4, 249:24, 251:5,
271:17, 295:5,
328:15, 330:10,
331:9, 331:11,
331:24, 332:2, 332:6,
341:6, 341:12, 357:8,
357:13, 360:15,
361:7, 364:21,
364:23, 368:17,
370:4, 373:16, 374:1,
377:20, 380:23,
388:21
   **biologically** [1] -
125:13
   **bioluminescence** [1]
- 261:17
   **biomass** [3] - 156:9,
221:13, 365:16
   **biomedical** [2] -
23:18, 350:25
   **biowarfare** [1] -
44:12
   **bit** [37] - 8:25, 13:2,

22:17, 28:18, 35:18,
35:23, 54:25, 57:6,
66:9, 72:5, 79:19,
83:23, 102:13,
141:17, 154:15,
159:10, 170:14,
206:16, 219:11,
226:2, 226:20, 259:7,
259:14, 271:20,
284:4, 296:23, 297:5,
297:6, 298:24,
308:23, 313:21,
334:17, 342:21,
344:3, 360:23, 371:6,
380:7
   **bite** [3] - 31:23,
210:11
   **bite-sized** [2] -
31:23, 210:11
   **black** [3] - 54:20,
137:6, 137:10
   **Blackwell** [1] - 2:12
   **blanket** [2] - 21:17,
106:18
   **blew** [2] - 269:6,
270:8
   **blow** [6] - 74:20,
104:18, 104:19,
270:8, 270:16, 270:19
   **blowers** [2] - 194:2,
195:8
   **blowing** [1] - 343:19
   **blown** [2] - 262:12,
268:3
   **blue** [2] - 114:17,
197:4
   **blurb** [1] - 81:9
   **Blvd** [1] - 2:8
   **board** [4] - 243:25,
245:18, 246:14,
334:10
   **body** [2] - 146:1,
309:23
   **body's** [1] - 83:17
   **bolt** [1] - 149:10
   **Borden** [2] - 1:21,
5:13
   **bother** [1] - 214:20
   **bottom** [16] - 39:2,
63:10, 102:17,
126:13, 176:9,
202:14, 204:16,
254:12, 261:12,
304:10, 304:16,
308:14, 322:3,
344:22, 365:4
   **bottoms** [1] - 365:3
   **boundary** [1] -
231:11
   **box** [2] - 374:20,
389:9
   **brainstorming** [1] -
348:25
   **bread** [1] - 389:9
   **break** [5] - 31:22,
55:2, 142:2, 190:6,
356:4
   **briefly** [1] - 375:3
   **bring** [5] - 27:14,
128:21, 147:8,
164:23, 368:23
   **brings** [1] - 153:23
   **British** [1] - 320:8
   **broad** [3] - 142:22,
216:11, 216:12
   **broke** [1] - 362:14
   **brought** [4] - 144:6,
199:1, 301:2, 301:3
   **bubble** [6] - 159:3,
159:9, 161:2, 161:3,

161:4, 161:10
**bubbles** [1] - 160:24
**Buck** [4] - 4:9, 35:5, 334:16, 335:17
**Buck's** [1] - 335:3
**build** [1] - 28:12
**bullet** [3] - 348:23, 350:6, 352:2
**bunch** [4] - 52:8, 190:12, 212:15, 213:7
**Burke** [1] - 2:12
**burn** [1] - 196:15
**burning** [1] - 228:6
**business** [3] - 33:24, 52:2, 307:22
**but..** [3] - 238:6, 273:2, 382:6
**buy** [1] - 11:2

**C**

**C.L** [1] - 2:12
**Calgary** [6] - 1:22, 5:13, 90:14, 90:23, 91:4, 391:11
**calibrated** [1] - 123:5
**calibre** [1] - 95:10
**camera** [1] - 19:4
**Canada** [2] - 1:22, 18:9
**Canada's** [1] - 9:23
**Canadian** [4] - 12:9, 22:25, 244:15, 388:25
**cannot** [17] - 21:17, 25:22, 73:2, 106:21, 114:16, 120:9, 144:20, 144:22, 147:10, 220:7, 260:18, 279:13, 308:2, 323:21, 339:9, 366:8
**capable** [4] - 60:14, 338:2, 339:11, 381:8
**capture** [1] - 390:7
**care** [3] - 50:13, 123:15, 220:17
**career** [8] - 9:22, 10:1, 10:3, 10:6, 10:19, 10:23, 15:3, 244:8
**careful** [3] - 6:19, 20:2, 279:8
**carefully** [2] - 29:12, 234:8
**caring** [2] - 196:10, 196:12
**carried** [1] - 357:24
**case** [100] - 6:6, 7:12, 7:15, 8:8, 8:10, 8:18, 12:13, 13:2, 13:5, 13:6, 13:15, 14:19, 14:21, 15:8, 15:15, 23:12, 26:3, 29:18, 29:25, 30:19, 31:8, 36:18, 42:5, 48:9, 48:17, 48:24, 58:7, 72:23, 96:9, 99:14, 100:7, 102:6, 107:3, 114:7, 116:11, 116:12, 117:14, 121:3, 123:13, 128:5, 128:17, 158:8, 160:10, 160:14, 188:21, 190:21, 205:17, 205:25, 207:12, 225:22, 233:8, 236:8, 236:13, 237:9, 237:25, 239:6, 239:15, 239:17, 239:21, 240:8,

240:10, 240:12, 241:4, 241:6, 241:20, 246:20, 247:14, 248:11, 249:8, 251:23, 259:13, 260:5, 260:15, 260:20, 271:15, 274:12, 274:19, 275:5, 275:8, 278:15, 278:25, 286:6, 287:15, 295:9, 303:10, 305:9, 330:11, 331:2, 346:23, 349:25, 355:20, 359:15, 364:19, 372:4, 373:9, 375:14, 376:5, 376:18, 381:14, 381:15
**cases** [1] - 52:3
**categorically** [1] - 266:10
**categories** [3] - 31:23, 65:17, 359:10
**category** [3] - 29:20, 30:1, 32:14
**caused** [1] - 27:5
**causes** [3] - 352:9, 352:18, 352:20
**causing** [2] - 17:3, 78:3
**ceiling** [1] - 342:10
**cell** [4] - 3:16, 188:4, 188:17, 192:11
**cell-processing** [4] - 3:16, 188:4, 188:17, 192:11
**Central** [1] - 141:21
**certain** [12] - 13:23, 89:3, 212:10, 301:21, 332:3, 334:11, 334:18, 363:4, 378:14, 378:15, 379:17, 379:20
**certainly** [3] - 157:19, 234:7, 257:7
**certainty** [2] - 372:5, 372:6
**Certificate** [1] - 391:2
**certify** [1] - 391:5
**cfm** [1] - 64:3
**CFM** [1] - 64:6
**CFU** [17] - 204:17, 204:23, 205:2, 205:10, 206:24, 207:3, 207:17, 207:13, 208:6, 209:6, 209:12, 217:11, 217:14, 218:7, 218:17, 258:15, 365:22
**CFU..** [1] - 209:11
**CFUs** [11] - 101:3, 101:11, 144:16, 203:20, 207:20, 211:11, 211:14, 218:2, 254:23, 337:12, 337:23
**cgordon@ blackwellburke.com** [1] - 2:14
**chain** [7] - 4:4, 4:6, 102:5, 102:17, 303:22, 308:8, 310:19
**chair** [3] - 146:11, 146:17, 146:19
**chairs** [1] - 146:12
**challenge** [1] - 340:22
**Chamber** [1] - 357:4

**chamber** [1] - 377:21
**chance** [11] - 147:2, 148:7, 148:9, 148:11, 148:12, 150:5, 150:11, 150:13, 157:22, 164:22, 361:6
**change** [10] - 45:21, 89:16, 95:19, 128:25, 138:15, 246:7, 301:24, 307:3, 309:25, 311:20
**changes** [6] - 89:9, 89:19, 95:20, 307:1, 311:1
**characteristics** [6] - 9:21, 15:2, 48:21, 74:23, 247:18, 349:22
**characterization** [1] - 320:24
**characterize** [5] - 9:21, 225:12, 242:16, 280:21, 293:16
**characterizing** [2] - 276:2, 276:4
**charge** [1] - 134:21
**charged** [2] - 133:24, 237:16
**charges** [1] - 133:23
**charging** [2] - 20:11, 237:19
**charitable** [1] - 218:19
**chart** [9] - 67:1, 204:19, 335:20, 384:18, 384:19, 384:21, 384:23, 384:25
**charts** [2] - 57:21, 340:5
**chased** [1] - 270:24
**check** [7] - 38:19, 38:20, 308:16, 332:16, 332:19, 377:7
**chemical** [1] - 81:16
**chemistry** [1] - 9:5
**chicken** [2] - 357:8, 357:11
**chickens** [2] - 357:13, 357:16
**China** [3] - 4:14, 356:17, 356:23
**choose** [1] - 223:25
**chop** [1] - 46:16
**chopped** [1] - 46:19
**chose** [4] - 276:4, 276:10, 276:18, 369:4
**chunks** [1] - 46:9
**circle** [1] - 251:16
**circles** [1] - 45:19
**circumstance** [1] - 312:3
**circumstances** [1] - 106:24
**citations** [3] - 29:12, 30:4, 241:25
**cite** [8] - 31:5, 68:21, 132:16, 285:16, 313:3, 313:8, 380:14
**cited** [15] - 27:23, 33:8, 166:4, 166:5, 251:1, 272:7, 273:18, 279:20, 283:15, 284:18, 286:22, 300:9, 341:10, 347:17, 355:8
**cites** [1] - 134:5
**citing** [7] - 132:4, 134:24, 243:11, 272:15, 280:24,

288:16, 297:2
**City** [1] - 391:11
**civil** [4] - 226:3, 227:1, 227:5, 234:14
**civility** [2] - 226:2, 226:21, 228:14
**claim** [13] - 20:2, 26:4, 33:24, 34:12, 53:9, 117:25, 119:13, 158:17, 193:4, 193:5, 267:21, 358:8, 359:8
**claimed** [1] - 24:5
**claiming** [9] - 19:18, 24:13, 26:2, 158:10, 158:11, 158:19, 158:21, 212:9, 372:10
**claims** [6] - 60:17, 119:12, 193:2, 195:18, 334:24, 375:24
**clarify** [2] - 279:12, 352:11
**class** [1] - 282:22
**clean** [4] - 17:22, 51:5, 51:25, 52:15, 53:14, 53:25, 54:17, 56:10, 75:13, 76:7, 106:5, 266:7, 342:10, 345:11
**clean-room** [1] - 56:10
**cleanroom** [4] - 3:16, 188:4, 188:17, 192:11
**cleansing** [1] - 103:5
**clear** [12] - 72:7, 72:7, 111:11, 119:25, 128:11, 157:2, 247:25, 287:4, 303:4, 306:6, 339:19, 347:11
**cleared** [1] - 351:23
**clearer** [1] - 239:10
**clearly** [4] - 85:21, 92:2, 277:3
**client** [2] - 185:23, 295:14
**clients** [3] - 12:5, 97:2, 97:22
**clinical** [28] - 15:19, 16:3, 16:17, 16:20, 17:9, 77:1, 77:6, 78:15, 245:23, 256:6, 306:24, 307:12, 320:15, 326:14, 326:15, 330:3, 330:4, 331:6, 331:18, 331:20, 333:10, 333:16, 344:14, 355:21, 373:24, 379:2
**Clinical** [1] - 304:20
**clinically** [4] - 75:12, 76:6, 76:22, 78:14
**clock** [2] - 141:21, 244:25
**close** [2] - 268:24, 324:7
**cloth** [1] - 25:10
**clothing** [2] - 266:1, 266:6
**cluster** [8] - 151:21, 151:24, 152:6, 152:9, 152:13, 152:17, 360:25
**clusters** [1] - 336:9
**coaching** [1] - 128:20
**coated** [1] - 80:25
**coating** [1] - 112:8
**coatings** [2] - 107:16, 113:5
**coffee** [2] - 389:11

**coin** [1] - 234:16
**coincidence** [1] - 241:5
**collaborated** [1] - 307:11
**collaborating** [2] - 245:22, 301:22
**collaborative** [1] - 306:22
**colleague** [1] - 224:13
**colleagues** [5] - 9:19, 173:10, 294:8, 377:7, 379:4
**collected** [1] - 361:23
**collecting** [1] - 117:8
**collection** [1] - 182:11
**colloquy** [2] - 45:3, 228:9
**colonies** [6] - 3:14, 188:1, 188:15, 192:10, 362:23, 362:24
**colony** [3] - 100:14, 117:8, 207:7
**colony-forming** [3] - 100:14, 117:8, 207:7
**coloured** [2] - 4:1, 265:18
**column** [3] - 204:16, 204:17, 204:22
**comfort** [1] - 314:15
**comfortable** [5] - 20:25, 91:18, 162:3, 260:4, 260:13
**comfortably** [1] - 22:13
**comical** [1] - 185:1
**coming** [23] - 18:14, 26:5, 26:12, 29:9, 76:25, 103:24, 121:18, 122:2, 122:22, 139:4, 139:23, 140:12, 166:8, 188:21, 198:1, 201:2, 201:6, 247:23, 361:15, 361:17, 375:2, 376:6, 382:1
**commenced** [1] - 5:1
**comment** [11] - 106:15, 161:19, 166:17, 189:9, 235:2, 303:9, 308:2, 353:17, 353:19, 358:14, 366:23
**commentary** [3] - 234:12, 317:25, 318:25
**comments** [2] - 137:2, 137:24, 309:24
**common** [1] - 190:10
**communicating** [1] - 305:6
**communication** [2] - 308:3, 308:13
**communications** [1] - 293:9
**community** [1] - 377:5
**company** [17] - 7:18, 101:16, 101:23, 177:4, 230:14, 233:15, 233:17, 233:24, 234:3, 234:4, 299:8, 306:17, 310:14, 351:17, 354:4, 354:16, 355:10
**compare** [2] -

**JIM HO - June 28, 2017**

218:16, 342:3
**compared** [1] -
261:22
**compensated** [1] -
8:14
**competently** [1] -
68:14
**competitor** [1] -
351:1
**complaint** [3] -
26:15, 26:20, 158:9
**complete** [1] - 391:6
**completely** [6] -
145:9, 146:6, 223:8,
223:20, 248:8, 281:9
**completeness** [1] -
276:23
**complex** [4] - 25:21,
140:21, 144:21,
148:15
**compliance** [1] -
347:12
**complicated** [2] -
123:20, 149:18
**component** [3] -
73:13, 73:16, 81:17
**comprehend** [1] -
43:9
**computer** [2] -
190:12, 190:15
**conceive** [1] - 11:15
**concentration** [8] -
207:14, 214:11,
217:17, 218:12,
362:8, 363:11,
365:23, 365:24
**concentration..** [1] -
365:22
**Concentrations** [1] -
357:2
**concentrations** [1] -
361:24
**concept** [1] - 76:9
**concepts** [7] - 251:8,
294:16, 294:24,
295:6, 295:12,
296:16, 296:25
**concern** [3] - 254:24,
269:7, 314:14
**concerned** [2] -
135:10, 230:9, 269:18
**concerning** [3] -
233:2, 233:9, 272:8
**concerns** [5] -
138:17, 203:13,
271:6, 349:10, 369:22
**conclude** [2] -
258:20, 371:7
**conclusion** [8] -
173:2, 175:10,
207:18, 214:12,
261:1, 345:4, 366:4,
366:5
**conclusions** [3] -
174:14, 204:1, 375:19
**conclusively** [2] -
352:8, 352:17
**condition** [1] - 17:23
**conditioning** [1] -
91:15
**conditions** [5] -
12:24, 99:2, 100:2,
106:17, 164:6
**conduct** [1] - 128:8
**conducted** [6] -
117:13, 132:1, 229:5,
319:15, 319:18,
330:5, 345:16, 352:23
**conducts** [1] -
307:22

**conferences** [1] -
9:17
**confidence** [4] -
216:18, 216:20,
370:24
**confident** [1] -
215:23
**confidential** [1] -
176:10
**Confidential** [1] -
63:8
**confirmed** [1] -
243:10
**conflict** [12] -
246:18, 299:3,
299:18, 299:20,
300:7, 300:11,
300:14, 301:1, 302:2,
302:12, 303:12,
308:23
**conflicts** [8] - 301:2,
301:9, 301:14,
301:15, 303:5,
312:12, 313:2, 313:9
**confused** [2] - 85:24,
280:20
**confusing** [4] -
119:18, 119:24,
120:19, 120:20
**conjecture** [1] -
156:1
**conjunction** [1] -
390:6
**connect** [4] - 129:23,
191:25, 213:14,
214:10
**connected** [3] -
129:16, 243:5, 269:17
**connection** [5] -
192:2, 194:21,
198:23, 220:7, 257:5
**connections** [1] -
243:12
**consequences** [1] -
106:20
**consequential** [1] -
36:20
**consider** [9] - 19:15,
19:24, 21:4, 23:8,
40:20, 45:6, 95:13,
150:2, 211:3
**considerable** [1] -
15:18
**considerably** [1] -
360:25
**considered** [1] -
261:21
**considering** [1] -
296:14
**consist** [1] - 28:1
**consists** [1] - 375:16
**constitutes** [1] -
244:10
**consultant** [2] -
177:14, 208:22
**consultants** [1] -
355:9
**consultation** [1] -
8:14
**contact** [7] - 315:12,
317:2, 323:4, 323:7,
323:17, 323:19,
324:22
**contacts** [1] - 240:12
**contained** [6] -
37:18, 38:12, 39:13,
40:13, 77:7, 107:24
**contains** [4] - 15:14,
48:6, 109:15, 332:14
**contaminant** [2] -

84:6, 87:17
**contaminants** [3] -
164:12, 165:5, 168:10
**contaminated** [1] -
164:7
**contamination** [11] -
107:21, 170:19,
193:16, 349:10,
351:4, 353:1, 353:6,
353:15, 353:22,
354:2, 354:17
**contamination..** [1] -
193:19
**Contamination/
ABAD** [1] - 350:20
**contend** [3] - 87:9,
172:2, 366:5
**content** [9] - 77:7,
89:17, 220:4, 302:9,
302:10, 303:5,
330:18, 343:8, 343:12
**contention** [3] -
53:18, 174:3, 336:14
**contentions** [1] -
36:5
**context** [11] - 39:16,
40:3, 40:16, 128:1,
129:20, 162:16,
192:18, 194:21,
277:3, 281:9, 311:13
**continue** [4] - 87:13,
154:23, 345:10,
382:24
**contradicting** [1] -
334:2
**contradiction** [1] -
183:22
**contrary** [2] - 245:20,
356:1
**contribute** [1] -
20:15
**contributes** [2] -
337:12, 337:22
**Control** [1] - 203:8
**control** [13] - 53:1,
53:7, 143:20, 143:22,
207:1, 250:6, 251:11,
294:17, 294:20,
294:23, 295:5,
295:13, 296:18
**controlled** [8] -
250:2, 250:3, 250:4,
250:14, 250:17,
251:6, 295:15, 295:19
**Controlled** [2] - 3:22,
200:20
**controversy** [3] -
14:24, 53:24, 54:1
**convenient** [2] -
46:9, 216:14
**conversation** [1] -
6:22
**conversations** [2] -
239:4, 240:15
**convert** [1] - 362:7
**conveying** [1] -
300:18
**convince** [3] -
192:21, 213:16,
216:15
**convincing** [1] -
302:24
**cool** [1] - 167:13
**coop** [3] - 357:8,
357:11, 357:14
**cooperation** [1] -
306:5
**copy** [5] - 7:19,
27:14, 201:24,
202:12, 384:10

**core** [4] - 371:8,
372:19, 374:19,
374:22
**Corey** [20] - 5:20,
44:6, 53:23, 61:4,
61:6, 86:13, 86:24,
93:2, 98:10, 98:24,
127:3, 127:9, 182:14,
226:8, 276:15, 277:7,
342:13, 342:21,
383:15, 386:13
**corner** [2] - 63:11,
365:4
**correct** [242] - 9:25,
10:7, 10:21, 11:10,
13:3, 13:18, 13:24,
15:16, 16:7, 16:9,
18:25, 20:13, 21:2,
23:16, 23:17, 29:23,
30:4, 31:13, 32:11,
34:23, 35:25, 36:8,
37:19, 37:20, 39:9,
39:14, 45:12, 47:24,
48:2, 48:7, 48:25,
49:9, 52:18, 55:6,
56:1, 56:7, 58:4,
58:15, 59:24, 60:15,
62:17, 63:12, 65:18,
66:4, 66:7, 66:11,
67:4, 67:7, 67:10,
67:13, 67:14, 67:16,
68:25, 69:7, 69:12,
71:16, 73:10, 73:25,
78:25, 79:8, 81:8,
83:8, 83:19, 84:4,
85:9, 98:3, 100:20,
101:13, 103:2,
106:12, 106:6, 109:9,
109:17, 112:4, 113:1,
114:13, 115:3,
118:15, 121:22,
129:22, 130:10,
130:24, 131:11,
131:12, 131:15,
134:6, 136:19,
136:24, 137:24,
137:25, 138:5,
138:10, 143:23,
144:13, 145:3,
145:24, 147:3,
147:22, 148:7, 150:2,
150:3, 151:15, 154:5,
154:22, 155:4,
168:21, 172:4,
173:14, 177:22,
178:3, 178:8, 178:19,
184:12, 186:13,
186:25, 188:21,
188:22, 191:22,
192:5, 193:4, 193:23,
197:22, 203:10,
203:15, 203:16,
203:22, 205:23,
207:8, 207:16,
208:11, 209:13,
209:19, 209:23,
211:11, 222:8,
239:12, 239:18,
241:22, 241:23,
242:2, 242:12,
242:23, 243:16,
243:20, 244:11,
244:12, 246:2,
244:18, 246:7,
250:11, 251:2,
251:19, 252:23,
252:25, 253:2, 255:6,
256:12, 257:19,
264:6, 266:7, 273:16,

273:20, 274:2,
275:19, 277:22,
278:1, 281:2, 281:6,
283:11, 284:8,
284:16, 287:21,
287:24, 288:7, 288:9,
288:11, 292:25,
294:17, 295:6,
295:21, 296:5,
303:16, 304:13,
305:10, 313:3,
315:12, 322:12,
324:2, 333:11, 334:6,
336:7, 336:24, 337:4,
338:9, 338:22,
340:12, 340:20,
341:5, 342:16,
342:17, 342:19,
343:10, 344:24,
345:19, 346:2,
346:24, 347:2, 347:5,
349:10, 349:25,
350:18, 353:2, 357:4,
357:5, 357:11,
357:17, 357:25,
358:7, 358:9, 358:25,
359:10, 360:3, 360:5,
361:9, 365:11,
367:14, 370:10,
372:18, 373:3,
373:14, 373:24,
375:11, 376:1, 376:4,
376:22, 377:10,
379:16, 386:8
**Correct** [1] - 273:12
**correctly** [8] - 26:4,
117:6, 138:21,
164:13, 164:14,
188:18, 188:19, 307:7
**correlate** [4] -
196:23, 207:19,
380:23, 390:8
**correlated** [9] -
189:2, 189:5, 189:6,
189:13, 189:14,
190:7, 191:5, 193:4,
198:9
**correlates** [5] - 3:14,
188:1, 188:15, 192:9,
203:20
**correlation** [5] -
189:12, 191:20,
191:23, 211:15,
365:15
**correlations** [3] -
190:16, 190:17, 191:8
**correspondence** [1]
- 238:2
**counsel** [14] - 5:14,
7:9, 7:11, 92:5, 92:8,
94:22, 170:1, 224:12,
238:11, 240:1, 285:4,
322:21, 327:9, 388:13
**counsel's** [5] -
106:15, 234:12,
317:25, 318:25,
320:20
**count** [4] - 170:15,
222:17, 362:22,
362:24
**counter** [6] - 121:24,
123:4, 123:12,
123:16, 334:19,
334:21
**counting** [7] -
123:25, 124:4,
145:25, 170:16,
170:18, 186:23,
202:24
**country** [1] - 309:11

**JIM HO - June 28, 2017**

counts [10] - 184:7,
186:13, 186:16,
207:2, 207:19, 208:5,
222:25, 223:16,
229:6, 282:6
couple [10] - 51:8,
61:21, 93:18, 248:5,
258:11, 288:6, 345:1,
372:14, 383:15,
388:15
course [9] - 210:20,
240:3, 240:16,
240:17, 240:19,
328:5, 330:8, 382:8,
383:18
COURT [4] - 1:1,
38:8, 187:12, 348:14
Court [5] - 2:18, 5:6,
128:21, 285:11,
391:19
court [6] - 5:22, 32:7,
38:5, 60:23, 81:21,
289:14
courthouse [1] -
19:10
courtroom [1] - 6:15
cover [2] - 242:6,
251:17
covered [3] - 146:3,
270:6, 374:18
covers [1] - 25:16
Craig [1] - 111:24
create [5] - 27:21,
54:12, 318:3, 318:9,
369:13
created [2] - 318:12,
328:21
credentials [1] -
371:19
credibility [2] -
295:11, 325:6
credible [4] - 345:25,
375:21, 376:8, 377:24
criteria [1] - 245:10
critical [10] - 101:4,
101:7, 119:1, 119:4,
121:18, 122:12,
159:18, 296:1,
297:16, 299:15
criticise [7] - 198:4,
284:8, 295:16, 296:4,
296:18, 330:4, 331:6
criticised [1] - 28:11
criticism [3] - 28:10,
295:10, 302:8
criticisms [9] -
297:22, 302:9, 303:4,
329:16, 330:14,
330:18, 330:21,
330:24, 368:6
criticize [1] - 117:20
criticized [1] -
296:14
criticizing [2] -
158:25, 312:13
CRT [1] - 310:10
crummy [1] - 180:19
CSR(A [3] - 1:21,
2:18, 391:18
cubed [3] - 144:16,
365:22, 365:25
cubic [9] - 64:7,
64:11, 64:16, 64:20,
104:19, 218:17,
262:1, 262:12, 262:24
culturable [1] -
214:11
cultured [6] - 100:14,
101:2, 101:24, 102:9,
102:24, 106:2

culturing [3] -
101:17, 103:11,
104:12
curious [2] - 43:8
current [2] - 10:17,
63:4
currents [2] -
158:12, 159:23
cut [3] - 50:5, 53:25,
183:10

# D

daily [4] - 3:15,
188:3, 188:16, 192:11
Dan [3] - 306:4,
307:6, 310:5
danger [1] - 51:24
dangerous [1] -
107:5
Daniel [2] - 305:7,
305:13
darn [1] - 61:1
Darouiche [13] -
3:19, 199:17, 199:19,
199:25, 200:7,
200:16, 201:18,
212:10, 214:1,
257:22, 321:15,
322:3, 366:18
Darouiche's [2] -
200:3, 215:11
data [65] - 34:2, 34:3,
81:4, 124:7, 161:18,
174:21, 175:3, 175:5,
175:15, 175:16,
175:20, 175:21,
179:2, 179:7, 179:13,
179:20, 180:12,
181:14, 182:3,
183:12, 185:12,
190:11, 195:19,
198:1, 211:22, 212:1,
212:16, 213:7,
213:10, 213:14,
213:15, 213:17,
213:19, 215:16,
216:13, 216:15,
222:3, 328:18,
328:25, 329:3, 329:7,
340:21, 361:15,
361:17, 361:20,
362:21, 368:9,
368:10, 368:12,
368:16, 369:1, 369:4,
369:12, 369:16,
369:20, 369:22,
370:1, 370:4, 370:19,
371:16, 380:22
datasets [2] - 390:8
date [7] - 5:7,
202:15, 202:18,
202:20, 202:22,
236:22, 346:4
dated [2] - 4:4,
303:22
Dated [1] - 391:11
dates [1] - 203:13
David [7] - 35:9,
243:17, 251:24,
253:10, 317:14,
342:24, 342:25
David's [8] - 243:16,
247:6, 248:16,
250:11, 252:9,
252:19, 252:25, 304:6
day-to-day [7] -
316:21, 317:1, 318:4,
318:10, 323:3, 323:6,
323:17

days [3] - 78:5, 78:8,
90:9
deal [1] - 15:1
dealing [2] - 148:15,
244:8
deals [2] - 43:23,
234:2
decent [2] - 113:13,
114:5
decide [2] - 161:20,
291:21
decides [1] - 231:13
decision [1] - 355:21
decisions [1] - 79:17
decreased [1] -
196:24
deep [2] - 189:18,
261:7
deeper [1] - 242:19
defecating [1] -
357:14
defence [1] - 388:25
Defence [4] - 9:15,
9:24, 13:4, 244:18
defendant [1] - 8:23
Defendants [1] -
2:11
defendants [1] - 5:21
define [7] - 9:21,
65:25, 89:1, 95:23,
95:24, 165:22, 190:19
defined [1] - 207:7
definite [1] - 191:21
definitely [3] - 175:3,
178:21, 319:17
definition [7] - 23:7,
126:2, 126:23,
127:25, 128:1, 191:9,
191:22
definitive [3] - 352:3,
352:7, 352:16
definitively [1] -
309:12
degree [4] - 79:6,
79:8, 95:17, 261:21
degrees [2] - 89:15,
89:17
deliver [2] - 375:2,
375:7
delivered [1] -
375:14
delivery [1] - 116:20
demonstrate [3] -
12:22, 173:11, 186:16
demonstrated [3] -
118:6, 209:8, 209:10
Densities [2] -
204:17, 204:23
density [9] - 205:2,
205:11, 206:24,
206:25, 207:4,
207:13, 208:6, 209:6,
258:15
Department [2] -
9:15, 9:24
depictions [1] -
267:23
deployment [1] -
314:12
deposed [4] - 6:11,
8:11, 31:8, 86:21
deposing [1] - 156:6
deposition [39] -
1:18, 5:3, 5:12, 6:7,
7:3, 28:18, 30:18,
31:25, 32:18, 33:11,
37:10, 61:11, 61:13,
87:2, 93:19, 100:3,
169:6, 176:15,
188:11, 230:7, 236:6,

286:14, 287:15,
288:8, 288:9, 289:6,
290:25, 291:15,
292:2, 300:3, 315:22,
316:5, 319:11,
319:23, 322:10,
322:11, 322:15,
365:13, 367:21
depositions [6] -
26:20, 61:15, 61:21,
288:1, 288:5, 288:12
depth [2] - 123:10,
368:4
derived [1] - 29:14
describe [7] - 16:19,
23:3, 189:4, 218:9,
253:9, 375:3, 375:15
described [4] -
249:4, 328:9, 348:24,
367:1
describing [3] -
105:19, 159:3, 253:11
description [3] -
23:22, 335:2, 368:10
desert [2] - 86:11,
91:1
desiccation [1] -
83:7
design [7] - 107:24,
166:7, 266:4, 294:17,
349:24, 351:1, 362:21
designed [4] - 161:4,
360:7, 362:16, 363:15
designer [1] - 73:10
designing [2] - 70:8,
75:21
desirable [2] - 52:1,
349:14
despite [2] - 150:9,
273:22
detail [3] - 185:3,
253:13
detect [3] - 11:11,
17:22, 282:5
detected [1] - 366:2
detecting [2] - 12:15,
336:23
detection [7] - 10:21,
10:24, 11:18, 11:22,
14:5, 14:15, 337:3
determine [5] - 17:1,
17:21, 71:14, 234:8,
242:11
determined [1] -
209:7
develop [7] - 10:23,
11:7, 12:8, 12:20,
146:11, 306:14,
310:11
developed [2] -
379:24, 388:24
developing [2] -
12:1, 12:4
development [2] -
10:20, 14:14
deviate [1] - 123:3
device [40] - 23:12,
23:13, 23:20, 23:24,
24:1, 24:14, 64:22,
70:13, 73:13, 73:14,
73:15, 74:2, 74:19,
76:18, 77:11, 77:12,
78:14, 97:9, 104:11,
106:2, 107:20,
107:24, 107:25,
131:21, 131:24,
139:21, 143:20,
245:5, 315:12, 317:2,
323:4, 323:7, 323:18,
324:22, 328:11,

349:24, 350:16,
351:7, 358:13, 359:2
devices [4] - 12:4,
73:10, 131:6, 345:8
devoted [1] - 334:2
diagnosed [1] -
333:13
dictated [1] - 138:16
difference [14] -
38:21, 80:19, 114:10,
114:12, 139:9,
139:12, 179:12,
205:5, 205:14, 255:4,
288:19, 289:17, 290:7
differences [2] -
141:12, 366:2
different [57] - 29:17,
46:12, 57:2, 65:17,
66:9, 66:25, 68:5,
73:8, 77:17, 80:7,
105:1, 106:7, 122:15,
124:23, 139:16,
148:19, 158:23,
159:11, 169:15,
170:7, 179:18,
189:13, 199:16,
202:9, 202:18,
206:11, 211:22,
242:16, 245:4, 247:7,
247:10, 247:17,
248:9, 248:20,
248:21, 252:4,
252:10, 252:11,
252:13, 252:16,
256:19, 257:17,
269:21, 278:22,
297:14, 302:18,
312:14, 350:4,
359:14, 361:19,
362:25, 363:3, 364:7,
380:1, 388:2
differential [1] -
166:10
differentiating [1] -
293:21
differently [1] -
121:13
difficult [6] - 100:23,
104:10, 106:4, 149:2,
179:8, 309:7
diffuser [1] - 342:10
diligence [1] -
106:11
dinner [1] - 220:25
dire [2] - 106:20,
106:24
direct [9] - 68:18,
111:22, 137:21,
163:22, 183:22,
254:11, 257:4, 350:5,
373:21
direction [3] - 77:17,
293:25, 326:7
directions [5] -
72:23, 77:4, 103:5,
120:5, 326:7
directly [5] - 36:10,
64:3, 274:18, 310:2,
310:25, 312:15,
334:11
director [3] - 136:17,
137:23, 355:20
Director [1] - 304:20
dirty [1] - 212:14
disagree [22] -
117:18, 117:20,
140:24, 153:14,
154:11, 170:22,
171:4, 184:3, 184:25,
185:14, 185:16,

**JIM HO - June 28, 2017**

186:20, 208:13, 230:19, 337:11, 338:6, 338:15, 342:7, 343:3, 365:2, 367:6, 379:8
**disagreed** [2] - 338:9, 365:14
**disagreeing** [1] - 366:20
**disagrees** [2] - 197:20, 199:10
**disappointing** [2] - 306:23, 307:12
**discharged** [1] - 138:19
**disclaim** [1] - 281:5
**disclaimed** [1] - 280:4
**disclosure** [1] - 202:14
**discover** [1] - 17:2
**discovery** [1] - 1:20
**discussed** [11] - 66:10, 132:21, 192:8, 247:6, 275:16, 278:14, 300:13, 304:5, 305:8, 372:15, 372:20
**discusses** [6] - 16:7, 16:9, 16:11, 16:14, 16:16, 168:17
**discussing** [1] - 236:7
**discussion** [21] - 7:9, 7:11, 15:18, 27:11, 35:24, 48:6, 132:24, 204:7, 205:18, 241:15, 247:5, 247:8, 259:17, 272:2, 284:5, 284:7, 284:15, 284:23, 297:10, 301:20, 351:12
**DISCUSSION** [1] - 62:7
**discussions** [3] - 7:4, 128:3, 312:6
**disease** [6] - 17:3, 22:22, 53:13, 158:3, 331:23, 333:13
**diseases** [1] - 16:22
**disgusting** [3] - 319:1, 319:8, 319:10
**disinfect** [3] - 103:13, 103:17, 104:20
**disinfected** [3] - 103:25, 107:24, 146:6
**disinfecting** [1] - 103:5
**disinfection** [1] - 103:22
**dispute** [4] - 90:25, 253:14, 254:4, 374:8
**disputing** [1] - 180:9
**disregarded** [1] - 285:11
**disrespect** [1] - 224:13
**disruption** [7] - 160:17, 161:15, 161:23, 162:6, 162:8, 163:8, 163:13
**distasteful** [1] - 127:19
**distilled** [1] - 378:11
**distinct** [1] - 258:22

**distort** [1] - 369:2
**distributed** [1] - 369:1
**distribution** [7] - 359:22, 362:6, 364:3, 364:5, 364:10, 364:14, 368:24
**distributions** [3] - 121:20, 359:14, 368:25
**Distributions** [1] - 357:2
**DISTRICT** [2] - 1:1, 1:2
**District** [7] - 5:5, 5:6, 225:10, 226:5, 319:16, 319:19, 319:20
**disturbance** [4] - 125:24, 126:17, 129:8, 374:14
**dive** [1] - 27:19
**divide** [1] - 10:3
**divided** [2] - 10:1, 65:10
**division** [2] - 112:4, 136:18
**doc** [1] - 320:1
**Doctor** [1] - 157:18
**doctor** [4] - 77:24, 245:21, 320:8, 320:12
**doctor's** [1] - 77:23
**doctors** [5] - 18:13, 313:6, 313:20, 185:6, 315:21
**Document** [2] - 62:22, 62:23
**document** [29] - 1:14, 4:11, 26:24, 26:25, 30:8, 62:13, 62:17, 63:5, 63:8, 63:11, 63:15, 63:21, 64:23, 105:25, 111:20, 111:23, 136:5, 137:7, 176:10, 183:14, 237:4, 348:17, 348:21, 353:21, 354:21, 387:20
**documents** [10] - 30:9, 30:13, 107:12, 290:14, 290:15, 290:19, 290:22, 346:23, 347:8, 348:9
**dog** [1] - 110:11
**done** [66] - 17:20, 34:16, 48:4, 71:24, 100:22, 101:12, 107:17, 118:2, 118:17, 119:2, 119:11, 124:4, 130:21, 136:1, 141:18, 141:20, 141:23, 144:14, 171:20, 172:3, 176:4, 178:13, 178:14, 178:18, 186:11, 186:23, 188:6, 188:8, 200:12, 202:4, 213:20, 213:21, 227:8, 233:2, 247:13, 271:19, 271:22, 271:24, 274:8, 279:17, 283:18, 307:5, 311:12, 337:9, 344:15, 353:5, 353:13, 353:14, 369:20, 373:17, 375:18, 376:15, 376:18, 377:3, 377:9,

378:4, 378:7, 378:8, 381:10, 381:15, 389:2, 390:13, 390:18
**Donna** [2] - 1:20, 5:23
**door** [1] - 164:19
**doors** [1] - 164:11
**dotted** [6] - 216:5, 216:24, 217:3, 217:15, 217:19, 218:1
**doubt** [6] - 182:16, 182:17, 182:20, 182:21, 210:22
**down** [28] - 6:20, 19:10, 20:20, 31:23, 32:19, 50:5, 53:25, 55:3, 65:3, 67:2, 70:10, 73:23, 90:21, 124:23, 129:7, 179:6, 182:2, 183:10, 202:14, 204:12, 210:14, 289:16, 300:1, 314:20, 351:16, 358:20, 363:10, 391:7
**downward** [1] - 342:9
**downwind** [1] - 39:23
**dozen** [1] - 377:3
**Dr** [80] - 3:19, 31:17, 33:1, 33:5, 33:10, 33:20, 34:9, 34:13, 35:9, 43:22, 45:8, 138:24, 140:6, 143:17, 160:15, 167:21, 172:5, 172:13, 173:3, 179:24, 180:24, 189:20, 199:17, 199:25, 200:3, 200:16, 208:19, 212:10, 214:1, 215:11, 216:23, 217:3, 222:21, 236:6, 241:11, 243:16, 243:17, 243:20, 247:6, 248:16, 250:11, 251:23, 252:9, 252:19, 252:25, 253:5, 253:10, 265:21, 282:1, 290:14, 291:6, 292:14, 304:6, 305:13, 305:20, 306:16, 309:17, 315:21, 316:14, 316:15, 316:16, 317:5, 317:8, 317:11, 317:14, 318:17, 319:3, 319:25, 320:3, 321:1, 321:6, 326:13, 334:10, 342:24, 342:25, 376:22, 381:25
**draft** [1] - 309:22
**drafting** [1] - 237:12
**drape** [1] - 323:13
**draped** [3] - 268:13, 322:13, 323:1
**drastically** [1] - 144:12
**draw** [1] - 120:9
**drawn** [1] - 375:19
**dress** [2] - 267:13, 268:3
**dressed** [2] - 268:7
**drew** [1] - 327:19
**drier** [4] - 88:11,

88:24, 89:20, 91:8
**driving** [5] - 23:2, 120:1, 131:13, 150:22, 231:11
**drugs** [1] - 78:4
**dry** [22] - 84:10, 84:17, 85:8, 85:16, 86:3, 86:9, 86:10, 87:9, 87:16, 88:1, 90:10, 90:11, 91:19, 93:19, 94:3, 94:10, 95:14, 95:21, 95:24, 97:11
**dryer** [1] - 270:8
**dryness** [4] - 95:16, 95:17, 95:23, 99:16
**dual** [1] - 381:4
**Dubon** [2] - 2:16, 5:11
**due** [1] - 106:11
**Duren** [6] - 304:19, 304:23, 305:6, 305:25, 309:17, 310:6
**during** [23] - 7:3, 75:13, 108:6, 116:14, 121:7, 125:25, 126:12, 126:18, 129:9, 130:2, 131:11, 131:20, 132:11, 134:15, 171:10, 178:2, 178:19, 182:15, 182:19, 270:9, 297:9, 343:18, 348:22
**duties** [1] - 13:22
**dying** [2] - 18:12, 18:13
**dynamics** [5] - 161:24, 162:19, 166:21, 374:5, 374:16

---

# E

**early** [3] - 39:8, 236:24, 237:3
**easier** [2] - 42:5, 104:25
**easiest** [1] - 105:10
**easily** [1] - 265:9
**easy** [4] - 104:3, 104:9, 213:12, 219:1
**echoed** [1] - 350:12
**edit** [1] - 312:15
**editor** [1] - 220:14
**education** [5] - 9:1, 9:8, 16:20, 161:22, 230:1
**effect** [7] - 73:15, 89:20, 100:17, 194:23, 195:9, 213:9, 257:8
**effectiveness** [1] - 55:23
**effectors** [3] - 83:7, 83:16, 83:18
**effects** [3] - 83:7, 83:16, 83:18
**efficacy** [1] - 345:7
**efficiencies** [2] - 65:23, 387:25
**efficiency** [20] - 61:7, 63:3, 63:4, 65:21, 68:25, 139:2, 139:22, 140:11, 385:5, 385:10, 385:15, 385:20, 386:7, 386:20, 386:23, 386:24, 387:4, 387:6, 387:24
**Efficiency** [1] - 64:2
**efficiency..** [1] - 69:7

**efficient** [2] - 138:4, 138:9
**effort** [1] - 306:22
**eight** [1] - 201:11
**either** [19] - 10:10, 11:2, 34:1, 78:12, 95:10, 120:5, 133:24, 140:24, 143:16, 148:8, 157:23, 185:11, 197:25, 227:19, 268:25, 305:4, 322:21, 372:21, 374:11
**electronic** [3] - 51:5, 184:6, 186:12
**electronically** [2] - 202:21, 203:7
**electrostatic** [2] - 133:18, 133:23
**electrosurgical** [1] - 168:9
**Elghobashi** [3] - 167:21, 170:1, 170:6
**email** [23] - 4:4, 4:6, 102:5, 102:7, 102:16, 102:20, 111:24, 112:6, 112:17, 112:19, 112:24, 136:9, 136:13, 136:19, 176:12, 183:18, 185:15, 186:7, 238:2, 303:22, 304:9, 304:18, 306:16, 307:21, 308:8, 308:15, 309:1, 309:15, 310:13, 310:18, 311:7, 367:1
**emails** [1] - 312:14
**emissions** [1] - 141:8
**emitted** [11] - 116:13, 125:25, 126:12, 126:18, 129:9, 130:2, 131:10, 131:20, 132:11, 134:15, 135:5
**emphasis** [1] - 59:1
**emphasize** [1] - 74:11
**employ** [1] - 130:7
**employed** [2] - 183:25, 376:5
**employee** [1] - 176:16
**employees** [1] - 310:7
**empty** [1] - 147:25
**enclosed** [2] - 309:22, 310:4
**encourage** [1] - 234:25
**end** [6] - 20:17, 74:23, 349:7, 349:13, 372:19, 390:14
**endeavors** [1] - 378:14
**ended** [1] - 390:24
**ends** [1] - 308:25
**enemy** [1] - 39:24
**engaged** [1] - 306:17
**engineer** [2] - 23:16, 23:18
**engineering** [1] - 138:16
**engines** [1] - 286:11
**English** [1] - 51:11
**enhanced** [2] - 84:7, 87:17
**enjoyed** [1] - 309:20
**enterprise** [1] - 115:11

JIM HO - June 28, 2017

**entire** [4] - 33:11, 180:24, 215:12, 282:3
**entities** [1] - 16:1
**entitled** [3] - 192:7, 204:17, 204:23
**environment** [47] - 12:23, 52:4, 52:9, 69:16, 70:5, 70:15, 71:16, 83:24, 84:1, 84:11, 84:17, 84:18, 84:25, 85:7, 85:8, 85:9, 86:2, 86:3, 86:4, 86:10, 86:16, 86:23, 87:9, 87:10, 87:17, 88:2, 88:18, 90:20, 91:4, 91:20, 92:1, 93:20, 94:3, 95:14, 95:20, 107:6, 142:14, 143:9, 145:10, 145:23, 155:3, 155:4, 164:20, 168:10, 343:9, 361:5, 380:15
**environmental** [1] - 194:1
**Epidemiological** [1] - 203:9
**Epidemiology** [1] - 203:9
**EPS** [5] - 82:1, 82:3, 82:6, 82:8, 83:21
**equal** [11] - 142:13, 142:24, 145:13, 385:13, 385:19, 386:7, 387:1, 387:5, 387:7, 387:8
**equate** [1] - 72:24
**equation** [2] - 144:22, 385:21
**equipment** [5] - 269:4, 269:16, 388:18, 389:3, 389:8
**equivalent** [1] - 21:16
**ER** [1] - 267:17
**error** [7] - 366:17, 370:10, 370:12, 378:15, 378:16, 378:25, 379:3
**errors** [3] - 361:14, 361:17, 362:3
**ESP** [1] - 81:20
**espouse** [1] - 361:20
**Esq** [3] - 2:2, 2:7, 2:12
**essentially** [4] - 25:13, 213:5, 295:9, 370:18
**EST** [2] - 168:14, 169:16
**establish** [2] - 42:7, 351:25
**establishes** [1] - 352:17
**estimation** [1] - 363:13
**et** [11] - 3:12, 3:19, 134:5, 134:13, 134:14, 135:10, 164:9, 168:8, 187:23, 188:13, 200:16
**et cetera** [1] - 230:8
**ethically** [1] - 162:3
**ethics** [3] - 244:10, 246:10, 303:10
**European** [1] - 253:11
**evaluate** [1] - 327:1
**evaluating** [1] - 17:9
**evaluation** [2] - 372:23, 373:11

**eventually** [3] - 106:20, 211:18, 237:21
**everywhere** [3] - 157:5, 266:11, 279:18
**evidence** [50] - 14:10, 66:13, 113:17, 116:12, 132:13, 155:24, 156:16, 158:10, 158:11, 158:16, 158:21, 159:18, 159:19, 159:21, 168:23, 171:1, 176:19, 177:16, 179:16, 186:4, 212:13, 223:9, 223:21, 229:25, 245:25, 246:13, 264:22, 274:21, 275:10, 275:11, 278:17, 279:4, 280:8, 280:11, 280:17, 281:9, 303:15, 312:1, 312:22, 315:5, 325:22, 327:7, 339:6, 339:9, 339:17, 353:9, 355:14, 355:25, 356:1
**evidentiary** [3] - 1:20, 92:24, 93:3
**exact** [8] - 128:8, 237:1, 237:2, 238:6, 238:7, 253:25, 295:2, 304:7
**exactly** [32] - 12:7, 14:21, 17:6, 19:12, 24:8, 25:20, 29:6, 47:17, 60:10, 68:13, 94:25, 98:10, 102:14, 114:18, 162:7, 180:6, 180:12, 202:19, 215:7, 222:7, 245:2, 267:14, 273:1, 287:7, 292:3, 293:20, 299:5, 300:5, 322:4, 329:13, 333:4, 351:24
**EXAMINATION** [1] - 3:4
**examine** [2] - 345:18, 346:10
**examined** [2] - 349:18, 357:7
**examining** [1] - 54:14
**example** [14] - 14:24, 16:6, 16:8, 19:20, 51:5, 59:3, 77:21, 84:8, 216:25, 244:11, 245:12, 246:4, 259:25, 260:24
**examples** [2] - 51:8, 300:8
**excellent** [1] - 204:14
**except** [1] - 350:3
**excursion** [2] - 216:14, 216:19
**excuse** [9] - 7:24, 64:10, 80:1, 128:12, 161:1, 173:2, 196:11, 338:11, 345:15
**executed** [2] - 13:23, 101:9
**exhausted** [2] - 26:8, 26:12
**exhibit** [8] - 187:17, 187:19, 200:9, 288:22, 289:18, 303:20, 308:24, 340:16
**Exhibit** [33] - 61:9,

62:15, 102:5, 111:22, 172:25, 176:8, 183:16, 186:9, 188:12, 202:7, 258:3, 258:4, 258:6, 258:7, 265:22, 271:23, 285:18, 285:19, 287:8, 287:24, 288:16, 288:17, 292:14, 292:24, 292:25, 335:15, 356:21, 367:17, 384:6, 384:9
**EXHIBIT** [16] - 3:12, 3:19, 4:1, 4:4, 4:6, 4:9, 4:11, 4:13, 187:23, 200:15, 265:18, 303:22, 308:8, 335:16, 348:17, 356:15
**exhibits** [9] - 135:19, 136:7, 285:16, 286:13, 287:15, 289:3, 289:6, 292:6, 293:13
**EXHIBITS** [1] - 3:10
**Exhibits** [5] - 136:8, 287:14, 291:22, 291:23, 292:1
**exist** [12] - 46:8, 47:7, 54:8, 54:15, 101:6, 210:15, 210:18, 210:22, 352:9, 352:16, 352:18, 352:19
**existence** [3] - 247:11, 365:16
**exists** [5] - 54:7, 55:6, 229:5, 229:7, 249:14
**exopolysaccharide s** [5] - 79:8, 80:25, 81:7, 81:19, 151:25
**expand** [1] - 111:4
**expect** [6] - 68:4, 77:18, 79:5, 95:9, 147:10, 357:10
**expectation** [2] - 179:14, 212:17
**expectations** [3] - 175:20, 213:6, 368:11
**expected** [1] - 364:11
**expecting** [2] - 17:5, 302:23
**expects** [1] - 79:5
**expel** [2] - 120:12, 120:22
**expelled** [3] - 119:14, 121:6, 169:16
**experience** [10] - 20:3, 20:4, 156:1, 331:9, 359:7, 370:3, 373:21, 377:9, 377:22, 378:10
**experienced** [2] - 7:1, 31:17
**experiment** [2] - 250:7, 380:20
**Experimental** [1] - 357:4
**experimental** [3] - 293:2, 294:17, 371:16
**experiments** [5] - 17:20, 212:16, 250:17, 374:4, 375:18
**expert** [57] - 4:9, 11:8, 11:10, 13:17, 13:22, 17:9, 17:14, 18:18, 19:15, 19:18,

19:21, 19:25, 20:5, 20:12, 20:19, 20:20, 20:24, 21:1, 21:5, 21:6, 22:1, 22:15, 22:19, 22:21, 24:4, 26:19, 31:24, 34:22, 34:25, 35:17, 43:23, 45:6, 50:23, 56:10, 103:23, 121:3, 122:19, 122:21, 156:5, 158:3, 160:4, 161:14, 165:24, 174:25, 177:4, 185:21, 224:2, 224:25, 239:13, 240:8, 263:22, 267:9, 318:21, 331:22, 335:16, 377:18
**expertise** [35] - 11:17, 11:21, 19:21, 20:2, 21:11, 21:22, 23:8, 42:16, 52:25, 53:4, 75:10, 75:21, 111:6, 111:9, 113:25, 114:18, 160:16, 161:18, 161:22, 162:4, 162:17, 174:24, 206:11, 326:17, 326:20, 327:1, 327:3, 329:19, 329:22, 330:2, 347:9, 348:10, 371:21, 378:6
**experts** [13] - 54:6, 54:10, 54:11, 54:12, 116:25, 117:13, 121:17, 187:21, 238:25, 239:1, 239:5, 240:4, 355:9
**Experts'** [1] - 333:24
**experts'** [1] - 334:4
**explain** [9] - 18:21, 211:25, 217:21, 217:23, 226:14, 288:19, 288:25, 327:23, 362:18
**explained** [2] - 95:16, 325:1
**explicitly** [2] - 272:12, 272:17
**exposed** [6] - 264:14, 268:11, 268:20, 268:21, 268:25, 269:14
**exposing** [1] - 220:23
**exposure** [1] - 194:4
**expressed** [3] - 65:21, 67:16, 92:1
**expressly** [2] - 280:4, 281:5
**extension** [1] - 358:4
**extraordinary** [1] - 128:16
**extrapolate** [2] - 279:6, 279:17
**eyes** [1] - 204:19

**F**

**fabricates** [1] - 223:21
**face** [1] - 306:23
**facilities** [1] - 56:10
**facility** [1] - 51:6, 51:25, 320:17
**fact** [35] - 22:3, 29:11, 31:16, 38:16, 66:4, 74:11, 90:19, 116:25, 122:17, 130:21, 145:25,

191:4, 198:8, 234:4, 251:5, 251:6, 253:4, 257:21, 260:18, 262:7, 273:4, 273:14, 294:22, 295:4, 296:17, 302:17, 314:8, 320:15, 345:3, 352:21, 356:1, 357:23, 360:23, 375:21, 381:11
**factors** [3] - 142:13, 142:23, 194:1
**facts** [24] - 14:10, 28:16, 113:17, 155:24, 156:16, 168:23, 170:25, 177:16, 264:22, 274:21, 275:10, 278:17, 279:2, 280:10, 280:16, 281:8, 312:1, 312:21, 315:4, 325:21, 327:7, 353:8, 355:13, 355:25
**fail** [2] - 91:12, 110:14
**fair** [23] - 15:7, 21:5, 31:10, 92:15, 92:17, 116:17, 125:16, 126:20, 130:4, 149:14, 149:15, 150:7, 157:16, 158:5, 233:24, 233:25, 251:14, 267:25, 277:6, 299:13, 311:14, 371:3, 377:24
**fairly** [8] - 69:10, 117:24, 177:22, 178:1, 226:3, 367:2, 389:13, 389:16
**faith** [3] - 74:14, 76:11, 127:21
**fake** [2] - 180:25, 182:7
**faked** [2] - 181:14, 220:22
**fall** [2] - 155:16, 363:20
**falling** [1] - 94:19
**false** [1] - 369:13
**familiar** [38] - 18:15, 67:18, 67:21, 85:12, 105:15, 107:4, 107:15, 110:22, 113:25, 118:19, 168:8, 170:15, 172:5, 172:13, 172:14, 172:16, 172:19, 172:21, 173:15, 199:16, 200:2, 201:20, 215:22, 230:13, 231:2, 231:4, 249:22, 251:7, 251:12, 294:16, 295:12, 296:15, 311:11, 317:14, 358:12, 368:20, 370:6, 378:16
**familiarity** [2] - 296:25, 311:12
**far** [10] - 19:2, 22:17, 65:8, 83:3, 132:8, 207:7, 237:17, 293:2, 361:10, 369:9
**Farrar** [1] - 2:2
**fast** [1] - 271:14
**fast-moving** [1] - 271:14
**fate** [1] - 161:20
**favor** [1] - 296:2
**favorable** [2] -

295:14, 296:5
**favour** [1] - 296:11
**FAW** [2] - 352:4,
353:1
**feasible** [1] - 349:14
**feathers** [1] - 330:12
**feature** [1] - 359:11
**featured** [3] - 107:20,
247:14, 248:10
**features** [2] - 16:11,
23:24
**feelings** [1] - 228:1
**feet** [8] - 64:7, 64:11,
64:16, 64:20, 104:19,
262:1, 262:12, 262:24
**fell** [1] - 363:20
**felt** [2] - 88:17
**fetched** [1] - 22:17
**few** [23] - 33:14,
116:13, 116:19,
119:14, 120:12,
120:22, 121:6,
122:22, 125:24,
126:17, 129:8,
129:10, 129:25,
131:10, 131:19,
132:10, 134:14,
135:4, 201:14,
375:20, 375:24,
381:11, 382:17
**fictional** [1] - 267:21
**field** [10] - 21:2,
139:14, 158:4, 259:7,
264:3, 264:5, 265:2,
266:19, 330:3, 375:23
**fields** [2] - 19:13,
19:14
**Figure** [13] - 174:10,
174:11, 174:15,
174:20, 206:23,
211:17, 215:21,
215:25, 218:9,
218:10, 369:10,
370:15, 370:17
**figure** [10] - 29:5,
158:20, 174:6, 208:1,
230:7, 272:4, 348:9,
376:21, 376:25, 379:1
**figured** [1] - 364:19
**figures** [2] - 327:18,
328:7
**fill** [1] - 389:10
**filter** [72] - 49:6,
49:8, 49:25, 50:1,
52:12, 57:7, 58:2,
58:9, 58:12, 59:19,
59:20, 59:23, 60:13,
60:14, 60:16, 60:19,
63:2, 63:23, 66:1,
66:5, 66:18, 66:23,
67:19, 67:22, 68:2,
68:7, 68:8, 68:24,
69:6, 69:12, 69:15,
70:3, 70:12, 70:14,
70:15, 71:5, 71:6,
71:7, 71:10, 71:11,
71:14, 71:25, 72:8,
72:17, 72:24, 72:25,
73:3, 73:5, 74:1, 74:9,
74:25, 138:15, 248:9,
248:22, 252:11,
338:7, 338:16,
338:22, 338:24,
339:11, 340:15,
340:18, 341:3,
349:13, 350:8,
350:11, 372:9,
372:10, 387:11,
387:14
**filters** [9] - 49:2,

49:11, 49:14, 49:20,
63:4, 65:22, 138:4,
138:9, 387:11
**filtration** [3] - 57:16,
75:11, 76:2, 76:5,
139:1, 139:4, 139:22,
139:24, 140:11,
140:13, 248:6, 340:2,
349:7
**final** [10] - 12:14,
63:16, 126:14,
126:16, 128:23,
131:9, 141:3, 196:21,
310:13, 370:13
**findings** [8] - 117:21,
189:13, 206:21,
215:2, 334:11,
357:22, 374:9, 376:2
**fine** [10] - 45:1, 57:5,
73:16, 141:1, 148:25,
244:6, 245:19,
323:12, 364:14,
364:25
**finish** [5] - 6:23,
147:15, 329:23,
329:25, 330:7
**finished** [1] - 390:19
**first** [58] - 10:5, 27:8,
29:20, 32:13, 62:16,
62:19, 64:14, 67:3,
102:16, 112:17,
112:18, 112:20,
124:9, 136:5, 136:8,
136:22, 164:25,
193:14, 203:2, 203:6,
203:18, 205:7, 205:9,
206:20, 207:6,
212:17, 214:9, 226:9,
236:10, 236:12,
242:6, 244:7, 262:19,
270:11, 270:24,
272:1, 275:17,
284:11, 285:1, 294:7,
298:7, 298:25,
308:15, 309:4, 309:5,
309:14, 313:21,
320:5, 326:12,
334:16, 334:17,
340:16, 349:3,
357:20, 364:20,
368:3, 388:4
**firstly** [1] - 149:5
**fit** [5] - 30:1, 175:20,
368:11, 369:10,
370:21
**five** [3] - 142:4,
333:8, 384:3
**FLAPS** [2] - 12:17
**flight** [1] - 382:17
**flip** [8] - 63:17,
68:16, 102:11, 137:9,
189:15, 193:6, 204:7,
241:14
**float** [1] - 79:24
**floating** [6] - 78:21,
78:22, 80:6, 80:22,
358:6, 389:6
**floor** [6] - 143:12,
143:22, 144:1,
155:16, 155:19, 156:7
**flow** [23] - 53:25,
54:7, 54:15, 55:14,
55:18, 55:24, 64:21,
160:17, 161:6,
161:11, 161:16,
161:23, 162:6, 162:8,
162:11, 162:20,
163:4, 163:6, 222:18,
253:12, 342:10,
342:15, 343:2

**fluid** [6] - 161:24,
162:19, 166:21,
271:14, 374:5, 374:16
**fly** [2] - 330:13,
385:10
**flying** [3] - 50:6,
50:7, 51:14
**focus** [6] - 48:10,
48:18, 59:11, 195:12,
195:15, 278:21
**focusing** [1] - 252:3
**folks** [1] - 122:21
**follow** [6] - 18:22,
69:24, 87:21, 89:12,
327:21, 362:8
**follow-up** [6] - 69:24,
87:21
**followed** [2] - 174:1,
365:25
**following** [5] - 36:24,
112:17, 134:18,
207:21, 299:1
**follows** [1] - 113:8
**fool** [1] - 219:1
**footprint** [1] - 389:16
**force** [2] - 166:20,
371:20
**Forced** [1] - 1:7
**forced** [32] - 5:4,
194:2, 194:17,
194:23, 195:8, 196:2,
242:11, 272:9,
272:13, 272:18,
272:23, 273:12,
274:25, 275:19,
276:7, 277:15,
279:21, 279:24,
281:2, 281:6, 282:6,
282:11, 282:24,
283:16, 283:24,
345:11, 352:8,
352:17, 353:5,
353:14, 354:2, 354:17
**forced-air** [21] -
242:11, 272:9,
272:13, 272:18,
272:23, 274:25,
275:19, 277:15,
279:21, 279:24,
281:2, 281:6, 283:16,
283:24, 345:11,
352:8, 352:17, 353:5,
353:14, 354:2, 354:17
**forces** [1] - 388:25
**foregoing** [1] - 391:6
**foremost** [1] - 214:9
**forget** [2] - 26:18,
44:10
**forgetting** [1] -
340:24
**form** [112] - 15:22,
17:16, 24:6, 24:15,
25:1, 25:18, 26:9,
28:3, 38:15, 42:19,
51:18, 52:19, 53:15,
66:12, 69:1, 69:18,
70:6, 75:15, 79:7,
79:9, 80:10, 87:11,
87:18, 91:10, 91:21,
93:21, 94:4, 96:4,
96:22, 97:13, 98:4,
99:20, 103:14, 104:6,
104:22, 105:12,
106:14, 107:7, 108:7,
113:15, 116:15,
117:22, 119:16,
120:5, 139:25,
140:14, 142:16,
144:18, 145:4,
151:25, 152:6, 152:7,

152:8, 152:17,
153:16, 154:2,
155:22, 156:15,
157:9, 168:22,
169:17, 170:24,
174:4, 176:18, 177:5,
177:15, 185:24,
191:11, 194:25,
203:23, 206:14,
208:8, 209:2, 221:3,
223:4, 223:7, 223:19,
224:4, 229:13,
232:17, 233:12,
249:17, 256:13,
264:8, 273:24, 277:9,
279:1, 280:6, 296:19,
299:22, 311:9,
311:25, 312:18,
315:3, 317:20, 318:6,
318:14, 320:19,
325:20, 327:6,
331:13, 332:4, 333:6,
333:18, 339:5, 353:7,
354:9, 355:12,
355:24, 372:25,
377:23, 380:6
**formed** [2] - 80:8,
237:8
**formerly** [1] - 384:9
**forming** [3] - 100:14,
117:8, 207:7
**formula** [1] - 144:23
**forth** [11] - 27:1,
32:20, 43:11, 45:4,
55:17, 64:20, 92:11,
99:14, 121:10,
121:13, 341:4
**forward** [1] - 309:24
**forwarding** [1] -
310:7
**foundation** [56] -
24:16, 36:23, 48:13,
69:20, 91:11, 94:5,
96:5, 103:15, 104:7,
104:23, 105:13,
113:16, 114:15,
115:5, 140:2, 140:15,
142:17, 153:17,
155:23, 156:17,
170:25, 219:21,
229:14, 255:23,
256:14, 256:21,
259:3, 260:7, 262:4,
262:15, 263:3,
263:18, 264:22,
265:5, 265:14, 266:9,
267:4, 268:16, 271:3,
274:21, 275:24,
278:3, 279:5, 280:15,
311:9, 312:22, 315:4,
318:7, 324:14, 327:6,
349:16, 351:21,
351:25, 353:8,
354:10, 355:13
**four** [6] - 67:2, 204:9,
204:10, 346:2, 346:7,
388:2
**fourth** [1] - 204:13
**frank** [1] - 180:23
**frankly** [4] - 92:5,
92:8, 127:18, 223:21
**free** [2] - 80:6, 358:6
**free-floating** [2] -
80:6, 358:6
**front** [16] - 19:4,
61:2, 66:23, 136:6,
183:14, 186:9,
188:12, 202:8, 208:3,
258:2, 258:7, 289:1,
327:18, 346:4

**fruitless** [1] - 115:10
**fudged** [3] - 175:15,
175:16, 220:20
**fudging** [1] - 179:1
**full** [7] - 147:9,
272:1, 282:14, 294:7,
298:7, 313:24, 344:22
**fun** [1] - 168:7
**function** [3] - 74:2,
89:6, 141:8
**functional** [1] - 11:25
**functionally** [1] -
144:25
**funded** [2] - 299:7,
302:19, 302:25
**funding** [1] - 245:14
**fungal** [4] - 40:21,
40:23, 40:24
**funny** [1] - 225:23
**future** [1] - 74:16
**fuzziness** [1] -
183:11
**fuzzy** [2] - 118:21,
183:7, 385:9

---

**G**

**Gabriel** [2] - 5:18,
226:16
**gain** [1] - 232:20
**gaping** [1] - 216:1
**garb** [2] - 265:23,
265:25
**Gary** [5] - 176:13,
176:16, 176:23,
310:8, 310:9
**gassaad@**
**kennedyhodges.**
**com** [1] - 2:9
**Gauthier** [1] - 317:11
**general** [8] - 8:14,
48:5, 67:24, 91:6,
110:5, 171:6, 359:4,
378:5
**generalized** [3] -
273:11, 276:6, 282:9
**generally** [6] - 27:20,
88:21, 98:21, 109:13,
110:9, 128:17
**generate** [1] - 37:22
**generated** [5] -
37:17, 38:11, 39:12,
39:18, 39:19
**generations** [1] -
247:10
**generic** [2] - 81:15,
262:8
**generically** [1] -
380:10
**generous** [1] -
372:22
**gentleman** [1] -
177:2
**gentlemen** [3] -
115:1, 115:23, 321:25
**genuinely** [3] -
120:21, 234:21,
234:23
**Gerbrandt** [5] - 1:21,
2:18, 5:23, 391:17,
391:18
**Gervais** [1] - 1:22,
5:13
**given** [22] - 6:7, 35:4,
35:16, 43:22, 71:15,
92:19, 107:12,
110:13, 143:20,
149:10, 178:2,
213:15, 287:11,
287:12, 287:21,

**JIM HO - June 28, 2017**

288:14, 292:8, 292:9,
292:18, 309:10,
345:7, 376:9
**glad** [2] - 190:8,
328:23
**glucose** [1] - 109:16
**glue** [1] - 76:13
**God** [3] - 54:12,
149:10, 225:8
**God-given** [1] -
149:10
**golly** [1] - 324:1
**Google** [1] - 201:23
**Gordon** [3] - 2:12,
5:20, 283:9
**GORDON** [378] - 3:7,
5:20, 7:24, 8:5, 14:9,
15:21, 17:16, 24:6,
24:15, 25:1, 25:18,
26:9, 28:3, 31:15,
31:19, 32:3, 32:6,
32:9, 36:22, 37:23,
38:2, 38:14, 38:21,
41:12, 42:18, 43:10,
43:21, 44:3, 44:8,
44:11, 44:19, 44:22,
45:1, 47:13, 48:12,
51:18, 52:19, 53:15,
57:11, 60:2, 60:6,
60:22, 61:8, 61:14,
61:22, 66:12, 69:1,
69:18, 70:6, 75:15,
79:9, 80:10, 82:1,
83:10, 84:19, 84:24,
85:4, 85:18, 85:23,
86:5, 86:15, 86:18,
86:22, 86:25, 87:5,
87:11, 87:18, 91:10,
91:21, 91:24, 92:8,
92:11, 92:14, 92:18,
92:21, 92:25, 93:6,
93:13, 93:21, 94:4,
94:12, 94:22, 95:2,
95:4, 96:1, 96:4,
96:22, 97:13, 98:4,
98:7, 98:17, 98:20,
99:20, 103:14, 104:6,
104:14, 104:22,
105:12, 106:14,
107:7, 108:7, 108:17,
113:15, 114:14,
115:4, 116:4, 116:15,
117:22, 119:16,
119:20, 120:14,
121:8, 122:24,
124:18, 125:9,
125:12, 125:15,
125:18, 125:20,
126:1, 126:22,
126:25, 127:5,
127:10, 127:15,
127:20, 127:24,
133:1, 133:4, 133:7,
133:11, 135:22,
135:24, 137:15,
139:25, 140:14,
141:18, 141:23,
142:16, 143:2,
144:18, 145:4,
145:12, 145:19,
153:3, 153:16, 154:2,
155:22, 156:15,
156:19, 157:9,
157:13, 160:6,
160:19, 160:23,
162:5, 162:22, 163:3,
163:7, 163:12, 167:3,
167:14, 167:21,
167:24, 168:4,
168:22, 169:17,

170:8, 170:24,
172:10, 174:4, 176:4,
176:18, 177:5,
177:15, 181:4,
181:10, 181:18,
181:21, 182:1,
182:11, 185:24,
186:3, 187:16, 189:7,
191:11, 191:15,
194:25, 200:8,
201:17, 202:21,
203:23, 206:14,
208:8, 209:2, 209:25,
210:4, 210:8, 210:11,
215:8, 219:20, 221:3,
223:3, 223:7, 223:19,
224:4, 224:8, 224:12,
224:17, 224:19,
224:22, 224:25,
225:4, 225:7, 225:10,
225:15, 225:19,
226:1, 226:4, 226:15,
226:19, 226:23,
227:6, 227:9, 227:13,
227:17, 227:22,
227:25, 228:3, 228:7,
228:10, 228:13,
228:16, 228:19,
228:23, 229:13,
232:17, 233:5,
234:11, 234:15,
234:18, 234:22,
235:1, 238:11,
238:14, 238:18,
240:1, 241:16,
249:17, 255:22,
256:13, 256:20,
258:3, 258:24, 259:2,
260:6, 262:3, 262:14,
263:2, 263:17, 264:7,
264:21, 265:4,
265:13, 266:8, 267:3,
268:15, 271:2,
271:22, 275:23,
274:3, 274:20, 275:9,
275:20, 275:23,
276:12, 276:16,
276:20, 277:2, 277:6,
277:9, 277:17, 278:2,
278:8, 278:16, 279:1,
279:4, 280:6, 280:10,
280:14, 281:7,
281:16, 281:19,
281:23, 282:17,
285:3, 285:10, 287:4,
288:18, 288:21,
290:3, 290:6, 293:8,
293:12, 293:15,
299:22, 311:8,
311:22, 311:25,
312:18, 312:21,
315:3, 317:20,
317:24, 318:6,
318:14, 318:18,
318:24, 319:4, 319:9,
319:14, 319:18,
319:22, 320:19,
320:24, 322:20,
324:13, 325:17,
325:20, 327:5,
331:13, 332:4, 333:6,
333:18, 339:5,
339:13, 339:16,
342:16, 342:19,
347:10, 347:15,
347:19, 347:24,
348:1, 348:13,
349:15, 351:21,
353:7, 354:6, 354:9,
355:12, 355:24,

360:19, 366:22,
367:3, 372:25, 380:5,
381:21, 382:4, 382:7,
382:12, 382:19,
382:23, 383:20,
383:24, 384:3, 384:5,
384:8, 384:11,
384:13, 385:23,
386:2, 386:5, 386:14,
386:17, 390:3,
390:11, 390:16
**government** [2] -
12:5, 244:15
**grade** [1] - 191:18
**graduate** [1] - 178:12
**grants** [1] - 244:21
**graph** [2] - 217:4,
370:19
**graphical** [1] - 219:2
**graphs** [1] - 213:15
**great** [4] - 15:1,
28:22, 230:18, 359:13
**greater** [10] - 141:7,
141:9, 361:2, 361:8,
385:11, 385:13,
385:16, 386:7, 387:1,
387:7
**Gregory** [3] - 172:5,
172:13, 367:18
**grew** [1] - 266:19
**ground** [1] - 329:1
**grounds** [3] - 36:23,
48:13, 120:15
**Group** [2] - 5:11,
5:24
**group** [10] - 186:16,
207:1, 209:7, 209:10,
211:12, 213:4,
274:11, 282:7, 282:8,
302:14
**groups** [4] - 193:15,
245:4, 302:19, 363:3
**grow** [1] - 99:1,
108:13, 108:16,
108:18, 108:22,
108:24, 109:17,
109:21, 109:24,
111:12, 111:16
**growing** [1] - 97:17,
105:20, 105:23
**grown** [1] - 112:10
**growth** [19] - 84:1,
84:11, 96:10, 96:16,
96:25, 98:1, 98:15,
99:6, 99:17, 100:1,
105:10, 105:14,
107:16, 108:5, 111:8,
114:13, 115:2,
115:21, 343:8
**guarantee** [1] - 37:11
**guess** [9] - 114:24,
170:4, 243:8, 261:1,
327:20, 341:16,
341:17, 371:18
**guessing** [4] - 243:4,
341:23, 342:1, 363:9
**guilty** [1] - 25:23
**guy** [2] - 81:12,
187:14
**guys** [1] - 61:18

**H**

**habit** [1] - 133:19
**hair** [1] - 167:12
**hairdryer** [5] - 269:5,
269:12, 270:18,
270:21, 271:7
**half** [4] - 247:22,
377:2, 389:17, 389:18

**Hamer** [2] - 316:14,
316:16
**Hamer's** [1] - 316:15
**hamper** [1] - 83:21
**hampers** [1] - 82:8
**hand** [22] - 24:9,
24:12, 62:12, 62:20,
72:11, 102:4, 111:20,
135:16, 172:23,
176:7, 195:15,
195:17, 204:16,
204:22, 304:8, 312:6,
314:12, 365:4,
367:16, 376:16,
385:21
**handed** [5] - 188:10,
233:15, 265:21,
356:11, 356:20
**handful** [1] - 143:4
**handing** [1] - 367:24
**handling** [1] - 299:13
**hands** [4] - 9:20,
227:8, 233:17, 233:24
**hands-on** [1] - 9:20
**handy** [1] - 67:23
**hang** [2] - 44:18,
132:22
**hang-up** [1] - 44:18
**hangs** [1] - 102:13
**Hansen** [4] - 176:13,
176:16, 176:23,
310:13
**happy** [2] - 379:13,
382:15
**harbor** [1] - 343:1
**hard** [1] - 70:18
**hardware** [4] - 12:8,
12:12, 14:4, 14:7
**Harper** [2] - 319:3,
321:1
**harper** [1] - 321:1
**hat** [1] - 85:15
**hate** [1] - 303:19
**hazard** [1] - 333:16
**head** [2] - 95:22,
98:11
**heading** [1] - 205:8
**Health** [4] - 173:17,
177:2, 185:10, 185:19
**healthcare** [4] -
17:10, 69:15, 70:4,
70:12
**Healthcare** [1] -
304:20
**hear** [8] - 36:12,
123:23, 123:24,
165:22, 212:21,
212:22, 289:23,
355:17, 374:10
**heard** [10] - 107:17,
110:24, 118:19,
141:11, 165:17,
165:18, 264:10,
279:13, 304:23,
350:22
**hearing** [1] - 54:25
**heat** [1] - 158:11
**heavily** [1] - 372:15
**heck** [1] - 180:5
**height** [1] - 389:17
**help** [12] - 17:7, 22:4,
22:8, 28:17, 51:12,
53:25, 77:19, 163:1,
176:15, 241:14,
253:9, 286:11
**helped** [2] - 318:3,
318:9
**helpful** [11] - 71:13,
154:12, 157:19,
184:11, 184:23,

232:25, 233:3, 233:4,
233:6, 265:6, 372:21
**helps** [1] - 154:14
**hematology/
oncology** [1] - 196:16
**Hen** [1] - 357:4
**HEPA** [10] - 49:11,
49:14, 49:20, 67:19,
67:22, 68:2, 68:4,
350:8, 350:11, 350:16
**hereby** [1] - 391:5
**hesitant** [1] - 42:20
**hesitate** [1] - 128:9
**Hi** [1] - 309:19
**hi** [1] - 306:20
**high** [6] - 122:1,
196:13, 196:25,
271:15, 327:2, 355:21
**high-risk** [2] -
196:13, 196:25
**higher** [2] - 217:17,
282:5
**highlight** [2] - 285:2,
285:3
**highlighted** [7] -
63:22, 112:22, 193:9,
198:9, 285:4, 285:5,
365:21
**highlighting** [3] -
198:15, 198:16,
198:17
**highlights** [1] -
187:15
**himself** [1] - 175:21
**hip** [1] - 264:14
**hire** [1] - 20:21
**hired** [5] - 13:17,
239:15, 239:20,
295:14, 381:14
**history** [2] - 120:15,
128:4
**hit** [1] - 201:23
**hits** [1] - 363:5
**hmm** [176] - 41:14,
46:4, 49:18, 50:19,
57:15, 60:20, 63:9,
68:22, 73:18, 76:10,
77:2, 77:22, 78:19,
81:3, 82:11, 82:19,
84:23, 87:24, 89:2,
89:5, 89:8, 89:13,
89:18, 90:22, 90:24,
95:18, 96:15, 96:17,
99:7, 103:20, 104:2,
108:12, 113:2,
114:20, 117:4,
117:15, 130:5,
135:13, 141:6,
142:21, 145:18,
147:7, 152:23, 160:8,
163:22, 174:9,
189:20, 190:9,
198:21, 199:4, 216:7,
218:13, 220:3, 222:2,
225:6, 230:15,
234:17, 239:2,
242:18, 244:2, 252:2,
264:25, 269:11,
269:22, 270:4,
270:13, 293:14,
298:12, 300:10,
307:14, 320:9,
321:22, 325:25,
326:16, 327:10,
327:16, 328:12,
328:24, 341:11,
343:15, 358:3, 362:9,
368:21, 378:18,
379:6, 379:19,
380:21, 380:25

**JIM HO – June 28, 2017**

**HO** [20] - 1:18, 3:5, 3:12, 3:19, 4:1, 4:4, 4:6, 4:9, 4:11, 4:13, 6:1, 187:23, 200:15, 236:2, 265:18, 303:22, 308:8, 335:16, 348:17, 356:15

**Ho** [56] - 5:3, 6:3, 27:19, 31:17, 38:25, 42:10, 43:22, 45:8, 62:12, 122:19, 128:22, 142:12, 160:15, 179:24, 187:9, 187:13, 188:11, 189:20, 190:24, 198:25, 200:11, 200:14, 202:7, 208:2, 210:3, 216:23, 217:3, 217:20, 236:6, 258:4, 258:5, 258:7, 265:21, 265:22, 282:1, 289:5, 289:6, 289:20, 289:24, 290:9, 290:10, 290:11, 290:14, 303:21, 304:9, 308:7, 308:25, 335:15, 348:12, 348:16, 348:20, 356:21, 376:22, 381:25

**Ho's** [2] - 143:17, 334:10

**Hodges** [4] - 2:7, 102:21, 102:22, 102:23

**Hold** [1] - 93:11

**hold** [13] - 38:18, 43:16, 128:13, 147:15, 212:9, 217:2, 260:11, 267:10, 313:20, 335:12, 371:10, 374:20

**holding** [1] - 348:7

**hole** [1] - 216:1

**holidays** [1] - 309:20

**home** [1] - 289:22

**hominem** [2] - 181:22, 224:20

**honest** [1] - 180:23

**honestly** [1] - 384:23

**hope** [2] - 96:15, 309:20

**hopefully** [2] - 212:16, 381:18

**hopes** [1] - 192:21

**hoping** [1] - 134:2

**horrible** [1] - 220:22

**Hose** [1] - 349:7

**hose** [8] - 100:14, 100:15, 101:3, 110:18, 116:20, 122:3, 132:14, 349:13

**Hose-end** [1] - 349:7

**hoses** [2] - 112:9, 131:6

**Hospital** [2] - 18:10, 203:9

**hospital** [5] - 17:14, 18:4, 196:9, 196:12, 325:2

**hospitals** [3] - 18:9, 101:17, 101:23

**host** [8] - 147:1, 147:13, 147:21, 148:2, 150:10, 150:16, 151:11, 151:15

**hot** [4] - 74:20,

270:16, 271:15, 342:8

**hour** [7] - 8:14, 8:15, 20:12, 337:12, 337:23, 382:2, 383:9

**hours** [2] - 238:23, 330:21

**Houston** [4] - 2:3, 2:8, 90:20, 90:21

**Huang** [13] - 249:11, 249:21, 249:23, 250:13, 250:17, 250:21, 251:5, 251:17, 252:15, 253:22, 294:20, 295:19, 297:2

**huge** [1] - 74:14

**Hugger** [162] - 1:6, 5:4, 23:13, 23:21, 26:5, 26:8, 27:5, 48:24, 49:9, 58:6, 58:11, 58:13, 60:13, 63:3, 64:21, 66:1, 66:5, 66:22, 72:18, 73:3, 74:1, 74:9, 75:11, 83:24, 84:2, 84:21, 85:3, 85:6, 85:19, 86:2, 86:5, 86:8, 86:19, 86:23, 87:8, 92:2, 92:4, 94:8, 98:3, 98:16, 98:21, 100:13, 101:3, 101:11, 101:18, 105:5, 107:20, 108:3, 108:6, 108:16, 108:22, 109:20, 109:24, 110:18, 112:8, 113:6, 115:3, 115:21, 116:14, 119:3, 119:15, 120:12, 120:22, 121:7, 121:19, 122:23, 124:16, 125:1, 125:5, 130:10, 130:12, 130:14, 130:16, 130:23, 130:24, 131:2, 131:11, 131:15, 131:21, 131:23, 132:12, 139:21, 140:10, 141:12, 158:12, 161:5, 161:11, 162:19, 165:3, 176:23, 223:1, 223:16, 232:4, 232:13, 233:9, 233:22, 234:3, 241:22, 242:22, 243:5, 246:1, 246:25, 247:8, 247:13, 247:17, 247:21, 248:21, 249:6, 249:8, 249:12, 249:14, 251:18, 252:11, 252:17, 273:19, 284:21, 286:10, 297:3, 304:1, 314:3, 314:13, 314:18, 315:2, 316:10, 316:22, 318:3, 318:5, 318:10, 318:11, 320:11, 320:16, 321:2, 321:7, 321:24, 322:14, 323:2, 324:3, 324:10, 326:1, 327:21, 328:10, 337:11, 337:22, 338:7, 338:16, 341:3, 342:9, 343:1, 343:13, 343:17, 343:23, 349:14, 349:19,

351:11, 351:13, 351:14, 371:11, 372:24, 373:13, 373:17, 374:4, 381:5

**Hugger's** [3] - 248:6, 315:10, 324:20

**Huggers** [2] - 101:24, 105:9

**Hulse** [4] - 136:13, 137:23, 138:24, 140:6

**human** [4] - 146:1, 148:16, 338:1, 338:2

**humid** [4] - 88:16, 113:12, 114:4, 343:24

**humidity** [9] - 84:2, 84:13, 85:12, 89:6, 89:19, 90:14, 96:11, 97:11, 99:16

**hurt** [4] - 97:9, 97:10, 97:24, 106:12

**hurts** [2] - 283:19, 295:9

**HVAC** [5] - 18:16, 18:18, 19:19, 19:25

**hypothermia** [1] - 345:9

**hypothesis** [2] - 214:6, 214:15

**hypothetical** [19] - 69:20, 96:6, 103:16, 104:24, 108:8, 113:17, 116:5, 131:5, 140:1, 140:16, 142:18, 144:19, 145:5, 147:4, 156:17, 168:24, 347:7, 353:21, 354:21

---

**I'm..** [1] - 13:16

**i.e** [1] - 282:25

**Iaizzo** [2] - 242:8, 246:12

**Iaizzo's** [1] - 246:25

**IARS** [1] - 310:4

**idea** [19] - 44:17, 77:14, 103:12, 103:17, 104:4, 104:20, 106:4, 106:5, 153:21, 192:24, 219:17, 220:10, 316:6, 341:15, 341:22, 347:4, 378:24, 389:8

**identified** [1] - 334:3

**identify** [1] - 5:14

**idle** [3] - 108:4, 115:16, 115:17

**ignore** [1] - 198:16

**illuminate** [2] - 25:14, 48:20

**illustrate** [4] - 165:4, 257:3, 260:21, 260:25

**illustration** [3] - 154:11, 159:6, 297:20

**imagine** [2] - 311:17, 328:6

**immaterial** [1] - 20:23

**immediate** [2] - 268:12, 328:13

**immediately** [2] - 186:24, 264:16

**immune** [4] - 82:9, 83:7, 83:16, 83:17

**impact** [1] - 363:15

**impacted** [1] - 362:23

**impactor** [8] -

358:12, 358:23, 359:5, 359:6, 359:12, 359:24, 362:11, 367:12

**implant** [12] - 78:17, 80:9, 152:18, 153:15, 203:14, 205:3, 205:12, 205:23, 206:5, 219:18, 258:17, 380:1

**Implant** [2] - 3:21, 200:19

**implants** [1] - 153:13

**implementing** [2] - 314:2, 314:18

**implements** [1] - 315:2

**implicates** [2] - 7:9, 7:10

**implication** [3] - 129:10, 259:19, 314:13

**implications** [1] - 353:18

**implied** [4] - 259:16, 259:17, 259:18, 300:17

**implies** [1] - 138:25

**imply** [4] - 150:21, 210:24, 210:25, 260:23

**implying** [2] - 248:24, 321:23

**importance** [3] - 37:15, 138:18, 168:2

**important** [19] - 36:17, 37:13, 51:1, 77:2, 104:10, 104:13, 139:21, 139:24, 140:9, 166:5, 176:2, 212:2, 212:3, 247:19, 292:25, 293:6, 368:24, 374:23

**impose** [2] - 126:23, 245:10

**imposing** [1] - 128:1

**impossible** [1] - 209:15

**impress** [1] - 15:4

**impression** [10] - 24:20, 26:13, 64:24, 97:15, 98:25, 279:16, 324:5, 369:13, 375:19, 380:19

**improper** [1] - 34:20

**inadequate** [2] - 338:8, 338:16

**inadvertent** [1] - 345:8

**incidence** [2] - 299:18, 303:12

**incidences** [2] - 299:2, 301:1

**incident** [5] - 56:6, 205:3, 205:12, 255:5, 258:16

**incision** [3] - 205:2, 205:11, 258:15

**incisional** [5] - 205:4, 205:13, 205:21, 258:17, 261:5

**incisionally** [1] - 206:10

**include** [3] - 276:10, 276:18, 296:17

**included** [3] - 59:7, 137:5, 277:15

**including** [2] - 98:2, 194:4

**incomplete** [17] -

69:20, 96:5, 97:14, 99:21, 103:15, 104:23, 108:8, 113:16, 116:5, 140:1, 140:15, 142:17, 144:19, 145:5, 156:17, 168:24, 273:24

**incorporated** [1] - 107:25

**Incorporated** [2] - 7:13, 304:21

**incorrect** [1] - 170:2

**incorrectly** [1] - 366:21

**increase** [20] - 142:13, 142:14, 142:24, 143:5, 143:9, 143:11, 143:13, 144:12, 144:16, 144:17, 157:20, 157:21, 216:24, 217:4, 217:11, 217:15, 217:20, 218:2, 229:6

**increased** [2] - 196:14, 223:16

**increases** [1] - 223:2

**increasing** [2] - 99:10, 218:4

**incredibly** [2] - 97:3, 311:6

**incredulous** [1] - 322:24

**indefinite** [1] - 78:23

**independent** [4] - 8:20, 239:13, 245:16, 296:9

**indicate** [1] - 81:5

**indicating** [2] - 207:1, 336:18

**indication** [3] - 29:13, 105:22, 120:1

**indirection** [1] - 15:25

**individual** [3] - 152:10, 336:7, 362:15

**individually** [1] - 187:21

**indoors** [1] - 377:21

**induces** [1] - 152:8

**inexperienced** [1] - 190:11

**infect** [1] - 147:23

**infected** [4] - 146:12, 146:19, 147:23, 331:21

**infecting** [1] - 107:3

**Infection** [3] - 203:8, 204:18, 204:24

**infection** [65] - 18:8, 18:14, 23:4, 48:25, 53:1, 53:7, 53:21, 56:6, 75:3, 75:8, 78:1, 112:3, 136:18, 142:15, 142:25, 143:12, 143:14, 143:20, 143:22, 144:1, 144:12, 144:17, 145:3, 145:11, 145:24, 146:10, 147:2, 147:22, 148:7, 148:10, 148:12, 150:6, 150:10, 150:11, 150:14, 150:15, 150:19, 150:22, 151:9, 151:12, 151:18, 157:22, 194:18,

196:3, 196:15, 205:3,
205:6, 205:12,
205:14, 206:9,
219:18, 222:17,
223:1, 255:5, 256:17,
257:1, 257:14,
258:17, 258:22,
258:23, 259:22,
259:23, 261:5, 261:8,
380:3
  **infection-control** [4]
- 53:1, 53:7, 143:20,
143:22
  **infection..** [3] -
205:4, 205:13, 258:18
  **infections** [35] -
23:9, 26:6, 27:6,
52:18, 54:1, 97:4,
143:5, 194:24, 195:9,
196:25, 203:14,
203:21, 205:19,
205:22, 205:24,
206:5, 214:10, 255:8,
255:19, 256:7,
256:11, 256:18,
256:19, 257:5, 257:9,
259:13, 260:5,
260:14, 260:20,
327:20, 352:9,
352:18, 352:20
  **Infections** [2] - 3:21,
200:19
  **infections..** [1] -
194:8
  **infectious** [5] -
22:21, 53:13, 151:13,
158:3, 331:22
  **infectivity** [10] - 23:2,
40:24, 144:21,
148:15, 148:17,
149:6, 149:9, 149:12,
331:15, 331:20
  **infects** [1] - 150:1
  **inflict** [1] - 228:20
  **information** [3] -
28:16, 29:14, 43:5
  **inherent** [4] - 11:11,
15:25, 16:3, 359:24
  **inhibit** [1] - 115:2
  **inhibiting** [1] -
114:12
  **inhibits** [1] - 84:11
  **initial** [1] - 63:22
  **initiating** [2] - 26:24,
309:15
  **injected** [1] - 38:22
  **inquisition** [2] -
228:17, 228:22
  **insane** [6] - 181:8,
224:18, 225:1, 225:3,
225:19, 235:2
  **inside** [25] - 18:4,
49:9, 86:18, 94:8,
100:15, 101:3,
101:11, 101:18,
101:24, 102:6, 103:6,
103:13, 103:18,
104:12, 104:21,
106:3, 110:17,
110:18, 112:8,
115:21, 145:2,
150:12, 343:12,
343:23, 357:16
  **insight** [2] - 14:22,
56:19
  **instance** [22] - 17:8,
18:3, 21:15, 24:12,
26:1, 31:3, 65:9,
71:24, 88:5, 119:1,

148:16, 209:18,
241:7, 244:6, 246:22,
247:21, 263:13,
266:17, 266:18,
289:20, 321:12,
373:16
  **instead** [4] - 118:17,
270:6, 342:2, 362:11
  **Institute** [4] - 173:16,
177:2, 185:9, 185:19
  **instructing** [1] -
128:20
  **instructions** [1] -
345:13
  **instrument** [12] -
7:16, 11:15, 12:14,
12:20, 49:24, 70:8,
73:6, 74:17, 362:22,
362:25, 389:1, 390:6
  **instrumentation** [5] -
9:20, 169:22, 182:23,
183:1, 183:3
  **instruments** [4] -
103:25, 116:23,
123:5, 263:14
  **insult** [3] - 296:1,
296:24, 319:20
  **intellectual** [1] - 7:20
  **intend** [4] - 95:6,
104:15, 104:18,
226:15
  **intending** [1] - 9:20
  **intends** [1] - 214:24
  **intent** [6] - 14:11,
14:20, 79:11, 79:14,
114:21, 161:13
  **intentionally** [2] -
119:21, 354:24
  **interaction** [1] -
318:11
  **interactions** [2] -
316:22, 318:4
  **interchangeably** [1]
- 139:19
  **interest** [16] - 123:6,
246:19, 299:2,
299:18, 299:21,
300:7, 300:11,
301:10, 301:15,
302:3, 302:12,
303:12, 312:12,
313:2, 313:9, 314:14
  **interested** [9] - 15:4,
96:24, 97:6, 99:9,
99:12, 199:12, 231:8,
232:6, 314:11
  **interesting** [1] -
154:9
  **interfere** [2] -
127:16, 342:9
  **interference** [1] -
342:15
  **interferes** [1] - 161:6
  **interior** [1] - 92:3,
343:1, 343:6
  **internal** [6] - 4:11,
105:10, 105:14,
346:23, 348:17,
348:21
  **interpret** [7] - 34:1,
161:18, 217:21,
217:24, 267:5, 363:2,
363:4
  **interpretation** [4] -
125:17, 189:16,
212:1, 261:20
  **interpretations** [1] -
143:8
  **interpreted** [3] -
72:22, 179:21, 183:8

  **interrupt** [2] - 6:22,
267:16
  **interrupting** [1] -
7:25
  **interrupts** [3] -
161:5, 161:11, 162:19
  **interval** [1] - 215:23
  **intervals** [2] -
209:11, 216:20
  **intervening** [1] -
131:6
  **intervention** [3] -
209:7, 209:10, 211:11
  **introduce** [3] -
164:11, 271:16, 343:2
  **introduction** [2] -
200:22, 214:16,
271:14
  **invention** [1] - 7:19
  **inventor** [1] - 7:16
  **investigate** [2] -
24:5, 161:5, 161:10
  **investigations** [1] -
186:12
  **invite** [1] - 311:3
  **invoices** [1] - 238:12
  **involve** [6] - 7:4,
274:11, 278:15,
373:25, 374:5, 388:19
  **involved** [7] - 9:12,
232:13, 236:8,
236:10, 248:20,
251:18, 252:16,
252:24, 253:15,
253:23, 278:14
  **involvement** [1] -
30:24
  **involves** [4] - 41:10,
232:14, 255:19,
367:11
  **involving** [2] - 107:3,
233:21
  **ion** [3] - 107:13,
107:16, 107:20
  **Iowa** [3] - 4:14,
356:16, 356:22
  **irrelevant** [1] -
227:18
  **island** [1] - 28:15
  **isolation** [10] -
129:19, 165:16,
165:18, 166:1, 166:6,
166:15, 166:23,
167:18, 170:10, 316:6
  **issue** [20] - 24:24,
54:21, 72:11, 73:8,
144:21, 148:15,
193:22, 221:7,
221:10, 221:11,
222:17, 223:1, 226:9,
239:3, 245:14, 275:4,
283:11, 334:12,
345:18, 346:11
  **issued** [1] - 237:14
  **issues** [17] - 15:19,
18:19, 24:9, 24:12,
25:3, 50:24, 164:4,
162:5, 162:7, 162:16,
194:12, 236:7, 239:5,
274:19, 347:9, 351:4,
379:21
  **item** [1] - 112:13
  **items** [1] - 129:16
  **itself** [7] - 27:20,
84:22, 86:6, 195:3,
313:12, 357:14,
359:25
  **IV** [1] - 333:23

## J

  **January** [11] - 4:4,
4:6, 4:7, 203:10,
303:23, 308:9,
308:17, 308:25,
309:1, 309:2
  **JIM** [4] - 1:18, 3:5,
6:1, 236:2
  **Jim** [1] - 5:3
  **job** [13] - 12:7, 12:11,
71:4, 71:22, 113:13,
114:5, 316:3, 323:25,
376:13, 376:16
  **joint** [13] - 4:13, 23:4,
23:9, 75:2, 75:8,
256:11, 256:18,
257:14, 258:23,
261:8, 356:15,
356:22, 380:2
  **Jones** [1] - 32:25
  **journal** [1] - 203:9
  **judge** [2] - 6:16,
231:13, 311:14
  **judgment** [5] -
233:12, 249:3,
372:23, 373:12,
378:12
  **Judy** [2] - 102:21,
102:22
  **July** [2] - 203:6,
391:12
  **jump** [2] - 20:19,
179:6, 260:16
  **jumped** [1] - 295:23
  **jumping** [2] - 82:10,
198:10
  **June** [5] - 1:23, 5:7,
236:15, 237:8, 237:11
  **jury** [17] - 18:25,
21:1, 22:13, 55:23,
74:8, 91:19, 99:15,
114:7, 121:4, 121:5,
122:19, 161:20,
162:3, 181:13,
371:23, 372:7, 375:15
  **just..** [1] - 389:24

## K

  **Kalliomaki** [4] -
164:9, 165:11, 170:4,
170:12
  **keep** [17] - 51:2,
51:4, 51:17, 52:14,
53:13, 54:9, 56:4,
76:25, 81:18, 207:23,
210:3, 227:12, 238:1,
282:19, 282:20,
317:5, 340:24
  **keeping** [1] - 237:24
  **keeps** [1] - 128:19
  **Kellam** [4] - 344:4,
344:7, 344:17, 345:21
  **Kellam's** [1] - 345:4
  **Kennedy** [1] - 2:7
  **kill** [4] - 84:6, 87:17,
113:13, 114:5
  **Kimberger** [1] -
321:6
  **kind** [41] - 7:17,
16:22, 32:21, 52:22,
104:17, 104:10,
114:18, 125:2, 125:9,
128:2, 147:12, 148:4,
153:22, 154:19,
167:24, 168:13,
169:10, 193:22,
205:19, 231:10,

232:15, 246:9, 248:9,
255:7, 255:9, 263:21,
265:23, 265:25,
266:5, 274:7, 274:12,
278:15, 320:12,
327:3, 333:15,
334:18, 370:7, 371:6,
378:25, 388:18,
389:20
  **kinds** [6] - 29:17,
33:24, 159:11, 165:6,
268:3, 367:10
  **kites** [1] - 76:13
  **knee** [4] - 264:13,
268:25, 274:11,
278:21
  **knowing** [3] - 42:22,
199:12, 199:23
  **knowingly** [1] -
296:16
  **knowledge** [8] -
9:14, 25:14, 28:12,
123:11, 244:9,
314:19, 348:1
  **known** [2] - 133:23,
317:18
  **knows** [1] - 122:18
  **Koenigshofer** [2] -
337:7, 337:10
  **Koenigshofer's** [2] -
337:20, 342:8
  **Konis** [1] - 35:6
  **Konisberger** [1] -
35:6
  **Kowalski** [6] - 68:21,
69:5, 350:12, 350:15,
384:24, 384:25
  **Kuehn** [3] - 240:3,
240:5, 241:11

## L

  **labelled** [1] - 289:8
  **labels** [1] - 20:18
  **laboratory** [1] -
12:22
  **lack** [53] - 24:16,
25:14, 69:19, 91:11,
94:5, 96:5, 103:15,
104:7, 104:23,
105:13, 113:16,
114:14, 115:4, 140:2,
140:15, 142:17,
153:17, 155:23,
156:17, 170:25,
219:20, 228:14,
229:14, 255:22,
256:14, 256:20,
259:2, 260:7, 262:3,
263:2, 263:17,
264:21, 265:4,
265:13, 266:8, 267:3,
268:15, 271:2,
274:20, 275:23,
278:2, 279:4, 280:15,
311:9, 312:22, 315:4,
318:7, 324:13, 327:6,
349:15, 353:8,
354:10, 355:13
  **Ladner** [2] - 1:21,
5:13
  **lady** [1] - 325:4
  **Lamar** [1] - 2:3
  **laminar** [20] - 53:24,
54:7, 54:14, 54:17,
55:13, 55:17, 55:24,
160:17, 161:6,
161:11, 161:16,
161:23, 162:6, 162:8,
162:11, 162:20,

**JIM HO – June 28, 2017**

163:4, 163:6, 222:18,
342:15
**language** [1] -
105:24
**large** [5] - 302:14,
344:14, 345:14,
345:17, 346:10
**large-scale** [2] -
344:14, 345:17,
346:10
**larger** [2] - 40:22,
357:24
**last** [12] - 102:12,
102:13, 102:15,
111:14, 187:20,
298:9, 298:10,
298:11, 344:22,
345:1, 345:3, 350:5
**latitude** [1] - 386:1
**laughs** [2] - 224:14,
226:10
**lawsuit** [15] - 13:7,
13:12, 14:8, 19:6,
22:16, 24:12, 26:25,
30:13, 31:12, 36:21,
205:17, 205:19,
206:1, 239:20, 247:14
**lawsuits** [1] - 282:22
**lawyer** [1] - 7:1
**lawyers** [2] - 43:24,
293:19
**lay** [3] - 118:23,
213:12, 219:1
**Laying** [1] - 357:4
**Laying-Hen** [1] -
357:4
**layman** [1] - 179:5
**layman's** [1] - 77:3
**laymen** [1] - 118:22
**lead** [2] - 106:20,
106:24
**leading** [3] - 130:19,
156:18, 386:9
**leap** [2] - 52:21,
74:14
**leaps** [1] - 76:11
**learn** [7] - 11:4,
11:25, 16:24, 42:22,
42:23, 232:20
**learned** [2] - 15:3,
20:4
**learning** [1] - 171:16
**least** [6] - 36:23,
113:11, 241:10,
271:8, 291:3, 309:5
**leave** [1] - 146:4
**left** [4] - 65:8, 82:21,
83:3, 343:21
**legal** [3] - 26:22,
230:1, 282:25
**Legg** [9] - 32:25,
33:1, 33:5, 33:10,
33:20, 34:9, 34:13,
288:6, 291:16
**Legg's** [3] - 290:25,
305:20, 315:21
**legitimate** [2] -
29:15, 369:17
**less** [10] - 42:15,
44:14, 120:20,
253:12, 253:16,
385:11, 385:16,
386:20, 387:8, 388:11
**lesser** [7] - 385:13,
385:19, 386:11,
386:19, 387:1, 387:5,
387:6
**letter** [1] - 220:13
**letting** [1] - 28:18
**level** [12] - 8:3, 63:4,

75:10, 76:2, 76:5,
78:15, 85:12, 96:11,
99:16, 107:5, 355:21,
370:24
**levels** [5] - 21:12,
21:16, 75:12, 76:6,
209:12
**liability** [1] - 5:5
**Liability** [1] - 1:8
**Lieber** [1] - 317:15
**life** [8] - 77:9, 104:10,
110:12, 147:9,
265:24, 267:12,
267:23, 379:11
**light** [4] - 120:14,
270:1, 270:3, 270:7
**lightning** [1] - 149:10
**likewise** [1] - 246:3
**limit** [2] - 216:18,
218:14
**limited** [3] - 78:24,
198:24, 242:5
**limits** [1] - 216:18
**line** [18] - 32:19,
39:4, 40:10, 216:16,
304:19, 327:19,
328:1, 328:16,
328:17, 328:22,
329:5, 330:12, 332:7,
332:15, 333:3,
370:20, 370:21,
371:19
**linear** [2] - 190:19,
365:25
**lines** [6] - 216:23,
216:24, 217:3,
217:15, 217:19, 218:1
**liquid** [10] - 10:10,
10:13, 89:16, 343:7,
343:12, 343:16,
362:13, 362:14,
363:16, 363:18
**list** [7] - 57:21, 61:2,
297:11, 315:14,
315:21, 340:5, 359:15
**listed** [5] - 112:25,
126:20, 305:18,
305:22, 323:17
**lists** [1] - 287:6
**literally** [1] - 85:23
**literature** [40] -
27:24, 28:2, 28:9,
28:22, 28:24, 29:22,
32:15, 35:19, 47:7,
53:23, 100:20, 132:5,
132:9, 159:11,
197:20, 240:24,
241:21, 241:25,
244:8, 250:24, 284:7,
287:13, 287:17,
295:8, 297:12, 315:9,
315:10, 318:22,
324:20, 325:15,
326:2, 344:6, 354:23,
372:24, 373:13,
375:25, 376:6, 376:8,
376:23
**Litigation** [1] - 1:9
**litigation** [9] - 5:5,
31:20, 62:14, 111:21,
156:25, 172:25,
176:8, 224:3, 348:22
**live** [13] - 11:11,
12:16, 143:12,
143:25, 175:2, 220:8,
222:1, 268:4, 268:8,
389:2, 389:6, 390:7
**living** [1] - 175:5
**LLP** [2] - 1:22, 2:2
**load** [1] - 63:22

**located** [1] - 182:23
**log** [3] - 368:19,
368:20, 368:22
**look** [71] - 27:18,
38:25, 40:7, 51:23,
62:15, 68:15, 77:16,
88:20, 102:7, 120:7,
127:22, 127:23,
128:4, 136:23, 141:3,
174:6, 174:11,
174:20, 176:1,
177:19, 195:7,
201:13, 211:17,
211:19, 213:9,
213:18, 214:23,
215:19, 215:21,
215:22, 215:25,
216:1, 216:2, 216:11,
216:17, 216:19,
216:25, 218:6,
218:11, 231:6, 231:7,
233:12, 233:23,
234:5, 234:7, 248:4,
252:1, 258:10,
266:21, 267:1, 273:4,
284:10, 286:10,
289:24, 298:5,
309:23, 344:17,
365:3, 370:23,
373:18, 375:17,
375:18, 375:23,
384:6, 385:3, 387:18
**Look** [1] - 20:20
**looked** [12] - 116:11,
185:2, 221:25,
257:21, 258:11,
289:23, 290:13,
339:3, 340:14,
384:14, 387:19,
387:23
**looking** [35] - 33:17,
64:19, 100:17, 103:4,
105:25, 124:7,
137:18, 164:3,
187:12, 183:12,
183:13, 202:13,
204:14, 204:18,
205:7, 213:5, 215:20,
218:18, 218:23,
255:15, 255:16,
258:1, 284:18,
284:19, 304:4,
308:24, 309:1,
327:14, 330:6,
344:23, 378:11,
386:25, 388:7, 388:8,
388:10
**looks** [6] - 201:11,
202:3, 204:12, 387:8,
387:16, 389:8
**loss** [1] - 133:18
**love** [2] - 28:24
**low** [6] - 51:4, 84:2,
97:10, 298:19,
326:10, 327:2,
327:13, 332:14, 333:1
**lower** [1] - 216:5
**luckily** [1] - 81:23
**lucky** [1] - 386:12
**lunch** [4] - 141:17,
176:1, 201:15, 234:14
**lunchtime** [1] -
226:13
**lying** [2] - 178:23,
179:4

---

**M**

**M*A*S*H** [1] - 267:18
**M.D** [1] - 2:2

**machine** [13] - 103:6,
103:11, 103:13,
103:18, 104:16,
104:21, 105:1,
105:11, 106:7,
152:21, 336:18,
343:7, 366:6
**machines** [2] - 11:9,
247:10
**madam** [1] - 38:5
**main** [1] - 374:19
**maintain** [3] - 75:12,
76:5, 343:8
**major** [5] - 52:1,
52:21, 311:1, 372:14,
374:24
**majority** [2] - 336:2,
357:23
**maker** [2] - 76:18,
153:22
**makers** [9] - 154:1,
154:19, 154:20,
155:1, 156:11,
176:22, 303:25,
357:15, 357:16
**man** [2] - 28:15,
61:1, 87:2, 87:4,
102:20, 111:24,
172:17, 172:18,
173:19, 228:12,
305:7, 332:18
**managed** [1] - 369:7
**manager** [1] - 112:3
**mandate** [2] - 10:22,
381:16
**manipulation** [2] -
369:12, 369:14
**manufactured** [1] -
43:15
**manufacturer** [3] -
245:5, 351:7, 354:24
**manufacturer's** [1] -
345:13
**manure** [5] - 143:4,
143:12, 143:21,
144:1, 150:12
**manuscript** [6] -
246:7, 301:24, 307:3,
309:23, 311:19,
312:16
**map** [1] - 174:21
**March** [1] - 176:24
**Mark** [12] - 5:16,
31:15, 44:23, 162:22,
167:3, 181:4, 284:16,
284:24, 288:18,
290:3, 319:5, 348:2
**mark** [12] - 110:11,
187:4, 187:14,
200:10, 200:14,
303:20, 308:7, 335:5,
335:9, 335:14,
348:12, 356:14
**mark@fbtrial.com**
[1] - 2:4
**marked** [16] - 61:11,
62:14, 102:5, 111:21,
172:24, 176:8,
187:11, 188:11,
202:7, 265:22, 304:8,
356:12, 356:13,
356:21, 367:17, 384:9
**mash** [1] - 363:16
**mass** [1] - 110:17,
207:15, 362:7,
365:10, 365:23
**masters** [1] - 9:2
**match** [1] - 341:4
**material** [11] - 27:24,
33:9, 39:23, 74:13,

112:23, 133:20,
138:15, 285:12,
299:14, 311:13,
358:14
**materials** [2] -
237:12, 285:24
**mathematical** [1] -
150:5
**Matter** [1] - 357:3
**matter** [1] - 5:3,
23:1, 109:13, 109:15,
146:14, 208:25,
218:25, 224:11,
232:14, 314:24,
357:13
**McGovern** [8] -
318:17, 319:25,
320:5, 320:6, 320:17,
326:13, 332:11,
332:24
**McGovern's** [2] -
320:3, 326:13
**MD** [1] - 136:13
**MDL** [1] - 1:14
**mean** [70] - 13:16,
18:22, 23:6, 23:13,
25:20, 26:7, 26:17,
32:5, 36:19, 39:19,
40:18, 43:19, 45:15,
45:16, 46:12, 49:5,
50:16, 59:4, 65:7,
71:18, 72:20, 73:21,
74:19, 77:6, 86:8,
88:4, 95:16, 95:17,
113:22, 120:18,
121:3, 124:19,
125:21, 133:18,
143:12, 167:7,
167:14, 171:21,
175:18, 178:6,
180:21, 189:6, 190:7,
190:17, 191:5,
192:19, 210:20,
210:21, 216:3, 249:1,
250:3, 250:4, 250:6,
251:7, 251:11,
255:25, 261:4, 264:2,
294:23, 304:12,
305:16, 305:17,
337:16, 341:17,
347:16, 350:24,
366:25, 388:20
**meaning** [4] - 26:24,
65:7, 374:20, 377:5
**meaningful** [3] -
91:13, 139:8, 192:2
**meanings** [1] -
139:16
**means** [24] - 40:3,
40:16, 41:19, 47:25,
58:13, 60:13, 72:3,
78:13, 84:6, 138:12,
178:7, 189:4, 189:12,
191:20, 191:23,
192:18, 192:23,
217:16, 282:25,
295:5, 298:16, 354:3,
358:4, 373:15
**meant** [7] - 39:25,
121:9, 161:10,
234:20, 234:23,
239:8, 277:17
**meantime** [2] -
226:20
**measure** [17] - 33:25,
171:6, 171:11,
171:16, 171:21,
174:2, 192:22,
192:24, 209:15,
211:10, 211:15,

**JIM HO - June 28, 2017**

242:20, 330:10,
362:6, 362:14,
363:17, 388:21
**measured** [13] -
91:14, 125:5, 145:1,
169:22, 175:1, 175:4,
178:25, 222:25,
232:3, 349:22,
361:23, 362:4, 365:24
**measurement** [8] -
33:21, 211:15, 217:9,
220:7, 328:15, 332:7,
338:4, 377:4
**measurements** [15] -
34:10, 65:3, 65:9,
90:6, 90:8, 117:5,
174:18, 178:14,
178:17, 331:10,
331:11, 336:12,
336:15, 360:5, 378:8
**measures** [5] - 53:1,
53:7, 334:22, 360:2,
389:1
**measuring** [12] -
33:18, 207:15, 220:2,
221:13, 256:5, 256:6,
331:15, 331:19,
331:24, 360:7,
363:22, 377:19
**mechanism** [1] -
256:17
**mechanisms** [4] -
206:8, 206:9, 206:11,
257:16
**median** [4] - 217:1,
217:11, 217:14, 218:2
**mediancy** [2] -
217:5, 217:7
**medical** [7] - 76:18,
77:19, 136:17,
137:23, 355:19, 372:5
**medicine** [2] - 15:19,
16:20
**meet** [5] - 46:17,
66:24, 67:15, 118:6,
310:11
**meeting** [1] - 179:14
**members** [1] -
310:14
**men** [1] - 266:20
**mention** [5] - 166:2,
295:15, 313:2, 313:9,
313:11
**mentioned** [15] -
16:8, 16:10, 16:15,
80:2, 96:18, 247:2,
273:2, 294:21,
301:11, 301:12,
301:13, 313:12,
328:23, 331:8, 379:5
**mere** [1] - 260:22
**MERV** [31] - 49:6,
49:8, 57:7, 57:16,
58:2, 58:9, 58:11,
59:19, 59:20, 59:23,
60:13, 60:19, 66:18,
68:7, 68:8, 68:23,
69:5, 71:25, 72:8,
72:17, 338:22,
338:24, 339:10,
340:2, 340:6, 347:12,
384:18, 384:22,
385:3, 386:6, 387:11
**message** [5] -
308:18, 309:5, 309:8,
310:6, 310:20
**messy** [3] - 50:12,
50:14, 50:21
**met** [3] - 136:15,
172:17, 172:18

**metaphor** [2] -
153:22, 154:12
**method** [1] - 11:15
**methodological** [4] -
175:13, 367:10,
368:6, 371:4
**methodologically**
[1] - 280:2
**methodology** [10] -
118:18, 119:2, 130:7,
174:2, 233:18, 362:3,
375:4, 375:10,
375:16, 376:5
**methods** [4] -
183:25, 184:21,
362:3, 380:1
**metre** [4] - 64:7,
64:15, 64:16, 144:16,
217:11, 217:14,
218:2, 218:17
**metres** [2] - 365:22,
365:25
**Michael** [2] - 4:9,
335:17
**Michelle** [1] - 136:13
**microbes** [2] - 127:7,
127:11
**Microbes** [1] -
284:21
**microbial** [3] - 9:4,
77:25, 343:9
**microbiological** [9] -
170:19, 251:8,
251:13, 294:16,
294:24, 295:12,
296:16, 296:25,
388:14
**microbiologist** [6] -
16:21, 16:24, 103:10,
143:19, 199:23,
201:18
**microbiology** [5] -
9:2, 21:2, 139:14,
201:20, 201:21
**micron** [26] - 36:6,
36:13, 37:19, 38:13,
39:14, 40:14, 40:22,
40:25, 45:10, 46:21,
47:20, 57:23, 58:15,
58:22, 59:24, 60:15,
65:3, 65:8, 65:11,
66:2, 66:20, 168:18,
336:22, 340:12,
341:9, 360:15
**microns** [24] - 41:3,
41:6, 41:11, 42:2,
42:16, 43:4, 48:2,
65:13, 65:15, 66:6,
68:3, 169:8, 334:22,
335:23, 335:25,
336:3, 339:12,
357:24, 358:7,
360:11, 361:7,
364:22, 364:23, 385:6
**microorganism** [1] -
17:1
**Microorganisms** [3]
- 3:20, 200:18, 203:14
**microorganisms** [4]
- 16:23, 201:22,
202:10, 359:9
**microphone** [1] - 8:1
**mid** [1] - 18:7
**middle** [13] - 68:20,
82:17, 82:19, 82:20,
82:22, 82:23, 83:2,
163:25, 216:16,
273:4, 273:5, 284:19
**might** [36] - 29:24,
32:6, 51:15, 53:22,

68:15, 71:15, 86:9,
104:25, 106:5, 107:2,
114:19, 116:2,
117:10, 176:21,
180:18, 182:7,
198:12, 199:24,
201:20, 201:23,
209:21, 233:22,
247:2, 269:16, 271:6,
295:1, 295:22, 308:3,
364:19, 374:12,
378:14, 378:25,
379:9, 381:13, 383:11
**mile** [3] - 216:2,
216:4, 216:19
**mileage** [1] - 170:11
**military** [6] - 12:9,
12:10, 12:24, 22:25,
39:16
**milligrams** [1] -
365:25
**million** [2] - 218:14,
368:19
**millions** [2] - 30:12,
77:14
**mind** [6] - 139:10,
231:5, 352:6, 382:16,
384:11, 390:5
**minded** [1] - 144:23
**mine** [1] - 381:19
**minimum** [2] - 51:2,
56:5
**Minneapolis** [1] -
2:13
**MINNESOTA** [1] -
1:2
**Minnesota** [9] - 2:13,
5:6, 225:11, 226:5,
319:19, 319:20,
382:1, 382:9, 383:3
**minute** [11] - 64:11,
64:20, 104:19, 262:1,
262:12, 262:25,
298:24, 299:11, 319:5
**minutes** [3] - 113:12,
364:4, 388:15
**mis** [1] - 38:2
**mischaracterize** [1] -
339:9
**mischaracterizes**
[11] - 223:8, 223:20,
275:10, 275:24,
278:3, 278:17, 280:7,
281:15, 283:18, 339:6,
339:17
**misconception** [2] -
15:1, 190:10
**misheard** [1] - 38:3
**misleading** [1] - 34:3
**misread** [1] - 69:2
**missed** [1] - 374:22
**missing** [1] - 374:25
**misstates** [7] -
38:15, 66:13, 87:12,
119:17, 176:19,
186:3, 223:21
**mistake** [1] - 362:11
**mistaken** [1] -
374:12
**misunderstood** [1] -
285:25
**mitigates** [3] - 139:3,
139:22, 140:11
**mitigation** [1] - 349:9
**model** [13] - 102:24,
14:9, 168:2, 246:24,
247:7, 247:17,
251:18, 252:10,
252:16, 252:24,
253:11, 253:15

**Model** [2] - 63:23,
140:10
**models** [2] - 252:4,
252:13
**modest** [2] - 20:7,
311:4
**modifications** [1] -
310:2
**moisture** [2] - 343:8,
343:12
**molecules** [1] - 89:4
**moment** [5] - 191:17,
278:20, 353:20,
353:24, 354:3
**money** [1] - 245:7
**monitor** [1] - 5:8
**monitoring** [5] -
3:13, 187:24, 188:14,
192:8, 196:17
**Montrose** [1] - 2:8
**morally** [1] - 162:3
**Moretti** [6] - 249:11,
252:22, 252:23,
253:15, 253:20, 254:4
**morning** [5] - 6:3,
6:4, 306:4, 310:11,
384:15
**most** [7] - 54:19,
139:18, 154:21,
229:24, 243:24,
244:14, 375:21
**mostly** [6] - 9:16,
9:19, 33:14, 37:18,
38:12, 39:13, 40:2,
40:13, 40:16, 41:19,
41:20, 41:21, 315:11,
324:21, 370:25
**motivation** [1] -
215:14
**motivations** [1] -
214:3
**move** [12] - 93:5,
163:17, 186:2,
199:15, 206:19,
221:4, 234:11,
281:18, 317:24,
318:19, 318:24,
320:20
**movement** [1] -
374:5
**movie** [1] - 267:21
**moving** [2] - 271:14,
271:15
**MPL** [1] - 5:6
**multiple** [3] - 32:5,
355:9
**multiply** [3] - 109:5,
111:12, 111:16
**multiplying** [2] -
99:9, 105:20
**must** [6] - 87:21,
150:18, 151:10,
309:4, 375:10

**N**

**name** [3] - 17:1,
169:2, 322:25
**Name** [1] - 62:23
**named** [3] - 102:21,
111:24, 305:7
**names** [3] - 35:2,
321:11, 321:21
**narrative** [2] - 78:10,
213:25
**narrow** [3] - 72:10,
262:2, 351:16
**National** [8] - 9:15,
9:24, 13:4, 173:16,
177:1, 185:9, 185:19,

244:18
**natural** [11] - 6:21,
41:9, 41:13, 41:24,
42:1, 42:12, 43:17,
43:19, 47:25, 357:8,
377:20
**naturally** [8] - 36:7,
36:14, 40:18, 43:12,
44:16, 45:11, 47:2,
47:21
**nature** [8] - 9:10,
20:7, 24:4, 47:7,
123:5, 134:20,
171:17, 373:24
**NBC** [1] - 267:17
**near** [3] - 255:2,
324:9, 324:12
**nearly** [1] - 12:3
**necessarily** [12] -
59:10, 143:15,
243:22, 245:7,
251:11, 261:4,
297:24, 297:25,
300:15, 301:21,
354:25, 370:10
**necessary** [3] - 75:9,
283:24, 307:1
**need** [48] - 6:18,
7:25, 11:4, 19:9,
19:12, 19:23, 19:24,
23:1, 24:4, 24:8,
24:21, 24:22, 39:22,
60:23, 69:15, 70:4,
70:15, 71:10, 71:15,
75:18, 77:10, 79:2,
79:7, 87:15, 88:25,
90:5, 100:7, 109:16,
113:10, 113:18,
128:25, 154:24,
171:9, 192:14,
192:22, 217:2,
226:13, 230:17,
238:7, 279:8, 346:18,
346:19, 366:14,
382:6, 382:25, 387:13
**needed** [9] - 75:11,
76:5, 141:1, 152:17,
183:4, 344:15,
350:11, 352:22,
382:16
**needs** [4] - 76:22,
109:7, 264:19, 283:17
**negative** [12] - 73:15,
165:6, 165:18,
165:23, 166:1, 166:6,
166:12, 166:16,
166:23, 167:18,
197:12, 245:23
**negatively** [1] -
133:24
**neutral** [2] - 114:2,
115:15
**never** [16] - 32:20,
78:1, 131:23, 156:7,
172:17, 172:18,
185:2, 191:10, 239:7,
240:9, 240:11,
283:19, 327:2, 328:2,
333:14
**New** [1] - 309:21
**new** [9] - 30:24,
105:4, 105:5, 138:15,
160:21, 187:16,
187:18, 200:9, 206:23
**newer** [3] - 138:5,
138:10, 138:12
**next** [24] - 67:9,
67:12, 114:9, 135:1,
135:2, 138:14, 164:4,
193:25, 196:8, 209:5,

**JIM HO – June 28, 2017**

241:15, 249:20,
249:21, 277:24,
278:8, 278:11, 283:8,
298:25, 306:16,
310:6, 337:8, 350:19,
351:20, 352:2
**nice** [4] - 118:21,
129:23, 167:12,
216:17
**nightmare** [1] -
350:6
**nightmares** [1] -
353:22
**Nightmares** [1] -
349:4
**nine** [2] - 312:12,
379:14
**nobody** [4] - 30:15,
122:17, 181:6, 353:13
**nobody's** [1] - 353:4
**noise** [8] - 217:16,
218:6, 218:9, 218:10,
219:3, 219:10, 220:6
**noisy** [1] - 216:14
**non** [7] - 3:13,
150:11, 187:25,
188:14, 192:8,
210:10, 329:9
**non-viable** [4] - 3:13,
187:25, 188:14, 192:8
**nonbacterial** [2] -
59:15, 209:22
**nonbiological** [3] -
171:22, 210:15,
210:17
**noncontrolled** [1] -
253:24
**none** [1] - 118:5
**nonetheless** [1] -
273:18
**nonpeer** [1] - 30:3
**nonpeer-reviewed**
[1] - 30:3
**nonrandomized** [1] -
254:5
**nonresponsive** [7] -
20:9, 34:7, 42:8,
54:22, 78:9, 213:24,
329:14
**nonsterile** [5] -
164:20, 263:7, 269:4,
271:7, 271:16
**nonviable** [2] -
189:1, 193:3
**normal** [2] - 368:24,
368:25
**normally** [3] - 84:7,
369:1
**Nos** [1] - 136:1
**nosocomial** [2] -
196:14, 196:24
**noted** [5] - 11:3,
14:25, 228:18,
228:24, 295:23
**notes** [1] - 391:9
**nothing** [20] - 41:17,
147:22, 147:23,
167:4, 167:17,
195:10, 213:19,
222:8, 237:18,
243:22, 244:1, 261:9,
268:24, 303:15,
329:15, 332:7,
352:19, 364:4,
379:10, 390:12
**notice** [9] - 1:19,
17:19, 159:2, 203:18,
240:22, 258:14,
322:2, 357:22, 370:17
**noticed** [1] - 310:19

**notions** [1] - 46:17
**number** [22] - 30:17,
30:20, 50:5, 54:1,
63:11, 63:14, 67:25,
89:3, 93:23, 141:4,
141:6, 190:23, 194:5,
218:12, 221:25,
238:6, 238:7, 327:20,
346:17, 362:5,
363:22, 372:20
**numbered** [1] -
204:8
**numbering** [1] -
61:15
**numbers** [25] -
32:19, 63:17, 65:21,
66:15, 67:23, 85:14,
91:14, 95:17, 99:10,
122:1, 179:2, 190:12,
190:20, 253:25,
303:20, 363:4, 363:5,
365:5, 368:17,
368:18, 368:23,
380:23, 380:24,
388:11
**numeric** [2] - 379:3,
385:8
**nurse** [9] - 314:2,
314:22, 325:4, 325:9,
325:16, 326:3, 344:5,
345:24
**nurses** [4] - 16:9,
271:8, 314:17, 326:7
**nutrient** [4] - 79:22,
109:10, 110:13,
110:17
**nutrients** [4] -
108:13, 109:7,
109:20, 111:3

## O

**object** [120] - 15:21,
17:16, 20:9, 24:6,
24:15, 25:1, 25:18,
26:9, 28:3, 36:22,
38:14, 42:18, 48:12,
51:18, 52:19, 53:15,
54:22, 66:12, 69:1,
69:18, 70:6, 75:15,
78:9, 79:9, 80:10,
87:5, 87:11, 87:18,
91:10, 91:21, 93:21,
94:4, 95:2, 96:1, 96:4,
96:22, 97:13, 98:4,
99:20, 103:14, 104:6,
104:22, 105:12,
106:14, 107:7, 108:7,
113:15, 116:15,
117:22, 119:16,
120:15, 139:25,
140:14, 142:16,
144:18, 145:4,
153:16, 154:2,
155:22, 156:15,
157:9, 168:22,
169:17, 170:24,
176:18, 177:5,
177:15, 181:21,
185:24, 191:11,
194:25, 203:23,
206:14, 208:8, 209:2,
213:24, 221:3, 223:3,
223:7, 223:19, 224:4,
229:13, 232:17,
249:17, 256:13,
273:23, 277:9, 279:1,
280:6, 293:9, 299:22,
311:22, 311:25,
312:18, 315:3,

317:20, 318:6,
318:14, 320:19,
324:13, 325:17,
325:20, 327:5, 329:9,
329:14, 331:13,
332:4, 333:6, 333:18,
339:5, 353:7, 354:6,
354:9, 355:12,
355:24, 372:25, 380:5
**objecting** [2] -
228:13, 385:24
**objection** [59] - 14:9,
28:5, 28:7, 34:7, 42:8,
87:9, 87:15, 87:22, 87:3,
87:4, 93:5, 93:7, 94:1,
114:14, 115:4, 116:4,
119:22, 121:8,
124:18, 157:13,
174:4, 215:8, 219:20,
228:25, 233:5,
255:22, 256:20,
258:24, 259:2, 260:6,
262:3, 262:14, 263:2,
263:17, 264:7,
264:21, 265:4,
265:13, 266:8, 267:3,
268:15, 271:2,
274:20, 275:9,
275:20, 275:23,
277:4, 277:8, 278:2,
278:16, 280:15,
281:7, 311:8, 327:5,
339:13, 339:16,
339:23, 339:15,
351:25, 385:19
**objections** [11] -
86:14, 92:24, 93:3,
94:12, 104:14,
108:17, 127:14,
128:17, 143:2,
227:16, 228:12
**objective** [2] - 8:20,
296:8
**objects** [1] - 79:22
**observation** [1] -
175:11
**observations** [1] -
370:25
**Observations** [1] -
333:23
**obtained** [1] - 29:14
**obvious** [1] - 243:13
**obviously** [6] -
31:16, 273:10, 276:5,
282:9, 286:16, 293:12
**obviously..** [1] -
273:7
**occasions** [2] -
93:19, 93:23
**occur** [3] - 44:14,
108:6, 112:11
**occurred** [3] - 96:10,
226:11, 237:13
**occurrence** [1] -
270:12
**occurring** [7] - 36:7,
36:15, 40:18, 43:13,
45:11, 47:2, 47:21
**occurs** [1] - 161:24
**October** [3] - 202:15,
202:20, 203:7
**odd** [1] - 232:19
**OF** [1] - 1:2
**OFF** [1] - 62:7
**offending** [2] -
310:25, 311:20
**offer** [9] - 135:20,
163:2, 279:14,
329:21, 349:25,
382:22, 382:24,

383:1, 383:2
**offered** [6] - 98:8,
163:4, 163:8, 240:19,
340:21, 378:11
**offering** [4] - 162:23,
269:9, 297:19, 301:23
**office** [1] - 77:23
**offices** [2] - 1:21,
5:12
**Official** [2] - 2:18,
391:19
**Oguz** [5] - 272:2,
272:3, 272:5, 277:18,
344:10
**old** [3] - 138:4,
138:9, 213:6
**Olmstead** [1] -
208:21
**Olmsted** [18] -
173:16, 176:13,
177:1, 177:3, 177:12,
177:14, 177:20,
183:20, 184:3,
184:16, 185:9,
185:15, 186:11,
222:21, 230:11,
366:19, 366:23
**Olmsted's** [1] - 367:1
**once** [6] - 6:12,
11:14, 17:2, 94:18,
124:8
**one** [139] - 6:13,
16:21, 16:23, 25:22,
25:23, 30:11, 32:13,
32:22, 32:25, 33:25,
35:5, 35:6, 35:8, 36:4,
43:12, 53:18, 55:20,
56:8, 61:4, 61:5, 74:6,
75:23, 76:9, 77:5,
78:18, 81:1, 81:5,
92:16, 94:15, 105:4,
111:15, 116:10,
121:2, 121:14,
121:21, 121:23,
124:5, 125:21,
135:22, 136:8,
137:10, 141:5, 143:8,
150:21, 160:15,
165:7, 168:7, 172:20,
173:24, 174:6,
174:19, 182:18,
187:15, 191:23,
192:22, 192:24,
196:7, 198:9, 199:21,
201:10, 201:11,
203:17, 203:18,
204:1, 204:2, 204:9,
205:16, 206:21,
207:24, 209:24,
226:8, 231:22,
231:23, 240:4,
240:22, 241:20,
242:7, 249:20,
251:17, 251:22,
265:24, 267:6,
269:25, 274:17,
274:24, 275:15,
279:6, 283:9, 291:16,
294:10, 296:14,
308:2, 308:21, 313:8,
315:1, 316:25,
319:22, 323:16,
326:7, 327:17, 328:6,
335:12, 338:1, 338:4,
342:25, 344:8, 352:3,
352:12, 357:20,
357:22, 361:20,
361:25, 363:1, 365:1,
367:9, 367:10,
368:16, 371:10,

372:14, 373:17,
377:7, 379:9, 379:23,
379:24, 380:3,
380:14, 381:19,
381:11, 386:13,
387:22, 388:4, 388:5,
389:17, 389:18
**ones** [12] - 35:15,
79:21, 118:6, 138:5,
138:10, 138:12,
155:3, 178:18, 216:8,
248:10, 315:14,
366:15
**OPC** [1] - 124:5
**open** [6] - 27:24,
39:22, 53:23, 163:19,
164:19, 375:25
**opened** [1] - 321:10
**Operating** [2] - 3:21,
200:18
**operating** [83] - 4:2,
16:12, 21:6, 21:12,
21:15, 50:4, 50:8,
50:11, 50:13, 50:21,
51:2, 51:15, 52:15,
53:2, 53:8, 53:14,
53:20, 56:5, 75:13,
76:7, 76:19, 76:20,
77:13, 84:14, 85:13,
85:18, 89:23, 90:2,
91:9, 91:14, 96:11,
96:12, 96:21, 96:25,
97:4, 97:16, 97:24,
98:2, 98:22, 99:2,
100:1, 120:12,
142:25, 143:4,
143:13, 143:20,
143:22, 144:13,
144:16, 145:2,
153:24, 153:25,
154:21, 156:8, 165:9,
165:12, 165:20,
165:23, 166:9,
166:24, 167:5,
167:17, 168:3,
170:11, 170:20,
171:10, 178:7,
181:14, 183:3,
193:17, 194:3, 196:4,
263:8, 263:10,
263:11, 265:19,
269:5, 270:17,
380:12, 380:16,
381:4, 388:15, 389:4
**operating-room** [1] -
194:3
**operation** [21] -
23:25, 50:18, 50:22,
116:14, 120:22,
121:7, 125:25,
126:12, 126:18,
129:9, 130:2, 131:7,
131:8, 131:11,
131:14, 131:20,
132:11, 134:15,
314:12, 323:10,
323:14
**operations** [2] -
274:12, 278:22
**opinion** [112] - 20:19,
36:18, 37:16, 38:9,
48:23, 49:16, 73:2,
83:25, 84:3, 87:16,
88:19, 92:1, 92:2,
97:12, 103:10, 108:2,
108:3, 108:5, 109:19,
109:23, 110:4, 110:8,
110:17, 111:13,
111:17, 113:24,
114:2, 114:16,

**JIM HO – June 28, 2017**

115:16, 115:18,
116:1, 116:3, 116:6,
116:8, 118:11,
118:16, 119:6, 119:8,
120:11, 120:13,
120:18, 120:21,
121:16, 122:8,
123:18, 123:21,
124:10, 124:16,
125:2, 125:7, 125:23,
126:20, 128:24,
129:13, 129:25,
130:8, 130:22, 131:1,
131:3, 131:21,
131:22, 132:2,
134:14, 135:2, 135:4,
140:19, 152:16,
173:13, 194:22,
196:4, 197:6, 201:6,
225:5, 229:11, 242:1,
273:19, 279:14,
281:1, 283:16,
297:25, 298:18,
298:21, 299:3, 299:4,
300:20, 313:17,
326:9, 332:11,
337:11, 337:20,
338:6, 338:7, 338:9,
338:15, 342:8,
342:18, 343:3, 343:6,
350:11, 367:4, 367:7,
371:10, 373:6,
374:11, 374:13,
376:7, 377:8, 377:12,
377:17, 377:23
  **opinion.** [1] - 298:14
  **opinions** [73] - 6:6,
15:15, 18:24, 19:6,
22:16, 49:2, 53:6,
53:19, 55:23, 55:25,
91:25, 92:17, 92:19,
96:9, 98:1, 98:16,
99:13, 99:15, 99:18,
100:6, 111:18,
116:11, 121:2, 160:4,
160:14, 160:15,
161:14, 161:19,
162:18, 165:3,
188:21, 197:2, 201:2,
230:8, 232:15, 233:8,
237:8, 239:17,
239:21, 245:16,
249:5, 249:10, 251:2,
272:8, 279:21, 284:6,
313:6, 313:16,
334:10, 340:25,
342:25, 349:12,
349:25, 351:6, 355:4,
371:8, 372:14,
372:20, 372:23,
373:9, 374:19, 375:3,
375:5, 375:8, 375:11,
375:14, 376:23,
378:2, 378:19,
378:25, 379:16,
379:18
  **opportunity** [2] -
189:8, 228:20
  **opposed** [4] - 203:2,
325:11, 334:9, 382:3
  **opposite** [2] -
197:13, 295:3
  **optical** [6] - 121:24,
123:4, 123:12,
123:15, 123:24, 124:4
  **option** [2] - 122:25,
276:23
  **OR** [28] - 84:25,
88:11, 88:24, 93:19,
94:3, 95:13, 95:25,

96:3, 164:1, 164:6,
164:19, 186:18,
261:22, 261:25,
262:10, 262:11,
262:18, 262:21,
262:23, 263:7,
263:24, 268:11,
269:16, 269:21,
314:2, 324:4, 338:9,
338:17
  **or.** [1] - 45:25
  **or..** [1] - 157:25
  **order** [9] - 24:5,
71:14, 117:25,
129:20, 135:20,
147:5, 151:9, 285:6,
304:16
  **ordinary** [1] - 144:3
  **organic** [3] - 109:13,
109:15, 154:20
  **organism** [3] -
146:14, 148:4, 151:13
  **organisms** [6] - 68:9,
69:11, 362:15,
363:17, 363:23, 389:6
  **oriented** [1] - 314:16
  **origin** [1] - 59:15
  **original** [3] - 117:3,
202:2, 310:20
  **ORs** [1] - 166:11
  **orthopedic** [41] -
16:7, 22:1, 22:4,
22:14, 53:2, 53:8,
53:12, 53:20, 75:13,
76:7, 76:19, 78:16,
80:9, 152:18, 153:13,
153:15, 160:17,
161:16, 161:23,
162:8, 162:20,
219:18, 262:11,
262:24, 263:9, 264:3,
264:12, 268:2, 270:6,
316:9, 316:20, 317:6,
317:17, 320:14,
322:1, 323:6, 325:11,
326:4, 326:15, 379:25
  **Os** [1] - 363:10
  **Oster** [2] - 111:24,
112:6
  **otherwise** [1] - 94:21
  **outcome** [5] - 234:9,
256:6, 331:7, 331:20
  **outcomes** [6] -
88:9, 88:11, 88:14,
88:16, 171:17, 377:21
  **outdoors** [7] - 12:25,
88:9, 88:11, 88:14,
330:4, 331:18, 373:25
  **outline** [1] - 15:14
  **output** [1] - 122:2
  **outright** [2] - 368:13,
375:21
  **outside** [18] - 12:22,
15:12, 40:4, 40:6,
40:17, 88:5, 88:6,
88:22, 89:24, 90:2,
92:1, 164:6, 166:14,
259:7, 259:15,
312:23, 351:10
  **outside-of-the-**
**report** [1] - 15:12
  **Overall** [1] - 349:4
  **overall** [6] - 26:12,
169:11, 273:11,
276:6, 282:10, 353:22
  **overkill** [3] - 49:12,
49:15, 350:16
  **overnight** [1] -
343:21
  **own** [7] - 44:12,

226:11, 233:18,
245:16, 286:2,
320:16, 376:7

**P**

  **P.A** [1] - 2:12
  **p.m** [8] - 235:5,
235:7, 236:1, 236:4,
356:6, 356:9, 390:22,
390:24
  **page** [74] - 32:18,
33:14, 35:24, 36:1,
38:25, 43:12, 45:9,
47:13, 47:15, 47:16,
57:8, 62:16, 62:20,
68:16, 68:17, 68:18,
82:13, 82:16, 82:18,
82:19, 92:3, 102:12,
102:13, 102:15,
102:18, 111:23,
112:17, 112:18,
112:20, 126:4, 126:6,
126:7, 126:8, 126:11,
131:9, 136:9, 137:10,
137:18, 137:20,
141:4, 163:19,
163:21, 193:7,
203:13, 204:11,
204:13, 204:14,
241:14, 241:16,
254:12, 258:1,
258:12, 261:11,
261:12, 271:21,
284:11, 284:20,
294:6, 297:6, 313:22,
324:19, 333:21,
334:25, 335:22,
336:1, 337:8, 339:22,
344:3, 384:16,
387:19, 387:20
  **pages** [8] - 30:13,
33:15, 137:9, 201:11,
258:12, 288:6, 365:3,
391:6
  **paid** [4] - 13:23,
224:2, 238:9, 244:17
  **paper** [57] - 3:12,
31:5, 153:9, 172:11,
172:15, 177:20,
177:22, 178:10,
178:24, 179:7,
184:19, 185:3,
187:23, 188:6,
188:12, 195:2, 195:5,
195:10, 195:15,
195:17, 198:5, 199:1,
199:5, 199:6, 199:10,
199:11, 200:24,
201:8, 240:23, 246:6,
248:24, 277:13,
283:12, 284:16,
286:12, 291:18,
297:19, 298:3,
301:20, 305:24,
306:7, 311:19,
312:16, 314:22,
321:21, 322:3, 323:1,
325:9, 328:2, 328:4,
330:5, 332:11,
332:24, 341:10,
367:2, 368:6, 380:18
  **papers** [26] - 33:7,
101:6, 159:3, 180:16,
213:3, 223:11,
244:11, 252:1, 284:6,
286:18, 286:22,
291:11, 291:13,
297:23, 298:18,
300:19, 302:6, 303:7,

312:12, 313:3, 313:5,
325:13, 325:16,
326:10, 367:10,
380:15
  **paragraph** [37] -
39:2, 57:19, 58:12,
68:18, 68:20, 82:17,
82:20, 82:21, 83:3,
126:13, 126:14,
126:16, 128:22,
128:23, 129:21,
133:8, 133:10,
163:23, 164:16,
186:6, 195:21, 205:8,
205:10, 206:20,
242:17, 249:21,
258:11, 261:12,
272:1, 273:5, 273:6,
284:17, 294:7, 298:7,
299:2, 313:24, 344:22
  **parameters** [1] -
384:19
  **pardon** [4] - 41:4,
221:8, 243:2, 313:4
  **parentheses** [1] -
164:1
  **part** [30] - 10:5,
20:14, 54:14, 63:15,
63:18, 70:22, 102:13,
121:4, 121:11,
126:10, 138:23,
158:25, 160:2, 174:3,
206:20, 262:19,
262:21, 277:8,
278:18, 283:8,
284:17, 284:20,
303:11, 314:6, 315:8,
315:22, 334:1, 334:9,
334:10, 334:18
  **Parthasarathy** [1] -
112:25
  **particle** [48] - 10:10,
10:14, 59:23, 65:18,
62:6, 79:12, 80:4,
80:22, 80:24, 117:13,
121:24, 123:4,
123:12, 123:16,
123:25, 124:4,
139:15, 168:13,
170:15, 170:16,
170:18, 174:18,
184:7, 186:12,
186:16, 186:23,
190:11, 207:19,
208:5, 209:6, 211:2,
211:3, 218:12, 220:2,
220:7, 222:17,
222:25, 223:16,
229:5, 230:25,
334:19, 334:21,
336:11, 336:14,
365:10, 365:23,
380:23, 387:23
  **particles** [177] - 3:14,
14:25, 15:2, 15:5,
15:24, 16:4, 17:22,
27:10, 27:11, 35:23,
36:5, 36:13, 37:18,
38:12, 39:13, 40:13,
40:25, 41:2, 41:5,
41:11, 42:2, 42:15,
43:4, 45:10, 46:10,
46:19, 47:19, 48:1,
48:6, 48:11, 48:19,
48:21, 50:2, 50:4,
50:5, 50:7, 50:11,
51:2, 51:4, 51:11,
51:14, 51:17, 51:22,
52:8, 56:4, 57:22,
58:14, 58:17, 58:18,

58:22, 59:2, 59:12,
59:14, 60:15, 66:6,
66:19, 67:4, 68:3,
79:14, 79:21, 79:22,
79:24, 80:6, 80:8,
116:13, 116:19,
119:14, 120:13,
120:23, 121:6, 121:9,
121:12, 121:18,
121:20, 122:2,
122:10, 122:22,
124:15, 124:19,
125:1, 125:7, 125:10,
125:17, 125:21,
125:25, 126:2,
126:11, 126:18,
126:23, 127:3, 127:4,
127:25, 129:2, 129:3,
129:8, 129:11,
129:14, 130:1, 131:4,
131:10, 131:20,
132:11, 132:15,
133:19, 133:23,
134:15, 134:21,
135:5, 135:11,
135:12, 138:19,
139:10, 145:2, 164:9,
166:8, 168:12,
168:17, 169:1,
169:16, 171:6, 171:8,
171:17, 171:22,
171:23, 173:3,
173:11, 175:2, 175:4,
187:25, 188:15,
189:1, 189:5, 192:9,
193:3, 201:3, 201:6,
209:19, 209:22,
209:23, 210:10,
210:15, 210:16,
211:1, 214:11,
218:16, 219:13,
219:14, 220:8,
220:11, 221:12,
221:25, 223:2,
271:17, 337:3,
339:11, 340:11,
340:19, 341:7, 341:8,
341:13, 341:21,
357:23, 357:24,
358:7, 361:7, 363:12,
363:16, 365:16,
372:16, 385:6,
387:12, 387:15,
388:21, 389:2
  **particular** [18] -
14:23, 110:4, 110:8,
165:2, 205:18,
215:21, 246:22,
259:21, 273:15,
275:2, 275:3, 276:9,
277:25, 280:1,
282:13, 302:3,
303:16, 329:6
  **particularly** [3] -
31:19, 43:22, 109:16
  **Particulate** [3] -
204:17, 204:23, 357:3
  **particulate** [6] -
139:15, 141:7,
206:25, 207:2,
232:14, 365:23
  **particulates** [12] -
139:3, 139:11,
139:23, 140:12,
196:22, 208:24,
232:3, 232:15, 233:2,
233:9, 233:22, 234:2
  **parties'** [1] - 28:2
  **parts** [7] - 21:24,
65:10, 155:21, 291:3,

310:25, 311:20, 327:8
**party** [1] - 28:9
**pass** [4] - 68:10, 69:12, 229:25, 230:3
**passage** [1] - 164:10
**passing** [1] - 262:1
**past** [2] - 240:15, 378:5
**patent** [3] - 7:21, 7:22
**pathogenic** [1] - 164:8
**pathogens** [2] - 78:21, 255:3
**pathological** [2] - 145:23, 151:15
**patience** [1] - 128:16
**patient** [30] - 23:25, 50:18, 51:24, 72:4, 72:9, 72:20, 72:22, 73:4, 74:9, 74:20, 75:2, 104:20, 145:17, 155:6, 157:7, 157:15, 157:18, 159:23, 196:25, 262:13, 263:1, 269:6, 270:7, 314:15, 321:24, 322:14, 323:2, 324:8, 373:25, 380:1
**patient's** [1] - 256:3
**patients** [2] - 107:3, 196:13
**pause** [1] - 6:20
**PAWS** [1] - 112:9
**pay** [1] - 20:23
**paying** [1] - 92:17
**peer** [16] - 29:15, 29:21, 30:5, 180:17, 180:19, 180:22, 197:20, 199:10, 222:9, 233:11, 233:21, 234:2, 311:18, 312:16, 325:13, 326:4
**peer-reviewed** [13] - 29:15, 29:21, 30:5, 180:22, 197:20, 199:10, 233:11, 233:21, 234:2, 311:18, 312:16, 325:13, 326:4
**people** [58] - 15:25, 18:12, 32:19, 33:24, 43:17, 52:17, 53:13, 54:8, 54:15, 54:19, 55:20, 106:13, 115:16, 117:5, 117:19, 119:2, 129:23, 132:5, 144:4, 145:15, 149:12, 153:24, 154:14, 154:20, 155:2, 155:13, 164:18, 165:7, 170:22, 171:5, 172:2, 172:20, 173:25, 179:10, 180:4, 190:11, 192:21, 194:5, 213:4, 213:12, 216:15, 219:2, 239:20, 252:4, 253:22, 254:5, 266:17, 271:8, 299:7, 302:19, 309:10, 321:21, 322:9, 323:16, 375:7, 377:3, 379:14, 381:12
**per** [16] - 64:7, 64:11, 64:16, 64:20, 80:5, 104:19, 105:23, 144:16, 217:11,

217:14, 218:2, 218:17, 262:1, 262:12, 337:12, 337:23
**percent** [31] - 66:14, 67:4, 67:7, 67:10, 67:13, 68:2, 68:9, 68:24, 69:11, 89:9, 90:17, 90:21, 90:23, 91:2, 150:13, 167:17, 215:22, 274:11, 305:18, 357:23, 358:6, 364:21, 364:22, 370:23, 379:10, 385:16, 386:7, 387:11, 387:14, 387:17, 388:11
**percentage** [3] - 65:21, 65:22, 385:5
**perfect** [4] - 61:2, 63:20, 134:1, 364:14
**perfection** [1] - 77:9
**perform** [6] - 13:3, 13:15, 68:4, 368:16, 376:10, 381:7
**performance** [8] - 3:17, 73:6, 188:5, 188:18, 192:12, 247:18, 338:8, 338:16
**performed** [6] - 12:15, 15:11, 18:4, 34:13, 170:10, 333:15
**performing** [6] - 11:18, 11:21, 13:22, 14:15, 39:8, 327:3
**peri** [10] - 23:4, 23:9, 75:2, 75:8, 206:10, 256:11, 256:18, 257:14, 258:23, 380:2
**peri-prosthetic** [9] - 23:4, 23:9, 75:2, 75:8, 256:11, 256:18, 257:14, 258:23, 380:2
**peri-prosthetically** [1] - 206:10
**period** [4] - 110:14, 308:19, 329:6, 346:10
**periods** [1] - 108:6
**perioperative** [1] - 345:9
**permission** [1] - 310:21
**person** [21] - 74:16, 77:18, 101:10, 144:10, 148:2, 149:22, 149:25, 150:5, 150:8, 151:11, 153:10, 171:21, 172:10, 172:12, 175:1, 318:9, 318:22, 322:8, 323:11, 376:20, 378:10
**person's** [2] - 261:2, 268:25
**personal** [2] - 228:1, 376:7
**personally** [1] - 199:24
**personnel** [5] - 164:10, 194:3, 315:11, 317:1, 324:21
**perspective** [2] - 73:4, 143:17
**pertaining** [1] - 292:4
**Peter** [1] - 277:5
**PhD** [2] - 9:4, 81:14
**phenomena** [4] - 129:24, 159:1,

191:24, 332:2
**phenomenon** [3] - 191:24, 330:11, 331:25
**phonetic** [3] - 110:12, 317:12, 317:15
**photograph** [2] - 4:1, 265:18
**phrase** [5] - 71:23, 118:19, 121:12, 232:19, 282:15
**phrased** [2] - 79:20, 182:22
**physical** [3] - 125:24, 126:17, 129:8
**physiological** [1] - 206:8
**pick** [7] - 70:15, 71:4, 71:6, 71:7, 71:11, 348:10, 377:6
**picked** [1] - 31:16
**picking** [1] - 70:14
**picture** [6] - 169:11, 184:11, 268:11, 268:17, 268:19, 268:23
**piece** [7] - 132:9, 197:19, 250:24, 269:4, 269:15, 370:20
**pieces** [2] - 149:15, 297:11
**pitfalls** [1] - 124:6
**place** [3] - 5:12, 212:17, 270:24
**place..** [1] - 196:18
**placed** [2] - 324:4, 324:7
**plaintiff** [4] - 24:13, 27:1, 257:1, 334:12
**plaintiffs** [12] - 5:17, 5:19, 26:2, 27:5, 61:20, 158:7, 158:10, 158:19, 159:13, 159:17, 159:20, 161:20
**Plaintiffs** [2] - 2:1, 2:6
**plaintiffs'** [6] - 26:15, 116:25, 117:13, 160:6, 160:14, 334:3
**Plaintiffs'** [1] - 333:24
**plan** [2] - 237:19, 310:3
**plane** [1] - 381:18
**planet** [1] - 53:19
**planted** [1] - 390:1
**plastic** [5] - 132:14, 133:20, 134:9, 134:10, 134:22
**plastics** [1] - 133:25
**plate** [3] - 282:6, 362:12, 362:23
**plates** [1] - 242:20
**players** [1] - 313:19
**please** [7] - 5:14, 5:24, 45:2, 211:25, 306:11, 309:22, 339:21
**plenty** [1] - 141:22
**plot** [3] - 219:2, 328:19, 370:20
**plots** [1] - 213:15
**plural** [3] - 150:25, 151:7, 151:10
**pluralize** [1] - 151:1
**plus** [1] - 261:25
**point** [22] - 70:20, 71:20, 72:21, 124:21,

137:22, 153:23, 176:22, 219:7, 219:19, 219:22, 220:1, 281:10, 283:7, 294:10, 294:11, 303:6, 308:5, 311:3, 322:4, 350:6, 351:24, 352:2
**pointed** [2] - 134:3, 300:11
**pointing** [2] - 41:15, 140:20
**points** [5] - 243:19, 348:23, 348:25, 361:20, 370:18
**polite** [1] - 370:11
**polysaccharides** [3] - 83:1, 83:2, 83:5
**poor** [2] - 81:21, 303:1
**poorly** [3] - 100:22, 179:21, 179:23
**pop** [3] - 186:12, 287:13, 287:17
**popcorn** [1] - 152:21, 152:22, 153:11, 153:22, 154:1, 154:19, 155:1, 155:2, 156:11, 157:4, 157:15, 157:18, 158:13, 159:22, 357:15, 357:16
**populations** [3] - 172:1, 197:1, 343:9
**portable** [1] - 389:15
**portion** [2] - 63:21, 372:22
**pose** [2] - 245:24, 271:6
**posed** [1] - 93:10
**poses** [1] - 242:23
**positive** [1] - 102:9, 102:24, 103:12, 166:12, 166:13, 166:16, 245:22, 301:22, 307:11, 363:5, 363:10
**positively** [2] - 133:24, 206:24
**possible** [4] - 113:4, 265:10, 265:11, 282:4
**post** [3] - 10:2, 10:19, 97:3
**poster** [1] - 310:4
**potential** [4] - 26:6, 151:18, 246:18, 255:3
**potentially** [2] - 270:10, 389:2
**practice** [4] - 12:3, 51:4, 170:16, 265:12
**practising** [1] - 322:1
**practitioners** [1] - 345:10
**pre** [1] - 10:2
**precedes** [1] - 308:21
**predecessor** [4] - 251:18, 252:24, 253:6, 253:15
**predicted** [1] - 164:10
**predictive** [1] - 170:19
**prefer** [2] - 148:21, 233:10
**preliminary** [1] - 136:23
**premarked** [1] - 61:5
**prepared** [1] - 45:5
**presence** [6] - 12:15,

17:22, 106:19, 203:19, 255:3, 260:22
**present** [10] - 34:2, 46:3, 150:18, 178:2, 178:5, 178:6, 182:15, 182:19, 310:3, 360:15
**presentation** [11] - 41:10, 41:25, 42:1, 42:12, 46:11, 168:21, 169:7, 169:14, 357:8, 364:21, 364:23
**presentations** [1] - 47:25
**presented** [7] - 48:7, 174:7, 179:7, 215:16, 292:12, 302:15, 369:12
**presenting** [1] - 213:3
**pressure** [13] - 165:16, 165:18, 165:23, 166:1, 166:6, 166:10, 166:12, 166:16, 166:24, 167:18, 306:10
**presumably** [1] - 166:7
**pretend** [4] - 191:17, 215:24, 227:3, 227:23
**pretending** [1] - 46:5
**pretense** [1] - 193:1
**pretty** [10] - 38:19, 82:10, 90:9, 90:11, 159:18, 199:2, 254:7, 325:7, 332:1, 382:1
**prevent** [5] - 53:20, 56:6, 107:16, 107:21, 166:8
**preventing** [1] - 345:8
**prevention** [2] - 112:3, 136:18
**previous** [2] - 86:1, 247:7
**previously** [10] - 7:12, 61:10, 62:14, 111:21, 172:24, 176:8, 236:2, 347:11, 367:17, 384:21
**Prielipp** [1] - 301:4
**primarily** [8] - 10:20, 273:15, 275:2, 276:8, 277:25, 278:23, 279:25, 282:12
**primary** [3] - 110:11, 325:16, 326:3
**prime** [1] - 314:14
**principle** [1] - 133:22
**principles** [2] - 16:25, 332:6
**print** [1] - 202:25
**printout** [1] - 388:10
**privilege** [1] - 224:2
**privileged** [1] - 7:8
**probable** [1] - 363:5
**probe** [1] - 266:20
**problem** [15] - 11:4, 18:8, 24:5, 45:7, 51:17, 73:25, 98:22, 143:21, 143:25, 154:16, 307:23, 312:17, 361:12, 364:17, 367:11
**problematic** [8] - 245:8, 245:9, 246:9, 270:10, 300:15, 311:6, 354:4, 354:8
**problems** [7] - 52:23, 57:6, 78:3, 175:13, 245:24, 307:10, 371:4

**JIM HO – June 28, 2017**

procedure [6] -
75:14, 171:11,
178:15, 178:19,
262:24, 270:6
procedures [4] -
53:19, 178:3, 182:15,
182:20
proceeding [1] -
226:5
Proceedings [2] -
5:1, 236:1
proceedings [3] -
235:7, 390:24, 391:7
process [3] - 83:21,
245:11, 381:3
processing [4] -
3:16, 188:4, 188:17,
192:11
produce [2] - 39:23,
238:12
produced [6] - 30:8,
30:12, 102:6, 168:10,
348:22, 364:9
produces [4] - 83:17,
152:11, 357:7, 357:15
producing [1] -
238:9
product [5] - 351:18,
354:23, 371:25,
372:7, 378:5
Products [1] - 1:8
products [1] - 5:4
professional [2] -
30:2, 240:14
program [2] -
190:13, 190:15
project [3] - 4:13,
356:16, 356:22
proper [5] - 34:19,
95:5, 244:10, 251:12,
381:1
properly [1] - 103:5
property [1] - 7:21
proposals [2] -
107:19, 107:23
propose [1] - 103:21
proposing [1] -
149:3
proposition [12] -
132:10, 143:1,
147:13, 147:20,
148:14, 165:1, 169:6,
212:11, 275:18,
337:17, 374:22,
374:23
propositions [1] -
275:17
prosthetic [9] - 23:4,
23:9, 75:2, 75:8,
256:11, 256:18,
257:14, 258:23, 380:2
prosthetically [1] -
206:10
protection [1] - 83:6
protective [1] - 285:5
protocol [1] - 29:2
prove [5] - 37:3,
54:3, 94:19, 212:10,
214:18
proves [1] - 352:8
provide [13] - 8:20,
31:24, 31:25, 52:4,
56:18, 63:2, 74:22,
75:1, 83:6, 121:3,
121:19, 129:20,
160:13
provided [11] -
14:22, 15:3, 20:18,
30:15, 48:23, 159:14,
187:20, 285:23,

286:8, 293:13, 293:19
provides [1] - 23:24
providing [1] -
136:23
Province [1] - 391:12
proxies [3] - 201:3,
201:7, 220:11
proxy [6] - 207:3,
207:20, 208:5,
208:24, 220:2, 372:16
publication [7] -
136:10, 172:22,
202:15, 220:14,
240:24, 245:10, 306:8
publications [6] -
28:25, 101:2, 220:10,
244:14, 375:23,
375:25
publish [4] - 202:22,
222:13, 230:16,
230:17
published [30] -
28:2, 29:21, 30:9,
33:7, 100:19, 101:10,
202:11, 202:19,
203:3, 203:7, 203:8,
220:14, 221:6, 221:9,
221:16, 221:23,
222:5, 240:23,
240:24, 241:25,
244:8, 287:5, 291:11,
291:13, 291:18,
297:11, 326:3, 355:8,
378:4, 378:9
publishers [1] - 31:4
publishing [4] -
202:18, 222:4,
244:14, 325:12
pull [3] - 38:20,
85:14, 129:19
pulling [1] - 126:5
pumping [1] - 107:5
pure [2] - 243:24,
314:5
purpose [6] - 49:23,
63:2, 143:23, 199:3,
212:15, 230:6, 280:3,
280:5, 371:12
purpose.. [1] - 62:25
purposes [3] - 1:20,
118:24, 188:11
pursuant [2] - 1:19,
285:5
pursue [1] - 381:9
putting [3] - 227:19,
266:19, 311:10
PVC [2] - 132:19,
132:20

Q

qualifications [4] -
75:10, 157:25,
150:16, 295:11
qualified [11] -
22:15, 55:25, 56:15,
56:25, 76:1, 76:2,
78:14, 161:15, 162:2,
374:8, 374:15
qualify [1] - 331:4
quality [13] - 17:15,
75:12, 76:6, 196:17,
298:19, 326:10,
327:2, 327:13,
332:14, 333:1,
372:22, 372:24,
373:12
quarrelling [1] -
230:21
question.. [1] - 34:6

questions [39] -
6:17, 7:3, 22:6, 22:9,
26:19, 32:19, 33:9,
44:4, 44:25, 70:1,
86:12, 86:13, 87:2,
97:20, 100:7, 107:1,
120:4, 148:22,
156:21, 161:4,
198:12, 201:14,
208:3, 210:12, 217:3,
224:1, 226:13,
227:12, 228:10,
329:11, 329:12,
340:24, 347:7,
358:15, 381:22,
382:18, 383:16
quick [7] - 32:23,
118:9, 142:4, 199:2,
335:10, 359:16,
381:22
quickly [1] - 141:3
quotation [5] -
49:13, 154:6, 154:10,
282:16, 379:4
quote [8] - 153:8,
164:4, 276:13,
276:21, 282:3, 283:5,
283:12, 345:20
quoted [6] - 153:8,
277:21, 283:15,
298:1, 298:3, 344:18
quoting [3] - 36:9,
36:10, 59:4

R

rabbit [1] - 182:2
Rabih [1] - 199:19
rainforest [1] - 86:11
random [1] - 370:25
randomized [1] -
253:20
Randomized [2] -
3:22, 200:20
range [22] - 36:6,
36:14, 40:4, 40:14,
40:17, 40:22, 41:1,
45:10, 46:23, 47:20,
58:18, 59:14, 68:3,
83:6, 169:2, 169:8,
336:3, 336:17,
336:23, 387:12,
387:15, 387:17
range' [1] - 38:13
range.. [2] - 37:19,
39:14
ranges [2] - 46:12,
366:1
Ranjani [2] - 112:25,
114:18
rare [1] - 151:21
ratchet [1] - 236:16
rate [8] - 64:21, 84:6,
87:17, 271:15,
378:15, 378:16,
378:24, 379:3
rather [1] - 183:7,
233:10, 233:14,
306:24, 317:17,
325:15, 326:2, 369:8,
373:25
Raval [3] - 3:12,
187:23, 188:13,
208:19, 366:19
raw [7] - 59:2, 124:7,
171:22, 175:19,
368:9, 368:10, 369:4
Re [2] - 1:6, 5:4
reach [1] - 375:10
reaching [1] - 375:13

read [69] - 23:23,
38:6, 44:12, 47:12,
69:4, 81:9, 129:20,
136:1, 136:25,
137:17, 138:6,
138:21, 140:5, 158:8,
164:13, 164:14,
176:14, 185:3,
188:13, 188:18,
188:19, 189:8,
189:21, 203:18,
243:16, 252:9,
252:19, 274:4,
276:20, 276:25,
282:2, 283:10, 288:1,
288:5, 288:7, 288:8,
288:11, 288:13,
290:15, 291:1, 291:3,
291:7, 291:16,
291:21, 292:4,
292:21, 293:1, 304:9,
304:15, 305:25,
307:7, 308:13,
315:21, 316:5,
320:21, 322:10,
322:15, 326:6, 328:2,
328:4, 336:1, 366:22,
380:18, 390:15
reader [1] - 302:7
reading [52] - 37:24,
38:4, 38:8, 38:16,
65:25, 69:7, 121:10,
138:8, 200:22,
250:10, 252:25,
255:18, 273:25,
282:14, 282:20,
283:6, 283:7, 291:8,
325:7, 338:23,
365:20, 376:6
reads [2] - 63:22,
365:21
ready [1] - 47:9
real [19] - 75:23,
114:21, 142:4,
188:14, 197:5,
265:24, 267:23,
268:4, 268:8, 303:3,
315:12, 324:22,
335:10, 353:1, 353:5,
353:14, 354:2,
354:16, 390:7
Real [3] - 3:13,
187:24, 192:8
real-time [1] - 188:14
Real-time [3] - 3:13,
187:24, 192:8
realistically [1] -
113:9
realized [1] - 252:12
really [76] - 6:18, 7:2,
12:10, 15:5, 16:2,
20:23, 21:20, 27:8,
30:23, 30:25, 31:9,
34:18, 42:4, 42:6,
42:9, 43:7, 46:5, 52:5,
54:20, 58:17, 70:18,
70:19, 72:10, 72:24,
76:14, 77:8, 80:4,
81:13, 90:15, 91:15,
92:14, 93:4, 99:5,
99:9, 114:10, 115:17,
118:8, 122:5, 127:18,
127:19, 141:3, 143:3,
147:8, 158:1, 174:1,
174:2, 180:23,
180:24, 192:22,
199:14, 225:1,
225:23, 227:13,
227:17, 263:25,
277:24, 279:19,

281:11, 283:9, 302:5,
308:5, 312:5, 327:22,
339:9, 353:5, 359:15,
360:6, 360:24,
362:20, 368:3, 368:4,
371:18, 374:22,
383:21, 383:24
realtime [2] - 389:2,
389:6
reason [12] - 50:3,
52:11, 52:12, 52:14,
56:4, 57:3, 115:11,
137:5, 187:21,
213:15, 257:2, 367:24
reasonable [12] -
72:3, 75:1, 78:15,
113:11, 114:4, 173:4,
173:11, 180:14,
186:17, 221:12, 372:5
reasonably [2] -
76:23, 371:11
reasons [2] - 366:10,
369:3
rebuttal [1] - 334:14
rebutting [1] - 334:2
recalling [2] - 351:9,
351:10
receiving [1] -
101:23
recognize [4] - 54:6,
100:12, 170:23,
186:24
recommence [1] -
235:7
recommenced [1] -
236:1
recommendation [1]
- 344:14
record [26] - 5:9,
60:5, 60:12, 61:23,
61:25, 62:2, 62:10,
111:11, 128:15,
136:2, 142:7, 142:10,
169:24, 189:23,
190:1, 190:4, 202:17,
225:20, 227:19,
235:4, 236:4, 356:6,
356:9, 390:20, 390:22
RECORD [2] - 62:7
red [3] - 137:6,
137:10, 137:24
red] [1] - 137:2
reduced [1] - 196:22
Reed [2] - 136:9,
317:5
refer [5] - 131:8,
241:7, 241:8, 241:11,
286:14
reference [6] - 32:23,
39:15, 134:5, 253:7,
335:24, 347:20
references [2] -
240:22, 287:6
referred [1] - 81:7
referring [12] - 40:5,
65:4, 66:14, 66:17,
96:20, 99:3, 129:3,
134:7, 137:18,
145:16, 169:4, 231:17
refers [1] - 131:14
reflect [3] - 197:14,
297:24, 299:13
refresher [1] - 6:14
refreshing [1] -
325:8
regard [1] - 306:21
regarding [8] - 27:9,
132:18, 202:9,
230:25, 239:3, 239:5,
357:21, 374:13

**regards** [2] - 307:6, 310:5
**regime** [1] - 117:24
**regularly** [1] - 43:23
**regulate** [1] - 271:9
**relate** [1] - 172:1
**related** [5] - 107:13, 205:3, 205:11, 206:24, 258:16
**relates** [2] - 1:14, 99:17
**relating** [3] - 31:11, 241:21, 373:13
**relation** [2] - 173:18, 193:18
**relationship** [8] - 190:19, 191:23, 192:2, 246:20, 330:12, 365:10, 365:15, 386:23
**relationships** [2] - 366:1, 366:2
**relative** [5] - 85:12, 89:6, 90:13, 97:11, 99:16
**relatively** [2] - 30:24, 261:22
**relevance** [4] - 256:25, 261:7, 275:8, 278:24
**relevant** [5] - 124:17, 259:12, 260:19, 274:18, 336:22
**relied** [9] - 167:22, 170:1, 201:2, 230:6, 230:8, 230:24, 242:7, 286:6, 347:1
**religion** [2] - 50:15, 50:16
**reluctant** [1] - 101:8
**Rely** [1] - 287:1
**rely** [7] - 80:5, 174:25, 222:20, 232:8, 232:10, 286:1, 287:21
**relying** [4] - 29:6, 110:3, 110:7, 159:17
**remarkable** [4] - 177:22, 178:1, 184:19, 367:2
**remember** [58] - 66:18, 66:20, 99:25, 117:9, 135:14, 152:22, 169:5, 169:9, 229:20, 247:5, 247:8, 249:22, 253:4, 253:7, 253:8, 253:10, 253:13, 253:25, 254:17, 257:21, 257:22, 257:25, 261:16, 267:15, 267:16, 270:2, 273:1, 291:8, 293:3, 294:19, 294:25, 296:7, 301:19, 304:7, 307:9, 307:13, 320:5, 320:6, 320:17, 337:7, 339:8, 339:10, 340:1, 340:4, 340:8, 340:10, 340:14, 340:15, 340:18, 344:6, 344:9, 344:10, 344:13, 347:15, 367:1, 377:19, 384:23, 388:16
**remind** [1] - 199:18
**removal** [4] - 57:22, 58:21, 340:11, 341:8
**remove** [7] - 58:14, 59:23, 66:1, 66:6,

66:19, 68:24, 69:6
**removed** [4] - 67:3, 67:6, 67:9, 67:12
**removing** [2] - 60:14, 339:11
**render** [1] - 233:8
**repeat** [1] - 75:19
**repeated** [1] - 352:21
**repeating** [1] - 313:14
**rephrase** [2] - 58:16, 79:19
**reply** [1] - 306:12
**report** [12] - 3:19, 4:9, 10:1, 15:8, 15:12, 15:14, 15:18, 16:6, 16:9, 16:11, 16:14, 16:16, 25:8, 25:12, 25:13, 25:16, 27:9, 27:15, 27:20, 27:21, 27:23, 29:6, 31:7, 33:8, 35:24, 36:5, 37:1, 37:2, 37:3, 37:24, 38:17, 38:25, 45:9, 47:12, 47:15, 48:5, 48:19, 57:8, 58:12, 58:19, 59:19, 61:7, 62:24, 66:11, 67:16, 68:16, 71:24, 72:16, 82:14, 82:16, 99:13, 121:11, 122:12, 126:4, 126:21, 132:16, 132:21, 134:8, 134:24, 152:20, 154:8, 158:25, 163:10, 163:19, 200:15, 212:11, 237:11, 237:13, 237:14, 238:9, 238:22, 241:15, 243:16, 247:6, 248:16, 248:20, 250:11, 251:23, 252:9, 252:15, 252:16, 252:20, 252:25, 253:5, 253:11, 254:21, 271:21, 272:8, 273:3, 276:19, 277:22, 286:18, 288:16, 293:7, 293:21, 294:2, 295:18, 296:9, 296:10, 297:7, 304:6, 305:18, 305:21, 312:13, 313:22, 320:10, 323:20, 328:3, 329:16, 330:15, 330:18, 330:21, 334:1, 334:9, 335:1, 335:2, 335:4, 335:16, 336:20, 337:8, 339:22, 341:5, 344:24, 347:18, 350:5, 360:14, 374:23, 375:15, 378:22, 384:16
**Report** [1] - 62:18
**reported** [7] - 122:1, 122:3, 122:10, 193:15, 260:2, 320:10, 330:5
**REPORTER** [3] - 38:8, 187:12, 348:14
**reporter** [1] - 5:22, 5:24, 38:5, 60:23, 81:21, 289:14
**Reporter** [2] - 2:18, 391:19
**Reporting** [2] - 5:11,

5:24
**Reports** [1] - 333:24
**reports** [15] - 31:24, 34:23, 34:25, 35:17, 100:16, 100:18, 101:17, 101:23, 121:21, 124:5, 293:2, 299:16, 303:4, 334:4, 347:12
**represent** [5] - 5:15, 22:13, 309:12
**representations** [2] - 74:8, 303:1
**representative** [5] - 36:6, 36:14, 45:11, 46:25, 47:21
**represents** [7] - 3:15, 188:2, 188:16, 192:10, 211:22, 215:2, 215:5
**reproduce** [1] - 110:14
**reputation** [1] - 200:3
**request** [2] - 226:8, 390:14
**required** [5] - 9:11, 49:21, 49:22, 151:12, 385:6
**requirements** [1] - 118:7
**requires** [1] - 150:16
**rereading** [1] - 310:18
**research** [12] - 113:1, 233:18, 244:10, 245:13, 246:10, 286:3, 326:4, 355:8, 355:22, 367:18, 378:3, 378:4
**Research** [1] - 284:20
**researcher** [2] - 9:23, 306:17
**Researcher** [1] - 245:13
**researchers** [7] - 100:13, 100:19, 101:2, 202:9, 208:23, 245:4, 352:22
**residence** [2] - 113:11, 114:4
**resistive** [1] - 282:8
**resources** [1] - 377:21
**respect** [19] - 11:5, 31:3, 166:13, 221:2, 227:2, 227:4, 227:10, 241:10, 245:25, 246:12, 286:5, 287:8, 291:5, 307:22, 338:8, 338:17, 366:25, 369:20, 372:9
**respectfully** [1] - 171:15
**respond** [1] - 247:25
**responding** [4] - 112:18, 147:17, 251:22, 251:23
**response** [8] - 82:9, 137:24, 138:24, 248:24, 306:14, 310:12, 327:14, 330:9
**responses** [3] - 156:24, 328:16, 331:10
**responsible** [2] - 27:2, 314:2, 314:18
**responsive** [3] - 281:13, 281:14,

281:15
**rest** [1] - 276:21
**result** [6] - 74:23, 245:23, 301:23, 306:24, 307:13, 378:3
**results** [1] - 117:20, 188:25, 189:16, 247:24, 299:12, 299:13, 339:4, 340:15, 362:18, 364:9, 370:13
**retain** [2] - 13:14, 132:15
**retained** [12] - 13:2, 160:13, 177:4, 177:12, 177:14, 185:21, 185:23, 208:21, 236:21, 236:23, 238:25, 355:10
**retrospective** [4] - 16:16, 320:15, 330:3, 331:6
**reveal** [1] - 302:6
**review** [17] - 28:8, 33:11, 33:13, 136:10, 201:12, 233:1, 237:12, 241:21, 297:19, 300:12, 310:10, 313:12, 313:15, 325:16, 326:3, 344:6, 348:6
**reviewed** [45] - 27:21, 27:23, 28:1, 28:8, 29:15, 29:17, 29:21, 29:25, 30:3, 30:5, 30:7, 31:11, 32:14, 32:20, 34:21, 34:22, 35:1, 35:13, 35:18, 35:20, 117:1, 121:21, 180:17, 180:19, 180:22, 188:20, 197:20, 199:10, 201:5, 222:9, 222:21, 233:11, 233:21, 234:2, 251:21, 305:9, 305:12, 311:18, 312:16, 325:13, 326:4, 334:4, 384:21
**reviewer** [5] - 300:17, 300:19, 300:25, 301:3, 366:7
**reviewing** [1] - 33:17
**revolve** [1] - 373:11
**rewrite** [1] - 312:15
**RH** [6] - 89:9, 89:14, 89:19, 95:17, 95:20, 100:2
**Richard** [2] - 261:15, 277:13
**Richard's** [3] - 269:19, 269:20, 270:2
**ridiculous** [2] - 222:3, 224:24
**right-hand** [5] - 204:16, 204:22, 365:4, 385:21
**rigorous** [5] - 117:24, 118:14, 119:7, 119:9, 130:7
**ring** [1] - 35:11
**risk** [22] - 48:25, 142:14, 142:25, 143:11, 143:13, 144:12, 144:17, 145:3, 145:11, 147:22, 193:18, 194:7, 195:9, 196:3, 196:13, 196:14,

196:24, 196:25, 242:12, 242:22, 242:23, 380:2
**road** [1] - 124:24
**role** [3] - 7:15, 8:18, 8:19
**Romano** [2] - 167:20, 168:8
**Room** [3] - 3:21, 200:19
**room** [112] - 8:15, 16:12, 17:23, 20:12, 21:12, 21:16, 21:24, 50:4, 50:8, 50:11, 50:13, 50:21, 51:2, 51:5, 51:15, 52:15, 53:8, 53:20, 56:5, 56:10, 75:13, 76:7, 76:19, 76:20, 84:7, 84:14, 85:13, 85:18, 89:24, 90:2, 91:9, 91:14, 96:11, 96:12, 96:21, 96:25, 98:2, 97:16, 97:25, 98:2, 98:22, 99:2, 100:2, 108:4, 142:25, 143:4, 143:13, 143:21, 143:22, 144:13, 144:17, 145:2, 145:11, 146:4, 146:23, 147:2, 147:25, 148:2, 148:6, 148:18, 149:22, 149:23, 151:7, 153:24, 153:25, 154:22, 155:8, 155:14, 155:21, 156:8, 164:23, 165:9, 165:12, 165:17, 165:18, 165:21, 165:23, 166:1, 166:6, 166:9, 166:15, 166:16, 166:23, 168:3, 170:10, 170:11, 170:20, 171:10, 178:8, 181:15, 183:3, 193:17, 194:3, 227:2, 227:4, 263:8, 263:10, 263:11, 266:7, 269:5, 270:17, 270:25, 380:12, 380:16, 381:4, 381:5, 383:9, 388:15, 388:21, 389:4, 389:10
**rooms** [12] - 21:7, 53:2, 53:14, 77:13, 166:12, 166:20, 167:5, 167:17, 167:18, 196:4, 266:21
**root** [3] - 368:12, 369:4, 370:4
**rough** [1] - 192:24
**roughly** [2] - 238:3, 247:22
**routine** [1] - 271:12
**row** [1] - 210:14
**rude** [1] - 73:21
**rule** [1] - 271:1
**ruled** [1] - 285:12
**run** [1] - 271:6
**Russell** [2] - 173:16, 176:13, 177:14, 183:20, 185:15

**S**

**safe** [15] - 22:23, 48:24, 71:15, 71:17, 75:12, 76:6, 76:23,

77:11, 77:15, 78:13, 168:25, 273:20, 371:11, 371:25, 372:7
**safely** [1] - 71:12
**safety** [35] - 72:4, 72:9, 72:20, 72:22, 72:25, 73:4, 73:7, 73:8, 74:10, 74:12, 77:1, 77:6, 77:16, 77:17, 78:16, 165:3, 272:8, 272:12, 272:18, 272:23, 273:11, 274:25, 275:18, 276:6, 277:14, 279:21, 279:24, 281:1, 281:6, 282:10, 282:24, 283:16, 283:23, 297:3
**said..** [1] - 60:8
**sake** [2] - 87:22, 120:24
**salaried** [1] - 244:25
**salary** [1] - 244:18
**sample** [2] - 78:2, 254:8
**sampled** [2] - 156:7, 359:9
**sampler** [2] - 388:23, 390:7
**samples** [1] - 304:7
**sampling** [14] - 11:19, 11:22, 14:15, 18:4, 34:14, 184:7, 255:24, 355:11, 358:5, 373:16, 374:1, 379:25, 380:13, 381:7
**sanctioned** [1] - 128:8
**sane** [1] - 144:10
**SARS** [1] - 18:8
**save** [1] - 124:8
**saves** [1] - 342:20
**saw** [10] - 32:22, 33:9, 214:10, 248:16, 252:8, 288:7, 290:3, 305:24, 347:14, 384:25
**scale** [3] - 344:14, 345:17, 346:10
**scatter** [1] - 370:18
**scattered** [1] - 174:21
**scenarios** [1] - 311:17
**school** [1] - 191:18
**science** [8] - 28:11, 214:21, 220:17, 220:19, 220:22, 220:24, 243:24, 283:19
**scientific** [24] - 28:24, 31:5, 32:15, 35:19, 116:23, 118:18, 119:2, 132:1, 132:4, 132:9, 213:16, 282:23, 284:7, 311:19, 321:15, 354:22, 354:23, 372:6, 373:12, 375:8, 376:6, 376:8, 377:14, 378:14
**scientifically** [3] - 160:5, 197:3, 280:2
**scientist** [2] - 20:1, 95:9
**scientists** [11] - 54:13, 55:5, 55:6, 55:7, 55:9, 55:13, 55:16, 171:3, 221:2, 357:7, 375:7

**se** [2] - 80:5, 105:23
**seamless** [1] - 349:9
**search** [1] - 286:11
**season** [2] - 39:4, 40:10, 57:18, 62:4, 67:6, 68:18, 70:22, 102:12, 102:15, 111:23, 122:18, 126:14, 126:16, 132:22, 142:5, 163:23, 186:6, 189:24, 244:7, 294:11, 294:12, 294:14, 298:10, 298:11, 313:24, 335:12, 363:1, 388:5
**second-to-last** [4] - 102:12, 102:15, 298:10, 298:11
**secret** [1] - 212:14
**section** [17] - 57:13, 65:7, 127:6, 127:10, 204:15, 204:23, 241:24, 285:2, 294:4, 297:9, 334:14, 349:4, 349:6, 350:6, 350:19, 365:19, 365:20
**Section** [3] - 297:10, 333:23, 340:2
**seed** [1] - 390:1
**seeing** [5] - 64:22, 232:6, 307:21, 360:24, 371:1
**seek** [2] - 77:18, 77:19
**seeks** [1] - 354:24
**seem** [2] - 51:21, 221:1
**selected** [3] - 73:5, 74:16, 287:20
**selecting** [3] - 69:14, 70:3, 70:12
**selection** [1] - 74:13
**self** [1] - 328:14
**selling** [2] - 12:4, 12:10
**semi** [1] - 347:7
**semi-hypothetical** [1] - 347:7
**send** [1] - 310:9
**senior** [2] - 112:2, 113:1
**sense** [4] - 64:16, 64:17, 94:15, 96:14
**sensors** [1] - 324:2
**sentence** [47] - 25:22, 25:23, 37:11, 37:12, 40:1, 40:2, 40:8, 40:12, 41:20, 47:11, 47:12, 57:18, 114:9, 126:15, 126:16, 128:23, 129:6, 129:14, 131:7, 131:9, 134:18, 135:1, 135:2, 136:22, 138:14, 139:5, 139:6, 164:4, 164:16, 193:14, 193:25, 196:8, 196:21, 205:9, 206:23, 207:22, 209:5, 273:6, 273:8, 278:12, 298:9, 298:10, 298:11, 299:1, 345:4
**sentences** [2] - 6:23, 345:1
**sentiment** [1] - 300:18
**separate** [3] - 136:7, 139:16, 361:19

**sequential** [3] - 61:15, 135:19, 187:22
**sequentials** [1] - 187:20
**series** [1] - 129:16
**serious** [3] - 97:3, 118:1, 224:11
**seriously** [2] - 93:2, 301:24
**serve** [1] - 186:17
**Sessler** [8] - 222:21, 230:11, 305:7, 305:13, 306:16, 309:17, 310:16
**Sessler's** [1] - 310:19
**set** [21] - 11:24, 12:24, 91:16, 99:13, 118:5, 140:21, 212:8, 212:10, 214:13, 214:14, 273:13, 275:3, 275:4, 278:1, 278:23, 278:24, 280:1, 338:4, 368:12, 379:20, 384:22
**set-up** [7] - 273:15, 275:3, 275:4, 278:1, 278:23, 278:24, 280:1
**sets** [5] - 27:1, 359:14, 359:22, 360:2, 366:12
**setting** [6] - 69:15, 70:4, 70:13, 193:17, 326:15, 333:16
**settings** [1] - 17:10
**setup** [2] - 276:9, 282:13
**seven** [2] - 202:9, 208:23
**Seventh** [1] - 2:13
**several** [8] - 193:15, 241:25, 297:11, 310:14, 330:17, 359:9, 365:14, 368:6
**shake** [1] - 227:7
**shaky** [1] - 329:1
**shaping** [1] - 329:7
**shed** [2] - 155:14, 156:10
**shelf** [1] - 11:3
**shook** [1] - 98:11
**short** [3] - 240:19, 308:2, 383:22
**shortens** [1] - 100:3
**shorthand** [2] - 391:8, 391:9
**shoulders** [1] - 28:13
**show** [23] - 137:7, 199:22, 204:11, 214:13, 214:20, 226:2, 229:19, 230:10, 231:15, 232:7, 232:9, 232:11, 267:15, 267:16, 267:18, 290:6, 308:12, 312:13, 321:14, 329:8, 330:12, 335:1, 347:3
**showed** [5] - 254:24, 255:1, 255:2, 340:15, 340:16
**shower** [2] - 256:8
**showering** [1] - 254:16
**showing** [4] - 224:14, 312:14, 347:12, 352:4
**shown** [3] - 35:15, 268:23, 348:20
**shows** [5] - 229:5,

267:18, 329:8, 352:19, 370:12
**shy** [1] - 311:1
**sic** [1] - 356:21
**side** [5] - 82:21, 121:17, 241:4, 269:6, 385:21
**sides** [1] - 234:16
**sign** [3] - 383:17, 386:19, 390:15
**signal** [1] - 219:9
**signature** [1] - 304:19
**significance** [3] - 37:4, 100:23, 165:2
**significant** [17] - 37:18, 38:11, 39:12, 39:18, 39:20, 54:14, 158:25, 164:12, 209:12, 366:1, 373:8
**significantly** [3] - 205:2, 205:11, 258:16
**signifies** [1] - 216:13
**signs** [1] - 111:11
**Sikka** [1] - 301:4
**silver** [2] - 107:16, 107:20
**simple** [20] - 42:20, 52:6, 54:23, 55:3, 69:10, 73:17, 77:20, 95:9, 107:9, 108:23, 123:8, 124:13, 144:23, 147:13, 147:20, 210:7, 216:25, 225:25, 377:2
**simple-minded** [1] - 144:23
**simplistic** [1] - 148:14
**simply** [16] - 56:18, 115:15, 134:16, 141:8, 148:13, 179:6, 179:19, 190:17, 191:3, 192:20, 215:15, 259:19, 260:24, 281:15, 371:15
**simulated** [1] - 380:15
**single** [8] - 101:10, 106:19, 150:21, 151:2, 153:14, 276:24, 313:8, 323:16
**singular** [1] - 151:3
**sit** [1] - 127:13
**site** [13] - 156:14, 157:21, 158:14, 194:7, 194:18, 194:23, 195:9, 196:3, 203:20, 203:21, 223:2, 229:6, 255:2
**sites** [3] - 205:2, 205:11, 258:16
**sits** [3] - 86:25, 108:4
**situation** [6] - 116:18, 131:5, 147:5, 211:9, 231:10, 311:11
**six** [2] - 236:18, 236:22
**Size** [1] - 357:2
**size** [53] - 27:10, 27:11, 36:6, 36:14, 37:19, 38:13, 39:14, 40:4, 40:14, 40:17, 40:22, 40:25, 45:10, 46:12, 46:23, 47:20, 48:6, 48:10, 48:18, 58:18, 59:14, 121:19, 125:12, 169:2, 169:15, 216:1, 216:4,

336:3, 336:17, 336:23, 337:4, 357:21, 359:9, 359:14, 359:22, 360:4, 360:7, 360:10, 360:13, 361:24, 362:4, 362:6, 363:1, 363:3, 364:2, 364:5, 364:10, 364:13, 387:12, 387:15, 387:17, 387:24
**sized** [10] - 31:23, 57:23, 58:14, 58:22, 60:15, 66:19, 210:11, 340:11, 341:8, 360:5
**sizes** [10] - 35:23, 59:24, 65:18, 66:2, 168:13, 254:8, 335:2, 359:14, 360:16, 362:25
**sizing** [1] - 362:25
**skeptical** [1] - 328:14
**skew** [1] - 362:18
**skewed** [1] - 362:21
**skill** [2] - 11:24, 391:9
**skilled** [1] - 43:22
**skin** [17] - 110:23, 111:1, 111:7, 111:13, 111:17, 145:16, 155:11, 155:14, 156:9, 194:4, 255:2, 255:25, 256:3, 257:4, 259:21, 260:22, 261:2
**skip** [1] - 124:11
**skyway** [1] - 88:8
**slap** [1] - 53:23
**slightly** [1] - 66:25
**slit** [2] - 388:23, 390:7
**slow** [1] - 75:23
**slowly** [1] - 262:5
**small** [5] - 218:20, 254:8, 261:22, 389:13, 389:16
**smaller** [8] - 41:2, 41:5, 41:11, 42:2, 48:1, 168:20, 358:7, 364:22
**smeared** [1] - 201:24
**smith** [1] - 310:22
**sneers** [2] - 224:14, 226:10
**snotty** [2] - 318:19, 318:20
**so..** [1] - 305:15
**software** [5] - 12:8, 12:12, 14:4, 14:7, 370:20
**solemn** [1] - 224:10
**solid** [3] - 10:10, 10:13, 216:16
**solution** [1] - 105:10
**someone** [3] - 112:17, 353:1, 354:1
**someplace** [1] - 182:24
**sometime** [1] - 237:7
**sometimes** [4] - 6:21, 73:12, 222:12, 243:12
**somewhere** [12] - 27:23, 79:25, 80:2, 89:25, 91:1, 94:10, 100:21, 132:18, 132:22, 156:18, 175:19, 347:18
**son** [2] - 22:4, 22:14
**soon** [1] - 382:1

**sooner** [1] - 361:14
**sorry** [26] - 37:23, 47:10, 61:25, 62:19, 73:24, 119:23, 187:14, 194:20, 197:9, 198:15, 202:12, 204:18, 224:21, 224:22, 225:3, 236:18, 241:16, 267:16, 277:7, 298:4, 298:9, 322:7, 339:19, 367:3, 386:18, 388:7
**Sorry** [1] - 7:10
**sort** [19] - 15:11, 33:21, 34:9, 70:17, 77:3, 77:25, 99:8, 122:15, 153:23, 193:22, 215:13, 244:9, 259:22, 259:23, 347:22, 348:24, 371:7, 371:20, 372:19
**sound** [2] - 8:3, 280:2
**sounded** [1] - 314:22
**source** [3] - 49:13, 153:24, 352:4
**sources** [5] - 29:15, 30:3, 165:6, 165:8, 180:22
**South** [1] - 2:13
**space** [2] - 39:22, 266:20
**speaking** [6] - 53:22, 74:15, 93:5, 93:6, 113:10, 128:17
**specialist** [1] - 113:1
**specific** [18] - 17:7, 17:8, 23:8, 37:15, 68:11, 75:7, 75:22, 94:7, 124:23, 171:8, 244:20, 244:23, 255:16, 302:17, 302:20, 303:15, 306:10, 378:3
**specifically** [13] - 18:9, 33:16, 129:2, 135:14, 168:15, 169:2, 171:10, 171:21, 231:17, 247:1, 270:21, 279:23, 327:19
**specification** [4] - 57:22, 66:10, 66:19, 340:5
**specifications** [4] - 67:22, 338:24, 341:4, 384:22
**specifics** [1] - 189:9
**specified** [1] - 243:25
**specifies** [1] - 248:13
**specify** [2] - 81:16, 299:24
**specs** [1] - 60:16
**spectral** [2] - 46:10, 46:15
**spectrum** [1] - 169:1
**speculate** [2] - 160:9, 171:13
**speculating** [1] - 100:1
**speculation** [2] - 171:13, 314:5
**speculations** [1] - 115:17
**speed** [2] - 28:17, 271:16

**spelling** [1] - 81:23
**spend** [8] - 37:10, 54:13, 158:25, 220:23, 237:25, 238:3, 267:6, 383:8
**spent** [6] - 9:9, 9:23, 21:4, 182:5, 238:5, 377:5
**spill** [1] - 155:3
**spilled** [1] - 155:2
**spills** [1] - 157:4
**spin** [3] - 245:22, 301:23, 307:11
**spoken** [5] - 238:24, 239:1, 239:23, 240:9, 304:25
**sponsor** [11] - 245:5, 245:12, 245:21, 246:4, 246:6, 246:19, 246:21, 301:20, 304:1, 307:10, 311:18
**sponsored** [10] - 234:3, 234:4, 242:25, 243:3, 243:5, 243:20, 244:15, 300:15, 302:4, 302:21
**sponsoring** [1] - 243:23
**sponsorship** [6] - 234:8, 243:25, 244:11, 244:16, 245:9, 304:5
**spores** [1] - 40:23
**squames** [8] - 110:23, 111:1, 111:7, 111:13, 111:17, 155:11, 155:14, 156:9
**square** [6] - 190:16, 190:22, 368:11, 369:4, 370:4
**squared** [3] - 217:11, 217:14, 218:2
**squeeze** [1] - 369:8
**squeezed** [1] - 369:5
**SSI** [1] - 352:4
**staff** [1] - 155:7
**stage** [4] - 362:12, 362:13, 363:1
**stages** [2] - 362:25, 364:7
**stain** [2] - 51:16, 51:22
**standard** [7] - 57:21, 66:10, 66:24, 67:15, 68:5, 340:5, 363:8
**standards** [2] - 118:5, 118:7
**standpoint** [6] - 74:10, 74:15, 103:25, 144:2, 349:24, 354:21
**staph** [3] - 68:9, 68:24, 69:11
**Staph** [1] - 69:6
**start** [17] - 13:10, 108:23, 171:16, 171:19, 179:1, 187:9, 201:13, 225:14, 225:17, 254:24, 273:7, 279:9, 328:25, 329:25, 339:8, 360:24
**started** [4] - 81:24, 169:6, 298:4, 316:15
**starting** [3] - 33:14, 96:14, 251:25
**starts** [5] - 57:14, 63:12, 63:14, 164:4, 231:10
**State** [3] - 4:14, 356:16, 356:22
**state** [10] - 5:15,

75:10, 76:2, 76:3, 85:22, 87:4, 128:15, 251:9, 324:19, 334:25
**statement** [50] - 21:18, 37:5, 44:13, 45:12, 47:24, 68:23, 113:14, 113:19, 126:20, 128:24, 129:12, 138:3, 153:18, 165:4, 195:5, 195:7, 195:14, 197:3, 197:4, 197:6, 197:16, 198:9, 208:6, 215:17, 257:13, 272:12, 272:18, 272:23, 273:4, 273:11, 273:25, 274:25, 275:18, 275:24, 276:7, 276:13, 276:24, 276:25, 277:14, 279:24, 281:5, 282:10, 283:9, 283:23, 286:1, 299:18, 353:16, 354:1, 354:19, 366:8
**statement's** [1] - 37:2
**statements** [10] - 47:7, 119:11, 140:21, 208:21, 213:8, 213:13, 213:14, 213:18, 276:3, 350:4
**STATES** [1] - 1:1
**states** [9] - 141:7, 193:14, 193:25, 196:8, 196:21, 272:12, 272:17, 310:15, 310:16
**States** [1] - 5:5
**stating** [2] - 147:4, 155:25
**statistical** [3] - 326:14, 363:9, 381:2
**statistician** [1] - 318:2
**stay** [2] - 207:23, 264:19
**step** [2] - 198:7, 207:24
**steps** [2] - 55:3, 358:20
**sterile** [11] - 145:9, 146:8, 263:16, 263:24, 264:3, 264:5, 264:20, 265:1, 265:2, 265:11, 269:16
**Stevens** [4] - 136:13, 137:23, 138:24, 140:6
**stick** [5] - 79:3, 79:7, 81:22, 133:25, 134:21
**sticking** [4] - 80:5, 81:19, 133:19, 133:22
**still** [14] - 54:2, 141:21, 161:8, 170:11, 176:22, 183:12, 183:13, 191:8, 195:2, 205:7, 250:18, 280:20, 303:1
**stipulate** [7] - 162:23, 163:16, 167:4, 167:7, 167:9, 167:12, 169:25
**stipulation** [1] - 342:14
**Stocks** [15] - 172:6, 172:13, 173:2, 173:3, 173:10, 173:25, 176:5, 177:20, 178:7, 180:24, 188:6, 208:16, 366:19,

367:2, 367:18
**Stocks'** [2] - 178:10, 178:12
**stop** [7] - 87:1, 154:25, 189:17, 208:1, 280:13, 340:19, 356:14
**straight** [11] - 308:14, 327:19, 327:25, 328:16, 328:17, 328:21, 329:5, 330:12, 332:7, 332:15, 333:3
**straight-line** [2] - 328:16, 330:12
**straightforward** [2] - 44:3, 44:6
**strange** [8] - 223:10, 223:13, 223:18, 229:12, 229:17, 229:21, 229:23, 354:15
**strategy** [2] - 156:25, 310:12
**stray** [1] - 231:10
**Street** [1] - 2:13
**stresses** [1] - 83:7
**stretch** [5] - 72:5, 354:11, 354:14, 369:8, 380:7
**stretching** [1] - 261:11
**strike** [6] - 106:15, 221:4, 234:11, 317:24, 318:24, 320:20
**strong** [1] - 369:14
**strongly** [1] - 182:6
**student** [2] - 178:13, 191:18
**studied** [7] - 165:13, 172:3, 172:20, 174:1, 249:12, 255:8, 255:10
**studies** [55] - 11:19, 11:23, 14:16, 34:14, 39:8, 159:1, 159:3, 159:9, 161:4, 161:10, 174:7, 194:12, 230:24, 230:25, 231:3, 233:1, 244:23, 245:25, 248:5, 248:10, 248:19, 251:17, 253:22, 274:18, 283:1, 283:4, 283:10, 283:20, 283:25, 286:5, 286:25, 297:14, 299:16, 299:20, 302:1, 302:14, 302:18, 302:23, 302:24, 304:1, 304:5, 321:15, 322:22, 355:11, 365:14, 366:12, 370:7, 372:21, 373:18, 373:24, 374:9, 375:20, 377:21, 378:8, 378:16
**study** [170] - 4:13, 54:7, 55:9, 55:13, 136:23, 165:11, 166:3, 166:5, 167:4, 167:16, 168:9, 168:17, 172:19, 179:10, 179:25, 182:20, 185:7, 188:23, 189:9, 190:25, 192:7, 193:2, 201:22, 202:8, 203:13, 203:18,

208:16, 208:19, 208:23, 214:4, 215:3, 215:6, 222:16, 222:17, 222:20, 222:22, 222:25, 223:15, 229:4, 230:11, 231:21, 231:25, 232:12, 232:16, 233:21, 234:2, 242:7, 242:10, 242:15, 243:1, 243:3, 243:11, 243:19, 243:23, 245:5, 245:6, 245:7, 246:21, 246:25, 247:12, 247:13, 249:21, 249:22, 249:23, 250:1, 250:5, 250:13, 250:17, 250:19, 250:21, 250:23, 251:5, 251:6, 251:13, 252:23, 253:15, 253:23, 253:24, 254:12, 254:15, 254:16, 254:17, 255:14, 256:10, 259:12, 260:4, 260:13, 260:19, 260:21, 261:16, 261:20, 269:20, 270:2, 272:2, 272:7, 272:11, 272:15, 272:21, 273:7, 273:10, 274:8, 275:7, 275:17, 275:25, 276:3, 276:5, 276:11, 276:18, 277:14, 278:21, 279:23, 280:3, 280:16, 280:24, 282:4, 282:8, 283:17, 284:24, 294:20, 295:13, 299:10, 300:4, 300:5, 300:14, 306:9, 307:22, 316:16, 320:3, 320:6, 320:15, 320:17, 320:18, 320:21, 321:10, 321:15, 326:13, 326:14, 327:1, 327:3, 327:8, 331:7, 331:12, 344:4, 344:9, 344:10, 344:11, 352:4, 352:8, 352:16, 353:1, 353:5, 353:13, 353:14, 354:2, 354:16, 354:23, 356:15, 356:21, 357:1, 357:20, 358:5, 358:11, 358:22, 361:11, 365:19, 371:4, 380:2
**stuff** [16] - 44:12, 45:4, 83:13, 93:5, 156:13, 159:16, 175:14, 180:19, 185:5, 185:13, 220:14, 233:16, 245:1, 281:20, 287:5, 376:22
**styled** [1] - 1:19
**Subject** [1] - 310:15
**subject** [3] - 144:21, 149:12, 222:9
**subjected** [2] - 125:24, 126:17, 129:7
**subjects** [2] - 9:12, 334:3
**submicron** [2] - 360:5, 360:7

**submit** [2] - 50:22, 306:7
**submits** [1] - 238:12
**submitted** [2] - 99:14, 381:1
**subranges** [1] - 366:3
**subsequent** [2] - 283:1, 283:3
**substance** [2] - 240:12, 299:16
**substantive** [1] - 330:17
**subtraction** [1] - 69:10
**suddenly** [3] - 43:18, 77:5, 147:2
**suffer** [1] - 75:2
**suffered** [3] - 97:3, 257:1, 259:13
**sufficient** [2] - 75:1, 162:18, 343:7
**sugar** [2] - 109:12, 109:16
**suggest** [2] - 171:15, 181:13
**suggested** [2] - 114:11, 182:7
**suggesting** [1] - 132:14
**suggestion** [1] - 31:22
**suggestions** [2] - 307:1, 309:25
**suggests** [1] - 371:16
**suit** [2] - 1:19, 7:17
**suite** [8] - 160:18, 161:6, 161:12, 161:16, 161:24, 162:9, 162:20, 194:6
**Suite** [3] - 2:3, 2:8, 2:13
**suits** [1] - 266:21
**sum** [2] - 376:14, 376:17
**summarize** [3] - 18:23, 372:13, 374:24
**summarizing** [1] - 297:18, 313:15
**summary** [3] - 100:22, 371:3, 374:21
**sun** [6] - 20:3, 20:8, 124:22, 125:2, 150:2, 231:19
**Sunnybrook** [1] - 18:9
**super** [10] - 43:8, 45:6, 54:23, 55:3, 90:21, 95:8, 123:8, 124:13, 124:21, 157:2
**superficial** [5] - 255:19, 256:7, 256:17, 257:8, 258:21
**superior** [1] - 162:4
**supply** [1] - 370:19
**support** [19] - 111:7, 119:8, 130:22, 132:2, 134:19, 135:7, 197:7, 213:10, 213:17, 215:16, 242:1, 251:1, 273:19, 279:20, 281:1, 283:16, 284:6, 313:6, 350:15
**supported** [2] - 195:19, 375:24
**supports** [2] - 132:10, 134:14
**suppose** [7] - 106:11, 116:24,

180:18, 210:19, 210:21, 242:13, 248:23
**supposed** [12] - 49:24, 50:1, 50:2, 74:17, 127:13, 127:14, 177:7, 177:9, 177:10, 244:19, 364:8
**supposing** [1] - 77:16
**surface** [17] - 79:2, 80:24, 86:8, 145:8, 261:25, 262:10, 262:11, 262:13, 262:18, 262:23, 262:25, 269:14, 270:8, 271:7, 271:16, 363:16
**surfaces** [13] - 79:23, 80:5, 98:2, 98:15, 261:22, 262:21, 263:7, 263:23, 268:12, 268:20, 269:1, 269:21, 270:1
**surgeon** [9] - 22:4, 22:15, 314:10, 316:10, 316:20, 317:6, 317:17, 320:14, 323:6
**surgeons** [13] - 4:1, 16:7, 265:19, 267:12, 267:19, 268:3, 268:4, 268:6, 268:9, 316:21, 322:1, 325:12, 326:4
**surgeries** [16] - 16:14, 77:14, 108:4, 178:24, 179:11, 179:17, 180:10, 181:1, 181:3, 267:11, 268:2, 268:3, 274:7, 278:14, 278:15, 326:15
**surgery** [18] - 22:2, 74:21, 78:17, 179:4, 179:13, 182:4, 182:24, 183:1, 263:9, 264:4, 264:13, 267:2, 268:12, 268:13, 269:7, 270:9, 343:18, 380:1
**surgical** [48] - 21:23, 23:13, 56:6, 97:3, 142:15, 144:17, 155:7, 155:19, 156:13, 157:21, 157:22, 158:14, 160:18, 161:6, 161:12, 161:16, 161:24, 162:9, 162:20, 178:19, 193:18, 194:6, 194:7, 194:18, 194:23, 195:9, 196:3, 203:20, 203:21, 223:2, 229:6, 255:2, 263:14, 265:23, 267:7, 268:21, 270:1, 270:3, 270:7, 273:15, 275:2, 275:4, 276:9, 277:25, 278:22, 278:24, 280:1, 282:13
**surprise** [3] - 90:16, 274:10, 274:13
**surprised** [6] - 90:16, 168:17, 168:19, 212:19, 212:22, 274:14
**surprising** [2] - 358:2, 364:24
**surrogate** [12] - 3:15,

173:4, 173:12, 186:17, 188:3, 188:16, 192:10, 192:17, 192:18, 192:23, 221:13, 372:17
**survivability** [7] - 78:23, 78:24, 79:6, 79:23, 80:4, 80:7, 80:20
**survive** [1] - 81:2
**susceptible** [4] - 40:24, 146:25, 150:16, 151:11
**suspect** [2] - 77:25, 112:10, 366:5
**suspended** [2] - 10:10, 10:14
**swab** [1] - 261:2
**swabbing** [6] - 254:16, 254:23, 257:3, 259:20, 260:22, 260:24
**swabs** [2] - 255:1, 261:17
**swap** [1] - 105:11
**swath** [1] - 142:22
**swear** [1] - 5:25
**switch** [2] - 43:14, 106:5
**switched** [2] - 43:18, 328:10
**switching** [1] - 84:20
**sworn** [3] - 6:1, 127:17, 236:2
**symbol** [2] - 385:8, 387:4
**system** [6] - 53:25, 63:3, 83:17, 91:16, 166:8, 338:4
**systems** [6] - 10:21, 14:7, 14:15, 110:12, 196:17, 345:12

**T**

**Tab** [3] - 61:1, 102:3, 110:10
**table** [13] - 21:23, 64:1, 65:20, 66:1, 69:5, 108:24, 109:2, 109:5, 155:20, 158:13, 264:13, 363:6, 363:10
**Table** [4] - 63:22, 64:4, 68:21, 384:19
**tables** [3] - 65:1, 65:2, 268:21
**tainted** [1] - 215:12
**taints** [1] - 234:8
**takeaways** [1] - 203:19
**talks** [7] - 39:17, 92:3, 115:17, 205:10, 261:15, 294:7, 353:21
**Tan's** [1] - 61:7
**task** [2] - 12:15, 376:10
**tasks** [1] - 388:2
**teach** [2] - 240:16, 240:17
**teaches** [1] - 240:3
**teaching** [1] - 382:8
**team** [7] - 173:3, 180:25, 208:17, 208:20, 215:12, 225:22, 338:2
**team's** [1] - 367:18
**teasing** [1] - 167:25
**technical** [8] - 45:18,

74:16, 82:10, 112:3, 128:3, 150:20, 206:16, 293:21
**technologies** [5] - 10:24, 11:5, 12:13, 14:4, 56:20
**technology** [12] - 9:10, 9:13, 11:2, 11:7, 12:1, 12:8, 23:23, 379:23, 380:4, 380:11, 381:6, 388:24
**teeth** [1] - 126:5
**Teflon** [1] - 134:11
**temperature** [6] - 84:8, 89:7, 89:10, 89:15, 89:16, 95:19
**ten** [6] - 297:14, 312:12, 368:22, 377:3, 379:4, 379:9
**tend** [3] - 6:22, 151:20, 151:25
**tendency** [2] - 133:25, 134:21
**Teri** [1] - 310:9
**term** [14] - 18:15, 26:22, 71:18, 77:4, 77:7, 81:16, 99:6, 110:24, 118:21, 139:8, 244:17, 264:10, 350:22, 369:14
**terminologies** [1] - 89:1
**terminology** [3] - 89:2, 95:23, 105:15
**terms** [26] - 27:21, 48:25, 49:25, 55:22, 68:7, 70:25, 72:3, 73:9, 74:2, 74:25, 83:16, 111:10, 111:11, 111:15, 114:3, 119:5, 141:12, 166:19, 179:5, 207:5, 259:11, 283:23, 300:7, 309:14, 349:1, 351:7, 361:10, 364:10
**terrible** [3] - 199:6, 199:11, 199:13
**terribly** [1] - 364:24
**test** [19] - 65:10, 66:23, 67:6, 67:9, 67:12, 249:24, 337:14, 337:19, 337:22, 337:24, 338:1, 339:3, 347:12, 377:1, 377:11, 381:4, 381:5, 381:6, 384:15
**Test** [1] - 62:18
**testable** [2] - 337:17, 337:18
**tested** [9] - 67:3, 116:22, 116:25, 117:19, 132:7, 260:21, 270:2, 341:25, 342:1
**testified** [4] - 7:12, 339:15, 347:11, 355:20
**testify** [3] - 127:8, 181:23, 206:3
**testifying** [4] - 8:15, 307:13, 339:10, 351:17
**testimonies** [1] - 176:15
**testimony** [39] - 31:11, 31:21, 32:5, 32:7, 32:18, 32:21, 35:18, 38:16, 87:12, 93:16, 98:14, 119:17,

121:4, 127:17, 147:16, 147:17, 181:8, 182:3, 183:23, 225:3, 225:15, 251:13, 260:3, 260:10, 260:12, 281:8, 288:5, 289:13, 289:18, 290:23, 291:21, 292:10, 292:18, 292:19, 305:20, 316:5, 322:11, 322:16, 340:23
**testing** [8] - 15:11, 117:14, 132:1, 338:3, 342:5, 373:17, 378:3, 389:20
**tests** [7] - 63:23, 65:22, 247:22, 379:17, 379:20, 388:14
**Texas** [3] - 102:8, 226:4, 319:14
**text** [8] - 193:10, 201:12, 204:20, 272:21, 307:2, 310:2, 310:22, 311:21
**the..** [2] - 14:22, 132:13
**theatre** [1] - 166:24
**theme** [2] - 213:6, 374:24
**themselves** [5] - 5:15, 46:3, 108:18, 325:19, 357:16
**theory** [1] - 350:16
**thesis** [1] - 81:14
**thin** [1] - 28:16
**thinking** [3] - 31:20, 32:6, 382:11
**thinks** [2] - 34:16, 214:9
**third** [5] - 28:2, 28:9, 278:13, 278:18, 382:13
**third-parties'** [1] - 28:2
**third-party** [1] - 28:9
**Thomas** [2] - 240:3, 240:5
**thoughts** [1] - 136:24
**thousands** [3] - 77:12, 77:13
**threat** [3] - 22:25, 39:16, 39:24
**threats** [5] - 37:18, 38:11, 39:13, 39:19, 39:20
**three** [18] - 30:25, 31:1, 65:10, 65:17, 78:5, 78:8, 120:5, 191:8, 204:9, 236:9, 236:13, 237:13, 275:3, 275:6, 275:16, 290:13, 290:15, 348:2
**throw** [4] - 52:8, 67:25, 190:12, 190:17
**throwing** [2] - 54:10, 143:3
**thrown** [1] - 190:20
**thrust** [2] - 52:2, 114:22
**tie** [1] - 144:22
**tight** [1] - 262:2
**tiny** [3] - 218:20, 219:11, 219:15
**title** [13] - 62:17, 62:18, 64:2, 188:13, 188:18, 188:19,

192:20, 195:18,
214:23, 214:24,
214:25, 350:21, 357:1
**Title** [1] - 62:23
**titled** [6] - 3:12, 3:20,
136:9, 187:24,
200:16, 333:23
**to..** [1] - 42:24
**today** [32] - 5:10,
5:23, 6:5, 8:16, 13:8,
22:6, 27:15, 45:7,
63:16, 75:4, 88:5,
88:9, 88:12, 88:17,
90:3, 141:13, 156:6,
166:25, 167:13,
193:23, 198:25,
212:23, 232:15,
236:15, 236:17,
237:4, 249:14,
292:19, 340:16,
372:15, 378:2, 378:20
**today's** [1] - 5:7
**together** [17] - 27:18,
40:8, 47:12, 76:13,
136:7, 240:16,
240:18, 241:1, 241:4,
245:22, 246:5,
266:20, 304:10,
308:13, 369:5, 369:8,
383:9
**token** [1] - 350:2
**tolerance** [1] -
128:18
**Tom** [1] - 240:6
**tons** [2] - 149:23
**took** [9] - 121:23,
175:20, 190:6,
238:22, 269:5, 270:8,
289:20, 289:22,
362:14
**tools** [1] - 168:9
**top** [12] - 28:12,
62:23, 63:8, 102:7,
102:9, 126:13,
135:22, 175:15,
202:13, 335:22,
336:1, 363:1
**topic** [3] - 25:21,
27:8, 355:22
**topics** [2] - 25:17,
351:16
**total** [4] - 206:25,
207:14, 218:12,
274:11
**totally** [13] - 57:2,
57:5, 92:17, 145:9,
146:2, 146:8, 154:10,
186:21, 244:6,
278:22, 279:13,
311:17, 319:7
**touched** [2] - 131:23,
375:1
**tough** [1] - 6:23
**towards** [6] - 262:13,
262:25, 269:6,
344:21, 345:1
**traces** [1] - 216:6
**track** [2] - 237:24,
238:1
**tracking** [2] - 307:3,
309:25
**traditional** [1] -
362:12
**traditionally** [3] -
40:21, 266:6, 368:18
**trail** [1] - 182:2
**trained** [1] - 20:6
**training** [2] - 16:23,
174:17
**traipsing** [1] - 165:7

**transcribed** [1] -
391:8
**transcript** [5] -
197:14, 288:21,
289:17, 291:7, 391:7
**Transcript** [1] -
391:2
**transcripts** [3] -
31:25, 291:8, 291:16
**transfer** [1] - 369:23
**transform** [9] -
175:21, 329:3,
368:12, 368:16,
368:19, 368:20,
369:16, 369:20, 370:1
**transformed** [1] -
328:25
**transforms** [1] -
179:2
**transmission** [1] -
150:10
**transported** [1] -
159:22
**transporting** [1] -
158:12
**transpose** [1] - 17:24
**trap** [3] - 50:2, 50:4,
94:20
**travel** [1] - 10:17
**tray** [1] - 263:14
**trays** [1] - 268:21
**treat** [1] - 369:1
**treated** [2] - 179:23,
368:8
**Trial** [2] - 3:22,
200:20
**trial** [7] - 74:7,
230:10, 342:18,
344:15, 346:10,
389:20, 389:22
**trials** [1] - 345:17
**tribunal** [1] - 127:17
**trick** [2] - 92:25, 93:1
**tried** [2] - 128:16,
222:16
**tries** [1] - 25:13
**trouble** [2] - 33:23,
54:24
**true** [30] - 6:9, 7:14,
8:17, 9:3, 10:18, 12:7,
16:13, 16:18, 45:25,
56:22, 143:15, 160:5,
178:20, 178:21,
186:24, 191:22,
197:7, 197:12,
197:15, 197:17,
214:18, 252:22,
254:9, 256:22, 275:7,
279:15, 287:23,
292:13, 381:13
**truly** [3] - 36:24,
42:21, 219:3
**trust** [2] - 122:21,
302:5
**truth** [1] - 377:14
**truthful** [1] - 120:6
**try** [17] - 6:20, 6:24,
43:24, 45:17, 51:12,
108:9, 123:22,
181:13, 183:10,
208:2, 213:16,
242:10, 265:11,
272:3, 275:15,
344:19, 374:19
**trying** [50] - 17:18,
34:14, 34:18, 37:3,
37:4, 42:22, 42:23,
42:24, 43:7, 44:14,
44:23, 46:2, 54:2,
72:24, 92:22, 93:1,

94:18, 123:8, 124:6,
126:19, 134:2,
145:22, 149:11,
149:18, 150:14,
150:21, 158:20,
159:19, 162:21,
198:2, 208:1, 210:24,
210:25, 211:6, 213:2,
217:21, 219:7,
219:22, 219:24,
220:1, 222:7, 230:23,
234:13, 234:24,
267:10, 280:21,
281:23, 348:9, 351:15
**TSI** [1] - 7:13
**tube** [1] - 262:2
**tubing** [1] - 134:9
**tubings** [10] - 131:5,
132:14, 132:19,
132:20, 132:24,
133:14, 134:11,
134:22
**Tuesday** [1] - 310:11
**tunnel** [2] - 17:21,
380:16
**turn** [7] - 53:22,
54:18, 54:19, 93:8,
202:1, 384:16, 387:20
**turned** [1] - 343:19
**TV** [3] - 267:10,
267:17, 267:19
**twice** [2] - 389:12
**twisting** [1] - 92:12
**two** [26] - 76:13,
115:1, 115:23,
122:14, 129:24,
136:7, 137:9, 150:18,
151:11, 172:1,
189:13, 191:24,
204:9, 205:6, 205:14,
234:16, 257:16,
269:9, 269:17,
274:10, 275:1,
312:14, 327:8,
357:19, 381:22, 390:8
**TX** [2] - 2:3, 2:8
**Tybon** [2] - 132:24,
133:1
**Tygon** [5] - 132:18,
132:20, 133:4,
133:14, 134:11
**type** [11] - 15:12,
42:21, 70:12, 92:15,
247:13, 256:25,
260:5, 260:14,
260:19, 379:3, 389:3
**types** [4] - 205:6,
205:14, 259:12,
378:15
**typical** [5] - 168:20,
169:7, 169:14, 267:2,
361:5
**typically** [2] - 48:7,
316:21
**typo** [2] - 138:7,
138:8

**U**

**U.S** [1] - 224:2
**ultimate** [1] - 94:13
**ultra** [2] - 75:13, 76:7
**un..** [1] - 51:23
**unconscionable** [1]
- 181:12
**unconventional** [7] -
270:14, 270:16,
368:13, 368:14,
369:25, 370:1, 370:6
**uncovered** [2] -

269:3, 269:14
**under** [18] - 20:2,
20:8, 23:25, 43:4,
87:2, 100:2, 106:17,
124:22, 125:2, 150:2,
222:18, 231:19,
284:22, 306:10,
365:19, 385:3
**Under** [1] - 309:23
**Under-body** [1] -
309:23
**underneath** [4] -
21:23, 64:2, 155:20,
205:8
**undersigned** [1] -
381:5
**understood** [5] -
11:14, 220:12,
252:10, 296:7, 306:21
**undesirable** [1] -
50:9
**unethical** [1] - 303:7
**unfair** [3] - 115:17,
281:11, 296:23
**unfamiliar** [2] -
294:24, 295:5
**unfortunately** [2] -
187:19, 201:25
**unhelpful** [1] - 159:5
**uniformly** [5] -
298:19, 326:10,
327:11, 332:12, 333:1
**unit** [8] - 23:14,
100:15, 102:8,
102:24, 106:6,
138:20, 207:8, 242:11
**United** [1] - 5:5
**UNITED** [1] - 1:1
**units** [5] - 100:14,
117:8, 141:12,
196:15, 351:4
**University** [4] - 4:14,
4:15, 356:17, 356:18,
356:22, 356:23, 382:9
**unknown** [1] - 369:3
**unless** [3] - 43:1,
43:4, 70:19, 125:24,
126:16, 129:7, 214:21
**unlike** [1] - 389:11
**unlikely** [2] - 83:25,
270:11
**unnecessary** [1] -
271:9
**unprofessional** [1] -
93:4
**unpublished** [1] -
293:22
**unsuitable** [1] -
282:25
**up** [63] - 10:2, 13:2,
18:22, 20:20, 25:6,
31:16, 38:20, 44:18,
46:16, 46:19, 62:23,
63:8, 69:24, 77:5,
87:21, 88:20, 107:4,
128:21, 144:6,
144:22, 153:10,
158:13, 158:24,
159:23, 163:20,
179:6, 179:10,
179:16, 212:16,
230:10, 244:7,
266:19, 269:19,
270:7, 273:15, 275:3,
275:4, 278:1, 278:23,
278:24, 280:1,
281:20, 286:10,
286:12, 287:13,
287:17, 301:2, 301:3,
302:23, 303:1, 338:4,

339:19, 351:24,
360:23, 362:14,
363:16, 370:12,
379:20, 382:1,
382:20, 382:21,
383:18, 387:16
**upper** [2] - 216:5,
218:14
**upset** [4] - 198:6,
198:8, 198:15, 198:18
**urging** [1] - 354:23
**urgings** [1] - 352:21
**urn** [1] - 389:12
**usage** [1] - 123:4
**use..** [1] - 315:9
**useful** [6] - 114:17,
223:23, 250:18,
250:19, 250:23,
250:24, 302:7, 326:6,
326:8
**uses** [9] - 109:25,
112:11, 114:10,
121:11, 121:12,
316:10, 321:2, 321:7
**usual** [2] - 323:12,
370:19

**V**

**vague** [4] - 69:19,
70:17, 87:6, 87:19,
97:14, 99:21, 116:16,
117:23, 119:17,
121:8, 124:18,
124:21, 168:24,
171:1, 232:18, 265:5,
349:16
**vaguely** [1] - 247:9
**vagueness** [1] -
120:16
**valid** [1] - 197:3
**validity** [1] - 377:14
**Van** [5] - 304:19,
304:23, 305:25,
309:17, 310:6
**van** [1] - 305:6
**variables** [8] - 147:9,
147:10, 148:17,
149:13, 149:21,
149:23, 150:9, 194:4
**variation** [1] - 209:12
**variety** [1] - 72:23
**various** [2] - 12:5,
148:17
**vast** [1] - 336:2
**ventilation** [3] -
18:19, 19:19, 19:25
**verbal** [2] - 153:4,
154:24
**verbatim** [3] - 35:6,
38:19, 102:21
**versus** [4] - 43:17,
206:10, 222:1, 282:7
**vertical** [1] - 65:7
**viable** [8] - 3:13,
187:25, 188:14,
189:1, 192:8, 193:3,
336:23, 389:1
**video** [2] - 5:8, 5:12
**VIDEOGRAPHER**
[15] - 5:2, 5:22, 8:4,
62:1, 62:5, 62:9,
142:6, 142:9, 189:25,
190:3, 235:3, 236:3,
356:5, 356:8, 390:21
**Videographer** [1] -
2:16
**videographer** [1] -
5:10
**videotaped** [2] -

**JIM HO - June 28, 2017**

1:18, 5:3
**view** [1] - 72:21
**viewpoint** [1] - 297:20
**Villafruela** [1] - 170:8
**violated** [1] - 7:20
**viral** [1] - 77:25
**virtue** [1] - 166:9
**visual** [1] - 153:22
**voice** [1] - 5:14
**volumetrics** [1] - 324:1
**volunteer** [1] - 7:6
**Voyageur** [1] - 266:20

## W

**wait** [9] - 181:18, 280:11, 299:11, 319:4, 319:5
**wake** [1] - 77:5
**walk** [2] - 118:8, 185:12
**walked** [1] - 323:13
**wall** [2] - 190:18, 190:20
**walls** [2] - 51:16, 51:23
**wants** [3] - 77:8, 214:19, 376:20
**ward** [1] - 267:7
**wards** [1] - 196:16
**warm** [2] - 74:20, 85:8
**warmer** [1] - 195:8
**warmers** [3] - 194:17, 194:23, 196:3
**Warming** [1] - 1:7
**warming** [33] - 5:4, 23:14, 23:24, 112:9, 138:20, 194:2, 242:11, 272:9, 272:13, 272:18, 272:23, 275:1, 275:19, 276:7, 277:15, 279:21, 279:24, 281:2, 281:6, 282:7, 282:8, 282:11, 283:17, 283:24, 345:11, 352:9, 352:17, 353:5, 353:14, 354:2, 354:17, 380:2, 381:6
**warming..** [1] - 273:12
**warning** [1] - 273:22
**warns** [1] - 272:22
**warranted** [3] - 283:2, 283:4, 283:10
**wasting** [1] - 181:23
**water** [2] - 89:4, 99:24
**ways** [3] - 115:2, 122:15, 183:9
**week** [2] - 26:20, 382:13
**weeks** [7] - 30:25, 31:1, 236:9, 236:13, 236:18, 236:22, 237:13
**weight** [1] - 371:20
**weird** [1] - 61:20
**well..** [3] - 125:18, 283:14, 307:25
**wet** [4] - 85:3, 86:12, 90:21, 94:10
**wetness** [1] - 99:16
**wetter** [7] - 88:24, 89:23, 89:24, 90:2,

90:20, 91:8
**whatsoever** [4] - 36:21, 132:2, 257:13, 302:17
**whereabouts** [1] - 389:23
**white** [1] - 54:21
**whoa** [7] - 142:19, 225:13, 321:13
**whole** [16] - 25:10, 69:4, 73:8, 127:10, 151:6, 175:10, 189:21, 214:23, 274:11, 282:20, 283:7, 303:11, 314:23, 314:24, 336:17, 345:3
**wholeheartedly** [1] - 28:19
**wide** [3] - 39:22, 83:6
**widespread** [1] - 138:17
**willful** [1] - 371:20
**willing** [2] - 185:12, 312:15
**wind** [2] - 17:21, 380:16
**wish** [2] - 52:3, 212:7
**wishes** [2] - 211:21, 309:21
**wishing** [1] - 379:3
**witness** [16] - 5:25, 7:1, 31:17, 43:23, 45:5, 45:6, 61:4, 92:15, 128:3, 128:20, 128:21, 226:12, 226:14, 228:4, 281:10, 390:15
**WITNESS** [1] - 3:4
**witnesses** [6] - 30:18, 30:20, 225:11, 225:22, 319:10, 319:20
**woman** [1] - 136:12
**wonder** [1] - 355:7
**wondering** [14] - 24:24, 37:12, 46:18, 71:3, 108:15, 144:6, 160:15, 173:19, 199:22, 229:22, 230:5, 230:23, 326:25
**word** [24] - 38:22, 40:2, 58:25, 59:20, 77:1, 251:23, 82:25, 121:11, 121:12, 125:17, 127:25, 129:13, 131:7, 131:14, 139:10, 139:15, 149:9, 150:24, 164:1, 191:4, 191:8, 192:14, 310:22, 310:24
**word-smith** [1] - 310:22
**words** [26] - 8:22, 19:3, 54:10, 67:1, 72:17, 149:22, 158:6, 192:1, 192:23, 276:4, 276:10, 276:18, 277:12, 290:1, 290:9, 290:10, 290:11, 291:20, 308:20, 334:8, 359:13, 364:9, 369:11, 372:3, 378:2, 387:2
**workers** [1] - 121:23
**works** [1] - 12:23
**world** [4] - 55:5, 211:2, 377:3, 381:12
**worried** [1] - 354:4

**worry** [4] - 101:15, 170:12, 198:13, 198:19
**worse** [3] - 34:2, 217:16, 218:3
**worth** [2] - 222:4, 341:19
**wound** [7] - 193:19, 255:19, 256:7, 256:18, 257:8, 258:21, 265:3
**wow** [1] - 76:24
**wrapped** [1] - 268:14
**write** [5] - 45:24, 81:22, 129:15, 220:13, 238:22
**writes** [2] - 138:24, 309:17
**writing** [4] - 6:19, 289:16, 294:2, 296:8
**written** [12] - 45:13, 45:16, 45:21, 45:22, 176:24, 213:13, 314:22, 315:10, 318:22, 324:20, 325:9, 326:3
**wrote** [10] - 15:8, 25:8, 129:6, 129:7, 136:12, 252:20, 294:4, 295:18, 320:1

## Y

**Yadin** [11] - 35:9, 243:17, 247:6, 250:11, 251:23, 252:9, 252:19, 252:25, 253:10, 304:6, 342:25
**Yadin's** [1] - 253:5
**year** [1] - 383:6
**Year** [1] - 309:21
**years** [7] - 12:3, 21:4, 333:8, 346:2, 346:7, 377:6, 379:24
**yesterday** [5] - 32:22, 32:24, 35:19, 288:7, 290:4
**you..** [1] - 255:18
**yourself** [8] - 19:15, 19:25, 23:8, 50:22, 110:13, 110:15, 241:11, 291:21
**Yu** [6] - 254:15, 255:14, 256:25, 259:11, 260:3, 260:13

## Z

**zero** [13] - 123:6, 144:25, 145:1, 145:3, 145:10, 145:11, 145:22, 150:5, 150:11, 227:3, 324:24
**Zink** [6] - 242:8, 246:13, 246:25, 248:5, 249:10, 299:9
**zones** [1] - 309:11