# EXHIBIT DX2

TO DECLARATION OF
DEBORAH E. LEWIS IN SUPPORT
OF DEFENDANTS' OPPOSITION
TO PLAINTIFFS' MOTION
TO EXCLUDE TESTIMONY OF
ALEXANDER A. HANNENBERG, M.D.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 1

1                  UNITED STATES DISTRICT COURT

2                    DISTRICT OF MINNESOTA

3      - - - - - - - - - - - - - - - - - - - -

4      In Re:

5      Bair Hugger Forced Air Warming

6      Products Liability Litigation

7

8      This Document Relates To:

9      All Actions              MDL No. 15-2666 (JNE/FLM)

10     - - - - - - - - - - - - - - - - - - - -

11

12

13           DEPOSITION OF ALEXANDER A. HANNENBERG

14                  VOLUME I, PAGES 1 - 306

15                     AUGUST 8, 2017

16

17

18           (The following is the deposition of

19     ALEXANDER A. HANNENBERG, taken pursuant to Notice of

20     Taking Deposition, via videotape, at the Aloft

21     Boston Seaport Hotel, 401-403 D Street, Boston,

22     Massachusetts, commencing at approximately 9:16

23     o'clock a.m., August 8, 2017.)

24

25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 2

1  APPEARANCES:
2    On Behalf of the Plaintiffs:
3      Gabriel Assaad
       KENNEDY HODGES
4      4409 Montrose Boulevard, Suite 200
       Houston, Texas  77006
5
       Genevieve M. Zimmerman
6      MESHBESHER & SPENCE, LTD.
       1616 Park Avenue
7      Minneapolis, Minnesota  55404
8    On Behalf of Defendants:
9      Deborah Lewis
       BLACKWELL BURKE P.A.
10     431 South Seventh Street, Suite 2500
       Minneapolis, Minnesota  55415
11
   ALSO APPEARING:
12
       Ronald M. Huber, Video Technician
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1        Board meeting           168
2  11  E-mail string, 3MBH01534469-71    176
3  12  E-mail string, 3MBH01037973-4     185
4  13  Article, Improving Perioperative
5       Temperature Management, by
6       Hannenberg, et al         191
7  14  Article, Resistive-Polymer
8       Versus Forced-Air Warming:
9       Comparable Efficacy in
10      Orthopedic Patients, by
11      Brandt, et al            203
12 15  Article, Intraoperative Hypo-
13      thermia in Total Hip and Knee
14      Arthroplasty, by Frisch, et al    208
15
16
17
18 WITNESS        EXAMINATION BY      PAGE
19 Alexander A. Hannenberg   Mr. Assaad      5
20                 Ms. Lewis      289
21                 Mr. Assaad     295
22
23
24
25

Page 3

1           I N D E X
2  EXHIBITS      DESCRIPTION      PAGE MARKED
3  Ex  1   Materials Considered        9
4      2   Revised Materials Considered     12
5      3   Hannenberg expert report     14
6      4   Hannenberg invoice       45
7      5   Hannenberg curriculum vitae      65
8      6   Medicare.gov Hospital Compare
9          surgical complications - details   126
10     7   Article, Intraoperative Core
11         Temperature Patterns,
12         Transfusion Requirement, and
13         Hospital Duration in Patients
14         Warmed with Forced Air, by
15         Sun, et al             155
16     8   Article, Compliance with Surgical
17         Care Improvement Project for
18         Body Temperature Management
19         (SCIP Inf-10) Is Associated
20         with Improved Clinical Outcomes,
21         by Scott, et al          156
22     9   Min-U-Script of Andrea Kurz's
23         deposition January 12, 2017      166
24    10   Minutes of October 18, 2012
25         Global Patient Warming Advisory

Page 5

1          P R O C E E D I N G S
2  (Witness sworn.)
3          ALEXANDER A. HANNENBERG
4  called as a witness, being first duly sworn,
5  was examined and testified as follows:
6          ADVERSE EXAMINATION
7  BY MR. ASSAAD:
8  Q.  Please state your name.
9  A.  Alexander Hannenberg.
10 Q.  You may need to speak up a little bit.
11 A.  Okay.
12 Q.  My name's Gabriel Assaad and I represent
13 thousands of plaintiffs in the multidistrict
14 litigation.  I'm here to ask you numerous questions
15 regarding your expert opinions today.  Do you
16 understand that?
17 A.  Yes, I do.
18 Q.  Okay.  Have you had your deposition taken
19 before?
20 A.  Yes.
21 Q.  Approximately how many times?
22 A.  Once.
23 Q.  And was that a medical malpractice case?
24 A.  It was.
25 Q.  And what were the allegations in that case?

2 (Pages 2 to 5)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 6

1    A.   The allegations were negligent care by the
2  anesthesiologist in the postoperative demise of a
3  surgical patient.
4    Q.   And were you an expert for the plaintiff or
5  the defendant?
6    A.   I was an expert for the defense.
7    Q.   Okay.  And did you know the doctor that
8  was --
9    A.   No.
10    Q.   -- who the lawsuit was filed against?
11    A.   No.
12    Q.   I'm --
13        Let me go through the instructions real
14  quick.  This is your second time doing a deposition
15  and I may do things differently than what was before,
16  but I'm going to ask you numerous questions.  If you
17  don't understand my question, please let me know.
18  Fair?
19    A.   Yes.
20    Q.   Okay.  Please answer in the affirmative,
21  "yes" or "no."  Shaking your head is something
22  difficult for the court reporter to take down and we
23  need a -- a complete and accurate transcript.  Do you
24  understand?
25    A.   I do.

Page 7

1    Q.   If you do answer the question that I ask,
2  I'm going to assume that you understood the question.
3  Fair?
4    A.   Yes.
5    Q.   And please don't answer any questions unless
6  you understand them.  Fair?
7    A.   Yes.
8    Q.   Okay.  Any time you want to take a break,
9  that is fine; I just ask that if there's a pending
10  question, you ask for a break after you answer the
11  question.  Fair?
12    A.   Understood.
13    Q.   What was the outcome of that medical
14  malpractice case, if you know?
15    A.   It was settled.
16    Q.   Okay.  Do you know for how much?
17    A.   I don't.
18    Q.   Okay.  Where was it located?
19    A.   Hartford, Connecticut.
20    Q.   And do you recall the name of the attorney
21  that hired you?
22    A.   No, I don't.
23    Q.   How long ago was this?
24    A.   Three or four years -- three or four years
25  ago.

Page 8

1    Q.   And how was it you became involved in that
2  medical malpractice case?
3    A.   I received a phone call from a law firm
4  briefly describing the circumstances of the case and
5  asking whether I would review the material.
6    Q.   Okay.  Do you advertise for expert services?
7    A.   No.
8    Q.   Do you know how they got your name?
9    A.   I don't.
10    Q.   Okay.  Do you know how you got involved in
11  this case?
12    A.   Sort of a similar scena -- scenario.  I
13  received a -- a phone call originally asking about one
14  of the single cases and asking whether I would review
15  it and offer an opinion.
16    Q.   Okay.  Do you know who contacted you?
17    A.   That would have been Greenberg Traurig.
18    Q.   Okay.  Do you know who at Greenberg Traurig?
19    A.   I can't recall -- recall, but I'm close.
20    Q.   Male or female?
21    A.   Male.
22    Q.   Evan Holden?
23    A.   Yes.
24    Q.   Okay.  Do you consult for 3M?
25    A.   Do I con --

Page 9

1        No, only -- only in this matter, in which
2  case I guess I consult for the law firm.
3    Q.   Do you -- do you know anyone at -- that
4  works for 3M?
5    A.   I don't believe so, no.
6    Q.   Okay.
7        (Exhibit 1 was marked for
8        identification.)
9  BY MR. ASSAAD:
10    Q.   Have you ever been --
11        Before I talk about Exhibit 1, have you ever
12  been -- or done any research that was funded by 3M?
13    A.   No.
14    Q.   Okay.  Do you know Scott Augustine?
15    A.   I have met him.
16    Q.   How long ago?
17    A.   More than five years ago.
18    Q.   Okay.  You just met him once?
19    A.   I believe so.
20    Q.   Did you have a conversation with him?
21    A.   Yes.
22    Q.   And what was the conversation about?
23    A.   It was about the content of a scientific
24  panel at the anesthesia annual meeting at which I had
25  presented.  He approached me at the end of the -- end

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 10

1  of the session to comm -- comment on the -- on -- on
2  the session.  Exactly his point I don't -- I don't
3  recall.
4      Q.  What was your presentation on?
5      A.  It was about performance measurement
6  relative to intraoperative temperature management.
7      Q.  Okay.  And I believe that's on your
8  curriculum vitae; correct?
9      A.  Yes.
10      Q.  So if I want to know the date of that --
11      I think you gave one or -- one talk on that;
12  correct?
13      A.  On -- on that particular performance
14  measure, yes, I think just one.
15      Q.  Yeah.  Okay.  So that if I look at your CV,
16  that would be about the time you spoke with Dr. Scott
17  Augustine.
18      A.  Yes.
19      Q.  And did you ever speak with him again?
20      A.  No.
21      Q.  Okay.  What's been marked as Exhibit 1 is
22  what you produced, attached to your expert report on
23  June 2nd, 2017.  Can you please look at Exhibit 1 and
24  let me know if that's what was attached to your expert
25  report on June 2nd, 2017.

Page 11

1      A.  Yes, --
2      Q.  Okay.
3      A.  -- it is.
4      Q.  At the time that you submitted your expert
5  report on June 2nd, 2017, were all the -- were all
6  those items listed on Exhibit 1 all the materials you
7  considered in formulating your opinions?
8      A.  No.  That's why I submitted a revised
9  document.
10      Q.  Okay.  So are you saying that Exhibit 1 was
11  incorrect at the time you submitted it --
12      A.  Yes.
13      Q.  -- to the --
14      Let me finish my question.
15      A.  Uh-huh.
16      Q.  You have to let me finish my question
17  because the court reporter --
18      A.  Okay.
19      Q.  -- will stop this whole deposition at yell
20  at me.
21      MS. ZIMMERMAN:  It's happened before.
22      Q.  So at the time of submitting Exhibit 1 on
23  June 2nd, 2017, the -- regarding the materials you
24  considered for your -- to formulate your expert
25  opinions, are you saying at the time it was

Page 12

1  incomplete?
2      A.  Yes, I did.
3      Q.  Okay.
4      (Exhibit 2 was marked for
5      identification.)
6  BY MR. ASSAAD:
7      Q.  I'm still on Exhibit 1.  With respect to
8  Exhibit 1, are all the materials that you considered,
9  do you consider them authoritative?
10      A.  What do you mean by "authoritative?"
11      Q.  Reliable.
12      A.  No.  There are -- there are some items in
13  this report who -- that offers conclusions I'm not
14  sure are valid.
15      Q.  Okay.  This is just stuff that you've
16  considered; correct?
17      A.  Yes.
18      Q.  And is this --
19      And what's been marked as Exhibit 2 is a
20  document that was provided to plaintiffs' counsel this
21  morning that is titled "Materials Considered;"
22  correct?
23      A.  Yes.
24      Q.  Okay.  And this is different than Exhibit 1;
25  correct?

Page 13

1      A.  Yes.
2      Q.  What is different?
3      A.  There are four -- four or five publications
4  that are on Exhibit 2 that aren't on Exhibit 1.
5      Q.  And it's my understanding today that you
6  considered those publications at the time of
7  submitting your expert report, you just failed to
8  include them on the Materials Considered; is that
9  correct?
10      A.  Yes, sir.
11      Q.  Okay.  And the five publications are what?
12      A.  Let's see, Legg, Wood, Melling, Scott.  I
13  think those are the -- I think those are the
14  additions.
15      Q.  Okay.  Now when did you create Exhibit No.
16  2?
17      A.  Yesterday.
18      Q.  Yesterday.  Why did you create --
19      What made you decide to look at what
20  materials were considered and revise Exhibit 1 to
21  create Exhibit 2?
22      A.  In -- in thinking about today's session I
23  realized that there were items that I had, over an
24  extended period of time, considered in thinking about
25  this matter that weren't originally listed.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 14

1     Q.  Okay.  Is it fair to say that these four
2 items, which are Legg, Wood, Melling and Scott, are
3 not cited in your expert report?
4     A.  It's easy enough to check if I can see my
5 expert report.
6         (Exhibit 3 was marked for
7         identification.)
8     A.  That is correct, they are not cited.
9     Q.  Okay.  You've been asked to be an expert in
10 this case; correct?
11     A.  Yes.
12     Q.  And you agree that an expert should be --
13 should be objective; correct?
14     A.  Yes.
15     Q.  Should not be an advocate for either side;
16 correct?
17     A.  Yes.
18     Q.  Should be accurate; --
19     A.  Yes.
20     Q.  -- correct?
21         So I'm trying to understand what was it
22 yesterday that made you think of these four documents.
23     A.  I was ref -- reflecting on the conversation
24 that we were going to have today and realized that my
25 thinking about the matter at hand was informed by

Page 15

1 material other than those that were on the Materials
2 Considered list.
3     Q.  Okay.  Did you review any depositions?
4     A.  Did I --
5         Yes, I reviewed depositions.
6     Q.  That's not on Exhibit 2; correct?
7     A.  That is on --
8         I'm sorry, I -- I -- I stand corrected.  The
9 expert reports.
10     Q.  So you haven't looked at any depositions?
11     A.  Have I looked at any dep --
12         Hon -- honestly, to make a distinction
13 between the depositions and the expert reports, I'm
14 not totally clear on --
15     Q.  You don't know what a deposition is?
16     A.  I know what a deposition is, but when I
17 think -- think about the opinions of those who have
18 been deposed and those who have submitted expert
19 reports, in my mind I'm not clear on in what format I
20 considered the material from those individuals.
21     Q.  So sitting here today you don't know what
22 depositions you reviewed, if any.
23     A.  I believe I have reviewed depositions.
24 Which ones, and which ones I relied on the expert
25 reports, I'm not able to say.

Page 16

1     Q.  Well on Exhibit 2 you only have two expert
2 reports of Dr. Michael J. Stonnington and Dr. William
3 Jarvis; correct?
4     A.  Yes.
5     Q.  Did you review any other expert reports?
6     A.  Yes, I'm -- I'm sure I did.
7     Q.  Which ones?
8     A.  Dr. Wenzel and Dr. Kuehn or Keen.
9     Q.  Which one, Kuehn, Keen, or both?
10     A.  I don't know.  I'd have to look at -- look
11 at them to see.
12     Q.  Was it -- was it a University of Minnesota
13 professor or a person from Toronto?
14     A.  I -- I have no idea.
15     Q.  Okay.  Do you have that with you today?
16     A.  No, I don't.
17     Q.  Okay.  What other expert reports?
18     A.  I can't think of any others.
19     Q.  What about Borak, does that sound familiar?
20     A.  No.
21     Q.  Holford?
22     A.  No.
23     Q.  Mont?
24     A.  Mont, per -- perhaps.  The name sounds
25 fam -- familiar.  Whether it's a paper or deposition

Page 17

1 or an expert report I'm not sure, but the name --
2     Q.  Houge?
3     A.  No.
4     Q.  Abraham?
5     A.  It doesn't sound familiar.
6     Q.  Did you see any videos regarding airflow?
7     A.  I --
8         Yes, I have.
9     Q.  Okay.  And what -- what do you recall?
10     A.  I -- I recall -- I recall that the video
11 depicted a study of airflow in essentially a vacant
12 operating room.
13     Q.  Okay.  So there was no individuals in that
14 airflow video; correct?
15     A.  Correct.  Or there was a single mannequin --
16 mannequin.  My conclusion from looking at it was that
17 it was a contrived model of an operating room.
18     Q.  Okay.  How did you obtain that video?
19     A.  I'm not -- I'm not sure whether it was among
20 the materials that was e-mailed to me along with many
21 other clinicians, or whether it was something that was
22 provided by -- by counsel.
23     Q.  Did you consider that in formulating your
24 opinions?
25     A.  Only to the extent I just -- I just stated,

5 (Pages 14 to 17)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 18

1  that I didn't think that it offered any credible
2  evidence about operating room airflow in a vacant
3  operating room without any live personnel or activity
4  or equipment.
5     Q.  But you considered it; correct?
6     A.  Yes.
7     Q.  Why isn't it on Exhibit 2?
8     A.  It was an omission.
9     Q.  Any other omissions in Exhibit 2 that you
10 can think of?
11    A.  Not -- not that I can think of.
12    Q.  Okay.  Did you look at Hughes' report?
13    A.  I don't believe so.
14    Q.  Lampotang?
15    A.  No.
16    Q.  Ulatowski?
17    A.  No.
18    Q.  Settles?
19    A.  No.
20    Q.  Okay.  So my understanding is the only
21 expert reports you've seen are Dr. Wenzel, Dr. Kuehn,
22 Dr. Mont.
23    A.  That is the best of my recollection.
24    Q.  On the defense side; correct?
25    A.  I don't know whether those are on the

Page 19

1  defense -- defense side, but those are the reports.
2     Q.  And as well as the two reports listed in
3  Exhibit 2; correct?
4     A.  Yes.
5     Q.  Okay.  Let's talk about depositions.  Have
6  you --
7        You know what a deposition transcript looks
8  like; correct?
9     A.  Yes.
10    Q.  I mean you've been deposed before and I'm
11 sure you reviewed your deposition transcript; correct?
12    A.  Correct.
13    Q.  There's someone asking questions and there's
14 the deponent answering the questions; correct?
15    A.  Yes.
16    Q.  Okay.  I just want to be clear that you
17 understand what it is before I ask you the next
18 question.  So you're clear you understand what a
19 deposition is.
20    A.  Yes.
21    Q.  Okay.  Do you recall reading any such
22 documents in the past, you know, in -- in -- in this
23 case?
24    A.  Yes.
25    Q.  Which -- which ones?

Page 20

1     A.  I don't know.
2     Q.  You don't know.
3     A.  I don't -- I -- I -- I don't know.  As I
4  said, the -- my impression -- my impressions are
5  related to the content, not so much the format; that
6  is to say, if an individual is deposed and offered an
7  expert opinion, whether I reviewed their expert
8  opinion or the deposition is hazy in my mind as I sit
9  here today.
10    Q.  Let's -- maybe we can make it sim -- be
11 simplified.  Did you rely on anything you read in the
12 depositions in formulating your opinions?
13    A.  That -- that is possible.
14    Q.  Well I don't want "possible," I want to know
15 one way or the other.
16    A.  Okay.  I am unable to tell -- to tell you
17 what I was --
18        What I've been saying is that I've reviewed
19 materials in various -- in various formats from
20 various sources.  My -- whatever opinion I
21 hold -- hold today is the result of the sum of that
22 information, and I have not really made an effort to
23 connect an opinion with whether it is directly derived
24 from a particular document.
25    Q.  So if I understand --

Page 21

1     A.  My --
2     Q.  -- to you today, that with respect to your
3  opinions, you don't know all the materials that you're
4  using to rely upon in formulating those opinions; is
5  that correct?
6        MS. LEWIS:  Object to the form.
7     A.  I am relying on a variety of materials and
8  my clinical training and experience to form my
9  opinion.
10    Q.  I understand that.  But besides what's been
11 marked as Exhibit 2 and the three expert reports that
12 we've mentioned, Wenzel, Kuehn and Mont, as well as
13 the Abraham video, sitting here today you cannot
14 testify as to what other documents or materials you
15 used and relied upon to formulate your opinions; is
16 that correct?
17    A.  That's correct.
18        MS. LEWIS:  Objection, form.
19        MR. ASSAAD:  Basis.
20        MS. LEWIS:  Misstating the -- his testimony.
21 He didn't say whether it was Abraham's video or whose
22 video, he just said video.
23        MR. ASSAAD:  Okay.  You may answer.
24    A.  Yeah.  I clar -- was about to say the same
25 thing.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 22

1    Q.  Let me ask the question again then, get it
2  nice and clean.
3        My understanding is what's been marked as
4  Exhibit 2, the three expert reports of Wenzel, Kuehn
5  and Mont, and a video that you don't know who created
6  it, is all that you relied upon -- or you remember
7  that you relied upon in formulating your opinions
8  today.
9    A.  No.
10    Q.  What else is there?
11    A.  I have -- I have been the recipient of
12  countless electronic mail communications on -- on this
13  subject, I have seen coverage of it in the trade --
14  trade press, I have had lec -- lectures and abstracts
15  that I have -- that I have seen.  I cannot recall the
16  de -- details of any one of those.  But in
17  synthesizing what I think about this issue today, all
18  of those, in addition to my own clinical experience,
19  play a role in formulating the materials.  So I think
20  that inevitably, given the multiplicity and variety
21  and the span of time over which this information has
22  come to me, I think that there are going to be items
23  that, almost perhaps even subconsciously, factor into
24  my thinking on the sub -- on the subject.
25    Q.  Well unfortunately I'm not a mind reader.

Page 23

1  You understand that; right?
2    A.  I -- I assume -- I assume that that's so.
3    Q.  Okay.  Do you understand we're here --
4        I'm here to take your deposition and to
5  understand your opinions.  You understand that;
6  correct?
7    A.  Yes.
8    Q.  And I want to understand the methodology in
9  formulating your opinions.  You understand that;
10  correct?
11    A.  Yes.
12    Q.  And understanding also what documents and
13  information you used in formulating opinions that you
14  relied upon.  You understand that; correct?
15    A.  Yes.
16    Q.  And sitting here today it's my
17  understanding, based on your testimony, that you do
18  not have that information for me today.
19    MS. LEWIS:  Objection, form.
20    A.  Is that -- was --
21        Was there a question?
22    Q.  You don't have all the documents or all the
23  materials you are going to use or you relied upon in
24  formulating your opinions; correct?  You don't have a
25  list.

Page 24

1    A.  Correct.
2    Q.  All right.  What I have is Exhibit 2;
3  correct?
4    A.  Yes.
5    Q.  Okay.  This electronic mail, is there
6  anything in the electronic mail that you used or you
7  relied upon in formulating your opinions?
8    A.  The --
9        I am thinking primar -- primarily of the
10  mass e-mails from stopsurgicalinfections.org and
11  similar related organizations.
12    Q.  Okay.  With respect to any e-mails with
13  counsel, any e-mails from counsel that -- that -- that
14  provided information that you relied upon?
15    MS. LEWIS:  Objection to the form of the
16  question.  It's asking for communication material, and
17  you don't have to answer questions about any
18  communications that you've had with counsel.
19    Q.  Is there any in --
20    MR. ASSAAD:  Actually, you're actually
21  wrong.  I'm allowed to --
22        If he's relying on any facts that you told
23  him, I don't -- if it's in a communication, I have
24  every right to know about it.
25    MS. LEWIS:  If he -- if he knew about that

Page 25

1  fact already, he is not getting that fact from
2  counsel.
3    MR. ASSAAD:  Okay.  Stop coaching the
4  witness, Ms. Lewis.
5    MS. LEWIS:  That's -- I'm -- I'm -- I'm --
6    MR. ASSAAD:  You are coaching the witness.
7    MS. LEWIS:  No, I am not coaching the
8  witness.
9    MS. ASSAAD:  If you want him to step out, we
10  could have him step out, we could have a legal debate
11  of whether or not it's confidential, but I don't want
12  you to coach --
13    MS. LEWIS:  He's not going to answer
14  questions on communications.
15    MR. ASSAAD:  I'm not asking about any
16  communications.
17    Q.  Is there any facts the defense gave you that
18  you're relying upon in formulating your opinions?
19    A.  Any facts?
20    Q.  Yes.
21    A.  Do you distinguish facts from materials?
22    Q.  Any materials they gave you that you're
23  relying upon, anything that they've given you that
24  you're relying upon in formulating your opinions.
25    A.  The expert opinions were provided to me by

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 26

1 counsel.
2    Q.  Okay.  So Jarvis and Stonnington.
3    A.  The video that we discussed was provided to
4 me by counsel.
5    Q.  Anything else?
6    A.  A test -- testing report on filters.
7    Q.  Is that listed in Exhibit 2?
8    A.  No, it is not.
9    Q.  Why not?
10    A.  Because I hadn't thought of it at the time I
11 created Exhibit -- Exhibit 2.
12    Q.  As of yesterday.
13    A.  Correct.
14    Q.  Okay.  What else?
15    A.  I can't say.
16    Q.  When did you receive the depositions?
17    A.  In the last several months.
18    Q.  Did you receive the deposition of Al Van
19 Duren?
20    A.  I'm sorry?
21    Q.  Al Van Duren.  Do you know who he is?
22    A.  Al Van -- Al Van Duren.  Al Van Duren, that
23 name sounds -- that sounds familiar.  And again,
24 whether the name sounds familiar because of seeing a
25 paper of his, whether he was referenced in the expert

Page 27

1 reports that I did -- did read -- read, I don't know,
2 but the name sounds -- sounds familiar.
3    Q.  Did you read his deposition?  Simple "yes"
4 or "no" or "I don't know."
5    A.  I don't know.
6    Q.  Okay.  Did you read the deposition of Dr.
7 Wenzel?
8    A.  No.
9    Q.  Did you read the deposition of Dr. Kuehn?
10    A.  No.  I believe I read their expert reports.
11    Q.  Did you read the deposition of Dr. Mont?
12    A.  I don't know.
13    Q.  Okay.  Can you tell me any dep -- any
14 deposition that you've read from what subject matter
15 it was dealing with, if it was a doctor, anything
16 today?
17    A.  I read -- I read parts of Dr. Kurz.
18    Q.  Kurz?
19    A.  Yes.
20    Q.  Who is Dr. Kurz?
21    A.  Dr. Andrea Kurz is a scientist and the
22 author of an important paper in the area of surgical
23 normothermia.
24    Q.  Are you talking about the 1996 paper on
25 thermoregulation --

Page 28

1    A.  Yes.
2    Q.  -- and infection, surgical-site infection?
3    A.  Yes.
4    Q.  Do you consider her an expert in the field?
5    A.  I consider her an expert in the field.
6    Q.  Do you consider Dr. Sessler an expert in the
7 field?
8    A.  Yes.
9    Q.  Have they done more research on normothermia
10 than you have?
11    A.  Yes.
12    Q.  In fact, you have done no research on
13 normothermia; have you?
14    A.  Correct, except to the extent that I have to
15 make decisions about how I manage the temperature of
16 the patients I anesthetize.
17    Q.  Let me ask my question again.  And this is
18 going to go a lot quicker if you answer my question.
19 Okay?
20        I understand you're a treating physician.  I
21 understand what anesthesiologists do.  We don't need
22 to go there.  My question is you, Dr. Hannenberg, have
23 not done any research on normothermia; correct?
24    A.  Well are you -- are you talking about
25 laboratory re -- research, clinical studies, or are

Page 29

1 you talking about re -- research in the sense of
2 evaluating the available science in order to make a
3 clinical decision?
4    Q.  I'm --
5        Let's talk about clinical studies.  Have you
6 done any clinical studies?
7    A.  No.
8    Q.  Have you done any laboratory research?
9    A.  No.
10    Q.  Okay.  You've read papers; correct?
11    A.  Correct.
12    Q.  Okay.  And some of the papers we'll be
13 talking about today; correct?
14    A.  Yes.
15    Q.  But you haven't done what Dr. Kurz or Dr.
16 Sessler has done; correct?
17    A.  Correct.
18    Q.  Or any other people out in -- in -- who have
19 published papers on normothermia; correct?
20    A.  Correct.  Other than an edit -- an editorial
21 on the subject of surgical normothermia, I have not
22 published on this subject.
23    Q.  And you read the paper of Dr. Sessler;
24 correct?
25    A.  Correct.

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 30

1    Q.   And how do you know Dr. Sessler?
2    A.   Dr. Sessler and I served on a committee that
3  developed a performance measure on perioperative
4  normothermia.
5    Q.   Okay.  So we're going to get to that, but I
6  just want to understand what is the universe of
7  information you used to formulate your opinions, and
8  my understanding right now is Exhibit 2, Dr. Wenzel,
9  Dr. Kuehn and Dr. Mont's expert reports, a video of
10  airflow, a testing report regarding filtration, and
11  parts of Dr. Kurz's deposition; correct?
12         MS. LEWIS:  Object to the form of the
13  question.
14    A.   Those materials did serve as the basis for
15  my opinions, --
16    Q.   Anything else?
17    A.   -- but I think I've already out -- outlined
18  the fact that I have seen trade press publications, --
19    Q.   Which ones?
20    A.   -- an e-mail --
21         I -- I cannot -- I cannot cite -- cite them.
22  I haven't kept a record of those publications that
23  I've seen over the course of a decade.
24    Q.   But did you use them and look at them in
25  creating Exhibit 3, your expert report?

Page 31

1    A.   With respect to what is in my expert report,
2  my expert report has the citations of the materials
3  that I point to in the text of the expert report.  So
4  the content of the expert rep -- report is one -- is
5  one thing, the full range of my opinions on the sub --
6  on the subject is something else.
7    Q.   Okay.  But with respect to all the materials
8  you used in formulating the opinions in your
9  Exhibit -- in Exhibit 3, your -- your expert report,
10  we've discussed those today; correct?
11    A.   I'm -- I'm sorry.  Say again.
12    Q.   With respect to Exhibit 3, --
13    A.   Yes.
14    Q.   -- we have discussed all the materials that
15  you have reviewed or looked at or considered in
16  formulating your opinions that are in Exhibit 3, your
17  expert report?
18    A.   Yes.
19    Q.   Okay.  I understand you have education,
20  training and experience, but I'm talking about
21  documents that you've looked at or considered.  You
22  understand that; correct?
23    A.   Yes.
24    Q.   Okay.  Did you look at the Huang paper?
25    A.   If you can show it to me I can --

Page 32

1    Q.   Well it's not listed here, so if it's not
2  listed in Exhibit 2, have you -- did you look at it or
3  consider it in formulating your opinion for your
4  expert report?
5    A.   No.
6    Q.   What about the Zink paper?
7    A.   I --
8         No, it did not factor into my expert report.
9    Q.   What about the Moretti paper?
10    A.   I probably have seen -- have seen it, but I
11  would not say that it is part of the content of my
12  expert report.
13    Q.   What about the Sun paper.  Do you know what
14  the Sun paper is?
15    A.   No.
16    Q.   Okay.  Sun with -- with Andrea Kurz, do you
17  know what paper that is?
18    A.   No.
19    Q.   Okay.  What about the Sessler/Olmstead --
20  Kuplinger paper, do you know what paper that is?
21    A.   No.
22    Q.   Okay.  What about Belani, does that name
23  sound familiar?
24    A.   Yes, it does.
25    Q.   Did you review that paper?

Page 33

1    A.   I prob -- I probably did.
2    Q.   Did you review that paper in formulating
3  your opinions in Exhibit 3?
4    A.   No.
5    Q.   What about the Reed paper, "Evaluation of
6  Intake Filtration:  Internal Microbial Buildup in
7  Airborne Contamination Emissions," did you review that
8  paper in formulating your opinions in Exhibit 3?
9    A.   No.
10    Q.   You added Legg, Cannon, Hamer, "Do forced
11  air patient-warming devices disrupt unidirectional
12  downward airflow?"  Did you look at any other Legg
13  paper in formulating your opinions on Exhibit 3?
14    A.   No.
15    Q.   Okay.  Did you find this Legg paper on your
16  own or did -- was that provided to you by counsel?
17    A.   That was, I believe, provided to me -- to me
18  by stopsurgicalinfections.org.
19    Q.   Okay.  Did you review the Desari paper,
20  "Effect of forced-air warming on the performance of
21  operating theatre laminar flow ventilation?"
22    A.   Yes, I think I did.
23    Q.   In formulating your opinions in -- in
24  Exhibit 3?
25    A.   Well in -- in Ex -- in Exhibit 3 I address

9 (Pages 30 to 33)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 34

1  the proposition that forced-air warming devices
2  disrupt laminar -- laminar flow.  There are multiple
3  sources of that proposition; I believe that is one --
4  is one of them.  So that I was -- did not refer
5  specifically to that paper but to the -- the opinion
6  about forced-air warming and laminar flow --
7       Q.  Does the Desari paper --
8       A.  -- more generally.
9       Q.  Does the Desari paper have to be
10  included --
11       MS. LEWIS:  Wait.  Did you finish your
12  answer?
13       THE WITNESS:  Yes.
14       Q.  Does the Desari paper have to be included in
15  Exhibit 2 now?  Would you include it?
16       A.  I -- I -- I don't -- I don't see why not.
17       Q.  Okay.  So it should be another document -- a
18  document that you considered in formulating your
19  opinions of Exhibit 3?
20       A.  Yes.
21       Q.  Okay.  So do you recall the paper written by
22  Sessler, "Forced-air warming does not worsen air
23  quality in laminar flow operating rooms?"  Did you
24  ever read that paper?
25       A.  I recall -- I recall the title.  Whether

Page 35

1  I've read it or not, I don't know.
2       Q.  Okay.  So you didn't -- you didn't consider
3  that paper in formulating your opinions in Exhibit 3;
4  correct?
5       A.  Correct.
6       Q.  Okay.  Do you recall reading the paper by
7  Belani, "Patient warming excess heat:  The effects on
8  orthopedic operating room ventilation performance?"
9       A.  No.
10       Q.  Do you know who Dr. Belani is?
11       A.  No.
12       Q.  He was -- he was the Chair of Anesthesiology
13  at the University of Minnesota.
14       A.  No.
15       Q.  Did you read the Stocks paper on particles?
16       A.  Did I read the Stocks paper?  I don't
17  recall.
18       Q.  What about the Darouiche paper on particles
19  and bacterial load?
20       A.  No.
21       Q.  I understand that on Exhibit 2 you looked at
22  the letter to the editor -- well strike that.
23       Did you read the Albrecht paper, "Forced air
24  warming:  A source of airborne contamination in the
25  operating room?"

Page 36

1       A.  I believe I did.
2       Q.  Okay.  But you didn't put that in something
3  that you considered in your ex -- for your expert
4  report; correct?
5       A.  Correct.
6       Q.  Let -- let me ask you a question.  Exhibit 2
7  is not in alphabetical order; correct?
8       A.  Correct.
9       Q.  So why would you stick four more items in
10  the middle -- or not even in the middle, like randomly
11  into Exhibit 2 and just -- instead of putting it at
12  the end to make it easy for everyone to know what you
13  added to your -- your Materials Considered?
14       A.  That's where the curs -- cursor was -- was
15  when I pulled the citation.
16       Q.  Yeah.  But then you -- you went from Melling
17  to Scott and you jumped over Leitjens, so it's not
18  like you continued writing four -- four directly in a
19  row.
20       A.  Well --
21       Q.  I mean you put Legg, Wood, then you
22  skipped -- then you -- then you put your cursor again
23  and you went to Melling and you moved your cursor
24  again and went to Scott.  Why would you do that?
25       A.  In order to look at what was already in

Page 37

1  the -- in the report, so scroll -- scrolling up and
2  down through the document.
3       Q.  So they're -- they're in order of what you
4  reviewed?  This is the order that it's in your -- in
5  your report?
6       A.  No.  I had the original re -- report
7  submitted previ -- previously.  I was reviewing it on
8  the computer screen, addressing omissions, and where
9  the cursor -- cursor was -- it was not --
10       Had the original report been in alphabetical
11  order, I probably would have inserted the new items in
12  alphabetical order, but it was -- but it wasn't.  I
13  was reviewing the pri -- previously submitted report.
14       Q.  So you -- are --
15       It's my understanding that -- that Materials
16  Considered is -- kind of follows the same format as
17  how it's cited in your report; correct?
18       A.  It is cited in my report in relation to the
19  commentary in the text of the report.
20       Q.  I -- I understand.  But my question is:  If
21  you look at page eight of your expert report, which is
22  Exhibit 3, and you look at Exhibit 2, which is the
23  documents called Materials Considered that you
24  provided today, is the order that is on Exhibit 2
25  similar to what is in Exhibit 3, you just added where

10 (Pages 34 to 37)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 38

1  those documents would go in relation to your report?
2      A.  I'm not -- I'm not sure I understand what
3  you're asking.
4      Q.  For -- for example, you added Legg and Wood
5  after McGovern.  Okay?  And McGovern is number 16 on
6  Exhibit 3; correct?
7      A.  Yes, it is.
8      Q.  Is it my understanding that Legg and Wood
9  are -- are around --
10         You're citing them for the same proposition
11  or around -- same subject area as where McGovern is in
12  your expert report?
13      A.  No.
14      Q.  Okay.  So why does --
15         Why are you skipping around on Exhibit 2 in
16  where you -- you added these new citations?
17      A.  Exhibit 2 does not have any particular
18  sequence after the content of the bibliography from
19  the expert report appears.
20      Q.  Well you put Legg and Wood between McGovern
21  and Memarzadeh on Exhibit 2.  You can look at Exhibit
22  2.
23      A.  I -- I --
24      Q.  Okay.
25      A.  I -- I know.

Page 39

1      Q.  Why did you put those there?
2      A.  As I -- as I said, the cursor on the screen
3  was there when I had the references and -- and added
4  them.  The cursor on the screen was in a different
5  place when I added the other references.
6      Q.  Why did you move the cursor on the screen
7  when you were editing the document?
8      A.  Because I was look -- because I was looking
9  at the pre-existing content of the doc -- of the
10  document.
11      Q.  Of Exhibit 2 or Exhibit 3?
12      A.  Exhibit 2.
13      Q.  So why did Melling go after patient warming?
14      A.  Because I was on that point in the page when
15  I paused to pull the reference for Melling and add it
16  to the document.
17      Q.  And why is Scott --
18         Why did you add Scott into your report, into
19  your Materials Considered?
20      A.  Because it influenced my opinion and it had
21  previously been omitted.
22      Q.  Okay.  Where would --
23         Where did it influence your opinion in
24  Exhibit 3?
25      A.  It influenced my --

Page 40

1      Q.  Where in Exhibit 3, what part of your report
2  of Exhibit 3?
3      A.  Well I guess I would say that my opinion
4  about the benefits and value of normothermia are in
5  part informed by the content of -- of -- of Scott.
6      Q.  Did you review the article Kimberger --
7  written by Kimberger, Held, Stadelmann, Mayer,
8  Hunkeler, Sessler, Kurz titled "Resistive polymer
9  versus forced-air warming:  comparable heat transfer
10  and core rewarming rates in volunteers?"
11      A.  No.
12      Q.  Okay.  Do you take the similar position as
13  Dr. Sessler in which you don't care how a patient is
14  warmed as long as the patient is warmed?
15      A.  I don't know that that's Dr. Sessler's
16  opinion, but I think --
17         No.  I -- I think I would dis -- disagree --
18  disagree with that, because, you know, part of the
19  decision about how to -- how to warm the patient is
20  two parts, it's efficacy and it's -- and it's safety.
21  It's more than -- it's cost, it's cost, it's -- it's
22  convenience, so there are multiple factors in
23  determining the choice of warming technology.
24      Q.  Okay.  So you disagree with Dr. Sessler when
25  he says that publicly at many 3M conferences.

Page 41

1         MS. LEWIS:  Object to the form.
2      A.  I don't know that he says that -- that he
3  says that publicly, but I've just told you what my
4  opinion about patient warming is.
5      Q.  Have you ever seen Dr. Sessler lecture on
6  maintaining normothermia?
7      A.  I -- I am sure I have.  I can't recall when
8  and where.
9      Q.  So sitting here today, you don't remember.
10      A.  Correct.
11      Q.  Okay.  Have you --
12         When was the last time you took a CLE on
13  maintaining -- or CME on maintaining normothermia, if
14  any?
15      A.  I can't -- I can't recall taking a CME
16  specifically on that subject.
17      Q.  When is the last time you've attended any
18  lecture -- CME, talk, anything -- on maintaining
19  normothermia?
20      A.  I don't -- I don't -- I don't recall.
21      Q.  When was the last time you went to the ASA
22  conference?
23      A.  Last October.
24      Q.  Okay.  With respect to Exhibit 2, is this
25  something that you drafted?

11 (Pages 38 to 41)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 42

1     A.  Yes.
2     Q.  Okay.  Did you ever review the deposition of
3  Dr. Sessler?
4     A.  I have reviewed a deposition of Dr. Sessler.
5     Q.  Okay.  Why wasn't that included in Exhibit
6  2?
7     A.  Because I can't identi -- identify what
8  content of that deposition informed my opinion.
9     Q.  Exhibit 2 says "Materials Considered;"
10  correct?
11     A.  Yes.
12     Q.  Correct?
13     A.  Yes.
14     Q.  It doesn't say "Materials Relied Upon;"
15  correct?
16     A.  Correct.
17     Q.  Okay.  So now we have Dr. Sessler's
18  deposition.  When did you review his deposition?
19     A.  I don't recall.
20     Q.  This year?
21     A.  Most probably.
22     Q.  Okay.  Have you reviewed the deposition of
23  Gary Maharaj?
24     A.  No.
25     Q.  Have you reviewed the deposition of --

Page 43

1  ever --
2         Have you ever reviewed the deposition of
3  Teri Sides?
4     A.  No.
5     Q.  Have you ever reviewed the deposition of
6  Karl Zgoda?
7     A.  No.
8     Q.  Have you ever reviewed the deposition of
9  Gary Hansen?
10     A.  No, I don't think so.
11     Q.  Have you ever reviewed the deposition of
12  Troy Bergstrom?
13     A.  No.
14     Q.  Have you ever reviewed the deposition of
15  Gary Maharaj?
16     A.  I don't recall.
17     Q.  Okay.  Have you ever reviewed the deposition
18  of Dave Westlin?
19     A.  No.
20     Q.  Have you ever reviewed the deposition of Dr.
21  Elghabashi?
22     A.  No.
23     Q.  Do you know who Dr. Elghabashi is?
24     A.  No.
25     Q.  What about Mike Buck?

Page 44

1     A.  No.
2     Q.  Do you know who Mike Buck is?
3     A.  No.
4     Q.  What about Dan Koenigshofer?
5     A.  Other than the name sounding familiar, no.
6     Q.  What about --
7         Did you review the deposition of Dr. Jarvis?
8     A.  I don't believe I read his deposition.  I --
9     Q.  Have you read the deposition of Dr.
10  Stonnington?
11     A.  No.  I read -- I read their expert reports.
12     Q.  I understand that.  I -- I know that's on
13  Exhibit 2.
14     A.  Yes.
15     Q.  I'm asking about depositions.
16     A.  Yes.
17     Q.  Have you reviewed any medical records in
18  this case?
19     A.  In this case.  In this case.
20     Q.  Yes.
21     A.  I reviewed medical records of Walton and
22  Johnson.
23     Q.  Okay.  But you haven't reviewed any of
24  the -- the upcoming trials and the medical records of
25  those cases.

Page 45

1     A.  Correct.
2     Q.  Okay.  You do understand that Walton and
3  Johnson are part of this case.
4     A.  Yes.
5     Q.  Okay.  So when I refer to "this case," I'm
6  talking about the Bair Hugger litigation in total.
7  You understand that; correct?
8     A.  Yes.
9     Q.  Okay.
10         (Exhibit 4 was marked for
11          identification.)
12  BY MR. ASSAAD:
13     Q.  What's been marked as Exhibit 4 is a -- is a
14  document -- the only document, the one and only --
15  produced by defendant in response to a subpoena to
16  you.  Do you recall --
17         Do you see this document?
18     A.  Yes, I do.
19     Q.  Okay.  You --
20         Do you recall receiving a subpoena in this
21  case?
22     A.  Yes.
23     Q.  Okay.  Did you review the subpoena?
24     A.  Yes.  The subpoena -- subpoena relative to
25  today's deposition?

12 (Pages 42 to 45)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 46

1    Q.   Yes.
2    A.   Yes.
3    Q.   Have you got another subpoena in this case
4  not related to this deposition?
5    A.   Not that -- not that I'm aware of.
6    Q.   Okay.
7    A.   I know that this document we're looking at,
8  Exhibit 4, was requested.  Whether that was requested
9  under subpoena or not, I don't know.
10   Q.   Did you --
11        Is this the only document that you provided
12 to defendant in response to the subpoena, defense
13 counsel?
14   A.   What I produced --
15        So I've produced a curriculum vitae.  What
16 is rela -- related to the subpoena or not, I don't
17 know.  I produced what counsel asked me to produce.
18   Q.   So you did not go through the subpoena and
19 determine whether or not you had documents responsive
20 to the subpoena, you just produced what defense
21 counsel told you to produce?
22   A.   We looked at -- we looked at the subpoena
23 recently for the purpose of confirming that we had
24 produced what was required by the subpoena.
25   Q.   Did you create any notes?

Page 47

1    A.   No.
2    Q.   You took no notes the entire time --
3    A.   Correct.
4    Q.   -- in this case at all.
5    A.   Correct.
6    Q.   Okay.  Did you make any notes on any papers?
7    A.   No, I did not.
8    Q.   Okay.  Any highlights?
9    A.   No, I did not.
10   Q.   Any communications with anyone besides
11 counsel?  E-mails?
12   A.   No.
13   Q.   Okay.  Did someone tell you not to take
14 notes?
15   A.   Not -- not in this case, but in prior
16 medical/legal work, yes.
17   Q.   Okay.  So the one case you did, the defense
18 attorney told you not to take notes?
19   A.   Correct.
20   Q.   Did he tell you why?
21   A.   That it was --
22        No.
23   Q.   Okay.  Did he give you instructions on how
24 to be an expert witness?
25   A.   I am not --

Page 48

1        I don't understand that question.
2    Q.   I mean did he give you --
3        Did he coach you on how to become an expert
4  witness and how to answer questions, defense counsel?
5    A.   Yes.
6    Q.   Okay.  What did he tell you?
7    A.   To ans -- answer truthfully and completely
8  and to be sure I understood the question.
9    Q.   Okay.  I mean as a doctor you take a lot of
10 notes, don't you, in your practice?
11   A.   Yes.
12   Q.   Okay.  Because that's how you can keep track
13 of what you did and -- and what was done in the past;
14 correct?
15   A.   Correct.
16   Q.   Okay.  And not only do you take notes, but
17 every other doctor takes notes and nurses take notes.
18 It's just general practice to take notes; correct?
19   A.   Correct.
20   Q.   And there's actually a section that says
21 "Progress Notes" in most medical records; correct?
22   A.   Correct.
23   Q.   But for acting as an expert, you don't take
24 notes.
25   A.   Correct.

Page 49

1    Q.   Okay.  Is there something you're trying to
2  hide?
3    A.   No.
4    Q.   Okay.  Then why not take notes?
5    A.   Because I was advised by counsel not to.
6    Q.   Okay.  I mean if you took notes about what
7  you reviewed, then we would have a list of what you
8  reviewed in this case; correct?
9    A.   Presumably.
10   Q.   You think we'd have a more accurate picture
11 of what you reviewed?
12   A.   We might.
13   Q.   We might or most likely we would?
14   A.   We -- we would have an additional resource
15 to -- to consult.
16   Q.   Well you don't even remember the depositions
17 you've read; correct?
18   A.   Correct.
19   Q.   If you took notes as to what depositions you
20 read, we'd have a record of what you read; correct?
21   A.   Correct.
22   Q.   And if you took notes of what documents you
23 reviewed, we'd have all the documents that you
24 reviewed; correct?
25   A.   Correct.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 50

1   Q.   Okay.  Note-taking is a good thing; isn't
2   it?
3       A.   I have been told that in this context it is
4   not -- it is not.
5       Q.   By defense attorneys?
6       A.   Correct.
7       Q.   Okay.  I mean you teach your residents to
8   take notes; correct?
9       A.   I don't teach -- I don't teach residents
10  now, but when I did -- when I did, yes.
11      Q.   Yeah.  I mean it would be almost malpractice
12  if you didn't take notes; correct?
13      A.   I'm not sure what medical practice and
14  medical malpractice has to -- has to do with conduct
15  as an expert wit -- expert witness, but it is
16  certainly standard practice among physicians to make
17  notes.
18      Q.   I mean you -- you understand that there's
19  almost 3,000 people that have filed cases in this
20  litigation.  Are you aware of that?
21      A.   I'm aware of that.
22      Q.   Okay.  That's 3,000 people that had severe
23  periprosthetic joint infections.  Do you understand
24  that?
25          MS. LEWIS:  Object to the form.

Page 51

1       A.   If you say -- if you say so.
2       Q.   I mean --
3       A.   I know -- I know about the details of two of
4   the cases.
5       Q.   You know what a periprosthetic joint
6   infection is.
7       A.   Yes, I do.
8       Q.   It's a serious infection; correct?
9       A.   Yes.
10      Q.   Okay.  Some people have --
11          Some people die.  You understand that;
12  right?
13      A.   Yes.
14      Q.   Some people have amputations.  You
15  understand that.
16      A.   Yes.
17      Q.   And most if not all, probably 90 -- at least
18  90 percent have additional surgery.  You're aware of
19  that; right?
20      A.   I'm not aware of that statistic.
21      Q.   So you understand that this is a serious
22  case.
23      A.   I understand this is a serious case.
24      Q.   And I have the right to understand all your
25  opinions and the basis for your opinions.  You

Page 52

1   understand that; correct?
2       A.   Yes.
3       Q.   And that's even required under the -- the
4   Federal Rules of Civil Procedure, Rule 26, that you
5   need to identify the facts and basis for all your
6   opinions.  Do you understand that?
7           MS. LEWIS:  Objection to form.
8       A.   I know nothing about Federal Rule 26.
9       Q.   Were you -- were you told that I -- that I'm
10  allowed to understand all the facts and basis of --
11  of -- of your opinions?
12          MS. LEWIS:  I object to your discussing any
13  communications that you've had with defense counsel.
14      Q.   Was it your understanding when you wrote the
15  report, Exhibit 3, that you must convey all your
16  opinions and the facts and basis behind those
17  opinions?
18      A.   I think I've stated in Exhibit -- Exhibit 3
19  that it is not a fin -- final or necessarily a
20  comprehensive re -- report.
21      Q.   Where did you get the idea that you didn't
22  have to have a final report by June 2nd, 2017?
23      A.   If I can quote --
24      Q.   I -- I know your report.  I'm asking where
25  did you get the idea or who told you that your report

Page 53

1   didn't have to be filed by June 2nd, 2017?
2       A.   The report was -- was -- was filed.  It
3   doesn't -- it doesn't mean that I necess --
4   necessarily included every thought or i -- idea
5   about -- about the case.  It doesn't mean that it is
6   an exhaustive recitation of all my opinions.
7       Q.   So your report's incomplete?
8       A.   I wouldn't characterize it as -- as
9   incomplete.  It is not an exhaustive recitation of all
10  my opinions.
11      Q.   You know what a deadline is; correct?
12      A.   Yes.
13      Q.   Okay.  The deadline was June 2nd, 2017.  You
14  understood that; correct?
15      A.   Yes.
16      Q.   Okay.  So why isn't your -- why isn't all
17  your opinions in your report?
18      A.   Well I may have thought about -- something
19  about this report on June 3rd.
20      Q.   Well has something come up in the science or
21  research of normothermia between June 3rd --
22  maintaining normothermia between June 3rd and today
23  that you're aware of?
24      A.   Has something --
25          Are you referring to a published --

14 (Pages 50 to 53)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 54

1    Q.  Publication.
2    A.  -- study?
3        Not in that -- not in that interval.  But
4  that's a different matter from my opinion taking --
5  taking shape or another perspective on a question I
6  find --
7    Q.  Your opinion could change; is that what
8  you're saying?
9    A.  -- my opinion -- my --
10       MS. LEWIS:  Gabe, would you let him
11  finish --
12    Q.  Your opinion could change?
13       MS. LEWIS:  -- before you start your next
14  question?
15    Q.  Your opinion can change?
16    A.  My opinion can change.
17    Q.  Okay.  So if that's the case, I might be
18  able to convince you that maintaining normothermia is
19  junk science today; correct?
20    A.  I doubt it.
21    Q.  Pretty good.
22       MR. ASSAAD:  Let's take a break.
23       THE REPORTER:  Off the record, please.
24       (Recess taken.)
25  BY MR. ASSAAD:

Page 55

1    Q.  Going back to Exhibit No. 2, I don't see any
2  internal 3M documents that you reviewed.  Have you
3  ever reviewed any internal 3M documents in formulating
4  your opinions?
5    A.  I don't recall that I have.
6    Q.  Well if it's not listed in Exhibit 2, that
7  means you never reviewed any internal 3M document,
8  correct, in formulating your opinions?
9    A.  In formulating my opinions, that's -- that's
10  correct.
11    Q.  So you have reviewed internal 3M documents?
12    A.  I -- I don't -- I -- I just said I didn't
13  recall whether I had or not, but if I -- if I did,
14  they were not material to creating my opinions.
15    Q.  But you considered them.
16    A.  I'm not sure what -- I --
17       So some things I may consider and dismiss as
18  not important in creating an opin -- an opinion on a
19  matter, so it's -- so I'm not -- I'm not sure whether
20  that counts as considered in -- in your view or in the
21  context of your question.
22    Q.  Well you -- you saw --
23       You mentioned there was a filtration study
24  that you looked at; correct?
25    A.  Correct.

Page 56

1    Q.  Okay.  And it was an internal 3M document?
2    A.  I don't -- I don't know whether it was or --
3  was or not.
4    Q.  You don't know?
5    A.  I don't know.
6    Q.  Do you have it here with you today?
7    A.  No, I don't.
8    Q.  Did you bring anything with you today?
9    A.  No.
10    Q.  Do you think if you brought your documents
11  you would be able -- you brought your documents you
12  would be able to answer these questions?
13    A.  If I looked at that particular document, it
14  might tell me whether it was an internal 3M document
15  or not, but I don't know that for sure.
16    Q.  Have you ever done a case study as a doctor?
17    A.  I'm not sure what you mean by "a case
18  study."
19    Q.  Like where you talk about a patient in front
20  of a bunch of students.
21    A.  Yes.
22    Q.  Okay.  Do you go into the case study and
23  discuss with your students about the case without any
24  of the medical records?
25    A.  Seldom.

Page 57

1    Q.  Okay.  Because it's good to have a reference
2  material when you discuss a subject; correct?
3    A.  In some circumstances, yes.
4    Q.  I mean when you're having a case study and
5  talk about a patient, sometimes you even make copies
6  of the medical records for others to review
7  and -- and look over so you can have an educated
8  conversation with them; correct?
9    A.  Sometimes we do that.
10    Q.  Okay.  Or you have a PowerPoint
11  presentation; correct?
12    A.  Correct, I have had PowerPoint
13  presentations.
14    Q.  And in fact, when you give presentations you
15  probably use a PowerPoint presentation to document
16  certain things that you rely upon or you looked at
17  when you give a presentation; correct?
18    A.  Well I'll go so far as agreeing I use
19  PowerPoint --
20    Q.  Okay.
21    A.  -- present -- presentations.
22    Q.  Okay.  And you might look at the studies
23  that you're referring to or some medical records that
24  you're -- you're discussing; correct?
25    A.  I don't --

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 58

1      I might look at them?  What do you mean?
2      Q.  Well I mean if you're talk -- giving a
3  presentation on thermoregulation, you might have some
4  of the studies that you are relying upon that
5  you're -- that you're discussing with the people
6  you're giving the presentation to; correct?
7      A.  In the PowerPoint, --
8      Q.  Yes.
9      A.  -- is that what you mean?
10     Yes.
11     Q.  Okay.  Why did you remove Dr. Wenzel's
12  science day presentation, May 19th, 2016, from Exhibit
13  2?
14     A.  Well I don't know that I did -- that I did.
15     Q.  If you look at Exhibit 1, it's third from
16  the bottom; in Exhibit 2 it's no longer there.
17     A.  Well, inadvertent.
18     Q.  You inadvertently deleted something?
19     A.  Yes.
20     Q.  Did someone tell you to delete it?
21     A.  No.  I said it was inadvertent.
22     Q.  How do you inadvertently delete something
23  from a -- from a document?
24     A.  I was editing the document, as you know.
25     Q.  Okay.  So you're not relying any more --

Page 59

1      I mean did you consider the science day
2  presentation?
3      A.  Yes, I did.
4      Q.  Was it --
5      What presentation was it?  Was it a
6  transcript?
7      A.  It was a PowerPoint.
8      Q.  A PowerPoint.  Okay.
9      Were you at science day?
10     A.  No.
11     Q.  Are there any other drafts of the Materials
12  Considered?
13     A.  No.
14     Q.  And would it be fair to say you deleted this
15  yesterday, the Dr. Wenzel science day presentation?
16     A.  Yes.
17     Q.  Were you with counsel when you were editing
18  the Materials Considered?
19     A.  No, I was not.
20     Q.  Did you already meet with counsel, prior to
21  editing the materials, counsel yesterday?
22     A.  Yes.
23     Q.  Okay.  So you met with counsel yesterday;
24  correct?
25     A.  Yes.

Page 60

1      Q.  And then you went back and edited the
2  Materials Considered; correct?
3      A.  Yes.
4      Q.  Okay.  With respect to Exhibit 3, that's
5  a -- that's a complete copy of your opinions in this
6  case; correct?
7      A.  Yes.
8      Q.  Have you reviewed it --
9      Did you review it in preparation of today's
10  deposition?
11     A.  Yes.
12     Q.  How many times did you read it?
13     A.  I have read it countless times -- countless
14  times since first drafting it.
15     Q.  So between June 2nd and today you've read
16  it -- you've read it countless -- countless times?
17     A.  Between June 2nd and today, five times --
18     Q.  Five times.
19     A.  -- is my best estimate.
20     Q.  And you believe it's correct?
21     A.  Yes.
22     Q.  And you stand by all your opinions?
23     A.  Yes.
24     Q.  Do you want to make any changes to your
25  expert report?

Page 61

1      A.  No.
2      Q.  Were you aware that science day was off the
3  record?
4      A.  No.
5      Q.  Okay.  Were there --
6      With respect to Exhibit 4, this is an
7  invoice from you to Deborah Lewis; correct?
8      A.  Correct.
9      Q.  By the way, have you spoken with anyone
10  internally at 3M regarding your opinions?
11     A.  No.
12     Q.  Okay.  Do you recall --
13     Has anyone from 3M made any edits to your
14  expert report?
15     A.  No.
16     Q.  Okay.  Is this the entire -- from --
17     Is this your entire work on this case from
18  June 6 -- I'm sorry -- April 6th to June 1st, 2017?
19     A.  To which date?
20     Q.  June 1st, 2017.
21     A.  Yes.
22     Q.  And this is all your work actually up to
23  June 14th, 2017; correct?
24     A.  Correct.
25     Q.  Okay.  How many hours have you billed since

16 (Pages 58 to 61)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 62

1  June 14th, 2017?
2      A.  I don't -- I don't recall.
3      Q.  Do you keep track of your hours?
4      A.  Yes.
5      Q.  Okay.  Where do you keep track?
6      A.  On my computer.
7      Q.  On your computer.  Okay.
8          Can you give me a rough estimate?
9      A.  Probably --
10         A rough estimate, probably an additional 15
11  hours.
12     Q.  Fifteen.  And that would be reviewing your
13  report and preparing for the deposition?
14     A.  Yes.
15     Q.  Did you review any additional articles?
16     A.  Did I review any additional articles when?
17     Q.  Between June 14th, 2017 and today that's not
18  in Exhibit 2 or we've discussed today.
19     A.  No.  I think we've discussed everything.
20     Q.  Okay.  And would it be fair to say that with
21  respect to your expert report, that Exhibit 4 is a sum
22  of all the time in preparing and formulating your
23  opinions outlined in Exhibit 3?
24     A.  Judge -- judging by the dates of the invoice
25  and the report, I think that's a fair conclusion.

Page 63

1      Q.  So the answer to my question is yes.
2      A.  Yes.
3      Q.  Okay.  And I assume that all the time that
4  you worked on your expert report, you -- you described
5  it as "Draft expert letter;" correct?
6      A.  I'm not sure I can draw a distinction
7  between rev -- reviewing documents and -- and drafting
8  the letter.
9      Q.  You can?
10     A.  No, I can't.
11     Q.  You understand that "review" is different
12  than "draft."
13     A.  Well I may do them contemporaneously.
14     Q.  Okay.  My question is: When you had pen to
15  paper, would that be described as "Draft expert
16  letter?"
17     A.  If that were the principal activity, yes.
18     Q.  Okay.  You might be looking at documents in
19  drafting your report, but "Draft expert letter" is pen
20  to paper.
21     A.  I think that's a fair way to characterize
22  it.
23     Q.  Okay.  So we're looking at 95 minutes, 130
24  minutes, 110 minutes, and 105 minutes; correct?
25     A.  It looks that way, yes.

Page 64

1      Q.  Okay.  That's a total of 440 minutes you
2  spent on pen to paper on your expert report; correct?
3      A.  Apparently.
4      Q.  Which is approximately 7.33 hours.  Does
5  that sound about right?
6      A.  Yes.
7      Q.  And you charge $500 an hour?
8      A.  Yes.
9      Q.  Okay.  Have you ever been retained as an
10  expert in this case -- in any case but not have a
11  deposition done?
12     A.  Yes.
13     Q.  Approximately how many times?
14     A.  Three or four.
15     Q.  Were they for the defense or the plaintiff?
16     A.  They were for the defense.
17     Q.  So you've never been retained by a
18  plaintiff?
19     A.  Correct.
20     Q.  Have you ever been asked to be -- to rep --
21  by a plaintiff's attorney to act as an expert?
22     A.  No.
23     Q.  Did you make any changes to your expert
24  report after May 25th, 2017?
25     A.  I don't recall.

Page 65

1          (Exhibit 5 was marked for
2          identification.)
3  BY MR. ASSAAD:
4      Q.  What's been marked as Exhibit 5 is a copy of
5  your curriculum vitae provided to us on June 2nd,
6  2017.  Is this the most-up-to-date copy of your
7  curriculum vitae?
8      A.  Yes, it is.
9      Q.  You have made no changes since June 2nd,
10  2017?
11     A.  Correct.
12     Q.  Okay.  No new publications?
13     A.  No, I don't think so.
14     Q.  Okay.  Are you board certified?
15     A.  Yes.
16     Q.  When did you become board certified?
17     A.  1984.
18     Q.  Did you have to --
19         Was there a recertification or were you
20  grandfathered in?
21     A.  I was grandfathered in --
22     Q.  Okay.
23     A.  -- but I have recertified anyway.
24     Q.  Okay.  Are you still practicing medicine?
25     A.  Not since January 1st.

17 (Pages 62 to 65)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 66

1    Q.   Okay.  And now you're a consultant or on
2  advisory for a couple companies; correct?
3    A.   No.
4    Q.   You don't --
5        You're fully retired?
6    A.   No, I'm not a consultant for companies.
7    Q.   Well it says "Principal Consultant,
8  ORDxRx..."
9    A.   That is -- that is a -- that is a company of
10 which I'm a princ -- a principal.
11   Q.   Were you at one --
12       Okay.  So you're a principal consultant.
13   A.   Yes.
14   Q.   Are you a shareholder?
15   A.   Yes.
16   Q.   What percentage?
17   A.   In the teens probably.
18   Q.   Okay.  Do you know Ms. Hughes?
19   A.   Ms. Hughes?
20   Q.   Antonia Hughes, an expert in this case.
21   A.   No.
22   Q.   Okay.  It also says "Chief Quality Officer
23 (interim), American Association of Anesthesiologists."
24 Is that still current?
25   A.   Yes.

Page 67

1    Q.   Okay.  And it says "Senior Research
2  Scientist, Brigham & Women's Hospital" --
3        Is that "Ariadne Labs?"
4    A.   Ariadne Labs.
5    Q.   Is that still current?
6    A.   Yes.
7    Q.   Are those the only positions that you're
8  holding right now?
9    A.   Well I -- I'm a member of boards of
10 directors of foundations, but as far as employment is
11 concerned, those are the only ones.
12   Q.   Any foundations dealing with anesthesiology?
13   A.   Yes.
14   Q.   What foundation?
15   A.   The Anesth -- the ASA Charitable Foundation
16 and the Lifebox Foundation.
17   Q.   What is Lifebox?
18   A.   Lifebox is a global health foundation --
19 foundation working in surgical safety.
20   Q.   When you talk about surgical safety, are you
21 talking about safety for the patient?
22   A.   Princ -- principally, although not -- not
23 exclusively.
24   Q.   You would agree with me that safety is
25 paramount with respect to patients.

Page 68

1    A.   Safety is paramount with respect to
2  patients.
3    Q.   And physicians should do everything --
4  strike that.
5        Do you have any experience designing a
6  medical device?
7    A.   Many -- many years ago I began the
8  process -- and quickly abandoned it -- of developing a
9  tooth guard, a tooth guard for intubation, but it
10 was -- the design was never completed.  It was never
11 brought to market or patented.  So that is the limit
12 of my experience.
13   Q.   Do you have any patents?
14   A.   No.
15   Q.   Have you ever dealt with the FDA?
16   A.   Have I ever dealt with the --
17   Q.   With a medical device issue or --
18   A.   No.
19   Q.   Okay.  You mention in your expert report
20 that you've acted as an anesthesiologist on
21 approximately 400 total joint arthroplasties.  Does
22 that sound about right?
23   A.   Yes, it does.
24   Q.   And that's over your career of -- since
25 1983?

Page 69

1    A.   1980, yeah.  Well it depends whether you
2  count residency or not -- or -- or not.  But it's a
3  rough estimate from 1984, roughly, which is when I
4  finished training.
5    Q.   So what are you counting the 400 as, from
6  when you graduated medical school or when you finished
7  your residency?
8    A.   After I finished my res -- residency.  But
9  it's a rough -- it's a rough estimate.
10   Q.   So it's about three or four a year; correct?
11   A.   Three or four a year?
12   Q.   I'm sorry.
13   A.   It's about -- about --
14       Well I guess that -- that comes out to about
15 15, 15 a year.
16   Q.   I'm sorry, 15 a year.
17   A.   That when framed -- when stated that way,
18 that sounds like an underest -- an underestimate,
19 particularly in the later years of my practice when
20 the volume of that kind of surgery had increased
21 substantially.
22   Q.   Do you have --
23   A.   So I would -- so it's a --
24       It probably is -- is more but by order --
25 order of magnitude is a reasonable estimate.

18 (Pages 66 to 69)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 70

1    Q.  When you say "more," are you talking about
2  like double?
3    A.  No.  But I mean 25, 30 percent more -- more.
4  As -- as I said, it's not something I keep regular
5  count of, but when I think back on, you know, how
6  many -- how many per week over how many weeks and
7  so -- so forth, the estimate is in that range.
8    Q.  Do you have --
9       Do you work with nurse anesthetists?
10   A.  Sometimes I do, yes.
11   Q.  Okay.  Do you supervise nurse anesthetists?
12   A.  Yes.
13   Q.  You don't believe that they should be able
14  to practice anesthesiology without supervision;
15  correct?
16   A.  Correct.
17   Q.  You've actually written an article on
18  that or you -- you commented in an article regarding
19  an issue about allowing nurses to take on full
20  responsibility for anesthesiology; correct?
21   A.  I don't know what you're reference --
22  referencing, but I believe that that is -- that is my
23  opinion.
24   Q.  Okay.  I mean at one time the Institute of
25  Medicine wanted to give nurses a bigger role and you

Page 71

1  argued against it.  Do you recall that?
2    A.  I don't -- I --
3       I have publicly stated that op -- that
4  opinion.  Whether it was in reference to something
5  that the Institute of Medicine said or someone else
6  said, I'm not sure.  But I have publicly stated that
7  opinion.
8    Q.  And you said that patients want doctors, not
9  nurses; correct?
10   A.  I have stated that public opinion polls
11  suggest that that's the case.
12   Q.  And you argued about pushing doctors' jobs
13  into nurses' hands; correct?
14   A.  That doesn't sound familiar to me.
15   Q.  Do you recall an editorial in the New York
16  Times that you were commenting on about giving --
17      The New York Times had an editorial about
18  giving nurses bigger roles.  Do you recall that?
19   A.  I do recall that.
20   Q.  Okay.  And you said it would be dangerous to
21  allow nurses to administer anesthesia care.
22   A.  Without supervision.
23   Q.  Yes.
24   A.  Well --
25   Q.  Yes.

Page 72

1    A.  -- do you want to rephrase that?
2    Q.  Well you -- you agree that allowing nurses
3  to -- to administer anes -- anesthesia care without
4  supervision would be dangerous; correct?
5    A.  Correct.
6    Q.  Well how many operating rooms can you run at
7  one time with -- with nurse anesthetists by
8  supervising them?
9    A.  What is the meaning of "can?"
10   Q.  Like how many --
11      How many operating rooms have you ran at one
12  particular time simultaneously?
13   A.  Two.
14   Q.  One with a nurse anesthetist and you?
15   A.  No, two nurse anesthetists and me.
16   Q.  Okay.  Now with respect to your CV, so
17  Ariadne --
18      How do you pronounce that?
19   A.  Ariadne.
20   Q.  -- Ariadne Labs, they put out a checklist
21  for surg -- surgical patient safety.
22   A.  Correct.
23   Q.  Okay.  And one of them is using a forced-air
24  warming de -- or warming device, correct, on the
25  checklist?

Page 73

1    A.  I'm not familiar with that.
2    Q.  Okay.  By the way, when you do -- when --
3       How long does a total knee or total hip
4  arthroplasty take when you were an anesthesiologist?
5    A.  Approximately an hour, sometimes --
6  sometimes as much as two.
7    Q.  Okay.  I'm talking about like a primary
8  arthroplasty.
9    A.  It var -- it varies by surgeons, size of
10  patients, many factors, the type of hardware being --
11  being used, so I can't state a precise number of --
12  applicable to all such operations.  So there's a
13  range.
14   Q.  Would it be fair on average it would be
15  about an hour?
16   A.  An hour and a half.
17   Q.  You think an hour and a half?
18   A.  Yes.
19   Q.  Did you read Dr. Mont's deposition where he
20  said that he does it in 25 minutes?
21   A.  I -- I don't recall -- recall that he said
22  that, but if he did, he did.
23   Q.  Do you think that's achievable to do,
24  from -- from incision to close, in 25 minutes?
25   A.  Well it depends what he's -- what he's

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 74

1  counting towards the -- towards the 25 minutes.
2      Q.  From incision to close.
3      A.  I -- I've never -- I've never seen a total
4  joint replacement done in twenty -- skin to skin in 25
5  minutes.
6      Q.  Okay.
7      A.  Whether it's possible or not, I can't
8  comment.
9      Q.  You agree with me that patient warming is
10 not indicated for surgery that lasts one hour or less;
11 correct?
12     A.  No.
13     Q.  You disagree?
14     A.  I disagree.
15     Q.  Okay.  Do you believe perioperative warming
16 actually works in the first hour?
17     A.  I think the longer perioperative warming is
18 applied, the more likely you are to achieve normo --
19 normothermia, so it's a -- so it's a continuum.
20     Q.  That wasn't my question.  Do you believe
21 that main -- like patient warming in the first hour
22 has any effect on a patient's temperature?
23     A.  Yes, it does.
24     Q.  In the -- in the first hour.
25     A.  Yes, it does.

Page 75

1      Q.  Now in looking at Exhibit 5, can you direct
2  me to any article in which you have discussed
3  thermoregulation?
4      A.  I think the only -- the only one is
5  Anesthesia & Analgesia in 2008.
6      Q.  2008.  Was it a peer-reviewed article?
7      A.  It's an invited editorial.
8      Q.  Is it under "PUBLICATIONS?"
9      A.  Yes.  Page 15, about halfway down.
10     Q.  Okay.  And that was an editorial that you
11 wrote with Sessler -- Dr. Sessler.
12     A.  Yes.
13     Q.  And it wasn't peer-reviewed; correct?
14     A.  Correct.
15     Q.  Okay.  Because it was an editorial.
16     A.  Correct.
17     Q.  Okay.  And that really had nothing to do
18 with the science of maintaining normothermia, it was
19 more with the -- the -- whatchumacallit -- the --
20 I'll get the right word in a second -- pay for
21 performance; correct?
22     A.  Correct.
23     Q.  Would you agree with me that most of your
24 talks and literature deal with pay for performance or
25 the economics of anesthesiology?

Page 76

1      A.  I -- I haven't done the math, but I have
2  spoken frequently on those subjects.
3      Q.  I mean let's go through your -- your talks
4  starting on page six.
5          Oh, before I get there, what is this medical
6  malpractice committee that you're on?
7      A.  Committee?
8      Q.  Yes.  Hold on.  The Massachusetts --
9      A.  Medical malpractice tribunal?
10     Q.  Yes.
11     A.  The law in Massachusetts requires that
12 medical malpractice cases be heard by a three-member
13 tri -- tribunal before they're allowed to go --
14 allowed to go forward.  The three-member tribunal is
15 constituted by a physician, a judge, and an attorney.
16 I think there is a requirement that it be a physician
17 of the same specialty.  So from time to time over many
18 years -- although not recently -- I've been asked to
19 serve on those -- those tribunals as the
20 anesthesiologist member.
21     Q.  When -- when -- when a -- someone wants to
22 sue an anesthesiologist?
23     A.  Yes.
24     Q.  How many times did you sit on the panel?
25     A.  Probably eight or 10, roughly.

Page 77

1      Q.  In any of those instances, did you ever find
2  that the anesthesiologist was negligent?
3      A.  The purpose of the tribunal was not to make
4  a judgment about whether the anesthesiologist was
5  negligent.
6      Q.  What was the purpose of the panel?
7      A.  Whether it met a stan -- the -- the standard
8  for allowing it to go to trial.
9      Q.  What standard is that?
10     A.  Is that the -- the evi -- the evidence
11 presented supported an expert opinion that there
12 was -- well "supported the expert opinion" -- that the
13 ex -- the expert opinion relied on documented fact
14 in -- in the alleg -- in forming the allegation.
15     Q.  Did you ever vote to allow a case to go
16 forward?
17     A.  Yes.
18     Q.  Did you ever vote for a case not to go
19 forward?
20     A.  Yes.
21     Q.  Approximately how many times for a case to
22 go forward?
23     A.  I --
24         The major -- the majority of the time.
25     Q.  Okay.  You use the term "relative value"

20 (Pages 74 to 77)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 78

1  numerous times in your CV.  What is relative value
2  with respect to anesthesiology?
3      A.  Relative value refers to a -- a -- a payment
4  system of aligning different physician services
5  according to their relative value.  The relative
6  val -- value itself reflects three components:  the
7  physician work involved, the practice expenses
8  involved, and the cost of professional liability
9  insurance for those providing that service.
10     Q.  And would it be fair to say that a lot of
11  your work done in the past dealt with trying to
12  educate and work to increase the payments made to
13  anesthesiologists?
14     A.  Yes.
15     Q.  Okay.  So in other words, a lot of your
16  lectures dealt with the money.
17     A.  They dealt with the relative value payment
18  system.
19     Q.  The money.
20     A.  Okay.
21     Q.  All right.  Again today it's about the
22  money; right?
23     A.  If you say.
24     Q.  I'm asking what you say.  I mean we could go
25  one by one and I could go ask you, but a lot of it

Page 79

1  has to do with the money.
2      A.  Sure.
3      Q.  Okay.
4      A.  Yeah.
5      Q.  Like, for example, number one on page six,
6  invited lecture, presentation, "Anesthes -- Anesthesia
7  Reimbursement...;" correct?
8      A.  Yes.
9      Q.  That's about the money; correct?
10     A.  It's about the mon -- money and the
11  methodology underlying the money.
12     Q.  Okay.  Next one, "Basics of Anesthesia
13  Economics," that's about the money as well; correct?
14     A.  Yes.
15     Q.  Next one, "Basics of an Anesthesia
16  Agreement," that's about creating agreements with
17  hospitals to make more money; correct?
18     A.  It's not about agreements with hospital --
19  with hospitals, it's about agreements with payers.
20     Q.  With payers.
21         I mean it's about how to get paid the most
22  for your services; correct?
23     A.  It's about how to get -- get paid an
24  equitable amount for our services.
25     Q.  "The Changing Business of Anesthesia,"

Page 80

1  that's about the economics of anesthesia; correct?
2      A.  Yes.
3      Q.  "The Economics of Private Practice" again is
4  about the economics of anesthesia and how to increase
5  your profits; correct?
6      A.  The -- that is --
7          That one is not so much about increasing
8  your profits, it's more methodological, it -- it being
9  a presentation for residents.
10     Q.  I mean the next two down, "Ins and Outs of
11  Anesthesia Reimbursements," that's about the money;
12  correct?
13     A.  It is about the method of payments from
14  payers to anesthesiology practices, from
15  anesthesiology practices to the employees of those
16  practices, so it is financially oriented.
17     Q.  It's about the money; correct?
18     A.  Yes.
19     Q.  Okay.  Two more down, "The Perils of RBRVS
20  Payment in Anesthesia."  What's RBRVS?
21     A.  Resource Based Relative Value System.
22     Q.  So it's about the money; correct?
23     A.  Yes.
24     Q.  "The Perils of Medicare RBRVS," that's about
25  the money; correct?

Page 81

1      A.  Yes.
2      Q.  And then "Anesthesia and Medicare," that's
3  also about reimbursement from Medicare; correct?
4      A.  Yes.
5      Q.  It's about the money; correct?
6          Yes?
7      A.  Yes.
8      Q.  Okay.  "Basics of Anesthesia Reimbursement,"
9  that's also about the money; correct?
10     A.  Yes.
11     Q.  "Emerging Trends in Reimbursement...,"
12  that's about the money, correct?
13     A.  Yes.
14     Q.  Let's go a couple down, "Analyzing the
15  Profitability of Anesthesia Fee Schedules," that's
16  about the money; correct?
17     A.  Yes.
18     Q.  "New Trends in Anesthesia Reimbursement,"
19  that's about the money; correct?
20     A.  Yes.
21     Q.  Okay.  So you agree that most of these are
22  about the money; correct?
23     A.  Yes.
24     Q.  Okay.  Very little science, scientific
25  research, all about the money; correct?

21 (Pages 78 to 81)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 82

1    A.  Yes.
2        MS. LEWIS:  Objection to form.
3    Q.  In fact, there's very little scientific
4  research in these invited presentations; correct?
5    A.  In that -- in that period of time, yes.
6    Q.  We go to page seven, number two, "Commercial
7  Payments Based on the Medicare Fee Schedule," that's
8  about the money; correct?
9    A.  Yes.
10    Q.  Next one, "Introduction to Anesthesia
11  Economics," that's about the money; correct?
12    A.  Yes.
13    Q.  I mean I --
14        Almost every single one of these is
15  something to do about the money; correct?
16    A.  In that period of time, yes.
17    Q.  Okay.  So would you agree with me that most
18  if not all invited lectures on page seven is about
19  money?
20    A.  On page seven?
21    Q.  Yes.
22    A.  Sure.
23    Q.  Okay.  Let's go to page eight.  Number two,
24  "Medicare Forecast 2004," that's about the money;
25  correct?

Page 83

1    A.  Yes.
2    Q.  "Anesthesia Reimbursement...," that's about
3  the money; correct?
4    A.  Yes.
5    Q.  "Payment for MAC and Conscious Sedation,"
6  that's about the money; correct?
7    A.  Yes.
8    Q.  "Coding and Compliance Considerations in
9  Monitored Anesthesia Care," that's about the money;
10  correct?
11    A.  Yes.
12    Q.  "Professional Fees and Other Departmental
13  Financial Support," that's about the money; correct?
14    A.  Yes.
15    Q.  "Anesthesia Economics...," that's about the
16  money; correct?
17    A.  Yes.
18    Q.  Okay.  You agree with me that most if not
19  all on page eight are invited lec -- presentations
20  about the money?
21    A.  Yes.
22    Q.  Okay.  Let's go to page nine.  First one,
23  "Perioperative Temperature Management," 2005, is that
24  about the money?
25    A.  No.

Page 84

1    Q.  Was it not --
2        Wasn't part of that pay for performance?
3    A.  A part of that lecture?  No.
4    Q.  Are you sure about that?
5    A.  Yes.
6    Q.  Okay.  Is that the one where you saw Dr.
7  Scott Augustine?
8    A.  No.
9    Q.  Okay.  But the next one is "Pay For
10  Performance...;" correct?
11    A.  Correct.
12    Q.  That's about the money.
13    A.  Yes.
14    Q.  "The Hospital Stipend Goldrush," that is
15  about the money?
16    A.  Yes.
17    Q.  "Pay For Performance...," next one, is that
18  about the money?
19    A.  In part.
20    Q.  Okay.  And the next two or three are about
21  pay for performance; correct?
22    A.  In part.
23    Q.  Okay.  You have "Malignant Hypo --
24  Hyperthermia;" correct?
25    A.  Yes.

Page 85

1    Q.  That's not any --
2        That doesn't deal with any issues in this
3  case; correct?
4    A.  Correct.
5    Q.  All right.  Would you agree with me that
6  except for one or two on page nine, that most of these
7  invited presentations are about the money?
8    A.  Yes.
9    Q.  Okay.  And also the politics to -- to -- to
10  deal with reimbursement; correct?
11    A.  What are you referencing?
12    Q.  "Science, Politics, Press and Money."
13    A.  That is about the activities of the American
14  Society.
15    Q.  Of --
16    A.  Anesthesiologists.
17    Q.  -- anesthesiologists; correct?
18    A.  Yes.
19    Q.  Which at one time you were the president;
20  correct?
21    A.  Correct.
22    Q.  And it's a -- and it has -- it's a lobb --
23        They have a lobbying group; correct?
24    A.  Yes.
25    Q.  Okay.  And you donate to the lobbying group

22 (Pages 82 to 85)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 86

1  for the ASA; correct?
2      A.  Correct.
3      Q.  Okay.  So page 10, first one, "Pay For
4  Performance and the Anesthesiologist," that's about
5  the money; correct?
6      A.  It's about the mon -- money, but like all
7  the discussions of pay for performance, it is about
8  managing clinical care to meet the pay-for-performance
9  standards, so it's both about the mon -- money and
10  clinical be -- and clinical behavior.
11      Q.  Now pay for performance is where you get
12  additional money for certain measures; correct?
13      A.  For certain measures.
14      Q.  They don't deduct money from you; correct?
15      A.  Well it depends when, when you're -- when
16  you're talking about, because in the current program,
17  yes, they -- yes, they do deduct money -- deduct
18  money.
19      Q.  Okay.  But during this time, pay for
20  performance in 2017, it would add additional money;
21  correct?
22      A.  Correct.
23      Q.  Okay.
24      A.  Correct, for those physicians who achieved
25  the benchmarks established in the pay-for-performance

Page 87

1  program.
2      Q.  When did they start -- when did they start
3  deducting money for not meeting the pay-for-
4  performance standards?
5      A.  Well they --
6          Based on this year's performance, they will
7  deduct mon -- money in the 2019 payments, so there's a
8  two-year-cycle lag.
9      Q.  Oh.  And how long has that been going on?
10      A.  This year.
11      Q.  This is the first time this year they're
12  doing that?
13      A.  Correct.
14      Q.  Okay.  So up until 2017, pay for performance
15  was additional money to meet certain outcomes.
16      A.  Certain outcomes or re -- or reporting
17  standards.
18      Q.  Reporting standards.  Okay.
19          So let's go to page 10.  You have "The
20  Hospital Stipend Goldrush."  That's about the money;
21  correct?
22      A.  Correct.
23      Q.  "The Future of Anesthesia Practice...,"
24  that's about the money; correct?
25      A.  I don't recall the content of that.

Page 88

1      Q.  "Pay For Performance...," that's about the
2  money; correct?
3      A.  As I have said before, it's about the --
4  money and the clinical practice required.
5      Q.  It has a money component.
6      A.  It has a money component.
7      Q.  Okay.  Let's go down.  "Medicare Reform,
8  Quality and Pay For Performance," that has to do with
9  money; correct?
10      A.  That has something to do with the money.
11      Q.  Would you agree with me that most on page 10
12  is dealing with the money issues and practice issues
13  of anesthesiology?
14      A.  Yes.
15      Q.  Okay.  Nothing scientific on -- on page 10;
16  correct?
17      A.  That's right.
18      Q.  Okay.  No research on page 10; correct?
19      A.  In the sense that I was not presenting my
20  original research -- research, that is -- that is
21  true.
22      Q.  And when I say "research," I'm talking about
23  scientific research dealing with patient care.
24      A.  Well the curr --
25          The pay-for-performance standards are

Page 89

1  grounded in scientific -- in scientific research, so
2  in that -- in that sense it is not devoid of -- of
3  science.
4      Q.  I guess my question is:  No research with
5  respect to like clinical studies or research on
6  patient care, it was more of how certain standards and
7  pay for performance were going to be met.
8      A.  In explain -- in explaining what the
9  pay-for-performance standards are -- are, particularly
10  with respect to process measures; that is, a standard
11  for a particular activity of care, explaining the
12  science that links that activity and care -- care to a
13  patient outcome is based on scientific studies.  So
14  frequently, in describing the pay-for-performance
15  stan -- standards, it would be important to explain
16  why do we have this measure about perioperative
17  temperature, for example, and what is the link --
18  linkage between warming a patient and an important
19  outcome, why do we have -- why do we have a measure on
20  this, and to some extent the editorial that we talked
21  about a moment ago was meant to answer -- answer that
22  question.  But in all of the pay-for-performance talks
23  that you have been referencing, that was, in most
24  instances, a component of the presentation.
25      Q.  But you're referencing articles, you're not

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 90

1  discuss --
2      You're referencing research articles, you're
3  not presenting research articles; correct?
4      A.  I don't understand the difference between --
5      Q.  For example --
6      A.  -- referencing and presenting --
7      Q.  Okay.
8      A.  -- a research article.
9      Q.  Well -- well, for example, I'm Andrea Kurz
10  and I just came out with my 1996 study, "I'm going to
11  talk about it, and here's my study and this is the
12  basis of my study."  That's presenting a research
13  paper; correct?
14      A.  That's presenting my own research paper.
15      Q.  Yes.
16      A.  Is that the distinction you're trying to
17  make?
18      Q.  Yes, or -- yes, or compared to --
19      A.  Okay.  Correct.
20      Q.  -- "Hey, we have this - these outcome
21  measures for thermoregulation.  And by the way, look
22  at Andrea Kurz's article of 1996."  That's what you
23  do; correct?
24      A.  Yes.
25      Q.  Okay.  Let's go down -- more down page 15 --

Page 91

1  or I'm sorry, page 10.  You have, you know, six from
2  the bottom, "Payment Issues Update."  That's about the
3  money; correct?
4      A.  Yes.
5      Q.  "Pay For Performance," that's about the
6  money; correct?
7      A.  Well I'll say -- I'll -- I'll -- I'll say it
8  again:  The discussions about pay for performance have
9  a financial aspect to -- to them, but the explanation
10  of the basis of the performance mea -- measures has a
11  scientific component to it.
12      Q.  I understand that, doctor.  But people are
13  not --
14      You're not giving a lecture on the benefits
15  of normothermia and its scientific basis behind it,
16  you're saying maintaining normothermia and it's going
17  to affect pay for performance; correct?
18      A.  It's -- it's both.  I mean the reason we
19  have these performance measures and created them was
20  to drive improvements in care, and that is, as much as
21  anything, the message of the presentations on pay for
22  per -- pay for performance.
23      Q.  By the way, SCIP-10 is no longer in
24  existence; correct?
25      A.  SCIP-10 -- SCIP-10 is no longer in

Page 92

1  existence, but the physician quality measures that is
2  analogous is still in existence.
3      Q.  But SCIP-10 is no longer in existence;
4  correct?
5      A.  Correct.
6      Q.  And that was dealing with thermoregulation;
7  correct?
8      A.  Correct.
9      Q.  Go to page 11.
10      Well, you agree with me that most of page 10
11  deals with some issue about pay for performance or
12  money of anesthesiologists.
13      A.  That's correct.
14      Q.  Okay.  "A Visit to the Sausage Factory,"
15  what's that about?
16      A.  That was a pre -- presentation made in
17  Great -- in Great Britain about American healthcare
18  reform and The Affordable Care Act.
19      Q.  By the way, you agree with me that 3M -- or
20  Arizant at the time -- was involved with the, quote,
21  unquote, lobbying to get the SCIP measures passed;
22  correct?
23      A.  I don't know that.
24      Q.  Were you involved with the SCIP measures?
25      A.  Not -- not directly.  I was involved with

Page 93

1  the physician measures and --
2      I was involved with the SCIP measures only
3  insofar as we were asked to harmonize the physician
4  normothermia measure with the SCIP-10.
5      Q.  Where is the physician normothermia?  Where
6  can I find that?
7      A.  You can find it on the second and third
8  items in Materials Considered.
9      Q.  Oh, the Centers for Medicare & Medicaid?
10      A.  Yes.
11      Q.  Okay.  Now you agree with me that there's
12  nothing on page 11 that deals with maintaining
13  normothermia, the actual research.
14      A.  There's talk on performance measur --
15  measurement in anesthesiology, which, as I have
16  previously said, would include -- include the
17  scientific basis of the performance measures.
18      Q.  I understand that.  But you -- you're
19  referring to other people's research in the pay for
20  performance; correct?
21      A.  Yes.
22      Q.  There's nothing on page 11 that deals with
23  any type of research that you've done on maintaining
24  normothermia.
25      A.  I think we've previously esta -- established

24 (Pages 90 to 93)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 94

1  that I have not personally conducted basic clinical
2  science research on temperature management.
3      Q.   I just like to be a little bit thorough just
4  in case something might trigger your brain later on to
5  saying, "Oh, actually I did something."
6          So let's look at page 12.  There's nothing
7  on page 12 that deals with any type of research that
8  you did regarding maintaining normothermia; correct?
9      A.   Correct.
10     Q.   Okay.  And the same thing for page 13,
11 there's nothing in there that deals with maintaining
12 normothermia, any research that you did; correct?
13     A.   Correct.
14     Q.   Okay.  When you were a visiting professor or
15 named lecturer, did you do any research under that
16 section with respect to maintaining normothermia?
17     A.   No.
18     Q.   Now you agree that many of your publications
19 deal with the actual practice of anesthesia with
20 respect to fee schedules or profitability or relative
21 value.
22     A.   I did not hear the question.
23     Q.   With respect to publications, would you
24 agree with me that most if not all of those
25 publications deal with -- let's just say most deal

Page 95

1  with the anesthesia practice itself, you know,
2  Medicare fee schedule, profitability, payments?
3      A.   Most.
4      Q.   Okay.  And sitting here today, based on
5  pages -- on 11, there's nothing -- or on page -- I'm
6  sorry, page 14, there's nothing on page 14 that
7  describes any type of research that you've done on
8  maintaining normothermia; correct?
9      A.   Correct.
10     Q.   And the same thing with page 15, there's
11 nothing on page 15 that you've done that deals with
12 maintaining normothermia; correct?
13          Research.
14     A.   There's nothing that presents original
15 clinical or basic science research by myself.
16     Q.   Okay.  And on page 16 as well, there's
17 nothing on page 16 that deals with anything that
18 describes any research that you've done on maintaining
19 normothermia; correct?
20     A.   Correct.
21     Q.   So basically with all your --
22          Would it be fair to say that with respect to
23 your knowledge of maintaining normothermia, you would
24 defer to people such as Andrea Kurz and Dr. Sessler?
25     A.   People such as those.

Page 96

1      Q.   Okay.  Who else would you defer to?
2      A.   Well I think, for example, Scott -- the
3  Hopkins -- Hopkins group, Dr. Scott and coll -- and
4  colleagues.
5      Q.   Okay.  The Hopkins group was just a single-
6  institution study; correct?
7      A.   Correct.  I believe so.
8      Q.   Okay.  So anyone else besides Dr. Scott?
9      A.   I can't -- I can't off -- off the top of my
10 head say -- say -- say, but I think it is fair to say
11 that the original research on the subject, Drs.
12 Sessler and Kurz are prominent.
13     Q.   I mean you would agree with me that no one
14 knows more about the 1996 study than Andrea Kurz.
15     A.   That's correct.
16     Q.   Okay.  The New England Journal of Medicine.
17 You know which one I'm referring to.
18     A.   I know which one you're referring to.
19     Q.   As well as Dr. Sessler; correct?
20     A.   Correct.
21          (Discussion off the stenographic record.)
22     Q.   So would it be fair to say that all the
23 opinions you're going to give today on maintaining
24 normothermia are based on other people's work?
25     A.   On other people's re -- research and my

Page 97

1  clinical experience.
2      Q.   Okay.  Well let's talk about your clinical
3  experience.  Have you looked at your patients and
4  determined the effectiveness of maintaining
5  normothermia and done a comparison?
6      A.   And done -- and done a compar -- comparison?
7  No, no, I haven't.  But I look at my patient's
8  temperature constantly and on every case.
9      Q.   I understand that.  That's part of your job;
10 correct?
11     A.   Correct.
12     Q.   Okay.  But have you -- you --
13          You've only used the Bair Hugger; correct?
14     A.   Correct.
15     Q.   You've never used the Mistral?
16     A.   Correct.
17     Q.   Have you ever used the Hot Dog?
18     A.   Correct.
19     Q.   Have you ever used VitaHEAT?
20     A.   No.
21     Q.   Okay.  Have you ever used Warmtouch?
22     A.   No.
23     Q.   Have you ever used just warm blankets?
24     A.   In the remote past.
25     Q.   Okay.  Have you ever used reflective

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 98

1   blankets?
2       A.   No, I don't believe I have.
3       Q.   Okay.  So your -- your -- your entire
4   experience of the effectiveness of Bair Hugger is
5   based on the fact that you used Bair Hugger for the
6   past 25 years.
7       A.   Correct.
8       Q.   Okay.
9       A.   My personal experience is based on --
10      Q.   You -- you -- you haven't compared it
11  yourself with any other patient warming device;
12  correct?
13      A.   That's correct.
14      Q.   You know what a patient warming device is;
15  correct?
16      A.   Well if you want to --
17           A patient war -- warming device could be
18  many -- it could be many things.
19      Q.   I mean there's fluid warming; correct?
20      A.   There is fluid warming.
21      Q.   When I'm talking about patient warming, I'm
22  talking about something that actually warms the core
23  of the body externally.
24      A.   Yes.
25      Q.   Okay.  And -- and there's many different

Page 99

1   modalities for patient warming; correct?
2       A.   Yes.
3       Q.   There is warming through forced air;
4   correct?
5       A.   Yes.
6       Q.   Through a heating pad?
7       A.   Yes.
8       Q.   Just like the Hot Dog is.  You understand
9   that?  It's a -- it's a -- it's a heated blanket.
10      A.   I -- I make a distinction between a pad and
11  a blanket, but yes.
12      Q.   Okay.  Have you heard of VitaHEAT before?
13      A.   I have heard the name.
14      Q.   Okay.
15      A.   I'm not familiar with it.
16      Q.   Do you know if 3M just -- has -- has a deal
17  with VitaHEAT to be a distributor?
18      A.   I am completely unaware of that.
19      Q.   Are you aware that actually 3M is going --
20  getting away from using forced-air warming?
21      A.   I don't know that.
22      Q.   Okay.  Would that surprise you?
23      A.   Yes.
24      Q.   You've dealt with orthopedic surgeons
25  before; correct?

Page 100

1       A.   Yes.
2       Q.   And dealing with total hip or total knee,
3   they want the sterile surg -- they want the surgical
4   site to be as sterile as possible; correct?
5       A.   Correct.
6       Q.   And they're against having any sort of
7   contaminants in the sterile field; correct?
8       A.   They would like to minimize the contaminants
9   in the sterile field.
10      Q.   And they dislike particles; correct?
11      A.   I -- I don't know that.
12      Q.   Well you have read the International
13  Concensus; correct?
14      A.   Yes.
15      Q.   Have you looked at questions numbers one and
16  two dealing with the operating room?
17      A.   The conclusion I drew -- drew from that --
18  that was related to the question of -- on -- their
19  opinion on the safety of forced-air warming.
20      Q.   So that's the only question you looked at in
21  the International Concensus?
22      A.   I re -- reviewed the document, but that is
23  the one that seemed most germane to my -- my interest.
24  My interest is in clinical infections and not particle
25  counts.

Page 101

1       Q.   Okay.  You do understand that bacteria
2   travel on particles; correct?  Or do you not know
3   that?
4       A.   Bacteria can travel on particles.
5       Q.   Bacteria can be airborne.  You understand
6   that; correct?
7       A.   Yes.
8       Q.   Okay.  You understand that many orthopedics
9   believe -- orthopedic surgeons believe that when an
10  implant gets contaminated, it's through airborne
11  contamination.
12           MS. LEWIS:  Object to form.
13      A.   I do not.  I don't know if they believe
14  that.
15      Q.   Do you know what they believe in?
16      A.   I think they were probably taught, as -- as
17  I was, that the most likely source of contamination
18  and infection is the patient's skin -- skin's
19  subcutaneous flora.
20      Q.   Subcutaneous?
21      A.   Yes.
22      Q.   Okay.  Have you ever --
23           Have you read Dr. Wenzel's deposition?
24      A.   Have I read Dr. --
25           Yes, I believe I have.

26 (Pages 98 to 101)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 102

1    Q.  I mean it would have been this week if you
2  read it.
3    A.  I'm sorry?
4    Q.  It would have been this week if you read his
5  deposition.
6    A.  His --
7      I'm sorry.  His deposition?  No.
8    Q.  Okay.
9    A.  His expert -- expert letter in science day.
10    Q.  Are you aware that 3M cares about particles?
11      MS. LEWIS:  Objection, form.
12    A.  I don't -- I --
13      I have no opinion what 3M cares about.
14    Q.  Well are you aware that they funded a study
15  doing particle tests when the Bair Hugger is on and
16  off?
17    A.  I'm not aware of what studies they funded.
18    Q.  The Dr. Sessler study, you know, the guy
19  that is well known in the field of maintaining
20  normothermia?
21    A.  Is there a question?
22    Q.  Yes.  Are you aware that he did a -- that 3M
23  funded a study with respect to particle counts?
24    A.  I'm not aware of what fund -- studies 3M
25  funded.

Page 103

1    Q.  Well do you know that corporations fund
2  studies?
3    A.  Yes.
4    Q.  Okay.  You're aware of that.
5    A.  Yes.
6    Q.  Okay.  And usually they fund studies to
7  determine whether or not their product is safe.  You
8  understand that?
9    A.  Usually they fund studies --
10      What's the question?
11    Q.  There's many reasons to fund studies;
12  correct?
13    A.  Yes.
14    Q.  One is to -- check out the efficacy of a
15  product; correct?
16    A.  Yes.
17    Q.  One is to check out the safety of a product;
18  correct?
19    A.  Yes.
20    Q.  Okay.  And were you aware that 3M funded a
21  study to determine whether or not the other studies
22  regarding increased particles or increased bubbles
23  over the surgical site were true or not?
24    A.  I'm not aware -- aware of which studies 3M
25  funded and which it didn't.

Page 104

1    Q.  Well you don't look to see, you know, the
2  conflicts of interest or anything on -- on par -- on
3  articles to see who funded the study?
4    A.  Well you just asked me about a specific
5  stud -- study, and I don't recall the conflict-of-
6  interest statement on that -- on that study or whether
7  in fact I read that study.
8    Q.  You were provided that study; weren't you?
9    A.  Which study?
10    Q.  The Sessler study.
11    A.  How do you know that?
12    Q.  I'm assuming that they must have provided it
13  to you since they must have given you some information
14  about what 3M has done.
15      They haven't provided it to you?
16    A.  Whether they provided it to me or -- or not,
17  I don't recall -- recall reading that study, and in
18  particular to your question, don't recall what the
19  disclosures on that study were.
20    Q.  Let me ask you this:  I assume that 3M
21  provided you some documents; correct?
22    A.  3M didn't provide --
23    Q.  Their attorneys.
24    A.  Oh.
25    Q.  When I'm talking about 3M, their attorneys.

Page 105

1    A.  Yes.
2    Q.  Let's not play games.
3      MS. LEWIS:  They're two different things.
4    Q.  You -- you understand that --
5    A.  I've had no contact with 3 -- with 3M.  I've
6  had contact with Ms. Lewis and her colleagues.
7    Q.  Well you know when you go to trial you're
8  going to be an expert for 3M, not an expert for
9  Blackwell Burke.  You understand that; correct?
10      MS. LEWIS:  Objection to form.
11    A.  If you say so.
12    Q.  I mean when you were an expert on behalf of
13  the defense in a medical malpractice case, you were
14  not an expert on behalf of the defendant's attorneys,
15  you were an expert on behalf of the defendant.  You
16  understand that; correct?
17    A.  If -- if you say so.
18    Q.  Okay.
19    A.  I admit I -- I am offering expert opinions
20  that are on behalf of myself.
21    Q.  All right.  Let me ask you this:  You
22  received documents from 3M or their attorneys;
23  correct?
24    A.  From their attorneys.
25    Q.  Did you read them all?

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 106

1    A.  No.
2    Q.  You did not read them all.
3    A.  I did not read them all.
4    Q.  Why not?
5    A.  Because many -- many of them -- there
6  were --
7        There were aspects of this case and
8  discussion around this case on which I am not going to
9  have an opinion, on which there are other experts, and
10  so that I was selective about which materials I
11  reviewed.  There's some materials I re -- I reviewed
12  that I determined were not meaningful in shaping my
13  opinion about the safety of the Bair Hugger, and
14  others that were.
15    Q.  So you're not going to offer any opinions on
16  any of the studies that discuss particles or helium
17  bubbles over the surgical site?
18    A.  To a limited degree and a limited -- and a
19  limited sense, but I am not going to represent myself
20  as an expert on those -- on those subjects.
21    Q.  Well what does it mean by "limited sense?"
22    A.  Well, for example, in the opinion -- opinion
23  letter I point out -- point out that there are
24  particle and bubble and airflow studies that use a
25  mod -- model that to my eye as a practicing

Page 107

1  anesthesiologist has very little in common with the
2  actual operating room --
3    Q.  Okay.
4    A.  -- and thus its relevance to the discussion
5  of what's important in harming my patients is limited
6  or nil.
7    Q.  Okay.  But --
8        So if there's a study that was funded by 3M
9  discussing particle counts, you don't believe you need
10  to look at that?
11    A.  Particle -- particle counts mean little to
12  me compared to surgical-site infection frequency.
13    Q.  Okay.  What research have you done on
14  surgical-site infection?
15    A.  I have not done original research on
16  surgical-site infection.
17    Q.  You're not an infectious disease expert;
18  correct?
19    A.  Correct.
20    Q.  You're not an orthopedic expert; correct?
21    A.  Correct.
22    Q.  You're not an airflow expert; correct?
23    A.  Correct.
24    Q.  You're not an internal medicine expert;
25  correct?

Page 108

1    A.  Correct.
2    Q.  Okay.  You're not -- you're not an engineer;
3  correct?
4    A.  Correct.
5    Q.  Okay.  You're not going to opine anything --
6        You're not a filtration expert; correct?
7    A.  Correct.
8    Q.  You're not going to offer any opinions on
9  the operating room environment; correct?
10    A.  That --
11        You'll have to be more specific about that.
12    Q.  Okay.  You agree with me --
13        Can we agree at least that periprosthetic
14  joint infections are caused by bacteria?
15    A.  Yes.
16    Q.  Okay.  Anything else that could cause a
17  periprosthetic joint infection?
18    A.  I -- I don't -- I don't know, but it
19  might -- there might be such a thing as a fungal
20  infection, but that is again not my expertise.
21    Q.  What about a virus?
22    A.  I have never heard of that.
23    Q.  Okay.  And you agree with me that -- that
24  withdraw that.
25        So just so I understand, you were provided

Page 109

1  documents by 3M or their attorneys and you didn't
2  review them all.
3    A.  Correct.
4    Q.  Okay.  How many documents did they provide
5  to you?
6    A.  Prob -- probably more than a hundred.
7    Q.  They provided you more than a hundred
8  documents and you didn't review --
9        How many did you review?
10    A.  I -- I don't -- I don't know.
11    Q.  Why aren't they on your list of materials
12  considered?
13    A.  Well I reviewed -- I reviewed those, but
14  there's a difference be -- between looking at a doc --
15  looking at a document and saying this is, you know, in
16  an -- in an area that is not going to contribute to
17  something I'm going to have -- express an opinion
18  about and considering it in developing my opinion.
19    Q.  Well you're discussing particles and helium
20  bubbles, and you just told me that you reviewed the
21  Dr. Sessler article that you -- that you seem to going
22  to be discussing about today.
23    A.  That I --
24    Q.  That you said you were going to discuss --
25  today you said -- strike that.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 110

1     You said today you're going to discuss
2  particles and helium and it's not representative of
3  what's going on in the operating room; correct?  The
4  setup.
5     A.  I -- right.  I'm going to comment on the
6  important differences between the experimental models
7  in several -- not all -- of the -- of the studies
8  relating to particle counts, et cetera, and my opinion
9  that the experimental mod -- model is substantially
10 different from a real operating room environment,
11 which casts doubt on its relevance to the risk of
12 infection.
13    Q.  I understand that.  My question is:  What --
14    Do you think having people in the models,
15 the particle or helium models, would make it better or
16 worse for particle counts over the surgical site, if
17 you know?
18    A.  I -- I don't -- I don't know.  But the
19 experimental model would be more important if it -- if
20 it had people and equipment and so forth.
21    Q.  So you don't know, sitting here today,
22 whether or not adding people or equipment to the
23 operative -- operating room model would increase or
24 decrease the amount of particles shown in these tests;
25 correct?

Page 111

1     A.  Correct.
2     Q.  Okay.  Do you know how many skin squames are
3  shed in a one-hour or two-hour surgery in the
4  operating room?
5     A.  I don't know the number.
6     Q.  Okay.  Do you know it's in the millions?
7     A.  If you say so.
8     Q.  You don't know?
9     A.  I don't know.
10    Q.  Okay.  You mentioned in your report that
11 your infection rate for your institution is .6
12 percent; is that correct?
13    A.  It was at the time I last inquire --
14 inquired, which was earlier this year.
15    Q.  Earlier this year?
16    A.  Yes.
17    Q.  Okay.  And what type of infections are we
18 referring to?
19    A.  Total joint arthroplasty infections.
20    Q.  Total joint?
21    A.  Yes.
22    Q.  Okay.  And where does that information come
23 from?
24    A.  The Direct -- Director of the Joint Center
25 at the hospital.

Page 112

1     Q.  Do you have a document that you have that --
2  that you get this --
3     A.  No.
4     Q.  -- .6 percent?
5     A.  No.
6     Q.  Okay.  Do you know what the national average
7  is?
8     A.  It's in the one and -- close to one and a
9  half percent.
10    Q.  Okay.  And that's for total hip and total
11 knee; correct?
12    A.  Yes.
13    Q.  And we're talking about periprosthetic joint
14 infections; correct?
15    A.  Yes.
16    Q.  And you think that your hospital, which is
17 Wellesley --
18    A.  Newton-Wellesley.
19    Q.  -- Newton-Wellesley is better than the
20 average?
21    A.  .6 percent is better than 1.5 percent.
22    Q.  And you're confident about those numbers?
23    A.  I have confidence in their source.
24    Q.  Okay.  And are you as confident in that
25 source as you are on your other sources listed on

Page 113

1  Materials Considered?
2     A.  Well I'm -- I'm -- I'm hesi -- hesitating
3  because there are items on my Materials Considered
4  that I considered -- thought were misleading or
5  inconclusive, so I'm not sure I would hold up that
6  list as exclusively being items in which I have
7  confidence.
8     Q.  Why don't we go through Materials
9  Considered, Exhibit 2, and why don't you mark with a
10 highlight -- do you have a highlighter? -- all the
11 documents that you are relying upon in formulating
12 your opinion.
13    THE REPORTER:  I have a red pen.
14    MR. ASSAAD:  That's fine, a red pen works.
15    (Red pen handed to the witness.)
16    A.  Now before I complete -- complete mark --
17 marking this, I just want to es -- es -- establish
18 that I'm marking -- I'm marking items that contributed
19 to formulating my opinions, which is not synonymous
20 with agreeing or accepting the conclusions.  So, for
21 example, Legg and McGov -- McGovern have often been
22 cited and presented to me in the campaign I referenced
23 earlier as items that prove -- prove the risk of the
24 Bair Hugger, so in formulating my opinions I needed to
25 come to a -- a conclusion as to whether those

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 114

1  assertions were substantiated or not and on that basis
2  looked at that material and concluded that they did
3  not substantiate it.  So I want to understand your
4  instruction about marking and, having described how
5  McGovern and Legg and perhaps others fit into my
6  creation of that opinion, whether to mark them or not.
7      Q.  Why don't we do this then.  Okay?  Why don't
8  you write the letter S next to every article under
9  Materials Considered in Exhibit 2 that support your
10 opinion that the Bair Hugger is safe.
11     A.  All right.  So I've des -- I've described
12 McGovern, which purports to show that it is hazardous.
13 It does not prove -- it does not prove that.  In
14 fact --
15     Q.  Why don't you listen to my question, sir.
16 Put an S next to every article on Exhibit 2 that
17 supports your opinion that the Bair Hugger is safe.
18 Please do.
19     A.  I think you need to be clear about whether
20 looking at a stud -- a -- a study that does not
21 support the opinion that it is unsafe should be marked
22 with an S or not.
23     Q.  Are you saying, sitting here today, that
24 there's no article on Exhibit 2 that supports your
25 opinion and states that the Bair Hugger is safe?

Page 115

1      A.  Oh, no, there -- there are -- there are
2  many -- there are --
3      Q.  You can mark them.
4      A.  There are many.  But what I do or don't do,
5  for example, with respect to McGovern, I want to be
6  very clear about what that signifies.
7      Q.  Okay.  I understand that Mc -- you disagree
8  with the McGovern study.
9      A.  Okay.
10     Q.  I understand that.  Okay?  My question is
11 different and it's very simple.  Put an S next to
12 every article that supports your opinion that the Bair
13 Hugger is safe.
14     A.  I don't want to -- I don't want to be
15 difficult here, but if I look at a paper that has been
16 represented as proving that it's unsafe and that it is
17 flawed, one could say that that supports the argument
18 that it is -- that it is safe.
19     Q.  So if I understand you correctly, sir,
20 you're saying that a paper -- a flawed paper that
21 indicates a product is safe, you could logically say
22 that the product is safe?
23     A.  No.
24     Q.  Okay.  So why don't we put an S where it
25 says anything that supports your opinion that the Bair

Page 116

1  Hugger is safe.
2      If you can't answer the question, we could
3  go to the court and say that the -- the deponent would
4  not listen to my instructions and put an S next to
5  every article that supports that the Bair Hugger is
6  safe.  And I'm fine with doing that.  If you don't
7  want to answer the question, we could come back at a
8  later date with a court order.  Or if you can't answer
9  the question, just say "I can't answer it."
10     Are you done, sir?
11     A.  No, I'm still thinking about what to do
12 about McGovern.
13     Q.  If you want to write "Disagree with Mr.
14 McGovern" and put a D in front of it, indicating you
15 disagree with that, that's fine, too.
16     A.  Okay.  Maybe that's a way to get past this.
17     Q.  All right.  So you believe that the
18 International Concensus states that the Bair Hugger is
19 safe for use.
20     A.  Yes.
21     Q.  Okay.  They didn't talk about further
22 research being needed?
23     A.  They probably did both.
24     Q.  They never --
25     Did it say that the Bair Hugger is safe?

Page 117

1      A.  Yes.
2      Q.  You don't think they said they understand
3  the theoretical risk posed by the Bair Hugger?
4      MS. LEWIS:  Do you have the document so he
5  can take a look at it?
6      MR. ASSAAD:  He's saying it's safe.  I don't
7  have a document.
8      A.  So I can't -- I can't quote it, but the
9  conclusion I drew from reviewing it was that they
10 supported the use of Bair Hugger in orthopedic implant
11 surgery.
12     Q.  The 1996 Kurz New England Journal of
13 Medicine article, you believe that she states in there
14 that the Bair Hugger is safe for use.
15     A.  I think she says -- she states that the
16 result of using the Bair Hugger was a reduction in
17 surgical-site infections.
18     Q.  You know what the issues in this case are;
19 correct?
20     A.  Yes.
21     Q.  Did you understand my question when I said
22 "safe to use," or do I need to go over the allegations
23 in this case with you?
24     A.  Well I think the reduct -- the reduction in
25 surgical-site infections addresses directly the

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 118

1  allegation in the case.
2  Q.  All right.  So you believe that Kurz says
3  that the Bair Hugger is safe for use; correct?
4  A.  Yes.
5  Q.  Okay.  You agree that Kurz did not use --
6  It wasn't an orthopedic case; correct?
7  A.  Correct.
8  Q.  Okay.  And you believe that Frisch indicates
9  that the Bair Hugger is safe to use?
10  A.  Frisch documented a small decrease in
11  surgical-site infections.
12  Q.  Okay.  What --
13  Which one of these articles looked at the
14  safety of the Bair Hugger being used in periprosthetic
15  joint infections?
16  A.  With respect to clinic -- the frequency of
17  periprosthetic joint infections --
18  Q.  Yes.
19  A.  -- per se, there isn't such a study.
20  Q.  Okay.  So you agree with me that, sitting
21  here today, there's -- there's not one study that
22  indicates whether or not maintaining normothermia
23  reduces the incidence of periprosthetic joint
24  infections.
25  A.  No.  I would -- I would say that the

Page 119

1  existing evidence in other settings demonstrates that,
2  the -- risk of surgical infections, and there's no
3  reason to believe that orthopedic surgery would be
4  different from the surgeries that have been studied
5  and in which a reduction in the risk of infection has
6  been documented would be different.
7  Q.  You -- you think a colorectal surgery where
8  you cut the gut open and it's a dirty surgery is the
9  same as placing an implant?
10  A.  No, I don't think it's -- I --
11  I don't think the surgery is the same.
12  Obviously, it's not.
13  Q.  You understand that an implant deals with
14  bacteria different than human tissue.
15  A.  Yes.
16  Q.  You understand that; correct?
17  A.  Yes.
18  Q.  I mean I know you're not an infectious
19  disease expert, but you learned that in medical
20  school; correct?
21  A.  Yes.
22  Q.  Okay.  By the way, you only deal with the
23  patient in the anesthesia or -- like pre-op,
24  perioperatively and post-op; correct?
25  A.  Yes.

Page 120

1  Q.  You don't deal with the patients later on
2  when they actually get the infection; correct?
3  A.  Correct, except for those who require
4  additional surgery.
5  Q.  I understand that.  For an infection;
6  correct?
7  A.  Or dislocation or a variety of indications
8  for reoperation.
9  Q.  But you don't -- you don't follow your --
10  You don't follow the patient after they
11  leave the post-op; correct?
12  A.  Briefly.
13  Q.  Okay.  Okay.  But whether or not they obtain
14  a periprosthetic joint infection, there's no way for
15  you to even know that unless they came back in and you
16  remembered them being in the hospital before.
17  A.  In -- in general, that's true.
18  Q.  Okay.  So with respect to -- you agree with
19  me that there's no -- you know what -- strike that.
20  Do you know what evidence-based medicine is?
21  A.  Yes.
22  Q.  Okay.  And that's where you have evidence of
23  a certain -- evidence to support a position; correct?
24  A.  Well, to support a practice, yes.
25  Q.  Okay.  So what evidence is there, scientific

Page 121

1  evidence -- not, "Well, look at these other studies,
2  so the same thing must happen," but real -- real
3  scientific evidence here that maintaining normothermia
4  reduces the incidence of periprosthetic joint
5  infections?
6  A.  The scientific evidence has to -- has to do
7  with microcirculation and tissue perfusion with oxygen
8  and neutro -- and neutrophils being the main mechanism
9  of host defense against wound contamination, and that
10  physiol -- physiology is common to all surgical
11  incisions.
12  Q.  Give me a scientific paper that indicates
13  that oxygenation can reduce infections on an implant
14  that's contaminated with bacteria.
15  A.  I'm not able to do that.
16  Q.  Okay.  Name me one peer-reviewed literature
17  that indicates that neutrophils have an effect on
18  fighting bacteria on a contaminated implant.
19  A.  Well I'm -- I'm only -- I'm only going to
20  say that the role of neutro -- neutrophils in
21  combating bacteria is basic -- is basic science, and I
22  can't produce the bibliography to support that, but
23  every medical student understands that neutrophil --
24  neutrophils play a role in controlling --
25  Q.  Okay.

31 (Pages 118 to 121)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 122

1    A.  -- bacter -- bacteria in surgical wounds.
2    Q.  Let's talk about science then.  How do
3  neutrophils travel --
4    A.  How do neutrophils travel?
5    Q.  -- in the body?
6    A.  In -- in the bloodstream.
7    Q.  Okay.  So you have to have circulation so
8  the neutrophils could get to the bacteria to fight
9  bacteria; correct?
10    A.  Yes.
11    Q.  Okay.  So on an implant, okay, where -- if
12  the implant is contaminated with bacteria -- -
13      We agree that an implant doesn't have
14  circulation; correct?
15    A.  The implant itself does not have
16  circulation.
17    Q.  Okay.  So there is --
18      Since there's no circulation, there's no
19  blood, therefore no neutrophils, therefore how do the
20  neutrophils fight the bacteria?
21      They can't; can they?  Or if you don't know,
22  you don't know.
23      MS. LEWIS:  Can you let him finish before
24  you jump in?
25      MR. ASSAAD:  I don't want him to guess,

Page 123

1  though.  He was about to guess.
2    A.  No, it's -- it's --
3      Part of the answer depends on how the
4  prosthesis is getting -- getting contaminated and
5  whether the tissue -- whether it's contaminated from
6  bacterial load in the ti -- in the tissues or not.  If
7  that were the case -- and I don't think you know --
8  you know how in any case a prosthetic gets
9  contaminated -- then the effect of circulation, oxygen
10  and neu -- and neutrophils in the tissues, unless --
11  unless you're suggesting that a bacterium from the
12  patient's skin -- skin somehow bypasses everything and
13  goes directly to the prosthetic material --
14    Q.  Well that's impossible; isn't it?
15    A.  Well I don't -- I don't know.  That sounded
16  as though it was the basis of your question.
17    Q.  Well I mean can -- can a bacteria from the
18  patient's skin pass through the tissue and the muscle
19  to get straight to the implant?  I mean they don't
20  fly; do they?
21    A.  No, but --
22      Well in -- in the tissues and -- and skin
23  they are phagocytized by the neutro -- by the
24  neutrophil, and that's why -- why those factors are
25  important -- important even in prosthetic joint

Page 124

1  surgery.
2    Q.  The Frisch article you cited, you agree with
3  me that there is no difference between patients that
4  were maintained normothermic and were hypothermic in
5  infection rates.
6    A.  Can I see the paper, please?
7    Q.  You cited it.  I don't have it.
8      You don't have it with you?
9    A.  Well I don't want to answer without checking
10  the details.
11    Q.  Okay.  So you don't know the answer to that
12  question of what Frisch did with respect to what the
13  infection rates are; correct?
14    A.  Frisch, there was small -- a small number of
15  patients in the cold -- in -- in the cold group, in
16  the hypothermic group, who had infections.  I don't
17  remember the statistical significance of that
18  difference, and that's why I'm hesitant -- hesitating
19  without referencing the document.
20    Q.  You didn't cite Frisch in your report; did
21  you?
22    A.  No, I don't believe I did.
23    Q.  Okay.  Tissue perfusion, that's blood flow;
24  correct?
25    A.  Yes.

Page 125

1    Q.  Okay.  And again, if the -- if the -- if the
2  implant is contaminated with bacteria and there's no
3  blood flow, would you agree with me that the
4  mechanisms in which maintaining normothermia assists
5  in surgical-site reduction don't apply?
6    A.  I'm not able to answer that question.
7    Q.  You can't answer that question.
8    A.  Correct.
9      MR. ASSAAD:  Okay.  Let's take a break.
10      THE REPORTER:  Off the record, please.
11      (Recess taken.)
12  BY MR. ASSAAD:
13    Q.  With respect to the International Concensus
14  that you referred to in Exhibit No. 2, did you read
15  the entire thing?
16    A.  I -- I scanned it.
17    Q.  Do you know how long it is?
18    A.  I seem to remember about 40 pages, but I'm
19  guessing.
20    Q.  Forty pages?
21    A.  Yes.
22    Q.  Okay.  Now with respect to the infection
23  rates in your hospital --
24      That's the Newton-Wellesley Hospital;
25  correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 126

1    A.  Newton-Wellesley, yes.
2         (Exhibit 6 was marked for
3         identification.)
4  BY MR. ASSAAD:
5    Q.  Have you heard of Hospital Compare?
6    A.  Yes, I have.
7    Q.  And that's done by the Medic -- by Medicare;
8  correct?
9    A.  Yes.
10   Q.  Do you see where on page one of Exhibit 6 it
11 says, "National complication rate for hip/knee
12 replacement patients was 2.8 percent?"
13   A.  Yes, I do.
14   Q.  See that?
15   A.  Yes.
16   Q.  Okay.  And then under "Hospital name" it has
17 "NEWTON-WELLESLEY HOSPITAL?"
18   A.  Yeah.
19   Q.  Correct?
20   A.  Yes.
21   Q.  And it's check marked "No different than the
22 national rate;" correct?
23   A.  That is what it says, yes.
24   Q.  That's opposite of what you put in your
25 report; correct?

Page 127

1    A.  Uh-huh.
2    Q.  Yes?
3    A.  Yes.
4    Q.  Okay.  Now with respect to Andrea Kurz's
5  deposition, what did you read in her deposition?
6    A.  There was a discussion about the differences
7  in how she would design the study today as compared to
8  what she did in 1996.
9    Q.  Okay.  Did you read the entire deposition?
10   A.  I scanned it.
11   Q.  You scanned it?
12   A.  Yes.
13   Q.  Okay.  Did you have a limit on the amount of
14 time that you could spend working on this case?
15   A.  No.
16   Q.  Were you -- were you --
17        Were there any constraints on how many hours
18 you could review materials?
19   A.  No.
20   Q.  Okay.  You -- you understand that 3M was
21 paying your bill; correct?
22   A.  Was paying whose bill?
23   Q.  Your bill.
24   A.  Yes.
25   Q.  Okay.  And 3M is a multi-billion-dollar

Page 128

1  corporation; correct?
2    A.  If you say so.
3    Q.  You don't know?
4    A.  I don't know what the value of 3M is.
5    Q.  Okay.
6    A.  It's large.
7    Q.  Okay.  One of the bigger companies in the
8  United States; correct?
9    A.  If you say so.
10   Q.  I mean you see their products all over the
11 place; correct?
12   A.  Yes.
13   Q.  Okay.  They go from Post-It notes to
14 surgical drapes; correct?
15   A.  Yes.
16   Q.  You use their surgical drapes; don't you?
17   A.  I don't know.
18   Q.  You don't know?
19   A.  I don't know whose surgical drapes we use.
20   Q.  You use their Bair Hugger device; correct?
21   A.  Yes.
22   Q.  Now with respect to Andrea Kurz's
23 deposition, was any of the deposition highlighted that
24 you reviewed?
25   A.  No, I don't believe so.

Page 129

1    Q.  Was any of it marked off?
2    A.  No, I don't believe so.
3    Q.  Were you told to go to a certain area to
4  read, certain line number?
5    A.  No.
6    Q.  Okay.  Was there any other depositions that
7  you recall scanning that you remember?
8    A.  I recall scanning a Sessler deposition.
9  Honestly, I can't remember whether it was in this --
10 in -- in this multidistrict case or in one of the
11 earlier ones.
12   Q.  Did you use any of the information that you
13 obtained in the previous case, in -- in the Walton and
14 Johnson case, in drafting your report in this case?
15   A.  Oh, yes.  Yes.  I mean I thought the issues
16 are very -- are very similar, so my thinking about
17 Walton and Johnson in many respects relates to the
18 questions in this case.
19   Q.  I mean in fact you didn't -- you did not
20 start your report from scratch for -- for this expert
21 report, which is Exhibit 3; correct?
22   A.  I had written -- written reports on Walton
23 and Johnson in the past.
24   Q.  And they are very similar to Exhibit 3;
25 correct?

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 130

1    A.  In -- in some respects.  Obviously, this
2  report doesn't reference anything about Walton or
3  Johnson.
4    Q.  I understand that.  But with respect for
5  Walton and Johnson, the -- the substance of your
6  report is pretty much identical to what was in Walton
7  and Johnson.
8    A.  Right, it is similar.
9    Q.  Very similar.  Do you agree?
10   A.  You want to define "very" -- "very similar?"
11  It's similar.
12   Q.  I mean you almost have the same headings.
13   A.  That may be the case.  I don't recall the
14  Walton and Johnson letters at this time.
15   Q.  Did you review what -- the Walton and
16  Johnson expert reports in preparation for today's
17  deposition?
18   A.  No.  I reviewed this one.
19   Q.  Okay.  Did you review Walton and Johnson's
20  reports before you wrote this report, Exhibit 3?
21   A.  Oh, yes.  Yes.
22   Q.  And in fact you just opened up the report
23  and just made changes to it; correct?
24   A.  Very -- very -- very likely.
25   Q.  Okay.

Page 131

1    A.  It was months ago, so I'm not sure exactly
2  what I -- what I did.
3    Q.  It was only two months ago, sir, --
4    A.  It was only two --
5    Q.  -- that you wrote this report.
6    A.  That I submitted this report, yes.
7    Q.  I mean it wasn't years ago, it was only two
8  months ago.
9    A.  No.  Okay.  So whether I copied -- copied or
10  pasted or edited or retyped --
11   Q.  Okay.  Now how much time did you bill in
12  Walton and Johnson?
13   A.  I -- I don't recall.
14   Q.  More than 20 hours?
15   A.  Probably.
16   Q.  And you used that work, the stuff that you
17  reviewed and you learned in Walton and Johnson, in --
18  in your expert report in this case; correct?
19   A.  Correct.
20   Q.  And you didn't submit any of those invoices
21  to us that you have in Walton and Johnson; did you?
22   A.  Correct.
23   Q.  Did you provide those invoices to defense
24  counsel?
25   A.  No.

Page 132

1    Q.  Why not?
2    A.  I wasn't asked to.
3    Q.  Well wasn't that part of the subpoena, all
4  the invoices in the Bair Hugger litigation?
5    A.  Well it depends --
6        I -- I don't recall the -- the wording, but
7  at least when I was thinking about it I was thinking
8  about the current action, the current action, and
9  thinking of that as distinct from the others.
10   Q.  Did you ask anyone -- did you ask anyone
11  whether or not this included the invoices for Walton
12  and Johnson?
13   A.  Yes, I did.
14   Q.  Okay.
15   A.  And I was told to limit -- limit the
16  invoices I produced to this -- this case.
17   Q.  Okay.
18       MS. LEWIS:  Counsel, we made our
19  objections -- which you guys have -- on the subpoena
20  and with respect to the scope of your subpoena and
21  time.
22   Q.  Do you know whether or not you billed more
23  than 20 hours in Walton and Johnson combined?
24   A.  I -- I seem to recall that that's probably
25  the case.  I don't know how many hours exactly.

Page 133

1    Q.  Okay.  Do you recall receiving over a
2  hundred articles in Walton and Johnson from Greenberg
3  Traurig?
4    A.  Yes.
5    Q.  Okay.  Do you recall receiving hundreds of
6  pages of internal documents from Greenberg Traurig, 3M
7  documents?
8    A.  I think there were 3M documents in the
9  materials that they sent.
10   Q.  Did you review those?
11   A.  I looked -- looked at them and determined
12  that they would not be helpful to me in formulating
13  my opin -- my opinions on this case.
14   Q.  So if there were internal documents at 3M
15  that indicated that the Bair Hugger increases
16  pathogens over the surgical site, that would not
17  pertain to your opinions in this case?
18   A.  My opinions in this --
19       MS. LEWIS:  Objection to the form.
20   A.  My opinions in this case are principally
21  focused on clinical outcomes.
22   Q.  Okay.  So is it fair to say that your sole
23  opinion in this case -- or your -- your opinion in
24  this case is not whether the Bair Hugger is safe, just
25  the clinical outcome of maintaining normothermia.

34 (Pages 130 to 133)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 134

1    A.  No, that's not correct.
2    Q.  Okay.  So if your opinion is whether or not
3  the Bair Hugger is safe for use, wouldn't internal
4  testing be relevant to determine the safety of the
5  Bair Hugger device?
6    A.  Well intern -- internal testing, to the
7  extent that it address -- addresses particles, air
8  bubbles and other surrogates, are neither my expertise
9  nor the basis on which I would make a clinical
10  judgment about choosing to use the Bair Hugger or not.
11    Q.  So if there were documents that exist that
12  indicate that the Bair Hugger increases the bacterial
13  load over the surgical site, that would be irrelevant
14  to the safety of the Bair Hugger to you?
15    MS. LEWIS:  Objection, form.
16    A.  A, I am not qualif -- qualified to draw the
17  connection between that finding and the risk of using
18  the Bair -- Bair Hugger, and this is, you know, a very
19  high -- high-volume operation and the rate of surgical
20  infections with it is amen -- amenable to study.  So
21  my expectation, what I am looking for and what I've
22  been looking for ever since I first heard allegations
23  of its hazard, has been documentation that more pa --
24  more patients have surgical-site infections when Bair
25  Huggers are used than when it is not used.  I don't

Page 135

1  believe such a thing exists.
2    Q.  Okay.  Do you know the difference between a
3  surgical-site infection and a periprosthetic joint
4  infection?
5    A.  I'm -- I'm sorry?
6    Q.  Do you know the difference between a
7  superficial -- a surgical-site infection and a
8  periprosthetic joint infection?
9    A.  Well surgical-site infection is kind of an
10  all-encompassing term, of which periprosthetic joint
11  infections is one variety.
12    Q.  Are there any allegations that you're aware
13  of that the Bair Hugger increases the incidence of
14  superficial surgical-site infections?
15    A.  I -- I think the -- the action is about
16  peri -- periprosthetic joint -- joint infections.
17    Q.  Do you know how many bacteria or CFUs are
18  needed to cause a periprosthetic joint infection?
19    A.  No.
20    Q.  Do you know if it's more or less than a
21  superficial surgical-site infection?
22    A.  No.
23    Q.  Are you aware -- strike that.
24    You agree with me that a study could be
25  conducted to determine whether or not the Bair Hugger

Page 136

1  increases the incidence of periprosthetic joint
2  infections; correct?
3    A.  Yes, I believe that's true.  But study --
4  study design is not my area of expertise.
5    Q.  Okay.
6    A.  But all right.
7    Q.  Your area of expertise is to just criticize
8  the literature in this case; correct?
9    A.  My area of expertise is making clinical
10  decisions about caring for my patients.
11    Q.  And your clinical decisions are based on
12  literature that you have read; correct?
13    A.  Yes.
14    Q.  Okay.
15    A.  Well let -- let me --
16    Q.  Yes.
17    A.  Let me, if I may, continue.
18    Q.  Sure.
19    A.  My clinical decision-making is based on --
20  not only on literature I have read but, when you look
21  at the list of materials, the systematic analyses that
22  groups like ECRI and NICE -- and NICE and others have
23  done, and those groups, because they are thor --
24  thorough, impartial and have advanced methodological
25  skills, the conclusions they draw from their analyses

Page 137

1  of the existing science is very persuasive.
2    Q.  Okay.  Well let's talk about ECRI then.  Are
3  you aware of the interact -- interactions ECRI had
4  with 3M and Arizant regarding this issue?
5    A.  No.
6    Q.  Okay.  Do you know that ECRI interviewed --
7  interviewed people at 3M and Arizant?
8    A.  I don't know that.
9    Q.  Okay.  Do you think --
10    If you found out that the information
11  provided by Arizant and 3M was inaccurate to ECRI,
12  would that affect your decision?
13    A.  Yeah, I --
14    You'd have to be more -- more specific about
15  what the inaccuracies were.
16    Q.  Well do you know that one of the goals of 3M
17  and Arizant was to prevent ECRI from doing any type of
18  study?
19    MS. LEWIS:  Objection to the form of the
20  question.
21    A.  Right.  So my understanding of what --
22    Q.  It's a simple "yes" or "no."  Did you know
23  that?
24    A.  No.  I don't know whether that's true or
25  not.

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 138

1    Q.  Okay.  So you've never heard that before;
2  correct?
3    A.  I have not.
4    Q.  Because you haven't looked at the internal
5  documents that 3M has; correct?
6    A.  Correct.
7    Q.  Okay.  If that was true, would that affect
8  your opinions in this case?
9    A.  If it were true that 3M tried to stop ECRI
10  from doing a study?
11    Q.  Yes.
12    A.  Well what they tried to do or didn't try to
13  do isn't really ger -- germane, it's what ECRI did or
14  didn't do in the end.
15    Q.  I understand that.  But would it affect your
16  decision with respect to the responses that 3M and
17  Arizant provided to ECRI regarding the safety of the
18  device?
19    A.  I'm not -- I'm not -- I'm not --
20       Would it affect my opinion about 3M and
21  Arizant, is that the question?
22    Q.  I think --
23       Yeah.
24    A.  I don't feel as though I particularly have
25  an opinion about 3M and Arizant's be -- behavior with

Page 139

1  respect to ECRI.  As I said, what ECRI did, which is
2  not a study of the -- the safety of the Bair Hugger in
3  the sense of original investigation --
4    Q.  They just reviewed the literature.
5    A.  It is a systematic re -- review, something
6  like a meta-analysis of the -- of the literature.
7    Q.  I wouldn't call it a meta-analysis.  They
8  just reviewed the literature.
9    A.  Okay.
10    Q.  Correct?
11    A.  Okay.
12    Q.  Do you recall any meta-analysis done by
13  ECRI?
14    A.  No.  A systematic review.
15    Q.  Okay.  Something that anyone could do;
16  correct?
17    A.  Well I -- I -- I think the --
18       When I refer to the methodological
19  expertise, I think that they bring to -- bring to the
20  table the ability to critically eval -- evaluate the
21  scientific validity of the material they're looking
22  at, and I'm not sure that everybody could do -- could
23  do that.  So I think the answer is no, not everybody
24  could do what ECRI did.
25    Q.  You do understand --

Page 140

1       Do you know what a 510(k) clearance is?
2    A.  I -- I -- I heard the term.
3    Q.  Okay.  You understand that, with respect to
4  the safety of medical devices or even drugs, that the
5  government relies on information provided by the
6  manufacturer?
7    A.  If you say so.  I have no experience in
8  the --
9    Q.  Okay.
10    A.  -- 510(k) process.
11    Q.  Okay.  And you're not going to be providing
12  any opinions on warnings since you don't understand
13  the FDA process; correct?
14    A.  Well I'm not going to give an opinion about
15  what the FDA requires or not -- doesn't require.  I
16  can give -- give an opinion about the warnings that
17  I -- I see as a user of the -- of the device if you
18  have questions about that.
19    Q.  Well what is your expertise in medical
20  device warnings, if any?
21       I'll withdraw the question.  Have you
22  yourself --
23       You've never created a medical device;
24  correct?
25    A.  Correct.  Correct.

Page 141

1    Q.  You've never been advised on --
2       You've never been consulted on what warnings
3  should be on a medical device; correct?
4    A.  Correct.
5    Q.  You've never actually written warnings in
6  your entire life; correct?
7    A.  Correct.
8    Q.  Okay.  You -- you -- you don't know --
9       You've never had any discussions with
10  respect with orthopedic surgeons and whether or not
11  they look unfavorably with respect to particles;
12  correct?
13    A.  Correct.
14    Q.  You're not an expert in airborne
15  contamination; correct?
16    A.  Correct.
17    Q.  You're not an expert in infectious disease;
18  correct?
19    A.  Correct.
20    Q.  You're not an expert in -- in -- in forced-
21  air warming; correct?
22       The device itself.
23    A.  Correct.
24    Q.  Okay.  Do you even know how much heat comes
25  out of the Bair Hugger?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 142

1    A.  I can only reflect on having sat next to
2  one -- next to one for thousands of hours.
3    Q.  Do you feel the heat coming out?
4    A.  No.
5    Q.  You never feel the heat coming out.
6    A.  Only when I'm under -- under the blanket.
7    Q.  So what does sitting next to -- next to them
8  indicate about how much heat is coming out of the Bair
9  Hugger?
10    A.  Not very much.
11    Q.  Do you think it's warmer -- warmer --
12       Do you think the temperature of the air
13  coming out is warmer or cooler than the body
14  temperature?
15    A.  Are you talking -- talking about coming out
16  of the blanket?
17    Q.  Yes.
18    A.  Yes, it's warm -- it's warmer than the
19  blank -- than the body temperature.
20    Q.  Do you know what temperature?
21    A.  It's --
22       On high I think it's 42 degrees.
23    Q.  You think it's 42 degrees?
24    A.  Yes.
25    Q.  Okay.  And you've had a thousand hours

Page 143

1  working on the Bair Hugger -- working with the Bair
2  Hugger?
3    A.  At least.  At least.
4    Q.  Okay.  And you're the one that controls the
5  Bair Hugger device?
6    A.  Yes.
7    Q.  Do you turn it on and off?
8    A.  I do.
9    Q.  And you believe it's 42 degrees.
10    A.  I think it's high -- high -- high, medium
11  and low, but I think the high corresponds to 42
12  degrees.
13    Q.  Okay.  And have you ever taken apart a Bair
14  Hugger?
15    A.  No.
16    Q.  What are plaintiffs' allegations with
17  respect to the mechanism of injury that the Bair
18  Hugger causes?
19    A.  There -- there are multiple:  increase --
20  increases particles, increases turbulence, increases
21  temperature in the vicinity of the -- of the -- of the
22  wound, disrupts laminar -- laminar flow.  You know,
23  those -- those are the ones that immediately come to
24  mind.
25    Q.  Where do you think the heat goes that comes

Page 144

1  out of the Bair Hugger?
2    A.  The heat goes, coming out of the Bair Hugger
3  blanket --
4    Q.  Where does it go?
5    A.  Generally, with an upper body blan --
6  blan -- blanket, the heat emanates at the patient's
7  head.
8    Q.  Emanates at the patient's head.
9    A.  Yes.
10    Q.  So how many holes does the Bair Hugger
11  blanket have?
12    A.  How many holes?
13    Q.  Yeah.
14    A.  It has many -- many small perforations.
15    Q.  Okay.  And it comes out at the patient's
16  head.  What percentage of the air comes out at the
17  patient's head?
18    A.  I don't know what percentage at the
19  patient's head.
20    Q.  Do you see the plastic sheet flapping that
21  goes -- covers the head?
22    A.  Occasionally, yes.
23    Q.  Occasionally?
24    A.  Yes.
25    Q.  What does "occasionally" mean?

Page 145

1    A.  Sometimes I observe it flapping and
2  sometimes it doesn't appear to be flapping.
3    Q.  Okay.  So what percentage of the time would
4  you see the -- the plastic sheet that covers the
5  patient's head flapping?
6    A.  I have -- I've never -- never calculated
7  that percentage.
8    Q.  Well can you give me a rough estimate?
9    A.  Not really.
10    Q.  More than 50 percent of the time?
11    A.  I'm not going to give you an estimate.
12    Q.  Why not?
13    A.  Because I don't --
14       I'm not guessing.
15    Q.  Okay.  So you think -- you think the
16  majority of the air comes out at the patient's neck
17  and head.
18    A.  The -- the upper -- upper body, yes.
19    Q.  Okay.  So --
20    A.  The rest of the blanket is tightly secured,
21  so that's the path of least resistance.
22    Q.  Okay.  And why do you think it's tightly
23  secured?
24    A.  To gain maxi -- maximum benefit from the use
25  of the blanket.

37 (Pages 142 to 145)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 146

1    Q.  You don't -- you don't think any air could
2  pass down the arm --
3    A.  Of course, of course, of course it can.
4    Q.  Okay.
5    A.  But it is -- the --
6    The area around the head -- head and neck is
7  more loosely applied than it is around the arms and
8  does not have the -- all the surgical drapes on top of
9  it in the same way that the arms do, so whatever air
10  is emanating is most often felt there.
11    Q.  Okay.  What basis do you have, scientific
12  basis, that most of the air comes out at the head and
13  neck?
14    A.  I have, as I said, thousands of hours of
15  using the device.
16    Q.  Yeah.  And you believe that the top
17  temperature is 42 degrees; right?
18    A.  Yes.
19    Q.  Okay.  And you also believe that your
20  infection rates in your hospital are .6 percent;
21  correct?
22    A.  That's what I was told.
23    Q.  Okay.  But that's not correct; is it?
24    MS. LEWIS:  Objection to the form of the
25  question.

Page 147

1    A.  I am not sure of the basis of the statistics
2  that you've -- you've given me, so I don't know which
3  one is correct.
4    Q.  Well you've heard of Hospital Compare;
5  correct?
6    A.  I have heard of Hospital Compare.
7    Q.  And that's based on reporting from the
8  hospitals; correct?
9    A.  Presumably, yes.
10    Q.  Okay.  The fact that Andrea Kurz cooled her
11  patients during the 1996 study, does that affect your
12  opinion of that study?
13    The control group, that she cooled the
14  control group.
15    A.  No.  I think her study is important.
16    Q.  Okay.  So the mere fact that the control was
17  actually cooled, which is not done in the real world,
18  okay, has no effect on the effects of the statistics
19  produced in that paper?
20    A.  I think the statistics are the statistics.
21    Q.  Yes.  A patient that's cooled and a patient
22  that's warmed; correct?
23    A.  Right.
24    Q.  Okay.  What -- what's the -- what's the
25  infection-rate drop, if any, if a patient is placed in

Page 148

1  warm blankets compared to forced-air warming?
2    A.  I'm sorry.  Say again.
3    Q.  What -- what -- what --
4    In a colorectal surgery, if a patient was
5  just using warm blankets, like heated blankets, as
6  compared to forced-air warming, would there be a
7  reduction in surgical-site infections, if you know?
8    A.  Well what I want to say is that warm
9  blankets are less effective in restoring core
10  temperature than active warming, and restoring core
11  temperature reduces the rate of -- of infection.
12    Q.  Would you agree with me that warming
13  blank -- warm blankets are more effective than cooling
14  a patient?
15    A.  I don't know.
16    Q.  You don't know?
17    A.  I don't know.
18    Q.  So if a patient went from 36 degrees to 35.5
19  degrees, do you know what the effects would be on
20  surgical-site infections in colorectal surgery?
21    A.  To -- to quantify that change?
22    Q.  Huh?
23    A.  To quantify -- to quantify the impact of
24  that change in temperature, is that what you're
25  asking?

Page 149

1    Q.  If the patient is 35.5 degrees, is that
2  going to increase the incidence of surgical-site
3  infections?
4    A.  As compared to normothermia.
5    Q.  As compared to 36 degrees.  If you know.
6    A.  In -- in theory, but I don't -- I don't
7  know.
8    Q.  Well could we --
9    Well you don't like theory because there --
10  there's a theor -- there's a theoretical risk
11  according to the International Concensus that Bair
12  Hugger increases the risks of infections; correct?
13    MS. LEWIS:  Objection to form.
14    Q.  So you disregard that theory, so let's not
15  talk about theories.  Let's talk about facts and
16  science.
17    A.  Okay.  So I don't -- I don't -- I don't know
18  what the incremental change in infection risk from
19  35.5 to 36 is.
20    Q.  If any.
21    A.  If any.
22    Q.  Okay.  What about 35 degrees compared to 36
23  degrees Celsius?
24    A.  Well the only thing I would -- I -- I would
25  say, that hypo -- hypothermia increases the risk of

38 (Pages 146 to 149)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 150

1  infection and other periprosthetic compli --
2  complications, and I don't know that I've seen that it
3  is, so to speak, dose-dependent, and -- and that is,
4  is the relationship between temperature and infection
5  risk linear or have some other relationship.  I don't
6  know.
7      Q.  Well with respect to surgical-site
8  infections, you're relying on the Kurz study; correct?
9         For perioperative warming.
10     A.  I am relying on the Kurz study and oth --
11  and others.
12     Q.  What others?
13     A.  Mell -- Melling, Scott.  So there are
14  number -- a number of studies, more recent ones, that
15  seem to come to the same conclusions as -- as Kurz did
16  in '96.
17     Q.  So you're talking about Melling and Scott;
18  correct?
19         And we're talking about wound infections
20  here; right?
21     A.  Correct.
22     Q.  Okay.  So Melling and Scott.  Anything --
23         And Kurz; correct?
24     A.  Yes.
25     Q.  What else, sitting here today?

Page 151

1      A.  We talked a little bit earl -- earlier,
2  again -- again I need to look at the statistics in
3  Frisch, but there was a diff -- a difference in the
4  frequency of infections in those patients.
5      Q.  Well you're --
6         You hold yourself out as an expert in
7  maintaining normothermia; correct?
8      A.  I hold myself out as a -- yeah, somebody who
9  has made that a clinical goal.
10     Q.  That's not my question of making a clinical
11  goal.
12     A.  Yeah.
13     Q.  Okay?  I -- I make many goals in my life but
14  I'm not an expert in.  Okay?
15         My question is:  Do you consider yourself an
16  expert in the risks and benefits of maintaining
17  normothermia?
18     A.  Yes.
19     Q.  Okay.  So you should know the studies that
20  you're going to rely upon because you yourself have
21  done no research on the issue; correct?
22     A.  I have, as I said previously, heavily re --
23  relied on systematic analyses of groups expert in
24  summarizing the available findings, such as ECRI,
25  NICE, and the physician consortium and the others I've

Page 152

1  identified.
2      Q.  Okay.  And they're relying on Kurz, Melling
3  and --
4      A.  Well they're -- they're -- they're look --
5  they're looking at McGovern and Legg and everybody who
6  has published on this.  Right?
7      Q.  Well here -- here's the unfortunate thing,
8  sir.  Okay?  You've been designated an expert in this
9  case as to maintaining normothermia; correct?
10     A.  I -- that's why --
11     Q.  Okay.
12     A.  That's why I'm here.
13     Q.  So you can't rely on other groups that have
14  done reviews --
15     A.  No, I -- I disagree with that.  I certainly
16  can.
17     Q.  Okay.  So you're going to rely on -- on --
18  on other people, so I could just read what they say
19  and that's what you're going to say.
20     A.  To a -- to a degree.
21     Q.  Okay.
22     A.  They have very -- they have --
23         They are very persuasive in my decision-
24  making.
25     Q.  Okay.  So sitting here today, besides Kurz,

Page 153

1  Melling, Scott and -- and Frisch, are you aware of any
2  scientific literature that's not a review that
3  discusses the -- the relationship between maintaining
4  normothermia and surgical-site infection?
5      A.  That discusses --
6         Well yes.  Mc -- McGovern purports to do --
7  to do that.
8      Q.  McGovern?
9      A.  He purports to discuss the relationship of
10  normothermia and surgical-site infection.
11     Q.  No.  He discusses the relationship between
12  the mode of maintaining normothermia and
13  periprosthetic joint infection.
14     A.  Well why -- why are we using Bair -- Bair
15  Hugger if not to maintain normothermia?
16     Q.  Well does he talk about the patient --
17         Does he take any temperature of -- of the
18  patient, measurement -- measurements of the
19  temperature of the patient?
20     A.  Okay.  Fair -- fair enough.  He's discussing
21  the hazards --
22     Q.  Yes.
23     A.  -- of warming the patient to achieve --
24  achieve the goal of normothermia.  Fine.
25     Q.  I'm talking about --

39 (Pages 150 to 153)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 154

1     A.  Okay.
2     Q.  I'm talking about maintaining
3  normothermia.
4     A.  Fine.
5     Q.  And so you're going to rely on Kurz,
6  Melling, Scott and Frisch today.
7        And feel free to look at Exhibit 2.
8     A.  Yes.  Yeah.
9        Yes, I'll -- I'll qualify Melling in that it
10  is mostly relevant to establish the safe -- the safety
11  of Bair Hugger and achieving norm -- normothermia,
12  because while many -- well infections broadly sta --
13  broadly stated were dramatically reduced, there was no
14  difference in the groups with respect to surgical-site
15  infect -- in -- in -- infections, which says -- says to me
16  that sepsis, which probably includes surgical-site
17  infections in many instances where there was a
18  dramatic reduction and all the other clinical outcomes
19  were im -- were improved, so that one is a little
20  different from the others.
21     Q.  You're talking about Melling?
22     A.  No, I'm sorry, Scott.
23     Q.  Scott.  Okay.
24     A.  Yeah.
25     Q.  Are you relying on Scott today, that

Page 155

1  maintaining normothermia reduces the incidence of
2  surgical-site infections?
3     A.  It reduces the in -- incidence of infectious
4  complications of all -- of any kind.
5     Q.  That wasn't my question, sir.
6     A.  Correct.  No difference in surgical --
7  surgical-site infections to the extent that the study
8  methodology would distinguish between those infections
9  and the others.
10     Q.  Well they actually did distinguish it;
11  didn't they?
12     A.  Well they said they did.
13     Q.  Have you looked at the data?
14     A.  I -- I looked at the source of the data,
15  which is administrative data, which depends on -- on
16  coding for the purpose of -- of billing.
17        (Exhibit 7 was marked for
18        identification.)
19     MR. ASSAAD:  No.  I'm sorry.  I gave you the
20  Sun article.  We'll get to this in a second.  Sorry.
21  BY MR. ASSAAD:
22     Q.  Are you familiar with this article, sir, the
23  Sun article?
24     A.  No, I don't think I am.
25     Q.  With Dr. Sessler and Andrea Kurz?

Page 156

1     A.  No, I don't think I am.
2     Q.  Okay.  Why don't you look at the
3  conclusions, tell me if you agree with this.
4     A.  Which one?
5     Q.  "Even in actively warmed patients,
6  hypothermia is routine during the first hour of
7  anesthesia."  Do you agree with that statement?
8     A.  Yes, temperatures drop in the first hour of
9  anesthesia.
10     Q.  Okay.
11        (Exhibit 8 was marked for
12        identification.)
13  BY MR. ASSAAD:
14     Q.  Exhibit 8 is titled "Compliance with
15  Surgical Care Improvement Project for Body Temperature
16  Management (SCIP-10) Is Associated with Improved
17  Clinical Outcomes" by Andrew V. Scott et al.  Is this
18  the article you're referring to?
19     A.  Yes, it is.
20     Q.  Okay.  Let's turn to page five.  Under
21  "Wound infection" --
22        That's a surgical-site infection, correct,
23  on -- on Table 4?
24     A.  Yes.  Yeah.
25     Q.  Do you agree with me that SCIP non-

Page 157

1  compliant has a lower infection rate than SCIP
2  compliant?
3     A.  Not in a significant way -- way.
4     Q.  That wasn't my question.
5     A.  Yes.
6     Q.  It's lower; correct?
7     A.  The raw -- the raw numbers are lower.
8     Q.  Okay.  It's not statistically significant --
9     A.  So I would characterize it as no difference.
10     Q.  Okay.  And this is 2015; correct?
11     A.  Correct.
12     Q.  Published in Anesthesiology; correct?
13     A.  Correct.
14     Q.  And you subscribe to Anesthesiology;
15  correct?
16     A.  Yes.
17     Q.  And you believe that's an authoritative
18  journal; correct?
19     A.  It's a reputable journal.
20     Q.  You -- you think it's authoritative.
21     A.  I believe it has -- has a robust editorial
22  process.
23     Q.  And you've cited to this article in your
24  Materials Considered; correct?
25     A.  Yes, I have.

40 (Pages 154 to 157)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 158

1    Q.  So you believe it's authoritative.
2    A.  I believe -- I -- it is --
3        It is there because it influenced my opinion
4  on the safety of the Bair Hugger.
5    Q.  Okay.  Well it doesn't really talk about the
6  safety of the Bair Hugger, it talks about the efficacy
7  of the Bair Hugger.
8    A.  No.  I think the frequency of the
9  complications stud -- studied goes directly to the
10  question of safety.
11   Q.  Is there anything in Scott that discusses
12  whether or not the Bair Hugger contaminates the
13  sterile field through either being contaminated itself
14  or by disrupting laminar flow?
15   A.  No.  That's the beauty of the Scott paper,
16  is that it talks about clinical outcomes and what
17  matters to patients.
18   Q.  Well the beauty is, then, that there's no
19  difference in wound infections between maintaining
20  normothermia and not maintaining normothermia,
21  correct?
22   A.  Normothermia in this study was maintained --
23  maintained with the use of the Bair Hugger.  There
24  being no difference in wound infections and a dramatic
25  difference in all infections, in addition to the other

Page 159

1  complications, tells me that it is a safe -- a safe
2  device and is good practice to -- to use.
3    Q.  What -- what percentage of patients that
4  have peri -- total knee or total hip actually have --
5  get sepsis?
6    A.  I don't know.
7    Q.  Okay.  What -- what percentage of patients
8  that have total hip or total knee actually have a
9  drug-resistant infection?
10   A.  I did not -- I don't --
11       I don't know.
12   Q.  Okay.  What percentage of patients have some
13  sort of an ischemic cardiac -- cardiovascular event,
14  of total hip or total knee patients, arthroplasty
15  patients?
16   A.  I don't know.
17   Q.  Okay.
18   A.  I don't know that they are different --
19  different from this diverse group of surgical
20  patients.
21   Q.  You agree with me that this article does not
22  talk about whether or not the Bair Hugger contaminates
23  the sterile field by its use.
24       MS. LEWIS:  Objection, form.
25   A.  It dis -- it discusses the out -- outcomes

Page 160

1  that would make that finding relevant but doesn't
2  discuss the contamination of the surgical wound --
3  wound directly, only the clinical marker of that
4  event.
5    Q.  Well it --
6        I mean you believe maintaining normothermia
7  reduces the risks of surgical-site infection; don't
8  you?
9    A.  Yes.
10   Q.  You do.  But this study says the opposite
11  with respect to wound infections; correct?
12   A.  No, it says there's no difference.
13   Q.  Well SCIP non-compliant means either, one,
14  they --
15       Well SCIP non-compliant means they didn't
16  use any type of maintain -- forced-air warming or
17  patient warming.
18   A.  Or didn't achieve the target temperature.
19   Q.  No.  You could still be SCIP compliant as
20  long as you --
21       As long as you're using a forced-air
22  warming --
23   A.  Correct.
24   Q.  -- device you're SCIP compliant; correct?
25   A.  Right, but --

Page 161

1        And if you don't use it and meet the target
2  temperature, you're also SCIP compliant.
3    Q.  Yes.  So the ones that they did not --
4        SCIP non-compliant means that you weren't at
5  the target temperature and you did not use a patient
6  warming device; correct?
7    A.  Correct.
8    Q.  Okay.  So we could agree, for the SCIP
9  non-compliant, no patient warming device was used.
10   A.  Or a patient warming device was used -- was
11  used --
12       No.  I'm sorry.  Correct.
13   Q.  I'm correct.
14   A.  Okay.
15   Q.  Right?
16   A.  You are.
17   Q.  Okay.  So we have here on page five 1,240
18  patients that no patient warming device was used on;
19  correct?  Correct?
20   A.  Correct.
21   Q.  Okay.  And then you have the SCIP compliant,
22  which has 44,000 patients that warming was used;
23  correct?
24   A.  Correct.
25   Q.  And it was forced-air warming in this case;

41 (Pages 158 to 161)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 162

1    correct?
2        A.   Yes.
3        Q.   Now since you believe that forced-air
4    warming or patient warming reduces the incidence of
5    surgical-site infection, why is there no difference
6    for wound infections?
7            If you know.
8        A.   Well I don't -- I don't know, I don't know,
9    but the -- the size of the two -- two groups may
10   produce a statistical effect that produces this.  But
11   as I said, this informs my opinion, because if
12   forced-air warming were dangerous, I would expect to
13   see the SCIP compliant group have a substantially
14   higher rate of wound infection and other -- and other
15   infectious complications than the group in which it
16   wasn't used, --
17       Q.   Did you ever think --
18       A.   -- and that is not the case.
19       Q.   Did you ever think of this possibility, sir,
20   that maintaining normothermia reduces the incidence of
21   wound infection but it's been offset because of the
22   risk of the Bair Hugger and that's why you get equal
23   numbers?  Isn't that -- isn't that a possibility?
24       A.   Well if this were the on -- were the only
25   study in existence addressing this and the others

Page 163

1    didn't -- didn't exist, that would -- might be an
2    attractive theory to explain the result.
3        Q.   And you need further research; correct?
4        A.   Well I have several -- several other studies
5    that show a reduction in infections.
6        Q.   Okay.  But with respect to Sun, that -- if
7    that -- that's a possibility --
8        A.   We're talking about Scott; right?
9        Q.   Or Scott.  That's a study that you would
10   maybe require further research to determine whether or
11   not the Bair Hugger is increasing the infection rate
12   but at the same time reducing the wound infection rate
13   so you get a non-statistically significant between use
14   and non-use.  It's a possibility; correct?
15       A.   I -- I suppose it's a possibility.
16       Q.   Okay.  So what study do you want to talk
17   about next, Kurz or Melling?
18       A.   You're -- you're asking the questions.
19       Q.   Okay.  Let's talk about Melling.  Is Melling
20   perioperative warming?
21       A.   Melling is perioperative warming.
22       Q.   Is that what you believe?
23       A.   It's perioperative warming.
24       Q.   Are you sure about that?
25       A.   Yeah.

Page 164

1        Q.   Okay.  And you believe Melling supports the
2    safety of the Bair Hugger perioperatively.
3        A.   Well the Bair -- in this --
4            In this case, this is about hypother --
5    hypothermia and the frequency of infections in
6    clean -- in clean surgery.  There were two modalities
7    used, neither in the operating room, but the patient's
8    temper -- temperatures or the surgical-field
9    temperature -- temperatures in some of the cases was
10   managed with local warming or body -- body warming
11   perioperatively.
12       Q.   You understand that Melling is -- is
13   preoperative warming.
14       A.   Yes.
15       Q.   Okay.  When --
16       A.   And when you said -- when you said
17   "perioperative warming," in my mind that includes
18   preoperative.
19       Q.   Okay.
20       A.   But the point here is the effect of warming.
21       Q.   You agree with me that prewarming lasts for
22   about three hours based on the science.
23       A.   Yeah.  I don't -- I don't know about that,
24   but these patients --
25       Q.   Okay.

Page 165

1        A.   The warmed patients were not surprisingly
2    warmer.
3        Q.   Melling wasn't --
4            Bair Hugger wasn't used from incision to
5    incision.
6        A.   Correct.
7        Q.   Okay.  So Melling was not used
8    intraoperatively; correct?
9        A.   Correct.
10       Q.   Okay.  So Melling wouldn't indicate whether
11   or not the use of Bair Hugger would contaminate the
12   sterile field because the Bair Hugger wasn't used
13   intraoperatively; correct?
14       A.   Correct.  Melling speak -- speaks to the
15   importance of normothermia in reducing the risk of
16   surgical infection.
17       Q.   The effect of prewarming on normothermia.
18       A.   Norm --
19       Q.   Okay.
20       A.   Normothermia.
21       Q.   Okay.  Let's talk about Kurz.  Do you recall
22   reading any -- anything in the deposition of Andrea
23   Kurz where she stated that, with -- let me get the
24   exact words --
25           MS. LEWIS:  Are you going to have a copy for

42 (Pages 162 to 165)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 166

1  Dr. Hannenberg?
2        MR. ASSAAD:  No.
3        MS. LEWIS:  Okay.  I just want the record to
4  so reflect.
5        MR. ASSAAD:  Next time maybe if you instruct
6  your witnesses to come with information so they can
7  answer questions --
8        MS. LEWIS:  Since they don't know what
9  question you're going to ask, --
10       MR. ASSAAD:  That's why they should bring
11  everything.
12       MS. LEWIS:  -- they're supposed to guess?
13       MR. ASSAAD:  I mean you go to trial with all
14  the files; don't you?  I don't know if you go to
15  trial, but if you do, you should bring all the files.
16    Q.  So do you recall when Dr. Kurz indicated
17  that Kurz would not meet current research guidelines
18  and -- and scientific reliability in -- in -- in
19  today's world?
20       MS. LEWIS:  Dr. Hannenberg, if you remember,
21  that's fine; if you don't, if you want to see the
22  document --
23       THE WITNESS:  Seeing the document would be
24  helpful.
25       (Exhibit 9 was marked for

Page 167

1        identification.)
2        MR. ASSAAD:  Why don't we take a break for
3  lunch and we'll get back to this when we get back.
4        THE REPORTER:  Off the record, please.
5        (Recess taken.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 168

1            AFTERNOON SESSION
2  BY MR. ASSAAD:
3    Q.  Are you ready to continue, doctor?
4    A.  Yes, I am.
5    Q.  Before I get to the Kurz deposition, we were
6  talking about some of the articles that support your
7  opinion that maintaining normothermia reduces the
8  incidence of infection.  You -- you haven't been
9  provided any internal documents or minutes regarding
10  conversations with Andrea Kurz or Dr. Sessler within
11  3M; have you?
12    A.  I don't believe so.
13    Q.  Okay.
14       (Exhibit 10 was marked for
15       identification.)
16  BY MR. ASSAAD:
17    Q.  Exhibit 10 is a document provided to the
18  plaintiffs from defendants talking about the Global
19  Patient Warming Advisory meeting on October 18th,
20  2012.  Do you see that as the heading?
21    A.  Yes, I do.
22    Q.  And do you see that the board members are Dan
23  Sessler, Pedro Barbieri, Andrea Kurz, Claude LaFlamme
24  and Berthold Bein.  Do you see that?
25    A.  Yes, I do.

Page 169

1    Q.  Do you know those individuals?
2    A.  I know Sessler and I've met Kurz; otherwise,
3  no.
4    Q.  Okay.  And at the bottom you see there's
5  Bates numbers there where there's like numbers 3MBH?
6    A.  3MBH, yes.
7    Q.  Okay.  I'd like you to turn to page
8  3MBH01242445.
9    A.  2445.  Has a 6 on the top right?
10   Q.  Yes.
11   A.  Uh-huh.
12   Q.  And on the top -- top it says "Kurz 1996 SSI
13  paper limitations:  only 200 patients, mostly
14  superficial infections with few clinical consequences
15  (we should focus on deep tissue organ SSIs), the
16  factor of 3 risk increase is not plausible (30 percent
17  or so is more likely)."
18       Did I read that correctly?
19   A.  Yes.
20   Q.  Were you aware that most of the infections
21  documented in the 1996 Kurz study in the New England
22  Journal of Medicine dealt with mostly superficial
23  infections with few clinical consequences?
24       MS. LEWIS:  Do you have a copy of the Kurz
25  study?

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 170

1   A.  Well I am aware -- aware that it didn't
2   involve prosthetic infect -- infections, but whether
3   it was superficial or deep -- or deep tissue or organ
4   space, I don't recall.
5   Q.  We talked about clinical outcomes --
6   A.  Yes.
7   Q.  -- regarding maintaining normothermia.  And
8   that's important, isn't it, clinical outcomes?
9   Correct?
10   A.  Yes.
11   Q.  And here's a document in which -- a meeting
12   in which Kurz attended that said most -- "mostly
13   superficial infections with few clinical consequences"
14   were the infections recorded in the Kurz paper.  Does
15   that change your opinion of the -- the strength of the
16   Kurz paper?
17   A.  I think the Kurz paper still is a
18   reli -- reliable piece of information about the effect
19   of normothermia on surgical in -- infections.
20   Q.  Do you think -- do you think maintaining
21   normothermia reduces the incidence of infection in
22   colorectal surgeries by a multiplier of three in
23   today's world?
24   A.  I have no basis on which to -- to say --
25   Q.  Okay.

Page 171

1   A.  -- in today's world what the result of such
2   a study would be.
3   Q.  I mean you agree that there are infections
4   out there that really have no clinical consequence.
5   A.  I -- I'm -- I'm not sure about that.  I
6   think to the patient infections have clinical
7   consequences.
8   Q.  That wasn't my question.  There --
9       There are infections out there that have no
10   clinical consequences.
11   A.  No.
12   Q.  You disagree with that?
13   A.  I disagree with that.
14   Q.  Okay.  So there are infections there that
15   could be a superficial wound infection, I put some
16   antibiotics on and I'm fine in a day?
17   A.  There could be infections like -- like that.
18   But among the infect -- infections identified in -- in
19   the study, I don't think Kurz was saying that they
20   were all superficial infections.
21   Q.  Right here, "mostly superficial
22   infections" --
23   A.  Mostly --
24   Q.  -- "with few clinical consequences."
25   A.  "Mostly superficial infections" --

Page 172

1   Q.  Okay.
2   A.  -- "with few" -- yeah.
3   Q.  And it actually goes on and say "(we should
4   focus on deep tissue organ SSIs)."
5       MS. LEWIS:  Objection to the form of the
6   question.
7   Q.  That's what it says there; right?
8   A.  That's what it says there.
9   Q.  Okay.  And this was a meeting in which
10   Andrea Kurz was present, and you agree with that.
11       MS. LEWIS:  Objection to the form of the
12   question.
13   A.  That's what it says.
14   Q.  And the reason why you should focus on deep
15   tissue organ SSIs is because those are clinically
16   significant; correct?
17   A.  I would say they are more clinically
18   significant.
19   Q.  Okay.  She goes on, "...the factor" -- or
20   the paper goes on, "...the factor of 3 risk increase
21   is not plausible..."  You have no reason to agree or
22   disagree with that; correct?
23   A.  Correct.
24   Q.  Okay.  The "Melling paper" -- next line --
25   "seriously flawed:  only 420 low risk patients,

Page 173

1   infection was not defined, core temperature not
2   recorded(!)"
3       Were you aware of the significant and
4   serious flaws of the Melling paper?
5   A.  I think the Melling paper is also infor --
6   informative despite -- despite these comments.
7   Q.  Okay.  But you would agree with me,
8   especially with the Kurz paper, that Andrea Kurz knows
9   more about her paper and the limitations than you do.
10   A.  She does.
11   Q.  Okay.  Let's go to the deposition of Andrea
12   Kurz.  I'd like you to turn to page 179.  If you look
13   at page 179 of Andrea Kurz's deposition, which is
14   marked as Exhibit No. 9, line 16:
15       "Question:  In today's scientific standards,
16   there is no reliable evidence that supports that
17   maintaining normothermia reduces the incidence of
18   infection.
19       "Answer:  That is correct."
20       Do you agree with that statement and answer?
21   A.  No.
22   Q.  Okay.  So you disagree with Andrea Kurz.
23   A.  Yes.
24   Q.  Okay.
25       MS. LEWIS:  I'm sorry, tell me what page

44 (Pages 170 to 173)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 174

1 number we are again.
2       MR. ASSAAD:  179.
3       MS. LEWIS:  Okay.  Thank you.
4    Q.  So Andrea Kurz, who has done more research
5 than most people in the world on maintaining
6 normothermia and its effects, you, as a person who's
7 never done research on maintaining normothermia,
8 disagree with Dr. Kurz.
9    A.  Yes.
10   Q.  Okay.
11   A.  I disagree with that -- with that statement.
12 I'm sure there are many things Dr. Kurz has said that
13 I agree with, but with respect to that statement, yes,
14 I disagree.
15   Q.  You disagree with that statement.  Okay.
16   A.  I disagree with that statement.
17   Q.  And what's your basis to disagree with that
18 statement?
19   A.  Because her research is not the -- the only
20 evidence that addresses this -- this question, and
21 we've already talked about oth -- others and other
22 more recent research.
23   Q.  Well, with respect to surgical-site
24 infections, what valid scientific evidence is there
25 that indicates that maintaining normothermia reduces

Page 175

1 the incidence of surgical-site infections?
2    A.  Kurz, Melling.
3    Q.  Okay.  Anything else?
4    A.  The --
5       No, I would say I would point to those.
6    Q.  Okay.  So you disagree with Dr. Kurz's
7 opinions on her own study that you're citing to
8 support maintaining normothermia reduces the incidence
9 of infections.
10   A.  Well I'm not --
11      So this statement of hers is conditioned by
12 the phrase "In today's scientific standards," and I
13 don't know what she means by -- by that.
14   Q.  Well if you read the deposition --
15   A.  Or that's your -- that's your ques -- that's
16 your question.  I'm not sure what -- what you mean by
17 that.
18   Q.  And you've had a copy of this deposition;
19 right?
20   A.  I had a copy of this deposition.
21   Q.  Okay.  And you had a chance to read it;
22 correct?
23   A.  I did.
24   Q.  Okay.  And you were never provided a -- a
25 copy of Exhibit No. 10; were you?

Page 176

1    A.  Which is Exhibit No. 10?
2    Q.  The minutes.
3    A.  I don't believe I was, --
4    Q.  Okay.
5    A.  -- no.
6    Q.  Were you ever informed that Dr. Sessler
7 indicated in 2016 saying that knowing what he knows
8 now, that he would have never published the 1996
9 Sessler paper with Dr. Kurz?
10   A.  I'm not aware of that statement.
11   Q.  Would that affect your opinion with respect
12 to the quality of the 1996 study?
13   A.  I -- I -- I don't know why he said -- why he
14 would say that.
15   Q.  So you're not aware that he's made that
16 statement in the past; correct?
17   A.  I am not aware of that.
18   Q.  And if he did make that statement, would it
19 change your opinion?
20   A.  Again, it would depend why he was saying it,
21 what he was thinking.
22      (Exhibit 11 was marked for
23      identification.)
24 BY MR. ASSAAD:
25   Q.  What's been marked as Exhibit 11 is an

Page 177

1 e-mail chain with Jay Issa, who I'll let you know is
2 an employee of 3M, Dr. Sessler, Mark Morken, another
3 employee of 3M, Michelle Stevens, who is a medical
4 director of 3M infectious disease, Jill Rector and
5 Andrea Kurz.  And I'm --
6       You know who Andrea Kurz is; correct?
7    A.  Yes.
8    Q.  Okay.  If you look on the second page, it's
9 an e-mail from Mark Morken to Dan, says, "Our group
10 met yesterday to discuss the proposed retrospective
11 review of SSI in Colorectal surgery protocol and we
12 have the following questions or clarifications:"
13      And I want to go to number three.  "The
14 infection rate in the 1996 study went from 19 percent
15 to 6.6 percent and in the background for this protocol
16 the infection rate is 13 percent - why is there such a
17 difference from what was achieved in 1996 and current
18 status?"
19      And if you go -- look up, it's an e-mail
20 from Dr. Dan Sessler to Mark.  If you look at number
21 three, it states, "Presumably the infection rates
22 differ because the institutions and definitions
23 differ.  Importantly, about half the Clinic cases are
24 inflammatory bowel disease, a group with a high
25 infection rate, where most patients in the 1996 trial

45 (Pages 174 to 177)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 178

1   have colon cancer.  The treatment reported in 1996 is
2   implausibly high (that is, the infection rate probably
3   wasn't actually as low as in our 100 warmed patients.
4   Knowing what we do know -- Knowing what we do now
5   about fragile clinical trials, we would never have
6   published such a small study."
7       Did I read that correctly?
8   A.   You did.
9   Q.   Okay.  The fact that Dr. Sessler states
10  that, knowing what he knows now about fragile clinical
11  trials, he would have never published such a small
12  study, which was the nineteen six -- 1996 Kurz study,
13  does that change your opinion regarding the strength
14  of the 1996 Kurz study?
15  A.   Well it sound -- it sounds as though he is
16  questioning the statistical pow -- power of the
17  study's sample size.  To the extent that that may, as
18  his parenthetical comm -- comment suggests, alter the
19  result with respect to the magnitude of the treatment
20  effect, it is of -- of some import, but even -- even
21  if the magnitude were substantially less but still
22  substantial, I would say that I would still conclude
23  from the study that warming is beneficial.  And of
24  course warming is beneficial not only for its impact
25  on surgical-site infections but a variety of other

Page 179

1   important outcomes.
2   Q.   Okay.  But you'd want to know what
3   statistical reduction it is; correct?
4   A.   Well my first -- first question is sort of
5   "yes" or "no" is it beneficial.  Beyond is it
6   beneficial, "yes" -- "yes" or "no," how beneficial is
7   it is of some interest.  But with respect to making a
8   judgment about the desirability of treating to prevent
9   normothermia, the first question is by far the more
10  important one, and it sounds as though -- I --
11      I don't see anything here that questions the
12  direction of the treatment effect, --
13  Q.   Okay.
14  A.   -- only its magnitude.
15  Q.   So the fact that most of the patients in
16  1996 had colon cancer doesn't affect, you know, the
17  susceptibility of those patients with infection?
18  A.   Well he -- he suggests, and I believe him,
19  that the baseline infection rates differ according to
20  the indication for the colon -- colon surgery.
21  Q.   Were you ever showed document Exhibit 11
22  before today?
23  A.   No.
24  Q.   Okay.  And you are aware that the patients
25  were cooled in the Kurz study; correct?

Page 180

1   A.   You reminded me of that earlier.
2   Q.   But were you aware of that before today?
3   A.   When I originally read the paper, I'm sure I
4   was.
5   Q.   Okay.  Well are you guessing, or were you
6   sure that you --
7   A.   Well if it was stated in the paper when I
8   originally read it, I -- I'm sure I noticed -- noticed
9   it.
10  Q.   How were they cooled?
11  A.   The paper has been published more than 20
12  year -- 20 years ago, so some of the details in fact
13  have es -- have escaped me.  But the impor -- the
14  important point is some patients were warmed, some
15  patients were cold.  How they got -- got cold is, I
16  think, the point you're address -- addressing.  But
17  there was a difference in their outcomes.
18  Q.   Do you know how the patients were cooled in
19  the Kurz --
20  A.   I don't -- I don't recall.  Probably a --
21      Well I don't want to guess.
22  Q.   Okay.  When was the last time you read the
23  Kurz study?
24  A.   Prob -- probably when I was constructing the
25  performance measure.

Page 181

1   Q.   Okay.  So it wasn't 20 years ago.
2   A.   Wasn't 20 years ago, but it was more than a
3   couple years ago.
4   Q.   Well you didn't read it before you submitted
5   your expert report, Exhibit No. 3?
6   A.   I re -- I reviewed it.  But the methodology
7   by which the patients were -- were cooled is not an
8   important consideration in judging the significance of
9   the result.  Warmer patients did better than cooler
10  patients.
11  Q.   Well to determine whether or not you need to
12  have some sort of patient warming device, don't you
13  think the information of what the control -- control
14  group temperature is to determine whether or not the
15  study is a valid study --
16  A.   Well I'm not -- I'm not doubting whether
17  patients, left unmanaged, become hypothermic.  I think
18  that's well established.
19  Q.   Well even if they're managed they become
20  hypothermic.
21  A.   Some.
22  Q.   But you agree with me that there's no
23  scientific evidence to determine the level of
24  hypothermic -- hypothermia and outcomes.
25  A.   The res -- res -- results from Kurz and in

46 (Pages 178 to 181)

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 182

1  fact others looked at patients above or below a
2  bench -- a benchmark for hypothermia, typically 36
3  degrees or sometimes 35 and a half degrees.
4      Q.  That wasn't my question, sir.
5          As we discussed earlier, there's no
6  scientific study that indicates the -- the level of
7  hypothermia and its effect on outcomes.
8      A.  Well I'm not sure what you mean by "the
9  level of hypothermia."  If you're looking at the
10 degree difference in temperature to the percentage
11 of in -- of infection, that kind of relationship curve
12 I don't think has been established.
13     Q.  Okay.
14     A.  But patients who are hypothermic, as defined
15 by below -- depending on the study -- 36 or 35.5
16 degrees, are different from patients who are
17 normothermic.
18     Q.  Is that how you look at the Kurz study, is
19 below 36 degrees?  Did you not look at what the
20 temperatures of the patients were, the control group?
21     A.  Well the --
22     Q.  "Yes" or "no," sir.  Did you look at the
23 temperature of the patients?
24     A.  Yes.  But I can't -- I don't recall what
25 they --

Page 183

1      Q.  They were 34.5 degrees.
2      A.  Okay.
3      Q.  Do you know what's significant about 34.5
4  degrees Celsius?
5      A.  What's --
6          I'm not sure what you mean by that question.
7      Q.  What happens to the body when you get below
8  34.5 degrees?
9      A.  You try to compen -- compensate for the
10 hypothermia.
11     Q.  Yeah.  You vasoconstrict; correct?
12     A.  You vasoconstrict.
13     Q.  Or vasoconstrict.
14     A.  Vasoconstrict and -- and shiver, and
15 there -- yeah, there are other mechanisms for
16 compensation.
17     Q.  Your body likes to hold 34.5 degrees Celsius
18 on average.
19     A.  I'm sorry?
20     Q.  Your body does not like to get colder than
21 34.5 degrees.
22     A.  Your body does not like to get colder than
23 35 degrees or 35.5 degrees.
24     Q.  But your body has a reaction --
25         Are you aware of the studies, by the way, of

Page 184

1  what happens below 34.5 degrees Celsius?
2      A.  What studies are you referring to?
3      Q.  How the body -- how the body starts
4  controlling the core temperature, and it's very
5  difficult for the body to get below 34 --
6      A.  Well if there are studies you're referring
7  to, can I -- can you show them --
8      Q.  You're the anesthesiologist.
9      A.  Yes.
10     Q.  Have you heard of those studies or not?
11     A.  I'm aware of the body's physiological
12 response to hypo -- hypothermia.
13     Q.  Okay.
14     A.  If there are specific studies you're looking
15 for in that connection, you'll have to suggest --
16     Q.  But you're aware there are studies out there
17 that indicate that at 34.5 degrees on average the body
18 vasoconstricts and holds -- holds the temperature as
19 best as possible at 34.5.
20     A.  No.  It is not a -- not a switch that goes
21 off -- off at 34.5.  For some patients it will
22 happ -- it will happen at a higher -- higher
23 temperature.  And it's a range.
24     Q.  I said on average 34.5 degrees.
25     A.  I don't know whether that is an av --

Page 185

1  whether that is an average, --
2      Q.  Okay.
3      A.  -- but when you're taking care of a patient
4  in front of you, averages may not be that important.
5  That is --
6      Q.  Well let me ask you this.
7      A.  Yeah.
8      Q.  Why is hypothermia considered below 36
9  degrees?
10     A.  It is be -- because things like surgical-
11 site infections, cardiovascular morbid -- morbid --
12 morbidity, coagulapathy start to appear at -- at -- in
13 that temperature range.
14     Q.  Do you know what Dr. Sessler and Dr. Kurz
15 say the reason why it's 36 degrees?
16     A.  Why do they say?
17     Q.  I'm asking you.
18     A.  No, I don't know why they say.
19     Q.  Do you think they know more than you?
20     A.  Yes.
21     Q.  Okay.
22         (Exhibit 12 was marked for
23          identification.)
24 BY MR. ASSAAD:
25     Q.  What's been marked as Exhibit 12 is an

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 186

1  e-mail chain with Al Van Duren, Dr. Sessler, Dr. Kurz,
2  and I will just say numerous employees of 3M at the
3  time.
4        Have you seen this before, doctor?
5     A.  No.
6     Q.  Okay.  I'd like you to turn to the bottom of
7  page -- your first page.  It's an e-mail from Dr.
8  Sessler and it has Michelle Stevens, who is the
9  medical director of 3M, as well as Al Van Duren, who
10 is a -- has an upper-level position at 3M, as well as
11 Gary Hansen.  It says, "Hi Folks,
12        "One of the points Andrea and I tried to
13 make at the KOL meeting in Washington" --
14        Do you know what "KOL" stands for?
15    A.  I don't.
16    Q.  Key opinion leaders.
17    A.  Okay:
18    Q.  -- "is that the evidence for hypothermia-
19 related complications mostly does not meet current
20 research guidelines for reliability and that previous
21 studies were done with much larger temperature
22 differences than are currently allowed."
23        Did I read that correctly?
24    A.  Yes.
25    Q.  Do you understand what Dr. Sessler is saying

Page 187

1  here?
2     A.  I -- I -- I can in -- infer, but he's not --
3  he does not provide a lot of detail about what he
4  means by "current research guidelines for
5  reliability."
6     Q.  Well you understand that we live in a world
7  where published literature is peer-reviewed; correct?
8     A.  Correct.
9     Q.  And it's peer-reviewed for --
10       Reliability is one of the reasons why it's
11 peer-reviewed; correct?
12    A.  Correct.
13    Q.  And if you have a methodology that's flawed,
14 it might not be reliable and it might not stand up to
15 peer review; correct?
16    A.  Correct.
17    Q.  Okay.
18    A.  However --
19    Q.  And reliability is --
20       I mean I understand you have a --
21       MS. LEWIS:  He hasn't finished his answer.
22       MR. ASSAAD:  He said "correct" so I moved
23 on.
24       MS. LEWIS:  He said "however."
25    A.  Correct.  However, if we are talking about

Page 188

1  the Kurz paper, not only was -- was it peer-reviewed,
2  it was peer-reviewed by the most rigorous medical
3  journal in the world.
4     Q.  And even that medical journal, not -- things
5  that are old in it are no longer reliable, correct, in
6  the New England Journal of Medicine?
7     A.  Well I would not agree with that blanket
8  statement.
9     Q.  Well science advances; doesn't it?
10    A.  Correct.  But red -- you know, hemoglobin
11 still carries oxygen, so there are things that are old
12 that are still reliable.
13    Q.  Okay.  And sometimes you look at things --
14       And right now I don't know if any doctor
15 cools patients in the operating room during a surgery
16 such as a colorectal surgery or total hip or total
17 knee arthroplasty; is that correct?
18    A.  That -- that is -- that is correct.
19    Q.  Okay.  Okay.  So --
20    A.  That is --
21       Whether that feature of the study design
22 affects its reliability is something I am not able to
23 judge.
24    Q.  Okay.
25    A.  I mean there may be ethical considerations

Page 189

1  about thinking about doing that -- doing that today,
2  but whether that goes to the reliability of the stu --
3  of the study, the fact of the matter is that it is
4  a -- it is an old -- old study and it is today
5  probably still the most-frequently-cited piece of
6  evidence on this subject, so the scientific community
7  obviously understands its age but still regards what
8  it contributes to our knowledge as substantial.
9     Q.  Okay.  Well you know that they're not just
10 talking about the Kurz study here.  Actually, he says,
11 "One of the points Andrea" -- Ms. Andrea Kurz -- "and
12 I tried to make at the KOL meeting in Washington" --
13 key opinion leaders -- "is that the evidence for
14 hypothermia-related complications mostly does not meet
15 current research guidelines for reliability and that
16 previous studies were done with a much larger
17 temperature difference than are currently allowed."
18 Not talking about the Kurz study, talking about
19 general evidence.  Let's continue.
20       Did I read that correctly by the way?
21    A.  You read that correctly.
22    Q.  Okay.  Let's continue.  "Others have noted
23 the same thing.  See, for example, page 13 of the
24 current issue of the ASA Newsletter which includes the
25 following:  'The normothermia measure has the weakest

48 (Pages 186 to 189)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 190

1  evidence supporting its ability to improve outcomes
2  and is a complex, non-intuitive measure involving
3  multiple inclusion of -- inclusion and exclusion
4  criteria.'"
5       First of all, you were president of the ASA;
6  correct?
7       A.  I was.
8       Q.  And what years were you president?
9       A.  I was president in 2010.
10      Q.  Until how long?  It's one year?
11      A.  It's a one-year term.
12      Q.  Okay.  So in two thousand twen --
13           You -- you -- you subscribe to the ASA
14  Newsletter; correct?
15      A.  I do.
16      Q.  Okay.  Do you recall reading an article on
17  normothermia that said such a statement?
18      A.  I don't recall --
19      Q.  Okay.
20      A.  -- this -- this quotation.
21      Q.  Okay.  Third paragraph, "The writing is on
22  the wall.  Without new evidence of harm from current
23  levels of hypothermia, SCIP-10 is unlikely survive
24  into the next version of pay-for-performance
25  measures."

Page 191

1       Did I read that correctly?
2       A.  You did.
3       Q.  Has SCIP-10 survived?
4       A.  SCIP-10 has not sur -- survived, but I --
5       Q.  So SCIP-10 has not survived; correct?
6       A.  Has not survived.
7       Q.  Okay.
8       A.  Wait a minute.  The reason it has not
9  survived has, as far as I know, little to do with the
10  underlying evidence base, it has to do with changes
11  in -- in performance on that measure.
12      Q.  Well you -- you weren't on the committee,
13  were you, for SCIP-10, as we discussed earlier?
14      A.  Correct.
15      Q.  Okay.  You're speculating at this point in
16  time.
17      A.  No.  No.  I am relating to you what I have
18  read about the retirement of the SCIP infection
19  control measure set, which was on the basis of the
20  measures being -- they are called topped out.
21      Q.  Simple question, "yes" or "no:"  Has SCIP-10
22  survived since 2012?
23      A.  No.
24      Q.  Thank you.
25           (Exhibit 13 was marked for

Page 192

1       identification.)
2  BY MR. ASSAAD:
3       Q.  Before we get to Exhibit 13, do you know
4  what research the different type of surgeries that
5  maintaining normothermia has been -- the research has
6  been conducted on?
7           Do you understand my question?
8       A.  Yes.  So Kurz studied it in the context of
9  colectomy pa -- patients; --
10      Q.  Okay.
11      A.  -- Melling studied it -- I think it was
12  most -- mostly if not all breast -- breast surgery, --
13      Q.  Breast and hernia.
14      A.  -- breast and hern -- and hernia; Frisch
15  studied it in hip-fracture surgery; and Scott studied
16  it in a wide -- wide variety of surgeries.
17      Q.  Okay.  And Scott showed no difference in
18  wound infections; correct?
19      A.  No difference in wound infections.  A
20  dramatic reduction in infectious complications and
21  other complications overall.
22      Q.  But no difference in wound infections;
23  correct?
24      A.  Correct.
25      Q.  Okay.  And Frisch, I think it was total hip

Page 193

1  and total knee, and it showed no difference in
2  infection rates.
3       A.  Well it depends which -- which -- which
4  Frisch.
5       Q.  Oh.  There's more than one Frisch?
6       A.  There's more than one Frisch.
7       Q.  Okay.  Which one did you consider, the one
8  listed in Exhibit 2?
9       A.  Yes.
10      Q.  Okay.  Exhibit 13 is a copy of a paper
11  titled "Improving Perioperative Temperature
12  Management;" correct?
13      A.  Yes.
14      Q.  And this was authored by you and Dr.
15  Sessler; correct?
16      A.  Correct.
17      Q.  And we've discussed this previously;
18  correct?
19      A.  Yes.
20      Q.  And even though it talks about the
21  randomized outcome trials and benefits of
22  normothermia, the -- the majority of this paper deals
23  with quality-based payment systems; correct?
24      A.  Yes.
25      Q.  Okay.  You do agree that practicing medicine

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 194

1    is -- is that, it's practicing medicine; correct?
2       A.  I have no idea what you mean by that.
3       Q.  Well I mean things could change over time;
4    correct?
5       A.  Things change over time.
6       Q.  Like you might think this antibiotic is
7    good, but then you might say, no, it's actually not
8    good, this antibiotic is better; correct?
9       A.  Yes.
10      Q.  You mentioned the laminar flow studies, and
11   at one time they thought laminar was the greatest
12   thing and now there's a question of whether it's good
13   at all; correct?
14      A.  Correct.
15      Q.  Okay.  So even though there are studies that
16   talk about how great laminar flow is back in the '70s
17   and '80s, now there's newer studies that question
18   that; correct?
19      A.  Correct.
20      Q.  Okay.  And you realize a lot of the studies
21   that you cite with respect to maintaining normothermia
22   are from the '90s.
23      A.  Some of them are, yes.
24      Q.  Most.
25      A.  Well I -- I don't -- I don't know whether

Page 195

1    that's most of them, but yes, some of them are.
2       Q.  I mean the Kurz study is '96; correct?
3       A.  Yeah.
4       Q.  Okay.
5       A.  Frisch is 2016.
6       Q.  And -- and Frisch shows no difference in
7    infection rates.
8       A.  Again -- again, that's the one that I asked
9    to see the statistical workup on.
10      Q.  I don't have it.  But --
11      A.  I'm sorry you don't.
12      Q.  -- we agree that Scott, with respect to
13   wound infection, which is the same type of study that
14   Kurz and Melling were looking at, showed no difference
15   in wound infections, and that was a 2015 study;
16   correct?
17      A.  Correct.
18      Q.  Okay.  When looking at the same thing --
19      A.  If I may -- if I may --
20      Q.  -- that Kurz and Melling were looking at,
21   wound infections --
22      MS. LEWIS:  You didn't let him finish his
23   answer.
24      A.  No.  My point about Scott is that Scott
25   looks at a whole variety of important clinical out --

Page 196

1    outcomes leading to patient morbidity and mortality
2    beyond surgical wound infections, and the inescapable
3    conclusion from looking at Scott is that -- is that
4    managing patient temperature with forced-air warming
5    benefits the patient.
6       Q.  But you can't say that with re -- with
7    respect to total hip and total knee arthroplasties
8    because you don't know, the surgeries that occurred,
9    which ones applied to orthopedic surgeries, correct,
10   with Scott?
11      A.  Scott does not iden -- identify which
12   orthopedic procedures.
13      Q.  But what we can say for sure in Scott is
14   that with respect to wound infections in orthopedic
15   procedures, there is no difference between SCIP
16   compliant and SCIP non-compliant.
17      A.  I don't think Scott broke out wound
18   infections for separate analy -- for separate
19   analysis.
20      Q.  Okay.  Are you familiar with the Clarissa
21   Tjoakarfa study --
22      A.  Does not sound familiar to me.
23      Q.  -- entitled "Reflective Blankets Are as
24   Effective as Forced Air Warmers in Maintaining Patient
25   Normothermia During Hip and Knee Arthroplasty

Page 197

1    Surgery?"
2       A.  No, I'm not familiar with that.  No.
3       Q.  Okay.  Do you know why they are not --
4          Do you have an opinion whether or not
5    reflective blankets are as efficacious as forced-air
6    warmers in total hip and total knee arthroplasty
7    surgeries?
8       A.  Do I have an opinion?
9       Q.  Yes.
10      A.  Yes, I have an opinion about that.
11      Q.  What's your opinion?
12      A.  They are not as effective as active warming.
13      Q.  What study have you performed to determine
14   that?
15      A.  You asked for my opinion, not for the result
16   of a study.
17      Q.  Well I'm hoping --
18         I don't want you to guess.  Your opinion is
19   based on some sort of fact or science.  Do you have
20   any fact or science to support your opinion that
21   forced-air warming is more effective than reflective
22   blankets?
23      A.  No, I can't -- I can't --
24      Q.  Okay.
25      A.  -- point to that study.

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 198

1      Q.   You're familiar with the studies comparing
2   forced-air warming to the Hot Dog device; are you --
3   are you not?
4      A.   I -- I have not -- I -- I have not
5   studied -- studied them.  My interest in this has not
6   been so much about the comparative efficacy but the
7   safety of the Bair Hugger, --
8      Q.   Okay.
9      A.   -- and so those are somewhat off point.
10     Q.   Okay.  Just so I understand, your opinion is
11  that since there's no article that you agree with or
12  you think is credible that the Bair Hugger is unsafe,
13  that it must be safe.
14     A.   That is in -- in part true, but it is
15  also -- my opinion is also based on the fact that
16  there is evidence that the risk of infections declines
17  with the use of the Bair -- Bair Hugger, and that
18  un -- unless I saw a clinical outcome study showing
19  me -- showing me that the Bair Hugger was unsafe in
20  that respect, I would continue to support its use and
21  advocate for its safety.
22     Q.   Can you --
23         And -- and try to get out for a second
24  the -- the fact that you honestly believe that
25  maintaining normothermia reduces the risk of

Page 199

1   surgical-site infections.  I don't want to talk about
2   that any more.  I want to talk about whether or not
3   the Bair Hugger contaminates the sterile field or
4   increases the bacterial load over the sterile field.
5   Do you understand?
6      A.   That's fine.
7      Q.   Okay.  Are you aware of any study that
8   indicates that the Bair Hugger does not increase the
9   bacterial load over the sterile field?
10     A.   I am aware of --
11         So the bacterial load over the sterile --
12  sterile field, the particles, the bubbles and the
13  air tur -- air turbulence are surrogates or -- or
14  proxy -- or proxies for what I am interest --
15  interested in, which is the risk of harm to the
16  patient, so the problem -- the problem is that that
17  ev -- evidence is not addressing the key and important
18  question here whereas the clinical studies do.  In
19  addition, most of the ones I have looked at, even as a
20  non-expert on particle sci -- science, et cetera,
21  have -- raise in my mind serious methodological flaws;
22  namely, the experimental -- the experimental setup
23  having nothing to do with the clinical setting in
24  which we use the Bair Hugger.
25         MR. ASSAAD:  Move to strike as

Page 200

1   non-responsive.
2      Q.   Listen to my question.  Are you aware of any
3   study that indicates that the Bair Hugger does not
4   increase the bacterial load over the surgical site?
5      A.   I -- I am not aware of it.
6      Q.   Okay.  Do you know what the Mistral warmer
7   is?
8      A.   I've heard -- I've heard of it.
9      Q.   You know it's a forced-air warming device?
10     A.   Yes, I know that.
11     Q.   You know it's made by Stryker?
12     A.   I didn't know that.
13     Q.   Okay.  Are you aware that Mistral, which is
14  a forced-air warming device, warns the doctors
15  regarding potential airborne contamination by its
16  product?
17         MS. LEWIS:  Objection, form.
18         MR. ASSAAD:  Basis.
19         MS. LEWIS:  It mischaracterizes the
20  evidence, it's not a warning, and y'all have talked
21  about that in other depositions.
22         MR. ASSAAD:  Not a warning?
23         MS. LEWIS:  No.
24         MR. ASSAAD:  Okay.
25     A.   I'm not aware of the non-warning.

Page 201

1      Q.   It is a warning.  Your counsel is wrong.
2   So --
3      A.   I'm not --
4         I -- I -- I have a passing familiarity --
5      Q.   Okay.
6      A.   -- and recognition of the brand name and
7   nothing -- know nothing more about Mistral.
8      Q.   Are you aware that the older models of Bair
9   Hugger --
10         Have you ever seen a model 200 series Bair
11  Hugger?
12     A.   I doubt -- I doubt it.  I think the models I
13  use are 500 series plus.
14     Q.   And 700 series?
15     A.   That I don't know about.
16     Q.   Have you looked at the warning labels on the
17  200 series?
18     A.   No, I don't think I've seen the 200.
19     Q.   Has counsel showed you those labels -- I'm
20  sorry.
21         Has counsel showed you those labels?
22     A.   No, I don't believe so.
23     Q.   Okay.  Do you understand there was no
24  verification testing on the Bair Hugger?
25     A.   What does "verification testing" mean?

51 (Pages 198 to 201)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 202

1    Q.  I won't go into it because you don't know
2  what it means.
3        Going back to your thousand hours sitting
4  next to a Bair Hugger device, is it your testimony
5  today that you've never felt heat sitting there as
6  a sur -- as a -- as a doctor around the patient coming
7  from the Bair Hugger device?
8    A.  From the generator?
9    Q.  From the blanket.
10    A.  From the blanket.  When I am in close
11  proximity or my hands are underneath the blanket or I
12  lift the head shield, yes, yes, I do, but when I'm
13  sit -- sitting a foot and a half away from it, no, I
14  don't.
15    Q.  Would you be surprised if there were studies
16  that indicated that the temperature around the
17  surgical table and the surgeon increased significantly
18  more with the Bair Hugger than with the Hot Dog
19  device?
20    A.  I -- I -- I wouldn't be -- I wouldn't be
21  surprised, but I don't necessarily attach any
22  significance to -- to that.
23    Q.  Okay.  Well if all of the air and heat are
24  coming out at the neck, where do you think that heat's
25  going to go?

Page 203

1    A.  It's mixing with the very substantially cool
2  air in the room.
3    Q.  You think it could change the temperature in
4  the room by a few degrees?
5    A.  No.
6    Q.  Okay.
7        (Exhibit 14 was marked for
8        identification.)
9  BY MR. ASSAAD:
10    Q.  Exhibit 14 is a peer-reviewed article titled
11  "Resistive-Polymer Versus Forced-Air Warming:
12  Comparable Efficacy in Orthopedic Patients," and it's
13  authored by Brandt, among others, including Oguz, Kurz
14  and Kimberger.
15        Have you seen this article before?
16    A.  No, I don't have.
17    Q.  Okay.  Under the conclusion it says,
18  "Resistive-polymer warming performs as efficiently as
19  forced-air warming in patients undergoing orthopedic
20  surgery."  Do you have any disa -- do you have any
21  disagreement with that conclusion?
22    A.  I have no basis to agree or disagree.
23    Q.  Because whether or not you think maintaining
24  normothermia is real science or junk science, it
25  doesn't matter which way you warm, correct, as long as

Page 204

1  you warm the patient?
2    A.  As long as you warm the patient safe --
3  safely and effectively.
4    Q.  I'd like you to turn to page 836,
5  "Environment" -- I want you to look under Table 1,
6  "Environmental temperature at 1 meter distance to
7  warming device (after 30 minutes)," and do you see
8  where it says 24.4 degrees plus or minus 5.2 degrees
9  for Bair Hugger and 22.6 degrees plus or minus 1.9
10  degrees for Hot Dog?
11    A.  Yeah.
12    Q.  Huh?
13    A.  Yes, I do.
14    Q.  Okay.  And you see that the OR temperature
15  started at 19.5 degrees --
16    A.  Uh-huh.  Yeah.
17    Q.  -- and it ended at 19.4?  Do you see that?
18    A.  Yeah.
19    Q.  And around the warming device, at a one-
20  meter distance around it, the temperature raised five
21  degrees.  Do you see that?
22    A.  I -- I see that.
23    Q.  And up -- and at some point up -- up over 10
24  degrees Celsius for the Bair Hugger based on the
25  standard deviation.

Page 205

1        Were you aware of this article, sir?
2    A.  I said no.
3    Q.  Has counsel -- has -- has counsel --
4        Would you be surprised if you were provided
5  this article in the hundreds of articles that you
6  received from --
7    A.  It's poss -- it's possible it's --
8    Q.  Okay.
9    A.  -- it's -- it's in there.
10    Q.  You just didn't review it before; correct?
11    A.  As I said and you said your -- yourself, the
12  point -- the point here is that we want to achieve
13  normothermia safely, so my focus in reviewing the
14  articles has been on the safety more than the
15  efficacy.
16    Q.  Would it be --
17    A.  The other point -- the other point I make
18  about this is that if -- if the Bair Hugger serves to
19  warm the up -- rise -- raise the temperature around
20  the patient, is that -- is that bad?
21    Q.  Do you know if it's bad or not?
22    A.  I don't think it's bad.  I think we try very
23  hard to warm the area around the patient.  I think
24  operating rooms are -- are too -- too cold.
25    Q.  Do you know what the effect of heat is

52 (Pages 202 to 205)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 206

1  around the operating room table on the sterility of
2  the surgical site?
3        "Yes" or "no."
4     A.  No.
5     Q.  Okay.  Move on then.
6        Do you think the data with respect to
7  cardiac morbidity and thermoregulation is strong or
8  weak?
9     A.  It is strong.
10    Q.  Have you done any research on it?
11    A.  No, I haven't.
12    Q.  Who has done research on it that you're
13 aware of?
14    A.  The original study we cited in the
15 performance measure was -- was Frank, but I think that
16 that was one of the endpoints also studied in -- in
17 Scott.  Wherever Scott is.  Yeah.
18    Q.  It's what?
19    A.  It says Scott showed a reduction by 50
20 percent in the frequency of ischemic cardiovascular
21 events, but the Frank, which is -- is also an older
22 paper, also studied vascular patients and showed a
23 lower frequency of morbid cardiovascular events in
24 warmed patients.
25    Q.  But you don't know what percentage of total

Page 207

1  hip or total knee have actually car -- cardiac events.
2     A.  No.  No.  As I said, I don't --
3     Q.  Okay.
4     A.  -- see that Scott has broken out those
5  subpopulations.
6     Q.  Do you recall what Dr. Kurz or Dr. Sessler
7  said in their depositions regarding the effect of
8  maintaining normothermia on cardiac events?
9     A.  I --
10       No, I don't recall them specifically talking
11 about them.  And the statements we looked at a little
12 earlier were very generic statements about -- about
13 outcomes.
14    Q.  Are you aware that 3M is conducting a large
15 study in China now on that very issue?
16    A.  No.
17    Q.  Okay.  And I take it you would defer to the
18 researchers that have done the research on the
19 relationship between normothermia and cardiac events
20 with respect to their outcomes; correct?
21    A.  Correct.
22    Q.  I mean you're not basing any of your
23 opinions on any of the work that you've done.
24    A.  Correct.
25       MR. ASSAAD:  Okay.  Take a break.

Page 208

1        THE REPORTER:  Off the record, please.
2        (Recess taken.)
3  BY MR. ASSAAD:
4     Q.  Ready to continue?
5     A.  Yes, sir.
6     Q.  So doctor, we talked about the Kurz study,
7  the Melling study and the Scott study; correct?
8     A.  We have.
9     Q.  And the one study that we haven't talked
10 about that you believe is authoritative is Frisch;
11 correct?
12    A.  I believe Frisch has influenced my opinion
13 about the safety of the Bair Hugger --
14    Q.  Okay.
15    A.  -- and the -- and the efficacy of
16 normothermia.
17    Q.  All right.
18       (Exhibit 15 was marked for
19       identification.)
20 BY MR. ASSAAD:
21    Q.  Is Exhibit 15 the Frisch article you're
22 referring to?
23    A.  No, it's not.
24    Q.  Okay.  So you're looking at the one on hip
25 fractures, not on hip and knee arthroplasty.

Page 209

1     A.  Correct.
2     Q.  Would you agree with me that the one dealing
3  with hip and knee arthroplasty are more relevant to
4  this case than hip fractures?
5     A.  Ever so slightly.
6     Q.  What do you mean "ever so slightly?"
7     A.  Because the nature of hip-fra -- hip-
8  fracture surgery is very similar to hip arthro --
9  arthroplasty, so I think, even more so than the other
10 studies, we're talking about the conclusions one would
11 draw from that have special bearing on at least hip
12 arthroplasty if not knee arthroplasty also.
13    Q.  Well do hip fractures all have implants?
14    A.  They have -- all have some kind of hard --
15 hardware.
16    Q.  Okay.
17    A.  Whether --
18       Some of them are repaired with a
19 hemiarthroplasty, which, as its name implies, is very
20 similar to a total hip arthroplasty.
21    Q.  Okay.  But you --
22       I mean this is the same Frisch though;
23 correct?
24    A.  I believe it is.
25    Q.  Okay.  Had you seen this article before?

53 (Pages 206 to 209)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 210

1    A.  No, I don't believe I have.
2    Q.  You have?
3    A.  No, I don't believe so.
4    Q.  You haven't.  Okay.
5        I'd like you to go to page 60 of the
6  article.  And this was published in 2016.  Are you
7  aware of that?
8    A.  It says 2017, but if you say it was
9  published in 2016 --
10   Q.  Oh, I'm sorry, you're right, 2017.  It
11 was -- it was submitted in 2016.
12   A.  Okay.
13   Q.  Do you see Table 3 where it indicates
14 "Univariate Analysis of Complications Associated With
15 Hypothermia?"
16   A.  Yes, I do.
17   Q.  And you see it says at the top TJA, and then
18 halfway down -- a little more than halfway has TKA, do
19 you see that?
20   A.  Yes.
21   Q.  And then if you go to the second -- other
22 column it has THA on the right-hand side.
23   A.  Yes.
24   Q.  Okay.  And also has p-values.
25   A.  Yeah.  So I infer from that that TJA is the

Page 211

1  combined results from TKA and THA.  Is that what --
2    Q.  Yes.
3    A.  -- what they've done?
4    Q.  Okay.  And TJA stands for total joint
5  arthroplasty.  You agree?
6    A.  Usually it does, yes.
7    Q.  And TKA is total knee arthroplasty?
8    A.  Yes, that's --
9    Q.  And THA is total hip arthroplasty.
10   A.  That's fine.
11   Q.  And they talk about the normothermic and
12 hypothermic patients, do you see that?
13   A.  Yes.
14   Q.  Okay.  Do you see that every single
15 comparison for MI, which is the mydocardial -- mydo --
16 myocardial infarction, --
17   A.  Infarction yes.
18   Q.  -- stroke, DVT, PE, DSSI, which is deep
19 surgical-site infection, SSI, which is superficial
20 surgical-site infection, and NSI, that there shows no
21 statistically significant -- or difference that --
22 that is statistically significant among patients that
23 are normothermic and hypothermic.
24   A.  I see that.
25   Q.  Okay.  And that's for every single category

Page 212

1  there; correct?
2    A.  Yes.
3    Q.  Okay.  And this is dealing with the same
4  type of surgeries that are involved in this multi-
5  district litigation.
6    A.  Yes, it is.
7    Q.  So based on this article and this raw
8  data -- this data, you would agree with me that
9  whether a patient is normothermic or hypothermic
10 doesn't have an effect on total knee and total hip
11 arthroplasties for an MI, a stroke, a DVT -- DVT, a
12 PE, a DSSI, an SSI, an NSSI and an LOS, which is
13 length of surgery.
14   A.  I would agree that this study fails to
15 demonstrate that difference.
16   Q.  Or demonstrates that there is no difference.
17   A.  Correct.
18   Q.  Okay.  And this is 2017; correct?
19   A.  Correct.
20   Q.  You were not provided this article by the
21 defendant; were you?
22   A.  I don't --
23       It does not look familiar to me.
24   Q.  Okay.  And this is one year --
25       This is an article that's dated one year

Page 213

1  after the Frisch article that you cited; correct?
2    A.  The Frisch article I cited was 2016.
3    Q.  Okay.  And it's the same author.
4    A.  I believe it is.
5    Q.  Okay.
6    A.  N.B. Frisch, yeah.
7    Q.  I'd like you to go to Exhibit 7, which is
8  the Sun study.
9    A.  Sun, yes.
10   Q.  This was Anesthesiology, a peer-reviewed
11 ar -- journal.  Are you familiar with Anesthesiology?
12   A.  Yes, I am.
13   Q.  Do you subscribe to it?
14   A.  Yes, I do.
15   Q.  Do you recall ever seeing this article?
16   A.  No.
17   Q.  Do you keep up to date with the literature
18 in intraoperative core temperature management?
19   A.  No more so than other clinical topics.
20   Q.  No --
21   A.  No more -- no more so to -- today than other
22 clinical topics.
23   Q.  Well do you focus on like maintaining
24 normothermia and the literature out there on it?
25   A.  Yes.

54 (Pages 210 to 213)

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 214

1    Q.  And you've never seen this document before?
2    A.  I missed this document.
3    Q.  And this was on the -- I think --
4        I believe this was on the cover of
5  Anesthesiology in February of 2015.  You do not recall
6  seeing it?
7    A.  I don't recall seeing this.
8    Q.  And you -- you left the practice of medicine
9  earlier this year; correct?
10   A.  Correct.
11   Q.  Why did you leave?
12   A.  Other demands on my time.
13   Q.  Such as?
14   A.  Such as -- such as foun -- foundation work
15  and work for The Specialty Society and work at Harvard
16  School of Public Health.
17   Q.  Would you agree with me that prewarming has
18  more of an effect on maintaining normothermia for the
19  first hour of anesthesia time than does intraoperative
20  warming?
21   A.  I would -- I would agree with that.
22   Q.  Turn to page 284.  Have you seen Table 4
23  before or understand what -- what it's saying?
24   A.  I have not seen Table 4 --
25   Q.  Do you know what --

Page 215

1    A.  -- previously.
2        I'm sorry?
3    Q.  Do you know what a degree-hour is?  Have you
4  heard that term in anesthesiology?
5    A.  No, but I --
6        No, I haven't.  Interesting.  I have not --
7  I have not seen data on this subject presented in this
8  way before.
9    Q.  Have you e-mailed with Dr. Sessler in the
10  past?
11   A.  Yes, I'm sure I have.
12   Q.  I assume those were on topics relating to
13  normothermia?
14   A.  In -- in -- indirectly.  Our committee work,
15  our author -- authorship, and our collaboration on
16  presentation.
17   Q.  You do understand that, based on this Sun
18  article, it confirms the hypothesis that when a body
19  goes under anesthesia, the -- the -- there's
20  redistribution of heat to the extremities.
21   A.  I believe that that's true.  Whether this
22  paper con -- confirms that or not I'm not able to say,
23  not having seen it before.
24   Q.  And that's why no matter what type of
25  warming is used, you see a drop in temperature once

Page 216

1  you start anesthesia.
2    A.  Well I think we agreed a moment ago that
3  prewarming by whatever mech -- mechanism would
4  mitigate that to a degree.
5    Q.  But you still see a drop.
6    A.  You still see a drop.
7    Q.  Okay.  It's just a slower slope or lower
8  slope than without prewarming.
9    A.  Correct.
10   Q.  Okay.
11   A.  And I -- I believe that early application of
12  active warming in the operating room probably changes
13  that slope also.
14   Q.  What other topics besides normothermia did
15  you -- did you discuss with Dr. Sessler?  What other
16  type of work?
17   A.  Well I just said -- I just said --
18   Q.  Besides that.
19   A.  None that I can think of.
20   Q.  I mean do you --
21       Are you friends with Dr. Sessler, or was it
22  mostly just a professional --
23   A.  Mostly a professional relationship.
24   Q.  Now you agree with me that, as we discussed,
25  there could be a study to determine whether or not

Page 217

1  Bair Hugger increases the risk of periprosthetic joint
2  infections in total hip and total knee arthroplasty;
3  correct?
4    A.  There could be a study.
5    Q.  There could be; correct?
6    A.  There could be a study.
7    Q.  Right.  And are you aware that Dr. Sessler
8  recommended on numerous occasions to 3M to perform
9  such a study?
10   A.  I'm not aware.
11   Q.  Do you think a company has an obligation, if
12  there is a -- someone such as Dr. Sessler that's
13  requesting such a study who is a leader in -- in
14  maintaining normothermia, that they should take that
15  request seriously?
16   A.  I -- I don't know what a large multinational
17  corporation's obligations are.
18   Q.  Do you think they have an obligation to the
19  safety of the public?
20   A.  To do -- to do studies as recommended by
21  parties external to the corporation?
22   Q.  No.  To have a product that's safe for --
23  for the public.
24   A.  Yes, I think they should have products that
25  are -- that are safe.

55 (Pages 214 to 217)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 218

1    Q.   You drive a car; correct?
2    A.   Yes.
3    Q.   You -- you expect that the car manufacturer
4  does what it can to ensure that the -- that the car is
5  a safe car, especially if it gets in an accident;
6  correct?
7    A.   Yes.
8    Q.   And you probably look into the safety of a
9  vehicle in determining whether or not you want to buy
10 the vehicle; correct?
11   A.   Yes.
12   Q.   And there's actually safety tests done on
13 many vehicles, and you make a determination on -- for
14 you yourself whether or not to purchase a certain
15 vehicle or not; correct?
16   A.   Right.  And the analogy to what we're
17 talking about is that I don't do the experiments on
18 the safety of the cars myself, I rely on groups like
19 the National Transportation Safety Board and oth --
20 and others, just as in this case I rely on groups like
21 ECRI and the others I've mentioned previously to
22 perform -- to perform that assessment.
23   Q.   So your --
24        So my understanding is that you rely on
25 third-party organizations to determine the safety of a

Page 219

1  product and you don't rely on the manufacturer.
2    A.   I rely on third parties evaluating the
3  available science, coupled with my own clinical
4  experience.  And when I develop questions about
5  safety, I will look at -- myself at individual studies
6  as we've been discussing all -- all day.  But as we
7  have also noted, I don't do every experiment that
8  pops -- pops into my head, nor do I expect the
9  manufacturer to do the studies that I prescribe or
10 recomm -- recommend.
11   Q.   What studies did ECRI do?
12   A.   ECRI --
13   Q.   What studies did ECRI do --
14   A.   ECRI --
15   Q.   -- for Bair Hugger?
16   A.   I'm not aware that ECRI did any studies for
17 Bair Hugger.
18   Q.   They relied on studies that -- some of which
19 were funded by 3M or Arizant.
20   A.   They may -- they may well have.
21   Q.   Okay.
22   A.   They did a systematic analysis of what has
23 been published, and I have reason to believe that some
24 of the published literature has been funded by 3M,
25 some has been funded by Hot Dog -- Hot Dog, and I'm

Page 220

1  sure numerous other sources.
2    Q.   Okay.  So the ones funded by 3M you give
3  credibility to, the ones that were funded by Hot Dog
4  you don't give credibility to.
5    A.   No, I didn't say that at -- at all.
6    Q.   Okay.
7    A.   That's a pretty bald misrepresentation of
8  what I've been saying.
9    Q.   But with respect to, for example, your --
10 your car, do you -- do you think the manufacturer has
11 a duty to perform studies to determine whether or not
12 the car is safe?
13   A.   I -- I think the man -- manufact -- I think
14 the manufact -- manufacturer has to supply
15 information.  Whether they do studies or not, I'm not
16 sure.  But I think all of us rely on an impartial
17 source that is going to reliably be objective, and
18 that's why I look at NICE and ECRI and others, and
19 that's why you look at the National Transportation
20 Safety Board and similar groups and you and I -- you
21 and I don't necessarily take Chevrolet's claim that
22 they make the safest car around at face value.
23   Q.   You rely on the manufacturers of all the
24 products you buy that you use, that they have done
25 their due diligence to make sure that the product is

Page 221

1  safe, or at least to warn you about it if it's not.
2    A.   Yes.
3    Q.   Okay.  There's a duty among a manufacturer
4  to provide safe products, and if there's a risk, to
5  warn you of the risk.  Do you understand that?
6        MS. LEWIS:  Objection to the form of the
7  question.
8    A.   Well --
9        Yes.
10   Q.   Like, for example, a typical iron usually
11 has that little sticker on it that says keep out of
12 water, you know, when it's plugged in because it could
13 cause an electrocution.  You -- you know what I'm
14 talking about; right?
15   A.   Yeah.
16   Q.   Okay.  Now they make the iron safe and it's
17 not going to explode, but they warn you of the risk of
18 getting it wet when it's plugged in; correct?
19   A.   Correct.
20   Q.   Okay.
21   A.   So they warn you about the risk of
22 getting -- of getting it wet.  I don't think they warn
23 you about the risk of dropping it on your -- on your
24 head.  So I think that what we expect are warnings
25 that are pertinent to reasonably corr -- correct and

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 222

1   appropriate use of the device.
2       Q.   And the appropriate use of a device is using
3   the device as it was intended to; correct?
4       A.   Yes.
5       Q.   And even when you use devices the way they
6   are intended to be used, there still exists warnings
7   for certain devices; correct?
8       A.   Right.
9       Q.   Okay.
10      A.   Those are the ones --
11          Those are the warnings that I think are
12   pertinent.
13      Q.   Okay.  Now you are familiar with the 700
14   series Bair Hugger; correct?
15      A.   I believe my experience has been with 500 --
16   the 505 and 5 -- 575.  I'm not sure whether we had the
17   other model -- the other model in clinical use.
18      Q.   Is the one you use white or blue?
19      A.   They're -- they're white.
20      Q.   Okay.  So you've never used a 750.
21      A.   Probably not in -- not in the operating
22   room.  I think they may be 750s in recovery.
23      Q.   When's the last time you used the 505?
24      A.   Probably the last week in December of 2016.
25      Q.   Do you know the 505 has been discontinued

Page 223

1   for a year?
2       A.   I -- I didn't -- I didn't know that.  I know
3   we have newer ones.
4       Q.   Which are blue?
5       A.   No.  We have white -- all --
6          In the operating room we have all white Bair
7   Huggers.
8       Q.   Okay.  So you've never seen a 750.
9       A.   Well is the 7 --
10         The 750 is a blue model Bair Hugger?
11      Q.   Yes.
12      A.   I probably have seen it, but I don't think
13   we have them in the operating rooms.  They would be in
14   other -- other areas.
15      Q.   What about Bair Paws, have you seen Bair
16   Paws?
17      A.   Only advertising for Bair -- Bair Paws.
18      Q.   You don't think prewarming is important?
19      A.   I think prewarming is valuable.
20      Q.   Do you have prewarming in your hospital?
21      A.   No.
22      Q.   If it's valuable because of the patient, why
23   don't you do it?
24      A.   Because there are logistical barr --
25   barriers to -- to doing it.

Page 224

1       Q.   What's the logistical barrier?
2       A.   The patient -- patients in the -- are in the
3   pre-op area for a brief period of time, they're in --
4   being moved from -- from place to place, and places
5   that have done it have anecdotally report -- reported
6   that people in the vicinity are uncomfortable with the
7   heat.
8       Q.   When you say "people in the vicinity,"
9   you're talking about hospital staff?
10      A.   It's usually mostly fam -- family mem --
11   members who are sitting by the patient's side.
12      Q.   What about using VitaHEAT?
13      A.   I don't know about VitaHEAT.
14      Q.   It's actually battery powered.  You could
15   actually stick it in the mattress and roll it wherever
16   it goes.
17      A.   Okay.  Looks like you could be a salesman
18   for VitaHEAT.
19      Q.   Well I'm wondering if pre-op -- prewarming
20   is so important, so beneficial, how come someone such
21   as yourself that looks for pay-for-performance
22   measures hasn't investigated the options you could use
23   for prewarming.
24      A.   Well my experience with intraoperative
25   warming is that the frequency of reaching target

Page 225

1   temperature is extraordinarily high, so that I am
2   achieving what I want to achieve -- achieve without
3   pre -- prewarming.
4       Q.   Your patients are different than everyone
5   else's patients around the world?
6       A.   I don't know what you mean by that.
7       Q.   Well everyone becomes hypothermic.  There's
8   a huge --
9          I mean the Sun article says that even in
10   intraoperative warming, that most patients become
11   hypothermic in the first hour.
12      A.   I'm not talk --
13         I'm talking about -- talking about reaching
14   a target -- a target temperature by the end of -- by
15   the end of surgery or on arrival in the recovery room,
16   which is what the measure prescribes.
17      Q.   Okay.  So do you know whether or not
18   becoming hypothermic during the intraoperative period
19   increases the risk of infection, or is it becoming
20   hypothermic while you're in the PACU increases the
21   risk of surgical-site infection?
22      MS. LEWIS:  Object to the form.
23      A.   Right.  So I think that becoming hypothermic
24   at the time at -- at which you are wanting your
25   physiologic defenses to be optimal is -- is

57 (Pages 222 to 225)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 226

1  deleterious.  You are corr -- correct that most
2  patients become hypo -- hypothermic.  If you are
3  warming them, they are transiently so, and they reach
4  target temperature, you know, within -- within an
5  hour, if that -- if that, of applying the forced-air
6  warming.
7      Q.  All right.  Okay.  Is it your opinion that
8  if a patient develops a periprosthetic joint infection
9  30 days out of -- from the date of the operation, that
10  if he was hypothermic during the in -- during the
11  procedure, that could be a significant -- or be a risk
12  factor for him developing a PJI?
13      A.  Well I think hypo -- hypothermia is a risk
14  factor for developing P -- PJI.  Admittedly, as we've
15  discussed repeat -- repeatedly based on ex --
16  physiology and extrapolation from other -- other
17  settings, if there is a critical moment at which the
18  temperature matt -- matters, I'm unable -- unable to
19  say.
20      Q.  Go to your report, Exhibit 3.  On page two,
21  top paragraph, you write, "The use of forced air
22  warming has provided patient comfort and reduced
23  postoperative shivering, a side effect that is very
24  unpleasant for patients..."
25      Did I read that correctly?

Page 227

1      A.  Yes.
2      Q.  Which is a more unpleasant side effect, a
3  periprosthetic joint infection or shivering?
4      A.  A periprosthetic joint infection.
5      Q.  Okay.  And you go on, "...in addition to
6  reducing the risk of cardiovascular and bleeding
7  complications."
8      Did I read that correctly?
9      A.  Yes.
10      Q.  But you have no evidence sitting here today
11  that there is a reduction in cardiovascular risk with
12  patients that undergo total hip or total knee
13  arthroplasty; correct?
14      A.  I have no reason to believe that the risk of
15  those complications would be substantially different
16  in joint arthroplasty patients from others.
17      Q.  I understand you can believe in anything you
18  want, sir.  My question is:  You have no evidence to
19  support that belief; correct?
20      A.  I have no evidence to support what --
21  what -- what belief?
22      Q.  That there's -- that there is a -- there --
23      That hypothermia increases the risk of
24  cardiovascular in total hip and total knee
25  arthroplasty surgeries.

Page 228

1      A.  I -- I have ev -- evidence.  If what you're
2  looking for is a specific study addressing those
3  complications in total joint arthroplasty patients, I
4  would say no, --
5      Q.  Okay.
6      A.  -- but the evidence qualifies in my mind to
7  a level substantiating that clinical practice.
8      Q.  Are you aware that Andrea Kurz informed 3M
9  that her 1996 study only applied to colorectal
10  surgeries and not to extrapolate into other surgeries?
11      A.  I'm not --
12      Q.  Are you aware of that?
13      A.  I am not aware of what she has said to 3M.
14      Q.  Okay.  You agree with me that a colorectal
15  surgery is way different than a total knee
16  arthroplasty.
17      A.  It is different, it is different, but it has
18  many characteristics in common with other kinds of
19  surgery.
20      Q.  Let me guess.  They use a scalpel, correct,
21  in both?
22      Let's talk about the length of surgery.  Is
23  the length different between the two surgeries?
24      A.  Marginally, perhaps.
25      Q.  Marginally?

Page 229

1      A.  Yes.
2      Q.  Did you look at the length of time for
3  surgery for the 1996 colorectal study?
4      They were two to four hours.  Are you aware
5  of that?
6      A.  And so what -- what were --
7      What was the length of total joint
8  arthroplasty --
9      Q.  On average an hour.
10      A.  -- at that time --
11      Q.  On average an hour.
12      A.  -- in 1996?
13      Q.  Well we're talking about 2017 today; aren't
14  we?
15      A.  Right.  So what's the length of colon --
16  colon surgery in 2017?
17      Q.  I don't know what it is.
18      A.  It's apples, and let's talk apples and
19  apples.
20      Q.  Okay.  You want to talk apples and apples,
21  sir?  Let's talk apples and apples.  You want to apply
22  a 1996 study, which is oranges, to a -- to a 2017
23  colorectal surgery, which is apples?  You want -- you
24  want to just use data that supports you that's apples
25  and oranges right now, but when -- when it goes

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 230

1  against, you can't compare?
2      A.  No.  But the --
3          MS. LEWIS:  Objection, argumentative.
4      A.  -- the -- the physi -- the physiology,
5  number one, has not changed since 1996, and the
6  physiology of the microcirculation and host defenses
7  is not substantially different from one operation to
8  the -- to the other.
9      Q.  One's a clean surgery, correct, the total
10  knee?
11      A.  Correct.
12      Q.  And colorectal is a dirty surgery; correct?
13      A.  Correct.
14      Q.  There's more heat lost when you open up the
15  abdomen than when you open up the knee; correct?
16          If you know.  Or if you don't know, you can
17  say you don't know.
18      A.  I would agree with that.
19      Q.  Okay.  There's way more bacteria in a
20  colorectal surgery around the surgical site because of
21  what you're cutting into than within knee surgery;
22  correct?
23      A.  Correct.
24      Q.  Okay.  So they're not apples to apples; are
25  they, doctor?  Two different surgeries.

Page 231

1      A.  They are --
2          I concede that they are two different sur --
3  surgeries.
4      Q.  Okay.
5      A.  There are differences.
6      Q.  Okay.  So how -- so you can't --
7          You know, let's talk about open-heart
8  surgery.  Okay.  That's different than a total knee
9  surgery; correct?
10      A.  Correct.
11      Q.  The -- the -- the risk of a cardiovascular
12  event in an open-heart surgery is much greater than it
13  is in a knee surgery; correct?
14      A.  Correct.
15      Q.  Okay.  Surgeries --
16          There's different surgeries.  You can't
17  com -- you -- you can't make all the surgeries the
18  same to support your opinions that maintaining
19  normothermia is -- is effective for every type of
20  surgery.  You have to look at case by case; don't we,
21  doctor?
22      A.  It would be nice to be able to do so.
23      Q.  Okay.
24      A.  But the evidence of benefit in cases other
25  than joint arthroplasty is persuasive, and in the

Page 232

1  absence of any credible evidence of a reason not to
2  apply it more broadly, I believe it is sound practice.
3      Q.  That's not evidence-based medicine; is it?
4      A.  We don't have evidence for every clinical
5  decision we make.
6      Q.  Okay.  I get that.  So there's no evidence
7  that maintaining normothermia reduces the risk of
8  cardiovascular events in total hip or total knee
9  arthroplasty.
10      A.  There is no specific study in that patient
11  population.  I am drawing distinction between that and
12  evidence in the sense that I look for evidence in
13  making deci -- in making decisions.
14      Q.  Doctor, do you even know what the risk of
15  cardiovascular injury is in a total hip or total knee
16  arthroplasty?
17      A.  I don't know what that statistic is.
18      Q.  It might be zero for all we know.
19      A.  No, it's --
20          I'm sure it's not zero.
21      Q.  It's probably --
22          It could be a super, super low number.
23      A.  If you want to speculate that that's the
24  case, given the fact that these are often elderly
25  patients with comorbidities, I would question it, but

Page 233

1  I think neither you or I have the statistic to --
2      Q.  I'm not an expert here, doctor.  You're
3  the -- you're the doctor.
4      A.  Okay.
5      Q.  You're the one that's saying that
6  maintaining normothermia reduces the risk of
7  cardiovascular injury in a total hip and total knee
8  arthroplasty; correct?
9      A.  Correct.
10      Q.  But you don't know what the risk is with or
11  without maintaining normothermia for a cardiovascular
12  injury in a total hip or total knee arthroplasty; do
13  you?
14      A.  I just saw that the risk of morbid
15  cardiovascular events in a broad range of surgeries
16  was reduced about 50 -- about 50 percent.  I think it
17  is completely fair and legitimate to apply a finding
18  like that to total joint arthroplasty patients.  And
19  similarly, the original Frank paper, which dealt with
20  vascular surgery patients with a high incidence, if
21  you can favorably impact the risk of cardiovascular
22  events in a high-risk population like -- like that,
23  you ought to be able to have an impact on -- on
24  lower-risk patients.
25      Q.  Do you know what a heater-cooler unit is?

59 (Pages 230 to 233)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 234

1     A.  I know what a heater-cooler is, yes.
2     Q.  Is it used in arth -- in a arth --
3   arthroplasty surgery?
4     A.  No.
5     Q.  Why not?
6     A.  Because you're not making the patient
7   hypothermic and rewarming them.
8     Q.  I mean there's no benefit for -- for
9   making --
10     A.  It has no application.  It has no relevance.
11     Q.  Okay.  So before you --
12       You agree that before you use a device, you
13   should determine whether or not it has a benefit to
14   the patient; correct?
15     A.  Yes.
16     Q.  And there's different types of surgeries.
17   There is open-heart surgery; correct?
18     A.  Yes.
19     Q.  There's abdominal surgery; correct?
20     A.  Yes, there is abdominal surgery.
21     Q.  There's brain surgery; correct?
22     A.  Yes.
23     Q.  For example, you don't want to cool a
24   patient in -- in arthroplasty because it has no
25   benefit; correct?

Page 235

1     A.  Correct.
2     Q.  Okay.  And I'm asking for what are the
3   benefits of warming a patient during arthroplasty, not
4   colorectal.  Talking about arthroplasty surgery.  And
5   that's something you should know before you make the
6   patient pay money for a device that they may or may
7   not need; don't you agree?
8     A.  I should make a -- make my best judgment
9   about whether it's beneficial.
10     Q.  Okay.  The only thing that we know today,
11   okay, is that forced-air warming is potentially
12   beneficial for colorectal surgeries according to a
13   '99 -- 1996 Kurz study with respect to intraoperative
14   warming.
15     A.  I -- I don't -- I don't believe that's --
16   that we just -- we -- we just --
17     Q.  That's all you have, doctor.
18       MS. LEWIS:  Can you let him finish his
19   answer, Gabe?
20     A.  We just -- we just looked at a paper which
21   showed reduced -- reduced blood -- blood loss in -- in
22   those patients.
23     Q.  Really?  You want to talk about the Sun
24   article?
25     A.  Is that what it is?

Page 236

1     Q.  Let's talk about the Sun article, sir.  Do
2   you want time to read the article before you make that
3   statement?
4     A.  Sure.
5     Q.  Okay.  Why don't --
6       Let's take a break and you can read it, and
7   I'd -- I'd tell you to focus on degree-hours, focus on
8   degree-hours before you're going to make that
9   statement with respect to arthroplasty surgeries.
10       MR. ASSAAD:  Let's take a break.
11       THE REPORTER:  Off the record, please.
12       (Recess taken.)
13   BY MR. ASSAAD:
14     Q.  Doctor, did you have time to read the Sun
15   article?
16     A.  Yes, I did.
17     Q.  Okay.  Turn to degree-hours on Table 4.
18       Do you understand what an odds ratio is?
19     A.  Yes.
20     Q.  Okay.  And do you understand when it says
21   "Area under 37 degrees Celsius (degree-hours)?"
22     A.  No.
23     Q.  Okay.  So you don't understand what the
24   authors here are indicating with respect to blood loss
25   and degree-hours.

Page 237

1     A.  Well from the -- from the text I gather that
2   they are looking at the dura -- duration of
3   hypothermia.
4     Q.  Below 37 degrees; correct?
5     A.  Corr -- correct.
6     Q.  And for how long as it is; correct?
7     A.  Yes.
8     Q.  Okay.  So you agree with me that the
9   adjusted odds ratio for a patient that is 35 degrees
10   Celsius for two hours would be about 1.06.
11     A.  I don't see -- I don't see where you're
12   getting -- getting that.
13     Q.  Okay.  So I -- I don't want you to guess, so
14   if you don't understand the chart, then we don't have
15   to go through the chart.  Is that fair?
16     A.  Well the -- the discussion of the
17   statistical methodology, which I think produced the
18   charts in this -- in this paper, is beyond my
19   expertise.
20     Q.  Okay.  You'd defer to someone like Andrea
21   Kurz who is an author on -- on this paper.
22     A.  Well in this case I def -- I defer to the
23   editor of the journal who says, "Hypothermia
24   significantly increased -- significantly increased
25   both transfusion requirements and duration of

60 (Pages 234 to 237)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 238

1  hospitalization..."
2      Q.  The editor or the author?
3      A.  The editor.
4      Q.  Where are you referring to the editor?
5      A.  "What This Article Tells Us That Is New."
6      Q.  Okay.  How would you apply this to total hip
7  and total knee, if you know?
8      A.  Well, it is another ar -- argument for the
9  benefit of minimizing hypothermia.
10      Q.  Okay.  So if a total knee or total hip
11  usually lasts about an hour to an hour and a half
12  and --
13      A.  An hour to two.
14      Q.  -- an hour to two, and the temp -- and the
15  patient -- let's --
16      Let's look at this real quick.  Go to page
17  282.  You agree with me that only 2.1 percent of
18  patients below 35 degrees Celsius were operations on
19  the musculoskeletal system?
20      A.  Yes.  And -- but I'm not clear whether this
21  refers to at any -- at any moment or at the end of --
22  or the end -- end-of-case temperature, --
23      Q.  Okay.
24      A.  -- which is shown separately.  So I don't
25  know what that means.

Page 239

1      Q.  Okay.  Well we'll just agree that the
2  document speaks for itself; correct?
3      A.  The document speaks for itself.
4      Q.  Okay.  If we also look at the Frisch
5  article, which is Exhibit 15, let's go to page 59 and
6  let's look under total -- total knee arthroplasty.
7      A.  Yeah.
8      Q.  If you look at -- on -- on Table 2 on the
9  right-hand side, which is total knee arthroplasty, it
10  says EBL.  What does EBL stand for?
11      A.  Estimated blood loss.
12      Q.  And you agree there's no statistically
13  significant difference between the patients that are
14  normothermic and the patients that are hypothermic;
15  correct?
16      A.  Correct.
17      Q.  And if you look below that under total hip
18  arthroplasty and you look at the estimated blood loss,
19  again there's no statistical significance between the
20  es -- estimated blood loss between patients that are
21  normothermic and the patients that are hypothermic;
22  correct?
23      A.  Correct.
24      Although I'm looking now at the authors'
25  abstract, "...hypothermia was associated with

Page 240

1  increased estimated blood loss..."  So let's --
2  let's -- let's find that.
3      Q.  If you look under total -- total joint where
4  he combines the two, you'll see a difference.
5      A.  Okay.
6      Q.  But you agree with me that the knee is a
7  different location than the hip; correct?
8      A.  The knee is a different location of the --
9  of the -- of hip.  Because it's, you know --
10      Q.  So when you compare apples to apples and
11  oranges to oranges, you don't see a statistically
12  significant difference between --
13      A.  Yeah.  It raises all kinds of questions in
14  my mind how you could take a cohort of patients in
15  which you have no difference, combine it with another
16  such cohort, and come up with a highly significant
17  diff -- difference.
18      Q.  But you don't know the answer to that
19  sitting here today.
20      A.  Correct.
21      Q.  Okay.
22      A.  But that is --
23      But the conclusion that the authors draw is
24  that hypothermia was associated with increased blood
25  loss.

Page 241

1      Q.  What percentage of hospitals in the United
2  States have laminar airflow?
3      A.  I don't know.
4      Q.  Does your OR have laminar airflow?
5      A.  We have -- we have two rooms with laminar
6  airflow.
7      Q.  Is it laminar or unidirectional?
8      A.  It's been described to me as laminar.
9  Whether that is technically used correctly when it's
10  been described to me, I can't necessarily say.
11      Q.  Okay.  Do you know whether or not a laminar
12  airflow OR even exists?
13      A.  So I -- so I have heard.
14      Q.  Do you know what "laminar" means?
15      A.  It means -- it means uni -- unidirection --
16  unidirectional.
17      Q.  You're not an engineer; correct?
18      A.  I'm not an engineer.
19      Q.  Okay.  Do you --
20      You understand "laminar" is an engineering
21  term?
22      A.  Yes.
23      Q.  Okay.  And "turbulent" is an engineering
24  term?
25      A.  Correct.

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 242

1    Q.  You say the Bair Hugger is located outside
2  the laminar flow area.
3    A.  Yes.  It should be, proper use.
4    Q.  What's outside the laminar flow area?
5    A.  So the laminar flow area is mar -- is marked
6  sometimes on the floor of the operating room but
7  almost always by a plexiglas curtain over -- overhead.
8  The air outside that ar -- area is not -- is not
9  laminar flow.
10    Q.  And you're talking about the Bair Hugger
11  blower; correct?
12    A.  Well I'm talking about the Bair Hugger
13  blower for certain in most instance -- instances,
14  particularly with total joint arthroplasty.  The Bair
15  Hugger blanket is usually located outside the curtain
16  as well.
17    Q.  Okay.  And by the way, you have issues with
18  laminar flow; correct?
19    A.  I don't have issues with lam -- lam --
20  lamin -- laminar -- laminar flow, but I am aware that,
21  as you described earlier, that the enthusiasm about
22  its benefit in years past has waned with contradictory
23  evidence.  So I would -- I would say that it is an
24  unsettled matter, at best, whether it is beneficial
25  for surgical patients.

Page 243

1    Q.  Have you raised that issue with the people
2  at the hospital?
3    A.  If I recall, 20 years ago when this facility
4  was built there was a bit of a debate about whether to
5  invest in it or not -- or not.  I was not a primary
6  decision-maker on that.
7    Q.  But recently and in preparing your report
8  and raising that issue, which you also raised in the
9  Walton case, have you raised that issue with -- with
10  people at the hospital that you were employed at?
11    A.  No.
12    Q.  Okay.
13    A.  I mean if we were building a new facility
14  to -- today, I would probably be part of the conver --
15  conversation, but I think the engineers and orthopedic
16  surgeons would be the ones who were most persuasive in
17  driving the decision.
18    Q.  And you would defer to the engineers with
19  respect to airflow in the operating room.
20    A.  Correct.
21    Q.  Okay.  You write on page four, "Based on a
22  frequently cited study, the air emitted from the Bair
23  Hugger blanket does not produce bacterial growth when
24  cultured."
25    A.  Yes.

Page 244

1    Q.  And you cite Avidan for that; correct?
2    A.  Yes.
3    Q.  Do you believe Avidan is a good study?
4    A.  Yes.
5    Q.  Okay.  You don't think it's underpowered in
6  any way?
7    A.  No.
8    Q.  Okay.  How many times did they test to see
9  whether or not they could culture bacteria from the
10  Bair Hugger blanket?
11    A.  I think there were nine -- nine -- nine
12  samples or nine trial runs.
13    Q.  In Avidan from the Bair --
14    A.  I think -- I think that's right.  Yes.
15    Q.  From the Bair Hugger blanket.
16    A.  Yeah.  I'd be happy to take a look at the --
17  at the paper to refresh my mem -- memory, but I think
18  that's --
19    Q.  Okay.
20    A.  -- that's my recollection.
21    Q.  Okay.  So your recollection is they tried
22  nine times -- or eight or 10 times, whatever, give or
23  take -- and -- from the Bair Hugger blanket to culture
24  bacteria.
25    A.  Correct.

Page 245

1    Q.  Okay.
2    A.  And it said nine trials, each of -- each of
3  which had an array of culture -- culture media.  And
4  again, my recollection is that in the nine trials,
5  none of the arrays of culture media grew any bacteria.
6    MR. ASSAAD:  Move to strike as
7  non-responsive to a non-existent question.
8    Q.  You next talk about the body heat emanating
9  from the surgical staff.  Do you know how many BTUs
10  per hour the Bair Hugger produces?
11    A.  No.
12    Q.  Do you know how many BTU -- BTUs per hour
13  a -- a person produces?
14    A.  No, I don't.
15    Q.  Okay.  Do you know --
16    I mean you're not an expert in heat
17  transfer; correct?
18    A.  Correct.
19    Q.  You're not an expert in fluid dynamics;
20  correct?
21    A.  Correct.
22    Q.  So you have no opinion with respect to how
23  the Bair Hugger blanket may affect the OR environment
24  by the heat it produces or the airflow it produces.
25    A.  Correct.

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 246

1       The commentary here is questioning the
2   studies that claim to describe how the Bair Hugger
3   influences those factors.
4       Q.  Excuse me.  I didn't understand you.
5       A.  The commentary in this letter are meant to
6   address the shortcomings in the studies that purport
7   to address the disruption in laminar flow and
8   related -- related factors; that is, as we've
9   discussed previous -- previously, the -- the
10  experimental mod -- model either having no per --
11  personnel, mannequins, no instruments, no Bo -- no
12  Bovies, et cetera, so in looking at -- at those, my
13  conclusion was they -- for me, not being a particle or
14  airflow expert -- they still lacked face validity on
15  that basis.
16      Q.  Well hypothetically speaking, if by adding
17  individuals would make the effect of the Bair Hugger
18  worse, would that affect your opinions regarding those
19  studies?
20      A.  Regarding these studies.  But what I would
21  say is that the studies of particle counts and air --
22  airflow patt -- patterns, their relevance to the risk
23  of infection is un -- is -- is unproven, so that even
24  if the particle counts --
25      Q.  I'm not talking about infection, I'm talking

Page 247

1   about particle counts and bubbles.
2       A.  Well --
3       Q.  Okay?  If --
4       A.  And I'm -- I'm going to -- I'm going to
5   say -- say that from my point -- point of view,
6   particle counts and bubbles are poor proxies or
7   surrogates.
8       Q.  And what's your basis?
9       A.  Because I have not seen any evidence
10  connecting them with the risk of infection.
11      Q.  Have you not looked at the Darouiche study?
12      A.  Show me the Darouiche study.
13      Q.  Have you looked at it?  "Yes" or "no."
14      A.  That doesn't sound familiar.
15      Q.  Okay.  Defense are very -- all aware of the
16  Darouiche study and the Stocks study.  Have they not
17  shown that to you?
18      A.  Stocks --
19      MS. LEWIS:  Objection to the form of the
20  question.
21      A.  Stocks sounds familiar.  Rouiche --
22  Rouiche -- Rouiche does not.
23      Q.  Do you know who Rabih -- do you know who
24  Rabih Darouiche is?
25      A.  No.

Page 248

1       Q.  So you're not aware of his study that --
2   that correlated bacterial load over the surgical site
3   with periprosthetic joint infections.
4       A.  No.
5       Q.  And in fact not --
6       He even went further and said the bacterial
7   load had an effect on periprosthetic joint infections
8   but not superficial wound infections.  Are you aware
9   of that study?
10      MS. LEWIS:  Objection to the form.
11      A.  Are you talking about the same study?
12      Q.  Yeah.
13      A.  Same study?  No, I'm still not aware of.
14      Q.  Would that affect your opinions if those
15  statements are true?
16      A.  The --
17      MS. LEWIS:  Objection to the form of the
18  question.
19      A.  Yeah.  Repeat the question.
20      Q.  Darouiche --
21      In the Darouiche study, he correlated
22  bacterial load with periprosthetic joint infections
23  and also showed there was no relation between
24  bacterial load over the surgical site and superficial
25  wound infection.  If -- if that study is accurate,

Page 249

1   would that change your opinion with respect to
2   bacterial load causing periprosthetic joint infection?
3       MS. LEWIS:  Object to the form.
4       A.  It -- it might, but I would not make any
5   conclusion about that without the opportunity to
6   review it in -- in detail --
7       Q.  Okay.
8       A.  -- and presuming that the details of the
9   study -- study were i -- i -- items with which I could
10  intelligently, based on my background and experience,
11  assess.
12      Q.  Let me ask you this, doctor:  Hypothetically
13  speaking, if the Bair Hugger increased particles over
14  the surgical site, and assuming that the increased
15  particles over the sur -- over the surgical site
16  indicated increased bacterial load over the surgical
17  site, and there was also a study that indicated
18  increased bacterial load over the surgical site
19  increases the risk of total hip and total arthroplasty
20  periprosthetic joint infections, would that change
21  your opinion with respect to whether or not the Bair
22  Hugger significantly increases the risk of
23  periprosthetic joint infections in total hip or total
24  knee arthroplasty --
25      MS. LEWIS:  Objection --

63 (Pages 246 to 249)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 250

1     Q.  -- if all the statements are true?
2         MS. LEWIS:  Objection to form.
3     A.  Perhaps, but not to the extent that a
4  clinical outcome study, Bair Hugger/no Bair -- Bair
5  Hugger, would -- would have.
6     Q.  Who do you think would fund a study with
7  respect to the clinical outcomes on total hip and
8  total knee arthroplasty periprosthetic joint
9  infections with the use of the Bair Hugger or the use
10 of a different warming device?
11    A.  I'm not able to speculate on who might fund
12 that.
13    Q.  Do you know how much that study would cost?
14    A.  I don't know.
15    Q.  Would you be surprised it would be millions
16 of dollars?
17    A.  Would I be -- would I be surprised?  No, I
18 wouldn't be surprised.
19    Q.  I mean just say assuming that the
20 periprosthetic joint infection rate for total hip and
21 total knee is two percent, do you know how many
22 patients you would need to conduct a study to show a
23 difference in an infection rate that's only two
24 percent?
25    A.  No, I don't know the number.

Page 251

1     Q.  Okay.  More than 10; right?
2     A.  Yeah.  Presumably, yes.
3     Q.  Probably more than a thousand.
4     A.  I -- I -- I don't know.
5     Q.  With respect to McGovern, you criticize
6  McGovern because of the change in infection prevention
7  practices during the study period; correct?
8     A.  Among other things, yes.
9     Q.  Well that's what you put here.  Oh,
10 motionless.  But with regard --
11        With respect to the clinical data, it's the
12 change in infection prevention practices; correct?
13    A.  And the anticoagulation practices.
14    Q.  Well that's not in here; is it?
15    A.  No, but it's true.
16    Q.  Well I'm looking at your report.  It's not
17 in your report; correct?
18    A.  Yes, that's true.
19    Q.  Okay.  So let's just talk about the
20 infection prevention practices.  Are you talking about
21 the prophylactic antibiotics?
22    A.  Yes.
23    Q.  Do you know whether or not the change in
24 the pro -- that the prophylactic antibiotics -- strike
25 that.

Page 252

1         Are you aware of any study that compares the
2  two anti -- different antibiotics that were used to
3  determine whether or not any one of them had a -- a
4  better or worse effect on periprosthetic joint
5  infections?
6     A.  I -- I -- I don't know.
7     Q.  Okay.  If there was a study that indicated
8  that the prophylactic antibiotics were -- they -- they
9  were not inferior to each other, would that affect
10 your opinion of whether or not the change in
11 antibiotics had an effect on the results?
12    A.  I -- I -- I think the results of this --
13 this study should control -- controlled for that.
14    Q.  Well why don't you answer my question.
15    A.  If there were effectively no change in the
16 anti -- antibiotic --
17    Q.  That wasn't my question, sir.  Why don't you
18 listen to my question.  We'll -- we could get out of
19 here really soon.  If there is --
20        If there was a study that indicated that the
21 two antibiotic -- the two different antibiotic
22 regimens used in the McGovern study were non-inferior
23 to each other, means there was no difference, would
24 that affect your opinion of whether or not the change
25 in the prophylactic antibiotics used had an effect on

Page 253

1  the McGovern results?
2         MS. LEWIS:  Object to the form.
3     A.  I would be -- I would be less -- less
4  concerned --
5     Q.  Okay.
6     A.  -- but not unconcerned.
7     Q.  Okay.  You say that more than 5,000 public
8  and private institutions rely on ECRI.  Is that
9  correct?
10    A.  Yes.
11    Q.  What's your basis?
12    A.  ECRI.
13    Q.  So you rely on ECRI to tell you who relies
14 on ECRI?
15    A.  ECRI -- yeah.  I think that came from ECRI's
16 annual -- annual report.
17    Q.  Well there's a difference of public and
18 private institutions relying on ECRI or them -- or
19 people subscribing to the ECRI website.  Do you
20 understand the difference?
21    A.  Okay.  Okay.
22    Q.  I mean you subscribe to the Anesthesiology
23 Journal; correct?
24    A.  Yes.
25    Q.  You don't rely on every article that's

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 254

1   published in the Anesthesiology Journal; correct?
2       A.  But to a degree I rely on it; otherwise, why
3   would I subscribe to it?
4       Q.  Because there might be some good parts,
5   there might be some bad parts; correct?
6       A.  Correct.
7       Q.  I mean there's some articles that I assume
8   an independent doctor would read are be like I just
9   disagree with -- with the research or disagree with
10  the conclusion; correct?
11      A.  Yes.
12      Q.  Even though you subscribe to Anesthesiology;
13  correct?
14      A.  Yes.
15      Q.  So you really can't sit here and say that
16  more than 5,000 public and private institutions rely
17  on ECRI for evidence, reports and assessments of
18  healthcare technology, but what you can say is there's
19  probably 5,000 people that subscribe to it.  Fair?
20      A.  Yeah.  I'm not sure that it's people as much
21  as institutions.
22      Q.  Okay.  You don't know whether or not the
23  institutions are relying on the data that ECRI
24  provides; correct?
25      A.  I don't -- I don't know the extent to which

Page 255

1   they do so.
2       Q.  That would be pure speculation; correct?
3       A.  Correct.
4       Q.  Okay.  Now you'll agree, with respect to the
5   heater-cooler devices, that the bacteria was
6   aerosolized on water vapor and traveled to the
7   patients; correct?
8       A.  That is -- that is what was reported.
9       Q.  Okay.  And you have no reason to disagree
10  with that; correct?
11      A.  I have no reason to disagree.
12      Q.  It wasn't by direct contamination but by
13  indirect contamination.
14      A.  I'm not sure what you mean by "direct
15  contamination" or "indirect contamination."
16      Q.  You don't know the difference?
17      A.  I don't know what you mean.
18      Q.  Okay.  When you say it's been aero --
19  aerosolized, it traveled through the air; correct?
20      A.  In -- in -- in liquid.
21      Q.  Okay.
22      A.  In water.
23      Q.  In water vapor.
24      A.  In water vapor.
25      Q.  Okay.  Do you know how small a water vapor

Page 256

1   is?
2       A.  I don't know.
3       Q.  Do you know whether water vapor is
4   equivalent in travel -- in the way it travels in the
5   air to neutrally buoyant bubbles?
6       A.  I don't know.
7       Q.  Do you know whether or not it is similar to
8   the way it travels with squames?
9       A.  I don't know.
10      Q.  Okay.  But we do know that water vapor could
11  travel from where the heater-cooler is and -- and
12  blown by the fan of the heater-cooler to the surgical
13  site; correct?
14      A.  That is what the alert implied.
15      Q.  Okay.  And you're aware that the heater-
16  cooler unit is much further away from the sterile
17  field than the Bair Hugger is.
18      A.  I don't know that.
19      Q.  Okay.  You've never used a heater-cooler
20  unit?
21      A.  Well I've been many -- many years ago in a
22  cardiac opera -- operating room, but it depends where
23  the pump -- where the pump and the heater-cooler sit.
24      Q.  And you're not disputing that an implant can
25  be contaminated by airborne contamination; are you?

Page 257

1       A.  I think it is -- I think it is possible.  I
2   think contamination of sur -- of surgical wounds is
3   principally from the skin and subcutaneous flora of
4   the patient.
5       Q.  Except when the heater-cooler is involved,
6   then it can be contaminated by the heater-cooler.
7       A.  I --
8           Again, I think that's the implication of the
9   FDA alert.
10      Q.  I mean you're citing it.  Do you agree with
11  it or not?
12      A.  Yes.
13      Q.  Okay.
14      A.  Yeah.
15      Q.  So -- so a wound could be contaminated by
16  airborne contamination.
17      A.  Right.
18      Q.  Okay.
19      A.  A -- a wound -- a wound can.
20      Q.  Okay.  I mean that's why you have
21  unidirectional flow or laminar flow and filters and
22  HVAC systems, to provide the cleanest air possible at
23  the OR; correct?
24      A.  Yes.
25      Q.  I mean that's why you have positive pressure

65 (Pages 254 to 257)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 258

1   in the OR; correct?
2       A.  Yes.  Yes.
3       Q.  To keep contaminants out.
4       A.  To keep contaminants out.  What the relative
5   risk of those contaminants are in surgical in --
6   infections is less clear.  As I said, the -- what I
7   have been taught is that it is about the skin -- skin
8   and subcutaneous flora as the source of surgical
9   contamination.  And while it may be possible that the
10  air is a contributor, I am unable to describe its
11  relative contribution and therefore risk.
12      Q.  But you're basing this on what you were
13  taught 25 years ago and not on any scientific journal
14  or article at -- at this point in time.
15          MS. LEWIS:  Objection, form.
16      A.  I'm base -- basing it on what is -- has been
17  taught continually since -- since my training.
18      Q.  But you're not an infectious disease expert;
19  correct?
20      A.  I'm not an --
21      Q.  Okay.
22      A.  -- infectious disease expert.
23      Q.  And you've never studied or researched the
24  causes of periprosthetic joint infections; correct?
25      A.  Correct.

Page 259

1       Q.  Okay.  I mean, in fact, if airborne
2   contamination were not an issue, the research and
3   development of high-quality HVAC systems in operating
4   rooms would be unnecessary; correct?
5       A.  Well I don't know how necessary they in fact
6   are.  And the example we just discussed of laminar
7   flow appearing to be very necessary at one point and
8   either unnecess -- somewhere between unnecessary and
9   hazardous at some other point, that evolution could be
10  occurring with any of the things you mentioned.
11      Q.  But you --
12          By the way, you would defer to the
13  International Concensus with respect to the cause --
14  the causes of periprosthetic joint infection,
15  International Concensus of Orthopedic Surgeons.
16      A.  I would -- I'd want to see their commentary
17  on that subject -- on that subject before endorsing it
18  altogether.
19      Q.  So you just want to take parts of what they
20  say and then disregard other parts?
21      A.  No.  I may -- I may --
22      Q.  Okay.
23      A.  I may fully embrace the language that you
24  are referencing, but I don't know that as I'm sitting
25  here.

Page 260

1       Q.  Well you cited -- you've --
2           You've had an opportunity to review their --
3   their -- their consensus; correct?
4       A.  Yes.
5       Q.  Okay.  And you don't recall what they
6   discussed with respect to --
7       A.  Well you're asking me to subscribe to a
8   specific statement, and I just don't think it's fair
9   to ask me to do -- do that without it in front of me.
10      Q.  Okay.  So you -- you -- you think it's fair
11  to take one statement out of a whole publication to
12  support your -- your theories, but disregard the rest
13  of the statements?
14      A.  Well I'm not -- I'm not sure that what they
15  say about the source of joint infections would
16  contradict what they've said about the safety of Bair
17  Hugger.
18      Q.  Assuming that the Bair Hugger increases the
19  risks of surgical-site infections, do you agree with
20  me that that risk is not warned on the warning labels
21  of the Bair Hugger?
22          MS. LEWIS:  Object to form.
23      A.  Right.  And yes, I would agree --
24      Q.  Okay.
25      A.  -- that an unproven risk is not warned.

Page 261

1       Q.  Are you aware that on the 200 series Bair
2   Hugger they warned about the risk of airborne
3   contamination?
4       A.  Well I'm not sure what they were referring
5   to when they said "airborne contam -- contamination."
6   Contamination --
7       Q.  Are you telling me that you might have a
8   different definition of "airborne contamination"
9   than --
10      A.  Well contaminate -- contaminated with what?
11      Q.  Anything.  Airborne contamination.
12      A.  I don't --
13          Well, so I don't know what they were -- were
14  referring to.
15      Q.  But when I use the term "airborne
16  contamination" in -- in -- in -- within the --
17          Let me ask you this:  When -- when your
18  colleagues use the word "airborne contamination," do
19  you know what they are referring to?
20      A.  I'm not sure that they know what they're
21  referring to.
22      Q.  Oh.
23      A.  So it could be --
24          You know, in my -- in my world we talk about
25  airborne contamination of trace anesthetic gases all

66 (Pages 258 to 261)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 262

1  the time.  Is that -- is that what you're talking
2  about, about chemical contamination?  And -- and then
3  there's a difference between particles and -- small
4  particles, large particles, bacteria, smoke, all of
5  these are potential airborne contaminants that we
6  think about and talk about in the operating room
7  setting.
8      Q.  So if a colleague of yours is talking about
9  airborne contam -- con -- contamination, you would
10  need more information to know what he's talking about.
11     A.  If they just use that phrase in a vacuum, I
12  would need to ask for clarification.
13     Q.  Okay.
14     A.  But obviously, in conversation things have a
15  context and it might be -- it might be clear.
16     Q.  In an OR, when doctors use the term
17  "airborne contamination," do you know what they're
18  referring to?
19     MS. LEWIS:  Objection, form.
20     A.  Yeah.  I don't --
21     I may know what they're referring to
22  depending on the context of the conversation.
23     Q.  You do agree that the area underneath the
24  operating room table is not sterile.
25     A.  Correct.

Page 263

1      Q.  Okay.  And in fact doctors are -- or
2  surgeons are taught to always keep their hands above
3  the operating room table.
4      A.  Surgeons are taught -- are taught that.
5      Q.  Otherwise, you'd have to --
6      If -- if your hands go below the sur -- the
7  operating room table, you'd probably have to go
8  and -- and rescrub and -- and be sterilized and --
9  and, you know, rescrub; right?
10     A.  I've seen -- I've seen that happen.
11     Q.  All right.  You've seen that happen?
12     A.  Yes.
13     Q.  Like the hands went underneath the table and
14  they have to go rescrub?
15     A.  Yes.
16     Q.  Do they touch anything underneath the table?
17     A.  They --
18     The concern -- concern was that they touched
19  the drape under -- under the table.
20     Q.  Are you aware that 3M markets to orthopedic
21  surgeons use of the Bair Hugger?
22     A.  I wasn't aware of that.
23     Q.  Well if you're going to opine on warnings,
24  which you are in your report, wouldn't it be helpful
25  to know who uses the device and for what purpose and

Page 264

1  who that -- and -- and who 3M markets the device to?
2      A.  I'm not sure how that's relevant to an
3  opinion on --
4      Did -- did you say labeling?
5      Q.  Warnings and labeling.
6      A.  Yeah.
7      Q.  Given it's important to know who uses the
8  device to determine what warnings should be --
9      A.  I think the device --
10     Q.  -- documented?
11     A.  -- the devices are probably nearly
12  universally operated and used by anesthesia staff.
13     Q.  Well if surgeons are concerned about
14  increased particles over the surgical site and 3M
15  knows of this concern, and 3M also is aware that when
16  the Bair Hugger is used it increases particles over
17  the surgical site, do you believe there's an
18  obligation for 3M to warn the orthopedic surgeons of
19  the increase of particles?
20     MS. LEWIS:  Objection to form.
21     A.  What -- what -- what is the significance or
22  meaning of those particles?
23     Q.  Doesn't matter what --
24     A.  Yes, it does.
25     Q.  No, it --

Page 265

1      I'm saying that the orthopedic surgeons care
2  about particles.  Whether or not it's significant to
3  you or not, that's what the orthopedic surgeons care
4  about, increased particles over the surgical site.
5      If 3M is aware of this concern by orthopedic
6  surgeons and they're aware that the Bair Hugger
7  increases particles over the surgical site, do they
8  have an obligation to warn the orthopedic surgeons?
9      MS. LEWIS:  Objection to form.
10     A.  No, not if they know --
11     Q.  Okay.
12     A.  -- that the particles are inconsequential.
13     Q.  Well how do you know the particles are
14  inconsequential?
15     A.  Well, because they can have the capacity to
16  meas -- meas -- measure the output of the -- of the
17  device.
18     Q.  Do you -- never mind.
19     The 200 series warned about airborne
20  contamination in 1987.  Are you aware of that?
21     A.  No.
22     Q.  Okay.  If that is the case, that 3M was
23  aware of airborne contamination as of 1987, do you
24  agree that aerosoliz -- aerosolization of bacteria
25  that could potentially cause an infection was a known

67 (Pages 262 to 265)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 266

1  risk for 3M?
2       MS. LEWIS:  Objection, form.
3       A.  No.
4       Q.  Okay.  If you yourself see, on a device that
5  blows air, potential for airborne contamination, what
6  would -- what would that mean to you as an
7  anesthesiologist in the operating room?
8       A.  I would want to know what it meant to the
9  auth -- authors of that -- of that warning.
10      Q.  You mean the manufacturer?
11      A.  That is the author of the warning.
12      Q.  Okay.  But for you to get to that point, you
13  would like to at least see the warnings so you could
14  ask questions about it; correct?
15      A.  Well I don't want to see warnings about
16  things that are not genuine risks.  Right?  I mean
17  I -- you know, it's like going to Cal -- going to
18  California, "This elevator contains materials that are
19  known to cause cancer," so I -- I --
20          If there is a substantial risk to the device
21  in -- in proper use of the device, I think that is a
22  fair -- a fair warning, but if the device produces
23  airborne contamination that is not meaningful to my
24  patient, then I'm not sure why I'd want to see that --
25  why I would want to see that warning.

Page 267

1       Q.  But you don't know either way if it's
2  meaningful or not.
3       A.  I'm sorry?
4       Q.  You don't know either way unless you see a
5  warning to even question the warning.
6       A.  Well to some extent -- to some extent I want
7  the manufacturer to use some judgment about what they
8  warn me about.  But if I saw the warning, I would ask
9  questions about so what is this -- what is it
10  contaminating the air with and what does that mean.
11      Q.  Well you're not an infectious disease
12  expert; correct?
13      A.  No.  But I would have some need to respond
14  to seeing that -- seeing that warning.
15      Q.  Are you aware that on the 510(k) application
16  they indicated the potential of airborne contamination
17  in the 500 series device?
18      A.  As I said, I don't think I've seen the
19  510(k) applications.
20      Q.  Okay.  You haven't seen the 510(k)
21  applications.
22      A.  I have not seen the 510(k) applications.
23      Q.  So you have -- you have not seen any of the
24  internal data regarding contamination; correct?
25      A.  Well as I said, I think the results of the

Page 268

1  testing of the -- of -- of the filters is relevant to
2  that -- that question, and I have seen that.
3       Q.  Okay.  And you've just recently seen it;
4  correct?
5       A.  Yes.
6       Q.  You got it yesterday; right?
7       A.  May -- within --
8          Within recent weeks.
9       Q.  Okay.  After you -- you -- you submitted
10  your report.
11      A.  Correct.
12      Q.  Okay.  But you're not a filtration expert.
13      A.  That is -- that -- that is true.
14          I must say -- I must say that, unlike some
15  of the statistics in the paper we just looked at, what
16  I saw in that report was meaningful to me.
17      Q.  Are you talking about the ones where they
18  tested the -- the MERV rating, or the contamination?
19      A.  It was --
20          Was it a 52.2 -- 2 test?
21      Q.  Yeah.  And that -- and that stank; right?
22      A.  No.
23      Q.  Fifty-two percent stank.
24          MS. LEWIS:  Fifty-two what?
25      Q.  Fifty-two percent stank.

Page 269

1       A.  No, I didn't say 52 percent.
2       Q.  Oh.
3       A.  I said the test was designated 52.2 or
4  something like that.
5       Q.  And of course since you did not bring this
6  filtration document, I have no idea what you're
7  talking about today; correct?
8       A.  Well let me tell -- tell you that what it
9  showed was that in the particle sizes with which I am
10  concerned; that is, the large -- larger particles, the
11  old and the new filters both were 99.8 percent, or
12  thereabouts, effective in removing them.
13      Q.  You did not bring the document today and you
14  have no Bates numbers to refer me to the document;
15  correct?
16      A.  I'm not sure what the Bates -- Bates number
17  is, but --
18      Q.  The number that has like 3MBH at the bottom
19  of it.
20      A.  I -- I don't have that.
21      Q.  Okay.  Because you were told not to bring
22  it.
23      A.  No, I was not told not to bring -- not --
24  not to bring it.  I was told to -- to -- to come and
25  not to bring -- not to bring anything.

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 270

1    Q.   You were told to what?
2    A.   Come here and not to bring anything.
3    Q.   Okay.
4    A.   Which makes perfect sense because I would
5  bring a truckload of stuff, poten -- potentially, and
6  I have no idea what's relevant to the discussion.  My
7  expectation was -- was that if you were going to ask
8  me about filtration, that you would have the documents
9  relevant to that discussion.
10   Q.   Is there anything about filtration in your
11  report?
12   A.   No, but you just asked me about it.
13   Q.   Well I mean I asked you about it because you
14  told me you could not produce a document; correct?
15       I can't read your mind, sir.  Okay?  How did
16  I know you were going to talk about filtration?  I
17  have your report.  Is there anything about your report
18  dealing with filtration?
19   A.   No, I don't believe there is.
20   Q.   Okay.  So how would I expect to ask you
21  questions on filtration if it's not in your report?
22   A.   Well many --
23       MS. LEWIS:  Gabe, my goodness.
24       THE WITNESS:  I'm sorry?
25       MS. LEWIS:  Just my comment.  Go ahead.

Page 271

1    A.   Because many of the allegations or
2  suggestions of the hazards and the basis of that
3  warning pertain directly to the efficiency of the
4  filtration.
5    Q.   How am I supposed to know you're going to
6  opine on anything in filtration that's not in your
7  expert report or in Exhibit B -- or Exhibit 2 of --
8    A.   Well you asked -- you asked me about it.
9    Q.   I'm talking about before today.  How am I
10  supposed to know that, sir?
11   A.   I don't know.
12       MS. LEWIS:  You're rising your voice
13  unnecessarily.
14       MR. ASSAAD:  No, I don't think it's
15  unnecessarily about coming up with new opinions on the
16  day before a deposition.
17       MS. LEWIS:  He didn't come up with new
18  opinions.
19   Q.   Sir, how am I supposed to know that?
20   A.   I have no idea.
21   Q.   I mean you're a doctor.  Is there any
22  medical -- medical situation where someone could
23  predict what someone's going to say at -- you know, at
24  a deposition?
25   A.   No, no.  But when you ask me about warnings

Page 272

1  about airborne contam -- contamination, that is in
2  essence a question about filtration, and so I think
3  that you obviously had it in your mind to discuss --
4  to discuss that.
5    Q.   Well so you're now predicting what I have in
6  my mind?
7    A.   I'm not predicting, I'm observing what you
8  just asked me about.
9    Q.   The reason I brought up filtration was
10  because you mentioned you looked at a document and you
11  wanted to -- that wasn't part of even any of the --
12  the materials that --
13   A.   No, you asked -- you asked me about the
14  warning label -- labels before I mentioned that.
15   Q.   Okay.
16       MS. LEWIS:  How long have we been going now?
17       THE VIDEOGRAPHER:  Let's see.  Five hours
18  and 23 minutes.
19       MS. LEWIS:  I'm -- I'm sorry, I meant since
20  the last break.  I'm sorry.
21       MS. ZIMMERMAN:  Forty minutes since the last
22  break.
23       MS. LEWIS:  Okay.  But we're now, I'm sorry,
24  five hours and how much?
25       THE VIDEOGRAPHER:  And 23 minutes.

Page 273

1        MS. LEWIS:  Okay.  Gabe, is this a good time
2  for a break or --
3        MR. ASSAAD:  Couple minutes on the warning.
4  BY MR. ASSAAD:
5    Q.   The only warning that you're referring to is
6  the hosing warning in your report; correct?
7        Page six.
8    A.   Well I can -- I can -- I can read it to you,
9  but it does comment on the hosing -- hosing warning
10  and says -- it says that with respect to risk of
11  contamination or infection, that I don't believe a
12  warning -- a warning was warranted.
13   Q.   Okay.  But you're not an infectious disease
14  expert; correct?
15   A.   I am not an infectious disease expert.
16   Q.   And you don't know what concerns orthopedic
17  surgeons have with particles; do you?
18   A.   I can't speak for orthopedic --
19   Q.   Okay.
20   A.   -- orthopedic surgeons.
21   Q.   And you've never once in your life
22  created any type of warning for a medical device;
23  correct?
24   A.   Correct.
25   Q.   And you offer that opinion without having

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 274

1  seen the warnings provided on the original device, the
2  200 series, the 500 model, or the 700 series; correct?
3      A.  I'm sorry?
4      Q.  You haven't seen the warnings on any of the
5  devices besides the 505.
6      A.  That's probably true.
7      Q.  Okay.  You haven't looked at the operating
8  room man -- operating manual; correct?
9      A.  Not since -- not since they first originally
10  put them into use.
11      Q.  You haven't looked at any of the warnings of
12  any other forced-air warming devices; have you?
13      A.  I haven't seen in person any other forced-
14  air warming devices.
15      Q.  You haven't looked at the 510(k); have you?
16      A.  No.
17          MR. ASSAAD:  Okay.  Let's take a break.
18          THE REPORTER:  Off the record, please.
19          (Recess taken.)
20  BY MR. ASSAAD:
21      Q.  Doctor, are you aware that the 1996 -- 1996
22  Kurz study was funded by Augustine?
23      A.  I'm not aware of that.
24      Q.  Would that affect your interpretation of --
25  or -- or your opinion of the 1996 article?

Page 275

1      A.  I -- I --
2          Would that affect?  No.
3      Q.  Okay.  But you agree with me that in 1996
4  that Augustine had a final -- financial interest in
5  the Bair Hugger.
6      A.  I believe so.
7      Q.  Okay.  So you don't criticize him in 1996,
8  but you criticize him -- or you criticize the authors
9  of McGovern for having a financial interest in the
10  subject matter.
11      A.  I note -- I note that that is the case.
12      Q.  So you looked at McGovern because of who had
13  a financial interest, but you didn't look at the 1996
14  Kurz article.
15      A.  I looked at the 1996 Kurz ar -- Kurz
16  article.  Are you looking about -- about the --
17  talking about the disclosures in partic --
18      Q.  Yes.
19      A.  -- in particular?
20          So again, I -- I may have at the time -- at
21  the time, but I am still confident in its value.
22      Q.  I mean we want to be objective here; right,
23  doctor?
24      A.  Correct.
25      Q.  Okay.  Not an -- not an advocate for either

Page 276

1  side; correct?
2      A.  Correct.
3      Q.  Okay.  So if you're going to criticize
4  McGovern for some of the authors having a financial
5  interest, you got to do the same criticisms for the
6  Kurz for those authors having a financial interest.
7          Goose/gander rule; right?
8      A.  Well I'm -- yeah.  So I'm not sure
9  what -- what "criticize" means.  So fine, I recognize
10  that Kurz was funded by Augustine and I recognize that
11  McGovern was funded by Augustine.
12      Q.  You believe McGovern was funded by
13  Augustine?
14      A.  By -- by -- by Hot Dog.
15      Q.  Okay.  Do you know if they fun -- they
16  provided any money?
17      A.  I don't -- I don't know.  But they -- that's
18  the --
19          The paper contains the disclosure.
20      Q.  Do you know that the only thing that Dr.
21  Augustine provided was just a Hot Dog device?
22      A.  I don't know -- I don't know that.
23      Q.  Okay.  Were you provided Dr. McGovern's
24  deposition?
25      A.  It may have been among -- among the

Page 277

1  materials I was provided.
2      Q.  Were you provided with Dr. Reed's
3  deposition?
4      A.  I don't know.
5      Q.  Were you provided Albrecht's deposition?
6      A.  I believe I was.
7      Q.  You --
8          Were you provided Legg's deposition?
9      A.  I don't -- I don't know.
10      Q.  Were you provided Belani's deposition?
11      A.  I don't know.
12      Q.  Do you know Dr. Reed was the advisor on the
13  McGovern study, the senior doctor?
14      A.  Do I know if he was -- if he was?
15      Q.  Yeah.  Do you know that that's the case?
16      A.  I don't know that that's the case.
17      Q.  Do you know that Dr. Reed has been hired by
18  3M to perform a study in -- in the U.K.?
19      A.  No, I don't know that.
20      Q.  Do you know who Nachtscheim is?
21      A.  No.
22      Q.  You would assume that if 3M has hired Dr.
23  Reed to do research for them, that Dr. Reed is a
24  competent researcher?
25          MS. LEWIS:  Object to form.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 278

1    A.  I'm unable to comm -- comment on Dr. Reed's
2  competence as a researcher.
3    Q.  So besides doing a literature review in your
4  expert report, Exhibit No. 3, what methodology did you
5  use to come up with your conclusions on pages six and
6  seven?
7    A.  I looked at the literature, including the
8  systematic rev -- reviews, and my own clinical
9  experience.
10    Q.  Okay.  I said besides the literature what
11  did you do.  Just your own clinical experience?
12    A.  Yes.  I did not undertake any primary
13  research.
14    Q.  So what in your clinical experience that you
15  did to indicate that maintaining normothermia improves
16  outcomes in surgical patients?
17    A.  That I don't see pa -- patients often --
18  often shiver, that I don't see pa -- patients who are
19  warm -- warm become dangerously hypertensive, and that
20  I believe that the rate of surgical infect --
21  infections is at least at bench -- benchmark or
22  better.
23    Q.  Well you don't follow patients after they
24  leave the PACU on a regular basis; do you?
25    A.  No.

Page 279

1    Q.  Okay.  And if they did get a surgical-site
2  infection, such as a superficial wound infection that
3  didn't -- that didn't require surgery, that you
4  wouldn't know about it; would you?
5    A.  I would -- I -- I would not perhaps know
6  about an individual patient, but in aggregate the
7  performance of our surgical service I would be aware
8  of.
9    Q.  By the data.
10    A.  By the -- by the data or by our tracking.
11    Q.  But what have you done, I mean clinically,
12  to show that maintaining normothermia improves the
13  outcomes in surgical patients?  What tests have you
14  done?  What data have you looked at?
15    A.  I've looked -- looked at -- I -- I've
16  looked -- looked at my -- my own patients and I've
17  looked at the aggregate da -- data from our
18  institution against various -- against various
19  benchmarks.
20    Q.  That could have been caused --
21        A reduction in infection rates could have
22  been caused by skin prep; right?
23    A.  It could be.  All -- all of these things
24  have many -- many cause -- many causes.
25    Q.  It could have been caused by prophylactic

Page 280

1  antibiotics' timing; correct?
2    A.  It could -- it could have.
3    Q.  So what have you done in your clinical
4  practice to show that maintaining normothermia
5  improves the outcome in surgical patients?
6        MS. LEWIS:  Objection, asked and answered.
7    A.  As I said, the -- the --
8        In aggregate, I can look at the rate of
9  surgical infections in my institution being at -- at
10  benchmark or bett -- or better, and I look at the --
11  at the literature and in particular the systematic
12  reviews.
13    Q.  Take the literature out of it.
14    A.  Well the literature is --
15    Q.  Take the lit --
16        I'm saying in your clinical practice, what
17  have you done to say, "Aha, maintaining normothermia
18  reduces the incidence of surgical-site infection?"
19    A.  I would say maintaining normother --
20  normothermia is one of a number of practices that lead
21  to that, and we adhere closely enough to those
22  practices to produce good results.
23    Q.  If you have prophylactic antibiotics, skin
24  prep, HVAC system, surgical procedure and technique,
25  okay, and maintaining normothermia, and you have an

Page 281

1  infection rate that meets benchmark or a little bit
2  better, how did you determine that this one,
3  maintaining normothermia, had an effect on surgical
4  patients -- outcomes of surgical patients and the
5  other four --
6    A.  I didn't say that the other four didn't.
7    Q.  Okay.  So it may -- it may or may not have
8  an effect.  You don't know; do you?
9    A.  So on the -- on -- on the basis of my
10  person -- of my personal exper -- experience, I have
11  not done a study to isolate temperature management
12  from other techniques to optimize patient outcomes.
13    Q.  So you're solely relying on the literature
14  to support --
15    A.  I am principally relying on the -- on the
16  literature.
17    Q.  Solely relying on the literature.
18        MS. LEWIS:  Objection, misstates the
19  testimony.
20    A.  No, I -- I disa -- I disagree.  I look at --
21        If -- if our performance on infections or
22  other important complications, cardiovascular
23  mortal -- morbidity and -- and so forth, were
24  outliers, then I would be looking at are we
25  maintaining normothermia, are we giving antibiotics at

71 (Pages 278 to 281)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 282

1  the -- and -- and -- and take it apart.  So I fully
2  recognize that these things are all multifactorial.
3       Q.  If I ask you to give me evidence outside the
4  literature in your clinical practice that indicates
5  maintaining normothermia im --
6       A.  In isolation?
7       Q.  -- improves outcomes in surgical patients in
8  your clinical practice, --
9       A.  No.
10       Q.  -- what evidence do you have?
11       A.  If you're talking about that as the sole
12  factor?
13       Q.  Yes.
14       A.  No.
15       Q.  Okay.  You have none; correct?
16       A.  Correct.
17       Q.  Okay.  Going to page four, halfway through
18  you write, "The opinions of plaintiffs' experts Drs.
19  Stonnington and Jarvis largely rely on this entirely
20  unproven relationship.  In addition, these experts
21  also attribute the alleged risk of the Bair Hugger
22  device to the bacterial content of the internal and
23  external surfaces of the device and the output of the
24  Bair Hugger hose."
25       Did I read that correctly?

Page 283

1       A.  You read that correctly.
2       Q.  Are those the only two criticisms -- wait,
3  strike that.  That --
4       Those are the only two criticisms in your
5  report of Drs. Stonnington and Jarvis; right?
6       A.  Well I am referencing here to this entirely
7  unproven relationship, which is discussed in the
8  previous sentences about laminar -- laminar flow and
9  turbulent airflow.
10       Q.  Okay.  But my point is that those are the
11  only criticisms of those two doctors, Stonnington and
12  Jarvis, is in this part of the report; correct?
13       A.  Those are the only criticisms in this -- in
14  this re --
15       Q.  Okay.
16       A.  -- in this report.  If you want to ask me
17  about other statements they have made and whether I
18  would accept or criticize them, happy to do that.
19       Q.  You -- you had -- you had your opportunity
20  by June 2nd to provide all your opinions, so I'm not
21  going to ask you anything outside the report, sir.
22  With respect to --
23       You haven't seen Dr. Elghabashi's report;
24  correct?
25       A.  Correct.

Page 284

1       Q.  Do you know what a computational fluid
2  dynamics analysis is?
3       A.  I've heard -- I've heard the term, but that
4  is way -- way outside my expertise.
5       Q.  Okay.  So you would defer to a computational
6  fluid dynamics expert with respect to computational
7  fluid dynamics; correct?
8       A.  Yes.
9       Q.  So just to be clear, besides --
10       I mean you haven't done research on
11  maintaining normothermia and you haven't published any
12  articles regarding maintaining normothermia and you're
13  not an infectious disease expert, you're not an
14  engineer, you're not an orthopedic surgeon, so what is
15  it with respect to your credentials that provides the
16  appropriate methodology to determine whether or not
17  the Bair Hugger is a safe device besides the
18  literature?
19       A.  "The appropriate methodology."
20       Q.  Yes.
21       A.  Help me understand what you mean by that.
22       Q.  Well you're not an engineer so you can't
23  look at the airflow of the Bair Hugger; correct?
24       A.  Correct.  I am --
25       Q.  Okay.  And you --

Page 285

1       A.  I am a clinician and I am there focus --
2  focusing -- thereby focusing on clinical outcomes, and
3  that's -- that's what I am most interested in.  I have
4  been presented, through the campaign, allegations
5  about this body of evidence on airflow or particles or
6  something -- or something else impugning the safety of
7  the Bair Hugger, so to the extent I am able,
8  recognizing the limitations in my training and back --
9  and background, I try to -- try to make an assessment
10  of whether those represent val -- valid indictments of
11  the safety of the -- of the Bair Hugger.  So I have
12  not seen any one -- any one of the things that have
13  been presented in the campaign to discredit the Bair
14  Hugger in which even the authors represent that they
15  have demonstrated a relationship between whatever they
16  are reporting on and the actual risk to the patient.
17       MR. ASSAAD:  Move to strike, non-responsive.
18       Q.  You're not an engineer, so you can't talk
19  about the airflow of the Bair Hugger; correct?
20       A.  Correct.
21       Q.  You're not an infectious disease doctor to
22  talk about the relationship between bacterial load and
23  periprosthetic joint infections; correct?
24       A.  Not in -- not in detail, but I am an
25  educated phys -- physician and so to a degree have

72 (Pages 282 to 285)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 286

1  some familiarity with the basic principles, but I am
2  not a specialist in that area.
3      Q.  Well you've never done any studies with
4  respect to bacterial load and --
5      A.  No.  You --
6      Q.  -- periprosthetic joint infections.
7      A.  No, but I --
8      Q.  I mean I could -- I could read a study as
9  well.  I mean I could read --
10     A.  No, but you -- you --
11     Q.  But let's talk about your experience.
12     A.  But you haven't, you know, written
13  consult -- consultations on patients with infectious
14  disease -- disease problems as a student or a -- or --
15  or a trainee.
16     Q.  And you consult with an I.D. expert.
17     A.  I was under the supervision of a faculty
18  I. -- I.D. expert, so I learned something about
19  infectious disease.  I'm not an infectious disease
20  ex -- expert.
21     Q.  Okay.  That's all I'm saying.
22     A.  Okay.  I have conceded that --
23     Q.  You've done no studies --
24     A.  -- half a dozen times today.
25     Q.  You've never done any studies on bacterial

Page 287

1  load and periprosthetic joint infections.
2      A.  I have not done any studies --
3      Q.  Okay.
4      A.  -- on that.
5      Q.  Okay.  You have never --
6          You're not an aerobiologist; correct?
7  Correct?
8      A.  I'm not a --
9      Q.  Aerobiologist.
10     A.  I am not an aerobiologist.
11     Q.  You're not a microbiologist; correct?
12  You're an anesthesiologist.
13     A.  Correct.
14     Q.  Okay.  And you use the device to -- Bair
15  Hugger to maintain normothermia; correct?
16     A.  Correct.
17     Q.  Okay.  But I'm talking about whether or not
18  the Bair Hugger -- the Bair Hugger --
19         I'm not talking about the literature.  Okay?
20  No literature here.
21     A.  Well --
22     Q.  What is it about your credentials that would
23  indicate that the Bair Hugger, okay, does not cause an
24  increased amount -- or increase the bacterial loads
25  over the surgical site?  Credentials, not literature.

Page 288

1      A.  My credentials have no -- say nothing -- say
2  nothing about the bacterial load.  I'm not sure how my
3  credentials could say anything about the bacterial
4  load or --
5      Q.  I'm just asking.  So you agree with me that
6  there's nothing --
7      A.  My creden -- my credentials say something --
8      Q.  Your experience.  Experience, education,
9  training.
10     A.  Okay.
11     Q.  What about your experience, education,
12  training, about you, doctor, gives you the expertise
13  to determine whether or not the Bair Hugger has any
14  effect on the airflow that could increase the
15  bacterial load over the surgical site?
16         MS. LEWIS:  Asked and answered.
17     A.  I have said multiple times that I am not an
18  expert in bacterial load over the -- over the
19  surgical site.
20     Q.  So I'm just trying to figure out --
21         Forget about the literature.  Without the
22  literature, you actually have no methodology to offer
23  the opinion that the Bair Hugger does not increase the
24  bacterial load over the surgical site and is safe.
25         MS. LEWIS:  Objection, form.

Page 289

1      A.  Without the literature.
2      Q.  Without the literature.
3      A.  That's -- that's -- that's corr -- correct.
4  I've already said that.
5          MR. ASSAAD:  Okay.  That's all I have.
6  Thank you.
7          MS. LEWIS:  We'll switch place -- places.
8          THE REPORTER:  Off the record, please.
9          (Discussion off the record.)
10             REDIRECT EXAMINATION
11  BY MS. LEWIS:
12     Q.  Dr. Hannenberg, you were asked questions
13  about a study called Darouiche and you mentioned that
14  you had not seen that study and that study wasn't
15  presented for you to review today; correct?
16     A.  That is correct.
17     Q.  Did Mr. Assaad mention to you that -- in
18  that study, whether the Bair Hugger was even studied
19  in that study?
20     A.  I think he said that the Bair Hugger
21  increased bacterial load and infections.
22     Q.  But did he tell you --
23         MR. ASSAAD:  Objection, misstates.
24     Q.  But did he tell you that the Bair Hugger was
25  even tested in that study?  I mean do you even know if

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 290

1    it was tested in that study or not?
2        A.   No.
3        Q.   You were asked earlier to put an S next to
4    all the articles that you cited in Exhibit 2, which is
5    titled "Materials Considered;" correct?
6        A.   Yes.
7        Q.   And this is the one that was presented this
8    morning; correct?
9        A.   Yes.
10       Q.   And you put an S next to -- tell me if this
11   is right -- the ECRI Institute.  Did you put an S next
12   to that one?
13       A.   Yes, I did.
14       Q.   Did you put an S -- S next to the Centers
15   for Medicare & Medicaid Services, number two?
16       A.   Yes, I did.
17       Q.   Okay.  Although they're not officially
18   numbered, I'm going to sort of say -- try as best
19   to --
20       A.   Okay.
21       Q.   -- identify them.
22            You put an S next to the Hooper study?
23       A.   Yes.
24       Q.   Next to a website.  Are you -- I guess it's
25   the NICE --

Page 291

1        A.   Yes, it is.
2        Q.   -- organization; correct?
3        A.   Yes.
4        Q.   You put an S next to Miller's Anesthesia;
5    correct?
6        A.   Yes.
7        Q.   An S next to the Kurz and Frisch study;
8    correct?
9        A.   Correct.
10       Q.   An S next to the Avidan study.
11       A.   Yes.
12       Q.   An S next to the Memarzadeh study; correct?
13       A.   Yes.
14       Q.   An S next to the Proceedings of the
15   International Concensus Meeting on Periprosthetic
16   Joint Infection; correct?
17       A.   Yes.
18       Q.   An S next to Melling and Leitjens, those two
19   studies?
20       A.   Yes.
21       Q.   You put an S next to the Scott study.
22       A.   Yes.
23       Q.   Okay.  And then last you put an S next to
24   the Association of Perioperative Registered Nurses.
25       A.   Yes.

Page 292

1        Q.   The "Perioperative Standards and Recommended
2    Practices."
3        A.   Yes.
4        Q.   You were also asked questions about the
5    Avidan study, in particular whether you believed the
6    Avidan was a good study; correct?  You remember that
7    questioning?
8        A.   Yes.
9        Q.   And whether you thought the study was
10   underpowered or not.  And so you remember that sort of
11   line of questioning?
12       A.   Yes.
13       Q.   Why did you put an S next to Avidan at
14   the -- on the -- I un --
15            As I understand, the S stood for you thought
16   that study supported your opinions, correct, --
17       A.   That is correct.
18       Q.   -- that the Bair Hugger was safe?
19       A.   That -- that is correct.
20       Q.   Why did you say that --
21            Why do you say that the Avidan study
22   supports your opinion?
23       A.   Because it specifically add -- addresses the
24   bacterial output of the Bair Hugger blan -- blanket
25   and it stands apart from other -- other studies that

Page 293

1    look at the internal contents of the heat generator or
2    even the hose itself, and I think that the -- in
3    clinical use what is most important is what is in the
4    air that is being delivered to the patient, which is
5    through the blanket, and the fact that they were
6    unable in multiple iterations of trial -- of trials
7    with that to produce any bacterial growth seems highly
8    persuasive to me to counteract any argument that the
9    Bair Hugger blanket is delivering bacteria into the
10   operating room environment.
11       Q.   So the --
12            One of the findings of the Avidan study was
13   that when the blanket was applied, which is the way it
14   is used -- you use it in the OR, Avidan did not find
15   any bacterial growth; is that correct?
16       A.   That is correct.
17       Q.   Is Avidan a study that shows that the Bair
18   Hugger does not increase bacteria to the patient?
19            MR. ASSAAD:  Objection to form.
20       A.   That -- that is a conclusion I would -- I
21   would draw from the Avidan -- Avidan study.
22       Q.   You've been asked lots of questions about
23   your methodology and you've described various
24   methodologies that you've used.  Can you --
25            Well let me ask this question:  Did you rely

74 (Pages 290 to 293)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 294

1  on your background and educational training in
2  reaching the conclusions that you did in your expert
3  report?
4         MR. ASSAAD:  Objection to form.
5     A.  Yes.  Yes, I did.
6     Q.  Did you rely on your clinical experience,
7  the years of clinical experience that you've worked
8  with the Bair Hugger, in reaching the conclusions that
9  you have in your expert report?
10        MR. ASSAAD:  Objection to form.
11    A.  Yes.  Yes.
12    Q.  You've already testified quite a bit about
13  the literature that you reviewed in reaching your
14  opinions; correct?
15    A.  Yes.
16    Q.  And some of those articles are listed in
17  both Exhibit 2, which is the Materials Considered, and
18  the references that are in Exhibit 3, which is your
19  report; correct?
20    A.  Yes.
21        MR. ASSAAD:  Objection to form.
22        MS. LEWIS:  Thanks, doctor.
23        THE WITNESS:  Thank you.
24        MR. ASSAAD:  I might have a few follow-up
25  questions.

Page 295

1         MS. LEWIS:  Want to move up?
2         MR. ASSAAD:  Maybe.  We'll see.
3         THE REPORTER:  Off the record, please.
4         (Discussion off the record.)
5            RECROSS-EXAMINATION
6  BY MR. ASSAAD:
7     Q.  Doctor, you cite the Memarzadeh study in
8  Exhibit 2; correct?
9     A.  Yes.
10    Q.  If you could --
11        You think that's a study that you cite?
12    A.  I said I -- I -- I cited it because it was a
13  state -- a statement, if I recall correctly, from
14  National Institutes of Health's assessment on this
15  question of safe -- safety of the forced-air warming.
16    Q.  You think it was a statement?
17    A.  There was a statement in -- in there that
18  the technology was safe.
19    Q.  So you think it was a statement, that's my
20  question, by the NIH.
21    A.  It was --
22        Again, I'm happy to -- happy to look at it
23  to verify.
24    Q.  It's your report, doctor.  Do you know what
25  it is?  Is it a statement, is it a study, do you know?

Page 296

1     A.  It's the report of a process at the NIH
2  assessing -- assessing this question, and the
3  conclusion was that it was a safe practice.
4     Q.  It wasn't a study and it wasn't a statement,
5  it was a letter to the editor from the Moretti study.
6  Are -- are you aware of that?
7        Do you know what the Moretti study is?
8     A.  Again, sounds -- it -- it sounds familiar,
9  but I don't know the details as we sit here.
10    Q.  I mean you're -- you're getting paid $500 an
11  hour to look at documents; correct?
12    A.  Correct.
13    Q.  And you got paid $2,000 just for the first
14  hour of today's deposition; correct?
15    A.  Correct.
16    Q.  And $200 each every other -- every other
17  hour; correct?
18    A.  Correct.
19    Q.  And you wrote this report; correct?
20    A.  Correct.
21    Q.  And you looked at the articles; correct?
22    A.  Correct.
23    Q.  And you can't tell me whether or not
24  Memarzadeh is a study, a statement, or a letter to the
25  editor?

Page 297

1     A.  I -- I read it some time -- some time ago
2  and I need to refresh my memory.
3     Q.  You prepared for today's deposition;
4  correct?
5     A.  Yes.
6     Q.  You spent about 15 hours in preparation of
7  today's deposition.
8     A.  Well if you say -- if you say.
9     Q.  Well that's what -- that's what you said.
10  You approximated 15 hours since June 15th and today in
11  preparation of today's deposition.
12    A.  Okay.
13    Q.  How did you prepare?  Did you look at the
14  studies in preparation?
15    A.  I looked at -- I looked at some of the
16  studies.  I did not look -- apparently look at all of
17  the studies.
18    Q.  Okay.  Did you look at the underlying CFD
19  analysis Memarzadeh did that -- in that letter to the
20  editor?
21    A.  In most of these instances, as I -- as I've
22  said, my expertise in statistical analysis and
23  methodologic design puts me in a position where I
24  re -- rely on methodol -- methodologists and -- and
25  editorial boards.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 298

1    Q.  So you're relying on Memarzadeh on a CFD
2  study that you don't even understand; isn't that
3  correct?
4    A.  I am relying on the conclu -- the conclusion
5  that he and -- he drew.
6    Q.  But you're not an engineer.  You don't
7  understand the methodology he used, do you, to come to
8  that conclusion?  Do you?
9    A.  Well if he is rep -- repre --
10   Q.  "Yes" or "no."  Do you understand the CFD
11 analysis?
12       MS. LEWIS:  Stop interrupting him, Gabe.
13   Q.  "Yes" or "no."
14   A.  Do I --
15       No.  That is not my expertise, --
16   Q.  Do you know what the Navier-Stokes equations
17 are?
18   A.  -- that's correct.
19   Q.  Do you know what the Navier-Stokes equations
20 are?
21   A.  No, I don't.
22   Q.  Okay.  So you just take the conclusions of
23 Memarzadeh without even understanding how he got to
24 his conclusions; do you?  Isn't that correct?
25   A.  Correct.

Page 299

1    Q.  Okay.  Did you --
2        Are you aware that in that letter to the
3  editor he actually indicates that forced-air warming
4  slightly disrupts laminar flow?
5    A.  The conclusion of interest is whether it is
6  safe -- safe or not, as I've said multiple times.  Its
7  impact on lam -- laminar flow is at best tangential to
8  the question.
9    Q.  So again you're just picking and choosing
10 statements that you like and disregarding statements
11 that don't like; correct?
12       MS. LEWIS:  Objection, argumentative, --
13   A.  I -- I wouldn't say that.
14       MS. LEWIS:  -- misstates his testimony.
15   Q.  Were you aware that in the Memarzadeh letter
16 to the editor and the study he found that the 505
17 disrupted laminar flow?  Are you aware of that?  "Yes"
18 or "no."
19       MS. LEWIS:  Objection, form.
20   A.  I -- I have said I don't believe that the
21 discussion of laminar flow informs my opinion about
22 the safety of the Bair Hugger.
23   Q.  Can you please answer my question.  Were you
24 aware that in the study he said the 505 disrupted
25 laminar flow?

Page 300

1        MS. LEWIS:  Same objection.
2    A.  I may have at the time of the initial rev --
3  review.
4    Q.  Do you know the difference between the 505
5  and the 750?
6    A.  No.
7    Q.  Do you know what blanket was used in
8  Memarzadeh's study?
9    A.  No.
10   Q.  It was an upper body blanket; wasn't it?
11   A.  If you say so.
12   Q.  Well do you know?
13   A.  I just said I didn't.
14   Q.  Okay.  So you just want to draw on a
15 conclusion of a study that you like without knowing
16 what the device -- what device was used, what blanket
17 was used, and the engineering principles behind the
18 study.  Is that a fair testament of your -- of -- of
19 your -- of your take of the Memarzadeh study?
20   A.  Well the conclusions that Memarzadeh
21 communica -- communicated were subject to editorial
22 review and come with the imprimatur of the National
23 Institutes of Health.  I find that that's per --
24 persuasive.
25   Q.  Where did you get that information from,

Page 301

1  sir?  It's a letter to the editor, it's not peer-
2  reviewed.
3    A.  It's reviewed -- it's reviewed by the
4  editors.
5    Q.  Yeah.  But it's not peer-reviewed.  It's not
6  peer-reviewed the same --
7        Do you know what peer review is?
8    A.  I know -- I have been a peer reviewer, I
9  know very well what -- what it is.  But not every
10 letter to -- that's sent to a journal is published.
11 There is a less-intens -- intensive review process
12 about which letters get published and which don't, and
13 this satisfied the editors of the journal.
14   Q.  But it's not peer-reviewed; correct?
15   A.  Normally it is not.
16   Q.  Okay.  Do you know -- do you know whether or
17 not Memarzadeh used draping in his CFD analysis?
18   A.  I don't know the details --
19   Q.  Okay.
20   A.  -- of the Memarzadeh study.
21   Q.  So you were provided that paper by defense
22 counsel, you just cited to it because it sounds good.
23   A.  I don't know whether --
24   Q.  Got it.
25   A.  -- it was provided or I found it in my own

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 302

1  literature search.
2      Q.  Let's talk about ECRI.  You reviewed -- you
3  reviewed the ECRI article, correct, the literature
4  review?
5      A.  Yes.
6      Q.  Is there one statement in ECRI that says the
7  Bair Hugger is a safe device?
8      A.  Verbatim?
9      Q.  Even if it comes close.
10     A.  Yes.  The conclusion of EC -- EC -- ECRI is
11  that it is -- it is safe to use.
12     Q.  It says, "Consequently, ECRI Institute does
13  not believe that the currently available evidence
14  justifies discontinuing the use of forced-air warming
15  during surgery."
16         You interpret that as saying the Bair Hugger
17  is safe?
18     A.  Yes.
19     Q.  You do?
20     A.  Yes, I do.
21     Q.  So then if it's safe, why do they say, "We
22  will continue to monitor this topic through the
23  published literature and will update our
24  recommendation as warranted?"
25     A.  New evidence may become avail -- available.

Page 303

1      Q.  No.  They're just saying there's not enough
2  evidence at this point in time.
3      A.  No, they did --
4      Q.  Okay.
5      A.  -- they did not say that.
6      Q.  Okay.  International Concensus says further
7  research is warranted.  Are you aware of that?
8      A.  Yes.
9      Q.  Okay.  ECRI says they're going to monitor
10  it; correct?
11     A.  Yes.
12     Q.  Okay.
13         (Discussion off the stenographic record.)
14     Q.  Do you even acknowledge there's a
15  theoretical risk that the Bair Hugger can cause a
16  surgical-site infection?
17         MS. LEWIS:  Objection to form.
18     A.  I know no basis for that theory.
19     Q.  So even though the International Concensus
20  has a basis for that statement, you have no basis.
21     A.  I --
22         Correct, I have no -- I have no basis.
23         MR. ASSAAD:  That's all I have.
24         THE REPORTER:  Anything further?
25         MS. LEWIS:  No.

Page 304

1         THE REPORTER:  Off the record, please.
2  (Deposition concluded.)

Page 305

1                C E R T I F I C A T E
2         I, Richard G. Stirewalt, hereby certify that
3  I am qualified as a verbatim shorthand reporter, that
4  I took in stenographic shorthand the deposition of
5  ALEXANDER A. HANNENBERG at the time and place
6  aforesaid, and that the foregoing transcript is a true
7  and correct, full and complete transcription of said
8  shorthand notes, to the best of my ability.
9         Dated at Deerwood, Minnesota, this 14th day
10  of August, 2017.
11
12
13
14
15
16
17         RICHARD G. STIREWALT
18         Registered Professional Reporter
19         Notary Public
20
21
22
23
24
25

Page 306

```
1          C E R T I F I C A T E
2          I, ALEXANDER A. HANNENBERG, hereby certify
3   that I have carefully read the foregoing transcript,
4   and that the same is a true and complete, full and
5   correct transcription of my deposition, except:
6   PAGE/LINE        CHANGE        REASON
7
8
9
10
11
12
13
14
15
16
17          ALEXANDER A. HANNENBERG
18          Deponent
19
20      Signed and sworn to before me this _____ day of
21  September, 2017.
22
23      _____
24          Notary Public
25
```

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com