# EXHIBIT DX1

**TO DECLARATION OF BRIDGET M. AHMANN
IN SUPPORT OF DEFENDANTS' MEMORANDUM IN
OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE
OPINIONS AND TESTIMONY OF TIMOTHY ULATOWSKI**

# EXHIBIT A:  CV

## Timothy A. Ulatowski

1103 Arboroak Place · Herndon, Virginia 20170

703-404-2997                              timothy.ulatowski@verizon.net

## Regulatory Consultant/Medical Devices

**Extensive Regulatory Experience ~ Risk Management ~ Technical Expert**

A unique medical device consultant with extensive experience in both premarket evaluation of new medical devices and enforcement of FDA laws and regulations.  Over 36 years of significant public health achievements, creating major regulatory programs and policies, developing and implementing strategic and risk management plans, and building collaborations with global regulatory partners and industry. Proven skills in advising industry on regulatory issues, assessing compliance and enforcement actions, evaluating premarket documents, managing and supervising large organizations, resolving complex technical and scientific problems of individual firms to those of national and international scope, and communicating to diverse audiences.

## Selection of Notable Accomplishments

Hands on technical leadership of numerous compliance, enforcement and recall actions, many of national and global importance

Initiated use of novel corporate enforcement actions

Created effective internal quality management system used as a model program in FDA

Lead author of international guidance documents on aspects of the Global Harmonization Task Force medical device regulatory model adopted by many countries

Recognized in "Top 100" of medical device professionals/MDDI

Primary FDA reviewer of hundreds of Premarket Notifications, Investigational Device Exemptions, Premarket Approval Applications, recalls and compliance actions

Leader of team that developed the current FDA device standards program

Author of many key FDA premarket guidance documents, technical standards and publications

FDA key witness in federal court (US v Abtox), contributor to many FDA court cases, advisor to DOJ and FDA criminal investigations office

Lead for agency on many GAO, OMB and Congressional activities

FDA spokesperson to major press and to large audiences

HHS Team Leader and technical expert remediating Anthrax contamination of Senate and Postal Service buildings

Creator of FDA/CDC/EPA tripartite collaborations on chemical germicides and co-author of current FDA/EPA national regulatory scheme for chemical germicides

Co-author and collaborator on sharps injury prevention guidance, related OSHA and NIOSH regulations and policies, resulting in documented reduction of injuries

Recipient of numerous major FDA awards

Since FDA, Expert witness in numerous litigations

Since FDA, Expert trainer on behalf of FDA and US Dept of Commerce for foreign regulatory staff and FDA staff

Since FDA, successful completion of numerous premarket, postmarket and compliance activities for large and small manufacturers or entrepreneurs

# Professional Experience

### Regulatory Consultant, Medical Devices

April 2014 - Present

- Regulatory support in medical device areas of premarket, postmarket, compliance, combination products
- Expert witness in litigation

### NSF Health Sciences (formerly Becker & Associates Consulting Inc.): Vice President, Regulatory and Compliance

September 2011 – March 2014

- Ensured effective and timely solutions to a variety of FDA regulatory and legal issues
- Provided expert advice and recommendations on premarket, quality systems, compliance and device reporting
- Trained industry executives and staff on FDA requirements

### NDA Partners LLC: Principal

January 2011 – June 2012

- Advise clients on FDA regulations and law regarding product submissions, compliance and enforcement actions, and postmarket surveillance activities
- Serve as an expert witness in litigation
- Conduct due diligence

### FDA, CDRH: Director, Office of Compliance and Senior Advisor for Enforcement

January 2003 – January 2011

- Managed and supervised office of four divisions and 180 professional staff responsible for ensuring compliance with medical device laws and regulations
- Directed FDA device quality system and bioresearch enforcement programs
- Directed inspection assignments and assessed quality system and bioresearch monitoring inspection reports and company/investigator/sponsor/IRB responses to determine violations
- Worked with all FDA districts, ORA and drug, biologics and food compliance executives to formulate enforcement strategies and actions
- Hands on evaluation and management of recalls, device advertising and promotion, MDRs, registration and listing, and medical device field resource allocation and prioritization
- Created new device enforcement policies and programs, directed implementation of the Commissioner's strategic action items, and participated in executive strategic planning at the agency and center levels
- Co-leader of FDA Medical Device Field Committee, an ORA/CDRH collaboration

- Initiated comprehensive training program for compliance staff and web-based information for the public
- Co-leader of 2010 user fee legislation post market committee, devising proposals and strategies with key Center and Agency staff for next round of legislation
- Senior Device Enforcement Advisor September 2010 – January 2011

### FDA, CDRH: Head of USA Delegation, Global Harmonization Task Force and FDA representative to GHTF Study Group 1 Premarket

January 1995 - October 2010

- Managed the activities of the USA FDA participants to the GHTF Steering Committee and the five study groups; collaborated with USA industry task force members, USA leader on the GHTF Steering Committee for last four years
- Coordinated creation and review of documents and recommended agency decisions on pending documents to Center Director
- Primary author of several GHTF documents, including the original premarket "STED" document, and Global Model document, which are now used internationally
- Frequently trained international government staff on GHTF and FDA procedures

### FDA, CDRH/Office of Device Evaluation: Director, Division of Dental, Anesthesiology, General Hospital, and Infection Control Devices

December 1996 – January 2003

- Managed premarket activities, such as review of premarket submissions and investigational applications, panel meetings, guidance development, and collaborative support for other CDRH offices
- Led development of the division during a major reorganization
- FDA lead on numerous international standards committees, reengineering task groups, and interagency task forces dealing with significant public health issues
- Succeeded in reducing review times while improving the quality and rigor of reviews
- Primary reviewer on numerous 510(k)s, IDEs, and PMAs
- Agency and ISO technical expert on medical device sterilization and disinfection

### Prior FDA experience, short summary

Device Evaluation Associate Director, Branch Chief and front line 510(k), IDE, and PMA reviewer

Director, Investigational Device Staff, IDE application review and protocol advice

New Drug Evaluation Product Manager, NDA and IND activities and advisory committee exec sec

Microbiologist, National Center for Antibiotic Analysis, drug assessments

Prior to college and FDA career: US Army 1968 – 1971

# Education

- Master of Science/Physiology with Biomedical Engineering emphasis, 1988 GPA 4.0

Georgetown University School of Medicine

- Bachelor of Science/Microbiology, 1974 cum laude

Pennsylvania State University

# EXHIBIT DX2

**TO DECLARATION OF BRIDGET M. AHMANN
IN SUPPORT OF DEFENDANTS' MEMORANDUM IN
OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE
OPINIONS AND TESTIMONY OF TIMOTHY ULATOWSKI**

# EXHIBIT B:  RELIANCE LIST

www.fda.gov

21 Code of Federal Regulations

Federal Food, Drug and Cosmetic Act

ASQ web site

Six Sigma web site

Quality Assurance Journal

AAOS web site

Additional reference material supplied by counsel attached hereto

**CHART OF MATERIALS SENT TO TIMOTHY ULATOWSKI**

Note: In connection with my work on individual cases before the MDL was created, I received Bates labeled documents. These are identified in this chart, with their original Bates numbers intact. Throughout my report, I included references to many of these documents. Counsel assisted me by providing the MDL Bates numbers for the documents I referenced.

| REVIEW MATERIALS SENT | DOC DATE (if appl) | BATES NOS. (if appl) |
|---|---|---|
| **01 - PLEADINGS / PROTECTIVE ORDER** | | |
| Pretrial Order #7: Protective Order | 4/29/2016 | |
| Ex. A to Proposed Pretrial Order #8 - Master Long Form Complaint | 8/24/2016 | |
| Defendants' Master Answer to Plaintiffs' Master Long Form Complaint and Jury Demand | 8/31/2016 | |
| Pretrial Order No. 17 - Amended Scheduling Order | 1/5/2017 | |
| Plaintiffs' Memorandum of Law in Support of Motion for Leave to Amend Master Long Form and Short Form Complaints to Add Claim for Punitive Damages | 4/21/2017 | |
| Exhibits re Plaintiff's Motion to add Punitive Damages; Exhibits 1-79 and Exhibits A-E | 4/21/2017 | |
| Walton Petition | 03/05/13 | |
| Walton Protective Order | 12/16/13 | |
| Affidavit of Robert Prestera | 04/22/13 | |
| **02 - PLAINTIFF'S EXPERT DISCLOSURES** | | |
| Plaintiff's Preliminary Designation of Expert Witnesses | 11/11/14 | |
| Plaintiff's Supplemental Designation of Expert Witnesses and Reports | 04/17/15 | |
| **03 - PLAINTIFF-PRODUCED DOCUMENTS** | | |
| N/A | | |
| **04 - 3M/ARIZANT'S DISCOVERY RESPONSES / EXPERT DISCLOSURES** | | |
| Defendants' Preliminary Designation of Expert Witnesses | 12/16/14 | |
| | | |
| **05 - EXPERT REPORTS & DECLARATIONS** | | |
| Expert Report of Dan Koenigshofer | 3/31/2017 | |
| Expert Report of Dr. Jonathan M. Samet | 3/30/2017 | |
| Expert Report of Dr. Michael J. Stonnington | | |
| Expert Report of Michael W. Buck | | |
| Expert Report of Said Elghobashi | 3/29/2017 | |
| Expert Report of William Jarvis | | |
| Expert Report of Yadin David (served in MDL) | | |

## CHART OF MATERIALS SENT TO TIMOTHY ULATOWSKI

| | | |
|---|---|---|
| Expert Report of Yadin David (served in Walton) | 09/28/15 | |
| Expert Report of Yadin David (served in Johnson) | 10/15/15 | |
| Report of Michael D. Freeman, MedDr, PhD, MPH | 04/11/15 | |
| Report of Paul J. Edelson, MD | 04/29/15 | |
| Report of Kenneth R. Diller, Sc.D., P.E. | 04/16/14 | |
| **06 - DEPOSITIONS [WITH EXHIBITS]** | | |
| Augustine, Scott | 3/31/2017 | |
| Crowder, Robert | 3/16/2017 | |
| Danielson, Suzanne | 3/17/2017 | |
| Hansen, Gary | 11/2/2016 | |
| Hulse-Stevens, Michelle | 12/19/2016 | |
| Maharaj, Gary | 1/18/2017 | |
| Rock, John | 11/4/2016 | |
| Tan, Winston | 3/10/2017 | |
| Van Duren, Albert, Volume I | 11/7/2016 | |
| Van Duren, Albert, Volume II | 3/7/2017 | |
| Westlin, David | 12/16/2016 | |
| Woodwick-Sides, Teri | 12/8/2016 | |
| Zgoda, Karl | 2/24/2017 | |
| Ziaimehr, Allen | 3/3/2017 | |
| Bergstrom, Troy | 02/18/15 | |
| Clyburn, Terry (MD) | 12/22/14 | |
| Dholakia, Nizar (MD) | 10/10/14 | |
| Hansen, Gary | 02/11/15 | |
| Lewallen, David (MD) | 09/25/14 | |
| Maharaj, Gary | 02/19/15 | |
| Rock, John | 02/19/15 | |
| Sessler, Daniel | 05/28/15 | |
| Sides, Teri | 03/03/15 | |
| Van Duren, Albert | 02/13/15 | |
| Walton, Tommy | 09/11/14 | |
| Walton, Wilma | 09/11/14 | |
| Westlin, David | 02/17/15 | |
| Wilson, Pamela (MD) | 04/21/15 | |
| Zgoda, Karl | 02/12/15 | |
| Johnson, Timothy | 3/6/2015 | |
| Westlin, David | 7/14/2015 | |
| Bergstrom, Troy | 7/15/2015 | |
| Rock, John | 7/16/2015 | |
| Zgoda, Karl | 7/22/2015 | |
| Rockford, Melissa (MD) | 8/6/2015 | |
| Clough, Lisa (MD) | 8/11/2015 | |
| Hansen, Gary | 8/27/2015 | |

**CHART OF MATERIALS SENT TO TIMOTHY ULATOWSKI**

| | | |
|---|---|---|
| Maharaj, Gary | 8/19/2015 | |
| Woodwick-Sides, Teryl | 9/15/2015 | |
| Van Duren, Al | 9/10/2015 | |
| Hawkinson, Dana (MD) | 11/11/2015 | |
| Hendricks, Kelly (MD) | 8/18/2015 | |
| Key, Vincent (MD) | 9/17/2015 | |
| Tan, Winston | 8/26/2015 | |
| **07 - MEDICAL RECORDS** | | |
| N/A | | |
| **08 - 3M/ARIZANT DOCUMENTS PRODUCED** | | |
| Bair Hugger Model 750 Labeling Documents | | |
| Device Design and Re-Design File | | 3M00005343 - 3M00005975, 3M00048780 - 3M00048782 |
| 510(k) Documents | | 3M00005976 - 3M00006290 |
| Additional 510(k) documents | | 3M00057816 - 3M00058560 |
| Instructions for Use - Bair Hugger Blankets | | 3M00052020 - 3M00052025 |
| Additional Regulatory materials | | 3MBH00500455- 3MBH00500464 |
| | | 3MBH00127752- 3MBH00129010 |
| | | 3MBH00501665- 3MBH00501957 |
| | | 3MBH00500654- 3MBH00500655 |
| | | 3MBH00500671- 3MBH00500674 |
| | | 3MBH00500681- 3MBH00500683 |
| | | 3MBH00500684 |
| | | 3MBH00500688 |
| | | 3MBH00500689 |
| | | 3MBH00500692 |
| | | 3MBH00501066 |
| | | 3MBH00501067 |
| | | 3MBH00501117 |
| | | 3MBH00501121- 3MBH00501124 |
| | | 3MBH00501150 |
| | | 3MBH00501272 |
| | | 3MBH00501348 |
| | | 3MBH00501414 |
| | | 3MBH00501446 |
| | | 3MBH00501471 |
| | | 3MBH00502015 |
| Additional Documents Produced | | 3MBH01517606- 3MBH01518524 |

## CHART OF MATERIALS SENT TO TIMOTHY ULATOWSKI

| | | |
|---|---|---|
| | | 3MBH01787664-3MBH01789042 |
| | | 3MBH02280982-3MBH02281003 |
| | | 3MBH02281065-3MBH02281067 |
| | | 3MBH02281280-3MBH02281285 |
| | | 3MBH02281286-3MBH02281293 |
| | | 3MBH02281349-3MBH02281354 |
| | | 3MBH00105369-3MBH00105370 |
| | | 3MBH00105373-3MBH00105375 |
| | | 3MBH00110304-3MBH00110305 |
| | | 3MBH00131406-3MBH00131407 |
| | | 3MBH00133481-3MBH001334813 |
| | | 3MBH00133490-3MBH00133496 |
| | | 3MBH00133502-3MBH00133506 |
| | | 3MBH00133945-3MBH00133947 |
| | | 3MBH00133948-3MBH00133952 |
| | | 3MBH00133953-3MBH00133955 |
| | | 3MBH00574130-3MBH00574135 |
| | | 3MBH01220351 |
| | | 3MBH00551942-3MBH00551959 |
| | | 3MBH00553184 |
| | | 3MBH02272940-3MBH02273024 |
| | | 3MBH02290678-3MBH02290689 |
| | | 3MBH02290726-3MBH02291030 |
| | | 3MBH02290690-3MBH02290725 |

## CHART OF MATERIALS SENT TO TIMOTHY ULATOWSKI

|  |  |  |
|---|---|---|
|  |  | 3MBH02273025-<br>3MBH02273133 |
|  |  | 3MBH02290402-<br>3MBH02290677 |
|  |  | 3M00075103-3M00075104 |
|  |  | 3MBH00002647 |
|  |  | 3MBH00005608 |
|  |  | 3MBH00018311-<br>3MBH00018313 |
|  |  | 3MBH00022366 |
|  |  | 3MBH00022367-<br>3MBH00022370 |
|  |  | 3MBH00022625-<br>3MBH00022662 |
|  |  | 3MBH00022877 |
|  |  | 3MBH00024592-<br>3MBH00024596 |
|  |  | 3MBH00024682 |
|  |  | 3MBH00025006-<br>3MBH00025008 |
|  |  | 3MBH00025527 |
|  |  | 3MBH00026841-<br>3MBH00026847 |
|  |  | 3MBH00030637-<br>3MBH00030658 |
|  |  | 3MBH00046971-<br>3MBH00046972 |
|  |  | 3MBH00047382-<br>3MBH00047383 |
|  |  | 3MBH00047858 |
|  |  | 3MBH00047859-<br>3MBH00047864 |
|  |  | 3MBH00048067-<br>3MBH00048085 |
|  |  | 3MBH00109033 |
|  |  | 3MBH00126140-<br>3MBH00126142 |
|  |  | 3MBH00132832-<br>3MBH00132834 |
|  |  | 3MBH00497304 |
|  |  | 3MBH00536470-<br>3MBH00536487 |
|  |  | 3MBH00580475 |
|  |  | 3MBH00630074-<br>3MBH00630089 |
|  |  | 3MBH00846631-<br>3MBH00846651 |

## CHART OF MATERIALS SENT TO TIMOTHY ULATOWSKI

| | | |
|---|---|---|
| | | 3MBH01031246 |
| | | 3MBH01617179-<br>3MBH01617181 |
| | | 3MBH01735812 |
| | | 3MBH01735994 |
| | | 3MBH01807381 |
| | | 3MBH02117830-<br>3MBH02117831 |
| | | 3MBH00553184 |
| | | 3MBH02281401-<br>3MBH02281452 |
| | | 3MBH01630219-<br>3MBH01630651 |
| | | 3MBH00047064 |
| | | 3MBH00105180 |
| | | 3MBH00129876 |
| | | 3MBH01849567 |
| | | 3M00000001-7 |
| | | 3M00000655-1911 |
| | | 3M00001930-2098 |
| | | 3M00004372-4460 |
| | | 3M00004462-4470 |
| | | 3M00004472-5944 |
| | | 3M00005959-6135 |
| | | 3M00006137-8294 |
| | | 3M00008296-8316 |
| | | 3M00008321-9491 |
| | | 3M00009493-9702 |
| | | 3M00009731-9852 |
| | | 3M00009881-10359 |
| | | 3M00010361-10573 |
| | | 3M00010580-10756 |
| | | 3M00010758-10780 |
| | | 3M00010782-10787 |
| | | 3M00010789-10792 |
| | | 3M00010794-10797 |
| | | 3M00010799-10802 |
| | | 3M00010804-10892 |
| | | 3M00010912-10919 |
| | | 3M00010921-10928 |
| | | 3M00010930-10958 |
| | | 3M00010960-10983 |
| | | 3M00010985-10998 |
| | | 3M00011000-11011 |
| | | 3M00011013-11026 |
| | | 3M00011029-11043 |

## CHART OF MATERIALS SENT TO TIMOTHY ULATOWSKI

|  |  |  |
|---|---|---|
|  |  | 3M00011045-11059 |
|  |  | 3M00011061-11064 |
|  |  | 3M00011066-11129 |
|  |  | 3M00011131-11151 |
|  |  | 3M00011153-11171 |
|  |  | 3M00011173-11176 |
|  |  | 3M00011178-11181 |
|  |  | 3M00011184-11214 |
|  |  | 3M00011216-11225 |
|  |  | 3M00011227-11229 |
|  |  | 3M00011231-11233 |
|  |  | 3M00011235-11241 |
|  |  | 3M00011243-11251 |
|  |  | 3M00011253-11256 |
|  |  | 3M00011258-11261 |
|  |  | 3M00011263-11266 |
|  |  | 3M00011268-11271 |
|  |  | 3M00011273-11276 |
|  |  | 3M00011278-11287 |
|  |  | 3M00011289-11294 |
|  |  | 3M00011296-11299 |
|  |  | 3M00011302-11382 |
|  |  | 3M00011384-11388 |
|  |  | 3M00011390-11446 |
|  |  | 3M00011448-11469 |
|  |  | 3M00011471-11481 |
|  |  | 3M00011483-11486 |
|  |  | 3M00011488-11491 |
|  |  | 3M00011493-11495 |
|  |  | 3M00011497-11498 |
|  |  | 3M00011502-11505 |
|  |  | 3M00011507-11525 |
|  |  | 3M00011528-11529 |
|  |  | 3M00011531-11534 |
|  |  | 3M00011536-11537 |
|  |  | 3M00011540-11541 |
|  |  | 3M00011544-11552 |
|  |  | 3M00011566-11580 |
|  |  | 3M00011583-11589 |
|  |  | 3M00011592-11612 |
|  |  | 3M00011614-11619 |
|  |  | 3M00011621-11623 |
|  |  | 3M00011625 |
|  |  | 3M00011627-11629 |
|  |  | 3M00011631-11644 |
|  |  | 3M00011646-11650 |

## CHART OF MATERIALS SENT TO TIMOTHY ULATOWSKI

| | | |
|---|---|---|
| | | 3M00011652-11681 |
| | | 3M00011683-11721 |
| | | 3M00011723-11731 |
| | | 3M00011733-11750 |
| | | 3M00011752-11766 |
| | | 3M00011768-11843 |
| | | 3M00011845-11851 |
| | | 3M00011853-11860 |
| | | 3M00011862-11885 |
| | | 3M00011887-11888 |
| | | 3M00011890-11895 |
| | | 3M00011897-11938 |
| | | 3M00011944-11949 |
| | | 3M00011951-11955 |
| | | 3M00011957-11966 |
| | | 3M00011968-11995 |
| | | 3M00011999-12006 |
| | | 3M00012008-12031 |
| | | 3M00012033-12038 |
| | | 3M00012045-12047 |
| | | 3M00012050-12053 |
| | | 3M00012076 |
| | | 3M00012081-12095 |
| | | 3M00012110-12142 |
| | | 3M00012144-12257 |
| | | 3M00012259-12277 |
| | | 3M00012283-12313 |
| | | 3M00012350-12517 |
| | | 3M00012535-12575 |
| | | 3M00012585 |
| | | 3M00012590 |
| | | 3M00012596-12603 |
| | | 3M00012606-16396 |
| | | 3M00016398-19451 |
| | | 3M00019453-20390 |
| | | 3M00020405-21672 |
| | | 3M00021674-22200 |
| | | 3M00022202-24541 |
| | | 3M00024843-25259 |
| | | 3M00025313-25317 |
| | | 3M00025348-25703 |
| | | 3M00025705-27846 |
| | | 3M00027848-29520 |
| | | 3M00029524-34781 |
| | | 3M00034784-35796 |
| | | 3M00035798-36022 |

**CHART OF MATERIALS SENT TO TIMOTHY ULATOWSKI**

| | | |
|---|---|---|
| | | 3M00036060-36196 |
| | | 3M00036199-36777 |
| | | 3M00036786-38851 |
| | | 3M00038853-41958 |
| | | 3M00041962-42532 |
| | | 3M00042537-42539 |
| | | 3M00042541-42848 |
| | | 3M00042851-42904 |
| | | 3M00042923-43042 |
| | | 3M00043044-43046 |
| | | 3M00043048-43469 |
| | | 3M00043477-43480 |
| | | 3M00043538-43567 |
| | | 3M00043570-43689 |
| | | 3M00044692-45608 |
| | | 3M00045610-46985 |
| | | 3M00046991 |
| | | 3M00046994-48786 |
| | | 3M00048788-50979 |
| | | 3M00050982-51277 |
| | | 3M00051279-51668 |
| | | 3M00051671-51682 |
| | | 3M00051756-52116 |
| | | 3M00052120-74119 |
| | | 3M00074121-74181 |
| | | 3M00074183-74375 |
| **09 - RELEVANT LITERATURE** | | |
| N/A | | |
| Charnley J., Eftekhar N. Postoperative infection in total prosthetic replacement arthroplasty of the hip joint. The British Journal of Surgery. 1969. | 1969 | |
| Franco J., et al. Airborne contamination in orthopedic surgery. Clinical Orthopedics and Related Research. 1976. | 1976 | |
| Adair F. Nosocomial Serratia outbreak: Guilt by association or scientific investigation? Lancet. 1981. | 1981 | |
| Lidwell O.M., et al. Effect of ultraclean air in operating rooms on deep sepsis in the joint after total hip or knee replacement: a randomized study. British Medical Journal. 1982. | 1982 | |
| Lidwell O.M., et al. Bacteria isolated from deep joint sepsis after operation for total hip or knee replacement and the sources of the infections with Staphylococcus aureus. Journal of Hospital Infection. 1983. | 1983 | |

## CHART OF MATERIALS SENT TO TIMOTHY ULATOWSKI

| | | |
|---|---|---|
| Sautter R.L., et al. Serratia marcescens meningitis associated with a contaminated benzalkonium chloride solution. Infection Control. 1984. | 1984 | |
| Lidwell O.M., et al. Ultraclean air and antibiotics for the prevention of postoperative infection. Acta Orthopaedica Scandinavica. 1987. | 1987 | |
| Sessler D., et al. Hypothermia during epidural anesthesia results mostly from redistribution of heat within the body, not heat loss to the environment. Anesthesiology. 1989. | 1989 | |
| Lewis A.M., et al. A hospital outbreak of Serratia marcescens in neurosurgical patients. Epidem. Inf. 1989. | 1989 | |
| Lennon R.L., et al. Evaluation of a forced-air system for warming hypothermic postoperative patients. Anesthesia & Analgesia. 1990. | 1990 | |
| Sessler D.I., & Ponte J. Shivering during epidural anesthesia. Anesthesiology. 1990. | 1990 | |
| Moayeri A., et al. Pre-induction skin-surface warming prevents redistribution hypothermia. Anesthesiology. 1991 | 1991 | |
| Sessler D., et al. Perioperative thermal insulation. Anesthesiology. 1991. | 1991 | |
| Camus Y., et al. Thermal balance using a forced-air warmer (Bair Hugger) during abdominal surgery. Anesthesiology. 1991. | 1991 | |
| Feroe DD & Augustine SD. Hypothermia in the PACU. Critical CareNursing Clinics of North America 1991. | 1991 | |
| Hall A.C. & Teenier T. Bair Hugger warmer does not increase microbial contamination in the operating room. 1991. | 1991 | |
| Hynson J.M. & Sessler D. Intraoperative warming therapies: A comparison of three devices. Journal of Clinical Anesthesia. 1992. | 1992 | |
| Sessler D. Perioperative Temperature Control. The Western Journal of Medicine. 1992. | 1992 | |
| Camus Y. et al. Leg warming minimizes core hypothermia during abdominal surgery. Anesthesia & Analgesia. 1993. | 1993 | |
| Glosten B., et al. Preanesthetic skin-surface warming reduces redistribution hypothermia caused by epidural block. Anesthesia & Analgesia. 1993. | 1993 | |

## CHART OF MATERIALS SENT TO TIMOTHY ULATOWSKI

| | | |
|---|---|---|
| Hynson J.M., et al. The effects of preinduction warming on temperature and blood pressure during propofol/nitrous oxide anesthesia. Anesthesiology. 1993. | 1993 | |
| Just B., et al. Prevention of intraoperative hypothermia by preoperative skin surface warming. Anesthesiology. 1993. | 1993 | |
| Sessler D. Perianesthetic thermoregulation and heat balance in humans. The FASEB Journal. 1993. | 1993 | |
| Zink R., et al. Convective warming therapy does not increase the risk of wound contamination in the operating room. Anesthesia & Analgesia. 1993. | 1993 | |
| Kurz A., et al. Forced-air warming maintains intraoperative normothermia better than circulating-water mattresses. Anesthesia & Analgesia. 1993. | 1993 | |
| Ouellette R.G. Comparison of four intraoperative warming devices. Journal of the American Association of Nurse Anesthetists. 1993. | 1993 | |
| Gandhi P.A., et al. Adaption and growth of Serratia marcescens in contact lens disinfectant solutions containing chlorhexidine gluconate. Applied and Environmental Microbiology. 1993. | 1993 | |
| Szewzyk U., et al. Growth and survival of Serratia marcescens under aerobic and anaerobic conditions in the presences of materials from blood bags. Journal of Clinical Microbiology. 1993. | 1993 | |
| Chandon M., et al. Prevention of postoperative shivering by pre- or intraoperative skin-surface warming. Anesthesiology. 1994. | 1994 | |
| Dirkes, W.E., et al. Convection warming in the operating room: Evaluation of bacterial spread with three filtration levels. Anesthesiology. 1994. | 1994 | |
| Giesbrecht GG, et al. Comparison of forced-air patient warming systems for perioperative use. Anesthesiology. 1994. | 1994 | |
| Matsukawa T., et al. Effects of a forced-air system (Bair Hugger, OR type) on intraoperative temperature in patients with open abdominal surgery. Journal of Anesthesia. 1994. | 1994 | |
| Murat I., et al. Evaluation of the efficacy of a forced-air warmer (Bair Hugger) during spinal surgery in children. Journal of Clinical Anesthesia. 1994. | 1994 | |

## CHART OF MATERIALS SENT TO TIMOTHY ULATOWSKI

| | | |
|---|---|---|
| Smith I., et al. Use of forced-air warming during and after outpatient arthroscopic surgery. Anesthesia & Analgesia. 1994. | 1994 | |
| Bennett J., et al. Prevention of hypothermia during hip surgery: effect of passive compared with active skin surface warming. British Journal of Anaesthesia. 1994. | 1994 | |
| Borms S.F., et al. Bair Hugger forced-air warming maintains normothermia more effectively than Thermo-Lite insulation. J Clin Anesth. 1994. | 1994 | |
| Camus Y., et al. Preinduction skin surface warming minimizes intraoperative core hypothermia. Journal of Clinical Anesthesia. 1995. | 1995 | |
| Matsukawa T., et al. Heat flow and distribution during induction of general anesthesia. Anesthesiology. 1995. | 1995 | |
| Sessler D., et al. Optimal duration and temperature of prewarming. Anesthesiology. 1995. | 1995 | |
| Carrero P., et al. Report of six cases of human infection by Serratia plymuthica . Journal of Clinical Microbiology. 1995. | 1995 | |
| Hubble M.J., et al. Clothing in laminar-flow operating theatres. Journal of Hospital Infection. 1996. | 1996 | |
| Kurz A., Sessler D., Lenhardt R. Perioperative normothermia to reduce the incidence of surgical wound infection and shorten hospitalization. The New England Journal of Medicine. 1996. | 1996 | |
| Schmied H., et al. Mild hypothermia increases blood loss and transfusion requirements during total hip arthroplasty. The Lancet. 1996. | 1996 | |
| Harrison S.J. & Ponte J. Convective warming combined with vasodilator therapy accelerates core rewarming after coronary artery bypass surgery. British Journal of Anaesthesia. 1996. | 1996 | |
| Janke E.L., et al. Evaluation of two warming systems after cardiopulmonary bypass. British Journal of Anaesthesia. 1996. | 1996 | |
| Karayan J., et al. Delayed forced-air warming prevents hypothermia during abdominal aortic surgery. British Journal of Anaesthesia. 1996. | 1996 | |
| Kempen P.M. Full body forced-air warming: commercial blanket vs. air delivery beneath bed sheets. Canadian Journal of Anaesthesia. 1996. | 1996 | |

**CHART OF MATERIALS SENT TO TIMOTHY ULATOWSKI**

| | | |
|---|---|---|
| Kurz A., Sessler D.I., et al. Perioperative normothermia to reduce the incidence of surgical wound infection and shorten hospitalization. The New England Journal of Medicine. 1996. | 1996 | |
| Pathi V., et al. The benefits of active rewarming after cardiac operations: A randomized prospective trial. The Journal of Thoracic and Cardiovascular Surgery. 1996. | 1996 | |
| Steele M.T., et al. Forced air speeds rewarming I accidental hypothermia. Ann Emerg Med. 1996. | 1996 | |
| Avidan M. S., et al. Convection warmers - not just hot air. Anesthesia. 1997. | 1997 | |
| Berti M., et al. Active warming, not passive heat retention, maintains normothermia during combined epidural general anesthesia for hip and knee arthroplasty. Journal of Clinical Anesthesia. 1997. | 1997 | |
| Camus Y., et al. Prevention of hypothermia by cutaneous warming with new electric blankets during abdominal surgery. British Journal of Anesthesia. 1997. | 1997 | |
| Sessler D. Mild perioperative hypothermia. The New England Journal of Medicine. 1997. | 1997 | |
| Sessler D. Perioperative thermoregulation and heat balance. Annals of the New York Academy of Sciences. 1997. | 1997 | |
| Lenhardt R., et al. Mild intraoperative hypothermia prolongs post anesthetic recovery. Anesthesiology. 1997. | 1997 | |
| Patel N., et al. Heat conservation vs. Convective warming in adults undergoing elective surgery. Canadian Journal of Anaesthesia. 1997. | 1997 | |
| Plattner O., Ikeda T., Sessler D.I., et al. Post anesthetic vasoconstriction slows peripheral to core transfer of cutaneous heat, thereby isolating the core thermal compartment. Anesthesia & Analgesia. 1997. | 1997 | |
| Hejazi A. & Falkiner F.R. Serratia marcescens. J. Med. Microbiol. 1997. | 1997 | |
| Passaro D., et al. Postoperative Serratia marcescens wound infections traced to an out of hospital source. JID. 1997. | 1997 | |
| Bock M., et al. Effects of preinduction and intraoperative warming during major laparotomy. British Journal of Anesthesia. 1998. | 1998 | |

## CHART OF MATERIALS SENT TO TIMOTHY ULATOWSKI

| | | |
|---|---|---|
| Defina J., et al. Prevalence of inadvertent hypothermia during the perioperative period: A quality assurance and performance improvement study. Journal of PeriAnesthesia Nursing. 1998. | 1998 | |
| Fleisher L.A., et al. Perioperative cost-finding analysis of the routine use of intraoperative forced-air warming during general anesthesia. Anesthesiology. 1998. | 1998 | |
| Eastlund T., Van Duren A., et al. Effect of heat on stored red cells during non-flow conditions in a blood warming device. Vox Sanguinis. 1999. | 1999 | |
| Edminston, et al. Airborne particulates in the OR environment. AORN Journal. 1999. | 1999 | |
| Mahoney C.B., et al. Maintaining intraoperative normothermia: A meta-analysis of outcomes with costs. AANA Journal. 1999. | 1999 | |
| Sigg D.C., Houlton A.J., Iaizzo P.A. The potential for increased risk of infection due to the reuse of convective air-warming/cooling coverlets. Acta Anaesthesiology Scand. 1999. | 1999 | |
| Augustine S. Malpractice implications of hypothermia during surgery. Augustine medical.com. 1999. | 1999 | |
| Woon S., et al. Amount of air infused to patient increases as fluid flow rates decrease when using the Hotline HL-90 fluid warmer. Journal of Clinical Monitoring and Computing. 1999. | 1999 | |
| Mangram A., et al. Guideline for prevention of surgical site infection. Infection Control and Hospital Epidemiology. 1999. | 1999 | |
| Sessler D. Perioperative heat balance. Anesthesiology. 2000. | 2000 | |
| El-Rahmany H.K., et al. Forced-air warming decreases vasodilator requirement after coronary artery bypass surgery. Anesthesia & Analgesia. 2000. | 2000 | |
| Greif R., et al. Supplemental perioperative oxygen to reduce the incidence of surgical wound infection. The New England Journal of Medicine. 2000. | 2000 | |
| Huang J.K.C., et al. The Bair Hugger patient warming system in prolonged surgery. Critical Care. 2000. | 2000 | |
| Truell K.D., et al. Third-degree burns due to intraoperative use of a Bair Hugger warming device. Annals of Thoracic Surgery. 2000. | 2000 | |

**CHART OF MATERIALS SENT TO TIMOTHY ULATOWSKI**

| | |
|---|---|
| Winker M., et al. Aggressive warming reduces blood loss during hip arthroplasty. Anesthesia & Analgesia. 2000. | 2000 |
| Richards, M., et al. Nosocomial infections in combined medical-surgical ICUs in the US. Infection Control and Hospital Epidemiology. 2000. | 2000 |
| Flores-Maldonado A., et al. Mild perioperative hypothermia and the risk of wound infection. Archives of Medical Research. 2001. | 2001 |
| Fossum S., et al. A comparison study on the effects of prewarming patients in the outpatient surgery setting. Journal of Perianesthesia Nursing. 2001. | 2001 |
| Sweney M., Sigg D., Tahvildari S., Iaizzo P. Shiver suppression using focal hand warming in unanesthetized normal subjects. Anesthesiology. 2001. | 2001 |
| A burning issue: Risks of hosing. Nurses.com. 2001. | 2001 |
| Janicki P.K., et al. Comparison of two different temperature maintenance strategies during open abdominal surgery. Anesthesiology. 2001. | 2001 |
| Melling A.C., et al. Effects of preoperative warming on the incidence of wound infection after clean surgery: A randomized controlled trial. Lancet. 2001. | 2001 |
| Nichols R.L. Preventing surgical site infections: A surgeon's perspective. Emerging Infectious Diseases. 2001. | 2001 |
| Baker, King, Smith. Infection control hazards of intraoperative forced air warming. Infection Control Today. 2002. | 2002 |
| Barie P. Surgical site infections: Epidemiology and prevention. Surgical Infections. 2002. | 2002 |
| DeWitte J. & Sessler D. Perioperative shivering. Anesthesiology. 2002. | 2002 |
| Dharan S., et al. Environmental controls in operating theatres. Journal of Hospital Infection. 2002. | 2002 |
| Kabbara A., et al. Randomized prospective comparison of forced air warming using hospital blankets versus commercial blankets in surgical patients. Anesthesiology. 2002. | 2002 |

## CHART OF MATERIALS SENT TO TIMOTHY ULATOWSKI

| | | |
|---|---|---|
| Sharp R.J., et al. Do warming blankets increase bacterial counts in the operating field in a laminar-flow theatre? The Journal of Bone and Joint Surgery. 2002. | 2002 | |
| Tumia N. & Ashcroft G.P. Convection warmers - a possible source of contamination in laminar airflow operating theatres? Journal of Hospital Infection. 2002. | 2002 | |
| American Society of Anesthesiologists. Practice Guidelines for Post Anesthetic Care. Anesthesiology. 2002. | 2002 | |
| Brauer A., et al. Comparison of forced-air warming systems with upper body blankets using a copper manikin of the human body. Acta Anaesthesiol Scand. 2002. | 2002 | |
| Dae M.W., Gao D.W., Sessler D.I., et al. Effect of endovascular cooling on myocardial temperature, infarct size and cardiac output in human-sized pigs. Am J Physiol Heart Circ Physiol. 2002. | 2002 | |
| Janicki P.K., et al. Water warming garment versus forced- air warming system in prevention of intraoperative hypothermia during liver transplantation: a randomized controlled trial. BMC Anesthesiology. 2002. | 2002 | |
| Lenhardt R., Seybold T., Kimberger O., Stoiser B., Sessler D.I. Local warming and insertion of peripheral venous cannulas: single blinded prospective randomized controlled trial and single blinded randomized crossover trial. British Medical Journal. 2002. | 2002 | |
| Sessler D.I. & Akca O. Nonpharmacological prevention of surgical wound infections. Healthcare Epidemiology. 2002. | 2002 | |
| Sharp R.J., et al. Do warming blankets increase bacterial counts in the operating field in a laminar-flow theatre. The Journal of Bone & Joint Surgery. 2002. | 2002 | |
| Brauer A., et al. Comparison of forced-air warming systems with lower body blankets using a copper manikin of the human body. Acta Anaesthesiol Scand. 2003. | 2003 | |
| Alfonsi P., et al. The effect of postoperative skin surface warming on oxygen consumption and the shivering threshold. Anesthesia. 2003. | 2003 | |
| Engesaeter L., et al. Antibiotic prophylaxis in total hip arthroplasty. Acta Orthopaedica Scandinavica. 2003. | 2003 | |

**CHART OF MATERIALS SENT TO TIMOTHY ULATOWSKI**

| | |
|---|---|
| Heuer L. Prewarming – How can perioperative hypothermia be avoided? Ubersicht. 2003. | 2003 |
| Huang J.K.C., et al. The Bair Hugger patient warming system in prolonged vascular surgery: an infection risk? Critical Care. 2003. | 2003 |
| Dae M.W., Gao D.W., Ursell P.C., Stillson C.A., Sessler D.I. Safety and efficacy of endovascular cooling and rewarming for induction and reversal of hypothermia in human sized pigs. Stroke. 2003. | 2003 |
| Doufas A.G., Lin C.M., Suleman M.I., Liem E.B., Lenhardt R., Morioka N., Akca O., Shah Y.M., Bjorksten A.R., Sessler D.I., et al. Dexmedetomidine and meperidine additively reduce the shivering threshold in humans. Stroke. 2003. | 2003 |
| Doufas A.G., Wadhwa A., Lin C.M., Shah Y.M., Hanni K., Sessler D.I. Neither arm nor face warming reduces the shivering threshold in unanesthetized humans. Stroke. 2003. | 2003 |
| Lamontagne A. The dangers of hypothermia in surgical patients. The Surgical Technologist. 2003. | 2003 |
| Walker S., et al. A comparison of radiant and convective warming in an anesthetized surgical patient: A case report. The Internet Journal of Anesthesiology. 2003. | 2003 |
| Chen J., et al. An RND-type multidrug efflux pump SdexY from Serratia marcescens. Journal of Antimicrobial Chemotherapy. 2003. | 2003 |
| Clarke, M. T., et al. Contamination of primary total hip replacements in standard and ultra-clean operating theaters detected by the polymerase chain reaction. Acta Orthopaedica Scandinavica. 2004. | 2004 |
| Owers K.L., et al. Source of bacterial shedding in laminar flow theatres. The Journal of Hospital Infection. 2004. | 2004 |
| Alfonsi P., Adam F., Passard A., Guignard B., Sessler D.I., et al. Nefopam, a non-sedative benzoxazocine analgesic, selectively reduces the shivering threshold. Anesthesiology. 2004. | 2004 |
| Bernards A.T., et al. Persistent Acinetobacter baumannii? Look inside your medical equipment. Infection Control and Hospital Epidemiology. 2004. | 2004 |

## CHART OF MATERIALS SENT TO TIMOTHY ULATOWSKI

| | | |
|---|---|---|
| Brauer A., et al. Efficacy of postoperative rewarming after cardiac surgery. Annals of Thoracic and Cardiovascular Surgery. 2004. | 2004 | |
| Chitwood L. Seven ways to warm your patients without inflaming your staff. Outpatient Surgery Magazine. 2004. | 2004 | |
| Frohlich D., Wittmann S., Rothe G. Sessler D.I., et al. Mild hyperthermia down regulates receptor-dependent neutrophil function. Anesthesia & Analgesia. 2004. | 2004 | |
| Ittner K.P., et al. Convective air warming is more effective than resistive heating in an experimental model with a water dummy. European Journal of Emergency Medicine. 2004. | 2004 | |
| Kabon B., Nagele A., Reddy D., Eagon C., Fleshman J.W., Sessler D.I., Kurz A. Obesity decreases perioperative tissue oxygenation. Anesthesiology. 2004. | 2004 | |
| Lin C.M., Neeru S., Doufas A.G., Liem E., Shah Y.M., Wadhwa A., Lenhardt R. Bjorksten A., Sessler D.I., Kurz A. Dantrolene reduces the threshold and gain for shivering. Anesthesia & Analgesia. 2004. | 2004 | |
| Nakajima Y., Takamata A., Matsukawa T., Sessler D.I., et al. The effect of an amino acid infusion on central thermoregulatory control in humans. Anesthesiology. 2004. | 2004 | |
| Robinson D., et al. Warming patients in the lithotomy position. Anaesthesia. 2004. | 2004 | |
| Taguchi A., et al. Effects of a circulating-water garment and forced-air warming on body heat content and core temperature. Anesthesiology. 2004. | 2004 | |
| Minnema B., et al. Risk factors for surgical site infection following primary total knee arthroplasty. Infection Control and Hospital Epidemiology. 2004. | 2004 | |
| Duisterwinkel A. How huggable is the Bear [sic] Hugger? 2005. | 2005 | |
| Edminston, C. E., et al. Molecular epidemiology of microbial contamination in the operating room environment: Is there a risk for infection? Surgery. 2005. | 2005 | |

**CHART OF MATERIALS SENT TO TIMOTHY ULATOWSKI**

| | | |
|---|---|---|
| Van Duren A. How huggable is Bear [sic] Hugger? A response from Arizant Healthcare manufacturers of Bair Hugger Warming Therapy. 2005. | 2005 | |
| Belda F.J., Aguilera L., Asuncion J.G., Alberti J., Vincente R., Ferrandiz L., Rodriguez R., Company R., Sessler D.I., et al. Supplemental perioperative oxygen and the risk of surgical wound infection. JAMA. 2005. | 2005 | |
| Kabon B., Akca O., Taguchi A., Nagele A., Jebadurai R., Arkilic C.F., Sharma N., Ahluwalia A., Galandiuk S., Fleshman J., Sessler D.I., Kurz A. Supplemental intravenous crystalloid administration does not reduce the risk of surgical wound infection. Anesthesia & Analgesia. 2005. | 2005 | |
| Komatsu R., Sengupta P., Cherynak G., Wadhwa A., Sessler D.I., et al. Doxapram only slightly reduced the shivering threshold in healthy volunteers. Anesthesia & Analgesia. 2005. | 2005 | |
| Ma M.S., Chiu A.H.F. An audit of perioperative hypothermia in the elderly patients. Bull HK Coll Anaesthesiol. 2005. | 2005 | |
| Maglinger P.E., Sessler D.I., et al. Cutaneous heat loss with three surgical drapes, one impervious to moisture. Anesthesia & Analgesia. 2005. | 2005 | |
| Sickbert-Bennett E.E., et al. Comparative efficacy of hand hygiene agents in the reduction of bacteria and viruses. American Journal of Infection Control. 2005. | 2005 | |
| Williams A.B., et al. Rewarming of healthy volunteers after induced mild hypothermia: a healthy volunteer study. British Medical Journal. 2005. | 2005 | |
| Ng V., Lai A., Ho V. Comparison of forced-air warming and electric heating pad for maintenance of body temperature during total knee replacement. Anesthesia. 2006. | 2006 | |
| Bruinsma G.M., et al. Resistance to a polyquaternium-1 lens care solution and isoelectric points of Pseudomonas aeruginosa strains. Journal of Antimicrobial Chemotherapy. 2006. | 2006 | |
| Cheadle W.G. Risk factors for surgical site infection. Surgical Infections. 2006. | 2006 | |

**CHART OF MATERIALS SENT TO TIMOTHY ULATOWSKI**

| | | |
|---|---|---|
| Kim J.Y., et al. The effect of skin surface warming during anesthesia preparation on preventing redistribution hypothermia in the early operative period of off-pump coronary artery bypass surgery. European Journal of Cardio-thoracic Surgery. 2006. | 2006 | |
| Lenhardt R., Sessler D.I. Estimation of mean-body temperature from mean-skin and core temperature. Anesthesiology. 2006. | 2006 | |
| Mizobe T., Nakajima Y., Ueno H., Sessler D.I. Fructose administration increases intraoperative core temperature by augmenting both metabolic rate and the vasoconstriction threshold. Anesthesiology. 2006. | 2006 | |
| Philips J.E., et al. The incidence of deep prosthetic infections in a specialist orthopaedic hospital. The Journal of Bone & Joint Surgery (Br). 2006. | 2006 | |
| Sessler D.I. Non-pharmacologic prevention of surgical wound infection. Anesthesiology Clin. 2006. | 2006 | |
| Young V.L & Watson M.E. Prevention of perioperative hypothermia in plastic surgery. Aesthetic Surgery Journal. 2006. | 2006 | |
| Bruinsma G.M., et al. Resistance to a polyquaternium-1 lens care solution and isoelectric points of Pseudomonas aeruginosa strains. Journal of Antimicrobial Chemotherapy. 2006. | 2006 | |
| Malhas A., et al. A case report of a Serratia marcescens infective arthritis after a knee arthroscopy. The Internet journal of Orthopedic Surgery. 2006. | 2006 | |
| Measure Summary NQMC-3673. Agency for Healthcare Research and Quality. 2007. | 2007 | |
| Kile, A. Clean air in the OR. AAOS Now. 2007. | 2007 | |
| Miner A., et al. Deep infection after total knee replacement: Impact of laminar airflow systems and body exhaust suits in the modern operating room. Infection Control and Hospital Epidemiology. 2007. | 2007 | |
| Brauer, A., et al. Efficacy of forced-air warming systems with full body blankets. Canadian Journal of Anaesthesia. 2007. | 2007 | |

## CHART OF MATERIALS SENT TO TIMOTHY ULATOWSKI

| | |
|---|---|
| Fleisher, et al. ACC/AHA 2007 Guidelines on Perioperative Cardiovascular Evaluation and Care for Noncardiac Surgery: Executive Summary. Anesthesia & Analgesia. 2007. | 2007 |
| Fry D.E., Fry R.V. Surgical site infection: the host factor. AORN Journal. 2007. | 2007 |
| Leung K.K., et al. A randomised controlled trial of the electric heating pad vs forced-air warming for preventing hypothermia during laparotomy. Anaesthesia. 2007. | 2007 |
| Taniguchi Y., et al. Comparison of cutaneous heat transfer using two different warm blankets in healthy volunteers. Anesthesiology. 2007 | 2007 |
| Vanni S.M.D., et al. Preoperative warming combined with intraoperative skin-surface warming does not avoid hypothermia caused by spinal anesthesia in patients with midazolam premedication. Sao Paulo Med Journal. 2007. | 2007 |
| Wadhwa A., Komatsu R., Orhan-Sungur M., Barnes P., In J., Sessler D.I., Lenhardt R. New circulating-water devices warm more quickly than forced-air in volunteers. Anesthesia & Analgesia. 2007. | 2007 |
| Weber D.J., et al. Outbreaks associated with contaminated antiseptics and disinfectants. Antimicrobial Agents and Chemotherapy. 2007. | 2007 |
| Brandt C., et al. Operating room ventilation with laminar airflow shows no protective effect on the surgical site infection rate in orthopedic and abdominal surgery. Annals of Surgery. 2008. | 2008 |
| Harper C.M., et al. NICE and warm. British Journal of Anaesthesia. 2008. | 2008 |
| Kimberger O., Held C., Stadelmann K., Mayer N., Hunkeler C., Sessler D., Kurz A. Resistive polymer versus forced-air warming: Comparable heat transfer and core rewarming rates in volunteers. Anesthesia & Analgesia. 2008. | 2008 |
| Liang, B., et al. Hidden but not forgotten: anesthesia responsibilities for intravenous catheter management. Journal of Clinical Anesthesia. 2008. | 2008 |
| Lipsett, P. Do we really need laminar flow ventilation in the operating room to prevent surgical site infections? Annals of Surgery. 2008. | 2008 |

## CHART OF MATERIALS SENT TO TIMOTHY ULATOWSKI

| | | |
|---|---|---|
| Sessler D. Temperature monitoring and perioperative thermoregulation. Anesthesiology. 2008. | 2008 | |
| Weirich T.L. Hypothermia / warming protocols: Why are they not widely used in the OR? AORN Journal. 2008. | 2008 | |
| Kurz A. Thermal care in the perioperative period. Best Practice & Research Clinical Anaesthesiology. 2008. | 2008 | |
| Alexander R., et al. Inadvertent perioperative hypothermia. National Institute for Health and Care Excellence (NICE). 2008. | 2008 | |
| Paulikas C.A. Prevention of unplanned perioperative hypothermia. AORN Journal. 2008. | 2008 | |
| Rajagopalan S., Mascha E., Na J., Sessler D.I. The effects of mild perioperative hypothermia on blood loss and transfusion requirement. Anesthesiology. 2008. | 2008 | |
| Thiele R.H., et al. The "six sigma approach" to the operating room environment and infection. Best Practice & Research Clinical Anaesthesiology. 2008. | 2008 | |
| Wagner K., et al. Comparison of two convective warming systems during major abdominal and orthopedic surgery. Canadian Journal of Anesthesia. 2008. | 2008 | |
| Munoz P., et al. Nasal carriage of S. aureus increases the risk of surgical site infection after major heart surgery. Journal of Hospital Infection. 2008. | 2008 | |
| Levison M.E. Klebsiella, Enterobacter and Serratia infections. The Merck Manual. 2008. | 2008 | |
| Albrecht M., Gauthier R., Leaper D. Forced-air warming: a source of airborne contamination in the operating room? Orthopedic Review. 2009. | 2009 | |
| Hooper V.D., et al. ASPAN's evidence-based clinical practice guideline for the promotion of perioperative normothermia. Journal of PeriAnesthesia Nursing. 2009. | 2009 | |
| Moretti B., et al. Active warming systems to maintain perioperative normothermia in hip replacement surgery: a therapeutic aid or a vector of infection? Journal of Hospital Infection. 2009. | 2009 | |
| Sessler D. Temperature Regulation and Monitoring. Miller's Anesthesia, 7th Ed. 2009. | 2009 | |

## CHART OF MATERIALS SENT TO TIMOTHY ULATOWSKI

| | | |
|---|---|---|
| Alfonsi P., Passard A., Gaude-Joindreau V., Guignard B., Sessler D.I., et al. Nefopam and Alfentanil additively reduce the shivering threshold in humans whereas Nefopam and Clonidine do not. Anesthesiology. 2009. | 2009 | |
| Gjolaj M.P., et al. Don't forget to change the Bair Hugger filter. Annual Meeting of the American Society of Anesthesiologist. 2009. | 2009 | |
| Ilfeld B.M., Ball S.T. Gearen P.F., Mariano E.R., Le L.T., Vandenborne K., Duncan P.W., Sessler D.I., et al. Health related quality of life after hip arthroplasty with and without an extended duration continuous posterior lumbar plexus nerve block: A prospective, one-year follow up of a randomized, triple masked, placebo-controlled study. Anesthesia & Analgesia. 2009. | 2009 | |
| Ilfeld B.M., Meyer R.S., Le L.T., Mariano E.R., Williams B.A., Vandenborne K., Duncan P.W., Sessler D.I., et al. Health related quality of life after tricompartment knee arthroplasty with and without an extended duration continuous femoral nerve block: A prospective, one-year follow-up of a randomized, triple-masked, placebo controlled study. Anesthesia & Analgesia. 2009. | 2009 | |
| Kim Y.S., et al. Intraoperative warming with a forced-air warmer in preventing hypothermia after tourniquet deflation in elderly patients. The Journal of International Medical Research. 2009. | 2009 | |
| Langham G.E., Maheshwari A., Contrera K., You J., Mascha E., Sessler D.I. Noninvasive temperature monitoring in Post Anesthesia Care Units. Anesthesiology. 2009. | 2009 | |
| Lenhardt R., Orhan-Sungur M., Komatsu R., Govinda R., Kasuya Y., Sessler D.I., et al. Suppression of shivering during hypothermia using a novel drug combination in healthy volunteers. Anesthesiology. 2009. | 2009 | |
| Radauceanu D.S., et al. NICE guidelines for inadvertent perioperative hypothermia. Anaesthesia. 2009. | 2009 | |
| Sajid M.S., et al. The role of perioperative warming in surgery: a systematic review. Sao Paulo Med Journal. 2009. | 2009 | |
| Sessler D.I. New surgical thermal management guidelines. The Lancet. 2009. | 2009 | |

**CHART OF MATERIALS SENT TO TIMOTHY ULATOWSKI**

| | | |
|---|---|---|
| Sessler D.I. Defeating normal thermoregulatory defenses: Induction of therapeutic hypothermia. Stroke. 2009. | 2009 | |
| Sessler D.I. Long-term consequences of anesthetic management. Anesthesiology. 2009. | 2009 | |
| Blossom D., et al. Multistate outbreak of Serratia marcescens bloodstream infection caused by contamination of prefilled heparin and isotonic sodium chloride solution syringes. Arch Intern Med. 2009. | 2009 | |
| Dowd S. Bacterial diversity in surgical site infections not just aerobic cocci anymore. Journal of Wound Care. 2009. | 2009 | |
| Memarzadeh F. Active warming systems to maintain perioperative normothermia in hip replacement surgery - Letter to the Editor. Journal of Hospital Infection. 2010. | 2010 | |
| Van Duren A. Temperature control: Patient warming systems. Hospital Management. 2010. | 2010 | |
| Van Duren A. A reply. Anesthesia. 2010. | 2010 | |
| Lehtinen S.J., et al. Normothermia to prevent surgical site infections after gastrointestinal surgery: Holy grail or false idol? Ann Surg. 2010. | 2010 | |
| Memarzadeh F. Active warming systems to maintain perioperative normothermia in hip replacement surgery. Journal of Hospital Infection. 2010. | 2010 | |
| Plattner O., et al. Comparison of forced-air and new resistive warming device for intraoperative rewarming. Annual Meeting of the American Society of Anesthesiologists. 2010. | 2010 | |
| Sessler D.I. Neuraxial anesthesia and surgical site infection. Anesthesiology. 2010. | 2010 | |
| Smith T.O., et al. The efficacy of the tourniquet in foot and ankle surgery? A systematic review and meta-analysis. Foot and Ankle Surgery. 2010. | 2010 | |
| Antimicrobial susceptibility – Understanding the detection of serine carbapenemases in Enterobacteriaceae (Serratia marcescens ). American Proficiency Institute. 2010. | 2010 | |
| Albrecht M., et al. Forced air warming blowers: An evaluation of filtration adequacy and airborne contamination emissions in the operating room. American Journal of Infection Control. 2011. | 2011 | |

## CHART OF MATERIALS SENT TO TIMOTHY ULATOWSKI

| | |
|---|---|
| CDC. National and State Healthcare-Associated Infections Standardized Infection Ratio Report. 2011. | 2011 |
| Diab-Elschahawi M., et al. Impact of different sized laminar air flow versus no laminar air flow on bacterial counts in the operating room during orthopedic surgery. American Journal of Infection Control. 2011. | 2011 |
| Egan C., et al. A randomized comparison of intraoperative PerfecTemp and forced-air warming during open abdominal surgery. Anesthesia & Analgesia. 2011. | 2011 |
| Engelen S., et al. An evaluation of underbody forced-air and resistive heating during hypothermic, on-pump cardiac surgery. Anesthesia. 2011. | 2011 |
| Hooper G., et al. Does the use of laminar flow and space suits reduce early deep infection after total hip and knee replacement? The 10 year results of the New Zealand Joint Registry. The Journal of Bone and Joint Surgery. 2011. | 2011 |
| Hulse-Stevens, M. Force-Air Warming: An effective tool in fighting SSI. Infection Control Today. 2011. | 2011 |
| Study confirms safety of forced air warming. Infection Control Today. 2011. | 2011 |
| McGovern P.D., Albrecht M., et al. Forced-air warming and ultra-clean ventilation do not mix. The Journal of Bone and Joint Surgery. 2011. | 2011 |
| Mu Y., et al. Improving risk-adjusted measures of surgical site infection for the National Healthcare Safety Network. Infection Control and Hospital Epidemiology. 2011. | 2011 |
| Napoli C., et al. Air sampling methods to evaluate microbial contamination in operating theatres: results of a comparative study in an orthopaedics department. Journal of Hospital Infection. 2011. | 2011 |
| Roder G., et al. Intra-operative rewarming with HotDog resistive heating and forced-air heating: a trial of lower-body warming. Anesthesia. 2011. | 2011 |
| Ruetzler K., et al. Forced air and a novel patient warming system (vitalHEAT vH2) comparably maintain normothermia during open abdominal surgery. Anesthesia & Analgesia. 2011. | 2011 |

**CHART OF MATERIALS SENT TO TIMOTHY ULATOWSKI**

| | | |
|---|---|---|
| Sessler D., et al. Forced-Air warming does not worsen air quality in laminar flow operating rooms. International Anesthesia Research Society. 2011. | 2011 | |
| Hart S.R., et al. Unintended perioperative hypothermia. The Ochsner Journal. 2011. | 2011 | |
| Marion D.W., Sessler D.I., Dietrich W.D. Temperature management in the neurological and neurosurgical ICU. Therapeutic Hypothermia and Temperature Management. 2011. | 2011 | |
| Moola S., et al. Effectiveness of strategies for the management and/or prevention of hypothermia within the adult perioperative environment. International Journal of Evidence-Based Healthcare. 2011. | 2011 | |
| Andersson A.E., et al. Traffic flow in the operating room: An explorative and descriptive study on air quality during orthopedic trauma implant surgery. American Journal of Infection Control. 2012. | 2012 | |
| Belani, et al. Patient warming excess heat: The effects on orthopedic operating room ventilation performance. Anesthesia & Analgesia. 2012. | 2012 | |
| Butt U., et al. Infection risk from surgeons' eyeglasses. Journal of Orthopaedic Surgery. 2012. | 2012 | |
| Cristina M.L., et al. Can particulate air sampling predict microbial load in operating theatres for arthroplasty? PLOS One. 2012. | 2012 | |
| Desari, et al. Effect of forced air warming on the performance of operating theatre laminar flow ventilation. Anesthesia. 2012. | 2012 | |
| Legg, et al. Do forced air patient warming devices disrupt unidirectional downward air flow? The Journal of Bone and Joint Surgery. 2012. | 2012 | |
| Parvizi J. and Karam J. Do forced-air warming blankets increase surgical site infections? 2012. | 2012 | |
| Gastmeier P., et al. Influence of laminar airflow on prosthetic joint infections: a systematic review. Journal of Hospital Infection. 2012. | 2012 | |
| Stanton C. New approaches in the fight against SSI. AORN Connections. 2012. | 2012 | |
| Mahmoud S.S., et al. Primary total knee arthroplasty infected with Serratia marcescens. BMJ Case Reports. 2012. | 2012 | |

**CHART OF MATERIALS SENT TO TIMOTHY ULATOWSKI**

| | | |
|---|---|---|
| Forced-air warming linked to orthopedic surgery infections: Studies. Becker's Infection Control & Clinical Quality. 2013. | 2013 | |
| Bernstein, L. One in 25 patients has an infection acquired during hospital stay, CDC says. The Washington Post. 2013. | 2013 | |
| Chen M. & Kohl B. Does perioperative hyperglycemia increase risk? Should we have aggressive glucose control perioperatively? Evidenced Based Practice of Anesthesiology. 2013. | 2013 | |
| ECRI Institute. Forced-air warming and surgical site infections. Health Devices. 2013. | 2013 | |
| Hardcastle T., et al. External patient temperature control in emergency centres, trauma centres, intensive care units and operating theaters: A multi-society literature review. The South African Medical Journal. 2013. | 2013 | |
| Kellam M.D., et al. Forced-air warming devices and the risk of surgical site infections. AORN Journal. 2013. | 2013 | |
| Legg, et al. Forced-air patient warming blankets disrupt unidirectional airflow. The Bone & Joint Journal. 2013. | 2013 | |
| Leijtens B., et al. High incidence of postoperative hypothermia in total knee and total hip arthroplasty: A prospective observational study. The Journal of Arthroplasty. 2013. | 2013 | |
| Liu, J. Book Chapter: What is the best technique for hip surgery? Evidenced Based Practice of Anesthesiology. 2013. | 2013 | |
| Mehta S. Burn injuries from warming devices in the operating room. American Society of Anesthesiologists. 2013. | 2013 | |
| Merollini K., et al. Surgical site infection prevention following total hip arthroplasty in Australia: a cost effective analysis. American Journal of Infection Control. 2013. | 2013 | |
| Occhipinti L., et al. Evaluation of bacterial contamination on surgical drapes following use of the Bair Hugger forced air warming system. Canadian Veterinary Journal. 2013. | 2013 | |
| Parvizi J. & Gehrke T. Proceedings of the international consensus meeting on periprosthetic joint infection. International Consensus Meeting on Periprosthetic Joint Infection. 2013. | 2013 | |

**CHART OF MATERIALS SENT TO TIMOTHY ULATOWSKI**

| | | |
|---|---|---|
| Reed M., et al. Forced-air warming design: Evaluation of intake filtration, internal microbial buildup, and airborne-contamination emissions. AANA Journal. 2013. | 2013 | |
| Alexander J.W., et al. Surveillance of bacterial colonization in operating rooms. Surgical Infections. 2013. | 2013 | |
| Belani K.G., et al. Patient warming excess heat: The effects on orthopedic operating room ventilation performance. Anesthesia & Analgesia. 2013. | 2013 | |
| Gorges M., et al. A retrospective audit to examine the effectiveness of preoperative warming on hypothermia in spine deformity surgery patients. Pediatric Anesthesia. 2013. | 2013 | |
| McNeill J., et al. Experimental investigation of operating room air distribution in a full-scale laboratory chamber using particle image velocimetry and flow visualization. Journal of Flow Control, Measurement & Visualization. 2013. | 2013 | |
| Roberson M.C., et al. A review of the evidence for active preoperative warming of adults undergoing general anesthesia. AANA Journal. 2013. | 2013 | |
| Ulu-Kilic A., et al. Outbreak of postoperative empyema caused by Serratia marcescens. The Journal of Hospital Infections. 2013. | 2013 | |
| Making Healthcare Safer – Stop infections from lethal CRE germs now. CDC Vital Signs 2013. | 2013 | |
| Anderson D.J., et al. Strategies to prevent surgical site infections in acute care hospitals: 2014 update. Infection Control and Hospital Epidemiology. 2014. | 2014 | |
| Septimus E., et al. Maintaining the momentum of change: The role of the 2014 updates to the compendium in preventing healthcare-associated infections. Infection Control and Hospital Epidemiology. 2014. | 2014 | |
| Zheng H., et al. Control strategies to prevent total hip replacement-related infections: a systemic review and mixed treatment comparison. Surgery. 2014. | 2014 | |
| Augustine S. Letters to the Editor: Another perspective on forced-air warming and the risk of surgical site infection. AORN Journal. 2014. | 2014 | |

**CHART OF MATERIALS SENT TO TIMOTHY ULATOWSKI**

| | | |
|---|---|---|
| Gorges M., et al. The influence of intraoperative hypothermia on adverse surgical outcomes in children undergoing spine surgery. Anesthesia & Analgesia. 2014. | 2014 | |
| Saager L., Hesler B.D., You J., Turan A., Mascha E.J., Sessler D.I., Kurz A. Intraoperative transitions of anesthesia care and postoperative adverse outcomes. Anesthesiology. 2014. | 2014 | |
| Sikka R.S. & Prielipp R.C. Forced air warming devices in orthopedics: A focused review of the literature. The Orthopaedic Forum. 2014. | 2014 | |
| Spruce L. Back to basics: Preventing surgical site infections. AORN Journal. 2014. | 2014 | |
| Wood A.M., et al. Infection control hazards associated with the use of forced-air warming in operating theatres. The Journal of Hospital Infections. 2014. | 2014 | |
| Harding A. Hypothermia found to be common during anesthesia, increasing need for transfusion. Scientific American. 2015. | 2015 | |
| Hopf H.W. Perioperative temperature management: Time for a new standard of care? Anesthesiology. 2015. | 2015 | |
| Sun Z., et al. Intraoperative core temperature patterns, transfusion requirement and hospital duration in patients warmed with forced air. Anesthesiology. 2015. | 2015 | |
| **10 - OTHER MATERIALS** | | |
| 3M Eden Prairie MN EIR Dec 5 2016 - Dec 5 2016 | | |
| 3M St. Paul MN EIR Nov 30 2016 - Dec 8 2016 | | |
| American Society of Anesthesiologists. Quality Incentives in Anesthesiology Perioperative Normothermia. | | |
| Greene LR, et al. Guide to the elimination of orthopedic surgical site infections. An APIC Guide. 2010. | | |
| How-to Guide: Prevent surgical site infections. Cambridge, MA: Institute for Healthcare Improvement; 2012. | | |
| The essentials of maintaining patient normothermia. Infection Control Today. 2010. | | |
| Recommendations for infection control for the practice of anesthesiology (Third Ed.) | | |

Error! Unknown document property name.

**CHART OF MATERIALS SENT TO TIMOTHY ULATOWSKI**

| | | |
|---|---|---|
| Specifications Manual for Joint Commission National Quality Core Measures (2010A1) | | |
| Fleisher LA, et al. 2014 ACC/AHA Perioperative Guideline. Circulation. 2014. | | |
| AST Guideline Statement for the Maintenance of Normothermia in the Perioperative Patient | | |

# EXHIBIT DX3

**TO DECLARATION OF BRIDGET M. AHMANN
IN SUPPORT OF DEFENDANTS' MEMORANDUM IN
OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE
OPINIONS AND TESTIMONY OF TIMOTHY ULATOWSKI**

# Exhibit C: Prior Depositions and Testimony

# Prior Depositions and Court Testimony

**Depositions:**

University of Pittsburgh of the Commonwealth System of Higher Education d/b/a University of Pittsburgh v. Varian Medical Systems, Inc.
Civil Action No.: 2:08-cv-01307 (USDC, Western District of Pennsylvania)

David M. Kloss, et al, v. I-Flow Corporation, et al, Case No. 2:10-cv-00295-JFC (USDC, Western District of Pennsylvania)

Retractable Technologies, Inc. and Thomas Shaw v. Becton, Dickinson and Company, Civil Action No.2:08-cv-16 (Folsom) (USDC, Eastern District of Texas Marshall Division)

Diagnostic Devices Inc, v. Pharma Supply, Inc. et al, Diagnostic Devices Inc, v. Taidoc Technology Corporation, Case No.3:08-CV-00149-MOC-DCK (USDC, Western District of North Carolina, Charlotte Division)

Brenda F. Kitrosser v. Nuvasive, Inc. et al., Case No: 37-2009-00099700-CU-MM-CTL [Consolidated with Case No: 37-2010-00099400-CU-PO-CTL] (Superior Court of the State of California In and For the County of San Diego, Central Branch)

Superior Court of New Jersey, Law Division, Atlantic County
In re Pelvic Mesh/ Gynecare Litigation, Case No.291 CT, Master Case 6341-10

Jackson, et al v DePuy Orthopedics, No. CAL 10-32147 (Prince George's County, MD)

Strum v. DePuy Orthopaedics, Inc., et al., No. 11 L 009352 (Circuit Court, Cook County, Illinois)

Dorney-Madgitz v. DePuy Orthopedics, Inc., et al., 5:11-cv-001240-RBS (USDC, Eastern District of Pennsylvania)

Weinstat, et al. v. Dentsply International, et al., San Francisco Superior Court No. CGC-04-432370

Braun v. Medtronic Sofamor Danek, USDC, District of Utah, Central Division, Case 2:10-cv-01283

Connie Schubert and Kevin Schubert v. Ethicon, Inc., Ethicon Women's Health and Urology, a division of Ethicon, Inc., Gynecare, and Johnson and Johnson, et. al., In the Circuit Court of Jasper County, Missouri at Joplin, Case No. 10AO-CC00219

Sekisui America Corporation and Sekisui Medical Co., Ltd. v. Richard Hart and Mary Louise Trudel-Hart, USDC, Southern District of New York, Case 1:12-cv-03479-SAS (for Plaintiff) Carol Lewis and Kenneth Lewis v. Ethicon, USDC, Southern District of West Virginia, MDL No. 2327

April Christine Cabana v. Medtronic Inc. (et al), Superior Court of the State of California, County of Los Angeles, Case No. BC 465 313

Christine Napolitano v. Synthes, Inc., USDC, District of Connecticut, Civil Action 3:09-CV-00828

Herlihy-Paoli v. DePuy Orthopedics, Inc., et al, 3:12-CV-04975-K (USDC, Northern District of Texas, Dallas Division)

City of Lakeland Employees Pension Plan v. Baxter International Inc., No. 10-cv-6016, USDC, Northern District of Illinois

Smith v. Baxano, Inc. et al, Superior Court of Washington for Snohomish County, Case No. 13-2-02714-1

Andrea Smith v DePuy Orthopedics, et al., District Court of Tulsa County, Oklahoma, No. CJ-2011-05804

Zimmer NexGen Knee Implant Products Liability Litigation, USDC, Northern District of Illinois, Eastern Division, MDL No. 2272, Master Docket No.:1:11-cv-05468

Sandra Garcia v Rodolfo J. Walss, MD, Johnson & Johnson, Inc. and Ethicon, Inc., District Court, 103rd Judicial District, Cameron County, Texas, Cause No. 2013-DCL-3511-D

Laura Ness v Depuy Orthopedics, Inc., et al., In the Circuit Court for Baltimore City, Case No. : 24-C-14-002465

Consolidated Fresenius Cases, Commonwealth of Massachusetts, Middlesex SS., Superior Court Department of the Trial Court, Civil Action No. 2013-03400-O Session

Aoki, Christopher, Greer, Klusmann, Peterson, Thibodeau (separate Plaintiffs) v DePuy Orthopedics, Inc. et al,. USDC, Northern District of Texas, Dallas Division, MDL No. 2244

Center City Periodontists, P.C., et al. v. Dentsply International, Inc., Eastern District of Pennsylvania, Civil Action No. 10-00744.

Michael Parker, Individually and Amy Parker, Individually v. Veronica A. Vasicke, MD; Bluegrass Orthopedics & Hand Care, PSC; and I-Flow Corporation, Fayette Circuit Court, Eighth Division, Civil Action No. 12-CI-3543.

2

Mary N. Insall, as the Executrix of the estate of John N. Insall, Petitioner and Zimmer, Inc. Respodent, American Arbitration Association, Chicago, Illinois, Case No. 01-15-0002-0601.

Dennis Brian Anders, et al. v Medtronic, Inc and Medtronic Sofamor Danek USA Inc, State of Missouri, 22nd Judicial Circuit Court, City of St. Louis, Case File No. 1322-CC10219.

Rachel Dennert v Medtronic, Inc. et al, USDC, District of Connecticut, Civil No: 3:11-cv-01229-SRU.

Dana Lemay, et al., v. Johnson and Johnson , et al., Superior Court Judicial District of Waterbury Complex litigation Docket, Docket No. X06-UWY-CV-13-6022061-S.

Scott Shields and Phyllis Shields v. Medtronic, Inc., Matthew McCormick, Southwestern Illinois Health Facilities, Inc. a/k/a Anderson Hospital and Dr. EI S. Lin, Circuit Court, Third Judicial Circuit, Madison County, Illinois, Case No. 2014-L-1222.

**Court Testimony:**

Strum v. DePuy Orthopaedics, Inc., et al., No. 11 L 009352 (Circuit Court, Cook County, Illinois)

Brenda F. Kitrosser v. Nuvasive, Inc. et al., Case No: 37-2009-00099700-CU-MM-CTL [Consolidated with Case No: 37-2010-00099400-CU-PO-CTL] (Superior Court of the State of California In and For the County of San Diego, Central Branch)

Weinstat, et al. v. Dentsply International, et al., San Francisco Superior Court No. CGC-04-432370

Sekisui America Corporation and Sekisui Medical Co., Ltd. v. Richard Hart and Mary Louise Trudel-Hart, USDC, Southern District of New York, Case 1:12-cv-03479-SAS

Becky S. Anderson v. Medtronic, Inc. (et al), Superior Court for the State of Washington, County of King, No. 12-2-17928-0 SEA

Donald Gustafson v. Zimmer, Inc., District Court, Collin County, Texas, 366th Judicial District, Cause No. 366-03111-2011

Herlihy-Paoli v. DePuy Orthopedics, Inc., et al, 3:12-CV-04975-K (USDC, Northern District of Texas, Dallas Division)

Andrea Smith v DePuy Orthopedics, et al., District Court of Tulsa County, Oklahoma, No. CJ-2011-05804

Alysia Ogburn-Sisneros, as personal representative of the estate of Billy Ogburn, Sr., Plaintiff v. Fresenius Medical Care Holdings, Inc.d/b/a Fresenius Medical Care North America, Inc, Fresenius USA, Inc., Fresenius USA Manufacturing, Inc., Fresenius USA Marketing, Inc., and

Fresenius USA Sales, Inc., Defendants, Commonwealth of Massachusetts, Superior Court Department, Civil Action No. 13-5050

Center City Periodontists, P.C., et al. v. Dentsply International, Inc., Eastern District of Pennsylvania, Civil Action No. 10-00744.

Aoki, Christopher, Greer, Klusmann, Peterson, Thibodeau (separate Plaintiffs) v DePuy Orthopedics, Inc. et al,. USDC, Northern District of Texas, Dallas Division, MDL No. 2244

Andrews, Davis, Metzler, Rodriguez, Standerfer, Weiser v. Depuy Orthopedics, USDC, Northern District of Texas, Dallas Division, MDL 3:11-MD-2244-K.

Mary N. Insall, as the Executrix of the estate of John N. Insall, Petitioner and Zimmer, Inc. Respodent, American Arbitration Association, Chicago, Illinois, Case No. 01-15-0002-0601.

# EXHIBIT DX4

**TO DECLARATION OF BRIDGET M. AHMANN
IN SUPPORT OF DEFENDANTS' MEMORANDUM IN
OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE
OPINIONS AND TESTIMONY OF TIMOTHY ULATOWSKI**

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA


In Re Bair Hugger Forced Air Warming          MDL No. 15-2666
Products Liability Litigation                 (JNE/FLN)


PLAINTIFFS,

 v.

3M COMPANY and ARIZANT

HEALTHCARE, INC.


### Supplemental Report of Timothy A. Ulatowski, MS, BS

**Purpose of Supplement**: This supplemental report provides my opinions regarding the August 30, 2017, Notice from the Food and Drug Administration entitled Information About the Use of Forced Air Thermal Regulating Systems-Letter to Health Care Providers.[1] It is new information made available after my report dated June 2, 2017. This supplemental report incorporates my June 2, 2017 report in its entirety.

**Discussion:** I have reviewed the Notice in its entirety and rely upon its content. From time to time FDA posts on its web site Letters to Health Care Providers about safety concerns regarding medical devices.[2] Currently FDA has 13 such notices posted. Letters to Health Care Providers is one type of FDA safety information.[3] FDA notes on its Medical Device Safety web page that it "monitors reports of adverse events and other problems with medical devices and alerts health professionals and

---

[1] FDA Notice on Forced Air Warming Devices,
https://www.fda.gov/MedicalDevices/Safety/LetterstoHealthCareProviders/ucm573837.htm.
[2] FDA Letters to Health Care Providers,
https://www.fda.gov/MedicalDevices/Safety/LetterstoHealthCareProviders/default.htm.
[3] See FDA Safety Information,
https://www.fda.gov/MedicalDevices/Safety/default.htm.

the public when needed to ensure proper use of devices and the health and safety of patients."

1. The August 30, 2017, FDA Notice to Health Care Providers is consistent with the opinions in my June 2, 2017 report.

2. The Notice does not cause me to change or modify any of the opinions in my June 2, 2017 report.

3. The August FDA Notice provides ample evidence that FDA conducted a thorough review of existing data and information on the subject of surgical site infections alleged to have been caused by forced air warming devices during surgery. The Notice states "FDA collected and analyzed data available to date from several sources, including medical device reports received by the agency, information from manufacturers and hospitals, publically available medical literature, operating room guidelines, and ventilation requirements." These types of data are in evidence in this litigation and referenced in my June 2, 2017 report.

4. I will rely on the FDA Notice at trial.

I certify under penalty of perjury that the statements in my expert report dated June 2, 2017, and in this supplement are true and correct.

Executed on this date in Herndon, Virginia.

Timothy A. Ulatowski
September 8, 2017

# EXHIBIT DX5

**TO DECLARATION OF BRIDGET M. AHMANN
IN SUPPORT OF DEFENDANTS' MEMORANDUM IN
OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE
OPINIONS AND TESTIMONY OF TIMOTHY ULATOWSKI**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1

1                    UNITED STATES DISTRICT COURT

2                       DISTRICT OF MINNESOTA

3     - - - - - - - - - - - - - - - - - - - -

4     In Re:

5     Bair Hugger Forced Air Warming

6     Products Liability Litigation

7

8     This Document Relates To:

9     All Actions              MDL No. 15-2666 (JNE/FLM)

10    - - - - - - - - - - - - - - - - - - - -

11

12

13             DEPOSITION OF TIMOTHY A. ULATOWSKI

14                  VOLUME I, PAGES 1 - 414

15                       JULY 7, 2017

16

17

18             (The following is the deposition of TIMOTHY

19    A. ULATOWSKI, taken pursuant to Notice of Taking

20    Deposition, via videotape, at the Renaissance

21    Arlington Capital View Hotel, 2800 Potomac Avenue,

22    Arlington, Virginia, commencing at approximately 9:02

23    o'clock a.m., July 7, 2017.)

24

25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

2

1    APPEARANCES:

2         On Behalf of the Plaintiffs:

3              Mark D. Bankston
               KASTER, LYNCH, FARRAR & BALL LLP
4              1010 Lamar, Suite 1600
               Houston, Texas    77002
5
               Genevieve M. Zimmerman
6              MESHBESHER & SPENCE, LTD.
               1616 Park Avenue
7              Minneapolis, Minnesota    55404

8         On Behalf of Defendants:

9              Christin Jaye Eaton and Jeffrey M.
               Wojciechowski
10             FAEGRE BAKER DANIELS LLP
               2200 Wells Fargo Center
11             90 South Seventh Street
               Minneapolis, Minnesota    55415

12   ALSO APPEARING:
13
               Ronald M. Huber, Videographer
14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

3

1                          I N D E X

2   EXHIBITS            DESCRIPTION        PAGE MARKED

3   Ex   1   Medical Devices and the Public's

4            Health, The FDA 510(k) Clearance

5            Process at 35 years                    70

6        2   Exhibit B to Ulatowski expert

7            report                                 89

8        3   Letter, July 10, 1990, Augustine

9            to FDA, 3MBH00047446                  124

10       4   K903360, Substantial Equivalence

11           (SK) Decision Making Documentation,

12           3MBH00047439-42                       164

13       5   Letter stamped April 30, 1998,

14           Ulatowski to Augustine,

15           3MBH01696526-7                        216

16       6   Letter dated August 16, 2010,

17           Westlin to Wood, 3MBH00970030-1       226

18       7   Risk analysis spreadsheet,

19           3MBH00553184                          256

20       8   Annotated document, 3MBH01617179-

21           81                                    312

22       9   Letter dated June 1, 2000,

23           Westlin to Office of Device

24           Evaluation, 3MBH00046971-2            335

25       10  NSF Health Sciences invoice

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

4

1          dated June 21, 2017, three

2          pages                                    404

3     11   ECRI article, Forced-Air Warming

4          and Surgical Site Infections          405

5

6

7  WITNESS                 EXAMINATION BY          PAGE

8  Thomas A. Ulatowski     Mr. Bankston              5

9                          Ms. Eaton               404

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

5

1            P R O C E E D I N G S

2            (Witness sworn.)

3                TIMOTHY A. ULATOWSKI

4            called as a witness, being first duly sworn,

5            was examined and testified as follows:

6                ADVERSE EXAMINATION

7    BY MR. BANKSTON:

09:02:05    8        Q.    Can you state your name and what you do for

09:02:07    9    a living, sir.

09:02:07    10       A.    Timothy Ulatowski.  I'm a regulatory

09:02:10    11   consultant.

09:02:10    12       Q.    Okay.  I understand that you were asked to

09:02:15    13   address some of the allegations in plaintiffs' master

09:02:19    14   long form complaint as well as in the report of Dr.

09:02:22    15   Yadin David; is that correct?

09:02:22    16       A.    That's correct.

09:02:23    17       Q.    Okay.  I also understand I don't need to

09:02:27    18   explain to you anything about a deposition today.  I

09:02:29    19   would assume you're pretty familiar with this process.

09:02:30    20       A.    Pretty familiar.

09:02:31    21       Q.    Okay.  The first thing I want to talk to you

09:02:35    22   about:  When you were asked to do work on this case,

09:02:40    23   you generated a report; correct?

09:02:41    24       A.    That's correct.

09:02:42    25       Q.    Okay.  Can you tell me how much time you

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

6

09:02:46  1  spent reviewing materials and preparing your opinions

09:02:49  2  in this case?

09:02:51  3      A.  I don't have an exact time.  I haven't added

09:02:55  4  up all my time for this particular report.  I could do

09:03:00  5  so afterwards, but it would be a guess.

09:03:03  6      Q.  Okay.  Why don't you go ahead and take a

09:03:05  7  guess.  I want just a general idea of how long this

09:03:08  8  took.

09:03:08  9      A.  Well I think we have the vouchers, so I

09:03:10  10 think we have a more accurate accounting for the time,

09:03:12  11 rather than me guessing.

09:03:15  12      Q.  Do you --

09:03:15  13      MS. EATON:  For courtesy, Mark, he doesn't

09:03:15  14 want you to guess.

09:03:16  15      MR. BANKSTON:  Okay.  Well I'd like to know

09:03:17  16 for the purpose of this deposition.

09:03:18  17      MS. EATON:  We've produced the invoices.

09:03:20  18      MR. BANKSTON:  Okay.  All right.

09:03:21  19      Q.  So sitting here today, though, without the

09:03:24  20 benefit of your invoices, you don't know whether

09:03:26  21 you've spent 10 hours, a hundred hours, a thousand

09:03:28  22 hours.

09:03:29  23      MS. EATON:  Object to the form of the

09:03:30  24 question.

09:03:30  25      A.  Well let's not be absurd, but -- at the low

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

7

09:03:33  1   end, but my vouchers will attest to the hours I

09:03:36  2   reported to the attorneys and -- and the hours I was

09:03:40  3   paid for.

09:03:40  4       Q.   Were the hours you spent in this case more,

09:03:43  5   less, or generally the same than you would have done

09:03:45  6   in comparable litigations?

09:03:48  7            MS. EATON:   Object to the form of the

09:03:49  8   question.

09:03:49  9       A.   Well com -- comparable in what way?   In

09:03:52  10  regards to the numbers of documents or --

09:03:54  11      Q.   The time.

09:03:55  12      A.   -- an MDL or --

09:03:57  13      Q.   The time you spent generating the report.

09:04:00  14      A.   I would say it's probably in the range,

09:04:02  15  average range.

09:04:02  16      Q.   Same things you've done in other prior

09:04:05  17  medical device cases in other words.

09:04:06  18      A.   I believe so.

09:04:07  19      Q.   Okay.

09:04:07  20      A.   About that range.

09:04:08  21      Q.   All right.   Now sir, you spent about 30

09:04:19  22  years or more with the FDA; is that correct?

09:04:21  23      A.   Almost 37.

09:04:22  24      Q.   Okay.   Now I understand you've obviously had

09:04:26  25  communications with these lawyers about the facts of

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

8

09:04:29  1  the case, the allegations, the expert reports, et

09:04:31  2  cetera, in coming to your opinions; correct?

09:04:34  3       MS. EATON:  Object to the form of the

09:04:35  4  question.

09:04:36  5    A.   Well I had discussions with the attorneys

09:04:37  6  about the case and about the experts --

09:04:43  7       MS. EATON:  And -- and I would just caution

09:04:44  8  you that you're not entitled to ask about the

09:04:47  9  discussions that he's had with us.

09:04:49  10       MR. BANKSTON:  Sure.

09:04:49  11    Q.   I just want to know:  You spoke to attorneys

09:04:52  12  before writing your report.

09:04:53  13    A.   Sure.

09:04:53  14    Q.   Okay.  I'm wondering if you ever had

09:04:56  15  communications where you discussed your matters

09:04:58  16  relating to your time you were at the FDA.

09:05:00  17       MS. EATON:  Object.  You can't --

09:05:01  18       He's not allowed to answer what we talked

09:05:04  19  about.

09:05:04  20    Q.   Sir, you have had personal involvement with

09:05:06  21  the Bair Hugger over your time with the FDA?

09:05:08  22    A.   I had one episode of involvement.

09:05:10  23    Q.   You've actually been the signatory on

09:05:13  24  several documents relating to the Bair Hugger.

09:05:14  25    A.   I know that I've signed at least one in

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

9

09:05:18    1    regard to a warning letter.

09:05:19    2        Q.    The approval for the device came through

09:05:21    3    your office of which you have direct control; correct?

09:05:24    4        A.    No.

09:05:26    5            MS. EATON:    Object to the form of the

09:05:26    6    question.

09:05:26    7        Q.    The Bair Hugger -- which --

09:05:27    8            Which division of the FDA was responsible

09:05:29    9    for approving the Bair Hugger?

09:05:30    10       A.    It was the Cardiovascular Division.

09:05:32    11       Q.    Okay.  So in terms of the 510(k), it's your

09:05:36    12   testimony you've had no involvement whatsoever with

09:05:37    13   the 510(k) approval of a Bair Hugger device.

09:05:39    14       A.    I did not work in the Cardiovascular

09:05:41    15   Division.  And it's not an approval, it's called a

09:05:44    16   clearance.

09:05:45    17       Q.    Okay.  So in terms of when the 510(k)

09:05:47    18   clearance is granted to any Bair Hugger device, your

09:05:49    19   name will not be on those documents.

09:05:51    20       A.    That's correct.

09:05:52    21       Q.    Okay.  With regard to the involvement you

09:05:55    22   did have with the Bair Hugger in terms of things that

09:05:58    23   happened to you in connection with your government

09:06:00    24   experience before you were ever retained in this case,

09:06:02    25   have you had discussions with counsel about those?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

10

09:06:06   1      A.    In regard to the --

09:06:10   2            Well again, that's discussion with counsel,

09:06:11   3   so I don't know if I --

09:06:13   4      Q.    Well sir, you -- you understand that events

09:06:14   5   that happened to you factually that relate to the

09:06:17   6   facts of this case make you a witness in this case;

09:06:21   7   correct?

09:06:21   8            MS. EATON:   Object to the form of the

09:06:22   9   question.

09:06:22  10      A.    I -- I guess I don't understand your

09:06:24  11   statement.   Could you explain it to me?

09:06:26  12      Q.    Sure.   You understand that certain witnesses

09:06:27  13   like you are sometimes engaged and paid to provide

09:06:30  14   expert testimony in a lawsuit; correct?

09:06:32  15      A.    Correct.

09:06:33  16      Q.    And then there are other types of witnesses,

09:06:35  17   witnesses who, maybe from their own personal

09:06:37  18   experience, from their own facts and the bits that

09:06:42  19   they perceived with their two eyes, come and testify

09:06:44  20   in the case as well; correct?

09:06:46  21      A.    Yes, I understand those are -- that's

09:06:47  22   another type of witness.

09:06:47  23      Q.    Both of those things can apply to you;

09:06:50  24   correct?

09:06:50  25            MS. EATON:   If you would like to ask him

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

11

09:06:52  1    what he knows, you can go ahead.

09:06:53  2              MR. BANKSTON:  I --

09:06:54  3              Objection basis?

09:06:56  4              MS. EATON:  Yeah.

09:06:56  5              MR. BANKSTON:  Like is that a basis for an

09:06:58  6    objection?

09:06:58  7              MS. EATON:  Yeah.  Object to the form.

09:06:59  8              MR. BANKSTON:  Okay.  Thank you.

09:07:00  9         A.   I had involvement in one brief episode with

09:07:05  10   the Bair Hugger, --

09:07:05  11        Q.   Okay.

09:07:06  12        A.   -- if that's your question.

09:07:06  13        Q.   Sure.  And what actually my question was

09:07:09  14   after we had covered that:  Have you had discussions

09:07:11  15   about that episode with counsel?

09:07:14  16        A.   Inasmuch as I reviewed documentation in the

09:07:17  17   MDL.

09:07:17  18        Q.   Okay.  Have you had written communications

09:07:19  19   with counsel about your time relating to -- in your

09:07:23  20   time at the FDA relating to the Bair Hugger?

09:07:25  21        A.   I don't believe so.

09:07:26  22        Q.   Okay.  You spent your career with something

09:07:31  23   in the Office of Device Evaluation; is that right?

09:07:32  24        A.   That was a great deal of my experience at

09:07:37  25   FDA, but not my only experience.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

12

09:07:40    1      Q.   Okay.  And then you were also a director in

09:07:40    2  the Center for Devices and Radiological Health?

09:07:43    3      A.   I was -- I was one of half a dozen

09:07:45    4  directors, office directors.

09:07:46    5      Q.   Right.  A director?

09:07:47    6      A.   I was a director.

09:07:48    7      Q.   Okay.  After leaving the FDA, you started

09:07:52    8  testifying in numerous lawsuits relating to medical

09:07:56    9  devices.

09:07:57   10      A.   "Numerous" meaning --

09:07:59   11      Q.   More than one.

09:08:00   12      A.   Yes.

09:08:00   13      Q.   Okay.  In fact, a significant source of your

09:08:04   14  income, to come to courtrooms and rooms like this and

09:08:09   15  give testimony that medical devices which are alleged

09:08:12   16  to be unsafe are in fact safe.

09:08:14   17           MS. EATON:  Object to the form of the

09:08:15   18  question.

09:08:16   19      A.   Well the -- the aspects of the case are --

09:08:19   20  are unique in every instance in regard to what are the

09:08:21   21  issues at hand, and I testify for -- for defendants

09:08:25   22  and plaintiffs.

09:08:26   23      Q.   Well when you're on the plaintiff's side,

09:08:27   24  it's a medical device company though; right?

09:08:29   25      A.   Not always, no.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

13

09:08:30  1      Q.   Okay.  Do you --

09:08:32  2           Have you ever given testimony, expert

09:08:33  3  opinion on behalf of a patient who has been alleged to

09:08:36  4  be hurt by a medical device?

09:08:38  5      A.   Yes.

09:08:38  6      Q.   Okay.  Can you tell me about that.

09:08:40  7      A.   It was in -- you know, what do you call

09:08:45  8  them -- test cases or -- for -- in an MDL against a

09:08:51  9  company called Fresenius.

09:08:52  10     Q.   Okay.

09:08:52  11     A.   The product was -- was a hemodialysis fluid,

09:08:58  12  GranuFlo.  And there's another that was just -- that

09:09:02  13  was involved as well.

09:09:02  14     Q.   Okay.  What year was that?

09:09:04  15     A.   Well I think that was probably two to three

09:09:07  16  years ago.

09:09:07  17     Q.   Okay.  You've had dozens of cases since

09:09:14  18  you've left the FDA; correct?

09:09:17  19     A.   Well I've been engaged in a number of cases.

09:09:20  20  Some have not gone very far for one reason or another.

09:09:24  21  The ones that have progressed to a deposition and to

09:09:28  22  trial I list, and I could provide lists of what I've

09:09:32  23  been engaged in.  Others have not gone far because

09:09:36  24  case -- as you know, cases settle or the client

09:09:39  25  doesn't like what I have to say or whatever, whatever

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

14

09:09:42   1    the issue is.

09:09:43   2         Q.    Okay.   You're currently paid $500 an hour to

09:09:47   3    give opinions in this case?

09:09:49   4         A.    Yes.

09:09:49   5         Q.    Okay.   Now you don't consult or do anything

09:09:53   6    for the FDA currently; correct?

09:09:55   7         A.    I haven't for a little bit of time, couple

09:09:59   8    years, so --

09:10:00   9              Before that, after my departure from FDA, I

09:10:03  10    provided training to FDA personnel, as well as FDA

09:10:08  11    asked me to provide the training to international

09:10:11  12    regulators, which I did, so I traveled to several

09:10:15  13    places to provide training to them.

09:10:16  14         Q.    Were you paid for that work?

09:10:18  15         A.    No, I wasn't paid, but they paid for my

09:10:20  16    travel.

09:10:20  17         Q.    Okay.   The last time the FDA paid you for

09:10:22  18    any work was six years ago?

09:10:24  19         A.    2011.

09:10:26  20         Q.    Okay.   Now when you first left the FDA and

09:10:30  21    started getting involved in the work you do now, you

09:10:33  22    were working with a group called NDA Partners?

09:10:36  23         A.    Originally, yes.

09:10:37  24         Q.    Okay.   That's how you got your work;

09:10:40  25    correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

                                                            15

09:10:40    1              MS. EATON:  Object to the form of the

09:10:41    2    question.

09:10:41    3         A.    The -- the work of people --

09:10:43    4              Clients would contact NDA Partners who in

09:10:48    5    turn would analyze the request and -- and determine

09:10:52    6    what potential experts they have in their -- I'll call

09:10:56    7    stable --

09:10:57    8         Q.    All right.

09:10:58    9         A.    -- might -- might be good for that client.

09:11:01   10         Q.    And the way that would work is they would

09:11:02   11    get you cases, you'd keep 80 percent of the money and

09:11:05   12    give them 20 percent of the money; is that right?

09:11:07   13         A.    Right.  I -- I did not receive all of that

09:11:09   14    $500, but a portion of it.

09:11:10   15         Q.    Eighty percent; right?

09:11:12   16         A.    I think so, yes, that's the amount.

09:11:14   17         Q.    Now you've also done independent work as

09:11:18   18    Ulatowski Consulting.

09:11:19   19         A.    Yeah, but very little; I think one or two

09:11:22   20    clients only.

09:11:23   21         Q.    Well you used this work, this -- this

09:11:26   22    company, Ulatowski Consulting, you used that vehicle

09:11:30   23    to do work that NDA did not want to be associated

09:11:33   24    with.

09:11:33   25              MS. EATON:  Object to the form of the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

16

09:11:34  1  question.

09:11:35  2      A.  Well for one reason or another, yes.

09:11:36  3      Q.  And that reason being you were a paid

09:11:39  4  consultant to a major tobacco company.

09:11:42  5      A.  I -- I took a client, who was a major

09:11:45  6  tobacco company.  And that engagement lasted a grand

09:11:49  7  total of one day on site.  I guess they didn't like

09:11:52  8  what I told them, so we parted company.

09:11:54  9      Q.  NDA told you they did not want to be

09:11:56  10  involved with that work.

09:11:57  11      A.  I don't recall the conversation with NDA

09:12:00  12  Partners.

09:12:00  13      Q.  Do you recall giving testimony in the I-Flow

09:12:03  14  case -- I-Flow case that NDA did not want you to be

09:12:05  15  involved in that work?

09:12:06  16      A.  I don't recall that they didn't want to be

09:12:09  17  involved in that.  I just -- I don't recall.

09:12:10  18      Q.  Okay.  Sitting here today, though, you don't

09:12:15  19  remember that testimony and whether you gave it.

09:12:17  20      A.  I remember I-Flow testimony, I just don't

09:12:20  21  remember NDA Partners' position on that.

09:12:22  22      Q.  Correct.  That's what I mean.  You don't

09:12:25  23  know if you did or did not testify that FD -- that NDA

09:12:27  24  told you they did not want to be involved in that

09:12:29  25  work.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

17

09:12:29  1      A.   I -- I don't --

09:12:29  2           At this point in time I don't remember.

09:12:32  3      Q.   Okay.  Then you parted company with NDA and

09:12:35  4  worked with a group called Becker & Associates;

09:12:37  5  correct?

09:12:38  6      A.   Yes.  I -- I became an employee of Becker &

09:12:42  7  Associates for a period of time.

09:12:44  8      Q.   For about four years, three years?

09:12:46  9      A.   I don't think it was that long.

09:12:47  10     Q.   Okay.

09:12:48  11     A.   At least a couple years I think.

09:12:50  12     Q.   Okay.  And the same essential deal as with

09:12:52  13 NDA, they would find you work and headhunt it for you

09:12:54  14 and provide it to you?

09:12:55  15          MS. EATON:  Object to the form of the

09:12:56  16 question.

09:12:56  17     A.   Well I was an employee, I was a -- a manager

09:13:00  18 within the company, so clients would come to the

09:13:03  19 company and I would assist them as -- as necessary.

09:13:06  20     Q.   Okay.  And now you're on your own.  You're

09:13:09  21 not having to rely on anybody else to provide work

09:13:12  22 or -- or any of the support or management; correct?

09:13:15  23     A.   No.  I -- I still have associations with

09:13:18  24 both NDA Partners and what's now called NSF Health

09:13:22  25 Sciences, which used to be called Becker.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

18

09:13:24  1      Q.   Okay.

09:13:25  2      A.   Becker was purchased by NSF Health Sciences.

09:13:29  3      Q.   Is that how you acquired your work in this

09:13:32  4  case?

09:13:32  5           MS. EATON:   Object to the form of the

09:13:33  6  question.

09:13:33  7      A.   I believe the client --

09:13:34  8           Well I -- I just don't recall.  Either the

09:13:37  9  client approached me directly and I then contacted NSF

09:13:41  10  Health Sciences, or NSF Health Sciences was -- was

09:13:45  11  contacted, vice versa.

09:13:45  12     Q.   It could have been possible that they

09:13:47  13  contacted you directly; right?

09:13:49  14     A.   Clients sometimes do contact me directly.

09:13:51  15     Q.   Device manufacturers know to come to you by

09:13:54  16  now.

09:13:54  17          MS. EATON:   Object to the form of the

09:13:55  18  question.

09:13:55  19     A.   Well as you go along in a -- in any

09:13:58  20  consulting job, you -- you have familiarity with

09:14:01  21  certain clients, sure.

09:14:03  22     Q.   Have you had work with 3M before?

09:14:06  23     A.   I don't think so.  I don't recall.  I

09:14:08  24  don't -- I don't believe so.

09:14:09  25     Q.   So they -- chances are they might know you

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

19

09:14:12   1    through reputation.   Do you agree?

09:14:13   2        A.   Sure.

09:14:14   3             MS. EATON:   Object to the form of the

09:14:15   4    question, calls for speculation.

09:14:19   5        Q.   Now since leaving the FDA you've made a lot

09:14:23   6    of money from medical device companies that you were

09:14:26   7    responsible for regulating not too long ago.

09:14:28   8             MS. EATON:   Object to the form of the

09:14:29   9    question.

09:14:30  10        A.   I've -- I've made an income from doing

09:14:33  11    consulting work, yes.

09:14:34  12        Q.   It's what most people would consider to be a

09:14:37  13    lot of money; isn't it, Mr. Ulatowski?

09:14:38  14        A.   That's all rel -- relative I suppose.

09:14:41  15        Q.   Okay.

09:14:42  16        A.   I'm sure Uncle Sam is very happy because

09:14:45  17    half of it goes to him, so --

09:14:48  18        Q.   DePuy hip cases, you remember those; right?

09:14:52  19        A.   DePuy, yes.

09:14:53  20        Q.   Billing was about $700,000 at the time of

09:14:57  21    the last trial.

09:14:58  22        A.   Total billing I don't recall specifically,

09:14:59  23    but that's been a long engagement with several trials.

09:15:02  24        Q.   You wouldn't disagree with me that you've

09:15:04  25    testified to Mr. Lanier in that trial that you were

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

20

09:15:06   1   paid $700,000 at the time of trial.

09:15:08   2        A.   Perhaps, yes.  Perhaps I did.

09:15:10   3        Q.   I imagine you get paid for the trial as

09:15:12   4   well.

09:15:13   5        A.   Yes.

09:15:13   6        Q.   What is that typically like, another hundred

09:15:17   7   grand or --

09:15:17   8        A.   Oh, no, no, no.  It -- you know, it's my

09:15:20   9   hourly rate, it's how many hours I'm engaged in that

09:15:24  10   trial.

09:15:24  11        Q.   How many hours do you think you were engaged

09:15:26  12   in that trial?

09:15:27  13        A.   Which trial?

09:15:28  14        Q.   The last DePuy trial.

09:15:30  15        A.   I couldn't tell you exactly.

09:15:33  16        Q.   Okay.  But at the end of the day, something

09:15:36  17   close to three quarters of a million dollars from that

09:15:40  18   case.

09:15:41  19        A.   Well that case, it -- it's a -- it's an MDL

09:15:44  20   with several trials occurring, rolling over one to

09:15:48  21   another, so it's -- it's been a long engagement.

09:15:50  22        Q.   Okay.  Now did you testify for DePuy at the

09:15:53  23   trial where the jury found them liable for a billion

09:15:55  24   dollars or the trial where they just found them liable

09:15:58  25   for half a billion dollars, or any one of those?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

21

09:16:01   1        MS. EATON:   Object to the form of the

09:16:01   2   question.

09:16:01   3        A.   I don't -- I don't recall.   I -- I know

09:16:04   4   generally the outcome, but I don't know the awards or

09:16:07   5   anything of that sort.   I've been in DePuy trials

09:16:11   6   where defendant has -- has prevailed and trials where

09:16:14   7   they haven't.

09:16:15   8        Q.   Okay.   Do you do any other work for DePuy?

09:16:18   9        A.   No.

09:16:19   10        Q.   Okay.   Ethicon, do you remember Ethicon?

09:16:22   11        A.   Sure.

09:16:23   12        Q.   Okay.   And your billing for that, probably

09:16:25   13   another half a million?

09:16:27   14        A.   Well that's kind of not been a big income

09:16:31   15   area because I haven't done a lot of work in that area

09:16:34   16   in the last year or two.

09:16:35   17        Q.   Well my question was:   That's been about

09:16:38   18   another half a million though; right?

09:16:39   19        A.   I -- I don't recall.

09:16:40   20        Q.   Okay.   Do you remember testifying at the

09:16:43   21   time of the DePuy hip trial just last year --

09:16:46   22        A.   Yes.

09:16:46   23        Q.   -- that it was approaching 400,000 at that

09:16:49   24   time?

09:16:49   25        A.   I don't recall the statement, but that's --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

22

09:16:51  1          They had at that trial, of course -- my

09:16:54  2    defense attorneys had my vouchers for Ethicon, so if

09:16:56  3    that was the number stated -- that I stated, then --

09:17:00  4    then I'll stand by it.

09:17:01  5      Q.   Certainly it doesn't surprise you in an MDL

09:17:04  6    context when you're doing work for these medical

09:17:07  7    manufacturers that your billing could be something

09:17:09  8    like half a million dollars for an MDL like that.

09:17:12  9          MS. EATON:  Object to the form of the

09:17:13  10   question, and it's misstating the number of the

09:17:15  11   testimony that he just gave.

09:17:17  12     Q.   I'm just saying --

09:17:18  13         Let me withdraw that and address your

09:17:20  14   objection.

09:17:20  15         Irrespective of any case, we've had one with

09:17:24  16   700,000, we've had one approaching 400,000.  It would

09:17:26  17   not be a surprise to you to hear that your billing in

09:17:28  18   an MDL was half a million dollars that a medical

09:17:31  19   device manufacturer has given you.

09:17:33  20     A.   Well I'm not sure it's -- if it's been in an

09:17:36  21   MDL because the Ethicon engagements have evolved from

09:17:41  22   single cases in states to -- to MDL, so --

09:17:45  23     Q.   It wouldn't surprise you in that kind of

09:17:48  24   case that you were paid half a million dollars.

09:17:50  25     A.   Total work for Ethicon, if we can frame it

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

                                                              23

09:17:52   1   that way, I wouldn't be surprised.

09:17:54   2       Q.   What about Becton Dickinson.  You've done

09:17:58   3   work for them?

09:17:59   4       A.   Oh, some time ago.

09:18:00   5       Q.   Same kind of work?

09:18:02   6       A.   Same kind -- same type of work, yes.

09:18:05   7       Q.   Medtronic, you've done work for them?

09:18:07   8       A.   Yes.

09:18:08   9       Q.   Same kind of work?

09:18:09   10      A.   Yes.

09:18:09   11      Q.   So it's fair to say we're talking about,

09:18:12   12   since the time you left the FDA, we're well in excess

09:18:15   13   of a seven-figure number that the medical device

09:18:18   14   manufacturers have given you.

09:18:19   15           MS. EATON:   Object to the form of the

09:18:20   16   question.

09:18:22   17      A.   It's at -- it's at the low range, low of

09:18:25   18   seven.

09:18:26   19      Q.   That's something, after having left a career

09:18:28   20   of public service, you're comfortable trading on.

09:18:31   21           MS. EATON:   Object to the form of the

09:18:34   22   question.

09:18:34   23      A.   Well I don't subscribe to your term "trade."

09:18:37   24   You know, I served a long and -- and well-recognized

09:18:41   25   career at FDA and I'm certainly able and capable and

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

24

09:18:45   1   eligible to be a consultant afterward.

09:18:47   2       Q.   You provide services for money; right?

09:18:50   3            MS. EATON:  Object to the form of the

09:18:51   4   question.

09:18:52   5       A.   I have a -- I have a job, yes.

09:18:54   6       Q.   You trade what you -- your skills and your

09:18:57   7   presence and your ability to testify, your ability to

09:19:00   8   give opinion, you trade that for a sum of money.

09:19:02   9            MS. EATON:  Object to the form of the

09:19:04   10  question.

09:19:04   11      A.   I provide a service, a consulting service.

09:19:06   12      Q.   Okay.  You're not here to testify as an

09:19:10   13  expert in any sort of medical area; are you?

09:19:13   14      A.   Could you clarify?  Do you mean as a -- as

09:19:19   15  a -- as a physician or as -- as what?

09:19:23   16      Q.   Are you going to be --

09:19:25   17           From what I understand you're giving

09:19:26   18  regulatory testimony in this case.  That's what your

09:19:29   19  report states; right?

09:19:29   20      A.   That's correct.  That's the focus of my

09:19:32   21  testimony.

09:19:32   22      Q.   Okay.  You're not a medical expert.

09:19:33   23      A.   I'm not a medical doctor, no.

09:19:35   24      Q.   Well there are people who are not doctors

09:19:37   25  who are medical experts; correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

25

| | | |
|---|---|---|
| 09:19:39 | 1 | A.   Well that depends.  So what's the question? |
| 09:19:42 | 2 | What's the issue? |
| 09:19:43 | 3 | Q.   You have 37 years, did you say, in the FDA? |
| 09:19:45 | 4 | A.   That's correct. |
| 09:19:46 | 5 | Q.   You've developed -- |
| 09:19:47 | 6 | You've probably dealt with a large variety |
| 09:19:48 | 7 | of individuals in the medical device community. |
| 09:19:51 | 8 | A.   Right, dealing with many medical -- in |
| 09:19:53 | 9 | quotes, out of quotes -- issues, so you know, I guess |
| 09:19:57 | 10 | I have to understand the parameters of your question. |
| 09:19:59 | 11 | Q.   Sure.  And what I'm getting to is you've |
| 09:20:01 | 12 | also dealt with people in the industry, medical device |
| 09:20:04 | 13 | industry; correct? |
| 09:20:05 | 14 | A.   Yes. |
| 09:20:05 | 15 | Q.   Okay.  So you've dealt with a broad variety |
| 09:20:08 | 16 | of people of expertise. |
| 09:20:10 | 17 | A.   Yes. |
| 09:20:11 | 18 | Q.   Some of those people have been doctors. |
| 09:20:12 | 19 | A.   Yes. |
| 09:20:13 | 20 | Q.   Some of them have not been doctors. |
| 09:20:15 | 21 | A.   Correct. |
| 09:20:16 | 22 | Q.   Some of the people who are not doctors are |
| 09:20:18 | 23 | people who would classify themselves and hold |
| 09:20:20 | 24 | themselves out as medical experts; correct? |
| 09:20:25 | 25 | MS. EATON:  Object to the form of the |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

26

09:20:26   1   question.

09:20:27   2        A.   Well that's unclear to me, because if one is

09:20:30   3   not a physician with particular expertise, then you

09:20:34   4   have to start to slice and dice.

09:20:36   5        When you say "clinical expert," in what area

09:20:39   6   and what subject?  Typically, non-doctors may have

09:20:45   7   expertise in clinical trials, for example.

09:20:48   8        Q.   I'm trying to --

09:20:49   9        A.   You know, what --

09:20:50   10        I guess I'm trying to --

09:20:51   11        Q.   Sure.

09:20:52   12        A.   -- still understand your -- your point.

09:20:54   13        Q.   What I'm trying to understand is how, when

09:20:56   14   you were asked the same question, you don't hold

09:20:59   15   yourself out or are going to testify as a medical

09:21:01   16   area -- or in any sort of medical areas in I-Flow, you

09:21:04   17   said no.  Today is your answer different?  Have you --

09:21:07   18        Do you have different expertise today than

09:21:09   19   you did in I-Flow?

09:21:10   20        A.   Well I can't say how that question was

09:21:13   21   framed back with I-Flow, but I just don't --

09:21:17   22        I'm just trying to understand the parameters

09:21:19   23   of your question.

09:21:20   24        Q.   Sure.  I just want you to have the context

09:21:40   25   of that question and your answer.  This is your

27

09:21:42    1    testimony in I-Flow, and I'm going to --

09:21:43    2           MS. EATON:  Do you have a copy for me as

            3    well?

09:21:46    4           MR. BANKSTON:  Yeah, sure.

09:21:46    5           MS. EATON:  Thank you.

09:21:47    6      Q.   I'm going to hand you a copy of page 20 and

09:21:49    7    I would like you to look at nine -- line 19.

09:21:52    8      A.   Okay.

09:21:52    9           MS. EATON:  Please pause for one moment, I

09:21:54   10    have to get my glasses.

09:22:10   11           MR. WOJCIECHOWSKI:  On the left.

09:22:14   12           MS. EATON:  Thank you.

09:22:19   13      Q.   All right.  On page 20 of this transcript of

09:22:21   14    your testimony in the I-Flow matter --

09:22:23   15      A.   Uh-huh?

09:22:23   16      Q.   -- it states:  "You're not here to testify

09:22:25   17    as an expert in any sort of medical areas; are you?"

09:22:27   18           The answer is:  "No, I am not."

09:22:29   19           Do you think that your expertise today is

09:22:33   20    different substantially than your expertise at the

09:22:35   21    time of the I-Flow trial?

09:22:39   22      A.   Well I asked about context of the question

09:22:42   23    and I think I'm still trying to understand the

09:22:45   24    parameters of your question, because as I stated here,

09:22:49   25    it's -- as I was asked here is "You are not here" --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

28

09:22:54    1    "here" meaning in that case -- "to testify as an

09:22:56    2    expert in any sort of medical area," and I said, "No,

09:22:59    3    I am not."

09:23:00    4        Q.    Okay.

09:23:00    5        A.    Well that was that case under those

09:23:03    6    conditions, under that -- that set of evidence

09:23:06    7    with -- given my opinions that I expressed in that

09:23:10    8    case.  Today, here we are in July of -- of 2017,

09:23:15    9    different set of documents, different set of

09:23:16   10    experiences.  But I have my opinions expressed in my

09:23:19   11    report.

09:23:19   12        Q.    Okay.  So as opposed to in I-Flow, today in

09:23:23   13    this case with these documents, with your opinions

09:23:25   14    today, are you giving medical opinions?

09:23:28   15        A.    I don't have any medical opinions in my

09:23:31   16    report.

09:23:32   17        Q.    So that's a no; correct?

09:23:34   18        A.    That's --

09:23:35   19            It's as what I stated.

09:23:36   20        Q.    I don't -- I don't understand because I

09:23:38   21    asked you if you were giving medical opinions here

09:23:41   22    today in this room -- you, individual, Ulatowski --

09:23:44   23    and you told me about your report, which leads me to

09:23:47   24    suggest that there may be some disconnect between what

09:23:50   25    your report contains and what you plan to testify

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

29

09:23:52  1    about.  Is that the case?

09:23:53  2            MS. EATON:  Can I ask you please not to

09:23:54  3    point at the witness like that?

09:23:55  4            MR. BANKSTON:  Okay.

09:23:57  5       A.   Depends what questions I'm asked.

09:24:00  6       Q.   Okay.  Well one of the questions I'm asking

09:24:05  7    you today:  Have you formed any medical opinions in

09:24:10  8    this case?

09:24:10  9       A.   I don't believe my report has any medical --

09:24:11  10   in quotes, out of quotes -- opinions.

09:24:14  11      Q.   I understand your report doesn't have any

09:24:17  12   opinions that are medical.  Did you, in working on

09:24:19  13   this case, form any medical opinions?

09:24:20  14      A.   All my opinions are expressed in my report.

09:24:23  15      Q.   Excellent.  Thank you, sir.

09:24:25  16      A.   Unless, you know, I guess I'm asked a

09:24:27  17   question that provokes another response.

09:24:29  18      Q.   You are not an expert and do not hold

09:24:32  19   yourself out as an expert in the areas of research and

09:24:35  20   design for scientific studies.

09:24:41  21      A.   Well it's kind of --

09:24:43  22            It depends.  What kind of research studies?

09:24:47  23   In what area?  I certainly do have expertise in

09:24:49  24   certain areas.

09:24:55  25      Q.   Is that what you're here to talk about

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

30

| | | |
|---|---|---|
| 09:24:57 | 1 | today?  Are you going to be giving any opinions like |
| 09:25:01 | 2 | that? |
| 09:25:01 | 3 | A.   I -- none of my -- |
| 09:25:04 | 4 | All my opinions are regulatory-focused.  I |
| 09:25:08 | 5 | don't provide comment on any particular engineering |
| 09:25:15 | 6 | test methodologies, except in Dr. David I provided an |
| 09:25:19 | 7 | overview comment of his approach in regard to his |
| 09:25:22 | 8 | report.  But other than that, certainly I think my |
| 09:25:28 | 9 | report discusses aspects of disinfection of medical |
| 09:25:34 | 10 | equipment which has a methodology to it, so it -- it's |
| 09:25:37 | 11 | kind of -- it depends as to what I'm asked and what's |
| 09:25:43 | 12 | reflected in my report. |
| 09:25:44 | 13 | Q.   So your expertise changes from the type of |
| 09:25:47 | 14 | questions you're asked is what you're saying. |
| 09:25:48 | 15 | MS. EATON:  Object to the form of the |
| 09:25:49 | 16 | question. |
| 09:25:50 | 17 | A.   No.  I have expertise in -- in areas that |
| 09:25:53 | 18 | questions may provoke an answer that rely upon my |
| 09:25:57 | 19 | expertise in those areas. |
| 09:25:58 | 20 | Q.   Okay.  For instance, one of the things that |
| 09:26:00 | 21 | is involved in this case you understand is a surgery; |
| 09:26:02 | 22 | right? |
| 09:26:02 | 23 | A.   Is -- is surgery. |
| 09:26:04 | 24 | Q.   Correct.  Surgeries are involved in this |
| 09:26:06 | 25 | case. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

31

| | | |
|---|---|---|
| 09:26:06 | 1 | A.    Yes. |
| 09:26:07 | 2 | Q.    Okay.  You don't hold yourself out as an |
| 09:26:08 | 3 | expert in any kind of surgical areas such as |
| 09:26:12 | 4 | orthopedic surgery. |
| 09:26:13 | 5 | A.    No. |
| 09:26:13 | 6 | Q.    You're not going to be giving the jury an |
| 09:26:16 | 7 | opinion within a reasonable degree of medical |
| 09:26:20 | 8 | certainty that there is valid scientific evidence of |
| 09:26:22 | 9 | probable health benefits from the use of the Bair |
| 09:26:25 | 10 | Hugger in orthopedic surgeries. |
| 09:26:36 | 11 | A.    Well I -- I allude to that in my report in |
| 09:26:41 | 12 | regard to benefit and risk, so inasmuch as my report |
| 09:26:46 | 13 | touches upon benefit aspects and -- and risk, which is |
| 09:26:50 | 14 | reflected in clinical studies, published data, my |
| 09:26:55 | 15 | report is what it is. |
| 09:26:56 | 16 | Q.    Well right.  And that report does not |
| 09:26:58 | 17 | contain an opinion to a reasonable degree of medical |
| 09:27:02 | 18 | certainty that there is valid scientific evidence of a |
| 09:27:05 | 19 | probable health benefit from the use of the Bair |
| 09:27:08 | 20 | Hugger in orthopedic surgeries. |
| 09:27:11 | 21 | A.    In orthopedic surgeries.  Well I guess I |
| 09:27:13 | 22 | have to look at my report because I do discuss valid |
| 09:27:16 | 23 | scientific evidence and I do discuss the relationship |
| 09:27:21 | 24 | with certain data submitted to FDA as consisting of |
| 09:27:25 | 25 | valid scientific evidence.  So again, it's a -- it's |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

32

09:27:28   1   the question, it's the specifics that you may ask.

09:27:30   2       Q.   Well let's dive into that.  In terms of you

09:27:33   3   giving opinions that there is, within a reasonable

09:27:35   4   degree of medical certainty, valid scientific evidence

09:27:38   5   of probable health benefits from the use of the Bair

09:27:40   6   Hugger in orthopedic surgeries, what is that

09:27:43   7   scientific evidence?

09:27:43   8       A.   Well it wouldn't be -- let me clarify.  It

09:27:46   9   wouldn't be --

09:27:48   10           I think in my report as I characterized it,

09:27:51   11   again, from a regulatory point of view, it was valid

09:27:54   12   scientif -- scientific evidence applied to the Bair

09:27:58   13   Hugger in regard to its regulatory significance, not

09:28:03   14   medical significance.

09:28:03   15       Q.   Okay.  So in other words, you may be giving

09:28:06   16   us opinions about whether or not the defendant

09:28:10   17   complied with the regulatory scheme that you oversaw

09:28:12   18   during your many years at the FDA, but at the same

09:28:15   19   time you will not be giving an opinion, a medical

09:28:18   20   opinion, about the benefits of a Bair Hugger in

09:28:20   21   orthopedic surgery.  Is that fair?

09:28:23   22       A.   Generally, no.

09:28:24   23       Q.   Okay.  Just because that may be a little --

09:28:28   24   on the record, are you -- are you disagreeing and

09:28:31   25   saying you will be giving medical opinions on the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

33

09:28:33  1   benefits of the Bair Hugger in orthopedic surgery or

09:28:35  2   you will not be giving those medical opinions?

09:28:37  3       A.   I will not.  But it depends on -- again, on

09:28:41  4   the question asked and whether it touches upon

09:28:43  5   expertise I may have.

09:28:44  6       Q.   Okay.  Well in terms of the question I just

09:28:46  7   asked and when I asked you for the scientific

09:28:50  8   evidence, do you have a medical opinion about the

09:28:52  9   benefits of the Bair Hugger in orthopedic surgeries?

09:28:57  10      A.   No.  I've refer -- referenced other groups

09:29:02  11  and persons who have commented on that as a basis for

09:29:06  12  certain opinions I have.

09:29:06  13      Q.   And there are other experts in this case, I

09:29:08  14  assume you know from reading your reports, who have

09:29:11  15  given medical opinions and are giving medical opinions

09:29:14  16  on behalf of 3M; correct?

09:29:15  17      A.   Yes, I know that.

09:29:16  18      Q.   Okay.  You would agree with me that in terms

09:29:19  19  of whether the Bair Hugger has medical benefit in an

09:29:22  20  orthopedic surgery, witnesses such as that are far

09:29:26  21  better addressed to answer that question than somebody

09:29:30  22  with your lack of medical training.

09:29:30  23          MS. EATON:   Object to the form of that

09:29:32  24  question.

09:29:32  25      A.   I would -- I would defer to other defendant

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

34

09:29:35  1  experts that have more direct experience in that

09:29:38  2  regard.

09:29:39  3      Q.  Okay.  By the same token, you will not be

09:29:43  4  giving the jury an opinion to a reasonable degree of

09:29:46  5  medical certainty about the degree of medical risk

09:29:47  6  from the use of the Bair Hugger in orthopedic

09:29:49  7  surgeries.

09:29:50  8      A.  Medical risk?

09:29:52  9      Q.  Correct.

09:29:53  10      A.  I would defer to other defendant experts in

09:29:56  11  regard to that.

09:29:56  12      Q.  You don't hold yourself out as an expert in

09:29:59  13  statistics or statistical analysis; correct?

09:30:01  14      A.  No, I do not.

09:30:04  15      Q.  Okay.  Now before you accept any litigation

09:30:07  16  work, do you agree with me you have to make sure you

09:30:10  17  don't have any conflicts of interest relating to the

09:30:12  18  work?

09:30:12  19      A.  That's correct.

09:30:13  20      Q.  I'm wondering:  Did you contact anybody at

09:30:17  21  the FDA, like an ethics officer, about your testimony

09:30:19  22  in this case?

09:30:20  23      A.  I have.

09:30:20  24      Q.  Okay.  And can you tell me --

09:30:21  25      A.  In this case?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

35

09:30:22   1      Q.   Yes.

09:30:23   2      A.   Not in this case, but in performance of my

09:30:26   3   consulting duties I contacted the Ethics Office a

09:30:30   4   couple, three times to understand their parameters of

09:30:33   5   what clients can engage me, what data and information

09:30:37   6   I can rely upon to understand where to draw potential

09:30:41   7   lines where I -- I cannot have input.

09:30:45   8      Q.   Now in some prior cases you have

09:30:47   9   specifically contacted the Ethics Office to discuss

09:30:50  10   whether your work in that specific case was

09:30:52  11   appropriate; correct?

09:30:53  12      A.   Well as I said, I contacted the Ethics

09:30:55  13   Office.  It -- it may have been as a result of a

09:30:58  14   particular engagement, but I think the questions were

09:31:00  15   general in nature and not specific.

09:31:02  16      Q.   Okay.  What is your understanding of the

09:31:05  17   parameters in which you can testify for a product that

09:31:09  18   was under the purview of the FDA while you were there?

09:31:13  19      A.   Well one of the key responses I have, I

09:31:17  20   still have the documentation, is if you're relying

09:31:21  21   upon information produced in the litigation and you're

09:31:26  22   not relying upon any information that you took from

09:31:30  23   FDA or you know from behind the scenes at FDA, then

09:31:36  24   you're more than -- than capable of engaging in that

09:31:39  25   litigation.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

36

09:31:39    1    Q.   Then you would also agree with me to the

09:31:42    2    converse.   If you do possess significant information

09:31:45    3    from the time at your FDA, if you had direct

09:31:47    4    involvement in the regulation of the product, then it

09:31:50    5    may not be appropriate for you to testify.

09:31:52    6        MS. EATON:   Object to the form of the

09:31:53    7    question.   And you used a different verb than he did,

09:31:56    8    so it misstates his testimony.

09:31:58    9    A.   Well again, the -- the directive from the

09:32:01    10    Ethics Office was:   Where -- what -- what information

09:32:06    11    are you relying upon?   Is it from production in the

09:32:08    12    litigation?   You can't testify to anything you heard

09:32:14    13    or discussions at FDA.   You can't rely upon any

09:32:19    14    documentation that you may have from FDA.   And that

09:32:22    15    was really the parameters directed to me.

09:32:24    16    Q.   Okay.   Let me ask you this:   If you had a

09:32:26    17    product that a manufacturer approached you to give

09:32:29    18    litigation expert testimony on and you had direct

09:32:32    19    involvement in agency actions relating to that

09:32:35    20    product, is it ethical for you to testify?

09:32:37    21    A.   I believe so.

09:32:38    22    Q.   Okay.   Under what circumstances would you

09:32:42    23    have to be involved with the product for it not to be

09:32:44    24    ethical to testify?

09:32:45    25    A.   Well there's actually some initial

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

37

09:32:50  1   revolving-door restrictions where I -- I couldn't

09:32:54  2   participate for a year, two years; of course, those

09:32:56  3   have long expired.  And so, otherwise, then it becomes

09:33:02  4   much more open as far as participation.

09:33:05  5       Q.   Well I guess my question is:  In coming to

09:33:10  6   decide whether it's appropriate or not, whether it's

09:33:12  7   permitted or not to testify in a case, you would agree

09:33:16  8   with me that there is some question -- some focus is

09:33:20  9   given on the issue of whether you had direct

09:33:21  10  involvement in the regulation of that product.

09:33:26  11      A.   Well, I mean, what's your question?

09:33:28  12      Q.   My question is:  In deciding to work on

09:33:30  13  cases, does it matter if you had substantial

09:33:32  14  involvement in the product's regulation?

09:33:35  15      A.   Well I -- I consider that.  I consider

09:33:39  16  fundamentally what I -- what I recall, what I

09:33:43  17  remember, what -- what impact I had, how routine was

09:33:47  18  it, so I -- I consider that, but it hasn't necessarily

09:33:54  19  prevented my engagement.

09:33:55  20      Q.   Okay.  That --

09:33:56  21           So when you're thinking about whether it's

09:33:58  22  ethical to take a client, one of the things that you

09:34:01  23  considered is whether you had any direct involvement

09:34:03  24  in the product during its regulatory period.

09:34:06  25      A.   Right.  And perhaps whether I'm -- I'm

38

09:34:09  1  better as a fact witness rather than a -- you know, an

09:34:13  2  expert witness.

09:34:13  3      Q.   Why do you consider that?

09:34:18  4      A.   Just -- just to understand whether -- to

09:34:23  5  what degree I -- I remember any circumstance.  Because

09:34:25  6  I'm always asked, "Well, what do you recall about this

09:34:29  7  while you were at FDA?  What -- what discussions do

09:34:31  8  you recall?  What background do you" -- did -- you

09:34:33  9  know, "What decisions did you make?"  And at this

09:34:36  10  point in time, basically I've forgotten whatever has

09:34:41  11  occurred with Bair Hugger while I was FDA -- at FDA,

09:34:43  12  so --

09:34:45  13      And then I turn to, well, I'm going to rely

09:34:47  14  upon whatever is produced in this litigation because

09:34:50  15  otherwise I'm not going to remember anything.

09:34:52  16      Q.   Okay.

09:34:53  17      MR. BANKSTON:   Object as non-responsive.

09:34:54  18      Q.   My question more goes to there are things

09:34:57  19  you consider when deciding if you can ethically take

09:35:00  20  on a client, and one of those things you told me you

09:35:02  21  consider is the extent of your direct involvement in

09:35:05  22  the product.  Why is your direct involvement in the

09:35:08  23  product relevant to whether you can ethically take a

09:35:12  24  case?

09:35:13  25      A.   It's just -- it's just a matter of fact.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

39

09:35:16  1  Was -- was I involved?  Did I sign anything?  Was I

09:35:19  2  engaged in any way, shape or form?  I think to help

09:35:23  3  understand -- in understanding my role how to approach

09:35:28  4  the -- the documentation in the litigation, knowing

09:35:34  5  that -- trying to set the parameters of why I can't

09:35:37  6  talk about this because this isn't part of the

09:35:39  7  production, this is something that no one can be made

09:35:42  8  aware of even if I knew something, so it's just to

09:35:45  9  understand, trying to take a walk down Memory Lane in

09:35:50  10  regard to the product.

09:35:52  11      Q.   You would agree with me that if you had ever

09:35:53  12  made agency decisions directly about a product, had

09:35:56  13  been the person responsible for making those

09:35:59  14  decisions, it would not be appropriate for you to

09:36:01  15  testify about that product because of a conflict of

09:36:03  16  interest.

09:36:03  17          MS. EATON:  Object to the form of the

18  question, --

19      A.   Not if the subject --

09:36:07  20          MS. EATON:  -- assumes legal standards and

09:36:10  21  facts not in evidence.

09:36:13  22      A.   Well you've made a statement.  I -- it's

09:36:14  23  clear that, from my direction from the Ethics Office,

09:36:17  24  I can be engaged in this type of litigation.  I'll

09:36:20  25  leave it at that.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

40

09:36:20  1      Q.   "This type of litigation."  You mean

09:36:22  2   litigation in which there are medical devices?

09:36:25  3      A.   And -- and if I have -- have had

09:36:27  4   involvement.  And -- and it's frequently the case that

09:36:31  5   FDA individuals are engaged in topic areas where they

09:36:35  6   were involved at FDA, --

09:36:36  7      Q.   Okay.

09:36:36  8      A.   -- so --

09:36:37  9      Q.   Okay.  So --

09:36:37  10        I guess that takes us back to, when deciding

09:36:40  11  if you can ethically work on a case, you don't have to

09:36:43  12  consider whether you have substantial involvement.

09:36:46  13        MS. EATON:  Object to the form of the

09:36:47  14  question.

09:36:47  15     A.   Perhaps I don't.  It's just an exercise I go

09:36:51  16  through to try and recollect circumstances, but

09:36:54  17  frequently it's fruitless because I was involved with

09:36:57  18  so many things that, you know, I just don't know the

09:36:59  19  specifics other than what's produced in the -- in the

09:37:02  20  litigation.

09:37:02  21     Q.   Well one of the things you're going to

09:37:04  22  testify about here today is that a 510(k) decision is

09:37:08  23  in some manner determination of safety; correct?

09:37:11  24     A.   My opinion is that --

09:37:14  25        Well, it reads as it reads, that safety and

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

41

09:37:17  1  effectiveness are considerations in a 510(k)

09:37:20  2  evaluation.

09:37:20  3      Q.   Okay.  If you were to have made a 510(k)

09:37:25  4  decision on a product and then you were later asked

09:37:29  5  in -- in a litigation context whether that product was

09:37:32  6  dangerous or not, you would agree that invokes a

09:37:35  7  potential conflict.

09:37:37  8      A.   I'm not so sure about that, because the

09:37:40  9  510(k) process is a -- is a moment in time based upon

09:37:48  10  documentation at a point in time, and -- and once a

09:37:52  11  product is then marketed, things can happen.  Things

09:37:57  12  can happen during manufacturing, things can happen

09:38:00  13  that are only revealed through clinical use, so

09:38:03  14  the -- the circumstances of a product may change over

09:38:06  15  time.  So a decision can be made on a 510(k) and a

09:38:11  16  good decision can be made on a 510(k) which may later,

09:38:14  17  because of other facts and circumstances, may -- may

09:38:17  18  alter the circumstances of the safety and

09:38:19  19  effectiveness of that product.

09:38:21  20      Q.   If the plaintiff in a lawsuit alleged that a

09:38:24  21  510(k) was improperly granted and that a product

09:38:27  22  should not have been cleared and you were one of the

09:38:30  23  people involved in that process, in that hypothetical

09:38:33  24  situation there's a conflict there; isn't there?

09:38:36  25      A.   I don't think so.  I'd have to look at the

42

09:38:38  1   facts in that instance to see what -- what the

09:38:40  2   argument is and -- and evaluate that.

09:38:44  3        Q.   If you were asked in that kind of case, "Was

09:38:48  4   the FDA decision rightfully or wrongfully granted?"

09:38:51  5   in coming to that decision, if you arrived at the

09:38:53  6   decision that it was wrongfully granted, that would be

09:38:56  7   an indictment of yourself if you had been the person

09:38:58  8   who had approved it; correct?

09:38:59  9        MS. EATON:   Object to the form of that

09:39:00  10  question.

09:39:06  11       A.   If a certain fact --

09:39:09  12       The answer is -- is perhaps, because in

09:39:11  13  certain circumstances certain facts come to my

09:39:13  14  attention that, upon retrospect, may affect my opinion

09:39:21  15  on the basis for the finding of equivalence.  I did

09:39:26  16  so, for example, in an I-Flow case, looking at certain

09:39:28  17  interactions of FDA personnel with the company in

09:39:33  18  rendering an opinion that, well, if -- if we really

09:39:34  19  had thought about that or asked about that, we may

09:39:39  20  have come up with a different decision.  So -- so

09:39:42  21  those opportunities present themselves, but rarely.

09:39:45  22       Q.   Okay.  But in this case you don't have that

09:39:47  23  problem -- well let me back up.

09:39:48  24       You understand in this case and from the

09:39:52  25  report of Yadin David that there is the allegation

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

43

09:39:54  1    that this product should not have cleared 510(k), both

09:39:58  2    as the Bair Hugger 500 and 750 series.

09:40:02  3           MS. EATON:  Object to the form of the

09:40:02  4    question.

09:40:03  5       A.   Well I don't think he comes out and says

09:40:06  6    that directly.  I think he says the -- the process

09:40:08  7    was -- was troubling in one respect or another.  Of

09:40:11  8    course I found otherwise, but -- but I -- I just -- I

09:40:17  9    just disagree with his perspective on the 510(k).

09:40:21  10      Q.   Sure.  We'll get to all of that.

09:40:23  11      A.   Sure.

09:40:25  12      Q.   All I'm trying to set up -- and I'm going to

09:40:26  13   use your word -- is you understand Dr. David is

09:40:28  14   critical in that he calls the regulatory history of

09:40:31  15   this product alarming; correct?

09:40:32  16          MS. EATON:  Object to the form of the

09:40:33  17   question.  That's not what he said.

09:40:34  18      A.   Well I mean "troubling" was --

09:40:35  19      Q.   "Troubling," I'm sorry, your word was

09:40:37  20   "troubling."  Let's do it again, put it on the record

09:40:41  21   again.

09:40:41  22          You understand that Dr. David in his report

09:40:41  23   criticizes the regulatory process as troubling.

09:40:44  24      A.   Yes.

09:40:45  25      Q.   Okay.  But in this case we don't have the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

44

09:40:48  1  kind of conflict we were just talking about because

09:40:50  2  you were never involved in any kind of 510(k) approval

09:40:53  3  for this product; right?

09:40:54  4      A.    Clearance for the product, no.

09:40:56  5      Q.    And again, let me go ahead and make that

09:40:59  6  clear for the record.  And please keep correcting me

09:41:02  7  if I use the wrong word today because eventually you

09:41:06  8  will probably drill it into my head.  But in terms --

          9  we don't --

09:41:08 10          In this case we don't have the same conflict

09:41:10 11  we had just been talking about where you may have a

09:41:12 12  plaintiff alleging something about 510(k) when you

09:41:15 13  were involved in it.  In this case you had no

09:41:17 14  involvement, did -- made no approvals in 510(k);

09:41:19 15  correct?

09:41:20 16      A.    510(k) clearances, yes.

09:41:22 17      Q.    510(k) clearances.

09:41:23 18      A.    Right.

09:41:24 19      Q.    Okay.  So the poten --

09:41:24 20          According to you, there is no potential

09:41:26 21  conflict because there is no approval letter from

09:41:31 22  Timothy Ulatowski regarding the Bair Hugger.

09:41:32 23          Or excuse me.

09:41:32 24          MS. EATON:  Object to the form of the

09:41:33 25  question.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

45

```
             1              MR. BANKSTON:  Say that again.  I think I'm
09:41:34     2   going to get it.
09:41:34     3              MS. EATON:  That wasn't the only reason I
09:41:36     4   objected to the form --
             5              MR. BANKSTON:  I'll let you get --
09:41:37     6              MS. EATON:  -- but that was one.
09:41:38     7              MR. BANKSTON:  I'll let you get your other
09:41:40     8   objection in in a second here.
09:41:42     9      Q.   In this case we don't have this kind of
09:41:45    10   conflict because there is no clearance letter from Tim
09:41:49    11   Ulatowski about the Bair Hugger.
09:41:49    12              MS. EATON:  Object to the form of the
09:41:50    13   question.
09:41:50    14      A.   Well there is no letter from Timothy
09:41:53    15   Ulatowski.  I --
09:41:54    16              You characterize that as a conflict or
09:41:55    17   whatever.  I -- I -- I don't agree with that, --
09:41:57    18      Q.   Okay.
            19      A.   -- but -- but --
09:41:57    20      Q.   Wait a minute.  Hold on one second.  Let me
09:42:00    21   just back up because I think I may be misunderstanding
09:42:03    22   your testimony.  I thought that we had come to the
09:42:06    23   realization that if there was a plaintiff alleging a
09:42:09    24   problem with the 510(k) process and an FDA employee
09:42:12    25   had been the person responsible for that 510(k)
```

46

09:42:14  1   decision, that there could be a potential conflict

09:42:17  2   there.  Do you agree with that?

09:42:19  3        A.   I don't think we came to that conclusion.

          4        Q.   Okay.  Can you --

09:42:21  5        A.   I didn't state that.

09:42:21  6        Q.   Okay.  And that --

09:42:23  7             I just want it clear on the record.

09:42:23  8        A.   Yeah.

09:42:23  9        Q.   You don't agree that there -- there's any

09:42:25 10   potential conflict now.

09:42:26 11        A.   I don't believe there's a conflict because

09:42:30 12   each case stands -- is -- is -- is independent, each

09:42:33 13   case is based upon productions in that particular

09:42:36 14   case.  I rely upon the production or rely upon the

09:42:39 15   facts in the particular case.

09:42:40 16        Q.   And I'm not so much concerned about anything

09:42:43 17   else that happens be -- beyond the date you're

09:42:46 18   retained or -- or let's keep it hypothetical -- beyond

09:42:51 19   an FDA employee -- former FDA employee is retained; in

09:42:52 20   other words, the materials they see and what they do.

09:42:54 21   I'm talking about the ethical decision to have

09:42:57 22   engagement.  And what I want to understand is if

09:43:00 23   there's a former FDA employee who made a decision on

09:43:02 24   the 510(k) and then there is a plaintiff who is

09:43:04 25   alleging a problem with that decision, that if that

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

47

09:43:08    1    employee was to come to a decision that that 510(k)

09:43:11    2    was granted wrongfully, they would be criticizing

09:43:14    3    themselves.

09:43:15    4           MS. EATON:  Object to the form of the

09:43:16    5    question, and also object to any attempt to tie what

09:43:18    6    you just said to what's expressed in Dr. David's

09:43:22    7    reports.

09:43:25    8           MR. BANKSTON:  The basis, like the legal

09:43:25    9    basis though.  For that little bit, what was the legal

09:43:28    10    basis?

09:43:28    11           MS. EATON:  Let me read it.

09:43:29    12           MR. BANKSTON:  If we kind of keep it

09:43:31    13    confined to legal bases instead of talking, that would

09:43:35    14    be great.

09:43:35    15           MS. EATON:  I think I've been doing a great

09:43:38    16    job here with your questions.

09:43:38    17           MR. BANKSTON:  You've been doing -- you've

09:43:39    18    been doing a lot better than the last people in this

09:43:41    19    case.  You know me, and I'm very policing about that.

09:43:42    20           MS. EATON:  And your -- yeah.  And your

09:43:44    21    questions give me a lot to object to.

09:43:46    22           MR. BANKSTON:  Right.  With -- consistent

09:43:47    23    with the federal rules and not speaking objections.

09:43:50    24    Let's keep it clean.

09:43:51    25           MS. EATON:  I'm trying.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

48

09:43:53    1            MR. BANKSTON:  Actually, I understand that

09:43:53    2    you're giving it an effort and that's --

09:43:55    3            When you don't, I'm going to go ahead and

09:43:56    4    remind you.  Just like every time I say "clearance" or

09:43:59    5    "approval" --

09:44:00    6            MS. EATON:  I need -- I need a second to

09:44:01    7    read this or I'm not going to be able to give you

09:44:03    8    your --

09:44:03    9            MR. BANKSTON:  Okay.  Legal objection.

09:44:04   10            MS. EATON:  Yeah.

09:44:06   11            MR. BANKSTON:  Okay.

09:44:26   12            MS. EATON:  Objection to the hypothetical.

09:44:28   13    And I don't understand that Dr. David gave any opinion

09:44:30   14    that the FDA did something wrong.  I understand --

09:44:32   15            MR. BANKSTON:  Hold -- hold -- hold it.

09:44:33   16            MS. EATON:  You asked me why I said what I

09:44:35   17    said, and what I said is --

09:44:36   18            MR. BANKSTON:  No.  I asked for your legal

09:44:37   19    objection and for there not to be speaking objections.

09:44:39   20            MS. EATON:  Right.

           21            MR. BANKSTON:  I'm going to ask --

09:44:40   22            MS. EATON:  My legal objection is I think

09:44:41   23    you mischaracterized Dr. David's report and I think

09:44:43   24    your question is an incomplete hypothetical.

09:44:45   25            MR. BANKSTON:  Okay.  There we go.  That's

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

49

| | | |
|---|---|---|
| 09:44:46 | 1 | how we do that. |
| 09:44:47 | 2 | MS. EATON:  I don't need your instruction |
| 09:44:48 | 3 | about how to practice law.  Thank you. |
| 09:44:50 | 4 | MR. BANKSTON:  I think you do.  Let's not -- |
| 09:44:52 | 5 | MS. EATON:  We can continue. |
| 09:44:52 | 6 | MR. BANKSTON:  Let's not -- let's not do -- |
| 09:44:53 | 7 | Let's put it on the record right now that I |
| 09:44:55 | 8 | have now officially asked counsel multiple times |
| 09:44:58 | 9 | please do not have speaking objections in this |
| 09:44:59 | 10 | deposition. |
| 09:45:00 | 11 | MS. EATON:  You asked me the basis of my |
| 09:45:03 | 12 | form objection. |
| 09:45:03 | 13 | MR. BANKSTON:  I've asked that -- |
| 09:45:03 | 14 | Excuse me, ma'am.  What is going on here?  I |
| 09:45:06 | 15 | feel like there's like just absolute anarchy right |
| 09:45:10 | 16 | now.  I'm in the middle of speaking to a court |
| 09:45:11 | 17 | reporter to put something on the record and you just |
| 09:45:13 | 18 | flat out interrupted me with more speaking, and in a |
| 09:45:18 | 19 | deposition we do not need speaking.  So I know this is |
| 09:45:18 | 20 | a tense situation, I know you're going to want to be |
| 09:45:22 | 21 | motivated to speak and make commentary on the record. |
| 09:45:24 | 22 | I don't think it's appropriate.  I've said that in the |
| 09:45:26 | 23 | last expert deposition I was in.  I have in this case |
| 09:45:29 | 24 | brought a motion, successfully, on this issue against |
| 09:45:32 | 25 | counsel.  Let's not do it.  It's not hard.  It's not |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

50

09:45:36   1   difficult at all to just give a legal objection.

09:45:38   2           So from this moment forward, I'd please

09:45:41   3   appreciate it if we didn't have any more commentary,

09:45:44   4   we just had legal objections.  Is that agreeable?

09:45:45   5           MS. EATON:  Mr. Bankston, it is, except when

09:45:47   6   you ask me for the basis of my objection, I will

09:45:51   7   answer your question, and that's what I was just

09:45:52   8   doing.

09:45:52   9           MR. BANKSTON:  Okay.

09:45:53  10   BY MR. BANKSTON:

09:46:15  11       Q.  You signed a number of -- in fact let me --

09:46:19  12           Because so much has elapsed between that and

09:46:22  13   the objection, we'll withdraw that last question.  I

09:46:25  14   know there's a question, but --

09:46:25  15       A.  Good, because I've lost it entirely.

09:46:27  16       Q.  Believe me, I have no idea what that

09:46:31  17   question was.  I know, that's kind of the problem.

09:46:34  18           When you were working at the FDA, there are

09:46:34  19   documents relating to the Bair Hugger you signed.

09:46:38  20       A.  Well --

09:46:38  21       Q.  Let me -- and let me be more specific.

09:46:41  22   Enforcement actions.

09:46:42  23       A.  It's not an enforcement action.

09:46:44  24       Q.  Okay.  And -- and this may be my bad

09:46:47  25   terminology.  When a warning letter is issued, what

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

51

09:46:50   1   kind of action is that?

09:46:51   2       A.   An advisory action.

09:46:52   3       Q.   Okay.  And -- and an advisory action is --

09:46:56   4            Those are actions that you had

09:46:57   5   responsibility at during what approximate time of your

09:47:00   6   tenure?

09:47:00   7       A.   2003 to 2011.

09:47:02   8       Q.   Okay.  During that entire period of that

09:47:04   9   space, you were involved in advising companies if they

09:47:09   10   were perhaps in violation or potential violation of

09:47:12   11   regulations.

09:47:13   12       A.   Correct.

09:47:13   13       Q.   Okay.  One of the people that you made an

09:47:17   14   advisory action to is your current client.

09:47:22   15       A.   Correct.

09:47:23   16       Q.   That --

09:47:25   17            And that advisory letter concerned adverse

09:47:28   18   events.

09:47:29   19       A.   Correct.

09:47:30   20       Q.   Those adverse events, those were burns;

09:47:33   21   right?

09:47:33   22       A.   That was associated, yes.  Right.

09:47:36   23       Q.   And there were burns that had not been

09:47:40   24   properly reported by the company.

09:47:41   25       A.   There were reporting issues that were

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

52

09:47:43    1    observed.

09:47:44    2        Q.    You're familiar with what I say when I say

09:47:47    3    MDR?

09:47:47    4        A.    Correct.

09:47:48    5        Q.    Can you explain to the jury real quick what

09:47:50    6    an MDR is.

09:47:51    7        A.    Medical device report.  It's a report made

09:47:54    8    to FDA by manufacturers, by healthcare facilities, by

09:47:59    9    importers related to deaths or serious injuries

09:48:02   10    that -- or malfunctions that -- that may be related or

09:48:06   11    associated with a medical device.

09:48:08   12        Q.    That may be related; correct?

09:48:09   13        A.    Correct.

09:48:10   14        Q.    Okay.  In other words, if a -- a

09:48:13   15    manufacturer has information in its possession that a

09:48:16   16    device is potentially involved in an adverse event,

09:48:20   17    under certain circumstances that has to be reported.

09:48:23   18        A.    If there's reasonable evidence to that fact,

09:48:25   19    yes.

09:48:25   20        Q.    Okay.  In the case of your advisory letter,

09:48:30   21    there were adverse events that legally should have

09:48:33   22    been reported to the FDA but were not reported to the

09:48:35   23    FDA by Arizant; correct?

09:48:38   24        A.    As I recall, there were observations related

09:48:40   25    to late reports or non-reports, yes.  A few.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

53

09:48:46  1      Q.   You would agree with me that the bulk of

09:48:49  2  your opinions in this case focus on FDA regulations,

09:48:51  3  FDA procedures such as the 510(k) clearance process,

09:48:55  4  FDA communications, defendants' compliance with

09:49:00  5  regulatory duties, these are the general things you're

09:49:04  6  testifying about.

09:49:04  7      A.   That's the bulk of it, although there's a --

09:49:08  8  a -- I'll call it a smattering of -- of expertise I --

09:49:13  9  I offer in regard to a particular area of expertise I

09:49:16  10  have in regard to disinfection, sterilization for

09:49:19  11  example.

09:49:19  12     Q.   Okay.  For my next series of questions I

09:49:22  13  want to limit us to the parts and opinions of your

09:49:24  14  report that deal with the 510(k) process.  Okay?

09:49:28  15     A.   Okay.

09:49:29  16     Q.   From the way I understand it, 510(k) is a

09:49:32  17  determination by the FDA that a product being offered

09:49:36  18  in the application is substantially equivalent to a

09:49:40  19  previously-legally-marketed product.

09:49:42  20     A.   That's correct.

09:49:43  21     Q.   Okay.

09:49:43  22     A.   That is also Class II and subject to legal

09:49:47  23  marketing, as you said.

09:49:49  24     Q.   Okay.

09:49:49  25     A.   For classification number.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

54

09:49:51  1      Q.    You would agree that your opinions in this

09:49:53  2  case both implicate the 510(k) clearance process in

09:49:56  3  general and with respect to Bair Hugger specifically.

09:49:59  4      A.    Correct.

09:49:59  5      Q.    Okay.  You would also say that the 510(k)

09:50:05  6  process speaks to or relates to safety and efficacy.

09:50:10  7      A.    Yes.  It must.

09:50:11  8      Q.    Okay.  In fact, you have testified before

09:50:17  9  and I believe you'll be testifying today that 510(k)

09:50:19  10 clearance is a determination of safety and

09:50:21  11 effectiveness.

09:50:22  12     A.    No, I am not.

09:50:23  13     Q.    Okay.  That's not going to be your opinion

09:50:25  14 today.

09:50:25  15     A.    No.

09:50:26  16     Q.    Okay.  I notice your report provides a

09:50:31  17 narrative description of the FDA processes for

09:50:33  18 regulating medical devices; is that correct?

09:50:35  19     A.    Correct.

09:50:36  20     Q.    It has an overview of forced-air warming

09:50:40  21 devices generally?

09:50:41  22     A.    Generally, yes.

09:50:42  23     Q.    Okay.  It has -- discusses a history of

09:50:45  24 Arizant's 510(k) submissions?

09:50:47  25     A.    Right, to the degree that I could discover

55

09:50:49  1    that on FDA's website.

09:50:50  2         Q.    Okay.  Now all of those things we just

09:50:57  3    talked about, these opinions that you hold, you will

09:50:59  4    agree with me multiple federal courts have excluded

09:51:03  5    those opinions as improper.

09:51:04  6              MS. EATON:  Object to the form of the

09:51:05  7    question.

09:51:05  8         A.    No, that's incorrect.

09:51:07  9         Q.    Okay.  Do you remember in --

09:51:08  10             You remember the Bellew versus Ethicon case?

09:51:11  11        A.    Well let me -- let me try and clarify what I

09:51:16  12   just said.  I know that certain judges have excluded

09:51:21  13   testimony on 510(k)s simply because they -- they don't

09:51:25  14   want to talk about federal regulations and 510(k)s.

09:51:28  15   It's not me, it's not my report, it's just an overall

09:51:32  16   decision that we're not going to talk about this

09:51:35  17   topic.

09:51:36  18        Q.    You don't believe that federal courts have

09:51:38  19   stated that you have stated the law incorrectly?

09:51:40  20        A.    Well if you let me finish -- you jumped in.

09:51:44  21             The other half has been in a case people

09:51:49  22   have brought up, Medtronic/Lohr, for example, and the

09:51:54  23   Supreme Court's decision on PMAs, premarket approval

09:51:58  24   applications versus 510(k)s, although the fact is that

09:52:03  25   I've recognized the regulatory standard for PMAs

56

09:52:06  1   versus 510(k)s, which is different, but nonetheless

09:52:11  2   for a 510(k), as I state in this report, the elements

09:52:15  3   of safety and effectiveness factor into every 510(k)

09:52:18  4   review, and -- and it must, as noted by regulation and

09:52:21  5   statute.

09:52:21  6       Q.   Now multiple federal courts have said, in

09:52:24  7   regard to your testimony, the kind of opinions that

09:52:26  8   you give about 510(k), have said the 510(k) clearance

09:52:30  9   process does not speak to safety and effectiveness,

09:52:33  10  disagreeing with you.  Do you remember that?

09:52:35  11      A.   Well I -- I think we --

09:52:37  12           I'm not a lawyer so I can't speak to the

09:52:39  13  Supreme Court's specific decision, any judge's

09:52:43  14  particular evaluation of -- of, for example,

09:52:46  15  Medtronic/Lohr or the Supreme Court's dicta in regard

09:52:49  16  to their decision that might illuminate their decision

09:52:53  17  further, but what I'm providing in my report in this

09:52:58  18  case is to make it clear that, as FDA points out,

09:53:04  19  safety and effectiveness factors into every 510(k)

09:53:07  20  review.  And I provide ample basis for that.

09:53:09  21      Q.   Okay.

09:53:10  22      A.   Now understanding and recognizing, as I do

09:53:13  23  in my report, the PMA standard is not the same as the

09:53:16  24  510(k) standard.  The PMA standard is a determination

09:53:19  25  of safety and effectiveness.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

57

09:53:20   1       Q.    Uh-huh.

09:53:21   2       A.    510(k) standard is substantial equivalence.

09:53:25   3   So I -- I recognize that, that's certainly the case,

09:53:29   4   but now you have to burrow into how do you determine

09:53:31   5   substantial equivalence, what factors enter into that

09:53:34   6   decision, and so that's where my comments arise.

09:53:38   7       Q.    Okay.   My -- my question was in --

09:53:40   8       Well I'm sure we'll be talking about a lot

09:53:43   9   of this stuff, so I don't mean to dive too quickly

09:53:46   10   into some of this, but my question was simply:   You

09:53:48   11   recognize that multiple federal courts have said that

09:53:50   12   you were wrong, that 510(k) does not relate to safety

09:53:53   13   and effectiveness.

09:53:54   14       A.    Well I'm not sure they said it in those

09:53:56   15   terms.   I think they are recognizing that the standard

09:53:59   16   is different between PMAs and 510(k)s.

09:54:02   17       Q.    Would you -- would you be of the opinion

09:54:05   18   that a 510(k) clearance is equivalent to a finding of

09:54:08   19   non-negligent design?

09:54:11   20       A.    Well that sounds like -- like a legal --

09:54:13   21   legal finding.   I'm not a lawyer, so I couldn't

09:54:16   22   comment on that.

09:54:16   23       Q.    That's an opinion you gave in NexGen though;

09:54:19   24   correct?

09:54:19   25       MS. EATON:   Object to the form of the

58

09:54:20  1   question.

09:54:20  2       A.   I -- I don't recall that specific wording,

09:54:22  3   but that sounds like a legal approach.

09:54:27  4       Q.   Today we're not going to have that kind of

09:54:30  5   opinion.

09:54:31  6       A.   I'm not a lawyer.  I'm not going to --

09:54:33  7            I haven't proposed my opinions in those

09:54:35  8   in -- in the framework of a -- of a -- of a

09:54:38  9   litigation -- legally-based litigation aspect.

09:54:42 10       Q.   And therefore you're not going to be giving

09:54:44 11   an opinion about whether the design of the Bair Hugger

09:54:46 12   device was negligent or non-negligent.

09:54:54 13       A.   Well I guess I have to understand the

09:54:56 14   parameters of the definition and what that entails.

09:55:00 15   You know, I understand that from a -- from a --

09:55:04 16            I understand at least that from a -- from a

09:55:06 17   legal position that there's -- one has to be very

09:55:10 18   careful in how one approaches the negligence and

09:55:12 19   defect in regard to how that is defined in a

09:55:16 20   particular state or particular MDL versus as FDA may

09:55:19 21   define safety and effectiveness and how that -- those

09:55:23 22   things differ.

09:55:23 23       Q.   Okay.  Similarly, likewise -- because you

09:55:26 24   brought up the term, it's going to be my next

09:55:29 25   question -- is about the concept of defect.  And are

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

59

09:55:31  1   you going to be giving an opinion in this case that

09:55:33  2   the Bair Hugger is or is not defective?

09:55:36  3       A.   I haven't rendered an opinion on that.

09:55:38  4       Q.   Okay.

09:55:39  5       A.   My position is, from a reg -- regulatory

09:55:42  6   perspective, were these products found substantially

09:55:45  7   equivalent or the basis for ---for those findings, so

09:55:51  8   on and so forth.

09:55:52  9       Q.   Okay.  We had talked a little bit earlier

09:56:00  10  about the 510(k) clearance process and about clearance

09:56:04  11  being granted when a product is found to be

09:56:06  12  substantially equivalent to a previously-legally-

09:56:09  13  marketed device.  Do you remember that?

09:56:11  14      A.   Yes.

09:56:11  15      Q.   Okay.  In terms of what "substantially

09:56:15  16  equivalent" means, you would agree that that means the

09:56:18  17  product has the same intended use and same

09:56:22  18  technological characteristics, or it may have

09:56:25  19  differences but those do not raise new questions of

09:56:28  20  safety or effectiveness.

09:56:29  21      A.   Yes.  That's how the statute and -- and --

09:56:32  22  is embedded in the regulations.

09:56:34  23      Q.   Okay.  You would also agree with me that the

09:56:36  24  510(k) process is a very liberal process in regards to

09:56:40  25  the uses of its products.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

60

09:56:41    1           MS. EATON:  Object to the form of the

09:56:43    2    question.

09:56:43    3        A.    Repeat that, please.

09:56:45    4        Q.    Sure.  The 510(k) process is a very liberal

09:56:49    5    process in regard to the uses of products.

09:56:52    6           MS. EATON:  Object to the form of the

09:56:53    7    question.

09:56:53    8        A.    Well I guess it's the last part, "in the

09:56:58    9    uses of products."  I think -- I guess I don't

09:56:58    10    understand your phraseology.

09:56:59    11        Q.    Okay.  It's your phraseology as well, not

              12    that you --

09:57:00    13           Do you remember giving that testimony in

09:57:02    14    I-Flow?

09:57:02    15        A.    I don't recall that, but, you know, the

09:57:06    16    context probably would make it clear to me what I was

09:57:11    17    saying or --

09:57:12    18        Q.    Okay.  Sure.  We can do that.

09:57:15    19           THE REPORTER:  Let's go off the record a

09:57:16    20    moment, please.

09:57:49    21           (Discussion off the record.)

09:57:49    22    BY MR. BANKSTON:

09:57:53    23        Q.    Sir, I'm going to hand you page 130 of your

09:57:56    24    deposition in I-Flow, and I'd like to talk to you a

09:58:04    25    little bit about the question that begins on line

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

61

09:58:06  1    four, and that question reads:

09:58:09  2           "Did the -- Did I-Flow add anything to the

09:58:11  3    labeling to be more specific with regards to where it

09:58:16  4    was -- would not -- what type of surgeries it was not

09:58:18  5    to be used in?"

09:58:19  6           The answer was:  "Well, then we get into the

09:58:22  7    issue of 510(k) clearances and what -- and what it all

09:58:26  8    means.  The 510(k) process is a very liberal process

09:58:29  9    in regards to uses of products.  It's a building-block

09:58:33  10   process where prior clearances have just as much

09:58:37  11   importance and effect as the current submission."

09:58:39  12          Do you agree with that testimony today?

09:58:40  13      A.   Right.  And this was in regard to

09:58:44  14   indications for use of the product.  I-Flow was --

09:58:48  15          There was a particular issue about this --

09:58:52  16   this pump's usage in -- in certain clinical

09:58:56  17   conditions, and my point was very broad indications

09:59:00  18   allow very broad uses.

09:59:08  19      Q.   We have some discussion in various reports

09:59:28  20   in this case about indications for use of this

09:59:28  21   product; right?

09:59:28  22      A.   Right.  Environments of use.  Intended use

09:59:28  23   mostly.

09:59:28  24      Q.   Correct.  Okay.  In regards to how that

09:59:28  25   process is carried out when looking at a product by

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

62

09:59:28   1   the FDA in terms of its intended uses, indications for

09:59:29   2   use, you will agree that that is a very liberal

09:59:29   3   process.

09:59:29   4          MS. EATON:   Object to the form of the

09:59:30   5   question.

09:59:34   6      A.   It can be liberal, it can be narrow, so --

09:59:37   7          As Congress stated and as FDA has

09:59:41   8   implemented the 510(k) process, it's not so broad as

09:59:43   9   to let everything through the door, nor should it be,

09:59:47   10  nor is it so narrow as to require everything -- or

09:59:50   11  many things to be Class III and go through PMA.  So

09:59:53   12  it -- it varies depending on the product, the proposed

09:59:58   13  use of the product, the history of the products, the

10:00:01   14  current literature.  So, you know, very liberal at

10:00:04   15  times, yes.

10:00:05   16         There's an evolutionary progression of

10:00:08   17  products based upon 510(k)s.  In other cases FDA is

10:00:12   18  very -- more measured in regard to 510(k) clearance.

10:00:19   19     Q.   So it depends on what case you're in and

10:00:21   20  what questions are being asked, what product you're

10:00:23   21  looking at, whether the 510(k) process is liberal or

10:00:25   22  not.

10:00:26   23     A.   I think it -- it depends on the product,

10:00:29   24  right, yes.

10:00:31   25     Q.   Your opinion, though, is that the FDA's

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

63

10:00:33  1   review of 510(k) marketing applications is rigorous.

10:00:37  2       A.   Yes.

10:00:37  3       Q.   Okay.  You will agree with me a front-line

10:00:41  4   510(k) review approximately around the time that this

10:00:43  5   product was reviewed was done in about 20 hours

10:00:46  6   average?

10:00:47  7            MS. EATON:  Object to the form of the

10:00:48  8   question.

10:00:48  9       A.   No, I -- I disagree with that.

10:00:50  10      Q.   You agreed with that when Mr. Lanier asked

10:00:55  11  you it last year in I-Flow; correct?  Excuse me, in

10:00:57  12  DePuy.

10:00:58  13      A.   That -- that's -- that's from the Supreme

10:01:00  14  Court Medtronic/Lohr again, which is old, old data.  I

10:01:04  15  could talk about it for --

10:01:06  16           Let me -- let me just boil it down.  That

10:01:09  17  data was based upon early-1980s 510(k) information

10:01:14  18  when Class I devices were reviewed as well as Class II

10:01:18  19  devices.  After that point in time when -- when the

10:01:21  20  Supreme Court evaluated that data, FDA exempted all

10:01:27  21  the Class I devices, so they were off the table for

10:01:30  22  510(k)s, and FDA concentrated on Class II.  The actual

10:01:34  23  review time since early '90s up until current has been

10:01:38  24  constantly moving upward, so 20 hours per 510(k) is an

10:01:43  25  old, old number.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

64

10:01:43  1      Q.   Your testimony is that since 1985 the

10:01:48  2   efficiency -- for lack of a better word -- of the

10:01:50  3   device office in approving medical devices through

10:01:53  4   510(k), the -- their ability to do that has

10:01:57  5   consistently improved since 1985.

10:01:59  6           MS. EATON:   Object to the form of the

10:02:00  7   question.

10:02:01  8      A.   Coupled with the complex -- increased

10:02:04  9   complexity of submissions, it has had to do so.  But

10:02:07  10   the fact of the matter is the data show -- FDA's own

10:02:10  11   data show a constant increase in the review time --

10:02:13  12   average review time for 510(k)s over -- over time.

10:02:15  13      Q.   A constant increase or decrease?

10:02:18  14      A.   Increase.

10:02:18  15      Q.   In review time?

10:02:19  16      A.   Yes.

10:02:20  17      Q.   It takes longer to review 510(k)s in 2003

10:02:23  18   than it did in 1985.

10:02:24  19      A.   That's correct.

10:02:25  20      Q.   Okay.  You're familiar that right about the

10:02:32  21   time before you left in 2001, around the 2010

10:02:37  22   timeframe with your new FDA commissioner, an

10:02:41  23   investigation and a committee report was begun and put

10:02:44  24   together by what was then known as the Institute of

10:02:47  25   Medicine reviewing the 510(k) process.

65

10:02:50  1        A.    Right, yes.  The IOM, yes.

10:02:52  2        Q.    And then as soon as IO --

10:02:55  3              Like when the IOM came out is roughly

10:02:57  4    concurrent with when you left the agency.

10:03:00  5        A.    When the report came out, yes.

10:03:01  6        Q.    Correct.  That report --

10:03:02  7              MS. EATON:  Can I just clarify?  You said

10:03:05  8    2001, and I think you meant 2011.

10:03:08  9              MR. BANKSTON:  That is true.

10:03:09  10             THE WITNESS:  Yeah.  I let that go by.

10:03:09  11             MS. EATON:  I just want that to be clear on

10:03:11  12   the record.

10:03:11  13       Q.    Yeah.  You left the agency in 2011.

10:03:14  14       A.    '11, yes.

10:03:14  15       Q.    That's when the IOM report was published.

10:03:17  16       A.    It was thereabouts, yes.

10:03:19  17       Q.    Okay.  That IOM report states/finds that the

10:03:21  18   510(k) process was not designed to determine whether a

10:03:23  19   new device provides a reasonable assurance of safety.

10:03:29  20       A.    Yeah.  The -- the IOM --

10:03:32  21             There's only two real conclusions in the IOM

10:03:36  22   report, and one of them is the 510(k) process was not

10:03:39  23   designed to evaluate safety and effectiveness in

10:03:44  24   certain cases, but the fact of the matter is, as FDA

10:03:49  25   has implemented the process, it certainly had to

66

10:03:52   1   consider safety and effectiveness aspects in its

10:03:55   2   review of 510(k)s.

10:03:56   3       Q.   Okay.   There are two relevant opinions in

10:03:59   4   this report?

10:03:59   5       A.   Well there's two -- two -- two general

10:04:02   6   opinions, and then there's other findings in the

10:04:04   7   report.

10:04:04   8       Q.   Okay.   Let's talk about some of those

10:04:07   9   findings.   You understand that one of the things the

10:04:10  10   IOM found was that congressional appropriations for

10:04:14  11   the operation of 510(k) clearance have been unstable

10:04:18  12   and frequently inadequate throughout its lifespan.

10:04:22  13       A.   Yes, I agree.

10:04:24  14       Q.   Now when you were an FDA director you were

10:04:28  15   in the Center for Devices and Radiological Health;

10:04:31  16   correct?

10:04:31  17       A.   Correct.

10:04:31  18       Q.   Okay.   Your division by far received the

10:04:35  19   most 510(k)s of any division within the Office of

10:04:38  20   Device Evaluation.

10:04:40  21       A.   I believe so.

10:04:41  22       Q.   Okay.   Now you --

10:04:42  23            When that was going on, you had a few staff

10:04:46  24   who could review general hospital devices, and you

10:04:48  25   reviewed all the devices and were responsible for all

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

67

10:04:51   1   the devices in the division; correct?

10:04:54   2        A.   Well that's a --

10:04:55   3             You made multiple statements there.

10:05:00   4        Q.   Uh-huh.

10:05:00   5        A.   Yes, I was the director of a division that

10:05:00   6   handled several types of devices.  We had a staff

10:05:03   7   of -- well it varied over time -- 30 to 50 individuals

10:05:10   8   I would say, and we reviewed a number of 510(k)s.

10:05:13   9        Q.   And you reviewed --

10:05:15  10             MS. EATON:  I just want to go back and

10:05:16  11   object to the form of that question.  Thank you.

10:05:19  12        Q.   You reviewed all the devices.

10:05:19  13        A.   I reviewed all the --

10:05:21  14        Q.   Correct?

10:05:22  15        A.   Well, ultimately the division director signs

10:05:25  16   off on the 510(k)s.

10:05:27  17        Q.   Correct.  You were --

10:05:27  18        A.   But then there's a process, yes.

10:05:28  19        Q.   You were responsible for all the devices in

10:05:30  20   that division.

10:05:31  21        A.   Yes, I would say so.

10:05:32  22        Q.   Okay.  During that time period you would see

10:05:37  23   on a given date potentially dozens and dozens of

10:05:40  24   510(k)s.

10:05:42  25        A.   Not on average, but, you know, there were

68

10:05:45  1  days where there were more and days where there were a

10:05:48  2  lot fewer, so it depends.

10:05:50  3      Q.   You have testified previously that on a

10:05:52  4  given date you could see dozens and dozens of 510(k)

10:05:55  5  clearances.

10:05:55  6      A.   On a given date, yes.

10:05:57  7      Q.   Uh-huh.  You had to rely on your front-line

10:06:02  8  reviewers.  You would agree with me?

10:06:05  9      A.   Yes.  And others that -- individuals that

10:06:08  10  were bought -- brought to bear in evaluating 510(k)s.

10:06:10  11  For example, we enlisted the assistance of the Science

10:06:16  12  Division to review 510(k)s, we enlisted the assistance

10:06:20  13  of advisory committee members to review 510(k)s, and

10:06:24  14  others.  So I had a core of reviewers, the division,

10:06:27  15  but there were other reviewers that assisted.

10:06:30  16      Q.   Right.  What you saw at the end of the

10:06:33  17  process from your perspective running that division,

10:06:38  18  being responsible for all these devices, what you saw

10:06:39  19  was a stack of blue folders with letters with a space

10:06:42  20  for your signature; right?  You -- you didn't --

10:06:45  21          You had no time to review those 510(k)s.

10:06:48  22          MS. EATON:  Object to the form of the

10:06:49  23  question.

10:06:49  24      A.   I did review several of them.  It depended

10:06:51  25  on the 510(k).  So if they were, I'll call them,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

69

10:06:56   1   routine documents, because you would receive

10:07:02   2   submissions for -- for devices that -- that were very

10:07:06   3   routine sorts of changes or new devices, and others

10:07:10   4   that were much more complex.  You had to take some

10:07:13   5   time on those 510(k)s.

10:07:14   6         Q.   Well I want to make sure I understand you.

10:07:18   7   You're saying -- I mean --

10:07:18   8         Well let me put it this way:  You're saying

10:07:20   9   you would not say you had no time to review those

10:07:22   10   510(k)s.

10:07:22   11         A.   I -- I --

10:07:23   12         Well it's not the same thing.  I decided

10:07:25   13   that, based on the product, based on the reviewer and

10:07:29   14   the branch chief's evaluation, I could rely upon those

10:07:34   15   decisions.  In other cases I found it necessary to

10:07:37   16   evaluate the 510(k) myself as well.

10:07:39   17         Q.   Right.  But what I'm saying is when you'd

10:07:40   18   get a stack of blue folders on your desk, you had no

10:07:44   19   time to review those, you're just signing a letter.

10:07:47   20   There's no way you can review every device that passes

10:07:50   21   through your office.

10:07:50   22         A.   Nor did I find it necessary to do so.

10:07:52   23         Q.   Okay.  And there are times when your lower-

10:07:56   24   level employees, these people you're relying on to do

10:07:59   25   the reviews, there are times when they did not make

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

70

10:08:01   1   the appropriate recommendations to you; correct?

10:08:03   2       A.   Well I think it's a very rare instance.

10:08:15   3   I've only uncovered, I think, one circumstance when I

10:08:19   4   think, given the review criteria at the time, given

10:08:21   5   the proc -- procedures at the time, that -- that there

10:08:25   6   were -- there were problems with any of the 510(k)

10:08:27   7   clearances.

10:08:28   8       Q.   What one specific instance is that?

10:08:30   9       A.   Well as I mentioned, I think, I -- I perused

10:08:34  10   litigation-produced documents in I-Flow and identified

10:08:38  11   some new information.  I thought, you know, if we had

10:08:40  12   brought that to bear, maybe we could have made a

10:08:43  13   different decision.  But, you know, that's based on

10:08:45  14   new information.

10:08:46  15       Q.   Okay.

10:09:05  16           (Discussion off the stenographic record.)

10:09:05  17           (Ulatowski Exhibit 1 was marked for

10:09:08  18           identification.)

10:09:08  19   BY MR. BANKSTON:

10:09:09  20       Q.   Mr. Ulatowski, I've put in front of you the

10:09:12  21   IOM report so we can kind of follow along with each

10:09:15  22   other, --

10:09:15  23       A.   Uh-huh.

10:09:15  24       Q.   -- and I was wondering if you could flip to

10:09:17  25   65 for me.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

71

10:09:18  1      A.   Sure.

10:09:20  2      Q.   Okay.  Now I want to --

10:09:21  3           As you're doing that, the division that you

10:09:26  4   were in charge of is the Center for Device and

10:09:30  5   Radiological Health.

10:09:32  6           MS. EATON:   Object to the form of the

10:09:33  7   question.

10:09:34  8      A.   No.

10:09:34  9      Q.   Okay.  What association did you have with

10:09:36  10  the CDRH?

10:09:37  11     A.   I was --

10:09:40  12          In my final position I was the director of

10:09:44  13  the Office of Compliance within the Center for Devices

10:09:47  14  and Radiological Health.

10:09:48  15     Q.   Okay.  So you were a director in CDRH at the

10:09:54  16  time you left the agency.

10:09:54  17     A.   An office director, yes.

10:09:54  18     Q.   An office director.  Okay.

10:09:55  19          You understand that around the time that you

10:09:59  20  were leaving the FDA, that there had been an FDA

10:10:02  21  working group formed to examine the CDRH and what it

10:10:08  22  was doing in approving devices.

10:10:10  23     A.   Yes.

10:10:10  24     Q.   Okay.  That was running concurrently,

10:10:12  25  basically, with IOM's investigation of 510(k)s.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

72

10:10:16    1        A.    Yes.

10:10:16    2        Q.    Okay.  You'll agree -- and I have some

10:10:19    3    language there I believe you'll see there on page

10:10:21    4    65 -- and you'll agree that the working group found

10:10:26    5    that the Center for Devices and Radiological Health

10:10:29    6    does not have an adequate mechanism to regularly

10:10:32    7    assess the quality, the consistency, and the

10:10:35    8    effectiveness of the 510(k) program.  I'm assuming you

10:10:39    9    were made aware of that.

10:10:40   10        A.    Yeah.  Let me just read it.  I -- I recall

10:10:42   11    it.

10:10:50   12              Yes, I understand this.  I -- I think it's

10:10:53   13    not quite accurate in that CDRH actually had gone

10:11:01   14    through --

10:11:01   15              If you were there long enough -- you know,

10:11:04   16    37 years -- you would have been aware, and these -- I

10:11:09   17    don't think these people have awareness of it, but FDA

10:11:12   18    had -- had been through previous cycles of analysis of

10:11:16   19    the 510(k) program, had undergone a -- an intensive

10:11:22   20    evaluation of the 510(k) program and consistency in

10:11:26   21    the 510(k) program and retrospective analysis of prior

10:11:31   22    510(k) decisions, one of them is called the Temple

10:11:34   23    Report, and I think what this group was saying, we

10:11:38   24    need to build in that sort of review process more

10:11:42   25    frequently and more systematically than what we've

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

73

10:11:47   1   done in the past.  But FDA had done so in the past,

10:11:49   2   looked at that -- these very same topics.

10:11:52   3           MR. BANKSTON:  I'll object as

10:11:53   4   non-responsive.

10:11:53   5       Q.   I asked if you were aware of the findings.

           6       A.   Yes.

10:11:55   7       Q.   Are you aware of the findings?

10:11:57   8       A.   Yes.

10:11:57   9       Q.   Okay.  You were also aware that the IOM

10:12:00  10   reviewed what the working group did and said we agree

10:12:02  11   with the working group that there's not an adequate

10:12:05  12   mechanism to regularly assess the quality,

10:12:08  13   consistency, or effectiveness of the 510(k) program.

10:12:13  14       A.   Well I don't -- I don't recall if the IOM

10:12:15  15   said we agree.  I know the IOM took up some of the

10:12:21  16   working group's findings and embedded them in the

10:12:23  17   report -- in their report.

10:12:24  18       Q.   Can you look at page 65, at the top of that

10:12:29  19   page, and tell me if that helps you understand whether

10:12:30  20   they agreed with the 510(k) working group.

10:12:32  21       A.   Okay.  They do say agree, --

10:12:34  22       Q.   Okay.

10:12:34  23       A.   -- so I stand corrected.  But my -- my point

10:12:38  24   is they -- they lifted the working group's report into

10:12:40  25   their report without a lot of foundation.  But it is

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

74

10:12:44   1   what it is.

10:12:44   2        Q.   So you're saying you're critical of what --

10:12:46   3   the job the IOM did.

10:12:48   4        A.   Well I can take issue in a number of things.

10:12:50   5   For example, the -- the -- the IOM did not evaluate in

10:12:56   6   any significant manner any 510(k)s, so it's all kind

10:13:01   7   of theoretical based upon legal foundation,

10:13:06   8   Medtronic/Lohr and -- and whatnot, but nobody went in

10:13:09   9   there and started reviewing 510(k)s to any extent to

10:13:12  10   say -- to see, well, this is a 510(K), let me see

10:13:14  11   what -- what FDA did with this particular 510(k) or

10:13:19  12   that particular 510(k).

10:13:20  13        Q.   Okay.

10:13:21  14        A.   So it's all kind of theoretical on the part

          15   of the IOM.

          16        Q.   So your testimony -- oh, excuse me.

          17             Your testimony is that during the IOM

10:13:29  18   investigation, nobody did an audit of any 510(k)

          19   approvals to see whether they were appropriate or not

10:13:34  20   or made any efforts to understand that process of

10:13:34  21   approving 510(k)s for specific devices.

10:13:36  22        A.   Yeah.  They didn't have time.  They -- they

10:13:38  23   didn't do that sort of analysis.

10:13:40  24        Q.   Okay.  You're familiar with the publication

10:13:41  25   called The FDA Daily News?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

75

10:13:45  1      A.   I think so.

10:13:47  2      Q.   You've been quoted in that publication on

10:13:50  3  several occasions.

10:13:50  4      A.   Probably.

10:13:51  5      Q.   Do you remember telling that publication and

10:13:54  6  it having been published that you had said that over

10:13:57  7  your time at -- in Device Evaluation, that the FDA's

10:14:04  8  device experience in the field had shrunk?

10:14:07  9      A.   Yes, and that -- and that's a fact.  In

10:14:11  10  the -- in the field, --

10:14:12  11     Q.   Uh-huh.

10:14:13  12     A.   -- not in Device Evaluation.

10:14:15  13     Q.   In fact, the FDA has made efforts within the

10:14:18  14  past 10 to 15 years to recruit support from the

10:14:23  15  private sector in terms of device experience and

10:14:27  16  expertise.

10:14:27  17     A.   Right, third -- third-party reviews for

10:14:30  18  example.

10:14:30  19     Q.   Yeah.  And -- and there are more private-

10:14:32  20  sector consultants who are brought in to address

10:14:35  21  various issues; correct?

10:14:36  22     A.   Well they're all vetted in regard to their

10:14:40  23  conflicts and -- and carefully monitored, so there's a

10:14:45  24  process there.  So it's not -- it's not a free-for-

10:14:48  25  all.  It's --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

76

10:14:48　1　　Q.　Sure.　I mean the FDA is rigorous about

10:14:50　2　this.　It values that support.

10:14:52　3　　A.　Correct.

10:14:52　4　　Q.　And one of those people would be Dr. Yadin

10:14:56　5　David.

10:14:57　6　　A.　I comment on my understanding of

10:15:00　7　his, based on his CV that he produced and my fading

10:15:05　8　knowledge of my interaction with him, what his

10:15:08　9　experience was.

10:15:08　10　　Q.　Uh-huh.　He was a private-sector consultant

10:15:10　11　that was engaged by the FDA.

10:15:13　12　　　　MS. EATON:　Object to the form of the

10:15:15　13　question.

10:15:15　14　　A.　Well he attests to the fact that he's on the

10:15:20　15　GMP committee.　I don't think he attests to anything

10:15:22　16　more.

10:15:22　17　　Q.　He's on several committees according to his

10:15:25　18　CV; isn't he?

10:15:26　19　　A.　Not FDA committees --

10:15:27　20　　Q.　Okay.

10:15:28　21　　A.　-- is my understanding from his CV.

10:15:32　22　　Q.　Okay.　You'll agree with me that it's the

10:15:34　23　manufacturer, not the FDA, who is primarily

10:15:37　24　responsible for the assurance of safety of medical

10:15:39　25　devices.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

77

10:15:45  1      A.    Yes.   The regulations are geared to the fact

10:15:47  2  that the manufacturer must follow regulations in order

10:15:52  3  to design and manufacture and monitor the devices,

10:15:56  4  with the surveillance and oversight of FDA.

10:15:58  5      Q.    Right.   The FDA can't monitor each and every

10:16:01  6  manufacturer and the marketing of each and every

10:16:04  7  product; can it?

10:16:04  8      A.    No.   That's why FDA prioritizes its

10:16:07  9  monitoring and its evaluation of devices.

10:16:20  10     Q.    One of the opinions you give in your report

10:16:24  11 is that the FDA must consider issues of safety and

10:16:26  12 effectiveness when comparing any differences in

10:16:31  13 indications for use in claims.   You'd agree with that?

10:16:33  14     A.    Correct.

10:16:33  15     Q.    Okay.   And -- and I think, as we saw from

10:16:36  16 your I-Flow testimony, you'll agree that prior

10:16:38  17 clearances have just as much importance and effect as

10:16:41  18 current clearances.

10:16:42  19            MS. EATON:   Object to the form of the

10:16:44  20 question.

10:16:44  21     A.    Yes.   They have an impact on assessing

10:16:47  22 indications and intended use.

10:16:48  23     Q.    The prior clearances have just as much

10:16:54  24 importance as the current submission.

10:16:56  25            MS. EATON:   Object to the form of the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

78

10:16:56  1  question.

10:16:57  2      A.  Well yes, because of the appliance of

10:16:59  3  current usage of the current product being submitted.

10:17:03  4      Q.  Now when the Bair Hugger was first legally

10:17:05  5  cleared, it was because the manufacturer assured the

10:17:08  6  FDA that it was substantially equivalent to a device

10:17:11  7  that had been legally marketed before; correct?

10:17:13  8      A.  Yes.

10:17:14  9      Q.  Okay.  What device was that?

10:17:15  10     A.  Are we talking about Sweetland early on?

10:17:18  11     Q.  Is that the first one you know about?

10:17:20  12     A.  Well that's -- that's in the 200 series.

10:17:25  13 Then the 500 series and 700 series came along.  But I

10:17:29  14 think that's what the focus was of Dr. David.

10:17:34  15     Q.  Sure.  Let's -- and let's go through --

10:17:34  16         Let's do the history, because as we say,

10:17:37  17 it's -- each submission builds on the last; right?

10:17:39  18         MS. EATON:  Object to the form of the

10:17:40  19 question.

10:17:40  20     A.  Right.  There's a -- there's a --

10:17:42  21 equivalence has a --

10:17:44  22         There's an evolutionary comparison with

10:17:46  23 prior devices.  The manufacturer identifies the

10:17:49  24 particular predicate that -- upon which they want to

10:17:53  25 compare the new product to, but behind that are -- is

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

79

10:17:57    1    a history of other devices that -- that may be

10:17:59    2    relevant or may not be relevant, but -- but -- and so

10:18:02    3    it's a -- it's on a case-by-case basis.

10:18:06    4         Q.   Well the prior clearances have just as much

10:18:09    5    importance as the current submission; right?  Because

10:18:09    6    they're relevant.

10:18:10    7              MS. EATON:  Object to the form of the

10:18:11    8    question.

10:18:11    9         A.   Well they're relevant, but as far as their

10:18:13   10    application to a particular new device, there may be a

10:18:16   11    break in the chain of equivalence where they're not as

10:18:19   12    relevant as before.  But they're all important.  Every

10:18:21   13    510(k) is important.  Every 510(k) in the history has

10:18:26   14    some contribution to the new device, some aspect.

10:18:30   15         Q.   I want to ask you about that term you used,

10:18:33   16    a break in the chain of substantial equivalence.

10:18:37   17         A.   Correct.

10:18:38   18         Q.   Does that exist in this case?

10:18:40   19         A.   No.  I think -- I think there's a --

10:18:42   20              Not in the form that I've described in other

10:18:44   21    cases.

10:18:44   22         Q.   All right.  Well then what I want to do is

10:18:47   23    go through the history of the products that stack on

10:18:49   24    each other.  All right?

10:18:51   25         A.   Sure.

80

10:18:51  1    Q.   So the first product that we know about is

10:18:52  2  the Bair Hugger 200 series; correct?

10:18:54  3    A.   That's the first one that I think I -- Dr.

10:18:58  4  David references, I think, in my listing of products.

10:19:01  5    Q.   Yeah.  You didn't find anything earlier than

10:19:04  6  that; right?

10:19:04  7    A.   No.

          8    Q.   Okay.

10:19:05  9    A.   No.

10:19:07  10   Q.   So that product --

10:19:07  11   A.   Not based upon my search terms.

10:19:08  12   Q.   That product has a predicate.

10:19:11  13   A.   Right.

10:19:11  14   Q.   And that product is the Sweetland Bed Warmer

10:19:14  15 and Cast Dryer; correct?

10:19:16  16   A.   Correct.

10:19:18  17   Q.   And can you describe to me what that product

10:19:19  18 is, what it does?

10:19:20  19   A.   That -- that was a product used, I think,

10:19:23  20 for hospital use for warming, but it was -- it was --

10:19:27  21        I don't recall the specifics.  I'd have to

10:19:29  22 look at my report.

10:19:30  23   Q.   Okay.  Do you know when that product was

10:19:32  24 made?

10:19:33  25   A.   That was probably back in the '80s, nine --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

81

10:19:37    1    early '90s.

10:19:38    2        Q.    Would it surprise you that the Sweetland Bed

10:19:41    3    Warmer was designed and manufactured in 1932?

10:19:44    4        A.    Yeah.   That's why I'd have to look at my

10:19:47    5    report to see what I referenced.

10:19:48    6        Q.    Okay.

10:19:49    7        A.    But I wouldn't be surprised.

10:19:51    8        Q.    Wouldn't be surprised if the Bair Hugger 200

10:19:53    9    series is held to be substantially equivalent to a

10:19:55   10    cast dryer in the 1930s.

10:19:58   11        A.    Not particularly.   I think when -- when

10:20:00   12    510(k)s are being submitted, when you're evaluating

10:20:05   13    predicates pre-'76, 1976 predicates are -- are

10:20:10   14    eligible as predicates based on technology and -- and

10:20:15   15    whatnot, so --

10:20:16   16            And that's the way the law is structured.

10:20:18   17    So yes, it's a -- it's a legitimate predicate.

10:20:22   18    Potential predicate, let me put it that way.

10:20:24   19        Q.    Okay.   So that Bair Hugger device was

10:20:28   20    submitted, the Bair Hugger 200 series, and it had the

10:20:32   21    predicate of the Sweetland Bed Warmer and Cast Dryer,

10:20:36   22    and in doing so it had to represent that that device

10:20:37   23    either had the same IFUs, indications for use, and

10:20:41   24    technological characteristics, or it had differences,

10:20:44   25    but those differences didn't affect health and safety

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

82

10:20:46    1    and effectiveness; is that correct?

10:20:48    2         MS. EATON:  Object to the form of the

10:20:49    3    question.

10:20:50    4         A.   Not --

10:20:52    5              That's not precise.

10:20:52    6         Q.   Okay.

10:20:52    7         A.   First of all, the -- that the new device to

10:20:56    8    which comparison was made to the predicate had the

10:21:01    9    same intended use as the predicate.

10:21:03   10         Q.   Okay.

10:21:04   11         A.   And intended use in this case with these

10:21:07   12    types of devices are what's the functional purpose of

10:21:11   13    the product.

10:21:11   14         Q.   Can you help me understand.  Is there a --

10:21:14   15    is there a distinction between indications for use and

10:21:17   16    intended use?

10:21:17   17         A.   Yes, there is.

10:21:18   18         Q.   Okay.

10:21:18   19         A.   Yeah.

10:21:19   20         Q.   So from what I understand, indications for

10:21:21   21    use is -- is how the company communicates through its

10:21:25   22    labeling and otherwise the purposes of the product; is

10:21:29   23    that fair?

10:21:30   24              How would you define "indications for use?"

10:21:33   25         A.   Well indications for use is -- are the --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

83

10:21:38   1   the diseases, the conditions, the patient populations

10:21:43   2   for use of the product in a similar manner that

10:21:46   3   drugs -- drug indications are --

10:21:47   4       Q.   Okay.

10:21:48   5       A.   -- identified in the labeling.  Intended use

10:21:50   6   is a functional purpose of a product, generally, which

10:21:54   7   may be determined through indications for use through

10:21:57   8   other claims in the submission.

10:21:58   9       Q.   Yeah.  Okay.

10:21:59  10       A.   So the intended use of the Bair Hugger has

10:22:04  11   always, as I said in my report, has always been the

10:22:07  12   heating of patients, the intended use has never

10:22:12  13   changed, and -- and so inasmuch as the Sweetland was

10:22:15  14   used for heating patients, had the same intended use.

10:22:18  15       Q.   What are the indications for use for the

10:22:19  16   Bair Hugger?

10:22:22  17            MS. EATON:  Object to the form of the

10:22:23  18   question.

10:22:24  19       A.   I don't --

10:22:24  20            Well hypothermia is a -- is a clinical

10:22:26  21   application, so it's an indication of sorts.

10:22:28  22       Q.   Okay.  So you would agree with me, though,

10:22:34  23   that when the first Bair Hugger, the Bair Hugger 200

10:22:36  24   series, was introduced, it was represented as being

10:22:41  25   substantially equivalent as the Sweet -- Sweetland Bed

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

84

10:22:45   1   Warmer and Cast Dryer.

10:22:47   2        A.   Correct.

10:22:47   3        Q.   Okay.

10:22:47   4        A.   And also we're aware that FDA had -- had

10:22:50   5   classified that group of products, it's a Class II, so

10:22:55   6   FDA was recognizing through that classification that

10:22:58   7   there were predicate devices in the marketplace, at

10:23:02   8   least at one point in time prior to '76, that could be

10:23:05   9   used as predicate.

10:23:06  10        Q.   Okay.  In other words, Arizant assured the

10:23:12  11   FDA that either those two pro -- products had the same

10:23:17  12   intended uses or maybe different intended uses, but

10:23:21  13   those differences did not affect safety or

10:23:24  14   effectiveness.

10:23:25  15             MS. EATON:  Object to the form of the

10:23:26  16   question.

10:23:26  17        A.   Right.  That's part of the intended use

10:23:30  18   evaluation and that's one point -- the first point

10:23:32  19   where safety and effectiveness comes into play.

10:23:34  20        Q.   Okay.

10:23:35  21        A.   Or this term safety and eff -- these terms,

10:23:39  22   safety and effectiveness.  Well here we are.  So FDA

10:23:40  23   will evaluate the labeling for the Sweetwater --

10:23:44  24   Sweet -- yeah, Sweetland device and -- if the labeling

10:23:50  25   is available, it's al -- it's sometimes a challenge to

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

85

10:23:55   1   get predicate labeling, and the new product labeling

10:23:57   2   to kind of match things up and to identify any

10:24:00   3   differences.  Plus, FDA relies upon other information

10:24:04   4   it may have -- it may bring to bear, other

10:24:06   5   submissions, literature, other marketing information

10:24:09   6   it may have at hand, to try and analyze the intended

10:24:12   7   use, the similarity of intended use.

10:24:14   8           MR. BANKSTON:  Okay.  Object as

10:24:15   9   non-responsive.

10:24:17   10      Q.   When -- when the Bair Hugger 200 was first

10:24:23   11   submitted to the FDA, there was no indication that

10:24:29   12   that product may ever be inside of an operating room.

10:24:32   13   Would you agree with me that?

10:24:35   14      A.   Yeah.  Looking at the 200, I didn't see

10:24:38   15   reference to OR use.

10:24:40   16      Q.   In fact, the company knew that it wasn't

10:24:43   17   going to sell it into ORs.  You understand that?

10:24:46   18           MS. EATON:  Object to the form of the

10:24:48   19   question.

10:24:48   20      A.   I don't know that specifically, but I

10:24:50   21   wouldn't be surprised.

10:24:50   22      Q.   Do you remember in the depositions that you

10:24:52   23   reviewed seeing about warnings on the 200 for "Not for

10:24:58   24   use in ORs?"  Do you remember anything like that?

10:25:01   25      A.   I recall warnings, yes, in the 200.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

86

10:25:03   1      Q.   Okay.  Now the third product in this series

10:25:08   2   of products, major iterations of this product, do you

10:25:11   3   understand that there was then a 500 series of Bair

10:25:14   4   Hugger?

10:25:14   5      A.   Yes.

10:25:14   6      Q.   Okay.  Now were there any differences in

10:25:18   7   either the IFU statement, the indications for use, or

10:25:21   8   the intended uses between the 200 and the 500 series?

10:25:25   9      A.   Well the intended use had not changed.  The

10:25:28  10   intended use was still fundamentally the functional

10:25:33  11   use of warming patients.

10:25:35  12      Q.   Okay.

10:25:36  13      A.   So the intended use had not changed.

10:25:38  14      Q.   What about the indications for use?

10:25:39  15      A.   I think indications evolved with the 500

10:25:44  16   into the 505 into OR use.

10:25:46  17      Q.   Okay.  So in other words, you're telling me

10:25:50  18   that between the 200 and the 500, the company let the

10:25:56  19   FDA know that with the 500 there would be an expansion

10:26:00  20   of its indications for use into operating rooms.

10:26:04  21      A.   I don't think the 50 -- 500, as I recall --

10:26:08  22   and I may be incorrect here -- discussed OR use.  The

10:26:12  23   505 certainly did; that was -- that was in numerous

10:26:17  24   spots where OR use was indicated.  And there was a

10:26:19  25   paper also included that referred to OR use.  So, you

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

87

10:26:24    1    know, FDA was certainly made aware at that point in

10:26:27    2    time with the 505.

10:26:29    3            As far as the 500, I'm -- I'm recollecting

10:26:32    4    the data submitted and I'm not sure if there was OR

10:26:37    5    references in there as I recall.

10:26:38    6        Q.    Okay.  What about the 500 OR, do you know

10:26:41    7    anything about that product?

10:26:42    8        A.    Yeah.  Variation of the 500 probably, yes.

10:26:47    9        Q.    Okay.  When the FDA became aware that the

10:26:49    10   IFUs were being expanded to include OR usage, part of

10:26:55    11   the job then of the FDA would be to determine if that

10:27:00    12   expansion of IFUs presented any new questions of

10:27:04    13   safety.

10:27:04    14           MS. EATON:  Object --

10:27:05    15       A.    Right.

10:27:05    16           MS. EATON:  -- to the form of the question.

10:27:06    17       A.    Yes.  That would be an element for FDA to

10:27:09    18   consider.  And we know that in the 505 they actually

10:27:12    19   considered the flip side, which was home use, as being

10:27:15    20   potentially significant.  So yes, FDA was analyzing

10:27:20    21   the -- the -- the -- the possibilities for use of the

10:27:24    22   product.

10:27:24    23       Q.    Okay.  What did the FDA do to determine that

10:27:29    24   the Bair Hugger's expansion of use into the OR did not

10:27:33    25   pose any new questions of safety?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

88

10:27:37    1        A.   Well we don't have available to us the

10:27:40    2   reviews by FDA, so we don't -- we cannot benefit from

10:27:46    3   that, but as a -- as a matter of policy and procedure,

10:27:49    4   FDA would be required to evaluate that, bring to -- to

10:27:53    5   bring to bear not only what's been submitted but also

10:27:56    6   any other information it may bring to bear in its

10:28:00    7   knowledge of patient warming devices being used in the

10:28:03    8   OR.  So -- so FDA can bring to bear, as I did numerous

10:28:08    9   times over many years and as I trained people to do,

10:28:11   10   other submissions, literature, expert opinion of -- of

10:28:16   11   individuals on staff or advisory committee members.

10:28:19   12   So it's -- it's a very -- it's a more comprehensive

10:28:23   13   input source than just a submission.

10:28:25   14        Q.   I -- I'm guessing from your comments that

10:28:28   15   it -- it would be difficult for you to talk about what

10:28:32   16   happened in terms of the 500 series in terms of its

10:28:35   17   510(k) clearance process because, according to you, we

10:28:38   18   don't have the decision-making documentation produced

10:28:42   19   in this case or available for your review for you to

10:28:46   20   be able to discuss those matters.

10:28:47   21        MS. EATON:  Object to the form of the

10:28:48   22   question.

10:28:48   23        A.   Well I can't discuss the reviews without

10:28:50   24   having them, and having them would shed more light on

10:28:54   25   FDA's foundation for their finding of substantial

89

10:28:57   1   equivalence, but in the absence of that I certainly

10:29:00   2   understand the review process and what's brought to

10:29:03   3   bear.

10:29:03   4       Q.   Let me -- let me back up a little bit to --

10:29:06   5            MR. BANKSTON:  In fact, I can just give you

10:29:07   6   a copy of this really quick.  Actually, let's mark

10:29:10   7   that as an exhibit.  And I have a copy for you.

10:29:20   8            (Ulatowski Exhibit 2 was marked for

10:29:21   9            identification.)

10:29:21  10   BY MR. BANKSTON:

10:29:28  11       Q.   Mr. Ulatowski, I handed you what's been

10:29:30  12   marked as Ulatowski Exhibit 2.  It is an attachment to

10:29:34  13   your report; correct?

10:29:35  14       A.   Yes.

10:29:35  15       Q.   Okay.  This is a list of materials that you

10:29:37  16   reviewed in coming to your opinions in this case.

10:29:40  17       A.   Yes.

10:29:40  18       Q.   Okay.  These materials, were these things

10:29:44  19   that you actually went out and located yourself, or

10:29:49  20   were they things that were provided to you?

10:29:51  21       A.   Some things I did, some things that were

10:29:55  22   produced in -- in the litigation.

10:29:55  23       Q.   Okay.  One of the things that you'll see in

10:29:57  24   this list is a long list of Bates-numbered documents;

10:30:01  25   correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

90

10:30:01    1      A.    Yes.

10:30:01    2      Q.    Okay.  I believe there's, I mean, dozens of

10:30:04    3   pages --

10:30:04    4      A.    Yes.

10:30:04    5      Q.    -- of documents that you have seen.  And

10:30:07    6   when I say "dozens of pages," I mean dozens of pages

10:30:10    7   on that list; right?

10:30:11    8      A.    Yes.

10:30:11    9      Q.    In other words, hundreds if not thousands of

10:30:14   10   pages of documents you've reviewed.

10:30:16   11      A.    A lot.

10:30:18   12      MS. EATON:  Let me just object to the form

10:30:20   13   of the question about the --

10:30:20   14      MR. BANKSTON:  Yeah.  Do you want to count

10:30:22   15   them or --

10:30:22   16      MS. EATON:  Yeah.  It's like six.  I mean

         17   I --

10:30:22   18      It's a lot of documents, but it's six pages.

10:30:25   19      MR. BANKSTON:  Oh, okay.  Maybe we're

10:30:26   20   talking about the study stuff.

10:30:27   21      Q.    Let's --

10:30:30   22      With respect to how many pages are in your

10:30:32   23   actual exhibit there, you will agree with me there are

10:30:34   24   hundreds if not thousands of pages you've reviewed in

10:30:37   25   terms of Bates-labeled documents.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

91

10:30:38  1      A.   Right.  And, you know, I was engaged in

10:30:41  2   prior litigation, so that's additive to this

10:30:45  3   particular MDL work.

10:30:46  4      Q.   You mean that one of the cases that's

10:30:48  5   currently before this court has been pending for some

10:30:51  6   time.

10:30:51  7      A.   A couple of them, yes.

10:30:55  8      Q.   Right.  And you've done work in those cases.

10:30:55  9      A.   Right.  So, you know, time added there

10:30:57  10  because a lot of documents are -- are the same, just

10:31:00  11  with different Bates numbers.

10:31:03  12     Q.   In other words, some of these documents were

10:31:13  13  produced a couple years ago, some of them were

10:31:16  14  produced more recently.

10:31:16  15     A.   Correct.  In Walton and Johnson, for

10:31:19  16  example.

10:31:19  17     Q.   Correct.

          18     A.   Yes.

10:31:20  19     Q.   So some of your review of documents occurred

10:31:22  20  a couple years ago, some of it occurred recently; is

10:31:25  21  that right?

10:31:25  22     A.   Right.  I looked at new information, but

10:31:28  23  already at hand, all that information I had received

10:31:32  24  in Walton and Johnson, which was essentially the same

10:31:36  25  documentation in many respects.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

92

10:31:38  1      Q.   Okay.

10:31:38  2      A.   Not all respects, but many respects.

10:31:41  3      Q.   Now these documents that we're talking about

10:31:42  4  here, the ones that have 3M at the front of them or

10:31:46  5  3MBH at the front of them, those are documents that

10:31:50  6  were given to you; right?

10:31:50  7      A.   Or I asked for, yes.

10:31:52  8      Q.   All right.  So you might have requested

10:31:53  9  certain types of documents and this is what was

10:31:56  10  provided to you.

10:31:56  11      A.   Yes.

10:31:56  12      Q.   Okay.  One of the things you might want to

10:31:58  13  see is 510(k) documents; right?

10:32:00  14      A.   Yes.

10:32:01  15      Q.   Okay.  So one of the things listed on your

10:32:03  16  list here is 510(k) documents.

10:32:05  17      A.   Yes.

10:32:07  18      Q.   And other things might be additional

10:32:08  19  regulatory materials.  There's a large category of

10:32:10  20  documents that fit that on your list; right?

10:32:13  21      A.   Yes.

10:32:13  22      Q.   Okay.  These sorts of things that you've

10:32:15  23  relied on to give your opinions about the 510(k)

10:32:17  24  process in this case.

10:32:18  25      A.   Yes.

10:32:19  1      Q.   Included within that scope of documents you

10:32:23  2  do not -- you were not provided the decision-making

10:32:26  3  documents for the 510(k) approval process for the

10:32:29  4  series 500 Bair Hugger.

10:32:32  5      A.   No.  I don't have those.  I have no

10:32:36  6  knowledge if they exist.  But those would be obtained

10:32:39  7  through Freedom of Information requests.

10:32:41  8      Q.   Or perhaps, if they were produced in a

10:32:43  9  lawsuit, you could also have access to them that way;

10:32:47  10  right?

10:32:47  11      A.   Well inasmuch as the company has them.  But

10:32:50  12  the company typically doesn't have the FDA review

10:32:52  13  documents.

10:32:53  14      Q.   Do you know if 3M does?

10:32:54  15      A.   No.

10:32:56  16      Q.   Have you asked them?

10:32:58  17           Is that a type of material you would have

10:33:01  18  wanted to review in this case?

10:33:04  19      A.   No.  I looked at the 510(k) submissions --

10:33:04  20      Q.   So the decision --

10:33:06  21      A.   -- and -- and -- excuse me -- and in the

10:33:08  22  510(k)s there's also documentation of FDA's

10:33:10  23  interaction with the company, the letters that FDA has

10:33:12  24  written to the company, the responses by the company,

10:33:15  25  so there's some -- there's important information

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

94

10:33:21  1   contained there.  But what I'm referring to is, you

10:33:25  2   know, where is the review of the FDA reviewer of the

10:33:31  3   submission, and that -- that I don't have.

10:33:33  4       Q.   Okay.  And I had asked you some questions

10:33:37  5   about the 510(k) approval process and what the FDA did

10:33:41  6   or did not do or did or did not find during that

10:33:43  7   process, and those were questions that you would be

10:33:45  8   unable to answer unless you had the decision-making

10:33:48  9   documents; correct?

10:33:48  10      A.   No.   I would say no, because the fun --

10:33:52  11  you --

10:33:54  12           Inasmuch as we're talking about policy and

10:33:57  13  procedure, it's all the same no matter what the 510(k)

10:34:00  14  is.  So when I say -- when you asked, for example,

10:34:03  15  would they have evaluated a new indication for safety

10:34:06  16  and effectiveness related to this difference and my

10:34:10  17  answer is there's no question because that's -- that's

10:34:13  18  invariable in regard to policy and procedure.  You

10:34:16  19  must.

10:34:16  20      Q.   Okay.  Well this is good because I can ask

10:34:18  21  you this question, and this is -- we're going to go

10:34:21  22  back to something we talked about before, which is:

10:34:23  23  What did the FDA do in order to determine that the

10:34:26  24  Bair Hugger 500 series deployment into ORs did not

10:34:31  25  pose a new question of safety or effectiveness?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

95

10:34:35   1       A.   Well that's FDA's analysis of the new

10:34:37   2   labeling compared to the old labeling.  In addition,

10:34:40   3   bringing to bear, as I mentioned, all other infor --

10:34:42   4   information at their disposal on the use of these

10:34:45   5   types of products.

10:34:46   6       Q.   You don't know what that information was.

10:34:50   7       A.   Well I didn't amass it, I didn't collect it

10:34:54   8   and -- and evaluate it for purposes of any particular

10:34:59   9   510(k).

10:34:59   10      Q.   Nor were you provided the decision-making

10:35:02   11  documentation from the FDA that was produced by --

10:35:06   12  that was created by the FDA.  That has not been

10:35:08   13  provided to you in this litigation.

10:35:11   14      A.   No.  But I might add that this type of

10:35:14   15  evolution of indication for use is -- is not

10:35:18   16  extraordinary.  I'll call it almost commonplace that

10:35:22   17  devices of this type and others will find their usage

10:35:30   18  expansion -- expanded into different hospital

10:35:36   19  settings, home-use settings, various settings.  So

10:35:39   20  it's not --

10:35:40   21           It wasn't remarkable with me at all that the

10:35:43   22  Bair Hugger evolved, in regard to its intended use and

10:35:47   23  indications for use, into the OR setting.

10:35:50   24           MR. BANKSTON:  Okay.  Object as

10:35:51   25  non-responsive.

96

10:35:52  1      Q.   All I really wanted to know was in your

10:35:55  2   materials review, were you provided the decision-

10:35:58  3   making documents for the 500 series Bair Hugger?

10:36:00  4      A.   No.

10:36:01  5      Q.   Okay.

10:36:12  6           THE WITNESS:  Maybe we can take a break in

10:36:15  7   just a minute.

10:36:15  8           MR. BANKSTON:  Absolutely.  Sure, we can do

10:36:16  9   that.

10:36:16  10          MS. EATON:  Thank you.

10:36:18  11          THE REPORTER:  Off the record, please.

10:51:10  12          (Recess taken.)

10:51:10  13  BY MR. BANKSTON:

10:51:16  14     Q.   All right, Mr. Ulatowski, first of all, you

10:51:20  15  understand not --

10:51:22  16          We didn't really get to this at the

10:51:22  17  beginning.  I just want to make sure you are clear.

10:51:26  18  You understand that I represent about 2,000 plaintiffs

10:51:28  19  who have brought suit against 3M.

10:51:31  20     A.   Right, I -- I -- I -- I know.  I think it's

10:51:33  21  up to 2,000 right now, yeah.

10:51:35  22     Q.   Okay.  Today I'm here --

10:51:37  23          First of all, you'll agree with me this

10:51:39  24  lawsuit, it's an important matter, it's an important

10:51:41  25  thing to get right.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

97

10:51:42   1       A.   Certainly.

10:51:43   2       Q.   It's something to treat with seriousness,

10:51:47   3   solemnity, all that sort of stuff.

10:51:49   4       A.   Of course.

10:51:49   5       Q.   Sure.  And in doing your report, you were,

10:51:54   6   say, conscientious about reviewing information

10:51:57   7   effectively, assembling materials, coming to re --

10:52:02   8   opinions based on the materials that you reviewed.

10:52:04   9       A.   Yes.

10:52:05   10      Q.   Okay.  And your report lists, we've talked

10:52:08   11  about -- and we'll talk about Exhibit 2 -- lists some

10:52:13   12  materials that you've relied on.

10:52:16   13      A.   Correct.

10:52:16   14      Q.   And that would be, you would agree with me,

10:52:17   15  the sum total of things that you have reviewed,

10:52:20   16  documentary material that form the basis of your

10:52:22   17  opinions in this lawsuit.

10:52:23   18      A.   Yes.

10:52:24   19      Q.   Okay.  You took care in reviewing those

10:52:28   20  documents.

10:52:28   21      A.   I tried to, yes.

10:52:29   22      Q.   From what I can tell, you reviewed 12 expert

10:52:33   23  reports.

10:52:38   24      A.   I'll turn to that so I can --

10:52:40   25      Q.   Sure.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

98

10:52:52  1       A.   Right, concentrating on Dr. David and -- and

10:52:56  2  Bill Jarvis, yes.

10:52:58  3       Q.   Okay.  Twelve of those expert reports you

10:53:02  4  have reviewed.

10:53:03  5       A.   To some degree.

10:53:05  6       Q.   I'm not sure I'm understanding what you're

10:53:09  7  meaning.  I understand that with Dr. David and Dr.

10:53:09  8  Jarvis, you probably reviewed them very closely to

10:53:12  9  give opinions about what they're saying, but with the

10:53:15  10  other ones, those are reports you've read; right?

10:53:17  11       A.   Yes.  And the reason I said that was I -- I

10:53:21  12  focused on Dr. David because he was making regulatory

10:53:25  13  assertions, Dr. Jarvis because he also alluded to some

10:53:31  14  regulatory-related information.  And -- and, you know,

10:53:34  15  I think I know Bill Jarvis, but it's been a long time.

10:53:39  16       Q.   Okay.  In coming to determine who you need

10:53:41  17  to concentrate on, who is saying what, you have to

10:53:44  18  read the report.

10:53:45  19       A.   Yes.  And I --

10:53:46  20            What I do is I will look at the reports, the

10:53:49  21  topic matters, first looking for any particular

10:53:55  22  relevance to what my focus is, and -- and then

10:54:01  23  proceeding.  So things, for example, of airflow and

10:54:04  24  things of that -- well that's not really within my

10:54:06  25  wheelhouse, so I wouldn't spend a lot of time on that.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

99

10:54:09    1        Q.    And when reading those reports, you

10:54:11    2    discovered that they contained information that wasn't

10:54:12    3    in your wheelhouse and therefore you don't concentrate

10:54:15    4    on those reports in giving your opinions.

10:54:17    5        A.    Correct.

10:54:18    6        Q.    You've read them though.

10:54:20    7        A.    Yes.

10:54:20    8        Q.    Okay.  You have also reviewed 44

10:54:24    9    depositions; correct?

10:54:25   10        A.    Yeah.  Yes.  Yes.

10:54:27   11        Q.    Okay.

10:54:28   12        A.    A lot of depositions.

10:54:29   13        Q.    I take it that the -- the sort of chuckle

10:54:31   14    was because it's a huge amount of material.

10:54:33   15        A.    Well depositions are --

10:54:34   16              You got to slug through them.  And, you

10:54:38   17    know, there have been depositions of the same people

10:54:40   18    over time that, you know, it --

10:54:43   19              But they're all important.

10:54:45   20        Q.    Right.  All 44 of those depositions, all the

10:54:47   21    testimony given that you've reviewed, you cited it,

10:54:50   22    that there were things you wanted to review because

10:54:53   23    their testimony is important.

10:54:54   24        A.    Certainly.

10:54:55   25        Q.    Certainly.

100

10:54:55  1          Those depositions, some of them are 300 or

10:54:59  2    plus pages; correct?

10:55:00  3          A.    Or more, yes.

10:55:01  4          Q.    Correct.  So there's been a lot of testimony

10:55:04  5    given in this case about the issues you discuss in

10:55:06  6    your report.

10:55:07  7          A.    Yes, there has been.

10:55:08  8          Q.    Okay.  You also have reviewed over 200

10:55:12  9    different medical articles.

10:55:15  10          A.    Yes.  I received early on in Walton, I

10:55:18  11    think, or -- or Johnson, copies of relevant literature

10:55:24  12    pro and con.  I may not necessarily review each and

10:55:29  13    every article word for word, but I certainly look at

10:55:32  14    the abstract, look at conclusions, then delve into

10:55:36  15    particular ones as my interest takes me.

10:55:38  16          Q.    Okay.  So some of those medical articles you

10:55:41  17    may have just read, while some of them you may have

10:55:44  18    done a pretty thorough review on if they were

10:55:47  19    something that was close to your report.

10:55:49  20          A.    No, close to the area of my interest.  So if

10:55:53  21    it was particular -- pro and con.  So if it was

10:55:56  22    relevant to a particular topic cited in a 510(k),

10:56:07  23    cited to FDA in one way or another, yes, those I would

10:56:11  24    pay attention to.  Also, what experts referred to in

10:56:15  25    their report.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

101

10:56:16  1      Q.   Uh-huh.  Well let me make sure I understand.

10:56:19  2    When you say "what the experts referred to in their

10:56:21  3    report," is that additional materials you've reviewed

10:56:24  4    on top of what's listed in Exhibit B?

10:56:26  5      A.   No, that -- that's all incorporated here.

10:56:28  6      Q.   Okay.  Now those medical articles, those are

10:56:32  7    technical publications; correct?

10:56:33  8      A.   Yes.

10:56:34  9      Q.   The -- the average layman off the street is

10:56:37  10   going to have some difficulty with those publications.

10:56:41  11     A.   Perhaps.

10:56:42  12     Q.   I mean that's part of the reason why we have

10:56:44  13   expert witnesses, right, is to have people who can

10:56:46  14   read those kind of publications.

10:56:48  15     A.   Who have particular expertise in the subject

10:56:51  16   matter.

10:56:52  17     Q.   Okay.  And when reading those articles and

10:56:55  18   reviewing them and using them to support your opinions

10:56:57  19   in this case, you attempted to be conscientious about

10:56:59  20   reviewing them correctly and understanding their

10:57:01  21   conclusions.

10:57:02  22     A.   Right.  Because in my experience at FDA

10:57:04  23   and -- and now as consultant, I -- it was my history

10:57:09  24   and process and policy to evaluate the information

10:57:13  25   provided, whether pro or con, to get a sense of -- of

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

102

10:57:18   1   what it was saying, and -- and then to proceed

10:57:21   2   accordingly.

10:57:21   3        Q.    Okay.  Another thing you reviewed was

10:57:26   4   hundreds of litigation-produced documents.

10:57:31   5        A.    Yes.  A lot of documents.

10:57:32   6        Q.    Okay.  Thousands of pages.

10:57:35   7        A.    Right.  Not necessarily every page in

10:57:38   8   detail.  For example, some documents may contain

10:57:43   9   information that's not particularly relevant to -- to

10:57:46  10   my focus area, regulatory focus, so you can -- you can

10:57:51  11   typically identify that early on and -- and then move

10:57:55  12   on.

10:57:55  13        Q.    Okay.  Are there --

10:57:56  14              Now these materials that are cited in your

10:57:58  15   report, would you characterize these as materials that

10:58:04  16   you are relying on for your report and there are other

10:58:08  17   materials not listed here that you've reviewed but did

10:58:11  18   not rely on, or does this list constitute everything

10:58:15  19   you've reviewed in the case?

10:58:17  20        A.    Well, as far as documents are concerned,

10:58:25  21   this list should contain everything upon which -- and

10:58:28  22   does contain everything upon which my report is based.

10:58:32  23   I don't know if you're implying that do I -- do I rely

10:58:36  24   upon other things.  You know, certainly I have my own

10:58:41  25   expertise and experiences over my lifetime at FDA

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

103

| | | |
|---|---|---|
| 10:58:45 | 1 | and -- and -- and now as a consultant. |
| 10:58:46 | 2 | Q.   Now my question was more directed towards |
| 10:58:49 | 3 | were there materials that you found and read or were |
| 10:58:52 | 4 | provided to you and you read that, once you looked at |
| 10:58:55 | 5 | them and read them, said, okay, no, this is absolutely |
| 10:58:58 | 6 | no way even relevant to this case, this is not |
| 10:59:00 | 7 | something I'm relying on, it's not on that list.  So |
| 10:59:04 | 8 | you may have read it but it has no relevance to the |
| 10:59:06 | 9 | case. |
| 10:59:06 | 10 | A.   No.  I expect ev -- everything I've been |
| 10:59:10 | 11 | given ends up on this list. |
| 10:59:12 | 12 | Q.   Okay.  Now one of the other things that you |
| 10:59:13 | 13 | have done in this case is there was a subpoena served |
| 10:59:16 | 14 | on you; correct? |
| 10:59:17 | 15 | A.   Yes. |
| 10:59:18 | 16 | Q.   Okay.  And it requested certain items. |
| 10:59:19 | 17 | A.   Yes. |
| 10:59:20 | 18 | Q.   And you were conscientious -- conscientious |
| 10:59:23 | 19 | and treated that with seriousness in responding to it. |
| 10:59:26 | 20 | A.   Yes. |
| 10:59:26 | 21 | Q.   One of the things that it asked you for was |
| 10:59:29 | 22 | invoices relating to the work that you have performed |
| 10:59:32 | 23 | on the Bair Hugger. |
| 10:59:33 | 24 | A.   Yes. |
| 10:59:34 | 25 | Q.   Okay.  And you produced at least some |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

104

10:59:36  1    invoices of work you've performed.

10:59:38  2       A.   Yes.

10:59:39  3       Q.   Okay.  And we talked this morning that you

10:59:42  4    didn't have a direct memory of what those invoices

10:59:47  5    said and how many there were, but the invoices were

10:59:47  6    there and we can refer to them to determine how much

10:59:50  7    work you've done on this case.

10:59:52  8       A.   Yes.  I don't prepare the invoices.  I don't

10:59:54  9    submit the time to the clients.  That's done by NSF

10:59:59  10   Health Sciences in this case.

11:00:00  11      Q.   Okay.  I have taken a look at the response

11:00:07  12   to the subpoena and looked at the hours that have been

11:00:12  13   submitted and I wanted to talk to you a little bit

11:00:14  14   about that.

11:00:15  15      A.   Sure.

11:00:15  16      Q.   From the subpoenas that we have, there is

11:00:18  17   work being billed from you in January, February, March

11:00:21  18   and April; correct?

11:00:24  19      A.   Okay.

11:00:24  20      Q.   Okay?  In January there was eight -- eight

11:00:29  21   and a quarter, 8.25 hours, and that is labeled as

11:00:32  22   "Document review."  When you say "Document review,"

11:00:36  23   what does that entail?

11:00:37  24      A.   It can mean a lot of different things:

11:00:39  25   individual documents, depositions.  Typically, I -- I

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

105

11:00:43  1    may say "depositions" and not "document review," so it

11:00:46  2    could be a number of things.

11:00:47  3         Q.   Okay.  So we have eight and a quarter hours

11:00:49  4    in January.  In February there's an hour and a half of

11:00:52  5    billing, and then in March there's two and a quarter

11:01:00  6    hours of billing, and in April there's 31 and three-

11:01:04  7    quarters hours of billing, and that is labeled "MDL

11:01:09  8    report."  And so I take it that there is various

11:01:13  9    things that you had to do in order to end up with the

11:01:18  10   report that we have.  The hundred-page or so report

11:01:21  11   that you did took work and effort into making it.

11:01:23  12        A.   Yes.

11:01:24  13        Q.   Okay.  Can you give me an estimate sitting

11:01:26  14   here in terms of the drafting process, of drafting the

11:01:29  15   report -- not the review of documents, not any of that

11:01:32  16   sort of stuff -- in terms of just how long does it

11:01:35  17   take Mr. Ulatowski to write a one-hundred-page report?

11:01:39  18   How long does that take?

11:01:40  19        A.   That would be incorporated in the 31 hours.

11:01:43  20        Q.   Okay.  And I understand that.  So what I'm

11:01:45  21   trying to say is in that 31 hours, when you're talking

11:01:49  22   about your MDL report, there are things involved in

11:01:51  23   that billing that are not simply typing the report.

11:01:53  24        A.   Well there may be, yes.  There often are.

11:01:56  25        Q.   Okay.  So in other words, it did not take

106

11:01:58    1    you 31.75 hours to type the report.

11:02:05    2         A.    Could.  Could have but -- but may not have.

11:02:08    3         Q.    Okay.

11:02:09    4              MR. BANKSTON:  I'm sorry, do you need to --

11:02:10    5              MS. EATON:  Yeah.  Just if I may, what I

11:02:13    6    understood we were to produce is invoices of his work

11:02:16    7    specific to the MDL, and so the invoices I produced

11:02:20    8    did not include prior time that he had reviewed

            9    materials.

           10              MR. BANKSTON:  Okay.  Well if we need to --

11:02:23   11              MS. EATON:  Just to clarify.

11:02:25   12              MR. BANKSTON:  If we need to get what your

11:02:27   13    opinion on that is, well we have it on the record now.

11:02:29   14              MS. EATON:  It isn't an opinion, it's a fact

11:02:33   15    I'm letting you know --

           16              MR. BANKSTON:  Well I -- I --

11:02:33   17              MS. EATON:  -- for your purpose.

11:02:33   18              MR. BANKSTON:  I don't have it in front of

11:02:35   19    me.  You don't have it in front of you either.

           20              You're not testifying today.  I'm asking him

11:02:38   21    questions.  I appreciate your input into the

11:02:39   22    deposition.

11:02:39   23         Q.    But as far as what you have produced to us

11:02:41   24    in terms of writing this MDL report, you have produced

11:02:43   25    to us 44 hours of billing.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

107

11:02:45  1        A.    Right.  And that was my understanding, it

11:02:48  2    was the MDL.  It wasn't the prior work done for

11:02:50  3    Greenberg Traurig or -- or -- or this law firm on the

11:02:57  4    same topic --

11:02:57  5        Q.    Correct.

11:02:58  6        A.    -- area.

11:02:58  7        Q.    Okay.  So let's just talk about your work in

11:03:02  8    this phase of the proceedings; in other words, since

11:03:06  9    you have been brought to bear on the MDL side of it.

11:03:09  10   Okay?  You understand that of the expert reports that

11:03:12  11   you reviewed in this case, nearly all of them were

11:03:15  12   produced in the MDL.

11:03:17  13       A.    Uh-huh.

11:03:18  14       Q.    Okay.

11:03:19  15       A.    Yes.

11:03:19  16            THE REPORTER:  Your answer?

11:03:20  17            THE WITNESS:  Yes.

11:03:21  18       Q.    Of the depositions that you reviewed, the

11:03:23  19   great majority of them were done in the MDL.

11:03:25  20            MS. EATON:  Object to the form of the

11:03:26  21   question.

11:03:27  22       A.    The new ones.

11:03:29  23       Q.    Uh-huh.

11:03:30  24       A.    There are older ones from the same people on

11:03:32  25   the same topic area, yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

108

| 11:03:34 | 1 | Q.    There are some, correct.  Right.  What I'm |
| 11:03:36 | 2 | asking you is:  The majority of the depositions you've |
| 11:03:37 | 3 | reviewed have been in the MDL.  Would you agree with |
| 11:03:41 | 4 | that? |
| 11:03:41 | 5 | A.    Correct. |
| 11:03:42 | 6 | Well in the MDL, yes.  There were |
| 11:03:44 | 7 | depositions specific to the time period for the MDL. |
| 11:03:47 | 8 | Q.    What I'm asking is:  There is a total pool |
| 11:03:50 | 9 | of depositions you reviewed, some of them occurred in |
| 11:03:53 | 10 | two prior cases a couple years ago and some of them |
| 11:03:55 | 11 | occurred in this MDL. |
| 11:03:57 | 12 | A.    Yes. |
| 11:03:57 | 13 | Q.    The vast majority of them occurred in the |
| 11:03:59 | 14 | MDL.  Do you agree with that? |
| 11:04:01 | 15 | MS. EATON:  Object to the form of the |
| 11:04:02 | 16 | question. |
| 11:04:02 | 17 | A.    You know, I couldn't say that's the fact, |
| 11:04:04 | 18 | but I know there were numerous depositions, prior |
| 11:04:06 | 19 | depositions, same people, same topic areas, and then |
| 11:04:10 | 20 | the newer depositions that I had to look through to |
| 11:04:15 | 21 | update my -- my report in the MDL. |
| 11:04:18 | 22 | Q.    Okay.  So we have also medical journal |
| 11:04:24 | 23 | articles, and any medical journal article that is not |
| 11:04:27 | 24 | listed in your Walton or Johnson report is something |
| 11:04:29 | 25 | that would have been new and reviewed in the MDL. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

109

| | |
|---|---|
| 11:04:35 | 1 |

11:04:35    1              MS. EATON:   Object to the form of the

11:04:36    2    question.

11:04:37    3         A.   If -- if provided and not previously

11:04:40    4    provided.

11:04:41    5         Q.   Well if it wasn't listed as something you

11:04:42    6    reviewed in Walton/Johnson, you didn't review it in

11:04:45    7    Walton and Johnson; correct?

11:04:47    8         A.   Probably not.

11:04:48    9         Q.   Okay.  You think there's a reasonable

11:04:51   10    possibility there are materials that you reviewed in

11:04:54   11    pre -- in preparing your opinions in Walton/Johnson

11:04:56   12    that you did not disclose?

11:04:58   13         A.   No.  I'm saying I was provided material in

11:05:00   14    Walton/Johnson.  If there was new material provided in

11:05:03   15    the MDL, you know, that was the new material to

11:05:05   16    evaluate under the MDL.

11:05:07   17         Q.   Correct.  So if the material was not listed

11:05:10   18    in your Walton or Johnson report, then it must be part

11:05:15   19    of this 44 hours.

11:05:15   20         A.   Perhaps.

11:05:16   21         Q.   I -- I don't --

11:05:17   22              I'm trying to understand why when you say

11:05:19   23    "perhaps."  Are you saying that there are articles

11:05:20   24    that you did not review -- or that you did review to

11:05:24   25    form your Walton/Johnson opinions that you did not

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

110

11:05:27  1  disclose in your report in Walton/Johnson?

11:05:29  2      A.   Well I never -- never produced a report.

11:05:32  3  You know, I don't know the status of those, but --

11:05:34  4      Q.   Are -- I'm sorry.  Are you saying you did

11:05:36  5  not make a report in Walton?

11:05:37  6      A.   I did.  I did.  I just don't know the status

11:05:39  7  of it as far as if it was ever formally produced.  You

11:05:43  8  know, I'm looking at my attorney, but --

11:05:45  9      Q.   Okay.  I'll represent to you I got a copy of

11:05:48  10  it --

11:05:48  11      A.   Okay.

11:05:48  12      Q.   -- so it exists, it's out there.

11:05:49  13      A.   Okay.

11:05:50  14      Q.   What I'm asking is:  When you gave that

11:05:52  15  report and included your references in it, there's --

11:05:54  16  there's not materials out there that you reviewed that

11:05:56  17  you failed to disclose in that report.

11:05:58  18      A.   No.  Everything was in there, in that

11:06:01  19  disclosure.

11:06:01  20      Q.   Okay.  So --

11:06:02  21      A.   Now I can't say, and it's probably not the

11:06:04  22  case, that in the interim between the Walton report

11:06:08  23  and the MDL I wasn't provided something else until

11:06:13  24  January of this year.  You know, I just -- I don't

11:06:16  25  think so, but --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

111

11:06:17   1      Q.   Okay.  Another thing that you reviewed was

11:06:22   2   hundreds of internal documents; correct?

11:06:25   3      A.   A lot of those were duplicates of

11:06:28   4   previously-reviewed material.

11:06:30   5           MR. BANKSTON:  Okay.  Objection,

11:06:31   6   non-responsive.

11:06:31   7      Q.   Sir, in this case you've re -- you've

11:06:32   8   reviewed hundreds of internal documents.

11:06:37   9      A.   Duplicate documents, yes.

11:06:42  10      Q.   The documents on that list that say 3MBH

11:06:48  11   that are related to this MDL, it's your contention

11:06:51  12   that none of those are new documents?

11:06:52  13      A.   Well I think some of them are, but a lot of

11:06:54  14   them are -- are duplicates of what was produced in

11:06:57  15   Walton and Johnson.

11:06:58  16      Q.   Okay.  Well we could easily --

11:06:59  17           That's something you could easily find out

11:07:01  18   if you needed to.

11:07:02  19      A.   Well I'd look to them to do that kind of

11:07:05  20   search.

11:07:05  21      Q.   Sure.  Sure.

11:07:06  22      A.   Yeah.

11:07:06  23      Q.   In other words, your report lists out your

11:07:08  24   materials in such a way that it could be determined

11:07:11  25   what has been reviewed since the MDL -- your work

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

112

11:07:14  1   started in the MDL.

11:07:15  2        A.   Right.  As I -- as I produced -- began to

11:07:18  3   produce my MDL report I had, because I didn't want to

11:07:26  4   reproduce -- go from the -- from the first step again,

11:07:34  5   I looked at my Walton report and Johnson to see what I

11:07:39  6   had done, what reference documents I had, and those

11:07:42  7   were -- those are different Bates formats.  So when I

11:07:47  8   produced the MDL, even though relying on the same

11:07:50  9   documents, we had to translate them into MBH Bates

11:07:54  10  numbers.

11:07:54  11       Q.   Okay.  So the list that was created in your

11:07:59  12  report, are you saying that those are simply the

11:08:02  13  documents that are in your Walton report with new

11:08:04  14  Bates numbers?

11:08:05  15       A.   Many of them are.

11:08:06  16       Q.   Okay.

11:08:07  17       A.   Yes.  Not all of them.

11:08:08  18       Q.   Okay.  That's what I want to make sure I

11:08:12  19  understand.  There is a pool of documents that you

11:08:12  20  have not seen in Walton and Johnson that you did

11:08:15  21  review for those -- this case.

11:08:17  22       A.   Yes.  For example, when I reviewed Dr.

11:08:21  23  David's report, he had reference to a number of

11:08:24  24  documents.  I requested all his reference documents.

11:08:29  25  Some I -- I don't think I had seen before, --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

113

11:08:31    1        Q.    Okay.

11:08:32    2        A.    -- some I had seen before.

11:08:33    3        Q.    Okay.  Then with respect to the expert

11:08:38    4    reports you reviewed, you'll agree with me that the

11:08:40    5    overwhelming majority of those expert reports did not

11:08:44    6    exist at the time of Walton and Johnson.

11:08:46    7        A.    Right, inasmuch as they were produced for

11:08:48    8    the MDL.

11:08:49    9        Q.    Okay.  So we have the majority of the expert

11:08:54   10    reports, a large sum of the depositions, any medical

11:09:00   11    articles that are not contained in your original

11:09:02   12    Walton report, and any new internal documents.  All of

11:09:06   13    that was reviewed in this MDL.

11:09:09   14        A.    Right, in one -- one form or another, yes.

11:09:12   15        Q.    Okay.  So it's your sworn testimony that you

11:09:17   16    were able to review all of those materials, those

11:09:20   17    approximately 10 expert reports, those potentially 20

11:09:27   18    or so depositions -- let's just go ahead and make it

11:09:30   19    fair; there's 44 depositions on your report, let's

11:09:32   20    just go ahead and call it 20, you can say the majority

11:09:35   21    were from Walton and Johnson even though we know

11:09:38   22    that's not the case -- and there's some medical

11:09:41   23    journal articles and internal documents, and you read

11:09:43   24    conscientiously those documents and you drafted a

11:09:47   25    one-hundred-plus-page report and you did that in 44

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

114

11:09:50    1  hours.

11:09:51    2              MS. EATON:  Object to the form of the

11:09:52    3  question.  It mischaracterizes --

11:09:55    4              We have the dates of the depositions if

11:09:59    5  you'd like to see them.  And I would also like to

11:09:59    6  clarify for the record that there was time spent in

11:10:04    7  May 2017, I don't believe we have an invoice yet, or

11:10:06    8  at least we didn't at the time we prepared the

11:10:08    9  subpoena.

11:10:08   10              MR. BANKSTON:  Okay.  That's testimony and

11:10:13   11  he can tell me that.

11:10:14   12      Q.   Do you remember the question, sir?

11:10:16   13      A.   Yes.  I reviewed the documents to the degree

11:10:19   14  I found necessary, and I described instances where I

11:10:24   15  did not find it necessary to review the entire expert

11:10:27   16  report because it wasn't germane to the focus of my

11:10:30   17  report.  In regard to deposition testimony, as I -- as

11:10:35   18  I coursed through depositions, I -- I can identify

11:10:39   19  areas that, through word searches and other, that are

11:10:42   20  relevant to what I'm looking for.  And exhibits.

11:10:46   21  So --

11:10:47   22              And it astounds me in many regards that --

11:10:52   23  that some experts take enormous amounts of time to go

11:10:54   24  through information.  It's just -- I don't know how

11:10:57   25  they do it.  I'm -- I'm a very quick worker, so I'm --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

115

11:11:02  1   I'm selective in regard to what I look at in regard to

11:11:07  2   the material I'm provided.  I focus in on what I'm

11:11:11  3   interested in, what's germane to what I'm -- the focus

11:11:15  4   of my expertise, my report, what I was asked to do.

11:11:18  5   And understanding that, yes, all the information

11:11:20  6   provided to me may have value, so I take a look at it

11:11:24  7   to get the gist of what's going on to the degree

11:11:27  8   necessary, and then I move on.

11:11:29  9        Q.   Okay.  You --

11:11:32  10            We had talked about this is an important

11:11:34  11   matter, you take it seriously.

11:11:35  12       A.   Yes.

11:11:36  13       Q.   Yeah.  But in terms of these materials, you

11:11:41  14   didn't conscientiously review their totality; did you?

11:11:43  15   I mean if we're talking about word searches and speed

11:11:46  16   reading, we're not talking about a conscientious

11:11:48  17   review of these materials; are we?

11:11:50  18            MS. EATON:  Object to the form of the

11:11:51  19   question.

11:11:51  20       A.   It certainly is a matter of how you may

11:11:53  21   characterize it.

11:11:55  22       Q.   I'm just wondering if you want our clients

11:11:58  23   to believe that it's physically possible to have read

11:12:02  24   the amount of material you claim to rely on in this

11:12:04  25   case in 44 hours, plus draft a one-hundred-page

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

116

11:12:08  1   report.

11:12:08  2           MS. EATON:   Object to the form of the

11:12:09  3   question.

11:12:09  4       A.   It is what it is.

11:12:14  5       Q.   Let's jump a bit into our conversation about

11:12:24  6   how devices are used.  The FDA does not, when making

11:12:33  7   the decisions about the Bair Hugger 200, 500, 700

11:12:36  8   series, making decisions about both the clearance of

11:12:39  9   the product and its continuing monitoring of the

11:12:41  10  product, it does not have a lot of information about

11:12:44  11  exactly how the product is used.  Would you agree with

11:12:48  12  me there?

11:12:52  13      A.    Not necessarily.  There is information

11:12:55  14  FDA -- and I've alluded to this already or stated

11:13:00  15  directly, that FDA has at its disposal and it utilizes

11:13:04  16  not only submissions made to it, it has postmarketing

11:13:07  17  information that it monitors, including clinical

11:13:10  18  literature or other literature, other submissions made

11:13:14  19  by competitors who -- of like devices, MDR reports for

11:13:21  20  example, and other information that's brought to bear.

11:13:23  21  So FDA does -- to the extent it can, monitors the

11:13:28  22  products while in the marketplace.

11:13:30  23      Q.    What information did you review in this

11:13:32  24  case, if any, that would give the FDA any indication

11:13:35  25  that any Bair Hugger was going to be deployed in an

117

11:13:39   1   orthopedic surgery and implant situation?

11:13:44   2       A.   Well from the submissions, as I've stated,

11:13:48   3   there's reference to OR use.  As far as particular

11:13:53   4   orthopedic use, well that's -- that's, you know, a

11:13:57   5   subset of OR use.  So I don't think orthopedic use was

11:14:02   6   discussed in the 505.  But again, FDA has information

11:14:09   7   to bring to bear about the current usage of products,

11:14:12   8   being knowledgeable about the usage even in the

11:14:15   9   absence of submission data and information.

11:14:19   10      Q.   Okay.  I -- I realize when asking this

11:14:28   11  question we had talked earlier, I know you're not an

11:14:28   12  expert in orthopedic surgery and I'm not asking you to

11:14:31   13  be one for this question, but I -- I -- I think you'd

11:14:33   14  agree with me that from reviewing the reports you've

11:14:36   15  reviewed in this case and from reviewing the

11:14:38   16  deposition testimony in this case, you will agree with

11:14:42   17  me orthopedic surgeries have some very unique

11:14:44   18  characteristics.

11:14:48   19      A.   Many unique characteristics and many

11:14:51   20  similarities.

11:14:52   21      Q.   Sure.  And you are aware of the unusual

11:14:58   22  sensitivity of orthopedic surgeries to post-surgical

11:15:02   23  infections.

11:15:04   24      A.   Post-surgical infections occur in orthopedic

11:15:07   25  surgery, yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

118

11:15:07   1        Q.    They occur in a lot of surgeries; don't

11:15:10   2    they?

11:15:10   3        A.    Absolutely.

11:15:10   4        Q.    Okay.  What I'm asking you is:  You

11:15:12   5    understood from reading your depositions, your reports

11:15:14   6    and everything else you reviewed in this case, you

11:15:16   7    understood that orthopedic surgeries were unusually

11:15:19   8    sensitive to post-surgical infections.

11:15:22   9        A.    Well I --

11:15:22  10        MS. EATON:  Object to the form of the

11:15:23  11    question.

11:15:24  12        A.    Yes.  But I know -- I know that from other

11:15:28  13    experience.

11:15:28  14        Q.    Sure.  And maybe you knew that even before

11:15:29  15    you came onto this case; correct?

11:15:30  16        A.    Absolutely.

11:15:31  17        Q.    Okay.

11:15:31  18        A.    I mean I have been engaged -- you know,

11:15:34  19    that's -- it's one example, but in hip implant surgery

11:15:37  20    cases, knee surgery cases, and while at FDA being

11:15:42  21    involved in many, many companies creating medical

11:15:46  22    devices used in orthopedic surgery and the problems

11:15:49  23    encountered.  So it wasn't new information for us.

11:15:51  24        Q.    Sure.  And so you understood, for example,

11:15:53  25    that the surgeons in an orthopedic implant surgery do

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

119

11:15:55   1   not dress like surgeons in other surgeries.

11:15:59   2       A.   That's evolved over time and -- and

11:16:00   3   currently, yes.  It's -- it's changing even as we

11:16:03   4   speak.

11:16:03   5       Q.   And you understood that orthopedic surgeries

11:16:05   6   as opposed to general surgeries present unique

11:16:08   7   clinical questions of safety.

11:16:10   8           MS. EATON:  Object to the form of the

11:16:11   9   question.

11:16:12   10      A.   I don't know if it's unique questions of

11:16:14   11  safety.  I think it's -- there's -- there's -- there's

11:16:17   12  different aspects, but it's -- it's similar questions

11:16:20   13  being asked about the infectious process, the

11:16:24   14  organisms, the environment of use.  There's

11:16:28   15  particular --

11:16:29   16          As you stated and as I confirmed, yes,

11:16:31   17  there's unique aspects to orthopedic surgery.  They're

11:16:35   18  surgeries of a type that's particularly invasive, it's

11:16:38   19  prolonged, aspects like that.

11:16:41   20      Q.   Okay.  For instance, what's safe in a

11:16:49   21  vascular surgery might not be safe in an orthopedic

11:16:53   22  surgery.

11:16:53   23          MS. EATON:  Object to the form of the

11:16:54   24  question.

11:16:57   25      A.   I guess we'd have to talk about some spec --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

120

11:17:01  1  specifics here, because there's a lot of similarities

11:17:03  2  in the types of medical devices used in all surgeries.

11:17:08  3  Yes, there's particular instruments used in orthopedic

11:17:10  4  surgeries, there's, you know, all the saws and

11:17:12  5  paraphernalia, but -- but there's other similar types

11:17:15  6  of devices used as well.

11:17:17  7      Q.   Okay.  I understand that both surgeries have

11:17:20  8  tools they use in each of the surgeries, and I

11:17:22  9  understand that some of those overlap and some of them

11:17:25  10  don't.

11:17:25  11      A.   That's correct.

11:17:27  12      Q.   Right.  But what I'm really asking is a

11:17:28  13  product, a device that may be safe for a vascular

11:17:32  14  surgery, there is the potential that it may not be

11:17:34  15  safe for an orthopedic surgery.

11:17:37  16          MS. EATON:  Object to the form of the

11:17:38  17  question.

11:17:38  18      A.   I guess it depends on the particular

11:17:40  19  vascular surgery or -- or cardiac surgery, because --

11:17:45  20  or neurosurgery, because they can be very, very

11:17:49  21  intensive and have a potential for infection as well.

11:17:51  22  So --

11:17:51  23      Q.   Sure.  So in fact there may be things that

11:17:53  24  are safe in an orthopedic surgery that are not safe in

11:17:56  25  a vascular surgery.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

121

11:17:58    1          MS. EATON:   Object to the form of the

11:18:00    2     question.

11:18:00    3          A.   Potentially.

11:18:01    4          Q.   Okay.  Would you also agree with me that the

11:18:04    5     insufficiency of information about how devices are

11:18:08    6     actually used once they're on the market, that that

11:18:11    7     insufficiency of information adversely affects the

11:18:16    8     ability of the FDA to evaluate devices for safety?

11:18:25    9          A.   Well the -- the setup is the insufficiency

11:18:28   10     of information, and I -- I don't agree that there's an

11:18:32   11     insufficiency of information within FDA on the -- on

11:18:38   12     the usage of -- of the types of product it -- it

11:18:42   13     evaluates and monitors.  I think -- I think, unknown

11:18:46   14     to lawyers or -- or the public in general, FDA has

11:18:51   15     considerable knowledge about the use of products.  FDA

11:18:55   16     employs clinicians, FDA employs people who are fresh

11:19:01   17     from -- from hospital employment, trained

11:19:07   18     orthopedists, so I -- I think it would be an

11:19:09   19     overstatement about FDA's lack of knowledge about use

11:19:13   20     of products.

11:19:13   21          Q.   So in other words, I think what you would

11:19:16   22     say is that insufficiency of information about how

11:19:17   23     devices have -- are being used once they're on the

11:19:20   24     market, that has not been a major problem for the FDA.

11:19:23   25          A.   We'd have to talk specifics, I think, in

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

122

11:19:26  1  regard to particular products, but I think as a

11:19:29  2  general rule that's --

11:19:30  3          I think it's a dangerous statement to make.

11:19:31  4      Q.    Okay.  I want you to take Exhibit 1, and if

11:19:36  5  you could flip to page 80 for me.

11:19:55  6          All right, sir.  I have directed you to page

11:19:58  7  80 of the IOM report --

11:20:00  8      A.    Uh-huh?

11:20:01  9      Q.    -- which was a report directed to be created

11:20:02  10  by the commissioner of the FDA to examine the 510(k)

11:20:07  11  process; correct?

11:20:08  12      A.    Right.

11:20:08  13      Q.    Okay.  Do you see finding 4.6?

11:20:16  14      A.    Yes, I see what's stated.

11:20:18  15      Q.    Okay.  And finding 4.6 states,

11:20:21  16  "Insufficiency of information about how devices are

11:20:24  17  used and perform once they're on the market adversely

11:20:28  18  affects the ability of the FDA to evaluate devices'

11:20:32  19  intended uses, indications for use, and substantial

11:20:36  20  equivalence in a 510(k) review."

11:20:38  21          Is it your testimony today that that kind of

11:20:40  22  statement is what you meant by a dangerous statement?

11:20:42  23      A.    It's a broad-based statement that has to be

11:20:47  24  applied and evaluated to specific instances where it

11:20:51  25  may be false, entirely false.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

123

11:20:52    1        Q.    Okay.  I believe you are of the opinion that

11:20:57    2    the 510(k) submission for the model 500 included valid

11:21:01    3    scientific evidence for the Bair Hugger's use in

11:21:03    4    operating rooms.

11:21:07    5        A.    Did include valid scientific evidence, yes.

11:21:11    6        Q.    Okay.  I mean from your opinion of the Bair

11:21:13    7    Hugger's use in operating rooms.

11:21:14    8        A.    I think it was either in the 500 or 505

11:21:18    9    there was -- there was information.

11:21:19   10        Q.    All right.  Well let's --

11:21:20   11              Do you have your report with you?

11:21:22   12        A.    Yeah.  On a flash drive, not in hard copy.

11:21:25   13        Q.    Okay.  I'll give you a copy.

11:21:37   14              MR. BANKSTON:  Counsel, do you have a copy

11:21:38   15    or do you need one as well?

11:21:41   16              MS. EATON:  I have one.

11:21:41   17              MR. BANKSTON:  Okay.  There we go.

11:21:44   18              (Document handed to Ms. Eaton.)

11:21:45   19              MS. EATON:  Thank you.

11:21:48   20        Q.    Can you flip to page 90 for me, sir.

11:21:51   21        A.    Okay.

11:21:51   22        Q.    The opinion that I'm specifically directing

11:22:02   23    you to here, and you can review this page, but the

11:22:05   24    opinion I'm directing you to is the part that begins

11:22:07   25    with "The 510(k) submission for the Model 500..."  Do

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

124

| | | |
|---|---|---|
| 11:22:11 | 1 | you see that statement? |
| 11:22:11 | 2 | A. Yes. |
| 11:22:12 | 3 | Q. Okay. And that statement reads that "The |
| 11:22:14 | 4 | model 510(k) submission for the Model 500" -- |
| 11:22:18 | 5 | Excuse me. Let me rephrase that for the |
| 11:22:20 | 6 | record. This states that "The 510(k) submission for |
| 11:22:22 | 7 | the Model 500 included valid scientific evidence of |
| 11:22:26 | 8 | the Bair Hugger's use in operating rooms." That's |
| 11:22:29 | 9 | what your statement is. |
| 11:22:30 | 10 | A. That's what my statement is. |
| 11:22:32 | 11 | Q. Okay. Then there's a footnote; correct? |
| 11:22:34 | 12 | A. Yes. |
| 11:22:34 | 13 | Q. And a cite to a document? |
| 11:22:36 | 14 | A. Yes. |
| 11:22:36 | 15 | Q. Okay. That document citation reads |
| 11:22:50 | 16 | 3MBH00047446. |
| 11:22:51 | 17 | A. Correct. |
| 11:22:52 | 18 | Q. Okay. |
| 11:23:01 | 19 | (Ulatowski Exhibit 3 was marked for |
| 11:23:08 | 20 | identification.) |
| 11:23:08 | 21 | MS. EATON: I'm sorry. We did not mark the |
| 11:23:10 | 22 | report as an exhibit? |
| 11:23:11 | 23 | MR. BANKSTON: Huh-uh. |
| 11:23:16 | 24 | MS. EATON: Okay. |
| 11:23:16 | 25 | BY MR. BANKSTON: |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

125

| | | |
|---|---|---|
| 11:23:17 | 1 | Q.   All right, Mr. Ulatowski, this is the |
| 11:23:18 | 2 | document you cited for your opinion that there was |
| 11:23:20 | 3 | valid scientific evidence for the submission of the |
| 11:23:24 | 4 | model 500 for its use in operating rooms; correct? |
| 11:23:27 | 5 | A.   This is the document I refer to. |
| 11:23:29 | 6 | Q.   That is what you were using to support your |
| 11:23:31 | 7 | opinion in that report. |
| 11:23:32 | 8 | A.   This is a document, yes.  This is the |
| 11:23:36 | 9 | document I referred to, not -- |
| 11:23:37 | 10 | Q.   That was specifically -- |
| 11:23:39 | 11 | A.   It's not necessarily the only document that |
| 11:23:41 | 12 | may be relevant. |
| 11:23:42 | 13 | Q.   Okay.  We'll get to that in a second. |
| 11:23:45 | 14 | Let's talk about this document that you |
| 11:23:46 | 15 | cited in your report.  There's a reason you cited this |
| 11:23:50 | 16 | document; right? |
| 11:23:50 | 17 | A.   Sure. |
| 11:23:51 | 18 | Q.   You were trying to convince us -- the -- |
| 11:23:53 | 19 | Your report is -- is making the opinion that |
| 11:23:57 | 20 | there was, when the 500 was submitted and cleared by |
| 11:24:01 | 21 | the FDA, valid scientific evidence of its use in |
| 11:24:03 | 22 | operating rooms, and this document was cited to help |
| 11:24:07 | 23 | establish that. |
| 11:24:09 | 24 | A.   Yes.  And -- and what it refers to, yes. |
| 11:24:11 | 25 | Q.   Okay.  So let's talk a little bit about this |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

126

11:24:13  1  document.  This document is dated July 10, 1990;

11:24:16  2  correct?

11:24:16  3      A.  Yes.

11:24:17  4      Q.  Okay.  Is that before or after the clearance

11:24:20  5  of the Bair Hugger 500?

11:24:20  6      A.  Well this would be before.

11:24:22  7      Q.  Okay.  This states that "Since its

11:24:27  8  introduction to the market approximately 20 months

11:24:30  9  ago, the Bair Hugger Convective Warming Therapy has

11:24:33  10  enjoyed a rapid acceptance by the Acute Care medical

11:24:38  11  community.  In the first 20 months of use, over

11:24:41  12  400,000 hypothermic patients have been treated in Post

11:24:46  13  Anesthesia Care Unit (recovery room), Intensive Care,

11:24:49  14  operating room, emergency room and labor and delivery

11:24:52  15  suite."

11:24:53  16      Did I read that paragraph correctly?

11:24:54  17      A.  Yes.

11:24:54  18      Q.  Okay.  That paragraph does not support the

11:24:57  19  idea that there's valid scientific evidence of its use

11:24:59  20  in the operating room; right?  That's not the part of

11:25:03  21  the letter that's important.

11:25:03  22      A.  Well I was also --

11:25:05  23      This embodies the references.

11:25:08  24      Q.  What embodies the references?  I'm sorry.

11:25:10  25      A.  This -- this letter here.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

127

11:25:11  1      Q.   Okay.   Sure.   And I'm just going through it

11:25:13  2   piece by piece.

11:25:16  3      A.   Yeah.   Yeah.

11:25:16  4      Q.   This particular paragraph, there's nothing

11:25:16  5   from that paragraph that you're using to support the

11:25:19  6   idea that there's valid scientific evidence.

11:25:21  7      A.   Well it alludes to valid scientific

11:25:23  8   evidence.

11:25:24  9      Q.   In what way does this paragraph allude to

11:25:27  10  valid scientific evidence?

11:25:28  11     A.   Well first, understand what constitutes

11:25:31  12  valid scien -- scientific evidence, and it's -- it's

11:25:35  13  quite broad for medical devices and can include not

11:25:38  14  only the traditional controlled clinical studies, it

11:25:41  15  can include reports of significant human experience,

11:25:45  16  so statements like this could be implied to be valid

11:25:48  17  scientif -- scientific evidence.

11:25:51  18     Q.   Scott Augustine writing to the FDA saying

11:25:53  19  I've sold a lot of my product and it's been used in

11:25:56  20  400,000 patients, that's a statement of safety to you,

11:25:58  21  that's valid scientific evidence of safety.

11:26:01  22          MS. EATON:   Object to the form of the

11:26:02  23  question.

11:26:02  24     A.   That's a statement of usage which then FDA

11:26:05  25  can begin to rely upon, using the other information

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

128

11:26:09  1  provided as well as the information they can bring to

11:26:12  2  bear.

11:26:12  3      Q.   Okay.  Let's talk about the next statement

11:26:14  4  which is, "Published clinical and laboratory evidence

11:26:17  5  has proven the Bair Hugger to be a very effective

11:26:20  6  active warming device (see enclosed Articles 1 to

11:26:26  7  15)."  Is this the part of the letter that supports

11:26:28  8  valid scientific evidence?

11:26:30  9      A.   Well those articles would be valid

11:26:32  10  scientific evidence.

11:26:33  11      Q.   That's the --

11:26:34  12           I'm sorry, I didn't mean to interrupt.

11:26:35  13      A.   No.  To the degree that they refer to OR use

11:26:37  14  or -- or other uses, yes, they're valid scientific

11:26:41  15  evidence.

11:26:41  16      Q.   Okay.  Is it your --

11:26:43  17           Have you reviewed those articles?

11:26:44  18      A.   Not in the last few days, no.

11:26:47  19      Q.   Okay.  But you believe you have reviewed

11:26:48  20  articles 1 through 15 as listed in this letter.

11:26:51  21      A.   I believe so, yes.

11:26:51  22      Q.   Okay.  Can you tell me any article that

11:26:54  23  would have been included in this enclosure that in any

11:26:57  24  way is valid scientific evidence of the Bair Hugger's

11:27:00  25  safety in ORs?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

129

| | | |
|---|---|---|
| 11:27:01 | 1 | A.   I'd have to look at those articles.  I think |
| 11:27:03 | 2 | either in this 5 -- I may be -- |
| 11:27:06 | 3 | As I recollect, there was one paper |
| 11:27:12 | 4 | discussing OR use of the Bair Hugger. |
| 11:27:15 | 5 | Q.   Okay.  Do you have any idea what that is? |
| 11:27:18 | 6 | A.   No.  I don't recall specifically. |
| 11:27:19 | 7 | Q.   Is that the Hall poster? |
| 11:27:21 | 8 | A.   I don't think so, but -- |
| 11:27:22 | 9 | Q.   Okay. |
| 11:27:23 | 10 | A.   Yeah. |
| 11:27:23 | 11 | Q.   Is that Zink or Iaizzo? |
| 11:27:26 | 12 | A.   I -- I -- |
| 11:27:27 | 13 | As I said, I don't recall. |
| 11:27:28 | 14 | Q.   Okay.  You have your Exhibit B with you here |
| 11:27:30 | 15 | today that you rely on; right? |
| 11:27:32 | 16 | A.   Yes. |
| | 17 | Q.   List all the studies you've relied on. |
| | 18 | A.   Yes. |
| | 19 | Q.   In looking at that list, can you find it for |
| 11:27:35 | 20 | me? |
| 11:27:35 | 21 | A.   Well we'd have to look at this exhibit, one |
| 11:27:38 | 22 | through 15. |
| 11:27:39 | 23 | Q.   Actually, let's just go out -- outside the |
| 11:27:41 | 24 | exhibit right now.  Let's say even if it wasn't found |
| 11:27:44 | 25 | in this letter, okay, is there any study that you know |

130

11:27:45  1  of that existed in July of 1990 which is -- is valid

11:27:52  2  scientific evidence of the safety of the Bair Hugger

11:27:54  3  in an operating room?

11:27:56  4      A.   Well I'd have to refer to these exhibits for

11:27:58  5  starters.

11:27:58  6      Q.   What exhibits?

11:28:00  7      A.   One through 15.

11:28:01  8      Q.   I actually just said don't --

11:28:03  9           Forget about the letter.

11:28:04  10     A.   Well --

11:28:05  11     Q.   Let's not talk about the letter.  Put it --

11:28:06  12  put it a little over to the side so we don't think

11:28:09  13  about it.

11:28:09  14          I just want to know from your report and the

11:28:12  15  materials you cited in your report -- you have a long

11:28:13  16  list of literature and that's what I'm here to talk to

11:28:16  17  you about today -- I want to know anywhere in that

11:28:20  18  literature is there a study that existed before 1990,

11:28:22  19  at the time the Bair Hugger was approved, that gave

11:28:23  20  valid scientific evidence of its safety in an

11:28:26  21  operating room?

11:28:26  22     A.   I'd have to look at that again.

11:28:28  23     Q.   Okay.  But it is your opinion, you are

11:28:31  24  giving the opinion that the 510(k) process was proper

11:28:37  25  and that clearance was properly granted because there

131

11:28:41  1  was valid scientific evidence as of this date of the

11:28:44  2  Bair Hugger's safety in an operating room.

11:28:45  3      A.   Yes.

11:28:45  4           MS. EATON:   Object to the form of the

11:28:47  5  question.

11:28:48  6      Q.   Okay.  You just can't tell me what that

11:28:49  7  evidence is right now.

11:28:50  8      A.   Well you're putting me at a disadvantage.

11:28:53  9      Q.   I --

11:28:53  10          In what way, sir?  You -- you knew you were

11:28:56  11  coming here to give a deposition today; right?   I

11:28:58  12  didn't catch you off guard; did I?

11:28:59  13     A.   Yeah.  I don't -- I don't typically try to

11:29:02  14  memorize clinical studies, authors and whatnot.  I

11:29:05  15  know attorneys in deposition try to quiz people on --

11:29:08  16  in regard to that:  "Well what's the name?  What's the

11:29:10  17  date?"  You know, really, come on.

11:29:13  18     Q.   Do you think it's a gotcha question, sir,

11:29:16  19  for me to ask you, these 2,000 plaintiffs, can you

11:29:19  20  name one piece of literature that supports your

11:29:21  21  opinions that the FDA properly granted clearance

11:29:24  22  because the Bair Hugger is safe?

11:29:27  23     A.   Well allow me --

11:29:27  24     Q.   Is it?

11:29:27  25     A.   Allow me to evaluate what -- what this

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

132

11:29:29    1    document is and I will tell you --

11:29:31    2        Q.    I'm -- I'm not --

11:29:33    3              Again, sir, I'm not --

            4        A.    Well --

11:29:35    5        Q.    -- talking about the document.  I'm -- I'm

11:29:35    6    asking you:  You gave opinions in this case, you're

11:29:36    7    being paid handsomely to give those opinions, and you

11:29:40    8    have shown up to this room to say that the Bair

11:29:44    9    Hugger's clearance was properly granted.  I mean that

11:29:46   10    is the bulk of what you are here to say.  And I'm not

11:29:49   11    asking you about some sort of ancillary issue or study

11:29:52   12    dug up from the bottom of our case files.  What I want

11:29:56   13    to know is, if you're going to give this jury the

11:29:58   14    opinion that clearance was properly granted because

11:30:00   15    there was valid evidence of the Bair Hugger's safety

11:30:02   16    in an operating room at the time of clearance, do you

11:30:05   17    think that you could be able to tell me at all what

11:30:07   18    that evidence is?

11:30:08   19              MS. EATON:  Object to the form of the

11:30:11   20    question.

11:30:13   21        A.    My answer isn't going to change.

11:30:15   22        Q.    Okay.  Is that something that, if you were

11:30:21   23    to take time to look at the exhibit list of the things

11:30:25   24    you've reviewed, the studies that you have reviewed

11:30:28   25    and are relying on for your opinions, you could

133

11:30:30   1   identify that for me?  Right?

11:30:33   2        A.   Well I imagine as we get to -- to trial I'll

11:30:36   3   be responsive to that.

11:30:40   4        Q.   I'm sure we'll ask questions at trial, but

11:30:44   5   sir, I'm here today to find out your opinions.  I get

11:30:45   6   one shot to find out before trial what you're going to

11:30:48   7   say, and this is that day.  So what I'm asking you:

11:30:50   8   If you were perform -- if you were afforded the

11:30:52   9   opportunity and the time to look at that list, knowing

11:30:55   10  the materials like you do and the opinions you have,

11:30:57   11  you could identify for me what you're talking about;

11:31:00   12  right?

11:31:00   13       A.   I -- I think it's a rare case when -- when I

11:31:04   14  can, in deposition, provide verse -- chapter and verse

11:31:10   15  of clinical articles and -- and the substance of them.

11:31:12   16  I -- I always refer back to the articles, you know, de

11:31:20   17  novo, and look at the information.  So --

11:31:21   18       Q.   Okay.

11:31:22   19       A.   You know, that's just the way it is.

           20            MS. EATON:  Repeatedly you --

           21       Q.   My question --

11:31:24   22       A.   That's my style, and if you don't like it,

11:31:26   23  well I guess that's too bad.

11:31:27   24            MS. EATON:  And to be clear, I would like to

11:31:29   25  say in fairness what Mr. Ulatowski did is cite a

134

11:31:33  1   document, and what he's asked you to do is provide him

11:31:35  2   the article cited within the document so that he could

11:31:36  3   review that.

11:31:36  4         MR. BANKSTON:  Okay.  First of all, that's

11:31:38  5   not an objection.  Second of all, I've already said

11:31:41  6   three times put that document over there, I don't want

11:31:43  7   to talk about that document any more.

11:31:45  8         Q.   What we are talking about is what you came

11:31:47  9   to in your report, which is a statement that there is

11:31:48  10  valid scientific evidence of the Bair Hugger's use in

11:31:51  11  operating rooms and that that evidence existed at the

11:31:55  12  time of the Bair Hugger's clearance, and what I think

11:31:57  13  I'm understanding from you is that when I am here

11:32:00  14  today to ask you what evidence that is, what evidence

11:32:03  15  you're relying on to make that opinion, you are

11:32:05  16  telling me today in deposition you will not be able to

11:32:07  17  give me that answer.

11:32:08  18        A.   I'm not prepared to give you that answer --

11:32:10  19        Q.   Okay.

11:32:11  20        A.   -- today.

11:32:11  21        Q.   Thank you, sir.

11:32:12  22        A.   Not to say it does not exist.

11:32:14  23        Q.   Sure.  Just not going to disclose that today

11:32:17  24  in the deposition that we are here to talk about.

11:32:20  25        A.   Right.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

135

11:32:21    1      Q.    Okay.

11:32:30    2            MS. EATON:  Object to the form of the

11:32:32    3    question.

11:32:32    4      Q.    You also have the opinion that the expansion

11:32:33    5    of clinical settings for the use of the Bair Hugger is

11:32:37    6    legitimately encompassed by Bair Hugger's intended

11:32:39    7    use.

11:32:40    8      A.    Yes.

11:32:40    9      Q.    Okay.  That means that 3M can put it into an

11:32:44   10    operating room with no controls over its intended use;

11:32:50   11    correct?

11:32:50   12      A.    No.  That's a different question.

11:32:51   13      Q.    Okay.  Well that's what I'm asking.  Are you

11:32:54   14    saying that if 3M changes its intended use or --

11:33:00   15            This is going to be kind of a complicated

11:33:02   16    question because I think isn't your opinion that the

11:33:04   17    intended use has never changed?

11:33:04   18      A.    It's never changed.

11:33:05   19      Q.    So if it goes in an OR or not, that's not a

11:33:08   20    change of intended use to you.

11:33:09   21      A.    Correct.

11:33:09   22      Q.    Okay.  And that's not a change of

11:33:11   23    indications for use.

11:33:14   24      A.    It -- it -- it may be relative to

11:33:18   25    indications for use, but it's not a change in intended

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

136

11:33:21   1   use.

11:33:22   2        Q.   Okay.  Are you aware that the model 200

11:33:24   3   specifically said "Caution:  This machine is not

11:33:26   4   intended for use in the operating room?"

11:33:32   5        A.   Well that's fine, but that's not the

11:33:34   6   intended use.  The functional purpose is to heat a

11:33:38   7   patient.

11:33:38   8        Q.   Okay.

11:33:39   9        A.   That's --

11:33:40  10        Q.   So --

11:33:40  11        A.   So that -- that is another form of statement

11:33:44  12   that has a particular application.

11:33:47  13        Q.   I get it.  Okay.  So when they say -- the

11:33:49  14   company says on the model 200, "Caution:  This machine

11:33:52  15   is not intended for use in an operating room," that is

11:33:55  16   not relevant to what its intended use is.

11:33:59  17        A.   Not in the broad sense of the functional

11:34:01  18   purposes of the device, which is to heat patients.

11:34:03  19        Q.   Okay.  And that's the regulatory part,

11:34:05  20   right, that that's --

11:34:06  21        A.   Correct.

11:34:07  22        Q.   -- most important when we're talking about

11:34:08  23   regulation; right?

11:34:09  24        A.   Well, that's what we're talking about,

11:34:13  25   510(k) clearance --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

137

11:34:13  1      Q.   Right.

11:34:13  2      A.   -- plus --

11:34:13  3      Q.   But in other words, what I meant is this

11:34:15  4  statement from the company, the warning on the device,

11:34:20  5  that -- when they're talking about intended use,

11:34:22  6  you're saying they're not using it in the way --

11:34:24  7  "using" meaning using the term "intended use" -- in

11:34:24  8  the way the regulation uses it.

11:34:26  9           MS. EATON:  Object to the form of the

11:34:27  10  question.

11:34:28  11     A.   I -- I think it's relevant in regard to an

11:34:30  12  indication, an environment of use.  Does it affect the

11:34:35  13  intended use overall?  No.  No.

11:34:35  14     Q.   Well I -- I guess what I'm saying is just

11:34:37  15  because they say on the model 200, they say this

11:34:40  16  machine is not intended for use in the operating room,

11:34:43  17  according to you the regulatory definition of

11:34:46  18  "intended use" does encompass its use in the operating

11:34:49  19  room.

11:34:51  20     A.   Correct.  It's -- it's because there --

11:34:52  21  you --

11:34:53  22           You need to understand from a regulatory

11:34:55  23  point of view, and Dr. David as well, that -- that

11:35:03  24  "intended use" has a particular meaning in a

11:35:05  25  regulatory environment in terms of substantial

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

138

11:35:08   1   equivalence.

11:35:11   2        Q.   Correct.  So --

11:35:11   3        A.   And -- and there's guidance documents on

11:35:12   4   that, there's explanations of that, and -- and FDA can

11:35:16   5   apply that broadly or -- or, when necessary, narrowly.

11:35:20   6   In this case, as I've interpreted it, the devices over

11:35:25   7   time, and as the classification of the product

11:35:28   8   identify their products, the classification says these

11:35:32   9   are products intended to heat patients.

11:35:32  10        Q.   Okay.

11:35:35  11        A.   It doesn't say in an OR, doesn't say at

11:35:37  12   home, doesn't say anywhere.  It says the intended --

11:35:40  13        Q.   Where does it say that?  I'm sorry.

11:35:41  14        A.   In the classification regulation for this --

          15        Q.   Got you.

11:35:43  16        A.   -- type of device.

11:35:44  17        Q.   Okay.  So when 3M says "Caution:  This

11:35:48  18   device is not intended for use in the OR," they are

11:35:49  19   not using the "intended use" in the same way you would

11:35:53  20   use it in the FDA for regulatory purposes.

11:35:56  21        A.   Yeah.  I don't think so.  I think it's a

11:35:57  22   restricted application, but it doesn't really change

11:36:00  23   the -- the fundamental intended use.

11:36:05  24        Q.   So when we're --

11:36:05  25             MS. EATON:  Object to the form of the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

139

11:36:05   1   question.   That misrepresented the document.

11:36:05   2            MR. BANKSTON:   Okay.

11:36:06   3       Q.   When we're talking about intended use and

11:36:09   4   indications for use, okay, and those two things, --

11:36:11   5       A.   Yes.

11:36:12   6       Q.   -- and they were whatever they were for the

11:36:14   7   Bair Hugger 200, --

11:36:15   8       A.   Right.

11:36:15   9       Q.   -- and then the Bair Hugger 500 starts

11:36:18  10   getting used in operating rooms, --

11:36:19  11       A.   Correct.

11:36:20  12       Q.   -- it's your testimony that neither the IFU

11:36:22  13   nor the intended use has changed; correct?

11:36:24  14            MS. EATON:   Object to the form of the

11:36:25  15   question.

11:36:27  16       A.   The intended use has not changed.

11:36:28  17       Q.   So its -- its sudden deployment into the

11:36:30  18   operating room with a new device, that really has no

11:36:33  19   regulatory impact or consequence.

11:36:35  20            MS. EATON:   Object to the form of the

11:36:37  21   question.

11:36:37  22       A.   It may.   It may.

11:36:38  23            And you said "sudden."   I'm not sure whether

11:36:41  24   it's sudden or became, you know, the standard for not

11:36:45  25   just Bair Hugger but for all heating devices, the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

140

11:36:48  1   standard of care as it evolved.  But the point of the

11:36:52  2   fact is that device usage does evolve.  It --

11:36:57  3          There may be impact on that evolutionary

11:37:00  4   usage, and in fact FDA identified -- they -- they --

11:37:05  5   they -- they put a stop point, so to speak, by

11:37:09  6   identifying home use as a potential problem --

11:37:13  7          Q.   Okay.

11:37:13  8          A.   -- in the use of the product.

11:37:16  9          Q.   There are certain times and during the

11:37:18  10  510(k) clearance process --

11:37:20  11         Let me -- let me back up a little bit.

11:37:22  12  You've seen, I take it, on decision-making documents

11:37:24  13  for 510(k) a little flowchart, checklist?

11:37:26  14         A.   Sure.  Sure.

11:37:27  15         Q.   And -- and sometimes it will say things like

11:37:29  16  are there any differences in the device, and yes/no;

11:37:32  17  right?

11:37:32  18         A.   Correct.

11:37:32  19         Q.   And then like if that one is answered yes,

11:37:35  20  the next question might be does it raise any new

11:37:37  21  safety questions or new effectiveness questions.

11:37:40  22         A.   Correct.

11:37:41  23         Q.   Right.  So in other words, there are certain

11:37:42  24  times in the 510(k) process where the FDA learns of a

11:37:45  25  piece of information, and because of that new piece of

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

141

11:37:49  1   information it must make an assessment or at least ask

11:37:52  2   the question does that raise new questions of safety.

11:37:55  3        A.   Correct.  Whenever -- whenever --

11:37:58  4             Now we've gone beyond intended use.

11:38:00  5        Q.   Right.  Exactly.

11:38:01  6        A.   We've now gone to different technological

11:38:04  7   characteristics.

11:38:05  8        Q.   Right.

11:38:05  9        A.   And if there are any differences, the first

11:38:07 10   issue is, well, do these differences raise new types

11:38:10 11   of questions, --

11:38:10 12        Q.   Right.  And that's the point --

11:38:12 13        A.   -- which gen -- generally is not -- is a

11:38:12 14   null for this kind of product.

11:38:13 15        Q.   I got you.  Okay.

         16             MS. EATON:  Let me just pause here and ask

         17   if you two would both -- essentially you keep jumping

         18   in on him when he's still talking and I ask you to

         19   please stop that.

         20             MR. BANKSTON:  Yeah, I know.  I keeping

         21   thinking this over.  Exactly.  No, I get it.

         22        Q.   When -- when --

11:38:27 23             One of the things you talked about was

11:38:30 24   different technological characteristics.  If that's

11:38:32 25   the case, then -- then that question has to be asked.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

142

11:38:34  1   That's one of the situations; right?

11:38:35  2        A.   It -- it always has to be asked.

11:38:37  3        Q.   No.  For instance, if what I'm asking is --

11:38:41  4   is if their conclusion is made that there are no

11:38:41  5   technological differences, then you obviously don't

11:38:43  6   have to ask the question do the differences make a

11:38:46  7   difference in safety and effectiveness because there's

11:38:48  8   no differences; right?

11:38:49  9        A.   Right.  But that's rare.

11:38:51  10       Q.   Okay.  So --

11:38:52  11            But you occasionally do have a product that

11:38:55  12  has no -- it's a new product that has no changes in --

11:38:57  13  in -- in technological characteristics.

11:38:59  14       A.   Right.

11:39:00  15       Q.   Usually that's not going to require a brand

11:39:03  16  new 5(k) -- 510(k).

11:39:07  17       A.   It may.  For example, if -- if a device is

11:39:07  18  being used in an entirely different clinical purpose,

11:39:15  19  not OR versus non-OR but -- but for an entirely new

11:39:19  20  disease condition, gone from neurological to

11:39:23  21  cardiovascular, some disease, but the device is the

11:39:27  22  same device, well there you don't -- you have the same

11:39:28  23  technology, you have the same device, but now you've

11:39:31  24  changed its -- it's significantly changed its

11:39:35  25  condition of use.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

143

11:39:37  1      Q.    I'm glad that --

11:39:37  2            Interesting, because that's exactly where I

11:39:40  3  was going to be going, is that there are other things

11:39:42  4  with the device that can change besides technological

11:39:45  5  characteristics that would require the FDA to ask that

11:39:48  6  question again, is there a possible effect on the

11:39:49  7  safety, and one of those things that could change is

11:39:52  8  the indications for use.

11:39:53  9      A.    Right.  It may --

11:39:54  10           But those are typically very significant

11:39:56  11  changes.

11:39:56  12     Q.    Sure.  So, for instance, say you had a

11:39:59  13  device and it had a -- a very significant change in

11:40:02  14  the indications for use.  One day it's being used to

11:40:05  15  treat bunions, the next day it's in brain surgery.

11:40:09  16  Right?  If you have that kind of significant change,

11:40:13  17  there's going to need to be the question asked does it

11:40:13  18  raise any safety or effectiveness questions.

11:40:13  19     A.    Correct.

11:40:14  20     Q.    If the IFUs are not changed, there's no

11:40:17  21  change in the IFUs, you don't have to ask if there's

11:40:21  22  any changes in safety and effectiveness for the IFUs

11:40:23  23  because those IFUs haven't changed.

11:40:25  24     A.    Correct.

11:40:25  25     Q.    You might have to ask it for other things

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

144

11:40:28    1    like technological characteristics, but not for the

11:40:31    2    IFUs.

11:40:31    3         A.    Correct.

11:40:31    4         Q.    Okay.  What about intended use?  If intended

11:40:33    5    use changes, do you have to then do the same flowchart

11:40:36    6    process and ask if it raises new questions?

11:40:39    7         A.    No.  If there's a new intended use,

11:40:41    8    you're -- you're typically dead in the water at that

11:40:43    9    point in time.

11:40:43   10         Q.    Got you.  Okay.  So if -- if --

11:40:45   11              Stay with the Bair Hugger for instance.  One

11:40:46   12    of the things I think you'll agree with me on is we

11:40:49   13    had talked about its use between the 200 and the 500

11:40:53   14    and the 500 series being -- starting to be used in the

11:40:55   15    ORs.

11:40:55   16         A.    Yes.

11:40:55   17         Q.    And that's not a change in the indications

11:40:58   18    for use.

11:40:58   19         A.    No, that's not -- that's not a significant

11:41:01   20    change as FDA has evaluated devices used in hospitals.

11:41:04   21         Q.    Sure.  And the Bair Hugger 200 to 500,

11:41:06   22    there's not a significant different technology being

11:41:09   23    used; correct?

11:41:09   24         A.    Fundamentally, no.

11:41:10   25         Q.    Okay.  So in neither of these cases with the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

145

11:41:13  1   200 to 500 under FDA regulations for the indications

11:41:18  2   for use, in other words, it -- it being used in an OR

11:41:20  3   didn't change that, so when the 200 goes to the 500 --

11:41:26  4        Let me -- let me rephrase this because I'm

11:41:27  5   really trying to understand.  If -- if -- if the 200

11:41:32  6   is being used not in ORs and the 500 is being used in

11:41:36  7   ORs but there's no change in IFUs and there's no

11:41:39  8   change in technology, there's no need to ask if that

11:41:42  9   use in OR raises new questions of safety or

11:41:44  10  effectiveness; right?

11:41:47  11       A.   If the intended use is the same, looking at,

11:41:50  12  you know, what Dr. Augustine said particularly here,

11:41:55  13  and understanding FDA's viewpoint on the flexibility

11:41:58  14  in regard to in-hospital product usage, that, you

11:42:03  15  know, they would look at this, they'd evaluate it as

11:42:07  16  they are required to do, but then they'd move on to

11:42:09  17  the technology and any test results that were

11:42:12  18  obtained --

11:42:13  19       Q.   Okay.

11:42:13  20       A.   -- with -- with the 500.

11:42:14  21       Q.   I'm not sure I understand the answer there

11:42:17  22  about whether, if the Bair Hugger -- new model of Bair

11:42:21  23  Hugger is going to be used in the OR --

11:42:24  24       A.   Uh-huh?

11:42:24  25       Q.   -- but that doesn't constitute a change in

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

146

11:42:25  1  the indications for use, that means you don't have to

11:42:27  2  do -- at the FDA you don't have to ask if that

11:42:31  3  raises -- the use the in the OR raises new questions

11:42:36  4  of safety or effectiveness because the IFUs are the

11:42:38  5  same.  Right?

11:42:39  6       A.   Well there is a -- there is a different

11:42:40  7  environment in change.  That would be assessed.  But

11:42:43  8  did it change the intended use?  No, it didn't change

11:42:46  9  the intended use of the product.

10       Q.   When you mean --

11:42:48  11       A.   It's still warming, the product.

11:42:49  12       Q.   When you mean it would be the environment of

11:42:51  13  use --

11:42:51  14            Is that what you said?

11:42:52  15       A.   Environment of use.

11:42:52  16       Q.   Okay.  The environment of use would be

11:42:54  17  assessed; is that --

11:42:56  18       A.   It would be assessed to what degree there's

11:42:58  19  any difference or extraordinary change in use of this

11:43:01  20  type of product.  You know, you have to understand

11:43:04  21  there's --

11:43:06  22            The Bair Hugger is but one heating type of

11:43:08  23  device.  There were other predicate heating devices of

11:43:11  24  course.  There's evolution of -- of use of the

11:43:16  25  on-the-market heating devices, there's FDA's knowledge

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

147

| | | |
|---|---|---|
| 11:43:20 | 1 | of evolutionary changes of the use of heating devices. |
| 11:43:24 | 2 | It -- it may not be particularly highly significant to |
| 11:43:29 | 3 | FDA, the evolution into the OR. |
| 11:43:32 | 4 | Q.  I -- I -- I had thought that you had |
| 11:43:34 | 5 | testified that if IFUs change, there has to be a |
| 11:43:38 | 6 | safety -- you know, safety questions asked. |
| 11:43:40 | 7 | A.  Right.  If there's any -- |
| 11:43:41 | 8 | Q.  But -- hold on. |
| 11:43:42 | 9 | A.  Any differences in the IFUs need to be |
| 11:43:45 | 10 | assessed. |
| 11:43:45 | 11 | Q.  Right.  But if there's differences in |
| 11:43:48 | 12 | intended use, the 510(k) does not require to ask if it |
| 11:43:52 | 13 | raises new questions of safety and effectiveness. |
| 11:43:52 | 14 | A.  Ultimately FDA's decision, based upon its |
| 11:43:55 | 15 | comparison of labels, is there's no difference in |
| 11:43:58 | 16 | intended use. |
| 11:44:00 | 17 | Q.  Correct.  Okay.  So if there is no |
| 11:44:00 | 18 | inten -- there's no difference in intended use, okay, |
| 11:44:03 | 19 | if the FDA concludes that there's no difference in |
| 11:44:05 | 20 | intended use, nothing further needs to be done |
| 11:44:08 | 21 | regarding the subject of intended use. |
| 11:44:10 | 22 | A.  Correct. |
| 11:44:12 | 23 | Q.  Do you agree with me? |
| 11:44:12 | 24 | A.  Correct. |
| 11:44:12 | 25 | Q.  Are you saying that if the FDA finds there |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

148

11:44:14  1  is a substantially different intended use, the FDA

11:44:17  2  then must, under the regulations, ask if that change

11:44:20  3  in intended use raises new questions of safety and

11:44:22  4  effectiveness?

11:44:23  5      A.   Well let me back up a little bit.

11:44:26  6      Q.   Uh-huh.

11:44:26  7      A.   FDA examines the differences.  Whatever

11:44:30  8  differences exist, FDA will -- may, I'll say, consider

11:44:33  9  safety and effectiveness at that point in time, thus

11:44:38  10  rendering the decision ultimately it's a new intended

11:44:40  11  use or it's not a new intended use.  My -- my

11:44:43  12  additional point is that the evolution of products

11:44:47  13  within the hospital and its -- their usage in and out

11:44:49  14  of ORs, I've seen that in other types of devices, it's

11:44:55  15  not been particularly a turning point on new intended

11:44:58  16  use.

11:44:58  17      Q.   Okay.  I want to make sure I'm not -- I

11:45:02  18  totally have this understood, so let's -- let's go

11:45:04  19  through the three different things we're talking about

11:45:06  20  here, which is, first, technological characteristics.

11:45:10  21  If character --

11:45:12  22          That's something that, if it changes, the

11:45:12  23  FDA regulations require that you ask if it raises new

11:45:15  24  questions of safety and effectiveness.  Yes?

11:45:17  25      A.   Say it again.  Sorry.

149

11:45:18   1        Q.   If there are technological differences

11:45:20   2   between the two products, --

11:45:21   3        A.   Yes, yes.

11:45:21   4        Q.   -- then if that exists, then the regulations

11:45:24   5   require the FDA to ask whether that raises new

11:45:27   6   questions of safety.

11:45:27   7        A.   New types of safety questions, yes.

11:45:29   8        Q.   Okay.

11:45:30   9        A.   Or effectiveness questions.

11:45:31  10        Q.   Second one was indications for use.

11:45:33  11        A.   Right.

11:45:36  12        Q.   If indications for use change, the FDA under

11:45:38  13   510(k) has to ask the question does it raise new

11:45:41  14   safety questions.

11:45:43  15        A.   Right.  FDA will examine the two labels,

11:45:48  16   here's the indications, here's the indications, is

11:45:48  17   there something significant here?  If so, let's

11:45:53  18   analyze the safety and effectiveness impact.  No

11:45:56  19   impact, same intended use.

11:45:57  20        Q.   All right.  I'm not terribly concerned about

11:46:00  21   the methodology at this point.  What I really wanted

11:46:03  22   to know is if there is a change in intended use, the

11:46:07  23   regulations direct the reviewer to ask if there is a

11:46:09  24   difference in safety.

11:46:10  25        A.   No.  If there's a change in intended use --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

150

| | | |
|---|---|---|
| 11:46:12 | 1 | Q.   That's -- okay.  Let me -- |
| 11:46:14 | 2 | And you're right, I -- I messed up the word, |
| 11:46:15 | 3 | so let's go back. |
| 11:46:17 | 4 | A.   The end result is you're not equivalent. |
| 11:46:19 | 5 | Q.   Right.  Let's go back and -- and -- |
| 11:46:20 | 6 | A.   If there's a change in indications for use, |
| 11:46:23 | 7 | it may or may not be equivalent. |
| 11:46:24 | 8 | Q.   Got you.  So -- |
| 11:46:26 | 9 | In fact, that's what I did, is I said it |
| 11:46:26 | 10 | wrong. |
| 11:46:26 | 11 | So the second one we talked about was |
| 11:46:28 | 12 | indications for use. |
| 11:46:29 | 13 | A.   Right. |
| 11:46:29 | 14 | Q.   And if there is a different indication for |
| 11:46:32 | 15 | use on the labeling, that will trigger a question of |
| 11:46:35 | 16 | whether there is new safety questions. |
| 11:46:37 | 17 | A.   Right.  What's -- |
| 11:46:39 | 18 | Q.   Okay. |
| 11:46:39 | 19 | A.   What's -- what's the indication?  Is it in |
| 11:46:41 | 20 | this case warming of patients perioperatively, |
| 11:46:45 | 21 | preoperatively, postoperatively?  You know, we're on a |
| 11:46:49 | 22 | continuum there of sorts. |
| 11:46:50 | 23 | Q.   Hold on, hold on, let me make sure I |
| 11:46:53 | 24 | understand that.  When you say indications for use and |
| 11:46:56 | 25 | you said whether you're warming a patient |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

151

11:46:58  1  preoperatively, perioperatively or postoperatively, --

11:47:00  2      A.   Right.

11:47:00  3      Q.   -- so where you use the device, whether or

11:47:03  4  not it's in an OR, that's a part of the indications

5  for use.

11:47:06  6      A.   Right.  The usage environment, as I said.

11:47:07  7      Q.   Okay.  So --

11:47:08  8          But I thought I understood that from the 200

11:47:10  9  to the 500 series the indications for use didn't

11:47:13  10  change according to the FDA.

11:47:14  11          MS. EATON:  Object to the form of the

11:47:15  12  question.

11:47:16  13      A.   The intended use didn't change, the

11:47:17  14  environment of use changed.

11:47:19  15      Q.   What I'm asking very specifically right now

11:47:20  16  is, because I thought I had this --

11:47:22  17      A.   And maybe I mis -- misunderstood.

11:47:23  18      Q.   Yeah.  I think maybe we crossed at each

11:47:29  19  other at some point.

20      A.   Yeah.

11:47:29  21      Q.   But when you're saying when that 510(k) was

22  approved between the 200 and the 500 series, did the

11:47:32  23  FDA find the indications for use had changed or not?

11:47:36  24      A.   As I -- as I would look at the 200 versus

11:47:40  25  the 500, I would see a difference in the -- in how

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

152

| | | |
|---|---|---|
| 11:47:44 | 1 | Augustine has described the 500 probably as compared |
| 11:47:48 | 2 | to the 200, so that would be observed by FDA, that |
| 11:47:51 | 3 | would be assessed for any impact on intended use. |
| 11:47:56 | 4 | But -- but again, I keep bringing this up -- |
| 11:47:58 | 5 | Q.   Hold on.   I'm -- I'm really confused because |
| 11:48:00 | 6 | you just said "intended use." |
| 11:48:01 | 7 | MS. EATON:   He was trying to finish his |
| 11:48:04 | 8 | answer. |
| 11:48:04 | 9 | Q.   Yeah.   Like I just want to make sure we're |
| 11:48:05 | 10 | not -- I just wanted to correct the record -- |
| | 11 | A.   Okay. |
| 11:48:07 | 12 | Q.   -- because I knew you were in the middle of |
| | 13 | your answer and you said "intended use" -- |
| | 14 | A.   Well let me back up. |
| | 15 | Q.   -- not "indications for use." |
| 11:48:08 | 16 | A.   Let me back up. |
| 11:48:08 | 17 | MS. EATON:   But I believe that's what he |
| 11:48:09 | 18 | meant, So can we let him finish his answer? |
| 11:48:12 | 19 | MR. BANKSTON:   Yeah.   Let's find out. |
| 11:48:13 | 20 | A.   You got the 200 label, -- |
| 11:48:15 | 21 | Q.   Uh-huh. |
| 11:48:15 | 22 | A.   -- you got the 500 label -- |
| | 23 | Q.   Okay. |
| 11:48:17 | 24 | A.   -- and statements by Augustine, -- |
| 11:48:18 | 25 | Q.   Okay. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

153

11:48:20  1    A.    -- because all statements within the 510(k)

11:48:22  2    contribute to intended use.

11:48:23  3    Q.    Sure.  Okay.

11:48:25  4    A.    Okay?  Whether or not the label even says

11:48:30  5    it, which is -- which is an interesting quirk of the

11:48:32  6    regulations.  But even Augustine saying it's in the OR

11:48:37  7    has a hook on intended use.

11:48:38  8    Q.    Sure.  Okay.

11:48:41  9    A.    Okay?

11:48:41  10         MS. EATON:  Can I ask you to please wait

11:48:42  11   until he finishes his answer.

11:48:43  12         MR. BANKSTON:  Oh.  I'm trying to just -- so

11:48:45  13   we can understand each other.  I'm sorry.

11:48:46  14         MS. EATON:  I understand that, but I would

11:48:48  15   ask you to please wait.

11:48:49  16   A.    Here -- here's the progression.

11:48:50  17   Q.    Okay.  My --

11:48:51  18         Sir, I'm sorry.  Whenever you --

11:48:51  19   A.    Here's the progression.

          20   Q.    Okay.

          21   A.    You get the 200 label, you get the 500

11:48:52  22   label, you look at the label.  Is there a difference?

11:48:58  23   Well yes, there's a difference.  Does that difference

11:49:02  24   raise issues of safety and effectiveness?  Yes/no.

11:49:05  25   Based on not what's just in the 510(k), but everything

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

154

11:49:08   1   the else that can be brought to bear.

11:49:09   2        Q.   Okay.

11:49:10   3        A.   And then the decision made new intended use

11:49:15   4   or not new intended use.

11:49:16   5        Q.   Okay.  Have you ever heard --

11:49:17   6             You've heard the term "indications

11:49:19   7   statement."

11:49:19   8        A.   Right.

11:49:20   9        Q.   Right.  And that's indications for use.  Is

11:49:23   10  that related --

         11        A.   Right.

11:49:23   12       Q.   -- to that topic?

11:49:26   13       A.   You typically see that a lot in -- in drugs

11:49:27   14  and certain devices.  Devices are a little bit unusual

11:49:30   15  because sometimes you -- you won't see indications for

11:49:32   16  use, --

11:49:32   17       Q.   Okay.

11:49:33   18       A.   -- you'll see a functional use, which is

11:49:35   19  really equivalent to the intended use.

11:49:38   20       Q.   And I think from what we were talking about

11:49:40   21  with his letter and things like that, really anything

11:49:44   22  inclusive in the 510(k), the totality of information

11:49:46   23  there is relevant to what the indications for use

11:49:50   24  indications statement is.

11:49:50   25       A.   It can be, yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

155

| | | |
|---|---|---|
| 11:49:51 | 1 | Q.   Okay.  And so again from this situation, the |
| 11:49:55 | 2 | indications for use, the indications statement between |
| 11:49:58 | 3 | these two devices has changed. |
| 11:50:01 | 4 | A.   Well the use condition -- |
| 11:50:02 | 5 | They haven't characterized it as |
| 11:50:05 | 6 | indications, but the environment of use I'll |
| 11:50:08 | 7 | characterize for -- for purposes of this deposition as |
| 11:50:09 | 8 | indications for use. |
| 11:50:10 | 9 | Q.   Got you.  Okay.  So I -- and basically -- |
| 11:50:13 | 10 | I know we don't have the documents in front |
| 11:50:15 | 11 | of us, and so part of what I'm -- |
| | 12 | A.   Yes. |
| 11:50:16 | 13 | Q.   -- trying to do is reconstruct what the |
| 11:50:18 | 14 | front-line reviewer would have done in approving the |
| 11:50:20 | 15 | 500 series from the 200 series. |
| 11:50:23 | 16 | A.   Sure. |
| 11:50:23 | 17 | Q.   And in part of that checklist he would have |
| 11:50:27 | 18 | had to go, first of all, is the device even subject to |
| 11:50:29 | 19 | 510(k), and you would have said yes, this device is a |
| 11:50:32 | 20 | 510(k)-subject device. |
| 11:50:33 | 21 | A.   Yes.  Is there a valid predicate?  Has that |
| 11:50:35 | 22 | been presented in the 510(k)? |
| 11:50:36 | 23 | Q.   Well I mean even before he starts looking at |
| 11:50:38 | 24 | predicate, he has know whether this device is even |
| 11:50:41 | 25 | subject to the regulation; right?  It might be subject |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

156

11:50:44   1   to PMA.  You have to figure out what kind of device it

2   is.  That would be your first step --

11:50:52   3       A.   Well in -- in a very --

11:50:52   4            THE REPORTER:  Just a moment.

5            THE WITNESS:  We're stepping on each other.

11:50:52   6            THE REPORTER:  You are.  One at a time,

11:50:54   7   please.

11:50:54   8       Q.   Let's -- let's -- let's do it real simply in

11:50:55   9   little chunks from this doc.

11:50:56  10       A.   I'll slow up as well.  Right.

11:51:00  11       Q.   How about this way?  Is the product --

11:51:00  12            The first thing you have to determine is is

11:51:02  13   the product a device.

11:51:05  14       A.   Yes, generally, in a -- in a very general

11:51:08  15   manner.

11:51:08  16       Q.   Now devices can be subject to different FDA

11:51:11  17   regulations.

11:51:12  18       A.   Correct.

11:51:12  19       Q.   One of those regulations is 510(k).

11:51:15  20       A.   Correct.

11:51:16  21       Q.   One --

11:51:17  22            So then one of the next things you have to

11:51:18  23   determine, is the device subject to 510(k)?

11:51:22  24       A.   Yes.  You may --

11:51:24  25            That may be a front-end decision or will

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

157

11:51:26  1   have to remain as a back-end determination.

11:51:29  2        Q.   Right.  Okay.  And then one of the next

11:51:32  3   things you might do when actually looking at the

11:51:34  4   product -- and I'm not sure what order you might do

11:51:38  5   this, so if this is out of order, you know, I know --

11:51:39  6   but one of the steps might be does the product have

11:51:41  7   the same indication statement.

11:51:44  8        A.   Right.

11:51:45  9        Q.   And in this case you would conclude, no, it

11:51:49  10  doesn't, and then that would trigger you to ask the

11:51:51  11  question does that new indication for use present any

11:51:55  12  safety questions.

11:51:57  13       A.   Yes.

11:51:57  14       Q.   That would be the proper way for a 510(k)

11:52:00  15  reviewer to go about looking at this product.

11:52:02  16       A.   Yes.

11:52:02  17       Q.   Okay.

11:52:08  18            MR. BANKSTON:  Are we at --

11:52:09  19            I'm not sure if my time is off of Central or

11:52:12  20  not.  Are we near --

          21            Are we at noon?  Is that where we're at, or

11:52:15  22  are we at 11:00?

11:52:15  23            (Discussion off the stenographic record.)

11:52:16  24            (Luncheon recess taken.)

          25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

158

12:48:36    1                    AFTERNOON SESSION

12:48:37    2    BY MR. BANKSTON:

12:48:39    3         Q.    Mr. Ulatowski, before we broke, we kind of

12:48:41    4    broke in the middle of going through a step-by-step

12:48:45    5    process by which a reviewer reviews a 510(k), and I

12:48:50    6    kind of wanted to pick back up on that a process.  We

12:48:53    7    had talked --

12:48:54    8              We had kind of gone down some steps and we

12:48:56    9    kind of got interrupted in the steps, so I want to go

12:48:59   10    through the steps we had talked about.  We had talked

12:49:01   11    about the determination is the product a device, and

12:49:04   12    then is it subject to 510(k), and then does it have

12:49:07   13    the same indications statement and indications for

12:49:11   14    use, and we had talked about when that question is

12:49:14   15    answered it would be in the affirmative for the Bair

12:49:17   16    Hugger in terms of its change for indications for use,

12:49:20   17    and then we go on to the next question, which is does

12:49:22   18    it raise new questions of safety and effectiveness.

12:49:25   19    Do you remember that discussion?

12:49:26   20         A.    Right.  I'm not quite sure you got all the

12:49:30   21    steps in place, but --

12:49:31   22         Q.    Sure.

12:49:32   23         A.    Is -- is it a device for sure.  Is it

12:49:36   24    subject to 510(k), well that -- that may be a, as I

12:49:39   25    said, a front-end or a back-end determination, meaning

159

12:49:43  1  front end you can tell it's a 510(k) device because

12:49:47  2  it's -- it's classified by FDA, there's a regulation

12:49:50  3  on that type of device and it's for a Class II device

12:49:54  4  you submit a 510(k), for some devices you really don't

12:49:57  5  know where it's going to fall out, and so you have to

12:49:59  6  kind of wait and see what the decision is.  So is it

12:50:03  7  5 -- 510(k)-eligible?  Is there a legally marketed

12:50:08  8  predicate?  Yes/no.  If you don't have a predicate,

12:50:11  9  you're going nowhere.  Does -- does it have the same

12:50:15  10  intended use is the next point, and in making that

12:50:18  11  decision, the labeling -- labeling's examined one

12:50:22  12  against the other, any claims in the 510(k), any

12:50:25  13  statements in the 510(k) may describe aspects of

12:50:28  14  intended use, so all that's examined, and a decision

12:50:33  15  rendered based on all that information what

12:50:37  16  differences may exist or what similarities there are.

12:50:41  17  If there are significant differences, what effect may

12:50:45  18  it have on safety and effectiveness, and FDA will

12:50:48  19  assess that to the degree necessary using whatever

12:50:51  20  information it -- it needs to bring to bear.

12:50:53  21         Decision made on intended use, is it the

12:50:56  22  same or different?  If it's the same, you move to the

12:50:59  23  next step.  If it's a different intended use,

12:51:02  24  you're -- you're not equivalent.

12:51:03  25         Q.   Okay.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

160

12:51:03  1      A.    And -- and there's alternative steps that

12:51:06  2   can be taken then with -- with a different kind of

12:51:09  3   submission.  But then -- then you line up the devices.

12:51:12  4   Is the technology the same or different?  If it's

12:51:15  5   different, then the issue is, well, those -- do those

12:51:18  6   differences raise new types of safety and

12:51:20  7   effectiveness questions?  If the answer is no, then

12:51:24  8   you move on to any performance data that's been

12:51:28  9   submitted or necessary as required by FDA, and then

12:51:32  10  that's assessed and then a final determination made on

12:51:35  11  equivalence.

12:51:36  12     Q.    Okay.  And we had started talking about how

12:51:39  13  those decisions would have been made with respect to

12:51:41  14  the Bair Hugger, and we hadn't quite gotten to some of

12:51:45  15  that later stuff you had been talking about, hopefully

12:51:47  16  we'll get to talk about it, different ways that

12:51:49  17  decisions were made.  But with respect to the stuff

12:51:52  18  that we had just -- to pick up from where we were at

12:51:55  19  break, if the -- the proper way, the -- how this would

12:51:59  20  have been --

12:51:59  21          Let me back up.  I understand you haven't --

12:52:01  22  you don't have access to the 510(k) decision-making

12:52:04  23  documents so you can't say this with absolute

12:52:06  24  certainty.

12:52:07  25     A.    Right.  Yes.  So how I approach it is how --

161

12:52:09   1   how would I have evaluated it based on what I see in

12:52:12   2   this 510(k).

12:52:12   3        Q.   Yeah, absolutely.  And so what we had talked

12:52:15   4   about was one of those -- one of those first questions

12:52:17   5   being about the indications statement or the

12:52:20   6   indications for use and that the reviewer would have

12:52:22   7   concluded that the Bair Hugger had a different

12:52:24   8   indications for use or different indications and then

12:52:27   9   would have then answered the question do those

12:52:31   10  questions -- do those new indications pose any new

12:52:34   11  questions of safety or effectiveness.

12:52:35   12       A.   That's -- that's one of the possible

12:52:37   13  alternatives, or -- or the evaluator was com --

12:52:41   14  comfortable enough consolidating all hospital use into

12:52:46   15  one use condition.

12:52:46   16       Q.   Sure.

12:52:47   17       A.   So I mean there's alternatives that may have

12:52:48   18  occurred.

12:52:49   19       Q.   Absolutely.  Okay.

12:52:51   20            So with respect to the indications for like

12:52:53   21  hospital use or whatever the indications are, this

12:52:56   22  reviewer has -- the -- the fact that the 510(k)

12:53:00   23  does -- has gone, as you said, means that there was at

12:53:02   24  some point somebody at the FDA who looked at the

12:53:05   25  indications and then asked the question, and answered

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

162

| | | |
|---|---|---|
| 12:53:07 | 1 | it, does this raise new questions of safety or |
| 12:53:10 | 2 | effectiveness. |
| 12:53:11 | 3 | A.   No, I -- I think -- I think you would have |
| 12:53:17 | 4 | to deal with that because in Augustine's setup |
| 12:53:21 | 5 | correspondence in comparison to the 200 labeling |
| 12:53:24 | 6 | there's enough difference there to evoke a response to |
| 12:53:27 | 7 | evaluate that sort of question. |
| 12:53:28 | 8 | Q.   Got you.  Okay. |
| 12:53:29 | 9 | A.   So -- |
| 12:53:30 | 10 | Q.   So like -- |
| 12:53:32 | 11 | No.  I'm sorry. |
| 12:53:32 | 12 | A.   So it's an issue as to degree of evaluation, |
| 12:53:37 | 13 | what's the expertise of the evaluator, what |
| 12:53:39 | 14 | information could she -- he or she bring to bear to |
| 12:53:43 | 15 | render a decision that, okay, I see a difference. |
| 12:53:46 | 16 | It's not a big deal.  Same intended use. |
| 12:53:49 | 17 | Q.   Okay.  And for instance, we had talked about |
| 12:53:51 | 18 | Ulatowski Exhibit 3 there in front of you, the letter, |
| 12:53:54 | 19 | that sometimes other things that are given to the FDA |
| 12:53:57 | 20 | including commu -- communications from the |
| 12:53:59 | 21 | manufacturer can help inform intended use and |
| 12:54:03 | 22 | indications for use and an indications statement. |
| 12:54:09 | 23 | A.   Yes, from the manufacturer or from any other |
| 12:54:09 | 24 | source. |
| 12:54:09 | 25 | Q.   Okay.  So this -- this reviewer had that |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

163

12:54:14  1  kind of information.  I mean while -- while you

12:54:16  2  haven't seen the document for the actual decision-

12:54:18  3  making, you have seen these kind of documents to know

12:54:20  4  that the -- the reviewer had this kind of information

12:54:23  5  or the FDA had it at its disposal.

12:54:25  6      A.  Yes.

12:54:26  7      Q.  Okay.  And so it --

12:54:29  8          Therefore, all of this that we've been

12:54:30  9  talking about, would you agree with me that this is

12:54:32  10  part of your support for your opinion that there was a

12:54:35  11  determination of safety and effectiveness for the

12:54:38  12  change in the indications of use for the Bair Hugger?

12:54:41  13      A.  There was -- would have been an assessment

12:54:45  14  to one degree or another of the differences, including

12:54:49  15  differences and their impact on safety and

12:54:51  16  effectiveness.

12:54:51  17      Q.  Okay.

12:54:52  18      A.  Then moving on to the final decision -- the

12:54:55  19  decision, which is, is it the same intended use or

12:54:56  20  isn't it?

12:54:57  21      Q.  Got you.  Okay.  So if we're following this

12:54:59  22  in a step-by-step process, like a flowchart process,

12:55:02  23  we -- one of the questions we'd be posed then was are

12:55:06  24  there different indications for use, and that question

12:55:08  25  would be answered yes, and then the following question

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

164

12:55:10  1   that would have to be answered is do those differences

12:55:13  2   pose any new questions of safety and effectiveness,

12:55:15  3   and the answer to that would be no; correct?

12:55:18  4        A.   Well I think we're saying are the

12:55:22  5   indications different.  Well I think there's different

12:55:24  6   wording, but within FDA's evaluation of devices, FDA

12:55:29  7   may be more allowing, if I can use that word, in

12:55:37  8   regard to differences in words or conditions than you

12:55:42  9   might think.  For example, I said is this still used

12:55:47  10  in hospital?  Yes/no.  Is this outside of hospital

12:55:50  11  use?  So it depends to what degree and level the FDA

12:55:54  12  evaluator considered those factors.

12:55:56  13       Q.   Okay.  Well let's talk about with this

12:55:58  14  device, the Bair Hugger, moving from the 200 to the

12:56:01  15  500.  So the 500 was approved, and from what I'm

12:56:05  16  understanding from you, the FDA understood that there

12:56:08  17  was a change in indications for use but concluded that

12:56:11  18  those changes did not affect health and safety

12:56:15  19  questions.

12:56:16  20            MS. EATON:  Object to the form of the

12:56:16  21  question.

12:56:17  22       A.   I think that's the case.

12:56:18  23       Q.   Okay.

12:56:35  24            (Ulatowski Exhibit 4 was marked for

12:56:37  25            identification.)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

165

12:56:37  1  BY MR. BANKSTON:

12:56:38  2      Q.  All right, sir, I've handed you what has

12:56:40  3  been marked as Ulatowski Exhibit 4.  You've seen one

12:56:43  4  of these documents -- type of documents before in your

12:56:46  5  career, correct, a "'SUBSTANTIAL EQUIVALENCE' DECISION

12:56:51  6  MAKING DOCUMENTATION?"

12:56:51  7      A.  Yes.

12:56:51  8      Q.  Okay.  At the bottom of this document there

12:56:53  9  is Bates numbers; correct?

12:56:54  10      A.  Yes.

12:56:56  11      Q.  Okay.  So this is a document from this

12:56:58  12  litigation.  You understand that?

12:56:59  13      A.  Yes.

12:57:00  14      Q.  Okay.  This is not a document you have

12:57:02  15  reviewed.

12:57:03  16      A.  No, I don't think I've seen this.

12:57:05  17      Q.  Okay.  And this is -- and --

12:57:05  18          And when we talk about decision-making

12:57:07  19  documentation on the 500, that was the -- the universe

12:57:10  20  of documents you had indicated before you did not have

12:57:13  21  available to you; correct?

12:57:13  22      A.  This is a type of document, yes.

12:57:16  23      Q.  Okay.  And this document has a flowchart

12:57:18  24  like we've been talking about; correct?

12:57:19  25      A.  It should have a flowchart, if I can turn to

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

166

| | | |
|---|---|---|
| 12:57:22 | 1 | the back. |
| 12:57:22 | 2 | Q. Well what I'm actually describing -- |
| 12:57:25 | 3 | A. Oh. Well, okay. |
| 12:57:25 | 4 | Q. -- is the front page. |
| 12:57:26 | 5 | A. Yeah. But usually there was a flowchart |
| 12:57:29 | 6 | also attached to it. |
| 12:57:29 | 7 | Q. Okay. And I guess maybe a better way to |
| 12:57:31 | 8 | describe this would be a series of yes/no questions |
| 12:57:34 | 9 | and then with flowchart instructions off to the side; |
| 12:57:37 | 10 | correct? |
| 12:57:37 | 11 | A. Yes. Because there was a -- like I said, a |
| 12:57:40 | 12 | flowchart, that this described the flowchart. |
| 12:57:42 | 13 | Q. Okay. So -- |
| 12:57:43 | 14 | And this reviewer, Glenn Bird -- |
| 12:57:45 | 15 | You're familiar with Mr. Bird? |
| 12:57:47 | 16 | A. Yes, I know Glenn. |
| 12:57:48 | 17 | Q. Okay. And just as you see, the trade name |
| 12:57:50 | 18 | would be the Model 250 and 500; correct? |
| 12:57:53 | 19 | A. Yes. Well it lines up with that letter. |
| 12:57:57 | 20 | Q. Correct. |
| 12:57:58 | 21 | And then you'll also see that the product to |
| 12:58:00 | 22 | which it's compared is the Bair Hugger model 200; |
| 12:58:03 | 23 | correct? |
| 12:58:03 | 24 | A. Yeah. I'm looking at this. |
| 12:58:06 | 25 | Yes. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

167

| | | |
|---|---|---|
| 12:58:06 | 1 | Q.   Okay.  So let's go down the checklist. |
| 12:58:09 | 2 | A.   Okay. |
| 12:58:09 | 3 | Q.   This reviewer -- |
| 12:58:11 | 4 | A.   Okay. |
| 12:58:11 | 5 | Q.   -- on number one said the product is a |
| 12:58:13 | 6 | device. |
| 12:58:15 | 7 | A.   Yes. |
| 12:58:15 | 8 | Q.   Yes.  Okay.  And number two is he said it |
| 12:58:19 | 9 | was subject to 510(k) and said yes. |
| 12:58:22 | 10 | A.   Correct. |
| 12:58:22 | 11 | Q.   Okay.  The next one is he says it has the |
| 12:58:25 | 12 | same indications statement; correct? |
| 12:58:26 | 13 | A.   Yes. |
| 12:58:27 | 14 | Q.   Okay.  So that's a bit contrary to what |
| 12:58:29 | 15 | we've just been talking about; right? |
| 12:58:30 | 16 | A.   No, not necessarily, because I said the |
| 12:58:32 | 17 | particular evaluator may have a -- a broader -- I |
| 12:58:36 | 18 | forget what term I used -- a more generous maybe I |
| 12:58:40 | 19 | said -- a broader interpretation of indication for |
| 12:58:41 | 20 | use. |
| 12:58:41 | 21 | Q.   Do you remember before we break and I asked |
| 12:58:44 | 22 | you about the proper format and the proper steps for |
| 12:58:46 | 23 | this person to take and that included finding that it |
| 12:58:50 | 24 | had a different indications statement and then asking |
| 12:58:50 | 25 | the question if it raised new questions of safety and |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

168

12:58:53    1    effectiveness?

12:58:53    2        A.    Right.  But this is -- this is the --

12:58:57    3            This is an -- an expert reviewer applying it

12:59:00    4    to a product with his view of the data and information

12:59:07    5    and clinical usage.

12:59:08    6        Q.    So he had a different view about what he

12:59:10    7    should be doing with this device than you did.

12:59:12    8        A.    No.

12:59:12    9            MS. EATON:    Object to the form of that

12:59:14   10    question.

12:59:16   11        A.    No.  He would have evaluated comparatively

12:59:18   12    the submission, the labeling and claims being made.

12:59:20   13        Q.    Things like Exhibit 3.

12:59:22   14        A.    Exactly.

12:59:22   15        Q.    And those are the things that you indicated

12:59:24   16    to me would indicate to a reviewer that the

12:59:26   17    indications had changed; correct?

12:59:28   18        A.    In -- in my interpretation I would think

12:59:31   19    that there's some differences, but does that create a

12:59:34   20    new -- to -- to me, would that create a new intended

12:59:39   21    use?  My -- my response was no.  To Glenn, Glenn was

12:59:42   22    saying --

12:59:42   23            Well, as I said -- said to you, the reviewer

12:59:47   24    may have a broader interpretation, so I gave you that

12:59:49   25    alternative.  The reviewer may have a more broad

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

169

12:59:53  1   interpretation and consider in-hospital use the same

12:59:56  2   indication use -- for use.

12:59:57  3        Q.   I -- I just want to make sure I'm clear on

12:59:59  4   your testimony because I was pretty sure you had told

13:00:04  5   me that from your review of materials in this case and

13:00:04  6   from your review of materials like what's in front of

13:00:06  7   you, that the indications statement and the

13:00:08  8   indications for use on the Bair Hugger fif -- 500

13:00:11  9   versus the 200 had changed and that that would require

13:00:14  10  the FDA to ask if that raised new safety of -- safe --

13:00:18  11  new questions of safety and effectiveness.  Do you

13:00:22  12  agree with that or not?

13:00:22  13       A.   Well I don't think I expressed that in my

13:00:24  14  report, but as I view this here now, that could be my

13:00:29  15  approach.  But it doesn't mean his approach is

13:00:33  16  invalid.

13:00:33  17       Q.   And you see where it says "DO DIFFERENCES

13:00:35  18  ALTER THE EFFECT OR RAISE NEW ISSUES OF SAFETY OR

13:00:38  19  EFFECTIVENESS?"  Do you see where it says that?

13:00:40  20       A.   Yes.

13:00:41  21       Q.   That question was not answered; correct?

13:00:43  22       A.   Right.  It wouldn't have to be answered.

13:00:45  23       Q.   Right.  Because you can skip it if you find

13:00:47  24  it has the same indications statement.

13:00:49  25       A.   Correct.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

170

13:00:50   1      Q.    Correct.  So at no point at the approval of

13:00:54   2   the Bair Hugger 500 series did the FDA ever make a

13:00:56   3   determination of whether the new indications for use

13:00:59   4   in an operating room or any new indications for use

13:01:03   5   altered the effects or raised new safeties of safety

13:01:07   6   or effectiveness.

13:01:07   7      A.    That point wasn't addressed in this

13:01:10   8   flowchart, but that's not to say, you know, identi --

13:01:14   9   the reviewer, Glenn Bird in this case, you know,

13:01:16   10  identifying the same indications statement, that he

13:01:21   11  didn't have the knowledge base of in-hospital use and

13:01:25   12  the safety factors related to in-hospital use

13:01:28   13  generally.

13:01:28   14     Q.    That --

13:01:29   15     A.    So -- so his knowledge base is different

13:01:31   16  than mine.

13:01:32   17           He's the reviewer here.  He's the person

13:01:34   18  reviewing these things day in and day out.  His

13:01:37   19  knowledge base is different from mine.

13:01:38   20     Q.    Uh-huh.

13:01:39   21     A.    He may well have stated, "OR use.  Well we

13:01:43   22  know that, so no, same indication."

13:01:44   23     Q.    You can't state any of what you've just said

13:01:46   24  to a reasonable degree of certainty because you would

13:01:48   25  be totally speculating about what Mr. Bird thought or

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

171

13:01:51   1   did not think; correct?

13:01:52   2       A.   Not so much, because I can view any number

13:01:55   3   of 510(k)s and there may be some variations on a theme

13:01:57   4   from what I may consider, but it's --

13:02:00   5            It may be because it's a device that I

13:02:03   6   didn't -- I wasn't supervisory in control of, it is a

13:02:07   7   different knowledge base than I have, a different

13:02:09   8   expertise, so there may well be a different pathway

13:02:13   9   this reviewer followed.

13:02:14   10      Q.   If you had given the opinion at some point

13:02:17   11  in today's deposition, if you had given testimony that

13:02:20   12  said the proper way to fill out this flowchart is to

13:02:22   13  answer number three "NO" and number four, answer that

13:02:26   14  question, this -- if that's what you said, this is not

13:02:30   15  consistent with that; right?

13:02:30   16           MS. EATON:   Object to the form of the

13:02:31   17  question.

13:02:33   18      A.   That would be my opinion in regard to my

13:02:36   19  particular expertise set.

13:02:37   20      Q.   Okay.   I'm going to talk to you a little bit

13:02:52   21  about the organization of your report, and as we

13:02:55   22  talked at the beginning, your report sets forth that

13:02:57   23  there were -- there were two basic things off the back

13:03:00   24  that you were asked to look at and then some things in

13:03:03   25  addition, and we'll go down into those.   The first two

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

172

13:03:05  1  things that is listed in your report that you were

13:03:08  2  asked to do is to deliver opinions in response to

13:03:11  3  plaintiffs' master long form complaint and the report

13:03:14  4  of Yadin David; is that correct?

13:03:15  5      A.   Right.   As I always do, I'll --I'll look at

13:03:17  6  the complaint as -- as a starting point for -- to

13:03:20  7  understand what are the arguments and what am I trying

13:03:23  8  to address here.

13:03:24  9      Q.   Okay.

13:03:25  10     A.   And then any -- to rebut any expert report

13:03:28  11 that's been provided.

13:03:31  12     Q.   Well I'm trying to figure out where in your

13:03:31  13 report in what you were asked to do does it talk about

13:03:35  14 any expert other than Yadin David.

13:03:40  15     A.   Well it does --

13:03:41  16          Well, I think I talked about one other

13:03:45  17 expert, or two maybe, briefly, briefly, --

13:03:48  18     Q.   Okay.

13:03:49  19     A.   -- in aspects of my report.

13:03:51  20     Q.   Okay.   So we have --

13:03:52  21          In terms of what you are saying that's

13:03:54  22 addressing plaintiffs' experts, we have -- you have

13:03:58  23 first --

13:03:59  24          Okay.   So first there's a section of your

13:04:01  25 report entitled rebuttal opinions to Dr. David.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

173

13:04:03    1        A.    Correct.

13:04:04    2        Q.    Okay.  So you will agree with me that you

13:04:06    3    reviewed Dr. David's report and that in this section

13:04:10    4    of your report you are addressing the opinions set

13:04:15    5    forth by Dr. David and explaining why you think

13:04:17    6    they're wrong.

13:04:17    7        A.    Not --

13:04:18    8              MS. EATON:  Object to the form of the

13:04:19    9    question.

13:04:19   10        A.    Not totally, because in the -- in the body

13:04:23   11    of my report, before the rebuttal section, I also

13:04:25   12    address aspects that he commented on, so I make clear

13:04:29   13    in the rebuttal portion or in aspects of the rebuttal

13:04:33   14    that I've already commented on this and refer to that,

13:04:37   15    for example.

13:04:37   16        Q.    Okay.  So what I think I hear you saying is

13:04:40   17    that in other parts of your report, in the main part,

13:04:43   18    there are statements being made in that report that

13:04:45   19    are specifically linked to Dr. Yadin David's report.

13:04:47   20        A.    I believe so, yes.

13:04:48   21        Q.    Okay.  And then there are statements in your

13:04:50   22    report that are linked to plaintiffs' motion for

13:04:53   23    punitive damages.

13:04:55   24        A.    Correct.

13:04:55   25        Q.    Okay.  That's another thing that you are

174

13:04:57   1   re -- had reviewed and delivered opinions on.

13:04:59   2        A.   Right.  That was -- that was provided kind

13:05:05   3   of late in the game, so to speak, and -- and I wanted

13:05:06   4   to make sure that at that point in time I understood

13:05:10   5   again, because, you know, complaints will be modified

13:05:15   6   and things will be said, additional things, I wanted

13:05:17   7   to make sure I went through that, that -- if there was

13:05:20   8   anything new, and to try and hit those points as best

13:05:23   9   I could in summation.

13:05:25  10        Q.   Now there are things in that punitive damage

13:05:28  11   report that don't have anything to do with plaintiffs'

13:05:31  12   experts; right?

13:05:31  13             MS. EATON:   Object to the form of the

13:05:32  14   question.

13:05:35  15        A.   I would --

13:05:36  16             Well, I'd have to look at that to say "yes"

13:05:38  17   or "no."

13:05:38  18        Q.   Okay.  In other words, there are materials

13:05:43  19   cited in the punitive damages motion that you reviewed

13:05:44  20   that were not in plaintiffs' expert reports.

13:05:48  21        A.   Give me that again.

13:05:51  22        Q.   We'll ask that one more time.

13:05:51  23        A.   Sure.

13:05:52  24        Q.   You reviewed plaintiffs' punitive damage

13:05:54  25   motion.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

175

| | | |
|---|---|---|
| 13:05:54 | 1 | A.  Yes. |
| 13:05:55 | 2 | Q.  That included materials that were attached |
| 13:05:58 | 3 | to that motion, exhibits and -- and whatever was cited |
| 13:06:01 | 4 | in that motion. |
| 13:06:01 | 5 | A.  Yes. |
| 13:06:02 | 6 | Q.  Okay.  Some of the materials cited in that |
| 13:06:03 | 7 | motion were also included in plaintiffs' expert |
| 13:06:05 | 8 | reports. |
| 13:06:05 | 9 | A.  I believe so, yes. |
| 13:06:08 | 10 | Q.  Some of those materials cited in the |
| 13:06:09 | 11 | punitive damage motion were not included in |
| 13:06:11 | 12 | plaintiffs' expert reports, they were new to you. |
| 13:06:15 | 13 | A.  They may have been.  I know that, as you |
| 13:06:16 | 14 | said, a lot of it referred to -- seemed to be |
| 13:06:20 | 15 | reflecting Dr. David's report and the positions he |
| 13:06:24 | 16 | took. |
| 13:06:24 | 17 | Q.  Okay.  Now there -- |
| 13:06:27 | 18 | Like you say, there are other parts of your |
| 13:06:29 | 19 | report -- |
| 13:06:29 | 20 | There's a brief mention of -- of William |
| 13:06:31 | 21 | Jarvis for instance. |
| 13:06:33 | 22 | A.  Correct. |
| 13:06:33 | 23 | Q.  Okay.  So there is at least a portion -- a |
| 13:06:36 | 24 | portion of your report, an opinion somewhere in there |
| 13:06:40 | 25 | that is meant to direct and rebut the opinions of Dr. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

176

13:06:41   1   William Jarvis.

13:06:43   2        A.   Well I'd say indirectly -- directly, because

13:06:47   3   Dr. David pointed to, for example, the HICPAC meeting,

13:06:51   4   and -- and Dr. Jarvis also commented on that, this

13:06:58   5   very same thing, so it was just by happenstance that

13:06:59   6   they kind of overlapped at that point.

13:07:01   7        Q.   Sure.   Okay.   And then there is material in

13:07:05   8   your expert report that is more addressing the general

13:07:07   9   allegations that were contained in plaintiffs' master

13:07:10   10  complaint; correct?

13:07:10   11       A.   I think so.

13:07:11   12       Q.   Okay.   And then there are some materials in

13:07:14   13  your report that were not brought up by plaintiffs'

13:07:17   14  experts and not brought up in a master complaint and

13:07:19   15  not brought up in a punitive damage motion; correct?

13:07:22   16            MS. EATON:   Object to the form of the

13:07:23   17  question.

13:07:23   18       A.   I think that's the case, and -- but only in

13:07:26   19  one or two instances.

13:07:27   20       Q.   Okay.   In other words, let me try to -- just

13:07:32   21  to put it into, you know, a list of the kinds of

13:07:35   22  opinions you're giving in this case, and you can tell

13:07:38   23  me if you're giving them or not.   One of the kinds of

13:07:40   24  opinions you're going to be giving in this case is

13:07:42   25  a -- is a rebuttal to Dr. Yadin David.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

177

13:07:44    1        A.    Correct.

13:07:44    2        Q.    To a limited extent, one of the other

13:07:47    3    opinions you'll be giving is the rebuttal to Dr.

13:07:51    4    William Jarvis.

13:07:52    5        A.    Very limited.

13:07:52    6        Q.    Very limited, yes.

13:07:54    7              Just offhand, do you think there's anything

13:07:57    8    but the HICPAC minutes that relate to Dr. Jarvis?  Do

13:08:00    9    you remember offhand?  And I know there may --

13:08:01   10              If it's in the report, it's in the report.

13:08:01   11        A.    You mean is there -- is there something else

13:08:02   12    in my report about --

13:08:03   13        Q.    Yeah.  Yeah.  Do you even remember offhand?

13:08:05   14        A.    I don't -- I don't think so.

13:08:06   15        Q.    Okay.

13:08:06   16        A.    I may be incorrect, but I don't think so.

13:08:07   17        Q.    Sure.  Sure.  And I mean if it's in the

13:08:10   18    report, it's in the report.

13:08:10   19        A.    Sure.

13:08:11   20        Q.    I'm not holding you to that now.  And

           21    then --

13:08:13   22              So you have those.  Then you also have

13:08:15   23    opinions that dir -- that are directed towards the

13:08:16   24    arguments raised in the punitive damage motion which

13:08:19   25    somewhat overlap in some cases with experts' reports.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

178

13:08:21   1       A.    Correct.

13:08:22   2       Q.    And then you have more-general opinions

13:08:25   3   about the plaintiffs' complaint and perhaps what we

13:08:27   4   could just call Dr. -- Mr. Ulatowski's general

13:08:30   5   opinions.

13:08:30   6             MS. EATON:   Object to the form of the

13:08:31   7   question.

13:08:31   8       Q.    Is that fair?

13:08:33   9       A.    I think that's fair enough.

13:08:34   10      Q.    Okay.   There is also quite a bit about a

13:08:40   11  discussion about Dr. Augustine.   You're familiar with

13:08:43   12  who Dr. Augustine is.

13:08:44   13      A.    Yes.

13:08:44   14      Q.    And your report discusses certain activities

13:08:46   15  by Dr. Augustine and things that he's done over the

13:08:50   16  years.

13:08:50   17      A.    Yes.

13:08:52   18      Q.    Okay.   That's not meant to address anything

13:08:52   19  in plaintiffs' expert reports; correct?

13:08:57   20            MS. EATON:   Object to the form of the

13:08:57   21  question.

13:08:59   22      A.    Well I think it's -- it's -- well I think

13:09:10   23  it's sparked by aspects of -- of other documents.   For

13:09:17   24  example, if I speak of MDRs, medical device reports,

13:09:22   25  certainly that aspect is brought up in my discussion

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

179

13:09:26   1   of the warning letter to Arizant, and -- and -- and so

13:09:36   2   there's a relationship there, you know.

13:09:38   3        Q.   Do any of the plaintiffs' experts that

13:09:40   4   you're rebutting, do they talk about the warning

13:09:42   5   letter to Arizant relating to burns?

13:09:44   6        A.   Well Dr. David talks about FDA's interaction

13:09:48   7   with Arizant, and to me that opened the door to -- to

13:09:54   8   talk about as well, but -- but -- so --

13:09:59   9        Q.   So your view is because Dr. David talks

13:10:02  10   about some regulatory aspects of the -- Arizant

13:10:04  11   dealing with the FDA, that that was somehow related to

13:10:08  12   Augustine and his actions related to the FDA?

13:10:12  13        A.   Well there's a history here.  We're talking

13:10:14  14   about a -- a -- 510(k) submissions, the performance of

13:10:19  15   these devices over time, so postmarket information

13:10:24  16   provided to FDA is very relevant in regards to -- to

13:10:28  17   this whole scenario.

13:10:29  18        Q.   Okay.  There's --

13:10:30  19             MS. EATON:  And I just want to interject an

13:10:32  20   objection to the form of that question.

13:10:33  21             MR. BANKSTON:  Okay.

13:10:33  22        Q.   There is then --

13:10:35  23             There's some opinions, too, about

13:10:39  24   Augustine's delay in filing a MedWatch report until 30

13:10:43  25   days had passed since a complaint was filed.  Do you

180

13:10:46  1   know that -- that part of your report?

13:10:47  2       A.   Yes.

13:10:47  3       Q.   Okay.  And it's your opinion that Dr.

13:10:49  4   Augustine was acting unconscionably in waiting 30 days

13:10:54  5   to file an MDR report.

13:10:55  6           MS. EATON:  Object to the form of the

13:10:56  7   question.

13:10:56  8       A.   I think I used words of that type.

13:10:58  9       Q.   Okay.  Is it your testimony that the day a

13:11:02  10  re -- claim was filed, Dr. Augustine -- and he becomes

13:11:08  11  aware of it, that a claim is filed against another

13:11:09  12  company, he has an affirmative duty to file an MDR

13:11:12  13  report that day?

13:11:13  14      A.   Could you repeat the question?

13:11:14  15      Q.   Sure.  If Augustine becomes aware that

13:11:17  16  there's a lawsuit against a device made by another

13:11:20  17  company, is -- on the day he becomes aware of that

13:11:23  18  complaint, is he obligated to file an MDR report?

13:11:26  19      A.   No, not on the day, but within a certain

13:11:29  20  timeframe.

13:11:29  21      Q.   And what timeframe is that?

13:11:31  22      A.   It's a 30-day timeframe.

13:11:32  23      Q.   And that's when mis -- Dr. Augustine

13:11:34  24  reported that; correct?

13:11:35  25      A.   No.  I think there were --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

181

13:11:36   1        There was a process there of -- of waiting

13:11:39   2   for the company to submit an MDR and then delaying the

13:11:45   3   submission to -- to impugn, in my view, the integrity

13:11:51   4   of the company.

13:11:52   5        Q.   Okay.  So in other words, you're saying that

13:11:55   6   it was improper for Dr. Augustine to wait for 3M to

13:12:00   7   fulfill any alleged obligations under that 30 days,

13:12:02   8   that he should have, if he wanted to file an MDR

13:12:05   9   report, should have filed it immediately when he knew

13:12:07  10   about it.

13:12:07  11        A.   No, I'm not saying that.  I'm saying his

13:12:10  12   motivation was not, in my view -- it's my opinion,

13:12:13  13   it's my report -- that in my view his motives were not

13:12:18  14   related to public health but rather to impugning the

13:12:22  15   integrity of the Bair Hugger manufacturer.

13:12:24  16        Q.   Okay.  You read Dr. Augustine's deposition?

13:12:27  17        A.   Yes, I have.

13:12:27  18        Q.   Okay.  And do you use that deposition to

13:12:29  19   support your opinions that you think he had an

13:12:31  20   improper motive?

13:12:32  21        A.   Oh, I think so.  Sure.

13:12:39  22        Q.   There is a section of your report that

13:12:41  23   discusses 20 MDRs for the Hot Dog device.

13:12:44  24        A.   Yes.

13:12:44  25        Q.   What's that relevant to?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

182

13:12:46  1      A.    It's relevant inasmuch as I discuss it in my

13:12:49  2   report, which is --

13:12:51  3           Well, if I'm going to be talking about

13:12:53  4   Arizant or 3M or Augustine -- whatever the timeframe

13:12:57  5   is -- reporting to FDA, then I want to take a look at

13:13:03  6   Hot Dog, which is Dr. Augustine's device, and to see

13:13:08  7   on a comparative basis what are the adverse outcomes

13:13:12  8   being reported to FDA.  And, you know, I state what I

13:13:15  9   state in my report, that absent the litigation report,

13:13:20  10  it's my view that the numbers of MDRs would have been

13:13:23  11  about the same between the two companies.

13:13:25  12      Q.    Why does it matter what MDRs were filed

13:13:29  13  about some other device that's not subject to this

13:13:31  14  lawsuit?  What is that important to?

13:13:33  15      A.    I -- I think it -- it sets the context

13:13:36  16  for -- for the -- as I do often in device reports, is

13:13:43  17  to look at competing devices, to look at their

13:13:46  18  performance of devices vis-a-vis others and see how

13:13:49  19  they compare.  So, you know, I think it's very

13:13:51  20  relevant.  I think it's important.

13:13:53  21      Q.    What other devices did you look at in terms

13:13:58  22  of MDR reports?

13:13:58  23      A.    I looked at the Hot Dog.

13:14:01  24      Q.    What other devices?

13:14:01  25      A.    I don't think I looked at other devices.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

183

13:14:03   1       Q.   So in terms of looking at competitive

13:14:05   2   devices, it was solely limited to Dr. Augustine's

13:14:07   3   device.

13:14:08   4       A.   I believe so.

13:14:08   5       Q.   Which isn't a device that's mentioned in Dr.

13:14:11   6   David's report; right?

13:14:12   7       A.   I don't know if he talks about the Hot Dog

13:14:16   8   at all.  You know, proba -- interestingly, probably

13:14:21   9   not, but I -- I can't be exactly sure of that.

13:14:24  10       Q.   He talks about four other devices; right?

13:14:27  11       A.   Correct.

13:14:28  12       Q.   Did you search any MDRs for those devices?

13:14:31  13       A.   No.  Because I think a couple of them were

13:14:34  14   relatively new; there wouldn't be a history of -- a

13:14:38  15   coincidental history of MDR submissions.  No, I didn't

13:14:41  16   look at them is the short answer.

13:14:42  17       Q.   You're -- you're -- you're also testifying

13:14:45  18   that those four devices, you think that certain of

13:14:46  19   them are new devices.  What do you mean by that?

13:14:49  20       A.   Well a couple of them are relatively new

13:14:52  21   devices.  I -- I can't recall the -- the marketing

13:14:55  22   data of all them, but the point is I did not look at

13:14:58  23   the MDRs for their devices.

13:15:01  24       Q.   Okay.  In terms of the MDR reporting for the

13:15:04  25   Bair Hugger, is that Augustine's obligation or 3M's

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

184

13:15:07   1   obligation?

13:15:09   2       A.   Well that's ultimately 3M's obligation, but

13:15:13   3   it doesn't prevent, depending on --

13:15:16   4            You know, there's reporting requirements for

13:15:18   5   various parties, not just the manufacturer.  There's

13:15:22   6   health -- healthcare facility reporting and there's

13:15:26   7   importer reporting, those are required reports, and

13:15:29   8   there's voluntary reports by -- by virtually any other

13:15:34   9   person.  So, you know, that's the structure of

13:15:37   10  reporting to FDA.

13:15:41   11      Q.   Have you been retained to offer opinions on

13:15:44   12  Augustine's motives?  Is that one of the things that

13:15:46   13  you're retained to do?

13:15:50   14      A.   That's an opinion I generated based upon my

13:15:53   15  analysis of the MDR data and his deposition.  And I --

13:15:57   16  I explored it because, you know, FDA's been in kind of

13:16:03   17  the midst of this MDR reporting issue recently.  It

13:16:09   18  was a subject of a recent inspection.  There's been

13:16:13   19  correspondence with FDA.  I felt I'd like to take a

13:16:17   20  look myself to see what's going on with this MDR

13:16:19   21  reporting, whether there's anything there there, and

13:16:21   22  so I looked at it.

13:16:23   23      Q.   You're talking about Augustine's MDR

13:16:26   24  reporting with respect to the Bair Hugger; correct?

13:16:27   25      A.   Yes.

185

13:16:28   1        Q.    Not his MDR reporting with respect to the

13:16:31   2    Hot Dog.

13:16:32   3        A.    Correct.

13:16:32   4        Q.    Okay.  Any of the plaintiffs' experts that

13:16:35   5    address Augustine or his motives in this litigation?

13:16:38   6        A.    Any plaintiff.  Well --

13:16:40   7        Q.    Did you come across anything in reviewing

13:16:42   8    plaintiffs' expert reports about Augustine or his

13:16:45   9    motives?

13:16:46  10        A.    I don't believe so.

13:16:47  11        Q.    Okay.  Can -- can you flip to page 25 of

13:17:09  12    your report for me.

13:17:10  13        A.    Sure.

13:17:18  14        Q.    Okay.  At the top paragraph, in the second

13:17:22  15    line it says, "...I reserve the right to supplement

13:17:26  16    this report and my opinions after that reviewed is

13:17:30  17    completed and as discovery progresses in this

13:17:33  18    litigation."  Correct?

13:17:34  19        A.    Yes.

13:17:34  20        Q.    Okay.  From where do you get the ability to

13:17:38  21    reserve that right do you believe?

13:17:40  22        A.    As new information is provided --

13:17:42  23        Q.    Okay.

13:17:43  24        A.    -- and they provide me an opportunity to

13:17:45  25    modify my opinions or supplement my opinions.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

186

13:17:48  1      Q.    You understand general discovery in this

13:17:51  2   case for general causation is closed; correct?  Have

13:17:54  3   you been told that?

13:17:55  4      A.    No, I haven't been told that.

13:17:56  5      Q.    Okay.  And you understand the parties from

13:17:57  6   here on out are going to be doing discovery on the

13:18:01  7   specific cases and these specific patients; right?

13:18:03  8      A.    I suspect.

13:18:04  9      Q.    Okay.  Do you have any reason to think at

13:18:05  10  all that additional discovery on what happened to

13:18:08  11  these particular patients is going to be in any way

13:18:11  12  relevant to your opinions about whether the company,

13:18:13  13  in working with the device, complied with FDA

13:18:16  14  regulations?

13:18:17  15     A.    I have no idea.  Possibly.

13:18:20  16     Q.    Can you give me a detail of a plaintiff's

13:18:20  17  surgery that could perhaps be relevant to your

13:18:23  18  regulatory opinions?

13:18:24  19     A.    Repeat the question again.

13:18:25  20     Q.    Can you give me a detail of plaintiff's

13:18:29  21  surgery that could be relevant to your -- that could

13:18:31  22  change or alter your regulatory opinions?

13:18:33  23     A.    Well I can't foresee it at this time, not to

13:18:36  24  say there isn't.

13:18:45  25     Q.    Are you going to be offering any opinions on

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

187

13:18:47   1   the individual plaintiffs?

13:18:50   2       A.   I -- I would suspect not in regards to

13:18:54   3   clinical aspects or any other aspect.  There may be

13:19:00   4   aspects, for example, of --

13:19:05   5            Well, I -- I guess I don't want to

13:19:08   6   speculate.

13:19:15   7       Q.   Okay.  I want to talk to you about a section

13:19:16   8   of your report that discusses the definition of

13:19:18   9   "safe."

13:19:18  10       A.   Sure.

13:19:19  11       Q.   And that there's one definition of "safe"

13:19:21  12   that applies to medical devices; correct?

13:19:23  13       A.   Correct.

13:19:24  14       Q.   Okay.  Let's turn to page 31 so we can look

13:19:27  15   at that definition together.

13:19:36  16            On page 31 you state that the one definition

13:19:38  17   of "safe" that applies to medical devices is as

13:19:41  18   follows:  'There is reasonable assurance that a device

13:19:45  19   is safe when it can be determined, based upon valid

13:19:49  20   scientific evidence, that the probable benefits to

13:19:52  21   health from the use of the device for its intended

13:19:55  22   uses and conditions of use, when accompanied by

13:19:59  23   adequate directions and warnings against unsafe use,

13:20:03  24   outweigh any probable risk.'"  That's your definition

13:20:06  25   that you're using in this case; correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

188

13:20:07  1      A.    That's correct.

13:20:08  2      Q.    Okay.  You have already told me today that

13:20:12  3  you're not going to be giving the jury an opinion

13:20:13  4  within a degree of -- reasonable degree of medical

13:20:16  5  certainty that there is valid scientific evidence of

13:20:18  6  probable health benefits from the use of the Bair

13:20:21  7  Hugger in orthopedic surgeries; correct?

13:20:27  8      A.    I believe so.  The aspect of safety that I

13:20:31  9  address in my report is in regard to my response to

13:20:36  10  Dr. David.  As -- as you know, in reading my report,

13:20:42  11  that -- that his report is devoted to risk without any

13:20:47  12  discussion of benefit.

13:20:49  13      Q.    Okay.  So the -- the answer is no, you're

13:20:52  14  not going to be giving that opinion to the jury.

13:20:54  15      A.    I'll discuss it from a regulatory point of

13:20:56  16  view that safety is based upon benefit versus risk,

13:20:59  17  and Dr. David discusses risk.

13:21:01  18      Q.    Right.  And -- and I understand that you're

13:21:02  19  going be to giving opinions about what the regulations

13:21:06  20  require and about the existence of this definition;

13:21:07  21  right?  That's something that's --

13:21:09  22          You would agree that this is something that

13:21:11  23  the regulations inform, this definition.

13:21:13  24      A.    Correct.

13:21:13  25      Q.    Okay.  But in terms of whether you can have

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

189

13:21:16 | 1 | medical testimony about whether there is actually

13:21:19 | 2 | valid scientific evidence of a probable risk, you've

13:21:22 | 3 | told me today that's not an opinion you're going to be

13:21:25 | 4 | giving the jury.

13:21:25 | 5 | A.   I will defer to experts, clinical experts on

13:21:28 | 6 | that matter.

13:21:28 | 7 | Q.   Okay.  And -- and the same answer was true

13:21:30 | 8 | with regard to an opinion within a reasonable degree

13:21:34 | 9 | of medical certainty about the degree of medical risk

13:21:36 | 10 | from the use of the Bair Hugger in orthopedic

13:21:37 | 11 | surgeries.

13:21:39 | 12 | MS. EATON:  Object to the form of the

13:21:40 | 13 | question.

13:21:40 | 14 | A.   In regard to medical risk, yes.

13:21:42 | 15 | Q.   Yes.  Okay.

13:21:43 | 16 | A.   There are vari -- various aspects of risk,

13:21:47 | 17 | medical risk, yes.

13:21:47 | 18 | Q.   Sure.  So when we talk about this definition

13:21:50 | 19 | of "safe" which requires a finding of valid scientific

13:21:53 | 20 | evidence supporting probable benefits to health and

13:21:56 | 21 | also a finding concerning any probable risks in

13:22:00 | 22 | connection with its intended use and its conditions of

13:22:02 | 23 | use, that's not testimony you are qualified to give.

13:22:06 | 24 | That's somebody else.

13:22:07 | 25 | A.   From a medical position.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

190

13:22:09  1      Q.   Correct.  So by your definition, you are not

13:22:13  2  going to be testifying in this case that there is a

13:22:17  3  reasonable assurance from a medical point of view that

13:22:18  4  the device is safe.

13:22:22  5      A.   I don't think I address that in my report

13:22:24  6  head on.

13:22:25  7      Q.   And I -- uh-huh.  And so I just want to

13:22:28  8  confirm that's not an opinion you're going to be

13:22:31  9  giving.

13:22:31  10      A.   That's correct.

13:22:31  11      Q.   Okay.  I want to talk to you about your

13:22:35  12  opinion that 3M was appropriate in not considering the

13:22:42  13  MDR reports that were based on litigation because they

13:22:46  14  would not reasonably suggest to the company that there

13:22:48  15  was an event, in basic shorthand.  Do you agree that's

13:22:52  16  essentially your opinion?

13:22:53  17          MS. EATON:  Let me object to the form of the

13:22:54  18  question.

13:22:55  19          MR. BANKSTON:  What's wrong on that one?

13:22:58  20          MS. EATON:  The word "considering."

13:22:58  21          MR. BANKSTON:  Okay.

13:22:58  22          MS. EATON:  I object to that word.  I don't

13:23:00  23  think it's accurate.

13:23:00  24          MR. BANKSTON:  Okay.  Let's -- let's get

13:23:02  25  that from your report.  That's in your report.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

191

13:23:06   1          MS. EATON:  At least how I heard you use it.

13:23:59   2          MR. BANKSTON:  I need a better word to

13:24:00   3   search for.

13:24:08   4      Q.   All right, here we go.  Let's go to page 65.

13:24:12   5      A.   Okay.  All right.

13:24:20   6      Q.   All right.  This is the opinion that I was

13:24:23   7   quoting, it's at the very bottom of the page, and you

13:24:23   8   will see in the second sentence in the last paragraph,

13:24:26   9   "It is my opinion that 3M appropriately did not

13:24:30  10   consider the litigation-based complaints to

13:24:33  11   'reasonably suggest' that a Bair Hugger may have

13:24:35  12   caused or contributed to an infection."  That's your

13:24:37  13   opinion in this case?

13:24:38  14      A.   Right.  Correct.  Yes.

13:24:40  15      Q.   All right.  So part of what we're saying --

13:24:44  16   what is being said in this report, and I think you'll

13:24:47  17   see from the -- the following sentences, is that the

13:24:50  18   litigation-based complaints and the associated

13:24:53  19   MedWatch reports submitted by Dr. Augustine are

13:24:56  20   tainted because they're unverified, they're

13:24:58  21   incomplete, have motive ascribed to them.  There's

13:25:01  22   reasons to dismiss them in other words.

13:25:03  23      A.   Yes.

13:25:03  24      Q.   Okay.  And in fact if a complete is

13:25:11  25   unverified and incomplete --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

192

1          THE REPORTER:  I'm sorry?

2          MR. BANKSTON:  No problem.  I can do it

13:25:11   3   again.

13:25:11   4          MS. EATON:  Can you stop for a moment?

13:25:13   5   Because I'm -- I'm not able to follow this (referring

13:25:14   6   to realtime screen).  What did I need to click?

13:25:16   7          Okay.  Now I think it's working.

13:25:18   8          (Discussion off the stenographic record.)

13:25:22   9      Q.   Let's start that question again, which is

13:25:25  10   essentially:  Part of your opinion is that because

13:25:27  11   these reports are incomplete and unverified, it's

13:25:33  12   impossible to tell if the device did or did not cause

13:25:36  13   an injury.

13:25:39  14      A.   No.  It's the -- it's the sum of my

13:25:41  15   statement, which it's been biased and contrived by Dr.

13:25:49  16   Augustine that -- generated and -- and precipitated by

13:25:53  17   Dr. Augustine in this really extraordinary, outrageous

13:25:59  18   process he had, that in my years at FDA is

13:26:02  19   unprecedented.  And boy, I'll -- I'll say that in

13:26:08  20   court without any -- any deviation or hesitance.

13:26:13  21   Un -- unmatched in my experience, in my FDA experience

13:26:18  22   evaluating MDRs, taking action on MDRs or not taking

13:26:23  23   action on MDRs, I've never seen anything like -- like

13:26:25  24   this.  And -- and so given all that, for 3M -- and

13:26:32  25   then FDA inspecting 3M based upon a complaint by

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

193

13:26:38  1  probably Dr. Augustine, and then FDA being apprised

13:26:43  2  again through correspondence, 3M was very visible on

13:26:47  3  this with FDA about their -- their position without

13:26:52  4  response from FDA to the negative that, you know,

13:26:57  5  these -- it was --

13:26:58  6        These reports are not reasonable and should

13:27:00  7  not be reported.

13:27:01  8     Q.   Okay.  My question is:  If an MDR report is

13:27:04  9  submitted and it has -- and it's incomplete and

13:27:07  10 unverified, that makes it difficult or maybe even

13:27:10  11 impossible to tell if the device did or did not cause

13:27:13  12 the injury.

13:27:14  13    A.   As a general rule, that's possible, yes.

13:27:16  14    Q.   Okay.  And if the company can't tell whether

13:27:18  15 the device did or did not cause the injury, they don't

13:27:21  16 have to report it.

13:27:24  17    A.   No.  The -- the rule is if -- if there's

13:27:29  18 reasonable evidence that the device may have caused or

13:27:33  19 contributed to certain events, may have caused or

13:27:38  20 contributed, then it's reportable unless there is

13:27:41  21 evidence to the contrary.

13:27:42  22    Q.   Okay.

13:27:42  23    A.   The keyword here is -- is "reasonable"

13:27:46  24 evidence, and -- and that's the linchpin here that Dr.

13:27:52  25 Augustine has undermined the process.

194

13:27:55    1        Q.    Okay.  So in other words, because of the

13:27:59    2    tainting influence of Dr. Augustine --

13:28:02    3            I'll correct you just for going forward:

13:28:05    4    For the record, his name is Augustine.

13:28:07    5        A.    Okay.  Augustine.  Sorry.

13:28:10    6        Q.    Yeah.  It's not -- yeah, confuses.  Plenty

13:28:10    7    of people named Augustine, too.

13:28:11    8        A.    Well, you know, I'm Catholic.  St.

13:28:13    9    Augustine.

13:28:14   10        Q.    Right.  Yes.

13:28:15   11            Because of this taint of Dr. Augustine,

13:28:19   12    you're saying that there's no way these -- these

13:28:22   13    reports could be accurate, or are you saying that

13:28:24   14    because of the taint of Augustine there's significant

13:28:27   15    reason to doubt these reports?

13:28:29   16        A.    The -- the latter.  Because of -- because of

13:28:32   17    the manner in which these were generated were -- and

13:28:38   18    how this was all set up, that that's what tainted,

13:28:43   19    that they should be disregarded as -- as unreasonably

13:28:46   20    submitted.  And -- and, you know, the fact of the

13:28:49   21    matter is FDA hasn't said anything to the contrary.

13:28:52   22        Q.    Okay.  So what that brings us to is that Dr.

13:29:00   23    Augustine's reports and his influence in it and his

13:29:03   24    tainting influence in it means there's significant

13:29:06   25    reason to doubt these reports, and therefore, while

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

195

13:29:10   1   you probably can't say for sure it didn't cause these

13:29:12   2   incidents, it probably didn't cause these incidents.

13:29:16   3   That would be a fair conclusion for the company to

13:29:17   4   reach?

13:29:18   5           MS. EATON:  Object to the form of the

13:29:19   6   question.

13:29:22   7       A.   I -- I think that --

13:29:25   8           Well my answer is I think if -- if there

13:29:29   9   were other methodologies for submitting these reports,

13:29:32   10  if the patients had submitted them, if the patient's

13:29:35   11  doctor had submitted them, if a patient's lawyer,

13:29:38   12  without the undue influence from Dr. Augustine, had

13:29:46   13  submitted them, then -- then there may be more

13:29:50   14  credibility to them.  But this is -- it -- it's almost

13:29:53   15  without thought that -- that these were submitted

13:29:59   16  just -- just as a matter of -- of pumping up the

13:30:02   17  numbers of MDRs for no public-health reason but solely

13:30:06   18  to, in my view, my opinion, to -- to create this

13:30:11   19  impression of the Bair Hugger device.  Well that's not

13:30:14   20  the purpose of the MDR reporting process.

13:30:17   21      Q.   Well I'm really trying to specifically

13:30:18   22  address what this taint from Dr. Augustine would make

13:30:22   23  a reasonable company conclude, and would it --

13:30:24   24          What I'm trying to understand is:  That

13:30:27   25  taint makes them feel that there's, as you said,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

196

13:30:30   1   credibility issues with this.  That's one thing they

13:30:32   2   would notice as you're saying; correct?

13:30:34   3       A.   Yes.  We'll have to let the chips fall where

13:30:37   4   they may on any specific plaintiff once the evidence

13:30:40   5   comes to bear, once the clinical evidence, the usage

13:30:43   6   of Bair Hugger or non-usage or how it was used, when

13:30:46   7   it was used, the clinical condition of the plaintiff,

13:30:50   8   all that stuff comes to bear in a -- in a trial, well,

13:30:53   9   you know, then -- then we'll know more, perhaps, or we

13:30:57  10   may know even less.

13:30:58  11       Q.   Sure.  Okay.  So in the future --

13:31:01  12            Let me see if you'd agree with my statement

13:31:03  13   right now.  Right now, because of these tainted MDR

13:31:06  14   reports, which have, according to you, significant

13:31:09  15   problems, right now the company cannot say with any

13:31:13  16   authority what happened with any particular patient,

13:31:17  17   they can't say with authority that the device did or

13:31:20  18   did not cause the injury, they have very significant

13:31:23  19   reason to doubt it.  Is that fair?

13:31:26  20            MS. EATON:  Object to the form of the

13:31:27  21   question.

13:31:27  22       A.   What I'll say is I -- I think the evidence

13:31:29  23   will have to be brought to bear for a more clear

13:31:34  24   finding of root cause --

13:31:36  25       Q.   Okay.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

197

13:31:36    1        A.    -- of a particular clinical event.

13:31:38    2        Q.    If --

13:31:39    3              In other words, as we go further and more

13:31:41    4    evidence comes out and as we look closer at these

13:31:44    5    events and apply scrutiny to them, we may be able to

13:31:47    6    come to a firm conclusion that this device did not

13:31:50    7    cause these injuries.

13:31:52    8        A.    That may well be the case.

13:31:54    9        Q.    That's --

13:31:55   10        A.    I think --

13:31:55   11        Q.    That's down the road.

13:31:56   12        A.    Yes.  But -- but -- yes.  But in addition,

13:31:59   13    look, we -- we have an -- an allegation of infection

13:32:03   14    reported in these reports, and boom, right away it's

13:32:07   15    the Bair Hugger.  Well I'm sorry, there's lots of

13:32:11   16    stuff in an OR, there's lots of things going on in an

13:32:14   17    OR, and to -- to pinpoint the Bair Hugger is -- is

13:32:20   18    really extraordinary in MDR reports.

13:32:22   19              You know, what I will see is, depending on

13:32:24   20    the device, you'll see some greater definition of

13:32:28   21    causation because of the particular infection or

13:32:31   22    outcome of the patient and there won't be a jumping to

13:32:34   23    conclusions.

13:32:35   24              MR. BANKSTON:  Okay.  I'm going to have to

13:32:37   25    object as non-responsive.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

198

13:32:41  1      Q.   If that's further down the road, you're

13:32:44  2  going to -- you would agree with me that right -- that

13:32:46  3  off the basis of the MDR reports themselves, just from

13:32:49  4  those, just from the reports the manufacturer received

13:32:52  5  before you ever got involved in the case or any of

13:32:55  6  this ever happened right here, that at that moment

13:32:58  7  from those MDR reports, the company did not have

13:33:01  8  sufficient information to conclude conclusively that

13:33:03  9  the device did not cause these injuries.  That's still

13:33:07  10  an open question even sitting here right now.  And I

13:33:09  11  understand you think that they most probably did not,

13:33:12  12  but can you point me to any information in those MDR

13:33:15  13  reports that says -- would be used for a conclusion

13:33:18  14  that these absolutely did not cause the problem?

13:33:23  15          MS. EATON:  Object to the form of the

13:33:23  16  question.

13:33:23  17      A.   You're asking about an absolute situation,

13:33:27  18  and -- and there are -- there's no absolutes in

13:33:29  19  medicine.  But what I'm also saying is for any given

13:33:36  20  plaintiff, the facts will -- may bear out a more

13:33:40  21  likely causation or even more lack of determination of

13:33:47  22  what actually caused it.

13:33:48  23      Q.   We had been talking about experts who are

13:33:52  24  qualified in medical things, a lot of them involved in

13:33:55  25  this case.  You've seen some of their reports.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

199

| | | |
|---|---|---|
| 13:33:56 | 1 | There's defendants' experts, too.  Would you think |
| 13:34:00 | 2 | that -- that you could have a person who is medically |
| 13:34:05 | 3 | qualified and that person could be presented with |
| 13:34:07 | 4 | evidence, and then that person, using medical |
| 13:34:10 | 5 | judgment, could conclude that this device did not |
| 13:34:13 | 6 | cause these injuries?  That's something that's |
| 13:34:15 | 7 | possible in your mind? |
| 13:34:16 | 8 | A.   Yes. |
| 13:34:16 | 9 | Q.   Okay.  That's -- that's not what Arizant was |
| 13:34:21 | 10 | doing in terms of the MDR.  They weren't trying to |
| 13:34:25 | 11 | conclusively prove that the product didn't cause these |
| 13:34:28 | 12 | injuries.  You're saying that because they doubted the |
| 13:34:32 | 13 | reports because the reports had significant problems, |
| 13:34:35 | 14 | they were non-reportable. |
| 13:34:36 | 15 | A.   They were -- |
| 13:34:37 | 16 | MS. EATON:   Object to the form of the |
| 13:34:38 | 17 | question. |
| 13:34:38 | 18 | A.   These were form-letter MDRs -- |
| 13:34:40 | 19 | Q.   Okay. |
| 13:34:42 | 20 | A.   -- from Dr. Augustine. |
| 13:34:42 | 21 | Q.   Okay.  So what I -- |
| 13:34:43 | 22 | A.   They -- they -- they weren't individualized |
| 13:34:46 | 23 | accounts of events.  These were precooked testimonies |
| 13:34:52 | 24 | of -- of his theory. |
| 13:34:53 | 25 | Q.   Okay.  So in other words, when making the |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

200

13:34:56  1   decision about re --

13:34:57  2           When receiving those MDR reports and making

13:34:59  3   the decision about whether to report, Arizant was not

13:35:03  4   quali -- was not required by law to have a medical

13:35:08  5   person deliver a medical judgment or a medical opinion

13:35:12  6   that this device did not cause these injuries.

13:35:15  7       A.   Well that is one of the -- the -- one of the

13:35:20  8   processes in an MDR analysis, --

13:35:22  9       Q.   Okay.  So --

13:35:23  10      A.   -- that a -- that a medical doctor -- excuse

13:35:25  11  me -- a medical doctor, a biomedical engineer or a

13:35:29  12  health professional such as a nurse can make decisions

13:35:32  13  of that type, that the device conclusively did not --

13:35:37  14  the device was not involved in the event.  But the

13:35:39  15  regulation provides enough flexibility and

13:35:43  16  interpretation for 3M to say, look, based on the facts

13:35:47  17  that -- that we're seeing here, these were all

13:35:51  18  contrived and -- and are unreasonable.  And FDA has

13:35:53  19  not concluded otherwise, so --

13:35:55  20          And believe me, I think, you know, being

13:35:58  21  director of compliance for so many years, if FDA

13:36:01  22  thought other -- if I thought otherwise as director of

13:36:03  23  compliance, and I -- I would be the one that made that

13:36:06  24  decision, I would have jumped on 3M right away.  And

13:36:08  25  that's not been the case.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

201

13:36:09    1        Q.    Are you testifying that in making decisions

13:36:12    2    about MDR reporting, the company had sufficient

13:36:16    3    information to lead a medical individual to conclude,

13:36:19    4    about all of those surgeries that were reported, that

13:36:21    5    the devices did not cause those injuries?

13:36:25    6        A.    You're -- you're asking about a process

13:36:29    7    that --

13:36:29    8             3M actually identified and assessed the

13:36:31    9    reasonableness of the submission, and they -- as has

13:36:36   10    been expressed in deposition testimony, as has been

13:36:38   11    expressed at FDA, and 3M has never attested to the

13:36:41   12    fact that they made a -- at least I don't think so --

13:36:44   13    ever made a -- conducted a medical opinion of the

13:36:48   14    reports because you couldn't even get that far because

13:36:51   15    the reports were so contrived as to be, really,

13:36:55   16    medically not -- not yet valuable for that purpose.

13:36:58   17        Q.    So they had reports that alleged that the

13:37:01   18    product may have caused an injury and they did not at

13:37:05   19    that time have medical opinions saying that the device

13:37:08   20    did not cause the injury.

13:37:10   21        A.    I may be incorrect, but I -- I don't -- I'm

13:37:13   22    not --

13:37:13   23             I'd have to look at deposition testimony

13:37:15   24    again, but I'm not sure they have that analysis for

13:37:19   25    each of the MDRs.  That analysis -- position, as I

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

202

13:37:24  1  understand it and as I concluded, too, was that -- was

13:37:28  2  the unreasonableness of the submissions.  And, you

13:37:32  3  know, once again, FDA evaluated their thought process,

13:37:35  4  their procedures, their rationale for not submitting

13:37:39  5  the MDRs, and have not concluded that they should be

13:37:44  6  submitted.

13:37:44  7       Q.    In order --

13:37:45  8            Put it this way:  If a medical -- medical

13:37:48  9  device manufacturer is in possession of an MDR

13:37:52  10 report -- or excuse me.  Let's -- that's just not the

13:37:54  11 correct terminology.

13:37:55  12           If a medical device manufacturer is in

13:37:57  13 possession of an allegation of a patient injury from

13:38:00  14 their device and that medical device manufacturer does

13:38:04  15 not currently possess information that would lead a

13:38:07  16 person who's qualified to make a medical judgment to

13:38:10  17 conclude that the device did not cause or contribute

13:38:12  18 to the death, if they don't have that information,

13:38:15  19 that event is reportable.  Agreed?

13:38:17  20      A.    In the normal course of events.  But this is

13:38:20  21 very abnormal, as I stated.  This is unprecedented.

13:38:23  22      Q.    So because this situation to you is un -- is

13:38:25  23 abnormal, we can ignore the letter of the law.

13:38:28  24           MS. EATON:  Object to the form of the

13:38:29  25 question.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

203

13:38:29   1       A.   No, no.   No.   We're consistent with the law

13:38:31   2   in that are the reports reasonable?   That's part of

13:38:34   3   the definition of -- of the decision process.   And a

13:38:39   4   reasonable report is one independently submitted by a

13:38:45   5   manufacturer, healthcare facility or importer

13:38:50   6   attesting to what I'll call a complaint, and -- and

13:38:54   7   that being evaluated by the manufacturer.

13:38:56   8       Q.   Let's -- let's try to -- let's try to take

13:38:59   9   it into the hypothetical sphere for a moment and to

13:39:03  10   say:   If Arizant possessed information that could

13:39:07  11   reasonably suggest that a device caused or even may

13:39:13  12   have caused an injury, it has to report that unless

13:39:16  13   it's in possession of information that would lead a

13:39:19  14   medical professional to conclude that the device did

13:39:24  15   not cause the injury.

13:39:24  16           MS. EATON:   Object to the form of the

13:39:24  17   question.

13:39:25  18       A.   Well the regulation is as it is.   In the

13:39:27  19   normal course, as typically occurred day in and day

13:39:33  20   out at FDA, doctors, hospitals, manufacturers submit

13:39:36  21   reports with MDRs based on complaints provided to

13:39:40  22   them.   So that occurs every day, day in, day out, and

13:39:44  23   that's -- that's the way reporting normally ensues.

13:39:47  24   This -- this is quite -- quite an extraordinary

13:39:50  25   animal here.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

204

13:39:50   1       Q.   It is your opinion that because this is an

13:39:55   2   abnormal situation or because Augustine's taint was

13:40:03   3   involved in this situation, that even though the

13:40:07   4   company was in possession of an allegation that their

13:40:11   5   product may have caused an injury, it -- because it

13:40:13   6   was abnormal, it did not need to be in possession of

13:40:17   7   information that would lead a medical professional to

13:40:20   8   conclude it did not cause the injuries?

13:40:21   9       A.   No, I -- I think it provided a foundation

13:40:24  10   for -- for not reporting until I believe at such time

13:40:28  11   other evidence comes to bear that can be relied upon

13:40:32  12   and can be assessed by 3M, and then, again, a

13:40:37  13   reporting decision can be made.

13:40:39  14       Q.   Okay.

13:40:45  15           MS. EATON:  When you have a stopping point,

13:40:47  16   I need to take a break.

13:40:49  17           MR. BANKSTON:  Yeah, we can take a break.

13:40:51  18           THE REPORTER:  Off the record, please.

13:46:50  19           (Recess taken.)

13:46:50  20   BY MR. BANKSTON:

13:46:50  21       Q.   I want to talk a little bit about your

13:46:52  22   report again, if you want to pull that out.

13:46:54  23       A.   Okay.

13:46:54  24       Q.   Let's go to page 55.

13:46:57  25       A.   Fifty-five.  Okay.

205

13:47:03  1      Q.   All right.  And you see this opinion that

13:47:05  2   begins at number seven?

13:47:06  3      A.   Yes.

13:47:07  4      Q.   Okay.  And what is this opinion just

13:47:09  5   generally about?

13:47:10  6      A.   It's about the MedWatch report.

13:47:11  7      Q.   Okay.  Now go straight through -- flip to

13:47:15  8   about page 66, and all of these pages between here and

13:47:20  9   66, those are dealing with opinion number seven;

13:47:23  10  correct?

13:47:23  11     A.   Right.

13:47:23  12     Q.   Okay.  And you'll agree with me that there

13:47:26  13  are no opinions disclosed by plaintiffs' experts about

13:47:28  14  MDR reporting.

13:47:34  15     A.   No.  I think we talked about that already.

13:47:36  16     Q.   Yeah.  I just want to make sure I have that

13:47:38  17  correct.  Just from the standard of plaintiffs'

13:47:40  18  experts, we talked about --

13:47:41  19          Well, and just to confirm, we talked about

13:47:43  20  Augustine.  There was no plaintiffs' opinions about

13:47:45  21  Dr. Augustine; right?

13:47:46  22     A.   No.

13:47:46  23     Q.   And likewise, MDR reporting in general,

13:47:50  24  there's no reports and nothing in plaintiffs' reports

13:47:53  25  about MDR reporting.

206

13:47:55    1              MS. EATON:  Object to the form of the

13:47:58    2    question.

13:47:58    3              MR. BANKSTON:  What's your objection?

13:47:59    4              MS. EATON:  I think that mischaracterizes

13:48:00    5    what he said, but I'd have to go back and look.

13:48:03    6              MR. BANKSTON:  Okay.

13:48:03    7         A.   I -- I don't believe so.  I might be

13:48:04    8    incorrect, but I -- I don't believe so.

13:48:04    9         Q.   In other words, these are your opinions, not

13:48:07   10    something in response to plaintiffs' expert opinions.

13:48:09   11         A.   This is my opinion, yeah, because --

13:48:11   12              You know, if there was a setup for a

13:48:13   13    plaintiffs' expert, I would have said so.

13:48:15   14         Q.   Okay.

13:48:16   15         A.   Well it says here, for example, on seven,

13:48:19   16    "The Complaint...alleges that 3M/Arizant failed to

13:48:22   17    conduct surveillance of the Bair Hugger."

13:48:24   18         Q.   Okay.  That's about the complaint, correct,

13:48:26   19    not --

13:48:26   20         A.   Right.

13:48:26   21         Q.   -- the plaintiffs' expert reports?

13:48:29   22         A.   Right.

13:48:29   23         Q.   Okay.

13:48:30   24         A.   And so that -- you know, I was going to --

13:48:32   25              And then there was ample deposition

207

13:48:35    1    testimony due to questioning posed by plaintiffs'

13:48:39    2    attorney, maybe one of you -- you two, so obviously

13:48:42    3    it's -- it's of interest to you two in one form or

13:48:45    4    another, so I felt it's important to address it.

13:48:49    5        Q.   Sure.  And -- and I'm not -- not trying to

13:48:52    6    make any judgments about what you did, I'm just trying

13:48:54    7    to figure out what they are.  And in this case, these

13:48:57    8    are opinions, like we say, addressed in the complaint

13:49:01    9    and not -- where those are organized instead of

13:49:05   10    plaintiffs' experts.

13:49:05   11        A.   Right.  I don't think Dr. David discusses

13:49:08   12    MDRs except --

13:49:16   13             No.  I don't think he discusses the 2016

13:49:19   14    inspection.

13:49:19   15        Q.   Okay.

13:49:21   16        A.   But certainly he talks about the 20 -- 2010

13:49:24   17    inspection where MDR is brought up.

13:49:27   18        Q.   Hold on.  On that 2009 facility

13:49:30   19    inspection --

13:49:31   20        A.   Right.  The -- the 2010 warning letter.

13:49:33   21        Q.   Right.  And those are reports about burns;

           22    right?

13:49:36   23        A.   It -- it ended up being about burns, yeah.

13:49:38   24    But --

13:49:38   25        Q.   Nothing about that MDR is about airborne

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

208

13:49:41  1   contamination.

13:49:42  2       A.   No.  That came later.

13:49:43  3       Q.   Okay.  In other words, the inspection that

13:49:47  4   Dr. David talks about in his report has no relation to

13:49:53  5   MD -- failure of MDR reporting or warning letters

13:49:57  6   relating to airborne contamination.

13:49:59  7       A.   Well it doesn't in -- in -- in that the FDA

13:50:02  8   inspector evaluated 3M's medical device reporting

13:50:09  9   procedures, their thought process and their conduct,

13:50:13  10  so --

13:50:15  11      Q.   What --

13:50:16  12      A.   So -- so that's -- and -- and that was --

13:50:18  13           And that seemed to be fine according to the

13:50:23  14  FDA.  It was -- it was certain individual reports as I

13:50:24  15  recall.

13:50:24  16      Q.   What if any opinions did Dr. David express

13:50:27  17  regarding MDR reporting in connection with that 2009

13:50:31  18  inspection that you take issue with?

13:50:32  19      A.   Well what I'm saying is that he mentioned

13:50:35  20  the -- the warning letter and I think within the

13:50:40  21  context of the troublesome conduct of the company, if

13:50:44  22  I'm not mistaken, so I thought it necessary to address

13:50:51  23  that.  And, you know, due to your emphasis,

13:50:56  24  plaintiffs' emphasis on those litigation-based

13:51:01  25  reports, you know, that that seemed obvious I should

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

209

13:51:04  1   address it.

13:51:08  2       Q.   You were retained to provide a -- a rebuttal

13:51:13  3   opinion report, rebuttal opinion testimony; correct?

13:51:16  4       A.   Once I -- well --

13:51:18  5            MS. EATON:  Object to the form of the

13:51:20  6   question.

13:51:20  7       A.   In the MDL?

13:51:22  8       Q.   Correct.

13:51:23  9       A.   Yeah.  I'm just wondering about the timing

13:51:26  10  of Dr. David's report.  I think that's the case.  The

13:51:28  11  reason I paused is because in Walton and Johnson, of

13:51:32  12  course, I didn't -- Dr. David had a report there, too,

13:51:36  13  but they came along later.  In this case I think I

13:51:40  14  had -- I might be incorrect -- had Dr. David's report

13:51:43  15  first.

13:51:47  16      Q.   Well what I'm trying to understand is

13:51:49  17  specifically in this case, this report right there,

13:51:53  18  that's -- you've been retained to provide rebuttal

13:51:55  19  testimony, rebuttal opinions in that report.

13:51:58  20      A.   Yes.  Yes.

13:51:58  21      Q.   Okay.  You were not retained to offer

13:52:02  22  broad-based testimony generally about the Bair Hugger.

13:52:06  23           MS. EATON:  Object to the form of the

13:52:08  24  question.

13:52:09  25      A.   Well I -- I --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

210

13:52:10    1    In my evaluation of the complaint and in the

13:52:14    2    context of how I evaluate devices, my opinions -- my

13:52:21    3    foundation for the appropriateness of the device from

13:52:25    4    a regulatory position must include an analysis of its

13:52:28    5    regulatory history and whether or not it's appropriate

13:52:32    6    or inappropriate.

13:52:34    7        Q.   And that's completely independent whether or

13:52:35    8    not any given opinions are provided by plaintiffs'

13:52:37    9    experts.

13:52:39   10        A.   Right.  But we know, of course, Dr. David

13:52:41   11    did impugn the 510(k) process in his report.

13:52:44   12        Q.   Sure.  Sure.  And we know there's plenty of

13:52:47   13    opinions about the 510(k) process and plenty of

13:52:50   14    opinions in your report addressing what Dr. David has

13:52:52   15    to say about the 510(k) process; correct?

13:52:55   16        A.   Right.

13:52:55   17        Q.   Okay.  That is different from the opinions

13:52:57   18    you have that are not in any way connected with Dr.

13:53:00   19    David's report.

13:53:01   20            MS. EATON:  Object to the form of the

13:53:02   21    question.

13:53:02   22        A.   Well -- yes.  In regard to the litigation-

13:53:08   23    based MDR reporting, my opinion is based on 510(k)s,

13:53:12   24    upon -- you know, I'll call them the front-end

13:53:15   25    opinions in my report are all foundational in regard

211

13:53:19   1   to addressing his opinions on 5 -- on the 510(k)

13:53:22   2   process.

13:53:22   3       Q.   Okay.  All right.  Can you flip to 75 in

13:53:46   4   your report for me.  All right.  And you see here we

13:53:52   5   have opinion number nine; right?

13:53:54   6       A.   Yes.

13:53:54   7       Q.   And that opinion is about warning letters

13:53:57   8   that were sent in 2010; correct?

13:53:58   9       A.   Correct.

13:54:01   10      Q.   It's a warning letter you sent.

13:54:01   11      A.   Under my signature, yes.

13:54:02   12      Q.   Correct.  Is there a distinction there?

13:54:05   13      A.   Well I mean that I sent.  Well, you know --

13:54:09   14          Yeah.  I signed it, yes.  Do I -- do I send

13:54:14   15  it?  Well --

13:54:14   16      Q.   You stand by what was said in the letter

13:54:14   17  though; right?

13:54:15   18      A.   Of course I do.

13:54:16   19      Q.   And that's --

13:54:17   20          I mean when it's under your signature,

13:54:18   21  you're responsible for what's in that letter.

13:54:20   22      A.   Well it's my signature.  It's FDA's advisory

13:54:23   23  action.  I'm an agent of FDA in this instance.

13:54:25   24      Q.   Okay.  Now this opinion regards --

13:54:32   25          Let's just read the opinion out.  "It is my

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

212

13:54:34   1   opinion that a 2010 Warning Letter from FDA to

13:54:37   2   Arizant, Incorporated did not result in any

13:54:41   3   observation regarding MDRs for complaints of infection

13:54:44   4   and the findings in the letter which were quickly

13:54:46   5   resolved does not undermine the reasonable assurance

13:54:50   6   of safety and effectiveness of the Bair Hugger."

13:54:52   7           What plaintiff opinion, if any, does this

13:54:55   8   rebut?

13:54:58   9       A.   Well Dr. David --

13:55:00   10      Q.   What opinion does Dr. David have --

13:55:04   11      A.   -- referred to that warning letter.

13:55:04   12      Q.   Okay.  He referred to the warning letter.

13:55:05   13      A.   Correct.

13:55:05   14      Q.   What was his opinion about the warning

13:55:07   15  letter?

13:55:07   16      A.   Well I can't -- I can't say it word for

13:55:11   17  word.  I guess we'd have to look at that.  But --

13:55:14   18      Q.   Okay.

13:55:16   19      A.   -- let me see where -- if and where I refer

13:55:20   20  to it.

13:55:31   21           Perhaps I don't, but --

13:55:32   22      Q.   Well the problem I'm having, Mr. Ulatowski,

13:55:34   23  is -- is I'm word-searching as best I can through Mr.

13:55:37   24  David -- Dr. David's report, maybe we can take a break

13:55:40   25  at some time and go through it, but I'm not finding

213

13:55:43  1  any mention of a warning letter in Dr. David's report.

13:55:46  2       A.  Well maybe I'm -- maybe I'm incorrect there.

13:55:48  3       Q.  Okay.  So this might be one of those

13:55:51  4  opinions that's more addressed to the allegations in

13:55:54  5  plaintiffs' complaint.

13:55:55  6       A.  Perhaps.

13:55:55  7       Q.  Okay.  I want to go back to a discussion we

13:55:59  8  had a little bit earlier, and we had a discussion --

13:56:02  9       A.  Can we -- excuse me.

13:56:03  10      Q.  Sure.

13:56:04  11      A.  If I --

13:56:07  12          I mean I do say, "This inspection is one of

13:56:08  13  the regulatory events Dr. David finds to be

13:56:11  14  troubling."

13:56:11  15      Q.  Sure.  The inspection is absolutely

13:56:13  16  discussed in Dr. David's report; isn't it?  Yeah,

13:56:16  17  there's -- there's talk about the -- the visit for

13:56:18  18  discussion of airborne contamination issues.

13:56:20  19      A.  Correct.

13:56:21  20      Q.  Right.  And then I think you also remember

13:56:23  21  there's some discussion about what may or may not have

13:56:25  22  been said about the filter.

13:56:26  23      A.  Yes.

13:56:27  24      Q.  Okay.  There's no discussion about warning

13:56:29  25  letters for burns, though; is there?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

214

13:56:32   1      A.   No discussion of warning --

13:56:33   2           No.   No.   It's the visit, it's the

13:56:35   3   examination by --

13:56:36   4           But, you know, to me it's all part and

13:56:40   5   parcel of the same thing, the inspection, the

13:56:41   6   observations, the outcome.

13:56:42   7      Q.   Okay.   I want to talk to you a little bit

13:56:50   8   earlier when we spoke about the process by which you

13:56:55   9   examined conflicts before you take on litigation.   You

13:56:58   10  remember we had that discussion this morning?

13:57:00   11     A.   Yes.

13:57:00   12     Q.   Okay.   And part of that discussion is we

13:57:02   13  were talking about a hypothetical FDA employee who

13:57:07   14  might have a conflict if they had some direct personal

13:57:12   15  involvement in the regulation of the product they're

13:57:15   16  testifying about, and specifically, for instance, say,

13:57:17   17  an employee who approved a 510(k) and then was going

13:57:21   18  to give testimony about whether that was proper or

13:57:24   19  not.   That could raise an issue that is not present in

13:57:27   20  this case; correct?

13:57:28   21     A.   Yes.

13:57:29   22     Q.   Okay.   And that's because you had no

13:57:31   23  personal direct involvement in approving any of these

13:57:34   24  510(k)s we've been talking about today.

13:57:36   25     A.   Yes.   And clearing, yeah.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

215

13:57:38    1      Q.    And the Bair Hugger did not come through

13:57:40    2   your office for 510(k) clearance.

13:57:42    3      A.    My division, no.

13:57:44    4      Q.    In -- in your division.

13:57:45    5      So I think the other thing you've testified

13:57:47    6   to me is unlike in a case where you might have a

13:57:49    7   conflict, there's not a letter in this case with your

13:57:51    8   name on it that says clearance for a Bair Hugger under

13:57:55    9   510(k).

13:57:55   10      A.    Correct.

13:57:56   11      Q.    Okay.   Now when a 510(k) is granted --

13:58:13   12      When it's cleared would be the correct term;

13:58:14   13   right?

13:58:14   14      A.    Correct.

13:58:15   15      Q.    I keep messing that up.   And I'm going to

13:58:16   16   get it.   You know, by the end of this litigation, I

13:58:18   17   think I'm going to start saying "clearance" every

13:58:21   18   time.

13:58:21   19      But when a 510(k) product is cleared, the --

13:58:23   20   the manufacturer is notified; correct?

13:58:25   21      A.    There's an order issued by FDA and -- you

13:58:29   22   know, by letter, yes.

13:58:30   23      Q.    And then the letter is sent letting them

13:58:33   24   know that the -- we've -- we've determined substantial

13:58:37   25   equivalency and you're now cleared to market the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

216

13:58:40   1   product.

13:58:40   2       A.   Correct.

13:58:41   3       Q.   And also provides them with some other

13:58:44   4   general information about other things they need to be

13:58:46   5   aware of to comply with certain controls and

13:58:49   6   regulations.

13:58:52   7       A.   Correct.

13:58:52   8       Q.   And that they have ongoing obligations even

13:58:52   9   after the clearance is granted.

13:58:53   10      A.   Correct.

13:58:54   11      Q.   All right.  And then that letter is issued

13:58:56   12   by whatever controlling division has performed the

13:58:59   13   review and -- and assessed the okay on the 510(k)

13:59:02   14   clearance.

13:59:03   15      A.   Right.  It's a form letter that's used by

13:59:05   16   every -- every division.  It's changed over time.

13:59:08   17      Q.   Okay.  I want to show you one of those

13:59:10   18   letters so we can talk about it, about what's

13:59:12   19   contained in those kind of letters.

13:59:19   20           MR. BANKSTON:  Can I have that marked.

13:59:29   21           (Ulatowski Exhibit 5 was marked for

13:59:30   22           identification.)

13:59:31   23   BY MR. BANKSTON:

13:59:31   24      Q.   All right, Mr. Ulatowski, we're looking at a

13:59:33   25   document here.  Do you see here at the top it says

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

217

| | | |
|---|---|---|
| 13:59:35 | 1 | April 30th, 1998? |
| 13:59:36 | 2 | A.   Yes. |
| 13:59:37 | 3 | Q.   It's addressed to Scott D. Augustine, M.D. |
| 13:59:39 | 4 | at Augustine Medical; correct? |
| 13:59:40 | 5 | A.   Correct. |
| 13:59:41 | 6 | Q.   The product is a Bair Hugger Fluid Warmer, |
| 13:59:44 | 7 | Class II. |
| 13:59:44 | 8 | A.   Yes. |
| 13:59:45 | 9 | Q.   Right.  And this product code's BSB and this |
| 13:59:52 | 10 | was done in February of 1998; correct? |
| 13:59:52 | 11 | A.   Correct. |
| 13:59:53 | 12 | Q.   Okay.  So now we have this kind of letter |
| 13:59:55 | 13 | we've just been talking about that approved the 510(k) |
| 13:59:57 | 14 | and says that "We have reviewed your 510(k) |
| 14:00:00 | 15 | notification of intent to market the device referenced |
| 14:00:03 | 16 | above and we have determined that the device is |
| 14:00:04 | 17 | substantially equivalent...to devices marketed in |
| 14:00:06 | 18 | interstate commerce prior to 20 -- May 28th, 1976." |
| 14:00:11 | 19 | A.   Correct. |
| 14:00:12 | 20 | Q.   Correct? |
| 14:00:12 | 21 | MS. EATON:  Object to the form of the |
| 14:00:15 | 22 | question. |
| 14:00:15 | 23 | MR. BANKSTON:  Yeah.  We'll -- we'll just |
| 14:00:15 | 24 | add for the record that we omitted a parenthetical; |
| 14:00:18 | 25 | didn't we? |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

218

14:00:18  1          MS. EATON:  That's not my objection though.

14:00:19  2          MR. BANKSTON:  Okay.  What is your

14:00:22  3  objection?

14:00:22  4          MS. EATON:  You equated this to the kind of

14:00:23  5  letter that the two of you have been discussing.

14:00:24  6          MR. BANKSTON:  Okay.

14:00:25  7      Q.  Mr. Ulatowski, you remember we just talked a

14:00:27  8  minute ago about the letters that were sent that said

14:00:30  9  here is your 510(k), it is substantially equivalent,

14:00:33  10  you're now allowed to market the device, here are some

14:00:37  11  more instructions?

14:00:37  12      A.  Correct.

14:00:37  13      Q.  That's this kind of letter.

14:00:40  14      A.  Yes.

14:00:42  15      Q.  Yes.  Okay.  So the next part of this says

14:00:42  16  the things we were talking about before about here are

14:00:45  17  some things you might need to pay attention to.  Do

14:00:48  18  you agree with me there?

14:00:49  19      A.  Yes.

14:00:49  20      Q.  This is the approval letter for a Bair

14:00:51  21  Hugger product; correct?

14:00:52  22      A.  For -- for the blood fluid warmer.

14:00:55  23      Q.  Right.  So --

14:00:56  24      A.  It's one of the accessories, yeah.

14:00:59  25      Q.  Right.  Right.  It's a Bair Hugger product.

219

14:01:00   1          MS. EATON:  Object to the form of the

14:01:01   2   question.

14:01:01   3      A.   It's -- it's one of the -- yes, one of the

14:01:03   4   devices used with the -- with the unit.

14:01:05   5      Q.   Yes, exactly.

14:01:06   6          The device has several components to it;

14:01:08   7   doesn't it?

14:01:08   8      A.   Correct.

14:01:08   9      Q.   Right.  It says --

14:01:10   10          In fact, I think what you could refer to as

14:01:11   11   a -- the company has referred to it on occasion as a

14:01:16   12   patient warming system.

14:01:17   13      A.   Right.  And this is one of the optional

14:01:19   14   accessories used specifically for the stated case,

14:01:22   15   blood fluid warming.

14:01:23   16      Q.   Okay.  So we have a -- a regulatory letter

14:01:25   17   here with an action by the FDA granting a 510(k)

14:01:30   18   approval to a Bair Hugger; correct?

14:01:31   19          MS. EATON:  Object to the form of the

14:01:32   20   question.

14:01:33   21      A.   To a blood fluid warmer.

14:01:36   22      Q.   Okay.  So we're going to make a distinction

14:01:38   23   here that a blood fluid warmer -- a Bair Hugger blood

14:01:42   24   fluid warmer is not a Bair Hugger product.

14:01:44   25      A.   It's one of the Bair Hugger accessories, as

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

220

14:01:46  1   I said -- said already.

14:01:48  2       Q.   Okay.  Bair Hugger devices have been

14:01:53  3   submitted to the FDA for approval.

14:01:55  4       A.   Well there's systems consisting of the unit,

14:01:59  5   of a hose, of optional equipment, blankets.  A blood

14:02:04  6   fluid warmer is one of the optional elements that's

14:02:08  7   somewhat unique, and it's used with the Bair Hugger.

14:02:09  8       Q.   Okay.  So this letter granting approval had

14:02:15  9   to do with Dr. Augustine submitting a Bair Hugger

14:02:19  10  product to the FDA and the -- and the company

14:02:22  11  evaluating how it was used --

14:02:23  12      A.   Uh-huh.

14:02:24  13      Q.   -- and coming to a decision on it.

14:02:25  14      A.   Uh-huh.

14:02:26  15      Q.   Okay.

14:02:27  16           THE REPORTER:  Your answer?

14:02:28  17           THE WITNESS:  Yes, yes.

14:02:29  18      Q.   This is a letter that you signed.

14:02:30  19      A.   Correct.

14:02:33  20      Q.   Okay.  This comes out of the Center for

14:02:33  21  Device Evaluation.

14:02:35  22      A.   Yes.  Office.

14:02:37  23      Q.   Office.  Excuse me.  Comes out of the Office

14:02:37  24  of Device Evaluation.

14:02:39  25      A.   Right.

221

14:02:39    1      Q.   Comes from the Center for Devices and

14:02:41    2  Radiological Health.

14:02:43    3      A.   Correct.

14:02:44    4      Q.   That's -- that's your center.

14:02:45    5      A.   Right.

14:02:46    6      Q.   Okay.  So you will agree with me that you

14:02:48    7  had personal involvement in granting a 510(k)

14:02:50    8  clearance to a Bair Hugger product.

14:02:54    9      A.   Right.  A Bair Hugger accessory used for

14:02:55   10  blood fluid warming, evidently.

14:02:57   11      Q.   Evidently so.

14:03:00   12           Have you seen this document before?

14:03:11   13      A.   No, I didn't recollect this, but I'm not

14:03:13   14  surprised because my division handled IV solution

14:03:20   15  containers, perhaps blood -- blood containers, so I'm

14:03:27   16  not surprised by this.  I -- it --

14:03:29   17           I didn't think about it, but I'm not

14:03:31   18  surprised to see this.  And again, it's not the device

14:03:34   19  that's really subject of this litigation, you know,

14:03:37   20  it's not the -- the air-blowing device with the hose

14:03:41   21  and the blankets.

14:03:41   22      Q.   Okay.  So I guess that would be the

14:03:44   23  qualification to the answers you gave this morning.

14:03:47   24      A.   Well becoming aware of this, it's -- my

14:03:51   25  answer is, well, so what?  You know, this is not the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

222

14:03:54   1   focus of this particular litigation, this -- this

14:03:56   2   accessory.  Is it?

14:03:58   3        Q.   So --

14:03:58   4        A.   It is not.

14:03:59   5        Q.   -- when I asked the question this morning,

14:04:01   6   there's not a letter that says Bair Hugger on it that

14:04:04   7   has Tim Ulatowski's name on it, that was not a correct

14:04:07   8   answer.

14:04:07   9        A.   Well I was assuming the air-blowing device

14:04:10   10  with the blankets and the blower.

14:04:11   11       Q.   Well we were talking about whether this

14:04:13   12  creates a conflict between you and your client.

14:04:16   13  That's -- that's one of your client's devices; right?

14:04:18   14       A.   Yes, it is.

14:04:20   15       Q.   It's a Bair Hugger device.

14:04:20   16       A.   It's an accessory, yes, --

14:04:22   17       Q.   Okay.

14:04:22   18       A.   -- to the Bair Hugger.

14:04:24   19            MS. EATON:  Let me just go back and object

14:04:26   20  to the form of the previous question.

14:04:27   21            MR. BANKSTON:  Okay.

14:04:28   22       Q.   You agree this creates a conflict between

14:04:32   23  you and your client; correct?

14:04:34   24            MS. EATON:  Object to the form of the

14:04:35   25  question.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

223

14:04:35  1          Actually, I withdraw my objection.

14:04:37  2      A.   Absolutely not.  This isn't even the topic

14:04:42  3  of this litigation.

14:04:44  4      Q.   That's your interpretation today; correct?

14:04:47  5      A.   I've given you my answer.

14:04:49  6      Q.   Have you talked --

14:04:51  7          Have you asked the FDA Ethics Office about

14:04:53  8  that?

14:04:53  9      A.   No.  I won't burden them with this

14:04:57  10  triviality.

14:04:57  11     Q.   Avoiding conflicts of interest, --

14:05:01  12     A.   We've already --

14:05:02  13     Q.   -- that's not trivial; is it?

14:05:03  14     A.   Excuse me.  They've already opined on my

14:05:05  15  participation in litigation, even in 510(k)s where

14:05:08  16  I've been involved, allowing me to testify, provided,

14:05:11  17  as I stated early on, the source of information upon

14:05:15  18  which I'm opining is the litigation production,

14:05:19  19  information provided, and I'm not relying on

14:05:22  20  information known to me and not known otherwise to

14:05:26  21  anyone else about what I know from FDA.

14:05:29  22     Q.   Let me make sure I have this totally clear

14:05:31  23  for the record.  You are saying that you believe it is

14:05:34  24  ethically appropriate for you to be involved in a

14:05:38  25  piece of litigation where you had direct personal

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

224

14:05:40   1   involvement in regulating the product line being

14:05:43   2   litigated.

14:05:48   3       A.   Yes.  I've done so before, and I have not

14:05:50   4   been prevented from doing so upon the opinion of the

14:05:53   5   Ethics Office.  And again, I know it may be a big deal

14:05:59   6   to you, but this is even -- not even the subject of

14:06:02   7   this litigation for this particular device.

14:06:04   8       Q.   Well let's -- let's just go ahead and focus

14:06:07   9   like a laser in on that, then, not just the device but

14:06:10   10  the issues we're talking about today.

14:06:11   11       When it comes to the allegations of airborne

14:06:14   12  contamination, did you have any personal involvement

14:06:15   13  at all at the FDA to reviewing those allegations?

14:06:19   14       A.   No.

14:06:20   15       Q.   Okay.

14:06:20   16       A.   Well let me take that back.  You know, it

14:06:24   17  was the subject of evaluation of FDA inspection, but I

14:06:29   18  believe that came along after I had departed from FDA.

14:06:31   19       Q.   What I guess I'm asking you is:  Have you

14:06:34   20  been involved in written communications between, say,

14:06:37   21  either Augustine or with your current client about

14:06:40   22  airborne contamination issues while you were

14:06:43   23  responsible for compliance at the FDA?

14:06:46   24       A.   Airborne compliance --

14:06:48   25       Airborne contamination generally or

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

225

| | | |
|---|---|---|
| 14:06:49 | 1 | specifically? |
| 14:06:49 | 2 | Q. No, the -- |
| 14:06:50 | 3 | I mean let's just break it down to the very, |
| 14:06:53 | 4 | very laser-like, specific allegations in this case. |
| 14:06:56 | 5 | All right? You understand, for instance, we talk |
| 14:06:57 | 6 | about the Augustine MedWatch reports -- |
| 14:06:59 | 7 | A. Uh-huh. |
| 14:07:00 | 8 | Q. -- and the allegations -- |
| 14:07:01 | 9 | A. Yes. |
| 14:07:02 | 10 | Q. -- made within them; correct? |
| 14:07:03 | 11 | A. Yes. |
| 14:07:03 | 12 | Q. And they concern airborne contamination. |
| 14:07:06 | 13 | A. That's one aspect, yes. |
| 14:07:07 | 14 | Q. And you -- |
| 14:07:08 | 15 | So you understand generally what I mean when |
| 14:07:10 | 16 | I say the allegations made by Dr. Augustine. |
| 14:07:13 | 17 | A. Yes. |
| 14:07:14 | 18 | Q. Okay. And from what I understand your |
| 14:07:16 | 19 | testimony is, you had no direct involvement at the FDA |
| 14:07:20 | 20 | or any written communications with Dr. Augustine or |
| 14:07:23 | 21 | with your current client relating to those allegations |
| 14:07:28 | 22 | while you were doing enforcement for this product |
| 14:07:31 | 23 | line. |
| 14:07:32 | 24 | A. Well I know there was a warning letter to |
| 14:07:34 | 25 | Dr. Augustine on his Blowing Air Is Risk -- or |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

226

14:07:40   1   something related to some device.  I'm not sure if

14:07:43   2   that's particularly relevant here, but I would have to

14:07:45   3   look at that.

14:07:46   4        Q.   Did you have something to do with that?

14:07:48   5        A.   I'd have to look at the dates of that.  It's

14:07:49   6   in my report.

14:07:50   7        Q.   Okay.  That's all there is.  That's the

14:07:53   8   extent of your -- your personal involvement or

14:07:54   9   communications on this issue.

14:07:56   10        MS. EATON:  Object to the form of the

14:07:57   11   question.

14:07:57   12        A.   As far I recall.

14:07:58   13        Q.   Okay.  And that's something that would be

14:07:59   14   important for you to check into and look into before

14:08:01   15   you took this case.

14:08:04   16        A.   Well to the degree I can recall, because I

14:08:05   17   had no FDA records.  I took none with me.  I have no

14:08:09   18   documents whatsoever.  The best I can do is recollect

14:08:12   19   any involvement or through any production in any

14:08:14   20   litigation where that's --

14:08:17   21        Q.   Very good point.

14:08:18   22        A.   -- evident.

14:08:29   23        (Ulatowski Exhibit 6 was marked for

         24        identification.)

         25   BY MR. BANKSTON:

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

227

1       Q.   Mr. Ulatowski, this is a letter sent by

14:08:35   2   Arizant Healthcare on August 16, 2010.  This is not a

14:08:39   3   document you've relied on in this case; correct?

14:08:45   4       A.   Hang on just a moment here.

14:08:47   5       Q.   Uh-huh.

14:08:59   6       A.   I don't -- I don't think so, but --

14:09:01   7           I don't believe I was at that point in time

14:09:04   8   technically the director of the Office of Compliance

14:09:09   9   at that point in time, so I don't think I have any

14:09:09   10   knowledge of this letter.

14:09:11   11       Q.   Okay.  You know, I mean you don't remember

14:09:13   12   it, I'm assuming.  This is --

14:09:15   13       A.   Right.

14:09:15   14       Q.   -- seven years ago, something like that.

14:09:17   15       A.   Right.  Well I don't remember, but -- but

14:09:20   16   let me explain.  I re -- I retired from FDA in January

14:09:23   17   of 2011.  In approximately July or so I assumed a

14:09:30   18   temporary position as senior advisor for enforcement

14:09:35   19   to the commissioner and to the center director, and I

14:09:40   20   delegated my responsibilities as director of

14:09:44   21   compliance to another person during that period of

14:09:46   22   time.  So I don't think I know about this letter, to

14:09:48   23   tell you the truth.

14:09:49   24       Q.   Okay.  During the time you were director of

14:09:54   25   the Office of Compliance for the Centers of Devices

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

228

14:09:56   1   and Radiological Health, you had confined -- you had

14:10:00   2   enforcement authority over the Bair Hugger line.

14:10:04   3       A.   Yes.

14:10:04   4       Q.   This letter was sent to you; correct?

14:10:06   5            MS. EATON:   Object to the form of the

14:10:07   6   question.

14:10:08   7       A.   It was cc'd to me, yes.

14:10:09   8       Q.   You received this letter.

14:10:12   9       A.   You know, I don't know if I received it

14:10:15   10  or --

14:10:15   11           It was directed to the acting director of

14:10:17   12  compliance.

14:10:18   13      Q.   How would you have any idea that this was

14:10:22   14  directed to the acting director?

14:10:23   15      A.   Because that would be the case.

14:10:25   16      Q.   Right.  So I mean other than the main

14:10:28   17  recipient; right?  You understand it's directly

14:10:31   18  addressed to him.

14:10:31   19      A.   Right.

14:10:32   20      Q.   Okay.  So it's cc'd to you.

14:10:34   21      A.   Correct.

14:10:35   22      Q.   Right.  So it's not like your copy is then

14:10:37   23  going to be taken and given to him; is it?

14:10:39   24      A.   No.  What I'm saying is my copy would have

14:10:42   25  been given to the acting director of compliance.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

229

| | | | |
|---|---|---|---|
| 14:10:43 | 1 | Q. | That's this person. |
| 14:10:44 | 2 | A. | No, no.  No, no.  This is a different |
| 14:10:47 | 3 | office. | |
| 14:10:47 | 4 | Q. | Oh, he's in a different office.  He's in -- |
| 14:10:49 | 5 | A. | Right. |
| 14:10:51 | 6 | Q. | -- Postmarket Surveillance. |
| 14:10:51 | 7 | A. | Right. |
| 14:10:53 | 8 | Q. | So you -- |
| 14:10:53 | 9 | | There would be a different acting director |
| 14:10:53 | 10 | for compliance -- | |
| 14:10:54 | 11 | A. | Right. |
| 14:10:55 | 12 | Q. | -- and that when you got this letter -- |
| 14:10:56 | 13 | A. | I was out of the loop already. |
| 14:10:58 | 14 | Q. | And may have, either your or someone else |
| 14:11:02 | 15 | you're saying, forwarded it to that person. | |
| 14:11:02 | 16 | A. | Right. |
| 14:11:03 | 17 | Q. | You have no specific memory of any of this. |
| 14:11:05 | 18 | A. | No. |
| 14:11:05 | 19 | Q. | The only thing that we can say for any |
| 14:11:07 | 20 | certainty at all is that your current client sent you | |
| 14:11:10 | 21 | a letter on this date; right? | |
| 14:11:12 | 22 | A. | Sent -- |
| 14:11:12 | 23 | | MS. EATON:  Object to the form of the |
| 14:11:13 | 24 | question. | |
| 14:11:14 | 25 | A. | Sent Mr. Douglas, with a letter on which I |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

230

14:11:16    1    was cc'd.

14:11:17    2         Q.    Right.  And I mean you don't --

14:11:19    3              I don't think there's a meaningful

14:11:20    4    distinction between that.  Do you?

14:11:21    5         A.    Well if a letter came to the director of

14:11:24    6    compliance in my office --

14:11:25    7              In fact, I wasn't even residing in my -- in

14:11:29    8    my office at that point in time, so it would have been

14:11:31    9    forwarded to the acting director of compliance.

14:11:32   10         Q.    Okay.  This is a letter that was sent to you

14:11:35   11    that outlines a discussion of the very allegations

14:11:39   12    we've been discussing today; correct?

14:11:41   13         A.    Well, you know, of course this is news to

14:11:43   14    me, but okay.

14:11:45   15         Q.    That's true; right?

14:11:47   16              MS. EATON:  Object to the form of the

14:11:48   17    question.

14:11:49   18         A.    What's the question?

14:11:49   19         Q.    The question was:  This is a letter that is

14:11:52   20    addressed with your address on it that was sent to you

14:11:57   21    that discusses the airborne contamination issues and

14:12:01   22    allegations that we've been discussing today.

14:12:06   23         A.    Well I have to read it first of all.  Let me

14:12:08   24    read it, --

14:12:08   25         Q.    Sure.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

231

14:12:09   1        A.    -- see what this is all about, because this

14:12:11   2   is news to me.

14:12:43   3              Okay, I've read it.

14:12:45   4        Q.    Okay.  Your answer?

14:12:46   5        A.    Never saw it before.

14:12:47   6        Q.    That's not the question, sir.

14:12:49   7        A.    What's the question?

14:12:49   8        Q.    The question for the third time is:  This is

14:12:51   9   a letter addressed with your name on it, your address,

14:12:55  10   that discusses the allegations of airborne

14:12:58  11   contamination that we've been discussing today.

14:13:00  12        A.    Yes.  My address is on here.

14:13:01  13        Q.    Uh-huh.

14:13:02  14        A.    I never received it.  I have no knowledge of

14:13:07  15   it.

14:13:07  16        Q.    You -- well let's -- let's back up.  You

14:13:07  17   don't have any independent knowledge about whether you

14:13:09  18   actually put hands on this letter seven years ago; do

14:13:12  19   you?

14:13:12  20        A.    It's unlikely I did because of the reasons I

14:13:14  21   said already.

14:13:14  22        Q.    All right.  Prior to this letter, you had

14:13:18  23   been directly sent MedWatch reports relating to these

14:13:21  24   issues; correct?

14:13:22  25        A.    No, I wouldn't have received them directly.

232

14:13:24   1        Q.    You deny that you were directly sent

14:13:26   2   MedWatch reports by Dr. Augustine.

14:13:27   3        A.    I don't know if I was directly sent, but FDA

14:13:30   4   may have been sent MedWatch reports.

14:13:33   5        Q.    And at that time when you were in the Office

14:13:34   6   of Compliance, if you had a MedWatch report relating

14:13:36   7   to the Bair Hugger line, you had the authority to take

14:13:39   8   compliance action; correct?

14:13:39   9        A.    If I had --

14:13:43  10              Again, say again.

14:13:44  11        Q.    Sure.  While you were in the Office of

14:13:46  12   Compliance, if it came into your possession a MedWatch

14:13:49  13   report that alleged some sort of problem with a

14:13:53  14   device, you had it within your authority to take

14:13:56  15   regulatory compliance action on that line.

14:14:07  16              MS. EATON:  Object to the form of that

14:14:08  17   question.

14:14:09  18        A.    MedWatch reports in and of themselves do not

14:14:13  19   precipitate enforcement action.

14:14:15  20        Q.    Okay.  In your job as enforcement director

14:14:19  21   or director of compliance --

14:14:19  22        A.    Director of compliance.

14:14:20  23        Q.    -- director of compliance in your division,

14:14:23  24   you reviewed MedWatch reports.

14:14:24  25        A.    I did.  I wasn't the primary evaluator of

233

14:14:27   1   MedWatch reports.  And let me explain.  The MedWatch

14:14:30   2   reports are sent to another office, Division of

14:14:33   3   Postmarket Surveillance.  That office evaluates the

14:14:36   4   MedWatch reports.  If there's some problem with --

14:14:40   5   with the MedWatch reports that's identified by that

14:14:43   6   office, they may forward a -- a notice to the Office

14:14:49   7   of Compliance that something needs to be looked into

14:14:52   8   or whatever.  So it's that office's responsibility for

14:14:55   9   evaluating the MedWatch reports.

14:14:57  10       Q.   Okay.  So what -- what --

14:15:01  11            Towards what end would you review a MedWatch

14:15:03  12   report?

14:15:03  13       A.   If there's been, as I said, a -- a forwarded

14:15:09  14   recommendation for potential enforcement action by

14:15:13  15   that office I just spoke of, if during an inspection

14:15:16  16   there'd been evidence of non-compliance of a nature

14:15:22  17   that -- where enforcement action is indicated, I would

14:15:25  18   be involved in that.  So those are two examples.

14:15:29  19       Q.   Okay.  In other words, during the time at

14:15:32  20   which Augustine submitted his first MedWatch report,

14:15:37  21   circa 2009, that would be a time in which you were in

14:15:40  22   the Office of Compliance; correct?

14:15:41  23       A.   Yes.  Yes.

14:15:49  24       Q.   Did we --

14:15:50  25            I don't know if I maybe asked you this or

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

234

14:15:52  1   not.  This is not a document you reviewed before this

14:15:54  2   litigation?

14:15:55  3       A.   It looks new to me.

14:15:58  4       Q.   Okay.  And it's not one of the ones that

14:15:58  5   would be cited in your report.

14:16:01  6            MS. EATON:  I would simply ask that we check

14:16:03  7   that.

14:16:03  8       A.   Perhaps.  Perhaps.  I just don't recognize

14:16:06  9   it.

14:16:06  10      Q.   Right.  That would be really surprising if

14:16:08  11  it was.

14:16:12  12           You made no efforts --

14:16:13  13      A.   Well excuse me.  If -- if it was, you know,

14:16:16  14  I had no participation in it as -- for the reasons I

14:16:20  15  stated.

14:16:20  16      Q.   You don't --

14:16:21  17           At least that's what you can testify to

14:16:23  18  today seven years later.

14:16:24  19      A.   Well it's just the timing is -- is my basis,

14:16:27  20  because at that point in time I was out of the loop in

14:16:29  21  compliance.  I was -- I was assigned to other duties

14:16:32  22  at that point.

14:16:32  23      Q.   You cannot testify to me today that you were

14:16:34  24  not privy to this information.

14:16:36  25      A.   It's unlikely I was because of the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

235

14:16:38    1    timeframe.

14:16:40    2        Q.    That's not an answer to the question.  You

14:16:40    3    understand that.

14:16:41    4        A.    To the best of my knowledge, based upon the

14:16:44    5    facts here, I can say with -- with a high degree of

14:16:49    6    certainty I was out of the loop.

14:16:50    7        Q.    Okay.  When you got involved in this case

14:16:55    8    and you started going through documents, did you ever

14:16:59    9    think to look to see if you had ever been personally

14:17:02   10    involved in this case by looking through the documents

14:17:04   11    that are produced in this lawsuit?

14:17:06   12        A.    Well that's something I look at.  I look at

14:17:08   13    the 510(k)s, for example.  I look at any particular

14:17:15   14    evidence otherwise that seems to be immediately

14:17:18   15    apparent, you know.  So -- so I do some diligence --

14:17:22   16    some degree of diligence at the front end.  And of

14:17:25   17    course if there is some relationship, then typically

14:17:28   18    the lawyers know that connection coming in at the

14:17:31   19    front end, or people in the company know that

14:17:34   20    connection at the front end.

14:17:35   21        Q.    Uh-huh.

14:17:36   22        A.    And, you know, I -- I was unaware.

14:17:42   23        Q.    So there was never any time that you, for

14:17:46   24    instance, searched the document production for your

14:17:47   25    own name.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

236

14:17:53   1       A.    Well it would have been difficult to do a

14:17:55   2   word search on all the documents the way they were

14:17:58   3   provided to me, but -- because some of the f -- pdf's

14:18:01   4   were not word-searchable.

14:18:03   5       Q.    I actually --

14:18:04   6             What I really meant was not just the

14:18:08   7   documents you provided to you, but the total sum of

14:18:10   8   litigation documents in this case.  Do you know if a

14:18:11   9   word search had been perverted -- or performed for

14:18:14   10  "Ulatowski" on those documents?

14:18:15   11      A.    I have no knowledge of that.

14:18:15   12      Q.    Okay.  That's not something you did.

14:18:17   13      A.    No, it's not something I did.

14:18:19   14      Q.    Not something you requested.

14:18:20   15      A.    Not something I requested.

14:18:21   16      Q.    And I take it --

14:18:22   17      A.    And the reason being, since these were

14:18:26   18  regulated, except for the fluid warmer, in a different

14:18:29   19  division for 510(k) purposes, I -- I certainly would

14:18:31   20  not be in that loop.  For compliance, I was aware of

14:18:35   21  the warning letter, so I was aware of that.  Other

14:18:38   22  than that, you know --

14:18:41   23      Q.    What I think we can say, then, is before you

14:18:44   24  became a retained expert, before you took on this

14:18:49   25  client, before you formed any relationship with them

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

237

14:18:52  1  and signed any papers, you did not make a request to

14:18:56  2  these lawyers or the company, "Please provide me with

14:18:59  3  any indication of any of my involvement in the events

14:19:02  4  of this case."

14:19:03  5       A.   I don't recall that specific request.  But

14:19:08  6  typically that's revealed early on anyhow.

14:19:10  7       Q.   Typically it is.

14:19:11  8       A.   Yes.

14:19:12  9       Q.   It was not in this case.

14:19:13  10          MS. EATON:  Object to you getting into

14:19:15  11  discussions that he may have had with lawyers.

14:19:16  12          MR. BANKSTON:  I'll agree --

14:19:17  13          MS. EATON:  You know that that's improper.

14:19:19  14          MR. BANKSTON:  And I asked before he ever

14:19:21  15  formed a relationship, before he ever signed a piece

14:19:24  16  of paper --

          17          MS. EATON:  And I --

14:19:25  18          MR. BANKSTON:  -- and he was still just a

14:19:27  19  former FDA employee, not a retained expert.

14:19:31  20          MS. EATON:  I'm talking about the follow-up

14:19:32  21  that he's speaking of that it's revealed early on.

14:19:36  22          MS. BANKSTON:  What -- what was that about

14:19:38  23  communications?  I'm trying to figure out what that

          24  was --

14:19:38  25          How did that implicate communications?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

238

14:19:38  1          MS. EATON:  I am asking that we please not

14:19:40  2   talk about any discussions he may have had with

14:19:43  3   lawyers.  As long as you're not asking about that, I

14:19:45  4   want --

14:19:45  5          I heard your question --

14:19:46  6          MR. BANKSTON:  All right.

14:19:47  7          MS. EATON:  -- to perhaps implicate that,

14:19:49  8   and that's why I said what I said.  If you're not

14:19:52  9   asking that, that's fine.

14:19:53  10         MR. BANKSTON:  No, that's what I was asking

14:19:55  11  is the basis, and there's nothing in that question

14:19:56  12  that you can identify to me about communications.  Or

14:19:59  13  is there, because I --

14:20:01  14         MS. EATON:  Well if you would like me to

14:20:01  15  scroll back, I can look.  But I'm simply telling

14:20:02  16  you --

14:20:02  17         MR. BANKSTON:  I'm going to have to ask a

14:20:04  18  new question anyway.

14:20:04  19         MS. EATON:  Yeah, that's fine.  I'm simply

14:20:06  20  telling you what my concern was.

14:20:07  21         MR. BANKSTON:  Okay.  Yeah.  That makes us

14:20:10  22  ask a new question.

14:20:10  23         MS. EATON:  Because I have a legitimate

14:20:11  24  concern that I was protecting.

14:20:12  25         Q.  So we know -- okay.

239

14:20:14   1        So we have in this case been discussing

14:20:18   2   whether you had any personal involvement relating to

14:20:22   3   the product, and one of the things I think was

14:20:26   4   mentioned early was this warning letter, this advisory

14:20:30   5   action; right?

14:20:32   6        A.   2010?

14:20:33   7        Q.   Yes.   Okay.   So in your role as compliance,

14:20:39   8   you had a direct personal involvement in the

14:20:41   9   regulation and advising of compliance to the product

14:20:47  10   the Bair Hugger.

14:20:48  11        A.   And every other medical device manufactured.

14:20:50  12   So am I excluded from all litigation?   I doubt it.

14:20:53  13        Q.   Hmm.

14:20:54  14        A.   I doubt it.

14:20:55  15        Q.   Probably not.

14:20:56  16        A.   Probably not.

14:20:57  17        Q.   Probably not.

14:20:58  18        A.   Yeah.   Probably not.   Right.

14:21:00  19        Q.   No.   Because apparently your testimony to me

14:21:03  20   today is that if you had direct personal involvement

14:21:06  21   in a compliance action, an enforcement action or an

14:21:09  22   approval or clearance action, that you think it is

14:21:12  23   fine for you to testify in that case.

14:21:14  24        MS. EATON:   Object to the form of the

14:21:15  25   question.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

240

14:21:16  1    A.   I -- I sought Ethics Office input.  They

14:21:19  2    provided their opinion.  "Fine, go ahead, and here's

14:21:23  3    the provisions under which you can do so."

14:21:25  4    Q.   Let's make it very clear for the record.

14:21:27  5    When you speak of your discussions with the Ethics

14:21:30  6    Offices at the FDA, you have never once discussed

14:21:33  7    anything relating to 3M, Arizant, or the Bair Hugger.

14:21:37  8    A.   No.  Makes no matter because it's the same

14:21:40  9    situation.

14:21:42  10    Q.   Were you involved in any FDA approvals --

14:21:54  11    excuse me, the --

14:21:55  12    Were you involved in any of the 510(k)

14:21:57  13    clearances for I-Flow?  Did you sign any of those

14:22:01  14    letters?

14:22:01  15    A.   Yes.

14:22:05  16    Q.   Okay.  Let's talk a little bit about

14:22:07  17    warnings in labels.  You want to go to page 66 of your

14:22:10  18    report for me?

14:22:11  19    A.   Okay.

14:22:18  20    Q.   Let's first talk about the basic general

14:22:22  21    opinion that warnings and labels met regulatory

14:22:25  22    requirements and industry standards.  All right?

14:22:26  23    A.   That's what it says.

14:22:28  24    Q.   And no basis to find it misbranded.

14:22:31  25    A.   That's correct.

241

| | | |
|---|---|---|
| 14:22:31 | 1 | Q.   Okay.  I want you to flip further into the |
| 14:22:33 | 2 | discussion of this to page 73. |
| 14:22:35 | 3 | A.   Okay. |
| 14:22:39 | 4 | Q.   All right.  I want to direct your attention |
| 14:23:02 | 5 | to the final paragraph on page 73.  Do you see there |
| 14:23:07 | 6 | it says, "According to the FDA" -- |
| 14:23:09 | 7 | Or let me start that again so -- I want to |
| 14:23:13 | 8 | make sure we get this word perfect.  "According to |
| 14:23:15 | 9 | FDA, a Warning in labeling may be appropriate if there |
| 14:23:18 | 10 | is reasonable evidence of an association of a serious |
| 14:23:22 | 11 | hazard with the use of the device."  That's correct? |
| 14:23:26 | 12 | A.   Correct.  I reference that. |
| 14:23:28 | 13 | Q.   All right.  And that cites your footnote 132 |
| 14:23:33 | 14 | is an FDA guidance document; correct? |
| 14:23:33 | 15 | A.   Correct. |
| 14:23:34 | 16 | Q.   These are known as Blue Book guidance; |
| 14:23:37 | 17 | correct? |
| 14:23:37 | 18 | A.   Correct. |
| 14:23:38 | 19 | Q.   Okay.  And that cites an FDA website; |
| 14:23:41 | 20 | correct? |
| 14:23:41 | 21 | A.   Correct. |
| 14:23:42 | 22 | Q.   Okay.  Now in your report you give four |
| 14:23:45 | 23 | reasons why a warning -- the lack of a warning was |
| 14:23:49 | 24 | appropriate, and I want to talk about those four |
| 14:23:51 | 25 | reasons. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

242

| | | |
|---|---|---|
| 14:23:51 | 1 | A.   Okay. |
| 14:23:52 | 2 | Q.   And you understand that the first of your |
| 14:23:54 | 3 | reasons was that there were no MDR reports pertaining |
| 14:23:57 | 4 | to infections. |
| 14:24:00 | 5 | A.   Correct, until Dr. Augustine-induced reports |
| 14:24:04 | 6 | began in 2015-'16. |
| 14:24:06 | 7 | Q.   Okay.  And you call that a paucity of MDR |
| 14:24:10 | 8 | reports pertaining to infections. |
| 14:24:12 | 9 | A.   Correct. |
| 14:24:12 | 10 | Q.   Okay.  So is it your testimony that no |
| 14:24:16 | 11 | warnings need to be given until customers can prove |
| 14:24:20 | 12 | they're getting hurt? |
| 14:24:20 | 13 | MS. EATON:  Object to the form of the |
| 14:24:21 | 14 | question. |
| 14:24:22 | 15 | A.   No.  There has to be -- |
| 14:24:24 | 16 | That's not what I'm saying. |
| 14:24:25 | 17 | Q.   I'm wondering why the existence or non- |
| 14:24:28 | 18 | existence of MDR reports of customers being able to |
| 14:24:32 | 19 | prove that they're hurt is relevant to whether a |
| 14:24:36 | 20 | warning should be given or not.  Can you explain that |
| 14:24:37 | 21 | to me? |
| 14:24:37 | 22 | A.   Well, you know, MDR reports are not proof |
| 14:24:39 | 23 | positive of -- of injury and causation. |
| 14:24:42 | 24 | Q.   Absolutely. |
| 14:24:42 | 25 | A.   Right? |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

243

14:24:43  1       Q.    Sure.

14:24:43  2       A.    So, you know, just to correct your statement

14:24:47  3  there.

14:24:48  4             Warnings are an element of labeling.

14:24:52  5  Warnings are essentially adverse effects that have

14:25:01  6  been -- company's been made aware of that are of

14:25:05  7  particular significance.

14:25:05  8       Q.    Okay.  So let's just go back, though, to MDR

14:25:09  9  reports.

14:25:10  10      A.    Okay.

14:25:11  11      Q.    There are situations where a company could

14:25:13  12  have MDR reports and have actually made MDR reports to

14:25:16  13  the FDA because there may have been a device injury,

14:25:19  14  not sure, doesn't look like it, but there may have

14:25:22  15  been, so they gave them the report, and simply because

14:25:25  16  there's been reports and they've gotten allegations,

14:25:27  17  that doesn't necessarily mean they have to give a

14:25:29  18  warning; right?

14:25:30  19      A.    Right.  There has to be some assessment of

14:25:32  20  that, of the association, the reason -- reasonableness

14:25:36  21  of the report and the association.

14:25:38  22      Q.    Right.  So --

14:25:39  23      A.    There's --

14:25:40  24      Q.    -- in other words --

14:25:40  25      A.    There's some analysis going on.

244

14:25:41  1     Q.   There could be an MDR report to the FDA that

14:25:44  2   says, look, we've gotten some allegations of patient

14:25:47  3   industry -- patient and injury, we don't think they're

14:25:52  4   very credible for XYZ reasons, it doesn't look like

14:25:56  5   any credible person would find that there's a

14:25:57  6   reasonable risk here.  Without reasonable evidence of

14:26:04  7   an association of the risk, there's no need for a

14:26:04  8   warning.  Do you agree with that?

14:26:05  9          MS. EATON:  Object to the form of the

14:26:06  10  question.

14:26:06  11    A.   That may be one of the -- one of the

14:26:07  12  situations.  And, you know, a warning is a -- has a

14:26:10  13  particular significance; otherwise, it would be

14:26:12  14  embedded in adverse effects.

14:26:13  15    Q.   On the contrary, there is the other

14:26:16  16  situation where a manufacturer has no MDR reports

14:26:21  17  whatsoever but a warning could still be appropriate;

14:26:25  18  correct?

14:26:26  19    A.   Give me that again, please.

14:26:27  20    Q.   Sure.  There could be a situation where a

14:26:29  21  manufacturer doesn't have any MDR reports, maybe it

14:26:34  22  hasn't even ever sold the product before, but a

14:26:37  23  warning could still be appropriate.

14:26:38  24    A.   It would have to be a -- a generic type of

14:26:47  25  issue I suppose.  Just speculating.

245

14:26:50   1        Q.   Well I mean, for instance, if a manufacturer

14:26:52   2   is going to make a product, put it out there on the

14:26:55   3   market, first time ever, nev -- product's never

14:26:57   4   existed before, right, and obviously in this case it

14:27:01   5   would have to be something substantially equivalent to

14:27:05   6   a prior product if we're talking about a 510(k)

14:27:07   7   product, but assume for me a moment we're talking

14:27:09   8   about a brand-new product.  Okay?

14:27:12   9        A.   Yes.

14:27:12  10        Q.   There are manufacturers who have put man --

14:27:13  11   put warn -- put warnings on products that have never

14:27:17  12   been on the market before; correct?

14:27:18  13        A.   Yes.  Based upon literature, clinical

14:27:21  14   studies, very similar prior devices, whatever the case

14:27:24  15   may be.

14:27:26  16        Q.   Sure.  And -- and there may be no MDR

14:27:27  17   reports for that device.

14:27:28  18        A.   Not yet, because it's not marketed.

14:27:30  19        Q.   Right.  And hopefully if it's warned right,

14:27:33  20   if the warnings are good, hopefully there will never

14:27:36  21   be any MDR reports for it; right?

14:27:39  22        A.   Well unlikely, but yes.

14:27:40  23        Q.   Well I mean there are -- there are some

14:27:41  24   devices out there, would you agree with me, that just

14:27:44  25   don't ever cause an adverse injury.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

246

14:27:47  1      A.    For the lower-risk devices, yes.  For

14:27:48  2    anything other than that, that's unlikely.

14:27:51  3      Q.    Right.  So anything, par -- particularly

14:27:53  4    something that's an electrical device, something like

14:27:55  5    that --

14:27:55  6      A.    A Class II device, it's unlikely there will

14:27:59  7    be no MDR reports.

14:27:59  8      Q.    Okay.  What I'm saying, though, is -- is if

14:28:02  9    a -- if a manufacturer has some sort of reasonable

14:28:04  10   evidence, letter, from the clinical literature, from

14:28:07  11   its own investigations, something like that, there are

14:28:08  12   situations where it would be appropriate to put a

14:28:10  13   warning on a device when there are no MDR reports.

14:28:15  14     A.    I'd have to look at -- I'd have to look at

14:28:18  15   the specific instance.  Hypothetically that may be the

14:28:21  16   case, but it's subject to the specifics --

14:28:25  17     Q.    Sure.

14:28:25  18     A.    -- of the case.

14:28:26  19     Q.    But for instance, let's just brainstorm a

14:28:28  20   couple hypotheticals right now.  If a company was in

14:28:32  21   possession of not just one, two, three, but numerous

14:28:34  22   clinical studies that suggested a reasonable

14:28:37  23   association of a risk with use of a product, that's

14:28:39  24   the kind of information that could justify a warning

14:28:43  25   even in the absence of any MDR reports.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

247

| | | |
|---|---|---|
| 14:28:44 | 1 | A.    Well it's all within the -- |
| 14:28:47 | 2 | Perhaps, perhaps not, because it's all |
| 14:28:49 | 3 | within the context of the company's risk analysis, |
| 14:28:54 | 4 | risk management analysis whether or not there's a |
| 14:28:58 | 5 | credible association of the device to -- to the event. |
| 14:29:06 | 6 | So if the company has conducted analysis or has |
| 14:29:10 | 7 | otherwise assessed that and they've decided, no, it |
| 14:29:14 | 8 | really doesn't apply at this point in time, you know, |
| 14:29:16 | 9 | we don't have enough data, you know, they may decide |
| 14:29:19 | 10 | it's not yet time for a warning. |
| 14:29:20 | 11 | Q.    Okay.  And that kind of analysis that you're |
| 14:29:23 | 12 | talking about, that has to be done irrespective of if |
| 14:29:26 | 13 | there are MDR reports or not. |
| 14:29:28 | 14 | A.    Well the whole -- the -- |
| 14:29:30 | 15 | Right.  Well, a device that's not yet |
| 14:29:33 | 16 | marketed, there is no experience, there are no MDR |
| 14:29:35 | 17 | reports, so the labeling is based upon those factors I |
| 14:29:38 | 18 | mentioned before:  prior similar devices, literature |
| 14:29:43 | 19 | related to the device, the risk management analysis |
| 14:29:47 | 20 | which may lead to labeling of the device.  So it's a |
| 14:29:51 | 21 | number of things. |
| 14:29:51 | 22 | Q.    Okay.  I want to go to your second reason |
| 14:29:54 | 23 | why a warning was not necessarily appropriate in this |
| 14:29:57 | 24 | case, okay, and that reason is the lack of a direct |
| 14:30:01 | 25 | causal relationship of infections to forced-air |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

248

14:30:04    1    warming.  Do you remember that opinion?

14:30:05    2         A.    Yes.  I have it here.

14:30:06    3         Q.    Yeah.  And that's right there in front of

14:30:08    4    you as well.

14:30:09    5              In other words, nobody's proved a causal

14:30:12    6    relationship between infection and forced-air warming.

14:30:15    7         A.    To my knowledge, I -- I haven't seen it.  I

14:30:18    8    don't think any of your experts are attesting to that.

14:30:21    9         Q.    Right.  And so for that reason, because that

14:30:25    10   causal relationship has not been proved, warnings are

14:30:29    11   not necessarily appropriate.

14:30:30    12        A.    Well then that -- that would lend itself to

14:30:34    13   not having it as a warning.  There's other ways of

14:30:37    14   providing communication, but not necessarily a

14:30:39    15   warning.

14:30:40    16        Q.    I mean a company is not going to give a

14:30:43    17   warning for a condition that hasn't been proved.

14:30:45    18              MS. EATON:  Object to the form of the

14:30:46    19   question.

14:30:46    20        Q.    A causal --

14:30:47    21              Excuse me.  Let me rephrase that.  A company

14:30:50    22   is not going to give a warning regarding a causal

14:30:51    23   relationship between a condition and a product that

14:30:53    24   hasn't been proved.

14:30:54    25        A.    Well a warning --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

249

14:30:54   1          MS. EATON:  Object to the form of the

14:30:55   2    question.

14:30:56   3       A.    Excuse -- yeah.  A warning, there -- there

14:30:59   4    need not be a -- an established causal relationship,

14:31:04   5    but there must be strong evidence to -- to indicate a

14:31:07   6    warning as opposed to an adverse effect as opposed to

14:31:11   7    a precaution.

14:31:11   8       Q.    Well your words in your report are there is

14:31:14   9    a lack of a direct causal relationship, that's why you

14:31:17  10    don't have to warn; right?

14:31:18  11          MS. EATON:  Object to the form of the

14:31:19  12    question.

14:31:20  13       A.    There's not strong --

14:31:20  14          MR. BANKSTON:  Let's go ahead and get that

14:31:21  15    one.  What's that about?

14:31:22  16          MS. EATON:  You're taking one line out of

14:31:25  17    the context of an entire paragraph.

14:31:26  18          MR. BANKSTON:  Oh.  Is that an objection?

14:31:27  19          MS. EATON:  Yes.

14:31:28  20          MR. BANKSTON:  What is the objection?

14:31:29  21          MS. EATON:  It's an objection to the form.

14:31:31  22    It mischaracterizes his report.

14:31:32  23          MR. BANKSTON:  Okay.  There's the objection.

14:31:33  24          MS. EATON:  Yes.

14:31:34  25          MR. BANKSTON:  All right.

250

14:31:35    1        Q.    So you see the sentence there, right, lack

14:31:43    2    of causal relationship?

14:31:43    3        A.    Right.

14:31:44    4        Q.    Okay.  So let's look at that sentence

14:31:46    5    together.

14:31:59    6              Help out here, Mr. Ulatowski.  What page are

14:32:01    7    you on?

14:32:01    8        A.    Seventy-three.

14:32:02    9        Q.    Okay.

14:32:03   10        A.    Seventy-four.

14:32:06   11        Q.    All right.  So the paragraph, the thing that

14:32:08   12    I was taking out of context was --

14:32:10   13              There's four reasons in that paragraph;

14:32:14   14    right?

14:32:14   15        A.    Right.

14:32:14   16        Q.    And we're going through each one of them;

14:32:14   17    aren't we?

14:32:15   18        A.    And in sum, the reasons are I would not have

14:32:18   19    a warning at this point in time.

14:32:19   20        Q.    Okay.  So the first one we talked about was

14:32:22   21    a paucity of MDR reports.

14:32:24   22        A.    Right.

14:32:24   23        Q.    Okay.  So the second one is what you say is

14:32:27   24    the lack of a direct causal relationship of infections

14:32:29   25    to forced-air warming that Dr. David acknowledges in

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

251

14:32:32   1   his report.

14:32:33   2        A.    Correct.

14:32:33   3        Q.    Okay.  So if there is a lack of a direct

14:32:36   4   causal relationship, that is something that the

14:32:39   5   company should take into mind and say this is a

14:32:42   6   justification for why not to warn.

14:32:44   7        A.    It's one element to consider, and that's why

14:32:48   8   I list four elements.  Taken together, I don't think a

           9   warning is appropriate.

14:32:51  10        Q.    Well you understand Dr. David in his report

14:32:54  11   cites the same Blue Book documents you do; right?

14:32:58  12        A.    Yes, he does.

14:32:58  13        Q.    Okay.  And I noticed when I was looking at

14:33:01  14   Dr. David's -- when I was looking at Dr. David's

14:33:14  15   report at page 41 --

14:33:15  16             MR. BANKSTON:  You got a copy?

14:33:16  17             MS. EATON:  I do.

14:33:18  18        A.    Is this for me to look at?

14:33:19  19        Q.    No.  I'm going to hand you one right here --

14:33:22  20        A.    Oh.

14:33:24  21        Q.    -- where I've got it open.

14:33:24  22        A.    Okay.

14:33:24  23        Q.    Do you see there towards the bottom of the

14:33:26  24   paragraph where it says "FDA Blue Book Guidance

14:33:29  25   Document?"

252

14:33:29    1        A.    Hang on a second.

14:33:37    2              Yes, --

14:33:38    3        Q.    Okay.

14:33:38    4        A.    -- as I've explained to you.

14:33:39    5        Q.    Yes.  So in --

14:33:41    6              Dr. David, he cited on page 41 of his report

14:33:43    7    the exact same Blue Books document that you cited.

14:33:46    8        A.    Right.

14:33:47    9        Q.    Okay.  And he includes the line that you

14:33:50   10    omitted, which is a causal relationship need not have

14:33:53   11    been proved.

14:33:53   12        A.    I just explained that to you.

14:33:55   13        Q.    I'm asking you what's in your report, sir.

14:33:57   14    That's not in your report; is it?

14:34:00   15        A.    That statement is not in my report.

14:34:01   16        Q.    Right.  That statement was omitted.

14:34:04   17              And these are Blue Book documents that you

14:34:07   18    relied on and administered for years; correct?

14:34:10   19        A.    Well I don't have a long answer here.

14:34:16   20    This -- this -- although there's some utility --

14:34:20   21              First of all, this is a guidance document,

14:34:22   22    it's not regulation; therefore, it -- it can be

14:34:25   23    applied to the degree the FDA chooses to apply it and

14:34:29   24    industry chooses to apply it, because there -- it's

14:34:33   25    not force of regulation.  And secondly, if you read

253

14:34:35    1    the guidance, it's based on FDA drug regulations, it's

14:34:41    2    not -- it's not a device regulations-based guidance.

14:34:45    3    It was created just as a -- at that point in time it

14:34:48    4    was intended as a stopgap until device regulations

14:34:51    5    were -- were improved and expanded.  But -- but here

14:34:56    6    it is and -- but it's a --

14:34:58    7            If you read the foundation for this

14:35:01    8    guidance, it's a drug regulation-based guidance.

14:35:03    9    So --

14:35:04   10        Q.   May not be so appropriate for this

14:35:07   11    situation.

14:35:07   12        A.   May not be so appropriate, right.

14:35:11   13        Q.   But you cited it in your report --

           14        A.   I did.

           15        Q.   -- in support for this opinion; --

           16        A.   I did.

           17        Q.   -- didn't you?

           18        A.   I mean it is what it is.

           19        Q.   The same document?

           20            THE REPORTER:  One at a time.

14:35:14   21        Q.   You cited this in your opinion, the exact

14:35:15   22    document that Dr. David cited; right?

14:35:17   23        A.   I did.

14:35:19   24        Q.   Okay.  And you reviewed Dr. David's report.

14:35:20   25        A.   Yes, I did.

254

14:35:21  1        Q.    In fact, your testimony is meant to address

14:35:23  2    his report.

14:35:24  3        A.    Yes.

14:35:24  4        Q.    And in fact, it's meant to address his

14:35:27  5    testimony with regard to whether there be should have

14:35:30  6    been a warning.

14:35:30  7        A.    Yes.

14:35:30  8        Q.    And you --

14:35:30  9              He gave the opinion there should have been a

14:35:32  10   warning; correct?

14:35:33  11       A.    Yes.  Which really wasn't a warning, but

14:35:36  12   yes.

14:35:36  13       Q.    Okay.  Well let's -- let's just say in any

14:35:39  14   way he doesn't think that there was an adequate

14:35:42  15   communication of the risks of this device.

14:35:45  16       A.    Generally spoken, yes.

14:35:45  17       Q.    Right.  And he included documents like the

14:35:49  18   Blue Book guidance document in supporting his

14:35:52  19   opinions; right?

14:35:55  20       A.    As I did, yes.

14:35:56  21       Q.    And you gave the opinion that one of the

14:35:59  22   reasons the warning was not appropriate is because 3M

14:36:02  23   lacked proof of a direct causal relationship.

14:36:04  24       A.    Yes, that's one of the elements of my

14:36:06  25   four- -- four-point rationale.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

255

14:36:10  1      Q.   But a causal relationship need not have been

14:36:12  2  proved to give a warning; correct?

14:36:14  3      A.   Which I told you before you told me.

14:36:16  4      Q.   Right.

14:36:18  5           Your report, then, which is meant to address

14:36:20  6  Dr. David on the contention that as long as there's

14:36:24  7  reasonable evidence, not a direct causal link, a

14:36:27  8  warning is appropriate, your rebuttal to that is one

14:36:31  9  of the reasons you don't give a warning is because

14:36:32  10  there's no direct causal relationship.

14:36:35  11      A.   Yeah.  I think that's part of this

14:36:36  12  litigation, to establish the reasonableness of that

14:36:40  13  association.  So --

14:36:41  14      Q.   And you don't --

14:36:43  15      A.   Which I -- which I -- excuse me -- which I

14:36:46  16  think is, you know, open to great debate at this point

14:36:48  17  in time.

14:36:48  18      Q.   And you don't see a glaring contradiction

14:36:52  19  between your opinion that that is a basis of not

14:36:52  20  warning and the Blue Book's guidance documents.

14:36:55  21      A.   No, I --

14:36:56  22           In sum, no, because I found my opinion on

14:36:59  23  four points, and this is -- this is one element of

14:37:02  24  that.

14:37:02  25      Q.   All right.  Let's look at the third one.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

256

14:37:04   1   The third one is the analysis of surgical-site

14:37:06   2   infections in the 3M risk management report; correct?

14:37:09   3        A.   Yes.

14:37:10   4        Q.   All right.  So the defendant --

14:37:12   5             MR. BANKSTON:  Let's take a look at that

14:37:13   6   real quick.  Let's talk about this --

14:37:23   7             Let's have that marked.

14:37:33   8             (Ulatowski Exhibit 7 was marked for

          9             identification.)

14:37:39  10             THE WITNESS:  Boy, this is an eye test.  You

14:37:41  11   know, I can blow mine up on the screen, but --

          12   BY MR. BANKSTON:

14:37:44  13        Q.   Well good thing I'm not going to be asking

14:37:47  14   you a bunch of words in it, but I do want to bring to

14:37:49  15   your attention that is the document that you cited as

14:37:51  16   the 3M risk management report; right?

14:37:53  17        A.   Yeah.  Although I'm having trouble reading

14:37:55  18   it.  But go ahead.

14:37:56  19        Q.   Well we can just compare the Bates number to

14:37:59  20   what you cited in your report; right?

14:38:01  21        A.   No, I'm not denying that, I'm just saying I

14:38:03  22   can't --

14:38:03  23        Q.   Yeah.  And again, I don't --

          24        A.   My glasses --

14:38:06  25        Q.   I'm not concerned about the content at this

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

257

14:38:06   1   point.  I don't really care what it says.  I'm trying

14:38:09   2   to say that this is the document, the 3M risk

14:38:11   3   management report, that's cited in your report.

14:38:14   4       A.   Okay.

14:38:15   5       Q.   Correct?

14:38:15   6       A.   I believe so.

14:38:17   7       Q.   Okay.

14:38:18   8       A.   I recognize it --

14:38:19   9       Q.   Okay.

14:38:19  10       A.   -- generally.

14:38:20  11       Q.   So this chart in front of you, this -- that

14:38:24  12   they've made -- let me try to get this on --

14:38:27  13            Let me make sure I understand.  So defendant

14:38:31  14   made a chart saying that their billion-dollar

14:38:32  15   investment was not to blame and you find that

14:38:35  16   compelling.

14:38:36  17       A.   It's --

14:38:37  18            MS. EATON:  Object to the form of that

14:38:39  19   question.

14:38:40  20       A.   I find FMBAs to be important documents to

14:38:44  21   assess.

14:38:44  22       Q.   And you've just reviewed this chart; right?

14:38:48  23       A.   Well there --

14:38:49  24            It's part of a larger document, but yes --

          25       Q.   Have you reviewed --

258

14:38:51    1        A.    -- it's a part of it.

14:38:52    2        Q.    Did you review that larger document?

14:38:54    3        A.    Yes.

14:38:54    4        Q.    Okay.  And what methodologies were

14:38:56    5    undertaken to determine this risk?

14:38:58    6        A.    By 3M?

14:39:00    7        Q.    Uh-huh.

14:39:01    8        A.    There's a risk management standard that 3M

14:39:05    9    and -- and almost the entire medical device industry

14:39:08   10    applies in regards to identifying and managing risks,

14:39:14   11    dealing with risks.

14:39:14   12        Q.    Okay.

14:39:15   13        A.    So I --

14:39:15   14              Which surprised me Dr. David doesn't even

14:39:18   15    reference, but ISO 14971.  So this is very much in

14:39:24   16    line with -- with that manner.

14:39:26   17        Q.    Okay.  So this chart here and these

14:39:29   18    conclusions that 3M reached, because you look at that,

14:39:34   19    you think there shouldn't have been a warning made;

14:39:36   20    correct?

14:39:36   21        A.    Yes.  And this is -- this is retrospective

14:39:40   22    as I viewed it and -- and as discussed in this, so

14:39:45   23    it's not only going forward, I -- in my opinion it's

14:39:48   24    a -- it's a backward-looking document as well.

14:39:52   25        Q.    Okay.  And what are you meaning exactly by

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

259

14:39:54     1    that?

14:39:54     2         A.   Well 3M's taking a look on this particular

14:39:58     3    date and making its decisions, but of course we know

14:40:01     4    time is -- this -- this issue has not reared its head,

14:40:08     5    airborne contamination, whenever this document was --

14:40:12     6    was decided upon.  I can't -- I can't read the date on

14:40:15     7    this particular page.

14:40:16     8         Q.   I don't think there's a date on it which is

14:40:18     9    what I was going to ask you.  When did this happen?

14:40:21    10         A.   Yeah.  There -- there --

14:40:22    11              This is part of a larger document where

14:40:23    12    there is -- there are dates.

14:40:24    13         Q.   Okay.  Do you know when this happened?

14:40:27    14         A.   This was --

14:40:30    15              This is relatively recent I think.

14:40:32    16         Q.   Not when the decisions were being made

14:40:34    17    whether to put a warning on this device; correct?

14:40:36    18         A.   And that's why I say its -- it's, in my

14:40:40    19    opinion, based upon the foundation here, useful in

14:40:45    20    retrospect as well, because there's no less

14:40:47    21    information now than there was years ago, there's more

14:40:52    22    information now.  So if -- if -- you would expect new

14:40:55    23    information to be amassed that would, if I were to go

14:41:00    24    on plaintiffs' side, say, well, the risk is greater,

14:41:03    25    the risk is more prominent, there's more evidence.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

260

14:41:06  1   What I'm saying is roll this back to 1997, whatever,

14:41:11  2   and what was known then.  Well even less, and the

14:41:15  3   risk, if there is one, was even less apparent.  So --

14:41:18  4       Q.   Well what about the studies that 3M is using

14:41:21  5   to say there's no risk, things like Dr. Sessler and

14:41:23  6   Dr. Olmstead's study?  That did not exist back then,

14:41:26  7   did it, back at the time of clearance and decisions

14:41:29  8   made on warnings?

14:41:30  9       A.   No.  I think that's my point, that data and

14:41:32  10  information has -- has evolved over time but it hasn't

14:41:36  11  changed the profile over time.  There's pros and cons,

14:41:42  12  there's more or less, there's this and that, but I

14:41:45  13  don't think the needle moved any in regard to the

14:41:46  14  outcome.

14:41:47  15      Q.   Really.  Okay.

14:41:48  16      A.   You know, 3M has their position, their

14:41:53  17  foundation, their conclusions, and of course

14:41:54  18  plaintiffs have their conclusions as well.

14:41:56  19      Q.   And a lot of independent people have their

14:41:59  20  conclusions, too; right?

14:42:00  21      A.   Right, that it's not a problem.

14:42:03  22      Q.   And that it is a problem.

14:42:03  23      A.   Well there you, pros and cons.

14:42:05  24      Q.   Yeah.  You've got a lot of different people

14:42:08  25  concluding a lot of different things; right?  Correct?

261

14:42:13  1      A.    You've got different people concluding

14:42:13  2   different things, strengths and weakness of all the

14:42:15  3   data.

14:42:16  4      Q.    Uh-huh.

14:42:17  5      A.    And so that -- that all needs to be taken

14:42:20  6   into account.

14:42:21  7      Q.    And --

14:42:23  8      A.    I think -- I think 3M's position in this

14:42:24  9   assessment is -- is sufficiently well founded at this

14:42:27  10  point in time.

14:42:28  11          MS. EATON:   And I would just pause and ask

14:42:30  12  you to remember to wait for a question.

14:42:33  13          THE WITNESS:   Okay.

14:42:35  14          MS. EATON:   Thank you.

14:42:35  15     Q.    When it comes to people's independent

14:42:37  16  opinions, people who have no dog in this fight, none

14:42:41  17  of those are cited in your four reasons for not to

14:42:44  18  warn; right?  The only one -- like the only person

14:42:47  19  source of information that you've cited is the most

14:42:50  20  biased person in the equation; correct?

14:42:52  21          MS. EATON:   Object to the form of the

14:42:54  22  question.

14:42:57  23     A.    Well for whatever reason, you know, I

14:43:00  24  certainly do address those, you know, ECRI and the

14:43:05  25  Periprosthetic Consensus opinion, I do discuss those

262

14:43:09  1    later, so I haven't -- I don't neglect them.  And

14:43:12  2    they're supportive of 3M's position.  But --

14:43:14  3          So my point here is -- is that a risk

14:43:21  4    management process, of which this is a part, is one of

14:43:24  5    the vehicles whereby labeling instructions are either

14:43:30  6    found to be necessary or unnecessary.

14:43:34  7          Q.   Let's talk a little bit about those

14:43:35  8    independent organizations you just brought up.  Let's

14:43:37  9    first talk about the International Concensus on

14:43:39  10   Periprosthetic Joint Infection.  That's something you

14:43:42  11   rely on?

14:43:42  12         A.   That's something I comment on in the report.

14:43:44  13         Q.   Do you understand that 87 percent of the

14:43:47  14   delegates agreed in that consensus statement that they

14:43:51  15   recognized the theoretical risk of forced-air warming?

14:43:53  16         A.   Their conclusions are stated in their

14:43:58  17   conclusions, so --

14:43:58  18         Q.   That's reasonable evidence of an association

14:44:01  19   of a potential risk of this product; isn't it?

14:44:03  20         MS. EATON:  Object to the form --

14:44:04  21         Well, I withdraw my objection.

14:44:06  22         A.   No, I -- I think this is -- it's supportive

14:44:08  23   of 3M's position that -- that it's not evident to

14:44:13  24   the -- to the degree that Dr. Augustine would have

14:44:16  25   people think.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

263

14:44:16   1      Q.    All right.  All the consensus statement

14:44:19   2   says, the entirety of it is we recognize the

14:44:22   3   theoretical risk of forced-air warming and the fact

14:44:24   4   that no study has ever conclusively proved the

14:44:27   5   existence of an infection.  You understand that those

14:44:30   6   are the two conclusions.

14:44:30   7      A.    And there should be no change in therapy and

14:44:33   8   use of the product.

14:44:33   9      Q.    Right, exactly.  They conclude that there's

14:44:35   10  no change in use of the product.

14:44:37   11     A.    Right.

14:44:38   12     Q.    You're not pulling it out of hospitals.

14:44:40   13     A.    Don't pull it out, keep using it.

14:44:42   14     Q.    Yeah, exactly.

14:44:42   15     A.    Right.

14:44:42   16     Q.    You don't agree with me, though, that when

14:44:45   17  87 percent of those delegates agree and recognize the

14:44:49   18  theoretical risk, that that isn't some evidence of a

14:44:50   19  reasonable association between the products and that

14:44:54   20  risk?

14:44:54   21     A.    You have to rely upon the official position

14:44:58   22  as stated by the group, which is their -- the

14:44:59   23  statement they made.

14:45:00   24     Q.    Which has nothing to do about whether the

14:45:02   25  product should have warnings or not; right?  That's

264

14:45:04  1   not what they're there to decide.

14:45:07  2        A.   Well then why are you asking me why didn't I

14:45:09  3   cite it?

14:45:09  4        Q.   I'm just trying to figure out where -- if

14:45:10  5   there exists in these independent groups reasonable

14:45:14  6   evidence of the association between a risk of a

14:45:16  7   product, and you would agree with me the International

14:45:16  8   Concensus is one such -- is one such document.

14:45:20  9        A.   Their statement stands on its own, and their

14:45:22  10  statement that the device can continue to be used with

14:45:25  11  no modification.

14:45:26  12       Q.   Let's talk about ECRI.  You know that when

14:45:29  13  ECRI did a literature review, it said not a single

14:45:32  14  study met their inclusion criteria, not a single one.

14:45:36  15  Do you recognize that?

14:45:36  16            MS. EATON:  If you're going to ask him

14:45:39  17  questions about the ECRI report, I would ask that you

14:45:39  18  put it front of him so he can be precise.

14:45:40  19            MR. BANKSTON:  I don't have it.  He brought

14:45:42  20  it up.  I did never think I was going to be talking

14:45:45  21  about it.  He brought it up, so I'm asking questions

14:45:46  22  about it.

14:45:47  23            MS. EATON:  That's fine.

14:45:49  24       A.   What's your question again?

14:45:49  25       Q.   They -- they -- of all --

265

14:45:49   1        When they did a literature review and they

14:45:50   2   reviewed all the literature on it, they didn't find a

14:45:53   3   single study that met their inclusion criteria.

14:45:55   4        A.   Well yes, they did --

14:45:57   5        As -- as any literature search will do,

14:46:02   6   you'll begin with everything and narrow it down to

14:46:05   7   particular criteria that you've established.  That's

14:46:07   8   always the case with a very rigorous data analysis.

14:46:10   9   I've done that many times.

14:46:11   10        Q.   It's always the case that you don't find a

14:46:13   11   single study that meets the inclusion criteria?

14:46:16   12        A.   Well I think they did arrive at -- at -- at

14:46:20   13   a few studies that -- that were important to them, and

14:46:23   14   they commented on that in their report.

14:46:25   15        Q.   Yeah.  They said there was a couple studies

14:46:27   16   that came close.  Do you remember that?

14:46:28   17        A.   Fine.  But that doesn't say much about the

14:46:30   18   plaintiffs' studies either I suppose; right?

14:46:31   19        Q.   It doesn't really say anything much about

14:46:34   20   anything; does it?

14:46:34   21        A.   Well then why are we here?

14:46:34   22        MS. EATON:   Object to the form of the

14:46:35   23   question.

14:46:36   24        Q.   What's that, sir?

14:46:36   25        A.   Then why are we here?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

266

1    Q.   Well you cited it as a re -- support for

2    your idea that there has been a finding that a warning

3    isn't appropriate, that there's no reasonable evidence

4    of an association between a risk, and what I want to

5    understand from you, sir, is what you think in ECRI's

6    position supports that statement.

7    A.   Well first of all, we've gotten off track

8    here.  We started at here are my four positions to

9    substantiate, and you asked why didn't you reference

10   anything else.  Well I said why I talk about other

11   things, but not in this instance.  So -- so why don't

12   we just concentrate on what I said to support the --

13   as a foundation for my statement.

14   Q.   Sir, you're the one who volunteered to me

15   that you were relying on independent organizations

16   such as ECRI and the International Concensus; correct?

17   A.   No.  I -- I think the discussion began, you

18   know, why didn't you talk about ECRI and that.

19   Q.   Okay.  So let's get to --

20   A.   And I said why I didn't.

21   Q.   So then let's go back to your warning

22   opinions, which is:  When you cite your four reasons

23   for your warnings, you don't cite anybody who is

24   independent.  You have no independent support for that

25   opinion.

267

14:47:46  1      A.    No.   It's unnecessary at this point in time

14:47:48  2  because I provide foundation for my opinion.

14:47:51  3      Q.    Instead, we're just going to rely on the

14:47:54  4  information by the people who have an enormous amount

14:47:56  5  to lose.

14:47:58  6            MS. EATON:   Object to the form of the

14:47:58  7  question.

14:47:59  8      A.    No, sir.   I -- I rely upon the typical

14:48:03  9  foundation for labeling statements, such as warnings

14:48:08  10  in labeling, which this is one of those primary

14:48:12  11  sources right here.

14:48:12  12      Q.    Another thing about ECRI, they also found

14:48:15  13  that these concerns of risk are particularly

14:48:18  14  worrisome.   Do you remember them saying that?

14:48:20  15            MS. EATON:   Object to the form of the

14:48:21  16  question.

14:48:21  17      A.    Well I have their statement in my report.

14:48:24  18      Q.    Sure.

14:48:24  19      A.    I'd have to read it.

14:48:25  20      Q.    All right.   And so these ones --

14:48:27  21            The International Concensus statement and

14:48:29  22  the ECRI statement, these are the two of the

14:48:30  23  independent things that you think are good for the

14:48:33  24  defendants' side; right?

14:48:34  25            MS. EATON:   Object to the form of the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

268

14:48:37  1  question.

14:48:37  2       A.   You know, we can read their -- their

14:48:40  3  findings again.  It's remarkable that and supportive

14:48:43  4  that the perioperative group said keep using the

14:48:46  5  device.

14:48:48  6       Q.   There are other independent groups and other

14:48:50  7  independent authors and other literature reviews which

14:48:53  8  have been far less favorable on the subject and

14:48:56  9  recommended alternative warning therapies; correct?

14:48:58 10           MS. EATON:  Object to the form of the

14:49:01 11  question.

14:49:01 12       A.   Well I guess that's all going to come out.

14:49:02 13  I haven't commented on that.

14:49:04 14       Q.   Okay.

14:49:04 15       A.   But ECRI and -- you know, I point to them in

14:49:07 16  my report, not in this section.  They're an informed

14:49:12 17  group, they provide input to -- on public health

14:49:16 18  matters to -- to the United States.  I've had

14:49:19 19  interactions with them before on many topics and find

14:49:22 20  them to be credible and useful.

14:49:24 21       Q.   And that is an organization that has

14:49:27 22  recommended that further study be performed on this

14:49:30 23  product.

14:49:30 24       A.   Fine.

14:49:31 25           MS. EATON:  Could we take a break?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

269

14:49:32    1        Q.    Is that correct?

14:49:33    2        A.    I'd have to read their report again.

14:49:40    3        Q.    Okay.

14:49:40    4              MS. EATON:  I'd like to take a break.

14:49:43    5              MR. BANKSTON:  Okay.

14:49:43    6              THE REPORTER:  Off the record, please.

14:58:15    7              (Recess taken.)

14:58:15    8    BY MR. BANKSTON:

14:58:20    9        Q.    Mr. Ulatowski, portions of your report

14:58:24   10    discuss scientific literature; correct?

14:58:26   11        A.    I refer to it.

14:58:27   12        Q.    Correct.  Things you have reviewed include

14:58:32   13    the scientific literature cited in Dr. David's report.

14:58:36   14        A.    Right.  Early on, as I mentioned I think

14:58:38   15    earlier in the day, I -- I received virtually every

14:58:45   16    relevant report related to the Bair Hugger or the

14:58:48   17    technology, both pro and con.

14:58:52   18        Q.    You realize a large amount of the authors

14:58:57   19    who have written and studied the Bair Hugger have been

14:59:01   20    deposed in this case.

14:59:01   21        A.    Well I guess I may not know everyone who's

14:59:04   22    been deposed or have -- have read every one, but, you

14:59:09   23    know, I imagine there's been quite a number of them.

14:59:12   24        Q.    I notice there's not a deposition transcript

14:59:15   25    on your reviewed list of Dr. Belani, for instance.  Do

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

270

14:59:20  1    you know who Dr. Belani is?

14:59:21  2         A.    Doesn't ring a bell.

14:59:22  3         Q.    Okay.  He's one of the authors in Dr.

14:59:25  4    David's report who had given one of the --

14:59:28  5              Are you aware he's been deposed?

14:59:30  6         A.    You know, if Dr. David referred to it in his

14:59:33  7    report, I did ask for all the references Dr. David had

14:59:40  8    so I could understand whether or not I had seen those.

14:59:44  9    So, you know, if -- if it was in one of the records

14:59:51  10   provided to me as I requested, you know, I may have

14:59:54  11   seen it, but I -- I don't recall it offhand.  There's

14:59:57  12   so many of them.

14:59:58  13        Q.    Your understanding is you -- you have been

15:00:00  14   provided or it was your intent to be provided with

15:00:02  15   everything cited in Dr. David's report?

15:00:04  16        A.    Yes.

15:00:04  17        Q.    Okay.  But in terms of these physicians and

15:00:11  18   researchers, Dr. Nachtsheim, Dr. Legg, Dr. Hammer, Dr.

15:00:17  19   Reed, Dr. McGovern, Dr. Gauthier, Dr. Leaper, Dr.

15:00:23  20   Litchy, Mr. Albrecht, none of those depositions are

15:00:25  21   things that you read in coming to your conclusions

15:00:28  22   about the scientific evidence in this case?

15:00:30  23        A.    Well again, as -- as we discussed earlier,

15:00:36  24   I -- I don't make a -- an affirmative statement about,

15:00:41  25   you know, the benefits or -- or data related to the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

271

15:00:47   1   studies, --

15:00:48   2        Q.   Okay.

15:00:49   3        A.   -- and -- and that's simply the case.  I

15:00:52   4   just, for example, comment on Dr. David's approach to

15:00:58   5   analyzing the literature indicating that he appeared

15:01:01   6   to be very selective in what he looked at.

15:01:04   7        Q.   All right.  You have -- you have no training

15:01:07   8   as an orthopedic physician; correct?

15:01:08   9        A.   No.

15:01:09   10        Q.   Okay.  You have no training or --

15:01:13   11             Not an infectious disease doctor; right?

15:01:15   12        A.   I'm not an infectious disease doctor.

15:01:18   13        Q.   All right.  One of --

15:01:19   14             You've got an opinion in your case

15:01:20   15   addressing Dr. William Jarvis, right, and his

15:01:23   16   opinions?

15:01:24   17        A.   Related to HICPAC.

15:01:27   18        Q.   Right.  Do you feel qualified to address Dr.

15:01:32   19   Jarvis's opinions as -- his clinical conclusions as an

15:01:32   20   infectious disease doctor?

15:01:34   21        A.   No.

15:01:34   22        Q.   Okay.  You're not an expert in filtration.

15:01:37   23        A.   No, I wouldn't call myself an expert.  I

15:01:40   24   used it in the course of my laboratory work.  But no.

15:01:43   25        Q.   You're not an expert in what we would call

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

272

| | | |
|---|---|---|
| 15:01:46 | 1 | HVAC.  Are you familiar with that term? |
| 15:01:48 | 2 | A.   Of what? |
| 15:01:50 | 3 | Q.   HVAC. |
| 15:01:53 | 4 | A.   HVAC? |
| 15:01:53 | 5 | Q.   H-V-A-C. |
| 15:01:54 | 6 | A.   No. |
| 15:01:54 | 7 | Q.   Okay. |
| 15:01:55 | 8 | A.   No, I'm not an expert in HVAC. |
| 15:01:57 | 9 | Q.   You're not an expert in OR design. |
| 15:02:00 | 10 | A.   No, I am not. |
| 15:02:00 | 11 | Q.   You are not an expert in particulate flow in |
| 15:02:04 | 12 | the air. |
| 15:02:05 | 13 | A.   No. |
| 15:02:05 | 14 | Q.   Not an expert in physics. |
| 15:02:07 | 15 | A.   No. |
| 15:02:08 | 16 | Q.   Not an expert in computational fluid |
| 15:02:10 | 17 | dynamics. |
| 15:02:11 | 18 | A.   No. |
| 15:02:12 | 19 | Q.   Not an expert in epidemiology. |
| 15:02:14 | 20 | A.   No. |
| 15:02:15 | 21 | Q.   Okay.  You won't be offering any testimony |
| 15:02:21 | 22 | in this case today or at trial on any of those issues |
| 15:02:25 | 23 | we just talked about right now. |
| 15:02:26 | 24 | A.   No.  I haven't in my report.  If I'm asked, |
| 15:02:30 | 25 | you know, I guess I'll have to defer.  But who knows? |

273

| | | |
|---|---|---|
| 15:02:34 | 1 | Q.   Okay.  I want to jump back into your |
| 15:02:40 | 2 | discussion about warnings, and let's talk about the |
| 15:02:44 | 3 | fourth reason.  So you might want to go -- |
| 15:02:46 | 4 | (Discussion off the stenographic record.) |
| 15:02:46 | 5 | A.   Can we go back to that -- refer me to that |
| 15:02:49 | 6 | page because I closed it. |
| 15:02:50 | 7 | Oh, yeah, 75 -- 73-75. |
| 15:02:53 | 8 | Q.   I just wanted to make sure I heard you |
| 15:02:55 | 9 | correctly on the last answer because there was a word |
| 15:02:59 | 10 | that has a homophone to it, and it is when you say -- |
| 15:03:03 | 11 | Did you say you'd defer to those experts or |
| 15:03:07 | 12 | you'd confer with those experts? |
| 15:03:09 | 13 | A.   In my last -- |
| 15:03:10 | 14 | Q.   In your last answer about your statements |
| | 15 | to -- about conclusions that experts might draw in |
| 15:03:12 | 16 | this case. |
| 15:03:12 | 17 | A.   Our -- our -- |
| 15:03:12 | 18 | I think our last example was the airflow, |
| 15:03:15 | 19 | air particulates or something.  I say I'd defer to |
| 15:03:19 | 20 | experts on that. |
| 15:03:19 | 21 | Q.   Okay.  Defer. |
| | 22 | A.   Defer. |
| 15:03:22 | 23 | Q.   Okay.  I want to talk to you about -- |
| 15:03:25 | 24 | Back on 73 you have your reasons that you |
| 15:03:27 | 25 | have given concerning why a warning wasn't |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

274

15:03:29  1  appropriate, and the last one that we hadn't gotten to

15:03:33  2  yet was the existing blanket and taping design and

15:03:37  3  blanket labeling and filter mitigation.  Those -- I

15:03:41  4  want to break those down each as a piece.  Okay?

15:03:44  5          With respect to the taping design, do you

15:03:50  6  have anything you can offer me today that you're

15:03:52  7  relying on that would support the idea that this

15:03:55  8  taping design mitigates the risk of airborne

15:03:58  9  contamination and infection in orthopedic surgeries?

15:04:01  10      A.  That's what it's intended to do.

15:04:04  11      Q.  Right.  And I understand I could -- I could

15:04:06  12  make something -- I could -- I could make something in

15:04:09  13  my garage that's intended to do a lot of things, but I

15:04:11  14  may not be necessarily successful.  Correct?

15:04:13  15      A.  Well theoretically, yes.  I mean a physical

15:04:19  16  barrier is -- we talk about filtration, but a physical

15:04:23  17  barrier is a physical barrier, so if there's an

15:04:26  18  effective taping mechanism, that should be an

15:04:28  19  effective physical barrier without efficiency issues

15:04:33  20  or about transmission issues.  It should be all or

15:04:34  21  none.

15:04:34  22      Q.  And what if anything are you relying on to

15:04:37  23  say that there is an effective taping barrier?

15:04:40  24      A.  Well the -- the label --

15:04:44  25          The submissions for blankets, 510(k)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

275

15:04:46    1    submissions, indicated that these blankets should be

15:04:49    2    taped to prevent -- to prevent airflow.

15:04:54    3        Q.    That -- that was something submitted by Dr.

15:04:57    4    Augustine.

15:04:57    5        A.    Right, early on.   And there's many blanket

15:04:59    6    submissions stating that.

15:05:00    7        Q.    Dr. Augustine's that guy you don't find

15:05:02    8    credible at all.

15:05:03    9        A.    Well the 510(k)s are reviewed by FDA and

15:05:06   10    either found credible by FDA because of what's

15:05:09   11    submitted or because of what FDA knows.

15:05:12   12        Q.    Okay.

15:05:12   13        A.    I had on my staff seven OR nurses, so if

15:05:16   14    they saw things that were not ringing true, they could

15:05:22   15    pick it up.

15:05:22   16        Q.    What would --

15:05:22   17        What did the FDA do in order to determine

15:05:24   18    that the taping mechanism was effective?

15:05:27   19        A.    Well I don't think FDA did any testing or

15:05:32   20    any evaluation.   It was based upon --

15:05:35   21        You know, the company would be expected to

15:05:37   22    evaluate the taping mechanism and effective --

15:05:41   23    effectiveness of that.

15:05:41   24        Q.    What did the company do to evaluate the

15:05:43   25    taping mechanism and the effectiveness of that?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

276

15:05:45  1      A.    I don't recall the specific testing in

15:05:47  2    regard to the blankets.  Those are pretty -- some of

15:05:51  3    them are pretty old 510(k)s.

15:05:51  4      Q.    Okay.  Is it your contention that the

15:05:53  5    company did something to test these blanket strips for

15:05:58  6    airborne contamination?

15:06:00  7      A.    Individually, yes, or relying upon prior

15:06:03  8    experience of other designs and other taping

15:06:07  9    mechanisms.  That would be my answer.

15:06:09  10     Q.    Do you have any idea if there's ever been a

15:06:11  11   product like the Bair Hugger before that had a taping

15:06:13  12   mechanism?

15:06:15  13     A.    It wouldn't necessarily be a blanket taping

15:06:17  14   mechanism, could be just a taping or -- of particular

15:06:20  15   drapes and gowns and things like that.

15:06:22  16     Q.    Okay.  But in terms of any actual evidence

15:06:27  17   that the Bair Hugger's taping mechanism does anything

15:06:30  18   at all, you don't have anything to offer me today.

15:06:34  19     A.    Well I'd have to look back at the studies

15:06:36  20   that were conducted within the design history file.

15:06:40  21   I -- I think I'd probably find some evaluation of

15:06:43  22   airflow around the blankets.

15:06:47  23     Q.    You would agree that that design history

15:06:47  24   file, that's something you've reviewed; right?

15:06:49  25     A.    Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

277

15:06:49  1       Q.   That's something you've reviewed

15:06:51  2   conscientiously.  It's a pretty important document in

15:06:54  3   this case.

15:06:54  4       A.   Yes.  I looked through it.

15:06:55  5       Q.   Okay.  What if anything in the DHF concerns

15:07:00  6   airborne contamination?

15:07:05  7       A.   Well I think inasmuch as the 510(k)s

15:07:21  8   themselves are by their nature inherently part of the

15:07:24  9   design history file, you know, there's discussion in

15:07:27  10  the 510(k)s early on of airborne contamination, and of

15:07:31  11  course the Hall and Zink article early on.  All the

15:07:35  12  testing done by 3M or Arizant, whoever it may have

15:07:43  13  been at a certain point in time, all that testing and

15:07:46  14  evaluation should reside in the design history book.

15:07:49  15      Q.   You reviewed it; right?

15:07:50  16      A.   Yes.  And I reviewed --

15:07:52  17      Q.   Conscientiously.

15:07:53  18      A.   Yes.  And I looked at the other tests, not

15:07:56  19  with an expert eye but just to understand that there

15:08:00  20  was testing conducted.  And what I'm saying is my view

15:08:03  21  of the design history file, what constitutes the

15:08:05  22  design history file is -- is all -- any testing

15:08:09  23  concerning the device, its design, its operation, that

15:08:12  24  should be embodied in the design history file.

15:08:14  25      Q.   Should be.  Is it?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

278

15:08:15    1        A.    Doesn't necessarily have to reside

15:08:18    2   physically in the design history file.  It may be

15:08:20    3   referred to or -- or found through reference.

15:08:24    4        Q.    Well what I'm trying to get at is you've

15:08:27    5   told me you're relying on the design history file for

15:08:29    6   your opinion that the taping design is effective, and

15:08:32    7   I want to know what's in the design history file that

15:08:34    8   would indicate that the taping is effective or

15:08:35    9   addresses airborne contamination in any way.

15:08:37   10        A.    Well that's not entirely what I said.  What

15:08:40   11   I said is I'd have to review the design history file

15:08:44   12   again and any testing that's included and the 510(k)s

15:08:47   13   to look for that, as well as I have said -- I think I

15:08:51   14   said I understand through my reading of test results

15:08:59   15   that there had been tests of airflow in and around the

15:09:04   16   blanket area, and so, you know, that -- that would

15:09:06   17   constitute relevant information.

15:09:09   18            But there's also a foundation of this is not

15:09:17   19   particularly -- I would expect not a particularly new

15:09:21   20   procedure for there to be taping of -- of gowns and

15:09:25   21   drapes in a certain fashion, so it -- it wouldn't

15:09:28   22   create -- it wouldn't be a -- a new phenomenon that

15:09:31   23   drapes and gowns and blankets would be taped.

15:09:34   24        Q.    Okay.  But a forced-air warming blanket

15:09:36   25   cover that expels air out of it into the area of the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

279

15:09:40  1  surgical site, it's a lot different than a drape;

15:09:43  2  isn't it?

15:09:43  3        MS. EATON:  Object to the form of the

15:09:44  4  question.

15:09:44  5     A.  Well I don't think it's been determined that

15:09:47  6  it expels air into the surgical site, but --

15:09:51  7     Q.  Certainly --

15:09:51  8     A.  What's the other aspect of your question?

15:09:52  9     Q.  Well certainly, first of all, the device has

15:09:54  10  a coverlet blanket with perforations in it that expel

15:09:58  11  air in and near the surgical site.

15:09:59  12        MS. EATON:  Object to the form of the

15:10:02  13  question.

15:10:02  14     Q.  And you don't dispute that; do you?

15:10:03  15     A.  Well there are perforations that expel air,

15:10:05  16  but I guess isn't it the contention of the litigation

15:10:09  17  whether or not there is activity in the surgical-site

15:10:12  18  area?

15:10:12  19     Q.  Can you describe to me anything else in that

15:10:16  20  operating room that is closer to the surgical site

15:10:18  21  than the Bair Hugger blanket?

15:10:20  22     A.  Besides the participants in the --

15:10:22  23     Q.  Besides the participants.

15:10:23  24     A.  As well as any other devices that may be

15:10:26  25  used, anesthesia devices, any other devices used

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

280

15:10:29  1   during operation?

15:10:30  2        Q.   Do you think anes --

15:10:31  3        A.   There's multiple devices used during an

15:10:34  4   orthopedic operation.

15:10:34  5        Q.   Do you think anesthesia devices are closer

15:10:37  6   to the surgical site than the Bair Hugger blanket?

15:10:39  7        A.   May be.  May be.  Depends on how the anes --

15:10:41  8   particular anesthesiologist has positioned the

15:10:45  9   devices.

15:10:45  10       Q.   Have you seen a Bair Hugger?

15:10:45  11       A.   Yes.

15:10:45  12       Q.   You held one in your hands?

15:10:47  13       A.   No, I haven't held one in my hands.

15:10:49  14       Q.   Never looked at it, seen how it works?

15:10:51  15       A.   Not physically.  I haven't -- haven't

15:10:54  16  received one or -- or used one.

15:10:56  17       Q.   Never viewed one in operation?

15:10:58  18       A.   No, I don't -- well other --

15:11:01  19            Yes.  In regard to videos, yes.

15:11:03  20       Q.   You've seen one being used in orthopedic

15:11:06  21  surgery?

15:11:09  22       A.   I may have seen simulations, yes, for

15:11:14  23  example.

15:11:14  24       Q.   Okay.  Let's talk about the filter, because

15:11:26  25  one of your -- part of the fourth reason there is

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

281

15:11:27  1    filter mitigation; correct?

15:11:28  2        A.    Yes.

15:11:29  3        Q.    Okay.  Do you have any specific information

15:11:30  4    to offer me that the filter is effective at preventing

15:11:34  5    airborne contamination?

15:11:34  6        A.    Well that's a subject of this whole ball

15:11:38  7    game I suppose.

15:11:39  8        Q.    That's why I'm asking if you got any

15:11:42  9    opinions on it.

15:11:42  10       A.    Well, there's information both pro and con,

15:11:47  11   pro on the part of the company, con on the part of the

15:11:48  12   plaintiffs, each making their arguments based upon

15:11:54  13   literature, based upon their own testing and

15:11:56  14   evaluation, based upon that type of information.  So,

15:12:01  15   you know, all I can say is there is -- there's a lot

15:12:07  16   of information that's, I understand, contentious and

15:12:11  17   everybody -- every camp has a position on it.

15:12:14  18       Q.    Nonetheless, you say that the fact that the

15:12:16  19   filter acts as a mitigating element is a reason not to

15:12:19  20   warn; right?

15:12:20  21       A.    Well I don't think it's --

15:12:21  22             It's indisputable that a filter arguably,

15:12:26  23   whatever -- to what degree, but a filter is -- is a

15:12:31  24   mitigation.  I think -- I think people are arguing

15:12:34  25   shades of mitigation, effectiveness of mitigation, but

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

282

15:12:39  1  nonetheless it is a mitigation.

15:12:42  2      Q.   You don't have any experience to sit here

15:12:42  3  today and tell me that that filter prevents the

15:12:45  4  passing through of nosocomial infection-type organisms

15:12:50  5  through it and towards the patient.

15:12:52  6      A.   Well you've got a lot going on there in

15:12:54  7  that --

15:12:54  8      Q.   Uh-huh.

15:12:54  9      A.   -- in that point.

15:12:55  10     Q.   Yup.  Let's -- let's break it down a piece

15:12:58  11  at a time actually.

         12     A.   And that's a --

15:13:01  13     Q.   Let's -- let's do it that way.  I'll

15:13:01  14  withdraw that question.

15:13:01  15          Do you have any information about what the

15:13:03  16  typical size of a nosocomial infection -- infectious

15:13:07  17  element is?

15:13:07  18     A.   Well you're drawing upon my microbiology

15:13:11  19  experience.  I -- I have a degree in microbiology.

15:13:14  20  It -- it -- that --

15:13:16  21          That aspect has not been a particular focus

15:13:19  22  of my expertise at FDA, but it's -- it's certainly

15:13:22  23  larger than .2 micron, and some are -- are actually

15:13:25  24  quite large, in the .4, .5 and up.

15:13:29  25     Q.   You would agree with me you're not qualified

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

283

15:13:31  1   to offer an opinion on the effectiveness of filtration

15:13:35  2   or the mechanics of filtration.

15:13:37  3       A.   I think I already stated I'm not a

15:13:38  4   filtration expert.

15:13:39  5       Q.   Correct.  And so I just want to make sure

15:13:42  6   that in terms of the opinions you're giving today,

          7   you're not going to be test -- talking about the

15:13:44  8   efficiency or effectiveness at preventing airborne

15:13:46  9   contamination of any given filter.

15:13:48  10          MS. EATON:  Object to the form of the

15:13:48  11  question.

15:13:49  12      A.   Well in my report I respond to Dr. David,

15:13:53  13  who also is not a filtration expert, his assertions

15:13:56  14  regarding certain data, and -- and so I do have

15:13:59  15  that -- that in my report to the extent I found

15:14:02  16  necessary to rebut what he was saying.  But I'm not a

15:14:06  17  filtration expert.  I rely upon the filtration expert

15:14:10  18  who was deposed in this litigation, which ends up

15:14:18  19  being very supportive by the company I felt, and so

15:14:22  20  that's -- so it's -- it's indirect support, not

15:14:25  21  personal knowledge of filtration.

15:14:27  22      Q.   All right.  Couple things I need to unpack

15:14:30  23  from that.  First of all, with respect to Dr. David,

15:14:32  24  I'm assuming that from your prior relationship with

15:14:34  25  him you must understand what his level of expertise

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

284

15:14:36   1   with filtration is.

15:14:37   2        A.   Well as I said in my report, I think I --

15:14:41   3             I know Dr. David, --

15:14:41   4        Q.   Uh-huh.

15:14:42   5        A.   -- I knew him back at FDA when we were

15:14:46   6   considering members of the GMP committee, --

15:14:49   7        Q.   Uh-huh.

15:14:51   8        A.   -- so I reviewed his qualifications as an

15:14:52   9   engineer, and background, and I don't recall any

15:14:55  10   evidence of filtration expertise to the degree that

15:14:58  11   you're looking for.

15:14:59  12        Q.   Okay.  Let's talk about the blanket

15:15:14  13   labeling.  It's the final element of opinion four of

15:15:15  14   why you don't have to warn.  Do you see what I'm

15:15:18  15   talking about there?

15:15:18  16        A.   Opinion four?

15:15:19  17        Q.   Well would be not numbered in that way of

15:15:21  18   your dark points, but it will on 73 in the list of

15:15:24  19   things --

15:15:25  20        A.   Oh, oh.  Okay.

15:15:26  21        Q.   And you see where we're talking about point

15:15:28  22   four?

15:15:30  23        A.   Yes.

15:15:30  24        Q.   Okay.  And we had talked about a couple of

15:15:31  25   those things, being the taping design, the filter

285

15:15:34   1   mitigation.  I want to talk about the labeling, the

15:15:37   2   blanket labeling.  In what way --

15:15:38   3           What is there about the blanket labeling

15:15:40   4   that deals with airborne contamination?

15:15:41   5       A.   Well I think it's the labeling that warns

15:15:44   6   about the need to tape and careful use of the blanket.

15:15:48   7   I think I referenced blanket labeling here somewhere.

15:15:51   8       Q.   Okay.  So the blanket labeling, you believe

15:15:53   9   that has to do with the taping in terms of --

15:15:55   10      A.   Right, proper use of the labeling to -- to

15:15:59   11   prevent -- I --

15:16:00   12           I don't want to misspeak, but I do reference

15:16:02   13   a statement in here somewhere about what the labeling

15:16:05   14   says.

15:16:05   15      Q.   Okay.

15:16:05   16      A.   And it -- it contributes to the overall

15:16:10   17   mitigation of the risk of airborne contamination.

15:16:13   18      Q.   Okay.  I want to talk about --

15:16:15   19           You realize that the warnings over time have

15:16:17   20   changed and some have been removed from the Bair

15:16:20   21   Hugger.

15:16:20   22           MS. EATON:  Object to the form of the

15:16:21   23   question.

15:16:22   24      A.   Say again please.

15:16:22   25      Q.   You realize that when it comes to the

286

15:16:24  1  warnings of the Bair Hugger, they -- some have changed

15:16:27  2  or been removed over time.

15:16:29  3      A.   Yes.  I -- I have a pretty extensive

15:16:31  4  analysis of the Bair Hugger labeling and of the --

15:16:35  5  what the 200s had versus later models.

15:16:38  6      Q.   Okay.  So you are aware that, first of all

15:16:41  7  with respect to one of the warnings that was given

15:16:43  8  with an early model Bair Hugger, the 200, it was

15:16:47  9  expressly warned not to use this in an operating room.

15:16:49  10      A.   Correct.

15:16:50  11      Q.   Okay.  That warning does not appear on later

15:16:53  12  Bair Huggers.

15:16:53  13      A.   Correct.

15:16:55  14      Q.   Okay.  You do understand that there is a

15:16:56  15  warning concerning the possibility of airborne

15:16:58  16  contamination should be considered by the user of the

15:17:00  17  device.  That has existed on a device.

15:17:04  18          MS. EATON:  Object to the form of the

15:17:04  19  question.

15:17:04  20      A.   On a device?

15:17:05  21      Q.   On a Bair Hugger.

15:17:06  22      A.   Say again.

15:17:06  23      Q.   Sure.

          24      A.   Yeah.  Sorry.

15:17:07  25      Q.   At one point there was a Bair Hugger device,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

287

15:17:11   1   it had a warning on it, that warning advised that the

15:17:16   2   possibility of airborne contamination should be

15:17:16   3   considered by the user.

15:17:18   4       MS. EATON:  Object to the form of the

15:17:18   5   question.

15:17:22   6       A.   Yeah, I believe so.  It was -- it was later

15:17:24   7   dropped, and I explained the -- what I believe there

15:17:30   8   of the circumstances.

15:17:30   9       Q.   That was the model 200 that had that

15:17:32  10   warning.

15:17:32  11       A.   Correct.

15:17:33  12       Q.   And the company did not sell that device or

15:17:37  13   advise people to use that device in an operating room.

15:17:41  14       A.   Right.  It could have been because of

15:17:44  15   electrical safety hazards, or who knows?

15:17:46  16       Q.   You don't know?

15:17:48  17       A.   I don't know.

15:17:48  18       Q.   Okay.  You haven't seen documents relating

15:17:49  19   to why the 200 can't be used in an operating room?

15:17:52  20       A.   No.  But it -- it could be, you know,

15:17:56  21   various reasons.

15:18:01  22       Q.   Now this idea of a warning that appeared on

15:18:07  23   these early devices, not only do you understand that

15:18:09  24   there was a warning on the devices, but there were

15:18:12  25   statements made in the 510(k) recognizing the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

288

15:18:14   1   potential -- the possibility of airborne contamination

15:18:18   2   and that that needed to be mitigated against; correct?

15:18:21   3            MS. EATON:  Just let me read the question.

15:18:31   4            Object to the form of the question.

15:18:35   5       Q.   Do you remember the question, sir?

15:18:37   6       A.   Yes.

15:18:38   7            And you're talking about the summary and the

15:18:41   8   Hall and Zink reference and all that.

15:18:42   9       Q.   Uh-huh.  Well, and I mean in the summary of

15:18:44  10   safety and effectiveness for Bair Huggers, --

15:18:46  11       A.   Yes.

15:18:46  12       Q.   -- for 500, the 750, 775, it states that

15:18:52  13   there is -- one of the safety things that is being

15:18:54  14   addressed is the potential for airborne contamination.

15:18:58  15            MS. EATON:  Object to the form of the

15:18:58  16   question.

15:19:00  17       A.   Well, yeah.  There's been a con -- an

15:19:03  18   early-on reference to that with follow-through later,

15:19:07  19   yes.

15:19:08  20       Q.   Yeah.  There's --

15:19:09  21            In every 510(k) that has appeared since the

15:19:11  22   500, it mentions one of the potential safety issues

15:19:15  23   with this device is the potential for airborne

15:19:17  24   contamination.

15:19:19  25       A.   Yeah.  I'd have to look at the labeling

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

289

15:19:21  1    again, but I think that's the case.

15:19:23  2        Q.   Okay.   In other words, this isn't an issue

15:19:25  3    that was new to the company.   The company knew about

15:19:27  4    the potential of this issue as far back as, say, 1989.

15:19:33  5        A.   Well yeah.   Early on in the -- in the

15:19:35  6    summary, the early summary, again I refer to the Hall

15:19:39  7    and Zink reference and statement made that -- that

15:19:43  8    there's -- there's some -- some degree of

15:19:45  9    acknowledgment of -- of -- of that potential.   Let me

15:19:51  10   put it that way.

15:19:53  11       Q.   Okay.

15:19:53  12       A.   But it doesn't really define the risk,

15:19:56  13   degree of risk, just says "potential" or something.   I

15:20:00  14   forget the wording.

15:20:01  15       Q.   Sure.   It basically just says there's a

15:20:03  16   potential association between this product and this

15:20:05  17   condition.

15:20:05  18            MS. EATON:   Object to the form of the

15:20:06  19   question.

15:20:07  20       A.   I'd have to see the exact wording again.   I

15:20:09  21   don't recall.   I should have memorized it by now, but

15:20:13  22   I haven't.

15:20:13  23       Q.   Well in terms of 510(k)s and when a company

15:20:16  24   is listing the potential safety issues that need to be

15:20:19  25   mitigated against, what it is doing is listing certain

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

290

15:20:23   1   conditions that have a reasonable, rational

15:20:26   2   association, a logical association with that product.

15:20:32   3       A.   Well they're -- they're listing risks,

15:20:36   4   potential risks to whatever degree they are, which are

15:20:43   5   then mitigated, if necessary, to whatever degree

15:20:46   6   necessary. And so, you know, I see the -- I see the

15:20:52   7   early reference that's been carried forward and is the

15:20:57   8   subject of this litigation.

15:21:03   9       Q.   I want to talk about your opinion that

15:21:06   10   Arizant appropriately monitored the literature and

15:21:11   11   other sources of information regarding this product

15:21:13   12   and investigated concerns regarding this device.

15:21:17   13       A.   Yes.

15:21:17   14       Q.   Okay. You hold that opinion in this case.

15:21:19   15       A.   Yes, I do.

15:21:22   16       Q.   I want to specifically ask you about

15:21:22   17   investigating concerns. Okay?

15:21:25   18       A.   Okay.

15:21:25   19       Q.   And I want to know each and every thing you

15:21:29   20   were relying on for your opinion that Arizant

15:21:32   21   appropriately investigated the concern of airborne

15:21:34   22   contamination.

15:21:36   23       A.   Well that's a simple question, not -- not so

15:21:41   24   quite a simple answer. I had received a -- a lot of

15:21:46   25   documents about Arizant's -- we'll talk about Arizant

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

291

15:21:52   1   for a moment -- Arizant's receipts of concerns from

15:21:59   2   hospitals or persons, you know, letters from

15:22:03   3   customers, let me put it that way, interaction with

15:22:07   4   customers, how responsive they were.  Of course, you

15:22:14   5   know, what -- what came about later was the -- the

15:22:16   6   Blowing Air Is Risky campaign and their response to

15:22:19   7   that.  So what I was looking for was -- was evidence

15:22:26   8   of what sorts of communications were they receiving

15:22:31   9   and how -- how were they responding, and it appeared

15:22:36  10   to me that -- that they were responding to these

15:22:39  11   communications.  You may argue not effectively or not

15:22:46  12   correctly, but -- but I saw responsiveness.  I saw a

15:22:51  13   rationale for the position they took in their

15:22:53  14   response.  Certainly during the course of inspection

15:22:58  15   FDA looked at their -- and these were -- these were

15:23:03  16   comprehensive surveillance inspections, so FDA looked

15:23:05  17   at their postmarket procedures and activities and --

15:23:08  18   and so -- and did not provide adverse comments on

15:23:12  19   them.  So there's --

15:23:15  20           In sum, and I've looked at so many companies

15:23:18  21   and how they deal with their devices, and I didn't

15:23:22  22   find them to be -- I found them to be in pretty good

15:23:27  23   shape in regard to response.

15:23:29  24      Q.   Okay.  Well part of that answer dealt with

15:23:30  25   what the FDA did; right?

292

15:23:31   1       A.    Yes.

15:23:31   2       Q.    Okay.  And my question was about what did

15:23:34   3   Arizant do to investigate the concerns, and what I

15:23:37   4   have heard is they got letters and they responded to

15:23:40   5   them appropriately.

15:23:41   6       A.    Right.  And I detail --

15:23:43   7             I couldn't detail everything, every

15:23:45   8   response, because there were so many interactions, so

15:23:48   9   I -- I decidedly picked and choosed, not for any

15:23:55   10  particular reason, but to identify some areas of -- of

15:23:57   11  interaction and response.

15:24:02   12      Q.    I want to look at some of the communications

15:24:04   13  the company did receive that you're saying they -- on

15:24:09   14  this issue.

15:24:09   15      A.    In my report that I refer to?

15:24:11   16      Q.    Something that you've reviewed, yes, sir.

15:24:12   17      A.    Okay.

15:24:13   18      Q.    And I'm going to refer you -- okay.

15:24:29   19            I'm going to show you a copy of page 38 of

15:24:35   20  plaintiffs' motion for punitive damages, which is

15:24:37   21  something you've reviewed.  You see at the top of the

15:24:42   22  page, you see where there's a discussion of an e-mail

15:24:44   23  from Dr. Daniel Sessler?

15:24:47   24      A.    Hang on a second.

15:24:48   25            Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

293

15:24:48    1        Q.    You know who Dr. Sessler is.

15:24:49    2        A.    Yes.

15:24:50    3        Q.    Dr. Sessler is somebody the company pays to

15:24:55    4    give them advice on clinical issues; correct?

15:25:00    5            MS. EATON:   Object to the form of the

15:25:01    6    question.

15:25:02    7        A.    Well that they solicit input on where his

15:25:09    8    outcomes end up or --

15:25:12    9            You know, they'll end up where they end up,

15:25:14   10    pro or con.

15:25:15   11        Q.    Right.   You understand he's a retained

15:25:17   12    consultant for the company; correct?

15:25:19   13        A.    Right.   But that --

15:25:20   14            You're implying a bias in his results, and

15:25:23   15    that's not necessary.

15:25:24   16        Q.    I'm actually --

15:25:26   17            You're going to see I'm about to imply the

15:25:27   18    opposite, sir.   Okay?

15:25:30   19        A.    Okay.

15:25:30   20        Q.    So we understand he's a paid consultant and

15:25:30   21    he's there to give advice on clinical issues.

15:25:33   22            MS. EATON:   Object to the form of the

15:25:34   23    question.

15:25:34   24        Q.    Correct?

15:25:34   25        A.    Okay.   Okay.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

294

| | | |
|---|---|---|
| 15:25:35 | 1 | Q.   Okay. |
| 15:25:36 | 2 | A.   I understand that he had a relationship. |
| 15:25:38 | 3 | Q.   Right.  Dr. Sessler had been engaged with |
| 15:25:40 | 4 | e-mails with the company urging them repeatedly to do |
| 15:25:45 | 5 | clinical testing on this issue; correct? |
| 15:25:47 | 6 | MS. EATON:  Object to the form of the |
| 15:25:49 | 7 | question. |
| 15:25:51 | 8 | A.   I recall interaction with Dr. Sessler and |
| 15:25:53 | 9 | the company on testing. |
| 15:25:55 | 10 | MR. BANKSTON:  Let me ask your basis on that |
| 15:25:58 | 11 | one.  Ms. Eaton, your basis on that one. |
| 15:26:02 | 12 | MS. EATON:  You're mischaracterizing the |
| 15:26:05 | 13 | record. |
| 15:26:05 | 14 | MR. BANKSTON:  Okay. |
| 15:26:07 | 15 | Q.   Sir, you agree you reviewed this motion; |
| 15:26:10 | 16 | right? |
| 15:26:10 | 17 | A.   Yes, I did. |
| 15:26:11 | 18 | Q.   Dr. Sessler wrote repeated e-mails to the |
| 15:26:14 | 19 | company; correct? |
| 15:26:15 | 20 | A.   I recall looking at the information. |
| 15:26:16 | 21 | But -- but not to forestall the |
| 15:26:20 | 22 | conversation, you also know that in my report there's |
| 15:26:22 | 23 | two areas I defer to others because I didn't fully |
| 15:26:25 | 24 | analyze the information, nor will I do so today, and |
| 15:26:28 | 25 | those two areas were I defer to other witnesses on the |

295

15:26:43  1  plaintiffs' conclusion regarding manipulation of

15:26:44  2  certain research and on plaintiffs' conclusions

15:26:48  3  regarding suppression of testing.

15:26:49  4      Q.   Okay.

15:26:50  5      A.   So, you know, I didn't comment, I didn't

15:26:53  6  review, and I'm not going to do so today in the spur

15:26:56  7  of the moment.

15:26:57  8      Q.   Okay.  And I understand --

15:26:58  9           Do you think I'm asking you questions about

15:26:59  10  manipulation of scientific studies?

15:27:01  11      A.   Well I think you're getting to that here

15:27:02  12  from what I'm seeing.

15:27:04  13      Q.   Okay.  Well when we get there, we'll deal

15:27:06  14  with it.  Okay?  Right now all I'm asking you about is

15:27:09  15  communications to the company --

15:27:10  16      A.   Okay.

15:27:11  17      Q.   -- about the airborne contamination issue.

15:27:12  18      A.   Okay.

15:27:13  19      Q.   Dr. Sessler is one of the individuals who

15:27:18  20  communicated to the company about the airborne

15:27:20  21  contamination issue; correct?

15:27:21  22      A.   Okay.

15:27:21  23      Q.   Is that correct?

15:27:23  24      A.   I'm reading what's here.

15:27:24  25      Q.   Right.  You -- you've read it before; right?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

296

15:27:26   1        A.   Well this is an excerpt, so, you know, I'm

15:27:29   2   reading what's here.

15:27:29   3        Q.   Well you've read this motion before; right?

15:27:32   4        A.   Yes.  Yes.

           5        Q.   Okay.

15:27:32   6        A.   I'm reading it here.

15:27:33   7        Q.   All right.  And you haven't read Dr.

15:27:36   8   Sessler's deposition, is that what you're saying?

15:27:37   9        A.   Oh, I'm sure I read his -- at least one or

15:27:40  10   more of his along the way.

15:27:41  11        Q.   Okay.  This is not new material for you.

15:27:43  12        A.   No.  No.  But this is an excerpt of a quite

15:27:48  13   lengthy deposition I'm sure.

15:27:49  14        Q.   And I'm sure if you reviewed this document

15:27:51  15   and there were conclusions made about the case and

15:27:53  16   they were citing deposition testimony, to be thorough,

15:27:57  17   you'd want to go look at that testimony if you had any

15:27:59  18   issues with it.

15:28:00  19        A.   I read the testimony, but I didn't, as I

15:28:03  20   said, analyze certain aspects of testimony or --

15:28:06  21   because it -- for whatever reason.

15:28:09  22        Q.   Okay.  Dr. Sessler told the defendants that

15:28:13  23   their decision not to conduct the clinical studies

15:28:17  24   that were being advised was short-sighted and that

15:28:21  25   there's no way to put any gloss on that.  Isn't that

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

297

15:28:23    1    what he said?

15:28:23    2         A.   Where are you reading from?

15:28:24    3         Q.   I'm reading from the bolded part of that top

15:28:26    4    there.

15:28:27    5         A.   Oh, I see.

15:28:28    6         Q.   That's what Dr. Sessler said?

15:28:29    7         A.   I'm assuming this is an accurate quote.   I

15:28:38    8    see what's being said.

15:28:39    9         Q.   Okay.   And if you'll flip to the previous

15:28:40   10    page, on 37, do you see on that page where another

15:28:52   11    e-mail from Dr. Sessler is being discussed?

15:28:53   12         A.   You know, these are aspects that I've just

15:28:57   13    talked to you about that I deferred to others on.

15:28:59   14         Q.   I don't understand what you mean by that,

15:29:00   15    but I'm going to ask you the questions I want to ask

15:29:02   16    you, and if you want to tell me you have no opinion on

15:29:05   17    them, you can tell me you have no opinion on them.

15:29:07   18         A.   I have no opinion.

15:29:07   19         Q.   Okay.   So in coming to your decision that

15:29:10   20    Arizant acted appropriately in investigating its

15:29:14   21    concerns regarding the device, you did not consider

15:29:16   22    Dr. Sessler's repeated e-mails, including the one page

15:29:22   23    37 in front of you, where he said that their refusal

15:29:22   24    to actually perform these tests seemed like a

15:29:25   25    dangerous strategy.   That was not something you

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

298

15:29:28    1    reviewed or considered.

15:29:28    2        A.    I have no opinion on this specific instance.

15:29:30    3        Q.    Right.  So these e-mails from Dr. Sessler

15:29:33    4    are things you did not consider in coming to your

15:29:34    5    opinion about what Arizant did in terms of whether it

15:29:36    6    was appropriate in investigating its concerns

15:29:40    7    regarding the device.

15:29:41    8        A.    You know, I've said what I've said.  I

15:29:43    9    didn't consider them.

15:29:43   10        Q.    Thank you.

15:29:44   11        A.    I defer to others on this -- those

15:29:48   12    particular two aspects that I mentioned.

15:29:49   13        Q.    Well let's -- let's break down those

15:29:51   14    aspects.  You understand that there are allegations,

15:29:53   15    and you understand them because you saw them in the

15:29:59   16    punitive damages complaint, --

           17        A.    Uh-huh.  Yes.

           18        Q.    -- and I'm also --

           19            THE REPORTER:  "...you understand them

           20    because you saw them" --

15:30:00   21        Q.    -- in the punitive damage motion, and I'm

15:30:00   22    also assuming that because you made special effort to

15:30:02   23    list them in your report as to something you were not

15:30:06   24    talking about, you saw a discussion of manipulation of

15:30:09   25    a scientific study; correct?

299

15:30:12   1       A.   No, I'm not saying I've seen that.  I'm just

15:30:13   2   saying that inasmuch as that there's an allegation to

15:30:15   3   that, I haven't independently assessed that.  Whether

15:30:20   4   or not that's within my wheelhouse from a regulatory

15:30:22   5   point of view is another story, you know.

15:30:25   6       Q.   It -- it --

15:30:25   7            I mean you -- you knew of it from reading

15:30:28   8   this motion; right?  You just didn't invent the phrase

15:30:31   9   "manipulation of scientific studies" out of whole

15:30:35  10   cloth; did you?

15:30:35  11       A.   Again, you know, I've cut this manipulation

15:30:38  12   stuff and suppression stuff out of my review.

15:30:41  13       Q.   Absolutely.  And -- and there's a part of

15:30:42  14   that motion that talks about the manipulation that the

15:30:45  15   plaintiff alleges that the company engaged in with the

15:30:48  16   design and performance of a scientific study; correct?

15:30:54  17       A.   Which I said I'm not addressing.

15:30:54  18       Q.   And I haven't asked you a single question

15:30:55  19   about that; have I, sir?

15:30:58  20       A.   No, sir.  This is -- this is all part of it.

15:31:01  21   You can't divorce those issues from what you're

15:31:03  22   reading to me here.

15:31:04  23       Q.   You're giving opinions about whether they

15:31:06  24   acted responsibly investigating concerns about the

15:31:09  25   device, and I am asking you about e-mails of an expert

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

300

15:31:12  1  who is urging them to investigate concerns with the

15:31:15  2  device.  You don't think that's relevant to your

15:31:17  3  opinion?

15:31:17  4       A.   I haven't fully analyzed it.  I think that

15:31:20  5  taking things out of context and not fully evaluating

15:31:24  6  all deposition testimony and related facts is -- is

15:31:28  7  biased and -- and, you know, incomplete, so -- so, you

15:31:35  8  know, I can't subscribe to where you're headed on

15:31:38  9  this.  All I said is if there's been an allegation of

15:31:42  10  suppression or manipulation, I didn't deal with that.

15:31:44  11       Q.   Okay.  And then there are also allegations

15:31:46  12  in the second part of that, being the thing you don't

15:31:49  13  want to talk about, as suppression, saying that's not

15:31:52  14  part of your opinion.  There is a discussion -- a

15:31:54  15  section of that motion that talks about the

15:31:56  16  company's -- what plaintiff alleges are the company's

15:31:57  17  active efforts to suppress others' research; correct?

15:32:00  18       A.   Didn't review it.

          19       Q.   And that's --

15:32:01  20       A.   Didn't analyze it.

15:32:02  21       Q.   Exactly.  Okay.  So we have those two

15:32:04  22  sections, the section about the manipulation of the

15:32:07  23  study and we have the section about the suppression of

15:32:10  24  outside research, and now we have a section in the

15:32:14  25  punitive damage motion about what the company did

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

301

15:32:16   1   itself to investigate the concern.  That, you would

15:32:18   2   agree with me, is relevant to your opinions.

15:32:20   3       A.   Well inasmuch as it's not related --

15:32:20   4            MS. EATON:  Object to the form.

15:32:21   5       A.   -- to the manipulation or the suppression.

15:32:25   6       Q.   Right.  And I'm -- have you -- when I --

15:32:28   7            When Dr. Sessler says I think y'all should

15:32:31   8   do some studies and I'm really urging you to do that,

15:32:34   9   does that have anything to do with manipulation or

15:32:36  10   suppression?

15:32:37  11       A.   I think it could be implied.

15:32:38  12       Q.   And what is being suppressed exactly?

15:32:40  13       A.   "I think you should do studies."  Whether or

15:32:42  14   not the company does studies, you know, that if they

15:32:46  15   did not do the studies --

15:32:49  16            I took a -- I took a --

15:32:50  17       Q.   That's a surprise.

15:32:51  18       A.   I took a pretty broad swath on manipulation

15:32:54  19   or suppression.

15:32:54  20       Q.   Okay.  So let's just --

15:32:55  21            We're going to go broad swath.  In terms of

15:32:57  22   what the company did or did not do to investigate the

15:33:01  23   device, including whether it did or did not perform

15:33:04  24   clinical testing that was advised to it, those are

15:33:08  25   things you do not have opinions on.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

302

15:33:10  1      A.    On several of these aspects, no, because I

15:33:14  2   felt it required a rather intensive assessment of the

15:33:20  3   facts and deposition testimony, but also a degree of

15:33:24  4   expertise that I believed I did not possess in order

15:33:28  5   to analyze that.

15:33:42  6      Q.    Can you --

15:33:53  7            Now Michelle Hulse Stevens, you know who

15:33:55  8   that is.  Do you recall her?

15:33:57  9      A.    I remember her deposition.

15:33:58  10     Q.    Okay.  And she's a medical director with the

15:33:59  11  company?

15:33:59  12     A.    Yeah.  Yes.  Yes.

15:34:01  13     Q.    Okay.  That's a deposition you reviewed?

15:34:03  14     A.    Yes.

15:34:03  15     Q.    Okay.  And also Ms. Hulse Stevens

15:34:07  16  discussed -- is discussed in this motion; correct?

15:34:09  17     A.    I see an excerpt.

15:34:11  18     Q.    Correct.  In fact, on this very page; right?

15:34:13  19  And there's something coming up about Dr. Michelle

15:34:15  20  Hulse Stevens.

15:34:16  21     A.    Right.  It starts here.

15:34:17  22     Q.    Okay.  You understand from her testimony and

15:34:19  23  from this motion that she testified that decisions

15:34:23  24  were previously made at a high level not to pursue

15:34:26  25  clinical research on this topic.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

303

15:34:29  1       A.   I don't recall the specific testimony but,

15:34:31  2  you know, there's an excerpt here.  Well -- and I see

15:34:36  3  a --

15:34:37  4       "And decisions have been made at the highest

15:34:40  5  levels not to conduct it; correct?

15:34:41  6       "Yes."

15:34:41  7       Q.   That was something you reviewed in coming to

15:34:44  8  your opinions in this case.

15:34:45  9       A.   I -- I -- I read the depositions.  But

15:34:48  10  again, I excluded potential text because there's a

15:34:52  11  particular expertise I think that's necessary to

15:34:53  12  come -- bring to bear on feasibility of those types of

15:34:58  13  studies, meaningfulness of those types of studies,

15:35:01  14  rigor of those types of studies.  So a lot of things

15:35:05  15  have to come to bear and a full review of facts from

15:35:09  16  all sides to render a conclusion on this, so I just

15:35:13  17  didn't deal with it.

15:35:14  18       Q.   Okay.  So in terms of what Arizant did in

15:35:20  19  terms of creating studies, performing studies, which

15:35:24  20  studies they did choose to do, which studies they

15:35:26  21  didn't choose to do and the appropriateness of all of

15:35:29  22  that, that is not something you're here to testify

15:35:31  23  about.  That's not --

15:35:32  24       That's somebody else.  That's not a

15:35:33  25  Ulatowski opinion.

304

15:35:34  1      A.    Well in regard to these particular facts;

15:35:37  2  for instance, the Sessler studies or other studies

15:35:42  3  that people were suggesting needed to be done, when in

15:35:45  4  fact, you know, who knows what experts are going to

15:35:47  5  say about these things, whether they're feasible,

15:35:51  6  whether they're going to tell you anything in the end

15:35:53  7  or --

15:35:53  8          You know, who knows?

15:35:55  9      Q.    There's other doctors besides Dr. Sessler

15:35:58  10  discussed in that motion, too, who have made those

15:36:00  11  recommendations.  Do you remember that?  For instance,

15:36:02  12  Dr. Parvizi.

15:36:03  13      A.    I -- I -- I can't say for sure.

15:36:06  14      Q.    Okay.  And what about a Dr. Stefan --  and

15:36:09  15  I'm going to butcher this Russian -- but Ianchulev?

15:36:13  16      A.    Sounds like part of The Family.

15:36:14  17          No, I don't recall that.

15:36:16  18      Q.    Okay.  Can you flip to page 40 for me.

15:36:27  19      A.    Forty of --

15:36:28  20      Q.    The punitive damage motion.

15:36:29  21      A.    Okay.

15:36:30  22      Q.    Correct.  All right.  Do you see on page 40

15:36:35  23  a discussion of what has been referred to in many

15:36:38  24  depositions as the war games memorandum?

15:36:41  25      A.    I see the term here.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

305

15:36:42  1      Q.   You remember that term from several

15:36:44  2  depositions in this case.

15:36:46  3      A.   I recall the term.

15:36:47  4      Q.   And you've seen that document as well.

15:36:50  5      A.   I have --

15:36:51  6           Well, if it's in my reference list, yes.

15:36:53  7      Q.   Okay.  And --

15:36:54  8           Well you've reviewed the exhibits to

15:36:56  9  plaintiffs' punitive damage motion; correct?

15:36:58 10      A.   Yes.

15:36:58 11      Q.   Okay.  So you've reviewed this document.

15:37:00 12      A.   Probably that's the case.

15:37:01 13      Q.   Now you under -- you understand in this

15:37:04 14  document they were afraid of someone doing a real

15:37:06 15  study on forced-air warming and contamination.  Do you

15:37:08 16  agree with that?

15:37:09 17      A.   Well I didn't --

15:37:10 18           Again, I think this is part and parcel of

15:37:14 19  the -- of the information that I stayed away from

15:37:16 20  because it really deserved a very intensive evaluation

15:37:21 21  of -- from not only a microbiological point of view

15:37:25 22  but a clinical point of view -- clinical research

15:37:27 23  point of view on -- on what to make of this all.

15:37:30 24  Because at least I know in my experience at FDA and as

15:37:33 25  a microbiologist, you may -- you may think you can do

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

306

15:37:37  1    certain types of studies, but they're -- they're

15:37:39  2    extremely difficult to conduct in the infection

15:37:42  3    control area.

15:37:43  4        Q.   Well they're not ask -- talking about in

15:37:45  5    that document whether it can or can't be done, they're

15:37:48  6    making the assumption that if it could be done, that

15:37:51  7    would be not a good thing for the company.

15:37:53  8             MS. EATON:  Object to the form of the

15:37:54  9    question.

15:37:54  10       Q.   Do you agree with that?

15:37:55  11       A.   I can't say neither here nor there because I

15:37:58  12   didn't evaluate that.

15:37:59  13       Q.   So when it comes to what the company did to

15:38:02  14   investigate concerns regarding the device, things like

15:38:05  15   their actual discussions on documents about what they

15:38:08  16   would or would maybe not like to do in investigating

15:38:10  17   the device, and their e-mails from their scientific

15:38:13  18   consultants about what to do about investigating or

15:38:16  19   not investigating the device are not things you've

15:38:19  20   considered in this case and do not inform your

15:38:21  21   opinion.

15:38:21  22            MS. EATON:  Object to the form of the

15:38:22  23   question.

15:38:22  24       A.   Not in regards to these things.  As I said,

15:38:25  25   I -- I looked at a great deal of communications from

307

15:38:27  1  customers, their interactions with customers, their

15:38:31  2  feedback, their interactions with government agencies

15:38:35  3  in regard to their activities, the focus of

15:38:39  4  inspections and FDA's analysis of their conduct in

15:38:43  5  regard to their postmarket activities, including

15:38:49  6  airborne contamination potential and the company's

15:38:52  7  responsiveness to that, so -- and, you know, that's

15:38:56  8  what I commented on.  These -- these -- these other

15:38:59  9  aspects are propositions on studies, interestingly

15:39:07  10  enough after plaintiffs' experts have conducted study

15:39:10  11  after study after study after study, and here we have,

15:39:12  12  "Well they didn't do this study."  That's going to be

15:39:15  13  a recurring argument.  "Well you didn't do that study.

15:39:18  14  You didn't do that study."  Well, I didn't -- I didn't

15:39:21  15  explore that, I didn't research it.  And as I said,

15:39:24  16  I -- I think you need a particular expertise to see

15:39:27  17  whether this is hogwash or whether there's some merit

15:39:30  18  here.

15:39:30  19       Q.   Okay.  And that's not expertise you have.

15:39:32  20       A.   No.  Not that I would claim to have, no.

15:39:35  21       Q.   Okay.  Would you make any arguments about

15:39:45  22  whether any particular studies were applicable to any

15:39:48  23  particular Bair Hugger device?

15:39:50  24            MS. EATON:  Object to the form of the

15:39:51  25  question.

308

15:39:55    1        A.    Well there's -- there's the rub, I suppose,

15:39:58    2    because in many of the studies the -- the application

15:40:02    3    of the -- or the methodologies and the results are --

15:40:05    4    are in question and how relevant it is to the actual

15:40:09    5    performance of the Bair Hugger device in a real-world

15:40:13    6    situation, so, you know, that's -- that's a part of

15:40:17    7    the conten -- contention between both sides.  One side

15:40:21    8    yes, we have information, we don't have evidence of

15:40:24    9    this or that, we've done studies; the other side says,

15:40:28    10   well, we've done studies and we find it.  So, you

15:40:33    11   know, it's --

15:40:33    12           There's two sides on it.

15:40:33    13       Q.    I -- I need to make something clear that I

15:40:37    14   think may help you answer some of my questions, and

15:40:40    15   it's come up a couple of times.  I'm not real

15:40:43    16   concerned about what one side might say or what

15:40:46    17   another side might say, I'm extremely concerned about

15:40:50    18   what you are going to say.

15:40:50    19       A.    Yes.  And I told you what -- what I would

15:40:52    20   probably say.

15:40:52    21       Q.    All right.  So what I still am not clear on

15:40:54    22   is: Are you going to be giving any opinions about

15:40:56    23   whether any particular study is directly applicable to

15:41:02    24   any particular model of Bair Hugger?

15:41:02    25           MS. EATON:  Object to the form of the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

309

15:41:02  1  question.

15:41:02  2      A.   If it's not in my opinions, it's not in my

15:41:06  3  opinions --

          4      Q.   Well --

15:41:06  5      A.   -- unless a question provokes some answer.

15:41:09  6      Q.   Let's look at page 37.

15:41:10  7      A.   Okay.

15:41:11  8           MS. EATON:  Of what?

15:41:12  9           MR. BANKSTON:  Of his report.

15:41:17  10     A.   Okay.

15:41:18  11     Q.   And you're --

15:41:19  12          One of the opinions you give here, do you

15:41:21  13  see where you're talking about the Zink and Hall

15:41:23  14  publication?

15:41:23  15     A.   Yes.

15:41:25  16     Q.   Okay.  One of those is the argument that the

15:41:26  17  Zink and Hall publication and poster are not

15:41:28  18  applicable to the model 750 due to a change in media

15:41:31  19  and airflow is incorrect.  That's your opinion?

15:41:35  20     A.   Well that was provoked by Dr. David's

15:41:36  21  opinion.

15:41:37  22     Q.   Every opinion is provoked by Dr. --

15:41:40  23          You're here to rebut Dr. David's --

          24     A.   Right.

15:41:43  25     Q.   -- opinions; right?

310

15:41:43  1       A.   Right.

15:41:44  2       Q.   So that's your opinion.

15:41:45  3       A.   Right.   That's a statement that I have, yes.

15:41:47  4       Q.   Okay.   First of all, do you understand the

15:41:49  5   differences between those two devices?

15:41:51  6       A.   Yes.

15:41:51  7       Q.   Okay.   Tell me what they are.

15:41:52  8       A.   The --

15:41:54  9            Well the airflows are different, for

15:41:56  10  example, the filter being different ultimately.

15:42:00  11      Q.   How is the airflow different?

15:42:01  12      A.   More so in the 750.

15:42:05  13           Again, the -- the filter ultimately is being

15:42:09  14  changed to be different, the other mechanical --

15:42:12  15  electromechanical aspects of the device being

15:42:15  16  different.   I'd have to look in the 510(k) again to

15:42:18  17  see what those differences were, but I mean those are

15:42:22  18  a couple differences.

15:42:25  19      Q.   Okay.   Now if the 5 -- if the -- excuse me.

15:42:31  20  If --

15:42:31  21           The 750, if it turns out, contrary to what

15:42:35  22  you believe right now, that the 750 is putting

15:42:39  23  particulates into the air, assume for me for the

15:42:41  24  moment that is something that is an opinion, is that

15:42:43  25  an opinion that you're prepared to rebut today in this

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

311

15:42:46  1  deposition?

15:42:49  2          MS. EATON:  Object to the form of the

15:42:50  3  question.

15:42:50  4      A.   My opinions are what my opinions are.  I --

15:42:53  5  I -- I don't understand your question.

15:42:53  6      Q.   My question is:  If somebody makes the

15:42:56  7  argument, "Model 750 is putting particulates into the

15:43:00  8  operating room air," do you have a rebuttal opinion

15:43:02  9  for that?

15:43:03  10     A.   Do you mean during the trial if someone

15:43:06  11 makes that statement?  I -- I guess I still don't get

15:43:09  12 it.

15:43:09  13     Q.   Well if I made it right now.  I'm making

15:43:10  14 it, I'm making it in the room this very moment.  Do

15:43:14  15 you have an opinion on that?

15:43:14  16         MS. EATON:  Hold on.  Let me -- let me read.

15:43:23  17         THE WITNESS:  Are we holding on here?

15:43:24  18         MR. BANKSTON:  Yes, we're waiting for an

15:43:26  19 objection.

15:43:26  20         MS. EATON:  Yes, just a second.  I'm just

15:43:27  21 going to read it.

15:43:35  22         Okay.

15:43:36  23         MR. BANKSTON:  Answer.

15:43:38  24     A.   You know, I'm sorry, you're going to have to

15:43:41  25 read the question again.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

312

15:43:41    1        Q.    Okay.  Let's ask it this way.  We got to

15:43:49    2    reboot the opinion, which is the opinion that -- was,

15:43:51    3    if I'm saying it right now, "The Bair Hugger 750

15:43:56    4    causes more particulates, is introducing particulates

15:43:59    5    into an operating room," that's my contention I just

15:44:01    6    threw into the air, do you have rebuttal opinions that

15:44:05    7    you're qualified to give about whether that opinion is

15:44:08    8    true or not?

15:44:09    9             MS. EATON:  Object to the form of the

15:44:10   10    question.

15:44:10   11        A.    I'd have to look at your foundation for that

15:44:12   12    statement.  I'd have to assess it.

15:44:14   13        Q.    Okay.  Let's look at --

15:44:16   14             MR. BANKSTON:  Can we have this marked.

15:44:25   15             (Ulatowski Exhibit 8 was marked for

15:44:26   16             identification.)

15:44:27   17             (Discussion off the stenographic record.)

15:44:29   18    BY MR. BANKSTON:

15:44:39   19        Q.    All right, Mr. Ulatowski, you've seen this

15:44:41   20    document in a couple of depositions and in motions

15:44:44   21    with the red and black; right?

15:44:46   22        A.    Yes, it looks familiar.

15:44:48   23        Q.    Okay.  This is --

15:44:50   24             You're familiar with Al Van Duren.

15:44:53   25        A.    Yes.

313

15:44:53  1      Q.   Okay.  Al Van Duren manages clinical affairs

15:44:57  2  for the company for many years; correct?

15:44:59  3      A.   Yes.

15:44:59  4      Q.   Okay.  And he was communicating with Dr.

15:45:02  5  Michelle Hulse Stevens.  Do you remember that?

15:45:03  6      A.   Okay.  Yes, I do now.

15:45:05  7      Q.   And do you remember that Al Van Duren made

15:45:07  8  some notes about a study by Reed?

15:45:09  9      A.   I'm trying to recollect the context here.

15:45:11  10     Q.   Okay.  If you will flip the page, you'll see

15:45:15  11  that there's red and black comments.

15:45:22  12     A.   Okay.

15:45:23  13     Q.   All right.  And do you remember the

15:45:25  14  deposition testimony about how there are comments in

15:45:28  15  black from Mr. Van Duren and responses in red from Dr.

15:45:32  16  Michelle Hulse Stevens?

15:45:33  17     A.   I -- I am recalling that.

15:45:34  18     Q.   Okay.  One of the things I want you to go

15:45:39  19  down and look is on the very last page on number

15:45:43  20  seven.

15:45:44  21     A.   Okay.

15:45:44  22     Q.   Do you see where Mr. Van Duren says, "The

15:45:47  23  apparently greater particulate emission from the 750

15:45:51  24  may simply be a function of its airflow, which is 81

15:45:56  25  percent greater than the model 505E."  Do you see that

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

314

15:45:59   1   statement?

15:45:59   2         A.   I see it.

15:46:00   3         Q.   Do you have any reason to dispute Mr. Van

15:46:02   4   Duren on that statement?

15:46:04   5         A.   Nor to support it without evaluating what

15:46:10   6   he's basing this on.

15:46:14   7              I notice that there's not a comment from

15:46:17   8   Hulse Stevens.

15:46:18   9         Q.   Yes.  She didn't have anything to say to

15:46:20   10  this one.

15:46:21   11             This one here, he's talking just simply

15:46:23   12  about the function of airflow; right?

15:46:25   13             MS. EATON:   Object to the predicate.

15:46:28   14        A.   Well it's a simple statement, --

15:46:31   15        Q.   Uh-huh?

15:46:31   16        A.   -- isolated statement.  I -- I don't know

15:46:33   17  what to make of it, to tell you the truth.

15:46:36   18        Q.   You don't think what?

15:46:37   19        A.   I don't know what to make of it, to tell you

15:46:39   20  the truth, the 10 words, 15 words here.

15:46:42   21        Q.   All right.  Let's go back up to number one.

15:46:49   22  You see where he says, "The assertion that old filters

15:46:51   23  are more efficient than newer ones is correct."

15:46:59   24        A.   Yes.

15:46:59   25        Q.   Yes.  And that's true; isn't it?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

315

15:47:02   1       A.   The M20 was -- had a lower efficiency than

15:47:06   2   the M10, if that -- if that's your point.

15:47:09   3       Q.   I would think that that would mean that the

15:47:11   4   old effi -- old filters are more efficient than the

15:47:15   5   new ones; right?

15:47:16   6       A.   Correct.

15:47:17   7       Q.   Okay.  So that statement he gives is

15:47:19   8   correct; right?

15:47:25   9       A.   Yes.  Yes.

15:47:26  10       Q.   Okay.

15:47:27  11       A.   Both .2 micron filters, but nonetheless

15:47:30  12   different efficiencies.

15:47:31  13       Q.   What does a .2 micron filter mean?  What is

15:47:34  14   that?

15:47:37  15       A.   It's a particulate size that the particular

15:47:38  16   filter media is designed to block at -- at some degree

15:47:41  17   of efficiency.  I -- there's diff --

15:47:44  18            There's various types of filters.  I used

15:47:49  19   cellulosic .2 micron filters in the lab.  There's

15:47:54  20   different filters.

15:47:54  21       Q.   That -- that term doesn't really mean at lot

15:47:55  22   until you know the efficiency at that particle size;

          23   right?

15:47:58  24       A.   What do you mean, it doesn't mean a lot?  It

15:47:59  25   means a lot.  .2 micron --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

316

15:48:00   1          You can buy filters at different micron

15:48:03   2   levels for filtering.  I used various filters of

15:48:07   3   different sizes for filtering solutions, bacterial

15:48:09   4   solutions versus viral -- virus solutions versus other

15:48:16   5   types of -- of pharmaceuticals in the area that I --

15:48:19   6   that I worked.

15:48:20   7       Q.   All right.  You would agree with me --

15:48:23   8          I guess what you're saying is let's say

15:48:27   9   there's a filter and it, at two mic -- at .2 microns,

15:48:29  10   filters out 95 percent of the particulate matter at .2

15:48:32  11   microns.  We can call that a .2 micron filter.  That's

15:48:35  12   fine; right?

15:48:35  13       A.   Sure.

15:48:36  14       Q.   Let's say we have a filter at .2 microns, it

15:48:40  15   filters out one percent of --

15:48:41  16          Ninety-nine percent of .2 micron particles

15:48:44  17   get through this filter.  Is that a .2 micron filter?

15:48:44  18       A.   It's still a .2 micron filter, and its

15:48:47  19   efficiency changes over time as -- as the filter

15:48:50  20   become used, so the efficiency actually increases over

15:48:53  21   time.

15:48:53  22       Q.   Okay.  So you're saying that you would

15:48:54  23   have --

15:48:55  24          You think it is appropriate and honest to

15:48:58  25   describe a filter that only filters out one percent of

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

317

15:49:01　1　two micron filters, you're comfortable with calling

15:49:04　2　that a .2 micron filter.

15:49:06　3　　　A.　Right.  It's clear that that's -- that's the

15:49:07　4　primary specification.  The efficiency is another

15:49:12　5　characterization of the product's performance.  So

15:49:14　6　yes, if -- if -- if indeed that's the filter

15:49:19　7　manufacturer's, based on standard testing and design,

15:49:22　8　yes, if that's their finding, that's their finding.

15:49:25　9　　　Q.　You -- you've read Dr. Robert Crowder's

15:49:27　10　deposition; right?

15:49:28　11　　　A.　Yes.

15:49:28　12　　　Q.　Okay.  He works for Pentair, --

15:49:30　13　　　A.　Yes.

15:49:31　14　　　Q.　-- not 3M.  Right?

15:49:32　15　　　A.　Correct.

15:49:32　16　　　Q.　Okay.  And you understand that Dr. Crowder

15:49:34　17　doesn't have a definition or no -- treat the term ".2

15:49:39　18　micron filter" as meaningful.  That was a term

15:49:42　19　invented by the company.  Do you understand that?

15:49:45　20　　　A.　No, that's -- that's -- that's incorrect.  I

15:49:48　21　used to use Millipore filters that had definitely

15:49:49　22　different micron designations, so, you know, I can't

15:49:52　23　subscribe to that.

24　　　Q.　And he --

15:49:52　25　　　A.　He might -- he might be used to the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

318

15:49:55  1  particular filters he's familiar with.  I used various

15:49:58  2  other types of filters that were also designated.

15:50:02  3      Q.   Okay.  But at the end of the day, say we

15:50:05  4  have a filter that at .2 microns is almost entirely

15:50:09  5  ineffective at filtering out .2 microns, only gets one

15:50:14  6  percent or .5 percent, .1 of one percent at two

15:50:18  7  microns, that's still a .2 micron filter in your view?

15:50:21  8      A.   It still has the potential for filtering .2

15:50:24  9  micron particulates.  You'll find that, for example,

15:50:28  10  in --

15:50:28  11      I mean let's look at something common, the

15:50:31  12  house filters.  You'll find various designations of

15:50:34  13  filtration size as well as efficiency, and people will

15:50:38  14  buy mostly the least efficient but yet particularly --

15:50:45  15  particulate-rated filters there are because -- because

15:50:50  16  of cost.

15:50:50  17      Q.   Okay.  Let's go to the next sentence in that

15:50:53  18  statement, which is, "The change to new filter

15:50:56  19  material was dictated by engineering concerns prior to

15:51:00  20  widespread appreciation of the importance of

15:51:04  21  particulates discharged by the warming unit."  Do you

15:51:08  22  agree with that?

15:51:09  23      A.   I agree that's what's stated here.

15:51:11  24      Q.   Well let me ask it this way:  Do you have

15:51:14  25  any reason to dispute Mr. Van Duren about the change

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

319

15:51:18   1    of filter materials and what the company did or did

15:51:21   2    not know?

15:51:21   3         A.   Yeah.   I wouldn't rely on only Mr. Van

15:51:27   4    Duren.   I think I -- I'd be evaluating in total, to

15:51:31   5    the degree I could, all the experts in the company,

15:51:34   6    those that were involved in the design of the

15:51:38   7    products, the rationale for the changes, what was

15:51:40   8    known, what wasn't known.   I found company testimony

15:51:44   9    that some testimony is not entirely -- doesn't

15:51:50   10   entirely speak to the whole picture.

15:51:53   11        Q.   Okay.   So in this case you believe Mr. Van

15:51:54   12   Duren is wrong, or do you not have an opinion?

15:51:56   13        A.   I'm not saying he's wrong.   I think this

15:51:58   14   is --

15:51:58   15            If this is what he said, this is what he

15:52:00   16   believed, but it's not necessarily the case.

15:52:03   17        Q.   That's what Mr. Zgoda, the project leader of

15:52:06   18   the Bair Hugger 750, said as well, too; right?

15:52:08   19        A.   I'd have to look at all that.

15:52:09   20        Q.   We will.

15:52:10   21        A.   I mean you're throwing this in front of me.

15:52:12   22        Q.   Don't worry, we will.

15:52:14   23            The last line is the Michelle Hulse Stevens

15:52:16   24   line, the medical director; correct?

15:52:18   25        A.   Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

320

15:52:18   1      Q.   Do you remember that from her testimony?

15:52:19   2      A.   Yes.

15:52:19   3      Q.   Okay.  And she says, "This implies then that

15:52:21   4   the 750 does not have a filtration efficiency that

15:52:25   5   adequately mitigates parti -- particulates in the air

15:52:28   6   coming out after filtration."  Do you see that

15:52:30   7   statement?

15:52:30   8      A.   I see it.

15:52:31   9      Q.   Okay.  Now in your view, is Dr. Michelle

15:52:35   10  Hulse Stevens wrong here?

15:52:37   11     A.   Well she's making a simple statement.  You

15:52:40   12  know, I'd have to review her entire deposition and

15:52:45   13  other information.  What I'm saying is I -- I can't

15:52:45   14  draw a lot of conclusions from reading these couple

15:52:49   15  sentences.

15:52:49   16     Q.   You did read her deposition; correct?

15:52:51   17     A.   I did.

15:52:51   18     Q.   And you read plaintiffs' punitive damage

15:52:53   19  motion; correct?

15:52:54   20     A.   Right.

15:52:54   21     Q.   And you've read Dr. Yadin David's report;

15:52:58   22  correct?

15:52:58   23     A.   Right.  And I -- I --

15:52:59   24     Q.   And your opinions are meant to address

15:53:01   25  those -- all of those things; right?

321

15:53:03  1       A.    Right.

15:53:03  2       Q.    Okay.  So I'm wondering, what else do you

15:53:06  3   need to review to have an opinion about Dr. Michelle

15:53:09  4   Hulse Steven's statement?

15:53:11  5       A.    My -- my impression from my review of all

15:53:14  6   that information is I don't think this adequately

15:53:18  7   expresses the view of the company.

15:53:19  8       Q.    Okay.  Okay.  I'd like you to take

15:54:06  9   plaintiffs' punitive damage motion in front of you and

15:54:09  10  flip it to page nine.  I'm actually sorry, the

15:54:13  11  numbering ought to be seven.  Forget --

15:54:14  12           At the bottom of the page it will say seven.

15:54:16  13      A.    Okay.  I'm taking this one and looking at

15:54:19  14  page what?

15:54:20  15      Q.    Seven.

15:54:21  16      A.    Seven.

15:54:22  17           MS. EATON:  Hold on.  Let me get it.

15:54:26  18      A.    Hopefully this is what you're asking me to

15:54:28  19  look at, but okay.

15:54:29  20      Q.    Okay.

15:54:29  21           MS. EATON:  Just a moment, because I have to

15:54:31  22  find my place, please.

15:54:54  23           MR. BANKSTON:  Are we ready to proceed?

15:54:55  24           MS. EATON:  Yes.

15:54:56  25           THE WITNESS:  Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

322

| | | |
|---|---|---|
| 15:54:56 | 1 | Q.   On page seven, you see there's some |
| 15:55:00 | 2 | discussion by a gentleman named Karl Zgoda; right? |
| 15:55:04 | 3 | A.   Right.   There -- there's an extraction from |
| 15:55:06 | 4 | his deposition. |
| 15:55:06 | 5 | Q.   Right.   A quotation from his deposition; |
| 15:55:08 | 6 | right? |
| 15:55:08 | 7 | A.   Yes. |
| 15:55:08 | 8 | Q.   A deposition you reviewed. |
| 15:55:09 | 9 | A.   Yes. |
| 15:55:10 | 10 | Q.   A deposition that was attached to this |
| 15:55:12 | 11 | motion; correct? |
| 15:55:13 | 12 | A.   Yes. |
| 15:55:14 | 13 | Q.   A deposition that was cited and discussed in |
| 15:55:16 | 14 | the same language in Dr. David's report; correct? |
| 15:55:18 | 15 | A.   Correct. |
| 15:55:19 | 16 | Q.   Okay.   Karl Zgoda was the project leader for |
| 15:55:23 | 17 | the 750; right? |
| 15:55:30 | 18 | A.   I think so. |
| 15:55:30 | 19 | Q.   Okay.   He was asked, "In validating the 750, |
| 15:55:34 | 20 | what testing did you rely on?" |
| 15:55:36 | 21 | And he answered, "As far as validating the |
| 15:55:38 | 22 | device?" |
| 15:55:38 | 23 | And he was re-asked, "As far as this |
| 15:55:41 | 24 | prevention of airborne contamination, what testing did |
| 15:55:44 | 25 | you rely on to assure us that the unit was safe?" |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

323

15:55:47    1         Mr. Zgoda stated, "I would say I'm not aware

15:55:50    2    of any verification testing that was done internal to

15:55:54    3    the company to verify this."

15:55:56    4         Do you have any reason to believe Mr. Zgoda

15:55:59    5    was wrong about that before the release of the model

15:56:01    6    750?

15:56:02    7         A.   Well I -- I see his response.  He says "I'm

15:56:08    8    not aware."

15:56:09    9         Q.   Uh-huh.

15:56:10   10         A.   Well there's -- there's many people involved

15:56:15   11    in the evaluation, so -- and they're relying upon also

15:56:19   12    supplier evaluations of components.  So, you know, I

15:56:23   13    don't know if I'd -- I'd -- I'd say this is entirely

15:56:25   14    accurate, but I see what he's saying.

15:56:28   15         Q.   Okay.  And you're not disputing what he's

15:56:30   16    saying, right, that Mr. Zgoda did testify that he was

15:56:34   17    not aware of any verification testing done internal at

15:56:37   18    the company.  Right?

15:56:37   19         A.   Well I see what he's saying.

15:56:39   20         Q.   Right.  In terms of supplier relationships

15:56:41   21    that you just discussed and outside testing by

15:56:44   22    suppliers, you've read Dr. Crowder's deposition, the

15:56:46   23    representative of Pentair; correct?

15:56:49   24         A.   Yes.

15:56:49   25         Q.   And you understand that they did no testing

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

324

15:56:51  1   for internal contamination for airborne contamination

15:56:55  2   issues.

15:56:56  3        A.   Well they were evaluating the performance of

15:56:58  4   the filter --

15:56:58  5        Q.   Sure.

15:56:59  6        A.   -- under various test conditions.

15:57:01  7        Q.   Well do -- do you have understanding that --

15:57:03  8   that Pentair knew the efficiency of the M20 filter and

15:57:08  9   knew what it was, had done testing?

15:57:11  10       A.   I don't recall the testimony, but I do

15:57:13  11  recall some of the test results.  And -- and now --

15:57:17  12  now you're --

15:57:18  13            I don't want to stick my neck out in regard

15:57:20  14  to filter testing because I'm not a filter expert.

15:57:23  15       Q.   Okay.  But you have given the test -- your

15:57:27  16  opinions in your report that the filter for the Bair

15:57:29  17  Hugger is adequate; right?

15:57:32  18       A.   I didn't say it in those terms.

15:57:36  19       Q.   Okay.  So that's not an opinion you're going

15:57:36  20  to be giving, that you won't be addressing clinical

15:57:38  21  adequacy -- adequacy of the Bair Hugger's filter.

15:57:41  22       A.   No.  Where this all began I think is in my

15:57:44  23  response to Dr. David's contention that Hall and Zink

15:57:50  24  data have no relevance whatsoever to the 750.

15:57:52  25       Q.   Okay.  And another thing that you had

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

325

15:57:54   1    testified about was how the design process, as

15:57:57   2    encapsulated in the design history file and perhaps

15:58:01   3    other documents and other testimony, from that you

15:58:02   4    were able to determine that the risk of airborne

15:58:05   5    contamination had been adequately considered and

15:58:06   6    addressed; correct?

15:58:09   7        A.    I don't think those are my exact words.

15:58:11   8        Q.    Would you agree with that statement?

15:58:17   9        A.    Well that would take me into territory that

15:58:20   10   I didn't opine on, I believe.

15:58:22   11       Q.    Okay.  You stated your opinion was the

15:58:34   12   design history files of the Bair Huggers model 505 and

15:58:37   13   750 provided reasonable assurance of the safety and

15:58:39   14   effectiveness of the design of these devices, and what

15:58:41   15   I want to know from that opinion:  Are you making any

15:58:45   16   specific claims about the filters being adequate?

15:58:49   17       A.    Well certainly the design history file as I

15:58:52   18   found that, based upon the regulatory requirements and

15:58:56   19   my experience evaluating design history files,

15:58:59   20   contained the elements necessary to be addressed in

15:59:03   21   the design of a -- of a device.  So I know you

15:59:06   22   concentrate on -- on filtering efficiency and that's

15:59:10   23   part -- partly a supplier expectation, but certainly

15:59:17   24   was significant testing on electrical safety, on other

15:59:21   25   aspects of the device that were, I think, disregarded

326

15:59:24  1   by Dr. David.  So, you know, to say there was no

15:59:29  2   safety testing is -- is completely incorrect.

15:59:32  3         As far as airborne contamination testing,

15:59:35  4   that's why I referred to the contention on the Hall

15:59:38  5   and Zink article, because the act of filtering in a

15:59:43  6   filtered environment has value.  To what degree, it

15:59:48  7   can be contentious -- contentious as to what degree it

15:59:51  8   has value, but the fact of filtering has value, and

15:59:56  9   that was -- I call it proof of principle that, you

16:00:05  10  know, the filtering is -- filtering has an effective

16:00:08  11  result in regard to airborne contamination.  So we can

16:00:12  12  argue about the degree of filtering, airborne

16:00:15  13  contamination degrees, where the air is going, that's

16:00:18  14  all part of an argument that's broader than what I'm

16:00:22  15  able to opine on.

16:00:23  16        Q.   Okay.  Now one of those that you just

16:00:25  17  discussed is Hall; right?

16:00:27  18        A.   Yes.

16:00:27  19        Q.   That's a poster presentation.

16:00:28  20        A.   Yes.

16:00:28  21        Q.   Not peer reviewed or anything like that.

16:00:30  22        A.   Correct.

16:00:31  23        Q.   Okay.  The other one is Zink and Iaizzo;

16:00:34  24  correct?

16:00:34  25        A.   Correct.

327

16:00:37    1        Q.    That's something Dr. Augustine paid for;

16:00:37    2    right?

16:00:37    3        A.    Right.  And he's paid for other studies too.

16:00:41    4    Yes.

16:00:41    5        Q.    Uh-huh.  And you've had some problems with

16:00:44    6    him paying for studies; don't you?

16:00:45    7        A.    I don't -- I don't fundamentally have a

16:00:48    8    problem paying for studies.  I think that's been the

16:00:50    9    course of industry practice.

16:00:53   10        Q.    Okay.

16:00:53   11        A.    So I don't think that fundamental aspect is

16:00:54   12    arguable.

16:00:55   13        Q.    Now that study was conducted on eight

16:00:57   14    volunteers and --

16:00:58   15        A.    Correct, at that point in time.  It -- it is

16:01:00   16    what it is.

16:01:02   17        Q.    Now that test, the company did not conduct

16:01:07   18    that test before it starts selling the product; did

16:01:10   19    it?

16:01:10   20        A.    No.  They didn't conduct the test, no.

16:01:13   21        Q.    And in fact that test didn't occur until the

16:01:17   22    product was already on the market and being sold and

16:01:19   23    there had been significant investment in it.

16:01:22   24            MS. EATON:  Object to the form of the

16:01:23   25    question.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

328

16:01:23  1      A.   Well the paper was published, it was in the

16:01:25  2   510(k), so, you know --

16:01:28  3      Q.   Zink and Iaizzo was not in the original --

         4           THE REPORTER:   I'm sorry?

         5           MR. BANKSTON:   I'm sorry.

16:01:35  6      Q.   Zink and Iaizzo was not in the 500 series

16:01:35  7   510(k); is it?

16:01:36  8      A.   No, not in the 500.

16:01:36  9      Q.   Okay.  And that's the first product to be

16:01:37  10  used in an operating room.

16:01:39  11     A.   Correct.

16:01:39  12     Q.   Okay.  I just want to point to you in

16:01:41  13  plaintiffs' punitive damage motion -- I know you

16:01:45  14  talked about how it was probably not a good idea to

16:01:48  15  rely on Mr. Zgoda in isolation.  One person probably

16:01:51  16  can't remember everything, right, that happened in a

16:01:53  17  company?

16:01:53  18     A.   Correct.  They have particular

16:01:55  19  responsibilities and duties and -- and, you know,

16:02:00  20  sometimes the left hand doesn't know what the right

16:02:02  21  hand's doing --

16:02:03  22     Q.   Right.

16:02:03  23     A.   -- in an organization.

16:02:04  24     Q.   So you have this gentleman, who was the

16:02:07  25  project leader of the Bair Hugger 750, who presumably

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

329

16:02:07  1  knows a great deal about the Bair Hugger 750 but maybe

16:02:10  2  doesn't know everything, so you'd agree with me it's

16:02:13  3  probably a good idea to see what others have to say as

16:02:16  4  well.

16:02:16  5      A.   Sure.

16:02:17  6      Q.   Okay.  If you look further down the page

16:02:19  7  you'll see there's testimony from Mr. Van Duren;

16:02:22  8  correct?

16:02:22  9      A.   Where are we at now?

16:02:22  10     Q.   Same page.  Do you see the next --

16:02:26  11     A.   Okay, I see it.

16:02:27  12     Q.   Okay?

16:02:27  13     A.   Uh-huh.

16:02:28  14     Q.   And Mr. Van Duren was asked, before 750 was

16:02:31  15  ever released and sold and used on a patient, what was

16:02:33  16  done to ensure that the change in air output had no

16:02:36  17  adverse effect on airborne contamination issues, and

16:02:38  18  Mr. Van Duren, the clinical director of the company

16:02:41  19  says, "Well to my knowledge there were no tests that

16:02:44  20  looked at airborne particulate levels with the new

16:02:49  21  device before it went on the market."

16:02:49  22      That's something that you saw and reviewed

16:02:50  23  before you came to your opinions; correct?

16:02:52  24     A.   I read the deposition testimony.

16:02:53  25     Q.   Correct.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

330

16:02:56    1         I'd like to refer you to the previous page.

16:03:01    2    Do you see in the bolded print type where the CEO of

16:03:05    3    the company, Gary Maharaj, testified that he could not

16:03:08    4    recall any testing carried out during the development

16:03:10    5    of the Bair Hugger 500 series to support the assertion

16:03:14    6    that airborne particles were not a problem?  Do you

16:03:16    7    remember that testimony from Mr. Maharaj?

16:03:19    8         A.    Well this is -- I mean this isn't a quote.

16:03:25    9              Oh, hang on a second.  What is the quote

16:03:28   10    here?

16:03:31   11         Q.    It's the part in quotation marks.

16:03:33   12              Do you remember that testimony?

16:03:35   13         A.    Yeah.  But part of this is not a quotation,

16:03:38   14    so it's a characterization of his testimony.

16:03:41   15         Q.    Uh-huh.  Did you look into that?

16:03:44   16         A.    Yeah, I looked at the DHFs, I looked at the

16:03:48   17    510(k)s, I looked at the evaluations done by the

16:03:54   18    suppliers, knowledge of the par -- particular filters

16:04:00   19    being made and their efficiencies, and of the testing

16:04:03   20    and all the -- so on -- on both sides --

16:04:07   21         Q.    I was --

16:04:09   22         A.    -- to assess, you know, this very same

16:04:10   23    issue.

16:04:10   24         Q.    I was a little bit imprecise with my

16:04:14   25    pronouns by saying "that," "Did you look into that?"

331

16:04:18    1    What I meant by that is you say that this is a partial

16:04:20    2    quote and partial characterization.  Did -- did you

16:04:22    3    look at Mr. Maharaj's testimony on this issue?

16:04:25    4         A.   I read his deposition.

16:04:27    5         Q.   Okay.  So do you remember this particular

16:04:28    6    statement of his?

16:04:29    7         A.   I don't particularly remember this specific

16:04:32    8    statement.

16:04:33    9         Q.   Do you have any feeling today of what Mr.

16:04:37   10    Maharaj's opinion or statement or testimony was

16:04:40   11    regarding whether the company had carried out testing

16:04:41   12    for airborne contamination on the Bair Hugger before

16:04:44   13    it was released for surgery?

16:04:45   14         A.   Which one?

16:04:47   15         Q.   Before it was released for surgery, so that

16:04:49   16    would be the 500; correct?

16:04:50   17         A.   I'd have to look at all the other test data

16:04:58   18    and -- and background information, --

16:04:59   19         Q.   Okay.

16:05:02   20         A.   -- the literature, see what they make of

16:05:03   21    airborne contamination in the --

16:05:04   22         Q.   What about --

16:05:05   23         A.   -- in the hospital setting.

16:05:07   24         Q.   You reviewed Teri Woodwick-Sides'

16:05:10   25    deposition; right?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

332

16:05:11   1      A.   Whose?

16:05:11   2      Q.   Teri Woodwick-Sides.

16:05:13   3      A.   That -- that does ring a bell, yes.

16:05:15   4      Q.   You've actually read two of her depositions;

5   right?

16:05:18   6      A.   I believe so.

16:05:19   7      Q.   Okay.   She's the vice president of product

16:05:20   8   development.   Do you remember that now?

16:05:21   9      A.   I don't recall her title.

16:05:23   10      Q.   Okay.   Would you disagree with me that she

16:05:26   11   testified that no product testing had ever recurred

16:05:28   12   with regard to the Bair Hugger and airborne

16:05:30   13   contamination?

16:05:30   14      A.   I'd have to evaluate that again.   I didn't

16:05:34   15   opine on it.

16:05:34   16      Q.   If she said that, was that something you

16:05:35   17   re -- included when reviewing and forming your

16:05:38   18   opinions?

16:05:39   19           MS. EATON:   Object to the form of the

16:05:40   20   question.

16:05:40   21      A.   I'd have to review her deposition to see --

16:05:42   22   again, to see what relevance.   I didn't

16:05:44   23   particularly -- I didn't cite her deposition testimony

16:05:49   24   in any evaluation of the DHFs.

16:05:52   25      Q.   You're familiar with regulatory compliance

333

16:05:54    1    manager David Westlin?

16:05:55    2        A.    Yes.

16:05:56    3        Q.    Okay.  You read his deposition?

16:05:57    4        A.    Yes.

16:05:58    5        Q.    Read two of his depositions in fact.

16:06:00    6        A.    Probably.

16:06:02    7        Q.    Okay.  Would you dispute with me that he

16:06:02    8    testified that the company has not done any internal

16:06:04    9    testing with regard to airborne contamination?

16:06:08   10        A.    I don't recall his testimony in regard to

16:06:10   11    that, so --

16:06:11   12        Q.    Wouldn't you think it was important, sir,

16:06:13   13    when reviewing the testimony of the witnesses in this

16:06:16   14    case, primarily the executive corporate witnesses who

16:06:18   15    made decisions on the Bair Hugger, to understand what

16:06:21   16    they did in terms of testing and evaluating airborne

16:06:26   17    contamination risks?  That's an important thing; isn't

16:06:28   18    it?

16:06:28   19        A.    I -- I addressed Dr. David's report, I

16:06:35   20    addressed what I viewed as relevant to the opinions

16:06:37   21    that I created in my report, so --

16:06:41   22        Q.    All of -- all of this that we've just

16:06:44   23    discussed was in Dr. David's report; correct?

16:06:46   24        A.    Not necessarily, no.

16:06:48   25            MS. EATON:  Object to the form of that

334

16:06:48    1    question.

16:06:48    2        A.    No.

16:06:48    3        Q.    Okay.

16:06:49    4        A.    I don't think so.  No.  Some of it was, not

16:06:51    5    all of it.

16:06:54    6        Q.    I want to talk about the filter a little

16:08:21    7    bit, about -- okay.  First of all, let's talk about

16:08:24    8    the change in filter.

16:08:26    9              There was, between the 500 series and 700

16:08:29   10    series, a change in filter; correct?

16:08:31   11        A.    Yes.

16:08:32   12        Q.    Okay.  Your opinion is that the FDA was

16:08:33   13    informed by means of a letter that the model 750 would

16:08:38   14    include a .2 micron filter just as the model 505 did.

16:08:43   15        A.    Correct.

16:08:44   16              MS. EATON:  Object to the form of the

16:08:45   17    question.

16:08:46   18        A.    And not -- and not a HEPA filter.

16:08:47   19        Q.    Correct, it's not a HEPA filter.

16:08:49   20              And you say that Augustine Medical never

16:08:54   21    claimed in that letter that the model 750 would have

16:08:57   22    the same filter efficiency as the model 505.

16:09:01   23        A.    I believe I say that.

16:09:02   24        Q.    Okay.  Now in that letter --

16:09:05   25              Let me go ahead and get you a copy of that.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

335

16:09:14  1          MR. BANKSTON:  And Dick, let's re-mark that

16:09:16  2  over the old exhibit.

16:09:28  3          (Ulatowski Exhibit 9 was marked for

16:09:31  4          identification.)

16:09:31  5  BY MR. BANKSTON:

16:09:39  6      Q.   All right.  In this document, Ulatowski

16:09:43  7  Exhibit 9 --

16:09:44  8          MS. EATON:  Did you give me a copy?

16:09:45  9          MR. BANKSTON:  He has it right next to him.

         10  I don't know --

16:09:47  11          He's looking at it.

16:09:47  12          MS. EATON:  No.  Did you give me a copy?

16:09:49  13          MR. BANKSTON:  Oh, no.  Here you go.

16:09:51  14          MS. EATON:  Thank you.

16:09:52  15          (Document handed to Ms. Eaton.)

16:09:56  16      Q.   Sir, I'd like to ask you about Exhibit 9.

16:09:58  17      A.   Right.  The reason I'm -- I'm pausing is I'm

16:10:01  18  turning to my opinion to see precisely what I said

16:10:05  19  about it.

16:10:05  20      Q.   You see in Exhibit 9 that this is a letter

16:10:09  21  that the F -- that was written to the FDA concerning

16:10:12  22  the change of filter in the Bair Hugger.

16:10:15  23      A.   Yes.

16:10:16  24      Q.   Okay.  This letter tells the FDA that

16:10:21  25  instead of a plan to improve the filter from what it

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

336

16:10:25  1  was to a HEPA filter, now instead the company is going

16:10:30  2  to use our current filter characteristics; correct?

16:10:36  3      A.   Hang on, let me just read further.

16:10:53  4           Current filter characteristics is what it

16:10:58  5  says.

16:10:58  6      Q.   Yes.  That's what I'm asking you.  They told

16:10:58  7  the FDA we plan, instead of improving the filter, to

16:11:01  8  use our current filter characteristics; correct?

16:11:04  9      A.   Yes.

16:11:05  10     Q.   Okay.  And then do you see down -- down in

16:11:09  11  the later paragraph there's a portion where it

16:11:12  12  describes some differences?  Do you see that?

16:11:15  13     A.   Yes.

16:11:16  14     Q.   And in the des --

16:11:18  15          What it says is, "The description of this

16:11:20  16  filter will be the same, but the physical size will be

16:11:23  17  slightly smaller."

16:11:24  18     A.   Yes.

16:11:25  19     Q.   Correct?

16:11:25  20     A.   Yes.

16:11:26  21     Q.   Can you point me to anything in this

16:11:28  22  document that would inform the FDA, that would allow

16:11:33  23  them to know in any way, shape or form that the

16:11:35  24  performance characteristics of that filter were

16:11:38  25  changing?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

337

16:11:40  1        A.   Well I think -- I think, first of all, that

16:11:43  2   it says the filter characteristics.  Are they

16:11:46  3   referring to .2 micron only?  If that's the case, then

16:11:49  4   there's no misstatement.

16:11:51  5        Q.   There's -- and there's --

16:11:53  6             Well that's not my question.  You understand

16:11:54  7   I did not ask you that.

16:11:56  8        A.   Just let me preface that.

16:11:58  9        Q.   Okay.

16:11:59  10        A.   And the second part is you have to

16:12:01  11   understand even -- even if it was the intention of the

16:12:03  12   company to have the exact same filter efficiency,

16:12:09  13   exact same efficiency as the 505, the M10, as soon as

16:12:15  14   that 510(k) was cleared by FDA, Arizant could change

16:12:20  15   those specifications over night and market a different

16:12:23  16   product without another 510(k).

16:12:26  17        Q.   In fact, they did that with the 505; didn't

16:12:28  18   they?  They changed the filter in the 505.

16:12:30  19        A.   Right.  And they -- they changed it with the

16:12:33  20   750.

16:12:33  21        Q.   And --

16:12:34  22             Well they made a new 510(k) for the 750;

23   right?

16:12:37  24        A.   Not for the filter characteristics.

16:12:39  25        Q.   Well I mean I'm not trying to mince words

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

338

16:12:43　1　with you here, but there was a new 510(k) for that

16:12:45　2　product; right?

16:12:46　3　　　　　　MS. EATON:  I'm sorry, can -- I didn't --

16:12:48　4　　　　　　MR. BANKSTON:  Correct?

16:12:49　5　　　　　　MS. EATON:  I did not hear what you said.

16:12:53　6　　　　　　MR. BANKSTON:  There's a new 510(k) for that

16:12:53　7　product.

16:12:53　8　　　　　　MS. EATON:  Which product?

16:12:54　9　　　　　　MR. BANKSTON:  The 750.

16:12:55　10　　A.　Well there was a new 510(k) for the 750.

16:12:57　11　　Q.　Right.  There was a new 510(k) for the 750.

16:13:02　12　　A.　Right.  Yes.

16:13:02　13　　Q.　There was not --

16:13:02　14　　　　　　There's never been a new 510(k) for the 505.

16:13:04　15　　A.　No.

16:13:04　16　　Q.　Okay.  They both had the same change.

16:13:06　17　　A.　Right.

16:13:07　18　　Q.　Okay.  The --

16:13:09　19　　　　　　What I'm asking you is:  In this document,

16:13:11　20　is there anything in this document that indicates to

16:13:14　21　the FDA in any way whatsoever that the efficiency or

16:13:17　22　performance of that filter is being reduced?

16:13:22　23　　A.　It's not stated here.

16:13:23　24　　Q.　No.

16:13:24　25　　A.　But it didn't have to be stated to FDA.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

339

16:13:26   1      Q.   Again, my question is, just to go down a

16:13:28   2   trail here if we can find from this document, is there

16:13:31   3   anything --

16:13:31   4           Did the FDA have any idea that the filter

16:13:34   5   was being reduced in its performance?

16:13:39   6      A.   Not from this correspondence or any other

16:13:41   7   correspondence that I've seen.  But it's my contention

16:13:45   8   and my opinion in my report that's not the type of

16:13:46   9   change that's reportable to FDA in any case.

16:13:49  10      Q.   Okay.  Now irrespective of whether that

16:13:52  11   change was reported to the FDA, if the company's going

16:13:54  12   to change a safety component on their product, they

16:13:56  13   need to validate and make sure that change is safe.

16:13:59  14      A.   Well they need to assess the change and

16:14:01  15   whether -- whether they need to validate.

16:14:03  16      Q.   Okay.  What was done?  What was done to

16:14:06  17   assess the change?

16:14:08  18      A.   Well they looked at the characteristics of

16:14:11  19   the device, the improved performance of the device

16:14:13  20   because of airflow -- airflow characteristics, so they

16:14:18  21   were increasing the benefit of the device.  They

16:14:20  22   understood that the efficiency was different at a

16:14:23  23   certain micron level, which probably, in my opinion,

16:14:29  24   would be irrelevant at the higher micron level.

16:14:33  25   But --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

340

16:14:34 | 1       And so they -- they did a -- what

16:14:38 | 2  essentially is a -- a scientific paper evaluation of

16:14:41 | 3  the difference in the products.

16:14:42 | 4       Q.   Okay.   First of all, with respect to your

16:14:48 | 5  opinion you just gave about not even relevant at

16:14:51 | 6  higher micron levels, what we were talking -- what

16:14:54 | 7  you're talking about is the typical size of airborne

16:14:58 | 8  bacteria; correct?

16:14:58 | 9       A.   Right.

16:14:59 | 10      Q.   Okay.   That's not something you're offering

16:15:00 | 11 opinions on; right?

16:15:01 | 12      A.   No, I'm not.

16:15:02 | 13      Q.   Okay.   Dr. Ho, are you familiar with him?

16:15:05 | 14      A.   Yes.

16:15:05 | 15      Q.   Yeah.   He offered opinions on that.   Have

16:15:07 | 16 you read his report?

16:15:07 | 17      A.   No, I don't think I have seen his report.

16:15:09 | 18      Q.   Have you seen his testimony that I took?

16:15:11 | 19      A.   Recently?

16:15:12 | 20      Q.   Yeah, --

16:15:13 | 21      A.   No.

16:15:13 | 22      Q.   -- in the last little bit.

16:15:14 | 23      A.   I have not seen it.

16:15:15 | 24      Q.   Okay.   You would defer to him on the size of

16:15:20 | 25 airborne particular matter.

341

16:15:21  1      A.    Yes.  He's more -- he's certainly more up to

16:15:24  2  date, more expert.

16:15:25  3      Q.    Okay.

16:15:26  4      A.    Right.

16:15:28  5      Q.    Now first of all, you admit the filter is a

16:15:33  6  safety-related component; right?

16:15:37  7            Well let me -- let me rephrase that.  I'm

16:15:40  8  sorry.  Let me take that back.

16:15:41  9            The filter is specifically identified as a

16:15:43  10  safety component in the 510(k) summary of safety and

16:15:46  11  effectiveness for both the model 500 and the model

16:15:50  12  750.

16:15:50  13            MS. EATON:  Object to the form of the

14  question.

15      A.    For 500, yes.  750, I'm not -- I don't

16:15:55  16  recall for certain.

16:15:56  17      Q.    Okay.  I'll -- I'll -- I'll represent to

16:15:59  18  you, I don't know if you remember it or not, but the

16:16:00  19  only difference between the two safety and

16:16:03  20  effectiveness statements which occurred with the

16:16:04  21  filter is a slight changing in the wording.  You

16:16:09  22  understand the filter is still mentioned in the 510(k)

16:16:10  23  for the 750?

16:16:11  24      A.    Oh, sure.  And, you know, I know in the

16:16:12  25  specifications list in the labeling it points to a .2

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

342

16:16:15  1  micron filter.  Doesn't say anything about efficiency.

16:16:17  2      Q.   Right.  And that part is there to mitigate

16:16:19  3  the possibility of airborne contamination.

16:16:20  4          MS. EATON:   Object to the form of the

16:16:21  5  question.

16:16:22  6      A.   Well there's different opinions on that.  I

16:16:25  7  think opinions on whether it's there --

16:16:28  8          I think it has a -- a couple functions based

16:16:30  9  on deposition testimony.

16:16:31  10     Q.   Let's -- let's just do it then with what it

16:16:34  11 says in the 510(k).  In the 510(k) for both of those

16:16:36  12 devices, the 500 and the 750, that is identified

16:16:40  13 specifically as something that is used to mitigate the

16:16:43  14 possibility of airborne contamination.

16:16:46  15     A.   Right.  And -- and --

16:16:49  16         I want to make sure that, you know, we have

16:16:51  17 terminology right here.  When -- when you say

16:16:53  18 "contamination," you know, there's a difference

16:16:56  19 between airborne particulates versus airborne

16:17:02  20 contamination versus airborne-induced/caused potential

16:17:09  21 fomites in a surgical field.  So, you know,

16:17:14  22 particulates, yeah.  Whether that translates to

16:17:17  23 infectious particles, that's another story.

16:17:19  24     Q.   All right.  The -- the 510(k) doesn't say

16:17:20  25 anything about particles, does it, just says airborne

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

343

16:17:23  1   contamination of the surgical room.

16:17:24  2              MS. EATON:  If we're going to talk about two

16:17:26  3   different 510(k) summaries of safety and

16:17:30  4   effectiveness, can we please have them in front of us

16:17:31  5   rather than asking for a memory test?

16:17:33  6              MR. BANKSTON:  If he's got them, he's got

          7   them.  But I mean we're just talking about the very

          8   thing that --

16:17:35  9              THE WITNESS:  I don't have it with me.

16:17:35  10             MS. EATON:  That's fine.  I would -- I

16:17:38  11  would --

16:17:38  12             MR. BANKSTON:  Then he can --

16:17:38  13             Then his answer can be, simply enough, "I do

16:17:39  14  not know."

16:17:39  15             MS. EATON:  That's fine.

16:17:40  16             MR. BANKSTON:  "I don't have it in front of

16:17:41  17  me."

16:17:41  18             MS. EATON:  I'm -- I'm simply asking you as

16:17:43  19  a matter of fairness, rather than having him try to

16:17:48  20  memorize completely two statements from among the

16:17:48  21  documents he has reviewed, if you intend to ask him

16:17:51  22  very detailed questions about the language in those

16:17:53  23  documents, I think it would be appropriate and fair

16:17:54  24  for you to place them in front of him.

          25             MR. BANKSTON:  All right.  Well let's just

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

344

1    ask --

16:17:57    2         MS. EATON:  You will decide if you're going

16:17:57    3    to do it or not.

16:17:58    4         MR. BANKSTON:  Right.

16:17:59    5    Q.    Let's just ask you the simple question,

16:18:01    6    because at the end, it all gets done.

7         Do you admit the filter is a safety

8    component and identified as such to the federal

9    government?

16:18:05   10         That's not a complicated, get-down-in-the-

16:18:08   11    weeds opinion; right?  It's identified as a safety

16:18:10   12    component.

16:18:10   13         MS. EATON:  Object to the form of the

16:18:11   14    question.

16:18:11   15    A.    Well I -- I think early on there's some --

16:18:15   16    it's alluded to.  I don't think in subsequent 510(k)s

16:18:19   17    it's necessarily an affirmative statement.

16:18:22   18         MR. BANKSTON:  Let's go off the record for

16:18:23   19    just a second.

16:18:26   20         THE REPORTER:  Off the record, please.

16:18:28   21         (Recess taken.)

16:27:12   22    BY MR. BANKSTON:

16:27:22   23    Q.    All right, Mr. Ulatowski, if 3M informed the

16:27:29   24    FDA that the filter was a safety component, played a

16:27:33   25    safety function, and then decided to change that

345

16:27:36  1  filter and its media in some respect, you would agree

16:27:40  2  with me that the company has an obligation to assess

16:27:42  3  that change and determine that it is safe.

4      MS. EATON:  Object to the form of that

16:27:53  5  question.

16:27:53  6      A.  I would be more -- more general to say when

16:27:55  7  you change a component, there should be some assess --

16:27:59  8  assessment on the effect on the device.

16:28:02  9      Q.  So really if anything changes on the device,

16:28:05  10  we need to assess whether it -- it affects safety from

16:28:09  11  a responsible manufacturer.

16:28:10  12      A.  To -- to whatever degree is necessary in the

16:28:12  13  view of the company.

16:28:15  14      Q.  What if the company decides that nothing is

16:28:18  15  necessary to do any assessment?

16:28:21  16      A.  Well I need to know the rationale, I

16:28:23  17  suppose.  But, you know, it's possible that happens

16:28:26  18  certainly.

16:28:26  19      Q.  Okay.  And that's -- you'd agree that's

16:28:34  20  particularly true of safety functions.  Safety pieces

16:28:37  21  of the device need to be looked at fairly carefully

16:28:39  22  whenever they're changed.

16:28:40  23      A.  It -- it depends what the change is.  It may

16:28:42  24  be within a range of change that really doesn't have a

16:28:47  25  particular impact.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

346

16:28:48　1　　Q.　Okay.　I -- I want to ask you about if you

16:28:53　2　had a filter you were selling to the public on your

16:28:56　3　device and it filters out 95 percent of .2 micron

16:29:01　4　particles, they're calling it a .2 micron filter, and

16:29:05　5　then you change that filter and it now filters out

16:29:07　6　less than half of the .2 micron particles, is it your

16:29:11　7　testimony today that it is still an honest

16:29:14　8　representation to say to customers and the government

16:29:17　9　that that filter has the -- is -- is a two -- .2

16:29:21　10　micron filter with the same filter characteristics?

16:29:25　11　　　　MS. EATON:　Object to the form of the

16:29:26　12　question.

16:29:27　13　　Q.　Yeah.　The specifications haven't changed.

16:29:29　14　That's -- that's what was listed in the device.　Would

16:29:31　15　it be material to the customer to know that?　Well

16:29:38　16　I -- I don't think so.　I -- I think people are

16:29:40　17　getting too hung up on this filter-efficiency issue.

16:29:44　18　　Q.　You -- you certainly know that orthopedic

16:29:47　19　surgeons are highly sensitive and concerned about

16:29:51　20　particulate matter in their operating rooms; correct?

16:29:54　21　　A.　I can't speak for all orthopedic surgeons.

16:29:58　22　Some may not be all that concerned at all.　I don't

16:30:00　23　know.

16:30:01　24　　Q.　Well you've read the International

16:30:03　25　Concensus; right?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

347

16:30:03   1      A.   Yes.

16:30:03   2      Q.   And they were very concerned about

16:30:05   3  particles; correct?  That's some of their opinions in

16:30:11   4  that consensus.

16:30:12   5      A.   That's what they addressed.  But I can't

16:30:14   6  speak for all physicians or -- or generally for

16:30:17   7  orthopedic surgeons as a whole.

16:30:17   8      Q.   Okay.  I want to talk a little bit about the

16:30:21   9  2009 facility inspection.

16:30:23  10      A.   Sure.

16:30:23  11      Q.   Okay.  So part of that, you understand, is

16:30:29  12  that FDA had an inspector show up to the facility,

16:30:32  13  conduct interviews with employees; correct?

16:30:34  14      A.   Correct.

16:30:35  15      Q.   One of those employees being David Westlin,

16:30:37  16  the regulatory compliance director.

16:30:39  17      A.   Sure.

16:30:39  18      Q.   That's fairly usual.  That's somebody you

16:30:43  19  would talk to in one of those kind of inspections.

16:30:45  20      A.   Absolutely.

16:30:45  21      Q.   Okay.  After the inspection is done there's

16:30:48  22  a report prepared; correct?

16:30:50  23      A.   That's correct.

16:30:51  24      Q.   Okay.  And in that report -- you understand

16:30:56  25  that in that report the report states what is not

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

348

16:31:00    1    true, that the Bair Hugger has a HEPA filter.

16:31:03    2        A.    Correct.

16:31:03    3        Q.    Okay.  You understand that after an FDA

16:31:12    4    inspection it sends its findings to the manufacturer.

16:31:16    5        A.    That should be done.  It -- it's actually

16:31:18    6    not frequently done.

16:31:20    7        Q.    Okay.  Are you familiar with reports known

16:31:22    8    as 483 inspectional observations?

16:31:24    9        A.    Yes.

16:31:24   10        Q.    Okay.  Those were provided to the company;

16:31:28   11    correct?

16:31:28   12        A.    Yes, those are provided at the conclusion of

16:31:30   13    the inspection.

16:31:30   14        Q.    Okay.  And the company actually had an

16:31:32   15    opportunity to respond and did respond in the company

16:31:35   16    by letter; correct?

16:31:36   17        A.    That's the normal industry practice, yes.

16:31:38   18        Q.    Right.  And they make any comments they may

16:31:40   19    have on the inspectional observations.

16:31:42   20        A.    On 483, yes.

16:31:44   21        Q.    Okay.  Nowhere during that process, whether

16:31:47   22    it was during the 483 process, the letters that were

16:31:51   23    being written or upon publication of the report, no

16:31:54   24    action was taken immediately upon the issuance of that

16:31:58   25    report to correct that statement to the FDA.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

349

16:32:00    1          MS. EATON:  Object to the form of the

16:32:01    2    question.

16:32:03    3        A.   I'm not aware of any correction being made.

16:32:05    4        Q.   At any time?

16:32:07    5        A.   At any time.

16:32:08    6        Q.   You have not been provided with a letter

16:32:11    7    dated December of 2016 that was addressed to the

16:32:15    8    Minneapolis field office of the FDA?

16:32:17    9        A.   In regard to the 2009 inspection?

16:32:20   10        Q.   Uh-huh.

16:32:20   11        A.   I don't think I've seen that.

16:32:21   12        Q.   So you didn't know in 2016 that the company

16:32:24   13    wrote saying that they're going to clarify that

16:32:27   14    statement and it doesn't have a HEPA filter.

16:32:29   15        A.   Well I may have to take that back, but I --

16:32:33   16    I just didn't recall them addressing that point in the

16:32:36   17    prior inspection.

16:32:36   18        Q.   Okay.  So between 2009 and 2016 they did

16:32:40   19    nothing to correct that assertion in that report and

16:32:44   20    in 2016 they did.  You understand that?

16:32:46   21        A.   Okay.

16:32:48   22          MS. EATON:  Object to the form of the

16:32:49   23    question.  The original letter did not come in 2009.

16:32:52   24        Q.   Well the inspection was in 2009; correct,

          25    sir?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

350

16:32:55    1        A.    Yes.

16:32:57    2        Q.    Okay.  Thank you.

16:32:57    3              Have you ever seen a company send a letter

16:33:12    4    by priority overnight delivery seven years after an

16:33:16    5    inspection report correcting information within it?

16:33:19    6    Is that something you've ever seen?

16:33:21    7        A.    Could I please see the letter just to

16:33:23    8    refresh my memory?

16:33:23    9        Q.    I actually don't --

16:33:25   10              I thought you might have it.  I thought you

16:33:27   11    knew about this letter.

16:33:28   12        A.    I don't have it.

16:33:28   13        Q.    We can get one.  I mean I'm just wondering,

16:33:31   14    not with regard to this letter, but have you ever seen

16:33:35   15    a letter sent to the FDA correcting a inspection

16:33:38   16    report seven, eight, nine years after it happened?

16:33:42   17        A.    I've seen corrections to inspection reports,

16:33:43   18    I've seen corrections to 510(k)s years after the fact,

16:33:48   19    so nothing would surprise me.

16:33:49   20        Q.    Okay.  You will agree with me that Arizant

16:33:51   21    knew that in a report dealing with airborne

16:33:56   22    contamination risk their filter was incorrectly

16:34:00   23    described as a HEPA filter and for six years they did

16:34:02   24    nothing to correct that.

16:34:06   25        A.    Well what -- it --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

351

16:34:08    1            It was not corrected.

16:34:11    2            MS. EATON:  Object to the form of the

16:34:12    3    question.

16:34:19    4        Q.   Did you happen to review --

16:34:21    5            I know you reviewed plaintiffs' motion for

16:34:23    6    punitive damages.  Did you happen to review

16:34:26    7    defendants' response to that motion?

16:34:31    8        A.   I don't think I did.

16:34:31    9        Q.   Okay.  Okay.  And maybe that's where we got

16:34:36   10    it up.  I didn't -- I didn't actually --

16:34:38   11            I thought maybe it was part of the punitive

16:34:40   12    damages report.  My mistake.  It was actually in

16:34:44   13    exhibits to defendants' response on punitive damages.

16:34:45   14            As far as the exhibits go that defendant may

16:34:48   15    have offered in response to punitive damages, you

16:34:53   16    don't think that's something you reviewed?

16:34:53   17        A.   Not --

16:34:54   18            No.  I don't recall it offhand.

16:34:55   19        Q.   Okay.  Now I'm going to ask you to assume

16:35:08   20    that from 2009 to 2016 Arizant did nothing to correct

16:35:16   21    the observation in the inspection report that there

16:35:18   22    was a HEPA filter.  All right?  You can make that

16:35:20   23    assumption with me.  Do you think that it is proper

16:35:24   24    for a manufacturer to allow that information to

16:35:27   25    continue, knowing that it's not true?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

352

16:35:30    1        A.    Well I think I actually addressed this in

16:35:34    2    my -- my report, and -- and I believe I said, well,

16:35:38    3    looking at the -- looking at the particular focus of

16:35:41    4    the inspection and the observations, it wasn't

16:35:44    5    particularly germane to the -- to the topic.

16:35:47    6        Q.    You --

16:35:48    7        A.    There were a couple issues to be addressed,

16:35:50    8    air -- certainly airborne contamination, the MDRs.  I

16:35:53    9    think the focus came out to be what -- what do you do

16:35:57    10    with MDRs and with the so-called CAPAs, C-A-P-As,

16:36:01    11    and -- and that -- and that's where it fell out.

16:36:06    12    And -- and so that -- that --

16:36:10    13           I'm not sure what importance that really had

16:36:13    14    in the end result.

16:36:14    15        Q.    It had importance enough to be sent in an

16:36:17    16    overnight letter for priority delivery to the FDA in

16:36:23    17    December of 2016; correct?

16:36:23    18        A.    Well they did that, but -- but in -- in

16:36:26    19    thinking back, would that have changed anything in

16:36:28    20    regard to how I responded -- the agency responded to

16:36:33    21    that inspection, and -- and I think not.

16:36:40    22        Q.    You -- I can't recall if you said "yes" or

16:36:42    23    "no."  Actually, let me just check.

16:36:48    24           I think you have Exhibit 1 in front of you

16:36:52    25    there, Exhibit 2, which is your reliance list.  Will

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

353

16:36:54    1    you check that for me?

16:36:55    2         A.    Oh, yeah.  Yes.  There it is.

16:37:00    3         Q.    Okay.  Can you tell me, did you read Dr.

16:37:04    4    Sessler's deposition?

16:37:05    5         A.    Deposition?

16:37:06    6         Q.    Yes, sir.

16:37:06    7         A.    Well, this should tell the tale.  It's not

16:37:23    8    listed here.

16:37:24    9         Q.    Okay.

16:37:27   10         A.    Oh, yes, it is.

16:37:28   11         Q.    Okay.  And what date do you have for that?

16:37:30   12         A.    May 28, 2015.

16:37:33   13         Q.    Okay.  So that would be a deposition that

16:37:35   14    was conducted in the prior -- your prior engagement.

16:37:38   15         A.    Yes, it appears so.

16:37:39   16         Q.    Okay.  So you have not reviewed Dr.

16:37:41   17    Sessler's testimony in -- in the consolidated case.

16:37:45   18         A.    Evidently not.

16:37:46   19         Q.    Okay.  So you wouldn't be able to tell me

16:37:48   20    what kind of filter Daniel Sessler thought was on the

16:37:53   21    machine when reaching his conclusions about it, about

16:37:56   22    the adequacy of it.

16:37:56   23         A.    I have no knowledge of his testimony.

16:37:58   24         Q.    Okay.  One more question about the filter.

16:38:16   25    You recall seeing the e-mails discussing that we

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

354

16:38:22   1   currently offer sub-HEPA filtration?

16:38:25   2        A.   Yes.

16:38:25   3        Q.   Okay.

16:38:26   4        A.   Yes.

16:38:26   5        Q.   And -- and this e-mail that you discussed

16:38:31   6   about the --

16:38:32   7             The e-mail says a reduction in efficiency --

16:38:35   8   a reduction in the efficiency of the filter may

16:38:37   9   require some action, but because of the way it's

16:38:40   10  described as a sub-HEPA filter, the basis of our

16:38:43   11  safety claims is a sub-HEPA filter, as long as you're

16:38:48   12  still sub-HEPA, you're still in that categorization.

16:38:50   13  Would you agree with that?

16:38:52   14            MS. EATON:   Object to the form of the

16:38:53   15  question.

16:38:53   16       A.   I comment on that sub-HEPA filtration

16:38:56   17  aspect.   I'm not sure if this is what you're speaking

16:38:58   18  to, but I certainly --

16:38:59   19            Dr. David, I know, referred to a -- a

16:39:01   20  portion of a conversation, and I expanded with the

16:39:03   21  full conversation to give it context, and the issue

16:39:09   22  was, well, we had sub -- sub-HEPA in the -- sub-HEPA

16:39:13   23  in the prior device and we have sub-HEPA in this

16:39:15   24  device, so -- so hey.   You know, I guess that was what

16:39:19   25  my point is.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

355

16:39:19    1        Q.    Right.  So I guess what -- what you had said

16:39:21    2   was a plausible interpretation of this document is

16:39:25    3   that sub-HEPA filtration is needed for new devices.

16:39:28    4   You got to have sub-HEPA because that's what we had in

16:39:31    5   our product.

16:39:31    6        A.    Sub-HEPA is -- right.  Otherwise, we might

16:39:36    7   not --

16:39:37    8            I think the point was we might have to

16:39:39    9   assess with data or something like that.

16:39:40   10        Q.    All right.  A filter that stops zero percent

16:39:43   11   of particles up to 50 microns, that's sub-HEPA;

16:39:49   12   correct?

16:39:49   13        A.    Zero percent of particles up to 50 percent.

16:39:53   14        Q.    Fifty microns.

16:39:56   15        A.    Fifty microns.

16:39:57   16        Q.    That's sub-HEPA.

16:39:58   17        A.    Yeah.  I'm -- I'm thinking about the HEPA

16:40:02   18   categorization.  I'm not sure that's quite right,

16:40:06   19   but -- but, you know --

16:40:07   20        Q.    Well let's -- let's talk about the HEPA

16:40:11   21   characterization, about what its specifications are.

16:40:13   22            You would agree with me that a high-

16:40:17   23   efficiency particulate filter, a HEPA filter, is able

16:40:18   24   to filter out 99.97 percent of particles at .3

16:40:23   25   microns.  Do you agree that's about right?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

356

16:40:25 1      A.   Yes, with -- with, you know, a given test

16:40:28 2  methodology and airflow, for example, and of course

16:40:33 3  assuming no bleed-through around the filter.

16:40:35 4      Q.   Now a filter that can filter out one percent

16:40:39 5  of particles 5,000 micron size, that's sub-HEPA.

16:40:43 6  That's below HEPA's efficiency.

16:40:46 7      A.   Yes.

16:40:46 8      Q.   And that would be fine to use on the Bair

16:40:48 9  Hugger?

16:40:48 10     A.   That would be --

16:40:50 11          Excuse me?

16:40:50 12     Q.   You could --

16:40:50 13          In other words, you don't have to do any

16:40:52 14 sort of testing or any sort of thing special because

16:40:54 15 that's a sub-HEPA filter.  If you put that filter on

16:40:57 16 the Bair Hugger, you're good because it's sub-HEPA.

16:40:59 17          MS. EATON:  Object to the form of the

16:41:01 18 question.

16:41:01 19     A.   Well I -- I think that the idea of

16:41:02 20 filtration at the .2 micron level is -- is an

16:41:10 21 interesting aspect of -- of the Bair Huggers.  I

16:41:12 22 think -- as I alluded to, I think people are getting

16:41:16 23 perhaps too caught up in this efficiency issue in

16:41:19 24 regard to the filtration, filtration in a filtered

16:41:23 25 environment.  And when you -- when you change the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

357

16:41:27  1  efficiency, what -- what are your criteria established

16:41:33  2  that you made any clinical difference?  That's a very

16:41:36  3  tough thing to -- to prove.  Very tough thing.

16:41:39  4        MR. BANKSTON:  Objection, non-responsive.

16:41:41  5     Q.    My question is:  Is a filter that filters

16:41:44  6  out one percent of particles of 5,000 micron size,

16:41:48  7  that is a sub-HEPA filter; correct?

16:41:50  8     A.    Anything below HEPA is a sub-HEPA filter.

16:41:53  9        MS. EATON:  Let me object to the form of

16:41:54  10 that question.

16:41:54  11    Q.    Any --

16:41:55  12       Basically, any filter under the sun, any one

16:42:00  13 of them that doesn't live up to the HEPA certification

16:42:03  14 is going to be a sub-HEPA filter.

16:42:06  15       MS. EATON:  Object to the form of that

16:42:07  16 question.

16:42:07  17    A.    To the absurd point, extreme, yes, but

16:42:10  18 that's not where the company was going.

16:42:12  19    Q.    Well your plausible interpretation, sir, is

16:42:16  20 that sub-HEPA filtration is all that's needed for

16:42:18  21 these new devices; right?

16:42:19  22    A.    Yes, within the -- just as within the

16:42:22  23 parameters of how the company considered the standard

16:42:24  24 that they were trying to meet.

16:42:26  25    Q.    What standard were they trying to meet?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

358

16:42:28   1      A.   Ultimately, they -- they gravitated to the

16:42:31   2   MERV 14 standard because of the operating room

16:42:33   3   characteristic standard that existed, and so the

16:42:38   4   filters they were using both met the same MERV 14

16:42:40   5   standard.

16:42:41   6      Q.   Your testimony, though, has been -- and at

16:42:44   7   least your opinions in your report is there's not a

16:42:46   8   standard for filtration on a forced-air warming

16:42:49   9   device; right?

16:42:50  10      A.   Right.  Not specifically for a forced-air

16:42:53  11   warming device.

16:42:53  12      Q.   Okay.

16:42:54  13      A.   But what I'm saying is there are standards

16:42:57  14   for filtration in an OR, so in the absence of specific

16:43:03  15   standards the industry moves to and utilizes whatever

16:43:08  16   might be germane to the issue, in this case MERV

16:43:11  17   standards, for example.

16:43:12  18      Q.   All right.  And so we're --

16:43:13  19      A.   And I wouldn't argue with that, that usage.

16:43:16  20      Q.   Right.  So we're talking about these MERV 14

16:43:19  21   standards for use approved in surgeries.  Do you have

16:43:21  22   any idea what the standard is for filtration when

16:43:24  23   performing an ultraclean orthopedic surgery?

16:43:26  24           MS. EATON:  Object to the form of the

16:43:27  25   question.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

359

16:43:27  1      A.    I don't recall the -- the -- the standard.

16:43:29  2   But, --

16:43:30  3      Q.    Okay.

16:43:30  4      A.    -- you know, the point is people are making

16:43:32  5   some to-do about moving from 10 to 20, and it made no

16:43:37  6   difference within the parameters of the MERV 14

16:43:41  7   standard.

16:43:46  8      Q.    You can't tell me that all MERV 14 standards

16:43:49  9   are safe in orthopedic procedures; can you?

16:43:52  10     A.    Well I think that --

16:43:53  11            MS. EATON:   Object to the form of the

16:43:55  12   question.

16:43:55  13     A.    -- that goes beyond my expertise in

16:43:57  14   filtration, and, you know, I'd leave that to those who

16:44:02  15   are better suited to assess that.

16:44:03  16     Q.    Okay.  Some of your opinions are regarding

16:44:06  17   the alternative designs identified by Dr. David;

16:44:09  18   correct?

16:44:09  19     A.    Correct.

16:44:09  20     Q.    Okay.  Your opinion is that these devices

16:44:13  21   have some different features than the Bair Hugger

16:44:15  22   devices and that they have different features that

16:44:19  23   present new hazards; correct?

16:44:21  24     A.    Yes.

16:44:22  25     Q.    Okay.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

360

16:44:22  1      A.    Yes.

16:44:23  2      Q.    Are you familiar with the Mistral-Air

16:44:25  3  system?

16:44:25  4      A.    Yes.   That's one of the examples he gave.

16:44:27  5      Q.    Okay.   What different features does it have?

16:44:30  6      A.    You know, I recall pulling up the

16:44:33  7  Mistral-Air website and looking at that device, and --

16:44:38  8  and I don't recall the specific characteristics,

16:44:41  9  but -- but I do remember researching those alternative

16:44:45  10 designs by pulling up the websites and looking at

16:44:48  11 them.

16:44:48  12     Q.    Okay.

16:44:49  13     A.    So I -- I did research, you know, to support

16:44:52  14 what I was saying.

16:45:10  15     Q.    That's not on the materials listed; right?

16:45:13  16     A.    Oh, I don't know.   It's in my report.

16:45:16  17     Q.    Regarding the website for the Mistral-Air?

16:45:19  18     A.    Yeah.   I mean --

16:45:20  19           Let me turn to it.

16:45:21  20     Q.    Okay.

16:45:22  21     A.    Well I would think so.   I recall doing it.

16:45:27  22 If you want me to take time to find that --

16:45:30  23     Q.    You know what?   Why don't we do it when we

16:45:32  24 go off the record next, and you can let me know if

16:45:34  25 it's there and we'll try to figure out --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

361

1      A.   Okay.

16:45:36   2      Q.   -- if that's something to check.

16:45:39   3           Mistral-Air, with regard to new hazards,

16:45:42   4   what new hazards does Mistral-Air pose?

16:45:45   5      A.   Well insomuch as it has different operating

16:45:49   6   characteristics, different design characteristics, so

16:45:53   7   those would pose particular hazards.  As I -- as I

16:45:55   8   recall looking at the design and its operating

16:45:59   9   characteristics, since it was different from the Bair

16:46:02  10   devices in certain regards, those differences would --

16:46:07  11   would elicit potentially new hazards.  So I -- I just

16:46:10  12   don't recall the specifics and I didn't document

16:46:13  13   those.

16:46:13  14      Q.   The -- the Mistral-Air is a device that's

16:46:16  15   been held to be substantially equivalent to Bair

16:46:18  16   Hugger; correct?

16:46:19  17      A.   Yes.

16:46:19  18      Q.   That means that the -- the FDA determined

16:46:21  19   that the technological differences in the device did

16:46:24  20   not raise new questions of safety and effectiveness;

16:46:26  21   correct?

16:46:26  22      A.   No, that's -- that's a misunderstanding of

16:46:28  23   that provision.

16:46:29  24      Q.   Okay.

16:46:29  25      A.   I'm surprised, I guess, we haven't touched

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

362

16:46:31   1   upon that before, the different technological

16:46:34   2   characteristics, whether they raise new types of

16:46:37   3   safety and effectiveness issues.  So new types of

16:46:41   4   safety and effectiveness issues would be:  Would I

16:46:44   5   analyze this -- this heating device in a different

16:46:47   6   manner than I would this other device?  What would I

16:46:49   7   look at from an engineering point of view, from an

16:46:53   8   electrical safety point of view different from any

16:46:56   9   other heating device, from any water cooling/heating

16:46:59   10  device?  And -- and the fact of the matter is there --

16:47:02   11  there's no fundamental differences in the assessment,

16:47:06   12  so there's no new types of issues to be -- to be

16:47:08   13  asked.

16:47:08   14       Q.   With regard to the Mistral-Air, can you give

16:47:10   15  me an opinion within a degree of reasonable scientific

16:47:12   16  certainty regarding any new, enhanced hazards posed by

16:47:17   17  the device?

16:47:18   18       A.   Enhanced hazards?

16:47:19   19       Q.   Sure.  Things in ways that it's more

16:47:22   20  hazardous than the Bair Hugger.

16:47:23   21       A.   Well I'm not saying it's more hazardous, I'm

16:47:28   22  saying there may be new hazards.

16:47:29   23       Q.   All right.  Then let's talk about that.  Can

16:47:30   24  you give me an opinion within a reasonable degree of

16:47:33   25  scientific certainty regarding the existence of new

363

16:47:38   1   hazards in the Mistral-Air device?

16:47:39   2       A.   Well again, I'd have to again go through the

16:47:42   3   exercise of pulling up the device and looking at its

16:47:45   4   characteristics compared to the Bair Hugger.  I did

16:47:46   5   identify some differences in technology which would

16:47:50   6   be -- raise potentially new risks which would have to

16:47:53   7   be assessed.

16:47:54   8       Q.   Can -- can you give me an example of one?

16:47:56   9   Like what could be changed in the Mistral that makes a

16:47:59   10  new hazard?

16:48:01   11      A.   New or different hazards?  It could be the

16:48:04   12  power consumption, electrical characteristics.  The --

16:48:11   13  the operating characteristics of the device itself may

16:48:14   14  have an impact upon the application of heat, so the

16:48:19   15  functional characteristics.  So it's -- it's a matter

16:48:22   16  of -- of not just design but function, and if it's --

16:48:26   17  and where it's different, those may present

16:48:30   18  modifications of hazards.

16:48:31   19      Q.   Okay.  Those are reasons that --

16:48:34   20           Those are ways that it could present new

16:48:34   21  hazards.

16:48:35   22      A.   Sure.

16:48:36   23      Q.   Do you know any ways it does?

16:48:37   24      A.   Well that would require further analysis.

16:48:38   25      Q.   And that's not analysis you've done.

364

16:48:41   1      A.    No.

16:48:41   2      Q.    Okay.

16:48:41   3      A.    No.

16:48:41   4      Q.    For instance, you're not a biomedical

16:48:43   5  engineer; are you?

16:48:44   6      A.    No.  No.  My -- my master's degree is in

16:48:47   7  physiology with an emphasis in biomedical

16:48:51   8  engineering, --

16:48:51   9      Q.    Okay.

16:48:51   10     A.    -- but it's not an engineering degree.

16:48:53   11     Q.    Now Dr.  David, who is a biomedical

16:48:55   12  engineer, gave an opinion that for each of these

16:48:57   13  devices, they are most likely safer and as effective

16:49:00   14  as the Bair Hugger.  You aren't going to be giving

16:49:03   15  opinions to the contrary based on reasonable

16:49:06   16  engineering certainty; are you?

16:49:08   17     A.    No.  But he provides no foundation for his

16:49:11   18  statement.

16:49:11   19     Q.    I understand you have criticisms.  I'm not

16:49:15   20  asking you that.  What I'm asking is a very simple

16:49:18   21  question, is if you can give me an opinion to a degree

16:49:19   22  of medical or scientific certainty that these devices

16:49:22   23  are not safer and as effective than the Bair Hugger.

16:49:28   24     A.    I have -- don't have that in my report.

16:49:30   25     Q.    Okay.  You -- you understand what the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

365

| | | |
|---|---|---|
| 16:49:39 | 1 | Tablegard system is. |
| 16:49:40 | 2 | A.   Yeah.   That's one of those devices. |
| 16:49:42 | 3 | Q.   That's another one that's been held |
| 16:49:44 | 4 | substantially equivalent to the Bair Hugger. |
| 16:49:45 | 5 | A.   Correct. |
| 16:49:46 | 6 | Q.   Okay.   That's a device that uses a -- an air |
| 16:49:48 | 7 | blower like the Bair Hugger. |
| 16:49:51 | 8 | A.   I'll have to research it again.   I don't |
| 16:49:53 | 9 | recall the specifics of it. |
| 16:49:55 | 10 | Q.   Well let's -- let's just take a look at it |
| 16:49:57 | 11 | in Dr. David's report.   Do you have that in front of |
| 16:50:00 | 12 | you? |
| 16:50:00 | 13 | A.   Let's see. |
| 16:50:01 | 14 | Q.   If not, I can give you a copy. |
| 16:50:03 | 15 | A.   No.   I probably have it. |
| 16:50:05 | 16 | Q.   Here you go. |
| 16:50:06 | 17 | A.   Okay. |
| 16:50:12 | 18 | Q.   All right.   You see that little product |
| 16:50:14 | 19 | right there? |
| 16:50:15 | 20 | A.   Right.   Right. |
| 16:50:15 | 21 | Q.   Okay.   Does that refresh your memory as to |
| 16:50:19 | 22 | what the Tablegard is? |
| 16:50:20 | 23 | A.   Right. |
| 16:50:22 | 24 | Q.   Okay.   That product has an air blower in it; |
| 16:50:24 | 25 | right? |

366

16:50:24   1        A.   As far as I recall.

16:50:25   2        Q.   It warms the air.  Correct?

16:50:30   3        A.   Yes.

16:50:31   4        Q.   Distributes that air to the area of the

16:50:34   5   patient on the operating table.

16:50:35   6        A.   Right.

16:50:35   7        Q.   It does so with the intent to combat

16:50:38   8   operative hypothermia; correct?

16:50:41   9        A.   Okay.

16:50:42   10        Q.   You agree with that.

16:50:43   11        A.   Yeah.  It's substantially equivalent, so

16:50:46   12   yes.

16:50:46   13        Q.   Yeah.  That device uses, instead of an air-

16:50:51   14   circulation system, that is a closed-air system.

16:50:54   15        A.   It's recirculating.

16:50:55   16        Q.   Right.

16:50:56   17        A.   Right.

16:50:56   18        Q.   And you will agree with me you have seen in

16:51:00   19   Dr. David's report 3M has actually investigated how to

16:51:03   20   make the Bair Hugger a closed/recirculating system.

16:51:08   21        A.   One of the ideations are you referring to?

16:51:14   22        Q.   A couple of things, but sure.

16:51:14   23             Are you familiar with what Project Chameleon

16:51:17   24   is?

16:51:17   25        A.   Chameleon.  You know, that doesn't ring a

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

367

| | | |
|---|---|---|
| 16:51:20 | 1 | bell -- |
| 16:51:20 | 2 | Q.  Okay. |
| 16:51:21 | 3 | A.  -- offhand. |
| 16:51:21 | 4 | Q.  Okay. |
| 16:51:22 | 5 | MS. EATON:  And let me just go back and |
| 16:51:24 | 6 | object to two questions ago. |
| 16:51:25 | 7 | MR. BANKSTON:  To two questions ago. |
| 16:51:26 | 8 | MS. EATON:  When you were characterizing Dr. |
| 16:51:29 | 9 | David's report. |
| 16:51:31 | 10 | MR. BANKSTON:  I don't even know what I |
| 16:51:31 | 11 | said. |
| 16:51:31 | 12 | MS. EATON:  I'm just objecting to the form. |
| 16:51:34 | 13 | MR. BANKSTON:  Okay. |
| 16:51:35 | 14 | BY MR. BANKSTON: |
| 16:52:05 | 15 | Q.  I want to talk to you a little bit about how |
| 16:52:07 | 16 | your report is organized, and so I think a -- a good |
| 16:52:09 | 17 | place to -- to go off on these questions is to look at |
| 16:52:12 | 18 | your report in the table of contents.  I'm going to be |
| 16:52:17 | 19 | asking you some questions about your headings. |
| 16:52:17 | 20 | A.  Sure. |
| 16:52:20 | 21 | Q.  And you have a -- a background section, a |
| 16:52:24 | 22 | qualifications/credentials-type section, those sorts |
| 16:52:28 | 23 | of introductions into the report; right? |
| 16:52:31 | 24 | A.  Yes. |
| 16:52:31 | 25 | Q.  Okay.  And I'm -- |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

368

16:52:32  1          After that we get to a section that's

16:52:34  2  labeled Roman numeral Section VII, and that's the

16:52:36  3  methodology and opinions; correct?

16:52:38  4      A.   Correct.

16:52:39  5      Q.   This is the section of your report where

16:52:41  6  your opinions are summarized.

16:52:42  7      A.   Yes.

16:52:42  8      Q.   All of your opinions in this case, the

16:52:44  9  opinions you're offering affirmatively in this case,

16:52:47  10  are summarized within this one-to-13 list; correct?

16:52:50  11      A.   That -- that's my core opinions, followed by

16:52:55  12  an additional rebuttal of Dr. David, yes.

16:52:57  13      Q.   Correct.  On -- and that's my next question.

16:53:00  14  On -- on VIII it is titled "SUMMARY REBUTTAL OF ALL

16:53:03  15  OF" -- excuse me -- "SUMMARY REBUTTAL OF DR. DAVID'S

16:53:06  16  LEGAL CONCLUSIONS AND RESPONSE TO PLAINTIFFS APRIL '17

16:53:11  17  CONCLUSIONS."

16:53:12  18          The April '17 conclusions, do you know what

16:53:15  19  that refers to?

16:53:18  20          MS. EATON:  Do you mean April 2017?

16:53:18  21          MR. BANKSTON:  Yeah, yeah, that's what I

16:53:19  22  mean.

16:53:20  23      A.   I think -- I think that was the plaintiffs'

16:53:23  24  summation of their position on the aspects of their

16:53:29  25  case.  It was a seven- or eight- or nine-point --

369

16:53:33    1        Q.    That would be the punitive damage motion

16:53:35    2    we've been looking at today?

16:53:36    3        A.    Right.  Right.

16:53:37    4        Q.    Okay.

16:53:37    5        A.    Right.

16:53:38    6        Q.    All right.  So --

16:53:39    7              And I want to go through these 13 opinion

16:53:41    8    areas, okay, and ask you some questions about them.

16:53:44    9        A.    Sure.

16:53:44   10        Q.    Okay.  So the first one is, "It is my

16:53:48   11    opinion that safety and effectiveness factored into

16:53:50   12    FDA's review of every Bair Hugger 510(k);" correct?

16:53:53   13        A.    Correct.

16:53:54   14        Q.    Okay.  And continuing on with 510(k)

16:53:57   15    opinions, your second opinion is, "It is my opinion

16:54:00   16    that the Traditional 510(k)s for the Bair Hugger

16:54:04   17    Models 505 and 750 met all FDA premarket requirements,

16:54:09   18    recommendations of guidance, and industry standards.

16:54:12   19    FDA orders clearing these devices were -- provided, in

16:54:15   20    part, reasonable assurance that the Bair Huggers were

16:54:18   21    safe and effective;" correct?

16:54:19   22        A.    Correct.

16:54:21   23        Q.    All right.  Now these are legal conclusions;

16:54:22   24    correct?

16:54:22   25              MS. EATON:  Object to the form of that

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

370

16:54:24   1   question.

16:54:24   2        A.   Well these are regulatory opinions.

16:54:25   3        Q.   That's law; right?

16:54:26   4        A.   Huh?

16:54:27   5        Q.   Regulations are laws passed by the

16:54:30   6   government.

16:54:30   7        A.   No.  Regulations are -- implement the laws

16:54:33   8   passed by the government.

16:54:33   9        Q.   Okay.  It's --

16:54:35   10            Part of the legal structure of our country

16:54:36   11  is we have a regulatory regime.

16:54:38   12       A.   Yes.

16:54:38   13       Q.   Okay.

16:54:39   14       A.   And so I administer my duties at FDA on --

16:54:43   15  according to the regulations.

16:54:45   16       Q.   Okay.  And you have also given the opinion

16:54:47   17  in -- in these two subheadings that the 510(k) process

16:54:51   18  itself evaluates and makes judgment calls on safety

16:54:56   19  and effectiveness; correct?

16:54:57   20       A.   My opinion is clear, that safety and

16:55:01   21  effectiveness factors into 510(k) reviews.

16:55:03   22       Q.   Okay.

16:55:03   23       A.   And I explain that.

16:55:04   24       Q.   Now that's the -- that's the opinion about

16:55:07   25  the effect of the regulations that has been prohibited

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

371

16:55:10   1    on several occasions.

16:55:11   2        A.   No.

16:55:12   3        Q.   You don't think so.

16:55:14   4        A.   I don't think so.

16:55:14   5        Q.   Okay.  So after having dealt -- went through

16:55:19   6    that experience of having opinions limited in cases,

16:55:20   7    you don't believe that these are the same kind of

16:55:22   8    opinions.

16:55:23   9        A.   They are not.

16:55:23   10        Q.   Okay.  How are your opinions --

16:55:29   11        For instance, in this case regarding 510(k),

16:55:32   12    can you tell me how they're different than, say, what

16:55:35   13    was offered in Ethicon?

16:55:43   14        A.   Probably by not, in Ethicon, acknowledging

16:55:48   15    more proactively and affirmatively the difference in

16:55:52   16    the statutory and regulatory standards between

16:55:57   17    premarket approval and -- and 510(k)s, which -- which

16:56:01   18    I certainly recognize and support and believe is

16:56:05   19    entirely the case.  But -- but in these opinions, as

16:56:11   20    we've discussed when we talk about intended use, when

16:56:14   21    we talk about technology, do not the words safety and

16:56:19   22    effectiveness enter into that conversation?  Of course

16:56:20   23    they do.  And I'd further support the contention with

16:56:24   24    reference to FDA's statements that -- in guidance

16:56:29   25    documents that safety and effectiveness factors into

372

16:56:31    1    510(k) reviews.

16:56:32    2        Q.   Now I don't think we have any dispute or

16:56:34    3    quarrel between the two of us that the words safety

16:56:36    4    and effectiveness appear in 510(k) documents and are

16:56:39    5    part of 510(k) flowcharts and decision-making; right?

16:56:41    6        A.   Well I hope not.

16:56:42    7        Q.   Yeah.  I wouldn't think so.  We do --

16:56:45    8        We have had a difference today about whether

16:56:47    9    the 510(k) regime is effective at all at doing that;

            10    right?

16:56:53   11        A.   Well you've asked a couple questions that --

16:56:56   12    that allude to -- to FDA's ability to conduct its --

16:57:04   13    its evaluation process, if that's what you're asking.

16:57:06   14        Q.   And then the FDA's actual study of the

16:57:09   15    510(k) process, which was published just as you left

16:57:13   16    the agency, that also tends to find -- have some

16:57:16   17    serious criticisms of the effectiveness of the 510(k)

16:57:18   18    process in safeguarding American patients; correct?

16:57:24   19        A.   Yes, I -- I --

16:57:26   20        The IOM opinions are what they are, but my

16:57:28   21    position is you have to evaluate these devices.  We're

16:57:33   22    talking about Bair Huggers today.  Do their broad,

16:57:37   23    overarching opinions apply to the Bair Hugger?  And my

16:57:41   24    opinion is they do not.

16:57:42   25        Q.   Your number three opinion is that "It is my

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

373

16:57:45  1  opinion that after clearance of the Bair Hugger" --

16:57:49  2  excuse me.

16:57:49  3       "It is my opinion that after the clearance

16:57:50  4  of the Model 750 FDA reconfirmed the safety and

16:57:54  5  effectiveness of the Bair Hugger forced air technology

16:57:57  6  by clearing additional 510(k)s for additional uses and

16:58:00  7  new promotional claims;" correct?

16:58:02  8       A.   Right.

16:58:03  9       Q.   That's your opinion?

16:58:04  10      A.   But my point is every time FDA reviews a new

16:58:07  11  510(k), it has a renewed chance to evaluate the

16:58:10  12  technology.

16:58:11  13      Q.   My -- my question here is this is another

16:58:14  14  opinion dealing with the 510(k) process and the safety

16:58:17  15  ramifications of it; correct?

16:58:19  16      A.   Right.  That safety and effectiveness

16:58:22  17  factors into those 510(k) reviews, also relying upon

16:58:25  18  the history of the product to that point in time.

16:58:27  19      Q.   Your number four opinion is, "It is my

16:58:30  20  opinion that FDA cleared the Model 750 with full

16:58:33  21  knowledge that the air filter to be used in the Model

16:58:36  22  750 was not a HEPA filter;" correct?

16:58:38  23      A.   Correct.

16:58:39  24      Q.   Did any of plaintiffs' experts say that FDA

16:58:41  25  thought there was a HEPA filter?

374

16:58:45  1      A.   Well this is an opinion.  I expand upon it.

16:58:53  2   And that's not the entire opinion, but --

16:58:58  3      Q.   Okay.  And if the FDA -- excuse me.  If

16:59:02  4   Arizant sent the FDA -- no.  Let's back up and do that

16:59:07  5   again.

16:59:07  6           If 3M sent the FDA a letter in December of

16:59:12  7   2016 meaning to correct information to tell the FDA

16:59:15  8   there was not a HEPA filter as the FDA had previously

16:59:18  9   reported, would you agree with me that sort of

16:59:21  10  conflicts with the idea that the FDA had full

16:59:24  11  knowledge that there wasn't a HEPA filter in the

16:59:26  12  device?

16:59:27  13          MS. EATON:  Object to the form of the

16:59:28  14  question.

16:59:30  15     A.   Yeah.  I -- I -- I don't think there was a

16:59:33  16  degree of impact of that misstatement in the re --

16:59:38  17  EIR, so --

16:59:38  18     Q.   Well I don't --

16:59:39  19          I'm not concerned about its impact.  What I

16:59:43  20  want to know is if the FDA is stating in its official

16:59:45  21  publications that the Bair Hugger has a HEPA filter,

16:59:47  22  doesn't that kind of contradict the opinion that they

16:59:50  23  had full knowledge it doesn't have a HEPA filter?

16:59:52  24          MS. EATON:  Object to the form of the

16:59:53  25  question.

375

16:59:54  1    A.    I stand by my opinion.  When they cleared

16:59:56  2  the 750, it was clear they knew it wasn't going to be

16:59:59  3  a HEPA filter, they knew it was going to have the .2

17:00:01  4  micron characteristics of the prior filters.

17:00:05  5    Q.    Now the other part of that opinion of four

17:00:08  6  that continues over is, "There is no FDA regulatory

17:00:12  7  requirement for a warming device to meet a specific

17:00:16  8  air filter standard."

17:00:16  9    A.    That's correct.  Nor is there any other

17:00:18  10  industry standard for that matter.

17:00:20  11    Q.    Okay.  And you have told me that you're not

17:00:26  12  in any way knowledgeable about what air filters are

17:00:29  13  required or what air filters are standard inside of

17:00:33  14  orthopedic operating rooms; correct?

17:00:35  15    A.    Well I'd have to evaluate -- re-evaluate

17:00:42  16  what I -- what I did for -- to examine HEPA filters

17:00:46  17  and the classifications and other data on hospital use

17:00:51  18  of filters, so -- and -- and that --

17:00:55  19        It's in fact evolving, even as deposition

17:00:59  20  testimony is provided, that standards committees are

17:01:01  21  reassessing what their requirements should be.

17:01:04  22    Q.    So I'm still confused.  Do you know or do

17:01:07  23  you not know or have any information?

17:01:08  24    A.    Well I think I may have known, I just -- I

17:01:11  25  just don't recall.

376

17:01:11    1        Q.    Okay.

17:01:12    2        A.    Because I did investigate filtration

17:01:15    3    standards and classifications and -- and usage because

17:01:20    4    there -- there are standards related to that, and

17:01:23    5    usage conditions.

17:01:24    6        Q.    All right.  But that's not something you've

17:01:27    7    relied on for your report today.

17:01:28    8        A.    Well I did to a degree, because I recall

17:01:34    9    looking at the industry standard for MERV and

17:01:40   10    application of MERV, so -- so yes, I did look at these

17:01:44   11    things and refer to them in my report.

17:01:45   12        Q.    Right.  Well --

17:01:45   13            And I understand that you were citing a -- a

17:01:48   14    MERV specification for general surgeries.  What I --

17:01:52   15    what I'm trying to understand is I believe we had

17:01:55   16    discussed earlier you were not familiar with any

17:01:58   17    standards for filtration in an ultraclean orthopedic

17:02:00   18    procedure.

17:02:01   19        A.    No.  I don't --

17:02:03   20            MS. EATON:  Object to the form of that

17:02:03   21    question.

17:02:03   22        A.    No.  I don't know which -- what exists,

17:02:06   23    what's generally applied by industry in -- in

17:02:09   24    healthcare facilities.

17:02:10   25        Q.    Okay.  Your next opinion, number five, is

377

17:02:13  1   it's your opinion that design history files for the

17:02:17  2   Bair Hugger models 505 and 750 provide reasonable

17:02:19  3   assurance of safety and effectiveness of the designs

17:02:23  4   of these devices; correct?

17:02:23  5        A.   Correct.

17:02:23  6        Q.   Okay.  We've talked a little bit about that;

17:02:26  7   correct?

17:02:26  8        A.   Yes.

17:02:26  9        Q.   Okay.  Number six is, "It is my opinion

17:02:29 10   there was no unacceptable risk or regulatory

17:02:32 11   imperative prompting Arizant to modify the Model 750

17:02:36 12   to include a filter at the distal end of the air

17:02:39 13   supply hose or a silver coating to the interior of the

17:02:43 14   hose."  Did I read that correct?

17:02:45 15        A.   Correct.

17:02:45 16        Q.   Okay.  So when we say that there was no

17:02:49 17   regulatory imperative, nothing in the law required

17:02:52 18   them to have an alternative design; right?

17:02:54 19        A.   Right.  There was no recall or documented

17:02:59 20   patient harm that -- that would drive this

17:03:03 21   manufacturer to make a design change.

17:03:04 22        Q.   Okay.  But in terms of the risk that may

17:03:07 23   have imposed, that's not something medically you can

17:03:09 24   speak about; right?

17:03:12 25        A.   I would speak to MDR reports, literature

378

17:03:16   1   reports that would be -- be brought to bear, but not

17:03:18   2   as a clinical clinician assessing those data.

           3        Q.   Okay.

17:03:23   4        A.   If you understand what I'm saying.

17:03:25   5        Q.   Right.  And that's not an engineering

17:03:26   6   opinion either; correct?

17:03:27   7        A.   It's not an engineering opinion, no.

17:03:30   8        Q.   Okay.  And number seven, "It is my opinion

17:03:32   9   that the MedWatch reports to FDA in 2016 from Dr.

17:03:37  10   Augustine and his company, all of which were third

17:03:40  11   hand voluntary reports based on Dr. Augustine aided

17:03:44  12   litigation, are biased, incomplete, and unverified.

17:03:48  13   3M had a -- has a reasonable regulatory basis for not

17:03:53  14   reporting litigation-based events to the FDA

17:03:56  15   concerning allegations of infections associated with a

17:03:59  16   Air -- with a Bair Hugger."  Correct?

17:04:02  17        A.   Correct.

17:04:02  18        Q.   Okay.  When it comes to reporting litigation

17:04:07  19   events to the FDA concerning allegations of

17:04:11  20   infections, nobody on the plaintiffs' side is talking

17:04:13  21   about that, right, that you're responding to?

17:04:17  22        A.   Oh, we -- we kind of went through this.  If

17:04:20  23   you want to cover the same ground --

17:04:23  24        Q.   Just a little bit.

17:04:29  25             This isn't rebuttal to anybody is what I'm

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

379

17:04:31  1  saying.

17:04:31  2      A.   No.  Well --

17:04:34  3           MS. EATON:  Object to the form of the

17:04:34  4  question.

17:04:34  5      A.   You know, I think as I answered, there is

17:04:36  6  enough in the complaint and -- and even Dr. David's

17:04:42  7  report that opens the door to the need -- and

17:04:48  8  deposition testimony and questions that you on

17:04:50  9  plaintiffs' side have asked, for me to -- to have

17:04:54  10  found it necessary to explore that.

17:04:56  11      Q.   Okay.  And -- and one of those things that

17:05:00  12  this does, though, directly address is plaintiffs'

17:05:03  13  complaint.  You --

17:05:04  14           This is meant to rebut or address the

17:05:08  15  allegations made in plaintiffs' complaint.

17:05:10  16      A.   The regulatory aspects, yes.

17:05:12  17      Q.   Okay.  Number eight is, "It is my opinion

17:05:16  18  that the labeling for the Bair Hugger Models 505 and

17:05:19  19  750 met regulatory requirements and are consistent

17:05:21  20  with industry standards."  And that "There is no basis

17:05:23  21  to find the labeling misbranded."  Do you remember

17:05:25  22  that?

17:05:26  23      A.   Correct.

17:05:26  24      Q.   Okay.  That's one we talked pretty

17:05:29  25  extensively about; right?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

380

17:05:31    1        A.    Yes.

17:05:31    2        Q.    Do you remember our discussions on that?

17:05:32    3        A.    Yes.

17:05:32    4        Q.    Okay.   Are you going to have any opinions

17:05:42    5    about the warning in labeling of the model 200?

17:05:45    6    Because I don't see that in the report.

17:05:48    7        A.    No, I didn't address that.

17:05:48    8        Q.    Okay.   Number nine opinion, "It is my

17:05:57    9    opinion that a 2010 Warning Letter from FDA to

17:06:01   10    Arizant, Incorporated did not result in any

17:06:05   11    observation regarding MDRs for complaints of infection

17:06:08   12    and the findings in the letter which were quickly

17:06:11   13    resolved does not undermine the reasonable assurance

17:06:13   14    of safety and effectiveness of the Bair Hugger."

17:06:16   15    That's your opinion?

17:06:17   16        A.    Yes, it is.

17:06:18   17        Q.    Okay.   Now that's also another one that is

17:06:20   18    addressed to the extent it's responding to something

17:06:23   19    in the plaintiffs' complaint; correct?

17:06:26   20        A.    Right.   I think Dr. David talks about that

17:06:31   21    inspection again.

17:06:31   22        Q.    Well we'll --

17:06:32   23            Actually, when we're done here, I'm going to

17:06:34   24    have you look for that in terms of is there any

17:06:36   25    discussion of the warning letter from Dr. David.

381

17:06:39  1      A.   Well as I said, it's part and parcel.  I --

17:06:42  2  I find it difficult to separate --

17:06:46  3      Q.   The inspection -- -

17:06:47  4      A.   -- the inspection and observations from the

17:06:50  5  ultimate disposition by FDA.

17:06:51  6      Q.   It's difficult for you to separate the

17:06:53  7  infections from the burns.  They're all part of the

17:06:56  8  same thing.

17:06:57  9          MS. EATON:  Object to the form of the

17:06:58  10 question.

17:06:58  11     A.   That's not what I said.

17:07:01  12     Q.   Okay.  I'm asking you if that's true.

17:07:04  13     A.   Well I looked at the purpose of the

17:07:07  14 inspection and what was found and what FDA ultimately

17:07:10  15 thought about.  Because the 483 is not conclusions of

17:07:14  16 FDA; you have to look at the warning letter to see the

17:07:17  17 conclusions of it.

17:07:18  18     Q.   Okay.  So when looking at the warning

17:07:20  19 letter, there is information in it that relates to

17:07:23  20 infections; correct?

17:07:24  21     A.   In the --

17:07:26  22          No, there's no --

17:07:27  23     Q.   There's --

17:07:28  24          You don't believe in the warning letter that

17:07:30  25 there's any information suggesting that there was an

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

382

17:07:32  1   inspection of Arizant's facility for infection

17:07:36  2   concerns.

17:07:36  3       A.   Well it would have been relevant because

17:07:39  4   they would be looking at MDR reporting generally.

17:07:41  5       Q.   Okay.  Well let's look at --

17:07:43  6            Then so you'll agree with me the -- the

17:07:45  7   warning letter that you're discussing, the 2010

17:07:48  8   warning letter, has nothing to do with infection.

17:07:50  9       A.   I don't think that was the focus of it.

17:07:52  10      Q.   Right.  No, I'm -- I'm totally agreeing with

17:07:55  11  you there.

17:07:55  12      A.   Right.

17:07:55  13      Q.   That has nothing to do with --

17:07:56  14      A.   2016 it was certainly relevant.

17:07:58  15      Q.   Sure, sure.

17:08:01  16           So when Dr. David is talking about the

17:08:01  17  inspection establishment report -- rather,

18  establishment inspection report --

19           Is that how you say it?

20      A.   Establishment inspection report.

17:08:02  21      Q.   When he's talking about that, he's talking

22  about the inspection of the facility for infection

17:08:15  23  issues; correct?

17:08:15  24      A.   No.  I -- he --

17:08:16  25           You know, I might be incorrect here, but he

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

383

17:08:19  1   addressed -- he refers to the 2009 inspection.

17:08:22  2       Q.   Right.  And yeah, I think we're on the same

17:08:23  3   page.

17:08:24  4       A.   So, you know, the inspection is what it is

17:08:27  5   and what was found and what FDA responded to, so since

17:08:31  6   he addressed it in -- in -- in negative terms, I

17:08:36  7   believe, you know, I felt it necessary to put the

17:08:41  8   proper regulatory perspective on that.

17:09:13  9       Q.   Your next opinion is number 10, "It is my

17:09:16  10  opinion that in a 2012 Warning Letter to Augustine

17:09:22  11  Biomedical & Design, LLC the FDA repudiated claims

17:09:27  12  against the Bair Hugger made by Augustine Biomedical &

17:09:31  13  Design, LLC;" correct?

17:09:32  14       A.   Correct.

17:09:33  15       Q.   Okay.  Now again, this is one of those

17:09:35  16  things that is directed at the plaintiffs' complaint,

17:09:37  17  if anything, not a plaintiffs' expert report; correct?

17:09:40  18            MS. EATON:   Object to the form of the

17:09:41  19  question.

17:09:41  20       A.   Well I'll have to look at the --

17:09:43  21            Because I usually preface with some --

17:09:46  22       Q.   Sure.  Yeah.  If you want to flip to page

17:09:48  23  77.

17:09:48  24       A.   I will.

17:09:49  25       Q.   And if you can tell me, does any plaintiffs'

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

384

17:09:51   1   expert discuss the 2012 warning letter?

17:10:01   2        A.    Perhaps not, but I found it relevant because

17:10:04   3   it's all part and parcel of the same issue of Dr.

17:10:12   4   Augustine's claims against the Bair Hugger.

17:10:13   5        Q.    Correct.  And -- and I think what we may be

17:10:15   6   able to agree on is that while maybe not relevant

17:10:18   7   directly to a specific expert report, it is in your

17:10:23   8   opinion relevant to the general subject matter of the

17:10:25   9   case.

17:10:25  10        A.    Correct.

17:10:27  11        Q.    Okay.  Thank you.

17:10:27  12        A.    Correct.

17:10:28  13        Q.    Number 11 is, "It is my opinion that

17:10:33  14   CDC/HICPAC and FDA meeting discussions concerning a

17:10:39  15   heater-cooler device are unrelated to forced air

17:10:43  16   warming devices;" correct?

17:10:44  17        A.    Correct.

17:10:44  18        Q.    We haven't gotten to talk much about the

17:10:47  19   heater/cooler today; have we?

17:10:48  20        A.    No.

17:10:49  21        Q.    I don't think it's come up really.

17:10:50  22        A.    No.

17:10:50  23        Q.    Let's talk about that for a minute right

17:10:53  24   now.  You understand that there are --

17:10:55  25             This is the part that I think you would

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

385

17:10:57   1   agree that is addressed not just to Dr. David but

17:11:00   2   at -- at Dr. William Jarvis as well.

17:11:02   3        A.   Right.  He speaks to it.

17:11:04   4        Q.   Okay.  And in Dr. Jarvis's professional

17:11:07   5   clinical opinion, there are -- there is relevance to

17:11:11   6   the heater/cooler unit.  That's what he believes;

17:11:15   7   correct?

17:11:16   8        A.   He has a different opinion.

17:11:18   9        Q.   Right.  And that's what his opinion is, and

17:11:20   10  that's the opinion you're going to address, is his

17:11:24   11  opinion that those are relevant to the Bair Hugger;

17:11:26   12  correct?

17:11:26   13       A.   Right.  And -- and Dr. David talks -- speaks

17:11:29   14  to it as well.

17:11:30   15       Q.   Yeah.  And I don't necessarily think --

17:11:33   16            He maybe talks to the heater/coolers, so

17:11:36   17  let's talk to the other part of HICPAC, which is the

17:11:38   18  part Dr. David talks about.  Because he doesn't really

17:11:41   19  get into the specifics of heater/cooler, but he does

17:11:43   20  talk about something from that report.  And do you

           21  remember a phrase at the FD -- the HICPAC draft minute

17:11:48   22  pad that said, "Nothing that blows air should be in an

17:11:49   23  OR, if possible?"

17:11:50   24       A.   Right.  And I think too much is made of that

17:11:53   25  in the HICPAC comments by Dr. David and Dr. Jar -- Dr.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

386

17:11:59  1   Jarvis, and I explained my reasoning in my report.

17:12:01  2        Q.   Sure, sure, absolutely.  And -- and you

17:12:03  3   wouldn't agree with that statement then, "Nothing that

17:12:05  4   blows air should be in the OR, if possible."

17:12:09  5        A.   I -- I wouldn't take action based upon that

17:12:13  6   statement were I still at FDA.  It's -- it's a -- it's

17:12:17  7   a passing comment by somebody in an unsubstantiated or

17:12:22  8   undefined purpose or meaning, and -- and it's almost

17:12:27  9   an absurd comment because of course there's lots of

17:12:30  10  things blowing air in an OR, so what are you going to

17:12:33  11  do?

17:12:33  12       Q.   Well certain things have to be in an OR;

17:12:37  13  right?

17:12:37  14       A.   Right.

17:12:37  15       Q.   Yeah.  Not -- not a Bair Hugger though;

17:12:38  16  right?  You have alternative designs that don't blow

17:12:41  17  air; right?

17:12:42  18       A.   No.  No.  I think the statement --

17:12:44  19            My point is it's -- whoever made it, and

17:12:46  20  there's no attribution actually I don't think, and

17:12:49  21  it's certainly not addressed by HICPAC, --

17:12:51  22       Q.   My question --

17:12:52  23       A.   -- it's made in a statement -- let me

17:12:55  24  finish -- statement made by someone in passing,

17:12:57  25  certainly not actionable by anybody, so -- so are you

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

387

17:13:02  1  going to change the world because some -- some unknown

17:13:06  2  person made an unsubstantiated statement in one

17:13:09  3  meeting regarding a wholly different device?  So, you

17:13:13  4  know, it's just -- it's just too awkward.

17:13:17  5      Q.   My question is:  There are devices that

17:13:22  6  fulfill the same role as the Bair Hugger that do not

17:13:25  7  blow air into the operating room.

17:13:29  8      A.   Well I'll say that do not function in the

17:13:31  9  same manner as the Bair Hugger.

17:13:33  10     Q.   Okay.  There are other devices that have air

17:13:38  11  blowers that warm air that deliver heat to the patient

17:13:42  12  and accomplish the same clinical goals as Bair Hugger

17:13:45  13  that do not blow air into the operating room.  Do you

17:13:48  14  agree with that?

17:13:48  15     A.   There's a --

17:13:49  16          As I said, there's products that have

17:13:51  17  different characteristics from the Bair Hugger, may or

17:13:54  18  may not be as effective.  Who knows?  But, you know,

17:13:58  19  that's -- that's where I'll leave it.

17:13:59  20     Q.   In terms of whether they're effective or not

17:14:02  21  or safer or not than the Bair Hugger, certainly you

17:14:06  22  don't know.

17:14:06  23     A.   No.  I haven't assessed those devices --

17:14:08  24     Q.   Okay.

17:14:08  25     A.   -- to the degree necessary to take

388

17:14:11    1    conclusions.  Nor has Dr. David.

17:14:13    2            MR. BANKSTON:  I object to the

17:14:16    3    non-responsive part.

17:14:16    4        Q.    Opinion number 12 is, "It is my opinion that

17:14:19    5    Arizant appropriately monitored the literature and

17:14:23    6    other sources of information regarding its products

17:14:24    7    and investigated concerns regarding its device in

17:14:28    8    accordance with FDA post market procedures and

17:14:30    9    industry practice.  Arizant also conducted field

17:14:35   10    actions based upon postmarket information as

17:14:37   11    appropriate."  Correct?

17:14:38   12        A.    Yes.

17:14:38   13        Q.    Okay.  So the first part of this opinion I

17:14:40   14    want to make sure I understand is some of this is a

17:14:44   15    regulatory opinion, that they complied with what is

17:14:48   16    required under the FDA in terms of postmarket.

17:14:50   17        A.    Yes.  That's the purpose of my report.

17:14:53   18        Q.    Okay.  Now there's another part of this,

17:14:56   19    though, where you talk about field actions.  Is -- is

17:15:00   20    a field action something that is part of -- of

17:15:05   21    fulfilling your regulatory obligations under the FDA,

17:15:07   22    or is that something separate?

17:15:08   23        A.    No.  That's all part and parcel of the

17:15:11   24    obligations of a manufacturer --

17:15:12   25        Q.    Okay.  So --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

389

17:15:12  1      A.   -- in a postmarket --

2      Q.   So ev --

17:15:15  3      A.   -- environment.

17:15:16  4      Q.   Ev --

5      A.   Excuse me.

6      Q.   I'm sorry.  I keep doing it.

17:15:16  7           Everything in opinion 12 concerns regulatory

17:15:22  8  concerns, your regulatory opinions, and about the

17:15:25  9  company's compliance with those regulations.

17:15:27  10     A.   Yes.

17:15:27  11     Q.   Okay.  Now 13 is the additional rebuttal

17:15:33  12  opinions to Dr. David.

17:15:34  13     A.   Right, where I -- where I walk through his

17:15:37  14  report page by page and identify areas I believe

17:15:45  15  require comment and rebuttal and that were not

17:15:48  16  contained previously in the other opinions.

17:15:50  17     Q.   Okay.  So that was at page 85 to 109 in

17:15:54  18  opinion 13.

17:15:54  19     A.   Correct.

17:15:57  20     Q.   And then we get to section VIII, Roman

17:15:57  21  numeral VIII, and that's also a rebuttal of Dr.

17:16:00  22  David's conclusions, in part; right?

17:16:02  23     A.   Right.  Because in sum, as he concluded his

17:16:06  24  report, or -- and partially embodied in the report, he

17:16:11  25  made -- he made regulatory conclusions regarding the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

390

17:16:15  1  product, and -- and I wanted to put that -- that

17:16:19  2  process in proper perspective and to -- and to rebut

17:16:23  3  that in -- in a summation form.

17:16:26  4      Q.   Okay.  I want to talk to you real quickly

17:16:28  5  about some of your -- some of these additional

17:16:32  6  rebuttal opinions that you identify in 13.

17:16:33  7      A.   Sure.

17:16:34  8      Q.   And because it's not spelled out in the

17:16:38  9  table of contents.

17:16:38  10     A.   Correct.

17:16:38  11     Q.   I just wanted to ask you about a couple of

17:16:39  12  them.

17:16:39  13     A.   Sure.

17:16:40  14     Q.   First of all, is -- you understand he -- he

17:16:42  15  took a look at an eBay device --

          16     A.   Yes.

17:16:44  17     Q.   -- that he bought?

17:16:44  18     A.   Yes.

17:16:45  19     Q.   And I think you say that it doesn't

17:16:49  20  represent a service device currently in use or you

17:16:52  21  don't even know it's within its specifications.  It's

17:16:55  22  not -- you can't use it to prove anything.  Is that

17:16:58  23  basically true?

17:16:59  24     A.   Right.  It's -- it's -- it's only --

17:17:01  25          I mean you can take at gross look at it, but

391

17:17:04  1   it's -- you can't make -- render a conclusion based on

17:17:06  2   it.

17:17:06  3          He didn't describe his methodology, the

17:17:10  4   foundation for his statements in -- in many regards,

17:17:13  5   so --

17:17:14  6      Q.   Well he -- he in fact says the same exact

17:17:16  7   thing; right?  "The machine is not representative of a

17:17:19  8   typical device.  Out of spec.  I -- I can't use it

17:17:20  9   to -- to make it a representation of the actual

17:17:23  10  device."

17:17:23  11     A.   Right, but yet he -- he entitles his report

17:17:27  12  a hazard analysis.

17:17:29  13     Q.   Uh-huh.

17:17:29  14     A.   Well, you know, that's -- it's a -- that's

17:17:31  15  a -- probably the most rudimentary explanation in a

17:17:36  16  hazard -- so-called hazard analysis I've ever seen, so

17:17:41  17  he -- he could probably do without it, to tell you the

17:17:43  18  truth.

17:17:44  19     Q.   Yeah.  He didn't need --

17:17:45  20     A.   Because it has no merit.

17:17:46  21     Q.   Right.  He didn't need to look at a device.

17:17:48  22     A.   Right.

17:17:50  23     Q.   The only purpose for him looking at the

17:17:51  24  device is so he could see what it looks like when you

17:17:53  25  turn it on, where the air goes.  He's not really using

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

392

17:17:58  1   it for anything; right?

17:17:58  2       A.   Well I'm not --

17:17:58  3           MS. EATON:  Object to the form of the

17:17:59  4   question.

17:17:59  5       A.   I'm not sure that's the case.  I mean he

17:18:01  6   looked at that device and -- and -- and -- and gained

17:18:05  7   opinions -- impressions of the device based on that

17:18:06  8   examination, and then he approached the rest of his

17:18:10  9   analysis.

17:18:10  10      Q.   Right.  Like one opinion that he gave was

17:18:12  11  that he could tell, from the fact that this device was

17:18:15  12  a used device, he could look at the feet of the device

17:18:19  13  and tell it had been placed on the floor; right?

17:18:21  14      A.   Fine.

17:18:21  15      Q.   Is that -- is that okay with you?  Are

          16  you --

17:18:23  17           Is that an opinion you're not okay with or

17:18:26  18  are okay with?

17:18:26  19           MS. EATON:  Object to the form of the

17:18:28  20  question.

17:18:28  21      A.   Those sorts of observations are -- are

17:18:32  22  interesting.  I -- it doesn't contribute to his hazard

17:18:36  23  analysis.

          24      Q.   Sure.

17:18:38  25      A.   None -- none of that really contributed to

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

393

17:18:39  1   his hazard analysis.

17:18:40  2       Q.    You were --

17:18:43  3       A.    But containing it in a hazard analysis

17:18:46  4   attempts to give it some importance in regard to

17:18:50  5   that -- the focus of his review.

17:18:51  6       Q.    You know where the device is used in the OR

17:18:54  7   has been somewhat of a point of contention in the

17:18:56  8   case.

17:18:56  9       A.    Yes.

17:18:57  10      Q.    Okay.  So evidence that the device was used

17:18:59  11  in a certain place is relevant; right?

17:19:03  12      A.    Not in his particular assessment.

17:19:05  13      Q.    Well he had found that Bair Huggers that are

17:19:08  14  being used in the field, here's one that has wear on

17:19:12  15  the floor, It's definitely been used on the floor.

17:19:13  16  That's relevant; right?

17:19:15  17          MS. EATON:  Object to the form of the

17:19:16  18  question.

17:19:17  19      A.    Well that's an observation, but it's not

17:19:20  20  particularly useful in regard to hazard analysis.

17:19:22  21      Q.    Okay.  Now you've never touched the device,

17:19:25  22  unlike Dr. David; right?

17:19:28  23      A.    No, I have not, --

17:19:28  24      Q.    Okay.

17:19:28  25      A.    -- because of the very same reasons I

394

17:19:29  1  describe as being problematic with Dr. David's

17:19:32  2  examination.  So if -- if you -- if you touch the

17:19:35  3  device, if you are examining the device, what -- what

17:19:37  4  is that -- what is that helping you with?  What is

17:19:39  5  that doing for you in regard to your analysis and your

17:19:42  6  report?

17:19:45  7      Q.  That's a --

17:19:45  8      A.  So --

17:19:45  9      Q.  That's a -- a question a biomedical engineer

17:19:47  10  could maybe answer for us; correct?

17:19:49  11      A.  Well I'm not without expertise in evaluating

17:19:52  12  devices, so I -- I think you have to be very careful

17:19:56  13  when requesting devices and conducting quasi-analyses

17:20:01  14  of devices for -- for dubious purposes.

17:20:04  15      Q.  Here's -- I -- here's the thing is I --

17:20:08  16  I --

17:20:08  17      I know maybe we're up in the air about who

17:20:10  18  has what expertise, so I'm not trying to tie this to

17:20:13  19  any specific person, but you agree with me you're

17:20:16  20  going to defer to experts on filtration, computational

17:20:21  21  fluid dynamics, and HVAC, on those topics.

17:20:25  22      A.  Yes.

17:20:25  23      MR. BANKSTON:  Okay.  Let's go off the

17:20:27  24  record for just a minute.

17:20:29  25      THE REPORTER:  Off the record, please.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

395

17:20:33    1            (Recess taken.)

17:28:18    2    BY MR. BANKSTON:

17:28:21    3        Q.    Okay.  On page 92, --

17:28:23    4        A.    Yes.

17:28:23    5        Q.    -- do you see the phrase that talks about

17:28:25    6    "None of the technological issues raise..."  See if

17:28:29    7    you can find that phrase for me.

17:28:30    8        A.    On page 92.

17:28:31    9        Q.    Page 92, yes, sir.  I hope I got that right.

17:28:34   10        A.    Right.  "None of the technological changes

17:28:37   11    raise new types of safety and effectiveness

17:28:40   12    questions..."

17:28:40   13        Q.    And it continues to say "and standards-based

17:28:42   14    or state of the art test methodologies enabled

17:28:46   15    assessment of the changes;" correct?

17:28:47   16        A.    Correct.

17:28:48   17        Q.    What state-of-the-art test methodologies are

17:28:51   18    you referring to?

17:28:52   19        A.    Those were electrical test standards, those

17:28:55   20    were flow standards that -- flow tests that they used,

17:29:02   21    so -- so -- so generally those are what I'm talking

17:29:05   22    about.

17:29:05   23        Q.    None of those state-of-the-art test

17:29:07   24    methodologies you were discussing in that statement,

17:29:09   25    in that opinion, refer to tests for airborne

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

396

17:29:12    1   contamination issues; correct?

17:29:13    2        A.   I -- I don't think there are or were a

17:29:18    3   state-of-the-art or standards-based test methodology.

17:29:24    4        Q.   Okay.

17:29:25    5        A.   A lot of people were winging it.

17:29:28    6        Q.   I want to --

17:29:30    7             Last thing I want to quickly ask you about

17:29:33    8   is:  Over the course of your time at the FDA --

17:29:40    9             The FDA has leadership above you; correct?

17:29:43   10        A.   Has leadership above me?

17:29:46   11        Q.   Correct.  The FDA commissioner, for example.

17:29:48   12        A.   Yes, there are -- there were persons in the

17:29:50   13   organizational chart above me, yes.

17:29:51   14        Q.   FDA commissioner helps define the mission of

17:29:57   15   the -- of the organization and help it accomplish its

17:29:57   16   mission; correct?

17:29:57   17        A.   Overall, yes.

17:29:58   18        Q.   Okay.  And affects the culture of the

17:30:00   19   organization.

17:30:01   20        A.   May or may not.  You'd be surprised how much

17:30:03   21   a new commissioner doesn't change the culture, but --

17:30:07   22   but it may have an effect.

17:30:08   23        Q.   Well let's talk about that for a minute.  I

17:30:10   24   would imagine the first commissioner that you had

17:30:12   25   pretty deep experience with, considering you began in

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

397

17:30:15  1  2003, so you came in under a commissioner who was just

17:30:18  2  leaving; correct?

17:30:20  3      A.  I came to FDA --

          4      Q.  Oh.

17:30:20  5      A.  -- in 1976.

17:30:21  6      Q.  I made a mistake.  I meant in terms of when

17:30:23  7  you came to work as a director in the Office of

17:30:26  8  Devices.

17:30:26  9      A.  Yes.

17:30:27  10     Q.  That was around 2003 that you got your

17:30:29  11 directorship?

17:30:30  12     A.  In devices?  I came to devices around 2000,

17:30:34  13 2001.

17:30:34  14     Q.  Okay.  One of the first FDA directors that

17:30:36  15 you got to know real well while being a director in

17:30:40  16 devices would have been Mark McClellan; correct?

17:30:43  17     A.  Right.  I interacted with Dr. McClellan,

17:30:46  18 yes.

17:30:46  19     Q.  Okay.  He's the brother of the press

17:30:48  20 secretary, Scott McClellan; right?

17:30:51  21     A.  He was.

17:30:51  22     Q.  Okay.  You'd agree with me that Mark

17:30:54  23 McClellan is somebody who is fairly well associated

17:30:57  24 with being a deregulation advocate; correct?

17:31:00  25     A.  Oh, I didn't --

398

17:31:00  1          I wasn't part of the politics at my level at

17:31:03  2  that point in time.

17:31:04  3      Q.   I mean you understood the fight of

17:31:05  4  deregulation in this country; correct?

17:31:08  5      A.   Well those things waxed and waned depending

17:31:11  6  on who was in -- who was in the White House.

17:31:11  7      Q.   Absolutely.  And once somebody came into the

17:31:14  8  White House who was pro regulation, that's when you

17:31:16  9  left, basically.

17:31:17  10     A.   Well I've been under so many

17:31:21  11  administrations, I -- I can't count them on two hands

17:31:22  12  any more.

17:31:22  13     Q.   All right.  Well let's move on from Mr.

17:31:25  14  McClellan.  You remember Lester Crawford; right?

17:31:28  15     A.   Sure.

17:31:28  16     Q.   Okay.  Now that's the commissioner who

17:31:31  17  resigned and was convicted of lying and violating

17:31:35  18  conflict-of-interest laws; right?

17:31:35  19     A.   I don't recall the specifics, to tell you

17:31:35  20  the truth.

17:31:36  21     Q.   Okay.  Are you familiar with Andrew von

17:31:40  22  Eschenbach?

17:31:41  23     A.   Yes.

17:31:42  24     Q.   Now I'm sure from knowing Mr. Eschenbach and

17:31:45  25  what went down with his tenure, you know about the

399

17:31:47  1  Miniflex knee implant.

17:31:49  2      A.    I have some knowledge, but not -- not

17:31:52  3  extensive knowledge of it.

17:31:52  4      Q.    You understand he overruled subordinates

17:31:55  5  based on outside influences and ordered the approval

17:32:00  6  of the Miniflex knee implant?

17:32:00  7      A.    I think there was an allegation in regard to

         8  that.

         9      Q.    Now he runs some biotech and pharma

         10  companies.  Do you have any --

         11          THE REPORTER:  Just a minute.

17:32:05  12          MR. BANKSTON:  Sure.

17:32:05  13          MS. EATON:  And let me just object to the

17:32:08  14  form of that question first.  I'm sorry.

17:32:08  15      A.    I believe there were allegations in regard

17:32:10  16  to that.

17:32:11  17      Q.    Now Mr. Eschenbach, he now runs some biotech

17:32:15  18  and pharma companies.  Do you have any relationship

17:32:17  19  with those companies?

17:32:20  20      A.    I have no idea what he's doing.

17:32:20  21      Q.    Okay.  The next administrator --

17:32:21  22          The next commissioner you had familiarity

17:32:23  23  with is Dr. Margaret Hamburg; correct?

17:32:25  24      A.    Yes.

17:32:26  25      Q.    Okay.  She's the one who came in after the

400

17:32:28  1  change of administrations and launched the IOM

17:32:30  2  committee investigation; correct?

17:32:31  3      A.    Actually, it was Dr. Jeff Shuren that

17:32:37  4  initiated the charge to the IOM and not -- and not Dr.

17:32:42  5  Hamburg.

17:32:42  6      Q.    She was commissioner at that time; correct?

17:32:44  7      A.    She was commissioner at the time.

17:32:46  8      Q.    In other words, the -- the --

17:32:47  9            After the changing over of that

17:32:49  10  administration, there was an investigation launched by

17:32:52  11  the IOM committee into whether medical device approval

17:32:56  12  was doing a good job of protecting public safety.

17:32:58  13      A.    Right.  At points in time --

17:32:59  14            FDA is constantly under scrutiny in regard

17:33:02  15  to how it's functioning.  It's -- it's probably on The

17:33:06  16  Hill more than any other agency.

17:33:07  17      Q.    Now at the time that that report was

17:33:09  18  delivered, would you agree with me it was both

17:33:12  19  generally critical of 510(k) and specifically critical

17:33:15  20  of your division, that's when you left the FDA.

17:33:17  21      A.    My division.  I -- I don't understand.

17:33:20  22      Q.    Correct.  At that time when you --

17:33:22  23            MS. EATON:  I'm sorry.  And let me object to

17:33:24  24  the form of that question.

17:33:25  25            I -- I should not be reading while we're --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

401

17:33:27  1  while you're talking.

17:33:28  2       Q.   When you were in the FDA, when you left,

17:33:31  3  what was the last position you held?

17:33:32  4       A.   The special advisor on enforcement --

17:33:35  5       Q.   Okay.

17:33:37  6       A.   -- to the commissioner.

17:33:37  7       Q.   And before that you had had jobs in Centers

17:33:39  8  for Device and Radiological Health.

17:33:41  9       A.   Correct.

17:33:42  10      Q.   And that was specifically criticized by the

17:33:46  11  IOM report.

17:33:46  12           MS. EATON:   Object to the form of the

17:33:46  13  question.

17:33:47  14      A.   Well FDA's operations were criticized as

17:33:50  15  Center for Devices and its observations.   There were

17:33:53  16  observations and findings made.

17:33:56  17      Q.   Okay.   I want to go back to the time of Mark

17:33:57  18  McClellan.   Do you remember a deputy commissioner

17:34:00  19  named Scott Gottlieb?

17:34:01  20      A.   Yes.

17:34:01  21      Q.   Okay.   Another --

17:34:04  22           Was that somebody you had regular

17:34:04  23  interactions with?

17:34:05  24      A.   At that point in time, no, I wasn't high

17:34:07  25  enough to have frequent interactions with the guy.

402

17:34:11    1        Q.    Have you had interactions with him since?

17:34:11    2        A.    No.

17:34:12    3        Q.    Okay.  You understand he's a noted

17:34:14    4   deregulation advocate too; right?

17:34:16    5             MS. EATON:   Object to the form of the

17:34:17    6   question.

17:34:17    7        A.    He's not the commissioner though.

17:34:19    8        Q.    Yeah.  I mean that's not too controversial a

17:34:22    9   statement; right?

17:34:22   10        A.    No.  I -- I think that's -- that's the

17:34:24   11   general waxing and waning of -- of regulatory

17:34:27   12   agencies.

17:34:27   13        Q.    And indeed that there has been, you will

17:34:30   14   agree over the last 17 years, some -- a lot of

17:34:34   15   fighting back and forth over what the role of the FDA

17:34:36   16   should be and what the role of medical device

17:34:39   17   regulation should be.  You would agree with that?

17:34:42   18        A.    No, I -- I wouldn't characterize it that

17:34:43   19   way.  The -- the fundamental aspects of medical device

17:34:47   20   regulation are the same as they were in '76.  There

17:34:51   21   have been modifications, but the statutory foundation

17:34:54   22   remain -- remains the same.

17:34:56   23        Q.    You wouldn't agree with me that during two

17:34:59   24   of the administrations in which you were involved in

17:35:02   25   there was a serious em -- em -- emphasis to staff the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

403

17:35:06  1  agency with people who were generally hostile or

17:35:09  2  skeptical of the agency's core goals?

17:35:11  3       A.   No, I -- I wouldn't say that's the case.

          4       Q.   Okay.

17:35:13  5       A.   Not -- not in the area where I worked, areas

17:35:15  6  where I worked.

17:35:18  7            MR. BANKSTON:  You know what?  I think --

17:35:20  8  yeah, I think that's all -- that's all the questions I

17:35:23  9  have for you today.

17:35:25  10            I'll reserve the right to continue the

17:35:26  11  deposition after a complete response to the subpoena:

17:35:31  12  notes, billings, articles, et cetera, that sort of

17:35:33  13  thing, but for the moment I'll go ahead and pass the

17:35:37  14  witness.

17:35:37  15            MS. EATON:  Mr. Bankston, there is no

17:35:39  16  incomplete response to the subpoena.  There's answers

17:35:41  17  with respect to everything.  And I did provide you

17:35:44  18  over the lunch break with the May 2017 invoice.

17:35:46  19            MR. BANKSTON:  If I get anything else, I

17:35:49  20  might want to redepose him, that's all I'm putting on

17:35:56  21  the record.

17:35:56  22            MS. EATON:  We'll go off for a moment.

17:35:59  23            THE REPORTER:  Off the record, please.

17:36:00  24            (Recess taken.)

17:50:17  25            MS. EATON:  Can you mark that for me.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

404

17:50:29  1          (Ulatowski Exhibit 10 was marked for

17:50:32  2          identification.)

17:50:32  3          MS. EATON:  Thank you.

17:50:32  4                  REDIRECT EXAMINATION

17:50:32  5  BY MS. EATON:

17:50:33  6      Q.   Mr. Ulatowski, I've marked as Exhibit 10 an

17:50:35  7  invoice for your work on this litigation and related

17:50:39  8  to this report in May of 2017; is that correct?

17:50:42  9      A.   Yes.

17:50:44  10         MS. EATON:  And Ms. Zimmerman, you would

17:50:46  11  agree that this is a document I handed to Mr. Bankston

17:50:50  12  over the lunch break; is that right?

17:50:51  13         MS. ZIMMERMAN:  Yes.

17:50:53  14         MS. EATON:  Thank you.  We just needed to

17:50:55  15  put that on the record.

17:50:57  16      Q.   Mr. Ulatowski, how much time is reflected on

17:50:59  17  this invoice?

17:51:01  18      A.   For May, 69 and a quarter hours.

17:51:06  19      Q.   Was that time spent in relation to the

17:51:09  20  review and report that we have been discussing here

17:51:12  21  today?

17:51:13  22      A.   Yes.

17:51:14  23         MS. EATON:  Okay.  And I will just state for

17:51:17  24  the record that that invoice came to me by e-mail on

17:51:19  25  Friday when I was traveling and I did not see it, so

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

405

17:51:22  1   that's why I was prompted by the discussion this

17:51:25  2   morning to look for it and produce it.

17:51:32  3       Q.   Mr. Ulatowski, in preparing your report and

17:51:35  4   expressing your opinions in this litigation, have you

17:51:38  5   used any information that you gained during your time

17:51:40  6   at FDA about the blood fluid warmer?

17:51:44  7       A.   No.

17:51:45  8           MS. ZIMMERMAN:  Object to form.

17:51:46  9       Q.   Have you used --

17:51:47  10          MS. EATON:  What is the objection?

17:51:49  11          MS. ZIMMERMAN:  It's leading.

17:51:52  12          MS. EATON:  I don't think I could make it

17:51:53  13  any less leading.

17:51:55  14      Q.   Have you used any information that you

17:51:56  15  gained during your time at FDA in expressing your

17:51:59  16  opinions in this case?

17:52:01  17      A.   Just my experience with regulations.

17:52:03  18      Q.   I'm sorry.  Specific to the devices at

17:52:05  19  issue.

17:52:06  20      A.   No.

17:52:07  21          MS. EATON:  Okay.  I would like to mark

17:52:10  22  this.

17:52:27  23          (Ulatowski Exhibit 11 was marked for

17:52:...  24          identification.)

17:52:32  25  BY MS. EATON:

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

406

17:52:32  1      Q.   Is Ulatowski Exhibit 11 the ECRI statement

17:52:39  2  that we have -- that you have been discussing here

17:52:40  3  today?

17:52:41  4      A.   Yes.

17:52:42  5      Q.   Is Exhibit 11 a document that you reviewed

17:52:46  6  in the course of your work on this case?

17:52:49  7      A.   Yes.

17:52:49  8      Q.   Is Exhibit 11 a document that you cited in

17:52:51  9  your report?

17:52:51  10     A.   Yes.

17:52:52  11     Q.   Could you please turn to the third page of

17:52:54  12 Exhibit 11.

17:53:02  13     A.   Okay.

17:53:02  14     Q.   I'm sorry, perhaps I meant the fourth page.

17:53:04  15 I want the page that has "CONCLUSIONS."  Thank you.

17:53:07  16          You see that there's a few paragraphs under

17:53:11  17 the heading "CONCLUSIONS?"

17:53:12  18     A.   Yes.

17:53:12  19     Q.   Could you please just read for us what those

17:53:15  20 paragraphs state.

17:53:16  21     A.   "Based on our focused systematic review of

17:53:20  22 the published literature, we believe that there is

17:53:23  23 insufficient evidence to establish that the use of

17:53:27  24 forced-air warming systems leads to an increase in

17:53:32  25 surgical-site infections compared to other warming

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

407

17:53:37  1  methods.  Although one study (McGovern et al.)

17:53:43  2  presents data that suggests higher PJI rates with use

17:53:51  3  of forced-air warming compared to an alternative

17:53:54  4  warming method, this study has serious limit --

17:53:57  5  limitations such that its findings on PJI rates cannot

17:54:02  6  be considered conclusive.  Studies that look at

17:54:05  7  forced-air warming's contribution to operating room

17:54:09  8  air contamination and/or airflow disruption raise

17:54:13  9  questions about the technology and its potential

17:54:16  10  impact, but they do not provide sufficient evidence to

17:54:19  11  demonstrate that the use of forced-air warming poses a

17:54:23  12  greater risk of" -- I'll use the acronym -- "SSIs or

17:54:28  13  PJIs than the use of other warming methods.

17:54:31  14          "Consequently, ECRI Institute does not

17:54:34  15  believe that the currently available evidence

17:54:37  16  justifies discontinuing the use of FAW during surgery.

17:54:43  17  We will continue to monitor this topic through the

17:54:46  18  published literature and will update our

17:54:49  19  recommendation as warranted."

17:54:51  20      Q.  Was that information important to you in

17:54:54  21  your review of this case?

17:54:55  22      A.  Yes, and -- and I included it in my report.

17:54:59  23      Q.  How was that information relevant to the

17:55:01  24  opinions you expressed in this case?

17:55:03  25      A.  Well it's an independent organization

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

408

17:55:05  1  commenting on their analysis of the -- of the data at

17:55:10  2  that point in time, in 2013, concerning the issues at

17:55:14  3  hand in this litigation.

17:55:16  4      Q.   Could you please turn to page 43 of your

17:55:18  5  report.

17:55:29  6      A.   Okay.

17:55:30  7      Q.   Nearly at the very bottom of the page you

17:55:36  8  give the opinion that --

17:55:40  9          I'm sorry.  Let me start over.

17:55:40  10         Near the bottom of page 43 you express the

17:55:43  11 opinion that you have bases -- four bases for

17:55:55  12 substantial --

17:55:56  13         I'm sorry.  Let me start over.

17:55:57  14         Really, what I want to ask about is subpart

17:56:02  15 one.  "There are no publications prior to or after the

17:56:05  16 Model 750 was cleared by FDA that have verified the

17:56:08  17 infection related to any Bair Hugger regardless of

17:56:10  18 filter media."  That is the sentence I would like you

17:56:12  19 to focus on.  Have I read that correctly?

17:56:15  20     A.   Yes.

17:56:16  21     Q.   Did you review the literature with respect

17:56:20  22 to whether people had reported an increased risk of

17:56:27  23 infection caused by the use of the Bair Hugger device?

17:56:32  24     A.   In regard to the literature?

17:56:34  25     Q.   Did you review the literature to see if

409

17:56:36  1   anyone had reported an increased risk of infection

17:56:40  2   that they attributed to the use of the Bair Hugger

17:56:42  3   device?

17:56:43  4       A.   Yes.  I looked at all -- all the literature

17:56:45  5   and the implications of the Bair Hugger and the -- the

17:56:52  6   postulations, I'll call them, that infection rates

17:56:56  7   were related, but as a -- as a -- as a portion of some

17:57:00  8   of the -- some of the studies.

17:57:02  9       Q.   Did the study authors that you reviewed

17:57:05  10  conclude that their individual studies did not

17:57:09  11  establish a causal relationship between use of the

17:57:11  12  Bair Hugger device and any increased infection risk?

17:57:14  13      A.   Right.  That was ultimately the -- the

17:57:17  14  conclusion -- or the finding because of the nature of

17:57:23  15  the studies that -- that one -- neither --

17:57:24  16           None of the studies could conclusively draw

17:57:26  17  that direct linkage from infections to the Bair

17:57:30  18  Hugger.

17:57:31  19      Q.   Was that important to the work that you did

17:57:35  20  and the opinions that you expressed in this case?

17:57:37  21      A.   Yes.  It's certainly relevant and -- and not

17:57:40  22  surprising.

17:57:42  23      Q.   Okay.  If you could turn to page 78 of your

17:57:45  24  report.

17:57:48  25      A.   Okay.

410

17:57:50   1        Q.    On page 78 you are discussing a warning

17:57:55   2   letter that was sent by the FDA to Augustine

17:58:00   3   Biomedical & Design; correct?

17:58:00   4        A.    Yes.

17:58:06   5        Q.    Is this discussion relevant to your review

17:58:11   6   of Dr. David's expressed opinions and your response to

17:58:14   7   those opinions?

17:58:15   8        A.    Yes, because the -- the claims being made by

17:58:22   9   Dr. Augustine in -- his comparative claims between his

17:58:30   10  technology and forced-air warming, and the fact that

17:58:35   11  FDA determined that his claims were without foundation

17:58:40   12  and -- and so asked him to eliminate those claims from

17:58:45   13  his products.

17:58:46   14       Q.    Were the claims that Dr. Augustine was

17:58:50   15  making related to airborne contamination and infection

17:58:54   16  risk?

17:58:56   17       A.    Yes.  He stated Bair Hugger contaminates the

17:58:59   18  sterile field, so on and so forth, in his claims.

17:59:02   19       Q.    On this page do you also cite the literature

17:59:05   20  and the ECRI analysis that we just discussed?

17:59:08   21       A.    Yes.

17:59:08   22       Q.    Have you expressed any opinion in this

17:59:17   23  report concerning how particulate emission relates to

17:59:20   24  infection risk from a scientific or medical

17:59:23   25  perspective?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

411

17:59:24  1      A.    No.

17:59:24  2      Q.    Have you focused your review of Dr. David's

17:59:27  3   report and your response to his report on regulatory

17:59:30  4   issues?

17:59:30  5      A.    That was the focus.

17:59:31  6      Q.    Have you focused your review of the punitive

17:59:35  7   damages motion and any response you made to that to

17:59:38  8   regulatory issues?

17:59:40  9      A.    That was my focus.

17:59:41  10     Q.    When you reviewed the punitive damages

17:59:46  11  motion, were you also focused on those things that

17:59:48  12  related to any opinions you had expressed?

17:59:51  13     A.    Well yes.

17:59:51  14           MS. ZIMMERMAN:   I'm going to object to form

17:59:53  15  to the extent that this witness has been identified as

17:59:55  16  a witness who has rebutting testimony.   Any kind of

17:59:59  17  legal argument that is made in a punitive damages

18:00:00  18  motion is outside the scope of any report that he has

18:00:03  19  prepared or ought to be prepared and will be

18:00:05  20  considered in this court.

18:00:10  21     Q.    Did you include in your report only opinions

18:00:12  22  that you felt qualified to express?

18:00:14  23     A.    Yes.

18:00:14  24     Q.    Did you include in your report the bases

18:00:17  25  that you felt were important and required to support

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

412

18:00:21    1    your opinions?

18:00:21    2           A.    I believe so.

18:00:22    3                 MS. EATON:  That's all I have.

18:00:24    4                 THE REPORTER:  Off the record, please.

18:00:27    5                 (Deposition concluded.)

            6

            7

            8

            9

           10

           11

           12

           13

           14

           15

           16

           17

           18

           19

           20

           21

           22

           23

           24

           25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

413

1                    C E R T I F I C A T E

2              I, Richard G. Stirewalt, hereby certify that

3    I am qualified as a verbatim shorthand reporter, that

4    I took in stenographic shorthand the deposition of

5    TIMOTHY A. ULATOWSKI at the time and place aforesaid,

6    and that the foregoing transcript is a true and

7    correct, full and complete transcription of said

8    shorthand notes, to the best of my ability.

9              Dated at Deerwood, Minnesota, this 14th day

10   of July, 2017.

11

12

13

14

15

16

17                    RICHARD G. STIREWALT

18                    Registered Professional Reporter

19                    Notary Public

20

21

22

23

24

25

414

1                    C E R T I F I C A T E

2            I, TIMOTHY A. ULATOWSKI, hereby certify that

3   I have carefully read the foregoing transcript, and

4   that the same is a true and complete, full and correct

5   transcription of my deposition, except:

6   PAGE/LINE              CHANGE              REASON

7

8

9

10

11

12

13

14

15

16

17                             TIMOTHY A. ULATOWSKI

18                             Deponent

19

20       Signed and sworn to before me this _____ day of

21   August, 2017.

22

23                   _____

24                   Notary Public

25

# EXHIBIT DX6

**TO DECLARATION OF BRIDGET M. AHMANN
IN SUPPORT OF DEFENDANTS' MEMORANDUM IN
OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE
OPINIONS AND TESTIMONY OF TIMOTHY ULATOWSKI**



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Public Health Service

Food and Drug Administration
9200 Corporate Boulevard
Rockville MD 20850

JUN 17 1996

Scott D. Augustine, M.D., CEO
Augustine Medical, Inc.
10393 West 70th Street
Eden Prairie, Minnesota  55344

Re:  K960167
     Bair Hugger Model 505 Warming Unit/Bair Hugger Blankets
     Regulatory Class:  II (Two)
     Product Code:  74DWJ
     Dated:  May 10, 1996
     Received:  May 14, 1996

Dear Dr. Augustine:

We have reviewed your Section 510(k) notification of intent to market
the device referenced above and we have determined the device is
substantially equivalent (for the indications for use stated in the
enclosure) to devices marketed in interstate commerce prior to
May 28, 1976, the enactment date of the Medical Device Amendments, or
to devices that have been reclassified in accordance with the
provisions of the Federal Food, Drug, and Cosmetic Act (Act).  You
may, therefore, market the device, subject to the general controls
provisions of the Act.  The general controls provisions of the Act
include requirements for annual registration, listing of devices, good
manufacturing practice, labeling, and prohibitions against misbranding
and adulteration.

If your device is classified (see above) into either class II (Special
Controls) or class III (Premarket Approval), it may be subject to such
additional controls.  Existing major regulations affecting your device
can be found in the <u>Code of Federal Regulations</u>, Title 21, Parts 800
to 895.  A substantially equivalent determination assumes compliance
with the Good Manufacturing Practice for Medical Devices:  General
(GMP) regulation (21 CFR Part 820) and that, through periodic GMP
inspections, the Food and Drug Administration (FDA) will verify such
assumptions.  Failure to comply with the GMP regulation may result in
regulatory action.  In addition, FDA may publish further announcements
concerning your device in the <u>Federal Register</u>.  Please note:  this
response to your premarket notification submission does not affect any
obligation you might have under sections 531 through 542 of the Act
for devices under the Electronic Product Radiation Control provisions,
or other Federal laws or regulations.

3MBH00047138

Page 2 - Scott D. Augustine, M.D., CEO


This letter will allow you to begin marketing your device as described in your 510(k) premarket notification. The FDA finding of substantial equivalence of your device to a legally marketed predicate device results in a classification for your device and thus, permits your device to proceed to the market.


If you desire specific advice for your device on our labeling regulation (21 CFR Part 801 and additionally 809.10 for _in vitro_ diagnostic devices), please contact the Office of Compliance at (301) 594-4646. Additionally, for questions on the promotion and advertising of your device, please contact the Office of Compliance at (301) 594-4639. Also, please note the regulation entitled, "Misbranding by reference to premarket notification" (21 CFR 807.97). Other general information on your responsibilities under the Act may be obtained from the Division of Small Manufacturers Assistance at its toll-free number (800) 638-2041 or at (301) 443-6597.

            Sincerely yours,

            Thomas J. Callahan, Ph.D.
            Director
            Division of Cardiovascular, Respiratory,
              and Neurological Devices
            Office of Device Evaluation
            Center for Devices and
              Radiological Health


Enclosure

# EXHIBIT DX7

**TO DECLARATION OF BRIDGET M. AHMANN
IN SUPPORT OF DEFENDANTS' MEMORANDUM IN
OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE
OPINIONS AND TESTIMONY OF TIMOTHY ULATOWSKI**



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Public Health Service

Food and Drug Administration
9200 Corporate Boulevard
Rockville MD 20850

SEP - 6 2000

Augustine Medical
c/o David Westlin
Director of Regulatory Affairs and
Quality Assurance
10393 West 70ᵗʰ Street
Eden Prairie, MN 55344

Re:  K001149
     The Bair Hugger® Model 750 Total Temperature
       Management® System
     Regulatory Class: II Two
     Product Code: DWJ
     Dated:  July 19, 2000
     Received:  July 21, 2000

Dear Mr. Westlin:

We have reviewed your Section 510(k) notification of intent to market
the device referenced above and we have determined the device is
substantially equivalent (for the indications for use stated in the
enclosure) to legally marketed predicate devices marketed in
interstate commerce prior to May 28, 1976, the enactment date of the
Medical Device Amendments, or to devices that have been reclassified
in accordance with the provisions of the Federal Food, Drug, and
Cosmetic Act (Act). You may, therefore, market the device, subject to
the general controls provisions of the Act. The general controls
provisions of the Act include requirements for annual registration,
listing of devices, good manufacturing practice, labeling, and
prohibitions against misbranding and adulteration.

If your device is classified (see above) into either class II (Special
Controls) or class III (Premarket Approval), it may be subject to such
additional controls. Existing major regulations affecting your device
can be found in the Code of Federal Regulations, Title 21, Parts 800
to 895. A substantially equivalent determination assumes compliance
with the Current Good Manufacturing Practice requirements, as set
forth in the Quality System Regulation (QS) for Medical Devices:
General regulation (21 CFR Part 820) and that, through periodic QS
inspections, the Food and Drug Administration (FDA) will verify such
assumptions. Failure to comply with the GMP regulation may result in
regulatory action. In addition, FDA may publish further announcements
concerning your device in the Federal Register. Please note: this

Page 2 - Mr. David Westlin

response to your premarket notification submission does not affect any obligation you might have under sections 531 through 542 of the Act for devices under the Electronic Product Radiation Control provisions, or other Federal laws or regulations.

This letter will allow you to begin marketing your device as described in your 510(k) premarket notification. The FDA finding of substantial equivalence of your device to a legally marketed predicate device results in a classification for your device and thus, permits your device to proceed to the market.

If you desire specific advice for your device on our labeling regulation (21 CFR Part 801 and additionally 809.10 for in vitro diagnostic devices), please contact the Office of Compliance at (301) 594-4648. Additionally, for questions on the promotion and advertising of your device, please contact the Office of Compliance at (301) 594-4639. Also, please note the regulation entitled, "Misbranding by reference to premarket notification" (21CFR 807.97). Other general information on your responsibilities under the Act may be obtained from the Division of Small Manufacturers Assistance at its toll-free number (800) 638-2041 or (301) 443-6597 or at its Internet address "http://www.fda.gov/cdrh/dsma/dsmamain.html".

Sincerely yours,

James E. Dillard III
Director
Division of Cardiovascular and
Respiratory Devices
Office of Device Evaluation
Center for Devices and
Radiological Health

Enclosure

3MBH00046941

# EXHIBIT DX8

**TO DECLARATION OF BRIDGET M. AHMANN
IN SUPPORT OF DEFENDANTS' MEMORANDUM IN
OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE
OPINIONS AND TESTIMONY OF TIMOTHY ULATOWSKI**

# Premarket Notification 510(k)

- **Introduction**
- **What is Substantial Equivalence**
- **Who is Required to Submit a 510(k)**
- **When a 510(k) is Required**
- **When a 510(k) is not Required**
- **Preamendment Devices**
- **Third Party Review Program**

> Please note: **FDA charges a fee for review of Premarket Notifications [510(k)] (/MedicalDevices/DeviceRegulationandGuidance/HowtoMarketYourDevice/PremarketSubmissions/ucm540444.htm)**

## Introduction

Each person who wants to market in the U.S., a Class I, II, and III device intended for human use, for which a Premarket Approval (PMA) is not required, must submit a 510(k) to FDA unless the device is exempt from 510(k) requirements of the Federal Food, Drug, and Cosmetic Act (the Act) and does not exceed the limitations of exemptions in .9 of the device classification regulation chapters (e.g., 21 CFR 862.9, 21 CFR 864.9). There is no 510(k) form, however, **21 CFR 807 (http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfcfr/CFRSearch.cfm? CFRPart=807&showFR=1&subpartNode=21:8.0.1.1.5.5)** Subpart E describes requirements for a 510(k) submission. Before marketing a device, each submitter must receive an order, in the form of a letter, from FDA which finds the device to be substantially equivalent (SE) and states that the device can be marketed in the U.S. This order "clears" the device for commercial distribution.

A 510(k) is a premarket submission made to FDA to demonstrate that the device to be marketed is at least as safe and effective, that is, substantially equivalent, to a legally marketed device (21 CFR 807.92(a)(3)) that is not subject to PMA. Submitters must compare their device to one or more similar legally marketed devices and make and support their substantial equivalency claims. A legally marketed device, as described in 21 CFR 807.92(a)(3), is a device that was legally marketed prior to May 28, 1976 (preamendments device), for which a PMA is not required, or a device which has been reclassified from Class III to Class II or I, or a device which has been found SE through the 510(k) process. The legally marketed device(s) to which equivalence is drawn is commonly known as the "predicate." Although devices recently cleared under 510(k) are often selected as the predicate to which equivalence is claimed, any legally marketed device may be used as a predicate. Legally marketed also means that the predicate cannot be one that is in violation of the Act.

Until the submitter receives an order declaring a device SE, the submitter may not proceed to market the device. Once the device is determined to be SE, it can then be marketed in the U.S. The SE determination is usually made within 90 days and is made based on the information submitted by the submitter.

Please note that FDA does not perform 510(k) pre-clearance facility inspections. The submitter may market the device immediately after 510(k) clearance is granted. The manufacturer should be prepared for an FDA quality system (21 CFR 820) inspection at any time after 510(k) clearance.

 -Top-

## What is Substantial Equivalence

A 510(k) requires demonstration of substantial equivalence to another legally U.S. marketed device. Substantial equivalence means that the new device is at least as safe and effective as the predicate.

A device is substantially equivalent if, in comparison to a predicate it:

- has the same intended use as the predicate; **and**

- has the same technological characteristics as the predicate;
  **or**

- has the same intended use as the predicate; **and**

- has different technological characteristics and the information submitted to FDA;
  - does not raise new questions of safety and effectiveness; **and**
  - demonstrates that the device is at least as safe and effective as the legally marketed device.

A claim of substantial equivalence does not mean the new and predicate devices must be identical. Substantial equivalence is established with respect to intended use, design, energy used or delivered, materials, chemical composition, manufacturing process, performance, safety, effectiveness, labeling, biocompatibility, standards, and other characteristics, as applicable.

A device may not be marketed in the U.S. until the submitter receives a letter declaring the device substantially equivalent. If FDA determines that a device is **not** substantially equivalent, the applicant may:

- resubmit another 510(k) with new data,

- request a Class I or II designation through the **de novo (/MedicalDevices/DeviceRegulationandGuidance/HowtoMarketYourDevice/PremarketSubmissions/ucm462775.htm)** process

- file a **reclassification petition (http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfcfr/CFRSearch.cfm? CFRPart=860&showFR=1&subpartNode=21:8.0.1.1.15.3)**, or

- submit a premarket approval application (PMA).

 -Top-

## Who is Required to Submit a 510(k)

The Act and the 510(k) regulation (21 CFR 807) do not specify who must apply for a 510(k). Instead, they specify which actions, such as introducing a device to the U.S. market, require a 510(k) submission.

The following four categories of parties must submit a 510(k) to the FDA:

1. Domestic manufacturers introducing a device to the U.S. market;

   Finished device manufacturers must submit a 510(k) if they manufacture a device according to their own specifications and market it in the U.S. Accessories to finished devices that are sold to the end user are also considered finished devices. However, manufacturers of device components are not required to submit a 510(k) unless such components are promoted for sale to an end user as replacement parts. Contract manufacturers, those firms that manufacture devices under contract according to someone else's specifications, are not required to submit a 510(k).

2. Specification developers introducing a device to the U.S. market;

   A specification developer develops the specifications for a finished device, but has the device manufactured under contract by another firm or entity. The specification developer submits the 510(k), not the contract manufacturer.

3. Repackers or relabelers who make labeling changes or whose operations significantly affect the device.

   Repackagers or relabelers may be required to submit a 510(k) if they significantly change the labeling or otherwise affect any condition of the device. Significant labeling changes may include modification of manuals, such as adding a new intended use, deleting or adding warnings, contraindications, etc. Operations, such as sterilization, could alter the condition of the device. However, most repackagers or relabelers are not required to submit a 510(k).

4. Foreign manufacturers/exporters or U.S. representatives of foreign manufacturers/exporters introducing a device to the U.S. market.

Please note that all manufacturers (including specification developers) of Class II and III devices and select Class I devices are required to follow design controls (21 CFR 820.30) during the development of their device. The holder of a 510(k) must have design control documentation available for FDA review during a site inspection. In addition, any changes to the device specifications or manufacturing processes must be made in accordance with the Quality System regulation (21 CFR 820) and may be subject to a new 510(k). Please see our guidance, "**Deciding When to Submit a 510(k) for a Change to an Existing Device (/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm080235.htm)**."

 -Top-

# When a 510(k) is Required

A 510(k) is required when:

1. Introducing a device into commercial distribution (marketing) for the first time. After May 28, 1976 (effective date of the Medical Device Amendments to the Act), anyone who wants to sell a device in the U.S. is required to make a 510(k) submission at least 90 days prior to offering the device for sale, even though it may have been under development or clinical investigation before that date. If your device was not marketed by your firm before May 28, 1976, a 510(k) is required.

2. You propose a different intended use for a device which you already have in commercial distribution. The 510(k) regulation (**21 CFR 807 (http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfcfr/CFRSearch.cfm? CFRPart=807&showFR=1&subpartNode=21:8.0.1.1.5.5)**) specifically requires a 510(k) submission for a major change or modification in intended use. Most, if not all changes in intended use will require a 510(k). Please note that prescription use is over the counter use is a major change in intended use and requires the submission of a new 510(k).

3. There is a change or modification of a legally marketed device and that change could significantly affect its safety or effectiveness. The burden is on the 510(k) holder to decide whether or not a modification could significantly affect safety or effectiveness of the device. Any modifications must be made in accordance with the Quality System regulation, 21 CFR 820, and recorded in the device master record and change control records. It is recommended that the justification for submitting or not submitting a new 510(k) be recorded in the change control records.

   A new 510(k) submission is required for changes or modifications to an existing device, where the modifications could significantly affect the safety or effectiveness of the device or the device is to be marketed for a new or different indication for use. See **Is a new 510(k) required for a modification to the device? (/MedicalDevices/DeviceRegulationandGuidance/HowtoMarketYourDevice/PremarketSubmissions/PremarketNotification510 k/ucm134575.htm)** for additional information.

 -Top-

# When a 510(k) is Not Required

The following are examples of when a 510(k) is not required.

1. You sell unfinished devices to another firm for further processing or sell components to be used in the assembling of devices by other firms. However, if your components are to be sold directly to end users as replacement parts, a 510(k) is required.

2. Your device is not being marketed or commercially distributed. You do not need a 510(k) to develop, evaluate, or test a device. This includes clinical evaluation. Please note that if you perform clinical trials with your device, you are subject to the **Investigational Device Exemption (/MedicalDevices/DeviceRegulationandGuidance/HowtoMarketYourDevice/InvestigationalDeviceExemptionIDE/default.htm)** (IDE) regulation (21 CFR 812).

3. You distribute another firm's domestically manufactured device. You may place a label on the device, "Distributed by ABC Firm" or "Manufactured for ABC Firm," (**21 CFR 801.1 (http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfcfr/CFRSearch.cfm?fr=801.1)**) and sell it to end users without submission of a 510(k).

4. In most cases, if you are a repackager or a relabeler you are not required to submit a 510(k) if the existing labeling or condition of the device is not significantly changed. The labeling should be consistent with the labeling submitted in the 510(k) with the same indications for use and warnings and contraindications.

5. Your device was legally in commercial distribution before May 28, 1976 and you have documentation to prove this. These devices are "grandfathered" and have **Preamendment Status (/MedicalDevices/DeviceRegulationandGuidance/MedicalDeviceQualityandCompliance/ucm379552.htm)**. You do not have to submit a 510(k) unless the device has been significantly modified or there has been a change in its intended use.

6. The device is made outside the U.S. and you are an importer of the foreign made medical device. A 510(k) is not required if a 510(k) has been submitted by the foreign manufacturer and received marketing clearance. Once the foreign manufacturer has received 510(k) clearance for the device, the foreign manufacturer may export his device to any U.S. importer.

7. Your device is exempted from 510(k) by regulation (21 CFR 862-892). That is, certain Class I or II devices can be marketed for the first time without having to submit a 510(k). A list of the Class I and II exempted devices can be found on **Medical Device Exemptions 510(k) and GMP Requirements (http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpcd/315.cfm)**. However, if the device exceeds the limitations of exemptions in .9 of the device classification regulation chapters (e.g., 21 CFR 862.9, 21 CFR 864.9), such as the device has a new intended use or operates using a different fundamental scientific technology than a legally marketed device in that generic type of device, or the device is a reprocessed single-use device, then a 510(k) must be submitted to market the new device.

 -Top-

## Preamendment Devices

The term "preamendments device" refers to devices legally marketed in the U.S. by a firm before May 28, 1976 **and** which have not been:

- significantly changed or modified since then; **and**
- for which a regulation requiring a PMA application has not been published by FDA.

Devices meeting the above criteria are referred to as "grandfathered" devices and do not require a 510(k). The device must have the same intended use as that marketed before May 28, 1976. If the device is labeled for a new intended use, then the device is considered a new device and a 510(k) must be submitted to FDA for marketing clearance.

Please note that you must be the **owner** of the device on the market before May 28, 1976, for the device to be grandfathered. If your device is similar to a grandfathered device and marketed **after** May 28, 1976, then your device does NOT meet the requirements of being grandfathered and you must submit a 510(k). In order for a firm to claim that it has a preamendments device, it must demonstrate that its device was labeled, promoted, and distributed in interstate commerce for a specific intended use and that intended use has not changed. See **Preamendment Status (/MedicalDevices/DeviceRegulationandGuidance/MedicalDeviceQualityandCompliance/ucm379552.htm)** for information on documentation requirements.

 -Top-

## Third Party Review Program

The Center for Devices and Radiological Health (CDRH) has implemented a Third Party Review Program. This program provides an option to manufacturers of certain devices of submitting their 510(k) to private parties (Recognized Third Parties) identified by FDA for review instead of submitting directly to CDRH. For more information on the program, eligible devices and a list of Recognized Third Parties go to **Third Party Review Program Information (/MedicalDevices/DeviceRegulationandGuidance/HowtoMarketYourDevice/PremarketSubmissions/ThirdParyReview/default.htm)** page.

 -Top-

| References |
| --- |
| • **CDRH Learn Module: 510(k) Program (http://fda.yorkcast.com/webcast/Play/d91af554691c4260b5eca0b2a28e636b1d)** ⬀ **(/AboutFDA/AboutThisWebsite/WebsitePolicies/Disclaimers/default.htm)** |
| • **510(k) Frequently Asked Questions (/MedicalDevices/DeviceRegulationandGuidance/HowtoMarketYourDevice/PremarketSubmissions/PremarketNotification510k/ucm142654.htm)** |
| • **New Section 513(f)(2) - Evaluation of Automatic Class III Designation, Guidance for Industry and CDRH Staff (/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm080195.htm)** |
| • **510(k) Decision-Making Flowchart (http://www.fda.gov/downloads/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/UCM284443.pdf#page=30)** |
| • **The 510(k) Program: Evaluating Substantial Equivalence in Premarket Notifications [510(k)] - Guidance for Industry and Food and Drug Administration Staff (PDF - 844KB) (/downloads/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/UCM284443.pdf)** |

- **Deciding When to Submit a 510(k) for a Change to an Existing Device (K97-1)
  (/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm080235.htm)**

---

**Additional Information**

- **510(k) Clearances (/MedicalDevices/ProductsandMedicalProcedures/DeviceApprovalsandClearances/510kClearances/default.htm)**

---

**Contact FDA**

1 (800) 638-2041
(301) 796-7100
**DICE@fda.hhs.gov (mailto:DICE@fda.hhs.gov)**

**Information-Medical Devices / Radiation Products**
**Division of Industry and Consumer Education (http://www.fda.gov/dice)**
CDRH-Center for Devices and Radiological Health
Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993

---

**More in Premarket Notification (510k)
(/MedicalDevices/DeviceRegulationandGuidance/HowtoMarketYourDevice/PremarketSubmissions/PremarketNotification510k/default.htm)**

**510(k) Submission Process
(/MedicalDevices/DeviceRegulationandGuidance/HowtoMarketYourDevice/PremarketSubmissions/PremarketNotification510k/ucm070201.htm)**

**510(k) Forms
(/MedicalDevices/DeviceRegulationandGuidance/HowtoMarketYourDevice/PremarketSubmissions/PremarketNotification510k/ucm070202.htm)**

**510(k) Submission Methods
(/MedicalDevices/DeviceRegulationandGuidance/HowtoMarketYourDevice/PremarketSubmissions/PremarketNotification510k/ucm134034.htm)**

**How To Prepare A Special 510(k)
(/MedicalDevices/DeviceRegulationandGuidance/HowtoMarketYourDevice/PremarketSubmissions/PremarketNotification510k/ucm134573.htm)**

**How to Find and Effectively Use Predicate Devices
(/MedicalDevices/DeviceRegulationandGuidance/HowtoMarketYourDevice/PremarketSubmissions/PremarketNotification510k/ucm134571.htm)**

**How to Prepare a Traditional 510(k)
(/MedicalDevices/DeviceRegulationandGuidance/HowtoMarketYourDevice/PremarketSubmissions/PremarketNotification510k/ucm134572.htm)**

**How to Prepare an Abbreviated 510(k)
(/MedicalDevices/DeviceRegulationandGuidance/HowtoMarketYourDevice/PremarketSubmissions/PremarketNotification510k/ucm134574.htm)**

**Is a new 510(k) required for a modification to the device?
(/MedicalDevices/DeviceRegulationandGuidance/HowtoMarketYourDevice/PremarketSubmissions/PremarketNotification510k/ucm134575.htm)**

**Special Considerations
(/MedicalDevices/DeviceRegulationandGuidance/HowtoMarketYourDevice/PremarketSubmissions/PremarketNotification510k/ucm134578.htm)**

# EXHIBIT DX9

**TO DECLARATION OF BRIDGET M. AHMANN
IN SUPPORT OF DEFENDANTS' MEMORANDUM IN
OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE
OPINIONS AND TESTIMONY OF TIMOTHY ULATOWSKI**

# The 510(k) Program: Evaluating Substantial Equivalence in Premarket Notifications [510(k)]

# Guidance for Industry and Food and Drug Administration Staff

**Document issued on: July 28, 2014**

**The draft of this document issued on December 27, 2011.**

**This document supersedes FDA's Guidance on the CDRH Premarket Notification Review Program, 510(k) Memorandum K86-3, dated June 30, 1986.**

For questions for the Center for Devices and Radiological Health regarding this document, contact the Premarket Notification (510(k)) Section at 301-796-5640.

For questions for the Center for Biologics Evaluation and Research regarding this document, contact the Office of Communication, Outreach and Development at 1-800-335-4709 or 240-402-7800.



**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Devices and Radiological Health**
**Center for Biologics Evaluation and Research**

*Contains Nonbinding Recommendations*

# Preface

## Public Comment

You may submit electronic comments and suggestions at any time for Agency consideration to http://www.regulations.gov.  Submit written comments to the Division of Dockets Management, Food and Drug Administration, 5630 Fishers Lane, Room. 1061, (HFA-305), Rockville, MD, 20852.  Identify all comments with the docket number FDA-2011-D-0652. Comments may not be acted upon by the Agency until the document is next revised or updated.

## Additional Copies

**CDRH**
Additional copies are available from the Internet. You may also send an e-mail request to CDRH-Guidance@fda.hhs.gov to receive a copy of the guidance.  Please use the document number 1766 to identify the guidance you are requesting.

**CBER**
Additional copies are available from the Center for Biologics Evaluation and Research (CBER) by written request to the address below, by email request to the email address below, by calling the phone number below, or from the Internet at the webpage below:


Center for Biologics Evaluation and Research (CBER),
Office of Communication, Outreach and Development,
10903 New Hampshire Ave, Bldg. 71, Room 3128
Silver Spring, MD 20993, or by calling 1-800-835-4709 or 240-402-7800, by email ocod@fda.hhs.gov, or from the Internet at
http://www.fda.gov/BiologicsBloodVaccines/GuidanceComplianceRegulatoryInformation/default.htm.

*Contains Nonbinding Recommendations*

# Table of Contents

*I.*    *Introduction* ................................................................................................. *1*

*II.*    *Background* .................................................................................................... *2*

    **A.**    **The Medical Device Amendments and Device Classification** ................ **2**

    **B.**    **The 510(k) Classification Process** ......................................................... **3**

    **C.**    **Evolution of the 510(k) Program** ......................................................... **4**

*III.*    *Scope* ............................................................................................................ *5*

*IV.*    *The 510(k) Decision-Making Process* .......................................................... *5*

    **A.**    **The 510(k) Review Standard** ................................................................ **6**

    **B.**    **The Flowchart** ...................................................................................... **10**

    **C.**    **Predicate Device(s)** .............................................................................. **10**

    **D.**    **Intended Use** ......................................................................................... **15**

    **E.**    **Technological Characteristics** .............................................................. **18**

    **F.**    **Requests for Performance Data** ........................................................... **22**

    **G.**    **The 510(k) Summary** ........................................................................... **26**

*Appendix A. 510(k) Decision-Making Flowchart* ............................................. *27*

*Appendix B. The 510(k) Summary Document Requirements* .............................. *28*

*Appendix C. Sample of 510(k) Summary Complying with 21 CFR 807.92* ......... *33*

*Appendix D. Glossary of Significant Terminology* ........................................... *39*

*Contains Nonbinding Recommendations*

# The 510(k) Program: Evaluating Substantial Equivalence in Premarket Notifications [510(k)]

## Guidance for Industry and Food and Drug Administration Staff

> *This guidance represents the Food and Drug Administration's (FDA's) current thinking on this topic. It does not create or confer any rights for or on any person and does not operate to bind FDA or the public. You can use an alternative approach if the approach satisfies the requirements of the applicable statutes and regulations. If you want to discuss an alternative approach, contact the FDA staff responsible for implementing this guidance. If you cannot identify the appropriate FDA staff, call the appropriate number listed on the title page of this guidance.*

## I.  Introduction

FDA developed this document to provide guidance to industry and FDA staff about current review practices for premarket notification (510(k)) submissions. The intent of this guidance is to identify, explain, and clarify each of the critical decision points in the decision-making process FDA uses to determine substantial equivalence. This guidance is not intended to implement significant policy changes to the current 510(k) review process. Rather, the intent of this guidance is to enhance the predictability, consistency, and transparency of the 510(k) program by describing in greater detail the regulatory framework, policies, and practices underlying FDA's 510(k) review.

The draft of this guidance document contained sections addressing FDA's Special and Abbreviated 510(k) programs. FDA intends to finalize those sections separately. Until FDA issues new final recommendations on the Special and Abbreviated 510(k) programs, the recommendations for Special and Abbreviated 510(k)s contained in "The New 510(k) Paradigm - Alternate Approaches to Demonstrating Substantial Equivalence in Premarket Notifications," dated March 20, 1998, (http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm080187.htm) remain in effect.

FDA's guidance documents, including this guidance, do not establish legally enforceable responsibilities. Instead, guidances describe the Agency's current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited. The use of the word *should* in Agency guidances means that something is suggested or recommended, but not required.

*Contains Nonbinding Recommendations*

# II. Background

## A.    The Medical Device Amendments and Device Classification

The Medical Device Amendments (MDA) (Pub. L. 94-295) to the Federal Food, Drug, and Cosmetic (FD&C) Act were enacted on May 28, 1976.  The MDA directed FDA to issue regulations that classify all devices that were in commercial distribution at that time into one of three regulatory control categories:  Class I, II, or III, depending upon the degree of regulation necessary to provide reasonable assurance of their safety and effectiveness.  The class into which a device is placed determines the requirements that a medical device manufacturer must meet prior to distributing a device in interstate commerce.  According to section 513(a)(1) of the FD&C Act (21 U.S.C. § 360c(a)(1)), the three device classes are defined as follows:

- **Class I**:  Devices are subject to a comprehensive set of regulatory authorities called general controls that are applicable to all classes of devices.[1]

- **Class II**:  Devices for which general controls, by themselves, are insufficient to provide reasonable assurance of the safety and effectiveness of the device, and for which there is sufficient information to establish special controls to provide such assurance.[2]

- **Class III**:  Devices for which general controls, by themselves, are insufficient and for which there is insufficient information to establish special controls to provide reasonable assurance of the safety and effectiveness of the device.  Class III devices typically require premarket approval.[3]

Premarket notification is the process by which a new device,[4] i.e., a post-amendments device, is classified into one of these three device classes.[5] A manufacturer who intends to market in the United

---

[1] General controls apply to all classes of medical devices and provide FDA with the means of regulating devices to assure their safety and effectiveness. General controls include but are not limited to provisions that relate to establishment registration and device listing; premarket notification, although most class I devices are exempt by regulation from this requirement; prohibitions against adulteration and misbranding; records and reports; and good manufacturing practices.  Section 513(a)(1)(A) of the FD&C Act (21 U.S.C. § 360c(a)(1)(A)).

[2] The original definition of a class II device in the Medical Device Amendments of 1976 (Pub. L. 94-295) identified performance standards rather than special controls as the mechanism by which FDA could establish reasonable assurance of safety and effectiveness. The Safe Medical Devices Act of 1990 (Pub. L. 101-629) added "special controls," which can include the promulgation of performance standards as well as postmarket surveillance, patient registries, development and dissemination of guidelines (including guidelines for the submission of clinical data in premarket notification submissions), and other appropriate actions as FDA deems necessary to provide such assurance.  Section 513(a)(1)(B) of the FD&C Act (21 U.S.C. § 360c(a)(1)(B)).

[3] Certain types of devices classified into class III that were in commercial distribution in the United States before May 28, 1976, and those determined to be substantially equivalent to such devices, may be cleared through the 510(k) process until FDA issues an administrative order requiring them to go through the premarket approval process.  Section 515(b)(1) of the FD&C Act (21 U.S.C. § 360e(b)(1)).  Prior to the enactment of the Food and Drug Administration Safety and Innovation Act (FDASIA) (Pub. L. 112-144) on July 9, 2012, FDA had to publish regulations to require such devices to go through the premarket approval process.  Section 608(b) of FDASIA (126 Stat. 1056) changed the process from rulemaking to administrative order.

[4] For the purpose of this guidance document, a "new device" means a device within the meaning of section 201(h) of the FD&C Act that is not legally marketed.  It can be either a completely new device or a modification of a legally marketed device that would require a new 510(k).

[5] By contrast, an unclassified devices, as defined in FDA's Guidance for Industry and Food and Drug Administration Staff, "Medical Device Classification Product Codes" (http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm285317.htm), is a pre-amendments

*Contains Nonbinding Recommendations*

States a Class I, II, or III device intended for human use, for which a Premarket Approval application (PMA) is not required, must submit to FDA a premarket notification submission (often referred to as a 510(k)), unless the device is exempt from the 510(k) requirements of the FD&C Act and does not exceed the limitations of exemptions for each of the device classification regulations (Section .9 of 21 CFR Parts 862 through 892, e.g., 21 CFR 862.9, 21 CFR 864.9, etc.).  Under section 510(k) of the FD&C Act, a manufacturer must submit a 510(k) to FDA at least 90 days before introducing, or delivering for introduction, a device into interstate commerce for commercial distribution so the Agency can determine whether or not the device meets the criteria for market clearance (Sections 510(k) and (n) of the FD&C Act (21 U.S.C. §§ 360(k) & (n))).  The Agency bases its decision on whether the device is substantially equivalent (SE) to a legally marketed (predicate) device (Section 513(i) of the FD&C Act (21 U.S.C. § 360c(i))).  The device cannot be commercialized until FDA issues an order (510(k) clearance) stating that the device has been determined to be SE (Section 513(f)(1) of the FD&C Act (21 U.S.C. § 360c(f)(1))).

## B.      The 510(k) Classification Process

According to section 513(f) of the FD&C Act, a new (i.e., post-amendments) device is automatically in Class III and must undergo premarket approval or reclassification before it can be marketed, unless it is a type of device that was in commercial distribution prior to May 28, 1976, and is SE to another such device; or it is within a type of device introduced after May 28, 1976, that has been reclassified into Class I or II and is SE to another device within such classification.  For information about how FDA's classification product codes assist in accurate identification and tracking of current medical devices, please see FDA's Guidance for Industry and Food and Drug Administration Staff, "Medical Device Classification Product Codes" (http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm285317.htm).

When FDA determines under sections 510(k), 513(f)(1), and 513(i) of the FD&C Act that a new device is SE to a legally marketed (predicate) device, the new device is classified into the same class and subject to the same requirements as the predicate device.  (See **Section IV.C.**)  A determination that a new device is not substantially equivalent (NSE) to a predicate device results in the new device being classified into Class III.  Thus, 510(k) review is both the mechanism by which a manufacturer seeks marketing authorization for a new device and by which FDA classifies devices into their appropriate regulatory category.  Because devices are classified according to the level of regulatory control necessary to provide a reasonable assurance of safety and effectiveness,[6] classification of a

---

device for which a classification regulation has not been promulgated. Unclassified devices require submission of a 510(k) premarket notification to FDA. A not-classified device is a post-amendments device for which the Agency has not yet reviewed a marketing application or for which the Agency has not made a final decision on such a marketing application. A pre-amendments device is a device that was on the market prior to the enactment of the Medical Device Amendments to the FD&C Act on May 28, 1976.

[6] The three device classes are described in section 513(a) of the FD&C Act (21 U.S.C. § 360c(a)):
   (1) There are established the following classes of devices intended for human use:
   (A) CLASS I, GENERAL CONTROLS.—
   (i) A device for which the controls . . . are sufficient to provide reasonable assurance of the safety and effectiveness of the device.
   (ii) A device for which insufficient information exists to determine that the controls referred to in clause (i) are sufficient to provide reasonable assurance of the safety and effectiveness of the device or to establish special controls to provide such assurance, but because it—
   (I) is not purported or represented to be for a use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health, and
   (II) does not present a potential unreasonable risk of illness or injury,
   is to be regulated by the controls referred to in clause (i).

*Contains Nonbinding Recommendations*

new device through the 510(k) process requires FDA to determine the issues of safety and effectiveness presented by the new device, and the regulatory controls necessary to address those issues.[7]

# C.    Evolution of the 510(k) Program

Since its inception, the 510(k) program has undergone a number of statutory changes.  Notably, the Safe Medical Devices Act of 1990 (Pub. L. 101-629) added section 513(i), which codified FDA review practice in applying the "substantial equivalence" review standard.  In addition, FDA has modified its implementation of the program to adapt to changing circumstances and to accommodate the evolving medical device landscape.  For example, the alternative options of a Special 510(k) or an Abbreviated 510(k) still exist today.  Additional information regarding these alternative options can be found in FDA's guidance, "The New 510(k) Paradigm – Alternative Approaches to Demonstrating Substantial Equivalence in Premarket Notifications" (http://www.fda.gov/downloads/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm080189.pdf).  The current 510(k) program reflects the current statutory framework and FDA's implementation of that framework through regulation, guidance, and administrative practice.  A history of the 510(k) program has been summarized in other documents that FDA has published.[8]

This guidance document provides updated information to the existing guidance document entitled "Guidance on the CDRH Premarket Notification Review Program, 510(k) Memorandum K86-3" (K86-3 Guidance), issued on June 30, 1986.  The K86-3 Guidance was written and issued as final guidance prior to the February 27, 1997 implementation of FDA's Good Guidance Practices (GGPs), and has not been updated since its initial publication date.  This guidance replaces the K86-3 Guidance.

---

(B) CLASS II, SPECIAL CONTROLS.—A device which cannot be classified as a class I device because the general controls by themselves are insufficient to provide reasonable assurance of the safety and effectiveness of the device, and for which there is sufficient information to establish special controls to provide such assurance . . .

(C) CLASS III, PREMARKET APPROVAL.—A device which because—

(i) it (I) cannot be classified as a class I device because insufficient information exists to determine that the application of general controls are sufficient to provide reasonable assurance of the safety and effectiveness of the device, and (II) cannot be classified as a class II device because insufficient information exists to determine that the special controls described in subparagraph (B) would provide reasonable assurance of its safety and effectiveness, and

(ii)(I) is purported or represented to be for a use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health, or

(II) presents a potential unreasonable risk of illness or injury,

is to be subject, in accordance with section 515, to Premarket approval to provide reasonable assurance of its safety and effectiveness.

[7] If FDA has established special controls applicable to the device type, the 510(k) would need to adequately address the issues covered by the special controls for the device to be classified into Class II.  *See* Section 513(a)(1)(B) of the FD&C Act (21 U.S.C. § 360c(a)(1)(B)).

[8] *See* CDRH Preliminary Internal Evaluations – Volume I: 510(k) Working Group Preliminary Report and Recommendations (http://www.fda.gov/downloads/AboutFDA/CentersOffices/CDRH/CDRHReports/UCM220784.pdf).  *See also* CDRH Preliminary Internal Evaluations – Volume II: Task Force on the Utilization of Science in Regulatory Decision Making Preliminary Report and Recommendations (http://www.fda.gov/downloads/AboutFDA/CentersOffices/CDRH/CDRHReports/UCM220783.pdf).  *See also* 510(k) and Science Report Recommendations: Summary and Overview of Comments and Next Steps (http://www.fda.gov/downloads/AboutFDA/CentersOffices/CDRH/CDRHReports/UCM239449.pdf).

*Contains Nonbinding Recommendations*

# III. Scope

This guidance provides recommendations to industry and FDA staff about the content of 510(k) submissions and the decision-making process for determining substantial equivalence of devices reviewed under the 510(k) program.  The guidance has been organized to coincide with the critical decision points outlined in the 510(k) Decision-Making Flowchart (See **Appendix A**), which has been updated to track section 513(i) of the FD&C Act and relevant regulations more closely.  This document provides guidance on the following issues:

- the appropriate use of multiple predicates (See Section IV.C);
- the processes associated with determining whether a new device with new indications for use has a new intended use (See Section IV.D);
- the process for determining whether different technological characteristics raise different questions of safety and effectiveness (See Section IV.E);
- when performance data, with special emphasis on clinical performance data, may be necessary to support an SE determination (See Section IV.F); and
- how to develop 510(k) Summaries to promote greater transparency in the 510(k) decision-making process (See Section IV.G).

The overarching principles in this guidance are applicable to devices that are subject to 510(k) review by CDRH, including the Office of Device Evaluation (ODE) and the Office of In Vitro Diagnostics and Radiological Health (OIR), as well as devices that are subject to 510(k) review by the Center for Biologics Evaluation and Research (CBER).  This guidance is not intended to supplant existing device-specific guidance, but may cover broader areas not addressed in device-specific guidance documents.  If you have questions about how this guidance and a device-specific guidance apply to a particular issue, please contact FDA to discuss.  In addition, this guidance does not address review issues unique to combination products.  For information on combination products, please refer to the Office of Combination Products webpage (http://www.fda.gov/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/OfficeofScienceandHealthCoordination/ucm2018184.htm).

# IV. The 510(k) Decision-Making Process

A 510(k) is a premarket submission made to FDA to demonstrate that the new device to be marketed is "substantially equivalent" to a legally marketed device[9] (21 U.S.C. §§ 360(k), 360(n), 360c(f)(1) & 360c(i); 21 CFR 807.92(a)(3)) which is not subject to PMA.  Manufacturers must compare their new device to a similar legally marketed device to support its substantial equivalence (21 U.S.C. § 360c(i); 21 CFR 807.92(a)(3)).

The most commonly used method of demonstrating substantial equivalence is through the submission and FDA review and clearance of a Traditional 510(k).  Under 21 CFR 807.87, FDA established basic content requirements for 510(k)s to be submitted by device manufacturers in support of substantial equivalence.  The Agency has provided a general framework on how to format an original submission for a Traditional 510(k) in FDA's Guidance for Industry and FDA Staff, "Format for

---

[9] Under 21 CFR 807.92(a)(3), a legally marketed device to which a new device may be compared for a determination regarding substantial equivalence is a device that was legally marketed prior to May 28, 1976, or a device which has been reclassified from class III to class II or I, or a device which has been found to be substantially equivalent through the 510(k) premarket notification process.

*Contains Nonbinding Recommendations*

Traditional and Abbreviated 510(k)s"
(http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm084365.htm).  Although the basic content requirements apply to all 510(k)s, the type of data and information necessary to establish substantial equivalence varies by the type of device and the differences between the new device and the predicate device.  FDA has issued many device-specific guidance documents that clarify the data that should be included in 510(k)s for particular device types.  If a manufacturer is unsure of what information to include within a 510(k) submission, the manufacturer may contact FDA and submit a pre-submission to seek additional feedback to ensure submissions contain appropriate data elements.  For more information on the pre-submission process, see FDA's Guidance for Industry and FDA Staff, "Requests for Feedback on Medical Device Submissions: The Pre-Submission Program and Meetings with Food and Drug Administration Staff"
(http://www.fda.gov/downloads/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/UCM311176.pdf).

Please note that the use of the Standards Data Report for 510(k)s (Form 3654)
(http://www.fda.gov/downloads/AboutFDA/ReportsManualsForms/Forms/UCM081667.pdf),
recognized consensus standards, and device-specific guidance documents is not limited to Abbreviated 510(k) submissions.  Appropriate reliance on these documents can facilitate the review of all 510(k) submissions and can help to make the review process more consistent.  Medical device manufacturers should consider relying on and citing to standards and device-specific guidance documents wherever appropriate, regardless of the type of 510(k) submission.

A new device does not need to be identical to the predicate device for it to be found substantially equivalent to the predicate device.  In FDA's experience, it is rare for a new device to be identical to a predicate device.  Given the diversity of technologies evaluated under this review standard, this guidance adopts a flexible approach to determining "substantial equivalence" to accommodate evolving technology while maintaining predictability and consistency to promote confidence among device developers, practitioners, and patients.

# A.    The 510(k) Review Standard

### 1.    The Statutory Standard

The 510(k) review standard (substantial equivalence of a new device to a legally marketed (predicate) device) differs from the PMA review standard (reasonable assurance of safety and effectiveness).  The 510(k) review standard is comparative, whereas the PMA standard relies on an independent demonstration of safety and effectiveness.  Nonetheless, the principles of safety and effectiveness underlie the substantial equivalence determination in every 510(k) review.  The standard for a determination of substantial equivalence in a 510(k) review is set out in section 513(i) of the FD&C Act, which states:

Substantial Equivalence

(i)(1)(A) For purposes of determinations of substantial equivalence under subsection (f) and section 520(l), the term "substantially equivalent" or "substantial equivalence" means, with respect to a device being compared to a predicate device, that the device has the same intended use as the predicate device and that the Secretary by order has found that the device

6

*Contains Nonbinding Recommendations*

(i) has the same technological characteristics as the predicate device, or

(ii)(I) has different technological characteristics and the information submitted that the device is substantially equivalent to the predicate device contains information, including appropriate clinical or scientific data if deemed necessary by the Secretary or a person accredited under section 523, that demonstrates that the device is as safe and effective as a legally marketed device, and (II) does not raise different questions of safety and effectiveness than the predicate device.

(B) For purposes of subparagraph (A), the term "different technological characteristics" means, with respect to a device being compared to a predicate device, that there is a significant change in the materials, design, energy source, or other features of the device from those of the predicate device.

Safety and effectiveness factor into both parts of the FDA's review.  First, FDA must find that the intended use of the device and its predicate are "the same."  As discussed in the Intended Use Section of this guidance, differences in the indications for use, such as the population for which a device is intended or the disease a device is intended to treat do not necessarily result in a new intended use. Such differences result in a new intended use when they affect (or may affect) the safety and/or effectiveness of the new device as compared to the predicate device and the differences cannot be adequately evaluated under the comparative standard of substantial equivalence. (See **Section IV.D.**)

Second, when comparing a new device to a predicate device, FDA must find that the two devices have "the same technological characteristics," or that a "significant change in the materials, design, energy source or other features of the device" does not raise different questions of safety and effectiveness and that the device is as safe and effective as a legally marketed device.

Although the 510(k) process involves a comparison of a new device to a predicate device rather than an independent demonstration of the new device's safety and effectiveness, as is required for approval of a PMA, in both cases FDA's review decision reflects a determination of the level of control necessary to provide a "reasonable assurance of safety and effectiveness."[10]  The evidentiary standard, however, is different.  In the 510(k) context, FDA generally relies, in part, on FDA's prior determination that a reasonable assurance of safety and effectiveness exists for the predicate device. Demonstrating basic similarities between a new device and a predicate device typically requires manufacturers to provide descriptive information such as a comparison of specifications, materials, and technology.  In contrast, FDA generally evaluates differences between the new device and the predicate device to determine their effect on safety and effectiveness.  It follows that the evidence necessary to show substantial equivalence will increase as differences between the new device and the predicate device increase if those differences significantly affect, or may significantly affect, safety or effectiveness (21 CFR 807.81).

---

[10] Under section 513(a)(2) of the FD&C Act, the safety and effectiveness of a device are to be determined:
    (A)  with respect to the persons for whose use the device is represented or intended,
    (B)  with respect to the conditions of use prescribed, recommended, or suggested in the labeling of the device, and
    (C)  weighing any probable benefit to health from the use of the device against any probable risk of injury or illness from such use.

*Contains Nonbinding Recommendations*

> **2.   *The Least Burdensome Principle***

The FDA Modernization Act of 1997 (FDAMA) added two provisions, commonly known as "the least burdensome provisions," to the FD&C Act; these were amended by the FDA Safety and Innovation Act of 2012 (FDASIA) (Pub. L. 112-144; 126 Stat. 1051).  The provision relating to substantial equivalence, section 513(i)(1)(D), states:

> (i)   Whenever the Secretary requests information to demonstrate that devices with differing technological characteristics are substantially equivalent, the Secretary shall only request information that is necessary to making substantial equivalence determinations. In making such request, the Secretary shall consider the least burdensome means of demonstrating substantial equivalence and request information accordingly.
>
> (ii)   For purposes of clause (i), the term "necessary" means the minimum required information that would support a determination of substantial equivalence between a new device and a predicate device.
>
> (iii)   Nothing in this subparagraph shall alter the standard for determining substantial equivalence between a new device and a predicate device.

Although the statutory provision refers only to information requests related to determining the substantial equivalence of technological characteristics of a device and its predicate, the underlying principle that information requests should relate to the review standard is a basic principle of good regulatory practice with broad applicability to the 510(k) decision-making process.

FDA's guidances, "The Least Burdensome Provisions of the FDA Modernization Act of 1997: Concept and Principles" (http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm085994.htm) and "Suggested Format for Developing and Responding to Deficiencies in Accordance with the Least Burdensome Provisions of FDAMA" (http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm073679.htm) ("the Least Burdensome Guidances"), explain how FDA intends to apply the least burdensome provisions.  "The Least Burdensome Provisions of the FDA Modernization Act of 1997: Concept and Principles" interprets least burdensome as "a successful means of addressing a premarket issue that involves the most appropriate investment of time, effort, and resources on the part of industry and FDA," and specifies that the least burdensome provisions do not affect the statutory premarket review standards for devices.  The recommendations discussed in this guidance for evaluating substantial equivalence are consistent with the principles discussed in the Least Burdensome Guidances, but applies them by discussing the considerations that may affect the type of information necessary to demonstrate substantial equivalence at different decision points in the review of a 510(k).

> **3.   *Categories of NSE Determinations***

The K86-3 Guidance stated:  "If it is clear from an initial review that a new device has a[n] intended use or technological feature that makes it NSE, the Center will not review or require performance information in the 510(k). Instead the applicant will be notified that the device is NSE, and any performance data will be reviewed in a PMA or reclassification petition."  The same is not true for NSE decisions based on a lack of performance data, which do not preclude submission of a new 510(k) containing different or additional data to support a finding of substantial equivalence.  Thus, it

*Contains Nonbinding Recommendations*

has been FDA's longstanding policy to treat NSE determinations as falling into two categories: (1) those that reflect FDA's affirmative determination that the device is a Class III device and cannot be reviewed in a 510(k) submission, and (2) those that reflect inadequacies in the evidence that preclude a finding of substantial equivalence.

The first category of NSE determinations includes a variety of different decisions, such as a finding of a lack of a predicate device, a new intended use, or different technological characteristics that raise different questions of safety or effectiveness when the new device is compared to the cited predicate device, that as a matter of law results in an NSE determination.  In most cases, FDA will provide the opportunity for the manufacturer to respond to initial concerns regarding the equivalency of the new device's intended use or technology to a predicate device via response to a request for additional information.  When FDA issues an NSE letter for a reason in this first category, the letter will typically not identify performance-based deficiencies.  Consequently, the device is automatically classified into Class III and will require PMA approval,[11] or if eligible, granting of a *De Novo* before marketing.  If FDA believes that the device found NSE may be eligible for the *De Novo* program, the NSE letter will typically indicate FDA's recommendation.  More information regarding the *De Novo* program can be found in FDA's Guidance for Industry and CDRH Staff, "New Section 513(f)(2) - Evaluation of Automatic Class III Designation" (http://www.fda.gov/downloads/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm080197.pdf).

The second category of NSE determinations is for those devices for which FDA has not affirmed that the new device has a different intended use or that the different technological characteristics raise different questions of safety or effectiveness when compared to the cited predicate device, but rather that the information provided in the submission is insufficient to demonstrate substantial equivalence to the predicate device.  In this situation, FDA generally first identifies the specific additional information – typically related to performance testing – that needs to be provided so that FDA may complete its evaluation of substantial equivalence.  Upon receipt of FDA's request for additional information (either through a formal letter, email, phone call or fax), the manufacturer has the opportunity to respond to FDA's request.  If the manufacturer in its response does not provide the requested information or a substantive justification for not providing the requested information, FDA will consider the response incomplete and place the submission immediately back on hold as an incomplete response.  Once a complete response is received, FDA will work with the manufacturer to try to resolve identified deficiencies in an interactive capacity following the timeframes and interactions instituted with the passage of the Medical Device User Fee Amendments of 2012 (MDUFA III).[12]  For more information on communications during the review of a 510(k) submission, see FDA's Guidance for Industry and FDA Staff, "Types of Communication During the Review of Medical Device Submissions"

---

[11] Alternatives to PMAs include submission of a Product Development Protocol (PDP) (Section 515(f) of the FD&C Act) or a Humanitarian Device Exemption (HDE) (Section 520(m)(2) of the FD&C Act and 21 CFR 814.104).  An HDE may be an appropriate option if the device has been determined by the Office of Orphan Products Development to be eligible for an HDE through a Humanitarian Use Device (HUD) designation (21 CFR 814.100 and 814.102).  Unlike other regulatory submissions, given the limited patient population, an HDE only has to demonstrate a reasonable assurance of safety and probable benefit (Section 520(m)(2) of the FD&C Act and 21 CFR 814.104).  For more information on HUD designations, please see FDA's guidance "Humanitarian Use Device (HUD) Designations" (http://www.fda.gov/downloads/RegulatoryInformation/Guidances/UCM336515.pdf).

[12] The passage of FDASIA (Pub. L. 112-144) on July 9, 2012, included the Medical Device User Fee Amendments of 2012 (MDUFA III), Title II of FDASIA (126 Stat. 1002), which reauthorized the device user fee program for another five years.  The MDUFA III Commitment Letter (http://www.fda.gov/downloads/MedicalDevices/NewsEvents/WorkshopsConferences/UCM295454.pdf) outlines changes to the review timeframes and/or expected interactions for many premarket submissions.

*Contains Nonbinding Recommendations*

(http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm341918.htm).  If the manufacturer does not respond at all to FDA's requests for additional information, the submission will be subsequently withdrawn by FDA within the timeframe specified by FDA's Guidance for Industry and FDA Staff, "FDA and Industry Actions on Premarket Notification (510(k)) Submissions: Effect on FDA Review Clock and Goals" (http://www.fda.gov/downloads/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/UCM089738.pdf).  If a 510(k) is withdrawn due to a lack of response, the manufacturer may submit a new 510(k) with additional information that addresses the outstanding deficiencies communicated by FDA based on the review of the prior 510(k).  If the manufacturer provides the requested information after the withdrawal date, it will be considered and processed as a new 510(k) (21 CFR 807.87(l)); therefore, all information previously submitted would have to be resubmitted so that the new 510(k) is complete.  If a new 510(k) is submitted to address deficiencies raised in this type of NSE letter, as explained in FDA's Guidance for Industry and FDA Staff, "Refuse to Accept Policy for 510(k)s" (http://www.fda.gov/ucm/groups/fdagov-public/@fdagov-meddev-gen/documents/document/ucm315014.pdf), the new 510(k) should clearly identify how the outstanding issues have been addressed and cross-reference where the new information is provided within the newly submitted 510(k).  Failure to cite the prior 510(k) number may result in a Refuse to Accept decision.

## B.    The Flowchart

The 510(k) Substantial Equivalence Decision-Making Process Flowchart (K86-3 Flowchart) was originally presented in the K86-3 Guidance and has served as the overarching "framework" for 510(k) decision-making for decades.  The K86-3 Flowchart has provided a concise summary of the 510(k) decision-making process and serves as a common frame of reference for scientific and regulatory discussions related to the 510(k) process.  However, the K86-3 Flowchart has not been updated since 1986 and, consequently, does not incorporate certain terminology set out in subsequent amendments to the FD&C Act.  Furthermore, the K86-3 Flowchart's visual structure may be more complex than necessary.  To specifically address these issues, a modified Flowchart is provided that both more closely tracks the language of section 513(i) of the FD&C Act and relevant regulations, and visually simplifies our presentation of the decision-making algorithm.

It should be noted that the 510(k) Decision-Making Flowchart (the Flowchart) (see **Appendix A**) is meant to be used in conjunction with this guidance document and not as a "stand-alone" document without appropriate references to the context of each critical decision point.

## C.    Predicate Device(s)

As discussed in Section IV.A, the 510(k) review standard is substantial equivalence of a new device to a legally marketed device.  Under 21 CFR 807.92(a)(3), a legally marketed device is a device that (i) was legally marketed prior to May 28, 1976 (preamendments device[13]) and for which a PMA is not required; *or* (ii) has been reclassified from Class III to Class II or I; *or* (iii) has been found SE through the 510(k) process.  For purposes of determining substantial equivalence, the legally marketed device is commonly referred to as the "predicate device" or "predicate."  While manufacturers may identify more than one predicate device, only one is required.  FDA encourages

---

[13] *See* Preamendment Status (http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/ComplianceActivities/ucm072746.htm).

*Contains Nonbinding Recommendations*

manufacturers to identify a single predicate device to simplify and facilitate the decision-making process.  When a manufacturer does identify **multiple predicates**, the **primary predicate** refers to the one with indications for use and technological characteristics most similar to the device under review.  Although using a single predicate is optimal, when multiple predicates are appropriate (as described in the examples below), FDA recommends identifying a primary predicate in the submission to facilitate a timely, well-supported decision.

Section 513(i) of the FD&C Act and 21 CFR 807.100(b) state that, for a new device to be considered substantially equivalent to a predicate device, the new device must have the same intended use as the predicate device **and** the same technological characteristics or different technological characteristics that do not raise different questions of safety and effectiveness than the predicate device.  Therefore, the use of a "split predicate" is inconsistent with the 510(k) regulatory standard.  "Split predicate" refers to a situation in which a manufacturer is attempting to "split" the 510(k) decision making process by demonstrating that a new device has the same intended use as one marketed device while comparing the new device's technological characteristics with a second marketed device that has a different intended use.  As a general matter, to find a device substantially equivalent, FDA must be able to address Decision Points 1 through 4 in the Flowchart using one predicate device identified by the manufacturer.  FDA may use one or more additional devices proposed by the manufacturer in certain instances to help support substantial equivalence, as described below.

### 1.    *Multiple Predicates*

A manufacturer may use multiple predicate devices[14] to help demonstrate substantial equivalence in certain circumstances.  Manufacturers sometimes choose to do this when combining features from two or more predicate devices with the same intended use into a single new device, when seeking to market a device with more than one intended use, or when seeking more than one indication for use under the same intended use, as described in the examples below.

**Multiple Predicates Example 1**:
A manufacturer submits a 510(k) for a new hemodialysis catheter.  This new catheter has an extension (the portion of the device outside the body) design that is similar to predicate A and a tip (the portion of the device inside the body) design similar to predicate B.  Both predicates A and B have the same intended use as the new device. In this example, the manufacturer is relying on both predicate A and predicate B, which have the same intended use as the new device, to support substantial equivalence with respect to technological characteristics.  The manufacturer may choose either predicate as the primary predicate in this example.

**Multiple Predicates Example 2**:
A manufacturer submits a 510(k) for a plate indicated for fixation of both diaphyseal (the shaft of a long bone) and epiphyseal (the ends of a long bone) fractures, i.e., the plate can be used to set a long bone, such as the femur or thigh bone, that is broken in the middle or at the ends.  The manufacturer cites a predicate device that is a plate indicated for middle bone fractures only and another predicate device that is indicated specifically for bone tip fractures.  While the indications for use of each predicate device are different, both devices have the *same* intended use, namely,

---

[14] *See* 510(k) and Science Report Recommendations: Summary and Overview of Comments and Next Steps. (http://www.fda.gov/downloads/AboutFDA/CentersOffices/CDRH/CDRHReports/UCM239449.pdf).

*Contains Nonbinding Recommendations*

fracture fixation of the long bone.[15]  Thus, although the manufacturer could have used a single predicate device, in cases where a manufacturer intends to market a device for more than one indication and a different predicate exists to support each specific indication, the manufacturer may cite more than one relevant predicate device to support an SE determination.  In this case, using two appropriate predicates clearly identified by the manufacturer helped to facilitate clearance of the new device, which was indicated to treat both types of fractures treated by the predicates.

**<u>Multiple Predicates Example 3</u>**:
A manufacturer submits a 510(k) for a laser platform that consists of two hand pieces:  an Er:YAG laser hand piece and a Q-Switch Nd:YAG laser hand piece.  The manufacturer cites two predicates to support substantial equivalence for both of their requested proposed indications for use.  In this case, each predicate cited does not share the same indications for use as the other predicate because each predicate consists of only one hand piece in which the indications correspond to the indications for one of the hand pieces included in the new device.  However, the indications for both hand pieces fall within the scope of the general intended use of lasers, "incision, excision, ablation, vaporization of soft tissue."  The Er:YAG laser hand piece is indicated for the incision, excision, ablation, vaporization of soft tissue; and the Q-Switch Nd:YAG laser hand piece is indicated for tattoo removal.  The new device is found substantially equivalent to the predicate devices because it has the same intended use and the new device's technological characteristics are similar to the cited predicates.

In each example above, a single predicate could have been used to establish substantial equivalence of the new device, but the manufacturer used multiple predicates to show that FDA had found similar technology or indications to be substantially equivalent.

**<u>Multiple Predicates Example 4</u>**:
A manufacturer submits a 510(k) for a multi-parameter monitor.  The monitor includes different technologies that can stand alone independently, but can also be used together for the general intended use of measuring patient vital information.  If there is a predicate device for each of the parameters, then the combination of these parameters, assuming that monitoring of each individual parameter does not interfere with the others, can be found substantially equivalent.

It should be noted that in Examples 2, 3, and 4 above, the specific indications of the new device may necessitate new performance testing, but they do not change the overall intended use of the device relative to the predicates.  These types of situations will need to be assessed on a case-by-case basis; in some situations, a specific indication may actually alter the overall intended use of the device in which case the multiple predicates concept may not be applicable.  More information regarding when a specific indication is reasonably included within a general indication can be found in FDA's Guidance for Industry, "<u>General/Specific Intended Use</u>" (<u>http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm073944.htm</u>).

Features can also be added to a new device to increase convenience of use and/or functionality, without altering the intended use or risk profile (relative to a predicate) of the new device.  Under

---

[15] It is important to note that if multiple predicates are used to support the same intended use, any different technological characteristics between the new device and the cited predicate devices must not raise different questions of safety and effectiveness.  Section 513(i) of the FD&C Act (21 U.S.C. § 360c(i)).

*Contains Nonbinding Recommendations*

such circumstances, the device with the added feature can be reviewed in a 510(k), even if the added feature consists of a component that may fall under a different classification regulation. A catheter-thermometer construct is useful in illustrating this concept.

**Multiple Predicates Example 5**:
A manufacturer submits a 510(k) for a urinary catheter with a thermometer. The thermometer/temperature-measuring feature is not affecting the intended use or risks of using the catheter (assuming it is integrated appropriately), nor is the catheter affecting the performance or risk profile of the thermometer. The temperature-measuring feature is a convenience component that is added to the catheter, with the intended use of the device still being that of the catheter to pass fluids to or from the urinary tract, so it is appropriate to have a legally marketed catheter serving as the primary predicate.

There are obvious limitations to feature/component additions in the 510(k) program. If a feature is added which alters the intended use of the new device and/or alters the safety profile (i.e., introduces new or additional risk factors) such that comparison to a predicate cannot be made, the new device is ineligible for the 510(k) program. A new device with a new design feature or added component must meet the SE standard with at least a single predicate from the same classification regulation.

## 2. *Reference Devices*

When demonstrating substantial equivalence in a 510(k) submission, manufacturers sometimes direct attention to similar situations FDA has encountered in the past. If a manufacturer successfully navigates through Decision Point 4 on the Flowchart using a single predicate device, other legally marketed devices, which FDA calls "**reference devices**," may be used to support scientific methodology or standard reference values at Decision Point 5a.

It is important to note that a reference device is not considered a predicate device and it cannot be used to address Decision Points 1 – 4 on the Flowchart. Additionally, the applicability of a reference device will need to be reviewed by FDA for its appropriateness. If a selected reference device is used in an anatomical location or for a physiological purpose that is considerably different than that of the new device, its utility as a reference device may be limited.

If a manufacturer intends to use a reference device, the manufacturer should provide a scientific rationale that justifies its use. This concept is illustrated in the Reference Device Examples below. We recommend that you read these examples side-by-side with the Flowchart in Appendix A so that you can follow the decision-making process.

**Reference Device Example 1**:  A manufacturer submits a 510(k) for a total knee implant with coating X (the new device). Other coated knee implants with the same intended use with coatings A, B, and C are legally marketed. In addition, a total hip implant with coating X is legally marketed. The manufacturer cites the legally marketed knee implant with coating A as the predicate device. FDA determines that the new device has an appropriate predicate device (thus, answering "yes" at Decision Point 1) and the new device has the same intended use as the predicate device (thus, answering "yes" at Decision Point 2 in the Flowchart).[16]  However, FDA

---

[16] The answer at Decision Point 2 may possibly be "no" if the predicate device is uncoated. Introducing a coated arthroplasty device into an anatomical location which previously only had non-coated devices would likely create a new intended use due to the different fixation methods.

13

*Contains Nonbinding Recommendations*

determines that the new device does not have the same technological characteristics as the predicate device (thus, answering "no" at Decision Point 3 in the Flowchart), because the new device (knee implant with coating X) has a chemical profile different from the chemical profile of the cited predicate device (knee implant with coating A).  There are no other technological differences between the new device and the cited predicate device (knee implant with coating A).  FDA determines that the new device does not raise different questions of safety and effectiveness.  In this case, FDA determines that the safety and effectiveness questions regarding the coating material are whether it is biocompatible and whether it affects the fixation of the implant and these questions apply to both the new device and predicate device (thus, answering "no" at Decision Point 4 in the Flowchart).

After Decision Point 4 in the Flowchart, if appropriate, the manufacturer may refer to the reference device (the hip implant with coating X in this situation) to support the appropriate scientific methods for the characterization of coating X on the new knee implant device.  In this particular example, the manufacturer provided an adequate scientific rationale to support that the methods used to characterize the biocompatibility and characteristics of the coating (e.g., strength, abrasion, etc.) on the hip implant are applicable to the knee implant.[17]  The reference device (hip implant with coating X) is used in this case solely to assist with the characterization of the coating on the new device (knee implant with coating X).

**Reference Device Example 2:**  A manufacturer submits a 510(k) for an over-the-counter blood glucose test system (glucose meter).  Other glucose meters with the same intended use are legally marketed.  The manufacturer cites a legally marketed glucose meter as the predicate device.  FDA determines that the new device has an appropriate predicate device (thus, answering "yes" at Decision Point 1) and the new device has the same intended use as the predicate device (thus, answering "yes" at Decision Point 2 in the Flowchart).  The manufacturer has not demonstrated that the new device has the same technological characteristics as the predicate device (thus, answering "no" at Decision Point 3 in the Flowchart), but the new device does not raise different questions of safety and effectiveness (thus, answering "no" at Decision Point 4 in the Flowchart).

Because glucose meters of this type typically have relatively high inherent total error due to limitations in their technology and other factors, in order to sufficiently characterize the analytical performance of the new device (and answer "yes" at Decision Point 5a in the Flowchart), the new device uses the same approach to characterize analytical performance as the predicate device.  Specifically, the accuracy of the new device is evaluated by comparing its blood glucose results to reference values generated on a laboratory-based glucose measurement device that has been well-validated for precision and accuracy, and that is traceable to a higher order, e.g., internationally recognized standard.  If the performance of the new device (including accuracy compared to the reference values from a reference device) is equivalent to the performance of the predicate device (including accuracy of the predicate compared to the reference values from a reference device), the FDA would determine that the data demonstrate equivalence (thus answering "yes" at Decision Point 5b in the Flowchart).

---

[17] The applicability of the scientific methodology used to characterize certain aspects of a legally marketed device will depend upon the specific scenario.  In this example, it is determined that the duration of contact, which affects the biocompatibility testing, and the mechanical testing conducted to fully characterize the coating on the hip implant are directly relevant and informative for the same coating applied to the knee implant.  However, if the manufacturer wanted to rely on the scientific methodology for a coating used in a different type of implant (e.g., cardiovascular), it may not be appropriate to exercise this approach.

*Contains Nonbinding Recommendations*

### 3.    Lack of Predicate Device

If a predicate device with the same intended use cannot be identified, or if the new device's different technological characteristics raise different questions of safety or effectiveness, a manufacturer may submit a *De Novo* request, either after receipt of an NSE letter or directly requesting classification through the *De Novo* process.[18]  For high risk devices, a PMA (or alternative submission type) may be required.

### 4.    Identification and Documentation of the Predicate(s)

Although manufacturers may cite more than one predicate device in a 510(k), FDA recommends that the manufacturer clearly identify the primary predicate device to which substantial equivalence is being claimed.[19]  Further, as part of the decision-making process, FDA should clearly cite the predicate device relied upon in determining substantial equivalence for the new device in its review documentation.  If multiple predicates or reference devices are used in accordance with this guidance, the manufacturer should identify each device and explain why more than one predicate or a reference device is necessary and appropriate to support substantial equivalence.  Manufacturers should choose the most appropriate single or primary predicate for their new device, and should limit the multiple predicates to those most helpful in facilitating review of the new device and to the minimum number necessary to support substantial equivalence.  Predicate device(s) relied upon for SE must be accurately cited in the 510(k) Summary (see **Appendix B**) according to 21 CFR 807.92 (a)(3).  Reference devices also may be cited in the 510(k) Summary.

## D.    Intended Use

Under section 513(i) of the FD&C Act, FDA may only determine that a device is substantially equivalent to a predicate device if it has the same intended use.[20]  (Refer to the 510(k) Decision-Making Flowchart in **Appendix A**).  A finding of NSE due to a new intended use is relatively rare.  Approximately 10% of all NSE decisions are due to a new intended use.[21]  This type of NSE determination generally reflects a finding that a change in the *indications for use* of a device creates a

---

[18] Section 607 of FDASIA (Pub. L. 112-144; 126 Stat. 1054), which was enacted on July 9, 2012, amended section 513(f)(2) of the FD&C Act by providing the option of directly submitting a request for *De Novo* classification without the need for an NSE determination.  A manufacturer who intends to submit a direct *De Novo* request is encouraged to engage in dialogue with FDA through the pre-submission process to obtain additional feedback related to whether a valid predicate exists for the new device and appropriate performance data that will be necessary to support a reasonable assurance of safety and effectiveness.  For more information on the pre-submission process, see FDA's Guidance for Industry and FDA Staff, "Requests for Feedback on Medical Device Submissions: The Pre-Submission Program and Meetings with Food and Drug Administration Staff" (http://www.fda.gov/downloads/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/UCM311176.pdf).

[19] Although devices recently cleared under the 510(k) program are often selected as the predicate device to which substantial equivalence is claimed, any legally marketed Class II or Class I device may be used as a predicate device.  However, section 513(i)(2) of the FD&C Act provides that a predicate device may not have been removed from the market at the initiative of the Commissioner of Food and Drugs or been determined to be misbranded or adulterated by a judicial order.  *See also* 21 CFR 807.100.

[20] This guidance is not intended to supplant either of the following guidance documents:  "Determination of Intended Use for 510(k) Devices; Guidance for CDRH Staff" (Update to K98-1)" (http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm082162.htm) or "General/Specific Intended Use" (http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm073944.htm).

[21] Refer to "Initial Results of 510(k) Audit: Analysis of Not Substantially Equivalent (NSE) Determinations" (http://www.fda.gov/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/CDRH/CDRHReports/ucm259173.htm).

*Contains Nonbinding Recommendations*

new *intended use*. This section of the guidance provides further clarification about the terms "intended use" and "indications for use," describes how FDA determines what the intended use of a device is, and provides examples of changes in indications for use that may constitute a new intended use making the device ineligible for review under the 510(k) program.

### 1.    Explanation of Intended Use and Indications for Use

For purposes of substantial equivalence, the term **intended use** means the general purpose of the device or its function, and encompasses the indications for use. The term **indications for use**, as defined in 21 CFR 814.20(b)(3)(i), describes the disease or condition the device will diagnose, treat, prevent, cure or mitigate, including a description of the patient population for which the device is intended.[22] The intended use of a device is one criterion that determines whether a device can be cleared for marketing through the 510(k) process or must be evaluated in a PMA (or alternative submission type), or if appropriate, a *De Novo* request. The proposed labeling in a 510(k) is used to determine a device's intended use (Section 513(i)(1)(E) of the FD&C Act). The indications for use statement in a 510(k) is also a factor in determining a device's intended use. Consistency between the indications for use statement and the proposed labeling will facilitate the review of the 510(k).

A finding of substantial equivalence means that the indications for use of the new device fall within the intended use of the predicate device and, therefore, the two devices have the same intended use. For devices with general indications for use that do not specify a disease, condition, or population (or an anatomical site from which a disease state or population may be inferred), the indications for use and intended use are the same. Such indications for use are referred to as "tool type" indications for use. Examples of devices with "tool type" indications for use include devices such as scalpels, which are often indicated for cutting tissue, or imaging devices, which are often indicated for taking images of the body. A scalpel indicated for removing a particular type of cancerous cell, however, has indications for use specific to the identified disease, condition, or population, and therefore, does not have "tool type" indications for use.

### 2.    Determining Intended Use

Section 513(i)(1)(E)(i) of the FD&C Act provides that the FDA's determination of intended use of a device "shall be based upon the proposed labeling" submitted in a 510(k). When a review of the indications for use and all other information in the proposed labeling submitted with a 510(k) supports an intended use that is the same as that of the predicate device, FDA will determine that the new device and predicate device have the same intended use. This guidance does not address FDA's authority to consider information outside the labeling in reviewing a 510(k) and issue an "SE with limitations" under section 513(i)(1)(E) of the FD&C Act because "there is a reasonable likelihood that the device will be used for an intended use not identified in the proposed labeling" and such use "could cause harm." For information on "SE with limitations," please see the guidance document, "Determination of Intended Use for 510(k) Devices; Guidance for CDRH Staff (Update to K98-1 )" (http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm082162.htm). When a review of the labeling submitted with a 510(k) shows that the indications for use of a new device and predicate device differ, FDA must evaluate whether the new[23] indications for use

---

[22] We have a long-standing policy of applying the definition of indications for use in the PMA regulation at 21 CFR 814.20(b)(3)(i) in the same way in the 510(k) context.

[23] For purposes of Section IV.D, the term "new" in describing indications for use refers to an indication that is new or differs from that of the predicate device.

*Contains Nonbinding Recommendations*

fall within the same intended use as that of the predicate device.  As described in Section IV.A, because the substantial equivalence determination is grounded in safety and effectiveness, this determination depends upon the safety and effectiveness of the new device for the new indications relative to the safety and effectiveness of the predicate device.

Once FDA has determined the indications for use of the new device upon review of the proposed labeling, FDA may rely upon relevant clinical and/or scientific information, that does not appear in the proposed labeling submitted with the 510(k), regarding the safety and effectiveness of the new indications for use.  For example, FDA may rely upon publicly-available scientific information or Agency knowledge about how a disease progresses to determine whether indications for use to treat a certain disease or anatomical site constitute a new intended use.

### 3.    Determining When Indications for Use Result in a New Intended Use

Not every change in indications for use that may affect safety or effectiveness will result in a finding of a new intended use.  Only a change in the indications for use that raises different questions of safety and effectiveness and therefore, precludes a meaningful comparison with the predicate device constitutes a new intended use.  FDA may find changes in indications for use of a device to constitute a new intended use when the changes raise a safety or effectiveness issue that was not raised by the predicate device, or the changes have the potential to significantly increase a safety or effectiveness concern raised by the predicate device.[24]  In the first case, reliance on a predicate device is inadequate because the safety or effectiveness issue was not considered in reviewing the 510(k) for the predicate device.  In the second case, although the safety or effectiveness issue may have been considered in the 510(k) for the predicate device, the finding of substantial equivalence for the predicate device cannot be generalized to the new indications for use because of a probable, significant change in the incidence or severity of the issue.  In both cases, the predicate device is not an adequate "proxy" for an independent determination of safety and effectiveness.

**Illustrative Example 1**:  A new device's instructions for use describe using a general surgery device in a body cavity, but the predicate device is used only to treat external injuries.  A comparison to the predicate device may not be adequate to address the risk of infection posed by internal use of the device.  Because of the need for an independent assessment of an issue that was not evaluated or was of significantly less concern during FDA's review of the 510(k) for the predicate device, FDA may determine that the indication for use of the new device constitutes a new intended use and a PMA (or alternative submission type), or if appropriate, a *De Novo* request, is required.

**Illustrative Example 2**:  A 510(k) for an existing surgical ablation device cleared for ablation of cardiac tissue has now been submitted for the treatment of atrial fibrillation. While the devices are similar in technology, additional clinical testing has been conducted to demonstrate that not only can the device ablate cardiac tissue, but also that doing so can treat atrial fibrillation safely and effectively.  While the question of whether or not cardiac tissue can be safely and effectively ablated was raised by the predicate device, FDA has determined that the specific indication for the treatment of atrial fibrillation constitutes a new intended use because it raises questions of both safety and effectiveness not raised by the predicate device.  Specifically, treatment of atrial

---

[24] *See* 21 CFR 807.92(a)(5); *see also* FDA guidance "General/Specific Intended Use" (http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm073944.htm) which implements section 513(i)(1)(F) of the FD&C Act.

*Contains Nonbinding Recommendations*

fibrillation requires extensive ablation to create linear lines of conduction block in a maze-like pattern that eliminates fibrillatory conduction in the atria.  The effectiveness assessment for the treatment of atrial fibrillation warrants a clinical outcome study.  Furthermore, the risks of iatrogenic heart block and collateral cardiac or extra-cardiac damage are either raised or increased when such a complex and extensive lesion set is created.  As a result, a PMA (or alternative submission type) is required.

### 4.    Changes in Indications for Use that May Result in a New Intended Use

All new indications for use should be evaluated to determine whether they reflect a new intended use.  Certain types of changes, however, warrant particular attention in evaluating whether the new indications for use result in a new intended use because they are more likely to significantly affect safety or effectiveness:

- a change from a functional/performance indication to a treatment or aesthetic indication;

- a change from a diagnostic indication to a screening indication, or vice versa;

- a change in the anatomical structure of use;

- a change in the patient population (e.g., adult versus pediatric; different disease populations);

- a change in the clinical context or setting (e.g., periodic monitoring versus continuous monitoring; hospital versus home use).

# E.    Technological Characteristics

After FDA has determined that a valid predicate device exists for a new device and that both devices have the same intended use, FDA will move to Decision Points 3 and 4 of the Flowchart (see **Appendix A**).  In these steps of the 510(k) review process, FDA compares the technological characteristics of the new device and the predicate device to determine whether the new device has the same technological characteristics as the predicate, and if not, whether the different technological characteristics raise different questions of safety and effectiveness.[25]  Devices reviewed under the 510(k) program commonly have different technological characteristics from their predicate device(s); however, FDA rarely makes a finding of NSE at Decision Point 4.[26]

### 1.    Step 1 – Identification of Technological Characteristics of the New and Predicate Device

For FDA to evaluate whether differences exist between the technological characteristics of the new device and the predicate device(s), the manufacturer should clearly identify the technological characteristics of each device individually.  Technological characteristics include materials, design,

---

[25] Section 513(i)(1)(A) of the FD&C Act and 21 CFR 807.100(b)(2).  "Different technological characteristics" are defined as "significant change in the materials, design, energy source, or other features of the device from those of the predicate device."  Section 513(i)(1)(B) of the FD&C Act and 21 CFR 807.100(b)(2)(ii)(A).

[26] Refer to "Initial Results of 510(k) Audit: Analysis of Not Substantially Equivalent (NSE) Determinations" (http://www.fda.gov/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/CDRH/CDRHReports/ucm259173.htm).

*Contains Nonbinding Recommendations*

energy source, and other device features, as defined in section 513(i)(1)(B) of the FD&C Act and 21 CFR 807.100(b)(2)(ii)(A).

To facilitate FDA's review of a device's technological characteristics, the device description in a 510(k)[27] should include the information necessary to explain the new device's technological characteristics, including similarities in materials, design, energy source, and other device features. This information will be evaluated by FDA to determine whether the technological characteristics of the new device are different and, if so, whether they raise different questions of safety and effectiveness as compared to the predicate(s).  Examples of key characteristics that should be provided as part of a 510(k) submission include, but are not limited to, the following features:

- An overall description of the device design.  A complete description of the device may be facilitated by the submission of engineering drawings or other figures.  If the device consists of multiple components, a diagram identifying how the different components of the device system work together may be beneficial.  The device description should also include a discussion of the physical specifications, dimensions and design tolerances that are critical to the new device.[28]  Significant features of the new device should have a clear purpose within the context of the overall design and intended use.  In cases where this is not apparent, it is important for the 510(k) submission to provide a discussion of how a particular device design or component contributes to the overall use and function of the new device.

- Materials.  For many devices, a complete identification of the detailed chemical formulation used in the materials of construction, especially for those materials that come into contact with the patient, should be provided.  Note that the FDA does not clear/approve materials.[29]  Any additives, including color additives, coatings, or other surface modifications should also be identified.  For some devices, the processing of the material (e.g., forged vs. cast) or the state of the material (e.g., amorphous vs. crystalline) may also significantly contribute to or affect the overall safety or function of the device, and so should be included as part of the device description, as applicable.

- Energy sources.  This not only includes energy delivery to the device, including the use of batteries, but also energy delivery that is part of the functional aspect of the device (e.g., laser, radiofrequency, ultrasound, etc.) and that affects the patient and/or the health care

---

[27] FDA's regulations require manufacturers to include in their 510(k)s "[a] description of the device that is the subject of the premarket notification submission, such as might be found in the labeling or promotional material for the device, including an explanation of how the device functions, the scientific concepts that form the basis for the device, and the significant physical and performance characteristics of the device, such as device design, material used, and physical properties." 21 CFR 807.92(a)(4); *see also* 21 CFR 807.87(f).

[28] The original Flowchart from the K86-3 Guidance included a decision point related to whether or not "descriptive characteristics" were precise enough to ensure equivalence.  However, the term "descriptive characteristics" does not appear in the statute or regulations.  The 510(k) Decision-Making Flowchart described in **Appendix A** specifically addresses this to reflect the statute more closely and minimize confusion.

[29] For additional considerations, refer to the FDA guidance, "Use of International Standard ISO-10993, 'Biological Evaluation of Medical Devices Part 1: Evaluation and Testing' (Replaces #G87-1 #8294) (blue book memo)" (http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm080735.htm).  *See also* Draft Guidance for Industry and FDA Staff, "Use of International Standard ISO-10993, 'Biological Evaluation of Medical Devices Part 1: Evaluation and Testing'" (http://www.fda.gov/downloads/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/UCM348890.pdf).  FDA's draft guidance represents the Agency's proposed approach on this topic.

*Contains Nonbinding Recommendations*

professional using the device.  Where applicable, a discussion of this characteristic should be provided.

- Other key technological features.  These include, but are not limited to, software/hardware features, density, porosity, degradation characteristics, nature of reagents (recombinant, plasma derived, etc.), principle of the assay method, etc., that are not explicitly included as part of the materials, design or energy source characteristics.  These technological features should be included as part of the device description in the 510(k) submission, as appropriate for the specific device technology.[30]

A 510(k) submission must also contain information about the technological characteristics of the predicate device (21 CFR 807.87(f), 807.92(a)(3) and (a)(6)).  The manufacturer of the new device should provide information necessary and sufficient to fully and clearly identify and describe the technological characteristics of the predicate device so that FDA can conduct a comparative assessment of the technological characteristics, as further described in Step 2.

### 2. *Step 2 – Identification of Differences in Technological Characteristics Between the New and Predicate Device*

Once the technological characteristics of the new and predicate device(s) have been clearly identified, the next step involves a comparison of these characteristics to identify any differences.  This may involve a comparison of detailed specifications as well as a comparison of the system-level technological characteristics of the devices.  FDA relies upon information provided about the predicate device, in addition to the information in our files as appropriate, and the new device to determine whether the new device has different technological characteristics (Decision Point 3) in comparison to the predicate(s).

At this point, FDA will assess whether the similarities/differences in technological characteristics between the new and predicate device(s) have been appropriately identified.  FDA highly recommends that the manufacturer summarize this information in tabular format to facilitate this step of review.

### 3. *Step 3 – Determination of Whether the Differences in Technological Characteristics Raise Different Questions of Safety and Effectiveness*

If FDA determines that there are differences in the technological characteristics of the new device and the predicate device, FDA will review and evaluate all relevant information bearing on any such differences in technological characteristics to determine whether they raise different questions of safety and effectiveness for the new device as compared to the predicate device (Decision Point 4 on the Flowchart).  A "different question of safety or effectiveness" is a question raised by the technological characteristics of the new device that was not applicable to the predicate device, and poses a significant safety or effectiveness concern for the new device.

Some examples are provided below to illustrate cases where the response to this general question was "yes," i.e., the new device was determined to raise different safety and effectiveness questions in comparison to the predicate device, and the new device was found NSE.

---

[30] We encourage manufacturers to determine whether there is an applicable device-specific guidance or special controls for the device type as provided in a special controls document or classification regulation.

*Contains Nonbinding Recommendations*

**Illustrative Example 1**
**Predicate:**  A biological indicator utilizing natural bacterial spores with recognized resistance characteristics as organisms for the biological indicator, where the presence of a color change or fluorescent signal is indicative of bacterial viability.
**New Device:** A biological indicator based on recombinant technology/genetic engineering, where the fluorescent signal is not indicative of bacterial viability; it is indicative of plasmid enzyme expression.
**Intended Use:**  Same
**Different questions of safety and effectiveness?**  Yes
**Why:**  Due to the engineering of a plasmid into the biological indicator, it is possible to have viable bacteria that do not contain the plasmid in sufficient amounts to generate a signal.  In this case, the biological indicator could falsely indicate that the monitored load was sterilized properly due to the absence of fluorescent signal, while there are viable non-expressing bacteria in the indicator (development of false negatives).  This technological difference raises different types of safety and effectiveness concerns for using a recombinant-DNA plasmid that codes for antibiotic resistance and a signaling enzyme in the spores of a biological indicator.  Appropriate test methodologies and risk assessments need to be determined to address the properties of the introduced plasmid and host bacterial spore that could affect indicator performance.  Because these types of questions were not necessary to take into account for the predicate device, the new device would be found NSE.

**Illustrative Example 2**
**Predicate:**  A mechanical device used for embryo dissection
**New Device:**  An electrical device used for embryo dissection
**Intended Use:**  Same
**Different questions of safety and effectiveness?**  Yes
**Why:**  In this example, changing the process from a mechanical process to an electrical energy source (e.g., laser) changes the way the device operates and raises different safety concerns regarding how the heating aspect of the electrical mechanism affects the embryo.  Because these types of questions were not necessary to take into account for the predicate device, the new device would be found NSE.

**Illustrative Example 3**
**Predicate:**  A device inserted into the patient's pharynx through the mouth to provide a patent airway by mechanically moving the soft tissue.
**New Device:**  A device placed externally on the mandible and neck to apply a vacuum to move the soft tissue forward and thus "open" the airway.
**Intended Use:**  Same
**Different questions of safety and effectiveness?**  Yes
**Why:**  The predicate device is invasive and placed midline in the oropharynx and does not exert pressure on the vascular, respiratory, or nerve structures in the neck, whereas the new device exerts continuous external negative pressure on these areas, raising different types of safety questions, such as the risks and potential adverse events associated with the stimulation of the nerve structures in the neck.  Because these types of questions were not necessary to take into account for the predicate device, the new device would be found NSE.

In the event the answer to Decision Point 4 is "No" and the differences between the new device and the predicate device do not raise different questions of safety and effectiveness, then the scientific

*Contains Nonbinding Recommendations*

review of the performance data will proceed.  However, if the answer to Decision Point 4 is "Yes" and the differences between the new device and predicate device raise different questions of safety and effectiveness, then the new device will be found NSE.  Upon receipt of this type of NSE letter, the manufacturer may submit a PMA (or alternative submission type), or if appropriate, a *De Novo* request.

# F.    Requests for Performance Data

Although FDA may rely upon descriptive information alone to address the critical questions in the Flowchart (Decision Points 1 through 4), performance data are typically needed in a Traditional 510(k) to demonstrate the substantial equivalence of a new device to a predicate device.  In addition, information on device performance described in labeling or other sections of the 510(k) should be supported with appropriate performance data.  The type and quantity of performance data necessary to support a determination of substantial equivalence depend upon the device and/or device type.[31] Performance data may be needed to address a variety of safety and effectiveness issues and may be generated from different types of tests and studies.

FDA's data requests typically follow a stepwise analytical process to ensure the information requested reflects the least burdensome approach to establishing substantial equivalence.[32]  First, FDA considers whether descriptive information about the technological characteristics, such as the materials, design, and specifications, of the new device is sufficient.  Very few 510(k) submissions rely solely on descriptive information about materials, design, specifications, and other technological characteristics (see 21 CFR 807.87(f) and (g)).  When this information is not sufficient to support a substantial equivalence determination, FDA then considers whether non-clinical bench performance testing or analytical studies using clinical samples would be sufficient.  For *in vitro* diagnostic devices (IVDs), analytical studies include, but are not limited to, evaluations of accuracy, precision, specificity, and sensitivity.  Non-clinical bench performance testing includes a wide variety of test modalities that will be dependent upon the specifics of the actual device, including, but not limited to:

- mechanical, electrical, and biological engineering performance, such as fatigue, wear, tensile strength, compression, flowrate, burst pressure;
- electromagnetic compatibility (EMC);
- sterility;
- stability/shelf life;
- software validation;
- other forms of non-clinical, including device-specific.

Non-clinical animal and/or biocompatibility studies are typically requested when other forms of non-clinical bench performance testing are not sufficient to demonstrate substantial equivalence.  Non-clinical laboratory studies that support the safety of medical devices must be conducted in compliance with 21 CFR Part 58, Good Laboratory Practice (GLP) for Nonclinical Laboratory

---

[31] Manufacturers should also determine whether there is an applicable device-specific guidance or special controls for the device type as provided in a special controls document or classification regulation.

[32] FDA follows the "least burdensome" provisions.  *See* Final Guidance for FDA and Industry, "The Least Burdensome Provisions of the FDA Modernization Act of 1997: Concept and Principles" (http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm085994.htm).

*Contains Nonbinding Recommendations*

Studies, as applicable, to ensure the quality, reliability, and integrity of study data.[33] For more information on this topic, see FDA's Draft Guidance for Industry and Food and Drug Administration Staff, "The Applicability of Good Laboratory Practice in Premarket Device Submissions: Questions & Answers" (http://www.fda.gov/medicaldevices/deviceregulationandguidance/guidancedocuments/ucm366338.htm).  FDA's draft guidance represents FDA's proposed approach on this topic.

When analytical or non-clinical bench performance testing data, or non-clinical animal and/or biocompatibility studies are insufficient, or available scientific methods are not acceptable, e.g., the scientific methods are deemed unacceptable because they are not clinically validated or are not supported by a valid scientific rationale, FDA may request clinical performance data to support a substantial equivalence determination.  For 510(k)s reviewed in the Office of Device Evaluation, FDA currently requests clinical data for less than 10 percent of the 510(k) submissions.  In some instances, clinical data may be a less burdensome means of demonstrating substantial equivalence than other means of performance testing, and 510(k)s reviewed in CBER for products intended to ensure the safety and effectiveness of blood and blood products typically include clinical data.  Clinical data provided in support of any marketing application, including a 510(k) when those data are relevant to a substantial equivalence determination, should constitute valid scientific evidence as defined in 21 CFR 860.7(c)(2)[34] and must comply with the Investigational Device Exemptions (IDE) regulations as applicable.[35]

Although not an exhaustive list of instances in which FDA may request clinical data to demonstrate substantial equivalence,[36] the following scenarios illustrate the most common situations in which clinical data may be requested.  As explained in the Scope Section (see **Section III**), the information in this guidance and the examples below do not take the place of any device-specific guidance.

---

[33] The applicability of GLPs to non-clinical studies in a 510(k) submission is also mentioned in FDA's Guidance "Refuse to Accept Policy for 510(k)s" in the Performance Data – General section of the checklist (http://www.fda.gov/downloads/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm315014.pdf).

[34] 21 CFR 860.7(c)(2): Valid scientific evidence is evidence from well-controlled investigations, partially controlled studies, studies and objective trials without matched controls, well-documented case histories conducted by qualified experts, and reports of significant human experience with a marketed device, from which it can fairly and responsibly be concluded by qualified experts that there is reasonable assurance of the safety and effectiveness of a device under its conditions of use. The evidence required may vary according to the characteristics of the device, its conditions of use, the existence and adequacy of warnings and other restrictions, and the extent of experience with its use. Isolated case reports, random experience, reports lacking sufficient details to permit scientific evaluation, and unsubstantiated opinions are not regarded as valid scientific evidence to show safety or effectiveness. Such information may be considered, however, in identifying a device the safety and effectiveness of which is questionable.

[35] In the U.S., clinical studies/investigations (*see* 21 CFR 812.3(h)) involving one or more human subjects to determine the safety or effectiveness of a device must be conducted in accordance with the Investigational Device Exemptions (IDE) regulations, 21 CFR Part 812, as applicable.  In addition, such studies/investigations must comply with the regulations governing institutional review boards (21 CFR Part 56), informed consent (21 CFR Part 50), and financial disclosure (21 CFR Part 54).  *See also* Guidance for Clinical Investigators, Industry, and FDA Staff, "Financial Disclosure by Clinical Investigators" (http://www.fda.gov/downloads/RegulatoryInformation/Guidances/UCM341008.pdf). Studies conducted outside the U.S. generally do not have to comply with the IDE regulations, but FDA recommends that such studies be conducted in accordance with good clinical practice.  For information on good clinical practice, see 78 FR 12664 (Feb. 25, 2013).

[36] The acceptability or level of data necessary to support an SE determination is product specific and therefore, not discussed in this guidance.  Manufacturers should determine whether there is an applicable device-specific guidance or special controls for the device type as provided in a special controls document or classification regulation as these sources may provide further information about performance data that may be necessary in a 510(k) submission.

*Contains Nonbinding Recommendations*

Note:  The examples provided below distinguish between examples that are only applicable to diagnostic devices, including IVDs, and therapeutic devices.  This is because there are significant differences in the clinical data requirements for these two categories of devices.

### 1.   *New or Modified Indications for Use – Same Intended Use*

In rare instances, FDA may rely upon clinical data to determine that new or modified indications for use fall within the same intended use as a predicate device.

**Illustrative Examples:**

- The new device is an IVD that is indicated for over-the-counter use, whereas the predicate device is indicated for prescription use in the home or prescription use in a clinical setting. The newly indicated test population might fall within the intended use of the predicate device. Clinical data (demonstrating that the user can collect the sample, generate an accurate result, and adequately interpret the result) might establish that the indication for use for the new device falls within the intended use of the predicate device.

- The new IVD is indicated for use with patients who have symptoms and signs of illness from any member of a specified set of closely related diseases.  The indications for use for the predicate IVD do not include one of the diseases addressed by the new IVD.  Clinical data (concerning all diseases in the newly specified set) might establish that the indications for use for the new device fall within the intended use of the predicate device.

- The manufacturer modifies the indications for use, explicitly or implicitly, by proposing a different surgical implantation method which also affects the indications for use, e.g., a minimally invasive procedure in place of an open procedure, and the safety and effectiveness of the new device cannot be adequately replicated or otherwise characterized in a non-clinical performance (including animal) test environment to adequately support substantial equivalence to the predicate.  Although on its face a minimally invasive procedure would appear to involve less serious risks than an open procedure, the minimally invasive procedure may be less effective or may present different but still serious risks.

### 2.   *Technological Differences*

FDA may request clinical data for a 510(k) when the technological differences between the new device and predicate device are significant but do not support an immediate NSE determination due to different questions of safety and effectiveness.  In these limited situations, clinical data may be needed to evaluate the safety and effectiveness of the new device as compared to the predicate device.

**Illustrative Examples:**

- A new IVD uses the same analyte-specific chemistry as the predicate, but with a different read-out technology (e.g., chemiluminescence instead of colorimetry).  Clinical data may be necessary to demonstrate that the new device performs equivalent to the predicate.

- Performance characteristics of the new device in comparison to the predicate are significantly different in non-clinical performance testing, e.g., the predicate is rigid whereas the new

*Contains Nonbinding Recommendations*

device is designed to be more flexible.  Clinical data may be necessary to demonstrate that the new device performs equivalent to the predicate.

- Some devices that display data about the patient's anatomy or physiology, e.g., glucose meters, pulse oximeters, blood pressure cuffs, are supported by software.  If there is a change in the software that relates to how the software analyzes the patient's anatomy or physiology, the device may need to be tested on actual patients to assure that the software performs in a manner that is equivalent to the previous version.  In this case, non-clinical data may not suffice.

- The technological characteristics of the new device raise a question concerning whether its clinical performance can be expected to be equivalent to the clinical performance of the predicate.  Clinical data may be necessary to demonstrate that the new device performs equivalent to the predicate.  For IVDs, an example is a new prothrombin time (clotting) test using thromboplastin that is a recombinant product instead of a naturally occurring material.

### 3. Non-clinical Testing Methods are Limited or Inappropriate Because of the Indications for Use or Device Technology

FDA requests clinical data for a 510(k) submission to address issues that cannot be adequately addressed using non-clinical test methods because of the indications for use or device technology.  For instance, for certain indications or technologies, FDA may request clinical data when non-clinical testing methods are not validated, are limited or are inappropriate, because of either their scope or their applicability, to demonstrate substantial equivalence.

**Illustrative Examples:**

- For some devices, the way they are used and the environment in which they are used affect the way they perform.  For example, the non-clinical performance testing on the new device may be insufficient to support a substantial equivalence determination if the testing cannot replicate the way the device will be used or the way similar devices have been demonstrated to fail in a clinical setting. Although the non-clinical testing for these devices might be informative for many other aspects of the device, it may be necessary to supplement the non-clinical data with clinical simulation performance data or clinical performance data.

- If the non-clinical testing of a device raises safety concerns that cannot be mitigated or answered through non-clinical testing, such a device may require clinical testing to assure that the safety questions are not greater than those raised by the predicate device.

New scientific information may affect FDA's expectations concerning the type and level of performance data included in a 510(k) submission.  For device types with long histories of safe use and well understood mechanisms of action, more limited performance testing data may be sufficient.  On the other hand, a pattern of adverse events or published literature documenting poor clinical outcomes with a particular technology may lead FDA to reconsider its regulatory approach to premarket submissions for such technology. [37]  Should FDA change its scientific decision making

---

[37] *See* SOP: Decision Authority for Additional or Changed Data Needs for Premarket Submissions (http://www.fda.gov/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/CDRH/CDRHReports/ucm279288.htm).

*Contains Nonbinding Recommendations*

with regard to a particular device, FDA will consider its options (e.g., guidance, advisory panel meeting, etc.), for explaining such change and the basis for the decision to ensure transparency in the change in policy. FDA also intends to consider any pending 510(k) submissions that may be affected by the change or allow for an appropriate transition period, in certain situations that may affect the industry at large.

# G.    The 510(k) Summary

The 510(k) Summary[38] is a document that provides a high-level discussion of the content of a 510(k) and must include all the elements identified in 21 CFR 807.92. A 510(k) Summary must be in sufficient detail to provide an understanding of the basis for a determination of substantial equivalence (21 CFR 807.92(a)).

In an effort to improve the transparency and predictability of the 510(k) program and to ensure that the 510(k) Summary reflects the information provided in a 510(k) submission to support a substantial equivalence determination, FDA intends to verify the accuracy and completeness of the information included in a 510(k) Summary.

Although the 510(k) Summary is a document created by the manufacturer and is included in the 510(k), revisions to the 510(k) Summary may be necessary to accurately reflect the FDA's decision-making process. For example, manufacturers may have identified several devices as potential predicate devices, whereas, in the course of FDA's substantial equivalence evaluation, FDA may have determined that only one of these devices is an appropriate predicate device. In addition, it is possible during the course of FDA's review of the 510(k), that additional information or testing may be requested and submitted. Consequently, the manufacturer may be requested to update the 510(k) Summary to accurately include and convey the information identified in 21 CFR 807.92 and which was used to support the final decision-making process.

In **Appendix B**, FDA describes the requirements of the content to be included in a 510(k) Summary, in accordance with 21 CFR 807.92, and provides guidance on the information to be included in a 510(k) Summary to ensure compliance with 21 CFR 807.92 and consistency in the level of information conveyed and captured in the 510(k) Summaries which are available to the public on FDA's website. In **Appendix C**, FDA has provided a hypothetical 510(k) Summary in order to demonstrate the recommended level of detail for each section.

---

[38] As specified in 21 CFR 807.87(h), a 510(k) Statement as described in 21 CFR 807.93 may be provided in lieu of a 510(k) Summary. However, in order to facilitate transparency, FDA encourages all submitters to utilize the 510(k) Summary option.

*Contains Nonbinding Recommendations*

# Appendix A.  510(k) Decision-Making Flowchart



SE = "Substantially Equivalent"
NSE = "Not Substantially Equivalent"
IFU = "Indications For Use"

*This Flowchart is not intended to be used as a 'stand-alone' document and should only be considered in conjunction with the accompanying text in this guidance.*

27

*Contains Nonbinding Recommendations*

# Appendix B.  The 510(k) Summary Document Requirements

In Appendix B, FDA provides further clarification and guidance to facilitate compliance with the requirements set forth in 21 CFR 807.92 and consistency in the information conveyed in the 510(k) Summaries which are available to the public on FDA's website.  As noted earlier in this guidance document, if during the course of review, additional testing or information are requested, the manufacturer should submit a revised 510(k) Summary to reflect the additional information.  The following identifies the information that must be included in the 510(k) Summary under 21 CFR 807.92, information that we recommend be included in the 510(k) Summary, and other considerations.

- 807.92(a)(1): "The submitter's name, address, telephone number, a contact person, and the date the summary was prepared."
  - The "submitter" or manufacturer should be the holder of the 510(k), not a consultant or law firm.

- 807.92(a)(2): "The name of the device, including the trade or proprietary name if applicable, the common or usual name, and the classification name, if known."
  - FDA recommends that the manufacturer list all applicable names and model numbers, if known.
  - If the submission is bundled[39], the 510(k) Summary should list all applicable classification regulations and product codes.

- 807.92(a)(3): "An identification of the legally marketed device to which the submitter claims equivalence.  A legally marketed device to which a new device may be compared for a determination regarding substantial equivalence is a device that was legally marketed prior to May 28, 1976, or a device which has been reclassified from class III to class II or I (the predicate), or a device which has been found to be substantially equivalent through the 510(k) premarket notification process."
  - FDA recommends that the manufacturer provide the 510(k) number of the device used as the predicate device in support of the current 510(k) submission.
  - If using an exempt device as a predicate, the manufacturer should list the classification regulation and the product code.
  - If using a device that has been reclassified from Class III to II as a predicate, where a 510(k) has not been submitted, please list the PMA number.
  - If the manufacturer lists an inappropriate predicate device, FDA will request that such information be removed and the 510(k) Summary updated accordingly by the manufacturer.

- 807.92(a)(4): "A description of the device that is the subject of the premarket notification submission, such as might be found in the labeling or promotional material for the device, including an explanation of how the device functions, the scientific concepts that form the basis for the device, and the significant physical and performance characteristics of the device, such as device design, material used, and physical properties."

---

[39] *See* Guidance for Industry and FDA Staff, "Bundling Multiple Devices or Multiple Indications in a Single Submission" (http://www.fda.gov/downloads/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm089732.pdf).

*Contains Nonbinding Recommendations*

The description of the device attributes should include the following details:

- o Device Identification:
  - ▪ List all key device components included in the submission (e.g., catheter, cable wire, leads)
  - ▪ List all model numbers (if known) and briefly explain the differences among models

- o Device Characteristics (address all that apply):
  - ▪ software
  - ▪ biologics
  - ▪ drugs
  - ▪ any patient-contacting materials
  - ▪ coatings
  - ▪ additives
  - ▪ single-use
  - ▪ sterile
  - ▪ sterilization method [specify]

- o Environment of Use (address all that apply):
  - ▪ healthcare facility/hospital
  - ▪ home
  - ▪ other [specify]

- o Brief Written Description of the Device:
  - ▪ Explanation of how the device works/principle of operation
  - ▪ Mechanism of action
  - ▪ Any necessary feature to determine SE or device performance
  - ▪ Energy source (if applicable)

- o Materials of Use
  - ▪ General type of material used (e.g., polysulfone, stainless steel)
  - ▪ If material conforms to an FDA recognized consensus standard for medical use, include the applicable number (e.g., ASTM FXXXX-last 2 numbers of the year)
  - ▪ Duration and type of contact

- o Key Performance Specifications/Characteristics of the Device

- 807.92(a)(5): "A statement of the intended use of the device that is the subject of the premarket notification submission, including a general description of the diseases or conditions that the device will diagnose, treat, prevent, cure, or mitigate, including a description, where appropriate, of the patient population for which the device is intended. If the indication statements are different from those of the legally marketed device identified in paragraph (a)(3) of this section, the 510(k) summary shall contain an explanation as to why the differences are not critical to the intended therapeutic, diagnostic, prosthetic, or surgical use of the device, and why the differences do not affect the safety and effectiveness of the device when used as labeled."

*Contains Nonbinding Recommendations*

- o The 510(k) Summary should include the Indications for Use, which should be identical to that proposed on the Indications for Use Sheet and the labeling.
- o If the Indications for Use are different from those of the predicate device, a brief explanation is required to address why the differences in the Indications do not affect the safety and effectiveness of the device and do not alter the intended therapeutic, diagnostic, prosthetic, or surgical use of the device.

- 807.92(a)(6): "If the device has the same technological characteristics (i.e., design, material, chemical composition, energy source) as the predicate device identified in paragraph (a)(3) of this section, a summary of the technological characteristics of the new device in comparison to those of the predicate device. If the device has different technological characteristics from the predicate device, a summary of how the technological characteristics of the device compare to a legally marketed device identified in paragraph (a)(3) of this section."

- 807.92(b): "510(k) summaries for those premarket submissions in which a determination of substantial equivalence is also based on an assessment of performance data shall contain the following information:"
  "(1) A brief discussion of the nonclinical tests submitted, referenced, or relied on in the premarket notification submission for a determination of substantial equivalence,"
  - o A high level summary of the tests that were used to demonstrate substantial equivalence should be included (e.g., fatigue testing, biocompatibility, etc.).
  - o If a guidance document was referenced/used for the testing, the guidance document should be referenced in this section.
  - o If an FDA recognized consensus standard (e.g., test method or guide) was used/relied upon for testing, please list the standard connotation (e.g., ASTM FXXXX-last 2 numbers of the year).

  "(2) A brief discussion of the clinical tests submitted, referenced, or relied on in the premarket notification submission for a determination of substantial equivalence. This discussion shall include, where applicable, a description of the subjects upon whom the device was tested, a discussion of the safety or effectiveness data obtained from the testing, with specific reference to adverse effects and complications, and any other information from the clinical testing relevant to a determination of substantial equivalence,"
  - o FDA is interested in collecting an appropriate degree of detail within this section to be informative regarding the level of evidence that was necessary to support an SE determination.
  - o As applicable, FDA recommends the following details be included regarding the clinical evidence provided to support an SE determination:

    - Level of Evidence (identify one)
      - Randomized, multi-arm, "blinded" study with concurrent sham (placebo) control
      - Randomized, multi-arm, "blinded" study with concurrent ("active") control
      - Randomized, multi-arm, un"blinded" study with a control (control that is either active or consists of no treatment)
      - Non-randomized study with concurrent ("active") control
      - Single-arm study with patient serving as own control (include designed single-arm crossover)
      - Single-arm study with Historical Control (using patient-level data)

30

*Contains Nonbinding Recommendations*

- ▪ Single-arm study with Literature Control (historical control)
- ▪ Single-arm study with Objective Performance Criteria
- ▪ Single-arm study with Performance Goals
- ▪ Registry
- ▪ Observational study
- ▪ Systematic review (meta-analysis with patient-level data)
- ▪ Meta-analysis based on summary information only
- ▪ Literature Summary
- ▪ Uncertain

- Location of Study (specify one of the following)
  - o United States only
  - o outside of United States only
  - o both in United States and outside of United States
  - o Identify applicable IDE number [Gxxxxxx]

- Primary Safety Endpoint Identified?
  - ▪ If Yes, describe

- Primary Effectiveness Endpoint Identified?
  - ▪ If Yes, describe

- Primary Composite Safety/Effectiveness Endpoint Identified, if applicable?
  - ▪ If Yes, describe

- Patient Accountability (Enter number of patients reported at each stage):

| Stage | Investigational Device Arm Total | Control Arm Total | Total |
|---|---|---|---|
| Enrollment | | | |
| Treatment | | | |
| Primary Safety Endpoint Analysis | | | |
| Primary Effectiveness Endpoint Analysis | | | |
| Primary Composite Safety/Effectiveness (if app) | | | |

The content of the table may need to be modified depending upon the specifics of the clinical data provided and the endpoints studied.

- Identify whether the study met the primary endpoint
  - ▪ Whether Yes or No, describe

- Describe the study results in appropriate parameters

- Identify the adverse events and complications observed in the study, including those associated with the device.

*Contains Nonbinding Recommendations*

"(3) The conclusions drawn from the nonclinical and clinical tests that demonstrate that the device is as safe, as effective, and performs as well as or better than the legally marketed device identified in paragraph (a)(3) of this section."

- o  A brief summary of why the device is substantially equivalent to the predicate.

- 807.92(c): "The summary should be in a separate section of the submission, beginning on a new page and ending on a page not shared with any other section of the premarket notification submission, and should be clearly identified as a '510(k) summary'."

- 807.92(d): "Any other information reasonably deemed necessary by the agency."
  - o  If the FDA determines that other information needs to be included within the 510(k) Summary, such information must be included within this document.

*Contains Nonbinding Recommendations*

# Appendix C. Sample of 510(k) Summary Complying with 21 CFR 807.92

510(k) Summary

### I.  SUBMITTER

Device Submitter, Inc.
123 Main Street
Anywhere, MD 01234

Phone: 555-555-1234
Fax: 555-555-0123

Contact Person: John Contact
Date Prepared: May 16, 2013

### II.  DEVICE

Name of Device: Brand X Endoscopic Stapling System, Model x123, Model y456
Common or Usual Name: Endoscopic Stapling System
Classification Name: Endoscope and Accessories (21 CFR 876.1500)
Regulatory Class: II
Product Code: ODE

### III. PREDICATE DEVICE

Brand Z Endoscopic Plication System, KXXXXXX
This predicate has not been subject to a design-related recall.[40]

No reference devices were used in this submission.

### IV. DEVICE DESCRIPTION

The Brand X Endoscopic Stapling System consists of a flexible endoscope, an endoscopy suite, and a number of associated accessories. The endoscope and staples are provided sterile (EtO).

Brand X uses an implant (surgical staple) that is delivered by a flexible endoscope by a surgeon or gastroenterologist for approximating adjoining portions of the esophageal and gastric tissues at the gastroesophageal junction, thereby creating a permanent surgical fundoplication. The system includes an ultrasonic transducer that operates as a range finder for measuring the relative alignment and the distance between the transducer at the tip of the endoscope (the anvil) and the ultrasonic mirror in the

---

[40] On July 9, 2012, section 605 of FDASIA (Pub. L. 112-144) added section 518A to the FD&C Act, which directs FDA to establish a program to routinely and systematically assess information regarding device recalls, and to use that information to proactively identify strategies for mitigating health risks presented by defective or unsafe devices.  FDA believes that one way to carry out this directive is to provide greater transparency on recalled devices.  Identifying whether a predicate was recalled is optional, but doing so would help the Agency achieve this FDASIA directive.

cartridge (that includes the staples). The device deploys sets of implantable staples for performing the fundoplication procedure.

The system combines a video camera, an ultrasonic range finder and a surgical stapler in a single unit. The flexible endoscope includes light guides, irrigation, air insufflation and suction channels that terminate at the endoscope tip.  The stapler portion includes a cartridge that contains sterile 4.8 mm standard "B" shaped titanium surgical staples. Model x123 includes five (5) staples per cartridge, while Model y456 contains only four (4). The tip of the endoscope contains an anvil for the staples, as well as two small stainless steel screws that are extracted from the tip of the endoscope and engage into nuts positioned in the cartridge. The ultrasonic range finder measures the distance between an ultrasonic mirror in the cartridge and the tip of the endoscope. It also verifies alignment between the cartridge and the anvil, before insertion of the screws.

The endoscopy suite includes the ISL (Insufflation, Suction and Light) console, the CCU (Camera Control Unit) console and a monitor. The ISL console provides suction, insufflation and a white light (Xenon) source for illumination. The CCU console contains a controller for the camera, ultrasonic range finder and sensors that indicate status of the bending angle, screws and fire. The monitor displays patient information, the video image, and the processed data from the controllers such as ultrasonic data, fire status, degree of bending and screw position.  A keyboard for entering data during the procedure is also included.  The System includes three software applications: the video controller software, the ultrasound controller software, and the ISL controller software.  The software systems work in conjunction with the hardware consoles listed above in order to visualize the procedure and deliver the staples.  The endoscope is designed for single-patient use, and it is connected to the CCU and ISL consoles via a multi-connector.  The endoscope handle contains the controls used by the operator to manipulate the endoscope.

The associated accessories include:
- Irrigation bottle with liquids for irrigation of the camera lens
- Suction canister for extracting liquids during the procedure
- Silicon tubes for connecting the ISL and other accessories to the endoscope
- Disposable air filter of the suction ISL input channel
- Overtube for protecting patient's pharynx

V.  INDICATIONS FOR USE

The Brand X Stapling System is indicated for the endoscopic placement of surgical staples in the soft tissue of the esophagus and stomach in order to create anterior partial fundoplication for treatment of symptomatic chronic Gastro Esophageal Reflux Disease (GERD) in patients who require and respond to pharmacological therapy.

The Indications for Use statement for the Brand X device is not identical to the predicate device; however, the differences do not alter the intended therapeutic use of the device nor do they affect the safety and effectiveness of the device relative to the predicate.  Both the subject and predicate devices have the same intended use for the treatment of GERD, by approximating tissue in the esophagus and stomach.

*Contains Nonbinding Recommendations*

VI. COMPARISON OF TECHNOLOGICAL CHARACTERISTICS WITH THE PREDICATE
   DEVICE

Transoral endoscopic fundoplication is the technological principle for both the subject and predicate devices. It is based on the use of endoscopic instrumentation for approximating and permanently adjoining gastric and esophageal tissues, creating plications at the level of the gastroesophageal valve and thereby restoring valvular functionality and reducing gastric reflux into the esophagus.
At a high level, the subject and predicate devices are based on the following same technological elements:
- Endoscope – used to reach the target tissue
- Device inserted through an overtube – to protect the esophagus
- Creation of a gastric (or gastroesophageal) plication in close proximity to the gastroesophageal junction by the retroflexed device
- Use of a permanent implant to secure tissue
- Use of a mechanical component for positioning and launching the implant
- User-controlled mechanical trigger (or knob) to launch the fastener (implant)
- Mechanically securing the plication by a permanent implant fastener

The following technological differences exist between the subject and predicate devices:
- Use of an ultrasound range finder
- Use of a staple as a fastener
- Use of different tissue capture and fixation mechanisms
- The predicate device must be used in conjunction with a flexible endoscope whereas the subject device has a flexible endoscope incorporated into the system.

VII.   PERFORMANCE DATA

The following performance data were provided in support of the substantial equivalence determination.

**Biocompatibility testing**
The biocompatibility evaluation for the Brand X device was conducted in accordance with the FDA Blue Book Memorandum #G95-1 "Use of International Standard ISO-10993, 'Biological Evaluation of Medical Devices Part 1: Evaluation and Testing,'" May 1, 1995, and International Standard ISO 10993-1 "Biological Evaluation of Medical Devices − Part 1: Evaluation and Testing Within a Risk Management Process," as recognized by FDA.  The battery of testing included the following tests:

- Cytotoxicity
- Sensitization
- Irritation
- Systemic toxicity
- Pyrogen Testing

The endoscopic delivery system is considered tissue contacting for a duration of less than 24 hours, while the staples are considered permanent implants.  The titanium staple material conforms to ASTM F-67-06 for chemical composition.

*Contains Nonbinding Recommendations*

**Electrical safety and electromagnetic compatibility (EMC)**
Electrical safety and EMC testing were conducted on the Brand X device, consisting of the ISL console, CCU console and endoscope.  The system complies with the IEC 60601-1, IEC 60601-2-18 and IEC 60601-2-37 standards for safety and the IEC 60601-1-2 standard for EMC.

**Software Verification and Validation Testing**
Software verification and validation testing were conducted and documentation was provided as recommended by FDA's Guidance for Industry and FDA Staff, "Guidance for the Content of Premarket Submissions for Software Contained in Medical Devices."  The software for this device was considered as a "major" level of concern, since a failure or latent flaw in the software could directly result in serious injury or death to the patient or operator.

**Mechanical and acoustic testing**
- Acoustic Testing
- Elongation of the bending cable
- Torque on the handle wheel and force on cable
- Crimp assembly, cable tensile strength, cable flexibility, minimum bending radius of the cables
- Staple verification
- Simulated use testing

**Animal Study**
In the animal study conducted, 16 pigs underwent endoscopy with the Brand X System. Twelve pigs underwent fundoplication, and 4 pigs served as a sham (control) group. There were no procedure related complications or premature deaths in this study, at the 2, 4 and 6 week follow-up (4 pigs in each group).

The safety and feasibility of the Brand X device were evaluated by macroscopic and histological evaluation of the tissue in the treatment stapled areas. These studies demonstrated that the Brand X device can safely create an anterior partial fundoplication, similar to that which is constructed using other endoscopic suturing devices.

**Clinical Studies**
Clinical testing of the Brand X device included an initial feasibility study of 6 patients, a pilot study consisting of 13 patients and a pivotal study of 72 patients. Substantial equivalence was based in part on the pivotal study.

Pivotal Study
The pivotal study was a prospective, multi-center, open label, non-randomized, single arm study of 72 patients, of which 66 were available for primary endpoint analysis; 3 subjects did not complete the procedure, and 3 were excluded from the effectiveness analysis.  The device was used to staple the fundus of the stomach to the esophagus, using standard B shaped surgical staples. Stapling was performed in two or three locations at least 1.5 cm above the GE junction, separated by at least 90 degrees. The procedure was intended to create a partial anterior fundoplication as a reflux barrier. Patients were followed for a period of six months at 6 sites both in the United States and outside of the United States under IDE G070136.

*Contains Nonbinding Recommendations*

Primary effectiveness endpoint:
GERD health related quality of life score (GERD-HRQL) off proton pump inhibitor (PPI) was improved from baseline by > 50%, at six months post procedure in at least 53% of the patients (53% is the lower boundary of the 95% confidence interval).

Primary safety endpoint:
The primary safety endpoint consisted of all treatment-related adverse events, during and after the procedure. "Treatment-related" events were conventionally defined as those which occurred in the first 30 days post-procedure.

Effectiveness
The primary endpoint for the Brand X study focused on the GERD-HRQL score. The study results demonstrated that 75% of the patients had a >50% improvement in their GERD-HRQL score off PPI at six months compared to baseline. Hence the study met its primary endpoint with the required 95% confidence level.

The reduction in the median score for the Brand X device of 23.0 units (from 29.0 to 6.0) represents a 79.3% improvement. This value is almost identical to the published result for the pivotal trial of the predicate device (79.2%). Therefore, the effectiveness of the Brand X system in successfully treating chronic symptoms of GERD is similar to the effectiveness reported for the predicate device.

The median value of the percent of time pH < 4.0 decreased from an initial value of 8.3% at baseline to 6.75%. Therefore, the study met its secondary endpoint related to the acid exposure test. A comparison to results reported in the literature revealed that the change in the median values of the Brand X device showed a decrease of 19%, while the predicate showed a decrease of 18%. Hence, the Brand X results in reducing the exposure to gastric acids are similar to those reported for the predicate system.

Safety
The study reported nine patients with a total of nine serious adverse events (SAEs). Four events were considered mild in intensity, involving pain and fever. Three events were classified as moderate in intensity, involving pneumothorax, pneumomediastinum, and pneumoperitoneum (all resolved spontaneously). Two events were considered severe in intensity: one involved esophageal perforation (required drainage) and another had suicidal thoughts (non-device/procedure related).

Six of the SAEs were considered related to the device: one definitely (esophageal perforation) and the others possibly. Three events were considered not related to the device. The median time from procedure to SAE was 1.5 days for events related to the device. None of the patients with SAEs required any operation or re-operation. Adverse events reported that occurred in greater than the 5% level were postoperative pain or discomfort in 33% of patients, postoperative nausea in approximately 10%, and sore throat in 21%. The adverse events were mild or insignificant in most cases.

The SAEs and overall safety profile were similar to the predicate device for which two perforations and one bleeding event were reported. The number of AEs was similar to those reported for the predicate device. Three cases of fever were reported in the current study (for 72 patients), similar to the 3 cases of fever reported for the predicate. There were 23 cases of chest pain (23/72 = 32%) vs. 17% reported for the predicate; abdominal pain was recorded for 5% of the patients in the current

*Contains Nonbinding Recommendations*

study vs. 44% of the patients for the predicate. Sore throat was reported for 15 patients (15/72 = 21%) vs. 15% for the predicate.

Summary

Based on the clinical performance as documented in the pivotal clinical study, the Brand X system was found to have a safety and effectiveness profile that is similar to the predicate device.

VIII.   CONCLUSIONS

Since the predicate device was cleared based in part on the results of clinical studies, and since the comparison of bench testing to clinical outcomes is still not well understood for this type of device, clinical testing was required to support substantial equivalence.  The non-clinical data support the safety of the device and the hardware and software verification and validation demonstrate that the Brand X device should perform as intended in the specified use conditions.  The clinical data demonstrate that the Brand X device performs comparably to the predicate device that is currently marketed for the same intended use.

*Contains Nonbinding Recommendations*

# Appendix D.  Glossary of Significant Terminology

The following terms are defined for purposes of this guidance:

**Classification regulation –** The classification regulations are Agency-defined categories of medical devices based on intended use and technology. Each device classification regulation defines the class (i.e., Class I, II, or III) for the device category which in turn determines the regulatory requirements. Device classification regulations are codified by rule or order in 21 CFR Parts 862-892.

**Indications for use –** The disease or condition the device will diagnose, treat, prevent, cure or mitigate, including a description of the patient population for which the device is intended.

**Intended use –** The general purpose of the device or its function.  The intended use of a device encompasses the indications for use.

**Multiple Predicate Devices –** Two or more predicate devices that have been provided to support an SE determination.  If using multiple predicate devices to demonstrate substantial equivalence, each predicate device must have the same intended use as the new device, and any different technological characteristics between the new device and the predicate devices must not raise different questions of safety and effectiveness.

**Performance Data –** Performance data can be any data, including non-clinical (e.g., data from engineering testing, such as fatigue, wear, corrosion, etc., biocompatibility, functional animal studies, cadaver, etc.) and/or clinical, that are provided to support the substantial equivalence of a device that is intended to be marketed.

**Predicate Device –** A legally marketed device (as defined in 21 CFR 807.92(a)(3)) to which a new device may be compared for a determination regarding substantial equivalence because the devices have the same intended use and the same technological characteristics or different technological characteristics that do not raise different questions of safety and effectiveness.

**Primary Predicate Device –** A predicate device with indications for use and technological characteristics that are most similar to the new device.  The primary predicate should be identified within a 510(k) submission.

**Reference Device –** A legally marketed device that is intended to provide scientific and/or technical information (e.g., test methodology) to help address the safety and effectiveness of a new technological characteristic.  Reference devices are not predicate devices and may only be used after Decision Point 4 on the 510(k) Decision-Making Flowchart.

**Split Predicate –** Using one legally marketed device for intended use and a different legally marketed device for technological characteristics to demonstrate substantial equivalence.  The use of a "split predicate" is inconsistent with the 510(k) regulatory standard.

# EXHIBIT DX10

**TO DECLARATION OF BRIDGET M. AHMANN
IN SUPPORT OF DEFENDANTS' MEMORANDUM IN
OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE
OPINIONS AND TESTIMONY OF TIMOTHY ULATOWSKI**

STAYED,APPEAL,CLOSED,JURY,LODGE_DOC,OBJMAG

## US District Court Electronic Case Filing System
## District of Utah (Central)
## CIVIL DOCKET FOR CASE #: 2:10-cv-01283-RJS

Braun et al v. Medtronic Sofamor Danek et al
Assigned to: Judge Robert J. Shelby
Case in other court:  Tenth, 15-04173
Cause: 28:1332 Diversity-Breach of Contract

Date Filed: 12/30/2010
Date Terminated: 07/08/2014
Jury Demand: Plaintiff
Nature of Suit: 190 Contract: Other
Jurisdiction: Diversity

| Date Filed | # | Docket Text |
|---|---|---|
| 02/05/2014 | 535 | Minute Order. Proceedings held before Judge Robert J. Shelby: The court hears oral argument on a number of motions. For the reasons stated on the record, the court rules on the following motions: Plas MOTION in Limine and Memorandum in Support Daubert Motion in Limine #4 to Preclude MSD Testimony re Sound and Reasonable Judgment, docket entry 408 is granted in part. The court will not grant a sweeping motion to exclude all fact and expert testimony relating to sound and reasonable judgment. The court finds that the expert testimony, to the extent addressed in this motion, was based upon sufficient facts and data to satisfy Rule 702. The court does not view Medtronics defense as the traditional advice of counsel defense that justifies broad exclusion of documents. Out of concerns about privilege, the court will exclude evidence that Medtronic relied on legal advice of its cnsl when determining whether to prosecute Dr. Brauns patent. The court will consider an appropriate jury instruction on patent attorney consultation at trial. For similar reasons, Plas MOTION in Limine and Memorandum in Support Daubert Motion in Limine #5 to Exclude Speculation re Bevan and Breard Patents, docket entry 409 is denied. The court is not persuaded that broad exclusion is appropriate under Rule 702, where the experts relied on sufficient facts and data. To the extent that the testimony speculates on decisions of the USPTO, Dr. Braun may raise timely objections at trial. For similar reasons, Plas MOTION in Limine and Memorandum in Support Daubert Motion in Limine #6 to Exclude Evidence that MSD's Existing Intellectual Property Included Dr. Braun's Concepts, docket entry 410 is also denied for the reasons stated in the briefing and because the expert opinions are based on sufficient facts and data. The court also concludes that the issue of active correction is the proper subject of cross-examination at trial. To the extent the motion raises the possibility of exclusion of late produced documents, the court has already addressed the issue. The court does not rule on Plas MOTION in Limine and Memorandum in Support Daubert Motion in Limine #7 to Exclude William Richter, docket entry 411 , which is subject to additional briefing. Plas MOTION in Limine and Memorandum in Support Daubert Motion #8 to Exclude Rodney Ballard, docket entry 412 is denied without prejudice. The court concludes that Mr. Ballards testimony will be limited to the subjects listed in the disclosure, and that Dr. Braun should be permitted to raise timely objections to foundation during the trial. Dft's MOTION in Limine and Memorandum in Support Daubert Motion to Exclude Subjects of Michael Collins's Testimony, docket entry 421 is granted. Mr. Collins may not vouch for certain facts or evidence, and the court will consider an admonishment if Mr. Collins opines on the veracity of facts. Plas MOTION in Limine and Memorandum in Support Daubert Motion in Limine #9 to Exclude Karen Becker and Timothy Ulatowski, docket entry 413 is granted in part. The court concludes that Ms. Becker may not provide an opinion on legal interpretation of the contractual provisions, and neither FDA expert may |

speculate on what the FDA would have done. Neither witness will be permitted to instruct the jury on the law. The court, however, will consider objections on the issues of duplicate testimony and foundation at trial. Dfts Defendant's MOTION in Limine and Memorandum in Support Gaubert [sic] Motion regarding John Guynn's Methodology, docket entry 427 and Dfts SEALED Daubert MOTION Regarding the Qualifications of Plaintiff's Expert John Guynn, docket entry 430 are granted in part, subject to the same limitations as the Plas motions to exclude patent expert testimony. For example, Mr. Guynn may testify at trial; however, he may not instruct the jury on legal standards or testify on subjects for which he is not skilled in the art. Dfts Defendant Medtronics Daubert Motion to Exclude Subjects of Michael Collinss Testimony, docket entry 422 is granted in part. Mr. Collins is not an expert in the art of fusionless technology and may not opine on the scope of the patents or the intent or purpose of Medtronic. Mr. Collins may provide an expert opinion on the royalty agreements and possibly FDA regulatory practice, subject to cross-examination. The parties stipulated that Mr. Collins may rely on the five percent royalty rate in the License Agreement License. The court sets the following schedule: Additional motion hearing and final pretrial conference set for 2/7/2014 at 10:00 a.m. Further trial related matters will be heard on 2/14/2014 at 10:00 a.m. Written Order to follow oral order: No. Attorney for Plaintiff: Alan Bradshaw, Chad Derum, Roger Dodd, Brent Manning; Attorney for Defendant John Adams, Ryan Bell, Greg Newman, James Jardine, Jennifer Leigh Truelove. Court Reporter: Ray Fenlon. (mjm) (Entered: 02/11/2014)

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 09/29/2017 10:24:25 | | | |
| **PACER Login:** | jeff.wojciechowski | **Client Code:** | 423286.000401 20267 |
| **Description:** | Docket Report | **Search Criteria:** | 2:10-cv-01283-RJS Starting with document: 535 Ending with document: 535 |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

# EXHIBIT DX11

**TO DECLARATION OF BRIDGET M. AHMANN
IN SUPPORT OF DEFENDANTS' MEMORANDUM IN
OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE
OPINIONS AND TESTIMONY OF TIMOTHY ULATOWSKI**

C E R T I F I C A T E

I, TIMOTHY A. ULATOWSKI, hereby certify that I have

carefully read the foregoing transcript, and that the same is a true and

complete, full and correct transcription of my deposition, except:

| PAGE/LINE | CHANGE | REASON |
|---|---|---|
| P.9, l.20, | Add at end of line: ", in regard to the FAW devices cleared by the Cardiovascular Division." | Clarification. |
| P. 88, ll. 1-2, | Replace "we don't have" to "I don't recall that we have". | Clarification. |
| P. 96, l. 4: | Replace "No" with "I was provided those materials in an earlier litigation for the Bair Hugger, but did not recall having seen them at the time of my deposition." | Accuracy. |
| p. 105, l. 19, | Add at the end of the sentence: ", and in the 69 hours recorded for the next month." | Accuracy. |
| p. 116, l. 4, | Replace "It is what it is" with "The time I spent reviewing materials and writing a report for this MDL included the 44 hours plus the 69 hours I spent in the month of May." | Accuracy. |
| p. 118, l. 23 | Change "us" to "me". | Clarification. |
| p. 134, ll. 18-22 | Replace with: "As I said, the letter cited in my report referenced articles submitted to FDA. Reference to a clinical study also was submitted to Mr. Bird on August 8, 1990.  3MBH00047485 and 47488." | Accuracy. |
| p. 182, l. 9 | Change "report" to "reports". | Accuracy. |

p. 193, l. 2    Change "visible" to "transparent".              Clarification.

p. 258, l. 15   Delete "but".                                   Transcription
                                                                error.


TIMOTHY A. ULATOWSKI
Deponent


Signed and sworn to before me this 11th day of August, 2017.


Katelyn Marie Nassoiy
Commonwealth of Virginia
Notary Public
Commission No. 7704332
My Commission Expires 8/31/2020

Notary Public

# EXHIBIT DX12

**TO DECLARATION OF BRIDGET M. AHMANN
IN SUPPORT OF DEFENDANTS' MEMORANDUM IN
OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE
OPINIONS AND TESTIMONY OF TIMOTHY ULATOWSKI**

S118

TITLE:    COMPARISON OF INTRAOPERATIVE
WARMING DEVICES

Authors:    JM Hynson M.D., DI Sessler M.D.

Affiliation:    Department of Anesthesia, UCSF, San
Francisco, CA 94143

Mild hypothermia remains an almost inevitable consequence of anesthesia and surgery. We therefore evaluated the efficacy of three intraoperative warming techniques.

With IRB approval, 12 patients undergoing kidney transplantation were randomly assigned to: 1) a full length (54 X 145 cm) circulating water blanket set at 40°C positioned under the subject (N=4); 2) humidification and heating to 40°C of inspired gases (N=3); 3) skin surface warming of the lower extremities (to mid thigh level), using a Bair Hugger® convective air warmer set on "high" (≈43°C) (N=4); and 4) no extra warming (control) (N=5). Intravenous fluids were warmed in all groups. Fresh gas flows were maintained at 5 L/min without a heat and moisture exchanger. Ambient temperature and preoperative conditions were similar in all groups. Tympanic membrane temperature was measured starting 30 min before induction of anesthesia.

In all groups, tympanic membrane temperature decreased ≈0.7°C, during the first 30 min (fig.). Tympanic membrane temperatures in patients given forced air warming began to increase ≈60 min after induction. Those given external warming with the circulating water blanket, had little further decrease in temperature after the first h of anesthesia. Central temperatures continued to decrease throughout the 3 h study period in the control and heated humidifier groups.

We conclude that convective air warming of the legs is more effective than the use of a circulating water blanket. Heated humidification offers little protection from intraoperative hypothermia.



Figure. After initially decreasing, central temperature began to increase in patients given convective air warming. Error bars in the control group were deleted for clarity, but were similar to those in the other groups.

Supported by National Institutes of Health grant #R29 GM39723.

3MBH00047488

# EXHIBIT DX13

**TO DECLARATION OF BRIDGET M. AHMANN
IN SUPPORT OF DEFENDANTS' MEMORANDUM IN
OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE
OPINIONS AND TESTIMONY OF TIMOTHY ULATOWSKI**

# Information about the Use of Forced Air Thermal Regulating Systems - Letter to Health Care Providers

August 30, 2017

Dear Health Care Provider,

The FDA is reminding health care providers that using thermoregulation devices during surgery, including forced air thermoregulating systems, have been demonstrated to result in less bleeding, faster recovery times, and decreased risk of infection for patients.

The FDA recently became aware that some health care providers and patients may be avoiding the use of forced air thermal regulating systems during surgical procedures due to concerns of a potential increased risk of surgical site infection (e.g., following joint replacement surgery). After a thorough review of available data, the FDA has been unable to identify a consistently reported association between the use of forced air thermal regulating systems and surgical site infection.

Therefore, the FDA continues to recommend the use of thermoregulating devices (including forced air thermal regulating systems) for surgical procedures when clinically warranted. Surgical procedures performed without the use of a thermoregulation system may cause adverse health consequences for patients during the postoperative and recovery process.

Forced air thermal regulating systems, also called forced air warmers or forced air warming systems, are devices used to regulate a patient's temperature during surgical procedures. Forced air thermal regulating systems use an electrical blower to circulate filtered, temperature controlled air through a hose into a blanket placed over or under a patient.

To determine if there is an increased risk of surgical site infection when forced air thermal regulating systems are used during surgery, the FDA collected and analyzed data available to date from several sources, including medical device reports received by the agency, information from manufacturers and hospitals, publically available medical literature, operating room guidelines, and ventilation requirements

As always, please follow the manufacturer's instructions for use in the operating room/and or the post-operative environment.

**FDA ACTIONS**

The FDA will continue to actively monitor this situation and will update this communication if significant new information becomes available.

**CONTACT US**

If you have questions about this communication, please contact CDRH's Division of Industry Communication and Education (DICE) at **DICE@FDA.HHS.GOV (mail-to:DICE@FDA.HHS.GOV)**, 800-638-2041, or 301-796-7100.

Sincerely,
/s/
William Maisel, MD, MPH
Deputy Center Director for Science
Center for Devices and Radiological Health
U.S. Food and Drug Administration

> **More in Letters to Health Care Providers
> (/MedicalDevices/Safety/LetterstoHealthCareProviders/default.htm)**