# EXHIBIT DX2

TO DECLARATION OF
DEBORAH E. LEWIS IN SUPPORT
OF DEFENDANTS' MEMORANDUM IN
OPPOSITION TO PLAINTIFFS' MOTION
TO EXCLUDE TESTIMONY OF
ANTONIA HUGHES, RN, BSN, MA, CNOR

Confidential - Subject to Protective Order

Page 1

1                  UNITED STATES DISTRICT COURT

2                    DISTRICT OF MINNESOTA

3    - - - - - - - - - - - - - - - - - - - - - - - - - - -

4    In Re:

5    Bair Hugger Forced Air Warming

6    Products Liability Litigation

7

8    This Document Relates To:

9    All Actions                MDL No. 15-2666 (JNE/FLM)

10   - - - - - - - - - - - - - - - - - - - - - - - - - - -

11

12

13              DEPOSITION OF ANTONIA B. HUGHES

14                 VOLUME I, PAGES 1 - 189

15                    AUGUST 3, 2017

16

17

18           (The following is the deposition of ANTONIA

19   B. HUGHES, taken pursuant to Notice of Taking

20   Deposition, via videotape, at the Hausfeld law firm,

21   1700 K Street Northwest, Suite 650, in the City of

22   Washington, District of Columbia, commencing at

23   approximately 10:05 o'clock a.m., August 3, 2017.)

24

25

Confidential - Subject to Protective Order

Page 2

1  APPEARANCES:
2    On Behalf of the Plaintiffs:
3      Gabriel Assaad
       KENNEDY HODGES
4      4409 Montrose Boulevard
       Suite 200
5      Houston, Texas  77006
6      Genevieve M. Zimmerman
       MESHBESHER & SPENCE, LTD.
7      1616 Park Avenue
       Minneapolis, Minnesota  55404
8
     On Behalf of the Defendants:
9
       Deborah E. Lewis
10     BLACKWELL BURKE P.A.
       431 South Seventh Street
11     Suite 2500
       Minneapolis, Minnesota  55415
12
   ALSO PRESENT:
13
       Ronald M. Huber, Videographer
14     Angel Dorsey, Hausfeld Law Firm
15           EXAMINATION INDEX
   WITNESS        EXAMINED BY      PAGE
16  Ms. Hughes     Mr. Assaad       3, 184
               Ms. Lewis       181
17
           EXHIBIT INDEX
18  EXHIBIT      DESCRIPTION       PAGE
   Hughes
19   1    Letter report, Hughes to Lewis,     22
         June 1, 2017, 7 pgs.
20   2    Subpoena for production to Antonia   38
         Hughes, 6/7/2017, 8 pgs.
21   3    CV, Antonia B. Hughes, 3 pgs.     42
     4    Statements, Hughes to Blackwell     99
22       Burke, May and June 2017, 2 pgs.
     5    Expert Report of Dr. Michael J.    177
23       Stonnington, 11 pgs.
24
25

Page 3

1          P R O C E E D I N G S
2     (Witness sworn.)
3          ANTONIA B. HUGHES,
4      Called as a witness, being first
5      duly sworn, was examined and
6      testified as follows:
7            EXAMINATION
8   BY MR. ASSAAD:
9     Q.  Can you please state your name?
10    A.  Antonia B Hughes.
11    Q.  What's your current address?
12    A.  11 Carvel Circle, Edgewater, Maryland 21037.
13    Q.  Have you ever had your deposition taken
14  before?
15    A.  Once.
16    Q.  Approximately how long ago?
17    A.  Five'ish years.
18    Q.  And was it as an expert in a case?
19    A.  Yes.
20    Q.  What kind of case was it?
21    A.  A medical malpractice case.
22    Q.  All right.  And where was the case located?
23    A.  I believe it was Montgomery County here in
24  -- It was here in Maryland, Montgomery County.
25    Q.  Were you -- Were you an expert for the

Page 4

1  plaintiff or the defense?
2    A.  Not -- The plaintiff is the one asking for
3  injuries?
4    Q.  Yes.
5    A.  No.  For the defense.
6    Q.  Do you recall who the attorneys were?
7    A.  No.
8    Q.  Do you recall the name of the case?
9    A.  No.
10    Q.  Did you testify -- Did you actually --
11        Did you testify at trial?
12    A.  No.  It was dismissed before trial.
13    Q.  Was it dismissed, or settled, or you don't
14  know?
15    A.  I don't know.  I was informed that the case
16  had been resolved and to destroy the records.
17    Q.  Okay.  Do you recall any of the attorneys in
18  the case?
19    A.  No.
20    Q.  Well I'm going to go through a few rules
21  regarding this deposition just so we're all on the
22  same page.  You understand?
23    A.  Okay.
24    Q.  I'm going to ask you numerous questions
25  today about your opinions.  If you don't understand my

Page 5

1  question, please let me know.  Fair?
2    A.  Yes.
3    Q.  If you answer the question that I ask, I'll
4  assume that you understood the question.  Fair?
5    A.  Yes.
6    Q.  At any time you want to take a break, that's
7  fine, but I ask that you only request a break after
8  you answer a pending question.  Fair?
9    A.  Okay.  Yes.
10    Q.  And at any time that you -- that -- during
11  the deposition you realize that a ques -- answer you
12  gave me was incorrect or incomplete, or you want to
13  add something, just please let me know and we can
14  always go back.  Fair?
15    A.  Yes.
16    Q.  And you're doing a good job by answering
17  verbally, but please don't just shake your head or go
18  hmm-umm or uh-huh because it's very difficult for the
19  court reporter to -- to transcribe, and that's all we
20  have here is the transcription of the deposition.  You
21  understand?
22    A.  Yes.
23    Q.  And you're also doing a very good job by
24  waiting for me to finish my question before you answer
25  and so we don't talk over each other, because that's

Confidential - Subject to Protective Order

Page 6

1   also difficult for the court reporter.  Fair?
2       A.  Yes.
3       Q.  Okay.  With respect to the deposition you
4   did five years ago, what were the issues in that case?
5       A.  It was issues of whether or not a medical
6   test that had been performed were -- the results were
7   given to the surgeon in a timely manner.
8       Q.  Okay.  What medical tests?
9       A.  It was a chest x-ray.
10      Q.  Was it a wrongful death case?
11      A.  The patient subsequently died, but she was
12  not deceased during the time that I was --
13      Q.  And what was --
14      A.  Involved.
15      Q.  Sorry.
16          What was the alleged misdiagnosis?
17      A.  Lung cancer.
18      Q.  Do you recall what hospital?
19      A.  No.
20      Q.  Was it, like, Shady Grove?
21      A.  I -- I don't remember if it was Shady Grove
22  or Holy Cross, it was -- I don't -- truly don't
23  remember.
24      Q.  And you're a Registered Nurse?
25      A.  Yes.

Page 7

1       Q.  And why don't you -- if you can briefly go
2   through your educational background?
3       A.  Okay.  I graduated from a nursing diploma
4   program in 1974, became certified in operating room
5   nursing in 1983, and have maintained that
6   certification.  I received my Bachelor's of Nursing
7   from the college of Notre Dame in 1995, and my
8   Master's of Arts in administration at the college of
9   Notre Dame.  Both of those are in Baltimore.
10      Q.  You received your bachelor's in nursing in
11  --
12      A.  Yes.
13      Q.  -- 1995?
14      A.  Yes.
15      Q.  Okay.  And so what did you receive in 1974?
16      A.  A diploma in nursing.  It was a different
17  type of nursing curriculum, it was a three-year
18  program --
19      Q.  Okay.
20      A.  -- with some college credits and some
21  clinical.
22      Q.  But you became a Registered Nurse in 19 --
23  after you finished in 1974?
24      A.  Yes.
25      Q.  Okay.  Why did you decide to go back to

Page 8

1   college to get your bachelor's in nursing?
2       A.  Good question.  I wanted some different
3   opportunities.
4       Q.  Okay.  And I take it you needed your
5   bachelor's to go receive a master's?
6       A.  Yes.
7       Q.  Did you go straight through from your
8   Bachelor's of Science in nursing to your Master's of
9   Arts in management?
10      A.  I had about a year off.
11      Q.  And during that time were you continually
12  employed as a nurse?
13      A.  Yes.  I was full-time employed all of the
14  time I was in school.
15      Q.  And where were you employed?
16      A.  At that time, Anne Arundel Medical Center in
17  Annapolis.
18      Q.  And you also mentioned in 1983 you became a
19  -- a certified operating room nurse?
20      A.  Yes.
21      Q.  What does that entail?
22      A.  The initial certification is an exam based
23  on current practices in OR nursing and patient case
24  care -- care scenarios.
25      Q.  So after that period of time did you mostly

Page 9

1   work in an operating room?
2       A.  Yes.  The whole time.
3       Q.  And that would be at Anne Arundel County?
4       A.  No.  I worked at Anne Arundel for 15 years,
5   then I went to Hopkins Bayview, then I went to Calvert
6   Memorial down in Prince Frederick, and then went to
7   Baltimore Washington Medical Center.
8           (Interruption by the reporter.)
9       A.  Baltimore Washington Medical Center in Glen
10  Burnie.
11      Q.  Okay.  Tell me more about your certification
12  for an operating room nurse.  What does that entail?
13      A.  It's -- You need two years of eligibility,
14  which means you need to have been employed as an OR
15  nurse for at least two years.  And other than that you
16  need to be a Registered Nurse.  And other than that it
17  is a preparation, studying, reviewing case studies.
18  And the organization that administers the test gives
19  prep courses and gives you ideas of what material
20  should be studied.  It's material about generic
21  nursing, what would a nurse do, but also specific to
22  the OR.
23      Q.  Okay.  So let's get into more specifics
24  about that.
25      A.  Okay.

Confidential - Subject to Protective Order

Page 10

1    Q.   What would be the curricula with respect to
2  what are the materials that you would be looking at or
3  asked to be studying in preparation --
4    A.   One of them is --
5    Q.   -- in preparation of the exam?
6    A.   Okay.  One is a textbook called Alexander's
7  Care of the Patient in Surgery.  Another would be the
8  current Guidelines to Perioperative Practice, which is
9  published by AORN.  Another is Berry & Kohn's, trying
10  to remember the title, I think it's Surgical Care.
11  Don't quote me on that title, but it's Berry & Kohn's
12  is another textbook that's a good basis for
13  certification review.  They also have flash cards,
14  they also have test questions online to help you look
15  at the format of the questions.
16    Q.   And what are the subject areas that you're
17  looking at?
18    A.   Preoperative nursing, intraoperative
19  nursing, some equipment questions, some holistic
20  questions about materials management, hospital
21  administration, staffing, budgets.  Some questions on
22  cultural diversity, and some -- I think that's the --
23  I'm trying to remember the breakdown.  It's like a
24  breakdown of five categories, but I don't have that in
25  my head.

Page 11

1    Q.   Okay.  And with respect to equipment, what
2  equipment would you be asked to --
3    A.   Things about --
4    Q.   -- look at?
5    A.   Things about positioning, safely positioning
6  the patient.
7    Q.   Is that equipment, or is that some -- would
8  that be more of patient care?
9    A.   Both.
10    Q.   Okay.
11    A.   It would be both, truly.
12        If a patient has a fracture you need to know
13  how to safely use the fracture table, that would be an
14  equipment, but then also position the patient safely
15  so that they don't have any skin or neurological
16  injuries being positioned on that table.
17    Q.   What other equipment?
18    A.   An overview of an anesthesia machine, how to
19  supply -- not to administer anesthesia, but how to
20  administer oxygen.  There's usually another oxygen
21  port, and in an emergency you'd need to know where
22  that's located to support a patient.
23    Q.   Did you go into the different types of
24  patient-warming devices?
25    A.   I would say no.  They talk --

Page 12

1  Patient-warming devices would be in more on
2  hypothermia and how to prevent hypothermia.
3    Q.   Is that part of the OR certification?
4    A.   It would be a question like what are SCIP
5  guidelines.  SCIP guidelines are antibiotics timing,
6  normothermia, blood glucose monitoring, not shaving
7  the patient, but clipping, the bathing of the patient
8  pre-op.  Those are the things all sort of encompassed
9  in the SCIP guidelines.
10    Q.   I understand that, but were the SCIP
11  guidelines with --
12    A.   Would they be --
13    Q.   -- normothermia were there in 1983?
14    A.   In nineteen -- Are you asking me about my
15  test from nineteen --
16    Q.   Oh yeah.
17    A.   Oh, I can't remember my test from 1983.
18    Q.   But I'm looking at the subject areas.
19    A.   Oh, the subject areas would be similar, but
20  the equipment, I don't know that we were talking about
21  hypothermia in 1983.
22    Q.   Okay.
23    A.   I -- I misunderstood.  I thought you meant
24  current.
25    Q.   And I'm looking at what you --

Page 13

1    A.   Oh, what did I study.
2    Q.   Yes.
3    A.   Okay.
4    Q.   What subject areas were -- and materials
5  were you had to review in preparation of your --
6    A.   Okay.
7    Q.   -- exam in 1983?
8    A.   Probably not the SCIP guidelines, they were
9  not in effect in 1983.
10    Q.   Okay.
11    A.   They came about in the '90s.
12    Q.   Okay.  You also mentioned --
13        And I'm just trying to understand what --
14  what is it about a certifi -- what it is that a
15  operating nurse that's certified, like what is the
16  certification process; what makes you different than
17  any other nurse that's not certified, like, what do
18  you learn that's different?
19    A.   Okay.  To maintain your certification you
20  nee -- every five years you need to either retake the
21  exam or have at least 30 hours of continuing education
22  or a total of 150 during that five-year period.  So
23  during that five-year period you need to have read and
24  studied and completed certification credits to be
25  eligible to be -- to renew your certification.

Confidential - Subject to Protective Order

Page 14

1    Q.   Have you taken any classes on, like, being
2  an expert witness?
3    A.   No.
4    Q.   Okay.  Do you advertise for your services?
5    A.   No.
6    Q.   Do you know how is it that 3M obtained your
7  name?
8    A.   From a professional colleague.
9    Q.   Who?
10   A.   Two.  Sharon Chappy and Joy Don Baker.
11   Q.   Sharon?
12   A.   Chappy, C-H-A-P-P-Y.
13   Q.   And?
14   A.   Joy Don, two words, J-O-Y, capital D-O-N,
15  Baker.
16   Q.   And are they in Maryland?
17   A.   No.
18   Q.   Where are they?
19   A.   Joy Don's in Texas, and Sharon is in
20  Oshkosh, Wisconsin.
21   Q.   And how is it that both of them referred you
22  to 3M?
23   A.   I don't know.
24   Q.   Okay.
25   A.   I -- They said, I referred you because I

Page 15

1  think you're a better qualified witness than either of
2  us, you have more recent clinical experience.  I said,
3  thank you.
4    Q.   In your experience have you dealt -- have
5  you worked in operating rooms where total joint
6  arthroplasty was performed?
7    A.   Yes.
8    Q.   Do you work for an orthopedic surgeon or --
9    A.   Directly for an orthopedic surgeon?
10   Q.   Yeah.
11   A.   No.  I've always worked for facilities.
12   Q.   Okay.  And how long were you involved in
13  actually handling cases of total hip or total knee
14  arthroplasty?
15   A.   During my career how long?
16   Q.   Yeah.  Like what years?  Was it a stretch of
17  --
18   A.   You're talking about me being the nurse in
19  the room, or being a supervisor, or being an educator?
20   Q.   Let's start with you being a nurse in the
21  room.
22   A.   Probably from 19 -- No, let's see -- 1984 to
23  about 2000.
24   Q.   Okay.  Has it -- Was there -- Did there --
25  strike that.

Page 16

1        Did there come a point where you were no
2  longer acting as a nurse and more of a supervisor and
3  educator?
4    A.   In the year 2000 I left Anne Arundel to take
5  a managerial role.
6    Q.   Okay.
7    A.   But did function in the role as an RN
8  circulator on occasion.  Not usually total joints,
9  though.
10   Q.   Okay.  When was the last time you were
11  involved in a total joint arthroplasty?
12   A.   In the room as the nurse or in the room
13  supervising?
14   Q.   As a nurse.
15   A.   Probably 2015.
16   Q.   2015?
17   A.   Umm-hmm.
18       THE REPORTER:  Your answer, please?
19   A.   Yes.  Sorry.  2015.  Apologize.  I don't
20  mean to...
21   Q.   Okay.  And when you say in 2015, was it on a
22  regular basis, or was it just --
23   A.   No.  No.
24   Q.   No.  Okay.
25   A.   That was not my regular daily assignment,

Page 17

1  no.
2    Q.   Okay.  So roughly speaking between 2000 and
3  2015, approximately how many times a year would you be
4  involved as --
5    A.   Depending on --
6        (Interruption by the reporter.)
7    Q.   -- as a nurse in an operating room in a
8  non-supervisory role, actually doing work?
9    A.   So the question is from 2000 to 2015.
10   Q.   Yes.
11   A.   I don't know that I can pull out a number.
12   Q.   Was it like once a month, twice a month,
13  once a year?
14   A.   Depending on the year, perhaps once a month.
15   Q.   Okay.  And since 2000 to 2015, how often
16  would you be involved as a nurse in a total hip or
17  total knee arthroplasty?
18   A.   Is that the same question?
19   Q.   Well one was more general, in all types of
20  --
21       I assume you just didn't handle total hip or
22  total knee; correct?
23   A.   Correct.  But I misunderstood your first
24  question.
25   Q.   Okay.

Confidential - Subject to Protective Order

Page 18

1     A.  I thought you were asking about numbers of
2  times I had done total knees or hips from 2000 to
3  2015.
4     Q.  Okay.  So my understanding, based on your
5  statement, is between 2000 and 2015 you were probably
6  involved with one total knee or total hip arthroplasty
7  per month.
8     A.  Correct.
9     Q.  Okay.  What about overall all types of
10  surgeries?
11     A.  Depending upon the month and the year,
12  probably once a week.
13     Q.  Okay.  And the rest of the time you were
14  acting as a supervisor or an educator.
15     A.  Correct.
16     Q.  Okay.  Now how long have you been an
17  educator?
18     A.  Since 2007, so -- at full ti -- Well, no.
19  Full time since 2007.
20     Q.  Okay.  And as an educator, where are you an
21  educator?
22     A.  Currently I'm an independent practitioner.
23     Q.  And what does that mean, "independent
24  practitioner"?
25     A.  That means I do a contract with a facility

Page 19

1  to coordinate, facilitate a course called Periop 101,
2  which is an introductory course for nurses who are not
3  familiar with the clinical environment in the OR.
4  It's a six-month program.  It has some didactic
5  material provided by AORN, and then I provide the
6  clinical experiences and hopefully put the two
7  together for the individuals.
8     Q.  And what subjects are taught or what areas
9  are taught in the Perioperative 101?
10     A.  I couldn't begin to list them.  It's about
11  50 modules in the didactic, so to go through and name
12  them, I -- I couldn't begin to do that.
13     Q.  Do you discuss --
14     A.  I would -- I would miss some.
15     Q.  Okay.  But do you discuss normothermia?
16     A.  Yes.
17     Q.  Do you discuss patient prep?
18     A.  Yes.  Not only discuss, but demonstrate and
19  teach back.
20     Q.  Okay.  Are there any modules with respect to
21  different types of surgeries, such as surgeries
22  pertaining to total hip or total knee?
23     A.  Yes.
24     Q.  Are total hip and total knee surgeries
25  different than other surgeries?

Page 20

1     A.  The difference is the amount of traffic in
2  the room.  There are not extra individuals in the room
3  other than the staff assigned to that room.
4     Q.  Why aren't there --
5        Why is that?
6     A.  We want to decrease the traffic, potential
7  door openings and closings, any unnecessary movement.
8     Q.  Why?  If you know.
9     A.  The best answer is I've read that that will
10  help with patient outcomes.
11     Q.  Why?
12     A.  It's not necessarily a why, but it's a
13  literature suggests that if there is less movement and
14  less door openings, the patient outcome will be
15  improved.
16     Q.  I understand that's the literature, but
17  what's your understanding as to the reason why that's
18  the case; if you know?
19     A.  I don't, other than reading the literature,
20  know.
21     Q.  Yeah, but what is -- I mean the literature
22  just doesn't say --
23     A.  It's --
24     Q.  -- doesn't say, you know, less traffic or
25  less opening of doors.  Does it give a reason that

Page 21

1  you're -- I mean, pretend I'm a student and I say,
2  okay, but why is it different for total hip and total
3  knee not to -- to have less traffic?
4     A.  There is a prosthesis involved.  This is not
5  just total hips and total knees, I will go back and
6  clarify your question.  It's also for any patient
7  that's having a prostheses; whether it's a hernia
8  repair with mesh, a breast implant after
9  reconstruction.  Any patient that will have a
10  potential for an -- a implant we want to be sure that
11  the traffic is to a minimum, --
12     Q.  What is --
13     A.  -- to decrease door openings.  We want to
14  keep the positive pressure that's in the room going
15  and circulating the air as best as possible.  When the
16  door opens and closes numerous times, that positive
17  pressure is disrupt -- potentially disrupted.
18     Q.  But, so what?  The temperature -- It's
19  disrupted.  How does that affect the patient outcome?
20     A.  The correlation between the research is that
21  there is a correlation between disruption of the
22  positive pressure and increased risk for surgical-site
23  infections.
24     Q.  And do you have a -- a -- an article that
25  you could refer me to, a peer-reviewed article?

Confidential - Subject to Protective Order

Page 22

1    A.  Yes.
2    Q.  And by the way, --
3    A.  But I don't -- I know -- I know --
4    Q.  -- she can't give you any answers.
5    A.  No, I know.  I'm trying to remember the name
6  of the author.  I'm sorry.
7        I believe it's on my statement.  I believe I
8  referred that -- to that article in my statement.
9        MR. ASSAAD: Let's mark this as Exhibit 1.
10       (Hughes Exhibit 1 marked for
11        identification.)
12 BY MR. ASSAAD:
13   Q.  What's been marked as Exhibit 1 is a copy of
14 your expert report provided to us on June 2nd, 2017 by
15 -- by the defense in this case.
16       Before you look at it to determine whether
17 or not -- or to point me to the citation that you're
18 referring to, is this a correct and complete copy of
19 your expert report?
20   A.  (Witness reviewing exhibit.)  Yes.
21   Q.  Have you had a chance to review your report
22 before your deposition today?
23   A.  Yes.
24   Q.  Are there any corrections that you want to
25 make to your report before we begin discussing it?

Page 23

1    A.  I think the only correction I -- (Witness
2  reviewing exhibit.)
3        No.  I do not.
4    Q.  Okay.  And is your report a complete list of
5  all the opinions in this -- in the case that you have?
6    A.  That I have --
7    Q.  Yes.
8    A.  -- personally?  Yes.
9    Q.  Okay.  And everything in your --
10       And all the material that you rely upon to
11 support your opinions are in the report; correct?
12   A.  Yes.
13   Q.  Okay.  And you wrote this report yourself;
14 correct?
15   A.  Yes.
16   Q.  Okay.  Did you have any help writing this
17 report?
18   A.  No.
19   Q.  Okay.  Did anyone offer any comments to you
20 regarding the report?
21   A.  No.
22   Q.  Okay.  Did you discuss your opinions with
23 anyone besides counsel?
24   A.  No.
25   Q.  Did you look at any other --

Page 24

1        With respect to your references 1 through 7
2  on page 7 of your report, did you independently
3  provide these references, or were these given to you
4  by somebody?
5    A.  Oh, no.  I provided them.
6    Q.  Okay.  Do you know any of the authors that
7  you cite in this report?
8    A.  I do not.
9    Q.  Okay.  What reference are you referring to
10 with respect to --
11   A.  I believe it was number 2.
12       MS. LEWIS:  Let him finish his question.
13       THE WITNESS:  Oh, I'm sorry.  I'm sorry.
14   Q.  What reference were you -- were you
15 referring to with respect to traffic and opening
16 doors?
17   A.  Number 2, Andersson, and number 3, Parah, I
18 believe are the ones I cited.
19   Q.  Okay.  So Andersson sta -- is titled
20 "Traffic flow in the operating room:  an explorative
21 and description study of air quality during orthopedic
22 trauma implant surgery."
23       First of all, orthopedic trauma implant
24 surgery is different than elective total hip and total
25 knee arthroplasty; correct?

Page 25

1    A.  It's --
2        Depending on the facility and the
3  classification.  There are some classifications that
4  put the two together, and some that separate.  And I
5  don't know which one he used without looking at the
6  article.
7    Q.  And I take it you've read all these
8  articles; correct?
9    A.  Yes.
10   Q.  All right.
11   A.  Yes.
12   Q.  Like from beginning to end, not just the
13 abstract.
14   A.  Yes, --
15   Q.  Okay.
16   A.  -- from beginning to end.
17   Q.  And it says something about "description
18 study on air quality."  What does air quality have to
19 do with traffic flow?
20   A.  I'd have to go back and look at the study,
21 whether he was measuring particles or current.  I
22 don't remember.
23   Q.  Well assume he was measuring particles, what
24 do particles have to do with air quality?
25       MS. LEWIS:  Do you want to show her the

Confidential - Subject to Protective Order

Page 26

1 article so she can look to see?
2     MR. ASSAAD: I don't have it.
3     A. Okay. Ask your question again. I'm sorry.
4     Q. Well you cite this study yourself as -- you
5 know, you read this; correct?
6     A. Yes.
7     Q. And you've read it in preparation of writing
8 your report; correct?
9     A. Yes. And that was two months ago.
10     Q. I understand that.
11     A. Okay.
12     Q. And did you look at the study previously
13 before -- in preparation of your deposition?
14     A. Yes, but again, awhile ago.
15     Q. Okay.
16     A. Not last night.
17     Q. Well what's "awhile ago"?
18     A. Three weeks, four weeks.
19     Q. Okay. So you mentioned either particles or
20 currents; correct?
21     A. Correct.
22     Q. Okay. You're just not sure which one it was
23 he was referring to.
24     A. Correct.
25     Q. Okay. Just assume that he was referring to

Page 27

1 particles. How would particles affect air quality?
2     MS. LEWIS: Objection to the form of the
3 question and foundation. And again if -- I mean,
4 you're asking her to guess on what the article said,
5 so unless -- if you don't have a copy of the article
6 --
7     MR. ASSAAD: I'm not asking her to guess.
8 She's the one that cited it. I assume as an expert
9 in this case that's going to offer opinions and you
10 refer to an article, you actually know what the
11 article states.
12     MS. LEWIS: Well no, this is not a memory
13 game, Gabe.
14 BY MR. ASSAAD:
15     Q. Do you know what the article states, ma'am?
16     A. Not without looking at it again.
17     Q. Okay. So sitting here today you don't know
18 what the article states.
19     A. Not looking at it again today.
20     Q. Let's look what you used for number 2.
21     A. Okay.
22     Q. Let's look where it states that you cite to
23 number 2. If you look at page 3 it says: According
24 to published literature, increased 'door openings'
25 causes more air current into the operating room and

Page 28

1 increase the risk to the patient of a potential for a
2 surgical site infection."
3     Did I read that correctly?
4     A. Yes.
5     Q. Okay. So does that refresh your memory as
6 to what the article states?
7     MS. LEWIS: Objection, form.
8     Q. "Yes" or "no"?
9     A. My understanding is that it goes into the
10 next sentence.
11     Q. I understand, but what I'm trying to
12 understand is how does air current or particles
13 increase the risk to the patient of a potential for a
14 surgical-site infection; if you know. If you don't
15 know, that's fine.
16     A. Okay. I don't know.
17     Q. Okay. You're not an engineer; correct?
18     A. That's correct.
19     Q. So you don't consider yourself an expert in
20 airflow; correct?
21     A. That's correct.
22     Q. And you're not a medical doctor; correct?
23     A. That's correct.
24     Q. So you don't consider yourself an expert in
25 infectious diseases?

Page 29

1     A. No.
2     Q. You don't consider yourself an expert in
3 orthopedics?
4     A. No.
5     Q. You don't consider yourself an expert in
6 anesthesiology?
7     A. That's correct.
8     Q. You don't consider yourself an expert in
9 hospital ventilation?
10     A. No.
11     Q. You don't consider yourself an expert in
12 aerobiology?
13     A. No. Whatever that is.
14     Q. You don't consider yourself an expert in
15 operating room design?
16     A. No.
17     Q. Okay. You don't consider yourself an expert
18 in microbiology?
19     A. That's correct.
20     Q. Have you ever designed a medical device?
21     A. No.
22     Q. So you don't consider yourself an expert in
23 the design of medical devices; correct?
24     A. Correct.
25     Q. You don't consider yourself an expert with

Confidential - Subject to Protective Order

Page 30

1    respect to FDA clearance; correct?
2        A.   No.
3        Q.   Correct; right?
4        A.   That is correct.  I am not an expert on FDA
5    clearance.
6        Q.   You mentioned that, you know, surgeries such
7    as hernia prosthesis or breast implant surgeries, that
8    the opening of doors and traffic could increase the
9    risk of surgical-site infection; correct?
10       A.   In some facili --
11            MS. LEWIS:  Objection to the form of the
12   question.
13       A.   -- I didn't say it increased -- No.  State
14   that --
15       Q.   Maybe I misunderstood you.
16       A.   Yeah.
17       Q.   So what is it about those surgeries that are
18   significant?
19       A.   In some facilities they are treated as the
20   same as a total joint and work -- the facility and the
21   staff work very hard to restrict traffic in any room
22   that has a prosthesis.
23       Q.   Okay.  And it's -- based on what I'm
24   understanding is that they want to restrict traffic
25   because the more traffic that exists can increase the

Page 31

1    risk of a surgical-site infection; correct?
2            MS. LEWIS:  Objection to the form.
3        A.   The traffic --
4            MR. ASSAAD:  Basis?  Basis?
5            MS. LEWIS:  Foundation.
6            MR. ASSAAD:  Okay.
7        A.   The traffic increases the door openings and
8    closings.  That's my statement.
9        Q.   Okay.  Do you know whether or not, sitting
10   here today, that the -- the number of people in an
11   operating room can affect the risk of a surgical-site
12   infection in total hip or total knee arthroplasty?
13            MS. LEWIS:  Same objection.
14       A.   No.
15       Q.   Okay.
16       A.   I do not.
17       Q.   Is there something about a prosthesis such
18   as a total hip or total knee that the opening of the
19   door increases the risk of surgical-site infection?
20       A.   Again --
21            MS. LEWIS:  Same objection.
22       A.   -- disturbance to the positive airflow in
23   the room.
24       Q.   What does that mean?  I mean, so what?
25       A.   That's what the literature has shown that

Page 32

1    if -- when there is a disturbance to that, there is an
2    increased potential risk for surgical-site infection.
3        Q.   Do you know what causes surgical-site
4    infection?
5        A.   A variety of factors, most often,
6    unfortunately, the patient.
7        Q.   Okay.  And your basis?
8        A.   Literature reading.
9        Q.   What's --
10            What are you citing to?
11       A.   I'm not citing anything.  This is from my
12   knowledge --
13       Q.   Okay.
14       A.   -- as a practicing nurse.
15       Q.   Okay.  But your knowledge is not based on
16   your education in infectious diseases or anything like
17   that; is it?
18       A.   No.
19       Q.   And you would defer to an infectious disease
20   expert with respect to what causes a surgical-site
21   infection; correct?
22       A.   Yes.
23       Q.   But when I said what causes a surgical-site
24   infection, is it -- you agree with me that it's a
25   bacteria; correct?

Page 33

1        A.   Occasionally.
2        Q.   Occasionally?
3        A.   Yeah.  Sometimes it's not bacteria.  It can
4    be a fungus, can be a spore, --
5        Q.   Let's --
6        A.   -- can be a prion.  There are more than just
7    bacteria out there.
8        Q.   Let's just focus on total hip and total knee
9    arthroplasty.
10            Would you agree with me that with respect to
11   a total hip or total knee arthroplasty that the -- the
12   most likely cause of a periprosthetic joint infection
13   is a bacteria?
14            MS. LEWIS:  Objection, form.
15       A.   I don't know that for a fact.  I don't have
16   that --
17       Q.   Okay.
18       A.   -- fact in front of me.
19       Q.   Do you know the difference between a -- a
20   superficial surgical-site infection and a deep joint
21   infection?
22       A.   Yes.
23       Q.   What's the difference?
24       A.   A superficial is as it says.  It may be just
25   the skin and the subcutaneous tissue that's involved.

Confidential - Subject to Protective Order

Page 34

1    A deep will go further into the wound as it's
2    described as deep.
3        Q.  Okay.  Do you know the difference between a
4    superficial surgical-site infection and a
5    periprosthetic joint infection?
6        A.  No.
7        Q.  Do you know when -- Strike that.
8            By the way, looking at Exhibit 1, your
9    report, the first paragraph, are these all the
10   documents you reviewed or were provided to you prior
11   to you formulating your opinions in paragraph one?
12       A.  Yes.
13       Q.  Okay.  So you looked at the Master Long Form
14   Complaint and Jury Demand; correct?
15       A.  Yes.
16       Q.  You looked at Defendants' Master Answer to
17   Plaintiffs' Master Long Form Complaint and Jury
18   Demand; correct?
19       A.  Yes.
20       Q.  You looked at the Memorandum in Support of
21   Defendants' Proposed Phase I Scheduling Order?
22       A.  Yes.
23       Q.  Why'd you look at that?
24       A.  It was provided to me.  It was in a group of
25   documents sent to me.

Page 35

1        Q.  And you looked at the expert report of
2    Michael J. Stonnington, M.D.?
3        A.  Yes.
4        Q.  Anything else you looked at, besides the
5    literature that's referenced?
6        A.  Not that I recall.
7        Q.  Did you look at any other expert --
8            Were you provided any other expert reports?
9        A.  No.
10       Q.  So you don't -- you haven't looked at the
11   report of Dr. Mont?
12       A.  No.
13       Q.  Have you read any depositions?
14       A.  No.
15       Q.  You know what a deposition is.
16       A.  Yes, I do.  I'm trying to recall, that's
17   all.
18       Q.  Okay.
19       A.  No.  The answer is no.
20       Q.  So you haven't looked at any of the defense
21   experts; correct?
22       A.  No.
23       Q.  So you haven't looked at the report of Dr.
24   Borak.
25       A.  No.

Page 36

1        Q.  Or Dr. Hawfeld -- or Mr. Hawfeld, Dr.
2    Hawfeld [ph]?
3        A.  No.
4        Q.  Have you looked at the report of Dr. Wenzel?
5        A.  No.
6        Q.  And you haven't looked at any of the reports
7    of any of the engineering experts; correct?
8        A.  I may have looked at one of those, --
9        Q.  Was it --
10       A.  -- but I don't remember which one.
11       Q.  -- Dr. Abraham?
12       A.  I don't remember which name it was.
13       Q.  Okay.  What was in the report?
14       A.  It was an airflow report showing the airflow
15   from the center of the room down from the ceiling
16   tiles out to the exhaust on the side of the room.
17       Q.  And were they, like, colored dots?
18       A.  No.  I thought they were flow, what I would
19   call flow diagrams.
20       Q.  Okay.  But were they, like, streamlines?
21       A.  I guess you could describe it that way.
22       Q.  Okay.  Were they different --
23       A.  I would call it flow.
24       Q.  Were they different colors?
25       A.  I don't remember.

Page 37

1        Q.  Did you use that report in any way in -- to
2    --
3            Did you rely on the report in any way in
4    your opinion?
5        A.  No.
6        Q.  Okay.
7        A.  I believe I read them after I had completed
8    my statement.
9        Q.  Okay.  Have you looked at the flow done --
10   done by Dr. Elghobashi?
11       A.  No.
12       Q.  Have you looked at any expert reports by Dr.
13   Jarvis?
14       A.  No.
15       Q.  Okay.  Is there anything else you looked at
16   besides what we've discussed today?
17       A.  No.
18       Q.  Any other literature you looked at besides
19   what's --
20       A.  No.
21       Q.  -- been -- been marked under your references
22   in your expert report, --
23       A.  No.
24       Q.  -- Exhibit 1?
25       A.  No.

Confidential - Subject to Protective Order

Page 38

1    Q.   Okay.  Have you looked at the manual,
2  operating manual for the Bair Hugger?
3    A.   No.
4    Q.   Have you looked at a Bair Hugger?
5    A.   Yes.
6    Q.   Have you taken it apart?
7    A.   No.
8    Q.   Have you used a Bair Hugger?
9    A.   Yes.
10   Q.   Approximately how many times?
11   A.   Every time I took care of a patient.
12   Q.   So you're the -- you'd be the one to put the
13  blanket on the patient?
14   A.   Correct.  And attach -- help with anesthesia
15  to attach it, yes.
16   Q.   Okay.  Would you control the Bair Hugger,
17  turn it on and off?
18   A.   Occasionally.  Sometimes -- Most of the time
19  anesthesia did.
20   Q.   Do you know what model Bair Hugger you used?
21   A.   No.
22   Q.   Do you know whether -- if it was white or
23  blue?
24   A.   Blue.
25      (Hughes Exhibit 2 marked for

Page 39

1      identification.)
2  BY MR. ASSAAD:
3    Q.   What's been marked as Exhibit 2 is a
4  subpoena issued by the plaintiffs to you on June 7,
5  2017 for documents to be produced in this case.
6      Do you recall seeing this subpoena?
7    A.   Yes.
8    Q.   When did you first see the subpoena?
9    A.   Don't know the date.  It was emailed to me.
10   Q.   Was it before June 21st, 2017?
11   A.   I can't answer that.  I don't truly remember
12  the date.
13   Q.   So it's possible you seen the subpoena after
14  June 21st, 2017?
15   A.   I can't answer.
16   Q.   Okay.  What did you do when you received the
17  subpoena?
18   A.   I received an email saying that it would be
19  coming, and so I read it.
20   Q.   Okay.  Did you go through the subpoena?
21   A.   Yes.
22   Q.   Did you provide documents responsive to this
23  subpoena to counsel?
24   A.   Not other than my statement.  I provided the
25  documents with my statement.

Page 40

1    Q.   So you didn't provide the articles to
2  counsel?
3    A.   I did.
4    Q.   Okay.
5    A.   With my statement is what I'm saying.
6    Q.   Okay.
7    A.   With my statement.
8    Q.   All right.  Did you --
9      Did you create any notes?
10   A.   No.
11   Q.   Okay.  So going through this subpoena,
12  number 1:  "All documents reviewed by the deponent in
13  anticipation of or in preparation for this
14  deposition," we've already discussed that; correct?
15   A.   Yes.
16   Q.   Okay.  Number 2:  "All correspondence and
17  documents between the deponent and non-lawyers..."
18  Have you --
19      Did you have any correspondence with anyone
20  besides counsel?
21   A.   No.
22   Q.   Number 3, you said you have no notes;
23  correct?
24   A.   Correct.
25   Q.   Okay.  "Copies of all documents provided to

Page 41

1  the deponent by Defendants' counsel..."
2      Did you provide -- Did you have any of
3  those?
4    A.   Notes, or articles?
5    Q.   Articles.
6    A.   I've -- I provided them.
7    Q.   But the --
8      I'm just talking about were any -- were any
9  of those articles provided to you?
10   A.   Given to me?
11   Q.   Yeah.
12   A.   No.
13   Q.   Okay.  Number 6, a list of all books,
14  treatises and articles authored or coauthored by the
15  deponent.  Do you have a list --
16      Do you have any peer-reviewed publications?
17   A.   I have one related to safe patient care --
18   Q.   Is it --
19   A.   -- in the AORN Journal.
20   Q.   Okay.  Is it -- Was it peer reviewed?
21   A.   Yes.
22   Q.   Okay.  Is it listed here?
23   A.   It's a peer-reviewed journal.
24   Q.   Okay.  But was your article peer reviewed?
25   A.   I don't know, to tell you the truth.

Confidential - Subject to Protective Order

Page 42

1   Probably, yes.
2      Q.   Okay.  Do you recall receiving comments on
3   the article from other -- from colleagues in your
4   field?
5      A.   No.
6      Q.   Okay.  And is it listed under your
7   publications and presentations in your CV?
8      A.   I believe so.  If it's not, it's -- I
9   apologize for the omission.
10       I don't know if it is or not, to tell you
11  the truth.  It was a "how to," rather than a peer
12  type.
13       (Hughes Exhibit 3 marked for
14       identification.)
15       THE WITNESS:  I don't know if it's there or
16  not, to tell you the truth.  (Witness reviewing
17  exhibit.)  Yes.  "Developed competency statements,"
18  yes.
19  BY MR. ASSAAD:
20     Q.   Okay.  And that was published --
21     A.   This -- "Implementing AORN recommended
22  practices..."  It's one, two, three, fourth, fifth one
23  down:  "Implementing AORN Recommended Practices for a
24  Safe Environment of Care" --
25       (Interruption by the reporter.)

Page 43

1      A.   "Implementing AORN Recommended Practices For
2   a Safe Environment of Care," August 2013, Volume 98,
3   Number 2, AORN Journal.
4      Q.   Did you provide a copy of that journal to
5   counsel?
6      A.   I did not.  I believe they retrieved it
7   themselves.
8      Q.   You understand that the subpoena required
9   you to do a search and produce articles and documents
10  that you've authored; correct?
11     A.   Umm-hmm.
12       THE REPORTER:  Your answer, please?
13     Q.   Is that a "yes"?
14     A.   Yes.
15     Q.   And sitting here today, you did not provide
16  that article to counsel; correct?
17     A.   Correct.
18       MS. LEWIS:  Where does it say she's
19  supposed to produce articles that she's authored?
20       MR. ASSAAD:  Number 6, a list of books,
21  treatises and articles authored or co-authored by the
22  deponent.
23       MS. LEWIS:  That's a list, not to produce.
24       MR. ASSAAD:  Okay.  Okay.
25       MS. LEWIS:  There's not a list --

Page 44

1      MR. ASSAAD:  Correct.
2      MS. LEWIS:  -- but it -- but it is in her
3   CV.
4   BY MR. ASSAAD:
5      Q.   Do you agree that providing a safe
6   environment for every patient undergoing a surgical or
7   other invasive procedure is imperative?
8      A.   Yes.
9      Q.   Do you agree that -- Strike that.
10       Do you have an engagement agreement with
11  defense counsel?
12     A.   No.
13     Q.   Have you produced -- Strike that.
14       When was the last invoice that you provided
15  to defense counsel?
16     A.   June.
17     Q.   For the --
18       For your time in June?
19     A.   Yes.
20     Q.   Okay.
21     A.   Yes.
22     Q.   And it's my understanding that you only
23  provided two invoices in this case; correct?
24     A.   Yes.
25     Q.   How much time have you spent in July on this

Page 45

1   case?
2      A.   I think none in July.  I think the next
3   invoice will be for August time.  I'll have to -- I'll
4   have to look.
5      Q.   So you spent -- you spent --
6      A.   No.  There would be -- No.  Four hours in
7   June -- or July, I'm sorry.
8      Q.   Okay.  And that was what we discussed before
9   when you prepared for this deposition.
10     A.   Correct.
11     Q.   Okay.  So four hours in July.  And what
12  about in August to date?
13     A.   To date, probably another 12.
14     Q.   Twelve hours?  So you've spent 12 hours
15  between --
16     A.   I'd have to look at my calendar.
17     Q.   Okay.  And you keep detailed billing
18  records; correct?
19     A.   Yes.
20     Q.   And it's important to be accurate; correct?
21     A.   Yes.
22     Q.   Okay.  Do you have a correspondence file?
23     A.   "Correspondence file"?
24     Q.   Like a file where you keep all your, like --
25  Strike that.

Confidential - Subject to Protective Order

Page 46

1    You have no correspondence at all; correct?
2    A.  Correct.
3    Q.  Okay.  Have you discussed your opinions with
4  any other expert in this case?
5    A.  No.
6    Q.  Do you know any of the other experts in this
7  case?
8    A.  I do not.
9    Q.  Do you know who Dr. Mont is?
10    A.  Do not.
11    Q.  Any email with anyone besides counsel in
12  this case?
13    A.  No.
14    Q.  Besides your report, are there any other
15  electronic files that you have, like that have been
16  saved on your computer?
17    A.  No.
18    Q.  Have you looked at any other forced-air
19  warming devices?
20    A.  No.
21    Q.  Do you even know of any other forced-air
22  warming devices?
23    A.  I do not.
24    Q.  Do you know of any other patient-warming
25  devices?

Page 47

1    A.  No.
2    Q.  Have you heard of the HotDog?
3    A.  I have heard of it, but I've never seen it
4  or used it.
5    Q.  Do you know who Dr. Scott Augustine is?
6    A.  I recognize the name.
7    Q.  How do you recognize the name?
8    A.  From Augustine Medical.  From years ago when
9  Bair Hugger was owned by Augustine.
10    Q.  Okay.  Have you heard of anything from --
11  Strike that.
12    Have you heard any information regarding Dr.
13  Augustine in this case?
14    A.  No.
15    Q.  What was your experience with Augustine
16  Medical?
17    A.  I saw the display at a vendor fair and
18  learned about it there, and then used it in my work
19  practice.
20    Q.  Are you familiar with the SCIP 10 protocols
21  with respect to maintaining normothermia?
22    A.  Yes.
23    Q.  And what is your understanding of the SCIP
24  10 protocol?
25    A.  It has to do with antibi -- correct

Page 48

1  antibiotic, correct antibiotic dosing, correct dosing
2  related to patient weight.  It has to do with
3  clipped -- shaving -- not shaving, but clipping the
4  hair.  It has to do with normothermia, and it has to
5  do with blood glucose.  And I think there's another
6  one, prepping.
7    Q.  That's --
8    A.  It's --
9    Q.  That's SCIP in general.
10    A.  Correct.
11    Q.  Okay.  But SCIP 10 deals with normothermia.
12    A.  All of them.  They're all part of the SCIP
13  protocol.
14    Q.  But you know there's different numbers, --
15    A.  Yes.
16    Q.  -- like there's SCIP 1 through 10.
17    A.  So I --
18    If SCIP 10 deals with normothermia I'm not
19  aware of that.
20    Q.  Okay.
21    A.  I have no knowledge of that one.
22    Q.  Do you know whether or not the SCIP protocol
23  that pertains to maintaining normothermia still
24  exists?
25    A.  Yes.  As far as I know --

Page 49

1    As far as I know, yes, it does still exist.
2    Q.  Would you be surprised if I told you that it
3  no longer exists?
4    A.  Yes, I would.
5    Q.  So you've been asked to be an expert
6  in this case; correct?
7    A.  Yes.
8    Q.  Do you understand as being an expert --
9  Strike that.
10    You agree with me that as an expert you're
11  to be objective; correct?
12    A.  Yes.
13    Q.  Not to be biased for one side or the other
14  in this case; correct?
15    A.  That's correct.
16    Q.  Not to be an advocate for one side or the
17  other; correct?
18    A.  That's correct.
19    Q.  All right.  I understand that you have done
20  only other one deposition.  Let's talk about your
21  expert legal work.
22    Have you been retained by other law firms to
23  review cases?
24    A.  Yes.
25    Q.  Okay.  And approximately how many times?

Confidential - Subject to Protective Order

Page 50

1    A.  Ten.
2    Q.  Ten.  When did you start becoming -- or
3  start acting as an expert?
4    A.  Probably in the '90s.
5    Q.  '90s.
6    A.  I don't know that I can give you a specific
7  date.
8    Q.  And out of the 10 times, it's my
9  understanding that you only have given one deposition
10 until today.
11   A.  Correct.
12   Q.  Okay.  And out of those 10, were they all
13 medical malpractice cases?
14   A.  Yes.
15   Q.  So would this be the first one that dealt
16 with a product liability case?
17   A.  Yes.
18   Q.  And out of those -- is 10 --
19       You said approximately 10; correct?
20   A.  Approximately, yes.
21   Q.  Would you --
22       What percentage of the cases that you've
23 been retained on as an expert were for the plaintiff
24 as compared to the defendant?
25   A.  I believe I was all -- they were all for the

Page 51

1  defendant.
2    Q.  Okay.  Why is that?
3    A.  Because I was looking at nursing practice
4  and I wanted to be sure the nursing practice was
5  correct, and I was.
6    Q.  But why -- why is it that you haven't worked
7  for any plaintiffs?
8    A.  I haven't been asked.
9    Q.  Okay.  Would you work for a plaintiff?
10   A.  I don't know.  Can't answer that question.
11   Q.  I mean, you do agree that medical
12 malpractice exists and occurs; correct?
13   A.  Yes.
14   Q.  Okay.  And you do --
15   A.  But I'm not a physician.
16   Q.  I understand that.  But you work in -- in
17 a -- you -- you are a nurse; correct?
18   A.  Yes.
19   Q.  And in a majority of the cases that you were
20 a nurse on medical malpractice cases; correct?
21   A.  Yes.
22   Q.  Okay.  And let me ask you this.  Out of the
23 cases that you worked in a medical malpractice case
24 did you ever look at the medical records and determine
25 that a nurse was negligent?

Page 52

1    A.  No.
2    Q.  Do you believe a nurse can be negligent and
3  cause harm?
4    A.  Yes.
5    Q.  Do you believe a medical device company can
6  make a bad product?
7    A.  Yes.
8    Q.  You seem unsure about that answer.
9    A.  I think there would be a lot of steps in the
10 process before the product would be available to --
11 for use with patient care.
12   Q.  Okay.
13   A.  There are a lot of safeguards with the FDA.
14   Q.  But you're not an expert in regulatory;
15 correct?
16   A.  Not an -- Not an expert.
17   Q.  Okay.  You are aware of medical products
18 that have been FDA approved or cleared that end up
19 being recalled; correct?
20   A.  Correct.
21   Q.  Okay.  So you agree with me it's fair to say
22 that if a device is in the market that you assume that
23 the device must not be defective; correct?
24       MS. LEWIS:  Objection, form.
25   A.  I don't know that I can assume one way or

Page 53

1  the other.
2    Q.  Okay.  Has there ever come a time in your
3  career that you would not use a device because you
4  didn't think it was safe for the patient?
5    A.  Yes.
6    Q.  What device was that?
7    A.  It was a screw implant, and --
8    Q.  Pedicle screw?
9    A.  Umm-hmm.  No, not pedicle.  A different --
10 orthopedic screw, but it was packaged in such a way
11 that it was not -- we were not able to open the
12 product without contaminating it.
13   Q.  Okay.
14   A.  So I asked not to -- we couldn't use it.
15   Q.  It was a one-time experience, or just you
16 told the hospital --
17   A.  No, --
18   Q.  -- we're not going to use it?
19   A.  -- we told the vendor and the surgeon and
20 the -- they needed to go back to redesign the
21 packaging.
22   Q.  Okay.
23       MS. LEWIS:  Let him finish the question.
24   Q.  So you --
25       So it was the packaging that you thought was

Confidential - Subject to Protective Order

Page 54

1    defective; correct?
2        A.   Correct.
3        Q.   Okay.  Any other experience?
4        A.   No.
5        Q.   Do you agree that preventable injuries to
6    patients that are caused during medical care are a
7    leading cause of death in the U.S.?
8            MS. LEWIS:  Objection, form.
9        A.   I don't --
10           Go through that again.  I don't know that
11   I --
12       Q.   Do you agree --
13       A.   -- can answer that question.
14       Q.   Do you agree that preventable injuries to
15   patients that are caused during medical care are a
16   leading cause of death in the United States?
17       A.   I don't --
18           MS. LEWIS:  Objection, form.
19       A.   -- know the answer to that one.
20       Q.   You agree with me that doctors make
21   mistakes?
22       A.   Occasionally, yes.
23       Q.   Nurses make mistakes?
24       A.   Yes.
25       Q.   Engineers can make mistakes?

Page 55

1        A.   Yes.
2        Q.   I mean, bridges fall; correct?
3        A.   Yes.
4        Q.   Okay.  Buildings collapse?
5        A.   Yes.
6        Q.   Okay.  With respect to the SCIP protocol
7    with -- with maintaining normothermia, what are your
8    -- what's your understanding of the requirements, like
9    when to use patient warming?
10       A.   The requirement is that the patient's
11   temperature is taken 30 minutes before the procedure,
12   monitored during, and 15 minutes post procedure.  So
13   the care practitioners are instructed to maintain that
14   normothermia as best as possible.
15       Q.   Does it talk about, like, what are the
16   criteria to actually use the patient-warming device,
17   --
18       A.   No.
19       Q.   -- like length of surgery?
20       A.   No.  No criteria.  Suggestions, but not
21   criteria.
22       Q.   Okay.  Any suggestions as to what length of
23   surgery you should use patient warming?
24       A.   I think the criteria is that any procedure
25   over 30 minutes.

Page 56

1        Q.   Okay.  Is that -- Is that a guess?
2        A.   Yes.  Might be 60 minutes.
3        Q.   Okay.
4        A.   Yes, it's a guess.
5        Q.   Okay.  I don't want you to guess today.
6        A.   Okay.  All right.  Then it's an "I don't
7    know."
8        Q.   Okay.
9        A.   I'll leave it at that.
10       Q.   And your counsel doesn't want you to guess.
11       A.   I'll leave it at "I don't know."
12       Q.   Okay.  Have you taught the SCIP protocols in
13   your -- any of your classes?
14       A.   Yes.
15       Q.   Okay.  Do you know what the difference
16   between pre-warming and perioperative warming is?
17       A.   Pre-warming is exactly what it says, it's
18   done in the pre-op holding area, wherever that is in
19   the facility, and introap -- peri is -- to me, I would
20   be intraop warming.
21       Q.   Okay.  Do you know --
22           Are you aware of any studies with respect to
23   the effects of pre-warming as compared to
24   perioperative warming?
25       A.   Say the question again.

Page 57

1        Q.   Do you --
2            Are you aware of any studies that compare
3    pre-warming only as compared to perioperative warming?
4        A.   I am not aware of any, no.
5        Q.   Okay.  And with respect to the issues of
6    warming patients and maintaining normothermia, you
7    agree with me that'd be more of -- in the purview of
8    an anesthesiologist that is responsible for those
9    issues as compared to a nurse; correct?
10       A.   No.  It's usually a collaborative effort.
11       Q.   Okay.  So what nurse are you aware of that's
12   actually done clinical studies on -- on maintaining
13   normothermia?
14       A.   None that I know of.
15       Q.   Okay.  It's usually done by
16   anesthesiologists; correct?
17       A.   Correct.
18       Q.   They're the experts with respect to
19   hypothermia and maintaining normothermia; correct?
20       A.   I believe they have done more studies, yes.
21       Q.   Okay.  Well are you aware of any nurse
22   that's done a study?
23       A.   Not studies, no.
24       Q.   Okay.  I mean, any literature that was
25   created by a nurse was basically review of what the

Confidential - Subject to Protective Order

Page 58

1  literature is done by medical doctors; correct?
2      A.  Correct.
3      Q.  Okay.  Because a nurse is not an expert in
4  hypothermia; correct?
5      A.  A nurse can conduct research.
6      Q.  Okay.  But are you aware of any nurse --
7  You're not an expert -- Strike that.
8          You've done no research on hypothermia;
9  correct?
10     A.  Correct.
11     Q.  You've done no research on maintaining
12  normothermia; correct?
13     A.  Correct.
14     Q.  Okay.  And sitting here today, are you aware
15  of any research with respect to using -- the effects
16  of hypothermia on total hip or total knee
17  arthroplasty?
18     A.  That there --
19          The question is whether or not --
20     Q.  Are you aware of any research?
21     A.  -- aware of any research on --
22          MS. LEWIS:  Let him ask the question.
23     Q.  Let me ask it again.
24     A.  Okay.
25     Q.  Are you aware of any research, sitting here

Page 59

1  today, that looked at the effects of hypothermia on
2  total knee and total hip arthroplasty?
3      A.  Yes.
4      Q.  What?
5      A.  I can't name it, but yes, I under -- I
6  believe, in my recall of reading, there is some
7  literature, yes.
8      Q.  About what?  What -- Like, about infections?
9      A.  Increased coagulation time, increased
10  cardiac ischemia or risk for, and increased potential
11  risk for SSI.
12     Q.  Increased potential risk for SSI?
13     A.  Correct.
14     Q.  Are you sure about that, or are you
15  guessing?
16     A.  I can't cite the article, so.
17     Q.  My question is:  Do you specifically,
18  sitting here today, recall an article that states that
19  maintaining normothermia for a total hip or total knee
20  arthroplasty reduces the incident of surgical-site
21  infections?
22     A.  No.
23     Q.  Okay.
24     A.  I'll say no.
25     Q.  Okay.

Page 60

1          MS. LEWIS:  But that was a different
2  question, but --
3      A.  It was, but no.
4          MS. LEWIS:  Can we take a break?
5          MR. ASSAAD:  Five minutes.
6      Q.  Do you need a break?
7      A.  I would love a break.
8      Q.  Sure.
9          MR. ASSAAD:  Let's take a break.
10     A.  I would love to go to the restroom.
11         THE REPORTER:  Off the record, please.
12         (Recess taken from 11:07 to 11:13 a.m.)
13  BY MR. ASSAAD:
14     Q.  Are you ready to continue?
15     A.  Yes.  Thank you.
16     Q.  Are you a member of AORN?
17     A.  Yes.
18     Q.  How long have you been a member?
19     A.  Since 1980.
20     Q.  What was your understanding of the issues
21  you were to address with respect to this case?
22     A.  To describe the environment for the surgical
23  patient, and how -- part of how the Bair Hugger
24  blanket is completely separate, away from the surgical
25  site and the procedure.

Page 61

1      Q.  What is your understanding of the
2  plaintiffs' claims in this case?
3      A.  That the device is somehow sucking up what
4  is their version of dirty air and circulating it to
5  the surgical site.
6      Q.  Okay.  Do you have any understanding of the
7  mechanism in which the plaintiffs allege that the,
8  quote unquote, dirty air gets to the surgical site?
9      A.  No.
10     Q.  You do agree with me that the air underneath
11  the operating room table is considered, quote unquote,
12  dirty air.
13     A.  No.
14     Q.  You disagree?
15     A.  I disagree.
16     Q.  Okay.  So you think the bacterial load
17  underneath the operating room table is equivalent to
18  the air above the operating room table?
19     A.  Yes.
20     Q.  And why do you think that?
21     A.  From my own knowledge, not as an engineer,
22  but knowledge of understanding the air current and
23  flows in the operating room and the forcefulness of
24  the flow down over the patient.
25     Q.  Okay.  So you have air that's coming in from

Confidential - Subject to Protective Order

Page 62

1  the ventilation from above the patient; correct?
2      A.  Correct.
3      Q.  Okay.  And you believe that the air that's
4  coming down from the ventilation system, its bacterial
5  load is the same as the air that's underneath the
6  operating room table.
7      A.  Yes.
8      Q.  Okay.  Do you know what a skin squame is?
9      A.  Yes.
10     Q.  Okay.  Do people shed skin squames in the
11 operating room?
12     A.  Yes.
13     Q.  Do you know roughly how many skin squames
14 are shed during a one-hour period?
15     A.  No.
16     Q.  Would you be surprised that in between two
17 and four hours, between one million and 900 million
18 skin squames are shed?
19     A.  I would not be surprised, but I don't know
20 the number.
21     Q.  Do you know whether or not skin squames have
22 bacteria on them?
23         MS. LEWIS:  Objection, form.
24     A.  I don't know one way or the other.
25     Q.  Do you know what bacteria is?

Page 63

1      A.  Yes.
2      Q.  Okay.  Do you know whether or not people
3  have bacteria on their skin?
4      A.  Yes.
5      Q.  Okay.  And do you know what percentage of
6  bacteria are contained on the skin compared to the
7  amount of skin cells someone has?
8      A.  No.
9      Q.  When the skin squames shed off a -- a
10 person, do you know whether or not they go up, down,
11 left or right?
12     A.  I do not.
13     Q.  Okay.  Do you believe the floor is clean in
14 the operating room?
15     A.  Yes.
16     Q.  At all times?
17     A.  Yes.
18     Q.  So why is it cleaned?
19     A.  It's cleaned between patients to put --
20 reduce any risk of contamination from one patient to
21 the other, --
22     Q.  Okay.  So at some point --
23     A.  -- as well as the rest of the room, not just
24 the floor.
25     Q.  But at some point it gets dirty; correct?

Page 64

1      A.  It gets potentially dirty.  It does not
2  necessarily get dirty.
3      Q.  Okay.  So your --
4      So it's your testimony today that during an
5  operation you can't say for certain whether or not the
6  floor gets dirty or not.
7      A.  Depends on the procedure.
8      Q.  Say a total hip or total knee.
9      A.  Again depends on the procedure.  If there's
10 nothing that's spilled onto the floor, it's as clean
11 as when it started the procedure.
12     Q.  What about all the skin squames that fall
13 off people?
14     A.  I can't answer whether they and -- they land
15 on the floor or not.
16     Q.  Where do you think they go?
17     A.  I can't answer that.
18     Q.  You don't know?  Okay.
19     A.  No.
20     Q.  What about bone fragments that -- when --
21 when the surgeon cuts the bone in a total hip or total
22 knee, do you know where those fragments go?
23     A.  No.
24     Q.  Okay.  Do you know whether or not you teach
25 your nurses to keep their hands above the operating

Page 65

1  room table as compared to letting them below the
2  operating room table?
3      A.  Are you talking about those who are scrubbed
4  at the surgical field?
5      Q.  Yes.
6      A.  They are instructed to keep them in front of
7  them so that they can see them at all times.
8      Q.  Are they allowed to put them down below the
9  operating room table?
10     A.  If it's a low --
11     If it's a sitting case, yes, but otherwise
12 not usually.
13     Q.  Okay.  Say in a total hip or total knee, are
14 they allowed to put their arms underneath the
15 operating room table?
16     A.  Under the table?
17     Q.  Or below the operating room table?
18     A.  It's not below the table, it's below where
19 the -- where they are in relation to the table, so
20 they don't want to be below the table.
21     Q.  Why not?
22     A.  Because, again, they may inadvertently touch
23 something that was not sterile like they were.
24     Q.  Okay.  But what if they don't touch
25 anything, is it still okay to put your hands

Confidential - Subject to Protective Order

Page 66

1  underneath the operating room table?
2      A.  The recommendation is to keep them in front
3  of you at all times.
4      Q.  Why is that the recommendation?
5      A.  So, again, you are not inadvertently
6  contaminating yourself.
7      Q.  So sitting here today you have no opinion as
8  to whether -- Strike that.  Strike that.
9          You do understand that the airflow in the
10 operating room is pushing all the contaminants down to
11 the floor and then out of -- out to the output vents
12 in the operating room.
13     A.  I don't know if --
14         MS. LEWIS:  Objection, form.
15     A.  -- it's pushing contaminants.  I know the
16 direction of the flow.  I can't answer whether or not
17 it's pushing anything besides the flow.
18     Q.  You write on page 2, under introduction to
19 operating room environment, last sentence:  "Although
20 the unidirectional air is filtered, it is not
21 considered sterile, and is not sterile over the
22 operating room bed."
23         What is your basis behind that?  What are
24 you -- What citation are you referring to in your
25 citations to support that statement?

Page 67

1      A.  I don't know that I can answer with a
2  citation.
3      Q.  Okay.
4      A.  The air in the room is not sterile.  I can
5  honestly say that.  It is not sterile.
6      Q.  And what's your basis?
7      A.  My basis of microbiology and sterilization
8  properties.
9      Q.  What class or what lecture have you taken in
10 the microbiology -- with respect to microbiology that
11 discusses the unidirectional airflow in an op --
12     A.  Nothing.
13     Q.  Okay.
14     A.  Nothing.
15     Q.  What citation are you referring to that
16 could support that statement, sitting here today?
17     A.  Probably a basic course on sterilization.
18     Q.  Well I'm asking about a citation, like a --
19     A.  I cannot spit out a citation for you today.
20     Q.  Okay.  Do you know whether or not the air is
21 filtered coming out of the ventilation?
22     A.  I'm not an engineer, but I understand it is.
23     Q.  Do you know what level filtration?
24     A.  I do not.
25     Q.  You write down, like four, five lines up

Page 68

1  from that:  "The air is filtered and the
2  unidirectional downward air flow is strong."
3          What do you mean by the term "strong"?
4      A.  That means when you're standing next to the
5  patient at the surgical site you can feel the airflow
6  on the back of your neck.
7      Q.  Okay.  So that to you is "strong."
8      A.  Yes.
9      Q.  Okay.
10     A.  That's my words and my description.
11     Q.  And I take it if I ask you what the velocity
12 of the air, you would not know what the answer is;
13 correct?
14     A.  That's correct.
15     Q.  Okay.  Are you --
16         When you participate in a total hip or total
17 knee are you the scrub nurse?
18     A.  I can function as either the scrub nurse or
19 the circulating nurse.
20     Q.  Okay.  Does the Bair Hugger work, in your
21 opinion?
22     A.  Yes.  It keeps the patient at a good
23 normothermia temperature.
24     Q.  So you think the Bair Hugger is effective in
25 the first hour of surgery?

Page 69

1      A.  I can't answer on the hour.  I can answer on
2  whether or not it keeps the patient at normothermia.
3      Q.  Okay.  Have you --
4          So it's your opinion today that if you use
5  the Bair Hugger that it keeps the -- it keeps the
6  patient normothermic.
7      A.  It gets to the normothermic goal, yes.
8      Q.  And what's the normothermic goal?
9      A.  Remember we were going to take their
10 patient -- their temperature 30 minutes before and 15
11 minutes after, and we want them to be in a normal
12 range during that period of time.
13     Q.  What is considered hypothermic?
14     A.  Below -- Below 98.6.
15     Q.  So that would be about --
16     A.  Thirty --
17     Q.  -- 37 degrees?
18     A.  Yeah.  Thirty --
19         Yes.
20     Q.  So it's your --
21     A.  And there are -- there are some parameters,
22 you'd have to look again at the anesthesia guidelines
23 for the parameters.  There are parameters for
24 normothermia.
25     Q.  So 98.6 degrees is 37 degrees Celsius.

Confidential - Subject to Protective Order

Page 70

1    A.  Okay.
2    Q.  So is it your opinion that a patient's
3  hypothermic if they're below 37 degrees?
4    A.  If they were at 98.6 before their procedure
5  started.
6    Q.  Have you ever touched a Bair Hugger blanket
7  in use?
8    A.  Touched it?
9    Q.  Yeah.
10    A.  Yes.
11    Q.  Do you feel it being warm?
12    A.  Yes.
13    Q.  Okay.  Can you feel it being warm, like
14  standing around it?
15    A.  Not unless you're touching it, no.
16    Q.  Okay.  Can you feel air coming out of the
17  Bair Hugger when you're next to it?
18    A.  Only if you're at the head with -- next to
19  anesthesia.
20    Q.  Okay.  How much air do you feel coming out
21  of it, a lot or a little?
22    A.  A little.
23    Q.  Okay.  Like, would the air current be
24  stronger than the unidirectional flow, or much weaker
25  than the unidirectional flow?

Page 71

1    A.  Much weaker.
2    Q.  Okay.  So when you say you feel it, you just
3  feel, like, some warm air.
4    A.  Correct.
5    Q.  Okay.  And that's when you're standing at
6  the head of the patient?
7    A.  Correct.
8    Q.  In a total hip and total knee arthroplasty?
9    A.  Correct.
10    Q.  Do you know the different settings on a Bair
11  Hugger?
12    A.  Yeah, but I can't recite what they are.  I
13  believe there are different settings.  I think one is
14  -- I shouldn't guess.  One is ambient and one is warm,
15  but I don't know the temperature settings for either.
16    Q.  Well ambient would be room temperature;
17  correct?
18    A.  Room air, correct.
19        But I can't tell you what it -- there is a
20  number on it, and I don't know what that is.
21    Q.  Okay.  Have you -- Have --
22        Do you know whether or not there's different
23  fan speeds?
24    A.  I do not know that.
25    Q.  Do you know whether or not you put the --

Page 72

1  you -- like, you put the forced-air warmer on high or
2  medium or low or?
3    A.  I don't, no.
4    Q.  You don't know what anesthesiologists do?
5    A.  No.
6    Q.  Okay.  Do you yourself monitor the
7  temperature of the patient when you're in the
8  operating room?
9    A.  No.
10    Q.  Do you agree with me that heat rises?
11    A.  Yes.
12    Q.  That's why hot air balloons go up.  You
13  understand that; correct?
14    A.  Yes, I do.
15    Q.  Okay.  You agree with me that a -- a
16  periprosthetic joint infection is a very serious
17  infection; correct?
18    A.  I'm not sure I understand the term
19  periprosthes -- I've never heard that term before.
20    Q.  You never heard of a -- the term
21  "periprosthetic joint infection"?
22    A.  No.
23    Q.  Okay.  Sitting here today, do you know the
24  --
25        So sitting here today you would not know the

Page 73

1  difference between a periprosthetic joint infection
2  and a superficial wound infection; correct?
3    A.  Correct.
4    Q.  Okay.  And if I asked you the amount of --
5        Do you know what a CFU is?
6    A.  I've forgotten.
7    Q.  Okay.  So sitting here today, you don't know
8  what a CFU is; correct?
9    A.  No.
10    Q.  Okay.  So sitting here today, you would not
11  know the mechanism of causing an infection with
12  respect to a periprosthetic joint infection; correct?
13    A.  Correct.
14    Q.  Okay.  You agree with me that you want to
15  keep the operating room as sterile as possible;
16  correct?
17    A.  The operating room is not sterile.
18    Q.  Let me rephrase that.
19        You want to keep the area -- the surgical
20  site as sterile as possible.
21    A.  No.  I would not agree with that statement.
22    Q.  Okay.  Do you want to place measures to keep
23  as much of the contaminants out of the surgical site?
24    A.  Yes.
25    Q.  And you also want to keep -- you want to

Confidential - Subject to Protective Order

Page 74

1 place measures that would keep contaminants out of the
2 area in which the surgeon is working; correct?
3    A.  Yes.
4    Q.  Keep contaminants out of the area of the
5 surgeon's hands or anyone's hands that are going to
6 the surgical site; correct?
7    A.  Yes.
8    Q.  You want to keep contaminants out of the
9 area where the surgical instruments are being placed.
10    A.  Yes.
11    Q.  You want to keep the --
12       You want to place measures to keep the area
13 where the implant is being placed before it's placed
14 into the patient, to limit the contaminants that reach
15 that area; correct?
16    A.  Yes.
17    Q.  Okay.  Because there's many ways that you
18 could infect an implant; correct?  Strike that.
19       There's many ways an implant could be
20 contaminated; correct?
21    A.  Yes.
22    Q.  Could be by direct contamination if the
23 surgeon's hands are not sterile; correct?
24    A.  His hands --
25    Q.  Where his gloves are, they're not sterile.

Page 75

1    A.  I don't get that question.  I'm sorry.  I'm
2 not following that question.
3    Q.  You do understand to cause a infection you
4 need bacteria; correct?
5    A.  Correct.
6    Q.  And bacteria needs to be transferred to --
7 for example, if it's an implant infection, onto the
8 implant; correct?
9    A.  Potentially, yes.  Correct.
10    Q.  Okay.  And you want to place measures to
11 limit the chances of any bacteria getting onto that
12 implant.
13    A.  Correct.
14    Q.  Okay.  That means you want to place measures
15 to limit the amount of contaminants that could get
16 onto the surgical gloves of the surgeon; correct?
17    A.  What do you mean by "place measures"?
18    Q.  Like, you want to -- you want to keep the
19 area as clean as possible.
20    A.  Sterile.
21    Q.  Sterile.
22    A.  So ask the question again.
23    Q.  Have you heard of the term "a sterile
24 field"?
25    A.  Yes.

Page 76

1    Q.  Okay.  But it's your opinion that a sterile
2 field is not sterile.
3    A.  It is as sterile as it can be.
4    Q.  Okay.  And there's many procedures and rules
5 and regulations in the operating room to keep the
6 sterile field as sterile as possible.
7    A.  Yes.
8    Q.  Okay.  And not just the --
9       And the sterile field includes the surgical
10 site?
11    A.  Yes.
12    Q.  Okay.  It includes the front of the surgeons
13 and the assistants participating in the surgery?
14    A.  Yes.
15    Q.  It includes the back tables?
16    A.  Yes.
17    Q.  Okay.  It includes anything that may
18 contaminate the surgical site; correct?
19    A.  Any inanimate object, is that what you're?
20    Q.  Yes.
21    A.  Yes.
22    Q.  Okay.  And in fact you do -- there is the
23 patient prep where you try to make the skin around the
24 patient where the surgical site is as sterile as
25 possible, as clean as possible.

Page 77

1    A.  Clean.
2    Q.  Okay.
3    A.  The skin --
4       We do not sterilize the skin.
5    Q.  But you have sterile drapes; correct?
6    A.  Yes.
7    Q.  And you isolate the surgical site and you
8 put the sterile drapes around it; correct?
9       (Interruption by the reporter.)
10       THE REPORTER:  "And you isolate the"?
11    Q.  -- sterile site, and you try to keep the --
12 you try to limit the amount of contaminants that could
13 get to that area; correct?
14    A.  Yes.
15    Q.  Okay.  For example, you put, like, even for
16 the overhead lights you put, you know, a covering over
17 the handles so it doesn't potentially contaminate the
18 sterile field.
19    A.  No.
20    Q.  You don't put, like --
21    A.  The cover is used for the surgeon to
22 manipulate the light, not to cover or sterilize the
23 light.
24    Q.  Yeah, because you don't want the surgeon to
25 touch the light that could be contaminated; correct?

Confidential - Subject to Protective Order

Page 78

1    A.  Correct.  Yes.  Touch an un --
2    Q.  The handle.
3    A.  -- the handle that's unsterile, yes.
4    Q.  Okay.
5    A.  The light is not covered, though.
6    Q.  I understand that.
7    A.  Okay.
8    Q.  But the light is cleaned; correct?
9    A.  Yes, it is cleaned.
10   Q.  And in fact on page 2, under "Introduction
11 to the Operating Room Environment" of Exhibit 1 you
12 write:  "The operating room environment is one of
13 rigid rules and regulations put in... place to protect
14 the surgical patient and the healthcare worker";
15 correct?
16   A.  Correct.
17   Q.  Okay.  There are many rules and regulations
18 to protect a surgical patient; correct?
19   A.  Correct.
20   Q.  And that one of the reasons to protect the
21 surgical patient is to try to protect the patient from
22 obtaining a surgical-site infection.
23   A.  Yes.
24   Q.  Okay.  And you agree with me that there are
25 certain types of infections that occur while the

Page 79

1 patient is in surgery.
2       MS. LEWIS:  Objection, form.
3    A.  I don't know that.  I don't know that.
4    Q.  Okay.  You don't know that.  Okay.
5    A.  No.
6    Q.  You write down here:  "The air handling
7 requirement for an operating room is a minimum of 20
8 exchanges an hour, with a minimum of 4 air changes of
9 outdoor air."
10   A.  Correct.
11   Q.  Where'd you obtain that information?
12   A.  From the AORN recommended practice.
13   Q.  Is that cited?
14   A.  I believe it is, the 2017.  (Witness
15 reviewing exhibit.)
16      No, I didn't put it in there.
17   Q.  Okay.
18   A.  Sorry.
19   Q.  So there's no reference --
20   A.  For garments --
21      Yes, I'm sorry, I did.  AORN Guideline for
22 Safe Environment of Care.  Part II is the one with
23 air-handling recommendations.
24   Q.  Okay.  But you yourself don't consider
25 you're an expert in air handling; correct?

Page 80

1    A.  That's correct.
2    Q.  Okay.  You go on and say:  "The pressure is
3 maintained as positive pressure to the surrounding
4 rooms."
5    A.  Correct.
6    Q.  Do you know what the -- the difference in
7 pressure is?
8    A.  The degree, or the --
9    Q.  Yeah.
10   A.  No.
11   Q.  Okay.  Do you agree that, on the first line
12 of -- under "The Operating Room Procedures," that:
13 "The goal is to provide for each surgical patient a
14 safe clean environment"; correct?
15   A.  Yes.
16   Q.  So you want to do everything possible to
17 have a clean, safe environment for the patient;
18 correct?
19   A.  Yes.
20   Q.  You don't want any device in there that
21 could possibly cause harm to the patient; correct?
22   A.  Correct.
23   Q.  And if that device causes harm it should not
24 be used in the patient unless it's absolutely
25 necessary; correct?

Page 81

1    A.  Correct.
2    Q.  And if there are other products that could
3 do the same thing but are safer for the patient, then
4 you should use that product; correct?
5       MS. LEWIS:  Objection to form.
6    A.  Say -- State that one again, I'm...
7    Q.  Well if there are -- if there are many ways
8 to warm a patient, and one is safer than the other,
9 you should use the one that's safer for the patient,
10 correct, if they're both as effective?
11   A.  I don't --
12      MS. LEWIS:  Objection to form.
13   A.  -- know the answer to that.
14   Q.  You don't?
15   A.  No.  I've only used one device, so I don't
16 know if there are others that are as effective.
17   Q.  Well hypothetically --
18   A.  You're asking my opinion.  That's my
19 opinion.  I don't know.
20   Q.  Hypothetically, if there is a device that is
21 safer for the patient and it's just as effective as
22 the Bair Hugger, would you agree with me, as an
23 advocate for the patient, that you should use the
24 safer device?
25      MS. LEWIS:  Objection to form.

Confidential - Subject to Protective Order

Page 82

1      A.  I can't answer that.
2      Q.  You can't answer that question?
3      A.  I can't answer that.
4      Q.  Why not?
5      A.  The answer would depend on the cost of the
6  device, the studies that show it's as effective, and
7  as ease of use.  There are lots of factors other than
8  just saying it's as effective.
9      Q.  So are you sitting here today that cost may
10 be important than patient safety?
11     A.  Huge.  Huge.
12     Q.  So you're saying it's more important than
13 patient safety?
14     A.  No.  I didn't say "more important."
15     Q.  Well that was my question, ma'am.
16     A.  It -- Say your question again.
17     Q.  Are you sitting here today saying that cost
18 is more important than patient safety?
19     A.  No.
20     Q.  Okay.  Are you saying that the ease of use
21 of the device is more important than patient safety?
22     A.  No.
23     Q.  Okay.  Patient safety is paramount; correct?
24     A.  Yes.
25     Q.  And you think the Bair Hugger is safe;

Page 83

1  correct?
2      A.  Yes, --
3      Q.  Okay.
4      A.  -- in my experience.
5      Q.  Okay.  Did you do any research to see what
6  has been written about the Bair Hugger and its safety
7  in the past 10 years?
8      A.  No.
9      Q.  Okay.
10     A.  Other than to cite my articles.
11     Q.  Okay.
12     A.  That's the reading I've done.
13     Q.  So you were asked to be an expert in this
14 case; correct?
15     A.  Correct.
16     Q.  Okay.  And you got a call from some attorney
17 at 3M, I guess it was in May of 2017; correct?
18     A.  Yes.
19     Q.  Okay.
20     A.  It was Deborah.
21     Q.  Okay.  And before you were --
22         Did you know you would be receiving a call,
23 from your colleagues, regarding the Bair Hugger device
24 and this litigation?
25     A.  No.

Page 84

1      Q.  Okay.  So they didn't tell you that they
2  referred you to Deborah Lewis.
3      A.  One colleague did, yes.
4      Q.  Okay.
5      A.  She sent me an email saying, I've tossed
6  your name out there.
7      Q.  Okay.
8      A.  But did not have any particulars of the
9  case.
10     Q.  Okay.  And before you --
11         Let me ask you this:  Were there any facts
12 that 3M provided, or their counsel, that you relied
13 upon in formulating your opinions?
14     A.  No.
15     Q.  Okay.  Did you do any independent research
16 to determine whether or not the plaintiffs'
17 allegations were true or false?
18     A.  No.
19     Q.  Okay.  So my understanding is that you were
20 asked to offer an expert opinion in this case
21 regarding the safety of the Bair Hugger, and you
22 yourself did not provide any inde -- perform any
23 independent research.
24         MS. LEWIS:  Objection, form.  That's not
25 what --

Page 85

1          MR. ASSAAD:  Basis?
2          MS. LEWIS:  That's not what's in her
3  report.
4      A.  I was asked to testify as to the flow of the
5  patient in the OR environment, not to conduct
6  independent research.
7      Q.  You were asked to testify to what?  I'm
8  sorry.
9      A.  To the flow and -- of the patient in the
10 operating room.
11     Q.  When you say "the flow of the patient,"
12 what, the airflow?
13     A.  No, the flow, the -- the description of what
14 happens to the patient in the operating room.
15     Q.  Okay.  So sitting here today, you have done
16 no research or looked at the issues in this case to
17 determine, as a -- as a scientist, whether or not the
18 Bair Hugger is safe.
19     A.  No, I would answer that, no, I have.
20     Q.  What research have you done?
21     A.  I have not done independent research, if
22 that's what you're asking.  No, I have not done any
23 independent research.  I have done reading.
24     Q.  Okay.  What reading have you done besides
25 what's in here?

Confidential - Subject to Protective Order

Page 86

1    A.  This is what I've read.
2    Q.  Okay.  So you've read two articles on page
3  7, items number 6 and 7, with respect to forced-air
4  warming devices?
5    A.  Yes.
6    Q.  Okay.  So your -- sitting here today it is
7  your -- it's my understanding that your basis for
8  whether or not the Bair Hugger is safe is based on
9  references numbers 6 and 7 to your report.
10    A.  And my --
11        And my expertise as a nurse.
12    Q.  Well your expertise as a nurse did not
13  involve any research with respect to the Bair Hugger
14  safety; has it?
15    A.  That's correct.
16    Q.  Okay.  So your expertise as a -- as a nurse
17  has nothing to do with your opinion with respect to
18  the safety of the Bair Hugger.
19    A.  I disagree.
20    Q.  Okay.  What research have you done in the
21  past --
22    A.  I have not done research.
23    Q.  Okay.  What --
24        What is it about being a nurse that you've
25  done, and have done anything, to determine the Bair

Page 87

1  Hugger is safe?
2    A.  My practice is I'm very interested in making
3  sure the patients are safe.  If there was any
4  literature, or recalls, or concerns that any device
5  was not safe to be used on patients, I would not use
6  it in my practice.
7        MR. ASSAAD:  Move to strike, nonresponsive.
8    Q.  What have you done?
9    A.  I have not done any independent research.
10    Q.  Okay.  Have you done any biological testing?
11    A.  No.
12    Q.  Have you done any filtration testing?
13    A.  No.
14    Q.  Have you looked at particle counts in an
15  operating room?
16    A.  No.
17    Q.  Okay.  In fact you have not done any type of
18  testing with respect to the Bair Hugger; correct?
19    A.  Correct.
20    Q.  Okay.  So again, besides your -- I mean, did
21  you have any -- With re -- Strike that.
22        With respect to determining, outside reading
23  those two articles, that the Bair Hugger is safe, what
24  methodology did you use?
25    A.  None.

Page 88

1    Q.  Have you looked at the McGovern study?
2    A.  No.
3    Q.  Have you looked at any of the Legg studies?
4    A.  Is it --
5    Q.  Legg, L-E-G-G.
6    A.  No.
7    Q.  Have you looked at any of --
8        Have you looked at the Dasari study?
9    A.  No.
10    Q.  Have you looked at the Belani study?
11    A.  No.
12    Q.  Have you looked at the Harper study?
13    A.  No.
14    Q.  Have those studies been provided to you by
15  the defendants in this case?
16    A.  I don't remember that they have.  I do not
17  -- No.  No.
18    Q.  Because if they were listed it would be in
19  your report; correct?
20    A.  Correct.
21    Q.  Okay.  You stated that you -- that as an
22  expert you were to be objective; correct?
23    A.  Correct.
24    Q.  Do you think it's being objective by not
25  looking at the studies that the plaintiffs rely upon

Page 89

1  to determine whether or not the Bair Hugger is safe?
2        MS. LEWIS:  Well again, counsel, objection
3  to the form.  Her expert report doesn't talk about an
4  expert opinion on whether the Bair Hugger is safe or
5  not.  So, I mean, your question is unfair when that's
6  not what she's got in her report.  [Clearing throat.]
7    Q.  You may answer the question.
8        MS. LEWIS:  My same objection applies.
9        THE WITNESS:  Could you state the question
10  again?  I'm sorry.
11    Q.  Do you think it's being objective by not
12  looking at the studies that the plaintiffs rely upon
13  to determine whether or not the Bair Hugger is safe?
14    A.  Yes.
15    Q.  You think that's being objective?
16    A.  Yes.
17    Q.  So you think being objective is looking at
18  one side of -- of an issue and not looking at the
19  other side and see what science or literature or
20  testing were done with respect to the Bair Hugger?
21    A.  Being objective is coming up with my own
22  opinion, which is what I did.
23    Q.  Okay.
24    A.  Which is I provided my opinion.
25    Q.  So just so I understand at trial.  You're

Confidential - Subject to Protective Order

Page 90

1    not going to come in at trial and offer the opinion
2    that the Bair Hugger is safe; correct?
3         A.   That's correct.  I'm going to offer that
4    it's efficient, and talk about the flow of the
5    patient, not -- not airflow.  Don't confuse my
6    statement with patient processes in the operating
7    room.
8         Q.   Why do you say it's efficient?
9         A.   It's efficient in maintaining normothermia.
10        Q.   As compared to what?
11        A.   That's it.  It's efficient.
12        Q.   Well wh --
13        A.   I don't have a comparison.
14        Q.   Well don't you agree to determine something
15   is efficient that you should compare it to something?
16        A.   In determining whether the patient
17   maintained their temperature from pre-op to post-op,
18   in monitoring the temperature the Bair Hugger is able
19   to do that.
20        Q.   Okay.  But you're not aware of studies that
21   indicate --
22             Well do you know who Dr. Sessler is?
23        A.   No.
24        Q.   Okay.  Do you know who Dr. Kurz is?
25        A.   No.

Page 91

1         Q.   Okay.  And you're not aware of any studies
2    that discusses the effectiveness of the Bair Hugger in
3    -- in the first hour of surgery; correct?
4         A.   That's correct.
5         Q.   Okay.  So you'd be surprised if there's
6    studies out there that say preoperative warming is
7    more efficient to maintain normothermia in the first
8    hour of an operation than perioperative warming.
9         A.   Yes, I would be surprised.
10        Q.   Okay.  And do you know the term of -- that's
11   used by anesthesiologists called the redistribution of
12   heat?
13        A.   No.
14        Q.   Okay.  Do you know what happens biologically
15   when a patient goes under general anesthesia?
16        A.   Generally.
17        Q.   Okay.  With respect to the heat of --
18             With respect to the body temperature?
19        A.   There's --
20             Yes.  There's vasodilatation which takes
21   temperature away from the core, which decreases the
22   patient's core temperature.
23        Q.   And it redistributes it to the extremities;
24   correct?
25        A.   Correct.

Page 92

1         Q.   Okay.  Do you know what happens when a
2    patient gets below 34.5 degrees?
3         A.   I believe that's when they're at risk for a
4    cardiac ischemia, clotting changes, yes.
5         Q.   Okay.  But so --
6         A.   So there are some metabolic changes that
7    happened in the body, yes.
8         Q.   Are you aware that the seminal study that
9    was performed by Dr. Kurz and Dr. Sessler with respect
10   to the effects of -- or maintaining normothermia in
11   infection rates was a study where they actually cooled
12   patients down?
13        A.   No, I'm not.  I'm not.
14        Q.   And that --
15             You agree with me that would be unethical
16   today to cool patients down during surgery.
17        A.   I can't answer that question.
18        Q.   Okay.  So just so I understand, you are
19   claiming that the Bair Hugger is efficient, but
20   sitting here today you have no idea what other
21   products out there are for patient warming?
22        A.   Correct.
23        Q.   Okay.  And when you're saying "efficient" --
24             Well I don't even know what you mean by
25   saying "efficient."  What do you mean by "efficient"?

Page 93

1         A.   Efficient, again, in that in measuring
2    pre-op temperature and post-op temperature it is able
3    to maintain their normal body temperature --
4         Q.   Okay.
5         A.   -- or keep them at a normal body
6    temperature.
7         Q.   So basically you're saying that the Bair
8    Hugger performs its job.  You're not saying it's
9    efficient at doing its job.
10        A.   It's performed to what it --
11             It does what it --
12        Q.   Okay.
13        A.   -- says it will do, is maintain
14   normothermic.
15        Q.   Okay.  And when you were called by defense
16   counsel in this case you agreed to handle the case;
17   correct?
18        A.   Yes.  After discussion, yes.
19        Q.   Okay.  Did you look at any literature or do
20   any research before you decided to be a defense for
21   the expert?
22        A.   No.
23        Q.   Do you know how much air is blown out of a
24   Bair Hugger when it's in use?
25        A.   No.

Confidential - Subject to Protective Order

Page 94

1    Q.  Do you know what the temperature of the air
2  is that comes out of the blanket in the Bair Hugger?
3    A.  No.
4    Q.  On page 4, on the paragraph that begins,
5  "the anesthesia provider."
6    A.  Yes.
7    Q.  It says, the last sentence:  "The air
8  directed through the Bair Hugger blanket to the
9  patient is a gentle or mild air flow."
10       Did I read that correctly?
11    A.  Yes.
12    Q.  What's your basis if you don't know what the
13  -- the speed of the air coming out?
14    A.  That's just from my opinion in feeling it.
15  That's my opinion.
16    Q.  Okay.  So you have no scientific basis, it's
17  just your opinion.
18    A.  Correct.
19    Q.  Okay.
20    A.  Correct.  The same as with the "strong," the
21  adjective of "strong" with the overhead --
22    Q.  Okay.
23    A.  -- air.
24    Q.  So it's a very subjective opinion; correct?
25    A.  Yes.

Page 95

1    Q.  There's no methodology behind that opinion.
2    A.  That's correct.
3    Q.  Okay.  You mention about five lines up:
4  "The Bair Hugger may be on an IV pole also used by
5  anesthesia, or on a rolling cart."
6       Did I read that correctly?
7    A.  Yes.
8    Q.  Have you ever seen the Bair Hugger just
9  sitting on the floor?
10    A.  No.
11    Q.  You've never seen that?
12    A.  No.
13    Q.  Okay.  How often do you see it on a IV pole?
14    A.  Depends on the facility --
15    Q.  Okay.
16    A.  -- and how they want to --
17    Q.  How often?
18    A.  I can't answer that.
19    Q.  How often do you see it on an IV pole in a
20  total knee or total hip arthroplasty?
21    A.  I can't answer that.  I don't have a
22  correlation.
23    Q.  What color is the rolling cart?
24    A.  I believe it's the same color as the device,
25  blue.

Page 96

1    Q.  Okay.  And where is the Bair Hugger usually
2  placed in the operating room?
3    A.  At the head of the bed.
4    Q.  Okay.  Well isn't the anesthesiologist
5  sitting at the head?
6    A.  Yes.
7    Q.  Okay.  So --
8    A.  It's next to or adjacent to him or her.
9    Q.  Underneath the bed?
10    A.  No, not.  Adjacent.  And if it's a lower end
11  unit it's at the foot.
12    Q.  I understand that.
13       But for a total hip or total knee where
14  you're using an upper body blanket.
15    A.  Correct.
16    Q.  Okay.
17    A.  So it would be adjacent to the machine or
18  the cart, depending on how the -- anesthesia's
19  assembled their work area.
20    Q.  When you say "the machine or the cart"?
21    A.  Anesthesia machine or their cart --
22    Q.  Okay.
23    A.  -- which they usually have for medications.
24    Q.  Do you know how long the hose is of the Bair
25  Hugger blanket?

Page 97

1    A.  No.  I never measured it.
2    Q.  Do you know how much heat is transferred to
3  the patient when the Bair Hugger blanket's being used?
4    A.  No.
5    Q.  You're not an expert in heat transfer; are
6  you?
7    A.  Correct.
8    Q.  Sitting here today, do you know what's more
9  effective, the Bair Hugger or warm blankets?
10    A.  My understanding from research is that the
11  Bair Hugger is more effective.
12    Q.  And your basis?
13    A.  Knowledge the blankets --
14       My personal knowledge the blankets cool and
15  lose their temperature and don't provide any warming
16  support to the patient.
17    Q.  If you use warming blankets, do you know
18  what the drop in the patient would be as compared to a
19  Bair Hugger blanket?
20    A.  You mean a cotton blanket?
21    Q.  Yeah, a warm cot -- there are warming --
22       You have warm blankets in the operating
23  room; correct?
24    A.  Correct.
25    Q.  You actually have a cabinet that heats up

Confidential - Subject to Protective Order

Page 98

1  blankets; correct?
2  　　A.  Correct.
3  　　Q.  And you could place those to warm the
4  patient; correct?
5  　　A.  Correct.
6  　　Q.  If you use those blankets as compared to --
7  like a cotton blanket as compared to a Bair Hugger
8  blanket, do you know the difference in temperature
9  that will result by using a warm cotton blanket as
10  compared to a Bair Hugger blanket?
11  　　A.  No.
12  　　Q.  And you agree with me that time would be a
13  factor with respect to the temperature drop; correct?
14  　　A.  I don't know that for a fact.
15  　　Q.  Okay.  You talked before about, regard to
16  the certified operating room nurse, you talked about
17  budgets as part of -- part of the curriculum?
18  　　A.  Absolutely.
19  　　Q.  What do you mean by "budgets"?
20  　　A.  Materials management, staffing, staffing
21  budgets, how to do a staffing budget.
22  　　Q.  Okay.  You're aware that hospitals make a
23  profit off the Bair Hugger blanket?
24  　　A.  Not necessarily.
25  　　Q.  Do you know one way or the other?

Page 99

1  　　A.  I would say no.
2  　　Q.  So they don't charge the patient for the
3  Bair Hugger blanket?
4  　　A.  My answer will be depend on what state you
5  wor -- live in and work in, and what insurance you
6  have.  So I don't know the fact that the pati -- that
7  the patient, number one, is billed, or, number two,
8  that the hospital makes money.
9  　　Q.  Okay.  So you don't know one way or the
10  other, sitting here today.
11  　　A.  Correct.
12  　　Q.  Okay.
13  　　　　MR. ASSAAD:  We'll probably go, like,
14  another fifteen minutes then we'll take a lunch
15  break.  Is that okay?
16  　　　　MS. LEWIS:  You'll go another how long?
17  　　　　MR. ASSAAD:  Fifteen minutes, and we'll do
18  a lunch break.
19  　　　　MS. LEWIS:  Will you need a lunch break?
20  　　　　MR. ASSAAD:  Yeah.
21  　　　　MS. LEWIS:  Okay.
22  　　　　(Discussion off the stenographic record.)
23  　　　　(Hughes Exhibit 4 marked for
24  　　　　identification.)
25  BY MR. ASSAAD:

Page 100

1  　　Q.  Please describe Exhibit 4 for the record.
2  　　A.  The initial consultation with Deborah Lewis
3  was on May 15th.  May 22nd and May 25th of the same
4  month I spent time preparing the document, with
5  revisions to clarify my statements.
6  　　Q.  Okay.  Your initial conversation was on May
7  19th, not 15th; correct?
8  　　A.  I'm sorry.  Yes, May 19th.
9  　　Q.  Okay.  So you were contacted by Ms. Lewis on
10  May 19th, 2017; correct?
11  　　A.  No.  I think I was contacted the week --
12  earlier that week by telephone, and then we had a
13  consultation on the 19th.
14  　　Q.  Okay.  Was anything substantively talked on
15  the week before?
16  　　A.  No.
17  　　　　MS. LEWIS:  Counsel, we're not getting into
18  the substance of conversations.
19  　　　　MR. ASSAAD:  Well I just want to know if it
20  was -- I just want to know what she did, and I'm
21  trying to figure out was it just like, hey, let's sit
22  and talk, and I only want to know, like, if that was
23  the conversation or you actually had another initial
24  consultation.
25  　　A.  Oh, no, no, no, no.

Page 101

1  　　　　MS. LEWIS:  Whoa, whoa, whoa, whoa.  Whoa.
2  　　　　THE WITNESS:  I'm sorry.
3  　　　　MS. LEWIS:  Conversations with defense
4  counsel are protected.  We're not going into that.
5  　　　　MR. ASSAAD:  I'm allowed to go into the
6  times and when, not to substance.
7  　　　　MS. LEWIS:  Well we're not going into
8  substance.
9  　　　　MR. ASSAAD:  Okay.
10  　　　　MS. LEWIS:  You've asked about the time.
11  　　　　MR. ASSAAD:  I said I'm not going to go
12  into substance, Ms. Lewis.  That's what I said.
13  BY MR. ASSAAD:
14  　　Q.  So you had an initial consultation on May
15  19th, 2017 for one hour; correct?
16  　　A.  Correct.
17  　　Q.  Okay.  And then on May 22nd, 2017 you had
18  "preparation of document"; correct?
19  　　A.  Correct.
20  　　Q.  And that would be Exhibit 1 in this case;
21  correct?
22  　　A.  Yes.
23  　　Q.  And how much did you complete of the report
24  on that day --
25  　　A.  Probably --

Confidential - Subject to Protective Order

Page 102

1    Q.   -- in those two hours?
2    A.   -- two thirds.
3    Q.   Two thirds.  Okay.
4         And then between May 22nd, 2017 and May 25,
5    2017 I see that you didn't charge for any type of
6    telephone calls or emails or -- or communications with
7    defendants; right?
8    A.   That's correct.
9    Q.   Okay.  Did you have any communications with
10   defendants during that time?
11   A.   No.  It was a holiday weekend.
12   Q.   Okay.  Then you had "revision of document"
13   for three hours; correct?
14   A.   Correct.
15   Q.   Is that when you finalized your doc -- your
16   report?
17   A.   Yes.
18   Q.   So my understanding is it took you two hours
19   to do two thirds of the report, and then three hours
20   to finish the report; correct?
21   A.   Correct.
22   Q.   That's a total of five hours for the report.
23   A.   Correct.
24   Q.   Okay.  And you charged $225 an hour;
25   correct?

Page 103

1    A.   Yes.
2    Q.   Okay.  How'd you come up with that rate?
3    A.   That's the rate I have used previously in
4    deposition -- or deposition and support.
5    Q.   Okay.  On June 9th, 2017 you have "purchase
6    of articles."
7    A.   Correct.
8    Q.   What articles did you purchase?
9    A.   All of the articles for my report.  I wanted
10   a hard copy of them.
11   Q.   Okay.  So what -- So what did you have
12   before?
13   A.   An online.  I was reading them online.
14   Q.   Is the $110 the cost to purchase the
15   articles?
16   A.   Yes.
17   Q.   So it wasn't for your time, it was just to
18   buy them.
19   A.   Correct.
20   Q.   Okay.  What articles did you purchase on
21   Exhibit 1?
22   A.   Andersson and Parah, and Sikka and -- Sikka,
23   yeah.  Kellam I already had.
24   Q.   So Andersson, Parah and Sikka.
25   A.   And Sikka.

Page 104

1    Q.   Okay.  So did you not have full copy of
2    those articles before you wrote your report?
3    A.   I had online copies only.
4    Q.   So why didn't you just print them from
5    online?
6    A.   It was not that kind of a subscription.  I
7    needed to purchase to be able to print.
8    Q.   What type of subscription did you have to
9    get to those articles?
10   A.   One was Springer, the other I don't
11   remember.  Elsevier maybe.  I'm not -- I -- I'll say
12   Springer, and I don't know the other one.
13   Q.   So is it your testimony today that these
14   sites where you purchased these articles, that you
15   could look at them, the entire article, but not print
16   them up?
17   A.   Correct.  That's my recollection.
18   Q.   Recollection?
19   A.   Yes.  That's how I remember why I needed to
20   purchase.
21   Q.   You --
22   A.   To print -- To print it popped up you must
23   purchase.
24   Q.   Do you have the receipts for those articles?
25   A.   No, not with me.

Page 105

1    Q.   What'd you provide to defendant to --
2         Did you provide the defendant any receipts?
3    A.   I don't recall.
4    Q.   Okay.  I mean, the reason why I'm asking is
5    I've never seen that done because I've purchased many
6    articles.
7    A.   Umm-hmm.
8    Q.   I can't even look at them until I've
9    purchase them.
10   A.   Yeah.
11   Q.   So are you under a different plan than
12   everyone else in the world?
13   A.   I don't know.  I don't remember.
14   Q.   Well it wasn't that --
15   A.   I remember reading them and remembering
16   wanting to print, and I had to purchase to print.
17   Q.   Okay.  And you don't have those articles
18   today with you; correct?
19   A.   Correct.
20   Q.   Were you told not to bring anything today?
21   A.   I asked, and was told I didn't need to.
22   Q.   Okay.  Do you think having those articles
23   here today would help you better answer the questions
24   and review your report?
25   A.   I don't know.  I don't -- Can't answer "yes"

Confidential - Subject to Protective Order

Page 106

1   or "no."
2       Q.   Okay.  Well we did talk about one article
3   regarding the traffic flow, and you didn't have it
4   today, and you wanted to look at --
5       A.   Correct.
6       Q.   -- and you wanted to look at it to answer
7   some questions; correct?
8       A.   Correct.
9       Q.   Okay.  So you agree with me --
10      A.   To -- To refresh my memory.
11      Q.   So you agree with me that if you had brought
12  the articles with you today it might help you refresh
13  your memory.
14      A.   It might have.
15          MS. LEWIS:  She wasn't under an obligation
16  to.
17          THE WITNESS:  Obligation to.  I was not
18  required or requested to bring them.
19      Q.   And just so I understand, you did not
20  purchase these articles before you wrote your report;
21  correct?
22      A.   I purchased them -- I don't remember the
23  date.
24      Q.   Well according --
25      A.   This is the date that I submitted the

Page 107

1   invoice, but that may not have been the date I
2   purchased, and I don't have the receipts today.
3       Q.   But you do have the receipts.
4       A.   Yes.
5       Q.   Okay.  Well I ask you, please don't destroy
6   those receipts.  I may subpoena them.
7       A.   Okay.
8          MR. ASSAAD:  All right.  Let's take lunch.
9          THE WITNESS:  Okay.
10         THE REPORTER:  Off the record, please.
11         (Luncheon recess taken at
12          approximately 12:09 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 108

1                   AFTERNOON SESSION
2          (Deposition reconvened at
3           approximately 12:50 p.m.)
4   BY MR. ASSAAD:
5       Q.   Are you ready to continue?
6       A.   Yes.  Thank you.
7       Q.   In reviewing your report you have seven
8   references; correct?
9       A.   Yes.
10      Q.   And would it be fair to say that all
11  statements that you rely on these references you have
12  cited in your -- you cite -- you put a footnote in
13  your report?
14      A.   Yes.
15      Q.   Okay.  And the statements that have no
16  references, is that just based on your personal
17  opinion?
18      A.   Yes, and knowledge.
19      Q.   And would it be fair to say that the
20  statements that do not have any footnotes at the end
21  of them in your report of Exhibit 1 you're not relying
22  on any literature to support those statements?
23          MS. LEWIS:  Objection, form.
24      A.   No.
25      Q.   That's not fair?

Page 109

1       A.   That's not fair.
2       Q.   Okay.  But sitting here today you don't --
3   you would not have a reference to give me to support
4   those statements; correct?
5       A.   That's correct.
6          MS. LEWIS:  Objection, form.
7       Q.   On page 2 of your report --
8          Before I even get there.  Are you related to
9   any physicians, like are you married to a physician?
10      A.   No.
11          I'm the daughter of a physician.
12      Q.   Okay.
13      A.   I will volunteer that.
14      Q.   Your father is a medical doctor?
15      A.   He is.  He is deceased, yes.
16      Q.   Was he a medical doctor in Maryland?
17      A.   No.
18      Q.   Has he ever been sued --
19      A.   No.
20      Q.   -- that you're aware of?  Okay.
21      A.   No, not that I was aware of.
22      Q.   And with respect to the ten cases that
23  you've consulted on or been retained by defense
24  counsel, in medical malpractice cases, do you recall
25  any of the defense counsel you worked for?

Confidential - Subject to Protective Order

Page 110

1    A.  No.
2    Q.  Are you currently involved in any medical
3  malpractice cases?
4    A.  No.
5    Q.  When was the last time you were involved in
6  a medical malpractice case?
7    A.  Over fi -- four, five'ish years.
8    Q.  Okay.
9    A.  Quite awhile.
10    Q.  Okay.  Is there a reason why you did not
11  look up or provide references for statements that are
12  in your report of Exhibit 1 that haven't been re --
13  cited to?
14        MS. LEWIS:  Objection, form.  I mean, she's
15  got seven pages.  What are you talking about in
16  particular would be fair.
17        MR. ASSAAD:  Do you want to coach the
18  witness some more, or?
19        MS. LEWIS:  I'm sorry?
20        MR. ASSAAD:  Do you want to coach the
21  witness some more?
22        MS. LEWIS:  Gabe, I'm saying you've got
23  seven pages.  You're saying for every -- every
24  sentence, every statement in the report.  So I'm just
25  saying --

Page 111

1        MR. ASSAAD:  Fine.  We'll do this --
2        MS. LEWIS:  -- come on.
3        MR. ASSAAD:  -- the long way then.
4        Thank you, Ms. Lewis.  Okay.
5  BY MR. ASSAAD:
6    Q.  Going to page 2 of your report, last
7  paragraph, you say:  "Each room will have an operating
8  room bed" --
9    A.  Yes.
10    Q.  I wasn't done yet.
11    A.  Oh, I'm sorry.  I'm just looking at the
12  right sentence.  I'm sorry.
13    Q.  Each room with will have an operating room
14  bed, quote, unquote, surgical table, moveable overhead
15  surgical lights, electrosurgery -- surgical cautery
16  device, laparoscopic camera, light boxes, if required,
17  sequential compression sleeve device, forced air
18  warming device, IV pumps, anesthesia machine,
19  anesthesia cart, computer work station for the RN
20  circulator, several stainless-steel tables of various
21  sizes, suction device, and receptacles for trash,
22  linen and sharps.
23        Did I read that correctly?
24    A.  Yes.
25    Q.  When you say the term "if required" are you

Page 112

1  just talking about the light boxes, or everything
2  after that sentence?
3    A.  It could be any part of the sentence.
4  What's not listed is, like, a robot.  If you're doing
5  robotic cases, that's not listed.
6    Q.  Is it your opinion that every single
7  operating room has a forced-air warming device?
8    A.  No.  It may.
9    Q.  Okay.  And what is the purpose of this
10  statement, in your opinion; how does this pertain to
11  your opinions?
12    A.  Again this is to -- to lay the groundwork of
13  the operating room itself, what pieces of equipment or
14  devices may be in the room prior to when the patient
15  enters the room.
16    Q.  Okay.  You agree with me that the fact that
17  these devices or equipment are in the operating room
18  you're not going to offer any opinions with respect to
19  whether or not these devices cause surgical-site
20  infections; correct?
21    A.  Correct.
22    Q.  On this next sentence, on the next page,
23  page 3, the top paragraph you say:  "Many of the
24  devices near the surgical field have their own
25  internal motor and fan for cooling...motors."

Page 113

1    A.  Yes.
2    Q.  Okay.  Why is that in here?
3    A.  Just to talk about, again, more of the
4  equipment that's in the room.  The cautery device has
5  a cooling unit, causes some warmth to the room.  The
6  compression devices have cooling -- have a little fan
7  to cool the motor.  So do the cameras and the light
8  boxes.
9    Q.  Okay.  You said the electrocautery unit
10  provides warmth to the room?
11    A.  No, no, no.  It has its own warmth.
12    Q.  You stated:  "The cautery device has a
13  cooling unit, causes some warmth to the room."
14    A.  Okay.  Let me restatement that so it's --
15  restate it, so it's clearer.
16        The electrocautery device has its own motor
17  and cooling device.  The fan inside, my understanding,
18  is to cool the motor, to keep it at normal temp, keep
19  it at a maintained temperature.
20    Q.  Okay.
21    A.  Like a computer fan, if you will.
22    Q.  Do you know how much airflow that produces?
23    A.  I do not.
24    Q.  Do you know whether or not they allow
25  contaminants to cause surgical-site infections?

Confidential - Subject to Protective Order

Page 114

1      A.  I do not.
2      Q.  Okay.  So what's the point of your opinion
3  here?  What's the purpose?
4      A.  The purpose, again, is to describe the
5  environment for the patient and all of the devices
6  that are in the room.  It's not a, as you would
7  describe, sterile environment, it is a clean
8  environment with lots of pieces of equipment
9  supporting the patient and near the patient.
10      Q.  But you have no opinion whether or not, for
11  example, any of these devices would cause a surgical
12  site infection.
13      A.  Correct.
14      Q.  Okay.  I'm just trying to figure out --
15      I'm representing over 2700 people in the
16  multidistrict litigation, and I need to understand the
17  basis for your opinions to determine whether or not
18  your opinions are reliable.  You understand that?
19      A.  Yes.
20      Q.  That's why we're here today; correct?
21      A.  Yes.
22      Q.  So for lack of, you know, going into
23  specific detail, is the summation of your opinions
24  that there are just many equipment and devices in the
25  operating room and they may or may not be sterile?

Page 115

1      A.  Correct.
2      Q.  Okay.  But you're not going to offer any
3  opinions of whether or not a -- a device that could be
4  contaminated with bacteria could cause a surgical-site
5  infection; correct?
6      A.  Correct.
7      Q.  Okay.  And were you under the impression
8  that there was a dispute among the parties of whether
9  or not everything in the operating room was
10  contaminated or not?
11      A.  I'm not sure I understand your question.
12      Q.  Well were you under the impression that the
13  plaintiffs are alleging that an operating room is
14  completely sterile?
15      A.  No, I didn't understand there -- that that
16  was their premise.
17      Q.  Well I'm just trying to understand the
18  purpose of your report, like what are you -- what is
19  your conclusions besides there are devices and
20  equipment in the operating room that may or may not be
21  contaminated?
22      A.  I'm sorry.  Ask the question again.  I'm not
23  sure I'm --
24      Q.  I've read your --
25      A.  -- able to answer -- answer your --

Page 116

1      Q.  -- all your opinions in your report --
2      Or all your opinions are in your report of
3  Exhibit 1 and your references, and you basically say,
4  in conclusion, "...it is my expert opinion that the
5  operating room is a clean, but not completely sterile,
6  environment."
7      A.  Correct.
8      Q.  Okay.
9      A.  I would agree, yes.
10      Q.  That bacteria cannot be eliminated from the
11  operating room environment.
12      A.  That's correct.  I would agree.
13      Q.  The operating room equipment, including
14  equipment that will be close to the surgical field,
15  quote, and are not -- or parentheses, and are not
16  covered by sterile drapes, closed parentheses, contain
17  bacteria and are not sterile.
18      A.  Correct.
19      Q.  Okay.  That's pretty much the sum of your
20  opinions in this case.
21      A.  Yes.
22      Q.  Okay.  But, for example, is the anesthesia
23  machine sterile?
24      A.  No.
25      Q.  Okay.  Why is that important?

Page 117

1      A.  Why --
2      Q.  In this case?
3      A.  It's again another piece of equipment that's
4  brought in close to the patient and could have some
5  contaminants that are transferred to the patient.
6      Q.  How would they be transferred?
7      A.  Fingers.
8      Q.  Any other way?
9      A.  Not that I'm aware of.
10      Q.  Well do you agree with me that it would be a
11  deviation of the standard of care for a surgeon or a
12  scrub nurse or any of the assistants that are
13  operating on the -- on the surgical site to touch the
14  anesthesia machine and then put their hands into the
15  sterile field?
16      A.  Correct.  That would be incorrect.  That
17  would not be good practice.
18      Q.  Okay.  Actually, if a patient got infected,
19  if a scrub nurse touched the anesthesia machine and
20  then touched the sterile field and there was an
21  infection, you'd agree with me that you would probably
22  testify that that scrub nurse deviated from the
23  standard of care; correct?
24      A.  Yes.
25      Q.  Okay.  Now let's just assume that doctors

Confidential - Subject to Protective Order

Page 118

1 are doing what they're supposed to be doing and
2 following the standard of care, and all of the nurses
3 are following the standard of care. You agree with me
4 that the fact that the anesthesia machine has bacteria
5 on it --
6    A. I'm not aware of that it has bacteria on it.
7    Q. Well it can be contaminated, potentially.
8    A. Potentially.
9    Q. Wait.
10      Do you know whether or not any of the
11 devices have bacteria on them or not?
12    A. I do not.
13    Q. Okay. But for the -- for patient safety you
14 assume they do when you teach proper regulations and
15 procedures in the operating room.
16    A. Yes.
17    Q. Okay. So unless someone -- unless you
18 transfer any of the potential contaminants on an
19 anesthesia machine directly to the surgical site, the
20 -- by contact, you agree with me that unless that
21 deviation of the standard of care occurs, that the --
22 there's no way that the bacteria on the anesthesia
23 machine is going to transfer to the surgical site and
24 cause an infection; correct?
25      MS. LEWIS: Objection, form.

Page 119

1    A. I'm not sure I follow your question.
2    Q. Okay. Okay.
3    A. Try -- I'm trying to follow it.
4    Q. We discussed that the anesthesia machine, if
5 it is contaminated, that the only way that the
6 contaminants would be transferred from the anesthesia
7 machine to the surgical site would be by contact.
8    A. Touch.
9    Q. Okay.
10    A. Yes. We agree.
11    Q. You don't believe that the bacteria could be
12 aerosolized; correct?
13    A. I don't know if --
14    Q. Okay.
15    A. -- if it could or could not.
16    Q. Okay.
17    A. I don't have that knowledge.
18    Q. Okay. So my point is is that if the -- if
19 the healthcare providers, the surgeons, the
20 assistants, the nurses in the operating room are
21 following the standard of care, the fact that there
22 may be contaminants on the anesthesia machine is not a
23 risk factor for causing surgical-site infections
24 during an operation.
25    A. I --

Page 120

1      MS. LEWIS: Object to the form.
2    A. I don't know that I can answer that.
3    Q. Okay. Do you know whether or not the Bair
4 Hugger's contaminated?
5    A. I do not.
6    Q. Okay. Were you ever --
7      Were you ever told by 3M that they concede
8 that the Bair Hugger is not sterile?
9    A. No. It is not -- It is not sterile.
10    Q. Were you ever told by 3M that they're aware
11 that the hose of the -- inside the hose of the Bair
12 Hugger contains or harbors bacteria?
13    A. No.
14      MS. LEWIS: Objection to form.
15    Q. Did you do a search to find out whether or
16 not the Bair Hugger contains, or is -- harbors
17 bacteria?
18    A. Did I do a what?
19      MS. LEWIS: Same objection.
20    Q. Any research.
21    A. No.
22    Q. You write on page 2, "as each piece" -- at
23 the bottom of page 2, the last sentence.
24    A. Umm-hmm. Okay.
25    Q. "As each piece of equipment is put into use,

Page 121

1 it is then brought close to the surgical field."
2      What's the importance of that?
3    A. I think... It's just, again, describing the
4 lo -- the patient and the patient process in the room
5 and how the patient is the center and the equipment
6 then is brought in close to support the patient.
7    Q. Does that have any relevance with respect to
8 the risk of infection?
9    A. Not with just one sentence, no.
10    Q. Well --
11    A. No.
12    Q. -- the fact --
13    A. No.
14    Q. The fact that equipment are brought close to
15 the patient that -- and brought close to the surgical
16 field that may be contaminated, is that relevant to
17 the risks of a surgical-site infection?
18      MS. LEWIS: Objection to form.
19    A. Say that question again.
20    Q. Well I talk --
21      You talk about the operating room is clean,
22 but not sterile; correct?
23    A. Umm-hmm.
24    Q. "Yes"?
25    A. Yes.

Confidential - Subject to Protective Order

Page 122

1    Q.  And you're discussing this talking about the
2  -- like, devices that are not sterile --
3    A.  Correct.
4    Q.  -- in the operating room; correct?
5    A.  Correct.
6    Q.  And you talk about, you know, devices that
7  are not sterile that are brought close to the surgical
8  field; correct?
9    A.  Yes.
10   Q.  What's your point?
11   A.  There is no point.  I'm just --
12   Q.  Okay.
13   A.  It's a com --
14      It's just a statement as is.
15   Q.  Okay.  Is it --
16      Is it your opinion that it's okay to have
17  non-sterile equipment next to the surgical field?
18   A.  When appropriate.
19   Q.  When would it be appropriate?
20   A.  Again, the cautery device, the machine
21  itself is not sterile, it's brought up adjacent to the
22  sterile field; not touching the drapes, but adjacent
23  to it.
24   Q.  But the cautery itself, which goes into the
25  surgical -- into the wound, is sterile.

Page 123

1    A.  Is sterile.
2    Q.  Okay.
3    A.  Device.  But the machine is not.
4    Q.  Okay.  You agree that there is a difference
5  between "not sterile" and "contaminated"?
6    A.  There are two different definitions.
7    Q.  Okay.  What's your definition of "not
8  sterile"?
9    A.  Unsterile.  Unsterile and not sterile --
10  Unsterile is something that is considered not sterile,
11  but it may in fact be clean.  Depends on the device.
12      Contaminated means it may have gross
13  bacteria or gross contamination, spill of blood or
14  body fluid.
15   Q.  You mentioned that you're not sure whether
16  or not the non-sterile equipment contained bacteria.
17  Remember that?
18   A.  Yes.
19   Q.  But if you look at your sentence on page 3
20  you say:  "The equipment in the operating room
21  including equipment that will be close to the surgical
22  field (examples, anesthesia machine, electrosurgical
23  cautery device, IV poles and pumps, anesthesia cart,
24  computer monitors and hard drives, patient warming
25  devices, suction bottles, overhead lights, compression

Page 124

1  sleeve device, closed parentheses, contain bacteria
2  and are not sterile."
3      (Interruption by the reporter.)
4    A.  Correct.
5    Q.  So now you -- now you're saying that you are
6  -- it's your opinion now that they actually contain
7  bacteria?
8    A.  They may contain bacteria, yes.
9    Q.  Well do they may contain or do they contain?
10  There's a big difference.
11   A.  May.
12   Q.  "May"?
13   A.  May.
14   Q.  So is that statement wrong then, it should
15  say "may"?
16   A.  No.  I'm saying they probably do contain
17  bacteria.
18   Q.  Well --
19   A.  Yeah.
20   Q.  -- which one is it?
21   A.  We'll say as my statement is written.  I do
22  not want to change it.
23   Q.  Okay.  So now they contain bacteria.
24   A.  Correct.
25   Q.  Not "may" contain, but they contain

Page 125

1  bacteria.
2    A.  Correct.
3    Q.  Okay.  And it's your opinion that -- that
4  bringing in devices close to a sterile field that
5  contain bacteria is acceptable.
6    A.  Yes.
7    Q.  You agree with me that none of those devices
8  that -- except for the forced-air warming device,
9  blows significant amount of air; correct?
10      MS. LEWIS:  Objection to form.
11   A.  No.
12   Q.  What else blows significant amount of air?
13   A.  I mentioned all of the i -- that other items
14  had internal motors and fans for cooling.
15   Q.  But you don't even -- you don't even know
16  the volumetric flow of those fans.
17   A.  I don't know the volu --
18      That's correct.
19   Q.  You feel the air coming out of a Bair Hugger
20  blanket; correct?
21   A.  Yes.
22   Q.  Okay.  You actually put it --
23      It was gentle or mild airflow; correct?
24   A.  Yes.
25   Q.  Have you ever felt air coming out of the

Confidential - Subject to Protective Order

Page 126

1  anesthesia machine?
2      A.  Yes.
3      Q.  Where?
4      A.  In the back.
5      Q.  "In the back," okay.
6      A.  Umm-hmm.
7      Q.  Away from the surgical table; correct?
8      A.  Depends on the position of the machine.
9      Q.  So you're telling me that you've seen an
10  anesthesiologist put an anesthesia machine facing
11  backwards?
12      A.  Potentially.
13      Q.  You've seen that done?
14      A.  Yes.
15      Q.  Where?  Give me the date and time because I
16  want to talk to this doctor.
17      A.  I can't give you a date.
18      Q.  It was abnormal; wasn't it?
19      A.  It was a procedure that we turned the bed,
20  and so in turning the bed we moved the anesthesia
21  machines and all of the equipment to support the
22  patient.  Depends on -- It's patient and surgical
23  procedure dependent.
24      Q.  What about a total knee or total hip?
25      A.  Probably not.

Page 127

1      Q.  Okay.  And how much airflow do you feel
2  coming out of the exhaust of a -- of a anesthesia
3  machine?
4      A.  Enough to feel it.  I can't give you the
5  velocity.
6      Q.  What about the electrosurgical cautery
7  device, do you feel air --
8      A.  Enough to feel it, yes.  Yes.
9      Q.  But the --
10          Where is the fan?
11      A.  In the back.
12      Q.  In the back of the device that goes in the
13  surgical --
14      A.  In the back of the --
15      Q.  -- in the wound?
16      A.  -- of the device itself.
17      Q.  Okay.  And where's that device sit?
18      A.  On a stand.
19      Q.  Where?  How far?
20          In front of the surgeon or behind the
21  surgeon?
22      A.  It can be next to or behind or across from;
23  again, depending on the procedure.
24      Q.  But you agree with me that the device is
25  above the operating room table.

Page 128

1      A.  Not necessarily.
2      Q.  Talking about the electrocautery device.
3      A.  Not necessarily.  Depending on the size and
4  height of the stand.
5      Q.  Do you know the airflow coming out of that?
6      A.  No.
7      Q.  Okay.  What else is --
8          What else do you feel blowing air in the
9  operating room?
10      A.  Cameras, light cords, computers.
11      Q.  You feel air coming out of the computers.
12      A.  Some of them, yeah.  Some of them are old,
13  big PCU units.
14      Q.  And where are the computers located?
15      A.  The floor.
16      Q.  Huh?
17      A.  The floor.
18      Q.  In the surg -- Under the --
19          Near the surgical site?
20      A.  No, on the workstation for the --
21      Q.  Which is against the wall, usually.
22      A.  Usually.
23      Q.  Okay.
24      A.  Or on a WOW, a movable cart.
25      Q.  And how long is the electrocautery device

Page 129

1  used in a total hip or total knee surgery?
2      A.  The whole procedure.  The entire procedure.
3      Q.  You're telling me they're using an
4  electrocautery device during the entire procedure?
5      A.  Yes.
6      Q.  Okay.  What does the electrocautery device
7  do?
8      A.  Cauterizes and cuts tissue.
9      Q.  Okay.  And they're cutting and cauterizing
10  the entire procedure?
11      A.  Yep.  Yes.
12      Q.  How long does a total hip or total knee
13  last?
14      A.  Depends on the surgeon.
15      Q.  In your experience?
16      A.  A knee can be an hour or more, and a hip can
17  be an hour and a half or more.
18      Q.  You say computer monitors blow air?
19      A.  Yes.
20      Q.  And you can -- And you can feel them?
21      A.  Yes.
22      Q.  Okay.
23      A.  The --
24      Q.  You don't know --
25          You don't know the rate, the velocity?

Confidential - Subject to Protective Order

Page 130

1     A.  No.  No.
2     Q.  Okay.  Just out of curiosity, did you go to
3  an operating room after you'd been retained in this
4  case to go see what blows air?
5     A.  No.  No.  This is all from my recollection
6  and memory.
7     Q.  Okay.  And a hard drive, to you, blows air?
8     A.  I'm talking about the little -- the unit
9  that sits on the floor, the PC unit where you can put
10  in discs and things.  I don't know if that's called
11  the hard drive or the --
12     Q.  Now every computer that I've ever used, --
13     A.  Uh-huh.
14     Q.  -- like, it sits and the fan's in the back
15  of the computer; correct?
16     A.  Well it's dependent on where that box sits,
17  if the box is sitting facing the wall or -- or out.
18  I'm not talking about a laptop, --
19     Q.  Understood.
20     A.  -- I'm talking about a --
21     Q.  A CPU.
22     A.  Yes, a CPU.  Thank you.
23     Q.  And you're saying that you feel --
24        You agree with me that the fan is usually in
25  the back.

Page 131

1     A.  It's on the side.  The ones I've seen it's
2  been on the side.  I -- It's mounted vertically, not
3  horizontally, and so it's on that, like --
4     Q.  Are you seeing --
5        Like could you see holes on the side of the
6  --
7     A.  Yeah.
8     Q.  Okay.
9     A.  And the fan --
10        And the whole round area where the fan sits.
11     Q.  And you believe that's on the side of a CPU?
12     A.  I don't know if it's the side or the end.  I
13  don't know.
14     Q.  Okay.  You're -- I mean, you're guessing;
15  right?
16     A.  Well I'm describing what my recollection of
17  the unit looks like.
18     Q.  Okay.  Do you have any reason to believe
19  that that fan could cause contaminants to reach the
20  surgical site?
21     A.  I have no knowledge of that.
22     Q.  Okay.  What about with respect to the
23  electrocautery device, do you believe any reason that
24  fan --
25     A.  I have no knowledge of that.

Page 132

1     Q.  And with respect to all these devices that
2  potentially blow air, you're relying on your personal
3  experience and not any literature to support that;
4  correct?
5     A.  Correct.
6     Q.  You write here, it is also my expert opinion
7  that the action of wiping down equipment will
8  decrease, not eliminate or kill, all the bacterial
9  load on the surfaces of the equipment.
10        What are you referring to to support that
11  statement?
12     A.  In my knowledge as an OR nurse we are not as
13  efficient as we could be in our wiping, or we're not
14  using the product appropriately.
15     Q.  So you're saying it's human error.
16     A.  Correct.
17     Q.  Okay.  And when you say you're not wiping as
18  efficient or using the product, have you done any
19  testing or research to see anything?
20     A.  No.  No.
21     Q.  So this is basically a guess on your part.
22        MS. LEWIS:  Objection, form.
23     A.  It's from my experience, not -- not as a
24  guess.
25     Q.  Well how do you know?  I mean, if you don't

Page 133

1  test the --
2     A.  I've observed it.  I've observed.  From my
3  observations.
4     Q.  But have you done testing?
5     A.  No.
6     Q.  Have said, like, well let's check the
7  bacterial load, or do swabs?
8     A.  No.
9     Q.  Okay.  So you're just basically saying, hey,
10  I see this person clean the operating room, I don't
11  see them doing a good job, so there might be more
12  bacteria because of my observation.
13     A.  Yes.
14     Q.  Okay.  No scientific basis at all.
15     A.  Correct.
16     Q.  On page 3 you talk about the drapes on the
17  first -- you know, bringing in the drapes into the
18  operating room.
19     A.  Yes.
20     Q.  Then you say:  "During any procedure that
21  will involve an implant, traffic into and out of the
22  room is restricted."
23        And we talked about that before; correct?
24     A.  Yes.
25     Q.  But sitting here today you have -- does that

Confidential - Subject to Protective Order

Page 134

1 have anything to do with contamination of the drapes?
2     A.  No.
3     Q.  Okay.  Can bacteria go through -- get
4 through the drapes?
5     A.  Not to my knowledge, but I'm not the
6 researcher that would know that answer.
7     Q.  I mean, from what I am reading here, there's
8 something different about an implant surgery, whether
9 it's a breast implant or hernia, than many other types
10 of surgeries; correct?
11     A.  Yes, in the traffic --
12     Q.  Okay.
13     A.  -- restrictions, traffic restrictions.
14     Q.  And I assume that is because those types of
15 surgeries, those implants are very susceptible to
16 infection.
17     A.  No.  That's not my answer.
18     Q.  Well then why care?
19     A.  Because those procedures are more difficult
20 for the patient if they have to come back for a
21 different procedure.
22     Q.  Why would they have to come back?
23     A.  If in fact the implant is infected.
24     Q.  Okay.  So you don't want the implant to get
25 infected; correct?

Page 135

1     A.  Correct.
2     Q.  And you do all these procedures to prevent
3 infection; correct?
4     A.  Correct.
5     Q.  And that is to limit traffic; correct?
6     A.  Yes.
7     Q.  To make sure to keep the sterile field as
8 sterile as possible; correct?
9     A.  Yes.
10     Q.  So you agree with me that you do these extra
11 precautions for implant surgeries because they're more
12 susceptible to infection.
13     A.  Not more susceptible.  That's not what I
14 said.
15     Q.  Then why do everything if they're not more
16 susceptible?
17     A.  You do it as a precaution to preve -- to
18 decrease their risk.
19     Q.  Why don't you do that for all surgeries,
20 then?
21     A.  That would be a good goal for all surgeries.
22     Q.  Why not?  Why for total hip and total knee
23 and not for colorectal?
24     A.  Good question.  I don't have an answer for
25 that.

Page 136

1     Q.  So you just want to talk about what you do
2 for these total hip and total knee, but you have no
3 idea why you do it?
4          MS. LEWIS:  Objection, form.
5     A.  That isn't what I said.
6     Q.  Well tell me why you do it.
7     A.  It's based on good literature.
8     Q.  Are the total hip patients more important
9 than the colorectal patients?
10     A.  No.
11     Q.  Okay.  Are they more important than the eye
12 surgery patients?
13     A.  No.
14     Q.  Are they more important than the -- you
15 know, what a -- what a ENT does, like some other
16 surgery that they do?
17     A.  No.
18     Q.  Okay.  So why -- why give them better
19 precautions and do more for a total hip or total knee
20 than you do for other types of surgeries?
21     A.  It's not better or worse.
22     Q.  Well you are doing way more things -- I
23 mean, you're not allowing peo -- you're restricting
24 access to the operating room; correct?
25     A.  Correct.

Page 137

1     Q.  Okay.  You are limiting traffic in the
2 operating room; correct?
3     A.  Correct.
4     Q.  Okay.  You are --
5     I mean, you even put down here that you have
6 someone standing on the outside so you don't have to
7 open the door, okay?
8     A.  Correct.
9     Q.  Okay.  Because there's something about
10 traffic and opening the door that increases the risk
11 of something.
12     A.  Correct.
13     Q.  Correct?
14     A.  And that's what I cited in my references.
15     Q.  Okay.  It increases the risk of infection.
16 Okay.
17     A.  Potential for.  The risk --
18     Q.  What do you mean by "potential for"?
19     A.  Potential for infection.
20     Q.  Okay.
21     A.  It doesn't say that opening and closing the
22 door causes infection.  It increase --
23     Q.  Did I ask you that, ma'am?  I didn't ask --
24     I said "increases the risk of infection."  I
25 didn't say it's going to give you an infection.

Confidential - Subject to Protective Order

Page 138

1  Increases the risk.  Do you understand what that
2  means?
3      A.  Yes.
4      Q.  Okay.  I mean you've heard that before as a
5  nurse; correct?
6      A.  Yes.
7      Q.  There's certain things that increase the
8  risk of infection, and some things that don't make a
9  difference; correct?
10     A.  Yes.
11     Q.  Okay.  Like, for example, if I, you know,
12 don't wash my hands, okay, and do a surgery, that's
13 going to increase the risk of infection; correct?
14     A.  Correct.
15     Q.  Okay.  If you open the doors you believe
16 it's going to increase the risk of infection.
17     A.  Correct.
18     Q.  Okay.  So what is it about opening doors
19 that increases the risk of infection that increases it
20 for a total hip but doesn't increase it for a
21 colorectal?
22     MS. LEWIS:  Objection, form.
23     A.  They're two different types of procedures.
24 Colorectal procedure has its own inherent risks from
25 body organisms, whereas the total joint does not.

Page 139

1      Q.  You have absolutely no idea why the
2  literature says do not open doors in the operating
3  room for a total hip or total knee.
4      A.  Yes, I do.
5      Q.  Huh?
6      MS. LEWIS:  Objection, argumentative.
7      A.  Yes, I do.
8      Q.  Well what is it then; why?  I've asked you,
9  like, five times, and you don't tell me why is it
10 about opening doors that increases the risk of
11 infection for a total hip.
12     A.  I'm not sure --
13     MS. LEWIS:  Hold on.
14     A.  -- I understand your question.
15     MS. LEWIS:  If it's asked and answered do
16 you want to stand by your previous answer?
17     THE WITNESS:  Yeah.  I'm --
18     MR. ASSAAD:  It hasn't been answered.
19     MS. LEWIS:  It has been answered.  You said
20 you've asked five times and she's given you an
21 answer.
22     MR. ASSAAD:  I said I've asked five times.
23 I said -- I haven't said it's been answered five
24 times.
25     MS. LEWIS:  She's answered five times.

Page 140

1      Do you wish to stand by your previous
2  answers?
3      THE WITNESS:  Yes.
4      MR. ASSAAD:  Are you instructing her not to
5  answer?
6      THE WITNESS:  No.
7      A.  I have answered the question.  I'm not
8  changing my answer.
9      Q.  Do you agree with me that opening the door
10 may -- Strike that.
11     Do you agree with me by having a lot of
12 traffic in the operating room might increase the
13 bacterial load in the operating room?
14     A.  I don't know that for a fact.
15     Q.  Why does it matter if the airflow is
16 disturbed in the operating room?
17     A.  We want to maintain the positive flow over
18 the patient.
19     Q.  But what does the positive flow do?
20     A.  The positive flow again brings that clean --
21 clean, fresh air, some from the outside, away -- down
22 over the surgical site and then away to the exhaust.
23     Q.  And that's because that's the cleanest air
24 in the operating room, the air that's coming out of
25 the ventilation.

Page 141

1      A.  All the room --
2      All of the air in the room is clean.  That's
3  where the flow is of the air, is over the surgical
4  field.
5      Q.  So you think that the air that's coming out
6  of that vent up there [indicating] is the same level
7  of cleanli -- of cleanliness as it is close to the
8  floor?
9      A.  Yes.
10     Q.  Okay.  Healthcare workers wear masks over
11 their mouth, correct, in the OR?
12     A.  Yes.
13     Q.  Why?
14     A.  Because it has been shown and researched,
15 and I cannot cite the study, that talking and
16 particles that potentially come from the mouth could
17 in fact potentially contaminate a surgical site.
18     Q.  So the particles could become airborne,
19 contaminated particles; correct?
20     A.  Coughed or sneezed or talking, yes.
21     Q.  Okay.  So you do agree that airborne
22 particles can cause surgical-site infections.
23     MS. LEWIS:  Objection, form.
24     MR. ASSAAD:  Basis?
25     MS. LEWIS:  Foundation.

Confidential - Subject to Protective Order

Page 142

1    MR. ASSAAD: "Foundation"?  Okay.
2    Q.  You do believe that airborne particles can
3  cause surgical-site infections.
4    MS. LEWIS:  Same objection.
5    A.  Potential.  I don't know what you mean by
6  "airborne particles."
7    Q.  Well if someone --
8    A.  What do you mean by "airborne particles"?
9    Q.  You don't know what "airborne particles"
10  means?
11    A.  I'm not sure I understand what --
12    Q.  If you don't understand what it means, we'll
13  just move on.
14    A.  Okay.
15    Q.  Do you understand what it means?
16    MS. LEWIS:  She doesn't understand --
17    A.  No.
18    MS. LEWIS:  -- what you mean.
19    A.  What I -- What you're trying to ask in the
20  question.
21    Q.  Do you know what the term "airborne" means?
22    A.  Yes.
23    Q.  Okay.  I mean, you're a nurse; correct?
24    A.  Yes.
25    Q.  And you understand that there could be --

Page 143

1  you know, as -- you wear a mask because you don't want
2  to release any type of contaminants from your mouth
3  that are particles or bacteria into the air that might
4  end up in the surgical site; correct?
5    A.  Correct.  I would agree with that.
6    Q.  So you've heard the term "airborne
7  particles" before.
8    A.  Correct.
9    Q.  Okay.  So you do know what I mean when I say
10  "airborne particles in an operating room."
11    A.  Yes.
12    Q.  Okay.  So you do agree that airborne
13  particles can cause surgical-site infections.
14    A.  Potentially.
15    Q.  I said "can cause." I didn't --
16    Okay.  You believe that airborne particles
17  can potentially cause surgical-site infections.
18    A.  Yes.
19    MS. LEWIS:  Objection to the form.
20    Q.  Do you agree with me that the sterile table
21  is one of the responsibilities of a scrub nurse?
22    A.  Yes.
23    Q.  Okay.  And it's very important to protect
24  that sterile table from contamination; correct?
25    A.  Yes.

Page 144

1    Q.  Because the sterile table has instruments
2  that are going to be used in the surgical site;
3  correct?
4    A.  Yes.
5    Q.  And it may contain the implant that's going
6  to be implanted into the surgical site in a total knee
7  and total hip arthroplasty; correct?
8    A.  No.
9    Q.  Where is that going to be located?
10    A.  The implant won't be opened until just prior
11  to its use.
12    Q.  But it does get opened.
13    A.  Yes.
14    Q.  Okay.  And you'd agree with me that many
15  surgeons, orthopedic surgeons are very careful with
16  handling the implant; correct?
17    A.  Correct.
18    Q.  They even replace their gloves before they
19  handle the implant.
20    A.  Correct.
21    Q.  Okay.  Because they don't want to
22  contaminate the implant because of a risk of surgical
23  -- of causing a periprosthetic joint infection.  Wait.
24  You don't know what that means.
25    You don't want -- You don't want them to

Page 145

1  contaminate the implant because it may cause a
2  surgical-site infection.
3    A.  Correct.
4    Q.  On page 4, under the patient flow in the
5  operating room, I guess that's what you meant by
6  "flow," "patient flow."
7    A.  Correct.
8    Q.  Okay.
9    A.  I probably should have used a different
10  word, but yes.  Patient process.
11    Q.  You write on the second paragraph under
12  there, the device is -- you talk about compression
13  stockings.
14    A.  Yes.
15    Q.  It says:  "This device is used to decrease
16  the risk of post-operative deep vein thrombosis" or
17  "blood clot"?
18    A.  Yes.
19    Q.  What does that have to do with any of the
20  issues in this case?
21    A.  I'm talking about, again, the patient flow,
22  all of the pieces of equipment that are used on the
23  patient in support of the patient during their
24  surgical procedure.
25    Q.  What does that have to do with the issues in

Confidential - Subject to Protective Order

Page 146

1    this case?
2        A.  It's also another device that has a fan.
3        Q.  A compression stocking?
4        A.  The device, yes.
5        Q.  What device of a compression stocking has a
6    fan?
7        A.  It's a little motor that sits either on an
8    IV pole or on a stand or on the floor, and it blow --
9    inflates a stocking on the patient's leg during the
10   procedure.
11       Q.  But then it stops.
12       A.  At the end of the procedure.
13       Q.  It keeps on --
14       A.  It runs dur -- It runs during the whole
15   procedure.
16       Q.  It keeps on inflating the entire time?
17       A.  Inflates and deflates and inflates, so sort
18   of massaging the leg, yes.  And will be used on the
19   nonoperative leg.
20       Q.  Okay.  Do you know whether or not they're
21   used on total hip and total knee?
22       A.  I would say yes, on the nonoperative leg.
23       Q.  Okay.  Is it used perioperatively?
24       A.  Yes.
25       Q.  Okay.  So it's your opinion --

Page 147

1        A.  And it may also be used postoperatively.
2        Q.  And sitting here today --
3            Do you know whether or not they're used by
4    all surgeons during --
5        A.  I do not.
6        Q.  Okay.
7        A.  I do not.
8        Q.  By the way, have you ever worked outside of,
9    like, the Maryland region?
10       A.  Massachusetts and New Jersey.
11       Q.  Okay.  Was that --
12           At what point in your life?
13       A.  The last two years.
14       Q.  Okay.  As a nurse?
15       A.  Yes.
16       Q.  Okay.  But you agree with me that this case
17   is not about blood clots.
18       A.  Correct.
19       Q.  Okay.
20       A.  Correct.
21       Q.  Was one of your objectives in writing your
22   report was to go through an operating room and identify
23   everything that may blow air?
24       A.  No.  It's to describe the -- again, the
25   patient process.

Page 148

1        Q.  Why is blowing air important?  Why is that
2    relevant?
3        A.  Irrelevant?
4        Q.  No.  Why is it relevant to your --
5            I mean, you've listed all these things that
6    may blow air.  Why is it relevant to your opinions?
7        A.  It's relevant whether or not the dis --
8    there's a disruption to the flow, the positive flow
9    for the -- around the patient and the surgical site.
10       Q.  But you're not an engineer that could
11   determine that; correct?
12       A.  Correct.
13       Q.  Okay.  Did you do any research to determine
14   whether -- whether or not any of these devices that
15   blow air have any effect on the airflow in an
16   operating room?
17       A.  No.
18       Q.  Were you --
19           I mean, was that part of your objective is
20   -- objectives in this case is to identify all the
21   equipment that blow air?
22       A.  No.
23       Q.  You just decided to come up with that on
24   your own?
25       A.  No.  I'm just, again, describing all of the

Page 149

1    pieces of equipment around the patient.
2        Q.  Okay.  You write:  "The disposable Bair
3    Hugger blanket is attached to the patient with an
4    adhesive strip placed on the chest usually above the
5    nipple line."
6        A.  Yes.
7        Q.  Where's the nipple line?
8        A.  Right where it sounds like.
9        Q.  So you're saying it's taped right here
10   [indicating]?
11       A.  Or above, depending -- depending on the
12   procedure it may be taped low --
13       Q.  Well --
14       A.  -- but that's a marker that we use.
15       Q.  So the total -- a total hip and total knee
16   surgery, what type of blanket would you use?
17       A.  Upper body.
18       Q.  Okay.  And where is it usually taped?
19       A.  I'm going to answer depending on where the
20   surgeon wants -- how much of the hip he wants prepped.
21   If he wants prepped very high, then you're going to
22   put the blanket above away from where his surgical
23   prep area is going to be.
24       Q.  Okay.  So you think that the 522 blanket's
25   adjustable with the height?

Confidential - Subject to Protective Order

Page 150

1    A.   What does that mean?
2    Q.   Like you cam move -- you could place it at
3  different areas?  Like you could tape it at different
4  areas on the chest?
5    A.   Are you asking do we?
6    Q.   I'm saying that's what you believe, --
7    A.   Yes.
8    Q.   -- the five twenty --
9    A.   Yes.
10   Q.   -- the Bair Hugger upper body blanket?
11   A.   Yes.
12   Q.   Okay.  Well aren't you concerned that if you
13 put it too high up you're going to obstruct the -- the
14 face and the mouth of the -- of the patient for the
15 anesthesia?
16   A.   No.  It has a little kind of cutout and a
17 drape for the head for anesthesia to have access.
18   Q.   I understand that, but it also has a width
19 of the blanket, has a certain width; correct?
20   A.   Correct.
21   Q.   Okay.  And what do you think happens when
22 you put air into the Bair Hugger blanket, you think
23 it's going to stay -- in what shape is it going to
24 take; do you even know?
25   A.   I'm not sure I understand your question.

Page 151

1    Q.   When you blow up --
2         When you blow up the blanket with air, --
3    A.   Yes.
4    Q.   -- do you think it's going to -- it's going
5  to take its own shape, it's going to expand; correct?
6    A.   Right.  Into the shape of the blanket.
7    Q.   Okay.  And you think that there is enough
8  room in there between the -- and the plastic that
9  covers the face that you have adjustability of how
10 high or low you want to put the blanket?
11   A.   Yes.
12   Q.   Okay.  When was the last time you placed a
13 522 upper body blanket on a -- on a patient?
14   A.   Probably in April this year.
15   Q.   And you yourself placed it?
16   A.   Yes.
17   Q.   What kind of surgery?
18   A.   Abdominal.
19   Q.   Where?  What hospital?
20   A.   Lawrence General.
21   Q.   Where is that?
22   A.   Lawrence, Massachusetts.
23   Q.   Are you a traveling nurse now?
24   A.   No.  I'm an education consultant.
25   Q.   So why are you working up in Massachusetts?

Page 152

1    A.   I was doing a Periop 101 course with
2  students there and then assisting them with building
3  -- moving into a new OR.
4    Q.   Okay.  On page 4, second-to-last paragraph
5  you say:  "Research has shown forced-air warming
6  devices to be safe for use in the operating room," and
7  you cite --
8    A.   Sikka and Kellam.
9    Q.   You cite AORN Guideline For the Prevention
10 of Unplanned Hypothermia.
11   A.   Correct.  Sorry.
12   Q.   That's not Sikka; correct?
13   A.   I'm sorry.  No.  I'm sorry, I mis -- I
14 looked at the numbers wrong.
15   Q.   So you're citing a nursing guideline --
16   A.   Correct.
17   Q.   -- for this statement; correct?
18   A.   Correct.
19   Q.   Okay.  Do you know what research they did?
20   A.   No.
21   Q.   So when you went and -- and put the Bair
22 Hugger blanket back in April of this year, was it
23 Lauren hospital, Lawrence?
24   A.   Lawrence.
25   Q.   Lawrence?  Was that to teach -- to teach a

Page 153

1  class?
2    A.   No.  It was assisting with a procedure.
3    Q.   So you're allowed to go off into another
4  hospital and just assist with a procedure?
5    A.   No.  I was there as an employee.
6    Q.   Okay.  Was it like a temporary employee?
7    A.   Six months.
8    Q.   Okay.  How did you find the Sikka article?
9    A.   How did I find it?
10   Q.   Yeah.
11   A.   Probably from looking back at the AORN
12 Guidelines.  I don't know that I did a search for just
13 forced warmed air.
14   Q.   Did you do --
15   A.   I don't remember.
16   Q.   Did you do any search on a computer?
17   A.   For forced air?  I looked at the AORN
18 Guidelines for -- not only for unplanned, but also
19 looked at Kellam.  I had read Kellam previously.  So
20 looked at Kellam's sources also.
21   Q.   Have you done any Google searches?
22   A.   No.  Hmm-umm.
23   Q.   So you were asked to offer an opinion in
24 this case in which you say that research has shown
25 forced-air warming devices to be safe for the use in

Confidential - Subject to Protective Order

Page 154

1   the operating room, and you haven't done even a Google
2   search?
3       A.   No.  I look at the guidelines.
4       Q.   That's not my question.
5       A.   Okay.
6       Q.   You haven't --
7       A.   No, --
8       Q.   You haven't --
9       A.   -- I have not.
10      Q.   -- done a Google search.
11      A.   I have not.
12      Q.   You haven't --
13          Have you gone to do any PubMed searches?
14      A.   No.
15      Q.   Do you know what PubMed is?
16      A.   Yes, I do.
17      Q.   Okay.  You say: "Cotton blankets, although
18   cost effective, do not retain the heat needed to keep
19   the patient at normothermia during the entire
20   procedure."
21          Do you see that?
22      A.   Yes.
23      Q.   But we've talked about before that you don't
24   know the -- like what the del -- the change in
25   temperature would be between using a cotton blanket

Page 155

1   and a forced-air warming blanket; correct?
2       A.   Correct.  Cotton blankets are considered
3   passive.  The forced-air are considered active types
4   of warming.
5       Q.   I assume that when you were -- agreed to be
6   an expert in this case you just automatically accepted
7   the fact that the Bair Hugger was effective and safe.
8       A.   That was in my practice, yes.
9       Q.   Okay.  But you've never yourself questioned
10   that before; correct?
11      A.   Correct.
12      Q.   You were just taught to use the Bair Hugger,
13   and you used it.
14      A.   It was effective in keeping the patient warm
15   and normothermic, and yes, that was my intent.
16      Q.   Well we went through that before.  I think
17   the word "effective" is an incorrect word because you
18   don't know how effective it is compared to other --
19   other things.  You say it works.
20      A.   Compared to others.  It was effective in
21   keeping the patient at their normothermic, --
22      Q.   Okay.
23      A.   -- and that was my knowledge.
24      Q.   But you don't know whether or not the Bair
25   Hugger even works in many surgeries to keep a patient

Page 156

1   normothermic, do you?
2       A.   I do.
3       Q.   Oh really?
4          Are you aware of any --
5       A.   From --
6       Q.   Are you aware of any studies that indicate
7   that patients that have been -- orthopedic patients
8   that have been warmed with a Bair Hugger, over 50
9   percent of them still become hypothermic?
10      A.   No.
11      Q.   Okay.  And you yourself don't even look at
12   the temperature of the patient during the surgery; do
13   you?
14      A.   Correct.
15      Q.   That's the anesthesiologist.
16      A.   Correct.
17      Q.   You don't know whether or not they're being
18   kept normothermic during the surgery; do you?
19          Do you?
20      A.   Anesthesia would let us know.
21      Q.   Have you looked at any medical records?
22      A.   Yes.
23      Q.   Okay.  Are you saying that -- that you --
24   that patients that are warmed with the Bair Hugger are
25   kept above, or are kept normothermic?

Page 157

1       A.   Yes.
2       Q.   That is your opinion?
3       A.   Yes.
4       Q.   And that's based on what?
5       A.   Quality studies I've done at different
6   facilities in tracking not only SCIP -- all SCIP
7   guidelines, but normothermic part of patients.
8       Q.   So you would disagree with the leading
9   researcher --
10      A.   No.
11      Q.   -- in a -- in --
12          MS. LEWIS:  Let him finish his question.
13          THE WITNESS:  Okay.
14      Q.   -- in a -- on hypothermia, Dr. Sessler, that
15   did a study that was funded by 3M and that was
16   published in 2015 that indicated that for the first
17   hour, hour and a half of surgery, perioperative
18   warming just doesn't work?
19      A.   I would not.
20          MS. LEWIS:  Objection to the form.
21      A.   I would not disagree.
22      Q.   They would know more than you; wouldn't
23   they?
24      A.   Probably.
25      Q.   Okay.  And you yourself haven't looked at

Confidential - Subject to Protective Order

Page 158

1    temperature readings of patients that are -- that are
2    warmed perioperatively with forced-air warming; have
3    you?
4        A.  Correct.
5        Q.  Okay.  You just read some AORN guideline and
6    just took it as the truth and accepted it; correct?
7        A.  With careful consideration.
8        Q.  What consideration?  You didn't look at
9    what's going on with the patient during the many
10   hundreds of surgeries you've -- you've attended;
11   correct?
12       A.  I don't think I'm going to answer that one.
13       Q.  Why not?
14       A.  Because I find that...
15           THE WITNESS:  Can I take a short break?
16           MR. ASSAAD:  Sure.
17           MS. LEWIS:  Sure.
18           THE WITNESS:  Thank you.
19           THE REPORTER:  Off the record, please.
20           (Recess taken from 1:41 to 1:51 p.m.)
21   BY MR. ASSAAD:
22       Q.  You ready to continue?
23       A.  Yes.
24       Q.  Okay.
25       A.  You may repeat the last question.

Page 159

1        Q.  Just about to do that.
2        A.  Okay.
3        Q.  You didn't look at what's going on with the
4    patient during the many hundreds of surgeries you've
5    attended with respect to their temperature.
6        A.  No.  That's not correct.
7        Q.  You have?
8        A.  You can see the temperature on the monitor,
9    just as I would glance at the monitor to see what
10   their heart rate or blood pressure is, you can see the
11   temperature monitor on the -- on the monitor.
12       Q.  And it's your opinion in many, if not most
13   of those surgeries, that the patient was normothermic?
14       A.  I would not begin to answer that question.
15       Q.  Okay.  I mean, sitting here today you do not
16   know how effective the Bair Hugger is with maintaining
17   normothermia during surgery.
18       A.  That's not true.
19       Q.  Okay.  Well how do you know how effective it
20   is?
21       A.  From the anesthesia provider that I would
22   work with would let us know what the patient's
23   temperature was pre, during and post for each patient.
24       Q.  Well you --
25       A.  It's recorded.

Page 160

1        Q.  You haven't looked --
2        A.  It's recorded.
3        Q.  You haven't looked at the many studies that
4    indicate that even with forced-air warming that the
5    majority of patients become hypothermic.
6        A.  I have not.
7        Q.  Okay.  And you wouldn't disagrees with that
8    literature, would you?
9            MS. LEWIS:  Objection to form.
10       A.  Until I read it, I don't know.
11       Q.  Do you know whether or not a -- if you
12   compare a -- a knee implant surgery, a total knee as
13   compared to a abdominal surgery, which patient is more
14   susceptible to becoming hypothermic?
15       A.  No, I do not.
16       Q.  You're aware that this case is a
17   multidistrict litigation.  You know what that means?
18       A.  Yes.  It's more than one --
19       Q.  Okay.
20       A.  -- area.  Yes.
21       Q.  And you're aware that, as I said before,
22   there is, I think over 2700 plaintiffs in the case.
23       A.  Yes, I believe you told me that.
24       Q.  And growing every day.  More people are
25   filing cases.  Do you understand that?

Page 161

1        A.  It's -- You're telling me that.  I have no
2    knowledge of it.
3        Q.  Now are you aware that there has been
4    studies performed that show that the Bair Hugger
5    increases the risks of surgical-site infections or
6    joint infections 3.8 times?
7        A.  No.
8            MS. LEWIS:  Objection, form.
9        Q.  You don't recall reading that, looking at
10   the Kellam article and where it sites a lot of the
11   literature that indicate that forced-air warming, or
12   the Bair Hugger, might cause a risk to the patients?
13           MS. LEWIS:  Objection, form.
14       A.  I believe their conclusion was it was
15   inconclusive.
16       Q.  That wasn't my question, ma'am.
17       A.  Okay.
18       Q.  My question is --
19       A.  Restate your question.
20       Q.  My question:  Did you -- Did you -- Did you
21   --
22           You're aware that they looked through all
23   the literature; correct?
24       A.  Yes.
25           MS. LEWIS:  Do you want to show her the

Confidential - Subject to Protective Order

Page 162

1 articles, --
2         MR. ASSAAD:  No.
3         MS. LEWIS:  -- Gabe, please?
4         MR. ASSAAD:  No.
5         MS. LEWIS:  Well it's not a memory game.
6         MR. ASSAAD:  I'm not asking here to put
7 anything --
8         MS. LEWIS:  Then don't expect an answer.
9         MR. ASSAAD:  Feel free to show her the
10 article when you want to do a direct.  I do my
11 examination the way I want to do it, you do it the
12 way you want to do it.  Fair enough?
13        MS. LEWIS:  It's not a memory game, so.
14        MR. ASSAAD:  She can say I "don't
15 remember."  You want to coach her to what --
16        MS. LEWIS:  No.  I'm just saying, if you --
17 if you're going to ask her about an article --
18        MR. ASSAAD:  I'm not asking her about
19 articles.
20        MS. LEWIS:  You said did it say something.
21        (Interruption by the reporter.)
22        (Discussion off the stenographic
23        record.)
24 BY MR. ASSAAD:
25     Q.  Do you recall it cited numerous articles or

Page 163

1 literature in the Kellam study?
2     A.  Yes.  I do recall that it was more than one
3 study --
4     Q.  Okay.
5     A.  -- that they cited.
6     Q.  At any point did you actually go and review
7 those articles?
8     A.  Not to my knowledge.
9     Q.  What do you mean, not to your knowledge?
10    A.  Not that I recall reading any of them, no.
11    Q.  Well do you recall --
12        I mean, you kept accurate records of your --
13 of your time; correct?
14    A.  Yes.
15    Q.  And if you were working on this case and you
16 went and read some articles and spent time doing it,
17 you would have put that on your time sheet; correct?
18    A.  Yes.
19    Q.  Okay.  And --
20        (Discussion off the stenographic record.)
21    Q.  And in Exhibit 4, prior to the submission of
22 your report of June 2nd, 2017 there's nothing to
23 indicate that you reviewed articles.
24    A.  Correct.  That does not state that, that's
25 correct.

Page 164

1     Q.  And you agree as an expert you should be
2 independent in thought; correct?
3     A.  Yes.
4     Q.  And to evaluate all the information before
5 you offer an opinion; correct?
6     A.  Yes.
7     Q.  Okay.  And you basically took a nursing
8 article and formulated all your opinions with respect
9 to the safety of the Bair Hugger.
10        MS. LEWIS:  Objection, form.
11    A.  My background is nursing.
12    Q.  And what?
13    A.  My background is nursing.
14    Q.  Yeah, but you took a nursing -- this AORN
15 article by Kellam, who -- who is a nurse --
16    A.  Correct.
17    Q.  -- or she's a nurse.
18    A.  She is.
19    Q.  And you just took that as your only resource
20 regarding the safety of the Bair Hugger.
21    A.  Correct.
22        MS. LEWIS:  Objection, form.
23    Q.  And Kellam is a literature review; correct?
24    A.  Yes.
25    Q.  And you --

Page 165

1         And sitting here today if I asked you about
2 any of the articles cited in Kellam that they
3 reviewed, the literature, you would not be able to
4 answer because you did not review them.
5     A.  Correct.
6     Q.  Did you even ask for any of the plaintiffs'
7 expert reports besides the orthopedic surgeon, Dr.
8 Stonnington?
9         MS. LEWIS:  Objection, form, to any
10 discussions with counsel.
11    A.  No.
12    Q.  You did not see plaintiffs' computational
13 fluid dynamics expert's report; correct?
14    A.  Correct.
15    Q.  Which shows the airflow similar to the
16 airflow that you saw; correct?
17    A.  Correct.
18    Q.  Would you --
19        Would you have taken that into consideration
20 if the plaintiffs' report, which was done by one of
21 the leading experts in particle flow in the United
22 States, showed that the Bair Hugger does cause
23 significant particle increase over the surgical site?
24        MS. LEWIS:  Objection, form.
25    A.  Take it into consideration for --

Confidential - Subject to Protective Order

Page 166

1    Q.   In your opinions of whether or not the Bair
2 Hugger is safe.
3    A.   No.
4         MS. LEWIS:  Objection, form.
5    A.   I don't have an opinion on that.  I'm not
6 that kind of expert.
7    Q.   I understand that, but you looked at an
8 airflow that was provided to you by the defense;
9 correct?
10   A.   Correct.
11   Q.   Okay.  Have you ever consulted for 3M
12 before?
13   A.   No.
14   Q.   Have you ever worked for 3M?
15   A.   No.
16   Q.   Please help me understand what exactly --
17 what exact methodology that you looked at or did to
18 determine that -- that the Bair Hugger is safe
19 besides your predisposed determination based on your
20 experience.
21        MS. LEWIS:  Objection, form.
22   A.   From -- I believe I cite AORN as a
23 recommendation, and the articles that I have attached,
24 used.
25   Q.   Well you've been a nurse for a long time;

Page 167

1 correct?
2    A.   Correct.
3    Q.   And recommendations change; correct?
4    A.   Yes.  They're updated.
5    Q.   Okay.  Certain things become -- science
6 advances and things that were thought were good for
7 patients were decided they weren't good for patients
8 any more; correct?
9    A.   That's correct.
10   Q.   I mean we could talk about, you know,
11 preparing the skin of the patient; correct?
12   A.   Correct.
13   Q.   Some things they thought were good they
14 realized they weren't good and they've changed them;
15 correct?
16   A.   Correct.
17   Q.   Okay.  So just -- besides looking at AORN,
18 did you do any -- did you create any -- Strike that.
19        Besides looking at the literature, did you
20 yourself apply any independent thought and formulate
21 your own opinions with respect to the safety of Bair
22 Hugger?
23   A.   No.
24        MS. LEWIS:  Objection, form.
25        Gabe, I mean, you can keep going down this

Page 168

1 road, but she's not offering an expert opinion on the
2 safety of the Bair Hugger.  There's no expert opinion
3 in her report on the safety of the Bair Hugger.
4    Q.   If you look at page 4.  It states:
5 "Research has shown forced-air warming devices to be
6 safe for use in the operating room."
7    A.   Yes.
8         MR. ASSAAD:  If you're willing to cross
9 that statement out, stipulate to cross that out,
10 I'll stop asking.
11        MS. LEWIS:  It's a statement, it's not an
12 opinion.  It's a statement.  It's not an expert
13 opinion.  It doesn't say, "it is my expert opinion
14 that."  So she's not offering expert opinions on the
15 safety of the Bair Hugger.
16 BY MR. ASSAAD:
17   Q.   On page 4, last paragraph, you talk about
18 the antiseptic solution to decrease the transient
19 bacteria on the skin of a patient.
20   A.   Yes.
21   Q.   Are you going to offer any opinions with
22 respect to the different types of antiseptic
23 solutions?
24   A.   No.
25        MR. ASSAAD:  And Ms. Lewis, I assume that

Page 169

1 she's not going to offer any opinions on the efficacy
2 of Bair Hugger; correct?
3         MS. LEWIS:  I mean, she's not offering
4 expert opinions on the efficacy or safety.
5         MR. ASSAAD:  Okay.  Just -- Because she
6 keeps on saying it.  I want to make sure, if there's
7 reference to it in her report that --
8         MS. LEWIS:  Not with respect to an expert
9 opinion.  I mean, if you want us to stipulate?
10        MR. ASSAAD:  Yes.
11        MS. LEWIS:  I'm saying there's not -- she's
12 not offering an expert opinion on the safety of the
13 Bair Hugger.
14        MR. ASSAAD:  Or efficacy.
15        MS. LEWIS:  Or efficacy.
16        MR. ASSAAD:  Okay.
17 BY MR. ASSAAD:
18   Q.   Are you going to offer opinions on draping
19 of a -- in a total knee or total hip arthroplasty?
20   A.   No.
21   Q.   You say here that:  "Sterile light handle
22 covers may be attached to the surgical lights by any
23 team member."
24   A.   Correct.
25   Q.   Is that what we talked about before for the

Confidential - Subject to Protective Order

Page 170

1    handles of the lights?
2        A.  Correct.
3        Q.  On page 5, fourth paragraph from the bottom
4    you state:  "During the surgical procedure, the
5    surgeon and the scrub nurse stand across the operating
6    room bed from each other.  Throughout the procedure,
7    the surgical team is passing instruments and sponges
8    back and forth across the surgical site which can
9    potentially create air current disturbances."
10           What's your basis behind that?
11       A.  Observations.  Just watching instruments
12   being handled back and forth I know there's some
13   changes.
14       Q.  Well that's obvious because you're moving to
15   perform an operation.
16       A.  Absolutely.
17       Q.  But why do you think it causes air current
18   disturbances?  What's your basis?
19       A.  Just my own personal knowledge.
20       Q.  Have you measured --
21       A.  No, --
22       Q.  -- any air --
23       A.  -- I have not.
24       Q.  Have you felt any air current disturbances?
25       A.  No.

Page 171

1        Q.  So would it be fair to say that you really
2    have no scientific basis to support that statement?
3        A.  Other than my own observations.
4        Q.  Well an obser -- Is that a scie --
5            Is your observation a scientific basis?
6        A.  No.
7        Q.  Okay.  So you agree with me that there's no
8    scientific basis to support that observa -- to support
9    that statement; correct?
10       A.  There's no research or a scientific basis
11   that I know of.
12       Q.  So the --
13       A.  There may be some.
14       Q.  So the answer to my question previously is
15   "correct."
16       A.  Yes.
17       Q.  Are you aware that there are orthopedic
18   surgeons that do not use the Bair Hugger?
19       A.  Not in my practice in my experience.
20   They've all used them.
21       Q.  In the Kellam paper it states that inad --
22   inadvertent perioperative hypothermia is defined as a
23   core body temperature of less than 36 degrees, and
24   that's different than what you said of 37.
25       A.  I will -- I will defer to the experts.  I

Page 172

1    don't know.
2        Q.  Okay.
3        A.  I believe I said there was a range that was
4    usually defined by anesthesia.
5        Q.  Do you consider everything that AORN
6    publishes authoritative?
7        A.  Yes.  That's a strong word, but yes.
8        Q.  So AORN's never wrong.
9        A.  No.
10       Q.  Even though they may change, from time to
11   time, their recommendations.
12       A.  Correct.
13       Q.  Okay.  But AORN doesn't perform scientific
14   studies, they just do mostly literature reviews;
15   correct?
16       A.  Correct.
17       Q.  Because AORN is basically a nursing
18   organization; correct?
19       A.  Professional, yes.  Professional nursing
20   organization.
21       Q.  Okay.  So my understanding is AORN is --
22   rarely -- rarely publishes, like, peer-reviewed
23   literature regarding scientific studies.
24           MS. LEWIS:  Objection, form.
25       A.  Their journal is a peer-reviewed journal

Page 173

1    which is published on a monthly basis.
2        Q.  Yeah, but most of their publications are
3    just literature reviews.
4        A.  No.
5            MS. LEWIS:  Objection, form.
6        Q.  So they actually do research?
7        A.  They publish research.
8        Q.  So they publish research that nurses do.
9        A.  Yes.
10       Q.  Okay.  Where does AORN get its funding?
11       A.  To publish?  I'm sorry.
12       Q.  Where does -- I mean, it's a professional
13   nursing organization.
14       A.  Correct.  There are dues, and they have a
15   variety of funding sources.
16       Q.  Do you have to pay money to publish in AORN?
17       A.  No.
18       Q.  You said you reviewed Dr. Stonnington's
19   expert report?
20       A.  Yes.
21       Q.  What in his report are you --
22       A.  I'm trying to remember his report, to tell
23   you the truth.
24       Q.  Well is there anything in his report that
25   you are rebutting or contending?

Confidential - Subject to Protective Order

Page 174

1    A.  Not that I can recall at this moment.
2    Q.  Is there anything you disagree in his
3  report?
4    A.  I don't -- don't remember.
5    MR. LEWIS:  If you don't remember --
6    A.  Don't remember.
7    (Discussion off the stenographic record.)
8    MR. ASSAAD:  All right.  Let's take a
9  break.  We're going to go print up his report and so
10 we can discuss it.
11   THE WITNESS:  Okay.
12   THE REPORTER:  Off the record, please.
13   (Recess taken from 2:13 to 2:28 p.m.)
14 BY MR. ASSAAD:
15   Q.  Go to Exhibit 1, which is your report.
16   A.  Yes.
17   Q.  You mentioned you received materials that
18 you reviewed.  Did you review these materials prior to
19 writing your report?
20   A.  Yes.
21   Q.  Okay.  When did you receive these materials?
22   A.  I don't -- don't have that in my head.
23   Q.  Was it before or after the initial
24 consultation?
25   A.  After.

Page 175

1    Q.  After.  So it would be after May 19th?
2    A.  Yes.
3    Q.  Okay.  And before you started preparing your
4  document?
5    A.  I can't answer to timeline.
6    Q.  Well why don't you look at Exhibit 4, which
7  is the invoices.
8    A.  Correct.
9    Q.  So you -- you had an initial consultation
10 with defense counsel on May 19th, 2017; correct?
11   A.  Yes.
12   Q.  All right.  And then I take it that after
13 that you received the documents listed in paragraph
14 one of Exhibit 1; correct?
15   A.  Yes.
16   Q.  Okay.  And I take it that --
17   Were they emailed to you or delivered to you
18 by mail?
19   A.  Emailed.
20   Q.  Okay.  Did you print them up?
21   A.  No.
22   Q.  Okay.  And did you review the items of the
23 -- the Complaint, the Answer to the Complaint and the
24 Memorandum in Support of Defendants' Proposed Phase I
25 Scheduling Order and the expert report of Dr.

Page 176

1  Stonnington prior to writing your expert report?
2    A.  I can't answer that.  I don't remember.  I
3  may have been reading them concurrently, don't
4  remember.
5    Q.  Do you know who Dr. Stonnington is?
6    A.  No, other than an author of this report.
7    Q.  Do you know --
8    Do you know whether or not he's an expert
9  for the plaintiff or the defendant?
10   A.  I do not.
11   Q.  Okay.
12   A.  It says he's an expert, but I don't recall.
13   Q.  Do you recall --
14   I mean, you've read his report; correct?
15   A.  Yes.
16   Q.  Do you consider himself an --
17   Do you consider him an expert?
18   A.  I am not qualified to answer that.
19   Q.  Okay.  Is --
20   I'll show you his report, but before I show
21 you the report, is there anything that comes to mind
22 that you disagreed with his report?
23   MS. LEWIS:  Objection, --
24   A.  I have no comment.
25   MS. LEWIS:  -- form.

Page 177

1    Q.  Okay.
2    (Hughes Exhibit 5 marked for
3    identification.)
4  BY MR. ASSAAD:
5    Q.  What's been Exhibit 5 -- marked as Exhibit 5
6  is the expert report of Dr. Michael J. Stonnington.
7  Is this the expert report that you've seen?
8    A.  Yes.  I believe it is.
9    Q.  Okay.  And do you recall reading this
10 report?
11   A.  Yes.
12   Q.  Did you read it from -- from beginning to
13 end?
14   A.  Yes.
15   Q.  You didn't focus on any section?
16   A.  No.
17   Q.  Okay.  What is it in this report, and you
18 can go through page-by-page, that -- that -- if -- if
19 there's anything that you disagree with -- that you
20 would -- that you disagree with in this report?
21   A.  I have no comment that.
22   Q.  Are you rebutting this report in any way?
23   A.  No.
24   Q.  Okay.  Was part of your objectives --
25 objective in formulating your opinions was to rebut

Confidential - Subject to Protective Order

Page 178

1    any of the opinions of Dr. Stonnington?
2        A.    No.
3            (Discussion off the stenographic record.)
4        Q.    On Exhibit 3, which is your CV, under
5    "Publications and Presentations," do any of those deal
6    with patient-warming devices?
7        A.    On my publications?
8        Q.    Yeah.
9        A.    No.  Not specifically, no.
10       Q.    Generally?
11       A.    No.
12       Q.    Okay.  Under "Professional Affiliations" you
13   have, "Presented to FDA regarding reprocessing single
14   use devices --
15       A.    Yes.
16       Q.    -- consideration."
17           What's that about?
18       A.    That was the era of reprocessing cardiac
19   cath stents --
20       Q.    Okay.
21       A.    -- and whether or not they could be safely
22   cleaned and reused.
23       Q.    Is anything -- any of your involvement with
24   -- any of your involvement with AORN, any of your work
25   you've done with them deal with patient-warming

Page 179

1    devices?
2        A.    No.
3        Q.    It says you were -- you're chair of the
4    Transition Into Practice Committee.
5        A.    Correct.
6        Q.    And what does that entail?
7        A.    That's a work group of volunteers from AORN
8    who are exploring ways to not only invite new graduate
9    nurses into perioperative nursing, but to have
10   clinical experiences for those still in baccalaureate
11   programs.
12       Q.    And you're also chair of the -- from 2009 to
13   2014, of the Recommended Practices Advisory Board?
14       A.    Yes.
15       Q.    Does that deal with operating rooms?
16       A.    Yes.  They all deal with operating rooms,
17   yes.
18       Q.    Was there any work done in that committee or
19   that Advisory Board dealing with patient warming?
20       A.    There may have been, but I'd have to look at
21   the dates.
22       Q.    Okay.  But sitting here today you don't
23   recall one way or the other.
24       A.    No.
25       Q.    Okay.  Are you aware that 3M is one of the

Page 180

1    largest contributors to AORN?
2        A.    I'm not aware of that.
3        Q.    Okay.  You are aware that you're testifying
4    on 3M's behalf in this case.
5        A.    Yes.
6        Q.    Okay.  When you stated previously that one
7    of the two opinions you're going to offer -- well the
8    two opinions were describe the environment, and Bair
9    Hugger is separate from the surgical site.  Remember
10   you stated that?
11       A.    Yes.
12       Q.    Is that the only opinion you're going
13   to offer is that the Bair Hugger blanket is separated
14   from the surgical site?
15       A.    Yes.
16       Q.    Anything else with regard to that issue
17   besides that it's not on the surgical site?
18       A.    No.
19       Q.    Okay.
20           MS. LEWIS:  You mean other than what's in
21   her report, or just what she said today?
22           MR. ASSAAD:  I don't know what is in her
23   report, but basically the two opinions that she said
24   today.
25       A.    Yes.  I...

Page 181

1        Q.    Okay.  And I guess what Ms. Lewis was going
2    to is you're also going to describe the environment of
3    the OR.
4        A.    Correct.
5        Q.    Okay.  And -- Strike that.
6            Give me a minute or two.  I might be done.
7            Have you been asked to do any further
8    research or any work for 3M?
9        A.    No.
10       Q.    Or the attorneys?
11       A.    No.
12       Q.    Have you been asked to participate in any
13   studies or scientific experiments for 3M regard -- in
14   this case?
15       A.    No.
16           MR. ASSAAD:  That's all I have.  Thank you.
17           THE WITNESS:  Thank you.
18           MS. LEWIS:  I do have some questions.
19           THE WITNESS:  Okay.
20           MS. LEWIS:  Just a few.
21           (Discussion off the stenographic record.)
22           (Brief recess taken.)
23               EXAMINATION
24   BY MS. LEWIS:
25       Q.    Ms. Hughes, I have a couple of questions, I

Confidential - Subject to Protective Order

Page 182

1  believe just a few.
2      A.  Okay.
3      Q.  You were asked a question -- or you were --
4          You were asked a question that you --
5  whether you could cite a source for your statement
6  that the air is not sterile.  And so my question is:
7  Do you need a source to make that sort of a statement,
8  or is that common knowledge?
9      A.  It's pretty much common knowledge that
10 sterile is a different categori -- categorization and
11 the air is not something that can be sterilized.
12         (Interruption by the reporter.)
13     Q.  You were also asked the question whether you
14 had a scientific basis for your statement about wiping
15 down the equipment.  The -- The question you were
16 asked was from a statement in your report, and you
17 were asked whether there was a scientific basis for
18 talking about a disinfectant killing all bacteria.
19         And so my question is:  [Clearing throat.]
20 Is there any label on a disinfectant that says the
21 disinfectant will kill all bacteria?
22     A.  No.  Most of the statements talk about the
23 percents, and the most effective are at least 99
24 percent, but not one -- not 100 percent.
25     Q.  So the manufacturers of the disinfectants

Page 183

1  themselves say, or already make clear that they aren't
2  killing all bacteria; correct?
3      A.  Correct.
4          MR. ASSAAD:  Objection to form.
5      Q.  You were asked a question about AORN's
6  research.  You were asked whether you knew what
7  research AORN did.  And in your response when you said
8  you did not know, were you saying you didn't have
9  personal knowledge of the research, or -- or not?  I'm
10 just trying to understand your question.  Did --
11         Does the AORN article itself cite the
12 research on which they put in their report?
13     A.  Yes.  And to clarify, AORN itself as an
14 entity does not do research, but they will publish
15 research, and then there is a foundation group that
16 will fund research.
17     Q.  So for the article -- the guidelines on
18 which you mentioned earlier, AORN does cite, in the
19 guidelines, these studies or research on which they
20 referenced --
21     A.  Correct.
22     Q.  -- for their statement; correct?
23         MR. ASSAAD:  Object to the form.
24     A.  Correct.  And their research is rated.
25         MS. LEWIS:  Those are all the questions I

Page 184

1  have.
2          MR. ASSAAD:  I just have one follow-up
3  question.
4          THE WITNESS:  Yes.
5              EXAMINATION
6  BY MR. ASSAAD:
7      Q.  You just testified that you are basing it on
8  common knowledge that the air is not sterile.
9      A.  Correct.
10     Q.  But sitting here today you don't know how
11 many CFUs per cubic feet or cubic meter the air coming
12 out of a -- a ventilation system has; correct?
13     A.  That's correct.
14     Q.  So it can be sterile, you just don't know
15 one way or the other.
16     A.  That's correct.  I've never been -- I've
17 never been --
18         That knowledge has never been shared to me
19 that the air coming out of a ventilation system is in
20 fact sterile.
21     Q.  So you're basically just guessing.
22     A.  No.
23     Q.  Well if you don't know what the CFU burden
24 is out of the air, okay, I mean it could be -- it
25 could be HEPA filtered; correct?

Page 185

1      A.  Correct, but that's still not 100 percent,
2  it's not sterile.
3      Q.  Well it's 99.997 percent of .3 microns
4  coming out of the air, okay?  Do you understand that?
5  That's what HEPA means.
6      A.  Correct.
7      Q.  Do you know how large a bacteria is?
8      A.  No.
9      Q.  Okay.  So the air can be come --
10         The air out of a HEPA filtration ventilation
11 system may be sterile, it may not, you just don't know
12 today.
13     A.  It's not the recognized definition of
14 sterile.
15     Q.  What's the recognized definition of sterile?
16     A.  It's 6D, 99 -- 99 and point 6 bacterial kill
17 is sterile.
18     Q.  99.6?
19     A.  99999, six nines, which is called 6D, 6
20 deep --
21     Q.  Okay.
22     A.  -- is what's the recognized definition of
23 sterile.
24     Q.  Okay.  And you don't know what is the
25 bacterial load coming out of a ventilation system.

Confidential - Subject to Protective Order

Page 186

1    A.  Correct.
2    Q.  Okay.  So it may be sterile, it may not be,
3  you don't know.
4    A.  Correct.
5    Q.  Okay.
6        MR. ASSAAD:  That's all I have.
7        THE WITNESS:  Okay.
8        THE REPORTER:  Off the record, please.
9        (Discussion off the stenographic record.)
10       (REPORTER'S NOTE:  The following
11       is stenographic record only.)
12       MR. ASSAAD:  I request that she reads and
13  signs her transcript.
14       THE WITNESS:  Okay.
15       MS. LEWIS:  It's up to you, but --
16       MR. ASSAAD:  Actually it's not.  Under the
17  rules, I can request it.  If she doesn't want to do
18  it, that's fine, but she can be held responsible for
19  it.
20       MS. LEWIS:  No problem.
21       THE WITNESS:  Is -- Do you provide a paper
22  copy for me then, --
23       MS. LEWIS:  Yes.
24       THE WITNESS:  -- to read and sign?
25       MS. LEWIS:  Yes.  She'll get you a copy.

Page 187

1  She'll get it to me and I'll get it to you.
2        THE WITNESS:  Thank you.  That's what I
3  wanted to know.  I can read it before I sign it.
4        (Deposition concluded at 2:46 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 188

1           C E R T I F I C A T E
2        I, Debby J. Campeau, hereby certify that I
3  am qualified as a verbatim shorthand reporter; that I
4  took in stenographic shorthand the testimony of
5  ANTONIA B. HUGHES at the time and place aforesaid;
6  and that the foregoing transcript consisting of 187
7  pages is a true and correct, full and complete
8  transcription of said shorthand notes, to the best of
9  my ability.
10       Dated at Lino Lakes, Minnesota, this 7th
11  day of August, 2017.
12
13
14
15           DEBBY J. CAMPEAU
16           Notary Public
17
18
19
20
21
22
23
24
25

Page 189

1          S I G N A T U R E   P A G E
2        I, ANTONIA B. HUGHES, the deponent, hereby
3  certify that I have read the foregoing transcript,
4  consisting of 187 pages, and that said transcript is
5  a true and correct, full and complete transcription
6  of my deposition, except per the attached
7  corrections, if any.
8  PAGE  LINE    CHANGE/REASON FOR CHANGE
9  ____ ____  _____
10 ____ ____  _____
11 ____ ____  _____
12 ____ ____  _____
13 ____ ____  _____
14 ____ ____  _____
15 ____ ____  _____
16 ____ ____  _____
17 ____ ____  _____
18
19 _____  _____
20  Date        Signature of Witness
21
22       WITNESS MY HAND AND SEAL this _____
23       day of _____, 2017.
24
25 (DJC)     _____

48 (Pages 186 to 189)