# EXHIBIT 12

1           UNITED STATES DISTRICT COURT
              DISTRICT OF MINNESOTA
2    ------------------------------------------------
3    In Re:
4    Bair Hugger Forced Air Warming
     Products Liability Litigation
5
     This Document Relates To:
6
     All Actions                          MDL No.
7                                         15-2666 (JNE/FLM)
8    ------------------------------------------------
9
                   VIDEOTAPED DEPOSITION
10
                          OF
11
                  CHRISTOPHER NACHTSHEIM
12
                  Minneapolis, Minnesota
13
              Tuesday, November 29, 2016
14
15   ------------------------------------------------
16
17
18
19
20
21
22
23
24   Reported by:
     Amy L. Larson, RPR
25   Job No. 113495

## Page 2

```
 1                  NACHTSHEIM
 2   APPEARANCES:
 3      ON BEHALF OF 3M:
 4      CHRISTIN GARCIA, ESQUIRE
        FAEGRE BAKER DANIELS
 5      2200 Wells Fargo Center
        90 South Seventh Street
 6      Minneapolis, MN 55402
 7
        DEBORAH LEWIS, ESQUIRE
 8      BLACKWELL BURKE
        431 South Seventh Street
 9      Minneapolis, MN 55415
10
11
        FOR THE PLAINTIFF:
12
        MICHAEL SACCHET, ESQUIRE
13      CIRESI CONLIN
        225 South Sixth Street
14      Minneapolis, MN 55402
15
16
17      ALSO PRESENT:  Kraig Hildahl, Videographer
18
19
20
21
22
23
24
25
```

## Page 3

```
 1                  NACHTSHEIM
 2   INDEX:
 3   EXAMINATION BY:                       PAGE
 4   Ms. Garcia.............................8, 372
 5   Mr. Sacchet............................254
 6   EXHIBITS MARKED FOR IDENTIFICATION:
 7   Exhibit 1....................10
     Acknowledgment and Agreement to be Bound
 8   No Bates
 9   Exhibit 2....................10
     Notice of Videotaped Deposition of
10   Christopher Nachtsheim
     No Bates
11
     Exhibit 3....................12
12   Christopher Nachtsheim, Ph.D.,
     Curriculum Vitae
13   No Bates
14   Exhibit 4....................15
     Forced-Air warming and ultra-clean
15   ventilation do not mix
     No Bates
16
     Exhibit 5....................15
17   Patient Warming Excess Heat:
     The Effects on Orthopedic Operating
18   Room Ventilation Performance
     No Bates
19
     Exhibit 6....................29
20   Statistical Analysis for HPS Protocol 003
     Bates Albrecht_0016008 - Albrecht_0016012
21
     Exhibit 7....................34
22   Research Agreement
     Bates Belani_000054 - Belani_000061
23
     Exhibit 8....................37
24   Logistic Regression -
     Mark Albrecht - March 11, 2016
25   Bates Albrecht_0002275 - Albrecht_0002278
```

## Page 4

```
 1                  NACHTSHEIM
 2   INDEX:  (Cont'd.)
 3   EXHIBITS MARKED FOR IDENTIFICATION:    PAGE
 4   Exhibit 9..................38
     11/1/2013 E-mail Chain
 5   Subject:  Re:  Analytically speaking
     Bates Albrecht_0000101 - Albrecht_0000102
 6
     Exhibit 10.................53
 7   3/24/10 E-mail Chain
     Subject:  First Publication I'd Like to
 8   Include you on
     Bates Nachtsheim_0000364 - Nachtsheim_0000382
 9
     Exhibit 11.................58
10   April 2010 E-mail Chain
     Subject:  Testing
11   Bates Nachtsheim_0001408 - Nachtsheim_0001410
12   Exhibit 12.................62
     4/8/10 E-mail
13   Subject:  Update on testing
     Bates Nachtsheim_0001571
14
     Exhibit 13.................78
15   4/9/10 E-mail
     Subject:  Problem with laminar flow lab
16   Bates Nachtsheim_0000832 - Nachtsheim_0000833
17   Exhibit 14.................84
     April 2010 E-mail Chain
18   Subject:  Update
     Bates Nachtsheim_0001545 - Nachtsheim_0001547
19
     Exhibit 15.................95
20   May 2010 E-mail Chain
     Subject:  Abstract "crud and bug"
21   !!Important!!
     Bates Nachtsheim_0000118 - Nachtsheim_0000120
22
     Exhibit 16................100
23   5/29/10 E-mail
     Subject:  Both abstracts,
24   Statistical files and data files
     Bates Nachtsheim_0000191 - Nachtsheim_0000192,
25   Nachtsheim_0000211 - Nachtsheim_0000223
```

## Page 5

```
 1                  NACHTSHEIM
 2   INDEX:
 3   EXHIBITS MARKED FOR IDENTIFICATION:    PAGE
 4   Exhibit 17................114
     July 2010 E-mail Chain
 5   Subject:  Manuscript drafts for meeting
     Bates Nachtsheim_0000548 - Nachtsheim_0000549,
 6   Nachtsheim_0000556 - Nachtsheim_0000576,
     Nachtsheim_0000600 - Nachtsheim_0000608,
 7   Nachtsheim_0000577 - Nachtsheim_0000599,
     Nachtsheim_0000613 - Nachtsheim_0000615
 8
     Exhibit 18................146
 9   7/8/10 E-mail
     Subject:  Arizant FDA Warning Ltr
10   Bates Nachtsheim_00000385
11   Exhibit 19................188
     1/4/11 E-mail Chain
12   Subject:  Article I was talking about
     Bates Nachtsheim_0000177 - Nachtsheim_0000179
13
     Exhibit 20................192
14   December 2010/January 2011 E-mail Chain
     Subject:  Rough Copy
15   Bates Nachtsheim_0001110 - Nachtsheim_0001115,
     Nachtsheim_000127 - Nachtsheim_000130,
16   Nachtsheim_0001199 - Nachtsheim_0001201,
     Nachtsheim_0001206
17
     Exhibit 21................195
18   Forced Air Warming versus Conductive
     Fabric Warming - An Evaluation of
19   Laminar Operating Room Ventilation Disruption
     Bates Nachtsheim_0001206 - Nachtsheim_0001229
20
     Exhibit 22................205
21   Implementing Effective SSI Surveillance
     No Bates
22
     Exhibit 23................226
23   1/25/11 E-mail Chain
     Subject:  Minor Changes and a Query
24   Bates Nachtsheim_0000750 - Nachtsheim_0000751,
     Nachtsheim_0000727 - Nachtsheim_0000749
25
```

Page 6

NACHTSHEIM

INDEX: (Cont'd.)
EXHIBITS MARKED FOR IDENTIFICATION:     PAGE
Exhibit 24................................231
January 2011 E-mail Chain
Subject: Papers you are involved in
Bates Nachtsheim_0000819 - Nachtsheim_0000821

Exhibit 25................................277
April 2015 E-mail Chain
Subject: Statistical Practitioners Forum:
Advanced DOE Class
Bates 3MBH01293497 - 3MBH01293499

Exhibit 26................................322
Doctor Says a Device He Invented
Poses Risks
No Bates

Exhibit 27................................333
Table
Bates Albrecht_0002298

Exhibit 28................................341
Would Complications Following Rivaroxaban
Administration - A Multi-Centre Comparison
with Low Molecular Weight Heparin for
Thromboprophylaxis in Lower Limb
Arthroplasty
Bates Nachtsheim_0000451 - Nachtsheim_0000466

Exhibit 29................................369
Forced-Air Warming Does Not Worsen Air
Quality in Laminar Flow Operating Rooms
Bates 3MBH00985628 - 3MBH00985633

Exhibit 30................................377
Curriculum Vitae

Page 7

NACHTSHEIM
THE VIDEOTAPED DEPOSITION OF CHRISTOPHER
NACHTSHEIM, taken on this 29th day of November,
2016, at the Law Offices of Faegre Baker
Daniels, LLP, 2200 Wells Fargo Center, 90 South
Seventh Street, Minneapolis, Minnesota, commencing
at approximately 9:11 a.m.

P R O C E E D I N G S

    THE VIDEOGRAPHER: This is the
Start of tape labeled number 1 of the
videotaped deposition of Christopher
Nachtsheim in the matter of In Re: Bair
Hugger Forced Air Warming Products Liability
Litigation in the U.S. District Court for the
District of Minnesota, Case Number 15-2666
(JNE/FLM).
    This deposition is being held at the
Faegre Baker law firm in Minneapolis,
Minnesota, on November 29th, 2016. We are
going on the record at 9:11 a.m. My name is
Kraig Hildahl, I'm the legal video specialist
from TSG Reporting. The court reporter is
Amy Larson also in association with

Page 8

NACHTSHEIM
TSG Reporting.
    Will counsel please introduce
themselves for the record.
    MS. GARCIA: Christin Garcia,
counsel for defendants 3M and Arizant.
    MS. LEWIS: Deborah Lewis also
counsel for defendants 3M and Arizant.
    MR. SACCHET: Michael Sacchet for
plaintiffs.
    THE VIDEOGRAPHER: Will the court
reporter please swear in the witness and then
we can proceed.

    CHRISTOPHER NACHTSHEIM,
    a witness in the above-entitled action,
    after having been first duly sworn, was
    deposed and says as follows:

        EXAMINATION
BY MS. GARCIA:
Q. Hello, Professor Nachtsheim.
A. Hello.
Q. Thank you for coming here today. Could you
    start by, for the record, just providing your

Page 9

NACHTSHEIM
full name and spell your last name and let us
know your address.
A. Christopher John Nachtsheim. And it's N as
in north, A-C-H-T, S as in Sam, H-E-I-M.
Address is 1789 Summit Avenue, St. Paul,
Minnesota 55105.
Q. Thank you. Have you ever been deposed
before?
A. Yes.
Q. Okay. The one rule of deposition I just want
to reinforce today is if you have any
difficulty understanding -- well, if you
don't understand my question, if you would
like me to clarify something, will you please
let me know that?
A. Uh-huh. Yes.
Q. Yes?
A. Yes.
Q. There's rule number 2.
A. That's rule number 2, I knew that.
Q. You will need to say things out loud so that
we can get an accurate transcription of the
record in writing where your head movements
can't be taken down, and then we will try not

```
                                                    Page 322
 1                NACHTSHEIM
 2           MR. SACCHET:  Sure.
 3           THE WITNESS:  Yes.
 4           (Whereupon, Exhibit 26 was
 5           marked for identification.)
 6           MR. SACCHET:  I believe it was
 7   marked, was it?
 8           THE WITNESS:  Yeah, this is
 9   Exhibit 26.
10   BY MR. SACCHET:
11   Q. So does the website address at the bottom
12      left-hand corner of Exhibit 26 --
13   A. Oh, does it match, I see what you're saying.
14   Q. -- match the --
15   A. Yes, it does.  It does.
16   Q. If you could take a moment to just scan the
17      three odd pages of the article.
18   A. (Reviews document.)
19           MS. GARCIA:  Is there a question?
20           MR. SACCHET:  There's not one
21   pending.
22           MS. GARCIA:  Okay.  Thank you.
23           THE WITNESS:  (Reviews document.)
24   Okay.
25   BY MR. SACCHET:
```

```
                                                    Page 323
 1                NACHTSHEIM
 2   Q. Just a few quick questions about the article.
 3           Did you find any reference to the
 4      McGovern study or the McGovern data in the
 5      article?
 6   A. I did not.
 7   Q. This study was -- or this article from the
 8      New York Times was in fact published
 9      approximately 11 months before the McGovern
10      article was published, wasn't it?
11   A. Yes, it was.
12   Q. The only data mentioned in the article are
13      those presented to the ECRI Institute that
14      you can find at the top of the last full text
15      page, correct?
16   A. Yes.
17   Q. And at the bottom of the article is
18      presumably what you and Mr. Albrecht were
19      referring to in your correspondence marked in
20      Exhibit 19 in which you say something to the
21      effect of, "His statement is hard to argue
22      with," correct?
23           MS. GARCIA:  Object to the form of
24      the question.
25           THE WITNESS:  I just wanted to
```

```
                                                    Page 324
 1                NACHTSHEIM
 2      review where that shows up.  Is that --
 3           MR. SACCHET:  That's --
 4           THE WITNESS:  That's what --
 5           MR. SACCHET:  Exhibit --
 6           THE WITNESS:  Oh, yes, "Hard to
 7   disagree with the last quote" --
 8           MR. SACCHET:  The last quote.
 9           THE WITNESS:  -- "where the guy
10   said the data are compelling, but they don't
11   prove a link to infections in practice and a
12   clinical trial would be needed to do that?
13           MR. SACCHET:  Yup.
14   BY MR. SACCHET:
15   Q. And the last quote also says that, "Proving
16      such a link might be impossible, because it
17      would require mounting a huge clinical
18      study," correct?
19   A. Correct.
20   Q. In the absence of a clinical study, is the
21      next best evidence observational data?
22           MS. GARCIA:  Object to the form of
23      the question.
24           THE WITNESS:  Yes.  In the absence
25   of a -- of an experimental or a clinical
```

```
                                                    Page 325
 1                NACHTSHEIM
 2   study, it's the -- the only evidence you
 3   would have would be observational data.
 4   BY MR. SACCHET:
 5   Q. And you agreed with the statement made by
 6      Dr. Jeffrey Gumprecht that it would be
 7      impossible to mount a huge clinical study,
 8      correct?
 9           MS. GARCIA:  Object to the form of
10      the question.
11           THE WITNESS:  I -- I really -- I
12   really don't know for sure that it would be
13   impossible.  I don't know what -- first of
14   all, I think it's possible.  I don't know
15   what it would cost.  I don't know -- I'd have
16   to think through how that kind of study would
17   be designed and -- and -- and the logistical
18   problems that might present themselves.  I
19   don't see any impossibility.
20           MR. SACCHET:  Okay.
21   BY MR. SACCHET:
22   Q. Assuming a randomized control trial could not
23      be conducted, observational data would be the
24      next best alternative?
25           MS. GARCIA:  Object to the form of
```

Page 326

NACHTSHEIM

the question.
    THE WITNESS: That would be the next best alternative.
BY MR. SACCHET:
Q. Why is that?
A. Here what we're doing with the -- with the randomized -- with a clinical trial is that we're going to actually put both -- both types of blankets in practice and we can look at -- look directly at infection rates that result from the two different conditions, and that's the -- that's the clinical study. If you're looking at -- if you want to know about infections, I think you're limited to looking at observational studies such as -- such as the one that we report on.
    We did -- we did experimental studies on bubbles, but we can't do experimental studies on infections without -- without resorting to a clinical trial of some kind.
    So I think that, yeah, I think you probably -- if you want to look at infections, I think you're -- I think you're

Page 327

NACHTSHEIM

probably limited to observational data.
Q. Isn't it true that a well-designed observational study can render results extremely similar to a properly conducted randomized trial --
    MS. GARCIA: Object --
BY MR. SACCHET:
Q. -- on the same subject matter?
    MS. GARCIA: Object to the form of the question.
    THE WITNESS: I think that can happen, but I don't believe that the level of proof reaches the same -- I don't think that the proof reaches the same level of rigor. There's just always that chance in observational studies that -- I mean, I think there's a greater chance that something -- a confounding factor might be present, something you just hadn't thought of.
BY MR. SACCHET:
Q. But it is possible that if statistical significance is found based on observational data, that that significance may be replicated in a randomized control trial?

Page 328

NACHTSHEIM

A. Yes.
Q. So the observational data that is presented in the McGovern study is certainly valuable, is it not?
    MS. GARCIA: Object to the form of the question.
    THE WITNESS: I think it's valuable.
BY MR. SACCHET:
Q. That's why you published the observational data, correct?
A. Yes.
Q. You were previously asked about potentially confounding factors with respect to the observational data that was presented in the McGovern study, correct?
A. Correct.
Q. And some of those potentially confounding factors dealt with infection control measures, correct?
A. Correct.
Q. If we could turn to page 1540 of Exhibit 4, the McGovern study.
A. (Complies.)

Page 329

NACHTSHEIM

Q. I want to make sure that we are on the same page with respect to the change that occurred as to the antibiotic regime. Would you agree that an antibiotic called Gentamycin was applied during the forced-air warming period from July 1st, 2008, to the end of February 2009? It's about halfway down the paragraph.
A. I see it. From July 2008 to February 2009 a single dose of Gentamicin 4.5 was given at -- at induction.
Q. Whereas, a combination of Gentamycin and Teicoplanin -- and I'd be surprised if any of us know how to pronounce it, but that's how I'm going to say it -- was applied during the end of the forced-air warming period and throughout the entire conductive fabric warming period, which would namely be March 1st, 2009, until January 2011, correct?
    MS. GARCIA: Can you please point to where you're reading from?
    MR. SACCHET: So I am interpreting what's said in this paragraph and based on what's presented in Figure 7 so --
    MS. GARCIA: Okay. Then I'll

Page 330

NACHTSHEIM

object to the form of the question.
 THE WITNESS: I -- I read this --
 MR. SACCHET: I can walk through it slower.
 THE WITNESS: Well, I read this to say that in March 2009 there was a change to the combination of the two drugs you've pronounced, and I don't believe there were any changes until the end of the study.
 MR. SACCHET: Okay.
BY MR. SACCHET:
Q. So -- so we're clear, there was a period in which Gentamycin was applied to some forced-air warming patients, and then the antibiotic changed to a combination of Gentamycin and Teicoplanin that applied to some forced-air warming patients and all of the conductive fabric warming patients, correct?
A. Correct.
Q. Assuming the change in antibiotic did not affect infection rates between warming devices, would you still consider the antibiotic a confounding variable?

Page 331

NACHTSHEIM

 MS. GARCIA: Object to the form of the question.
 THE WITNESS: I'm going to assume that it has -- the change had no effect?
BY MR. SACCHET:
Q. Yeah, assume that the antibiotic had no effect on the infection rate. Would it still be a confounding variable?
 MS. GARCIA: Object to the form of the question.
 THE WITNESS: I don't think it would be -- I don't think it would be considered a confounding variable. I'm trying to think of how else it might have an impact, if it's not having an effect. I guess it -- no, I don't think it would be, yeah.
BY MR. SACCHET:
Q. One way that we could control for the -- let me strike that.
 In order to determine whether the antibiotic had an effect on infection rates, we could control for the warming device --
A. Yes.

Page 332

NACHTSHEIM

Q. -- and evaluate whether infection rates between the changed antibiotic stayed the same or went up or down --
A. Correct.
Q. -- with that control device, correct?
A. (Nods head.)
 MS. GARCIA: I'm going to object to the form of the question.
BY MR. SACCHET:
Q. Did you understand it?
A. Yes.
Q. If infection rates between the two groups were similar, that would tend to show that the antibiotic was not a confounding factor?
A. Correct.
 MS. GARCIA: Object to the form of the question.
BY MR. SACCHET:
Q. Assume that Mr. Albrecht, who you previously mentioned was an expert in statistics and you had full confidence in his ability to analyze data presented in this article, informed you that he found a 2.8 percent infection rate in those who received Gentamycin, a single drug,

Page 333

NACHTSHEIM

but 3.1 percent of patients who received the combination of antibiotics, but also forced-air warming patients, with a nearly identical infection rate, would you determine that the antibiotic was a confounding factor?
 MS. GARCIA: Object to the form of the question.
 THE WITNESS: That would be strong evidence that it was not a confounding factor.
 MR. SACCHET: Let's mark this.
 (Whereupon, Exhibit 27 was marked for identification.)
BY MR. SACCHET:
Q. So just to be clear, if we look at this table that's presented here, we can see in the first line it presents antibiotic protocol 1 versus 2 for FAW, does it not?
A. It does.
Q. Assume that protocol 1 is the singular antibiotic, i.e. Gentamycin, and that protocol 2 is the combination of Gentamycin and Teicoplanin.
A. Uh-huh. Yes.

Page 334

1  NACHTSHEIM
2  Q. In this particular analysis, forced-air
3     warming is held constant, correct?
4  A. Correct.
5  Q. And for forced air, protocol 1, the percent
6     of patients developing infection was 2.8?
7  A. Correct.
8  Q. And for forced air, protocol 2, involving
9     patients who received both Gentamycin and
10    Teicoplanin, the infection rate was 3.1,
11    correct?
12 A. Correct.
13 Q. And the p-value was 0.839, correct?
14 A. That's what's reported here.
15 Q. That's what's reported here. We could
16    conclude, based on this data set of these
17    numbers, that when the patient-warming device
18    is held constant, that the change in
19    antibiotic had no effect on infection rates,
20    correct?
21        MS. GARCIA: Object to the form of
22    the question.
23        THE WITNESS: Assuming there's
24    sufficient power in those sample sizes,
25    although they look fairly large to me, yes.

Page 335

1  NACHTSHEIM
2  BY MR. SACCHET:
3  Q. The patient population for forced-air
4     protocol 1 was 389 patients, correct?
5  A. Correct.
6  Q. And the patient population for those
7     receiving the combination was 678, correct?
8  A. Correct.
9  Q. Those are fairly large patient populations,
10    correct?
11 A. Correct.
12        MS. GARCIA: Object to the form of
13    the question.
14 BY MR. SACCHET:
15 Q. Another way to determine whether the
16    antibiotic was a confounding variable would
17    be to control the antibiotic, but evaluate
18    different infection rates between different
19    forced-air -- or different warming devices,
20    correct?
21 A. Yes.
22        MS. GARCIA: Object to the form of
23    that question also.
24 BY MR. SACCHET:
25 Q. And if the infection rates were still higher

Page 336

1  NACHTSHEIM
2     among those who received forced-air warming
3     compared to those who received conductive
4     fabric warming, that would tend to show the
5     antibiotic did not substantially affect
6     infection rates, correct?
7  A. Correct.
8        MS. GARCIA: Object to the form of
9     the question.
10 BY MR. SACCHET:
11 Q. And if that's true, the change in antibiotic
12    would also not be a confounding factor,
13    correct?
14 A. Correct.
15        MS. GARCIA: Object to the form of
16    the question.
17 BY MR. SACCHET:
18 Q. If I could --
19        MR. SACCHET: Could I ask your
20    basis for the objection?
21        MS. GARCIA: I'm sorry?
22        MR. SACCHET: Could I ask your
23    basis for the objection on form?
24        MS. GARCIA: Yes. You keep using
25    the word, "determine," and you keep using the

Page 337

1  NACHTSHEIM
2     word, "show," and you keep using the word,
3     "establish," and I'm objecting to the form of
4     the question based on those terms.
5        MR. SACCHET: That's not going to
6     pass muster in the court.
7  BY MR. SACCHET:
8  Q. As to the hypothetical I just presented, if
9     you could turn your attention to the second
10    line of the table.
11       MS. GARCIA: I'm sorry, to just be
12    complete with my form objection, it's also an
13    incomplete hypothetical.
14       MR. SACCHET: Fair enough.
15 BY MR. SACCHET:
16 Q. Antibiotic protocol 2 involved a combination
17    have Gentamycin and Teicoplanin, correct?
18       MS. GARCIA: Object to
19    foundation --
20 BY MR. SACCHET:
21 Q. -- for the sake of --
22 A. Yes.
23       MS. GARCIA: Excuse me. Object to
24    foundation for that.
25 BY MR. SACCHET:

```
                                                        Page 338
 1                     NACHTSHEIM
 2   Q.  And the data here shows that 3.1 percent of
 3       patients who received forced-air warming in
 4       the combination antibiotic developed joint
 5       infections, correct?
 6   A.  Correct.
 7   Q.  Whereas, .9 percent of patients who received
 8       conductive fabric warming and the combination
 9       of antibiotics developed joint infections,
10       correct?
11   A.  Correct.
12   Q.  By holding the antibiotic constant and
13       discontinuing the use of forced-air warming,
14       that resulted in a 71 percent decrease in
15       joint infections, did it not?
16           MS. GARCIA:  Object to the form of
17       the question.
18           THE WITNESS:  Yes, it did.
19   BY MR. SACCHET:
20   Q.  That essentially matches the 73 percent
21       decrease in infections that was noted in the
22       McGovern article itself, does it not?
23   A.  Correct.
24           MS. GARCIA:  Object to the form of
25       the question.
```

```
                                                        Page 339
 1                     NACHTSHEIM
 2   BY MR. SACCHET:
 3   Q.  And based on the p-value of .0008, which is
 4       far less than .05, you would determine that
 5       difference to be statistically significant,
 6       would you not?
 7   A.  I would.
 8   Q.  So whether we control for the device or
 9       control for the antibiotic, based on this
10       data set in Exhibit 27, would you determine
11       that the antibiotic was not a confounding
12       factor?
13           MS. GARCIA:  Object to the form of
14       the question, it's a lack of foundation, it's
15       an incomplete hypothetical.
16           THE WITNESS:  This data certainly
17       supports that hypothesis.
18   BY MR. SACCHET:
19   Q.  And if it were not a confounding factor,
20       would there be any reason to deselect
21       patients from the population of 1,437
22       accounted for in the McGovern study in order
23       to exclude those who received a single
24       antibiotic?
25   A.  No.
```

```
                                                        Page 340
 1                     NACHTSHEIM
 2           MS. GARCIA:  Object to the form of
 3       the question.
 4   BY MR. SACCHET:
 5   Q.  And if we were to do that and reduce the
 6       population, let's say, from the 1,473, or 37,
 7       I've forgotten which number it is, down to a
 8       number of let's say 500 patients, there could
 9       be concern about the powering of that
10       population?
11   A.  There could.  There could be.
12   Q.  Another confounding factor that was discussed
13       this afternoon was a change in the
14       thromboprophylaxis protocol, correct?
15   A.  Yes.  Can -- can you just remind me where
16       that --
17   Q.  Yeah, if we could turn to page 1540.
18   A.  (Complies.)
19   Q.  If you look at the bottom of the first full
20       paragraph in the left-hand column, it states
21       the thromboprophylaxis regimen from
22       July 2008 to the end of July 2009 was
23       Tinzaparin.
24   A.  Uh-huh.
25   Q.  Then it says from August 2009 to February
```

```
                                                        Page 341
 1                     NACHTSHEIM
 2       2010, Rivaroxaban, which I'll represent is
 3       otherwise known as Xarelto, was provided from
 4       day one, but in February 2010 to the end of
 5       this study, patients were reverted to
 6       Tinzaparin, correct?
 7   A.  Yes.
 8   Q.  Assuming the change in the prophylaxis did
 9       not affect infection rates during the time of
10       this study, i.e., Exhibit 4, would you still
11       consider it a confounding variable?
12   A.  No.
13           MS. GARCIA:  Object to the form of
14       the question.
15           (Whereupon, Exhibit 28 was
16       marked for identification.)
17           MS. GARCIA:  What number are we
18   on?
19           MR. SACCHET:  Twenty-eight, I
20   believe.
21           THE COURT REPORTER:  Correct.
22           MS. GARCIA:  Thank you.
23   BY MR. SACCHET:
24   Q.  Have you seen this document before,
25       Professor?
```

Page 342

NACHTSHEIM
1
2  A. No, I have not.
3  Q. Was this document produced with the set of
4     documents that you provided to 3M in response
5     to the subpoena?
6  A. No.
7  Q. Does the bottom right-hand label of this
8     document bear a Bates number of Nachtsheim --
9  A. It does.
10 Q. -- space 0000451?
11 A. It must have been attached to one of my
12    e-mails. I -- I -- I don't remember seeing
13    the document.
14 Q. Since you don't remember receiving or reading
15    the document, let's go through it.
16 A. Okay.
17 Q. If you'd turn to the second page of text that
18    bears the heading, "Introduction"; do you see
19    that?
20 A. I do.
21 Q. Do you see the last paragraph at the bottom
22    of that page?
23 A. "This multicenter study"?
24 Q. Correct. I'll read it out loud and you just
25    confirm that we're on the same page. "This

Page 343

NACHTSHEIM
1
2     multicenter study based on prospectively
3     collected national data aims to evaluate the
4     surgically relevant complications of using
5     either Rivaroxaban, or LMWH," which I'll
6     represent means low molecular weight
7     heparins, "as thromboprophylaxis, including
8     wound complications, readmission and return
9     to theater for deep infection, in addition to
10    the incidents of major bleeds and EVT,"
11    correct?
12 A. Correct.
13 Q. Based on that statement, do you agree that at
14    least two or three outcomes were measured,
15    one being wound complications, another being
16    return to theater for deep infection, and
17    another being major bleeds?
18 A. I agree.
19        MS. GARCIA: I object to lack of
20    foundation.
21 BY MR. SACCHET:
22 Q. If you could turn to the next page under,
23    "Methods," in the third paragraph it states,
24    "The primary outcome measure was wound
25    complications," parens, "Including hematoma,

Page 344

NACHTSHEIM
1
2     superficial wound infection and deep
3     infection requiring return to theater, RTT,
4     within 30 days of procedure"; do you see
5     that?
6  A. I do.
7  Q. And you see the designation that RTT involves
8     a deep infection requiring a return to
9     theater, correct?
10 A. Correct.
11 Q. Which is one of the independent variables
12    that was mentioned in the prior paragraph
13    that we read, correct?
14        MS. GARCIA: Object to the form of
15    the question.
16        THE WITNESS: Correct. I think
17    dependent variables.
18        MR. SACCHET: Okay. Noted.
19 BY MR. SACCHET:
20 Q. If we can now turn to the next page under,
21    "Results," do you see that heading?
22 A. Yes, 456.
23 Q. It says, "During the study period, 2,762
24    patients received Rivaroxaban, and 10,361
25    received LMWH. Patient demographics are

Page 345

NACHTSHEIM
1
2     shown in table 1. There were significantly
3     fewer wound complications in the LMWH group,"
4     parens, "2.81 percent versus 2.85 percent, OR
5     equals .72, 95 percent confidence intervals
6     between 0.58 to 0.90 with a p-value of .005.
7     However, rates of RTT for infected wound
8     washout were not significantly different."
9     Do you see that?
10 A. I do.
11 Q. Assuming the truth of this study in what we
12    just read, would you agree that Rivaroxaban,
13    otherwise known as Xarelto, increased wound
14    complications compared to low weight
15    molecular heparins like Tinzaparin?
16        MS. GARCIA: Object to the form of
17    the question, to an incomplete hypothetical
18    and to a lack of foundation for this witness
19    to opine about the meaning of this article.
20        THE WITNESS: It says there were
21    significantly fewer wound complications in
22    the LMH -- LMWH group. Is that what you're
23    referring to?
24 BY MR. SACCHET:
25 Q. That's what I'm referring to. And the

Page 346

1  NACHTSHEIM
2  p-value was a statistically significant
3  value, correct?
4  A. Yes, correct.
5  Q. So there were fewer wound complications as a
6  result of the use of a low weight molecular
7  heparin --
8  A. Correct.
9  Q. -- compared to Rivaroxaban, correct?
10 A. Yeah, correct.
11       MS. GARCIA: Object to the form of
12 the question.
13 BY MR. SACCHET:
14 Q. However, the study notes that rates for RTT,
15 which we established to be a return to
16 theater for --
17 A. Uh-huh.
18 Q. -- infections, were not significantly
19 different; do you see that?
20 A. Correct. Yes, I do.
21 Q. Assuming the truth -- well, let me back up.
22       Would you also agree that the
23 McGovern study, Exhibit --
24       MS. GARCIA: Four.
25 BY MR. SACCHET:

Page 347

1  NACHTSHEIM
2  Q. -- 4, evaluated joint infections?
3  A. Yes.
4  Q. It did not evaluate wound complications, did
5  it?
6  A. Correct, it did not.
7  Q. Assuming the truth of this study, would you
8  ultimately agree that the change in protocol
9  from Tinzaparin, which is an LMWH, to
10 Xarelto, otherwise known as Rivaroxaban, and
11 then back to Tinzaparin, did not
12 significantly affect the infection rate?
13       MS. GARCIA: Object to the form of
14 the question, to lack of foundation, and it's
15 an incomplete hypothetical.
16       THE WITNESS: Assuming the study
17 was carefully done and generalizable, yes.
18 BY MR. SACCHET:
19 Q. And assuming the study was well done and
20 generalizable, would you agree that the
21 change in thromboprophylaxis noted in the
22 McGovern study, Exhibit 4, did not confound
23 the infection rates?
24       MS. GARCIA: Object to the form of
25 the question.

Page 348

1  NACHTSHEIM
2        THE WITNESS: Assuming -- yes.
3  BY MR. SACCHET:
4  Q. And would you also conclude that, assuming
5  the truth of this study, it would be improper
6  to deselect all of the patients who received
7  Xarelto, otherwise known as Rivaroxaban, from
8  the patient population if the
9  thromboprophylaxis was not a confounding
10 variable?
11       MS. GARCIA: Object to the form of
12 the question.
13       THE WITNESS: It doesn't seem
14 justified in -- on the basis of these
15 results.
16 BY MR. SACCHET:
17 Q. And, in fact, when the coauthors of the
18 McGovern study were in the process of
19 publication, are you aware that at numerous
20 times they sought to collect additional data
21 in support of the study?
22 A. I was not aware of that. I knew that -- I
23 knew that they sought to run this study out
24 in time.
25 Q. Are you aware that when Mr. Albrecht and

Page 349

1  NACHTSHEIM
2  Dr. Reed collected additional data that went
3  beyond January 2011 in the conductive fabric
4  warming population, that the data still
5  showed a significant decrease in infections
6  when conductive fabric warming was used?
7  A. I'm aware of that.
8  Q. Assuming that --
9        MS. GARCIA: Can we take a break
10 shortly?
11       MR. SACCHET: Yeah, give me two
12 minutes.
13 BY MR. SACCHET:
14 Q. Assuming that neither the antibiotic nor the
15 thromboprophylaxis protocol required control
16 because they were not confounding factors as
17 we discussed, you would be confident in the
18 results of the observational study presented
19 in the McGovern data?
20       MS. GARCIA: Object to the form of
21 the question.
22       THE WITNESS: I'm confident that
23 those weren't confounding factors, that those
24 studies are well done. It doesn't rule out
25 the potential for other confounding factors.

Page 350

1  NACHTSHEIM
2  MR. SACCHET: Fair enough.
3  BY MR. SACCHET:
4  Q. And you continue to stand by the results of
5    the observational studies --
6  A. Yes.
7  Q. -- in the McGovern publication?
8  A. I do.
9       MR. SACCHET: Let's take a break.
10      THE VIDEOGRAPHER: We're going off
11   the record at 5:07 p.m.
12      (Whereupon, a brief recess
13      was taken.)
14      THE VIDEOGRAPHER: This is video
15   number 6 in the deposition of Christopher
16   Nachtsheim. Today is November 29th, 2016.
17   We're going back on the record at 5:18 p.m.
18 BY MR. SACCHET:
19 Q. Professor Nachtsheim, if we could turn to
20   Exhibit 5, which is the Belani study.
21 A. I have it.
22 Q. Great. And as to this study, your role was
23   to exclusively review the statistical portion
24   of this study, correct?
25 A. Correct.

Page 351

1  NACHTSHEIM
2  Q. You had no involvement in the setup of the
3    experiment?
4  A. I did not.
5  Q. You had no role in the execution of the
6    physical experiment?
7  A. I did not.
8  Q. You had seen, whether by video or in person,
9    disruption of laminar flow caused by the
10   Bair Hugger before, correct?
11 A. I had, yes.
12      MS. GARCIA: I'm sorry, can I hear
13   that question again? I was thinking and I
14   did not hear the question.
15      MR. SACCHET: Can you -- do you
16   mind repeating it.
17      (Whereupon, the last question
18      was read by the court reporter.)
19      MS. GARCIA: Object to the form of
20   the question, asked and answered.
21 BY MR. SACCHET:
22 Q. So you were familiar with the possibility,
23   based on your personal experience, that the
24   Bair Hugger could disrupt laminar airflow,
25   correct?

Page 352

1  NACHTSHEIM
2       MS. GARCIA: Object to the form of
3    the question, misstates the record and lack
4    of foundation.
5       THE WITNESS: Correct.
6  BY MR. SACCHET:
7  Q. If we could turn to the third page of the
8    study.
9  A. (Complies.) 408?
10 Q. Yes. Do you see the header entitled,
11   "Statistical Analysis"?
12 A. I do.
13 Q. And it reads, "A Poisson regression model for
14   overdispersed data was fit having the sum of
15   bubble counts for each experimental run,"
16   paren, "ten pictures," end parens, "as the
17   response, and the factors identified in the
18   experimental design as predictors plus an
19   interaction term." Do you see that?
20 A. I do, yes.
21 Q. Did you determine that a Poisson regression
22   was the most appropriate statistical model to
23   employ because you were dealing with counts
24   data -- or data counts?
25 A. Yes.

Page 353

1  NACHTSHEIM
2       MS. GARCIA: Object to the form of
3    the question, previously asked and answered.
4  BY MR. SACCHET:
5  Q. And that Poisson regression was a better
6    model to use than, let's say, an ANOVA model?
7       MS. GARCIA: Object to the form of
8    the question, previously asked and answered.
9       THE WITNESS: Yes.
10 BY MR. SACCHET:
11 Q. And if we could just turn our attention one
12   paragraph above that, it says, "For the
13   experimental design, a replicated and equals
14   to 2 by 3 full factorial design was used to
15   assess changes in bubble counts over the
16   surgical site," correct?
17 A. Correct.
18 Q. And what were the factors?
19 A. So the first factor is the anesthesia screen,
20   low grade/high grade, those are the two
21   levels, and then there were three
22   patient-warming devices, conductive fabric,
23   forced-air or no warming device, and that
24   would -- that was considered a control.
25 Q. Does Figure 3, directly above that paragraph,