# EXHIBIT 13

Page 1

1      UNITED STATES DISTRICT COURT
2         DISTRICT OF MINNESOTA
3
4  In re Bair Hugger Forced Air   )  MDL No. 15-2666
   Warming Products Liability    )         (JNE/FLN)
5  Litigation,                    )  VOLUME I
                                  )  PAGES 1-210
6
7
8
9
10
11
12
13    VIDEOTAPED DEPOSITION OF JONATHAN SAMET, M.D.
14           LOS ANGELES, CALIFORNIA
15            TUESDAY, JULY 11, 2017
16
17
18
19
20
21
22
23
24  Job No. 124786
25  DORIEN SAITO, CSR 12568, CLR

Page 2

```
 1            UNITED STATES DISTRICT COURT
 2               DISTRICT OF MINNESOTA
 3
 4    In re Bair Hugger Forced Air  ) MDL No. 15-2666
      Warming Products Liability    )     (JNE/FLN)
 5    Litigation,                   )
                                    )
 6
 7
 8
 9
10         Videotaped deposition of JONATHAN SAMET,
11    M.D., taken on behalf of Defendants, at 601
12    South Figueroa Street, Suite 2500, Los
13    Angeles, California 90071, commencing at
14    10:57 a.m., Tuesday, July 11, 2017, before
15    Dorien Saito, CSR 12568, CLR.
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1    A P P E A R A N C E S:
 2
        FOR PLAINTIFFS:
 3
          CIRESI CONLIN
 4        By: JAN CONLIN, ESQ.
          225 South 6th Street
 5        Minneapolis, Minnesota  55402
 6
 7
 8      FOR DEFENDANTS:
 9        BLACKWELL BURKE
          By:  COREY GORDON, ESQ.
10        431 South Seventh Street
          Minneapolis, Minnesota  55415
11
12
13
        ALSO PRESENT:
14
          JORDAN LEADS, Videographer
15        JONATHAN BORAK
          MORDECAI BOONE
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                 I N D E X
 2    WITNESS:
 3    JONATHAN SAMET, M.D.                    PAGE
 4         EXAMINATION BY MR. GORDON             8
 5    AFTERNOON SESSION:
 6         EXAMINATION BY MR. GORDON            97
 7
 8    INFORMATION REQUESTED:
 9              (NONE)
10
11    QUESTIONS INSTRUCTED NOT TO ANSWER:
12              (NONE)
13
14    E X H I B I T S:
15    NUMBER        DESCRIPTION              PAGE
16    Exhibit 1   Expert report of Jonathan M.  28
                  Samet M.D., M.S. dated
17                March 30, 2017
18    Exhibit 2   Article entitled "Arthroplasty, 61
                  Forced-air warming and
19                ultra-clean ventilation do not
                  mix"
20
      Exhibit 3   Expert Report of Theodore R.  71
21                Holford, Ph.D.
22    Exhibit 4   Publication from the CDC      84
                  regarding the health
23                consequences of smoking
24    Exhibit 5   Raw case data (No infection or 128
                  infection)
25
```

Page 5

```
 1              I N D E X (continued)
 2    E X H I B I T S:
 3    NUMBER        DESCRIPTION              PAGE
 4    Exhibit 6   Article entitled "Arthroplasty, 129
                  Forced-air warming and
 5                ultra-clean ventilation do not
                  mix"
 6
      Exhibit 7   Email from Mark Albrecht to Mike 132
 7                Reed, et al. With cc to Scott
                  Augustine dated January 31, 2011
 8
      Exhibit 8   Email from Mark Albrecht to Mike 136
 9                Reed with cc to Scott Augustine
                  dated November 1, 2010
10
      Exhibit 9   Spreadsheet                   137
11
      Exhibit 10  Document entitled "Implementing 141
12                effective SSI surveillance"
13    Exhibit 11  Trust Wide Surgical Site      142
                  Infection Intervention Timeline
14                for Orthopaedic THR & TKR
                  surgery (including revision) and
15                Repair Neck of Femur
16    Exhibit 12  Email from Mar Albrecht to Mike 149
                  Reed and cc to Christopher
17                Nachtsheim dated
                  November 22, 2011
18
      Exhibit 13  Document entitled "A Novel    169
19                Approach to Assess the Effect of
                  a Forced-air Patient Warming
20                System on Increasing the Risk of
                  Nosocomial Infections at the
21                Surgical Wound Site" by Farhad
                  Memarzadeh, Ph.D., P.E.
22
23
24
25
```

Page 6

```
 1        I N D E X  (continued)
 2   E X H I B I T S :
 3   NUMBER       DESCRIPTION        PAGE
 4   Exhibit 14  Article entitled "Patient     182
               Warming Excess Heat: The Effects
 5             on Orthopedic Operating Room
               Ventilation Performance" by
 6             Kumar G. Belani, Mark Albrecht,
               Paul McGovern and Christopher
 7             Nachtsheim, Ph.D.
 8   Exhibit 15  Article entitled "Forced-air    184
               warming blowers: An evaluation
 9             of filtration adequacy and
               airborne contamination emissions
10             in the operating room" by Mark
               Albrecht, Robert L. Gauthier,
11             M.D., Kumar Belani, Mark Litchy,
               M.E. and David Leaper, M.D.
12
     Exhibit 16  Article entitled "Arthroplasty,  186
13             Do forced air patient-warming
               devices disrupt unidirectional
14             downward airflow? By A.J. Legg,
               T. Cannon and A.J. Hamer
15
     Exhibit 17  Article entitled "Arthroplasty,  188
16             Forced-air patient warming
               blankets disrupt unidirectional
17             airflow" by A.J. Legg and A.J.
               Hamer
18
     Exhibit 18  Email from Mark Albrecht to     189
19             Andrew Legg, M.D., Scott
               Augustine and Christopher
20             Nachtsheim dated
               September 10, 2010
21
     Exhibit 19  Email from Mark Albrecht to Mike  197
22             Reed and Paul McGovern dated
               July 9, 2010
23
24
25
```

Page 7

```
 1        LOS ANGELES, CALIFORNIA; TUESDAY, JULY 11, 2017
 2           10:57 A.M.
 3           -0o0-
 4           ***
 5        THE VIDEOGRAPHER:  This is the start of
 6   tape labelled Number 1 of the videotaped
 7   deposition of Dr. Jonathan Samet in re Bair Hugger
 8   Forced Air Warming Products Liability Litigation
 9   in the United States District Court, District of
10   Minnesota, Case Number 15-2666(JNE/FLN).
11        This deposition is being held at
12   601 South Figueroa Street, Suite 2500,
13   Los Angeles, California, on Tuesday, July 11 of
14   2017 at approximately 10:58 a.m.
15        My name is Jordan Leads from TSG
16   Reporting, Incorporated, and I'm the legal video
17   specialist.
18        The court reporter is Dorien Saito in
19   association with TSG Reporting.
20        Will counsel please introduce yourselves.
21        MR. GORDON:  Corey Gordon on behalf of
22   the defendants 3M Alizant.  Also with me today is
23   Mordecai Boone, the in-house counsel #M as well as
24   Professor Jonathan Borak, experts.
25        MS. CONLIN:  Jan Conlin and Mike Sacchet
```

Page 8

```
 1   on behalf of the plaintiffs from Ciresi Conlin.
 2        THE VIDEOGRAPHER:  Thank you.
 3        THE REPORTER:  Would you raise your right
 4   hand.
 5        THE WITNESS:  (Complies.)
 6        THE REPORTER:  Do you so state under
 7   penalty of perjury that the testimony you shall
 8   give in your deposition shall be the truth, the
 9   whole truth, and nothing but the truth?
10        THE WITNESS:  Yes, I do.
11           ***
12           JONATHAN SAMET, M.D.,
13      having been duly administered an oath
14       in accordance with CCP 2094, was
15       examined and testified as follows:
16           ***
17           EXAMINATION
18   BY MR. GORDON:
19      Q   Good morning, Dr. Samet.
20      A   Good morning.
21      Q   As you know from our brief introduction a
22   moment ago, my name is Corey Gordon.  And I'll be
23   asking you some questions today about the expert
24   opinions you proffered in the multidistrict litigation
25   pending.
```

Page 9

```
 1      Q   So you've had your deposition taken several
 2   times before; is that correct?
 3      A   I have in the past, yes.
 4      Q   And you've testified as an expert witness in
 5   litigation before; is that correct?
 6      A   That's correct.
 7      Q   Now, I know you've testified as an expert in
 8   several cases involving the claims being made against
 9   the tobacco industry.
10        Is that correct?
11      A   That's correct.
12      Q   Have you testified as an expert or offered --
13   well, strike that.
14        Have you testified as an expert in any cases
15   involving anything other than tobacco-related claims?
16      A   To my recollection, solely tobacco.
17      Q   And have you offered opinions maybe that
18   didn't lead to you ever having to give a deposition or
19   testimony in court outside of the tobacco arena?
20      A   I would suspect if I looked back across a
21   long career, I've had lawyers contact me about a
22   variety of matters.  At most these resulted in
23   conversations but nothing further.
24      Q   I'm guessing that you've probably been
25   frequently asked by lawyers to serve as a consultant
```

Page 62

1  Q   And one of the reasons you conclude that the
2  odds ratio that is reported, the relative risk that is
3  reported is not influenced by any confounders is the
4  fact that it is a strong association; is that correct?
5  A   In part, yes.
6  Q   Anywhere in part.
7      And tell me -- well, strike that.
8      Would you -- would you agree that -- that
9  generally in the epidemiological literature,
10 associations are usually categorized as weak,
11 moderate, or strong?
12 A   I -- people may do that.  I personally don't.
13 Q   You don't?
14 A   No.
15 Q   Okay.  So is it binary for you?  Something
16 is -- an association is either strong or it's not
17 strong?
18 A   I think the numbers speak for themselves.
19 Q   Well, what's a strong association?
20 A   I -- I -- again, I rely not on adjective
21 descriptors in -- in general but on the description of
22 what the actual estimate is.
23 Q   So would you rely on 3. -- a relative risk of
24 3.8 as a -- as evidence of a strong association?  That
25 a relative risk of 3.8, in your opinion, constitutes

Page 63

1  based on association; is that right?
2  A   Actually, I'm not sure I applied the word
3  "strong."  I'd have to look through my report.
4      (Witness reviewing document.)
5      THE WITNESS:  I discussed strength of
6  association on page 16.  I did not -- I said
7  moderately.  It says "moderately strong."
8  Page 16.
9  BY MR. GORDON:
10 Q   Moderately strong association.
11     Okay.  Tell me, in your stratification of --
12 of a strength of association, what -- what are the
13 different categories?  Is there --
14 A   Again --
15 Q   Is it moderately strong?  You know, strongly
16 strong?  Weakly strong?  I -- I'm not --
17 A   That's why.  I just can't give you a
18 Jonathan Samet classification where I have a set of
19 standard descriptors I would use.
20 Q   Okay.  But to you, 3.8 is moderately strong?
21 A   Correct.
22 Q   And would -- would you consider a 3. -- if
23 somebody said "Dr. Samet, I've got a" -- "got some
24 observation study that concluded that there was a
25 relative risk of 3.7," do you think that kind of

Page 64

1  eliminates the possibility of -- of confounders?
2  Would you say that 3.7 was a moderately strong
3  association that would give you reason to -- a comfort
4  level that there -- that that's not a result of
5  confounding?
6  A   I -- it's not so simple a question.  It
7  really depends -- it depends on the relevant
8  confounder set and how strong confounders might be
9  as -- as risk factors for the outcome of it.
10 Q   So it's not be the number in the abstract
11 that allows to you decide whether it's a moderately
12 strong association or not?  There are some other
13 factors that you consider in conjunction with the
14 actual relative risk number?
15 A   I'm sorry.  You're speaking to the strength
16 of the relative risk or confounding?
17 Q   Well, I'm focusing on -- on page 16 where you
18 say (reading):
19         "With respect to the Hill
20      criteria" -- "Hill postulates, that
21      with respect to strength of
22      association, the available
23      observational evidence indicates a
24      moderately strong association."
25     And you discussed McGovern and say

Page 65

1  (reading):
2         "The relative risk is estimated
3      at 3.8."
4      And, you know, I -- I'm -- I'm pretty
5  sure I saw it somewhere else.  You did link that.
6      Yeah, I -- I think what I was -- thank
7  you for pointing me to that.  What I was thinking
8  of is on page 12 where you said that (reading):
9         "A more general argument
10     against confounding can also be
11     made.  In setting aside whether the
12     antibiotics and/or
13     thromboprophylaxis were truly
14     confounding, the magnitude of the
15     association, 3.8 odds ratio
16     reported by McGovern, et al.,
17     deserves consideration."
18     You say that (reading):
19        "Such confounding is not only
20     unlikely but is not supported by
21     the evidence considered above and
22     reviewed by Professor Nachtsheim
23     and Drs. McGovern and Reed."
24     Right?
25 A   Correct.

Page 122

1  infections in the reported surveillance period divided
2  by total number of procedures performed during the
3  period; right?
4      A   Correct.
5      Q   And in the McGovern paper, what was the rate
6  for the HotDog only period?
7          (Witness reviewing document.)
8          THE WITNESS:  I --
9  BY MR. GORDON:
10     Q   If it's taking too long, it's on page 5042.
11     A   0.8.
12     Q   And that's based on how many --
13         How -- how is that 0.8 derived?
14     A   That is 3 over 268.
15     Q   Okay.  What was the rate for the HotDog only
16 period?
17     A   I'm sorry.  That's -- that was the HotDog
18 period.
19     Q   I'm sorry.  I misspoke.
20         What was the rate during the Bair Hugger
21 period?
22     A   3.0.
23     Q   3.0?
24     A   That's correct.
25     Q   Okay.  And what was the -- what were the --

Page 123

1      What was the equation that --
2      A   Well, it's 32 over 1,034.
3      Q   Okay.  And so tell me how -- how the
4  calculation gets to 3.1.
5      A   Oh, it's calculated -- it's the odds ratio
6  divided by 2. --
7      Q   I -- I misspoke.  3.8; right?  The average
8  that you're using is 3.8; right?
9      A   Correct.
10     Q   Divide that 3 percent -- or 3.0 by 0.8;
11 right?
12     A   No.  It's the odds ratio from the table.
13     Q   Well, how -- how was that -- that 3.8 odds
14 ratio derived?
15     A   There's an underlying 2x2 table with warming
16 device, yes/no; infection, yes/no.  And then it's
17 calculated as the odds ratio from the table.
18     Q   But I'm just trying to understand, What --
19 what are the numbers that are plugged in?
20     A   The numbers are the -- sure.  The numbers are
21 the 321034 and the 3368.
22     Q   Well, is -- is there any relationship between
23 3.0 and 0.8 in terms of coming up with the odds ratio?
24     A   The -- are you asking for how an object was
25 calculated?

Page 124

1      Q   Yeah.
2      A   So it is -- it comes out of the table that
3  describes.  And it's simply the cross-product of the
4  diagonals.
5      Q   Does it have anything to do with the ratio of
6  3.0 to 0.8?
7      A   Well, the same -- the same numbers are -- the
8  same numbers are involved, yes.
9      Q   And that if that -- if the -- for example, if
10 the 0.8 number were higher, the odds ratio would go
11 down, wouldn't it?
12     A   It would be a different data set, but yes.
13     Q   Okay.  Well, do you recall when you read
14 Dr. Reed's testimony that he said that there was --
15 that the numbers weren't quite correct, there was
16 actually one more infection in each group?
17     A   I'm aware of that discussion, yes.
18     Q   Well, were you aware of it before you wrote
19 your report?
20     A   I don't think I was.
21     Q   Okay.  So you're aware of it now?
22     A   I'm aware of it now.
23     Q   You became aware of it because you read
24 Dr. Holford's report?
25     A   I -- probably Holford's report brought my

Page 125

1  attention to it.
2      Q   So you hadn't read -- either hadn't read it
3  or just --
4      A   I -- you know, again, I -- I remember some
5  discussion about data sets.  And I don't know what is
6  the, quote, "correct" -- "correct data set."  But I'm
7  aware that Reed commented about the data.
8      Q   Okay.  If you add one infection to each
9  group, what happens to the odds ratio?
10     A   That's -- you know, again, I mean, that's not
11 a question that could be answered generically.  I
12 mean, if we calculate it here, I suspect that since 3
13 is a very small number, adding 1 to make it 4 would
14 lower the odds ratio.
15     Q   Well, why don't you take a look at
16 Dr. Holford's report here.
17         Is that Exhibit 4?
18         MS. CONLIN:  Exhibit 3.
19 BY MR. GORDON:
20     Q   3.  And if you'll look at page 3, Footnote 1.
21         (Witness turning to page.)
22 BY MR. GORDON:
23     Q   For the moment, I don't want to ask you about
24 Dr. Holford's calculation based on his analysis of the
25 data set and the -- all the other things.  He's

Page 126

1  just -- Footnote 1 is just based on Dr. Reed's
2  testimony that was one more infection in each group.
3     Do you have any reason to think that
4  Professor Holford screwed up the calculations that he
5  did there?
6     A   Oh, he certainly did the calculations
7  correctly.
8     Q   Okay.  And assuming those --
9     Well, first of all, do you have any reason to
10 think that Dr. Reed testified inaccurately?
11    A   I can't comment on that.
12    Q   Okay.  Well, if -- if -- if that testimony is
13 accurate and Dr. Holford's calculations are accurate,
14 the odds ratio would be 2.86; right?
15    A   According to the calculation shown here, yes.
16    Q   And the confidence interval would be 1.03 to
17 8.33; right?
18    A   As described here, yes.
19    Q   Is that -- would you say that's a strong
20 association or moderately strong association, one that
21 would allow you to feel comfortable in saying there
22 couldn't be any confounders that can account for this
23 odds ratio?
24    A   My only comment is 2.86 is lower than 3. --
25 3.8.

Page 127

1     Q   And a confidence interval that starts at 1.03
2  is just barely meaningful; right?
3     A   I don't think meaningful is determined by the
4  confidence level.  Perhaps as significant as 3.05 is,
5  but meaningful, no.
6     Q   Okay.  But your report was predicated on the
7  assumption that the odds ratio of 3.8 was accurately
8  reported in the McGovern paper; right?
9     A   It was based on a report in a peer reviewed
10 paper, correct.
11    Q   Okay.  And based on the testimony of Dr. Reed
12 at least -- and there are -- and -- and there are
13 other documents that Dr. Holford refers to that
14 corroborate at least his -- his point about there
15 being one more in -- in HotDog -- based on that and
16 the calculations, the -- this -- the odds ratio is at
17 best 2.86; right?
18    A   Well, in this -- in this recalculation adding
19 one more event to each group, it's 2.86, correct.
20    Q   Does that give you any pause that adding one
21 more infection to each group causes the odds ratio to
22 go from 3.8 to 2.86?
23    A   I don't know about giving any pause.  But
24 I've commented before that these events are not -- are
25 not so common.  So it's not surprising that the odds

Page 128

1  ratio would drop with the addition of one event to the
2  HotDog period when there's very few events there.
3     MR. GORDON:  What number are we on?  5.
4  Let me show you what's been marked as Exhibit 5.
5  This was previously part of -- of the McGovern
6  exhibits, which did not have unique exhibit
7  numbers for a multiseries of pages.
8        (The aforementioned document was
9        marked Exhibit 5 for identification
10       by the reporter.)
11 BY MR. GORDON:
12    Q   But you did indicate that you had available
13 to you the McGovern testimony and the McGovern
14 exhibits, and there was some discussion -- there was
15 some testimony about this.
16    Do you recall seeing this, Exhibit 5, prior
17 to today?
18    A   I think I've seen this.
19       Is this the sixty-day moving average data?
20    Q   No.  That would be Professor Holford's
21 report.  This is --
22       MS. CONLIN:  This is Exhibit 21 from the
23 McGovern deposition.
24       THE WITNESS:  Okay.
25 ///

Page 129

1  BY MR. GORDON:
2     Q   Well, let me see if this helps refresh your
3  recollection.  Why don't you -- you know what,
4  Ms. Conlin pointed out to me before we just broke that
5  I had marked an exhibit from Mr. Albrecht's deposition
6  where there was actually writing on it from
7  Mr. Albrecht.  So I didn't copy that.
8        MR. GORDON:  So this one, I want you to
9  have a copy available to you -- to you.  So I'm
10 going to give you Exhibit 6.  I will hand you
11 Exhibit 6, which is the same McGovern paper we've
12 been talking about, but it just has no writing on
13 it the way the one in ours did.
14       (The aforementioned document was
15       marked Exhibit 6 for identification
16       by the reporter.)
17 BY MR. GORDON:
18    Q   And I would like you on Exhibit 6 to turn to
19 Figure 7, which appears on page 1843.
20       (Witness turning to page.)
21 BY MR. GORDON:
22    Q   Does this refresh -- refresh your
23 recollection as to whether you saw Exhibit 5, this
24 version of Figure 7 where the infection rate is
25 reflected as a -- as a moving average as opposed to

Page 166

1  BY MR. GORDON:
2      Q   Okay.  But what I want to understand is when
3  you came to the opinion that you offered to the court
4  on March 30, as I read the report, it -- the McGovern
5  study is a critical element in how you arrived at your
6  conclusions.  But if I'm -- in fact, that's how I read
7  it.  That doesn't really matter.
8      A   Yeah.  That's --
9      Q   My question to you, because you keep talking
10 about it -- it's is just part of the data.  If you
11 didn't have the Mc --
12         If you hadn't had the McGovern paper at all,
13 would you have, based on all the other stuff that
14 you're talking about, arrived at the same conclusion
15 on March 30?
16     A   The McGovern paper is, at the time I wrote my
17 report, the sole paper in the peer reviewed literature
18 offering an estimate of the risk of deep joint
19 infection associated with the Bair Hugger device.
20     Q   So if you hadn't had the McGovern paper, you
21 would not have reached the conclusions that you
22 reached --
23         MS. CONLIN:  It calls for speculation.
24 BY MR. GORDON:
25     Q   -- on March 30; right?

Page 167

1         MS. CONLIN:  It calls for speculation.
2         THE WITNESS:  I -- I could only -- I
3  could only say that there would not have been
4  anybody to -- absent the McGovern paper, to
5  quantify the magnitude of this.
6  BY MR. GORDON:
7      Q   Okay.  But you would have still opined that
8  there was a risk, just you couldn't quantify it?
9      A   I just can't answer that question.
10     Q   Well, let's approach it from a different
11 standpoint.  You've mentioned now several times that
12 the McGovern paper was not the only evidence or data
13 upon which you based your conclusion.
14        Tell me what the other body of -- of data is
15 that contributed to your opinion.
16     A   Well, let me take out my report --
17     Q   Sure.
18     A   -- and -- and comment on that.  I think the
19 sections lay out the different lines of evidence that
20 were considered and perhaps --
21        Critically the idea is laid out in Figure 3
22 on page 21.
23     Q   Okay.  So table -- that table lists four
24 sentences; right?
25     A   No.  I said Figure 3 on page 21.

Page 168

1      Q   Oh, Figure 3.  I'm looking at page 3.
2          I'm sorry.  What page?
3      A   21.
4      Q   Okay.  Okay.  So you -- this is, you say,
5  "Mechanisms by Which the Bair Hugger Increases Risk
6  for Joint Infection"; is that right?
7      A   That's the title.
8      Q   And you have the first two arrows.  One goes
9  to disturbed unit or directional flow.  The other goes
10 to microbial contamination of a surgical field.
11 Right?
12     A   Correct.
13     Q   Let's talk about the bottom, microbial
14 contamination of a surgical field.
15        What do you mean by "microbial
16 contamination"?
17     A   Microorganisms.
18     Q   Okay.  And what data did you review that --
19 well, strike that.
20        Am -- am I correct in inferring from your
21 depiction here in Figure 3 that you believe there are
22 some evidence that the Bair Hugger device results in
23 increased microbial contamination of a surgical field?
24     A   Well, it is shown that -- the -- the
25 literature cited shows that -- and -- and also the

Page 169

1  computational fluid dynamics of modeling that there's
2  increased flow of particles across the surgical field.
3         I believe at least one study -- maybe it's
4  Moretti [phonetic] -- shows increased numbers of
5  microorganisms associated with the Bair Hugger
6  operating and then also the disruption of directional
7  flow.  So those contribute to increased risk of
8  infection, which is what I've laid out here in
9  Figure 3.
10     Q   You -- you referenced computational fluid
11 dynamics.
12        I take it you are referring to the
13 computational fluid dynamics analysis that was done
14 under contract to Dr. Al Garbashi [phonetic] at the
15 request of plaintiffs in this case?
16     A   That's correct.
17     Q   I noticed --
18        MR. GORDON:  Let me show you an exhibit
19 I'm up to 13.  Let me show you Exhibit 13.
20        (The aforementioned document was
21        marked Exhibit 13 for
22        identification by the reporter.)
23 BY MR. GORDON:
24     Q   I noticed in your reference materials you
25 cited to an unpublished document by Memarzadeh.

1           UNITED STATES DISTRICT COURT

2             DISTRICT OF MINNESOTA

3

4  In re Bair Hugger Forced Air    )  MDL No. 15-2666
   Warming Products Liability      )      (JNE/FLN)
5  Litigation,                     )  VOLUME II
                                  )  PAGES 211-324

6

7

8

9

10

11

12

13    VIDEOTAPED DEPOSITION OF JONATHAN SAMET, M.D.

14            LOS ANGELES, CALIFORNIA

15            TUESDAY, AUGUST 8, 2017

16

17

18

19

20

21

22

23

24  JOB NO. 128394

25  DORIEN SAITO, CSR 12568, CLR

Page 212

1  UNITED STATES DISTRICT COURT
2  DISTRICT OF MINNESOTA
3
4  In re Bair Hugger Forced Air     ) MDL No. 15-2666
   Warming Products Liability      )    (JNE/FLN)
5  Litigation,                     )
                                   )
6
7
8
9
10      Videotaped deposition of JONATHAN SAMET,
11  M.D., taken on behalf of Defendants, at
12  2001 North Soto Street, 3rd Floor,
13  Los Angeles, California 90032, commencing
14  at 8:36 a.m., Tuesday, August 8, 2017,
15  before Dorien Saito, CSR 12568, CLR.

Page 213

1  APPEARANCES:
2
    FOR PLAINTIFFS:
3
       CIRESI CONLIN
4      By: JAN CONLIN, Attorney at Law
       By: MICHAEL SACCHET, Attorney at Law
5      225 South 6th Street
6      Minneapolis, Minnesota 55402
7
8
9  FOR DEFENDANTS:
10     BLACKWELL BURKE
       By: COREY GORDON, Attorney at Law
11     431 South Seventh Street
12     Minneapolis, Minnesota 55415
13
14
    ALSO PRESENT:
15
       JORDAN LEADS, Videographer
16     MORDECAI BOONE

Page 214

1           I N D E X
2  WITNESS:
3  JONATHAN SAMET, M.D.                     PAGE
4     EXAMINATION BY MR. GORDON        219, 318
5     EXAMINATION BY MS. CONLIN            314
6
7  INFORMATION REQUESTED:
8
          (NONE)
9
10 QUESTIONS INSTRUCTED NOT TO ANSWER:
11
          (NONE)
12
13
   E X H I B I T S :
14
   NUMBER        DESCRIPTION            PAGE
15
   Exhibit 20   Orthopedic Reviews 2017;   222
16             Volume 9:6998 entitled
              "Forced-air warming
17            discontinued: Periprosthetic
              joint infection rates drop"
18            by Scott D. Augustine
19
   Exhibit 21  EHP Commentary "Epidemiology,  225
20            Public Health, and the
              Rhetoric of False Positives"
21
22 Exhibit 22  American Journal of         233
              Epidemiology "Risk Factors
23            for Wound Infections After
              Total Knee Arthroplasty" by
24            Steven M. Gordon, et al.

Page 215

1           I N D E X
2          (Continued)
3  E X H I B I T S :
4  NUMBER        DESCRIPTION            PAGE
5  Exhibit 23   Conductive Fabric Warming   252
              Beta Site: Reduction in Joint
6             Implant Infections from
              Ridgeview Medical Center and
7             Clinics
8
   Exhibit 24  Email from Mark Albrecht to   256
9             Scott Augustine with
              attachments dated
10            November 22, 2015
11
   Exhibit 25  RMC Total Joint Infection    259
12            Rates 2006 Through 2009
13
   Exhibit 26  "Predicting bacterial        289
14            populations based on airborne
              particulates; A study
15            performed in non laminar flow
              operating rooms during joint
16            arthroplasty surgery" by
              Gregory W. Stocks, M.D., et
17            al.
18
   Exhibit 27  PLOS One, document entitled  293
19            "Can Particulate Air Sampling
              Predict Microbial Load in
20            Operating Theaters for
              Arthroplasty?" By Marla Luisa
21            Cristina, et al.

Page 216

```
 1                  I N D E X
 2                 (Continued)
 3  E X H I B I T S :
 4  NUMBER          DESCRIPTION           PAGE
 5  Exhibit 28    Journal of Hospital Infection    296
                  document entitled "Monitoring
 6                air sampling in operating
                  theatres: Can particle
 7                counting replace
                  microbiological sampling?"
 8                by A. Landrin, et al.
 9
    Exhibit 29    Journal of Clinical              298
10                Anesthesia document entitled
                  "Airborne bacterial
11                contamination during
                  orthopedic surgery; A
12                randomized controlled pilot
                  trial" by Ruken Oguz, et al.
13
14  Exhibit 30    Document entitled "Do Forced     300
                  Air Warming Devices Increase
15                Bacterial Contamination of
                  Operative Field?" by
16                McGovern, et al.
17
    Exhibit 31    Augustine Biomedical + Design    305
18                Research Report dated
                  April 4, 2008 by
19                Mark Albrecht
20
    Exhibit 32    Kennedy Hodges L.L.P.            309
21                document "Bair Hugger Warming
                  and Peri-Prosthetic
22                Infections in Joint
                  Replacement Surgery: A Guide
23                to Product Liability
                  Litigation
24
25
```

Page 217

```
 1                  I N D E X
 2                 (Continued)
 3  E X H I B I T S :  (Previously marked)
 4  NUMBER          DESCRIPTION           PAGE
 5  Exhibit 1     Expert Report of Jonathan M.     221
                  Samet, M.D., M.S. dated
 6                March 30, 2017
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 218

```
 1       LOS ANGELES, CALIFORNIA; TUESDAY, AUGUST 8, 2017
 2                        8:36 A.M.
 3                         -oOo-
 4                          ***
 5           THE VIDEOGRAPHER:  This is the start of
 6   tape labelled Number 1 of the videotaped
 7   deposition of Dr. Jonathan Samet in re Bair Hugger
 8   Forced Air Warming Products Liability Litigation
 9   in the United States District Court, District of
10   Minnesota, Case Number 152666 JNE/FLN.
11           This deposition is being held at
12   2001 North Soto Street, Los Angeles, California,
13   on Tuesday, August 8 of 2017 at approximately
14   8:36 a.m.
15           My name is Jordan Leads from TSG
16   Reporting, Incorporated, and I am the legal video
17   specialist.
18           The court reporter is Dorien Saito in
19   association with TSG Reporting.
20           Will counsel please introduce yourselves.
21           MR. GORDON:  Corey Gordon on behalf of
22   the defendants.
23           MS. CONLIN:  Jan Conlin on behalf of the
24   plaintiffs.  With me here today is Mike Sacchet.
25           MR. GORDON:  Also -- also here with me
```

Page 219

```
 1   today is Mordecai Boone from the 3M office of
 2   legal counsel.
 3           THE VIDEOGRAPHER:  All right.  Thank you.
 4           Would the court reporter please swear in
 5   the witness.
 6           THE REPORTER:  Would you raise your right
 7   hand.
 8           THE WITNESS:  (Complies.)
 9           THE REPORTER:  Do you so state under
10   penalty of perjury that the testimony you shall
11   give in your deposition shall be the truth, the
12   whole truth, and nothing but the truth?
13           THE WITNESS:  Yes.
14                          ***
15           JONATHAN SAMET, M.D.,
16       having been duly administered an oath
17         in accordance with CCP 2094, was
18         examined and testified as follows:
19                          ***
20                      EXAMINATION
21   BY MR. GORDON:
22     Q   Good morning, Dr. Samet.
23           We -- we met about a month ago when we started
24   your deposition.
25           And I guess the first thing I want to find out
```

Page 244

1  on this, but I want to -- want you to recall the
2  discussion of Professor Holford's calculation of the
3  odds ratio based on Dr. Reed's testimony that there
4  should have been one additional deep joint infection in
5  each of the cohorts that were considered and
6  Dr. Holford's calculation came up with an odds ratio of
7  2.86.
8       Do you recall that?
9    A  I recall that, yes.
10   Q  And I read your deposition again last night,
11 and I'm pretty sure that -- what your answer is, but
12 I -- it was -- it was -- there's just enough of a
13 question in my mind that I want to ask.
14      Do you have any reason to quarrel with
15 Dr. Holford's analysis of that 2.86 odds -- odds ratio?
16   A  Well, I think it's a straight -- the
17 calculation of the odds ratio itself is a rather
18 straightforward matter, I think.
19      The basis for Dr. Reed's comment that the
20 data set might have this error in it, I'm not sure.
21 I'm a little bit -- I don't know the basis for that
22 comment.
23      But the computation of adding one to each of
24 the appropriate cells is a rather simplistic matter.
25   Q  Well, do you have any basis for questioning

Page 245

1  Dr. Reed's testimony that there should have been one
2  additional infection added to --
3    A  Well --
4    Q  -- each cohort?
5    A  Of course I -- I don't.  I simply don't know
6  what the basis for his suggestion is.
7    Q  Okay.  Do you need the -- the basis to factor
8  in his sworn testimony on that point into arriving at
9  your opinions?
10   A  Well, I will only give a more general
11 response.  That when one suggests that there's an
12 error in the database, it's usually with some specific
13 justification that a correction is made.
14   Q  All right.  And the reason I'm asking you this
15 is because you -- you once again mentioned a 3.8 odds
16 ratio and -- and you discussed that earlier in your
17 deposition.
18      Based on Dr. Reed's testimony and
19 Dr. Holford's recalculation, the odds ratio at most
20 is -- was 2.86; correct?
21      MS. CONLIN:  I'm going to object --
22      THE WITNESS:  Yeah.
23      MS. CONLIN:  -- to the form of the
24 question.
25      THE WITNESS:  If that's the specific

Page 246

1  number.  I'd have to go look to verify that it's
2  2.86.  But it's around -- it's around that value.
3  BY MR. GORDON:
4    Q  All right.  So in -- in holding the opinions
5  that you hold today and are prepared to offer in court,
6  is your opinion based on your assumption that the
7  McGovern study stands for the proposition that -- that
8  there is a 3.86 odds -- odds ratio or something else?
9    A  Well, the -- relying on the published peer
10 reviewed paper, the odds ratio that stands in the
11 literature is 3.8.
12   Q  And my question, though, is, Is that what
13 you're relying on in the opinions you hold as you sit
14 here today?
15   A  Well, as stated in my expert report, I
16 addressed the issue of the potential for confounding
17 to lead to an estimate of 3.8.
18      Again, I think if -- if one were to say could
19 the estimate be 2.8 based on Reed's comment, I think
20 the same issue still stands around the potential for
21 confounding to generate a relative risk that is
22 roughly triple the -- I'm sorry.  Yeah -- tripling the
23 risk for deep joint infection.
24   Q  So whether it's 2.8 or 3.8, it doesn't in any
25 way impact your opinions?

Page 247

1    A  You know, again, the point is that you have
2  to postulate a set of uncontrolled confounding factors
3  that could lead to such strong association.
4    Q  Okay.  And just looking at Exhibit 22, one --
5  there was a -- a -- at least a statistically
6  significant association with a particular surgeon and a
7  particular -- and a particular cohort of patients,
8  their -- their ASA class; right?
9    A  Well, the paper shows a particular positive
10 interaction between being -- having higher ASA class
11 and having been operated on by a particular surgeon,
12 yes.
13   Q  And neither the surgeon-specific factors or
14 patient-specific factors were -- were considered in the
15 McGovern paper; correct?
16      MS. CONLIN:  Asked and answered.
17      THE WITNESS:  Well, again, I -- I think I
18 commented.  The same institution in a very short
19 temporal separation of the two time periods.
20 BY MR. GORDON:
21   Q  Let's go to the Augustine paper, if you would.
22      Was that Exhibit --
23      MS. CONLIN:  20.
24 BY MR. GORDON:
25   Q  20.  And your -- based on what Dr. Augustine

Page 312

1  airflow, those mechanistic things, that Dr. Augustine
2  and his employees also conducted research that
3  demonstrated that the Bair Hugger didn't actually
4  increase bacteria at the surgical site and never
5  published it, and Dr. Augustine hired a group of
6  plaintiffs' lawyers and drafted this guide to product
7  liability litigation in their name, set up a website
8  ostensibly in the name of the plaintiffs' law firm,
9  sent out the guide to other plaintiffs' law firms in an
10 effort to encourage litigation.
11      If you -- if all those facts were assumed to
12 be true, is that something that you, as a professional
13 scientist, epidemiologist, public health expert -- is
14 that something that you -- you'd feel comfortable
15 associating yourself with?
16      MS. CONLIN: I'm going to object to the
17 form of the question both based on the fact that
18 it misstates the record and it misstates the facts
19 and makes assumptions that are not borne out by
20 the evidence in this case.
21      THE WITNESS: I'm not going to ask you to
22 repeat the question, but...
23      And, again, I have not seen this
24 document. I do find it difficult, which I think
25 you implied, that an entire body of literature in

Page 313

1  this sense has been both created and -- and
2  legitimate investigators like McGovern and Reed
3  somehow were contaminated by a single individual.
4      So I -- I think that's the -- the
5  scenario that you laid out with your list of
6  assumptions. I really can't comment on it because
7  I don't have the basis for -- for doing so.
8      But I find it somewhat implausible to
9  think that, you know, legitimate academics with
10 strong records would allow their work to be
11 subverted, if you will.
12 BY MR. GORDON:
13    Q   It's happened, though, hasn't it, in the past?
14 We talked about Dr. Wakefield [phonetic] and all the
15 other co-authors on his Lancet papers.
16    A   I'm not sure that Dr. Wakefield was a
17 legitimate academic. Unfortunately, his co-authors
18 signed onto that particular paper.
19    Q   By legitimate academics, I was referring to
20 some of the co-authors of Dr. Wakefield's Lancet paper.
21    A   Certainly there were people who had solid
22 reputations who were co-authors on that paper.
23      MR. GORDON: Let's take a quick break.
24 See if I have --
25      THE VIDEOGRAPHER: The time is 10:53 a.m.

Page 314

1  We are off the record.
2      (A brief recess was taken.)
3      THE VIDEOGRAPHER: We are back on the
4  record. The time is 10:56 a.m.
5      MR. GORDON: Dr. Samet, I have a number
6  of other things I can -- can take time asking you
7  about. But I understand you have a very narrow
8  time window. So out of respect to you and your
9  other commitments, I'm going to pass the witness.
10     THE WITNESS: Great. Thank you very
11 much.
12     MS. CONLIN: Thanks.
13          ***
14          EXAMINATION
15 BY MS. CONLIN:
16   Q   So I just have a couple questions, Doctor.
17     You are relying in part of on Dr. Jarvis and
18 Dr. El-Ghobashy [phonetic]; is that correct?
19     MR. GORDON: Object to the form of the
20 question.
21     THE WITNESS: Yes.
22 BY MS. CONLIN:
23   Q   Okay. And with respect to this issue of
24 particulates being a proxy for CFUs, were you aware the
25 PJI consensus in 2016 says that there is a correlation

Page 315

1  between the two?
2      MR. GORDON: Object to the form of the
3  question.
4      THE WITNESS: Yes, I am aware.
5  BY MS. CONLIN:
6    Q   And you're aware that Dr. Jarvis testified to
7  that as well; correct?
8      MR. GORDON: The same objection.
9      THE WITNESS: Yes, I am.
10 BY MS. CONLIN:
11   Q   Okay. One of the studies that you mentioned
12 in your report, the Moretti [phonetic] study, did that
13 show direct evidence of significant increase in
14 bacteria or CF use in the Bair Hugger?
15     MR. GORDON: The same objection.
16 BY MS. CONLIN:
17   Q   I believe it's on page 12 --
18   A   Let me --
19   Q   -- 13 of your report?
20   A   Let me find my report. But that rings a
21 bell, and it's perhaps what I was looking for.
22     I'm sorry. Page --
23   Q   I think it's 13, Doctor.
24     (Witness turning to page.)
25     THE WITNESS: That's correct.

27