# EXHIBIT 50

Page 1

1  ANDREW JOHN LEGG

2  UNITED STATES DISTRICT COURT
   DISTRICT OF MINNESOTA
3

4  - - - - - - - - - - - - - - - - - - - - - - - - -

5  In re Bair Hugger Forced
   Air Warming Products
6  Liability Litigation,

7                    MDL No. 15-2666 (JNE/FLN)

8  - - - - - - - - - - - - - - - - - - - - - - - - -

9  - - - - - - - - - - - - - - - - - - - - - - - - -

10

11         VIDEOTAPED DEPOSITION OF

12            ANDREW JOHN LEGG

13 - - - - - - - - - - - - - - - - - - - - - - - - -

14

15

16

17       Taken Thursday, December 1st, 2016

18

19

20

21

22

23

24 Reported By: Victoria Davies

25 Job No: 115949

TSG Reporting - Worldwide - 877-702-9580

Page 2

```
 1                  ANDREW JOHN LEGG
 2
 3
 4            APPEARANCES:
 5   THE EXAMINER
     Mr. Allen Dyer
 6
 7   SERJEANTS' INN CHAMBERS
     85 Fleet Street
 8   London EC4Y 1AE, UK
     By: Jonathan Holl-Allen
 9       For the witness
     - and -
10
     MDU SERVICES LIMITED
11   One Canada Square
     London E14 5GS, UK
12   By: Katie Costello
            For the witness
13
14   BLACKWELL BURKE
     431 South Seventh Street
15   Minneapolis, MN 55415
     By: Corey Gordon Esq.
16      For 3M Company and Arizant Healthcare, Inc.
17
     KENNEDY HODGES
18   4409 Montrose Boulevard
     Houston, TX 77006
19   By: Gabriel Assaad Esq.
         For Plaintiffs
20   - and -
21   MESHBESHER & SPENCE
     1616 Park Avenue
22   Minneapolis, MN 55404
     By: Genevieve Zimmerman Esq.
23      For Plaintiffs
24
25   Also present: Mr. Simon Addinsell, videographer
```

Page 3

```
 1                  ANDREW JOHN LEGG
 2
 3
 4            I N D E X
 5   LEGAL ARGUMENT   re SENIOR MASTER        6
                  FONTAINE'S ORDER
 6
     ANDREW JOHN LEGG  Affirmed              22
 7
     EXAMINED by    MR. GORDON               22
 8   EXAMINED by    MS. ZIMMERMAN            89
     EXAMINED by    MR. GORDON              111
 9
     CERTIFICATE of DEPONENT                118
10
     CERTIFICATE of COURT REPORTER          119
11
     ERRATA SHEET                           120
12
     EXHIBIT 1     File of documents.        27
13   EXHIBIT 2     Curriculum Vitae of Mr.  113
                  Andrew Legg.
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                  ANDREW JOHN LEGG
 2            Thursday, December, 1st, 2016
 3       THE VIDEOTAPED DEPOSITION OF ANDREW JOHN LEGG
 4   is taken on this 1st day of December 2016,
 5   at The Hilton Sheffield, Victoria Quay, Sheffield.
 6   S4 7YA. England, commencing at 11.02 a.m.
 7           THE VIDEOGRAPHER:  This is the beginning
 8   of DVD 1 in volume 1 of the deposition of Andrew
 9   Legg in the matter of -- two matters here.  This
10   order to obtain evidence in the United States
11   District Court District of Minnesota.  So in the
12   High Court of Justice Queen's Bench Division before
13   Senior Master Fontaine, Master in Chambers, in part
14   of the evidence of the Proceedings in Other
15   Jurisdictions Act 1975; and in the matter of the
16   Hague Convention of the 18th March 1970 on the
17   taking of evidence abroad in civil and commercial
18   matters and in the matter of a civil proceeding now
19   pending before the United States District Court for
20   the District of Minnesota entitled as follows:  In
21   Re Bair Hugger Forced Air Warming Products Liability
22   Litigation, Plaintiffs, verses 3M Company and
23   Arizant Healthcare Incorporated.  The claim number
24   in the High Court of Justice is CR2016-420.  And in
25   the District of Minnesota, it is MDL number 15-2666
```

Page 5

```
 1                  ANDREW JOHN LEGG
 2   (JNE/FLN).
 3           Today's date is 1st December 2016 and
 4   the time is 11.02 a.m.  I have just seen that the
 5   recording equipment says "1st November", so I will
 6   have to adjust that in a second.
 7           The deposition is taking place at the
 8   Hilton Sheffield.  The Court Reporter is Victoria
 9   Davies; videographer Simon Addinsell, both with TSG
10   Reporting.
11           Could counsel in the room please
12   introduce themselves and state who they are
13   representing today, please. Starting with you, sir.
14           MR. GORDON:  I am Corey Gordon.  I
15   represent the Defendants 3M and Arizant Healthcare
16   Inc.
17           MS. ZIMMERMAN:  Genevieve Zimmerman.
18   Represent the Plaintiffs in the American
19   proceedings, the MDL.
20           MR. ASSAAD:  Gabriel Assaad.  I also
21   represent the Plaintiffs.
22           MS. COSTELLO:  Katie Costello.  I am
23   solicitor for Dr. Legg.
24           MR. HOLL-ALLEN:  Jonathan Holl-Allen.  I
25   am an English barrister representing Mr. Legg.
```

Page 38

1  ANDREW JOHN LEGG
2  THE EXAMINER: The paper says the number
3  of particles was measured. Was that you who was
4  able to carry out that measurement?
5  A. Correct.
6  BY MR. GORDON:
7  Q. I am going to have you take a look at
8  page 149. It is actually a fairly large document
9  all the way to 221?
10  THE EXAMINER: This is one I removed in
11  the interests of portability.
12  MS. GARCIA: I don't think we're going to
13  dwell on it.
14  Have you seen this before?
15  A. Not until I was given this bundle.
16  Q. Okay. And --
17  MS. ZIMMERMAN: Can I ask a point of
18  clarification? As we make objections to foundation,
19  for example, should we be looking to you?
20  THE EXAMINER: You're putting them on the
21  record for the US judge.
22  MS. ZIMMERMAN: That is what I would
23  assume. Well, we renew our objection for lack of
24  foundation given the witness's testimony.
25  BY MR. GORDON:

Page 39

1  ANDREW JOHN LEGG
2  Q. Do you recall how you set the
3  particle-size channels on the HandiLaz?
4  A. No, is the answer to that.
5  Q. When you actually used it for the first
6  study, how did you -- how did you employ it? In
7  other words, was it something that you held in your
8  hand; did somebody else hold it; was it mounted on
9  something?
10  A. It was mounted above -- we held it above
11  the surgical site, ie the knee, which was the focus
12  of the operation.
13  THE EXAMINER: Were you the surgeon in
14  the operating room for the purposes of these
15  experiments?
16  A. Correct. And Mr. Cannon, who is the
17  other member on the -- was the patient.
18  THE EXAMINER: Right.
19  MR. HOLL-ALLEN: He was the human.
20  THE EXAMINER: Not the mannequin.
21  BY MR. GORDON:
22  Q. Was there anyone else present, besides
23  you and Dr. Cannon, for that first experiment?
24  A. No.
25  Q. So, you were playing both the role of the

Page 40

1  ANDREW JOHN LEGG
2  surgeon standing there, and also holding the
3  particle counter?
4  A. Sure.
5  Q. Okay. You also on the -- on page 411,
6  the first page of the 2011 study?
7  MR. ASSAAD: 2012.
8  MR. GORDON: No. 2011.
9  Q. Do you have that page 411?
10  A. Yes.
11  Q. On the right-hand side, the second
12  paragraph down of text describing the vertical
13  unidirectional ventilation, there is a reference to
14  the walls around the operating area reaching down to
15  30 centimetres from the floor and then a discussion
16  of body exhaust suits. Then it states:
17  "Both of these systems are employed in
18  our theatre set-up".
19  Then on the next page, on the right-hand
20  side, you refer to an:
21  "ExFlow 90 Howorth enclosure with
22  vertical wall extensions to 1 metre from the floor".
23  A. Correct.
24  THE EXAMINER: Where is the second one?
25  MR. GORDON: In the middle on the

Page 41

1  ANDREW JOHN LEGG
2  right-hand side.
3  Q. If you can just help me understand. How
4  far did the wall extensions extend? Was it 30
5  centimetres or --
6  A. One meter off the ground. I was implying
7  that we used wall extensions on the first page.
8  Q. Was there ever time when you used wall
9  extensions that went all the way to 30 centimetres
10  on to the floor?
11  A. No.
12  Q. Okay.
13  On the first page of the 2011 study, it
14  is page 411 in exhibit 1, in the second line of the
15  introduction you say:
16  "Recently there have been concerns that
17  forced air warming may interfere with unidirectional
18  airflow, potentially posing an increased risk of
19  infection".
20  To what was that referring? To what
21  concerns?
22  A. Well, the concerns that had been raised
23  by the HotDog company.
24  Q. Okay. At that point were you aware of
25  concerns raised by anyone else?

Page 42

```
 1                ANDREW JOHN LEGG
 2       A.  No.
 3       Q.  Okay.  Prior to conducting this study,
 4   had you had discussions with Mr. Albrecht?
 5       A.  No.
 6       Q.  Had you had discussions with anyone
 7   connected with HotDog (the HotDog Company) other
 8   than the representative who facilitated you getting
 9   use of the equipment?
10       A.  No.
11       Q.  Who designed the study?
12       A.  I designing the study, along with the
13   supervision of Mr. Hamer.
14       Q.  There are, looks like, 18 references in
15   the published version of the 2011 study.  Who did
16   the research to collect those references?
17       A.  I did.
18       Q.  How did you go about doing that?  Was
19   that a computer research?  Was there a library --
20       A.  It's a combination of library and also
21   doing the big medical journal reference libraries,
22   which you can do searches through, which is what I
23   did for this.
24       Q.  Do you remember what the search terms
25   were, the search parameters that led you to these
```

Page 43

```
 1                ANDREW JOHN LEGG
 2   references?
 3       A.  No, I don't.
 4       Q.  Again, going back to the front page of
 5   the 2011 article, you say at the beginning of the
 6   text paragraph, at the bottom at the last line of
 7   that:
 8           "There are also concerns that forced air
 9   warming devices disrupt unidirectional airflow, thus
10   potentially causing risk of infection".
11           For that it looks like you cite a 2002
12   paper by Tumia and Ashcroft.  Is that correct?
13       A.  That is correct.
14       Q.  Do you recall whether that paper
15   concluded that there was any reason to be concerned
16   about forced-air warming devices disrupting
17   unidirectional airflow?
18       A.  I don't specifically know, recall the
19   exact paper, I am afraid.
20           THE EXAMINER:  Was that not the paper
21   name set out at note six?
22           THE WITNESS:  Correct, yes.
23   BY MR. GORDON:
24       Q.  That is what you cited --
25       A.  I can't recall the exact conclusion from
```

Page 44

```
 1                ANDREW JOHN LEGG
 2   that paper.
 3           THE EXAMINER:  I understand that, but the
 4   name of the paper is as set out at note six.
 5           THE WITNESS:  Absolutely, yes.
 6   BY MR. GORDON:
 7       Q.  For the set-up, for the first experiment,
 8   was there any drape suspended from the ceiling?
 9       A.  Define "ceiling".
10       Q.  Maybe that is too broad -- too narrow a
11   question.
12           Was there any drape that was used within
13   the enclosure?
14       A.  Yes.
15           MR. GORDON:  Where --
16           THE EXAMINER:  Do you want to explore,
17   for the purpose of a US jury, what "drape" in these
18   circumstances precisely means?
19   BY MR. GORDON:
20       Q.  Yes, thank you.
21               Maybe it is easier if we look at
22   the drawing in your second study.  If you turn to --
23           MS. ZIMMERMAN:  407.
24   BY MR. GORDON:
25       Q.  407.  Does that depiction on the top of
```

Page 45

```
 1                ANDREW JOHN LEGG
 2   the page, does that show generally where the drape
 3   was?
 4       A.  Yes.
 5       Q.  Is the drape the vertical black line that
 6   goes down to about the surgeon's elbows?
 7       A.  No.  That is part of the wall extensions,
 8   which come out from the Howorth enclosure.  The
 9   blue, which is blue on mine, is the drape.
10           MR. GORDON:  Okay.
11           THE EXAMINER:  It comes right down to the
12   patient's chest.
13           THE WITNESS:  Yes, and covers the rest of
14   the patient apart from the limb being operated on.
15   BY MR. GORDON:
16       Q.  How, so that the -- part of the drape
17   that goes from the patient up, how is that held
18   there?  Is it suspended from the ceiling?  Suspended
19   from stanchions of some sort?
20       A.  Yes.  It is suspended.  Across the
21   enclosure there is metal railing, which it is
22   clipped to.
23           THE EXAMINER:  That is the enclosure of
24   the operating section of the theatre?
25           THE WITNESS:  Correct.
```

Page 62

1  ANDREW JOHN LEGG
2       THE WITNESS: Upper thigh, yes.
3       THE EXAMINER: Depending on how tall Dr.
4  Cannon was?
5       THE WITNESS: I can't tell you exactly
6  how -- we didn't measure that.
7  BY MR. GORDON:
8       Q.  Okay.  There were no other -- there was
9  just the single drape on top of the Bair Hugger?
10      A.  Yes.
11      Q.  Do you use any kind of warming device in
12 your current practice?
13      A.  Yes.
14      Q.  What do you use?
15      A.  We use a Bair Hugger.
16      Q.  Is the draping method that you use now
17 essentially the same?
18      A.  No.
19      Q.  How does it differ?
20      A.  So, we don't have -- I don't use wall
21 extensions, so you just have that Howorth enclosure
22 and no wall extensions.  I cover the warming blanket
23 with additional insulation and drapes similar at the
24 top end to how it is, but there are significant
25 changes which I have made.

Page 63

1  ANDREW JOHN LEGG
2       Q.  And are those --
3       A.  That is in my current place.
4       Q.  Are these changes that you implemented
5  yourself?
6       A.  Nobody in my current institute uses the
7  wall extensions.  I don't think we even have them in
8  the hospital.  I can't comment on how other people,
9  whether they insulate the Bair Hugger, but I do
10 that.
11      Q.  And do you do that as a result of your
12 studies?
13      A.  Yes.
14      Q.  If we could turn now to page 430.  Have
15 you seen this document before, this e-mail?
16      A.  Yes.
17      Q.  Prior to when you got this pack of
18 material?
19      A.  Correct, yes.
20      Q.  It is dated September 10th, 2010.  Is
21 that about the time that you would have seen it?
22      A.  Yes.
23      Q.  Could you tell me what the e-mail is?
24      A.  So, the e-mail is -- was attached to
25 that.  There was a manuscript from Mark Albrecht,

Page 64

1  ANDREW JOHN LEGG
2  essentially that had been written by himself, or one
3  of his colleagues, and was given to us for review.
4       Q.  And I apologize, things got a little
5  jumbled.  Well, no, I guess not.  It is a divider.
6            If you look at pages 432 through 450, is
7  that the manuscript that would have been attached to
8  the e-mail?
9       A.  Yes.
10      Q.  Who drafted the manuscript pages 432
11 through 450?
12      A.  Either Mark Albrecht or Christopher
13 Nachtsheim.
14      Q.  Had you -- did you ever meet Christopher
15 Nachtsheim?
16      A.  I never met him or had any contact with
17 him.
18      Q.  What was your understanding of his role
19 in the preparation of this?
20      A.  I didn't really -- didn't really know.
21      Q.  Were you -- strike that.
22           The manuscript pages 432 through 450,
23 what relation, if any did, that have to the
24 experiments that you and Mr. Albrecht carried out in
25 July 2010 at the hospital in Sheffield?

Page 65

1  ANDREW JOHN LEGG
2       A.  It was -- that is what, he wrote it.
3  That was what was written up on the basis of what
4  happened that day.
5       Q.  Okay.  And if we turn to the 2013 study,
6  pages 406 to 409, is this paper the 2013 paper, that
7  you and Dr. Hamer published, is that based on the
8  same experiments that are discussed in the draft
9  article pages 432 through 450?
10      A.  Correct.
11      Q.  In the published paper, four pages,
12 406-409, is there any reference to participation by
13 Mr. Albrecht or Dr. Christopher Nachtsheim?
14      A.  No.
15      Q.  Why was that?
16      A.  Based on the manuscript, which we
17 received to this draft manuscript, after discussing
18 with Mr. Hamer it felt that it was more appropriate
19 for us to write up the manuscript.  We never had any
20 deal that they were going to write the manuscript,
21 so we were very surprised when that happened and
22 felt very uncomfortable for them to be writing that
23 manuscript.  After a number of e-mails, mainly by
24 Mr. Hamer, it was decided that we would write up the
25 manuscript independently.

17 (Pages 62 to 65)

Page 78

ANDREW JOHN LEGG

A. I don't recall. There were many.

Q. Okay. In this second study, the 2000 -- the mannequin study -- did you also use any type of device to see if you could collect bacteria?

A. No.

Q. You did the mannequin study. Which did you do first, the Bair Hugger or the HotDog?

A. It was random how we did it. Randomly generated. So, we set them up so there was not a pattern that flowed.

Q. How much time was lapsed between the completion of one and the starting of the next one?

A. Again, I don't recall. We ensured that the temperature had returned to the ambient temperature, which was measured outside the theatre, and that the particle levels were back down to normal so they had equalized.

Q. Okay. The Rocket PS23 Smoke Machine, that generated the 0.3-micron glycerol tracer particles, that was one of the pieces of equipment supplied by the HotDog Company?

A. Correct.

Q. Who set that up?

A. That was set up by both -- I had used it

Page 79

ANDREW JOHN LEGG

before because I had used it in my previous study.

Q. Did you still have it, or had you sent it back and --

A. No, I still had it. I still had it.

Q. When you were done with the mannequin study did you keep -- did you keep the Rocket PS23 Smoke Machine, or did it go back to the HotDog people?

A. I don't have it, so I don't recall, but I presume that the rep had picked it up. I re-contacted him and gave it back to him, but I don't have it now.

Q. So, what if any equipment did Mr. Albrecht bring with him?

A. A camera, a light source, the bubble machine, and I don't remember whether we used the temperature probe which I had from the first study, or whether we used the temperature probe which he had as well.

Q. How about that particle counter? Was that not used?

A. No, that was used and I'm pretty sure that I still had that for the second study so we would have probably used the one that I had from the

Page 80

ANDREW JOHN LEGG

first study.

Q. And did Mr. Albrecht take back with him, after you were done with this mannequin experiment, the equipment he bought: The camera; the bubble generator?

A. Correct.

Q. The number -- the particle numbers that you reflect in your 2013 paper would be at page 408.

A. Yes.

Q. They appear to be close, but not identical, to the numbers in the Albrecht drafts and I am wondering is that -- did you do more than one counting?

THE EXAMINER: What is the comparison between -- 408 and? 439 to 440?

MR. GORDON: We can go to that one. That is fine, I will find the specific pages in it. Page 439 to 440.

THE EXAMINER: Okay.

BY MR. GORDON:

Q. And the numbers that I am looking at are 2,000,000 -- on the Albrecht draft 2,173,000 --

A. What page is that again?

Q. 439. He's got 2,173,000.

Page 81

ANDREW JOHN LEGG

A. Yes.

Q. And 2,172,000?

A. Yes.

Q. And you have 2,174,000?

A. Yes. He's referring to the difference, whereas I put the exact figures. So if you take 2,174,000 and you take 2,000 away you get his figure. If you take 1,000 away, you get -- he's put difference but I've put exact.

Q. But they are the same numbers?

A. The same numbers, yes. It was the same experiment.

Q. But they're different "p" values given?

A. So, again, I had the original data so he, or his -- where he did statistics and I did statistics.

Q. So, you did your own statistics --

A. Yes.

Q. -- for the 2013. You, yourself, or did you have the assistance of any statistician?

A. No. I used software, which is SPS software, and did some statistics on the paper.

Q. Now, on your 2013 paper page 408, on the second column sort of in the middle, you say:

21 (Pages 78 to 81)