# EXHIBIT 71

Page 1

1        MICHAEL J. STONNINGTON, M.D.
2        UNITED STATES DISTRICT COURT
            DISTRICT OF MINNESOTA
3
4   In re Bair Hugger Forced-Air Warming
    Products liability Litigation
5
                    MDL NO. 15-2666 (JNE/FLN)
6
    This Document Relates To:
7   All Actions
8
9
10
    *****************************************************
11           VIDEOTAPED DEPOSITION OF
            MICHAEL J. STONNINGTON, M.D.
12  *****************************************************
13
14
            APPEARANCES NOTED HEREIN
15
16
17      TAKEN AT INSTANCE OF:  3M COMPANY AND
               ARIZANT HEALTHCARE INC.
18            DATE:  JULY 21, 2017
      PLACE:  PAGE, MANNINO, PERESICH & MCDERMOTT
19              759 HOWARD AVENUE
                BILOXI, MISSISSIPPI
20            TIME:  8:59 a.m.
21
22
    JOB NO. 124788
23  REPORTED BY:  CONNIE CHASTAIN, RMR
                CSR No. 1025
24
25  VIDEOTAPED BY:  MARCEL LANOUX

Page 2

MICHAEL J. STONNINGTON, M.D.

APPEARANCES:

BEN GORDON, ESQ.
Levin, Papantonio, Thomas, Mitchell,
  Rafferty & Proctor
316 Baylen Street
Pensacola, Florida 32591

MICHAEL MCGARTLAND, ESQ.
McGartland Law Firm
1300 S. University Drive
Fort Worth, Texas 76107

COUNSEL FOR PLAINTIFFS

DEBORAH LEWIS, ESQ.
Blackwell Burke
431 South Seventh Street
Minneapolis, Minnesota 55415

COUNSEL FOR 3M COMPANY AND
ARIZANT HEALTHCARE INC.

Page 3

MICHAEL J. STONNINGTON, M.D.

INDEX

Style, Cause Number..............................1
Appearances.....................................2
Index............................................3
Examination by Ms. Lewis.........................6
Deposition Concluded...........................324
Certificate of Court Reporter..................325
Certificate of Deponent........................326

EXHIBITS

Exhibit 1 - Amended Notice of Videotaped
    Deposition.................................6
Exhibit 2 - Exhibit B - References...............6
Exhibit 3 - Health Devices, ECRI Institute........6
Exhibit 4 - AORN, Perioperative Standards and
    Recommended Practices, 2013 Edition..........6
Exhibit 5 - Proceedings of the International
    Consensus Meeting on Periprosthetic Joint
    Infection....................................6
Exhibit 6 - DICON Infection Prevention News,
    Volume 10, Number 11, November 2015..........6
Exhibit 7 - 3-16-17 E-Mail from Elaina Fischer
    to Katie Stoney with Attachments............12
Exhibit 8 - 5-4-17 Letter from Bryant Ricker,

Page 4

MICHAEL J. STONNINGTON, M.D.

    3M Infection Prevention Division to
    Alicia M. Hamlin, RN, BSN, CNOR, Forrest
    General Hospital...........................33
Exhibit 9 - Guideline for Prevention of Surgical
    Site Infection, 1999......................187
Exhibit 10 - Stonnington Articles...............314
Exhibit 11 - Stonnington's Handwritten Notes....323
Exhibit 12 - Articles..........................323

Page 5

MICHAEL J. STONNINGTON, M.D.

        (Exhibits 1 through 6 were marked.)
        VIDEOGRAPHER: We are now on record at
8:59 a.m. Today's date is July 21st, 2017.
Here begins the videotaped deposition of
Michael Stonnington in the matter of Bair
Hugger Forced-Air Warming Products
Liability Litigation.
        This case is being held in the U.S.
District Court, District of Minnesota, MDL
Number 15-2666 (JNE/FLN). This deposition
is taking place at Page Mannino Law Firm in
Biloxi, Mississippi.
        My name is Marcel Lanoux, videographer
present on behalf of TSG Reporting. The
court reporter is Connie Chastain, also of
TSG Reporting.
        Counsel, please identify yourselves
and whom you represent.
        MR. LEWIS: I'm Deborah Lewis
representing 3M Company and Arizant.
        MR. GORDON: I'm Ben Gordon and I
represent the Plaintiffs and the
Plaintiffs' Steering Committee.
        MR. MCGARTLAND: Mike McGartland for

Page 18

MICHAEL J. STONNINGTON, M.D.
So authoritative, in all my upbringing in science, I think it's rare to find anything, quote, authoritative.
Q. What about your textbooks in medical school?
A. That's a tree.
Q. I'm sorry?
A. They're a tree. That means there are trees in the forest.
Q. Are they authoritative?
A. That's what I'm saying, I don't like the use of that word and I'm not going to give in on the use of that word. In science you have to look at everything as a big picture. The mistakes we make in science and -- is something that I've been learning ever since I was a little boy.
My dad was an academic doctor, actually at the Mayo Clinic, and when he was bringing me up he was always teaching me these principles, and so I really learned a lot from him.
And through my years of training and studying, the take-home message is in science, if you look at something and treat it as a smoking gun, which is basically what that word means, you're

Page 19

MICHAEL J. STONNINGTON, M.D.
going to make mistakes.
So you have to look at everything in the context of a big picture. That's why I love the analogy of the forest. And you have to look at -- you look at each tree, but you don't look at it without understanding the rest of the trees in the forest.
And so that's why I'll never give in on that word, because I think it will take you down a road that you don't want to go and you might lead -- it might lead you to an untruth.
Q. All the studies and/or articles on which you rely for your opinions, then none of those are authoritative. Is that what you mean?
    MR. GORDON: Object to the form.
A. They are important, and I'll give in on that word. Those studies are important, but you don't want to hang your hat on one single study. And I'll never do that.
MR. LEWIS:
Q. Is the Albrecht study authoritative, in your opinion?
    MR. GORDON: Objection, asked and
    answered.

Page 20

MICHAEL J. STONNINGTON, M.D.
A. No, ma'am. I just said it's a very important study.
MS. LEWIS:
Q. But you don't consider it authority?
    MR. GORDON: Object to the form.
A. I consider Mr. McGovern an authority on the subject matter he's writing, but I don't consider any single study a smoking gun or in that word, authoritative.
You are going to go down a wrong pathway as a scientist if you do that. You you have to look at that study in the context of other studies.
MS. LEWIS:
Q. My question was --
A. But not just studies, you have to look at that study in the context of real world experiences and your training and the treatment of your patients and your own data as a surgeon.
I read studies all the time and I look at them and go, whoa, that's not my experience. Then I have to step back and look and say why is that study saying this but that's not my experience.
So then I have to look at other things to try to figure out how they came to that conclusion.

Page 21

MICHAEL J. STONNINGTON, M.D.
It is very, very dangerous to treat one study as a smoking gun. And that's why that's not a good word to use in medicine or science.
Q. Let me just go through some of the studies I believe you reviewed and you can answer --
A. Sure.
Q. -- yes or no, they're authoritative. And if you don't like that word I guess your answer would be no. Okay?
    MR. GORDON: I'm going to object to
    the form because I think he has covered
    that. And if you want to ask about every
    other study and waste your time that way,
    that's your prerogative, but he's answered.
    So it's asked and answered.
    MR. LEWIS: Ben, you're wasting time
    by all your side objections, so.
MR. LEWIS:
Q. Is the Albrecht study published in 2009, Forced-Air warming, a source of airborne contamination in the operating room --
    MR. GORDON: Objection, form, asked
    and answered.
MR. LEWIS:

Page 22

MICHAEL J. STONNINGTON, M.D.
 2    Q.  Is it authoritative or not?
 3        MR. GORDON:  Objection, asked and
 4    answered.
 5    A.  It's a very important study, but it's not
 6 authoritative by itself.
 7 MR. LEWIS:
 8    Q.  Is the Albrecht study published in 2011,
 9 Forced-Air warming blowers: evaluation of filtration
10 adequacy and airborne contamination emissions in the
11 operating room, is that authoritative or not?
12        MR. GORDON:  Object to the form, asked
13    and answered.
14    A.  Were you quoting the Albrecht 2011 study?
15 MS. LEWIS:
16    Q.  Yes.
17    A.  It's a very important study.  It's a very
18 important tree in the forest, but it's not
19 authoritative by itself.  Just like that tree in the
20 forest is not authoritative by itself.
21    Q.  Is the study first authored by Belani,
22 Patient warming excess heat: the effects on
23 orthopedic operating room ventilations performance,
24 is that authoritative?
25        MR. GORDON:  Object to the form, asked

Page 23

MICHAEL J. STONNINGTON, M.D.
 2 and answered.
 3    A.  Again, very important study, makes very
 4 important findings but I have to step back from that
 5 study and realize that it's a study amongst other
 6 studies and it's a very important study but by
 7 itself cannot be taken as authoritative.
 8 MR. LEWIS:
 9    Q.  The study by Legg in 2012, Do forced-air
10 warming devices disrupt unidirectional downward air
11 flow, is that authoritative or not?
12        MR. GORDON:  Object to the form.
13    A.  Very important study but not authoritative
14 by itself.
15 MS. LEWIS:
16        MR. GORDON:  Are you going to just
17    cherry pick out the ones that you don't
18    like or are you going to ask about all 89
19    and we'll stipulate he's going to say that
20    89 times?
21 MR. LEWIS:
22    Q.  The study published by Legg in 2013,
23 Forced-Air patient warming blankets disrupt
24 unidirectional air flow, is that study authoritative
25 or not?

Page 24

MICHAEL J. STONNINGTON, M.D.
 2        MR. GORDON:  Same objection.
 3    A.  Very important study and, again, by itself
 4 not authoritative, but no scientific study lives in
 5 a vacuum or on an island by itself.  You have to
 6 look at the forest.
 7 MR. LEWIS:
 8    Q.  Is the study by Reed published in 2013,
 9 Forced-Air warming design: evaluation of intake
10 filtration, internal microbial buildup, and
11 airborne-contamination emissions, is that article
12 authoritative or not?
13        MR. GORDON:  Object to form, asked and
14    answered.
15    A.  Again, very important study, not
16 authoritative by itself.
17 MR. LEWIS:
18    Q.  The study published by McGovern in 2011,
19 Forced-Air warming and ultra clean ventilation do
20 not mix, is that study authoritative or not?
21    A.  Very important study, not authoritative by
22 itself.
23        MR. GORDON:  Same objection, but I
24    didn't say it.  Eighty-nine objections?
25 MR. LEWIS:

Page 25

MICHAEL J. STONNINGTON, M.D.
 2    Q.  You've been testifying that these studies
 3 by themselves are not authoritative, so let me put
 4 them all together and ask you this question.  Do you
 5 believe the joint combination of Albrecht 2009,
 6 Albrecht 2011, Belani 2013, Legg 2012, Legg 2013,
 7 Reed 2013, McGovern 2011, do all those studies
 8 combined make them authoritative?
 9        MR. GORDON:  Objection to form.
10    A.  No, ma'am.  Those are very important
11 studies combined together that are now a group of
12 trees in the forest, but that forest isn't complete
13 with those studies alone.
14 MR. LEWIS:
15    Q.  So all those combined, you still don't
16 believe combined they are authoritative; correct?
17        MR. GORDON:  Object to form.
18    A.  There are a large group of trees in the
19 forest, but it's not yet a forest.
20 MR. LEWIS:
21    Q.  Is that authoritative or not?
22        MR. GORDON:  Object to the form.
23    A.  The whole forest is authoritative, and so
24 just to say again, as a surgeon, as a doctor, as a
25 scientist with lots of years of training by very

Page 26

MICHAEL J. STONNINGTON, M.D.

1  famous scientists, you have to take the whole
2  picture.
3      The whole picture is not just laboratories,
4  it's not just clinical studies. The whole picture
5  involves -- it really starts with the doctor and the
6  patient in the clinic room. So that whole forest
7  begins there when I'm treating a patient.
8      It also involves my clinical training. It
9  also involves the techniques I use in the operating
10 room. It also involves the setup of the operating
11 room. It also involves the nursing staff and how
12 they're trained. It also involves the surgical
13 technicians and how they're trained.
14     This is a big forest and you have to take
15 all of that into consideration. So part of that
16 forest are the journal articles, part of that forest
17 are the clinical studies, part of that is the
18 laboratory studies, but that's not the whole thing.
19     So when I make my decision about something,
20 it incorporates all that. So when I put all that
21 together, that forest, that's authoritative.
22 MS. LEWIS:
23     Q.  So these articles, as you started at the
24 beginning, you said the forest is authoritative, so

Page 27

MICHAEL J. STONNINGTON, M.D.

1  that includes these studies; is that correct?
2          MR. GORDON:  Objection to form, asked
3      and answered.  It's not his previous
4      testimony.
5      A.  To repeat, they're part of the forest, but
6  you cannot look at all the conglomeration of studies
7  as the whole forest.
8  MR. LEWIS:
9      Q.  I heard that but what I'm saying is -- my
10 question is very specific about these articles. I
11 understood you to say about a minute ago that the
12 forest is authoritative and the forest includes
13 these studies; correct?
14     A.  They include very important trees and those
15 articles are some of those trees.
16     Q.  That are --
17     A.  So they're very important.
18     Q.  That are authoritative?
19         MR. GORDON:  Objection to form.
20     A.  No, ma'am.  The -- the forest is
21 authoritative.  Those are trees in a forest but
22 we're building a forest.
23 MR. LEWIS:
24     Q.  These articles that I separated out and

Page 28

MICHAEL J. STONNINGTON, M.D.

1  spoke to you about, those articles alone, just
2  looking at those articles, does the combination of
3  just those articles, are those articles together
4  authoritative?
5          MR. GORDON:  Objection to form.
6      A.  No, ma'am.
7  MR. LEWIS:
8      Q.  Okay.
9      A.  They are part of a very important picture.
10 They're very important trees in the forest.  And
11 so --
12     Q.  I understand.
13         MR. GORDON:  Let him finish.  You can
14     finish.
15     A.  So part of my job, a part of one of the
16 things I do and love is I have a cattle farm and
17 it's a cattle business.  And if I just look at 10
18 cows in a herd and they all look beautiful, that
19 doesn't mean the whole herd is beautiful.
20     I have to look at the whole herd to make a
21 decision whether that herd of cows is a beautiful
22 set of cows.  You don't just look at 10, you look at
23 everything.
24 MS. LEWIS:

Page 29

MICHAEL J. STONNINGTON, M.D.

1      Q.  Number 8 on Exhibit A asked about your CV,
2  and I believe I have your CV that you looked at just
3  a minute ago; correct, that you provided to
4  Mr. Gordon?
5      A.  Yes, ma'am.
6      Q.  Your CV is up to date and current; correct?
7      A.  Yes, ma'am.
8      Q.  Number 9 asks for an engagement agreement.
9  What I understood from counsel's earlier response to
10 the subpoena is that you don't have an engagement
11 agreement with counsel; is that correct?
12     A.  Ma'am, I don't know what an engagement
13 agreement is.
14     Q.  A written agreement saying I agreed to do
15 XYZ for X payment.  Do you have a written agreement?
16     A.  You mean my fee schedule?
17     Q.  It could be a fee schedule.  Do you call
18 that an engagement agreement?
19     A.  I don't speak in those terms so I'm -- if
20 you show me an engagement agreement I'll tell you
21 whether it's accurate.
22     Q.  Do you have a fee schedule?
23     A.  Yes, ma'am.
24     Q.  Did you bring it with you?

Page 50

1    MICHAEL J. STONNINGTON, M.D.
2  Hospital.
3     Q.  But it's still a separate --
4     A.  It's a separate building.
5     Q.  -- facility?
6     A.  It's a separate facility.
7     Q.  At that facility was Bair Hugger patient
8  warming units used in the operating room?
9     A.  And it still is.
10    Q.  So was and still is; correct?
11    A.  Yes, ma'am; however, not with me.
12    Q.  Do you use the -- all right.  So for
13 Forrest General Hospital you started -- you know for
14 sure Forrest General Hospital was using Bair Hugger
15 in early 2000s?
16    A.  Yes, ma'am.
17    Q.  You don't know exactly which year; correct?
18    A.  No, I don't.
19    Q.  Does Forrest General Hospital still use
20 Bair Hugger, to your knowledge?
21    A.  Yes, ma'am.
22    Q.  In orthopedic surgeries?
23    A.  Not in my orthopedic surgeries.
24    Q.  In orthopedic surgeries, just not yours?
25    A.  That's correct.

Page 51

1    MICHAEL J. STONNINGTON, M.D.
2     Q.  For Orthopedic Institute, it still uses
3  Bair Hugger; correct?
4     A.  Yes, ma'am, but not in my surgeries.
5     Q.  But in other ortho surgeries, Orthopedic
6  Institute, which is now a part of Forrest General,
7  still uses Bair Hugger; correct?
8     A.  Yes, ma'am.
9     Q.  How long -- let me ask this question:  When
10 did you stop using Bair Hugger at Forrest General
11 Hospital?
12    A.  The best that I can determine by looking
13 back at my practice, it was probably in the fall of
14 2015, and that would have been everywhere.
15    Q.  In the fall of 2015 you individually
16 stopped having the anesthesiologist use Bair Hugger
17 patient warming devices for your patients at both
18 Forrest General Hospital and Orthopedic Institute;
19 correct?
20    A.  Yes, ma'am, to the best of my recollection.
21    Q.  How many surgeons in your group, Southern
22 Bone and Joint Specialists?
23    A.  It's approximately -- it's 13, 14,
24 somewhere in there.
25    Q.  Surgeons?

Page 52

1    MICHAEL J. STONNINGTON, M.D.
2     A.  Yes, ma'am.
3     Q.  Performing orthopedic procedures?
4     A.  Yes, ma'am.
5     Q.  Has any other surgeon in your group stopped
6  using Bair Hugger?
7     A.  I believe there's a spine surgeon that's
8  not using it, but I would have to check on that.
9     Q.  All the others do continue to use Bair
10 Hugger for their orthopedic procedures?
11    A.  Yes, ma'am.
12    Q.  So 11 of the 13 --
13    A.  We'll have to look at the list of my
14 partners --
15    Q.  Okay.
16    A.  -- but it's somewhere in there.
17    Q.  Let me finish my question first before you
18 give your answer.  So 11 of the 13 orthopedic
19 surgeons in your group continue to use the Bair
20 Hugger patient warming system in their orthopedic
21 procedures; correct?
22         MR. GORDON:  Object to form.
23    A.  Yes, ma'am, and the spine surgeon I believe
24 does not use it on his spine surgery cases but he
25 might use it on other cases.

Page 53

1    MICHAEL J. STONNINGTON, M.D.
2  MS. LEWIS:
3     Q.  And those cases that your partners continue
4  to use the Bair Hugger includes arthroplasty
5  procedures; correct?
6     A.  Yes, ma'am.
7     Q.  From early 2000s until fall of 2015, you
8  were using the Bair Hugger; correct?
9     A.  Yes, ma'am, I was using it until I stopped.
10    Q.  During that time period did your incidence
11 of surgical site infections increase?
12    A.  Repeat your question.
13    Q.  During the time you were using -- or Bair
14 Hugger patient warming systems were used on your
15 patients from early 2000 until you stopped using --
16 or having the Bair Hugger used for your patients in
17 the fall of 2015, did you have a higher incidence of
18 surgical site infections?
19        MR. GORDON:  Object to form, vague as
20    to time, assumes facts not in evidence.  Go
21    ahead.
22    A.  Yes, ma'am, I did.  In fact, that's why I'm
23 sitting here.  Probably around late 2014, early
24 2015, I began really in earnest having concerns
25 about the Bair Hugger.

Page 62

MICHAEL J. STONNINGTON, M.D.
when did you first notice an increase, that you were having a higher incidence of surgical site infections?  That's what you've said -- that's what you've said, you started noticing that you had a higher increase.  I'm just trying to pinpoint when did you start noticing that?
    MR. GORDON:  Objection to form.  He didn't say a higher increase, you said that.  He said unacceptable rate.  You're misstating his testimony, it's improper.
    A.  Yes, ma'am.  I believe I didn't say higher increase, but if the record shows I did --
MS. LEWIS:
    Q.  I think you said a higher incidence.
    A.  An incidence that's unacceptable to me.  The national norm of infection rate is unacceptable to me.
    Q.  I understand that.
    A.  And so I'm not looking at -- I'm not looking at rate, rates of increase.  I'm looking at infections.  And if it's above zero, I don't like it.  So I'm trying to get my infection rate, particularly for implant surgeries, down to zero.  I think it's possible to get down to zero.

Page 63

MICHAEL J. STONNINGTON, M.D.
So my point is I think you're misunderstanding my -- the way I looked at my patient population.
    Q.  No --
    A.  I --
    Q.  Go ahead.
    A.  I basically want to try to get it to zero.  So when I looked at years where there were levels that were, to me, out of the norm, which is above zero for me, I look at the operating room, I look at the whole picture and try to figure out how can I get that down to zero.
    Q.  When did you notice numbers were out of the norm for you?
    A.  For me, probably any year I saw infections.
    Q.  Can you give me a year?
    A.  No, ma'am, I can't.  I can't tell you exact years because I don't have that -- I don't have my hospital records in front of me.
    Q.  So from early --
    A.  But there's definitely years.
    Q.  So from early 2000 until fall of 2015 --
    A.  Uh-huh.
    Q.  -- you noticed a higher incidence or

Page 64

MICHAEL J. STONNINGTON, M.D.
numbers out of the norm for patients -- for your patients; correct?
    A.  Yes, ma'am.
    Q.  And you can't give me an exact date when; correct?
    A.  There were several years in that period from 2005, particularly to 2014, where there were blips of infection that were unacceptable to me.  There were years that were unacceptable to me, and those years are years that I really looked at to see if I could figure out what was going on.
    So when you average all those years from 2005 to 2014, the average -- the infection rate was above zero.  When you look at 2015 and beyond, it's zero.  What I changed was getting Bair Hugger out of the operating room.  Everything else stayed the same.  Antibiotic prophylaxis, everything.
    The staff who I've been involved with -- I've also been chief of staff and I'm about to be chief of staff again.  I'm very involved with the training of staff.  And part of that training is to make them scrupulous about infection control.  So that continued, as well.
    So I'm always looking at ways to make us

Page 65

MICHAEL J. STONNINGTON, M.D.
better.  And so the bottom line is when you average those years, it's above zero.  When you average after 2015 and beyond, it's zero.
    Q.  Did you ever suspect that those out of norm numbers were due to the Bair Hugger?
    A.  That began -- that's what I was talking about, my journey beginning late 2014.  That's when I really started to look at it in earnest.
    Q.  Did you think in 2014 that the Bair Hugger was causing your patients infections?
    A.  That's when I started to look at it.  And when I first started looking at it I did not make that call.  That's because I had not appreciated the forest yet.
    Q.  So in 2014 you did not think that the Bair Hugger was causing your patients' surgical site infections?
    MR. GORDON:  Object to form, he didn't say that, misstates his testimony.
    A.  I don't think any scientist will make a call before they've looked at the whole picture.  So when somebody does a study they have a hypothesis, and my hypothesis -- and we're looking at in 2014 after I looked in -- started looking into it, was

Page 118

1 MICHAEL J. STONNINGTON, M.D.
2 such that its findings on PJI rates cannot be
3 considered conclusive.
4 Q. Do you agree or disagree with that
5 sentence?
6 A. I agree, going back again -- I know I'm
7 wearing this topic out. Going back to the forest,
8 McGovern is a tree in the forest and it cannot be
9 considered authoritative on its own. What is
10 authoritative is the forest.
11 So I believe that this review is really
12 making a error in hanging their hat on that study.
13 Q. Do you agree that the McGovern study has
14 serious limitations?
15 A. I believe that the McGovern study, much
16 like most studies, have confounding variables. And
17 it is essentially impossible to create a perfect
18 study.
19 Q. So you agree the McGovern study has some
20 limitations?
21 MR. GORDON: Objection to form, asked
22 and answered, argumentative.
23 A. I believe it has some confounding variables
24 that make it like all studies, not perfect. And I
25 think it's ridiculous for anybody to assume that a

Page 119

1 MICHAEL J. STONNINGTON, M.D.
2 study is perfect, which is why you don't call a
3 substudy authoritative in and of itself because in
4 the early days of tobacco, I'm sure we can point to
5 studies which were, quote, authoritative that said
6 tobacco did not cause lung cancer. We know that not
7 to be true.
8 So this is why you don't make mistakes on
9 hanging your hat on one study. I don't hang my hat
10 on McGovern. If McGovern didn't exist I would still
11 be sitting here today.
12 MS. LEWIS:
13 Q. Do you agree that the McGovern findings on
14 PJI rates cannot be considered conclusive?
15 MR. GORDON: Objection to form.
16 A. The same answer applies that you cannot
17 hang your hat on one study. I think the study is
18 very important. The decreased infection rate that
19 he found actually mirrors my own practice. I have a
20 decreased infection rate without the use of Bair
21 Hugger.
22 Augustine has also said the same thing and
23 I believe there are -- this shows -- this is
24 something that's really interesting about medicine
25 is you read a study and you look at your own

Page 120

1 MICHAEL J. STONNINGTON, M.D.
2 practice, your own real world practice and you say
3 wow, I'm seeing that in my own practice. That also
4 gives you -- that gives that study credibility.
5 That's why you don't look at the study by
6 itself. You have to put it in the context of real
7 world, not a piece of paper.
8 MS. LEWIS:
9 Q. Do you agree, then, that the McGovern study
10 cannot be considered conclusive?
11 MR. GORDON: Objection to form,
12 argumentative, asked and answered.
13 A. I believe that it is a very important study
14 that has very important findings. And I think that
15 it is a tree in the forest that when it is taken
16 into the context of other studies, clinical
17 practice, patient findings, that altogether there is
18 conclusive evidence that the Bair Hugger is a
19 dangerous device.
20 MS. LEWIS:
21 Q. I didn't ask you about the Bair Hugger
22 being a dangerous device in all of the studies put
23 together, I asked about McGovern. Do you think the
24 findings in McGovern cannot be considered
25 conclusive?

Page 121

1 MICHAEL J. STONNINGTON, M.D.
2 MR. GORDON: Objection, asked and
3 answered, argumentative. He can answer the
4 question the way he sees fit, Counsel. You
5 just didn't like the answer.
6 A. Much like how the ECRI is stating that they
7 will continue to monitor, which means that they're
8 saying that their findings aren't conclusive because
9 they will continue to monitor the issue and change
10 and amend their findings as indicated, as necessary.
11 So they're being honest that they're open -- they're
12 leaving it open, that they could be wrong.
13 So this is an example of why scientists
14 don't like to use the word "authoritative" or
15 "conclusive". That's -- those might be words that
16 are used by attorneys sitting around a deposition
17 table, but those aren't words that scientists throw
18 out very often because you always want to look at
19 other evidence, you always want to understand that
20 other studies are coming around the corner and you
21 don't want to be boxed in.
22 So I'm not going to say that any of those
23 studies are conclusive.
24 MS. LEWIS:
25 Q. Including McGovern?

CASE 0:15-md-02666-JNE-DTS   Doc. 910-58   Filed 10/03/17   Page 10 of 13

Page 126

1           MICHAEL J. STONNINGTON, M.D.
2   its potential impact but they do not provide
3   sufficient evidence to demonstrate that the use of
4   forced-air warming poses a greater risk of SSIs or
5   PJIs than the use of other warming methods.
6           MR. GORDON:  That's what he's been
7       saying.
8   MS. LEWIS:
9       Q.  Did I read that right?
10      A.  Yes, you read that right.
11      Q.  Do you agree or disagree with that?
12      A.  I believe if you look at the studies in
13  conjunction with the way I look at this issue, I
14  will disagree with that statement.
15      Q.  Okay.
16      A.  But I'm not going to take that statement by
17  itself because I look at the whole issue, which
18  includes the review of the literature, which
19  includes the review of my practice, which includes
20  the review of the OR and how it's set up, which
21  includes the review of the people in the OR and how
22  they're acting and approaching a patient.
23          It includes a review of the
24  anesthesiologists and how they're setting up their
25  situation at the front of -- at the end of the table

Page 127

1           MICHAEL J. STONNINGTON, M.D.
2   or at the head of the table.  It's a review of the
3   air handling systems, talking to the engineers on
4   how they are functioning in the operating room.
5           It is a review of my own patient base.  It
6   is me talking with a patient in my clinic room.
7   It's all of those things put together and the
8   articles are just a big part, but they're a part of
9   it.  And that's how I come to my decision.
10          And so when I put it all in that context, I
11  would disagree with that.  But I'm sure these
12  authors would like to know that that statement is
13  being put in a context.
14      Q.  You ready to move on?
15      A.  Yes, ma'am.
16      Q.  The next sentence says consequently -- do
17  you see where I am?
18      A.  I'm listening, yeah.
19      Q.  Consequently, ECRI Institute does not
20  believe that the currently available evidence
21  justifies discontinuing the use of forced-air
22  warming during surgery.
23          Did I read that right?
24      A.  Yes, ma'am.
25      Q.  Do you agree or disagree?

Page 128

1           MICHAEL J. STONNINGTON, M.D.
2           MR. GORDON:  Objection.
3   MS. LEWIS:
4       Q.  Sounds like you're going to say you
5   disagree?
6           MR. GORDON:  Objection to form and
7       taking one sentence out of context.
8       A.  Well, I don't disagree that the ECRI
9   Institute had made that statement, but if I were to
10  make that statement it would read differently.
11  MS. LEWIS:
12      Q.  No, I didn't ask if they made the
13  statement.  We can see they made the statement.  I'm
14  asking do you agree with their conclusion that it
15  does not believe the currently available evidence
16  justifies discontinuing the use of forced-air
17  warming during surgery?
18          MR. GORDON:  Same objection.
19      A.  Well, they did say ECRI Institute does not
20  believe is why I'm agreeing that the ECRI Institute
21  does not believe that forced-air warming should
22  be -- that there's sufficient evidence to
23  discontinue forced-air warming.  I believe that ECRI
24  believes that.  So I understand --
25  MS. LEWIS:

Page 129

1           MICHAEL J. STONNINGTON, M.D.
2       Q.  I'm not asking --
3       A.  I know.  I know.  Let me finish.
4       Q.  Do you believe it or not?  Do you agree or
5   not?
6       A.  And so in the context of what I just said
7   just prior to this without repeating it again, I
8   believe there is sufficient evidence to make a
9   conclusion that the forced-air warming device should
10  be removed from all ORs in orthopedic cases.
11      Q.  Since what you just said is inconsistent
12  with what they're saying, that means you disagree
13  with their --
14      A.  With --
15      Q.  -- their sentence in conclusion that they
16  do not believe the evidence, current evidence
17  justifies discontinuing the use?
18          MR. GORDON:  Objection to form,
19      argumentative, asked and answered.
20  MS. LEWIS:
21      Q.  Correct?
22      A.  Within the context of the way I look at
23  this issue, I disagree with their statement.
24      Q.  Doctor, I have put in front of you Exhibit
25  Number 4 and it reads, perioperative standards and

TSG Reporting - Worldwide    877-702-9580

33

Page 170

1      MICHAEL J. STONNINGTON, M.D.
2    Do you see that?
3    A. Yes, ma'am.
4    Q. Did I read that correctly?
5    A. You did.
6    Q. You disagree with that?
7    A. I disagree that it's reasonable to
8  continue, yes, ma'am.
9    Q. It goes on to say, indeed, our data and
10 that collected by NHSN suggests that approximately
11 99 percent of patients undergoing joint replacement
12 procedures do not develop a SSI despite the fact
13 that forced-air warming warming devices continue to
14 be widely and appropriately used.
15    Did I read that right?
16    A. That's correct.
17    Q. Do you think 99 percent of patients
18 undergoing joint replacement procedures is accurate?
19        MR. GORDON: Objection to form, out of
20    context.
21    A. That's a debatable number. It's -- I
22 believe I used two percent, but that's one to two
23 percent. So we can say 98 to 99 percent, I'm not
24 going to quibble.
25 MS. LEWIS:

Page 171

1      MICHAEL J. STONNINGTON, M.D.
2    Q. Okay.
3    A. I believe that that argument is really
4  faulty, though.
5    Q. What argument, that you just said you
6  agreed to?
7        MR. GORDON: He didn't say agree, he
8    said he agrees to the percentage.
9    A. No, the argument that do not develop an SSI
10 despite the fact that forced-air warming devices
11 continue to be widely and appropriately used. So
12 they're basing the argument that it's okay because
13 99 percent are not getting infections.
14 MS. LEWIS:
15    Q. So you disagree with that?
16    A. If I may finish. The argument is, is that
17 because 99 percent are not being damaged, therefore,
18 the Bair Hugger is not a damaging device, that's a
19 really -- that's a really dicey way to look at this
20 because it's -- basically in my expert report I
21 wrote about bullets on a battle field. Just because
22 soldiers didn't get shot in a battle doesn't mean
23 that there weren't dangerous bullets on the battle
24 field.
25    Just because she swam in shark infested

Page 172

1      MICHAEL J. STONNINGTON, M.D.
2  water and didn't get eaten by a shark doesn't mean
3  that there weren't sharks in the water. So --
4    Q. So you disagree?
5        MR. GORDON: Let him finish.
6    A. Ma'am, may I finish? The 99 percent
7  argument is the same thing. Just because 99 percent
8  didn't get a infection, which there is data that
9  makes you question whether that was one to two
10 percent numbers even, just because 99 percent got
11 away without having an infection is not an argument
12 to say that the Bair Hugger is not dangerous.
13    It's the bullets on the battle field, it's
14 the shark infested waters. It's the same type of
15 thing. You cannot make that conclusion based on
16 that number. Looking at it that way, you just
17 can't. So that's what I disagree with.
18 MS. LEWIS:
19    Q. A long way of saying you disagreed, which
20 was the question I asked, do you agree or disagree.
21 So you disagree.
22    All right. Conclusions, do you see where I
23 am?
24    A. Yes, ma'am.
25    Q. We continue to believe that it is

Page 173

1      MICHAEL J. STONNINGTON, M.D.
2  reasonable and appropriate to use forced-air warming
3  warming devices to maintain normothermia as these
4  devices are the only devices proven to decrease the
5  risk of developing a postoperative infection.
6    Did I read that right?
7    A. Yes, you did.
8    Q. Give me the short version of do you agree
9  or disagree with that statement?
10        MR. GORDON: Objection to form.
11    A. Well, ma'am, I can't always give a short
12 version because you have to put things in context.
13 But that is a very loaded statement because, as I've
14 said here, unless you show me the studies, there's
15 no definitive study, which again, I don't hang my
16 hat on one study, but this is what they're talking
17 about, they're looking for smoking guns.
18    The studies showing that forced-air warming
19 decreases infection rates in orthopedics, in total
20 hips and total knees, that study is not out there.
21 In fact, to the contrary. The Frisch study in 2017
22 shows that hypothermia actually did not cause
23 complications in orthopedics, which includes
24 infections.
25    And so this is a -- this is something that,

Page 270

1      MICHAEL J. STONNINGTON, M.D.
2  patient treating experience, my expertise in the
3  operating room, my expertise in doing surgery on
4  patients, my understanding of the whole forest.
5  Those are things that I'm assuming Ben knew about me
6  and thought I would be important.
7      Q.  You did come up with some opinions in this
8  case; right?
9      A.  Yes, ma'am.
10     Q.  And you have relied on certain documents
11 for your opinions; is that fair?
12     A.  That is fair.
13         MR. GORDON:  Object to the form.
14 MS. LEWIS:
15     Q.  Can you tell me all the documents that
16 support the opinions that you have in this case and
17 then we'll go through the documents, but first can
18 you --
19         MR. GORDON:  Before we get into that,
20     it's going to be kind of lengthy, we've
21     been here since lunch for an hour and a
22     half, almost two hours.  Can we take a
23     break?
24         MS. LEWIS:  Do you need to take a
25     break?

Page 271

1      MICHAEL J. STONNINGTON, M.D.
2         THE WITNESS:  I would like to.
3         MS. LEWIS:  Sure.
4         VIDEOGRAPHER:  Off the record at 2:56
5     p.m.
6         (Off the record.)
7         VIDEOGRAPHER:  Back on record at 3:03
8     p.m.
9  MS. LEWIS:
10     Q.  Dr. Stonnington, just before the break we
11 were talking about the fact that you have come up
12 with opinions in this case and I was asking you a
13 question that I wanted you to identify for me all
14 the support in terms of documents that you believe
15 support your opinions.
16         So can you name for me all the documents or
17 studies in which you either rely or claim support
18 your opinions and then we'll go through them?
19         MR. GORDON:  You mean other than all
20     the things he's talked about already or the
21     things that are in his report or that he
22     brought with him today and gave you?
23 MS. LEWIS:
24     Q.  I just want you to name for me the studies
25 and/or documents that you believe support your

Page 272

1      MICHAEL J. STONNINGTON, M.D.
2  opinion.
3      A.  Well, that goes back to the whole idea of
4  what's authoritative, which I think you have to
5  understand that I'm looking at this like a forest
6  and so there's no one particular document by itself
7  that is going to be what is a smoking gun for me.
8  And again, I believe the smoking gun theory is not
9  reliable and not a safe way to look at this issue.
10        What I have done is I've looked at my own
11 practice, I've looked at the operating rooms, I've
12 looked at my results, I've looked at how I do
13 surgeries and looked at my own clinical training.
14 Looked at what's standard protocol.  Looked at
15 what's proper procedure and I've looked at journal
16 articles.
17        And you have a binder there that some are
18 counterpoints and some are pro points, for lack of a
19 better way of saying it.  But what I don't want to
20 do is throw out articles and have you or a jury
21 member or the judge think that I'm relying on that
22 one article to make my opinions, I'm not.  I'm
23 relying on the forest.
24        I think it's very dangerous to look at one
25 article or look at one surgery result and make --

Page 273

1      MICHAEL J. STONNINGTON, M.D.
2  try to make a definitive conclusion.  That's not
3  what I've done.  So that's I think the best way to
4  answer that question.
5      Q.  Are you able to tell me whether you relied
6  on the Albrecht study for your opinion?
7         MR. GORDON:  Object to the form, use
8     of the word "reliance" and asked and
9     answered.
10     A.  I will say that orthopedic surgeons like
11 myself who are board certified will look at an issue
12 like I looked at an issue and come to conclusions,
13 but it would be reckless to take one tree out of the
14 forest and say because of that tree I'm going to
15 make this statement.
16        So I can name for you some trees and
17 there's a lot of trees in that binder right there.
18 And I believe you know what those trees are.  So I
19 think it's important to know that that's a binder
20 full of trees.  And I think I've made that argument
21 very clear already.
22 MS. LEWIS:
23     Q.  You've testified that the Bair Hugger is
24 dangerous and causes infections; right?
25     A.  Yes, ma'am.

Page 274

1                MICHAEL J. STONNINGTON, M.D.
2       Q.  Tell me what is the support for those --
3   for that opinion?
4       A.  Again, looking at the forest, I can look at
5   my own practice and that's very important to look at
6   my own practice, to look at my own house, which is
7   real world.  Before Bair Hugger -- well, actually
8   with Bair Hugger I had above zero percent infection
9   rate, after Bair Hugger I have no infection rate.
10  All things were kept the same.
11          I think that's very powerful.  That's a --
12  that's quite a few trees in the forest.
13      Q.  Anything else that's the basis for your
14  opinion that the Bair Hugger is dangerous and causes
15  infection?
16          MR. GORDON:  Objection to form,
17      separate and apart from all the other
18      things he said today about this process
19      with this.
20      A.  Well, again, that binder is full of trees.
21  And there are some very important trees in that
22  binder.  And I would say they're all important and
23  so that forest is -- again, is made up of a lot of
24  trees and there's lots of ways that -- lots of --
25  there's a multi-faceted approach that I've taken to

Page 275

1                MICHAEL J. STONNINGTON, M.D.
2   come to this conclusion that the Bair Hugger is
3   dangerous.
4           And it's based in the literature, it's
5   based in my practice, it's based in my clinical
6   training, it's based on what's proper procedure,
7   it's based on what's standard of care.
8   MS. LEWIS:
9       Q.  What literature are you referring to?
10      A.  So if you want to go look at trees, the
11  literature trees, for lack of a better way of saying
12  it, there's Darouiche, there's the Albrecht, there's
13  Reed, there's Legg and Hamer, there's -- amongst
14  many others.  They're -- you know, I also looked at
15  laminar flow issues.
16          MR. GORDON:  You can refer to your
17      list if you need to, Doctor.
18      A.  And the Stocks article, Avidan article and
19  Birgand, amongst many others.
20  MS. LEWIS:
21      Q.  I need you to name them for me.
22      A.  Well, you have a list in front of you.
23      Q.  Well, you need to name for me the ones on
24  which you relied that support your opinion --
25      A.  I don't rely --

Page 276

1                MICHAEL J. STONNINGTON, M.D.
2           MR. GORDON:  Whoa, whoa, Doctor.
3   MS. LEWIS:
4       Q.  Let me finish my question.
5           MR. GORDON:  She's got to finish and
6       I've got to object.
7   MS. LEWIS:
8       Q.  I need you to name for me the literature
9   that you said supports your opinion that the Bair
10  Hugger is dangerous and causes infections.
11          MR. GORDON:  Okay.
12  MS. LEWIS:
13      Q.  So you've started your list of literature,
14  I need you to complete your list for me.
15          MR. GORDON:  I would object to the
16      form and to the extent that he's asked and
17      answered this in his own way a variety of
18      times and said it's not just the papers,
19      the articles, that's one -- he points one,
20      trees he says a thousand times, but if you
21      want him to list more articles that support
22      his conclusion, I'm sure he can do that.
23      A.  I wasn't aware you wanted me to go through
24  all of them because you have a binder full, but I'll
25  be happy to.  So the -- I'm just going to go through

Page 277

1                MICHAEL J. STONNINGTON, M.D.
2   it as I look at it.
3           And these are important trees, they're not
4   the only trees, and I don't want to you interpret
5   that these are the articles like they're smoking
6   guns because I don't know how many times I have to
7   say this, these are not smoking gun articles.
8           Everything has to be taken in its entirety
9   and context and put together to create that forest.
10  And so --
11  MS. LEWIS:
12      Q.  I want the literature that supports your
13  opinion that the Bair Hugger is dangerous and causes
14  infection.  That was my question.
15      A.  Correct.  And the way I look at the
16  literature is if there are very salient points in
17  the article that I believe are -- create a very
18  important tree, then I'm going to list that article.
19  Even though you may think the conclusion of that
20  article is supportive of a safe -- of the Bair
21  Hugger being safe.
22      Q.  Doesn't matter what I think at this point.
23      A.  No, I just --
24      Q.  I want you to list for me all the
25  literature that you believe supports your opinion