# EXHIBIT 44

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1

```
 1                UNITED STATES DISTRICT COURT

 2                   DISTRICT OF MINNESOTA

 3    - - - - - - - - - - - - - - - - - - - - - - - - -

 4    In Re:

 5    Bair Hugger Forced Air Warming

 6    Products Liability Litigation

 7

 8    This Document Relates To:

 9    All Actions      MDL No. 15-2666 (JNE/FLM)

10    - - - - - - - - - - - - - - - - - - - - - - - - -

11

12             DEPOSITION OF KARL D. ZGODA

13              VOLUME I, PAGES 1 - 238

14                 FEBRUARY 24, 2017

15

16

17         (The following is the deposition of KARL D.

18    ZGODA, taken pursuant to Notice of Taking Deposition,

19    via videotape, at the offices of Ciresi Conlin

20    L.L.P., 225 South 6th Street, Suite 4600, in the City

21    of Minneapolis, State of Minnesota, commencing at

22    approximately 9:08 o'clock a.m., February 24, 2017.)

23

24

25
```

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

2

```
 1   APPEARANCES:
 2   On Behalf of the Plaintiffs:
 3      Mark D. Bankston
        Kyle W. Farrar
 4      William R. Ogden
        KASTER, LYNCH, FARRAR & BALL, LLP
 5      1010 Lamar
        Suite 1600
 6      Houston, Texas  77002

 7      Noah Lauricella
        GOLDENBERG LAW
 8      800 LaSalle Avenue
        Suite 2150
 9      Minneapolis, Minnesota  55402

10   On Behalf of the Defendants:

11      Peter J. Goss
        BLACKWELL BURKE P.A.
12      432 South Seventh Street
        Suite 2500
13      Minneapolis, Minnesota  55415

14   On Behalf of the Deponent:

15      William A. Brewer III
        Dale O. Fresch
16      BREWER ATTORNEYS & COUNSELORS
        1717 Main Street
17      Suite 5900
        Dallas, Texas  75201
18
     ALSO PRESENT:
19
        Jason L. Przymus, Videographer
20
               EXAMINATION INDEX
21   WITNESS        EXAMINED BY        PAGE
     Karl D. Zgoda    Mr. Bankston        4
22
                 EXHIBIT INDEX
23   EXHIBIT      DESCRIPTION          PAGE
     277    Memo, Zgoda to Lastovich, 3/15/99,  49
24          3MBH01735994
     278    Cobra Filtration Meeting 5/23/00,   54
25          3MBH00025527
```

ST REWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

3

| | | |
|---|---|---|
| 279 | Cobra Logic Meeting 5/24/00, 3MBH00025543 | 57 |
| 280 | email, Zgoda to Hanging Cobra's, June 07, 2000, 3MBH00497304 | 58 |
| 281 | Filter - Test Report, 3MBH00025543 to 2370 | 65 |
| 282 | PowerPoint, Bair Hugger Therapy, Model 750 Technical/Service Training, Aug. 27-28, 2003, 3MBH00017229 to 7257 | 75 |
| 283 | email, Zgoda to Lastovich, 7/27/2008, 3MBH00026490 | 85 |
| 284 | email string, Lastovich to Zgoda, 7/29/2008, 3MBH00026492 | 87 |
| 285 | email string, Zgoda to list, 8/4/2008, 3MBH00026515 to 6516 | 89 |
| 286 | email string, Collins to list, 12/19/2008, 3MBH00026708 to 6709 | 95 |
| 287 | email string, Eickhoff to list, 1/16/2009, 3MBH00026724 to 6725 | 103 |
| 288 | Arizant Research and Development TEST REPORT, 3MBH00018311 to 8313 | 108 |
| 289 | email, Zgoda to Barrows/Hansen, 7/31/2008, 3MBH00026496 | 141 |
| 290 | email string, Poppen to list, 1/27/2009, 3MBH01807381 | 146 |
| 291 | PowerPoint, Ducky/Phase 1, Final Concepts, May 20, 2009, 3MBH00022625 to 2662 | 156 |
| 292 | email, Card to Woodwick-Sides/Gary Maharaj, July 1, 2009, 3MBH00024947 | 166 |
| 293 | email string, Lastovich to Zgoda, 8/12/2008, 3MBH00026595 to 6596 | 169 |
| 294 | email string, Hansen to Lastovich, 11/24/2008, 3MBH00024569 | 172 |
| 295 | email string, Scott to list, 10/2/2009, 3MBH00024682 | 175 |
| 296 | email string, Parthasarathy to Oster, 8/26/2013, 3MBH00542396 to 2398 | 182 |
| 297 | email string, Maharaj to Mark J, 10/07/2013, 3MBH00126140 to 6142 | 188 |
| 298 | email, Hulse Stevens to list, 8/24/2013, 3MBH00000826 | 198 |
| 299 | untitled, 3MBH01617179 | 201 |

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

4

```
09:08:25   1           P R O C E E D I N G S

09:08:25   2      (Witness sworn.)

           3               KARL D. ZGODA,

           4      Called as a witness, being first

           5      duly sworn, was examined and

           6      testified as follows:

           7           E X A M I N A T I O N

           8   BY MR. BANKSTON:

09:08:39   9      Q.   All right, sir.  Can you state the name for

09:08:41  10   the record?

09:08:41  11      A.   Karl Zgoda.

09:08:42  12      Q.   All right.  Mr. Zgoda, you understand we're

09:08:43  13   here today to talk about a medical device made by 3M

09:08:46  14   known as the Bair Hugger; correct?

09:08:47  15      A.   Correct.

09:08:48  16      Q.   Okay.  You've given a couple depositions

09:08:50  17   before regarding the Bair Hugger.

09:08:52  18      A.   Correct.

09:08:52  19      Q.   Okay.  This -- I believe this will be your

09:08:54  20   third deposition?

09:08:54  21      A.   Yes.

09:08:55  22      Q.   I'm going to go ahead and assume, then,

09:08:56  23   after going over the ground rules in these depos and

09:08:59  24   talking to your lawyers, nothing's unfamiliar about

09:09:02  25   what's going on today.  You understand why you're here
```

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

09:09:05 1  today.

09:09:05 2    **A.** Yes.

09:09:06 3    **Q.** Okay. Now for many years the Bair Hugger
09:09:09 4  was made by Arizant Healthcare; correct?

09:09:15 5    **A.** Yes.

09:09:16 6    **Q.** Later it was -- that company was purchased
09:09:17 7  by 3M.

09:09:18 8    **A.** Yes.

09:09:19 9    **Q.** And at some point before that it actually
09:09:21 10 had been known as Augustine Medical; correct?

09:09:23 11   **A.** Correct.

09:09:24 12   **Q.** Okay. Your employment spanned all three of
09:09:26 13 those entities.

09:09:27 14   **A.** Yes.

09:09:28 15   **Q.** During this deposition there's going to be a
09:09:30 16 lot of times that I may say generically, "the
09:09:33 17 company," and unless I specifically tell you
09:09:35 18 otherwise, when I say that, I mean the entire span of
09:09:39 19 your employment. So if an event happened at Augustine
09:09:43 20 Medical, or if it happened at Arizant, or if it
09:09:45 21 happened at 3M, if we're just talking generically when
09:09:47 22 I say "your time at the company," I'm not going to pay
09:09:50 23 too much attention to name changes.

09:09:52 24   **A.** Okay.

09:09:52 25   **Q.** But if there is some -- some part of your

09:09:54 1  answer that you need to tell me that is specific to
09:09:57 2  one of those entities, please feel free to point that
09:10:00 3  out to me any time during the deposition.

09:10:02 4    **A.** Okay.

09:10:03 5    **Q.** But if it's all right with you, for a lot of
09:10:05 6  the questions I'm just going to refer to it
09:10:08 7  generically as "the company."

09:10:09 8    **A.** Yes.

09:10:09 9    **Q.** Okay. Now you no longer work for 3M;
09:10:11 10 correct?

09:10:11 11   **A.** Correct. I do not.

09:10:13 12   **Q.** Okay. You left the company about three
09:10:14 13 years ago?

09:10:15 14   **A.** Yeah, it would have been November -- a
09:10:16 15 little bit over two years ago. I believe November of
09:10:18 16 '15, --

09:10:19 17   **Q.** Okay.

09:10:21 18   **A.** -- '14. I've been there two -- a little bit
09:10:22 19 over two years.

09:10:23 20   **Q.** Okay. And you're working now for a company
09:10:25 21 called RespirTech?

09:10:26 22   **A.** Correct.

09:10:27 23   **Q.** Now there's some other former Arizant/3M
09:10:29 24 folks over there as well; right?

09:10:31 25   **A.** Yes.

09:10:31 1    **Q.** And Gary Hansen's over at RespirTech?

09:10:33 2    **A.** Yes.

09:10:33 3    **Q.** Bob Buehler would be another one?

09:10:35 4    **A.** Correct.

09:10:35 5    **Q.** Is there anybody else from the old team that
09:10:37 6  went over to RespirTech?

09:10:39 7    **A.** Oh, yeah. There's a whole bunch of us.

09:10:41 8    **Q.** How many people do you think made the leap
09:10:42 9  over to RespirTech?

09:10:44 10   **A.** Oh, I'm guessing there's between a dozen and
09:10:48 11 15 --

09:10:48 12   **Q.** Okay.

09:10:48 13   **A.** -- off the top of my head.

09:10:50 14   **Q.** Does that include engineers who used to work
09:10:51 15 for you --

09:10:52 16   **A.** Yes.

09:10:53 17   **Q.** -- at your time?

09:10:53 18   **A.** Yes.

09:10:55 19   **Q.** Now you were given a little bit of advance
09:10:58 20 notice of this deposition. Have you spent any time
09:11:01 21 preparing for the deposition?

09:11:02 22   **A.** Yes.

09:11:03 23   **Q.** About how much time have you spent preparing
09:11:06 24 for this deposition?

09:11:07 25   **A.** Twenty, 25, 30 hours.

09:11:09 1    **Q.** Okay. And then you also spent about the
09:11:12 2  same amount of time, about 20 hours preparing for each
09:11:14 3  of your prior depos; correct?

09:11:16 4    **A.** That's my recollection, yes, in that area.

09:11:19 5    **Q.** Okay. So all tolled, when going over the
09:11:23 6  issues in this case, the documents in this case
09:11:25 7  preparing for these depositions, be fair to say that
09:11:28 8  you've spent about 60 to 70 hours doing that.

09:11:31 9    **A.** Yes. I'd say probably 60 to 80. I don't
09:11:34 10 know the exact number, but in that ballpark, yeah.

09:11:36 11   **Q.** Okay. Now I realize that some of the events
09:11:38 12 we're going to be talking about today were a long time
09:11:40 13 ago, but during that prep -- during that preparation I
09:11:43 14 take it you reviewed documents from that time period?

09:11:45 15   **A.** Yes.

09:11:45 16   **Q.** Okay. Do you feel comfortable talking about
09:11:48 17 those issues today?

09:11:50 18   **A.** Yes.

09:11:51 19   **Q.** And let me clarify what I mean by that, by
09:11:53 20 "these issues."

09:11:53 21   **A.** Yeah.

09:11:54 22   **Q.** You feel comfortable about talking about the
09:11:56 23 development of the Model 750 that you were a part of?

09:11:59 24   **A.** Yes.

09:11:59 25   **Q.** Okay. Now you were hired as a design

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

9

09:12:03  1    engineer back about 1997; correct?

09:12:05  2        A.   April of '97, yes.

09:12:07  3        Q.   Okay.  And you were the project lead on the

09:12:10  4    development of the Bair Hugger Model 750.

09:12:12  5        A.   Yes.

09:12:15  6        Q.   In that your responsibility was ultimately

09:12:18  7    to develop the product and get it to market.

09:12:20  8        A.   I'd say that's accurate, yes.

09:12:23  9        Q.   Okay.  You would be the high-level person

09:12:27  10   responsible for making sure the product was safe and

09:12:30  11   that the necessary verification testing had been done.

09:12:36  12        MR. GOSS:  Object to form.

09:12:37  13        A.   I would say I was responsible for making

09:12:39  14   sure all of the tasks/requirements of the product

09:12:44  15   development system were met, and so -- I mean I was

09:12:48  16   ultimately responsible for making sure all the boxes

09:12:50  17   were checked as far as what we needed to do to launch

09:12:53  18   the product.  I may not have been specifically

09:12:55  19   responsible for those individual tasks but, you know,

09:12:58  20   I had to make sure that we did everything we were

09:13:01  21   supposed to do.

09:13:01  22        Q.   Okay.  You remember giving a deposition in

09:13:05  23   the case Timothy Johnson versus 3M, that was your most

09:13:09  24   recent deposition?

09:13:09  25        A.   Yes.

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

10

09:13:10  1        Q.   Okay.  And the reason I ask you this

09:13:11  2    question today is because during that deposition do

09:13:14  3    you remember saying that you were the person who was

09:13:15  4    responsible for making sure that the product was safe

09:13:17  5    and effective and that the necessary verification

09:13:20  6    testing had been done?

09:13:21  7        A.   I don't recall explicitly saying that, but

09:13:23  8    if that's what the -- the transcript shows.

09:13:27  9        Q.   Okay.  And then -- And you would agree with

09:13:29  10   me that's generally consistent with what you're

09:13:31  11   telling me today.

09:13:31  12        A.   Yeah, I believe so.  Yeah.

09:13:33  13        Q.   Okay.  So if I'm trying to drill down and

09:13:35  14   find the person who's responsible for making sure,

09:13:38  15   during the development period, that the product's safe

09:13:40  16   and effective and that the necessary verification

09:13:42  17   testing had been done, you're a person I can talk to

09:13:45  18   about that.

09:13:47  19        A.   I would say you can talk to me about that,

09:13:49  20   but once again other individuals may have been

09:13:51  21   explicitly responsible for making sure the

09:13:53  22   verification testing was done, that the safety

09:13:56  23   requirements were met.  But I was, you know,

09:13:57  24   responsible for making sure that they had done their

09:14:01  25   jobs and all the boxes were checked.  I don't know if

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

11

09:14:04  1    it's different semantics or not, but.

09:14:06  2        Q.   Sure.  And in fact I want to get away from

09:14:10  3    that kind of semantics.  I want to show you the

09:14:11  4    transcript.  Let's --

09:14:11  5        A.   Okay.

09:14:12  6        Q.   -- do a little bit of refreshing here.  And

09:14:14  7    I'm actually -- I'm gonna go ahead and give it to you.

09:14:22  8        And I'm going to hand you your deposition

09:14:23  9    here open to page 47.

09:14:25  10       A.   Okay.

09:14:26  11       Q.   Okay.  And I want to review a question and

09:14:27  12   answer with you.

09:14:29  13       Do you see there at page 47, and then you

09:14:32  14   see at line 20 there is a question, who is the high

09:14:36  15   level -- who is "the higher level person responsible

09:14:39  16   to make sure that the required tests were done on the

09:14:42  17   750 to make sure it's safe?"

09:14:44  18       And your answer was --

09:14:45  19       A.   Page -- I'm sorry?  Page 47, line 20?

09:14:48  20       Q.   Twenty.

09:14:50  21       Are you finding that question?

09:14:51  22       A.   That was my response, but that's not -- Oh,

09:14:54  23   it's a question.

09:14:56  24       Q.   Take a minute to just look at the

09:14:58  25   transcript, --

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

12

09:14:58  1        A.   Yeah.  Let me read it, please.

09:15:01  2        Q.   -- get yourself familiar with it.  Right.

09:15:03  3        (Witness reviewing document.)  Okay.

09:15:15  4        Q.   So in this question you were asked who is

09:15:18  5    the higher level person responsible to make sure the

09:15:20  6    required tests were done on the 750 to make sure it's

09:15:23  7    safe.  And your answer was:  "As the project lead, I'd

09:15:27  8    be responsible for making sure...the product was safe

09:15:30  9    and effective and the necessary verification testing

09:15:33  10   was being done."

09:15:34  11       Do you stand by that testimony today?

09:15:36  12       A.   Yeah.  I'd say that's accurate.

09:15:39  13       Q.   And you know --

09:15:40  14       And part of the reason I'm asking you is

09:15:41  15   I've obviously deposed a lot of employees in this

09:15:44  16   case --

09:15:44  17       A.   Umm-hmm.

09:15:44  18       Q.   -- and I've been trying to find the person

09:15:48  19   who's consistent with this testimony that the

09:15:49  20   necessary verification testing had been done.  And

09:15:52  21   everyone keeps pointing to project lead and your

09:15:53  22   engineering department.

09:15:53  23       A.   Okay.

09:15:54  24       Q.   So would you agree with me that when it

09:15:56  25   comes to verification, that's your department's -- in

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

09:15:58  1   other words that has nothing to do with the legal
09:16:00  2   department, human resources.  That's an engineering
09:16:02  3   issue.
09:16:03  4         MR. GOSS:  Object to the preamble.
09:16:05  5         MR. BREWER:  I'm going to object to the
09:16:06  6   form.  I think it assumes facts that have not been
09:16:09  7   established.
09:16:10  8         MR. BANKSTON:  The form's fine.
09:16:12  9         MR. BREWER:  And it's compound.
09:16:14 10      Q.   And you can --
09:16:15 11         If your attorneys haven't let you know, I'll
09:16:17 12   go ahead and let you understand.  When objections are
09:16:19 13   made, there's not a judge here to rule on them,
09:16:22 14   that'll have to be done later.  So unless your
09:16:24 15   attorney specifically says, "I do not want you to
09:16:26 16   answer that question," after an objection you can go
09:16:28 17   ahead and answer.
09:16:29 18      A.   So I would say that the R&D group would
09:16:36 19   perform the required verification testing to make sure
09:16:38 20   that the product met its design inputs and its
09:16:41 21   requirements, and as the project lead I would have to
09:16:44 22   make sure that those tests were done.
09:16:46 23      Q.   Okay.  And in looking up the chain of
09:16:48 24   accountability, I guess, when you mention research and
09:16:50 25   development, --

09:16:50  1      A.   Yeah?
09:16:51  2      Q.   -- does that mean that during this period of
09:16:53  3   time Gary Hansen would have been your superior?
09:16:55  4      A.   During the development?  No, I don't believe
09:16:57  5   he was an employee at that time.
09:16:58  6      Q.   Okay.
09:16:59  7      A.   It would have been Gary Maharaj.
09:17:01  8      Q.   Would have been your direct --
09:17:02  9         The first next direct supervisor to you --
09:17:05 10      A.   Umm-hmm.
09:17:05 11      Q.   -- would have been Mr. Maharaj?
09:17:06 12         And then would I be correct then that Mr.
09:17:09 13   Maharaj, as director of R&D, would report to the CEO?
09:17:13 14      A.   I'm not certain what Mr. Maharaj's title
09:17:16 15   was, but I think he was VP of R&D or something along
09:17:20 16   those lines.  But yeah, I believe he reported to the
09:17:22 17   CEO at the time.
09:17:23 18      Q.   Okay.  Now I want to talk to you today about
09:17:26 19   the 750 development efforts.
09:17:28 20      A.   Umm-hmm.
09:17:28 21      Q.   And as we discussed, that's something you've
09:17:31 22   been preparing with attorneys to talk about; correct?
09:17:33 23      A.   Correct.
09:17:34 24      Q.   Okay.  Now when we talk about this job of
09:17:38 25   necessary verification testing, making sure the

09:17:40  1   product's safe, you'll agree with me it's a crucial
09:17:43  2   function to perform verification testing and safety
09:17:46  3   testing.  That's a crucial function of medical device
09:17:50  4   design.
09:17:51  5      A.   It is a design requirement, yes.
09:17:52  6      Q.   Okay.  It's crucial that you test and that
09:17:55  7   you validate changes in the product that could affect
09:17:58  8   patient safety.
09:18:01  9      A.   Verify and validate, yes.
09:18:03 10      Q.   Okay.  It would be necessary to test and
09:18:06 11   validate any changes in the product that could impact
09:18:10 12   any of the safety assurances made in the company's
09:18:12 13   government filings.
09:18:14 14      A.   Yes.
09:18:15 15      Q.   Okay.  Now when you were in the 750
09:18:18 16   development process you understood that that product
09:18:20 17   would be used in different kinds of surgeries.
09:18:24 18      A.   Yes.
09:18:26 19      Q.   In other words, when designing the 750 you
09:18:27 20   did not set out to design it for one particular type
09:18:30 21   of surgery.
09:18:32 22      A.   Correct.
09:18:32 23      Q.   Okay.  So during that design process you
09:18:36 24   would have to consider different surgeries and their
09:18:38 25   unique demands and their unique risks; correct?

09:18:50  1      A.   Since we were in the --
09:18:51  2         Since the mode of therapy was a heat
09:18:54  3   transfer, delivering heat to the patient, and that
09:18:57  4   seems to be kind of independent of surgery type, I'm
09:19:03  5   not sure I'd agree with the assessment that we drilled
09:19:07  6   down to that level of differentiation between the
09:19:10  7   surgeries.  It was, you know, for people undergoing
09:19:13  8   anesthesia who couldn't thermoregulate their own body
09:19:15  9   and we needed to apply patient -- or heat to the
09:19:17 10   patient to keep them warm.
09:19:19 11      Q.   Okay.
09:19:20 12      A.   So I don't think we differentiated between
09:19:23 13   the actual --
09:19:23 14      Q.   Well for instance --
09:19:23 15      A.   -- procedures in the requirements.
09:19:24 16      Q.   Sure.  Okay.
09:19:26 17         For instance, you understand, sitting here
09:19:27 18   today, that -- that orthopedic surgery -- orthopedic
09:19:31 19   implant surgery is very sensitive to infection.
09:19:36 20      A.   Yes.
09:19:37 21      Q.   During the design process of the Model 750
09:19:39 22   the company understood that; correct?
09:19:43 23      A.   I would say at least certain segments of the
09:19:46 24   company understood that.  Maybe not universally by
09:19:50 25   everyone.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

17

| | | |
|---|---|---|
| 09:19:50 | 1 | **Q.** Okay. And you understand, sitting here |
| 09:19:52 | 2 | today, orthopedic surgeries are done under ultraclean |
| 09:19:54 | 3 | conditions? |
| 09:19:58 | 4 | MR. GOSS: Object to form. |
| 09:20:00 | 5 | (Interruption by the reporter.) |
| 09:20:01 | 6 | **A.** I think the phrase you used is "ultraclean." |
| 09:20:03 | 7 | I'm not sure what that means -- |
| 09:20:03 | 8 | **Q.** Okay. |
| 09:20:04 | 9 | **A.** -- so I guess I'm not really -- |
| 09:20:06 | 10 | **Q.** Well you understand extra measures are taken |
| 09:20:08 | 11 | to prevent infection in an orthopedic surgery as |
| 09:20:11 | 12 | opposed to other surgeries. |
| 09:20:12 | 13 | MR. GOSS: Object to form. |
| 09:20:15 | 14 | **A.** I believe I have heard that, but I don't |
| 09:20:18 | 15 | know what those extra measures are. |
| 09:20:19 | 16 | **Q.** Okay. Have you ever seen the doctors who |
| 09:20:21 | 17 | wear the space suits into orthopedic surgeries? |
| 09:20:26 | 18 | **A.** Yes. |
| 09:20:27 | 19 | **Q.** Okay. And you understand that in orthopedic |
| 09:20:29 | 20 | surgeries the airflow in the room is important and |
| 09:20:32 | 21 | it's controlled. |
| 09:20:34 | 22 | **A.** My understanding is that in most every |
| 09:20:37 | 23 | procedure the airflow is important and they're |
| 09:20:40 | 24 | supposed to have laminar flow. Whether they're |
| 09:20:43 | 25 | properly designed or not, I can't speak to. |

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

18

| | | |
|---|---|---|
| 09:20:46 | 1 | **Q.** Okay. Now the 750 project was about making |
| 09:20:52 | 2 | improvements to the Model 505. You'd agree with that? |
| 09:20:57 | 3 | **A.** I would say it was about refreshing the |
| 09:20:58 | 4 | design and increasing its heat-transfer rate. So |
| 09:21:03 | 5 | yeah, I guess you could bump that under an umbrella of |
| 09:21:06 | 6 | improvements. |
| 09:21:07 | 7 | **Q.** Okay. In other words, with the 750 there |
| 09:21:09 | 8 | were things that were going to be different in terms |
| 09:21:11 | 9 | of performance and in terms of components than from |
| 09:21:14 | 10 | the 505. |
| 09:21:16 | 11 | **A.** That was the goal, yes. I mean the |
| 09:21:18 | 12 | performance difference was the goal. The component |
| 09:21:20 | 13 | differences just became a requirement of the -- |
| 09:21:24 | 14 | because of the differences in the goals. |
| 09:21:26 | 15 | **Q.** And -- And it would be fair to say that sort |
| 09:21:28 | 16 | of the task you were given was to develop the next |
| 09:21:31 | 17 | generation of warming unit for the company. |
| 09:21:34 | 18 | **A.** That would be an accurate statement, yeah. |
| 09:21:36 | 19 | **Q.** Okay. So your starting place, let's -- |
| 09:21:38 | 20 | The Model 505 was released in 19 -- or |
| 09:21:40 | 21 | excuse me. Let me start that over. |
| 09:21:42 | 22 | The Model 505 was granted government |
| 09:21:44 | 23 | clearance in 1996, which is just a year before you |
| 09:21:47 | 24 | arrived at the company; correct? |
| 09:21:49 | 25 | **A.** I don't know that that date is accurate, but |

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

19

| | | |
|---|---|---|
| 09:21:51 | 1 | I know it was being -- it was being built and sold |
| 09:21:54 | 2 | when I started. |
| 09:21:56 | 3 | **Q.** And so one of the things you would have |
| 09:21:58 | 4 | access to is the company's prior knowledge, testing, |
| 09:22:03 | 5 | documents relating to the 505. That's something that |
| 09:22:07 | 6 | was available to you when you were designing the 750. |
| 09:22:08 | 7 | **A.** Yes. |
| 09:22:10 | 8 | **Q.** Okay. I want to show you one of those |
| 09:22:11 | 9 | documents. |
| 09:22:15 | 10 | MR. BANKSTON: Would you get tab 1 out for |
| 09:22:15 | 11 | everybody? |
| 09:22:20 | 12 | |



STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

20

| | | |
|---|---|---|
| 09:22:55 | 1 | **Q.** |



| | | |
|---|---|---|
| 09:23:27 | 16 | you see the number 1 there? |
| 09:23:29 | 17 | **A.** Yes. |
| 09:23:29 | 18 | **Q.** Okay. So it states: "Contamination. |
| 09:23:33 | 19 | Airborne contamination from air blown intraoperatively |
| 09:23:36 | 20 | across the surgical wound may result in airborne |
| 09:23:39 | 21 | contamination." |
| 09:23:40 | 22 | In other words, this is a potential concern |
| 09:23:42 | 23 | that needs to be mitigated in the design of the unit; |
| 09:23:44 | 24 | correct? |
| 09:23:50 | 25 | **A.** Can you rephrase that? |

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

21

09:23:52  1    Q.   This issue that's being brought up, the
09:23:54  2  "other safety concern," --
09:23:56  3    A.   Yes.
09:23:57  4    Q.   -- "contamination," that's something that
09:23:58  5  needs to be taken into account and mitigated in the
09:24:00  6  design of the unit.
09:24:01  7         MR. GOSS:  Objection, foundation.
09:24:07  8    A.   Yeah.  I guess I'm not --
09:24:09  9         Having not seen this document previously,
09:24:11 10  I'm not sure I feel equipped to answer that question.
09:24:15 11    Q.   Well let's -- let's talk about it outside of
09:24:16 12  this document.  You understand that airborne
09:24:19 13  contamination is a risk in surgical theatres; correct?
09:24:22 14         MR. BREWER:  Objection, assumes facts.
09:24:26 15    A.   I would say I do now, yeah.
09:24:29 16    Q.   You do now.
09:24:31 17         Are you saying that at the time of the Model
09:24:34 18  750's development, you, the person who was supposed to
09:24:37 19  make sure this product was safe, was unaware that
09:24:40 20  surgical contamination was a problem in operating
09:24:43 21  rooms?
09:24:47 22    A.   I would go back to saying that I was -- as
09:24:50 23  the project lead I was responsible for making sure
09:24:52 24  that the verification testing that was identified as
09:24:55 25  being necessary to be done, was done.

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

22

09:25:00  1    Q.   Who's identifying it to be done?
09:25:03  2    A.   It would be a team effort of mostly --
09:25:08  3  mostly technical people, so R&D staff.
09:25:12  4    Q.   Who's accountable, at the end of the day,
09:25:13  5  for making sure that the right tests are identified?
09:25:24  6    A.   I would say probably the development team
09:25:28  7  and whoever signs off, from a management perspective,
09:25:31  8  on the project being ready to launch.
09:25:33  9    Q.   Okay.  So when you say "the development
09:25:35 10  team," that's what you're -- you're the leader of that
09:25:37 11  team.
09:25:37 12    A.   Correct.
09:25:38 13    Q.   Okay.  So at the end of the day the buck
09:25:40 14  stops on your desk for that.
09:25:41 15         MR. GOSS:  Object to form.
09:25:43 16    A.   I would say once again that the re -- my
09:25:47 17  responsibility is to make sure that all of the tasks
09:25:50 18  required in the product development system were
09:25:52 19  followed, and everything that we said was going to be
09:25:54 20  done was completed and filed.
09:25:57 21    Q.

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

23

09:26:06  1    Q.

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

24

09:27:05  1

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com



09:27:53  1   A. ███████████████████████

███████████████████████████
███████████████████████████
██████████████████████
███████████████████████████
███████████████████████████████
███████████████████████
███████████
███████████████
███████████████████████████
███████████████████████████
███████████████████
█████████████████████████████████
████████████████████████
█████████████████████████████
███████████

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

09:28:51  1   Q. ██████████████████████

███████████████████████████
███████████████████████████
█████████████████
███████████
███████████████████████████
███████████████████████████
████████████████████
███████████
████████████████████████
███████████████████████████

.
09:29:39  25   It's necessary to test and validate any
STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

09:29:41   1   changes that could impact any of the safety assurances
09:29:45   2   made in the company's government filings.
09:29:46   3        You don't disagree with that; right?
09:29:51   4   A.  I would say I don't disagree with that.
09:29:53   5   Q.  Right.  So if these --
09:29:55   6        In order to find out if the safety claims
09:29:57   7   have changed, it's necessary for you, the lead
09:30:01   8   developer of the Model 750, to know what the safety
09:30:04   9   claims were; right?
09:30:05  10        MR. GOSS:  Object to form.
09:30:08  11   A.  I would say it's the company's
09:30:12  12   responsibility to know that, but maybe not exclusively
09:30:15  13   the project lead.
09:30:17  14   Q.  Well how are you going to make sure that the
09:30:19  15   right validation has been done and the safety testing
09:30:22  16   has been done if you don't know if there's been
09:30:25  17   changes that impacted the safety claims?
09:30:28  18   A.  You rely on the expertise and experience of
09:30:30  19   the people on the development team.
09:30:32  20   Q.  Okay.  So in other words, somebody on your
09:30:33  21   development team told you whether or not any changes
09:30:37  22   might impact the statements being made in this
09:30:39  23   document.
09:30:42  24   A.  Ask that one more time.
09:30:43  25   Q.  Somebody on your development team told you
STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

09:30:46   1   whether or not things being done in the Model 750
09:30:50   2   could impact the statements being made in that
09:30:52   3   document.
09:30:56   4   A.  I would say that's not accurate.  This --
09:30:58   5   This summary or document I don't recall being a
09:31:01   6   specific discussion point during the development
09:31:03   7   effort.
09:31:04   8   Q.  So let's make sure I understand this
09:31:05   9   perfectly clear.
09:31:06  10   A.  Yeah.
09:31:06  11   Q.  During the Model 750 development, nobody
09:31:09  12   made you aware of what the safety claims actually were
09:31:11  13   on the Model 505.
09:31:12  14        MR. GOSS:  Object to form.
09:31:13  15        MR. BREWER:  Objection, form.
09:31:15  16   A.  Nobody made me aware of the 510(k) filing
09:31:18  17   summary for the 505.  I do not -- I do not recall
09:31:20  18   anybody doing that.
09:31:22  19   Q.  Okay.  Now one of the goals of the 750
09:31:26  20   project was a higher volume of airflow.
09:31:30  21   A.  Correct.  The -- The goal was to have a
09:31:32  22   higher heat transfer rate, and the way to achieve that
09:31:35  23   while maintaining safe temperatures was a higher
09:31:37  24   airflow rate.
09:31:38  25   Q.  It's about double what the 505 is?
STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

29

```
00:31:41  1        MR. GOSS:  Object to form.
00:31:42  2     A.  No.  I would not characterize it as that.  I
00:31:44  3  mean, it depends on the blanket, but I wouldn't say
00:31:47  4  it's twice as much.  Maybe 50 percent more.
00:31:49  5     Q.  How about 82 percent, would that be okay?
00:31:51  6     A.  Airflow?
00:31:52  7     Q.  Umm-hmm.
00:31:52  8     A.  No.
00:31:53  9     Q.  Okay.  That's wrong?
00:31:55 10     A.  I don't believe it to be correct.  It
00:31:58 11  depends on what the unit is attached to as -- you
00:31:59 12  know, as far as a blanket design as far as the level
00:32:01 13  of airflow.  But the vast majority of the products
00:32:05 14  sold is the upperbody blankets and I wouldn't call
00:32:07 15  that a 80-some percent increase in airflow I don't
00:32:13 16  believe.
00:32:13 17     Q.  Would you agree with me that the Model 505
00:32:16 18  blows about 25 cubic feet a minute?
00:32:18 19     A.  I thought it was 27 or 28, but we're in the
00:32:20 20  --
00:32:20 21     Q.  Same ballpark.
00:32:22 22     A.  -- general ballpark.
00:32:23 23     Q.  And we're talking high 30s, low 40s for the
00:32:27 24  Model -- Model 750?
00:32:28 25     A.  Yeah.  So I would say 28 to 42 was the
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

30

```
00:32:30  1  numbers I was thinking, which is about a 50 percent
00:32:33  2  increase.
00:32:33  3     Q.  Okay.  Now you also mentioned higher heat
00:32:36  4  transfer rates, --
00:32:36  5     A.  Yeah.
00:32:37  6     Q.  -- maybe about 30 to 50 percent higher heat
00:32:40  7  transfer rates; right?
00:32:41  8     A.  I don't recall what the heat transfer rate
00:32:42  9  change was due to the increased airflow.
00:32:45 10     Q.  Okay.  Now I believe that you were more
00:32:47 11  prepared on that in the Johnson deposition.
00:32:50 12        Do you remember giving testimony about the
00:32:51 13  heat transfer rate?
00:32:53 14        MR. GOSS:  Object to the preamble.
00:32:55 15     A.  I recall talking about heat transfer studies
00:32:57 16  being done at some point, probably after the 750
00:33:01 17  development, but I don't recall specifically talking
00:33:03 18  about the increased heat transfer rates.  And if I
00:33:07 19  did, I'm guessing it was speculative because I don't
00:33:10 20  know what the actual values -- I don't know what the
00:33:13 21  heat transfer rate measurements were compared to the
00:33:15 22  airflow.
00:33:15 23     Q.  In other words, before you came to this
00:33:17 24  deposition today you don't have reca -- memory of
00:33:19 25  reading a specific document that told you what the
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

31

```
00:33:21  1  heat transfer would be?
00:33:22  2     A.  I know I did not as part of dep --
00:33:24  3  preparation for this deposition, and I don't recall
00:33:27  4  reading one for the previous one, --
00:33:28  5     Q.  Okay.
00:33:29  6     A.  -- but I might have.
00:33:31  7     Q.
```



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

32

```
00:34:09  1
00:34:16  4     Q.  Okay.  Now after that change had been done,
00:34:21  5  or during the development of the 750 when the airflow
00:34:24  6  had been changed, --
00:34:25  7     A.  Yeah.
00:34:25  8     Q.  -- okay?  During that development period you
00:34:27  9  will agree with me there was no testing with respect
00:34:32 10  to the effect on the operating room air environment.
00:34:38 11     A.  I would qualify your comment by saying that
00:34:41 12  I am not personally aware of any testing that was done
00:34:43 13  related to that, but I can't say universally that none
00:34:46 14  was done.
00:34:49 15     Q.  Okay.  You're the person who's responsible
00:34:53 16  for making sure that testing's done.
00:34:56 17     A.  I'm once again responsible for making sure
00:34:58 18  the testing that was identified in the project plan
00:35:00 19  and the test plans are satisfactorily completed, yes.
00:35:03 20     Q.  All right.  So part of that as product lead
00:35:06 21  is to create a test plan.
00:35:08 22     A.  No, not necessarily.  I wouldn't say the
00:35:10 23  test plan is the project lead's responsibility.  The
00:35:13 24  project lead's responsibility is to make sure that the
00:35:15 25  testing that was identified by the development team
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

33

1  was satisfactorily executed and there were test
2  reports showing the results of the tests.
3      Q.  And in that test plan and those results did
4  not include any testing with respect to the unit's
5  effect on the operating room air environment.
6      MR. GOSS:  Object to form.
7      MR. BREWER:  Object to the form.
8      A.  I think what I just said was I -- I don't
9  recall and I'm not aware personally of any testing
10  that was done to test that.
11      Q.  You spent 60 to 70 hours preparing for this
12  deposition, and I'm wondering during those 60 to 70
13  hours did you not look into whether this unit had ever
14  been tested for its effect on operating airflow
15  environment?
16      A.  I looked at documents that were provided to
17  me by counsel.
18      Q.  Okay.  You understand that's not exactly
19  what I asked, though; right?  I'm not asking you did
20  counsel give you documents.
21      I'm asking you, during --
22      You were spending 60 to 70 hours preparing
23  for this case.  In fact, let's back up.
24      You understand what the fun -- what the
25  allegations in this case are by the plaintiffs?

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

34

1      A.  Generally, yes.
2      Q.  Okay.  And when I -- when you say
3  "generally," I'm going to be very general as well.
4      Okay.
5      Q.  You understand that there is an allegation
6  in this case that the Model 750 that you were the
7  project lead on --
8      A.  Umm-hmm.
9      Q.  -- has an adverse effect on the operating
10  airflow environment which could lead to surgical-site
11  infections.  You understand that's the allegation
12  being made.
13      A.  My understanding was that the claims are
14  that the Bair Hugger device played a role in the
15  surgical-site infections, yeah.  I don't know -- Not
16  the explicit wording you used.  Yes, the allegation
17  was that Bair Hugger was responsible or had an impact
18  on surgical-site infections in patients.
19      Q.  Okay.  So when you knew that and then you
20  spent 60 to 70 hours getting ready for this, did you
21  go and look to see if the unit had ever been tested
22  for those things?
23      A.  I'm not an employee of 3M so I had no access
24  to any of that information after the fact and so I had
25  nothing to go look for.

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

35

1      Q.  So in other words, everything that you're
2  telling us today that is about refreshed memory from
3  the documents are not documents that you went and
4  searched for, they're just whatever your lawyers put
5  in front of you.
6      A.  Yeah.  I mean, I would say I would no
7  ability, not being an employee of 3M, to go look for
8  documents.  So I would say that's an accurate
9  statement.
10      Q.  Okay.
11      A.  I didn't bring 3M documents home with me
12  when I quit.
13      Q.  Sure.
14      Now if you had wanted, before this
15  deposition, to look at testing documents, find out
16  safety validation, you had wanted to see those
17  documents, do you think there's any reason to keep
18  them from you?
19      MR. GOSS:  Objection to form.
20      MR. BREWER:  Objection, form.
21      A.  That'd be a question for the attorneys, I
22  guess.
23      Q.  No.  It's a question for you.
24      Do you think it's right, do you think it
25  would be proper for you to request those documents and

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

36

1  have them withheld from you?
2      MR. GOSS:  Same objection.  Assumes facts.
3      MR. BREWER:  It's an improper hypothetical.
4  I object to the form.
5      A.  Ask it one more time, please.
6      Q.  Sure.
7      If you wanted these documents, could you
8  have requested them?
9      A.  I could have requested them.
10      Q.  And it wouldn't -- it would be pretty
11  abnormal for them to be withheld from you; correct?
12      A.  I have no idea.
13      Q.  Okay.
14      A.  I've never prepared for other cases.
15      Q.  You have a relationship with these folks in
16  the room; right?
17      A.  I have met with them, yeah.  I guess I don't
18  know if you would call it a relationship, but.
19      Q.  I've met with them, he's met with them, but
20  they don't -- we don't have relationships.
21      You have a relationship with some of the
22  people in this room; right?  A formal relationship.
23      MR. GOSS:  Objection, vague.
24      A.  Define "formal relationship."
25      Q.  Is that your lawyer?

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

37

09:38:45 1     A.   They are a firm that's representing me, yes.

09:38:47 2     Q.   Okay. So that's your lawyer. You

09:38:49 3 understand that means you have a relationship with

09:38:49 4 them. You have --

09:38:51 5     A.   If you want --

09:38:52 6     Q.   Okay.

09:38:53 7     A.   If you want to make that connection, sure.

09:38:55 8     Q.   So you're not like a person off the street

09:38:56 9 asking for documents, you're in a collaborative

09:38:59 10 relationship with these folks; right?

09:39:02 11        MR. GOSS: Object to form.

09:39:07 12     A.   I'd say that's probably an accurate

09:39:10 13 statement.

09:39:11 14     Q.   Right.

09:39:11 15        They're paying you money for you to help

09:39:13 16 them defend the case.

09:39:16 17        MR. GOSS: Object to form.

09:39:16 18        MR. BREWER: Objection, assumes facts not

09:39:18 19 in evidence.

09:39:19 20     A.   I would --

09:39:20 21        MR. BREWER: I think it misstates -- Well

09:39:21 22 anyway. Objection to form.

09:39:23 23     A.   I would say that they have compensated me

09:39:25 24 for my time in preparation for this case.

09:39:31 25     Q.   And you're providing a consulting service to

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

38

09:39:32 1 them.

09:39:34 2        MR. GOSS: Object to form.

09:39:35 3        MR. BREWER: Objection, assumes facts not

09:39:36 4 in evidence.

09:39:36 5     A.   Yeah, I don't know if I'd call it a

09:39:38 6 consulting service, but I have met with them and went

09:39:42 7 through documents and answered questions related to

09:39:45 8 the timing and development of the 750.

09:39:47 9     Q.   Right. That's the nature of your

09:39:49 10 consulting, right, that you're reviewing technical

09:39:51 11 documents and sharing information with them?

09:39:53 12        MR. BREWER: Object to the form. I think

09:39:54 13 it misstates the testimony.

09:39:56 14     Q.   Right?

09:39:56 15     A.   I don't have any consulting agreement, and

09:39:57 16 so I'm not sure if "consulting" is the proper term.

09:40:01 17     Q.   Any more; right? You've had a consulting

09:40:03 18 agreement for this litigation, for these Bair Hugger

09:40:06 19 cases.

09:40:06 20     A.   In the previous two depositions, yes.

09:40:09 21     Q.   Okay. So you've been doing consulting, you

09:40:12 22 -- that consulting has included reviewing technical

09:40:14 23 documents and sharing information with the defense.

09:40:18 24     A.   In previous depositions, yes.

09:40:20 25     Q.   Okay. No longer discussing technical

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

39

09:40:23 1 documents or sharing information with them?

09:40:25 2     A.   No. We -- We discussed documents, but I

09:40:27 3 didn't have a formal consulting agreement.

09:40:30 4     Q.   Oh, I see. So the difference now is just

09:40:32 5 there's nothing on paper.

09:40:34 6        MR. BREWER: Objection, --

09:40:34 7        MR. GOSS: Object to form.

09:40:35 8        MR. BREWER: -- improper hypothetical.

09:40:39 9     A.   Yeah, I'm not sure I agree with that

09:40:42 10 characterization, but there is no signed document for

09:40:44 11 a legal consulting agreement.

09:40:47 12     Q.   Okay. Let's jump back to where we kind of

09:40:49 13 went off onto a side road there.

09:40:51 14     A.   Okay.

09:40:52 15     Q.   Where we had left off was that you were not

09:40:54 16 personally aware of any testing that had been done

09:40:56 17 with respect to the effect of the Model 750 on the

09:40:58 18 operating room airflow during the development of that

09:41:00 19 product.

09:41:00 20        Do you remember that?

09:41:01 21     A.   Correct.

09:41:02 22     Q.   Okay. And in fact not just -- when it comes

09:41:04 23 down to it, not just testing, but you'll agree with me

09:41:07 24 that during the development of the Model 750, you

09:41:11 25 didn't have any kind of discussions at all with

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

40

09:41:14 1 respect to whether it would have an effect on the

09:41:16 2 operating room airflow.

09:41:17 3        MR. GOSS: Object to form.

09:41:20 4     A.   I don't personally recall any discussions

09:41:23 5 that I had with anyone related to that -- to the

09:41:26 6 impact it would have on the airflow in the OR.

09:41:31 7     Q.   And that means you, as project lead, in

09:41:33 8 discussions with your engineers; correct?

09:41:38 9     A.   Engineers and other team members. But I

09:41:40 10 guess the point I'm trying to make is there may have

09:41:42 11 been discussion between other individual team members

09:41:44 12 that I wasn't present or participating in, so I can't

09:41:47 13 exclude that.

09:41:48 14     Q.   Sure.

09:41:49 15        And this would include you've never had any

09:41:51 16 of kind of those discussions with anybody in the

09:41:53 17 clinical department; correct?

09:41:55 18     A.   I do not recall any discussions, no.

09:41:57 19     Q.   You've never had those kind of discussions

09:41:59 20 with anybody in upper management; correct?

09:42:03 21     A.   Correct. I don't recall any discussions

09:42:04 22 like that.

09:42:05 23     Q.   Okay. Now flow of air in the operating

09:42:07 24 room, airborne contamination, these are important

09:42:09 25 issues; right?

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

41

09:42:15 1      A.   I'm not a surgeon and I'm not an OR expert,
09:42:17 2   but yes, I would agree with that.
09:42:19 3      Q.   Well you are the project lead of a medical
09:42:21 4   device that's going to be placed in an operating room
09:42:23 5   with thousands and thousands of patients.  You think
09:42:26 6   it's important that you should understand, right, that
09:42:28 7   airborne contamination is an issue to be taken
09:42:30 8   seriously.  Am I -- Do you agree with that?
09:42:33 9         MR. GOSS:  Object to form.
09:42:34 10     A.   I would think that it's important that the
09:42:36 11  company understand that.
09:42:38 12     Q.   But not you as the project lead.
09:42:43 13     A.   Not necessarily explicitly me, no.
09:42:48 14     A.   Well again, you're the one who has to make
09:42:50 15  sure the product is safe and that the right
09:42:51 16  verification testing has been done in doing that.
09:42:55 17     A.   Making sure that the -- the verification
09:42:58 18  testing that was identified is done properly.
09:43:00 19     Q.   Okay.  It seems to me, then, that the main
09:43:07 20  job of the project lead is basically to just check
09:43:09 21  that other people did their job?
09:43:14 22     A.   I think that's an oversimplification, but
09:43:16 23  you're basically the person that's orchestrating the
09:43:19 24  project and making sure that all the tasks that are
09:43:21 25  identified in the product development system are done

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

---

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

42

09:43:25 1   satisfactorily.
09:43:27 2      Q.   Now when we talk about flow of air in the
09:43:29 3   operating room, airborne contamination, --
09:43:31 4      A.   Umm-hmm.
09:43:32 5      Q.   -- that's an issue the company knew could be
09:43:34 6   a potential hazard if the design of the device didn't
09:43:37 7   account for it.
09:43:38 8         MR. BREWER:  Objection, foundation.
09:43:39 9         MR. GOSS:  Same objection.
09:43:41 10     A.   I'm sorry.  Can you repeat it again?
09:43:45 11     Q.   Sure.
09:43:45 12         Flow of air in the operating room, airborne
09:43:47 13  contamination, that's an issue the company knew could
09:43:51 14  be a potential hazard if the design of the device did
09:43:54 15  not account for it.
09:43:55 16        MR. BREWER:  Objection, --
09:43:56 17        MR. GOSS:  Same objection.
09:43:57 18        MR. BREWER:  -- foundation.
09:43:58 19     A.   I would say some segments of the company
09:44:00 20  would know that, yes.
09:44:02 21     Q.   In fact if we look -- Exhibit 47, right,
09:44:05 22  where it ███████████████████████████████████████

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

---

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

43

09:44:17 1

09:45:00 17     Q.   Sure.  Well let's stick with the
09:45:02 18  development, because as I remember you telling me, if
09:45:05 19  something changes that could impact the safety
09:45:08 20  assurances made in the federal government filings,
09:45:10 21  that needs to be validated and verified.
09:45:13 22        Remember telling me that?
09:45:16 23        MR. GOSS:  Object to form.
09:45:21 24     A.   I don't know what the filing for the 750
09:45:24 25  said.  I a --

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

---

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

44

09:45:25 1      Q.   Sure.  Let me just back you up.
09:45:27 2      A.   Okay.
09:45:28 3      Q.   All I asked you is do you remember telling
09:45:29 4   me that if something changes that could impact the
09:45:32 5   safety assurances in the federal filing it needed to
09:45:34 6   be verified?
09:45:36 7      A.   Yes.  I recall saying that.
09:45:37 8      Q.   Okay.  And you will agree with me that
09:45:39 9   something has changed.  The air output in this unit
09:45:41 10  has changed.
09:45:43 11     A.   Yes, the air output has changed.
09:45:45 12     Q.   And the air output is something that is
09:45:45 13  specifically discussed in the safety claims for the
09:45:48 14  unit, the 505.
09:45:51 15     A.   Correct.
09:45:51 16     Q.   So it would require verification testing
09:45:53 17  that was not performed; correct?
09:45:55 18        MR. GOSS:  Object to form.
09:45:58 19     A.   Verification testing was performed to verify
09:46:02 20  the increased airflow of the device and the heat
09:46:05 21  transfer rate, but that -- but not anything dealing
09:46:08 22  with OR airflow.
09:46:10 23     Q.   Or safety.
09:46:12 24        MR. GOSS:  Object to form.
09:46:13 25     A.   Well no.  I mean there's plenty of safety

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

45

09:46:16 1 done -- safety testing done as far as, you know, safe

09:46:18 2 temperatures and safe heat transfer rates.

09:46:20 3 **Q.** Safety with respect to airborne

09:46:22 4 contamination like we see in the 505's verification

09:46:24 5 testing. There's -- That doesn't exist for the 750;

09:46:28 6 right?

09:46:28 7 **A.** Well once again, that's not verification

09:46:30 8 testing, it's clinical studies.

09:46:32 9 **Q.** And that validates the design and its

09:46:34 10 safety; correct?

09:46:34 11 **A.** Verification is not validation.

09:46:36 12 **Q.** All right. Why -- Why would you ever

09:46:40 13 include clinical studies during the design process,

09:46:44 14 what's the purpose of that?

09:46:47 15 **A.** I have not developed a new device from the

09:46:50 16 ground up that involved clinical studies, so I don't

09:46:53 17 feel equipped to answer that.

09:46:54 18 **Q.** Okay. In any case, we do know that the air

09:46:58 19 output specifications for this unit was changed --

09:47:00 20 **A.** Correct.

09:47:01 21 **Q.** ████████████████████████████████

22 ████████████████████████████████████

23 ████ ██████████████████████████████

24 ████ ███████████████████████████████

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

46

09:47:13 1 correct.

09:47:14 2 **Q.** I want to talk to you about another way that

09:47:15 3 this product was different than the 505.

09:47:17 4 **A.** Umm-hmm.

09:47:18 5 **Q.** Now you understand that when the Model 505

09:47:20 6 was -- was cleared in 1996 it had a .2 micron

09:47:24 7 high-efficiency filter. You aware of that?

09:47:27 8 **A.** I am aware that that is the terminology that

09:47:30 9 the company used to define the filter used, yeah. The

09:47:35 10 manual said .2 micron high-efficiency filter.

09:47:39 11 **Q.** Okay. That's a little --

09:47:40 12 I'm going to try to ask you about the

09:47:41 13 details of that because that's a little bit different

09:47:43 14 than what I asked you, because I asked you, did it

09:47:46 15 have such a filter, a .2 micron high-efficiency

09:47:47 16 filter. And the change you made was to say, that's

09:47:50 17 how it was defined. That leads me to believe that it

09:47:52 18 really wasn't a .2 micron high-efficiency filter.

09:47:55 19 Was that your intention, or am I parsing too

09:47:59 20 much?

09:47:59 21 **A.** I wouldn't say that was my intention.

09:48:00 22 My contention is that any filter would

09:48:02 23 filter a .2 micron particle size. Why the company

09:48:06 24 chose to use that as the defining particle size for

09:48:10 25 their filter, I am not certain, and I am not certain

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

47

09:48:13 1 the term "high efficiency" has any tangible meaning

09:48:16 2 when it comes to filtration. But I do know that the

09:48:19 3 company, before I started, called the filter in the

09:48:22 4 505 a .2 micron high-efficiency filter.

09:48:25 5 **Q.** And in fact at that time, when it was

09:48:27 6 released in 1996, that was a filter that was capable

09:48:30 7 of filtering roughly 95 percent of .2 micron

09:48:34 8 particles. Are you familiar with that?

09:48:36 9 MR. GOSS: Objection, foundation.

09:48:39 10 **A.** That value sounds reasonable, but where --

09:48:43 11 whether it's actually 95 percent, I can't --

09:48:47 12 **Q.** Okay.

09:48:47 13 **A.** -- comment or...

09:48:49 14 **Q.** ████████████████████████████

15 ███ ████████████████████████████████

16 ███ ████████████████████████████████

17 ███ ████████████████████████████████

18 ███ ████████████████████████████████

19 ██ ███████████████████████████████.

09:49:03 20 **Q.** Okay. Now when you were developing the

09:49:05 21 Model 505 it was your original intention -- your

09:49:10 22 original plan --

09:49:11 23 **A.** The 750?

09:49:12 24 **Q.** Oh, excuse me. Thank you for correcting me.

09:49:14 25 Okay.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

48

09:49:14 1 **Q.** Let's start that over.

09:49:16 2 When you were developing the Model 750 your

09:49:18 3 original plan was to use a HEPA filter in the device.

09:49:22 4 **A.** I'm not sure that's an accurate assessment.

09:49:24 5 It was something that we discussed and entertained and

09:49:26 6 pursued and investigated, but I'm not sure it was the

09:49:31 7 intention. Maybe it was a goal because of customer

09:49:35 8 perceptions.

09:49:35 9 **Q.** Sure.

09:49:36 10 Or at least it was something you'd thought

09:49:37 11 about at one point.

09:49:38 12 **A.** It was something we'd thought about and

09:49:40 13 looked at, yes.

09:49:41 14 **Q.** Right.

09:49:41 15 But when you actually went into the

09:49:43 16 development, I want to talk about those kind of

09:49:47 17 1999/2000 time period --

09:49:48 18 **A.** Okay.

09:49:49 19 **Q.** -- where you're starting to get the device

09:49:51 20 off the ground. Part of your design at that point,

09:49:54 21 your plan was I want the same filter efficiency that's

09:49:56 22 in the Model 505. We're going to use a substantially

09:50:00 23 equivalent filter to the 505, not a HEPA filter. Is

09:50:04 24 that accurate?

09:50:05 25 MR. GOSS: Object to form.



1  A.  I would say we looked at various filter
2  options and sticking with something, quote unquote,
3  comparable to the 505 was probably an assumption of
4  the effort of our team.
5       (Discussion off the stenographic record.)
6       (Exhibit 277 marked for identification.)
7  BY MR. BANKSTON:
8  Q.

14  going to be blowing harder, it might take a different
15  kind of filter to reach the same level of efficiency.
16  A.  It might take different filter media,
17  different geometry, a different configuration, yes.
18  Q.  But at this point that -- that isn't so much
19  as your concern as having end results of it having
20  substantially equivalent efficiency to the Model 505;
21  is that right?
22  A.  Yeah.  I mean, I would say the -- the goal
23  at the time was to have a filter that was comparable
24  efficiency.
25       MR. BANKSTON:  Tab 6.

1  Q.

7  Q.  Okay.  I'm actually --
8       Do you want to take a quick moment to read
9  that letter?
10  A.  Yeah, if you're going to ask me --
11  Q.  Sure.  I'm going to ask you some questions
12  about it, yep.
13  A.  (Witness reviewing exhibit.)
14       (Discussion off the stenographic record.)
15  A.  Okay.
16  Q.  Now this is a letter by Mr. Westlin;
17  correct?
18  A.  Correct.
19  Q.  Mr. Westlin is in regulatory.
20  A.  Correct.
21  Q.  Mr. Westlin, in regulatory, is somebody you
22  might have to deal with from time to time if you had
23  regulatory questions; for example.
24  A.  Correct.
25  Q.  And also Mr. Westlin's not a product

1  engineer; right?
2  A.  Correct.
3  Q.  So when it comes down to him understanding
4  what's going on with the Model 750 development, that's
5  information he's going to get from outside his
6  department, from somebody like your design engineers.
7  A.  Correct.
8  Q.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



53

09:56:36   **7**       (Discussion off the stenographic record.)
09:56:37   **8**       (Exhibit 278 marked for identification.)
09:56:37   **9**   BY MR. BANKSTON:
09:56:40 **10**      **Q.**   Mr. Zgoda, you're familiar with a term
09:56:42 **11**   called "pressure drop"?
09:56:43 **12**      **A.**   Umm-hmm.
09:56:44 **13**      THE REPORTER:  Your answer, please?
09:56:45 **14**      THE WITNESS:  Sorry.
09:56:46 **15**      **A.**   Yes.
09:56:46 **16**      **Q.**   Now when we talk about "pressure drop," that
09:56:47 **17**   can be measured with a water test, basically?
09:56:52 **18**      **A.**   Yes.
09:56:53 **19**      **Q.**

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



Q. Okay. I -- Yeah.

(Discussion off the stenographic record.)

(Exhibit 279 marked for identification.)

BY MR. BANKSTON:

Q.

(Discussion off the stenographic record.)

(Exhibit 280 marked for identification.)

BY MR. BANKSTON:

Q.

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com



STIREWALT & ASSOCIATES
1-800-553-1953   info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

65

10:09:12 **10**   **Q.**   So we would actually need to see what it did
10:09:15 **11**   at two microns to be able to come up with an
10:09:18 **12**   efficiency for two microns; right?  I mean, excuse me,
10:09:22 **13**   .2 microns.
10:09:23 **14**          MR. GOSS:  Object to form.
10:09:24 **15**   **A.**   Yes.
10:09:25 **16**   **Q.**   In other words, what I'm saying is this
10:09:27 **17**   filter likely has a different efficiency at .2 than it
10:09:30 **18**   does at .3.
10:09:31 **19**   **A.**   That's entirely plausible, yes.
10:09:33 **20**   **Q.**   Let's check on that real quick.
10:10:18 **21**          (Discussion off the stenographic record.)
10:10:19 **22**          (Exhibit 281 marked for identification.)
10:10:22 **23**          MR. GOSS:  Do you mind we if we take a
10:10:24 **24**   quick bathroom break while he's going for the
10:10:28 **25**   stapler?

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

66

10:10:28 **1**    MR. BANKSTON:  Yeah.  I think we can do
10:10:30 **2**    that.
10:10:31 **3**          THE REPORTER:  Off the record, please.
10:10:32 **4**          (Recess taken from 10:10 to 10:21 a.m.)
10:21:49 **5**    BY MR. BANKSTON:
10:21:52 **6**    **Q.**   Mr. Zgoda, would you do me a favor and the
10:21:55 **7**    exhibit number on the bottom, what exhibit is that?
10:21:57 **8**    **A.**   The one that was stapled?
10:21:59 **9**    **Q.**   Yes, sir.
10:21:59 **10**   **A.**   281.
10:22:00 **11**   **Q.**

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

67



SOCIATES
1-800-553-1953  info@stirewalt.com



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
69

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
71

**Page 71**

3  Q.  And you never tested the efficiency of this
4  filter at 40 cubic feet per minute; did you?
5  A.  I don't know that it was or was not tested
6  at that volumetric airflow.
7  Q.  You're certainly not aware of it sitting
8  here today; are you?
9  A.  I'm not aware one way or the other.
10  Q.  Seventy hours of preparation for this depo
11  here about the Model 750 development, and you're not
12  able to tell me if there was or was not testing of the
13  efficiency of this filter as it operates in the 750.
14  MR. GOSS:  Objection; argumentative, asked
15  and answered.
16  A.  I am not aware of volumetric airflow testing
17  performed --
18  Q.  So the fil --
19  A.  -- on filter -- at the airflow of the 750.
20  Q.  So the filter was reduced in efficiency, but
21  it was never tested; correct?
22  MR. GOSS:  Object to form.
23  A.  It was tested in the system for the output
24  of the system as far as the airflow rate.
25  Q.  So we knew it's fine as far as airflow, but

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
72

**Page 72**

1  when it comes to about the particles going through the
2  machine you really don't have any idea, do you?
3  MR. GOSS:  Object to form.
4  A.  Yeah.  I don't think that'd be a sa --
5  that'd be too broad of a generalization to say we had
6  no idea.
7  Q.  Well certainly you don't know the amount of
8  particles; for instance, if you threw an X number of
9  particles at this filter at a certain speed of a
10  certain size, there'd be no data that you could pull
11  up for us right now that the company's ever done that
12  would tell us how many particles are going to get
13  through.
14  MR. GOSS:  Object to form.
15  A.  Nothing I could pull up since I don't have
16  access to the data.
17  Q.  Well, and as the project lead, if that was
18  on your little list that you do your checkoffs on,
19  that would be something that would be available to
20  you; right?
21  A.  Not now.
22  Q.  Why -- Why would you think that?
23  In other words, have you been told that's
24  not available to you?
25  A.  No.

ric

10:28:48  1    Q.   Okay.  So until you ask for it, you really
10:28:50  2  don't have any idea; do you?
10:28:55  3    A.   I would answer that by saying that I didn't
10:28:58  4  ask for any specific documents.  I reviewed what was
10:29:01  5  provided to me by counsel.
10:29:02  6    Q.   In other words, you didn't see what you
10:29:03  7  wanted to see, you saw what they wanted you to see.
10:29:07  8        MR. GOSS:  Object to form, argumentative.
10:29:08  9        MR. BREWER:  Objection.  Yeah.  Objection,
10:29:11  10  foundation.
10:29:12  11    A.   Yeah.  I mean, I wouldn't say there was
10:29:14  12  anything I specifically wanted to see.
10:29:24  13    Q.   Now this change in filtration, to your
10:29:28  14  knowledge you've never taken any steps to make sure
10:29:29  15  that that's communicated to the government; right?
10:29:35  16    A.   Not being in the regulatory, I'm not aware
10:29:37  17  one way or the other what was communicated to the
10:29:41  18  government.  That would be more of a regulatory
10:29:44  19  assignment.
10:29:45  20    Q.   How's Dave Westlin supposed to know what's
10:29:48  21  going on with the filter if you don't tell him?
10:29:50  22    A.   There's a regulatory member on the team that
10:29:53  23  participates in team meetings.
10:29:54  24    Q.   Who's your regulatory member on the
10:29:56  25  development of the Model 750?

10:29:59  1    A.   I would have to go back and look at records,
10:30:01  2  but my recollection is a gentleman named Jim Jenkins.
10:30:04  3  But if somebody had a document showing it was somebody
10:30:06  4  else, I would trust the documents.
10:30:08  5    Q.   So you would assume, I would take it, in the
10:30:10  6  regular course of business, that if you made a change
10:30:13  7  to the filter, reduced its efficiency, that you
10:30:16  8  wouldn't have to go communicate that to regulatory,
10:30:18  9  regulatory would know that because they were part of
10:30:20  10  this team.
10:30:22  11    A.   Looking back 15 years later, that would be
10:30:25  12  my assumption, yes.
10:30:26  13    Q.   Okay.  Now when it comes to other people in
10:30:29  14  the company, your salesmen, technical staff, people
10:30:33  15  like that, this filter change was kept secret from
10:30:36  16  them; correct?
10:30:37  17        MR. GOSS:  Object to the form.
10:30:39  18    A.   Yeah.  I think the term "kept secret" isn't
10:30:42  19  necessarily fair, but I'm not sure it would have been
10:30:44  20  explicitly communicated.
10:30:46  21    Q.   Okay.  Well let's see if it ever was.
10:30:50  22        (Discussion off the stenographic record.)
10:30:53  23    Q.   You're familiar that once the Bair Hugger
10:30:55  24  750 was completed, there had to be training given to
10:30:58  25  the people in the company to say, here's our new

10:31:00  1  device, here's its features, here's how it works;
10:31:04  2  correct?
10:31:04  3    A.   Correct.
10:31:04  4    Q.   And the technical people would maybe have to
10:31:06  5  know certain things about the device that the public
10:31:08  6  doesn't even know; right?
10:31:11  7    A.   The technical people.
10:31:12  8    Q.   Sure.  Say you have people who are
10:31:13  9  responsible in the maintenance department for when
10:31:15  10  Bair Huggers are returned.  They might have to know,
10:31:18  11  for instance, how the circuit board works; right?
10:31:19  12    A.   Internal, yeah.
10:31:20  13    Q.   And it's probably not necessary for an
10:31:22  14  anesthesiologist to know how to fix the circuit board.
10:31:25  15    A.   That would be correct.
10:31:25  16    Q.   Okay.  So in other words, there's a training
10:31:27  17  that's given just to employees based on here's the new
10:31:30  18  device and here's how it works.
10:31:32  19    A.   Likely, yes.
10:31:34  20    Q.   Okay.
10:31:37  21        (Exhibit 282 marked for identification.)
10:32:02  22  BY MR. BANKSTON:
10:32:02  23    Q.   ███████████████████████████████████████
10:32:06  24  ███████████████████████████████████Model 750
10:32:10  25  Technical and Service Training.  Correct?

10:32:12  1    A.   ████████████████████████████████████████
(remaining lines redacted)



3  **A.** Given what the audience may have needed to
4  know or not need to know, it may have been honest --
5  **Q.** Quote/unquote.
6  **A.** -- or not -- or not relevant to what they
7  needed to know.
8  **Q.** So in the company's view when it comes to
9  things like honesty, honesty depends on what the
10 person needs to know.
11 **A.** I didn't say that.
12 MR. GOSS: Object to form, --
13 MR. BREWER: Objection.
14 MR. GOSS: -- argumentative.
15 **Q.** Tell me that that that's not its --
16 That's my question. Is that not how the
17 company operates --
18 MR. BREWER: Hold on. Foundation.
19 MR. BANKSTON: If I could finish my
20 question before you --
21 MR. BREWER: Well why don't you go ahead
22 and finish the question.
23 **Q.** Are you telling me that when the company
24 operates it always tries to provide honest
25 information, or it tries to provide what it thinks the

1  person needs to know?
2  MR. BREWER: Objection, foundation. Go
3  ahead.
4  MR. GOSS: Join.
5  **A.** I would say in the internal training we
6  would have strived to provide honest information at a
7  level that was relevant for what the person needed to
8  know, not wanting to bog down non-technical people
9  with information that wasn't relevant to what they
10 needed to know.
11 **Q.** Because those people might not need the
12 technical details is what you're saying.
13 **A.** I think that's what I'm trying to say, yeah.
14 **Q.** Okay. On the previous page?
15 **A.** Yeah.
16 **Q.** Seems like you really wanted to tell them
17 about technical details, though; right?
18 MR. GOSS: Object to the form. The witness
19 didn't write the document.
20 **A.** Not knowing who the audience for this was,
21 it could be technical details for a sales force.
22 **Q.** And those sales force might pass that
23 information on to the customers at some point;
24 correct?
25 **A.** My understanding is that internal training

1  documents probably wouldn't have been passed on to
2  customers, so.
3  **Q.** Oh, no. I didn't -- I --
4  Excuse me. Let me rephrase the question. I
5  didn't mean --
6  Salespeople aren't going to give this
7  document to customers; right? That's not going to
8  happen.
9  **A.** Should not happen.
10 **Q.** Okay. But the information that's contained
11 into it is the education that the salespeople are
12 going to take out into the real world; right?
13 **A.** That, or what's in the operator's manual.
14 **Q.** If a salesperson tells a customer that the
15 750 has the same filter media as the 505, is that an
16 honest statement to the customer?
17 **A.** Once again I would say I wouldn't consider
18 it dishonest because it's still glass-filled media and
19 since there's no reference to efficiency in here I
20 wouldn't necessarily call it dishonest.
21 **Q.** Okay. You're comfortable with salesmen
22 saying that to customers.
23 **A.** Based on what I know, yeah.
24 **Q.**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

81



10:37:59 17  Q.  Okay.  And on the issue about terminology
10:38:02 18  here, we'll agree that one filter had a higher
10:38:04 19  efficiency than the other one.
10:38:06 20  A.  Yes.
10:38:07 21  Q.  Okay.  So when I'm --
10:38:09 22       In comparison to the two, there is the
10:38:11 23  filter that has the higher efficiency and the lower
10:38:14 24  efficiency; correct?
10:38:15 25  A.  Yes.  And you said low -- you said "low,"

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

82

10:38:16 1  but not "lower."
10:38:17 2  Q.  Okay.  So when I talk about these, when I
10:38:19 3  say the lowered efficiency, just shorthand that for
10:38:23 4  M20 versus high efficiency M10.  That'd be accurate;
10:38:27 5  right?
10:38:27 6  A.  That --
10:38:27 7       That works, yes.
10:38:28 8  Q.  Okay.  Now I want to make sure that I
10:38:31 9  understand that you -- you're the guy who's
10:38:34 10  responsible for getting this product developed,
10:38:36 11  bringing it to market.
10:38:37 12  A.  Ultimately, yes.
10:38:39 13  Q.  Okay.  And you ultimately made a device
10:38:42 14  which increased the airflow and cut the filtration and
10:38:46 15  you can't tell me that there was safety testing done
10:38:48 16  on either of those changes.  Is that correct?
10:38:51 17       MR. GOSS:  Object to form.
10:38:53 18  A.  There was safety testing done on increased
10:38:55 19  airflow.
10:38:56 20  Q.  Okay.  Well let's -- let's put it back to
10:38:58 21  the context of this lawsuit.
10:38:59 22       You made a device which increased the
10:39:02 23  airflow and cut the filtration, and there was no
10:39:05 24  safety testing regarding potential infection or
10:39:09 25  potential airborne contamination that might affect the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

83

10:39:12 1  patients this was used on.
10:39:17 2  A.  I do not recall there being any specific
10:39:19 3  tests being done on the verification that addressed
10:39:24 4  filtration efficiency, or --
10:39:27 5  Q.  Seventy hours of preparation.  Did any of it
10:39:30 6  discuss safety verification of this product?
10:39:33 7       MR. GOSS:  Object to the preamble.
10:39:35 8       MR. BANKSTON:  Which part of the preamble?
10:39:37 9       MR. GOSS:  You keep bringing up the 70
10:39:39 10  hours.
10:39:39 11  Q.  I'm asking him --
10:39:41 12       MR. GOSS:  You can just ask him questions.
10:39:42 13  Q.  -- of the 70 hours, which -- was there any
10:39:44 14  part of that 70 hours that you discussed safety
10:39:46 15  verification testing of this product?
10:39:48 16       MR. BREWER:  Well I'm going to instruct you
10:39:49 17  not to reveal any conversations you had with lawyers
10:39:55 18  that were intended to be confidential and privileged.
10:40:01 19  If -- Well, that's my instruction.
10:40:03 20  Q.  During your 70 hours of preparation did you
10:40:06 21  come to any sort of greater recollection or
10:40:08 22  understanding about the safety verification of this
10:40:11 23  product with regard to airborne contamination or
10:40:14 24  infection?
10:40:17 25  A.  I'm sorry.  Ask that one more time.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

84

10:40:20 1  Q.  In the 70 hours --
10:40:21 2  A.  Yep.
10:40:22 3  Q.  -- you prepared, --
10:40:22 4  A.  Yep.
10:40:23 5  Q.  -- did you come to a greater understanding
10:40:26 6  or recollection regarding safety verification testing
10:40:30 7  in terms of airborne contamination?
10:40:35 8  A.  No.
10:40:41 9  Q.  During your 70 hours of preparation did you
10:40:45 10  at any point see any documented safety or verification
10:40:50 11  testing with regards to airborne contamination?
10:40:54 12  A.  I did not.
10:40:58 13  Q.  I want to talk to you --
10:40:59 14

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

85



10:41:32 **1**

10:43:34 **15**   **Q.**   -- at that point the company was receiving
10:43:36 **16** quite a bit of negative attention with regard to
10:43:39 **17** filtration and potential airborne contamination.
10:43:40 **18** You'd agree with that?
10:43:42 **19**        MR. GOSS:  Object to form.
10:43:43 **20**     **A.**   I would not agree with that because I simply
10:43:47 **21** wasn't involved in what information the company
10:43:49 **22** received from the outside.
10:43:50 **23**

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

87

10:44:01 **1**

10:46:44 **20** (Discussion off the stenographic record.)
10:46:54 **21**     **Q.**   Okay.  Now those prototypes, do you recall
10:46:57 **22** conducting testing on them?
10:47:00 **23**     **A.**   I did not personally do testing on them, but
10:47:03 **24** I recall there being testing performed on various
10:47:08 **25** configurations of filtration in hoses.
          **Q.**   Somebody like Mr. Barrows would be the

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
89

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
91



10:47:10  1  person who would likely perform the hands-on of that;
10:47:13  2  correct?
10:47:13  3      A.   I believe he's the one that would have done
10:47:15  4  it, yes.
10:47:33  5          (Exhibit 285 marked for identification.)
10:47:33  6  BY MR. BANKSTON:
10:47:39  7      Q.   All right.  Mr. Zgoda, Exhibit 285, is this
10:47:42  8  a document you've seen in preparation for deposition?
10:47:53  9      A.   I be -- Yeah, I believe I saw it, but I
10:47:56  10  think I saw it as part of the previous preparations,
10:47:58  11  --
10:47:58  12      Q.   Okay.
10:47:59  13      A.   -- but it looks familiar.
10:48:01  14      Q.

10:50:29  1

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

1-800-553-1953  info@stirewalt.com



STIREWALT & ASSOCIATES
1-800-553-1953   info@stirewalt.com



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
97

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
99

10:59:44  1    A.  Can you be more specific?
10:59:44  2    Q.  Sure.
10:59:45  3    I'm not sure what you're asking.
10:59:46  4    Q.  If you wanted to know what claims the
10:59:48  5  company makes about filter efficiency on the 500
10:59:50  6  series units, you could get that question answered.
10:59:55  7    A.  If the proper question were asked, yes.
11:00:03  8        To my knowledge at the time the only
11:00:04  9  efficiency claim that was made on the units was what
11:00:06  10  was mentioned in the manual of a .2 micron
11:00:09  11  high-efficiency media.
11:00:11  12    Q.  Okay.  Well one of the things that would
11:00:13  13  have been available to you at that time is the first
11:00:15  14  exhibit we looked at today, Exhibit 47.  That would
11:00:18  15  have been available to you; correct?
11:00:19  16    A.  If I had known about its existence, yes.
11:00:22  17    Q.  Well you knew that there were federal safety
11:00:24  18  claims made on the device in 505.
11:00:27  19        MR. GOSS:  Object to form.
11:00:28  20    A.  I knew that a 510(k) had been filed on the
11:00:31  21  505 that showed it was substantially equivalent to a
11:00:34  22  predicate device.
11:00:35  23    Q.  You understand, though, that claims were
11:00:36  24  made to the federal government about the 505.
11:00:42  25    A.  I knew claims would had to have been made,

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
100

11:00:45  1  but I didn't know what the specific claims were, and
11:00:47  2  if any of them related to filtration.
11:00:49  3    Q.  Right.  At the moment you got this email,
11:00:51  4  you didn't know; right?
11:00:52  5    A.  Correct.
11:00:54  6    Q.  Can you go to the first exhibit we looked at
11:00:56  7  today?
11:00:58  8    A.

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

| | | |
|---|---|---|
| 11:01:36 | 1 | MR. GOSS:  Object to form. |
| 11:01:36 | 2 | **A.**  I don't know that anybody did or did not do |
| 11:01:39 | 3 | that. |
| 11:01:39 | 4 | **Q.**  I'm not asking if anybody did or didn't. |
| 11:01:41 | 5 | I'm asking:  You had that ability. |
| 11:01:43 | 6 | **A.**  I know how to use a phone, so yes, -- |
| 11:01:43 | 7 | **Q.**  Yeah. |
| 11:01:45 | 8 | **A.**  -- I think I would have been able to do |
| 11:01:47 | 9 | that. |
| 11:01:48 | 10 | **Q.**  And you had a little thing probably next to |
| 11:01:50 | 11 | your phone that gave you some extensions for different |
| 11:01:51 | 12 | people around the company? |
| 11:01:52 | 13 | **A.**  I could look up by name, but yes. |
| 11:01:54 | 14 | **Q.**  Yes.  So there was a way to get in touch |
| 11:01:56 | 15 | with regulatory and ask them this question; right? |
| 11:02:01 | 16 | **A.**  And I knew where he sat, yes. |
| 11:02:05 | 17 | **Q.**  Yes.  Okay. |
| 11:02:05 | 18 | (Interruption by the reporter.) |
| 11:02:06 | 19 | **Q.**  I believe your answer is you "knew where he |
| 11:02:08 | 20 | sat"? |
| 11:02:08 | 21 | **A.**  Yes. |
| 11:02:09 | 22 | **Q.**  At that point y'all had a facility, you are |
| 11:02:14 | 23 | in the same building; right? |
| 11:02:16 | 24 | **A.**  I'm sorry.  Ask it -- Say -- |
| 11:02:16 | 25 | **Q.**  You -- |

| | | |
|---|---|---|
| 11:02:17 | 1 | At the time of this, 2008, you and Dave |
| 11:02:19 | 2 | Westlin are in the same facility. |
| 11:02:21 | 3 | **A.**  Eden Prairie, correct. |
| 11:02:24 | 4 | **Q.**  Okay.  Now in this Exhibit 47 it talks about |
| 11:02:27 | 5 | the filter |



11:07:55 **1**     **Q.**     Okay.  There's some discussion then in this
11:07:58 **2**





STIREWALT & ASSOCIATES
1-800-553-1953   info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
113



11:30:24  14    **A.**    Yes, because what the focus was on was the
11:30:27  15    airflow and delivering the heat to the patient to
11:30:31  16    maintain a normothermia.
11:30:32  17    **Q.**    The focus was on those engineering issues
11:30:35  18    rather than patient safety at that point.
11:30:37  19        MR. GOSS:  Object to form.
11:30:38  20    **A.**    And once again I would not agree with that,
11:30:40  21    because delivering the proper temperature air, having
11:30:44  22    proper overtemperature safety systems, actually
11:30:46  23    keeping people warm, in my mind, does address patient
11:30:51  24    safety.
11:30:53  25    **Q.**    But you'll agree with me that concerns about

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
116

11:30:54  1    particulates in the OR, those concerns involve patient
11:30:59  2    safety and those concerns were not addressed prior to
11:31:01  3    changing this filter.
11:31:05  4        MR. GOSS:  Objection, compound.
11:31:08  5    **A.**    I would answer that by saying at the time
11:31:11  6    that was not front and center as far as what people
11:31:17  7    were concentrating on.  It was one again more the
11:31:21  8    airflow and the temperature delivery.  So it was
11:31:24  9    likely not discussed.
11:31:31  10    **Q.**    So a change of component to a component that
11:31:34  11    was identified in the company's safety claims to the
11:31:36  12    federal government, that component was changed with no
11:31:40  13    testing and no safety verification for airborne
11:31:43  14    contamination.
11:31:44  15        MR. GOSS:  Object to form.
11:31:45  16    **A.**    I am not aware of testing that was done on
11:31:53  17    that, and I guess I would defer to regulatory who'd
11:31:57  18    have to sign off on the ECO to make the change as far
11:32:01  19    as whether any regulatory, you know, requirements
11:32:03  20    needed to be addressed.
11:32:05  21    **Q.**

1-800-553-1953  info@stirewalt.com

11:33:22 20   **Q.**   How would a customer or anybody outside the
11:33:24 21   company even know the efficiency of the filter?  I
11:33:29 22   mean, you didn't; right?
11:33:35 23   **A.**   I don't know how they would know.
11:33:36 24   **Q.**   Yeah.  I mean I guess my question is, if you
11:33:38 25   didn't know what your efficiency on your filter was,

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

---

11:33:41 1   didn't even know what filter it was, the customer
11:33:44 2   certainly isn't going to know that; right?
11:33:46 3   **A.**   Wel I would characterize it --
11:33:46 4   MR. GOSS:  Object to form.
11:33:47 5   THE WITNESS:  Sorry.
11:33:47 6   **A.**   Well I would characterize it as saying not
11:33:50 7   recalling what it was, but maybe -- not necessarily
11:33:51 8   not knowing what it was.
11:33:56 9   **Q.**   Okay.  But the customer has no reason to
11:33:58 10   know that; right?
11:34:01 11   **A.**   Unless they asked, yeah.
11:34:03 12   **Q.**   Right.
11:34:04 13   **A.**   They would go off the manual which says .2
11:34:06 14   micron high-efficiency filter or whatever the manual
11:34:10 15   says.
11:34:11 16   **Q.**   Because as we discussed before, you tell the
11:34:13 17   public what you think they need to know; right?
11:34:16 18   MR. GOSS:  Objection; form, argumentative.
11:34:19 19   MR. BREWER:  Objection; assumes facts not
11:34:21 20   in evidence, foundation.
11:34:25 21   **A.**   Yeah.  I mean, I guess I would take issue
11:34:27 22   with that characterization.  That's not what I meant
11:34:30 23   to -- meant to imply.  What I tried to communicate
11:34:34 24   earlier is, you know, not trying to drown
11:34:36 25   non-technical people in technical information unless

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

---

11:34:39 1   they ask or we think there's a need to know.  So it
11:34:42 2   wasn't a, you know, intentional try to hide
11:34:45 3   information, it was trying to gauge what would be
11:34:47 4   relevant to their level of education or interest.
11:34:50 5   **Q.**   Well Mr. Zgoda, you do understand in your
11:34:52 6   subsequent years in the country -- I mean, excuse me.
11:34:55 7   You understand, in your subsequent years
11:34:57 8   with the company, that there was intentional decisions
11:34:59 9   made to withhold and intentionally not disclose
11:35:03 10   filtration-level efficiencies in response to direct
11:35:06 11   customer questions.
11:35:07 12   MR. GOSS:  Object to form.
11:35:08 13   **A.**   I have no knowledge of that whatsoever.
11:35:10 14   **Q.**   Okay.  You've never seen documents in this
11:35:13 15   case, in your preparation for this case, in which that
11:35:16 16   occurred?
11:35:17 17   **A.**   Oh, I don't believe so, no.
11:35:19 18   **Q.**   That would not be a good practice; would it?
11:35:22 19   MR. GOSS:  Object to form.
11:35:24 20   **A.**   I don't know how to answer that.
11:35:26 21   **Q.**   Well, okay.  So you -- you did some time
11:35:30 22   supporting these product lines, supported the 750 and
11:35:32 23   the 505 product lines.
11:35:33 24   **A.**   The 750.
11:35:34 25   **Q.**   Okay.  And occasionally engineering

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

---

11:35:35 1   questions would be directed in your direction.
11:35:38 2   **A.**   Engineering questions from who?
11:35:41 3   **Q.**   From anybody.
11:35:42 4   **A.**   Technical questions, yeah.
11:35:44 5   **Q.**   Sure.  So salespeople, for instance, might
11:35:46 6   be dealing with customers --
11:35:46 7   **A.**   Yeah.
11:35:47 8   **Q.**   -- and they may not know exactly how to
11:35:49 9   answer a question; right?
11:35:50 10   **A.**   Correct.
11:35:50 11   **Q.**   And they may come to you and say, Mr. Zgoda,
11:35:53 12   what should I say to this?
11:35:54 13   **A.**   Yes.  That has happened.
11:35:56 14   **Q.**   Okay.  So -- And that's part of your job
11:35:58 15   responsibility.  You need to know how to do that
11:36:00 16   responsibly; correct?
11:36:03 17   **A.**   I would say it would be an uncommunicated
11:36:05 18   expectation, but that would be a reasonable
11:36:08 19   expectation, yeah.
11:36:09 20   **Q.**   And in doing, in fulfilling that job
11:36:11 21   function you have certainly responsibilities, ethical
11:36:14 22   and moral responsibilities as a corporate person to
11:36:16 23   your customers at the end of the day.  You gotta do
11:36:18 24   your job ethically; right?
11:36:20 25   MR. GOSS:  Object to form.

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

121

| | |
|---|---|
| 11:36:21 | 1      MR. BREWER:  Objection, foundation. |

11:36:21  2    A.  I would say everybody has to do their job

11:36:23  3 ethically, not just engineers.

11:36:25  4    Q.  And you need to know how to be able to tell

11:36:27  5 good behavior from bad behavior in your corporate

11:36:29  6 environment; don't you?

11:36:31  7      MR. GOSS:  Objection to form.

11:36:32  8    A.  I would say every company needs to know how

11:36:34  9 to do that, yeah.

11:36:36 10    Q.  Okay.  Let me -- Let me ask you a situation.

11:36:40 11 A salesperson comes to you and says, customer wants to

11:36:40 12 know what the filtration efficiency is, wants to know

11:36:43 13 the specifications, the technical specifications for

11:36:46 14 this filter.  Would it be okay for an engineer in your

11:36:49 15 department to turn around to that salesperson and say:

11:36:51 16 "Don't give it to them?  We do not want to disclose

11:36:55 17 that information."

11:36:55 18      Is that -- Is that an --

11:36:57 19      MR. GOSS:  Objection --

11:36:58 20    Q.  -- okay thing to do to your customers?

11:37:00 21      MR. GOSS:  Objection; form, improper

11:37:02 22 hypothetical.

11:37:03 23      MR. BREWER:  Yeah.  I join in that.

11:37:04 24    A.  I'm sorry.  That always throws me.

11:37:06 25      Can you ask me the question again?

---

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

122

11:37:08  1    Q.  I know it does.  Absolutely.  Unfortunately.

11:37:11  2      I'm trying to ask you if a salesperson came

11:37:13  3 to you and said a customer had a direct inquiry --

11:37:17  4    A.  Umm-hmm.

11:37:17  5    Q.  -- about what the technical specifications

11:37:19  6 of the filter were in terms of efficiency, if one of

11:37:22  7 your engineers told that salesperson:  "Do not tell

11:37:26  8 the customer.  Do not disclose that information.  We

11:37:29  9 don't want to disclose that information."  Would you

11:37:31 10 be okay with your engineer doing that?

11:37:34 11      MR. GOSS:  Same objection.

11:37:35 12    A.  I guess it would depend on the motive as far

11:37:38 13 as why they didn't want to communicate that, if it was

11:37:41 14 some kind of competitive, you know, advantage or

11:37:45 15 something like that.  So I'd need more context as far

11:37:45 16 as the motive for not communicating that.  There are

11:37:48 17 very plausible reasons why you don't want to share

11:37:51 18 technical data with customers in case they are asking

11:37:53 19 on behalf of -- I mean of customers in case they're

11:37:57 20 asking on behalf of competitors.  So I need context.

11:38:00 21    Q.  So there are -- for instance, industrial

11:38:02 22 espionage could be a reason not to disclose

11:38:04 23 information.  You get what I'm saying?

11:38:09 24    A.  If I understand the question.  I mean, if

11:38:11 25 you were -- Personally if I was concerned that a

---

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

123

11:38:14  1 customer was asking on behalf of a competitor and it

11:38:17  2 was information that we didn't want them to have,

11:38:17  3 yeah, I mean, I think that'd be a plausible reason to

11:38:23  4 say, you know, I'm not going to answer at this time

11:38:25  5 why, you know, dig into it deeper.

11:38:27  6    Q.  Yeah.  Okay.  But if a caretaker, clinician

11:38:31  7 is asking and it's reasonably apparent he's doing so

11:38:34  8 to make choices in the kind of care he delivers to his

11:38:36  9 patient, the company has a responsibility to provide

11:38:38 10 responsible information; doesn't it?

11:38:41 11    A.  If you can decipher what their motive is,

11:38:43 12 yeah.  I think get back to being honest as long as

11:38:47 13 it's, once again, information that you don't want to

11:38:49 14 keep private for some competitive reason.

11:38:52 15    Q.  So the policy then could be boiled down to,

11:38:54 16 we generally want to provide customers with the

11:38:56 17 information they request about clinical issues, except

11:39:00 18 if we suspect them of spying on us.

11:39:00 19      MR. GOSS:  Objection to form; foundation,

11:39:03 20 argumentative.

11:39:05 21    A.  I don't think I said that or didn't mean to

11:39:08 22 say that.

11:39:09 23    Q.  Why -- I don't --

11:39:10 24      I'm having trouble understanding why you

11:39:11 25 would ever want to keep your filtration rate a secret.

---

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

124

11:39:15  1 Is that a technical secret that you were told to keep

11:39:17  2 secret, or?

11:39:18  3    A.  I personally was not told, but I was never

11:39:20  4 asked the question.

11:39:21  5    Q.  Okay.  Now going back to the 750 and no

11:39:28  6 complaints about its efficiency.  You remember that

11:39:30  7 being talked about in the test report?

11:39:32  8    A.  Yeah.

11:39:33  9    Q.  And so I guess the understanding is if there

11:39:35 10 had been complaints, then that would be something you

11:39:37 11 would look into.

11:39:40 12    A.  Yeah.  It would have been more of a

11:39:42 13 consideration if we had known that there'd been

11:39:44 14 concerns raised about it.

11:39:46 15    Q.  But until those concerns are raised, that's

11:39:48 16 not on your radar.

11:39:52 17    A.  I would say that's accurate.  Once again,

11:39:55 18 what we really concentrated on was the effectiveness

11:39:57 19 of the heat transfer of the device since we, you know,

11:40:01 20 deliver that as the therapy.  So it was all airflow

11:40:03 21 and safe temperature distribution and fault condition

11:40:09 22 concerns/awareness.

11:40:11 23    Q.  So I guess --

11:40:13 24      I mean I guess the attitude became, if a lot

11:40:16 25 of people get sick or die I'm sure someone well let us

---

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
125

11:40:20  1    know; right?
11:40:20  2           MR. GOSS:  Object to form, --
11:40:21  3    Q.   That's basically where y'all were at?
11:40:21  4           MR. GOSS:  -- argumentative.
11:40:23  5           MR. BREWER:  Objection to the form.
11:40:28  6    A.   I would say that's not accurate.  And not
11:40:29  7    being a person that fields customer comments or
11:40:31  8    complaints, I mean you're asking me about an area that
11:40:34  9    isn't really my sandbox.
11:40:38 10    Q.   Being patient safety.
11:40:40 11           MR. BREWER:  Objection to form.
11:40:42 12    A.   Feedback from customers.
11:40:44 13    Q.   Ahh, okay.
11:40:44 14           So you have other people in the company who
11:40:46 15    rely on collecting information from the customers
11:40:48 16    about maybe what's going on with the product.
11:40:50 17    A.   All feedback, comments, complaints,
11:40:55 18    commendations were supposed to be logged through
11:40:58 19    customer care/customer service, whatever the
11:41:00 20    department was called.
11:41:02 21    Q.   Well what I'm -- guess I'm trying to get at
11:41:04 22    is that the justification in this report that we've
11:41:06 23    been using it on the 750 for years and nobody's
11:41:09 24    complained, doesn't that really mean that those
11:41:12 25    thousands of people who it's been used on were

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
126

11:41:15  1    basically unknowing test subjects?
11:41:17  2           MR. GOSS:  Objection to form; foundation,
11:41:19  3    --
11:41:19  4    Q.   Do you see what I mean by that?
11:41:21  5           MR. GOSS:  -- argumentative.
11:41:22  6           MR. BREWER:  Objection, form.
11:41:23  7    A.   I guess I would disagree with that.  You
11:41:25  8    look at the clinical studies which I'm not keenly
11:41:29  9    aware of, but aware of the general overarching theme
11:41:33 10    that forced-air warming such as Bair Hugger reduces,
11:41:37 11    you know, complications from hypothermia and
11:41:39 12    surgical-site infections and so I think it's just
11:41:41 13    quite the opposite of what you --
11:41:41 14    Q.   Right.  But --
11:41:45 15    A.   -- just implied.
11:41:45 16    Q.   -- there's no clinical studies on
11:41:48 17    contamination and infection regarding the 750 before
11:41:49 18    you put it on the market; is there?
11:41:54 19    A.   Related to the 750?  No.  I mean, I think
11:41:59 20    that would be --
11:42:00 21           Well I would think I would be aware of that,
11:42:02 22    but I guess I'm not aware of any.
11:42:06 23    Q.   Now --
11:42:07 24           And you had no way at this time, when this
11:42:08 25    report was done, you had no way of knowing whether

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
127

11:42:11  1    those changes to the 750 were causing wound infections
11:42:14  2    in the field.  You had no way of knowing that; right?
11:42:18  3           MR. BREWER:  Objection, foundation.
11:42:19  4           MR. GOSS:  Join.
11:42:20  5    A.   I personally --
11:42:25  6           It's plausible I personally wouldn't be
11:42:27  7    aware of that information.
11:42:28  8    Q.   I mean at this point all you knew is that
11:42:30  9    nobody was complaining in terms of that subject.
11:42:34 10           MR. GOSS:  Objection, foundation.
11:42:35 11    A.   I was --
11:42:36 12           All I was aware of was that I wasn't
11:42:38 13    personally aware of anybody complaining about that.
11:42:41 14    Q.   Okay.
11:42:41 15    A.   It had not been brought to my attention.
11:42:45 16    Q.   You'll agree with me that if the company
11:42:48 17    wanted to use reduced filtration in the 505 with its
11:42:53 18    federal clearance, you would need to prove that that
11:42:56 19    reduced filtration was still safe.  That was the
11:42:58 20    company's responsibility.
11:43:03 21           MR. BREWER:  Objection, foundation.
11:43:06 22    A.   Yeah.  Going back to, you know, not knowing
11:43:08 23    what was in the regulatory filings, I wouldn't --
11:43:15 24    didn't know that that was an item that should have
11:43:18 25    been addressed.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
128

11:43:20  1    Q.   That somehow didn't appear on your list.
11:43:23  2    Remember we were talking about that checklist of
11:43:25  3    safety testing that had to be done?  That didn't
11:43:27  4    appear on your list.
11:43:29  5    A.   There would have been no checklist for a
11:43:32  6    design change like that, but yeah.  I mean, checking
11:43:34  7    for, however you phrased it, you know, particle counts
11:43:40  8    in the OR was not on my radar for testing as far as
11:43:45  9    design changes go.
11:43:46 10    Q.   Well you remember when we talked about if
11:43:47 11    there's anything in the product that changes that
11:43:50 12    could affect the safety assurances made in the
11:43:52 13    government's filing that that needs verification and
11:43:55 14    validation; right?
11:43:57 15    A.   I recall us discussing that.
11:43:58 16

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

129

11:44:31 1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
11:44:33 2     **Q.**   So regulatory's supposed to do that
11:44:36 3 engineering, it's supposed to know that from an
11:44:38 4 engineering standpoint.  It's not --
11:44:40 5     **A.**   I didn't say that, no.  I mean, they'd know
11:44:42 6 what the --
11:44:42 7         They would sign off on what the change was
11:44:44 8 to the filter, and it would be up to them to assess
11:44:46 9 the ramifications of that.
11:44:47 10     **Q.**   And they'd get the engineering details from
11:44:51 11 you and your department.
11:44:52 12     **A.**   They -- Yeah.  I mean, that -- we would be
11:44:56 13 the source of it.
11:44:56 14     **Q.**   And if we look back at the discussion
11:45:00 15 between Mr. Eickhoff and Mr. Scott, --
11:45:03 16     **A**

131

11:48:22 1     **Q.**   All right.  This exhibit, Exhibit 49 here,
11:48:29 2 is a



11:45:43 5         (Discussion off the stenographic record.)
11:45:43 6     **Q.**   Now in dealing with the regulatory
11:45:46 7 department sometimes it would require a collaborative
11:45:50 8 effort.  R&D needs to work hand in hand with
11:45:54 9 regulatory at certain points in the company.
11:45:56 10     **A.**   I'd say that's accurate.
11:45:57 11     **Q.**   There are things that regulatory knows that
11:45:57 12 R&D and engineering doesn't know, and there are things
11:46:01 13 that engineering knows --
11:46:01 14         (Interruption by the reporter.)
11:46:02 15     **Q.**   There are things that R&D knows that
11:46:05 16 regulatory doesn't know, and there are things that
11:46:07 17 regulatory knows that R&D doesn't know.
11:46:10 18     **A.**   Correct.
11:46:10 19     **Q.**

11:50:50 25 don't recall ever having heard that in the course of

STIREWALT & ASSOCIATES
1-800-553-1953   info@stirewalt.com
1-800-553-1953   info@stirewalt.com
03/01/2017 09:51:23 AM          Page 129 to 132 of 238          33 of 61 sheets

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

133



Q.   Okay.  But you understood the drop in the
efficiency might have patient-safety consequences.

A.   I think what I said earlier is no, I did not

STIREWALT & ASSOCIATES
1-800-553-1953   info@stirewalt.com

---

y.

11:53:45  11      Q.   Do you recall if you told Dave Westlin that
11:53:47  12   you changed the filter efficiency?
11:53:50  13      A.   I don't recall a specific discussion about
11:53:52  14   changing it, but regulatory signs off on all
11:53:56  15   engineering change orders and so they would have been
11:53:58  16   aware of the design change during the normal sign-off
11:54:01  17   procedure or process.
11:54:02  18      Q.   Okay.  So they would have perhaps been aware
11:54:05  19   of that report approving the change, in other words.
11:54:08  20   That's something they would need to see in regulatory.
11:54:10  21   Would you agree with that?
11:54:12  22      A.   It would have been available for their
11:54:13  23   review if they had so asked, and it would likely -- it
11:54:18  24   would have been referenced on the ECO form.
11:54:21  25      Q.   Okay.  I want to talk a little bit --

STIREWALT & ASSOCIATES
1-800-553-1953   info@stirewalt.com

---

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

134

11:52:06  1   understand that or comprehend that.  It was -- We were
11:52:10  2   focusing on the airflow output of the device and the
11:52:13  3   temperatures of the device.
11:52:14  4      Q.   That's not something you learned until much
11:52:15  5   later; correct?
11:52:17  6      MR. GOSS:  Object to form.
11:52:18  7      MR. BREWER:  Objection, foundation.
11:52:23  8      A.   I guess if that argument were to be true, I
11:52:26  9   was not made aware of it until later on, the concept
11:52:30  10   or the -- yeah, the concept was not raised with me
11:52:33  11   until later on.
11:52:36  12      Q.

---

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

136

11:54:23  1      There's been a couple mentions that you've
11:54:25  2   been making that the reduction in filtration doesn't
11:54:29  3   really concern you because of your understanding of
11:54:31  4   bacteria.
11:54:32  5      Do you remember those references you made?
11:54:34  6      A.   I recall making comments, and so what I've
11:54:37  7   tried to articulate is that, you know, these -- these
11:54:40  8   efficiency numbers that you were calling low at .2
11:54:42  9   micron are sizes that are much smaller than normal
11:54:46  10   bacteria sizes, and given the fact that efficiency in
11:54:50  11   filters and -- you know, it's parabolic, it increases
11:54:54  12   as particle size changes, the efficiency at .2 micron,
11:54:58  13   based on my understanding, may not necessarily be
11:55:01  14   relevant when it comes to the size of bacteria and
11:55:06  15   their carriers.
11:55:08  16      Q.   What training do you have in the size of
11:55:09  17   bacteria and their carriers?
11:55:11  18      A.   No formal training.
11:55:15  19      Q.   But you were making decisions about the
11:55:18  20   safety of the patients based on your understanding of
11:55:21  21   bacteria and its relationship to the filter?
11:55:22  22      A.   Going back at that time once again, the --
11:55:27  23   that was not front and center in our
11:55:31  24   decision-making process, it was the temperature and
11:55:33  25   airflow.  It was only after-the-fact that I became

STIREWALT & ASSOCIATES
1-800-553-1953   info@stirewalt.com

---

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
137

1    aware of that and the particle sizes, --

2    Q.    That --

3    A.    -- that the bacteria was bigger than .2

4    micron.

5    Q.    So in other words, when the people

6    developing the 505 developed it, and we see from the

7    federal clearance that they considered the possibility

8    of airborne contamination and its mitigation through a

9    filter, you're telling me that that is not really what

10   was in front of you when you were developing your

11   product.

12        MR. GOSS:    Objection, form.

13   A.    I can say that it was not front and center

14   when I developed the product.  I -- I wasn't around

15   when the 505 was developed and so I don't know how

16   important or prevalent it was.

17   Q.    When you --

18        When you made the change to the filter,

19   either for the 750 or the 505, even as late as 2008,

20   you and your engineers did not know how much bacteria

21   could be allowed to pass through that filter without

22   it being dangerous.  Correct?

23        MR. GOSS:    Object to form.

24   A.    Yeah.  We did not perform testing as far as

25   particle count or bacteria count through the filter.

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
138

1    Q.    Yeah.  I mean, I'm saying regardless of all

2    the testing you didn't do, at the end of the day you

3    did not know how much bacteria could be allowed to

4    pass through the filter and it not be dangerous.

5         MR. GOSS:    Objection.

6    Q.    You didn't know that.

7    A.    I personally did not, no.

8    Q.    And you were making changes to the filter's

9    efficiency without that key piece of information.

10        MR. GOSS:    Objection --

11   Q.    You agree with me on that?

12        MR. GOSS:    Objection to form.

13   A.    I would contend that I didn't make the

14   change.  I was, you know, cc'd on it.  But I -- You

15   know, it wasn't my personal decision to make that

16   change so I can't say definitively that nobody else on

17   the team was aware of that or knew about that or

18   considered that.

19   Q.    I notice that --

20        Are you speaking now, and let me make sure I

21   have it clear, because there's two filter changes.

22   A.    Umm-hmm.

23   Q.    There's the change in roughly 2000/2002

24   where the 750 is introduced and there's a new filter

25   put on the 750.  Okay?

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
139

1    A.    Correct.

2    Q.    At the end of the day if I have to put the

3    buck on somebody' desk, that's your desk that that

4    changed under; right?

5         MR. BREWER:    Objection, foundation.

6    A.    I'm not sure the buck is on anybody's desk,

7    any individual's desk in that regard.

8    Q.    So nobody has responsibility at the end of

9    the day, or accountability for changing that filter.

10   If I'm looking for the person who's accountable for

11   changing that filter and making it happen, approving

12   it and giving -- That person does not exist.

13        MR. GOSS:    Objection, mischaracterizes.

14   A.    I would say that it didn't rely solely on

15   one single individual.

16   Q.    Okay.  If I'm CEO and I want to come find

17   out, hey, I know there's been a filter change, I want

18   to find out why it was done and what was done to make

19   sure it was safe.  And I come to you and I say, Mr.

20   Zgoda, where can I get that information; who's going

21   to tell me?  Is your answer to me, I don't know,

22   you're going to have to go talk to everybody?

23   A.    It would depe --

24        MR. GOSS:    Objection, argumentative.

25   A.    It would depend on where you're at in the

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
140

1    development process or support process, but it boils

2    down to the team that supports or develops projects --

3    products being responsible for the --

4    Q.    How many members on your team?

5    A.    Well it depends on whether it's development

6    or ongoing support, but typically it's a

7    cross-functional team represented by every part of the

8    functional organization; purchasing, marketing,

9    engineering, manufacturing, quality, regulatory.

10   Q.    Dozens of people.

11   A.    I'd say less than a dozen people but, you

12   know, somewhere between 6 and 10.

13   Q.    Okay.  So if I'm CEO and I came to you with

14   that question I have to go talk to all those people to

15   get an answer.  There's not a person who's accountable

16   at the end of the day who can give me that

17   information.

18   A.    I'm not sure there's a case of it being one

19   indi -- being any single individual for any particular

20   case.  I mean, it may be somebody different depending

21   on the change.

22   Q.    Okay.  I want to get back to this issue of

23   an unknown amount of material passing through the

24   filter and whether or not you could say it was

25   dangerous or not.

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

141

| | | |
|---|---|---|
| 11:59:54 | 1 | Would you agree with me that past the |
| 11:59:57 | 2 | development stage in 2008 you could not state how much |
| 12:00:01 | 3 | bacteria could be allowed through the filter and it |
| 12:00:03 | 4 | not be dangerous? |
| 12:00:05 | 5 | MR. GOSS:  Objection, asked and answered. |
| 12:00:09 | 6 | A.  I think what I said is I personally could |
| 12:00:16 | 7 | not answer that. |
| 12:00:16 | 8 | Q.  And that's -- So what I'm basically going to |
| 12:00:16 | 9 | -- |
| 12:00:19 | 10 | That's true both at the time of the 750 |
| 12:00:21 | 11 | development in around 2000, and that's also true in |
| 12:00:24 | 12 | 2008. |
| 12:00:29 | 13 | A.  For me, yes.  Whether that -- Whether that |
| 12:00:29 | 14 | knowledge existed somewhere else or not, I -- I don't |
| 12:00:31 | 15 | know. |
| 12:00:32 | 16 | Q.  Well you tried to get that knowledge, didn't |
| 12:00:33 | 17 | you?  You attempted to find out the answer to that |
| 12:00:37 | 18 | question during your time with the company. |
| 12:00:41 | 19 | A.  I don't -- I don't know what you're |
| 12:00:44 | 20 | referring to.  I -- |
| 12:00:45 | 21 | Q.  Okay. |
| 12:00:47 | 22 | A.  I don't think so, me personally. |
| 12:00:48 | 23 | Q.  Okay. |
| 12:01:06 | 24 | (Exhibit 289 marked for identification.) |
| 12:01:06 | 25 | BY MR. BANKSTON: |

STIREWALT & ASSOCIATES
1-800-553-1953   info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

142

| | | |
|---|---|---|
| 12:01:08 | 1 | Q. |



STIREWALT & ASSOCIATES
1-800-553-1953   info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

145

12:04:26 14 participated in that or done that and so, no, I had no
12:04:29 15 knowledge of that.
12:04:33 16     Q.   Let's talk about one more document and then
12:04:35 17 we'll go to lunch.
12:04:35 18     A.   Okay.
12:04:37 19     Q.   I think we're around a good time to do that.
12:04:39 20 So let's talk about one more.
12:04:39 21          (Discussion off the stenographic record.)
12:04:47 22     Q.   Now one of the things with the filter over
12:04:50 23 the years has been there's been a recommendation for a
12:04:52 24 filter change interval.  You know what I mean by that?
12:04:55 25     A.   Yes.

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

146

12:04:56 1     Q.   Okay.  And that has been debated a bit
12:04:58 2 within the company.  You'd agree?
12:05:00 3     A.   Yes, I'd agree with that.
12:05:02 4

12:07:04 4          --
              Sitting here today, do you think you did
12:07:05 5 that at some point during a part of the development
12:07:07 6 period?
12:07:08 7     A.   I personally did not, no.
12:07:09 8     Q.   Okay.  So any verification that has been
12:07:12 9 done, any testing that's been done on the unit with
12:07:15 10 respect to its filter, was done on new units; right?
12:07:25 11    A.   Yeah.  That's the only testing I'm aware of.
12:07:27 12 I can't exclude the fact that testing wouldn't have
12:07:29 13 been done on a unit that was returned from the field,
12:07:32 14 but I don't -- I don't personally re -- I'm not
12:07:33 15 personally aware of any testing like blower curves
12:07:42 16 that would have been done on those.
12:07:43 17    Q.   Do you think --
12:07:43 18         (Interruption by the reporter.)
12:07:44 19    Q.   Do you think, sitting here today, that any
12:07:46 20 point subsequent to 2009 you ever ordered this testing
12:07:49 21 to be conducted?
12:07:53 22    A.   I don't -- I don't believe I requested that
12:07:56 23 or was involved in any testing similar to that, no.
12:08:00 24    Q.   Okay.
12:08:00 25    A.   And I think the logic for me was that, you

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
149

12:08:04  1   know, as filters get clogged they only get more
12:08:06  2   efficient, they trap more particulate and so the
12:08:09  3   interest would have been in is, you know, the filter
12:08:11  4   so occluded that it affects the temperature
12:08:13  5   performance of the device or the airflow out of the
12:08:14  6   device.
12:08:16  7        Q.   What testing are you relying on to say that?
12:08:19  8        A.   Just general knowledge obtained about
12:08:22  9   filtration, and that as you get more particulates in
12:08:24  10  it you basically occlude the airflow path so they get
12:08:28  11  more restrictive.
12:08:29  12       Q.   Okay.  And do you know if that has any
12:08:31  13  effect, the occlusion of material on the filter, do
12:08:34  14  you know if that has any effect on the integrity of
12:08:37  15  the filter substrate or medium?  Do you know that
12:08:40  16  sitting here today?
12:08:41  17       A.   Not definitively, no.
12:08:42  18       Q.   Okay.  In other words, if I put foreign
12:08:44  19  particles, possibly consisting of biological
12:08:46  20  materials, onto that filter and let them sit there for
12:08:49  21  months at a time, do you have any knowledge about
12:08:51  22  whether that will break down the filter consistency or
12:08:53  23  its fibrous construction?
12:08:55  24       A.   I have no knowledge of that.
12:08:56  25       Q.   And then if we were to test a unit under the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
150

12:08:59  1   way Mr. Poppen's describing, we would have a better
12:09:01  2   understanding of that issue, wouldn't we?
12:09:05  3        MR. GOSS:  Object to form.
12:09:08  4        A.   I guess I'm not sure I would agree with that
12:09:10  5   because when you're -- if you want to run a unit for
12:09:13  6   that amount of time, we have -- we would have a hard
12:09:16  7   time recreating the environment used and actual
12:09:19  8   facilities.  So taking and putting it on a bench in a
12:09:21  9   lab may not be indicative of what you would get in a
12:09:26  10  a -- an account.
12:09:27  11       Q.   Say an operating room, for example; right?
12:09:29  12       A.   Correct.
12:09:29  13       Q.   Because what's going on in an operating room
12:09:32  14  is a little different than, say, what's going on in
12:09:34  15  this room.
12:09:35  16       A.   Correct.
12:09:35  17       Q.   And you would agree that there are materials
12:09:37  18  in an operating room, biological materials that are
12:09:39  19  probably not present in the same amount that they are
12:09:41  20  in other environments.
12:09:44  21       MR. GOSS:  Object to form.
12:09:45  22       MR. BREWER:  Objection, foundation.
12:09:47  23       A.   I don't know.  I couldn't comment on that.
12:09:48  24  I mean, I know there's bacteria everywhere, but as far
12:09:51  25  as the amounts in an operating room, I don't know.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
151

12:09:53  1        Q.   Okay.
12:09:55  2        MR. BANKSTON:  Let's go ahead and take a
12:09:58  3   break for lunch, then.  I think it's a good spot.
12:10:01  4        THE WITNESS:  Okay.
12:10:02  5        THE REPORTER:  Off the record, please.
12:10:03  6        (Luncheon recess taken at
            7        approximately 12:10 p.m.)
            8
            9
            10
            11
            12
            13
            14
            15
            16
            17
            18
            19
            20
            21
            22
            23
            24
            25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
152

          1        AFTERNOON SESSION
          2        (Deposition reconvened at
          3        approximately 1:06 p.m.)
          4   BY MR. BANKSTON:
13:06:09  5        Q.   All right.  Mr. Zgoda, we've had a lunch
13:06:11  6   break and now we're going to move to a little bit of a
13:06:14  7   different topic, okay?
13:06:16  8        A.   Okay.
13:06:16  9        Q.   We've been talking quite a bit today about
13:06:18  10  the M20 filter, and the transition to the M20 filter.
13:06:23  11  You knew that after the implementation of the lower
13:06:28  12  efficiency M20 filter that the company was receiving
13:06:33  13  numerous reports from the field and in the published
13:06:36  14  literature showing bacterial growth in Bair Hugger
13:06:40  15  units beyond the filter.
13:06:42  16       MR. GOSS:  Object to form.
13:06:45  17       A.   I was only partially aware of hallway
13:06:50  18  conversations where Scott supposedly did some
13:06:54  19  swabbing, but no, I wouldn't say I was aware of
13:06:57  20  numerous reports or complaints.  I was never informed
13:07:00  21  of that.
13:07:00  22       Q.   Who did the swabbing?
13:07:02  23       A.   Scott Augustine is what I was told.
13:07:03  24       Q.   Oh, okay.
13:07:04  25       So in terms of reports of bacterial growth

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

153

13:07:08  1  in the Bair Hugger units, do you, sitting here today,
13:07:11  2  know if people other than Scott Augustine had reported
13:07:13  3  that to the company?
13:07:15  4      MR. GOSS:  Object to form.
13:07:16  5      A.  I'm not aware of that one way or the other.
13:07:18  6  I was -- It was not mentioned to me.
13:07:20  7      Q.  Certainly you knew that in the years
13:07:24  8  following the implementation of that filter, the
13:07:27  9  company was struggling to battle certain perceptions
13:07:30 10  in the marketplace relating to infection and
13:07:33 11  contamination.
13:07:35 12      A.  My take on it was I knew -- excuse me -- you
13:07:39 13  know, I knew Scott was creating, you know, allegations
13:07:43 14  and as a company we were, you know, responding to what
13:07:46 15  he was -- what he was saying.
13:07:48 16      Q.  So I take it at that time you weren't aware
13:07:50 17  of independent published literature on these subjects.
13:07:53 18      A.  Correct.  I'm not aware of any literature
13:07:56 19  really related to that.
13:07:57 20  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
         21  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
         22  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
         23  ▮▮▮
13:08:07 24      A.  Yes.  I worked on that.
13:08:09 25      Q.  And you were one of four people at the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

154

13:08:11  1  company who went to California to work with IDEO.
13:08:16  2      A.  Correct.
13:08:16  3      Q.  And those four people would be the CEO, Gary
13:08:18  4  Maharaj.  That would be one; right?
13:08:21  5      A.  I recall Gary being there, yep.
13:08:23  6      Q.  Do you remember the vice president, Ms.
13:08:24  7  Woodwick-Sides, going to that?
13:08:26  8      A.  Yeah.  I think it was her, Gary, Gary and
13:08:29  9  myself, but.
13:08:30 10      Q.  And "Gary" being the director of R&D.
13:08:32 11      A.  Sorry.  Gary Hansen, yes.
13:08:34 12      Q.  Okay.  And Gary Hansen, director of R&D.
13:08:35 13  And then you were the final member of that team as the
13:08:38 14  engineer who went to those meetings; correct?
13:08:41 15      A.  I mean, I will take your word for it.  I
13:08:43 16  know I was there and I know they were there.  Whether
13:08:45 17  that was the entire group, I just don't recall.
13:08:48 18      Q.  Okay.  Now one of the things that you've
13:08:49 19  been paid by the lawyers in this case for is your
13:08:53 20  knowledge relating to Project Ducky; correct?
13:08:55 21      MR. GOSS:  Object to form.
13:08:57 22      MR. BREWER:  Objection.
13:08:57 23      A.  I would say I was paid for my time to go
13:09:00 24  through the documents, but I'm not sure I was paid for
13:09:02 25  my knowledge.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

155

13:09:08  1      Q.  So I want to go back to your Johnson
13:09:10  2  deposition.
13:09:11  3      A.  Okay.
13:09:13  4      Q.  And do you remember being asked about what
13:09:15  5  type of consulting you were doing, and telling that it
13:09:18  6  was relating to the 750 development effort and Project
13:09:21  7  Ducky.  Those are the things you consulted on;
13:09:23  8  correct?
13:09:26  9      A.  If that's what I said, that's what I said.
13:09:28 10  And those were the documents or the areas of focus on
13:09:31 11  the information that we reviewed for the previous
13:09:34 12  depositions --
13:09:34 13      Q.  Okay.
13:09:34 14      A.  -- if that's the same thing.
13:09:38 15      Q.  Now when you began --
13:09:40 16  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
13:09:43 17  the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
         18  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
         19  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
         20  ▮▮▮
         21  ▮▮▮
         22  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
         23  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
13:10:00 24      MR. GOSS:  Object to form, foundation.
13:10:05 25      MR. BREWER:  Objection, foundation.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

156

13:10:06  1      A.  Yeah.  See I'm not sure I'd characterize it
13:10:10  2  that way.  I wasn't -- I wasn't privy to discussions
13:10:13  3  of that if that were the case.
13:10:16  4      Q.  Okay.
13:10:16  5      A.  You know, I was brought into the project,
13:10:18  6  didn't initiate it.
13:10:20  7      Q.  Who brought you in?
13:10:23  8      A.  I mean, it would have been Gary, Teri or
13:10:26  9  Gary.  I don't remember who initially broached the
13:10:28 10  subject to me, but it likely would have been one of
13:10:30 11  those three.
13:10:31 12      Q.  Okay.
13:11:18 13      (Discussion off the stenographic record.)
13:11:18 14      (Exhibit 291 marked for identification.)
13:11:18 15  BY MR. BANKSTON:
13:11:19 16      Q.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
13:11:22 17  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
         18  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
         19  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
         20  ▮▮▮
         21  ▮▮▮
         22  ▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
         23  ▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
         24  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ I";
13:11:43 25  correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

157



13:15:05  4   into the MERV standards because whatever I knew about
13:15:08  5   the MERV standards I definitely don't remember.
13:15:11  6        Q.   Okay.  And that's --
13:15:12  7             You've gained no greater recollection of
13:15:14  8   that between your 70 hours of preparation?
13:15:16  9        A.   No.  My recollection is that Gary Hansen did
13:15:18 10   most of the MERV calculations, or not really
13:15:20 11   calculations, but investigation.
13:15:22 12        Q.   Well you were --
13:15:23 13        A.   I was more, you know, getting prototypes,
13:15:25 14   getting them tested, stuff like that.
13:15:28 15        Q.   You are aware, though, that the M20 filter
13:15:32 16   does not have a dust spot efficiency of greater than
13:15:35 17   95 percent.
13:15:36 18             MR. GOSS:  Objection to form, foundation.
13:15:38 19        A.   Well once again I don't know that because I
13:15:40 20   don't know what "dust spot efficiency" means.
13:15:44 21        Q.   For the person making decisions on the
13:15:46 22   filter of the unit, wouldn't it be a good thing if you
13:15:49 23   did know what that meant?
13:15:52 24        A.   Not if it's a phrase I'd never heard before,
13:15:54 25   no.

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

161

| | | |
|---|---|---|
| 13:15:59 | 1 | **Q.** So in your job when you're trying to decide |
| 13:16:01 | 2 | what information you need or don't need, if you run |
| 13:16:03 | 3 | across a phrase you've never seen before that's just |
| 13:16:05 | 4 | something you throw out? |
| 13:16:07 | 5 | MR. GOSS: Object to form. |
| 13:16:08 | 6 | **Q.** I'm trying to understand the reasoning |
| 13:16:09 | 7 | there. |
| 13:16:09 | 8 | **A.** I don't think I said that. |
| 13:16:11 | 9 | **Q.** Okay. So what I'm trying to understand is |
| 13:16:12 | 10 | you didn't think it would be important to know what |
| 13:16:15 | 11 | dust spot efficiency was when making decisions on the |
| 13:16:17 | 12 | filter. Do you agree with that or don't agree with |
| 13:16:19 | 13 | that? |
| 13:16:20 | 14 | MR. GOSS: Object to form. |
| 13:16:20 | 15 | **A.** I guess I disagree with that. I may have |
| 13:16:20 | 16 | known what it meant at the time. I don't know what it |
| 13:16:30 | 17 | means now. All I see is the dust spot... |
| 13:16:30 | 18 | (Interruption by the reporter.) |
| 13:16:31 | 19 | A |



13:24:39  14    **Q.**    I don't want to have to belabor the point,
13:24:41  15  but I want to go specifically to what I was actually
13:24:44  16  asking.
13:24:44  17    **A.**    Okay.
13:24:45  18    **Q.**    Which is that it was possible to develop and
13:24:47  19  implement a HEPA filter that did not sacrifice
13:24:50  20  airflow, that could get you into your airflow target
13:24:53  21  if you were willing to spend the money to do it.
13:24:55  22        MR. GOSS:  Object to form, --
13:24:56  23        MR. BREWER:  Objection, foundation.
13:25:00  24        MR. GOSS:  -- assumes facts.
13:25:01  25    **A.**    I said I don't know that to be fact, because

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

169

13:25:02 **1**   I need to see -- I would need to see performance

13:25:04 **2**   curves as far as where all the numbers ended.

13:25:06 **3**        **Q.**   You sure would.  You're absolutely right.

13:25:06 **4**   Let me --

13:25:14 **5**            (Discussion off the stenographic record.)

13:25:14 **6**        **A.**   And cost did not play into it, just to sort

13:25:17 **7**   of complete your thought.

13:25:18 **8**        **Q.**   What was that? I'm sorry.

13:25:19 **9**        **A.**   Cost did not play into it.  I do not recall,

13:25:22 **10**   it was not a key decision making --

13:25:24 **11**        **Q.**   Stick a pin in that.  We'll come back to it.

13:25:24 **12**            (Exhibit 293 marked for identification.)

13:25:24 **13**   BY MR. BANKSTON:

13:25:48 **14**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

173



**11**  **Q.**  Because a fabrication can take investment to
**12**  make it work.  You have to buy certain things or put
**13**  money into certain things to get a result out;
**14**  correct?
**15**  **A.**  Yeah.  I mean if you're creating a plastic
**16**  part that's custom to your application, somebody has
**17**  to shoot that part for you so there's tooling costs
**18**  associated with it that are outside the cost of
**19**  actually building the part.
**20**  **Q.**  All right.  And when the company found out
**21**  that cost, the company chose not to do it; right?
**22**  MR. GOSS:  Object to form.
**23**  **A.**  I don't think I'd agree with that.
**24**  **Q.**  Well you would agree that a HEPA filter with
**25**  good airflow like this M03, this prototyped M03 with

STIREWALT & ASSOCIATES
1-800-553-1953   info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

175

**1**  good airflow, that was going to be more expensive than
**2**  the filter you were using.
**3**  MR. GOSS:  Object to form.
**4**  **A.**  I don't agree nor disagree with that.  I
**5**  don't know the cost of the HEPA media compared to the
**6**  cost of the non-HEPA media.  My assumption is that
**7**  most of it is the labor to assemble and, you know,
**8**  shoot the plastic parts, not necessarily the cost of
**9**  the media.  But I don't have a cost of billed material
**10**  before me.
**11**  **Q.**  You aren't able to disagree with me today
**12**  that the filter being used in the Bair Hugger is a
**13**  cheaper filter.
**14**  MR. GOSS:  Object to form.
**15**  **A.**  I don't know one way or another which filter
**16**  would be less or more expensive.
**17**  **Q.**  Okay.
**18**  (Discussion off the stenographic record.)
**19**  (Exhibit 295 marked for identification.)
**20**  BY MR. BANKSTON:
**21**  **Q.**  Mr. Zgoda, Exhibit 295 is an email --
**22**  (Discussion off the stenographic record.)
**23**  BY MR. BANKSTON:
**24**  **Q.**

TES
1-800-553-1953   info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
177

13:33:40 1   Q.   ████████████████████████
████████████████████████████████
████████████████████████
████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████
████████████████
████████████████████████████████████
████████████████████████████████████████
████████████████████████████████
████
████████████████████████████
████████████████████████████████████
13:34:44 25   that would be with respect to testing that the company

STIREWALT & ASSOCIATES
1-800-553-1953   info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
178

13:34:46 1   has ever conducted; right?  That's your wheelhouse you
13:34:49 2   didn't know about.  And I want to make sure if that
13:34:50 3   answer always applies to independent studies.
13:34:53 4        Do you think, sitting here today, that there
13:34:55 5   are any independent studies that show the current
13:34:56 6   level of filtration in the Bair Hugger is very
13:34:59 7   effective?
13:35:00 8        MR. GOSS:  Same objection.
13:35:02 9   A.   I'm not aware one way or the other if there
13:35:08 10  are independent studies that show that or substantiate
13:35:11 11  it.
13:35:12 12  Q.   Okay.  I want to talk now about as the
13:35:15 13  Project Ducky decision was being made.  We know we
13:35:17 14  started that -- this discussion with some documents
13:35:20 15  from 2008, we talked about 2009, that there were some
13:35:24 16  meetings out in California, and we've also talked
13:35:26 17  about some decision discussions that were being made
13:35:31 18  sort of in the late summer of 2009.
13:35:34 19       Do you remember this?
13:35:34 20  A.   I don't remember the timing, per se, but I
13:35:37 21  remember the project.
13:35:38 22  Q.   It matches up with the documents we've
13:35:39 23  looked at anyway, over that time period.  We're
13:35:42 24  talking about a 2008/2009 time period.
13:35:45 25  A.   Yes.

STIREWALT & ASSOCIATES
1-800-553-1953   info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
179

13:35:45 1   Q.   Okay.  Now after --
13:35:47 2        A few months after the Project Ducky
13:35:49 3   decision, negotiations began on what would ultimately
13:35:53 4   become the sale of Arizant to 3M for almost a billion
13:35:56 5   dollars.  You're aware that occurred?
13:35:59 6   A.   Well obviously I know the sale occurred.
13:36:01 7   I'm not privy to anything related to the timing or the
13:36:05 8   beginning of the negotiations or who was involved in
13:36:07 9   that.  The only time I found about the sale of the
13:36:09 10  company when it was publicly announced by the 3M press
13:36:12 11  release, whatever day that was.
13:36:13 12  Q.   And that was consummated in 2010; correct?
13:36:16 13  A.   That's my recollection.  In September 2010,
13:36:17 14  I think.
13:36:18 15  Q.   Okay.  Well you and Arizant management
13:36:24 16  certainly understood that if the company started
13:36:24 17  making changes to the device that were related to an
13:36:28 18  infection risk, it would cause people to scrutinize
13:36:31 19  the Bair Hugger on that issue more closely.  You
13:36:34 20  understood that; right?
13:36:36 21  A.   I was not privy to anything dealing with the
13:36:39 22  sale and so to say I understood that, I'd say no.
13:36:41 23  Q.   We're not talking about the sale.  I want to
13:36:43 24  move generally to everything.
13:36:46 25  A.   So say it again.

STIREWALT & ASSOCIATES
1-800-553-1953   info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
180

13:36:47 1   Q.   Is that if you and -- you and people at
13:36:49 2   Arizant management knew that if you made changes to
13:36:53 3   the Bair Hugger related to these contamination issues,
13:36:55 4   it would cause people, anybody outside the company, to
13:36:57 5   scrutinize the Bair Hugger more closely on that issue.
13:37:00 6   A.   I was not part of any discussions related to
13:37:05 7   that, and that honestly wasn't on my radar.
13:37:07 8   Q.   But you --
13:37:07 9        I mean again I'm not talking about if you
13:37:10 10  discussed it.  You understood that.  That is not a
13:37:12 11  leap of logic that would have been outside your field
13:37:14 12  of knowledge.  You knew that that would happen.
13:37:17 13  A.   Well --
13:37:17 14       MR. GOSS:  Object to form.
13:37:17 15  A.   -- no.  I mean, I wouldn't say I knew it
13:37:19 16  because I hadn't thought about it or discussed it.
13:37:22 17       If you frame it up now, in hindsight, would
13:37:24 18  that have been logical?  Yeah.  But at the time, no.
13:37:28 19  It wasn't even a thought of mine.
13:37:31 20  Q.   Okay.  Looking back now you could see how
13:37:34 21  people could conclude, if they thought about that
13:37:37 22  issue, that it would cause more scrutiny of the Bair
13:37:39 23  Hugger if you made a bunch of design changes relating
13:37:42 24  to infection.
13:37:42 25  A.   Purely speculative people can, you know,

STIREWALT & ASSOCIATES
1-800-553-1953   info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

181

13:37:46  1  construe whatever they want.

13:37:47  2      Q.   Okay.  I want to talk a little bit now --

13:37:53  3  your career sort of transitioned, now you're a 3M

13:37:56  4  employee after 2010, so I want to move into that time

13:37:59  5  period.

13:37:59  6      A.   Okay.

13:38:00  7      Q.   2010, 2011 sort of getting acclimated to the

13:38:04  8  3M environment.

13:38:05  9      A.   Yeah.

13:38:05 10      Q.   Did you know during that period that Gary

13:38:08 11  Hansen and John Rock were trying to launch a filter

13:38:10 12  improvement project?

13:38:12 13      A.   No.  I don't think I had --

13:38:14 14      Q.   Okay.

13:38:15 15      A.   -- any knowledge of that.

13:38:16 16      Q.   Has any person at 3M ever told you or any of

13:38:19 17  your engineers that you're familiar with that a good

13:38:23 18  idea would be to redesign the Bair Hugger such that it

13:38:26 19  collected its own exhaust and recirculated it back

13:38:29 20  through the system?

13:38:30 21      A.   I'm not familiar with any of that.

13:38:32 22      Q.   Okay.  When you went to 3M in those years,

13:38:35 23  2011 to 2013 or so, did your job change in any

13:38:39 24  fundamental respect?

13:38:44 25      A.   I would say yes.  Any time a small company

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

182

13:38:46  1  is acquired by a bigger company your role tends to

13:38:50  2  change.  You know, I was still part of the Patient

13:38:53  3  Warming Business, which is what the business was

13:38:55  4  called when 3M acquired us, working with generally the

13:38:57  5  same people, but the way 3M was structured is either

13:39:01  6  you're a functional manager or you lead projects, you

13:39:05  7  don't do both like a small company.

13:39:06  8          And so while I had the same reporting --

13:39:09  9  people reporting to me, still worked on patient

13:39:12 10  warming products, I would say my role changed a little

13:39:14 11  bit, yeah, where I was just more of a -- managing a

13:39:17 12  department and less actively involved in managing

13:39:19 13  projects.

13:39:20 14      Q.   Gotcha, okay.

13:39:21 15          But in other words, you hadn't been taken

13:39:23 16  off the Bair Hugger.  You were still providing product

13:39:25 17  support to the Bair Hugger units at that time.

13:39:27 18      A.   I actually spent more time working on fluid

13:39:30 19  warming or temperature monitoring, but it was still

13:39:33 20  part of the core Patient Warming Business, but not

13:39:36 21  really so much forced-air warming.

13:39:39 22      Q.   Gotcha, okay.

13:39:39 23          (Discussion off the stenographic record.)

13:40:03 24          (Exhibit 296 marked for identification.)

13:40:03 25  BY MR. BANKSTON:

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

183

13:40:06  1      Q.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

185



STIREWALT & ASSOCIATES
1-800-553-1953   info@stirewalt.com



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

193



6    MR. BANKSTON:  There we go.  Thanks, Peter.
7  BY MR. BANKSTON:
8        Q.    Let's talk about --
9              Well first of all, when they said that
10  confidentially we are looking to improve the filter.
11  When they say, confidentially to the people on this
12  email reply, have you ever had situations where you're
13  working on a project in engineering but you're keeping
14  it secret from the rest of the company?  Has that ever
15  happened to you?
16        A.    Yes.  You keep it secret from certain parts
17  of the company.
18        Q.    Okay.  In other words, there's such a thing
19  called black projects.  Have you heard that term be
20  thrown around at Arizant or 3M?
21        A.    I have not personally used it myself, but I
22  know what you're talking about, yeah.
23        Q.    Okay.  In fact, did you know --
24

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

196

1

.
4        Q.    Okay.  If someone was to make a claim
5  externally to the company that that filter excluded
6  the vast majority of these .2 micron particles, that
7  wouldn't be an honest claim; correct?
8              MR. GOSS:  Object to form.
9        A.    Based solely on that one curve that you
10  showed me where the number looked like it was slightly
11  sub-50 percent.
12        Q.    Well I don't -- You know, I have that
13  document.  I have it, I've seen it plenty of times.
14              This is my day to talk to you.  And you're
15  the guy who spent all this time on the 750.  You're
16  the -- You're the project lead; correct?
17        A.    Not the one curve that you showed me from
18  2008 or whenever it was.
19        Q.    Sure.  Okay.
20              But what I'm saying, when it came time to
21  put the 750 together and choose a filter for it,
22  you're the project lead of that.
23        A.    Yes.
24        Q.    And since the inception of this lawsuit
25  alleging airborne contamination you've spent 70 hours

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

197

13:54:33 **1** getting ready to come here and testify to me and

13:54:35 **2** answer my questions; correct?

13:54:37 **3**     MR. BREWER:  Objection, misstates the

13:54:39 **4** record.

13:54:41 **5**     **A.**  I've estimated the total of 70 hours of time

13:54:44 **6** spent between the three depositions discussing

13:54:47 **7** documents in the case with various legal counsel.

13:54:50 **8**     **Q.**  And I'm asking you, aside from what I

13:54:53 **9** educated you on today, besides the documents that

13:54:55 **10** you've seen from me, --

13:54:56 **11**     **A.**  Yep.

13:54:57 **12**     **Q.**  -- can you say, if somebody made the claim

13:55:00 **13** external to the company that your filter excludes a

13:55:02 **14** vast majority of .2 micron particles, is that honest

13:55:06 **15** or is it dishonest?

13:55:09 **16**     MR. GOSS:  Object to form.

13:55:10 **17**     **A.**  I wouldn't characterize it as honest or

13:55:13 **18** dishonest because coming into today -- or -- until I

13:55:16 **19** saw that document I don't remember what the efficiency

13:55:17 **20** curve of the M20 media was like.

13:55:24 **21**     **Q.**  Before making that kind of statement, let's

13:55:26 **22** say you're going to make a statement to the public

13:55:28 **23** about excludes the vast majority of .2 micron

13:55:32 **24** particles.  That's the kind of statement that should

13:55:33 **25** be verified with data before it's made to the public;

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

198

13:55:36 **1** correct?

13:55:37 **2**     MR. BREWER:  Objection, foundation.

13:55:41 **3**     **A.**  It would seem prudent.

13:55:51 **4**     (Discussion off the stenographic record.)

13:56:06 **5**     (Exhibit 298 marked for identification.)

13:56:07 **6** BY MR. BANKSTON:

13:56:09 **7**





14:03:12  19    **Q.**   Well you did nothing to validate the effect
14:03:14  20   of the 750 on operating room airflow when you
14:03:17  21   developed it; right?
14:03:19  22    **A.**   That is accurate.
14:03:20  23    **Q.**   Okay.  And so let's go away from your
14:03:22  24   development days to now sitting here in this room in
14:03:25  25   front of this jury.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

205

14:03:27 1      You can now acknowledge that that change
14:03:29 2  that you made in airflow may be a cause of the
14:03:32 3  increased particulate counts being observed in
14:03:34 4  studies.
14:03:35 5      MR. GOSS:  Object to form.
14:03:36 6      MR. BREWER:  Objection, foundation.
14:03:39 7      A.  And I don't think I really have the
14:03:42 8  background in those studies or the testing that was
14:03:43 9  done and how they did it, and so I think any opinion I
14:03:47 10 would interject is not of great value.
14:03:51 11     Q.  If you had to do it over again, if we could
14:03:55 12 turn back the hands of time and go back to developing
14:03:58 13 the 750 again, you'd want to make sure these tests
14:04:00 14 were done; wouldn't you?
14:04:04 15     A.  A lot of things are obvious in hindsight,
14:04:07 16 but given where we're sitting today, yes, it probably
14:04:10 17 would have been prudent to do them.  But they were not
14:04:14 18 on my radar to do, so.
14:04:16 19     Q.  As the person who was responsible for the
14:04:18 20 safety and to make sure at the val -- verification
14:04:20 21 testing had been done, that hadn't --
14:04:21 22     A.  Once again --
14:04:22 23     Q.  I'm sorry.  I gotta finish my question
14:04:25 24 before.  She can only take down one of us at a time.
14:04:27 25     As the person who was being responsible for

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

206

14:04:29 1  the safety and verification testing, you could only
14:04:31 2  verify what had been put on your list to verify;
14:04:33 3  correct?
14:04:34 4      A.  Yes.  I'm sorry.
14:04:35 5      I would say that was accurate.  It was my
14:04:37 6  responsibility to make sure that all the verification
14:04:39 7  testing that was identified by the team was executed
14:04:42 8  satisfactorily.
14:04:42 9      Q.  And if that safety issue wasn't put on your
14:04:45 10 radar by somebody, it wasn't going to get checked.
14:04:50 11     A.  I would say that's likely, yes.
14:04:53 12     Q.  Who should have put it on the list?
14:04:59 13     A.  That would just be conjecture on my part.
14:05:05 14 I'm not sure I could say who would be responsible for
14:05:07 15 that.
14:05:09 16     Q.  I've sat in this room many hours and I've
14:05:12 17 talked to many of your colleagues, and I have been
14:05:14 18 looking for a long time for the person who can tell me
14:05:17 19 who's responsible for getting all of the testing done
14:05:19 20 on the 750, making sure that the right things were
14:05:23 21 tested.  And if there is anything you can tell me
14:05:25 22 today about who that person might have been, is there
14:05:29 23 any information that you can have that can lead me to
14:05:31 24 that right person?
14:05:32 25     MR. GOSS:  Object to the preamble.

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

207

14:05:34 1      MR. BANKSTON:  I'll allow it.
14:05:35 2      MR. BREWER:  Objection, foundation.
14:05:37 3      A.  I'm sorry.  Can you either rephrase it or
14:05:41 4  repeat it based on their objections?
14:05:42 5      Q.  Yeah.
14:05:43 6      I've been hoping for a long time to find out
14:05:45 7  who that person is.  You know what I mean when I say
14:05:47 8  "who that person is."
14:05:49 9      A.  Yep.
14:05:49 10     Q.  Is there anything you can tell that tells me
14:05:51 11 who the person is who should have put that information
14:05:53 12 on the list or should have come up with the things
14:05:55 13 that needed to be tested on the Bair Hugger?
14:05:58 14     A.  I'm not sure who that individual would be,
14:06:01 15 and once again, it's a -- you know, it's a team
14:06:04 16 effort, every department is represented.  As part of
14:06:07 17 the effort we identified whatever testing needed to be
14:06:10 18 done to verify and validate the device, and we did
14:06:12 19 that.
14:06:13 20     Now whether you say it's, you know,
14:06:15 21 regulatory because they knew what was filed with the
14:06:18 22 FDA or, you know, clinical because of the
14:06:21 23 applications.  I'm not equipped to say it was one
14:06:24 24 person.
14:06:26 25     Q.  Sometime after you left 3M someone contacted

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

208

14:06:32 1  you to let you know about the existence of a lawsuit
14:06:36 2  involving the Bair Hugger; right?
14:06:38 3      A.  I don't know about the timing of that.  I
14:06:42 4  don't know if I knew about the existence of the
14:06:44 5  lawsuit before I left or not.
14:06:47 6      Q.  Okay.  I see what you're saying.  Okay.
14:06:49 7      But somewhere in the recent timeframe you
14:06:53 8  were informed that there was a lawsuit with the Bair
14:06:55 9  Hugger.
14:06:55 10     A.  Yes.
14:06:56 11     Q.  Who was that who told you; do you remember?
14:06:59 12     A.  I don't recall.  I think it was somebody
14:07:01 13 internal to 3M and not out of the blue, but I can't
14:07:06 14 say definitively who told me.
14:07:07 15     Q.  Okay.  And at that time you negotiated an
14:07:09 16 agreement with a law firm in which they would pay to
14:07:12 17 act you as their consultant.
14:07:15 18     A.  I had an LCA with --
14:07:18 19     So when I left the company 3M made the law
14:07:24 20 firm available to me as part of the litigation
14:07:28 21 arrangement.
14:07:30 22     Q.  No.  What I'm asking is you negotiated an
14:07:34 23 agreement with a law firm in which that law firm
14:07:36 24 would pay you money to consult with them on the
14:07:38 25 lawsuit.

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

209

14:07:39 1    A.   I negotiated the dollar amount but not -- I
14:07:41 2  didn't negotiate the need for the existence of the
14:07:44 3  LCA.  It was basically proposed and given to me and
14:07:47 4  the only thing that's the subject of negotiation was
14:07:49 5  the dollar amount.
14:07:50 6    Q.   Let's make that then to fit more with what
14:07:53 7  you're saying.  And that is that you executed an
14:07:54 8  agreement with a law firm in which they would pay you
14:07:56 9  to act as their consultant.
14:08:00 10    A.   It might be semantics, but I executed an
14:08:03 11  agreement to meet with them to discuss the specifics
14:08:05 12  of the case under what was called an LCA.  And so
14:08:10 13  whether the term "consultant" is what I, you know,
14:08:13 14  thought or inferred, I don't know.  But yes, I signed
14:08:16 15  an agreement with them to meet with them and be
14:08:16 16  compensated for my time as we discussed specifics of
14:08:21 17  the case.
14:08:24 18    Q.   You testified regarding these matters on two
14:08:26 19  prior occasions; right?
14:08:27 20    A.   I believe so, yes.
14:08:27 21    Q.   The first time you testified you received
14:08:30 22  $150 an hour for your services to the defendants' law
14:08:34 23  firm.
14:08:34 24    A.   I believe that to be accurate, and I'll take
14:08:36 25  your word that that's actually what's in there.

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

210

14:08:38 1    Q.   Okay.  Then you testified a second time, and
14:08:41 2  the second time you asked for $300 an hour to keep
14:08:44 3  doing it.
14:08:45 4    A.   I believe that's what I asked for.  I know
14:08:50 5  that's not what we settled on.  I think it was two
14:08:54 6  hun -- I don't remember the dollar amount.
14:08:55 7    Q.   Okay.  And I believe, when asked about how
14:08:57 8  you got to that 300 figure you said you were aware of
14:09:01 9  people who had been medical device consultants who had
14:09:04 10  been paid $200 an hour before.  You knew that that was
14:09:07 11  something that had happened.
14:09:08 12    A.   What I recall saying is that the first $150
14:09:11 13  was based on my experience as far as what I paid
14:09:15 14  consultants or contractors to work in the medical
14:09:17 15  device industry, but given the fact that I was in a
14:09:19 16  new job, I was more deeply integrated into it, I was
14:09:22 17  more important to it and my time was at more of a
14:09:27 18  premium, I felt that my time was of more value to me.
14:09:31 19    Q.   Okay.  So let me make this clear at the time
14:09:33 20  you asked for that $300 an hour.  At that time you did
14:09:36 21  not make $200 an hour.
14:09:38 22    A.   Myself?
14:09:39 23    Q.   You, yourself.
14:09:40 24    A.   Correct.
14:09:41 25    Q.   Okay.  But you had known of people that you

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

211

14:09:43 1  had paid $200 an hour to do medical device consulting.
14:09:47 2    A.   Hundred and fifty to 200, yeah.
14:09:49 3    Q.   So you just took that and added an extra
14:09:53 4  hundred and hundred and fifty above it and that was
14:09:53 5  your figure, 300.
14:09:54 6    A.   It was part of the negotiations, yes.
14:09:56 7    Q.   And 300, you asked for that not because it
14:09:59 8  has a direct relationship to your actual pay.
14:10:03 9    A.   Correct.
14:10:04 10    Q.   You wanted them to give you something more
14:10:06 11  than what your usual salary would be.
14:10:11 12    A.   I wanted them to give me more than they had
14:10:13 13  given me previously because I felt my time was more
14:10:16 14  valuable.
14:10:16 15    Q.   If you had not been --
14:10:16 16    A.   More -- Sorry.
14:10:17 17    It was more of an inconvenience to me to --
14:10:19 18  to spend the time discussing the case.
14:10:22 19    Q.   So you were going to need a financial
14:10:24 20  incentive in order to balance out that inconvenience.
14:10:29 21    MR. BREWER:  Object.  I think it misstates
14:10:31 22  the testimony.
14:10:33 23    A.   I had more time to make up so it was a
14:10:36 24  greater inconvenience to make to accommodate them
14:10:39 25  and so, yeah, I thought my time was worth more than it

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

212

14:10:44 1  was previously.
14:10:45 2    Q.   Okay.  So the purpose of this additional
14:10:47 3  financial inducement is to make up for the additional
14:10:51 4  inconvenience that you would have in your new
14:10:52 5  position?
14:10:55 6    A.   Yes, because I had a day job I had to, you
14:10:58 7  know, continue to do.
14:10:59 8    Q.   If you had not been offered these payments
14:11:01 9  it is quite likely you would have not met with these
14:11:04 10  lawyers and talked to them about testimony.
14:11:06 11    A.   I don't think that's accurate.  I may not
14:11:09 12  have spent as much time as I did, but I held no
14:11:13 13  animosity to 3M, and so I -- I probably wouldn't have
14:11:18 14  -- I mean I wouldn't have cut them off entirely, but
14:11:20 15  I'm not sure I would have spent as much time as I did,
14:11:24 16  given the compensation at the time.
14:11:26 17    Q.   Well I want to remember back last year when
14:11:28 18  you testified in the Johnson matter.
14:11:29 19    Do you remember saying that if you had not
14:11:32 20  been offered these payments, it's quite likely you
14:11:36 21  would not have met with these lawyers and helped them
14:11:38 22  with this testimony?
14:11:39 23    A.   I don't recall saying that.
14:11:40 24    Q.   Okay.  Let me show you something really
14:11:42 25  quick.  Okay.  Let's --

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
213

14:11:50 **1** Oh, you have a copy in front of you.  That's
14:11:52 **2** right.
14:11:52 **3** **A.**   Okay.
14:11:52 **4** **Q.**   So what I'd like you to do is you'll see
14:11:54 **5** that there are pages here.  If you can go to 107.
14:11:58 **6** **A.**   I'm sorry, hundred?
14:12:00 **7** **Q.**   Hundred and seven.
14:12:03 **8** **A.**   Okay.
14:12:04 **9** **Q.**   And at 107 I'd like you to start at line 16.
14:12:08 **10** Do you see line 16 on 107?
14:12:10 **11** **A.**   Yes.
14:12:10 **12** **Q.**   And the question that was posed to you:
14:12:13 **13** "Would you have consulted for
14:12:14 **14** Greenberg Traurig for no fee?"
14:12:17 **15** And your answer was:
14:12:18 **16** "I would have been here... -- I
14:12:20 **17** would have been here today at the
14:12:21 **18** deposition for no fee, but it's
14:12:24 **19** quite likely I would have not met
14:12:25 **20** with them nor spent the time
14:12:27 **21** reviewing the documents."
14:12:28 **22** You stand by that testimony today; right?
14:12:32 **23** **A.**   I stand by the fact that apparently I said
14:12:34 **24** that at my last deposition, yes.
14:12:36 **25** **Q.**   What does that mean?  Does that mean that's

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
214

14:12:38 **1** not --
14:12:38 **2** What about my question, though?  Do you
14:12:40 **3** stand by the testimony?
14:12:47 **4** **A.**   I think what I said today is probably more
14:12:49 **5** likely the correct answer for lack of a -- for lack of
14:12:52 **6** a better phrase of, I mean I definitely wouldn't have
14:12:55 **7** been as accommodating as I was, but whether I would
14:12:57 **8** have not met at all.  I likely would have given them
14:13:02 **9** some time.
14:13:03 **10** **Q.**   Okay.  Well when you were appearing at that
14:13:05 **11** deposition you were being paid.
14:13:08 **12** **A.**   I was being --
14:13:09 **13** Yes.  I was being compensated for my time.
14:13:11 **14** **Q.**   Okay.  And then after that deposition do you
14:13:14 **15** remember being sent a copy of this deposition
14:13:16 **16** transcript?
14:13:16 **17** **A.**   Yes.
14:13:17 **18** **Q.**   And then you were actually paid additional
14:13:20 **19** money to review this entire transcript, check it for
14:13:22 **20** accuracy and make any changes to the transcript that
14:13:24 **21** needed to be made; right?
14:13:24 **22** **A.**   Yes.
14:13:25 **23** **Q.**   This is not something that you changed at
14:13:27 **24** that time when you were being paid to do that.
14:13:29 **25** **A.**   I would assume that based on what's in front

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
215

14:13:31 **1** of me, yes.
14:13:33 **2** **Q.**   Okay.  You said you were going to bill for
14:13:37 **3** about 20 hours in the Johnson case.  Do you remember
14:13:40 **4** that?
14:13:44 **5** **A.**   I think I said the accumulation between all
14:13:46 **6** of them was, you know, 20 to 30 hours of -- you know,
14:13:49 **7** each one.  But I don't remember exactly what it was in
14:13:51 **8** the Johnson case, but I had, you know, invoice and
14:13:54 **9** documentation showing what it was, but.
14:13:55 **10** **Q.**   Okay.  So we had 20 hours or so,
14:13:57 **11** approximately, in the one case you testified in.
14:13:57 **12** **A.**   Yeah.
14:13:59 **13** **Q.**   You testified in another one for another 20
14:14:02 **14** hours.  Is that what you actually billed to 3M or your
14:14:05 **15** lawyers or whoever it was?
14:14:06 **16** **A.**   I would have to look and see what the
14:14:08 **17** numbers are.  It was in the 20 to 30 range I believe,
14:14:11 **18** and I could produce the invoices, but I don't remember
14:14:13 **19** the exact hour amounts.
14:14:14 **20** **Q.**   You didn't come here today prepared to
14:14:16 **21** testify about the amounts that the defendant or their
14:14:20 **22** lawyers had given you in connection with testimony?
14:14:22 **23** **A.**   No.
14:14:22 **24** **Q.**   Did you feel that wasn't important?
14:14:28 **25** **A.**   It just didn't dawn on me to look.  I wasn't

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
216

14:14:31 **1** sure the number of hours would be explicitly relevant.
14:14:34 **2** I thought the bigger point of discussion would be just
14:14:36 **3** the existence of the agreement and the fact that I was
14:14:38 **4** compensated for my time.
14:14:40 **5** **Q.**   Right.  And you know that the issue of what
14:14:42 **6** you were paid has become a matter of some controversy
14:14:45 **7** in this case?
14:14:50 **8** MR. GOSS:  Object to form.
14:14:52 **9** **A.**   I knew --
14:14:52 **10** (Interruption by the reporter.)
14:14:53 **11** **A.**   I knew, when the cases were consolidated
14:14:55 **12** here and different legal teams started participating
14:15:01 **13** in the process, yeah, there were discussions as far as
14:15:01 **14** the previous LCAs and level of compensation causing
14:15:06 **15** issues, for lack of a better word.
14:15:08 **16** **Q.**   Well at some point those first lawyers, they
14:15:10 **17** stopped being your lawyers.
14:15:12 **18** **A.**   Correct.
14:15:12 **19** **Q.**   Those people don't represent you any more.
14:15:14 **20** **A.**   Correct.
14:15:14 **21** **Q.**   Okay.  Did you fire them?
14:15:16 **22** **A.**   No.
14:15:18 **23** **Q.**   So someone else fired them.
14:15:22 **24** **A.**   Or they quit.  I mean, I was not involved in
14:15:25 **25** the decision and process to remove them.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
217

14:15:29  1    Q.   Yeah.  That's not something you're --
14:15:30  2    You're not in control over that; are you?
14:15:34  3    A.   No.
14:15:35  4    Q.   So if someone -- if someone else doesn't
14:15:40  5    like what your lawyer is doing, they can just fire
14:15:43  6    them without your knowledge.
14:15:48  7         MR. BREWER:  Objection, misstates the
14:15:49  8    testimony.
14:15:53  9    A.   Yeah.  I'd go back to what I said is, I
14:15:55  10   mean, somehow they were removed.  I don't know who did
14:15:57  11   it, whether they did it themselves or whether 3M did
14:16:00  12   it, but I played no role.
14:16:01  13   Q.   It all happened without your knowledge.
14:16:03  14   A.   Without my prior knowledge.
14:16:05  15   Q.   Right.  So your legal counsel, people who
14:16:08  16   you had signed an agreement with to represent your
14:16:11  17   interests, were suddenly no longer your counsel and
14:16:14  18   through not any control of your own.  So that's a bit
14:16:19  19   weird; right?
14:16:21  20        MR. GOSS:  Object to form.
14:16:22  21        MR. BREWER:  Object to the form.
14:16:23  22   A.   Having never gone through this, I have no
14:16:25  23   idea how common or uncommon any of this is.
14:16:28  24   Q.   I'm just saying as you as a person is going
14:16:30  25   to have their rights protected, apparently, by an

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
218

14:16:32  1    attorney that you've agreed to let them represent you,
14:16:37  2    don't you find it weird that suddenly they weren't
14:16:40  3    your lawyers and you had no say over that?
14:16:42  4    A.   No.  I didn't find it odd.  I mean, if there
14:16:44  5    had been nobody to replace them and I was here on my
14:16:46  6    own I would have found that more odd, but not
14:16:50  7    necessarily the selection of who it is.
14:16:52  8    Q.   In other words, once you lost those lawyers
14:16:54  9    you didn't go out and find new lawyers, some new
14:16:57  10   lawyers were given to you.
14:16:58  11   A.   Well new teams approached me to talk about
14:17:02  12   their ability or desire to represent me.
14:17:07  13   Q.   That would include the lawyers of the Brewer
14:17:09  14   firm.
14:17:11  15   A.   Yes.  Mr. Fresch -- Fresch's firm.
14:17:15  16   Q.   Okay.  I just want to make sure I understand
14:17:16  17   this, okay?  So you got three lawyers --
14:17:16  18   A.   Yeah.
14:17:18  19   Q.   -- sitting next to you.
14:17:19  20        This one represents you.
14:17:20  21   A.   Yes.
14:17:20  22   Q.   That one represents you.
14:17:22  23   A.   Yes.
14:17:22  24   Q.   Does that one represent you?
14:17:23  25   A.   My understanding is that gentleman

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
219

14:17:25  1    represents 3M.
14:17:27  2    Q.   Does he represent you?
14:17:29  3    A.   Not based on my understanding, no.
14:17:32  4    Q.   Okay.  And so when we talk about the lawyers
14:17:35  5    who do represent you, they contacted you; right?
14:17:38  6    A.   The firm contacted me, not these two
14:17:41  7    particular individuals.
14:17:42  8    Q.   Perfect.  Okay.
14:17:42  9         In other words, you didn't pick up the phone
14:17:44  10   and go find out where the Brewer was located and call
14:17:46  11   them up.
14:17:47  12   A.   Correct.  I did not.
14:17:48  13   Q.   Okay.  They called you, they offered you
14:17:50  14   free representation.
14:17:54  15   A.   Yeah.  Yeah.  They offered to represent me,
14:17:56  16   yes.
14:17:56  17   Q.   Any --
14:17:57  18        Did you have any kind of meeting or sit-down
14:17:59  19   consultation with these lawyers when they weren't your
14:18:01  20   lawyers?  Like a meeting where they weren't
14:18:04  21   representing you and y'all talked about the case?
14:18:07  22   A.   No.  I mean, I did not meet with them prior
14:18:09  23   to one of them reaching out to me by phone basically
14:18:13  24   saying they were the new counsel assigned to represent
14:18:17  25   me.

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
220

14:18:17  1    Q.   So the first contact you had with them was
14:18:20  2    their offer of free representation.
14:18:22  3    A.   I don't remember if that was part of the
14:18:23  4    discussion, but I remember getting a voicemail from
14:18:25  5    them reaching out saying, you know, who they were and
14:18:27  6    they wanted me to call them.
14:18:29  7    Q.   Okay.  Do you have any agreements with these
14:18:30  8    lawyers?
14:18:31  9    A.   Not written.
14:18:32  10   Q.   Okay.
14:18:33  11   A.   Verbal.
14:18:34  12   Q.   And that tells me that there is an
14:18:35  13   agreement; right?
14:18:36  14   A.   It's a verbal understanding.  Whether it's a
14:18:38  15   legal agreement or not, I don't know.
14:18:40  16   Q.   Hmm.  Okay.
14:18:41  17        So when you were testifying before and you
14:18:44  18   had an agreement with counsel, you wrote a legal
14:18:47  19   document that you signed your name to.  You remember
14:18:48  20   that?
14:18:49  21   A.   Yeah.  The LCA?  Yeah.
14:18:51  22   Q.   Okay.  And it defined your obligations to
14:18:53  23   your lawyers, and it defined your lawyer's
14:18:56  24   obligations to you.  You remember that?
14:18:59  25   A.   I don't remember explicitly what was on the

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
221

14:19:01 1 document, but I remember signing it.

14:19:02 2 **Q.** You don't have anything like that now.

14:19:04 3 **A.** No.

14:19:07 4 **Q.** Do you know the value of the services

14:19:08 5 they're offering you for free?

14:19:12 6 **A.** Definitively, no.

14:19:14 7 **Q.** You're going to pay taxes on it, though;

14:19:16 8 right?

14:19:19 9 **A.** Oh --

14:19:19 10 **Q.** You.

14:19:19 11 **A.** -- my compensation for my time, yes. I'll

14:19:22 12 get a tax form on it.

14:19:24 13 **Q.** I'm talking about income from any source.

14:19:25 14 You're being given a very large gift in this case.

14:19:28 15 You understand that; right?

14:19:29 16 MR. GOSS: Object to the form.

14:19:30 17 MR. BREWER: Objection, foundation.

14:19:31 18 **A.** I'm not sure it's a gift.

14:19:33 19 **Q.** It's given to you free, gratuitously. You

14:19:36 20 don't have to pay for it.

14:19:37 21 **A.** Correct.

14:19:38 22 **Q.** Okay. You understand if you were given

14:19:40 23 large sums in value, things of value were given to you

14:19:43 24 gratuitously, that over a certain amount you have to

14:19:46 25 pay federal income tax on that; right?

STIREWALT & ASSOCIATES
1-800-553-1953 info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
222

14:19:49 1 MR. BREWER: Objection, foundation.

14:19:50 2 **A.** Don't know in this case.

14:19:52 3 **Q.** So in other words, for the last years in

14:19:54 4 which you were given free representation, did you pay

14:19:56 5 taxes on the compensation I received.

14:19:58 6 **A.** I pay taxes on the compensation I received.

14:20:03 7 **Q.** All right. But that's not the question I

14:20:04 8 was asking. All right.

14:20:05 9 So the question I asked was: Did you pay

14:20:07 10 taxes on the free representation you were given?

14:20:09 11 **A.** No. I was given no tax documents related to

14:20:12 12 that.

14:20:13 13 **Q.** Okay. Now with the prior lawyers you had a

14:20:17 14 written agreement with respect to confidentiality.

14:20:21 15 You know what that -- what I mean by that word?

14:20:24 16 **A.** Well I understand confidentiality, but once

14:20:25 17 again I don't remember if that was being part of the

14:20:27 18 document or not.

14:20:28 19 **Q.** Well sure, there was in that document, do

14:20:30 20 you remember the section that talked about your

14:20:32 21 confidentiality obligations, things you could or could

14:20:35 22 not tell me or the rest of the world relating to this

14:20:37 23 case?

14:20:37 24 MR. BREWER: Objection, foundation.

14:20:38 25 **A.** Not explicitly, no. I would need to see it

STIREWALT & ASSOCIATES
1-800-553-1953 info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
223

14:20:41 1 in front of me to remember the details of what was --

14:20:43 2 **Q.** All right. Unfortunately I don't have a

14:20:44 3 copy of it printed out. But I'm wondering, do you

14:20:47 4 have just no memory of there being a confidentiality

14:20:50 5 clause in your agreement?

14:20:51 6 **A.** I have said I don't recall what was actually

14:20:53 7 on the document that I signed because I haven't

14:20:55 8 reviewed it in, whatever, two plus years, whatever the

14:20:58 9 time has been.

14:20:59 10 **Q.** Yeah. Okay.

14:21:06 11 (Discussion off the stenographic record.)

14:21:06 12 THE VIDEOGRAPHER: Off video.

14:21:11 13 (Recess taken from 2:21 to 2:27 p.m.)

14:27:28 14 BY MR. BANKSTON:

14:27:32 15 **Q.** Mr. Zgoda, we cut off talking about

14:27:34 16 confidentiality and agreements with respect to that.

14:27:38 17 If -- If you had to figure out what you were allowed

14:27:42 18 to talk about, what you could or could not talk about

14:27:44 19 with respect to me, the whole world, you don't have a

14:27:47 20 document you can look at that can tell you; do you?

14:27:51 21 **A.** Correct.

14:27:52 22 **Q.** If I want to know what your confidentiality

14:27:54 23 agreements are, there's nothing you can give me, I

14:27:56 24 just have to hear it from your mouth; right?

14:27:59 25 **A.** Correct.

STIREWALT & ASSOCIATES
1-800-553-1953 info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
224

14:28:00 1 **Q.** Okay. Do you understand we've been looking

14:28:02 2 at confidential documents today?

14:28:05 3 **A.** Yes.

14:28:06 4 **Q.** And you see how they say "3M Confidential"

14:28:08 5 at the bottom of them; correct?

14:28:11 6 **A.** They say "confidential," yes.

14:28:13 7 **Q.** Yeah. Have you ever signed any kind of

14:28:14 8 order relating -- any kind of agreement relating not

14:28:17 9 to your testimony, but just to the confidentiality of

14:28:20 10 those documents?

14:28:25 11 **A.** Not that I recall, no.

14:28:28 12 **Q.** Now you'll acknowledge that if you once had

14:28:31 13 a written agreement with respect to confidentiality

14:28:33 14 and now you no longer have any kind of written

14:28:36 15 agreement on these issues, you would acknowledge that

14:28:38 16 that could maybe make it difficult for you to know

14:28:40 17 exactly what you can and cannot share with me.

14:28:44 18 **A.** Can you say that one more time, please?

14:28:46 19 **Q.** Sure.

14:28:49 20 You used to have --

14:28:49 21 In a situation where you used to have a

14:28:50 22 firmly defined set of confidentiality obligations

14:28:53 23 written in an agreement, and now you have a new

14:28:56 24 agreement with new counsel where there is no written

14:29:00 25 agreement for that, you'll agree that that might make

STIREWALT & ASSOCIATES
1-800-553-1953 info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
225

14:29:03 1 it difficult for you to exactly know what you are
14:29:05 2 allowed to or not to share with me.
14:29:08 3 A. Yes. I would use their guidance here in the
14:29:11 4 deposition to -- as far as what I shouldn't -- or as
14:29:16 5 far as what I shouldn't comment on, I should say.
14:29:18 6 Q. Okay. Do you understand whether there's a
14:29:22 7 joint representation agreement between you and 3M?
14:29:27 8 A. No.
14:29:28 9 MR. BREWER: Objection --
14:29:29 10 Q. That's not something you have an informed
14:29:31 11 understanding about, whether that exists or not.
14:29:34 12 A. Correct.
14:29:34 13 Q. Okay. You do understand that these lawyers
14:29:37 14 who represent you, that they have a duty to you, and
14:29:41 15 they also have a simultaneous duty to the people
14:29:46 16 paying them, whoever that might be.
14:29:47 17 MR. BREWER: Objection.
14:29:50 18 A. Hadn't thought about it. I thought about it
14:29:54 19 in the context of them having a duty to me since they
14:29:57 20 have been assigned to me.
14:29:59 21 Q. But you do understand that they also have
14:30:01 22 duties to whoever's paying them.
14:30:02 23 A. I understand --
14:30:03 24 MR. BREWER: Objection, foundation.
14:30:05 25 A. I understand they're being paid by someone

STIREWALT & ASSOCIATES
1-800-553-1953 info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
226

14:30:07 1 else, but hadn't really thought about their duties to
14:30:09 2 them other than receiving compensation.
14:30:11 3 Q. Who's paying them?
14:30:13 4 A. My understanding is that 3M will be paying
14:30:14 5 them.
14:30:15 6 Q. Okay. Do you --
14:30:16 7 How have you confirmed that?
14:30:18 8 A. I have not confirmed it.
14:30:20 9 Q. Okay. Do you have any reason that you're
14:30:30 10 assuming that 3M's the one who's the benefactor here,
14:30:34 11 who's paying for all of this?
14:30:37 12 A. Just the fact that I can't imagine them
14:30:41 13 doing it for free and I'm not paying them, so I'm
14:30:44 14 assuming it's 3M.
14:30:46 15 Q. Okay. So you have you, who they're going to
14:30:49 16 be representing your interest, and another party who's
14:30:51 17 paying the money. Okay. You understand that that's
14:30:53 18 the situation that's occurring right now.
14:30:55 19 A. Yes.
14:30:57 20 Q. Okay. Do you have an informed understanding
14:30:59 21 of the risks and the alternatives to that kind of
14:31:02 22 joint employment?
14:31:06 23 A. No.
14:31:06 24 Q. Okay. Do you have an informed understanding
14:31:10 25 of to what extent confidences will be shared between

STIREWALT & ASSOCIATES
1-800-553-1953 info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
227

14:31:14 1 these two entities, between you and 3M?
14:31:17 2 A. Ask that one more time. Sorry.
14:31:18 3 Q. Yeah. Sure.
14:31:19 4 Do you have an extent of an understanding,
14:31:22 5 the extent of the confidences that will be shared
14:31:25 6 between you and 3M?
14:31:26 7 MR. BREWER: Well hold on. Let me -- To
14:31:31 8 the -- To the extent that you would answer that
14:31:35 9 question and reveal conversations that you had with
14:31:38 10 lawyers, either from my firm or some other place,
14:31:42 11 that were intended to be confidential, I direct you
14:31:48 12 not to reveal those conversations. To the extent
14:31:50 13 that you can answer it otherwise, you're free to do
14:31:54 14 so.
14:31:56 15 A. You know the routine.
14:31:58 16 Q. Do you remember the question? Yeah.
14:31:59 17 A. Sorry.
14:32:00 18 Q. All right. Do --
14:32:00 19 And again, I'll echo Mr. Brewer's
14:32:03 20 instructions to you, which is I don't want to know
14:32:05 21 anything a lawyer told you.
14:32:06 22 A. Okay.
14:32:07 23 Q. Okay. I don't want to know anything that
14:32:08 24 you asked for in legal advice. You know that certain
14:32:11 25 conversations, those are like you and your priest.

STIREWALT & ASSOCIATES
1-800-553-1953 info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
228

14:32:15 1 But what I do want to know, do you have an
14:32:17 2 informed understanding of the extent to which
14:32:20 3 confidences will be shared between you and 3M?
14:32:24 4 MR. BREWER: I think that's a "yes" or a
14:32:25 5 "no."
14:32:27 6 THE WITNESS: I'm sorry?
14:32:27 7 MR. BREWER: You can answer that "yes" or
14:32:32 8 "no."
14:32:32 9 A. No.
14:32:33 10 Q. Okay. Do you know what's going to occur if
14:32:36 11 any client withdraws from this joint agreement?
14:32:43 12 A. Definitively? No.
14:32:47 13 Q. Do you understand what it means for you and
14:32:48 14 3M to develop a conflict of interest?
14:32:54 15 A. I understand the concept of conflict of
14:32:57 16 interest obviously, but in this case I hadn't thought
14:33:00 17 or not aware of a conflict of interest between me and
14:33:03 18 3M.
14:33:03 19 Q. In other words, when you formed this
14:33:05 20 attorney-client relationship you did not do so with an
14:33:08 21 informed understanding of the potential for conflicts
14:33:11 22 of interest between you and 3M.
14:33:14 23 MR. BREWER: My prior instruction about
14:33:16 24 revealing conversations you had with me or anybody in
14:33:21 25 my -- anyone else at our firm or any other lawyer you

STIREWALT & ASSOCIATES
1-800-553-1953 info@stirewalt.com

14:33:26 1 might have spoken with should remain confidential.
14:33:29 2 If you have some answer that you can give without
14:33:32 3 revealing confidences you had with lawyers that were
14:33:36 4 pursuant to the rendition of legal advice, then
14:33:40 5 you're free to do so.
14:33:43 6     Q.  One more time?
14:33:44 7     A.  I'm sorry.  Please.
14:33:46 8     MR. BANKSTON:  Actually -- Can I actually
14:33:48 9 get that one read back?  I haven't tried to do that
14:33:51 10 to you too much today if I could avoid it.
14:34:14 11     (Record read by the reporter.)
14:34:15 12     A.  I would say --
14:34:16 13     MR. BREWER:  In addition I have an
14:34:17 14 objection to the form.  I think it assumes facts not
14:34:20 15 in evidence.
14:34:20 16     A.  I would say I did not have an informed
14:34:22 17 understanding.
14:34:24 18     Q.  Do you know what will happen if a conflict
14:34:27 19 arises that precludes this continuing representation?
14:34:30 20     MR. BREWER:  The same instruction as
14:34:32 21 before.
14:34:32 22     A.  I do not.
14:34:36 23     Q.  Okay.  Could you fire these lawyers and go
14:34:38 24 hire your own lawyer?
14:34:43 25     A.  I hadn't really thought about it, but I

14:34:44 1 assume I would be allowed to if I chose to.
14:34:47 2     Q.  No guarantee of that, though, at this point
14:34:50 3 is what you're telling me?
14:34:51 4     A.  Definitive guarantee, no, because it's not
14:34:54 5 an idea I've broached or thought about.
14:34:55 6     Q.  If you wanted to go get your own lawyer to
14:34:58 7 protect your interest, is your benefactor going to pay
14:35:00 8 for it?
14:35:01 9     MR. BREWER:  Objection to the form.  I
14:35:03 10 think it assumes a fact that's not in evidence.
14:35:03 11     A.  I don't know.
14:35:10 12     Q.  You don't know if they'll pay for it.
14:35:14 13     A.  (Shaking head.)
14:35:18 14     THE REPORTER:  Your answer, please?
14:35:19 15     THE WITNESS:  I said "I don't know."
14:35:21 16     THE REPORTER:  I'm sorry.  I didn't hear
14:35:22 17 you.
14:35:23 18     THE WITNESS:  Okay.  All right.  At least I
14:35:26 19 meant to say that.
14:35:30 20     Q.  Oh, I wanted to ask you just a couple
14:35:32 21 questions, totally changing gears now.
14:35:34 22     A.  Okay.
14:35:35 23     Q.  But we had mentioned an individual a couple
14:35:36 24 of times today by the name of Ryan Barrows.
14:35:40 25     A.  Yes.

14:35:41 1     Q.  Okay.  And so I want to kind of go through
14:35:43 2 time.
14:35:44 3     Do you know when Ryan Barrows started
14:35:46 4 working with you, or at the company?
14:35:50 5     A.  Only speculatively.  He was only around I
14:35:52 6 think for a couple few years, and so if I were to
14:35:55 7 guess it was in the 2005/2006 timeframe, but I don't
14:36:00 8 know definitively.
14:36:00 9     Q.  That's, you know, from a lot of the
14:36:01 10 documents I've been noticing, that's about the
14:36:03 11 timeframe, 2005, over that kind of period.
14:36:05 12     A.  Okay.
14:36:05 13     Q.  And I was wondering, do you have any memory
14:36:08 14 of Ryan Barrows being around for the 750's development
14:36:11 15 cycle, or was that way too early for him?
14:36:14 16     A.  I believe that was too early for him.
14:36:16 17     Q.  Okay.  And so you --
14:36:18 18     It also seems, from the timeframe you've
14:36:20 19 given me, Ryan Barrows never worked in 3M.
14:36:23 20     A.  Correct.
14:36:23 21     Q.  Okay.  Now let me get an understanding in
14:36:26 22 those years that he was working with you.  What was
14:36:30 23 his job description, what did he do for you?
14:36:33 24     A.  He would have been a mechanical engi -- a
14:36:35 25 design engineer or a senior design engineer and would

14:36:38 1 have worked on various product development efforts or
14:36:40 2 also supporting existing products in the general
14:36:43 3 engineering function.
14:36:45 4     Q.  Okay.  And that general engineering
14:36:47 5 function, that could be things -- that could include
14:36:50 6 coming up with design concepts, things like that?
14:36:53 7 Those are engineering-type jobs?
14:36:55 8     A.  Yep.
14:36:55 9     Q.  And another one, I noticed there was some
14:36:58 10 discussions about filters and plotting blower curves
14:37:00 11 and those sorts of things.  Creating that kind of
14:37:02 12 technical document, those are other things that Ryan
14:37:05 13 Barrows may have been involved in?
14:37:07 14     A.  Yes.
14:37:08 15     Q.  What about things like product -- like --
14:37:11 16 Okay.  Let me try to back up.
14:37:13 17     When we talk about those blower curves, are
14:37:15 18 those generated in a computer model, or are those done
14:37:18 19 with the actual machine?
14:37:19 20     A.  Actual machine.
14:37:20 21     Q.  Okay.  So Ryan Barrows is somebody who is
14:37:23 22 qualified to do some actual hands-on testing of the
14:37:25 23 device.
14:37:26 24     A.  Correct.
14:37:26 25     Q.  Okay.  Now in your job did you ever find

14:37:29  1  yourself, in your years -- and I want to talk about
14:37:32  2  from 750 forward, you know, for most -- which has been
14:37:36  3  most of your career.
14:37:37  4       Were you ever in a situation where you're
14:37:39  5  putting hands on the device to do testing that's
14:37:41  6  recorded, or is that only something that those blower
14:37:44  7  engineers did?
14:37:47  8    A.  I would say I would be hands on to build
14:37:49  9  devices, prototypes and stuff like that.  I would do
14:37:52 10  more simplified testing such as, you know, temperature
14:37:55 11  measurements with thermocouples and stuff like that,
14:37:57 12  but I never did blower curves myself.  I never ran the
14:38:01 13  heat flux or ASTM test bed or anything like that.  So
14:38:05 14  I did some basic level of testing, but not to the
14:38:08 15  extent that some of the other engineers would do.
14:38:10 16    Q.  Okay.  In general were you happy with Mr.
14:38:11 17  Barrows' work?
14:38:13 18    A.  Oh, gosh yes.
14:38:14 19    Q.  Okay.  In other words, when he left the
14:38:16 20  company, he didn't leave it for a non-amicable reason,
14:38:21 21  put it that way.
14:38:22 22    A.  Correct.
14:38:22 23    Q.  Do you know what I mean?
14:38:24 24       So when he parted ways I take it he went
14:38:27 25  with your blessing and recommendation?

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

14:38:28  1    A.  Not with my blessing because I didn't want
14:38:30  2  him to leave, but he would have gotten my
14:38:32  3  whole-hearted recommendation, yes.
14:38:34  4    Q.  Sure.  Okay.
14:38:35  5    A.  Okay.
14:38:35  6       MR. BANKSTON:  I think that's just about it
14:38:37  7  for us today.  You got any questions?
14:38:41  8  BY MR. BANKSTON:
14:38:42  9    Q.  Oh.  Yeah.  So I want talk just a minute
14:38:45 10  again about RespirTech.
14:38:46 11    A.  Umm-hmm.
14:38:46 12    Q.  Okay.  And I noticed that some 3M people
14:38:49 13  ended up at RespirTech.
14:38:50 14    A.  Correct.
14:38:50 15    Q.  Did they all go at once, or was that a slow,
14:38:53 16  iterative process?
14:38:54 17    A.  It was a slow, iterative process.
14:38:56 18    Q.  Okay.  So I want to talk about specifically
14:38:57 19  with you.  How did you get that job offer?
14:38:59 20    A.  I knew Bob Buehler had gone to work there.
14:39:04 21  I knew they didn't have a real strong product
14:39:07 22  development group, and so I kind of kept my ear to the
14:39:10 23  ground for them looking to fill engineering positions,
14:39:12 24  and actually applied to a job through LinkedIn.
14:39:15 25    Q.  Okay.  Your departure from 3M, was it

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

14:39:17  1  voluntary?
14:39:18  2    A.  Oh yes.
14:39:19  3    Q.  Okay.  So basically if I think I understand
14:39:22  4  the situation right, before you left for RespirTech
14:39:24  5  Mr. Buehler got involved in the management of
14:39:27  6  RespirTech.
14:39:28  7    A.  Correct.
14:39:28  8    Q.  And he knew you from his time at the company
14:39:30  9  in patient warming.
14:39:31 10    A.  Correct.
14:39:32 11    Q.  And so it was his invitation that got you
14:39:34 12  there.
14:39:35 13    A.  Technically, no, because we have non-recruit
14:39:39 14  -- non --
14:39:40 15    Q.  Ahh.
14:39:41 16    A.  So I went there because I knew he was there,
14:39:43 17  but it was not at his beckoning of me.
14:39:47 18    Q.  Right.  It wasn't --
14:39:47 19    A.  He played a role in me going, though.
14:39:50 20    Q.  It wasn't like Mr. Buehler could check a box
14:39:53 21  that says, he's coming.  You had to prove yourself to
14:39:55 22  RespirTech.
14:39:56 23    A.  Yeah.  I mean, I had to apply to an open
14:39:56 24  position and interview and prove myself.  But I'm sure
14:39:59 25  Bob's opinion of me swayed the decision-making

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

14:40:02  1  process.
14:40:02  2    Q.  Sure.  Sure.
14:40:04  3       And do you remember about what time Mr.
14:40:06  4  Hansen came over to the company?
14:40:08  5    A.  It would be purely speculative.  I'm
14:40:10  6  guessing about 18 months ago.
14:40:12  7    Q.  Are y'all still working sort of side by
14:40:14  8  side, are y'all both doing the same, like in
14:40:15  9  design stuff?
14:40:16 10    A.  No.  He's more of a clinical position, so
14:40:18 11  we'll interact on certain things, but no, he's not
14:40:21 12  part of my reporting structure and he's not part of
14:40:23 13  product development like I am.
14:40:25 14    Q.  Okay.
14:40:25 15    A.  We're a small enough company where, you
14:40:27 16  know, a lot of us interact on a daily basis.
14:40:29 17    Q.  Sure.
14:40:29 18       MR. BANKSTON:  All right.  Mr. Zgoda, thank
14:40:31 19  you for your time today.
14:40:32 20       THE WITNESS:  Thank you.
14:41:09 21       (Deposition concluded at 2:41 p.m.)
         22
         23
         24
         25

STIREWALT & ASSOCIATES
1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

237

1      C E R T I F I C A T E

2          I, Debby J. Campeau, hereby certify that I

3  am qualified as a verbatim shorthand reporter; that I

4  took in stenographic shorthand the testimony of KARL

5  D. ZGODA at the time and place aforesaid; and that

6  the foregoing transcript consisting of 236 pages is a

7  true and correct, full and complete transcription of

8  said shorthand notes, to the best of my ability.

9          Dated at Lino Lakes, Minnesota, this 28th

10  day of February, 2017.

11

12

13

14              DEBBY J. CAMPEAU

15              Notary Public

16

17

18

19

20

21

22

23

24

25

STIREWALT & ASSOCIATES

1-800-553-1953   info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

238

1          S I G N A T U R E   P A G E

2      I, KARL D. ZGODA, the deponent, hereby certify

3  that I have read the foregoing transcript, consisting

4  of 236 pages, and that said transcript is a true and

5  correct, full and complete transcription of my

6  deposition, except per the attached corrections, if

7  any.

8  PAGE   LINE      CHANGE/REASON FOR CHANGE

9   ____  ____   _____

10  ____  ____   _____

11  ____  ____   _____

12  ____  ____   _____

13  ____  ____   _____

14  ____  ____   _____

15  ____  ____   _____

16  ____  ____   _____

17  ____  ____   _____

18

19  _____   _____

20    Date          Signature of Witness

21

22          WITNESS MY HAND AND SEAL this _____

23          day of _____, 2017.

24

25  (DJC)      _____

STIREWALT & ASSOCIATES

1-800-553-1953   info@stirewalt.com