# EXHIBIT DX2

TO DECLARATION OF PETER J. GOSS IN
SUPPORT OF DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION TO EXCLUDE THE
OPINIONS AND TESTIMONY OF
DR. MICHAEL A. MONT

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 1

1                    UNITED STATES DISTRICT COURT

2                       DISTRICT OF MINNESOTA

3    - - - - - - - - - - - - - - - - - - - - - -

4    In Re:

5    Bair Hugger Forced Air Warming

6    Products Liability Litigation

7

8    This Document Relates To:

9    All Actions              MDL No. 15-2666 (JNE/FLM)

10   - - - - - - - - - - - - - - - - - - - - - -

11

12

13              DEPOSITION OF MICHAEL A. MONT

14                 VOLUME I, PAGES 1 - 369

15                     JULY 28, 2017

16

17

18            (The following is the deposition of MICHAEL

19   A. MONT, taken pursuant to Notice of Taking

20   Deposition, via videotape, at the offices of Weisman,

21   Kennedy & Beris, 101 West Prospect, Cleveland, Ohio,

22   commencing at approximately 9:14 o'clock a.m., July

23   28, 2017.)

24

25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 2

1  APPEARANCES:
2    On Behalf of the Plaintiffs:
3      Ben W. Gordon, Jr.
       LEVIN, PAPANTONIO, THOMAS, MITCHELL,
4      RAFFERTY & PROCTOR, P.A.
       316 South Baylen Street, Suite 600
5      Pensacola, Florida  32502-5996
6      Gabriel Assaad
       KENNEDY HODGES
7      4409 Montrose Boulevard, Suite 200
       Houston, Texas  77006
8
       Christopher L. Coffin
9      PENDLEY BAUDIN & COFFIN
       1515 Poydras Street, Suite 1400
10     New Orleans, Louisiana  70112
11   On Behalf of Defendants:
12     Corey L. Gordon, Peter J. Goss and Micah
       Hines
13     BLACKWELL BURKE P.A.
       431 South Seventh Street, Suite 2500
14     Minneapolis, Minnesota  55415
15   ALSO APPEARING:
16     Ryan M. Stirewalt, Videotechician
17
18
19
20
21
22
23
24
25

Page 3

1          I N D E X
2  EXHIBITS        DESCRIPTION        PAGE MARKED
3  Ex  1    Subpoena                9
4      2    Handwritten notes, one page       11
5      3    Handwritten reference list       13
6      4    Mont curriculum vitae        15
7      5    Mont expert report        16
8      6    Invoices                57
9      7    Invoices                57
10     8    Exhibit A to expert report       69
11     9    Mont listing of depositions and
12          trials                69
13     10   Slide, Sources of Heat in Operating
14          Room                 69
15     11   Article, HEPA Filters Do Not
16          Affect Infection Rates following
17          Primary Total Joint Arthroplasty
18          with Forced Air Warmers, by
19          Curtis, et al          69
20     12   Group of slides             69
21     13   Slide, Common Sources of
22          Bacteria in Operating Room       69
23  WITNESS        EXAMINATION BY        PAGE
24  Michael A. Mont    Mr. B. Gordon        4
25              Mr. Assaad        220

Page 4

1          P R O C E E D I N G S
2      (Witness sworn.)
3      MR. B. GORDON:  Do you want to make
4  appearances for the record?
5      Ben Gordon, Ben Gordon for the plaintiffs.
6      You guys want to put your appearance on the
7  record?
8      MR. ASSAAD:  Gabe Assaad for the plaintiffs.
9      MR. COFFIN:  Chris Coffin for the
10 plaintiffs.
11     MR. C. GORDON:  Corey Gordon for the
12 defendant.
13     MR. GOSS:  Peter Goss for the defendant.
14     MS. HINES:  Micah Hines or the defendant.
15         MICHAEL A. MONT
16     called as a witness, being first duly sworn,
17     was examined and testified as follows:
18         ADVERSE EXAMINATION
19 BY MR. B. GORDON:
20     Q.  Good morning, Dr. Mont.  My name is Ben
21 Gordon and we met a few minutes ago; did we not?
22     A.  Yes, we did.
23     Q.  You've had your deposition taken before I
24 understand; right?
25     A.  I have.

Page 5

1      Q.  How many times?
2      A.  Hmm.  Now I have to be --
3      Q.  Approximately.
4      A.  -- precise.  Been in practice for about 30
5  years, and some years zero, some years three or four,
6  so I would just say an average of two a year, so 60.
7      Q.  Depositions, right?
8      A.  Depositions.
9      Q.  And you --
10     A.  Two per year.  Something like that would be
11 a --
12     Q.  And you gave us a testimony --
13     A.  If you want a more -- sorry.  If you want a
14 better answer, I'd have to think about it.
15     Q.  No, just looking for an approximate.  Thank
16 you.
17     So you know the ground rules.  One is that
18 we try not to talk over each other, and I'll try to
19 let you finish if you'll let me finish my questions
20 before you answer.  And answer audibly.
21     A.  Yes.
22     Q.  Thank you.
23     You understand you're under oath; right?
24     A.  Yes.
25     Q.  You're to answer everything to the best of

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 6

1  your ability, but to give us the truth and the entire
2  truth. You understand that; right?
3      A.  Yes.
4      Q.  You've been retained by 3M to work in this
5  case as an expert witness; correct?
6      A.  I've been retained by a -- a legal firm to
7  represent 3M. I don't know if I would phrase it that
8  I was directly retained by 3M.
9      Q.  Who is it --
10     A.  Indirect.
11     Q.  -- that you understand retained you
12 specifically?
13     A.  Two different legal firms, members from two
14 different legal firms that are representing 3M.
15         Maybe I'm not answering the question right.
16     Q.  And is it your understanding that your
17 testimony is on behalf of those legal firms or on
18 behalf of 3M?
19     A.  My testimony is for the truth about a
20 specific --
21         In the first -- in the first position it was
22 on two specific cases, that was the first firm, and
23 the next was on a topical issue relevant to a whole
24 series of cases.
25     Q.  Let's back up.

Page 7

1      A.  But I -- I've been to -- I -- I don't --
2         I want to try to answer you directly and not
3  belabor the point. I do rep --
4         I do agree that this is all being direct --
5  directly from legal firms that are representing 3M.
6  Does that help you?
7      Q.  And -- and --
8         It does. I think so. And so just to be
9  clear, through that analysis you would concede that
10 your testimony in this lawsuit is on behalf of 3M
11 corporation; would you not?
12         MR. C. GORDON:  I object to the form of the
13 question.
14         MR. B. GORDON:  You can answer, doctor.
15     A.  In a general sense, yes.
16     Q.  Okay.
17     A.  We'll just leave it at that.
18     Q.  You said you worked for two different law
19 firms or were retained by two different law firms.
20 Who is the first lawyer who contacted you in this
21 case?
22     A.  I'm almost 100 percent sure her name was
23 Marcela Duca, and it's -- it's spelled D-u-c-a.
24     Q.  Marcela Duca. Do you know what law firm she
25 works for?

Page 8

1      A.  I could find out. But offhand, I didn't --
2         MR. C. GORDON:  Do you want to know?
3      A.  -- prepare --
4      Q.  Was that in the Walton case? Was that
5  before the MDL, if you know?
6      A.  Yes, it was before the MDL.
7      Q.  Walton and Johnson.
8      A.  Yes.
9      Q.  Okay.
10     A.  Those two. Tommy Walton.
11     Q.  And what time period was that,
12 approximately, that you were first retained?
13     A.  I don't --
14        If I said two years ago, I'm hazarding a big
15 guess. I -- I'd like to give you a better answer than
16 that.
17     Q.  Okay. That's fine.
18     A.  I could get it for you later. So --
19        By the way, any answers that I can't be that
20 precise, I'm happy to try to get -- get for you later
21 after this deposition.
22     Q.  Thank you, doctor. Appreciate that.
23        Have you ever done any legal work or
24 consulting work for 3M corporation before these cases?
25     A.  To the best of my knowledge, no.

Page 9

1      Q.  You mentioned a second lawyer or law firm
2  that contacted you after the initial contact; right?
3      A.  Yes.
4      Q.  And who was that?
5      A.  That's the -- the lawyers represented here.
6      Q.  So Corey Gordon?
7      A.  Yes. Corey Gordon contacted me, actually at
8  the -- yeah, at a similar time period.
9      Q.  At a similar time period as the first
10 retention?
11     A.  The first retention, Corey Gordon's name was
12 mentioned, but I didn't deal with him until a -- a few
13 months after the first law firm.
14        MR. B. GORDON:  Okay. Let me do this.
15 We've got a subpoena, and I'm going to have the court
16 reporter mark this as Exhibit 1 to your deposition and
17 have you take a look at it, please.
18        (Exhibit 1 was marked for
19        identification.)
20 BY MR. B. GORDON:
21     Q.  Doctor, if you just leaf through this, this
22 is a subpoena to testify in this case along with an
23 attachment referred to as documents to be produced.
24 Have you seen this before?
25     A.  Yeah, this has a list of 18 things. Yes, I

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 10

1  have.
2      Q.  And you've reviewed this with counsel I
3  presume?
4      A.  Yes.
5      Q.  And in responses you've produced a number of
6  things that counsel gave to us, some before today and
7  some this morning; is that right?
8      A.  I don't --
9          I wouldn't have knowledge of when they gave
10  you these things.  I -- I would have --
11          My assumption would have been that this was
12  given to you before today, but maybe some of these
13  things were given you -- to you today.  But I don't
14  know when those transactions occurred.
15      Q.  We'll go through the -- the list in a
16  moment, doctor, but you would agree with me that at
17  least some of these things you produced to us just
18  this morning as you walked in; is that fair?
19      A.  I -- I will tell you that I went over these
20  things with counsel, if we're calling that Corey
21  Gordon and crew, and I don't know when that -- but --
22  hmm.
23      Q.  Well let me -- let me -- let me ask a
24  different question, doctor.
25      A.  I'm not the one that handed it to you

Page 11

1  directly.  They would have handed this to you.
2      Q.  So one of the things you've come in here
3  with --
4      A.  I --
5      Q.  -- this morning, doctor, is a page of notes
6  that I'm going to grab from you, one page of notes
7  that we're going to mark as Exhibit 2 to your
8  deposition real quick.  Okay?
9          (Exhibit 2 was marked for
10          identification.)
11      A.  Yes.  So that's a page of notes that I came
12  in today with.  Okay.  So agreed that that's on this
13  list, because I haven't looked at --
14      Q.  We'll go over the list in a minute.
15          Let me just ask you a question.  This
16  Exhibit 2 is labeled "Additional" and there is a list
17  of 13 items listed; is that right?
18      A.  Yes.
19      Q.  When did you prepare that list?
20      A.  This morning.
21          So insofar as one of these 18 items is
22  asking for additional materials, then -- then I'll
23  stand corrected for one of my previous answers, that
24  some of this I prepared, gave to you today.  So
25  that --

Page 12

1      Q.  Fair enough, doctor.
2      A.  -- was an error.
3      Q.  All right.  Let's move on.  We'll come back
4  to that when we need to.
5          Let me ask you first of all before we get
6  into these documents:  What was your assignment in
7  this case as you understand it?
8      A.  To review the facts about a Bair Hugger
9  device, forced-air warming device, and whether it
10  had -- various questions about it, which I don't want
11  to initially say one question or two questions, but
12  whether it was defective or whether it -- it led to an
13  increased incidence of SSIs, surgical-site infections.
14      Q.  And you would agree with me that your role
15  in this case is to be that of an objective, neutral
16  witness; would you not?
17      A.  Yes.
18      Q.  You're not an advocate in this case for 3M;
19  are you?
20      A.  No.
21          (Witness's cellphone dings.)
22      Q.  And in terms of the --
23          MR. B. GORDON:  Well let's just --
24          Let's go ahead and mark as Exhibit 3 your --
25          MR. C. GORDON:  Ben, hang on just one

Page 13

1  second.
2          THE WITNESS:  Just answering this.
3          MR. B. GORDON:  You need to look?  Okay.
4          THE WITNESS:  I'm -- I'm --
5          MR. ASSAAD:  Go off the record.
6          THE REPORTER:  Off the record, please.
7          (Discussion off the record.)
8          MR. B. GORDON:  Okay, doctor.  Thank you.
9  And if -- as I said earlier, if you need to take a
10  break at any time for things having to do especially
11  with your medical practice, just -- just say the word.
12  Okay?
13          THE WITNESS:  Okay.
14          MR. B. GORDON:  Let's mark as
15  Exhibit --
16          What are we on, three?
17          THE REPORTER:  Yes.
18          MR. B. GORDON:  -- a list of Mont
19  reference -- Mont reference -- "Michael Mont Reference
20  List," and I'll ask you a question about it.
21          (Exhibit 3 was marked for
22          identification.)
23  BY MR. B. GORDON:
24      Q.  So Dr. Mont, we've marked as Exhibit 3
25  something entitled "Michael Mont Reference List."  Is

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 14

1  this a list of notes that you prepared?
2     A.  Yes.
3     Q.  When did you prepare this, to the best of
4  your recollection?
5     A.  I think it was -- I think it was June.  I
6  could give you an exact date, but I think it was
7  like -- it might have been the weekend of -- I can
8  look at my calendar in the phone, but I would say it
9  was the weekend of maybe the 9th or the 16th.  I'd
10  have to go back, because I have good diaries of what I
11  do.
12     Q.  So just --
13     A.  And which -- which we --
14        It was a weekend I re -- after June --
15  certainly after June 2nd and 3rd.
16     Q.  And to be clear, you're talking about June
17  2nd or 3rd of this year, 2017.
18     A.  Yes.
19     Q.  Would this all have been compiled, to your
20  recollection, in one sitting?
21     A.  This was compiled over --
22        I believe it started on a Thursday night,
23  Friday, Saturday, Sunday, so if we call that one --
24        It was like one sitting.  It was a
25  continuous -- it was a -- a free weekend that I had

Page 15

1  to -- to work.
2     Q.  And then, if I'm understanding correctly,
3  doctor, based on what you've testified to already,
4  this would have -- this list, Exhibit 3, would have
5  been compiled after you completed your report in this
6  case; correct?
7     A.  Yes.
8        MR. B. GORDON:  Okay.  Let's mark as Exhibit
9  4 a copy of your recently updated CV that states
10  "(revised July, 2017)," and then we'll get you to take
11  a look at that.
12        (Exhibit 4 was marked for
13           identification.)
14     A.  So in -- in my hand is this Exhibit 4, which
15  is the best representation of the CV that I have
16  com -- redone yesterday just to include a few more
17  published reports, which is about all I do at the
18  present time to update CVs.  I don't put a lot of
19  other material in because I don't generally need --
20  need other material like meetings or different grants.
21     Q.  So Exhibit 4, doctor, would be a complete,
22  up-to-date copy of your curriculum vitae; correct?
23     A.  Yes.
24     Q.  Okay.  Thank you, doctor.  You can hang onto
25  that.  We've got one here.

Page 16

1        MR. B. GORDON:  Exhibit 5.  I'd like to have
2  the court reporter mark as Exhibit 5 a copy of your
3  expert report in this case.
4        Let me have you look at it first.  Does that
5  look like your expert report?
6        MR. C. GORDON:  Without any attachments;
7  right?
8        MR. B. GORDON:  Correct.
9        THE WITNESS:  Yeah, this looks like my
10  expert report without supplement -- what you -- what
11  was just mentioned, without the supplemental material.
12        MR. B. GORDON:  Okay.  And we're going to
13  mark that as Exhibit 5.  Thank you.
14        (Exhibit 5 was marked for
15           identification.)
16  BY MR. B. GORDON:
17     Q.  And doctor, we'll give you an opportunity to
18  talk about anything else you want to talk about, too,
19  but for purposes of this question I want you to refer
20  to Exhibit 5 as you need to and tell me if Exhibit 5
21  is a complete list of all the opinions that you have
22  in this case.
23     A.  It -- it's a complete list of obviously what
24  is printed here, but I can't answer in the affirmative
25  that it's a complete list of all my opinions.  It --

Page 17

1  it certainly is not all my opinions, but I felt at the
2  time these were all my relevant opinions in this case.
3  I'd like to think that's a hundred-percent-accurate
4  statement and I -- but I can tell you that if I come
5  up with any other opinions that I think are relevant
6  to the case, I would let you know after this point in
7  time.
8     Q.  And when was this -- sorry.
9     A.  And then in addition, again, for example, I
10  just reviewed a new article that came out after this
11  was written and that would give you -- might give me
12  more opinions.  And then I reviewed a few other expert
13  reports.  So to say that this is all the opinions I
14  have in the case, it's -- it's a -- it's a case in
15  flux, it has new materials that come out, new
16  information, and that might add different opinions
17  or --
18        But in a general sense, just to try to put
19  this to a close, this is generally how I feel about
20  this case in terms of the conclusions.  And at this
21  time when this was put together I thought that this
22  was the best -- best representation of my opinions
23  about this case.
24     Q.  And this -- you mentioned --
25        By the way, you mentioned a new study that

5 (Pages 14 to 17)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 18

1 just came out. Are you referring to the new Dr.
2 Augustine paper?
3    A. Yes.
4    Q. And so that paper may change your opinions
5 you say?
6    A. I don't know if it's a new study, by the
7 way. I think it's a newly published study of --
8 but -- old work, but a new --
9    Q. So you believe that that study may affect
10 your opinions.
11    A. I wouldn't --
12       I'm not even sure I would call it a study.
13 But it -- it just supplements my opinions. I mean
14 again, it -- I don't want to get involved in
15 semantics.
16    Q. Well your opinions were already formed at
17 the time you issued this report; correct, doctor?
18 Before that study -- before you ever saw that study;
19 right?
20    A. Yes. Yeah. It may accentuate some of my
21 opinions. I don't know if that's a -- when you have
22 opinions you -- you --
23       This report is supposed to be these are my
24 opinions and these are why I feel this way, and then
25 further information may add to those or make opinions

Page 19

1 more definitive.
2    Q. When did you prepare that report, doctor?
3    A. Well I was -- you --
4       You could say that I was preparing this
5 report for many months because a lot of the materials
6 I was reviewing, including most if not all of the
7 articles contained in these two folders, I was
8 reviewing as the months were going by and I was
9 formulating bits and pieces of my opinions in this
10 report which actually made it to the final draft of
11 this report. So in the -- in the absolute answer,
12 this report, it was done over a few-week period before
13 the due date, which was, I believe, June 1st or 2nd.
14 I don't want to get wrong on that due date.
15    Q. You mentioned draft. You have additional
16 drafts of that report?
17    A. I had drafts, but I discarded those after
18 this report was done.
19    Q. There's no record of those earlier drafts?
20    A. No.
21    Q. You mentioned at the end of that report that
22 you might supplement that report. Have you issued any
23 supplements to that report?
24    A. I have not.
25    Q. So as we sit here today, that's your final

Page 20

1 report.
2    A. As we sit here today --
3    Q. Okay.
4    A. -- this is my final report.
5    Q. Let's set that aside for the moment, and I
6 want to go back to your curriculum vitae, which I
7 think was number four.
8       MR. B. GORDON: Is that right, Dick?
9    A. Yeah.
10    Q. Let's look at your curriculum vitae, and I
11 guess I'll look at this one, although I got --
12       Give me one second.
13       You have your CV in front of you, doctor?
14    A. Yes, I do.
15    Q. So I'm going to ask you a couple of specific
16 questions about it, so bear with me.
17       You indicate in one place that -- I think
18 page -- it's three on the copy I'm looking at, it may
19 have changed --
20       Let's see. Bear with me. Yeah. Page three
21 you mention "CLINICAL DUTIES," that you see
22 approximately 4,000 outpatient visits per year;
23 correct?
24    A. Yes. So I would -- I would look at this
25 and --

Page 21

1    Q. I'm just asking you right now: Do you see
2 about 4,000 outpatient visits per year?
3    A. No. But I want to qualify my answer a
4 little. So as I said before, basically the only thing
5 I'm changing about this CV, because people want to
6 know articles, that's -- the major purpose is adding
7 articles, but a lot of the other materials I haven't
8 changed since I came to Cleveland Clinic, which was a
9 year ago. So presently I am --
10       I see what you've just pointed out. There's
11 a whole section about how many patients I see, how
12 many surgeries I do, and that should be changed. In
13 fact, the next -- probably by Monday I will change
14 that section in fact, maybe go over this. My --
15       All the numbers you see there have been
16 reduced by about -- let's just say 50 percent. So my
17 duties here is that --
18       These are numbers from last year when I was
19 in Baltimore. I came to Cleveland Clinic and I'm now
20 50 percent to 60 percent clinical, and the 40 percent
21 I use to be the head of the Orthopaedic Department at
22 Cleveland Clinic.
23    Q. So doctor --
24       MR. B. GORDON: I'm going to move to strike
25 as non-responsive.

6 (Pages 18 to 21)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 22

1    Q.  My question was simply is it correct that
2  you see approximately 4,000 outpatients per year, and
3  that was about a three-minute answer for a question
4  that just required you to tell me "yes" or "no," is
5  that an accurate --
6    A.  I -- I --
7    Q.  And let me finish, doctor.  If it's not
8  accurate, then tell me it's not accurate.  We're going
9  to be here a lot longer if you don't try to listen to
10  my question and give me a responsive answer.  And so
11  I'm just asking you --
12      I would appreciate it if you would try,
13  doctor.  That's all I'm asking.  Will you try?
14      MR. C. GORDON:  Objection, asked and
15  answered, and move --
16    Q.  Will you try, doctor?
17      MR. C. GORDON:  -- and move to strike
18  counsel's commentary.
19    A.  The -- the -- the answer is any question
20  that I find, even if it's a yes/no answer, but I find
21  can be taken out of context and to me in my opinion
22  deserves an explanation, which I feel what I said was
23  an appropriate explanation.  In fact, I will amend
24  this CV as of Monday to make sure it's better
25  accurate.  I'm not happy to see that this represents

Page 23

1  my clinical productivity from last year, not my
2  clinical productivity, because just as I am trying to
3  answer all of your questions as accurately as
4  possible, I like everything in print, everything that
5  represents me, to be as accurate as possible.  And I'm
6  not a lawyer and I don't know all the rules, but when
7  a question is asked of me and I see that there's a
8  clear discrepancy, I'd like that clarified.  I -- I
9  don't -- I don't like my answers to be potentially
10  taken out of context.
11      MR. B. GORDON:  Objection, move to strike,
12  non-responsive.
13    Q.  My question, doctor, was will you try --
14    A.  I will try the best --
15    Q.  -- and you gave me another oration.
16    A.  I -- I will try the best I can.
17    Q.  I appreciate that.  I think the jury would,
18  too.
19      Doctor, --
20      MR. C. GORDON:  Move to strike counsel's
21  comments.
22    Q.  -- you told us at the beginning of this
23  deposition that you revised this curriculum vitae
24  yesterday, I think; did you not?
25    A.  Yes.

Page 24

1    Q.  Okay.  So now you're telling us that, as
2  soon as we get to page three, it's not complete and up
3  to date, but you testified earlier it was up to
4  date, --
5      MR. C. GORDON:  Object --
6    Q.  -- so now you're -- you're changing that
7  answer; correct?
8      MR. C. GORDON:  Objection, objection, asked
9  and answered, miscon -- mischaracterizes the
10  testimony, --
11    Q.  Your earlier testimony --
12      MR. C. GORDON:  -- argumentative.
13    Q.  -- that the CV is up to date is in error;
14  correct, doctor?
15    A.  I'm going to answer --
16      MR. C. GORDON:  Same objection.
17    A.  I'm going to answer that your previous
18  question -- which we can read your previous comment
19  and question -- disregards the fact that I said
20  earlier that the only thing I did yesterday to the CV
21  was to add to get the references up to date.  I didn't
22  look at any of the other content because I'm here at
23  Cleveland Clinic as the chairman, I don't need a CV,
24  I'm not shipping this around, and it's not that
25  important to me to put page three, page five, page

Page 25

1  seven.  The only thing I've been doing -- and I said
2  this not in as much detail -- is adding references
3  because people like to see what I've published.  So
4  what you said in the previous comment, which was
5  attached to a question to say that I revised this
6  whole thing, I had earlier said that the only thing I
7  did was add things.  I didn't look at the other
8  details to revise that, which is the implication.
9      MR. B. GORDON:  Objection, move to strike,
10  non-responsive.
11    Q.  Doctor, when did you come to the Cleveland
12  Clinic precisely?
13    A.  I've been here a number of times as I --
14  that question --
15      I had to interview -- I had to interview
16  here to get this job, so I was here a number of times.
17  Do you want all the dates that I interviewed?
18    Q.  Doctor, I think my question was clear, but
19  perhaps not.
20      When did you move from Baltimore, at Mount
21  Sinai or wherever you were there, to join the staff at
22  the Cleveland Clinic?
23    A.  I --
24      That's a two-part question.  I moved at a
25  different time when I joined the staff.

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 26

1    Q.   When did you become an employee of the
2  Cleveland Clinic?
3    A.   I need a break.
4    Q.   You need a break.  We've been going --
5    A.   I need a break.
6    Q.   -- fifteen minutes.
7    A.   I have to discuss with counsel.
8    Q.   Okay, doc, Let's take a break.
9        MR. B. GORDON:  For the record, doctor needs
10  a break after 15 minutes, nothing to do with a medical
11  emergency, it's simply that he wants to talk with
12  counsel.
13       THE REPORTER:  Off the record, please.
14       (Recess taken.)
15       (Pending question read by the court
16  reporter.)
17       THE WITNESS:  Read the question right before
18  that, please.
19       MR. B. GORDON:  No.  That's the pending
20  question, doctor.
21    A.   Okay.  My first day at work was July 5th.
22    Q.   Of this year, 2017?
23    A.   Of 2016.
24    Q.   Okay.
25    A.   Sorry.

Page 27

1    Q.   And when --
2        Thank you.
3    A.   July 5th, 2016 was my first day.
4    Q.   And when did you become the chairman of the
5  Orthopaedic Department?
6    A.   That day.
7    Q.   That day.  Okay.
8    A.   Maybe officially, to correct that answer,
9  there was a holiday weekend July 4th and no -- and the
10  July 1st date was a Friday, so theoretically I became
11  the chairman July 1st, 2016.  That would be the better
12  answer.
13    Q.   And as of that time, July of 2016, were you
14  still seeing approximately 4,000 outpatient visits per
15  year?
16    A.   Right the -- the week before, the week
17  before --
18       Actually, that would also be an inaccuracy.
19  The number was probably -- the number from Baltimore
20  was probably closer to 6,000, not 4,000, and the
21  number right now at Cleveland Clinic, when I amend
22  this on Monday, is closer to about 3200, since I just
23  saw the numbers.
24    Q.   So still focused on Exhibit 4, your CV, I
25  want to ask you a couple other things to see if

Page 28

1  they're accurate or not.  You mention a number of
2  grants on your CV, and I think these start on
3  approximately page seven --
4        Make sure I'm looking at your current copy.
5        You see where I am, "GRANTS AND OTHER
6  SUPPORT?"
7    A.   Yes, I do.
8    Q.   And a number of these total presently about
9  56 or so; is that accurate?  Fifty-four on this list.
10    A.   Fifty-four on this list.
11    Q.   So in the updated one from today -- from
12  yesterday, that's gone down from the prior one by --
13       No, I -- strike that.  I withdraw that
14  question.
15       So these 54 grants, are these ongoing
16  grants?
17    A.   No.  I can go through each one, but many of
18  them are -- these are --
19       This has not been updated in a long period
20  of time.  I'm looking here, for example, 49, that you
21  could see it says "2008 to present;" that grant was
22  finished.  That same company has a study starting next
23  January.  Many of these are done.  This has not been
24  updated for many years.
25    Q.   So how many of these would you say are

Page 29

1  active grants, doctor?
2    A.   Do you want me to go through all them?
3  Right now I'm not --
4    Q.   I'm looking for an approximate --
5        Well let me ask you --
6    A.   Approximately zero.  These were --
7    Q.   So doctor --
8    A.   These have not been -- I --
9        I have over 20 active grants right now, I
10  have not been updating them, and every year I get 10
11  or 15 new ones.  We finish the studies and we do new
12  grants.  This has probably not -- that grant section
13  has not been up -- updated for -- I'd have to give you
14  the exact date, but it may not -- it may have been
15  eight or nine years.
16    Q.   So currently you have approximately 20
17  active grants that are not reflected on this CV; is
18  that fair?
19    A.   Something like that, yes.
20    Q.   And is there any particular reason, when you
21  updated your CV yesterday, that you didn't update this
22  section?
23       MR. C. GORDON:  Objection, asked and
24  answered.
25    A.   I don't use --

8 (Pages 26 to 29)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 30

1    I don't keep track of my grants.
2    Q.  Well you put on the Cleveland --
3    A.  I don't keep track of my --
4    I keep track of my grants, but not through
5  my CV.  I have other methods that keep track of -- of
6  my active grants.
7    Q.  How many --
8    A.  And in -- sorry.  And in fact, all the
9  grants that I'm involved with are reviewed -- not all.
10  Ninety percent of the active grants that I have at
11  Cleveland Clinic are reviewed on a weekly basis in a
12  morning conference, and it really -- it's not only 20
13  that I have, it's about 30 others that I'm
14  peripherally involved as the chairman of the
15  department, and then there's another 10 grants that I
16  don't review every week but I certainly review
17  every -- every quarter that are grants that I'm
18  involved with -- no, it's probably 20 grants, 30
19  grants -- 30 others grants that I'm involved with other
20  centers around the whole country that are re -- not
21  reviewed on a weekly basis, but I am part of at -- at
22  different medical centers, which I'm happy to name off
23  if you'd like.
24    Q.  I'd just like to know approximately, since
25  this isn't accurate on your CV, how many grants you

Page 31

1  believe you're actively involved in today.
2  Approximately, doctor.
3    A.  I still have to think about that.
4    Q.  Well let me see if I can --
5    A.  What -- what does -- what does "actively"
6  mean?  As the chairman, I theoretically have to sign
7  off on every grant in the whole department, so my --
8  my signature goes approving every grant.  So what is
9  "actively?"  Is that that I'm personally one of the
10  investigators?  Is that --
11    Q.  Well let's start with that.  How many grants
12  are you the principal investigator on today?
13    A.  Probably about four or five.
14    Q.  And how many grants are you not the
15  principal investigator on for which you have any kind
16  of regular, consistent, active participation?
17    A.  "Regular," how is that defined?  Is it on a
18  weekly basis or on a quarterly basis?
19    Q.  I gave you three adjectives, doctor.  You
20  can define it how you wish.  I said regular, --
21    A.  On a week --
22    Q.  -- consistent or active.
23    A.  On a weekly basis about -- what I said
24  first, about 20 to 25, and on a quarterly basis, if we
25  include all the other multicenters, another 20.

Page 32

1    Q.  So let me ask you --
2    Let me read you something, ask you if this
3  would be accurate or inaccurate.  "Dr. Mont actively
4  participates in many research studies in the area of
5  joint preservation arthroplasty with over 100 grants."
6    Based on your testimony a moment ago, I
7  guess that's inaccurate; right, doctor?
8    A.  How --
9    Can you explain to me why you think
10  that's --
11    Q.  Do you actively participate in over 100
12  grants today?  Based on your testimony a minute ago, I
13  presume the answer is no.
14    A.  The second part of that question says that
15  I've had over 100 grants.  I probably have had over
16  500 grants.
17    Q.  Maybe I mis --
18    A.  No, no, no.  I've had over 100 grants
19  because it's not my grants.
20    Q.  Doctor, maybe I -- you misunderstood the
21  question.  I'll read it again.  "He actively
22  participates in many research studies in the areas of
23  joint preservation arthroplasty with over 100 grants."
24    Do you actively participate in the
25  preservation arthroplasty -- I'm sorry -- in the areas

Page 33

1  of joint preservation arthroplasty with over 100
2  grants as we sit here today?
3    A.  Depends on how you interpret.  The way
4  you're interpreting it, it's wrong.  It doesn't mean I
5  have a hundred at this moment, that says I've had --
6  I've had over a hundred grants.  That's the way I
7  interpret that sentence.
8    Q.  Well why don't we do this, doctor.  Why
9  don't you tell us -- tell the members of the jury who
10  may read this or see this videotape what an active,
11  average, typical day is like for you on a typical week
12  in your practice.  What do you do in a typical week?
13  Take it however you want, day by day, week by week.
14    A.  Okay.  For the jury, each one of my days is
15  very uniquely different, so in answer to that
16  question, if we really want to hear about what I do --
17  and I'm happy to disclose this.  I actually enjoy what
18  I do and I have a lot of observers that visit me and
19  spend the whole day with me, and I enjoy sharing what
20  I do with them, so I don't mind sharing with the
21  members of the jury what I do.
22    On a Monday morning I get in around 7:30,
23  it's my late day, and I go over some of the work that
24  needs to be done with my research team, and it sort of
25  sets the pace of what we've done over the weekend and

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 34

1  what we're going to try to do over the weekend.  It's
2  the beginning; it doesn't end that part.
3        At 8:30 there is a research conference that
4  goes for two hours where two pages of -- of very
5  active grants are -- and proposals and studies are
6  gone over.  I'm always there for at least the first
7  hour of that conference.  And there are about 25
8  people in the -- in the joint replacement -- it's a
9  joint replacement research-specific conference.  We go
10  over all the studies that we're presently doing.  I
11  also have -- one of the residents is spending the day
12  with me every Monday, so they're also seeing what we
13  do in a -- from a research end and how somebody can
14  meld in a clinical practice with research.  The main
15  things that I do first in the first hour are going
16  over the 20 to 25 grants that I'm directly involved
17  with that I mentioned earlier at any particular time.
18  In addition, there are about 20 grant proposals or
19  things or grants in evolution, grants that were just
20  finished, studies that were just finished; those are
21  the ones that I absolutely do.  If there's --
22  sometimes I go into the second hour and I work through
23  a lot of the other studies that I'm not directly
24  involved with that I can give advice.  Sometimes those
25  conferences are used for other things like how to

Page 36

1  department, which is my major priority as the
2  orthopedic chairman.  I have the focus on the
3  different orthopedists that are not only on the main
4  campus of Cleveland Clinic, but we have seven other
5  hospitals in the region that are under Cleveland
6  Clinic.  So we go over that until about 11:00.
7        At 11:00 a clinic starts.  The clinic
8  encompasses about 20 to 30 patients; a little bit
9  variable.  I'm doing that clinic typically with my
10  nurse practitioner, my PA, a fellow, and then as I
11  mentioned earlier, I have a visiting resident every
12  Monday -- Monday morning that's seeing my life.
13        I'm seeing patients.  In between seeing
14  patients there are gaps.  I'm also doing reviews.  I
15  have -- there are anywhere from three to seven
16  research fellows that are working for us.  They are
17  all, in the midst of that, showing me different things
18  they're working on, different paragraphs they want
19  to -- me to look at, handing off manuscripts.  I'm
20  doing reviews.  I'm a major -- I'm the assistant
21  editor or the number-two editor for Journal of
22  Arthroplasty, which is the major arthroplasty
23  journal -- or one of the major if not the major
24  arthroplasty journal in the world.  I do all my
25  reviews that morning for that day, which is usually

Page 35

1  prepare a grant.  I just gave a lecture on how to
2  write a research paper.  That was two weeks ago.  I
3  spent 30 minutes teaching this whole group of 25
4  residents/research fellows how to do that.  That's my
5  8:30 to 9:30.
6        At 9:30 I then meet with another team and I
7  go over all the clinical cases that I will be doing
8  for the next month to six weeks.  So we go over all
9  the patients and all the x-rays, and we look at the
10  schedules for the operating room over the next four to
11  six weeks.  So that's an ongoing conference that
12  happens every morning with my PA, my nurse
13  practitioner, sometimes my administrative assistant, a
14  clinical fellow -- not a research fellow -- and
15  myself.  That goes on until 10:30.
16        Around 10:30 I come back and look and see if
17  there's any other issues that my administrative
18  assistant has for the next 30 minutes.  It actually --
19        Q.  We're still on Monday; right?
20        A.  We're still on Monday.
21        And it involves this list that is in my hand
22  that you're seeing.  Right now this is a list of 108
23  items.  When I started this past Monday the list was
24  about 76 items.  About half of them have to do with
25  any one of the 80 orthopedic attendings in my

Page 37

1  five to 10.  In the midst of it I'm handling --
2        Q.  You see patients all this time; right?  All
3  in the midst of this.
4        A.  I'm seeing patients.  I do not hem and haw
5  on any patients.  I give them all the appropriate
6  amount of time.  If the patient needs 15 minutes, they
7  get it.  If they need an hour -- hour, they get it.
8  If a clinic --
9        Q.  It's your testimony for this jury today that
10  you see patients for up to an hour?
11        A.  I've seen patients for longer than an hour.
12  In addition --
13        Q.  On a regular basis.
14        A.  On a regular basis every week.  There's no
15  week that goes by that I haven't at least one or two
16  patients I've spent an hour with them.
17        Q.  Doctor, that's pretty tough to do if you're
18  seeing, at the time you left Baltimore, you said,
19  6,000 patients a year; right?
20            MR. C. GORDON:  Object to the form of the
21  question.
22        Q.  Pretty tough to spend an hour with a patient
23  when you're spending -- seeing 6,000 patients a year;
24  isn't it?
25            MR. C. GORDON:  Same objection.

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 38

1    A.  I see plen -- not only to -- not only to --
2    Q.  Do you see patients on weekends, doctor?
3    A.  You're not letting me answer the question,
4  you're just ask --
5    Q.  It's a -- it's a "yes" or "no" answer.
6        MR. C. GORDON:  No, it isn't, and he
7  doesn't --
8    A.  Well I --
9        MR. C. GORDON:  -- need to answer your
10  question "yes" or "no."
11    Q.  Doctor, do you work on weekends?  Do you see
12  patients on weekends?
13    A.  I'm going to answer three questions ago.
14  You can read it back.
15    Q.  Just -- just --
16        I withdraw the prior question.  The question
17  on the table --
18    A.  I'm not -- I'm not -- I'm not going to --
19    Q.  Doctor --
20    A.  -- I'm not going to let any -
21    Q.  Doctor, I can withdraw any question I want.
22    A.  Well I'm going to answer the way I want
23  about seeing patients.
24    Q.  The next question, doctor.  The question
25  is --

Page 39

1    A.  The -- the number -- the number one thing I
2  do is I take care of patients.
3    Q.  Doctor, I'm not going to allow you to answer
4  questions not pending.  If I withdraw a question, we
5  move on.  It's my deposition.  Now we can get an
6  instruction from the court if you want.
7        The question is:  Do you see patients on
8  weekends?  That's the question I want an answer to
9  right now.
10    A.  I speak to many patients on weekends, so
11  in -- I just --
12    Q.  Do you see patients in clinic on weekends,
13  doctor?
14    A.  I don't physically see patients on weekends.
15    Q.  Okay.  So can we agree that you see patients
16  Monday through Friday?
17    A.  And if the -- if the visit is not done, then
18  there are calls, and I might spend a half hour to an
19  hour and a half talking to patients on weekends over
20  the phone, which is a continuation, theoretically, of
21  the visit that occurred in the weekday, --
22    Q.  Okay, doctor --
23    A.  -- and it gets recorded as such.  And I have
24  lists similar to this of weekend phone calls --
25        MR. B. GORDON:  Objection, --

Page 40

1    A.  -- of continuations of visits --
2        MR. B. GORDON:  -- non-responsive, --
3    A.  -- on weekends.
4        MR. B. GORDON:  -- move to strike.
5    Q.  Doctor, you have clinic during the week.
6  Are there certain days between Monday and Friday that
7  you have clinic where you see patients and certain
8  days when you do surgery?
9    A.  Yes.
10    Q.  Can you tell us what days those are.
11    A.  The primary days I see patients are Monday
12  and Tuesday on main campus, and every other Friday at
13  another hospital called Euclid Hospital -- that's
14  E-u-c-l-i-d -- I see patients in the morning on that
15  day.  I also see patients, theoretically, on any of
16  the other days, Wednesday and Thursday.  Or the other
17  days there will be patients that come in on a special basis
18  will come in.  I will -- I am --
19        If any patient had a complaint about any
20  provider, I -- I'm the first person to offer that I'm
21  able to see them.  Some of those are the patients
22  that I -- that had a problem with a provider before
23  me, are the ones that I spend an hour and a half with
24  just to try to make sure every one of their needs are
25  taken care of.  I feel like that's part of my role.

Page 41

1  We also see sometimes X -- no.  We -- we see
2  various --
3        Strike that.
4        MR. B. GORDON:  Objection, move to strike,
5  non-responsive.
6        Dick, could you read back my last question,
7  please.
8        (Record read by the court reporter.)
9    Q.  So doctor, I'm going to clarify that
10  question and break -- break it down and make it
11  simpler.  What days do you do surgeries?
12    A.  The primary days I do surgery are on main
13  campus on Wednesday and alternating Thursdays, more or
14  less.  I do surgery at Lutheran Hospital --
15  L-u-t-h-e-r-a-n -- and that alternates Thursdays with
16  Euclid Hospital, but in any given week I might -- that
17  can change depending on OR availability, so there are
18  some weeks I've done surgeries at Lutheran on a
19  Tuesday and had a full day.  In addition, on the main
20  campus I may squeeze a case in at the beginning of a
21  day or at the end of the day on any of the days of the
22  week.
23    Q.  So on average, based on that answer, one or
24  two days a week you do surgeries between those two
25  hospitals?

11 (Pages 38 to 41)

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 42

1    A.  No.  On average I do two surgeries -- two
2  days of surgery a week.
3    Q.  Okay.  So let's go with two days of
4  surgeries a week.  And based on Exhibit 4, your
5  curriculum vitae, you perform greater than eight to
6  nine hundred surgeries per year; is that right?
7    A.  We've -- we've already answered that
8  question --
9    Q.  No, sir.  I asked you about visits, not
10  surgeries.  I'm asking about surgeries now.
11    A.  I already answered your questions about
12  surgeries before.
13    Q.  I don't believe so, doctor.
14    Let me ask it again.  You do greater than
15  eight to nine hundred surgeries per year.  That's your
16  testimony?
17    A.  That's not my testimony.  I already answered
18  this question.
19    Q.  It would be pretty difficult to do eight to
20  nine hundred surgeries -- or greater than eight to
21  nine hundred surgeries if you did surgeries only two
22  days a week; wouldn't it, doctor?  It would be
23  impossible; --
24    A.  Yes.
25    Q.  -- wouldn't it?

Page 43

1    A.  No, it would not be impossible.
2    Q.  All right.  Well let's do the math.  If you
3  did surgery all day, --
4    A.  Yes.
5    Q.  -- which I don't believe you testified you
6  did it all day, in some cases I think you said you
7  squeeze in a case at the beginning of the day or the
8  end of the day, but let's say it's all day two days a
9  week.  How many surgeries would you have to do those
10  two days to do 900 cases a year?
11    MR. C. GORDON:  Object to the form of the
12  question, move to strike counsel's commentary and
13  testimony.
14    Q.  Have you done the math on that, doctor?
15    A.  Easily.  If --
16    Twenty times 50 weeks is a thousand cases,
17  so you -- you could do 10 each day two days a week and
18  you get 900 cases.
19    Q.  Is it your testimony that you do 10
20  surgeries a day two days a week?
21    A.  When that was written I did more than 10
22  surgeries in a day, 10 or 11 or 12.
23    Q.  And on those same days did you see other
24  patients, doctor?
25    A.  On those days, occasionally there might be a

Page 44

1  patient that I would squeeze, but generally, no.
2    Q.  Well to do six --
3    A.  In those days.
4    Q.  In those --
5    A.  In those days.
6    Q.  In those days you did 6,000 patient visits a
7  year you said; right?
8    A.  Correct.
9    Q.  To do 6,000 patients Monday through
10  Friday --
11    There's 260 weekdays in a year; right,
12  doctor?
13    A.  I didn't work 260 weekdays in a year.  There
14  were --
15    Q.  How many did you work?
16    A.  I'd have to recalculate it.  If you want,
17  I'll give you --
18    Q.  Well --
19    A.  -- an exact answer.
20    Q.  -- let's just say at 260 days, if you did --
21  if you saw patients every day -- weekday of the year,
22  that would be 23 patients a day every single day of
23  the year, 260 weekdays a year.  Did you see 23
24  patients a day every single day of the year when you
25  were at Baltimore, separate and apart from your

Page 45

1  surgeries?
2    A.  I saw more --
3    Your numbers are not an accurate reflection.
4  I saw easily 150 -- 125 to 150 patients on a regular
5  week every week.  If you did the math times 40 weeks,
6  that would be 6,000.  There were some weeks -- as I
7  told you, these become irregular -- that I threw in an
8  extra clinic and we'd see another 60 or 70 patients.
9  So that's what I did.
10    Q.  And you did that while giving conferences,
11  nationally and internationally; right, doctor?
12    A.  You're -- you're -- I --
13    I've always given conferences nationally and
14  haven't done as much internationally, but I do, yes, I
15  do internationally.
16    Q.  Do you take any vacations?
17    A.  I take vacations.
18    Q.  Do you do trips to work for your -- how do
19  you pronounce it -- Molluscan or Molluscan
20  Corporation?
21    A.  Okay.  If your implication is that you think
22  that I can't do all these things that I say on my CV,
23  I think you're mistaken.  I think -- I don't like --
24    Number one, I don't like the implication.  I
25  give -- my number-one thing that I do is my patient

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 46

1  care for the patients.  I give every patient -- every
2  patient I've ever operated on has my cell phone
3  number.  Any visit that -- is rechecked that the
4  patients have adequate time for everything; if they
5  don't, they're brought back even the same day.  I
6  continue this as virtual visits on the weekend.  I
7  speak to them.  So the implication that I don't have
8  enough time to do -- or that I'm not doing what I'm
9  saying is incorrect, that there is plenty of time in
10  the day to do what I'm doing.  The math you're
11  describing is not correct.  You're -- you're
12  averaging --
13       Q.   The math doesn't work; does it, doctor?
14       A.   The math doesn't work the way you have it.
15  It -- it -- one hun --
16          It more than works for me.
17       Q.   Doctor, it's impossible to see 6,000
18  patients in a year five -- if you -- if you see them
19  on clinic days while you're still doing surgery and do
20  anything else the rest of that year, to travel, you're
21  at conferences --
22       A.   Your implication is that I'm seeing --
23       Q.   It's impossible.
24       A.   -- all the patients while I'm doing surgery,
25  and that's incorrect and that's out of context.  And

Page 47

1  you're -- you're implying that I do something like
2  that, and I don't do that.
3       Q.   Well the fact is in a lot -- a lot of the
4  surgeries you don't even show up and do the surgery,
5  you have your residents do surgeries; isn't that
6  right?
7       A.   And that's incorrect.
8       Q.   All right.  Let's talk about your patients.
9  You -- you said you have this great relationship with
10  your patients, --
11       A.   Okay.
12       Q.   -- you give them your cell phone number.
13  Let's talk about that.
14       A.   Okay.  You can't make statements --
15       Q.   Do your patients tend to like you, doctor,
16  do you think?
17       A.   Yes, they do.
18       Q.   Okay.  You think you have a good bedside
19  manner?  Do your patients tell you that?
20       A.   Yes, they do.
21       Q.   All right.  Let's talk about some of them.
22  You -- you --
23          Have you seen the reviews your patients give
24  you, doctor?
25       A.   Yes.

Page 48

1       Q.   Let's read one from May 20th this year, just
2  a couple of months ago.  "Disappointed that Dr. Mont
3  doesn't even come by post surgery to see his
4  patients."
5          Let's look at another one a month before.
6  "Very impressed with everyone and everything at the
7  hospital except Dr. Mont.  He could listen better.  I
8  felt rushed with him.  I know he's a good surgeon so I
9  drive three and a half hours to see him, maybe he had
10  an off day, but his bedside manner leaves a lot to be
11  desired."
12          Let's look at one from January.  "The doctor
13  never even came by to see me after my surgery."
14          Let's look at another one from March of this
15  year.  "I was a patient of Dr. Mont's in Baltimore.
16  He has a terrible bedside manner.  Total knee
17  replacement came out terrible.  I never even saw him
18  after surgery."
19          December 2016:  "Dr. Mont's residents did my
20  total knee replacement in 2008 even after telling me
21  he did the whole surgery."
22          MR. C. GORDON:  Object --
23       Q.   Doctor, the list goes --
24          MR. C. GORDON:  Object -- strike -- excuse
25  me, doc.

Page 49

1          THE WITNESS:  That's okay.
2          MR. C. GORDON:  Object to the form of the
3  question, move to strike counsel's testifying.
4          If you've got a document you want him to
5  review, please show it to us, but you're just throwing
6  out random comments --
7       A.   You want an answer to this?
8          MR. C. GORDON:  -- and it's inappropriate.
9       Q.   Doctor, --
10       A.   Is this a question --
11       Q.   -- I should ask you a question.
12       A.   -- or is this a statement?
13       Q.   Let me ask you a question.
14          THE REPORTER:  Let's go off the record.
15          (Discussion off the record.)
16  BY MR. B. GORDON:
17       Q.   Doctor, for the record, when counsel
18  objects, I'll try to stop if you'll try to stop.  We
19  need to both let him get his objection on and then
20  I'll ask you a question.
21          I was reading those statements to lay a
22  foundation for the question I'm going to ask you now,
23  and the question is:  Have you seen patient reviews
24  like the kinds I just read, of which there are many,
25  that describes you as having a terrible bedside

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 50

1  manner?
2       MR. C. GORDON:  Objection --
3       Q.  Have you seen those?
4       MR. C. GORDON:  Same objections, also lack
5  of foundation.
6       Q.  Have you seen those, doctor?
7       A.  I've seen hundreds and hundreds of my
8  reviews.  The greater-90-percent preponderance are
9  very positive.  And there are certainly -- you read
10 one from 2008 that was negative and there's
11 certainly -- any practitioner has negative reviews,
12 and we can find that for not only myself, for any
13 practitioner.  And there can be a response to each one
14 of the ones that you read.  And fortunately, the
15 preponderance of my reviews and my ratings in the past
16 and where I am are very -- are extremely high.
17      Q.  Doctor, the review I read, just so it's
18 clear to you, was from December 12th of 2016 and it
19 referred to residents doing surgery for you in 2008 in
20 Baltimore.  It wasn't from 2008.  But let me ask you a
21 question since you mentioned that.
22      Would it surprise you that I found 35
23 reviews of you within the last seven months that are
24 of the same type, talking about how bad your bedside
25 manner is?

Page 51

1       MR. C. GORDON:  Object to the form of the
2  question, lack of foundation, move to strike counsel's
3  commentary and testimony.
4       Q.  Would that surprise you, doctor, 35 bad
5  reviews?
6       A.  You might have 3500 great reviews.
7       Q.  All right.  Let me ask you this:  Have you
8  ever been involved in a lawsuit, doctor?
9       A.  Yes.
10      Q.  How many?
11      A.  I don't know the exact number.
12      Q.  You've been sued a number of times; haven't
13 you?
14      A.  Yes.
15      Q.  For medical malpractice; right?
16      A.  Yes.
17      Q.  Any of those still pending?
18      A.  I think there may be -- there might be one.
19 I'm not sure where it is.
20      Q.  Okay.  So is it fair to say in the last nine
21 years you've been sued at least 11 times?  Would that
22 surprise you?
23      A.  Potentially.  That's possible.
24      Q.  Okay.  You don't disagree with that number.
25      A.  I don't know the exact number, but I

Page 52

1  wouldn't disagree with it.
2       Q.  Okay.  Doctor, I want to follow up on that
3  question about the lawsuits.  Have you had any
4  verdicts rendered against you by juries?
5       A.  I don't know if it's against me or the
6  hospital.
7       Q.  Cases where you were a defendant.
8       A.  I don't --
9       I'm going to answer the same way:  I don't
10 think it's against me personally, or if it is, it's --
11 I don't know the semantics of it.
12      Q.  So it --
13      A.  I've been -- I've been told by the hospital
14 that it's -- if there are settlements, that it's not
15 against me personally.
16      Q.  You are aware that --
17      MR. C. GORDON:  I -- I just want to --
18      You and I know the difference between a
19 verdict and a settlement.  You were asking just about
20 verdicts; right?
21      MR. B. GORDON:  I was in that question.
22 I'll clarify.
23      Q.  So in that last question I was asking about
24 verdicts where a jury or a judge decided against you.
25 So have there been any cases that you're aware of

Page 53

1  where you've been a defendant that a judge or a jury
2  has issued an award against you?
3       You're shaking your head.  Is that a no?
4       A.  I don't think any jury or judge, to the best
5  of my knowledge.  I could be mistaken.
6       Q.  Okay.  So you're not sure.
7       A.  I'm pretty sure no.  I haven't --
8       I've only gone to jury once.  Yeah, I've
9  only been in jury once.  Of all these -- these 11
10 cases, it's only gone to jury one time.
11      Q.  Okay.
12      A.  And it was -- and it was, whatever the term,
13 hung jury.
14      Q.  And the other cases have all been
15 settlements, to your knowledge?
16      A.  To the best of my knowledge, yes.  Or -- or
17 dropped.
18      Q.  Or what?
19      A.  Or dropped.
20      Q.  Dropped.  Okay.
21      Do you have any lawsuits that you filed
22 against other physicians?
23      A.  A lawsuit that I filed against a physician?
24      Q.  Where you were a plaintiff and another
25 doctor is a defendant.

14 (Pages 50 to 53)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 54

1     A.  No.
2     Q.  None?
3     A.  Not --
4         I mean maybe I'm forgetting something, but I
5  don't remember suing --
6     Q.  Well let's be very clear.  It's your
7  testimony before the jury in this case that you've
8  never filed a lawsuit against another doctor in
9  Baltimore.
10    A.  Well, it's a question I haven't really
11 thought about or asked.  Have I ever filed a lawsuit
12 against another doctor?
13    Q.  Who is Martin Binstock?
14    A.  Oh.  Well that's not a doctor.  I mean that
15 would have been in a lawsuit that was against Good --
16 my former employer, Good Samaritan Hospital, so I
17 don't know how that was framed.
18        Martin Binstock was the -- one of the higher
19 executive office -- officers at Good Samaritan
20 Hospital.  If he met me now he would give me a hug.
21 So if the lawsuit in name was -- it was a -- I left --
22        So the details of what your implication is,
23 I left Good Samaritan Hospital, which was -- I was
24 part of Johns Hopkins Medical Institution, and I went
25 to Sinai Hospital around 2000 -- you can see that in

Page 55

1  my curriculum vitae -- vitae, which that's correct --
2  and then there was an issue of pay that was -- that I
3  felt that I deserved that wasn't given to me, so there
4  was a lawsuit against Good Samaritan Hospital for
5  payments of the last six months or whatever it was, it
6  might have been -- I don't remember the details of it,
7  which I eventually won.  So if Martin Binstock was
8  part of that lawsuit, it was probably only his name as
9  representing Good Samaritan.  I wouldn't know that his
10 name was on that.
11    Q.  Okay.  My question, just to be clear, was
12 who was Martin Binstock, and that was your answer;
13 right, doctor?
14    A.  Well I was trying to clarify, because to me
15 it came out of nowhere, because Martin Binstock and I,
16 when I've seen him maybe five to seven years ago, are
17 in a great relationship, and I don't think that he
18 would view with me as suing him or --
19    Q.  So you and he --
20    A.  -- relate that.
21    Q.  -- have mended fences.
22    A.  I don't think we didn't ever have mended
23 fences.  I think he was disappointed that I left Good
24 Sam, but he understood some of the reasons.
25    Q.  Doctor, let's talk about your report.  Do

Page 56

1  you have Exhibit 5 in front of you, which I think is
2  your report in this case?
3         MR. B. GORDON:  Let's take a five-minute
4  break.
5         THE REPORTER:  Off the record, please.
6         (Recess taken.)
7  BY MR. B. GORDON:
8     Q.  Doctor, I'm going to ask you, for purposes
9  of the court reporter and the judge and the jury who
10 have to read this transcript, probably, or look at
11 this videotape, would you try to meet me halfway and
12 listen to my questions carefully and try to limit your
13 answers as much as you can?
14        MR. C. GORDON:  Object to the form of the
15 question.
16    Q.  Would you do that for us?
17    A.  I will do the best I can.
18    Q.  I appreciate that much very.  Thank you,
19 doctor.
20        Let's look at your report.  Do you have your
21 report in front of you?
22    A.  Yes, I do.
23    Q.  And that --
24        We've got that market as Exhibit --
25        MR. C. GORDON:  Five.

Page 57

1     Q.  -- 5, right?  Okay.
2     A.  Correct.
3         MR. B. GORDON:  Real quick before we do
4  that, your counsel was kind enough to provide us with
5  some invoices, and I'm going to show you two documents
6  and have those marked as the next two exhibits in
7  order, one from May 16th, 2016, the next from July
8  10th, 2017, and we'll mark those as, I think, six and
9  seven respectively.
10        (Exhibits 6 and 7 were marked for
11        identification.)
12        (Discussion off the stenographic record.)
13 BY MR. B. GORDON:
14    Q.  So doctor, do you have Exhibits 6 and 7 in
15 front of you?
16    A.  Yes, I do.
17    Q.  Have you had a chance to look at those?
18    A.  Yes.
19    Q.  Those appear to be all of the invoices that
20 you submitted to counsel for your work in this case.
21    A.  No.  No.
22    Q.  So there are --
23    A.  There may -- there may be an April 2017
24 invoice.  And --
25    Q.  All right.  And I apologize.  So you think

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 58

1  we may be missing an April of 2017 invoice?
2      A.  Well I don't see it here.
3      Q.  Nor do I.  So bear with me just a minute,
4  doctor.  I thought I had everything.
5          MR. ASSAAD:  Here, it's on the last page.
6          MR. B. GORDON:  Oh.
7      Q.  So if you will, doctor, look at the one
8  we've marked as Exhibit 6.  The third page of that is
9  May of 2017 for work that was presumably submitted, it
10  says, April -- it says "MICHAEL MONT, APRIL INVOICE
11  2017."  Is that the one you're referring to?
12      A.  Yes.
13      Q.  Okay.  Let me ask you about that one first.
14  Setting aside the first two pages of that exhibit,
15  which relate to work you did for science day, as I
16  understand it --
17          Is that right, the first two pages?
18      A.  I haven't looked at this lately.
19      Q.  Let me ask it this way.
20      A.  Please ask the question again.
21      Q.  Yeah, let me ask it this way.  On page --
22          On Exhibit 6, the first two pages are dated
23  two different dates in May of 2016; correct?
24      A.  They're May 16th, May 24th, 2016, correct.
25      Q.  So given that fact, that those are 2016,

Page 59

1  would that refresh your recollection that this work
2  related to the time you spent on science day --
3      A.  Well --
4      Q.  -- in preparation for --
5      A.  Yes.  And also reading the actual invoice,
6  it says "Rehearsal day," so that sounds like the day
7  before.
8      Q.  Right.  Yeah.  Let's talk about that.  The
9  one you're talking about at the top of the beginning
10  of the first page of Exhibit 6, you -- you've got a
11  couple of things that mention "Dry run with Peter
12  Goss" --
13          What was that about?
14      A.  I don't --
15          I'd have to really wrack my brain to
16  remember exactly, but it probably was just going over
17  some details of what I was presenting.  So on the
18  science day I made a presentation, which you were
19  there for, and it would have been -- is this the
20  correct -- there was a multitude of material that
21  could have been presented.  I had to know exactly what
22  was -- lot of details, my time limit, what are the
23  details to be put into that presentation, et cetera.
24  So that -- that answers your question.
25      Q.  So what does "dry run" connote to you,

Page 60

1  doctor?
2      A.  This is what I'm going to present at this --
3  close --
4          This is what I'm proposing to present at
5  science day to another party.
6      Q.  And so that, to the best that you can
7  describe it for the jury, was about an hour you spent
8  with Mr. Goss where he -- just sort of a mock
9  examination of you for science day?
10      A.  I don't think he did an examination.  I
11  think I just gave him my presentation, and he
12  critiqued how I did.
13      Q.  And then --
14          MR. C. GORDON:  Ben, I need to impose --
15          You can ask questions, but I want to put --
16          MR. B. GORDON:  I'm asking a question.
17          MR. C. GORDON:  -- put an objection on the
18  record.  But yeah, science day was, per the court, off
19  the record, and I mean it was not -- so --
20          MR. B. GORDON:  I'm not asking the
21  substance.  I won't get into the --
22          I'm almost done here.
23          MR. C. GORDON:  Okay.
24          MR. B. GORDON:  Thank you.  I understand
25  that, Corey.

Page 61

1      Q.  And then the other thing you mentioned was,
2  quote, "Rehearsal day, 4 hours," so that was half a
3  day that you spent rehearsing what you were going to
4  do at science day; is that fair?
5      A.  Yes.
6      Q.  Okay.  Let's turn to page three of Exhibit
7  6, and this is your April invoice from 2017, April of
8  2017; correct?
9      A.  Oh.  Yes.
10      Q.  And one of the --
11      A.  Sorry.  So --
12      Q.  Sorry.
13      A.  Yeah, I see now.  That's true.
14      Q.  Here's my question.  Yeah.  So we've got the
15  one you -- you thought was missing, and so one of the
16  things I note on here is that about one, two, three,
17  four -- five lines down you say "Initial Review Jarvis
18  report, 30 minutes."  Do you see that?
19      A.  Yes.
20      Q.  Is there anywhere that you have time for
21  additional review of Dr. Jarvis's report?
22      A.  I don't -- we can look at it.  You can -- if
23  you know I didn't, I can --
24          Do you want me to look at the May and
25  June --

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 62

1    Q.  Well --
2    A.  -- invoice?
3        The answer is, just as a general, there are
4   a number of reviews.  This is probably understated,
5   some of this.  I did a lot of reviews.  Sometimes I
6   didn't record when I looked at something for 10 or 15
7   minutes -- or 10 minutes or 15 minutes, I just --
8        So -- so these -- these are known time
9   periods that I took out, recorded it.  There are other
10  times I didn't record it.  The Jarvis report was
11  something that -- that to me I looked at, I scanned
12  it, I spent some time on it, and I put "Initial
13  Review" because my brain said potentially I'll come
14  back to this and put a lot more detailed time into it
15  if I think I need it.
16   Q.  And that's really my question, doctor.
17  This -- this says "Initial Review."  Doesn't that
18  denotatively imply there will be more review of Dr.
19  Jarvis's report?  Doesn't it?
20   A.  Potentially.
21   Q.  Okay.  Was there?  Have you done any more?
22       Let's look at Exhibit 7 --
23   A.  I -- I think --
24   Q.  -- if you want to.
25   A.  I think that --

Page 63

1    Q.  Have you spent any more time on Dr. Jarvis's
2   report as far as anything reflected --
3    A.  I think --
4    Q.  -- in these two invoices?
5    A.  I would say less than 10 minutes.
6    Q.  Okay.  And let's look at --
7    A.  But I have spent --
8        I probably wouldn't have put that into these
9   invoices.
10   Q.  And let's look at Exhibit 7, which are your
11  July and June -- dated July and June but actually your
12  June and May invoices.  You see those?
13   A.  Yes.
14   Q.  And, for example, in the first page dated
15  July 10th, reflecting your June invoice from 2017, the
16  second line you have "Review Richard Wenzel report, 3
17  hours."
18       Who is Richard Wenzel?
19   A.  He is one of our experts.
20   Q.  One of your experts.  One of the defense
21  experts; right?
22   A.  Yes.
23   Q.  He's a defense infectious disease doctor;
24  right?
25   A.  Yes.

Page 64

1    Q.  And Dr. Jarvis is the plaintiffs'
2   infectious --
3    A.  Yes.
4    Q.  -- disease doctor; right?
5    A.  Yes.
6    Q.  And you spent three hours on Dr. Wenzel's
7   report just in this one statement; correct?
8    A.  Correct.
9    Q.  And only 30 minutes plus 10 minutes you said
10  on Dr. Jarvis's report; correct?  My question --
11   A.  Yes.
12   Q.  My question is:  Is that correct?
13   A.  Yes.
14   Q.  So in your mind, before this jury under
15  oath, is it your testimony that you put six times more
16  emphasis and importance on Dr. Wenzel's report as Dr.
17  Jarvis's?
18   A.  Incorrect.  And the explanation is that
19  since I'm sitting here, I don't --
20       There's a lot of different reasons for that.
21  One of the reasons would be if he is covering certain
22  topics as part of this defense, then I would want to
23  know what he's saying very precisely; I wouldn't want
24  to nec -- number one, I wouldn't want to necessarily
25  replicate what he's already doing.  There are --

Page 65

1   number two, there are degrees of expertise that people
2   have.  I'm supposed to be an expert on orthopedics but
3   I also -- my expertise runs past orthopedics in a lot
4   of different areas.  He's an infectious disease
5   expert.  I have to know infectious disease.  I write a
6   lot of papers and reports on infectious disease, but I
7   certainly want to know what -- his opinions and
8   where -- what topics he might be talking about --
9    Q.  Dr. Wenzel you're talking about.
10   A.  We're talking about Dr. Wenzel.
11   Q.  But not Dr. Jarvis.
12   A.  Well I'm --
13   Q.  He's an infectious disease doctor too;
14  right?
15   A.  Well I glanced at what he --
16   Q.  He was with the CDC for 23 years.  Are you
17  aware of that?
18       MR. C. GORDON:  Object to the form of the
19  question.
20   A.  He mentioned something like that.
21   Q.  Do you not --
22   A.  On science -- science day he mentioned
23  some --
24   Q.  Do you not recognize Dr. Jarvis as a leading
25  authority in the world on infectious disease?

17 (Pages 62 to 65)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 66

1      MR. C. GORDON:  Object to the form of the
2  question, lack of foundation.
3      A.  I don't -- I don't recognize one way or
4  another.
5      Q.  Okay.
6      A.  So it would be in his report.
7      Q.  Have you talked to Dr. Wenzel about Dr.
8  Jarvis?
9      A.  I'm not sure.  I can't ans --
10      Q.  Have you talked to Dr. Wenzel?
11      A.  I've talked to Dr. --
12          Yes, I have talked to Dr. Wenzel.
13      Q.  Have you asked him what he thinks about Dr.
14  Jarvis?
15      A.  I don't remember.
16      Q.  Would it surprise you that he thinks Dr.
17  Jarvis is one of the leading authorities on infectious
18  disease in this country for sure?
19      MR. C. GORDON:  Object to the form of the
20  question, assumes facts not in evidence.
21      Q.  Does that surprise you?
22      A.  I'd have to think about the answer and --
23      Q.  Okay.
24      A.  -- go over it.
25      Q.  That's fine.  You think about it.  We'll

Page 67

1  come back to it.
2      A.  The ans -- the question --
3          Does that mean --
4      Q.  You think about it.
5      A.  -- at the present time or back in the
6  '90s --
7      Q.  Well --
8      A.  -- or something like that?
9      Q.  -- think about it and we'll come back to it.
10          Let me ask you this:  So you said it was
11  incorrect when I asked you if you thought Dr. Wenzel's
12  report was six times more important to you than Dr.
13  Jarvis's, so that means Dr. Jarvis's report is at
14  least somewhat important to you?
15      MR. C. GORDON:  Object --
16      Q.  How would you characterize it?
17      MR. C. GORDON:  Object to the form of the
18  question.
19      Q.  Is it one-half as important as Dr. Wenzel's,
20  a third?
21      MR. C. GORDON:  Object -- object to the form
22  of the question.
23      Q.  Well you would say it's not as important as
24  Dr. Wenzel's because you spent one-sixth the amount of
25  time reviewing it.  Is that fair?

Page 68

1      A.  It doesn't -- it doesn't ascribe the
2  importance.  Time spent on something doesn't ascribe
3  whether -- a quality of importance or a rating of
4  importance or not.  Some things that are important you
5  might spend five minutes on because you know it or you
6  see it, other things that you find unimportant for
7  opinions, you might spend a lot of time on it.  So
8  I've never thought of it that way and I don't
9  necessarily agree with that.
10      Q.  Isn't it true, doctor, that you had your
11  mind made up when you came into this case that you
12  thought the Bair Hugger was a perfectly safe device?
13  Isn't that correct?
14      A.  When I -- when I came into this case?
15  No, --
16      Q.  Right.
17      A.  -- that's not -- that's not how I felt.
18      Q.  You didn't come into this case with the
19  preconceived belief that the Bair Hugger device was a
20  safe and effective device to use in surgery?  Is that
21  your testimony before this jury?
22      A.  The best answer is that I came into --
23          I believed that the Bair Hugger was safe
24  because it was used at the hospital that I was at and
25  has continued to be used --

Page 69

1      Q.  And that was before you were retained in
2  this case; correct?
3      A.  Yes.
4      Q.  Okay.  Thank you.  Let me ask --
5      MR. B. GORDON:  I'm going to mark some
6  additional exhibits, doctor.  I want to mark next in
7  order the exhibits that you had to your report, and
8  I'm going to -- we're going to call these 8, 9, 10,
9  11, 12 and 13, in the order that I'm going to hand
10  them to the court reporter, and then we'll talk about
11  them.
12          Hopefully that works, Dick.
13          (Exhibits 8 through 13 were marked for
14          identification.)
15  BY MR. B. GORDON:
16      Q.  So doctor, I'm going to do my best to
17  describe these and then show them to you and --
18          (Witness texting on cellphone.)
19      MR. B. GORDON:  Do you need to take a
20  minute?
21      THE WITNESS:  I'm okay.
22      MR. B. GORDON:  Okay?
23      Q.  No. 8 I'm going call what you list as
24  "EXHIBIT A - REFERENCES AND MATERIALS CONSIDERED" and
25  ask you if that sounds like a fair description of that

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 70

1  document.
2      A.  Yes.
3      Q.  And No. 9 -- thank you.
4          And No. 9 is entitled "Mike -- Michael A.
5  Mont 6/1/2017 Depositions and Trials," and this
6  appears to be a list of your testimony going back to
7  2013 in other cases.  Does that look right?
8      A.  Yes.
9      Q.  Thank you.
10         No. 10 is a photo compilation of something
11 entitled "Sources of Heat in the Operating Room;"
12 correct?
13     A.  Yes.
14     Q.  No. 11 is a document entitled -- looks like
15 an abstract, a medical abstract entitled "HEPA Filters
16 Do Not Affect Infection Rates Following Primary Total
17 Joint Arthroplasty With Forced Air Warmers;" is that
18 correct?
19     A.  Correct.
20     Q.  No. 12 is a stack of photographs -- some of
21 which I think you presented at science day, but you
22 tell me if I'm wrong -- and it starts out "Bair Hugger
23 Blanket" and looks like it's a depiction of an
24 operating room setting with you on the table, if I'm
25 not mistaken.  Is that right?

Page 71

1      A.  That's not correct.
2      Q.  That's not you.
3      A.  That's not me.
4      Q.  Okay.
5          MR. C. GORDON:  Were those -- were those the
6  attachments to his report?
7          MR. B. GORDON:  Yes.
8          MR. C. GORDON:  Okay.
9          MR. B. GORDON:  Yeah.
10     Q.  These all have been attachments to your
11 report, so that's --
12     A.  Way younger person.  I wish it was me.
13     Q.  Okay.  So -- so that's --
14         It's fair to say, though, that's a --
15     A.  No.  I don't know --
16     Q.  -- re-creation of an actual patient.
17     A.  I don't -- I don't -- I don't know who that
18 is.
19     Q.  But is it a patient, or is that a mock
20 setup?
21     A.  I believe --
22         To the best of my knowledge this is a mock
23 setup because you're seeing a patient -- I mean you're
24 seeing a per -- an individual on a table, and the way
25 the leg is prepared is not -- for modesty issues

Page 72

1  there's -- there's a thing there, and that's not the
2  way you would --
3          So I think it's -- it's just a -- it's a
4  mock demo with a model.  I don't know who the model
5  is.
6      Q.  Okay.  I guess my question is:  As to all of
7  those photos -- and there's one more that we've marked
8  separately as Exhibit 13 entitled "Common Sources of
9  Bacteria in Operating Room" -- and I guess with
10 respect to all of these, did you prepare these photos
11 and these representations of the operating room
12 setting?
13     A.  Inso -- insomuch as I might have helped
14 pick -- I -- I didn't -- I didn't -- the --
15         The true answer is I didn't -- didn't
16 physically prepare it, like I copied this or I did
17 this, but insomuch as I had input on which of these
18 pictures were selected, the answer is yes.  If that
19 answers your question.
20     Q.  It does.  Let me ask a followup question.
21 You --
22         Did you supervise the representation of mock
23 surgical settings that are depicted in these photos,
24 or at least some of these photos?
25     A.  I wouldn't say "supervise."  I was part of

Page 73

1  the team that discussed and selected these.  I -- I --
2      Q.  Who else was on that team?
3      A.  I would say Corey Helton.
4      Q.  Corey Helton.  Who is that?
5      A.  Corey.
6      Q.  Oh, Corey Gordon.
7      A.  Corey Gordon.  I'm -- not Helton.  I'm
8  thinking --
9      Q.  Who is Corey Helton?
10     A.  -- of a baseball player.
11     Q.  Oh, okay.
12     A.  I'm sorry.  I'm a baseball person.
13         MR. C. GORDON:  He's a baseball player,
14 Corey Helton?
15         THE WITNESS:  Yeah.  Yeah.  Anyway, my --
16 I -- I --
17     Q.  Okay.  So counsel helped put these together;
18 is that fair?
19     A.  Cor --
20         Yeah, Corey Gordon and counsel.  And let me
21 think.  Is there anybody else that helped us put this
22 together besides --
23     Q.  Any other non-lawyers involved, any like
24 nurses or doctors?
25     A.  I wouldn't know if Dick Wenzel inputted on

19 (Pages 70 to 73)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 74

1  that or not, or somebody like that.  So basically it
2  was me and the counsel team.
3      Q.  Who are the people depicted in some of these
4  photos?  Are these staff that work for you?
5      A.  No.  I don't know who these people are.
6      Q.  You don't know who those people are.  Okay.
7  And you're aren't physically --
8      A.  I may -- I may have at one point known where
9  this --
10         This might have been a demo that was done.
11 This potentially is something that is on YouTube and
12 these were pictures from them, or it may have been
13 there was -- maybe it's a -- it's a lab in Florida or
14 a lab in Minnesota.  But --
15         I may have known the answer to those
16 questions earlier, but I don't -- as we're sitting
17 here today --
18      Q.  Okay.
19      A.  -- I don't know where --
20      Q.  You kind of anticipated my followup
21 question.  You don't know as we sit here today with
22 certainty where those operating rooms or mock
23 operating rooms took place.
24      A.  I'm sure --
25         If you want, I'll -- we -- I can find out

Page 75

1  later.  We can ask.
2      Q.  Yeah.
3      A.  I believe I would try to figure out, if you
4  want.
5      Q.  Yeah.  And if you figure it out in a
6  break --
7      A.  Let me --
8      Q.  -- and you want to tell us later, then that
9  would be --
10     A.  No, no.  Well I'd have to go and do a little
11 research in the break, if that's what you want me to
12 do.
13     Q.  Well I don't want you to take time away from
14 your testimony here today, doctor, but certainly at
15 some point between now and the time of trial we'd like
16 to know, if you know, where those operating rooms
17 were, who set them up, and who the personnel are
18 depicted in those.
19     A.  Okay.  So where they were --
20     Q.  Who -- who supervised or set up the --
21     A.  Who set up.
22     Q.  -- representations and --
23        So where they were, who's in them, who set
24 it up.  Who, where, what.
25     A.  Okay.

Page 76

1      Q.  All right.  Thanks, doctor.
2         Now we'll set those aside for the moment and
3  come back.
4         And let's go back to your report, which was
5  Exhibit 5, and turn -- have you turn to page three
6  where you start opinions.  Okay?  And let me ask you
7  first:  Are you familiar with Federal Rule of
8  Evidence -- I'm sorry, Federal Civil Procedure 26 at
9  all?
10     A.  Can you say that again?  Federal what?
11     Q.  Federal Rule of Civil Procedure 26.  You've
12 heard that before; haven't you?
13     A.  No, I have not.
14     Q.  You've heard of a Rule 26 report.  You've
15 done a bunch of them over the years; haven't you,
16 doctor?
17         MR. C. GORDON:  Object to lack of
18 foundation.
19     A.  You may -- you may know better than me
20 because I don't -- this is --
21         I'm not a lawyer and I don't know things
22 like Civil Procedure 26.  I try to --
23     Q.  Okay.  So you just don't know the term Rule
24 26 report.  That's fine.  That's fair.
25         The report you have in front of you, which

Page 77

1  we've marked as Exhibit 5, is your complete report and
2  the basis for your opinions in this case up to this
3  point in time; is that fair?
4      A.  I guess that's the report, and then I
5  guess --
6         I don't know where you put the supplemental
7  materials into that answer --
8      Q.  Well let me ask you this --
9      A.  -- but --
10        I guess that and the supplemental materials.
11 But --
12     Q.  You knew there was a deadline to issue your
13 report in this case; right?
14     A.  Yes.
15     Q.  You mentioned June 1st or June 2nd; right?
16     A.  Yes.
17     Q.  And you -- you complied with that deadline;
18 right?
19     A.  Yes.
20     Q.  And you did everything in your power, to the
21 best of your ability, up through and including that
22 date, to include everything in your report that you
23 thought expressed your complete opinions in this case;
24 correct?
25     A.  Correct.

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 78

1    Q.  And the support for those opinions; correct?
2    A.  Yes.
3    Q.  All right.  So let's talk about some of
4  those opinions.
5        On page three, the first opinion that you
6  state, your number-one opinion is, quote, "The major
7  source of periprosthetic joint infections (PJIs) is
8  the patient's own skin;" correct?
9    A.  Correct.
10    Q.  So I want to know every single piece of
11  support you can cite as the basis for that opinion.  I
12  need specific citations of authority for that narrow
13  opinion.
14    A.  I -- I don't think that many of these
15  citations are of authority.  This is a whole list of
16  body of literature.  To -- to call one
17  authoritanian -- authoritarian is a misnomer.
18    Q.  Well I didn't say authoritarian.
19    A.  But I -- I view this as more of --
20        (A person enters the deposition room.)
21        THE REPORTER:  Go off the record.
22        (Discussion off the record.)
23    A.  I'd say where to get that opinion, some of
24  that to me is knowledge that I had as -- it's a
25  working knowledge that I had when I first got

Page 79

1  introduced to orthopedics as a resident.  There are
2  different documents from --
3        So it's a general knowledge from the CDC and
4  different things.  I think even Dr. Jarvis himself in
5  the '90s wrote a document for -- that talks about
6  sources of infection coming from the patient's skin
7  and -- and body majority-wise.  But I don't know
8  which --
9        There's a whole bunch of articles that are
10  listed here, 11.  I don't know if it's every article
11  that I wrote.  I just put some of them that are
12  dealing with the skin and decontamination.  That's why
13  I spent so much of my life -- no -- a -- a good
14  portion of research -- my research life with studying
15  skin decontamination.  We were able to reduce
16  infection rates by like 60 or 70 percent, sometimes
17  even more.
18    Q.  And -- and we're going to talk about that,
19  but let me just take you back to this question right
20  now, doctor.  The -- the question we're talking about,
21  top of page three, is your one sentence in bold, "The
22  major source of PJIs is the patient's own skin."  I
23  just want to take you to that narrow question right
24  now and ask you to look at Exhibit 8, I think it is --
25  yeah, Exhibit 8, which is your "EXHIBIT A --

Page 80

1  REFERENCES AND MATERIALS CONSIDERED," and ask me what
2  specific authority, if anything, on this list supports
3  that statement.
4        MR. C. GORDON:  On only --
5        You -- you want to limit him to what's on
6  the reference list --
7        MR. B. BORDON:  Well --
8        MR. C. GORDON:  -- as opposed to what he
9  specifically cited in that specific section?
10    A.  This is in my report.  There's 11
11  references.
12    Q.  Well doctor, you have --
13        You're referring now to 11 references on
14  pages four and five --
15    A.  Correct.
16    Q.  -- relating to chlorhexidine skin prep and
17  control of the skin in an operating setting; right?
18    A.  Skin infections, which is a direct answer to
19  your question.
20    Q.  And we're going to talk about that.  But are
21  you saying that these 11 sources specifically support
22  the statement that the major source of periprosthetic
23  joint infections is the patient's own skin?
24    A.  Some of them say that.
25    Q.  Okay.

Page 81

1    A.  I'd have to look at the references.  Some of
2  them mention that.
3    Q.  And what these articles reference, do they
4  not, doctor, is a process that you as a surgeon follow
5  and other surgeons follow to try to prevent skin from
6  having infective microorganisms; correct?
7    A.  Correct.
8    Q.  Okay.  So you're trying to control for that
9  possibility, that there might be microbes on the skin;
10  right?
11    A.  Correct.
12    Q.  And so what I'm asking you now is a little
13  different than, I think, and that is:  Are there any
14  specific authorities that say that notwithstanding
15  that prep that you've done with the chlorhexidine that
16  you've been so, you know, scrupulous about in these
17  references, there are patient's own skin flora that
18  still can cause PJI notwithstanding that chlorhexidine
19  prep?  Are there any specific references that say
20  that?
21    A.  I don't really understand the question.
22    Q.  Well let me -- let me rephrase it.
23    A.  You have to --
24        I don't understand the "notwithstanding"
25  part.

21 (Pages 78 to 81)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 82

1    Q.  So you say, the beginning of page three, you
2  know, your first opinion in this report --
3        In fact, it's in bold; right, doctor?
4    A.  Yes.
5    Q.  You put it in bold; right?
6    A.  I wrote this report.  Yes, I did it.
7    Q.  You intended to emphasize this opinion;
8  right?  It's number one in your report; right?
9    A.  I don't know if the ordering of --
10    Q.  It's the first opinion in your report; isn't
11  it?
12    A.  But that --
13        I don't think the first is necessarily the
14  most important.
15    Q.  Okay.  It's in bold; isn't it?
16    A.  I -- I -- I just put a list of opinions.  I
17  didn't --
18    Q.  All right.
19    A.  -- I didn't put a value equation on which
20  one is more --
21    Q.  Well the jury can decide --
22    A.  -- or less important.
23    Q.  -- if they think it being first has any
24  weight.
25    A.  Okay.

Page 83

1    Q.  It's in bold.  Does that give it some
2  intended emphasis?
3    A.  Well I --
4        Aren't all them in bold?
5    Q.  Well just the --
6    A.  Yeah, they're all --
7        A lot of the opinions are in bold.  So this
8  whole thing --
9    Q.  So anything in bold you intended to
10  emphasize; did you not?
11    A.  No.  They -- no.
12        MR. C. GORDON:  Object to the form of the
13  question.
14    A.  The bold was to --
15        No.
16    Q.  Okay.  So --
17    A.  The bold was to separate different, in my
18  opinion --
19        The way I intended this report to be is that
20  the bold was separating different concepts --
21    Q.  Okay.
22    A.  -- so that the reader could look at them
23  with a little bit of ease rather than have a single
24  18-page opinion without separations.  And what I could
25  have done was number them, and what I could have done

Page 84

1  in reference to your thing, which if I looked at this
2  again I would have written something like "Here are my
3  opinions numerically numbered, not necessarily in
4  order of importance," which is what I usually do on
5  reports.
6    Q.  So the fact that this opinion is in bold and
7  is listed first in your report has no weight in where
8  it stacks among your opinions.
9    A.  I -- I --
10    Q.  Is that fair?
11    A.  I apologize to you and to the jury for not
12  making that -- which is in almost every record that
13  I've ever done before, that the following are my
14  opinions, usually numbered, and I say "not necessarily
15  in order of importance or priority."  That's in --
16        And if you looked at my last five hypes, or
17  whatever opinion, they all have that same sentence.  I
18  don't know why this one didn't.
19    Q.  So this is just one of your opinions;
20  correct?
21    A.  Yeah.  And they're bolded just to -- they're
22  bolded just to separate them.
23    Q.  Yeah.  Separate them but not emphasize them.
24  I got it.
25        So let me ask you this:  There's not a

Page 85

1  single citation in that paragraph of any authority; is
2  there?  You mention the 11 citations --
3    A.  Well -- well --
4    Q.  -- two pages later, but is there a single
5  citation of authority in that paragraph for that
6  proposition?
7        MR. C. GORDON:  Object to the form of the
8  question, --
9    A.  There's -- there's 11 --
10        MR. C. GORDON:  -- mischaracterizes the
11  evidence.
12    A.  There's 11 citations after this section that
13  are cited.
14    Q.  One, two, three, four -- five paragraphs
15  down there are 11 citations relating to a paragraph
16  that begins about chlorhexidine prep.
17    A.  Yeah.
18    Q.  And all of those citations concern
19  chlorhexidine prep; don't they?
20    A.  No, I don't think so.
21    Q.  Well they -- they all concern skin prep.
22    A.  No.  Number five says "Preoperative skin
23  disinfection..."
24    Q.  That's not skin prep?
25    A.  Well okay, that is.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 86

1      Let me look at the rest of this.
2      Q.  Show me which one does not concern skin prep
3  in some way.  And the -- and the question I'm asking
4  you about, --
5      A.  Okay, so --
6      Q.  -- your first opinion doesn't relate to skin
7  prep, it's making the skin --
8      A.  All right.  So -- so I didn't --
9      I have published on prevention of
10  perioperative infections.  I didn't put it in those 11
11  references.  To me it's a more common-knowledge
12  statement.  And I'm happy to provide you or the court
13  and the jury with references to that opinion, but I
14  didn't put it here.
15      Q.  Okay.  And now that's why I'm asking.  Since
16  there's not a citation on page three with respect to
17  that first proposition, first opinion about the
18  patient's own skin being the source of maj -- a major
19  source of the PJIs, where in Exhibit A, your list of
20  references and materials considered, do you -- do you
21  find support for that proposition?  Is there
22  anything --
23      A.  I'd have to go through the articles.  And I
24  believe that some of these --
25      First of all, some of these references would

Page 87

1  support that proposition of these 11, because --
2      Q.  Can you point to one?
3      A.  I have to look at them, because some of them
4  have it, some of them none.
5      Q.  All right.  Well as we sit here right --
6      A.  Because when you write the paper, the first
7  paragraph of the paper --
8      Q.  Pretty important, first paragraph; right?
9      A.  -- often might say that skin contamination
10  is the major source of infection.  It -- the first
11  paragraph of many of these papers might say that.  So
12  even though you're saying -- and I hear you -- that
13  the major topic is that -- that statement, that bolded
14  statement, it -- that statement is very -- is in some
15  of these papers, --
16      Q.  You're -- you're --
17      A.  -- or very similar to it.
18      Q.  Doctor, you're familiar with the old adage
19  "First impressions are lasting impressions;" right?  I
20  mean you intended for the first thing in this report
21  to be --
22      A.  No, I did not.
23      Q.  -- important; did you not?
24      Okay.  So it's not.
25      A.  No.  As a matter of fact, I didn't --

Page 88

1      As you're pointing this out, if -- that
2  may -- that may be good, but no, I didn't do it that
3  way.  I should have -- I just told you a few answers
4  back that I should have said --
5      You know, I'm not the one to decide what are
6  the major and critical issues of this case.  I wanted
7  to put all my opinions in.
8      Q.  Who is the one to decide?
9      A.  What?
10      Q.  Who's the one --
11      A.  I think the --
12      You.
13      Q.  The lawyers?
14      A.  Probably.  You're --
15      Q.  So it's --
16      A.  You're the one trying the case.
17      Q.  So it's not the scientists who should decide
18  what the important issues in this case are?
19      A.  Well let's -- let's -- then let's -- let's
20  answer --
21      MR. C. GORDON:  Object to the form of the
22  question, lack of foundation.
23      A.  -- that it's a team effort.  But I'm not --
24      I'm only one member of the team and I just
25  wanted --

Page 89

1      Q.  The rest of the team were lawyers.
2      MR. C. GORDON:  Object to the form of the
3  question.
4      A.  No, it could be other experts like me, it
5  could be the jury, it can be the judge, --
6      Q.  It's not up to you --
7      A.  -- it could be a whole team of people that
8  are going --
9      Q.  You said you came into this case with an
10  open mind about the answer you were looking at, right,
11  about the answer that you were trying to -- to derive
12  in this case.  What -- what was the question --
13      A.  Answer, yes.
14      Q.  -- you were trying to answer you described
15  at the beginning?
16      I guess two questions, whether -- whether
17  this device led to an increased risk of SSIs or
18  whether it was defective.
19      Q.  And you told us earlier that you believed,
20  based on your history, that it was a safe device.
21      A.  Yes.
22      Q.  Okay.  Let -- let's talk about a little
23  farther down on page three.  There's another
24  statement, doctor, on page three where you state that
25  the factors that are --

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 90

1    Well bear with me because I think it's a
2  typo.  In the middle of the second paragraph -- do you
3  have that in front of you, the paragraph that starts
4  "A brief discussion...?"
5    A.  I'm looking at it, yes.
6    Q.  Okay.  It says, "The factors that are can
7  cause..."  I think -- I think maybe there's a
8  superfluous "are" there.  I think it means, "The
9  factors that can cause PJIs involve the host and the
10  environment."  Would you agree with me that's the way
11  that should read?
12    Well let's forget about it.  I'm not worried
13  about the "are."  Let's -- let's read it as it is.
14  "The factors that are can cause PJIs involve the host
15  and the environment."
16    The fact is, however you read the "are" and
17  the "can," that's a bit of a misstatement; isn't it,
18  doctor?
19    A.  I -- I don't know.  What are you --
20    Q.  Well --
21    A.  Well if I said "are" and "can," that's a
22  misstatement.  It's obviously --
23    Q.  Well --
24    A.  Thank you for pointing that out.  There's --
25  there's --

Page 91

1    Q.  I'm not worried about that, that's why I
2  tried to correct it.  I'm not worried about it.  My --
3  my real question is, doctor, even with a correct of
4  that -- correction of that typo, the statement that
5  PJIs are caused by the host and the environment is
6  inaccurate; isn't it?
7    A.  I -- I think in some ways you can say it's
8  semantics.  You --
9    Q.  Well a microbe can cause --
10    A.  I -- I might say it better that --
11    THE REPORTER:  I'm sorry.
12    MR. B. GORDON:  Sorry.  Go ahead.  Go ahead,
13  doctor.
14    A.  Do you want --
15    Q.  Let me start it -- I'll re -- I'll start the
16  question over.
17    Doctor, you have to have a microbe of some
18  kind to cause an infection; don't you?
19    A.  Yes.
20    Q.  Okay.  So like the old adage when we were
21  kids and -- and maybe our moms or parents told us
22  don't go outside without your coat on or without your
23  shoes on, you'll catch cold, that's just --
24  scientifically that's just nonsense; right?
25    A.  Don't go out --

Page 92

1    MR. C. GORDON:  Object to the form of the
2  question.
3    A.  Not necessarily anyway, but keep going.
4    Q.  Well doctor, you can't catch cold --
5    THE REPORTER:  Off the record.
6    (Discussion off the record.)
7  BY MR. B. GORDON:
8    Q.  All right, doctor, let's start again.  So
9  let me ask you a question.  You can't catch a cold, a
10  rhinovirus, without being exposed to someone else with
11  an infective organism; correct?
12    MR. C. GORDON:  No.
13    A.  That's not correct.
14    Q.  Okay.  So -- so it's your testimony that you
15  can catch a virus without being exposed to the virus?
16  How does that work?
17    A.  I didn't say that.
18    Q.  All right.  Well I'll ask you another
19  question.  Let me ask it this way:  Can you go outside
20  and catch a virus simply because you're not dressed
21  for inclement weather?  Is that possible?
22    MR. C. GORDON:  Object to the form of the
23  question.
24    A.  I don't know how to answer the question.  If
25  somebody has their --

Page 93

1    If they're not dressed appropriately and
2  their immune system is down, they may be more
3  susceptible to ambient rhinoviruses or parvoviruses in
4  the environment from droplets that they could
5  theoretically be at increased risk, and there are
6  anecdotal studies like that that I've seen, but I'm
7  not -- where they say, "Maybe what mom said was
8  correct," but I'm not an absolute expert on that
9  topic, so I think we should use perhaps a different
10  analogy.  I understand that you're saying that about
11  cause and effect.
12    Q.  Thank you for that clarification, doctor.
13  And I -- I guess that that's really my point, is that
14  those airborne droplets you mentioned of
15  microorganisms, viral or otherwise, whether you have a
16  susceptibility or not, you at least have to have them
17  in order to come down with the virus; don't you?
18    MR. C. GORDON:  Object to the form of the
19  question.
20    A.  The question is --
21    I think you're saying that to get an
22  infection you have to have the antecedent infective
23  particle, DNA, virus, bacteria, and the answer to that
24  question, if that's what you're asking me, is yes.
25    Q.  Thank you, doctor.

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 94

1      Let's move on in your report a little
2  farther down.  In the same paragraph on page three you
3  state, quote, "Host factors" -- make sure I get this
4  right.  "These host factors can have an enormous
5  impact on the patient's own bacterial burden, as well
6  as the patient's ability to resist infection from
7  endogenous bacteria (bacteria that come from the
8  patient)."
9      Do you see where I'm reading?
10     A.  Yes.
11         MR. C. GORDON:  You read it wrong.
12         MR. B. GORDON:  Okay.  I'm sorry.  Let me
13  read it again.
14     Q.  "These factors can have an enormous impact
15  on the patient's own bacterial bioburden, as well as
16  the patient's ability to resist infection from
17  endogenous bacteria (bacteria that come from the
18  patient)."
19         MR. C. GORDON:  Now you got it wrong in a
20  different way, but --
21     A.  You left out the word -- the second word
22  "host" this time.  But other than leaving out the word
23  "host" when you read this this time --
24     Q.  "These host factors..."  All right.  I
25  apologize.

Page 95

1      A.  -- then that's the sentence, yes.
2      Q.  Well my question --
3          I wanted to alert you to that sentence, and
4  my question about that is:  What do you mean by
5  "bacterial bioburden?"
6      A.  Again, I wrote this now --
7          I did read this a few times over again.  I
8  was using this material just as a little bit of a
9  background, so I don't know exactly what I meant.  But
10  when I'm talking about bacterial bioburden, we're
11  talking about the amount of bacteria on the patient's
12  skin, sometimes in their nasal -- their nares or
13  their whole body, sometimes even in their GI tract,
14  sometimes --
15         For example, it would be considered an
16  excess bioburden if somebody had an open sore on the
17  same leg that we're doing a knee replacement.  That
18  might increase the bi -- the bacterial bioburden.  I
19  think this -- these were general comments that I made
20  about patient-specific bacterial bioburden.
21     Q.  So let me ask you, with respect to a
22  patient's own bacterial bioburden:  Their bacterial
23  bioburden in and of itself, regardless of what level
24  that may be at, cannot cause their infection; can it,
25  doctor?

Page 96

1      A.  I -- I --
2          MR. C. GORDON:  Object to the form of the
3  question.
4      A.  I don't see why not.
5      Q.  Well let --
6      A.  What -- what are you --
7          Unless I'm missing something of what you're
8  asking me here.
9      Q.  Yeah.  Let me ask a followup question.  The
10  bacteria that you're referring to, whether there are
11  few or there are many, the bacteria have to find a
12  route, a mode of transmission to the patient's immune
13  system or to their body internally to cause an
14  infection; don't they?
15     A.  I guess I would agree with that, yes.
16     Q.  Okay.  So, for example, I think you
17  mentioned --
18         Well I don't want to talk about science day.
19         So there are advantageous -- to use a
20  word -- bacteria on our skin; are there not?
21     A.  Yes.
22     Q.  And there's evidence that there are certain
23  symbiotic relationships between bacteria both on our
24  skin and inside of us that are written about; is that
25  fair?

Page 97

1      A.  Yes.
2      Q.  And so just because someone has a particular
3  type of bacterium on his or her skin doesn't mean
4  they're going to get an infection; does it?
5      A.  Correct.
6      Q.  Okay.  On the bottom of page three you talk
7  about a --
8      A.  Ahh.
9      Q.  Sorry.
10     A.  Excuse me.  I'm going to amend that last
11  answer.  Sorry.  I answered a little too quickly.
12         It is potentially possible that a person
13  that has a particular type of bacteria -- I have to
14  think about this answer -- that is pathologic as
15  opposed to a more friendly bacteria, that if they have
16  that particular bacteria on their skin, that could
17  lead to an infection because it's not --
18         I think that's a better answer.  And for the
19  most cases my answer was correct, but there can be a
20  scenario where you have a, quote, bad bacteria that is
21  not good.
22         MR. B. GORDON:  Objection, move to strike as
23  non-responsive everything after the word "yes."
24     Q.  Doctor, at the bottom of page three you talk
25  about exogenous sources of bacteria.  Do you see that?

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 98

1  Just before the bottom.  You state, "These host
2  factors can also diminish the ability of the patient
3  to void infection from exogenous sources of bacteria
4  (external to the patient) as well."  Do you see that?
5      A.  I see the sentence.
6      Q.  I'd like to know if you have any specific
7  citations of authority for that sentence.
8      A.  I have to read the sentence more than once
9  because it's a little bit --
10         I have to remember what I was thinking when
11  I wrote this.
12      Q.  And just for the record, while you're
13  reading, doctor, I'm not asking you necessarily what
14  you were thinking or what you're thinking about it
15  right now in terms of what it means, I'm just asking
16  you if there's anything on your Exhibit A references
17  and materials considered or any citation you can give
18  us right now that specifically supports that
19  proposition.
20      A.  I'm looking here --
21         I would have to go through this whole list
22  to see what supports that.  I think Parvizi,
23  "Prevention of Periprosthetic Joint Infection," so
24  it's under Parvizi -- P-a-r-v-i-z-i -- would support
25  that statement.

Page 99

1      Q.  And Dr. Parvizi is a doctor here at the
2  Cleveland Clinic; isn't he?
3      A.  No, he is not.
4      Q.  He's not -- he's not here?  Was he at one
5  time?
6      A.  Never.
7      Q.  Okay.  Where is he located?
8      A.  To the best of my knowl -- to the best of my
9  knowledge, never.
10      Q.  So where is Dr. Parvizi?
11      A.  He is at The Rothman Institute in
12  Philadelphia, Pennsylvania.
13      Q.  And is he --
14      A.  That's R-o-t-h-m-a-n.
15      Q.  Is he part of 3M's infection prevention
16  team, to your knowledge?
17      A.  I don't know.  He might be.
18      Q.  Okay.  Let me ask --
19      A.  I --
20      Q.  Sorry.  Go ahead.
21      A.  Can I qualify this?  I don't really know
22  what 3M -- what you just asked me in answer to the
23  question.  I didn't know that -- if there is a 3M --
24      Q.  Infection prevention --
25      A.  -- whatever you said, infection prevention

Page 100

1  team.  I wouldn't know what that is.
2      Q.  Well what about Dr. Sessler?  You know who
3  Dan Sessler is; right?
4      A.  I know who Daniel Sessler is, if it's the
5  same Dr. Sessler you're talking about in this --
6  that's related to this.
7      Q.  And he's at the Cleveland Clinic; right?
8      A.  He is.
9      Q.  You're not aware that he is part of the
10  infection prevention team at 3M?
11      A.  I'm not.  I didn't even know 3M had an
12  infection prevention team.  It's not part of my
13  review.
14      Q.  So following up on your report, from page
15  three and page four you talk about sources of what you
16  call, again, exogenous bacteria.  For the benefit of
17  the jury, how would you define "exogenous sources of
18  bacteria?"
19      A.  Exogenous can come from any -- anything
20  from, I guess simply -- I don't want to confine my
21  answer but -- outside the patient.  Like from, if
22  we're talking about in the OR, the different -- me as
23  a surgeon, if I shed some bacteria, some skin squames
24  or fomites or things are -- anything outside the
25  patient would --

Page 101

1         Obviously, the word "exogenous" means
2  outside.
3      Q.  So anything in the operating room that might
4  contribute to an infection other than the patient him
5  or herself; is that fair?
6      A.  That might be fair.  Let me think about it,
7  if that's the only context here.
8         Yeah, I -- I would -- I would say that's
9  fair.
10      Q.  And you say at the top of page four that
11  "The operating room environment has a multitude of
12  sources of potential contamination;" correct?
13      A.  Yes.
14      Q.  And you mention a number of them, such as
15  minimizing operating room traffic; right?
16      A.  Yes.
17      Q.  And contam -- decontamination --
18         Or be -- I'm sorry -- being careful about
19  contamination of necessary equipment, and you list
20  several things there; right?
21      A.  Yes.
22      Q.  So the point of this section is that you do
23  everything in your power and surgeons do everything in
24  their power to minimize the risk of these exogenous
25  sources of contamination; right?

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 102

1    A.  What we can, yes.
2    Q.  And you mention a number of things here and
3  then later in your report.  I notice one thing you
4  don't mention are heat -- heater-cooler devices.
5  You're familiar with those; right?
6    A.  I'm familiar with heater-cooler devices.
7    Q.  They're used in cardiac surgery; right?
8    A.  Well I'm not a cardiac surgeon, but I know
9  that they do use these water devices.  Sometimes they
10  use different types of devices.  But I'm not a
11  cardiac -- cardiothoracic surgeon.  Last time I was
12  there was as a resident, which is a few years ago.
13    Q.  But you are aware that they are used in some
14  hospitals in some surgeries to both heat and cool
15  patients; correct?
16    A.  Say what these devices that you're re --
17  this class of devices you're talking about.
18    Q.  Heater-cooler devices.  They are used both
19  for heating and cooling of patients; aren't they?
20    A.  Yes.  But not -- I don't --
21      I'm not an expert on that.  I've seen that
22  written.  I haven't seen those devices personally with
23  my eyes lately.  I will accept it, I've read about it,
24  but I don't --
25      They're not used in orthopedics.  I don't

Page 103

1  know the -- the details.  I'm happy to -- to answer
2  your question by looking it up or going to the
3  cardiothoracic room and get better knowledge.
4      There are -- I'll add that there are some
5  other heating devices when we heat up -- that we use
6  in orthopedics just to heat up fluids when we have
7  the, you know, cool fluids that come out of the
8  freezer that we need in the OR, that gets in the OR to
9  heat up --
10    Q.  Doctor, are you aware -- sorry.
11      You're aware, are you not, that
12  heater-cooler devices have been found to be sources of
13  contamination in operating rooms?  You're aware of
14  that; aren't you?
15      MR. C. GORDON:  Object to the form of the
16  question.
17    A.  I think I've heard about that.  And I don't
18  want to answer imprecisely, but certain -- certain may
19  have been.
20    Q.  So doctor, if there are multiple studies
21  over the course of the last two years and FDA and CCD
22  guidelines with respect to contaminated heater-cooler
23  units causing bacterial infections of cardiac
24  patients, are you telling this jury that you just
25  don't know about that?

Page 104

1      MR. C. GORDON:  Object to the form of the
2  question.
3    A.  I know about that to an ex -- to a very
4  minor extent, because to me they are -- those are
5  different devices.  There are -- there's certainly a
6  lot of different devices in multiple specialties, and
7  I'm trying to confine this to what is used in the --
8  in -- for this device.
9    Q.  Well when you say "for this device," do you
10  mean the Bair Hugger?
11    A.  Or the --
12      We can take it as the Bair Hummer -- Bair
13  Hugger or devices that are -- that are designed to
14  promote normothermia.
15    Q.  So other types of patient warming systems.
16    A.  Yeah.
17    Q.  But in your report, doctor, on page four and
18  later, you mention a number of different devices that
19  are potential sources of exogenous contamination based
20  on your expertise and based on the literature; right?
21      MR. C. GORDON:  Object to the form of the
22  question, it's argumentative, assumes facts not in
23  evidence.
24      He -- he's listing orthopedic devices.
25      MR. B. GORDON:  That's a -- that's a good

Page 105

1  speaking objection.  You got onto me about it.
2    Q.  So doctor, I'm going to repeat the question.
3  I don't think it's argumentative.
4    A.  Okay.
5    Q.  The question is whether, in your report, you
6  listed a number of different operating room devices
7  that you believe are things that have to be looked at
8  with respect to potential contamination of the
9  operating room environment.  Isn't that what you said
10  on page four?
11    A.  It -- I used a --
12      Yeah.  You're using the term "devices."
13  Some of these things are -- I don't know what the
14  definition that you have of "devices" -- some of them
15  are blades, --
16    Q.  Well doctor, you said --
17    A.  -- tips -- suction tips.  I mean they can
18  all be considered devices.  Some of them are operating
19  room traffic.  I just -- I just listed a melange of
20  things in the orthopedic theater that are used that
21  are exogenous sources of -- potential exogenous
22  sources of contamination in the operating room theater
23  and --
24      But I'm happy to answer any question you're
25  asking.

27 (Pages 102 to 105)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 106

1    Q.  Let me read your -- let me read your
2  sentence exactly, doctor, so it's clear for the jury.
3  And I want you to listen for me here and ask you where
4  you limit this to orthopedic cases.
5       Top of page four, quote, "The operating room
6  environment has a multitude of sources of potential
7  contamination.  This should be minimized, as much as
8  possible, by not prolonging surgeries unnecessarily to
9  minimize further skin or wound contamination,
10  minimizing operating room traffic, and being careful
11  about contamination of necessary equipment, e.g.
12  suction tips, blades, saws, light handles, et cetera."
13       Anywhere in those two sentences did you
14  limit your concern about the operating room and
15  potential contamination to just orthopedic cases?
16       MR. C. GORDON:  Object to the form of the
17  question, --
18    A.  I -- I --
19       MR. C. GORDON:  -- it mischaracterizes --
20  wait, wait, wait -- mischaracterizes the -- the -- the
21  evidence, takes it out of context.  And the entire
22  section is about periprosthetic joint infections.
23       MR. B. GORDON:  Object to counsel's side-bar
24  and testifying for the witness.
25    A.  I -- I would have answered it without his

Page 107

1  prompting in two manners.  I would have said that
2  the -- what we said, the bold part of this topic is
3  periprosthetic joint infections, so what I'm saying in
4  here primarily applies to -- to joint arthroplasty
5  surgeries, which is the major topic of this whole
6  case, which is what we're talking about.  That would
7  have been my first answer.  But the second part is
8  when you were reading it carefully to me, I know how I
9  listening and reading it again carefully.  Would I
10  agree with almost all of those statements being
11  correct in a generic sense for the operating room?  I
12  didn't write it in that -- I -- I was writing this
13  more for orthopedics and for joint arthro --
14  arthroplasty when I wrote that.  I know how I was
15  thinking because I was just imagining myself doing a
16  joint arthroplasty case, and that's how I wrote it.  I
17  didn't write this from a book.
18       You're asking for references sometimes.
19  Some of these -- some of these statements here in
20  this -- even in this whole section, they're not
21  referenced because it's from my knowledge.  I believe
22  a lot of it is common knowledge like what I put in
23  there.  But if I read that, unless we nitpick this on
24  something else, I think that statement also applies in
25  general to any surgery.

Page 108

1    Q.  Doctor, you would agree -- and I think you
2  did earlier -- with the proposition that patient
3  warming devices are potential external sources of
4  contamination in the operating room; --
5       MR. C. GORDON:  Object to the form --
6    Q.  -- correct?
7       MR. C. GORDON:  Object to the form of the
8  question.
9    Q.  In orthopedic cases.
10    A.  No, I don't agree with that.
11    Q.  So you don't agree that patient warming
12  devices are among the pieces of equipment in the
13  operating room, like this litany of others you list,
14  that could be sources of contamination in orthopedic
15  surgery cases?
16    A.  Well you want to go one by one?  What are we
17  defining as patient warming devices?  If you bring --
18  if you bring a little hot -- if you bring a little IV
19  fluid that's a little warm and you call that a patient
20  warming device -- which it shouldn't be, it shouldn't
21  be used for that purpose -- and the thing is
22  contaminated, it could cause bacteria.  Is that
23  what --
24       I mean I don't understand what the question
25  is.

Page 109

1    Q.  Doctor --
2    A.  Which one are you -- which, quote, patient
3  warming device are we referring to and what are you --
4       Some things heat patients up in the OR.
5  There are different devices.
6    Q.  So doctor, is it your testimony to the jury
7  that some patient warming devices that might be used
8  in cardi -- I'm sorry -- orthopedic surgery may pose a
9  risk of contamination but others do not?
10    A.  I don't think that's my opinion.
11    Q.  Isn't that what you just said?
12    A.  No, that's not what I just said.
13    Q.  So is it your testimony that --
14    A.  What you're saying is -- it's out of
15  context.
16    Q.  So is it your testimony that no patient
17  warming devices can be external sources of
18  contamination, as you've described them in page four
19  of your report?
20       MR. C. GORDON:  Object to the form of the
21  question.
22    Q.  I just want to be clear.  Is it none or is
23  it some?
24    A.  I have to go and think about every patient
25  warming device that's been used and on the market.  I

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 110

1  would go through a review of the --
2       There are a number of review articles on
3  different patient warming devices. I don't want to
4  answer incorrectly here. There are ones that go
5  through a whole litany of different types of patient
6  warming devices.
7       Q. Well doctor, you had --
8       A. And then I would basically go through that
9  article and go one by one and say do I think that any
10  one of these could potentially pose a risk of
11  increasing bacterial contamination. On the --
12       In the general sense, my answer is no.
13       Q. Doctor, you had a lot of days before today
14  to consider whether forced-air warming or other
15  patient warming devices, such as all these other
16  sources of heat and other equipment in the operating
17  room, whether any of these things contribute to or
18  cause infection; didn't you?
19       A. Yes.
20       Q. You -- you had hours and hours that you
21  billed Mr. Gordon for, including up through just the
22  last couple of weeks, for reviewing the literature and
23  studying the very question that -- that I just asked
24  you, whether any sources of contamination could be
25  forced-air warming devices. So you've considered that

Page 111

1  question already as you've written your report here;
2  haven't you?
3       MR. C. GORDON: Object to the form of the
4  question.
5       A. I don't know what the question -- you -- it
6  keeps -- the --
7       The phrases of your question keep changing
8  if we read the last three statements -- or no, your
9  statements keep changing. But yeah, I think the
10  answer is: I've considered different -- I've -- I've
11  considered forced-air warming devices and did a lot of
12  work on this case to look at risk factors.
13       Q. And your opinion is that forced-air warming
14  devices do not cause or contribute to orthopedic --
15  periprosthetic joint infections; right?
16       MR. C. GORDON: Object to the form of the
17  question.
18       A. I didn't look at every forced-air warming
19  device ever in the history of mankind, if that's what
20  you're asking.
21       Q. How many --
22       A. I only really looked at the Bair Hugger
23  device. There's a number of others on the market, and
24  I -- I didn't -- you don't --
25       I didn't do a major assessment of these

Page 112

1  other devices, if that's what you're asking.
2       Q. One of the other ones on the market is the
3  Mistral, marketed in this country by Stryker
4  Corporation. You're familiar with that one; right?
5       A. Yes.
6       Q. In fact, that's the one you use at the
7  Cleveland Clinic; right?
8       A. Yes.
9       Q. You don't think that one causes infections;
10  do you?
11       A. I don't think it causes infections at the
12  pre --
13       I'm a little concerned because there was an
14  increased -- in comparison to the Bair Hugger, in the
15  recent report that we have there was an increased --
16  although not statistically -- there was an increased
17  rate of deep infections when we did a comparison of
18  the Mistral to the Bair Hugger device, so I think that
19  may prompt a further investigation. Because if that
20  type of numbers keep adding up, then I'd like to know
21  why that occurred.
22       There may be many other factors so I would
23  never want to imply that, but if anything, there was
24  an increased rate using that device. But that's --
25  but --

Page 113

1       So let's see. The overall answer, you're
2  asking do I imply that.
3       Q. I'm happy to ask you another question,
4  doctor. I think --
5       A. I'm -- I'm looking into it, --
6       Q. Okay.
7       A. -- but I don't see any difference --
8  statistical difference between those. And I would say
9  no, they do not increase risk of infection.
10       Q. Based on your answer, then, I would take it,
11  for the jury who is going to hear this, that you still
12  have an open mind as to whether some forms of forced-
13  air warming may actually contribute to contamination
14  of the surgical site.
15       MR. C. GORDON: Objection --
16       A. I have an open mind always to anything -- a
17  lot of things that you may ask me, as you see that I
18  do a lot of research projects, so I'm always looking
19  for signals or ways to -- to help patients increase
20  their safety, be aware of -- any trends or things --
21       Q. So as we sit --
22       A. -- that cause --
23       Q. Sorry.
24       A. -- that cause problems with patients. I
25  have an open mind with all these things. As we sit

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 114

1  here today, I don't think that there is a problem
2  with -- with those two forced-air warming devices.  I
3  don't have tremendous knowledge of any of the other
4  forced -- forced-air warming devices, so -- which is
5  part of your previous questions that I couldn't answer
6  exactly.
7      Q.  So as we sit here today, you have not ruled
8  out the Mistral or other forms of forced-air warming
9  that you haven't evaluated being a potential
10  contributor to contamination of the surgical site.
11      MR. C. GORDON:  Object to the form of the
12  question.
13      Q.  You haven't looked at those.  You haven't
14  ruled them out.
15      A.  Wasn't part of what I was being asked to do.
16      Q.  So the answer is you have not ruled those
17  out; is that fair?
18      A.  Yes.
19      Q.  Okay.  When did the Cleveland Clinic switch
20  to the Mistral from the Bair Hugger?
21      A.  I can look at this abstract, and I think the
22  exact date --
23      There's an abstract as one of the exhibits,
24  it's Exhibit 11.  This represents a study comparing
25  the --

Page 115

1      Q.  And -- and doctor, just -- not to interrupt
2  you, let me catch up with what you're saying.  I'm --
3  we're going to ask you about that, but my question
4  right now is just do you know when the Cleveland
5  Clinic switched to that device?
6      A.  I can't --
7      I'd like to give you an exact date --
8      Q.  I don't need an exact date.  Approximately.
9  Couple of years ago?
10      A.  I think around 2014 --
11      Q.  Okay.  And --
12      A.  -- but I don't --
13      I apologize.
14      Q.  Do you know --
15      A.  I think it's about 2014.  I don't know if
16  that's an exact answer, whether it was my orthopedic
17  department that switched or the Cleveland Clinic,
18  because you asked me about Cleveland Clinic, so the
19  better answer would be around 2014 for joint
20  arthroplasties is when the switch was made.
21      Q.  And that's all I'm looking for is your best
22  recollection, doctor.
23      A.  Okay.
24      Q.  That's fine.
25      Do you know why they switched?

Page 116

1      A.  The best of my knowledge, when I asked this,
2  it was a cost issue.
3      Q.  Okay.  Can you give me any details about
4  that?
5      A.  I think that it was just a matter -- what --
6  what we do at --
7      We have a supply chain department that looks
8  at different devices.  When they see -- they get
9  different bids every few years for different products,
10  and if they see equivalent devices, they get --
11  they -- what they presume are equivalent devices --
12  that's just an example -- they would look at -- they
13  would try to get the best bid.  Cleveland Clinic is a
14  large provider, and when you get competitive bids at
15  reduced prices, they save a lot of money.
16      Q.  Who told you that?
17      A.  So --
18      Who told me?  That's what I -- that's part
19  of my role here, is to be looking at supply chain
20  things for the whole department.
21      Q.  I'm sorry, let me narrow my question,
22  doctor.  My question is if you knew why they switched
23  and you indicated it was a cost issue.  Who told you
24  that?  That's what I'm asking.
25      A.  I don't remember who -- I --

Page 117

1      I brought it up when I got here at a -- one
2  of the joint arthroplasty clinics.  To the best of my
3  knowledge it -- one of the orthopedic surgeons --
4      There is a supply chain committee that makes
5  these decisions for the whole institution.  I can't
6  tell you exactly how many people are on the supply
7  chain committee.  It's about 15 or 20 would be a
8  guess.  But that group, two of them are
9  orthopedists --
10      Q.  Who are they?
11      A.  I don't know if I should be telling you
12  names of people that are not involved, so I'll --
13  I'll -- I'll ask --
14      Q.  Doctor --
15      A.  -- I'll ask my lawyers.  I don't want to --
16      Two of them are orthopedists, one of them
17  is -- in particular is a joint arthroplasty
18  surgeon, --
19      Q.  Well I'm going to need their names.
20      A.  -- one of them is a pediatric surgeon --
21      Q.  There's nothing privileged about their
22  names, doctor.  I'm going to need their names.
23      A.  I'm going to continue with my answer,
24  please.
25      Q.  No.  So you're refusing --

30 (Pages 114 to 117)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 118

1    A.  Can -- can I -- can I continue with my
2  answer without being interrupted?  You asked me a
3  question.  I'm trying to answer the question.
4    Q.  The question is:  Who are the doctors?
5    A.  Okay.  I haven't finished my answer and you
6  keep --
7       You've interrupted this answer about five
8  times.  Five.  Would you --
9    Q.  Do you want him to read back the question?
10    A.  I don't need to be --
11       I'm in the middle of answering the question
12  you asked four --
13       Let's -- let's take a time out.
14    Q.  Doctor --
15    A.  Let's take a time out.  We're not going to
16  continue where you ask me a question, in the middle of
17  my answer you've interrupted me five times.
18    Q.  Doctor, if you need a break --
19    A.  In fact, I'm giving this fellow a break
20  because he made the comment as well as me.
21    Q.  I'm trying not speak when you speak, doctor,
22  for his sake.
23    A.  We're taking a timeout.
24    Q.  But for the record, --
25    A.  We're taking a timeout.

Page 119

1    Q.  -- I'm objecting to the break.  We're still
2  on the record and I'm objecting to the doctor walking
3  out of the deposition.
4       MR. C. GORDON:  And we're on --
5       We're taking a break.
6       THE REPORTER:  Off the record, please.
7       (Recess taken.)
8  BY MR. B. GORDON:
9    Q.  Did you have a good break, doctor?
10    A.  Yes.
11    Q.  Let's back up for a second, maybe make this
12  a little simpler.
13       And one thing I probably forgot, I don't
14  know what we said what the Mistral is.  Could you tell
15  the jury what the Mistral is?
16    A.  I don't know everything about the Mistral,
17  but it's a forced-air warming device that has a
18  HEPA-type filter, would be one of the features.  I'm
19  trying to think of some of their -- of the other
20  features.  There's one I can't remember right now.  I
21  could look at the abstract.  But I'm happy to --
22       I didn't focus a lot of this on that device.
23    Q.  Well for the jury that may read this, one
24  thing is they're quieter than the Bair Hugger; aren't
25  they?

Page 120

1    A.  I don't know that.
2    Q.  Okay.  Do you know whether they cause
3  lofting of the blanket up off of the patient like the
4  Bair Hugger?
5       MR. C. GORDON:  Object to the form of the
6  question.
7    A.  I can't give you an answer to that.
8    Q.  Well we use them; right?
9    A.  Well I haven't noticed --
10    Q.  Lofting?
11    A.  -- lofting that bothers me with the Bair
12  Hugger or the Mistral.
13    Q.  Well --
14    A.  There hasn't --
15       I don't know what you -- how you term
16  "lofting."  I don't notice it, that it -- it to me
17  affects my surgery or --
18    Q.  To be fair, doctor --
19    A.  -- insurance.
20    Q.  Sorry.
21       To be fair, doctor, you know that the Bair
22  Hugger blankets are well known to loft up off of the
23  patient unless you put extra blankets on top of them;
24  right?
25       MR. C. GORDON:  Object to the form of the

Page 121

1  question.
2    Q.  You know that.
3    A.  That doesn't typically --
4       It hasn't been something I'm concerned
5  about.
6    Q.  Well, not concerned about it, but it
7  happens; right?
8       MR. C. GORDON:  Object to the form of the
9  question.
10    Q.  Is it your testimony under oath that Bair
11  Hugger blankets do not loft up off of the blanket --
12  off of the patient unless you put extra blankets on
13  top of them?  Is that your testimony?
14       MR. C. GORDON:  Object to the form of the
15  question.
16    A.  I don't have -- I don't have an answer to
17  that one way or the other.
18    Q.  Well do other orthopedic surgeons talk about
19  that?
20    A.  No.
21    Q.  Okay.  So if another orthopedic surgeon
22  comes into trial and testifies if that happens, he's
23  lying, he's mistaken?
24    A.  Excuse my answer to -- when I said "no."  To
25  the best of my knowledge it's not a part of our --

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 122

1    I can't say no.  Other orthopedists may talk
2  about what you're talking about, but I haven't
3  witnessed the thousands and thousands of orthopedic
4  surgeons that I encounter talking about that.
5    Q.  You mentioned that the Mistral has a HEPA
6  filter whereas the Bair Hugger does not; correct?
7    A.  Correct.
8    Q.  And that's a higher level of filtration, the
9  HEPA filter, than the MERV 14 filter or the M20
10  filter, or however you want to describe it, that is in
11  the Bair Hugger; isn't that right?
12    A.  I don't know how you're defining "higher
13  level."  You -- you're defining it filters a certain
14  amount -- it --
15    It does have a higher filtration efficiency
16  for certain size particles, if that's how you are
17  defining "higher level."
18    Q.  Are you an expert on filtration efficiency,
19  doctor?
20    A.  No, I'm not an expert on filtration
21  efficiency.
22    Q.  You're not an engineer; right?
23    A.  I am not an engineer.
24    Q.  Have you ever designed a patient warming
25  system of any kind?

Page 123

1    A.  No, I have not.
2    Q.  And you would then defer to others in terms
3  of the differences in filtration efficiencies between
4  different patient warming devices I assume?
5    MR. C. GORDON:  Object to the form of the
6  question.
7    A.  Not necessarily.
8    Q.  So you would not defer to experts in those
9  areas on the questions of filtration efficiency level?
10    MR. C. GORDON:  Object to the form of the
11  question, lack of foundation.
12    A.  I think there are others, and even in
13  this -- in this trial, who are more expert than me,
14  but that doesn't mean I'm always going to defer to
15  others.  If you were pitting me right now against many
16  other orthopedists, because of the nature of this case
17  I might know a little bit more about the filtration
18  than a standard orthopedist, but --
19    So I don't know what you're asking.  If you
20  want me, I can say that, yes, there are experts in
21  this case that will talk about the filtration --
22  filter that I would defer to --
23    Q.  And you --
24    A.  -- on those issues.
25    Q.  Thank you.

Page 124

1    And you brought up the fact that the Mistral
2  has a HEPA filter unlike the Bair Hugger; correct?
3    A.  Yes.
4    Q.  And are you aware that HEPA filters cost
5  more than non-HEPA filters, doctor?
6    A.  I would imagine they do, because --
7    I don't know exactly what the costs are, but
8  I imagine -- hmm.
9    Obviously, laminar flow has HEPA filters.
10  I'm trying to think where I would know -- know that.
11    So the question is do --
12    Q.  HEPA filters --
13    A.  -- HEPA filters cost more than what filters?
14    Q.  Non -- non-HEPA filters.
15    A.  It would --
16    You would have to tell me what was the
17  non-HEPA filter.  I mean I -- I don't know the real --
18  I never looked at costs of things like this.  There
19  prob -- there might be --
20    Like what is there, the other filters?
21  There's an ultrafilter.  What is that?
22    Q.  Doctor, would --
23    A.  If there's an ultrafilter, that might be
24  more expens -- would be considered a non-HEPA filter
25  that in the category of your question might be more

Page 125

1  expensive than a HEPA filter.  So I don't -- I --
2    The reason I brought it up is because a
3  number of articles that I have seen -- and I'm
4  volunteering something now -- mention the need for a
5  HEPA filter on the device used here, on a forced-air
6  warming device, and yet here is a forced-air warming
7  device that has a HEPA filter and had no difference in
8  infection rates.  That's --
9    (Witness's cellphone rings.)
10    Q.  And we'll talk about that in a moment.
11    A.  I'm volunteering that.
12    THE WITNESS:  I won't answer.
13    MR. B. GORDON:  Do you need to take a break,
14  doctor?
15    THE WITNESS:  No.
16    Q.  Okay.  And we'll talk about that in a
17  moment.  But that's at least one difference between
18  the Mistral and the Bair Hugger that you mentioned.
19  The Mistral has a HEPA filter, the Bair Hugger does
20  not; correct?
21    A.  Correct.
22    Q.  And would it surprise you if an expert came
23  into court and testified that a HEPA filter costs more
24  to manufacture than a non-HEPA filter?  Would that
25  surprise you?

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 126

1    A.  It wouldn't surprise me.
2    Q.  And yet it's your testimony that the reason
3  that the Cleveland Clinic switched to use of the
4  Mistral system from the Bair Hugger was strictly a
5  cost-savings issue.  Isn't that what you told us?
6        MR. C. GORDON:  Object to the form of the
7  question.
8    A.  Yes, but the cost might not be only the
9  filter, --
10    Q.  Well --
11    A.  -- might be other reasons.
12    Q.  And that's why I wanted to find out more
13  information.  And now that you had a break and talked
14  to counsel, can you give us the names of -- let me
15  finish, please -- can you give me the names of anyone,
16  orthopedic surgeons or otherwise, who may have been
17  involved, to your knowledge, on the decision to take
18  out the Bair Hugger and replace it with the Mistral at
19  the Cleveland Clinic?
20    A.  So I don't know if they were involved
21  because they're on the supply chain now; they may not
22  have been on it.  Two were Robert Molloy --
23    Q.  Molloy?
24    A.  Molloy, M-o-l-l-o-y, Robert, and David Gurd.
25    Q.  How do you spell that one?

Page 127

1    A.  G-u-r-d, David.
2    Q.  And they're both orthopedic surgeons at the
3  Cleveland Clinic?
4    A.  Yes.
5    Q.  Anyone else you can think of as we sit here?
6    A.  No, I don't know who else is on that supply
7  chain.  And they -- in addition, they may not have
8  been involved when that decision was being made.
9    Q.  Do you know -- and I'll follow up on that
10  last answer -- do you know, then, who made the final
11  decision?
12    A.  If you want as my answers to you, trying to
13  be as responsive to you as possible, these are the
14  type of things I can try to find out if you would
15  like.
16    Q.  I appreciate that.  I -- I would -- I would
17  follow up and ask you, doctor, if you would let
18  counsel know, to provide us with the names of anyone
19  that you believe may have been involved in the
20  decision to switch from the Bair Hugger to the
21  Mistral, we'd be grateful for that.  Thank you.
22  You'll do that for us?
23    A.  I'm writing it down, yes.
24    Q.  Thank you, sir.
25        All right.  Let's talk about that abstract

Page 128

1  that you mentioned.  I think it was Exhibit E to your
2  expert report, and I think he's marked it as --
3        MR. B. GORDON:  Sorry, do you want to say --
4        MR. C. GORDON:  Eleven.
5        MR. B. GORDON:  Okay, thank you.
6    Q.  -- Exhibit 11.  You have that in front of
7  you; right, doctor?
8    A.  Yes.
9    Q.  So first of all, this was not --
10        Well let me ask you first:  You were not
11  involved in any way in this study; is that as fair?
12    A.  I was not involved with this study.
13    Q.  And this was not a random controlled
14  trial -- a randomized controlled trial; was it,
15  doctor?
16    A.  No, it was not.
17    Q.  So was there any --
18        I mean do you know what they did with
19  respect to issues like -- on the patients involved
20  concerning things like the type of skin prep that was
21  used, whether it was chlorhexidine as you mentioned or
22  something else?
23    A.  Can you ask me the question better?  I -- I
24  don't want to --
25    Q.  Sure.

Page 129

1    A.  -- give you an answer that I'm giving you
2  that may not be the answer --
3    Q.  Absolutely.
4    A.  -- you want to hear about.  I don't know
5  exactly what you're asking.
6    Q.  I'll be happy -- any time you want, I'll try
7  to rephrase things.
8        Let me ask you first:  Do you know who
9  funded the study?
10    A.  To the best of my knowledge, 3M funded this
11  study.
12    Q.  Okay.  Thank you for that.  Do you know
13  what -- well I --
14        Let me ask you:  This was a retrospective
15  study; right?
16    A.  We have a database that we keep of -- of all
17  the joint replacements that are done.  The database
18  goes back like over 10 years.  Some information is
19  more robust than others; keeps getting better and
20  better.  The -- our -- our database the last -- for
21  example, last year's is -- last year or two is even
22  superior, like '16 and '17, because we have a new
23  database that -- that patients get entered right away.
24  But we have not only --
25        I don't know exactly how they did this, but

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 130

1  we had databases there with great information. That's
2  part of the pride of what Cleveland Clinic does with
3  their studies. That's why they're --
4      But in addition, there are a lot of research
5  fellows; namely, I believe, right now as we're sitting
6  here there are eight research fellows that are just in
7  the joint arthroplasty division. So -- so if you look
8  at this paper, there were two -- the first two authors
9  are research fellows, so to some extent they were able
10 to look at the existing databases. Again, I don't
11 know this, but I imagine, since I'm involved every
12 week in the studies, that's pretty much probably how
13 it was done, they looked at the databases. But I
14 could be --
15     Another thing that I -- to finish this
16 answer, Cleveland Clinic keeps a lot of records on --
17 on SSIs, wound infections and deep infections as part
18 of quality control, so some of this data could have
19 been gathered from knowing -- from the quality control
20 records as well. So there's a combination of
21 different sources for not only getting the data but
22 also confirming that the data was accurate.
23     MR. B. GORDON: All right. Objection, move
24 to strike, non-responsive.
25     Q. And doctor, I'm not meaning any disrespect,

Page 131

1  but I want to be clear this time. I didn't say a word
2  in -- during that five-and-a-half-minute answer out of
3  respect for Mr. Stirewalt now, how hard he's working
4  here and how bad the record's going to be if we don't
5  all comply. So my question -- and he can read it back
6  if you don't believe me -- was simply: This was a
7  retrospective study; wasn't it, doctor? Now I'm just
8  asking --
9      A. But --
10     Q. Let me finish. Let me finish.
11     And I'm just asking you to work with me. I
12 understand your whole answer was intended to give me
13 all this information about how robust the Mayo -- I'm
14 sorry, another robust clinic out there -- the
15 Cleveland Clinic is and all, and that's all well and
16 good, but if you give me a five-minute answer to every
17 question that I'm just asking for is it a
18 retrospective study or not, we'll never get done here,
19 doctor. Do you understand that?
20     A. I apologize to you.
21     Q. Thank you. I appreciate that.
22     So is it yes, it's a retrospective study?
23     A. Yes.
24     Q. And -- and that's okay; right? I mean it
25 has its value; right?

Page 132

1      A. Yes.
2      Q. Just the fact that it's not a random
3  controlled -- randomized controlled trial doesn't mean
4  it's worthless; does it?
5      A. Correct.
6      Q. Okay. Thank you.
7      Do you know if the differences in this study
8  were stratified by or -- or analyzed by total hip
9  arthroplasty versus total knee arthroplasty? Did they
10 say that?
11     A. I'd have to look. Since I wasn't involved
12 in this study, I don't know all the details of the
13 study, so I -- I'd have to look right now.
14     Q. All right.
15     A. Pretty much all the study that I know about
16 is on this page.
17     Q. Yeah. It's a one-page abstract and an
18 attachment with three tables on it; right?
19     A. Right. So if you want me to answer that
20 question, I'd have to look at this a little more
21 carefully now.
22     Q. Sure. And -- and --
23     A. That's all the knowledge I'm going to know.
24     Q. Sure. And while you look at it, I'm going
25 to ask one more question, but then go ahead and look

Page 133

1  at it.
2      The full paper is coming out in like a week
3  or so; isn't that right?
4      A. Well the presentation will be at the MSIS
5  meeting, and I can't tell you when the full paper will
6  come out. It -- it's not going to be a week or so, it
7  will probably --
8      Q. I thought there was an indication in looking
9  in your -- in your report or somewhere that it was
10 coming out on August 5th.
11     A. The presentation is August 5th. If I said
12 the paper is, then I was mistaken.
13     Q. And that's MSIS. Where is that?
14     A. I don't know where it is this year. I'm not
15 going.
16     Q. What does that stand for for the jury?
17     A. Musculoskeletal --
18     Q. Something Society?
19     A. -- In -- Infect --
20     It might be Musculoskeletal Infection
21 Society. If you want, in the break I can look that up
22 and I'll give that to the court reporter.
23     Q. That's all right. But you're not going to
24 it.
25     A. And I can tell you -- I'll be able to tell

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 134

1  you the exact dates and where it's located because I
2  didn't have those answers for you, but I can get those
3  easily enough.
4      Q.  And when you say "the presentation," you
5  mean there won't be any more written documentation
6  presented in this, or do you know?
7      A.  Not all meetings but this meeting in
8  particular is presented and then it's -- and then the
9  presentation, I would assume, would be some time
10  like --
11      Well, I don't want to go crazy on this
12  answer.  You're asking me can I go and tell you the
13  sequence here about how this will go towards
14  presentation?
15      Q.  Actually, let me withdraw and ask another
16  question because it reminded me while you were
17  talking.
18      What leads you to believe that 3M funded
19  this study?  How do you know that?
20      A.  I don't know whether I got that information
21  from the legal team or I got that from Carlos.
22      Q.  Who is Carlos?
23      A.  Oh, I'm sorry.
24      Q.  One of the authors?
25      A.  Carlos Higuera is the senior author here.

Page 135

1      Q.  So if I wanted --
2      A.  In fact, no, I know that, that he applied
3  for funding and they give him some funding.  And why
4  do I know that?  Because I have to sign off on all
5  these studies --
6      Q.  All right.
7      A.  -- and proposals, --
8      Q.  As the chairman?
9      A.  -- so they -- so they --
10      Yes.
11      Q.  Okay.  Fair enough.
12      A.  So they would have been --
13      That would have come.
14      Q.  Fair enough.
15      One question I had about this, and I realize
16  it's limited information and if you can't tell it from
17  the paper, that's okay, but I notice they had data on
18  one set of patients from 2013 and one from 2015, which
19  I think, you know, is the non-Bair Hugger group or
20  the -- what they call the FAW-HEPA group, presumably
21  that would be the Mistral group, and that's because
22  they had to wait until after they switched to the
23  Mistral to have those data, I assume; right?
24      A.  Well you -- I --
25      MR. B. GORDON:  Do you have our copy of

Page 136

1  this?
2      A.  I don't know what you're asking me exactly,
3  but you do want to wait a year to see the -- is there
4  an infection.  If you're looking at infections, you
5  don't -- you do the procedure and then you want to see
6  how many infections occur in that year to see an
7  infection rate.
8      Q.  So is your testimony they should look out to
9  a year to see how many people --
10      A.  Not necess --
11      Q.  -- are infected?
12      A.  I don't know what they did, if they looked
13  at 30-day infection rates or 90-day.  It used to be a
14  year by the --
15      Q.  CDC.
16      A.  -- by the CDC, but I think they've changed
17  some of their criteria to 90 days now.  I don't want
18  to say that with a mistake.
19      Q.  And if they only look to 90 days here,
20  wouldn't that be a concern to you as an orthopedic
21  surgeon knowing that sometimes patients don't get
22  followed up on and don't report infection
23  complications until after 90 days?
24      A.  It wouldn't be a concern about the study if
25  they were consistent, they looked at 90 days in the

Page 137

1  2013 group and 90 days at the 2015, as long as they're
2  reasonably consistent in what they're looking at, --
3      Q.  Well --
4      A.  -- if that's what you're asking.  I -- I
5  don't know if that's what you're asking me.
6      Q.  Not exactly.  Let me ask it this way:  If
7  they only looked at patients out to 90 days, isn't it
8  possible and in fact in your vast experience as an
9  orthopedist isn't it likely that people -- patients
10  after 90 days may have developed and been diagnosed
11  with periprosthetic joint infections after 90 days but
12  in less than one year that -- that aren't going to be
13  found in this?
14      A.  It's likely that that will occur, but a lot
15  of periprosthetic ones -- and that's why the CDC, I
16  believe, changed their stance to 90 days, because the
17  majority -- and I can't tell you whether that's an 80
18  percent majority -- are typically found within the
19  90-day period.
20      Q.  Can you --
21      A.  There are -- there are certainly --
22      The answer to your question, yes, it's
23  likely that there will be cases that occur between 90
24  and a year that would have been undetected before the
25  90 days.  I think that's what you're asking me.

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 138

1    Q.   Yes, sir.  Thank you.
2        So the 2013 was the set of patients who were
3    before the Cleveland Clinic switched to the Mistral,
4    that was the Bair Hugger group or the -- what they
5    call the non-HEPA group or -- or the CFAW group I
6    think they refer to it as, the 2015 cohort are the
7    patients who received treatment using what they call
8    the FAW-HEPA or the Mistral that Cleveland Clinic is
9    using now.
10        What about 2014, why didn't they include any
11   patients from 2014?
12   A.   Okay.  First of all, anything you're asking
13   me, I mostly would have to read this very carefully
14   because, number one, it hasn't been presented, I don't
15   know all the details, and a lot of the details of what
16   I know is exactly what you know.  We can read this
17   together if you want me to give you an answer, and I
18   can --
19        Now I can help you because I read abstracts
20   all the time, so if you can -- I could try to read
21   this and try to help you with an answer and say why
22   didn't they do the 2014.  I gave you a guess before
23   about when this switched and I guessed right, I
24   believe, 2014, but I don't know when in 2014, so it --
25        A potential answer to what you just asked me

Page 139

1    could be that there was a switch that they didn't want
2    to confuse, or there could have been an irregular
3    switch, that would be a second hypothesis -- again,
4    that's complete conjecture -- that they -- they still
5    had Bair Hugger devices that were being mixed with
6    Mistrals so they didn't want to contaminate their
7    results, and then when they purely switched fully
8    over -- I don't -- I don't --
9        I'm making that up because that's just a
10   hypothesis of an answer very carefully to your -- your
11   question about 2014.  If you want, I'll relook at this
12   abstract to see if I can get a better answer for you.
13   Q.   That's fair enough, doctor.  I mean "I don't
14   know" is a perfectly fair answer.  However, if you do
15   need to read that one page to answer any of these
16   questions definitively, I'm happy to have you to do
17   that in the next couple minutes.
18   A.   Can I read this one paragraph?
19   Q.   Go ahead.  And I'll stretch my legs when you
20   do that.
21   A.   Okay.
22        Okay.
23   Q.   Go ahead, doctor.
24   A.   So I read the abstract and the best -- to my
25   best of knowledge, the abstract says that they

Page 140

1    switched in 2014, there is no knowledge whatsoever,
2    but what it says is they used the 2013 group for
3    the -- which would be pre -- before the 2014 switch,
4    and they used the 2015, and we have no data on why
5    they didn't include 2014.  So some of my previous
6    comments could be any or none of the reasons for why
7    they didn't do that.
8    Q.   You would -- thank you, doctor.
9        You would agree with me there are a number
10   of limitations of this study; right?
11   A.   There are a number of limitations of any
12   published study.
13   Q.   Including this one; right?  And they even
14   talk about some of them.
15   A.   There are always limitations of any study.
16   Q.   First, it's a very weakly-powered study; is
17   it not?
18   A.   I -- I didn't look at that part.  If you
19   want me to look at that, where -- where --
20   Q.   Well can you look -- certainly.  Can you
21   look at the numbers, and they disclose the specifics
22   in passing and then in detail on the second page.  And
23   my question:  As you read those numbers, are they
24   sufficiently powered to give you a definitive answer
25   to the question?

Page 141

1    A.   Okay.  Let me -- let me take a minute and
2    read the "Results" section and then the next table.
3        Okay.  I can answer.
4    Q.   Thank you, sir.  I'm ready.
5    A.   I don't know where we're saying that --
6    necessarily that this is a weakly-powered study,
7    unless you point that out to me, something that I
8    missed in their methods.  I think that I'm very happy
9    with what I'm seeing here, that they didn't just look
10   at infection rate, they actually adjusted to factors
11   in a logistic regression model for age, gender,
12   Charlson index -- that's C-h-a-r-l-s-o-n -- index
13   score, which is an indication of morbidities, body-
14   mass index and operative times, they did that, so I
15   like the way that was done.  I think that the --
16        What I'm really looking at here is this deep
17   infection rate which was -- which was higher for the
18   Mistral device, 20 versus 13.  I can't tell you about
19   the power of superficial infections or that.  But to
20   me we're talking about a study with -- with thousands
21   of patients in it; the total number of patients are
22   5,400, so it's -- it's pretty good.  Obviously, when
23   you do studies like that, sure, we'd like to have as
24   many patients as possible, but it would be pretty hard
25   for me to imagine with that deep infection rate of

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 142

1  being .77 versus .47 in 2600 patients versus 2700
2  patients, that's pretty reasonably powered for that
3  endpoint right -- right there.
4      Q.  So let me ask you that.  What --
5  specifically, what was the power of this study to
6  detect differences in these two different groups?
7      A.  I don't know the power.
8      Q.  Okay.
9      A.  I don't at this -- as I'm sitting here.
10     Q.  Then I'm going to move on.  I don't want to
11 press on things you're not --
12         If you don't know, that's okay.
13         Let me ask you this:  Did they use the CDC
14 NHSN definitions of SSI and PJI in this study?
15     A.  They would have used the --
16         I don't know which definitions you are
17 referring to.  They would have most likely used the
18 MSIS -- which is the same group where this is being
19 presented -- definitions of SS -- SSI and deep joint
20 infections, but that's in concordance with the CDC.  I
21 think they're equal.
22     Q.  Well what they say, doctor, as you partly
23 stated, is that "Prosthetic joint infection (PJI) was
24 defined as reoperation with arthrotomy or meeting MSIS
25 criteria for PJI.  Surgical-site infection" --

Page 143

1      A.  All right.
2      Q.  -- "(SSI)" -- let me finish -- "was defined
3  as a wound complication treated with antibiotics or
4  irrigation and debridement."
5         And my question is:  Does that comport with
6  CDC definitions for PJI and SSI?
7      A.  So I'll amend since -- since as --
8         I'm at a disadvantage because I haven't
9  answered your questions and read this abstract for
10 your questions, so I will amend my answer to say that
11 I don't --
12         They obviously expanded their definition of
13 infections to MSIS criteria, and then they added
14 people brought to the OR and what you just read, and I
15 can't -- we'd have to go and look at the CDC
16 guidelines, which change, and see exactly how it
17 corresponds for me to really answer that question.
18     Q.  Fair enough.
19         Do you know what surveillance was done on
20 these patients for SSIs and PJIs?  I mean did they
21 call the patients, did they see them in the clinic at
22 90 days, or -- or did they just see if there was
23 evidence that they got readmitted, or do you know?
24     A.  We have --
25         Well that's where you're asking me how we do

Page 144

1  it.  I've been here since 2016 and 2017 and we --
2  we -- we have a followup at three months of as high as
3  anybody -- I can proudly say that -- we have a
4  followup that's -- at three months that's like over 99
5  percent.  Or I -- I won't say 99.  Let's just say at
6  three months we're like in the high nineties, we're as
7  high as anybody not only in the country, in the world.
8  And we're trying to get the six-month followup also
9  close to that level at the present time.  And that is
10 pretty --
11         So that -- that's probably the best answer
12 I -- I can give you.  And there's tremendous quality
13 control.  And that's for the entire cohort of joint
14 arthroplasties, hip and knee, that are done at
15 Cleveland Clinic.
16         So clearly, the best answer is could there
17 have been an infection that we missed?  Yeah, that can
18 al -- that went to another institution.  But it's less
19 likely because we do try to follow up a hundred
20 percent of our patients, and typically the problem
21 patients are seen and not ignored.
22     Q.  But doctor, this is a retrospective
23 analysis.  This is the doctors, probably employing
24 nurses or research assistants, going back
25 retrospectively and looking at patient records, seeing

Page 145

1  who was exposed to one product, who got which outcome,
2  who was exposed to another product and got perhaps
3  another outcome.  And what I'm asking is:  Did -- do
4  you know what the process was for surveillance of this
5  retrospective study?
6         MR. C. GORDON:  Object to the form of the
7  question.
8      A.  Well I think I answered I don't know exactly
9  that.  If there were -- for example, if there were
10 negative -- not negative values, if there were open
11 values that they didn't have followup on X patient,
12 did -- did they actively go and look at that?  I
13 believe, based on what they've done in past studies,
14 they proactively went to make this data as robust as
15 possible.  What's --
16         That wouldn't be contained in an abstract,
17 but you would expect that that type of information
18 would be found in the actual paper of what percent
19 followup, in answer to your questions, and I can't --
20 I could only surmise from what I know has been done in
21 my year there and what I know has been done, because
22 I -- I'm not just a year there, I know what they've
23 done in their other studies, so that's why I am able
24 to give you a little bit better than just simple
25 conjecture.

37 (Pages 142 to 145)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 146

1    Q.  Well that's why I'm asking you though.  They
2  didn't disclose that here specifically; did they,
3  doctor?
4    A.  No.  So we're sitting here with a lot of the
5  information that's me and you looking at this and
6  trying --
7    Q.  Right.
8    A.  -- to surmise what they did.
9    Q.  And another question I have on that -- on
10  that same line is:  Were these patients all cultured,
11  or did they just go by their own review of the records
12  and make a subjective determination of whether it was
13  an SSI or a PJI?
14    Makes a big difference; doesn't it?
15    A.  I -- I think that they are incredibly -- at
16  Cleveland Clinic they are incredibly fastidious about
17  looking at infection rates.  This is an institution,
18  not only for orthopedics but for every -- every
19  department, this is an institution that is number two
20  in the country and they want -- and a major part of
21  that are infection rates, and they have quarterly
22  meetings and they're looking at every single mini
23  spike and looking at quality control and they're
24  looking at different things like that.  So it's not a
25  simple thing of what you just said.  They are -- they

Page 147

1  are fastidious at checking every patient and not just
2  a few little blips in a retrospective study.  This
3  was --
4    In some ways you could say that this was all
5  being done prospectively.  This specific was -- right?
6  It was prospectively collected data, but they --
7  they --
8    Another way to look at this is a ret --
9  retrospective review of prospectively collective --
10  prospectively collected data.
11    Q.  Well doctor, I'm not sure I understand what
12  that means, I mean "prospectively collected data."
13  They're looking at the records and retrospectively
14  extracting what was done to crunch their analysis and
15  do their univariate and multivariate analysis.
16  There's nothing in here that says they called these
17  patients back in to do new testing; is there?
18    MR. C. GORDON:  Object to the form of the
19  question, --
20    Q.  Is that what you're saying, --
21    MR. C. GORDON:  -- move --
22    Q.  -- prospectively collected data?
23    A.  That's not what I said.
24    Q.  Well what does that mean?
25    A.  Well when the year is two thousand --

Page 148

1    Let's even go before the study just to turn
2  this over.  2010 and '11 and '12, before the study,
3  all these patients were being followed like hawks on a
4  quarterly basis institution-wise, and they were doing
5  their best to try to get like a hundred percent
6  followup.  I mean this goes to 90 days.  I looked at
7  this to make sure that we're not missing any
8  infections; they're checking them out, they're keeping
9  the quality control, they're very concerned about
10  infection in this institution.  That's why they are
11  ranked very high.  So therefore, prospectively there
12  is a quality initiative that goes on that looks at
13  every infection and characterizes them.  Often it
14  would go to me or a person in quality control, so it's
15  not totally that we just retrospectively looked at a
16  bunch of these and called people back.
17    Q.  But it's fair to say, isn't it, doctor, that
18  from this abstract, --
19    A.  Yes.
20    Q.  -- because it's all we have right now, we
21  don't know if -- because they didn't tell us -- if
22  they're looking at cultured pathogens versus
23  subjective determinations of SSI versus PJI; do we?
24  We don't have that evidence.
25    A.  So I'm going to just answer that that for

Page 149

1  this abstract we have what the abstract says, and I
2  would be -- just as I offered before to give you more
3  information, I would be happy to go back, I would
4  prefer to do it after he presents August 4th, and
5  answer --
6    If you give me a list of questions like
7  this, I'll be happy to answer, you know, any or all
8  the questions you have.  Just give me a list.  I'll go
9  right --
10    Q.  Well doctor, you understand --
11    A.  I -- I hear what you're saying.  I'd love to
12  be responsive to you and I'll answer any of these
13  questions, but again, I have a bit of what you have on
14  this abstract.
15    Q.  You understand this is my day to take your
16  deposition; right, doctor?
17    A.  Yes.
18    Q.  And I appreciate your offer to provide us
19  additional information, and if counsel will let you do
20  that, I'll be happy to get it, but it might involve
21  reopening your deposition.  Do you understand that?
22    A.  Just as I've offered you, I have three other
23  things where you've asked me for questions.  I'm just
24  offering this.  I think it's up to the -- you and
25  counsel to decide what you want to do, and I'm here to

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 150

1  help.  If I have to be open to another deposition, I'm
2  open to another deposition.
3      Q.   Well we appreciate that, doctor.
4          I guess let's just end this discussion of
5  this abstract with the agreement that there's a lot of
6  information that neither one of us has answers to
7  based on what we have in this abstract; is that fair?
8      MR. C. GORDON:  Object to the form of the
9  question.
10     A.   I'm going to say I feel very comfortable
11  with this abstract and the results because I know the
12  quality of the re -- the two of the researchers -- no,
13  three of the researchers and what they put out and how
14  they did this analysis.  So I feel, even though there
15  are questions with this paper as there are with any
16  published paper, any published paper, I feel very
17  comfortable with what this abstract is saying and the
18  message that it's delivering.
19     Q.   And yet you -- indicated earlier when we
20  first talked about it that -- that you had concerns
21  about the increased or apparent increased infection
22  rate in some of the patients with SSIs found in this
23  study; right?
24     MR. C. GORDON:  Object to the form of the
25  question.

Page 151

1      A.   It's just me looking at an abstract and
2  seeing that that number is a little higher.  I may
3  not -- have concerns or I may not.  I'm going to --
4  I'll come back after I've looked at this.  Actually
5  this week I said I'm --
6          I think maybe that's worth just a little
7  query.
8      Q.   In terms of your background, real quick,
9  since this is a Stryker product, you do a lot of
10  consulting work or work of one kind or another for
11  Stryker Corporation; don't you?
12     A.   Yes, I do.
13     Q.   In fact, they've paid you well over a
14  million dollars to date; haven't they?
15     A.   Yes.
16     Q.   What about DePuy, a J&J company, how much
17  have they paid you to date?
18     A.   They paid me indirect --
19          They paid me nothing to date, --
20     Q.   Well they've --
21     A.   -- the company.  Indirectly, I've defended
22  them in some of the metal-on-metal cases, if you want
23  me to include that.
24     Q.   When you say "defended them," you've
25  testified in deposition and trial against patients on

Page 152

1  behalf of DePuy in those metal-on-metal hip cases,
2  like the ASR case; right?
3      A.   Correction on my answer.  I may have
4  defended them or --
5          I was there as an objective -- as we said
6  earlier -- as an objective witness, fact-finder,
7  subject, person there to -- on their -- whatever you
8  want to say.  I don't want to get caught up in saying
9  the wrong legal terminology because I'm not a lawyer.
10     Q.   So how much have they paid you
11  approximately?  Is it over a million also?
12     A.   No.
13     Q.   Hundreds of thousands though; right?
14     A.   Yes.
15     Q.   Okay.  Fair to say there are a number of
16  other medical device companies and pharmaceutical
17  companies that have paid you significant six-figure
18  sums; is that fair?
19     A.   Other than what we've just said here?
20     Q.   Yes, sir.
21     A.   Not --
22          One or two others maybe over the years in my
23  past.
24     Q.   Well there's some that you talk about just
25  in terms of funding your grants that are paying you

Page 153

1  even through now, I think, tens of thousands --
2      A.   Oh, that's what --
3      Q.   -- per month, separate and apart from
4  consulting.
5      A.   Okay.  So I didn't know what your question
6  was.  I thought your question was talking about me
7  personally versus what is being paid in studies.
8      Q.   Well --
9      A.   So you didn't -- you didn't -- I --
10     Q.   My apology.
11     A.   My answer was personally.  You brought up
12  Stryker, as a consultant for Stryker, you brought up
13  DePuy, and I gave you have an answer as an in -- I --
14          The real answer in DePuy is DePuy, I've
15  never gotten paid personally from them, but through
16  attorneys and through the defense of that.  So I
17  thought all these questions that you just started was
18  for me personally.
19     Q.   Then let's be clear.
20     A.   Now you just pushed it into studies, --
21     Q.   Let's break it down.
22     A.   -- a separate discussion.
23     Q.   Sorry, doctor.
24     MR. B. GORDON:  I'm sorry, Dick.
25     Q.   Let's break it down.  With respect to DePuy,

39 (Pages 150 to 153)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 154

1  you have done testimonial work for them in defense of
2  the ASR product, a metal-on-metal hip implant, and
3  been paid hundreds of thousands of dollars personally
4  for that testimony; have you not?
5       MR. C. GORDON: Object to the form of the
6  question.
7     A.  Yes, through a lot of trouble over a number
8  of years.  Yes.
9     Q.  And --
10    A.  It added up to that, yes.
11    Q.  And you recognize that the DePuy ASR product
12 was a defective -- was determined to be a dangerous
13 and defective device for a lot of patients; right?
14    A.  No, I --
15       MR. C. GORDON: Object to the form of the
16 question.
17    A.  I do not recognize that.
18    Q.  It was recalled; wasn't it, doctor?
19    A.  It was recalled.  That doesn't mean it was
20 defective.
21    Q.  Well doctor, you know Tom Schmalzried;
22 right?
23    A.  I know him.
24    Q.  He helped design that product; right?
25    A.  Yes.

Page 155

1     Q.  And you're aware that he testified that
2  ultimately his opinion was that the device was
3  defective.
4     A.  I don't --
5     Q.  Do you disagree with the designer?
6     A.  I disagree with -- that he said that.
7     Q.  Well doctor, he was paid millions of dollars
8  to help design and promote that product; wasn't he?
9       MR. C. GORDON: Object to the form of the
10 question, --
11    Q.  Are you aware of that?
12       MR. C. GORDON: -- lack of --
13    A.  He was definitely paid millions to design
14 and I -- I guess promote.  Yes, I would say yes.
15    Q.  And he wrote -- he wrote white papers for
16 DePuy on that product; didn't he?
17    A.  He published papers.  I don't know if he
18 particularly wrote the white papers, but I would -- I
19 would agree with you maybe.
20    Q.  He ghost -- testified that he ghost-wrote
21 white papers, which are marketing pieces, for Polly
22 Carey and the other marketing directors at DePuy that
23 were not peer-reviewed published papers; did he not?
24       MR. C. GORDON: Object to the form of the
25 question.

Page 156

1     A.  I'll -- I'll accept the answer because I
2  know -- I did all that over a number of years -- I
3  know who wrote the papers.  I'm sure he had input in
4  it.  For you to say that he wrote those things,
5  because I saw all the material that DePuy came out, I
6  went through everything -- not everything, but a good
7  portion of it, and I don't believe that he
8  particularly wrote it.  But I'm sure he oversee'd it,
9  he looked at it, he analyzed it.  Maybe he did testify
10 somewhere that you have and I missed that, so -- but
11 to the best of my knowledge --
12       But fine.  If you want, I'll just agree with
13 what you said.  It's not a -- it's a small point.
14    Q.  And doctor -- thank you, doctor.  And it's
15 nice that we can find agreement where we can.  Thank
16 you.  So --
17       But you don't agree that the consensus of
18 the medical community, the orthopedic community
19 ultimately, was that the ASR was a defectively
20 designed acetabular cup product, that the acetabular
21 component of that product was determined to be
22 defective by everyone who looked at it.  You don't
23 agree with that.
24    A.  I don't agree with it.
25    Q.  And you don't agree that the metal-on-metal

Page 157

1  meltdown, if you will -- let me -- let me -- let me
2  withdraw that and start over.
3       You disagree that metal-on-metal
4  articulations, which were once thought to be the way
5  of the future, have now been roundly agreed as -- as
6  being a disastrous result for the patient.  You don't
7  agree with that?
8     A.  For which patients?
9     Q.  For the patients who got metal-on-metal hip
10 implants.
11    A.  Not all.
12    Q.  And you put in how many thousand resurfacing
13 devices?
14    A.  Several thousand.
15    Q.  And how many of those were metal-on-metal
16 resurfacing devices?
17    A.  They were all metal-on-metal resurfacings.
18    Q.  And when you first put those in, you thought
19 they were the best product -- best orthopedic hip
20 product ever created; right?
21    A.  I thought they were an excellent orthopedic
22 hip product for certain specific indications.
23    Q.  And you've given YouTube video presentations
24 in 2006 through 2009 about how great you thought
25 various of those resurfacing devices were; have you

40 (Pages 154 to 157)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 158

1  not?
2      A.  I don't -- haven't looked at those lately,
3  but whatever -- if I did --
4          There are some YouTube videos of me talking
5  about resurfacing, that is correct, yes.
6      Q.  And you promoted some of those devices for
7  use in an off-label manner; did you not?
8      A.  Yes.
9      Q.  In so many words.
10     A.  Well I -- I don't know if I --
11         Yes.
12     Q.  In so many words.  You -- you promoted those
13  on YouTube for use in an off-label manner; didn't you
14  doctor?
15     A.  Well I don't know if I'm the one that
16  promoted it because I didn't --
17         First of all, I never made a YouTube video,
18  so -- somebody else did it.  So you keep saying "you
19  promoted it."  I didn't necessarily promote it.  I was
20  on a YouTube video, I had an interview and I talked
21  about it.  If somebody asked me is this off label, I
22  would have said yes, this is off label -- off label.
23  I think that is a service to the patient by telling
24  them you have to realize that this should be used for
25  the right indications.  And --

Page 159

1      Q.  So is it your testimony, doctor, that you
2  didn't affirmatively raise that as a selling point,
3  that this device can be used in an off-label manner?
4  Is that your testimony?
5      A.  You just asked me a few parts.  "As a
6  selling point?"  What do you mean by "a selling
7  point?"
8      Q.  Did you or did you not have an interview on
9  multiple occasions in which you affirmatively stated,
10  without being questioned specifically first, that use
11  of metal-on-metal resurfacing devices could and should
12  be done in an off-label manner?
13     A.  All right.  I'm going to try to help you
14  with the answer.  Could be done in an off-label
15  manner?  Yes.  Should?  I don't know if that's said
16  because I don't force people.  "Should" is a bad word,
17  so we'll leave that alone.  For the right indications,
18  maybe I said it.
19         In addition, you said "on multiple
20  occasions."  I believe that I was interviewed one time
21  and that was cut in -- by the same lady, if it's what
22  we're talking about -- I could be mistaken -- and that
23  was cut into two parts.  So in fact you said multiple
24  interviews.  I believe it was one time, cut into two
25  parts, which may be two videos.  I haven't looked at

Page 160

1  this in a while.  But I'm -- I could be wrong because
2  it's not something I'm focusing on right now.  These
3  videos were done a long period of time ago.  They may
4  be over 10 years old.  They're still up there, but --
5      Q.  You don't dispute that you were interviewed
6  and made statements promoting use of resurfacing
7  metal-on-metal devices in an off-label manner before
8  2010; do you?
9      A.  For a specif -- for a specific company, if
10  they asked me, for example, about Wright Medical, I
11  would have said off label because the cup was approved
12  for use and the head was FDA approved, but off-label
13  use is coupling the two together, and I would have
14  said that.  It's the same way that we use, for
15  example, different medications, different devices off
16  label; we let the patients know that.  Not -- not all
17  medicine is done on label.  We --
18         Like aspirin for certain things is off-label
19  use.
20     Q.  But doctor, you were one of the pioneers in
21  this country of using metal-on-metal resurfacings; are
22  you not?
23         MR. C. GORDON:  Object --
24     A.  Yes, I was.
25     Q.  And that's one of the reasons you were happy

Page 161

1  to do these interviews and -- and promote these
2  products, because you wanted them to become
3  mainstream; didn't you?
4          MR. C. GORDON:  Object to the form of the
5  question.
6      A.  I wanted them to be used appropriately.
7          And I don't know what you mean by
8  "mainstream."  I -- I did resurfacing, but in the same
9  period of time at the peak of my doing resurfacing I
10  was still doing way more standard non-metal-on-metal
11  hips in a patient population that needs a hip
12  replacement, if -- and we're calling a resurfacing a
13  type of hip replacement.
14     Q.  Well doctor, it says on one of your
15  websites, doesn't it -- or maybe it was on Sinai's
16  website -- and I quote, "Dr. Mont has been
17  instrumental in bringing a revolutionary hip
18  replacement alternative called metal-on-metal
19  resurfacing to the United States," close quote.  Do
20  you dispute that that has been at least accredited --
21  attributed to you in the past?
22     A.  I'll -- I'll accept that.
23     Q.  And in fact --
24     A.  I mean do you want me to read it?
25     Q.  No.  I -- you accepted it --

41 (Pages 158 to 161)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 162

1    A.  I accept it --
2    Q.  Well if you accepted it --
3    A.  I accept it as a general thing, yes.
4        MR. B. GORDON:  Sorry, Dick.
5    Q.  Let's move on if we can.  And there was a
6  time when you thought that you could get a 99 percent
7  survivorship rate on these resurfacings out to 10
8  years; isn't that right?
9    A.  I don't know if that's right.  If I said
10  that, I won't deny it.  I would -- probably would --
11      You're saying "thought," so I'll hedge that.
12  I think it's very --
13      When we get to 10 years for any person or
14  device, it's hard to get 99 percent survivorship
15  because -- because if a person got into a car accident
16  on year seven, for example, and they had to -- got a
17  fracture around the prosthesis, it would depend -- and
18  that fails, that would count as a failure of the
19  device.  So it might depend on your definitions of
20  what we call "survivorship."
21      If we include all survivorships of
22  everything, including septic, which is pertinent to
23  this case, aseptic periprosthetic fractures, to think
24  that a population of patients are going to get to 10
25  years and 99 perc -- '9 percent of them are still

Page 163

1  going to have it --
2    Q.  Doctor --
3    A.  -- is -- is hard.  So if I said that, I'll
4  hedge it a little bit.
5    Q.  You --
6    A.  I would like to think it was going to do
7  very well.
8    Q.  Do you dispute that you said, in so many
9  words, that you expect to and believe you can get a 99
10  percent survivor rate for resurfacings at 10 years?
11      MR. B. GORDON:  Object --
12    Q.  "Yes" or "no."
13      MR. C. GORDON:  Object to the form of the
14  question.
15    Q.  Did you ever say that?
16    A.  I might or might not.  I'm not sure.
17    Q.  Fair enough.
18      You know as you sit here today, eight years
19  later, that that's not accurate; right, doctor?  You
20  cannot get a 99 percent survivorship rate for any
21  resurfacing device at 10 years; can you?
22      MR. C. GORDON:  Object to the form of the
23  question.
24    Q.  Not even close; can you?
25      MR. C. GORDON:  Same objection.

Page 164

1    A.  I think some surgeons have gotten very
2  high -- let --
3        Let's not say 99.  Let's say in the upper
4  nineties, okay, because I don't -- if you want me to
5  answer this right.  Because remember, things get --
6  things happen to patients in a -- okay?  So let's just
7  say high survival rates in the high nineties.
8        We can look at registries, and if we looked
9  at certain patient populations, some of them are doing
10  better than total hip.  So the answer to that at --
11  even getting towards 10 years --
12        I have a partner here at Cleveland Clinic
13  that would probably say he's in the high nineties at
14  10 years with -- and that is Peter Brooks,
15  B-r-o-o-k-s.  And there are some people that are still
16  doing resurfacings that get very high --
17        I don't want to use this term 99, and if I
18  said that, I don't like using it now, so --
19        MR. B. GORDON:  Objection, move to strike as
20  non-responsive.
21    Q.  Doctor, let me ask you this:  You mentioned
22  registries.  We don't have a registry in the United
23  States yet; do we?
24    A.  We do have a registry.
25    Q.  Well we have -- we have one that's been

Page 165

1  started, but we historically have not had a joint
2  registry maintained by the federal government in the
3  way that the United Kingdom does and Australia does;
4  do we?
5    A.  We have an American Joint Registry.  A lot
6  of effort, time, a mega num -- a lot of patients are
7  in it, but it -- and it's a more recent offering.
8  Some of the data may not be as robust as what they
9  have in the United Kingdom or some other countries.
10  So in a general sense, yes.
11    Q.  And doctor, are you aware as you sit here
12  today of what the --
13        You studied all the DePuy stuff you told us;
14  right?
15    A.  Yes.
16    Q.  So are you aware of what the 10-year
17  survivorship rate is published in the United Kingdom,
18  the British Joint Registry, for the ASR?  Or the
19  five-year data, whichever?
20    A.  I know what the data was when they got to
21  five years and six or seven for the ASR.  However --
22    Q.  Forty-four percent; right?
23    A.  What?
24    Q.  Forty-four percent failure rate; right?
25    A.  No, it wasn't that.  When it was recalled --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 166

1     There is a recall phenomenon that occurs.
2  When things get recalled, then everybody -- there
3  is -- there is a phenomenon that occurs that -- that
4  you get increased revision rates that may or may not
5  be due to the prosthesis.  And I have said that and
6  that's been published, that type of phenomenon.  It
7  actually has a name that I'm forgetting off the top of
8  my head, but it may just be -- "recall phenomenon"
9  might be a name for that.  So I will grant you that
10  the revision rate of that prosthesis you're -- you
11  just said 44 percent.  I think that depends on what
12  you're looking at, what population, who was doing it,
13  what center, how -- how fast people are to revise
14  things, the degree of surveillance, the technique.
15  There's a lot of factors that go into those revision
16  numbers.
17     Q.  Doctor, orthopedic surgeons wouldn't revise
18  a hip implant unless there was some kind of medical
19  indication to do so; would they?
20     A.  I can't always speak for other orthopedic
21  surgeons.
22     Q.  Would you?
23     A.  Well I would never do that.  But there is
24  different levels of what people might consider is
25  appropriate to revise.  For example, some surgeons

Page 167

1  might say if metal ions are elevated a little bit --
2     Q.  What did Dr. Schmalzried say on that?
3  What -- what was his threshold for metal-ion levels to
4  indicate a need for revision?
5     A.  I don't know what his --
6     Q.  Two parts per billion; right, doctor?
7     MR. C. GORDON:  Ben, let him finish --
8     A.  I don't --
9     MR. B. GORDON:  I'm trying.
10     MR. C. GORDON:  -- before you step on him.
11     A.  I don't know if he ever said two parts.  I
12  would love for you to show me where he said two parts
13  per billion.
14     Q.  Okay, doctor.
15     A.  I don't believe -- first -- first of all
16  that is -- would be --
17     Most people have two parts per billion -- or
18  a level of two is what I think you're talking about --
19  that have metal-on-metals for an appreciable time, so
20  he wouldn't say that a hundred percent of people that
21  are asymptomatic, have no symptoms, at 10 years has a
22  level of two, need to be revised.  So I -- I don't
23  think that's a correct statement for Dr. Schmalzried.
24     Q.  Doctor, we can agree to disagree, but if I
25  showed you testimony where Dr. Schmalzried changed his

Page 168

1  view and indicated that his threshold -- perhaps in
2  combination with other symptoms, I didn't say in the
3  absence of other symptoms -- but that his threshold
4  for a finding on micrograms per nanoliter -- that is,
5  parts per billion -- of cobalt was two or greater as
6  being a criterion for his thoughts on need for
7  revision, that would surprise you as you sit here
8  today.
9     MR. C. GORDON:  Object to the form of the
10  question.
11     Q.  You don't think he said that.
12     A.  I don't think he said that.
13     Q.  Okay.  Fair enough.  We'll move on then.
14  Fine.
15     A.  No, he didn't say that.
16     Q.  Let's -- let's just move past hips.  The
17  point I'm trying to make, doctor, or get your opinion
18  on, is there are medical technologies, there are
19  biomedical devices that have been thought historically
20  to be great technologies that ultimately were
21  determined not to be; isn't that fair?
22     A.  There's many technologies like that, or
23  devices, whether they're medical or non-medical.
24     Q.  And sometimes there may be necessary
25  technologies that are found to have problems later

Page 169

1  that, even if they have a benefit, they have risks
2  associated with them that are not known initially;
3  isn't that fair?
4     A.  The vaccines, some of the vaccines that were
5  developed had risks at the beginning.
6     Q.  Great example.
7     What about the heater-coolers that we talked
8  about?  You are aware that Sachs and Sommerstein and
9  others identified, about three years ago now, a
10  problem of contamination with heater-cooler devices.
11  You've seen those papers; haven't you, doctor?
12     MR. C. GORDON:  Object to the form of the
13  question.
14     A.  It -- it's not --
15     I've seen something like that, but it's not
16  something I studied.  So the answer is no.  Why would
17  I see the papers?
18     Q.  Okay.
19     A.  It's not -- it's not in my field of vision
20  that we -- we -- we have a --
21     Sometimes I am aware of things that are
22  outside my scope of practice, but in this case, no, I
23  didn't see those papers.
24     Q.  Let me read you a quote and ask you if you
25  recognize this quote:  "Adequate preclinical trials

43 (Pages 166 to 169)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 170

1 should be used to help identify some of the
2 shortcomings of medical devices before widespread
3 marketing of such devices to doctors and patients,"
4 close quote. Have you ever heard that before?
5     A. I think you're probably referring to
6 something that I wrote myself.
7     Q. Do you know if you said that?
8     A. Sounds like something I might have wrote. I
9 wrote -- I wrote a few papers on different devices
10 that have been released, prosthetic devices by the
11 way. I think that's -- you're talking about
12 one or two articles I wrote on -- on -- on dealing
13 with prosthetic devices that are released into the
14 market, if that's what you are writing. I mean I
15 think I'm not the only one that -- that wrote similar
16 quotes to that. I might have been paraphrasing
17 somebody else, or that could be what I'm the prime
18 author of.
19     Q. It's not -- sorry.
20         It's not a controversial statement; is it,
21 doctor?
22     A. No.
23     Q. And in fact, wouldn't you agree with me that
24 if adequate preclinical trials had been done with
25 respect to the Bair Hugger to try to identify some of

Page 171

1 its shortcomings before widespread use, we might not
2 be having this conversation today?
3         MR. C. GORDON: Object to the form of the
4 question, assumes facts not in evidence.
5     A. No, I disagree with that.
6     Q. Do you disagree that it might have been a
7 good idea to use preclinical trials before mass
8 marketing the Bair Hugger system?
9         MR. C. GORDON: Object to the form of the
10 question, assumes facts not in evidence.
11     Q. Do you agree or disagree?
12         You can answer.
13     A. So -- so give me the question again. What
14 did --
15         I don't disagree with that statement in
16 general for any enough.
17     Q. Fair enough. That's -- I'll take that.
18     A. Period.
19     Q. Let me ask this followup: If a company were
20 to market a medical device without taking reasonably
21 available measures to minimize potential safety risks,
22 you as a doctor would be against that; wouldn't you?
23     A. I don't think --
24         I would be against it, and I don't think
25 they would be allowed to do that in a general sense by

Page 172

1 different governing bodies, whether it's the FDA or
2 whatever governing body is in charge of that specific
3 device. Which, obviously, there are many different
4 devices and many different governing bodies that have
5 jurisdiction over those different devices.
6     Q. So, for example, if a manufacturer produced
7 a device for use in the operating room around patients
8 without fully investigating its potential for spread
9 of contamination, that would be a bad idea; wouldn't
10 it?
11         MR. C. GORDON: Object to the form of the
12 question.
13     Q. Hypothetically.
14         MR. C. GORDON: Same objection.
15     A. That would be a bad idea.
16     Q. Thank you.
17         Talking about the Bair Hugger specifically
18 now, did the company do anything, as far as you know,
19 with respect to making representations to the FDA
20 about the level of filtration on the device when it
21 was first approved --
22         MR. C. GORDON: Object to the form of the
23 question.
24     Q. -- or cleared? Have they told you one way
25 or another or have you seen any documents concerning

Page 173

1 that issue?
2     A. I know a little bit about the MERV rating of
3 14. I know about -- I have read articles on what is
4 required by different devices.
5     Q. Have you seen any testimony on that in any
6 of the depositions in terms of --
7     A. I -- I haven't focused on that.
8     Q. Okay. Fair enough. I'll move on.
9         What about evidence of contamination of the
10 Bair Hugger machines. Have you read studies or case
11 reports or internal documents concerning whether the
12 Bair Hugger or any parts of the Bair Hugger have been
13 found to be contaminated with microorganisms?
14         MR. C. GORDON: Object to the form of the
15 question.
16     A. I've read studies on that topic.
17     Q. Okay.
18     A. Multiple.
19     Q. And you are aware, then, that there is no
20 disagreement that some Bair Huggers -- in fact a
21 significant number of Bair Hugger devices have been
22 found to harbor microorganisms.
23         MR. C. GORDON: Object to the form of the
24 question.
25     A. I think every piece of equipment in the OR

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 174

1  harbors organisms.  I don't know -- really understand
2  the --
3      All right.  The relevance of the question
4  and some of those studies to me are -- are --
5      All right.  We'll -- I'll just answer.
6  Q.  That -- that --
7  A.  You want me to just answer.
8  Q.  Yeah.  I'll move on.  That's fine, doctor.
9      (Witness's cellphone dings.)
10 Q.  So -- so since you mentioned other things,
11 those are --
12     MR. B. GORDON:  I'm sorry.  You need to
13 check that?  Go ahead.
14     THE WITNESS:  I'm going to just say
15 "Will" -- just got to say "In deposition and will call
16 later."
17     MR. B. GORDON:  That's great, because I tell
18 you, in the next 15 or 20 minutes I'll be at a good
19 closing point for lunch maybe, so if we can finish
20 this line of inquiry, then we can wrap up and take a
21 break.
22     THE WITNESS:  Okay.
23 Q.  So to go back to that area, we talked a
24 little earlier about exogenous or external -- whatever
25 word you want to use -- sources of potential

Page 175

1  contamination in the operating room.  You remember
2  when we talked about that?
3  A.  Yes.
4  Q.  And some of those that you mentioned are --
5  I think was the Bovie.  What's a Bovie for the jury,
6  doctor?
7  A.  That's a cautery device that we use to --
8  when you have bleeding, it -- it heats up a few
9  hundred degrees or more and a -- and a vessel that is
10 bleeding, you hit the vessel with this device and
11 the -- and the vessel will stop bleeding.
12 Q.  And it's kind of like a zzzt.  Is it a very
13 intermittent kind of thing, or how would you describe
14 that?
15 A.  You would use it the least amount just to
16 hit the vessel because you don't want --
17     It burns, it coagulates the vessel.  You
18 don't want to burn regular tissue that is normal
19 tissue, so you minimize use.  And it -- it's just
20 one -- it's --
21 Q.  It's one source of potential or -- or -- a
22 potential contamination.
23 A.  Source of heat, contam -- anything that's --
24     Anything in the OR can be a source in a
25 general sense of contamination, some more likely than

Page 176

1  others.
2  Q.  And you mentioned a lot of those.  Lighting
3  you mentioned; right?
4  A.  Yes.
5  Q.  The lighting could have microbes on it;
6  right?
7  A.  Correct.
8  Q.  And that's why you put -- on the handles,
9  you put --
10     What do you put on them, condoms or gloves?
11 A.  We -- we put light handles.  I -- I
12 personally like my lights adjusted.  I don't use the
13 light handles.  I adjust the --
14 Q.  It's a special thing.
15 A.  I adjust the light handles before I start my
16 cases, my knee or hip replacements, so the light's
17 there.  And I don't -- not only do I not want to -- do
18 I not trust reaching up for these -- what you called
19 this -- condoms, or they're -- they're hand --
20 they're -- they're -- they're devices that go over the
21 handle that you -- that are packaged sterilely -- I
22 don't like even the waving of the hand up to grab the
23 light and adjust it.  I think that creates waves that
24 could be moving wind or particles that could be
25 flapping into the wound.  So you brought -- you

Page 177

1  brought that example up --
2  Q.  And -- and that's --
3  A.  -- and that's why I don't -- I don't even
4  use the light handles.  I just adjust at the beginning
5  of the day.  It's my -- my thing.
6  Q.  And -- and the idea is that you as, captain
7  of the ship, the orthopedic surgeon in the operating
8  room, are trying to do everything you reasonably can
9  to minimize potential sources of contamination to the
10 patient; right?
11 A.  Yes.
12 Q.  So what are some other examples?  Let's just
13 go through a few more.  What are the --
14 A.  The -- the -- the first source are the --
15     Well again, I've gotten criticized by what's
16 number one, two, three, four, five.  But I don't want
17 to say this is the first, it's the most important, so --
18 so I'm going to go into different sources.
19     I think of the -- the -- the people that
20 are -- the surgeon and the team as a big source.  You
21 want to make sure you're -- you're disinfecting your
22 hands to the best that you can, that you -- you put
23 your -- your gown on.  We have -- you do -- you put
24 two -- I --
25     We use two gloves typically.  You make sure

45 (Pages 174 to 177)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 178

1  you have the appropriate gloving technique, not only
2  for the surgeon but usually two assistants when
3  they're doing a hip or knee replacement.  Also,
4  there's a surgical person.  So you're trying to
5  minimize that, any breaks in contamination; that's
6  just one of the things.  If we --
7       The better way to look at it would be --
8  what I just said, would be to -- to organize this
9  answer -- would be to say here's the patient walking
10  in the room and what are they doing -- what are you
11  doing first?  Even before you get in the room you're
12  clipping any excess hair.  Often we use the night
13  before and the morning of chlorhexidine, which is what
14  I published on contamination, you're making sure about
15  the patient doesn't have any sores on their body,
16  things like that.  Then you're going in the room, and
17  one of the first things you're doing is applying
18  disinfectants to the patients.  If we're doing a hip
19  or knee replacement, to their whole leg, and often you
20  do two -- at least two coatings and you're waiting for
21  that to dry because that's what the CDC says for
22  effect -- effectiveness.  So --
23       You're asking for other sources.  So any of
24  these are sources of infection.
25       You want me to keep going in all the

Page 179

1  different things --
2       Q.  No.
3       A.  -- that could be happening in an OR?
4       Q.  I --
5       A.  I mean there's so many different sources,
6  you know, which we did on -- on this, quote, science
7  day.  The instruments, the saw blades.  You
8  mentioned -- you mentioned the cautery, the sucker
9  tip.
10       Q.  You mentioned the doors swinging open.
11       A.  The doors going open, the amount of traffic,
12  people -- the way the -- the gown -- the way the whole
13  patient is draped, the way --
14       As I said, I don't like flapping.  Are
15  drapes being moved back and forth?  Are the surgeons
16  or the team, are they walking too much?  And I say,
17  "Stay still.  Don't create all these winds and -- and
18  currents."  Are people coming in from the outside to
19  deliver blood and they're -- they're creating
20  currents?  But these are all potential sources of
21  waving air currents or creating heat --
22       Q.  And in addition --
23       A.  -- or --
24       Q.  And I'm sorry I interrupted, but my question
25  was kind of -- we've gotten a little off track, but I

Page 180

1  appreciate the explanation -- was really with respect
2  to potential sources of contamination.  It is your
3  belief that each of those -- and put aside the
4  patients and the -- and the -- and the staff for a
5  moment -- each of those inanimate objects is a
6  potential source of contamination that you need to try
7  to avoid.
8       MR. C. GORDON:  Object to the form of the
9  question.
10       A.  Well --
11       Q.  Miti -- mitigate.
12       A.  -- you need to use them all to do your case.
13       Q.  So to mitigate their --
14       A.  But you want to do the best you can to
15  mitigate those sources that could cause contamination,
16  yes.
17       Q.  And -- and you listed a bunch of them, I
18  don't have to go through all of them right now, you
19  said in no particular order all these devices that you
20  need to use in the operating room.
21       Do you need to use the Bair Hugger in the
22  operating room?
23       A.  You need to use the Bair Hugger or some type
24  of device that maintains normothermia.  That -- that's
25  a normal temperature for the patient.  We can define

Page 181

1  that and talk about that some more if you want --
2       Q.  We may get to that --
3       A.  -- in an OR -- in an OR setting.
4       Q.  -- a little later, but there are other
5  types, as you alluded to, since you brought that up,
6  of -- of warming -- a patient warming that can achieve
7  normothermia without forced air; correct?
8       A.  Yes.
9       Q.  And you've used some of those in the past;
10  right?
11       A.  Well there's -- there -- there's -- there's
12  ancillary devices --
13       Just like you mentioned, just putting
14  blankets on a patient keeps you warm a little bit.  Is
15  that what you're asking me?
16       Q.  Well yes.  You've used sources, if you will,
17  or types of patient warming other than forced air
18  successfully in operations in your career; haven't
19  you?
20       A.  Well in every hospital before here I used
21  the Bair Hugger device, that I ever operated on, as
22  the major -- as major device that maintains
23  normothermia --
24       Q.  Do you miss having the Bair Hugger?
25       A.  -- until the Mistral.

46 (Pages 178 to 181)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 182

1    Not necessarily.
2    Q.  I mean you got the Mistral now because
3  that's what Cleveland Clinic uses, but you just said
4  you've been using Bair Hugger for how many years?
5    A.  Well I started practice around '89, so --
6    Q.  I mean are you disappointed that you don't
7  have option to use the Bair Hugger now?
8    A.  I just --
9    I don't know what your question is asking.
10  I just want --
11    Q.  I mean it's pretty clear.
12    A.  -- a very effective -- I want an effective
13  device that's going to maintain normothermia, so
14  whether it's the Bair Hugger or this Mistral, assuming
15  this is doing the job, I'm okay with that.
16    Q.  Well let's ask that.  Is -- is the Mistral
17  doing the job?  Is it -- is it warming as well or
18  better than the Bair Hugger?
19    A.  I can't give you that answer from -- from
20  one or two studies.  No, I'd have to --
21    Q.  Have you talked to anyone at the Cleveland
22  Clinic about whether they should consider letting you
23  use the Bair Hugger?
24    A.  No, I haven't.
25    Q.  You used it for a couple of decades; is that

Page 183

1  fair?
2    A.  Yes.
3    Q.  And successfully you believe?
4    A.  Yes.
5    Q.  What was your infection rate on average per
6  year during that period of time?
7    A.  Low.  There were some years they were a
8  little higher than others, and then we tried to
9  identify.  Some of them are even reported publicly in
10  these papers I wrote.  They --
11    Q.  Sir --
12    A.  -- at some times, and it depended on my
13  patient composition, for primary joints they were well
14  under one percent.
15    Q.  So fair to say not zero.
16    A.  Not zero.
17    Q.  One percent.  What's --
18    A.  Some --
19    Well some years they were zero, so that's
20  not true.  So reported, some years were zero, some
21  years might have spiked.  Then we try to identify what
22  that is.  And that's why we did -- that's what led to
23  me to doing a lot of the studies that you see in this
24  report.
25    Q.  Do you have any citations of authority or

Page 184

1  evidence that you can point the jury to from your
2  experience or review of the literature that
3  demonstrates that the Bair Hugger was more effective
4  than the Mistral system or any other for -- any other
5  forced-air warming --
6    In fact let me back up.  Ask another
7  question.
8    MR. B. GORDON:  Sorry, Dick.
9    Q.  How many forms of forced-air warming are
10  there?
11    A.  I can't give you the exact answer.  I know
12  that I've seen in print -- because I haven't used
13  these and I can get you the answer if you want
14  later -- but four or five companies that have forced-
15  air warming devices.
16    Q.  There are more than that; aren't there,
17  doctor?
18    A.  Well I imagine there are.
19    Q.  Internationally?
20    A.  I don't know what's being used in Europe or
21  Australia.  But I don't -- I wouldn't know.  Maybe
22  that -- those would be exact -- there are --
23    Could be.  My answer is if exactly there are
24  four companies or five companies that have forced-air
25  warming devices, I can't give you that answer.

Page 185

1    Q.  Let's take your number.  Let's say there's
2  five.  Let's say there's Mistral, Bair Hugger and two
3  other -- three others.  Of those, do you know how many
4  have a fil -- a HEPA filter and how many don't?
5    A.  I don't know.  I just know --
6    No, I don't know.  I know at least one.
7    Q.  Would it surprise you that the Bair Hugger
8  is the only one without a HEPA filter?
9    Does it matter to you?
10    A.  No, it doesn't matter to me.
11    Q.  Okay.  You would agree with me that forced-
12  air warming is not the only means to effectively warm
13  patients; wouldn't you?
14    MR. C. GORDON:  Object to the form of the
15  question.
16    A.  It's viewed as a very -- as one of the most
17  effective ways if not the most effective way.
18    Q.  My question is:  It is not the only means of
19  effectively warming patients; is it?
20    MR. C. GORDON:  Object to the form of the
21  question.
22    A.  Correct.
23    Q.  Dr. Sessler's stated the same thing
24  explicitly; hasn't he?
25    A.  I don't know what Dr. Sessler --

47 (Pages 182 to 185)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 186

1    I didn't read his deposition. I don't know.
2    Q.  Well do you know Dr. Sessler personally?
3    A.  I met him on one occasion.
4    Q.  Your testimony is you haven't talked to him
5   about this at all, Bair Huggers?
6    A.  About what?
7    Q.  About the Bair Hugger issue.
8    A.  We talked about other studies, and the only
9   thing is he mentioned that he had been deposed for
10  five days about this case and that was --
11    Let me see if he -- if anything else was
12  discussed. And then I basically told him I was -- I
13  had been involved, and I don't think anything else.
14  That was basically it. We talked about another -- a
15  whole bunch of studies in my one meeting with him.
16    Q.  But you did talk to him about the Bair
17  Hugger case; didn't you?
18    A.  No. I just said that I --
19    He mentioned that he had been involv -- to
20  the extent of what I just said. We didn't --
21    There was no detail, so I wouldn't consider
22  that talking about the case. He told me that he had
23  been deposed for a five-day period, and I told him
24  that I was involved. That's the --
25    Q.  Has he --

Page 187

1    A.  -- pretty much --
2    That's not a hundred percent of what I
3   discussed. We had a lot of things to discuss that
4   day.
5    Q.  Has he told you that he doesn't care how you
6   warm patients as long as you warm patients?
7    A.  I -- he didn't --
8    We didn't have that discussion, as I said,
9   so I wouldn't know --
10    Q.  In fact --
11    A.  -- anything of what you're asking me.
12    Q.  Sorry.
13    In fact, many other orthopedic surgeons use
14  types of patient warming other than the Bair Hugger
15  successfully; don't they?
16    MR. C. GORDON: Object to the form of the
17  question.
18    Q.  And you know that; don't you?
19    MR. C. GORDON: Same objection.
20    A.  Other surgeons use other types besides
21  forced-air warming.
22    Q.  And some of them have very low, lower-than-
23  national-average infection rates without use of the
24  Bair Hugger; isn't that true?
25    A.  I imagine some have low, some have higher.

Page 188

1    Q.  Okay. You talk in your report about the
2   Bair Hugger and describe it as being far away from the
3   patient or far away from the sterile field. Do you
4   recall that?
5    A.  Yes.
6    Q.  How far away is the exhaust of the Bair
7   Hugger from the patient typically in your operating
8   room?
9    MR. C. GORDON: Object to the form of the
10  question.
11    Q.  And when I say that, in the past, obviously.
12    MR. C. GORDON: Same objection.
13    A.  I can't give you an exact number, but
14  it's -- I would say it's in feet, --
15    Q.  And --
16    A.  -- two feet or more.
17    Q.  Is it your testimony before this jury today
18  that a device that is -- that is within feet of the
19  patient, it's okay with you as the orthopedic surgeon
20  doing those ultraclean prosthetic joint surgeries to
21  have a machine that has known contamination in the
22  machine in that context? Is that acceptable to you as
23  a surgeon?
24    MR. C. GORDON: Object to the form of the
25  question.

Page 189

1    A.  I have machines that are within inches that
2   have known contamination, and we have to deal with
3   that. So this is well further away and draped off.
4   It's so far removed compared to a number of other
5   things that are within inches --
6    Q.  And you're concerned about --
7    A.  -- or -- or less in the field.
8    Q.  Sorry.
9    A.  I'm always concerned about everything, but
10  not --
11    Q.  Not the Bair Hugger.
12    A.  It's so -- it's far removed and it's --
13  it's --
14    If I put on my list of concerns, if we say
15  that anything is game, if we want to do it that way,
16  then I -- I can probably make a list for you and put
17  it as number 27 out of 28.
18    Q.  Okay. So -- so it's on the list, it's just
19  way down the list.
20    A.  I wouldn't even put it on the list.
21    Q.  Well you didn't in your report; did you?
22    A.  I don't think it's operative.
23    Q.  You put a litany of things on --
24    A.  Some things, I think that if you -- I think
25  that if you -- if you go into Burger King and you have

48 (Pages 186 to 189)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 190

1  a Big Mac, it doesn't make you fat, but if you had --
2  if you had one of those -- two of those a day, then
3  you'll get fat, and so you don't say that the Burger
4  King -- or the Big Mac causes you to be obese when you
5  have one.  And the same way, I don't -- I don't view
6  this Bair Hugger as operative as leading to
7  infections.  It's not in there on the list.  There
8  are -- if -- as if --
9        It's like saying that the -- the garbage --
10  there's a garbage -- there's two or three garbage
11  pails in every operating room and there's one like
12  four feet away that we're putting things in there,
13  that you could say all this stuff that's going into
14  that garbage pail was contaminated, but I'm not
15  putting that garbage pail on the list of things that
16  are causing contamination for my patient even though I
17  would rate that way higher than the Bair Hugger.
18     Q.  Well you said a minute ago that anything is
19  game and then you said it's 27th on the list, or way
20  down the list.  But it's still on the list.  It's
21  still game.  You said that.
22     A.  Well then I'll take that --
23     Q.  Okay.
24     A.  -- and I'll say I don't think it's game.
25     Q.  So you're changing your mind -- you're --

Page 191

1        As we sit here today --
2     A.  Yeah.  As -- as I --
3     Q.  -- you're changing your testimony.
4     A.  Well it depends on what you're saying.  Is
5  something a one-in-10-million chance?  But no, zero
6  chance.
7     Q.  Well --
8     A.  So I'm going to change that answer.  I
9  have -- I reserve the right to say that I don't think
10  it's operative in causing infections.
11     Q.  Well the jury has a right to know why you're
12  changing your answer.  You -- you just said it's on
13  the list, it's way down the list.  And doctor, in your
14  report you've listed more than a dozen things that are
15  potential sources of exogenous contamination and the
16  only one you haven't mentioned -- or the only two are
17  the Bair Hugger and the heater-cooler devices.
18     A.  No.
19        MR. C. GORDON:  Object to the form of the
20  question --
21     Q.  Okay.
22        MR. C. GORDON:  Wait, wait, wait.  Ben, calm
23  down.
24        -- and assumes facts not in evidence,
25  mischaracterizes the testimony.

Page 192

1     A.  So let's see how I would answer that.  I am
2  the one that sees patients that have these weird
3  things, that the chances of it happening because of
4  that is like one in -- I'd see the one in 10 thousand
5  or the one in 10 million, these weird things that
6  could have happened for this thing, but 99.9999
7  percent it didn't happen that way.  And I'll just put
8  something like the Bair Hugger is as close to zero as
9  possible as leading to something that creates a
10  bacterial infection.
11     Q.  But not zero.  Okay.  Fair, doctor.  Thank
12  you.  Let me ask you this.
13     A.  The reason I'm going to say it's not zero,
14  you have a device and what if the -- by accident --
15  this could happen in the OR -- the whole drape falls
16  off that's protecting the patient from the wound, that
17  could happen in an OR, and lo and behold patient moves
18  in the middle of the case their thing and their wound
19  touches, something like that.  That's like a -- we
20  could all it an act of God.  So to say -- for anybody
21  to say something -- some weird scenario couldn't
22  happen --
23        But this isn't one of those 99.9999s, it's
24  not in -- it's not operative.  That's what I sort of
25  was trying to imply.  It's not one of those things

Page 193

1  that are really known or would be causative in
2  creating an infection.
3     Q.  So this is sort of the anything-can-happen
4  idea.  All these things you've listed, anything can
5  happen.  The -- the Bovie could become contaminated.
6  But you do --
7     A.  Oh, that's a real thing.
8     Q.  Well the Bovie --
9     A.  That does happen.  That does happen.
10     Q.  Do you have --
11        Did you cite any piece of literature --
12     A.  Oh, yes.  Oh, yes.
13     Q.  -- that show me cases where the Bovie had
14  became contaminated and caused an infection of a
15  joint?
16     A.  You don't need to --
17        The answer is, the first part, yes.  I -- I
18  cited literature that shows -- say -- I don't have the
19  exact number, that Bovies are contaminated in 25
20  percent.
21     Q.  Just like Bair Huggers are contaminated.
22  They can be contaminated too; right?
23     A.  No.  But you're using a Bovie on a wound.
24  The Bair Hugger is so far removed from a wound --
25     Q.  You're using it on a wound --

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 194

1    THE REPORTER:  Just a moment.
2    MR. B. GORDON:  All right.
3    MR. C. GORDON:  Yeah.  Let him finish his
4  answers.
5    A.  You're using a Bovie, which is
6  contaminate -- this 20 percent contamination rate,
7  that's why you have to be very careful.  And often you
8  may want to switch your Bovie tips during the case,
9  which many -- many people do on a regular basis,
10  because you're taking that Bovie and you're -- you're
11  directly putting it into the wound directly where
12  you're concerned.  That's -- and that --
13    So you don't have to do studies that --
14  that -- that have to tell all the surgeons that we
15  don't want to -- we want to minimize the chance of
16  using things like Bovies and saws that get
17  contaminated or things that fall on the floor, and
18  then you put them -- you don't want to put that back
19  in the wound.  They're directly used in there.  That's
20  a far different scenario than you're saying that some
21  of the -- the -- the -- the tubes in the Bair device
22  have contamination, which is the same as all the
23  other -- many of the other pieces of equipment in the
24  OR anyway.  There's no -- that's not a standard
25  that -- that any of these other pieces in the device

Page 195

1  need a HEPA filter or anything more than what they're
2  doing, and that any of that contamination that has
3  been found on that device, which is not meant to be
4  sterile, has anything to do with dissemination of
5  bacteria or any problem whatsoever.  And that's what
6  I'm saying.
7    Q.  Thank you, doctor.
8    You -- you need the Bovie to do surgery;
9  right?  Or to -- skin preparation.
10    A.  Actually, no, not all the time.  I -- no, I
11  use --
12    Sometimes I use other cautery devices
13  besides the Bovie.  We're using --
14    Q.  The ultrasonic?
15    A.  We're using a PlasmaBlade now, and then we
16  have this new Cat -- Canady device.  So we're using --
17  we are actually using -- we're -- we're going to get
18  on some studies with that and we're going to start --
19  I have few data on that.  But the answer is you would
20  want some device that minimizes bleeding, like a
21  cautery or some other device, so the answer is yes.
22    Q.  And so I understand and be clear so the jury
23  understands, you don't use those actually in the
24  wound; do you?  You use them to cauterize a vessel.
25  You don't actually stick them into an open wound; do

Page 196

1  you?
2    A.  I don't --
3    They definitely go in the open wound.  I
4  don't know what you're asking me.
5    Q.  Okay.
6    A.  I mean you have --
7    The -- the vessel is not outside the wound,
8  the vessel is in the wound.
9    Q.  Okay.
10    A.  Is that what --
11    Q.  Yeah, I think that clarifies it for me.  Do
12  you --
13    The other things in the operating room that
14  you've talked about, they are all essential pieces of
15  equipment.  Like lights, you got to have lights to
16  operate; right?
17    A.  You would not want to do these in the dark.
18    Q.  Okay.  So the point is you've listed a
19  number of things that you as an orthopedic surgeon
20  need to do your job that could be contaminated, but
21  you want to minimize or mitigate the risk of that
22  contamination; right?
23    A.  Yes.
24    Q.  Is the Bair Hugger absolutely essential to
25  operate?

Page 197

1    A.  What I said before is we're calling Bair --
2    I don't know what your question is.  Is it
3  Bair Hugger or device to maintain normothermia would
4  be considered standard of practice by the CDC, any
5  level, even the latest ruling by the --
6    Yeah.  They just had a new guideline with
7  that guy that I mentioned, Parvizi is like the middle
8  author, that absolutely recommends maintenance of
9  normothermia through -- through devices.
10    Q.  And -- and those devices, just to be clear
11  and go back to this, could be a number of different
12  types of patient warming.  Even Dr. Sessler agreed
13  with that; right?
14    A.  I don't --
15    MR. C. GORDON:  Object to the form of the
16  question.
17    A.  You're asking me --
18    I apologize for the way I answered it.  But
19  you ask me a question, I'm about to answer it, and
20  then you throw in this other clause.
21    The first part of your question is a yes.  I
22  have no idea what -- I've never read Dan -- is it
23  Daniel Sessler?  He has a father also that was a
24  nuclear physicist.  I think it's Dan Sessler.  I have
25  never read his deposition.  I have no idea what he

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 198

1  thinks about this.  So if you can --
2      Q.  Well --
3      A.  If you want to give it to me, I'll be happy
4  to read his deposition, I'll do that afterwards if we
5  want -- if everybody wants me to do so I can answer
6  your questions better.  Because he keeps popping up
7  here.
8      Q.  You're not aware that he's given
9  presentations -- public presentations where he says
10  specifically that he doesn't care what type of patient
11  warming you use as long as you warm the patient?
12      A.  I am not aware.
13      Q.  And so my question -- underlying question
14  is, doctor, --
15          (Witness's cellphone dings.)
16      Q.  -- again, there are numerous different ways
17  to warm the patient to try to prevent hypothermia --
18      THE WITNESS:  Excuse me one second.
19      MR. B. GORDON:  Sure.
20      THE WITNESS:  I apologize.
21      MR. ASSAAD:  Let's go off the record.
22      MR. B. GORDON:  Yeah.
23      THE REPORTER:  Off the record, please.
24          (Discussion off the record.)
25  BY MR. B. GORDON:

Page 199

1      Q.  Thank you.  My --
2      Doctor, I was following up on that area
3  about different types of patient warming.  And you
4  would agree with me, would you not, that the forced-
5  air warming provided by Bair Hugger is not absolutely
6  essential to be used in every orthopedic surgery; is
7  it?
8      MR. C. GORDON:  Object to the form of the
9  question, asked and answered.
10      Q.  I'm not sure you've answered that question;
11  that is, is the Bair Hugger specifically required --
12      I mean you talked about this --
13      A.  Is this -- is this the only device, is that
14  what you're asking me?
15      Q.  Correct.
16      A.  It's not the only device.
17      Q.  Fair enough.
18      Do you know who Dr. Kamal -- and I'm going
19  to butcher this -- Maheshwari is?  Ma -- it's
20  M-a-h-e-s-h-w-a-r-i, first name is K-a-m-a-l.
21      A.  K-a-m-e -- a-l.
22      Q.  a-l, yes, sir.  Kamal Maheshwari.
23      A.  There is a Dr. Maheshwari that I'm a
24  co-author on, but I believe -- my brain is not
25  thinking.  Because I haven't authored with him in a

Page 200

1  few years.  And he's at -- downstate in New York and
2  his name --
3      Q.  I'll help you out.
4      A.  --is Atta -- Attatuck.
5      Q.  This is someone else.  So --
6      A.  Oh.
7      Q.  Okay.  So you don't know a doctor of that
8  name at -- who is an anesthesiologist at the Cleveland
9  Clinic?
10      A.  Okay.  Now I have another question here.
11  Kamal Maheshwari.  So if you show me his --
12      Okay.  So here's the deal.  On any given
13  Wednesday, as I told you before, I work with any --
14  from -- could be over 20 anesthesiologists.  There are
15  three or four that I primarily work with.  And it's
16  not ringing a bell, Maheshwari.  Again, I would have
17  mixed it with up with a guy I published with.
18      If you show me a picture of him, if you can
19  get a picture on the internet, I can tell you whether
20  I recognize him.
21      (Mr. B. Gordon displays computer screen to
22      the witness.)
23      Q.  Boom.  Look familiar at all?
24      MR. C. GORDON:  Now you got to put a little
25  surgical mask on.

Page 201

1      MR. B. GORDON:  Exactly.  A little cap.  No.
2      A.  Somebody like that with a beard looks a
3  little familiar because he does -- somebody like that
4  was asking me about doing a study, and then when I
5  finally said we could do the study, then the company
6  withdrew the support for the study.  But I'm not that
7  familiar.  If it is that person, it's only about doing
8  studies.  I don't know what you're going to ask me,
9  but I got it.
10      Q.  Well are you -- are you familiar with
11  guidelines utilized by the Cleveland Clinic concerning
12  ventilation systems?
13      A.  Guidelines --
14      Q.  Standards or guidelines that are actually
15  published in a book that is used by the Cleveland
16  Clinic?
17      A.  No.  I -- I make an assumption, and if you
18  want I'm happy to go through those, but I make an
19  assumption that they are incredibly strict at the
20  Cleveland Clinic about their ventilation systems.  I
21  don't know all the details about that.  I assume --
22  it's a big assumption -- that they're safe.  They've
23  got a lot of ORs going at one time.  I do --
24      In action, I remember one day where there
25  was just a little bit of a defect in the wall that

51 (Pages 198 to 201)

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 202

1  happened over the weekend where there was like a
2  damage to a wall, and they shut down the whole OR, one
3  of our orthopedists. So they are to me obsessively
4  compulsive about the details of what you just asked
5  about everything. I've seen that with them. So there
6  are people doing that. I'm just not involved in that.
7      Q.  Have you ever opera -- I'm sorry -- designed
8  an operating room manual for oper -- let me --
9          MR. B. GORDON:  That's bad, Dick. Let me
10  start over.
11     Q.  Have you ever designed an operating room?
12     A.  The closest I could say to designing an OR
13  is when I would do surgery on animals in the '90s and
14  we had to figure out which room we were going to use
15  to operate on rabbits or dogs and say, "Is this
16  ideal?" And I'd get an anesthesiologist and my vet
17  and we'd sit there and we'd look at different rooms
18  and say where do we think it's best. So maybe that's
19  a facetious answer, but the answer is no --
20     Q.  So would you --
21     A.  -- in a general sense.
22     Q.  Thank you, doctor.
23         Based on that answer, would you defer to
24  experts on operating room design about the ventilation
25  systems used in those operating rooms?

Page 203

1      A.  Absolutely.
2      Q.  Okay. Fair enough.
3          You're not a member of ASHRAE. You know
4  what ASHRAE is?
5      A.  I -- I don't --
6          I can't give you give you the whole eponym,
7  but yes --
8      Q.  And --
9      A.  -- that determines the standards for --
10     Q.  -- NIOSH is another one.
11     A.  I don't even know that one. I'm just --
12     Q.  Okay. What about the American Institute of
13  Architects who help design hospitals, you -- you a
14  member of that?
15     A.  No, I'm not a member of that.
16     Q.  All right. Let me ask you if you -- if you
17  agree or disagree with this statement. I'm going to
18  give you two statements. Number one: "Infection
19  control is critical in ORs." Agree or disagree?
20     A.  Have to hundred percent agree.
21     Q.  Number two: "Studies have demonstrated that
22  most of the causes of wound contamination in the OR
23  are the result of the patient's skin flora and
24  bacteria shed on airborne particles from the OR
25  personnel." Agree or disagree?

Page 204

1      A.  Let me write it down.
2      Q.  I'll read it again.
3      A.  "...most of the" --
4          Yeah.
5      Q.  "Studies have demonstrated that most of the
6  causes of wound contamination in the OR are the result
7  of the patient's skin flora and bacteria shed on
8  airborne particles from the OR personnel."
9          MR. C. GORDON:  Object to the form of the
10  question and the way you read it.
11     A.  I'm -- I -- I need --
12     Q.  I read it slowly. I was trying.
13     A.  Let me read it back to you because I didn't
14  get the part --
15     Q.  Sure.
16     A.  Because I've got to analyze this because
17  it's a --
18         "...most of the studies" --
19     Q.  Well no. It just starts "Studies..."
20  Sorry.
21     A.  Oh. What's the beginning of it again?
22     Q.  "Studies have demonstrated that most of the
23  causes" --
24     A.  "...that most of the causes of wound
25  camin -- contamination in the OR are a result of

Page 205

1  patient's skin flora or bacteria" --
2      Q.  And bacteria.
3      A.  "And" or "or?"
4      Q.  It's "and" here. Yes, sir.
5      A.  And bacteria.
6      Q.  "...shed on airborne particles from the OR
7  personnel."
8      A.  On airborne particles.
9      Q.  From the OR personnel.
10         Do you agree or disagree with that
11  statement?
12     A.  Wound contamination, patient's skin flora
13  and bacteria shed --
14         So their skin flora or bacteria is being
15  shed on airborne particles --
16         I can't even understand this. I have --
17     Q.  That's okay.
18     A.  I have a hard time with this.
19     Q.  That's okay. You can't answer.
20     A.  You've got a patient's skin flora is what
21  I'm thinking, and bacteria is being shed -- that
22  that's being shed into the air, and then it just says
23  from the OR personnel, so it implies that the -- the
24  OR person -- OR cre -- OR personnel are creating the
25  shedding? Doesn't make sense.

52 (Pages 202 to 205)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 206

1      The whole way it's phrased, it doesn't
2  totally make sense and is subject to different
3  interpretation.
4      I'm going to keep trying to give you the
5  benefit of the doubt on this statement. And I'm sure
6  some authoritarian person said this or they're trying
7  to make these statements, but boy, is this difficult.
8      Q.  If you can't answer --
9      A.  We're not -- we're not saying that --
10  infections, we're saying wound contamination, so you'd
11  have to tell me what that means by "wound
12  contamination," are a result --
13      Q.  What does it mean to you? I mean you're an
14  orthopedic surgeon. What does "wound contamination"
15  mean to you?
16      A.  Well this could be anything, just a bacteria
17  or two, or it could be a whole -- something that leads
18  to infection. They could be two different things.
19      Q.  Well if it's just a bacteria or two, we're
20  not going to worry about it.
21      A.  Not always.
22      Q.  Okay.
23      A.  You would like to avoid that at -- if at all
24  possible.
25      Q.  Not a good idea to even get any bacteria in

Page 207

1  the wound, is it, if you can help it?
2      A.  Well we -- we just --
3      What we want to do is minimize that as much
4  as possible and dilute everything as much as possible.
5  There clear --
6      Clearly, there are colony-forming units in
7  every OR.
8      Q.  Doctor, the point of this --
9      A.  You just can't have zero. But I mean that's
10  such a -- this is such a weird statement that I have
11  trouble reading it. I -- I don't know what --
12      Q.  Well let me ask --
13      A.  If this was the case, if this was truly the
14  case, then why wouldn't we have every OR personnel --
15  why I don't totally agree with it -- why wouldn't we
16  have every OR personnel that is even working in that
17  OR -- which is not the case -- that even walks in
18  there completely scrub? Why wouldn't we have -- and
19  there was a study like this. Why wouldn't we have
20  people prepping the leg, which could be one or two,
21  completely as sterile as possible in their gowns?
22      Q.  So you're not --
23      Is it your testimony you're not concerned
24  about airborne particles around the patient at all?
25      A.  I'm definitely concerned.

Page 208

1      Q.  Waving your hand, you said you try to
2  minimize that, right, for that very reason?
3      A.  I didn't say I wasn't concerned.
4      Q.  You don't leave the windows open, do you, in
5  the operating room?
6      A.  Part of this is this "most" and --
7      Q.  Most of --
8      A.  -- some of it I don't know and some of the
9  way this is phrased --
10      Q.  You'd be --
11      A.  So I don't have a problem with --
12      Excuse me. Can I just -- I just want to --
13      I'm concerned about all these things.
14      Q.  You're concerned about air particles around
15  the patient; aren't you?
16      A.  Sure.
17      Q.  Of course. You -- you don't leave the
18  window open to let the breeze blow in; do you, doctor?
19      A.  What window?
20      Q.  Any O --
21      I'm sorry.
22      A.  We wouldn't --
23      Q.  You don't have operating rooms with windows;
24  do you?
25      A.  No. We sometimes have operating rooms --

Page 209

1      But we --
2      Q.  If -- if -- if you have --
3      A.  -- we don't do that. I agree.
4      Q.  If you have an operating room with a window,
5  you keep it closed during surgery; right?
6      A.  Yes.
7      Q.  Because you don't want particles or debris
8  or pollution or anything blowing in in a sterile
9  environment; right?
10      A.  As an anecdote, if a fly or anything walked
11  in an OR, everything would have to be shut and you'd
12  have to get rid of that fly and close -- you know,
13  cover --
14      I mean it's like a whole thing.
15      Q.  You don't smoke cigarettes in the OR.
16      A.  It doesn't happen too often, like once every
17  five years.
18      Q.  Let me ask you this. You've been around a
19  little. Were you around back in the day when I've
20  heard anecdotally that some of the people in the OR
21  would actually light up a cigarette?
22      A.  I couldn't even conceive of it. It's never
23  been in my --
24      Q.  Never seen that?
25      A.  Never. Never been in my frame of reference.

53 (Pages 206 to 209)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 210

1    Q.  Certainly wouldn't be allowed today.
2    A.  Yeah.  I mean it's not even in the ballpark.
3    Q.  Yeah.  Striking a match would be same thing.
4  You'd have to shut down the OR; wouldn't you?
5    A.  You don't --
6        There's so many things that could lead to a
7  fire in the OR, not only --
8        I mean when I said that three-minute thing
9  with the alcohol and the prep, they're concerned with
10 everything.  A Bovie coming in contact with a prep
11 with alcohol that could lead to a fire.  So they are
12 very ultraconservative about all these things.
13   Q.  Doctor, we're going to take a lunch break.
14 Before we do, I want to ask you one just very quick
15 line of questioning.
16       Somewhere in your report or in these papers
17 you indicated that, I think -- tell me if this is
18 wrong -- that you do about 80 percent of your
19 testifying for industry and about 20 percent for
20 plaintiffs.  Is that about right?
21   A.  Industry?
22   Q.  Well --
23   A.  Say it again.
24   Q.  -- defendants.  About 80 percent for
25 defendants, about 20 percent for plaintiffs?

Page 211

1    A.  Something like that.
2    Q.  80/20.  And the 20 percent for the
3  plaintiffs --
4    A.  Wait, wait, wait.  For -- define --
5        The plaintiff, we're talking about a --
6    Q.  That's what I'm asking you.
7        Sorry.
8    A.  All right.
9    Q.  I want to know what you mean by plaintiff.
10   A.  In that type of answer, it would be 80 -- it
11 would be the type of case where a physician is being
12 sued.  There -- there's a middle ground where I'm just
13 called as an expert on a topic, like I'm an expert and
14 I'm not for either side.  That happens.  I'm a
15 osteonecrosis expert, they call me for both sides.
16 "You're an expert.  We want to hear on these things."
17 But in cases where I'm defending a doctor, let's call
18 it that way, or am I on the side for a patient taking
19 a case, it's about 80/20.
20   Q.  So it's your testimony --
21   A.  Which -- which I think -- I think holds up
22 in that list I gave you.  You know, a small part of my
23 life, but there was a list of 20 cases.  If we looked
24 at that, I could actually tell you what that number is
25 from that list of 20, which was compiled over four

Page 212

1  years, and since then I haven't really done much.
2    Q.  Let's take --
3    A.  One or two.
4    Q.  -- a look at that, doctor.  Find that
5  exhibit for me there.  I've got a -- my copy, but
6  there's a marked copy.  You can look at that one.
7    A.  Yeah.  So this would be --
8    Q.  Eleven cases.
9    A.  So right.  And the reason I brought it up,
10 most of the time I'm defending doctors --
11       Well one of them is just a worker's comp
12 case.  That's number three.
13   Q.  So Judith Cherrak, number three, --
14   A.  It's a worker's comp.
15   Q.  -- you were testifying then as a treating
16 doctor for this patient?
17   A.  Treating doctor.  And they wanted to know if
18 she should be out of work X period of time.
19   Q.  So let me ask you about that, doctor.  Was
20 your opinion in favor of the patient and her
21 disability, or contrary to that?
22       MR. C. GORDON:  Object to the form of the
23 question.
24   A.  It was in favor with a lot of provisions,
25 because they --

Page 213

1        They were happy with me, but ultimately they
2  weren't wholly happy with me.  They wanted to do a lot
3  more, if you want -- if you want, the patient and
4  their lawyer.  But they -- they had what I felt was
5  the truth.
6    Q.  Who was the patient's lawyer?
7    A.  I don't remember.
8    Q.  You don't remember?
9    A.  Just one quick deposition.  It took two
10 hours.  And they wanted to claim that X was due to her
11 injury, and some portion of it -- she had like partial
12 liability due to the jury.  But it was --
13       They probably would have wanted me to say
14 that all her disability was due to this injury, and I
15 basically said some percent that I felt was due to the
16 injury and some percent was pre-existing condition.
17   Q.  Who was her employer?
18   A.  I have no idea.  I don't remember this.
19   Q.  Who noticed your deposition?  Who --
20       Did the plaintiff's counsel notice your
21 deposition or did the worker's comp counsel?
22   A.  I don't know.
23   Q.  Okay.
24   A.  I don't --
25       I mean this is not a big part of my life, so

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 214

1  something like that --
2       Q.  Any other --
3       A.  I do not have the records of this.
4       Q.  All right.  Let's move on.
5       Any others of these 11 --
6       A.  I'm -- I'm --
7       Q.  Let me ask my question.  Any others of these
8  11 where you testified on behalf of a patient?
9       If you want, I'll narrow it, doctor, and
10  save time.  There are five cases I'm most interested
11  about, there's five trials if I'm counting right.  In
12  those five trials were you testifying on behalf of the
13  patient or the doctor or someone else?
14      A.  Number one is the patient.
15      Q.  Okay.  So Ms. -- I'm sorry.  Heather Carter
16  versus Loucks, what kind of case was that?
17      A.  That was a --
18      It was a purported malpractice against a
19  surgeon --
20      Q.  And you --
21      A.  -- and I was -- I was representing Heather
22  Carter in that one.
23      Q.  The patient.  And how did that end up?
24      A.  I don't know.  They were going to appeal it
25  or something.  It -- it did not --

Page 215

1       Q.  So she lost her case?
2       A.  Yes.
3       Q.  Okay.  Next?
4       A.  Mingo versus DePuy  is -- is one of those
5  ASR cases.
6       Q.  You testified for DePuy.
7       A.  Yes.  I'm --
8       Q.  Okay.
9       A.  Or we're just going to say for the truth on
10  all these things.  But then --
11      MR. B. GORDON:  Object, non-responsive.
12      A.  -- who is --
13      Q.  Your testimony was on behalf of DePuy.
14      A.  The lawyers that represented DePuy, yes.
15      Q.  Your testimony was to defend DePuy's medical
16  products; was it not, doctor?
17      MR. C. GORDON:  Object to the form of the
18  question, asked and answered.
19      A.  I don't have an answer to that.
20      Q.  Okay.  That's fair enough.
21      A.  I'm here for both sides.
22      Q.  All right.
23      A.  Say it that way.
24      Q.  Any others where you testified on behalf of
25  the patient, like with Ms. Loucks, out of these 11?

Page 216

1       If you don't remember, that's okay, doctor.
2       A.  The only one --
3       I think all the other ones are in behalf of
4  a surgeon or doctor, not --
5       I can't remember Wade off -- off my head
6  right now.
7       Q.  So with respect to the last four years at
8  least, the 80/20 doesn't hold true, it's more like --
9       A.  Well this is only --
10      Q.  -- 10 to one.
11      A.  This is only a sampling of 11, and I told
12  you -- what  did I say earlier -- 60.
13      Q.  This -- this is -- I'm sorry.  This is only
14  11 --
15      A.  It's not even 11, it's 10, because the
16  number two is the -- is the DePuy case, and number --
17      It's not even 11, it's -- it's at best nine.
18      Q.  What I'm trying to understand, doctor, is
19  this list is 11 cases where you testified by
20  deposition or trial since June 1st of 2013.  What am I
21  missing?  Is that not right?
22      A.  No.  This is from '13 to '17.
23      Q.  Right.
24      A.  I haven't been doing that much.  I haven't
25  done any --

Page 217

1       This is the first time I've been here this
2  year and I'm not -- don't plan --
3       I'm the chairman of Cleveland Clinic.  I'm
4  not doing too much now and I've slowed this down.
5  What I'm telling you is I've done 60 or so.  You have
6  a sampling here of nine -- 10 or nine.  Mingo versus
7  DePuy doesn't count.  That's a separate category.  And
8  number three is a -- is what -- is a disability.  I
9  gave you a number of 60 where it's a decision
10  plaintiff versus defendant -- or let's say -- I'll
11  lower it to 50.  This is only a sampling of nine.
12      Q.  Okay.  So this --
13      A.  So I would still say the 80/20 holds up, if
14  you're trying to say that it doesn't hold up.
15      (Mr. Assaad tries to get Mr. B. Gordon's
16  attention.)
17      MR. B. GORDON:  I'm done.  Just let me
18  finish, Gabe.  If you want to walk out, step out.
19  Quit interrupting me.
20      A.  If -- if the implication is that I'm not
21  doing 20, I am doing about 20.  I know that there
22  could be two in a row.  Sometimes it's not a
23  physician, it's an ER or it's a situation.
24      Q.  All right, doctor, I'm trying to understand,
25  I'm just -- and let's go to lunch, but the question

55 (Pages 214 to 217)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 218

1  I'm not clear on is these 50 or 60 you're talking
2  about, are we talking about in the last four years?
3  Because all I want to know about is the last four
4  years.
5      A.  No.  This is career.
6      Q.  Correct.  That's what I want to understand.
7          In the last four years you've given us all
8  the cases that you testified in, the 11.
9      A.  Okay.  So my 80/20 would have been lifetime.
10     Q.  Understood.
11     A.  If I implied otherwise in a previous answer,
12 it's a general number.  These are the cases, to the
13 best of my knowledge, that I was able to collect over
14 the four-year period.  It amounts to 11.  Of those,
15 nine -- I don't -- I -- the last two I'm a little
16 questioning of, but I'll give it as ones that I
17 defended doctors.  I can go back and really defin --
18         I might be able to go in my computer.  I'm
19 not sure.  A lot of it I got rid it.  So we'll say of
20 those cases it's one versus eight -- one out of nine.
21     Q.  That's all I was trying to clarify.
22     A.  Okay.  You got it.
23     Q.  So in the last four years, the cases that
24 we've got on this exhibit, it's only one out of nine
25 or 11 on behalf of patients, so the -- just so it's

Page 219

1  clear.
2      A.  Well my own patient is two out of 10, --
3      Q.  Okay.  Two out of 10.
4      A.  -- Carter and Cherrak.
5      Q.  Okay.  Doctor, you're not an infectious
6  disease doctor; are you?
7      A.  No.
8      Q.  You don't hold yourself out as an expert in
9  microbiology or infectious disease?
10     A.  I don't hold --
11         I hold myself to the extent, as an
12 orthopedic surgeon, I have to deal with infections and
13 have published a lot on infected hip and knee
14 replacements, which are relevant to the case, to that
15 extent I'm to some extent an expert.  As a -- as a
16 pure infectious disease person, microbiologist, no,
17 I'm not an expert.
18         MR. B. GORDON:  Fair enough.  Thank you,
19 doctor.  We can take lunch.
20         THE REPORTER:  Off the record, please.
21         (Luncheon recess taken.)
22
23
24
25

Page 220

1              AFTERNOON SESSION
2          MR. C. GORDON:  And I just want to note for
3  the record that we understand that Mr. Gordon, Ben --
4  Mr. Ben Gordon has unexpectedly left and Mr. Assaad is
5  going to -- has indicated he's going to take over the
6  questioning.  We think this is irregular and
7  inconsistent with the -- with -- with the practice if
8  not specific rules, but I've also indicated in order
9  to finish this out we're going to let Mr. -- Mr.
10 Assaad go ahead and ask -- ask questions.
11         MR. ASSAAD:  Thank you, Mr. Corey Gordon.
12 I'm going to say "Corey Gordon" because I don't want
13 to mix the two Gordons.
14         MR. C. GORDON:  Now it's easy.  I mean I'm
15 the only Gordon in the room.
16         (Discussion off the stenographic record.)
17 BY MR. ASSAAD:
18     Q.  So Dr. Mont, we have met before; haven't we?
19     A.  Yes.
20     Q.  Actually, one of the cases you listed on
21 your deposition or trial list is a case of Victoria
22 Smith, and we met at trial.
23     A.  Smith versus Moskowitz.
24     Q.  Yes.  All right.  I don't recall, but I
25 think I was the one that actually cross-examined you

Page 221

1  at trial.  Yeah.  But now that I'm thinking about it,
2      A.  Yeah.  But now that I'm thinking about it,
3  maybe there -- you both were doing it.
4      Q.  Maybe.
5      A.  I mean I think you tag-teamed that one.
6  Right?  You came in like a little later.
7      Q.  It's my new -- it's my new MO I guess.
8      A.  I think there were more than one.
9      Q.  Yeah.
10     A.  I think you were --
11     Q.  So --
12     A.  That's why, when you said that, I seemed to
13 remember it.  But I don't -- what do I --
14         I don't remember all these cases.  I'm
15 surprised I remembered --
16     Q.  First thing, sir, I want to go to page two
17 of your report, Exhibit 5.
18     A.  Okay.
19     Q.  It's right there.
20         Now you wrote this report and you submitted
21 it around June 1st or 2nd; correct?
22     A.  Somewhere in that vicinity.
23     Q.  Okay.  And --
24     A.  Well it was being written like a week or two
25 before.

56 (Pages 218 to 221)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 222

1    Q.  Okay.
2    A.  Final, it was handed in in those days.
3    Q.  Fair enough.
4         And when you wrote this report, I mean
5  you -- you checked it for accuracy to make sure
6  everything was correct.
7    A.  I did to the best of my ability.  Since then
8  I found a few typos or things that --
9    Q.  Forget about --
10        Substantively.
11   A.  I might -- I might change.
12        Yes.
13   Q.  And as you testified earlier, this -- this
14 report, which was due by -- by June 2nd, is the
15 totality of your opinions as of the date of filing
16 this report; correct?
17   A.  Depends on, I guess, what are considered the
18 most relevant things.  I mean I have other opinions,
19 but --
20   Q.  Okay.
21   A.  -- that -- that your side should know.
22   Q.  Fair enough.
23        We talked about how many surgeries you did
24 previously per year and how many you -- patients you
25 see per month, and you wrote in your report on page

Page 223

1  two, "I routinely take care of lower extremity joint
2  arthroplasty patients.  I have performed during my
3  professional career over 500 to 700 joint replacement
4  surgeries per year for a total of over 15,000 since
5  1999."
6         I take it that was at the time you wrote the
7  report; correct?
8    A.  If you read the last phrase in that
9  paragraph, that's not true.  It says -- look in the
10 paragraph there, it says "...(although with duties as
11 Chairman this past year, my clinical activity has been
12 reduced)."  So what this is referring to is -- is
13 factually right.
14   Q.  Okay.  So --
15   A.  Not every year did I do 700 surgeries.  At
16 the beginning of my career I was doing closer to 500.
17 The later part of my career I was doing closer to 900.
18 I'm giving a general average since 1990.
19   Q.  Up until you went to the Cleveland Clinic?
20   A.  And then -- and then what I said, actually I
21 didn't even realize it says here, so 6,000 was a more
22 factual -- what I said earlier in -- today --
23   Q.  Okay.
24   A.  -- was more right.  But if you see the last
25 parenthesis, when I become chairman, the clinical --

Page 224

1         Let's call clinical 50/50 now.  Okay?  So
2  whatever number is there, it should be three thousand
3  and --
4         But that's not even right.  I was doing -- I
5  did 865 cases -- I'll do about 400 surgical cases, and
6  I'm seeing, I think, a little over 3,000 cases by the
7  last numbers.  And we -- we get the numbers every
8  month to see.
9    Q.  How long does it take you to do a total hip
10 on average?
11   A.  Skin to skin, about -- we're talking about
12 somebody that does not markedly have a high BMI --
13 about twenty -- the average would be about 22 to 24
14 minutes.
15   Q.  To do a total hip?
16   A.  Without rushing.  Yes.
17   Q.  Okay.
18   A.  Skin to skin.
19   Q.  What about a total knee arthroplasty?
20   A.  Total knee, a little bit longer.  I would
21 say about 40 to 45 minutes.  So --
22   Q.  Okay.  And -- and all those --
23        In all those cases you used some sort of
24 device that maintains normothermia?
25   A.  All of those cases.

Page 225

1    Q.  All.  So you --
2         And while you were at the -- in Baltimore,
3  that device was the Bair Hugger forced-air warmer;
4  correct?
5    A.  If not a hundred percent, then I would say
6  99.99.
7    Q.  Okay.
8    A.  And maybe there was an exception, --
9    Q.  Do you know which Bair Hugger --
10   A.  -- but few.
11   Q.  Sorry.
12        Do you know which Bair Hugger device you
13 used?
14   A.  I know there's a lot of different models or
15 things, but I can't tell you that.
16   Q.  Okay.
17   A.  I can find that out if you want later.
18   Q.  And the blower of the Bair Hugger, that's
19 placed next to the anesthesiologist; correct?
20   A.  Yes.
21   Q.  Underneath the operating room table;
22 correct?  Underneath the head of the patient.
23   A.  If we put it underneath the operating room
24 table, that would be like on the floor.  No.
25   Q.  So --

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 226

1    A.   At the head of the -- at the head of the
2  table.
3    Q.   Was it on the floor or on a pole, if you
4  know?
5    A.   It would be over the patient --
6       Oh, the actual --
7    Q.   Blower.
8    A.   Yeah.  The device would be -- I guess would
9  be on the floor.
10    Q.   Okay.  And that device would be close to the
11  anesthes --
12    A.   I'm thinking of what's attached to the
13  patient.
14    Q.   And that's why I referenced the blower.  The
15  blower is on the floor; correct?
16    A.   Yes.
17    Q.   And the blower is placed underneath the head
18  of the -- usually around the head area of the patient,
19  on -- on the floor.
20    A.   Yes.
21    Q.   Okay.  You don't hold yourself out as an
22  expert on normothermia; do you?
23    A.   I don't know what that question means.  I --
24  I mean I've read a number of articles on nor --
25  normothermia in preparation for this -- this case.  I

Page 227

1  don't know if there's any person that would call
2  themselves --
3       It's not a subject in medical school that
4  you study.
5    Q.   I understand.  But you know Dr. Sessler and
6  Dr. Kurz have devoted their life to doing research in
7  the areas of maintaining normothermia.
8    A.   I couldn't tell you that they devoted -- it
9  doesn't seem --
10       Having met Dr. Sessler one time, I don't
11  think he spent his whole life, --
12    Q.   Okay.
13    A.   -- has devoted his life.  I wouldn't
14  charact -- he -- he has a -- in the --
15       In the role that I have at the Cleveland
16  Clinic, he's the director of -- one of the directors
17  of research at Cleveland Clinic.  I don't know the
18  exact title.  He also oversees research for the whole
19  anesthesia department.  I was getting involved with
20  some other studies that are not related to this one,
21  so that's why the meeting was.  But I think he's
22  also -- I -- I don't know --
23    Q.   Okay.
24    A.   -- if I would say --
25    Q.   That's fine.

Page 228

1    A.   -- what you said.
2    Q.   And to speed things along and -- I mean if
3  you disagree, you don't think he's an expert, just say
4  "I don't think he's an expert" and let's move on.
5       So I want to turn to page 17 of your report.
6    A.   So -- so should I --
7    Q.   You cite -- you cite Dr. Kurz and Dr.
8  Melling as -- as citations for strong evidence of SSI
9  reduction for active warming.  Do you see that in your
10  report on page seventeen?
11    A.   Wait.  I didn't say that Dr. Sessler is not
12  an expert in -- in hypothermia.
13    Q.   You just didn't --
14       You didn't know.
15    A.   I mean he's published on it.
16    Q.   You didn't know.
17    A.   Well I know he has publications on
18  hypothermia, so we're level with that.  Okay.  So
19  let's --
20       What's this question?  I'm sorry.  I
21  apologize.
22    Q.   Now you -- you cite on page 17 the Kurz
23  article of 1996 and Melling -- Melling article 2001
24  as -- to support your statement that strong evidence
25  of SSI reduction for active warming was found.  Page

Page 229

1  17.
2    A.   Okay.  Okay.
3    Q.   Do you see that?
4    A.   I see that.
5    Q.   Okay.  Have you read those articles?
6    A.   To the best of my ability, not recently, but
7  yes.
8    Q.   Okay.  Are you aware whether or not Melling
9  supports the proposition --
10    A.   Yeah.
11    Q.   Do you -- do you under --
12       Do you understand that Mellon -- Melling
13  deals with prewarming and not perioperative warming?
14    A.   Yeah.  Melling -- Melling is -- well Melling
15  is on pre -- the whole --
16    Q.   Yeah.
17    A.   The whole article is on prewarming.
18    Q.   Okay.  And that's different than
19  perioperative warming; correct?
20    A.   Well it depends on your definition.  You can
21  call everything perioperative.
22    Q.   Okay.
23    A.   So I mean I -- I don't want to get lost in
24  semantics.  But I'll -- I'll agree with you.  I mean
25  if you want -- I --

58 (Pages 226 to 229)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 230

1    I wouldn't hang up my whole argument on the
2  beneficial effects -- which is what this is -- on
3  those two articles alone.  I think there's a lot of
4  articles, if you want to hang up -- hang on those two
5  articles.  If you want to delete those, I could give
6  you others articles.  But that is prewarming.
7    My life, I view prewarming -- the whole part
8  as part of the perioperative period.
9    Q.  Do you know whether or not the -- the study
10  in Melling dealt with warming patients while -- before
11  or after the incision?
12    A.  No.  I don't want -- I don't want to rely on
13  memory for --
14    Q.  Okay.
15    A.  -- any of these.  I mean for some of them I
16  will rely on memory.  And I apologize for saying this:
17  Even my own studies where my name is the lead author,
18  I don't want to rely on memory in answering specific
19  questions like that.  If you --
20    I'm very happy to answer this later, or if
21  you want to pull up the article right now, we'll go
22  and look at it.
23    Q.  Well let's just --
24    The article states what it states; correct?
25    A.  Of course.

Page 231

1    Q.  Okay.  And -- and --
2    A.  Based whatever --
3    If you say that, then I agree that --
4    Q.  And you're aware that Kurz -- you're aware
5  that Kurz dealt with colorectal surgeries; correct?
6    A.  I would say --
7    What I would say, it's not orthopedic, yes.
8    Q.  Okay.
9    A.  I - I don't know which one -- and some --
10    I don't want to mix up ones on colorectal,
11  ones on cardiac.
12    Q.  Sitting here today, are you aware of any
13  study that indicates that maintaining normothermia
14  during the perioperative period reduces the incidence
15  of a periprosthetic joint infection?
16    A.  Any orthopedic study.
17    Q.  Any study that indicates that maintaining
18  normothermia during a -- a total hip or total knee
19  arthroplasty reduces the incidence of periprosthetic
20  joint infection.
21    A.  You just said "any study," but you said
22  periprosthetic, so we're talking -- can't say "any."
23  It's --
24    We're talking about total joint studies, hip
25  or knee arthroplasty.

Page 232

1    Q.  Whether it's done by anesthes --
2    A.  Periprosthetic means prosthesis.
3    Q.  I understand what it means, sir.  My
4  question is:  Are you aware of any study from any
5  discipline that -- that supports -- strike that.
6    Are you -- do you rely on any -- strike
7  that.
8    Are there any studies that you're aware of
9  that indicates that maintaining normothermia during a
10  total hip or total knee arthroplasty reduces the
11  incidence of periprosthetic joint infection?
12    It's a simple "yes" or "no."
13    MR. C. GORDON:  Well --
14    A.  Well I'm scanning my memory bank here.
15    Q.  Okay.
16    A.  And it's not a simple "yes" or "no."  We
17  know that there's a lot written.  For example, the
18  consensus statement by that Parvizi group with the
19  book, there was a 92 percent concurrence that using --
20  maintaining normothermia would reduce the in -- was --
21  was believed that that would reduce the incidence of
22  periprosthetic infections.  Most -- they did say in
23  the conjecture that most of the -- that's why --
24    The evidence was from three or four studies
25  that were non-orthopedic, in that -- in that statement

Page 233

1  which came out, I guess, in '14, okay, so that was --
2    Q.  You mean the one that came out in 2013, the
3  International Concensus?
4    A.  The International Concensus.  That's a
5  book --
6    Q.  Do you think that's authoritative?
7    MR. C. GORDON:  Let him answer the question.
8  Just hold on.
9    A.  I think that's very authoritative.
10    Q.  Okay.
11    A.  That's -- that's what a lot of us are going
12  by.  And there's going to be another meeting of the
13  400 experts in -- and we're not talking about the CDC,
14  we're talking about what you -- in one of your parts
15  of your question you're asking about periprosthetic
16  joint, prosthetic meaning joint.  So they did say that
17  there was a lack of studies in orthopedic literature,
18  but based on the studies that were non-orthopedic, 92
19  percent or maybe higher felt that maintaining
20  normothermia was important to reduce the risk of
21  infection.
22    There was another CDC statement that came
23  out saying similar things.  There may be -- I don't
24  want to say the wrong thing.  And, you know, I do
25  recall the study in Orthopedics on hip fractures by

59 (Pages 230 to 233)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 234

1  Frisch that showed a lower periprosthetic infection
2  rate.  The -- I have --
3      Q.  So first, how do you spell Frisch?
4      A.  The last name is F-r-i-s-c-h.
5          And I would have to get back to you on that,
6  because sometimes --
7      Q.  Sir, I understand that you keep on saying
8  you have to get back to me, but today is the time I
9  take the deposition.  This is your report and it's
10 certified; correct?
11         Let me ask you this:  Have you cited --
12         Is there any study in Exhibit 5 that you
13 could cite to that -- that claims that maintaining
14 normothermia reduces the risk of periprosthetic joint
15 infections?
16     A.  Let me look through Exhibit 5, because I
17 don't want to give you the wrong number.
18     Q.  I'm not talking about --
19     A.  Exhibit -- this -- this exhibit.
20     Q.  No.  Exhibit 5, your report.
21     A.  This is part of Exhibit 5.
22         MR. C. GORDON:  Well --
23     Q.  No, that's --
24         MR. C. GORDON:  He separately -- separately
25 marked the reference list --

Page 235

1          MR. ASSAAD:  Okay.
2          MR. C. GORDON:  -- as eight.
3          MR. ASSAAD:  Withdraw the question.
4      Q.  You've studied periprosthetic joint
5  infections; correct?
6      A.  Yes.
7      Q.  You've actually done studies and have
8  published on the issue; correct?
9      A.  Yes.
10     Q.  And you --
11         And sitting here today, you can't cite a
12 study without looking at Exhibit A, off the top of
13 your head, of any study that shows that normothermia
14 reduces the risk of periprosthetic joint infection.
15         If you can't, you can't, sir.
16     A.  For a real answer, there are some things
17 that if it's already been confirmed in other
18 specialties, it would be unconscionable -- by all
19 three definitions of the word -- to actually do a
20 study would be unethical, unconscionable.  You
21 couldn't get patients to do a study like that.  And
22 because of all the problems that not maintaining
23 normothermia would ensue, there wouldn't be a study
24 like that.  In addition, we know that the lack of
25 normothermia will lead to hematomas and bleeding

Page 236

1  risks, all of which lead to infection.
2      Q.  That's not what I asked you.  Let's stick
3  to -- let's stick to --
4      A.  But I -- no.
5          MR. GORDON:  Let him answer the question.
6          MR. ASSAAD:  Corey, you -- you understand
7  where he's going here.
8          THE WITNESS:  But I'm --
9          MR. ASSAAD:  You know what he's doing.
10         THE WITNESS:  But I'm not --
11         MR. ASSAAD:  I'm asking about -- I'm asking
12 you about --
13         THE WITNESS:  But I'm not here to answer --
14         THE REPORTER:  Off the record.  Off the
15 record.
16         (Discussion off the record.)
17 BY MR. ASSAAD:
18     Q.  Sir, I'm specifically -- I want --
19         I'm going to ask you questions and I want
20 you to answer the question that I ask you.  I asked
21 you about periprosthetic joint infection.  I did not
22 talk about hematomas, I didn't talk about any other
23 issues.  I asked are you aware of any peer-reviewed
24 literature that indicates that maintaining
25 normothermia reduces the incidence of periprosthetic

Page 237

1  joint infection?
2          That's either a "yes" or "no."
3          MR. C. GORDON:  Hang on.  Gabe, it's --
4  you're not going to get to instruct him whether your
5  question is "yes" or "no."  He's going to answer the
6  question the way he feels fit.
7          I think the answer that he was giving when
8  you interrupted him was directly answering your
9  question.  You may disagree.  You have the right to
10 move to strike after he has finished with his answer.
11 That's the way it works.  If nothing else, as a matter
12 of courtesy to the court reporter.
13         MR. ASSAAD:  I --
14         MR. C. GORDON:  If you -- if you want to be
15 courteous to the witness, wait until he's done with
16 his answer.  If you don't think it's responsive, move
17 to strike.  But let's have a little decorum here.
18         MR. ASSAAD:  I understand that, Mr. Gordon,
19 but I'm asking a specific question of whether he's
20 aware of any pub -- peer-reviewed literature that
21 supports -- or indicates that maintaining normothermia
22 reduces the incidence of periprosthetic joint
23 infection.  If he's --
24         He could say, "Yes, this is the literature,"
25 or, "No, not right now.  I don't know what it is."

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 238

1    So --
2        MR. C. GORDON:  Okay.  You know, Gabe, I
3    just want to point out, in that question you asked
4    "literature that supports."  He was giving you a --
5    a -- a fairly detailed explanation of the literature
6    that supports normothermia's relationship to
7    periprosthetic joint infection.  You may not like it,
8    you may not think it's responsive, that's fine, --
9        MR. ASSAAD:  I want --
10       MR. C. GORDON:  -- just let him finish.
11   Q.  So -- so I want the name of the literature.
12   A.  So I'm -- I'm not going to -- to --
13       My answer is normothermia promotes
14   tremendous health benefits to the patients that have
15   been studied outside of orthopedics.  I would have to
16   look specifically in ortho and see the -- indirectly
17   how it's shown that, but it wouldn't be something
18   studied because of what -- that specific topic because
19   we know that normothermia promotes so many other
20   beneficial effects.  And in fact you asked me for a
21   study and you didn't -- and I don't have to even tell
22   you what I mean by "a study," so I know that published
23   literature is considered studies by many people, so
24   that consensus statement by -- by Parvizi would count,
25   so would the CDC recommendation to reduce

Page 239

1    infections -- periprosthetic infections by maintaining
2    normothermia, that would count.  And for all the
3    benefits of normothermia, I don't like a -- an answer
4    that would be taken out of context, so I will maintain
5    that answer.
6    Q.  Do you have an understanding of whether or
7    not using forced-air warming has an effect on
8    hypothermia during the first hour of surgery?
9    A.  I can't give you every detail of it.  I
10   would expect that FAW can help --
11       I'm trying to think of different studies
12   that looked at timing of forced-air warming.  But
13   again, that's not what I was called to be the expert.
14   There are other experts on the device.
15   Q.  And -- and I agree to that.  And you --
16       So you would agree that you are not an
17   expert with respect to maintaining normothermia and
18   its effect on -- all its effects on surgical outcomes.
19   A.  There are articles I've written that show
20   that the FAW was very eff -- extremely effective at
21   maintaining normothermia.  There are a number of
22   published reports; they are part of that exhibit
23   that's in there.  And it's been recommended by
24   association of the nurses.  A lot has been written
25   about it.  So -- and -- and there are a number of

Page 240

1    review articles that go through the literature, like
2    Jacofsky's article -- J-a-c-o-f-s-k-y.  So to that
3    extent I'm -- I can give you an answer.  To the extent
4    of knowing the minute-to-minute effects of FAW, I --
5    that's not -- you have other experts to -- to handle
6    that.
7    Q.  Have you read Al Van Duren's deposition?
8    A.  Whose?
9    Q.  Al Van Duren.
10   A.  Why is that not ringing a -- a bell?
11   Q.  So I take it since it's not on your list of
12   exhibits --
13   A.  Who is he?
14   Q.  Doesn't matter who he is.  Have you read his
15   deposition?
16   A.  Unless some -- sometimes I don't know --
17       Can you spell the name, sir?
18   Q.  Let me ask you this:  If it's listed --
19   would it be listed --
20       If you read his deposition, would it be
21   listed on your invoices?
22   A.  Yes.
23   Q.  Okay.  So if it's not listed on your
24   invoice, could we assume you didn't read his
25   deposition?

Page 241

1    A.  No, I wouldn't read a deposition that didn't
2    get --
3    Q.  Okay.  Have you read the deposition of
4    Andrea Kurz?
5    A.  No, I have not.
6    Q.  Do you know who Andrea Kurz is?
7    A.  Yes.
8    Q.  She's actually a physician at the Cleveland
9    Clinic; correct?
10   A.  Correct.
11   Q.  Okay.  Have you read any of the depositions
12   of Dr. Sessler?
13   A.  I already said that earlier.
14   Q.  Okay.
15   A.  No.
16       I'll be happy, if you want me to read these
17   at a later time, I'll be happy to do that --
18   Q.  Well --
19   A.  -- if you need that.
20   Q.  -- it's not my job to tell you what to rely
21   upon or the materials to give.
22   A.  Okay.
23   Q.  That would have been your -- the people you
24   work for.
25   A.  Okay.

61 (Pages 238 to 241)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 242

1    Q.  Turning to page five of your deposition
2  dealing with the paragraph that starts "The impact of
3  ventilation" --
4        MR. GOSS:  His report?
5        MR. ASSAAD:  I'm sorry.  Correct, your
6  report, Exhibit 5.  Page five Exhibit 5.  Thank you,
7  Corey.
8    Q.  You don't hold yourself out as a ventilation
9  expert; correct?
10   A.  I am not a ventilation expert.  I know of
11  ventilation to some extent, but --
12   Q.  Okay.  You wouldn't know how an operating
13  room ventilation works and maintains positive pressure
14  and the types of filtration used.
15   A.  I would know that --
16       For example, at this consensus conference I
17  was asked questions about the -- the success rate of
18  laminar flow versus ultraviolet versus turbulent
19  versus -- what was the other one -- versus something
20  else.  I had to actually give a few statements, so --
21   Q.  Did you say ultraviolet?  You meant ultra --
22  ultraclean?
23   A.  UV radiation.
24   Q.  Okay.
25   A.  Okay.  So I had to prepare little statements

Page 243

1  on the literature at the time.  Now that doesn't make
2  me an expert, it just makes me looking at results of
3  like New Zealand Registry about laminar flow and
4  cup -- and I also had to look up space suits, so --
5  which were related, combination of laminar flow with
6  space suits and the risk of periprosthetic infection
7  for -- I did a little bit of that work for the
8  consensus conference.
9    Q.  Do you know what a Reynolds number is?
10   A.  A what?
11   Q.  A Reynolds number.
12   A.  I've heard of a Reynolds number, but no, I'm
13  not --
14   Q.  Do you know what the Navier-Stokes equations
15  are?
16   A.  No, I don't.
17   Q.  Do you know -- do you know what the
18  Archimedes number is?
19   A.  I know who Archimedes is, but I don't know
20  what the Archimedes --
21   Q.  Do you know --
22   A.  -- number is.
23   Q.  Do you know the difference between a lam --
24  what the Reynolds number would indicate, to know the
25  difference between what's a laminar flow and a

Page 244

1  turbulent flow?
2    A.  These are the parts that I'm not an expert
3  on, and that's why you see that certain -- certain --
4        I don't spend that much time on that part.
5  That's not -- I'm not --
6        On the part of what you're asking me is
7  infection rates with laminar flow versus turbulent
8  flow, but not knowing how many cycles of -- of --
9  are -- are -- of air are coming per minute or at a
10  certain point, what is disrupting the -- the turbulent
11  flow or the laminar flow, what -- what's the effect of
12  people going into the flow rate and things like that,
13  that is not my expertise, which is I -- what I think
14  you're asking.
15   Q.  So sitting here today, would you agree with
16  me that you don't have the expertise to indicate if
17  any medical device that blows air, its effect on the
18  airflow in an operating room?
19       MR. C. GORDON:  Object to the form of the
20  question, misstates his testimony.
21   A.  I think I have been aware when something is
22  blowing air in my face in the OR or things like that
23  on a gross level, and on -- and on a micro level or
24  a --
25       I have read these articles that are

Page 245

1  pertinent to the case.  I have my own opinions about
2  what I think is relevant.  I also have some opinions
3  on certain conclusions that were made about different
4  devices that are pertinent to this case.
5        (Witness's cellphone dings.)
6    Q.  So tell me what a large eddy is with respect
7  to flow.
8        THE WITNESS:  Excuse me one second.
9    A.  Say this again.
10   Q.  Do you know -- do you know what a large eddy
11  is with respect to turbulent flow?
12   A.  I mean I know what an eddy is.  It's a
13  current that gets raised up.
14       No.  You're asking me questions, and those
15  are details of that that I would -- would not profess
16  to be an expert on.
17   Q.  Okay.  Let's go to page nine under "Many
18  things in the operating room impact airflow."  What
19  evidence are you relying upon that -- scientific
20  evidence that surgeon traffic disrupts or impacts
21  airflow in the room?
22   A.  There -- there have been a number of papers
23  and reports that have been written on the amount of
24  surgeon traffic that affects infection rates.  I
25  think -- I could be wrong -- I think it's the Lidwell

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 246

1    study -- L-i-d-w-e-l-l -- but I could be wrong on
2    that, where in a -- in a general surgery operating
3    room where the -- there was an average of 18 people
4    per OR case versus a group of cases where there is an
5    average of four, the infection rate was four-fold.
6           You're asking me about currents.  Some of
7    those articles, like that article, liken it to
8    creating more currents, more doors opening and
9    shutting, and that's --
10    Q.  Well I'm familiar --
11    A.  -- a direct answer.
12    Q.  -- with the article, and wouldn't you agree
13    with me that that article dealt more with the
14    bioburden that's created by having more people in the
15    operating room as compared to disrupting airflow?
16           MR. C. GORDON:  Object to the form of the
17    question, also lack of foundation.
18    A.  Well you --
19           We could argue about that and say that's --
20    that's similar; more people in the OR creates more air
21    currents from the people walking in and out of the OR,
22    things like that.  In our ORs we view that opening and
23    we -- when -- cases in Baltimore, when there were
24    problems, they slammed the door shut and said, "We
25    don't want any flow of air."  That was what our I.D.

Page 247

1    people said.  "We don't want the door opened or shut.
2    We want no air currents from opening or shutting the
3    door, and we don't want people walking around and
4    throwing more currents."  And that was stated by
5    our -- our infectious disease experts --
6    Q.  So --
7    A.  -- in those periods of time when we wanted
8    to reduce infections.
9    Q.  So you're relying on what the infection
10    disease experts told you in Baltimore in your opinion.
11    A.  That, and reading articles, --
12    Q.  What --
13    A.  -- speaking to people, expert -- expert, and
14    I think there's also some of -- some statements by the
15    CDC.  As well as this consensus statement mentions
16    that, reducing that.
17    Q.  But you have no education with respect to --
18           You're not an engineer; correct?
19    A.  I already answered that question.  I am not
20    an engineer.
21    Q.  Okay.  And you -- and you have not done
22    any --
23           You have no education with respect to how
24    objects that move affect airflow; correct?
25    A.  What do you mean I have no education?

Page 248

1    Q.  Well what --
2    A.  Formal education?  Scientific?  I didn't
3    write a --
4    Q.  Do you take -- do you take --
5           Did you ever take a class on fluid dynamics?
6    A.  No, I did not.
7    Q.  Did you ever have a class on heat transfer?
8    A.  No.
9    Q.  Okay.  I mean air -- air -- the -- you
10    have --
11           You have no expertise to indicate whether or
12    not someone moving in the operating room will affect
13    the unidirectional or downward airflow of a
14    ventilation system; do you, sir?
15    A.  I -- I can read an article and see --
16           When the article that says a person moving
17    into the room, their head moving this way or that
18    affects laminar flow and causes laminar flow currents
19    to become disrupted or can affect that, I'm -- I may
20    not have an engineering degree, but I'm able to read
21    certain articles, discuss different things with
22    different people and, in my idea, form an opinion.
23    That doesn't mean I have to know Reynolds numbers or
24    be an engineer to be able to form an opinion.
25           Anyone, even if you are an engineer, these

Page 249

1    are opinions, but I think that some of this makes
2    sense.
3    Q.  So --
4    A.  It's a logic thing.  Some of these things
5    you do want to have an engineering degree to
6    understand and calibrate ORs the correct way, I agree
7    with you on that, but some of them --
8           Clearly, if you have people running around
9    the OR and creating -- and waving their hands, that's
10    not optimal for surgery.
11           That would be an exaggeration.
12    Q.  What's the velocity of air that's created by
13    waving your hand?
14    A.  I can't give you an exact number right this
15    moment.
16    Q.  So my understanding is if I read an
17    orthopedic article, that makes me an expert in that
18    area of orthopedics --
19           MR. C. GORDON:  Object to the form of the
20    question.
21    Q.  -- by just reading the article?
22           MR. C. GORDON:  Object to the form of the
23    question.
24    A.  I never said that.
25           MR. C. GORDON:  Also lack of foundation.

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 250

1    Q.  Huh?
2    A.  I never said that.
3    Q.  Well, you're relying on articles you've
4  read, correct, even though they're outside your
5  expertise?
6    A.  I'm -- I'm allowed to have an opinion about
7  many topics that are outside my expertise.  As an
8  orthopedic surgeon, as I said earlier, I can't
9  divorce -- even though I'm not an infectious disease
10  expert or microbiologist, I can't divorce myself from
11  knowledge in taking care of the patients that have
12  infections and working with the microbiologists,
13  infections from the surgeons' points of view, and
14  it -- you work as teams, but it is important for me to
15  have a working knowledge of a lot more topics than are
16  in my exact field of expertise past just general
17  orthopedics or joint -- joint reconstruction about
18  orthopedics.  That would be my answer.
19    Q.  Okay.  On number eight you type -- you --
20  you say, "Many pieces of equipment in the OR generate
21  air currents, including those that have cooling fans."
22    What devices are you referring to?
23    MR. C. GORDON:  Where is that?
24    MR. ASSAAD:  Number eight.
25    MR. C. GORDON:  Oh.

Page 251

1    A.  There -- there's a device where -- that
2  irrigates wounds.  We have a flow tube that goes into
3  the wound that has a cooling fan on it.
4    Q.  Is the cooling fan directed onto the
5  surgical site?
6    A.  No.
7    Q.  Okay.
8    A.  No.  It's away from.  But it has --
9    Q.  And what's the CFM of that cooling fan, do
10  you know?
11    A.  I wouldn't know that.
12    Q.  Okay.  What other device?
13    A.  I mean I can find any of these things out
14  for you, but that's not to me relevant to knowing
15  that.  Maybe you find it was.
16    Q.  Okay.  What other device, sir?
17    Monitors?
18    A.  Well those are further -- I'm not going to
19  even think about those.  But further away from the
20  field are anesthesia machines, at least one or two,
21  and they're going to have cooling fans that would
22  be -- you'd want to maintain the temperature.
23    Q.  Any evidence that indicates that the cooling
24  fans of an anesthesia machine has caused a
25  surgical-site infection or periprosthetic joint

Page 252

1  infection?
2    A.  Not to my knowledge.
3    Q.  Okay.  What else, sir?
4    A.  Irrigation device, cautery.
5    I don't know if the electrocautery machine
6  has something in it that has -- it's a piece of
7  machinery, it can't get overheated.  I --
8    Has some mechanism for maintaining cooling
9  in the machine itself because it's plugged in.  I
10  don't --
11    Q.  Are you speculating or --
12    A.  I don't know if it's a fan or not.
13    Q.  -- you -- or are you -- are you --
14    Do you say that to a reasonable degree of
15  probability, that you are certain that the
16  electrocautery device has some sort of cooling
17  mechanism?
18    A.  I'm speculating --
19    Q.  Okay.
20    A.  -- there, but I would believe that's the
21  case.
22    Q.  Well let's not speculate.  And I think
23  counsel will agree with me that you're not here to
24  guess or speculate.  If you don't know the answer --
25    A.  All right.  I'll -- I'm going to think about

Page 253

1  the answer there.
2    Q.  Okay.
3    A.  Okay?  And as we're sitting here, if we have
4  a little break I might think about what has that.
5    Q.  Okay.  Any other -- any other devices that
6  generate air currents -- air currents that you're
7  aware of sitting here today?
8    A.  Well when you're using a saw and you're
9  actually sawing, you're creating air currents, so
10  indirectly the saw is creating currents as you're
11  using it.
12    Q.  Any -- any scientific evidence that
13  indicates that when you use a saw, the air currents
14  that it creates causes any periprosthetic joint
15  infection?
16    A.  The whole -- yes.  The whole --
17    Q.  What's -- what's a citation I could look up?
18    A.  Well if --
19    There's one citation that talks about
20  home -- bringing your homemade drills and saws into
21  the OR are not very sterile.  That in itself is not a
22  good idea, which people were doing in some foreign
23  countries.
24    Q.  Sir, I'm talking about what most people do
25  in the United States of America.  They don't bring in

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 254

1  a --
2        You don't bring in a home saw into the
3  surgical site; do you?
4     A.  There -- there is --
5        MR. C. GORDON:  Gabe, you have got to let
6  him finish his answer.
7        THE WITNESS:  I haven't finished my answer.
8        MR. ASSAAD:  Corey, we are going to the
9  court on this.  He is not answering the questions
10 and -- and --
11       THE WITNESS:  I didn't even finish my --
12       MR. ASSAAD:  -- we're not talking about
13 what's happening --
14       MR. C. GORDON:  Okay.
15       MR. ASSAD:  -- in some Third World country
16 about people bringing in drills and saws --
17       THE WITNESS:  But you interrupted me before
18 my answer was done.
19       MR. ASSAAD:  Let me -- let me finish, sir.
20 We're not talking about --
21       You know, we're talking about what happens
22 here in the United States of America, and he
23 understands the question and he's just trying to
24 delay.
25       Answer my question.

Page 255

1        THE WITNESS:  I'm not -- not trying to
2  delay.
3     Q.  Name a site that indicates that a surgical
4  saw used in an orthopedic surgery causes air currents
5  that -- that cause periprosthetic joint infections.
6  "Yes" or "no."
7     A.  So --
8        MR. C. GORDON:  No, no.  Gabe, you're not
9  going to tell him "yes" or "no" and you're not going
10 to interrupt him --
11       MR. ASSAAD:  Are you instructing him not to
12 answer?
13       MR. C. GORDON:  No, I'm going to -- I'm
14 just --
15       I'm instructing you to -- to behave
16 yourself.
17       MR. ASSAAD:  I am behav --
18       I just want a -- I just want a cite.  If he
19 has a cite, great.  If he doesn't or he says, "I'm not
20 sure of the name of it," that's fine.  If it's Exhibit
21 A, he could point to Exhibit A.  But I'm only
22 asking -- the only thing I'm asking for, Corey, is a
23 cite.  I'm not asking for an explanation.  A cite.
24       MR. C. GORDON:  Gabe, I understand that
25 tensions are pretty high on your side of the table and

Page 256

1  I'm trying to give you some latitude --
2        MR. ASSAAD:  Okay.
3        MR. C. GORDON:  -- so we can get through
4  this deposition.  Please calm down.  Let him finish
5  his answers.  If you don't like them, move to strike,
6  do a followup.  But stop the interrupting, stop the
7  cutting him off and stop the badgering.
8        MR. ASSAAD:  I'm not badgering.  I just want
9  a cite.
10       MR. C. GORDON:  Yeah, you are.
11       MR. ASSAAD:  I just want a cite.
12    A.  All right.  So -- so number one, I'm not --
13 I don't feel tense here and I'm not trying to delay
14 anything, but I'm -- I -- I prefer not to answer
15 questions that I have never had before in some ways I
16 think that are out of context.  Saws --
17       The combination of using saws with the
18 technique of the surgeon using the blades spews --
19 spews bone chips, particles, blood all over the place.
20 The move -- it --
21       You're doing movements.  You have to contain
22 it.  There's differences in technique.  And in my
23 opinion that is a major source of splattering of
24 materials all around the case that could lead to
25 contamination and infection of the cases.  It is one

Page 257

1  of the major reasons why some people really do like
2  having hoods so that when they use the saws, it
3  splatters and it doesn't -- some of it con -- is
4  contained and doesn't hit back into the patient.  In
5  terms of -- it --
6        It's just another one of those things where
7  the saw has to be given back and forth by the nurse to
8  the surgeon, back to the nurse and back.  It's
9  creating -- all the things we do in the OR -- OR are
10 creating waves that are pushing air across.
11       I do believe that -- but I don't have it
12 offhand -- that -- that there have been studies
13 looking at different saws related to contamination in
14 the OR and different techniques and different blades.
15 I don't have those off my hand because to me that --
16 what I'm saying all makes sense to a surgeon.
17    Q.  Okay.  So let's go to number one.  You agree
18 with me that on item number one, "Surgeon traffic,"
19 there's no citation listed after number one; correct?
20       There's no citation in Exhibit 5 under
21 number one of page nine, there's no citation listed,
22 correct, to any cite?
23    A.  What's the question?  Right there on the
24 page --
25    Q.  Yes.

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 258

1    A.  -- or in -- in the rest of all the
2  references that we've done?
3    Q.  I'm -- I'm not talking about Exhibit A.
4    On number one, you agree with me under
5  "Surgeon traffic," there's no citation listed on --
6  after number one; correct?
7    A.  Out of all due respect, the only way I can
8  really answer is to look at that whole reference list
9  and see if anything relates to surgeon traffic.  And
10  an answer, that's not true because the Parvizi thing
11  there does mention surgeon traffic, so that's
12  incorrect.
13    Q.  What Parvizi thing?  I'm talking about --
14    I mean are you looking at the same page I
15  am, on page nine?
16    A.  I'm looking at this.
17    Q.  Okay.
18    A.  And my whole report cites data.  I don't put
19  a reference on every line here.  I put a number of
20  statements, and a lot of these statements are backed
21  up with what's in the supplemental list of references,
22  which is why I did it, because I was told put a whole
23  group of references that you've been relying on in
24  here that will support a lot of your statements that
25  you placed here.  So for number one, I'd have to go

Page 259

1  through this whole thing.  It's definitely mentioned
2  under Parvizi about operating traffic.  Some of these
3  other papers I'm looking at also mention operating
4  room traffic.  So I don't -- I don't really think --
5    I think that's an appropriate way to answer
6  this.
7    Q.  Okay.  Well answer my question.  Do you
8  agree with me that on Exhibit 5 of your report under
9  number one, "Surgeon traffic," and its effect on -- on
10  airflow, there's no reference there; correct?
11    MR. C. GORDON:  Objection, asked and
12  answered.
13    Q.  Correct?
14    A.  I already answered the question.
15    Q.  You have not answered the question, sir.
16  "Yes" or "no."
17    A.  The references --
18    MR. C. GORDON:  Objection, asked and
19  answered.  Move to strike counsel's comments.
20    A.  The references are contained in my list of
21  references.
22    Q.  Okay.  So are you saying that all your
23  references listed in Exhibit A are authoritative and
24  reliable?
25    A.  I never said that either.

Page 260

1    Q.  Okay.  So sitting here today, if I want to
2  know what you're referring to under "Surgeon
3  traffic" --
4    (Witness's cellphone rings.)
5    THE REPORTER:  Let's go off the record.
6    THE WITNESS:  No.  I'm okay.  I'm not
7  answering that.
8    THE REPORTER:  Back on the record, please.
9  We're on the record.
10    Q.  If I want to know what -- for --
11    For anything that does not have a reference
12  in your report, is it your testimony that it's all
13  supported in articles in Exhibit A, which are -- which
14  is Exhibit 8 to this deposition?
15    A.  I --
16    In this case it was supported, but I agree
17  with you that not everything I stated here was
18  supported.  As I said earlier, some of my statements I
19  feel are common sense, they're statements that any
20  orthopedic resident or surgeon would know, so I didn't
21  support it.  But any of my statements, if you want me
22  to try to substantiate, I can look back and, after
23  this deposition, try to substantiate any sentences
24  like that that you have.  I'd be happy to do that.  I
25  didn't --

Page 261

1    Okay.
2    Q.  Do you have an opinion -- strike that.  What
3  is the -- the --
4    With respect to all people in the operating
5  room, which is pretty much items one through five, do
6  you know what volumetric flow is created when a person
7  walks?
8    A.  No.
9    Q.  Okay.
10    A.  I can --
11    Happy to look that up for you if you really
12  want me to know that.
13    Q.  Do you know whether or not that volumetric
14  flow would have an effect on the ventilation airflow
15  over the surgical site?
16    A.  I would --
17    Based on what I've read and what I would
18  think, it could have an effect.
19    Q.  Okay.  How much -- how much airflow,
20  volumetric airflow would be required to disrupt the
21  unidirectional airflow in an operating room over the
22  surgical site?
23    A.  Of which type of ventilation?
24    Q.  A unidirectional airflow coming down at
25  about --

66 (Pages 258 to 261)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 262

1    A.  Turbulent airflow or laminar or -- or
2    what -- what --
3        I mean they're all different.  Some of them
4    are horizontal laminar, some of them are vertical
5    laminar.
6    Q.  Unidirectional vertical laminar -- or
7    unidirectional flow.  Well strike that.
8        Do you believe that there are any operating
9    rooms that have laminar flow?
10   A.  Do I believe what?
11   Q.  Is there any operating room that actually
12   has laminar flow?
13   A.  I don't know what your question is, but
14   there are -- there are many operating rooms that feel
15   they use laminar flow, yes.
16   Q.  All right.  What about in the United States?
17   A.  Yes.
18   Q.  Do you use laminar flow?
19   A.  No.
20   Q.  Do you use unidirectional flow?
21   A.  I don't know your def -- definition of it.
22   Q.  Okay.
23   A.  We don't call it that.
24   Q.  Okay.  Well for downward unidirectional
25   flow, turbulent if you want to define it, do you know

Page 263

1    what volumetric flow is required --
2        (Mr. C. Gordon sneezes.)
3    Q.  -- to disrupt --
4        THE WITNESS:  Gesundheit.
5    Q.  -- to disrupt the protective effect of the
6    unidirectional airflow in an operating room?
7    A.  No.
8    Q.  Okay.  Would number seven, "Moving of lights
9    and other equipment directly creates waves or currents
10   by individual (surgeon or team), as well as the
11   specific object moving," do you know what volumetric
12   airflow is created when you move lights?
13   A.  No.
14   Q.  Okay.
15   A.  I'd be happy to find out if you really think
16   that's important.
17   Q.  Do you know how --
18       Do you know what the volumetric flow rate
19   coming out of a Bair Hugger?
20   A.  I don't want to say the wrong number, so the
21   answer is no.
22   Q.  Okay.  Do you know what -- how much heat is
23   produced by a Bair Hugger?
24   A.  I have numbers in my head of what was said
25   in articles.

Page 264

1    Q.  Okay.  What's the number?
2    A.  Some number like 800 milliwatts.
3    Q.  Eight hundred milliwatts?
4    A.  Milli, but the unit may be wrong.
5    Q.  Okay.
6    A.  But I know that in relation to what is
7    generated in a ratio per -- per person on the
8    operating room team.
9    Q.  How -- how many milliwatts does a person
10   create?
11   A.  On the same ratio, if the number without the
12   units is 800, then a person is a -- is a bit over 200.
13   Q.  Okay.
14   A.  And these -- okay.
15   Q.  And have you actually looked at the
16   operating manual or the -- of a Bair Hugger?
17   A.  At some point, yes, but not very -- not in
18   any specifics that I would comment on.
19   Q.  I mean it's not listed on any of the stuff
20   you considered; correct?
21   A.  No.
22   Q.  Correct?
23   A.  That's not my field.  That's not my -- as
24   you would say, that's not my area of expertise.  And
25   other people can comment on that.

Page 265

1    Q.  Okay.  Do you believe --
2        Do you have any opinion of whether or not
3    heat can affect airflow in an operating room?
4    A.  I have an opinion.
5    Q.  What's your opinion?
6    A.  It can affect.
7    Q.  Okay.  By the way, do you understand what
8    plaintiffs' theory of the case is with respect to how
9    the Bair Hugger increases the risk of surgical -- of a
10   periprosthetic joint infection?
11       MR. C. GORDON:  Well the way it's phrased,
12   I'll object.  You can ask him what he knows of --
13   what -- what his understanding of it is.
14       MR. ASSAAD:  Okay.
15   A.  I --
16       MR. C. GORDON:  Do you understand why?
17   Yeah.
18   A.  You may have a different --
19       I know what some people have said or
20   different -- there are many different things that have
21   been said on it, articles, websites, maybe you, you,
22   what's been said.
23   Q.  You read the report of John Abraham;
24   correct?
25   A.  Very briefly, if -- if --

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 266

1  Q.  It says here 15 minutes on Exhibit 7.
2  A.  Yeah.  I looked at it, but I don't --
3  Q.  Have you read the report of Dr. Elghabashi?
4  A.  Yes.
5  Q.  Would you agree with me that Dr. Elghabashi
6  is an expert in computational fluid dynamics?
7       MR. C. GORDON:  Objection, foundation.
8  A.  I can't assess what his level of
9  expertise --
10      Are you talking about considered a legal
11  expert or an expert in the whole field, what his --
12  Q.  Expert in --
13  A.  -- peers think?
14  Q.  Expert in the field.
15  A.  I don't know.  I don't know.
16  Q.  Is there a --
17  A.  That's not my say to say who is an expert or
18  not.
19  Q.  Is there a distinction between a legal
20  expert and an expert in his field?
21  A.  I think there is a distinction between --
22      For example, some people might call an
23  orthopedic surgeon that has an expertise in
24  periprosthetic infections or osteonecrosis an expert
25  in that field, but a board --

Page 267

1       I believe, legal definition, any -- if
2  you're in a legal case, any board certified pract --
3  you'd have to be --
4       A practicing orthopedic surgeon could be
5  considered a legal expert to opine opinions in the
6  case, and that's a different definition of the first
7  part of what I said was an expert on specific topics,
8  if that's what you're asking me.
9  Q.  So -- okay.
10      Turning to page 10, you indicate on -- under
11  the -- you have the bold that says "There are many
12  sources...," but the first line after that says, "For
13  example, 4 people involved in the operating room, as
14  well as being much closer to the operative site than a
15  Forced Air Warmer, generate much more heat than the
16  Forced Air Warmer..."
17      Is that something that you agree with?
18  A.  Well that's -- that's why I --
19      Those numbers I gave you was the best of my
20  knowledge about heat generation when we -- we -- I --
21      Earlier, that four-questions-ago or so
22  number about the ratios, I don't know the units
23  exactly, but this 200 times four, a little bit more
24  than 200 times four is more than the 800, with the 200
25  times four a lot closer than the 800, which is further

Page 268

1  removed from the operative site.  Eight hundred and
2  fifty or 900 is more than the 800 from a Bair Hugger,
3  which is further away, and that heat gets dissipated.
4  Q.  But you're not certain about the numbers of
5  200 or 250; are you?  For --
6  A.  No.  I've seen those numbers printed, I just
7  don't know the -- what I don't know is the --
8      And again, I'm only as good as what I've
9  seen printed in an article, and I'm not an absolute
10  expert in this, but I see it in more than one place.
11  And I don't know the units.
12  Q.  So you were citing off numbers that you
13  looked -- you've seen in articles; correct?
14  A.  Yes.
15  Q.  You've never done any studies or -- or
16  calculated how much heat's coming off --
17  A.  I definitely have not --
18  Q.  Okay.
19  A.  -- done any studies.
20  Q.  Okay.  I'm trying to let you finish my --
21  your answer.  You got to let me finish my question.
22  A.  I'm -- I'm sorry.  I apologize.
23  Q.  What --
24      You also go under "...there are many more
25  heat sources closer to the field."  What other heat

Page 269

1  sources are there?
2  A.  Well the --
3      For example, when the cautery is turned on,
4  the machine that actually has the cautery that we are
5  not sure whether it has a fan or not that -- that gets
6  plugged into the wall, that -- that drives the
7  machine --
8  Q.  Are you talking about the electrocautery --
9  A.  Yes.
10  Q.  -- device itself produces heat?
11  A.  Both.  Both.  The device when it's turned on
12  creates like -- like 400 to 600 degrees of
13  temperature.
14  Q.  The control --
15  A.  In fact, when you touch the tissue, it
16  starts smoking up and you get -- you have to often get
17  a sucker to get rid of the smoke.  And if you touch
18  it, it's going to be pretty damned hot I would say.
19  Q.  And that heat is being generated above the
20  operating room table, correct, when you use the
21  device?
22  A.  Directly in the wound of the patient.
23  Q.  But it's not -- it's not heat generated
24  underneath the operating room table; correct?
25  A.  It's not -- it's not underneath the

68 (Pages 266 to 269)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 270

1  operating room table.
2     Q.  Okay.  So the heat that it generates is
3  above the -- the operating room table; correct?
4     A.  Well yes.  It's -- it's -- it's at the --
5  it's at the operating room table or --
6       It's in the patient's wound, so it's, yes,
7  slightly above the operating room table.  Yes.
8     Q.  Okay.
9     A.  Okay.  Sorry.
10     Q.  And the electrical box that controls the
11  electrocautery device, do you know how much heat that
12  produces?
13     A.  I can't tell you that right now.
14     Q.  Okay.  Now you also mentioned saw blades
15  produce heat; correct?
16     A.  Well when you're hitting the bone and you're
17  doing the case, again the -- the -- the bone is going
18  to smoke up as you're cutting the bone.  These are --
19  these are --
20       Hip or knee replacements generate a
21  tremendous amount of heat.  You're cutting them and
22  you're going through them.
23     Q.  Do you know how much heat that produces?
24     A.  I can't give you a -- the amount.  You can't
25  even touch the blade after using it because you'll

Page 271

1  burn your finger.
2     Q.  And you agree with me that the heat that is
3  being produced by the saw blade is above the operating
4  room table.
5     A.  It's above --
6       It's in the patient's wound, so anything in
7  the patient's wound is above the table.
8     Q.  Okay.  And do you know how much heat the
9  batteries that power the saw blades create?
10     A.  I don't know the exact number.  We --
11     Q.  And you -- you --
12     A.  We can get that, but there is certainly
13  heat.
14     Q.  And you --
15     A.  The whole -- the whole --
16       Not only the battery and the saw blade, but
17  the whole instrument can get, as you're using it more
18  time and it's turned on, the whole thing can get
19  really hot.
20     Q.  And that -- that heat is generated above the
21  operating room table; correct?
22     A.  Correct.
23     Q.  Okay.  And the battery pack that -- that --
24  that use the space -- that are on the spacesuits,
25  they're right behind the head of the -- the surgeons,

Page 272

1  the people that use them; correct?
2     A.  They're behind the head, or they can be
3  hanging down on the shoulder --
4     Q.  Okay.
5     A.  -- across the lower black.
6     Q.  But they're also above the operating room
7  table; correct?
8     A.  Yes.
9     Q.  Okay.  Do you know how much heat they
10  produce?
11     A.  No.
12     Q.  Okay.  The general overhead lights in an
13  operating room, you agree that the heat they -- they
14  produce is above the operating room table; correct?
15     A.  Yes.
16     Q.  Do you know how much heat they produce?
17     A.  Often a watt, but I can't tell you how much.
18     Q.  Okay.  The focused overhead lights directly
19  at field, those are above the operating room table;
20  correct?
21     A.  Yes.
22     Q.  And the heat they produce is above the
23  operating room table; correct?
24     A.  Yes.
25     Q.  And do you know how much heat they produce?

Page 273

1     A.  No.
2     Q.  Okay.  The ancillary hooded lights that many
3  surgeons wear and the light generating unit,
4  that's -- that's -- that's above the operating room
5  table; correct?
6     A.  Yes.
7     Q.  Do you know how much heat they produce?
8     A.  No.
9     Q.  Okay.  Do you know how much heat a patient
10  produces?
11     A.  I should know and I did know at one point,
12  but I don't know exactly.
13     Q.  Okay.
14     A.  I'm -- I'm sure that's variable depending on
15  the -- the patient.
16     Q.  And you told me before with respect to the
17  surgeons and the people that are moving around, that's
18  roughly about 200?
19     A.  To the best of my knowledge.
20     Q.  Okay.
21     A.  I will --
22     Q.  All right.
23     A.  I will recheck that.
24     Q.  The machine to process fluid -- irrigation
25  fluids, vacuum canisters and more substantial

69 (Pages 270 to 273)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 274

1  canisters used nowadays that generate much heat, do
2  you know how much heat they produce?
3      A.  I don't know the exact number.
4      Q.  Okay.  Do you know whether or not they
5  produce heat underneath the operating room table?
6      A.  Well they are on the floor, so if you want
7  to say under or pretty close to the bottom of the
8  operating --
9          They start from the floor, they're --
10  they're sitting on the floor and they go upwards, so
11  they're -- so that would be the closest of all these
12  answers to being on the floor or below the operating
13  room table, those -- that.
14      Q.  Well you -- you -- you mentioned that you
15  read -- on your invoice you saw the report of --
16          Did you receive a copy of -- oh, here it
17  is -- Settles paper?  You read the Settles paper;
18  correct?
19      A.  Very briefly I did.
20      Q.  Fifteen minutes; right?
21      A.  Yes.
22      Q.  Were you aware that he measured that the
23  temperature increased underneath the operating room
24  table when the Bair Hugger was used?
25      A.  I'd have to look at this report with you.  I

Page 275

1  wasn't -- I don't remember being -- I don't --
2      Q.  By the way, when did you get the expert
3  reports of Settles, Abraham, Lampotang, Hughes,
4  Holford, the defense experts?
5      A.  You want the exact date?
6      Q.  Was it -- was it this month?
7      A.  No.  It was in June.
8      Q.  Okay.
9      A.  Somewhere like June 10th.  So I -- I read
10  these about a month ago, that's why I can't give you
11  an exact answer.
12      Q.  Number nine --
13      A.  On the Settles paper, which I had read, 15
14  minutes was carefully enough for me to read that
15  paper.
16      Q.  By the way, do you feel any air come out of
17  the Bair Hugger when you use it?
18      A.  No.
19      Q.  What about the --
20      A.  Oh.  Do I feel it when I'm in the case or --
21      Q.  Yes.
22      A.  -- do I feel it right there?
23      Q.  When you're in the operating room.
24      A.  No.
25      Q.  Do you see air coming out of the neck, like

Page 276

1  flapping around from the neck with a plastic sheet
2  cover?
3      A.  Not really.
4      Q.  Okay.  Have you noticed a change -- change
5  in temperature when the Bair Hugger is on?
6      A.  No.
7      Q.  Now number nine says, "Often other power
8  sources for special blades used in some surgeries
9  (more often revisions) for burring bone, cement, et
10  cetera - Anspach/Midas Rex devices generates a
11  tremendous amount of heat."
12          Do you agree with me the heat that these
13  devices produce are above the operating room table;
14  correct?
15      A.  Yes.  Some of the -- some of these are
16  plugged into a wall that could be like, say, on the --
17  there could be a wall outlet.  So, for example, the
18  Anspach device is plugged into a wall, but I don't
19  think that's generating that much heat.  It could be
20  creating currents --
21      Q.  Well the ones --
22      A.  -- as it's moved around.
23      Q.  Well the ones that generate a tremendous
24  amount of heat, those are above the operating room
25  table; correct?

Page 277

1      A.  Well an Anspach device --
2          I would say yes, that's correct.
3      Q.  Okay.  And sitting here today, you don't
4  know the exact amount of heat that they produce;
5  correct?
6      A.  Correct.
7      Q.  Okay.  Standard elect -- electrocautery
8  devices, those produce heat above the operating room
9  table; correct?
10      A.  Correct.
11      Q.  And sitting here today, you don't know
12  what -- the amount of heat that they produce; correct?
13      A.  I know how many degrees that a -- in a
14  general sense that an electrocautery hits when it's
15  turned on.  It's like between three and five hundred
16  degrees Fahrenheit.  It's pretty --
17      Q.  But when you're asked about watts or BTUs --
18      A.  No, I don't -- I don't know that.
19      Q.  Okay.  And you don't know whether or not
20  that quick burst of heat affects the unidirectional
21  flow in an operating room; do you?
22      A.  No.
23      Q.  Okay.
24      A.  I'll defer that.
25      Q.  And -- and in fact you don't know --

70 (Pages 274 to 277)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 278

1    I mean based on your education, training and
2 experience, you haven't studied the effects of heat on
3 unidirectional flow in an operating room; have you?
4    A.  The effects of heat on unidirectional flow.
5 No.
6    Q.  Okay.  Number 11, "Ancillary cautery
7 devices - Plasmablade, Aquamantis, Canady, and
8 others."  You agree with me that all those devices
9 produce heat above the operating room table; correct?
10    A.  Correct.
11    Q.  And sitting here today, you have no idea --
12    A.  I'm going to say that I haven't studied that
13 question about heat and everything like that, but I
14 have read these articles and I see what -- the
15 arguments that are made, so I -- I can still render
16 certain opinions.
17    Q.  Okay.  And I can read orthopedic articles
18 and render opinions as well in a court of law;
19 correct?
20    A.  Yes.
21    Q.  Okay.  Is that the standard --
22    MR. C. GORDON:  Object to the form --
23    Q.  -- that you're going by?
24    MR. C. GORDON:  Object to the form of the
25 question, --

Page 279

1    A.  No.
2    Q.  Okay.
3    MR. C. GORDON:  -- lack of foundation.
4    Q.  Okay.  Let's talk about --
5    So you agree with me that under 11, you
6 don't know how much heat they produce; correct?
7    A.  Can I say -- I --
8    In terms of what goes on in an operating
9 room, I'm still the primary important person or the
10 primary person in charge, that I have to theoretically
11 be aware of not only my discipline but the
12 anesthesiologist, except certain things, but be aware
13 and understand other things.  So I don't have to be
14 the absolute expert on every single topic, but I still
15 can have an opinion about them and I -- and I think
16 that's very appropriate.
17    MR. ASSAAD:  Move to strike as non-
18 responsive to a non-existent question.
19    Q.  Number 11, you agree with me that the
20 devices under number 11 on page 11 of Exhibit 5, you
21 don't know how much heat those devices produce;
22 correct?
23    A.  I don't know exactly.
24    Q.  Okay.  Number 12, "Various ancillary devices
25 in the operating room by anesthesiologist, example,

Page 280

1 defibrillator, computer, their monitor, their
2 anesthesia machine is a source of heat."
3    Sitting here today, you agree that none of
4 those devices produce heat underneath the operating
5 room table; correct?
6    A.  I wouldn't know that --
7    Q.  Okay.
8    A.  -- one way or the other.
9    Q.  And sitting here today, you don't know how
10 much heat those devices produce; correct?
11    A.  Correct.
12    Q.  Okay.  So don't you think it would be
13 important to know the exact amount of heat being
14 produced by these devices to offer an opinion as to
15 whether or not they have an effect, if any, greater or
16 less than the Bair Hugger device?
17    A.  So my answer is once I knew that the four
18 players that are involved in the surgery generate way
19 more heat than -- directly to the patient than a Bair
20 Hugger device, which is feet away, and that amount of
21 heat would be dissi -- dissipated by the inverse of
22 the distance, then to me all these other things were
23 just further additive events and I didn't feel that I
24 had to study and give you a -- a number for each of
25 these answers.  Nor do I feel that it -- it

Page 281

1 necessarily matters whether it's below the table or
2 above the table.  I'm way more interested in heat
3 that's generated right to the wound, which is the
4 point of interest.
5    I certainly don't think that if I had spent
6 a bunch more hours and been able to give you much
7 better answers that would have been --
8    Well anyway, so that's why I felt that this
9 was appropriate.  These are the different devices that
10 generate heat.  I'd be happy to go and -- and read
11 back these questions and give exact numbers and give a
12 much better answer, but my basis of using that opinion
13 was that I already knew that direct heat involvement
14 and what a patient sees, which is what I'm worried
15 about is what's happening in that wound, in that knee
16 replacement or hip replacement, that is way more
17 important in what's hitting that patient than things
18 so far away.  And that --
19    MR. ASSAAD:  Move to strike as -- I'm
20 sorry.  Move to strike as non-responsive.
21    Q.  What methodology -- well strike that.
22    Does the location of where the heat is
23 produced, was that any part of your methodology in
24 formulating your opinions?
25    A.  I just told you it was.  It even says it

71 (Pages 278 to 281)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 282

1  here on page 10.
2      Q.  I'm saying the location in the operating
3  room where the heat is produced, where the device is,
4  did you take that into account with respect to your
5  methodology in formulating your opinions?
6      MR. C. GORDON:  Objection, asked and
7  answered.
8      A.  It's --
9      I just gave you the answer.
10     Q.  Are you not going to answer my -- not going
11  to --
12     A.  I just did.
13     Q.  No.
14     A.  It's on page 10.  Yes.
15     Q.  Page 10?
16     A.  It's further away from the field.  The
17  forced-air warmer is further away and any heat would
18  be dissipated.
19     Q.  I understand --
20     A.  I just said that.
21     Q.  I understand further away from the surgical
22  field.  That's not my question, sir.  My question is:
23  The location of where the heat is generated, besides
24  the distance away from the surgical field, did you
25  take any -- did you take any other consideration of

Page 283

1  where -- of the location of the heat?
2      A.  I think you're trying to ask me whether --
3  whether it's on the floor or if it's a thing or if
4  it's disrupting sort of waves.  No.  I'll --
5      Q.  Okay.
6      A.  I'll defer those opinions to other people.
7      Q.  Okay.  What is the velocity of the airflow
8  underneath the drapes when the Bair Hugger is being
9  used?
10     A.  I don't know.  We -- I don't know exactly.
11  I -- I did know at one point.  I don't want to guess
12  here.
13     Q.  Okay.  So what is your basis that you say on
14  page 10, "...any airflow that emerges from under the
15  drapes is so low in velocity that it has no impact on
16  the air currents in the OR?"
17     A.  I guess the basis is -- is a -- is I
18  can't --
19     I can feel so much air flowing from people
20  moving around me and all that, and I can see the
21  drapes moving from different things, but I don't feel
22  anything from -- anything from a -- from a Bair Hugger
23  device that's far away that affects any air currents
24  that does anything to my operative field.
25     Q.  But you don't know the airflow velocity

Page 284

1  of -- coming out underneath the drape; correct?
2      A.  I don't know the exact airflow velocity.
3      Q.  Okay.  And -- and what do you wear during an
4  operation?  Do you wear a hood?
5      A.  No, I don't -- I don't use it.  I have a --
6  a gown --
7      I have my regular surgical scrubs, I put on
8  booties, on my pants, I have a -- a bouffant over my
9  hair, I have a -- a mouthpiece that goes over my mouth
10  and my nose that's strapped in, and when I go into the
11  OR I am -- I'm -- we here -- and it's been a move
12  towards paper gowns, so I -- I am paper-gowned, and
13  then I double glove.  And I believe -- I don't believe
14  I missed anything.
15     Q.  Anything over your eyes or anything?
16     A.  Oh.  Thank you.  I did miss something.  Yes.
17  And we -- we would like to have protective eyewear,
18  and I do forget that sometimes and then I'm reminded.
19  I have two people that are supposed to remind me to
20  always --
21     Everybody on the team should have protective
22  eyeware.  That's a new Cleveland Clinic dictum.  So
23  yes, we have these sort of clear-goggle type of things
24  that are disposable that everybody wears.  And that's
25  a new rule, that you're not allowed to be in the OR

Page 285

1  without those.
2      Q.  What are you relying upon with respect to
3  the -- to your understanding that the Bair Hugger
4  filters are MERV 14?
5      A.  There was a whole --
6      There were a bunch of articles.  There was
7  an AORN article about specs which is mentioned in the
8  list of references that I have.  There were -- there
9  were a few of these articles that talked about that.
10  I'm not --
11     I agree that I'm not an expert on those
12  regulations and everything, but I did look at those
13  articles and see what --
14     Q.  So your basis --
15     You think that there's articles that
16  indicate that the Bair Hugger filter is a MERV 14.  Is
17  that my understanding here today?
18     A.  Yes.
19     Q.  Okay.  With respect to the -- the Cleveland
20  Clinic abstract that's being presented next week at
21  MSIS --
22     Would you agree with me that the Cleveland
23  Clinic is a teaching hospital?
24     A.  Among other things.
25     Q.  Okay.  And they -- they have fellows,

72 (Pages 282 to 285)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 286

1  correct, --
2     A.  Yes.
3     Q.  -- that come in and out?  They -- they're
4  there for -- I think it's five years -- or four years.
5        Is it a five-year residency for -- for
6  orthopedic surgery?
7     A.  No.  Fellows are there --
8        Clinical fellows are there for a year.
9     Q.  Yeah, but residency is five years.
10    A.  The residency is five years.  Some people
11 opt for a sixth-year --
12    Q.  Okay.
13    A.  -- research year.
14    Q.  So it's five-year residency and fellows;
15 correct?
16    A.  Yes.
17    Q.  Okay.
18    A.  It's really four years of orthopedics, one
19 year of an internship where they do a little
20 orthopedics.  Some people opt to do an extra year.  We
21 do have clinical fellows as well.
22    Q.  And you mentioned that there were, I
23 think -- I think there were -- there were a large
24 academic center and two high-volume arthroplasty
25 regional hospitals, correct, part of this study?

Page 287

1     A.  I didn't do the study, so I don't know what
2  they --
3        What does it say?
4     Q.  It says, "Patients who underwent primary TJA
5  at a large academic center and two high-volume
6  arthroplasty regional hospitals..."
7     A.  Is that what it --
8        Can you give me the report again?
9     Q.  Exhibit No. 11.  I believe it's in here.  It
10 should be --
11    A.  Here.
12    Q.  Okay.  Under "Methods."
13    A.  Okay.  So -- so this would have been main
14 campus, and the two that were picked would have been
15 Lutheran and where the joint replacements -- I'm not
16 sure where the --
17       Lutheran would -- would be one of the two
18 high volume, and I'm not sure which of the other two.
19 It might have been -- it -- it would have either
20 been -- hmm.
21    Q.  Florida?
22    A.  Oh, no.  I don't think it used Florida.
23    Q.  Well isn't W. -- Barsoum, W.K. in Florida?
24    A.  Oh.  So maybe it did.  I don't think so, but
25 maybe.

Page 288

1     Q.  Do you know -- do you know Wael Barsoum?
2     A.  Yes.
3     Q.  How do you know him?
4     A.  He's the -- he's in my department.  He's an
5  orthopedic surgeon and he's the -- he's also the head
6  of Weston's Cleveland Clinic.
7     Q.  Which is in Florida; correct?
8     A.  Yes.
9     Q.  Okay.
10    A.  So he may --
11       That may have been part of the database.  I
12 don't know.  We can --
13       I can get you the details of the study.
14    Q.  Do you know -- do you know whether or not,
15 with respect to -- with respect to the analysis, they
16 took into account individual resident or surgeon
17 infection rates when they compared the forced-air
18 warming to the forced-air warming with a HEPA filter?
19    A.  I can't tell you that.
20    Q.  Okay.  Because I -- I think you stated in
21 your report that surgeons' experience has an effect on
22 PJI rates; correct?
23    A.  Yes.
24    Q.  I mean if you look at page --
25    A.  I agree with that.  You don't have to look

Page 289

1  at the page.
2     Q.  Well I --
3        Just for the record, if you look at page 18
4  of Exhibit 5, you say, "Variations in skill of
5  surgeons or surgical techniques can markedly influence
6  infection rates;" correct?
7     A.  Correct.
8     Q.  Okay.  And if you also look at Exhibit No.
9  11, you agree with me that they looked --
10       They did a univariate analysis; correct?
11    A.  Well I imagine they did a univariate
12 analysis first.  I don't know --
13    Q.  And a multivariate analysis, correct, if you
14 look at the second page?
15    A.  Well what does -- what does it say?  The
16 first page says that --
17    Q.  Well if you look at the second page, you
18 have the table that says "Univariate Analysis" and
19 "Multivariate Analysis."  Okay?
20    A.  Fair enough.
21    Q.  And is it okay to do a univariate analysis
22 here --
23       MR. C. GORDON:  Object to the form of the
24 question.
25    Q.  -- in Exhibit No. 11?

73 (Pages 286 to 289)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 290

1      A.  It's okay to do univariate anyway.  How much
2  credence it is, you --
3          You do a univariate analysis often first and
4  then see if it's sometimes worth doing a multivariate
5  analysis.
6      Q.  Okay.  So you wouldn't criticize a -- a
7  paper that does a -- that first does a univariate
8  analysis, correct, and then does a multivariate
9  analysis?
10     A.  I wouldn't criticize?
11     Q.  Yeah.
12     A.  Depends on the paper.
13     Q.  Okay.  Do you have any criticisms of this
14 paper, Exhibit 11, this -- this --
15     A.  I don't --
16     Q.  -- abstract?
17     A.  It's just an abstract right now.  I don't --
18     Q.  I understand.  But on the abstract, do you
19 have any criticisms?
20     A.  I'm --
21         I think in a -- in a general sense it's a
22 nice abstract.  Abstracts are not meant to be papers.
23 Every question that you're asking you can't get from
24 an abstract.  I think it -- so --
25     Q.  Has it been accepted for publication?

Page 291

1      A.  It's a presentation, and usually these
2  presentations will go in to clinical orthopedics and
3  related research X months afterwards.  That's why the
4  paper gets written afterwards.
5      Q.  And A. K. Klika, that's -- that's Alise?
6      A.  Alison.
7      Q.  Alison.
8          Is she in the Cleveland Clinic here?
9      A.  Yes.
10     Q.  Is she a resident, a fellow, attending?
11     A.  No, she's one of the --
12         I don't know her exact title.  She's one
13 research director.  She's a permanent employee that
14 oversees research.
15     Q.  Okay.  So she's not a physician?
16     A.  She's not a physician.
17     Q.  Okay.  And she's the one that's presenting
18 this, correct, at MSIS?
19     A.  I don't know if she's presenting it or -- I
20 would have --
21         My guess -- if you ask me to guess -- before
22 you made that statement would have been that Carlos
23 Higuera is a presenting it.  He's a physician.
24     Q.  Okay.
25     A.  Actually, can I amend that answer?  Excuse

Page 292

1  me.  It --
2          Since Carlos Higuera probably has more than
3  one of these presentations at the MSIS, it may be very
4  possible that the very first author here, who is a guy
5  named -- who is a research fellow, his name is Gannon
6  Curtis, he would be the one that may be presenting.
7  He would be the more likely.  But I can certainly find
8  that out.
9      Q.  Looking at page nine --
10         Well let me ask you this:  You've reviewed
11 many studies in this case; correct?
12     A.  Yes.
13     Q.  Research papers; correct?
14     A.  Yes.
15     Q.  And you agree with me that if -- if you're
16 going to make an opinion on a medical device, that you
17 should read studies that pertain to that specific
18 medical device; correct?
19     A.  It's not a bad idea.
20     Q.  Okay.  Like, for example, if you want to
21 know whether or not the Bair Hugger concerned like --
22 strike that.
23         If you want to know what the Bair Hugger
24 750, which is -- or 775, which is the latest Bair
25 Hugger device, you want to look at studies on that

Page 293

1  device; correct?
2          MR. C. GORDON:  Object to the form of the
3  question.
4      A.  I don't -- I don't really understand the
5  question.
6      Q.  Well you know that devices change over time.
7  They -- they're either improved or some -- well strike
8  that.
9          Do you know the difference between a -- a
10 Bair Hugger 775 and a Bair Hugger 505?
11     A.  I don't know all those differences.
12     Q.  Okay.
13     A.  I know -- I know that some of them have
14 differences with different --
15     Q.  I -- I don't want you to guess.
16     A.  -- for upper extremity or lower extremity or
17 straps, and there's like -- I've seen pictures of 20
18 different models.  And the answer is no, I don't know
19 those.  And I just --
20     Q.  I'm talking about the blowers.  Forget about
21 the blankets.  Do you know the difference between a
22 model 505 blower and a model 750 blower?
23     A.  There was a difference in filtration
24 efficiency, I don't know the exact numbers, and things
25 like that.

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 294

1    Q.  Was there a difference in the heat output?
2    A.  I don't know those numbers.
3    Q.  Well do you think that when you look at a
4  study you should know what device is being used to
5  determine whether or not I could apply that study to
6  the device that's at issue in this case?
7        MR. C. GORDON:  Object to the form of the
8  question.
9    A.  Not necessarily.
10    Q.  Okay.  So --
11    A.  If I -- if I think the device --
12        No, not necessarily.  If I think the device
13  is safe for both of them, I don't necessarily have to
14  analyze what you're asking me to analyze.
15    Q.  Looking at page nine under those -- those
16  articles you cite at the top, which is Hall poster,
17  Zink, Dirkes, Avidan, Tumia, Huang, Moretti,
18  Occhipinti and Oguz, sitting here today do you know
19  what devices that were -- that were being looked at in
20  those studies?
21    A.  Well you can surmise that there might be
22  slightly different models in them because they were
23  from different dates.  So would I agree with you on
24  that?  Yes.
25        So you are also right that sometimes when

Page 295

1  you change different features of a device or a model,
2  the change could be for the better, it could have no
3  effect, or it could be for the worse.  Okay?  So I
4  can't disagree with that.  And these -- these are
5  posters that -- or presentations -- most of them were
6  actually published -- over a wide span of years, from
7  60 years with a model that's changing.  But having
8  said that, if I was trying to figure out, oh, this --
9  this device change might have led to this problem and
10  this led to this problem, I didn't have any problems
11  in any of these studies.
12    Q.  You -- you didn't see a problem in the Huang
13  study on the Bair Hugger?
14    A.  No.  No.  I didn't see a problem in any of
15  these studies.
16    Q.  Or Moretti?
17    A.  Moretti, that --
18        These are supporting of the Bair Hugger,
19  these studies.
20    Q.  So you think -- you think Moretti supports
21  the Bair Hugger?
22        MR. C. GORDON:  Objection, asked and
23  answered.
24    A.  Absolutely.  Yes.
25    Q.  You would bet your whole opinion on this

Page 296

1  case that Moretti supports the Bair Hugger.
2        MR. C. GORDON:  Object to the form of the
3  question.
4    A.  I don't have to bet my whole opinion on this
5  case.
6    Q.  Well are you that confident that Moretti
7  supports the Bair Hugger?
8    A.  I don't know what --
9        I looked at the data.  I don't know what the
10  conclusion is.  I'm pretty sure the Moretti study
11  supports --
12    Q.  Well are you --
13    A.  -- with a high degree of probability, yes.
14    Q.  Okay.
15    A.  The same thing that you want from this case.
16  I'm under oath.
17    Q.  So the --
18    A.  Is -- is it --
19        I will say this, because you told me to bet
20  my whole opinions on this case -- that's pretty
21  strange -- everything I'm giving you is to the best of
22  my knowledge at this point.  So yes, if you show me
23  the study right here, maybe I mixed up a study, I
24  don't think so, but I would --
25        And there are more than one Moretti study,

Page 297

1  to the best of my knowledge, also.
2    Q.  Oh, there is?
3    A.  I thought.
4    Q.  Okay.  So is it --
5        All the opinions you give in this case is to
6  the best of your knowledge; is that -- is that
7  your -- is that your -- is that what I just heard?
8    A.  Yes.
9    Q.  Okay.
10    A.  I mean under oath, this is the best of my
11  knowledge.
12    Q.  Okay.  Are you aware that Oguz showed that
13  the Bair Hugger had an increase in bacterial load over
14  the surgical site than the Hot Dog but not a
15  statistically significant difference?
16    A.  It was absolutely not statistically
17  significant.
18    Q.  But you agree --
19    A.  That's what their conclusion was.
20    Q.  But you agree with me that when you looked
21  at the data, that there was an increased bacterial
22  load over the surgical site with the Bair Hugger than
23  compared to the Hot Dog.
24    A.  It's not statistically different, so the
25  answer is:  That's not --

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 298

1    So the answer is:  As a scientist, you
2  couldn't say that.
3    Q.  Well this --
4    A.  No difference.
5    Q.  -- is statistically significant, Exhibit 11,
6  and you're going to go back and do some more
7  investigation; correct?
8        MR. C. GORDON:  Object to the form of the
9  question.
10    Q.  I mean there's something to be said --
11    A.  Well if -- if I'm talking about --
12        In that study, all I have to do as far as --
13        I'm going to answer you on that study.
14    Q.  Exhibit 11.
15    A.  It's true --
16        I can also answer you on the Moretti
17  study, --
18    Q.  We're talking about Oguz.
19    A.  -- not the Oguz study, because --
20        But you said -- acted like Moretti is not
21  supporting Bair Hugger when it does.  So let's go
22  back --
23        You just went to Carlos Higuera's study.
24    Q.  Yeah.
25    A.  To -- not show statistical difference

Page 299

1  between these two devices, you might need not only
2  five thousand, you might need fifty thousand, hundred,
3  two hundred, if there really truly is a difference.
4  So it is not necessarily powered to show a difference
5  between those two devices.
6        But another way to look at this study is:
7  Is this study sufficiently powered to show that the --
8  that the Bair Hugger does not increase infection rates
9  versus the Mistral device?  And in fact the Bair
10  Hugger has a lower infection rate than the Mistral,
11  and for the Bair Hugger to actually get to a point
12  where it would be a statistically higher likelihood of
13  causing infections than the Mistral, based on these
14  numbers, it might be powered for that.  It's not
15  powered to show that the Bair Hugger is superior to
16  the Mistral, but it's incre -- I think it's incredibly
17  powered to show that the -- the Bair Hugger is not
18  inferior to the Mistral because it's actually -- with
19  all these big numbers, it's performing better than the
20  Mistral.
21        Does that answer your question?
22    Q.  Well that's fine.  So if you look at the
23  Oguz study where it shows that there is a difference
24  in the bioburden when you compare the Bair Hugger to
25  the Hot Dog, though it's not statistically

Page 300

1  significant, that's because it only looked at 80
2  patients and it's underpowered; correct?
3        MR. C. GORDON:  Object to the form of the
4  question.
5    A.  No.
6    Q.  Okay.
7    A.  Let's look at the study.  I don't agree with
8  you.
9    Q.  All right.  Now you agree with me that when
10  you prep the patient in the operating room by putting
11  on the drapes and -- and moving the patient, there's
12  probably a high amount of bioburden during that time
13  about the surgical site -- surgical table.
14    A.  Some people say that's some of the most
15  bioburden.  I'm not so sure I agree with that, but
16  some people say yes, that's the most right there.
17    Q.  Okay.  Before incision, before anything
18  else, it's when you're moving -- people moving around,
19  a lot of particles and bacteria are -- from not only
20  the patient but also people setting up the patient;
21  correct?
22    A.  Yes.
23    Q.  And these are other people --
24        Those are other colleagues in the field of
25  orthopedic surgery that say that?  You say other

Page 301

1  people.  Who -- who are the other people?
2    A.  No.  I'm saying the printed papers --
3    Q.  Oh, okay.
4    A.  -- that -- that mention that, that that may
5  be a --
6    Q.  Okay.
7    A.  -- large source.
8    Q.  Okay.
9    A.  Like this concensus type of paper.  Like
10  Moretti's paper actually says -- Moretti's paper said
11  that, that the -- and it was lower than the amount
12  that was in preparing patients in terms of --
13    Q.  Right.  So -- so you think the consensus
14  done by Parvizi or organized by Parvizi is
15  authoritative.
16    A.  I didn't say anything necessarily -- I
17  don't --
18        You'd have to define what's authoritative.
19  It's a --
20    Q.  Okay.  I believe --
21    A.  It's a pretty good thing that was put out by
22  a series of -- of several hundred people about a peri-
23  prosthetic infection --
24    Q.  Well do you agree with -- I'm sorry.
25    A.  Okay.

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 302

1    Q.  I'm sorry.  Are you done?
2    A.  Well I'll be done.
3    Q.  Do num --
4        Do you agree that the numbers of bacteria
5  arriving at the surgical wound correlate directly with
6  the probability of surgical-site infection?
7        MR. C. GORDON:  Object to the form of the
8  question.
9    Q.  Do you agree with that statement?
10   A.  The number of bacteria --
11   Q.  Arriving in the surgical wound correlate
12 directly with the probability of surgical-site
13 infection.
14       MR. C. GORDON:  Same objection.
15   A.  It would depend on what you're talking
16 about.  So are you talking about two -- two versus one
17 or -- or millions versus hundreds?
18       So the answer is:  millions versus hundreds?
19 The answer is yes.  The answer is:  three versus one?
20 The answer is no.
21   Q.  Well let me ask you this then.
22   A.  What do you --
23       What are you asking?
24   Q.  Question one in the consensus.  "Do numbers
25 of bacteria arriving in the surgical wound correlate

Page 303

1  directly with the probability of surgical-site
2  infection?"
3        Consensus answer:  "We recognize the
4  probability of SSI correlates directly with the
5  quantity of bacteria that reach the wound.
6  Accordingly, we support strategies to lower
7  particulate and bacterial counts at surgical wounds."
8        Would you agree, disagree, or abstain?
9    A.  Well I just told you if -- it's -- what my
10 answer was.  You do want to reduce bacteria.  That's
11 what we -- that's what we're trying to do.
12   Q.  And lower --
13   A.  But your question was different than mine.
14   Q.  I'm reading directly from the concensus.
15   A.  No, no.  Now I --
16       Oh.  With that answer, I agree with that.
17   Q.  Okay.  So -- so you would say --
18   A.  Oh, oh, I definitely agree with that.
19   Q.  Okay.
20   A.  Not the first question, which was not
21 phrased that way.
22   Q.  And I'm reading directly from the concensus.
23   A.  Yeah, of course.
24   Q.  So you agree --
25   A.  I agree with that.

Page 304

1    Q.  Sorry.
2    A.  Sorry.
3    Q.  So you agree that --
4        So you support strategies to lower
5  particulate and bacterial counts in surgical wounds;
6  correct?
7    A.  Yes.
8    Q.  Okay.  And the reason why you want to lower
9  particulates is because particulates carry bacteria;
10 correct?
11   A.  Some --
12   Q.  Or can, can carry bacteria.
13   A.  Some particulates --
14   Q.  Okay.
15   A.  -- can carry bacteria.
16   Q.  And you -- you cited to ASHRAE.  Do you
17 agree with ASHRAE that between one million to nine
18 hundred million squames are -- are disseminated during
19 a two- to four-hour surgery?
20   A.  I don't know the exact number, but it's a
21 lot.
22   Q.  Okay.
23   A.  It is a tremendous amount.  It's sometimes
24 more than you would ever dream of.
25   Q.  Okay.

Page 305

1    A.  So whatever you're saying, I don't -- you
2  know, if you told me --
3        If your question was do you believe it's
4  fifty to a hundred thousand or five hundred to a
5  million, I mean that's fine.  I don't --
6    Q.  You wouldn't disagree with the studies that
7  ASHRAE cites to.
8    A.  Well I don't know who did the study.  But,
9  you know, I look at some of those studies and -- and
10 there are eight studies and the -- and the
11 variability, like that number you gave me, might be
12 like orders of magnitude between each study.  But I
13 think I would agree with you it still says the same
14 point:  there's a lot of squames that are being shed.
15   Q.  And --
16   A.  So that's --
17       So I think we can agree on that.
18   Q.  It depends on the number of people in the
19 operating room.
20   A.  How the study was done, what were they
21 measuring, what was the technique, things --
22       There's so many different ways to measure
23 particles and sizes and the squames and the -- this
24 and -- what type of procedure.  There's a lot of
25 different answers to -- to that question, but I think

77 (Pages 302 to 305)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 306

1   we agree on what you just said.
2       Q.   You -- you cited to the Sessler study;
3   correct?  And you -- you looked at that; correct?
4       A.   I looked at that at one point, sure.
5       Q.   You realize that was funded by 3M; correct?
6       A.   I didn't know who funded it.
7       Q.   Okay.  Well do you know if that study was
8   performed by 3M?
9           MR. C. GORDON:  Which Sessler study are you
10  talking about?
11          MR. ASSAAD:  The Sessler one with particle
12  counts.  I'm sorry.
13      Q.   The 2011 Sessler/Olmstead study.  Are you
14  fam -- are you familiar with that study?
15      A.   You'd have to show me it.
16      Q.   Okay.
17      A.   There's a few Sessler studies.  I'm more
18  familiar --
19          I mean the normothermia study is the one
20  that I really -- that I think I cited.
21      Q.   Are you aware that during the deposition
22  of -- of Andrea Kurz, that she stated that currently
23  there's so -- there's no scientific -- there's no
24  current scientific evidence that maintaining
25  normothermia reduces the risks of a surgical-site

Page 307

1   infection?
2       A.   Andrea Kurz --
3           MR. C. GORDON:  I object to the form of the
4   question, mischaract --
5       A.   Andrea Kurz --
6           MR. C. GORDON:  Hang on.
7           -- mischaracterizes the evidence.
8       A.   Andrea Kurz is on -- on an opioid/narcotic
9   reduction at Cleveland Clinic's subcommittee or
10  committee with me and that's where I know the name.  I
11  think I met her, was introduced to her, but other than
12  that I -- I don't -- I don't --
13      Q.   Were you --
14      A.   I don't know what -- I didn't --
15          As I said before a few times now, I've never
16  read her deposition and know what she said.
17      Q.   You're aware --
18          Were you aware that she -- she -- that I
19  took her deposition in this case?
20      A.   I may have been.  Let's see, I -- I know
21  you -- you took the Daniel -- the Sessler one because
22  I told you about that conversation, and I think it was
23  mentioned to me that you took a deposition for her,
24  but it went past me because it's not something that I
25  read.  And it was mentioned five months ago, it wasn't

Page 308

1   in my brain, so not -- not there.
2       Q.   If you look at page four of Exhibit No. 3 --
3       A.   Okay.
4       Q.   Here you go.
5       A.   I got it.  I have it.  Oh, the original.
6       Q.   -- under number 15, it says "Does forced-air
7   warming increase the risk of SSI?"  Do you see that?
8       A.   Yes.
9       Q.   Okay.  And this was the Sessler study;
10  correct?  Or no, this was --
11          I -- I don't know what study you're
12  referring to.
13      A.   Alijanipour.  Nine, number nine?  What --
14  what study --
15      Q.   Fifteen.  Fifteen.
16      A.   Oh, I'm looking at number nine.  I'm sorry.
17      Q.   Page four --
18      A.   This is a chapter in the annual review of --
19          Oh, page four.
20      Q.   Yes.
21      A.   I apologize.  I keep --
22          Page four.
23      Q.   I think it's a 15 there.  It's nine --
24  number nine looks like a 15.
25          MR. C. GORDON:  Can I point him to it

Page 309

1   because I --
2           MR. ASSAAD:  Yeah.
3       A.   Well I see your fifteen.
4       Q.   Okay.  It says, "Does forced-air warming
5   increase the risk of SSI?"  And I don't know -- I
6   don't know if you're referring to the article that's
7   number nine, but underneath you say "Contrary
8   Sessler - no decrease..."  Do you see that?
9       A.   It says "Contrary Sessler - no decrease in
10  air quality laminar flow."
11      Q.   Okay.  Where are you -- where are you
12  getting that information from?
13      A.   This is from the --
14          I believe this is from the Parvizi consensus
15  statement.
16      Q.   Okay.  And --
17      A.   So this -- so that this is --
18          This Alijanipour paper that is published in
19  Journal of Orthopedic Research, which you can see in
20  2014, has a supplemental issue.  It says on very top
21  it's from the MSIS meeting, so it's on a section
22  that --
23      Q.   From the consensus?
24      A.   From the consensus.  And it mentions some of
25  the things that were mentioned in the consensus; I'm

78 (Pages 306 to 309)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 310

1  not saying it's complete, but it mentions some of the
2  topics.  So on the number 15, you can read it yourself
3  or you -- if -- you can have me read it.
4      Q.  I don't need you to read it.  My question
5  is:  Have you looked at -- have you actually looked at
6  the Sessler article that shows particle counts in an
7  operating room?  Have you read it?
8      A.  I don't know that this article was on the
9  particle counts.
10      Q.  Okay.
11      A.  There was more than one Sessler article, and
12  I read the one on normothermia earlier in his
13  career --
14      Q.  What about Memarzadeh?
15      A.  -- that had the four --
16      Q.  What about Memarzadeh?  Two lines under
17  Sessler, it says, "Memarzadeh - no negligible
18  disruption" or --
19      A.  I don't know if I read that or not.
20      Q.  Okay.
21      A.  So here, "Moretti - increased bacteria but
22  lower than simply placing patient in the OR!" which
23  they used as their -- as positive for favoring FAW.
24      Q.  For Moretti?
25      A.  Yeah.

Page 311

1      Q.  Okay.  If you were to compare the
2  bioburden --
3          (Witness texting on his cellphone.)
4      MR. ASSAAD:  Am I interrupting you?
5      THE WITNESS:  No.
6      MR. ASSAAD:  Okay.
7      THE WITNESS:  Sorry.
8      Q.  Okay.  If you were to compare the bioburden
9  of -- created by a device being opposite the Bair
10  Hugger, would you compare it to the bioburden when --
11  after the place -- the patient's been prepped and get
12  that as a control, or check the bioburden when the
13  patient is being prepped?
14      MR. C. GORDON:  Object to the form of the
15  question.
16      Q.  Let me -- let me withdraw that question.
17      A.  You could do it both ways.
18      Q.  Okay.  Well you agree --
19          You stated previously that -- that there's
20  literature out there that the bioburden is the most
21  significant during the time the patient is being
22  prepped.
23      A.  There is some literature.  That doesn't mean
24  I agree with it.  And -- and it may also depend on how
25  you prep.  There are different ways to prep patients,

Page 312

1  et cetera.
2      Q.  But the prepping can have an effect on the
3  bioburden over the surgical table; correct?
4      A.  Yes.
5      Q.  Okay.  Depending on how you prep; correct?
6      A.  Yes.
7      Q.  You prep the patient and the patient is
8  ready to go and the airflow is on and everything's
9  going to settle out in the operating room and any type
10  of bioburden that was increased is going to be removed
11  by the ventilation system; correct?
12      MR. C. GORDON:  Object to the form of the
13  question.
14      A.  Maybe.
15      Q.  You're saying the bioburden is not going to
16  decrease above the surgical-site table after the
17  patient's been fully prepped and left at rest?
18      A.  You hope.  I mean there's still a bioburden
19  that's always there.  Is that what you're asking me?
20      Q.  Is it going to decrease?
21      A.  When the patient is prepped --
22      Q.  After the patient's prepped.
23      A.  We hope it's going to decrease.
24      Q.  Well if you had an opinion today, what would
25  your opinion be?

Page 313

1      A.  Yes, it's going to decrease.
2      Q.  Okay.
3      A.  With the one on the skin, yes, that
4  bioburden is decreased.
5      Q.  Because the patient is not moving around and
6  there's less people around the operating room table.
7      A.  Patient's enroute, you just put an
8  antibacterial on the operating site, et cetera, and
9  that's -- we -- for that operative site you're
10  reducing the bioburden.
11      Q.  And also the bioburden in the air around the
12  patient, because there are less people moving around
13  prepping the patient.
14          The patient's already been prepped; correct?
15      A.  I will agree with that.
16      Q.  Okay.  So would you agree with me that if
17  you're going to compare whether or not the Bair Hugger
18  has a -- has an effect on the bioburden over a
19  surgical site, that you should compare the bioburden
20  after the patient's been prepped with the Bair Hugger
21  off and then turning the Bair Hugger on afterwards?
22      MR. C. GORDON:  Object to the form of the
23  question.
24      A.  It -- it's different questions that you're
25  asking.  I mean that is one way to do it.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 314

1   Q.  Well you want to get a control that would be
2   the actual bioburden that would occur during a surgery
3   with the Bair Hugger off; correct?
4         MR. C. GORDON:  Object to the form of the
5   question.
6   Q.  With -- with not other confounding factors
7   such as prepping; correct?
8   A.  Let me write it down.  So in one study you
9   have the Bair Hugger is on.  Right?  But you're
10  prepping the patient and you're doing all that stuff.
11  Q.  No.
12  A.  That's what happens.  You do realize that's
13  the reality.
14  Q.  You think the Bair Hugger gets turned on
15  before --
16  A.  It's very --
17  Q.  -- before the Bair Hugger blanket's even
18  placed?
19  A.  No.  It's while some of the prepping is
20  going on the Bair Hugger has been turned on.  It's not
21  done.
22  Q.  Okay.  Before the drapes or after the
23  drapes, the draping?
24  A.  It -- before --
25        During the draping.

Page 315

1   Q.  Okay.
2   A.  During the draping.
3   Q.  Okay.
4   A.  So there is some simultaneous stuff going
5   on.  We don't just do things in series, which is what
6   you're saying.  We do some things in parallel.
7   Q.  Let -- let me --
8   A.  So -- so just --
9   Q.  Let -- I know you --
10  A.  I just want to write down what you're saying
11  there.
12  Q.  Well I want to write down so it's correctly
13  so I don't have to go over this, because I --
14  A.  Okay.
15  Q.  -- I think I see what you're saying and --
16  and with that assumption, my question is simply this.
17  A.  Okay.
18  Q.  If you want to know if the Bair Hugger
19  increases the bioburden during surgery when the
20  patient has a wound, would you agree with me that you
21  need to compare when the patient -- you need to
22  compare with the Bair Hugger on as compared to the
23  Bair Hugger off during the same time period of when
24  the surgical wound exists?
25  A.  You -- you want to --

Page 316

1         MR. C. GORDON:  Object to the form of the
2   question.
3   A.  You want to compare it at -- yes, on/off at
4   similar --
5   Q.  Time.
6   A.  -- time periods of the case.
7   Q.  Yes.
8   A.  I agree with that.
9   Q.  Okay.  I mean, for example, if the Bair
10  Hugger is on and you're prepping the patient, there's
11  many confounding factors such as people moving around,
12  putting drapes on.  That's going to affect the
13  bioburden over the surgical site; correct?
14  A.  But if your control is when it's off and
15  those same factors are going on, you could do that
16  study.
17  Q.  Okay.  So you have to --
18        But you want to keep the factors the same;
19  correct?
20  A.  No.  I'm -- I just told you that you --
21        I hear what you're saying and I don't mind
22  what you're saying, and you can do the study that way
23  that you're describing to me, but you can always --
24  also do the study the other way, the Bair Hugger on at
25  the same time that things are going.  You still have

Page 317

1   the control group.
2   Q.  Would proper --
3   A.  But being prepped and all that stuff, it
4   still represents the control group whether the Bair
5   Hugger is on or off.
6   Q.  But as long as the control group --
7   A.  You might -- I mean your studies --
8   Q.  Okay.
9   A.  Yeah.
10  Q.  But -- but you have to agree with me that as
11  long as the control group, the only thing that changes
12  is that the Bair Hugger is turned on or off, depending
13  on what you consider the control group, you need that
14  single change; correct?  If you make any other
15  changes, it's going to affect -- it may the affect the
16  results.
17        MR. C. GORDON:  Object to the form of the
18  question.
19  A.  I'd have to see what you're saying.  But
20  I --
21        In a general sense, yes.
22  Q.  Okay.
23  A.  You -- you --
24        When you do an experiment, you want to
25  change only one variable; otherwise, they can affect

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

Page 318

1  the results.  I a hundred percent agree with that.
2      MR. C. GORDON:  Can we take a break sometime
3  in the near future?
4      MR. ASSAAD:  Sure.  Let's take a break now.
5      THE REPORTER:  Off the record, please.
6      (Recess taken.)
7  BY MR. ASSAAD:
8      Q.  Dr. Mont, I'm going to read again from the
9  consensus that you're familiar with.
10     Question number two, page 115 of the
11 consensus.  "Do numbers of bacteria in the operating
12 room (OR) environment correlate directly with the
13 probability of SSI?"
14     Consensus:  "We recognize that airborne
15 particulate bacteria are a major source of
16 contamination in the OR environment and the bacteria
17 shed by personnel are the predominant source of these
18 particles.  The focus in our recommendation is to
19 reduce the volume of bacteria in the OR with
20 particular attention to airborne particles."
21     Do you agree, disagree, or would you
22 abstain?
23     A.  I would --
24     I'd want more discussion, so I might
25 abstain.

Page 319

1      Q.  Okay.  Are you -- are you aware that 93
2  percent agree with that statement?
3      A.  That's fine.
4      Q.  Okay.  And only five percent disagree.
5      A.  I don't think it's terribly bad.  I think
6  that's fine.
7      Q.  But you agree the 93 percent agreement
8  according to the consensus, that's a strong consensus.
9      A.  That's a very strong consensus.
10     Q.  Okay.  You agree with me that the majority
11 of PJIs, periprosthetic joint infections, are
12 initiated through the introduction of microorganisms
13 at the time of surgery.
14     A.  Yes.
15     Q.  Okay.
16     A.  Is that one of the --
17     Oh, never mind.
18     Q.  Why would you abstain, by the way, from --
19     A.  I'm -- I'm only abstaining right now because
20 I don't know the context of what was being discussed
21 since all those questions, they were part of group
22 discussions and meetings.
23     Q.  Okay.
24     A.  And as I said, that, you know, whether it
25 comes directly on the skin or from the air, I don't

Page 320

1  totally believe that it's all airborne that leads to
2  infections.
3      Q.  Okay.  Sitting here today, can you tell me
4  what percentage of periprosthetic joint infections
5  come from airborne bacteria as compared to from the
6  skin?
7      A.  I can't give you exact percentages.
8      Q.  Okay.
9      A.  And maybe it's saying the same thing.  It
10 may be that, airborne, but no, I view it more of the
11 skin.  That's why I spent my life disinfecting skin
12 and -- or the -- or the wound itself or what you're
13 doing in the case with your instruments and what
14 you're touching.  So I have a little hard time with
15 that whole statement.
16     Q.  Well --
17     A.  I mean the surgeons, what they're doing in
18 the case and their gloves get penetrated and the
19 instruments may get contaminated and the skin is
20 there, and as the case goes on they're sweating from
21 the skin and --
22     Q.  Would -- would --
23     A.  -- and things like that.  So to make that
24 statement, that's why I might abstain or disagree.
25 But maybe, depending on the context of that statement,

Page 321

1  I would --
2      Q.  And you would --
3      A.  -- I might agree with them the way it was
4  presented.
5      Q.  You would agree with me that after
6  disruption in the unidirectional flow, the instruments
7  and even the hands of the surgeon might be
8  contaminated; correct?
9      A.  Potentially.
10     Q.  Okay.  And you would also agree with me that
11 if the implant is uncovered, that any disruption in
12 the unidirectional airflow could cause the implant to
13 become con -- contaminated; correct?
14     A.  Correct.
15     Q.  Okay.  On page six --
16     MR. ASSAAD:  Doctor, I have about one hour
17 left, and I'd appreciate your attention --
18     THE WITNESS:  I'm sorry.
19     MR. ASSAAD:  -- to the deposition instead
20 of --
21     THE WITNESS:  Okay.
22     MR. ASSAAD:  -- being on your phone.
23     Q.  On page six of Exhibit 5, bottom of the
24 first paragraph, it says, "...turbulent air systems
25 are not sensitive to airflow disruption in the manner

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 322

1 purportedly demonstrated in these experiments
2 involving laminar flow."
3 　　　What's your basis behind that statement?
4 　　A. It's page six --
5 　　MR. C. GORDON: Of his report.
6 　　MR. ASSAAD: Of Exhibit 5.
7 　　MR. C. GORDON: Yeah.
8 　　THE WITNESS: Yeah. What line?
9 　　MR. C. GORDON: I'm sorry, I thought you
10 said the deposition.
11 　　THE WITNESS: What line?
12 　　Q. The first par -- the par -- paragraph up at
13 the top, the fourth line from the bottom of that
14 paragraph starts with, "However, turbulent air systems
15 are not sensitive to airflow disruption" --
16 　　A. I don't --
17 　　Page six.
18 　　Q. Page six.
19 　　A. I don't see it on the fourth line.
20 　　Q. Fourth line from the bottom of the first
21 paragraph.
22 　　MR. C. GORDON: Can I point him to it?
23 　　MR. ASSAAD: Yeah.
24 　　A. Oh, fourth from the bottom --
25 　　Okay. It's not the fourth line, that's the

Page 323

1 eighth line.
2 　　Q. Okay. I'll read it again.
3 　　Question: You state, --
4 　　A. Okay. So --
5 　　Q. -- "However, turbulent air systems are not
6 sensitive to airflow disruption in the manner
7 purportedly demonstrated in these experiments
8 involving laminar flow."
9 　　What is your basis that turbulent air
10 systems are not --
11 　　A. I -- I --
12 　　Q. -- sensitive to airflow disruption?
13 　　A. I was looking at a few articles, and laminar
14 flow is -- is a completely different scenario than
15 turbulent airflow that we would use at Cleveland
16 Clinic, for example.
17 　　Q. I'm more specific to your -- your statement
18 that they're not as sensitive to airflow disruption as
19 laminar flow.
20 　　A. I saw some reference. I'd have to find that
21 for you.
22 　　Q. Would it be in Exhibit A?
23 　　A. It would be in -- it would be in -- it would
24 probably be in one of those.
25 　　Q. Okay. But --

Page 324

1 　　I don't want you to look, but you, sitting
2 today, you -- I mean you can't cite the name of the
3 article sitting here right now this instant.
4 　　A. No.
5 　　Q. Okay. Do you agree with me that you need
6 fewer CFUs to cause a periprosthetic joint infection
7 than a superficial wound infection? Correct?
8 　　A. Correct.
9 　　Q. Okay. You just disagree with our experts
10 that you only need one.
11 　　A. That could be a little bit of a semantic.
12 Are we talking one growing to a million or --
13 　　Generally, inoculums, when you have small
14 inoculums that are in the hundreds or thousands, they
15 don't create infections. I did some of this work that
16 wasn't published with fracture work myself personally.
17 When you had small inoculums of bacteria, no
18 infections occurred even though -- and there were --
19 and there were like thousands in fracture-healing
20 scenarios, so I know that you could -- any one could
21 turn into a million, but in a general --
22 　　When we're talking about creating an
23 infection, you need -- in many of these, even the
24 animal models that I cited, it was still like a
25 thousand before that was inoculated, before infections

Page 325

1 occurred in the animal models even with prostheses.
2 　　Q. Okay. But are you aware -- you --
3 　　Have you ever looked at an implant under an
4 electron microscope?
5 　　A. I have looked at implants --
6 　　Q. Okay.
7 　　A. -- under electron microscope, on scanning
8 electron microscopy with various techniques.
9 　　Q. And -- and you agree with me that even
10 though the implant might feel smooth, in some areas
11 there's always crevices because the metal is not
12 perfectly smooth.
13 　　A. Well there's no artificial --
14 　　It's not perfectly smooth. I mean some
15 people get worn -- things get worn as they're used.
16 　　Q. I'm talking about when they are brand-new,
17 like when you put them in.
18 　　A. They're pretty smooth. They meet pretty
19 good standards. They're pretty smooth, but of course
20 there's crevices.
21 　　Q. Okay. And you agree with me that it's very
22 difficult for the host to -- to fight off a
23 periprosthetic joint infection.
24 　　MR. C. GORDON: Object to the form of the
25 question.

82 (Pages 322 to 325)

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 326

1    A.  In a general sense, yes.
2    Q.  And that's why --
3    A.  Yes.
4    Q.  That's why the standard of care is to do
5  a -- a two-stage revision usually.
6    A.  Okay.  You're -- you're -- now you're --
7       I was going to give you the general
8  question.  So let's go back.  The host --
9       What type of infection?
10    Q.  Like --
11    A.  What, where, when, how, deep infections,
12  superficial, this --
13       And we don't always use two stages, we use
14  one stage sometimes.  Now the field is turning into a
15  lot of people where we use debridement, it depends on
16  where the infection is, and now we're even turning
17  into a lot of people saying we would like to do one
18  stage rather than two stage.  So let's go back and ask
19  the questions a little bit more precisely.
20    Q.  Okay.  Well in the past, if there was --
21  if -- if it was found that the prosthetic joint was
22  infected, had infectious material around it, the
23  standard of care was to do a two-stage revision.
24    A.  Are we talking about a hip or a knee?  Are
25  we talking --

Page 327

1    Q.  A hip.
2    A.  -- an early infection, a late hematogenous
3  one, are we talking about an acute one or subacute?
4       So I published papers on infections in knees
5  caught within 30 days and the standard of care that I
6  developed, which a lot of people follow, is just wash
7  out the plastic, wash out like a maniac, and I was
8  able to save 80 percent of those prostheses
9  without a two-stage.  That's published in the '90s.
10    Q.  Okay.  And sometimes you would have to do a
11  two-stage.
12    A.  Sometimes, yeah.
13    Q.  Okay.  What about with hip?
14    A.  Hips, again it depends on how early.
15  Sometimes when you catch these really early, within a
16  month, you can bring it back, wash it out.  Sometimes
17  in those cases -- it depends on what it looks like in
18  the OR -- we can do a one-stage right then, just take
19  out the stem and the cup and clean it out and -- or --
20       There's different treatments.  Each -- each
21  one dictates.  But in a general sense, just to cut to
22  the chase here, when you get a deep infection that's
23  caught a little late or it's postoperative and it's
24  caught like two months later, it doesn't look that
25  good, in a general sense the general standard of care

Page 328

1  is just take it all out and put an antibiotic spacer
2  and do it as a two-stage, which is I think where you
3  may be leading.
4    Q.  Assuming that, when the Bair Hugger is
5  turned on in an operating room, that the particles
6  increase over the surgical site, would that cause you
7  any concern?
8       MR. C. GORDON:  Object to the form of the
9  question, increased -- incomplete hypothetical.
10    A.  So -- so I don't know --
11       Again, it's the same question that I might
12  have gotten trapped before and I don't know what you
13  were asking me.  Are you talking about like an extra
14  one or two particles?  What do you mean by
15  "increased?"  And we're talking now about particles.
16  It might depend on a lot of different things like the
17  amount of particles, what I just said, the size of the
18  particles or something like that --
19    Q.  Well --
20    A.  -- whether -- whether -- whether those
21  were --
22       It wouldn't be concerning me if they were
23  non-pathogenic particles.  How's that for an answer?
24  But again, you'd have to ask the question differently.
25    Q.  Let me ask you this:  If you found out a

Page 329

1  device increased the particles above the surgical
2  site, okay, would you agree with me that you'd want to
3  investigate that as an orthopedic surgeon, to whether
4  or not that could be harmful to your patients?
5    A.  Maybe or maybe not.  I -- I already know
6  that the -- having the lights above my surgical site
7  create these particles, or dust, they're particles
8  that we're -- we're a little concerned about but
9  generally surgeons are not that concerned about.  They
10  think the --
11       You know, there's been UV radiation.  The OR
12  has generally low CFUs and those aren't -- they're not
13  as worried about those types of particles.  So I would
14  be asking more questions.
15    Q.  You'd ask questions; right?
16    A.  Sometimes.
17    Q.  Okay.  And you agree with me that --
18       Well.  You agree with me that people shed
19  skin squames; correct?
20    A.  Yes.
21    Q.  And as a --
22       And the purpose of the ventilation system,
23  unidirectional like the oper -- the circ -- the
24  operating rooms that you use, is to push those skin --
25  skin squames down to the floor and out to the sides;

83 (Pages 326 to 329)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 330

1  correct?
2      A.  That's -- that's been described, yes.
3      Q.  Okay.  So you -- and that's one -- one of
4  the reasons why surgeons --
5          Well you -- you do agree that surgeons
6  believe anything under the operating room is -- is not
7  sterile -- operating room table is not sterile.
8      A.  Correct.
9      Q.  Okay.  That's probably --
10         I would assume -- and this is an assumption,
11  you could agree with me or not -- that probably the
12  largest bioburden in the operating room table -- or in
13  the operating room is probably on the sides and
14  underneath the operating room table.
15     A.  I -- I can't totally agree with that.  I
16  mean that's a large part.  What about the garbage
17  pail?
18     Q.  I'm talking about --
19     A.  I mean what about the people themselves?
20  They're walking around, the people that are not even
21  scrubbed and they're walking around.  Look what their
22  bodies look like.
23     Q.  Would you agree there's a large bioburden
24  underneath the operating table and around the
25  operating room table?

Page 331

1      A.  Yes.
2      MR. C. GORDON:  Object to the form of the
3  question.
4      Q.  And if you found out that a device was
5  bringing up that bioburden from underneath the
6  operating room table and putting it over the surgical
7  site, would that cause you any concern?
8      A.  That would cause me concern.
9      Q.  Okay.  Because you would agree with me that
10  particles -- there's a high probability of particles
11  underneath the operating room table, some of them are
12  going to contain pathogens.
13     A.  No.  They're --
14         We've just done an experiment where we were
15  using a BioTrack device, which is evaluating bioactive
16  particles, and we're finding that there's only like
17  one in a thousand particles are -- are -- have
18  bacteria in them.  Low amount.  And then it also has
19  different size particles, and some particles I
20  wouldn't be concerned about if they are -- because
21  they wouldn't be harboring bacteria.  I don't think
22  they would be harb -- harboring virus; I'm not worried
23  about viral infections.  So if they're particles that
24  are under .3 microns or something like that, I'm not
25  that worried about that.

Page 332

1      Q.  Do you know --
2      A.  So it would depend on a few things like
3  that.
4      Q.  Do you know what percentage of skin squames
5  contain pathogens?
6      MR. C. GORDON:  Object to the form of the
7  question.
8      A.  Well when they're in the body -- well we
9  don't know what --
10         No.  I don't think anybody knows that.
11     Q.  Okay.  Well I'm not asking if anyone knows
12  that.  Do you know that?
13     A.  What do --
14         How do you define "pathogens?"  Do they have
15  bacteria in them, --
16     Q.  Yes.
17     A.  -- is that what you're asking?
18         When they're in the body, probably a hundred
19  percent have bacteria settle on them.
20     Q.  What about skin squames that are shed from
21  human beings during a surgical procedure, do you know
22  what percentage of those skin squames --
23     A.  I think I've seen different numbers for
24  that, so I wouldn't put any number on that.
25     Q.  Okay.  Would you agree --

Page 333

1      A.  Nor would I just --
2      Q.  -- it's more than one percent?
3      A.  I'll go for --
4         I don't know.
5      Q.  Okay.
6      A.  Because if it was more than one -- look at
7  your numbers.  If it was more than one percent, you
8  just said nine million are hitting into a body or
9  something, then -- then you're telling me that we're
10  getting 90,000 bacteria that are hitting into a wound?
11     Q.  I didn't say hitting into a wound, sir.  I'm
12  talking about shedding from humans.  What percentage
13  of those skin squames that are -- are shed from a
14  human contain --
15     A.  No.  At some point you said that --
16     Q.  -- contain CFU --
17     THE REPORTER:  Just a moment.
18     THE WITNESS:  I'm sorry.  You're right.
19     THE REPORTER:  "...are shed from a human" --
20     Q.  -- contain CFUs?
21         If you don't know, that's fine.
22     A.  Okay.  We'll pass on that.  I don't want to
23  say a wrong answer.
24     Q.  Okay.  You -- you mentioned something about
25  you're not concerned about viral infections; correct?

84 (Pages 330 to 333)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 334

1    A.  I'm concerned about viruses any time, but
2  not -- it's not typically what leads to infections
3  here, periprosthetic infections.
4    Q.  Okay.  But bacteria causes infections;
5  correct?
6    A.  Well there -- there's also -- there's fungal
7  infections also.  They're very rare.
8    Q.  Okay.
9    A.  So that wouldn't be a bacteria.
10   Q.  But the majority of periprosthetic joint
11 infections are caused by bacteria; correct?
12   A.  Yes, the greater majority.
13   Q.  Okay.  You -- you agree with me that the
14 fact that someone's obese, without a bacteria that --
15 that enters the surgical site you're not going to have
16 an infection.
17     MR. C. GORDON:  Object to the form of the
18 question.
19   A.  The fact that somebody's obese --
20   Q.  Obesity doesn't cause infections; correct?
21   A.  Well that was that earlier question that I
22 got asked and some of it is maybe the way I phrased
23 it.  Obviously, a bacteria causes infection in the way
24 that other sentence was phrased, that obesity would be
25 a risk factor, and it would depend on the amount of

Page 335

1  obesity --
2    Q.  It makes you more susceptible.
3    A.  It would make you more susceptible.
4    Q.  Just like diabetes, you might be more
5  susceptible.
6    A.  Right.  That's what was meant from the
7  phrase, --
8    Q.  Okay.
9    A.  -- not -- not that --
10   Q.  Okay.
11   A.  -- these risk factors cause the infection,
12 which -- which might have been implied by that --
13   Q.  And that --
14   A.  -- ill-worded sentence in the beginning that
15 I got asked about.
16   Q.  And that's what I was trying to correct, is
17 you're not saying that the fact that somebody is a
18 diabetic or obese or any other type of risk factor
19 is -- is -- is the cause of the infection.  You still
20 need the bacteria to cause an infection.
21   A.  Yeah.  If you -- the only qualify, if you
22 operated --
23     Bacteria is the cause of an infection.
24 There are sometimes we operate -- we have operated on
25 people that might have had an unknown bac -- dental

Page 336

1  infection and -- or they had an ulcer that wasn't
2  detected, you find out later, so -- so it's an
3  actual -- a nidus of bacteria that led to the
4  infection.  You might find that out later in certain
5  cases.  Actually --
6      And certainly, yes, periodontal disease and
7  an ulcer disease on somebody's leg --
8    Q.  You still need bacteria though.
9    A.  -- is a risk factor, but it comes from
10 bacteria, just may not --
11     (Witness's cellphone dings.)
12   A.  But that's a risk factor.  Nobody paid
13 attention to it.
14   Q.  It may have not come from the skin or the
15 air, but you still need a bacteria.
16   A.  Yes.
17   Q.  Okay.
18     THE WITNESS:  I'm just going to answer one
19 thing, but I can hear a question.
20   Q.  Have you ever been involved in the design of
21 a patient warming device?
22   A.  No.
23   Q.  Now you agree with me -- well strike that.
24     I know you disagree that the Bair Hugger has
25 an effect on contaminating the sterile field, but if

Page 337

1  it did have an effect on contaminating the sterile
2  field, you agree then it would be a defective product;
3  correct?
4      MR. C. GORDON:  Object to the form of the
5  question, calls for a legal conclusion.
6      THE WITNESS:  Does that mean I answer it?
7      MR. ASSAAD:  Yes.
8      MR. C. GORDON:  It's whatever you can
9  answer.
10   A.  If a device -- am I allowed to answer --
11 causes bacteria into a sterile field, would I agree
12 that we shouldn't be using that device?  Is that your
13 question?
14   Q.  Yes.
15   A.  Yes.
16   Q.  Okay.  Now I noticed that you comment in
17 your report -- on pages 13 and 14, 15 and 16 -- on the
18 McGovern article; correct?
19   A.  Yes.
20   Q.  All right.  You mentioned that the McGovern
21 article could be explained by the Hawthorne effect.
22 Do you remember saying that in your report?
23   A.  Yes.
24   Q.  Sitting here today, have you talked to any
25 of the -- any of the physicians or researchers that

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 338

1  did the -- that published the McGovern article and ask
2  whether or not they considered whether or not the --
3  the results could have been affected by the Hawthorne
4  effect?
5      A.  No.  First of all, I haven't talked to any
6  of these physicians in the whole thing, so why are
7  you --
8      Q.  Have you read the depositions?
9      A.  I saw those depositions.
10     Q.  That wasn't my question.  Have you read
11  those depositions?
12     A.  Oh, the --
13        Oh.  The answer is yes, I read them.
14     Q.  Okay.  So you read Dr. McGovern's
15  deposition?
16     A.  Yes.
17     Q.  You read Dr. Reed's deposition?
18     A.  Reed.
19     Q.  Do you know Dr. Reed right now is -- is --
20     A.  And Leaper.
21     Q.  -- is working on a -- a study funded by 3M?
22     A.  Dr. Reed.
23     Q.  Yes.
24     A.  Yeah.
25     Q.  You know Dr. Reed personally?

Page 339

1      A.  No.  He sounded like he was very interested
2  in some knowledge and interested in this topic, in
3  reading the deposition.
4      Q.  Are you aware --
5      A.  I'm aware of that.
6      Q.  Are you aware that 3M right now is
7  conducting a pilot study with respect to forced-air
8  warming and infection rates on certain types of -- of
9  orthopedic surgeries?
10     A.  Yes, it was mentioned --
11        Well I don't know exactly where it is.  It
12  was mentioned in the deposition.
13     Q.  Okay.  So sitting here today, your -- would
14  you agree with me that your opinion that the results
15  in McGovern could be explained by the Hawthorne effect
16  is just speculation on your part?
17     A.  This --
18        You're asking me about the Hawthorne.  This
19  is one of the worst -- based on looking at this thing,
20  this is one of the worst results articles which could
21  be explained by not only the Hawthorne effect, by
22  multiple, multiple other effects which I elaborated in
23  this report, and many of those effects that are in
24  this report were even further published in one of the
25  citations here from U.K. of all the changes that were

Page 340

1  done that weren't mentioned in the McGovern article,
2  all of which had effect in this period of time.  So
3  not only --
4        You said did I speak to these people.  No, I
5  didn't speak to these people, but this is like
6  everything that I put in there, and there's a lot
7  more, and it's even been published about all these
8  things that were done at the time of this study, and
9  they -- and in addition to that publication from U.K.,
10  the same authors published other things about some of
11  the factors that I mentioned like the antibiotic
12  change and the anticoagulant change, et cetera, so you
13  know what, your ques --
14        I never spoke to these people, but it's
15  almost like they spoke to me multiple times in the
16  literature -- it's amazing, they really did -- to tell
17  me all the confounding factors and the reasons why you
18  couldn't take any credence to the results of that
19  study.
20     Q.  Prior to submitting your report by June 2nd,
21  you reviewed under Exhibit A the -- the expert report
22  of -- of Dr. Holford.  Do you recall citing that to
23  Exhibit 8?
24     A.  Exhibit 8 or A?
25     Q.  A of your report, Exhibit 8 of this

Page 341

1  deposition.  Defense expert report.
2      A.  Oh, yeah, yeah.  Holford.
3      Q.  Have you relied on his opinions in
4  formulating your opinions?
5      A.  Not really.
6      Q.  Okay.  Now also on Exhibit 8 --
7      A.  You mean A?
8      Q.  Yeah, but it's eight of this deposition.
9  It's been marked as Exhibit 8.
10     A.  Oh, I apologize.
11     Q.  Okay.
12     A.  Sorry.
13     Q.  I know that's probably confusing, but
14  exhibit -- I'm going to use the exhibit depo -- the
15  number for this deposition.
16     A.  Got it.  I got it.
17     Q.  I mentioned that you had Mark Albrecht's
18  deposition; correct?
19     A.  Yes.
20     Q.  But I don't see where you spend time reading
21  it --
22        Oh, never mind.  I do.  You read that in May
23  of 2017?
24     A.  Whenever it was marked as --
25        I tried to be as accurate as I could with

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 342

1  when I read things --
2      Q.  Okay.
3      A.  -- in the -- in the invoice.
4      Q.  Did you have a copy of Dr. Nachtsheim's
5  deposition?
6      A.  Nachtscheim.  Doesn't ring a bell.
7      Q.  Did you receive any internal documents from
8  3M?
9      A.  Internal documents from 3M.  I don't know
10  how --
11      You'd have to define that for me.  The only
12  thing from 3M that I remember reading at the very
13  beginning, I went to the websites and I went to --
14  there were like a lot of things about 3M on the
15  website, there were like 14 different panels and
16  YouTube videos.  I wanted to become familiar.
17      When it comes to 3M, what did -- what else
18  could I potentially have gotten?
19      Can you ask the question again?
20      Q.  Let's may -- maybe --
21      A.  I mean I'm unsure --
22      Q.  -- do it this way.  Is Exhibit 8 everything
23  that you considered prior to submitting your report?
24      A.  Exhibit -- okay.  Exhibit 8, everything that
25  exhibit -- I will --

Page 343

1      To the best of my knowledge, the answer is
2  yes.  But I'm happy, because I don't want to be
3  inaccurate, to --
4      Q.  All right.
5      A.  -- to -- to think in my brain is there
6  something I didn't --
7      It's -- it's certainly possible there's an
8  article or two that I might have just had a lapse and
9  didn't put it in because I just thought it was common
10  knowledge, --
11      Q.  Okay.
12      A.  -- something I had published that I didn't
13  think I needed to put in the report, something like
14  that.
15      Q.  Did you pull all these articles your --
16  yourself, or did people from 3M or their attorneys
17  provide some articles to you?
18      MR. C. GORDON:  Object to the form of the
19  question.
20      A.  Most of these articles I pulled myself or
21  looked at before the report.  Most of -- most of the
22  articles, if -- I looked at the article or the
23  abstract or something online or looked at some
24  internet things.  Sometimes it was internet, sometimes
25  it might have been -- in answer to your other question

Page 344

1  before -- it might have been from a 3M website, it
2  might have been from some other things.  So that was
3  before the report.  There might have been a few
4  exceptions and I'd have to look at this and tell you
5  the few exceptions where --
6      Q.  Well let me ask it --
7      A.  But most of these reports I pulled myself
8  or -- or saw an abstract.  I didn't have every full
9  report before the June 1st or 2nd thing.  I had some
10  that I relied on abstracts.
11      Q.  And you agree with me that some of the
12  articles were provided by 3M or -- or their attorneys.
13      A.  I am not sure.
14      Q.  Okay.
15      A.  I'd have to go through one by one.  It could
16  be that none or both, meaning I had the abstract and
17  then they -- I said, "Do you have this paper?"  Or I
18  saw reference to something and then they got me this.
19      Q.  Now you mentioned that --
20      In the McGovern study you mentioned
21  something about the prophylactic antibiotics and the
22  anti -- or the prophylactic antithrombosis drugs;
23  correct?
24      A.  Yes.
25      Q.  Okay.  Do you agree with me that it is

Page 345

1  possible that those -- like, for example, the
2  prophylactic antibiotic -- may have had no effect on
3  infection rates?  Correct?
4      A.  Well in this particular study, when there
5  was pound per pound the same antibiotics used, there
6  was -- there was no difference in infection rates.
7  It's right there, first six- or seven-month period.
8      Q.  So you're saying when the -- when -- when --
9  when the antibiotic switched, there was no difference
10  in infection rates?
11      A.  In data that was provided to me, when
12  they -- when concurrent antibiotics were used, there
13  was no difference -- in the six- or seven-month period
14  there was no difference in infection rates.  When
15  you're mixing and matching antibiotics and in one
16  group you have differences, then --
17      Q.  You're not opining that the -- that the
18  change in the antibiotics had an effect on the
19  infection rates; are you?
20      A.  It certainly could have had an effect.  Yes,
21  I am opining that.
22      Q.  Certainly could or -- or are you --
23      Are you saying it's a possibility or a
24  probability?
25      A.  Probability.

87 (Pages 342 to 345)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 346

1    Q.  Okay.  And your basis?
2    A.  That when you look pound per pound at
3  patients treated with the same antibiotics, they have
4  not a 3.8- or four-fold difference in infection rates,
5  they're the same.
6    Q.  Okay.
7    A.  So that's -- so that's why it's more likely
8  than not, which is what I said.
9    Q.  You looked at the raw data?
10    A.  Yes, I saw raw data --
11    Q.  And --
12    A.  -- for a six- or seven-month period.
13    Q.  Okay.  And have you read the deposition of
14  Albrecht or Reed or McGovern?
15    A.  I read their depositions.  In addition, they
16  have the same effect for their antico -- they
17  published a difference of infection rates, five to 13,
18  and they called that non -- when they were using
19  anticoagulants, and they didn't account for that as
20  well, and they called that a non-significant increase.
21  Well of course it's non-significant, it's 13 versus
22  five.  Thirteen versus five is a tremendous increase
23  when you're using different anticoagulations, so they
24  even published a paper on that whole effect in terms
25  of infection rates when they were using the

Page 347

1  anticoagulant with the Bair Hugger device.  So they
2  had a lot of confounding factors.
3        In addition, they even admitted in the
4  deposition that they had cases that they put maybe in
5  the wrong category, and that was admitted by McGovern.
6    Q.  And you also read in the deposition that the
7  data that was provided to them by -- by defense
8  counsel, they weren't sure if that was the final data
9  used for the study; correct?
10    A.  Yeah, that --
11        I mean there was at lot of e-mails like
12  that.
13    Q.  Okay.
14    A.  So -- so if you want to provide me different
15  information to look at --
16        But I certainly looked at a lot of things
17  like that.
18    Q.  Okay.  Have you read Dr. Holford's
19  deposition?
20    A.  To some extent.
21    Q.  When did you receive his deposition?
22    A.  Hmm?
23        MR. C. GORDON:  Deposition or expert report?
24        MR. ASSAAD:  Deposition.
25    A.  I don't know if I read his deposition.

Page 348

1    Q.  By the way, on Exhibit 8 you put down
2  "Plaintiffs' Studies" on page two, and then "Other
3  articles and materials (in addition to those
4  specifically cited in my report)."
5        What makes you believe that those studies
6  under --
7        Why did you title it "Plaintiffs' Studies?"
8    A.  All right.  You're asking me too many
9  questions at once.  Start with this one now?
10    Q.  On page two --
11    A.  Page two of what?
12    Q.  -- of Exhibit 8 --
13    A.  Of eight.
14    Q.  -- you have a title that says "Plaintiffs'
15  Studies."
16    A.  Oh, because -- all right.  Maybe --
17        Because some of these -- I view some of
18  these, as the ones of Albrecht, that he is somebody
19  that worked with the company at the time.
20    Q.  Is there any evidence --
21    A.  Maybe I'm -- maybe I'm mistaken, and if I
22  am, then I can cross that off.
23    Q.  Are you aware of any -- any studies
24  sponsored or funded by any of the plaintiffs or their
25  attorneys in this case?

Page 349

1    A.  Yes.  There was mention by McGovern and I
2  think by Reed that there were some studies that were
3  being sponsored or -- or --
4        Yes.
5    Q.  By the plaintiffs?
6    A.  By Augustine and that group.
7    Q.  Do you believe Augustine is a plaintiff in
8  this case?
9    A.  All right.  Now we're mix --
10        Okay.  I don't want to get into this
11  discussion right now.
12    Q.  I'm asking you:  Do you think Augustine is a
13  plaintiff in this case?
14    A.  No, he's not a plaintiff.
15    Q.  So --
16    A.  I'm talking about that side of the case, the
17  people that have a --
18        All right.  Let's --
19    Q.  I mean --
20    A.  All right.
21    Q.  -- you put in "Plaintiffs' Studies."  I'm
22  just trying to determine why on Exhibit 8 you put in
23  "Plaintiffs' Studies."  What were -- what were you
24  informed to declare that the eight studies listed
25  there are plaintiffs' studies?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 350

1    A.  I will put Augustine as a person that has a
2  vested interest in his conduction-fabric de -- his Hot
3  Dog device that has put out tremen -- when I got
4  introduced to these studies, tremendous information as
5  if he was a plaintiff against these devices, so that's
6  why I put that in the category.
7    Q.  So --
8    A.  These -- these are -- these are studies that
9  are done by people from that device company.  So if
10  you want, I'll be happy to cross that out.
11    Q.  Does -- does it take away any credibility of
12  those studies?
13    A.  Yes.
14    Q.  So you're saying that a study that's funded
15  by a corporation that has a vested interest in what
16  those studies are saying are not credible studies?
17    A.  No.  But they -- they -- they have to be
18  disclosed.  And perhaps some of those studies were not
19  published.  As we heard from McGovern's testimony, it
20  was pretty interesting how he was a young fellow that
21  wanted to publish papers and multiple times wanted to
22  publish the work that showed non --
23    Q.  You mentioned earlier --
24    A.  So --
25    Q.  -- you had an unpublished study; correct?

Page 351

1    A.  Hmm?
2    Q.  You mentioned earlier that you had some
3  unpublished studies.
4    A.  What does that have to do with what I'm
5  saying right now?
6    Q.  I mean the fact that something is
7  unpublished, does that make a difference if it's
8  unpublished or not?
9        THE REPORTER:  Just a moment.
10        MR. ASSAAD:  Sorry.
11        THE REPORTER:  What's the question?
12    Q.  If -- if a published --
13        If somebody does a study and unpublishes it,
14  is that -- do you hold that against them?
15    A.  You're taking it out of context.  This is a
16  person that wanted to publish his multiple times.
17  You can read his deposition, and these were the
18  queries that were made.  But we can keep talking about
19  this if you'd like.
20    Q.  I mean before --
21        You've done tests before to see what's the
22  best way to perform a study, little pilot studies;
23  correct?
24    A.  Yes.
25    Q.  Okay.  And some may work and some might not

Page 352

1  work; correct?
2    A.  Correct.
3    Q.  Okay.  For example, if I did a particle-
4  counting test above the surgical site and it showed an
5  increase in particles, you'd come back and say that's
6  not a good study because particles don't equal
7  bacteria; correct?
8        MR. C. GORDON:  Object to the form of the
9  question, incomplete hypothetical.
10    A.  Say it again.
11    Q.  If I had a study that -- that showed the
12  effect of the quantity of particles created by a
13  medical device over the surgical site, you might
14  not -- you might criticize that study or say it's not
15  a valid study because particles don't equal
16  bacteria; --
17        MR. C. GORDON:  Object to --
18    Q.  -- correct?
19        MR. C. GORDON:  Object to the form of the
20  question.
21    A.  It might or might not.  It would depend on
22  the size of the particles, the amount of particles, --
23    Q.  Okay.
24    A.  -- how the study was done.  There's a lot of
25  different effects of it.

Page 353

1    Q.  There are many reasons why people don't
2  publish studies; correct?
3    A.  Correct.
4    Q.  And sitting here today, you're -- you're not
5  aware of many unpublished tests that 3M performed
6  internally or Arizant performed internally regarding
7  the Bair Hugger and its effect on airflow.
8    A.  I can --
9        No.
10    Q.  Okay.  In the consensus, do you agree with
11  the consensus that further research is required with
12  respect to the significance of patient normothernia --
13  normothermia on orthopedic surgeries?
14    A.  Yes.
15    Q.  Do you agree with the consensus that further
16  study is needed with respect to the theoretical risk
17  posed by forced-air warming blankets?
18    A.  I don't mind the statement.
19    Q.  So you -- you would agree.
20    A.  I would agree.
21    Q.  I'll read the whole thing for you, so --
22    A.  Well there was a study.  The -- the Siguera
23  study was on forced-air warming.
24    Q.  The what study?
25    A.  You just --

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 354

1      We just discussed it during this whole
2  deposition.
3      Q.  I didn't hear what you said.  Which study?
4      A.  We discussed the Siguera study.
5      Q.  Siguera?
6      A.  Higuera.  The Cleveland Clinic study --
7      Q.  Oh, Higuera.  Okay.
8      A.  -- was a study done on forced-air warming.
9      Q.  Well let me read the question.  "Do forced-
10  air warming blankets increase the risk of SSI?"
11      Consensus: "We recognize the theoretical
12  risk posed by forced-air warming blankets and that no
13  studies have shown an increase in SSI related to use
14  of these devices.  We recommend further study but no
15  change to current practice."
16      Do you agree with that?
17      A.  Yes.
18      Q.  Okay.  If there was going to be further
19  study with respect to whether or not forced-air
20  warming increases the risks of surgical-site
21  infection, who do you think would be responsible for
22  funding that study?
23      MR. C. GORDON:  Object to the form of the
24  question.
25      A.  You just saw a study that -- that was funded

Page 355

1  by 3M but it was from a ret -- from a prospectively-
2  gathered database of -- from Cleveland Clinic.
3      Q.  But that's --
4      A.  So it might be 3M, it might not be 3M.
5      Q.  Well would you agree with me that the most
6  likely person that would be funding a study such as
7  that would be the manufacturer of the device?
8      MR. C. GORDON:  Object to the form of the
9  question, lack of foundation.
10      A.  Sometimes, sometimes not.  But yes, I'm okay
11  with what you said.
12      Q.  And the study funded by 3M between forced-
13  air -- before -- between the Bair Hugger and the
14  Mistral doesn't really answer this question; does it?
15      MR. C. GORDON:  Object to the form of the
16  question.
17      A.  Well it almost does, because there's no
18  increased rate with infections.
19      Q.  Well this is asking, "Do forced-air warming
20  blankets increase the risk of SSI?"  Wouldn't you
21  agree with me that both the Bair Hugger and the
22  Mistral are forced-air warming blankets?
23      A.  Yeah, but look at how low they are, these
24  infection rates at Cleveland Clinic.
25      Q.  Yeah.  But it could -- it could be because

Page 356

1  forced-air warming in general increases the risks of
2  SSI.  You can't say --
3      You can't compare two forced-air warming
4  blankets and say, "Oh, since they're close, there's no
5  risk of forced-air warming blankets increasing the
6  risk of SSI;" can you?
7      MR. C. GORDON:  Object to the form of the
8  question.
9      A.  May be a good thing for me to look at, see
10  when they --
11      But I don't know if we can.
12      Q.  I mean, doctor, you can't compare two
13  products with the same form of warming, both
14  forced-air warming, and say they're no different, "Oh,
15  and by the way, they don't increase SSIs" when you
16  have --
17      A.  Well if the rate of infections are so
18  minuscule, you could say it's very unlikely that they
19  increase SSI.  They are so minuscule compared to the
20  national average and national standards that it would
21  be, again, unconscionable to do the study because
22  here's a study of not what you said to me before with
23  your 40 versus 40 -- 80 patients, here you've got
24  5,000 patients and you have such a low rate of
25  infection that maybe that should -- I didn't even

Page 357

1  think of it.  Maybe I should remind them that they
2  should mention that it's unlikely that FAW increases
3  infection rates when you have two patient populations
4  with FAW that have such low infection rates.  That
5  might be the proof right there --
6      Q.  What's your control?
7      A.  -- I didn't think about.
8      Q.  What's your control?
9      A.  I don't need a control.
10      Q.  You don't need a control in a study?
11      A.  You do need a control in general, but when
12  the rate is so low, you wouldn't even --
13      Why would you do a control?  You don't want
14  to take a chance.  It would be -- it would be -- it
15  would be un -- immoral and unethical to do it.
16      Q.  But you're looking only at the first 90
17  days, correct, in the study?
18      A.  You can keep saying that all you want, but
19  90 days is --
20      Q.  I'm --
21      It's a study that you're citing to, doctor.
22      A.  That's what the CDC wants us to look at is
23  90 days right now.
24      Q.  But you're aware that periprosthetic joint
25  infections can occur up to a year.

90 (Pages 354 to 357)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 358

1      A.  But they are wanting us to look at 90
2   days --
3      Q.  I don't care.
4      A.  -- right now.
5      Q.  Doctor, you just admitted earlier that these
6   type of infections occur -- occur during the surgery;
7   correct?
8      A.  So this is -- so --
9      Q.  "Yes" or "no?"
10     A.  Fair enough.
11     Q.  Okay.
12     A.  We -- we can look at this up to one year as
13  a future study, and then I might be able to make the
14  conclusion that I did.
15     Q.  Maybe even up to two years.  Sometimes they
16  show up two years later.
17     A.  Sometimes they show up five years later.
18     Q.  Up to five years; correct?
19     A.  Ten years, 15 years.  I've seen people 14
20  years later.  I don't know what you're driving at.
21     Q.  I'm saying a periprosthetic joint infection
22  can occur up to 15 years later after a surgery
23  occurred.
24     A.  Well we --
25        It depends.  Are we going to talk late

Page 359

1   hematogenous infections or postoperative infections?
2   They have different definitions.  Clearly, anything
3   could happen that -- that gets harbored.
4      Q.  But you would agree with me that there's a
5   significant number of periprosthetic joint infections
6   that arise after the first 90 days --
7        MR. C. GORDON:  Object to the form of the
8   question.
9      Q.  -- after surgery.
10     A.  Most of the infections arise in the first 90
11  days, so I don't know what your term called
12  "significant" is.
13        When we did the study, the greater majority
14  were in the first 90 days.
15     Q.  Have you --
16        Are you familiar with the article by Parvizi
17  with respect to the economic burden of periprosthetic
18  joint infections that track PJIs over something like
19  2001 to 2012?
20     A.  He has a lot of articles, --
21     Q.  Okay.
22     A.  -- so I don't know which one you're
23  referring to.  He's published, you know, 50 articles a
24  year on -- or some number like that on periprosthetic
25  infections, so you'd have to show me which article.

Page 360

1   And you can ask me the point you're trying to make.
2        Time check:  It's 10 to 5:00.
3      Q.  What is the national average for primary
4   periprosthetic joint infections?
5      A.  Depends on which database.  I mean some --
6        I don't know what the latest is.  And the
7   hip and knee might be a little different.  But my --
8   and also the data is a little old.
9        I would say it's about 1.5 percent, would be
10  my best guess.  But again, you would have to depend on
11  What population are you looking at?  There would be
12  regional -- regional differences.  What year are you
13  talking about?  The latest data I think is from 2014,
14  so --
15        Yeah.  In fact I'm pretty sure that's the
16  case.
17     Q.  Roughly 1.5 percent, that's --
18     A.  Maybe something like that.  Maybe two
19  percent.
20     Q.  What about revisions?
21     A.  Revisions, much higher.
22     Q.  What percentage?
23     A.  That's too variable for me to give you a
24  number.  I've published on this, but depends on the
25  database you're looking at.

Page 361

1      Q.  More than two percent?
2      A.  Yes.
3      Q.  What percentage of those revisions are due
4   to infections?
5      A.  What --
6        Most studies show that about 20 percent of
7   revisions of knee or hip are due to infections.  But
8   that's variable also.
9      Q.  Are you familiar with the SCIP protocol?
10     A.  Yes, I am.
11     Q.  Is even using -- for you, who does these
12  surgeries anywhere in between 22 to 45 minutes -- is
13  using a Bair Hugger device indicated for that time and
14  length of surgery?
15        MR. C. GORDON:  Object to the form of the
16  question.
17     A.  Why wouldn't it be?
18     Q.  Well have you read -- have you read the SCIP
19  protocol regarding when you should use a -- a -- a
20  warming device on a patient?
21     A.  I didn't -- from my end --
22        First of all, when I said to -- "skin to
23  skin," that has nothing do when a patient's put on a
24  table and this and then draped and taken off the table
25  as well.

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 362

1    Q.   Okay.  By the way, do you use the Mistral
2  device at Cleveland Clinic?
3    A.   Presently that's what's being used.
4    Q.   Have you read the warnings for the Mistral
5  device?
6    A.   No, I have not.
7    Q.   Would you be surprised if the warnings
8  indicate that use of this device may cause airborne
9  contamination?
10    A.   I -- I don't know.  I'd have to read that.
11  I don't want to say anything out of context.
12  Obviously --
13    Q.   I asked would you be surprised.
14    A.   Maybe.  Yeah, maybe --
15    Q.   And you're aware that --
16    A.   -- if you don't use the device right, you
17  don't check -- you don't change the filters right, you
18  don't do certain things correctly, don't apply it
19  right.
20    Q.   Have you looked at the warnings for the Bair
21  Hugger device?
22    A.   No, I haven't.
23    Q.   Okay.  And just so I understand, based on
24  the -- based on the consensus, orthopedic surgeons
25  care about particles over the surgical site; correct?

Page 363

1    MR. C. GORDON:  Object, object to the form
2  of the question.
3    A.   In a general sense, yes.
4    Q.   And you would expect a corporation or a
5  company that manufactures a medical device to indicate
6  whether or not there would be an increase in particles
7  over the surgical site if they're aware of scientific
8  data that shows that -- that -- that shows that fact.
9    MR. C. GORDON:  Object to the form of the
10  question.
11    A.   Not necessarily.
12    Q.   I mean wouldn't you want to know the safety
13  of your patients?
14    MR. C. GORDON:  Same objections.
15    A.   You said that in -- in a whole sphere, one
16  or two particles increase, when everything else is
17  increasing particles by thous -- hundreds and
18  thousands, then no, you're -- you're -- you're putting
19  something way out of context.
20    Q.   So you're saying depending on the amount of
21  particles would decide whether or not orthopedic
22  surgeons should be warned?
23    A.   That would be part --
24    That we're talking generically for any
25  device, it would depend on the amount of particles.

Page 364

1  And are we talking about a particle that's from some
2  object from -- from one that crosses the room seven
3  feet across and hits into the wound, one particle,
4  versus the hundreds that are being shed by the lights
5  and all these other sources?  The answer is no, you
6  wouldn't make a warning on that.
7    Q.   What about --
8    A.   So everything has to do with degree.
9    Q.   What about a device that's placed right next
10  or underneath the operating room table.  As an
11  orthopedic surgeon, would you want to know if that had
12  an effect on the particle count over the surgical
13  site?
14    MR. C. GORDON:  Object to the form of the
15  question.
16    A.   I guess in a general sense I'd want to know
17  about --
18    I'd want to know a lot of different things
19  in my operating room.
20    Q.   Would you want to know that fact?  If you
21  had a medical device that was sitting underneath or
22  next to the operating room table that showed an
23  increase in --
24    A.   Well --
25    Q.   -- particle counts over the surgical site,

Page 365

1  would you want to know that information?
2    A.   But we have a de --
3    MR. C. GORDON:  Object to the form of the
4  question.
5    A.   We have a device in multiple, multiple,
6  multiple studies, as I enumerate in my report, which I
7  looked at carefully, that showed no increase in
8  bacteria to a surgical site multiple times by the
9  company, that showed negative effects, many studies
10  that didn't show increase in particle counts, et
11  cetera.  So the answer is:  These studies were done
12  and they were done over many years, they were done, as
13  you would say, with many different device types of the
14  same general forced air, and they were -- they were
15  published, not only were they done, they were
16  published, and they showed no study showing increased
17  bioburden at operative sites.  So the answer is yes,
18  you'd want to know that, but in fact there was good
19  diligence done, multiple, multiple studies, they're
20  enumerated there, that do not show increases in
21  bacterial bioburden at the operative site.  So what
22  more can you do?
23    Q.   And the studies that show the opposite that
24  were funded by Augustine -- or -- or not funded, but
25  Augustine donated some of the equipment, you don't

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 366

1  hold that -- you don't hold those studies as being
2  credible studies; correct?
3          MR. C. GORDON:  Object to the form of the
4  question.
5      A.  Some of them I might, but -- but I don't --
6  but -- but he didn't show that.
7      Q.  Are you aware that some of the studies that
8  you use to support your opinions in this case were
9  funded -- also funded by Augustine?
10     A.  Yeah.  So that's why I just said what I said
11 in the previous thing, --
12     Q.  So the --
13     A.  -- that that's not necessarily true.
14     Q.  So the fact that a study is funded by
15 Augustine has no difference on the credibility of the
16 study.  You actually look at the study itself.
17         MR. C. GORDON:  Object to the form of the
18 question.
19     A.  Of course I do.  But when I hear depositions
20 and things being said about some of the studies, I
21 start questioning it.
22     Q.  Okay.
23     A.  Especially like the recent study that just
24 got published.  We --
25     Q.  Okay.  Well I don't want to talk about that

Page 367

1  study.
2          MR. ASSAAD:  That's all I have.
3          MR. C. GORDON:  Thank you.  We'll read and
4  sign.
5          THE REPORTER:  Off the record, please.
6          (Deposition concluded.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 368

1          C E R T I F I C A T E
2          I, Richard G. Stirewalt, hereby certify that
3  I am qualified as a verbatim shorthand reporter, that
4  I took in stenographic shorthand the deposition of
5  MICHAEL A. MONT at the time and place aforesaid, and
6  that the foregoing transcript is a true and correct,
7  full and complete transcription of said shorthand
8  notes, to the best of my ability.
9          Dated at Deerwood, Minnesota, this 3rd day
10 of August, 2017.
11
12
13
14
15
16
17         RICHARD G. STIREWALT
18         Registered Professional Reporter
19         Notary Public
20
21
22
23
24
25

Page 369

1          C E R T I F I C A T E
2          I, MICHAEL A. MONT, hereby certify that I
3  have carefully read the foregoing transcript, and that
4  the same is a true and complete, full and correct
5  transcription of my deposition, except:
6  PAGE/LINE          CHANGE          REASON
7
8
9
10
11
12
13
14
15
16
17         MICHAEL A. MONT
18         Deponent
19
20     Signed and sworn to before me this _____ day of
21 September, 2017.
22
23         _____
24         Notary Public
25

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com