# EXHIBIT 5

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - -

In Re:
Bair Hugger Forced Air Warming
Products Liability Litigation

This Document Relates To:
All Actions MDL No. 15-2666 (JNE/FLM)

- - - - - - - - - - - - - - - - - -

DEPOSITION OF THOMAS H. KUEHN
VOLUME I, PAGES 1 - 351
JULY 10, 2017

(The following is the deposition of THOMAS H. KUEHN, taken pursuant to Notice of Taking Deposition, via videotape, at the offices of Ciresi Conlin L.L.P., 225 South 6th Street, Suite 4600, Minneapolis, Minnesota, commencing at approximately 9:25 o'clock a.m., July 10, 2017.)

APPEARANCES:

On Behalf of the Plaintiffs:

Gabriel Assaad
KENNEDY HODGES
4409 Montrose Boulevard, Suite 200
Houston, Texas 77006

Genevieve M. Zimmerman
MESHBESHER & SPENCE, LTD.
1616 Park Avenue
Minneapolis, Minnesota 55404

On Behalf of Defendants:

Peter J. Goss and Vinita Banthia
BLACKWELL BURKE P.A.
432 South Seventh Street, Suite 2500
Minneapolis, Minnesota 55415

ALSO PRESENT:

Ronald M. Huber, Videographer

Kansaa Nadeem, Summer Associate, Blackwell Burke

INDEX

| EXHIBITS | DESCRIPTION | PAGE MARKED |
|---|---|---|
| Ex 1 | Expert report of Thomas H. Kuehn | 33 |
| 2 | Corrected Exhibit C to Kuehn expert report | 33 |
| 3 | Subpoena to Produce Documents, Information, or Objects, or to Permit Inspection of Premises in a Civil Action | 37 |
| 4 | Kuehn invoices | 49 |
| 5 | University of Minnesota website download re ANSYS | 71 |
| 6 | ME 4054: Ethics in Design PowerPoints | 106 |
| 7 | E-mail string, 3MBH01330587-92 | 159 |
| 8 | E-mail string, 3MBH00544754-5 | 164 |
| 9 | E-mail string, 3MBH00132501-2 | 168 |
| 10 | E-mail string, 3MBH00050932-3 | 170 |
| 11 | E-mail with attachment, 3MBH00053467-72 | 183 |
| 12 | Kuehn invoices | 187 |
| 13 | HVAC Design Manual for Hospitals and Clinics, Second Edition | 253 |
| 14 | CFD image | 267 |

| EXHIBITS | DESCRIPTION | PAGE MARKED |
|---|---|---|
| 15 | Article in Journal of Solar Energy, Airborne Infection Control in Health Care Facilities, by Kuehn | 292 |

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| Thomas H. Kuehn | Mr. Assaad | 5 |
| | Mr. Goss | 328 |
| | Mr. Assaad | 339 |
| | Mr. Goss | 348 |

PROCEEDINGS
(Witness sworn.)
THOMAS H. KUEHN
called as a witness, being first duly sworn, was examined and testified as follows:
ADVERSE EXAMINATION
BY MR. ASSAAD:
Q. Good morning. Can you please state your name.
**A. Yes. My name is Thomas Howard Kuehn.**
Q. Do you go by Mr. Kuehn or Dr. Kuehn?
**A. Dr. Kuehn is just -- is fine.**
Q. Okay. My name's Gabriel Assaad and I'm here with Genevieve Zimmerman, and we represent over 2,000 plaintiffs in this multi-district litigation. Now before I begin I just want to go over a few instructions.
Have you ever had your deposition taken?
**A. I have.**
Q. Approximately how many times?
**A. Twice.**
Q. Well I'm going to go through a couple of the ground rules. I'm going to ask you numerous questions. If you don't understand my question, please let me know. Fair?

**A. Yes.**
Q. If you answer the question, I'll assume -- I'll assume that understood the question. Fair?
**A. Yes.**
Q. Any time you want to take a break, please let me know. I just ask that if you request a break, let it be after you answer a pending question. Fair?
**A. Okay.**
Q. Also, with respect to any of your testimony today, I would not like you to guess. If you don't know the answer, just say "I don't know." Fair?
**A. Yes.**
Q. I don't think any side here wants any guessing. Fair?
**A. Yes.**
Q. Okay. Now the two depositions that you took previously, were they as an expert witness?
**A. Yes, they were.**
Q. Okay. Can you please describe the two.
**A. The first one was a case involving a hotel fire in International Falls, Minnesota. The power company had cut power to the building, this was in winter, so my expertise was requested to determine how fast the building would cool off and how fast the water in the sprinkler-system pipes would freeze such**

**that the sprinkler system would be inoperable prior to the fire breaking out.**
Q. And were you an expert for the plaintiff or the defendant?
**A. That was the plaintiff.**
Q. Okay. And do you recall the name of the attorney you worked for?
**A. Yeah. That was about 25, 30 years ago. I -- I do not recall.**
Q. Okay. Was it here in Minnesota?
**A. Yes.**
Q. And do you recall any of the attorneys on the defense side?
**A. That was so long ago, no, I don't recall.**
Q. Okay. So 25 years ago, so looking at about early '90s?
**A. Probably maybe late '80s, early '90s.**
Q. And you -- you did a deposition; correct?
**A. Yes.**
Q. Did you testify at trial?
**A. Yes.**
Q. And what was the verdict?
**A. The plaintiffs did not prevail.**
Q. Okay. So it was a defense verdict.
**A. Yes.**

Q. Okay. And during that --
During your time being an expert for the plaintiff in that case, were any of your opinions limited by the court?
**A. It was so long ago, I really don't -- don't remember.**
Q. Okay. Now you said you were an expert -- or you testified in another case.
**A. Yeah. The second case was with Rochester Meat & Provision Company in Rochester, Minnesota. They -- they are a provider of hamburger patties to restaurant chains. They had recently purchased and installed a large spiral blast freezer to improve their productivity, their output. The blast freezer did not perform according to the specifications supplied by the vendor, so Professor Ramsey and I and a graduate student were initially contacted to just serve as consultants to see if we couldn't resolve the problems. We actually did measurements in their freezer, temperature of patty measurements versus time, freezer temperature, airflow measurements. They adjusted their production to the best they could, they still could not meet production as specified in the requirements, so it went into litigation and I was retained as an expert witness on behalf of Rochester**

**Meat.**
Q. For the defendant.
**A. For the plaintiff.**
Q. For the plaintiff. Okay. And what was the outcome of that case?
**A. Outcome of that case was a settlement.**
Q. And did you -- did you --
If it was a settlement, you didn't testify at trial; correct?
**A. Actually, I was on the stand when there was a recess, and then I was told shortly after that that a settlement had been reached.**
Q. Okay. So you did a deposition and testimony and --
**A. Yes.**
Q. -- trial testimony.
**A. Yes.**
Q. One more instruction. Wait until I finish the question before you answer, and I'll trying to do the same, I'll try to wait until you finish your answer. It's better for the court reporter, it's a cleaner transcript. Fair?
**A. Yes.**
Q. And I understand many times you will predict what my question is going to be; just wait just until

I finish the question. And I will usually look up at you and wait for an answer.
**A. Okay.**
Q. Do you have copies of any of the transcripts, deposition transcripts in your previous cases where you acted as an expert?
**A. Again, this was also 25, 30 years ago. I -- I certainly do not have anything in my possession at present.**
Q. So --
And that would have been in the late '80s for Rochester Meat?
**A. Again, either late '80s or early '90s.**
Q. Okay. Fair enough.
Besides those two cases in which you testified either in a deposition or trial, were you ever retained by a law firm as a consulting expert?
**A. Not that I can recall.**
Q. And so my understanding with respect to the first case dealing with the pipes freezing, that dealt with mostly, you know, how fast a building would cool down and how fast the pipes would get down to below freezing and freeze.
**A. That's correct. It was really a heat-transfer study.**

Q. Okay. And that would be the same thing with the Rochester Meat, it was more of a heat-transfer problem.
**A. Yes, that's correct.**
Q. And nothing to do with fluid flow or particle flow; correct?
**A. Nothing to do with particle flow, although there was fluid flow involved in the hamburger-freezing blast freezer.**
Q. Fair enough.
Have you ever consulted for 3M before?
**A. No, I have not.**
Q. What about Arizant?
**A. No, I have not.**
Q. Before this litigation were you aware of a company called Arizant?
**A. Not that I recall, no.**
Q. What about Augustine Medical, had you ever heard about Augustine Medical before this litigation?
**A. No.**
Q. Do you know who Scott Augustine is?
**A. I did not before this litigation began.**
Q. Fair enough.
So you've been retained as an expert in this case; correct?

**A. That's correct.**
Q. And as an expert you would agree that when you look at a problem, you should be objective; correct?
**A. That's correct.**
Q. You're not here to be an advocate for 3M or the plaintiffs; correct?
**A. I'm just trying to deliver my expertise and -- and be as accurate and honest as possible.**
Q. To be objective and be impartial; correct?
**A. That's correct.**
Q. And you're aware that you're under oath; correct?
**A. Yes.**
Q. And that means that here today it's like being in trial; correct?
**A. I -- I assume that's correct.**
Q. Okay. And you understand that your testimony should be -- should be truthful.
**A. Yes.**
Q. And objective.
**A. Yes.**
Q. And it's under the penalty of perjury if you're not truthful. Do you understand that?
**A. Yes.**

Page 13

Q. Now what's your current status at the University of Minnesota?
**A. I retired approximately one year ago, so I'm officially a professor emeritus.**
Q. And you understand as a professor in an academic institution, providing false data or false results would be considered fraudulent; correct?
MR. GOSS: Object to form.
**A. That's certainly not according to the ethical standards I was -- I was raised to believe in.**
Q. Okay. When you talk about ethical standards, you're talking about engineering ethics?
**A. Yes.**
Q. And such, you know, providing false data or false results would be considered fraudulent; correct?
MR. GOSS: Object to form.
**A. I -- I would believe so.**
Q. Okay. And sitting here today, you wouldn't put -- you would never commit -- strike that.
It's my understanding that you recently went over your report and checked all your calculations; correct?
**A. That's correct.**
Q. Okay. And you did that on Friday; correct?
**A. One of the exhibits, not the entire report.**

Page 14

Q. Okay. But you have checked your report for accuracy; correct?
**A. Yes.**
Q. And being a pro -- professor emeritus, you would never -- you would never commit research fraud or put your name on a court document that you do not believe in; correct?
**A. I would say that's correct.**
Q. And I assume when you checked all your work prior to -- in preparation of this deposition, that all your calculations made engineering sense; correct?
**A. They -- they certainly made engineering sense when I was developing them initially. Of course all engineering calculations are subject to some level of uncertainty in some of the values that are -- that are put in. But within engineering judgment, I believe they to be -- them to be correct.**
Q. So are there some --
Are you sitting here today to say that some of the numbers that were used in your calculations you're uncertain about?
**A. I would say the precision of some of the numbers I -- I do not know very precisely.**
Q. Can you elaborate on that a little bit?
**A. I would say my definition of "precision"**

Page 15

**would be, for example, how many significant figures of a number you believe are absolutely correct, and in many cases an engineer needs to make a -- a judgment call in terms of how many significant digits are -- are defensible and -- and how many are perhaps digging a little bit too keep into the details.**
Q. Are any of the numbers that you have measured or used -- strike that.
Now we're going to go through your report today. If any time you realize that any of your calculations are wrong or your statements are wrong, can you please let me know?
**A. I will let you know, yes.**
Q. Because right now this is my only chance to take your deposition in this case, and my goal is to find out what your opinions are. Do you understand that?
**A. Yes.**
Q. Okay. And if there is a mistake or you realize there needs to be another correction, this is the time to do it. You understand that?
**A. Yes.**
Q. Okay. You were retained back in February of this year by the defense in this case; correct?
**A. That's correct.**

Page 16

Q. Did you obtain any other students or graduate students or anyone else to assist you with your report?
**A. No. This is entirely my own work.**
Q. Okay. So no one assisted you at all.
**A. That's correct.**
Q. So when you --
Was there a -- a written agreement between you and Blackwell Burke or 3M with respect to the scope of your work?
**A. I think it was primarily verbal.**
Q. Okay. And do you know how 3M obtained your information to contact you?
**A. I do not know that.**
Q. Okay. Do you know who contacted you from 3M or Blackwell Burke?
**A. Yes. It was a woman lawyer that --**
**I can't remember her first name off the top of my head.**
Q. What was her last name?
**A. The name escapes me. I'm sorry, I can't -- I can't come up with that at the moment.**
Q. Was it by e-mail or was it by telephone?
**A. By phone contact.**
Q. Okay. Are you still teaching classes at the

Page 17

University of Minnesota?

**A. Not regular classes. I'm still involved in a summary short course.**

Q. Is that the one this August?

**A. Yes.**

Q. Okay. With Professor -- with -- with Jim Ho?

**A. Yes.**

Q. Okay. I take it you know Jim Ho personally.

**A. I do.**

Q. Okay. And you've actually written papers with him.

**A. One paper.**

Q. Okay. When was the last time you talked to Jim Ho?

**A. I think that my last correspondence with him was e-mail, probably sometime last fall.**

Q. So you have not discussed this case with Jim Ho.

**A. I have not.**

Q. Okay. Have you discussed this case with anyone outside Blackwell Burke or 3M?

**A. I have not.**

Q. Now prior to conducting your work in this case, did you prepare any protocols or methodologies

Page 18

with respect to how you're going to attack the issue?

MR. GOSS: Object to form.

**A. Your -- your question was prior to my --**

Q. Well let's back up. I'll -- that's a good objection. What was your --

What was the scope of your work in this case?

**A. The scope of my work was to address issues involving filtration and particle movement primarily.**

Q. Were those the only two issues?

**A. Also did some work with temperature measurements and velocity measurements.**

Q. Anything else?

**A. Those were the main -- main topic areas.**

Q. And what are the minor topic areas?

**A. Well there's -- there's aerosol science which -- which underlies -- its principles underlie particle motion and particle attachment/detachment, aerosol measurement technology instrumentation.**

Q. Anything else?

**A. Also computational fluid mechanics and -- and the particle motion predicted by computational fluid dynamics.**

Q. Did you do any type of computational fluid dynamics?

Page 19

**A. Not --**

Q. Not in this case?

**A. Not associated with this case.**

Q. Okay. Have you ever done that in the past?

**A. I have.**

Q. And what program do you usually use?

**A. I started back in the '80s actually writing my own from -- from scratch, and more recently my students have used a program called Fluent or -- trying to think of the more current name -- CFX.**

Q. ANSYS?

**A. Not --**

Q. CFX.

**A. CFX, yes.**

Q. Okay. And is that the academic version of Fluent and CFX?

**A. They're available through our Supercomputer Institute on campus, so I -- I -- I'm not sure of the actual --**

Q. Okay.

**A. -- designations.**

Q. Are students allowed to use that for commercial activities?

**A. Um --**

Q. Do you know one way or the other?

Page 20

**A. Yes. The -- the license agreement is different, but -- but yes, they are allowed to do that.**

Q. They're allowed to use its for commercial purposes?

**A. Yes.**

Q. And for research?

**A. Yes.**

Q. And that's a license with -- between the University of Minnesota and ANSYS?

**A. Or -- or --**

**Yes. Or the -- or the parent company of the software.**

Q. Well you understand that Fluent and CFX is owned by ANSYS. Do you understand that?

**A. I -- I --**

Q. A-N-S-Y-S.

**A. If you say so. I'm not aware of the details.**

Q. When is the last time you used ANSYS?

**A. I have never used ANSYS personally.**

Q. When was the last time you performed a computational fluid dynamic using a supercomputer?

**A. Personally, it was probably 20 years ago.**

Q. Okay. So you agree with me that you're not

up to date with respect to the current capabilities with respect to ANSYS, Fluent, or CFX; correct?

**A. I would not agree with that. I think I am aware of the capabilities, I've just not done that type of simulation work myself.**

Q. Okay. So you're aware of the -- the code that ANSYS uses with respect to CFX or Fluent?

**A. I'm aware of the basic fundamental code that began with Professor Patankar that then became Fluent, that then became CFX.**

Q. I understand that. But there are many versions that have occurred since 20 years ago. You understand that; correct?

**A. Yes, I understand that.**

Q. Okay. And you understand that the output is usually only as good as the code; correct?

**A. Well the -- the code itself and the user inputs, including boundary conditions.**

Q. But the code is very important.

**A. The code has been well validated, yes.**

Q. Okay. So it's the code that's validated; correct?

**A. Yes.**

Q. Okay. So when -- when an engineer such as yourself performs a CFD analysis and says it's

validated, it means that the code is validated; correct?

MR. GOSS: Object to form.

**A. I -- I would think that's what it would represent.**

Q. As someone in your field, as a doctor in engineering that has done CFD, that is the term of art used. When you say this -- this -- this CFD analysis is validated, you mean the code is validated; correct?

MR. GOSS: Same objection.

MR. ASSAAD: Basis.

MR. GOSS: Vague.

Q. Do you understand my question?

**A. I would -- I would respond and say that the -- the code itself has been validated, but not any particular results derived from that.**

Q. But to validate a code --

The code is used for very complex questions or analysis; correct?

**A. It -- it can be.**

Q. Okay. And if it's -- if it's validated for a very complex model, then it would be validated for less-complex models looking for the same type of results; correct?

**A. It really depends what type of validation is**

**performed and how that's done.**

Q. Well what do you mean by that?

**A. Some type of evaluation are -- is corresponding -- or comparing results for fluid mechanics flow measurements, velocity measurements to experimental data, sometimes it's comparing one set of -- one type of code to another -- another type of code. So there's -- there are numerical comparisons code to code and also comparisons with experiments.**

Q. For example, if a code has been validated for jet-engine combustion, by comparing the CFD results to experimental data, you would agree that that code now is validated for other types of jet-engine combustion that are less complex than what the validation scenario was provided.

**A. As long as the same code is used, the same subroutines. There are also issues; for example, turbulent modeling and what parameters to put in there.**

Q. For turbulence, for flow, for combustion, if it's been validated experimentally, the code is validated for less-complex modeling; correct?

**A. I would --**

MR. GOSS: Object to form.

**A. I would -- I would think it would be**

**accurate for less-complex flows.**

Q. Okay. And so when an engineer such as yourself that has used CFD analysis, when a code is validated for a complex model, that means that less-complex models could be used with the same CFD code and obtain accurate results; correct?

**A. Again, it depends on the user. If they're using the code accurately and if the boundary conditions are correct.**

Q. Okay. I understand there's a boundary question and whether or not you've input the information correctly, but for the actual mathematical results depend -- based on correct boundary conditions, the computational analysis performed by the CFD is validated; --

MR. GOSS: Object --

Q. -- correct?

MR. GOSS: Object to form.

**A. I would -- I would not say validated.**

Q. You would not say validated?

**A. No.**

Q. What would you say?

**A. I would say it's most likely correct, but to me validation means there's some other means of checking the results.**

Q. Okay. Well that's different. That's verification; correct?

**A. I -- I guess if we define that to be verification, yes.**

Q. Well you're the doctor in engineering. Do you understand the difference between validation with the CFD code and verification?

**A. I'm not sure I -- I --**

Q. You've never heard --

**A. -- know the difference.**

Q. You've never heard those terms?

**A. I've heard the terms, but I'm not sure I ever distinguished between the two.**

Q. What do you teach your students with respect to validation?

**A. I really don't teach any -- any CFD in my course work.**

Q. Okay. Are you familiar with any other CFD programs besides ANSYS?

**A. I'm familiar with older ones I used to work with; for example, Fluent and -- and the Patankar original code.**

Q. Okay. Are you familiar with STAR-CCM?

**A. I am not.**

Q. Have you heard of STAR-CCM?

**A. I don't think I have.**

Q. Okay. Now with respect to the issues that you were asked to address by the defense in this case, which is the filter particle movement with a subcategory of aerosols, temperature increase, velocity, and a little bit of computational fluid analysis --

Is that the word you used?

**A. I -- I believe that's the word I used.**

Q. Okay. Is there anything else that you were asked to do in this case?

**A. Not that I can recollect.**

Q. Okay. Prior to doing any work, did you prepare any protocols or methodologies with respect to your analysis of these issues?

**A. Prior to being retained, is that the question?**

Q. No. After you had been retained but prior to doing any testing or formulating your opinions.

**A. Could you repeat question, please?**

Q. Prior to formulating your opinions, did you prepare any type of protocol or analysis on how you would solve these issues?

**A. I did some literature review and also reviewed some material provided by counsel.**

Q. And you -- and also what?

**A. Provided by counsel.**

Q. So you did a literature review -- review?

**A. Yes.**

Q. On your own?

**A. Yes.**

Q. Okay. And where did you do the literature review?

**A. On my laptop.**

Q. Okay. Did you Google or did you go to some sort of a --

**A. I used -- used Google.**

Q. Okay. And how long did you spend doing literature review?

**A. Probably not very long. Maybe -- maybe an hour or so.**

Q. One hour.

And what were your search terms, do you recall?

**A. I'm -- I'm trying to recall what I was searching for at that time.**

Q. Sitting here today, do you recall what you were searching for at that time?

**A. Not off the top of my head.**

Q. Okay. Did you print any of the research

that you found?

**A. I did not, because I don't have a printer at home.**

Q. Okay. Did you save any of them?

**A. Yes, I did.**

Q. Okay. And you --

And do you recall any of the articles that you saved?

**A. One of them was an article by Dr. Tsai and Dr. Pui dealing with particle adhesion on surfaces. Another one was a study done by some researchers in the Netherlands on particle removal from surfaces.**

Q. Anything else?

**A. Those are the two that come to mind.**

Q. All the articles that you saved, are they listed in your report under Exhibit E?

**A. They are -- I'm -- I'm --**

**They should be listed in the report somewhere, whether -- which exhibit I -- I can't say.**

Q. Okay.

**A. They may be in the main -- main body of the report, they may be in one of the exhibits, or maybe both.**

Q. Did you do any literature search with respect to Bair Hugger?

Page 29

A. **I think I did, just to get a -- a look -- look at the -- essentially the user's manual.**
Q. Did you look at anything else?
A. **Regarding Bair Hugger, that -- that's all I -- I was looking at.**
Q. And the -- the three articles listed in Exhibit E with respect to peer-reviewed literature regarding the Bair Hugger, that was provided to you by counsel; correct?
A. **I would have to see what they are to respond to that.**
Q. The two Albrecht articles and the Reed article.
A. **I believe they were all provided by counsel.**
Q. Okay. Any other documents or literature provided by counsel?
A. **Yes.**
Q. What?
A. **There was a report by -- filter testing that 3M had done.**
Q. I'm talking about peer-reviewed literature.
A. **Oh, peer-reviewed literature. Not that I can think of off the top of my head.**
Q. Okay.
A. **Well there -- there was a -- I should --**

Page 30

**There was a study that attempted to correlate particle concentration versus biological particle correlation.**
Q. Is that the DeRue study?
A. **That's not the first author I'm thinking of.**
Q. Stocks?
A. **Stocks, yes.**
Q. Okay. When was that provided to you?
A. **I think it was on Friday.**
Q. This Friday?
A. **(Nodding.)**
Q. Okay. Have you reviewed any of the expert reports, defense expert reports?
A. **I have.**
Q. Okay. Which ones?
A. **I'm sorry, you said defense expert reports.**
Q. Yes.
A. **I have reviewed some of the plaintiffs' reports.**
Q. And I have a list in Exhibit E of what you reviewed.
A. **Yeah.**
Q. I'm talking about defense experts.
A. **Not that I can recall right -- right at the moment.**

Page 31

Q. Okay. Do you know who --
Do you know Jim Ho is an expert in this case?
A. **Yes.**
Q. He's a friend of yours; correct?
A. **Yes.**
Q. Did you review his report?
A. **I have not seen his report.**
Q. Do you know who John Abraham is?
A. **Yes.**
Q. Do you know him personally?
A. **Yes.**
Q. He was a student at the University of Minnesota; correct?
A. **Yes.**
Q. Did you ever teach any of his classes?
A. **I don't believe so.**
Q. Okay. His focus was on heat transfer just like you; correct?
A. **That's what I've been told by counsel.**
Q. Okay. When was the last time you spoke with John Abraham?
A. **Probably several years ago.**
Q. Did you teach --
Do you recall teaching any of his classes?

Page 32

A. **No, I do not.**
Q. Okay. Do you know if he was an A student, B student, C student?
A. **I -- I cannot recall that.**
Q. Okay. Do you know who Gary Settles is?
A. **I do.**
Q. Personally?
A. **I -- I know of him. I don't think I know him personally.**
Q. Have you read his report?
A. **I have not.**
Q. Okay. Do you know who Michael Keen is?
A. **I do not.**
Q. Okay. Have you read his report?
A. **I have not.**
Q. So do any of these names sound familiar with respect to reports that you've seen: Abraham, Borak, Hannenberg, Ho, Hulford, Hughes, Keen, Lampotang, Mont, Settles, Ulatowski or Wenzel? Have you seen any of -- any of their reports?
A. **I have not seen any of those reports.**
MR. ASSAAD: Okay. I'd like to mark your report as --
THE REPORTER: Exhibit 1.
MR. ASSAAD: -- 1.

(Kuehn Exhibit 1 was marked for identification.)

MR. ASSAAD: And I'd like to mark as Exhibit 2 the corrected version of Exhibit C.

(Kuehn Exhibit 2 was marked for identification.)

BY MR. ASSAAD:

Q. Now Dr. Kuehn, I represent to you that this is an exact copy of the report that was provided to us by counsel, as well -- which includes the report Exhibits A, B, C, D and E as Exhibit 1, and Exhibit 2 is the corrected Exhibit C. Do you agree with me?

**A. Well I'll take your word for it.**

Q. Well I don't want you to take your word -- my word for it. I want it on the record that you agree with me that Exhibit 1 and 2 is your report, unless your counsel wants to stipulate to that.

MR. GOSS: Do you want to just take a minute to flip through it?

THE WITNESS: Yeah. I'd ask to take a look to verify that.

MR. GOSS: I have no reason to think it's not a bad -- that it's not an accurate copy, but if you want him on the record, he might as well take a look.

**A. Okay. Yes, I agree this is an accurate copy.**

Q. For the record, Exhibit 1 and Exhibit 2 is an accurate copy of your report, Exhibits A, B, C, D and E of your report; correct? For Exhibit 1; correct?

**A. With Exhibit 2 being the corrected Exhibit C.**

Q. And Exhibit 2 is a corrected version of Exhibit C that was provided to counsel on Friday, July 7th, 2017; correct?

**A. I believe that's when it was provided.**

Q. Okay.

**A. I do -- I do not know that.**

Q. Well when did you correct your report?

**A. Friday.**

Q. Okay. So it couldn't have been provided -- provided to us earlier than Friday; correct?

**A. No. Right.**

Q. Okay. And therefore I assume that you recently reviewed your entire report; correct?

**A. I -- I did look through it, yes.**

Q. Are there any other corrections, sitting here today, that you'd want to inform me before we get into your report?

**A. No.**

Q. Okay. So you believe at this point in time that the report reflects all the opinions you intend to offer to the court and to the jury in this matter; correct?

MR. GOSS: Object to form.

MR. ASSAAD: Basis.

MR. GOSS: Well, I think he left it open that he may address new information as it becomes available to him, as all the experts have.

MR. ASSAAD: So what's your objection?

MR. GOSS: Well, that you're closing the door on him, and I think we intended to leave it open.

Q. Dr. Kuehn, would you agree with me that your report contains all the opinions you intend to offer to the court and to the jury in this matter that you're aware of at this time on the day of your deposition?

**A. At this time of day, yes.**

Q. Okay. Sitting here today at this point in time, on July 10th, 2017 at 10:02 a.m., is there anything that you want to add to your report or delete from your report with respect to your opinions that you will give in this case?

**A. Not at this time.**

Q. Okay. And you understand that I'm one of the attorneys working on behalf of over 2,000 people who have filed lawsuits alleging that they have been harmed by the Bair Hugger. You understand that; correct?

**A. I have heard that, yes.**

Q. Okay. And --

But you understand that; correct?

**A. Yes.**

Q. Okay. And you understand that the plaintiffs have a legal right to understand the full scope of your opinions in this case.

**A. I believe so, yes.**

Q. Okay. We also have the right to know all the methodologies as to how you reached your opinions. Do you understand that?

**A. Yes.**

Q. Now in reading your report, my understanding is that your two main opinions are that the filter that was selected for the Bair Hugger is appropriate and that the Bair Hugger does not disrupt the airflow in the operating room; is that correct?

**A. Those are two main opinions, yes.**

Q. Okay. And now looking at your report, you reviewed the -- the reports of Dan Koenigshofer, Said

Elghobashi, Michael Buck, Yadin David, William Jarvis and Michael Stonnington; correct?

**A. That's correct.**

Q. And your rebuttal to those expert reports of the plaintiffs' experts are contained from page nine to page 16; correct?

**A. That's correct.**

Q. And with respect to pages one through eight, those were the issues that you were asked to address by the defendant that we talked about earlier; correct?

**A. Including the top of page nine, yes.**

Q. Okay. Do you recall receiving a subpoena in this case?

**A. Yes, I do.**

Q. Okay. Did you produce all the documents requested in the subpoena to Blackwell Burke?

**A. If I could take a look at the subpoena again, I could answer that.**

**(Kuehn Exhibit 3 was marked for identification.)**

BY MR. ASSAAD:

Q. Exhibit 3 is a subpoena issued on June 7th, 2017 to Dr. Kuehn in this case. Do you recall receiving this subpoena?

**A. Yes, I do.**

Q. Now before we get to the subpoena, did you create any notes, handwritten notes in this case?

**A. I did.**

Q. Okay. Were they notes that you created while you were formulating your opinions?

**A. Yes.**

Q. Did you also create notes with regard -- with respect to conversations you had with counsel?

**A. Yes.**

Q. Okay. Are they on a separate notebook or on the same notebook?

**A. Same notebook.**

Q. Okay. Do you have that notebook here with you today?

**A. I do not, no.**

Q. Did you bring anything with you today?

**A. I did not.**

Q. Why not?

**A. My impression was that the opposing attorney would provide all the documents necessary.**

Q. Well if -- if you have an article that may support your opinion that you want to refer to, wouldn't it be helpful if you had it here today when you're expressing all your opinions today?

MR. GOSS: Object to form.

**A. If I had to dig down into the details and -- and go back and look at where I obtained some of my information, that would be helpful.**

Q. Okay. So you agree with me it would be helpful.

**A. Yes.**

Q. Okay. So it's clear that you have --

Do you have notes that you created on a computer, like on a Word document or Excel sheet?

**A. I do not.**

Q. Okay. They're all handwritten notes --

**A. Yeah.**

Q. -- that you created?

Okay. Let's go through the subpoena. If you go to page four of Exhibit 3, --

Page four.

**A. Uh-huh.**

Q. -- do you recall seeing this list of documents to be produced, items one through 18?

**A. I have.**

Q. Did you go through all the list and produce documents to your counsel?

**A. I did.**

Q. Okay. Did you produce your notes to your

counsel?

**A. I did.**

Q. You produced your invoices; correct?

**A. Yes.**

Q. Number one, "All documents reviewed by the deponent in anticipation or in preparation for this deposition." Did you produce those to your counselor?

**A. I did.**

Q. What documents were those?

**A. Those include the -- some of the papers I found online that I mentioned before, the books I used as reference books, and also the -- the documents provided by -- by counsel.**

Q. Okay. If you go to Exhibit E of Exhibit 1, which is a list of the materials considered, is there anything on that list that you provided to -- that are responsive to item number one of Exhibit 3 that is not on this list?

**A. Anything I provided that's not on the list, is that the question?**

Q. Yes.

**A. I think that covers everything.**

Q. Okay. So you haven't reviewed anything besides what's on this list in preparation for your deposition or anticipation of litigation.

**A. I don't believe so.**
Q. Okay.
MR. GOSS: I think he said --
MR. ASSAAD: I'm going to get there in a second. We're going.
MR. GOSS: Okay.
Q. Besides the Stocks document; correct?
**A. Yes.**
Q. Okay. Any other documents that were provided to you by counsel except the Stocks document provided on Friday that you reviewed?
**A. That's -- that's not on this list; --**
Q. Yes.
**A. -- correct?**
**That's the only one I can think of.**
Q. Did --
Were there any documents that you reviewed on Friday that's on this list?
**A. I think there was a 3M data test report by Winston Tan, which is about midway down on the first page of Exhibit E.**
Q. And that's the filter testing; correct?
**A. Yes.**
Q. Okay. Anything else?
**A. Those were the two that we looked at on --**

**on Friday.**
Q. Have you ever designed a filter?
**A. I have not designed a filter from scratch, no.**
Q. Okay. Well when you say you haven't designed a filter from scratch, have you done any type of design of a filter?
**A. Yes.**
Q. What?
**A. I helped design a device that would behave as a filter but is not using normal fibrous media, but the output would be the same or very similar to a fibrous-media filter.**
Q. What was that, a synthetic media?
**A. It was actually using three parallel-stage impactors that could be put into an ASHRAE 52.2 test facility such that it could be replicated very precisely, used in different laboratories to help inter -- interlaboratory test results to assume they were more uniform -- to make them more uniform.**
Q. You need to speak up a bit for the camera though.
**A. Okay.**
Q. Because I'm having trouble hearing you, so --

**A. Okay.**
Q. Is that the only time you've ever designed a filter-type like device?
**A. That's my recollection, yes.**
Q. Okay. With respect to number two, are there any correspondence between you and anyone besides Blackwell Burke or any of the attorneys from 3M?
**A. No.**
Q. Okay. How many pages of notes do you have?
**A. Perhaps 30 or 40.**
Q. Thirty or 40 pages. And you gave them to Mr. Goss?
**A. I did.**
Q. When did you give it to him?
**A. A few weeks ago.**
Q. Okay. And out of those 30 or 40 pages, how many pages dealt with actual conversations you had with Mr. Goss?
**A. Maybe one or two.**
Q. One or two pages. Okay.
With respect to the conversations you had with Mr. Goss, were there any facts that you relied upon in formulating your opinions?
**A. I would -- I would answer that as -- as no. All -- all the facts I developed myself --**

Q. Okay.
**A. -- or -- or found in the literature or other -- other materials provided to me.**
Q. So all the facts that you relied upon are contained in your report and in Exhibit E of Exhibit 1.
**A. That's correct.**
Q. Okay. There's nothing that Mr. Goss --
You never asked Mr. Goss a question with respect to a certain issue that you relied upon.
**A. Not without getting some other documentation that would satisfy my question.**
Q. Such as?
Did you ask a question of Mr. Goss and he provided you information through a document?
**A. I asked about how a typical Bair Hugger setup would -- would be used in a -- or how it would be set up in an operating room, and I was provided photographs of how -- how the Bair Hugger would be set up in a typical patient.**
Q. So he provided you photographs.
**A. Yes.**
Q. Okay. Where are those photographs? Are they listed in Exhibit E?
**A. No, they're not.**

Q. Okay. Did you produce them back to Doc -- Mr. Goss in response to your exhibit -- or in response to the subpoena, Exhibit 3?

**A. They were provided me on Friday.**

Q. They were provided to you on Friday.

**A. On Friday, yes.**

Q. So it's my understanding that you did -- you did not know how a Bair Hugger was set up in an operating room before this Friday, July 8th -- July 7th, 2017.

**A. I wanted to have additional documentation that I had reviewed prior to coming here today that I could say, yes, I understand how a Bair Hugger is to be set up properly in an operating room.**

Q. And how many pictures did he send over to you?

**A. Approximately six.**

Q. Okay. And where were those pictures taken?

**A. I do not know.**

MR. GOSS: These are the draping pictures that Dr. Mont used in his Science Day presentation, and we can send them over.

MR. ASSAAD: Can you please send over the notes as well?

MR. GOSS: I will review that with the team.

That call was made when I was out of the country.

Q. Did you rely on those notes to prepare your -- your report?

**A. I -- I did the background work in the -- in the notes and then used those to prepare the report, yes.**

Q. Okay. Now your report is -- your report is only 16 pages; correct?

**A. Well I should say the report and exhibits.**

Q. Okay. And you have 30 pages of notes at least.

**A. That's my approximation.**

Q. Was it on an engineering notebook pad or was it a regular like legal pad?

**A. It's on a bound engineering notebook.**

Q. Okay. Did you make any marks on any of the documents you reviewed in Exhibit E of Exhibit 1?

**A. Some of the documents provided by counsel I did.**

Q. Okay. Did you provide those to your counsel?

**A. I did.**

Q. Okay. By the way, are you being represented by Blackwell Burke today?

**A. My understanding is I'm here serving as an**

**expert witness on the case and not -- not being personally represented.**

Q. Okay. So now we know you have notes on -- with respect to the item number four of Exhibit 3. There's notes -- there's handwritten notes on documents that you reviewed that you provided to counsel; correct?

**A. That's correct.**

Q. With respect to item number five, do you have any documents responsive to number five?

**A. You're referring back to the subpoena?**

Q. Yes.

**A. The -- the two papers I referred to earlier by Tsai and the -- the Dutch researchers, I have an electronic form on my computer. I do not recall if I have provided copies to counsel of those.**

Q. With respect to six and seven, "A list of all books" -- well strike that.

With respect to item six of Exhibit 3, "A list of all books, treatises, and arti -- articles authored or co-authored by the deponent," that would be in your CV; correct?

**A. That's correct.**

Q. Okay. With respect to number seven, "A list of all books, treatises, articles, publications, or

materials which the deponent considers authoritative with regard to the deponent's opinions in this case," would that be in Exhibit E of your report?

**A. I'm -- I'm sorry, I'm trying to follow where -- where you are.**

Q. Number seven.

**A. On which --**

Q. Page four of Exhibit 3, number seven. I'm going down the list.

**A. Okay, number seven. I provided everything that I used in preparing my -- my report, yes.**

Q. And you consider all those items authoritative.

**A. Yes.**

Q. Do you consider the ASHRAE manuals and -- and papers authoritative?

**A. As engineering best practice, yes.**

Q. So you consider it authoritative.

**A. Yes.**

Q. Number 10 states, "An itemized list of time, charges, and expenses for services or opinions rendered in this case, including an itemization for said services performed by any person employed by the deponent in this case." Did you produce all those to your -- to counsel?

**A. As of early June I did, yes.**
Q. Okay.
**A. Not since then.**
**(Kuehn Exhibit 4 was marked for identification.)**
BY MR. ASSAAD:
Q. Exhibit 4 I represent are three invoices provided to the plaintiffs in response to our subpoena to you. Do you recognize these three pages?
**A. Yes, I do.**
Q. You guess you do?
**A. Yes, I do.**
Q. Oh, yes, you do. I'm sorry. I thought you said "I guess I do."
Okay. Are you aware that out of all the documents that we have been talk -- discussing, that these are the only three pages provided by your counsel in response to the subpoena to plaintiffs?
**A. I have no idea of that.**
Q. Okay. All right. You mentioned you spent an hour doing independent research. Where is that on any of these invoices that you did in the beginning of the case?
**A. I think I submitted an invoice for the month of March, which is not included in here, which may**

**have in -- included that. Or perhaps when I'm saying "Continue work on expert report," that may have included some -- some online searching for documents --**
Q. Okay.
**A. -- in the -- in the April invoice.**
Q. So these are not all the invoices you -- you have created in this case.
**A. I recall submitting one for the month of March, which I do not see here.**
Q. Do you remember how many hours that was?
**A. I do not remember off the top of my head.**
Q. Okay. And the last invoice you have is invoice date of July 12th for the month of June; correct?
**A. I think that may be a -- an incorrect date. That may have been June 12th --**
Q. Okay.
**A. -- instead of --**
**Yeah. If you look up in the first line it says 6/1/2017.**
Q. Okay. Have you provided any other invoices since then?
**A. I have not.**
Q. How many hours have you billed for the month

of July, to your recollection?
**A. I have not billed anything since this.**
Q. How many hours have you worked on this case in the month of July?
**A. I would estimate maybe 15 to 20.**
Q. Fifteen. And that was in the preparation of your deposition; correct?
**A. I don't recall when I actually submitted the -- the expert report, if that included July or if that was done in June. I do not know if the July time included any expert-report preparation or if it's simply preparing for the deposition.**
Q. Well I state for the record that your expert re --
Well if you look at Exhibit 1, your expert report was signed on June 1st, 2017.
**A. Okay. Then -- then I did not spend time on the expert report in July. I was simply preparing for the deposition.**
Q. Okay. So the whole time in July, all the hours you worked on this case and will submit to defense counsel was in preparation of your deposition; correct?
**A. And also reviewing the report and -- yes.**
Q. Your report.

**A. Yes.**
Q. You haven't read any other reports in preparation for this deposition; correct?
**A. Yes. I --**
**Well no -- no defense reports.**
Q. You reviewed some of the plaintiffs' reports?
**A. Yes.**
Q. Whose?
**A. Koenigshofer's, I don't remember when I did that, Buck, Elghobashi. Those are the main three. Also reviewed a few others.**
MR. GOSS: Are you asking just in July?
MR. ASSAAD: In preparation for today's deposition.
**A. I think there's a total of maybe six or seven I looked at altogether.**
Q. Do you know Dr. Elghobashi?
**A. I've heard of him. I do not know him.**
Q. Okay. Have you ever heard of the Elghobashi Map?
**A. I have not heard of that.**
Q. Okay. Do you know what coupling is with respect to particle movement?
**A. I -- I would say I -- prob --**

**Probably not.**
Q. Okay. Do you know who Lagrange is?
**A. Yes.**
Q. And Mueller?
**A. Yes.**
Q. Have you ever heard the term boussinesq?
**A. Yes.**
Q. What's your understan -- what's your understanding of boussinesq?
**A. It's a simplified approximation for -- for fluid mechanics.**
Q. With respect to what?
**A. I believe it's assuming the fluid properties are constant.**
Q. Excuse me?
**A. Assuming the fluid properties are constant.**
Q. What property of fluids?
**A. I think it's both density and viscosity.**
Q. When is the last time you used the boussinesq approach in solving problems?
**A. It's probably a long time ago, maybe 20 -- 20 years ago.**
Q. Do you know the limitations of the boussinesq approach?
**A. I know they're not valid when there's large**

**temperature gradients, which -- which changes both density and viscosity.**
Q. What would you consider a large temperature gradient?
**A. In -- in -- mostly in -- in liquids, because the viscosity is much stronger a function of temperature than it is of, say, gases.**
Q. I understand. But what would you consider a large temperature gradient?
**A. In liquids, for example in water, maybe something more than 20 or 30 degrees Fahrenheit.**
Q. How about gas?
**A. Gas is a probably much higher temperature because the viscosity and density are not nearly as -- as temperature-dependent. I would say maybe 50 to a hundred.**
Q. Okay. Is that a guess or is that based on --
**A. That's --**
Q. -- any document or research that you've done?
**A. That's -- that's an estimate based on my experience.**
Q. Can you point me to a literature or peer-reviewed article that supports that statement?

**A. I could probably find documentation of that in a -- a good fluid mechanics textbook.**
Q. Okay.
MR. GOSS: We've been going about an hour. Do you want to take a quick break?
MR. ASSAAD: Give me five minutes.
MR. GOSS: No problem.
Q. Do you know Dan Koenigshofer?
**A. I do not.**
Q. Do you know Michael Buck?
**A. I may have run across him at the university, but no, I really don't know him.**
Q. He works with Andy Streifel. Do you know him?
**A. I do know Andy, yes.**
Q. Do you know him very well?
**A. Reasonably well. We've worked together from time to time in the past.**
Q. Okay. With respect to using the boussinesq approach, are you aware of what ANSYS, Fluent or CFX states in their manuals with respect to using that approach?
**A. I do not know that.**
Q. Okay. Would you be surprised that they consider a gradient greater than three or four degrees

Celsius with respect to using particle flow, that that would be too large of a gradient with respect to using the boussinesq approach?
**A. Based on my experience, that seems to be overly restrictive.**
Q. Okay. When is the last --
Well your experience has been over 25 years using the boussinesq approach; correct?
**A. Yes.**
Q. With respect to item number nine on Exhibit 3, the subpoena, there's no engagement agreement between you and Blackwell Burke or 3M; correct?
**A. Can you define "engagement agreement?"**
Q. No written document or contract between you two.
**A. It's -- it's a verbal agreement.**
Q. Okay. Do you have any correspondence at all with either defense counsel or anyone else in this case? And that includes e-mails.
**A. There are some e-mail correspondence between myself and counsel.**
Q. Okay. But no one else besides counsel.
**A. No.**
Q. Besides the six photographs that were provided to you on Friday, five or six photographs,

any other photographs provided to you?
**A. Not other than the ones that are included in one of my exhibits.**
Q. Okay. Who took those pictures in the exhibits?
**A. Oh, it was either Peter or -- or Vinita.**
Q. Who is Vinita?
**A. Vinita is one of the lawyers in Blackwell Burke's office.**
MR. GOSS: She's an associate in my office.
MR. ASSAAD: Okay.
MR. GOSS: She will be here later, after lunch.
MR. ASSAAD: Okay.
Q. Was anyone else in the room in Exhibit D?
**A. No, just the three of us.**
Q. Okay. Where -- where did that Exhibit D, where did that occur?
**A. That occurred in the 3M laboratory.**
Q. Okay. So it happened in a 3M laboratory in --
**A. Yes.**
Q. -- St. Paul?
**A. Yes.**
Q. Okay. I take it you had no communications

with any other experts in this case, defense experts.
**A. I have not communicated with anybody other than defense -- other than counsel I should say.**
Q. Is there any agreements for you to perform any other work in this case besides formulating your opinions that are outlined in Exhibit 1 and 2?
**A. I would anticipate as additional information becomes available I would be asked to perform additional services.**
Q. Such as what additional information?
**A. Perhaps reviewing additional depositions or other -- other documents that may come forward.**
Q. Are you aware that general causation discovery is closed in this case?
Do you know what that means?
**A. I -- I'm not -- not aware of that.**
Q. You know what general --
You know what discovery is; correct?
**A. Yes.**
Q. You're familiar with lawsuits; correct?
**A. Yes.**
Q. Have you ever been sued yourself?
**A. No.**
Q. Have you ever sued anybody?
**A. No.**

Q. Okay. Discovery has been closed in this case for a few months now; correct? Are you aware of that?
**A. I -- I'm not aware of the legal terms, no.**
Q. Okay. Is there anything specific with respect to patients that would change your opinions in this case?
**A. Could you re -- repeat the question?**
Q. Well you talked about getting new information, you know, you might ask to be -- offered some potential new information, so I'm trying to figure out what type of information might affect your opinions. So my first question is: Anything specific to a patient's medical records that might affect or change your opinions in this case?
**A. I -- I'm going under the assumption that the only additional information provided would be, for example, a deposition from someone.**
Q. Okay. What in a deposition might affect your opinions in this case?
**A. It's difficult for me to say without reading the deposition.**
Q. Okay. Do you feel that you have all the information necessary to support your opinions in this case?

**A. I think I do.**
Q. Okay. You -- you agree that the good engineering approach in attacking an issue is to study the issue extensively; correct?
**A. Engineers always have restrictions on time and resources, so one does the best one can under the existing circumstances.**
Q. Did you have any restrictions on your time by 3M or Blackwell Burke?
**A. I did not.**
Q. So you could have spent as much time as you want or you felt necessary to research the issues in this case; correct?
**A. That's correct.**
Q. Okay. Could you -- would --
Could you have asked a graduate student or a -- a researcher to assist you in this case?
**A. I didn't think that was appropriate.**
Q. Why not?
**A. Because I was the one retained as an expert witness and not a -- not a graduate student.**
Q. I understand that. But you've also written many papers and used graduate students to help you do the research; correct?
**A. Yes, but that's not a litigation process.**

Q. But you rely on -- on your graduate students; correct?
**A. For the research they do in the laboratory, yes.**
Q. Or to do any type of research review; correct?
**A. Under my direction, yes.**
Q. For example, when you attack a new problem, you want to review and obtain all the peer-reviewed literature, relevant literature on that issue to see what other people have done; correct?
**A. As much as is reasonably possible, yes.**
Q. Did you do that in this case?
**A. Other than some keyword searches, I did not do a very exhaustive search, no.**
Q. You relied on what 3M provided you; correct?
**A. That, and some of the work -- some of the searching I did on my own.**
Q. Well what we talked about today, those two articles; correct?
**A. Those were the two that I thought were the most relevant to support my opinions.**
Q. What other articles did you think that were relevant but not the most relevant?
**A. There were a number of articles on particle**

**deposition, particle removal, filtration that I didn't think were as relevant, so I did not include them.**
Q. With respect to the use of the Bair Hugger and its effect on the environment, did you review any articles of that nature?
**A. I don't believe I did, other than what was provided.**
Q. Okay. You relied on 3M to provide you those articles; correct?
**A. I relied on counsel to provide the articles.**
Q. Well counsel represents 3M in this case. You understand that; correct?
**A. Yes.**
Q. Okay. And you would expect that, being retained as an expert in this case and being a professor at the University of Minnesota, that 3M would provide you with all the information necessary to formulate your opinions; correct?
**A. I --**
**That -- that's not the case. They provided some of the material and I obtained other material myself, some background material.**
Q. Yeah. But if they were aware of information that might be relevant to your opinions or could affect your opinions, you'd expect 3M to provide you

that information; correct?
**A. I would expect that to be the case, yes.**
Q. Okay. Because that would be --
I mean for you to be objective, you want to know the good and the bad with respect to an issue that is known in the scientific community; correct?
**A. You want to know as much as possible, yes.**
Q. To be objective.
**A. Yes.**
Q. Okay. Because you're not here to be an advocate, you're here to be objective as an engineer and pretty much black and white on the science; correct?
**A. I am --**
MR. GOSS: Object to form.
**A. -- here -- I'm here to defend the positions that I have set forth.**
Q. You're here to defend 3M's positions; correct?
MR. GOSS: Object to form.
Q. Correct?
**A. These are my positions I have put forth.**
MR. ASSAAD: I think it's time for a break.
THE REPORTER: Off the record, please.
(Recess taken.)

BY MR. ASSAAD:
Q. Dr. Kuehn, did you meet with anyone at 3M to discuss this issue?
**A. No, I did not.**
Q. So you never met with like Michelle Stevens, Al Van Duren, any one of --
Any of those names sound familiar?
**A. No.**
Q. Okay. Going back to Exhibit 4, my understanding is that you believe there's a March invoice and a May invoice that is not reflected in Exhibit 4; correct?
**A. That's my recollection. I thought I submitted invoices every month up until the 1st of June.**
Q. Okay. Besides --
If you look at page three, besides your work on June 1st, 2017 for one hour, do you recall any other work you performed on this case in the month of June?
**A. Yes, yes, there was work done after this. I believe the expert report, as -- as you mentioned, was submitted about June 1st, so I was told to submit all my invoices, all my time up to that date, which I did.**
Q. Okay. My question is: Was there any other

work you performed on this case in the whole entire month of June?

**A. After June 1st, yes.**

Q. What work?

**A. I would say probably reading -- reading depositions that were provided by counsel.**

Q. My understanding is that the deposition of Jim Ho was provided to you on Friday; correct?

**A. That's correct.**

Q. Okay. So you didn't do that work in June; correct?

**A. No.**

Q. Okay. I'm asking for the month of June, --

**A. Yes.**

Q. -- any other work that was performed on this case.

**A. I -- I can't recall specifics off the top of my head.**

Q. Okay. What other depositions besides Jim Ho's deposition was provided to you?

**A. Koenigshofer's and Zgoda's, Karl Zgoda, Elghobashi's. Those are the ones that come to mind.**

Q. Okay. And also Mr. Crowder?

**A. I think I reviewed his expert report, but I don't think I recall seeing his --**

Q. Well he's not an expert in this case. He was deposed. He's the person with Pentair.

**A. Then -- then I must have seen his -- his deposition.**

Q. I believe you put it -- you put it down on Exhibit E of Exhibit 1.

**A. Okay. Then -- then that must be correct.**

Q. Okay. So when did you receive Dr. Elghobashi's deposition?

**A. I can't say for sure. Probably maybe six weeks ago.**

Q. Okay. Well his deposition was taken on June 15th, --

**A. Okay.**

Q. -- so it had to have been after that.

**A. Okay.**

Q. Okay. You said you also received Dan Koenigshofer's deposition; correct?

**A. Yes.**

Q. And did you receive Michael Buck's deposition?

**A. Yes.**

Q. Okay. Did you receive Dr. Ulatowski's deposition?

**A. No.**

Q. Did you read the entire deposition of Dr. Elghobashi?

**A. I have not read the entire deposition, no.**

Q. Have you read the entire deposition of -- of Dan Koenigshofer?

**A. Yes, I have.**

Q. Have you read the entire deposition of Michael Buck?

**A. Yes, I have.**

Q. Have you read the entire deposition of Jim Ho?

**A. Yes, I have.**

Q. Were there any parts of the deposition that you were asked to review?

**A. Not specifically. I was asked --**

**Well, I took it upon myself to read the entire deposition of those -- those four.**

Q. Okay. And I assume you've read the entire reports of Dr. Elghobashi, Dr. David, Dr. Stonnington and Dr. Samet; correct?

**A. There were a number of reports given to me several months ago, so I -- I can't recall exactly which ones.**

Q. Okay.

**A. But those -- those sound correct.**

Q. When you received the report, did you read the entire report?

**A. Reviewed, at least -- at least glanced through the entire report, yes.**

Q. When you use the term "glance," what -- what does "glance" mean to you?

**A. Take a -- a first look through all of it, and then some of them I went back and -- and read in more detail.**

Q. Okay. And -- and are the hours spent with respect to your work on Exhibit 4 accurate?

**A. With -- with the exception of the perhaps two missing invoices, yes.**

Q. I understand that. But when you say you spent one hour doing something, it was actually an hour and not two hours, three hours.

**A. I try to be very -- very correct about that.**

Q. Because that's what engineers do, they -- we try to be accurate; correct?

**A. That's correct.**

Q. Okay. You're a member the American Society of Mechanical Engineers; correct?

**A. Yes.**

Q. And you're also a member of ASHRAE; correct?

**A. Yes.**

Q. Okay. So just to be clear, on page two of Exhibit 4, on April 8th it states that you spent one hour on the expert reports from Samet, Stonnington, Jarvis and David. Do you see that?

**A. I see that.**

Q. Okay. So it's my understanding you spent one hour reviewing those four expert reports; correct?

**A. As I said, I -- I did not -- probably did not read any of them in -- in great detail.**

Q. Okay. On April 8th it also states "expert report from Elghobashi and drafted rebuttal," one hour; correct?

**A. Yes.**

Q. What part of his report -- is the --

Is the rebuttal aspect of Elghobashi what you have in your report here in Exhibit 1?

**A. That -- that was the beginning of that, yes.**

Q. Okay. Do you agree that Dr. Elghobashi is an expert in the field of particle flow?

**A. I --**

**Again, I don't know him very well, so I -- I really have no opinion on that.**

Q. Have you read any of his papers?

**A. I don't believe I have.**

Q. Okay. You've never heard of the Elghobashi

Map; correct?

**A. I --**

**No, I have not.**

Q. So sitting here today you have no idea what the Elghobashi Map refers to.

MR. GOSS: Are you saying "map?"

MR. ASSAAD: Map.

MR. GOSS: Okay.

**A. I do not.**

Q. Okay. Do you know what DNS is?

**A. Yes.**

Q. What's DNS?

**A. Direct Numerical Simulation.**

Q. Do you have access to any DNS software?

**A. I think at the University I probably do.**

Q. Okay. What software would that be?

**A. I -- I do not know.**

Q. Okay. Have you used any DNS software?

**A. I have not used any myself, no.**

Q. Do you agree that DNS software is more advanced than ANSYS, Fluent or CFX?

**A. That -- that's my understanding.**

Q. Okay. And it's also your understanding that very few supercomputers in the world could actually use DNS.

**A. I have no opinion on that.**

Q. Okay. Are you familiar with the supercomputer at the University of Minnesota?

**A. Yes.**

Q. How many cores does it have?

**A. I -- I don't know. I have not used that for many years.**

Q. Okay. Are you aware that the license that the University of Minnesota has for ANSYS is not licensed for research work?

**A. Could you repeat the question?**

Q. Are you aware that the license for -- that -- the license as used at -- that the University of Minnesota has for the use of ANSYS is not licensed for research work?

**A. I -- I'm not aware of that, no.**

Q. Okay. And in fact it's also supposed to be used for students enrolled in classes that use ANSYS, or instructors and TAs involved in the course that makes use of ANSYS software products.

**A. That -- that could be the case. I do not know.**

**(Kuehn Exhibit 5 was marked for identification.)**

BY MR. ASSAAD:

Q. What's been marked as Exhibit 5 is a copy of a page of the website. If you look at the bottom page, left, it gives you the web address, and if you look at the upper left-hand corner it says the date that this was copied off of the website. Do you recognize Exhibit 5?

**A. I have not seen this before, no.**

Q. Do you know what CSE-IT stands for?

**A. I believe CSE stands for College of Science and Engineering --**

Q. Yes.

**A. -- and IT is probably Information Technology. But that's --**

**I'm fairly sure about CSE; I'm making a guess at IT.**

Q. Do you agree with me that, based on your knowledge today, that this is a page taken from the University of Minnesota website?

**A. It appears to be, yes.**

Q. Okay. And on top it talks about "ANSYS License."

**A. Yes.**

Q. Okay. Do you see where it says under "ANSYS License," "This copy of Ansys is NOT LICENSED FOR RESEARCH WORK?"

**A. I see that.**
Q. And if you look at the bottom paragraph, it says, "Access can be granted for use by students enrolled in classes that use ANSYS or instructors and TAs involved in the courses that make use of the ANSYS software products?"
**A. I see that.**
Q. So you agree with me that under the license agreement, based on this document, that no one should be able to use ANSYS for any type of commercial work; correct?
MR. GOSS: Object to form, lacks foundation.
**A. Repeat the question.**
Q. Well let's back up. I mean you've been in academia for how many years, 30, 40 years?
**A. About 40 years.**
Q. Okay. And you're aware that companies will give academic licenses to the university for -- for a reduced rate to -- to train students; correct?
**A. That's correct.**
Q. Okay. And part of the --
And many of the licenses that are granted to the university are -- are not to be used for commercial purposes; correct?
**A. That -- that's probably some license-**

**agreement language, yes.**
Q. I mean you're familiar with that being in academia for so many years; correct?
**A. Yes.**
Q. Okay. And companies do that because they want students to become familiar with their products, to use their products when they go out into the real world; correct?
**A. I agree with that.**
Q. Okay. Because the cost for the license for -- for an academic institution is much less than the cost it would be for a private corporation.
**A. That -- that's what I have heard.**
Q. And in fact, when you --
When I was a student, and I'm sure your students know, the cost of even getting Micro -- Microsoft Office as a student is much cheaper than when you're not a student any more.
**A. There again, they're student versions, too, that are much cheaper.**
Q. Yeah. So you agree with me that if anyone used ANSYS for a commercial purpose, that would be in violation of the ANSYS license with the University of Minnesota; correct?
MR. GOSS: Object to form.

**A. Well it says "LICENSED" -- "NOT LICENSED FOR RESEARCH WORK." I -- I would imagine one would have to interpret what that would mean.**
Q. Well it also says, "Access can be granted for use by students enrolled in classes..." It -- it's not access for any type of commercial use.
**A. It says, "Access can be granted..." It says access is restricted to.**
Q. Well let me ask you this: If you -- would this license --
Based on your reading of this license, would a -- would a professor or a student be allowed to do research for 3M under this license?
**A. If -- if one were to define the term "research" as indicated under here, then I would agree.**
Q. Well how do you define "research?"
**A. Research is -- I would define as generating new knowledge.**
Q. In formulating your report, did you read any of the depositions of any of the fact witnesses?
**A. I'm not sure who the fact witnesses are. If -- if you could identify --**
Q. Did you read any of the depositions by any of the engineers at 3M?

**A. I don't believe so. But if you were to name them, I could tell -- tell you "yes" or "no."**
Q. Karl Zgoda.
**A. Yes.**
Q. You've read his deposition.
**A. Yes.**
Q. Okay. What about Gary Hansen?
**A. I do not believe so.**
Q. What about Al Van Duren?
**A. No.**
Q. What about Michelle Hulse Stevens?
**A. No.**
Q. Are the only depositions you have read are the ones outlined in Exhibit 1 on your report, as well as the depositions that -- of -- of the plaintiffs' experts provided to you by defense counsel?
**A. I believe that to be correct.**
Q. And Jim Ho, who is a defense expert.
**A. Yes.**
Q. Okay. Did you -- were you provided -- strike that.
Are you aware that there are about five to eight peer-reviewed articles that discuss either particle flow or disruption of the operating room environment or filtration with respect to the Bair

Hugger?
A. I do not know the exact number, but I -- I know there are some peer-reviewed publications, yes.
Q. And the ones that you know about are the ones provided to you by defense counsel.
A. I think that's correct.
Q. Do you know who Dr. Sessler is?
A. I have heard the name.
Q. Before this litigation?
A. No.
Q. Okay. How have you heard the name?
A. Just through discussions with counsel.
Q. Okay. Have you read any of his peer-reviewed articles?
A. I do not believe I have.
Q. Do you know who Dr. McGovern is?
A. I do not.
Q. Do you know who Dr. Reed is?
A. I have read one of his papers, but other than that, I do not know who he is.
Q. The paper that was provided to you; correct?
A. Yes.
Q. Do you know who Mark Albrecht is?
A. I --
Prior to this --

Q. Litigation.
A. -- litigation, no.
Q. But you've read some of his articles.
A. Yes.
Q. Do you know who Dr. Belani is?
A. No.
Q. Do you know Dr. Belani used to be the chair of anesthesiology at the University of Minnesota?
A. I was not aware of that, no.
Q. Did you --
Were you provided with a deposition -- the corporate representative deposition of 3M in which it was 3M's -- well strike that.
Do you know what a corporate deposition is?
A. I -- I do not. Please educate me.
Q. Okay. In litigation there's a deposition which you actually take the deposition of 3M and they provide a person to speak on behalf of 3M.
A. Okay.
Q. Did you read any of the depositions of any of the corporate representative depositions?
A. Other than the one that I mentioned by Karl Zgoda, I don't believe I have.
Q. Okay. Do you know who Nachtsheim is?
A. I do not.

Q. Okay. Did you review any of the depositions with respect to any of the study authors in this case?
A. Could -- could you repeat that?
Q. Are you aware that 3M took the depositions of many of the authors that had peer-reviewed literature that questioned the safety of the Bair Hugger device?
A. I was not aware of those depositions, no.
Q. Do you think reading those depositions would have been helpful in formulating your opinions?
A. Possibly.
Q. Do you know who Farhad Memarzadeh is?
A. Again, I have heard the name. I do not know him personally.
MR. GOSS: Memarzadeh.
Q. Memarzadeh. Does that refresh your recollection when it's Memarzadeh?
A. I still do not know him.
Q. Okay. Are you aware that he's done computational fluid dynamic work with respect to operating rooms?
A. I do not recall that.
Q. Are you a member of the -- are you a member of the ASHRAE Rule 72 Committee?
A. I'm not.

Q. Okay. Do you know what the Rule 72 Committee is?
A. I'm -- I'm not sure what the title of that would be.
Q. Dealing with hospital rooms or -- and hos -- and air -- hos -- healthcare facilities.
A. That -- that's not --
170 you say?
Q. I'm sorry, 172.
A. Yeah. No, I'm not a member of that.
Q. Okay. You're a member of the 52 Committee; right?
A. Actually, I'm not a member of 52, I'm a member of the technical committee that oversees Standards Committee 52.2.
Q. Okay.
(Discussion off the stenographic record.)
Q. Now in reading your report, I just want to be clear so I understand you. Is -- is it your opinion that the Bair Hugger has no impact on the airflow environment of an operating room?
A. I think my opinion would be somewhat more restrictive than that, that it has negligible effect on the airflow near the surgical site.
Q. On the surgical

And when you say "negligible," what do you mean by "negligible?"

**A. One would not be able to measure the difference whether the Bair Hugger was being used or not at the surgical site, everything else being equal.**

Q. Okay. Does it have an impact on the unidirectional airflow?

**A. I would say no.**

Q. Okay. Does it have any impact in the operating room with respect to airflow?

**A. I guess we would have to define "impact." I would say it does circulate some of the air in one portion of the operating room, behind the anesthesia drape, but as -- as I said, I do not believe it would have any significant effect of the airflow near the surgical site.**

Q. And with respect to your filtration opinion, it's your understanding that the filters used by 3M are -- have a MERV 14 rating; correct?

**A. That's my understanding, yes.**

Q. Okay. And have you yourself done any biological sampling of the bioburden in an operating room?

**A. No, I have not.**

Q. Do you know what the bioburden in an

operating room is?

**A. Not having worked in that area, I do not know that.**

Q. Okay. Do you agree with me that to determine the type of filter to be used and to formulate an opinion on that, knowing what the bioburden in an operating room is necessary?

**A. Well I do know this case is really focused on bacteria-containing particles, and therefore my opinion is based on the filter performance at that type of particle and that particle size.**

Q. Okay. We'll get to that later on.

Did you request to see the expert reports provided by the defense in this case?

**A. I -- I did not know what expert reports there were, so they were provided to me by counsel.**

Q. So until you were provided the expert report of Jim -- or the expert deposition of Jim Ho, you had no idea that Jim Ho was retained by the defense in this case?

**A. I had no idea.**

Q. And with respect to Gary Settles, you had no idea that Gary Settles was an expert in this case?

**A. Prior to counsel mentioning that, no.**

Q. Sitting here today -- well strike that.

Are you aware that Gary Settles took temperature measurements when the Bair Hugger was in use?

**A. I -- I do not recall that.**

Q. When you say you don't recall that, were you --

You haven't seen his report; correct?

**A. I have not seen his report.**

Q. Were you ever informed that Gary Settles took temperature measurements of the Bair Hugger similar to what you did?

**A. I -- I do not remember that.**

Q. When you say you do not remember that, I mean did you or did you not see it?

**A. I -- I can't recall.**

Q. Okay. Have you looked at Dr. Abraham's report?

**A. I have not seen that.**

Q. Have you looked at his CFD analysis at all?

**A. I have not seen anything from John related to this case.**

Q. Okay. Have you ever authored anything with Dr. Abraham?

**A. I do not believe so, no.**

Q. Have you looked at any comments or materials

from the CDC with respect to this case?

**A. I -- I do not believe I have, no.**

Q. Do you know what Schlieren testing is?

**A. I do.**

MR. ASSAAD: And Schlieren is spelled S-c-h --

THE REPORTER: I know it.

MR. ASSAAD: Okay.

Q. Have you ever used Schlieren testing?

**A. Yes, I have.**

Q. When is the last time you used Schlieren testing?

**A. Probably during my Ph.D. thesis work, maybe 40 years ago.**

Q. Okay. Have you seen any Schlieren testing done by 3M?

**A. I have not.**

Q. Have you seen any Schlieren testing by any of the defense experts?

**A. I have not seen any -- any Schlieren work regarding this -- this case.**

Q. Do you know many people -- do you know --

Do you know whether or not many engineers still use Schlieren testing?

**A. My understanding is that not very many.**

Page 85

Q. They give you more of a qualitative result, not a quantitative result; correct?
**A. You can actually get quantitative results from Schlieren if it's set up properly.**
Q. Well when you say if it's set up -- set up properly, what do you mean?
**A. I helped author a chapter in a textbook on optical methods of temperature measurement, which includes Schlieren method -- measurements.**
Q. So you can measure temperature by looking at a Schlieren image?
**A. You can, yes.**
Q. Does it have to be a color image?
**A. Doesn't necessarily have to be color, it could be gray scale.**
Q. Okay. Is it a -- is it a very complicated mathematical equation?
**A. The procedure for getting the image is very straightforward. Again, it would have to be calibrated to actually back out appropriate temperature data.**
Q. So it has to be set up properly; correct?
**A. Yes.**
Q. Does it use a different type of camera?
**A. You can use a standard optical camera.**

Page 86

Q. Okay. Are you surprised, sitting here today, that these other expert reports and testing done of the Bair Hugger, they were not provided to you?
**A. I -- I guess not knowing everything that's out there, I -- no, I'm not surprised.**
Q. Well do you think it's strange that Gary Settles did temperature measurements as well and that information wasn't provided to you?
MR. GOSS: Object to form.
**A. Actually, I think that may have been a -- a wise decision to have two completely independent people try to measure similar things.**
Q. And if they came up with the same result, that would validate each other; correct?
**A. I think that would -- that would certainly support each other, yeah.**
Q. What if they came up with different results?
**A. Then we'd have to look in -- in more detail as to what the differences were in the setup or the measurements.**
Q. Because the setup makes a difference; correct? The way the experiment is set up; correct?
**A. And the -- and the instruments used, yes.**
Q. Okay. Sitting here today, do you believe

Page 87

that 3M gave you all the information necessary to formulate your opinions?
**A. I would -- I would say they hopefully did not withhold anything to support my opinion.**
Q. Well you haven't received any of the depositions of the fact witnesses; correct?
MR. GOSS: Object to form.
Q. Except for Karl Zgoda.
MR. GOSS: Object to form.
**A. As -- as -- as you outlined, yes.**
Q. Let's say it this way: There's many depositions you have not reviewed in this case from any of the fact witnesses in this case; correct?
**A. The fact witnesses that -- that you listed, yes.**
Q. Yes. And you haven't received any of those depositions of any of the study authors in this case; correct?
**A. And the study authors are --**
Q. Albrecht, Reed, McGovern, Nachtsheim, Belani.
**A. That's correct.**
Q. You haven't received any of the depositions of -- the corporate representative depositions.
**A. Other than if you include Karl Zgoda's, no.**

Page 88

Q. That's not a corporate --
I'm talking about the one done by Al Van Duren.
**A. No, I have not seen those.**
Q. Do you think that if 3M admits that the Bair Hugger -- every study that looked at whether or not particles are increased over the surgical site by the Bair Hugger, that it actually occurred, that would be something important to know?
MR. GOSS: Object to form.
**A. I don't know how they would approach that or attribute that.**
Q. Well if 3M did a study and many other people did a study and all the studies indicated that when the Bair Hugger is turned on there were increased particles over the surgical site, isn't that information you would think would be relevant in formulating your opinions?
MR. GOSS: Same objection.
**A. I'm -- I'm -- I'm not sure I would agree with that.**
Q. Well whether or not you agree with it or not, do you agree that if peer-reviewed literature done by 3M as well as others all indicate that particles increase over the surgical site when the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Bair Hugger is turned on, that would be relevant information and necessary information for you to know in formulating your opinions?

MR. GOSS: Same objection.

**A. I am not sure that would be necessary opinion -- or necessary information.**

Q. It would be relevant; correct?

**A. It would be relevant.**

Q. Okay. I mean you would want to look at the test to see why the particles increased and what their setup was and how the test was performed; correct?

MR. GOSS: Same objection.

**A. And in terms of measuring particles, there are a lot of pitfalls involved with that.**

Q. Okay. So you don't believe in particle testing?

**A. I believe in particle testing if -- if it's done appropriately, but as I mentioned, there are many pitfalls involved in performing correct aerosol measurements.**

Q. I mean in fact you -- you -- you recommend particle testing as an alternative in clean rooms; correct?

MR. GOSS: Objection, vague.

**A. Say that again.**

Q. Well you recommend, in -- in -- in -- in determining whether or not a clean room is working properly, as an alternative to doing biological testing, that you could do particle testing.

**A. That's a protocol that's often used by some manufacturers, yes.**

Q. And it's something that you've actually recommended in papers before; isn't it?

**A. Yes.**

Q. Okay. Because I think you --

If I recall correctly, a room is not static, it's dynamic; correct?

**A. Yes. Air is moving.**

Q. Okay. And there could be bursts in particles that, even if you did a biological sampling, you're not going to get any changes because of the possible bursts in particles or -- as well as biological bursts; correct?

**A. You -- you may miss a burst event.**

Q. And that's why particle monitoring is a good alternative to biological sampling which takes days to obtain the results.

**A. Well again, biological sampling gives you, if it's done correctly, very good information, it's just that the information is provided in a delayed manner.**

Q. At least one day.

**A. Usually at least one day for culturing, yes.**

Q. Exactly. And that's why an alternative would be particle sampling, which could give you real-time data, and you could actually set it up to give you an alarm if it goes over a certain amount; correct?

**A. You could do that, yes.**

Q. And that's something you've recommended in the past.

**A. I'm not sure I have recommended that. Certainly not for operating rooms.**

Q. Well you --

Well for clean rooms.

**A. That -- that's possible, yes.**

Q. Okay. Well you've actually written on it.

**A. Well I --**

**You'd have to refresh my memory going -- going back.**

Q. And we will later on, but --

**A. Okay.**

Q. -- you don't deny that you've written on it.

**A. Not at this point, no.**

Q. And you would agree with me that as an engineer, as a professor of engineering, that you would expect to be provided by 3M in this case all the testing that was done and -- all the testing that was done by 3M or others so that at least you can compare your results with what other people did; correct?

MR. GOSS: Object -- objection.

**A. I would expect that would be the case.**

Q. Assuming that all tests that were done with the Bair Hugger, including particle tests, all showed an increase in the particles when the Bair Hugger was turned on, would that in any way affect your opinions?

MR. GOSS: Object to form.

**A. I'd have to look at those -- all those -- those reports and then evaluate them.**

Q. Excuse me?

**A. I would have to look at all the reports and then evaluate them.**

Q. Okay. So it may affect your opinion.

**A. It's possible.**

Q. Okay. And if someone, such as someone at the NIH, did a CFD analysis of the Bair Hugger and showed that there was a disruption in the airflow when the Bair Hugger was turned on, that may be relevant information in formulating your opinions; correct?

MR. GOSS: Object to form.

**A. Possibly. I'd have to look at the study and make my own judgment.**

Q. Okay. And, for example, if there was a peer-reviewed article out there that indicate -- that did temperature measurements around the operating room table that showed a significant increase in -- a statistically significant increase in the temperature above the operating room table when the Bair Hugger was on compared to when the Bair Hugger was off, that may be relevant to you in formulating your opinions; correct?

**A. It's possible.**

Q. Okay. But at least it would be a place for you to compare your results to other peer-reviewed literature in the field; correct?

**A. Yes, I could do that.**

Q. And by the way, your expert opinion is not peer-reviewed; correct?

**A. That's correct.**

Q. Okay. It hasn't been tested or -- or checked by any of the colleagues in your field; correct?

**A. It's -- it's my own personal opinion.**

Q. Okay. Do you know -- do you know what peer review is?

**A. I do.**

Q. What is peer review?

**A. It's a review by colleagues who are familiar with the -- in the engineering world, the technology that you're working with.**

Q. Okay. And it's like a checks and balances to make sure there's no junk science published in the literature; correct?

**A. Assuming the -- the reviewers have appropriate credentials and appropriate expertise to evaluate your -- your publication or your -- your report, then yes. That's not always the case.**

Q. There is some junk science out there; correct?

**A. Yeah.**

Q. And you will agree with me that there's actually some dangerous products out there; correct?

**A. I don't know how you would --**

**That seems to be a very broad --**

Q. Well --

**A. -- categorization.**

Q. There -- there are devices out there that end up being a risk to -- to humans, correct, that are manufactured?

MR. GOSS: Object to form.

**A. Well I can think of a car is a risk to humans, too, if you get in an accident.**

Q. Yeah. But there's, for example, the Pinto. The Pinto was a dangerous device; correct?

**A. Well it was a car that had a lot of accidents associated with it.**

Q. Yeah. And it caused severe injuries as a result of a design error; correct?

**A. Well I'm not sure if you'd say design error, but based on the product.**

Q. Well the product was designed; correct?

**A. It was designed.**

Q. Okay. And there was an error in the design that could have been fixed that wasn't fixed; correct?

MR. GOSS: I'm just going to object to foundation on this.

Q. You're aware of the Pinto case; correct?

**A. Yes.**

Q. Okay. And you actually --

I mean in most engineering schools you're taught about that case; correct?

**A. I -- I'm not aware of that. I'm not in that area.**

Q. You're not in engineering ethics?

**A. Well I'm in engin --**

**I've never taught a class in engineering ethics and I don't -- would not work with the Pinto, for example, in any -- any of my examples.**

Q. You've never taught -- taught a class on engineering ethics?

**A. I've never -- never taught a class on engineering ethics, no.**

Q. Have you ever taken a class in engineering ethics?

**A. I've taken some -- I wouldn't call it a -- a class or a --**

**Training I would say.**

Q. Are there any other Kuehns that teach at the University of Minnesota in the engineering department?

**A. Not with the same spelling of my name that I'm aware of.**

Q. Okay.

**A. I couldn't rule it out, but I don't know of any personally.**

Q. Do you agree that engineers should uphold and advance the integrity, honor and dignity of the engineering profession?

**A. I will agree with that.**

Q. Do you agree that engineers should be objective?

**A. Yes.**
Q. Do you agree that engineers should have -- should be honest?
**A. Yes.**
Q. Do you believe that engineers should have integrity?
**A. Yes.**
Q. Do you believe that they need all those things in formulating their opinions?
**A. Yes, that would be --**
Q. Honesty, integrity and objectivity.
**A. I -- I would agree with that.**
Q. Okay. Do you believe that engineers of 3M should be held to the same standard?
**A. Well I think all engineers should be held to the same standard.**
Q. Okay. Do you agree that engineers must use their knowledge and skill for enhancement of human welfare?
**A. I -- I would agree with that.**
Q. Do you agree that human safety should always come first?
**A. I'm not sure I would agree with that.**
Q. You don't believe safety should come first?
**A. If -- if a product doesn't do what it's**

**supposed to, then -- then the safety is -- is immaterial.**
Q. Okay. Do you believe, with respect to designing a medical device that goes in an operating room, that the medical device should not increase the risk of harm to a patient?
MR. GOSS: Object to form, --
**A. I --**
MR. GOSS: -- foundation.
**A. I -- I would agree.**
Q. I mean I'm not sure you're aware of this, but I'm an engineer as well, mechanical engineer, graduate from the University of Florida, and I was always taught that engineering is a profession, not just a job. You have a duty to the public. Do you agree with that?
**A. I -- I agree with that.**
Q. So engineering is -- is -- is a profession.
**A. Yes.**
Q. You have a duty to the public; correct?
**A. Yes.**
Q. And as a professor of engineering, you have a duty to teach ethical behavior to your students; correct?
**A. It's included in our curriculum, yes.**

Q. Okay. You guys actually have a class on that; correct?
**A. Yes.**
Q. And you teach your students that engineers need to be honest.
**A. Yes.**
Q. To be impartial.
**A. Yes.**
Q. To serve with fidelity to the public.
**A. Sounds like you're reading from something, but --**
**It sounds like a -- like in the ASME Code of Ethics or something. So --**
Q. And that's a code of ethics by the American Society of Mechanical Engineers; correct?
**A. That's where I thought it was coming from, yes.**
Q. And it should be applied to all engineers; correct?
**A. Yes.**
Q. Even 3M engineers; correct?
**A. As I said before, all engineers.**
Q. So you agree that 3M -- 3M's engineers should be honest, impartial, and serve with fidelity.
**A. Yes.**

Q. Okay. And as an expert in this case and as a member of ASME, you must follow engineering ethics; correct?
**A. Yes.**
Q. And to do that and to do that in formulating your opinion, you should have all the information -- reasonable information available to you in formulating your opinion; correct?
**A. I think all reasonable information, yes.**
Q. Okay. You should have all the relevant studies that were done to review before formulating your opinions; correct?
**A. All that I think are relevant, yes.**
Q. Okay. And you should have the opinions -- all the relevant studies, whether or not they're supportive or critical of the Bair Hugger in this case, correct, before formulating your opinion; correct?
**A. That would be ideal.**
Q. Well as an engineer, before you solve a problem, you have to research the problem; correct?
**A. Yes.**
Q. Okay. That -- that goes to the integrity of your opinions; correct?
**A. Yes.**

Page 101

Q. Okay. And you would expect that 3M would provide you with all the information they had available to educate you on the issues in this case; correct?
**A. That would be my assumption.**
Q. Because at the end of the day when it comes to engineering and formulating your opinion, integrity and honesty are the most important things; correct?
**A. I think personally, yes.**
Q. Well as an engineer dealing with people's lives and -- and coming to conclusions, you have to be objective, honest, and have integrity.
MR. GOSS: Object to form, asked and answered.
**A. Yeah, I -- as I say, I think I've answered that already.**
Q. And these principles we're talking about, engineering ethics, that's a required class for all mechanical engineering students at the University of Minnesota; correct?
**A. It is.**
Q. And I believe it's a required class for all mechanical engineering students at any accredited university; correct?
**A. I believe it's an ABET requirement.**

Page 102

Q. Okay. And in fact you can't become a member of the American Society of Mechanical Engineers unless you've taken engineering ethics; correct?
**A. I -- I -- I don't know about that level of detail.**
Q. Okay. You agree with me that engineers should solve a potential problem instead of ignoring it; correct?
**A. Yes.**
Q. I mean engineers are problem-solvers; right?
**A. Yes.**
Q. They're not problem-hiders. They don't hide problems, they should solve problems; correct?
MR. GOSS: Object to form.
**A. Well that's what -- what engineers are trained to do.**
Q. Okay. And if an engineer is aware of a problem, it would be unethical to try to hide it publicly; correct?
MR. GOSS: Object to form.
**A. Possibly.**
Q. That was a big issue with the Pinto, is that the engineers, they looked at it and they tried to hide it publicly instead of solving the problem because the bean counters came up and said it would be

Page 103

cheaper to pay off people in lawsuits than fix the problem; correct?
**A. I do not recall that level of detail on that particular case.**
Q. We'll get to that in a second then.
Are you aware of the Citibank case, Citibank Building?
**A. You'll have to educate me or remind me.**
Q. The Citibank Building in New York City where it was built and some graduate student came in later on and realized that if the wind hit it at a certain angle, the -- the skyscraper would fail. Does that refresh your recollection?
**A. I don't recall that, no.**
Q. Okay. Now you agree with me that there's a certain process that -- that engineers are taught when there is a problem in a design.
**A. I'm -- I'm not sure that's actually part of the education.**
Q. Okay. Well you agree with me when there is a problem in a design, the first thing to look at is to determine who are the stakeholders. Does that sound familiar?
**A. Well if there's a problem in the -- in the design, it's usually the design does not meet the**

Page 104

**expect -- expected requirements or expected outcome.**
Q. What do you teach engineers when -- of what to do when a potential problem is identified?
**A. I'm not sure I actually teach that in any of my courses.**
Q. Were you ever taught what to do if and when a problem is identified in the design that's out in the -- in the market?
**A. I do not recall that, no.**
Q. Would you agree with me that an engineer who has a potential problem identified to them should identify a potential solution before they consider the impact on potential stakeholders?
MR. GOSS: Object to form.
**A. I -- I think an engineer would look at the entire scenario and -- and determine what -- what a possible path forward would be.**
Q. So they would look at the cost of the path -- the cost of the time when they're trying to solve the problem?
**A. That would be part of it.**
Q. You think they should look at -- if there's --
If there's a product out there that has potential to injure people, that in finding a

solution, they should look at the cost of the solution; is that your testimony today?

MR. GOSS: Objection, incomplete hypothetical.

**A. Again, an en --**

**Any engineering decisions, that's -- that's always part of the final solution.**

Q. I'm not talking about the final solution, I'm talking about finding the initial solution. Should they look at the cost?

MR. GOSS: Same objection.

**A. It -- it's part of the path to the approach of the final solution. It's one of the considerations along the way.**

Q. Is that what you teach your students?

MR. GOSS: Objection, form, asked and answered.

Q. So sitting here today, you don't believe you've ever taught a case -- a class in ethics.

**A. As I said before, I've not taught -- taught a class in ethics, no.**

Q. Did you ever lecture on ethics?

**A. I think as part of a training program for graduate students, yes.**

Q. Can you elaborate on that a little bit more.

**A. Our -- our department has a separate you might call it short course for -- for providing ethics training for graduate students, and at one time I was involved in -- in that course. And it was, again, many years ago, so I don't remember the -- the details of my -- my involvement.**

Q. How long ago?

**A. Probably 15 years ago.**

Q. Okay. Would that be a 5000- or 6000-level class?

**A. No, it's a separate --**

**It -- it's not listed in the class schedule. It's a separate simply ethics required course that all graduate students must attend. Or I shouldn't say course, a training.**

MR. ASSAAD: Let's take a five-minute break.

THE REPORTER: Off the record, please.

(Recess taken.)

(Kuehn Exhibit 6 was marked for identification.)

BY MR. ASSAAD:

Q. So marked as Exhibit 6 is a PowerPoint presentation obtained from the University of Minnesota in the fall of 2010 titled "ME 4054: Ethics in Design." Do you see that?

**A. I see that.**

Q. And it says "Prof. Kuehn" at the bottom.

**A. And also was 17 years ago, which is close to my estimate of 15 years ago.**

Q. It says fall of 2010.

**A. Seven years ago. Okay.**

Q. Okay.

**A. My mistake.**

Q. Okay. Does this refresh your recollection of teaching a course on ethics in design?

**A. This course ME 4054 is a -- is our senior design course, and I apparently taught that course, it must have been in fall of 2010, and --**

Q. And --

**A. -- this was the -- looks like the set of notes I gave for that particular lecture.**

Q. And it was on ethics; correct?

**A. Yes.**

Q. Okay. I'd like you to turn to page six. Do you recall teaching your students about case study number one, the Ford Pinto in the 1970s?

**A. Apparently I must have.**

Q. Okay. And you had some group discussion items with respect to the case study of the Ford Pinto, which is the slide on the bottom of the page;

correct?

**A. Yes.**

Q. It says, "Ford knows there's a problem. What should they do?

"Group Discussion Items."

Do you see that?

**A. I -- I don't -- do not see that.**

Q. "Ford knows there's a problem."

**A. Oh.**

Q. "What should they do?"

**A. Yes, okay.**

Q. "Group Discussion Items."

**A. Okay.**

Q. And -- and this is what you're teaching your students; correct?

**A. This was a set of notes that was generic to the course that -- that I used when I was facilitating the -- the course at that time.**

Q. And you were with a bunch of other professors in that course; correct?

**A. Yes.**

Q. Okay. But you yourself taught this lecture to your students; correct?

**A. Apparently I did, yes.**

Q. Okay.

MR. GOSS: I'm just going to state an objection that he's not being offered to provide any opinions on engineering ethics. That's my objection.

MR. ASSAAD: Okay.

Q. The first one are --

The first question is "Who are the stakeholders?" What did you mean by that?

**A. I guess going back and thinking about this again, I mean I haven't looked at this for a long time, it probably would include the -- the company, the people who bought the product, and maybe other service personnel.**

Q. So basically the manufacturer and the consumers; correct?

**A. Well those would be the two main stakeholders.**

Q. So with respect to the Ford Pinto, the stakeholders would be the -- the manufacturer, Ford; correct?

**A. Yes.**

Q. The consumers that bought the Ford Pinto; correct?

**A. Yes.**

Q. As well as, if there's a car accident, other individuals that might be involved in the accident;

correct?

**A. That's -- that's potentially correct, yes.**

Q. Okay. But just to refresh your recollection, you remember the Pinto had a problem with the -- with the gas tank; correct?

**A. Yes.**

Q. Okay. And in certain rear-end collisions it could cause it to catch on fire and explode.

**A. That -- that's what I recall.**

Q. Okay. And Ford knew about this problem but decided not to do anything about it; correct?

**A. That's what I had read.**

Q. Okay. And in fact, based on this case study, I'm sure that you taught your students what Ford did was unethical; correct?

**A. Yes.**

Q. Okay. Because they put profits over safety; correct?

**A. Again --**

MR. GOSS: Object to form.

**A. Well, their approach to the problem was perhaps not as expedient as -- as might be anticipated --**

Q. They ignored the problem.

**A. -- or expected.**

Q. They ignored the problem.

**A. I can't speak for Ford, but --**

Q. Okay. Under "Group Discussion Items," number two, you teach your students "Propose as many different alternative solutions as you can think of;" correct?

**A. That's what it says.**

Q. And you agree with that; correct?

**A. Yes.**

Q. Okay. It says, "Do not assign any value or determine the implications of this proposed solution for now;" correct?

**A. That's the brainstorming part, yes.**

Q. So you find a solution and you don't take into account, at this time of -- of -- of the problem solving, the implications of cost.

**A. I believe that to be correct.**

Q. Okay. And that's ethical; correct?

**A. This is the first stage, the brainstorming-potential-problem part of the solution, yes.**

Q. Okay. So the first stage is propose solutions, you know, and not to consider cost. Agree?

**A. I would agree with that.**

Q. Okay. And this is an outline that you created; correct?

**A. I did not, actually. This was an outline provided to me by the overall course instructor for the design course that I then used in this particular lecture.**

Q. But you don't disagree with this outline; correct?

**A. I do not disagree with it, no.**

Q. And this is also taught by the American Society of Mechanical Engineers; correct?

**A. Yes.**

Q. Okay. Once you come up with a solution, you go to number three and it states, "Now try to predict each option's impact on the stakeholders;" correct?

**A. That's what it says.**

Q. So, for example, in the Ford Pinto case you look at what the cost would be to Ford as well as the effect they put on the safety of the consumer as well as other people that are on the road; correct?

**A. I would think you would include all stakeholders involved, yes.**

Q. Okay. Number four is "Determine the best possible course of action and explain the reasons for your choice;" correct?

**A. That's what it says.**

Q. Okay. And that would be a -- similar to a

cost/benefit analysis; correct?
**A. That would probably include cost, but this is more than that.**
Q. Well what else would it include?
**A. Potential time to make potential modifications, could it be done quickly or if it would take mult -- multiple years, for example.**
Q. Are you familiar with the Takata litigation?
**A. Say that again.**
Q. The Takata -- Takata/Takata litigation regarding airbags?
**A. I have heard of that. I'm not very familiar with that.**
Q. Okay. Do you know whether or not you have a Takata airbag in your car?
**A. I do not know.**
MR. GOSS: I got a notice last week.
MR. ASSAAD: Off the record.
THE REPORTER: Off the record, please.
(Discussion off the record.)
BY MR. ASSAAD:
Q. Number five states, "Are your answers to the above questions the same regardless of whom you represent? In other words, does one's response change depending on one's stake in the solution?" Did I read

that correctly?
**A. I believe you read it correctly.**
Q. When you taught that to your students, what did you mean by that?
**A. In what it says here, and I guess I would agree with that, is whether you represent the -- let's take two stakeholders, the manufacturer or the owners of vehicles, that the solution should be acceptable to both sides.**
Q. Okay. So basically, if you're a consumer that owns a Pinto, the solution should be I should have a car that doesn't blow up and catch on fire.
**A. Well the solution hopefully would be whatever -- whatever would mitigate the problem in the first place.**
Q. Okay. So you're --
If you're the consumer, you want to drive a car that's safe; correct?
**A. You want to make sure the problem that was identified had been corrected.**
Q. And by "corrected," you mean driving a safe car that the gas tank doesn't blow up.
**A. I guess I would agree with that.**
Q. Okay. And that's what you taught your students as well. You should have a car --

In this case the solution should be a car that's driven that doesn't blow up; correct?
**A. I guess one could come to that conclusion, yes.**
Q. Well what's your conclusion?
**A. Well that -- that would -- I would -- I would agree with that.**
Q. Because as an engineer you have a fidelity, you have a fidelity to the public; correct?
**A. Yes.**
Q. Go to page eight. Do you agree with respect to the Ford Pinto that Ford decided not to change the design?
**A. That -- that didn't seem to be a wise decision.**
Q. And you write down, "An internal Ford memo stated that it would be cheaper to pay off possible lawsuits for resulting deaths than recall the vehicles. A cost-benefit analysis compared the cost of a $13 repair against the monetary value of a human life." Did I read that correctly?
**A. I --**
**You read that correctly.**
Q. And you agree with me that the engineers and the people at Ford that decided to go along that

course of action, you consider that to be unethical.
**A. I do.**
Q. Go to page 14. You're familiar with the Challenger explosion; correct?
**A. Yes.**
Q. And it was a faulty O-ring, do you recall that?
**A. I recall that.**
Q. Okay. And in fact the potential for failure was identified in the failure mode and effects analysis process, but NASA management pushed for launch. Do you recall -- recall --
Do you see that at the bottom?
**A. I see that at the bottom, yes.**
Q. And you recall that; correct?
**A. I don't recall that detail at the time. Again, someone else put these notes together, so I -- I would agree that's correct.**
Q. But you were aware of the Challenger, and later on they found out that they pushed for launch even though they were aware of the possible failure of the O-ring; correct?
**A. I do recall that.**
Q. And so they ignored -- they ignored the -- the -- the potential failure and decided to go for the

launch, and that was a big criticism, and determined that that behavior was unethical according to engineering standards; correct?

MR. GOSS: Objection, form, foundation.

**A. I -- I don't -- I don't recall the engineering-ethics part, but I do recall the -- the -- the issue.**

Q. If you go to page 18 -- or 16, you teach your students, "Compromise is not an option." Do you agree with that?

**A. That's what it says, and --**

Q. That's what you taught your students.

**A. Yes.**

Q. Okay.

**A. Uh-huh.**

Q. It states, "Most engineers never encounter an ethical dilemma during your career. If you do, think it through and take advice as appropriate." Do you agree with that?

**A. Yes, I do.**

Q. And then you teach your students, "Nine of the most dangerous words in the English language are: 'If I ignore it, maybe it will go away.'" Do you agree those are dangerous words as an engineer?

**A. Yes.**

Q. And that's not something you would teach your students to do, to ignore potential problems.

**A. Not -- not if you're certainly made aware of it, no.**

Q. Okay. And then you write down, "Most large companies and organizations have an ethics or ombudsman office that allows employees to report or discuss ethics concerns confidentially." Do you know whether or not 3M has such an office?

**A. I have no idea.**

Q. You agree that lack of due diligence could create an ethical dilemma; correct?

MR. GOSS: Objection, vague.

**A. Say that again.**

Q. Lack of due diligence by ignoring something could cause an ethical dilemma.

**A. Potentially, yes.**

Q. Okay. You agree that engineers and the corporations they work for should not manipulate research.

**A. I -- I should think they would -- should not manipulate research results or research data.**

Q. Yeah. They should not manipulate the results of the data; correct?

**A. Correct.**

Q. Okay. You agree that engineers and corporations they work for should not suppress research.

**A. I think --**

**Well by suppressing research, do you mean suppressing release of information?**

Q. No. Let's put it this way: If a corporation has a product in the market and the organization or researchers want to do research on the safety of that product, you agree with me that the corporation should not suppress the research on that product dealing with the safety of the product.

MR. GOSS: Objection, incomplete hypothetical.

**A. Well I -- I would hope that would be the case.**

Q. So you agree with that statement.

**A. Yes.**

Q. Okay. You would expect a reasonable, prudent company to identify solutions to potential problems with their products; correct?

MR. GOSS: Objection, form.

**A. I would -- I would expect that.**

MR. ASSAAD: Basis.

MR. GOSS: Vague.

Q. Did you understand my question?

**A. Could you repeat it?**

Q. You would expect a reasonable, prudent corporation to identify solutions to potential problems with their products; correct?

**A. Yes.**

Q. You understood the question; correct?

**A. Yes.**

Q. And you agree with that statement; correct?

**A. Yes.**

Q. And then we just discussed before, in identifying solutions in the initial brainstorming you should not consider cost.

**A. That's what I said, and I still agree with that.**

Q. Okay. Engineers and corporations should not ignore research conducted by other scientists with respect to the safety of the company's product. Do you agree with that?

MR. GOSS: Object to form, incomplete hypothetical.

**A. I would think that would be prudent.**

Q. So you agree with that statement.

**A. Yes.**

Q. An engineer should not ignore apparent

problems; correct?
MR. GOSS: Objection, vague.
**A. Could you define "apparent?"**
Q. Well if there's a problem they're aware of, an apparent problem, they know of a problem or a potential problem, they should not ignore it.
**A. Potential problems are difficult to anticipate, so I would -- I would think they should be aware of actual problems that are brought to their attention.**
Q. So apparent. They should be --
They should not ignore an apparent problem.
**A. If they're aware of a real problem that exists.**
Q. Okay. Do you agree with me that engineers and corporations should not ignore apparent problems by dismissing or criticizing safety issues raised by peer-reviewed studies?
MR. GOSS: Object to form, incomplete hypothetical.
**A. Can you repeat that, please?**
Q. Engineers should not ignore apparent problems by dismissing or criticizing safety issues raised by peer-reviewed studies.
MR. GOSS: Same objection.

Q. Do you understand that question?
**A. I -- I think I do.**
**I think like an engineer should take those into consideration when making any -- any judgments.**
Q. Well, for example, if a study comes out and states that a company's product is defective or unsafe, a company should not ignore that study.
MR. GOSS: Objection, incomplete hypothetical.
**A. Again, if they're made aware of it, I -- I would agree with that.**
Q. Now when designing a device, engineers should take into account warnings of other similar devices that are in the market; correct?
MR. GOSS: Same objection.
**A. I think one -- I think one -- one should be aware of potential similar products --**
Q. Okay.
**A. -- and -- and issues associated with them.**
Q. And the warnings of those products given by out -- by those products; correct?
**A. Again, the --**
MR. GOSS: Objection to form and lack of foundation. I'd also object that he's not being offered to provide opinions on warnings.

You can answer if you can.
**A. Repeat that, please.**
Q. Engineers should take into account warnings of other similar devices in the field.
MR. GOSS: Same objection.
**A. If they're --**
**It depends how -- how close the other devices are to their device, and again, being aware of any issues that have resulted -- that have developed.**
Q. Well if you have a forced-air warming device made by 3M and a similar device made by another company that warns of a certain risk, the 3M engineers should be aware of the other device's warnings and determine whether or not they're typical to the device that they're manufacturing; correct?
MR. GOSS: Same objection, beyond the scope of what he's being offered to testify to.
**A. I think a prudent engineer should be aware of that, and whether that makes --**
**The decision has to be made by somebody whether it's really going to affect their product or not.**
Q. Were you provided any warnings in your review or in the formulation of your opinions with respect to other patient warming devices that are used

in the -- that are sold in the -- in the market?
**A. I may have. I can't recall.**
Q. Okay. But if you had been provided, that would be on the list of Exhibit E of Exhibit 1 of this deposition; correct?
**A. It may have just been discussions with counsel.**
Q. Okay. Well do you recall any type of warnings provided by other manufacturers, sitting here today?
**A. Not off the top of my head, no.**
Q. You agree with me that when engineers determine the safety of a device, they should not consider potential litigation.
**A. I -- I think an engineer should -- should do that, yes.**
Q. Should not consider potential litigation when determining the safety of a device; correct?
**A. I think they should make the device as safe as -- as is feasible from an engineering standpoint.**
Q. Litigation should have nothing to do with that situation; correct?
**A. I would think not.**
Q. Okay. Now my understanding is you've only reviewed three articles with respect to the Bair

Hugger -- with respect to the Bair Hugger; correct?
**A. I -- I believe that's correct.**
Q. Okay. And that is going to be the three -- the last three items on Exhibit E, correct, of Exhibit 1?
**A. Let me look at Exhibit 1 here.**
**I believe that's correct.**
Q. You have not reviewed any of the Andrew Legg studies; correct?
**A. I have not.**
Q. And are you aware that Andrew Legg did the particle testing and -- and -- on the Bair Hugger?
**A. I was not aware of that, no.**
Q. Okay. You have not reviewed the published literature by Dr. McGovern and Dr. Reed; have you?
**A. The Reed article at the very end I have.**
Q. Okay. But that dealt with the -- with the evaluation of the intake filtration; correct?
**A. Yes.**
Q. Okay. But you haven't read the McGovern article dealing with neutral buoyancy bubbles as well as infection rates; have you?
**A. I -- I do not believe so, no.**
Q. Okay. You have not read an article by Dasari with respect to temperature measurements around

the operating room or above the surgical table when the Bair Hugger was turned on as compared to when it was turned off; correct?
**A. I have not.**
Q. You have not looked at the Sessler article regarding particle tested -- particle testing in a unidirectional operating room in Holland that was actually done, conducted by 3M.
MR. GOSS: Object to form.
**A. I don't -- don't recall that, no.**
Q. You haven't read the Brandt article; correct?
**A. No.**
Q. You haven't read -- have you -- were you provided --
Have you read the Huang article on bacteria testing in an operating room when the Bair Hugger is on as compared to when the Bair Hugger is off?
**A. No, I have not.**
Q. Have you read the Moretti article, which is a similar article doing bacterial testing -- or biological testing in an operating room when the Bair Hugger is on as compared to when the Bair Hugger is off?
**A. No, I have not.**

Q. By the way, these were all peer-reviewed literature. You're aware of that; correct?
**A. If you say that. I'm not aware of the citations.**
Q. Have -- have you reviewed the letter by Farhad Memarzadeh --
MS. ZIMMERMAN: Memarzadeh.
MR. GOSS: Memarzadeh.
Q. -- Memarzadeh that was a letter to the editor of the Moretti article talking about his CFD analysis?
**A. No, I have not.**
Q. Have you --
Were you provided with an e -- an internal e-mail by 3M talking about whether or not air goes through -- gets into the system or bypasses the filter when it gets into the -- to the Bair Hugger system? Are you aware of that e-mail?
**A. I do not recall that, no.**
Q. Okay. Were you provided schematics of -- of the Bair Hugger and the tolerances of where the filter fits in, where the seat of the filter is?
**A. I do not recall seeing tolerances of the filter, filter fit or -- no.**
Q. So when you're determining whether or not

the filter is appropriate for the Bair Hugger in your opinions, you're not taking into account whether or not the filter is seated well into the Bair Hugger; correct?
**A. I've actually looked at -- at both models of Bair Hugger, the earlier one and the later one, and I've taken the filters out and put them back in, so I know what the seals are like, and in my best professional opinion they are well sealed.**
Q. So you -- so you believe -- it's your opinion that the 505 --
You looked at the 505 and the 750?
**A. I believe it was the 775.**
Q. 775, which has similar indications with the 750.
**A. Yes.**
Q. So you looked at the 505 filter?
**A. Yes.**
Q. And it's your opinion that the -- the -- all the air that goes -- that comes out of the Bair Hugger is filtered through the filter?
**A. In the 505 there's some other holes near the top of the case which may communicate between the out -- outside air and in -- inside of the case. I'm not prepared to -- to state definitively everything**

**goes through the filter.**
Q. Well if -- if air that is blown through the Bair Hugger device is not 100 percent filtered through the filter, would you agree with me that that's a design defect?
**A. Not necessarily.**
Q. Why not?
**A. Because filters are lost in other parts of the system even if they do pass the filter.**
Q. You said filter is lost in other --
**A. Par -- particles are lost in other parts of the airflow path before they leave the system through the holes in the blankets.**
Q. When you say they're lost to the air -- airflow path, what do you mean by that?
**A. They're deposited on various surfaces as they're carried along by the airflow if they were to pass the filter.**
Q. Can you -- did you test --
Did you take apart the Bair Hugger, or just took off the filter?
**A. I took off the filter.**
Q. Okay. And that's both the 750 and the 775?
**A. That's correct.**
Q. Okay. And did you test to see whether or

not there was any leakage in the 775?
**A. I did no tests for leakage, no.**
Q. Okay. Have you looked at other patient warming devices?
**A. I have not.**
Q. Have you -- have you looked at the older models of the Bair Hugger, the 200 series?
**A. No, I have not.**
Q. Have you looked at the Mistral that uses a HEPA filter?
**A. I have not.**
Q. Are you aware that other patient warming devices use a HEPA filter?
**A. I have heard that that -- that unit does.**
Q. So you're aware that the Mistral uses a HEPA filter.
**A. I -- I've -- I've been told by counsel.**
Q. Okay. Are you aware that the Warmtouch --
Are you aware of the Warmtouch device?
**A. I am not.**
Q. Are you aware that that device uses a HEPA filter?
**A. I'm not aware of that.**
Q. In your results, would you agree with me that you did not perform a -- an analysis to determine

whether or not the values that you've obtained were statistically significant; correct?
**A. I did not do a statistical analysis, that -- that's correct.**
Q. So would you agree with me that a -- a peer-reviewed article that actually did calculations to see whether the results are statistically significant have more weight than your expert report on the same issues?
**A. It really depends on the expertise of the researchers and the reviewers as to whether the methodology was correct, the results are -- are correct.**
Q. But you don't know one way or the other sitting here today; correct?
**A. Without -- without looking at the -- at actual reports and reviewing them myself, no.**
Q. And you were not provided any of those reports or literature by 3M; correct?
**A. Other than what's listed in my list, no.**
Q. Were you aware that in the older models of Bair Hugger, that they actually warned for airborne contamination when using the Bair Hugger?
**A. I was not aware of that.**
Q. Would that affect your opinions in this

case?
**A. I do not think so.**
Q. Did you re -- did you review the 510(k) application for the 505 that was submitted to the FDA?
**A. I have not seen that, no.**
Q. Would it surprise you that in the 510(k) application they actually warned, as one of the warnings of the device, that there was a risk of airborne contamination?
**A. I -- I have -- I have no opinion on that. I have not read the document.**
Q. I understand that. But would you be --
Would that affect your opinions in any way?
**A. No.**
Q. Okay. So the mere fact that 3M admits that when the Bair Hugger is on, every single study indicate more particles and that they've warned about airborne contamination in older devices as well as the 505 to the FDA, that would have no bearing on your opinions in this case.
MR. GOSS: Objection to form.
**A. Not -- not based on the -- the information I've reviewed.**
Q. And it is possible that your methodology is incorrect and the other ones are correct in --

MR. GOSS: Objection.
Q. -- in getting the results; correct?
MR. GOSS: Object to form.
**A. It -- it's possible.**
Q. I mean you did not perform any statistical analysis to see whether or not your results were even statistically significant; correct?
**A. As I said before, I did not do any statistical analysis.**
Q. You only -- you only took one temperature measurement for each of the times listed on Exhibit B; correct?
**A. That's not correct. I took multiple temperature measurements at some locations.**
Q. Yeah. But you listed the different times of those temperature measurements; correct?
**A. Yes.**
Q. Okay. And you did not --
You only did one test; correct? You didn't do this multiple times; correct?
**A. One -- one day.**
Q. One day. Okay.
By the way, who is the patient who was laying down on the -- on the -- in -- on the table?
**A. It's a mannequin. I don't remember his**

**name.**
Q. Okay. So it was a mannequin?
**A. Yes.**
Q. Okay. Now according to your results, you would not expect increased particles over the surgical site when the Bair Hugger is turned on; correct?
**A. That's correct.**
Q. You understand that particles are very important to surgeons in an operating room; correct?
**A. I would think a subcategory of particles would be if they're carrying bacteria, yes.**
Q. I understand that. But if you have zero particles, you're going to have zero bacteria.
MR. GOSS: Objection.
Q. A bacteria is a particle; correct?
MR. GOSS: Object to form.
**A. Well aerosolized bacteria is an aerosol particle, yes.**
Q. Okay. And -- and I mean even in a clean room, that's why you check for particles because you -- you know, you might not know what the particle is, but it may -- may or may not be something bad; correct?
**A. Yes.**
Q. Okay. Same thing in an operating room. You

want to reduce the --
The purpose of an operating room is to reduce the number of particles over the surgical site because that's the belief, that if you reduce particles, you're going to reduce colony-forming units over the surgical site; correct?
MR. GOSS: Object to form.
**A. That -- that's one of the intents of a clean -- of an operating room, yes.**
Q. What's the other?
**A. To maintain surfaces as -- as clean as possible in addition just to the air.**
Q. Okay. And the -- the surface of the air, you want to reduce particles because particles carry bacteria.
**A. Air can contain bacteria-laden particles, yes.**
Q. Okay. And do you agree that if an engineer is aware that the Bair Hugger device can -- has -- has a risk of airborne contamination in the operating room, it would be unethical for the engineer not to warn the doctors of the potential airborne contamination?
MR. GOSS: Objection to form, beyond the scope of his opinions in this case.

**A. Again, the engineer is working in a group, typically a design group with management, safety people. I'm not sure how much information would actually be obtained by the -- by the engineer and how the engineer would -- would know how to respond.**
Q. Well let's take it as a corporation then. A corporation --
It would be unethical for a corporation not to warn a consumer of a device of potential risks; correct?
MR. GOSS: Same objections.
**A. Depends on what the perceived risks would be and -- and how important they would be to the -- to the product.**
Q. Well, so if 3M informs the FDA that there's a potential for airborne contamination in using the device but they didn't warn the consumers, the doctors of the hospitals, of the potential risk, that would be unethical; correct?
MR. GOSS: Same objection, lack of foundation, --
**A. Again, it --**
MR. GOSS: -- assumes facts.
**A. It would depend on the level of risk.**
Q. Okay. And to understand the level of risk,

you would have to understand the requirements of the orthopedic surgeon in this case with respect to what would be a risk that would be acceptable.
MR. GOSS: Same objection.
**A. Again, I'm not sure who would make the judgment call as to what -- what risk would be acceptable or not.**
Q. Well you agree with me that engineers and -- and the corporations they work for should not hide danger from the customers that purchase their products; correct?
**A. Again, as -- as with danger, I think it would be what level of -- of danger. There is almost danger in every product, so it's a question of what -- what's sufficient to alert potential users.**
Q. And that's why we have warnings; correct?
**A. Yes.**
**(Ms. Banthia enters the deposition room.)**
MR. GOSS: Do you want to go off the record for just a second?
MR. ASSAAD: Sure.
THE REPORTER: Off the record, please.
(Luncheon recess taken.)

AFTERNOON SESSION
BY MR. ASSAAD:
Q. Are you ready to continue?
**A. I am.**
Q. Before we begin, is there anything that you want to change in your testimony that's been given to date -- given to date at this time?
**A. Not that I know of, no.**
Q. Okay. Now you agree with me that an engineer or a company should not hide relevant information from customers; correct?
**A. Well I guess it depends on what you mean by "relevant."**
Q. Well if -- if there's certain information that a customer wants regarding, say, for example, filtration efficiency of the Bair Hugger filter, 3M should not hide that information from them; correct?
MR. GOSS: Objection, form.
**A. It would de -- it would depend on whether there's competitive issues between different product manufacturers; for example, one would not want to release proprietary information that may give them a competitive disadvantage.**
Q. Are you aware of any situation where a filter efficiency used in a product is proprietary

information?
MR. GOSS: Objection to form, foundation.
**A. I -- I cannot think of anything, no.**
Q. Okay. And you agree with me that hospitals, when they use medical devices in their operating rooms, might want to know the filter efficiency of a Bair Hugger device; correct?
MR. GOSS: Objection to form, foundation. He doesn't work in a hospital.
**A. I -- I -- again, I don't -- I don't know how to answer that.**
Q. You've worked on clean rooms before; correct?
**A. Semiconductor-manufacturing clean rooms.**
Q. And actually, one of the students actually --
You worked -- worked on a case for doing numerical -- a numerical simulation of airflow and airborne pathogen transport in a -- in a operating room; correct?
**A. It may have been a patient isolation room or patient protection room.**
Q. Okay. And you're aware -- you're aware that, especially for clean rooms, that filtration and particle -- particle flow are relevant to the company

that's using the clean room; correct?
**A. That's the purpose of the clean room, yes.**
Q. Okay. And the same thing for an operating room, it's relevant information of how well the filtration is and the quality of the filters being used.
MR. GOSS: Object to form.
**A. I'm not --**
**I can't comment on all equipment in the -- in the hospital. I can comment on the filters supplying the air to the room.**
Q. But you understand --
Well how does a clean room work?
**A. Well a clean room tries to provide clean air that meets minimum requirements, and that clean air then passes through the critical areas of -- of the room and hopefully pretense -- prevents contamination.**
Q. And what would be the critical area in an op -- in a clean room?
**A. In a semiconductor-manufacturing clean room I'm most familiar with, it's the top surface of the clean bench where wafers are being processed.**
Q. Okay. And based on your work on this case, what do you consider the critical areas in an operating room?

**A. I would say the most critical area is probably the surgical zone.**
Q. What about the table where the equipment sits and the instruments?
**A. I would say that's not as important as -- as the -- the surgical site.**
Q. But you believe it's important though.
**A. I think everything in an OR should be as -- as clean as -- as minimum requirements dictate.**
Q. Now as a manufacturer of -- of the Bair Hugger device, if a customer is evaluating a device to be used in the operating room, such as the Bair Hugger, and wants to know what the filter efficiency is, do you think the company should provide that information to the customer?
MR. GOSS: Objection to form, beyond the scope of his opinions.
**A. As I said before, it depends on what the company perceives to be proprietary information and whether that -- they should divulge that or not.**
Q. Do you know whether or not 3M perceives the filter efficiency as proprietary?
**A. I cannot comment on that.**
Q. Do you know that 3M --
You've read the manual for the 775; correct?

**A. Yes.**
Q. And it states it uses a .2 high-efficiency filter; correct?
**A. I do not recall that level of detail without seeing a document in front of me.**
Q. Well in the -- you -- you work --
You've worked with ASHRAE 52.2; correct?
**A. That's correct.**
Q. And you've actually -- you actually have a test lab for ASHRAE 52.2 that meets the standards of that -- of the testing for the filtration; right?
**A. That's correct.**
Q. Okay. When you say "a high-efficiency filter," does that have any meaning in the engineering world?
**A. In terms of the filtration I'm most familiar with, which is building ventilation filtration, it means a fairly high MERV number.**
Q. When you say "high MERV number," can you give me a range?
**A. Probably 13, 14.**
Q. Okay. And when you say it's a .2 high-efficiency filter, what does that mean?
**A. I am not quite sure what that means. It doesn't relate to the ASHRAE Standard 52.2 that I base**

**most of my research on.**
Q. So you agree with me that the term "high efficiency" is meaningless without the specification of the size of the particle and the efficiency -- the filtration efficiency for that size; correct?
MR. GOSS: Object to form.
**A. That -- that would be very useful information to have.**
Q. What?
**A. That would be very useful information to have.**
Q. Well if I told you this filter here is high efficiency without knowing for what particle size I'm referring to or the efficiency level for that particle size, "high" -- "high efficiency" is meaningless.
**A. It's -- it's -- it's not quantitative, yes.**
Q. Okay. So you agree with me that it's meaningless --
MR. GOSS: Object to form.
Q. -- for people in the field.
**A. I -- I would say it's not meaningless, it's just not -- not quantified so it could be compared with another filter type.**
Q. I mean you could be high efficiency for -- for particles size -- the size of tennis balls but not

high efficiency for bacteria; correct?
**A. That's --**
**Yes.**
Q. Okay. So there's no really --
There's no information, technical information you could get from the term "high efficiency" unless you know for what particle size and the percentage of efficiency; isn't that correct?
**A. I would need that information to -- to quantify the performance, yes.**
Q. And you need to quantify it before you could deem it as high efficiency; correct?
MR. GOSS: Object to form.
**A. I would think so, yes.**
Q. So if you hear the term ".2 high efficiency," does that give you any information -- "a .2 micron high efficiency filter," does that give you any information as to what the efficiency is at .2 microns?
**A. It -- it does not give me any quantitative information, no.**
Q. Would you consider a filter that only has a 60-percent filter efficiency for -- for .2 microns high efficiency?
**A. Again, the "high efficiency" term depends**

**on -- on the size particle it's being used against and what the application is.**

Q. I'm asking you, a .2 micron filter, high-efficiency filter that only has a 60-percent filter efficiency for .2 microns, do you consider that high efficiency?

**A. It could be in other ranges of particle sizes, yes.**

Q. I'm saying for .2 micron.

**A. Well for only .2 micron, .63 seems a bit low.**

Q. When you say .63, that's what you've seen in the documents for 3M; correct?

**A. Yes.**

Q. Okay. And in fact, that is why ASHRAE came up with the MERV rating, so you could determine the efficiencies for different-size particles based on the MERV rating; correct?

**A. Yes. The MERV --**

**The Standard 52.2 was developed to determine -- to provide filter efficiency versus particle size, yes.**

Q. Because that would be important in determining what type of filter would be needed for a certain application when an engineer decides in the

design what type of filter to use; correct?

**A. That's correct.**

Q. Assuming that 3M admits that every single study performed by 3M or other researchers indicate that when the Bair Hugger is turned on it increases the particles over the surgical site, do you believe that is relevant information that a consumer of the Bair Hugger should know?

MR. GOSS: Object to form.

**A. Just saying the particle concentration is increased does not -- does not infer potential hazards; for example, biological particle-number increase.**

Q. That wasn't my question, sir. Do you believe the --

Do you agree that the consumer of the Bair Hugger is going -- is -- is --

3M knows that it's going to be used in an operating room; correct?

**A. Yes.**

Q. And the purpose of the operating room as well as the clean room is to reduce the particle counts over the critical areas; correct?

MR. GOSS: Object to form.

**A. You're saying infectious particle counts.**

Q. Yes. But infections travel on particles; correct?

**A. Yes.**

Q. Okay. And that's something relevant to people that design operating rooms and people that use operating rooms; correct?

**A. Yes.**

Q. Okay. And the fact that increased particles -- strike that.

You would agree with me that surgeons as well as hospitals do not want to increase particles over a surgical site; correct?

MR. GOSS: Lack of foundation.

**A. I -- I really don't -- I --**

**I'm not a surgeon. I don't have an opinion on that.**

Q. You agree that in clean rooms, the manufacturers that use the clean rooms do not want increased particles over the critical areas; correct?

**A. That statement is correct, because almost any particle of any size would be detrimental.**

Q. Okay. Do you know whether or not orthopedic surgeons consider increased particles over the surgical site relevant?

**A. I -- I have no direct information on that.**

**I'm not an orthopedic surgeon.**

Q. Well let's assume that orthopedic surgeons care about particles and any increase in particles over the surgical site for this question. Fair enough?

**A. We'll make that assumption, yes.**

Q. Okay. Do you agree with me that if 3M is aware that the Bair Hugger increases particles over the surgical site, that that's relevant information they should inform their customers?

MR. GOSS: Objection to form.

**A. Again, following the assumption we've made earlier, yes.**

Q. Okay. And did you ever look into the issue -- well you've never heard about the --

3M never provided any of these studies, correct, --

MR. GOSS: Objection, vague.

Q. -- regarding particle counts?

**A. None other than what I've listed in my -- in my report.**

Q. Well none of the studies listed in your report deal with particle counts over the surgical site; correct?

**A. I'd have to go back and -- and look to make**

**sure.**

Q. Well are you aware sitting here today that there are any studies --

I mean you haven't read the McGovern study; correct?

**A. That's correct.**

Q. And you haven't read any of the Legg studies; correct?

**A. That's correct.**

Q. Okay. And are you aware that 3M has done no studies internally with respect to whether or not the Bair Hugger increases particle counts?

**A. I have no information on that.**

Q. Assuming that when the Bair Hugger is turned on there is an increase in particle counts over the surgical site, does that have any relevance to your opinions?

**A. Again, as I said, increase of particles could represent a particle that has nothing to do with surgical infections.**

Q. I'm not talking about surgical infections, I'm talking about the fact that when the Bair Hugger is off there is X amount of particles and when the Bair Hugger is turned on there is X plus Y particles over the surgical site, an increase. Does that have

any relevance to your opinions today?

**A. I'd have to look at the reports and the -- and the data collected in order to evaluate whether it would be important or not.**

Q. Well what would you need to look at?

**A. I would need to look at their methodology and their data-collection techniques and -- and data reduction.**

Q. Are you familiar with TSI?

**A. I am.**

Q. Are you -- are you -- are you familiar with their particle counters?

**A. Yes.**

Q. Do you think they're accurate particle counters?

**A. When they're used appropriately and -- Yes.**

Q. Okay. And if -- you agree --

And if the setup is identically -- is identical, so the particle counter is in the same place, same setup in an operating room, the only difference is Bair Hugger off and Bair Hugger on, and you see an increase, would that -- would that affect your opinions in this case?

**A. No.**

Q. Why not?

**A. Because I don't think it has -- has a bearing on the infectious particles that are going to be causing the concern associated with this case.**

Q. But sitting --

Why do you say it doesn't have a bearing on the infectious particles? What's your basis behind that?

**A. Because an increase in particle size -- or increase in particle numbers, again not being defined at this point, could be just increases in very small particles, which is perhaps the case, with -- with nothing -- nothing correlated to hospital infections.**

Q. But you're not a hospitalist or an infectious disease expert; correct?

**A. I'm not, yes.**

Q. But would it at least indicate to you that the Bair Hugger has an effect on the HVAC system in the operating room?

MR. GOSS: Object to form, --

**A. It --**

MR. GOSS: -- calls for speculation.

**A. It may have.**

Q. Well from an engineering standpoint, I have X amount of particles with the Bair Hugger off over

the surgical site, I turn the Bair Hugger on and there is a significant increase in particles, statistically significant, --

Okay?

**A. Okay.**

Q. -- what would be the cause of that?

**A. Again, if it's a carefully controlled study, it -- it could be sole -- solely due to the Bair Hugger.**

Q. Well if the only difference is Bair Hugger off, Bair Hugger on, that's the only thing that's changed, what other cause could it be?

MR. GOSS: Objection, incomplete hypothetical.

**A. Again, it could be differences in other -- other conditions.**

Q. Well the only condition that's changed is the Bair Hugger on and Bair Hugger off. What other conditions could change in an operating room?

**A. Again --**

MR. GOSS: Object to the form.

**A. Again, the methodology used could bias the particle counts towards -- towards one size or another. So total particle counts coming into the sampler could remain the same, but their size is**

**different. That could result in different outputs from the -- from the instrument.**

Q. Have you ever heard of a DIN standard?

**A. Yes.**

Q. Have you -- have you heard of the DIN standard before today -- before getting involved in this case?

**A. Yes.**

Q. How do you know about the DIN standard?

**A. I'm -- I'm peripherally aware of it. I don't know very much about the details.**

Q. Okay. Have you reviewed the DIN standard before?

**A. I don't believe I have.**

Q. Well do you have any reason to disagree with its methodology?

**A. Not having looked at it, no.**

Q. Okay. And that's a standard that -- that evaluates operating rooms and its effect -- its protective effect of removing particles; correct?

**A. Again, not --**

MR. GOSS: Object to form.

**A. -- having read the document, I don't know.**

Q. Well assuming the study was properly done and there was an increase in particles as a result of

the Bair Hugger, is it your testimony today that that has no effect on your opinion that the Bair Hugger has no effect on the airflow in an operating room?

MR. GOSS: Asked and answered.

**A. And I think I've already answered that.**

Q. Please answer it again.

**A. I -- I -- I will stand by my opinion.**

Q. Which is?

**A. Which is the Bair Hugger has negligible influence on the airflow near the surgical site.**

Q. That wasn't -- that wasn't my question, sir. Please answer my question.

My question is: Assuming that the methodology and the peer-reviewed studies are correct and that there is an increase in particles over the surgical site when the Bair Hugger is on as compared to when it's off, are you saying, your testimony today, that it has no effect on your opinion that the Bair Hugger has a negligible effect on the surgical site?

MR. GOSS: Objection to form, calls for speculation without seeing the study.

**A. Again, I would stand by my -- my testimony.**

Q. Which is?

**A. Which is -- which is no.**

Q. Okay. So it will have no effect on your testimony.

**A. Yes.**

Q. Okay. Are you aware that 3M did not want to disclose the filtration level of its filters to its customers?

MR. GOSS: Objection to form.

**A. I -- I did not know that.**

Q. Do you think that's ethical?

MR. GOSS: Objection to form, beyond the scope of his opinions in this case.

**A. As I mentioned before, it depends on a number of factors, including any proprietary information.**

Q. You don't think a hospital has a right to know what the filtration of a filter is in a medical device that's used in the operating room?

MR. GOSS: Objection to form. He's not here to testify about anybody's rights.

Q. Is that what you're saying here?

**A. Again, I -- I -- I cannot comment on a hospital's position.**

Q. As a patient, do you think a patient would want to know whether or not a filter is fil -- filtering bacteria from a device that blows air on

their body during a surgical operation?

**A. I don't think a patient would have any idea of that, unless they're involved in the procedure somehow.**

Q. The fact that 3M admits that every study indicates that the Bair Hugger increases the particle count over the sterile -- ster -- sterile field and that they have no internal studies to refute that has no bearing on your opinion today?

MR. GOSS: Object to form.

**A. Not having seen all the studies, no, I can't comment on that.**

Q. Well this is what 3M admits in a 30(b)(6) corporate representative deposition. They admit that all the studies --

They didn't say they're incorrect. They said all the studies indicate this and they have no data to refute that. That has no bearing on your opinion today?

MR. GOSS: Objection to form, lack of foundation.

**A. Again, not having seen the data, I -- I do not want to comment.**

MR. ASSAAD: I'm not going to mark this, but can we put this on the screen?

THE VIDEOGRAPHER: Put it in front of the witness.
Q. Take a look at the highlighted area and read it aloud for the record.
**A. Okay. I'm reading what -- what it says, page 258. It says:**
**"Q. Okay. Based on the data that we have today, including the study funded by 3M as well as other studies, every single study indicates that the Bair Hugger increases the particle count over the sterile field; correct?"**
**This is A. in bold: "In absolute numbers, yes."**
**And then: "Q. Yes. Okay. And you have no internal studies to refute that; correct?"**
**And there's "A. No, we don't."**
Q. And you're sitting here today and your testimony is that as a corporate statement by 3M under penalty of perjury in this litigation, that in -- that information would have no effect on your opinion today whether or not the Bair Hugger has any effect on the airflow in an operating room.
MR. GOSS: Asked and answered.
**A. I would request to see the actual results myself.**

Q. Did you ask for the -- any data?
**A. I did not know they existed, so no, I did not ask for them.**
Q. It's not enough for you that 3M admits it in a -- in a -- under penalty of perjury?
MR. GOSS: Objection to form, asked and answered.
**A. I think I've answered that already.**
Q. So it's not important that 3M admits it to you?
Well is there anything that -- let --
Let's be honest, doctor. It's quite clear that you're finding out for the first time other studies and other information regarding the issues in this case that have not been provided to you; correct?
MR. GOSS: You can answer.
**A. Yes.**
Q. And you agree that to be objective in formulating opinions, that you should have all the studies and all the information relevant to the issues of your opinions; correct?
**A. All the information that -- that I think is important, yes.**
Q. And other studies by 3M as well as other researchers regarding the effect of the Bair Hugger on

the airflow in an operating room is relevant in this case; isn't it?
**A. Yes.**
Q. Especially ones done by 3M, which you can't even claim any bias towards because it was conducted and funded by 3M.
MR. GOSS: Objection to form.
Q. Do you agree?
**A. I agree there's -- there's no bias associated with that.**
Q. Okay.
(Kuehn Exhibit 7 was marked for identification.)
BY MR. ASSAAD:
Q. Marked as Exhibit 7 is an e-mail chain between Michelle Stevens, Mark Scott, Ms. Soria, Scott Waite, and Mark Morken.
I -- I assume, Dr. Kuehn, that you've never seen this document before; correct?
**A. That's correct.**
Q. Okay. If you want a --
Do you want a minute to review this document, or I'll just ask you some questions?
**A. Let me just quickly page through it.**
MR. GOSS: Looks like it starts on --

The first message is on page 89, the one ending in 89.
**A. Okay.**
Q. I want you to read the sentence regarding -- from Mark Morken to Scott Waite and Michelle Stevens. It states on the second line --
**A. Wait. Where are you?**
Q. First page.
Well first of all, if you look at the subject, it states "Message to address safety and efficacy of forced air warming." Do you see that?
**A. At the top of the first page, yes.**
Q. Yes. And I -- and I -- and I represent this is --
They're discussing whether or not to do the study to determine the safety and efficacy of forced-air warming in this e-mail, based on the subject.
**A. Something dealing with safety and efficacy, yes.**
Q. And the response by 3M is, "What are -- What are his findings and own data? Also we would need to really understand what type of study is being proposed. Giving -- Given the ongoing legal situation, decisions were made previously (at a high level) not to pursue clinical research work on this

topic."

**A. I see that.**

Q. Did I read that correctly?

**A. Yes.**

Q. Remember we talked about previously that it would be unethical for an engineer to -- to not do research regarding the safety of a device solely based on litigation?

MR. GOSS: I'm going to object to form on the ground that he's not offering any opinions on clinical research or research ethics or engineering ethics.

Q. Do you recall that conversation?

**A. I do.**

Q. Do you agree with me that for a company to allow litigation to -- to prevent them from doing research on the safety and efficacy of a device is unethical?

MR. GOSS: Also going to object to lack of foundation with this document.

**A. Well again, "decisions were made...(at a high level)...," I don't -- I don't see the direct correlation to any engineers there.**

Q. So if it's not an engineer it could be ethical, but if it's an engineer it could be

unethical; is that your testimony?

MR. GOSS: Same objection, it's also argumentative.

**A. I thought you were referring to engineering ethics.**

Q. Well engineers make devices; correct?

**A. Yes.**

Q. Okay. So assuming that there are engineers at a higher level, do you agree that it would be unethical to -- to not pursue research on the safety and efficacy of a device based on -- on an ongoing legal situation?

MR. GOSS: Same objections.

**A. The last sentence says, "Given the ongoing legal situation..." I'm not aware of the legal issues that would be involved in this and how that would play into the -- the decision.**

Q. It's this case. That's the legal situation. Okay?

**A. Yes.**

Q. Assume that. And assume it says "not to pursue clinical research work on this topic," and we could agree that the topic is "Message to address safety and efficacy of forced air warming."

MR. GOSS: Object to the witness's complete

lack of foundation with this issue.

Q. Do you believe such a course of action is ethical? "Yes" or "no."

**A. Again, without any information on the legal ramifications and the decisions made, I -- I really don't know.**

Q. So sitting here today, you don't know whether or not, when -- when decisions are made at a higher level not to pursue research on the safety of a device as a result of a legal situation, you have no opinion whether or not that's ethical or not, ethical based on your testimony before?

MR. GOSS: Objection, assumes facts not in evidence, in fact contrary to evidence, and lack of foundation.

MR. ASSAAD: You can answer the question.

**A. Again, I have no information on what was being discussed legally regarding this case and how that impacted their decision.**

Q. Well isn't that contrary to what you stated previously in this deposition?

MR. GOSS: Objection, form, mischaracterizes his testimony.

Q. Do you want to go to your testimony? Would that be helpful?

MR. GOSS: What's -- what's the question?

**A. Yes. What --**

Q. Remember the question I asked you: Engineers should not take into account -- oh, strike -- strike that.

Engineers, in determining the safety of a device, should not consider potential litigation, and you agreed with that statement?

**A. I -- I -- I may have.**

MR. GOSS: Improper impeachment.

**A. I -- I -- I --**

**If it was a statement I made earlier today, I would have to go back and look at the record.**

Q. Do you think your answer is different now since you've seen this document?

MR. GOSS: Objection to form, improper impeachment.

**A. I don't -- I don't think my answer would be different.**

Q. Do you remember testifying earlier that a company -- engineers and their company should not suppress research regarding the safety of a device?

**A. I believe I said that, yes.**

Q. Okay.

(Kuehn Exhibit 8 was marked for

identification.)

BY MR. ASSAAD:

Q. Exhibit 8 is an e-mail from Gary Hansen to Dave Westlin, Teri Woodwick-Sides, Jana Stender and John Rock.

Do you know any of these people?

**A. I do not, no.**

Q. Do you know who ECRI is, E-C-R-I?

**A. I do not think I know that.**

Q. I'm just going to read the first line. "Our first step with ECRI should be preventing them from doing their own testing, but rather to rely on published data." Did I read that correctly?

**A. You read that correctly.**

Q. Do you think it's good for a company to try to prevent the gaining of knowledge of devices from outside companies that want to do research?

MR. GOSS: Objection to form, I don't think that's what this sentence said, and beyond the scope of any opinions he's going to offer in this case.

**A. I -- I don't know what ECRI refers to.**

Q. And you weren't provided any documents from the defendant regarding ECRI or the history of -- of the situation with ECRI; correct?

**A. I was not.**

Q. I'm going to have you assume that ECRI is an independent organization. Do you agree -- assuming that fact, do you agree that one of the goals of 3M in this -- in -- in this e-mail is to prevent ECRI from doing their own testing?

MR. GOSS. Objection to form, lack of foundation, assumes facts not in evidence, beyond the scope of any opinions he's going to offer in this case.

**A. Well I'd -- I'd have to do some interpretation. "Our first step" with this organization that I'm not familiar with, "should be preventing them" -- I'm assuming it's the organization -- "from doing their own testing, but rely on published data," so -- so it sounds to me like they're trying to prevent ECRI from doing some -- some testing; rather, rely on published data.**

MR. GOSS: You don't have to speculate about what the document says.

MR. ASSAAD. Well the document speaks for itself I believe.

MR. GOSS: That's right.

Q. As -- as an engineer, you agree that -- well strike that.

What do you know about Dr. Sessler?

**A. Not very much I would say. I certainly don't know him personally. I've heard the name.**

Q. Are you aware that Dr. Sessler has done a lot of work in the area of normothermia?

**A. I -- I was not aware of that.**

Q. So what do you --

You've heard the name Dr. Sessler before.

**A. I think perhaps from counsel in this litigation.**

Q. So what is your knowledge of him besides knowing the name?

**A. That -- that's about it.**

Q. Are you aware that Dr. Sessler is on the advisory council for 3M?

**A. I did not know that.**

Q. Do you know what an advisory council does?

**A. Basically, yes.**

Q. What do they do?

**A. Provides advice to the company on generally broad issues, broad topics.**

Q. And companies hire advise -- advisory counsels to offer advice; correct?

**A. Yes.**

Q. Okay. Were you aware that -- that Dr. Sessler advised 3M on numerous occasions to perform

more studies on the safety of the Bair Hugger device?

**A. I was not aware of that, no.**

Q. And are you aware that 3M disregarded all the advice that Dr. Sessler has given them regarding that issue?

MR. GOSS. Objection to form, contrary to evidence.

**A. Since I'm not aware of the -- of his comments in the first place, I -- I can't comment on 3M's response.**

**(Kuehn Exhibit 9 was marked for identification.)**

MR. GOSS: Do you have another copy?

MR. ASSAAD: Oh, I'm sorry.

(Discussion off the stenographic record.)

BY MR. ASSAAD:

Q. This is an e-mail -- this is --

Exhibit 9 is an e-mail from Gary Hansen to Dan Sessler -- or an e-mail chain between Gary Hansen and Daniel -- and Dr. Sessler. Have you seen this document before?

**A. I have not.**

Q. Dr. Sessler writes to -- Dr. Sessler writes to Gary Hansen, talks about Scott's paper, and that's Scott Augustine just for the record, "We were lucky

that this was published at almost the same time as Scott's paper. We may not have warning of his next effort though. There is a very real possibility that he will do some sort of bacterial sampling study (the idea is obvious) and that the first we will know of it is a published paper. If that happens, whatever Scott reports will be un-opposed for one or two years while we do a catch-up study, analysis, and get through the publication process. Waiting much longer seems like a dangerous strategy." And I represent they're talking about doing an aerobiology study.

Do you know whether or not 3M has done an aerobiology study on the Bair Hugger?

MR. GOSS: Objection to form, foundation.

**A. I -- I have no idea.**

Q. Are you aware of any study that indicates that the Bair Hugger device -- peer-reviewed study -- does not disrupt the airflow in an operating room?

**A. Off the top of my head, no.**

Q. Have you reviewed any articles, were provided any articles of that nature?

**A. No.**

Q. Have you been -- have you been provided the compendium created by 3M for marketing its Bair Hugger device discussing all the research available?

MR. GOSS: Object to form.

**A. No.**

Q. Are you aware that 3M has manipulated studies?

MR. GOSS: Objection, form, assumes facts.

**A. I have -- have no idea. I have not seen the -- the report.**

**(Kuehn Exhibit 10 was marked for identification.)**

BY MR. ASSAAD:

Q. What's been marked as Exhibit 10 is an e-mail chain between Dr. Sessler, Gary Hansen and Russ Olmstead.

Do you know who Russ Olmstead is?

**A. I do not.**

Q. The first sentence of the top e-mail chain of the second -- the second paragraph, first sentence says, "What clinicians will want to see is basically particle counts under the three test circumstances (Off, Ambient and Warm)." Do you see that?

**A. I see that.**

Q. Do you disagree with that statement at all?

MR. GOSS: Objection to form, lack of foundation. He's not a clinician.

**A. I -- I'm not sure what clinicians would want**

**to see.**

Q. Well you've formulated your opinions to see whether or not the Bair Hugger has an effect on the sterile field in an operating room; correct?

**A. That's correct.**

Q. So I assume you have to understand what the issues in this case are; correct?

**A. Yes.**

Q. Which is the sterility of the sterile field of an operating room; correct?

**A. Yes.**

Q. Okay. So you do agree that physicians want to keep the sterile field as particle-free as possible.

**A. I would assume so.**

Q. Okay. And that's not rocket science. That's basically the issues in this case; correct?

**A. Yes.**

Q. Okay. I mean you didn't perform your study or your -- your eval -- your opinion in a vacuum. You understood the issues in this case before you performed your study; correct?

**A. Yes.**

Q. And you were sent out to prove that the Bair Hugger has a negligible effect on the sterile field in

an operating room; correct?

MR. GOSS: Objection to form.

**A. I actually determined that based on my experimental measurements from the Bair Hugger oper -- in operation.**

Q. But that was your working hypothesis; correct?

MR. GOSS: Objection to form.

**A. I was open to whatever the results were that -- that I measured in the lab.**

Q. But as a scientist, you agree that before you perform any scientific study, you usually have a working hypothesis; correct?

**A. There's usually some -- some goal that you're working towards.**

Q. Okay. What was your working hypothesis in this case?

**A. To measure the actual -- in the lab, measure the actual temperature and airflow rates out of the Bair Hugger and determine if they were significant or strong enough to go around the anesthesial -- anes -- anesthesical drape to get to the surgical site.**

Q. Okay. That's not your hypothesis, that's what you did. What was your hypothesis?

**A. My hypothesis was that the airflow delivered**

**would have negligible effect on the airflow of the surgical site.**

Q. Fair enough. So your hypothesis was that the airflow had a negligible effect, and you did your study to prove your hypothesis; correct?

MR. GOSS: Object to form.

**A. The results I think showed that to be correct.**

Q. I understand that. But now we're both engineers, we've both written papers. You have a hypothesis and then you do your study to prove your hypothesis to see if your hypothesis is correct or not; correct?

MR. GOSS: Objection to form.

**A. I -- I would say I was not -- I was not proving a hypothesis set up ahead of time. I was looking at the data that I collected and then, based on that, determining my -- my position.**

Q. So you never formulated a hypothesis before you obtained your data.

**A. I was open-minded in terms of what -- what would happen.**

Q. So the answer to my question is "correct."

MR. GOSS: Objection to form. He answered the question.

**A. I -- I did not have a goal in mind. I -- I did the measurements I -- I performed, and based on the results of the measurements, I used that to support my --**

Q. And that's --

I'm asking you: In your methodology, you did not have a hypothesis before you started taking measurements; correct?

**A. Yes.**

Q. I'll represent that Exhibit 10 is discussion between Gary Hansen and Dr. Sessler and Russ Olmstead discussing the Sessler paper of 2011 that 3M funded and performed and which was published regarding particle count using the DIN standard.

MR. GOSS: Objection to form.

MR. ASSAAD: Basis.

MR. GOSS: 3M didn't perform it. 3M definitely funded it.

Arizant funded it. Sorry. Arizant funded it.

Q. Do you see on the second line of the first paragraph, "The increase with the 635 cover on ambient or warm in Amersfoort seemed substantial, roughly a factor-of-five-to-ten?"

**A. Where -- where are you again?**

Q. First paragraph, second sentence.

**A. Okay.**

Q. "The increase with the 635 cover on ambient or warm in Amersfoort seemed substantial, roughly a factor-of-five-to-ten."

**A. I -- I think you --**

Q. Talking about particles here.

**A. Well --**

MR. GOSS: Wait for a question.

Q. Do you agree that --

Well let me ask you this: The effect that -- withdraw that question.

Since you've never read the Sessler article regarding particle counts funded by 3M, you have no idea sitting here today what actually made it into the published paper; do you?

**A. That's correct.**

Q. Do you think that if you obtained data that showed that particle counts increased on a factor of five to 10 when the Bair Hugger was ambient or warm, that is a finding that should be published in an objective, impartial study to be peer-reviewed?

MR. GOSS: Object to form.

**A. Potentially, uh-huh.**

Q. Do you think it's ethical for a company to

fund research, analyze the data, and then give it to a researcher to publish it?

MR. GOSS: Objection to form. He's not an ethicist and he's not offering opinions on ethics.

MR. ASSAAD: This whole case is about ethics.

**A. It -- it's not uncommon for a company to support research that then is sent back to the corporation prior to publication, not for changing any information per se, but there may be again some proprietary issues with something that was -- was used in the study that the company does not want released.**

Q. But if I understand you correctly, it's okay for the -- the researchers to send back the manuscript to the corporation for them to change --

MR. GOSS: Object to form, assumes facts.

Q. -- or edit?

**A. I would say edit.**

Q. So a corporation is allowed to edit the substance of a research paper that they fund?

MR. GOSS: Objection to form.

**A. Again, in my experience it's very common for a researcher who is funded by a company to have an agreement in writing before that project starts that any information release would have to be approved by**

**the -- the funding agency or the company.**

Q. I understand the release, but what about editing, editing the content of -- of a manuscript?

**A. I would say not changing the results. There may be --**

**Again, something proprietary could be in there that the company does not want released, but that should not change the overall results of the study.**

Q. Okay. So -- so you'll agree with me that a -- a researcher should not send back the manuscript to the corporation that funded the research and give them free reign to do any type of edit they want to do; correct?

MR. GOSS: Objection, form, beyond the scope of the opinions.

**A. That -- that would be my --**

**Yes, I would agree with that.**

Q. Because if it was done, that would lack integrity in that paper; correct?

MR. GOSS: Same objection.

**A. Well the original researchers would hopefully have integrity. It's a question of what happens after that. I would say that's not a -- that would be a non -- a non-ethical decision.**

Q. It would not be ethical.

**A. I agree.**

Q. Okay. Have you heard of Hybeta?

**A. I do not believe I have.**

Q. Does the fact that Dr. Sessler indicated the results show a factor of five to 10 increase in particle counts when the Bair Hugger was on ambient or on high -- or on warm, would that have any effect on your opinions in this case?

MR. GOSS: Objection, assumes facts not in evidence.

**A. Without --**

**Not without having read the article.**

Q. Okay. Going back to the last exhibit talking about the particle counts being five to 10 times, --

**A. Okay.**

Q. -- are you aware that 3M deleted that information from the final manuscript submitted for publication?

MR. GOSS: Objection to form.

**A. I have no information on that.**

Q. Would you -- would that --

If that is the case, assuming that's the case, do you agree that's unethical?

MR. GOSS: Objection to form, beyond the scope of his opinions. He's not an ethicist.

**A. Well, I would probably agree with that.**

Q. Sitting here today, do you have any understanding or -- or -- or knowledge as to why you were not provided most of the relevant peer-reviewed literature in this case?

MR. GOSS: Objection, argumentative, calls for speculation.

**A. I was given a task that was fairly narrow in scope, and that may have limited the amount of information I was given.**

Q. So your task was narrow in scope?

**A. Yes, to look -- look at primarily the filter -- filtration issues and -- and particle movement on surfaces, and transport issues.**

Q. Well you also calculated bouyancy using the Archimedes number to see whether or not there would be any effect on -- on air movement in the operating room; correct?

**A. That was in response to one of the expert reports.**

Q. So what -- what analysis did you do with respect for you to come to your conclusion that the Bair Hugger has a negligible effect on the airflow in

the operating room?

**A. Based on my measurements of the velocity leaving the blanket primarily.**

Q. Okay. So it's solely based on your Exhibit B then.

**A. Yes.**

Q. That's it.

**A. And knowledge of how operating rooms typically work with air coming down through the filters in the ceiling towards the surgical wound site and the air from the blanket being emitted, I would say, down -- on the downstream side of the surgical drape.**

Q. Okay. And we'll get to that in a little bit. But let's talk about operating rooms. So you understand that the --

Do you know what the term "environment of use" is?

**A. Yes.**

Q. Have you ever used that term before?

**A. I do not believe I have.**

Q. Have you ever heard of it before?

**A. I have heard of it before.**

Q. And would you agree with me that when designing any device, you have to look at what

environment the device is going to be used in, correct?
**A. That's correct.**
Q. And you understand that the -- the Bair Hugger is being used in an operating room as well as other areas, but it's also being used in an operating room; correct?
**A. Correct.**
Q. Okay. And have you looked at the environment of an operating room with respect to the bacterial load in an operating room?
**A. I've not personally, no.**
Q. Could you agree with me that the bacterial load, if we're talking about CFUs per meter cubed, is not uniform throughout the operating room?
**A. I would agree with that.**
Q. A certain area is going to have a higher bioburden than other areas; correct?
**A. Yes.**
Q. Could you agree with me that probably the most -- the -- the area with the greatest bioburden is probably around the surgical table?
**A. I --**
**Not having seen any data, I'm -- I'm offering speculation, so I would not have a basis to**

**agree with that.**
Q. Well will you agree that the bioburden, which is bacteria, are usually coming off of individuals, off their skin, as well as it could have been not cleaned properly before, some areas of the operating room; correct?
**A. And also coming through the filters in the ceiling.**
Q. Okay.
**A. Other --**
Q. What do you think has a larger bioburden, the air coming out of the ceiling or the air underneath the operating room table?
**A. I have no basis to make an opinion on that.**
Q. Okay. So sitting here today, you can't use your -- you can't use science and your engineering education to determine, based on the airflow in an operating room, whether or not the air coming out of the ventilation system has a greater or lesser bioburden than the air where there are a patient and three or four people standing around a surgical table.
**A. Well I -- I cannot rely on any data, but I can speculate that it would be -- the concentration would be higher under the table.**
Q. And that would be because air is blowing

down through the ventilation and it's moving the bacteria and the squames on a downward motion to the floor; correct?
**A. Yes.**
Q. Okay. So you agree with me that from engineering common sense, that the area with the least amount of bioburden is probably the air coming from the vents in an operating room.
**A. That's certainly one of the areas of low bioburden.**
Q. Okay. Have you heard the term "war games" used by 3M?
**A. No.**
**(Kuehn Exhibit 11 was marked for identification.)**
BY MR. ASSAAD:
Q. Exhibit 11 is an e-mail from Jana Stender to John Rock, and attached to it is something called "war games notes.docx." I assume you've never seen this document before; correct?
**A. That's correct, I have not -- I have not seen this before.**
Q. Were you aware -- if you look at the bottom of page two, the fifth line up -- that 3M had a concern that someone was going to do a real study on

forced-air warming and contamination?
**A. That -- that's what it says here.**
Q. Okay. Do you agree with me that, based on the information that you've been provided today, that there's no evidence that 3M performed any study to determine whether or not the Bair Hugger contaminates a sterile field?
MR. GOSS: Objection to form, lack of foundation, beyond the scope of his opinions.
**A. Nothing that I've seen today, no.**
Q. And I assume that information is not important to your opinions; correct?
**A. Not -- not based on how I developed my opinions.**
Q. So if your opinions and your calculations are contrary to peer-reviewed studies, you would still stand by your opinions?
**A. I would say some peer-reviewed studies, especially those dealing with particle measurements, are often flawed because of a poor -- poor methodology or -- or --**
Q. You're speculating though; correct?
MR. GOSS: Objection to form.
**A. Without -- well, without -- without reading them, I'm speculating, yes.**

Page 185

Q. I mean you can't sit here today and say whether or not the Legg study had poor methodology; can you?
**A. Not --**
MR. GOSS: Show him the study.
MR. ASSAAD: I'm not going to show it to him. You can show it to him. 3M could show it to him.
MR. GOSS: Well you're asking him questions about the study and he can only -- he can only speculate --
MR. ASSAAD: No.
MR. GOSS: -- if you're not going to show him.
Q. Sitting here today you cold not state --
MR. ASSAAD: I'm sorry, Dick.
Q. Sitting here today you could not state whether or not the 3M -- or the Legg study had poor methodology; can you?
**A. I cannot state that because I've not seen it.**
Q. Okay. And you --
Sitting here today, you could not say whether or not the Sessler study funded by 3M had poor methodology; correct?

Page 186

**A. Having not seen it, I could not say that, yes.**
Q. And you can't sit here today and say the McGovern study that had neutral-buoyant bubbles had poor methodology; can you?
**A. Not having seen it, no, I cannot say that.**
Q. Are you aware that Gary Hansen stated in an edit on a paper that there actually is evidence that forced-air warming increases the risk of infection?
MR. GOSS: I think she's going to correct you.
MR. ASSAAD: I'm sorry, Al Van Duren.
MR. GOSS: Object to form.
**A. I -- I -- I have not seen that.**
Q. You know Al Van Duren is still with the company 3M; correct?
**A. I -- I did not know that.**
Q. Okay. Assuming that Al Van Duren, who is upper-level management at 3M, stated, "Actually, there is evidence that forced-air warming use increases risk -- this evidence was the motivation behind Dr. Memarzadeh's work," assuming that's correct, would that affect your opinions in this case?
MR. GOSS: Objection to form.
**A. Could you repeat that again?**

Page 187

Q. Okay. Assuming that Al Van Duren, who is upper-level management at 3M stated, "Actually, there is evidence that forced-air warming use increases risk" -- and they're talking about infections -- "this evidence" -- dash "this evidence was the motivation behind Dr. Memarzadeh's work." Assuming that's correct, would that affect your opinions in this case?
MR. GOSS: Same objection.
**A. I would say no.**
MR. ASSAAD: Take a five-minute break?
MR. GOSS: Sure.
(Kuehn Exhibit 12 was marked for identification.)
BY MR. ASSAAD:
Q. What's been marked as Exhibit 12 are invoices that have been provided to me today which are your March and May invoices to Blackwell Burke; is that correct?
**A. Yes, that's correct.**
Q. And with respect to the invoices that we -- have been marked in today's deposition, that's all the invoices that you have prepared so far in this case.
**A. That's correct, February through the first of June.**
Q. Okay. On May 16th you indicate you

Page 188

"Reviewed 3M report, read ASHRAE HVAC design guide and 52.2."
**A. Yes, I believe that's what it says.**
Q. What's the ASHRAE HVAC design guide? Is that for hospitals?
**A. Yes. Yes.**
Q. Is that the 2007 I think it was?
**A. I don't remember what version it was, but --**
Q. Second version?
**A. It's probably the most recent hospital design guide.**
Q. Now let's go to your report, which is Exhibit 1. I want to go to Exhibit 1 -- Exhibit A of Exhibit 1, which is your curriculum vitae.
**A. Okay.**
Q. Is this the most-up-to-date CV available?
**A. It was when I submitted it, yes.**
Q. So back in June?
**A. I -- I don't recall when I actually submitted it.**
Q. Okay. Well your expert report is dated June 1st, so would that be when you submitted this CV?
**A. I think I may have as part of the report, yes. Yes.**
Q. Well have you consulted with anyone that's

Page 189

not on the list that you would add to the CV?
**A. Certainly not since '87, no.**
Q. Okay. Under your honors and awards you put down "Minnesota Supercomputer Institute, Associate Fellow 1994."
**A. Yes.**
Q. Is there any other supercomputers in Minnesota besides the one at the University of Minnesota that you're aware of?
**A. That's the only one I'm aware of.**
Q. Does St. Thomas have a supercomputer?
**A. I do not --**
**I'm not aware of that, no.**
Q. Okay. And you have listed here patents, you have three patents on page two. Have those all been assigned to the University of Minnesota?
**A. The first one was in -- let's see. First one was actually developed when I was at Iowa State University.**
Q. Okay. So that was assigned to Iowa State?
**A. That was assigned to Iowa State. The others are the University of Minnesota.**
Q. Okay. Now you don't hold yourself out as an expert in internal medicine; do you?
**A. That's correct, I do not.**

Page 190

Q. And you don't hold yourself out as an expert in infectious diseases; correct?
**A. That's true.**
Q. Sitting here today, you have no opinion of how many CFUs would cause a periprosthetic joint infection; correct?
**A. I'm not an expert in that area, so yes, I have no opinion on that.**
Q. Do you know the difference between a periprosthetic joint infection and a superficial wound infection?
**A. I do not.**
Q. Okay. You don't hold yourself out as an expert in orthopedics; correct?
**A. That's -- that's true, I'm not an orthopedics expert.**
Q. You don't hold yourself out as an expert in -- in nursing; correct?
**A. That's correct.**
Q. You don't hold yourself out as an expert in the manufacturing of filters; correct?
**A. Manufacturing, that's probably correct.**
Q. Okay. You don't hold yourself out as an expert in medical device design; correct?
**A. That's correct.**

Page 191

Q. You don't hold yourself out as an expert with -- with respect to medical device warnings; correct?
**A. That's correct.**
Q. You don't hold yourself out as an expert in anesthesiology; correct?
**A. That's correct.**
Q. You don't hold yourself out as an expert in patient warming devices; correct?
**A. Other than this, the work I've done here, I've -- I've not done any other work in other patient warming devices.**
Q. Do you know what other patient warming devices are out there in the market?
**A. You, I think, alluded to some earlier today, but I -- I cannot repeat their names.**
Q. Have you heard of the Mistral?
**A. Yes.**
Q. Have you heard of Warmtouch?
**A. Yes.**
Q. Have you heard of the Hot Dog?
**A. Yes.**
Q. Have you heard of VitaHEAT?
**A. I am not --**
Q. A 3M product.

Page 192

**A. I'm not -- not sure I have.**
Q. Okay. You're not an expert in operating room design; are you?
**A. No.**
Q. And you agree that an operating room is different than other areas in the hospital; correct?
**A. Yes.**
Q. It's not the same as a PACU; correct?
**A. Same as -- come again.**
Q. It's not the same as a PACU.
Do you know what a PACU is?
**A. Will you spell it out?**
Q. Post Anesthesia Care Unit.
**A. Oh. Yes, it's different, yes.**
Q. It's different than an ER -- ER triage center; correct?
**A. Yes.**
Q. Do you agree that ASHRAE has different standards for air exchanges in different types of a hospital?
**A. Yes.**
Q. Like the OR requires a different air exchange than, say, a patient's room.
**A. Right. Patient isolation room or some other room, yes.**

Q. Or regular patient room like a --
A. **Yes.**
Q. And also the filtration requirements are different for an OR than other parts of the hospital; correct?
A. **That's correct.**
Q. Okay. Because when you determine filtration for a certain room, you have to determine the environment of use of that room; correct?
A. **That's correct.**
Q. In an operation --
In an operating room, a -- a person's very susceptible to infection because he at that time is immunosuppressed because he basically has a wound that's open to the air; correct?
MR. GOSS: Object to form.
A. **I'm not aware of the details of that.**
Q. Well you agree with me that you want an operating room to be clean as possible to prevent infections of open wounds; correct?
A. **Yes.**
Q. And you don't hold yourself out as an expert in operating room airflow; correct?
A. **That's correct.**
Q. Do you know the difference between laminar

flow and turbulent flow?
A. **Yes.**
Q. Do you hold yourself out as an expert between laminar flow and turbulent flow with respect to an operating room?
A. **As applied to an operating room, probably not.**
Q. Okay. Do you know whether or not you could get true laminar flow in an operating room?
A. **I would suspect that would be highly unlikely.**
Q. You don't hold yourself out as an expert in particle flow in an operating room; correct?
A. **Not that I've worked in. I've never measured particle flows in an operating room, so I do not consider myself to be an expert.**
Q. Are you able to calculate how turbulent flow affects particle movement in an operating room?
A. **I -- I know how to do that in -- in general. I would assume it would be applied to airflow in an operating room also.**
Q. Can you do that by hand, or do you need to use the Navier-Stokes equation?
THE REPORTER: "...do you need to use" --
Q. Can you do that by hand, or do you need to

use some sort of computational modeling?
A. **For realistic applications that are fairly complex, you would need to use some software.**
Q. Okay. Such as ANSYS?
A. **Yes.**
Q. Okay. And have you ever used ANSYS or any type of computer program to determine how particles move in a turbulent environment?
A. **Yes.**
Q. When?
A. **I gave a short course for the American Association of Aerosol Research probably 20 years ago which included stochastic particle modeling, effect of turbulence, turbulent kinetic energy, and basically using Lagrange in particle tracking.**
Q. And you agree with me that you have to use Lagrange in particle tracking to actually track particles in a turbulent environment; correct?
A. **It turns out that if your particles are small enough and the airflow does not change direction very quickly, you could actually use a streamline, the time-average streamlines, and predict the most probable particle trajectory in a turbulent environment.**
Q. And when you say "small enough," usually one

micron or less; correct?
A. **Yes.**
Q. Anything larger than one micron actually has inertia; correct?
A. **As I said, it depends on the -- the direction-of-flow change. If there's no significant acceleration or direction-of-flow change, then you can actually use larger particles.**
Q. Well how large?
A. **Again, depends on the -- the direction-of-flow change.**
Q. But you agree with me that even in a filter, that particles larger than one micron do not follow the -- the -- the airflow stream; correct?
A. **Because of the -- the sharp transition of air -- air streamlines around the fibers of the filter material.**
Q. And that's when you -- you -- you collect particles by impaction during -- for larger particles; correct?
A. **That's correct.**
Q. Because larger particles have inertia; correct?
A. **Yes.**
Q. If there's a -- if there's a change in the

direction of the air stream, it's no longer going to follow -- the particle is no longer going to follow the air stream, it has inertia and will get away from the air stream; correct?

**A. And it depends on the ratio of the particle inertia and the -- the acceleration.**

Q. And in fact, when you add turbulence to the equation, that also affects the airflow when the intensity of the turbulence increases; correct? Or particle movement.

**A. Yes, it definitely affects particle movement.**

Q. Okay. You could have a general air stream, but once you add turbulence to that air stream, you really can't use the -- the mean average with respect to particle movement any more because you have turbulence.

**A. That would still be the most probable particle path. The turbulence dispersion would be about that streamline.**

Q. Okay. Do you have any articles to support that opinion?

**A. I'm -- I'm trying to think if -- if we published something like that back in the early 1990s, and I -- I'd have to go back and look at my**

**publication record.**

Q. And there has been a lot of advancement in computational fluid dynamics software since the 1990s; hasn't there?

**A. Yes.**

Q. More-powerful computers; correct?

**A. Yes.**

Q. The technical limitation is actually the computer.

**A. That's probably correct.**

Q. Might be other limitations, but the most significant limitation in performing these calculations are the ability of computers to actually computate all the data.

**A. It's -- it's the refinement of the grid essentially.**

Q. When is the last time you constructed a grid for a CFD analysis?

**A. Personally?**

Q. Yes.

**A. Probably -- it's been probably about 20 years ago.**

Q. You've read Elghabashi's expert report; correct?

**A. I have.**

Q. Do you agree that Elghabashi is an expert in particle movement?

**A. I would say he probably is, yes.**

Q. Are you aware that --

You also looked at his deposition, correct, Dr. Elghabashi's deposition?

**A. I -- I was given his deposition. I did not have a chance to read through it.**

Q. Are you aware that he's doing work for the military with aircraft-carrier design?

**A. I was not aware of that.**

Q. Okay. Are you aware that he has access to the military supercomputer that most people don't have access to?

**A. I was not aware of that.**

Q. Are you aware of the military supercomputer that the military uses for aviation?

**A. Not specifically, no.**

Q. Are you familiar with the Navier-Stokes equation?

(Discussion off the stenographic record.)

**A. Yes.**

Q. If I asked you to write the equation out, could you do that today?

**A. I could probably give it a good -- good**

**shot.**

Q. So the answer to that would be maybe, but not -- you're not a hundred percent sure you could do it.

**A. I -- I'm probably 90 percent sure I could do it.**

Q. Could you write out the boussinesq approach with -- incorporating that into the Navier-Stokes equation today?

**A. I could probably do that.**

Q. Have you reviewed the videos of Dr. Elghabashi regarding his CFD analysis?

**A. The videos, no.**

Q. Did you ever consider doing your measurements with a PIV?

**A. Which -- which measurements?**

Q. The measurements you did for Exhibit B with a --

Do you know what a PIV is?

**A. Yes.**

Q. What's a PIV?

**A. Particle Image Velocimetry.**

Q. And that's the most accurate way to measure velocity of the air today; correct?

**A. It's a non-intrusive method. It's also a**

**very expensive piece of equipment and requires a lot of data -- data analysis.**

Q. Did you consider using that in your analysis?

**A. No, because of the --**

**I wasn't sure I had avail -- that type of instrumentation available to me and how much effort it would require to set it up and -- and reduce the data.**

Q. And it's very expensive.

**A. And it's very expensive, yes.**

Q. Could be in -- in -- in the millions.

**A. I don't think it's quite that much, but certainly hundreds of thousands.**

Q. Okay. Did you ever consider using ANSYS to model the Bair Hugger in an operating room?

**A. I did not really consider that. I really have not done CFD work myself for -- for many years.**

Q. But you consider yourself an expert in CFD.

**A. I -- I know the protocol, the limitations, yes.**

Q. What are the limitations?

**A. Limitations are associated with time steps, with grid resolution, with the turbulent model that you use if you're using a turbulent model, surface conditions, any thermal bouyancy involved. And of**

**course particle modeling adds another way of complexity.**

Q. Do you think you're capable sitting here today to perform a CFD analysis, without anyone else's help, on an operating room?

**A. It would take me quite a while to go back and review the manual and get up -- up to speed. I could probably do it, but it would take me quite a while.**

Q. So you'll agree with me that with respect to computational fluid dynamics in the present, you're not an expert in it as of right now.

**A. In terms of actually personally performing the results, --**

Q. Yes.

**A. -- no.**

Q. So you'll agree that you're not an expert at this point in time in your career.

**A. In terms of analyzing other people's results, I think I am. In terms of generating my own results, no.**

Q. Do you know the difference between a RANS model and an LES model? R-A-N-S and L-E-S.

**A. It's been a long time since I've thought about that, but it's Reynolds Averaging Navier-Stokes**

**versus Large Eddy Simulation.**

Q. When you performed CFD analysis, did you ever use LES?

**A. I did not personally. It was the Reynolds Averaging.**

Q. Okay. And -- and the purpose of the boussinesq and the RANS is to reduce the computational time when you use computational fluid dynamics; correct?

**A. That's correct, using a simplified set of equations.**

Q. Okay. When was the first time you saw a Bair Hugger?

**A. Probably in the -- the office, maybe in March or April.**

Q. Okay. And which Bair Hugger model was it?

**A. I believe it was the -- we may have looked at both the 505 and the 750 or 755, or --**

**There was an earlier version and at least one of the later versions.**

Q. Okay. Going -- going back, and I might have asked you this before, you haven't seen Abraham's report; correct?

**A. I have not, yes.**

Q. Okay. So you haven't seen whether or not he

used R -- RANS or LES or the type of turbulent modeling.

**A. Having not seen his report, I have no idea.**

Q. Would you agree that when you -- when you model an operating room and you have people in it as well as lights and the flow is not turbulent -- or the flow is turbulent, that you should have some sort of turbulent modeling in your CFD analysis?

**A. It depends what your ultimate objective is.**

Q. To follow particles.

**A. As I said before, if the streamlines had not changed direction very rapidly and the particles are small enough, they would simply follow the time-average streamline without using a turbulence model.**

Q. Okay. When you say they're not -- they don't change direction very rapidly, what would that mean? What does that mean to you?

**A. I -- I go back to impactor technology where you're purposely trying to extract particles from the airflow by changing the direction very rapidly, and so it depends on the velocity of the particle and -- and the -- well basically the velocity of the particle heading towards the surface, so impaction technology.**

Q. Are you saying the change of airflow like 90 degrees, or are you saying five degrees, three

degrees?

**A. It -- it --**

**Really, it depends on the rate of change of airflow, the -- the acceleration I would -- I should say, perpendicular to the mean flow direction.**

Q. And in analyzing --

And in determining whether or not to use a turbulent model in the CFD, how do you determine whether or not you should assume that the particles travel along the air streams or not?

**A. Again, depends on whether your flow is essentially unidirectional or there's a lot of accelerations associated with it, and -- and the directional changes.**

Q. Well you agree with me that when you have obstructions such as the patient, surgeon, table, lights, you're going to have significant changes in the airflow direction when the air hits that; correct?

**A. Yes.**

Q. Okay. Knowing what an operating room is, do you agree with me that you should have some sort of turbulence modeling in an operating room if you're going to have a -- a valid CFD analysis?

MR. GOSS: Objection.

**A. I think that would be the most appropriate,**

**but I wouldn't necessarily start there.**

Q. Well it would be the better approach.

**A. Actually, I would start with the first approach of a time-averaged laminar-flow approach and then do analysis on that and then see what would need to be changed to -- if you -- if one would -- if one needs to go to a turbulent approach.**

Q. Why would you use a laminar-flow approach when you -- when we just discussed that most likely the air in an operating room is not laminar?

**A. It's -- it's a much easier, straightforward, simpler code to run.**

Q. But it's not accurate.

**A. It's not as completely accurate as -- as a fully turbulent model, that's correct, but it's a good starting point.**

Q. When you first saw a Bair Hugger, did you take it apart?

**A. The first time, no, I don't think I did.**

Q. Well did you ever take apart the Bair Hugger and look at the internal components?

**A. The only thing I've taken apart is the -- the filter in the -- the bottom.**

Q. Do you believe that the Bair Hugger is a sterile device internally?

**A. I -- I have no knowledge of that.**

Q. Okay. So you, sitting here today, you have no opinion on whether or not there's any -- whether or not the Bair Hugger hose harbors contaminants or bacteria.

**A. I would say it probably does.**

Q. Okay. Do you understand the plaintiffs' claims in this case?

**A. Not -- not without hearing them again very explicitly.**

Q. What's your understanding of the mechanism of injury the plaintiffs claim in this case?

**A. I think the plaintiffs are claiming that the Bair Hugger increases surgical-site infections.**

Q. In what way?

**A. By providing --**

**Could be disturbing airflow near the surgical site, it could be providing additional particles into the surgical site.**

Q. And how would those particles get to the surgical site?

**A. If they're airborne, they have to be convected there.**

Q. Excuse me?

**A. If they're airborne, they'd have to be**

**convected there.**

Q. By conduction?

**A. By convection.**

Q. And do you know what pathway the par -- the plaintiffs allege that particles get to the surgical site when the Bair Hugger is on?

**A. Not specifically, no.**

Q. Okay. Did you make any assumption in -- in formulating your test or testing?

**A. Assumptions of what the plaintiffs' arguments are?**

Q. Yes.

**A. None other than -- than maintaining as -- as clean a wound area as possible.**

Q. You agree with me that the Bair Hugger produces more watts of energy than any other device in the operating room; correct?

MR. GOSS: Objection, lacks foundation.

**A. I -- I'm not aware of what other equipment would -- what -- what the heat loads of other equipment in the operating room would be.**

Q. On page 11 of your report you indicate, "As the Bair Hugger uses the power to provide heat, it may be the most energy intensive piece of equipment in the OR."

Page 209

A. **That's what I said, yes.**
Q. So you agree with me that --
Well do you mean "the most intensive energy piece," like it absorbs the most en -- uses the most energy?
A. **Uses the most energy, yes.**
Q. Okay. To create heat, which is energy; correct?
A. **Yes.**
Q. Okay. Are you aware of any other device in the OR that produces more watts of heat around the patient than the Bair Hugger?
A. **No, I'm not aware of that.**
Q. When the Bair Hugger exits the blanket, did you determine where most of the heat goes?
A. **When the Bair Hugger exits the blanket?**
Q. When the heat -- I'm sorry. When the heat of the --
When the Bair Hugger blows and heat exits the blanket, you know, the Bair Hugger blanket --
A. **Yes.**
Q. Okay. By the way, do you know what type of blanket you used in your testing?
A. **It was an over -- over-body blanket.**
Q. Was it the 522?

Page 210

A. **I don't remember the exact number.**
Q. Okay. Did you inspect the blanket or study the blanket in any way?
A. **It was installed before I arrived. I looked at the entire installation.**
Q. Who installed it?
A. **Two nurses.**
Q. What nurses?
A. **I was told nurses from 3M.**
Q. 3M has in-house nurses?
A. **That was what I was led -- led to believe.**
Q. So sitting here today, you don't know how the setup was -- what was under the drapes?
A. **I didn't remove the -- the drape to look underneath, no.**
Q. Have you seen the -- have you seen the Bair Hugger upperbody blanket by itself?
A. **Yes.**
Q. And did you look at how many perforations occur or how many are on the blanket?
A. **A lot of them.**
Q. How many?
A. **I -- I couldn't hazard --**
**I don't want to hazard a guess. It's a lot of holes.**

Page 211

Q. Over 10?
A. **Oh, yes.**
Q. Over a hundred?
A. **Probably.**
Q. Over a thousand?
A. **Maybe.**
Q. Okay. When the Bair Hugger --
Do you know what position the patient was in when you did your testing?
A. **It was set up to be a -- a hip surgery.**
Q. Okay. So the patient was to the side.
A. **Yes.**
Q. Okay. And how was the Bair Hugger blanket on the patient?
A. **It was wrapped around his upper body so his head was protruding at -- at one end, and a blanket over the whole thing, and then there was an anesthesia drape over that.**
Q. Okay. And how far did the drape go down?
A. **The photographs in my report would -- would show that.**
Q. Are all the photographs taken are in your report?
A. **I believe so, yeah.**
Q. So there are no other photographs that you

Page 212

took.
A. **No.**
Q. Okay. Who took the photographs, you or Mr. Goss?
A. **It was either Peter or Vinita.**
Q. Is that Vinita right there?
A. **Yes.**
Q. Okay. So you go to 3M, okay, to do this testing, and when you get there it's already set up; correct?
A. **That's correct.**
Q. Okay. And where in 3M was this testing, what room?
A. **It was in a lab room. I don't remember the exact room number or building number.**
Q. Was it a simulated operating room?
A. **No, it was not an operating room.**
Q. Okay. How big was the room?
A. **It was roughly maybe 12 feet wide by maybe 15 feet deep with maybe a nine-foot ceiling.**
Q. Okay. And how many doors to this room?
A. **Just one.**
Q. Okay. And so you get there and it's already set up; correct?
A. **Yes.**

Q. So you don't -- you don't know in what position the -- the blanket is in, the -- the Bair Hugger blanket; correct?
**A. Other than looking at the edges that are sticking out from the blanket above.**
Q. Okay. Was it laid all the way across the patient?
The patient wasn't like in the crucifix position; was he?
**A. No. No.**
Q. Okay.
**A. Laying --**
Q. Patient was to the side; correct?
**A. Yeah. Yeah.**
Q. Was the blanket -- was the blanket wrapped around like in a -- in a -- circular over the patient, was it only over -- was only half the blanket over the patient, do you know?
**A. It was over the entire upper body of the mannequin and then it draped down somewhat on both sides.**
Q. Well if the patient's to the side like this, was there part of the blanket that didn't cover the patient, if you know?
**A. I'd have to go back to the photos to look.**

Q. Feel free.
**A. Okay. I guess the first and last photos show the majority of the blanket setup.**
Q. I don't see the Bair Hugger in any of these blankets. Can you tell me how you can look at photos -- the first page and the last page of pictures --
Well, the last page is a picture of the Bair Hugger on a -- on a -- on a stand. Are you talking about the second-to-last picture?
**A. I think it was second-to-the-last, yes.**
Q. Okay. So it's clear from the -- the picture that is entitled "3 Inches Over Hip," you can't see the Bair Hugger blanket in this picture; correct?
**A. Probably not.**
Q. Well "yes" or "no?"
**A. I -- I -- I cannot see it, no.**
Q. Okay. So you can't see the blanket in this picture; correct?
**A. Except perhaps maybe over my hand. That may be part of the blanket coming down on one side.**
Q. You think the Bair Hugger blanket is coming over your hand?
**A. Behind, behind my hand. If you look at the top of my hand and -- and what's behind my hand, that**

**appears to be part of the blanket coming down on one side.**
Q. Can you circle that for me on that report where you see the Bair Hugger blanket.
MR. GOSS: I think you're looking at different pictures.
MR. ASSAAD: I'm looking at the one that says "3 Inches Over Hip."
MR. GOSS: Yeah.
THE WITNESS: Yeah. And I'm --
MR. GOSS: So he --
MR. ASSAAD: Wait, wait, wait. I don't want any instruction here. I don't want any coaching.
**A. I'm referring to this.**
Q. Okay. I'm talking about the one that says "3 Inches Over Hip," the second-to-last picture of Exhibit B. That picture right there. You just passed it. See where it says "3 Inches Over Hip?"
**A. Yeah.**
Q. Do you agree that you can't see the Bair Hugger blanket in this picture?
**A. I agree with that.**
Q. Okay. Wanted to make sure.
So you're looking at the first page where it says "3 inches from blanket edge."

**A. Yes.**
Q. Okay. And where do you see the Bair Hugger blanket?
**A. Just to the --**
**I'll circle it here.**
Q. Circle it, please.
**A. (Complying.) Okay.**
Q. Can I see Exhibit 1, please?
(Exhibit 1 handed to Mr. Assaad.)
Q. Okay. Fair enough. And I -- I see what you're -- you're pointing to.
Now you can't see how this blanket is set up underneath, what part of the body it's covering; correct?
**A. Not except for where it's extending out under the blanket.**
Q. Do you know whether or not the Bair Hugger blanket was taped down to the patient?
**A. I assume it was.**
Q. I'm not asking you to assume anything. I don't want any guesses.
Sitting here today, do you know whether or not it was taped down or not?
**A. I did not investigate that, no.**
Q. Okay. I mean this is your experiment;

correct?
**A. Yes.**
Q. You're the doc --
You're the engineer; correct?
**A. Right.**
Q. You're in charge. You got to make sure that everything is done properly because you're relying on the setup to conduct your testing; correct?
**A. That's correct.**
Q. You did not check to see whether or not the Bair Hugger blanket was taped; did you?
**A. I did not.**
Q. Okay. So sitting here, focused, you cannot tell me whether or not air is escaping downward of the body as compared to coming out of, like, the head or the arms; correct?
MR. GOSS: Object to form.
**A. Not having checked the taping, that -- I cannot guarantee that.**
Q. Do you know whether or not the taping actually sticks well to a mannequin?
**A. I -- I do not know that.**
Q. That would be something important to know; wouldn't it?
**A. It would be useful, yes.**

Q. Yeah. Because you might actually have leakage of air going where it doesn't happily -- doesn't normally go during normal operation; correct?
MR. GOSS: Objection, form.
**A. It's possible.**
Q. And it could affect your results; correct?
MR. GOSS: Same objection.
**A. Potentially.**
Q. Did you talk to these nurses at all that set up the operating room?
**A. I did not.**
Q. Okay. So sitting here today, you don't even know their names; do you?
**A. I do not know their names.**
Q. Did you write their names down anywhere on your -- on your pad?
**A. No, because I do not know their names.**
Q. You relied on 3M to do the setup; correct?
**A. Yes.**
Q. Okay. The same -- the same attorneys that provided you the plethora of information that's out there; correct?
MR. GOSS: Objection, argumentative, asked and answered.
Q. And I assume you never measured the

temperature of the air coming out of the -- out of the holes, correct, the perforations?
**A. That's correct, I did not do that.**
Q. Okay. Would you agree with me that the air coming out of the perforations is roughly 40 to 41 degrees Celsius?
**A. That sounds much higher than what I was measuring right near the discharge of the air coming out the edge of the blanket.**
Q. Well let's talk about heat transfer for a second.
By the way, what's the first law of thermodynamics?
**A. First law of thermodynamics is conservation of energy.**
Q. Energy is neither created or destroyed; correct?
**A. Yes.**
Q. Heat transfer is a transfer of heat from a higher heat content to a lower heat content; correct?
**A. Higher temperature to a lower temperature.**
Q. Yes. You're not going to transfer heat from a -- you know, from a lower temperature to a higher temperature. Heat transfer goes from highest to lowest; correct?

**A. Yes.**
Q. That -- that's a fundamental engineering principle; correct?
**A. Yes.**
Q. Okay. What's the temperature of a human body?
**A. Skin temp --**
**Well core temperature and then there's skin temperature.**
Q. Just skin temperature.
**A. Skin temperature really depends on clothing and the environment.**
Q. Well what's the core temperature?
**A. Core temperature is averaged around 98.6 Fahrenheit.**
Q. Which would be what in Celsius? Thirty-six and a half?
**A. That sounds reasonable, yes.**
Q. Okay. So you agree with me that to warm a patient, the temperature has to be above 36.5 degrees Celsius.
**A. Not necessarily, because the skin temperature could be much lower than that.**
Q. Well what do you think the skin temperature is?

Page 221

A. **As I said, it depends on -- on clothing and -- and the ambient environment.**
Q. So if 3M has done research and done studies and indicated the temperature coming out of the Bair Hugger blanket is between 40 to 41 degrees Celsius when a Bair Hugger 775 is used on a 522 blanket, would you disagree with that?
A. **Say that again.**
Q. Would you dis -- would you disagree with 3M's own studies that indicates that the temperature coming out of a Bair Hugger blanket from the perforations when a 775 blower is used and a 522 blanket is used is between 40 to 41 Celsius, would you disagree with that?
A. **If that's their measurements, I would not disagree with that.**
Q. Do your measurements reflect that?
A. **My measurements were taken at a different location.**
Q. Okay. So sitting here today, you have no idea what the temperature out of the blanket -- the air temperature out of the blanket is.
MR. GOSS: Objection to form.
A. **I -- I do in the locations that I measured.**
Q. I'm talking about right directly out of the

Page 222

blanket. You don't know what that is; do you?
A. **There was a discharge right out of the blanket right near the first figure where I'm measuring the temperature and velocity.**
Q. That's three inches from the blanket edge; correct?
A. **Yes, I think that's right.**
Q. Okay. And you measured it at, when the Bair Hugger was off, at 66.2 degrees; correct?
A. **Yes.**
Q. Okay. Now let's talk about this room some more. Okay? Did the room have ventilation?
A. **Yes.**
Q. What was the ventilation?
A. **It was provided through a ceiling supply and ceiling return.**
Q. Okay. One ceiling supply, one ceiling return?
A. **It was a -- a slot supply at one end of the room and a slot return at the other.**
Q. Okay. Was it positive pressure or negative pressure or neutral pressure?
A. **I did not measure that.**
Q. Well wouldn't that be something important to know?

Page 223

A. **Not necessarily, because if -- if -- unless there was significant leakage between the room and the surrounding areas.**
Q. Well can we assume that there was no leakage?
A. **That would be a good assumption.**
Q. Okay. What was the temperature of the walls?
A. **Temperature of the walls were probably near the initial temperature when we started the test, so --**
Q. Sixty-six degrees?
A. **-- probably about 66.**
Q. Okay. What was the temperature of the -- was --
Was it an operating room table that was used?
A. **I believe so, yes.**
Q. They actually had a real operating table in this random room at 3M.
MR. GOSS: Objection to form.
A. **Well what -- what do you mean by "real operating table?"**
Q. Did you see the table, or was it covered with drapes?

Page 224

A. **It was covered with drapes.**
Q. So you don't know what was underneath; do you?
MR. GOSS: Objection to form.
A. **Not --not really.**
MR. ASSAAD: Basis.
MR. GOSS: Well, it was set up by nurses, so he's assuming that they set it up in a way they would have done for a real operation. That's my basis.
MR. ASSAAD: Do you have a legal -- do you have a legal basis?
MR. GOSS: You're -- you are -- you are expressing the idea that he knew absolutely nothing. He's not a nurse. He relied on the nurses to set everything up and use the proper equipment.
Q. So you relied on --
MR. GOSS: That's my basis.
Q. You relied on nurses; correct?
A. **Yes.**
Q. Nurses you don't know; correct?
A. **Yes.**
Q. Nurses hired by 3M; correct?
A. **Probably, yes.**
Q. They were 3M nurses; correct?
A. **I do not know who they were.**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Q. I mean does 3M have a hospital inside its facility?
**A. Not that I'm aware of.**
Q. Okay. Do you know if any of the attorneys were involved in the setup?
(Discussion off the stenographic record.)
**A. I don't think so. I think we met there together.**
Q. How did you get into the building? Did you meet Mr. Goss and his associate at -- at the front of the building?
**A. Yes.**
Q. Okay. Do you know whether or not Mr. Goss or his associate was involved in the setup?
**A. I do not know that.**
Q. You agree that people emit energy that -- or heat in a -- in a room; correct? The heating load.
**A. People give off energy, yes.**
Q. Okay.
**A. Yeah.**
Q. That's why people --
If the room is really crowded, if you get really warm, you have to turn up the air conditioning; correct?
**A. Yes.**

Q. To increase the cooling load; correct?
**A. Right.**
Q. Okay. Do you agree that the setup that you have here is not similar to what actually occurs in an operating room?
**A. I would agree that the room configuration is not a typical operating room, yes.**
Q. Well you don't have surgical lights; correct?
**A. Yes.**
Q. You don't have surgeons and -- and an anesthesiologist around the surgical table; correct?
**A. Right.**
Q. And you agree that's going to affect airflow as well as turbulence as well as heat transfer; correct?
**A. Yes.**
Q. Okay. Now did the room have its own thermostat?
**A. I believe it did.**
Q. Well "yes" or "no."
**A. Yes.**
Q. Okay. Did you change the thermostat at all during the -- during the testing?
**A. Yes.**

Q. You did?
**A. Yes.**
Q. What did you change it from?
**A. Increased it, I don't remember the exact number, from -- it may have been set something like 65, maybe up to 70, something like that.**
Q. Why did you change it?
**A. Just seemed to be extremely cold in there.**
Q. Did you change it in the middle of the test or before the testing?
**A. Before the testing.**
Q. Okay. How much longer before the testing?
**A. Maybe a half hour.**
Q. Half hour. Okay.
So by the 30 minutes, the room should have been at equilibrium; correct?
**A. That's a good assumption.**
Q. Okay. So if you changed it to 70, okay, why am I seeing results of 66.6 degrees here?
**A. It -- it may have just taken -- taken longer than I --**
Q. You just told me it was at equilibrium.
**A. Well may -- maybe it did not reach equilibrium yet.**
Q. We don't know. We could --

So now we don't know if these numbers are correct; do we?
MR. GOSS: Objection to form.
**A. The numbers are -- are correct as I measured them in the location I measured them.**
Q. Well now add another variable. You added -- you changed the room temperature.
**A. Yes.**
Q. You then -- now --
You said it was at equilibrium and now you're saying it might not be at equilibrium. Which one it is, doctor?
MR. GOSS: Wait for a question.
Q. Which one is it?
**A. May not be in equilibrium.**
Q. Okay. So now you have a variable that you're not accounting for in your results; isn't that correct?
**A. Yes.**
Q. And you call that good engineering?
MR. GOSS: Objection to form, argumentative.
**A. If I had more time to develop a better test method, I would probably take that into consideration.**
Q. Well are you saying this is not a good test method?

Page 229

**A. It -- it was set up to do some temperature and flow measurements leaving the Bair Hugger blanket, primarily, and entering the Bair Hugger filter.**

Q. That wasn't my question. Is this a good test method, "yes" or "no?"

**A. Yes.**

Q. Okay. So you have an operating room that's not at --

You have a room that's not at equilibrium; correct?

**A. Yes.**

Q. You don't know how the Bair Hugger is set up underneath the blanket; correct?

**A. Yes.**

Q. Okay. You have --

You changed the temperature at some point because you were cold; correct?

**A. Yes.**

MR. GOSS: Objection to form.

Q. Okay.

MR. ASSAAD: Basis.

MR. GOSS: He didn't say because he was cold.

Q. Why did you change the temperature then?

**A. I'm not sure I actually feel like I did**

Page 230

**change the temperature.**

Q. Who did?

**A. May have been one of -- Peter or -- or Vinita.**

Q. I mean we have the law of thermodynamics. We're not going to break that law; correct?

**A. Right.**

Q. Okay. You have the temperature coming out at 70 degrees; correct? Seventy-two degrees.

**A. Seventy-two degrees from what?**

Q. It's coming out the diffuser.

**A. It -- it may take a while for the thermostat to --**

**Well, it may take a while for the air to reach the temperature that the thermostat is set at.**

Q. But you have the diffuser air coming out at 72 degrees and you did that 30 -- 30 minutes before you started taking these tests; correct?

**A. That's what I recall.**

Q. Okay. And the room is only 12 by nine; correct?

MR. GOSS: Objection.

**A. Roughly 12 by 15 but with a nine-foot ceiling.**

Q. Nine feet high.

Page 231

What's that volume?

**A. I'd -- I'd have to calculate it.**

Q. Are you sure about those numbers?

**A. I'm not absolutely certain.**

Q. Wouldn't that be important to know?

**A. If I was looking at air-change rate, yes.**

Q. So you're looking at about 10,000 cubic feet. Does that sound about right?

**A. That's probably about right.**

Q. Eleven thousand.

Do you stand by these numbers, doctor, in Exhibit B? Are they accurate? Are they reliable?

**A. Based on the test configuration we had or the conditions, yes.**

Q. Well doctor, let's go to page -- the one that says "3 Inches Over Hip."

Well before we get to that, let's go to the last page of Exhibit B. That's the calibration by TSI of the device; correct?

**A. The very last page, yes.**

Q. Okay. And on May 8th, 2017, this device was calibrated; correct?

**A. That's what it says, yes.**

Q. Okay. And you -- you -- you agree with this, that the device used was calibrated; correct?

Page 232

**A. Yes.**

Q. Who provided the device?

**A. Device was provided by 3M.**

Q. Okay. So 3M provided the device and 3M provided the room and 3M provided the setup; correct?

**A. Well that's my understanding.**

Q. Okay. Whose idea was it to do this testing?

**A. I think it was mine.**

Q. Okay. Why didn't you do it at the University of Minnesota?

**A. I am no longer a faculty member there, I'm retired, so I did not have access to a facility.**

Q. Okay. Let's go to the page that says "3 Inches Over Hip" where it was "Under linear slot diffuser air supply on ceiling (Front) - half inch from supply." Do you see that?

**A. Wait a minute.**

Q. It's the pic -- it's -- it's the picture --

**A. Oh.**

Q. You measured the temperature coming out of the air supply; correct?

**A. Yes.**

Q. And this was done 30 minutes --

You changed the temperature 30 minutes before you started doing any testing; correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 233

**A. That -- that's my recollection.**

Q. I mean that's an important fact when you're going to start taking temperature measurements, that you actually changed the temperature of the air supply; don't you agree?

**A. Yes, it would be important to document that.**

Q. Very important. Is it documented anywhere in your report?

**A. No.**

Q. Okay. So we see, depending on where you're measuring, you see anywhere between 330 feet per minute to 1550 feet per minute; correct?

**A. That's correct.**

Q. Are those numbers accurate?

**A. I believe they -- I believe they're accurate.**

Q. Okay. So you tried --

In the same diffuser, you're getting a range of 330 to 1550 feet out of the same duct.

**A. There are actually three separate diffusers end to end.**

Q. Okay. So three diffusers. So I should add all these up for the amount of air entering the room; correct?

**A. That's --**

Page 234

Q. Sounds good since that is --

**A. That's not going to be volumetric flow rate.**

MR. GOSS: Just let him finish, please. Let him finish.

Q. Huh?

**A. That's not volumetric flow rate. Those are just velocity measurements in the center of the diffuser.**

Q. Okay. So that's the velocity of the air coming in; correct?

**A. Yes.**

Q. Do you know what the flow rate is?

**A. I did not calculate that.**

Q. Would that be important to know?

**A. Perhaps.**

Q. Perhaps or yes?

**A. Yes.**

Q. That's a -- that's a pretty high velocity; isn't it?

**A. It is, yes.**

Q. Okay. So in a room that small, you would agree that within 30 minutes you should reach equilibrium.

**A. I'd have to look at the -- the wall structure and the thermal mass in the room, and --**

Page 235

**and I -- I can't -- I can't speculate at this point.**

Q. Okay. But that would be important to know; wouldn't it?

**A. It -- it would.**

Q. And sitting here today we don't know that; do we?

**A. We do not.**

Q. Okay. But what we do know is this, okay, that the air is coming in at 72 degrees, it's been on for 30 minutes, and you're getting temperatures below 72 degrees in the -- in the room; correct?

**A. Yes.**

Q. Okay. And in fact, according to your calculations, when the Bair Hugger is on, it actually cools the area over the head; correct?

MR. GOSS: Objection to form.

**A. I don't think I have temperature measurements into the inlet of the Bair Hugger and out at the same time, so --**

Q. Well let's look at this page right here, let's look at three inches over the hip. Bair Hugger off, 70.7 degrees; correct?

**A. Yes.**

Q. That's parallel and perpendicular, that's just giving you different flow rates; correct?

Page 236

**A. Yes.**

Q. Okay. And then you turn the -- you turn -- you turn the Bair Hugger on and all of a sudden the temperature is 64.9 degrees. Does that make sense?

**A. That's what it says.**

Q. Does that make engineering sense?

**A. Unless there was something going on with temperature fluctuations in the room, I -- I -- I don't know.**

Q. That does not make sense; does it, doctor?

**A. Again, I don't know how the HVAC system temperature was controlled.**

Q. We're talking about a six- -- a five-degree drop, almost six degrees once you turn the Bair Hugger on.

Let me back up a second. Doctor, did you do these tests in a continuous fashion or did you go take measurements, then change the thermostat and take measurements with the Bair Hugger on?

**A. No. The thermostat was changed before we did any of the measurements.**

Q. Okay. And you took them in continuous fashion. You turned the Bair Hugger --

It was off and then you turned it on to see what the change was; correct?

**A. Yes.**
Q. How long did you wait?
**A. It probably took, I would guess, maybe an hour for the measurements with the Bair Hugger off before we turned it on.**
Q. So you spent an hour with the Bair Hugger off and then you turned it on.
**A. Yes.**
Q. So you did all the measurements off first and then all the measurements on later?
**A. I'm -- I'm trying to recollect the -- the sequence of -- of measurements.**
Q. Well I mean part of writing a scientific report is that someone else could reproduce the results; correct?
**A. Yes.**
Q. Okay. None of that is in this report; correct?
**A. Without additional information, that's correct.**
Q. I'm asking you in this report is there any --
Is there a methodology written out in this report how this was done?
**A. No, there's no methodology.**

Q. There's no methodology in this report; is there?
**A. No.**
MR. GOSS: Asked and answered.
Q. So how is it that when you have the first law of thermodynamics and you turn on a device that blows 40-degree heat into an operating room -- or into a room that's only 12 by 15, that you see a reduction in air temperature? Can you answer that question?
**A. I'm -- I'm trying to recollect the actual sequence of measurements.**
Q. Forget about the sequence. I'm looking at the data here. This is your data. You say one minute, two minutes, three minutes, four minutes. How is adding heat to a room, and you have the first law of thermodynamics, Engineering 101, --
MR. GOSS: You don't have to yell.
Q. -- and you have to get a reduction in temperature, could you please answer that question?
MR. GOSS: You don't -- you don't have to yell at him.
**A. I -- I would have to give that more thought to explain why the --**
Q. Now is your time for an answer. I'm not coming back another day.

**A. Okay.**
Q. Do you know the answer to that? "Yes" or "no."
**A. Not at the moment without further thought.**
Q. What further thought? Would it violate the first law of thermodynamics?
**A. I'd have to think about other aspects of the airflow in the room that may have affected that.**
Q. What other aspects are there? We have the ventilation that we have accounted for. That's been constant. Okay? What -- what other aspects?
**A. I am not sure the ventilation rate was constant.**
Q. Well do you know one way or the other?
**A. I do not know.**
Q. Okay. Well if it wasn't constant, that's going to affect all your results; correct?
**A. I would not think it would affect the results right near the Bair Hugger blanket or right near the inlet to the filter.**
Q. Well it's affecting the area right above the hip.
**A. That's not near the Bair Hugger blanket discharge or the filter inlet.**
Q. We're measuring above the hip here. We're

seeing a change for no apparent reason when the Bair Hugger is on to a lower level.
**A. Again --**
Q. What -- what -- what's the second law of thermodynamics?
**A. Can't destroy entropy.**
Q. Okay. What's entropy?
**A. It's a natural direction of disorder.**
Q. You go from order to disorder; correct?
**A. Yes.**
Q. Such as, in this case, as heat leaves an area, it's going to dissipate in an orderly fashion; correct?
**A. That's correct.**
Q. Okay. Entropy applies to this case; correct?
**A. That should apply to every case.**
Q. And in a room of this confinement, 12 by 15 --
Which is not a large room; correct?
**A. That's not very large, yes.**
Q. Okay. So you have the first law of thermodynamics and the second law of thermodynamics, it's going to increase the average temperature in the room if you turn on the Bair Hugger; correct?

**A. Say that again.**

Q. The Bair Hugger is going to increase the temperature of the room. You have another heat source of -- of -- of a device blowing 40-degree Celsius air at 43 to 45 cfm. It's going to --

It's a heater, it's a space heater.

**A. Yes, it's a heater.**

Q. Okay. It's going to affect the temperature of the room. It's not going to decrease the temperature; correct?

**A. Right.**

Q. Okay. But we have a decrease here; correct?

**A. That -- that's what it shows.**

Q. Okay. You agree that these numbers are not reliable.

MR. GOSS: Objection to form.

**A. I would -- I would argue with not being reliable. Those -- those are the measurements that we made at the time.**

Q. Part of your job as an engineer is to look at the reliability of the data you obtain; correct?

**A. Yes.**

Q. Okay. As a scientist, you have to look at its reliability; correct?

**A. Yes.**

Q. You have a project --

And this is where the hypothesis is very important. Okay? Hypothesis: I have a Bair Hugger in a room. I turn it on. It's going to increase the temperature. That would be a correct hypothesis in that situation; correct?

**A. Yes.**

Q. Okay. And all of a sudden you turn it on and you get something against the hypothesis, it decreases the temperature according to your data; correct?

MR. GOSS: Objection to form.

**A. That -- that's what it appears, yes.**

Q. That's the measurements you took; correct?

**A. Yes.**

Q. Not only does this violate the first and second laws of thermodynamics, it doesn't make sense; correct?

**A. Can I interject something here?**

Q. "Yes" or "no," then you can do that.

MR. GOSS: You can -- you can answer his question.

**A. It -- in --**

**From a straight heat-transfer standpoint, no, it does not make sense.**

Q. Okay. Therefore it's not reliable.

MR. GOSS: Object to form.

**A. I guess -- I guess one could come to that conclusion.**

Q. Well what do you come to? Do you believe this data here is reliable with respect to the measurements on Exhibit B of your Exhibit 1 of your report, which is three inches over the hip, and when the Bair Hugger is turned on the temperature above the hip goes down? Does that make engineering sense?

**A. It may not.**

Q. You agree with me, doctor, that this is not reliable data with this set of data points; correct?

MR. GOSS: Objection to form, asked and answered.

MR. ASSAAD: He hasn't answered the question.

MR. GOSS: Yeah, I think he has.

**A. I'll -- I'll agree with you.**

Q. It's not reliable; correct?

MR. GOSS: Objection to form.

**A. It -- it's not reproducible probably.**

Q. Or reliable; correct?

MR. GOSS: Objection to form.

**A. Again, how do you define "reliable?"**

Q. Show me an engineering calculation in which you add a heat source to a room and the -- and the temperature of the room -- that's the only change in the room, you add a heat source, okay, above the ambient temperature, that the temperature actually goes below ambient. Can you give me a calculation and engineering principles that could solve that equation?

**A. It may have to do with the initial temperature of the room being -- being low and the heat being ab -- absorbed by those low-temperature surfaces.**

Q. You turn on the Bair Hugger and the temperature started going down. The room was constant. Okay? How does this result occur unless these are wrong results and therefore not reliable?

MR. GOSS: Objection to form, misstates the experiment.

MR. ASSAAD: I just want him to answer the question.

Q. Do we need to go back to engineering ethics about honesty, integrity, fidelity?

MR. GOSS: Badgering.

Q. It's a simple question, doctor. You know these -- these are not reliable. Just admit to it.

MR. GOSS: No. Objection to form,

Page 245

argumentative, badgering.

**A. I -- I stand by the results as -- as obtained.**

Q. I don't care if you stand by them or not. I want to know if these are reliable. Answer the question.

MR. GOSS: He answered the question.

MR. ASSAAD: No, he hasn't.

MR. GOSS: You don't have to say anything further on this. You answered the question.

Q. Then I'm going assume that it's not reliable according to your testimony. Fair enough?

MR. GOSS: You can assume whatever you want. He testified that he stands by the results.

Q. How are these temperatures higher or lower than the air going into the air return?

**A. I -- I can't answer that. I don't have a good explanation for that.**

Q. Go to the page before that. "Over center of anesthesia screen, 3 inches above top (Center)." Now the diffuser's on the ceiling; correct?

**A. That's correct.**

Q. And there's three of them; correct?

**A. Yes.**

Q. Okay. Are they all spread evenly in the

Page 246

ceiling?

**A. Yes, they're -- they're lined up.**

Q. Okay. Did you take any pictures?

**A. Not of those, no.**

Q. Okay. That would be something important to -- to have today; wouldn't it?

**A. If this was set up as a simulated OR, yes, but I admit it's not a typical OR setup.**

Q. So you have air coming out at 72 degrees except you read when the -- when the Bair Hugger is on but on ambient it's 64.9 degrees. How do you get that temperature?

Not only is it below the 66 degrees that you think the room is at or you stated was in the report, but it's below the 72.

**A. That does strike me as unusual.**

Q. Is that a reliable number?

**A. I would say probably not.**

Q. Okay. Did you determine where most of the air --

I asked you this before; I don't think I had an answer. Do you know where most of the air goes when it comes out of the blanket, where it escapes from?

**A. I did not determine that.**

Page 247

Q. Would that be important to know where to make measurements?

**A. I was assuming that the blanket was -- was taped as it should be on the lower-body end, and so the air would be coming out near the head and shoulder area.**

Q. Why would you assume it comes out near the head and shoulder?

**A. Because of the blanket that's put over the Bair Hugger blanket.**

Q. Yeah. But it's also going over the arm; correct?

**A. Yes. Yes.**

Q. That's not the head and shoulder.

**A. Well I -- I should include that then.**

Q. Okay. So now we got the head and shoulder, the arm. Do you know where the air escaped? Does it escape --

Do you know how it's set up in an operating room?

**A. None other than the way observed here.**

Q. Well doctor, you -- you -- you're here as an expert to say, hey, look at this report, this is what happens in an operating room. You agree with me this is nowhere near what happens in an operating room;

Page 248

correct?

MR. GOSS: Object to the form.

**A. I'm not claiming this is what happens in an actual operating room.**

Q. Okay. What's the longest time you had the Bair Hugger on? How long did you have the Bair Hugger on?

**A. Maybe an hour, hour and a half.**

Q. It was on continuously for an hour, hour and a half.

**A. Yes.**

Q. Where -- where does it say that in the report?

**A. It doesn't.**

Q. So how do I know that?

MR. GOSS: He just testified to it.

Q. Besides your testimony, how do I know that?

**A. Not other than my testimony.**

Q. At what time -- how long was the Bair Hugger on when you --

If you go to the "3 Inches Over Hip" where it says "Off -- par -- Off -- parallel, Off -- perpendicular, On -- parallel, On -- perpendicular, On -- parallel, parallel, parallel," how long was the Bair Hugger on before you started taking those

measurements?
**A. Where are you? Back on the hip page?**
Q. Uh-huh.
**A. I do not record that information, so I -- I do not recall.**
Q. So I -- I -- I mean you don't recall, so sitting here today I cannot determine the methodology used and reproduce what you did in this case; correct?
MR. GOSS: Objection to form.
Q. Because you don't know.
MR. GOSS: Wait for him to ask a question.
Q. You don't know, do you, what you did sitting here today?
MR. GOSS: Object to form.
**A. I do, but not some of the details you're asking about.**
Q. Well details are important; isn't it?
**A. Yes.**
Q. I mean would you accept a report like this from one of your students doing a thesis for a Ph.D.?
**A. Not solely, no.**
Q. I mean you'd expect some sort of methodology and some way to determine that the data is reliable; correct? Correct?
**A. Yes.**

Q. Okay. There's definitely no methodology here that's indicated in this report; correct?
**A. Yes.**
Q. And as of right now, the reliability is very questionable; correct?
MR. GOSS: Objection to form, asked and answered.
**A. I would -- I would say reproducing the results here would -- would be difficult.**
Q. And therefore, if you can't reproduce the results, not reliable.
MR. GOSS: Objection to form, asked and answered.
Q. Correct?
**A. I think I answered that.**
Q. Correct?
MR. GOSS: Objection to form, asked and answered.
**A. I think I answered that.**
Q. Are you afraid to answer this question again? It's a simple question.
MR. GOSS: Objection, argumentative, badgering.
MR. ASSAD: Counsel, tell him to answer the question.

MR. GOSS: No.
MR. ASSAD: Tell your expert to answer the question.
MR. GOSS: No, I'm not going to.
MR. ASSAAD: Oh, really?
MR. GOSS: I'm not going to tell him to answer the question. He's already answered it.
MR. ASSAAD: No, he hasn't.
Q. I'm asking as a --
I didn't ask for one specific data, I'm asking data as a whole. Since there's no methodology and it's not reproducible, therefore it can't be reliable; correct?
MR. GOSS: You can't --
You haven't gone over all the data.
MR. ASSAAD: I don't need to go over --
Q. Exhibit B of your report, there's no methodology, can't be reproducible, therefore it's not reliable; correct?
MR. GOSS: Objection, asked and answered.
**A. If -- if that's how you define "reliable," I will agree with that.**
Q. Well how do you define "reliable?"
**A. I think I would say something that -- that could be reproduced.**

Q. We can't reproduce this; can we?
**A. Not with what's here, no.**
Q. Okay. So therefore this report, based on what's here, is not reliable.
MR. GOSS: Objection to form.
**A. By inference, yes, I agree.**
MR. ASSAAD: Let's take a break.
THE REPORTER: Off the record, please.
(Recess taken.)
BY MR. ASSAAD:
Q. You don't consider yourself an expert with respect to how skin squames are transported in an operating room; correct?
**A. That's true.**
Q. You are aware that skin squames carry bacteria; correct?
**A. Yes.**
Q. And are you aware that between one million to 900 million skin squames are shed during a typical surgery?
**A. I do not -- have not heard that number before.**
Q. Are you familiar with the HVAC Design Manual for Hospitals and Clinics?
**A. The ASHRAE --**

Q. Yes.
**A. -- Hospital Design Guide? Yes, I am.**
Q. And actually one of the contributors was Dan Koenigshofer?
**A. Yes.**
Q. Have you read the HVAC Design Manual for Hospitals and Clinics recently?
**A. I have --**
**I don't think I'd read it prior to this -- this case, no.**
Q. But you agree to -- for it to be authoritative, correct, in your -- in your field of work?
**A. In my opinion, yes, sir.**
Q. Okay.
(Kuehn Exhibit 13 was marked for identification.)
MR. ASSAAD: Did you say 13?
THE REPORTER: Yes.
BY MR. ASSAAD:
Q. Now if you look on page v or five, Table of Contents --
And I represent to you that I -- that I did not print out the entire manual, just some relevant parts. Fair enough?

**A. Yes.**
Q. I'd like you to turn to page 27. And it's not in order, actually. The page after that.
**A. Okay.**
Q. If you look at the highlighted section, it states here, "Between 1 million and 900 million squames are shed during surgery." Do you see that?
**A. That's what it says.**
Q. Okay. Do you disagree with that?
**A. I do not disagree with that.**
Q. And actually, since you agreed this is authoritative, you must agree with it; correct?
**A. Yes.**
Q. Go to page 26, last paragraph. States, "Operating rooms are one of the most critical areas for infection control..." Do you agree with that?
**A. I do.**
Q. Continues, "...this is where patients are opened to the surrounding environment while in an immune-suppressed condition." Do you agree with that?
**A. Yes.**
Q. "The patient is vulnerable to attack from any infectious agents that get into the room and into the surgical site." Do you agree with that?
**A. Yes.**

Q. Also like you to turn to page 154, upper left-hand corner. Are you there?
**A. Yes.**
Q. Under 8.3 it discusses operating rooms. Have you read this section before?
**A. I believe I have.**
Q. First sentence, "The purposes of the HVAC system in an operating room are to minimize infection, maintain staff comfort, and maintain patient comfort." Did I read that correctly?
**A. You did read that correctly.**
Q. Do you agree with that?
**A. I do.**
Q. Now you agree with me that ASHRAE is a standard -- a -- a minimum standard; correct?
MR. GOSS: Objection, form.
**A. It's intended to be a minimum standard, yes.**
Q. Okay. It doesn't mean it's the best practice, it's just a minimum standard; correct?
MR. GOSS: Objection to form, vague.
**A. That's typically the way -- well, this is a --**
**This is not an ASHRAE standard, it's an HVAC Design Manual for Hospitals and Clinics, so I would say this would be best practice.**

Q. Okay. And you agree that ASHRAE, any of the standards or best practices do not apply to medical devices; correct?
**A. I believe that's a correct statement.**
Q. So to determine or to select a filter for a medical device, you have to look at how the medical device is used and the environment of use; correct?
**A. That's correct.**
Q. Okay. The ASHRAE standard has -- is not applicable at all to medical devices such as the Bair Hugger; correct?
**A. It was not intended to be used for medical devices.**
Q. Go to page 157. There's a diagram that's highlighted. That's an operating room, --
**A. Yes.**
Q. -- a schematic of an operating room; correct?
**A. Yes.**
Q. Are you familiar with how an HVAC system works in an operating room?
**A. Not having worked with operating rooms personally, I rely on documents such as this.**
Q. How many filters does -- does the air go through before it enters an operating room?

**A. I would -- as --**
**As what I have read, it's typically two.**
Q. Okay. There's a -- there's a prefilter, which is usually like a MERV 7, and then the MERV 14 filter; correct?
**A. Yes.**
Q. Okay. And you agree with me that an operating room ventilation system is not drawing from air below the operating room table; correct?
**A. Say that again.**
Q. It's not drawing -- the intake that --
The air where it's drawing from is not from below the operating room table; correct?
**A. It's -- it's not from below the table, it's from below sidewall return grilles.**
Q. And it's usually about 75 percent recycled air and 25 percent fresh air; correct?
**A. I recall 80/20, but you may be correct.**
Q. 80/20, depending on the system.
**A. Yes.**
Q. Okay. And you agree with me that in this picture here it talks about the heat sources that are typical in an operating room; correct?
**A. It does, yeah.**
Q. Talks about the equipment of one kilowatt;

correct?
**A. Yes.**
Q. All right. And how many watts is the Bair Hugger for producing -- how much --
How many watts of heat is it producing?
**A. Off the top of my head I -- I --**
**I could hazard a guess, but I don't want to give you an exact number. I don't recall.**
Q. Would that be something important to know, the effect of --
**A. It -- it -- it --**
**Yes.**
Q. -- of a unit in an operating room?
**A. Yes.**
Q. But you don't know that information sitting here today.
**A. I could -- I could hazard a guess, but I don't know the exact number.**
Q. Again, I don't want guessing, I want your expert opinion.
**A. Okay. I cannot give you an exact number at this point.**
Q. You agree that people produce heat; correct?
**A. Yes.**
Q. And that should be taken into account of --

of --
Well let's put it this way: When you look at a problem, you have to look at the whole picture; correct?
**A. Yes.**
Q. You can't just take a -- a Bair Hugger and put it in isolation and not take into account the barriers in airflow of the operating room and how many people are in the operating room and the devices in the operating room; correct?
**A. That would be my assumption, yes.**
Q. Okay. And you did not do that in this case; correct? You didn't take into account the people in the operating room; correct?
MR. GOSS: With respect to what part of the report?
MR. ASSAAD: Any of the studies he's done, any of the testing he did.
**A. The only testing I did was with -- with the Bair Hugger.**
Q. So you didn't take any of the people into account; correct?
**A. Not with those tests, no.**
Q. Do you know why medical devices are -- strike that.

Do you know why prosthetic surgeries or orthopedic surgeries have a higher risk of surgical-site infection?
**A. Not being a surgeon, I really can't answer that.**
Q. Do you know whether or not the number of -- number of bacteria required to cause a periprosthetic joint infection is the same as a superficial knee infection?
**A. I --**
**Again, not being a surgeon or microbiologist, I -- I cannot comment on that.**
Q. Now you've read Dr. Elghabashi's report; correct?
**A. His report, yes.**
Q. Okay. Do you understand his report?
**A. I do.**
Q. Okay. You've gone through all the calculations or the equations?
**A. Not in sufficient detail, but I -- I get them, that he's done it correctly.**
Q. Okay. So you agree with me that all the calculations that Elghabashi has done with respect to the analysis of an operating room was done correctly.
**A. With the exception of the assumption of 106-**

**degree Fahrenheit air leaving the blanket, which I don't think is correct.**
Q. Okay. That's the only criticism you have of his report.
**A. No. I also criticized the number of particles he assumed was getting at the -- into the critical-care area, the infection box.**
Q. And why do you criticize that?
**A. He lists very large numbers of particles originating near the floor ending up near the -- near the critical-care area when the Bair Hugger was on, and my criticism of that was the -- it's approximately a million particles near the floor that he's using in his calculations to arrive at his number near the critical-air area.**
Q. Okay. What number should he have used?
**A. I -- I suggest he use the most appropriate value of CFU of bacteria aerosols per cubic meter per cubic foot that's available in the literature.**
Q. And that you found was 10 CFU's per cubic -- per cubic meter?
**A. I went back to Galson and Goddard, the number I included in my report, which I think is -- is high, but I used that as a starting point.**
Q. Which was what?

**A. I have to look in my report.**
Q. Please do.
Let me help you out here. Let's go to page 13 of your report.
**A. I -- I -- yes. Thank you. I found page 13. I was looking at the exhibits and it wasn't there.**
**I see the number four CFU per cubic foot.**
Q. Okay. What would that be per cubic meter?
**A. Roughly -- it would be roughly 10 times that.**
Q. So about 40?
**A. Roughly 40, yes.**
Q. Okay. And you got this number from where?
**A. From --**
**This was published years ago by a reference, Galson and Goddard, an ASHRAE journal article.**
Q. So we just read ASHRAE, which you consider authoritative, that said between 100 and 900 million skin squames fall during a typical surgery; correct?
**A. That's what it said, yes.**
Q. Okay. And you don't disagree with that; correct?
**A. No.**
Q. Okay. And Elghabashi used three million, correct, skin squames?

**A. His total particle count, yes, I think it was three.**
Q. One -- one million in each section; correct?
**A. That's -- that's my understanding.**
Q. That's on the lower side of 900 million; correct?
**A. Repeat the question.**
Q. I mean three million is much lower than 900 million.
**A. Yes.**
Q. Okay. And the squim -- the squib scale --
The skin squames, they fall from the patient as well as the surgical staff; correct?
**A. Yes.**
Q. They're around the operating room; correct?
**A. Yes.**
Q. Do you know whether or not the value taken by Galson and Goddard were underneath the operating room table around the surgical site, or just the average in an OR?
**A. I -- I do not know the precise location for their measurement.**
Q. That would be kind of important, wouldn't it, before you criticize another expert in this case?
MR. GOSS: Objection to form.

**A. Well yes.**
Q. I mean -- I mean we know at least one million skin squames fall during a typical surgery according to authoritative ASHRAE.
**A. Yes.**
Q. Okay. So --
And Dr. Elghabashi has never stated in his report that those were colony-forming units, he just said they were skin squames; correct?
**A. I think he defined them as 10-micron particles.**
Q. Okay. He didn't say they were bacteria or CFUs, he just said they were skin squames; correct?
**A. Well as I recall he called them 10-micron particles.**
Q. Do you understand how he calculated them to be 10-micron particles?
**A. I -- I don't know how he arrived at it.**
Q. Did you not look at his appendix in -- in his report?
**A. I cannot recall that at the moment.**
Q. Okay. And are you aware that Farhad Memarzadeh, as I like to call him, also used a 10-micron sphere as a shape that would be equivalent to a skin squame?

**A. I don't recall seeing that article. I can't comment on that.**

Q. Are you aware that 3M cites that article on numerous letters that they send to their valued customers, doctors?

**A. I -- I am not aware of that, no.**

Q. You haven't seen any of those documents; have you?

**A. I have not.**

Q. Okay. And do you understand why he used a 10-micron particle?

**A. Yes.**

Q. Why?

**A. That -- that's a particle that could contain infectious bacteria.**

Q. Do you know why he used a spherical particle instead of the shape of a skin squame?

**A. It's much easier to calculate in terms of the numerical methodology.**

Q. Are -- are you --

Can CFD calculate particle movements that are not spheres?

**A. It's very difficult. Typically, what one does is use what's called aerodynamic diameters, which takes into a account the particle shape, density, and**

**that sort of thing.**

Q. Exactly. And that's why you use a 10-micron sphere. And if you look at his calculation, that's how he calcu -- that's the aerodynamic diameter of a skin squame, of an average skin squame. Do you agree with that?

**A. I -- I don't -- I don't know that I've seen that information, but that seems reasonable.**

Q. Okay. You don't disagree with the 10-micron size.

**A. I don't disagree with it.**

Q. Okay. So the two things that you disagree with Elghabashi are the amount of skin squames -- or particles on the floor --

Were they on the floor or above the floor?

**A. Above the floor. They were in a given volume.**

Q. Huh?

**A. They were in a specified volume above the floor.**

Q. But they weren't on the floor.

**A. No.**

Q. Do you know why he didn't put them on the floor?

**A. I -- I -- I do not know his reasoning, no.**

Q. Okay. And the other criticism is the temperature coming out of the blanket.

**A. Yes.**

Q. Okay. And that's based on your own measurements that you did in Exhibit B; correct?

**A. Yes.**

Q. Okay. So what's your basis, if we're just talking about particles or skin squames -- squames, that using three million around the operating table is unreasonable when ASHRAE states that between one -- one million to 900 million are shed during surgery?

**A. Well "shed during surgery" means the entire duration of the surgical procedure I would assume, you know, so therefore, since the room air is changing every -- or there's 15 to 20 air changes per hour, then most of these would follow airflow out of the room or be deposited on surfaces.**

Q. What's the airflow underneath the operating room table?

**A. The air change rate's probably quite low.**

Q. Is there any change -- air-change rate?

**A. There's probably some.**

Q. Very minimal; would you agree?

**A. That's -- that's -- that's probably true.**

**(Kuehn Exhibit 14 was marked for**

**identification.)**

BY MR. ASSAAD:

Q. Dr. Kuehn, I represent that Exhibit 14 is a CFD image -- or an image produced by CFD by defense expert Dr. Abraham. Have you seen this document before?

**A. I have not.**

Q. Do you understand what this document is by looking at it as a -- as an engineer?

**A. I have a rough idea, yes.**

Q. Would you agree with me that's airflow based on a CFD analysis of an operating room? Correct?

**A. I'm not sure I have the entire image here. Looks like the walls are missing on the left- and right-hand sides.**

Q. But it's airflow in an operating room with there being a surgical table and a patient and lights and everything.

**A. That's what it looks like, yeah.**

Q. And that's what I represent to you, that this was produced to us by defense in this case.

Do you see the -- the vectors of air underneath the operating room table?

**A. Yes.**

Q. You see that it's very turbulent underneath

there; correct?

**A. A lot of recirculation, yes.**

Q. And this supports your opinion that there's probably very little air exchange underneath the operating room table; correct?

**A. Well less than the other parts of the room.**

Q. Much less.

**A. It would also depend on the -- the drapes hanging down, how -- how far the edge of the drapes are above the floor.**

Q. The longer the drapes, the less --

**A. Less --**

Q. -- air exchange; correct?

**A. Yes.**

Q. And it creates more of an insulation from the air.

**A. Yes.**

Q. Okay. And when you have insulation, you have less airflow going in and out of the area underneath the drapes; correct?

**A. Yes.**

Q. Okay. And since you have less airflow going in and out of the drapes, you have less of a cooling effect; correct?

**A. Less --**

Q. Well the air is pretty -- pretty stagnant underneath the operating room table if the drapes are long; correct?

**A. Yes.**

Q. Okay. And you have the Bair Hugger that's underneath the drapes that's heating up that area, correct?

MR. GOSS: Objection, form.

**A. That's not the way we set our Bair Hugger up.**

Q. Oh, it isn't?

**A. No.**

Q. Why not?

MR. GOSS: Are you talking about the blanket or the warming unit?

MR. ASSAAD: The blanket.

**A. Oh, the blanket. I'm sorry. I thought you meant the -- the warming unit.**

Q. No. The blanket's underneath the drapes; correct?

**A. Yes.**

Q. Okay. And you agree with me at some point, you know, the Bair Hugger blanket is going to warm the actual drapes on top through conduction; correct?

**A. Yes.**

Q. Okay. And by convection it's going to warm the patient as well as underneath the drapes; correct?

**A. Yes.**

Q. Okay. And over time the air underneath the drapes is going to increase; correct?

**A. That's possible.**

Q. Well if you have the drapes around the table, okay, and you're getting very little air movement underneath the table, by the first law of thermodynamics, the conservation of energy, okay, the heat has to warm up something; correct?

**A. Well it depends on where the air is actually leaving the blanket with respect to the drapes.**

Q. Do you think the air could pass through the drapes?

**A. No.**

Q. Okay. So we know the air is not leaving through the drapes; correct?

**A. Yes.**

Q. And the drapes act like some sort of insulation, kind of like when you all have blankets on us at night, it acts like an insulation; correct?

**A. Yes.**

Q. That's why --

I mean when you sleep at night, the blankets

don't warm you up, your own body heat warms you up, it just acts as an insulator to keep you warm; correct?

**A. Yes.**

Q. The same concept applies here with the Bair Hugger, correct, and the drapes?

**A. Yes. The Bair Hugger is providing warmth to the patient, yes.**

Q. And the drape is keeping all the -- it's -- it's insulating the patient and the area underneath the drapes from the cold air up top; correct?

**A. Yes.**

Q. Okay. The only way that that cold air coming in from the ceiling could warm up the air underneath the operating room table is either by having air coming in from the sides underneath the drapes --

Correct?

**A. Yes.**

Q. -- or it warms the air -- warms the blanket by convection and then the blanket -- the drape, I'm sorry, warmed by con -- convection, and then the drape warms the Bair Hugger blanket by convection and cools it down to blow cold air, which doesn't happen in real life; correct?

**A. Yes.**

Q. Okay. So over time energy has --
Energy, first law of thermodynamics, is conserved, and the area underneath the operating room table, which is -- doesn't have a significant amount of air exchanges, gets warmer and warmer, correct, until it reaches an equilibrium?
**A. I'll agree with that.**
Q. Okay. And sitting here today, you don't disagree with Dr. Abraham's CFD analysis as shown in Exhibit 14; correct?
**A. Well not having looked at any of the other background information or boundary conditions, just given this one figure, this figure's results look reasonable, but I'd really like to look at the other part of his report before I answered that question.**
Q. And you never asked for his report from 3M; have you?
**A. I --**
**No, I did not.**
Q. Do you know how much heat -- what's the right term?
Do you know how much heat is absorbed by a human body in the torso region?
**A. I do not know that.**
Q. Okay. Would that be something important to

know to determine how much of the heat produced by the Bair Hugger is actually absorbed by the body and how much of it's waste heat?
MR. GOSS: I don't think he's offering any opinions on that, but you can answer.
**A. If -- if I was in the design area, I think that would be something I would want to know.**
Q. You're aware that there's different patient warming products --
**A. Yes.**
Q. -- as we discussed previously.
**A. Yes.**
Q. They're just different designs; correct?
**A. Yes.**
Q. One design might be forced-air warming; correct?
**A. Yes.**
Q. Another design might be conductive warming; correct?
**A. Yes.**
Q. You've heard of conductive warming mattresses; correct?
**A. I believe so, yes.**
Q. Okay. They're all patient warming products; correct?

**A. Yes.**
Q. Just a different design; correct?
**A. Right.**
Q. And that's based -- and -- and that's an engineer -- that's that they're --
They're the same product with different design; correct?
**A. Same --**
Q. Product. They're both pat --
They're all patient warming products; correct?
**A. Same -- same application --**
Q. Yes.
**A. -- but just different products.**
Q. Different products or different designs?
**A. Well different designs and different products.**
Q. What's different between the Mistral and the Bair Hugger?
**A. I have not looked at the Mistral in any amount of detail, so I -- I can't answer that.**
Q. There's three modes of heating: convective, conductive, and radiation; correct?
**A. Yes.**
Q. Do you know a Dr. Sparrow?

**A. I do.**
Q. Are you friends with him?
**A. We're colleagues, yeah.**
Q. Have you done any work with him?
**A. No, not -- not really, other than I may have served on some of his graduate students' final exam committees.**
Q. And he focuses on heat transfer as well; correct?
**A. Yes.**
Q. Is there anyone at the University of Minnesota that focuses on particle movement through turbulent airflow?
**A. I could think of Mike Zacharia probably, does a lot of modeling work in that area.**
Q. Is he from Stanford?
**A. No, I think he's from the University of New York - Buffalo.**
Q. Okay.
**A. What name did I give you? I just want to make sure I gave you the correct --**
Q. Zacharia.
**A. That's -- that's not correct.**
MS. ZIMMERMAN: University of Minnesota is a big school.

THE WITNESS: Yeah.
**A. I'm just having a mental --**
**I'll -- I'll -- I'll come up with it.**
Q. Not important.
**A. I'll come up with it.**
Q. It's not important.
**A. Oh. Sean Garrick is -- G-a-r-r-i-c-k, I believe. Sean Garrick.**
Q. And he went to SUNY Buffalo?
**A. Yes.**
Q. Okay. Do you know whether or not the University of Minnesota has their own CFD code?
**A. I don't think so, but I'm not -- not aware of that.**
Q. Are you aware that like universities such as Stanford have their own code?
**A. Yes.**
Q. Okay.
**A. I -- not --**
**Not that I'm aware of.**
Q. Okay.
**A. I mean individual researchers have their own code, but whether there's a blanket University of Minnesota code, I am not aware of any such thing.**
Q. Now you agree with me that in selecting a

filter to be used in a -- in a device during the design process, you have to know how that device is going to be used; correct?
**A. Yes.**
Q. And you agree with me that that -- that that -- the air that the bacteria -- strike that -- the air that the Bair Hugger is filtering has a higher bacterial load than the air coming out of that ventilation system; correct?
**A. That -- that may be the case. I have not seen data that supports that, I don't believe.**
Q. Let's just use common sense. You have squames from people and the patient and blood and other stuff during the surgical procedure that's going down to the floor of the operating room; correct?
**A. Okay.**
Q. Okay. I mean it would be a -- a reasonable conclusion that the bacterial load in that area around the surgical table is much greater than coming out of the ventilation system, which has 25 percent air coming from the outside as well as being filtered twice through a -- through a HEPA -- a MERV -- a MERV 7 filter and a MERV 14 filter; correct?
**A. That would be a logical assumption, yes.**
Q. And that needs to be taken into account in

determining the filtration to be used by the device; correct?
**A. Yes. The -- the challenge aerosol into the device would have to be taken into account, into the filter.**
Q. Because using a MERV 14 that removes 95 percent of the part -- of particles the size of -- or 90 percent -- 90 percent of the particles larger than three to 10 microns means that some get through; correct?
**A. And the numbers you're referring to appear to be from the ASHRAE Standard 52.2. Those are minimum values for that particle-size range.**
Q. That's fine. But --
It's a percentage; correct?
**A. Yes.**
Q. Okay. And you have to take into account in designing a device, when you're putting a filter in it, is what is the bacterial load, because allowing 10 percent of a low number to get through is different than allowing 10 percent of a large number to get through; correct?
**A. Yes.**
MR. GOSS: Object to form.
Q. And the bacterial load underneath the

operating room table is much greater than coming out of the HVAC system; correct?
**A. I think we could probably assume that.**
Q. And you have to take that into consideration in choosing the correct filter for the device; correct?
**A. Depends where the device is located.**
Q. Well where is the Bair Hugger located?
**A. Sometimes it's on an IV pole, sometimes it's mounted on a cart.**
Q. Either/or. Why does it make a difference?
**A. The location of the air coming in will be different than, for example, under the operating table.**
Q. Do you know how high, when you use it -- put on a pole, how high it's off the ground, the Bair Hugger?
**A. Typically, the bottom I've heard is between 18 inches and two feet.**
Q. Okay. And that's still below the operating room table; correct?
**A. Below the top of the table, yes.**
Q. Okay. And as we discussed before from Exhibit 14, the air is very turbulent underneath that area; correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 281

**A. Yes.**
Q. So particles are all over the place in that area; correct?
**A. Yes.**
Q. We could agree that the concen -- the bacterial load concentration is probably pretty uniform underneath the operating room table due to the turbulence; correct?
**A. Under the table, yes.**
Q. Okay. So it really doesn't matter if it's on the floor, you know, on a stand or -- or on a pole which is below the operating table, it's still drawing from the same amount of bacterial load; correct?
**A. But it's not under the operating table.**
Q. It isn't?
**A. The unit when it's -- when it's placed, no.**
Q. Where is it placed?
**A. It's placed behind the anesthetic screen.**
Q. Behind the screen.
**A. Yes.**
Q. Well just --
And -- and the screen is not above the operating room table?
**A. The screen is above the table, yes.**
Q. Okay. So it's placed -- and -- and when

Page 282

you -- and who told you --
Where did you come up with this assumption? Who told you that?
**A. Well based on the photos I've -- I've seen as how a typical Bair Hugger unit would be set up, and the setup in the 3M lab.**
Q. How long is the hose?
**A. I'm guessing --**
**Well, I don't know the exact number.**
Q. So it's your belief that the area where the Bair Hugger is placed has the same bacterial load as the areas coming out from the HVAC.
**A. I did not say that.**
Q. Okay. That's --
I just want to make sure. So what are you saying?
**A. I'm saying it's -- it's -- it could be significantly different than what's under the table.**
Q. Okay. But you agree it's still significantly more than what's coming out of the HVAC system.
**A. It could be, depending on where the unit is located.**
Q. Well the hose is only so long.
**A. But there could be airflow from the ceiling**

Page 283

**coming over the table near the floor where the unit is located, which would still be very clean air.**
Q. But sitting here today, you don't know either way; do you?
**A. Say it again.**
Q. Sitting here today, you don't know either way what the bacterial load is, whether or not the area where the Bair Hugger sits has air from the ceiling clearing out the bacteria.
**A. Not -- not without seeing actual applications.**
Q. Okay. Assuming that it is underneath the operating room table --
Okay?
**A. Okay.**
Q. -- or an area where there is turbulence, and the HVAC system can't clear out the bacterial load, --
**A. Okay.**
Q. -- would you agree with me that a MERV 14 filter -- strike that.
You agree with me that just because a hospital operating room uses a MERV 14 filter, that is a sufficient reason to use a MERV 14 filter in the Bair Hugger?
**A. I would say it's not a sufficient reason.**

Page 284

Q. Okay. And you agree with me that you have been provided no data with respect to the bacterial load underneath the operating room table.
**A. I believe that's a correct statement.**
Q. Okay. And to choose a filter, a reasonable and prudent engineer should know the bioburden of the air that the bacter -- that the Bair Hugger is drawing from in selection of a filter; correct?
**A. That would be prudent, yes.**
Q. Okay. Do you have any reason to believe that -- that 3M or Arizant considered that in selecting the MERV 14 -- selecting their filter?
**A. I cannot point to a document that says that, no.**
Q. Okay. Do you know what the efficiency is for one to three microns of the Bair Hugger filter?
**A. I have seen a test report where the filters have been sent to an external test lab for -- for measurements and --**
Q. So what is it?
**A. It's from -- from .3 to one.**
Q. From one to three.
**A. From one to three. I think it's in the nineties.**
Q. In the nineties. Okay.

And your opinion in this case is that's an acceptable choice; correct?
A. **Yes.**
Q. Did you take into account in formulating your opinions the -- the -- the bioburden of the air that the Bair Hugger is drawing from?
A. **Not specifically.**
Q. What does that mean, "not specifically?"
A. **I was looking at the most probable particle size containing a -- a bacteria and how the filter would -- would perform against that particle size.**
Q. And what's that? What size?
A. **Size between five and 10 microns.**
Q. Okay. What's the efficiency for five to 10 microns?
A. **The data I show, it's high nineties, close to a hundred percent.**
Q. Were you aware that they performed a test on the filter --
You've read Winston Tan's report; correct?
A. **That's what I'm referring to, yes.**
Q. Okay. And actually, they ran initial tests and the first -- first test results were not good because of a manufacturing defect. Do you recall that?

A. **There were three batches that were tested, and one of the batches, I -- I believe, did not meet the requirements.**
Q. Had a manufacturing defect; correct?
A. **That -- that's what I read.**
Q. Okay. And knowing where the --
Assuming that the Bair Hugger is drawing air that has a large bioburden, did you take into account whether the device had any leakage?
MR. GOSS: Object to the predicate.
A. **I didn't --**
Q. Do you know what I mean by "leakage?"
A. **Yes.**
Q. Okay.
A. **Yes. Yes, I did.**
Q. But you didn't test for leakage; correct?
A. **I did no testing, no.**
Q. And the Bair Hugger filter has a seal on it; correct?
A. **Which -- which Bair Hugger are you referring to?**
Q. The 750 or 775.
A. **775, yes.**
Q. Did you -- did you check to see whether or not, when the Bair Hugger is turned on, that it forms

a good seal so that no air could bypass the filter through the sides?
A. **It has what appeared to me to be a black foam-rubber gasket, that when the filter is placed in the bottom of the unit with the cover over it and the bolts tightened down, that the gasket is compressed, which indicates to me that there would be a good seal.**
Q. But you don't know one way or the other; correct?
A. **I have not measured for leakage, no.**
Q. Okay. By the way, you're aware that in Elghabashi's study, that he assumed that the filter stopped 100 percent of the particles?
A. **I would have to go back and check that level of detail. I don't recall at the moment.**
Q. All right. Now you've done research on actual bacterial growth that occurs within a filter; correct?
A. **That's correct.**
Q. Okay. And as long as there are nutrients provided to the bacteria, it actually could go -- grow in the filter and -- and grow all the way through the filter and then be released on the other side; correct?
A. **With appropriate environmental temperature**

**and humidity conditions, yes.**
Q. Okay. What --
Do you know what the humidity is in -- in an OR?
A. **From what the design I have read, I think it's supposed to be 50 percent.**
Q. Okay. And that would be an ideal situation for bacterial growth; correct?
A. **I think --**
**Again, I'm not a microbiologist, but from what I've heard from others, I think that's lower than what's required to grow and propagate bacteria.**
Q. Do you think --
What do you think the humidity should be?
A. **I'm -- I'm thinking --**
Q. If you know.
A. **Again, I'm not a microbiologist. I don't want to hazard a guess.**
Q. Okay. And why does --
Why is humidity a factor?
A. **Again, I'm not a microbiologist, but humid --**
**Bacteria needs -- needs moisture to grow.**
Q. What's a loaded filter?
A. **The common term "loaded filter" typically**

**refers to a -- in -- in my area of expertise of ventilation, an HVAC filter that has captured ambient aerosol and dust over a fairly long period of time so that it affects the filter performance both in pressure drop and -- and capture efficiency.**

Q. And what's a long period of time?

**A. It really depends on the -- the loading. It could be years if it's lightly loaded, it could be in a matter of weeks or months.**

Q. Okay. Do you agree that a filter with sufficient dust loading will contain the nutrients necessary to support mi -- microbial growth?

**A. Our tests on a hundred percent outside air confirmed that, provided the humidity was high enough.**

Q. Well what's high enough?

**A. We -- we did not --**

**We tested two media filters for one year, hundred percent outside air. We did not find any bacterial or fungal growth on those filters for the whole year. We then put them in a test facility that maintained 90 percent relative humidity, then we did find growth.**

Q. Okay. So you know 90 percent, growth, --

**A. Yes.**

Q. -- zero percent, no growth.

**A. Well I didn't say zero percent. I said just natural outdoor --**

Q. Where were -- where were you?

**A. It could range anywhere from in the wintertime --**

**Well even in the summer, the early morning, it could be close to 70, 80 percent, and then during the hot afternoon it might drop down to 30 or 40.**

Q. Okay. You agree with me that skin squames would be good nutrients for bacteria; correct?

MR. GOSS: Objection, lack of foundation.

**A. Again, I'm not a microbiologist. I would -- I would -- I -- I --**

**I don't want to answer that.**

Q. Well you say here in one of your report -- your articles, "Atmospheric dust contains 30 to 40 percent organic matter by mass." Do you remember that?

**A. I think I remember that, yes.**

Q. Would you consider skin -- skin squames organic matter?

**A. Yes. I think that was referring to outside air in that case.**

Q. I understand that, but I was talking about skin squames. Do you consider that organic matter?

**A. Skin squames is organic matter, I -- I agree with that.**

Q. Do you know --

Have you done any testing to see whether or not bacteria could grow in the Bair Hugger over time and come out the other end?

**A. I have not done anything like that, no.**

Q. Do you have any reason to believe that it wouldn't occur in the Bair Hugger filter?

MR. GOSS: Object to form.

**A. Again, we need two -- well, we need --**

**We need sufficient nutrients, number one --**

Q. Which we know we have; correct?

MR. GOSS: Object to form.

**A. -- which could be -- could be -- could be the skin squames, but we also need the appropriate humidity level, and with ORs controlled about 50 percent humidity, I think that's too low.**

Q. Okay. But if some ORs are up to 70 percent humidity, then there's potential for growth?

MR. GOSS: Calls for speculation.

**A. I would speculate it has to be higher than that.**

Q. Okay. But you're speculating; correct?

**A. Yes.**

**(Kuehn Exhibit 15 was marked for identification.)**

BY MR. ASSAAD:

Q. What's been marked as Exhibit 15 is an article titled "Airborne Infection Control in Health Care Facilities," authored by you; correct?

**A. That's correct.**

Q. And it's published in an August 2003 -- I guess in the Journal of Solar Energy Engineering?

**A. That's correct.**

Q. Okay. Is that a publication put out by ASME?

**A. It is.**

Q. I want you to turn to page 369 under "Monitoring." Do you see that?

**A. I see that.**

Q. Okay. Do you recall writing this article?

**A. I do.**

Q. What was the purpose of writing this article?

**A. Professor Jane Davidson asked me for a contributed article in one of these issues of the Solar Energy Journal, so I -- I complied with her request.**

Q. Okay. And in "Monitoring" you're talking

about monitoring the -- the critical areas in a clean room and as well as a healthcare facility; correct?
**A. As I'm reading "Monitoring," it starts out with pressure difference --**
Q. But --
**A. -- between clean zones.**
Q. But this is "Airborne Infection Control in Health Care Facilities;" correct?
**A. Yes.**
Q. So this is talking about monitoring in those types of facilities; correct?
**A. Yes.**
Q. Okay.
**A. Uh-huh.**
Q. If you go to the last page -- or the last -- before the --
The next page, it says, "An alternative is to use a continuous particle counter for the measurement of total aerosol concentrations versus time with periodic sampling of bioaerosols." Do you agree with that statement?
**A. Yes.**
Q. And if you read two lines before that, it talks about there could be elevated concentrations that could occur as short-term bursts; correct?

**A. Yes.**
Q. So do you agree that you could use particle counting to measure the total aerosol concentration in an operating room?
**A. Within the range of the instrument, yes.**
Q. Okay. And if you used --
Most instruments, they could go from .3 to 10 microns; correct?
**A. Optical particle counters can, yes. There are other instruments that could go much lower and much higher.**
Q. But for the purposes of an operating room, .3 to 10 microns would be appropriate; correct?
**A. That's a reasonable particle-size range.**
Q. You don't need nanometers at all.
**A. Not -- not --**
**No.**
Q. Yeah. Bacteria are -- are not that small; correct?
THE REPORTER: Was there an answer?
MR. ASSAAD: I thought he said yes.
Q. But bacteria are not that small; correct?
**A. Yes.**
Q. When a Bair Hugger is turned on, how long do you think it takes for equilibrium to reach?

**A. How do you define "equilibrium?"**
Q. Well, the Bair Hugger's turned on, the, you know, Bair Hugger blanket's at room temperature, --
**A. Yes.**
Q. -- the blankets are at room temperature, the drape is at room temperature, the table is at room temperature. How long do you think it takes for the Bair Hugger, when you turn it on, to actually heat up itself to get to, you know, where it could eject air at -- at 40 to 41 degrees Celsius and then warm up the drapes around it and to get to like -- to equilibrium?
**A. The only basis I can reply to that would be the tests we did in the test room.**
Q. And -- and --
**A. And I --**
Q. -- what's your answer? How long?
**A. I recall the --**
**It took a matter of a few minutes before the supply-air temperature was up -- up to design values, and then I -- I don't know how long it would take for the entire hose and the blanket to reach equilibrium.**
Q. Now did you look at the temperature on the Bair Hugger, of what the exit temperature is?
**A. Not while I was doing my measurements, no.**
Q. Do you know whether or not it was on high or

low or medium?
**A. It was on high. We did --**
**Yes, it was on high.**
Q. And the temperature that it comes out of the blower, do you know if that temperature being measured is out of the exit end -- end of the hose or at where the blower -- where the air comes out of the blower itself?
**A. I don't recall that level of detail.**
Q. Well you agree with me that that would be important information to know, to know the actual air entering into the Bair Hugger blanket, what temperature it is; correct?
**A. Yes.**
Q. Okay. And -- strike that.
Doctor, assuming that when you did the temperature in the testing with the Bair Hugger and you saw an increase of five degrees Celsius over the assumed surgical site, would that be significant?
**A. Frankly, I was focusing on the velocity measurements, not -- not the temperature measurements, so those were -- that was considered to be secondary measurements in the -- in the study we did. So I was not paying much attention to those, I was paying more attention to the velocity.**

Q. Well you used your temperature measurements to criticize Elghabashi.
**A. I did.**
Q. Okay. And to do your Archimedes calculation; correct?
**A. Yes.**
Q. Okay. And to do your -- whether or not --
The adhesion forces with respect to particles, you used temperature; correct? Used temperature, those temperatures measurements you did in those calculations; correct?
**A. I don't recall using them in adhesion calculations.**
Q. You're right. Well -- no, you're right. My fault.
If the temperature rose by five degrees over the surgical site, would that be significant to you?
MR. GOSS: With the Bair Hugger on.
MR. ASSAAD: With the Bair Hugger on.
**A. If that's the only thing that changed and the airflow did not change at all, I would say that's -- that's not significant.**
Q. Well how would you think the heat increased?
**A. Could be from the lights or from personnel.**
Q. Lights are constant, personnel are constant.

Say the Bair Hugger turns on, that's the only change, it goes up five degrees. Would that be significant to you, having everything else constant?
**A. If everything else is constant, that would be the logical choice.**
Q. Okay. Would that be significant with respect to airflow disruption?
**A. It -- it -- it possibly could be.**
Q. Okay. Do you know who Professor Kurz is -- or Dr. Kurz?
**A. I do not think I know him.**
Q. I'll represent that she is on the advisory panel for 3M. Have you seen any literature that she's produced?
**A. No.**
Q. If the temperature around the surgical table -- surgical site increased by five degrees when the Bair Hugger was on, would you agree with me that there's going to be a bouyancy force around the surgical table?
**A. There -- there's a bouyancy force anyway because of the patient temperature and the wound temperature, and that buoyant force is typically very weak compared to the forced-air pressure force coming down from the flow from the ceiling.**

Q. So you have the flow coming down from the ceiling at whatever, 59 degrees Celsius, correct, with a certain velocity; correct?
**A. Yes.**
Q. But all of a sudden the Bair Hugger is on and there's a five-degree increase in temperature over the surgical site.
**A. Yes.**
Q. What's causing that heat to get up to that -- to that area?
MR. GOSS: I'm going to object to 59 degrees Celsius, counsel. It sounds a little hot.
MR. ASSAAD: Or 59 degrees Farenheit. I'm sorry.
MR. GOSS: All right.
MR. ASSAAD: Thank you.
**A. It sounds like it would be coming somewhere from the Bair Hugger.**
Q. So the heat would be com --
It would be from the waste heat of the Bair Hugger; correct?
**A. That sounds like a logical conclusion, yes.**
Q. Okay. Let's go to Exhibit D of your report, of Exhibit 1.
**A. Okay.**

Q. And that has to deal with the Archimedes number; correct?
**A. Yes.**
Q. Have you ever calculated the Archimedes number in the past 20 years?
**A. Yes.**
Q. For what purpose?
**A. We were looking at the ventilation in hog barns, the air coming in through the slot in one side of the barn and then out through the fans on the other side, exhausted on the other side.**
Q. Okay. Now let's go through the equation. You know the Archimedes number --
Which is dimensionless; correct?
**A. Yes.**
Q. -- equals the gravity, which is g.
**A. Yes.**
Q. And that's a constant; correct?
**A. Yes.**
Q. L, what's L?
**A. It's a -- a length scale, which typically this is applied to air jets, so it would be the -- say the width from the diameter of that air jet.**
Q. Okay. And you take one inch.
**A. Yes, because I was based that -- basing that**

**on the measurements we made of the velocity leaving the Bair Hugger blanket that we did.**

Q. But where did you make the demens --

Where did you get a length scale of one inch?

**A. Well based on moving the probe around as the flow is coming out the edge of the blanket, that seemed to be the width of the jet roughly three inches from the blanket edge.**

Q. Three inches from the blanket edge?

**A. Yes.**

Q. So you're saying the jet was only one inch wide?

**A. Approximately, yes.**

Q. That's all you measured coming out of the blanket edge.

**A. Well I was measuring the velocities and the -- and the temperature there, and by measuring the velocities I would move the probe up and down and try to determine the width of the jet and where the centerline was.**

Q. Let's talk about engineering common sense here. Okay? You have a blanket with over a thousand holes blowing 43- to 45-cubic-feet-per-minute air. Do you agree?

**A. Yes.**

Q. And you're saying that the length of the air coming out of that area is only one inch?

**A. That's the width of the air jet that I measured coming out of the blanket.**

Q. Okay. Is that the only place the air did come out of the blanket?

**A. No.**

Q. Okay. Why didn't you use the length of where all the air was coming out of the blanket?

**A. You could think of the air coming out of the blanket as -- as being with a certain height and a certain length along the length of the blanket, so it's the width of the jet, not the length of the jet that's important.**

Q. So the width as in --

**A. Think of --**

Q. -- an X axis?

**A. Think of a slot. So air coming out of a slot, which would be coming out the edge of the blanket.**

Q. What would -- is it the hydraulic width or -- or --

Like what's the width of -- of the air coming out of this slot here, this air, or

these -- or these slots over here, the air supply?

**A. If one looked at an individual slot, it would be about a half inch.**

Q. A half inch?

**A. Yeah, for -- for an individual slot.**

Q. So you're looking at the width, not the length.

**A. Yes.**

Q. Okay. And you're saying when you move the temperature -- or the -- the measurement device, you moved it up and down one inch; correct?

**A. Moved it up and down sufficient to -- to map out the approximate width of the jet to be about one inch.**

Q. And did --

How did you measure that?

**A. Just by monitoring the velocities, primarily, as I was moving the probe up and down.**

Q. Okay. So you did it by looking at it by eye. You didn't get a measurement you needed to scale.

**A. No. No.**

Q. Okay. So -- so it's your -- it's your testimony today that the width of the air coming out of the Bair Hugger blanket three inches from the

blanket is only one inch.

**A. Again, that was the representative measurement I took to try to put a reasonable value into this Archimedes equation.**

Q. Okay. Have you looked at other areas of how to calculate the length, what other people use in the field?

MR. GOSS: The width or length?

MR. ASSAAD: The width, so L.

**A. Typically, for a -- a slot, it -- it's always the width.**

Q. You do understand, when you're looking at air jets, length is the distance of how far the air pene -- jets out from the hole in a perpen -- like a perpendicular -- if the hole is -- parallel to the hole; correct?

**A. Again, the Archimedes number is the ratio of Reynolds number and Grashof number.**

Q. I understand that. But when --

If you look at other studies, as you look at act -- the Handbook of Fundamentals, Chapter 20, did you actually go and look at it?

**A. I don't believe I did. Well act -- actually, I may have done that to get this Archimedes equation. I think I referenced that here.**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Q. And did you look at what they -- when they used L, what they were referring to?
**A. I don't, again, recall that level of detail.**
Q. Well that's kind of an important detail to know what numbers to put into the equation; isn't it?
**A. Again, this is a ratio of Reynolds number to Grashof number where L is the same for both.**
Q. Well L is very important when it comes to calculating the numerator here; correct?
**A. Yes.**
Q. Because if L increases, your Archi -- your Archimedes numbers increase; correct?
**A. Yes.**
Q. Okay. And if your delta T increases, your Arch -- Archimedes number increases; correct?
**A. Yes.**
Q. Okay. These are important numbers; correct?
**A. Yes.**
Q. And ambient you used -- you used 70 degrees. Why is that?
**A. I was trying to estimate the value of the Archimedes number and determine if it's near one, much larger than one, or much less than one to determine if the force convection or natural convection was dominant, so I wasn't paying too much attention to the**

**absolute numbers here and the precision of the numbers.**
Q. So you're saying these numbers aren't precise?
**A. They're not very precise, they're -- they're estimates.**
Q. Okay.
**A. Order -- order-of-magnitude estimates.**
Q. Okay. So if length increases or the delta T increases, you could actually get an Archimedes number greater than one.
**A. Yes.**
THE REPORTER: Let's take a five, please. Off the record.
(Recess taken.)
BY MR. ASSAAD:
Q. 2013 ASHRAE Handbook Fundamentals, Chapter 20, what is that titled?
**A. I -- I don't remember offhand the exact title.**
Q. Is it titled "Space Air Diffusion?"
**A. It sounds correct.**
Q. Okay. And do you understand what a hydraulic diameter is?
**A. Yes.**

Q. What's a hydraulic diameter?
**A. It's the area divided by the perimeter.**
Q. Okay. And -- and that's for a square; correct? Or a rectangle.
**A. For any -- any flow area.**
Q. Okay. And would you agree that, according to Chapter 20, that L should be -- is equal to the length scale of the diffuser outlet equal to the hydraulic diameter of the outlet?
**A. I guess that seems reasonable.**
Q. Okay. Is that --
Did you calculate the hydraulic diameter?
**A. Not of the Bair Hugger blanket, no.**
Q. Okay. So you agree with me if that's the correct definition of what L should be, the number you used is incorrect.
**A. Again, I was just trying to get a rough order-of-magnitude estimate of the ratio between the buoyant force and the inertia force.**
Q. That wasn't my question.
**A. So if I have misread the definition of L, then so be it.**
Q. So these numbers are incorrect.
**A. They could be not entirely accurate.**
Q. Well if something --

I mean engineering is a profession of accuracy when it comes to calculations; correct?
**A. Yes.**
Q. Okay. And if you used the wrong formula to calculate -- or if you used the wrong definition of -- of length to calculate the Archimedes number, then the Archimedes number is incorrect.
**A. So the number I have here may be incorrect, yes.**
Q. Okay. And the delta T, that 75 degrees for delta T is the difference between -- is -- is the temperature you measured in Exhibit B; correct? Seventy-five degrees.
**A. Yes, it is.**
Q. And let me ask you another question: Delta T, according to your definition, is the temperature difference between the jet and ambient; correct?
**A. Yes.**
Q. And then in the denominator you're supposed to go temperature ambient times velocity square; correct?
**A. Yes.**
Q. And you used two different temperatures for ambient here; isn't that correct? One is 66, the other is 70.

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN 1-800-553-1953 info@stirewalt.com

**A. Yes. Because the temperature in the denominator I took to be the -- the mean of the two, the -- the jet temperature of 75 and the room temperature of 66.**
Q. Well isn't the room temperature the ambient temperature?
**A. I guess one -- one -- one could use that definition, yes.**
Q. Well --
**A. It's --**
Q. -- it's your definition here, doctor.
**A. Yes.**
Q. T ambient is the mean absolute temperature of the jet and its surroundings.
**A. Yes.**
Q. Okay. And how did you calculate 70?
**A. Seventy was -- was an estimate, as I said, between the 75 we measured and the 66 we measured.**
Q. Okay. And -- and the 460 is just to make it absolute; correct?
**A. That's correct.**
Q. So if you would --
Would you agree with me that the hydraulic diameter of the Bair Hugger blanket is much larger than one inch? Correct?



**A. For --**
MR. GOSS: Object to form.
**A. For the blanket, yes.**
Q. Okay.
**A. For the entire blanket.**
Q. Okay. So you would agree with me that if you actually used the hydraulic temperature of the blanket, that that would significantly increase the Archimedes number.
**A. Say that again.**
Q. If you used the actual hydraulic temper -- hydraulic diameter of the blanket, that would significantly increase the Archimedes number; correct?
**A. It would change it from the value of one inch I used to perhaps 10, 15 inches.**
Q. Ten, 15 inches.
What's the dimension of the Bair Hugger blanket?
**A. I'm -- I'm talking about an edge -- one of the edges of the blanket since the air is blowing different directions on different edges.**
Q. Well you can't use an edge because you're looking at area divided by perimeter; correct? An edge doesn't have an area.
**A. But the air is coming out between the --**



**what I'll call the blanket over the Bair Hugger blanket and the Bair Hugger blanket itself along an edge someplace.**
Q. You don't know what the Arch --
You don't know what the length is; do you? You're just using a number.
**A. I can estimate it based on the dimensions of the blanket.**
Q. What are the dimensions of the blanket?
**A. I -- I could hazard a guess. I don't know the exact numbers.**
Q. Okay. So sitting here today, you agree with me that based on the definition provided by the ASHRAE Handbook of Fundamentals as to what length is supposed to be, that the numbers that you have given for the Archimedes number is incorrect.
**A. That appears to be the case.**
Q. Let's go to Exhibit C of your report. Exhibit C is titled "Calculation of potential particle removal between the bottom of the Bair Hugger and the floor which would also be the case when the Bair Hugger is sitting on a cart with a flat top." Did I read that correctly?
**A. That's correct.**
Q. And you are calculating the forces needed to



basically move a particle that's on a floor; correct?
**A. On a flat surface, yes.**
Q. On a flat surface. Okay.
Do you know whether or not Corn and Stein were looking at -- strike that.
Did you actually read the article that was authored by Corn and Stein in 1965?
**A. I don't believe I did, no.**
Q. You just looked at the diagram; didn't you?
**A. In the textbook by Hinds, yes.**
Q. Okay. And they're talking about what force would be required to begin to basically move a particle on a flat surface; correct?
**A. Yes.**
Q. And the forces is --
Do you know what the direction of the force was?
**A. Force would have to be horizontal to the surface.**
Q. Okay. So parallel with the surface; correct?
**A. Yes.**
Q. Okay. So that's not this case here; is it? There's a vertical component of that force; correct?
**A. Could you clarify "vertical component?"**

Page 313

Q. Well, you have a particle on -- on the surface; correct?
**A. Yes.**
Q. And you have a velocity of air going against gravity up; correct? So there's a force, a suction force on the particle; correct?
**A. I think it's strictly a -- a shear-force issue where the flow is blowing parallel to the surface the particle is attached to.**
Q. So you don't think that the upward force has any effect on whether or not a particle is going to move with a certain amount of force?
**A. I --**
**My understanding of this data, it's based on a horizontal --**
Q. I under -- I understand that.
**A. Uh-huh.**
Q. But we're not just looking at a horizontal force with the -- with the effect of a Bair Hugger sucking in air from the floor; correct?
**A. If we're looking at particles attached to a horizontal surface, there is no vertical velocity at the surface.**
Q. Of the particle; correct?
**A. And the surface.**

Page 314

Q. And the surface. But there's a -- there's a -- there's a force -- there's a force that's -- that the Bair Hugger is exerting on the particles, which is an upward force from suction.
**A. If you're talking about a particle attached to a surface, --**
Q. Yes.
**A. -- I -- I disagree with that.**
Q. Okay. So you're saying all the -- when -- when a --
When a Bair Hugger is turned on and it's on the floor and it's -- it is .626 inches above the floor, that the force it exerts on the particle is only horizontal?
**A. I'm looking at the most likely scenario to dislodge particles attached to the surface.**
Q. Now what was the point of you performing this calculation?
**A. I was responding to -- I believe it was Koenigstofer's report.**
Q. What part of his report?
**A. Re -- report where he said --**
**If I could go back to my report here. On page nine of Exhibit 1 there's items two and three. "The Bair Hugger draws particles off the floor into**

Page 315

**the unit. It functions much like a household vacuum cleaner," and number three, "The air velocity at the floor under the Bair Hugger is sufficient to entrain particles from the floor."**
Q. Okay. But with respect to Dr. Elghabashi's report, this -- this Exhibit C has nothing to do with his report; correct?
**A. He's not assuming particles are attached to the floor. They're in a volume.**
Q. So you agree with me that Exhibit C, the calculations in this report, has nothing to do with Dr. Elghabashi's report; correct?
**A. That's correct.**
Q. And it seems here that you calculated the area for a cylinder; correct? The outside area of the cylinder, not the --
**A. For a sphere.**
Q. Huh? For a sphere?
**A. Yes.**
**Where -- where are you looking at?**
Q. Part of Exhibit C. Under A.
**A. Oh, under A.**
Q. PiDH.
**A. Yes, that -- that's the -- the cylindrical passage between the edge of the filter and the bottom**

Page 316

**of the -- I think it was a 505 Bair Hugger model and the edge of the case. That was the --**
Q. And -- and PiDH is the calculation -- the calculation of the area of a sphere -- or of a -- of a cylinder; correct?
**A. Yes.**
Q. Okay. Not a sphere.
**A. Yes.**
Q. Okay. And for the velocity of 27 CFM, where did you get that number from?
**A. I believe that was provided by counsel.**
Q. They actually gave you 27 CFM for the 505?
**A. I believe that was correct.**
Q. And so you relied upon that number; correct?
**A. Yes.**
Q. Is there any document they provided to you to give you that number?
**A. There -- there may have been. I -- I cannot recall.**
Q. In Exhibit E, what were you look -- what document in here did you use to rely on that 27 CFM?
**A. Exhibit D?**
Q. E.
**A. Oh, E.**
Q. Under "Materials Considered."

**A. I don't -- I don't think it was a document, it was probably discussion with -- with counsel.**
Q. So when I asked you are there any facts that you relied upon from counsel and you told me "no" earlier in this deposition, that wasn't correct.
**A. Apparently you -- you found one that was not in my list.**
Q. Any other facts or -- or information that is in your report that you obtained from counsel and you rely upon?
**A. Not that I can think of offhand.**
Q. And with respect to Fig. 6.4 of Exhibit C, do you know what type of floor or -- or the surface that the glass beads were on?
**A. Fig. 6.4, those are smooth surfaces.**
Q. Okay. Do you know what the surface is like in an operating room?
**A. It's, I would assume, not as smooth as the surface as used for these measurements.**
Q. And that would change --
And -- and when the surface is not smooth, the adhesion force is less; correct?
**A. It's more.**
Q. More?
**A. Yes. Because there's more contact areas between the particles and the surface.**

Q. When it's smooth or not smooth?
**A. When it's not smooth.**
Q. More contact --
**A. Yes.**
Q. -- with the sphere and the surface?
**A. Yes, because of the irregularities in the surface.**
Q. You have facilities at the University of Minnesota to test the Bair Hugger filtration; correct?
**A. There probably are. But as I said, I'm a retired faculty member and do not really have access to that.**
Q. Okay. But you have colleagues that have access to it; correct?
**A. Yes.**
Q. Did you ask any of them to -- to do an efficiency testing on the filter?
**A. No, I have not.**
Q. And you have a clean room in the University of Minnesota?
**A. Actually, two.**
Q. Two.
**A. Yes. One in the Electrical Engineering Building that was built in the, I think, mid-'80s, and there's a newer one in the -- it's actually a new physics building.**

Q. And they're both still working?
**A. As far as I know, yes.**
Q. And you've used before neutrally buoyant helium bubbles in your -- in your testing; correct?
**A. I have, yes.**
Q. And that's a -- a reasonable methodology to follow an airflow; correct?
**A. For low-velocity airflows, yes, in -- in room environments.**
Q. In a what?
**A. In room environments.**
Q. Such as an operating room?
**A. I would think so, yes.**
Q. Okay. Do you know whether or not the Bair Hugger filters have binders in them, uses binders?
**A. I do not know for certain, but I would assume they did.**
Q. But you would be guessing.
**A. I would be guessing.**
Q. Go to page four of your report. And -- and with respect to the filter testing, do you know if 3M has asked anyone at the University of Minnesota to do any filter efficiency tests?

**A. Regarding the Bair Hugger?**
Q. Yes.
**A. Not that I'm aware of.**
Q. So looking at the diagram of impaction, it states, "Impaction occurs when the momentum of a large particle causes it to deviate from a streamline and collide with a filter fiber..." Did I read that correctly?
**A. Yes.**
Q. Okay. We talked about this earlier; correct?
**A. Yes.**
Q. Okay. So looking at this picture here, that -- would you consider that deviation of a streamline significant?
**A. Yes.**
Q. Okay.
**A. Uh-huh.**
Q. Then if you go to page five, do you agree that, based on page five, any particle size greater than one micron, that its primary source of filtration is impaction?
**A. I think that's -- as --**
**As the figure indicates here, that would be correct.**

Q. Okay. Would that indicate that particles over one micron rarely follow air streams unless the air stream is not changing?

**A. Well with -- within the filtration media, they do not follow the streamlines.**

Q. And that would --

I mean if they don't follow the streamlines, then the filtration media --

If there's a change in the streamline in the regular environment, inertia is going to cause it to deviate from the streamline; correct?

**A. As I said before, it depends on the magnitude of the acceleration perpendicular to the direction of flow.**

Q. And as well as how intense the turbulence is; correct?

**A. Yes.**

Q. Do you think it's possible to use a HEPA filter in the Bair Hugger 775?

**A. I would say yes, it's possible.**

Q. But sitting here today you don't think it's necessary.

**A. I do not, no.**

**(Discussion off the stenographic record.)**

Q. But since the Mistral and WarmAir uses a

HEPA filter, there should be no reason from an engineering standpoint that a HEPA filter cannot be used in the Bair Hugger; correct?

MR. GOSS: Objection to form.

**A. There are a lot of other variables to consider; you know, the flow rate, the motor size, leakage issues. There would have to be some redesign.**

Q. Of course you have to change the motor. You need a more powerful motor; correct?

**A. Yes.**

Q. You write on paragraph nine -- or page nine, the first paragraph, "The Bair Hugger's incorporation of a MERV 14 filter -- the same minimum filtration level that ASHRAE recommends for air supplied to operating rooms -- provides additional protection from airborne bacteria for patients undergoing surgery."

What basis do you have that the filter that's used in the Bair Hugger provides additional protection from airborne bacteria for patients undergoing surgery?

**A. So I was referring to the filter in the incoming air into the operating room itself being filtered, as we've talked about, twice, the prefilter and -- and the final filter, and then that air going through a third filter, really, through -- through the**

**Bair Hugger.**

Q. And you don't think that air picks up any bacteria or -- or -- or particles between the HVAC system as it goes over the patient and the surgical staff?

**A. It certainly could and probably does.**

Q. You -- you really have no basis for that statement; isn't that correct?

MR. GOSS: Objection, form, argumentative.

Q. It's pure speculation; correct?

MR. GOSS: Object to form.

**A. Again, I was referring to the secondary -- the filtration after the filter -- filtered air entering the room.**

Q. So you have a fil -- air coming out after it's been filtered twice, and it picks up a lot of junk by the time it gets to the floor, and the Bair Hugger filters that, you consider that additional filtration?

**A. Yes.**

Q. Okay.

**A. Uh-huh.**

Q. Okay. Additional protection?

**A. It's removing particles from the air, yes.**

Q. Well why do you consider it to have

additional protection from the airborne bacteria for patients undergoing surgery? What's additional?

**A. It -- it's -- it's an additional removal mechanism of particles in the OR.**

Q. Why were you concerned about the particles on the floor or below the operating room table?

**A. Again, they -- they could be transported to the surgical site for some reason.**

Q. Such as use of the Bair Hugger?

MR. GOSS: Object to form.

Q. Maybe; correct?

**A. Well, possibly.**

MR. GOSS: Calls for speculation.

Q. Are you aware that --

You've read Michael Buck's report; correct?

**A. Yes.**

Q. And he conducted some of those tests in the clean room at the University of Minnesota. Are you aware of that?

**A. Yes.**

Q. Have you ever used that clean room?

**A. I have, actually. I -- I think so.**

Q. Okay. The small one, it's like on the bottom floor of a building.

**A. Yeah, the basement floor of the Boynton**

**Health Service Building.**
Q. Okay. When was the last time you used that?
**A. Probably early '90s.**
Q. Okay. Do you disagree with his report that when the Bair Hugger was turned on, that there was an increase in particles found in the clean room irregardless of size?
**A. I would have to look at his report.**
Q. Well you've criticized his report, so do you have the report with you today?
**A. I did not bring it, no.**
Q. Okay.
**A. By the way, I -- I was not provided the tableted results until Friday. All I was able to comment on was his plots up to -- up to Friday.**
Q. So on Friday you also received his -- his -- his results, his numerical results; correct?
**A. Yes. Yes.**
Q. Do you agree, based on what you've seen on Friday, that there was an increase in particles when the Bair Hugger was turned on?
**A. Again, I'd have to go back and look at the -- look at the data.**
Q. Okay. Do you know who Andy Streifel is?
**A. I do.**

Q. We talked about that before; right?
**A. Yes.**
Q. Do you know what he does for a living?
**A. He's basically a hospital infection-control specialist.**
Q. Environmentalist; correct?
**A. Yes.**
Q. Okay. And he goes around testing air quality in hospital rooms; correct?
**A. Yes.**
Q. Do you agree he's an expert in that field?
**A. Yes.**
Q. Have you read an article authored by Ativan?
**A. I --**
MR. GOSS: Avidan?
MR. ASSAAD: Avidan, yes.
**A. I do not recall that I have.**
Q. Do you believe a filter is required on the Bair Hugger device?
MR. GOSS: Objection, vague.
**A. I would -- I would say it certainly makes intuitive sense to include a filter, yeah.**
Q. Why?
**A. Several reasons. You want to --**
Q. Well for -- forget about --

I'm talking with respect to patient safety. I understand that every motor needs a filter in front of it so you don't destroy the motor, like most cars do and everything like that.
**A. Right.**
Q. Okay. Forget the reasons for protection of the device. Do you believe that it needs a filter to protect contamination of the operating room?
**A. It would certainly help protect the -- or ensure the air leaving the blanket is -- is -- has lower concentrations than if the filter was not there.**
Q. Do you believe that the blanket can prevent --
Is there anything within the blanket that protects bacteria from coming out of the -- the perforations?
**A. Because the blanket is made of a non-metallic -- I'm not sure the exact material, and there's a large surface area within the blanket, I would think there would be some -- some deposits within the blanket itself before the particle leaves the holes, yes.**
Q. Okay. But some particles will leave the holes.
**A. Some particles will leave the holes, yes.**

Q. And some of that will contain bacteria; correct?
**A. Most likely, yes.**
Q. Okay.
**A. Uh-huh.**
MR. ASSAAD: At this time, doctor, I have no more questions. I think your counsel might have some questions.
Thank you.
THE WITNESS: You're welcome.
MR. ASSAAD: Oh. Before I forget, I'm going to leave this deposition open based on his notes, his 30-page notes we may receive, as well as the photos that -- we requested some of the photos he's also received from you.
MR. GOSS: All right. I have a few questions.
THE REPORTER: Let's go off the record a moment, please.
(Discussion off the record.)
REDIRECT EXAMINATION
BY MR. GOSS:
Q. Dr. Kuehn, you were asked questions about notes that you had in connection with your work on this case. Do you recall that testimony?

**A. Yes, I do.**
**(Discussion off the stenographic record.)**
Q. All right. And those notes included some of the calculations that are reflected in your report; correct?
**A. Yes. They were the preliminary calculations I did that ended up in the report.**
Q. Okay. And those notes also included notes on conversations that you had with me; correct?
**A. Yes.**
Q. All right. Is there anything substantive in those notes, setting aside the notes on conversations you had with me, is there any -- any substance in those notes that -- different from or in addition to what ended up in your report?
**A. Nothing substantive, no.**
Q. Okay. If you would turn to your report, please, Exhibit 1, and in particular let's look at Exhibit B, which is the document -- or it's the exhibit entitled "3M Lab Measurements," and I believe you testified earlier that -- that it was your idea to take some measurements of temperature and velocity coming from the -- from a setup Bair Hugger; is that right?
**A. That's correct.**

Q. All right. Why did you want to do that?
**A. I wanted to have first-hand experience rather than relying on second- or third-hand information.**
Q. Okay. And what --
Why did you want the information? What was it about the information that was pertinent to your work in the formulation of your opinions?
**A. It was primarily the velocity both leaving the Bair Hugger blanket and near the filter or the intake of the Bair Hugger to address the issues of particle dislodgement and -- and the -- where the air would go once leaving the blanket.**
Q. Okay. And if you'll look at that first page of the exhibit, these are the measurements that were taken three inches from the blanket edge where the picture is shown; is that right?
**A. That's correct.**
Q. All right. And if you compare from a velocity standpoint the numbers for that measurement to the -- the numbers taken in other places, can you comment on any differences there in terms of the velocity?
MR. ASSAAD: Objection, vague.
Q. I guess what I would ask you is: What does

the -- the first page of the exhibit show you in terms of the velocity relative to velocity measurements elsewhere around --
MR. ASSAAD: Objection, vague.
Q. -- elsewhere around the setup that's depicted here?
MR. ASSAAD: Objection, vague and leading.
**A. I was looking at the -- the --**
**The question arose as what impact the velocity would have leaving the Bair Hugger blanket on the surgical site, air movement through the surgical site, so I was looking at velocities leaving the blanket, as best as I can measure with the setup provided, and determine that these -- these velocities were -- near the blanket were -- were quite high, but then they diminished rapidly as the air mixed with air in the room.**
Q. Okay. You testified earlier about your efforts to measure the width of the jet from the Bair Hugger blanket. Do you recall that testimony?
**A. Yes.**
Q. All right. Does this picture on the first page of -- of Appendix B, is -- is this where you were placing the probe to try to measure the jet?
**A. Yes, it was.**

Q. Okay. And you'll see the temperature measurements here begin with the Bair Hugger off, and it's 66.2 degrees; correct?
**A. Yes.**
Q. All right. And then what happens to the temperatures subsequently?
**A. The temperatures tend -- tended to rise.**
**And I should probably point out that the order of data shown in the table does not necessarily represent the order the data was taken in the -- in the facility.**
Q. Okay. So the -- the -- the measurements or the -- the part of the table that counsel was asking you questions about, the three inches over the hip, the first two lines of that --
Do you want to flip to that, the three inches over the hip?
**A. Yes.**
Q. Okay. So the first two rows of the chart show temperatures at 70.7 degrees Fahrenheit and 71.4 degrees Fahrenheit; correct?
**A. That's correct.**
Q. And that's with the Bair Hugger off.
**A. Yes.**
Q. All right. And then there are two

Page 333

subsequent measures, 64.9 degrees and 64.6 degrees with the Bair Hugger on; correct?

**A. Yes.**

Q. And I think you testified earlier that it didn't make sense to have those values in sequence; in other words, to have the temperature drop by five degrees; correct?

**A. That's correct.**

Q. All right. So how would you explain what's reported on this chart?

MR. ASSAAD: Objection, lack of foundation, calls for speculation.

**A. As I mentioned before, we do not have a timestamp on any of the data here, so the data presented in a given area were probably taken at different times.**

Q. Okay. What was your overall goal in taking the measurements reflected in Appendix B to your report? What was -- what was the purpose of doing it?

**A. I wanted some first-hand experience myself of what the -- primarily the velocities were near the entrance to the filter near the floor and near the edge of the blanket, so the -- and it was really --**

**Obviously, it's not an OR, I appreciate that, so it's not going to be a -- a purely totally**

Page 334

**accurate, reproducible set of results that one would obtain in an OR. It was intended to be a preliminary study to get some reasonable data in terms of the -- mainly velocity, and since we had temperature capability, we also included the temperature measurements.**

Q. So in your review of the plaintiffs' expert reports, did you -- did you see any measurements of temperature or velocity around a Bair Hugger in any of their reports?

**A. No, I did not.**

Q. And was your intent for this preliminary exhibit to be of publishable quality?

**A. Certainly not.**

Q. Okay. Okay. With respect to your calculation of the Archimedes number, you were asked questions about the proper value for L in that equation. Do you recall that?

**A. I recall that.**

Q. Okay. If the L were a different value, how would that affect your opinions in this case, if at all?

MR. ASSAAD: Objection, calls for speculation.

**A. I don't think it would affect my opinions if**

Page 335

**we increased L to make it the distance from the edge where the jet was emanated to someplace in the jet. The delta T would also diminish, and so since the Archimedes number is a very low value now, I don't think it would change my opinion.**

Q. Okay. If you look at Exhibit 15, which is your article that was published in the Journal of Solar Energy Engineering, pages 369 and the top of 370, and you were asked questions about your statements about monitoring particles in -- in a healthcare environment; correct?

**A. Yes.**

Q. All right. And you were asked about the use of a particle counter to measure the total aerosol concentration; correct?

**A. Yes.**

Q. All right. Is a particle counter alone sufficient to measure a bioaerosol concentration in a healthcare environment?

**A. A particle counter is not capable of measuring -- or distinguishing between a --**

Q. Okay.

**A. -- biological particle and a non-biological particle.**

Q. So what you say here is an alternative is to

Page 336

use a continuous particle counter for the measurement of total aerosol concentration versus time with periodic sampling for bioaerosol. What were you referring to when you mentioned "periodic sampling for bioaerosol?"

**A. That periodic sampling for bioaerosols could be done using a -- a sled impactor, for example, or an Andersen impactor.**

Q. And would you need to use those in order to have a real understanding of the bioburden in that room or environment?

**A. Yes, because an optical particle counter does not provide information on the biological nature of the particle.**

Q. Okay. I believe counsel asked you whether -- whether the Bair Hugger use could transport particles to the surgical site. Do you recall that question?

**A. I do.**

Q. Okay. What -- what is your -- and --

And I think your answer was "Well, possibly."

**A. I -- I think that was my response.**

Q. And what did you mean by that or what was the basis for that response?

**A. I don't think it's very likely, but there are various factors in an operating room that may change, so under certain conditions it -- it could be possible.**
Q. So there are other pieces of equipment in the OR that move air; fair?
**A. Yes.**
Q. All right. And there are people in the --
MR. ASSAAD: Objection.
MR. GOSS: Sorry, I'm -- I'm leading.
MR. ASSAAD: Object to the form.
Q. Let me -- let me try it this way: What -- what are the different things in an operating room that could cause the movement of -- of particles to the surgical site or anywhere else?
**A. Well number one --**
MR. ASSAAD: Objection, outside the scope of his report, outside -- it's outside the scope of my direct, and --
**A. Could you repeat the question again?**
Q. Sure. My question was -- hold on a second.
So you said there are various factors in an operating room that may change. What are -- what are some of the factors you have in mind there?
MR. ASSAAD: Objection, lack of foundation,

object to form.
**A. Again, I would envision an operating room has several personnel, surgeons, anesthesiologists, other -- other personnel that would be moving tools that would -- that would be in operation, tools being handed to the surgeon and -- and -- and vice versa, so quite a bit of movement around the surgical site.**
Q. All right. You were asked some questions about a couple of other patient warming products, one was the Mistral and the other was Warmtouch. Both of those incorporate HEPA filters, or so you were told by -- by plaintiffs' counsel. Do you recall that?
**A. Yes, I do.**
Q. All right. Does -- does a HEPA filter remove 100 percent of particles from the air?
**A. No. Even a HEPA filter allows some particles through.**
Q. And are there potential disadvantages to using a HEPA filter from an engineering standpoint?
**A. Well a HEPA filter generally creates a higher pressure drop to the filter, which would mean a lower pressure drop on the downstream side of the filter around the fan, which could potentially aggravate any leaks between the filter and the housing or leaks between the filter media and the filter**

**frame.**
MR. GOSS: Okay. That's all I have for now.
MR. ASSAAD: A few follow-up.
RECROSS-EXAMINATION
BY MR. ASSAAD:
Q. What's the definition of a HEPA filter?
**A. A HEPA filter is typically --**
Q. Let me make it quick. Do you agree that it's a MERV 17 or above?
(Discussion off the stenographic record.)
MR. GOSS: Object to form.
**A. I believe that was in the -- in the ASHRAE table I included in my -- my report.**
Q. And ASHRAE is authoritative; correct?
**A. Yes.**
Q. Okay. So a HEPA filter removes 99.97 percent of .3 microns to one micron; correct?
**A. That's what it states here, although they are typically measured at just 0.3 microns, but then the efficiency actually increases for particle sizes larger than .3.**
Q. So higher than 99.97; correct?
**A. Yes.**
Q. Almost to a hundred percent; correct?
**A. In some particle sizes, yes.**

Q. Well between three to 10 particles, what's the efficiency rating for a HEPA filter?
**A. I don't have a -- a precise number I can give you.**
Q. Would agree with me that it's larger than 99.999 percent?
**A. I --**
**Again, without looking at -- at the evidence, I -- I -- I could not agree with that.**
Q. Well .3 to .1 for a MERV 17 is 99.97; correct?
**A. Say that again.**
Q. The efficiency for a HEPA filter at -- at MERV 17 is greater than or equal to 99.97 percent efficiency for .3 to one micron; correct?
**A. Yes, that's correct.**
Q. Okay. And when you go from one to three or three to 10, it will be greater than 99.97; correct?
**A. That's correct.**
Q. Okay. So sitting here today, you are purely speculating as to whether particle -- particles that could carry bacteria could pass through a -- a HEPA filter; correct?
MR. GOSS: Object to form.
**A. Again, HEPA filters are not a hundred**

Page 341

**percent efficient. It's possible that some very small number could get through at larger particle sizes.**

Q. Well it's definitely less than .03 percent of the particles, correct, for that size?

**A. Depending on the particle size of interest, that could be true.**

Q. Okay. And you agree with me that a HEPA filter is going to filter out more bacteria than a MERV 14 filter.

MR. GOSS: Objection, form.

**A. Yes, I --**

**Yes.**

Q. Okay. Let's think about other --

You mentioned other -- there might be other factors that could cause contamination of the surgical site. I think you mentioned people moving, stuff like that. Is that correct?

**A. Yes.**

Q. Okay. When did you formulate that opinion? Just outside now when you spoke with counsel?

MR. GOSS: Object to the form.

**A. No. I think I -- I may have read that in some of the ASHRAE documentation on the -- the hospital design guide or somewhere else.**

Q. Where? Is it in your report?

Page 342

**A. That specific statement is probably not in my report.**

Q. What's your basis to support that statement that -- that -- that people moving in the operating room could cause surgical-site infections?

MR. GOSS: Object to the form. I don't think that was his testimony.

Q. Did I misstate your testimony?

**A. Without going back and -- and reviewing what I said, it may have.**

Q. Now you also mentioned with the Archimedes equation that if you change the L, it would change the delta T. What's your basis behind that?

**A. Because as a heated jet propagates through air, it's going to be losing the temperature difference -- the maximum temperature difference between the -- the jet and at ambient as it gets further away from the -- the source of the jet.**

Q. Well we're not just talking about one jet here, we're talking about thousands of jets.

**A. I'm talking about the combined air leaving the edge of the blanket entering the room, not that -- not individual holes in the blanket.**

Q. And you -- and you are assuming that delta T would change?

Page 343

**A. Yes.**

Q. And what's your basis behind that?

**A. I think that's -- that's engineering knowledge about thermal jets as they propagate into -- into room air.**

Q. Okay. So you're saying --

But the delta change might actually increase depending on where you take the measurement.

**A. I have -- I have never seen that.**

Q. Okay. With respect to Exhibit B, you have no idea sitting here today in what order you took those measurements; correct?

**A. Not based on what's provided in Exhibit B, no.**

Q. Are they in your notes anywhere?

**A. I was not the one taking the notes.**

Q. Oh. Who took the notes?

**A. Peter and Vinita.**

Q. Okay.

(Discussion off the record.)

BY MR. ASSAAD:

Q. Do you agree that in a typical orthopedic surgery you're going to have people moving --

You're going to have surgeons; correct?

**A. Yes.**

Page 344

Q. And they'll be moving; correct?

**A. Yes.**

Q. And you'll have other staff in the operating room; correct?

**A. Yes.**

Q. And the devices, like the anesthesia machine as well as any other device; correct?

**A. Yes.**

Q. Okay. There's a constant set of people and devices in an operating room; correct?

**A. I don't know about constant set, but there's certainly a -- a -- a variety of human operations -- operators, typically, and equipment.**

Q. And you agree with me that in Elghabashi's report, that he looked at the impact of the Bair Hugger with all those -- with people in the room; correct?

**A. Yes.**

Q. With lights; --

**A. Yes.**

Q. -- correct?

With the back tables.

**A. Yes.**

Q. Okay. And it's because that people are going to affect the airflow in a room; correct?

**A. Yes.**

Q. And there's going to be some thermal plumes that come off from people; correct?

**A. Right.**

Q. Okay. And when you want to model something in CFD, in a CFD model, you want to be as precise as possible; correct?

**A. Yes.**

Q. If you want to model whether or not particles get to the surgical site, you'd want to have a heat source from the lights; correct?

**A. Yes.**

Q. You'd want to have people in the room; correct?

**A. And they really should be moving as they are in an actual OR.**

Q. Well have you ever tried to do a dynamic model of a CFD?

**A. Very difficult with motion, but that -- that would be required to do an actual analysis.**

Q. I understand that, but -- but -- but say you want to do a static model, you still would want to have people in there with a heat source; correct?

**A. Yes.**

Q. Okay. And you'd want to have the heat

source -- you'd want to have the heat source coming from the walls; correct?

**A. If -- if there is any heat transfer, yes.**

Q. All right. And you agree with me that the more accurate a static model is in the -- in its modeling, the more accurate the CFD results; correct?

**A. If it's set up correctly and the boundary conditions are done correctly. Again, I'll go back to the lack of motion of anything in the OR.**

Q. Say again.

**A. I go back to the lack of motion of anything in the OR. That's -- that's a major contributor to mixing of particles.**

Q. Okay. Now let's talk about that for a second. Okay? You agree with me that in a unidirectional OR such as what's used mostly in -- in -- in orthopedic surgeries, that the purpose of having diffusers above the surgical table is to offer a protective effect to help prevent bacteria from getting into the critical site, the surgical site; correct?

**A. That -- that's the idea, yes.**

Q. Okay. And you don't want to have a device in the operating room that's going to reduce the protective effect of the ventilation system in an

operating room; correct?

**A. You would not want that, yes.**

Q. Okay. Because if you reduce the protective effect of the ventilation system, then you increase the risks of bacteria entering into the surgical site from other sources in the operating room; correct?

MR. GOSS: Objection to form, it's beyond the scope of his opinions, and it is an incomplete hypothetical.

**A. Say that again.**

Q. If you reduce the protective effect in the ventilation system, then you increase the risk of bacteria entering into the surgical site from other sources in the operating room; correct?

MR. GOSS: Object to form, beyond the scope of his opinions, incomplete hypothetical.

**A. That -- that could be possibly correct.**

Q. Well you have unidirectional flow coming down; correct?

**A. Except the wake regions under the surgeon's arms and tools and other things are blocking the airflow.**

Q. I understand that. But if you affect the -- the intensity of the protective effect, you basically decrease the force field around the patient that the

ventilation system is meant to -- to attain; correct?

MR. GOSS: Asked and answered, beyond the scope of his opinions.

**A. Again, I think the full recirculary -- full recirculation regions under a surgeon's arms and hands and -- and tools also disrupt the flow.**

Q. I understand that. But you don't want to disrupt the flow even more with another device; correct?

MR. GOSS: Object to form, beyond the scope of his opinions.

**A. I think that disruption of the flow would be much more than a small change in temperature.**

MR. ASSAAD: Okay. That's all I have. Thank you.

MR. GOSS: It's been a long day. I just have one question. Well, one -- one theme.

RE-REDIRECT EXAMINATION

BY MR. GOSS:

Q. So you --

Counsel asked you whether a HEPA filter would capture more bacteria than a MERV 14 filter. Do you -- do you recall that?

**A. Yes.**

Q. Okay. Have you done any experimental work

Page 349

yourself to try to quantify the difference in bacterial capture between MERV 14 and HEPA?

**A. I have not. That's strictly based on the published efficiency value versus the particle size of HEPA filters and MERV 14 filters.**

MR. GOSS: And I'll leave it at that.

MR. ASSAAD: That's all I have. Thank you.

THE REPORTER: Off the record, please.

(Deposition concluded.)

Page 350

CERTIFICATE

I, Richard G. Stirewalt, hereby certify that I am qualified as a verbatim shorthand reporter, that I took in stenographic shorthand the deposition of THOMAS H. KUEHN at the time and place aforesaid, and that the foregoing transcript is a true and correct, full and complete transcription of said shorthand notes, to the best of my ability.

Dated at Minneapolis, Minnesota, this 16th day of July, 2017.

RICHARD G. STIREWALT
Registered Professional Reporter
Notary Public

Page 351

CERTIFICATE

I, THOMAS H. KUEHN, hereby certify that I have carefully read the foregoing transcript, and that the same is a true and complete, full and correct transcription of my deposition, except:

PAGE/LINE CHANGE REASON

THOMAS H. KUEHN
Deponent

Signed and sworn to before me this ____ day of August, 2017.

______________________
Notary Public