# EXHIBIT DX2

TO DECLARATION OF PETER GOSS IN
SUPPORT OF DEFENDANTS' OPPOSITION
TO PLAINTIFFS' MOTION TO EXCLUDE
THE OPINIONS AND TESTIMONY OF

JOHN ABRAHAM, PH.D.

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - -

In Re:

Bair Hugger Forced Air Warming

Products Liability Litigation

This Document Relates To:

All Actions MDL No. 15-2666 (JNE/FLM)

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF JOHN P. ABRAHAM, Ph.D.

VOLUME I, PAGES 1 - 396

JULY 20, 2017

(The following is the deposition of JOHN P. ABRAHAM, Ph.D., taken pursuant to Notice of Taking Deposition, via videotape, at the offices of Ciresi Conlin L.L.P., 225 South 6th Street, Suite 4600, in the City of Minneapolis, State of Minnesota, commencing at approximately 9:26 o'clock a.m., July 20, 2017.)

APPEARANCES:

On Behalf of the Plaintiffs:

Gabriel Assaad
KENNEDY HODGES
4409 Montrose Boulevard
Suite 200
Houston, Texas 77006

Genevieve M. Zimmerman
MESHBESHER & SPENCE, LTD.
1616 Park Avenue
Minneapolis, Minnesota 55404

On Behalf of the Defendants:

Peter J. Goss
Micah Hines
BLACKWELL BURKE P.A.
431 South Seventh Street
Suite 2500
Minneapolis, Minnesota 55415

ALSO PRESENT:

Ryan M. Stirewalt, Videographer
Nathan Bushnell

EXAMINATION INDEX

| WITNESS | EXAMINED BY | PAGE |
|---|---|---|
| Dr. Abraham | Mr. Assaad | 4,353 |
| | Mr. Goss | 340 |

EXHIBIT INDEX

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Abraham | | |
| 1 | Expert Report, John Abraham, Ph.D. | 22 |
| 2 | CV, John P. Abraham | 26 |
| 3 | Materials Considered | 27 |
| 4 | Subpoena, John Abraham | 34 |
| 5 | 3M - University of St. Thomas Research Proposal, Oct. 18, 2015 | 40 |
| 6 | Chart, "Job Information at Start of Run," Abraham00000002 | 84 |
| 7 | 3.1.4 CODE OF PROFESSIONAL CONDUCT, Rev. 11/14, 6 pgs. | 104 |
| 8 | Chart, "Summary of data 2010-011 vs 2010-026, 3M00075103 to 75104 | 202 |

| | | |
|---|---|---|
| 9 | Internal Correspondence 3M, From Eaton, Endle, Chen, Wagner00000013 to 0029 | 303 |
| 10 | email string, fowler to wagner, 10/13/2015, Wagner00000001 to 0003 | 329 |
| 11 | Article, Stochastic modeling of atomizing spray in a complex swirl injector using large eddy simulation, Apte, et al, 2009 | 345 |
| 12 | Article, Large-Eddy Simulation of Realistic Gas Turbine Combustors, Moin and Apte, AIAA Journal, 2006 | 345 |
| 13 | Article, Forced-air warming and ultra-clean ventilation do not mix, McGovern, et al, The Journal of Bone & Joint Surgery, 2011 | 345 |
| 14 | Article, Patient Warming Excess Heat: The Effects on Orthopedic Operating Room Ventilation Performance, Belani, et al, Anesthesia & Analgesia, 2013 | 345 |
| 15 | Exhibit B of Dr. Elghobashi's errata sheet, with equation on back of one page | 349 |

P R O C E E D I N G S

(Witness sworn.)

JOHN P. ABRAHAM, Ph.D.,
Called as a witness, being first
duly sworn, was examined and
testified as follows:

EXAMINATION

BY MR. ASSAAD:

Q. Please state your name for the record.
A. John, J-O-H-N, Patrick, P-A-T-R-I-C-K, Abraham, A-B-R-A-H-A-M.
Q. Have you ever had your deposition taken before?
A. Yes.
Q. Approximately how many times?
A. Six or seven.
Q. Were they all in the capacity of an expert witness?
A. Yes.
Q. And we'll get to those in a little bit. I'm sure -- You've been through the drill before, but I have to go over a few instructions --
(Interruption by the reporter.)
Q. You've been through the drill before, but I'm going to go over a few instructions. Fair?

First of all, I'm going to ask you numerous questions today. If you don't understand the question I'm asking, please let me know and I'll do my best to rephrase it. Fair?
A. Yes.
Q. If you answer the question that I've asked, I will assume that you understood the question. Fair?
A. Yes.
Q. At any time you want to take a break just please let me know. I just ask that you request a break after you answer a pending question. Fair?
A. Yes.
Q. Okay. We've met before; correct?
A. Yes.
Q. We've actually met at the deposition of Dr. Elghobashi; correct?
A. That is correct.
Q. And actually we had a -- two brief discussions at the hotel that we both stayed at in Irvine, California.
A. That is correct.
Q. And you agree with me that none of the conversations that we've had had any -- anything to do with the substantive issues in this case.
A. I agree.

Q. In fact, you commented on my demeanor during the deposition; correct?
A. That is correct.
Q. And on my jacket that I'm actually wearing today; correct?
A. That is correct.
Q. And then we had a brief discussion about your work in global warming.
A. That is correct.
Q. Okay.
MR. GOSS: Are you contributing to global warming?
THE WITNESS: Yes. Right now.
(Laughter.)
Q. And -- And actually we talked about my appreciation for your work in the global warming area; correct?
A. That is true.
Q. Okay. And it's something you're passionate about.
A. That is true.
Q. And you publish frequently in the area of global warming or climate change.
A. That is true.
Q. In fact I was looking at your CV, and within

the first -- I only looked at the first 40 publications, and about 25 percent of those are on the issue of global warming or climate change.
A. That sounds reasonable.
Q. You give talks and presentations with respect to climate change and global warming.
A. That is true.
Q. And you even have some high-profile debates I've heard online regarding these issues.
A. Correct.
Q. And my understanding is the reason why you are passionate is because of the impact that global warming or climate change could have on the future of our -- of our world.
A. That is true.
Q. Okay. And you want to do whatever you can make the world a better place for -- for you and for your family and for the rest of the people in the world.
A. Yes.
Q. However, I think we could agree, based on the recent events in our country, that some people are in disagreement in the scientific community over whether climate change even exists.
A. There is a very small minority of people in

the scientific community --
Actually I don't know of anyone who would disagree that climate change exists. Sitting here now I cannot think of a single person in the scientific community who doubts climate change.
Q. But there's some high political figures that disagree that climate change exists.
A. I mean, we have to be a little bit careful because I don't think any political figures disagree climate change exists. I think there are some people who disagree that humans are causing current climate change, or that humans are a significant cause of current climate change, but I don't know of anyone who would say climate change doesn't exist.
Q. Okay. I think that makes sense.
I guess the better question is some people in the -- in the community believe that people don't have a -- a significant impact on climate change.
A. Yes.
Q. Okay. Would that include people in the scientific community as well, even though it's a very few minority?
A. There is a small minority that thinks --
I mean, this is a difficult question and I'm going to work to give you the best answer possible.

There's a very small minority of people in the scientific community who think that while climate change may exist and it's due in part to humans, it isn't going to be bad; or that the solutions may be more costly than the problem. So some of the most high-profile contrarians of the mainstream view acknowledge humans' affect on climate change, but it's an issue of magnitude and severity.
Q. Okay. And I take it that you disagree with respect to the people that the solutions would be more costly than the problem.
A. I'm not an economist, I'm a climate scientist. My understanding of climate change economics, through reading the literature, tells me that the most reputable climate-change economists are reporting that there will be social and economic costs with respect to future climate change, those costs will get worse as climate change gets worse, and in many cases the solutions are less expensive than the costs.
Q. Okay. In any event, given the potential impact of climate change, it is important to pursue good science.
A. I agree.
Q. And to pursue good science you want a solid

methodology.
A. Can you define what you mean by "methodology"?
Q. Let me ask you this. I assume in your research you use methodology to pursue answers to problems.
A. Yes.
Q. So how would you define "methodology"?
A. I would define methodology as -- as your plan.
Q. And to pursue good science you would need a good plan.
A. I would agree.
Q. Okay. And in reviewing a -- a methodology, a methodology or plan should be repeatable; correct? That's why you have a methodology.
A. I would say the results should be reproducible.
Q. Okay. So if you have a good methodology the results should be reproducible.
A. I want to be careful about not conflating those two things. I mean, you can reproduce results using a different methodology. The key is are the results reproducible.
Q. Okay. So my understanding is you could have

a different methodology but obtain repeatable results.
A. Yes.
Q. Okay. But -- But the --
But whichever methodology you use, the methodology has to be reasonable.
A. I would agree the methodology has to be reasonable.
Q. And with respect to methodology there might be multiple methodologies, but they should be identified so someone in the community could determine whether or not there's any potential biases in the methodology.
A. Yes.
Q. And with respect to methodology, one of the key is is that you need to communicate any assumptions you make in the methodology.
A. You need to communicate assumptions that are relevant that you expect could affect the results.
Q. Okay. And you would identify those in the methodology.
A. I mean, it depends on how broad you're interpreting the term "methodology." If your methodology, for example, is a test plan or a simulation method --
Could you restate your question?

Q. Well you've written many scientific papers; correct?
A. Correct.
Q. And usually there's a method -- a methods section in the paper; correct?
A. A methods or an equivalent of a methods section.
Q. Yes. There's some -- There's some section that says what you did and how you did it.
A. Yes.
Q. Okay. And the reason why that's there is for someone else that's reviewing the paper, it's there to understand the methodology that you used in performing your research.
A. Correct.
Q. Okay. And to determine whether or not the methodology you used is in fact correct?
A. Yes.
Q. Whether it is reasonable?
A. Yes.
Q. Whether it is a methodology used and well respected in the scientific community.
A. Yes.
Q. Okay. And in fact you've written papers on biases and errors with respect to issues in research.

A. Yes.
Q. And in fact you wrote an article in the Bulletin of the American Meteorological Society titled XBT science: Assessment of XBT biases and errors.
A. I -- I wrote an article --
The title sounds correct.
Q. Uh-huh.
A. I'm assuming you read it correctly, but yes, I wrote an article that is either that exact title or something similar.
Q. And it's important to communicate all your assumptions in your methodology because until research -- Strike that.
You mentioned you make -- you have to identify assumptions that may affect the results of your research; correct?
A. Correct.
Q. Okay. And it's important to communicate all -- it's important to communicate all your assumptions, because until research is -- the research is complete, you may not know whether the assumptions you make -- you made impact the outcome.
A. I disagree.
Q. Why?
A. Because some assumptions you make are so

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

trivial you know they would not affect the results. So I would -- I would amend your question, change your question to not use the word "all" assumptions, but I would say the important assumptions.
Q. Okay. So --
But you want to identify them and communicate them in the methodology because for the important assumptions, until the research is complete you may not know whether those important assumptions you made impact the outcome.
A. Correct.
Q. Okay. And you agree with me that in any type of research you do that you want to gather as much information as possible regarding research that has been done in the scientific community.
A. I don't necessarily agree with that, and I can explain. You gather as much background information as you need to understand what people have done and what the current state of the art is and the current state of the knowledge is. Let's say that I'm doing a paper on XBT biases, which is the title of the paper you read.
Q. I think I understand your answer, though. I mean, I don't need an example. I think I understand what you're saying.

A. But -- But if I give one it'll be clear for the record.
Q. I get it though, I don't need -- I'm fine.
A. Okay.
Q. So with respect to determining whether or not a -- an important assumption is correct or not, how do you determine that?
A. Well you may look at someone else -- There's a number of ways.
For example, you may find someone who has done work in the past and they've articulated or shown that a certain assumption matters or doesn't matter. Maybe you've done work in the past and you've quantified the effect of an assumption. Maybe the assumption is obvious on its face. So there's a number of ways where you might identify that an assumption matters or doesn't matter.
Q. Umm-hmm. Well you agree with me that certain assumptions can significantly affect the results.
A. I agree.
Q. Now I forgot to give you this instruction, but I'm going to ask you many questions today. I don't -- Unless I ask you to guess or give an approximation, when it comes to your expert opinions I

would not like any guessing, I'd like your -- your opinions without guessing. Fair enough?
A. Fair.
Q. And I don't think anyone here wants any guessing. But I might ask you to guess like guess how many hours you spent on something, that might be a guess. But when it comes to your expert opinions we don't want any guessing. Fair enough?
A. Fair.
MR. GOSS: I think we would -- rather than use the word "guess," I think approximation is the better term to use.
A. So if I could ask for a clarification.
Are you also asking me not to approximate, or are you just asking me not to guess?
MR. GOSS: He'll let -- He'll let --
Q. If the approx -- That's why --
If the approximation isn't something you can give as an expert opinion, for example, if I ask you a temperature in this room, you know, you might say well it's approximately between, you know, 70 and 75, you know, that's within -- within your education, training and expertise and just your experience. But to make an outlying guess about something when you don't know the answer, just say you don't know the answer.

A. Thank you.
Q. Okay?
You said you had six other depositions as an expert witness; correct?
A. Incorrect. I think I said I had six or seven.
Q. Six or seven.
A. Sorry.
Q. Okay. Any of them deal with forced-air warming?
A. No.
Q. Any of them deal with patient-warming devices?
A. No.
Q. Would most of them be with respect to burn cases?
A. No.
Q. What were the six or seven?
A. I've given a deposition related to a burn case. I've given a number of depositions related to intellectual property litigation. In fact I think, I am quite certain, that the remaining depositions were related to intellectual property cases.
Q. Okay. So one burn case and the rest dealing with intellectual property cases.

A. Correct.
Q. And they would be patent litigation cases?
A. Correct, if -- if "patent litigation cases" would include things like International Trade Commission, Inter Partes Review.
Q. Okay.
A. But I would just say within the intellectual property realm.
Q. Okay.
A. I don't know if they are technically considered patent litigation cases.
Q. Fair enough.
Now as an expert in this case you agree with me that you are supposed to be objective.
A. Yes.
Q. You're not supposed to be an advocate for either side in this case; correct?
A. Correct.
Q. And as a professor, you agree that providing false data or results would be fraudulent.
A. Correct.
Q. Okay. And if your research provided false data or results that would be considered research fraud; correct?
A. If it knowingly --

I think if it's knowingly fraudulent, then yes.
Q. Okay. And I take it you would never commit research fraud or put your name on a court document that you did not believe in.
A. Correct.
Q. You do understand that you are under oath today; correct?
A. Correct.
Q. And that's under penalty of perjury; correct?
A. Correct.
Q. And you understand what that means; correct?
A. I think I do.
Q. Did your lawyer not explain to you that sitting here today is like sitting in a courtroom, you're under oath and the same rules apply and the same penalties apply?
A. I understand that.
Q. Okay. And by the way, do you like to be called Mr. Abraham, Dr. Abraham, John, what do you like?
A. For a deposition I'd prefer Dr. Abraham.
Q. Okay. So Dr. Abraham, do you agree, or can we agree that if for any reason you discover that one

of the opinions you put in your report is incorrect, or not accurate, or if you even change your opinions today, that -- that you will tell me today?
A. Yes.
Q. Okay. This is the time for me to take your deposition and ask you questions about your opinions and all your opinions in this case. You understand that.
A. Yes.
Q. Okay. And when I leave here today I expect to have all your opinions outlined and understood that I could go back through the deposition and read. You understand that?
A. I understand that.
Q. Okay. You understand that I'm one of the attorneys working on behalf of over 2700 people who have filed lawsuits against 3M that they were harmed by the Bair Hugger.
A. I do not understand that.
Q. Okay. Do you understand that there's been over 2700 lawsuits in this case, in this litigation in Minnesota?
A. I do not understand that.
Q. Okay. So you, sitting here today, you don't know how many cases were fi -- have been filed.

A. Correct.
Q. Okay. Did you understand there were many cases that were filed?
A. I would say I know there are a number of cases filed. "Many" -- I don't know the number.
Q. Okay.
A. Sitting here right now I do not know the number of cases filed.
Q. You also understand that the plaintiffs have a right to determine all the methodologies you used to reach your opinions.
A. Correct.
Q. Okay. So that at the end we could test whether or not your methodologies are reliable.
A. Correct.
Q. And do you understand what I mean by "reliable"?
A. Yes.
Q. Like reproducible.
A. Yes.
Q. Okay.
A. Actually that may not be quite right. You could have results which are reliable, but they may not be reproducible.
Q. Okay. What do you mean by that in the

science -- with respect to research in the scientific community?
A. Let me give you an example. I work on areas of patient-specific medical interventions, and let's say I did an experiment on someone, on a person, and let's say that person died or was other -- otherwise unavailable for a repeat experiment. Someone could not reproduce the experiment on that person, and reproducing it on someone else would be slightly different.
Q. Let me define it, then. I understand that one outlier.
But with respect to your issues in this case, computational fluid dynamics, heat transfer, the laws of thermodynamics, you agree with me that if something is reliable, it should be reproducible.
A. Yes.
Q. Okay. So moving on.
(Discussion off the stenographic record.)
(Abraham Exhibit 1 marked for identification.)
BY MR. ASSAAD:
Q. What's been marked as Exhibit 1 is a copy of your report that is -- was submitted to the plaintiffs on June 2nd, 2017. I'll represent to you that this is

a copy -- a true copy of your report. If you want to review it, you can review it at a break, but I don't want to get into that issue right now.
Now my understanding is that this report deals with the Bair Hugger Model 750 or 775; correct?
A. The Bair Hugger model is listed, I think it's the --
Is it listed in this report? If it's not listed, then I'll say yes to that.
Q. Okay.
A. Yes, it's listed on page 5, third paragraph from the bottom.
Q. Okay. And this report you do not --
This report does not contain anything with respect to any studies done on the Model 505; correct?
A. This report does not.
Q. Okay.
A. However, since drafting this report I have analyzed that blower system.
Q. Okay. When was this report drafted?
A. I'm going to estimate.
Q. Okay.
A. I would estimate early 2016, but I don't have an exact date.
Q. And what was when you -- when you completed

the final draft was early 2016?
A. No.
Q. Okay. When did you complete the final draft?
A. Well the final draft would have been completed after I received the expert report from Dr. Elghobashi, so that part was added, that section was added after -- after that date.
Q. Okay. Could we -- Could we --
I'm going to just give you page numbers and let me just see if we could go through this quickly.
Would you agree with me that pages 1 through 10, the first part, was completed by early 2016?
A. You said "10, the first part"?
Q. Page 10 and -- with paragraph subtitled B.
A. Yes. I -- To my best recollection, that would have been completed early 2016.
Q. Okay. And then the part with respect to the schlieren and -- and the criticisms of Elghobashi would have been done probably this year, after you received those reports.
A. Correct.
Q. Okay. And you've kept detailed bills with respect to all the work you've done in this case.
A. Yes.

Q. Okay. So would you agree with me that this report was completed with respect to your CFD, not your criticisms of the schlieren, prior to Science Day where you testified in front of the Court in this case?
A. Yes.
Q. And let me just correct one thing. Go to page 11 and the top of 12. Was that -- part D, section D. Would that have been part of your report in January of 2016, or was that added later on?
A. That would have been part of the original, the early --
Q. Okay.
A. -- the early report.
Q. Okay. So now we have, just to be clear and for the record, pages 1 through 10 of -- section B of 10, and pages 11, section D, which completes on section 12, was all completed in January of 2016.
MR. GOSS: Object to form.
MR. ASSAAD: Basis?
MR. GOSS: I think he said "early" 2016.
Q. Early 2016.
A. That is the best of my recollection.
Q. And definitely before Science Day in this case.

A. Yes.
Q. Okay. Now for today's deposition all my questions will be with respect to the report that we have as -- marked as Exhibit 1. You understand that.
A. I understand it because you've just told me.
Q. Okay. Any work that you did on the 505 is not part of this report so we're not going to talk about that today. You understand that?
A. I do.
Q. Okay.
(Abraham Exhibit 2 marked for identification.)
BY MR. ASSAAD:
Q. What's been marked as Exhibit 2 is a copy of your curriculum vitae that was provided to us with your report. Is this the most --
Is this an accurate copy of your CV?
A. (Witness reviewing exhibit.) This would be an accurate copy of my CV at the time it was produced.
Q. Okay. I assume there might be a few new publications?
A. Correct.
Q. Any publications dealing with patient-warming devices?
A. No.

Q. Any publications dealing with the issues in this case?
A. No.
Q. Okay. And it seems like you've written about 100, 102 publications since 2010.
A. That sounds about right.
Q. Okay. About 15 publications per year; that sound about right?
A. Yes.
Q. Okay. And I take it these are publications which you have worked with research students as their advisor, or research that St. Thomas is doing that you've coauthored with other people; correct?
A. Oftentimes, yes.
Q. Okay. Are you the main writer in many of these publications, or just the advisor overseeing the research?
A. I am usually the main writer.
Q. Okay. Now --
(Abraham Exhibit 3 marked for identification.)
BY MR. ASSAAD:
Q. What's been marked as Exhibit 3 is a document that was provided to us of all the materials you considered with respect to your expert report of

Exhibit 1. Do you recall this document?
A. No.
Q. Have you ever seen this document before?
A. I don't recall seeing this document.
Q. Okay. This was provided to us by defense counsel discussing all the materials considered by you in -- in -- and relied upon in formulating your opinions in this case.
Do you agree with me that this is a complete list of the materials you considered that formulated your opinions in -- that are identified in Exhibit 1?
Let me rephrase that. I'm going to go back a little bit.
Exhibit 1 has references; correct?
A. Correct.
Q. Okay. So if you take those references along with this Exhibit 3, would that constitute all the materials you considered and relied upon in formulating your opinions?
A. (Witness reviewing exhibits.) We'd have to include the -- the videos, which I -- which I mention explicitly in the report. They're not in the reference list of the report. I'm trying to think of anything that would not be in these two groups.
Sitting here now I cannot think of anything

not in one of these two groups.
Q. Okay. And if you do later on, just say, hey, I forgot to include this on Exhibit C.
A. Thank you.
Q. Okay?
Now have you had a chance to review your report before today's deposition?
A. I didn't quite hear that question. Could you --
Q. Have you reviewed your report before today's deposition?
A. Yes.
Q. Okay. And I assume you met with counsel and went over your report; correct?
A. I met with counsel, but I don't recall going over the report.
Q. Okay. But you recently reviewed your report.
A. Yes.
Q. Any corrections you would like to make to your report before we begin discussing your report?
A. Not at this time.
Q. Okay. All the opinions you intend to offer to the court and the jury in this matter are contained in your report; correct?

A. Well the only other opinion that I have that's not in this report is that lower flow blankets -- lower flow forced-air warming devices also do not interrupt the airflow in an operating room, but aside from that, yes.
Q. When you say "lower flow," are you talking about devices such as the Mistral?
A. No.
Q. What -- What's lower flow?
A. 505.
Q. Okay. You stand by your report?
A. Yes.
Q. You checked your report for any type of error, mathematical or computational?
A. Yes.
Q. And you believe that all the numbers in your report are correct.
A. Yes.
Q. Okay. My understanding is, and I'll get into more detail, but the main opinions I obtained from your report is that the Bair Hugger does not disrupt airflow; correct? Over the surgical site.
A. That is one opinion.
Q. Okay. That the Bair Hugger does not increase the temperature around the surgical table.

A. That is another opinion.
Q. Okay. You also claim that you val -- you validated your CFD by temperature measurements; correct?
A. Correct.
Q. And you did that by doing measurements on the floor and the edge of the bed; correct?
A. Those were two locations, correct.
Q. Were there any other locations that you measured temperature?
A. Yes.
Q. Where else?
A. I took a number of temperatures in the room.
Q. And what page are you looking at?
A. The bottom of page 5.
Q. Okay.
A. And had a room average temperature of 62 degrees Fahrenheit. And I think you mentioned on the -- near the floor, I think you mentioned that.
Q. Yes.
A. That's one location. And yes, at the edge of the bed.
Q. I'm going to correct you for a little bit. I believe you measured -- your experimental measurements was 61 and your calculated measurements were 62 for an 8.1 million-grid-cell calculation.

A. Thank you for that correction.
Q. Okay. My understanding is besides those temperature measurements that we've just identified, you did not take any other temperature measurements in the room during your experiment.
A. Correct.
Q. You did not take any measurements of the drape temperature; correct?
A. Correct.
Q. You did not take any measurements of the temperature above the surgical site.
A. Correct.
Q. And if you go to page 12 of your report, you would agree with me that this is a -- a represent -- this is a view of the temperature represented in the operating room with respect to your CFD analysis along that plane.
A. Yes.
Q. Okay. And my understanding is also validated by smoke tests?
A. I don't know if I used the word "smoke." Did I use the word "smoke" in this?
Q. I don't know. Did --
I mean, did you use smoke tests?

A. Well technically it's not smoke.
Q. It's water vapor; correct?
A. Visible --
Condensed water droplets.
Q. Okay.
A. And maybe for -- for this deposition I'm going to use the term "visible water vapor," but --
Q. Okay.
A. -- but that's a -- that's not a technical term.
Q. So you used visible water vapor in your validation; correct?
A. Correct.
Q. Okay. And you did that yourself.
A. Yes.
And let me go back to a question you asked, did I measure any other temperatures? I actually did one that I had forgotten about. I measured the temperature of the water vapor emerging from the water vapor machine.
Q. What was that temperature?
A. I recall it 62.5 Fahrenheit.
Q. Do you have that written down somewhere?
A. Yes.
Q. Okay. And what device did you use for the

visible water -- visible water machine?
A. I recall it's a megasonic fog generator.
Q. Can we just call it fog, a fog generator?
A. Perfect.
Q. Okay. That's much easier to say than the "visible water."
A. I agree.
Q. Is a fog generator a generally accepted method in the scientific community to validate CFD?
A. Yes.
(Abraham Exhibit 4 marked for identification.)
BY MR. ASSAAD:
Q. What's been marked as Exhibit 4 is a subpoena issued by myself to you dated June 7th, 2017 for you to provide documents by June 21st, 2017.
Have you seen this document before?
A. Yes.
Q. Okay. And this was given to you by counsel for 3M when they received it; correct?
A. Yes.
Q. Did you go through the subpoena and produce documents to 3M's attorneys that are responsive to this subpoena?
A. No.

Q. Why not?
A. I don't believe --
Well I produced the documents to Blackwell Burke attorneys, --
Q. Yes.
A. -- not to 3M attorneys.
Q. They're 3M attorneys.
A. Oh.
(Laughter.)
A. My naivete on this whole matter, the legal matters.
Q. Okay. Okay.
A. But yes, I produced documents to Blackwell Burke attorneys related to this subpoena.
Q. Okay. Let's go to page four. Now you mentioned -- I'm going to only go through a few of them. You just mentioned you had some notes that you created during your whole -- the whole process of preparing -- of taking data and preparing your report?
A. No. I did not say that.
Q. So you said the 62.5 temperature for the fog generator, you said that was written down someplace.
A. That's correct.
Q. Where is it written down?
A. It's written down in a manuscript submitted

to a journal, but it's not a note.
Q. Okay. So you've submitted this -- the -- a manuscript to a journal in this case --
A. Yes.
Q. -- regarding your testing?
Who are the authors of that journal, or that manuscript?
A. Well I -- I wrote the manuscript.
Q. Is it listed in your resume?
A. Yes, it is.
Q. Okay.
A. It is the number one listing under the wor -- section "Publications."
Q. So do you have a copy of this manuscript with you today?
A. No.
Q. Has it been accepted?
A. Yes.
Q. Okay. And in there it talks about the Bair Hugger?
A. I don't know if the name Bair Hugger is used.
Q. Does it talk about a forced-air warming device?
A. Yes.

Q. Okay. And is it with the 505 or the 750 model?
A. Both.
Q. Okay. And you wrote this with B. D. Plourde; is that how you pronounce it?
A. Plourde.
Q. Plourde. And Ms. Vallez?
A. Correct.
Q. Okay. Did those two assist you with the CFD analysis that is the subject of your report?
A. No.
Q. So it's my understanding that the report -- the -- the creation of the CFD and the results was all created by you?
A. All of the results contained in the document and in my expert report were created by me.
Q. What about the geometry?
A. The geometry was not created by me.
Q. Who was it created by?
A. I don't know the answer to that.
Q. Was it given to you?
A. Yes.
Q. By whom?
A. If I recall, it was supplied by an attorney, but it would have been two years ago. I don't recall

the person.
Q. Was it Lori Cohen?
A. No.
Q. Christiana Jacxsens?
A. No.
Q. Evan Holden?
A. No.
Q. Okay. Was it someone from Greenberg Traurig?
A. I believe so.
Q. And this was submitted to Numerical Heat Transfer, your -- a journal, we're discussing?
A. Yes.
Q. Okay. And when's it going to be published?
A. I don't know.
Q. Okay. On the journal, did you inform the journal that this research was funded by 3M?
A. Yes. It is listed in the supporting section or the acknowledgment section.
Q. Okay. Did you inform the journal that the geometry that was created was not created by you?
A. No.
Q. Where did you obtain the data that you -- the 62.5 degrees for the journal? Did you have that just memorized regarding the temperature of the fog

generator?
A. Yes.
Q. Okay. So my understanding is you did not create any notes.
A. Incorrect.
Q. So you did create notes.
A. Yes.
Q. Where are the notes?
A. I had one note on a yellow sheet of paper like this [indicating], a note to myself about whether I had a reference, a certain reference. And when I confirmed that I had the reference, I discarded that note.
Q. Okay. So sitting here today there are no written notes in your possession regarding your research or your analysis performed in your expert report.
A. Sitting here today there are no notes regarding the analysis in my expert report. The only other notes that I would have would be annotations on journal papers, as I read through journal papers and I make notes.
Q. On the journal papers?
A. Correct.
Q. Okay. Did you provide those to 3M's

counsel?
A. No.
Q. Did Mr. Plourde or Ms. Vallez provide any work with respect to the CFD analysis you performed on the 750?
A. No.
Q. So even though part of your agreement with 3M was to -- that the money was to be used for a staff member and a student, you did not obtain a student or a -- or a staff member to work on the project.
A. Incorrect.
Q. So you did obtain a student.
A. Yes.
Q. What student did the work?
A. Lauren Vallez.
Q. Okay. So she did help you on the 750 analysis?
A. Incorrect.
Q. Okay.
(Discussion off the stenographic record.)
(Abraham Exhibit 5 marked for identification.)
BY MR. ASSAAD:
Q. What's been marked as Exhibit 5 is a document that the plaintiffs have received yesterday,

June -- July 19th, 2017 in response to the subpoena. Do you recog --
Do you recognize what's been marked as Exhibit 15 -- or Exhibit 5?
A. Yes.
Q. Okay. And this is the research proposal written by you to 3M; correct?
A. Yes.
Q. Even though you were dealing with 3M's attorneys at the time, which was Greenberg Traurig, this proposal is directed to 3M; correct?
A. Correct.
Q. Okay. And in the last paragraph it says: "The duration and cost of this project is $12,000 and one month. This is a fixed cost grant and will support the employment of one student, one staff member, and all other university costs."
Did I read that correctly?
A. Yes.
Q. Was a student employed with respect to this project?
A. Yes.
Q. Who?
A. Lauren Vallez.
Q. Okay. What did she do on the project?

A. She actually didn't accomplish anything. The -- It turns out the simulation was very challenging and she wasn't able to contribute meaningfully in any way. She didn't contribute in any way to the generation of the mesh, to the setting of the boundary conditions, and to the analysis.
Q. Okay.
A. But she was still paid.
Q. Okay. And was there a staff member used?
A. Yes.
Q. Who?
A. Brian Plourde.
Q. Okay. What was his role in -- with respect to the CFD analysis?
A. It was the same. It turns out the calculations -- All of the calculations in the report and in the journal paper were done by me. The problem was too complex and the timeline was too short for him to contribute meaningfully.
Q. So you agree with me that the -- the model is a complex model.
A. Yes.
Q. Okay. All right. Did the lawyers in this case provide you any documents?
A. Yes.

Q. Well they provided you the geometry; correct?
A. Yes.
Q. But with respect to documents, what documents did they provide you?
A. I was provided a literature archive.
Q. Is that listed in -- in any of your references or Exhibit 3?
A. Probably not because I did not use their literature archive.
Q. Okay.
A. I was provided deposition transcripts.
Q. Okay.
A. I'm trying to -- I'm struggling to think of oth --
Other things may come to my mind, but those were the two big things.
Q. Did they provide any internal documents, internal testing of the Bair Hugger?
A. They -- There was a document of flow through a Bair Hugger. Yes, they did provide a document.
Q. And what was that document?
A. Oh, man. It might have been called tech, tech documents or something. All I remember from the document is there was some testing of the airflow

through a tube that fed a Bair Hugger. And I think that there was some schematics of an operating room, if I recall correctly.
Q. Did you use that document in any way with respect to your CFD analysis?
A. Yes.
Q. How did you use the document?
A. I confirmed my understanding of the airflow going through a Bair Hugger.
Q. And we're talking about determining the mass flow through the Bair Hugger?
A. Yes.
Q. Okay. Anything else you used in that document?
A. I don't believe so.
Q. Did you provide that document to counsel in response to our subpoena?
A. I'm certain -- I'm certain I would have provided that document.
Q. Okay.
MR. ASSAAD: Do you have that document?
MR. GOSS: I believe it was produced separately in response to an earlier subpoena, when you subpoenaed Jennifer Wagner and John Abraham.
MR. ASSAAD: Well that's different than

subpoenaing him. I wanted to know what documents he had. And I don't want what document you're talking about or he's talking about, so I'd like to know what document you're referring to and get a copy of that.
If it's already been produced, then it should have been produced with his production; correct?
MR. GOSS: I'm saying it's already -- to my knowledge it's already been produced. We can identify it. I think I know what he's talking about.
MR. ASSAAD: So my understanding is 3M is only going to produce documents that Abraham has that was not produced previously according to the subpoena, even though the subpoena's directed to Abraham?
MR. GOSS: I think we did our best to comply with the subpoena. If we missed something we'll go back and look for it and supply it.
MR. ASSAAD: Well can I get it at the next break, please, if you know what you're talking about?
MR. GOSS: We will do our best to locate it.
MR. ASSAAD: Well it seems like you know what the document is, Peter Goss.
MR. GOSS: I think I do know what the

document is --
MR. ASSAAD: Well let's get --
MR. GOSS: -- Gabriel Assaad.
MR. ASSAAD: -- it produced then. Let's get it produced then, please.
MR. GOSS: I will do my best.
THE WITNESS: And if I could continue?
Q. Sure.
A. Sitting here I remember, I think, some communications with Augustine perhaps, or there may have been some kind of communications, emails that I received, but I don't recall what they were. And those were not used in the -- in these reports.
Q. Did you produce all your files in this case?
A. I believe I did. I am pretty sure I did. I mean certainly every file that is necessary for -- that went into these reports.
Q. What do you --
What do you mean, "every file that is necessary"?
A. Well, for example, I received a CAD file. I did not reproduce that CAD file because I produced a file in which the CAD file is contained.
Q. Okay. Let me tell you what I've got -- been produced regarding files, you tell me if that's all

the files.
I was produced a AGDBT file. Is that the CAD file?
A. Actually that would be the CAD file.
Q. Okay. And I was provided a TRN file, one TRN file --
A. Yep.
Q. -- previously from the original subpoena.
A. Umm-hmm.
Q. Do you recall producing that?
A. Yes.
Q. And I received another TRN file that was called the 2540 that is -- that was produced subject to your -- the subpoena. Does that sound correct?
A. Yes.
Q. Are there any other files that you have?
A. I don't think there's any other files that I have. I don't recall any other files that I have sitting here now.
Q. Okay. So the only --
And I don't know this for sure, and I was guessing based on the pictures that I received, but the 2540, is that your work on the 505?
A. Yes, that's correct.
Q. And the one that was titled "Abraham," which

you might have it titled something different, but it was provided to us as Abraham 001, which was a Bates number, was the TRN file on the 750; correct?
A. I don't know if that's the Bates number.
Q. Okay.
A. But the twenty -- 264.TRN would have been the results in CAD.
Q. 254.
A. 2540 is for the 505.
Q. Okay. And the other one is the 750.
A. Correct.
Q. Are there any other TRN files for runs that you did that you changed later on?
A. What do you mean by "changed"?
Q. I mean, did you on -- did you only make one run, or did you refine, you know, and get multiple results and then came up with the final results?
A. Yes, I did.
Q. So are there other files showing those results?
A. Yes.
Q. And where are those?
A. Those would be on my computer.
Q. Do you have your computer here today?
A. No. All of the results contained here are

from the 264 TRN, and other results are the sa -- give the same results as the ones shown here.
Q. Just out of curiosity, what does "264" stand for?
A. It's the time --
It's a number indicator from the software as it saves results.
Q. Okay. And what's the number mean? Does it mean anything?
A. Time step.
(Interruption by the reporter.)
A. Time step.
Q. Time step. Okay.
Does it apply -- Is it a time --
Does the value mean anything to you, 264?
A. Yes.
Q. What does it mean?
A. It means it's the 264th calculation.
Q. Calculation of what?
A. Of the airflow in the room.
Q. Okay. I might be confused, but I thought there was, like, thousands of calculations that the computer does before it gets a single result.
A. That's correct.
Q. So how can this --

So why would this only be such a small number, like 264, or am I mis -- or am I misunderstanding something?
A. Yeah. I think you're confused.
Q. I know I'm confused because we just agreed there's over a thousand calculations.
So what does -- Is the 264, is it 264 calculations, or 264 results?
A. There are many millions of calculations, and in a problem like this you have to do the calculations in time, you march forward in time. And so you have to wait until what's called quasi-steady results occur. And I used the 264th step for my quasi-steady calculation.
Q. Okay. So it's the 264th step, not the 264th calculation.
A. It's the 264th step, which is the 264th calculation in time.
Q. Okay. I think I understand. Let me see if I get this.
Each step might have millions of calculations for each step; correct?
A. Correct.
Q. Okay. And each step represents a period of time.

A. Correct.
Q. And 264 is the 264th period of time that you got a result.
A. Yes.
Q. So where are the other 263 results?
A. I -- I didn't archive them because the results are enormous and they fill up the hard drive. I think I have two others, just to verify that I re -- that I achieved steady state.
Q. Are they time steps before or after?
A. Both.
Q. How -- What's the -- the -- How far --
What number after?
A. I think 300.
Q. Okay. And what about before; do you remember the --
A. I don't know.
Q. Okay. And I take it that 300, it actually means something to you, the 300th time step?
A. Correct.
Q. Is a time step every second?
A. No.
Q. What's the time step, like in this case?
A. I don't recall what my time step was in the calculation.

Q. Is that something that's in your report?
A. I'll have to look. (Witness reviewing exhibit.)
Q. We have a lot to cover and I'm going to go page-by-page, so let's look for it when we start going page-by-page through your report later on, okay?
A. Great.
Q. So did you do any runs --
Did you do any other runs before you came with your final -- before you came up with your final results?
A. Yes.
Q. Okay. What were different about those runs?
A. A calculation like this requires an initial guess. These are what are called iterative calculations, so you're guessing and checking and guessing and checking. If you have a reasonable initial guess, it speeds the -- what we call the convergence.
So I did a calculation to get an initial guess, which I then used as an input. And the effect of that was to speed the process.
Q. Okay. How many of those did you do?
A. I think I would have done one.
Q. Okay. Do you have those results?

A. No.
Q. So those have been destroyed.
MR. GOSS: Object to form.
A. Well, I mean I -- there's no reason to keep them.
Q. That wasn't my question.
My question is: They're no longer -- They no longer exist.
A. I no longer --
That's correct, they no longer exist.
Q. So you destroyed them.
MR. GOSS: Object to form.
Q. Let me -- Let me withdraw that question.
Do files --
Is this on your personal computer or a St. Thomas computer?
A. St. Thomas computer.
Q. Okay. And do you have to go physically delete the file, or are they automatically deleted over a certain period of time?
A. I -- I actually do the deletion.
Q. So you deleted those files.
A. Correct.
Q. When did you delete those files?
A. Proba --

I don't know. I probably would have done it once I had obtained them and then I used the -- then I used them as the initial...

I don't -- I don't know when I did.

Q. Okay. Prior to writing this report?

A. I would have to guess. I don't know.

Q. So just so I understand, the only files available right now that you have on your computer are three -- with respect to the 750, are three TRN files, one which is the 264, one that's titled 300, and then one that's earlier than 264.

A. Correct.

Q. Okay. Any other files that you have available to you?

A. No.

Q. Okay. Are there any other files that you could obtain from your --

Well let me ask you this: Do you still have the model?

A. It's contained within the TRN.

Q. Okay. So if I want --

Can I reproduce your model through the TRN?

A. Yes.

Q. How would I do that?

A. The TRN contains all of the information,

including the geometry, the mesh, the boundary conditions, the time stepping information. The TRN actually contains everything.

Q. Okay. But it's at a certain time; correct?

A. That is correct.

Q. So how do I know what occurred before 264? Can I go backwards?

A. You cannot go backwards.

Q. So how do I know what your time zero was?

A. Well the time zero's not relevant because that's just your initial guess. So the time -- The time zero result has no physical meaning.

Q. But in this TRN your initial guess was -- or your initial -- your time zero wasn't an initial guess, or it was an educated assumption based on a previous file that you created.

A. That's correct.

Q. Okay. And this was a steady-state model; correct?

A. No.

Q. What was it then?

A. It was an unsteady model.

Q. Is that the same as transient?

A. Yes.

Q. Okay. I might have misunderstood you, but I

think you talked about converse or converge or convergence. Did you --

You said something about convergence?

A. Yes, I did.

Q. What is --

What is convergence?

A. Convergence has two meanings.

Q. In the CFD meaning.

A. It has two CFD meanings.

Q. Okay.

A. Sorry.

At each time step you can converge your solution to the correct solution. And another meaning is that over time you converge to a steady state, we call it quasi-steady result.

Q. Okay. And is 264 a quasi-steady result?

A. It was.

Q. Okay. And that means that you came close to steady state?

A. That means the results were no longer changing meaningfully over time.

Q. Okay. Which is not true steady state, but quasi-steady state.

A. That's correct.

Q. Okay. I think I'm understanding this.

And how do you determine whether or not you have quasi-steady results?

A. Well one way to determine that is to look at the results and see if they meaningfully change from one step to the next.

Q. Okay. Are you looking at the results while you're running this?

A. You can look at the results. I don't recall if I was, but you can look at them while you run.

Q. Okay. And just so I understand that you're saying that if you looked at, I guess, time like 260, 262, 263 and then 264, you're not seeing much of a change and therefore you could determine quasi-steady.

A. That's correct.

Q. Okay. And that is a judgment call based on the person doing the CFD.

A. Yes.

Q. Okay. Was there any correspondence between you and anyone besides attorneys for 3M regarding your work on this case, or your research work regarding the Bair Hugger?

A. No.

Q. What about with the journal?

A. Oh, there would have been correspondence with the journal.

Q. Did you provide those to counsel?
A. I -- I don't recall if I did.
MR. GOSS: We would invoke the Ingelfinger rule with respect to that correspondence.
MR. ASSAAD: That rule only applies during the submission, but once it's accepted it no longer applies. And according to his -- his publications it's already been accepted.
MR. GOSS: All right. Well it's a sauce-for-the-goose situation with respect to Elghobashi's correspondence with his journal.
MR. ASSAAD: Well I'm telling you the distinction here, sir. The distinction is Elghobashi is still being under review. This has been accepted.
MR. GOSS: I'm not aware that it isn't still under review.
MR. ASSAAD: It says right here, "accepted."
MR. GOSS: Okay.
MR. ASSAAD: Exhibit 2, page 12, under the number 1 publication, quote, accepted, A-C-C-E-P-T-E-D, closed quote. So it's -- we're in a different situation here.
Are you saying you're not going to produce that document under the -- under the law?

MR. GOSS: We are not producing it today.
MR. ASSAAD: Okay. Let's take a break.
THE REPORTER: Off the record, please.
(Recess taken from 10:39 to 10:50 a.m.)
BY MR. ASSAAD:
Q. To determine whether or not you had a quasi-steady result, what do you look at, in this case?
A. The patterns of flow.
Q. When you say "patterns," what do you mean by "patterns"?
A. In this case I looked at the streamlines, which you can think of as an instantaneous pattern of flow, and I compared streamlines.
Q. And is the streamline based on velocity?
A. Yes.
Q. Okay. Are you looking at the instantaneous velocity or the average velocity?
A. Instantaneous.
Q. Okay. Did you look at anything else besides the streamlines?
A. No.
Q. As you can see from Exhibit 5, which is the St. Thomas proposal, I understood that's probably the engagement agreement between -- to perform the study on the 750 between St. Thomas and 3M; correct?

A. Yes.
Q. Okay. Are there any other engagement agreements that exist with respect to your time on this case as a consultant, an expert for 3M?
A. Well I would say this isn't one of those. This isn't a engagement agreement with me as an expert.
Q. I understand that.
I'm saying are there any engagement agreements between you and 3M or the attorneys for 3M?
A. I -- I'm quite certain there isn't.
Q. Okay. Is there a similar document with respect to Exhibit 5 for your work on the 505?
A. I think there was a working draft, but not a final draft. I think the -- if I recall, the final proposal was by -- was verbal.
Q. Okay. And I know I wasn't going to ask much about the 505, but did you use the same type of methodology on your analysis of the 505 as you did with the 750?
A. Yes.
Q. Okay. And with respect to determining the quasi-steady state by looking at the instantaneous velocity, what did you consider a meaningful, I guess the term was convergence, what change, like what would be a non-meaningful change that you could say this is quasi-steady state?

A. It was by visual inspection, not quantitative comparison.
Q. Okay. So if I asked you today to show me the results that you looked at to determine quasi-steady state that's something that you couldn't put together because you don't have those files any more; correct?
A. I disagree.
Q. Okay. What would you look at?
A. I could compare the results at two different time steps to show that there's no meaningful difference in the streamlines, and that's what I would provide you.
Q. Okay. So you'd compare it to the two other files that you have.
A. That's one way. Absolutely.
Q. What would be the other way?
A. It would be to compare two files.
Q. Okay. But the only files that you have are the 264, the 300 and another file before 264.
A. That -- Those are the two files related to this expert report. In my journal paper I made a

further comparison where the two results differed by maybe 2,000 time steps, and I did a side-by-side comparison of those.
Q. So you ran it again for your journal paper?
A. No.
Q. I'm really confused now. So --
A. It was the same calculation.
Q. What do you mean by the "same calculation"?
A. I ran the simulation once.
Q. And how far did you run it?
A. At least to 2500 time steps.
Q. Okay. And do you have any of that data available?
A. I may have the data at 2500, I would have to check. But that data would show that over that entire time period there's no meaningful difference. And that comparison was in -- is in the journal paper.
Q. Why did you not put that information in your expert report?
A. What I put in the expert report is this, images from figures 3 through 8 could be replicated -- I'm on page 9 of Exhibit 1. "Images from figures 3-8 could be replicated at other time instances and the same conclusions would be drawn."
So I assessed them and I state that the

results are the same at other instances.
Q. Okay. I assume there is much more detail in your publication which is -- which has been submitted for publication than in your expert report.
A. There's different detail. I don't know if I'd say "much more," but there's different detail.
Q. What's the different detail?
A. Well, for example, in a journal paper I would have never included a critique of Said Elghobashi.
Q. I'm talking to the -- with respect to your CFD analysis, not the critiques, but.
A. Thanks for that clarification.
There is more detail related to the CFD in my journal paper.
Q. What detail is there in the journal paper?
A. Some equations are included.
Q. Okay.
A. I ran the -- a comparison with the forced-air warming and without, and I also -- if I recall correctly, I ran a case where I had a even higher temperature coming out of the Bair Hugger than is reasonable.
So I ran other cases for the journal paper.
Q. Okay. When you say "a higher temperature,"

what temperature?
A. For the journal paper I ran a calculation where the temperature emerging from the Bair Hugger was 43 Celsius.
Q. Okay. Now the opinions that you're going to be giving in today's deposition, they're based on the initial CFD analysis that was completed by January of 2016 with respect to the 750; correct?
A. They're based on the initial CFD analysis. I don't know if they were completed by January of 2016, but they are based on the initial CFD analysis.
Q. Okay. And you agree with me there's nothing in your report that identifies the equations that you used with respect to your analysis of the problem.
A. I agree.
Q. Okay. Now I asked you what the time step was, and I know you looked through your report somewhere. Did you see anything about the time step that was used?
A. The only thing I saw was the statement that the results at other time steps lead to the same conclusions.
Q. Is -- Is a time step, is that a -- is it a constant time between, like, 263 and 264?
A. Yes.

Q. And when you're talking about a time step are you like running it every second, every two seconds, every five seconds?
A. You -- It's like that, but you use -- you can use different time steps during your calculation. So, for example, you might want to use small time steps initially to get things going, and then you might use larger time steps, let's say, once you get to quasi steady and you want to go out further in time just to verify. So you can change the time step over ti -- over -- over -- during the calculation. But unless you do that, the time step is the same between each sequential time.
Q. So is it a second, a fraction of a second?
A. It would be a fraction of a second.
Q. And did you ever change the time steps?
A. Yes.
Q. At what point?
A. What do you mean by "at what point"?
Q. Like when did --
Did you change the time step between 1 and 264?
A. I don't recall.
Q. Where would that information be?
A. I don't know if I recorded that. I don't

recall recording when I changed -- when or if I changed time steps.
Q. So you don't know even if you changed the time step.
A. I --
You know, thinking back, I do recall changing the time step, but I don't recall when.
Q. You do understand that all the opinions you intend to offer in this case had to be disclosed to the plaintiff by June 2nd, 2017.
MR. GOSS: Object to form, foundation.
Q. Were you aware of a deadline for your expert opinion in this case? Your report?
A. Yes, I was.
Q. Okay. And the deadline was June 2nd, 2017?
A. That sounds --
Q. Okay.
A. -- right.
Q. And you prepared the report yourself?
A. Yes.
Q. Okay. Did anyone provide any edits to the report?
A. Yes.
Q. Who?
A. Counsel would have provided typographical

edits; commas, periods. Nothing substantive, nothing that would change the conclusions or any substance of the report.
Q. Any of your colleagues look at it and offer any edits?
A. No.
Q. Okay. When was the journal article submitted?
A. I would estimate -- estimate April or May.
Q. Of this year?
A. Yes.
Q. Okay. Did you put the time step in the journal?
A. I would have to look. I don't know.
Q. Okay. If you do change the time step during a -- a run, is that something that you would disclose in the methodology of a journal paper?
A. The choice of time step is important to disclose, and its bearing on accuracy, but whether or not you change it may or may not be important.
Q. So you definitely would have disclosed, like, the -- that the -- Strike that.
The time step is an important piece of information that is usually submitted as a part of a CFD analysis in a scientifical -- scientific research

report for publication.
A. Yes.
Q. Okay. Because you would need the time step to reproduce the results.
A. Correct.
Q. Okay. Do you agree with me that there is a lot more information in your journal article than is contained in your expert report? Scientific information?
A. No.
Q. "No"?
A. No.
Q. Okay. Without the time step can I reproduce your results?
A. Yes.
Q. But you just told me it was very important to reproduce the results.
A. Correct.
Q. So without it and it's an important piece of information to reproduce results, how would I reproduce your results without a time step?
A. And actually let me clarify my earlier answer.
Provided that your time step is sufficiently small and that it allows you to reach quasi-steady

results, you would be able to reproduce these results.
Q. Okay. But if I wanted to -- I guess for -- to create file 264 again, I would need the time step that you used; correct?
A. No.
Q. Well how would I know that 264 correlates to the time step you used without knowing your time step?
A. Well first of all, the TRN file that I provided has my time steps. Okay?
Q. Okay.
A. Secondly, the number 264 isn't important by itself. What's important -- And this is the same with Dr. Elghobashi's work. What's important is that you run the results long enough so that there's not meaningful change. And so you could repre -- reproduce the quasi-steady results without knowing the time step that I used.
Q. And I understand what you're saying, but my question's a little bit more specific, okay?
I assume that every single time step, okay, has numbers in it that -- that identify the results of the calculations for a different part of the mesh; correct?
A. Correct.
Q. Okay. So if I wanted to run a CFD model and

obtain the same numbers in the 264th time step, I would need to know what time step you used; correct?
A. That is correct, but that's not relevant.
Q. I understand that. It might not be relevant, but my statement is correct.
A. Yes.
Q. Okay. And I would have to know, like, where you started kind of; right?
A. Correct.
Q. I mean, is that called the boundary conditions or is it called something else where you start?
A. Where you start is called the initial condition.
Q. Okay. Are the initial conditions anywhere in your report?
A. No.
Q. Okay. Do you have it in any type of your notes?
A. No.
Q. Is it anywhere that I could obtain it sitting here today?
A. No. And it's not relevant.
Q. Okay. I understand that you say it's not relevant, but that's kind of a legal term. So let's

stick the relevancy objections to your counsel and just answer my questions for me.
MR. GOSS: Well I think "relevance" has a meaning outside of the law, and if that's the way he's using it, then --
MR. ASSAAD: Fair enough.
MR. GOSS: -- let him use it.
BY MR. ASSAAD:
Q. But I would need those initial conditions to do the exact same thing that you did to get the results that are obtained in the TRN file that you've provided; correct?
A. That is a correct statement.
Q. Okay. And I'd also have to know whether or not you changed the time step between the initial conditions and time step 264; correct?
A. Correct.
Q. Okay. Otherwise, without those data -- that data, it would be impossible for me to replicate the results you found in your 264 TRN file; correct?
A. I disagree.
Q. How would I replicate and get the exact same numbers -- I'm not talking about your judgment -- I'm talking about the exact same calculated numbers in the 264 TRN file, if I don't have the initial conditions?

A. You're using the word "replicate" in a way that's not the way it's used in our field. To replicate, and I mentioned this before, "replicate" doesn't mean to do the exact same thing with the exact same methodology, but it's to come up with the same results and conclusions. You are able -- Anyone is able to replicate my work simply from that TRN file. Now that doesn't mean that at the 264th time step they will have the exact same numbers, but it means that if they do the problem right they will come to the exact same conclusions.
Q. And I understand that, and I understand exactly what you're saying, sir. And I -- And I know you think some of my questions don't mean anything or are not relevant, but what I'm really just trying to find out is this. I cannot replicate the same numbers in 264 unless I have the initial -- the initial conditions; correct?
A. That is correct.
Q. Okay.
A. And I just want to correct your interpretation of my answer.
Can I ask for your answer to be -- your response to be read back?
Q. Well you can talk to your counsel and he

could ask -- he can correct anything later on when he has a chance to ask.
A. Okay. Well then I'll do it from memory.
It's not that I disagree with your question, it's that you're using the word "replicate" in a way that is not used in this field. You're -- Maybe you're using "replicate" with a legal meaning, but that's not -- when we talk about can you replicate someone's study we are not talking -- we're not using the word replicate as you've done. That's my clarification.
Q. And I understand that, because there could be a different methodology or a different initial conditions; correct?
A. Correct.
Q. But my question is more just simple math.
To get the calculated numbers in the 264 TRN, I would need to know what the initial conditions are; correct?
A. That is correct.
Q. Okay. Now for the 254 TRN file did you use RANS or LES?
A. I used LES, which is Large-Eddy Simulation.
Q. Okay. Did you ever use RANS initially?
A. Yes.

Q. And was that to create your initial conditions?
A. Yes.
Q. Okay. What was showed in Science Day, was that a RANS model or an LES model?
A. LES.
Q. Okay. And you ran RANS once, correct, to get your initial conditions?
A. I believe that's true.
Q. And RANS is steady state?
A. RANS does not have to be steady state.
Q. Did you run it steady state?
A. I would have run it steady state.
Q. Okay. And my understanding is that you used the, according to your report, the Boussinesq approximation?
A. That's right. And I'm going to try to spell that.
Q. We can -- We can give the spellings later on to her. I don't want to waste time with spelling.
A. Thank you.
Q. Okay. And on the --
And just so I understand, did you use RANS or LES for the 2540?
A. LES.

Q. Okay. And you also used the Boussinesq for the 2540?
A. Correct.
Q. And so you received a geometry, a CAD file from the lawyers for 3M.
A. Correct.
Q. Okay. And those are not the lawyers of Blackwell Burke, but Greenberg Traurig; correct?
A. Correct.
Q. Were you aware why -- why Greenberg Traurig was not -- no longer attorneys for 3M?
A. No.
Q. Okay. And you don't know who created the geometry; correct?
A. Correct.
Q. Do you know what software they used?
A. No.
Q. Okay. And I take it you just imported it into whatever system that you use.
A. Correct.
Q. And that would be ANSYS?
A. Correct.
Q. ANSYS CFX or ANSYS Fluent?
A. We used ANSYS CFX.
Q. Okay. And did you change the geometry in

any way?
A. Yes.
Q. How did you change the geometry?
A. I omitted small and insignificant objects, I don't recall which ones. But as an example, let's say I want to simulate the airflow in this room. There are many small features which may not matter, like the doorknob, the handle on the cup -- the cupboard over there. Those features that are small that don't affect the flow I would have -- I removed some of them.
Q. Okay. And that'd just be a judgment call what you believe would affect or not affect the airflow.
A. That is correct.
Q. Okay. Based on your education, training and experience.
A. That is correct.
Q. Okay. And did the geometry already contain a grid or a mesh?
A. No.
Q. Okay. Is a grid and mesh the same thing?
A. Yes.
Q. Okay. Now what program was used to create the mesh?

A. The ANSYS mesher.
Q. And what shapes were used to create the mesh?
A. The vast majority, perhaps all of the shapes were tetrahedral.
Q. Okay.
A. Pyramid -- Pyramid-like shapes.
Q. Okay. Four-sided trian --
Four sides of triangles; correct?
A. Or five sides.
Q. Or five sides. I'm sorry. You're right, five sides.
A. Well it's four or five, it's a combination.
Q. Okay.
A. Pyramids and tetrahedrons are two complimentary shapes; one of them has five sides, one has four sides.
Q. Okay. So tetrahedral could either be four or five sides?
A. No. We use the term tetrahedral for four sided, and that's what "tetra" comes from. We use pyramidal or pyramid elements in our field generally refers to five-sided.
Q. Okay. So you believe that all the mesh shapes were tetrahedral?

A. Or pyra --
Or pyramids.
Q. Okay. Is that something that you've written down?
A. No.
Q. How would I find that out?
A. From the TRN file.
Q. Okay. And what --
Do you know what CFX solves for; does it solve for the different shapes, or does it kind of say it's all one shape?
A. I don't quite know how to interpret your question.
Q. Well did you use any --
I guess what's the term polyhedra with respect to CFX; does that mean anything?
A. Polyhedra would refer to a multi-sided element.
Q. Okay. Does CFX solve for polyhedras?
A. Well polyhedra means a multi-sided object.
Q. Okay.
A. CFX will solve for brick-shaped elements, which have eight sides; it will solve for hexahedras, which have six sides. They can have -- It'll solve for wedge elements which have five; pyramid elements

which have five; and tetrahedras, which have five.
Q. Okay.
A. Or, I'm sorry, four.
Q. Okay. And I know you -- in your journal article you looked at the 505 as well?
A. Yes.
Q. And did you use the same geometry in the 505 as you did with the 750?
A. Yes.
Q. Okay. So I assume you still have the geometry someplace.
A. That's correct.
Q. Did you pull that geometry from the 505 -- that you used in the 505 from the TRN file, the 264?
A. Yes.
Q. So you don't have the original geometry file that was given to you by the lawyers for 3M.
A. I don't know. I may. I would have to look.
Q. Okay. So you said something about ANSYS mesher. Is that the only meshing program that you could use in ANSYS?
A. No.
Q. Why did you decide to use ANSYS mesher?
A. Well the meshing program in ANSYS actually has many different meshers.

Q. Okay.
A. So I used the meshers contained in the ANSYS software, but there are other meshers I could have used.
Q. Does it create its own file after it's done?
A. Yes.
Q. Where is that file?
A. It's --
The mesh is contained within the TRN.
Q. But does it create a separate file after you mesh?
A. It would create a separate file after the mesh.
Q. And where is that file?
A. I don't think I have it because it's contained within the TRN.
Q. I understand that, but you run the mesh and I -- you just said it creates its own separate file; correct?
A. That's right.
Q. That's before you probably run any of the calculations; correct?
A. That's correct.
Q. Did you delete that meshing file?
A. I would have to look to see if I have it,

but once you have the TRN file you don't nee -- you don't need the mesh file, so there's no reason to keep it.
Q. Okay. Okay. So whether or not you kept it or not is irrelevant because you have it in the TRN file.
A. That is correct.
Q. Okay. Does CFX put out any other files besides a TRN file?
A. Yes.
Q. What files?
A. It puts out an output file which is just a script of what you've done, which is the same as -- it's all contained in the TRN. And it puts out what's called a RES file, which is the results, which is also the same as the TRN.
Q. Okay. Do you have those files?
A. No. Well I may have the output file, which is a script file, but the results file are the same as the TRN.
Q. Okay. So what's the output file, does that contain your initial conditions?
A. It -- I don't know.
Q. So it may?
A. Well, I mean, it -- it does -- it --

Well let me say this. It does not contain the initial conditions. It's a script file. It's just writing of the setup of your problem.

Q. But wouldn't the setup have the initial conditions?

A. No, because it's just the script. So, for example, it says you're using air, you're using the LES method, your density is this, your velocity is this.

Q. Okay.

A. So it's information written to a script, but it's not data.

Q. Okay. And you said there was a results file but you don't have that any more; correct?

A. Correct, because it's contained within the TRN.

Q. Okay. Any other files?

A. Not that I can think of.

Q. I mean, does CFX put a CFX file out?

A. Yeah. Actually there are two more files, thanks for reminding me.

There could be a CFX file, and what's called a DEF file, definition file. Both of those are contained within the TRN.

Q. Okay. But they're al -- they're also

separate files as well.

A. That's correct.

Q. Do you still have those files, or have they been deleted?

A. I don't believe I still have them because they're contained within the TRN.

Q. And are these files on your personal computer, or on a server in St. Thomas?

A. They would be on a computer at St. Thomas.

Q. On the server?

A. Well they're on a desktop.

Q. Okay. And what computer did you use to run the CFX, or the -- the model?

A. I used a multicore desktop machine.

Q. How many cores?

A. I recall 16.

Q. Sixteen cores?

A. Yep.

Q. Did you consider using a supercomputer?

A. No.

Q. What about a computer at the University of Minnesota?

A. I did not consider that.

Q. So you never used a computer at the University of Minnesota?

A. The -- I have used computers at the University of Minnesota.

Q. I mean for this. For this.

A. For this I did not.

Q. Okay.

(Abraham Exhibit 6 marked for identification.)

BY MR. ASSAAD:

Q. What's been marked as Exhibit 6 is a document that was produced to us during the first subpoena issued to you, titled Abraham 00002 regarding your job information.

Do you recall this document?

A. Yes.

Q. What is this document?

A. This document lists the -- it's information about the run and the subdivision of elements or -- the subdivision of the problem to processors or to cores.

Q. Engineering Sparrow, what's that?

A. It's a name of a computer.

Q. That you use at St. Thomas?

A. Correct.

Q. And the reason why I'm confused is because you trained under Sparrow; correct?

A. That's correct.

Q. Okay. So this is not his computer?

A. That is correct.

Q. Okay. So you used no resources from the University of Minnesota.

A. Correct.

Q. Okay. And where it says "mesh," are these mesh or nodes? Or do you know what that even is?

A. I know what that is.

Q. What is it?

A. When you want to solve a problem, let's say fluid flow in this room, the problem is very complex and the mathematics is very difficult so what is done is you subdivide the room into a number of --

Q. Parts?

A. I'd say parts, and there are these tetrahedra, pyramid, hexahedra, these elements that we were talking about.

Q. Umm-hmm?

A. Those are cells. We call that the mesh.

At the intersection of those cells where two come together we call that a node. And so cells and nodes, or mesh and nodes are used together.

Q. So this isn't the mesh size, this is probably the nodes size?

A. I don't know if these numbers refer to the number of elements or the number of nodes.
Q. Well I add these up and they're roughly between 1.8 to 1.9 million. I assume your mesh was larger than 1.9 million.
A. Correct.
Q. Okay. Do you know how many nodes you had?
A. The re --
All the results contained here are about 8.1 million elements. I don't know the number of nodes, but it would be approximately that number.
Q. The same --
The nodes equal elements?
A. No.
Q. Close to the elements?
A. Close.
Q. Okay. Then how would I know this 8.1 million?
A. From the TRN file.
Q. Did you have another --
Do you have another one of these Job Information tables for the RANS model that you ran?
A. I don't believe so. I can go look when I get to my computer, but I don't recall. I don't believe so.

Q. And, I'm sorry, you said you had 16 cores?
A. Correct.
Q. Is it a double or single precision?
A. Well the cores aren't double precision, they're single precision.
Q. Did you monitor the solutions as they solved?
A. Yes.
Q. How long did it take to solve?
A. I recall something like 40 days.
Q. Forty days?
A. Correct.
Q. Nonstop running?
A. Correct.
Q. So when did you start the solution? Would it be this date, November 18th, 2015?
A. Well certainly --
It appears that that is the date.
Q. Okay. So that's the start time.
A. Yes.
Q. Okay. So you would have not gotten the solution till the middle of December?
A. You know, I think I -- I'm struggling with memory. I'm trying to remember the details of the length. If the run starting on November 18th was the

beginning of the run, and I recall 40 days, then yes, the result would have been obtained aft -- 40 days later.
But I don't know where in the calculation this run -- this start run corresponds to. So it could have been the initial start, it could have been after a hundred time steps, it could have been after 200, so I -- I can't tell you, sitting here, what time step this start run corresponds to. I just don't recall.
Q. So this -- this is performed for every time step?
A. No.
Q. Okay. So sitting here today, you're not sure of when you started the -- the run.
A. Correct.
Q. Okay. The fact that the contract was signed, or the proposal with St. Thomas and 3M was October 17th, 2015, does that give you -- does that refresh your recollection as how long it took you to, I guess, import the geometry, do the mesh or do whatever you had to do before you started the run?
A. No.
Q. How long did it take you to create the mesh?
A. I don't recall.

Q. Was it a day, an hour?
A. It would have been more than an hour, likely more than a day.
Q. Okay. By the way, do you have authority to sign contracts between St. Thomas and third parties?
A. I am one of the signers.
Q. And who is the other signer?
A. There are other folks in the administration. I think the Dean would sign, and then there may be someone else.
Q. Okay. I take it that you've reviewed Dr. Settles' report; correct?
A. Yes.
Q. And you reviewed Dr. Kuehn's report from University of Minnesota.
A. Yes.
Q. Have you ever had any classes with Dr. Kuehn?
A. Yes.
Q. When you were an undergrad?
A. That's correct.
Q. What class?
A. It -- And I think I was an undergrad, it's possible I was studying my mas -- getting my master's degree. But I recall taking a class from him related

to heating, ventilation and air conditioning.
Q. Okay. Did you rely on Dr. Settles' report for any information?
A. No.
Q. Did you rely on Dr. Kuehn's report for any information?
A. I relied on Dr. Kuehn's report to confirm my results.
Q. And what did you look at Dr. Kuehn's report?
A. His velocity and temperature measurements.
Q. Okay. Did you read his deposition?
A. Yes.
Q. Okay. The entire dep --
You read the entire deposition?
A. Yes.
Q. Did you read Dr. Settles' deposition?
A. Yes.
Q. Did you read any other depositions?
A. Yes.
Q. What other depositions did you read?
A. I read all of the depositions from the plaintiff's side.
Q. Plaintiffs' experts, or plaintiff's side?
A. Plaintiffs' experts.
Q. Okay.

A. Okay.
Q. So that would have been Dr. Elghobashi?
A. That's right. I read his.
Q. Okay. Doctor -- Or Dan Koenigshofer?
A. Yes.
Q. Michael Buck?
A. I -- I'm struggling to go through -- to remember the names, but there were perha -- maybe make this easier. There are maybe eight or nine or so expert depositions that I was provided, and I read all of them. I recall -- I think I recall the name Michael Buck.
Q. Okay.
A. Certainly Dan K.
Q. Umm-hmm.
A. Certainly Said Elghobashi.
Q. Okay. Well I will represent to you that the plaintiffs only have seven experts, and not all of them have been deposed. So -- So are there -- are you mixing expert reports and depositions?
A. That's actually possible. Maybe -- I think I am mixing expert reports and depositions.
Q. Okay.
A. Thank you for correcting me.
Q. So what depositions have you read?

You read Dr. Settles and Dr. Kuehn; correct?
A. That's correct.
Q. You've read Dr. Elghobashi; correct?
A. Correct.
Q. Have you read Michael Buck?
A. No.
Q. Have you read Dr. -- or Dan Koenigshofer?
A. The only deposition -- And thank you so much for correcting me.
The only deposition on the plaintiff's side that I've read is Elghobashi.
Q. Okay. So you've seen all the reports of plaintiffs' experts, you just have only read the Elghobashi deposition.
A. That is correct.
Q. Have you received any other depositions of plaintiffs' experts?
A. No.
Q. Okay. Have you read the depositions of defense experts?
A. Just the --
Just Settles and Kuehn.
Q. Okay. And Kuehn is K-U-E-H-N, that Kuehn; correct?
A. Correct.

Q. Okay. Have you read Michael Keen's deposition, Keen from Cali -- or from Canada?
A. No.
Q. Okay. Have you reviewed any expert reports by the defense?
A. I don't think so.
Q. Well you've seen Gary Settles' report; correct?
A. Correct.
Q. Okay. And you've -- you've seen Dr. Kuehn's report.
A. That is correct.
Q. Okay.
MR. GOSS: Do you mean American Kuehn?
MR. ASSAAD: American Kuehn.
MR. GOSS: Thank you.
Q. Okay.
A. Correct.
Q. Have you seen any other of defense expert reports?
A. I have defense expert reports. I have only read the two that we just mentioned.
Q. So you haven't read the report -- the expert report of Jim Ho.
A. Correct.

Q. You haven't read the report of Michael Keen from Canada.
A. Correct.
Q. You haven't read the report of Dr. Mont.
A. Correct.
Q. You haven't read the report of Dr. Holford? Holford.
A. Correct.
Q. You haven't read the report of Dr. Borak.
A. Correct.
Q. You haven't read the report of Dr. Wenzel; correct?
A. Correct.
Q. And you haven't read the expert report of Dr. Lampotang; correct?
A. Correct.
Q. You haven't read the report of Dr. Hannenberg; correct?
A. Correct.
Q. Have you read the deposition of Al Van Duren?
A. I have read a deposition of Al Van Duren.
Q. Which one; do you recall?
A. It was in maybe September 2015. So I have read a deposition around that time.

Q. So you read the deposition that was done in the Walton case, or the Johnson case.
A. I don't know about the cases.
Q. Okay.
A. I read a deposition from Al Van Duren around September 2015.
Q. Okay. Any other depositions you've read of fact witnesses?
A. Yes.
Q. Who?
A. Gary Hansen.
Q. Okay.
A. And Winston Tan.
Q. Okay. And was that back while Greenberg Traurig was the representative of 3M?
A. Yes.
Q. Okay. So would it be fair to say that if this MDL started in January of 2 -- December of 2015 that you haven't read any fact depositions that were conducted in the MDL?
A. Sitting here now, I cannot think of any fact dep -- witness depositions that I have read after the MDL.
Q. Okay. After the beginning of the MDL.
A. After the beginning of the MDL.

Thank you for correcting me.
Q. Okay. Did you have any criticisms of Dr. Kuehn's report?
A. No.
Q. Any criticism of Dr. Settles' report?
A. No.
Q. You have no criticism of -- of his measurement of air coming out of the Bair Hugger between 30 to 33 degrees Celsius?
A. No.
Q. Okay. Now my understanding is is that the invoices with respect to your expert work for 3M the money goes directly to you; correct?
A. Yes.
Q. Okay. And the two CFD studies for research, which is for the 750 and the 505, is money that goes to St. Thomas; correct?
A. That's correct.
Q. Okay. So the $15,000 in your CV for research in 2017 for 3M is for the 505; correct?
A. Can you point to me where you're seeing 15,000?
Q. I'm sorry. Fourteen thousand. My fault.
A. That is correct.
Q. Okay. And you've kept invoices

contemporaneously with your work in this case; correct?
A. Correct.
Q. Your invoices are complete; correct?
A. I -- Yes.
Q. And they're accurate; correct?
A. To the best of my knowledge.
Q. And they're so accurate that some months you even submitted invoices that you had no time; correct?
A. That is correct.
Q. Okay. And even for the cost of travel you -- you put it to the exact penny; correct?
A. I think I'm obligated to, but yes.
Q. I mean, you're an engineer, you like to be accurate; correct?
A. I certainly don't want to overcharge someone for work.
Q. So with respect to your invoices, and --
Do you have a copy of your invoices today?
A. No.
Q. Okay. Were you told to bring nothing to this deposition?
A. No.
Q. You just decided to bring nothing to this deposition?

A. That's not true.
Q. Okay. Well what did you bring to this deposition?
A. I have some files right here, some papers right here.
Q. Oh, I didn't see those. I'm sorry.
MR. ASSAAD: Let's take a break.
THE REPORTER: Off the record, please.
(Recess taken from 11:39 to 11:45 a.m.)
BY MR. ASSAAD:
Q. We were talking about your invoices. Would it be fair to say if I want to determine all the time you worked on your report that was completed by early January, I'd just have to look at your invoices?
A. No.
Q. Let me guess. I'm assuming that's because of the flat fee for the -- actually doing the CFD that was paid to St. Thomas; correct?
A. Well that's -- that is one reason, but also I tend not to -- I tend to undercharge. So, for example, I don't charge for many phone calls, and for travel, and so I tend to undercharge. It would be the lower bound of the work. It's the charged amount.
Q. Okay. Because I looked at it, and by the ti -- by the end of January you've only billed 30

hours. Does that seem about roughly how much time you spent, personal time that you charged directly to 3M on the -- your research and the report writing?
A. That seems reasonable.
Q. Okay. And I might have misspoke, but that was the beginning of 2016, correct, that you completed the report?
A. That's how I in --
Q. Okay.
A. Well that's how I interpreted what your question was.
Q. Okay. All right.
A. But I think you said completed the report by 2 -- early 2016?
Q. Just the CFD portion.
A. Okay.
Q. That's what I meant.
There's one thing I want to discuss if you know off the top of your head, but you spent about six hours to draft the protocol that's listed on your invoices. Do you know what that's referring to?
A. Can you show me which invoice?
Q. It was in December of 2016 and, I'm sorry, I misquoted, it was three hours to draft -- discussion of CFD and protocol and draft protocol.

Do you recall, back in 2016, what protocol that would be for?
A. No, I don't recall.
Q. Okay. Did you speak with any of the defense experts?
A. No.
Q. So you never spoke to Gary Settles or --
A. And in fact --
Can I correct that?
Q. Yes.
A. At Science Day there were some defense experts there along with myself.
Q. Fair enough.
A. Outside of that I have not spoken to any defense experts.
Q. Okay. Oh, by the way, that protocol, if it was in December of 2016, that would not -- that would not apply to your CFD analysis in your report; correct?
A. Correct.
Q. Okay. Are you a member of the American Society of Mechanical Engineers?
A. No.
Q. Were you ever a member?
A. Yes.

Q. Why are you no longer a member?
A. The American Society of Mechanical Engineers is a professional society where my understanding is if you pay your annual fee you become a member, and there wasn't much value in it for me, so I dropped membership.
Q. Okay. But at one time you were a member; correct?
A. I recall being a member.
Q. And at one time, you agree with me that while you went to the University of Minnesota you took a course on engineering ethics; correct?
A. I don't believe I did.
Q. Was -- Did any of your course involve -- any of your studies involve engineering ethics?
A. I don't recall taking any course on engineering ethics or a course that had a significant part of engineering ethics. I can't remember -- Sitting here right now I cannot remember any engineering ethics content in a course.
Q. Well do you agree that engineers uphold and advance the integrity, honor and dignity of the engineering profession?
A. They should.
Q. Do you agree that engineers should be

objective -- should be objective?
A. Yes.
Q. Should be honest?
A. Yes.
Q. And have integrity?
A. Yes.
Q. Do you agree that the engineers of 3M should be held to the same standards?
A. Yes.
Q. Do you agree that engineers must use their knowledge and skill for enhancement of human welfare?
A. Yes.
Q. Do you agree that safety should be considered in the engineering profession, the safety of humans?
A. Yes.
Q. And safety is paramount?
A. Well safety should be considered, should be highly considered. I don't know about "paramount," but safety should be highly considered.
Q. Do you believe that in the context of designing a device to be used by the public that safety is more important than profits?
MR. GOSS: Object to form.
A. Yes.

Q. Engineering's a profession; correct? Not just a job.
A. Correct.
Q. Okay. And as a professor you have a duty to teach ethical engineering behavior; correct?
A. If we have a class where that fits, then yes. But we have a duty to convey ethical behavior to our students.
Q. Okay. Engineers are to serve with the fidelity -- with fidelity to the public; correct?
A. Is "fidelity" truthfulness? What is "fidelity"?
Q. It's the quality of being faithful or loyal.
A. I don't know if engineers have to be loyal to the public.
Q. Okay.
A. That's not a word I would use.
Q. Are you familiar with the St. Thomas Code of Ethics?
A. I am familiar with it.
Q. Have you read them recently?
A. No.
MR. GOSS: I'm just going to state my usual objection to ethics as an improper subject matter.
Q. Did the St. Thomas Code of Professional

Conduct apply to you?
A. I don't know.
Q. Okay.
(Abraham Exhibit 7 marked for identification.)
BY MR. ASSAAD:
Q. I'd like for you to turn to page 4 of 6. Under Section VII it states: "Members of the University community must transact University business in compliance with applicable laws, regulations, and University" policy -- "policies and procedures."
A. Can you tell me where you're reading?
Q. Under Section VII, first sentence.
A. I'm reading "All University financial transactions and reports, including tax returns," and so forth.
Q. On page 4?
A. Page 4 of 6?
Q. Under Section VII, number --
A. Oh, Section VII. Sorry. My -- My mistake. (Witness reviewing exhibit.) Yes.
Q. Actually let's go to the first page, "POLICY STATEMENT." It states: "The University of St. Thomas is committed to upholding the highest ethical standards in all that it does and expects those who

are part of the University community, including trustees, officers, faculty, staff, and students to adhere to such standards in their business dealings."
Did I read that correctly?
A. Yes.
Q. Would you agree with me that this Code of Professional Conduct applies to you?
A. Yes.
Q. Okay. And you would agree with me that even in your work as a consultant, as a professor of engineering at the University of St. Thomas the Codes of Professional Conduct listed out here apply to you.
A. I don't know if that's technically true, but I would view them as applying to me.
Q. Okay. Under Section VI -- I'm sorry, Section VII, the last sentence says: "Therefore, only individuals who have been delegated proper authority by an appropriate University official are authorized to enter into contractual agreements on behalf of the University."
See where I read that?
MR. GOSS: Are you under one of the subs?
MR. ASSAAD: VII a., under "Contractual Obligations."
MR. GOSS: Okay.

Page 106

A. Yes.
Q. Are you --
Have you been delegated proper authority to contract -- or enter into contractual agreements on behalf of the university?
A. Well I'm one of a number of people that is able to enter into contractual obligations. I by -- I don't believe I, by myself, can.
Q. Okay. So you yourself can't go out and enter in a contract on behalf of the University without someone else from the University involved.
A. That's my understanding.
Q. Okay. Are any professors allowed to do that?
A. I don't know of any professors that are allowed to do that.
Q. Okay. Who else at St. Thomas approved the research with regard to the proposal with 3M?
A. The proposals would run through the Dean and then the grant's office.
Q. So if I subpoena the University of St. Thomas, I'll see documents signed by the Dean and the grant office with respect to approving this contract?
A. I expect you would.
Q. Okay. You agree that engineers should solve

Page 107

a potential problem instead of ignoring it?
A. Possibly.
Q. Engineers that are working in the community, not --
A. Possibly. Not always.
Q. Okay. So it's okay if -- if you're an engineer that has a product on the market and you identify a potential problem, to ignore it?
MR. GOSS: Object to form, mischaracterizes.
A. That's -- It -- It's --
I would take it on a case-by-case basis. There are some problems that are insignificant that you can ignore, and there are some problems that may be significant that you should not ignore.
Q. Well to determine whether or not the problem is significant or insignificant you have to identify the problem and determine whether or not it is significant or insignificant; correct?
A. Correct.
Q. So you might ignore moving on with respect to a problem, but the identification of a problem you would not ignore.
A. Could you rephrase that question?
Q. Well to determine whether -- the

Page 108

significance of a problem, you can't ignore the problem. You have to identify the problem and look at it.
A. Identifying the problem is different from acting on or ignoring a problem.
Q. Okay.
A. So I'm try -- I'm parsing your words.
Let me use this cup as an example. Underneath this cup there is a small indentation, which is by design. Let's say that this cup comes off of -- By the way, it's a very nice cup. Let's say the cup comes of the assembly line and there's a problem with the manufacturing and the indentation is 10 percent too large. That's a problem that someone may or may not identify and they may or may not act on it, so -- because it may not matter.
So the point I'm trying to distinguish is identifying a problem, and then making a decision to act on it are two different things.
Q. Okay. You agree, in any event, that problems involving patient risks should not be ignored.
A. It depends.
Q. Okay.
A. And let me --

Page 109

Q. No. That's fine. I mean I --
That's fine.
A. Well by just saying -- by cutting me off I am not able to fully qualify my answer, and I think that the record won't be clear.
Q. Well I'll withdraw my question then. Let's move on.
So you're familiar with the 35 bridge collapse here in Minneapolis; correct?
A. Yes.
Q. Did you ever go over the bridge?
A. Yes.
Q. How often did you go over that bridge?
A. One to three times per week.
Q. Is it on your way home? At that time.
A. Can you remind me what year it was?
Q. 2007.
A. It would not have been on my way home.
Q. So why would you go over it one or two ti -- three times a week?
A. It's a major bridge in South St. Paul, and I live in sou -- South Minneapolis, and I live in South Minneapolis, so I'm estimating that I might go over it one to three times a week.
MR. GOSS: If you went to Home Depot you

probably went over it.
A. There is a Home Depot, there's also a Target. Going downtown.
Q. But you didn't go over it every day; correct?
A. Correct. I did not go over it every day.
Q. You understand that in the 3M -- or in the Minnesota bridge collapse that engineers or the city ignored problems identified by the engineer.
MR. GOSS: Objection, lack of foundation.
Q. Are you aware of that?
A. That's not totally true.
Q. Okay. There weren't engineers that said that we should replace the bridge and there's structural problems with the bridge and just to monit -- and the city said just to monitor it instead of fixing it?
A. So I have to break that apart. First of all, any warnings related to the bridge collapse I think were associated with the questions about the strength of the gusset plates.
Q. Yes.
A. There were other warnings about the bridge that the city took action on. In fact, as I recall, they had annual remediation processes to maintain the

structural integrity of the bridge. So the city did take action on warnings from engineers.
Now I don't recall if a specific warning came about from the gusset-plate issue. If the city decided not to fix the problem but to monitor it, that is still taking action. It may not have been appropriate action, but it still is taking action.
So it's not a simple yes-or-no answer that I can give there.
Q. Okay. But at the end of the day the bridge collapsed.
A. At the end of the day, the bridge collapsed.
Q. Okay. Just by the way, did you receive any --
Well do you recall some of the engineers stated, in the bridge collapse, that a catastrophic collapse was possible?
A. Boy, sitting here now I cannot recall. That may have occurred.
Q. By the way, did you receive any -- did you look at the Sessler study?
A. Yes.
Q. Were you provided the raw data regarding the Sessler study?
A. No.

Q. Okay. Have you looked at any other patient-warming devices manufactured by 3M or Arizant prior to the 505 model or the 750 model?
A. Yes.
Q. What model?
A. I don't recall. I worked on patient warming with Augustine Medical at the time, back in 2000. I don't recall the model numbers that we worked with.
Q. Do you recall any model numbers that warned about possible airborne contamination?
A. No.
Q. Would that be relevant to --
Would that knowledge be relevant to your report?
A. I would need to see more. I doubt it would be relevant.
Q. Okay. When you worked with Augustine, what did you do for Augustine?
A. I worked on characterizing the rate of heat transfer from the blanket to a patient and the flow and temperatures within the blanket.
Q. Okay. Did you publish anything regarding that work?
A. No.
Q. Do you still have the data or information

regarding that work?
A. No.
Q. So you've met Dr. Augustine before; correct?
A. I have.
Q. Okay. When was the last time you spoke with Dr. Augustine?
A. To my best recollection, and mind you this is years, I think I met him at Augustine Medical. There was a social gathering or a party, and I believe I met him there, and I also met him after he left Augustine Medical. He moved to a nearby location and he had started a company, and I recall meeting him there.
Q. Did you do for --
Did you do any work for him after -- after he started his -- after he left Augustine Medical or Arizant?
A. No.
Q. Okay. Have you spoken with him or anyone from Augustine Medical since that time, since the last conversation, by email or telephone?
A. Well Augustine Medical is no longer around, right? Oh, oh. You mean Augustine -- Augustine --
Q. Biomedical or --
A. Okay.

Q. Any Augustine entity.
A. No.
Q. Okay. So you haven't heard from Randy Benham or anyone else in the past five years?
A. I don't know Randy Benham. I don't recall ever hearing from him. I did receive a subpoena, which I don't think was from Randy Benham, but it's possible it was.
Q. Okay.
A. But I have never spoken to him. I don't recall any speaking or emails.
Q. Now Exhibit 2 is your CV; correct? We already went over that.
A. Yes.
Q. Okay. Are you certified in any way by ANSYS? Like a certified ANSYS technician or anything like that?
A. No.
Q. Okay. What's your training in ANSYS?
A. I've taken a number of courses with ANSYS at the undergraduate and graduate level. I've taken a large number of short training seminars on ANSYS premises, and I --
Q. ANSYS what?
A. Premises.

Q. Okay.
A. Both in Minneapolis and in a place called Canonsburg, Pennsylvania.
Q. What's "ANSYS premises"?
A. Their locations.
Q. Oh, okay.
A. Their buildings.
Q. Okay.
MR. GOSS: Another legal term.
MR. ASSAAD: I thought it was a software bundle, --
THE WITNESS: Sorry.
MR. ASSAAD: -- you know, so --
A. Thank you for helping clarify that.
And I've used ANSYS as an instructor and a researcher throughout my career.
Q. Okay. And is this ANSYS CFX or ANSYS Fluent?
A. We have both.
Q. But which one do you use?
A. I have used both. I currently use CFX more often.
Q. And St. Thomas has both?
A. Correct.
Q. And what version does St. Thomas have

currently?
A. Version 18.
Q. Okay. But what version was the CFD done for the 750?
A. 17.
Q. 17, or 17.1?
A. I don't know if it was 17.0 or .1.
Q. Would there be a difference in the results if it was 17 or 17.1?
A. No.
Q. Okay. You're not an expert in medicine; correct?
A. Correct.
Q. You're not an infectious disease expert; correct?
A. Correct.
Q. So do you know how many CFUs it would take to cause a periprosthetic joint infection?
A. No.
Q. You're not an expert in orthopedics; correct?
A. Correct.
Q. You're not an expert in nursing; correct?
A. Correct.
Q. You're not an expert in filter

manufacturing; correct?
A. Correct.
Q. You're not an expert in medical device design; correct?
A. Well I've designed many medical devices and I've worked for many medical companies. I haven't been asked, in this case, to serve as a medical device design expert, so I'd have to give that some thought.
Q. Okay. But at this point you don't consider yourself a medical device design expert for this case.
A. Correct.
Q. And would you hold yourself out as a patient warmer medical device expert?
A. Yes.
Q. You would?
A. Yes.
Q. You have designed the patient-warming devices?
A. I have worked on the design of multiple patient-warming devices.
Q. Which ones?
A. I've worked on a device from Smiths Medical.
Q. Called?
A. It's a -- I don't know. It's EQ -- I think the name is an EQ something, so it's numbers and

letters.
Q. Okay.
A. I have published that work.
Q. Okay.
A. I have worked on the -- I think it's called the Ranger fluid warming system.
Q. Okay.
A. I have worked on the forced-air warming devices through Augustine Medical.
Q. Okay.
A. And I have analyzed multiple forced-air warming devices.
Q. Have you worked on any other patient-warming devices besides forced-air warming?
A. Yes.
Q. Which ones?
A. The Ranger.
Q. Okay. That's a fluid warmer; correct?
A. Correct.
Q. Okay.
A. But it warms fluids before they're inserted into the body, so it's essentially a patient warmer.
Q. Fair enough.
And have you used -- have you done any research on conductive blankets or conductive devices?

A. Yes, I have done research on conductive devices.
Q. Okay. What conductive devices?
A. In my research, almost every heat transfer situation has conduction.
Q. I'm talking dealing with patient warming.
A. Oh. Thanks for the clarification.
No. I have not done work on conductive warming devices.
Q. Okay. You agree with me that the patient-warming devices are either going to transfer heat by either convection, conduction or radiation; correct?
A. I agree.
Q. Those are the only three ways of heat transfer that I'm aware of. Is that --
Are there any other ways to do heat transfer?
A. You could have internal heat generation, but that -- I can't imagine that being used for a patient-warming device.
Q. Okay. So you agree there's multiple patient-warming devices out there, but just a different method of transferring heat.
A. I agree.

Q. Okay. Like some --
Like, for example, forced-air warming is going to transfer heat by both convection and conduction; correct?
A. Well it's really convection.
Q. Well would you agree with me that any part that the blanket is touching the body it's going to transfer heat by conduction?
A. I would agree that there would be conduction, but the vast majority of heat is transferred by convection.
Q. And -- And the -- the amount of heat I'm not really going to get into, but there is some conductive transfer when the Bair Hugger is used, Bair Hugger blanket.
A. There is no conduction heat transfer that does not also involve convection.
Q. Okay.
A. Would you like me to explain?
Q. I understand what you're saying, actually, so that's fine.
Is there any radiation transfer of energy using the Bair Hugger?
A. There -- It's the same answer for conduction. There would be some radiation, but it's

initially caused by convection.
Q. Okay. Well... That's fine.
You're not an expert with respect to medical device warnings; correct?
A. Did you say "warnings" or --
Q. Warnings. Warnings.
A. Correct. I am not.
Q. You're not an expert on operating room design.
A. That is correct.
Q. Besides doing the operating-room airflow in this case, and the 505 I guess, have you done any other work on operating-room airflow?
A. Yes.
Q. Where?
A. I worked for a company called Precision Air I think is their name, it was not a formal -- there was no formal grant, but I -- I have done work and informal consulting with them, and they design operating-room airflow systems.
Q. Okay. So besides Precision Air and this case, you have not worked on any operating-room airflow systems.
A. That's correct.
Q. Do you hold yourself out as an expert in

designing HVAC systems for operating rooms?
A. I do not.
Q. Okay. The airflow system that is used in an operating room, would you consider that laminar or turbulent?
A. I consider all airflow in all operating rooms turbulent because I'm using the fluid mechanics definition of turbulence.
Q. Which is the Reynolds number; correct?
A. It's based in part on the Reynolds number.
Q. Do you know what the Reynolds number is for the operating room that you used with respect to your CFD analysis?
A. Can you clarify when you say "for the operating room" used.
Q. Like for the CFD model it has airflow; correct?
A. Correct.
Q. And that is going to have a Reynolds number; correct?
A. No.
Q. It's not going to have a Reynolds number?
A. No.
Q. What's the Reynolds number based off of?
A. The Reynolds number is based off of flows

that have a defined velocity, a defined length of -- of an object they're flowing around or flowing through, like a duct, and a viscosity.
Now for example in this room, if the camera would pan up -- please don't pan up -- but if it did pan up or pan around we would see ventilation. Perhaps this screen in the ceiling's a ventilation. We can define a Reynolds number up there within that ventilation shaft. But when the Reynolds number -- when the flow gets into this room there's really no unique definition of the Reynolds number because there's no unique length. Do we use the length that's the height of the ceiling? Do we use the length that's the width of this room, according to my perspective? Do we use what's called the depth? Do we use the length, let's say, the diameter or height of this coffee cup? There's no unique definition.
Q. Okay.
A. So we -- it is very unusual --
I have never heard of someone defining a Reynolds number for a room.
Q. What about the Reynolds number of the ventilation right before it comes out of the vent, did you calculate that?
A. No.

Q. Okay. So you don't know what it is sitting today -- sitting here today?
A. I don't know what it is, and it's not material, and I could calculate it in a matter of a few minutes.
Q. Okay. Do you consider your -- yourself an expert in particle flow?
A. Yes.
Q. Do you consider yourself an expert in particle movement in a turbulent flow?
A. Well I've done multiple studies on movement of objects and particles in a turbulent flow, so -- and multiple peer-reviewed studies. Does that make me an expert? I don't know. I'd have to think about that.
Q. Well sitting here today, I mean, I understand you want to think about it, but I need a answer.
A. I consider myself an expert.
Q. Okay. Are you familiar with the Navier-Stokes equations?
A. Yes.
Q. Are you familiar with the Boussinesq approximation equations?
A. Yes.

Q. You agree that turbulence does not follow airstreams.
A. Turbul -- Well turbulence is a description of air motion.
Q. Yes.
A. So turbulence is not something that follows anything.
Q. Okay. And that's my point, it doesn't follow airstreams.
If it's not following anything, it's definitely not following airstreams.
A. Well, I mean, fluid that is turbulent that moves would carry its turbulence with it, but it's not -- someone wouldn't say turbulence follows an airstream.
Q. Okay. Just out of curiosity, on all your -- I see a lot of consulting work here, and have you always used ANSYS?
A. No.
Q. What did you use -- What other --
What other software device -- or software programs do you use?
A. I've written my own code, first of all. And I did use Fluent before they were part of ANSYS.
Q. Okay.

A. And now I strictly use ANSYS.
Q. Do you ever use your own code?
A. No.
Q. Have you used your co --
Has your code been verified?
A. I don't recall because it was years ago.
Q. Okay. And you know the difference between verification and validation; correct?
A. Yes, I do.
Q. Okay. Have you used your code in any of the consulting work you've done that's listed in your CV?
A. No, I don't believe I have. No.
Q. Okay. Now all -- all this, like for -- would it be fair to say that going from page -- from the "grants" section on page 5, all the way down for 6 and 7 and 8, 9, page 9, all those grants, did you primarily use either ANSYS Fluent or ANSYS CFX?
A. Well many of those grants didn't involve CFD.
Q. Okay. But the ones that did?
A. Yes.
Q. Okay. You didn't use any of your code for any of those grants.
A. That is correct.
Q. Okay. And the ANSYS that was used, if I

wanted to know the version that was used could I just look at what version was being used by the University at the time?
A. Yes.
Q. Have you ever used the ANSYS at the University of Minnesota since you left The University of Minnesota?
A. Yes.
Q. In what capacity?
A. I was an Associate Fellow at the Supercomputing Institute at the University of Minnesota for a number of years, and my research group would have used ANSYS stored there.
Q. Okay. Do you own ANSYS?
A. No.
Q. Okay. So whatever you use is what the University has.
A. Correct.
Q. Okay. And is --
I mean, does the University have a full version of ANSYS?
A. We have a -- what's called a research license.
Q. Okay.
A. We also have student licenses.

Q. Okay. What's a research --
I mean, but does it have the same capabilities of, like, what you could buy from ANSYS?
A. I believe it does.
Q. Does it have any limitations of how many -- like how big of a mesh it would calculate, or --
A. I don't think the research license has any limitations. If that's important, I could check.
But sitting here now I think the research license has all of the capabilities.
Q. Okay. With respect to the, say, for example, the $12,000 given to St. Thomas, do you receive any money from that?
A. Yes.
Q. What percentage?
A. I probably received approximately half of that. I would have to check.
Q. Okay. And with respect to most of the consulting work that you -- or grants that you have listed in your CV, would it be about the same percentage?
A. No.
Q. What would be the difference? Is it a case by case?
A. It's case by case.

Q. But would you agree with me that on some of them you do receive compensation?
A. Yes.
Q. Okay. Like, for example, you did something in 2015 for Mador Technologies, M-A-D-O-R. You got $20,000. Did you receive any personal, like, compensation?
A. I did not.
Q. Okay. What about Amphora Medical of fifty-five thousand point five -- 55.5 thousand; did you receive any compensation?
A. Yes.
Q. What percentage of that was direct compensation to you?
A. I would estimate I received 10 to 15,000.
Q. Okay. Windstrip, LLC. Do you recall doing work for them?
A. Yes.
Q. And it was 250,000 for development of vertical axis wind turbines?
A. Yes.
Q. Did you receive any personal compensation directly for you?
A. Four thousand dollars.
Q. Four thousand?

A. Correct.
Q. And that's not an estimate?
A. That is exact.
Q. Okay. Most of -- These -- Most -- Well, strike that.
With respect to a lot of these grants, are these grants that you've obtained while working at St. Thomas or The University of Minnesota, or did you work with somebody else that obtained the grants?
Do you understand the question?
A. No.
Q. For example, with 3M it was you that was the person that worked with 3M and obtained the grant for St. Thomas. You understand that; correct?
A. Yes.
Q. With respect to these other grants, were you the direct contact with The University of St. Thomas or University of Minnesota, or was this -- you're just itemizing grants that were received by St. Thomas or The University of Minnesota that you worked on?
A. For the vast majority of them I was the --
Q. Okay.
A. -- primary contact and recipient.
Q. Are you familiar with the ANSYS User's Guide?

A. Yes.
Q. Do you agree with me that it's authoritative on how to use ANSYS and its capabilities?
A. I don't know -- I don't know if I'd use -- I don't know if I'd ever use the word "authoritative." I would agree that it describes how to use ANSYS, and its capabilities.
Q. Okay. You agree with me that the programmers of ANSYS would probably know more about ANSYS's capabilities than you do.
A. In general, yes. I might know more about some small feature.
Q. Okay. Now I assume that you are aware of the basic laws of physics.
A. Yes.
Q. Okay. You agree with me that in a case such as this the law of thermodynamics applies.
A. Yes.
Q. Okay. And with respect to a complex model, which this is, as you described earlier, everything needs to be accounted for; correct?
A. I disagree.
Q. Okay. Why?
A. Not everything matters.
Q. Okay. Would you agree with me that

everything that matters needs to be accounted for?
A. Everything that --
Things that can significantly affect the results --
Q. Okay.
A. -- need to be accounted for.
Q. All right. So, for example, in your assumptions you determined what you would consider significant that could affect the results and not affect the results; correct?
A. Yes.
Q. For example, you -- you removed some geometry because when you were creating -- when you were -- you assumed, based on your education, training and experience, that that geometry would have no effect on the results, or very little effect.
A. Correct.
Q. So your assumptions -- you make assumptions about what would affect or not affect the model.
A. Yes.
Q. Okay. So you'd agree with me that if a heat source would affect the model significantly, that needs to be included in a model.
A. If it would affect the question you're trying to answer, then yes.

Q. Okay. And let's just agree that when I say "the problem," or "the model," we're talking about the ques -- you're creating a model to answer a question.
A. Correct.
Q. Okay. So you agree with me that if people would significantly affect the model, they should be included.
A. Yes.
Q. Okay. You agree with me that the inlets and outlets of a room should be included if it would significantly affect the model.
A. Yes.
Q. Okay. And the goal is to be as accurate as possible to put into a model things that may significantly affect the results.
A. Yes.
Q. You agree with me that if the model is not accurate, the model is not reliable.
A. I would say this: If the model does not have the ingredients which are significant and may affect the question being asked of the model, then it is not reliable.
Q. Okay. You agree with me that if you use the wrong mathematical equations, the model's not reliable.

A. Yes.
Q. By the way, you agree with me that particles do not follow airstreams; correct?
A. They may or may not follow airstreams.
Q. Depending on the size; correct?
A. Correct.
Q. Okay. Because particles have inertia.
A. That is correct.
Q. Okay. What size particles follow airstreams as compared to size particles that don't follow airstreams?
A. I cannot answer that question in the abstract because it depends on the airstreams.
Q. Okay. In the airstreams in this case -- with the velocity of the airstreams in this case, do you have any idea, sitting here today, what -- what size particles would follow the airstreams as compared to not follow the airstreams?
A. No.
Q. Okay. The fact that we have eight people -- seven people sitting in this room, does that affect the temperature of this room?
A. It may.
Q. Okay. But you can't assume that it doesn't.
A. The reason why I'm pausing is the answer

involves more than just the presence of eight people, it involves the ventilation system and the control system. So it's possible, and I would say likely, that when more people enter this room the control system reacts so that more -- more air, ventilation air is supplied. So in that respect it's likely the presence of people in this room does not affect the temperature.
Q. Well it's going to affect the temperature to a point in which the system reacts to it.
A. I would agree.
Q. Okay. So it has an effect on the temperature.
A. I agree, but it's unlikely to have a lasting effect.
Q. Okay. Well we're not talking about -- I'm just saying an effect, whether or not it's an instantaneous effect. I'm just saying it's going to have an effect.
A. I agree.
Q. The laws of thermodynamics, we're all putting off heat, energy, it's the conservation of energy, it's going to have an effect.
A. That is correct.
Q. Okay. And you yourself, I think what I'm

understanding, is you made assumptions with respect to your CFD analysis of what would have an effect and not have an effect; correct?
A. No.
Q. Well there are no people in your CFD geometry; correct?
A. That is correct.
Q. Except -- Except for the patient.
A. That's correct.
Q. So you assumed that the people are not going to have effects on the airflow.
A. No.
Q. Are they going to have an effect?
A. People in an OR will have an effect.
Q. Okay. But you did not put that in your CFD.
A. That's correct, and there's a reason why.
Q. Why?
A. The question I was trying to ans -- ask in my CFD model is does the Bair Hugger have the potential of disrupting the normal airflow in the operating room. Now I could have put people in the room, and in fact I could have put moving people in the room, but the fact of the matter is, movement would dominate any effect the Bair Hugger would have. So if there was some kind of motion of air in the

room, it would likely be from the humans. What I wanted to do was isolate the Bair Hugger, in a certain sense it's a worst-case scenario. Without any other thing that will hide the effect of the Bair Hugger, what is the effect of the Bair Hugger.
Now what I also did, though, is did experiments, and in those experiments there were people, with heat, moving in a simulated surgery, and the results corroborated my calculations.
Q. When did you do the experiments; before or after the CFD?
A. The experiments would have been done be -- after. I'm sorry.
The experiments were done before the CFD results.
Q. Okay. Now you agree with me that it's normal to have people in the OR.
A. I would agree.
Q. And you agree that -- you've seen videos of total hip and total knee surgeries; correct?
A. I have not seen a complete video of a total hip and total knee surgery. I've seen -- So no. The answer is no.
Q. I didn't ask for a complete video, but you've seen some videos, at least portions.

A. I've seen portions of videos of either hip or knee re -- surgeries.
Q. I mean, you were at Science Day.
A. That's right.
Q. Okay. So I know you've seen it.
A. Well, hold on. But you asked two different types of surgeries, and my recollection is it was just one type. I could be wrong.
Q. Okay.
A. So I didn't want to overrepresent my video watching.
Q. So are you assuming that -- Strike that.
You agree that even if you have non-moving people in an operating room it's going to affect airflow.
A. Yes.
Q. Okay. Especially if the people are around the operating room table it's going to affect the airflow underneath the operating room table.
A. I don't know if I agree with that.
Q. Well you're -- you're causing -- you are causing blockages underneath the operating room table because you have people standing next to it, correct, and that's going to affect the air underneath the operating room table.

A. You are causing blockages, but the effect of airflow underneath the operating room because of those blockages would be negligible.
Q. Okay. In your CFD model did you -- I remember this from college, because I did very little. I wasn't big when I was in college.
Like I remember you could put in, like, material properties, like, for heat transfer and stuff. Was that done in this CFD?
A. You can put in material properties for the materials.
Q. Yes.
A. We wouldn't say put in a material property for heat transfer, because heat transfer doesn't have a property. But it's true, you put in material properties.
Q. Well heat transfer is for different objects differently and different materials differently; correct?
A. That's correct.
Q. And that -- like, for example, in your research when -- because you do a lot of heat transfer; correct?
A. Correct.
Q. And I -- I can't remem --

What's the term used for how much an object absorbs heat, or -- Is it heat index or heat coefficient? Specific heat.
A. Specific heat.
Q. That's it, specific heat.
Was the specific heat ever -- did you use that at all with respect to your CFD analysis?
A. Yes.
Q. What -- What did you apply specific heat to?
A. The air.
Q. Anything else?
A. No.
Q. What about the blanket, the -- the Bair Hugger blanket?
A. I did not apply a specific heat to the Bair Hugger blanket.
Q. Okay.
A. It was not necessary.
Q. What about the drapes?
A. Same answer.
Q. What about the patient?
A. Same answer.
Q. So you didn't put -- you didn't apply any specific heat.
A. Correct.

Q. What about to the walls?
A. I did not --
Same answer.
Q. Okay. So is it fair to say that the only fluid you applied specific heat to was the air?
A. That's the only fluid in the model, so yes.
Q. Okay. Well when I took fluid dynamics I was told that everything's a fluid, even solids.
A. You were told incorrectly.
Q. Okay. They're just different densities.
A. You were still told incorrectly.
Q. Okay. It was Engineering 101 I guess.
MR. GOSS: Kind of wish I'd taken that class.
(Laughter.)
THE WITNESS: You still can.
Q. Were there any solids in your analysis?
A. No.
Q. So now I'm really confused, because I look at the pictures and there is a operating room table. Is that not a solid?
A. No. What you see is the interface between the table and the fluid. You're not seeing inside the operating room table itself.
So if I use this table as an example, what

you see is this top interface, but when you look at the model you're not looking at the wood grains inside, and that's the difference.
Q. So is it like a void in the model?
A. It is a void in the model, but that -- using that term is misleading.
Q. I know. I don't know what...
Like, for example, I mean it -- there's the table, but it's not really there, it's just telling that, like, it's a barrier type thing.
A. That's right.
Q. Okay. So -- So you would agree with me that --
What's the word? Is it adiabatic?
A. Adiabatic is the word meaning insulated, and I -- I used adiabatic surfaces to represent solids.
Q. Okay. Which means that there's no heat transfer among the solids.
A. Correct.
Q. So you had no heat transfer between the Bair Hugger blanket and the drapes.
A. Correct.
Q. But we know in the real world that's not accurate.
A. In the real world you have cool air on one

side which would cool off the drape. I didn't account for that cool air heat transfer to the drape, nor did I account for heat from any Bair Hugger air to the drape because it wasn't material to my analysis.
Q. Okay. Would you agree with me that what was material to your analysis -- Strike that.
Did you do the measurements in the OR that account for your geometry?
A. No. The measurements were sent to me. I double-checked the width and length of the room, but I did not do other measurements.
Q. How many times did you go visit the OR that you modeled?
A. Once.
Q. And that would have been in 2015?
A. Yes.
Q. Who was there with you?
A. Attorneys, or maybe it was one attorney, I can't recall, from the initial law firm. There were I believe hired surgeons and nurses who replicated a surgery. An attorney from 3M, Janell. Two engineers from 3M. And Jennifer Wagner and Brian Plourde. And I think two lighting people.
Q. "Lighting"?
A. Or cam -- camera people.

Q. Oh, was this filmed?
A. The --
Q. The experiments?
A. The visualization in the OR?
Q. Yeah.
A. Yes.
Q. Okay. Do you know how much film was taken?
A. I have no idea.
Q. Okay. The two engineers from 3M, do you know who they are?
A. I know one of them.
Q. Who?
A. Andy Chen.
Q. Who's Andy Chen?
A. An engineer from 3M.
Q. Is that how you know him? Did you know him before that day?
A. I did know him --
Q. Okay.
A. -- before that day.
Q. How?
A. I think he got his Ph.D. under Sparrow, who was my doctoral advisor.
Q. Before or after you?
A. After me.

Q. Okay. So he's a Ph.D.?
A. Yes.
Q. And in what, mechanical engineering?
A. In mechanical engineering with a specialty in the thermal sciences.
Q. Okay.
A. Which is heat and fluid flow.
Q. Does he do CFD?
A. I -- Yes, he does.
Q. Okay. Does 3M have the capability of doing their own CFD analysis?
A. I believe they do.
Q. So why'd they hire you?
A. I don't know.
Q. They could have done this internally?
A. It's possible.
Q. Okay. Do you know what soft --
Do they have their own proprietary software, or do they use a commercial product like you?
A. I don't --
Sitting here, I don't know the answer to that.
Q. Okay. Maybe I should ask this question: Have you seen any CFD models done by 3M?
A. No, I have not.

Q. Is there a geometry created for the Bair Hugger blower, or outlet, where the air blows?
A. Oh, you have to be more specific. I'm confused.
Q. Well, for example, there's geometry for the ventilation of the ducts or the vents; correct?
A. Yes.
Q. And there's geometry for the intake vents.
A. Yes.
Q. Now I've seen mixed terms of people calling air coming in as an inlet. I've heard people calling it as an outlet because it's coming out. What term do you use?
A. It's an inlet to the room.
Q. Okay. Is there a geometry for the Bair Hugger inlet?
A. There is a geometry for the Bair Hugger inlet to the room in the sense that the room -- the Bair Hugger air enters into the room.
Q. Okay. Is that --
Does it have an area for the geometry?
A. Yes.
Q. What is the area?
A. Sitting here now, I don't know.
Q. Could it be --

Could you get it from the TRN file?
A. Yes.
Q. Okay. And how'd you calculate that area?
A. It was part of the initial CAD file.
Q. Okay. And where is that geometry where the air is coming out?
A. Do you mean where in the model is it?
Q. Yes.
A. It's near the head and neck --
Q. So if we --
A. -- it shows.
Q. -- go to your report. Let's go to Exhibit 1. What picture would best show me where the air is coming out?
And please don't give me the one with all the dot -- dotted lines in it.
A. Figure 1(a).
Q. Okay. And where is the air coming out?
A. Can I mark it up?
Q. Yes. Why don't you mark it with a --
Do you have a pen on you?
A. No.
Q. Use --
[Red pen provided by the court reporter.]
MR. ASSAAD: Can we film that, please?

There's a camera above you, so.
THE WITNESS: Oh, great. Is it centered? Is it good?
(Discussion off the stenographic record.)
THE WITNESS: Can you see that?
Q. Can I see it, please?
A. Yes. (Handing.)
Q. Okay. Is it coming from --
Do you know whether or not it's coming from the front of the body or the back of the body?
A. Both.
Q. Both? Okay.
And so if I looked at the TRN file you're absolutely certain it comes out of both?
A. Yes.
Q. Okay. And what's the --
And you assumed that all the air comes out of the head and neck; correct?
A. That is correct.
Q. Why did you make that assumption?
A. Well there's a number of reasons. First of all, I saw the draping that was done and I saw that the draping channels the airflow so that once it touches the body, once it touches the body the air will migrate vertically upwards and it will exhaust

near the drape -- near the head and neck.
There is also prior literature that's been cited in this case that confirms my understanding that the air enters the room through the head or neck area.
In addition, the Bair Hugger has tape on it which adheres the Bair Hugger to the body so in those portions the air can't go elsewhere. And in this case on one side the Bair Hugger was wrapped around the back of the patient so there was no other alternative for it to go.
These views were confirmed by Dr. Kuehn's measurements when he took measurements of airflow near the Bair Hugger.
Q. Okay. And you're talking about Dr. Kuehn's measurements that when he raised the -- when he turned the Bair Hugger on, the temperature of the room went down?
MR. GOSS: Object to form.
A. I am not --
I'm not talking about that measurement, and I don't believe that that's a correct characterization of what he did.
Q. Have you ever heard the term "junk science"?
A. Yes.
Q. Okay. Is that a signif -- Is that a --

You made the assumption, based on your analysis, that all the air comes out of the head and neck area; correct?

MR. GOSS: Object to form, mischaracterizes the testimony.

A. You said "made the assumption based" -- I think you said "based on the analysis." I actually made the determination based on multiple, mutually reinforcing lines of evidence.

Q. Okay. But that's an assumption that you made in your CFD analysis; correct?

A. That is correct.

Q. Okay. If that assumption is incorrect, would you agree with me that your model is incorrect?

A. No.

Q. Why?

A. My model may or may not be incorrect if that boundary condition is incorrect.

Q. Okay. If you've made that -- Let's take it this way.

You can't sit here today and say your model is correct if that assumption is incorrect that all the air comes out of the head and neck.

MR. GOSS: Object as calling for speculation.

A. I disagree.

Q. Well you just said it may or may not be correct.

A. You used the word "all." Let's say, for example, 99 percent of --

Let's say we find out tomorrow 99 percent of the air comes out by the head and 1 percent comes out somewhere else. There's no reason to think that my results wouldn't be accurate.

Q. What if it was 50/50?

A. I don't --

Sitting here, I don't know the answer to that.

Q. Okay. So let's assume that half the air comes out of the hair and neck and half -- half the air goes down below the drape. Would you agree with me that the model that you have submitted as part of Exhibit 1 cannot be confirmed as correct?

MR. GOSS: Object to form.

A. I disagree.

Q. Okay. Why?

A. Well first of all I disagree with the hypothetical, but let's assume your hypothetical's correct.

Q. You don't have to agree with my

hypothetical.

A. I know. But I'm getting on the record that I -- there's no basis for the hypothetical, and I want -- I want that clear.

But let's say that it is correct and air exhausts somewhere else. The fact of the matter is, the easiest pathway -- buoyant air wants to rise, hot air wants to rise, and the easiest pathway would -- would be for it to rise up through the location which I've articulated on this diagram. So even if air came out somewhere else, it's my opinion it would ultimately enter the -- enter -- it would likely enter the room through the place I've just annotated.

Q. Okay. Assuming that 50 percent of the air was exhausted to below the operating room table, and 50 percent of the air came out of the head and neck, would you agree with me that you can't confirm that the model is correct?

MR. GOSS: Same objection.

A. Sitting here now --

I mean the word "confirm" to a scientist has a very high bar. Sitting here now, if -- I would like to know more about the hypothetical. If -- If hot air is vented beneath the table, it's my opinion, sitting here now, it is -- would most likely rise and still

exit through the head and neck, so I would have no reason to doubt my results.

Q. So your assumption is that no matter where the hot air goes, at the end of the day all of it's going to come out of the head and neck.

A. That is not my assumption, and I didn't state that.

Q. Well you said if the hot air rises, the hot air is going to rise no matter where it goes, and then it's going to come out of the head and neck area.

Do I need to read your answer again?

A. No. I know the answer.

What you said is if 50 percent of the hot air goes beneath the table and 50 percent dir -- is vented directly from the head and neck, would that invalidate my results. And in that case it's my opinion the air would most likely still leave by the head and neck.

But let's say 50 percent of the hot air exited by the foot of the patient. Well then I would change my answer because that air would not rise by the head and neck, so -- so I am not -- so I think you mischaracterized my testimony.

Q. Okay.

MR. GOSS: Gabe, if you get to a good spot

for a lunch break, let us know.
MR. ASSAAD: Okay.
Q. Do you believe it's possible that based on the geometry that air -- hot air could escape to the side of the drape?
A. Can you define what you mean by "the side of the drape"?
Q. Like you have a head, the feet, and then the two sides. Do you think, based on your geometry, that air could escape the sides, hot air, below the drape to the side?
A. No.
Q. Okay. And what's your basis behind that? Scientific basis.
A. Well let's take this case as an example. On the one side the Bair Hugger was wrapped around the back of the patient so that air cannot escape, and --
Q. Was it wrapped around the back or was it tucked in --
A. Both.
Q. -- underneath the pad?
A. Both.
Q. Well it can't be both. It's either one side's tucked under the pad, or it's wrapped underneath the patient.

A. Oh, no. I said wrapped around the back.
Q. When you say "wrapped around the back," what do you mean?
A. It -- It was wrapped around the back of the patient and then tucked in.
Q. Tucked in underneath the pad.
A. It was tucked in somewhere -- some part of the bed.
Q. Okay.
A. I did not --
If I said it was tucked underneath the patient, then that's a mistake.
Q. Okay. Fair enough.
A. That air clearly cannot vent beneath the room -- or beneath the table. I'm sorry.
But let's talk about the other air. This Bair Hugger blanket is a blanket with tubes, air tubes, and when you inflate it and you put on the cotton layer -- the cotton blanket and the drapes it wraps around the arm. And the way it works is you have very small jets of air that shoot out of those tubes and they impact the skin right away. In fact there's a connection between those tubes and the skin. So what happens is you have a warm, almost stagnant air space. Now we know hot air rises. Colloquially,

heat rises. So that stationary air now has to escape, and what it wants to do is it wants to rise. There is no reason to expect that that air would go down, vertically downwards, go underneath the drape and then come back up.
Here is an analogy I'd like to use. Let's -- Let's pretend that this is a match. [Demonstrating with the red pen.] And let's pretend this red part is the flame. If I hold the match like this, hot air rises. You see the flame go up, you see the soot, et cetera. If I -- Even if the air was to be vented downwards, which it's not, because it's vented against the skin, what happens when I do this? [Demonstrating.] The flame still rises, the smoke still rises.
I cannot get a match to have a flame that will go down vertically, somehow travel underneath the drape and then come back up, and that's the basis.
Q. Do you really believe that?
A. I am certain of it.
Q. You're certain of it.
A. Absolutely.
Q. Hundred percent.
A. Scientists never say 100 percent. I would say within a reasonable degree of engineering

certainty, yes.
Q. So if I put a -- 10 space heaters facing up five feet from the ceiling, okay, I turn them all on, are you telling me I'm not going to feel heat down here?
A. That's not what I said.
Q. Okay. So heat can actually go down; correct? Depending on if there's any insulation above, conservation of energy; correct? It's going to -- The hot air is going to start warming the air below and below and it's going to keep on going down until it reaches us, correct, in my -- in my hypothetical, in my example. "Yes" or "no"?
A. I cannot answer that --
Q. Okay.
A. -- with a "yes" or "no."
Q. If you can't answer "yes" or "no," that's fine. We'll move on.
A. No. I can answer it. I can't answer it with a "yes" or "no."
Q. Okay. Let's move on.
(Interruption by the videographer.)
MR. ASSAAD: Two minutes? One more question.
BY MR. ASSAAD:

Q. If hot air does get below the operating room table, you agree with me if the heat fills up underneath the operating room table, when it escapes the drape on the sides it's going to start rising; correct?
A. Your question --
MR. GOSS: Object to form.
A. -- is based on a faulty premise.
Q. Forget about the premise.
Just say if there's -- if there's heat underneath the operating room table to the point where when it escapes the drape it's -- the air is warmer than the ambient temperature, that air is going to rise; correct?
MR. GOSS: Same objection.
A. So if you had a perfectly insulated table -- I mean, to have your hypothetical work you would have to have it perfectly insulated, you would have to allow the heat to build up, and that's not what happens.
Q. Okay. But if it does happen and it escapes out the side the air is going to rise; correct?
A. If you had a perfectly insulated space under the table and you didn't let any heat leave, and you put heat into that space until the entire air space

was warm, then yes.
MR. ASSAAD: Okay. We can take a lunch break.
THE REPORTER: Off the record, please.
(Luncheon recess taken at approximately 12:56 p.m.)

AFTERNOON SESSION
(Deposition reconvened at approximately 1:49 p.m.)
(Mr. Bushnell joined the proceedings.)
BY MR. ASSAAD:
Q. You ready to continue, Dr. Abraham?
A. Yes. Thank you.
Q. You understand the allegations by the plaintiffs in this case; correct?
A. I understand generally that there is an allegation that for -- the Bair Hugger may cause infections.
Q. Or significantly increase the risk of infection.
A. I -- I don't know the specific allegation made in this case, so I -- so no.
Q. But you understand that for hip and knee implant surgery, infections are a serious thing.
A. That's my understanding.
Q. And they could be deadly; correct?
A. That is my understanding.
Q. And you agree with me no matter what side you're on, plaintiffs' side or the defense side, if -- if the Bair Hugger does cause an increase in hip and

knee implant infections that that's not a good thing.
MR. GOSS: Object to form.
A. I would agree.
Q. Okay. Because, you know, people -- if that is the case, people's lives are at stake.
MR. GOSS: Same objection.
A. I agree.
Q. Okay. And in fact you once were quoted for saying: In my research, people's lives are literally at stake. There is very little room for error when you're designing devices that will be implemented into bodies or trying to remove pathogens from dirty water that a village relies upon. I need the very best students who I can depend on to recognize that while engineering is fun, it is also deadly serious. Lauren is such a student.
Do you remember making that quote?
A. Yes.
Q. Okay. So although engineering is fun, it can be deadly serious; correct?
A. Yes.
Q. Okay. And we want to be for sure, we want to be certain, when we formulate opinions, that because the effect of these opinions could be -- have detrimental effects on people, we need to be serious

about it; correct?
MR. GOSS: Object to form.
A. I agree.
Q. Okay.
MR. ASSAAD: Basis?
MR. GOSS: Effects of opinions could be deadly?
MR. ASSAAD: Yeah.
Q. I mean, if your opinion in this case is, to 3M, that the Bair Hugger doesn't increase the risk of surgical-site infections and it actually does, but 3M relies upon it to keep it in the market or not make any changes to the product, that could be a -- an opinion that could cause serious harm; correct?
MR. GOSS: Object to form. You can answer if you understand the question.
A. I'm --
Yes.
Q. Okay. Now -- And the --
And Lauren Vallez is the person you were talking about earlier that is a -- is a co-author on the article that was submitted and accepted for publication regarding the 505 and 750; correct?
A. Yes.
Q. And you've published a lot with her;

correct?
A. Yes.
Q. Okay. And if I recall correctly, isn't she off to California?
A. I believe that's true.
Q. Is she still in town, or has she left for California?
A. I don't know.
Q. Okay. But she took a -- she's doing a Ph.D. program, is it at Stanford?
A. That sounds correct.
Q. Okay. Speaking about Stanford, are you -- do you know, personally, Dr. Krishnan Mahesh?
A. No.
Q. You understand that he's a professor at the University of Minnesota; correct?
A. If you present that, I have no reason to doubt that.
Q. Okay. So you don't know that he came from Stanford and was part of the Ph.D. students that worked on the code that was used by Elghobashi?
A. I don't know that.
Q. Okay. Now we -- you mentioned before we took up the lunch break that if air is coming on the arm it's going to migrate up and come out the head and

neck. Do you recall that testimony?
A. Yes.
Q. Do you have any calculations that you performed to support that assumption?
A. Are you asking me do I have calculations to support the idea that the air will rise?
Q. No. That the air will come from the arm -- the air that's being blown on the end of the hand is going to migrate up the arm and out the head and neck of the patient.
A. I have no calculations.
Q. Okay.
A. I have my experience in buoyant flow motion.
Q. Okay. But you have no calculations; correct?
A. Correct.
Q. Do you have any experimental testing to indicate of such?
A. There is experimental testing. Well that's a complex answer, I'm going to give it a few ways. I'm going to give the answer in a few ways.
I have experimental testing that shows the air does not exhaust beneath the table.
Q. And what testing was that?
A. That was testing --

That was flow visualization testing done in the OR with the draping as used in a hip or knee replacement.
Q. When you say "flow visualization testing," what device did you use?
A. The device we mentioned earlier in this deposition. I believe it's called a megasonic fog device.
Q. Okay.
A. Okay?
Q. So --
A. In addition to that my findings are corroborated by testing from Tom Kuehn, and by literature that the plaintiffs rely upon.
Q. Okay. But I'm talking about you yourself.
Have you done any experimental testing, besides using the fog generator, to support your assumption that all the air, even the air coming -- hitting the end of the hand, is going to migrate up out of the head and neck?
A. No.
Q. Okay. In your analysis does the temperature underneath the operating room table increase in temperature?
A. Temperature does not increase temperature.

Q. I'm saying does the temperature in -- I'm sorry.
Does the air underneath the operating room table increase in temperature?
A. I don't know -- I don't recall extracting that data point. I would presume it does. I would presume that the air underneath the operating table may increase, but I don't believe I presented that in this document, and I don't think I extracted that data.
Q. Can --
If I go to your TRN file, can I extract that data?
A. Yes.
Q. Okay. If it does increase in temperature, would that not indicate that hot air is blowing down?
A. Not necessarily.
Q. What would cause the increase in temperature?
A. Before I answer that can you tell me the increase in temperature of what?
Q. The air underneath the operating room table.
A. Okay. Thank you.
Q. Let's say two inches below the operating room table.

A. Air temperature --
Heat can get below the operating table a number of different ways, in fact we mentioned this earlier in this deposition. There are three modes of heat transfer; conduction, convection and radiation. So if I were to measure, let's say, the temperature directly underneath the operating table, and if I were to measure a temperature increase it could be by one of those three mechanisms. It may be that air has migrated under the table, it may be that that region has been heated by conduction, or it may be that it's been heated by radiation.
Q. Well we could agree in your model, since all the solids or all the geometry's adiabatic, that area cannot be created -- be heated up by conduction; correct?
A. That is correct.
Q. And since it's adiabatic it can't be -- there's no convective heat that's being transferred to that, correct, through the table.
A. Convection would not refer to heat transfers through the table.
Q. Okay. And there's no radiative heat that would warm up underneath the operating room table because the table is adiabatic.

A. That is correct.
Q. Okay. So let's go --
So how long did your model run to get to 264 step -- time step?
A. Sitting here now I don't know the answer to that.
Q. But if we go to the TRN file that's something we could determine?
A. Yes.
Q. Okay. And we could do that based on the time step; correct?
A. It would be information contained within the TRN file.
Q. If you did change the time step between time zero and time step 264, would you have increased or decreased the time step?
A. I don't know.
Q. So sitting here today we will never be able to know that answer; correct?
A. Sitting here today, I don't know if or whether I increased or decreased the time step.
Q. And if you did increase the time step you wouldn't know if you increased it or decreased it.
A. That is correct.
Q. Okay. So sitting here today we could not replicate that in ANSYS.

A. That is incorrect.
Q. Well how am I supposed to know the time step if you don't know the time step?
A. When we use the word "replicate" in CFD, what we mean is can you reproduce the results. Anyone with my TRN file could reproduce my results, whether or not they used the same time step or a different time step, provided it was sufficiently small. So the TRN file is all that you need to reproduce the results.
Q. When you say "sufficiently small," what do you mean by "sufficiently small"?
A. It has to be small enough so that the size of the time step does not affect the results.
Q. Okay. In the beginning of running a model do you want a large time step or a small time step for a model such as this?
A. I prefer a small time step.
Q. Okay. And what would you consider small?
A. Less than a second.
Q. What about less than a tenth of a second?
A. Likely less than a tenth of a second.
Q. So if I represent to you that your TRN files says .01 seconds, would you disagree with that?

A. I would not disagree with that.
Q. Is that something that you would likely do for a time step in a situa -- in a model such as this?
A. It seems reasonable.
Q. Okay. Having the fact that it was .01 --
Well let me ask you this: How would you know that the time step you used didn't affect the model?
A. You'd run the calculation, as I said before, and obtain quasi-steady results, and once your results were quasi steady and you abide by certain rules of the numerics, such as the Courant number has to be low enough, you would assume that the results are time-step independent.
Q. You used the word "Courant number"; correct?
A. Correct.
Q. And have you heard the term "CFL" number? Are you familiar with that?
A. "CFL number"?
Q. Yes.
A. It doesn't --
I've heard "CFL." I can't place it right now.
Q. So you've never heard of the Courant-Friedrichs-Lewy number?

A. That's probably the same thing as the Courant number I was mentioning.
Q. Well do you think it's the same number, or is it something similar to that number?
A. I think it's the same number, --
Q. Okay.
A. -- but I would have to check the --
Q. Okay.
A. -- whatever resource to verify.
Q. Now you mentioned earlier that --
Well let me ask you this question: Is the mesh that you used in the TRN file the mesh you put in Figure 2 on page 4?
A. I think it is.
Q. Okay. Well do you know one way or the other?
A. No.
Q. Okay. Well how would you formulate this mesh for your report if it did not come from the TRN file?
A. It is likely it is from the TRN file.
Q. Okay. So you believe that your mesh in the TRN file is as fine as it's in this -- depicted in Figure 2.
A. I don't recall if this image was taken from

the TRN file, so I can't answer that "yes" or "no."
Q. Well where would this image be taken from?
A. As noted in this report, calculations were done for an 8.1 million-element mesh, and a mesh that was approximately 60 million.
Q. So you did calculations for a 60 million mesh?
A. That's correct.
Q. And are the results in this report?
A. No.
Q. Why not? Did it --
Did it converge?
A. Yes.
Q. And you've gotten results?
A. Correct.
Q. Why didn't you produce those results?
A. Because the results were the same, and it's our practice in computational fluid dynamics to show that your results are independent of mesh and then to show one set of results.
Q. So my understanding is the calculations for the six -- the 60-million-grid mesh no longer exist.
A. I don't know if they exist.
Q. Okay. How long did it take you to calculate the 60-million-grid mesh?

A. I don't know.
Q. Was it done --
When was it done?
A. It would have been done about the same time that the initial calculations were done. We have that list of the time stamp, which I think was November 2015, so approximately then.
Q. Okay. Was it done in LES or RANS?
A. I believe it was LES.
Q. Okay. So -- And what was the time step -- step?
A. I don't recall.
Q. Would it have been less than a second?
A. I'm pretty sure it would have been less than a second, but I don't recall.
Q. Okay. So it's your testimony today that --
Well how long did it take to run?
A. I don't recall.
Q. A month, two months, five months?
A. Well not five months, but I don't recall how long it took.
Q. Can you give me an approximation?
A. No.
Q. Less than three months?
A. I don't know.

Q. Okay. So it's your --
Well, so less than five; correct?
A. Yes.
Q. Greater than a month?
A. I can't say.
Q. Okay. And what computer did you do it on?
A. A St. Thomas computer.
Q. A 16-core computer?
A. Yes.
Q. How long do you think it would take for a 16-core computer to run an LES mesh with 60 million cells?
A. Depends on how long you run it. It depends on how many time steps.
Q. Well how long did --
A. What we -- Hold on.
Sorry. That was inappropriate for me to say "hold on." I apologize.
In computational fluid mechanics what a standard practice is to run code on more than one mesh to show that the results -- the conclusions don't depend on the mesh.
Q. Called mesh independence; correct?
A. That's correct.
Q. How'd you perform your mesh independence?

A. Visualization of streamlines.
Q. Okay. So you'd done a mesh for eight thousand one hundred or whatever it -- eight million one -- eight million one hundred thousand; correct?
A. Correct.
Q. And you did one for approximately 60 million.
A. Correct.
Q. Exactly how many cells were used?
A. I don't recall the exact number, sitting here.
Q. Okay. And do you know what shapes were used in the approximate 60-million-cell mesh?
A. Yes.
Q. What?
A. The same shapes that were used in the 8.1-million-cell mesh.
Q. So the tetrahedras.
A. And pyramid.
Q. Okay. Well if I show you your ANSYS program today and there's no mention of any pyramid shapes, would you disagree with that?
A. No.
Q. Okay. So you're not absolutely certain that there are pyramid shapes in your mesh.

A. I believe there are. It would not surprise me if the entire mesh was tetrahedral.
Q. Okay. So would you agree with me that the mesh that's used in Figure 2 is most likely the mesh used for your 60-million-cell mesh?
A. I would say I don't recall which one it is.
Q. Okay. And your mesh independence was solely based on the streamlines.
A. Correct.
Q. Okay.
A. It was based on the trajectory of the fluid flow in the room.
Q. Which create the streamlines.
A. Correct.
Q. Okay. Did you do path lines?
A. I did not.
Q. Okay. And we could agree that you did not add particles to the flow; correct?
A. Correct. It was unnecessary.
Q. Well I understand you believe it's unnecessary, but you don't have to -- I'm just asking you correct or not. I don't need -- If I want a reason, I'll ask you for a reason.
So you agree with me you didn't add particles to the flow; correct?

A. I did not.
Q. Did you change the geometry between the 8-million-cell mesh and the 60-million-cell mesh?
A. Yes.
Q. How did you change the geometry?
A. In the 60-million-cell mesh we actually extended the geometry into the vents, the outlet vents. And in the 8-million-cell mesh we did not.
Q. So in the 8-million-cell mesh you removed the vents; correct?
A. In the 8-million-cell mesh we represented the vents on the wall, and in the 60-million-cell mesh we actually extended the solution up into the exhaust vents --
Q. Okay.
A. -- so that would be into the wall.
Q. Okay. In your meshing, what algorithm did you use?
A. I think I used a tetrahedral-based algorithm, but I don't recall.
Q. Was it patch conformal or patch non-conformal?
A. I don't recall.
Q. Is there any way to determine that today?
A. Not today.

Q. How? How would I determine that?
A. You -- From the TRN.
Q. So that would be in the TRN file?
A. Correct.
Q. Okay. Were any mesh controls used?
A. Sizing controls were used.
Q. Anything else?
A. Curvature controls were probably used, sitting here now I don't know for sure; and proximity controls were probably used, sitting here now, I don't know for sure.
Q. So mesh controls would have curvature and proximity values you could add to it?
A. That is correct.
Q. Did you use any defeaturing tools?
A. I defeatured manually. When we talked earlier today about removing small features, that was a manual defeaturing.
Q. Did you make --
Did you change any features of the drape?
A. No.
Q. Did you change any features of the patient?
A. No.
Q. Okay. And how'd you determine the quality of your mesh?

A. I determined the quality of the mesh by the fact that the solution -- the results were independent of the mesh, and that's the ultimate arbiter of whether the mesh is a good quality.
Q. Now was the only thing that was changed between -- Well, strike that.
We agree that we changed -- you changed the geometry between the 8.1-million-cell mesh and the 60-million-cell mesh; correct?
A. Correct.
Q. Okay. Was the only geometry changed the vents, exhaust vents?
A. That's the only thing I can recall now.
Q. Okay. Everything else was kept the same?
A. To my recollection, yes.
Q. Okay. Is it the same equations, used Boussinesq?
A. I believe that's true, yes. Same equations.
Q. Okay. So just so I understand, your determination of the mesh quality was solely based on doing the mesh-independence test between the 8.1 million cells and the 60 million cells.
A. That is the gold standard for determining mesh quality, and yes, that's the method I used.
Q. Okay. Is the standard practice with respect

to mesh independence to change the geometry?
A. The geometry --
If the geometry materially impacts the results, then no.
Q. So why did you change the geometry?
A. Because it was a defeaturing, as we mentioned. I defeatured the presence or absence of these vents. The ducts extended into the wall doesn't matter. So in my judgment there was no reason to calculate the flow up into the wall, so they were removed.
Q. And that was for the 8.1 million cells.
A. Correct.
Q. Okay. But you thought it was necessary for the 60 million cells?
A. No. It was probably not necessary for the 60 million cells.
Q. Which one did you run first, the 60 million or the 8.1 million?
A. I don't recall.
Q. What metrics did you use to check the mesh, besides grid independence?
A. I may have looked at --
I may have looked at shape quality, such as skewness or orthogonality, but in my experience those

are not important for determining the mesh quality for a solution, so I relied upon a comparison of the results, mesh independence.
Q. Okay. So sitting here today if I asked you what the aspect ratio was, or the skewness, or the expansion ratio, you wouldn't know.
A. I would not know, and it's immaterial.
Q. I understand you think it's immaterial. That's your opinion.
So the answer to the question is you would not know sitting here today.
MR. GOSS: All right. Wait for him to ask a question.
Q. You don't know the answers to the skewness, aspect ratio or expansion ratio sitting here today; correct?
A. Correct.
Q. Okay. So do you know if your aspect ratio -- it could have been anywhere from .1 to 15, you wouldn't know.
A. I don't know the aspect ratio.
Q. Okay. Do you know whether or not the Bair Hugger created any areas of turbulence in the operating room when you ran it?
A. Yes.

Q. Where?
A. Whenever you have rising buoyant flow into a larger space you almost always have turbulence.
Q. I understand that.
My question was where in the operating room.
A. So places where we have rising heated flow in this simulation are places where you would have turbulence, and that would clearly be shown on Figure 11.
Q. Okay. Is Figure 11 the temperature distribution of the room?
A. Yes.
Q. Okay. At a -- At time step 264; correct?
A. Correct.
Q. Okay. Now --
Going back to time step. If you ra -- If there is only 264 time steps, would that -- would I be able to calculate how long you let the model run?
A. Do you mean the computer time?
Q. No. Like how long it took from the initial conditions to time step 264.
A. I believe you would be able to determine that from the TRN.
Q. Okay. So if the TRN for 264 -- And I'm talking about simulation time. You understand when I

say "simulation time"?
A. Yes.
Q. I mean, a one-second simulation could take a week on the computer.
A. Correct.
Q. Okay. So if the time step that you used was .01, then I would multiply that by 264 to get the actual time of simulation?
A. If the time steps for those first 264 calculations was the same, then correct.
Q. Okay. Do you have any reason to believe that you changed the time step between time step zero and time step 264?
A. Sitting here now, no.
Q. Okay. So if the time step is 264, then the model would have ran for 2 -- the simulation would have ran for 2.64 seconds; correct?
A. Correct.
Q. And at that point you determined that, based on the instantaneous velocity measurements of the model, that you had quasi-static results.
A. Correct.
Q. Okay. Did you start the model at time zero?
A. Yes.
Q. Is it possible that you used a time step

before 264 of .001 seconds?
A. It is possible.
Q. And if that's the case, then it would be less than 2.64 seconds for the simulation; correct?
A. Correct.
Q. Okay. Do you --
Do you set the time step change prior to starting the model run, or can you change it in the middle of a run?
A. You can change it in the middle of a run.
Q. Okay. And you said the run for the -- for the 8.1 million model took 40 days.
A. Yes.
Q. Okay. And it took 40 days to get 264 time steps?
A. Well remember I have a file at 300, --
Q. Okay.
A. -- so I went beyond 264. I don't recall how far I went, but it took 40 days to do the calculation.
Q. I understand that. And you think -- It could be 300, it could be 264, you don't know.
A. Correct.
Q. Okay. And you said this report was done by Science Day; correct?
MR. GOSS: Object to form.

Q. All the pictures and the meshes and everything.
A. Boy, I think it was. I think all of these were done by Science Day.
Q. You said previously today that you ran through 2500 time steps; correct?
A. The 505 results include the 2540 time step result.
Q. Okay. How many time steps did you run for the 750?
A. I don't know.
Q. Okay. But it wasn't 2500.
A. Correct.
Q. Okay. Then I misunderstood you.
I thought we were talking about the 750.
A. The 2500 pertained to the --
Q. 505.
A. -- 505.
Q. And that's why we have a file named 2540 TRN.
A. Correct.
Q. Okay. And you believe that there is a time step 300 that was --
Well let me ask you this: Can you preset the amount of time steps you want in a model?

A. Yes.
Q. Did you do that in this -- in the 750 case?
A. No.
Q. So you just ran it till you believed you had a solution.
A. Correct.
Q. Till you had convergence.
A. Till I had a quasi-steady solution.
Q. Okay. Now you'll agree with me that if your boundary conditions are not correct, the model's not correct.
A. If your boundary conditions differ in a way that's substantive --
Let me put it this way: The software solves the problem for the boundary conditions. If the boundary conditions that you put into the software differ significantly from the actual boundary conditions then I agree, the solution will not reflect reality.
Q. So if your boundary condition's different from the actual, real-life conditions, then the model will not be accurate.
A. If the difference is significant.
Q. Okay. And you criticize Elghobashi on a number of things, but one of them is his boundary

conditions; correct?
A. That is correct.
Q. And that's why you say he's incorrect; right?
A. That is one of the reasons.
Q. Okay. And so therefore if your boundary conditions are incorrect, then your analysis would be incorrect; correct?
A. If the difference between my boundary conditions and the correct boundary conditions is significant, then yes, I agree with you.
Q. For example, if none of the air comes out the head and neck but goes below the operating room table, then -- and that -- and you are incorrect in that assumption, then your model would be incorrect. True?
MR. GOSS: Object to form, improper hypothetical.
A. I would say this. My model has a boundary condition where the air leaves through the head and neck area into the room. I do not have a boundary condition like Elghobashi where the air leaves at the bottom of the drape and then into a room. I would call that a significant difference.
Q. Okay.

A. If his boundary conditions are correct and if mine are incorrect, then that would cause me concern that my results are not correct.
Q. Well from an experienced computational fluid dynamics engineer, you would agree with me that the results of the TRN file that we're looking at in this case would not depict what would occur if the air was going underneath the operating room table and not out the head and neck; correct?
A. We have to be very careful and exact in our words.
If the air left the bottom of the drape and oozed uniformly from the drape into the room, as Dr. Elghobashi assumed, that would be a very different boundary condition than the one I used. And if he is correct, then I have great concern about my calculations.
Now if the air is exhausted, let's say along the arm, maybe under the table, but then still exits by the head and neck, then I am much less concerned.
Q. Okay. Well when you say "greatly concerned," it would question your reliability in your results; correct?
A. Yes.
Q. And you couldn't sit here today and say that

my results are correct and reliable because of these great concerns.
A. Correct.
Q. Okay. How do you determine if a difference is significant?
A. One way to determine it is to run both cases and to compare the results. That's probably the most direct way.
Q. Okay. And it's quite clear that your results are much different than Elghobashi's results; correct?
A. Correct.
Q. But with respect to your analysis, you did not -- you did not analyze particle flow; correct?
A. It was unnecessary.
Q. That wasn't my answer -- my question.
You did not analyze particle flow; correct?
A. Correct.
Q. Okay. Now you formulated your assumptions back in 2015; correct?
A. Yes.
Q. That was before any of the depositions in this MDL; correct?
A. Correct.
Q. Before any of these expert witnesses were

identified in written reports.
A. Correct.
Q. Okay. Before any --
Let me ask you this. Did anyone at 3M indicate to you that all the air comes from the head and neck?
A. No.
Q. Okay. Did you see any 3M testing that stated the opposite?
A. No.
Q. If they had actual testing done that indicated that -- that not all the air comes out of the head and neck, but most of it goes down -- from the arm section down below, would that change your opinions in this case?
A. I would need to see the --
MR. GOSS: Object to form.
A. -- details of the tests.
Q. Okay.
A. It's possible.
Q. You would agree with me that if you only ran your model for 2.5 seconds, roughly, that although you may be able to get changes -- determine quasi-static solution for a velocity, you could not apply that to a change in temperature in the operating room. True?

A. I disagree.
Q. You disagree. Why?
A. Remember you have to have initial conditions to start, and if your initial conditions are very good you can be very close to a quasi-steady result from time zero, and that's the whole point of setting good initial conditions.
Q. But you don't know what your initial conditions are.
A. I -- Well I had reasonable initial -- I had very good initial conditions.
Q. But sitting here today you do not know what your initial conditions are; correct?
A. My initial conditions were almost identical to the flow patterns that we see here, here [indicating].
Q. Are you guessing?
A. No.
Q. So how do I -- how do I --
How do you prove that to me, by just stating off the top of your head that your initial conditions are here, equivalent to here, here, here, here and here [indicating]?
MR. GOSS: Objection, move to strike, mischaracterizes his testimony.

A. Well I'm under oath and I'm obligated to tell the truth, and so I'm presenting to you that these results were very similar to the initial conditions.
Q. So you believe the initial conditions in an operating room would show very little temperature gradient between the ceiling and the floor?
"Yes" or "no," or you don't know.
MR. GOSS: Take your time and give the answer to the best of your ability.
A. Can you re-ask the question?
Q. Based on Figure 11 the temperature gradient between the ceiling and the floor is constant. Do you believe that your initial conditions --
Do you believe that the temperature gradient in an operating room would be constant from the ceiling, where the air is coming out of, to the floor?
A. Figure 11 does not show that.
Q. You're saying it's a different color from the ceiling and the floor?
A. Yes.
Q. How much of a difference?
A. Let me explain.
Q. I'm asking you a question. How much of a difference? You can look at the picture.

If you know. If you don't know, that's fine.
A. You have in your possession, I believe, an image which shows the temperature gradient vertically in the room for the 505. This image --
Q. 750, you mean.
A. For the 505.
Do you have any of the 505 results?
Q. I'm not talking about the 505, I'm talking about the 750 here.
A. I -- I know you are.
Q. I did not look at the 505 results because they don't apply to this report.
A. Okay. But had you looked at them, they showed the temperature variation vertically in a room and they -- the image that I used there was more appropriate to detect the temperature difference be -- than this image, because this image is called what's -- what's called scaled globally. That means the hottest value in the entire room is red, the coldest value in the entire room is dark blue. I scaled it this way so that you could see the hot -- hot spots, any hot spots in the room.
If I wanted to show the image that you've articulated -- by the way, which I have created -- I

would have scaled it differently. I would have scaled it, for example, from 59 to maybe 70, and then the 70 degree areas would be red.

So this image does not show that there is no temperature variation in a room. It is scaled to show the min and max range.

Q. Okay.

A. Okay?

Q. What other images --

Do you have images that you've scaled it to a different range?

A. Yes.

Q. Have you provided that to counsel?

A. Yes.

Q. And that has not been provided to me.

So what other images have you created that you provided to counsel that's not in your report?

A. Image --

MR. GOSS: I would just state for the record I'm not sure that it hasn't been provided.

But you can answer the question, if you can.

A. I don't know what images have been provided by counsel, but I've done calculations with the 505.

Q. I'm not talking about the 505, I'm talking

about the 750. I don't care about the 505, that's not part of your report. Do you understand that, sir?

A. Yes.

Q. Okay. So with the 750 are there other images that show temperature gradients?

A. Not that I'm aware of.

Q. Okay. Did you use a sub-grid model for your -- for the LES?

A. Yes.

Q. What was the sub-grid model?

A. The wall-adapted large-eddy model.

Q. So W-A-L-E?

A. Yes.

Q. And any --

And that was constant throughout your whole model; you didn't make any changes to that?

A. Correct.

Q. Okay. And you used Boussinesq?

A. Yes.

Q. Okay. And you agree with me that the temperature gradient on Figure 11 is from 105.9 degrees to 59 degrees; correct?

A. I disagree.

Q. You have air coming out of the Bair Hugger at 105.9 degrees; correct?

A. Correct.

Q. Okay. So the temperature gradient in the room is 105.9 to 59 -- 59 to 105.9; correct?

A. No, it is not.

Q. Why not?

A. Because the term "gradient" means a change of something over a distance. Gradient is like velocity.

What you're talking about is a temperature difference, not a gradient.

Q. Okay. Lack of term.

Temperature difference is between 59 degrees and 105.9 degrees.

A. Correct.

Q. Okay. And since --

You have the choice of using ideal gas in ANSYS, or Boussinesq; correct?

A. That is correct.

Q. And you chose Boussinesq because it's quicker computation; correct?

A. Incorrect.

Q. It's not?

Why did you use Boussinesq?

A. It is quicker, but I chose it because it makes it a worst-case scenario. It stacks the cards

against 3M and so it's a worst-case scenario.

Q. How does it stack the cards against --

I mean, isn't the whole point of doing CFD is to be as accurate as possible and to show exactly what happens in a model that would happen in real life?

A. Not necessarily.

Q. So is that not what you did here? Is this -- Is what you did in your -- in your modeling what happens in real life?

A. Let me explain.

Q. "Yes" or "no," then you could explain.

A. Yes.

Q. Okay.

A. When we do a calculation we have to make choices, and we can make choices that are judgements, and sometimes those judgements may affect the results in small ways. What I like to do is do what's called a bounding calculation. I like to assume worst-case scenarios. If I assume a worst-case scenario against the manufacturers of the Bair Hugger, and if I -- if my results show that the air does not intrude to the surgical site then I have added confidence that under a more exact calculation the results would hold.

Q. Worst-case scenario you performed?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

A. The Boussinesq --
Q. No. I'm saying you -- in all the assumptions you made you determined the worst-case scenario.
A. For the buoyancy model I did.
Q. Okay. You didn't --
You didn't assume it for where the air goes; correct? The hot air.
A. Well that --
(Interruption by the reporter.)
A. When we make assumptions, we make assumptions on things that we're uncertain about. Things that -- Let me give you an example. The air coming out of the blanket. It could be 41 Celsius, it might be 33 Celsius. We don't know for sure. And in fact you might have some air that's 33 and some air that's 41, so there's a judgment that has to be made. In those cases I tend to prefer judgements that stack the cards against the case so that if my results come out to show no intrusion, I have more confidence.
Q. By the way, in your report you said the war -- on page 6 [5]: "The warm air from the Bair Hugger blanket was treated as a second inlet to the room near the patient's head and the temperature of the air leaving the blower and entering the blanket was set to

the highest value of 43 degrees Celsius. This assumes a worst-case scenario; the temperature of the air exiting near the patient's head should be significantly less than 43 degrees Celsius -" the value used in these -- "the value used in these calculations was 43 degrees Celsius."
Correct?
A. You have read that correctly.
Q. Is that what you used, you used 43 or 41?
A. It's a typo. It should have been 41.
Q. Okay. Because 41 degrees is 106, not 43.
A. That's -- That's right.
Q. Okay. So that's a typo.
Any other typos I should be aware of?
A. Not that I know of.
Q. Okay. And now do you know what the temperature of a human body is? I'm sure you do because you've done studies on it.
A. Yes, I do.
Q. What's the skin temperature of a human body?
A. It depends on the environment that they're in. If you're out here in Minnesota in the winter your skin temperature is going to be colder than in the summer. It also depends on the part of the body, the face and nose and ears tend to be colder, but

generally it's a few degrees colder than body core temperature. So in metric units maybe 34 degrees Celsius.
Q. What about the core?
A. The core is approximately 37.
Q. Okay. Skin temperature, around the chest.
A. No.
Q. What about the skin around the -- like the chest and everything?
A. It depends on the clothing that peoples wear -- people are wearing. I would estimate, sitting here, with a reasonable degree of certainty, between 35 and 36.
Q. Okay. So I'm a little bit confused, because heat transfer goes from something that's hot to something that's cold; correct?
A. That is correct.
Q. Okay. And I think that's --
Is that the second law of thermodynamics?
A. No.
Q. Okay. Maybe I'm wrong.
So are you aware of internal studies of 3M that actually measured the temperature underneath the blanket when it's being used?
A. No.

Q. Why'd you come up with 41 degrees then?
A. I've studied these blankets for years. I've studied 3M's blankets and other blankets. Through my study know that when the air -- let's say the air enters the blankets at 43 Celsius, it transfers heat to the body and loses heat. It loses -- lowers its temperature. As the air exit -- exits out the holes it will be somewhat less than 43. Now in some parts of the -- The blanket's not a uniform temperature. If we were to lay a blanket out on this table and let's say the hose entered here and the end of the blanket was here, you would actually show a temperature decrease as you went from one end to the other.
Q. Did you ask for 3M whether or not they have measured the uniformity of their temperature under the blankets?
A. I did not.
Q. Wouldn't that be something that would be good to know?
A. Not necessary for my calculations.
Q. Okay. Well --
A. So what I did --
Q. You're making the assumption, sir, that the air might be different at one part of the blanket or the other. Is that based on any experiments done on

the Bair Hugger, or just an educated guess?
A. It's based on experiments done on the Bair Hugger.
Q. What studies?
A. I cannot tell you.
Q. Well I'm sitting here today and I need to know, so I can go back and check your credibility, what studies you're referring to.
Is it listed in -- in any -- in your CV?
A. No.
Q. Okay. Is it studies you've done for 3M or Arizant?
A. No.
Q. So what studies are they?
A. Actually, let me take that back.
We did do studies in the 2000, 2002 period where we measured temperature of air inside the Bair Hugger, and there is clearly a temperature variation as you move along the blanket.
So I made an engineering decision. I decided to use the hottest reasonable temperature at the exhaust because that would promote buoyant mixing.
(Abraham Exhibit 8 marked for identification.)
BY MR. ASSAAD:

Q. Was assuming 41 degrees in 3M's favor --
Was assuming 41 degrees in favor of 3M, or -- or an assumption made in favor of 3M, worst-case scenario?
A. You've handed me a document --
Q. That's a different question. I'm asking you a different question. I haven't got to this document yet.
A. Okay.
Q. Your assumption that 41 degrees is coming out of the blanket, was that in 3M's favor of creating a worst-case scenario?
A. It was a worst-case scenario against 3M.
Q. "Against 3M." Okay. All right.
What's been marked as Exhibit Number 8 is a document produced during the litigation which is a data of measurements taken by the Bair Hugger 505, as well as the 750, used with different blankets -- with a upper body blanket, a new body blanket and an older body 522 blanket.
Have you seen this document before?
A. I do not recall seeing this document.
Q. Okay. Do you see where it talks about MCST, the average of temperature across the blanket?
A. Yes.

Q. And I'm going to tell you and I'm going to represent to you that what they do at 3 -- at Arizant at this time is they have a -- a bed with many thermocouples on it and they place the Bair Hugger and they check how much of the -- how much heat is coming out of the -- out of the holes onto the test bed.
Have you ever heard of them doing that?
MR. GOSS: The Bair Hugger blanket.
MR. ASSAAD: Bair Hugger blanket.
Q. Have you --
Have you seen that test before?
A. No.
Q. Okay. Do you have any reason to believe that 3M or Arizant would incorrectly provide data in this case to the plaintiffs?
MR. GOSS: Object to the lack of foundation.
A. Could you repeat the question?
Q. Withdraw that question, it was a bad question.
Do you see here, under "Model 750 warming unit" that under "New (M9) 522," and I represent that's a new change in the Bair Hugger blanket, that the average temperature across the blanket is 41.1 degrees?

A. I see it says that, and I don't know what it -- what me -- what the meaning of "average temperature across the blanket" is.
Q. Okay. Do you see where it says the standard deviation is .7?
A. I see that.
Q. Okay. So sitting here today you've never seen this document.
A. I don't recall ever seeing this document.
Q. Okay. Wouldn't it be --
I mean, why recreate the wheel? Wouldn't it be just proper to ask 3M, hey, do you have any data on what the temperature is coming out of the blanket?
A. Not necessary. I've got a lot of experience with these devices, so I trust my own judgment.
Q. Do you have experience with the Bair Hugger blower 750 and the Model 522 blanket?
A. I don't know.
Q. Okay. Do you have any experience with the 750 prior to this study?
A. I don't --
I would have to look to see what models I've studied.
Q. Okay. So if you can't remember what you even studied, how do you have experience on what the

heat output and the airflow and the -- and what the temperature is coming out of the blanket if you can't even remember if you've even seen the device before?

A. Because I've studied many of these blankets and they all have a very similar behavior. The flow enters into the blanket through a tube, typically the temperature at entry is 43 or 44 Celsius, there is a temperature drop as you move from one end to the other of the blanket. Regardless of which blanket you're studying, regardless of the manufacturer, regardless of the brand, there are those temperature variations.

Q. But you don't know in this case.

A. What's that?

Q. You don't know in the 522 what the temperature difference is; do you?

A. Which temperature difference are you talking about?

Q. Across the blanket.

A. But where across the blanket?

Q. From -- From the hose where it's coming in at 43 degrees, and what's coming out of the perforations at the opposite end. You don't know what the change in -- the Delta T is; do you?

A. No, but I can estimate it within a reasonable degree of certainty.

Q. What would you estimate it as, how many degrees difference?

A. A couple degrees.

Q. Okay. So 43 to about 41 degrees Celsius; correct?

A. Correct.

Q. So the average temperature coming out of the Bair Hugger at about 41.1 seems reasonable.

A. It's not clear to me that this is the average temperature coming out of the Bair Hugger. What this says is "across the blanket." Now I would need to more -- know more information; for example, did they measure inside the channels of the -- of the Bair Hugger, or are they measuring outside or are they measuring the wall?

Q. I just told you. I told you.

I said they have a thermal bed -- a thermocouple -- a table with many thermocouples, they placed the Bair Hugger on top, turn it on, of course the Bair Hugger's going to rise a little bit because of the -- because that's what it does, and the convective currents are hitting the thermocouples and this is the measurement. If that --

Assuming that is the way they tested it, would you agree with me that the air coming out of the

blanket, on average, is 41.1 degrees Celsius?

MR. GOSS: Objection, lack of foundation. This document does not contain any of those experimental details.

Q. Assuming that's what -- that's what they did, would you agree with me that the temperature coming out is 41.1 degrees; "yes" or "no"? "Yes" or "no"?

A. You take --

Q. If you don't agree, you don't agree.

A. It's not that I agree or disagree, but I would, for example, want to know the room temperature, and I would want to know the constitution of the table upon which they sit this. If they put it on a table that's an insulator you're going to get a higher temperature. If it's in a room -- If it's covered by draping and blankets you'll get a higher temperature. There are many factors that go into these temperatures, and from this document I cannot assess them.

Q. Okay. But you agree that the 41 degrees that you used is consistent with the 41 degrees that is coming out of the blanket according to this document, Exhibit Number 8; correct?

A. I am not in agreement that -- If --

If this MCST is the temperature coming out of the blanket, if it is, then yes, the value I used is consistent with it.

Q. Okay. Which would be inconsistent with what Dr. Settles measured less than one millimeter coming out of the hole; correct?

MR. GOSS: Object to form.

A. I don't believe they are inconsistent.

Q. Okay. Are you aware that Dr. Settles criticized your boundary conditions?

A. Yes.

Q. Okay. So you believe that you could get a measurement less than one millimeter out of a heated air jet that dropped the temperature from 41 degrees to 32 to 33 degrees?

A. That's not necessarily the case. In my experience with these blankets every blanket that I've seen has a temperature variation across the blanket. It would go from maybe 43 down to 37 or 35.

Q. You just testified a Delta of two degrees from one end to the other.

A. I don't know if I did, and if I did, that was not --

Q. So it's incorrect testimony back then?

A. Well I'd have to see the question. It may

be. You may be misrepresenting the question that you asked.
Q. Oh no. I said to you: The hose here, 43 degrees, what would be the temperature drop at the other end of the Bair Hugger blanket, and you said about two degrees.
Do you remember me putting my arms like this?
A. Yeah. I would not agree with that.
Q. Okay.
A. What I would say is -- and I remember the context of this where you posed a hypothetical to me, or you -- you presented to me an experiment, and the experiment that you presented was, assume that the average air temperature coming out of the blanket's 41; is that consistent with your work? And I agreed to that.
Q. Okay.
A. But that is not the same as saying it's a Delta T of two degrees across the blanket.
Q. And your mass flow rate coming out of the Bair Hugger device is .025 kilograms per second; correct? Page 5.
A. No. I used .023.
Q. Okay. For a partially obstructed blanket

because the blanket was tucked underneath the table; correct?
A. Correct.
Q. Okay. Where'd you obtain these numbers?
A. These are numbers that are consistent with my experience working on blankets like this measuring airflow, and they were confirmed by a tech document from 3M.
Q. Okay. Is it the tech document that has not been produced by you in this case, but it was produced in another production? If you know.
A. I produced the tech document.
Q. Okay.
A. I did not create it.
Q. Who created it?
A. I don't know the answer.
Q. Okay.
MR. ASSAAD: Let's take a break.
THE REPORTER: Off the record, please.
(Recess taken from 3:01 to 3:11 p.m.)
BY MR. ASSAAD:
Q. In your manuscript that you submitted for publication you put equations down; correct?
A. Correct.
Q. Why'd you put equations down in that report

and not in the expert report of Exhibit 1?
A. It's a different audience, it would be read by scientists who would want the equations.
Q. Do you not think that Dr. Elghobashi would want to know the equations that you used for your model?
A. Dr. Elghobashi, when he sees that I used the LES model, would know what the equations are.
Q. Well wouldn't people that are reviewing numerical heat transfer know what the equations are in the use of the LES model?
A. They would.
Q. So why would you put the equations down if they already know the equations, like Dr. Elghobashi?
A. Overthoroughness.
Q. Okay. So you were thorough in your manuscript, but you were not thorough with respect to identifying the equations you used in your expert report.
MR. GOSS: Object to form.
A. I identified the equations in the expert report by indicating the model that was used.
Q. Okay. Do you know what --
You said LES; correct?
A. Correct.

Q. Okay. And are you sitting here --
Are you sitting here today and telling me that you know the equations that were used by ANSYS when you clicked -- when you used the LES model in ANSYS?
A. There are thousands of equations. I know the key equations.
Q. But you don't know the code; do you?
A. I mean, I -- I know how to do compu --
Q. You do not know the ANSYS code --
MR. GOSS: Well, hold on.
Q. -- sitting here today; correct?
MR. GOSS: Let him finish -- Let him finish his answer, then you can ask another question.
A. CFX is based on something called control-volume analysis for fluid mechanics. I've taken a number of courses at the graduate and undergraduate level on that topic. I could write the equations if I had to. Fortunately, they're contained within the software.
Q. Okay. But for the manuscript you decided to put the equations, but you did not decide to put them in your expert report; correct?
A. For the manuscript I put a brief summary of the equations, and I did not put them in the expert

report.
Q. Did you put the Navier-Stokes equations?
A. Yes.
Q. Did you put the Boussinesq equations?
A. No.
Q. Okay. So you would agree with me that -- I mean, you saw Dr. Elgho's report before you submitted your final report in this case; correct?
A. That is correct.
Q. And you had the opportunity, if you so choose, to add the equations; correct?
A. That is correct.
Q. And in fact the only thing you pretty much had to do was copy and paste from your manuscript, because your manuscript's already submitted by that point in time; correct?
A. Yes.
Q. But you decided not to do that; correct?
A. Correct.
Q. Okay. And you assumed that the lawyers, or our consultants, or even Judge Ericksen is a different audience than the peer reviewers for the -- for the journal; correct?
A. Yes.
Q. Okay. You do understand that Judge Ericksen

is the judge in this case.
A. No. You're telling me that now.
Q. Well the -- the female judge that you were in front of on Science Day was Judge Ericksen.
A. Okay.
Q. You understand that; correct?
And she is the judge of this MDL. You understand that.
A. Yes.
Q. And she decides whether or not expert opinions will eventually come in or not come in during trial. Do you understand that?
A. That is my understanding.
Q. Okay. Have you ever had your expert opinions limited in any way?
A. Yes.
Q. When?
A. Very recently in an intellectual property case.
Q. In what court?
A. I don't know.
Q. What state?
A. May I go to my --
Q. Sure.
A. -- CV? (Witness reviewing exhibit.)

Select Comfort versus Tempur Sealy, Eighth District Court, Minnesota.
Q. Okay. Is it --
Was it state court?
A. Well it's U.S. Eighth District Court.
Q. What page were you looking at?
A. Page 4.
Q. Of your CV, of Exhibit 2?
A. Yes.
Q. And was your entire expert opinion excluded?
A. No.
Q. What part of it was?
A. A very small fraction.
Q. Okay.
A. One opinion.
Q. Was there an opinion issued by the court as to why it was excluded?
A. Yes.
Q. Okay. What was the reasoning; do you recall?
A. No.
Q. Okay. And this was back in 2014?
A. The decision came out perhaps a month ago.
Q. Okay. And you said United States Eighth District Court?

A. I'm an engineer, so perhaps I got the court wrong.
Q. Okay.
A. But that's the best of my --
Q. Was the case originally in Minnesota, like -- or was it in a different state?
MR. GOSS: I think he gave you a file number.
MR. ASSAAD: Page 4?
MR. GOSS: I think it's -- the file number is listed right below where it says "United States 8th District Court, Minnesota."
MR. ASSAAD: Okay.
Q. Was that also in front of Judge Ericksen?
A. Well the -- I don't know who it's in front of.
MR. GOSS: That's Janie S. Mayeron.
MR. ASSAAD: Huh?
MS. ZIMMERMAN: That's a Magistrate. Janie S. Mayeron.
MR. GOSS: "JSM" is Janie S. Mayeron.
MR. ASSAAD: Okay.
BY MR. ASSAAD:
Q. So Judge Ericksen limited your expert opinion?

MR. GOSS: Objection, lack of foundation.
A. What I know is -- I don't know which judge or which court limited it. The extent of my knowledge is indicated by this court file number. I don't know who it was.
Q. Okay. Now 3M's a pretty big company; correct?
A. I believe that's true.
Q. Worth more than a billion dollars?
A. I believe that's true.
Q. So if they wanted to they could have spent more money and created a very detailed model, CFD model if they wanted to, and paid you for it; correct?
MR. GOSS: Object to form.
A. Yes.
Q. Okay. I mean, for example, there was nothing preventing you from adding surgeons and staff in your model; correct?
A. Correct.
Q. Except time and money; correct?
A. Incorrect.
Q. Okay. So you could have added people; correct?
A. Correct.
Q. You could have given properties to the

materials; correct?
A. That is correct.
Q. Okay. You could have had a --
You could have done particle testing, or added particles; correct?
A. Correct.
Q. You could have put skin squames like Dr. Elghobashi and Farhad Memarzadeh did in their studies?
A. They did not put skin squames in, --
Q. They --
A. -- but I could have done particle tracking.
Q. You're right, they did not put skin squames. They calculated the aerodynamic diameter of the skin squames and placed those in their studies; correct?
A. Incorrect.
Q. They didn't calculate the aerodynamic diameter?
A. They related skin squa -- skin squames to spheres whose diameter gave the same settling velocity. That's not the same as aerodynamics.
Q. Okay. But they both did the same thing.
A. I know that's what Said Elghobashi did. I don't recall, sitting here, what Memarzadeh did.
Q. Did you read Farhad Memarzadeh's report on the use of a Bair Hugger in a operating room?

A. I read multiple papers of his, so I'm certain I read...
He's done more than one.
Q. Okay. Did you read the one that dealt with the Bair Hugger 505 and its effect on the laminar system and where skin squames that were represented as spheres would go?
A. I believe I did read that.
Q. Okay. And do you recall reading that he indicated that the Bair Hugger 505 slightly disrupted the laminar flow?
A. I do not recall reading that.
Q. Would you agree with that if he said that?
A. It depends on what you mean by "disrupt." I know that Memarzadeh's work has shown that for -- that warming devices create a thermal plume, and in fact I think the body heat of the patient create a thermal plume that protects the surgical site, so I recall that.
Anyone who's done an analysis has to admit that everything in the room affects the flow. So no one can say it has no effect.
Q. So everything in the room affects the flow. Is that what you're saying?
A. Yes.

Q. So people affect the flow; correct?
A. That is correct.
Q. Okay. Actually a -- a Bair Hugger device that's sitting on the floor that sucks up air is going to affect the flow; correct?
A. That is correct.
Q. Okay. And in fact you did not even put the Bair Hugger device in your model; correct?
A. That is correct.
Q. Okay. The fact that heat might be causing thermal plumes through, you know, the Bair Hugger heating the blankets through conduction which create a thermal plume is going to affect the flow; correct?
A. Correct.
Q. Okay. But none of those things you decide to put into your model because you thought they would be insignificant; correct? With what you're trying to determine.
A. Correct.
Q. And that was your judgment call; correct?
A. Yes.
Q. And other people in the scientific community may disagree with you on that; correct?
A. Yes.
Q. Sitting here today I cannot determine, or

Page 222

anyone on my team, or my consultants, whether or not the equations that you used are the appropriate equations for the model because you did not inform me what the equations are; correct?
MR. GOSS: Well objection, lack of foundation as to what you would know or be able to do.
A. You know that I used the LES method. The equations -- If you need to see the equations written down they would be contained within the ANSYS theory manual. So yes, sitting here today you could.
Q. Okay. You agree with that ANSYS is not verified for every single type of physics; correct?
A. I don't understand your question.
Q. Well "verified" applies to the mathematics and "validation" applies to the physics. Do you understand that?
Have you ever heard that before?
A. I've heard it in a different -- slightly different phrasing, but essentially yes.
Q. Okay. Let me ask you this. Well, strike that.
Did you -- I might have asked this. Did you put the initial conditions in your manuscript?
A. No.

Page 223

Q. Okay. For either the 505 or the 750?
A. Correct.
Q. Is that common practice with respect to people in the CFD community when submitting a peer-review paper on a model not to put the input conditions?
A. When you say "manuscript," are you talking about the manuscript that's my expert report?
Q. No. Your expert report's your expert report. Your manuscript is what's been submitted for publication.
A. Thank you for clarifying.
In the manuscript for publication I show -- I show quasi-steady results have been achieved by comparing two results at different times, and that is sufficient, in my mind, for a peer-reviewed publication.
Q. Okay. Would you consider the Reynolds number --
Let me ask you this. Is the Reynolds number related to computational time in LES?
A. Yes.
Q. Okay. So the higher the Reynolds number is, the longer the computational time may be; correct? It's Reynolds cubed is the -- the -- CFD that you guys

Page 224

use to determine the relative compu --
(Interruption by the reporter.)
Q. -- Reynolds cubed to determine the relative computational time it takes -- or how much computational time is needed to solve an LES problem. Do you agree?
A. I don't know that.
Q. Okay. Do you agree that the most difficult calculations in computational fluid dynamics is the area where there's a transition between laminar and turbulent?
A. I would agree that that is a very difficult calculation in computational fluid dynamics.
Q. Do you know whether or not ANSYS is able to calculate those transition -- those -- those transition areas?
A. Yes.
Q. It can?
A. Yes.
Q. Okay. The Boussinesq approximation, what is its -- what is its underlying assumption?
A. The underlying assumption behind the Boussinesq approximation is that you relate density changes, which are the cause of buoyancy, to temperature changes.

Page 225

Q. So you would agree with me that in the Boussinesq approximation it disregards density for every variable except for gravity; correct?
A. Incorrect.
Q. So what's your definition again?
A. The Boussinesq model represents density variations through variations in temperature.
Q. You sure about that?
A. Yes.
Q. So what variables does density affect in the Boussinesq model?
A. Your question is not well posed.
Let me say this. When people use the Boussinesq model they're relating density variation in a fluid in the buoyancy term, to temperature variation.
Q. Do you agree that the Boussinesq approximation, which came out in 1903, suggested that density changes in the fluid can be neglected except where mu is multiplied by G, which is gravity, or density is multiplied by G, which is gravity.
A. Can you say that again?
Q. Do you agree that Boussinesq came out in 1903. Are you -- Are you familiar with that?
A. I don't know the year it came out.

Q. Okay. Suggested that density changes in the fluid can be neglected except where density is re -- is multiplied by gravity. So it only applies to the gravity term.
A. That's what I said in my answer.
Q. Okay. So you agree with me that density is a constant except for with relation to gravity.
A. In the model that I used density was treated as a constant with the exception of the term for buoyancy, the density variations in buoyancy.
Q. Okay.
A. I would agree with that.
Q. And you agree with me that the most common areas that Boussinesq has been used is in natural convection equations.
A. I don't know if that's a fact, but that would not surprise me. I believe that's true.
Q. And when you have a high Delta T temperature difference, that the Boussinesq approximation may fail.
A. That is correct.
Q. What would you consider a high temperature difference?
A. That's a very good question.
In 2003 I did a study on the applicability

of the Boussinesq model and we compared it to the ideal gas model, and we used a situation where the temperature difference was 150 degrees Celsius. We found that in that case the Boussinesq model did an excellent job of calculating the flow in an enclosure in a room.
Q. Airflow or particle flow?
A. Airflow.
Q. What about with respect to particle flow?
A. In my simulations I used airflow as a surrogate for particles because it's a worst-case scenario. I did not -- As I stated already, I did not model particles.
Q. So you assumed that airflow was the worst-case scenario as compared to particle flow?
A. Yes.
Q. And your basis behind that assumption?
A. Simple. Particles have a mass that is higher than their surrounding air, so particles like to settle out of the air. And in fact Said Elghobashi found his equivalent diameter by using the settling diameter. Particles like to fall out of the flow. Furthermore, particles have inertia. Multiple experts have already testified to this fact. Particles have inertia, and they find it hard to follow curved

streamlines, and that tends to bring particles out of the flow.
So for those two reasons I decided to use the worst-case scenario, which is air. I tracked air particles which have no gravity term and no inertia term. So in that respect it's a worst-case calculation.
Q. Well, I disagree with you mathematically and as a worst-case scenario, and I'm going to tell you why.
You don't think turbulence causes the spread of particles?
A. I think turbulence does cause the spread of particles.
Q. And don't you think that temperature differences affect the turbulence intensity?
A. And in fact I included that in my analysis.
Q. So you agree with me they do; correct?
A. I agree that temperature affects turbulence.
Q. Okay. And the fact that particles don't follow streamlines is that they may -- they may act with -- they may follow velocity vectors caused by turbulence; correct?
A. I'm not struggling because I can't answer it, I'm struggling to interpret your question and to

figure out a way to artfully answer.
Turbulence affects particles, and in fact particles can affect turbulence. Particles have inertia, and when a particle gets caught in an eddy it likes -- it has a tendency to leave that eddy.
So if you look at the simulations that I have where the flow goes down, curves against the ground and then curves against the wall, particles would have a tendency to leave the flow at that instant and land on the ground and the wall and surfaces, and in fact that's why we dust. We dust, if we're cleaning our house, because particles collect on a table. But there's not air particles collecting on this table, there's particles in -- in the air.
By giving -- I essentially gave my particles a zero mass so they had no weight, and zero inertia so that they would perfectly follow the flow. And whether that flow was turbulent or not they follow the flow. That's why it's a worst-case scenario.
Q. Well I think you just misspoke, sir, because you didn't use particles in your analysis; correct?
A. I did not misspeak.
Q. Well you did, because you said I gave my particles no inertia and no mass, but you did not use particles in your CFD; isn't that correct?

A. Actually the particles I used were air particles. I tracked air. So we can talk about particles, essentially I used oxygen and nitrogen molecules. I followed the air, not a solid, inertia-filled particle through the air.
Q. So you do not insert particles that have a mass into your system; correct?
A. That is correct.
Q. Okay. And you agree that the reason why there are particle models is because people in the scientific community understand that particles do -- always don't react or follow airstreams; correct?
A. That's correct.
Q. Okay.
A. In fact I've done particle modeling in the peer review --
Q. I know what you've done. I'm -- Just answer my questions, please.
A. Okay.
Q. So the fact that --
I mean, turbulence has a significant effect on particle flow; don't you agree?
MR. GOSS: That's asked and answered, but if you have more to say, please go ahead.
A. They may, and they may not.

Q. But you don't know until you model it; correct?
A. That is not true.
Q. Okay. Are there any turbulent areas in the operating room that would be significant with respect to whether or not particles could actually cause harm to a patient?
A. Could you restate that question?
Q. That's a bad question.
Are there -- Are there any areas that there exist significant turbulence in the operating room model that would have an effect on particles that would indicate to you that the particles would not follow streamlines?
A. That's still a confusing question, but I'm going to give an answer. I modeled turbulence. I modeled particles that had the characteristics of air. Insofar as there's turbulent motion in the air, those carry the air. So whether we're talking about a particle or not, turbulence -- whether we're talking about a solid particle or whether we're talking about air, the motion is affected by the turbulence and I included that in my model.
Q. What was the turbulent intensity --
If I ask you what the turbulent intensity

was underneath the operating room table could you tell me what that is in your model?
A. I could, and I don't have that information here with me.
Q. Okay. How would you do it? What would you look at?
A. I would either calc -- I would either have the software extract the turbulence intensity, or I would look at a surrogate like the eddy viscosity.
Q. Can ANSYS CFX determine turbulence intensity? Is there actually a function to do that?
A. I believe there is, and if not you can do it through other -- other parameters that it calculates.
Q. The eddy viscosity.
A. Yes.
Q. Okay.
A. In fact all you need is the fluctuating component of the velocities and the average velocities.
Q. Okay. In your manuscript did you indicate, with respect to the 750, why -- or what data that you used to show that it was a quasi-steady solution?
A. In my manuscript I compared two sets of results that differed substantially in time step and showed that they were immaterially different.

Q. For the 750 or the 505?
A. 750.
Q. Okay. And that would be the 264 and the 300 something?
A. No. I think they were further apart than that.
Q. All right. Did you provide those data files to counsel?
A. I don't know if I did. The data files for the journal paper? I don't recall.
Q. And you didn't cite your reasoning or your data to support that you reviewed the results to get a quasi-steady solution with respect to the expert report; correct?
A. Could you ask that again?
Q. In your expert report you did not provide that information of the data points that you looked at for you -- for your determination that the solution that you provided was a quasi-steady solution.
A. No, that's not quite true. On page 9 I actually say that images from Figures 3 through 8 could be replicated at other instan -- time instances and the same conclusions would be drawn.
Q. I understand that.
But it's a judgment call by you whether or

Page 234

not you had a quasi-steady solution; correct?
A. Correct.
Q. And I might look at it, or my expert might look at it and disagree with you; correct?
A. That's -- That's possible.
Q. Okay. And they can't do that because you did not provide that data in your expert report; correct?
MR. GOSS: Object to form, --
A. They --
MR. GOSS: -- calls for speculation.
Q. The only way I could determine whether or not you have a quasi-steady solution is to look at two -- at least two TRN files; correct?
A. Correct.
Q. I only have one TRN file. You understand that; correct?
A. Yes.
Q. And you did not -- you only plotted solutions for one TRN file in your -- in your expert report; correct?
A. That is correct.
Q. Okay. So sitting here today I don't have -- no one in the world has any information to make their own judgment call whether or not the two solutions are

Page 235

close enough to make the judgment -- judgment that it's a quasi-steady solution; correct?
A. From the data --
From the single TRN file that I provided, correct.
Q. Okay. And nothing in the report.
A. Well I stated it in the report.
Q. That's your opinion.
But I'm saying for someone to ascertain and make a determination of whether or not your judgment is correct, no one could do that right now based on the expert report; correct?
MR. GOSS: Argumentative, asked and answered.
A. Correct.
Q. Okay. Just out of curiosity, when you ran the model with 8.1 million cells that you said took roughly 40 days, was that the only program that was running on that machine?
A. I don't know.
Q. Okay. Does anyone else have access to that machine that you used?
A. Yes.
Q. Okay. Is it a single desktop computer or does it use, like, a combination of computers to

Page 236

solve?
A. Single desktop.
Q. Why didn't you use the Minnesota supercomputer?
A. I have enough computer power with me, and there was no reason to use the Minnesota supercomputer.
Q. Well you could have --
I mean that supercomputer has I think 16,000 cores. Does that sound about right?
A. I don't know how many cores it has, but there is an inconvenience of queuing your jobs, and I'm not -- and I wasn't willing to be subject to that inconvenience.
Q. So you'd rather wait 40 days?
A. Yeah.
Q. Do you know who Lagrange is?
A. Yes.
Q. Do you know who Euler is?
A. Yes.
Q. Their equations were not used in your CFD analysis; correct?
A. Incorrect.
Q. In what way were they used?
A. Well the Euler method, E-U-L-E-R, is

Page 237

generally re -- Let me back up.
In an overview, Lagrange means you follow the fluid or particle. The Euler method means that you calculate the flow by sitting in a single place in time and watching things go by you. So one has a moving perspective reference frame and the other one doesn't.
The CFD used to calculate the airflow is Eulerian, E-U-L-E-R-I-A-N. Now it turns out that these two ideas can be applied to particle tracking; Lagrange particle tracking and Euler particle tracking. And with respect to particle tracking I did not -- not use either of them.
Q. Do you agree that current -- that ANSYS CFX has limited capabilities for Lagrangian simulation?
A. I don't know that to be true.
Q. So you don't know one way or the other; correct?
A. Well, I mean, every software has limited capabilities, so I don't know the context of what you're --
Q. And you don't know the code that's used behind the black box of ANSYS; correct?
A. That's incorrect.
Q. Do you know the code?

A. I could actually write the code.
Q. Okay. But do you know the code?
A. What do you mean by "know the code"?
Q. Do you know the software or the code behind ANSYS?
A. I would say this.
MR. GOSS: Asked and answered. Go ahead.
A. I would say this. I know the equations that go in. I know the equations that ANSYS relies upon.
Q. I understand that. But everyone knows the equations. Everyone knows Navier-Stokes; correct?
MR. GOSS: I don't.
A. Incorrect.
Q. Well people that are doing CFD, like professors such as yourself should know the Navier-Stokes equations; correct?
A. That is correct.
Q. Okay. And the people that are writing the programs should know the Navier-Stokes equation; correct?
A. Correct.
Q. But some codes are verified because the mathematics work out, and other codes that use -- that try to solve for the Navier-Stokes equation are not verified. Do you agree with that?

A. I disagree.
Q. Okay.
A. I would have to understand more about the hypothetical that you're --
Q. Well --
A. -- suggesting.
Q. -- I could write a code that solves for the Navier-Stokes equations and I get wrong mathematical results and therefore my code is not verified even though I could write down the Navier-Stokes equations; correct?
A. I agree.
Q. Okay. So a code needs to be verified; correct?
A. I agree.
Q. Okay. So the code is more than just the equation, it's actually the code is what they use -- do to solve the equation; correct?
A. In this context "code" usually refers to the numerical algorithm that's used to solve the Navier-Stokes equations.
Q. So the mere fact that I know the equation doesn't mean I have the correct algorithm to solve the equation accurately; correct?
A. I agree --

Q. Okay.
A. -- with that statement.
Q. So the mere fact that you know the equations that ANSYS used, you don't know the code or the algorithm they used to solve the equation.
A. Incorrect.
Q. You do?
A. Well you have to be careful here because there's many equations and many algorithms. It's not as though there's a single algorithm for ANSYS.
For example, there is an algorithm on how to solve the mass equation over each element. There's an algorithm on how to solve the momentum equation. There's an algorithm on how to evaluate the density variation in a -- in a natural convection flow.
So there are many, many algorithms. It's not as though there's a single algorithm for a code.
Q. Have you actually looked behind the software and -- and the actual code that the programmers use for ANSYS CFX?
A. In fact --
Q. It's a simple yes-or-no answer.
Have you looked at it? That's all I need to know.
MR. GOSS: You can go ahead and answer.

A. In fact I've modified the code that they use.
Q. So you looked at it.
A. I have looked at the code.
Q. Okay. That's all I need to know.
How would you define "natural convection"?
A. Natural convection is the process --
Well colloquially hot air rises or heat rises, but more exactly it's the process of fluid, when it warms up -- and when I say "fluid" I mean a gas or a liquid -- when it warms up it wants to expand, and when it expands it's less dense so it wants to rise. Think of a hot air balloon would be natural convection.
Q. Do you agree with me that the density between 41 degrees Celsius and the density of 59 degrees Celsius of air is different?
A. I would agree.
Q. Okay. And you agree with me that the Boussinesq approximation does not take that difference in density except for the gravity term; correct?
A. Incorrect. The Bou -- The dens -- The buoyancy term is also in the turbulence production, but it does not -- the density variation does not appear in the other terms of the Navier-Stokes

equations. I think that's what you're trying to get at.
Q. So you think it's part of the turbulence equations?
A. The Boussinesq model, my recollection is that it includes density variations -- I'd have to go back and look.
The Boussinesq model relates density variations in the buoyancy term to temperature variations, period.
Q. Do you recall what your -- Does ANSYS CFX -- Strike that.
Does ANSYS CFX require you to give a temperature for -- a reference temperature for Boussinesq?
A. Yes.
Q. So what did you use?
A. 25 Celsius.
Q. "25 Celsius"?
Why'd you use 25 Celsius?
A. It's a good midpoint between 15 and 43.
Q. So 25 Celsius, what's that in Fahrenheit?
MR. GOSS: I'm going to guess 74 degrees.
[Calculating.]
Q. 77 degrees.

So that's what you used is 77?
A. That's what I recall.
Q. Okay. You know, why'd you use seven --
As a midpoint, you said?
A. Well it's not the exact midpoint, but it's between the two.
Q. And why would you use -- why would you want to use the midpoint?
A. I've done work on -- peer-reviewed published work on the Boussinesq model, and what we showed is that when -- even for temperature variations in a room of 150 Celsius, that if you use a temperature at or near the midpoint you'll get very accurate results.
Q. Would it --
Just so I understand, is -- is the temperature used in the Boussinesq, would that be equivalent to the buoyancy reference temperature?
A. It is my --
I believe it is, --
Q. Okay.
A. -- but I'd have to check the manual.
Q. Okay. And how would that affect the calculations?
A. It affects the calculations in a couple ways. First of all, it mean -- as you pointed out

earlier, warmer air is less dense than cooler air. So the air coming out of the Bair Hugger blanket, which I used as 41, is less dense than air coming out of the ceiling. By using a reference temperature that is between the two what I did is I made a worst-case scenario in that the density of air coming out of the Bair Hugger was higher than it actually is in real life and the density of the air coming out of the ceiling is lower. And what that means is I gave the Bair Hugger air more momentum.
So, for example, let's think of this as a car and a train having a collision. The momentum coming out of the ceiling is 60 times that of the Bair Hugger, so it's like a train hitting a car, train hitting a sedan, let's say. By using the Boussinesq model I made my sedan a little heavier, I made it an SUV, just to make it a worst-case scenario.
Q. So say you lowered the buoyancy reference temperature to 50, how would that affect your model?
MR. GOSS: 50 Fahrenheit?
MR. ASSAAD: 50 Fahrenheit.
A. It would make the density of the air in the room higher.
Q. Okay. You could have used ideal gas instead of Boussinesq; correct?

A. That is correct.
Q. Okay. And just so I'm absolutely sure, you ran one run as RANS on the 750 and one run as LES; correct?
A. No.
Q. On the 750.
A. All the results here, all the unsteady results were LES.
Q. I understand that, but you ran one run of RANS to get your initial conditions, and then you ran one run of LES.
A. I believe that's true. I don't recall exactly, but I'm pretty confident that is correct.
Q. Do you agree with me that the ideal gas is more accurate than the Boussinesq?
A. It is more accurate, but it's not a worst-case calculation, which is why I chose Boussinesq.
Q. But it's more accurate; correct?
A. Correct.
Q. Do you agree that Dr. Elghobashi is an expert in particle flow in turbulent air?
A. I would agree he's an expert on spherical particles in perhaps high-speed flows for sure. I don't know if I'd generally agree he's an expert in

particle flow in air.
Q. Would you -- Would you --
Would you consider yourself a particle expert in high-speed flows?
A. No.
Q. Would you consider yourself an expert in low -- with particles in low-speed flows?
A. Probably not.
Q. Okay. Have you ever done any work for the Department of Defense?
A. Via a subcontractor, yes.
Q. What about directly with the Department of Defense?
A. No.
Q. Have you done any work with the -- with any part of the military?
A. No.
Q. Do you have access to the military supercomputer?
A. No.
Q. Do you have access to a computer that could do DNS modeling?
A. Yes.
Q. What computer?
A. The ANSYS model, the ANSYS software has the

capability of doing D -- DNS if you set a term in the LES model to zero. I wouldn't use DNS for this case.
Q. No one could use DNS for this case.
A. I don't know --
MR. GOSS: Wait for a question.
Q. Do you agree with that?
Can anyone do DNS for this case?
A. I would have to calculate how many elements would be needed to recor -- to do the calculation, but sitting here now I think it's unlikely someone would do DNS for this.
Q. Do you know --
Have you ever done DNS?
A. No.
Q. Do you know what type of computing is required to run DNS?
A. What do you mean by "computing"?
Q. What size computer, how many cores?
A. It depends on the size of the problem and the number of elements.
Q. You agree that DNS is the most accurate form -- method of computational fluid dynamics.
A. It is generally considered the most accurate.
Q. And in fact it's probably more accurate than

experimental measurements.
A. I would disagree with that.
Q. You'd disagree with that?
A. Yes.
Q. Okay.
MR. ASSAAD: Let's take a break.
THE REPORTER: Off the record, please.
(Recess taken from 4:00 to 4:13 p.m.)
BY MR. ASSAAD:
Q. Are you aware of any peer-reviewed literature that has modeled an operating room?
A. Yes.
Q. Is that the Farhad Memarzadeh literature?
A. That is one. There may be others that I can't think of, but that's one of them.
Q. And you agree with me that Farhad Memarzadeh used the RANS model; correct?
A. Yes.
Q. Okay. He didn't use LES; correct?
A. Correct.
Q. And are you aware of any peer-review literature that gave -- that included no solids in their CFD model?
MR. GOSS: Of an operating room, or more generally?

Q. In the operating room.
A. Sitting here now, no.
Q. Well you had no solids; correct?
A. That is correct.
Q. Okay. Now you agree with me that I could try to run a model and get the same results as you can without having your initial conditions; correct?
A. Yes.
Q. Your opinion is that you don't believe that I need the initial conditions to obtain reproducible results in this model; correct?
A. Correct.
Q. Okay. However, you would agree with me that for me to verify that you had used the proper initial conditions I would need to know what the initial conditions are; correct?
A. I would disagree that there is such a thing as "proper initial conditions."
Q. For me to verify your initial conditions I would need to know the initial conditions; correct?
A. I would a -- I would agree for you to know my initial conditions you would have to know the initial conditions.
Q. Okay. And for me to determine whether or not there is quasi-steady solution with respect to

your CFD model, I would have to know the initial conditions.
A. I don't know if that's true.
Q. Well do you know that it's not true?
A. Well let's say you ran your own code and let's say you obtained initial -- quasi-steady results and compared them with mine. If yours were the same then you had reached quasi-steady results.
Q. What if mine were different?
A. Then you may not have quasi-steady results.
Q. Or you might not have quasi-steady results; correct?
A. That could be.
Q. And for me to determine that I would need the initial conditions to determine whether I had quasi -- you had quasi-steady results or I had quasi-steady results, and if we both came to different results then we might have to look further at the problem; correct?
A. I would agree. If we came to different results we'd have to look further.
Q. Okay. So there is a possibility, without the initial conditions, that I may never be able to determine whether or not your results show a quasi-steady solution if I cannot come to a

quasi-steady solution in my results; correct?
MR. GOSS: Calls for speculation.
A. That's a complex --
Could you re -- rephrase it, re-ask it?
Q. Well just assume that I -- I run your model and I cannot come to a quasi-steady solution, okay? I could determine whether or not you came to a quasi-steady solution if I had your initial -- your initial conditions and your final result; correct?
A. It's a --
That was a very cumbersome question. Could you just --
Q. Let's make it: I cannot independently verify that you have -- your solution is a quasi-steady solution without another TRN file or even -- or the initial conditions; correct?
A. You could not verify that my results were quasi-steady without another TRN file.
Q. And, I mean, these are transient results, TRN files; correct?
A. Correct.
Q. And all transient results are dependent on the initial conditions.
A. That is correct.
Q. Okay. So your failure to provide the

initial conditions prevents my independent verification of your CFD. You agree?
A. I disa --
MR. GOSS: Object to form.
A. I disagree.
Q. I can't verify your CFD to determine whether or not you have quasi-steady solution based on your one TRN value.
MR. GOSS: Asked and answered.
A. I disagree.
Q. You disagree to that now?
A. Yes.
Q. Okay. You told me before I need at least two TRNs to determine whether or not a solution is -- is a quasi-steady solution.
A. You need two --
Let's take a step back and make sure it's totally clear, and I want to make sure that I'm not confused.
If you want to know whether your results are quasi-steady you can do it a number of different ways. You can compare the results to an experiment that's quasi-steady, you could compare two sets of TRN files, which is what you mentioned, or you could compare someone else's calculations that are quasi-steady. So

there's different ways of doing it. But -- But I would agree with you to know if this set of results right here is quasi-steady [indicating Exhibit 1] you would want to compare two different TRN files.
Q. Okay. Because you didn't compare your results to anyone else's results; correct?
A. I did not --
Well I compared my results to an experiment.
Q. Okay. But I'm talking about your computational fluid -- your mathematical results.
A. Correct.
Q. Okay. For example, if I wanted someone on my team to -- Well, strike that.
Part of the methodology in doing CFD is to have a proper model; correct?
A. Yes.
Q. Proper boundary conditions; correct?
A. Yes.
Q. And you need to put in initial conditions; correct?
A. That is correct.
Q. Okay. Without the initial --
That is mandatory in a CFD analysis is having initial conditions; correct?
A. That is correct.

Q. And you have not provided the initial conditions to the plaintiff in this case; correct?
MR. GOSS: Asked and answered multiple, multiple times.
A. That is correct.
Now you can get the same results by having different initial conditions.
Q. But the methodology requires initial conditions; correct?
A. The methodology requires initial conditions, it doesn't require the same ones.
Q. Let's go to your CFD model.
(Discussion off the stenographic record.)
(Files brought up on a projector.)
BY MR. ASSAAD:
Q. Now I'm going to represent to you that the name of this file is Abraham 0000001, which is a Bates number that -- your TRN file that is TRN 264.
MR. GOSS: Can you -- I'm not suggesting that it isn't that, but can you give us, at the end of the deposition, a thumb-drive copy?
MR. ASSAAD: Is there any way we can go to the 264 TRN -- dot TRN number?
(Screen being manipulated.)
MR. GOSS: And I don't -- I don't question

that it is, it's just can we get a copy of the file after the deposition?
MR. ASSAAD: It's your file. So yeah, I can give it back to you.
MR. GOSS: That's fine. Just so I can verify.
BY MR. ASSAAD:
Q. Okay. Up there --
And if you want to stand up and look closer, feel free, but it says 264. And I represent that this is your TRN file loaded into ANSYS software.
Does this look like ANSYS software to you?
A. Yes.
Q. And what I have here is the temperature difference between --
MR. ASSAAD: Let's go off the record real quick.
(Discussion off the record.)
BY MR. ASSAAD:
Q. I'm sorry about that. I needed to get a mobile microphone so I can move.
So this is your TRN file for time step 264. And what I've put up on the screen is the temperature distribution in the room with a -- a scale range of 58 degrees Celsius to 62.

Do you see that?
A. Yes.
Q. Okay. Does that look about right?
A. I never provided a plot or looked at a plot with this temperature range, so I can't co -- I can't confirm.
Q. Okay. But you agree with me that with the TRN file that you provided that you could go in and get temperature ranges such as this.
A. Yes.
Q. Okay. And I represent to you that this is the temperature range along a certain plane along the middle -- going down the middle of the body roughly of the temperature differences in the room.
Do you see --
MR. GOSS: I'm sorry. Is this something that you did, or are you saying that she did it?
MS. ZIMMERMAN: This is off his --
MR. GOSS: What's that?
MR. ASSAAD: Well let me --
Q. You could produce many images off your TRN file depending on what you're looking for; correct?
A. Correct.
Q. And this is the type of image that you could pull off your TRN file; correct?

A. That is correct.
Q. You just do a couple clicks in ANSYS, you tell them what you need, you draw a plane where you're looking and you could produce this image; correct?
A. Correct.
Q. Okay. And you agree with me that when you put the temperature max of 62, the red area is all temperatures 62 degrees and above; correct?
A. Yes.
Q. And you agree with me that based on your initial conditions and that the air coming from the ceiling inlet of being 59 degrees, that the low temperature would probably be 59 degrees in the operating room; correct?
A. Correct.
Q. Okay. And this would be the temperature difference between the ceiling and the floor; correct?
A. Well you're showing the temperature distribution on a cross-section.
Q. Yes.
A. And that temperature distribution goes from the ceiling to the floor.
Q. Okay. And you agree with me that there's very little difference between the temperature of the ceiling and the temperature of the floor.

A. There is a few degrees difference.
Q. Okay. And we could actually go in and pick points and determine the temperature difference; correct?
A. Yes.
Q. Okay. I could go pick a point up at the ceiling and I could go pick a point up at the bottom and it'll give me the temperature difference; correct?
A. Correct.
Q. Do you know what the temperature difference in an operating room is between the ceiling and the height of the operating room table?
A. No. It would depend on where you are in the room, because the temperature difference would not be constant. It would not be the same depending on where you took the measurements.
But no, I do not know, as a general rule, the temperature difference between the ceiling in the OR.
Q. By the way, have you looked at any studies that did temperature monitoring of an operating room when the Bair Hugger was on as compared to the Bair Hugger was off?
A. Yes.
Q. Would that be the Dasari study?

A. That was one.
Q. What was the other one?
A. (Witness reviewing exhibit.) If I recall correctly, it was the Legg papers.
Q. Okay. Would you agree with me that a study that was identical with the number of people in an operating room, same flow, same operating room, and the only thing that changed was whether or not the Bair Hugger was used or not used and measured temperature difference would indicate the temperature rise in the operating room solely because of the Bair Hugger?
A. Boy, that was complex.
Could you rephrase it in a shorter, tighter --
Q. If there's a study which everything is identical; the number of people in the room, the airflow, the devices, the equipment, but the only thing that changed was the Bair Hugger was on as compared to the Bair Hugger was off, would you agree with me that any change in the temperature in that room would be a result of the Bair Hugger?
A. Yes.
MR. GOSS: Object to the incomplete hypothetical.

A. Yes.
Q. Okay. And say if they were comparing two devices. Say, for example, the difference between the Bair Hugger and the HotDog, okay? Everything's identical except one was the Bair Hugger was on, and one was that the HotDog was on, would you agree with me that if there was a Delta T between the temperature measurements you could say that was as a result of the differences in the devices?
MR. GOSS: Same objection.
A. I would agree to this and the prior question with the caveat that the -- any heat generated in an OR may create a change in the control system of the HVAC. So the HVAC may turn on or off or turn higher or lower depending on heat, but aside from that caveat, I agree.
Q. Okay. And have you looked at any studies that show the difference in the temperature increase around the surgical table between the Bair Hugger and the HotDog?
A. Yes.
Q. What study?
A. It may -- I -- I know this isn't a memory test and you're not making me do a memory test. It could be the two I mentioned, the Legg studies. It

could be Dasari. I just don't remember which one. I remember that there were -- there are two studies in my memory that looked at temperature changes over the surgical site, and I believe one of them did a comparison of the HotDog and Bair Hugger.
Q. And do you recall that study showing that when the Bair Hugger was used the temperature around the surgical table was higher than when the HotDog was used?
A. Can you show me the study?
Q. I'm asking if you recall that?
A. I don't recall.
Q. Okay. Assuming that when the Bair Hugger's used that the temperature around the surgical site is higher -- or the surgical table is higher than when the HotDog is used and everything else stayed constant, what would that indicate to you as a scientist?
MR. GOSS: Objection, incomplete hypothetical.
A. I mean you're asking me to comment on a study that I don't have in front of me so I'd have to read the study.
Q. I'm just saying -- Forget about the study.
In a hypothetical situation that you have a

HotDog --
You know what the HotDog is?
A. Yes.
Q. And you have a Bair Hugger. You know what a Bair Hugger is; correct?
A. Yes.
Q. Okay. And everything else is constant except in one -- in certain tests the HotDog is used, and in other certain tests the Bair Hugger is used, and when you compare the results it shows a statis -- statistic -- signi -- a statistic --
MR. GOSS: Ly [lee].
Q. -- statistically significant change between the Bair Hugger and the HotDog showing that the Bair Hugger warms the air around the operating room table more than the HotDog.
Assuming those facts, what does that mean to you as a scientist as to the effect of the Bair Hugger compared to the HotDog on the temperature around the surgical table?
MR. GOSS: Same objection, assumes facts not in evidence.
A. If that is correct, and part of the reason why I'm tentatively answering this is there have been multiple studies that I've read that actually show

conflicting measurements of temperature above the table, they show different values, so I wouldn't assume that that study is correct. But if it is correct, one interpretation may be that there is heat from the Bair Hugger that is entering the air. That's one possibility.
Q. What's the other possibility?
A. There is -- could be draping, it could be the measurement method is different. I would have to look at the study. You're asking me to comment --
Q. Well when you compare --
MR. GOSS: Hold on. Let him finish his answer.
A. You're asking me to comment on a study that I don't see, and I know that there are multiple studies that are conflicting on these very types of measurements that you've made.
Q. With respect to temperature measurements?
A. Yes.
Q. Okay. We'll get to that in a second.
But if everything is constant; where the temperature measurements are taken, the airflow, the number of people, okay? There's no change. The only thing that's changed is the HotDog and the Bair Hugger, and the Bair Hugger shows an increase in

temperature around the operating room table more than the HotDog, you would agree with me that the increase in temperature over the operating room table is most likely due to the heat coming from the Bair Hugger.
MR. GOSS: Objection, incomplete hypothetical.
A. It's possible, but there are other alternative explanations.
Q. Are there other heat sources that -- that --
A. Yes.
Q. -- are different if I say everything else is constant besides the Bair Hugger and the HotDog?
MR. GOSS: Same objection.
A. Let me give you two options. Let me give you just two alternatives to show that it's not a simple question without seeing the study in front of me.
Let's say the Bair Hugger initiated less of a temperature response in the HVAC system and that lesser response meant that there was less airflow coming out of the vents. That could be a reason.
Q. Is it your understanding that the mass flow out of the vents in an operating room can change?
A. It may. I would have to see the H -- the control system, but it could.

Q. Do you know the entire purpose of the unidirectional airflow is a constant velocity of air being -- coming out of the inlets over the surgical -- over the surgical table. You understand that; correct?
A. I do not under --
MR. GOSS: Object to form.
A. I do not understand that.
Q. You're not aware of that fact?
MR. GOSS: Object to form.
A. What I understand --
Q. Are you not aware of that fact?
MR. GOSS: Same objection.
A. Are you saying constant in time or constant in space?
Q. Well you -- you take the face velocity of I believe 39 feet per sec -- feet cubed per second. Do you recall that?
A. Yes. That is not a face velocity, but yes, I recall that number.
Q. You're right, it's not. It's a volumetric velocity.
Do you believe that number changes over time in an operating room?
A. Certainly it would. There is no perfect

ventilation system where the flow is always the exact same value.
Q. I understand that it's a tolerance and there's going to be a deviation, but do you -- do you believe that the controls of the HVAC system in an operating room may change the volumetric flow?
A. I don't know the answer to that --
Q. Okay.
A. -- but it -- they may.
Q. But you don't know sitting here today.
A. Correct.
Q. So again I don't want you to guess, so you could say "I don't know"; right? You can say those -- You know how to say "I don't know." If you don't know, you don't know; correct?
A. I do know how to say I don't know.
Q. Okay. Now let's look at your 3D model, and --
MR. ASSAAD: Can you put up the boundary condition for the outlet...
(Discussion off the stenographic record.)
(Change in projected image.)
MR. GOSS: Are we in ANSYS right now?
MR. ASSAAD: Let me ask the doctor.
BY MR. ASSAAD:

Q. Doctor, does this look like ANSYS?
A. Yes.
Q. Do you have any dispute that this is not ANSYS?
A. No.
MR. GOSS: I'm not disputing it, I just wanted to know.
Q. Do you agree that --
MR. ASSAAD: Turn it so I can see --
Q. Do you agree that the red area is the boundary condition for the Bair Hugger inlet?
A. I do.
Q. Okay. And you agree that's mostly coming from the back -- underneath the drape and the back of the patient.
A. I do, which reminds me that I gave an incorrect answer earlier today where I had recalled it came from both. But seeing it re -- seeing it here, it's clearly predominantly the back.
Thank you.
Q. Now we could agree that the -- the -- I mean, you might remember and not remember stuff, we always can go back to the TRN file to get the geometry and the mesh and everything; correct? And the boundary conditions.

A. Yes.
Q. Okay. So even though you might be incorrect, I could rely on your TRN file for the boundary conditions, the time step, the material properties, the airflow, et cetera.
A. Yes.
Q. Okay. Now my understanding is that the entire mass flow -- the entire mass flow of the Bair Hugger unit is coming out of that area that looks -- that's red.
A. Yes.
Q. Okay. And on top of it is a drape; correct?
A. Correct.
Q. And the drape -- the drape is adiabatic; correct? You set it as adiabatic.
A. Correct.
Q. Therefore there's no heat transfer from that Bair Hugger inlet to the drape; correct?
A. Correct.
Q. And that's not what happens in real life; correct?
A. That is different from real life.
Q. So -- Okay. Real life there'll be some heat transfer and actually convective -- or plumes above the drape; correct? There'll be convective currents

above the drape as a result of the change in temperature of the drape.
A. I disagree.
Q. You disagree?
A. Yes.
Q. Okay. So you disagree with Gary Settles, who did schlieren testing that showed that there was thermal convection above the drape.
A. Well there's thermal convection everywhere in the room.
Q. Okay. But you disagree that the Bair Hugger caused thermal convection above the drape as Gary Settles has testified.
MR. GOSS: Objection, lack of foundation.
A. When you --
MR. GOSS: If you know, you can answer.
A. When you use the words "thermal convection" and "above the drape," what do you mean by "above the drape"?
Q. Okay. The Bair Hugger is going to heat the drape, correct, in real life.
A. It may.
Q. Okay. The Bair Hugger air is coming out at 41 degrees Celsius according to what you've put down; correct?

A. Correct.
Q. And the drape is a cloth drape, a surgical drape; correct?
A. Correct.
Q. You would agree by the law of thermodynamics that there'll be -- and heat transfer that there's going to be some heat transfer to the drape; correct?
A. Pardon me. (Witness reviewing exhibit.)
Q. I'm not talking about your report here. Let's just talk about engineering principles.
MR. GOSS: Okay. But if he needs to refer to his report to answer --
MR. ASSAAD: I am not talking about his report, sir. I'm talking about this picture up here and common heat transfer.
MR. GOSS: You have plenty of time left on the tape to get an answer. You can answer when you're ready.
MR. ASSAAD: Okay.
A. If sufficient amount of warm air presses against -- touches that drape, then I agree there would be heat transfer between the air and the drape.
Q. Did you look at the drapes actually? Did you touch the drapes?
A. Yes.

Q. The drapes are -- they have no form to them, they're just like a drape, like a blanket; correct?
A. Correct.
Q. Okay. And when you put the drape on a patient do you get that same type of nice curvature shape that has an open area to the back of the patient?
A. No.
Q. Okay.
A. It is not exactly that shape.
Q. Okay. Because gravity is going to be pulling that drape down; correct? Unless something's holding it up.
A. Well the drape is held up by clips.
Q. Not that drape. That drape -- I don't see any clips here on this drape. This drape, the white line is held up by clips; correct?
A. I agree. I thought that's the drape we were talking about.
Q. This drape I'm talking about here. [Indicating.] This drape is not being held up by anything; correct?
A. It's hard for me to identify a different drape than that drape in this image. I mean, I would -- look, I would agree with you that the exact shape

of that inlet --
(Screen image modified.)
THE WITNESS: Thank you.
A. I would agree with you that the exact shape of that inlet shown in red would differ slightly from in actual practice. I agree.
Q. "Slightly"? Or --
Do you know, sitting here today?
A. Well I will say this. I don't think the cha -- the difference would have a material impact on the results.
Q. I understand that's your opinion, sir. But let's just not make --
I don't want to know about what your opinions on the results. I just want to know, do you know whether or not that drape shape is accurate, sitting here today?
A. That drape shape would not be perfectly accurate.
Q. Okay. Did you take any measurements of the shape, or pictures?
A. No.
Q. And in fact you did not even create this; did you?
A. Correct.

Q. Okay.
A. I did not create it.
Q. 3M created this; correct?
A. 3M created the geometry.
Q. Which is the shape of the -- of the Bair Hugger inlet.
A. Yes.
Q. Okay. You never did any measurements, you yourself or anyone on your team, to determine the shape of the Bair Hugger inlet; correct?
A. That is correct.
Q. Okay. So sitting here today, you cannot independently verify the shape of that Bair Hugger inlet, you're relying on what 3M has provided to you.
A. I relied, for the three dimensional object -- all the three dimensional objects, on what 3M provided to me.
Q. So you, sitting here today, cannot independently verify that shape, you are relying on what 3M has provided to you.
MR. GOSS: Asked and answered.
A. Correct.
Q. Okay. Now based on this geometry it was 3M that came up with the assumption of the Bair Hugger inlet; correct?

A. No.
Q. "No"?
A. That was my decision.
Q. If you look at the geometry file provided by 3M, that red area is titled "Bair Hugger inlet"; correct?
A. I don't know if it is. But the decision to have the hot air enter into the room from that surface was my decision regardless of the name on the file.
Q. Okay. But did you change the Bair Hugger inlet if 3M created it?
A. I did not change the Bair Hugger inlet.
Q. So you accepted their --
You looked at what they did and you determined that that assumption is correct.
A. I determined that that assumption is reasonable, yes.
Q. Okay. And by "reasonable" you mean correct.
A. Correct enough to --
Q. Okay.
A. -- answer the question I was trying to answer.
Q. Okay.
(Discussion off the stenographic record.)
Q. You agree with me that this is -- what's

shown up on the screen is a depiction of a patient in a hip arthroplasty surgery.
A. Yes.
Q. Okay. And that is when he's on the side and both of his hands are pointed, and in this case to the left direction.
A. Correct. Or her hands. Correct.
Q. Her hands. I apologize.
To play it safe I'll use "the patient's hands."
And the Bair Hugger blanket is going over the entire -- Rephrase that.
On the right-hand side the Bair Hugger blanket, we can agree, is being tucked in underneath the table, or the pad.
A. Correct.
Q. And on the left-hand side we agree that the Bair Hugger blanket is being -- is going over the -- the arms of the patient; correct?
A. Correct.
Q. And it's being tied down; correct?
A. Correct.
Q. Okay. And just so I understand, it is your assumption that no matter where the air comes out of the Bair Hugger that it ends up coming out of the area

that's red.
A. Yes.
Q. Okay. So if I could look from underneath this table and I see an opening to where the arms are, you're saying that no air is -- no hot air is going to come down the side of this drape over here [indicating].
A. It is highly unlikely.
Q. What's your scientific basis behind that?
A. As I've explained earlier in this deposition, the way this device works in a setup like this is the arms are out, could be two arms or it could be one arm. The Bair Hugger is in a blanket that is inflated with warm air and there are tubes that run along the arm. Those tubes wrap around the arm, and that wrapping is facilitated by the covering, the cotton blanket and the other draping. Out of that Bair Hugger blanket small jets of air hit the skin and then essentially stop, so you have a stagnant zone of warm air. It is my professional opinion -- Well it's more than my professional opinion that that stagnant air wants to rise. It is my professional opinion that it takes, as one of the other experts said, the path of least resistance and it will want to go along a vertical channel, and that would be along the arm

because there are channels, there are spaces, and then out through the head and neck area. Now --
Q. Do you take into --
While you answer this question do you take into account that it's -- there's still jets of air pushing down at all times?
A. Yes.
Q. Okay.
MR. GOSS: Were you finished with your earlier answer?
THE WITNESS: What I was going to add is that it is likely, and I would say certain, that the warm air would emerge from an area which may not be identical to that red area exactly, but it would be close enough so that the calculations are valid.
Q. And that is the assumption that there is an opening where that red is for the air to escape; correct?
A. Incorrect. What I said in my statement was that the air would travel up the natural channels that exist between the blanket and the body and it would emerge by the head or neck area. I concede, and I conceded in my last answer, that the area through which the air ultimately enters the room would likely not be exactly that red area. In fact some of that

air would emerge by the chest and neck, by the chin. So there would be some differences, but they would be immaterial to the results of the analysis.

Q. Would you agree with me, though -- I mean you've seen Gary Settles' measurements; correct?

A. Yes.

Q. And when the Bair Hugger was turned on, and this was in a warehouse with no people around, that the temperature underneath the operating room table increased.

MR. GOSS: Objection to form, lack of foundation, misstates the evidence.

A. I think what he said is the temperature underneath the drapes and perhaps underneath the arm-boards, but I would a -- with that caveat, I would agree.

Q. So if the temperature under the arm-boards increased, that means the heat is -- not all the heat's going up through the channels and out the area that you say it goes out; correct?

A. It is correct that not all the heat, but let's not confuse "heat" with "air."

Q. Okay. Well maybe that's where our issue is here, and maybe we're coming to the final, like, area we disagree.

Just because air travels up doesn't mean all of the heat is transferring with the air to -- to the -- not all the heat's being exited out of the red area here on the diagram; correct?

A. I agree.

Q. Okay. In fact, in real life heat's going to be transferred to the drapes around it; correct?

A. Could be.

Q. It's going to be transferred definitely to the patient, because that's the purpose of the Bair Hugger.

A. Yes.

Q. Okay. It's going to be transferred to probably the arm-boards a little bit; correct?

A. Yes.

Q. Okay. And if the flow is not fast enough, it's going to be -- it's going to start transferring hot air -- the air below the -- the arm-board is going to increase over time until it reaches steady state based on the flow of air escaping and the amount of heat that's being transferred. Correct?

A. No.

Q. Well --

A. That's not the only explanation.

Q. What's the other explanation?

A. What Gary Settles showed --

Well first of all, he said he did not know whether there is air that actually went beneath the arm-boards. That's my best reco --

Q. I'm not talking heat --

I'm not talking air, we're talking about heat.

A. Okay.

Q. Heat.

A. Okay. If temperatures are higher below the arm-board, if temperature measurements are higher, what are the possible explanations? One explanation is what you've just articulated, that hot air may get below the arm-boards. That's an explanation. Another explanation is that heat, as you pointed out, and I neglected this in my model, heat conducts through solids. Heat would conduct through the arm-board and that heat would end up on the undersurface of the arm-board. A third explanation is that he reported he put the -- a thermocouple or a thermal sensor under the drape and underneath the arm-board somewhere. If his thermal sensor was between the drape and the arm-board, or if it was in visible sight of the drape, the sensor was warmed by infrared radiation. And remember, sensors sense the temperature around them,

they don't sense their own temperature.

So there's other explanations, --

Q. Okay.

A. -- including the one you've given, about how the undersurface of the arm-board could warm.

Q. Okay. And if you gave material properties to the patient, and to the arm-board, and to the drapes, your model would be able to show where the heat is going to; correct?

A. My model would be able to show heat conduction through solids, if that's what you mean.

Q. And heat conduction through air.

A. My model does show heat conduction through air.

Q. Okay. Okay. I understand that.

But you agree with me --

But -- But since you made the board adiabatic, the drape adiabatic, and all the -- and everything in that room adiabatic except for air, we can't see the transfer of heat to the arm-board, to the drapes, and then its effect on the air below the operating room table; correct?

A. We cannot see conductive heat transfer. However, you have to recognize that this model was a replication of an actual OR, and in an actual OR what

I recall from the setup was there was an arm, there was a pillow, then there was another arm and the blanket wrapped around.

I made a judgment that the heat would not transfer through the pillow. I don't know if Gary Settles had an insulating pillow in his experiment. I don't know if he provided that detail or perhaps my memory's faulty.

Q. Well you've read his report; correct?

A. Yes.

Q. And I asked you if his data in his report's reliable, and you said "yes." And now you're sitting here telling me that you don't know how he took temperature measurements?

MR. GOSS: Object to form.

A. No, that's not what I'm telling you.

Q. Well do you know where he took the temperature measurements? Did he take them between the arm and the -- and the board -- and the arm-board?

MR. GOSS: Lack of foundation. If you have a --

Q. If you don't know, remember you can just say the words "I don't know."

A. What Gar --

What I recall Gary Settles saying, Dr.

Settles saying, is that the temperature measurement was made under the drape, so clearly under the drape. What I recall him saying was that the temperature underneath the arm-board was warmer.

Q. 28 degrees Celsius; correct? At one point.

A. I believe that was the maximum.

Q. Okay. 26 to 28 degrees Celsius depending on where he took it; correct?

A. That is what I recall.

Q. Okay. So --

A. What Gary Settles --

Q. -- it definitely shows that heat is getting underneath the arm-board; correct?

MR. GOSS: Hold on.

A. What Gary Settles was trying to do was to explore the veracity of Elghobashi's boundary conditions by looking at temperatures. As I understand it, and if I'm wrong I'm happy to admit I'm wrong. As I understand it, he was looking to see if he could find temperatures of 41 degrees Celsius under the table as reported by Elghobashi, and that was the intent of his study. In that respect it is reliable.

Q. You agree with me that if you put a heat source in a room, its change in the temperature in the room is relative to time; correct?

A. Yes.

Q. Okay. So if I put a 1600 BTU heater in this corner and turn it on, it might take time until you feel its effects where you're sitting in the deposition chair; correct?

A. I agree.

Q. Okay. So time is definitely a factor with respect to heat flow.

A. It can be.

Q. Okay. Well again, with heat flow it would take time for this room with a 1600 BTU heater, powered heater, to come to a steady state in this room; correct?

A. I agree.

Q. Okay. And you agree with me that when you turn the Bair Hugger on it's going to take some time for the area -- if the area under the floor board is heated, to reach steady state; correct?

MR. GOSS: "Under the floor board"?

MR. ASSAAD: Or under the arm-board.

A. I would agree.

Q. Okay. And depending on when you take that measurement, unless you're absolutely certain you're at steady state it might not be the max temperature underneath the arm-board; correct?

A. Correct.

Q. Okay. And do you recall his deposition in which he could not identify any of the times that he took the temperature measurements?

MR. GOSS: Object to form, lack of foundation. If you remember from reading the transcript, you can indicate as much.

A. I don't recall that.

Q. Okay. And the fact that --

MR. ASSAAD: Let's turn this upside down so I can see looking straight down.

(Image manipulated.)

MR. ASSAAD: Okay. Right there is perfect.

Q. You agree with me that there is an opening to the arm-board in your model right underneath right here; correct?

MR. GOSS: Can you tell me what we're looking at right now? I'm sorry.

Q. Do you know what we're looking at, Dr. Abraham?

A. It's hard for me to see from this side of the room.

Q. All right. Feel free to get closer.

MR. GOSS: I don't -- I can't tell how you oriented it. I could understand what we were looking

at and then you tilted it, and now are we looking at from the ceiling down?
MR. ASSAAD: From the floor up.
MR. GOSS: From the floor up. Thank you.
MR. ASSAAD: And you could notice by the X/Y coordinates here.
MR. GOSS: If I knew anything about that I could, that's true.
Q. You agree with me you're looking from the floor up; correct?
A. I agree.
MR. GOSS: Thank you.
Q. Okay. And if you are looking from the floor up, you see that there's a pathway to that arm-board that's in that little area here. Do you agree?
A. Could you color the body so that I can -- Everything is blue now and I can't distinguish between different features.
Okay. So we're not looking at the body.
Q. I said the arm-board.
MR. ASSAAD: Can you get a better view of the...
(Image manipulated.)
BY MR. ASSAAD:
Q. I mean, based on the geometry do you agree

that that's the arm-board?
A. I would agree.
Q. Okay. And you agree with me that it looks like you could see into where the drape is there's an open area there; correct?
A. We can visually see that on the screen.
Q. Okay.
A. But it's not necessary that there's a flow path.
Q. Well the reason why there's --
You can sit down.
The reason why --
MR. ASSAAD: Let's go back to the boundary condition.
(Discussion off the stenographic record.)
(Image manipulated.)
Q. You agree with me that --
MR. ASSAAD: A little more to the right so I can see some red. To the right. Other way. Okay.
(Image manipulated.)
Q. You agree with me that the boundary condition set for the Bair Hugger inlet is for a mass flow of heat going out of the inlet, correct, perpendicular?
A. A mass flow --

There's no such thing as a mass flow of heat.
Q. Well there's a mass flow of air; correct?
A. Correct.
Q. And there's heat --
And that air's heated to 41 degrees Celsius; correct?
A. Correct.
Q. And it's coming out perpendicular to that boundary; correct?
A. I don't recall if I set the velocity to be perpendicular, but I would agree it comes out of the boundary.
Q. Okay. It comes out of the boundary.
There is no -- There's nothing in your model of hot air around the arms; correct?
A. Correct.
Q. There's no flow of hot air on the arms; correct?
A. I did not model the flow of the jets hitting the arm, that is correct.
Q. You agree with me that if you did model that, of hot air around the arms, that when we looked at the underside, the view going from the floor to the ceiling, that you'd see a change of temperature in

that area.
A. Not necessary.
Q. Not necessarily? Okay.
MR. GOSS: Well wait. Did you say "not necessarily" or "not necessary"?
THE WITNESS: Not necessarily.
MR. GOSS: Okay. Thanks.
Q. So you're telling me if I have hot air blowing at 41 degrees Celsius on my hand, okay, and I'm looking at it and it's coming --
Air is fluid; correct?
A. Air is a fluid.
Q. -- and if I'm looking at it from the bottom I'm not going to see a change in temperature in this area [indicating]?
A. That's not what I'm saying.
Q. What are you saying, then?
A. Remember -- and I believe this is true with Dr. Elghobashi's model as well -- I did not model the solids, which means if you look up from the bottom you're not going to see the temperature of the air.
So I am not saying -- I will agree with you that if I modeled the air jets impinging on the skin, if I modeled that air region you would see it.
Q. But you did model the air; correct?

A. Yes.
Q. Well there's air around the board; correct?
A. There is air in the blanket, and between the blanket and the skin.
Q. Okay. And some of the air goes around the board; correct?
A. I disagree.
Q. You disagree. Okay.
Is there any basis, scientific basis why you disagree except that based on your experience --
A. Yes.
Q. -- with forced-air warming blankets?
A. Yes.
Q. What's your basis?
A. I'll try to do a better job of explaining it, because I think it's -- multiple times. I'm going to use my arm and --
THE WITNESS: If you can't catch this on the screen, I apologize.
A. The way the person is sitting they're laying like this. [Demonstrating.]
Q. Is that how he's laying?
A. Well it's essentially this. They've got two arms out to the side and is --
Q. Is there anything between the arms?

A. As I recall, there's a pillow.
Q. Okay.
A. Okay. There are blank --
There is a hot warming blanket which wraps around the arm, and in fact I think a cartoon version of this was provided in Said Elghobashi's, maybe it was his supplemental report or something that I saw yesterday where he had these tubes around the arm. Okay? And that's -- that cartoon outlines this quite well, okay? So you have these tubes around the arm. The tubes have these little jets of air that are one millimeter in diameter, approximately. They hit the skin, they stop. We call that stagnation. So now you have a warm stagnant body of air.
Now the question is, where does it go? If I have warm air near my hands, is that warm air going to travel up my arms and then out the open space by my head? And mind you there is air jets all along the way. So there's some air being -- hitting the arm here, and stagnating. There's other air hitting the arm here. There's other air hitting the arm here. A tiny amount is at the hands, but there's air all the way along, and in fact in the center part of the -- the blanket. So you have air oozing out of this blanket very slowly, it hits the arms, it's stagnant.

Then what does it do? If you're hot air right here are you going to be able to go down to the bottom of the drapes and then emerge out into the room? That's possible. Or are you going to just migrate upwards along with buoyant forces? That is actually what happens. There is no physical mechanism that would force that stagnant warm air to go downwards to the floor and then come back up. It's the analogy that I used before; the match, or incense, or a cigarette. If you hold those things upside down, the smoke or the flame still rise.
Q. Are you done?
A. Yes.
Q. Okay. Let's talk about heat, though. Are you saying all the heat's going to go out the head and neck?
A. In my model all the hot air emerged by the head and neck. I did not allow heat to transfer by conduction, for example, through the arm-board.
Q. Okay. And we know through Settles' results that heat does travel by conduction and heats up the -- the -- underneath the operating room table.
A. We do --
MR. GOSS: Object to form.
A. -- not know that.

Q. Okay. So you disagree with Settles.
A. No.
Q. Okay.
A. I gave two explanations of how temperature measurements in the place he made them could be elevated, not -- one of them was not by conduction.
Q. Okay. But regardless of what method it was heated, it was done by the Bair Hugger.
A. I would agree.
MR. GOSS: Lack of foundation. You can answer if you know.
A. I would agree.
Q. I mean, conservation of energy, you need a heat source to increase temperature; correct?
A. I agree.
Q. Okay.
MR. GOSS: I'm sorry, Gabriel, can I take a bathroom break when you have a chance? Too much coffee.
MR. ASSAAD: If I said "no," would you be upset?
MR. GOSS: I'd be uncomfortable.
MR. ASSAAD: You can take a break.
MR. GOSS: Thanks.
MR. ASSAAD: Off the record.

THE REPORTER: Off the record, please.
(Recess taken from 5:09 to 5:16 p.m.)
BY MR. ASSAAD:
Q. So real quick a couple of things. Looking at that picture up there if you look on the left side it says -- it states, time, 1.2 seconds. Would you agree with me that the file that you provided to us was at a simulation time of 1.2 seconds?
A. No. I don't know if it was. That looks to be an expression that was made, and I can't recall if I made a time expression. Oh, I'm sorry. I thought you were looking at the bottom.
Q. No. The right -- left-hand side --
A. Yes.
Q. -- where it says "time."
A. I agree.
Q. Okay. So your model is basically a simulation of 1.2 seconds; correct?
MR. GOSS: Object to form.
A. The results shown here --
Q. Yes.
A. -- are the results after 1.2 seconds.
Q. Of simulation time.
A. Correct.
Q. Okay. Which is 1.2 seconds real time;

correct?
A. Correct.
Q. And as I understand it, the streamlines is a line based on the instantaneous velocity at a particular cell; correct?
A. Yes.
Q. Okay. It's not that you're following the air around the operating room and seeing where that particular air goes; correct?
A. It is an instant --
What the streamline is is an instantaneous --
Let me tell you how streamlines are made. The vectors which describe the flow direction and speed are all obtained at a time instant and then they are connected by their tangents, and that gives us streamlines. So it's an instantaneous trajectory of air.
Q. So one of the videos I believe lasted about three minutes, or three and a half minutes long that you provided in this case; correct?
A. I don't know that.
Q. Okay. Well the video is on YouTube. You've seen your videos on YouTube that 3M has put on with respect to your -- this CFD analysis.

A. I have seen the CFD analysis on YouTube.
Q. And you've created the YouTube videos which are about -- more than 1.2 seconds long; correct?
A. Correct.
Q. Okay. The fact that the video is -- say, for example, is three minutes long of streamlines, or two minutes, doesn't mean that you ran the model for two minutes; correct?
A. That is correct.
Q. Okay. And so it's your opinion today that you got quasi-steady state by running the model in 1.2 seconds.
A. Yes.
Q. Okay. Is it possible to run the model forward based on the TRN file?
A. Yes.
Q. Without the initial conditions?
A. Correct.
Q. Now the fact that this is the 264th time step, does that indicate to you what your time step was?
A. No. I don't -- Looking at this here, I don't see -- it doesn't tell me the time step and I don't recall, sitting here.
Q. Can you determine the time step by looking

at the ANSYS file?
A. Could you determine it? Yes, you could.
Q. How would you do that?
A. Well remember this file, the TRN file contains everything, in the sense that it contains the mesh, the geometry and the setup. So you could pull it into the setup.
Q. So if I told you you could take over this ANSYS program right now and determine the time step, that's something you could do?
A. I may be able to.
Q. How long would it take you?
A. Boy, I don't know how long it would take me.
Q. Well where would you look?
A. I would load this thing into the CFX, what's called the setup file, and I would look there.
Q. Okay. You used ANSYS Academic; correct?
A. Incorrect.
Q. "Incorrect"?
A. Incorrect.
Q. What did you use?
A. ANSYS Research.
Q. That's part of the Academics soft -- package; correct?
A. I recall them being separate. I mean, if

you show me documentation that they are part of a single suite, then I would defer. But I recall ANSYS Academic and Research as separate licenses and separate software capabilities.
Q. So to determine the time step you would load the TRN file into a CF -- CFX file --
A. Correct.
Q. -- to the CFX setup program?
A. Yes.
Q. Okay. Now in some of your images it shows "ANSYS 17.1 Academic," not on here but on the files that you sent. Does that sound familiar?
A. No. I don't recall that.
Q. I'm going to show you on my computer, and we could -- I'm just going to show it to you. This is what's been provided to me, and it says "ANSYS R17.1 Academic;" is that correct? [Showing computer screen to witness.]
A. Yes.
Q. Okay. Does that mean Academic that was used?
A. Well it's my understanding, looking at that, that it's the Research license that's -- I believe that's what the "R" stands for, and as you pointed out earlier, that may be part of the Academic suite, and

so I would concur. It appears as though it's the Research portion of the Academic license.
Q. And you agree with me that the ANSYS Research license is not allowed to be used for consulting; correct?
A. I believe that is true.
Q. Okay. And you actually use it for consulting; correct?
A. I disagree.
Q. So the fact that 3M was in litigation and hired you as an expert to do the CFD study, you don't -- that wasn't in your -- in a consulting role to 3M?
A. I was hired in an academic capacity to do the CFD.
Q. You were hired by Lori Cohen and Greenberg Traurig; correct?
MR. GOSS: Object to form.
A. I don't know who officially hired.
Q. Okay.
A. But my understanding is I was hired to do an academic study, which is totally appropriate using the Research license that I used. The expert witness work is a separate issue, separate payment, and there's no formal proposal.
Q. Okay. You were hired by the attorneys of

Greenberg Traurig to do your CFD; correct?
A. I don't know that.
Q. Who contacted you first?
A. I don't recall.
Q. Okay. But you have no disagreement that -- that ANSYS Research is not allowed to be used for consulting purposes.
A. I don't believe it is allowed to be used for consulting purposes.
Q. You understand that you were contacted in this case to do research with respect to a litigation that was ongoing in 2015.
MR. GOSS: Object to form, mischaracterizes his testimony.
A. I understand that I was contacted to determine whether a device like the Bair Hugger would interrupt operating-room airflow. I did understand that it was part of a litigation.
Q. And in fact when you got -- you did your experimental measures at -- at the OR, there were lawyers there; correct?
A. That is correct.
Q. Okay. Are you aware of law firms contacting universities to do research?
MR. GOSS: Just going to object to what

this may -- I don't see what this has to do with his scientific opinions in this case, --
MR. ASSAAD: Well it goes to his --
MR. GOSS: -- but if you can answer the question, then you may.
A. My understanding is 3M wanted to understand the airflow in an operating room, and that's an academic question with real academic significance. That study was performed as we normally perform studies where a fixed-cost grant proposal was given. That study was the basis for the computational fluid dynamics and for the journal paper publication.
Q. And all the consulting fees you were receiving on behalf -- from 3M directly is from you offering opinions based on that study done at St. Thomas; correct?
A. No.
Q. Well all that we discussed about today and all your opinions in this case is -- is with respect to your CFD analysis of the problem.
A. That is incorrect.
Q. Okay. What else?
A. For example, I read a lot of literature, I read depositions, I read expert reports, I performed experiments. So to say that all of my opinions -- I

-- To say, for example, my opinions about Said Elghobashi's work, that was not based on my CFD, so -- so it's incorrect to say that all of my opinions are based on the CFD.
Q. Many of your opinions are based on the CFD that you've given today; correct?
A. Some of my opinions are based on the CFD work that we have discussed today.
Q. Well we've barely -- we rarely talked about Elghobashi's report so far; correct?
A. That is correct.
Q. Okay. And you're using the results of your CFD analysis in formulating your opinions regarding -- some of your opinions in this case; correct?
A. I agree.
Q. Okay. And in fact you plan on testifying in trial regarding the CFD analysis you performed in this case; correct?
A. I am prepared to testify in trial based on these CFD results.
Q. And that's not research, that's consulting; correct?
A. Well that would be unpaid consulting, but yes.
Q. Okay. Because you're not getting paid for

trial testimony; correct?
A. Correct.
Q. Now --
MR. ASSAAD: Let's mark this.
(Abraham Exhibit 9 marked for identification.)
BY MR. ASSAAD:
Q. Exhibit 9 is a document titled -- with the Bates number Wagner 0000013. Have you received this document before?
A. Yes.
Q. Okay. And this was authored by Andrew Chen, correct? If you look at the bottom left-hand corner?
A. Yes.
Q. Okay. And is this the document where -- in which you obtained your initial boundary conditions with respect to mass flow?
A. "Initial" and "boundary conditions" don't go together.
Q. I'm sorry. Your boundary conditions.
A. This is the document which confirmed my understanding of the boundary condition for the Bair Hugger. So I would say it confirmed my boundary conditions.
Q. Okay. And if you look at pages 23, 24, 25

and 26, and 27 and 28, those are the diagrams and pictures of the OR that's represented in your CFD model; correct?
A. I believe that's true.
Q. Okay. And the geometry which is on page Wagner 28 is the geometry that was most likely provided to you by 3M; correct?
MR. GOSS: Lack of foundation, but you can answer if you know.
A. I don't know if that is the geometry.
Q. Okay. But it's very similar; correct?
A. (Witness reviewing exhibit.)
MR. GOSS: You're on page 28?
MR. ASSAAD: Yes.
A. Yeah, it is --
Yes. I would agree.
Q. Okay. And in fact the -- Never mind.
Do you agree that it seems like a study was done by 3M that was memorialized in this memo on October 15, 2015?
A. Yes.
Q. Okay. And they did schlieren testing at 3M.
MR. GOSS: Wait for a question.
Q. Correct?
MR. GOSS: Objection, lack of foundation.

MR. ASSAAD: I'll withdraw that ques --
Q. Do you agree that this model contains schlieren photography?
MR. GOSS: The memo.
MR. ASSAAD: Yes.
MR. GOSS: You said "model."
MR. ASSAAD: Huh?
MR. GOSS: Sorry. You said "model." You meant "memo."
A. Yes.
Q. Okay. And if you look at page Wagner 19, you agree with me that the bottom image shows a schlieren photography of air from a rolled-up Bair Hugger blanket; correct? Figure 8.
(Interruption by the reporter.)
A. What's your question again?
Q. According to Figure 8 it's a schlieren picture of air emitted from the end of a rolled-up Bair Hugger blanket; correct?
A. That's what this figure shows.
Q. Okay. And you have no reason to disagree with that; correct?
A. Correct.
Q. Okay. And in fact the schlieren mirror is 26 inches in length; correct?

MR. GOSS: Object to the lack of foundation. If that's what the document shows, you can testify to that.
A. 26 inches is stated in the document.
Q. Okay. Let's look at Figure 9 on the following page, Wagner 20. Figure 9 says, "Air departing the region around the blanket representing the neck region of the blanket." Do you see that?
A. Yes.
Q. And you see a schlieren photography and something there that says 6 inches; correct?
A. Yes.
Q. Okay. So you would agree with me that the -- the disruption or the -- the refractiveness of the -- the light or the imaging, which is what schlieren shows --
You understand that; correct?
A. Yes.
Q. -- is when the air is coming out of the neck region of the blanket it's a little over 6 inches; correct?
MR. GOSS: Object to the lack of foundation, lack of expertise in schlieren imaging. You can testify to what the document shows if you understand it.

A. Can you restate your question?
Q. Let me ask. Do you --
Have you ever used schlieren photography before?
A. No.
Q. Okay. Do you understand schlieren photography?
A. I understand the basics of it.
Q. Okay. So the fact that if you look at the -- the -- Strike that.
Now with respect to -- Let's go to page 15. Figure 2 says a "System of Bair Hugger Model 750 blower and Upper Body Model 522 blanket integrated with flow measurement system pitot tube in a flow development pipe and" --
(Interruption by the reporter.)
Q. -- with flow measurement system pitot tube, P-I-T-O-T, in a flow development pipe and "Magnehlic manometer."
A. It's "Magnehlic," but yes.
Q. Okay. And in fact if you look, you agree with me that 3M did testing to determine the initial conditions to be used in a CFD analysis.
A. I'm not clear in this document where it says that.

Q. Okay. If you look at page Wagner 14, under "Bair Hugger Product Testing" it states: Testing the Bair Hugger product for volumetric flow was necessary to determine the boundary condition for a CFD model of a blanket with an actual operating room.
Did I read that correctly?
A. Yes.
Q. So you agree with me that they did product testing to determine the -- a boundary condition for the -- for a CFD model; correct?
A. Yes.
Q. And it says: A mass flowrate inlet condition was used in the operating room CFD model as the operating room supply air inlet boundary condition as well as the Bair Hugger air inlet using faces at the inlet boundary.
Did I read that correctly?
A. With the exception of you said "at," I think, or -- yeah -- yes, you read that correctly.
MR. GOSS: I'm just going to insert an objection that 3M may have done some testing internally for attorney-client purposes, we would assert work-product protection over that and reserve the right to claw back any portions of this memo that relate to that and do not have any relevance to Dr.

Abraham's work or his use of the document.
MR. ASSAAD: Okay.
Q. So it states here under the last paragraph: "For the Upper Body (Model 522) with one side rolled up," -- And that's the case that you used in your CFD modeling; correct?
A. Correct.
Q. Okay.
-- "a mass flow rate of 0.237 kilograms per second was calculated and used as an inlet condition for the area around the arms in the OR CFD model."
Did I read that correctly?
A. Yes.
Q. You did not have an inlet condition around the arms of an OR CFD model; correct?
A. Correct.
Q. Okay. For a fully open blanket and draping arrangement, 0.0255 kilograms per second, open parentheses, half on arms and half on the other side of the -- of head, closed parentheses, was used in the second OR CFD model as a Bair Hugger inlet condition.
Did I read that correctly?
A. Yes.
Q. So according to what 3M did, it's my understanding that based on the Bair Hugger product

testing that when the Bair Hugger is folded over, the mass flow rate of .0237 kilograms per second was going over the arms; correct?

MR. GOSS: I will object again that any internal testing --

MR. ASSAAD: I got your objection.

MR. GOSS: -- described in this document --

MR. ASSAAD: Don't waste my time, please. Stop the clock, then. I don't want to waste my time. I got your objection, it's already been said, we don't need to reiterate the record.

MR. GOSS: And this witness has no foundation. I think he's already said he has no foundation with respect to any internal CFD testing that 3M did.

Q. Go on.

Did I read that correctly?

A. I don't recall what you read, actually.

Q. The question was: Do you agree with me that according to what 3M's product testing did, when the Bair Hugger blanket is folded over, similar to what you did in your CFD, that they calculated that there is a mass flow over -- or on the area around the arms and that was used in the OR CFD model; correct?

A. That is what it says.

MR. GOSS: Same objection.

Q. Okay. And when the blanket was open, that based on testing they calculated a mass flow of .0255 kilograms per second, which was half on the arms and half on the other side of the head; correct?

A. That's what the document says.

Q. And in fact you used this document, sir, if you look at page 5 of your report where you took the measurements from this document and applied it in your report. Right above where it says "Step 5."

MR. GOSS: You can --

Q. I'll read it to you. Page 5, above where it says "Step 5 of the Analysis..." "Measurements were made using a Bair Hugger Blower model 750 and an Upper Body Blanket Model 522 to determine the flowrate through the system. The experiments" -- I'd like to say that word again, "experiments" --

MR. GOSS: Okay.

Q. -- "found a flow rate" --

MR. GOSS: You don't have to make faces at me, Gabriel.

Q. -- of .023 kilograms per second for a partially obstructed blanket and .025 kilograms per second for a fully open blanket."

Is that correct?

A. Correct.

Q. And you're basing it off the experiments that 3M did which is marked as Exhibit Number 9; correct?

MR. GOSS: Object to form, mischaracterizes his testimony. He has already answered this.

If you have a different answer, you may offer it.

A. My flow rate was based on my own experience of years working with these types of blankets. As -- As I said earlier -- As I said earlier in this deposition, this -- these results confirmed my knowledge of the airflow.

Q. I mean, we're talking about a flow rate going out to three decimal places. Correct? Am I correct? Three decimal places; correct?

A. Two significant figures.

Q. Okay. But three decimal places; correct? "Two significant figures." You want to use two -- That's fine.

Two significant figures of a difference of .002; correct?

A. Are you talking about the 3M document or my document? Because the 3M document uses different numbers. I actually didn't use their numbers.

Q. For the flow rate of a Bair Hugger blanket which is folded, you have -- or partially obstructed -- Would you say that's equivalent to being folded?

A. Yes.

Q. -- you have .023, and in the Bair Hugger testing they have 0.237; correct?

A. Correct.

Q. Okay. And for a open blanket you have .025 and they have .0255; correct?

A. That is correct.

Q. Okay. So you're telling me that based on your experience with forced-air warming blankets that you predicted these numbers that were similar to 3M? Is that what you're saying here today, sir?

MR. GOSS: There's no -- You asked him the question, there's no need for you to raise your voice, and I will --

Q. Well there's nothing in these papers --

MR. GOSS: -- and I will try to keep mine down, too.

Q. There's nothing in the papers to answer that question. So I'm saying because this is off of your memory that you got these numbers; correct?

A. No. That's not what I'm saying.

Q. So where'd you get your numbers from?
A. In fact I didn't use their numbers. These numbers are different.
What I'm saying, I've done many experiments on Bair Hugger and similar blankets. My recollection was that the -- the -- I recalled the flow rate through the Bair Hugger, it was very close, not the same as the Technical Data Sheet that we've got here, that confirmed that my answers -- my recollection was correct. But you notice I didn't take their numbers. I did not use their numbers as inputs.
Q. You just took it out to two significant places.
A. Well had I used their numbers, I -- and had I rounded, I would have had .024, and I have .023. They're close, but they're not the same. I did not solely rely on this. This confirmed my understanding.
Q. Where are the calculations or the documents that you got your numbers from?
A. It's from past work that I've done on Bair Huggers.
Q. Okay. So you have done work on a Bair Hugger 750 blower and a 522 blanket.
A. I didn't say that.
Q. Do you agree with me that every blanket will

have a different mass flow rate because of the resistance to the motor?
A. That is correct.
Q. Okay. And you agree with me that the 750 has a different volumetric flow without a blanket than the 505 or the Smiths Medical or any other non-750 blower out there.
A. I agree --
Q. Okay.
A. -- that blowers have a different flow rate.
Q. So sitting here today you're going to testify to a jury in Minnesota that you've obtained these very similar numbers to the Bair Hugger experiments that -- of Exhibit 9 based on your memory and experience of working with different forced-air warming devices.
A. What I can tell you is I had the number in my mind of what the flow rate through these systems were. I used this -- [Exhibit 9} I received this datasheet and it verified, hey, this is very close, and so I used my numbers.
Q. But your -- you can't reproduce your numbers from some physical document or even notes.
A. That is correct. I cannot.
Q. Okay. And in fact -- Strike that.

And based -- If you look at the last page of this document, you agree with me that they used -- if you look at the second-to-last sentence, they used Star CCM+ as the commercial CFD code.
MR. GOSS: Objection, lack of foundation.
You can testify as to whether he read that correctly.
A. It says here: "In all scenarios Star CCM+, (a commercial CFD code) was used to model the air flows."
Q. I'm sorry. I missed what you said.
A. I read the sentence. I confirmed what the sentence said.
Q. Okay. And they actually used a polyhedral mesh of 12 million and some cells; correct?
A. That is --
MR. GOSS: Again, lack of foundation, and I'm going to actually stop any more questions about the CFD which was done internally which again we are asserting work-product protection over. He has not testified that he has seen any of it or relied on any -- any CFD imaging that may have been done internally by 3M.
MR. ASSAAD: Well first of all, you referenced this document early on in this deposition

about a document produced by Jennifer Wagner; correct? And this was --
MR. GOSS: I'm not being deposed, Gabriel. You can ask him the question.
MR. ASSAAD: Well we've had the records indicate it, and you've had this document -- you provided this document way back in January and now you're claiming attorney work product?
MR. GOSS: You've had this document a long time. I'm saying that the references to CFD that were done internally, that is attorney work product and we reserve the right to claw it back.
And you can ask him about what he considered from this document with respect to his opinions, but other than that I'm going to instruct him not to speculate about anything in here that he doesn't know anything about.
BY MR. ASSAAD:
Q. You understand CFD modeling; correct?
A. Yes.
Q. Okay. You understand that if you look at here they used a RANS model, item number 7; correct?
MR. GOSS: I'm going to instruct you not to answer anything based on lack of foundation and no relevance to your opinions in this case.

Q. Correct?
MR. ASSAAD: Are you instructing him not to answer?
MR. GOSS: Right.
MR. ASSAAD: Okay.
Q. You agree with me that 3M used an ideal gas and did not use the Boussinesq according to their -- their -- the air physics that were followed; correct?
MR. GOSS: Is that something that you considered for your opinions in this case?
THE WITNESS: No.
MR. GOSS: Then I instruct you not to answer.
Q. Okay. You agree with me that they used a K-epsilon two-layer buoyancy driven XU option; correct?
MR. GOSS: Is that something that you considered for your work in this case?
THE WITNESS: No.
MR. GOSS: Then I instruct you not to answer.
Q. This document was provided to you; correct?
A. Correct.
Q. You received this document previously; correct?

MR. GOSS: That's been well established, but --
MR. ASSAAD: I'm asking him.
MR. GOSS: -- you can answer again.
MR. ASSAAD: Let me set up my case for the motion.
A. Yes.
Q. Okay. And actually, Jennifer Wagner, who assisted you in this case in some of the -- when you went to the OR, has also been provided a copy of this document.
A. I don't know if that's true.
Q. Okay. Well the fact that it says "Wagner 0000013," I represent to you that she's the one that produced this document.
MR. GOSS: You can wait for a question.
Q. And you reviewed this document and considered it with respect to your opinions; correct?
MR. GOSS: You can testify to what you considered out of this document with respect to your opinions.
Q. You were provided this document before you did your CFD analysis.
A. I don't know the answer to that. I don't know if I was.

Q. Well it's dated October 15th, 2015; correct?
A. Yes.
Q. Okay. And you said you compared your numbers to the numbers that were in this document regarding mass flow; correct?
A. What I said was that --
Q. Let me rephrase. Your numbers --
Your memory and your experience confir -- was confirmed by the numbers in this document.
A. My memory was confirmed by the flow numbers in Table 1 of this document.
MR. ASSAAD: Let's take a break.
THE REPORTER: Off the record, please.
(Recess taken from 5:50 to 5:58 p.m.)
BY MR. ASSAAD:
Q. I'd like to turn to page 5 of your report. Are you there? I want to talk about validation, the validated method; correct? That's what step 5 is; correct?
A. Yes.
Q. Okay. It states here that you took measurements of the room and you find it -- you found it to be 61 degrees Fahrenheit during the procedure; is that correct?
A. Correct.

Q. Where'd you take the measurements?
A. Multiple locations.
Q. Where?
A. All -- I walked all the way around the perimeter of the OR table multiple times and I took measurements at different heights.
Q. You agree the image that we put up regarding the temperature differences in the room, that many of the temperatures around the OR table were less than 61 degrees; correct?
A. Some temperatures were slightly less than 61.
Q. Okay. And by the way, do you believe that your CFD showed -- only has 8.1 million cells?
A. I believe that's true.
Q. If the CFD showed that there was over 9 million, would you disagree with that, the TRN file?
A. No.
Q. Okay. So this would be incorrect about 8.1 million cells then; correct? That you've testified earlier and that's in your validation.
A. Well would -- if -- if my TRN file shows that I have 9 million cells, it means that, if anything, it's more accurate.
Q. It just means that there's more cells. It

doesn't mean it's more accurate unless you do a quasi-steady solution judgment; correct?
A. That --
Q. I mean more cells don't mean it's more accurate; correct?
A. That's not true. Most -- More cells, in almost every case, means more accurate. And in fact Elghobashi agreed with that.
Q. Well if you have --
You did 60 million cells. Are you telling me the 60-million-cell solution is more accurate than the one provided in your report?
A. Adding more cells always has the potential to make your results more accurate.
Q. "Potential."
A. That's right.
Q. It doesn't mean it's more accurate. You might get the same solution whether you have 60 million cells or 5 million cells.
A. Yes, you're right.
Q. Okay. So the -- So that statement is incorrect that the more cells automatically means it's more accurate. It may be more accurate, but it might not be.
A. Correct. And I don't think I used the word

"automatically."
Q. Okay. So sitting here today I cannot replicate where you took temperature measurements in the room; correct?
A. I -- Well what you can --
What this document says and what's implied by this document is multiple temperature measurements were made, and the average was 61 Fahrenheit.
Q. I understand that. But if I want to replicate exactly what you did, I have no way of knowing exactly where you took the measurements; correct?
A. That is correct.
Q. Okay. And also you took measurements three inches off the floor and you measured that to be 60 degrees Fahrenheit; correct?
A. That is correct.
Q. And where were those measurements taken?
A. Those measurements were directly underneath the head.
Q. Okay. Was it one measurement or two measurements, or three?
A. It would have been multiple measurements.
Q. Sitting here today, do you know how many?
A. It would have been enough measurements so

that I could get an average temperature that -- that -- I mean there's obviously some short-term time-wise fluctuations. This -- This number represents enough measurements that I got a steady temperature variable.
Q. But you can't tell me how many; can you? Sitting here today.
A. Correct.
Q. And you have no notes to indicate actual -- the numbers that you took down or the measurements; correct?
A. Well the numbers that I took down are the numbers that we see here.
Q. But to do an average you have multiple numbers; correct?
A. You can have the --
And I don't know if I did this. You can have the software do the averaging for you. And in that case you wouldn't extract the individual numbers.
Q. Okay. But you need individual measurements to have an average; correct?
A. That is correct.
Q. Okay. And either the software did it or you did it to --
A. Correct.
Q. Okay. And sitting here today we don't have

what those individual numbers are, and we will never be able to find out what those individual numbers are exactly; correct?
A. Based on this document what you would know is that the temperature, the average temperature at that location is 60 or 60.5. You would not have the individual measurements that went into that number.
Q. So you agree with me. Sitting here today, I cannot calculate what the average is based on individual measurements because we do not have those individual measurements; correct?
A. I disagree.
Q. How would I calculate an average unless I have the numbers?
A. Well there are two sets of numbers here. One of them is calculated, and that means from the CFD model, so you could get that directly.
Q. But validation is based --
Your validation is based on experimental results; correct?
A. Yes.
Q. So if I want to test whether or not your experiments indicate that the temperature three inches above the floor -- the average temperature above the floor was 60.5 degrees, I would need the individual

numbers so I could calculate that average; correct?
A. If you wondered whether I know how to do an average and you doubted that, then yes, you would need the individual numbers.
Q. Okay. Because to calculate an average I need actual numbers to calculate an average from; correct?
A. That is correct.
Q. Okay. And that's not even college mathematics, that's like middle school maybe, or elementary? I don't know, but.
MR. GOSS: That's my level mathematics.
Q. So --
And you agree with me that as an engineer -- as -- it's good to, when you take measurements, to document them contemporaneously when you take the measurements; correct?
A. If it's needed. If that documentation's necessary.
Q. Or if you're writing a report -- an expert report in litigation and someone might want to reproduce how you calculated the average that would be something important to do; correct?
A. Calculating the average is so trivial I wouldn't have even thought of doing that.

Q. Okay. Now you also did -- you used a fog generator to do fog -- to do tests on the airflow; correct?
A. Correct.
Q. Okay. And the fog generator was provided by 3M; correct?
A. Correct.
Q. Okay. Have you ever used a fog generator before?
A. Yes.
Q. Do you recall --
Do you know how long the -- you'd be able to see the fog in a high velocity or turbulent flow?
A. It depends.
Q. Depends on what?
A. Depends on the speed, depends on whether the flow is disbursing, so the patterns of airflow, depends on the level of turbulence.
Q. And did you calculate or determine how long you would be able to see the fog in the test that you conducted?
A. No. It was not necessary.
Q. I understand that you believe it's not necessary. But sitting here today, if I want to replicate something I need to know all the facts and

how things are done. So I understand you don't think it's necessary, but you never calculated those numbers; correct?
A. Well I'm struggling to understa --
Q. I'll withdraw that question.
Did you ever talk to the manufacturer to see whether or not they recommended using this fog generator to determine whether or not it was a proper device to observe the airflow in an operating room?
A. That was complex. Could you re-ask the question?
Q. Did you talk to the manufacturer of this device, the fog generator, to determine whether or not this device would be a -- a device that could produce results that you could see in an operating room?
A. No. It was not necessary.
Q. Are you aware that the -- the person that provided the device to 3M stated that in turbulent or fast-moving air the fog generator would dissipiate in two feet due to mixing?
MR. GOSS: Object to form, lack of foundation.
A. I've never heard the word "dissipiate."
Q. Or dissipate. I'm sorry.
A. Could you read the sentence again?

Q. Are you aware that the person -- the company that provided the fog generator to 3M indicated to 3M that, in fast-moving air or turbulence it dissipiates in a foot or two due to mixing with the air?
MR. GOSS: Object -- Same objection.
MS. ZIMMERMAN: Dissipates.
Q. Dissipates.
A. I'm not aware that they said that. I would say it begins to di -- that it dissipates all the time, but. So I don't know what the word "dissipates in two feet," I don't know what that phrase means.
Q. Which means that in turbulent air you might not be able to see the fog because it dissipates in a foot or two -- a foot or two.
MR. GOSS: Objection, lack of foundation with respect to this document, and misstatement.
You can testify to it if you know the answer.
(Abraham Exhibit 10 marked for identification.)
BY MR. ASSAAD:
Q. What's been marked as Exhibit 10 is Wagner 0000001 that was produced in this case, and if you look, it's an email from Mr. Campbell from cleanroomfogger.com, or Clean Room Fogger, to Mr.

Fowler at GT Law. Do you know Mr. Fowler?
A. That name sounds familiar.
Q. If you look at paragraph two, it states: "At the other end of the scale in fast moving air or turbulence it dissipates in a foot or 2 due to mixing with the air."
Were you told that information regarding this fog generator that you used?
A. I was not, and it wasn't relevant.
Q. Okay. Well you saw the intensity model done by Dr. Elghobashi; correct? In his report.
A. I recall turbulence intensity calculations.
Q. Okay. If Elghobashi is correct in his report, you would agree with me that there is a -- there is -- there's more than two feet distance between underneath the drape and the surgical site; correct?
MR. GOSS: Object to form.
A. I don't understand that question.
Q. Well there's more than two feet of distance that air would have to travel between underneath the operating room table where the drape is, where the drape -- the end of the drape, and where the knee was in Dr. Elghobashi's model. You agree?
A. Are you asking --

I think you're asking is the physical distance between the bottom of the drape in his model and a knee more than two feet.
Q. Yes.
A. Is that what you're asking?
I believe it is more than two feet.
Q. Okay. So if the fog generator dissipates within one or two feet according to what Mr. Campbell states in this email, it's possible that you could use the fog generator and you're not going to see anything occur two feet away from where you insert the fog in a turbulent -- in turbulence.
MR. GOSS: Objection to form, calls for speculation.
A. I disagree. This document, when I read this document I see the words "fast-moving air" or "turbulence." What that means is high turbulence. What this person is saying is, look, this may not be the right device to use in those situations. Okay? They talk in other places in the email about the fog lasting a long time. For example, they say in the very same paragraph: "A few feet from the filter it can last up to 10 feet." So what this person appears to be warning Mr. Fowler of is, this device may not provide good visualization of airflow. That's what

they're saying. So then the question is, does it? Does it adequately visualize airflow? And the fact is, it does, and we showed that in our operating room FloViz experiments.
THE VIDEOGRAPHER: Ten minutes.
Q. What test did you do to state that it would show -- it would have enough life in it, I guess, for lack of a better term, that you could see the fog within more than two feet in a turbulent flow in the operating room?
A. Well first of all we have visual evidence. But secondly, the distance -- whether it can display fog in a visual manner for two feet or not is immaterial. What matters is does it display the fog long enough for long enough distances so that you can ascertain whether the Bair Hugger has an effect on flow. And it was --
Q. And you would agree --
MR. GOSS: Let him finish.
MR. ASSAAD: I thought he was done.
MR. GOSS: Thank you.
THE WITNESS: Thank you.
A. And this fog device, in my professional opinion, was able to show fog that extended long enough to provide that conclusion.

Q. But sitting here today you do not know how long the -- the fog generator will last in a -- in turbulence that may be found in an operating room.
MR. GOSS: Object to form.
A. No one can say that because there's -- I mean, what this -- what this person is doing is they're warning you. They're saying, look, this device, which they appear to be selling, sometimes has fog that lasts a long time and sometimes it doesn't, so if you have fast-moving air or turbulence you might want to be careful.
Now the fact is we saw it last longer than two feet, and that tells me that we don't have much turbulence.
Q. Did you take any measurements?
A. Measure --
Q. Did you take any measurements to say, look, we consider this lasting four feet or five feet? Visual measurements.
A. There are visual measurements of how far it lasted in the videos.
Q. With respect to --
Are you familiar with the publication titled Resistive-Polymer Versus Forced-Air Warming: Comparable Efficiency in Orthopedic Patients, authored

by Sebastian Brandt?
A. I don't recall if I've read that one. It's possible, but I don't recall.
Q. By the way, are you aware that every single study that looked at either particles or neutrally buoyant bubbles showed an increase in bubbles or particles over the surgical site when the Bair Hugger was on?
MR. GOSS: Object to form.
A. I don't know about "every single study." I'm aware of some that report to show that, and many of them I'm not impressed with. I believe that there are flaws in the papers.
Q. What about the study that was funded and done by 3M?
A. There was a study funded and done by 3M, and that study, if I recall correctly, had particle differences within the uncertainty of the observations, so essentially the same. And also if I recall -- and I'm doing this from memory, and I shouldn't be doing this -- but if I recall, when heat was turned on in some cases the particles went down. So -- And then finally, as I recall, every scenario that they looked at met the protective standard.
Q. The protective effect.

A. They may have called --
Q. The DIN standard. The DIN standard.
A. I believe they used the DIN standard, but I can't confirm.
Q. Hypothetically speaking if you were to find out that the particles in the 3M-funded study increased by a hundred-fold, would that affect whether or not, in your opinion, the Bair Hugger had an effect on the downward flow -- the unidirectional downward flow?
MR. GOSS: Object to form, incomplete/improper hypothetical, calls for speculation.
A. I would need to see the study to assess its quality.
Q. Well you've seen the study, correct, and you said it was within the margin of error.
A. Wait. Are you talking about a hypo --
Q. I'm talking about the --
A. Oh.
Q. I'm talking about the Sessler study.
A. I'm sorry. I thought you were talking about a hypothetical study.
Q. Well I'm saying if that same study indicated that the particle counts increased by a hundred times

with the same methodology, the same measurements, would that change your -- would that have an effect on your opinions in this case of whether or not the Bair Hugger had an effect on the unidirectional downward flow?
MR. GOSS: Same objections as before.
A. My recollection of that paper is that the results were within the uncertainty bounds, which means you could not say which scenario had more particles.
My other recollection is that that study --
Did that study ever test the composition of the particles? I -- I don't recall that they did. And I don't believe that that study had humans involved. So there's a number of questions that I would have about the study, I would need to see it. But what I recall is that they were -- the results were within uncertainty.
Q. By the way, what do you mean by "significant"?
A. It depends on the context.
Q. So the term "significant" depends on the context with you?
A. Yes. For instance, it could mean statistically significant, and it could mean

qualitatively significant.
Q. Your opinion in your conclusion says: "My opinion is that forced-air patient warming does not disrupt airflow in a way that would present a significant risk of infection."
What do you mean by "significant" in that statement?
A. I mean that in the --
Oh, I was just waiting till you --
Q. No. Go ahead.
A. That statement does not refer to statistical significance. In that sense it means meaningful, or non-negligible.
Q. Okay. It doesn't mean any clinical significance; correct?
A. Correct.
Q. Okay. It just means to you meaningful significance.
A. That's right.
Q. Okay. And what the is the basis for this opinion?
A. I have a lot of opinions.
Could you read this one again so you can refresh my memory? It's late in the day.
Q. "My opinion is that forced-air patient

warming does not disrupt airflow in a way that would present a significant risk of infection."

A. It means what it says, that airflow from a device like the Bair Hugger does not stop the downward airflow from the ventilation system from washing over the surgical site.

MR. GOSS: He asked for the basis of that.

THE WITNESS: Oh, the basis?

Q. Yeah. Is it your CFD study?

A. That would be one of the bases.

And I apologize for not listening carefully to your question.

Q. Does the use of your term "significant" in that context, in that opinion, mean you recognize there may be some risk of infection?

A. No.

Q. Because you used the term "significant" risk, not "any" risk.

A. Correct. I used that term.

Q. And you're not a neurobiologist; correct?

A. Correct.

Q. And you don't -- you don't hold yourself out as an expert in microbiology; correct?

A. Correct.

Q. So sitting here today you don't know how

many bacteria or CFUs could cause a -- could be a significant risk of infection to a person that's having an implant surgery; correct?

A. That is correct.

Q. Okay. And -- Does the fact that Memarzadeh, that showed a slight disruption in laminar flow using the 505, did not use the 750 in his study and that might show a more increased disruption of laminar flow? If you recall?

A. Is this the Memarzadeh study where he had the air jets just emerging from the top of the patient?

Q. Yeah.

A. So there was no draping on it?

Q. Yes.

A. Boy, that's so different from this case.

Q. I think we can agree on something.

That's a flaw by not having the patient being draped because the drape would affect airflow; correct?

A. If your model --

So he may have been modeling a different surgery. I don't -- I don't recall what he was modeling.

Q. Okay.

A. And I don't recall the in -- the question -- the scientific question he was trying to ask. So without looking at the paper I'm not prepared to say it was a -- it's a flaw in his model or not.

Q. But if you didn't use drapes in your model, that would be a flaw; correct? Because you want a model as accurate as possible.

A. No. I've never said that. You need to model the things that matter.

Q. Okay.

A. And some things matter.

So, for example, the anesthesia screen matters. I mean, look, if I had the air oozing vertically outwards without a drape I think that that would matter, but that's not how I understand these surgeries are done.

MR. ASSAAD: That's all I have.

MR. GOSS: All right. A couple questions for you, Dr. Abraham.

Should we -- I guess should we trade places, or does it matter?

(Discussion off the stenographic record.)

EXAMINATION

BY MR. GOSS:

Q. You brought some papers with you here today;

correct, Dr. Abraham?

A. That is correct.

Q. All right. And within that group there were a couple of publications by Apte. You recall those?

A. Yes.

Q. All right. And you can refer to them if you need to.

Why did you bring those papers?

A. It's my understanding that Apte is the person who actually did the calculations, or perhaps more accurate to say his graduate students. It's my understanding Dr. Elghobashi did not do the calculations himself. It's my understanding, based on sitting in the deposition, that it wasn't Elghobashi's software.

It is clear from Elghobashi's report that he relied upon the Apte work and he relied upon citations to Apte's code that reportedly showed validation. And I would argue that when you look at these papers cited by Elghobashi, they do not show validation.

Q. Why not?

A. Validation is best demonstrated by comparing your results against an experiment. That's the classic form of validation. And I can look at -- I am citing Apte, Mahesh, Gorokhovski and Moin, 2009. And

I believe this was cited in the Elghobashi report as validation. In Figure 4 there's a comparison of simulations to experiments, and there is an "a" and a "b" part. And what we see is that there is a experimental error bar which is listed in the caption, and in some cases the simulation is outside of the error bar.

Q. By how much?

A. Well in -- in Figure 4 a it's hard to determine, maybe a hundred percent in some cases. But then there's Figure 5, the very next figure, and the caption says, "Comparison of normalized droplet mass-distribution at different axial locations." By the way, that's particle tracking. And there are experiments, and then there is the so-called LES calculation which I understand Elghobashi used in this case. And the errors there are approximately 400 percent.

There was another Moin and Apte paper which shows the same experimental work. So this isn't just in one paper, it's in multiple ones.

Q. Is that paper cited by Dr. Elghobashi?

A. Yes, it is. And it is Moin and Apte 2006. And what's interesting about this second paper is we see something very interesting about the software.

Dr. Elghobashi mentioned in his deposition, once you validate for one case that's more complex and has all the ingredients, he said, you don't need to revalidate it. And I would argue strongly against that.

This is a case, it's a simulation that appears to be performed over a few centimeters' fluid domain, so a very small object, and the simulations were carried out to three milliseconds, and we see that in Figure 6.

It's my understanding that these papers do not, do not have buoyancy. So to say that a very small, very short-term simulation which is not well compared with experiments provides validation is, in my mind, an error.

I brought two other papers.

Q. What are those papers about?

A. These are papers that have been referenced in the course of this litigation. One is Belani, the year is 2012. And another one is McGovern, et al., year 2011.

Q. Why did you bring those papers?

THE VIDEOGRAPHER: Two minutes left on the tape.

THE WITNESS: This'll be fast.

A. In a section called "Total Knee Replacement

Experiment Setup" from the Belani paper it says: Bubbles were introduced at the head and neck of the mannequin to track under drape resident air movements in the region where...excess patient warming heat was being released." In --

Q. Why is that statement significant to you?

A. Well, it agrees with where I had the Bair Hugger air enter the room. And in fact that's confirmed by the other paper, which is McGovern.

Now they're working on hip replacement. So this is knee and hip. And they say -- I've got to find it. Ahh. Bubbles were introduced at the floor level between the surgeon's body and the operating ta -- Let's see. Hold on. That may not be the right one. I have to find it. Oh, here.

I'm in the section called "Experimental Setup: Hip Replacement." Bubbles were introduced at the head and neck region of the mannequin to track under-drape resident air movements in the region where the excess heat from the patient warming was being released.

So the documents relied upon by the plaintiffs agree with my supposition of where the heat enters the room.

MR. ASSAAD: I have a couple follow-up, if

you're not done.

MR. GOSS: Okay. So we better change the tape.

(Recess taken from 6:28 to 6:30 p.m.)

(Abraham Exhibits 11 - 14 marked for identification.)

BY MR. GOSS:

Q. All right, Dr. Abraham. Showing you Exhibit 11, "Stochastic modeling of atomizing spray in a complex swirl injector using large eddy simulation." Is that one of the Apte papers that you were discussing earlier?

A. Yes, it is.

Q. Okay. And this is one of the papers that was referred to -- or was this one of the papers referred to by Dr. Elghobashi as validating his CFD?

A. Yes.

Q. In your opinion, does it validate his CFD?

A. No.

Q. Exhibit 12 is a reference "Large-Eddy Simulation of Realistic Gas Turbine Combustors," by Moin and Apte. Is that an article or publication cited by Dr. Elghobashi as validation of his CFD?

A. Yes, it is.

Q. In your opinion does that validate his CFD?

A. It does not.
Q. Exhibit 13 is McGovern, et al. "Forced-air warming and ultra-clean ventilation do not mix."
And this is the paper from which you were reading about the -- the location of the helium -- neutrally buoyant helium bubbles being released around the head and neck of the mannequin; is that correct?
A. Yes.
Q. All right. And finally, Exhibit 14 is Belani, et al., "Patient Warming Excess Heat: The Effects of Orthopedic Operating Room Ventilation Performance," and is that another paper where the experiment released the flow tracer from the head and neck area of a mannequin?
A. Yes, it is.
Q. And in that paper there was a statement that -- that that is where the excess heat from the Bair Hugger was released; is that correct?
A. Correct.
Q. You attended Dr. Elghobashi's deposition; correct?
A. Correct.
Q. And that was after you submitted your report in this case on January -- I'm sorry -- June 2nd; correct?

A. Correct.
Q. Did you form opinions as a result of --
Well first of all, let me ask you: Why did you attend Dr. Elghobashi's deposition?
A. His report was not written in a clear way and I had questions about how his analysis was done.
Q. And what did you learn from that analysis?
A. I learned that my initial critiques still held, and in fact I -- are strengthened.
Q. Okay.
(Interruption by the reporter.)
Q. And are you prepared to offer opinions at trial based on the information you obtained during Dr. Elghobashi's deposition?
A. Yes, I am.
Q. Now yesterday you saw a document from Dr. Elghobashi called Exhibit B to his errata sheet. Do you recall that?
A. Yes.
Q. Did you have an opportunity to review that?
A. Yes.
Q. And are you prepared to offer --
Well first of all, what did you determine from your review of that document?
A. His analysis is in error.

Q. Okay. And are you prepared to offer opinions at trial with respect to that analysis?
A. Yes, I am.
Q. What errors specifically did you identify in -- in that Exhibit B to the errata sheet?
A. Do you have it? Could I look at it?
Q. Yes.
A. Or I could do it by memory.
MR. ASSAAD: Just for the record, I'm going to need at least another half -- you're bringing up new issues that are not raised in his report, stuff that's not cited in his report, and if we're going along this path of new opinions I'm going to request another 30 minutes to an hour to go over these documents that I haven't had a chance to go over till today, or his opinions.
MR. GOSS: Well it's his errata sheet. It's --
MR. ASSAAD: And he did not --
MR. GOSS: -- Dr. Elghobashi's errata sheet.
MR. ASSAAD: He did not cite any of these documents or any of this rebuttal opinions in his report.
MR. GOSS: Well of course he didn't. This

all happened after the report.
MR. ASSAAD: He's had those documents that were cited by Abraham -- or by Elghobashi prior to the deposition and prior to the submission of his report. He did not put any of those critiques regarding Apte's papers --
MR. GOSS: We can go as long as you need.
MR. ASSAAD: Okay.
MR. GOSS: That's fine.
MR. ASSAAD: Fair enough.
MR. GOSS: All right. I need to take a break to copy this real quick.
THE REPORTER: Off the record, please.
(Recess taken from 6:37 to 6:39 p.m.)
(Abraham Exhibit 15 marked for identification.)
BY MR. GOSS:
Q. All right. So Exhibit 15 is, I will represent to you, even though it doesn't say "Exhibit B" on top of it, this is a copy of Exhibit B to Dr. Elghobashi's errata sheet.
MR. GOSS: I will say for the record that we consider it to be an improper submission, nevertheless, since Dr. Abraham is here and has reviewed it, I will present it to him and ask him to

testify as to --
Q. Well, let me just ask you:
What errors did you identify in this Exhibit B? Or Exhibit 15. Sorry.
A. There were a number of errors. For instance, his Figure 3 is incorrect. His Figure 3 shows an arm with a heated-air gap and then inflated tube, so the blanket is actually elevated over the arm. And that's not how these devices operate. These devices operate where the ar -- the blanket wraps around the arm and touches the arm. So there is not a, the word is coaxial arm and blanket. That doesn't occur.
Q. Okay. Did you identify other errors in this Exhibit 15?
A. I did.
Q. Okay.
A. Another error that I identified is with his convective heat transfer coefficient which he used, and that is seen in equation 3. He's used a value of the convective heat transfer coefficient which is artificially low, his value is 5. My own research shows a value of about 11. So that's a error of a factor of two.
Q. Okay. And I realize you only saw this for

the first time yesterday, but did you formulate any other impressions of potential errors in this submission?
A. Yes.
Q. Okay.
A. He describes air supposedly moving around the arm from the blanket, and then he says -- he calculates an air velocity of .514 meters per second. Sitting here right now I don't recall if he ever used that number in his report. But what he says next is important. He says: "It should be noted that this is the velocity before the air reaches the drape that covers the blanket. The air will then leave the drape edges" at a lower velo -- "at a lower velocity as shown in Figure 4." And then he has arrows pointing to a red outline of the lower edge of the drape, and I believe that that is physically impossible. It is impossible for hot air to travel to the arrowed locations as he describes.
Q. And what's the length of the arrow locations; does he indicate?
A. I -- He --
There's no indication that I see --
Q. Okay.
A. -- of the length.

Q. Okay. Any other issues with Exhibit 15 that you've been able to identify in the last 24 hours?
A. Yes.
Q. Okay.
A. In Figure 5 he has a schematic for heat transfer from the air to the body, and he has two temperatures listed there which are both in error. He lists the body temperature of 37 degrees Celsius; it is not, that is too high. He lists the blower air temperature at the inlet of 41. And while I recognize that these devices operate with different blower temperatures, in my opinion this should be the inlet temperature to the blanket of 43 Celsius.
Q. Okay.
A. And those are the key issues.
Q. All right. Now on the back of one of those pages there are some notations?
A. Yes.
Q. All right. Did you make those notations?
A. Yes, I did.
Q. And what are those?
A. Those are written equations called the Navier-Stokes equations.
Q. All right. And why did you write those out?
A. Because I was anticipating that I would be

asked to write them in the deposition, and out of an abundance of caution I reminded myse -- they're very complex, so I had to remind myself of all the terms.
Q. All right.
MR. GOSS: That's all I have for you, sir.

EXAMINATION

BY MR. ASSAAD:
Q. How did you remind yourself?
A. I wrote them a number of times over and over.
Q. Were you looking at a book?
A. No.
Q. You did it off your memory.
A. No. I actually put the equations in my journal paper, and so I just transcribed them from the journal paper.
Q. Okay. So you didn't just write them off your memory, you actually looked at another document to write them down.
A. That is correct.
Q. And you practiced them because you thought I was going to ask you that question today.
A. I would say I memorized them. There's many terms, and I wanted to make sure I had every term correct.

Q. Okay. All right.
Let's first talk about validation. You listed two papers, Exhibits Number 12 and 11, written by one of the authors of Apte; correct?
A. Correct.
Q. And you're using this to prove that -- to show that the code is not validated; correct?
MR. GOSS: Object to form.
Q. That's what my under --
I could be incorrect, but that's what my understanding was.
A. Dr. Elghobashi cited a number of references of Elghobashi that he says demonstrated validation. In my mind those articles do not demonstrate validation.
Q. So they demonstrate --
So they don't demonstrate validation, in your mind, with regard to Elghobashi's validation; correct?
A. Correct.
Q. And just -- just to clarify, you've had Dr. Elghobashi's report since March; correct?
A. I don't know --
That seems a little early. I don't know when I received it.

Q. But you had the -- you had his report that -- report that these two articles are cited prior to submitting your expert report on June 2nd; correct?
A. That is correct.
Q. And these critiques of validation are being raised for the first time by you today; correct? To at least -- To at least the plaintiffs.
A. No. I critiqued him in validation in my expert report.
Q. But you did not use these two documents in your critique; correct?
A. That is correct.
Q. The first time you've raised to the plaintiffs the -- the critique of Elghobashi's validation with respect to these two articles, Exhibit 11 and 12, is today; correct?
A. Correct.
Q. Okay. And you understand that the deadline of June 2nd, 2017 was for the defense to provide rebuttal reports to plaintiffs' expert reports.
MR. GOSS: Object to form. He's not a lawyer.
You can testify if you have an understanding about that.
A. When I went to Elghobashi's deposition I

heard something that I disagreed with. What I heard was that if a code is validated for one case, it could automatically be used for another case provided the ingredients were the same. Now he said that in his deposition. That was not in his expert report. Following that deposition I inquired, was his statement at his deposition correct.
So you've asked me a question about a deadline? I'm not aware of the legal deadlines in this case.
Q. Okay. You agree that with respect to codes that are written for CFD, such as the one that Elghobashi used, it's always an ongoing process; correct?
A. Not necessarily.
Q. Well you agree that the Stanford code that was used is maintained and run by Ph.D. students that keep on updating it on a yearly basis, providing new code to solve problems.
MR. GOSS: Object to lack of foundation.
A. I have no basis to know that.
Q. Okay. So you don't know what the current code is -- the current state of the code as of 2017 is of the code that Elghobashi used; correct?
A. Correct. The only thing --

Q. Okay. And --
A. -- I know is --
Q. -- And -- And --
MR. GOSS: Let him finish. We're --
Q. And moving forward, you agree that --
MR. GOSS: Now we're off the clock. He can give a full answer.
MR. ASSAAD: Okay. That's fine.
A. The only thing that I know is based on the technical information in his report.
Q. Okay. And -- And the technical information you look at Exhibit 12, which is dated 2006; correct?
A. Say that again.
Q. The article's written in 2006; correct?
A. It was published in 2006.
Q. So it could have been written in 2005.
A. That's correct.
Q. Okay. So that is approximately 11 years ago; correct?
A. Yes.
Q. So you don't know what, if any, change in the code occurred between the publication of this paper and the code that Elghobashi used; correct?
A. What I know --
Q. "Yes" or "no," sir? "Yes" or "no"?

MR. GOSS: No --
Q. You don't know what has occurred between 2006 and 2017 with respect to the code that Dr. Elghobashi used; correct?
MR. GOSS: Time is no longer an issue.
MR. ASSAAD: I want him to answer my question.
MR. GOSS: You can answer it, and you can provide your explanation.
MR. ASSAAD: That's fine. As long as I get a "yes" or a "no," then he could...
A. Can you ask the question again?
Q. You don't know what has changed in the code between April of 2006, the date of this publication, and 2017; isn't that correct?
A. That is correct.
Q. Okay.
A. What I do know is that that's a paper he cited as supporting the validation of the code he used in this case.
Q. Okay. And you agree with me that Exhibit Number 11, it was published in 2009.
A. I agree.
Q. Okay. And you agree with me that you don't know any changes in the code that was use -- that was

made between 2009 and 2017 if any changes were made; correct?
A. I have the same answer as the prior question you asked, which is, yes, I do not know.
Q. Okay.
A. But that was a document cited in his expert report.
Q. But --
And you agree that you could -- you could validate CFD analysis based on the code being validated in prior experiments.
A. Can you ask that -- That's a cumber --
I'm struggling to understand your question.
Q. Well you cited to Exhibit 11 and 12 saying that you disagree with Dr. Elghobashi validating his code on articles 11 and 12; correct?
A. Correct.
Q. Okay. Which means that you could validate your CFD analysis based on more complex experiments made with the same code; correct?
A. That is possible, but not necessarily true.
Q. Okay. And you cited a paper written by Oberkampf and Trucano. You recall that; correct?
A. Yes.
Q. And you would agree with me that in that

paper it states, because of the infeasibility and impractibility of conducting true validation experiments on most complex systems, the recommended method is to use a building-block approach.
Do you agree with that?
A. Yes.
Q. Okay. And you testified earlier that the CFD modeling that was done in this by you and by Elghobashi was a complex system; correct?
A. Yes.
Q. Okay. And you're an alumnus of the University of Minnesota; correct?
A. Yes.
Q. You could have went and talked to Krishnan Mahesh and got what actually the Stanford code is validated for or not; correct?
MR. GOSS: I'll object to form.
A. I don't know. I mean, I -- I think Elghobashi said it was a proprietary code.
Q. You understand that the people that work on the code from Stanford take it with them and they're allowed to use it, just like Elghobashi was allowed to use it, as well as other people.
MR. GOSS: Lack of foundation.
A. I do not understand that.

Q. Okay.
(Interruption by the reporter.)
Q. Well you understand there's codes out there written by universities that are proprietary; correct?
A. Yes.
Q. And that many students or Ph.D.s work on that code and refine that code over time.
A. Yes.
Q. Okay. And the Stanford code is an example; correct?
A. Yes.
Q. And actually The University of Minnesota has its own code; correct?
A. Possibly. I don't know.
Q. You don't know.
A. Correct.
Q. Okay. And you still have ties to the University of Minnesota; correct?
A. Define "ties."
Q. You still have relationships with your -- with Sparrow; correct?
A. Yes.
Q. Okay. St. Thomas doesn't have its own code; correct?
A. St. Thomas uses ANSYS.

Q. Okay. You agree with me that if the code Elghobashi used was validated for more complex systems used in this case, the same type of math -- for the same type of physics and mathematics, that Elghobashi's CFD is validated.
MR. GOSS: Object to form.
A. I would agree that if it was validated for as complex or more complex of a case of the same nature, then...
No, I would not agree.
Q. You wouldn't.
A. No.
Q. Okay. So you disagree with the article that you wrote that I just read to you.
A. Say --
Read that statement again.
Q. You recall citing this article in your -- in your report.
A. Yes.
Q. Okay. Have you read this article?
A. Yes.
MR. GOSS: This is an article that he wrote?
MR. ASSAAD: He cited.
MR. GOSS: You said he wrote it.

MR. ASSAAD: I said he cited in his report.
MR. GOSS: Okay. I thought you said he wrote it. I'm sorry.
Q. You've read this entire article?
A. Yes.
Q. Okay. When's the last time you read this article?
A. Awhile ago. I can't --
Q. Okay.
A. I can't recall.
Q. It's a large article; correct?
A. It was heavy reading.
Q. Okay. And in the article which you said you agreed with... No. I withdraw that question.
Let me go to a different part, if I can find it.
By the way, do you agree that this article's authoritative on verification and validation in computational fluid dynamics?
A. I don't know what the word "authoritative" means in this context.
Q. But you cited it; correct?
A. I cited it as a representation of how these issues are viewed in the community.
Q. Okay. So this is --

You agree with me this is how -- these are how -- these are how verification and validation -- validation issues are viewed in the fluid dynamics community; correct?
A. Yes.
Q. Okay. Definitely not my community. You agree with that.
A. Possibly.
Q. Definitely not Peter Goss's community.
MR. GOSS: Well that we can stipulate to.
Q. Now you agree with me that Elghobashi put down calculations and computations that you were able to observe and critique; correct? For example, Exhibit Number 15. He wrote down his calculations; correct?
A. I believe that is from him, and yes, it does show a calculation.
Q. So someone such as yourself could look at what he did to calculate what he did and either agree with it or critique it; correct?
A. Correct.
Q. Okay. And you did not do such a thing with respect to your initial boundaries; correct?
A. Incorrect.
Q. Please show me the calculations. Please

show me one addition that you've provided that has a mathematical equation to the plaintiff in this case.
A. Well I think that the question's become confused.
Q. No, it hasn't become --
If it's confused, I'll re-ask it.
MR. GOSS: He may not --
MR. ASSAAD: I'll re-ask it.
MR. GOSS: -- understand what you're asking.
Q. I'll re-ask it.
Elghobashi provided you calculations of how he did things; correct?
A. Correct.
Q. And there are actual equations; correct?
A. Correct.
Q. With numbers.
A. Correct.
Q. With solutions.
A. Correct.
Q. With heat value coefficients; correct?
A. Correct.
Q. That you as a -- a -- a person in the field of mechanical engineering can look at it and critique it and determine whether or not it's correct or not;

correct?
A. Correct.
Q. And that's what you did in this case. You saw what he did and you say, I disagree.
A. That's right.
Q. Correct?
And you did not provide one equation to the plaintiffs that we could do the same type of critique that you did to Elghobashi; correct?
MR. GOSS: You mean other than the TRN file?
Q. There's no equations in the TRN file; are there?
A. Well, I mean, the equations are built into the software so you can't really separate the equations from the software. But here is -- here is the issue --
Q. My question --
Let me ask it simple, simple. In Exhibit 1, 2 or any of the exhibits we saw today that were produced by you, okay, except for the Elghobashi exhibits or any of the citings --
Let's go back. Exhibit 1 and 2 of your report, your CV, as well as your expert report, you agree with me that there is not one mathematical

equation that was provided to the plaintiffs in this case.
A. There is no equation.
Q. So you agree with me. "Yes" or "no"?
A. I agree with you, --
Q. Okay.
A. -- but the information is listed there that would allow someone to reproduce the results.
Q. Okay. You agree with me that there's not one mathematical equation in your expert report; correct?
MR. GOSS: I think he -- I think he answered that.
A. I agree, --
Q. Okay.
A. - and it's not necessary.
Q. And you agree with me there's not one number or -- like equation that uses numbers to show what you did to make any of your assumptions in your expert report; correct?
MR. GOSS: Asked and answered.
A. I agree, I think I've answered that.
Q. Okay. You disagree with Figure 3 of Exhibit 15; correct?
A. Yes.

Q. Okay. Do you have any experimental or scientific equations, besides the fact that you just sit here today and say you disagree, to support your -- your -- your critique of Figure 3?
MR. GOSS: Do you have the exhibit in front of you?
MR. ASSAAD: I showed it to him already.
MR. GOSS: Oh.
A. Figure 3 shows --
Q. That wasn't my question. I know what Figure 3 shows.
I'm asking you, do you have any mathematical equations or calculations or anything to support your critique of Figure 3?
A. Yes.
Q. Where?
A. I have direct observation. I have worked on these devices for years. The blanket touches the skin. There -- The arm is not in a concentric space within the blanket. That is not how these devices work.
Q. So your opinion is that the blanket touches the skin?
A. Yes.
Q. So the blanket would have a significant heat

transfer by conduction from the blanket to the skin; correct?
MR. GOSS: Object to form.
A. All of the heat is transferred via -- via convection.
Q. Really?
A. Yes.
Q. Would you -- I mean, your critique is that -- Strike that.
Do you not think that the -- the blanket itself, the -- that's not the pores heats up?
A. I do believe the pores heat up.
Q. So if it's touching the skin, you don't think it transfers heat by conduction?
A. How did the heat get there in the first place? All of the heat is transferred from the heater to the patient is by convection. Absolutely.
Q. You'd bet your career on that, that all the heat is transferred from the Bair Hugger by convection to the patient? You willing to bet your career on that?
MR. GOSS: I think you're talking about two different things.
MR. ASSAAD: No. He knows exactly what I'm talking about.

MR. GOSS: That's argumentative.
I think we covered this earlier, but if you have a different answer, you can provide it.
A. I would --
MR. GOSS: If you don't, you can stand by your testimony.
A. I would never bet my career on the word "all." But here's what I'll say. This device is designed and operated in a way where air is heated up, that air is blown into an inflatable blanket, and that air oozes out of the pores against the skin. That transfer of heat from the heater within the Bair Hugger base to the body is convection.
Q. You sure about that?
A. Yes.
Q. So you're telling me engineering principles of heat transfer that --
I mean you agree with me that you could heat something by convection -- I could heat this paper with a hot air blower by convection; correct? [Demonstrating.]
A. Correct.
Q. And this paper is going to warm up; correct?
A. Yes.
Q. Okay. And if I take this paper and put this

pen to it, okay, how's the paper warming up the pen; by convection or by conduction?
A. In that case it's a two-step process. The ultimate heat transfer is by convection, and it passes through the paper by conduction.
Q. And then it passes to the pen by conduction; correct?
A. Well once it's into the pen there's no issue of conduction.
Q. You said it passes into the paper by conduction; correct?
A. No. No. It pa -- If I said that, it was a mistake.
Q. Okay. It passes --
It heats up the paper by convection; correct?
A. Yes.
Q. And then the paper passes heat -- or transfers heat to the pen that's touching it by conduction; correct?
A. If there is contact, the heat is transferred through a wall by conduction.
Q. Okay. Okay. So the transfer of heat from the piece of paper to the pen in this example -- I'm going to put it in front of the camera -- is by

conduction.
A. Through an impermeable surface, the transfer across the surface is by conduction. The transfer to the object initially is convection.
Q. Okay. You agree with me that the -- the only way air escapes out of the Bair Hugger is through the pores.
A. No.
Q. How else would it escape?
A. Because when the hose connects with the blanket there may be imperfections in that connection, but I would say this. The majority of the air escapes through the holes.
Q. Okay.
A. And that air impinges on the skin, and that is a convective heat transfer process.
Q. Okay. What about the part where the plastic -- or the Bair Hugger bottom layer is heated? Not where the pores are, but the space in between the pores, okay? If that touches the patient, you agree that the heat transfer from that plastic Bair Hugger layer to the patient where there's contact is conduction.
A. I would agree that the heat transfer across the plastic is conduction, but the origination of the

heat is by convection.
Q. I understand that.
I think you and I are speaking two different things, because you could heat by convection, but then it's going to warm objects that might transfer heat by conduction; correct?
Even though the initial source --
A. The convective heat is transferred through -- could be transferred through the wall by conduction.
Q. Okay.
A. I would say that.
Q. So if the Bair Hugger is -- the plastic, not the -- where the jets are, but the non-jet areas or perforations are touching the patient, there is going to be heat transfer from that solid Bair Hugger wall to the patient.
MR. GOSS: Objection, I think it mischaracterizes the Bair Hugger.
But if you understand it, you can testify to it.
A. Can you ask the question again?
(Discussion off the stenographic record.)
MR. GOSS: It's not a solid wall.
Q. You're assuming that the Bair Hugger is

touching the patient; correct? And that's why you critique Figure 3.

A. The critique I have of Figure 3 is that it describes a situation which doesn't exist. That is, it's got a solid arm centrally located, and I think I may have used the word, like, axisymmetrically something located within a circle that is the blanket. And that's not how this thing works, and that's not how it operates.

So what he's done here is he's imagined long, straight, rectangular slots through which the air ejects downwards, and that is not how these devices operate.

Q. Well you agree that the air is ejected downwards; correct?

A. No.

Q. Where is the Bair Hugger air blowing?

A. Against the skin.

Q. Okay. Hypothetically speaking I am four feet tall and I stretch out my hands and the Bair Hugger goes past the end of my hand, the air over -- in that area that goes past my hand, is that ejecting down?

A. That --

I mean, that's a hypothetical. From my



understanding of operating room tables, that air would be ejected against... I don't know. I'd have to see it. I'd have -- I don't know.

Q. So sitting here today, you don't know.

A. Correct.

Q. Okay. And how wide is the -- is the arm where the -- where the arm extension is, like the arm pad and board; do you know?

A. I do not know.

Q. Okay. And what's the -- the dimensions of the Bair Hugger Blanket 522?

A. I don't know the numbers off the top of my head.

Q. Have you seen one?

A. Yes.

Q. Have you measured one?

A. I don't recall measuring the physical dimensions of one.

Q. Have you received the schematics of one?

A. Not that I recall.

Q. Do you disagree with the measurements that Elghobashi put in Figure -- Figure 1 with respect to the dimensions?

A. I have no reason to disagree.

Q. Okay. You disagree with the body



temperature of 37 degrees Celsius; correct?

A. I disagree that that's the skin temperature.

Q. Okay. What would you put here as the skin temperature?

A. The skin temperature depends on the environment, but a good estimate would be about 35 degrees.

Q. So you're saying that --

A. Maybe 36.

Q. 36 degrees? Okay.

A. 35 or 36.

Q. Okay. Let's just assume it's 35 degrees.

How much would that change his calculations by?

A. I did not put corrected numbers in to test that.

Q. Okay. So it might only change it insignificantly; correct?

A. No.

MR. GOSS: Calls for speculation.

Q. Well we've talked that --

You don't know how much it would change?

A. No. Let me see this. Let me --

Q. Why don't you calculate for me how much it would change?



MR. GOSS: He's had this for a day. I don't think --

MR. ASSAAD: If he's going to critique it and every little bit, I want to know --

MR. GOSS: He's going to offer additional critiques, because he's only had this for a day, but he can -- he can -- he can do his best to respond to your questions.

MR. ASSAAD: Would you agree --

Would you want to just reconvene this deposition, then, so he has time to critique it?

A. No. I can critique it now.

Q. Okay.

A. So let's take the air temperature which he has as 41, and I think a more appropriate number would be 43.

(Witness starting to mark an exhibit.)

A. Actually let me just -- Let's put forty --

(Interruption by the reporter.)

(Discussion off the stenographic record.)

A. Let me just do it in my mind.

So he's using 41 minus 37, that's a temperature difference of four degrees. I think a more accurate set of numbers would be 43 to 35, which is eight degrees, so that's a factor of two. He also

is off by --
Q. Before I finish. When -- Is "T" in the equations Celsius or Kelvin?
A. Celsius.
Q. Okay.
A. He's off by a factor of two in his "h" value, so that's --
Q. I'm just talking about the temperature now.
A. You just want me to --
Q. If you changed the temperature to what you thought it would be, how much would it affect the results of his -- of his tem --
A. One hundred percent.
Q. One hundred --
A. He would be off by a hundred percent.
Q. Okay. And you -- you think the temperature coming out of the Bair Hugger, the air is 43 degrees Celsius?
A. Well that would be the maximum temperature. It's my understanding that's the maximum temperature of the air entering the Bair Hugger.
MR. GOSS: Blanket; correct?
THE WITNESS: Blanket.
Q. Well he's talking about the Bair -- air coming out of the Bair Hugger, and in the gap between

the Bair Hugger blanket and the surface of the body.
So your testimony today is that air coming out of the Bair Hugger is 43 degrees Celsius?
A. No.
Q. You used 41 degrees; correct?
A. I did, but you're mixing what he's done and -- You're mixing things up.
Q. He put down the blower air, then the gap between the blanket surface and the body, and then the exit temperature; correct?
A. Yes. He put that down.
Q. Okay. So if he's referring to the air coming out of the blanket, you would have no critique of the 41 degrees Celsius temperature.
That's what you used.
A. Well it's hard to answer because...
I mean, you might be right. You might be right. Let me think about this.
The air entering the blanket is 43, so some of the air comes out at forty -- some of the air is coming out hotter, some of it's coming out colder. Okay. So if what he has done is assume that all the air comes out at 41, then I take that criticism back. That would be an average. That would be an appropriate upper bound average.

Q. Okay.
A. But that still doesn't correct his temperature-drop calculations.
Q. Okay. Well the other critique is he put 37, and you might think it's 35 or 36; correct?
A. Correct. And the "h" value.
Q. Okay. Not there yet.
You said he had an "h" value of 5; correct?
A. Correct.
Q. Do you disagree with the reference he used to determine his "h" value?
A. Can you remind me that reference?
Q. R. J. De Dear, E. Arens, titled -- a couple of authors -- titled "Convective and Radiative Heat Transfer Coefficients For Individual Human Body Segments."
A. That paper --
So I've actually done research on convective coefficients between forced-air warming blankets and bodies, and the values that we calculated were 10 to 11. Now that reference I don't believe pertains to forced-air warming blankets.
If I read that document -- See it doesn't mention anything in the title about forced-air warming blankets. If I read that document and I find that it

is related to forced-air warming blankets then I would revise my criticism, but I don't believe it is. I think he used an inappropriate value that's off by a hundred percent.
Q. Okay. And where would I find your value of 11?
A. In my CV. I've got a journal paper published -- I think it's called Whole Body Warming Hypothermia something, but it's there.
Q. Is that the one with Vallez and Plourde, Plourde?
A. I --
No, it's not that one that we're talking about. It's a different paper.
Q. Okay. Who funded that research?
A. That was funded by Smiths Medical.
Q. Okay. Now go to Belani, and...
You're not critiquing Dr. Elghobashi for the fact that he wrote down all his equations and assumptions; are you?
A. No.
Q. Okay. I mean, you agree that significant assumptions should be provided in a expert report or publication; correct?
MR GOSS: We're getting beyond the scope of

my redirect, but you can answer that.
A. I do agree significant assumptions --
Q. Okay.
A. -- should be listed.
Q. So you cite to McGovern with respect to their bubble tests; correct? That they put the bubble testing at the -- at the front of the anesthesia drape --
THE REPORTER: They put the bubble testing?
Q. -- at the head, at the -- in the front of the anesthesia drape where the head is; correct?
A. Correct.
Q. Okay. And you believe that's the correct way of --
You believe they did that because you think they felt that that's where the excess air was coming; correct?
MR. GOSS: Lack of foundation.
A. I can only --
I mean, I don't know what they were thinking, I only know what's in their report, and what's in their report contradicts Dr. Elghobashi.
Q. Are you aware that Dr. McGovern, Albrecht, Dr. Belani, Nachtsheim and Reed were all deposed in this case?

A. I am aware McGovern and Albrecht were deposed. I don't know if any others.
Q. Have you read their depositions?
A. Yes.
Q. I asked you before whether or not you read any fact witness depositions and you said you haven't read any since December of 2015. Do you recall that?
A. Yeah. Maybe I thought they were expert witnesses. I don't -- I may have -- I may have made an error, but I certainly read them. I thought I told you that. And if I didn't, I apologize.
Q. And I've also asked you what expert depositions you've read and you did not mention these people at all either; did you?
A. I don't know if that's true.
Q. Well you --
MR. GOSS: So if you want to ask him about that testimony, you have an opportunity to.
Q. Did you have that testimony prior to providing -- doing your report in this case?
A. No.
Q. So you got it after you submitted your report?
A. Correct.
Q. And you didn't cite to any of their

testimony or their depositions in your expert report; correct?
A. That is correct.
Q. Or in Exhibit C, which was documents you considered that were outside of your expert report; correct?
A. Boy, I'd have to check. Do we have Exhibit 3?
Q. Right there. Exhibit 3.
A. Those depositions are not cited here.
Q. Okay. Do you consider the report by Dr. McGovern, which is Exhibit 13, reliable?
A. No.
Q. Were you --
Did you find this report independently, or was it given to you by counsel?
A. I don't recall. I was given a number of documents and then I performed my own literature search. I don't recall using any of the documents given to me by counsel.
Q. So you found this document on your own then; correct?
A. I believe I did, but I don't know for sure.
Q. What search terms did you use?
A. Oh man. I may have used laminar flow,

operating room, forced-air warming. I don't recall the search terms I used.
Q. Would the same apply to the Belani article marked Exhibit 14?
A. Same answer.
Q. So I assume you pulled up more than these two articles; correct?
A. What do you mean by "pulled up"?
Q. Like you did some independent research and provided -- you found articles on the Bair Hugger which you cited in your references, and Exhibit C, if there are any -- or Exhibit 3, I'm sorry, and these two articles; correct?
A. Well there's many articles, but I think those articles are actually in my expert report.
Q. Okay. Okay. Do you agree with me that, with respect to Exhibit 15, that the equations that Dr. Elghobashi used are the correct equations?
A. Can you point out which equations you're referring to?
Q. The equations on top of page 2 where he calculates the volumetric flow rate over the gap area?
A. The mathematics is done correctly, but this equation represents something that doesn't happen physically, so it's a meaningless equation.

Q. Okay. But the equation is a correct equa -- the mathematics are correct, you don't think the equation itself is correct.
A. Just doing it in my head it appears the numbers work out. So the left -- the right-hand side is obtained when you put the left-hand side numbers in.
Q. Okay. Maybe the better question is this: Assuming that Figure 3 is correct, okay, and based off Figure 3 you want to calculate the velocity of the flow coming out, is the equation correct to use that veloci -- to calculate that velocity, if Figure 3 is correct?
MR. GOSS: Object to form.
A. No.
Q. What's wrong with it?
How would you calculate the velocity of the air coming out of the Bair Hugger over that area?
A. What he has ignored, eve --
Q. I'm asking how you would calculate it.
A. I would calculate it differently.
Q. How would you calculate it?
A. I'm going to tell you.
Q. Please do.
A. I would cal -- I do not believe --

Q. Actually, let's write it down.
MR. GOSS: Hold on.
Q. Let's -- Write it down.
MR. GOSS: Hold on. Let him answer.
MR. ASSAAD: Okay.
MR. GOSS: He's not going to obey your command to write anything. Let him answer the question.
Q. Feel free to write it down if you know how.
MR. GOSS: Object. Move to strike.
A. And can you tell me the question again, the specific --
Q. What equation would you use to calculate the velocity of the air coming out of the Bair Hugger assuming that Figure 3 is correct?
Do you need a pen?
A. Hold on. The velocity of the air coming out of the Bair Hugger?
Q. Yes. Blanket. Blanket.
A. The equation that I would use is I would take the number of holes, multiplied by the area of the holes, and that would be the total jet area, and then I would take the flow rate divided by that area. That's how I'd get the velocity of the air emerging from the Bair Hugger.

Q. Do you think the number of holes in a Bair Hugger is a constant from blanket to blanket?
A. No.
Q. Okay. So you'd have to physically cou -- you'd have to physically take a Bair Hugger blanket and count how many holes to get the correct velocity for that particular blanket; correct?
A. If you want to know the jet velocity coming out of the Bair Hugger then that is certainly one way. That's how I would do it.
Q. Okay. Do you agree with the equation of 1.2 with respect to the exit air temperature? The m in, h in?
A. I have no argument about --
I have no disagreement with that equation.
Q. What about with the equation below it with the h in equals h exit plus q body, divided by m?
A. I have no disagreement with that equation.
Q. Okay. So basically on those two equations you would agree with me that Elghobashi understands the basic laws of physics; correct?
MR. GOSS: Object to form. I also think in redirect he made clear what his criticisms are. Now you're asking him beyond -- questions beyond that.
If you can answer the question, you may.

A. Those two equations are the first law of thermodynamics, which governs energy conservation. I believe he has written those correctly.
Q. I mean, but you stated in your report that he didn't understand the basic laws of physics. Well with respect to these equations do they indicate or not indicate that he knows the basic laws of physics?
MR. GOSS: Objection to form. This is becoming counterproductive.
I don't think you have to answer that. I think you already have.
Q. Did you put in --
MR. GOSS: And you said --
Q. Did you put in your report that Elghobashi doesn't understand the basic laws of physics?
A. I may have, and I believe he --
I think you're confusing two things. I -- What we're talking about here is a simple conservation-of-energy equation which I think he's written correctly, but that -- my arguments in his expert report go beyond a simple conservation-of-energy equation.
Q. Okay. So you agree with me here that except for the one equation that you think you do different, which is the velocity -- the velocity of the air

coming out of the Bair Hugger, that all the other equations he used to calculate whatever he was calculating are correct?

A. Well I would argue the entire premise of his calculation is incorrect.

Q. Assuming Figure 3 is correct. The equations are correct. You're not disagreeing with the equations that he used.

MR. GOSS: Objection, mischaracterizes his testimony with respect to one of the equations.

A. I think equation 4 is incorrect.

Q. "Incorrect"?

A. Right.

Q. Okay.

A. I think he's used the wrong value of the convective coefficient.

Q. Well forget about the values used. I'm talking about the actual mathematical equation.

A. Actually he's got another maybe more serious error. In equation 3 he has the heat transfer to the body and he's got an "h" value times an area of the blanket surface. That's not correct. That should be the area of the body. So he's got the wrong area --

Q. Okay.

A. -- in equation 3.

I did not look up his enthalpy values, so I can't comment on whether they're correct or not.

Q. Okay.

(Interruption by the reporter.)

Q. Do you believe it is professional to call a professor or a scientist in the community that has been working 30 to 40 years doing engineering research and has published probably more than you, that that person doesn't understand the basic laws of physics?

MR. GOSS: All right. You had the opportunity to ask that question during seven hours of direct exam. This does not relate to my redirect.

MR. ASSAAD: It goes to him doing these calculations and criticizing his calculations.

MR. GOSS: Okay. I'm going to object to form on multiple grounds.

MR. ASSAAD: That's fine.

MR. GOSS: If you understand the question, then you can provide an answer.

A. I -- I'm not sure he has published more than me, but that's immaterial.

I think he has made some serious errors. I think he does not -- did not account for the buoyancy of the air in the OR, and I think that's a serious error. And so critici -- Look, scientists criticize

each other all the time.

Q. Would you expect someone such as your professor, Dr. Sparrow, to criticize someone of the stature of Elghobashi the way you did by saying he doesn't know the basic laws of physics?

MR. GOSS: Same objection. I'm also going to object that this doesn't have anything to do with the actual scientific opinions rendered in his report or the scientific issues subject to expert testimony in this case. I also think it was asked and answered.

MR. ASSAAD: What Dr. Sparrow would do?

MR. GOSS: All right. You can answer if you have an understanding of what Dr. Sparrow thinks and what he would do.

A. I don't know what Dr. Sparrow would do.

MR. ASSAAD: Well first of all I'm going to object to his -- any of his opinions that he gives outside his expert report as rebuttal under Rule 16 and Rule 26 and the Court's PTO order that governs discovery in this case. This is untimely, especially with some of the documents that he had in his possession. I think he had everything in his possession prior to the deposition of Dr. Elghobashi.

Furthermore, these are new opinions that

the court has specifically refused and that the defense had a time to offer rebuttal. Well the Court definitely has refused surrebuttal. The expert time -- deadline to provide rebuttal opinions was June 2nd, and this should have been disclosed prior to then.

MR. GOSS: And we will stipulate that Dr. Elghobashi's supplemental report is untimely.

Subject to that, I disagree with what you said, --

MR. ASSAAD: I haven't --

MR. GOSS: -- respectfully.

MR. ASSAAD: I haven't finished yet.

MR. GOSS: You may finish. You may finish.

MR. ASSAAD: And just for the record, this is not a supplemental report, this was added to his errata sheet in response to a question.

MR. GOSS: You call it what you will.

MR. ASSAAD: Okay. I lost my track or line, Peter. It's been a long day.

Anyway, we're just going to object, a formal objection, and we're going to leave this deposition open for me to seek more documents possibly, and files that were clearly not produced today that were clearly in the possession of Dr.

Abraham and may have been in the possession of 3M, and we will address the other issues -- these issues with the court.

MR. GOSS: And I'll just state that we believe we have complied, but we understand your position.

MR. ASSAAD: That's it.

MR. GOSS: I don't have any further questions.

THE REPORTER: Off the record.

(Deposition adjourned at 7:33 p.m.)

C E R T I F I C A T E

I, Debby J. Campeau, hereby certify that I am qualified as a verbatim shorthand reporter; that I took in stenographic shorthand the testimony of JOHN P. ABRAHAM, Ph.D. at the time and place aforesaid; and that the foregoing transcript consisting of 394 pages is a true and correct, full and complete transcription of said shorthand notes, to the best of my ability.

Dated at Lino Lakes, Minnesota, this 24th day of July, 2017.

DEBBY J. CAMPEAU
Notary Public

S I G N A T U R E P A G E

I, JOHN P. ABRAHAM, Ph.D., the deponent, hereby certify that I have read the foregoing transcript, consisting of 394 pages, and that said transcript is a true and correct, full and complete transcription of my deposition, except per the attached corrections, if any.

PAGE LINE CHANGE/REASON FOR CHANGE

____ ____ ________________________________________
____ ____ ________________________________________
____ ____ ________________________________________
____ ____ ________________________________________
____ ____ ________________________________________
____ ____ ________________________________________
____ ____ ________________________________________
____ ____ ________________________________________
____ ____ ________________________________________

____________ ________________________________
Date Signature of Witness

WITNESS MY HAND AND SEAL this _______ day of ____________, 2017.

(DJC) ______________________________________