# EXHIBIT 36

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1

1                 UNITED STATES DISTRICT COURT

2                   DISTRICT of MINNESOTA

3    - - - - - - - - - - - - - - - - - - -

4    In Re:

5    Bair Hugger Forced Air Warming

6    Products Liability Litigation

7

8    This Document Relates To:

9    All Actions              MDL No. 15-2666 (JNE/FLM)

10   - - - - - - - - - - - - - - - - - - -

11

12

13             DEPOSITION of THEODORE R. HOLFORD

14                VOLUME I, PAGES 1 - 386

15                    JULY 18, 2017

16

17

18           (The following is the deposition of THEODORE

19   R. HOLFORD, taken pursuant to Notice of Taking

20   Deposition, via videotape, at the Marriott Hartford

21   Downtown, 200 Columbus Boulevard, Hartford,

22   Connecticut, commencing at approximately 9:20 o'clock

23   a.m., July 18, 2017.)

24

25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

2

1   APPEARANCES:

2        On Behalf of the Plaintiffs:

3            Michael A. Sachet and Jan M. Conlin
             CIRESI CONLIN L.L.P.
4            225 South 6th Street, Suite 4600
             Minneapolis, Minnesota   55402
5
         On Behalf of Defendants:
6
             Corey L. Gordon
7            BLACKWELL BURKE P.A.
             432 South Seventh Street, Suite 2500
8            Minneapolis, Minnesota   55415

9   ALSO APPEARING:

10           Ronald M. Huber, Videotechnician

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

3

1                    I N D E X

2  EXHIBITS           DESCRIPTION        PAGE MARKED

3  Ex  1   Expert Report of Theodore R.

4          Holford, PhD                     11

5      2   Holford curriculum vitae         11

6      3   Expert report of Jonathan M.

7          Samet                            11

8      4   Albrecht October 7, 2016

9          deposition excerpts             23

10     5   Augustine Biomedical + Design

11         Research and Development

12         Report, 9/14/2007               24

13     6   Article, Forced-Air Warming

14         Design:  Evaluation of Intake

15         Filtration, Internal Microbial

16         Buildup, and Airborne-

17         Contamination Emissions, by

18         Reed, et al                     28

19     7   Article, Predicting bacterial

20         populations based on airborne

21         particulates:  A study performed

22         in nonlaminar flow operating

23         rooms during joint arthroplasty

24         surgery, by Stocks, et al       46

25     8   E-mail string, 3MBH00050770-1   50

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

4

1    9    Article, Association of Airborne

2         Microorganisms in the Operating

3         Room With Implant Infections:  A

4         Randomized Controlled Trial, by

5         Darouiche, et al                        54

6    10   Proceedings of the International

7         Concensus Meeting on Peri-

8         prosthetic Joint Infection              67

9    11   Van Duren March 7, 2017

10        transcript excerpt                      77

11   12   Article, Convection warmers --

12        a possible source of contamination

13        in laminar airflow operating

14        theatres? by Tumia, et al               80

15   13   Article, Forced-air warming

16        and ultra-clean ventilation do

17        not mix, by McGovern, et al             94

18   14   Computer printout, AUGUSTINE_

19        0005193-487                             104

20   15   Albrecht October 7, 2016

21        deposition excerpt                      123

22   16   LogisticRegression analysis,

23        Albrecht, March 11, 2016,

24        Albrecht_0002275-8                      135

25   17   Gmail string                            140

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

5

1    18   Computer printout                    148

2    19   Article, Return to theatre

3         following total hip and knee

4         replacement, before and after

5         the introduction of rivaroxaban,

6         by Jensen, et al                     179

7    20   Fisher's exact test of

8         independence article                 198

9    21   Article, Levels of Household

10        Mold Associated with Respiratory

11        Symptoms in the First Year of

12        Life in a Cohort at Risk for

13        Asthma, by Gent, et al               201

14   22   Chi-square test of goodness-

15        of-fit article                       208

16   23   Graph, 3M00554267                    229

17   24   Article, Infection Control in

18        Orthopaedic Surgery                  249

19   25   Article, Implementing effective

20        SSI surveillance, by Gillson

21        et al                                251

22   26   Article, Confounding in

23        Epidemiologic Studies, by

24        Greenland, et al                     283

25   27   Article, Statistical Methods in

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

6

1           Cancer Research, by Breslow et

2           al                                    297

3     28    Article, Forced-air warming

4           discontinued:  periprosthetic

5           joint infection rates drop,

6           by Augustine                          329

7     29    Jonathan Borak expert report          362

8     30    Record of Proceedings, Health-

9           care Infection Control Practices

10          Advisory Committee, November

11          5-6, 2015                             368

12    31    Record of Proceedings, Health-

13          care Infection Control Practices

14          Advisory Committee, March 31,

15          2016                                  376

16    32    Arizant forced-air warming and

17          SSI prevention:  Talking points

18          for sales, 3MBH00001336-7             381

19

20

21

22

23

24

25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

7

1               P R O C E E D I N G S

2          (Witness sworn.)

3               THEODORE R. HOLFORD

4          called as a witness, being first duly sworn,

5          was examined and testified as follows:

6               ADVERSE EXAMINATION

7  BY MR. SACCHET:

8      Q.   Good afternoon, Professor Holford.  My name

9  is Michael Sacchet and I represent the plaintiffs in

10  this litigation.

11          Could you please state your full name for

12  the record.

13      A.   Theodore Richard Holford.

14      Q.   And Professor Holford, have you had your

15  deposition taken before?

16      A.   Not on this.

17      Q.   In the past?

18      A.   Yes, I have.

19      Q.   What was the subject matter of that

20  deposition?

21      A.   Cigarette smoking.

22      Q.   How long ago?

23      A.   Ooh.  It was probably eight years ago,

24  something like that, eight, 10 years ago.

25      Q.   And were you called to offer opinion as to

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

8

09:20:48    1    biostatistics?

09:20:49    2      A.    Yes.

09:20:50    3      Q.    Epidemiology?

09:20:54    4      A.    It was in regard to a statistical review

09:20:57    5    that I did of an epidemiology calculation paper -- or

09:21:01    6    chapter of a book, actually.

09:21:04    7      Q.    What was the chapter of that book?

09:21:05    8      A.    It was a chapter dealing with lung cancer

09:21:08    9    trends, and they were relating it to smoking.

09:21:13    10      Q.    Okay.  And were the studies that you relied

09:21:16    11    on in that chapter of the book observational studies?

09:21:20    12      A.    Yes.

09:21:21    13      Q.    What --

09:21:24    14      How many studies were there?

09:21:26    15      A.    I don't recall.  It was a -- quite a long --

09:21:30    16    quite a long time ago.  I think some of it was

09:21:33    17    population data as I recall, but it's been -- been

09:21:35    18    quite a long time; I've forgotten the details of it.

09:21:39    19      Q.    And who retained you to provide expert

09:21:42    20    testimony in that litigation?

09:21:47    21      A.    It was the tobacco companies.  They --

09:21:52    22    they -- I was -- I -- they de -- deposed me.  They

09:21:59    23    subpoenaed me and wanted me to be a witness.

09:22:01    24      MR. GORDON:  I -- I think he's not

09:22:05    25    understanding -- he's not tracking what you mean by

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

9

09:22:07   1    "retained."

09:22:08   2              MR. SACCHET:  Yeah.  I'll -- I'll clarify

09:22:09   3    the question.

09:22:10   4              MR. GORDON:  Thank you.

09:22:11   5         Q.   So the tobacco industry was examining

09:22:13   6    adversely or --

09:22:15   7         A.   Yes.

09:22:15   8         Q.   Okay.  And who were you --

09:22:17   9         A.   Well I -- yeah, I guess it was --

09:22:19   10             Yeah.  They called me and it was because I

09:22:22   11   had been critical of one of the papers -- one of the

09:22:27   12   chapters at the time, and that's why I was deposed.

09:22:29   13        Q.   What were you critical about?

09:22:31   14        A.   Details on their analysis.

09:22:34   15        Q.   And their analysis is that there was not

09:22:36   16   causation with respect to tobacco use and lung cancer?

09:22:40   17        A.   No.  No.  It was --

09:22:41   18             The analysis had to do with looking at

09:22:44   19   trends, lung cancer trends --

09:22:46   20        Q.   Okay.

09:22:47   21        A.   -- and -- and disease trends, and that's an

09:22:50   22   area that's been of particular statistical interest.

09:22:54   23        Q.   These were time trends?

09:22:56   24        A.   Yes.

09:22:58   25        Q.   Any other times in which you've offered

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

10

09:23:04  1  expert testimony, whether it be in a deposition or

09:23:06  2  through an expert report?

09:23:08  3       A.   No.

09:23:08  4       Q.   You're familiar with the rules of

09:23:14  5  deposition?

09:23:15  6       A.   I think so.

09:23:16  7       Q.   I'll just quickly review them so we're on

09:23:18  8  the same page.

09:23:19  9            As you know, I'll be asking you questions

09:23:21  10  and you'll be answering un -- them under oath.  If you

09:23:23  11  don't understand a question, let me know and I'll do

09:23:26  12  my best to clarify.  For purposes of the court

09:23:31  13  reporter, it's best if you allow me to finish my

09:23:34  14  question before you attempt to answer it so that we

09:23:36  15  have a clear record.  And last and perhaps most

09:23:39  16  importantly, if you could answer all questions

09:23:42  17  verbally as opposed to nodding or shaking your head so

09:23:45  18  we have an opportunity to record your answer.  Is that

09:23:47  19  agreeable?

09:23:48  20       A.   Yes.

09:23:49  21       Q.   In this litigation you've drafted a report;

09:23:53  22  correct, professor?

09:23:54  23       A.   That's correct.

09:24:03  24       Q.   We'll be marking this report as Exhibit 1.

09:24:06  25  I see you have one in front of you, but for the sake

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

11

09:24:09  1  of the exhibit, please determine whether it is a full

09:24:10  2  and accurate copy of the report you have submitted in

09:24:13  3  this case.

09:24:16  4          (Exhibit 1 was marked for

09:24:18  5          identification.)

09:24:18  6          MR. GORDON:  This is just his report without

09:24:19  7  the CV?

09:24:20  8          MR. SACCHET:  Yeah.  I'll get there.

09:24:22  9          MR. SACCHET:  And attached to your --

09:24:24  10         Well I'll let you look at it first.

09:24:33  11         (Exhibit 2 was marked for

          12         identification.)

09:24:35  13     A.  Yes, it appears to be complete.

09:24:37  14     Q.  And you also attached your curriculum vitae

09:24:40  15  to your report; correct?

09:24:42  16     A.  Yes.

09:24:42  17     Q.  And is that an accurate copy of your CV from

09:24:44  18  what you can tell?

09:24:48  19     A.  It appears to be so, yes.

09:24:49  20         MR. SACCHET:  And as another housekeeping

09:25:01  21  matter, we are going to mark Dr. Samet's report as

09:25:07  22  Exhibit 3.

09:25:16  23         (Exhibit 3 was marked for

09:25:17  24         identification.)

09:25:17  25  BY MR. SACCHET:

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

12

09:25:18  1      Q.    The report that you have filed in this case

09:25:21  2   responds to Dr. Samet's report; is that correct, Dr.

09:25:24  3   Holford?

09:25:24  4      A.    Yes, that's correct.

09:25:26  5      Q.    And that appears to be a full version of Dr.

09:25:30  6   Samet's report?

09:25:30  7      A.    It appears to be, yes.

09:25:36  8      Q.    Based on your curriculum vitae, I understand

09:25:40  9   that you have a B.A. in mathematics and chemistry; is

09:25:44  10  that correct?

09:25:44  11     A.    That's correct.

09:25:44  12     Q.    And you earned those degrees from Andrews

09:25:47  13  University?

09:25:47  14     A.    Yes.

09:25:47  15     Q.    Where is Andrews?

09:25:48  16     A.    Berrian Springs, Michigan.

09:25:50  17     Q.    Is that where you're from?

09:25:52  18     A.    No.

09:25:53  19     Q.    Why did you decide to go there?

09:25:57  20     A.    Well my parents basically just made it clear

09:26:02  21  that that's where they wanted me to go.

09:26:05  22     Q.    Okay.  And you subsequently earned a Ph.D.

09:26:08  23  from Yale University in biometrics; correct?

09:26:10  24     A.    That's correct.

09:26:11  25     Q.    And biometrics is the application of

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

13

| | | |
|---|---|---|
| 09:26:14 | 1 | statistical methods to biological data? |
| 09:26:16 | 2 | A.   Basically, yes. |
| 09:26:19 | 3 | Q.   So in large part the focus is on statistics; |
| 09:26:23 | 4 | correct? |
| 09:26:24 | 5 | A.   Yes. |
| 09:26:24 | 6 | Q.   What is the relationship of biostatistics to |
| 09:26:27 | 7 | epidemiology? |
| 09:26:29 | 8 | A.   Epidemiologists use biostatistics a lot in |
| 09:26:35 | 9 | their -- in their research, so there's often a |
| 09:26:38 | 10 | collaborative arrangement between epidemiologists |
| 09:26:42 | 11 | and -- and -- and statisticians. |
| 09:26:44 | 12 | Q.   They are two separate fields though; |
| 09:26:46 | 13 | correct? |
| 09:26:46 | 14 | A.   They are, yes. |
| 09:26:47 | 15 | Q.   You do not have a degree in epidemiology; |
| 09:26:49 | 16 | correct? |
| 09:26:49 | 17 | A.   No. |
| 09:26:50 | 18 | Q.   You do not have clinical training in |
| 09:26:54 | 19 | epidemiology? |
| 09:26:55 | 20 | A.   Most epidemiologists are not clinicians -- |
| 09:26:59 | 21 | or many epidemiologists are not, so no, that's |
| 09:27:03 | 22 | correct. |
| 09:27:03 | 23 | Q.   Some are; correct? |
| 09:27:04 | 24 | A.   Some are. |
| 09:27:05 | 25 | Q.   Dr. Samet is; correct? |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

14

09:27:06    1        A.    Yes.

09:27:07    2        Q.    You are not a medical doctor.

09:27:09    3        A.    No, I am not.

09:27:10    4        Q.    And you are not an anesthesiologist.

09:27:13    5        A.    No.

09:27:14    6        Q.    And you do not have experience in

09:27:16    7    arthroplasty; correct?

09:27:17    8        A.    No.

09:27:19    9        Q.    The majority of your professional career has

09:27:24   10    been at Yale University in a research and teaching

09:27:28   11    capacity; correct?

09:27:28   12        A.    Yes, that's correct.

09:27:30   13        Q.    I saw some examples on your curriculum vitae

09:27:34   14    in which you've gone elsewhere, I think Oxford

09:27:37   15    University and maybe a few other locations, to do

09:27:38   16    other work.  Could you describe those -- those

09:27:44   17    opportunities briefly?

09:27:45   18        A.    Yes.  At Oxford I was on -- I had a

09:27:50   19    sabbatical year which I took at Oxford University.

09:27:53   20        Q.    And what did you do during the sabbatical

09:27:56   21    year?

09:27:56   22        A.    I -- I did research, I taught a class, and

09:28:00   23    I -- I basically worked on my research.

09:28:04   24        Q.    Okay.  With respect to the research that you

09:28:09   25    have published, you have focused on cancer; correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

15

09:28:16  1      A.   I've done a fair amount on cancer.  It's not

09:28:20  2  the only thing I've worked on, but yes.

09:28:22  3      Q.   Other topics that I noticed when I reviewed

09:28:24  4  some of your literature were articles on contraception

09:28:28  5  and pregnancy.

09:28:29  6      A.   That was early on.  It was -- it was more on

09:28:32  7  looking at the potential side effects of contraceptive

09:28:37  8  use.

09:28:38  9      Q.   What would you say are the primary topics of

09:28:43  10  your research in addition to cancer, smoking,

09:28:47  11  contraception and pregnancy?

09:28:50  12      A.   Air pollution is another thing that I've

09:28:53  13  worked on.  Yeah, air pollution and childhood asthma.

09:29:03  14      Q.   Okay.  So I've read a couple of the articles

09:29:05  15  and what I can tell is that you have researched the

09:29:07  16  impact of particulates on respiratory disease;

09:29:11  17  correct?

09:29:11  18      A.   Yes.

09:29:12  19      Q.   Have you ever researched the impact of

09:29:14  20  particulates on other types of disease?

09:29:17  21      A.   Not that I recall.

09:29:21  22      Q.   So it's limited to the impact on respiratory

09:29:24  23  diseases.

09:29:25  24      A.   Yes, particularly childhood -- childhood

09:29:28  25  asthma.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

16

09:29:32   1        Q.   Any other topics of focus?

09:29:36   2        A.   Oh, I've occasionally done things related to

09:29:45   3   in -- infectious diseases.  My dissertation research

09:29:50   4   was on schistosomiasis and statistical modeling for

09:29:56   5   that.  I've done work with a clinical trial on spinal

09:30:01   6   cord injuries, the treatment for spinal cord injury.

09:30:06   7        Q.   Okay.

09:30:12   8        A.   Lots of work in cancer of course,

09:30:14   9   various -- various aspects of it.  Currently, I'm

09:30:17  10   doing a lot of work on population models for cancer,

09:30:22  11   mostly lung cancer, but --

09:30:24  12        Q.   Okay.

09:30:25  13        A.   -- yeah, it's related.

09:30:26  14        Q.   You have not researched computational fluid

09:30:29  15   dynamics; correct?

09:30:31  16        A.   No.

09:30:31  17        Q.   You have not performed research on operating

09:30:33  18   room airflow; correct?

09:30:35  19        A.   On operating --

09:30:37  20             On what?

09:30:38  21        Q.   Room airflow.

09:30:39  22        A.   No.

09:30:39  23        Q.   How about filtration of operating rooms?

09:30:42  24        A.   No.

09:30:43  25        Q.   What about filtration of medical devices?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

17

| | | |
|---|---|---|
| 09:30:46 | 1 | A.   No. |
| 09:30:47 | 2 | Q.   What about anesthesia? |
| 09:30:49 | 3 | A.   No. |
| 09:30:50 | 4 | Q.   Microbiology? |
| 09:30:52 | 5 | A.   No. |
| 09:30:53 | 6 | Q.   Orthopedics? |
| 09:30:55 | 7 | A.   No. |
| 09:30:56 | 8 | Q.   So I assume that means no for deep joint |
| 09:31:00 | 9 | infection. |
| 09:31:00 | 10 | A.   Yes. |
| 09:31:01 | 11 | Q.   Are you offering testimony as to any of |
| 09:31:03 | 12 | those subject matters? |
| 09:31:06 | 13 | A.   I'm offering testimony on statistical |
| 09:31:10 | 14 | aspects that relate to the -- the Bair Hugger.  I |
| 09:31:16 | 15 | don't know if you think that's related or not. |
| 09:31:18 | 16 | Q.   But as to the core topic of those subject |
| 09:31:22 | 17 | matters -- |
| 09:31:23 | 18 | A.   Those subjects, no. |
| 09:31:24 | 19 | Q.   -- you are not opining -- |
| 09:31:25 | 20 | A.   No, I am not. |
| 09:31:26 | 21 | Q.   -- about them discretely; correct? |
| 09:31:28 | 22 | A.   That's correct. |
| 09:31:28 | 23 | Q.   So you are not responding to the reports of |
| 09:31:30 | 24 | Dr. Said Elghobashi, for example, -- |
| 09:31:34 | 25 | A.   No. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

18

09:31:35    1         Q.    -- which is a report on computational fluid

09:31:38    2    dynamics.

09:31:38    3         A.    Yeah.  No, I am not.

09:31:39    4         Q.    And you are not responding to Dr. Jarvis's

09:31:43    5    report from a microbiology standpoint; correct?

09:31:44    6         A.    Not from a microbiology standpoint.

09:31:47    7         Q.    Is your testimony limited to the McGovern

09:31:49    8    study?

09:31:49    9         A.    Primarily, yes.

09:31:51   10         Q.    What do you mean by "primarily?"

09:31:53   11         A.    Well that -- that was the focus of what I

09:31:55   12    was looking at, was the McGovern study.

09:31:57   13         Q.    Your report says that "This report is a

09:31:59   14    review of the observational study of risk for deep

09:32:02   15    joint infection following the use of Bair Hugger

09:32:04   16    warming device during hip and knee replacement

09:32:07   17    surgery...;" correct?

09:32:09   18         A.    Yes.

09:32:10   19              MR. GORDON:  To clarify, subsequent to his

09:32:12   20    report and -- and in light of Dr. Samet's reliance on

09:32:17   21    the newly published Augustine paper, we've asked him

09:32:20   22    to take a look at that.

09:32:21   23         Q.    To the extent that Dr. Samet's causal

09:32:25   24    inference depends on factors outside of the McGovern

09:32:28   25    study, you do not have an expertise to opine on that

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

19

09:32:31    1    subject matter; correct?

09:32:34    2         A.    Yes.

09:32:39    3         Q.    To the extent that Dr. Samet's report

09:32:44    4    includes his experience as a medical doctor, you do

09:32:46    5    not have expertise to respond to those opinions;

09:32:51    6    correct?

09:32:51    7         A.    Not the particular ones that related to the

09:32:54    8    medical opinions, yes.

09:32:56    9         Q.    To the extent that Dr. Samet's report relies

09:32:58   10    on his training in anesthesiology, you do not have

09:33:04   11    expertise to respond those conclusions; correct?

09:33:04   12         A.    That's correct.

09:33:06   13         Q.    To the extent that Dr. Samet's opinions

09:33:12   14    hinge on his experience as a clinical epidemiologist,

09:33:15   15    you do not have experience to respond to those

09:33:17   16    opinions; correct?

09:33:19   17         A.    I have not been a clinical epidemiologist,

09:33:28   18    no.   I have worked -- worked with a lot of others that

09:33:28   19    have done, you know, clinical epidemiology work so

09:33:30   20    I've been involved with people doing that kind of

09:33:33   21    work, but primarily from a statistical perspective.

09:33:37   22         Q.    So you don't have expertise to respond to

09:33:38   23    the clinical side of epidemiology; correct?

09:33:40   24         A.    Correct.

09:33:42   25         Q.    So you are not responding to Dr. Samet's

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

20

09:33:45  1  opinions to the extent that they rely on a clinical

09:33:49  2  perspective of epidemiology; correct?

09:33:50  3      A.   Not the clinical perspective, that's right.

09:33:53  4      Q.   To the extent Dr. Samet's opinions rely on

09:33:57  5  his experience with filtration, you are not responding

09:34:00  6  to those opinions; are you?

09:34:02  7      A.   No.

09:34:04  8      Q.   And to the extent that Dr. Samet relies on

09:34:09  9  his experience in particulate matter, you're not

09:34:15  10 responding to those opinions; are you?

09:34:18  11     A.   No.

09:34:30  12     Q.   You nonetheless opine, however, that

09:34:33  13 particles are simply an intermediate proxy for deep

09:34:38  14 joint infection; correct?

09:34:42  15     A.   I'm sorry, could you repeat that?

09:34:44  16     Q.   Your report states that particles are at

09:34:46  17 most an intermediate outcome that has not been shown

09:34:49  18 to directly relate to the outcome of interest, deep

09:34:51  19 joint infection; correct?

09:34:53  20     A.   Yes.

09:34:54  21     Q.   If you do not have the expertise that Dr.

09:34:58  22 Samet has in airborne particulate matter, on what

09:35:00  23 basis are you making that conclusion?

09:35:02  24          MR. GORDON:  Object to the form of the

09:35:04  25 question.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

21

09:35:06    1        A.    I'm sorry, could you repeat the question?

09:35:08    2        Q.    To the extent that you have concluded that

09:35:10    3    particles are at most an intermediate outcome that has

09:35:13    4    not been shown to relate to the outcome of interest,

09:35:16    5    deep joint infection, on what basis are you making

09:35:18    6    that conclusion?

09:35:20    7        A.    I'm basing that on the -- on the -- some of

09:35:26    8    the manuscripts related -- related to that and some of

09:35:30    9    the other testimony and things that I've related to

09:35:32   10    that or related to the pub -- in terms of the Bair

09:35:35   11    Hugger.

09:35:35   12        Q.    Which manuscripts?

09:35:45   13        A.    I'm -- let's see.  I've --

09:35:52   14             There's some of the work that the

09:36:01   15    Albright -- Albrecht, is that -- the person that works

09:36:05   16    with Augustine, and some of -- some of that work where

09:36:13   17    they were -- where they were trying to look at the --

09:36:20   18    the output from the device and look at the infection,

09:36:26   19    look -- looking for organisms deposited on agar plates

09:36:30   20    from -- from that, it was one of those papers.

09:36:33   21    I've -- I've forgotten exactly which -- which the

09:36:36   22    author was, but I re -- remember that recollection, so

09:36:39   23    that's the basis of that.

09:36:40   24        Q.    And that's your only basis?

09:36:42   25        A.    That's primarily my only basis, yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

22

09:36:44  1       Q.    You know that Mr. Albrecht is not a

09:36:49  2   microbiologist; right?

09:36:49  3       A.    Yes.

09:36:50  4       Q.    You have not reviewed any published studies

09:36:53  5   regarding the link between particles and bacteria and

09:36:56  6   deep joint infection?

09:36:57  7       A.    No, that's not been -- been my primary

09:37:01  8   focus.

09:37:01  9       Q.    So with respect to the conclusion that

09:37:03  10  particles are at most an intermediate outcome that has

09:37:06  11  not been shown to directly relate to the outcome of

09:37:09  12  interest, deep joint infection, you are solely relying

09:37:11  13  on Albrecht's manuscript.

09:37:13  14      A.    His manuscript and his testimony where he

09:37:16  15  was describing how he was trying to deposit organisms

09:37:22  16  onto agar plates and -- and that kind of stuff.  He

09:37:26  17  was --

09:37:26  18            That was not successful, as I recall.

09:37:33  19      Q.    And you're referring to his deposition

09:37:35  20  transcript; correct?

09:37:36  21      A.    Yes.

09:37:42  22      Q.    Have you listed everything that you have

09:37:43  23  relied on on page 14 of your report, which outlines 19

09:37:49  24  different sources?

09:37:57  25      A.    I think so.  That's the -- that's basically

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

23

09:37:57   1   what I relied on in writing this, yes.

09:38:00   2         Q.   Have you reviewed anything since you filed

09:38:03   3   your report until today in addition to those sources?

09:38:11   4         A.   I reviewed the recent paper by Augustine

09:38:20   5   and, let's see, what else?   That's most of what I --

09:38:27   6   what I have -- have re -- reviewed.   I -- I saw some

09:38:38   7   of -- a small piece of Augustine's dep -- deposition,

09:38:44   8   and that's -- that's about it.

09:38:46   9         Q.   Okay.   I'm going to circle back to

09:38:49   10   Albrecht's deposition testimony with respect to the

09:38:52   11   testing that he did on particles and bacteria.

09:39:04   12             (Exhibit 4 was marked for

09:39:09   13             identification.)

09:39:09   14   BY MR. SACCHET:

09:39:10   15         Q.   This is an excerpt of Mr. Albrecht's

09:39:13   16   deposition; correct?

09:39:17   17         A.   Yes.

09:39:19   18         Q.   And if you could turn to page seven in the

09:39:25   19   bottom right-hand corner, or internal page 23 in the

09:39:32   20   top right-hand corner --

09:39:34   21             MR. GORDON:   Did you mark this?

09:39:36   22             THE REPORTER:   Yes.

09:39:37   23             MR. SACCHET:   I did.

09:39:40   24             THE REPORTER:   That's four.

09:39:45   25         Q.   -- and you'll see line 23 of page 23 says,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

24

| | | |
|---|---|---|
| 09:39:49 | 1 | "...Exhibit 1 is a report for -- from certain work -- |
| 09:39:53 | 2 | research activities that were done at the Regina |
| 09:39:56 | 3 | Surgery Center..."  Do you see that, -- |
| 09:39:58 | 4 | A.   Yes. |
| 09:39:58 | 5 | Q.   -- Professor Holford? |
| 09:40:00 | 6 | A.   Uh-huh. |
| 09:40:00 | 7 | Q.   Is this one of the exhibits that you rely on |
| 09:40:05 | 8 | with respect to Mr. Albrecht's testimony regarding |
| 09:40:09 | 9 | bacteria? |
| 09:40:23 | 10 | MR. GORDON:  Do you have that exhibit? |
| 09:40:24 | 11 | MR. SACCHET:  I do. |
| 09:40:27 | 12 | A.   I -- I think this is -- this is -- this is |
| 09:40:30 | 13 | the one, yes. |
| 09:40:31 | 14 | Q.   Did you rely on the deposition testimony or |
| 09:40:34 | 15 | the exhibits to the deposition when you concluded that |
| 09:40:37 | 16 | particles are at most an indeterminate outcome? |
| 09:40:40 | 17 | MR. GORDON:  Object to the form of the |
| 09:40:42 | 18 | question. |
| 09:40:44 | 19 | A.   I was -- I was relying primarily on the -- |
| 09:40:47 | 20 | on the deposition. |
| 09:40:50 | 21 | Q.   Have you seen the Exhibit 1 that was marked |
| 09:40:54 | 22 | at this deposition? |
| 09:40:57 | 23 | A.   I -- I don't recall. |
| 09:41:10 | 24 | (Exhibit 5 was marked for |
| 09:41:12 | 25 | identification.) |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

25

09:41:12   1   BY MR. SACCHET:

09:41:15   2       Q.   Does this document refresh your recollection

09:41:18   3   as to whether you have reviewed Exhibit 1 of the

09:41:21   4   Albrecht deposition?

09:41:27   5       A.   No.  I did not see this document.

09:41:29   6       Q.   You've never seen the document before.

09:41:31   7       A.   No.

09:41:31   8       Q.   So you only relied on the deposition

09:41:34   9   transcript in determining that particles are at most

09:41:37  10   an indeterminate outcome of deep joint infection.

09:41:41  11            MR. GORDON:  Object to the form of the

09:41:42  12   question, assumes facts not in evidence.

09:41:52  13       A.   I think what I'm saying is that this -- this

09:41:54  14   document is not -- was -- was not what I had

09:42:00  15   considered.

09:42:00  16       Q.   Did you review any of the exhibits that were

09:42:04  17   marked at the Albrecht deposition with respect to the

09:42:08  18   testimony regarding testimony of particulates versus

09:42:12  19   bacteria?

09:42:12  20       A.   I didn't review the exhibits, no.

09:42:15  21       Q.   Okay.  Let's go back to the transcripts

09:42:17  22   then.  And I believe your conclusion about particles

09:42:28  23   being related to bacteria can be found on page 19 in

09:42:33  24   the bottom right-hand corner, or page 73, which is the

09:42:37  25   internal page.

26

09:42:43  1          MR. GORDON:  What page?

09:42:44  2          MR. SACCHET:  Nineteen TSG, internal 73.

09:42:47  3          MR. GORDON:  Oh, I see.  All right.

09:42:52  4      Q.  And line 16 states, "Okay.  Did -- so you --

09:42:57  5  you found that there were particles of various sizes,

09:43:00  6  various counts coming out of the Bair Hugger?"

09:43:03  7          Response:  "Yes, we did.

09:43:05  8          "Question:  But you really didn't find much

09:43:07  9  in the way of bacteria coming out?"

09:43:08  10         Response:  "We did not."

09:43:10  11     A.  Yes.

09:43:12  12     Q.  Did you review the other sections of this

09:43:15  13  deposition transcript aside from that conclusion?

09:43:19  14     A.  That's most of what I -- what I noticed in

09:43:24  15  that report, yes.

09:43:25  16     Q.  Okay.  If I could draw your attention to the

09:43:34  17  Exhibit 5, which is the report that is cited in this

09:43:38  18  deposition transcript, the last page, page 12, notes

09:43:44  19  that, in the first bullet point, "...testing done in

09:43:50  20  our lab rated the 505 intake filter at roughly 94

09:43:56  21  percent;" correct?

09:44:00  22     A.  Yes, that's what it says.

09:44:03  23     Q.  Do you have any reason to doubt that the

09:44:05  24  testing that was done with respect to Mr. Albrecht's

09:44:08  25  testimony in this transcript involved a device

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

27

09:44:12  1  different than the 505?

09:44:14  2         MR. GORDON:  Object to the form of the

09:44:15  3  question, lack of foundation.

09:44:17  4         A.  I have no idea what they were using.  I

09:44:20  5  mean --

09:44:20  6         Yeah, I don't -- I don't know.

09:44:23  7         Q.  This exhibit makes clear that testing was

09:44:31  8  done on the 505; correct?

09:44:33  9         A.  Yes.

09:44:34  10        Q.  Are you aware that the model 505 uses a

09:44:37  11  different filter than the Bair Hugger model 750 and

09:44:41  12  775?

09:44:42  13        A.  No.  I -- I'm not familiar with -- with

09:44:45  14  which filters are used on them.

09:44:47  15        Q.  You cited the Reed article in your reference

09:44:50  16  list; correct?

09:44:51  17        A.  Yes.

09:44:52  18        Q.  Did you review that article?

09:44:53  19        A.  I did look at that article, yes.

09:45:04  20        Q.  So you reviewed the article but you're not

09:45:06  21  aware that there are two different filter efficiencies

09:45:09  22  for the model 505 versus the model 750.

09:45:12  23        MR. GORDON:  Object to the form of the

09:45:13  24  question.

09:45:14  25        A.  I was not reviewing the particular filters.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

28

09:45:27  1          (Exhibit 6 was marked for

09:45:29  2          identification.)

09:45:29  3   BY MR. SACCHET:

09:45:31  4       Q.   If you could turn your attention to the

09:45:37  5   column in the right-hand side on page one, the first

09:45:41  6   full sentence starts with "Prior research..."  Do you

09:45:44  7   see that, Dr. Holford?  On the first page, right-hand

09:45:48  8   column.

09:45:50  9          Text, not abstract.

09:45:56  10      A.   "Prior research," is that what you said?

09:45:58  11      Q.   Yes.

09:45:59  12      A.   Yeah.  Okay.

09:45:59  13      Q.   "Prior research has rated the intake

09:46:03  14  filtration efficiency of legacy FAW devices (Bair

09:46:06  15  Hugger 505, Arizant Healthcare) at 93.8 percent for an

09:46:12  16  'older' filter model in clinical use (200708C) and

09:46:20  17  61.3 percent for a 'newer' filter model (200708D)

09:46:29  18  scheduled to replace the older filter in clinical

09:46:31  19  use."  Do you see that?

09:46:32  20      A.   Yes.

09:46:33  21      Q.   Does that make clear that there are two

09:46:35  22  different filtration capacities?

09:46:36  23      A.   Yes, it does.

09:46:37  24      Q.   And the older filter that we're talking

09:46:40  25  about has been denominated as the Bair Hugger 505;

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

29

| | | |
|---|---|---|
| 09:46:42 | 1 | correct? |
| 09:46:43 | 2 | A.   Yes. |
| 09:46:44 | 3 | Q.   And below that, do you see the reference to |
| 09:46:46 | 4 | Bair Hugger 750 in the next paragraph? |
| 09:46:49 | 5 | A.   Yes. |
| 09:46:50 | 6 | Q.   Are you now aware that there are two |
| 09:46:53 | 7 | different filtration efficiencies? |
| 09:46:54 | 8 | A.   Yes. |
| 09:47:05 | 9 | Q.   If we could now turn back to the deposition |
| 09:47:08 | 10 | transcript, which has been marked as Exhibit 4, and if |
| 09:47:15 | 11 | you could turn to page 40, internal page 40, and line |
| 09:47:30 | 12 | nine states, "We were assessing filtration efficiency |
| 09:47:34 | 13 | and that dealt with particles on the in and out |
| 09:47:37 | 14 | stream, because it's very important in case there are |
| 09:47:39 | 15 | resident airborne microbes that could be sucked in and |
| 09:47:42 | 16 | delivered through."  Do you see that? |
| 09:47:44 | 17 | A.   Yes. |
| 09:47:44 | 18 | Q.   Based on that testimony and the documents we |
| 09:47:48 | 19 | have reviewed, is it clear to you that Mr. Albrecht |
| 09:47:52 | 20 | was conducting testing on the filter of the model 505? |
| 09:47:55 | 21 | MR. GORDON:  Object to the form of the |
| 09:47:56 | 22 | question, lacks foundation. |
| 09:48:02 | 23 | A.   I'm not -- I guess I'm not really under -- |
| 09:48:07 | 24 | understanding if he's testing the filter or if he's |
| 09:48:10 | 25 | testing -- you know, filter per se, because as I -- as |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

30

09:48:14  1  I understand it, there's a whole mechanism that's --

09:48:16  2  that's involved here.  It's not just the filter.

09:48:19  3      Q.  Okay.  Let's look at what's been marked as

09:48:23  4  Exhibit 5, the report.

09:48:36  5      A.  Okay.

09:48:37  6      Q.  Do you see point four?

09:48:39  7      A.  Yeah.

09:48:39  8      Q.  Says, "Impaction:  Impaction sampling will

09:48:44  9  be performed on the air stream in the distal region of

09:48:47  10  the hose on a non-specific growth media."

09:48:51  11      A.  Okay.

09:48:51  12      Q.  Are you aware that in order to test whether

09:48:55  13  anything would come out of the hose, it would first

09:48:57  14  need to travel through the filter of the device?

09:49:00  15      A.  Yes.

09:49:00  16          MR. GORDON:  Object to the form of the

09:49:02  17  question, lack of foundation.

09:49:03  18      Q.  You are aware of that.

09:49:04  19      A.  It would have --

09:49:05  20          It would apparently go through -- through

09:49:07  21  the filter, yes.

09:49:08  22      Q.  So with respect to this testing, the model

09:49:11  23  505 was tested to determine whether particles moved

09:49:15  24  through the filter and out of the distal hose;

09:49:19  25  correct?

31

09:49:19  1          MR. GORDON:  Same object -- same objection.

09:49:23  2      A.  It would be doing that, but I've already

09:49:26  3  said that this -- this particular document was not

09:49:31  4  something that I -- I was reviewing.

09:49:33  5      Q.  Well this is a document that's referenced in

09:49:36  6  the deposition of the testing that was done with

09:49:38  7  respect to what you're relying on; correct?

09:49:40  8          MR. GORDON:  Object to the form of the

09:49:41  9  question, and also misconstrues the evidence.

09:49:46  10     A.  What I -- what I think I've -- what I said

09:49:49  11  was -- is I looked at the deposition, I was -- I did

09:49:53  12  not refer to the -- directly to the -- to all -- to

09:49:59  13  all of the exhibits in it.

09:50:00  14     Q.  So now that we're reviewing the exhibit,

09:50:04  15  that is a document -- the testing that was performed

09:50:06  16  by Mr. Albrecht, does that enlighten your viewpoint?

09:50:09  17         MR. GORDON:  Well object to the form of the

09:50:10  18  question.  Counsel, you've shown him one exhibit.

09:50:13  19  There were multiple exhibits marked in the

09:50:15  20  Augus -- at the Albrecht deposition.

09:50:17  21     Q.  We can go back to the line in the exhibit

09:50:20  22  which we reviewed just a moment ago on page --

09:50:23  23  internal page 23 that says, "...Exhibit 1 is a report

09:50:29  24  for -- from certain work -- research activities that

09:50:32  25  were done at the Regina Surgery Center..."  Do you

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

32

09:50:36   1   have any reason to doubt --

09:50:38   2              MR. GORDON:  But that -- that's true,

09:50:39   3   counsel, but you're -- you've jumped ahead about 50

09:50:42   4   pages in the deposition, and I -- I was there, I took

09:50:45   5   it.  There were other exhibits marked.  We were not

09:50:47   6   talking exclusively about Exhibit 1, and I think

09:50:51   7   that's really unfair.

09:50:53   8              MR. SACCHET:  There's one other exhibit I

09:50:55   9   can maintain that regards the testimony that Mr.

09:50:57   10  Albrecht gave in that deposition, and that has been

09:51:00   11  marked as Albrecht Exhibit 3.  Is that what you're

09:51:01   12  referring to, Mr. Gordon?

09:51:01   13             MR. GORDON:  I don't know.  You'd have to

09:51:03   14  show it to me.  But there was -- it wasn't just the

09:51:05   15  Regina testing; there were three different tests.

09:51:08   16       Q.   Okay.  So let's just look at the deposition

09:51:10   17  testimony if you're unwilling to conclude that

09:51:13   18  Exhibit 1 is -- is the foundation for the testimony

09:51:15   19  that Mr. Albrecht provided.

09:51:17   20             On line 36 of the deposition transcript --

09:51:25   21  or excuse me, page 36, if you could turn to that, Dr.

09:51:37   22  Holford, line five states:

09:51:39   23             "So you were looking for particles coming

09:51:42   24  out, that were being blown out of the Bair Hugger --

09:51:44   25             "Uh-huh."

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

33

```
09:51:45   1              Do you see that?
09:51:46   2        A.    Yes.
09:51:46   3        Q.    And the subsequent lines say:
09:51:49   4              "Question:  -- that was the particle
09:51:51   5   counting?
09:51:52   6              "But with the impaction counting you were
09:51:54   7   looking to see if there were any actual bacteria that
09:51:57   8   were being blown out of the Bair Hugger?
09:52:00   9              "Correct."
09:52:00  10        A.    Yes.
09:52:02  11        Q.    Does that provide an example of the
09:52:07  12   testimony that you relied on in determining that Mr.
09:52:10  13   Albrecht's testing involved whether Bair Hugger --
09:52:14  14   whether bacteria came out of the Bair Hugger?
09:52:21  15        A.    Are you asking for --
09:52:23  16              I don't understand the -- the question.  Are
09:52:25  17   you asking was he looking at any -- whether or not any
09:52:30  18   particles were coming out of the Bair Hugger --
09:52:34  19        Q.    Does this --
09:52:35  20        A.    -- or are you asking whether there were
09:52:37  21   bacteria that were coming out of the Bair Hugger?
09:52:40  22        Q.    Was Mr. Albrecht trying to determine that
09:52:42  23   bacteria were being blown out of the Bair Hugger?
09:52:44  24        A.    He was trying to do that, yes.
09:52:46  25        Q.    Okay.  Do you know how he was trying to
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

34

09:52:48  1  sample whether bacteria were coming out of the Bair

09:52:51  2  Hugger?

09:52:53  3      A.   As I've said, this is not really my area,

09:52:59  4  but I -- my understanding was the -- that the kinds of

09:53:02  5  things that he was doing is blowing it on agar plates

09:53:05  6  and things like that.

09:53:06  7      Q.   Do you know what he was blowing it out of?

09:53:08  8      A.   The Bair Hugger, this -- this device.

09:53:11  9      Q.   Do you know whether he was blowing it out of

09:53:13  10  the hose or out of the blanket?

09:53:16  11     A.   I -- I --

09:53:18  12          It's been a while since I read that.  I

09:53:22  13  think it was out of the -- out of the blanket, but I

09:53:24  14  may be -- I may be --

09:53:27  15          I don't recall -- really recall.

09:53:29  16     Q.   Do you know whether bacteria was tested at

09:53:32  17  the surgical site?

09:53:36  18     A.   At --

09:53:36  19          During the surgery?

09:53:37  20     Q.   Was bacteria being collected at the surgical

09:53:40  21  site?

09:53:41  22          MR. GORDON:  At what point?

09:53:43  23          THE WITNESS:  At what point?

09:53:43  24          MR. SACCHET:  During the testing.

09:53:44  25          MR. GORDON:  Which -- which testing?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

35

| | | |
|---|---|---|
| 09:53:46 | 1 | MR. SACCHET:  During the testing that Mr. |
| 09:53:47 | 2 | Albrecht discusses in his deposition transcript that |
| 09:53:50 | 3 | you relied on in opining that particles are at best an |
| 09:53:54 | 4 | indeterminate outcome of bacteria. |
| 09:53:59 | 5 | A.   I'm opining that -- you're looking -- |
| 09:54:01 | 6 | If you're just looking at particles, that's |
| 09:54:03 | 7 | not looking at whether bacteria are on those |
| 09:54:06 | 8 | particles. |
| 09:54:07 | 9 | Q.   And you have stated that -- |
| 09:54:09 | 10 | A.   My understanding was what he was looking at |
| 09:54:11 | 11 | is whether or not there were particles. |
| 09:54:14 | 12 | Q.   Okay.  And you have stated that the |
| 09:54:16 | 13 | foundation for your testimony that particles are at |
| 09:54:18 | 14 | most an indeterminate outcome for bacteria is the |
| 09:54:21 | 15 | Albrecht testing; correct? |
| 09:54:23 | 16 | A.   If -- if you're not looking -- if you're not |
| 09:54:26 | 17 | specifically looking at what those particles are, then |
| 09:54:32 | 18 | that's indirect evidence -- |
| 09:54:36 | 19 | Q.   Are you -- |
| 09:54:36 | 20 | A.   -- is what I'm -- what I'm saying. |
| 09:54:38 | 21 | Q.   Okay.  Are you -- |
| 09:54:39 | 22 | A.   Is that -- |
| 09:54:40 | 23 | Q.   Are you aware that Mr. Albrecht was only |
| 09:54:42 | 24 | testing whether bacteria could be cultured from the |
| 09:54:45 | 25 | air that came through the hose? |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

36

09:54:47   1            MR. GORDON:  Object to the form of the

09:54:48   2   question.

09:54:50   3       A.   I think he was trying to, yeah, culture

09:54:53   4   that -- what was coming out of the hose, yes.

09:54:58   5       Q.   Mr. Albrecht did not conduct testing to

09:55:00   6   determine whether disruption in airflow currents in

09:55:05   7   the operating room caused bacteria to enter the

09:55:08   8   surgical site; correct?

09:55:09   9            MR. GORDON:  Object to the form of the

09:55:10  10   question, assumes facts not in evidence, lack of

09:55:13  11   foundation.

09:55:16  12       A.   Yeah.  I'm not under -- really understanding

09:55:18  13   what your question is.  I --

09:55:20  14       Q.   You reviewed Mr. Albrecht's transcript; --

09:55:22  15       A.   Yes.

09:55:22  16       Q.   -- correct?

09:55:23  17            Did you see any mention in the transcript as

09:55:26  18   to whether Mr. Albrecht did any testing beyond simply

09:55:30  19   sampling bacteria out of the hose?

09:55:35  20       A.   Do you mean taking a swab out of -- of -- in

09:55:39  21   the hose itself, --

09:55:40  22       Q.   No.

09:55:40  23       A.   -- is that what you're saying?

09:55:43  24       Q.   I'm saying the only testing that Mr.

09:55:45  25   Albrecht did was collecting bacteria in an agar plate

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

37

09:55:48   1   from air that came out of the hose of the device.

09:55:50   2        A.   He was trying to do that, yes.

09:55:52   3        Q.   And that's the only testing that he did.

09:55:54   4        A.   No.  He was doing other -- other testing.  I

09:55:58   5   mean there was more to that ex -- those experiences he

09:56:02   6   was doing.  He was trying a number of different

09:56:03   7   things.

09:56:03   8        Q.   In terms of bacterial collection, did he do

09:56:06   9   anything else?

09:56:08  10        A.   He also swabbed, I think, the -- the -- the

09:56:12  11   tube.

09:56:12  12        Q.   Did he do anything else with respect to

09:56:14  13   either swabbing the interior of the tube or collecting

09:56:16  14   bacteria in an agar plate from the air that came

09:56:19  15   directly out of the hose?

09:56:19  16        A.   I don't recall.  I don't recall whether he

09:56:23  17   did or not.

09:56:24  18        Q.   So you don't recall whether Mr. Albrecht did

09:56:26  19   any testing to see whether the Bair Hugger created

09:56:30  20   convection currents that caused bacteria in the

09:56:33  21   operating room to go to the surgical site.

09:56:37  22        A.   I don't recall seeing any direct evidence

09:56:38  23   of -- of that.

09:56:39  24        Q.   And you're aware that Dr. Samet has opined

09:56:43  25   that there are two mechanisms of infection; correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

38

09:56:47   1          A.    Yes.

09:56:47   2          Q.    One mechanism is bacteria coming directly

09:56:50   3    from the Bair Hugger device itself; correct?

09:56:54   4          A.    Yes.

09:56:54   5          Q.    And the other mechanism is from the air --

09:56:57   6    from the airflow being generated from the Bair

09:57:00   7    Hugger --

09:57:00   8          A.    Yes.

09:57:00   9          Q.    -- causing bacteria to enter the surgical

09:57:02   10   site; correct?

09:57:03   11         A.    Yes.

09:57:04   12         Q.    So you're not aware of whether Mr. Albrecht

09:57:06   13   did any testing that goes to the second causal

09:57:09   14   mechanism; correct?

09:57:11   15         A.    Well I mean I think the -- the mechanism

09:57:14   16   we -- we've talked about where he's looking at the --

09:57:17   17   at what came out -- came out of the -- out of the

09:57:20   18   device, my assumption is that he was interested in

09:57:24   19   that because that -- that would then en -- enter

09:57:27   20   the -- the -- the air around the -- where -- where the

09:57:33   21   surgery was being conducted, and that that would be a

09:57:36   22   mode of -- for the -- for the second mode of -- of

09:57:40   23   infection that Samet is talking about.

09:57:42   24         Q.    Dr. Samet does not conflate the first

09:57:44   25   mechanism with the second mechanism; correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

39

09:57:46    1        A.    Yes.

09:57:47    2        Q.    So there is an entirely separate mechanism

09:57:49    3   which involves air being generated in the operating

09:57:52    4   room --

09:57:52    5        A.    Yes.

09:57:53    6        Q.    -- that causes bacteria to land on the

09:57:54    7   surgical site.

09:57:55    8        A.    Right.

09:57:56    9        Q.    Mr. Albrecht's test -- Mr. Albrecht's

09:57:59   10   testing was about air coming out of the hose into an

09:58:02   11   agar plate; correct?

09:58:04   12        A.    Yes.

09:58:04   13             MR. GORDON:   Objection, lack of foundation.

09:58:05   14        Q.    That does not directly involve whether

09:58:07   15   airflow created currents that caused bacteria to enter

09:58:09   16   the surgical site.

09:58:12   17        A.    It might, but it -- but -- but --

09:58:18   18             Yeah.   I mean it's not -- it's not directly

09:58:21   19   testing it while the operation is -- is being

09:58:24   20   conducted.   He's -- he's trying to get indirect

09:58:27   21   evidence of that -- that -- that -- that mechanism of

09:58:31   22   where the infection could have been caused.

09:58:33   23        Q.    So to the extent that you have concluded

09:58:35   24   based on Mr. Albrecht's testimony that particles are

09:58:39   25   at most an indeterminate outcome -- intermediate

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

40

09:58:41   1   outcome of deep joint infections, it relates solely to

09:58:45   2   the first causal mechanism that Dr. Samet described in

09:58:49   3   his report.

09:58:49   4             MR. GORDON:  Object to the form of the

09:58:50   5   question, misstates the testimony.

09:58:54   6        A.   The -- the two mechanisms --

09:58:57   7             I'm sorry, what -- what did you call the

09:58:58   8   first one?

09:58:58   9        Q.   The first mechanism of infection is bacteria

09:59:01   10  being blown directly out of the Bair Hugger onto the

09:59:04   11  surgical site.

09:59:08   12       A.   Yes.

09:59:08   13       Q.   The second mechanism of infection that Dr.

09:59:12   14  Samet describes is the Bair Hugger creating convection

09:59:15   15  currents in the operating room airflow --

09:59:17   16       A.   Right.  Okay.

09:59:18   17       Q.   -- that cause bacteria from anywhere in the

09:59:20   18  operating room, not just the Bair Hugger device, --

09:59:22   19       A.   Right.

09:59:23   20       Q.   -- to enter the surgical field.

09:59:25   21       A.   Yes.

09:59:25   22       Q.   Mr. Albrecht's testing did not involve

09:59:28   23  mechanism two.

09:59:29   24       A.   That's correct.

09:59:30   25       Q.   To the extent that you have opined that

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

41

| | | |
|---|---|---|
| 09:59:32 | 1 | particles are at best an indeterminate outcome of deep |
| 09:59:37 | 2 | joint infection, you are relying on Mr. Albrecht's |
| 09:59:40 | 3 | testimony; correct? |
| 09:59:40 | 4 | A.   In part, yes. |
| 09:59:42 | 5 | Q.   You told me in full.  Is there something |
| 09:59:45 | 6 | else now that you're relying on to make that |
| 09:59:47 | 7 | conclusion? |
| 09:59:48 | 8 | A.   Well the -- what he -- |
| 09:59:51 | 9 | As I understand it, what he was looking at |
| 09:59:53 | 10 | was particles and without distinguishing exactly what |
| 09:59:59 | 11 | those particles were, so what I'm saying, he looked -- |
| 10:00:07 | 12 | You know, there are particles there, that's |
| 10:00:09 | 13 | part of what he shows; some of them may come directly |
| 10:00:13 | 14 | from the hose, some of them maybe have been -- involve |
| 10:00:17 | 15 | the second -- second mechanism where it disturbed the |
| 10:00:20 | 16 | air around it and has particles from that.  What I'm |
| 10:00:24 | 17 | opining on is that the -- directly measuring bacteria |
| 10:00:31 | 18 | or infectious agents on those particles, that's -- |
| 10:00:37 | 19 | that's what I was referring to. |
| 10:00:39 | 20 | Q.   But you would agree that Mr. Albrecht's |
| 10:00:43 | 21 | testing did not directly relate to causal mechanism |
| 10:00:46 | 22 | two.  You've already said that. |
| 10:00:50 | 23 | MR. GORDON:   Object. |
| 10:00:50 | 24 | A.   Okay.  Yes. |
| 10:00:51 | 25 | Q.   And so your conclusion, which are that |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

42

| | | |
|---|---|---|
| 10:00:55 | 1 | particles are an indeterminate outcome of deep joint |
| 10:00:57 | 2 | infection, relies on Mr. Albrecht's conclusions as to |
| 10:01:01 | 3 | causal mechanism number one. |
| 10:01:06 | 4 | A.   In -- in part, yes.  But the -- |
| 10:01:10 | 5 | To say that what's on the particles, I mean |
| 10:01:14 | 6 | that -- that -- I'm -- I'm making that -- that -- that |
| 10:01:19 | 7 | claim generally.  It's more than just looking at |
| 10:01:23 | 8 | whether or not the particles have been dispersed, it's |
| 10:01:26 | 9 | looking at what -- what's on those particles and |
| 10:01:29 | 10 | analyzing the content of those particles. |
| 10:01:31 | 11 | Q.   Have you -- |
| 10:01:32 | 12 | A.   And from what I can tell, there was no |
| 10:01:35 | 13 | analysis of the chemistry or direct measurements of |
| 10:01:39 | 14 | the -- of what if any organ -- any infectious |
| 10:01:45 | 15 | organisms were on those particles. |
| 10:01:47 | 16 | Q.   So would it help you if there were studies |
| 10:01:49 | 17 | that linked particle concentration to bacterial |
| 10:01:52 | 18 | concentration? |
| 10:01:53 | 19 | MR. GORDON:  Object to the form of the |
| 10:01:54 | 20 | question. |
| 10:02:00 | 21 | A.   Are you -- you mean -- |
| 10:02:02 | 22 | Do you mean any studies or do you mean |
| 10:02:03 | 23 | studies particularly related to the Bair Hugger |
| 10:02:06 | 24 | device? |
| 10:02:06 | 25 | Q.   I'm saying peer-reviewed literature that |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

43

10:02:10  1  would conclude that particles are linked to bacteria.

10:02:15  2          MR. GORDON:  Object to the form of the

10:02:16  3  question.

10:02:17  4      A.   The parti -- I -- I --

10:02:19  5          Yeah, I -- I don't under --

10:02:20  6      Q.   Okay.  I'll rephrase.

10:02:22  7          Would it help if there was peer-reviewed

10:02:26  8  literature which concluded that as the number of

10:02:29  9  particles increase, so too do the number of bacteria?

10:02:33  10          MR. GORDON:  Object to the form of the

10:02:36  11  question.

10:02:36  12      A.   Always?

10:02:36  13      Q.   In a randomized controlled trial in

10:02:39  14  orthopedic surgeries.

10:02:41  15      A.   So you're analyzing the -- the particles

10:02:44  16  that are in the -- on the operating room during --

10:02:47  17  during orthopedic surgery --

10:02:49  18      Q.   Yes.

10:02:50  19      A.   -- and -- and looking at -- at --

10:02:55  20          Yeah.  If -- if there were -- if -- if I had

10:03:01  21  seen reports of that, I -- I would find that more

10:03:03  22  convincing, yes.

10:03:06  23      Q.   And that would allow you to determine

10:03:08  24  whether an increase in particles could be linked to

10:03:12  25  bacteria.

44

10:03:14  1      A.   It's a possibility.  Again, it's -- it's --

10:03:19  2   from when --

10:03:20  3           When I say "indirect," the direct evidence

10:03:23  4   is ultimately the infection.  That's the --

10:03:27  5      Q.   Okay.

10:03:28  6      A.   That's the event you want to look at and

10:03:31  7   that's -- that's the event that's of most interest.

10:03:34  8   But the event you're talking about is whether or not

10:03:36  9   there's something on the particles.

10:03:38  10     Q.   So if deep joint infection is the outcome of

10:03:41  11  interest, --

10:03:41  12     A.   Yes.

10:03:42  13     Q.   -- it would be especially helpful if there

10:03:44  14  was an article that linked particles to bacteria, and

10:03:48  15  what I mean by that is that the more particles, the

10:03:51  16  more bacteria, but also found that the more bacteria,

10:03:54  17  the greater risk of infection.

10:03:56  18     A.   Yes.

10:03:57  19     Q.   That would be very helpful evidence in

10:04:01  20  determining whether the Bair Hugger increases the risk

10:04:03  21  of infection.

10:04:06  22     A.   Well it's -- it's not directly related to

10:04:09  23  the Bair Hugger, but it would be -- yeah, it --

10:04:14  24  it's -- it's helping to pose -- to understand what the

10:04:21  25  potential mechanism might be.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

45

10:04:23  1      Q.   What about studies that have -- that would

10:04:25  2  have concluded that the Bair -- Bair Hugger actually

10:04:29  3  increases the number of bacteria at the surgical site,

10:04:32  4  would that be helpful?

10:04:35  5      A.   Yes.

10:04:37  6      Q.   And studies that show that the Bair Hugger

10:04:39  7  increases the number of particles at the surgical

10:04:43  8  site.

10:04:45  9      A.   Yes.  Compared to, you know, whatever the

10:04:48  10  comparison group is, yes.

10:04:54  11      Q.   Did you review any articles involving the

10:04:58  12  subject matter we just discussed, which is the

10:05:01  13  relationship of particles to bacteria and bacteria to

10:05:03  14  deep joint infection?

10:05:05  15      A.   That was not really part of my -- my review,

10:05:07  16  no.

10:05:08  17      Q.   So you have not reviewed the article by

10:05:11  18  Gregory Stocks; correct?

10:05:13  19      A.   No.

10:05:13  20      Q.   You have not reviewed the article by

10:05:16  21  Darouiche et al; correct?

10:05:18  22      A.   Correct.

10:05:18  23      Q.   You have not reviewed the article by

10:05:21  24  Moretti.

10:05:22  25      A.   Correct.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

46

10:05:46    1            (Exhibit 7 was marked for

10:05:48    2            identification.)

10:05:48    3    BY MR. SACCHET:

10:05:51    4        Q.    Doctor, this is an article authored by

10:05:53    5    Gregory Stocks; correct?

10:05:54    6        A.    Yes.

10:05:56    7        Q.    The title of the article is "Predicting

10:06:00    8    bacterial populations based on airborne particulates:

10:06:04    9    A study performed in nonlaminar flow operating rooms

10:06:06   10    during joint arthroplasty surgery;" correct?

10:06:10   11        A.    That's the correct title, yes.

10:06:12   12        Q.    The title involves the same subject matter

10:06:13   13    that we have just been discussing, which is the

10:06:16   14    relationship of particles to bacteria in orthopedic

10:06:18   15    surgeries; correct?

10:06:19   16            MR. GORDON:  Object to the form of the

10:06:20   17    question, lack of foundation.

10:06:22   18            If you want him to read -- read it so he can

10:06:24   19    answer the question --

10:06:25   20            MR. SACCHET:  I asked if the title reflects

10:06:28   21    the subject matter that we have discussed.  I said

10:06:30   22    nothing about the article itself.

10:06:33   23        A.    It appears to, yes.

10:06:37   24        Q.    And if I could turn your attention to the

10:06:39   25    bottom right-hand corner of the first page, do you see

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

47

10:06:47 1  the paragraph beginning, "The purpose of this study

10:06:50 2  was to determine whether the density of airborne

10:06:53 3  particulates at the surgery site and various behaviors

10:06:56 4  of operating room personnel can be used to predict the

10:06:59 5  density of viable airborne bacteria (ie, colony-

10:07:04 6  forming units (CFU) at the surgery site during hip and

10:07:07 7  knee joint arthroplasty?"

10:07:09 8     A.    Yes.

10:07:10 9     Q.    This --

10:07:11 10          The purpose of this article was to determine

10:07:12 11 whether particulates are related to bacteria in

10:07:16 12 orthopedic surgery; correct?

10:07:17 13    A.    Yes.

10:07:20 14    Q.    If you could turn to the third page of the

10:07:23 15 study in the "RESULTS" section on the right-hand

10:07:41 16 column in the first full paragraph that begins "Table

10:07:46 17 2..."  Do you see that?

10:07:49 18    A.    Yes.

10:07:49 19    Q.    The last sentence of that paragraph states,

10:07:54 20 "Neither sex nor surgery type was significantly

10:07:58 21 related to the square root CFU/m cubed;" correct?

10:08:08 22          I guess it's the second sentence.  I

10:08:10 23 apologize.

10:08:10 24    A.    Oh, oh, I -- okay.  I was looking at the --

10:08:15 25    Q.    Do you see the third sentence?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

48

10:08:18  1    A.   "...nor surgery type...," that's what it

10:08:23  2  says.

10:08:23  3    Q.   Yeah.  And the second --

10:08:24  4         And the next sentence says, "Surgery

10:08:27  5  duration, 5 micron to 9.99 micron particles per meter

10:08:33  6  cubed, greater than or equal to 10 micron particles

10:08:38  7  count per m cubed and staff count were each

10:08:42  8  significantly related (with a p-value of less than

10:08:46  9  .05) to the square root of the CFU per meters cubed;"

10:08:51  10  correct?

10:08:52  11    A.   That's what it says, yes.

10:08:57  12    Q.   Turning to the next page, in the right-hand

10:09:01  13  column, the first full paragraph begins with, "The

10:09:05  14  finding of a correlation..."  Do you see that?

10:09:07  15    A.   Yes.

10:09:08  16    Q.   It states, "The finding of a correlation

10:09:11  17  between the number of 10 micron particles per meter --

10:09:14  18  per m cubed and CFU per m cubed at the surgical site

10:09:18  19  has several important implications.  First, it

10:09:21  20  supports airborne parti -- particulate contamination

10:09:23  21  of the wound as a source of postoperative infection in

10:09:26  22  joint arthroplasty, as emphasized by Edmiston et al."

10:09:31  23  Do you see that?

10:09:32  24    A.   Yes.

10:09:33  25    Q.   And finally on the last page, the last

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

49

10:09:37  1  paragraph of text, do you see where it starts, "We

10:09:41  2  have found...?"

10:09:41  3      A.   Yes.

10:09:42  4      Q.   And it relates that, "We have found that the

10:09:45  5  number of airborne particulates greater than 10

10:09:47  6  microns was correlated with the number of CFUs grown

10:09:50  7  from the air sampled within the sterile field

10:09:53  8  approximately 40 centimeters from surgical incision."

10:09:57  9  Do you see that?

10:09:57  10      A.   Yes.

10:09:58  11      Q.   Do you have any reason to doubt the

10:09:59  12  conclusions of Stocks et al?

10:10:03  13      A.   I have not --

10:10:04  14          This is the first I've -- first I've seen

10:10:06  15  this paper, so I would have to study it and -- to get

10:10:12  16  a better understanding of their methodology and what

10:10:14  17  they had done to -- to reach an opinion on this paper.

10:10:17  18      Q.   Would it help you if one of 3M's past

10:10:23  19  experts had opined that the methods were good?

10:10:27  20          MR. GORDON:  Object to the form of the

10:10:28  21  question.

10:10:28  22      A.   No.

10:10:28  23      Q.   Do you know Mr. Russ -- Mr. Russell

10:10:31  24  Olmstead, an epidemiologists and infectious --

10:10:36  25      A.   No, I don't know him.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

50

10:10:37  1      Q.   -- disease doctor?

10:10:38  2      A.   No, I don't know him.

10:10:39  3      Q.   So you're not aware that he has stated that

10:10:41  4  the methods of Stocks are well done.

10:10:43  5           MR. GORDON:  Object to the form of the

10:10:44  6  question.

10:10:47  7      A.   I am not aware of what he -- what he has

10:10:50  8  said about this paper.  I'm not familiar with it.

10:11:03  9           (Exhibit 8 was marked for

10:11:05  10           identification.)

10:11:05  11  BY MR. SACCHET:

10:11:07  12     Q.   The subject line of this e-mail is "Stocks

10:11:10  13  Papers;" correct?

10:11:17  14     A.   Yes.

10:11:21  15     Q.   In the e-mail at the top we have a statement

10:11:25  16  from Mr. Gary Hansen to a Mr. Russell Olmstead

10:11:29  17  stating, "Could you send me a copy of the older Stocks

10:11:31  18  paper?  AJIC does not sell them on line."  Do you see

10:11:36  19  that?

10:11:36  20     A.   Yes.

10:11:37  21     Q.   And in the e-mail below that there are two

10:11:40  22  paragraphs; correct?

10:11:41  23     A.   Yes.

10:11:42  24     Q.   And the text is from Russell Olmstead, do

10:11:46  25  you see that?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

51

10:11:48   1      A.    Yes.

10:11:48   2      Q.    And the first line says, "Hi Gary:  fairly

10:11:51   3   remarkable paper given an ability to present during

10:11:54   4   actual procedures.  I had not seen it so thanks for

10:11:57   5   bringing it to my attention.  Demonstrates that pre

10:12:00   6   press page is useful place to visit often.  It is

10:12:03   7   difficult to get IRB approval for such investigations.

10:12:06   8   I don't know the authors but the methods employed are

10:12:09   9   very good and I like the use of electronic particle

10:12:12  10   counts AND bacterial air sampling.  Very helpful

10:12:15  11   picture of what happens in a typical non-

10:12:17  12   unidirectional HVAC design."  Do you see that?

10:12:20  13      A.    Yes.

10:12:22  14      Q.    Do you have any reason to doubt that the

10:12:24  15   methods in this paper are anything but well designed?

10:12:27  16            MR. GORDON:  Object to the form of the

10:12:28  17   question, also lack of foundation.

10:12:33  18      A.    I don't un -- I mean I -- I -- that's --

10:12:39  19            That's this person's review of it, that's

10:12:46  20   his opinion of it.  I agree -- I agree that that's his

10:12:51  21   opinion.  I don't have an opinion on it because I have

10:12:53  22   not reviewed it.

10:12:54  23      Q.    But you have seen that this article has

10:12:56  24   concluded that there is a link between airborne

10:12:59  25   particulates and bacteria; correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

52

10:13:01   1        A.    I've --

10:13:03   2             You just read me the paragraph, and I agree

10:13:05   3   that you've read them correctly to me.

10:13:08   4        Q.    And as we established earlier, you said it

10:13:10   5   would be helpful if there was peer-reviewed literature

10:13:13   6   concluding that there was a link between particles and

10:13:15   7   bacteria; correct?

10:13:17   8        A.    Well it would be helpful if I -- if it

10:13:19   9   was not only peer-reviewed but I had a chance to

10:13:22  10   review it.

10:13:22  11        Q.    So --

10:13:23  12        A.    I'm not going to take a peer-reviewed

          13   article --

10:13:26  14             You know, every peer-reviewed article is

10:13:29  15   not -- is not -- not appro -- not correct, --

10:13:32  16        Q.    Okay.

10:13:33  17        A.    -- so I need --

10:13:34  18             One needs a chance to actually review the

10:13:36  19   science and digest what -- what was -- the work that

10:13:39  20   was actually done to reach a conclusion.

10:13:41  21        Q.    So you did not review this article in

10:13:43  22   opining that particles are at most an indeterminate

10:13:46  23   outcome of deep joint infection.

10:13:49  24        A.    That's correct.

10:13:49  25        Q.    You also said that it would be helpful if

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

53

10:13:51   1   there were articles that concluded that particles were

10:13:54   2   not only related to bacteria but also that bacteria

10:13:57   3   was related to deep joint infection; correct?  That's

10:14:01   4   what you testified to.

10:14:02   5        A.   Yes.

10:14:03   6        Q.   Have you reviewed any such articles,

10:14:07   7   professor?

10:14:11   8        A.   No, I haven't.  I mean it's -- it's -- this

10:14:14   9   is not --

10:14:15   10            That particular part of it is not really my

10:14:18   11   area.

10:14:18   12       Q.   So it's not your area, but you concluded

10:14:21   13   that particles are at most an indeterminate outcome of

10:14:24   14   infection.

10:14:28   15       A.   I --

10:14:30   16            The infection is the ultimate outcome that I

10:14:37   17   was interested in in looking at the McGovern paper, so

10:14:44   18   it's the occurrence of the infection which is -- which

10:14:48   19   is the outcome that I was most interested in.  Whether

10:14:53   20   there's infectious organisms on particles is basically

10:15:01   21   an intermediate step which would be helpful of

10:15:05   22   understanding, perhaps, how they got there.

10:15:08   23       Q.   Okay.

10:15:09   24       A.   But it's not the outcome that I was

10:15:12   25   particularly interested in.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

54

10:15:14  1      Q.   So let's look at this paper which --

10:15:16  2           THE REPORTER:  Just a moment.

10:15:27  3           (Exhibit 9 was marked for

10:15:28  4           identification.)

10:15:28  5  BY MR. SACCHET:

10:15:32  6      Q.   The title of this article is the

10:15:34  7  "Association of Airborne Microorganisms in the

10:15:36  8  Operating Room With Implant Infections:  A Randomized

10:15:39  9  Controlled Trial;" correct?

10:15:40  10     A.   Yes.

10:15:41  11     Q.   The title of this article relates to the

10:15:45  12  relationship of airborne microorganisms to infection;

10:15:50  13  correct?

10:15:50  14     A.   That's what the title is, yes.

10:15:52  15     Q.   That is the subject matter by which you

10:15:54  16  testified one minute ago that it would be helpful to

10:15:57  17  review to determine whether bacteria are related to

10:16:00  18  the outcome of interest, deep joint infection;

10:16:03  19  correct?

10:16:03  20     A.   That would be helpful for under -- to

10:16:06  21  perhaps get an understanding of the mechanisms, yes.

10:16:09  22     Q.   The objective of the paper was to, quote,

10:16:12  23  "To evaluate the association of airborne colony-

10:16:16  24  forming units (CFU) at incision sites during

10:16:18  25  implantation of prostheses with the incidence of

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

55

10:16:22   1   either incisional or prosthesis-related surgical site

10:16:25   2   infections;" correct?

10:16:26   3        A.   Yes.

10:16:27   4        Q.   This was a randomized controlled trial;

10:16:31   5   correct?

10:16:31   6        A.   That's what it says.

10:16:32   7        Q.   Randomized controlled trials are first-tier

10:16:36   8   scientific evidence; correct?

10:16:38   9        A.   They can be, yes.

10:16:40  10        Q.   Are there other types of studies that are

10:16:42  11   given more weight than RCTs?

10:16:45  12        A.   In general, they're -- they're given the

10:16:47  13   most weight, yes, if they're well done.

10:16:55  14        Q.   If we could turn to page six, and you'll see

10:17:00  15   the pages are listed on the top of the paper, under

10:17:10  16   the header "CFU and Particulate Densities and

10:17:13  17   Infection," do you see that heading?

10:17:16  18        A.   Yes.

10:17:18  19        Q.   It states, "CFU density at incision sites

10:17:21  20   was significantly related to incidence of implant

10:17:24  21   infections (with a p-value of .021), but not of

10:17:28  22   incisional infections (with a p-value of .687).  Every

10:17:34  23   10 CFU per m cubed increase in median CFU denies

10:17:39  24   approximately doubled the probability of implant

10:17:41  25   infection (Figure 4).  CFU density was positively

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

56

10:17:45  1  related to total particulate density (with a p-value

10:17:49  2  of less than .001) in the control group, indicating

10:17:54  3  that airborne particle counts may be used as a proxy

10:17:57  4  for ambient CFU density."  Do you see that?

10:18:00  5       A.   Yes.

10:18:06  6       Q.   On page eight of this study, very last

10:18:14  7  paragraph, do you see that?

10:18:20  8       A.   Yes.

10:18:22  9       Q.   "In conclusion, our results indicate that

10:18:24  10  CFU contamination of air at the incision site is a

10:18:27  11  risk factor for implant but not incisional infections.

10:18:32  12  CFU contamination is related to the particulate

10:18:35  13  density in the air at the incision site, and both CFU

10:18:39  14  and particulate density are a function of the number

10:18:42  15  of people in the operating room.  Limiting airborne

10:18:45  16  CFU contamination at the incision site can be expected

10:18:48  17  to lower implant infection risk."

10:18:51  18       Did I read that correctly?

10:18:52  19       A.   Yes.

10:18:54  20       Q.   You have no reason to doubt that conclusion;

10:18:56  21  do you?

10:18:56  22       MR. GORDON:  Object to the form of the

10:18:58  23  question, lack of foundation.

10:19:00  24       A.   That conclusion would be based on the -- the

10:19:06  25  whole study, and you've just given me this study, and

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

57

10:19:10  1   I haven't had a chance to really study this paper, so

10:19:12  2   I would -- I would need to study the paper in order

10:19:15  3   to -- to have an opinion on that conclusion.

10:19:19  4        Q.   You didn't study the paper, but you did

10:19:21  5   conclude that particles are at best an indeterminate

10:19:24  6   outcome of infection; correct?

10:19:26  7             MR. GORDON:  Object to the form of the

10:19:27  8   question.

10:19:31  9        A.   I -- I concluded, as I've -- I've explained

10:19:37  10  the reason my --

10:19:39  11            What I meant when I said that is that that

10:19:43  12  was a diff -- an intermediate outcome.  I mean what

10:19:48  13  you have read to me does not --

10:19:53  14            I didn't see that the Bair Hugger was

10:19:55  15  involved with this.  Is that correct?

10:19:58  16       Q.   The Bair Hugger was not involved in this

10:20:00  17  study.

10:20:00  18       A.   Okay.

10:20:01  19       Q.   Would it help you if I showed you studies --

10:20:03  20       A.   If you --

10:20:03  21            If this study had used the Bair Hugger, that

10:20:05  22  would help.

10:20:06  23       Q.   Would it help you if I showed you studies

10:20:08  24  showing the Bair Hugger increasing particles or

10:20:10  25  increasing bacteria?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

58

10:20:11  1            MR. GORDON:  Object to the form of the

10:20:13  2  question, compound.

10:20:18  3        A.  Well which -- which --

10:20:19  4            What is the outcome that you're -- you're

10:20:21  5  showing me?

10:20:22  6        Q.  So we have a study here, and you would agree

10:20:25  7  that it has concluded that particles have a

10:20:29  8  relationship to bacteria and bacteria has a

10:20:32  9  relationship to deep joint infection; correct?

10:20:35  10            MR. GORDON:  Are you talking about Exhibit

10:20:36  11  8?

10:20:36  12            MR. SACCHET:  I'm talking about Exhibit --

10:20:38  13        A.  Exhibit 9?

10:20:39  14            MR. SACCHET:  -- 9.

10:20:40  15        A.  What?

10:20:41  16        Q.  This paper concludes --

10:20:42  17        A.  This one is 9.

10:20:44  18        Q.  Darouiche, Exhibit 9.

10:20:46  19        A.  Yeah, okay.

10:20:47  20        Q.  -- that the amount of particles is related

10:20:49  21  to the amount of bacteria; correct?

10:20:51  22        A.  That's what they -- that's this paper --

23  that's --

10:20:55  24            That's what they found in -- in this trial.

10:20:57  25        Q.  Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

59

10:20:58  1      A.    That appears to be from the limited reading

10:20:59  2   that -- that we've just done.

10:21:01  3      Q.    You have seen that it's a randomized

10:21:03  4   controlled trial.

10:21:04  5      A.    I've seen it described there.  I have not

10:21:06  6   reviewed exactly what they did, how they did the

10:21:09  7   randomization.

10:21:10  8      Q.    And this paper also concludes that the

10:21:13  9   number of bacteria increase -- as the bacteria

10:21:18  10  increases, that increases the risk of DJI, deep joint

10:21:22  11  infection; correct?

10:21:23  12     A.    That is their -- that is their conclusion,

10:21:25  13  yes.

10:21:26  14     Q.    If this paper did not involve the Bair

10:21:28  15  Hugger, would it help you to see studies that conclude

10:21:30  16  that the Bair Hugger increases particles?

10:21:34  17     A.    It would -- it would help to see that it

10:21:37  18  increases particles and it increases the -- the risk

10:21:41  19  of infection.

10:21:43  20     Q.    If this paper establishes a link between

10:21:46  21  particles, bacteria and infection, --

10:21:48  22     A.    Yes.

10:21:49  23     Q.    -- and the Bair Hugger increases particles,

10:21:52  24  is it your testimony that one cannot also conclude

10:21:56  25  that the Bair Hugger increases bacteria?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

60

10:21:58   1          MR. GORDON:  Object to the form of the

10:21:59   2   question, lack of foundation, incomplete hypothetical.

10:22:03   3       Q.   It's a simple syllogism:  Premise one,

10:22:07   4   particles relate to bacteria; premise two, bacteria

10:22:11   5   relates to deep joint infection.  Q.E.D., if Bair

10:22:14   6   Hugger increases particles, does it increase bacteria?

10:22:17   7          MR. GORDON:  Object to the form of the

10:22:19   8   question, lack of foundation, it's an incomplete

10:22:22   9   hypothetical.

10:22:23  10       A.   You haven't -- you -- you haven't shown the

10:22:25  11   whole -- whole scenario.

10:22:28  12       Q.   What's the whole scenario?

10:22:30  13       A.   Well that -- that you used the Bair -- used

10:22:34  14   the Bair Hugger --

10:22:34  15       Q.   Yeah.

10:22:34  16       A.   -- and that in turn increases your risk

10:22:37  17   of -- the risk of infection.

10:22:38  18       Q.   So you would only conclude that the Bair

10:22:42  19   Hugger increases infection if there was a study

10:22:45  20   showing the Bair Hugger increases the risk of

10:22:48  21   infection.

10:22:49  22          MR. GORDON:  Object to the form of the

10:22:51  23   question.

10:22:53  24       A.   I would -- I would want to see a well-

10:22:58  25   controlled study that showed that use of the Bair

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

61

10:23:01  1  Hugger during surgery increased risk of -- of -- of

10:23:05  2  infection.

10:23:06  3      Q.    Epidemiology considers more than evidence

10:23:10  4  that draws a unidirectional link between a variable

10:23:16  5  and an outcome; correct?

10:23:17  6          MR. GORDON:  Object to the form of the

10:23:19  7  question.

10:23:19  8      A.    Yeah.  I don't understand the question.

10:23:21  9      Q.    Part of epidemiology considers the mechanism

10:23:24  10  of infection; correct?

10:23:25  11      A.    That's one aspect of interest, yes.

10:23:27  12      Q.    That relates to the coherency of whether a

10:23:33  13  cause increases an outcome; correct?

10:23:35  14      A.    That's one of the considerations, is the

10:23:38  15  mech -- is -- is the mechanism.

10:23:39  16      Q.    And when you consider a mechanism, you can

10:23:42  17  consider intermediate outcomes that lend biological

10:23:47  18  plausibility to causal inference; correct?

10:23:50  19      A.    Well intermediate outcomes very often

10:23:53  20  have -- have -- have not worked out in ep -- in

10:23:58  21  epidemiological studies.  Sometimes -- sometimes --

10:24:00  22      Q.    I'm going to -- I'm going to interrupt you

10:24:02  23  and mover to strike.  The question is --

10:24:04  24          MR. GORDON:  No.  Let him answer the

10:24:04  25  question, then you can move to strike if you don't

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

62

10:24:06  1  like it, but don't cut -- don't cut him off during

10:24:11  2  the -- his answer.

10:24:11  3      A.   I mean there -- there are many -- there are

10:24:14  4  many studies that look at intermediate outcomes

10:24:18  5  that --

10:24:18  6      Q.   Okay.

10:24:19  7      A.   -- that you find an association with

10:24:23  8  intermediate outcomes, but then the main one of

10:24:25  9  interest, which is the primary -- primary point, is --

10:24:28  10  is not in fact demonstrated.  And it -- and it could

10:24:31  11  be due to a number of things; it may be that you have

10:24:34  12  the wrong idea of what the actual mechanism is.

10:24:38  13      Q.   In your view, what is the dose at issue in

10:24:42  14  this litigation?

10:24:43  15          MR. GORDON:  Object to the form of the

10:24:44  16  question, lack of foundation.

10:24:46  17      A.   Dose.

10:24:46  18      Q.   Dose is one of the criteria for determining

10:24:49  19  causal inference; correct?

10:24:55  20      A.   One of the things that's often of interest

10:24:59  21  is -- is not a -- a particular dose.

10:25:03  22          What dose do you have in mind?  I didn't --

10:25:05  23      Q.   As something increases, an outcome could

10:25:07  24  increase.

10:25:07  25      A.   Okay.  That -- so that would be a

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

63

10:25:09    1    dose/response relationship.  A dose/response

10:25:12    2    relationship would be -- would be one important thing

10:25:15    3    to look at.

10:25:16    4        Q.   What --

10:25:16    5            In your view what is -- what is the material

10:25:18    6    dose with respect to whether the Bair Hugger increases

10:25:20    7    infection?

10:25:21    8            MR. GORDON:  Object to the form of the

10:25:22    9    question, lack of foundation.

10:25:25   10        A.   I don't -- I don't recall seeing in any of

10:25:30   11    the -- the -- the -- for example, the McGovern study,

10:25:35   12    anything on dose of Bair Hugger.  You either use it or

10:25:39   13    you don't.  It's a binary --

10:25:41   14        Q.   What causes infection?

10:25:43   15            MR. GORDON:  Object -- same objections.

10:25:45   16        A.   What causes --

10:25:46   17        Q.   What -- what -- what thing leads to an

10:25:51   18    infection?  Particles?  Bacteria?  What?

10:25:56   19            MR. GORDON:  Object.

10:25:56   20        A.   Bacteria.

10:25:57   21        Q.   So is bacteria the dose, because the more

10:25:59   22    bacteria you have, the greater incidence of deep joint

10:26:03   23    infection?

10:26:04   24            MR. GORDON:  Object to the form of the

10:26:05   25    question, lack of foundation.

64

10:26:06   1          MR. SACCHET:  We've just reviewed a study on

10:26:08   2    the topic, so there is foundation.

10:26:10   3          A.   But --

10:26:11   4          MR. GORDON:  I mean --

10:26:12   5          A.   -- there's no evidence of what the dose --

10:26:14   6    the dose of bacteria is that's coming from that --

10:26:17   7    from the Bair Hugger.

10:26:17   8          Q.   If the Bair Hugger increases the amount of

10:26:20   9    bacteria --

10:26:21   10         A.   But you're not measuring the dose.

10:26:24   11         Q.   If it is found that the Bair Hugger

10:26:25   12    increases the amount of bacteria --

10:26:28   13         A.   Well the dose/response relationship is that

10:26:31   14    you measure different doses and that affects your

10:26:36   15    risk.

10:26:36   16         Q.   Would it help you if there were --

10:26:37   17         A.   No one has measured the dose -- the dose of

10:26:41   18    bacteria that's come -- that's come from the Bair

10:26:42   19    Hugger.

10:26:42   20         Q.   Do you know that a single bacterium can

10:26:45   21    cause a deep joint infection?

10:26:46   22         A.   Yes.

10:26:47   23         Q.   So does dose matter if the more bacteria you

10:26:52   24    have and that one bacteria can cause an infection?

10:26:55   25         MR. GORDON:  Object to form.  Object to the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

65

10:26:57    1    form of the question, lack of foundation.

10:27:03    2        Q.    If -- if one bacteria can cause an infection

10:27:07    3    and the more bacteria that you have increases the risk

10:27:10    4    of infection, it stands to reason that the

10:27:14    5    dose/response relationship as to how much the Bair

10:27:17    6    Hugger might produce in -- in terms of bacteria is not

10:27:22    7    the relevant question.

10:27:23    8            MR. GORDON:  Object to form, also -- also

10:27:25    9    lack of foundation.

10:27:27   10        A.    I mean you're -- you're not --

10:27:29   11            There's no data that you're showing me

10:27:32   12    that -- that relates -- that I have seen --

10:27:35   13        Q.    Yeah.

10:27:36   14        A.    -- related to the Bair Hugger --

10:27:39   15        Q.    Okay.

10:27:39   16        A.    -- that indicates the dose of bacteria that

10:27:43   17    each of these patients was exposed to.

10:27:47   18        Q.    Would a study showing that the Bair Hugger

10:27:49   19    increases the amount of bacteria at the surgical site

10:27:52   20    help you?

10:27:54   21        A.    You -- you --

10:27:57   22            To establish a dose/response relationship,

10:28:01   23    you need to know what the dose is.

10:28:03   24        Q.    So the only way that you would draw any

10:28:06   25    inference about whether the number of bacteria from

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

66

10:28:10    1    the Bair Hugger increases the risk of infection is if

10:28:13    2    you knew the dose/response relationship?

10:28:16    3              MR. GORDON:  Object to the form of the

10:28:17    4    question.

10:28:17    5        A.   You're the one that raised the issue of

10:28:20    6    there being a dose/response relationship.

10:28:24    7        Q.   And my question is:  What is the dose at

10:28:27    8    issue?  Bacteria?

10:28:29    9        A.   I guess --

10:28:29   10              Well I don't know.  You're the one that

10:28:32   11    raised it.  I haven't -- I've -- as I've -- as I've

10:28:36   12    said, I have not seen anything in these studies that

10:28:40   13    measures dose.  It could be the num -- the level of

10:28:43   14    bacteria, it could be how long you were in surgery, it

10:28:46   15    could be, you know, how -- I don't know if there's

10:28:51   16    different settings of these -- of these -- on -- on

10:28:55   17    the Bair Hugger, but I mean there are -- or -- or for

10:28:59   18    that matter any heating -- warming device, so it's --

10:29:07   19              Those would be some measurements of -- of

10:29:07   20    dose.

10:29:08   21        Q.   Okay.

10:29:08   22        A.   And these studies did not do that.

10:29:10   23        Q.   Okay.

10:29:13   24              MR. SACCHET:  We're going to pass you what

10:29:14   25    will be marked as Exhibit 10.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

67

| | | |
|---|---|---|
| 10:29:22 | 1 | (Exhibit 10 was marked for |
| 10:29:23 | 2 | identification.) |
| 10:29:23 | 3 | BY MR. SACCHET: |
| 10:29:25 | 4 | Q.  Have you seen this document before, |
| 10:29:27 | 5 | Professor Holford? |
| 10:29:29 | 6 | A.  No, I have not. |
| 10:29:31 | 7 | Q.  The title of the document is the |
| 10:29:35 | 8 | "Proceedings of the International Consensus Meeting on |
| 10:29:39 | 9 | Periprosthetic Joint Infection;" correct? |
| 10:29:42 | 10 | A.  Yes. |
| 10:29:42 | 11 | Q.  Do you know who Javad Parvizi is? |
| 10:29:45 | 12 | A.  No, I do not. |
| 10:29:47 | 13 | Q.  So you don't know that he is a consultant |
| 10:29:47 | 14 | for 3M? |
| 10:29:48 | 15 | A.  No, I don't. |
| 10:29:49 | 16 | Q.  Okay.  If you turn to page six, do you see |
| 10:29:52 | 17 | the 3M logo? |
| 10:30:03 | 18 | A.  Yes. |
| 10:30:04 | 19 | Q.  And above that we see the text "Platinum |
| 10:30:11 | 20 | Sponsor;" correct? |
| 10:30:11 | 21 | A.  Yes. |
| 10:30:12 | 22 | Q.  So 3M was a platinum sponsor of this |
| 10:30:16 | 23 | consensus; correct? |
| 10:30:16 | 24 | A.  Apparently. |
| 10:30:16 | 25 | Q.  The next page is page 114. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

68

10:30:18   1           MR. GORDON:  Counsel, is there --

10:30:19   2           Where is page seven through 113?

10:30:22   3           MR. SACCHET:  They are not included.

10:30:23   4           MR. GORDON:  Well I'm going to object to

10:30:26   5   this document on the grounds of completeness.

10:30:28   6           MR. SACCHET:  That's fine.

10:30:29   7       Q.   Page 114 is entitled "Workgroup 4;" correct?

10:30:33   8       A.   Yes.

10:30:33   9       Q.   On the operating room -- "Operative

10:30:37  10   Environment;" correct?

10:30:37  11       A.   Yes.

10:30:37  12       Q.   And beneath that we see numerous

10:30:41  13   delegates -- delegates, all of whom have M.D.s;

10:30:45  14   correct?

10:30:45  15       A.   They seem to, yes.

10:30:46  16       Q.   Okay.  On page 115, question one states, "Do

10:30:52  17   numbers of bacteria arriving in the surgical wound

10:30:54  18   correlate directly with probability of SSI?"  Do you

10:30:58  19   see that?

10:30:59  20       A.   Yes.

10:30:59  21       Q.   And the consensus statement reads, "We

10:31:01  22   recognize that the probability of surgical site

10:31:04  23   infection correlates directly with the quantity of

10:31:06  24   bacteria that reach the wound.  Accordingly we support

10:31:11  25   strategies to lower particulate and bacterial counts

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

69

10:31:15  1  at surgical wounds.

10:31:17  2          "Delegate Vote:  Agree:  97 percent, (Strong

10:31:21  3  consensus)."

10:31:22  4          Do you see that, professor?

10:31:23  5      A.  Yes, I do.

10:31:24  6      Q.  Do you have any reason to doubt the

10:31:26  7  consensus statement of these medical doctors?

10:31:29  8          MR. GORDON:  Object to the form of the

10:31:31  9  question.

10:31:35  10     A.  I -- I mean that's their opinion.  That's --

10:31:38  11         Yes.

10:31:39  12     Q.  And this opinion states that the number of

10:31:43  13  bacteria at the surgical site relates to the incidence

10:31:46  14  of surgical-site infection; correct?

10:31:48  15     A.  Yes.

10:31:49  16     Q.  Okay.  Does that explain that the number of

10:31:54  17  bacteria could be viewed as the dose at issue with

10:31:58  18  respect to surgical-site infection?

10:32:00  19         MR. GORDON:  Object to the form of the

10:32:01  20  question, also lack of foundation.

10:32:05  21     A.  The -- the -- the problem I -- I --

10:32:09  22         I mean I'm not sure what connection you're

10:32:11  23  looking at.  As the statement is --

10:32:14  24     Q.  Okay.

10:32:14  25     A.  -- as -- if the --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

70

10:32:16  1          If you have different levels of -- of

10:32:22  2    bacteria at the surgical site, you will affect the

10:32:25  3    risk.

10:32:26  4          Q.   Uh-huh.  And the more bacteria at the

10:32:28  5    surgical site, the increased risk of infection.

10:32:32  6          A.   That's -- that's what they're -- they're

10:32:34  7    concluding, yes.

10:32:36  8          Q.   Okay.  And question two says, "Do numbers of

10:32:39  9    bacteria in the operating room environment correlate

10:32:41  10   directly with the probability of surgical site

10:32:44  11   infection?"  And the consensus on that states, "We

10:32:48  12   recognize that airborne particulate bacteria are a

10:32:51  13   major source of contamination in the operating room

10:32:53  14   environment and that bacteria shed by personnel are

10:32:56  15   the predominant source of these particles.  The focus

10:32:59  16   of our recommendation is to reduce the volume of

10:33:01  17   bacteria in the operating room with particular

10:33:04  18   attention to airborne particles."

10:33:07  19         A.   Okay.

10:33:08  20         Q.   This consensus draws a relationship between

10:33:15  21   bacteria and particles; correct?

10:33:18  22         A.   Yes.

10:33:19  23         Q.   And 93 percent of the delegates agreed to

10:33:23  24   that link.

10:33:26  25         A.   Well they're --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

71

10:33:28  1         It's not just particles, they're talking

10:33:31  2  about bacteria.  Right?

10:33:33  3      Q.   The relationship of part --

10:33:35  4      A.   Do the -- do the number of bacteria in the

10:33:36  5  operating room correlate directly with the probability

10:33:39  6  of surgical-site infection, so it's -- you --

10:33:42  7         I think you stated the question as

10:33:44  8  "particles."

10:33:45  9      Q.   And it says there should be particular

10:33:47  10  attention to airborne particles; correct?

10:33:53  11      A.   Where are you reading?

10:33:54  12      Q.   From the consensus statement at the top of

10:33:57  13  page 116.

10:34:02  14      A.   It's referring again to the bacterial

10:34:05  15  particles.

10:34:05  16      Q.   And it says, "The focus of our

10:34:07  17  recommendation is to reduce the volume of bacteria in

10:34:11  18  the operating room with particular attention to

10:34:13  19  airborne particles;" correct?

10:34:15  20      A.   Well, but the particles that they're

10:34:18  21  referring to are airborne particulate bacteria.

10:34:21  22      Q.   Okay.  Let's look at the justification,

10:34:23  23  which is the paragraph below that.  The third

10:34:26  24  statement begins with "Bacteria can be considered..."

10:34:29  25  Do you see that?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

72

10:34:31  1      A.    The third --

10:34:33  2      Q.    The third sentence.  Do you see that?

10:34:37  3      A.    Yes.

10:34:38  4      Q.    "Bacteria can be considered as part of the

10:34:40  5  total mass of particulates in the air.  Some studies

10:34:43  6  have suggested that the airborne parti -- particulate

10:34:46  7  count should be considered as a potential surrogate

10:34:49  8  for airborne microbial density.  Others have found

10:34:54  9  correlation between the number of particles larger

10:34:56  10  than 10 micrometers with a density of viable bacteria

10:34:59  11  at the surgery measured by colony-forming units."  Do

10:35:03  12  you see that?

10:35:03  13      A.    Yes.

10:35:03  14      Q.    So the justification for the consensus

10:35:06  15  statement involves the relationship between particles

10:35:09  16  and bacteria.

10:35:10  17           MR. GORDON:  Object to the form of the

10:35:12  18  question, lack of foundation.

10:35:15  19      A.    I mean there again, the --

10:35:19  20           I don't think the intent of the statement is

10:35:21  21  any old particle.  They're interested in particles

10:35:27  22  that have bacteria on them.

10:35:30  23      Q.    I'll read the sentence again.

10:35:32  24      A.    Well that's what this sentence is, but I

10:35:33  25  mean this is what the question is.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

73

10:35:35  1      Q.   The justification for the answer draws a

10:35:39  2  link between airborne particles and bacteria; correct?

10:35:44  3      A.   There --

10:35:45  4           Yes, they are saying there is a

10:35:48  5  relationship.

10:35:48  6      Q.   And you have --

10:35:49  7      A.   There often is a relationship.

10:35:51  8      Q.   Okay.

10:35:51  9      A.   That's what they're saying.

10:35:52  10      Q.   You have no reason to doubt that

10:35:54  11  relationship; correct?

10:35:55  12      A.   But the --

10:35:56  13           It depends on what the -- what the

10:36:00  14  conditions are in that particular operating room.

10:36:03  15      Q.   You have no expertise in airborne particles

10:36:06  16  is your testimony from earlier this morning.

10:36:11  17      A.   Okay.  So I mean --

10:36:14  18           So I don't understand your question.

10:36:15  19      Q.   So --

10:36:16  20      A.   If you're saying I don't --

10:36:18  21      Q.   You have a reason to doubt the conclusion

10:36:20  22  even though you don't have expertise in the subject

10:36:22  23  matter is my point.

10:36:24  24      A.   I'm not --

10:36:25  25           MR. GORDON:  Object to the form of the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

74

10:36:26  1  question.

10:36:26  2      A.    I'm not -- I'm -- I'm not dis -- disputing

10:36:30  3  what I think they are saying, --

10:36:32  4      Q.    Okay.

10:36:33  5      A.    -- which is that -- relates, again, to the

10:36:39  6  particles and what is -- what those particles are.

10:36:42  7      Q.    So when they say there is a correlation

10:36:45  8  between the number of particulates with a density of

10:36:48  9  viable bacteria, you're interpreting that statement to

10:36:52  10  mean that those particles already are bacteria?

10:36:58  11      A.    If you're in an environment that is somehow

10:37:05  12  spraying out part -- particles that are sterile, are

10:37:12  13  you -- are you going to use this -- are you using

10:37:14  14  this -- their statement here that you're increase --

10:37:19  15  you are at increased risk of infection?  Is that what

10:37:23  16  you're arguing?

10:37:23  17      Q.    If there is a correlation between the number

10:37:25  18  of particles and bacteria is what it says.

10:37:26  19      A.    From the circumstances that I've described,

10:37:28  20  there's not going to be a correlation.

10:37:30  21      Q.    That may be very well in some circumstances,

10:37:32  22  but --

10:37:32  23      A.    Exactly.

10:37:35  24      Q.    -- it varies in other circumstances

10:37:36  25  according to the consensus statement.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

75

```
10:37:37    1      A.    There are --
10:37:37    2            Exactly.
10:37:38    3      Q.    So you would agree in some circumstances --
10:37:39    4      A.    In some circumstances, yes.
10:37:40    5      Q.    -- there is a relationship between particle
10:37:43    6  load and bacterial load.
10:37:44    7      A.    In some circumstances.
10:37:45    8      Q.    And in some circumstances the relationship
10:37:47    9  between bacterial load also relates to the increased
10:37:51   10  risk of infection; correct?
10:37:52   11      A.    Yes.
10:37:55   12      Q.    Are you aware that the Bair Hugger increases
10:37:59   13  particles in the operating room?
10:38:00   14            MR. GORDON:  Object to the form of the
10:38:02   15  question.
10:38:06   16      A.    I'm -- I'm aware that -- that some of
10:38:10   17  the -- some of the studies seem to suggest that
10:38:13   18  there -- that there is a -- an increase.
10:38:16   19      Q.    I notice that you used the word "some" in
10:38:19   20  your report as well.  That's true; correct?
10:38:22   21      A.    I don't recall what I -- exactly what I --
10:38:24   22  my wording was.
10:38:25   23      Q.    But your testimony today is that some
10:38:28   24  studies show an increase in particulate load over the
10:38:31   25  surgical site.
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

76

10:38:32　1　　　A.　There have been some studies, yes.

10:38:35　2　　　Q.　And some can include all as a logical

10:38:38　3　matter; correct?

10:38:38　4　　　A.　Some can --

10:38:39　5　　　Q.　Some can be all.

10:38:41　6　　　A.　All studies have found this?

10:38:43　7　　　Q.　I'm just saying it's -- there's --

10:38:45　8　　　　　There's no point in arguing over the

10:38:47　9　semantics, but have you read 3M's -- the deposition of

10:38:52　10　3M's corporate representative in this litigation?

10:38:54　11　　　A.　No, I have not.

10:38:55　12　　　Q.　You have not.  So you're not aware that the

10:38:58　13　corporate representative for 3M testified that every

10:39:02　14　single study indicates that the Bair Hugger increases

10:39:05　15　the particle count over the surgical field?

10:39:07　16　　　　　MR. GORDON:  Object to the form of the

10:39:09　17　question, assumes facts not in evidence, lack of

10:39:11　18　foundation.

10:39:12　19　　　A.　I -- I have not seen that.  I hadn't -- had

10:39:16　20　not seen that -- that testimony, so I --

10:39:19　21　　　　　I had not seen that statement.

10:39:32　22　　　　　MR. GORDON:  Are we reaching a point where

10:39:34　23　we can take a quick break?

10:39:36　24　　　　　MR. SACCHET:  In a little bit, yeah.  I'll

10:39:38　25　try to move through this.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

77

10:39:40  1          (Exhibit 11 was marked for

10:39:44  2          identification.)

10:39:44  3  BY MR. SACCHET:

10:39:50  4      Q.   This on the cover page has been denoted as

10:39:53  5  the deposition of Albert Van Duren.  Do you see that,

10:39:56  6  Dr. Holford?

10:39:57  7      A.   Yes.

10:39:57  8      Q.   Okay.  And turning to the back side of the

10:40:03  9  paper, there are lines of testimony; correct?  Do you

10:40:11  10  see page 258 internal?

10:40:15  11      A.   Yes.

10:40:16  12      Q.   Do you see lines five through 10?

10:40:19  13      A.   Yes.

10:40:20  14      Q.   Line five states:  "Based on the data that

10:40:23  15  we have today, including the study funded by 3M as

10:40:27  16  well as other studies, every single study indicates

10:40:29  17  that the Bair Hugger increases the particle count over

10:40:32  18  the sterile field; correct?"

10:40:33  19          "Answer:  In absolute numbers, yes.

10:40:36  20          "Question:  Okay.  And you have no internal

10:40:38  21  study to refute that; correct?

10:40:41  22          "No, we don't."

10:40:44  23      A.   Okay.

10:40:45  24      Q.   Does this clarify your position as to

10:40:49  25  whether some studies have shown an increase in

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

78

10:40:52   1   particles over the surgical site as a result of the

10:40:56   2   Bair Hugger?

10:40:56   3            MR. GORDON:   Object to the form of the

10:40:57   4   question, lack of foundation.

10:40:59   5       A.   There are some -- there are some studies.

10:41:03   6       Q.   Does this --

10:41:04   7       A.   I don't think --

10:41:05   8       Q.   -- testimony from 3M use the word "all" or

10:41:07   9   "some?"

10:41:07  10            MR. GORDON:   Object to the form of the

10:41:09  11   question, lacks foundation.

10:41:12  12       A.   I mean I've -- I've -- what -- what you're

10:41:15  13   showing me is just this one -- one statement.  I don't

10:41:17  14   know what all went before this.  My impression from

10:41:21  15   what you just read is that when they say "all,"

10:41:24  16   there's a whole set of studies that came before this

10:41:29  17   and the "all" of refers to those.

10:41:31  18       Q.   Do you know any studies that have not found

10:41:33  19   an increase in particles over the surgical site after

10:41:37  20   use of the Bair Hugger?

10:41:38  21       A.   No, I don't.

10:41:41  22       Q.   You reviewed the McGovern study; correct?

10:41:47  23       A.   Yes.  I don't recall that the -- I don't

10:41:50  24   recall the -- the McGovern study actually measuring

10:41:54  25   particles over the surgical -- over the surgical site.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

79

10:41:57  1      Q.   Is a bubble a particle?

10:42:01  2      A.   The bubble part of it was not taking place

10:42:03  3  during -- during surgery.

10:42:04  4      Q.   It was a simulated surgery; correct?

10:42:06  5      A.   It was simulated.

10:42:07  6      Q.   Right.

10:42:07  7      A.   It was not the actual surgery.

10:42:09  8      Q.   Fair enough.  But they did find an increase

10:42:12  9  of bubbles over the surgical site from the use of the

10:42:14  10  Bair Hugger compared to a conductive warming device.

10:42:18  11      A.   Yes.  I read that part of it, yes.

10:42:20  12      Q.   You reviewed the Legg studies; correct?

10:42:21  13      A.   No, I don't think I did.

10:42:23  14      Q.   You didn't.  So you're not aware that the

10:42:26  15  2013 Legg study found a one-thousand-times increase in

10:42:31  16  particles over the surgical site from the use of the

10:42:33  17  Bair Hugger compared to a radiant warming device.

10:42:35  18      A.   I'm not familiar with that study, no.

10:42:37  19      Q.   You're not aware that the 2012 Legg study

10:42:41  20  also found a statistically significant increase in

10:42:43  21  particles over the surgical site after use of the Bair

10:42:46  22  Hugger device.

10:42:47  23      A.   I am not familiar with that one.

10:42:49  24      Q.   Have you reviewed the Belani study?

10:42:51  25      A.   No.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

80

| | | |
|---|---|---|
| 10:42:51 | 1 | Q.   You're not aware that the Belani study found |
| 10:42:54 | 2 | that there was an increase in bubbles over the |
| 10:42:58 | 3 | surgical site after the use of the Bair Hugger |
| 10:43:00 | 4 | compared to a conductive warming device. |
| 10:43:06 | 5 | A.   I'm not familiar with that, no. |
| 10:43:07 | 6 | Q.   Have you reviewed the Sessler study? |
| 10:43:09 | 7 | A.   No, I have not. |
| 10:43:10 | 8 | Q.   You're not aware that the Sessler study also |
| 10:43:13 | 9 | found an increase in particles over the surgical site |
| 10:43:15 | 10 | from the use of the Bair Hugger when it was on versus |
| 10:43:17 | 11 | when it was off. |
| 10:43:19 | 12 | MR. GORDON:  Object to the form of the |
| 10:43:20 | 13 | question, assumes facts not in evidence, misstates the |
| 10:43:23 | 14 | testimony. |
| 10:43:24 | 15 | A.   I'm not familiar with the -- with the -- |
| 10:43:26 | 16 | with the findings of that study, no. |
| 10:43:34 | 17 | Q.   Have you reviewed any studies that show that |
| 10:43:35 | 18 | the Bair Hugger increases the amount of bacteria over |
| 10:43:38 | 19 | the surgical site? |
| 10:43:46 | 20 | A.   No, I'm not familiar with that. |
| 10:44:01 | 21 | MR. SACCHET:  Just maybe five more minutes. |
| 10:44:11 | 22 | (Exhibit 12 was marked for |
| 10:44:13 | 23 | identification.) |
| 10:44:13 | 24 | BY MR. SACCHET: |
| 10:44:19 | 25 | Q.   The title of this article, professor, is |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

81

10:44:21   1   "Convection warmers -- a possible source of

10:44:23   2   contamination in laminar airflow operating theatres?"

10:44:27   3   Correct?

10:44:27   4        A.   Yes.

10:44:29   5        Q.   Do you see in the summary in the second line

10:44:42   6   from the bottom, it starts, "This study" -- or I

10:44:47   7   apologize.  "A further small rise..."  Do you see the

10:44:50   8   beginning of that sentence, third-to-the-last

10:44:52   9   statement in the abstract?

10:44:53   10       A.   Yes.

10:44:54   11       Q.   "A small -- A further small rise is seen

10:44:56   12   after the convection heaters were turned on when

10:44:58   13   applied to patients.  This study showed that use of

10:45:01   14   warm air convection heaters on patients produced a

10:45:04   15   small increase in the number of colony forming units

10:45:06   16   in ultra-clean air theatres but the levels were

10:45:12   17   unlikely to have clinical significance."  Do you see

10:45:12   18   that?

10:45:13   19       A.   Yes.

10:45:13   20       Q.   So this study, based on the summary -- and I

10:45:16   21   understand you have not reviewed it in whole -- does

10:45:17   22   conclude that there was as small increase in bacteria

10:45:19   23   from a convection warmer.

10:45:21   24            MR. GORDON:  Object to the form of the

10:45:22   25   question, --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

82

10:45:22  1    A.    That was --

10:45:23  2        MR. GORDON:  -- lack of foundation.

10:45:24  3    A.    That was unlikely to have clinical

10:45:27  4  significance.

10:45:27  5    Q.    Okay.  And would it help if there were a

10:45:33  6  study that showed that there was a statistically

10:45:36  7  significant difference in terms of the amount of

10:45:38  8  bacteria produced by the Bair Hugger when it was on

10:45:41  9  versus off?

10:45:43  10       MR. GORDON:  Object to the form of the

10:45:44  11  question, lack of foundation, incomplete hypothetical.

10:45:47  12    A.    Well I mean statistical significance is

10:45:51  13  not -- well it's -- it's part of what -- what would be

10:45:55  14  convincing, but it also has to do with the magnitude

10:45:58  15  of what that effect would be, of whether or not it

10:46:01  16  would have a clinical -- you know, be clinically

10:46:04  17  important.

10:46:04  18    Q.    Statistical significance is not the same as

10:46:07  19  clinical significance; correct?

10:46:08  20    A.    Correct.

10:46:09  21    Q.    And epidemiology does not hinge on whether a

10:46:13  22  result is statistically significant or not; correct?

10:46:18  23    A.    Well the -- the -- for --

10:46:21  24       To definitely demonstrate a -- an

10:46:27  25  epidemiological effect, you'd want the association to

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

83

10:46:30    1    be statistically significant.  It may not be the only

10:46:33    2    thing you consider, but it's certainly an -- an

10:46:35    3    important part of it.

10:46:35    4         Q.   But for clinical significance, it's not

10:46:37    5    necessary to have statistical significance.

10:46:39    6         A.   Oh, I -- I'm -- no, I --

10:46:42    7         Q.   Not necessary.

10:46:44    8         A.   I think it would be important to have

10:46:46    9    statistical significance to say that it's

10:46:49   10    clinically -- clinically important.

10:46:50   11         Q.   Do you disagree with the recent statement of

10:46:53   12    The American Statistical Association that concludes

10:46:55   13    that clinical significance is not determined by

10:46:58   14    statistical significance?

10:47:01   15              MR. GORDON:  Object to the form of the

10:47:03   16    question.

10:47:08   17         A.   I'm not familiar with the particular

10:47:10   18    statement that you're saying, but I mean I think

10:47:12   19    it's -- I think we're, again, quibbling about --

10:47:17   20              I mean I -- I doubt that they're saying

10:47:19   21    that -- that when looking at a clinical effect, you

10:47:24   22    don't -- you're not interested in whether or not the

10:47:26   23    association of the study was statistically

10:47:28   24    significant.

10:47:28   25         Q.   Well I'm not -- I'm not limiting the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

84

10:47:31    1    question to whether you're interested in it.

10:47:35    2           Whether something is statistically

10:47:37    3    significant or not is a different question than

10:47:40    4    whether it's clinically significant.

10:47:42    5        A.   It is a different question.

10:47:43    6        Q.   Okay.

10:47:43    7        A.   Yes.

10:47:47    8        Q.   Statistical significance is not equivalent

10:47:49    9    to scientific, human, or economic significance;

10:47:52   10    correct?

10:47:52   11        A.   Correct.

10:47:52   12        Q.   One of the reasons why you say the McGovern

10:47:56   13    study has no import with respect to the relationship

10:47:58   14    between the Bair Hugger and deep joint infection is

10:48:01   15    that, based on using Fisher's exact test instead of

10:48:04   16    chi-squared and based on Albrecht's Exhibit 10, the

10:48:07   17    p-value is .0507; correct?

10:48:09   18           MR. GORDON:  Object to the form of the

10:48:11   19    question.

10:48:12   20        A.   I think that's what I -- what I found in my

10:48:15   21    analysis, yes.

10:48:16   22        Q.   And the statement of the ASA is that

10:48:19   23    statistical significance is not equivalent to

10:48:21   24    scientific, human, or economic significance; correct?

10:48:23   25        A.   Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

85

10:48:25  1          MR. SACCHET:  Okay.  We'll take a break.

10:56:37  2          (Recess taken.)

10:56:37  3  BY MR. SACCHET:

10:56:43  4      Q.   Dr. Holford, if we could turn back to your

10:56:47  5  curriculum vitae, which has been marked as Exhibit 2.

10:56:54  6  I don't think you'll need it to answer these

10:56:55  7  questions, but in case you do, there it is.

10:57:02  8          You are a fellow of The American College of

10:57:05  9  Epidemiology; correct?

10:57:07  10     A.   Yes.

10:57:08  11     Q.   Does your membership in the college reflect

10:57:12  12  your expertise in that subject matter?

10:57:15  13     A.   Yes.

10:57:16  14     Q.   And that subject matter is the incidence of

10:57:21  15  disease in certain populations; correct?

10:57:25  16     A.   Well it's -- it's more than just the

10:57:27  17  incidence, it's the -- it's a -- a lot of studies of

10:57:34  18  etiology of disease.

10:57:35  19     Q.   Okay.  How many members are there in the

10:57:39  20  college, do you know?

10:57:41  21     A.   No, I don't.

10:57:42  22     Q.   Okay.  The other members are presumably

10:57:44  23  experts in the field as well; correct?

10:57:47  24     A.   In different aspects of epidemiology, yes.

10:57:50  25     Q.   What does it take for one to become the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

86

10:57:53   1   president of the college?

10:57:56   2       A.   You have to run for election and be -- get

10:58:01   3   the most votes.

10:58:02   4       Q.   Have you voted in such an election?

10:58:05   5       A.   I -- I think I voted, yes.

10:58:08   6       Q.   What are your criteria for voting someone to

10:58:10   7   be president?

10:58:13   8       A.   My view of their scientific standing.

10:58:20   9       Q.   So the president would have sound scientific

10:58:23   10   standing in your view.

10:58:25   11       A.   Yes.  Oh, yeah.

10:58:27   12       Q.   You're aware that Dr. Samet was elected

10:58:29   13   president of the college in 1999; correct?

10:58:32   14       A.   Yes.

10:58:34   15       Q.   In that regard you review -- you view Dr.

10:58:38   16   Samet as an expert in epidemiology.

10:58:39   17       A.   I do.

10:58:40   18       Q.   You're also a member of The American College

10:58:43   19   of Statistics; correct?

10:58:45   20       A.   Well it's The American Statistical

10:58:48   21   Association.

10:58:48   22       Q.   Okay.  Thanks for the clarification.

10:58:54   23           And I assume the same holds true:  if you're

10:58:55   24   a member of that association, presumably you're an

10:58:59   25   expert in some matter in statistics; correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

87

10:59:02   1        A.    That's correct.

10:59:03   2        Q.    Are you aware that Professor Nachtscheim is

10:59:06   3   also a member of the association?

10:59:08   4        A.    I didn't know that, but --

10:59:10   5        Q.    You know that Professor Nachtscheim was one

10:59:15   6   of the authors of the McGovern study; correct?

10:59:15   7        A.    Yes.

10:59:17   8        Q.    So you have no doubt that Professor

10:59:21   9   Nachtscheim is an expert in the field of statistics.

10:59:24  10        A.    Yes, I'm sure he'd have some expertise in

10:59:27  11   that.

10:59:33  12        Q.    You did not review Professor Nachtscheim's

10:59:38  13   deposition; correct?

10:59:38  14        A.    No, I did not.

10:59:43  15        Q.    So you do not know anything about Dr.

10:59:48  16   Samet's testimony regarding the statistical methods

10:59:50  17   that were employed in the McGovern study; correct?

10:59:53  18             MR. GORDON:  Did you mean to say "Samet?"

10:59:55  19             MR. SACCHET:  No.

10:59:56  20             MR. GORDON:  You just said "Samet."

10:59:57  21             MR. SACCHET:  Oh.  Thanks, Mr. Gordon.

10:59:59  22        Q.    You're not aware of what Professor

11:00:03  23   Nachtscheim testified about the statistical methods

11:00:06  24   used in the McGovern study; correct?

11:00:09  25        A.    I -- I --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

88

11:00:11   1          My knowledge of what was -- statistical

11:00:15   2    methods were used is what's -- is what was in the

11:00:17   3    McGovern paper.

11:00:18   4          Q.   So the Nachtscheim deposition transcript

11:00:20   5    played no role in your opinion that you provided in

11:00:23   6    your expert report; correct?

11:00:25   7          A.   Correct.

11:00:26   8          Q.   You're not aware of whether Professor

11:00:29   9    Nachtscheim provided a justification for using

11:00:31   10   chi-squared instead of Fisher's exact; are you?

11:00:34   11         A.   No, I'm not.

11:00:35   12         Q.   You're not aware of whether Professor

11:00:38   13   Nachtscheim continues to stand by the calculations

11:00:39   14   that were made in the McGovern study; correct?

11:00:41   15         A.   I -- I have no idea what -- what his

11:00:47   16   opinions are.

11:00:47   17         Q.   You're not aware of whether Professor

11:00:50   18   Nachtscheim commented on the accuracy of Albrecht

11:00:52   19   Exhibit 10 or McGovern Exhibit 16; correct?

11:00:58   20         A.   Correct.

11:01:04   21         Q.   I apologize if I've already asked the

11:01:08   22   question, but you did not review the Moretti study in

11:01:14   23   terms of drafting your expert report in this case;

11:01:17   24   correct?

11:01:17   25         A.   Correct.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

89

11:01:18   1      Q.   Didn't you want to have all of the author

11:01:26   2   testimony when making determinations about the

11:01:27   3   accuracy of the McGovern study?

11:01:29   4           MR. GORDON:  Object to the form of the

11:01:30   5   question.

11:01:32   6      A.   Yeah.  I'm not -- all -- all of their

11:01:40   7   testimony or all of their work --

11:01:41   8           I mean the paper, I think, pretty much

11:01:46   9   stands on -- on -- on its own.  It justifies what

11:01:48  10   it -- what it did and why it did it.

11:01:50  11      Q.   Well you reviewed the Albrecht testimony as

11:01:53  12   it related to the McGovern study; correct?

11:01:55  13      A.   I did -- I did review it, yes.

11:01:57  14      Q.   And you relied on that testimony with

11:02:00  15   respect to using Albrecht Exhibit 10 --

11:02:03  16      A.   Yes.

11:02:03  17      Q.   -- to reanalyze the data; correct?

11:02:05  18      A.   Yes.  Well that's -- that's correct.

11:02:07  19      Q.   And you also reviewed Mr. McGovern's

11:02:09  20   testimony; did you?

11:02:10  21      A.   Yes.

11:02:10  22      Q.   Did you review both days of testimony?

11:02:14  23      A.   I believe I did, yes.

11:02:16  24      Q.   And you reviewed Mr. Reed's testimony as

11:02:18  25   well.

90

11:02:18   1        A.   Yes.

11:02:19   2        Q.   Why did you not review Professor

11:02:21   3   Nachtscheim's testimony?

11:02:23   4        A.   I don't know that I --

11:02:28   5             I just don't -- don't -- don't recall that.

11:02:30   6   I -- yeah.

11:02:30   7        Q.   He's the only professor of statistics that

11:02:34   8   was an author of that study; correct?

11:02:36   9        A.   Apparently, yes.

11:02:38   10       Q.   Don't you think it would have been helpful

11:02:39   11  to review that deposition considering that you

11:02:43   12  reviewed the other authors' deposition testimony?

11:02:45   13            MR. GORDON:  Object to the form of the

11:02:46   14  question.

11:02:50   15       A.   It -- it -- it could have been helpful, but

11:02:53   16  I -- I think what --

11:02:54   17            The statistical methods that were used were

11:02:57   18  pretty well described in the paper.

11:02:59   19       Q.   But you're not aware of the justifications

11:03:01   20  for why particular methods were used according to

11:03:06   21  Professor Nachtscheim; correct?

11:03:06   22       A.   I'm not sure what justifications he used,

11:03:08   23  but they are commonly-used statistical methods that

11:03:16   24  were in that paper, and so I'm -- I would not be --

11:03:23   25            You know, it -- it's -- it -- it's fairly

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

91

11:03:26  1    common to use, I mean, basically use chi-square.

11:03:29  2        Q.    One of your issues with the study is it used

11:03:33  3    chi-squared instead of Fisher's exact; correct?

11:03:36  4        A.    In this particular --

11:03:37  5              Yes.

11:03:37  6        Q.    And you're not aware of perhaps why

11:03:39  7    Professor Nachtscheim decided to use chi-squared

11:03:43  8    instead of Fisher's exact.

11:03:45  9        A.    Instead of Fish --

11:03:45  10             No, I'm not -- I don't -- I don't see why I

11:03:47  11   would not -- if he --

11:03:48  12             Whatever reasoning he might have had, I

11:03:50  13   would -- I would dispute that for reasons that are in

11:03:54  14   my report.

11:03:55  15       Q.    And you've already said that Professor

11:03:58  16   Nachtscheim is an expert in statistics because he is a

11:04:00  17   member of The American Statistical Association;

11:04:03  18   correct?

11:04:03  19       A.    He -- he is an expert.  He -- he obviously

11:04:07  20   has interest in -- in statistics, --

11:04:10  21       Q.    Okay.

11:04:10  22       A.    -- but --

11:04:11  23       Q.    Did you ask for Professor Nachtscheim's

11:04:14  24   deposition?

11:04:15  25       A.    No, I didn't.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

92

11:04:17  1      Q.   Were the other deposition transcripts from

11:04:21  2   Mr. Albrecht, Mr. McGovern and Mr. Reed provided to

11:04:24  3   you?

11:04:24  4      A.   Yes.

11:04:25  5      Q.   And Professor Nachtscheim's deposition was

11:04:29  6   not provided to you.

11:04:30  7      A.   I don't recall that it was.  I -- it may

11:04:34  8   have been, I -- I just -- I'm -- I just don't recall

11:04:40  9   it.

11:04:40  10      Q.   I'm going to put down the guard.  I mean

11:04:43  11   don't -- don't you find that unusual, that three of

11:04:44  12   the authors' deposition transcripts were provided to

11:04:47  13   you but the only statistician's deposition transcript

11:04:50  14   was not?

11:04:51  15           MR. GORDON:  Object to the form of the

11:04:52  16   question.

11:04:54  17      A.   These -- yeah, I mean I -- I was --

11:04:57  18           The statistical aspects of this study are

11:05:01  19   not terribly complicated, frankly.

11:05:05  20      Q.   You take issue, though, with respect to the

11:05:07  21   tabulation of the data; correct?

11:05:10  22      A.   Oh, it's -- you --

11:05:12  23           It's important that you put the right

11:05:13  24   numbers down, yeah.

11:05:15  25      Q.   And Professor Nachtscheim could have opined

93

11:05:18  1  on the tabulation of the data; correct?

11:05:22  2          MR. GORDON:  Object to the form of the

11:05:23  3  question.

11:05:24  4      A.   I -- I suppose he might have.  I mean the

11:05:28  5  other -- the other authors certainly did.

11:05:28  6      Q.   And that's why you reviewed their deposition

11:05:30  7  testimony; correct?

11:05:30  8      A.   That's -- that's part of what I -- what I --

11:05:33  9  what came out of my review of their testimony, yes.

11:05:40  10      Q.   Is --

11:05:43  11          So everything that's been marked on page 14

11:05:45  12  of your report, in addition to the recent Augustine

11:05:50  13  study, are the materials that you reviewed in drafting

11:05:54  14  your report and providing testimony today.

11:05:58  15      A.   Well the recent Augus -- Augustine study I

11:06:03  16  saw after --

11:06:04  17      Q.   Yes.

11:06:04  18      A.   -- this was submitted, so that's not on here

11:06:08  19  because I -- I hadn't seen it when I wrote this.

11:06:09  20      Q.   But that's the totality of evidence up to

11:06:12  21  this point in time.

11:06:13  22      A.   That's pretty much it, yes.  Yes.

11:06:13  23          MR. GORDON:  I -- I think he also reviewed

11:06:14  24  the Samet testimony about the Augustine article.

11:06:17  25          THE WITNESS:  Oh, I'm sorry, yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

94

1              MR. SACCHET:  Okay.

11:06:19    2              THE WITNESS:  There was also that.

11:06:19    3       Q.   Okay.  So no other articles other than

11:06:22    4   what's been listed on page 14.

11:06:25    5       A.   No.

11:06:26    6       Q.   And no other deposition transcripts aside

11:06:29    7   from Samet and I think you said Augustine.

11:06:32    8       A.   I saw -- I saw just a couple of pages of --

11:06:36    9   of Augustine, but --

11:06:37   10       Q.   Okay.  Did you perform any independent

11:06:40   11   investigation outside of what was provided to you?

11:06:43   12       A.   No.

11:06:47   13       Q.   So everything that you're relying on is what

11:06:52   14   3M provided to you.

11:06:52   15       A.   That's correct.

11:06:57   16       Q.   Okay.  With respect to the McGovern study,

11:07:00   17   I'd like to review that quickly.  I assume that we are

11:07:08   18   on the same page, doctor, with calling this study "the

11:07:11   19   McGovern study," which is the one that you discuss in

11:07:13   20   your report; correct?

11:07:14   21       A.   Yes.

11:07:21   22              (Exhibit 13 was marked for

11:07:23   23              identification.)

11:07:23   24   BY MR. SACCHET:

11:07:27   25       Q.   We have handed you what has been marked as

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

95

11:07:29  1   Exhibit 13.  The title is "Forced-air warming and

11:07:34  2   ultra-clean ventilation do not mix" by McGovern et al;

11:07:38  3   correct?

11:07:38  4        A.   Correct.

11:07:39  5        Q.   I do not know whether you will need the

11:07:41  6   study to answer these questions, but feel free to

11:07:44  7   refer to it as you see fit.

11:07:46  8             There were two components to this study;

11:07:48  9   correct?

11:07:48  10       A.   That's correct.

11:07:50  11       Q.   There was a study of bubbles in an

11:07:54  12  experimental setting, and then there was the

11:07:56  13  observational data aspect of the study; correct?

11:07:59  14       A.   Yes.

11:08:00  15       Q.   And the first part of the study, which we've

11:08:03  16  discussed a little bit, found a significant increase

11:08:06  17  in the amount of bubbles over the surgical site in

11:08:09  18  this experimental study when the Bair Hugger was used

11:08:11  19  compared to a conductive warming device; correct?

11:08:14  20       A.   That's what they report, yes.

11:08:15  21       Q.   Okay.  And the second part, which involved

11:08:18  22  the observational data set, involved 1,437 patients;

11:08:25  23  correct?

11:08:25  24       A.   I think that's right.

11:08:26  25       Q.   Table II, you might have to do a little

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

96

11:08:32   1   math, --

11:08:33   2        A.   Yeah.

11:08:33   3        Q.   -- or I believe on page 1541 you'll see it

11:08:36   4   in the bottom left-hand corner.

11:08:41   5        A.   Yeah.   Okay.

11:08:52   6             Yeah, 1066 and 371 are the two groups.

11:08:55   7        Q.   Which adds up though 1437.

11:08:57   8        A.   Okay.   Yeah, right.

11:08:58   9        Q.   And the -- the study period was 2.5 years;

11:09:04   10  correct?

11:09:04   11       A.   I think that's right, yes.

11:09:06   12       Q.   You can look at page 1540 --

11:09:08   13       A.   Yeah.

11:09:09   14       Q.   -- on the left-hand side under "Joint

11:09:10   15  Infection data."

11:09:11   16       A.   Right.

11:09:12   17       Q.   And deep joint infections as opposed to

11:09:17   18  superficial or wound infections was the outcome of

11:09:19   19  interest; correct?

11:09:20   20       A.   That's correct.

11:09:21   21       Q.   And there were three warming phases, there

11:09:23   22  was the Bair Hugger period, a transitional period, and

11:09:26   23  a conductive warming period; correct?

11:09:28   24       A.   That's correct.

11:09:29   25       Q.   And during the Bair Hugger period there was

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

97

11:09:32　1　a change in the antibiotic; correct?

11:09:35　2　　　A.　That's correct.

11:09:35　3　　　Q.　The first antibiotic was Gentamicin;

11:09:39　4　correct?

11:09:39　5　　　A.　Yes.

11:09:39　6　　　Q.　And the second antibiotic was Gentamicin

11:09:44　7　plus Teicoplanin.

11:09:46　8　　　A.　That's correct.

11:09:47　9　　　Q.　Are you comfortable referring to that

11:09:50　10　protocol as GenTeic?

11:09:50　11　　　A.　Okay.

11:09:51　12　　　Q.　There was also a change in the

11:09:53　13　thromboprophylaxis.

11:09:55　14　　　A.　That's right.

11:09:56　15　　　Q.　The first thromboprophylaxis was tinzaparin

11:10:00　16　during the Bair Hugger arm of the study; correct?

11:10:03　17　　　A.　Yes.

11:10:03　18　　　Q.　And in the last six months of the Bair

11:10:04　19　Hugger arm there was a change to rivaroxaban; correct?

11:10:08　20　　　A.　That's correct.

11:10:08　21　　　Q.　Are you okay with referring to rivaroxaban

11:10:12　22　as Xarelto?

11:10:14　23　　　A.　Okay.

11:10:14　24　　　Q.　It's just the pharmaceutical name of -- of

11:10:16　25　that thrombo.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

98

11:10:17    1          And in the Hot Dog period patients went back

11:10:21    2    and received tinzaparin as opposed to Xarelto;

11:10:25    3    correct?

11:10:25    4        A.    That's correct.

11:10:26    5        Q.    Okay.  So results reported in Table II of

11:10:29    6    this study show that three out of 371 patients

11:10:34    7    developed a deep joint infection in 60 days; correct?

11:10:37    8        A.    That's correct.

11:10:37    9        Q.    And the percentage of that infection rate is

11:10:41   10    .8 percent; correct?

11:10:41   11        A.    Correct.

11:10:42   12        Q.    As also reported in Table II, 32 out of

11:10:48   13    1,066 patients developed a deep joint infection after

11:10:53   14    receiving the Bair Hugger warming; correct?

11:10:55   15        A.    That's correct.

11:10:58   16        Q.    The change from the infection rate of the

11:11:02   17    Bair Hugger --

11:11:03   18          Which is three percent; correct?

11:11:04   19        A.    Yes.

11:11:05   20        Q.    -- to the .8 percent is a marked decline; is

11:11:09   21    it not?

11:11:09   22          MR. GORDON:  Object to the form of the

11:11:10   23    question.

11:11:13   24        A.    It -- it is -- it is lower, yes.

11:11:17   25        Q.    Would you agree that it's a marked decline?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

99

| | | |
|---|---|---|
| 11:11:19 | 1 | MR. GORDON:  Object to the form of the |
| 11:11:21 | 2 | question. |
| 11:11:22 | 3 | A.   I don't under -- what do you mean by -- |
| 11:11:24 | 4 | What is "marked?" |
| 11:11:25 | 5 | Q.   Have you asked Dr. Borak? |
| 11:11:29 | 6 | A.   The meaning of -- |
| 11:11:31 | 7 | It's -- it's not a quantitative term that |
| 11:11:33 | 8 | I'm familiar with. |
| 11:11:34 | 9 | Q.   So to the extent that Dr. Borak used that |
| 11:11:37 | 10 | language in his report, you wouldn't feel comfortable |
| 11:11:39 | 11 | with the same language. |
| 11:11:40 | 12 | A.   I'm not fam -- |
| 11:11:42 | 13 | I have not read his report.  I mean it's |
| 11:11:47 | 14 | a -- it's a -- it's a -- it's a substantial -- it's a |
| 11:11:52 | 15 | big decline, yes. |
| 11:11:53 | 16 | Q.   A big decline. |
| 11:11:55 | 17 | A.   It is a big difference. |
| 11:12:03 | 18 | Q.   And the p-value reported in Table II is |
| 11:12:08 | 19 | .024; correct? |
| 11:12:10 | 20 | A.   That's -- that is the reported value, yes. |
| 11:12:12 | 21 | Q.   And that reported p-value is statistically |
| 11:12:15 | 22 | significant based on the 95 percent confidential |
| 11:12:17 | 23 | interval; correct? |
| 11:12:19 | 24 | A.   I would disagree with your language. |
| 11:12:23 | 25 | Q.   Okay.  It's maybe not meaningful.  I |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

100

11:12:24   1   apologize.

11:12:26   2        A.   Yeah.   It -- it -- it is significant at the

11:12:27   3   five percent level, yes.

11:12:29   4        Q.   Okay.   So I always say this wrong, but

11:12:31   5   perhaps you can edify me.   If you have a statistically

11:12:34   6   significant p-value using a 95 percent or five -- five

11:12:40   7   percent threshold, --

11:12:42   8        A.   Yes.

11:12:42   9        Q.   -- does that mean that if you repeated the

11:12:45  10   study a hundred times using the same -- a similar

11:12:49  11   population of patients, that you would expect the same

11:12:52  12   outcome at least 95 -- 95 times out of a hundred?

11:12:56  13        A.   No.

11:12:56  14        Q.   Okay.   What --

11:12:57  15             So please edify.

11:13:01  16        A.   What that means is if -- if there is no

11:13:05  17   association and you repeat the study, you're comparing

11:13:16  18   two groups where there is no effect, then just five

11:13:22  19   percent of the time you will reject the -- you will

11:13:25  20   reject the -- the null hypothesis, which is that there

11:13:29  21   is no effect.

11:13:30  22        Q.   Okay.   So is another way to think about it

11:13:34  23   is there's a five-percent chance of getting a false

11:13:37  24   positive?

11:13:40  25        A.   No, it's not looking at the false positive.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

101

11:13:44  1      Q.   Okay.

11:13:44  2      A.   It's looking at what's the -- what's the

11:13:46  3  chance that you would see this big of a difference if

11:13:49  4  there was no effect.

11:13:50  5      Q.   Okay.  Got it.

11:13:51  6      A.   And it's only five per --

11:13:52  7           It's less than five percent, --

11:13:55  8      Q.   Got it.

11:13:55  9      A.   -- so that's a fairly rare event.  So we're

11:13:57 10  doing this under the null hypothesis, --

11:13:59 11      Q.   Yup.

11:14:00 12      A.   -- so therefore we would reject that

11:14:03 13  hypothesis --

11:14:03 14      Q.   Yeah.

11:14:04 15      A.   -- and take the alternative.

11:14:05 16      Q.   Got it.

11:14:06 17      A.   Yeah.

11:14:07 18      Q.   And the odds ratio reported in Table II is

11:14:10 19  3.8; correct?

11:14:11 20      A.   Yes, I think that's correct.

11:14:13 21      Q.   And would you agree with Dr. Borak's

11:14:15 22  statement that that's a significantly increased odds

11:14:19 23  ratio?

11:14:20 24      A.   Well there are two -- two parts to that.

11:14:25 25  It -- it is statis -- using the approach reported, it

102

11:14:31   1   is statistically significant.  The other part of it is

11:14:35   2   what is the magnitude of that effect, and for the

11:14:37   3   magnitude, of course, the point estimate is 3.8, which

11:14:41   4   is a fairly large effect.  The -- the confidence

11:14:45   5   interval on the other hand, as they reported here, is

11:14:50   6   1.2 to 12.5, so it's a very broad -- it's over the

11:14:56   7   line of statistical significance, but the precision

11:14:59   8   is --

11:15:01   9          Well I mean this is a tenfold range for your

11:15:03   10   95 percent confidence interval for the -- for -- for

11:15:06   11   your estimate of what that effect is.

11:15:08   12       Q.   And I'll get to the confidence interval

11:15:10   13   later on this afternoon, but with respect to just the

11:15:12   14   odds ratio --

11:15:14   15       A.   Oh, sure.

11:15:15   16       Q.   -- of 3.8, do you agree with Dr. Borak that

11:15:18   17   it significantly increased OR.

11:15:21   18       A.   Yes.

11:15:22   19       Q.   Significantly increased.

11:15:25   20       A.   It's increased, yeah.

11:15:27   21       Q.   Okay.  On page two of your report you

11:15:31   22   provide a calculation that uses different infection

11:15:40   23   data than what was reported in the McGovern study;

11:15:45   24   correct?

11:15:45   25       A.   It's different from what's in the paper,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

103

11:15:47  1  yes.

11:15:48  2       Q.    So instead of using three Hot Dog infections

11:15:52  3  as reported in the study, your tabulation uses four

11:15:57  4  Hot Dog infections; correct?

11:15:59  5       A.    We found the four based on the data in --

11:16:03  6  well, it's Exhibit -- it's Exhibit 10 of --

11:16:09  7       Q.    Mr. Albrecht.

11:16:10  8       A.    -- Albrecht's and also, I mean, there's

11:16:13  9  related data on that that McGovern provided and -- and

11:16:17  10  whatnot.

11:16:17  11       Q.    Okay.

11:16:18  12       A.    So going back to the -- the raw data,

11:16:20  13  that -- that -- that is the basis of what I report on

11:16:25  14  page two.

11:16:25  15       Q.    And you also in that calculation used 31

11:16:31  16  Bair Hugger infections as opposed to the 32 that was

11:16:34  17  reported in the study; correct?

11:16:37  18       A.    That's -- that's correct, yeah.

11:16:39  19       Q.    And that's --

11:16:40  20       A.    It seems like in that data set there's one

11:16:43  21  observation that occurred during the Hot Dog period

11:16:53  22  that was attributed in the McGovern tabulation to

11:16:59  23  being a -- a Bair Hugger infection when it actually

11:17:03  24  occurred during the Hot Dog period, so it -- based on

11:17:08  25  their description of what the -- what the study was,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

104

11:17:10   1   it should have been calculated -- attributed to -- to

11:17:14   2   that treatment.

11:17:15   3       Q.   So you said it seems that.  You're not sure

11:17:17   4   though; right?

11:17:17   5       A.   Well it's --

11:17:19   6            Taking those dates, doing what they said the

11:17:22   7   study was, that's what you get.

11:17:24   8       Q.   Okay.

11:17:24   9       A.   That's -- that's what I report in here.

11:17:26  10       Q.   But you would agree that the data in your

11:17:28  11   report in terms of how many infections were in each

11:17:32  12   arm of the study is different than what --

11:17:34  13       A.   That's correct.

11:17:35  14       Q.   -- the author published; correct?

11:17:36  15       A.   That's correct.

11:17:37  16       Q.   And you just mentioned that with respect to

11:17:39  17   conducting that calculation of the incidence of

11:17:43  18   infection in those Bair Hugger patients and Hot Dog

11:17:46  19   patients, you relied on Albrecht Exhibit 10; correct?

11:17:49  20       A.   Yes.

11:17:50  21            MR. GORDON:  Object to the form of the

11:17:51  22   question.  Misstates his testimony.

11:18:04  23            (Exhibit 14 was marked for

11:18:05  24            identification.)

11:18:05  25   BY MR. SACCHET:

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

105

11:18:08  1      Q.   I understand that there's a lot of pages in

11:18:11  2  front of you, but does this appear to be the document

11:18:17  3  that you reviewed in determining that there were,

11:18:21  4  according to you, one more infection in the Hot Dog

11:18:24  5  group and one less in the Bair Hugger group?

11:18:37  6      A.   It -- it -- it appears to be, yes.

11:18:38  7      Q.   And this document was provided to you by 3M?

11:18:42  8      A.   Yes.

11:18:43  9      Q.   Okay.  As kind of just a general statistical

11:18:50  10  or epidemiological matter, you need to rely on

11:18:54  11  complete data sets; correct?

11:18:56  12      A.   Yes.

11:18:57  13      Q.   And if you don't rely on complete data sets,

11:19:00  14  there could be an artifact issue; correct?

11:19:07  15      A.   Well -- well there could be -- there could

11:19:11  16  be an error in the calculation that is worth checking.

11:19:15  17      Q.   And that would be an artifact; right?

11:19:17  18      A.   Okay.  Yeah.

11:19:19  19      Q.   Could you please turn to the Bates number

11:19:23  20  AUGUSTINE -- which they all share in common -- 5277

11:19:30  21  in the document.

        22          MR. GORDON:  And the system.

11:19:32  23          MR. SACCHET:  Oh, so I can back up.

11:19:33  24      Q.   Are you familiar with Bates numbers, doctor?

11:19:36  25      A.   The base numbers?  No, I'm not sure which

106

11:19:38  1  ones you're talking about.

11:19:38  2      Q.   The Bates number is the number on the bottom

11:19:41  3  of the page.

11:19:41  4           MR. GORDON:  Did you say 5277?

11:19:43  5           MR. SACCHET:  Yes.

11:19:43  6           MR. GORDON:  My copy doesn't have one.

11:19:45  7           MR. SACCHET:  Does yours?

11:19:48  8           THE WITNESS:  No.

11:19:49  9           MR. SACCHET:  Mine doesn't either.

11:19:52  10      Q.   Do you know whether the copy that you had

11:19:54  11  had that page?

11:19:58  12      A.   I assumed it was all there, yeah.  I

11:20:02  13  didn't --

11:20:02  14      Q.   Well --

11:20:03  15      A.   Yeah, I don't -- don't recall.

11:20:05  16      Q.   Yeah.  You didn't look at whether there was

11:20:07  17  a gap in the Bates numbers that were included on the

11:20:09  18  pages; did you?

11:20:10  19      A.   No, I didn't.

11:20:11  20      Q.   Okay.  I'm going to try to walk you through

11:20:14  21  the sequence in -- of pages here.  On 5278 do you see

11:20:18  22  the table?

11:20:19  23      A.   Yes.

11:20:19  24      Q.   And that table has a list of dates in column

11:20:24  25  G?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

107

| | | |
|---|---|---|
| 11:20:26 | 1 | A.   Correct. |
| 11:20:26 | 2 | Q.   Okay.  And then the second page is another |
| 11:20:27 | 3 | large table of -- mostly ends in no quantitative data; |
| 11:20:32 | 4 | correct? |
| 11:20:32 | 5 | A.   Yes. |
| 11:20:33 | 6 | Q.   And then the third page is a similar table, |
| 11:20:36 | 7 | but it has kind of these -- a bunch of Ns with null |
| 11:20:40 | 8 | values. |
| 11:20:41 | 9 | A.   Correct. |
| 11:20:41 | 10 | Q.   Okay.  The fourth page is also a large table |
| 11:20:44 | 11 | with virtually no data on it. |
| 11:20:47 | 12 | A.   Correct. |
| 11:20:49 | 13 | Q.   And the fourth page is a much narrower table |
| 11:20:52 | 14 | that, in this instance, documents what appears to be a |
| 11:20:56 | 15 | deep joint infection; correct? |
| 11:20:57 | 16 | MR. GORDON:  You mean the fifth page? |
| 11:20:58 | 17 | MR. SACCHET:  The fifth page.  Thank you, |
| 11:21:00 | 18 | Mr. Gordon. |
| 11:21:01 | 19 | A.   Correct. |
| 11:21:01 | 20 | Q.   And that page in particular is AUGUSTINE_ |
| 11:21:05 | 21 | 0005282; correct? |
| 11:21:08 | 22 | A.   AUGUSTINE -- |
| 11:21:09 | 23 | Q.   At the bottom. |
| 11:21:10 | 24 | A.   Oh, I'm sorry.  Yes. |
| 11:21:11 | 25 | Q.   Okay.  Let's turn to the next page and see |

108

| | | |
|---|---|---|
| 11:21:15 | 1 | if the pattern repeats itself of those five pages.  Is |
| 11:21:18 | 2 | the first page a table with a bunch of dates and other |
| 11:21:22 | 3 | values? |
| 11:21:22 | 4 | A.   Yes. |
| 11:21:23 | 5 | Q.   Is the second table one with a bunch of Ns? |
| 11:21:26 | 6 | A.   Yes. |
| 11:21:27 | 7 | Q.   Is the third page, with the AUGUSTINE Bates |
| 11:21:32 | 8 | number 005285, a table with null values? |
| 11:21:39 | 9 | A.   Yeah, mostly null -- N and null.  Yeah. |
| 11:21:42 | 10 | Q.   Yeah.  Is the fourth page, which has the |
| 11:21:45 | 11 | Bates number AUGUSTINE_0005286, largely a blank table? |
| 11:21:50 | 12 | A.   Yes. |
| 11:21:50 | 13 | Q.   And is the fifth page, marked as AUGUSTINE_ |
| 11:21:55 | 14 | 005287, a narrower table that has NOs and in one |
| 11:22:02 | 15 | instance a YES? |
| 11:22:03 | 16 | A.   Yes. |
| 11:22:03 | 17 | Q.   Okay.  I'll represent to you that this |
| 11:22:07 | 18 | pattern runs true through the document itself. |
| 11:22:10 | 19 | A.   Yes. |
| 11:22:10 | 20 | Q.   But if we could turn back to Bates number |
| 11:22:14 | 21 | AUGUSTINE_005278, -- |
| 11:22:17 | 22 | A.   5278.  Okay. |
| 11:22:21 | 23 | Q.   -- and the missing page that we don't have |
| 11:22:23 | 24 | is AUGUSTINE_005277; correct? |
| 11:22:26 | 25 | A.   Correct. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

109

| | | |
|---|---|---|
| 11:22:27 | 1 | Q. Okay. So let's flip to AUGUSTINE_005274, |
| 11:22:35 | 2 | which is three pages before the document. |
| 11:22:38 | 3 | A. Okay. |
| 11:22:41 | 4 | Q. And, excuse me, let's actually go to 5273, |
| 11:22:44 | 5 | the page before that. That's the table like the other |
| 11:22:52 | 6 | pages we've seen that has the dates; correct? |
| 11:22:54 | 7 | A. Correct. |
| 11:22:55 | 8 | Q. On 5273; correct? |
| 11:22:58 | 9 | A. Yes. |
| 11:22:58 | 10 | Q. And then on 5274 we've got the big table |
| 11:23:03 | 11 | with a bunch of Ns; correct? |
| 11:23:07 | 12 | A. Correct. |
| 11:23:09 | 13 | Q. And the third page, which is 5275, there are |
| 11:23:11 | 14 | kind of the null values and other Ns; right? |
| 11:23:14 | 15 | A. Yes. |
| 11:23:14 | 16 | Q. Following the same pattern as the other |
| 11:23:16 | 17 | pages we've established; correct? |
| 11:23:17 | 18 | A. Correct. |
| 11:23:18 | 19 | Q. And the fourth page is, like the other |
| 11:23:21 | 20 | fourth pages in other sequences, a big table with |
| 11:23:26 | 21 | bunches of zeroes; right? |
| 11:23:28 | 22 | A. Bunch of blanks. |
| 11:23:29 | 23 | Q. Yeah. |
| | 24 | A. Yeah, uh-huh. |
| 11:23:29 | 25 | Q. And that's like the fourth page in the other |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

110

11:23:31    1    sequences we went over; correct?

11:23:32    2         A.    Correct.

11:23:33    3         Q.    The page that's missing, 5278, is the narrow

11:23:36    4    table; correct?

11:23:37    5              MR. GORDON:   5277 you mean?

11:23:39    6              MR. SACCHET:   5277.   I apologize.

11:23:41    7         A.    That's right.

11:23:41    8         Q.    And based on the sequence in the other

11:23:43    9    documents we looked at, that is the table that has

11:23:45    10   information as to whether or not there was a deep

11:23:46    11   joint infection; correct?

11:23:47    12        A.    Correct.

11:23:48    13        Q.    So this document that you relied on in your

11:23:50    14   report was missing the page that had information as to

11:23:56    15   whether or not there was a deep joint infection in the

11:23:58    16   time period that describes these five pages in the

11:24:01    17   table.

11:24:03    18        A.    I --

11:24:05    19              As I -- as I said, I don't -- I don't recall

11:24:07    20   going over all of the -- the details in these pages

11:24:11    21   and seeing that that was missing.

11:24:12    22        Q.    So you weren't aware that there was the

11:24:13    23   missing page that included infection data regarding

11:24:16    24   the use of the Bair Hugger device; correct?

11:24:18    25              MR. GORDON:   Object to the form of the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

111

11:24:20 1 question, assumes facts not in evidence.

11:24:21 2 A. I didn't see that there was a -- a -- a -- a

11:24:29 3 miss -- a missing page in the -- in the -- the data

11:24:32 4 set that I used to analyze.

11:24:34 5 Q. Let's go to AUGUSTINE_5273, which was the

11:24:37 6 first page of the sequence.

11:24:38 7 A. Right.

11:24:39 8 Q. The dates that are delineated there are from

11:24:42 9 September 2008 to September 26, 2008; correct?

11:24:48 10 A. September 8, yeah, twenty --

11:24:50 11 Yeah, uh-huh.

11:24:51 12 Q. And the Bair Hugger period of this study of

11:24:53 13 the McGovern et al paper began in July of 2008;

11:24:58 14 correct?

11:24:58 15 A. Yes.

11:24:59 16 Q. And it ran until February of 2010; correct?

11:25:01 17 A. Yes.

11:25:03 18 Q. So this table describes operations that

11:25:08 19 occurred when using the Bair Hugger in the McGovern

11:25:11 20 study; correct?

11:25:11 21 A. Correct.

11:25:12 22 Q. So if there were an infection that would

11:25:14 23 have occurred in this time period, it would have been

11:25:18 24 during the Bair Hugger warming period; correct?

11:25:21 25 A. Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

112

| | | |
|---|---|---|
| 11:25:22 | 1 | Q.   And we're missing the page in this document |
| 11:25:25 | 2 | to know whether or not there were additional |
| 11:25:28 | 3 | infections in the Bair Hugger period; correct? |
| 11:25:31 | 4 | A.   That -- |
| 11:25:33 | 5 | Well, that's not in this document, yes.  But |
| 11:25:37 | 6 | in the file I -- |
| 11:25:39 | 7 | I mean the numbers on my page two |
| 11:25:48 | 8 | essentially correspond to the numbers that are in |
| 11:25:51 | 9 | McGovern's paper, so the results I'm getting from my |
| 11:25:54 | 10 | tabulation, with the one difference of switching the |
| 11:26:00 | 11 | single value -- and if you go to the -- I think it's |
| 11:26:06 | 12 | the -- one of the exhibits from the McGovern |
| 11:26:15 | 13 | testimony, you can -- you can see where that one |
| 11:26:18 | 14 | observation was -- was described as FAW when it should |
| 11:26:29 | 15 | have been -- what is -- CFW or -- yeah. |
| 11:26:31 | 16 | Q.   And we'll get to the McGovern exhibit in a |
| 11:26:34 | 17 | couple minutes, -- |
| 11:26:35 | 18 | A.   Yeah. |
| 11:26:35 | 19 | Q.   -- but -- |
| 11:26:36 | 20 | A.   So we do not -- there's -- |
| 11:26:38 | 21 | The numbers that we're ending up with |
| 11:26:40 | 22 | correspond to what is in the McGovern paper. |
| 11:26:43 | 23 | Q.   So are you saying you don't feel comfortable |
| 11:26:45 | 24 | relying on Albrecht Exhibit 10? |
| 11:26:48 | 25 | A.   Well -- |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

113

11:26:48  1            MR. GORDON:  Object to the form of the

11:26:50  2   question.

11:26:50  3       A.   The -- the data that we're looking at are

11:26:54  4   derived from -- are basically from -- from --

11:26:58  5   from -- from -- from this, and I'm -- it's based on a

11:27:01  6   table from this that I am doing in my analysis.

11:27:04  7       Q.   And we're missing a page that deals with the

11:27:08  8   presence or not of deep joint infection; correct?

11:27:11  9       A.   The -- the data file that I -- that I'm

11:27:14  10  using is these same data that -- that are -- that I

11:27:18  11  think are tabulated in this.  They're tabulated here.

11:27:23  12  Apparently, one of the pages got missed in -- when

11:27:28  13  they produced -- produced this.  I wasn't -- and I --

11:27:34  14  you know, I wasn't shuffling through by hand

11:27:39  15  everything here to -- to do the -- to do the

11:27:41  16  tabulation.

11:27:42  17      Q.   So are you relying on McGovern 16 instead of

11:27:45  18  this?

11:27:45  19      A.   No.  Because McGovern 16, it includes

11:27:53  20  additional detail that -- that corroborate the

11:28:00  21  tabulations that were derived from this -- from this

11:28:05  22  data set.

11:28:09  23      Q.   You're aware that this data set was not

11:28:12  24  produced by any authors in the study; correct?

11:28:15  25           MR. GORDON:  Object to the form of the

114

11:28:16   1   question, lack of foundation, assumes facts not in

11:28:20   2   evidence.

11:28:22   3        A.   I -- I don't -- I don't know who

11:28:25   4   ultimately -- you know, originally produced this.

11:28:29   5        Q.   Why does your report on page two say that it

11:28:35   6   was produced by Dr. Scott Augustine in response to a

11:28:37   7   subpoena?  Did you write that?

11:28:39   8        A.   I -- I did write that.  I --

11:28:41   9             That was my understanding of where the --

11:28:43  10   where the file came from.

11:28:44  11        Q.   Dr. Augustine is not an author of the

11:28:46  12   McGovern study; is he?

11:28:47  13             MR. GORDON:  Object to the form of the

11:28:48  14   question, lack of foundation, assumes facts not in

11:28:50  15   evidence.

11:28:51  16        A.   He's not listed as an author.

11:28:54  17        Q.   His --

11:28:55  18        A.   My understanding is that he had some

11:28:59  19   involvement with -- with this.  And I mean his name's

11:29:03  20   at the bottom of this -- of this document that you

11:29:06  21   just gave me.

11:29:08  22        Q.   So do you feel comfortable relying on

11:29:11  23   documents produced by Dr. Augustine?

11:29:14  24             MR. GORDON:  Object to the form of the

11:29:18  25   question.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

                                                                    115

11:29:19   1       A.   I don't -- don't re --

11:29:22   2            I -- I'm not -- I'm not sure I understand

11:29:23   3    what you're -- what you're asking.

11:29:25   4       Q.   Well you just told me that this is produced

11:29:27   5    by Augustine and you're relying on Exhibit 10.

11:29:32   6       A.   I mean Augustine's name is on it.

11:29:34   7       Q.   Okay.

11:29:34   8       A.   I don't know that he sat there in front of

11:29:37   9    the computer and produced it.

11:29:38   10      Q.   So when you say it was produced by Dr. Scott

11:29:41   11   Augustine in response to a subpoena, you don't know

11:29:42   12   whether that's right or wrong.

11:29:44   13      A.   I -- I'm basing this on -- on what I

11:29:47   14   understand -- what the -- what -- what I was given to

11:29:50   15   understand of where the data came from that I was

11:29:52   16   using in my analysis.

11:29:53   17      Q.   Who gave you that understanding?

11:29:54   18      A.   When I was talking to the people that --

11:29:58   19   with 3M.

11:30:00   20      Q.   So you relied on 3M's statement that this

11:30:02   21   was produced by Dr. Augustine and you accepted that

11:30:04   22   statement.

11:30:05   23      A.   Yes, correct.

11:30:06   24      Q.   Did you perform any independent research to

11:30:09   25   determine whether that was true or false?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

116

11:30:09    1        A.    No, I didn't.

11:30:11    2        Q.    Do you know whether or not Augustine was

11:30:13    3    responsible for collecting the data that was

11:30:15    4    eventually used in the McGovern study?

11:30:20    5        A.    I don't know that he did.  I -- I'm sure he

11:30:26    6    delegated that to someone, it must be in all

11:30:30    7    likelihood, but I really don't know how this was --

11:30:33    8    was -- who all as involved with producing it.

11:30:36    9        Q.    You don't know that Dr. Reed, an orthopedic

11:30:41   10    consultant in the U.K., was the individual responsible

11:30:43   11    for collecting the data?

11:30:45   12        A.    I know that Dr. Reed was involved with it.

11:30:49   13    The -- the management organization of that is -- is --

11:30:54   14    is something I don't know.

11:30:57   15        Q.    Would knowing that Dr. Reed was in charge of

11:31:01   16    collecting the data instead of Dr. Augustine give you

11:31:04   17    any pause as to whether this is the final data set?

11:31:07   18            MR. GORDON:  Object to the form of the

11:31:08   19    question.

11:31:14   20        A.    I have --

11:31:16   21            I mean if -- if Dr. Reed produced it and --

11:31:20   22    and Dr. Augustine supplied it, I -- I'm taking the

11:31:25   23    values as they are.  I mean I -- I was just analyzing

11:31:29   24    the data that I was -- that I was shown.

11:31:31   25        Q.    Has anyone ever asked you for data based on

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

117

| | | |
|---|---|---|
| 11:31:34 | 1 | a published cit -- an article that you published? |
| 11:31:36 | 2 | A.   Yes. |
| 11:31:36 | 3 | Q.   And did you provide the data? |
| 11:31:42 | 4 | A.   Very often it's -- I'm -- |
| 11:31:44 | 5 | I'm often collaborating with another |
| 11:31:47 | 6 | investigator, so -- so the -- I would usually go to -- |
| 11:31:55 | 7 | go to the co-author who owned the data set and they |
| 11:31:58 | 8 | would be involved with the decision on whether or not |
| 11:32:00 | 9 | to provide it. |
| 11:32:01 | 10 | Q.   You'd go to a co-author. |
| 11:32:03 | 11 | A.   Yes.  Well it's often the main author of |
| 11:32:06 | 12 | the -- of the paper. |
| 11:32:07 | 13 | Q.   Reed was an author of the -- |
| 11:32:09 | 14 | A.   Yes. |
| 11:32:11 | 15 | Q.   -- of the article; right? |
| 11:32:11 | 16 | A.   That's right, he was the senior author. |
| 11:32:13 | 17 | Q.   Did you do any investigation to determine |
| 11:32:14 | 18 | whether Mr. Reed produced a data set? |
| 11:32:16 | 19 | A.   No, I didn't. |
| 11:32:17 | 20 | Q.   So you don't know whether or not Mr. Reed |
| 11:32:19 | 21 | produced the data set as an author of the study that |
| 11:32:22 | 22 | corroborates the data noted in the McGovern study. |
| 11:32:25 | 23 | A.   I don't -- don't know that the -- that |
| 11:32:28 | 24 | the -- that -- that that's what -- what transpired. |
| 11:32:34 | 25 | Q.   You didn't attempt to determine that though. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

                                                                 118

11:32:35    1        A.    No, I didn't.

11:32:37    2        Q.    And you agree with me that Augustine is not

11:32:41    3    a noted author on the study; correct?

11:32:44    4        A.    He is not.  He is not listed as an author,

11:32:45    5    yes.

11:32:45    6        Q.    So you relied on a third party's production

11:32:48    7    of a data set with respect to the McGovern study.

11:32:52    8        A.    Well while he's not an author, I don't know

11:32:55    9    if he was involved in fact.

11:32:58   10        Q.    So you don't know whether he was involved,

11:33:00   11    but you still relied on his data set.

11:33:03   12        A.    Well he had some involvement with -- with

11:33:06   13    this -- with this group.  I think --

11:33:08   14        Q.    Does it say that on the study?

11:33:09   15        A.    I mean where --

11:33:10   16              I forget where the funding comes from.

11:33:12   17        Q.    The last page of the study will tell you if

11:33:14   18    there were any benefits.  The very last page, very

11:33:17   19    last page.  Anything say Augustine?

11:33:31   20        A.    I don't think --

11:33:32   21              I don't see anything that says Augustine,

11:33:34   22    I -- but that was not the point that I was -- was

11:33:41   23    making.  I'm not sure where the funding for this work

11:33:45   24    came from.

11:33:47   25        Q.    So you have no basis to know whether or not

119

11:33:49  1  the funding came from Augustine; correct?

11:33:54  2       A.   Well as I say, I --

11:33:58  3            Oh, I don't know.

11:34:03  4       Q.   I'll represent to you that there's no

11:34:04  5  mention of Augustine in the McGovern study.  You're

11:34:08  6  not going to find it.

11:34:08  7       A.   There -- there is -- there is not.  I -- I

11:34:10  8  have acknowledged that there's no -- there's no

11:34:14  9  specific reference to -- to Augustine.  However, I

11:34:19  10  believe he did have some -- some involvement with

11:34:22  11  the -- the production of this work.

11:34:23  12       Q.   Have you reviewed the Augustine deposition?

11:34:27  13       A.   I've seen some of it.  Not the whole thing.

11:34:29  14       Q.   Did Augustine's deposition testimony

11:34:31  15  corroborate the fact that he was involved in this

11:34:33  16  study, the McGovern study?

11:34:34  17       A.   As I say, I don't -- I haven't seen the

11:34:37  18  whole -- whole of the deposition.

11:34:38  19       Q.   So you have no basis to conclude that

11:34:40  20  actually Augustine was involved in the McGovern study.

11:34:45  21       A.   Well as I -- as I say, I -- there was --

11:34:48  22            There is this issue of where some of the

11:34:49  23  funding was coming from for doing the McGovern study,

11:34:53  24  and I'm not putting my fingers on it right -- right at

11:34:56  25  the moment, so it was part of what I'm -- what I'm

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

120

11:34:59    1    saying.

11:34:59    2        Q.   Where did you get the idea?

11:35:00    3        A.   One of the -- one of the articles -- one of

11:35:03    4    the things that I've read -- that I read in preparing

11:35:05    5    this report.

11:35:06    6        Q.   One of the things in the 19 sources listed

11:35:09    7    on Ex -- on page 14 of your report?

11:35:11    8        A.   I believe it was somewhere in there, yes,

11:35:14    9    but --

11:35:17   10             I mean Albrecht, as I understand it, is --

11:35:21   11    was -- is an Augustine -- is working for Augustine.

11:35:25   12        Q.   Does it say that on the paper?

11:35:27   13        A.   It doesn't say that on the paper, but --

11:35:29   14        Q.   You're assuming that to be true.

11:35:31   15        A.   I think it says that in --

11:35:33   16             I think Albrecht says -- said that in his --

11:35:37   17    his deposition.

11:35:37   18        Q.   Are you sure?

11:35:39   19             MR. GORDON:  Object to the form of the

11:35:40   20    question.

11:35:42   21        A.   I would have to review his testimony again,

11:35:47   22    but it -- it -- it has appeared many -- in -- in

11:35:52   23    many -- many things that they -- they are -- they

11:35:55   24    are -- they are together, and --

11:35:58   25        Q.   3M told you this.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

121

| | | |
|---|---|---|
| 11:36:01 | 1 | A.    Well I -- |
| 11:36:02 | 2 | Q.    You said that earlier, five minutes ago. |
| 11:36:05 | 3 | A.    I -- |
| 11:36:06 | 4 | They -- they -- they've -- they've said |
| 11:36:07 | 5 | that.  I said -- as I say, I've also -- I've read it |
| 11:36:11 | 6 | in either a defi -- a deposition or one of the other |
| 11:36:16 | 7 | things that was -- that -- that I -- that I read, and |
| 11:36:20 | 8 | maybe in one of the other papers or something like |
| 11:36:22 | 9 | that. |
| 11:36:22 | 10 | Q.    So you said you read Mr. Albrecht's |
| 11:36:24 | 11 | deposition; correct? |
| 11:36:25 | 12 | A.    Yes. |
| 11:36:25 | 13 | Q.    Okay.  And are you familiar with the fact |
| 11:36:28 | 14 | that in Mr. Albrecht's deposition he said that the |
| 11:36:32 | 15 | data set that was analyzed in terms of conducting this |
| 11:36:35 | 16 | study contains three infections in the Hot Dog period? |
| 11:36:38 | 17 | MR. GORDON:  Object to the form of the |
| 11:36:40 | 18 | question, misstates the testimony. |
| 11:36:43 | 19 | A.    I -- I don't recall exactly what he said. |
| 11:36:47 | 20 | Q.    So you have no recollection as to whether |
| 11:36:49 | 21 | Mr. Albrecht actually did say that the data set |
| 11:36:54 | 22 | contained three infections for the Hot Dog period. |
| 11:36:58 | 23 | A.    I don't remember that. |
| 11:36:59 | 24 | Q.    Well you rely on Mr. Albrecht's testimony in |
| 11:37:03 | 25 | determining that Albrecht Exhibit 10 in fact is the |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

122

11:37:07   1    final data set; correct?

11:37:11   2               MR. GORDON:   Object to the form of the

11:37:12   3    question.

11:37:14   4        A.    I -- I don't know that this is the data

11:37:19   5    set --

11:37:21   6               I mean the numbers don't agree with what was

11:37:24   7    tabulated in the -- in the -- in -- in the McGovern

11:37:27   8    paper, --

11:37:27   9        Q.    Okay.

11:37:28   10       A.    -- so I mean I'm not sure where Albrecht did

11:37:35   11   the tab -- how -- how Albrecht did -- did the

11:37:38   12   tabulation.

11:37:39   13       Q.    But you rely on Mr. Albrecht's testimony

11:37:41   14   to -- in relying on using Exhibit 10; correct?

11:37:45   15       A.    Using Exhibit 10.   But then when you

11:37:49   16   tabulate Exhibit 10, you don't get what's in the

11:37:53   17   paper.

11:37:53   18       Q.    Yeah.   So you don't know whether Exhibit 10

11:37:55   19   is the final data set.

11:37:59   20       A.    It --

11:38:03   21             I don't know that it is the data set that he

11:38:05   22   used with this paper or --

11:38:09   23             Maybe he made a mistake in the tabulation.

11:38:11   24   I don't know.

11:38:12   25       Q.    Mr. -- or Dr. Borak doesn't conclude that it

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

123

11:38:16  1  was the final data set; does he?

11:38:20  2       A.   I don't know.

11:38:21  3            MR. GORDON:  Object to the form of the

11:38:22  4  question, lacks foundation.

11:38:23  5       Q.   He called it the apparent data set; doesn't

11:38:27  6  he?

11:38:27  7            MR. GORDON:  Same objection.

11:38:28  8       A.   As I say, I have not -- I have not seen his

11:38:30  9  report.

11:38:30  10      Q.   Okay.

11:38:39  11           (Exhibit 15 was marked for

11:38:40  12           identification.)

11:38:40  13 BY MR. SACCHET:

11:38:46  14      Q.   Exhibit 15 is the October 7, 2016 deposition

11:38:50  15 of Mr. Albrecht; correct, Dr. Holford?

11:38:55  16      A.   That's correct.

11:38:55  17      Q.   Okay.  If you could please turn to page 158

11:39:03  18 of the transcript, which is page 41 at the bottom.  Do

11:39:09  19 you see that?

11:39:13  20      A.   Yes.

11:39:18  21      Q.   Mr. Gordon asked, "If you count the

11:39:21  22 infections for that time period, June 1st 2010, to

11:39:26  23 December 31st, 2010, there are actually four,

11:39:29  24 correct?"

11:39:31  25           Do you see that question?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

124

| | | |
|---|---|---|
| 11:39:32 | 1 | A.  Yes. |
| 11:39:32 | 2 | Q.  And Mr. Albrecht responds, "I would have to |
| 11:39:35 | 3 | physically count these, but that's not what our data |
| 11:39:38 | 4 | set says here.  The data set that was analyzed there |
| 11:39:41 | 5 | was three." |
| 11:39:43 | 6 | A.  Yes. |
| 11:39:44 | 7 | Q.  Are you aware that Mr. Albrecht testified |
| 11:39:47 | 8 | that the data set that was analyzed had three deep |
| 11:39:51 | 9 | joint infections instead of the four that Mr. Gordon |
| 11:39:55 | 10 | had asked about? |
| 11:39:57 | 11 | A.  That's what -- that's what he's saying here, |
| 11:39:59 | 12 | and that corresponds to the -- |
| 11:40:02 | 13 | Q.  The study. |
| 11:40:03 | 14 | A.  -- the -- the -- the -- the Table -- the |
| 11:40:06 | 15 | Table II in this -- in the paper. |
| 11:40:08 | 16 | Q.  But in your report you say that the results |
| 11:40:11 | 17 | by McGovern are incorrect because they arise from an |
| 11:40:15 | 18 | incorrect tabulation error; an error is recognized in |
| 11:40:19 | 19 | the deposition by Albrecht. |
| 11:40:22 | 20 | A.  You're looking at one piece of it here. |
| 11:40:24 | 21 | There's elsewhere that he -- that -- that he talks |
| 11:40:29 | 22 | about a -- that -- that there were -- there was |
| 11:40:33 | 23 | apparently an error that they recognized later. |
| 11:40:38 | 24 | Q.  You think Mr. Albrecht said that? |
| 11:40:40 | 25 | A.  I thought he did somewhere.  I -- I don't |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

125

11:40:43  1    remember exactly where -- where it is.

11:40:45  2          Reed said it.

11:40:47  3    Q.   This is Mr. Albrecht.  Do you think Mr.

11:40:50  4    Albrecht said there was an error?

11:40:52  5    A.   I seem to recall he -- that -- that there

11:40:54  6    was.  I don't remember exactly where -- where it is.

11:40:58  7    It's a fairly long report.

11:41:00  8    Q.   Let's keep going then.  If you can go to

11:41:02  9    internal page 142, page 37 at the bottom, line 16, Mr.

11:41:17  10   Gordon asked, "I have something that's going to help.

11:41:20  11   But first I want to establish that -- that is a

11:41:23  12   printout of the data that Dr. Reed would have provided

11:41:26  13   to you and from which you generated your statistical

11:41:28  14   analysis that became the observational component of

11:41:32  15   Exhibit 8."

11:41:33  16         Do you see that question?

11:41:33  17   A.   Yes.

11:41:33  18   Q.   I'll represent to you that Exhibit 8 is the

11:41:35  19   McGovern study --

11:41:36  20   A.   Okay.

11:41:37  21   Q.   -- and I'll also represent to you that the

11:41:38  22   data set that Mr. Gordon is referring to is Albrecht

11:41:41  23   Exhibit 10.

11:41:41  24   A.   Okay.

11:41:42  25   Q.   The answer is, "I'm assuming, but there's no

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

126

11:41:45  1  way for me to verify something like this."

11:41:49  2       A.   Okay.

11:41:49  3       Q.   So Mr. Albrecht didn't know whether or not

11:41:52  4  Albrecht Exhibit 10 was the final data set, correct,

11:41:55  5  based on this testimony?

11:41:58  6       A.   I -- I --

11:41:59  7            Yeah.  Apparently, yeah.

11:42:01  8       Q.   But you have concluded that, based on Mr.

11:42:02  9  Albrecht's testimony, that Albrecht Exhibit 10 is the

11:42:06  10 final data set; is that correct?

11:42:09  11           MR. GORDON:  Object to the form of the

11:42:10  12 question, misstates his test -- misstates prior

11:42:13  13 testimony.

11:42:14  14      Q.   Is your testimony not that Albrecht Exhibit

11:42:18  15 10 is the final data set?

11:42:19  16           MR. GORDON:  Same objection.

11:42:20  17      A.   I don't -- I don't --

11:42:22  18           I'm taking Exhibit 10 as it -- as it -- as

11:42:26  19 it is.  I mean what --

11:42:31  20           What do you mean by "final data set?"

11:42:32  21      Q.   Well you've already said that the data set

11:42:35  22 that is in Albrecht 10 is not the data that was in the

11:42:39  23 study; correct?

11:42:41  24      A.   A tabulation based on -- based on that --

11:42:45  25 that data set doesn't agree with the paper.

127

| | | |
|---|---|---|
| 11:42:50 | 1 | Q.   Yeah. |
| 11:42:50 | 2 | A.   Yeah. |
| 11:42:51 | 3 | Q.   And Mr. Albrecht in this testimony is saying |
| 11:42:53 | 4 | he doesn't know whether it's the final data set. |
| 11:42:57 | 5 | A.   Okay. |
| 11:42:58 | 6 | Q.   And Mr. Albrecht also said in the testimony |
| 11:43:00 | 7 | we read a moment ago that there were three infections |
| 11:43:04 | 8 | in the Hot Dog arm that were analyzed with respect to |
| 11:43:05 | 9 | the paper; correct? |
| 11:43:06 | 10 | A.   That's -- |
| 11:43:07 | 11 | He's, I assume, re -- reporting back what -- |
| 11:43:10 | 12 | what was actually published in the paper, what this |
| 11:43:14 | 13 | tabulation that's in the paper showed. |
| 11:43:16 | 14 | Q.   He says the data set that was analyzed there |
| 11:43:20 | 15 | was three. |
| 11:43:22 | 16 | A.   So what is he referring -- |
| 11:43:24 | 17 | When he says "data set," what does he mean? |
| 11:43:26 | 18 | I don't know quite what he -- what he's referring to. |
| 11:43:29 | 19 | Is he referring to the data -- the tabulation that was |
| 11:43:32 | 20 | made from the data, or is he talking about the -- the |
| 11:43:35 | 21 | original file? |
| 11:43:38 | 22 | Q.   You're aware that not even Mr. Gordon knows |
| 11:43:41 | 23 | whether Exhibit 10 is the final data set; correct? |
| 11:43:44 | 24 | MR. GORDON:   Object to the form of the |
| 11:43:45 | 25 | question, lack of foundation. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

                                                              128

11:43:47   1      A.   I don't know what Mr. Gordon knows or

11:43:51   2   doesn't know about that.

11:43:51   3      Q.   Let's look at page 163, which is 42 at the

11:43:56   4   bottom.  Are you there, doctor?

11:44:05   5      A.   Okay.

11:44:06   6      Q.   Line 17, Mr. Gordon asks -- or states, "And

11:44:11   7   I want to make it very clear, I have no idea if

11:44:14   8   Exhibit 10 is the original data" --

11:44:17   9           Albrecht answers:  "I don't either."

11:44:20  10           Do you see that?

11:44:21  11      A.   Okay.

11:44:22  12      Q.   So Mr. Gordon doesn't know if it's the final

11:44:24  13   data set, Mr. Albrecht doesn't know whether it's the

11:44:26  14   final data set, Mr. Borak in his report uses the word

11:44:30  15   "apparent" data set, you don't know whether it's the

11:44:33  16   final data set --

11:44:34  17      A.   Well the question is not "final," question

11:44:38  18   is "original."

11:44:38  19      Q.   Okay.  So let's say the original data set.

11:44:40  20      A.   Okay.

11:44:41  21      Q.   Mr. Gordon doesn't know if Exhibit 10 is the

11:44:44  22   original data set.

11:44:45  23      A.   Okay.

11:44:46  24      Q.   Mr. Albrecht also doesn't know whether

11:44:48  25   Exhibit 10 is the original data set.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

129

| | | |
|---|---|---|
| 11:44:50 | 1 | A.   Yeah. |
| 11:44:51 | 2 | Q.   Mr. Borak also doesn't know whether Exhibit |
| 11:44:53 | 3 | 10 is the original data set. |
| 11:44:55 | 4 | A.   Okay. |
| 11:44:55 | 5 | Q.   And you don't know. |
| 11:44:56 | 6 | A.   I don't. |
| 11:45:04 | 7 | Q.   To the extent that you rely on Albrecht |
| 11:45:06 | 8 | Exhibit 10, not knowing whether or not it's the |
| 11:45:08 | 9 | original data set, it could be a data artifact issue; |
| 11:45:12 | 10 | could it not? |
| 11:45:14 | 11 | MR. GORDON:  Object to the form of the |
| 11:45:15 | 12 | question. |
| 11:45:18 | 13 | A.   If -- if there's an error in -- in -- |
| 11:45:21 | 14 | I mean if -- if the file is not the correct |
| 11:45:23 | 15 | data, then there -- there could be -- there -- there |
| 11:45:28 | 16 | would be a problem with -- with the analysis. |
| 11:45:30 | 17 | Q.   And -- and you don't know whether or not |
| 11:45:33 | 18 | there is a problem with the data. |
| 11:45:34 | 19 | A.   I don't know.  I don't know if there is or |
| 11:45:36 | 20 | if there is not. |
| 11:45:37 | 21 | Q.   You know that there's a missing page. |
| 11:45:40 | 22 | A.   You -- |
| 11:45:40 | 23 | There is one missing page. |
| 11:45:42 | 24 | Q.   You know that the missing page contains or |
| 11:45:45 | 25 | may not contain information regarding deep joint |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

130

11:45:48  1   infection during the Bair Hugger study period;

11:45:53  2   correct?

11:45:53  3       A.   It was --

11:45:54  4            I wasn't looking at the individual pages, as

11:45:57  5   I've -- as I've said, --

11:45:58  6       Q.   Yeah.

11:45:59  7       A.   -- and -- and my under -- I --

11:46:05  8            I don't know if this is the same data set

11:46:08  9   that -- that Albrecht was -- was looking at when he

11:46:13  10  did the -- his -- his calculations.

11:46:17  11      Q.   Thank you.

11:46:18  12           Do you have any other reason to assume that

11:46:25  13  Albrecht Exhibit 10 is the original or final data set?

11:46:31  14           MR. GORDON:   Object to the form of the

11:46:32  15  question.

11:46:35  16      A.   I mean why is Exhibit 10 as part of the

11:46:41  17  Albrecht testimony?

11:46:47  18      Q.   Why is it?

11:46:47  19      A.   Yeah.   How did it get there?

11:46:49  20      Q.   Mr. Gordon marked --

11:46:51  21      A.   Okay.

11:46:52  22      Q.   -- Exhibit 10 at the deposition.

11:46:53  23      A.   And I mean the assumption is is that that is

11:47:00  24  the data on which this is based.

11:47:03  25      Q.   You're making that assumption even though

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

131

11:47:05  1  Mr. Albrecht has said that the data set that was

11:47:07  2  analyzed, there was three deep joint infections.

11:47:11  3      A.  Yes.

11:47:12  4      Q.  You're making that assumption even though

11:47:14  5  Mr. Gordon said that Exhibit 10, he didn't know

11:47:17  6  whether it was the original data set.

11:47:20  7          MR. GORDON:  You're -- you're actually --

11:47:22  8          You're reading only a portion of the

11:47:23  9  testimony and you're --

11:47:26  10          MR. SACCHET:  I think you're testifying

11:47:26  11  right now, Mr. Gordon.

11:47:27  12          MR. GORDON:  Well no.  I mean --

11:47:29  13          But come on.

11:47:30  14          MR. SACCHET:  I'm --

11:47:30  15          MR. GORDON:  If you're going to quote me,

11:47:33  16  quote what I said; don't make -- don't -- don't --

11:47:37  17          MR. SACCHET:  Okay.

11:47:37  18          MR. GORDON:  -- don't screw up the record by

11:47:38  19  selectively quoting half of what I said.

11:47:39  20          MR. SACCHET:  Yeah.  I'll read the sentence.

11:47:41  21          MR. GORDON:  Read the whole sentence.

11:47:42  22          MR. SACCHET:  "And I want -- I want to make

11:47:43  23  it very clear, I have no idea if Exhibit 10 is the

11:47:46  24  original data" --

11:47:47  25          MR. GORDON:  And you see the thing it says

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

132

11:47:49    1    after that?  It says dash --

11:47:50    2              MR. SACCHET:  Dash.

11:47:51    3              MR. GORDON:  -- and continues on with the

11:47:52    4    rest of what I said.

11:47:54    5              MR. SACCHET:  -- "or the -- the newer data

11:47:56    6    that's slightly conflicted."

11:47:58    7         Q.   Does that change your mind?

11:48:01    8         A.   What is the question?

11:48:04    9         Q.   The question is:  Mr. Albrecht has said that

11:48:06   10    there was three infections in the Hot Dog period based

11:48:09   11    on the data that was analyzed.

11:48:10   12         A.   Yes.

11:48:11   13         Q.   Mr. Gordon has said he doesn't know if

11:48:15   14    Exhibit 10 is the original data or the newer data

11:48:17   15    that's slightly conflicted.

11:48:19   16         A.   Yes.

11:48:20   17         Q.   Dr. Borak has said that it apparently could

11:48:24   18    be.

11:48:26   19         A.   Yes.

11:48:28   20         Q.   You just told me that you're assuming

11:48:29   21    Albrecht Exhibit 10 is the final data set.

11:48:32   22              MR. GORDON:  I object to the form of the

11:48:34   23    question.

11:48:34   24         A.   Well I'm -- I'm -- that --

11:48:35   25              Exhibit 10 is the data on which I did the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

133

11:48:37  1    analysis, --

11:48:37  2         Q.    Okay.

11:48:38  3         A.    -- so in --

11:48:44  4              The total number of infections in my table

11:48:51  5    exactly -- are exactly the same as what are in

11:48:54  6    McGovern's paper.

11:48:57  7         Q.    Okay.  Do you rely on anything else to

11:49:01  8    conclude that Albrecht Exhibit 10 is the original

11:49:06  9    data?

11:49:06  10             MR. GORDON:  Objection --

11:49:07  11        Q.    That's -- that's -- that's the scope of the

11:49:08  12    question.

11:49:08  13             MR. GORDON:  Objection, asked and answered.

11:49:09  14        Q.    Do you rely on anything else?

11:49:11  15             MR. GORDON:  Objection, asked and answered.

11:49:13  16    He's also testified the other things he relied on.

11:49:18  17             MR. SACCHET:  I don't recall the other

11:49:19  18    testimony.  I'm not -- I'm not --

11:49:20  19             MR. GORDON:  All right.  Fair enough.

11:49:21  20        A.    I mean I -- I've -- I'm assuming that those

11:49:24  21    are --

11:49:24  22             The data that -- that formed the basis of --

11:49:28  23    of that -- of the McGovern paper, that they're in --

11:49:32  24    that they're in that file.

11:49:33  25        Q.    I'm going to ask the question again.  Do you

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

134

11:49:36   1   rely on anything else in making that assumption?

11:49:42   2      A.   Well I've --

11:49:43   3        There are other parts of the data that have

11:49:47   4   been given as some of the other -- other evidence.

11:49:50   5      Q.   What?

11:49:51   6      A.   Well there's a list of -- of the infections

11:49:57   7   that I think McGovern --

11:50:01   8      Q.   Okay.

11:50:02   9      A.   -- provided, the evi -- well I think

11:50:08   10   it's -- I think it was Exhibit 16 in his -- his

11:50:12   11   deposition.

11:50:12   12      Q.   Okay.

11:50:13   13      A.   And, you know, it's -- it's a different

11:50:15   14   file.  There are differences in there, differences in

11:50:18   15   the way the dates are recorded because we're dealing

11:50:21   16   with the way the Brits give dates and the way we give

11:50:26   17   dates in the U.S. and things like that.  But you can

11:50:33   18   match up the -- those two -- two files and they -- you

11:50:39   19   know, they -- they agree.  And so it -- that has given

11:50:46   20   me more confidence that the data that we're looking --

11:50:50   21   that I'm looking at really corresponds to the same

11:50:51   22   data --

11:50:51   23      Q.   Okay.

11:50:52   24      A.   -- that -- that forms the basis of the --

11:50:55   25   the report in McGovern.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

135

| | | |
|---|---|---|
| 11:50:56 | 1 | Q.   So anything else in addition to McGovern 16? |
| 11:50:59 | 2 | MR. GORDON:  Again, asked and answered. |
| 11:51:04 | 3 | A.   Yeah.  Anything -- |
| 11:51:09 | 4 | It's 10, 16 and -- well, an analysis of |
| 11:51:15 | 5 | those.  I'm not recalling other sources at the moment, |
| 11:51:18 | 6 | but -- |
| 11:51:20 | 7 | Q.   Okay.  Thank you.  That answers the |
| 11:51:23 | 8 | question. |
| 11:51:23 | 9 | A.   Yeah. |
| 11:51:23 | 10 | Q.   Before we get to McGovern 16, I'd like to |
| 11:51:26 | 11 | show you a few additional documents. |
| 11:51:37 | 12 | (Exhibit 16 was marked for |
| 11:51:39 | 13 | identification.) |
| 11:51:39 | 14 | BY MR. SACCHET: |
| 11:51:41 | 15 | Q.   Have you seen this document before, |
| 11:51:43 | 16 | Professor Holford? |
| 11:51:46 | 17 | A.   I don't recall seeing this. |
| 11:51:47 | 18 | Q.   Okay.  It has been produced by Mr. Albrecht |
| 11:51:51 | 19 | based on the Bates number in the bottom right-hand |
| 11:51:54 | 20 | corner; correct?  It -- |
| 11:52:03 | 21 | The bottom right-hand Bates number has the |
| 11:52:05 | 22 | prefix "Albrecht." |
| 11:52:06 | 23 | A.   Oh, I'm sorry.  Yes.  Yes. |
| 11:52:09 | 24 | Q.   And the top of the page is entitled |
| 11:52:11 | 25 | "LogisticRegression, Mark Albrecht, March 11, 2016." |

136

11:52:15  1        A.    Correct.

11:52:16  2        Q.    That's a number of years after the

11:52:18  3  publication of the McGovern study; correct?

11:52:20  4        A.    Okay.  Yeah.  Yes, it is.

11:52:23  5        Q.    And the first paragraph says, "Below is the

11:52:26  6  analysis source code and data supporting the

11:52:28  7  publication Forced-air warming linked to

11:52:30  8  periprosthetic total joint replacement infections.

          9  This s an R-markdown document, so it can be run

11:52:38  10  directly in the R-Console to produce -- to reproduce

11:52:38  11  the results."  Do you see that?

11:52:40  12        A.    Yes.

11:52:41  13        Q.    And then the next title is "Raw Data" and it

11:52:45  14  says, "The raw infection data by hospital is, colon;"

11:52:47  15  correct?  That's -- that's what it says, "The raw

11:52:50  16  infection data by hospital is, colon."

11:52:53  17        A.    Yes.

11:52:53  18        Q.    And there's some quotes.

11:52:54  19              If you look on the fourth line of that we

11:52:58  20  see "c(10, 11, 10, 21, 3, 32);" correct?

11:53:04  21        A.    Yes.

11:53:04  22        Q.    And then we see "NonInfections equal c(1087,

11:53:09  23  378, 1087, 656, 368, 1034)."  Do you see that?

11:53:14  24        A.    Yes.

11:53:15  25        Q.    Do the numbers 3, 32, 368 and 1034 ring a

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

137

11:53:20   1   bell?

11:53:20   2           MR. GORDON:   Object to the form of the

11:53:21   3   question.

11:53:24   4       A.   No.

11:53:27   5       Q.   The numbers 3 and 32 are not the same

11:53:30   6   numbers that were used in the McGovern publication

11:53:33   7   with respect to the total number of infections in the

11:53:36   8   Hot Dog arm versus the Bair Hugger arm?

11:53:42   9       A.   Which --

11:53:47   10          I don't understand what you're asking.

11:53:48   11      Q.   Okay.   In the Bair Hugger period, how many

11:53:51   12  infections did the authors report with respect to the

11:53:54   13  Hot Dog, the authors report in Table II?

11:53:57   14      A.   Table II.

11:54:12   15      Q.   Did they report three in Table II, Hot Dog

11:54:15   16  infections?

11:54:16   17      A.   Yeah.

11:54:16   18      Q.   Okay.   How many Bair Hugger infections did

11:54:18   19  they report in the McGovern study?

11:54:21   20      A.   Thirty-two.

11:54:22   21      Q.   Is that the same number that we see here?

11:54:30   22      A.   Oh, oh, I see.   This is --

11:54:32   23          I'm -- I'm sorry, I don't -- I'm not really

11:54:34   24  understanding this code.

11:54:36   25          Okay.   So what is this c?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

138

| | | |
|---|---|---|
| 11:54:43 | 1 | Q.   "Center" perhaps. |
| 11:54:45 | 2 | A.   No.  I think it's a vector usually in R, |
| 11:54:49 | 3 | it's a vector and it -- |
| 11:54:54 | 4 | Q.   My -- my -- my question -- |
| 11:54:56 | 5 | MR. GORDON:  Counsel, I mean, you know -- |
| 11:54:58 | 6 | A.   I don't know what -- |
| 11:54:59 | 7 | MR. SACCHET:  Corey, again it's a speaking |
| 11:55:00 | 8 | objection.  If you want to object, go for it. |
| 11:55:03 | 9 | MR. GORDON:  Yeah.  If you're representing |
| 11:55:04 | 10 | this has anything to do with the McGovern paper -- |
| 11:55:06 | 11 | MR. SACCHET:  Yeah? |
| 11:55:07 | 12 | MR. GORDON:  -- as opposed to what the |
| 11:55:08 | 13 | testimony was, which was this was what turned into the |
| 11:55:10 | 14 | Augustine -- recently published Augustine paper, you |
| 11:55:14 | 15 | know, you've got -- you've got an obligation to -- |
| 11:55:18 | 16 | to -- to be truthful. |
| 11:55:19 | 17 | MR. SACCHET:  I'm look -- I -- |
| 11:55:20 | 18 | My questions are solely about the numbers. |
| 11:55:22 | 19 | Q.   Professor Holford, were there three |
| 11:55:23 | 20 | infections in the Hot Dog period in the McGovern |
| 11:55:26 | 21 | study -- |
| 11:55:26 | 22 | A.   Looking at the paper, yes. |
| 11:55:28 | 23 | Q.   -- as reported in Table II? |
| 11:55:30 | 24 | A.   As reported in Table II, yes. |
| 11:55:32 | 25 | Q.   Were there 32 infections as reported in |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

139

11:55:34  1    Table II from the Bair Hugger period?

11:55:38  2        A.    That's correct.

11:55:38  3        Q.    Were there 368 non-infections in the Hot Dog

11:55:39  4    period reported in the McGovern study?

11:55:41  5        A.    Yes.

11:55:41  6        Q.    Were there a hundred and -- 1,034 non-

11:55:43  7    infections reported in the Bair Hugger -- in the

11:55:46  8    McGovern study with respect to the Bair Hugger arm?

11:55:49  9        A.    Yes.

11:55:49  10       Q.    These numbers are the same as what was

11:55:51  11   reported in the Bair Hugger study, the numbers are the

11:55:53  12   same -- it's a simple question -- as reported in the

11:55:55  13   McGovern study.

11:55:56  14       A.    The last -- the last two -- two columns of

11:56:02  15   this vector do correspond to that.  I don't know what

11:56:06  16   the other numbers that are there correspond to.  I

11:56:10  17   don't know what the 10 --

11:56:12  18             The 1087, for example, what is that?

11:56:14  19       Q.    I'm not asking about those numbers.

11:56:16  20       A.    Well I have to understand when I'm reading

11:56:21  21   someone's code.  I don't understand what it's

11:56:22  22   referring to.

11:56:23  23       Q.    And the date is March 11, 2016; correct?

11:56:25  24       A.    Yes.

11:56:27  25       Q.    Okay.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

140

| | | |
|---|---|---|
| 11:56:44 | 1 | MR. GORDON: I'm going to need a quick break |
| 11:56:46 | 2 | in the near future, -- |
| 11:56:47 | 3 | MR. SACCHET: Okay. |
| 11:56:48 | 4 | MR. GORDON: -- whenever it's convenient. |
| 11:56:51 | 5 | MR. SACCHET: Okay. Take about five minutes |
| 11:56:52 | 6 | if you don't mind. |
| 11:56:53 | 7 | MR. GORDON: Right now? |
| 11:56:54 | 8 | MR. SACCHET: Just in five minutes. |
| 11:56:55 | 9 | MR. GORDON: Oh, that's fine. |
| 11:57:06 | 10 | (Exhibit 17 was marked for |
| 11:57:07 | 11 | identification.) |
| 11:57:07 | 12 | BY MR. SACCHET: |
| 11:57:15 | 13 | Q. This is a document with a subject line "Full |
| 11:57:19 | 14 | workup of the stats you requested;" correct? |
| 11:57:23 | 15 | A. Yes. |
| 11:57:23 | 16 | Q. It's been previously marked as McGovern 23; |
| 11:57:26 | 17 | correct? |
| 11:57:26 | 18 | A. I don't know where you're getting that from. |
| 11:57:34 | 19 | Q. The bottom right of the page, there's a |
| 11:57:36 | 20 | stamp there and it says Exhibit -- |
| 11:57:37 | 21 | A. Oh, I see. |
| 11:57:38 | 22 | Q. -- Exhibit McGovern 23. |
| 11:57:41 | 23 | A. Yeah. |
| 11:57:43 | 24 | Q. Have you seen this document before? |
| 11:57:44 | 25 | A. No. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

141

11:57:45  1    Q.   This was a document that was --

11:57:49  2         I'll represent to you this is a document

11:57:51  3    that was marked at the McGovern deposition.

11:57:55  4         You reviewed other exhibits from the

11:57:57  5    McGovern deposition; correct?

11:58:01  6    A.   I looked at, I think, some of them, yeah.

11:58:03  7    Q.   One of them was McGovern Exhibit 16;

11:58:07  8    correct?

11:58:07  9    A.   Oh.  Yes, I did.

11:58:07  10   Q.   But you didn't see this one.

11:58:09  11   A.   No, I didn't look at this one.

11:58:10  12   Q.   Did you get all of the exhibits from these

11:58:12  13   depositions or just a select handful?

11:58:15  14   A.   I think they were all there.  I didn't -- I

11:58:18  15   didn't do an audit to check, but --

11:58:20  16   Q.   How did you determine which ones to look at

11:58:22  17   and which ones not to look at?

11:58:25  18   A.   It was what was most relevant to the

11:58:30  19   analysis that I was doing.

11:58:32  20   Q.   How did you make that determination?

11:58:34  21   A.   Well I was -- figured out what I was

11:58:40  22   interested in for that particular part of the report I

11:58:42  23   was working on.

11:58:43  24   Q.   Okay.  Let's see if this piques your

11:58:46  25   interest.  The first e-mail is dated November 29th,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

142

11:58:49  1    2011; correct?

11:58:50  2        A.    Yes.

11:58:51  3        Q.    And that is after publication of the

11:58:52  4    McGovern study; correct?

11:58:54  5        A.    I believe so, yes.

11:58:55  6        Q.    Okay.  And in the e-mail on November 30th,

11:59:03  7    2011 from Mike Reed to Mark Albrecht, the text states,

11:59:07  8    "Mark

11:59:07  9            "This is great.  I am very grateful.

11:59:09  10           So - for clarity - this chart is the same as

11:59:12  11   the one in our paper but with longer follow up?"

11:59:15  12           Do you see that?

11:59:15  13       A.    Okay.  Yes.

11:59:17  14       Q.    And then the last line says, "You are 3.6

11:59:20  15   times more likely to get an infection on FAW than

11:59:25  16   CFW?"  Correct?

11:59:28  17           Last line of that same paragraph.

11:59:30  18       A.    Yes.

11:59:30  19       Q.    Okay.  Now if we turn the page, Table 1 does

11:59:36  20   in fact look like Table II in the McGovern study;

11:59:41  21   correct?

11:59:41  22       A.    It looks like it, yes.

11:59:43  23       Q.    Okay.  Let's look at the number of patients

11:59:48  24   developing infection in the conductive fabric warming

11:59:51  25   group.  Do you see the number seven?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

143

| | | |
|---|---|---|
| 11:59:52 | 1 | A.   Yes. |
| 11:59:53 | 2 | Q.   And the percentage .9? |
| 11:59:58 | 3 | A.   Yes. |
| 11:59:58 | 4 | Q.   And then there were 792 of whom did not |
| 12:00:02 | 5 | develop an infection; correct? |
| 12:00:03 | 6 | A.   Yes. |
| 12:00:04 | 7 | Q.   That's approximately double the amount of |
| 12:00:06 | 8 | patients that were originally analyzed in the Bair |
| 12:00:09 | 9 | Hugger period; correct? |
| 12:00:09 | 10 | A.   Yes. |
| 12:00:10 | 11 | Q.   Okay.  So this appears to be an extended |
| 12:00:12 | 12 | data set; correct? |
| 12:00:13 | 13 | A.   It appears that they've extended the |
| 12:00:17 | 14 | conductive fabric, -- |
| 12:00:18 | 15 | Q.   Okay. |
| 12:00:19 | 16 | A.   -- yeah. |
| 12:00:20 | 17 | Q.   Let's look at the forced-air group.  How |
| 12:00:24 | 18 | many individuals developed an infection? |
| 12:00:27 | 19 | A.   Thirty-three. |
| 12:00:29 | 20 | Q.   That's two more than the 31 that you use in |
| 12:00:32 | 21 | your report; correct? |
| 12:00:33 | 22 | A.   Okay. |
| 12:00:35 | 23 | Q.   Is that correct? |
| 12:00:36 | 24 | A.   Appears to be correct.  Yeah, I used -- |
| 12:00:41 | 25 | Q.   Thirty-one; correct? |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

144

12:00:44  1       A.   I have 32.

12:00:45  2            Well wait, I'm sorry.  Yeah, 31, that's

12:00:57  3  right.

12:00:57  4       Q.   This is two more.

12:00:58  5       A.   It is two more.

12:01:00  6       Q.   And the percent of infection is 3.1 in the

12:01:05  7  forced-air group; correct?

12:01:06  8       A.   Yes.

12:01:07  9       Q.   That is in fact higher than the percent that

12:01:10  10  was reported in the study; correct?

12:01:11  11       A.   Yes.

12:01:12  12       Q.   That's higher than the percent that you use

12:01:14  13  in your report; correct?

12:01:15  14       A.   Yes.

12:01:16  15       Q.   Do you have any basis to conclude that this

12:01:22  16  data is not the final data set?

12:01:24  17            MR. GORDON:  Which data?

12:01:25  18            MR. SACCHET:  The numbers reported here.

12:01:27  19            MR. GORDON:  In --

12:01:28  20       A.   What do you mean by "final data set?"  I

12:01:30  21  mean --

12:01:31  22            MR. GORDON:  -- Exhibit 17.

12:01:31  23       A.   This is very different from --

12:01:33  24            It's not the data set that appears in

12:01:34  25  McGovern.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

145

12:01:35　1　　　　Q.　With respect to the forced-air group, there

12:01:37　2　are two more infections; correct?

12:01:40　3　　　　A.　There -- there are.

12:01:41　4　　　　　　MR. GORDON:　Two more infections than he

12:01:43　5　did -- he reported.

12:01:45　6　　　　A.　Two more than I -- than I reported.　It is

12:01:48　7　one more than McGovern reported.

12:01:50　8　　　　Q.　Okay.

12:01:51　9　　　　A.　And the total number is --

12:01:54　10　　　　　　What is it?

12:01:57　11　　　　Q.　One thousand --

12:01:58　12　　　　A.　1,098.

12:02:01　13　　　　Q.　You mean 68?

12:02:06　14　　　　A.　Thirty-two and 1066.

12:02:10　15　　　　　　Oh, I'm sorry, 1068 is the total.

12:02:12　16　　　　Q.　Yeah.

12:02:13　17　　　　A.　So this is --

12:02:16　18　　　　　　This says 1065 are in this report you're

12:02:21　19　just showing me.

12:02:22　20　　　　Q.　Uh-huh.　Does this calculation give you any

12:02:26　21　pause that perhaps there was more Bair Hugger

12:02:29　22　infections than the amount that you've reported in

12:02:32　23　your report?

12:02:34　24　　　　　　MR. GORDON:　Object to the form of the

12:02:35　25　question.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

146

| | | |
|---|---|---|
| 12:02:37 | 1 | A.    Yeah.  I -- I -- I don't know the sources -- |
| 12:02:41 | 2 | the sources of these data.  I mean it's -- |
| 12:02:45 | 3 | There's also less -- fewer subjects. |
| 12:02:47 | 4 | Q.    The source of the data is from Mr. Albrecht; |
| 12:02:51 | 5 | is it not? |
| 12:02:51 | 6 | MR. GORDON:  Object to the form of the |
| 12:02:52 | 7 | question, lack of foundation. |
| 12:02:58 | 8 | A.    Well it's -- it's based -- I gather -- well |
| 12:03:06 | 9 | I don't know where -- where -- |
| 12:03:08 | 10 | Where is this data?  Is this part of the |
| 12:03:10 | 11 | e -- no, this is not part of the e-mail.  Where does |
| 12:03:13 | 12 | Table 1 come from in this exhibit? |
| 12:03:15 | 13 | Q.    On the prior page Mr. Reed says, "So - for |
| 12:03:18 | 14 | clarity - this chart is the same as the one in our |
| 12:03:21 | 15 | paper but with longer follow up?"  Correct? |
| 12:03:25 | 16 | A.    "This chart," so what is this? |
| 12:03:27 | 17 | Q.    We read that earlier. |
| 12:03:28 | 18 | A.    Is this the percent of -- |
| 12:03:30 | 19 | Results.pdf, what is it?  What are we |
| 12:03:35 | 20 | looking at? |
| 12:03:35 | 21 | Q.    We're looking at the table Mr. Reed is |
| 12:03:37 | 22 | referring to in his e-mail. |
| 12:03:40 | 23 | A.    So this is an attachment to the e-mail, -- |
| 12:03:41 | 24 | Q.    Yes. |
| 12:03:42 | 25 | A.    -- is that what you're saying? |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

147

| | | |
|---|---|---|
| 12:03:43 | 1 | Q. Yes. |
| 12:03:43 | 2 | A. Okay. So -- okay. So you're asking me |
| 12:04:01 | 3 | about the number that developed, so they're reporting |
| 12:04:05 | 4 | 33 in this. In their -- in their paper that they |
| 12:04:11 | 5 | published they said there were 32. |
| 12:04:14 | 6 | Q. So it actually went up from what was |
| 12:04:16 | 7 | published in their report. |
| 12:04:18 | 8 | A. Went up from what was published, went up |
| 12:04:21 | 9 | one. |
| 12:04:21 | 10 | Q. Yeah. |
| 12:04:21 | 11 | A. It's not the file they're looking at. The |
| 12:04:24 | 12 | total number of cases is -- in this Table 1 goes |
| 12:04:27 | 13 | down -- |
| 12:04:28 | 14 | Q. Uh-huh. |
| 12:04:28 | 15 | A. -- to 1065 while here it was 10 -- 1066. |
| 12:04:38 | 16 | Q. So why did you decide to go down instead of |
| 12:04:41 | 17 | up? |
| 12:04:42 | 18 | A. Why did I decide to go down -- |
| 12:04:44 | 19 | Q. You report 31 infections, this document |
| 12:04:47 | 20 | reports 33 for forced-air warming. Why did you go |
| 12:04:50 | 21 | down? |
| 12:04:50 | 22 | A. Oh, because -- because I tabulated the -- |
| 12:04:52 | 23 | the file that I -- that I showed you, -- |
| 12:04:55 | 24 | Q. Okay. |
| 12:04:56 | 25 | A. -- ran that through the statistical |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

148

12:04:58  1  software, and that was the tabulation that -- that I

12:05:01  2  got using SAS.

12:05:07  3      Q.   And this document shows otherwise.

12:05:10  4      A.   This document is not showing those same

12:05:13  5  results, --

12:05:13  6      Q.   Okay.

12:05:14  7      A.   -- yes.

12:05:15  8           MR. SACCHET:  Let's take a break.

12:05:16  9           THE REPORTER:  Off the record, please.

12:05:18  10          (Recess taken.)

12:12:27  11          (Exhibit 18 was marked for

12:12:29  12          identification.)

12:12:29  13  BY MR. SACCHET:

12:12:30  14      Q.   Dr. Holford, Exhibit 18, which was

12:12:34  15  previously marked as McGovern 16, is the document that

12:12:40  16  you also reviewed in opining on the number of

12:12:44  17  infections in the Bair Hugger study; correct?

12:12:47  18      A.   Yes.

12:12:49  19      Q.   The document is not dated; is it?

12:12:56  20      A.   It doesn't appear to be.

12:12:58  21      Q.   So you do not know when this document was

12:13:06  22  finalized; correct?

12:13:07  23      A.   No.

12:13:09  24      Q.   Are you aware that Mr. McGovern never

12:13:20  25  testified that this was the final data set?

149

12:13:26    1        A.   I don't know what he said on it.

12:13:28    2        Q.   You don't know one way or another whether

12:13:31    3   Mr. McGovern said this was the final data set or was

12:13:34    4   not the final data set.

12:13:35    5        A.   No, I don't.

12:13:36    6        Q.   You reviewed Mr. McGovern's deposition;

12:13:39    7   correct?

12:13:39    8        A.   I did.  I just don't recall his comment

12:13:41    9   on -- on -- on this particular data set.

12:13:43   10        Q.   In the event that Mr. McGovern made no

12:13:46   11   comment regarding whether or not this was the final

12:13:48   12   data set, would that impact your opinion as to whether

12:13:51   13   it is or is not?

12:13:58   14        A.   I mean I don't -- I don't know where --

12:14:01   15            I mean I'm taking -- taking the data set at

12:14:04   16   face value, and he is talking about it and I --

12:14:08   17   it's -- so I'm assuming it -- it --

12:14:13   18            Well it formed the basis of what my -- what

12:14:16   19   my opinions are.  That's -- this is what I -- I based

12:14:20   20   it on.

12:14:20   21        Q.   Well in your report you say that "The

12:14:22   22   results in McGovern are incorrect because they arise

12:14:24   23   from an incorrect tabulation.  An error is recognized

12:14:27   24   in the depositions by Albrecht, Reed and McGovern."

12:14:31   25        A.   That there is a --

150

12:14:33    1         Well that's referring to not this -- not --

12:14:36    2    not this exhibit, that's referring to the paper.

12:14:41    3         Q.   So in your --

12:14:42    4         A.   And so I mean an initial source of -- of --

12:14:48    5    of the -- of the -- of the problem I think is -- was

12:14:54    6    in Reed's testimony.

12:14:54    7         Q.   Okay.

12:14:55    8         A.   Reed testified that there was one more

12:14:57    9    infection in each group.

12:14:58   10         Q.   We'll get there.  But with respect --

12:15:00   11         A.   Okay.

12:15:01   12         Q.   -- to Mr. -- Dr. McGovern, --

12:15:03   13         A.   Okay.

12:15:03   14         Q.   -- Dr. McGovern never says anything about a

12:15:06   15    tabulation error; correct?

12:15:10   16              MR. GORDON:  Object to the form of the

12:15:11   17    question, assumes facts not in evidence.

12:15:14   18         A.   I don't -- I don't recall exactly what

12:15:16   19    doc -- what -- all of the details of -- of McGovern.

12:15:21   20         Q.   So you don't know whether or not he said

12:15:23   21    there was a tabulation error; correct?

12:15:25   22         A.   I -- I don't remember.

12:15:28   23         Q.   Okay.  Your report says that he did

12:15:31   24    recognize an error; correct?

12:15:34   25         A.   I may have said that.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

151

12:15:44   1      Q.   Pages two and three.  I don't want to spend

12:15:46   2   a ton of time on this, but --

12:15:52   3      A.   I mean there's --

12:15:56   4      Q.   -- the quote is --

12:15:57   5      A.   I -- I -- I --

12:16:02   6      Q.   Can I read you the quote?

12:16:05   7      A.   Yes.

12:16:06   8      Q.   "The results by McGovern are incorrect,

12:16:09   9   however, because they arise from an incorrect

12:16:11  10   tabulation.  An error is recognized in the depositions

12:16:14  11   by Albrecht, Reed and McGovern."

12:16:18  12      A.   Okay.  The tabulation, based on this, if you

12:16:22  13   look at -- count the numbers in here, I think they

12:16:25  14   agree with -- with my tabulation --

12:16:28  15      Q.   Okay.

12:16:29  16      A.   -- in -- in terms of the numbers and the

12:16:32  17   dates in which these -- these occur, and so that's

12:16:36  18   based on this -- this table --

12:16:39  19      Q.   So you --

12:16:39  20      A.   -- of data.

12:16:40  21      Q.   You're relying on the table, not Mr.

12:16:43  22   McGovern's testimony -- Dr. McGovern's testimony.

12:16:46  23           MR. GORDON:  Object to the form of the

12:16:47  24   question.

12:16:48  25      A.   I -- I -- I -- as I say, I don't recall

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

152

12:16:53   1   exactly where -- what McGovern said, if he says it or

12:16:57   2   not, but I -- but this is a big part of where -- that

12:17:03   3   forms the basis for that statement.

12:17:04   4        Q.   But you don't know whether or not, sitting

12:17:06   5   here today, Mr. McGovern -- Dr. McGovern said that

12:17:11   6   there was a tabulation error or there was not a

12:17:13   7   tabulation error.

12:17:14   8        A.   I don't recall --

12:17:15   9        Q.   Okay.

12:17:15   10        A.   -- this morning.

12:17:26   11        Q.   If we could go back to the previous marked

12:17:29   12   document which is McGovern Exhibit 16 --

12:17:42   13        A.   To which document?

12:17:43   14        Q.   Exhibit 18 I believe.

12:17:44   15        A.   Okay.

12:17:45   16             MR. GORDON:   Eighteen?   What -- what -- just

12:17:48   17   what is it?

12:17:50   18             THE WITNESS:   McGovern 16 --

           19             MR. SACCHET:   McGovern 16 --

12:17:53   20             THE WITNESS:   -- which is 18.

           21             MR. SACCHET:   -- which is 18.

12:17:54   22             THE WITNESS:   Yeah, okay.

12:17:54   23             MR. GORDON:   Oh.

12:17:56   24        Q.   Did you review any other data sets that were

12:18:00   25   produced by Dr. McGovern?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

153

12:18:08   1      A.   I don't recall --

12:18:11   2           That were produced by him, no.

12:18:12   3      Q.   If he had produced other data sets, how do

12:18:14   4  you know that this is the data set that includes the

12:18:20   5  data that was published in the McGovern study?

12:18:22   6           MR. GORDON:  Object to the form of the

12:18:23   7  question, assumes facts not in evidence.

12:18:26   8      A.   I -- I mean the whole -- the whole past of

12:18:32   9  where these files came from is -- is not something

12:18:35  10  that I saw.

12:18:36  11      Q.   You don't know where they came from.

12:18:38  12      A.   Well I -- I know who gave them to me.

12:18:40  13      Q.   Who gave them to you?

12:18:41  14      A.   3M.

12:18:42  15      Q.   But you don't know who produced these.

12:18:44  16      A.   No.

12:18:45  17      Q.   Okay.  If we turn to the very last page of

12:18:52  18  this document, Exhibit 18, --

12:18:57  19      A.   Okay.

12:18:59  20      Q.   -- there is a condensed table, correct, with

12:19:02  21  various fields summing through --

12:19:06  22           Very last.  The last page with a table on

12:19:15  23  it.  I think you're looking at the first --

12:19:23  24      A.   In my page it's Table 1.

12:19:25  25      Q.   The front of the document has this stamp on

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

154

12:19:27   1   it, doctor, so that's the first page.

12:19:29   2        A.   Oh, I see.

12:19:29   3        Q.   Yeah.   First --

12:19:30   4             It was marked, actually, on the reverse

12:19:33   5   side --

12:19:33   6        A.   Okay.

12:19:33   7        Q.   -- so that's where the confusion is.

12:19:35   8             If you turn to the last page, which is

12:19:39   9   actually, from what I can see on your document, the

12:19:40  10   one with the blue sticker on it --

12:19:41  11        A.   That's the one I was looking at.

12:19:43  12        Q.   Yeah.

12:19:43  13        A.   Okay.   Sorry.

12:19:44  14        Q.   -- there are a number of fields here.   I

12:19:47  15   recognize it's small and I apologize for that.

12:19:49  16   However, you reviewed this table; correct?

12:19:52  17        A.   Yes.

12:19:53  18        Q.   And column BJ is the date-of-surgery column;

12:20:04  19   correct?

12:20:04  20        A.   Yes.

12:20:10  21        Q.   Okay.

12:20:11  22        A.   Appears to be, yeah.

12:20:12  23        Q.   And in your report you single out row 44,

12:20:20  24   which has a date of surgery of 9/15/2007 --

12:20:24  25        A.   Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

155

12:20:25  1      Q.   -- and as coded as FAW; correct?

12:20:27  2           MR. GORDON:   2010.

12:20:28  3           MR. SACCHET:   Oh, I'm sorry.   Thank you, Mr.

12:20:30  4      Gordon.

12:20:31  5      Q.   -- 9/15/2010 and as coded as forced-air

12:20:35  6      warming; correct?

12:20:36  7      A.   That's correct.

12:20:37  8      Q.   Okay.   How do you know that it was

12:20:38  9      incorrectly coded as to the type of device instead of

12:20:43  10     the type of -- date?

12:20:46  11     A.   I don't know that.

12:20:51  12     Q.   But you're relying on the fact that this

12:20:53  13     surgery in fact occurred on September 15th, 2010;

12:20:58  14     correct?

12:20:58  15     A.   That's right.

12:21:03  16          I mean if -- if the date is wrong and that

12:21:07  17     date should be, you know, sometime during the Bair

12:21:10  18     Hugger period, then not only the numerator would be

12:21:13  19     wrong but the denominator would be wrong as well.   I

12:21:17  20     think the total number of cases is -- in my tabulation

12:21:24  21     is the same as, I believe --

12:21:32  22          Let me double check that.   So 4037 --

12:21:58  23          No.   I'm sorry.   Yeah, I'm -- I'm assuming

12:22:01  24     that -- that that is -- that -- that the date is

12:22:06  25     correctly -- it was based --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

156

12:22:08  1          My tabulation was based on the date that was

12:22:11  2  given.

12:22:11  3      Q.    It was not based on the device coding.

12:22:13  4      A.    Not the --

12:22:13  5          No.

12:22:16  6      Q.    And if you could --

12:22:19  7          We're going to toggle back between two

12:22:21  8  different documents, so --

12:22:22  9      A.    Okay.

12:22:23  10      Q.    I don't want you to get too mixed up here,

12:22:26  11  but if you can go back to the McGovern study which we

12:22:29  12  had marked as Exhibit 13 in this deposition --

12:22:33  13      A.    Okay.

12:22:34  14      Q.    -- and pull that out.

12:22:41  15      A.    Okay.

12:22:41  16      Q.    And I just want you to hold Fig. 7, which is

12:22:45  17  in the back end of the McGovern study, next to the

12:22:51  18  table in front of you.  So you can just pull up Fig.

12:22:54  19  7 in the McGovern study.

12:22:59  20          MR. GORDON:  And what is --

12:23:00  21          What are we holding it next to?

12:23:03  22      Q.    Just simply if you can pull up Fig. 7 and

12:23:04  23  put it down and have the table that we just marked

12:23:06  24  from McGovern Exhibit 16 next to it.

12:23:08  25          Yup, you got it.  Okay.  Yeah.  And let's --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

157

12:23:13   1          You have to hold them there.

12:23:15   2      A.   Okay.

12:23:19   3      Q.   I recognize that this is a hypothetical, but

12:23:21   4   in the event that row 44 in this table, --

12:23:28   5      A.   Uh-huh.

12:23:29   6      Q.   -- if that infection had actually occurred

12:23:31   7   in September of 2008, that would be in the Bair Hugger

12:23:35   8   period; correct?

12:23:37   9      A.   Yes.  Yeah.

12:23:39  10      Q.   Okay.  Have you ever created a graph like

12:23:45  11   Fig. 7 before?

12:23:47  12          MR. GORDON:  Object to the form of the

12:23:48  13   question.

12:23:49  14      A.   No.

12:23:49  15      Q.   Okay.  But you understand that the X axis is

12:23:53  16   a range of dates and the Y axis is the percent of

12:23:56  17   infection; correct?

12:23:57  18      A.   Well it -- it depends on which axis you're

12:24:01  19   looking at.  It's the number -- it's -- there's a --

12:24:06  20          There is a left and a right axis.

12:24:08  21      Q.   Okay.  The horizontal line on the bottom of

12:24:14  22   the graph goes from July 2008 to January 2011; right?

12:24:19  23      A.   Yes.

12:24:19  24      Q.   Okay.  And there's a number of data points

12:24:22  25   in this graph and some are on the top and some are on

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

158

12:24:29    1    the bottom; correct?

12:24:29    2         A.    Yeah.

12:24:30    3         Q.    And based on the axis on the right-hand

12:24:32    4    side, those on the bottom designate no infection and

12:24:34    5    those on the top designate infection; correct?

12:24:37    6         A.    Correct.

12:24:38    7         Q.    And the legend for Fig. 7 notes that the

12:24:40    8    data points have been jittered to avoid overprinting;

12:24:43    9    correct?

12:24:43   10         A.    Yes.

12:24:44   11         Q.    And my understanding of that is essentially

12:24:46   12    that when you look at the graph, there could be two

12:24:49   13    data points that have similar times, but you don't put

12:24:52   14    them on top of each other because it would just look

12:24:55   15    like one point; is that correct?

12:24:56   16         A.    That's right.  They're trying to see it.  I

12:24:59   17    mean in the Xerox you kind of lose it, but --

12:25:02   18         Q.    Okay.

12:25:02   19         A.    Yeah.  Yeah.

12:25:03   20         Q.    And if you were to attempt to re-create this

12:25:11   21    graph --

12:25:12   22         A.    Uh-huh?

12:25:13   23         Q.    -- in a similar way that you recalculated

12:25:15   24    the data in the study, because each jittered data

12:25:18   25    point is specific to a date, --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

159

| | | |
|---|---|---|
| 12:25:22 | 1 | A.   Yes. |
| 12:25:22 | 2 | Q.   -- that's the manner in which you would have |
| 12:25:23 | 3 | to represent it on the graph; correct? |
| 12:25:28 | 4 | A.   My -- my assumption is -- is the jitter has |
| 12:25:31 | 5 | to do with the vertical jitter.  They vertically |
| 12:25:34 | 6 | jittered it and not -- so the -- so the date -- |
| 12:25:39 | 7 | It appears on the right date, -- |
| 12:25:40 | 8 | Q.   Yup. |
| 12:25:40 | 9 | A.   -- it's just the no-infection point is sort |
| 12:25:45 | 10 | of -- and they jittered both the no infections and the |
| 12:25:51 | 11 | infections.  If you notice, they're not all exactly |
| 12:25:52 | 12 | the same points, so they -- |
| 12:25:53 | 13 | Q.   Well let me put it this way:  If you were |
| 12:25:55 | 14 | going to put these dots on this graph, -- |
| 12:25:58 | 15 | A.   Yeah. |
| 12:25:58 | 16 | Q.   -- you wouldn't be able to put them in the |
| 12:26:00 | 17 | right location if you were just saying is it infection |
| 12:26:03 | 18 | or is it non-infection; right?  You need to consider |
| 12:26:06 | 19 | the date of the infection or non-infection; right? |
| 12:26:09 | 20 | A.   Yeah, it's -- it's by the date, yeah. |
| 12:26:11 | 21 | Q.   So the date is the way in which you |
| 12:26:13 | 22 | determine where each infection or non-infection goes |
| 12:26:15 | 23 | on the graph. |
| 12:26:16 | 24 | A.   Uh-huh. |
| 12:26:16 | 25 | Q.   Okay. |

160

12:26:17   1              THE REPORTER:  Your answer?  Your answer?

12:26:19   2              THE WITNESS:  Yes.

12:26:20   3        Q.    Okay.  Have you compared this graph to

12:26:27   4   Exhibit 18 in this case but was previously marked as

12:26:30   5   Exhibit 16 by McGovern in -- in the McGovern

12:26:34   6   deposition, have you done this side-by-side comparison

12:26:44   7   before?

12:26:45   8        A.    No.

12:26:46   9        Q.    Okay.  So I'm going to walk you through this

12:26:50  10   and I'll do my best to do it slowly, but the first

12:26:53  11   infection data point that we have in Fig. 7 of the

12:26:56  12   McGovern study appears to be July 2008; correct?

12:27:01  13   Right on the beginning of the study period in the

12:27:04  14   graph of Fig. 7, the first data point in the infection

12:27:12  15   area.

12:27:13  16        A.    First infection.  I guess so.

12:27:21  17        Q.    Yeah.  And if you go to McGovern 16, the

12:27:27  18   first infection, which is row six, the date of surgery

12:27:32  19   is July 1st, 2008; correct?

12:27:35  20        A.    That's right.

12:27:36  21        Q.    So that data point matches this date in

12:27:39  22   McGovern 16; correct?

12:27:40  23        A.    Okay.

12:27:41  24        Q.    Do you agree?

12:27:42  25        A.    Yeah, it seems to be.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

161

12:27:43  1      Q.   Yeah.  Okay.

12:27:44  2      A.   Yeah.

12:27:45  3      Q.   Now looking at the table, the next three

12:27:48  4  infections are August 7, 2008, August 12, 2008 and

12:27:53  5  August 13, 2008; correct?

12:27:54  6      A.   Yes.

12:27:55  7      Q.   In McGovern 16 --

12:27:56  8           Which we've marked as Exhibit 18; correct?

12:27:58  9      A.   Right.

12:27:59  10     Q.   -- do you see the cluster of three jittered

12:28:03  11  data points in the infection area of this graph?

12:28:06  12     A.   Yes.

12:28:06  13     Q.   That appears to align with those three

12:28:09  14  infections; correct?

12:28:10  15     A.   Yes.

12:28:10  16     Q.   Okay.  The next cell in McGovern 16 is

12:28:17  17  September 30th, 2008; correct?

12:28:19  18     A.   Yeah.

12:28:19  19     Q.   And the infection after that is November

12:28:23  20  4th, 2008; correct?

12:28:25  21           In the cell.

12:28:26  22     A.   Yeah.

12:28:26  23     Q.   Okay.  So that's a gap of about a month and

12:28:32  24  five days, September --

12:28:34  25     A.   Yeah.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

162

12:28:35  1      Q.   -- 30th to November 4th; correct?

12:28:37  2      A.   It is, yeah.

12:28:37  3      Q.   Okay.  Now let's go to the graph.  There are

12:28:40  4  two points in a horizontal line virtually on top of

12:28:46  5  each other; correct?

12:28:47  6      A.   Yeah.

12:28:48  7      Q.   One of those points must be the September

12:28:51  8  30th data point; correct?  Because that's the next

12:28:54  9  infection in the table and that's the next infection

12:28:56  10  reported in the graph.

12:28:59  11      A.   It could be.  I mean it's -- now you're

12:29:02  12  sort of --

12:29:03  13      Q.   Well I mean it --

12:29:06  14      A.   It's hard to tell.  The -- the axis is so

12:29:08  15  rough it's a little hard to tell exactly, but it seems

12:29:11  16  plausible.

12:29:12  17      Q.   I mean if the prior three infections are the

12:29:14  18  cluster of three, which are all August infections, --

12:29:16  19      A.   Yeah.

12:29:17  20      Q.   -- the next data point must be September,

12:29:20  21  correct, and that's the next infection in the McGovern

12:29:22  22  16 Excel file.

12:29:24  23      A.   It could be, yeah.

12:29:25  24      Q.   You're saying that McGovern 16 is the final

12:29:29  25  data set; correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

163

12:29:30  1        A.    I didn't say that.  I --

12:29:32  2        Q.    So you don't know that McGovern 16 is the

12:29:34  3   final data set.

12:29:35  4        A.    No, I don't.

12:29:36  5        Q.    Okay.

12:29:37  6        A.    But I mean it seems plausible.

12:29:40  7              MR. GORDON:  Counsel, counsel --

12:29:40  8        A.    It's hard to sort of compare here because

12:29:42  9   this axis is -- you know, the cut points are --

12:29:45  10       Q.    Yeah.

12:29:45  11       A.    -- six months --

12:29:46  12       Q.    I understand.  I just wanted to clarify

12:29:48  13  that.

12:29:48  14       A.    Yeah.

12:29:49  15             MR. GORDON:  Counsel, I just want -- want to

12:29:52  16  let you know I have e-mailed to you and Ms. Conlin the

12:29:55  17  Augustine Bates number 0005277 --

12:29:58  18             MR. SACCHET:  I know.

12:29:59  19             MR. GORDON:  -- that seems to have been

12:30:00  20  missing in the copy which you -- you marked as Exhibit

12:30:04  21  14.

12:30:04  22             MR. SACCHET:  Okay.

12:30:05  23             MR. GORDON:  I don't know if it's a

12:30:07  24  photocopy error or whatever, but anyway, you do have

12:30:09  25  access to it.  I can call it up on my iPad if you want

164

12:30:15  1  to look at it.

12:30:15  2          MR. SACCHET:  I'm not -- I'm not there right

12:30:15  3  now, but I appreciate it, Mr. Gordon.

12:30:17  4          MR. GORDON:  But in fairness, there are no

12:30:20  5  infections listed on that.

12:30:23  6          MR. SACCHET:  I appreciate your testimony.

12:30:23  7          MR. GORDON:  Well it stands in contrast to

12:30:26  8  you giving him an exhibit missing a page and implying

12:30:26  9  that there was something on that page that maybe, you

12:30:29  10  know, was a September 15th, 2008 --

12:30:31  11          MR. SACCHET:  I'm talking about McGovern 16

12:30:32  12  right now.

12:30:33  13          MR. GORDON:  I -- I was --

12:30:35  14          No, you were talking about --

12:30:36  15          MR. SACCHET:  I wasn't talking at all about

12:30:37  16  this.

12:30:37  17          MR. GORDON:  But -- but you set this whole

12:30:39  18  thing up with a missing page --

12:30:40  19          MR. SACCHET:  That's how it was produced.

12:30:41  20          MR. GORDON:  I don't know if that was how it

12:30:44  21  was produced or not.

12:30:45  22          MR. SACCHET:  Ask DFT.

23          MR. GORDON:  Pardon?

12:30:49  24          MR. SACCHET:  Ask DFT if that's the final

12:30:50  25  copy.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

165

12:30:50   1           MR. GORDON:  Well then maybe DFT screwed up.

12:30:50   2   I don't know.  But you now have --

           3           MR. SACCHET:  Thank you.

12:30:55   4           MR. GORDON:  -- 5277 --

           5           MR. SACCHET:  Great.

12:30:55   6           MR. GORDON:  -- in your e-mail and it shows

12:30:56   7   no infection.

12:30:57   8           MR. SACCHET:  I'll note for the record the

12:30:58   9   two-minute soliloquy by Mr. Gordon as a speaking

12:31:02  10   objection that should be not raised in any deposition

12:31:06  11   of an expert witness in this litigation.

12:31:06  12       Q.   Back to McGovern 16 -- which is actually the

12:31:09  13   document that we were speaking about, not Albrecht

12:31:13  14   Exhibit 10 -- you stated you don't know whether

12:31:15  15   McGovern 16 is the final data set, but I want to draw

12:31:18  16   your attention back to the graph, and there are two

12:31:20  17   dots there; correct?

12:31:21  18       A.   Right.

12:31:21  19       Q.   And they're on top of each other; correct?

12:31:23  20       A.   Yes.

12:31:24  21       Q.   And if the infection cell in the McGovern

12:31:34  22   table was from 9/30/2009 and that's the next

12:31:39  23   infection, the second data point in the graph should

12:31:43  24   be from a similar time period; correct?

12:31:47  25       A.   So where are you now?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

166

12:31:48  1      Q.   Okay.  So I'm still on the one we were

12:31:50  2  talking about, before I was interrupted about a

12:31:52  3  different exhibit, which is row 10 with the September

12:31:56  4  30th, 2008 infection.  Do you see that?

12:31:59  5      A.   Right.  Uh-huh.

12:32:00  6      Q.   Okay.  And the next infection isn't until

12:32:03  7  November 4th, 2008; correct?

12:32:04  8      A.   That's right.

12:32:05  9      Q.   And that's about a month-long gap; right?

12:32:07  10      A.   Right.

12:32:08  11      Q.   But in the graph we have two dots --

12:32:10  12      A.   Yeah.

12:32:11  13      Q.   -- right on top of each other, one of which

12:32:14  14  you said is plausibly the September 30th, 2008

12:32:19  15  infection; correct?

12:32:30  16      A.   Septem --

12:32:36  17           You're -- you're -- you're talking about

12:32:39  18  number 10?

12:32:40  19      Q.   Yup.  It's September 30th, 2008; correct?

12:32:43  20      A.   It's September 30.  Okay.

12:32:45  21      Q.   Okay.

12:32:45  22      A.   So that's one of the --

12:32:46  23      Q.   That's one of those two.

12:32:48  24      A.   -- two.

12:32:48  25      Q.   Yeah.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

167

12:32:49  1      A.   Okay.

12:32:49  2      Q.   And the next infection is not until November

12:32:52  3   4th --

12:32:53  4      A.   Yeah.

12:32:53  5      Q.   -- in McGovern 16; correct?

12:32:55  6      A.   Right.

12:32:55  7      Q.   And the one after that's November 7th --

12:32:58  8      A.   Yeah.

12:32:58  9      Q.   -- and the one after that's November 18th;

12:33:00  10  right?

12:33:00  11     A.   Right.

12:33:01  12     Q.   Do you see the cluster of three data

12:33:03  13  points --

12:33:04  14     A.   Yeah.

12:33:05  15     Q.   -- after the two?

12:33:06  16     A.   Yes.

12:33:06  17     Q.   Those are presumably the November cluster of

12:33:10  18  infections; correct?

12:33:11  19          MR. GORDON:  Object to the form of the

12:33:12  20  question, lack of foundation.

12:33:13  21     A.   I don't know for sure.  It --

12:33:17  22     Q.   It appears to be.

12:33:18  23     A.   It's plausible.

12:33:19  24     Q.   Okay.  What is the second date -- the second

12:33:24  25  dot in between the cluster of three on the right and

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

168

12:33:26  1  the cluster of three on the left that's paired with

12:33:29  2  the September 30th, 2008 infection?

12:33:30  3      A.   I don't know.

12:33:31  4          MR. GORDON:  Object to the form of the

12:33:32  5  question.

12:33:32  6      Q.   It's not in the McGovern 16 table; is it?

12:33:34  7          MR. GORDON:  Lack of foundation.

12:33:35  8      A.   I -- I don't know what formed this graph.  I

12:33:39  9  don't -- I mean --

12:33:40  10     Q.   This is the graph that's reported in the

12:33:41  11 published study; correct?

12:33:43  12     A.   It is a graph in the -- in the published

12:33:45  13 study, --

12:33:46  14     Q.   Yeah.  I mean --

12:33:47  15     A.   -- but the data that went -- that formed

12:33:49  16 this graph I do not -- I don't know that I've seen.

12:33:52  17 It doesn't seem to be this table.

12:33:54  18     Q.   Yeah.  So it's -- this --

12:33:55  19          This jittered data point is not in McGovern

12:33:59  20 16.

12:33:59  21     A.   It doesn't appear to be.

12:34:00  22     Q.   And this jit -- jittered data point is in

12:34:03  23 2008.

12:34:06  24     A.   It --

12:34:08  25          Yeah, it does seem to be in 2008.

169

12:34:11  1      Q.    That's during the Bair Hugger warming

12:34:13  2    period; correct?

12:34:14  3      A.    Uh-huh.

12:34:14  4      Q.    So there appears to be an additional

12:34:16  5    jittered data point in the 2008 Bair Hugger period

12:34:19  6    that is not reflected on the McGovern 16 --

12:34:22  7      A.    Yeah.  Yeah.

12:34:23  8      Q.    -- file.

12:34:24  9      A.    Yeah.

12:34:27  10          MR. GORDON:  Object to the form of the

12:34:28  11    question, lack of foundation.

12:34:36  12      Q.    And if you take away cell 44 for the sake of

12:34:41  13    argument and you add in the data point that we just

12:34:45  14    discussed, which is in the Bair Hugger period from

12:34:46  15    2008, that gives you 32 infections.

12:34:50  16          MR. GORDON:  Object to the form of the

12:34:51  17    question, lack of foundation, in -- incomplete

12:34:56  18    hypothetical.

12:34:59  19      A.    So I don't under --

12:35:03  20      Q.    I can break it down further if you want.

12:35:05  21      A.    Yeah.  What exactly are you proposing?

12:35:08  22      Q.    Okay.  So in your report you say cell 44 was

12:35:11  23    miscoded to be --

12:35:13  24      A.    Yeah.

12:35:14  25      Q.    -- a forced-air warming infection because

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

170

12:35:16  1  the date of infection -- or date of operation was

12:35:18  2  September 15, 2010; right?

12:35:19  3     A.   Yes.

12:35:20  4     Q.   So if we just take that off the table, we're

12:35:23  5  down to the 31 infections that you assume in your

12:35:26  6  report; correct?

12:35:28  7     A.   Yes.

12:35:29  8     Q.   Okay.  And this jittered data point in 2008

12:35:35  9  is not reflected in McGovern 16.  That's what you just

12:35:38  10 testified to.

12:35:38  11    A.   It doesn't seem to be.

12:35:39  12    Q.   Okay.  If we add that data point into this

12:35:42  13 graph, there are 32 infections.

12:35:44  14    A.   Okay.  Yes.

12:35:45  15    Q.   Thank you.

12:35:47  16         MR. SACCHET:  We'll take a break.

12:35:49  17         THE REPORTER:  Off the record, please.

12:35:51  18         (Luncheon recess taken.)

19

20

21

22

23

24

25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

171

| | | |
|---|---|---|
| 13:27:18 | 1 | AFTERNOON SESSION |
| 13:29:08 | 2 | BY MR. SACCHET: |
| 13:29:10 | 3 | Q.   Dr. Holford, I should ask, do you prefer |
| 13:29:14 | 4 | going by doctor or professor? |
| 13:29:16 | 5 | A.   Professor is fine.  Either one. |
| 13:29:17 | 6 | Q.   Okay.  In your report on page two you also |
| 13:29:24 | 7 | reference the testimony of Dr. Reed; correct? |
| 13:29:26 | 8 | A.   Yes. |
| 13:29:27 | 9 | Q.   And you state that the published McGovern |
| 13:29:34 | 10 | analysis may have been in error in light of that |
| 13:29:36 | 11 | testimony; correct? |
| 13:29:37 | 12 | A.   Yes. |
| 13:29:38 | 13 | Q.   And that testimony suggested that there may |
| 13:29:41 | 14 | have been an additional infection both in the Bair |
| 13:29:44 | 15 | Hugger arm and in the Hot Dog arm; correct? |
| 13:29:47 | 16 | A.   That's correct. |
| 13:29:48 | 17 | Q.   And you also perform a calculation in |
| 13:29:51 | 18 | footnote one of your report that states, "Even if one |
| 13:29:54 | 19 | assumes that Dr. Reed's recollection in his deposition |
| 13:29:59 | 20 | was correct (that there was one additional infection |
| 13:30:01 | 21 | in each group), the odds ratio is nevertheless |
| 13:30:04 | 22 | markedly different than reported in the published |
| 13:30:07 | 23 | paper," and you go on to note that the odds ratio |
| 13:30:09 | 24 | would be 2.86 with a significant p-value of .0356; |
| 13:30:13 | 25 | correct? |

172

13:30:13    1        A.    That's correct.

13:30:15    2        Q.    Do you have any reason for not relying on

13:30:20    3    Dr. Reed's recollection of one additional infection in

13:30:23    4    each arm versus the Albrecht Exhibit 10 and McGovern

13:30:28    5    Exhibit 16?

13:30:29    6        A.    No.   I was just taking what --

13:30:33    7              You know, it's just based on what he said --

13:30:35    8        Q.    You would agree that --

13:30:37    9        A.    -- in his deposition.

13:30:40   10        Q.    Are you finished?

13:30:41   11        A.    Yes.

13:30:41   12        Q.    You would agree that the calculations that

13:30:43   13    you have performed that are within your report rely on

13:30:48   14    McGovern 16 and Albrecht Exhibit 10; correct?

13:30:51   15        A.    I think all of the rest of the calculations,

13:30:55   16    other than footnote one, are based on 10 and 16.

13:31:00   17        Q.    And you recognize that Mr. Reed's testimony

13:31:04   18    and the cal -- and the calculation you performed based

13:31:06   19    on that testimony has a higher odds ratio of 2.86 than

13:31:11   20    the 2.76 that you used throughout the report, which

13:31:14   21    are based on Albrecht 10 and McGovern 16.

13:31:17   22        A.    That's right.

13:31:17   23        Q.    So it's possible that in fact the OR of 2.86

13:31:23   24    could be the actual odds ratio of the study.

13:31:25   25        A.    Yes.   There seems to be some error in the

173

13:31:28  1  tabulation in the -- in the paper is what -- what

13:31:36  2  seems to be implied by this testimony of, you know,

13:31:39  3  Reed and Albright and -- and whatever, so I'm trying

13:31:43  4  to sort out as best I can what that error is.

13:31:46  5      Q.   And you would agree that the calculation you

13:31:49  6  performed as to Mr. Reed's testimony contradicts the

13:31:53  7  calculation you performed with respect to the McGovern

13:31:55  8  Exhibit 16 and Albrecht Exhibit 10 data; correct?

13:31:59  9      A.   It -- it is different, yes.

13:32:00  10     Q.   And the Reed calculation results in a

13:32:03  11  significant p-value; correct?

13:32:05  12     A.   That's right.

13:32:09  13     Q.   To be specific, the calculation on page two

13:32:13  14  of your report where you derive a p-value -- or an

13:32:17  15  odds ratio of 2.76 derives from McGovern Exhibit 16

13:32:21  16  and Albrecht Exhibit 10; correct?

13:32:24  17     A.   That's correct.

13:32:25  18     Q.   To also be clear, the time trend data which

13:32:29  19  you discuss on page four of your report also derives

13:32:32  20  from Albrecht Exhibit 10 and McGovern Exhibit 16;

13:32:35  21  correct?

13:32:35  22     A.   That's correct.

13:32:37  23     Q.   The reanalysis of the Jensen data that you

13:32:41  24  performed on page five of your report also depends on

13:32:45  25  the veracity of McGovern Exhibit 16 and Albrecht

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

174

| | | |
|---|---|---|
| 13:32:48 | 1 | Exhibit 10. |
| 13:32:48 | 2 | A.   That's correct. |
| 13:32:49 | 3 | Q.   The calculation you performed on page four |
| 13:32:52 | 4 | with respect to controlling for the thromboprophylaxis |
| 13:32:57 | 5 | also derives from Albrecht Exhibit 10 and McGovern |
| 13:33:00 | 6 | Exhibit 16; correct? |
| 13:33:01 | 7 | A.   Correct. |
| 13:33:02 | 8 | MR. GORDON:  Object to the form of the |
| 13:33:03 | 9 | question. |
| 13:33:04 | 10 | Q.   The calculation you performed also on page |
| 13:33:06 | 11 | six with respect to controlling for the antibiotic |
| 13:33:09 | 12 | derives from the data in McGovern Exhibit 16 and |
| 13:33:12 | 13 | Albrecht Exhibit 10; correct? |
| 13:33:13 | 14 | A.   Yes. |
| 13:33:14 | 15 | Q.   And finally, with respect to the conclusions |
| 13:33:17 | 16 | that you offer in terms of causal inferences in the |
| 13:33:20 | 17 | latter parts of your report, those calculations so too |
| 13:33:24 | 18 | rely on the data from McGovern Exhibit 16 and Albrecht |
| 13:33:26 | 19 | Exhibit 10; correct? |
| 13:33:28 | 20 | A.   Yes.  They're basically referring to the |
| 13:33:32 | 21 | analyses I did in the previous sections. |
| 13:33:35 | 22 | Q.   So all those calculations depend on the |
| 13:33:37 | 23 | veracity of Albrecht Exhibit 10 and McGovern Exhibit |
| 13:33:40 | 24 | 16. |
| 13:33:43 | 25 | A.   Yes, I think that's right.  Yeah. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

175

| | | |
|---|---|---|
| 13:33:45 | 1 | Q.   I'm going to change gears a little bit now |
| 13:33:53 | 2 | and talk about the particular tests that -- |
| 13:33:56 | 3 | statistical tests that were used both in the McGovern |
| 13:33:58 | 4 | study and in your report. |
| 13:34:00 | 5 | A.   Uh-huh. |
| 13:34:01 | 6 | Q.   With respect to -- with respect to reviewing |
| 13:34:07 | 7 | the McGovern study, the authors used chi-squared; |
| 13:34:11 | 8 | correct? |
| 13:34:11 | 9 | A.   That's correct. |
| 13:34:11 | 10 | Q.   And their calculation, when using the data |
| 13:34:14 | 11 | reported in this study, resulted in a p-value of .024; |
| 13:34:21 | 12 | correct? |
| 13:34:21 | 13 | A.   I think that's correct.  That sounds -- |
| 13:34:23 | 14 | sounds right.  I'd have to look back at the paper, but |
| 13:34:25 | 15 | I think it's right. |
| 13:34:26 | 16 | Q.   Okay.  It is, but -- |
| 13:34:28 | 17 |      And based on the chi-squared on that data |
| 13:34:33 | 18 | set, the odds ratio is 3.8. |
| 13:34:35 | 19 | A.   That's right. |
| 13:34:36 | 20 | Q.   And the confidence interval was 1.2 to 12.5; |
| 13:34:39 | 21 | correct? |
| 13:34:39 | 22 | A.   That's right. |
| 13:34:40 | 23 | Q.   Now in your report you also apply Fisher's |
| 13:34:45 | 24 | exact test to the data that was reported in the |
| 13:34:49 | 25 | McGovern study; correct? |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

176

13:34:49  1    A.   Yes, I did.

13:34:50  2    Q.   And when you perform that calculation, you

13:34:53  3  also find a significant p-value; correct?

13:34:55  4    A.   That's correct.

13:34:56  5    Q.   And the p-value with respect to the reported

13:34:58  6  data using Fisher's is .0176; correct?

13:35:05  7    A.   That's correct.  Yeah.

13:35:07  8    Q.   So I've been trying to figure this out

13:35:09  9  because I know that Fisher's exact is generally a more

13:35:13  10  conservative test, but in this particular instance

13:35:16  11  chi-squared had a less significant p-value but which

13:35:20  12  was still significant than under Fisher.  Is that --

13:35:23  13            And I can back up.  The p-value using X

13:35:26  14  chi-squared was .024 in the study; correct?

13:35:29  15    A.   That's right.

13:35:31  16    Q.   And then when you did Fisher's on the -- the

13:35:35  17  data reported in this study, you got a p-value of

13:35:39  18  .07 -- .0176.

13:35:41  19    A.   Yeah.

13:35:41  20    Q.   So in that particular instance the p-value

13:35:45  21  actually increased by using chi-squared; correct?

13:35:49  22    A.   It -- it did.  The Fisher's -- but I --

13:35:53  23            The premise I think of your question was

13:35:55  24  that Fisher's is conservative.

13:35:57  25    Q.   And we can get to that later.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

177

13:35:59  1       A.    Oh, okay.  I would disagree with that --

2       Q.    Okay.

13:36:02  3       A.    -- characterization.

13:36:03  4       Q.    But with respect to what we're talking about

13:36:06  5  now, the p-val -- p-value actually went down when

13:36:09  6  using Fisher's as opposed to chi-squared.

13:36:12  7       A.    That's correct.

13:36:13  8       Q.    If the authors had truly wanted to cherry

13:36:16  9  pick a p-value, they could have employed Fisher's and

13:36:18  10  had a more significant p-value; correct?

13:36:21  11      A.    They -- they could have, yes.

13:36:22  12      Q.    And they did not.

13:36:23  13      A.    No.

13:36:25  14      Q.    When using Fisher's on the original data set

13:36:29  15  reported in the McGovern study, the OR, instead of

13:36:33  16  being 3.8, is 3.79, correct, so virtually identical?

13:36:37  17      A.    Yeah, uh-huh.  I assume it just depends on

13:36:42  18  how much --

13:36:42  19            What you're rounding is I think the

13:36:44  20  difference.

13:36:44  21      Q.    Okay.  Now going back to the data that you

13:36:50  22  used in your report; namely, the four infections in

13:36:53  23  the Hot Dog period and the 31 infections in the Bair

13:36:56  24  Hugger period, --

13:36:57  25      A.    Uh-huh.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

178

13:36:57    1      Q.    -- you also used that data and calculated

13:37:02    2   p-values and odds ratios using chi-squared; correct?

13:37:05    3      A.    For the analysis on --

13:37:14    4         Let's see, where is it?

13:37:15    5      Q.    Page two.

13:37:17    6      A.    Page two.  I mean the p-value I give there

13:37:24    7   is -- is actually the F -- I'm sorry, Fisher's --

13:37:29    8   Fisher's exact.

13:37:31    9      Q.    Did you report a p-value of .0480 when using

13:37:35   10   chi-squared --

13:37:35   11      A.    Oh, I'm sorry.

13:37:36   12      Q.    -- on the remixed data set?

13:37:39   13      A.    That's true.  I also -- I also did the

13:37:40   14   chi-square in the --

13:37:42   15         Yeah, it got a little lower.

13:37:45   16      Q.    And you note that it is just below the

13:37:47   17   threshold of statistical significance; correct?

13:37:51   18      A.    That's right.

13:37:51   19      Q.    It's the same p-value that was reported in

13:37:54   20   the Jensen study which you cited in your reference

13:37:57   21   material; correct?

13:37:58   22         MR. GORDON:  Which -- which is?

13:37:59   23         THE WITNESS:  Which --

13:37:59   24         MR. SACCHET:  The Jensen study on control --

13:38:01   25         MR. GORDON:  No, which -- which of the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

179

| | | |
|---|---|---|
| 13:38:02 | 1 | p-values, the chi-square one or the -- |
| 13:38:04 | 2 | Q. The chi-squared P&L value of .0480 -- |
| 13:38:09 | 3 | A. Okay. |
| 13:38:09 | 4 | Q. -- is the same p-value that Jensen et al |
| 13:38:14 | 5 | reported in their study, which evaluated whether there |
| 13:38:17 | 6 | was an increased risk of infection between using |
| 13:38:22 | 7 | Xarelto versus using a low-molecular-weight heparin. |
| 13:38:29 | 8 | A. I don't remember what they -- exactly what |
| 13:38:32 | 9 | they reported. |
| 13:38:46 | 10 | (Exhibit 19 was marked for |
| 13:38:48 | 11 | identification.) |
| 13:38:48 | 12 | BY MR. SACCHET: |
| 13:38:51 | 13 | Q. Exhibit 19 is entitled "Return to theatre |
| 13:38:56 | 14 | following total hip and knee replacement, before and |
| 13:38:59 | 15 | after the introduction of rivaroxaban," by Jensen et |
| 13:39:04 | 16 | al; correct? |
| 13:39:04 | 17 | A. Yes. And where are you -- |
| 13:39:05 | 18 | Q. In the abstract on the first page in the |
| 13:39:08 | 19 | second paragraph, the statement there says, "Nine |
| 13:39:12 | 20 | patients in the control (tinzaparin) group returned to |
| 13:39:15 | 21 | theatre with wound complications within 30 days, |
| 13:39:18 | 22 | compared with 22 patients in the rivaroxaban group. |
| 13:39:22 | 23 | This increase was statistically significant (at p |
| 13:39:25 | 24 | equals 0.048)." |
| 13:39:27 | 25 | MR. GORDON: Counsel, I think your earlier |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

180

13:39:28    1    question was that they reported a statistically

13:39:33    2    significant difference in infection rates at that

13:39:35    3    p-value, that's -- and that's not what they did.

13:39:37    4         Q.   I'll rephrase my question.

13:39:38    5         A.   They didn't -- yeah.

13:39:39    6         Q.   I'll rephrase the question.

13:39:40    7              Is the p-value that's reported in the

13:39:42    8    abstract of the Jensen study 0.048?

13:39:45    9              I recognize that the 8 is difficult to read.

13:39:48   10         A.   It's hard to see if it's an 8 or a 6, but

13:39:51   11    yeah, it's -- it's less than .05.

13:39:53   12         Q.   Okay.  And the authors there deemed it to be

13:39:55   13    statistically significant.

13:39:57   14              MR. GORDON:  What --

13:39:57   15         A.   That's right.

13:39:58   16         Q.   They made no mention that it was marginally

13:40:01   17    significant or close to the threshold of significance.

13:40:03   18         A.   They didn't say.

13:40:09   19         Q.   So whether or not one uses the original data

13:40:14   20    as reported in the McGovern study or the reanalyzed

13:40:18   21    data that you provide in your report, --

13:40:19   22         A.   Uh-huh?

13:40:20   23         Q.   -- using X-squared results in a significant

13:40:23   24    p-value; correct?  Under .05.

13:40:26   25         A.   That's right, yeah.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

181

13:40:30    1       Q.    You go on in your report, however, to state

13:40:39    2    that Fisher's exact test is the more appropriate test

13:40:42    3    in this circumstance; correct, professor?

13:40:44    4       A.    Uh-huh.

13:40:45    5             THE REPORTER:   Your answer?

13:40:46    6             THE WITNESS:  Yes.   Yeah.

13:40:48    7       Q.    Notwithstanding your view as to the

13:40:52    8    proprietary of Fisher's versus chi-squared, you'd

13:40:55    9    agree that there is a long-standing debate about

13:40:59   10    whether to use Fisher's or chi-squared based on

13:41:03   11    certain determinants such as sample size and incidence

13:41:07   12    of an outcome; correct?

13:41:07   13             MR. GORDON:   Object to the form of the

13:41:09   14    question.

13:41:10   15       A.    I -- I don't know that there's a debate.   I

13:41:12   16    think it's -- Fisher's is -- is --

13:41:19   17             I mean chi-square de -- derives from a -- a

13:41:25   18    mathematical approximation for what the distribution

13:41:29   19    is for the statistic that you're looking at, and so

13:41:34   20    it's relying on that approximation.   The approximation

13:41:40   21    works quite well if the sample size is large, it works

13:41:44   22    more poorly as the -- as the expected number of cases

13:41:49   23    becomes smaller and smaller.   And so it -- it's in --

13:41:57   24             In contrast, the Fisher's exact test is not

13:42:03   25    an approximation, it's an exact calculation.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

182

13:42:09    1    That's -- so because -- depending on the --

13:42:13    2              You know, if results that go into that

13:42:16    3    are -- are appropriate, then you're getting a -- an

13:42:19    4    actual p-value and not an approximate p-value, which

13:42:22    5    is what the chi-square is -- chi-square is yielding,

13:42:26    6    so in that respect I don't know that there's a huge

13:42:36    7    debate or controversy about that.  The only --

13:42:42    8              Chi-square is a lot easier to compute, and

13:42:45    9    so when you're doing it by hand it's a lot more work

13:42:49   10    to do Fisher's, but if you're just typing in the table

13:42:54   11    into a -- into a computer, which of course is what we

13:42:56   12    have now, it's pretty straightforward to do.

13:42:59   13         Q.    But you're aware that other statisticians

13:43:02   14    have criticized Fisher's exact test as being overly

13:43:05   15    conservative; are you not?

13:43:07   16         A.    I'm not sure it's particularly overly --

13:43:10   17    overly conservative.

13:43:12   18         Q.    Not in your view.  I'm saying are you --

           19         A.    Yes.

13:43:14   20         Q.    -- aware of other statisticians who have

13:43:17   21    criticized Fisher's exact test as being overly

13:43:19   22    conservative?

13:43:20   23         A.    Some might argue that, yeah.

13:43:23   24         Q.    So there is a --

13:43:24   25         A.    It -- it's not -- but it's not uniformly --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

183

| | | |
|---|---|---|
| | 1 | the -- |
| 13:43:27 | 2 | The direction does not go one way.  I mean |
| 13:43:32 | 3 | as you -- as you -- |
| 13:43:34 | 4 | Q.    Yeah. |
| 13:43:35 | 5 | A.    -- just pointed out, -- |
| 13:43:36 | 6 | Q.    It can go down. |
| 13:43:38 | 7 | A.    -- Fisher's can -- can be greater or less, |
| 13:43:41 | 8 | and the context in which I used Fisher's is that I |
| 13:43:44 | 9 | think it's more accurate when the numbers are small |
| 13:43:48 | 10 | and -- as in these tables. |
| 13:43:50 | 11 | Q.    I'll get to that in a moment.  I just want |
| 13:43:53 | 12 | to pin down -- |
| 13:43:53 | 13 | A.    Sure. |
| 13:43:54 | 14 | Q.    -- that there are statisticians who have |
| 13:43:57 | 15 | criticized Fisher's exact test as being overly |
| 13:43:59 | 16 | conservative. |
| 13:44:00 | 17 | A.    Okay. |
| 13:44:00 | 18 | Q.    You agree. |
| 13:44:02 | 19 | A.    There may be a few that -- that don't agree, |
| 13:44:05 | 20 | but -- |
| 13:44:06 | 21 | Q.    Do you know Professor Douglas Liddell of |
| 13:44:08 | 22 | McGill University? |
| 13:44:09 | 23 | A.    I know of him, yeah. |
| 13:44:10 | 24 | Q.    Have you read "Practical Tests of 2 x 2 |
| 13:44:15 | 25 | Contingency Tables" that was published in The |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

184

13:44:17  1   Statistician in 1976?

13:44:19  2       A.   Ooh, I don't know.  I may have at some

13:44:21  3   point.  I don't remember.

13:44:22  4       Q.   So you're not aware one way or the other

13:44:24  5   whether Professor Liddell said Fisher's exact test was

13:44:29  6   overly conservatively in that article.

13:44:31  7       A.   He may well have.  I'm not -- just -- I just

13:44:34  8   don't recall that paper off the top of my head.

13:44:35  9       Q.   He's an expert in the field; correct?

13:44:37  10      A.   Yeah, uh-huh.

13:44:38  11      Q.   I assume you're also aware of Professor --

13:44:39  12   or Dr. Joseph Berkson from the Mayo Clinic in

13:44:40  13   Minneapolis.

13:44:41  14      A.   Yes.

13:44:41  15      Q.   He was the head of biometry at the Mayo

13:44:44  16   Clinic?

13:44:44  17      A.   Yes.

13:44:44  18      Q.   Same field as you; right?

13:44:47  19      A.   That's right.

13:44:47  20      Q.   And the Mayo Clinic is a well-respected

13:44:50  21   institution; correct?

13:44:51  22      A.   Yes.

13:44:51  23      Q.   You respect Professor Berkson's views?

13:44:56  24      A.   Basically, yeah.  I mean, yeah, he was there

13:44:59  25   a while ago.

185

13:45:00   1        Q.    Have you read his article and his praises of

13:45:03   2   the exact test?

13:45:05   3        A.    I -- I may have.  I don't remember.  When

13:45:07   4   was that published?

13:45:08   5        Q.    I actually don't know when it was published.

13:45:10   6   I think it was in the '80s.

13:45:11   7        A.    Okay.

13:45:12   8        Q.    But are you aware of his conclusion that the

13:45:15   9   use of the term "Fisher's exact" is simply just a

13:45:18  10   sobriquet because it derives from R. A. Fisher's

13:45:22  11   creation of the test?

13:45:23  12        A.    That's -- that's a --

13:45:25  13              Yeah.  Fisher I know derived the test and --

13:45:28  14        Q.    But the use of the word "exact" really -- I

13:45:32  15   mean is a sobriquet.

13:45:35  16        A.    Well the --

13:45:37  17              I suppose.  I mean it's exact if -- if --

13:45:40  18   depending on the results that Fisher -- that form the

13:45:46  19   basis for -- for Fisher's derivation.  I mean it's

13:45:49  20   a --

13:45:50  21              It is based on a hypergeometric distribution

13:45:53  22   and it's exact from that.  The chi-square by

13:45:57  23   comparison is based on the idea that -- you know, that

13:46:03  24   it becomes approximately a chi-square distribution, so

13:46:06  25   there's an approximation involved with that.  And why

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

186

13:46:09  1  he called it an exact test is because there was not an

13:46:13  2  approximation involved.

13:46:14  3      Q.   Do you disagree with Professor Berkson's

13:46:17  4  view that the problem with Fisher's is that you're

13:46:19  5  essentially combining discrete statistics with fixed

13:46:23  6  significance levels -- significance levels?

13:46:25  7      A.   Well I think -- yeah.  I mean that -- that

13:46:29  8  is a problem.  That is, I think, a different --

13:46:33  9  different problem because it is discrete.  If you're

13:46:37 10  comparing at exactly the .05 level, the discrete

13:46:43 11  probabilities that it can take may not correspond to

13:46:47 12  exactly the .05.

13:46:48 13      Q.   Yeah.

13:46:49 14      A.   So it may go from .04 to .06, so you'd

13:46:54 15  reject the .04 but not the .06.

13:46:57 16      Q.   That's a problem.

13:46:59 17      A.   There's a space in there, so there is --

13:47:01 18  there is a little bit of an ambiguity there.  It

13:47:06 19  may --

13:47:07 20          Well not it's ambiguous.  It's either less

13:47:10 21  or not.

13:47:10 22      Q.   Yeah.

13:47:10 23      A.   But there is -- there is a bit of a -- of

13:47:13 24  a -- of a problem of comparing exactly because it's

13:47:16 25  not a continuous distribution.

187

| | | |
|---|---|---|
| 13:47:18 | 1 | Q.   And that's a problem with Fisher's test. |
| 13:47:21 | 2 | A.   I don't know if it's a problem.  It's -- |
| 13:47:23 | 3 | Q.   It's a ramification of the test. |
| 13:47:24 | 4 | A.   It's an issue, yes. |
| 13:47:25 | 5 | Q.   Okay.  And in light of that, according to |
| 13:47:27 | 6 | Berkson, Fisher's may result in the rejection of |
| 13:47:32 | 7 | p-values that are very close to significant but |
| 13:47:36 | 8 | ultimately render them non-significant. |
| 13:47:39 | 9 | A.   That's right.  Yeah.  You could -- you could |
| 13:47:41 | 10 | have that. |
| 13:47:42 | 11 | Q.   So in this -- |
| 13:47:43 | 12 | A.   So in the example I just stated, I mean it |
| 13:47:45 | 13 | could be if that's the situation involved, you would |
| 13:47:50 | 14 | only reject at the .04, and so there's that little -- |
| 13:47:53 | 15 | Q.   Yeah. |
| 13:47:54 | 16 | A.   -- gap. |
| 13:47:55 | 17 | Q.   Isn't that precisely the circumstance here, |
| 13:47:58 | 18 | because when you analyzed the remixed data using |
| 13:48:04 | 19 | chi-squared, you calculated a p-value of 0.0480; |
| 13:48:11 | 20 | correct? |
| 13:48:11 | 21 | A.   I guess that's what it was, yeah. |
| 13:48:13 | 22 | Q.   And then when you used Fisher, it went to |
| 13:48:17 | 23 | 0.0507, so it took -- it took a p-value -- |
| 13:48:21 | 24 | A.   Yes. |
| 13:48:22 | 25 | Q.   -- that was significant, just below the |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

188

13:48:25  1   traditional threshold of 0.05, and it rendered it non-

13:48:28  2   significant using Fisher's.  That's exactly what

13:48:31  3   Berkson describes in his article of -- in his praise

13:48:36  4   of the exact test; correct?

13:48:37  5       A.  As I say, I don't remember what -- what

13:48:39  6   Berkson -- Berkson's issue was.  If that was his

13:48:42  7   issue, that would be an issue, and that, I mean --

13:48:46  8       Q.  That's the issue we just talked about when

13:48:48  9   you said --

13:48:49  10      A.  Yeah, yeah.  That -- that is -- that is an

13:48:51  11  issue --

13:48:51  12      Q.  Okay.

13:48:51  13      A.  -- associated with that test.  I mean any

13:48:54  14  way you cut it, it's very close to the line.  Even --

13:48:58  15  even the chi-square was, what, point -- .048.

13:49:03  16      Q.  Yeah.

13:49:04  17      A.  That's not way out in the wild blue yonder

13:49:08  18  somewhere, that's really -- that is close to the line,

13:49:10  19  too.

13:49:12  20      Q.  Agreed.

13:49:12  21      A.  They're both, you know, close to the line.

13:49:13  22      Q.  But in your conclusions of your report, one

13:49:16  23  of your rationales for concluding that the McGovern

13:49:18  24  study is not valid is because the p-value is not

13:49:21  25  significant; correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

189

13:49:21  1                MR. GORDON:  Object to the form of the

13:49:22  2     question.

13:49:25  3         A.    That the p-value --

13:49:29  4                Well it is what it is.

13:49:31  5         Q.    Well on page six of your --

13:49:33  6         A.    I mean --

13:49:34  7         Q.    -- report in the "Conclusions regarding the

13:49:36  8     McGovern et al. findings" you say, "Reasons why the

13:49:39  9     McGovern et al. conclusions are not valid are:

13:49:42  10               "1."  And the very last clause of that

13:49:45  11    number one is, "...which is close but not

13:49:48  12    statistically significant."

13:49:52  13        A.    Yes.  So that is the difference because it

13:49:54  14    doesn't achieve statistical significance; it's very

13:49:57  15    close to the line.

13:49:59  16        Q.    And we just agreed that if you used

13:50:01  17    chi-squared it would be significant.

13:50:05  18        A.    Yes.

13:50:05  19        Q.    And we also just agreed that one of the

13:50:07  20    issues or ramifications of using Fisher's is that

13:50:12  21    values that are significant, --

13:50:14  22        A.    No.

13:50:14  23        Q.    -- just below the conventional line of

13:50:16  24    statistical significance, may be deemed non-

13:50:19  25    significant by applying Fisher.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

190

13:50:21  1      A.   No, that's not -- that's not what I said.

13:50:24  2  They could be close to the line, but that -- that

13:50:27  3  doesn't mean they're statistically significant.  If

13:50:30  4  they're -- if they're not --

13:50:31  5      If they don't cross the line, they're not

13:50:33  6  significant.

13:50:33  7      Q.   Okay.  So --

13:50:34  8      But I'm going to back up because we just

13:50:36  9  talked about how one ramification of using Fisher's,

13:50:39  10  because there are discrete statistics with fixed

13:50:43  11  significance levels, --

13:50:44  12      A.   Yeah.

13:50:44  13      Q.   -- that a statistic that is just below the

13:50:47  14  line of statistical significance, in the .04 range --

13:50:50  15      A.   Well if it's below .05 --

13:50:53  16      Q.   Yes.

13:50:54  17      A.   -- it's significant, so don't you mean just

13:50:56  18  above?

13:50:57  19      Q.   Well Fisher's would bring it just above;

13:50:59  20  correct?

13:50:59  21      A.   Fisher's would bring it above, --

13:51:02  22      Q.   Yes.

13:51:03  23      A.   -- but there --

13:51:07  24      The problem is is that you can -- there

13:51:10  25  would not be a corresponding table that would give you

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

191

13:51:13  1   exactly .05, so that's not to say that, you know, it's

13:51:21  2   not -- it is or isn't significant.  It doesn't cross

13:51:24  3   the line, which is the criteria for being

13:51:26  4   statistically significant.

13:51:28  5        Q.   Okay.  I'm going to try to back up again.

13:51:32  6             Your conclusion here on page six of your

13:51:34  7   report --

13:51:35  8        A.   Yeah.

13:51:35  9        Q.   -- says that one of the reasons the McGovern

13:51:37 10   study is not valid is because the p-value is close to

13:51:40 11   but not statistically significant; correct?

13:51:43 12        A.   That's right.  The p-value that I'm talking

13:51:45 13   about --

13:51:46 14        Q.   I just want to establish that.

13:51:47 15        A.   -- is .05 --

13:51:50 16        Q.   507.

13:51:51 17        A.   507.

13:51:51 18        Q.   Correct.

13:51:52 19        A.   That's greater than .05.

13:51:53 20        Q.   We've also established that when you apply

13:51:56 21   chi-squared to the data derived from Albrecht 10 and

13:51:59 22   McGovern seven -- 16, that the p-value is 0.048;

13:52:03 23   correct?

13:52:03 24        A.   That's right.

13:52:04 25        Q.   Just below statistical significance.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

192

13:52:06    1       A.    That's right.

13:52:07    2       Q.    One of Berkson's critiques, whether or not

13:52:10    3    you've read the article, you appeared to agree that

13:52:13    4    there's an issue with combining discrete statistics

13:52:15    5    with fixed significance levels; correct?

13:52:18    6       A.    I'm --

13:52:19    7       Q.    You said that was a ramification of using

13:52:22    8    Fisher's.

13:52:22    9       A.    A ramification, --

13:52:23    10      Q.    Yes.

13:52:23    11      A.    -- not necessarily a --

13:52:24    12            It's a problem with what you're -- with what

13:52:27    13   you're trying to do.  It is an issue with discrete --

13:52:31    14   discrete probability values.

13:52:32    15      Q.    And an implication of that is that p-values

13:52:35    16   that would otherwise be nominally significant, just

13:52:39    17   below the conventional limit of .05, would be rendered

13:52:45    18   non-significant above .05; correct?

13:52:47    19      A.    No.

13:52:48    20      Q.    So you disagree with Joseph Berkson.

13:52:51    21      A.    I don't think that's --

13:52:52    22            I doubt that's what he is saying.  I mean

13:53:00    23   the premise of what you just said was that the value

13:53:06    24   would be significant.  Right?  Isn't that what you

13:53:09    25   said?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

193

13:53:09   1       Q.   I said if you have a -- for example, a

13:53:11   2   p-value of 0.048, which is significant --

13:53:14   3       A.   That is significant, --

13:53:15   4       Q.   Yeah.

13:53:16   5       A.   -- but it's less than .05.  It's not .05.

13:53:21   6       Q.   Well it's significant because it's less than

13:53:24   7   .05; correct?

13:53:25   8       A.   Exactly.

13:53:26   9       Q.   Okay.  So I think we might be missing each

13:53:28  10   other.

13:53:29  11       A.   So --

13:53:31  12       Q.   So --

13:53:32  13       A.   So I --

13:53:34  14            How exactly did you say that statement

13:53:36  15   again, --

13:53:36  16       Q.   Okay.

13:53:36  17       A.   -- which is what my problem is?

13:53:39  18       Q.   Okay.  So when you apply chi-squared --

13:53:41  19       A.   Yeah.

13:53:41  20       Q.   -- to the reanalyzed data, we get a p-value

13:53:45  21   of 0.048, correct, which is below --

13:53:47  22       A.   That's -- that's an approximate p-value.

13:53:49  23       Q.   Yes.

13:53:49  24       A.   That approximate p-value is less than .05.

13:53:52  25       Q.   And it's statistically significant because

194

13:53:54   1   it's below --

13:53:55   2        A.   It's below.

13:53:56   3        Q.   -- 0.05, which is the conventional line for

13:53:59   4   significance.

13:54:00   5        A.   That's -- that -- that is one of the -- one

13:54:03   6   of the thoughts used, yes.

13:54:03   7        Q.   Yes.  When you apply Fisher's, it goes from

13:54:05   8   0.048 to 0.0507; correct?

13:54:09   9        A.   That's right.

13:54:09   10       Q.   And one of the issues with Fisher's is

13:54:13   11  that it's combining discrete statistics with fixed --

13:54:17   12       A.   Yeah.

13:54:18   13       Q.   -- significance levels; right?

13:54:19   14       A.   Well it has --

13:54:21   15       Q.   We said that three times.

13:54:22   16       A.   -- significant value, yeah.

13:54:24   17       Q.   Okay.  And the implication of doing that is

13:54:26   18  what you said earlier where a p-value of .04 could

13:54:32   19  then become non-significant by applying Fisher's.

13:54:35   20       A.   No.  The .04 doesn't --

13:54:43   21            It's not the .04 is going to this.  They're

13:54:47   22  two different -- completely different ways in which

13:54:51   23  these things are computed, so one does not change.

13:54:55   24       Q.   Okay.  Would you agree that chi-squared is

13:54:59   25  better for larger sample sizes --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

195

13:55:02   1        A.    I wouldn't say it's better.

13:55:03   2        Q.    -- than Fisher?

13:55:04   3              It's equally as good?

13:55:06   4        A.    There -- yeah, for large sample size --

13:55:10   5              Well the results will -- will agree much

13:55:11   6    better as the sample size increases.

13:55:14   7        Q.    Is chi-squared better or equally as good as

13:55:17   8    Fisher's when using a well-balanced table?

13:55:21   9        A.    "Well-balanced table," what do you mean?

13:55:23   10       Q.    I -- I -- I guess two arms that have

13:55:28   11   approximately the same number of data.

13:55:29   12       A.    It's --

13:55:32   13             I don't know if it's better or -- better or

13:55:38   14   worse.  How much --

13:55:39   15             It depends on the balance.  It depends --

13:55:43   16   what's particularly critical is the -- the expected

13:55:48   17   number --

13:55:49   18       Q.    Yes.  I'm going to go --

13:55:50   19       A.    -- in the cell, yeah.

13:55:53   20       Q.    I'll get here.

13:55:54   21             But you do say in your report that

13:55:56   22   chi-squared works well for comparing proportions when

13:56:00   23   the sample size is large; right?

13:56:02   24       A.    That's right.  When the -- when the -- when

13:56:03   25   the numbers in all of the cells of the tables are

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

196

13:56:05  1   reasonably large, greater than five is one rule of

13:56:09  2   thumb, --

13:56:09  3        Q.   Yeah.

13:56:10  4        A.   -- and then -- then it does pretty --

13:56:13  5   pretty --

13:56:14  6             The difference is pretty small.

13:56:15  7        Q.   What --

13:56:16  8             So in terms of just talking about

13:56:18  9   population, --

13:56:19  10       A.   Uh-huh.

13:56:19  11       Q.   -- what is a large population in your view?

13:56:23  12            MR. GORDON:  Object to the form -- object to

13:56:27  13  the form of the question.

13:56:27  14       Q.   So does it depend on what the expected value

13:56:29  15  would be, or could you determine that, okay, 5,000

13:56:32  16  persons is a large population, or, you know, 2,000 is

13:56:35  17  large or 10 --

13:56:36  18            You know, I'm just trying to understand.

13:56:38  19  Because in your report you say the McGovern population

13:56:41  20  is relatively small, so I'm trying to kind of

13:56:44  21  contrast, well, what's a large population in your

13:56:46  22  view?

13:56:46  23       A.   Well it's relatively small because the

13:56:53  24  number of infections in the -- in -- in one of the

13:56:59  25  groups is like, what, three -- three or four depending

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

197

13:57:01  1  on which tabulation it is, so it's less than five.

13:57:05  2      Q.   So --

13:57:05  3      A.   So it's that value --

13:57:07  4           So I mean 5,000 seems like a large

13:57:11  5  population, but if you're looking at an effect that

13:57:15  6  occurs one-tenth of one percent of the time --

13:57:19  7      Q.   Uh-huh.

13:57:20  8      A.   -- or less than that, then the numbers of

13:57:24  9  infected start getting pretty small.

13:57:26  10      Q.   Got it.

13:57:27  11           So do you agree or disagree with this view

13:57:31  12  that you can apply Fisher's or chi-squared based on

13:57:37  13  one option, which are expected values, and another

13:57:40  14  option, which is size of population, just raw

13:57:43  15  population?

13:57:45  16      A.   Just raw population I don't think is as

13:57:48  17  critical as -- as values in -- in individual cells.

13:57:53  18  That's -- that's -- that's a much more important --

        19      Q.   So --

13:57:58  20      A.   -- factor than the total size.

13:57:59  21      Q.   Do you disagree with The Handbook of

13:58:03  22  Biostatistics which states that "I recommend you use

13:58:06  23  Fisher's exact test when the total sample size is less

13:58:09  24  than a thousand?"

13:58:17  25      A.   I have to read the whole entry in the --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

198

13:58:20    1            But that doesn't sound quite right.  I mean

13:58:27    2    I think there would --

13:58:28    3            You could have the total sample size be less

13:58:33    4    than a thousand and if it's -- you know, if the

13:58:37    5    balance among cells is such that the expected values

13:58:43    6    of the fields are reasonably large, chi-square would

13:58:46    7    do reasonably well.

13:58:58    8            (Exhibit 20 was marked for

13:59:00    9            identification.)

13:59:00   10    BY MR. SACCHET:

13:59:05   11        Q.   Turning to the last page of the document,

13:59:07   12    professor, the citation is "McDonald, J.H. 2014.

13:59:14   13    Handbook of Biological Statistics (3rd edition)."  Do

13:59:18   14    you see that?

13:59:26   15        A.   Where is this?

13:59:28   16        Q.   On the last -- on the last page in the most

13:59:32   17    full paragraph that's three lines long, the citation

13:59:40   18    says this document may be cited as "McDonald, J.H.

13:59:43   19    2014.  Handbook of Biological Statistics (3rd

13:59:46   20    edition)."

13:59:47   21        A.   Okay.

13:59:47   22        Q.   Do you see that?

13:59:48   23        A.   Yeah.

13:59:48   24        Q.   Okay.  And if you go to the first page of

13:59:51   25    the document --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

199

| 13:59:53 | 1 | A. Okay. |
| 13:59:55 | 2 | Q. -- there's a "Summary" section of when to |
| 13:59:57 | 3 | use a null hypothesis and how the test works; right? |
| 14:00:00 | 4 | A. Yes. |
| 14:00:00 | 5 | Q. And under the "When to use it," the very |
| 14:00:03 | 6 | last paragraph starts with "Fisher's exact test is |
| 14:00:06 | 7 | more accurate" blah, blah, blah; right? The very -- |
| 14:00:10 | 8 | the last paragraph of the -- |
| 14:00:13 | 9 | A. Yes. |
| 14:00:14 | 10 | Q. -- section there. |
| 14:00:15 | 11 | A. Yes. |
| 14:00:15 | 12 | Q. The second sentence says, "I recommend you |
| 14:00:17 | 13 | use Fisher's exact test when the total sample size is |
| 14:00:20 | 14 | less than 1000..." |
| 14:00:21 | 15 | A. Okay. |
| 14:00:23 | 16 | Q. So is it wrong to conclude that you don't |
| 14:00:26 | 17 | need to use Fisher's exact test when the sample size |
| 14:00:30 | 18 | is greater than a thousand? |
| 14:00:31 | 19 | MR. GORDON: Object to the form of the |
| 14:00:33 | 20 | question. |
| 14:00:35 | 21 | A. I'm sorry, could you repeat that? |
| 14:00:37 | 22 | Q. So this paragraph is comparing the use of |
| 14:00:39 | 23 | Fisher's exact test to chi-squared in the G test. |
| 14:00:42 | 24 | A. Yes. |
| 14:00:43 | 25 | Q. And this handbook states that you should use |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

200

14:00:45   1   Fisher's exact test when the sample size is less than

14:00:49   2   a thousand; correct?

14:00:50   3        A.   Yes.

14:00:50   4        Q.   Do you disagree with the implication of that

14:00:54   5   statement, which is you don't need to use Fisher's

14:00:58   6   exact test when the sample -- when the sample size is

14:01:00   7   greater than a thousand?

14:01:01   8        A.   I don't think it says that.

14:01:02   9        Q.   What would it mean when it says it

14:01:04  10   recommends to use it when it's less than a thousand?

14:01:06  11   That doesn't mean that it's not --

14:01:08  12        A.   It doesn't -- it doesn't say what to do when

14:01:11  13   it's greater than a thousand.

14:01:12  14        Q.   Okay.  But it's your view that you don't

14:01:14  15   apply chi-squared if it's greater than a thousand just

14:01:19  16   as a raw number?

14:01:19  17        A.   I don't think it's particularly --

14:01:20  18             It doesn't say whether or not -- or not.  I

14:01:24  19   mean if it's greater than a thousand, there are

14:01:27  20   circumstances where I think it's still better to use.

14:01:28  21        Q.   You've applied chi-squared in populations of

14:01:32  22   less than a thousand; haven't you?

14:01:33  23        A.   I probably have, yeah.

14:01:35  24        Q.   Is there a reason why in those articles you

14:01:37  25   did so but in this report you don't?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

201

14:01:40  1      A.   Well because the numbers were -- in the

14:01:43  2   cells were bigger.

14:01:44  3      Q.   Okay.  I just want to make sure that that's

14:01:48  4   true.  So --

14:01:51  5      A.   Well I don't if I --

14:01:53  6           I've published a lot of papers, I don't know

14:01:56  7   if I made a mistake in some, but that's generally what

14:01:59  8   I do.  If it's -- if it's a small number, I'll do the

14:02:02  9   exact.

14:02:50  10          (Exhibit 21 was marked for

14:02:51  11          identification.)

14:02:52  12  BY MR. SACCHET:

14:02:55  13     Q.   Did you author this study, professor?

14:02:58  14     A.   I am one of the authors on this study.

14:03:00  15     Q.   Okay.

14:03:02  16     A.   Fairly far down the list.  Okay.

14:03:06  17     Q.   The last paragraph in the right-hand column

14:03:09  18  on the first page says that "Of the initial 1,002

14:03:16  19  infants enrolled, 880 were included..."  Do you see

14:03:19  20  that?

14:03:19  21     A.   Yes.

14:03:20  22     Q.   If you turn to internal page 785, --

14:03:28  23     A.   Yes.

14:03:30  24     Q.   -- the last paragraph in the left-hand

14:03:34  25  column starts "A major strength..."  Do you see that?

202

14:03:39   1      A.   Yes.

14:03:39   2      Q.   "A major strength of our study is that we

14:03:42   3  collected extensive respiratory symptom data, material

14:03:45   4  asthma allergy histories, and housing characteristic

14:03:49   5  information on a large population at high risk for

14:03:52   6  developing asthma."  Do you see that?

14:03:53   7      A.   Yes.

14:03:54   8      Q.   Was that the large population of eight

14:03:58   9  hundred some infants that you analyzed in this study?

14:04:03  10      A.   Yeah.  I mean the reference there I -- I

14:04:06  11  think is towards the size of the study in comparison

14:04:11  12  to other studies of children's health and airborne

14:04:15  13  disease.

14:04:16  14      Q.   Well you conclude, aside from the Augustine

14:04:18  15  2017 study, that the McGovern study is the only

14:04:22  16  observational data at hand regarding the use of the

14:04:26  17  Bair Hugger or a conductive warming device in deep

14:04:29  18  joint infections; correct?

14:04:29  19      A.   Okay.  Yeah.

14:04:30  20      Q.   And that study had approximately 1400

14:04:33  21  patients; correct?

14:04:34  22      A.   Yes.

14:04:34  23      Q.   And in that study you're calling it

14:04:36  24  relatively small, but in this study you're calling a

14:04:38  25  population of 800 persons large.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

203

14:04:41  1      A.   Well we're -- we're talking about two

14:04:44  2  different things.  It's small because what's -- in the

14:04:54  3  Hot Dog group there are only three or four infections.

14:04:59  4      Q.   So the expected value -- the actual value.

14:05:03  5      A.   So if we're looking at -- if you're --

14:05:04  6           If you -- what you want to do is design a --

14:05:06  7  an experiment that really addresses the question of

14:05:09  8  whether it reduces the rate of infection, 1400 is --

14:05:16  9  it's arguable about whether that is large enough a

14:05:20  10  study to do that.

14:05:21  11      Q.   So it's unclear whether it's large or small.

14:05:23  12      A.   Well I don't recall -- I --

14:05:25  13           I never saw a power analysis of this study.

14:05:29  14  And if you could show me one, I'd be glad to -- glad

14:05:33  15  to review it.

14:05:34  16      Q.   So you never --

14:05:35  17      A.   But -- but the -- the study was not designed

14:05:38  18  in the -- in the typical way that you would design a

14:05:41  19  study if you were seeking NIH funding or something

14:05:44  20  like that where you would be required to generate the

14:05:48  21  sample size.

14:05:49  22      Q.   So you haven't --

14:05:50  23      A.   That's what would be required, and that

14:05:53  24  would determine, you know, the -- the -- that would

14:05:55  25  determine -- be more relevant, it seems to me, in

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

204

14:05:58   1   terms of the size of the study and whether or not it

14:06:01   2   was big enough to address the particular hypothesis

14:06:06   3   that was being -- that was being proposed in the -- in

14:06:10   4   the proposal.

14:06:11   5       Q.    So it's your view that it's a better metric

14:06:13   6   to use expected values than actual values, correct, to

14:06:17   7   determine whether you apply Fisher's instead of

14:06:19   8   chi-squared?

14:06:23   9       A.    The -- the -- the typical rule of thumb

14:06:28   10  depends on the expected.  In my own bias I've found

14:06:33   11  that sometimes the observed number can be relevant as

14:06:36   12  well.

14:06:37   13      Q.    So based on your own bias, you relied on the

14:06:41   14  actual values reported in the study itself as opposed

14:06:43   15  to the expected values that most statisticians rely on

14:06:46   16  to determine whether to apply Fisher or not.

14:06:50   17      A.    Yeah.  That's probably less commonly used on

14:06:54   18  the observed values, but I prefer to do that because I

14:06:55   19  think in this case, actually, the expected values

14:06:58   20  are -- are greater, I -- I believe, than -- than --

14:07:05   21  than the nominal five, if that's the rule you're

14:07:08   22  using.

14:07:08   23      Q.    The rule of thumb.

14:07:10   24      A.    Yeah.  If that's the rule you're using,

14:07:12   25  that --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

205

14:07:13   1          I haven't read this complete article.  That

14:07:15   2   doesn't seem to be what the person that wrote this

14:07:19   3   article for Biological Statistics is using.

14:07:25   4       Q.   You would agree, though, the general rule of

14:07:27   5   thumb with respect to implying -- employing Fisher's

14:07:31   6   exact test is whether the expected value is under

14:07:34   7   five; correct?

14:07:37   8       A.   Yeah.  I mean there -- there's a difference,

14:07:39   9   you understand, between recommending the choice, the

14:07:46   10   extra calculation that's involved with doing Fisher

14:07:49   11   exact as opposed to the easier calculation of doing

14:07:52   12   chi-square; they recommended doing it based on the

14:07:57   13   expected value being less than five.

14:07:58   14       Q.   Uh-huh.

14:07:59   15       A.   That's not to say that it's wrong to do the

14:08:04   16   Fisher's exact test otherwise.

14:08:06   17       Q.   If you did an expected value calculation

14:08:09   18   based on the populations reported in the McGovern

14:08:12   19   study, it very well could exceed five for each arm of

14:08:17   20   the study; correct?

14:08:17   21       A.   It could, yeah.

14:08:19   22       Q.   But you --

14:08:20   23       A.   We can do it.  I --

14:08:21   24       Q.   I can --

14:08:23   25          But you agree that that's possible.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

206

14:08:25    1        A.    Yes.

14:08:26    2        Q.    And you didn't do it.

14:08:27    3        A.    I think I did look at it.  I think it is a

14:08:29    4    little bit greater, the expected value.  But based

14:08:33    5    on -- as I say, I -- my --

14:08:36    6              What I have found very often, that the

14:08:39    7    difference can be larger than I like depending on the

14:08:45    8    observed number.

14:08:47    9        Q.    And --

14:08:49   10        A.    And in fact you see in my --

           11        Q.    Yeah.

14:08:50   12        A.    -- report there's a difference in

14:08:52   13    p-values --

14:08:53   14        Q.    And --

14:08:54   15        A.    -- and that's why I did the Fisher.  And I

14:08:57   16    find a difference.

14:08:58   17        Q.    Yeah.  You -- you use Fisher instead of

14:09:01   18    chi-squared; correct?

14:09:02   19        A.    That's right.

14:09:04   20        Q.    Even though the expected value is above

14:09:06   21    five.

14:09:06   22        A.    That's right.

14:09:07   23        Q.    Okay.

14:09:07   24        A.    As I said, I mean it's not a --

14:09:09   25              It's a rule of thumb.  It's not a --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

207

| | | |
|---|---|---|
| 14:09:12 | 1 | Q.    You didn't follow the rule of thumb. |
| 14:09:13 | 2 | A.    I didn't follow the rule of thumb.  I |
| 14:09:16 | 3 | followed my own rule of thumb. |
| 14:09:18 | 4 | Q.    And that's contrary to generally accepted |
| 14:09:20 | 5 | methods; correct? |
| 14:09:21 | 6 | A.    Well it's -- |
| 14:09:22 | 7 | Q.    It's a rule of thumb. |
| 14:09:23 | 8 | A.    It's a rule of thumb that's sometimes |
| 14:09:26 | 9 | applied.  I mean you apply -- |
| 14:09:28 | 10 | Who is this, McDonald -- |
| 14:09:30 | 11 | Q.    Yeah. |
| | 12 | A.    -- in Exhibit 20? |
| 14:09:30 | 13 | Q.    Handbook of Biostatistics. |
| 14:09:32 | 14 | A.    Yeah.  And McDonald is using a different |
| 14:09:37 | 15 | rule of thumb.  He's not -- |
| 14:09:39 | 16 | Q.    Oh -- |
| 14:09:39 | 17 | A.    At least in that first paragraph.  I haven't |
| 14:09:41 | 18 | read the whole thing. |
| 14:09:41 | 19 | Q.    He uses the same rule.  I'll give you the |
| 14:09:44 | 20 | other section of the handbook. |
| 14:09:46 | 21 | A.    Yeah.  Well it's all -- it's all right.  I |
| 14:09:49 | 22 | mean I know there's -- there's a slight difference in |
| 14:09:53 | 23 | how the rule of thumb is sometimes -- sometimes |
| 14:09:56 | 24 | applied, but it's a rule of thumb that applies to the |
| 14:09:59 | 25 | approximation.  What does the approximation -- when |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

208

14:10:02  1  did the approximation break down, and it particularly

14:10:06  2  breaks down if the expectation is small.  My

14:10:09  3  contention is is that it breaks down also to some

14:10:12  4  extent when the observed values are small even though

14:10:15  5  the expected values may be large.

14:10:18  6          MR. SACCHET:  We're going to mark another

14:10:19  7  exhibit here.

14:10:33  8          (Exhibit 22 was marked for

14:10:34  9          identification.)

14:10:34  10  A.    The discreteness, for example, that we were

14:10:37  11  just talking about would also come into play to some

14:10:40  12  extent on chi-square, because I mean whenever you're

14:10:44  13  dealing with integers, the -- the chi-square

14:10:49  14  statistics that you -- that you get at the end is only

14:10:52  15  going to take discrete values, it's not going to take

14:10:56  16  a complete -- a continuum of values.  So the

14:11:00  17  particular criticism that -- that comes into play with

14:11:05  18  Fisher's also, I would say, comes into effect to some

14:11:09  19  extent on chi-square.

14:11:11  20  Q.    This --

14:11:12  21          If you turn to the last page of this

14:11:14  22  document, professor, is also part of McDonald's 2014

14:11:20  23  Handbook on Biological Statistics; correct?

14:11:23  24  A.    Apparently.

14:11:23  25  Q.    Last page of the document.  Do you see that

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

209

14:11:26  1  citation in the third kind of --

14:11:29  2      A.   Yeah, appears to be.

14:11:30  3      Q.   Yeah.  And if you turn to page four of the

14:11:33  4  document under "Similar tests" --

14:11:37  5           Do you see that heading?

14:11:38  6      A.   Yes.

14:11:38  7      Q.   In the third paragraph, the very first line

14:11:41  8  says, "The usual rule of thumb is that you should use

14:11:44  9  the exact test when the smallest expected value is

14:11:48  10  less than 5...;" correct?

14:11:48  11      A.   Where did you see this?

14:12:03  12      Q.   Are -- are you on page four?  On the very

14:12:05  13  top of the document there's pages X through seven.

14:12:08  14  Are you on page four?

14:12:10  15      A.   Yeah.  Which paragraph were you on?

14:12:15  16      Q.   Was I looking at the wrong document?

14:12:18  17           There's a heading called "Similar tests."

14:12:19  18      A.   That's right.

14:12:20  19      Q.   Okay.  And then in the -- I guess it's the

14:12:23  20  fourth paragraph because the first line just a sole

14:12:26  21  line, the paragraph begins, "The usual rule of

14:12:29  22  thumb" --

14:12:30  23      A.   Oh, okay.

14:12:31  24      Q.   -- "is that you should use the exact test

14:12:32  25  when the smallest expected value is less than 5..."

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

210

14:12:35   1      A.    That's right.  Yeah, I -- I thought you were

14:12:37   2   referring to the third paragraph.

14:12:39   3            Okay.  Yes.

14:12:40   4      Q.    So that that corroborates the fact that in

14:12:44   5   this handbook the rule of thumb is that the expected

14:12:45   6   value should be less than five to apply Fisher's.

14:12:48   7      A.    Yeah, which is what I -- which is what I

14:12:50   8   said, you know, --

14:12:51   9      Q.    Okay.

14:12:52  10      A.    -- a few minutes ago.

14:12:56  11      Q.    Okay.  As to the p-value that you calculated

14:13:04  12   using Fisher's instead of chi-squared, on the data

14:13:12  13   derived from Albrecht 10 and McGovern 16 the p-value,

14:13:18  14   as we stated, is 0.0507; correct?

14:13:22  15      A.    That's the value I got, yes.

14:13:25  16      Q.    And the difference between that p-value and

14:13:28  17   the p-value when you use chi-squared on the reanalyzed

14:13:32  18   data of 0.048 is a matter of a thousandth of a decimal

14:13:38  19   place; correct?

14:13:40  20      A.    Well it's point -- it's twen --

14:13:52  21            It's a difference of .2 -- 027; right?

14:13:59  22      Q.    I've got a difference of .0009.

14:14:06  23      A.    I thought we were comparing --

14:14:09  24      Q.    Let's see.  The difference between .0507 --

14:14:14  25      A.    And .048.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

211

14:14:20  1    Q.   .048.  Yeah.

2    A.   Well that's a difference --

14:14:22  3    Q.   I don't think mine's right.

14:14:22  4    A.   -- of .0027.

14:14:27  5    Q.   0027.

14:14:28  6    A.   Yeah.

14:14:29  7    Q.   And that is, in percentage value, .27

14:14:32  8  percent; correct?

14:14:33  9    A.   Correct.

14:14:34  10    Q.   And as a raw figure it's -- forgive my

14:14:40  11  mathematical ignorance -- two-thousandths of a decimal

14:14:45  12  point?

14:14:49  13    A.   Two --

14:14:51  14         Well it rounds up to, I think, three.  But

14:14:54  15  anyway, yeah.

14:14:55  16    Q.   Okay.  Three-thousandths of a decimal point?

14:14:59  17    A.   Right.

14:15:00  18    Q.   And that's the basis by which you say that

14:15:03  19  the McGovern data goes from non-significance to

14:15:07  20  significance -- or significance to non-significance;

14:15:10  21  correct?

14:15:10  22    A.   No.  I mean the definition of -- of

14:15:14  23  significance, is it above or below the line?

14:15:17  24    Q.   That's the conven --

14:15:18  25    A.   Critically thinking, that's the -- that's

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

212

14:15:22   1   the definition of it.

14:15:23   2       Q.   It's a conventional line; correct?

14:15:25   3       A.   It's the line that's often used.   It's

14:15:28   4   obviously arbitrary, but it's the one that is very

14:15:30   5   often used.

14:15:31   6       Q.   You agree that it's arbitrary.

14:15:34   7       A.   Oh, yeah.

14:15:34   8       Q.   And do you agree with The American

14:15:36   9   Statistical Association's recent statement that the

14:15:40  10   confidence levels of five percent and 10 percent are,

14:15:43  11   quote, "at best useful conventions?"

14:15:47  12          MR. GORDON:   Object to the form of the

14:15:49  13   question.

14:15:52  14       A.   I mean they're -- they're conventions that

14:15:55  15   are often used, yeah.

14:15:56  16       Q.   Do you agree with the statement that they

14:15:58  17   are at best useful conventions?

14:16:00  18          MR. GORDON:   Same objection.

14:16:03  19       A.   That sounds -- I --

14:16:05  20          I think I would agree with that.

14:16:07  21       Q.   Are you aware that certain peer-reviewed

14:16:11  22   journals have recently decided to ban the use of

14:16:13  23   p-values?

14:16:14  24          MR. GORDON:   Object to the form of the

14:16:15  25   question, lack of foundation.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

213

14:16:18  1      A.   I'm aware that some journals some time

14:16:22  2  ago -- I'm not sure, I thought they had retracted on

14:16:25  3  that somewhat more recently, but there was a -- there

14:16:30  4  was a period of time where they went through -- some

14:16:35  5  journals went through that -- the thing about --

14:16:37  6  about -- about the p-values.

14:16:44  7      Q.   Do you know Ron Wasserstein, who I think is

14:16:47  8  the president of the ASA?

14:16:49  9      A.   I don't know him, --

14:16:50  10     Q.   Okay.

14:16:51  11     A.   -- no.

14:16:51  12     Q.   Would you agree with his statement that the

14:16:58  13  p-value is not intended to be a substitute for

14:17:01  14  scientific reasoning?

14:17:02  15          MR. GORDON:   Object to the form of the

14:17:04  16  question and lack of foundation.

14:17:09  17     A.   You know, I'm -- I'm not sure what the whole

14:17:11  18  statement was that he is -- that he is talking about.

14:17:14  19  I mean certainly on the surface that --

14:17:18  20          It's not -- it's not the sole basis for

14:17:21  21  scientific reasoning, is that what you're saying?   I

14:17:23  22  mean --

14:17:24  23     Q.   His quote is the p-value is never intended

14:17:27  24  to be a substitute for scientific reasoning, end

14:17:30  25  quote.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

214

| | | |
|---|---|---|
| 14:17:30 | 1 | A.  Okay. |
| 14:17:31 | 2 | Q.  Do you agree with that statement? |
| 14:17:32 | 3 | A.  Yeah, uh-huh. |
| 14:17:33 | 4 | Q.  And do you also agree with the statement |
| 14:17:35 | 5 | that p-values -- a p-value of less than .05 is not a |
| 14:17:43 | 6 | line that separates real results from false ones? |
| 14:17:48 | 7 | A.  Well certainly, yeah. |
| 14:17:50 | 8 | Q.  Okay.  So if those -- |
| 14:17:54 | 9 | Well I'll ask you one more question.  Do you |
| 14:17:57 | 10 | agree that practices that reduce data analysis or |
| 14:18:01 | 11 | scientific inference to mechanical bright-line rules, |
| 14:18:05 | 12 | such as the p-value of being less than .05 for |
| 14:18:09 | 13 | justifying scientific claims or conclusions, can lead |
| 14:18:12 | 14 | to erroneous beliefs and poor decision-making? |
| 14:18:16 | 15 | A.  Yes. |
| 14:18:18 | 16 | Q.  One of your conclusions in this report is |
| 14:18:21 | 17 | that the McGovern data is invalid because the p-value |
| 14:18:23 | 18 | is .0507; correct? |
| 14:18:26 | 19 | A.  Well I think that's a -- |
| 14:18:29 | 20 | You're mixing -- you're mixing different -- |
| 14:18:33 | 21 | different issues here.  McGovern, as I understand the |
| 14:18:39 | 22 | way it's being used here, is to -- is not as a -- it's |
| 14:18:53 | 23 | used to try to say that there is strong scientific |
| 14:18:57 | 24 | evidence that infection rates for Bair Hugger are |
| 14:19:02 | 25 | higher than the Hot Dog warmer. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

215

14:19:07  1       Q.  My question is just about this p-value which

14:19:10  2   you use on page six of your report where you say, "The

14:19:14  3   reasons why McGovern et al conclusions are not valid

14:19:17  4   is because the p-value is close but not statistically

14:19:20  5   significant."  That's one of your conclusions; is that

14:19:23  6   not correct?

14:19:24  7       A.  Well the -- my con -- yes, my --

14:19:26  8           Well, what I'm saying is the evidence is not

14:19:28  9   strong.  Whether you say the p-value is .0507 --

14:19:33  10      Q.  Okay.

14:19:34  11      A.  -- or .048, those are not wildly small

14:19:39  12  p-values to say that there is extremely strong

14:19:44  13  evidence here of an association.

14:19:45  14      Q.  But you would agree that the fact that it's

14:19:47  15  just over statistical significance does not mean that

14:19:51  16  the results are invalid.

14:19:52  17      A.  The conclusions --

14:19:53  18          My conclusions are not terribly different

14:19:56  19  from either one of those p-values.

14:19:58  20      Q.  Okay.  So whether --

          21      A.  They're -- they're --

14:19:59  22      Q.  -- it's marginally significant or just over

14:20:02  23  statistical significance does not matter.

14:20:03  24      A.  They're -- they're all -- both on the

14:20:06  25  border.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

216

14:20:06  1      Q.   Okay.

14:20:07  2      A.   I mean what I'm doing, if -- and what I --

14:20:10  3           Part of what I'm commenting here and part of

14:20:13  4  what I would disagree with is a comparison with what

14:20:18  5  Samet is saying.

14:20:19  6      Q.   Okay.  We'll get to that.

14:20:20  7      A.   Samet is saying that the evidence is very

14:20:23  8  strong.

14:20:23  9      Q.   Okay.

14:20:23  10     A.   Okay?  And what I'm saying is that it's not

14:20:26  11  that strong, it's right on the cusp.

14:20:28  12     Q.   Are you aware that under the law, the

14:20:31  13  Supreme Court of the United States of America has

14:20:33  14  stated that statistically significant p-values are not

14:20:37  15  necessary to determine causation?

14:20:40  16          MR. GORDON:  Object to the form of the

14:20:42  17  question and lack of foundation.

14:20:44  18     A.   I -- I'm not familiar with -- with what the

14:20:47  19  Supreme Court said or exactly what they were dealing

14:20:50  20  with.

14:20:50  21     Q.   So your report does not account for the

14:20:53  22  legal standard that applies to determinations of

14:20:56  23  causation as a matter of law.

14:20:57  24          MR. GORDON:  Object to the form of the

14:20:58  25  question, lack of foundation.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

217

14:21:00  1        A.   Is that --

14:21:00  2             Is the Supreme Court talking about a matter

14:21:02  3   of -- matter of law, or you were -- you were stating

14:21:05  4   it as -- as scientific -- as a scientific -- statement

14:21:14  5   of scientific fact?

14:21:15  6        Q.   Quote, "A lack of statistically significant

14:21:18  7   data does not mean that a medical expert has no

14:21:20  8   reliable basis for inferring a causal link between a

14:21:23  9   product and an adverse event," end quote.

14:21:27  10       A.   The lack of -- I -- I --

14:21:30  11            I don't know.

14:21:30  12            MR. GORDON:  I'll object to the form of the

14:21:31  13   question.

14:21:31  14       A.   Yeah.  I don't really understand what --

14:21:34  15   what they're -- what they're getting at.  I would have

14:21:37  16   to --

14:21:37  17       Q.   Would it help to see the statement?

14:21:39  18       A.   I'd have to review the statement.  I mean

14:21:41  19   how --

14:21:43  20            What is it, a whole report?

14:21:45  21       Q.   It's a case, and we don't have time for you

14:21:48  22   to read the whole case, but --

14:21:50  23       A.   I mean that's --

14:21:51  24            I'd have to figure out what the case is

14:21:53  25   talking about.  It -- it's --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

218

14:21:55  1          I'm not a lawyer, obviously, and so I'm --

14:21:59  2     I'm not sure what distinctions that they're -- that

14:22:03  3     they're making.  Their language is sometimes a little

14:22:05  4     different.

14:22:06  5          MR. SACCHET:  Okay.  Let's take a break.

14:22:08  6          THE REPORTER:  Off the record, please.

14:31:05  7          (Recess taken.)

14:31:05  8     BY MR. SACCHET:

14:31:08  9     Q.    Professor Holford, in your report you also

14:31:11  10    note that applying Fisher's exact test on the data

14:31:15  11    derived from Albrecht Exhibit 10 and McGovern Exhibit

14:31:18  12    16 yields a confidence interval of .97 to 10.82;

14:31:24  13    correct?

14:31:24  14    A.    Yes.

14:31:25  15    Q.    And essentially that .97 is just .03 away

14:31:33  16    from the null value of one; correct?

14:31:35  17    A.    That's right.

14:31:35  18    Q.    So it's subject to this same debate about

14:31:38  19    just over/just under.

14:31:41  20    A.    It's just -- it's just under the critical

14:31:42  21    value.

          22    Q.    Yes.

14:31:43  23    A.    I mean it corresponds --

14:31:44  24          It's a little less because the p-value is a

14:31:48  25    little high.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

219

14:31:48    1        Q.    And you conclude that one of the issues with

14:31:52    2    that confidence interval is it's essentially 10 points

14:31:54    3    and therefore there's -- there could be unreliability

14:31:58    4    to the data; correct?

14:32:00    5        A.    Well the estimate of the -- of the odds

14:32:04    6    ratio is -- is not precise at all.  I mean it's a

14:32:08    7    ten-fold difference, ten-fold range.

14:32:11    8        Q.    So I was confused because when I read your

14:32:13    9    report and I saw your real analysis of the Jensen

14:32:16   10    data --

14:32:16   11              Which you did applying Albrecht Exhibit 10;

14:32:19   12    correct?

14:32:19   13        A.    Yes.

14:32:20   14        Q.    -- the confidence interval of your

14:32:22   15    calculation is 25 points wide.

14:32:27   16        A.    I forget what the range was.  It was pretty

14:32:30   17    wide.

14:32:34   18              Where was it?

14:32:34   19        Q.    It's on page five.

14:32:35   20        A.    Page five.  So you're referring to the 1.37

14:32:44   21    to 25.49.

14:32:45   22        Q.    Yeah.

14:32:46   23        A.    Yeah.  Yeah.  It's not a very good estimate.

14:32:48   24        Q.    It's double the size of the confidence

14:32:51   25    interval that you critique with respect to the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

220

14:32:54    1    McGovern study; correct?

14:32:54    2        A.    That's right.  It's statistically

14:32:56    3    significant, but the -- but the -- but it's not a good

14:33:00    4    estimate of what the risk is.

14:33:02    5        Q.    So it has double the variance as the

14:33:05    6    confidence interval in the McGovern study.

14:33:07    7        A.    Well it's -- it seems to be double the --

14:33:11    8    the range, the -- the -- the length of the -- of the

14:33:14    9    confidence interval.

14:33:16   10        Q.    But you rely on this calculation with

14:33:18   11    respect to arguing whether or not the

14:33:22   12    thromboprophylaxis that was used in the McGovern study

14:33:24   13    is in fact a confounding factor; correct?

14:33:27   14        A.    Well I'm --

14:33:30   15              I was looking at the p-value.  The p-value

14:33:33   16    that I get associated with that is .006 --

14:33:36   17        Q.    Uh-huh.

14:33:37   18        A.    -- 4, so it's quite a small p-value.  The

14:33:42   19    estimate of what that effect is is quite imprecise

14:33:46   20    because of -- you know, because of the range that we

14:33:49   21    were just talking about.

14:33:50   22        Q.    It's more imprecise than the McGovern

14:33:54   23    study's confidence interval that you critique.

14:33:57   24        A.    Well it's more imprecise in --

14:34:00   25              In general what happens with the -- with

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

221

14:34:04  1   the -- with the confidence interval is it kind of

14:34:10  2   depends on the logarithm, so it's more on the log

14:34:14  3   scale, so that's part of what happens.  I mean this

14:34:17  4   odds ratio is 4.77, so it's quite a bit bigger than

14:34:21  5   the odds ratios we were finding associated with Bair

14:34:25  6   Hugger use.  So that's -- that's of course just a

14:34:29  7   point estimate, and so we're talking about a higher

14:34:31  8   range, so the range is going to be -- going to tend to

14:34:36  9   be somewhat wider because -- because we're up there.

14:34:39  10  And of course the -- the total sample size, total

14:34:44  11  number of individuals involved is -- is quite a bit

14:34:48  12  smaller than -- than -- because it -- it's just

14:34:53  13  based --

14:34:54  14          It comes out to be a subset of the -- of the

14:34:59  15  Bair Hugger study because it's only the Bair Hugger

14:35:02  16  period, so it's reduced in that way, and then the

14:35:06  17  other thing is that it's not the entire period, it's

14:35:09  18  just part of it, so we -- you're splitting that data

14:35:12  19  set up.  And so your total sample size has gone down,

14:35:15  20  and that increases the -- that decreases the sample

14:35:19  21  size and in general makes the estimates less precise.

14:35:24  22      Q.   But there's no doubt that the confidence

14:35:26  23  interval in this Jensen reanalysis, which is in your

14:35:29  24  report on page five, is double the width of the

14:35:32  25  McGovern confidence interval; correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

222

14:35:33  1      A.   That seems to be what it is, yes.

14:35:36  2      Q.   That is what it is.

14:35:37  3      A.   Okay.  Yeah.

14:35:42  4      Q.   Your report also states that when applying

14:35:46  5  Albrecht Exhibit 10 and McGovern Exhibit 16, that the

14:35:49  6  p-value -- or that the odds ratio is 2.76 when using

14:35:53  7  Fisher's exact; correct?

14:35:57  8      A.   Well that -- that -- yeah.  And that --

14:35:59  9  that's not --

14:36:00  10          The -- the test, the Fisher's exact, has to

14:36:03  11  do with the p-value, not the -- not the estimate of

14:36:05  12  what the odds ratio is.

14:36:06  13     Q.   So on page two of your report when you say

14:36:10  14  the odds ratio for this comparison is 2.76, where did

14:36:16  15  you get that from?

14:36:16  16     A.   That's just a cross-product ratio for that

14:36:19  17  table.

14:36:20  18     Q.   And is that -- okay.

14:36:22  19          So the 2.76 derives from Albrecht Exhibit 10

14:36:26  20  and McGovern Exhibit 16.

14:36:28  21     A.   That's right.  It's a tabulation of those

14:36:30  22  data.  I mean it's --

14:36:32  23          Yeah.

14:36:32  24     Q.   And it's only accurate insofar as those

14:36:35  25  exhibits are accurate; correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

223

14:36:37  1      A.   Well the accuracy depends on -- on the -- on

14:36:44  2  the --

14:36:44  3      Q.   Cross product.

14:36:47  4      A.   Well the point estimate is the cross

14:36:50  5  product.  The -- the confidence interval depends on

14:36:54  6  this Fisher-like distribution.  It's not --

14:36:59  7           It's an exact kind of calculation that --

14:37:03  8  that -- that's involved, but it's kind of a lengthy

14:37:07  9  calculation that roughly depends on the standard

14:37:10  10  error.

14:37:11  11      Q.   So I might need to back up because I don't

14:37:14  12  know if I'm fully understanding what you're saying.

14:37:16  13  But the odds ratio reported in the McGovern study was

14:37:20  14  3.8; correct?

14:37:21  15      A.   Yes.

14:37:21  16      Q.   And then in your report on page two you say

14:37:24  17  the odds ratio for this comparison is 2.76, and

14:37:28  18  what --

14:37:28  19      A.   That's in the tabulation I used, yes.

14:37:31  20      Q.   -- what data are you using to derive that

14:37:33  21  odds ratio?

14:37:35  22      A.   The --

14:37:36  23           MR. GORDON:  Arithmetically, or the

14:37:39  24  underlying data?

14:37:40  25           MR. SACCHET:  Arithmetically.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

224

14:37:42   1        A.    Well it's the -- it's the -- two point --

14:37:47   2              Where is that?  Oh, here we are.  Okay.

14:37:52   3    Yeah.  That's based on this -- this table that is the

14:37:59   4    four out of 372 and 31 out of 1065.

14:38:03   5        Q.    And where did you get that data?

14:38:06   6        A.    That's from -- from --

14:38:07   7              Was it Albrecht 10?

14:38:09   8        Q.    Okay.  You would agree that that odds ratio

14:38:13   9    is still above 2.0; correct?

14:38:16   10       A.    Yes.

14:38:17   11       Q.    Would you agree that an odds ratio of 2.0 is

14:38:26   12   often referred to as a doubling of the risk?

14:38:27   13       A.    It -- it is, yeah.

14:38:28   14       Q.    And -- and that means you're 50 percent more

14:38:32   15   likely to experience the outcome after exposure to the

14:38:39   16   variable than the count as actual?

14:38:42   17             MR. GORDON:  Object to the form of the

14:38:43   18   question.

14:38:50   19       A.    Well if -- what it would imply, if -- if --

14:38:55   20   if the odds ratio was -- if the --

14:39:00   21             The odds ratio is actually a ratio of odds.

14:39:05   22   The statement that you made as -- is re -- is

14:39:08   23   related -- you state it as a ratio of -- of risks,

14:39:14   24   which would typically mean a ratio of the -- of the

14:39:20   25   incidence rates.

225

14:39:23   1        Q.    Okay.

14:39:24   2        A.    So when the incidence rates are small, those

14:39:28   3   two are very similar, okay, and so they're roughly

14:39:34   4   used in that way.  So an odds ratio of two, it's --

14:39:40   5   strictly speaking it's twice the odds of getting an

14:39:43   6   infection, although it's going to be very close as --

14:39:49   7   to -- to twice the incidence.

14:39:51   8        Q.    Okay.

14:39:52   9        A.    So if -- well if -- if you're saying that

14:40:02  10   the -- the Hot Dog is the norm and the odds ratio is

14:40:06  11   two, that would say that the Bair Hugger has twice the

14:40:10  12   risk.

14:40:10  13        Q.    Okay.

14:40:11  14        A.    That's how -- how you would roughly

14:40:13  15   interpret that statement.

14:40:14  16        Q.    Okay.

14:40:15  17        A.    Depending on whether or not -- whether that

14:40:17  18   statement is correct we might disagree on, but --

14:40:20  19        Q.    So if the incidence of disease in an exposed

14:40:24  20   group is more than twice the incidence in the

14:40:28  21   unexposed group, the probability that exposure to the

14:40:29  22   agent caused a similarly situated individual is also

14:40:33  23   greater than 50 percent; correct?

14:40:38  24        A.    If -- if that estimate is -- is accurate,

14:40:47  25   that's roughly what it would -- what it would be --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

226

14:40:50   1   what it -- what it would mean.

14:40:51   2        Q.   Thank you.

14:40:52   3        Okay.   I'd like to talk a little bit about

14:41:02   4   the other section of your report which deals with the

14:41:06   5   time trend infection rates at Wansbeck, and I guess

14:41:12   6   really the -- the big header is "Infection rate

14:41:14   7   comparison among hospitals" starting on page three, at

14:41:17   8   the bottom of page three, and then continuing into

14:41:20   9   four and five.

14:41:25   10       So to be clear, in your report you note that

14:41:32   11   there is a .6 percent infection rate among NHS trust

14:41:38   12   in 2010 to 2015; correct?

14:41:42   13       A.   Yes.

14:41:47   14       Q.   And when you cite a 2.9 percent infection

14:41:55   15   rate at the top of page four, that is based also on

14:42:05   16   the Albrecht Exhibit 10 and McGovern Exhibit 16 data;

14:42:09   17   correct?

14:42:09   18       A.   That's right.

14:42:11   19       Q.   And to be clear, that infection rate as it

14:42:15   20   relates to Bair Hugger patients was during the 2008

14:42:19   21   and 2009 time period; correct?

14:42:22   22       A.   That's correct.

14:42:25   23       Q.   So you are comparing an infection rate of

14:42:29   24   Bair Hugger patients in 2008 and 2009 to an infection

14:42:32   25   rate from 2010 to 2015.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

227

14:42:35  1      A.    That's right.

14:42:36  2      Q.    They are two different time periods;

14:42:40  3  correct?

14:42:40  4      A.    That's correct.

14:42:41  5      Q.    That's an apples-to-orange comparison; isn't

14:42:47  6  it?

14:42:47  7            MR. GORDON:  Object to the form of the

14:42:48  8  question.

14:42:51  9      Q.    Let me put it this way:  It's not externally

14:42:54  10  generalizable.

14:42:56  11     A.    It's not --

14:42:58  12           What do you mean?

14:42:59  13     Q.    It's not externally valid.  I mean if -- if

14:43:02  14  you're looking at a date range of 2010 to 2015, you

14:43:06  15  don't know for sure whether that --

          16     A.    Yeah.

14:43:07  17     Q.    -- infection rate should apply to prior

14:43:09  18  years; do you?

14:43:09  19     A.    Well if -- if things are reasonably --

14:43:12  20           I mean the -- the assumption there is that

14:43:15  21  there's not a huge temporal trend going on in

14:43:18  22  infection rates in the U.K., and so my -- my

14:43:24  23  assumption is -- I -- I didn't have --

14:43:27  24           Ideally, I would have had the data for the

14:43:30  25  same years.  I didn't.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

228

14:43:31    1       Q.    Okay.

14:43:32    2       A.    And so I used the best data that I could get

14:43:36    3   ahold of to -- to see what the experience was at other

14:43:41    4   hospitals using Bair Hugger at this time to get a

14:43:46    5   comparison of how Wansbeck fit -- fit in with the --

14:43:52    6   with the experience at other hospitals.

14:43:54    7       Q.    Did you try to get data from 2008 to 2009?

14:43:58    8       A.    I didn't have -- I didn't have a -- didn't

14:44:01    9   come across a good way of doing that.

14:44:02   10       Q.    Okay.  But you recognize that it's two

14:44:05   11   different time periods.

14:44:06   12       A.    Yes, I do.  Uh-huh.

14:44:08   13       Q.    Are you aware of infection rates in the

14:44:13   14   United States as opposed to infection rates reported

14:44:15   15   by the NHS in the U.K.?

14:44:18   16       A.    No.  I don't know what the rates are in the

14:44:21   17   U.S.

14:44:21   18       Q.    So you do not know whether the rates of

14:44:25   19   infection as reported in the McGovern study are

14:44:28   20   comparable to rates in the United States.

14:44:30   21       A.    I don't have a direct es -- estimate of

14:44:33   22   rates in the United States.  My assumption is that

14:44:36   23   they're not too different, but --

14:44:37   24       Q.    But --

14:44:38   25       A.    -- I don't know.  I don't have the data.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

229

14:44:40  1    Q.   -- with respect to your analysis as to

14:44:41  2  whether the time trend data of infections as reported

14:44:43  3  in McGovern is out of control, as you say, that is

14:44:47  4  only as compared to hospitals in the U.K. from 2010 to

14:44:53  5  2015.

14:44:56  6    A.   In terms of the magnitude of the effect,

14:44:58  7  that's -- that was one of the pieces of evidence that

14:45:00  8  I was -- that I was looking at.

14:45:02  9    Q.   But it's only specific to hospitals in the

14:45:04  10  U.K.

14:45:05  11    A.   That's right.  I was using data in the U.K.

14:45:07  12    Q.   Okay.

14:45:28  13       (Exhibit 23 was marked for

14:45:29  14       identification.)

14:45:29  15  BY MR. SACCHET:

14:45:35  16    Q.   Professor Holford, is this a graph bearing

14:45:37  17  the title "Joint infection rate in BH unit sales by

14:45:43  18  year?"

14:45:45  19    A.   Yes.

14:45:46  20    Q.   Okay.  And do you know what ICD codes are?

14:45:56  21    A.   Yes.  Those are disease codes for -- for

14:46:01  22  different diseases, yes, that are standardized.

14:46:07  23    Q.   They relate to disease in the United States.

14:46:11  24    A.   Are they only -- I don't -- I'm not sure

14:46:13  25  what -- what they use --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

230

14:46:15   1          I don't know what they use in the U.K.  This

14:46:17   2   is U.S. data, is it?

14:46:18   3      Q.   I'll represent to you that it is.

14:46:20   4      A.   Okay.

14:46:21   5      Q.   And there are three colored lines; correct?

14:46:23   6      A.   That's correct.

14:46:24   7      Q.   And to be clear, the title is "Joint

14:46:27   8   infection rate...;" correct?

14:46:28   9      A.   "Joint" --

14:46:30   10          Yes.

14:46:31   11     Q.   Of the graph.

14:46:32   12     A.   "Joint infection rate..."

14:46:33   13     Q.   Not like surgical-site infection or other

14:46:35   14   type of infection, this is specific to joint

14:46:37   15   infection; correct?

14:46:39   16     A.   That's right.

14:46:39   17     Q.   Okay.  And the two orange-colored lines

14:46:44   18   relate to infection rates; correct?

14:46:47   19          MR. GORDON:  Objection, lack of foundation.

14:46:49   20     A.   I don't know.  I --

14:46:49   21     Q.   Do you see the legend?

14:46:51   22     A.   Oh, I see.

14:46:52   23     Q.   Do you see the legend at the bottom?

14:46:55   24     A.   Yeah.  Okay.

14:46:56   25     Q.   And then the Y axis on the right side of the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

231

14:46:59  1  graph is titled "Joint Infection Rates" and then it

14:47:03  2  lists an ICD code; correct?

14:47:06  3      A.   Right.

14:47:06  4      Q.   Or codes.  Correct?

14:47:07  5      A.   Right.

14:47:08  6      Q.   And those percentages range from zero to

14:47:10  7  six, at least as depicted on the graph, correct, on

14:47:13  8  the Y axis on the right-hand side?

14:47:16  9      A.   That's right.

14:47:16  10     Q.   Okay.  And whichever --

14:47:19  11          Well let's look at 2008, and that's when the

14:47:23  12  Bair Hugger study period started; correct?

14:47:28  13     A.   2008.  Okay.

14:47:31  14     Q.   And the lower orange line, the dot there is

14:47:36  15  approximately four percent; correct?

14:47:41  16     A.   Four percent.

14:47:44  17          MR. GORDON:  Again, lack of foundation.

14:47:45  18     A.   Seems to be.

14:47:46  19     Q.   And the dot above that is between four and

14:47:50  20  five.

14:47:55  21     A.   Somewhere --

14:47:57  22          Something, yeah.

14:47:57  23     Q.   Okay.

14:47:57  24     A.   What are the two lines?  I don't

14:47:59  25  understand, --

232

14:47:59  1       Q.   So there's an infection rate --

14:48:03  2       A.   -- it's hard to read.

14:48:05  3       Q.   And I'm not going to focus on which line,

14:48:08  4   you know, we need to focus on, I just want to

14:48:11  5   establish that both lines depict infection rates --

14:48:15  6       A.   Okay.

14:48:16  7       Q.   -- equal to or greater than four but less

14:48:19  8   than five in 2008; correct?

14:48:20  9       A.   Yeah.

14:48:21  10      Q.   Okay.  And then in 2010 the dots appear to

14:48:26  11  be the same, somewhere between four and five; correct?

14:48:29  12      A.   Right.

14:48:31  13      Q.   And in fact in 2011 they went up to

14:48:33  14  approximately 4.5 and five; correct?

14:48:37  15      A.   Appears to, yeah.

14:48:38  16      Q.   Yeah.  So if we can find the graph to the

14:48:43  17  Bair Hugger study period, which is 2008 to 2010, based

14:48:47  18  on this graph the infection rate is four percent or

14:48:51  19  perhaps 4.5 percent; correct?

14:48:55  20      A.   Infection --

14:48:55  21           MR. GORDON:  Objection, lack of foundation.

14:49:02  22      A.   So I -- I mean what -- what do these -- what

14:49:08  23  do the ICD codes --

14:49:11  24      Q.   ICD codes --

14:49:12  25           I can't testify, but ICD codes, as you

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

233

14:49:15    1    stated earlier, --

14:49:16    2         A.    Yeah.

14:49:17    3         Q.    -- relate to particular outcomes of disease.

14:49:19    4         A.    No.  But what is ICD-9 -- 996.66?

14:49:28    5         Q.    I don't know the answer to that question,

14:49:30    6    but I can tell you that 3M's corporate representative,

14:49:33    7    Mr. Van Duren, testified that this graph depicts the

14:49:41    8    rate of Bair Hugger segment penetration with the rate

14:49:44    9    of joint infections.

14:49:51   10         A.    Okay.  So these are some sort of --

14:50:00   11               I'm having a hard time understanding what

14:50:02   12    you're trying to show here --

           13         Q.    I'm -- I'm --

14:50:04   14         A.    -- because, I mean, we've got two

14:50:05   15    different -- two different lines of the infection

14:50:07   16    rates --

14:50:07   17         Q.    So my question is --

14:50:08   18         A.    -- and when -- when I --

14:50:10   19               I don't know what these two different lines

14:50:12   20    are.

14:50:12   21         Q.    Okay.  My question is simple.

14:50:13   22         A.    Okay.

14:50:14   23         Q.    Whichever line you choose, the infection

14:50:17   24    rate, according to this graph, in 2008 and 2010 was

14:50:20   25    4.0 or 4.5; --

234

14:50:23  1      A.   Okay.

14:50:24  2      Q.   -- is that correct?

14:50:25  3           MR. GORDON:  Objection, lack of foundation,

14:50:26  4  assumes facts not in evidence, incomplete

14:50:30  5  hypothetical.

14:50:30  6      Q.   According to this graph.

14:50:32  7      A.   Those numbers that are shown, I don't -- and

14:50:35  8  as I say, I don't know what they are, you haven't told

14:50:37  9  me what they are, there's not a legend here that

14:50:39  10  exactly indicates what they are --

14:50:41  11     Q.   The graph is called "Joint infection

14:50:42  12  rate...;" right?

14:50:43  13     A.   That's what it -- that's what it's called.

14:50:45  14     Q.   Okay.

14:50:45  15     A.   But I mean if you look up the ICD code,

14:50:49  16  they're very specific on what -- what -- what they

14:50:52  17  mean.  They're -- they're pretty speci -- specific,

14:50:56  18  and I just -- I don't know how those values -- how

14:51:03  19  those codes compare with --

14:51:11  20          I -- I mean I don't know where you're going

14:51:12  21  with this, if you want to compare these values to the

14:51:16  22  experience in -- in the U.K. or what -- what exactly

14:51:20  23  you're -- you're looking at.

14:51:21  24     Q.   I'll -- I'll just cut to it.  Based on this

14:51:24  25  graph -- and I'll make the assumption that these I --

235

14:51:27    1    ICD codes relate to joint infection as the graph is

14:51:30    2    entitled, --

14:51:31    3        A.    Okay.

14:51:31    4        Q.    -- the infection rate of four percent is

14:51:34    5    higher than the infection rate reported by McGovern et

14:51:37    6    al.

14:51:38    7            MR. GORDON:   Object to the form of the

14:51:39    8    question, lack of foundation, assumes facts not in

14:51:43    9    evidence, incomplete hypothetical.

14:51:46   10        A.    Well I mean what I don't understand about

14:51:50   11    your question is that you -- there's not a -- there's

14:51:56   12    no evidence of how this definition of joint infection

14:52:01   13    compares to what McGovern was looking at.   What's the

14:52:08   14    denominator?   What are -- what are -- exactly are --

14:52:11   15            I mean are these specific knee and hip

14:52:15   16    surgeries?   I don't -- I don't know.

14:52:17   17        Q.    Well just is --

14:52:18   18        A.    It doesn't say.

14:52:19   19        Q.    Okay.   Assuming that it involves a different

14:52:22   20    category of infections, just for the sake of argument,

14:52:26   21    that's also a different group than looking at patients

14:52:30   22    from 2010 to 2010, isn't it, when the McGovern study

14:52:36   23    was about Bair Hugger patients from 2008 to 2009,

14:52:40   24    2010?

14:52:41   25        A.    Well, but I think -- I mean it does say --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

236

14:52:47   1        If you look at this graph, I mean those

14:52:49   2   orange lines are not changing very much between 1996

14:52:53   3   and 2012.  Okay?  They're pretty flat.  And so my

14:53:00   4   comparison of -- of these two periods for the U.K.,

14:53:06   5   one of which was, what, --

14:53:10   6        Q.   Two thousand --

14:53:12   7        A.   -- two thousand --

14:53:15   8        Let's see.  Bair Hugger is '8 to '9 and the

14:53:19   9   plot in this case, Fig. 1, has to do with '10 to '15.

14:53:28  10   Okay.  So based on this, it doesn't seem to be -- look

14:53:36  11   to -- to my eyes to be a whole lot different

14:53:38  12   between -- before 2010 and between '10 and '15.

14:53:42  13        Q.   Okay.

14:53:43  14        A.   Would you agree?

14:53:45  15        Q.   You assume, in calculating the deep joint

14:53:48  16   infection rate in the NHS, that there was complete

14:53:51  17   reporting practices among hospitals; correct?

14:53:54  18        A.   Yeah, that's my assumption.  Yeah.

14:53:56  19        Q.   And if there were not complete reporting

14:53:58  20   practices, those averages would be subject, again, to

14:54:01  21   a data artifact; correct?

14:54:03  22        A.   Yes.

14:54:04  23        Q.   You said that you reviewed Dr. Reed's

14:54:07  24   testimony; correct?

14:54:07  25        A.   Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

237

14:54:09    1        Q.    And did you see where Dr. Reed said that

14:54:13    2    "Not every trust puts in the data as we have

14:54:16    3    established and the infection rates that they quote

14:54:18    4    were very low.  And in fact government advisors on

14:54:22    5    infection have publicly written to say that their

14:54:25    6    quotes -- they quote very low infection rates,

14:54:27    7    unrealistically low, because the surveillance system

14:54:29    8    is poor in many trusts."

14:54:32    9        A.    Okay.  I mean it -- it may well be.

14:54:34   10        Q.    So if it may well be, the .6 percent rate

14:54:40   11    that you report in your study may also well be subject

14:54:43   12    to data artifact.

14:54:46   13        A.    The accuracy of -- of -- of that value

14:54:51   14    depends on the accuracy of the data that were reported

14:54:53   15    in the file that I looked at.

14:54:55   16        Q.    And in your report you relied on Mr.

14:54:58   17    Reed's -- Dr. Reed's testimony regarding other subject

14:55:00   18    matter; correct?

14:55:01   19            MR. GORDON:  Object to the form of the

14:55:02   20    question.

14:55:05   21        A.    Yes, some of the other subject matter.  I

14:55:07   22    mean I --

14:55:08   23        Q.    You have no reason to doubt Mr. Reed's

14:55:11   24    testimony regarding the --

14:55:15   25        A.    I --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

238

14:55:16    1        Q.    -- incomplete --

14:55:16    2        A.    Yeah.  I really don't --

14:55:17    3              I mean I have -- I have no reason to

14:55:23    4    question pro or con the -- the quality of the -- of

14:55:29    5    the U.K. data, the -- the NHS data.

14:55:33    6        Q.    Do you rely on Dr. Reed's testimony only

14:55:35    7    when it supports your conclusions?

14:55:39    8        A.    No.  It's just -- I -- I'm -- I mean I'm

14:55:43    9    not --

14:55:47   10              Dr. Reed is expressing his view on -- on

14:55:50   11    the -- on those -- those NHS data.  I have no basis to

14:55:58   12    know one way or the other how good those data are.

14:56:01   13        Q.    So you have no basis to know one way or

14:56:03   14    the --

14:56:03   15        A.    So I'm using their -- their data to get an

14:56:07   16    idea of what the -- what the rates -- what the rates

14:56:10   17    were, and those are the values that they reported.

14:56:12   18        Q.    Did you investigate whether there is

14:56:14   19    complete reporting among hospitals in the NHS?

14:56:17   20        A.    No.

14:56:18   21        Q.    You simply assumed that there was complete

14:56:20   22    reporting.

14:56:21   23        A.    I assume -- I assumed that the data --

14:56:24   24              I mean the data are what they are.

14:56:26   25        Q.    You also assumed that hospitals that use the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

239

14:56:29    1    Bair Hugger do not use other warming devices; correct?

14:56:32    2        A.    That was --

14:56:34    3            I mean the assumption was that the primary

14:56:36    4    warmers that they were using in these hospitals was in

14:56:39    5    fact the Bair Hugger.

14:56:40    6        Q.    In your report you state that 3M provided

14:56:42    7    you with documents that delineated whether or not a

14:56:46    8    hospital uses the Bair Hugger; correct?

14:56:49    9        A.    I was provided with hospitals that were

14:56:52   10    using Bair Hugger and that's what I used.  I don't --

14:56:56   11    didn't go into the detail of the -- of what was used

14:57:00   12    in these hospitals.

14:57:01   13        Q.    So you didn't know based on those documents

14:57:05   14    because they didn't specify whether or not those

14:57:08   15    hospitals also used other devices.

14:57:10   16        A.    The documents did not specify.  The

14:57:13   17    documents --

14:57:14   18            The indication that I had was that they

14:57:17   19    used -- were using Bair Hugger.

14:57:19   20        Q.    Are you aware that some hospitals in the NHS

14:57:22   21    used both Bair Huggers and conductive warmers?

14:57:26   22            MR. GORDON:    Object to the form of the

14:57:27   23    question, lack of foundation, assumes facts not in

14:57:29   24    evidence.

14:57:31   25        A.    I have not seen any data that -- that breaks

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

240

14:57:38   1   down the specific devices that they use and if they

14:57:44   2   use alternative devices.

14:57:45   3       Q.   You said you reviewed Dr. Reed's testimony;

14:57:46   4   correct?

14:57:46   5       A.   Yes.

14:57:47   6       Q.   You didn't see in Dr. Reed's deposition

14:57:49   7   where he made clear that there are hospitals that use

14:57:51   8   both the Bair Hugger and conductive warming devices?

14:57:54   9           MR. GORDON:   Object to the form of the

14:57:55  10   question, lack of foundation, assumes facts not in

14:57:57  11   evidence.

14:58:01  12       A.   I don't know what he was referring to.   I

14:58:05  13   don't know if he was looking at the same data set that

14:58:07  14   I was looking at.

14:58:08  15       Q.   Okay.   Did you investi --

14:58:09  16       A.   So I don't know.

14:58:11  17       Q.   Did you investigate to see whether or not

14:58:13  18   hospitals do use both devices beyond the documents

14:58:17  19   that 3M provided you?

14:58:18  20       A.   I -- I didn't get any further information.

14:58:23  21   I mean it wouldn't surprise me that -- that some

14:58:30  22   hospitals -- I mean I don't --

14:58:33  23           I don't know if this is exhaustive of all of

14:58:36  24   the hospitals or just those that -- that -- that were

14:58:42  25   indicated as having used Bair Hugger devices.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

241

14:58:44   1      Q.   Did you ask 3M for more information as to

14:58:47   2   whether the data that they provided, which showed that

14:58:50   3   some hospitals used the Bair Huggers, may also use

14:58:53   4   other devices?

14:58:54   5      A.   I didn't -- was not provided with any data

14:58:56   6   that indicated whether other devices were used by

14:59:00   7   any --

14:59:01   8      Q.   Did you ask them whether or not --

14:59:04   9      A.   Well my understanding was when it was given,

14:59:06   10   that those were using the Bair Hugger.

14:59:08   11      Q.   And you also just testified that it may very

14:59:10   12   well be that they used other devices as well; correct?

14:59:13   13      A.   Well I don't --

14:59:15   14           I didn't compare this to the list of all

14:59:17   15   hospitals in the U.K.

14:59:19   16      Q.   Understood.  But --

14:59:21   17      A.   So there may be hospitals outside of this

14:59:23   18   data set, and there is an issue -- issue there that I

14:59:30   19   cannot -- you know, cannot speak to.

14:59:32   20      Q.   But you recognize that other hospitals may

14:59:35   21   use --

           22      A.   It's possible.

14:59:37   23      Q.   -- devices in addition to the Bair Hugger.

14:59:38   24      A.   Sure.  Yes.

14:59:39   25      Q.   And if that is true, the statistic of an

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

242

| | | |
|---|---|---|
| 14:59:42 | 1 | infection rate of .6 from 2010 to 2015 may or may not |
| 14:59:48 | 2 | be attributable just to the Bair Hugger. |
| 14:59:52 | 3 | A.   It depends on the act -- the degree to |
| 14:59:56 | 4 | which, which is -- is true, that they only used one |
| 15:00:00 | 5 | device and not the other. |
| 15:00:02 | 6 | Q.   And you don't know that degree of accuracy. |
| 15:00:04 | 7 | A.   I don't know the degree of accuracy.  That |
| 15:00:06 | 8 | was not part of the data that I was provided as -- as |
| 15:00:11 | 9 | to measure. |
| 15:00:13 | 10 | Q.   And you didn't ask for that data. |
| 15:00:15 | 11 | A.   No. |
| 15:00:30 | 12 | Q.   To the extent you argue that the infection |
| 15:00:36 | 13 | rate from 2010 to 2015 was .6 percent, are you aware |
| 15:00:49 | 14 | that there was a significant decrease in deep joint |
| 15:00:55 | 15 | infections in the NHS from 2013 to 2015? |
| 15:01:04 | 16 | A.   I didn't have data specifically relating to |
| 15:01:11 | 17 | these. |
| 15:01:11 | 18 | Q.   So you did not review the Public Health of |
| 15:01:19 | 19 | England's report entitled "Surveillance of Surgical |
| 15:01:24 | 20 | Site Infections in NHS Hospitals in England?" |
| 15:01:26 | 21 | A.   No. |
| 15:01:27 | 22 | Q.   Okay.  So you're not aware that, according |
| 15:01:36 | 23 | to that document, there was a significant decrease in |
| 15:01:39 | 24 | the years of 2013 to '14 and 2014 to '15 and 2014 to |
| 15:01:44 | 25 | fif -- '15 -- I said that twice -- but from 2013 to |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

243

15:01:47    1    2015.

15:01:52    2        A.    Yeah.   I -- I mean maybe it was, or these --

15:01:55    3             That decrease changing the accuracy would go

15:01:59    4    to the reporting, as you said, that Dr. Reed reported

15:02:02    5    that it's notoriously inaccurately reported, so maybe,

15:02:07    6    yeah.   I don't know what the magnitude of the

15:02:09    7    difference is.   I -- I --

15:02:11    8             To answer your question specifically, I did

15:02:14    9    not review that document.

15:02:15   10        Q.    Okay.   To the extent that you argue that the

15:02:23   11    infection rate was .6 percent from 2010 to 2015, what

15:02:33   12    is your basis for determining that it is related to

15:02:36   13    the Bair Hugger as opposed to the other SSI

15:02:40   14    intervention practices that were incorporated in these

15:02:44   15    hospitals during that time?

15:02:45   16             MR. GORDON:   Objection, object to the form,

15:02:48   17    and also misconstrues his testimony.

15:02:53   18        A.    You know, I -- it's -- I mean I --

15:02:58   19             It's just using the values that they're --

15:03:00   20    they're using.   The data that we had -- that I had

15:03:02   21    was -- did not provide information other than, as --

15:03:10   22    as I've said, that these were hospitals using Bair

15:03:14   23    Hugger and this was their infection rate.   I don't

15:03:16   24    have information on -- on what other SSI methods they

15:03:23   25    might happen to have been using.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

244

15:03:25  1      Q.    Okay.  You also argue that there is no

15:03:29  2  reason provided for why the McGovern authors started

15:03:33  3  the study period on July 1st, 2008; correct?

15:03:35  4      A.    Yes.

15:03:36  5      Q.    And you go on to argue that had the authors

15:03:39  6  began the study just one month earlier, the data would

15:03:43  7  show a change from significance to non-significance;

15:03:46  8  correct?

15:03:46  9      A.    Using the chi-square test, yes.

15:03:50  10     Q.    And again you assume, based on that

15:03:54  11 calculation as provided in the figures attached to

15:03:56  12 your report, that you had complete information with

15:04:00  13 respect to infection data prior to July 1st, 2008;

15:04:05  14 correct?

15:04:05  15     A.    That's based on the Albright 10 -- Exhibit

15:04:10  16 10 data, yeah.

15:04:11  17     Q.    And we've discussed that document.

15:04:12  18     A.    Yes, uh-huh.

15:04:13  19     Q.    And are you aware that Mr. Reed -- Dr. Reed

15:04:20  20 has testified that there was not full surveillance at

15:04:24  21 Wansbeck Hospital prior to July 1st, 2008?

15:04:29  22     A.    Yes.  I'm aware that he said that, yeah.

15:04:33  23     Q.    Are you aware that he said that if one were

15:04:35  24 to look at data prior to the study period, there would

15:04:38  25 be, quote, big gaps in the period, end quote?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

245

| | | |
|---|---|---|
| 15:04:43 | 1 | A. That's -- that's -- that's what he reported. |
| 15:04:47 | 2 | Q. Are you aware that Dr. Reed also testified |
| 15:04:50 | 3 | that to rely on data prior to July 1st, 2008 would be, |
| 15:04:55 | 4 | quote, very unreliable, end quote? |
| 15:04:58 | 5 | A. That's what he reported. |
| 15:05:01 | 6 | I mean related to this, I mean there's a -- |
| 15:05:04 | 7 | there was a review of -- of the procedures that they |
| 15:05:08 | 8 | were using that's referred to in one of the other |
| 15:05:11 | 9 | papers -- |
| 15:05:12 | 10 | What is the author? Starts with a G. |
| 15:05:17 | 11 | Gissell? |
| 15:05:18 | 12 | Q. Gillson. |
| 15:05:19 | 13 | A. Gillson. Thank you. |
| 15:05:21 | 14 | -- that this was all not reviewed until |
| 15:05:24 | 15 | December, so I'm not sure where -- what Reed is |
| 15:05:30 | 16 | referring to. |
| 15:05:33 | 17 | Q. So you don't believe Dr. Reed's testimony |
| 15:05:36 | 18 | that full surveillance began on Septem -- on July 1st, |
| 15:05:40 | 19 | 2008. |
| 15:05:41 | 20 | A. Well he's -- he's depending on his |
| 15:05:43 | 21 | recollection, -- |
| 15:05:43 | 22 | Q. Okay. |
| 15:05:44 | 23 | A. -- I assume, in his deposition. |
| 15:05:45 | 24 | Q. Uh-huh. |
| 15:05:46 | 25 | A. And I mean that's what he's -- what -- what |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

246

| | | |
|---|---|---|
| 15:05:50 | 1 | he said in his -- in his deposition; however, that |
| 15:05:55 | 2 | seems to not correspond in a peer-reviewed paper what |
| 15:05:59 | 3 | was said about when this was all reviewed. |
| 15:06:02 | 4 | Q.   So is your statement that in the Gillson |
| 15:06:04 | 5 | article the authors there represented that the full |
| 15:06:09 | 6 | surveillance began in December of 2008? |
| 15:06:11 | 7 | A.   It was reviewed in December. |
| 15:06:13 | 8 | Q.   Reviewed in December.  But you have no |
| 15:06:15 | 9 | knowledge -- |
| | 10 | A.   I don't -- |
| 15:06:17 | 11 | Q.   -- as to whether -- |
| 15:06:17 | 12 | A.   It doesn't say when it was implemented, -- |
| 15:06:19 | 13 | Q.   Okay. |
| 15:06:20 | 14 | A.   -- but that would imply, if it was not |
| 15:06:22 | 15 | reviewed until December, that it would have been not |
| 15:06:25 | 16 | implemented until maybe January.  Right?  I mean if |
| 15:06:30 | 17 | it's not -- |
| 15:06:32 | 18 | Q.   January '09? |
| 15:06:33 | 19 | A.   '09.  Yeah. |
| 15:06:34 | 20 | Q.   Okay.  So if full surveillance wasn't |
| 15:06:38 | 21 | implemented until January '09, -- |
| 15:06:40 | 22 | A.   Yes. |
| 15:06:40 | 23 | Q.   -- you're relying on data from July -- prior |
| 15:06:45 | 24 | to July 2008. |
| 15:06:47 | 25 | A.   These were the data that were -- were |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

247

15:06:48    1    provided.  These were the data that I had available to

15:06:50    2    me.

15:06:50    3        Q.  But --

15:06:51    4        So I just want to be clear.  Based on what

15:06:53    5    you just said, it's either possible that full

15:06:57    6    surveillance began on July 1st, 2008 or --

15:07:00    7        A.  Yes.

15:07:01    8        Q.  -- perhaps even January 1st, 2009, --

15:07:03    9        A.  So what --

15:07:04    10        Yeah.

15:07:04    11        Q.  -- but you nonetheless constructed your

15:07:08    12    model on data that was prior to that time; correct?

15:07:12    13        A.  That's -- that's right.

15:07:13    14        Q.  And that data --

15:07:14    15        A.  And --

15:07:15    16        Q.  -- may or may not be complete.

15:07:17    17        A.  And --

15:07:17    18        Q.  Answer the question, please.

15:07:20    19        A.  Well according to Reed's testimony, if

15:07:23    20    Reed's correct, if -- if -- if this is correct, that

15:07:27    21    might be true.

15:07:29    22        Q.  Okay.

15:07:29    23        A.  The other thing that's true, then, if that's

15:07:33    24    what in fact took place, is that six months -- or

15:07:38    25    whatever it is -- six months or so of McGovern is not

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

248

15:07:44  1  reporting appropriately.

15:07:46  2      Q.  So if this document from the NHS says that

15:07:50  3  since July 2008 hospitals are required to have sys --

15:07:54  4  systems in place to identify patients who are included

15:07:57  5  in the surveillance and later admitted to hospitals

15:07:59  6  with an SSI, would that clarify any doubt as to when

15:08:03  7  full surveillance began in the NHS?

15:08:07  8           MR. GORDON:  Object to the form of the

15:08:08  9  question, lack of foundation.

15:08:09  10     A.  Well there is --

15:08:13  11          I mean you're -- you're raising questions

15:08:15  12 about how accurate the data were recorded, but I mean

15:08:19  13 all of these change -- changes took place during the

15:08:22  14 McGovern study.

15:08:24  15     Q.  If Mr. Reed's testimony is true -- if Dr.

15:08:30  16 Reed's testimony is true --

15:08:33  17          MR. SACCHET:  I just said "mister,"

15:08:34  18 but I --

15:08:36  19          (Discussion off the stenographic record.)

15:08:49  20     Q.  Okay.  If Mr. Reed's testimony is that full

15:08:55  21 surveillance began on July 1st, 2008, that is the

15:08:59  22 start of the Bair Hugger period in the McGovern study;

15:09:02  23 correct?

15:09:02  24     A.  That's --

15:09:03  25          According to his deposition, that -- that's

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

249

15:09:06   1   what it corresponds to, yes.

15:09:08   2       Q.   And you have no evidence to doubt that, do

15:09:12   3   you, Professor Holford?

15:09:14   4           MR. GORDON:  Object to the form of the

15:09:15   5   question.

15:09:18   6       A.   I mean the evidence to doubt it is that

15:09:21   7   seems to be somewhat contradictory to what Gillson

15:09:26   8   says, but I mean I -- I'm not going to -- you know, I

15:09:31   9   don't -- I'm -- I'm --

15:09:32   10          I'll -- I'll take -- I'll take him at his

15:09:36   11   word.

15:09:37   12      Q.   Okay.  And taking him at his word, full

15:09:39   13   surveillance starts on July 1st, 2008.

15:09:46   14      A.   That's what he said.

15:09:47   15      Q.   Yes.

15:10:12   16          (Exhibit 24 was marked for

15:10:14   17           identification.)

15:10:14   18   BY MR. SACCHET:

15:10:16   19      Q.   Professor Holford, is this the Gillson

15:10:18   20   article that you are referring to that was cited in

15:10:21   21   your report?

15:10:23   22      A.   Is this it?  I don't think it is.

15:11:22   23      Q.   Okay.  Let me --

15:11:25   24      A.   I -- let's see.

15:11:26   25          MR. SACCHET:  I may have marked the wrong

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

250

15:11:27  1  document, professor.  Is it -- I just --

15:11:29  2          I'll shortcut this because I think I might

15:11:31  3  have.  Is the first line of the document you're

15:11:33  4  looking at actually from Brister, not Gillson?

15:11:36  5          MR. GORDON:  Yeah.

15:11:37  6          MR. SACCHET:  I may have given you the wrong

15:11:38  7  one.

15:11:39  8          MR. GORDON:  That's what you want to give

15:11:40  9  him.

15:11:40  10          MR. SACCHET:  Okay.

15:11:43  11          THE WITNESS:  Yeah.  I think this is one of

15:11:44  12  the ones that --

15:11:46  13          MR. SACCHET:  Yeah.  That's my fault.

15:11:47  14          THE WITNESS:  Yeah.  It's strange, because

15:11:49  15  the author is not -- doesn't appear on it, which is

15:11:52  16  kind of a --

15:11:53  17          MR. SACCHET:  The author is there on the

15:11:55  18  top, it's just --

15:11:55  19          It's my fault.

15:11:57  20          THE WITNESS:  Okay.  Yeah.  It was hard to

15:11:59  21  find the author on this one, that's what -- yeah.

15:12:03  22  Anyway --

15:12:04  23          MR. GORDON:  This is al --

15:12:05  24          This Exhibit 24 is on his list of

15:12:07  25  references, it's just --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

251

15:12:08  1              MR. SACCHET:  Yeah, it's the Brister

15:12:09  2  article.

15:12:10  3              THE WITNESS:  Yeah, okay.  Yeah.  I didn't

15:12:20  4  think this was Gillson, that's all.  See, Gillson

15:12:31  5  is -- where are we -- same journal, 2014, June '17.

15:13:08  6  Is that true?  That was --

15:13:10  7              Oh, no.  It was published in 21 -- 2011.

15:13:14  8  Yeah, that's Brister.

15:13:16  9              MR. SACCHET:  Yeah.

15:13:17  10             THE WITNESS:  Yeah.

15:13:46  11             (Exhibit 25 was marked for

15:13:49  12             identification.)

15:13:49  13  BY MR. SACCHET:

15:13:49  14       Q.   Is this the Gillson article that you were

15:13:52  15  referring to?

15:13:53  16       A.   Yes, it is.

15:13:54  17       Q.   Okay.

15:13:54  18       A.   Yes.

15:13:55  19       Q.   Can you point me to any particular statement

15:13:58  20  in this article where there's information that

15:14:02  21  contradicts Mr. Reed's testimony?

15:14:06  22       A.   Oh.  There's a figure somewhere in there,

15:14:25  23  which is practically illegible in this copy --

15:14:49  24       Q.   I don't want to spend tons of time on this,

15:14:52  25  professor, but --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

252

15:14:54  1      A.   I've got a --

15:14:58  2      Q.   -- one thing that might be helpful is you

15:15:00  3  would agree, wouldn't you, that this particular

15:15:02  4  document relates to Northumbria Healthcare; correct?

15:15:06  5      A.   That includes Wansbeck, yeah.

15:15:09  6      Q.   But it's not specific to Wansbeck; correct?

15:15:11  7      A.   That -- that's correct.

15:15:13  8      Q.   So even if, for the sake of argument, this

15:15:14  9  document said something to the effect that there was a

15:15:17  10  different time in which full surveillance occurred,

15:15:20  11  that may or may not be specific to Wansbeck.

15:15:23  12      A.   Well I assume it would include Wansbeck.

15:15:26  13  I -- I don't know how they operate, but -- yeah.

15:15:29  14      Q.   It's possible that Wansbeck may have been

15:15:30  15  ahead of the curve with respect to what NHS did as a

15:15:34  16  trust; correct?

15:15:35  17      A.   I -- I guess that's possible.

15:15:37  18      Q.   Okay.  So even if there's a date in this

15:15:40  19  document that's specific to NHS, it does not

15:15:42  20  contradict Mr. Reed's testimony.

15:15:45  21      A.   Not necessarily.

15:15:45  22           MR. GORDON:  Object to the form of the

15:15:46  23  question, --

15:15:47  24      A.   Well --

15:15:47  25           MR. GORDON:  -- assumes facts not in

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

253

15:15:48  1  evidence.

15:15:49  2      A.   --it may or may not.  I don't know.

15:15:51  3      Q.   Well let's just do an example.  If this

15:15:53  4  document said that the NHS implemented full-scale

15:15:56  5  surveillance of DJI in 2015 -- which it doesn't, but

15:16:02  6  for the sake of argument assume that to be true --

15:16:05  7      A.   Yeah.  Well it --

         8           MR. GORDON:  Wait, wait.

15:16:06  9      A.   It's -- it's talking about --

15:16:07  10          MR. GORDON:  Wait, wait.  Is there --

15:16:09  11          I don't think he was done with his question.

15:16:11  12          MR. SACCHET:  I'm not.  Thank you.

15:16:13  13      Q.   -- even if there was such a suggestion in

15:16:15  14  this paper, that does not preclude the possibility

15:16:19  15  that Wansbeck started full-scale surveillance for

15:16:22  16  itself on July 1st, 2008.

15:16:24  17          MR. GORDON:  Object to the form of the

15:16:25  18  question, also assumes facts not in evidence.

15:16:28  19      A.   I -- I don't --

15:16:33  20          This is dealing with, as I understand it, as

15:16:38  21  I recall, Northumbria, --

15:16:39  22      Q.   Yeah.

15:16:40  23      A.   -- which includes, what, about three

15:16:43  24  hospitals I think.

15:16:43  25      Q.   Three hospitals, that's correct.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

254

15:16:45  1      A.   And one of them being Wansbeck.

15:16:47  2      Q.   That's correct.

15:16:47  3      A.   And so if they're making a policy with --

15:16:51  4  with regard to their group of hospitals, then I

15:17:00  5  would --

15:17:00  6           Was what you're suggesting is Wansbeck is

15:17:03  7  going outside of their --

15:17:04  8      Q.   Ahead of the curve.

15:17:06  9      A.   It's -- I guess it's conceivable.

15:17:08  10     Q.   That's how law works with respect to the

15:17:10  11  federal government and states; correct?  States can

15:17:13  12  implement rights that are more progressive than what

15:17:15  13  the federal government has promulgated; correct?

15:17:18  14     A.   They -- they can.  Whether hospitals --

15:17:21  15  hospital groups function that much, I -- I just don't

15:17:26  16  know that much about the hospitals in -- in -- in the

15:17:30  17  U.K.

15:17:31  18     Q.   Okay.

15:17:31  19     A.   I mean this took place in, what was it,

15:17:40  20  2008, '10, in that area, and when was Reed's

15:17:43  21  testimony?

15:17:44  22     Q.   His deposition testimony?

15:17:45  23     A.   His deposi -- yeah.

15:17:47  24     Q.   2016.

15:17:49  25     A.   '16.  So I mean he's recalling things, you

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

255

15:17:52   1   know, what, seven or eight years ago.  It seems

15:18:01   2   possible that he misremem -- didn't remember it quite

15:18:06   3   right.

15:18:06   4       Q.   Well this document was published in 2014;

15:18:10   5   correct?  October for that matter.

15:18:11   6       A.   Yeah, but -- well it -- this is a --

15:18:14   7            Gillson and Lowdon were writing this in the

15:18:18   8   leisure of their office.  They weren't under

15:18:21   9   deposi -- under pressure of being under a

15:18:23  10   deposition --

15:18:23  11       Q.   Okay.

15:18:24  12       A.   --- and having to come up with answers off

15:18:25  13   the top of your head.

15:18:26  14       Q.   Okay.  So let's just --

15:18:27  15            I think we need to cut to it.  There's

15:18:29  16   nothing in this doc -- document that necessarily

15:18:33  17   contradicts Mr. Reed's testimony.

15:18:35  18       A.   It may not.

15:18:36  19       Q.   It may not.

15:18:37  20       A.   Yeah.  It -- it --

15:18:38  21            Yeah, it may or may not.  I --

15:18:39  22       Q.   Is there any other evidence you relied on,

15:18:43  23   apart from that document, to surmise that there was

15:18:48  24   full reporting before July 1st, 2008 or after July

15:18:52  25   1st, 2008?

256

15:18:53     1        A.    Well these -- these data -- I mean that --

15:18:58     2             The Albrecht 10, as I understand it, was not

15:19:02     3    the routine way in which a lot of these data were

15:19:06     4    collected, that they had to go back to the hospitals

15:19:08     5    and add a lot of the variables that they did, and so

15:19:12     6    in doing that, well, they went back to -- what was

15:19:15     7    it --

15:19:19     8        Q.    Sometime in 2007.

15:19:21     9        A.    -- sometime in 2007, whatever it was, well

15:19:24    10    before Mr. July 2008.

15:19:27    11        Q.    But based on Mr. Reed's testimony, you do

15:19:30    12    not know --

15:19:30    13        A.    Based on the testimony --

15:19:32    14        Q.    -- whether it was a complete data set prior

15:19:34    15    to July 1st, 2008.  You don't know.

15:19:36    16        A.    Well was he talking about Albrecht 10?  I

15:19:38    17    don't know.

15:19:41    18        Q.    I'm talking about reconstruct --

15:19:44    19        A.    I know what you're talking about, --

15:19:45    20        Q.    Yeah.

15:19:46    21        A.    -- but I'm not sure what Reed is talking

15:19:48    22    about.

15:19:49    23        Q.    Talking about Wansbeck Hospital; correct?

15:19:52    24        A.    Okay.  But he --

15:19:53    25             MR. GORDON:  Object to the form of the

257

15:19:54    1    question.

15:19:54    2         A.   Was he talking about the data in Albrecht

15:19:56    3    10?  I just -- I don't remember, frankly.

15:20:03    4         Q.   Okay.  Did you make any inquiry separate and

15:20:13    5    apart from the Gillson document about when full

15:20:16    6    reporting began at Wansbeck?

15:20:18    7         A.   No.

15:20:19    8         Q.   And you didn't ask 3M for any documents on

15:20:34    9    the subject matter.

15:20:37   10         A.   No.

15:20:37   11         Q.   And they provided no such documents on the

15:20:39   12    subject matter.

15:20:41   13         A.   Not of when the -- on the -- on those

15:20:44   14    procedures, yeah.

15:20:45   15         Q.   Okay.

15:20:45   16         A.   They didn't.

15:20:46   17         Q.   So your opinion as to the table that you

15:20:49   18    provided is based on Albrecht Exhibit 10 and that's

15:20:53   19    it.

15:20:54   20         A.   That's right.

15:20:54   21         Q.   Okay.  With respect to Fig. 2, you provide

15:21:00   22    time trend data and there is a moving average line

15:21:03   23    which is the solid blue line; correct?

15:21:04   24         A.   Yes.

15:21:05   25         Q.   And that line -- or that data also begins in

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

258

15:21:09    1    2007; correct?

15:21:10    2        A.    That's right.

15:21:11    3        Q.    And it begins on September 1st, 2007, which

15:21:15    4    is approximately 10 months before the McGovern study

15:21:19    5    period; correct?

15:21:20    6        A.    Yes.

15:21:21    7        Q.    And that data also depends on Albrecht

15:21:23    8    Exhibit 10; correct?

15:21:24    9        A.    Yes.

15:21:26   10        Q.    And with respect to the first spike in this

15:21:30   11    figure, if you took away the data prior to July 1st,

15:21:35   12    2008, wouldn't be much of a spike; correct?

15:21:41   13        A.    Well it's sort of -- yeah.  In the earlier

15:21:43   14    data there was really very little going on, the rates

15:21:46   15    were very, very low.  Bair Hugger was being used, as I

15:21:49   16    understand it, but the infection rates were extremely

15:21:53   17    low.

15:21:53   18        Q.    And to the extent that there was incomplete

15:21:55   19    data prior to July 2007, that would explain the low

15:21:59   20    rates; correct?

15:21:59   21            MR. GORDON:  Objection, assumes facts not in

15:22:02   22    evidence.

15:22:04   23        A.    I mean the reason there were no -- there

15:22:10   24    were very few in -- infections -- I mean I don't -- I

15:22:14   25    don't know.  There were very few reported in the -- in

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

259

15:22:17  1   the data file.

15:22:17  2        Q.    In Albrecht Exhibit 10.

15:22:19  3        A.    Yes.

15:22:21  4        Q.    And the green line is the constant average

15:22:27  5   of deep joint infection in the Bair Hugger period and

15:22:30  6   the Hot Dog period; correct?

15:22:31  7        A.    That's right.

15:22:31  8        Q.    And that is also based on Albrecht Exhibit

15:22:34  9   10; correct?

15:22:34  10       A.    Yes.

15:22:35  11       Q.    So instead of an infection rate of 3.0, your

15:22:37  12  infection rate with respect to the Bair Hugger period

15:22:39  13  is 2.91.

15:22:41  14       A.    Something like that.

15:22:43  15       Q.    Okay.

15:22:43  16       A.    Looks about right.

15:22:48  17       Q.    And the Hot Dog rate, instead of being .8

15:22:53  18  percent, is 1.08 percent; correct?

15:22:57  19       A.    That sounds about right, and it looks about

15:23:01  20  right from the -- from the graph.

15:23:02  21       Q.    And that's based on using four Hot Dog

15:23:04  22  infections instead of three Hot Dog infections;

15:23:07  23  correct?

15:23:07  24       A.    That's correct.

15:23:08  25       Q.    And that derives from Albrecht Exhibit 10;

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

260

| | | |
|---|---|---|
| 15:23:10 | 1 | correct? |
| 15:23:10 | 2 | A.   Yes. |
| | 3 | Q.   Okay. |
| 15:23:12 | 4 | MR. GORDON:  Well -- |
| 15:23:12 | 5 | Q.   The broken blue line -- |
| 15:23:14 | 6 | A.   Well it depends on -- |
| 15:23:16 | 7 | I mean the four also comes from the -- from |
| 15:23:19 | 8 | the deposition by Reed where he reports that there was |
| 15:23:23 | 9 | one more in -- one more infection for -- |
| 15:23:27 | 10 | Well, he reports one more in each group. |
| 15:23:29 | 11 | Q.   Okay.  But you don't ever, aside from |
| 15:23:32 | 12 | footnote one, assume that there is one more infection |
| 15:23:34 | 13 | in the Bair Hugger period; correct? |
| 15:23:38 | 14 | MR. GORDON:  Object to the -- |
| 15:23:40 | 15 | A.   That's -- |
| 15:23:40 | 16 | Well I -- I mean I used -- used Exhibit 10. |
| 15:23:43 | 17 | Q.   Yes.  But you just -- |
| 15:23:45 | 18 | A.   I mean, again, we've been talking about |
| 15:23:47 | 19 | Reed -- |
| 15:23:47 | 20 | Q.   Uh-huh. |
| 15:23:47 | 21 | A.   -- and it seems quite possible that Reed |
| 15:23:55 | 22 | was, you know, retrospectively recalling what took |
| 15:24:02 | 23 | place, -- |
| 15:24:02 | 24 | Q.   Uh-huh.  And Reed -- |
| 15:24:04 | 25 | A.   -- and so he said there was one more. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

261

15:24:06    1        Q.    Uh-huh.

15:24:06    2        A.    Well, I wouldn't accuse him of lying if

15:24:10    3   there in fact was one more in one group and one less

15:24:13    4   in the other.

15:24:14    5        Q.    Okay.  If you wouldn't accuse him of lying,

15:24:16    6   you didn't rely on those numbers at any place in your

15:24:19    7   report other than footnote one; correct?

15:24:21    8        A.    Other than footnote -- footnote one, yeah.

15:24:23    9   Footnote one is basically where I --

15:24:25   10        Q.    That's the full extent.

15:24:26   11        A.    That's right.  I took -- I took -- took him

15:24:29   12   at his word and --

15:24:29   13        Q.    Okay.

15:24:31   14        A.    -- used those values.

15:24:31   15        Q.    So with respect to the statement you made

15:24:33   16   prior to that, you're relying on Reed with respect to

15:24:37   17   four Hot Dog infections but not 32 or 33 Bair Hugger

15:24:40   18   infections, only 31 Bair Hugger infections.

15:24:43   19        A.    Well the numbers -- the numbers that were

15:24:45   20   used in that tabulation were the numbers that I got

15:24:48   21   from -- from the -- from Albright 10 --

15:24:51   22        Q.    Yeah.

15:24:52   23        A.    -- and --

15:24:54   24        Q.    Which is inconsistent with Reed's testimony;

15:24:57   25   correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

262

15:24:57   1        A.    It's inconsistent.

15:24:58   2        Q.    Yeah.

15:24:59   3        A.    Yeah.  It's the -- it's -- it's --

15:25:02   4              I think it's the same for Hot Dog, but it's

15:25:05   5   inconsistent for Bair Hugger.

15:25:07   6        Q.    Well Reed says four infections Hot Dog, 33

15:25:11   7   infections Bair Hugger; correct?  One more in each

15:25:14   8   group.

15:25:16   9        A.    That's what -- that's what he said.

15:25:18   10       Q.    Yeah.

15:25:19   11       A.    Yeah.

15:25:19   12       Q.    And the --

15:25:19   13       A.    But -- but the tab -- but --

15:25:21   14             But Albright 10 --

           15       Q.    Yeah.

15:25:22   16       A.    -- says four and 31.

15:25:24   17       Q.    But you wouldn't assume, like you just said,

15:25:26   18   that Reed would be lying; right?

15:25:27   19       A.    No.  I just -- I -- I would guess that

15:25:30   20   he's -- that he's not remembering things.  I mean as

15:25:37   21   we -- as you notice, he's reporting on -- he's talking

15:25:41   22   about something in his deposition about eight --

15:25:42   23       Q.    Yeah.

15:25:43   24       A.    -- seven or eight years later, and he may

15:25:46   25   not remember --

263

15:25:46  1       Q.   Okay.

15:25:47  2       A.   -- things quite right.

15:25:48  3       Q.   But with respect to the four infections and

15:25:50  4  33 infections, that might be true, but it may not be

15:25:54  5  true that the start date was July 1st, 2008.

15:25:58  6       A.   Yeah.  I mean if he mis -- if he

15:26:01  7  misremembered one, it's possible he misremembered the

15:26:03  8  other as well.

15:26:04  9       Q.   Okay.

15:26:04  10      A.   I mean I --  I don't know.

15:26:06  11      Q.   But you don't know.

15:26:06  12      A.   I --

15:26:08  13           No, I don't know.  I don't know.  If you

15:26:10  14  asked me what I was doing --

15:26:12  15      Q.   Yeah.

15:26:12  16      A.   -- in July 2008, I don't think I could tell

15:26:15  17  you very accurately.

15:26:16  18      Q.   Had you relied on Reed's testimony regarding

15:26:19  19  the four infections in the Hot Dog group and the 33

15:26:22  20  infections in the Bair Hugger group, all of the

15:26:24  21  calculations in your report would be different;

15:26:27  22  correct?

15:26:27  23           MR. GORDON:  Object to the form of the

15:26:28  24  question, assumes facts not in evidence.

15:26:31  25      A.   Yeah.  I'm not sure what --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

264

15:26:34  1     Q.   I can re -- I'll rephrase.

15:26:36  2          Your calculation derives from four Hot Dog

15:26:40  3  infections and 31 Bair Hugger infections; correct?

15:26:43  4     A.   Yeah.  Well, which derives from Albrecht 10.

15:26:48  5     Q.   Albrecht 10.

15:26:49  6     A.   Yes.

15:26:49  7     Q.   And there's no reason to suspect that Reed

15:26:51  8  was lying.  He testified that there was four Hot Dog

15:26:53  9  infections and 33 Bair Hugger infections, and if that

15:26:57  10  is true, that would change all of the calculations in

15:26:59  11  your report; correct?

15:27:02  12     A.   It would change many of them.  I mean

15:27:05  13  ideally what I would like to know is why -- what --

15:27:08  14  what the correct --

15:27:10  15          While Reed may not remember exactly what

15:27:21  16  took place, what -- what the -- what the values were,

15:27:26  17  I think he's -- he's suggesting that there -- there

15:27:30  18  was an error in the data that are published in

15:27:35  19  McGovern.

15:27:36  20     Q.   And assuming that to be true, one of those

15:27:39  21  errors is actually there was more Bair Hugger

15:27:41  22  infections.

15:27:43  23     A.   And more -- I mean he --

15:27:47  24          One of the things he is conceding is that

15:27:49  25  there is more -- there -- there's one more Hot Dog

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

265

15:27:56  1    infection.

15:27:57  2         Q.    But you took into account --

15:27:59  3         A.    Because there's -- because there's so few,

15:28:01  4    there's only three, --

          5         Q.    Yeah.

15:28:02  6         A.    -- you're going from three to four, so

15:28:04  7    that's a 33 percent difference, so that's having a

15:28:07  8    much bigger effect on your estimates of risk than the

15:28:13  9    change of one or two in the -- in the -- in the Bair

15:28:18  10   Hugger.

15:28:18  11        Q.    But you never used that data with respect to

15:28:21  12   the Bair Hugger; correct?

15:28:23  13             MR. GORDON:  Objection.

15:28:23  14        Q.    You only used the four hundred -- or the

15:28:25  15   four Hot Dog infections and only used 33 Bair Hugger

15:28:28  16   infections in footnote one of your report; correct?

15:28:31  17        A.    That's the only place -- that's the only

15:28:33  18   place I -- I change it in my report.

15:28:35  19        Q.    Okay.

15:28:36  20        A.    Yeah.

15:28:36  21        Q.    Okay.

15:28:36  22        A.    I mean ideally what I would like to know, as

15:28:39  23   this implies, that there is -- that -- for Albrecht

15:28:45  24   10, and to be consistent, I would like to get it

15:28:50  25   consistent with -- with Reed.

266

15:28:52  1      Q.    And you can't.

15:28:54  2      A.    Not as they're given.

15:28:55  3      Q.    Okay.

15:28:56  4      A.    They would have to sit down and somehow make

15:28:58  5  a correction, either --

15:29:03  6            Well either Reed is right or -- or Albrecht

15:29:07  7  10 is -- is right on this particular question, and it

15:29:11  8  would be good if -- it would be nice if I could sit

15:29:15  9  down and they could correct what this -- what

15:29:18  10  the -- what the -- what the discrepancy is.

15:29:20  11      Q.    And you --

15:29:20  12      A.    There is a discrepancy.

15:29:21  13      Q.    And you don't know.

15:29:23  14      A.    And I don't know why there is a discrepancy.

15:29:24  15      Q.    And you don't know which one it might be.

15:29:28  16      A.    I don't know.  I mean in looking at a file

15:29:31  17  that looks like a raw data set gives me at bit more

15:29:34  18  confidence than someone remembering something eight

15:29:38  19  years ago.  But in any event, it needs -- well

15:29:45  20  someone --

15:29:45  21            Ideally, someone would sit down with these

15:29:48  22  data and, you know, review it with the -- with the raw

15:29:52  23  records and -- and -- to correct whatever -- whatever

15:29:55  24  it is.

15:29:56  25      Q.    It could also be neither.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

267

| | | |
|---|---|---|
| 15:29:58 | 1 | A.   That neither one was right? |
| 15:30:00 | 2 | MR. GORDON:  Object to the form of the |
| 15:30:01 | 3 | question, assumes facts not in evidence, calls for |
| 15:30:03 | 4 | speculation. |
| 15:30:03 | 5 | Q.   I mean the published data is neither one of |
| 15:30:06 | 6 | those two.  Correct? |
| 15:30:07 | 7 | A.   It's neither one of them. |
| 15:30:08 | 8 | MR. GORDON:  Same objection. |
| 15:30:09 | 9 | Q.   Right.  It's -- it's neither Albrecht 10 -- |
| 15:30:11 | 10 | A.   Oh, I see.  Yeah. |
| 15:30:12 | 11 | Q.   -- nor Reed's testimony. |
| 15:30:14 | 12 | A.   Yeah.  I mean if it's -- yeah, if you're |
| 15:30:17 | 13 | going -- |
| 15:30:17 | 14 | Q.   On the published data. |
| 15:30:20 | 15 | A.   Yeah.  If the published data is -- is |
| 15:30:22 | 16 | correct -- |
| 15:30:22 | 17 | Q.   Okay. |
| 15:30:23 | 18 | A.   -- and there's -- I mean, you know, there's |
| 15:30:25 | 19 | some doubt, obviously, but -- |
| 15:30:28 | 20 | Q.   Let's move to the confounding portion of |
| 15:30:32 | 21 | your report.  And I'd like to establish a definition |
| 15:30:40 | 22 | of "confounding," which I'll phrase as a variable C is |
| 15:30:45 | 23 | a confounder if it is related to disease and also |
| 15:30:48 | 24 | related to exposure.  Do you agree with that? |
| 15:31:00 | 25 | A.   State that again. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

268

15:31:01   1       Q.   A variable C is a confounder if it is

15:31:04   2   related to disease and also related to exposure.

15:31:11   3       A.   If -- if it is related to disease and it's

15:31:18   4   related to the exposure --

15:31:24   5            We're not saying statistically significant;

15:31:27   6   right?

15:31:27   7       Q.   Yeah.  I'm just --

15:31:28   8            Just for this definition.

15:31:29   9       A.   Yeah.  If that --

15:31:31  10            If those are true, then it is a confounder.

15:31:33  11       Q.   That's how you defined it in your article

15:31:35  12   "Confounding in Epidemiological Studies" which was

15:31:40  13   published in Biometrics; correct?

15:31:44  14       A.   Oh.  Oh, right, right.  Yeah, that's -- I --

15:31:47  15   I didn't remember which -- trying to remember which

15:31:50  16   article you were talking about.  Yeah.

15:31:52  17       Q.   By Wickramaratne --

          18       A.   Oh, okay.

15:31:55  19       Q.   -- and you.

15:31:56  20       A.   Not the --

15:31:57  21            Okay.  Yeah, yeah, yeah, yeah.

15:31:58  22       Q.   That's how you defined it.

15:32:00  23       A.   Okay.

15:32:01  24       Q.   And according to Dr. Borak, differently

15:32:03  25   stated, a variable must be an independent risk factor

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

269

| | | |
|---|---|---|
| 15:32:06 | 1 | for it to be a confounder on the outcome; correct? |
| 15:32:11 | 2 | MR. GORDON:  Well object, foundation. |
| 15:32:14 | 3 | A.   Yeah.  It needs to be a risk -- |
| 15:32:18 | 4 | It needs to have an association. |
| 15:32:19 | 5 | Q.   Okay.  And if there's no such association to |
| 15:32:23 | 6 | the outcome, it's not a confounder; correct? |
| 15:32:28 | 7 | A.   That's right.  I'm not eliminating it, of |
| 15:32:31 | 8 | course. |
| 15:32:31 | 9 | Q.   Yeah.  I know what you said before, but -- |
| 15:32:33 | 10 | A.   Again, I'm not saying -- |
| 15:32:34 | 11 | Q.   -- if there's no a priori relationship, it's |
| 15:32:37 | 12 | not a confounder. |
| 15:32:37 | 13 | A.   Yeah.  And we're taking about statis -- |
| 15:32:40 | 14 | We're not talking about statistics. |
| 15:32:41 | 15 | Q.   An a priori relationship. |
| | 16 | A.   Yeah. |
| 15:32:43 | 17 | Q.   If there's an a priori -- |
| 15:32:44 | 18 | If there's not an a priori relationship |
| 15:32:45 | 19 | between a variable and an outcome, it's not a |
| 15:32:48 | 20 | confounding factor. |
| 15:32:49 | 21 | A.   That's right.  Adjusted for the -- adjusted |
| 15:32:52 | 22 | for each other, yeah. |
| 15:32:53 | 23 | Q.   Okay.  Are you aware that thromboprophylaxes |
| 15:33:02 | 24 | are used for reducing the risk of blood clotting? |
| 15:33:09 | 25 | A.   I -- yeah.  I think so, yeah.  Yeah. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

270

15:33:11  1      Q.   The point of using --

15:33:13  2      A.   Yeah.

15:33:13  3      Q.   -- a thromboprophylaxis, whether it be

15:33:16  4  tinzaparin or Xarelto or any other low-molecular-

15:33:23  5  weight heparin, is to reduce the incidence of venous

15:33:27  6  thrombosis; right?

15:33:28  7      A.   Okay.  I'm not a clinician, but --

15:33:31  8      Q.   So you're not a clinician but you're

15:33:33  9  assuming there's an a priori relationship between

15:33:37  10  thrombo and other outcomes separate and apart from

15:33:40  11  deep vein thrombosis?

15:33:43  12      A.   Well what you're asking for is a -- is a

15:33:46  13  particular relationship, which is not --

15:33:48  14          I mean there are lots of drugs that are

15:33:50  15  related to more than one thing.

15:33:52  16      Q.   Okay.

15:33:53  17      A.   So the fact that that's what it is used for

15:33:57  18  does not mean it does not -- does or does not have

15:33:59  19  another effect.

15:34:00  20      Q.   Okay.  Do you know how thromboprophylaxes

15:34:03  21  are administered?

15:34:04  22      A.   No.

15:34:05  23      Q.   You're not aware that Xarelto is

15:34:08  24  administered postoperatively.

15:34:10  25      A.   No.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

271

15:34:12    1        Q.    You're not aware that tinzaparin is also

15:34:16    2    often administered postoperatively.

15:34:18    3        A.    I didn't know how they were operate -- they

15:34:22    4    were --

15:34:22    5        Q.    You didn't read that in the McGovern study?

15:34:23    6        A.    I probably did.  I wasn't --

15:34:24    7            I mean they were using it in the Jensen

15:34:29    8    study, they were using it and comparing it and looking

15:34:37    9    at it for an effect with -- with infections.

15:34:41   10        Q.    Understood.  But you're aware that the

15:34:43   11    McGovern study, the patients received the

15:34:46   12    thromboprophylaxis postoperatively.

15:34:49   13        A.    Okay.

15:34:51   14        Q.    Okay.  So the thromboprophylaxis does not

15:34:54   15    add particles to the surgical site; correct?

15:34:58   16        A.    Presumably not.

15:34:59   17        Q.    It doesn't add bacteria to the surgical

15:35:01   18    site; correct?

15:35:03   19        A.    No.

15:35:09   20        Q.    Xarelto is approved by The American College

15:35:11   21    of Chest Physicians.  Do you know that?

15:35:14   22            MR. GORDON:  Objection, lack of foundation.

15:35:16   23        A.    Xarelto is which one now?

15:35:18   24        Q.    Rivaroxaban.

15:35:20   25        A.    Rivaroxaban.  Okay.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

272

15:35:23  1      Q.   It is.

15:35:23  2      A.   Okay.  I don't --

15:35:23  3           I was not aware of that.  I --

15:35:25  4      Q.   Okay.  Have you studied the record trials?

15:35:29  5      A.   No, I have not.

15:35:30  6      Q.   You're not aware that there were five

15:35:32  7  randomized controlled trials that evaluated the safety

15:35:35  8  of rivaroxaban, otherwise known as Xarelto, in

15:35:40  9  orthopedic surgeries?

15:35:41  10     A.   No, I'm not familiar with that.

15:35:44  11     Q.   You're not aware that one of the studies

15:35:46  12  concluded that the clinical efficacy and safety of

15:35:52  13  rivaroxaban after elective hip and knee arthroplasty

15:35:58  14  has been established in the four randomized controlled

15:36:00  15  trials of the regulation of coagulation in orthopedic

15:36:03  16  surgery to prevent deep vein thrombosis.

15:36:07  17     A.   I was not familiar with that.

15:36:11  18     Q.   Did you attempt to investigate whether

15:36:16  19  thromboprophylaxes have been deemed to be safe in

15:36:20  20  orthopedic surgeries?

15:36:20  21     A.   No.  I was -- I was looking at -- well the

15:36:26  22  same -- the evidence that -- that McGovern cited as --

15:36:36  23           He was citing the -- the work that was done

15:36:38  24  by -- the paper by Jensen I believe.

15:36:42  25     Q.   So the only basis for an a priori assumption

273

15:36:46    1    that the use of Xarelto is related to the outcome of

15:36:50    2    interest; namely, deep joint infection, is the Jensen

15:36:54    3    study?

15:36:55    4        A.    That was, my understanding, the basis on

15:36:58    5    which they did not control for it.

15:37:00    6        Q.    And my question is a little different.  Your

15:37:03    7    basis for making an a priori assumption that Xarelto

15:37:08    8    is related to the outcome of interest, which is deep

15:37:12    9    joint infection, is only the Jensen study.

15:37:17   10        A.    That's what I was looking -- looking for.

15:37:21   11              McGovern did not control for any

15:37:26   12    confounding.

15:37:26   13        Q.    I understand.  My question again, which I

15:37:28   14    think you answered, is that the only piece of

15:37:32   15    evidence --

           16        A.    Yes.

15:37:33   17        Q.    -- that you considered as to whether there

15:37:34   18    is an --

           19        A.    I was --

15:37:34   20        Q.    -- a priori relationship between Xarelto and

15:37:37   21    the outcome of interest, which is deep joint

15:37:39   22    infection, is the Jensen study.  True or false?  It's

15:37:42   23    a one-word answer.

15:37:43   24        A.    Yeah.  Well I wasn't saying it was a priori.

15:37:47   25    I was looking at the data --

274

15:37:48   1        Q.    Okay.

15:37:49   2        A.    -- to see whether or not there was an

15:37:50   3   association.

15:37:51   4        Q.    Is that the only study that you looked at?

15:37:53   5        A.    Well I was using --

15:37:58   6              I referred to that study because that was

15:38:01   7   the study that McGovern referred to.

15:38:03   8        Q.    Did you look at any other studies?

15:38:04   9        A.    I didn't look at any other studies.  I had

15:38:08  10   be --

15:38:08  11              The data on which the Jensen paper was --

15:38:17  12   was based, I mean the design is basically the same

15:38:21  13   sort of --

15:38:23  14        Q.    The same design as in McGovern.

15:38:25  15        A.    Yeah.  It's the same flawed design that

15:38:28  16   McGovern used, which is based on dates.

15:38:30  17        Q.    Okay.  But my question again is did you look

15:38:34  18   at any other studies?

15:38:35  19        A.    And so I could repeat -- I could repeat the

15:38:37  20   analysis --

15:38:37  21        Q.    Okay.  We'll get there.  Trust me, we'll get

15:38:41  22   there.

15:38:41  23        A.    -- that -- that they did using Albrecht 10.

15:38:44  24        Q.    Okay.  So in other words, your only basis

15:38:49  25   for concluding that the thromboprophylaxis may or may

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

275

15:38:53  1  not be a confounder is based on the data from Albrecht

15:38:55  2  Exhibit 10.

15:38:56  3      A.   Yes.

15:39:01  4      Q.   You conducted no investigation to determine

15:39:04  5  whether the peer-reviewed public literature had

15:39:06  6  determined that Xarelto was safe in orthopedic

15:39:09  7  surgeries.

15:39:10  8      A.   No.

15:39:16  9      Q.   And the Jensen study, which appears to be

15:39:25  10 the source that you rely on with application of

15:39:29  11 Albrecht Exhibit 10, in fact found that there was not

15:39:33  12 a significant difference between deep joint infection

15:39:36  13 rates from the use of Xarelto compared to tinzaparin;

15:39:41  14 correct?

15:39:41  15     A.   They did not find a statistical

15:39:43  16 significance.

15:39:43  17     Q.   That's the scope of the question.

15:39:45  18     A.   That's right.

15:39:45  19     Q.   And the p-value wasn't even close to

15:39:49  20 significant; correct?

15:39:51  21     A.   Yes.  The p-value was --

15:39:53  22          Yeah.

15:39:54  23     Q.   Do you know what it was?

15:39:56  24     A.   I think somewhere around .11 or something.

15:39:58  25 I don't remember.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

276

15:39:59    1        Q.    .7 ring a bell?

15:40:01    2        A.    .7?

15:40:02    3        Q.    Yeah.

15:40:03    4              MR. GORDON:   Maybe you should look at the

15:40:04    5    article.

15:40:06    6        A.    Yeah.   That seems high.   I --

15:40:12    7              Do you have the article?

15:40:14    8        Q.    We have marked the article as a prior

15:40:17    9    exhibit, and I can tell you what it is in a moment.

15:40:24   10              MR. GORDON:   I'm look --

15:40:26   11              Nineteen.

15:40:26   12        A.    Here.   Oh, I'm --

15:40:28   13              MR. GORDON:   Exhibit 19.

15:40:32   14        Q.    If you turn to page 523 on the bottom right,

15:40:37   15    or internal page 93, there's a section entitled

15:40:40   16    "Results;" correct?

15:40:44   17              Of the Jensen study.

15:40:44   18        A.    Do I have --

15:40:44   19        Q.    Oh, okay.

15:40:45   20              MR. GORDON:   It's Exhibit 19.

15:40:46   21        Q.    Exhibit 19, professor.

15:40:48   22        A.    Nineteen.

15:40:55   23              MR. GORDON:   That's it.

15:40:58   24        Q.    Okay.   If you turn to page 523, in the

15:40:59   25    bottom right-hand corner --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

277

15:41:00    1        A.    Okay.

15:41:01    2        Q.    -- on the left column is a section entitled

15:41:03    3    "Results;" correct?

15:41:04    4        A.    Yes.

15:41:06    5        Q.    Do you see the third paragraph that says,

15:41:06    6    "Of those...?"

15:41:07    7        A.    Yeah.

15:41:07    8        Q.    It says, "Of those patients who returned to

15:41:10    9    theatre, microbiology results showed that five of the

15:41:15   10    nine (55.5 percent) in group 1 had a deep infection,

15:41:16   11    compared with 14 of 22 (63.6 percent) in group 2 (p

15:41:20   12    equals 0.7)."

15:41:23   13        A.    Okay.

15:41:23   14        Q.    Does that refresh your recollection --

15:41:24   15             MR. GORDON:  Well why don't you read the

15:41:26   16    rest of the section that actually talks about deep

15:41:29   17    infection.

15:41:29   18             THE WITNESS:  Yeah.

15:41:29   19        Q.    "The overall rate of deep infection in group

15:41:33   20    1 was one percent, compared with 2.5 percent in group

15:41:34   21    2" with a p-value of .1.

15:41:36   22        A.    Right.  So that's what I was --

15:41:37   23        Q.    Is that the p-value of interest or is it the

15:41:41   24    .7?

15:41:41   25        A.    I was thinking it was --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

278

15:41:43  1          You're com -- you're comparing the deep

15:41:44  2   infection rate --

15:41:45  3        Q.   Okay.

15:41:46  4        A.   -- between the two, and so that was the

15:41:48  5   comparison that I was looking at, because we were

15:41:50  6   looking at deep -- you know, deep infection rates in

15:41:56  7   McGovern.

15:41:57  8          And of course the definition of "deep

15:42:01  9   infection" is different in Jensen's paper than it is

15:42:04  10  in McGovern.

15:42:06  11       Q.   It was a 30-day period whereas in --

          12       A.   Thirty days --

15:42:08  13       Q.   -- McGovern it was a 60-day period; correct?

15:42:10  14       A.   Exactly.

15:42:10  15       Q.   Okay.

15:42:11  16       A.   So there are some -- going to be some more

15:42:14  17  infections in -- if -- I -- I --

15:42:18  18          I went on and I used the McGovern

15:42:21  19  definition.

15:42:21  20       Q.   Yeah.  For both arms of the study; correct?

15:42:23  21       A.   For -- for -- that's right, for the -- for

15:42:25  22  Jensen.

15:42:26  23       Q.   So there could be more infections in the

15:42:28  24  Bair Hugger group and there could be more infections

15:42:30  25  in the Hot Dog group.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

279

15:42:31   1        A.    Exactly.

15:42:32   2        Q.    Okay.  In addition to the Jensen study, did

15:42:34   3   you review the Reed study that also analyzed whether

15:42:39   4   there was a significant increase in deep joint

15:42:42   5   infection rates from the use of a low-molecular-weight

15:42:47   6   heparin to Xarelto?

15:42:48   7        A.    I don't know that I looked at that much.

15:42:51   8        Q.    It was cited by Dr. Samet; correct?

15:42:53   9        A.    It -- it may have been.  I -- I'm just not

15:42:57  10   re --

15:42:57  11             I don't recall that one.

15:42:58  12        Q.    I'll represent to you that it was cited

15:43:00  13   by --

15:43:00  14        A.    Okay.

15:43:02  15        Q.    -- Dr. Samet.  You did not review that

15:43:04  16   article?

15:43:04  17        A.    I don't recall reviewing that article, no.

15:43:06  18        Q.    So to the extent that Dr. Samet relied on

15:43:09  19   that article in concluding that the change in

15:43:11  20   thromboprophylaxis was not a confounding factor, you

15:43:14  21   have not reviewed that study and therefore cannot

15:43:16  22   comment on it.

15:43:17  23        A.    Well Samet was talking about looking at

15:43:20  24   effects and he was basing his conclusions on the

15:43:26  25   conclusion of the paper, which depended on statistical

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

280

15:43:28    1    significance, --

15:43:28    2         Q.    Okay.

15:43:29    3         A.    -- so he was looking at --

15:43:32    4              My understanding of Samet's statement was

15:43:35    5    on -- the basis of it was that they did not find that

15:43:38    6    it was statistically significant, --

15:43:39    7         Q.    Okay.

15:43:40    8         A.    -- and on that basis he -- he dismissed it.

15:43:43    9         Q.    To the extent that others have concluded,

15:43:46   10    such as Dr. Reed in his deposition, --

15:43:47   11         A.    Yeah.

15:43:48   12         Q.    -- that Xarelto can be ruled out as a

15:43:51   13    confounding factor, do you have any basis to doubt

15:43:53   14    that statement?

15:43:56   15         A.    Well I -- I mean we did -- we did the --

15:44:02   16    the -- we --

15:44:05   17              We talked about the reasons that a variable

15:44:10   18    is -- is a confounder, --

15:44:11   19         Q.    Yeah.

15:44:12   20         A.    -- and as I've -- as I've said, the -- the

15:44:18   21    reason for it being a confounder is that there is this

15:44:22   22    association with the exposure and with the outcome,

15:44:25   23    okay, and we've stipulated that that association may

15:44:29   24    not be statistically significant.

15:44:31   25         Q.    We haven't stipulated, but you said that.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

281

15:44:34    1        A.    Well -- and I've --

15:44:36    2              In my report I referred to the work by --

15:44:38    3    the -- the textbook by --

15:44:43    4        Q.    Breslow and Day.

15:44:45    5        A.    -- Breslow and Day where they in fact show

15:44:48    6    example -- a counterexample of where that is in fact

15:44:50    7    true.

15:44:51    8        Q.    That example related to cancer and age;

15:44:53    9    correct?

15:44:53   10        A.    I've forgotten what the -- what the table

15:44:57   11    was, but --

15:44:58   12        Q.    Okay.

15:44:58   13        A.    -- it -- it doesn't really -- it doesn't

15:45:01   14    really matter.  It was just illustrating the -- the

15:45:03   15    point --

15:45:04   16        Q.    Okay.

15:45:04   17        A.    -- that you could have -- you could have

15:45:07   18    associations that are not -- that don't achieve

15:45:10   19    statistical significance but they do in fact behave as

15:45:15   20    confounders in that they change the association when

15:45:19   21    you adjust for them.  And it can go either way, it can

15:45:23   22    go -- make a very weak association stronger or it can

15:45:27   23    make a strong association go away.

15:45:29   24        Q.    But you had said before that it's not always

15:45:32   25    necessary to control for a particular variable in the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

282

15:45:35   1   event that it is not significantly related to the

15:45:39   2   outcome; correct?

15:45:42   3        A.   You may need to control for it even if it is

15:45:45   4   not.

15:45:45   5        Q.   The question was a little different.  You've

15:45:47   6   said you do not need to control for a particular

15:45:52   7   variable in the event that there is not a significant

15:45:55   8   relationship between that variable and the outcome of

15:45:58   9   interest; correct?

15:46:00  10        A.   No, I don't think that's quite what I --

15:46:03  11   what I said.  I -- the --

15:46:12  12             When people are looking for confounders,

15:46:16  13   it's -- it's a tricky thing to look for it because

15:46:21  14   statistical significance is an easy thing for it to

15:46:25  15   sort of pop out, --

15:46:26  16        Q.   Uh-huh.

15:46:26  17        A.   -- but a confounding variable is does the

15:46:30  18   control for this variable change the magnitude of the

15:46:33  19   association that you're looking for, --

15:46:34  20        Q.   Okay.

15:46:34  21        A.   -- and so that's the relevant issue.

15:46:37  22        Q.   We'll get -- we'll get there.

15:46:38  23        A.   And that's -- and that's not what -- what --

15:46:41  24   what Samet seemed to be talking about in his

15:46:44  25   deposition.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

283

15:46:45   1          MR. SACCHET:  Okay.  We'll get to the change

15:46:46   2   in relative risk in a minute, but first I'd like you

15:46:49   3   to, in just a moment, return -- turn your attention to

15:46:56   4   what will be marked as Exhibit --

15:46:59   5          THE REPORTER:  Twenty-six.

15:46:59   6          MR. SACCHET:  -- 26.

15:47:10   7          (Exhibit 26 was marked for

15:47:12   8          identification.)

15:47:12   9   BY MR. SACCHET:

15:47:15   10      Q.   Is this a document regarding reader

15:47:18   11   reactions to your article entitled "Confounding in

15:47:23   12   Epidemiologic Studies?"  Which you can see on page

15:47:29   13   1309, the first page of actual text of the document,

15:47:36   14   on the title.  First page of text after the title

15:47:40   15   page.

15:47:52   16      A.   Oh, this is -- okay.

15:47:54   17      Q.   Have you seen this document before?

15:47:55   18      A.   Yes, I have.

15:47:57   19      Q.   Okay.  And you indeed published an article

15:48:00   20   called "Confounding in Epidemiologic Studies;"

15:48:05   21   correct, in 1989 --

15:48:06   22      A.   Yes.

15:48:06   23      Q.   -- in Biometrics?

15:48:08   24      A.   Nineteen --

15:48:13   25          Well I think this is referring -- this

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

284

15:48:16  1   appeared in --

15:48:17  2        Isn't this referring to the Wickramar --

15:48:22  3   Wickramaratne --

15:48:22  4        Q.   Yes.

15:48:23  5        A.   -- paper in '87?

15:48:24  6        Q.   Okay.  And you were a co-author of that

15:48:27  7   paper; correct?

15:48:28  8        A.   Yes, I am.

15:48:28  9        Q.   Okay.  So as you can see on the first page

15:48:30  10  of text at 1309, Sander Greenland from the Department

15:48:33  11  of Epidemiology at UCLA --

15:48:36  12       A.   Yeah.

15:48:36  13       Q.   -- provides a reader reaction; correct?

15:48:38  14       A.   Yes.

15:48:39  15       Q.   On page 1310, Paul Holland from Princeton,

15:48:43  16  New Jersey also provides a reader reaction; correct?

15:48:46  17       A.   Yes.

15:48:54  18       Q.   And on page 1317, Professor Mantel from

15:49:01  19  American University provides a review as well;

15:49:05  20  correct?

15:49:05  21       A.   Yes.

15:49:06  22       Q.   Professor Mantel is a notable statistician;

15:49:09  23  correct?

15:49:09  24       A.   Yes, he is.  Was.

15:49:11  25       Q.   Oh.  Okay.  I didn't know that.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

285

15:49:13  1          And on page 1319 you provide a response.

15:49:19  2      A.    Yes.

15:49:21  3      Q.    And if you go to the paragraph on 1319

15:49:27  4  beginning with "Mantel," do you see it says "Mantel

15:49:30  5  raises...?"

15:49:30  6      A.    Yeah.

15:49:30  7      Q.    And it says, "Mantel raises the important

15:49:32  8  question often facing the applied statistician of what

15:49:35  9  to do when faced with the analysis or design of a

15:49:38  10  particular study."  Do you see that?

15:49:39  11     A.    Yes.

15:49:40  12     Q.    I'm going to skip the next sentence and then

15:49:42  13  say, "Reasons given by Mantel for covariate adjustment

15:49:47  14  are '...to reduce bias and to increase precision.'

15:49:49  15  The particular example described by Mantel involves

15:49:53  16  age as a potential confounder for cancer, a situation

15:49:55  17  in which there is no question of whether there is in

15:49:58  18  fact association.  However, in other situations, one

15:50:01  19  must decide whether to adjust on an empirical basis,

15:50:05  20  and in these instances it was not always obvious how

15:50:08  21  one should behave."

15:50:10  22          That's what you wrote; correct?

15:50:11  23     A.    Yes.

15:50:11  24     Q.    You then say, "Statistical significance is

15:50:15  25  not always the best guide as to which variables are

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

286

15:50:18   1   confounders by any reasonable criterion, as was

15:50:24   2   elegantly pointed out in an example given by Breslow

15:50:24   3   and Day;" correct?

15:50:25   4       A.   Yes.

15:50:25   5       Q.   Why didn't you say it never is?

15:50:31   6       A.   Well it could be.

15:50:34   7       Q.   So in the event that there is not

15:50:38   8   statistical significance between two variables, there

15:50:41   9   may be no need to control as to whether that variable

15:50:45   10  is a confounder?

15:50:48   11      A.   Well you could have an association that is

15:50:55   12  not statistically significant but it is important to

15:50:59   13  control because it -- because your estimate of

15:51:04   14  association is biased if you don't control it.

15:51:07   15      Q.   But you may also have a situation in which

15:51:10   16  the variable is non-significant to an outcome and you

15:51:13   17  shouldn't control; correct?

15:51:16   18      A.   No.  It -- it has nothing to -- it's --

15:51:20   19  the --

15:51:21   20          The point is -- the point I was making

15:51:23   21  before is that -- is are -- is that statistical

15:51:26   22  significance is not necessarily the criteria you

15:51:32   23  should be looking at.

15:51:34   24      Q.   For confounding.

15:51:35   25      A.   For confounding.  You could have

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

287

15:51:38  1  assoc -- I mean it's not -- it could --

15:51:41  2         The reason it's not statistically

15:51:43  3  significant could be that there is no association,

15:51:47  4  okay, and that's in fact the criteria that -- that --

15:51:52  5  that -- that's what's needed for there to be --

15:51:58  6         Well, if there is no association, then it --

15:52:03  7  then there is no confounding.

15:52:04  8      Q.  Okay.

15:52:05  9      A.  But there could be an association, it's just

15:52:08  10  that that association -- you don't have enough power

15:52:10  11  to -- to determine if that association -- for that

15:52:14  12  association to be statistically significant.

15:52:16  13      Q.  Okay.

15:52:17  14      A.  And so in that case, you shouldn't make your

15:52:22  15  choice based on the statistical significance but

15:52:27  16  whether or not it actually does make a change in

15:52:29  17  the -- in the effect.

15:52:30  18      Q.  Okay.  And that's what you mean when you go

15:52:32  19  on to say, "In this instance, the potential confounder

15:52:35  20  was not significantly associated with disease, and yet

15:52:38  21  the inference on the disease factor association was

15:52:40  22  quite different depending on whether one controlled

15:52:43  23  for the confounding variable in the analysis."

15:52:45  24      A.  Yes.

15:52:45  25      Q.  Correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

288

15:52:46   1        A.   Uh-huh.

15:52:46   2        Q.   Okay.  So the bottom line is whether or not

15:52:50   3   something is significant, you should look at whether

15:52:53   4   the odds ratio changes based on the uncontrolled

15:52:57   5   calculation and the controlled calculation; correct?

15:52:59   6        A.   Yes.

15:53:00   7        Q.   And in this instance you applied McGovern 10

15:53:04   8   using the Jensen time periods and found that the odds

15:53:09   9   ratio was 2.16; correct?

15:53:12   10       A.   Something like that.

15:53:13   11       Q.   Is that true?

15:53:15   12       A.   I'd have to look it up.

15:53:31   13       Q.   Page six.

15:53:46   14       A.   "In this case the results are" blah, blah,

           15   blah.

15:53:50   16            2.168.  I'm sorry.  Okay.

15:53:51   17       Q.   Okay.

15:53:52   18       A.   Yeah.

15:53:52   19       Q.   So controlling for tinzaparin --

15:53:55   20       A.   Yeah.

15:53:56   21       Q.   -- in the Bair Hugger period compared to the

15:53:59   22   Hot Dog period, based on Albrecht 10, yielded an odds

15:54:03   23   ratio of 2.16; correct?

15:54:04   24       A.   That's right.

15:54:05   25       Q.   And the odds ratio that you calculated when

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

289

15:54:09  1  you used Albrecht 10, based on the uncontrolled

15:54:12  2  calculation, was 2.76; correct?

15:54:14  3      A.    That's correct.

15:54:14  4      Q.    The decrease in the odds ratio is .6;

15:54:17  5  correct?

15:54:17  6      A.    That's right.

15:54:18  7      Q.    So that would be at best the magnitude of

15:54:24  8  the degree of confounding if there is any confounding,

15:54:27  9  correct, based on your calculation?

15:54:29  10     A.    Yeah.  Well that -- that -- that change

15:54:32  11  would be a change due to controlling for --

15:54:42  12  controlling for use -- use of this -- of -- of this --

15:54:45  13  of this treatment, whatever that corresponds to.

15:54:48  14     Q.    But I want to be clear that the change is .6

15:54:51  15  in the odds ratio; correct?

15:54:53  16     A.    That's right.  That's right.

15:54:55  17     Q.    In your response to Mantel you say that the

15:54:58  18  inference on the disease factor association was quite

15:55:00  19  different when one controlled for age with respect to

15:55:04  20  cancer; correct?

15:55:06  21     A.    It depended --

15:55:07  22           I don't know what the example was here.

15:55:09  23     Q.    Okay.  Would you --

15:55:11  24     A.    Whatever it is.

15:55:12  25     Q.    -- view a change of .6 to be quite

290

15:55:15   1   different?

15:55:15   2        A.   I'd say it's a fair -- fair difference, yes.

15:55:19   3        Q.   Okay.

15:55:19   4        A.   So 2. -- 2.76, yeah, I mean that's --

15:55:23   5   it's --

15:55:27   6        Q.   Approximately 20 percent.

15:55:29   7        A.   Oh, it's more than 26 percent; isn't it?

15:55:32   8   It's --

15:55:37   9        Q.   I don't think so.

15:55:40  10        A.   -- two --

15:55:41  11        Q.   .6 --

15:55:46  12        A.   -- point --

15:55:48  13        Q.   -- on 2.76?

15:55:49  14        A.   Well the 2.76, that's a -- an increase of

15:55:52  15   1.76.

15:55:54  16        Q.   From 2.76 to 2.16 is a difference of .6.

15:56:01  17        A.   Right.

15:56:02  18        Q.   Okay.

15:56:03  19        A.   And so if there's no association, the odds

15:56:07  20   ratio is -- is -- is one.

15:56:11  21        Q.   You're getting that from controlling both --

15:56:14  22        A.   If there's no -- no association, you're

15:56:16  23   looking at --

15:56:17  24        Q.   Correct.

15:56:18  25        A.   -- the ratio of two incidence rates.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

291

15:56:19    1        Q.    This odds -- this odds ratio is still above

15:56:21    2    2.0 --

15:56:22    3        A.    It is.

15:56:22    4        Q.    -- when controlling for the

15:56:24    5    thromboprophylaxis; correct?

15:56:26    6        A.    That's right.

15:56:27    7        Q.    There is still a doubling of the risk even

15:56:29    8    when controlling for the thromboprophylaxis; correct?

15:56:33    9        A.    That's right.  So --

15:56:34    10       Q.    Okay.

15:56:35    11       A.    -- if you --

15:56:35    12             You're looking at a difference at -- at the

15:56:39    13   change above one, --

15:56:40    14       Q.    Okay.

15:56:41    15       A.    -- not -- not zero.

15:56:42    16       Q.    But you would still agree that the --

15:56:45    17       A.    It's a fairly big chart -- change.

15:56:48    18       Q.    -- the change --

15:56:49    19             The controlled thromboprophylaxis OR is

15:56:52    20   still above 2.0.

15:56:53    21       A.    It is, yes.

15:56:54    22       Q.    And it --

15:56:55    23             That means it's still a doubling of the risk

15:56:57    24   even when the thrombo --

15:56:59    25       A.    But the point -- the point estimate is

292

15:57:01  1    above.  I mean look at the confidence limits.

15:57:03  2         Q.  Of your calculation?

15:57:05  3         A.  .7 --

15:57:05  4             After you control for it.

15:57:06  5         Q.  Yes.

15:57:07  6         A.  .73 to 8. --

15:57:10  7             I mean it's still --

15:57:11  8         Q.  It's --

15:57:11  9         A.  The estimate of what the effect is is not

15:57:14  10   very precise I would say.

15:57:15  11        Q.  It's a third of the size of your Jensen

15:57:16  12   reanalysis; is it not?  Your Jensen reanalysis has as

15:57:22  13   25-point confidence interval.

15:57:27  14        A.  The 25, that's --

15:57:29  15        Q.  One to 25.

15:57:31  16             MR. GORDON:  Object to the form of the

15:57:32  17   question, assumes facts not in evidence.

15:57:35  18        A.  Yeah.  I -- you're looking at --

15:57:37  19             I mean those are not a fair comparison.  I

15:57:41  20   mean --

15:57:42  21        Q.  Why not?

15:57:45  22        A.  I mean both of them are very poor estimates.

15:57:50  23        Q.  Yours is three times the size --

15:57:53  24        A.  Well you're looking at the range.

15:57:56  25        Q.  -- of this.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

293

15:57:56    1        A.    Remember, I said, you know, the -- when you

15:57:58    2    construct a confidence interval on an odds ratio, you

15:58:01    3    generally do it on the log transformation, --

15:58:03    4        Q.    Okay.

15:58:04    5        A.    -- and so once you threw it -- do it in the

15:58:06    6    log, you have to look at it in the log scale.

15:58:09    7        Q.    Okay.  You would agree, nonetheless, that

15:58:12    8    the odds -- that the confidence interval you

15:58:15    9    calculated based on the Jensen reanalysis is larger

15:58:18   10    than the confidence interval of both the McGovern

15:58:20   11    study and the confidence interval that you report when

15:58:23   12    controlling for the thromboprophylaxis.

15:58:26   13        A.    The range of the two would be greater, yes,

15:58:27   14    the range of the two would be greater, but a big part

15:58:30   15    of that reason for the change in the range, the

15:58:32   16    arithmetic difference in that range, is because the

15:58:36   17    odds ration is much smaller.  In the other example in

15:58:40   18    the -- in the -- from the -- from the Jensen

15:58:43   19    comparison, the odds ratio was 4.77.

15:58:46   20        Q.    Okay.

15:58:47   21        A.    So that's more than twice --

15:58:50   22        Q.    Okay.

15:58:52   23        A.    -- what the odds ratio is here.

15:58:52   24        Q.    Your odds ratio is more than three times the

15:58:55   25    ev -- the confidence interval here.  Your confidence

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

294

15:58:59  1  interval is three times the size of the confidence

15:59:01  2  interval even though the odds ratio here is half the

15:59:03  3  amount of the odds ratio you reported --

4      A.   Yes.  Okay.

15:59:05  5      Q.   -- in the Jensen reanalysis.

15:59:07  6      A.   Okay.

15:59:08  7      Q.   Okay.

15:59:09  8      A.   So I don't -- I don't -- I don't understand

15:59:12  9  what your point is.  But --

15:59:13  10      Q.   My point is that it's clear that the Jensen

15:59:15  11  reanalysis has more variability than does your

15:59:18  12  calculation of the 2.16 odds ratio --

13      A.   The difference between the high and low --

15:59:24  14      Q.   -- when controlling for the

15:59:25  15  thromboprophylaxis; correct?

15:59:28  16      A.   The difference be -- the -- the --

15:59:31  17           The difference between the high and the low

15:59:33  18  of the confidence interval is greater on that one

15:59:35  19  than -- is -- is diff -- quite different between those

15:59:40  20  two.  I agree to that.

15:59:41  21      Q.   It's greater.

15:59:42  22      A.   It's greater.  I agree with that.

15:59:45  23      Q.   Thank you.

15:59:46  24           As to the Jensen reanalysis, have you

15:59:48  25  published your reanalysis of the Jensen study?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

295

| | | |
|---|---|---|
| 15:59:50 | 1 | A.   No. |
| 15:59:51 | 2 | Q.   So you haven't reviewed any published |
| 15:59:55 | 3 | literature regarding the safety of Xarelto with |
| 15:59:57 | 4 | respect to deep joint infection. |
| 16:00:00 | 5 | MR. GORDON:  Objection, asked and answered. |
| 16:00:01 | 6 | A.   No, I've -- |
| 16:00:03 | 7 | Q.   Are you going to publish it? |
| 16:00:05 | 8 | A.   No. |
| 16:00:06 | 9 | Q.   So there is no published literature that you |
| 16:00:09 | 10 | are aware of that suggests a relationship between the |
| 16:00:14 | 11 | variable of a thromboprophylaxis on the outcome of |
| 16:00:18 | 12 | deep joint infection. |
| 16:00:21 | 13 | A.   I don't know of any. |
| 16:00:22 | 14 | Q.   Okay.  If we could, let me show you another |
| 16:00:28 | 15 | document. |
| 16:00:28 | 16 | A.   I mean it is interesting that they in |
| 16:00:32 | 17 | fact -- they seem to have not -- |
| 16:00:35 | 18 | They went -- they went back to using the -- |
| 16:00:39 | 19 | using the treatment they were originally using even |
| 16:00:42 | 20 | though the Jensen paper did not find it statistically |
| 16:00:45 | 21 | significant. |
| 16:00:46 | 22 | Q.   You don't have an ex -- expertise in |
| 16:00:47 | 23 | infectious disease; do you? |
| 16:00:50 | 24 | A.   No. |
| 16:00:51 | 25 | Q.   You're not a medical doctor. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

296

16:00:53    1       A.    I'm not.

16:00:53    2       Q.    You don't know why they changed back to

16:00:56    3   tinzaparin.

16:00:57    4       A.    No, I -- no, I don't.  I don't know if this

16:00:59    5   is the basis of it or not.

16:01:00    6       Q.    Okay.

16:01:01    7       A.    But I mean this was the ba --

16:01:02    8             It was Jensen's paper that -- that McGovern

16:01:06    9   is quoting, right, --

16:01:07   10       Q.    Uh-huh.

16:01:08   11       A.    -- as the -- as for saying why it's not a

16:01:12   12   confounder?

16:01:13   13       Q.    And the Jensen --

16:01:14   14       A.    And while the Jensen paper is not -- not

16:01:19   15   statistically significant, --

           16       Q.    Uh-huh.

16:01:21   17       A.    -- they nevertheless changed the policy --

16:01:24   18   changed the regimen that they were using at Wansbeck.

16:01:27   19       Q.    Okay.  But you don't know why they did.

16:01:30   20       A.    No, I don't.

16:01:30   21       Q.    Okay.

16:01:31   22       A.    I find it interesting.

16:01:43   23       Q.    Did you ask anyone why they changed from

16:01:44   24   tinzaparin to Xarelto and back to tinzaparin?

16:01:47   25       A.    No.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

297

16:01:48    1              (Exhibit 27 was marked for

16:01:53    2              identification.)

16:01:53    3    BY MR. SACCHET:

16:01:54    4         Q.   Did you ask 3M to investigate the issue?

16:01:58    5         A.   Of why they changed back?

16:02:00    6         Q.   Yes.

16:02:01    7         A.   No.

16:02:01    8         Q.   Okay.  This is a section from Breslow and

16:02:09    9    Day; correct?

16:02:11   10         A.   Is it?  I don't -- I don't know.  It

16:02:13   11    doesn't --

16:02:13   12              Oh, okay.  Seems to be.

16:02:23   13         Q.   And here on page 105 Breslow and Day state,

16:02:31   14    about in the middle of the page, paragraph begins "A

16:02:34   15    third way..."  Do you see that?

16:02:35   16         A.   Uh-huh.

16:02:36   17         Q.   And the third sentence says, "Stratification

16:02:39   18    by factors which are not genuine confounding variables

16:02:42   19    would therefore increase the variability of the

16:02:44   20    estimates without eliminating any bias..."  Do you

16:02:46   21    agree with that statement?

16:02:53   22         A.   Trying to see what they're talking about

16:02:55   23    here.

16:02:59   24              MR. GORDON:  I'm sorry, where are you?

16:03:00   25              MR. SACCHET:  I'm on page 105 and the

298

16:03:03  1  paragraph starting "A third way...," in the third

16:03:06  2  par -- in the third sentence.

16:03:11  3      A.   Okay.  They're talking about overmatching.

16:03:14  4  Okay.

16:03:15  5      Q.   Yes.  Okay.  And then they say, "It is

16:03:17  6  commonly seen when data are stratified by a variable

16:03:20  7  known to be associated with exposure but not in itself

16:03:24  8  independently related to disease;" correct?

16:03:26  9      A.   Yes.

16:03:26  10      Q.   So to the extent that you have a factor and

16:03:30  11  you control for that factor, even though it's related

16:03:34  12  to the -- even though it's related to the treatment

16:03:41  13  but not necessarily the outcome, that will result in

16:03:45  14  unnecessary bias; correct?

16:03:47  15          MR. GORDON:  Object to the form of the

16:03:48  16  question.

16:03:51  17      A.   I don't think the term they're using is

16:03:53  18  "bias," I think they're talking about variability.

16:03:56  19      Q.   Okay.  So --

16:03:56  20      A.   That's different.

16:03:56  21      Q.   Okay.  You would agree to the extent that my

16:03:59  22  question involves variance or variability as opposed

16:04:04  23  to bias.

16:04:04  24      A.   Okay.

16:04:04  25      Q.   Okay.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

299

16:04:04    1        A.    So we're talking about vari -- variance and

16:04:06    2    not bias.  Okay.

16:04:07    3        Q.    Okay.  So in the event that, for the sake of

16:04:12    4    argument, the thromboprophylaxis is not in fact

16:04:16    5    related to the outcome of interest, which is deep

16:04:19    6    joint infection, if one were to control for the

16:04:22    7    thromboprophylaxis, that would inject variance;

16:04:26    8    correct?

16:04:26    9              MR. GORDON:  Object to the form of the

16:04:27   10    question, assumes facts not in evidence, incomplete

16:04:30   11    hypothetical.

16:04:33   12        A.    I mean I think what you see -- what --

16:04:36   13              What this is saying, if it's not, then they

16:04:41   14    would -- it would have no effect on the estimate but

16:04:44   15    it would increase the variance.

16:04:46   16        Q.    Okay.

16:04:47   17        A.    Okay?

16:04:48   18        Q.    Yeah.

16:04:49   19        A.    In the control that -- that I did in this

16:04:57   20    analysis, the estimate did change.

16:05:01   21        Q.    And the confidence interval did, too;

16:05:03   22    correct?

16:05:03   23        A.    And confidence --

16:05:05   24              They both changed, yes.

16:05:06   25        Q.    And that confidence interval measures

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

300

16:05:08　1　variance.

16:05:09　2　　　A.　That's -- that's an indication of precision.

16:05:10　3　　　Q.　Okay.

16:05:11　4　　　A.　Yeah.

16:05:11　5　　　Q.　If we look at --

16:05:12　6　　　A.　And so what they're saying here is that

16:05:14　7　you've -- you've got a variable, there's no point in

16:05:17　8　controlling it.  To control for bias, it's not going

16:05:23　9　to do anything to that, --

16:05:24　10　　　Q.　Okay.

16:05:25　11　　　A.　-- and so you're just throwing it in there

16:05:28　12　unnecessarily and that's going to increase the

16:05:29　13　variance.

16:05:29　14　　　Q.　Okay.

16:05:30　15　　　A.　And so -- so I would -- I would agree with

16:05:34　16　that, but I would disagree that that corresponds to

16:05:39　17　that particular analysis on page six --

16:05:42　18　　　Q.　In --

16:05:43　19　　　A.　-- of my report.

16:05:44　20　　　Q.　-- the bottom paragraph, the last full

16:05:47　21　sentence states, "Good evidence may be available from

16:05:50　22　previous studies that C is not causally related to

16:05:54　23　disease, in which case it should not be incorporated

16:05:57　24　as a confounder."  Do you see that?

16:06:01　25　　　A.　Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

301

16:06:04  1    Q.   Are you aware that the record studies found

16:06:09  2  that Xarelto is not related to infection?

16:06:14  3         MR. GORDON:  Objection, asked and answered,

16:06:16  4  lack of foundation.

16:06:19  5    A.   I think I said I had not looked at the

16:06:22  6  record studies.

16:06:23  7    Q.   Would it be helpful to look at one?

16:06:26  8    A.   I mean I -- it --

16:06:32  9         When I was looking within the Albright 10

16:06:36  10  data set, I found the association that I reported.

16:06:41  11  Now I think the premise of your question is:  Is the

16:06:48  12  association that I found, is that a causal association

16:06:51  13  or not?  The way this study was designed, is this

16:06:58  14  temporal?  You know, these time periods are changing.

16:07:06  15  And as I show in Fig. 2 --

16:07:15  16    Q.   Okay.

16:07:16  17    A.   -- show in Fig. 2 and I present the --

16:07:20  18  related to that I show in figure -- I'm sorry, on

16:07:31  19  page -- ah, where is that?  On page four, the last

16:07:43  20  paragraph, it compares the infection rates by

16:07:49  21  quarter --

16:07:49  22    Q.   Yeah.

16:07:50  23    A.   -- and we got a chi-square of 15.5 on six

16:07:54  24  degrees of freedom, p-value of .0167.  So what that

16:07:59  25  suggests is that the incidence rates during the Bair

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

302

16:08:05  1  Hugger period were changing quite a lot, and those

16:08:11  2  differences were statistically significant.

16:08:13  3      Q.    Okay.

16:08:14  4      A.    So this is not a period where things were

16:08:17  5  just under well controlled.

16:08:21  6      Q.    Are you aware of whether deep joint

16:08:23  7  infections are always constant or whether there is

16:08:25  8  variability in deep joint infections more generally?

16:08:28  9      A.    Well if there is variability more generally,

16:08:30  10  then that needs to be taken into account in the

16:08:32  11  analysis, and this analysis does not do that.

16:08:35  12      Q.    When you conducted --

16:08:37  13      A.    I did not do that, and McGovern certainly

16:08:38  14  didn't do it either.

16:08:39  15      Q.    When you construct a statistical model, the

16:08:41  16  confidence interval accounts for the variance of the

16:08:44  17  data; correct?

16:08:44  18      A.    Well it should.  But the confidence

16:08:49  19  intervals that I computed and the confidence intervals

16:08:52  20  that McGovern computed don't take that -- that

16:08:57  21  variability into account.

16:08:57  22      Q.    Okay.

16:08:59  23      A.    The expected value of this chi-square

16:09:01  24  statistic is equal to the degrees of freedom, so you

16:09:03  25  expect it to be six, in fact it's 15.5, so there's,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

303

16:09:08  1  what, two and a half times as much variability as what

16:09:12  2  I would expect to see if the only variation that was

16:09:15  3  taking place was just a random fluctuation based on,

16:09:20  4  you know, what's going on with the use of -- of -- of

16:09:24  5  these surgical procedures at Wansbeck.

16:09:27  6       Q.   You didn't do that calculation with respect

16:09:29  7  to the reanalysis of the Jensen data; correct?

16:09:34  8       A.   I -- I didn't -- I didn't allow for random

16:09:38  9  variability other than the binomial variability --

         10       Q.   Okay.

16:09:45 11       A.   -- that -- that we assumed.  No, I -- I took

16:09:47 12  that at a face value.  And -- and it could be random.

16:09:52 13  My assumption is it's not random.  My assumption is

16:09:55 14  it's due to other factors that are -- that were

16:10:00 15  affecting risk at Wansbeck during this time period.

16:10:03 16       Q.   That's an assumption.

16:10:04 17       A.   It is.

16:10:05 18       Q.   Okay.  I want to go back to the -- what we

16:10:09 19  were talking about with respect --

16:10:15 20            Did you do any investigation to determine

16:10:18 21  whether your assumption was correct or not?

16:10:22 22       A.   I -- I have no further --

16:10:24 23            I have not been in contact with Wansbeck or

16:10:26 24  anyone else involved with this to know that for

16:10:29 25  certain.  I guess a part of my -- my -- my reasons for

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

304

16:10:32   1   thinking there were other things going on is the

16:10:36   2   Gillson paper, for example, enumerates such a huge

16:10:43   3   array of things that were taking place at -- what is

16:10:48   4   it -- Northumbria group of hospitals, --

16:10:51   5        Q.   Okay.

16:10:52   6        A.   -- so they were having a problem.

16:10:54   7   Obviously, NHS was -- was calling them on having a

16:11:00   8   high infection rate that they needed to do something

16:11:04   9   about, and the -- the Gissell paper elaborates on all

16:11:09   10  the things that they were trying to do to bring this

16:11:11   11  thing under control, and there were a lot of other

16:11:13   12  things other than switching to Hot Dog.

16:11:16   13       Q.   Okay.  Did you ask 3M for any info with

16:11:19   14  respect to this issue?

16:11:19   15       A.   No.

16:11:20   16            MR. GORDON:  Object to the form of the

16:11:21   17  question.

16:11:21   18       Q.   Okay.  Are you aware that in the Gillson

16:11:23   19  article the descriptor for infection is SSI?

16:11:28   20            MR. GORDON:  Object to the form of the

16:11:29   21  question.

16:11:29   22       Q.   The title of the article is SSI.

16:11:33   23       A.   Which paper are you talking about?

16:11:35   24       Q.   You just referenced the Gillson article, --

16:11:37   25       A.   Gillson, okay.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

305

16:11:38  1    Q.    -- "Implementing Effective SSI Measures."

16:11:41  2    A.    Right.  Yes.

16:11:42  3    Q.    Do you know what "SSI" stands for?

16:11:45  4    A.    Ahh, oh --

16:11:49  5          I've forgotten.

16:11:50  6    Q.    Surgical-site infection ring a bell?

16:11:52  7    A.    Surgical-site infection.  Exactly, yeah.

16:11:54  8    Q.    Surgical-site infections are not the same

16:11:57  9   thing as deep joint infections.

16:11:57  10         MR. GORDON:  Object to the form of the

16:11:58  11  question, lack of foundation, misconstrues the

16:12:01  12  evidence and assumes facts not in evidence.

16:12:03  13   Q.    Do you know whether an SSI is the same as a

16:12:05  14  DJI?

16:12:06  15         MR. GORDON:  Same objection.

16:12:08  16   A.    It's -- it's not the same, it's not the same

16:12:11  17  thing.  They are -- they would be --

16:12:13  18         Are you saying -- suggesting they are not

16:12:14  19  related?

16:12:15  20   Q.    I'm suggesting that --

16:12:17  21         Do you know whether the measures that were

16:12:18  22  implemented in the Northumbria trust were specific to

16:12:23  23  SSI or DJI?

16:12:27  24   A.    I think --

16:12:28  25         Well the paper is entitled for SSI.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

306

16:12:31  1      Q.   So you don't know whether they were specific

16:12:33  2  to deep joint infection.

16:12:33  3      A.   Well I would assume that they would -- they

16:12:36  4  would be effective on affecting both.  I mean

16:12:42  5  orthopedic surgery appears to be one of the things

16:12:44  6  that they are in fact looking at.

16:12:46  7      Q.   Can you define SSI?

16:12:49  8      A.   I don't know the --

16:12:51  9           I don't know.  I'm -- it's not a -- an area

16:12:53  10  that I've particularly done -- done work -- work on.

16:12:57  11  I --

16:12:57  12     Q.   Can you define DJI?

16:12:59  13     A.   It's -- it's again the --

16:13:03  14          It's joint -- joint infections --

          15     Q.   Okay.

16:13:07  16     A.   -- that -- that you're looking at.

16:13:08  17     Q.   But you have no scientific basis or

16:13:11  18  expertise to conclude whether or not the inter --

16:13:14  19  interventions that are mentioned in the Gillson

16:13:16  20  article which relate to SSI would have an impact on

16:13:20  21  deep joint infection; correct?

16:13:21  22     A.   It's --

16:13:22  23          They're not areas that I have -- that I

16:13:25  24  have -- that I have personally done research on.

16:13:28  25  My -- my --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

307

16:13:29  1           But I -- I believe that they would be

16:13:33  2    related to each other.  And things that you're doing

16:13:35  3    to control SSI, my understanding is you would have --

16:13:46  4    you would have effects on -- on PJI as well.

16:13:52  5          Q.   What's your understanding based on?

16:13:56  6          A.   Well looking at -- well I mean the -- one --

16:14:00  7           This is from the -- from the Gillson paper.

16:14:07  8          Q.   What is?

16:14:08  9          A.   A patient with a -- with a -- with surgery

16:14:12  10   on his knee.

16:14:13  11         Q.   Do you see the implant?

16:14:14  12         A.   I see the surgery on his knee.

16:14:16  13         Q.   Do you know whether that would result in

16:14:18  14   either a superficial wound infection on the skin or

16:14:20  15   whether it would result in a deep infection on a

16:14:24  16   prosthetic?

16:14:24  17         A.   I don't know.  If it was a deep infection, I

16:14:26  18   think that would be something they would -- they would

16:14:28  19   be interested in.

16:14:29  20           You don't think that -- you don't think they

16:14:31  21   would be interested in that as -- as respect to the

16:14:35  22   surgery?

16:14:35  23         Q.   Are you asking me?

16:14:37  24         A.   Yeah.

16:14:37  25         Q.   I'm --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

308

16:14:38  1      A.   I mean you -- you seem to be suggesting that

16:14:40  2  there's no effect.  Why -- why what you're asking

16:14:43  3  me --

16:14:45  4      Q.   I would let --

16:14:45  5           Your -- your report concludes that the SSI

16:14:46  6  bundle may have had an effect on deep joint infection

16:14:49  7  rates; correct?

16:14:51  8      A.   Yes.  The things that they were doing to

16:14:54  9  control SSI may have had an effect.

16:14:56  10     Q.   You have no scientific basis to make that

16:14:59  11 conclusion.

16:15:01  12     A.   I'm -- no, no.  I'm just -- just assuming

16:15:04  13 that it does.

16:15:04  14     Q.   Thank you.

16:15:06  15          Do you know if any articles that you're

16:15:09  16 relying on relate to SSI versus DJI?

16:15:14  17     A.   No.

16:15:15  18     Q.   So you're not sure whether the publications

16:15:17  19 that you've cited on page 14 of your report are

16:15:20  20 specific to deep joint infection or a surgical-site

16:15:26  21 infection.

16:15:26  22     A.   Oh.  Some of them --

16:15:34  23          I'm not sure which articles you're -- you're

16:15:38  24 talking about.

16:15:39  25     Q.   Well do you know offhand?  I don't want to

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

309

16:15:41  1   spend a ton of time on this.

16:15:44  2        A.   I don't -- I don't know offhand.

16:15:45  3        Q.   Okay.

16:15:46  4        A.   I --

16:16:12  5        Q.   With respect to the conclusions that you've

16:16:14  6   offered in your report, did you distinguish between

16:16:17  7   SSI and DJI?

16:16:24  8        A.   I don't know that you're --

16:16:26  9             Most of what I was talking about in the

16:16:28  10  report has to do with analysis of -- of -- of

16:16:35  11  McGovern.

16:16:36  12       Q.   Do you know whether Albrecht 10, for

16:16:38  13  example, contained data on SSI versus DJI?

16:16:45  14       A.   I don't recall that it -- it did.  I think

16:16:48  15  it was basically looking at the -- the internal

16:16:54  16  infections.

16:16:55  17       Q.   But you don't know whether those infections

16:16:57  18  were SSI or DJI.

16:17:00  19       A.   I --

16:17:01  20            MR. GORDON:  Object to the form of the

16:17:02  21  question.

16:17:02  22       A.   I wasn't --

16:17:04  23            They were looking at in -- in -- whatever

16:17:06  24  their definition was of -- of infection.

16:17:09  25       Q.   But you don't know what that is.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

310

16:17:11   1        A.    They de --

16:17:13   2              I don't re -- recall exactly what the detail

16:17:14   3   is there.  They defined it in -- it's defined in

16:17:18   4   McGovern, and it's identified as one of the variables

16:17:22   5   that is in Albrecht -- Albrecht 10.

16:17:24   6        Q.    Albrecht 10 says what they're defined as,

16:17:27   7   whether they are DJI or SSI?

16:17:30   8        A.    I don't recall if it said that.  It just

16:17:32   9   said a --

16:17:35  10        Q.    I'll represent to you that it doesn't.

16:17:38  11        A.    Okay.

16:17:39  12        Q.    So you're not sure one way or the other

16:17:42  13   whether the data in Albrecht Exhibit 10 is specific to

16:17:45  14   SSI versus DJI, considering that the Gillson article

16:17:49  15   is talking about SSI.

16:17:53  16              MR. GORDON:  Object to the form of the

16:17:54  17   question, assumes facts not in evidence.

16:17:57  18        A.    I was using the definition that -- that was

16:18:00  19   in Albrecht 10.

16:18:01  20        Q.    Where is the definition in Albrecht 10?

16:18:03  21        A.    Well they defined it to -- to define their

16:18:10  22   variable that indicated --

16:18:12  23              What was the variable called?

16:18:16  24        Q.    It's not in there; is it, professor?

16:18:19  25        A.    Well there's one of the -- it's one of these

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

311

16:18:22  1   columns.  They are -- they are labeled, and somewhere

16:18:29  2   in here --

16:18:36  3            I've forgotten the variable names that they

16:18:39  4   used.

16:18:54  5        Q.   Do you see it?

16:19:00  6        A.   Deep infection.

16:19:01  7        Q.   Do you know whether that's DJI or SSI?

16:19:04  8        A.   I don't know.

16:19:04  9        Q.   Okay.  Do you know whether --

16:19:10  10       A.   Well DJ -- I think it's DJ -- DJI, that DJI

16:19:17  11  is deep joint infection.

16:19:18  12       Q.   Do you know whether the mechanism of

16:19:19  13  infection differs between the DJI and SSI?

16:19:23  14       A.   No.

16:19:24  15       Q.   Okay.  I'd like to turn back to the Breslow

16:19:35  16  and Day article that we were looking at, which has

16:19:36  17  been marked as Exhibit 26 I believe.

16:19:42  18            THE REPORTER:  Before we do that, let's go

16:19:44  19  off the record, take five minutes.

16:19:54  20            (Recess taken.)

16:30:02  21  BY MR. SACCHET:

16:30:06  22       Q.   Professor Holford, you have also analyzed

16:30:09  23  the change in the antibiotic regime that occurred

16:30:13  24  during the McGovern study; correct?

16:30:14  25       A.   Yes.

312

16:30:15  1    Q.    And there was a change from Gentamicin to

16:30:19  2    Gentamicin plus Teicoplanin; correct?

16:30:23  3    A.    That's correct.

16:30:23  4    Q.    And the change happened at the tail end of

16:30:25  5    the Bair Hugger period with some time left, and then

16:30:28  6    it was fully in force during the Hot Dog period;

16:30:32  7    correct?

16:30:32  8    A.    Yeah.

16:30:32  9         MR. GORDON:   Well I'll object to the form of

16:30:34  10   the question.

16:30:37  11   Q.    Are you aware of the relationship between

16:30:40  12   using prophylactic antibiotics on DJI versus SSI?

16:30:46  13        MR. GORDON:   Object to the form of the

16:30:47  14   question, lack of foundation.

16:30:49  15   A.    I'm not familiar with that, no.

16:30:51  16   Q.    Did you conduct any research to determine

16:30:52  17   how antibiotics operate as to the outcome of DJI

16:30:56  18   versus SSI?

16:30:57  19   A.    No.

16:30:58  20   Q.    Did you ask 3M for any information about how

16:31:02  21   change from Gentamicin to Gentamicin plus Teicoplanin

16:31:06  22   might affect deep joint infection rates?

16:31:08  23   A.    No.

16:31:09  24   Q.    Do you have any knowledge of how Gentamicin

16:31:12  25   versus Gentamicin and Teicoplanin affects joint

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

313

16:31:17  1   infection rates?

16:31:18  2       A.    Other than the -- the analysis that I did

16:31:20  3   using Albrecht 10, that -- that's basically what I was

16:31:24  4   using.

16:31:25  5       Q.    In your report you assume that the

16:31:27  6   thromboprophylaxis may be a confounding factor, but

16:31:31  7   you never state as much with respect to the

16:31:34  8   antibiotic; is that true?

16:31:36  9       A.    I don't know if I stated it.  It is -- it is

16:31:38  10  potentially a -- a -- a confounding variable and in

16:31:43  11  fact I did adjust for it in -- I did present an

16:31:47  12  analysis where I adjusted for it.

16:31:49  13      Q.    So did you adjust for the antibiotic without

16:31:53  14  considering whether it was a confounding factor?

16:31:56  15      A.    Well, I mean whether it's a confounding

16:32:01  16  factor, as I -- as I said before, it -- it depends on

16:32:06  17  whether -- whether there is a change in the --

16:32:11  18            It affects the -- the association.

16:32:14  19      Q.    Okay.

16:32:15  20      A.    And in this case the association -- let's

16:32:22  21  see.

16:32:24  22            When we just controlled for the

16:32:36  23  thromboprophylaxis --

16:32:38  24      Q.    I think we're on the antibiotic.

16:32:41  25      A.    Yes.  When we just controlled for -- for

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

314

16:32:44  1   the -- for the thromboprophylaxis, the -- the odds

16:32:49  2   ratio was, what, 2.49?  Is that right?  No, I'm sorry,

16:33:01  3   2.16.

16:33:08  4        Q.   That's the odds ratio for controlling for

16:33:10  5   the thromboprophylaxis; correct?

16:33:12  6        A.   From -- from --

16:33:13  7             Yes, right.

16:33:13  8        Q.   And we're talking about the antibiotic.

16:33:16  9        A.   And then so now when we add, in addition to

16:33:18  10  controlling for the thromboprophylaxis we're adding

16:33:21  11  the antibiotic, which is what you were asking about --

16:33:24  12       Q.   Well I actually wasn't asking about that.

16:33:26  13  I'm asking for just with respect to the antibiotic,

16:33:28  14  not controlling for both, just controlling for the

16:33:31  15  antibiotic.  You did that calculation prior to the

16:33:33  16  double control; correct?

16:33:35  17       A.   I don't know that I did the single control.

16:33:37  18       Q.   Okay.

16:33:37  19       A.   I looked -- I looked --

16:33:39  20            I did a double control.

16:33:40  21       Q.   You don't recall doing a single control on

16:33:48  22  the antibiotic?

16:33:50  23       A.   I don't think I did.

16:33:54  24       Q.   Well you did.

16:33:55  25       A.   Oh, I did?  Okay.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

315

16:33:57  1         MR. GORDON:  On page six.

16:33:58  2      Q.   It's on page six.

16:34:00  3      A.   Oh, I'm sorry.

16:34:01  4      Q.   Right under the heading "Comparison of the

16:34:03  5  effect of antibiotic regimen on study results."  And

16:34:08  6  you report that there was a rate of infection during

16:34:12  7  the Bair Hugger period when Gentamicin was used of

16:34:16  8  1.92 percent; correct?

16:34:17  9      A.   Oh, okay.  This is --

16:34:21  10         Yeah.  We were -- I think we were talking

16:34:22  11  about two different things.  This is, I think, just

16:34:25  12  looking at the effect of an antibiotic on --

16:34:28  13     Q.   Yes.

14     A.   Yeah.

16:34:30  15     Q.   Okay.

16:34:30  16     A.   I was talking about controlling for it.

16:34:31  17  Yeah.

16:34:31  18     Q.   Okay.  So here we essentially controlled for

16:34:34  19  the use of the Bair Hugger and viewed infection rates

16:34:39  20  when Gentamicin was applied versus when Gentamicin

16:34:42  21  plus Teicoplanin was applied; correct?

16:34:44  22     A.   That's right.  Because it's only during

23  the --

24     Q.   Yeah.

16:34:46  25     A.   -- Bair Hugger.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

316

16:34:46    1        Q.   Yeah.

16:34:46    2        A.   Sure.

16:34:47    3        Q.   And protocol one, which we'll call the

16:34:50    4    Gentamicin administration, resulted in an infection

16:34:52    5    rate of 1.92 percent in patients; correct?

16:34:57    6        A.   Yes.

16:34:58    7        Q.   Okay.  And then protocol two, when

16:35:01    8    Gentamicin plus Teicoplanin was used, the rate went up

16:35:05    9    to 3.13; correct?

16:35:06   10        A.   That's right.

16:35:07   11        Q.   That's an increase in the infection rate;

16:35:09   12    correct?

16:35:09   13        A.   Yes.

16:35:09   14        Q.   And that's the combination of antibiotics

16:35:13   15    that was used during the Hot Dog period; correct?

16:35:15   16        A.   Yes.

16:35:16   17        Q.   So actually, the combination of antibiotics

16:35:18   18    that was used resulted in a higher infection rate

16:35:23   19    between -- compared to the drug that was used with

16:35:24   20    just Bair Hugger patients; correct?

16:35:25   21        A.   That's right.

16:35:29   22        Q.   So if anything --

16:35:30   23        A.   Yeah.  It's the com -- wait.

16:35:44   24             That's right.  Yeah.

16:35:45   25        Q.   Okay.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

317

16:35:45   1      A.    The switchover.  Okay.  Sorry.

16:35:47   2      Q.    So if anything, there's actually reverse

16:35:50   3   confounding in the direction that the use of

16:35:52   4   Gentamicin plus Teicoplanin was less effective than

16:35:56   5   the use of just Gentamicin; correct?

16:36:00   6      A.    It appears to be, yes.

16:36:02   7      Q.    So based on that conclusion, the odds ratio

16:36:06   8   as reported in the McGovern study could even be higher

16:36:09   9   in the event that we controlled for the use of

16:36:13   10  Gentamicin plus Teicoplanin; correct?

16:36:17   11     A.    Well --

16:36:17   12     Q.    You just told me statistical significance

16:36:20   13  did not matter.

16:36:21   14           MR. GORDON:  Object to the form of the

16:36:22   15  question, misstates his testimony.

16:36:25   16     A.    I mean the issue of it being a confounder is

16:36:28   17  does it affect the association -- does it affect the

16:36:31   18  measure of association between -- the --

16:36:47   19           Well, in this case we're looking at Bair

16:36:49   20  Hugger, Bair Hugger/Hot Dog, does it -- does it affect

16:36:51   21  that association.

16:36:52   22     Q.    You didn't report an association; did you?

16:36:56   23           MR. GORDON:  Object to the form of the

16:36:57   24  question.

16:36:58   25     A.    Yeah, it --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

318

16:36:59   1       Q.   Did you report an association with respect

16:37:00   2   to controlling for the antibiotic in the Bair Hugger

16:37:04   3   arm of the study?

16:37:06   4            MR. GORDON:  Just the antibiotic?

16:37:08   5            MR. SACCHET:  Yeah.

16:37:09   6       A.   Not just the antibiotic, no.  That's what I

16:37:12   7   said, I didn't do that.

16:37:14   8       Q.   You didn't do that.

16:37:15   9       A.   Look at the effect of --

16:37:19   10           Well I -- I looked at the effect of -- of

16:37:26   11  the antibiotic --

16:37:27   12      Q.   Yeah.

16:37:27   13      A.   -- on risk of infection, --

16:37:35   14      Q.   Okay.

16:37:35   15      A.   -- and that was this difference of, oh, 1.9

16:37:39   16  versus 3.1 infection rate with a p-value of .17.

16:37:45   17      Q.   Okay.  And the percent of infection when

16:37:48   18  using Gentamicin plus Teicoplanin went up compared to

16:37:52   19  the use of just Gentamicin; correct?

16:37:56   20      A.   That's right.

16:37:57   21      Q.   And in the McGovern study, all the Hot Dog

16:38:00   22  patients received Gentamicin plus Teicoplanin;

16:38:04   23  correct?

16:38:04   24      A.   Yeah.

16:38:04   25      Q.   This calculation that you performed shows

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

319

16:38:07  1  that Gentamicin may be less effective than Gentamicin

16:38:13  2  plus Teicoplanin; correct?

16:38:14  3       A.   It -- it --

16:38:15  4            The point estimates go in that direction.

16:38:17  5  It's not --

         6       Q.   Okay.

16:38:18  7       A.   -- statistically significant, --

16:38:19  8       Q.   Okay.

16:38:19  9       A.   -- although it's --

16:38:21  10           It's sort of unclear as to whether or not it

16:38:23  11  does.

16:38:23  12      Q.   With respect to confounding, you previously

16:38:25  13  stated that statistical significance is not

16:38:27  14  determinant of whether there is confounding; correct?

16:38:30  15      A.   That's right.

16:38:30  16      Q.   So whether or not the p-value is .1683 does

16:38:34  17  not mean that there was reverse confounding with

16:38:38  18  respect to the odds ratio reported in the McGovern

16:38:41  19  study; correct?

16:38:42  20      A.   It's -- it --

16:38:44  21           Well it basically means that it's -- it's --

16:38:46  22  it's -- it could go either way.

16:38:49  23      Q.   It could --

16:38:50  24      A.   It's not -- it's not clear.

16:38:51  25      Q.   Okay.  And you have not reported an odds

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

320

16:38:54   1   ratio with respect to that calculation; correct?

16:38:57   2       A.   No, it does --

16:38:58   3            No, I have not.

16:38:59   4       Q.   So in order to determine whether there was

16:39:01   5   reverse confounding or general confounding, you have

16:39:04   6   not made the calculation in order to make that

16:39:07   7   conclusion; correct?

16:39:08   8       A.   I haven't said whether or not it's reverse

16:39:11   9   or --

16:39:11   10           I'm not -- I'm not sure what -- what you

16:39:13   11  mean by "reverse" or --

16:39:14   12      Q.   That's what I said, "whether or not."  You

16:39:18   13  don't know whether there was confounding because you

16:39:20   14  haven't reported an odds risk ratio with respect to

16:39:21   15  just the control for the antibiotic; correct?

16:39:24   16      A.   Well it's not just control.  I've -- I've

16:39:26   17  controlled for both antibiotic and thrombo.

16:39:29   18      Q.   I understand.  But with respect to

16:39:31   19  controlling for the antibiotic in this calculation --

16:39:33   20      A.   Yes.

16:39:33   21      Q.   -- you report infection rates and you report

16:39:35   22  a p-value, you do not report an odds ratio; correct?

16:39:38   23      A.   That's correct.

16:39:39   24      Q.   There is no way to determine whether the

16:39:41   25  odds ratio increased compared to what was provided in

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

321

| | | |
|---|---|---|
| 16:39:44 | 1 | the McGovern study or whether it decreased, |
| 16:39:46 | 2 | correct, -- |
| 16:39:47 | 3 | A.   Which odds -- |
| | 4 | Q.   -- when com -- |
| 16:39:48 | 5 | A.   -- ratio are you talking about? |
| 16:39:49 | 6 | Q.   Either the 3.8 or the 2.76 that you |
| 16:39:52 | 7 | calculated based on Albrecht 10.  You have no basis to |
| 16:39:55 | 8 | compare those odds ratios to this calculation. |
| 16:39:59 | 9 | A.   Well I compared the odds -- I mean I |
| 16:40:02 | 10 | didn't -- |
| 16:40:02 | 11 | I don't report the odds ratio, but you can |
| 16:40:04 | 12 | pretty good -- get a pretty good idea of what -- about |
| 16:40:07 | 13 | what it's going to be -- |
| 16:40:08 | 14 | Q.   You told me -- |
| 16:40:09 | 15 | A.   -- because the infection rate -- let's see. |
| 16:40:15 | 16 | "In order to control for the...one must use |
| 16:40:18 | 17 | the Bair Hugger period that -- that shares the |
| 16:40:21 | 18 | antibiotic and thromboprophylaxis regimen used in the |
| 16:40:25 | 19 | Hot Dog period," so -- which had an infection rate of |
| 16:40:31 | 20 | three out of 270, 1.1 percent, and compare that with |
| 16:40:36 | 21 | four out of 372, which is 1.08 percent. |
| 16:40:41 | 22 | Q.   You're looking at controlling for both |
| 16:40:42 | 23 | variables, correct, right now? |
| 16:40:44 | 24 | A.   That is correct. |
| 16:40:44 | 25 | Q.   I want to go back to when you just |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

322

16:40:46   1   controlled for the antibiotic, which is what we're

16:40:48   2   talking about.  You did not provide an odds ratio.

16:40:50   3        A.   I did not --

16:40:51   4             That's right, I didn't provide it.

16:40:52   5        Q.   You did not determine how or whether the

16:40:55   6   antibiotic by itself is a confounding variable.

16:40:58   7        A.   By -- by itself, no.  By itself, no.

16:41:00   8        Q.   And you have --

16:41:01   9        A.   But I've controlled for both of them --

16:41:04   10       Q.   We'll get there.  I'm just talking about

16:41:05   11  this calculation.

16:41:05   12            You do not know the degree of confounding,

16:41:08   13  if any, caused by only the antibiotic.

16:41:10   14       A.   That's right.  I didn't do that.

16:41:12   15       Q.   And you have not reviewed any literature to

16:41:14   16  suggest that an antibiotic is a confounding factor on

16:41:19   17  deep joint infections.

16:41:20   18            MR. GORDON:  Object to the form of the

16:41:22   19  question.

16:41:22   20       A.   I don't see -- understand that -- understand

16:41:27   21  your -- your question.  To be a confounding variable,

16:41:30   22  as we've said, it has to be associated with -- with

16:41:36   23  the -- with the outcome --

16:41:37   24       Q.   Okay.

16:41:38   25       A.   -- and the variable you're looking at.

323

| | | |
|---|---|---|
| 16:41:41 | 1 | Q.   Yeah.  And you haven't done -- |
| 16:41:42 | 2 | A.   So whether or not it's associated with -- |
| 16:41:44 | 3 | Well in this study it -- it certainly is |
| 16:41:47 | 4 | associated with -- with whether or not the Bair Hugger |
| 16:41:50 | 5 | or the Hot Dog was used.  In general, who knows? |
| 16:41:57 | 6 | Q.   You don't know whether -- |
| 16:41:59 | 7 | A.   Well -- |
| 16:42:00 | 8 | Q.   -- the Gentamic -- |
| 16:42:02 | 9 | A.   -- it depends on what -- what -- what is |
| 16:42:03 | 10 | done by the institution. |
| 16:42:05 | 11 | Q.   You don't know whether Gentamicin is more or |
| 16:42:07 | 12 | less effective than Gentamicin plus Teicoplanin -- |
| 16:42:09 | 13 | A.   Well that's a different question. |
| 16:42:11 | 14 | Q.   -- in terms of deep joint infection.  That's |
| 16:42:12 | 15 | the question right now.  Do you know? |
| 16:42:19 | 16 | A.   Well there is the -- |
| 16:42:22 | 17 | The analysis based on these data -- |
| 16:42:25 | 18 | Q.   That shows -- |
| 16:42:26 | 19 | A.   -- found -- found the -- the result was not |
| 16:42:28 | 20 | statistically significant, the difference of 2.19 |
| 16:42:32 | 21 | percent versus 3.1, but -- but -- |
| 16:42:33 | 22 | Q.   And the infection rate went up with |
| 16:42:36 | 23 | Gentamicin plus Teicoplanin. |
| 16:42:38 | 24 | A.   That's right. |
| 16:42:39 | 25 | Q.   Okay. |

324

16:42:39  1    A.    The one -- the one is higher.  It's not --

16:42:41  2         That difference is not statistically

16:42:42  3    significant.

16:42:43  4    Q.    Okay.  Based on that --

16:42:44  5    A.    When I -- when I added that into the

16:42:46  6    analysis and controlled for that after I had already

16:42:50  7    controlled from thromboprophylaxis, the -- any

16:42:53  8    association that -- an association that was 2.1 --

16:42:57  9    six was it? -- com -- disappeared effectively

16:43:01  10   completely, I mean 1 -- 1. -- 1.11 percent versus

16:43:07  11   1.08.

16:43:07  12   Q.    Okay.  Let's talk about --

16:43:08  13   A.    So they're basically -- I mean it -- as --

16:43:12  14        It would, I -- I -- I suggest, be an

16:43:15  15   indication that this is a confounding variable because

16:43:19  16   the odds ratio is bas -- basically eliminated.

16:43:23  17   Q.    Have you done a powering analysis of this

16:43:25  18   double-control calculation?

16:43:26  19   A.    A power analysis, no.

16:43:27  20   Q.    You have no idea whether this is adequately

16:43:30  21   powered.

16:43:30  22   A.    Oh, it's -- I -- there's --

16:43:32  23        There's never been a power analysis of

16:43:34  24   anything related to McGovern.

16:43:35  25   Q.    You don't know whether this calculation --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

325

| | | |
|---|---|---|
| 16:43:37 | 1 | A.    I don't -- I mean why are -- |
| 16:43:39 | 2 | What is the issue?  The power to do what?  I |
| 16:43:42 | 3 | don't know what you're asking. |
| 16:43:43 | 4 | Q.    You're analyzing a population of 270 persons |
| 16:43:49 | 5 | and 372 persons, totaling approximately 600 people; |
| 16:43:55 | 6 | correct? |
| 16:43:55 | 7 | A.    So what's your -- what's your hypothesis? |
| 16:43:58 | 8 | Q.    My question is:  If the McGovern study was, |
| 16:44:00 | 9 | in your words, a relatively small population based on |
| 16:44:03 | 10 | the incidence of infection and was therefore |
| 16:44:05 | 11 | unreliable, -- |
| 16:44:06 | 12 | A.    Yeah. |
| 16:44:07 | 13 | Q.    -- you've cut the population in half. |
| 16:44:09 | 14 | A.    Okay. |
| 16:44:09 | 15 | Q.    Doubly unreliable. |
| 16:44:11 | 16 | A.    Well whether it's double or not, I -- it's |
| 16:44:14 | 17 | not -- it's un -- it's unclear. |
| 16:44:16 | 18 | Q.    More unreliable. |
| 16:44:17 | 19 | A.    It -- it will be more -- more -- it will |
| 16:44:19 | 20 | have less -- |
| 16:44:20 | 21 | The study would have -- would have even less |
| 16:44:22 | 22 | power, that's true. |
| 16:44:23 | 23 | Q.    More unreliable. |
| 16:44:26 | 24 | A.    What do you mean by "reliable?" |
| 16:44:28 | 25 | Q.    More variance. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

326

16:44:28   1        A.    More variance, yes.

16:44:33   2        Q.    If anything, the best way to figure out

16:44:36   3    whether the thromboprophylaxis and the antibiotic

16:44:41   4    confounded the results in a population of patients who

16:44:45   5    were subjected to Bair Hugger warming versus Hot Dog

16:44:48   6    warming would be to look at a larger sample size when

16:44:50   7    both of those variables are controlled; correct?

16:44:53   8        A.    Well one would have to look at what the --

16:45:02   9              What I think is needed is a proper

16:45:05   10   protocol --

16:45:05   11       Q.    Okay.

16:45:06   12       A.    -- which would address the issue of power,

16:45:09   13   and you would have to specify what magnitude of effect

16:45:12   14   you wanted -- wanted to detect, --

16:45:13   15       Q.    Okay.

16:45:14   16       A.    -- and this, as far as I can tell, was never

16:45:18   17   done by this group.

16:45:19   18       Q.    Okay.  I'm going to ask the question again

16:45:22   19   because that didn't respond to it.

16:45:23   20              A better analysis than what you have done

16:45:26   21   here with respect to controlling for both var --

16:45:29   22   variables would be to look at a larger population of

16:45:33   23   patients who received the same thromboprophylaxis and

16:45:37   24   the same antibiotic; correct?

16:45:44   25       A.    Well --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

327

16:45:47  1      Q.    There would be less variance.

16:45:49  2      A.    Oh, if you -- if you -- if you restricted

16:45:53  3  both of those, but I mean that's not your only option.

16:45:56  4  If you restricted it to those groups and had an

16:45:59  5  increased sample size, that would -- that would

16:46:01  6  certainly give you more power.

16:46:02  7      Q.    Yeah.  It would -- it would be a more

16:46:04  8  accurate representation of whether those two variables

16:46:06  9  were confounders or not; correct?

16:46:09  10     A.    If that's what you were interested in.

16:46:10  11     Q.    Okay.  It would be a more accurate

16:46:13  12  representation as to whether there in fact is an

16:46:17  13  increased odds ratio; correct?

16:46:19  14     A.    For -- for --

16:46:21  15     Q.    The use of the device and the outcome of

16:46:23  16  infection.

16:46:24  17     A.    The use of the device.  It would give a

16:46:26  18  better estimate of that, yes.

16:46:27  19     Q.    Okay.  The recent Augustine study does that;

16:46:30  20  correct?

16:46:30  21     A.    The -- this is the published -- the one that

16:46:34  22  was just published?

16:46:35  23     Q.    Yeah.

16:46:36  24     A.    Well, I mean the recent study has its own --

16:46:41  25  has a -- has the potential for bias that is also in

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

                                                                    328

16:46:48   1   McGovern.

16:46:48   2       Q.   Okay.  But my question is different.  The

16:46:51   3   recent Augustine article has a larger patient

16:46:54   4   population; --

16:46:55   5       A.   It's a larger patient population.

           6       Q.   -- correct?

           7       A.   It is a larger patient population.  I think

16:46:58   8   it is, yes.

16:46:58   9       Q.   And the article notes that there was no

          10   change in the thromboprophylaxis or the antibiotic

16:47:05  11   regimen; correct?

16:47:05  12            MR. GORDON:  Object to the form of the

16:47:06  13   question, assumes facts -- mis -- it completely

16:47:08  14   misstates the evidence.

16:47:11  15       A.   I -- the -- the --

16:47:13  16            The paper says very little about -- very --

16:47:19  17   very little detailed about -- about -- about the

16:47:21  18   population.  I think it says that, yes.

16:47:23  19       Q.   Okay.  So we've established that it's a

16:47:25  20   larger population and that the study does say that

16:47:28  21   there was not a change in the thromboprophylaxis or

16:47:31  22   antibiotic; is that correct?

16:47:32  23            MR. GORDON:  Counsel, it doesn't -- it

16:47:33  24   doesn't say that.  Let him read it if you're going to,

16:47:36  25   you know, make it up, make up stuff.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

329

16:47:39    1              THE WITNESS:  Where specifically does it say

16:47:41    2    that?

16:47:42    3              MR. SACCHET:  Okay.

16:47:56    4              THE WITNESS:  Have you got it?

16:47:56    5              (Exhibit 28 was marked for

16:47:58    6              identification.)

16:47:58    7    BY MR. SACCHET:

16:47:59    8         Q.   Is this a copy of the recent Augustine

16:48:02    9    publication in Orthopedic Reviews?

16:48:04   10         A.   Yes, it is.

16:48:04   11         Q.   Okay.  We can see that on page one there is

16:48:09   12    a subject header entitled "Materials and Methods;"

16:48:11   13    correct?

16:48:11   14         A.   Yes.

16:48:14   15         Q.   In the bottom right-hand corner.

16:48:15   16              And it says, "This study is designed to

16:48:19   17    investigate periprosthetic joint infection (PJI) rates

16:48:22   18    while using FAW (Bair Hugger, 3M, St. Paul, Minnesota,

16:48:25   19    USA) compared with air-free CFW (HotDog, Augustine

16:48:31   20    Temperature Management, Eden Prairie, USA);" correct?

16:48:33   21         A.   Yes.

16:48:34   22         Q.   The next paragraph says, "Each hospital

16:48:37   23    report shares a study design similar to the McGovern

16:48:37   24    study;" correct?

16:48:38   25         A.   Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

330

16:48:39  1      Q.    "In each study, a baseline PJI rate was

16:48:42  2  determined for the FAW control group over a one-year

16:48:45  3  period of time.  FAW was then discontinued, and the

16:48:48  4  hospital switched to air-free CFW warming;" correct?

16:48:52  5      A.    Yes.

16:48:53  6      Q.    Okay.  The top of the next column says,

16:48:55  7  "Only hospitals reporting that no other significant

16:48:59  8  changes were made to their surgical and antibiotic

16:49:01  9  prophylaxis protocols during the study period

16:49:04  10  qualified to be part of this study."  Do you see that?

16:49:07  11      A.    Yes.

16:49:11  12      Q.    It says that there were no changes to

16:49:13  13  antibiotic prophylaxis protocols; correct?

16:49:15  14      A.    That's what it says, yes.

16:49:17  15      Q.    Do you have any reason to doubt that?

16:49:21  16      A.    I -- I don't know.  I mean that's what --

16:49:24  17  that's what it says.  I don't -- it -- it --

16:49:27  18          I mean we have very little detail here

16:49:29  19  about -- about any variables other than the -- other

16:49:36  20  than the device that was used --

16:49:37  21      Q.    Okay.  Do you have any --

16:49:39  22      A.    -- on the patients or --

16:49:42  23          I mean there's no table here giving basic

16:49:50  24  demographics about the -- about the patient

16:49:53  25  population.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

331

16:49:54  1      Q.   Demographics are different than whether

16:49:56  2  there were changes to the surgical and antibiotic

16:49:58  3  prophylaxis protocols; correct?

16:50:00  4      A.   They are diff -- they are, but I mean all --

16:50:04  5  all I'm -- all I'm indicating is that details --

16:50:06  6      Q.   Okay.

16:50:06  7      A.   -- related to what was done in this study

16:50:08  8  are pretty skimpy.

16:50:10  9      Q.   Have you tried to investigate the details

16:50:12  10  that you would otherwise like to know?

16:50:13  11      A.   Oh.  I mean you can look at any other paper.

16:50:17  12  I mean there's lots of reports on the -- on the -- on

16:50:20  13  the characteristics of the patients, what's the age

16:50:23  14  distribution of the patients that they're looking

16:50:25  15  at, --

16:50:25  16      Q.   Have you contact --

16:50:26  17      A.   -- how many males, how many females there

16:50:29  18  were, --

16:50:29  19      Q.   Okay.

16:50:29  20      A.   -- what is the racial distribution of the --

        21      Q.   Okay.

16:50:30  22      A.   -- of the -- of the paper.  I mean there's

16:50:31  23  a -- the --

16:50:32  24           The list of things that are not here --

16:50:35  25      Q.   Okay.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

332

16:50:36    1        A.    -- is pretty remarkable.

16:50:37    2        Q.    What is here?  There's a statement that says

16:50:40    3    "Only hospitals reporting that no other significant

16:50:42    4    changes were made to their surgical and antibiotic

16:50:45    5    prophylaxis protocols during the study period

16:50:48    6    qualified to be part of this study."

16:50:49    7        A.    Okay.

16:50:50    8        Q.    Do you have any basis, scientific or

16:50:52    9    otherwise, to doubt the veracity of that statement?

16:50:55   10        A.    No.

16:50:55   11        Q.    If we look at Table 1, there are three

16:50:59   12    centers denominated in the table; correct?

16:51:02   13        A.    That's correct.

16:51:03   14        Q.    And the first center has broken down between

16:51:09   15    conductive fabric and forced air; correct?

16:51:12   16        A.    Yes.

16:51:12   17        Q.    And the odds ratio, based on the increase in

16:51:14   18    infection from the use of forced air instead of

16:51:17   19    conductive fabric, is 4.59 as reported in this study;

16:51:21   20    correct?

16:51:21   21        A.    That's what they report, yeah.

16:51:22   22        Q.    Okay.  That's the question.

16:51:24   23              The second center also evaluates the change

16:51:27   24    from conductive fabric to forced air and it finds an

16:51:30   25    odds ratio of 11.47 as reported in Table 1; correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

333

16:51:34  1      A.   That's what they report.

16:51:36  2      Q.   Both of those odds ratios are higher than

16:51:38  3   what was reported in the McGovern study; correct?

16:51:41  4      A.   That's true.

16:51:42  5      Q.   The second odds ratio of 11.47 is almost

16:51:49  6   three times the size of what was reported in the

16:51:52  7   McGovern study; correct?

16:51:55  8      A.   That's the -- the --

16:51:57  9           You're -- you're referring to just the point

16:51:59  10  estimate.

16:51:59  11     Q.   Just the odds ratio.

16:52:00  12     A.   Just the point estimate.

16:52:02  13     Q.   Yeah, that's the question.

16:52:03  14     A.   It is large.  It is large, yes.

16:52:04  15     Q.   Okay.  And the center three, in all

16:52:09  16  fairness, reported a 1.33 odds ratio; correct?

16:52:11  17     A.   That's right.

16:52:12  18     Q.   The multi-center pooled results based on

16:52:14  19  those three institutions totaling a population of over

16:52:20  20  2,000 persons --

16:52:21  21          Correct?

16:52:22  22     A.   Yes.

16:52:23  23     Q.   -- found a collective odds ratio of 4.28;

16:52:27  24  correct?

16:52:27  25     A.   That's right.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

334

16:52:27  1      Q.    That is higher than what's reported in the

16:52:29  2    McGovern study; correct?

16:52:30  3      A.    That point estimate is higher.

16:52:31  4      Q.    It's doubled in the size of the odds ratio

16:52:34  5    of 2.16 that you reported in your study.

16:52:37  6      A.    It's twice -- twice that, yes.

16:52:39  7      Q.    It's four times the size of the odds ratio

16:52:42  8    that you reported when controlling for both the

16:52:44  9    thromboprophylaxis and the antibiotic; correct?

16:52:46  10     A.    That's correct.

16:52:47  11     Q.    The population is four times the size.

16:52:51  12     A.    That's --

16:52:53  13           Is it four times?

16:52:55  14     Q.    Your population was approximately 600

16:52:57  15   persons.

16:52:57  16     A.    Oh, oh, I see that's how you use that.

16:53:00  17           Yeah, that's true.  Yes.

16:53:01  18     Q.    Okay.  Based on this size of the

16:53:03  19   population -- well strike that.

16:53:08  20           The p-value for the multi-center pooled

16:53:11  21   result is .002; correct?

16:53:13  22     A.    That's right.

16:53:14  23     Q.    That is a statistically significant p-value;

16:53:18  24   correct?

16:53:18  25     A.    That is.  The -- the -- the confidence

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

335

16:53:23   1   interval is still 10.

16:53:27   2       Q.   It's half the size of the confidence

16:53:29   3   interval you reported in the Jensen reanalysis;

16:53:33   4   correct?

16:53:33   5       A.   The --

16:53:34   6            For that particular association, yes.  But

16:53:37   7   it's not that different from the confidence interval

16:53:40   8   that was reported in McGovern.

16:53:43   9       Q.   Okay.  If we could --

16:53:53  10       A.   May I --

16:53:54  11            There are other aspects of this -- of

16:53:57  12   this -- of this --

16:53:57  13       Q.   I haven't asked about them, so perhaps --

16:54:00  14       A.   I know you haven't asked about them, but

16:54:01  15   you --

16:54:01  16       Q.   -- perhaps you can explain them when Mr.

16:54:04  17   Gordon --

16:54:04  18       A.   Okay.

16:54:06  19       Q.   -- asks you some questions.

16:54:07  20            With respect to the conclusions that you

16:54:08  21   offer in the epi section of your report --

16:54:14  22            MR. GORDON:  What section?

16:54:15  23       Q.   -- the epidemiology section of your report

16:54:17  24   regarding drawing causal inferences, there is that

16:54:20  25   part of your report; right?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

336

16:54:20  1      A.   Yes.

16:54:21  2      Q.   Okay.

16:54:36  3           MR. GORDON:  Are you talking about

16:54:37  4      "Causation findings," that section?

16:54:39  5           THE WITNESS:  Yeah, I think that's what he's

16:54:41  6      citing.

16:54:41  7           MR. SACCHET:  Yeah.  That was inartful.

16:54:43  8      Q.   The first factor that you analyzed was the

16:54:46  9      temporality --

16:54:47  10     A.   Yeah.

16:54:48  11     Q.   -- of -- of this -- of this data.

16:54:54  12          You agree that temporality is met with

16:54:57  13     respect to the Bair Hugger and the risk of increased

16:55:01  14     infection, however; correct?

16:55:02  15     A.   Yes, I do.

16:55:03  16     Q.   Okay.  You also assume that it's possible

16:55:05  17     that temporality may be met with respect to the

16:55:07  18     thromboprophylaxis; correct?

16:55:09  19     A.   Yes.

16:55:10  20     Q.   We discussed earlier that the McGovern study

16:55:13  21     states that the thromboprophylaxis is applied

16:55:16  22     postoperatively; correct?

16:55:17  23     A.   Yes.

16:55:18  24     Q.   You --

16:55:20  25          Do you know the rate in which an infection

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

337

16:55:22  1   forms on a prosthetic upon a bacteria landing on the

16:55:29  2   prosthetic?

16:55:30  3          Let me rephrase.  It was not a good

16:55:32  4   question.

16:55:32  5          Do you know how quickly an infection may

16:55:36  6   manifest after a bacteria lands on a prosthetic

16:55:39  7   implant?

16:55:41  8      A.   No, I don't.  I mean I -- the --

16:55:50  9          Using the -- this part of the -- the

16:55:56  10  protocol, it is the same for -- for -- for McGovern's

16:56:04  11  study as it was for, you know, the Jensen study,

16:56:08  12  and -- and so they were -- they were using the same

16:56:12  13  method, so whatever the temporality is related to that

16:56:15  14  variable I assume is about the same.

16:56:17  15     Q.   So my question, though, is:  You don't know

16:56:20  16  whether or not a deep joint infection could occur

16:56:23  17  within an hour of a bacteria landing on the implant.

16:56:28  18     A.   Could it have -- I'm not --

16:56:32  19          I don't know how long it takes.  It often --

16:56:35  20  it -- it may take longer, and may take longer for the

16:56:38  21  diagnosis to come -- come in.

16:56:40  22     Q.   It could be shorter than an hour.

16:56:41  23          MR. GORDON:  Objection, lack of foundation.

16:56:43  24     A.   I don't -- I don't know how long it takes.

16:56:46  25     Q.   You don't know.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

338

16:56:46   1      A.   It's not -- it's not reported.  I think it's

16:56:48   2   reported how long after the surgery --

16:56:50   3      Q.   Up to 60 days; correct?

16:56:53   4      A.   Up to 60 days.  But some of that I assume is

16:56:56   5   lab time and all that stuff.

16:56:58   6      Q.   Yeah.

16:56:59   7      A.   And so who knows?

16:57:00   8      Q.   Okay.

16:57:01   9      A.   It's not addressing the question that you're

16:57:03  10   asking I don't think.

16:57:03  11      Q.   Well -- yeah.  So my question really is:  To

16:57:06  12   the extent that a deep joint infection may occur

16:57:10  13   within a matter of hours after surgery, temporality is

16:57:14  14   not met in the event that the thromboprophylaxis is

16:57:18  15   applied a day after the surgery.

16:57:20  16      A.   If it occurs within hours.  Well I mean --

16:57:26  17      Q.   The bacteria causes an infection within a

16:57:28  18   matter of hours --

16:57:30  19      A.   Yeah, but it -- what --

16:57:32  20           You're not observing it until 60 days later.

16:57:39  21      Q.   That's possible.  But of course --

16:57:41  22      A.   So if you're observing it at that point --

16:57:43  23           I mean the infection could have started

16:57:45  24   within hours and then you apply the -- imply

16:57:50  25   the -- apply the -- the anti -- antibiotic and it

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

339

16:57:55   1   kills whatever happened to be there.

16:57:56   2         Q.    You're talking about the thromboprophylaxis,

16:57:59   3   which is a blood thinner; correct?

16:58:00   4         A.    Okay.  The blood thinner, whatever effect

16:58:02   5   that is having.

16:58:03   6         Q.    Yeah.

16:58:03   7         A.    I don't know --

16:58:04   8         Q.    You don't know whether there is an effect.

16:58:05   9         A.    Don't -- I --

16:58:06   10          I don't know.  There is an association --

16:58:08   11        Q.    Okay.

16:58:08   12        A.    -- in -- in this particular study, --

16:58:10   13        Q.    Okay.

16:58:11   14        A.    -- so that -- which -- which would suggest

16:58:15   15   if it's not a causal effect, it's at least -- it's --

16:58:22   16   it's confounded by the same types of factors that

16:58:25   17   could be confounding the association that -- that --

16:58:30   18   with the device that's being reported by McGovern.

16:58:32   19        Q.    But in the event that an infection does in

16:58:34   20   fact occur within hours of a surgery, application of a

16:58:40   21   thromboprophylaxis a day later does not satisfy

16:58:44   22   temporality.

16:58:45   23          MR. GORDON:  Objection, lack of foundation,

16:58:48   24   incomplete hypothetical, assumes facts not in

16:58:51   25   evidence.

340

16:58:54   1      A.   I didn't analyze the temporal -- the -- how

16:58:59   2   long it took for the -- for the -- how -- when -- when

16:59:03   3   the infection -- infection occurred.

16:59:06   4      Q.   Uh-huh.

16:59:06   5      A.   Those data I don't think were reported on --

16:59:11   6   on the data that I was looking at.

16:59:12   7      Q.   So you don't know whether temporal --

16:59:14   8      A.   So I don't know whether the in -- there was

16:59:17   9   an infection at that point in time.  I -- the data --

16:59:22   10         When I compared the dates of the diagnosis

16:59:24   11   to when the surgery was done, I don't recall there

16:59:30   12   being -- I mean I went over the inci -- incidences, I

16:59:35   13   don't recall instances where they were diagnosed on

16:59:37   14   the same day.

16:59:38   15      Q.   Okay.  But you're not sure whether

16:59:41   16   temporality is satisfied in all cases with respect to

16:59:44   17   the thromboprophylaxis because you don't know how

16:59:46   18   quickly an infection manifests; is that true?

16:59:50   19      A.   I -- I didn't specifically look at that.  I

16:59:53   20   suspected that it was, but it -- it -- it -- it --

16:59:58   21   it -- it's possible that it wasn't.

16:59:59   22      Q.   You don't know.

16:59:59   23      A.   I -- I don't know.  I don't -- I don't know.

17:00:01   24      Q.   Okay.

17:00:02   25      A.   But there again, I mean the temporality is

341

17:00:08  1    important for finding the association for what

17:00:11  2    occurred during the time period that -- that the

17:00:16  3    particular form of prophylaxis was applied, because

17:00:20  4    that could be -- it -- it could be in fact due to

17:00:25  5    something else because of the way this study was done.

17:00:30  6    It was only done by looking at certain dates.  So what

17:00:33  7    happened?  And of course a lot of things could be

17:00:35  8    happening during these dates, because as -- as the --

17:00:45  9    this -- this study is related to --

17:00:47  10            All the changes that were taking place with

17:00:50  11   regard to SSI, which quite possibly were also

17:00:56  12   affecting the -- the -- the deep joint infections,

17:01:01  13   were taking place during this time period, and so

17:01:07  14   that -- it could be something in that that is being

17:01:12  15   indirectly controlled when I'm controlling for the

17:01:14  16   thromboprophylaxis.

17:01:15  17       Q.   The bottom line is that there's no doubt

17:01:18  18   temporality is satisfied with respect to the Bair

17:01:20  19   Hugger and incidence of infection; however, there is

17:01:22  20   potential doubt with respect to any of the other

17:01:24  21   factors that you've noted in your report.

17:01:26  22            MR. GORDON:  Object to the form of the

17:01:27  23   question, lack of foundation, assumes facts not in

17:01:29  24   evidence.

17:01:34  25       A.   There is -- there's the potential --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

342

17:01:37  1      Q.   Let me ask the question again.  There's no

17:01:39  2  question that temporality is satisfied with respect to

17:01:43  3  the Bair Hugger.  You've said as much in your report.

17:01:44  4      A.   Yes.

17:01:45  5      Q.   There is a question as to whether

17:01:47  6  temporality is satisfied with respect to the

17:01:50  7  thromboprophylaxis and any other of the -- of the

17:01:52  8  measures that were part of the SSI bundle.

17:01:55  9           MR. GORDON:  Same objections.

17:01:57  10     Q.   You don't know whether temporality is

17:02:00  11  satisfied as to those variables; do you?

17:02:05  12     A.   With regard to --

17:02:07  13     Q.   The thromboprophylaxis.  Do you know?

17:02:09  14     A.   -- thromboprophylaxis --

17:02:11  15     Q.   Do you know?

17:02:12  16     A.   I don't know exactly when it -- when it

17:02:14  17  was -- we --

17:02:14  18           We don't have data on the timing --

17:02:16  19     Q.   Okay.

17:02:16  20     A.   -- of it, but --

17:02:19  21     Q.   So you don't know.

17:02:19  22     A.   So --

17:02:21  23     Q.   It's really "yes" or "no."

17:02:26  24     A.   I --

17:02:28  25           Well I don't have sufficient detail to

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

343

17:02:30  1  really -- to really be able to -- to -- to nail it

17:02:33  2  down --

17:02:34  3       Q.   Okay.

17:02:34  4       A.   -- as to when it is.  I --

17:02:36  5       Q.   Thank you.

17:02:37  6       A.   I suspect it probably is, but it's unclear.

17:02:41  7  And I think I say -- well it -- it's --

17:02:47  8            I think it's potentially controlled for,

17:02:49  9  yes.

17:02:49  10      Q.   Okay.

17:02:49  11      A.   It's not --

17:02:50  12      Q.   It's unclear.

17:02:52  13      A.   Yes.

17:02:54  14      Q.   The second factor with respect to causal

17:02:56  15  inference is the strength of association; correct?

17:02:58  16      A.   Yes.

17:03:01  17      Q.   And as to that factor, unlike temporality,

17:03:05  18  it is not a prerequisite to drawing causal inference;

17:03:17  19  correct?

17:03:17  20      A.   Well it helps to -- to establish that the

17:03:22  21  association is temp -- is -- is in fact causal because

17:03:27  22  otherwise it could easily be confounded with something

17:03:29  23  else.

17:03:29  24      Q.   It helps, but it is not required as it is in

17:03:32  25  temporality; correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

344

17:03:34   1       A.    Well it's one of the factors that's looked

17:03:36   2    for, and in fact one of the factors that was addressed

17:03:39   3    that -- that Samet uses.

17:03:42   4       Q.    The question is different and that is:

17:03:44   5    Temporality is a required factor to draw causal

17:03:47   6    inference; correct?

17:03:48   7       A.    Yes.

17:03:49   8       Q.    The strength of association --

17:03:51   9       A.    Is another factor that --

17:03:53   10      Q.    -- is another factor, but is not a

17:03:55   11   prerequisite for drawing causal inference.

17:04:00   12      A.    Okay.

17:04:00   13      Q.    Okay.  The strength of association goes to

17:04:05   14   the magnitude of causation as opposed to the presence

17:04:08   15   of causation; correct?

17:04:10   16             MR. GORDON:  Object to the form of the

17:04:11   17   question.

17:04:14   18      Q.    You stated earlier --

17:04:15   19      A.    It's not looking at the mag -- but the --

17:04:18   20             I don't know what you mean by the magnitude

17:04:20   21   of the causation.

17:04:20   22      Q.    The odds --

17:04:21   23      A.    It's either causing or it's not causing.

17:04:24   24      Q.    The odds ratio --

17:04:25   25      A.    The association has a magnitude, so I'm not

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

345

17:04:27  1   sure what you're --

17:04:29  2        Q.   Okay.

17:04:30  3        A.   -- what you're saying.

17:04:30  4        Q.   Is the association measured by the odds

17:04:32  5   ratio?

17:04:32  6        A.   The magnitude of association, yes.

17:04:36  7        Q.   Yes.  So with respect to a number such as

17:04:38  8   3.8, that signifies the magnitude of the association

17:04:42  9   as reported in McGovern.

17:04:44  10       A.   That -- that -- that is a point estimate of

17:04:46  11  magnitude --

          12       Q.   Okay.

17:04:46  13       A.   -- of association, yes.

17:04:47  14       Q.   Okay.  And that's different than a simple

17:04:49  15  determination of causation.

17:04:51  16       A.   Yes.  It's, of course, not just the point

17:05:00  17  estimate, --

17:05:00  18       Q.   Yes.

17:05:00  19       A.   -- it's the precision of the estimate, so

17:05:02  20  you have to take into account the confidence interval

17:05:05  21  as well.

17:05:05  22       Q.   An odds ratio of less than two can show

17:05:07  23  causation; correct?

17:05:11  24       A.   It -- it might, yes.

17:05:12  25       Q.   Yes.

346

17:05:14  1            And you report that the odds ratio with

17:05:25  2   respect to Albrecht 10 using Fisher's exact is 2.76;

17:05:31  3   correct?

17:05:31  4       A.    Yes.

17:05:32  5       Q.    You also report that the odds ratio when

17:05:35  6   applying one additional infection in each arm of the

17:05:41  7   study, according to Mr. Reed's testimony, results in

17:05:43  8   an odds ratio of 2.89; correct?

17:05:48  9       A.    I think so.

17:05:50  10      Q.    Footnote one of your report.

17:05:57  11      A.    I think that's right.  I presume --

17:05:58  12            Well 2.886 actually I think it is.  Yes.

17:06:01  13      Q.    That's --

17:06:02  14            Oh, my apologies.  I said 2.89.

17:06:04  15            With respect to when you control for the

17:06:06  16   thromboprophylaxis using Albrecht Exhibit 10, the odds

17:06:10  17   ratio is 2.16; correct?

17:06:12  18      A.    Yes, I think it's right.

17:06:18  19      Q.    You did not report an odds ratio when only

17:06:21  20   controlling for the antibiotic; correct?

17:06:23  21      A.    That's correct.

17:06:25  22      Q.    Aside from when you controlled both

17:06:27  23   variables, all of the odds ratios that we just

17:06:30  24   discussed are above 2.0; correct?

17:06:33  25      A.    All of those, yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

347

17:06:34  1      Q.    Okay.  And as we've established, if an odds

17:06:38  2  ratio is above 2.0, that signifies a doubling of the

17:06:42  3  risk; correct?

17:06:43  4      A.    For the point estimate.

17:06:44  5      Q.    Okay.

17:06:45  6      A.    That's --

17:06:47  7            The precision of that estimate is obviously

17:06:51  8  also relevant.

17:06:52  9      Q.    Yeah.  And the Augustine 2007 paper reports

17:07:00  10 an odds ratio for the multi-center data above four;

17:07:04  11 right?  I believe that's what it was.

17:07:05  12     A.    That's what's reported, yes.

17:07:07  13     Q.    Okay.

17:07:15  14            MR. SACCHET:  Can I have a time check, Mr.

17:07:16  15 Stirewalt?

17:07:19  16            THE VIDEOGRAPHER:  Six hours and 20 minutes

17:07:24  17 we've been going, forty minutes remaining.

17:07:36  18     Q.    Are you aware of the difference in the legal

17:07:38  19 standard versus scientific standard for drawing causal

17:07:43  20 inference?

17:07:44  21            MR. GORDON:  Objection, object to the form,

17:07:47  22 also lack of foundation.

17:07:53  23     A.    I'm not -- I don't -- not sure what you're

17:07:55  24 asking.

17:07:56  25     Q.    Do you know whether as a matter of law it's

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

348

17:08:00  1   okay to rely on one observational study --

17:08:03  2              MR. GORDON:   Same --

17:08:05  3        Q.    -- to prove causation?

17:08:07  4              MR. GORDON:   Same objection.

17:08:07  5        A.    I am not a lawyer, I've not studied law, so

17:08:13  6   I'm not -- I don't know what the -- what the

17:08:16  7   definitions are that are used.

17:08:18  8        Q.    You didn't opine on that in your report;

17:08:22  9   correct?

17:08:22  10       A.    No.  No.

17:08:22  11       Q.    Okay.  With respect to the variable of

17:08:25  12  consistency, which is the third factor that both you

17:08:30  13  and Dr. Samet considered with respect to causal

17:08:33  14  inference, even inconsistent results do not rule out

17:08:40  15  causal nexus; correct?

17:08:42  16             MR. GORDON:   Object to the form of the

17:08:43  17  question.

17:08:50  18       A.    What do you --

17:08:52  19             If they're inconsistent, then it -- it's

17:08:58  20  going -- going to make it more difficult to determine

17:09:03  21  that the association is -- is causal.

17:09:05  22       Q.    But you can still draw a causal inference

17:09:08  23  even with inconsistent results.

17:09:09  24             MR. GORDON:   Same objection.

17:09:12  25       A.    It really depends on what -- what you're

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

349

17:09:15   1   looking at.  I mean in the abstract I don't -- I have

17:09:17   2   a hard time of knowing exactly what you're talking

17:09:20   3   about.

17:09:20   4        Q.   Do you agree with the statement provided in

17:09:22   5   The Reference Manual on Epidemiology that inconsistent

17:09:26   6   results do not necessarily rule out a causal nexus?

17:09:29   7        A.   Yes.

17:09:30   8        Q.   You disagree with that?

17:09:31   9        A.   No, I would agree with that.

17:09:33   10       Q.   You agree with that.

17:09:34   11       A.   Yes.

17:09:34   12       Q.   Okay.  Are you aware of any inconsistent

17:09:39   13  results with respect to the Bair Hugger causing deep

17:09:46   14  joint infections?

17:09:53   15       A.   I -- I'm not --

17:09:56   16            I don't agree with the idea that it -- it --

17:09:58   17  that the causality has been established.  If what

17:10:02   18  you're asking for is consistency of the

17:10:07   19  association, --

17:10:07   20       Q.   I can rephrase.

17:10:09   21       A.   -- that -- that's a little different.

17:10:12   22  That's -- certainly the --

17:10:16   23            I mean basically what we have is the

17:10:19   24  Augustine paper and the McGovern paper.  Those

17:10:22   25  published associations are -- are consistent.

350

17:10:27  1        Q.    So there are two studies and they're both

17:10:29  2   consistent; correct?

17:10:30  3        A.    Those two studies agree with each other,

17:10:32  4   apparently.

17:10:33  5        Q.    Are you aware of any other observational

17:10:36  6   studies that have been conducted that are inconsistent

17:10:38  7   with those two studies?

17:10:39  8        A.    Those are the only studies that I'm aware of

17:10:41  9   that have been -- that -- that have compared Bair

17:10:44  10  Hugger and Hot Dog.

17:10:46  11       Q.    Are you aware of any mechanistic studies

17:10:48  12  that have been published that are inconsistent with

17:10:50  13  the fact that the Bair Hugger increases the risk of

17:10:53  14  deep joint infection?

17:10:54  15            MR. GORDON:    Object to the form of the

17:10:55  16  question.

17:10:58  17       A.    These are the only two studies that I -- I

17:11:02  18  think I said that I know of that have looked at that

17:11:05  19  association --

17:11:06  20       Q.    Okay.

17:11:06  21       A.    -- between use of the -- of -- the type of

17:11:11  22  warming device that was used and risk of infection --

17:11:14  23  of deep infection.

17:11:15  24       Q.    Are you aware of any studies regarding the

17:11:17  25  Bair Hugger that show the device does not increase the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

351

17:11:23   1   amount of particles over the surgical site?

17:11:25   2           MR. GORDON:  Object to the form of the

17:11:26   3   question, lack of foundation.

17:11:29   4       A.   That does not --

17:11:31   5       Q.   Increase particles over the surgical site.

17:11:36   6       A.   Well if you're talking about --

17:11:38   7           You're reducing it then for particles.  I

17:11:42   8   mean we -- we've talked about --

17:11:43   9       Q.   Yeah.  I'm just asking just this question.

17:11:45   10      A.   -- discussed all of that on the record --

17:11:47   11      Q.   Just this question.

17:11:47   12      A.   -- and I'm --

17:11:50   13          I mean there have been several studies that

17:11:52   14  have looked at particle distribution associated with

17:11:56   15  the -- with the -- with the use of Bair -- Bair

17:11:57   16  Hugger.

17:11:57   17      Q.   The question is:  Are you aware of any

17:12:00   18  studies that do not show an increase in particles over

17:12:03   19  the surgical site from the Bair Hugger?  That's the

17:12:05   20  question.  "Yes" or "no."

17:12:08   21          MR. GORDON:  Same objection.

17:12:11   22      A.   I have not -- haven't really investigated

17:12:14   23  that -- that field of how -- of what all the studies

17:12:17   24  are --

17:12:18   25      Q.   On what basis --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

352

17:12:19   1      A.    -- that have looked at that.

17:12:20   2      Q.    On what basis do you conclude, then, that

17:12:23   3   there is any consistency, if any, with respect to the

17:12:29   4   risk of infection posed by the Bair Hugger?

17:12:32   5           MR. GORDON:  Object to the form of the

17:12:33   6   question.

17:12:38   7      A.    I -- I mean I think what I was -- what I

17:12:41   8   said in my report is that there's --

17:12:44   9           Well, at the time this was written --

17:12:45  10      Q.    One study, yeah.

17:12:47  11      A.    -- there was one study.

17:12:49  12      Q.    That no longer applies; correct?

17:12:49  13      A.    There's -- there's now two.

17:12:50  14      Q.    And you've just said that those two studies

17:12:52  15   are consistent.

17:12:53  16      A.    Those two studies made the same mistakes and

17:12:57  17   they found similar magnitudes of association, so

17:13:03  18   that's --

17:13:04  19           So now there is a consistency of two.

17:13:06  20      Q.    Okay.  So you're --

17:13:09  21      A.    Samet was talking about -- was comparing the

17:13:11  22   situation of Bair Hugger to cigarettes.

17:13:13  23      Q.    Could you show me where he does that?

17:13:17  24      A.    Oh --

17:13:18  25           MR. GORDON:  Did you mark Samet already?

353

17:13:20  1           MR. SACCHET:  Yeah, I did.  Exhibit 3.

17:13:25  2      A.   I mean he uses cigarettes -- he -- he talks

17:13:28  3  about cigarettes, and that's basically the -- the

17:13:33  4  analogy that he is using where he's looking at that

17:13:36  5  association.

17:13:37  6      Q.   Where does he do that?

17:13:56  7      A.   Okay.  Exhibit 3.

17:14:13  8      Q.   I can speed this up for you, Professor

17:14:16  9  Holford, and -- and show you the two places that Dr.

17:14:20  10  Samet references tobacco, outside of his history, in

17:14:24  11  uncovering the link between tobacco use and cancer, if

17:14:28  12  that would be helpful.

17:14:29  13      A.   Okay.

17:14:31  14      Q.   On page 10, Dr. Samet says in the second --

17:14:45  15  or the first full paragraph, about halfway through,

17:14:51  16  "For example, observational designs were used in

17:14:54  17  linking cigarette smoking to lung cancer, as some

17:14:58  18  people were either current or former smokers and

17:15:00  19  others had never smoked.  Two basic designs were used;

17:15:05  20  the case-control study..."  And he goes on to

17:15:06  21  explain --

17:15:07  22      A.   Uh-huh.

17:15:07  23      Q.   -- those types of studies; correct?

17:15:09  24      A.   Yes.

17:15:09  25      Q.   That's one example.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

354

17:15:10  1     A.    Yeah.

17:15:11  2     Q.    The second example is on page 11, in the

17:15:15  3  third paragraph, in the last sentence, which says,

17:15:19  4  "These arguments are the typical general claims made

17:15:21  5  by those seeking alternative explanations for an

17:15:24  6  association, and reach back to the strategies employed

17:15:27  7  for decades by the tobacco industry," citing Proctor,

17:15:33  8  2012 and Samet and Burke, 2001; correct?

17:15:33  9     A.    Yes.

17:15:34  10    Q.    Are you aware of any other references to

17:15:37  11  tobacco that Dr. Samet makes outside of the first

17:15:40  12  three or four pages of the report which describes his

17:15:43  13  background?

17:15:46  14    A.    Well I mean he --

17:15:48  15          In this part of his report he is, I think,

17:15:52  16  using tobacco as -- I mean it's under the section

17:15:58  17  entitled "Evidence Synthesis and Findings on

17:16:02  18  Causation."

17:16:02  19    Q.    Okay.

17:16:02  20    A.    So this is forming the basis that he's using

17:16:05  21  for his justification of causation.

17:16:08  22    Q.    Where does he link the causation in tobacco

17:16:13  23  to causation with the Bair Hugger?  Where is that

17:16:17  24  express link in this report?

17:16:19  25    A.    Well no, the point is not that he's -- that

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

355

17:16:22  1    those two are --

17:16:23  2         He's using tobacco, the experience with

17:16:28  3    tobacco in showing the causal association with tobacco

17:16:34  4    and -- as I understand it, to try to argue that

17:16:37  5    there's a causal association between a warming device

17:16:41  6    and the risk of in -- of deep infection.

17:16:43  7         Q.   So those two sentences in the 17-page report

17:16:47  8    in your view show that Dr. Samet is linking tobacco to

17:16:51  9    the Bair Hugger.

17:16:52  10        A.   Well it's not just those --

17:16:53  11             MR. GORDON:  No, no, no.  Take -- take the

17:16:54  12   time and go through it page by page and -- and --

17:16:56  13   and --

17:16:56  14             MR. SACCHET:  We don't have time for that.

17:16:57  15             MR. GORDON:  Well then -- no.  Then you're

17:16:59  16   not going to just tell him what you've decided are the

17:17:03  17   only two sentences and -- and -- and then get him to

17:17:06  18   say -- to agree that those are the only two sentences.

17:17:08  19        Q.   Do you have a recollection to the contrary?

17:17:09  20   I've gone through this report and I have made a great

17:17:11  21   effort to isolate those two sentences that are the

17:17:14  22   only two in my view that exist outside of the

17:17:16  23   background section of this report in which Dr. Samet

17:17:20  24   describes that he was a senior scientific editor of

17:17:23  25   both the 2004 and 2014 report to the Surgeon General

356

17:17:24  1   regarding the incidence of cancer with respect to

17:17:25  2   tobacco use, along with being an associate editor of

17:17:28  3   the 1986 report to the Surgeon General.  Are you aware

17:17:31  4   of any other statement?

17:17:31  5           MR. GORDON:  Well -- well great, counsel,

17:17:34  6   then you have all you need to know about your views.

17:17:36  7           MR. SACCHET:  Okay.

17:17:36  8           MR. GORDON:  If you want to know Dr.

17:17:38  9   Holford's views, he's not going to rely on your

17:17:40  10  representation of your views, he's going to go through

17:17:42  11  the document and --

17:17:43  12      Q.   Sitting here today, do you have any

17:17:45  13  recollection of any other statements that Dr. Samet

17:17:48  14  has made linking the use of tobacco and the incidence

17:17:51  15  of cancer to the use of the Bair Hugger and deep joint

17:17:54  16  infection, sitting here right now?

17:17:55  17          MR. GORDON:  If you want him to answer that

17:17:56  18  question, he will go through the report.  If you don't

          19  want --

17:17:59  20          MR. SACCHET:  You just want me to do that,

17:18:00  21  Corey, to use the rest of the time, which I'm not

17:18:03  22  going to do.

17:18:04  23          MR. GORDON:  No.  If you don't want a -- if

17:18:05  24  you don't want an answer to the question, withdraw it

17:18:08  25  and move on.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

357

17:18:08    1       Q.   I'm asking right now:  Sitting here today,

17:18:10    2   are you aware of any other statements?

17:18:11    3            MR. GORDON:  I'm not going to let him answer

17:18:13    4   that question --

17:18:14    5            MR. SACCHET:  You're going to instruct him

17:18:15    6   not to answer?

17:18:16    7            MR. GORDON:  Yeah, I'm going to instruct him

17:18:18    8   not to answer.

17:18:19    9            MR. SACCHET:  Okay.  Noted for the record.

17:18:21   10   I'll move on.

           11            MR. GORDON:  If you want him to answer the

           12   question, he will go through the report and -- and

17:18:23   13   answer it.

17:18:23   14       Q.   Do you agree with Dr. Borak that the

17:18:24   15   particles are relevant to determining the coherency of

17:18:29   16   the scientific evidence to draw a causal inference?

17:18:31   17            MR. GORDON:  Object to the form of the

17:18:33   18   question, lack of foundation, mischaracterizes the

17:18:35   19   evidence, assumes facts not in evidence.

17:18:38   20            THE REPORTER:  We have 25 minutes left.

17:18:45   21       A.   What was the question again?  I -- I don't

17:18:47   22   understand --

17:18:48   23       Q.   Do you agree with Dr. Borak that studies

17:18:51   24   involving particles are relevant to the factor of

17:18:56   25   coherency under the Bradford-Hill criteria?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

358

17:19:00  1          MR. GORDON:  Same objection.

17:19:00  2      A.   I haven't seen the -- the Borak report, as

17:19:02  3  I --

17:19:02  4      Q.   I'm not asking you whether you've seen it,

17:19:04  5  I'm asking whether you agree with Dr. Borak.

17:19:06  6          MR. GORDON:  Well you're assuming that

17:19:08  7  you've --

         8      A.   Well then how can I --

17:19:08  9          MR. GORDON:   -- accurately characterized

17:19:09  10  what he said.  He -- he -- he lacks foundation,

17:19:11  11  counsel, he doesn't know what Dr. Borak said.  If you

17:19:14  12  want to ask him if he agrees generally with his --

17:19:16  13  with whatever statement, you can ask him, but if

17:19:18  14  you're going to pin it on Dr. Borak, he doesn't have a

17:19:22  15  foundation to respond to that because he hasn't read

17:19:27  16  it.

17:19:27  17      Q.   Do you disagree with this statement, "The

17:19:29  18  particle count studies might contribute to coherence?"

17:19:34  19      A.   I -- I would need to get more of the

17:19:36  20  background of what that statement is -- is --

17:19:42  21          I mean you're taking one sentence out of --

17:19:44  22  of a whole report.

17:19:48  23      Q.   Did you talk to Borak about your report?

17:19:51  24      A.   No.

17:19:51  25      Q.   Did you talk to Dr. Borak about his report?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

359

17:19:54   1      A.   No.

17:19:55   2      Q.   You didn't meet with Dr. Borak on May 19th

17:19:58   3   in Washington, DC?

17:19:59   4      A.   I did, but the --

17:20:02   5           Neither one of us, I think, had written a

17:20:04   6   report to that point.

17:20:06   7      Q.   Did you talk about the substance of the

17:20:06   8   report prior to writing the report?

17:20:09   9      A.   Of our report?

17:20:10  10      Q.   Yeah.

17:20:10  11      A.   We didn't discuss our own reports.  Our

17:20:14  12   reports are our reports.

17:20:15  13      Q.   What did you talk about at the May 19th

17:20:17  14   meeting?

17:20:20  15      A.   Generally talked about how --

17:20:24  16           I mean we're in different fields, --

17:20:29  17      Q.   I understand.

17:20:29  18      A.   -- I mean, and so --

17:20:31  19      Q.   Is your field specific to statistics and Dr.

17:20:35  20   Borak's is specific to epidemiology?

17:20:37  21      A.   That's more of the division it would be --

17:20:38  22   it would be, I would say.

17:20:39  23      Q.   Was the decision that you would opine on

17:20:41  24   statistics and Dr. Borak would respond on epi?

17:20:43  25      A.   Well there is some -- some overlap, but I

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

360

17:20:45  1   mean we were covering different parts of the -- parts

17:20:48  2   of the question, and so he's looking at -- he --

17:20:52  3           He is considering different issues than what

17:20:54  4   I considered.

17:20:55  5       Q.   Well what did you talk about on May 19th?

17:21:01  6       A.   Oh.  You want me to generate minutes of the

17:21:04  7   meeting?  Which I didn't at the -- at the time.

17:21:08  8           We were talking generally about -- about

17:21:13  9   basically how we -- what the issues were that we

17:21:16 10   would -- we would consider in our separate reports.

17:21:21 11       Q.   And were there any issues with respect to

17:21:24 12   those views that either one of you were concerned

17:21:27 13   about?

17:21:28 14           MR. GORDON:  Object to the form of the

17:21:29 15   question.

17:21:32 16       A.   What -- what are you asking?  I don't

17:21:34 17   understand the question.

17:21:34 18       Q.   Were there any topics of conversation that

17:21:37 19   you were not comfortable with answering without

17:21:39 20   talking to Dr. Borak?

17:21:42 21       A.   Not -- not in --

17:21:44 22           Not that I was looking at in my report, no.

17:21:46 23       Q.   Okay.  Were there any topics of conversation

17:21:51 24   that questioned whether the Bair Hugger does in fact

17:21:56 25   increase the rate of infection in deep joint

361

17:21:58   1   infections?

17:21:59   2          MR. GORDON:  Object to the form of the

17:22:02   3   question.

17:22:04   4       A.   What was the question again?

17:22:07   5       Q.   Was there any conversation as to whether the

17:22:08   6   Bair Hugger does in fact increase the rate of deep

17:22:11   7   joint infection?

17:22:13   8       A.   I mean there was general discussion about

17:22:17   9   what the -- what the association was and what --

17:22:21   10  what -- what the state of the evidence was on -- on

17:22:23   11  that association.

17:22:24   12      Q.   Okay.  Is it true that you decided that Dr.

17:22:27   13  Borak would be primarily responsible for the causal

17:22:31   14  inferences based on epidemiology and you would be

17:22:33   15  primarily responsible with respect to the statistical

17:22:36   16  application and reanalysis of the McGovern data?

17:22:39   17         MR. GORDON:  Object to the form of the

17:22:40   18  question, also lack of foundation.

17:22:51   19      A.   I'm not sure what you're asking.  I --

17:22:54   20      Q.   Did Dr. Borak ask you to help with drafting

17:22:58   21  a report or did 3M ask you?

17:23:00   22      A.   3M.

17:23:02   23      Q.   They approached you independently of Dr.

17:23:05   24  Borak?

17:23:07   25      A.   I think they may have gotten my name from

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

362

17:23:11  1  Dr. Borak, but --

17:23:12  2      Q.   Okay.

17:23:13  3      A.   -- we did not discuss our reports --

17:23:15  4      Q.   Okay.

17:23:15  5      A.   -- together.

17:23:16  6      Q.   Getting back to the question:  Do you have

17:23:18  7  any reason to doubt Dr. Borak's statement that

17:23:22  8  particles might contribute to the question of

17:23:22  9  coherency under the Bradford-Hill criteria?

17:23:25  10         MR. GORDON:  Object to the form of the

17:23:26  11  question, incomplete hypothetical, also lack of

17:23:30  12  foundation.

17:23:30  13     A.   As I say, I haven't read his report, so I

17:23:35  14  would have to read his report and study his report to

17:23:38  15  know exactly what he's saying.  I don't -- I don't

        16  know --

17:23:40  17         You're taking that sentence out of his

17:23:42  18  report, and you'll have to give me time to read the

17:23:45  19  report and to -- to -- to comment on it.

17:23:49  20     Q.   Well let's look at the paragraph that he

17:23:51  21  discusses because it's three sentences long and I

        22  don't think --

17:23:54  23         It's going to illuminate the issue.

17:24:05  24         (Exhibit 29 was marked for

17:24:07  25         identification.)

363

17:24:07    1          MR. GORDON:  Page?

17:24:08    2    BY MR. SACCHET:

17:24:08    3        Q.    If you could please turn to page 22, and

17:24:13    4    I'll read the isolated sentence and then we can turn

17:24:16    5    back to page 21 and read the preceding sentences.

17:24:21    6        A.    Page 22?

17:24:22    7        Q.    Yes.

17:24:24    8        A.    These are references.

17:24:29    9        Q.    You might be -- you might be looking at page

17:24:31   10    22 of the references as opposed to page 22 of the

17:24:34   11    report itself.

17:24:36   12        A.    Oh, I'm sorry.  This is --

17:24:38   13              I guess it's actually his CV.  Okay.  Sorry.

17:24:43   14        Q.    At the top of page 22 it says, "However, as

17:24:46   15    discussed below, the particle count studies might

17:24:49   16    contribute to coherence."  Do you see that?

17:24:51   17        A.    Yes.

17:24:51   18        Q.    Okay.  I'm happy to read the preceding

17:24:54   19    sentence if that provides context for you.  We can

17:24:57   20    look at the subsequent statements if that provides

17:25:00   21    context.  What would be helpful to you?

17:25:06   22        A.    "...might contribute to co" --

17:25:08   23              "...might contribute to coherence," what

17:25:25   24    does he mean by that?  I'm not sure --

17:25:27   25              Oh.

364

17:25:27　1　　　Q.　Okay.　Well in this section of his report,

17:25:30　2　if you turn back a couple pages, on page 20 we see the

17:25:38　3　Samet opinion, correct, on the top of the page 20?

17:25:40　4　　　A.　Right.　Yes.

17:25:41　5　　　Q.　And then paragraph 61 says "Strength of

17:25:43　6　Association," correct, as the --

17:25:46　7　　　A.　Yeah.

17:25:46　8　　　Q.　-- subject of that paragraph.

17:25:47　9　　　A.　Uh-huh.

17:25:48　10　　　Q.　Paragraph 65 has the consistency of the data

17:25:51　11　as the topic of that paragraph, and then the

17:25:55　12　paragraphs that follow that relate to consistency,

17:25:59　13　correct, because paragraph 70 is entitled "Coherence."

17:26:04　14　　　A.　Oh, I see.　So -- okay.　So he's talking

17:26:06　15　about consistency.　So I wasn't understanding what you

17:26:12　16　were saying for that.

17:26:16　17　　　　　Yeah, it says it "might contribute."

17:26:19　18　　　Q.　You disagree with that statement.

17:26:22　19　　　A.　It's a pretty vague statement, isn't it?　I

17:26:25　20　don't know.　It might.　It might or it night not.

17:26:27　21　　　Q.　Okay.　Do you disagree with it?

17:26:29　22　　　　　Might it?

17:26:30　23　　　A.　Might it?　It might.

17:26:31　24　　　Q.　Okay.

17:26:40　25　　　　　MR. SACCHET:　Where are we at?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

365

17:26:42   1              THE VIDEOGRAPHER:  We have 20 -- 21 minutes

17:26:45   2   remaining.

17:26:45   3        Q.   With respect to making causal inferences,

17:26:51   4   mechanistic studies may be helpful; correct?

17:26:58   5              MR. GORDON:  Object to the form of the

17:27:00   6   question.

17:27:02   7        A.   What type of mechanistic studies are you --

17:27:06   8   are you indicating?

17:27:07   9        Q.   So a study or a document that shows the

17:27:11  10   biological plausibility or the mechanism of infection

17:27:14  11   by which either a drug or a device or --

17:27:16  12        A.   Okay.

17:27:17  13        Q.   -- some entity might result in an increased

17:27:19  14   outcome at issue.

17:27:22  15        A.   That can help, yes.

17:27:22  16        Q.   That can help.

17:27:22  17        A.   Yes.

17:27:23  18        Q.   And in the event of two products, for

17:27:26  19   example, --

17:27:27  20        A.   Uh-huh.

17:27:28  21        Q.   -- would it be helpful if one particular

17:27:31  22   product, albeit a different product, had the same

17:27:35  23   mechanism of infection as a different product?

17:27:38  24              MR. GORDON:  Object to the form of the

17:27:39  25   question.

366

17:27:46  1        A.    I guess I would have to know exactly what

17:27:53  2   the -- what -- what was -- what -- what you're -- what

17:27:56  3   was involved in the two products and which was --

17:27:58  4        Q.    So in the event that there is one product

17:28:00  5   like the Bair Hugger where Dr. Samet opines that one

17:28:03  6   of the causal mechanisms is the disruption of airflow

17:28:06  7   currents in the operating room that then deposit

17:28:08  8   bacteria on the surgical site, if that's the mechanism

17:28:12  9   of the Bair Hugger for the sake of an example --

17:28:13  10            Do you understand?

17:28:14  11       A.    Okay.

17:28:14  12       Q.    -- and if there were another product that

17:28:21  13  involved the same mechanism of infection of creating

17:28:26  14  currents of air in an operating room that caused

17:28:30  15  bacteria to be deposited at the surgical site, those

17:28:33  16  are the same mechanisms of infection; correct?

17:28:36  17       A.    Uh-huh.

17:28:36  18       Q.    But they're different products, for example.

17:28:38  19       A.    Okay.

17:28:39  20       Q.    Because the mechanism is the same, would

17:28:43  21  that contribute to coherency of drawing an inference

17:28:48  22  about causation?

17:28:49  23            MR. GORDON:  Object to the form of the

17:28:51  24  question, incomplete hypothetical, assumes facts not

17:28:53  25  in evidence, lack of foundation.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

367

17:28:55  1     A.   Well it -- I mean I think if -- if --

17:29:00  2          It depends a lot, I think, on what the --

17:29:06  3     what the outcome is on -- on the -- the study that

17:29:09  4     you're --

17:29:10  5     Q.   Same outcome.  Let's say --

17:29:12  6     A.   Infection?

17:29:13  7     Q.   -- infection and that --

17:29:14  8     A.   Deep infection?

17:29:15  9     Q.   -- that's the one you've always been worried

17:29:17  10    about.

17:29:18  11    A.   Okay.  So if you're looking at a deep

17:29:20  12    infection, if that is the outcome that you're

17:29:22  13    measuring with these -- with these two different

17:29:24  14    devices, then -- then I think it would be helpful.

17:29:26  15    Q.   What if it was SSI versus DJI?

17:29:30  16         MR. GORDON:  Same objection.

17:29:32  17    A.   It -- there it --

17:29:34  18         I mean when you start getting away from it,

17:29:36  19    then you really have to get into the details of what

17:29:39  20    it is that -- that you're -- what -- what it is you're

17:29:43  21    looking at and where the -- where the potential

17:29:46  22    differences could be.

17:29:46  23    Q.   You need to look into those details with

17:29:49  24    respect to whether the SSI intervention measures have

17:29:52  25    an impact on deep joint infection; correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

368

17:29:54  1       A.    I was not separately studying the -- the SSI

17:29:58  2    and -- and DJI, yeah.

17:29:59  3       Q.    Okay.  But with respect to the two devices

17:30:02  4    that share the same exact mechanism of infection that

17:30:05  5    would both increase the risk of infection, that would

17:30:07  6    be helpful in determining whether there was biological

17:30:10  7    plausibility or coherency to whether there was an

17:30:12  8    increased risk of infection; correct?

17:30:14  9              MR. GORDON:  Same objection.

17:30:17  10      A.    It -- it -- it could be.

17:30:20  11      Q.    Okay.

17:30:21  12      A.    I don't know.

17:30:22  13      Q.    Okay.

17:30:25  14      A.    It depends on the details.

17:31:02  15            (Exhibit 30 was marked for

17:31:03  16            identification.)

17:31:03  17   BY MR. SACCHET:

17:31:06  18      Q.    This is a document from the CDC; correct,

17:31:11  19   Dr. Holford?

17:31:12  20      A.    It appears to be.

17:31:14  21      Q.    Are you familiar with HICPAC?

17:31:17  22      A.    I'm not familiar with it, no.

17:31:18  23      Q.    Okay.  If you could please turn to page 24

17:31:23  24   of that document, there is a title that says

17:31:38  25   "Nontuberculosis Mycobacterium Infections Associated

369

17:31:41  1    With Heater-Cooler Devices."  Do you see that?

17:31:43  2        A.   Yes.

17:31:44  3        Q.   Okay.  And heater-cooler devices are not the

17:31:47  4    same as Bair Huggers; correct?

17:31:49  5        A.   I don't know what devices they're talking

17:31:51  6    about.

17:31:51  7        Q.   Okay.  The first sentence of text says, "Dr.

17:31:56  8    Perz reviewed points about Nontuberculosis

17:31:59  9    Mycobacterium and infections associated with

17:32:02  10   heater-cooler devices;" correct?

17:32:03  11       A.   Yes.

17:32:04  12       Q.   And this is talking about a device, whether

17:32:06  13   or not you know that it's the same as the Bair Hugger

17:32:08  14   or not; correct?

17:32:09  15            MR. GORDON:  Object to the form of the

17:32:10  16   question, lack of foundation.

17:32:13  17       Q.   Does -- does this say that there's a device

17:32:16  18   that they're discussing?

17:32:18  19       A.   There is a device they're discussing.

17:32:20  20       Q.   Okay.

17:32:20  21       A.   I don't know --

17:32:21  22            I know nothing about it, --

17:32:22  23       Q.   Yeah.

17:32:22  24       A.   -- the device.

17:32:23  25       Q.   I understand that.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

370

17:32:24  1              On page 25 in the second paragraph --

17:32:28  2       A.    Yeah.

17:32:29  3       Q.    -- it says, "Two fans are present in the

17:32:30  4  heater-cooler."

17:32:31  5       A.    Uh-huh.

17:32:32  6       Q.    And it says, "This design is typical for

17:32:35  7  this class of device.  One fan cools the device's

17:32:38  8  internal components, and another, larger fan draws air

17:32:41  9  into the machine."  Correct?

17:32:42  10      A.    Yes, that's what it says.  Yeah.

17:32:44  11      Q.    Do you know that the Bair Hugger draws air

17:32:46  12  into the machine so it warms patients through the hose

17:32:50  13  and into the blanket?

17:32:53  14      A.    I -- I don't know very much about the de --

17:32:57  15            I -- I think that's what it does -- does.  I

17:32:59  16  don't know a lot of detail about how the -- how the

17:33:01  17  Bair Hugger works.

17:33:02  18      Q.    You don't know a lot of details about how

17:33:04  19  the Bair Hugger works?

17:33:05  20      A.    No.

17:33:05  21      Q.    Okay.  On page 26 there are five bullets

17:33:14  22  listed there.  Do you see them?

17:33:15  23      A.    Yes.

17:33:15  24      Q.    And the third one is, "Direct the exhaust

17:33:17  25  from the device away from the sterile field."  Do you

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

371

17:33:20  1   see that?

17:33:20  2        A.   Yes.

17:33:21  3        Q.   Okay.  And then on the subsequent page, page

17:33:25  4   27, in the last paragraph it says, "The heater-cooler

17:33:29  5   unit appears to be harmless from an infection

17:33:32  6   perspective, but the water overflow -- overflow bottle

17:33:34  7   is likely rarely, if ever, sanitized and is situated

17:33:38  8   in front of a fan.  Nothing that blows air should be

17:33:40  9   in the operating theater, if possible."  Do you see

17:33:42  10  that?

17:33:42  11       A.   Yes.

17:33:44  12       Q.   Do you know why they're concerned about

17:33:46  13  things blowing air in the operating room?

17:33:48  14            MR. GORDON:  Object to the form of the

17:33:50  15  question, lack of foundation, it mischaracterizes the

17:33:52  16  evidence.

17:33:56  17       A.   I mean I -- I --

17:33:58  18            This is the first I read this, I --  I've

17:34:00  19  seen this article.  I -- it's -- it's -- it's really

17:34:05  20  not my -- my -- not my area.

17:34:08  21       Q.   You've seen this article?

17:34:09  22       A.   No, I have not seen it.

17:34:11  23       Q.   You have not seen it.

17:34:12  24       A.   That's what I said.

17:34:13  25       Q.   Okay.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

372

17:34:14    1        A.    It -- I mean it -- it sort of co --

17:34:22    2   coincides with a lot of the concern of what we've been

17:34:25    3   talking about today.

17:34:27    4        Q.    It does; correct?

17:34:28    5        A.    It's really --

17:34:29    6              MR. GORDON:  Same objections.

17:34:31    7        A.    Well I think that was the bas -- basic --

17:34:34    8   the -- the purpose of the bubble study and whatnot, is

17:34:37    9   to consider --

            10        Q.    Yeah.

17:34:38   11        A.    -- particles that were distributed in the

17:34:39   12   operating room.

17:34:41   13        Q.    So this is describing a similar concern

17:34:44   14   based on the mechanism of infection; correct?

17:34:45   15              MR. GORDON:  Same objection.

17:34:49   16        A.    Well it doesn't say why.  I mean I -- it

17:34:51   17   just --

17:34:51   18        Q.    One of -- one of the mechanisms is that

17:34:53   19   blowing air in the operating room might create

17:34:56   20   convection currents that deposit bacteria at the

17:34:59   21   surgical site; correct?

17:35:00   22              MR. GORDON:  Same objections.

17:35:02   23        A.    I --

17:35:03   24        Q.    According to Dr. Samet.

17:35:05   25        A.    Well if it's Dr. Samet, I mean quote Dr.

373

17:35:09    1    Samet.  It's not --

17:35:10    2         That's not my area.  I mean we've already

17:35:14    3    established what his area is --

17:35:15    4         Q.   Okay.

17:35:16    5         A.   -- and this is an area that he feels

17:35:18    6    comfortable in and that -- and has -- has -- has done

17:35:22    7    work in, and this is not the area --

17:35:25    8         Q.   You don't feel comfortable in this area.

17:35:27    9         A.   It's not an area that I -- that I work

17:35:29   10    in, --

17:35:30   11         Q.   Okay.

17:35:31   12         A.   -- no.

17:35:31   13         Q.   And so you're unclear about what the

17:35:33   14    mechanism of infection that is the issue with respect

17:35:35   15    to blowing air in the operating theater; is -- is

17:35:37   16    that -- is that your testimony?

17:35:39   17         MR. GORDON:  Object to the form of the

17:35:40   18    question.

17:35:45   19         A.   It's --

17:35:50   20         I mean the authors of this report are

17:35:53   21    obviously concerned about blowing -- you know, blowing

17:35:57   22    air over water that's -- water that's infected.

17:36:01   23         Q.   Uh-huh.

17:36:01   24         A.   I don't know enough about the mechanism of

17:36:04   25    the Bair Hugger --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

374

17:36:05  1     Q.   Yeah.

17:36:05  2     A.   -- to know exactly what is --

17:36:08  3         Is there a pool of water in the Bair Hugger

17:36:11  4  that it -- that it's blowing air over?

17:36:13  5     Q.   Okay.

17:36:13  6     A.   I don't know.

17:36:14  7     Q.   So you've opined about whether one can draw

17:36:18  8  a causal inference as to whether the Bair Hugger

17:36:19  9  increases the risk of infection, but you don't

17:36:22  10  understand the ways in which the Bair Hugger might in

17:36:25  11  fact result in an increase in infection.

17:36:27  12         MR. GORDON:  Object to the form of the

17:36:28  13  question, misstates his testimony.

17:36:30  14     A.   I think -- I think that's not -- not an

17:36:33  15  accurate description of what -- what I've -- what I've

17:36:37  16  been saying.  I was looking at the -- the evidence for

17:36:41  17  a causal -- a causal association --

17:36:44  18     Q.   Uh-huh.

17:36:45  19     A.   -- and does -- that has in -- that has

17:36:47  20  basically involved looking at what the -- the design

17:36:54  21  and the estimates of effect that were known to me

17:36:58  22  at the -- at the time that I did that -- did that

17:37:01  23  analysis.

17:37:01  24     Q.   And that's it.

17:37:02  25     A.   And that's basically what I was drawing my

375

17:37:05    1    con -- conclusions are about -- about causal

17:37:09    2    inference.

17:37:09    3         Q.    Okay.

17:37:09    4         A.    It was basically the strength --

17:37:11    5         Q.    Uh-huh.

17:37:13    6         A.    -- in terms of not only the magnitude of the

17:37:14    7    effect, but in terms of the design that was used

17:37:19    8    and -- to -- to find those -- those associations and

17:37:24    9    whether that is -- the strength of that evidence is --

17:37:26    10   was enough to demonstrate a causal -- a causal

17:37:31    11   association.

17:37:32    12        Q.    Do you agree with the statement from The

17:37:33    13   Reference Manual on Statistics that "In the end,

17:37:36    14   deciding whether associations are causal typically is

17:37:39    15   not a matter of statistics alone, but also rests on

17:37:42    16   scientific judgment?"

17:37:43    17        A.    Yes.

17:37:43    18        Q.    You've only considered the statistical

17:37:46    19   aspects; correct?

17:37:48    20        A.    Well I tried to consider the -- the other

17:37:52    21   aspects of -- of the -- of the study as well.

17:37:55    22        Q.    You said you have no expertise and have not

17:37:58    23   delved into the literature as to those additional

17:38:01    24   topics; correct?

17:38:04    25        A.    Of the associated -- of things related

376

17:38:10  1    specifically to these devices.  I was primarily

17:38:13  2    concentrating on the studies that had been done on the

17:38:17  3    epidemiology.

17:38:18  4         Q.    And those studies are the McGovern study and

17:38:21  5    the Augustine study, which are the only two

17:38:25  6    epidemiologic studies on the risk of infection from

17:38:27  7    the Bair Hugger to deep joint infection; correct?

17:38:31  8         A.    For the Bair -- for the Bair Hugger effect,

17:38:35  9    the Bair Hugger/Hot Dog comparison, those were the --

17:38:42  10   basically the studies that I was comparing.

17:38:44  11             MR. SACCHET:  Okay.  We're going to look at

17:38:45  12   one more document.  Maybe two, but --

17:38:54  13             (Exhibit 31 was marked for

17:38:55  14             identification.)

17:38:57  15   BY MR. SACCHET:

17:38:58  16        Q.    This is another document from the CDC;

17:39:05  17   correct?

17:39:05  18             MR. GORDON:  Objection, lack of foundation.

17:39:09  19             THE REPORTER:  We have eight minutes left.

17:39:11  20        Q.    Does the title page of this document,

17:39:15  21   professor, show the CDC's logo on it?

17:39:16  22        A.    Yes.

17:39:17  23        Q.    Okay.  And if you could please turn to page

17:39:29  24   12 of the document, it states "FDA Device Updates:

17:39:36  25   Flexible Endoscopes and Heater Coolers;" correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

377

17:39:39   1      A.   Yes.

17:39:39   2      Q.   Okay.  If you could turn to page 15 of the

17:39:42   3  document, there are a number of bullet points;

17:39:47   4  correct?

17:39:47   5      A.   Yes.

17:39:48   6      Q.   And the fourth one down says, "The

17:39:50   7  orientation of the vent(s) on the devices may or may

17:39:53   8  not direct the fan exhaust toward the patient or the

17:39:55   9  sterile field.  The exhaust from cooling fans may also

17:39:58  10  play a role in the airflow within the OR, possibly

17:40:02  11  facilitating movement of the aerosolized NTM into the

17:40:06  12  sterile field."  Do you see that?

17:40:07  13      A.   Yes.

17:40:07  14      Q.   Is that the same mechanism of infection that

17:40:09  15  Dr. Samet described in his report?

17:40:11  16           MR. GORDON:  Object to the form of the

17:40:12  17  question, lack of foundation, assumes facts not

17:40:15  18  evidence, mischaracterizes the testimony.

17:40:19  19      A.   I -- I don't recall the detail of how --

17:40:24  20  what Dr. Samet's description was on -- on -- on the --

17:40:29  21  on the -- on devices used.

17:40:30  22      Q.   One of the issues in this litigation that

17:40:33  23  was discussed in the McGovern study, which you are

17:40:35  24  aware of, is that the Bair Hugger might generate

17:40:37  25  convection currents that results in increased

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

378

17:40:40  1   particles over the surgical site; correct?

17:40:41  2      A.   Yes.  Yes.

17:40:42  3      Q.   This bullet says that "The exhaust from

17:40:44  4   cooling fans may also play a role in the airflow

17:40:47  5   within the OR, possibly facilitating movement of the

17:40:50  6   aerosolized NTM into the sterile field."  Do you see

17:40:53  7   that?

17:40:55  8           MR. GORDON:  Objection, asked and answered.

17:40:56  9      Q.   You've seen it.

17:40:57  10          Does that describe a similar mechanism of

17:41:03  11  moving particles or bacteria to the sterile field?

17:41:06  12          MR. GORDON:  Well wait, wait, wait.  You

17:41:06  13  started out with talking about convection currents,

17:41:09  14  now you're changing gears.  What -- what are you

17:41:11  15  asking him?

17:41:12  16     Q.   I'm asking:  One of the mechanisms of

17:41:13  17  infection described in the McGovern study is the

17:41:16  18  movement of particles from air currents generated by

17:41:20  19  the Bair Hugger; correct?

17:41:20  20          MR. GORDON:  Well before you said convection

17:41:22  21  currents, not --

17:41:23  22          MR. SACCHET:  Okay.

17:41:23  23          MR. GORDON:  You say you're changing that

17:41:26  24  now?

17:41:27  25          MR. SACCHET:  I am.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

379

17:41:27  1              MR. GORDON:  Okay.

17:41:28  2              MR. SACCHET:  Yes.

17:41:28  3       Q.    That's correct.

17:41:28  4       A.    Okay.

17:41:30  5       Q.    And this bullet, which is from the CDC that

17:41:34  6  we established, says that "The exhaust from cooling

17:41:36  7  fans may also play a role in the airflow within the

17:41:39  8  OR, possibly facilitating the movement of the

17:41:43  9  aerosolized NTM into the sterile field;" correct?

17:41:47  10      A.    It possibly is.

          11              MR. GORDON:  Objection, asked and answered.

          12      Q.    Possibly?

          13              MR. GORDON:  You read it right.

          14      A.    Yes.

17:41:48  15      Q.    Okay.

17:41:49  16              MR. GORDON:  Are you asking him if he -- if

17:41:50  17  he has any basis for --

          18              MR. SACCHET:  No, I'm not, Corey.

17:41:52  19              MR. GORDON:  -- saying anything --

17:41:52  20  commenting on that?

17:41:53  21              MR. SACCHET:  Please don't use the rest of

17:41:56  22  my time.  I'm not going to engage --

17:41:56  23              MR. GORDON:  Well I want -- I want to get an

17:41:56  24  objection.  I thought you were just, once again,

17:41:58  25  reading the same sentence.  If you're asking him to

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

380

17:42:00  1  comment on it, I object on the grounds of lack of

17:42:03  2  foundation.

17:42:03  3      Q.   Does this describe a similar mechanism of

17:42:06  4  infection as noted by McGovern et al in the study that

17:42:08  5  you have reviewed?

17:42:09  6           MR. GORDON:  Object to the form of the

17:42:10  7  question, also lack of foundation, also

17:42:13  8  mischaracterizes the evidence.

17:42:16  9      A.   I'm not sure it --

17:42:23 10           It's un -- it's unclear.  I mean just that

17:42:25 11  sentence, I can't figure out -- I -- I -- I'm not --

17:42:30 12  unclear as to whether -- how this relates to what

17:42:32 13  McGovern is saying.

17:42:34 14      Q.   Did you try to shore up your

17:42:35 15  misunderstanding or questions about that statement?

17:42:38 16      A.   Well I mean you just -- you just showed me

17:42:39 17  this, --

17:42:40 18      Q.   Okay.  So you -- you didn't investigate --

17:42:42 19      A.   -- so how could I --

17:42:43 20      Q.   You didn't investigate this.

17:42:44 21      A.   Not when --

17:42:45 22           No.  I mean you asked me this question

17:42:46 23  about --

17:42:47 24      Q.   You didn't know about it.

17:42:49 25      A.   -- a minute before.  I didn't know about

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

381

17:42:50   1   this report, no.

17:42:51   2           MR. SACCHET:   Okay.   I'm going to show you

17:42:53   3   one other document.

17:43:06   4           (Exhibit 32 was marked for

17:43:08   5           identification.)

17:43:08   6   BY MR. SACCHET:

17:43:08   7       Q.   This is a document bearing the Bates number

17:43:11   8   3MBH0001 -- 1336; correct?

17:43:15   9       A.   Yes.

17:43:15   10      Q.   Have you seen it before?

17:43:16   11      A.   No.

17:43:22   12      Q.   The top line says "CONFIDENTIAL - NOT FOR

17:43:25   13  EXTERNAL DISTRIBUTION;" correct?

17:43:26   14      A.   Yes.

17:43:27   15      Q.   And then the bolded typeface says "Arizant

17:43:30   16  forced-air warming and SSI prevention:   Talking points

17:43:32   17  for sales;" correct?

17:43:33   18      A.   Yes.

17:43:33   19      Q.   And it says "Our position."   The first line

17:43:36   20  is, "There is no evidence that forced-air warming

17:43:39   21  (FAW) increases risk of surgical site infections

17:43:42   22  (SSIs)...;" correct?

17:43:43   23      A.   That's what it says.

17:43:44   24      Q.   And there's a comment right next to it;

17:43:46   25  correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

382

17:43:46    1        A.    Yes.

17:43:47    2        Q.    And it says, "Actually, there is evidence

17:43:49    3    that FAW use increases risk."  Do you see that?

17:43:53    4        A.    Yes.

17:43:54    5        Q.    Do you know who wrote that statement?

17:43:57    6        A.    No, I don't.

17:43:57    7        Q.    Do you know whether that statement was

17:44:00    8    written by a 3M employee?

17:44:01    9              MR. GORDON:  Object to the form of the

17:44:03   10    question, lack of foundation.

17:44:04   11        A.    I've never seen this document before, so I

17:44:07   12    have no idea.

17:44:08   13        Q.    Are you surprised that this statement was

17:44:10   14    made in a document that's confidential regarding

17:44:13   15    Arizant talking points on SSI prevention?

17:44:16   16              MR. GORDON:  Object to the form of the

17:44:17   17    question, lack of foundation, misstates --

17:44:19   18    mischaracterizes the evidence.

17:44:22   19        A.    I don't --

17:44:23   20              I mean I know basically nothing about this

17:44:28   21    document.

17:44:29   22        Q.    You've never seen it before.

17:44:30   23        A.    I've never seen it before.

17:44:31   24        Q.    Okay.  Did you look at any documents that

17:44:35   25    had a 3M Bates number on it, like this in the bottom

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

383

17:44:39  1  right-hand corner, as part of your review?

17:44:43  2         A.  Any documents that had --

17:44:45  3         Q.  That had a Bates number bearing the prefix

17:44:47  4  3MBH.

17:44:50  5         A.  I don't recall.  I -- al -- although I don't

17:44:53  6  know --

17:44:53  7             I didn't look carefully at that Bates number

17:44:56  8  on all of the documents.  I don't recall that.

17:45:00  9         Q.  Were any internal 3M documents provided to

17:45:04  10  you as part of your review of the evidence in this

17:45:06  11  case?

17:45:07  12        A.  No.

17:45:08  13        Q.  Did you meet with any people from 3M with

17:45:12  14  respect to preparing your report?

17:45:13  15        A.  No, I did not.

17:45:14  16            MR. SACCHET:  Okay.  I will reserve the rest

17:45:18  17  of my time.

17:45:23  18            THE REPORTER:  Off the record, please.

17:45:40  19            (Discussion off the record.)

17:45:40  20            MR. GORDON:  We'll read -- we'll read and

17:45:42  21  sign.

17:45:44  22            MR. SACCHET:  I'd like to make one note.

17:45:50  23            THE REPORTER:  Let's go back on the record.

17:45:53  24            MR. SACCHET:  To the extent that Dr. Holford

17:45:56  25  has noted in his report that he reviewed documents

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

384

17:45:58   1   provided by 3M with respect to the use of the Bair

17:46:02   2   Hugger at particular hospitals in the NHS and that

17:46:06   3   those documents were not cited in his report, I'm

17:46:08   4   leaving the deposition open.

17:46:09   5            THE REPORTER:  Off the record, please.

17:46:16   6            (Deposition concluded.)

           7

           8

           9

          10

          11

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

385

1                    C E R T I F I C A T E

2              I, Richard G. Stirewalt, hereby certify that

3    I am qualified as a verbatim shorthand reporter, that

4    I took in stenographic shorthand the deposition of

5    THEODORE R. HOLFORD at the time and place aforesaid,

6    and that the foregoing transcript is a true and

7    correct, full and complete transcription of said

8    shorthand notes, to the best of my ability.

9              Dated at Deerwood, Minnesota, this 23rd day

10   of July, 2017.

11

12

13

14

15

16

17                    RICHARD G. STIREWALT

18                    Registered Professional Reporter

19                    Notary Public

20

21

22

23

24

25

386

1                  C E R T I F I C A T E

2            I, THEODORE R. HOLFORD, hereby certify that

3   I have carefully read the foregoing transcript, and

4   that the same is a true and complete, full and correct

5   transcription of my deposition, except:

6   PAGE/LINE              CHANGE                REASON

7

8

9

10

11

12

13

14

15

16

17                             THEODORE R. HOLFORD

18                             Deponent

19

20        Signed and sworn to before me this _____ day of

21   August, 2017.

22

23                    _____

24                         Notary Public

25