EXHIBIT 38

Page 1

1                  UNITED STATES DISTRICT COURT
                     DISTRICT OF MINNESOTA
2    --------------------------------------------------
3    In Re:
4    Bair Hugger Forced Air Warming
     Products Liability Litigation
5
     This Document Relates To:
6
     All Actions                    MDL No.
7                                   15-2666 (JNE/FLM)
8    --------------------------------------------------
9

                     VIDEOTAPED DEPOSITION
10
                             OF
11
                        MARK ALBRECHT
12
                          VOLUME 1
13
                   Minneapolis, Minnesota
14
                   Friday, October 7th, 2016
15
16   --------------------------------------------------
17
18
19
20
21
22
23
24   Reported by:
     Amy L. Larson, RPR
25   Job No. 112502

```
1    APPEARANCES:
2        ON BEHALF OF 3M:
3        COREY GORDON, ESQ.
         PETER GOSS, ESQ.
4        BLACKWELL BURKE
         431 South Seventh Street
5        Minneapolis, MN 55415
6
7
8        FOR THE PLAINTIFF:
9        BEN GORDON, ESQ.
         LEVIN PAPANTONIO THOMAS MITCHELL
10       RAFFERTY & PROCTOR
         316 S Baylen Street
11       Pensacola, FL 32502
12
13       GENEVIEVE ZIMMERMAN, ESQ.
         MESHBESHER & SPENCE
14       1616 Park Avenue South
         Minneapolis, MN 55404
15
16       GABRIEL ASSAAD, ESQ.
         KENNEDY HODGES
17       4409 Montrose Boulevard
         Houston, TX 77006
18
19       BEHRAM PAREKH, ESQ.
         Kirtland & Packard
20       2041 Rosecrans Avenue
         El Segundo, CA 90245
21
22
23       ALSO PRESENT:  Kraig Hildahl, Videographer
24
25
```

```
 1                          ALBRECHT
 2   INDEX:
 3   EXAMINATION BY:                              PAGE
 4   Mr. Gordon...................................6
 5   EXHIBITS MARKED FOR IDENTIFICATION:
 6   Exhibit 1...................................22
     Augustine Biomedical & Design
 7   Research and Development Report
     Dated 9/14/07
 8   Bates AUGUSTINE_0001577 - AUGUSTINE_0001588
 9   Exhibit 2...................................30
     Hastings Ventilation Assessment
10   Bates AUGUSTINE_0010948 - AUGUSTINE_0010952
11   Exhibit 3...................................76
     Augustine Biomedical & Design
12   Research and Development Report
     Dated 10/12/2007
13
     Exhibit 4...................................95
14   Forced-Air Warming:  A Source of Airborne
     Contamination in the Operating Room?
15   No Bates
16   Exhibit 5...................................95
     Forced-Air Warming Design:
17   Evaluation of Intake Filtration, Internal
     Microbial Buildup, and Airborne-Contamination
18   Emissions
     No Bates
19
     Exhibit 6...................................95
20   Forced-Air Warming Blowers:  An
     Evaluation of Filtration Adequacy and Airborne
21   Contamination Emissions in the Operating Room
     No Bates
22
     Exhibit 7...................................95
23   Patient Warming Excess Heat:  The Effects
     On Orthopedic Operating Room Ventilation
24   Performance
25
```

1                      ALBRECHT

2    INDEX:  (Cont'd.)

3    EXHIBITS MARKED FOR IDENTIFICATION:      PAGE

4    Exhibit 8.................................95
     Forced-Air Warming and Ultraclean

5    Ventilation Do Not Mix
     No Bates

6
     Exhibit 9.................................95

7    Effect of Forced-Air Warming on the
     Performance of Operating Theatre Laminar

8    Flow Ventilation
     No Bates

9
     Exhibit 10...............................141

10   Data
     Bates AUGUSTINE_0005193 - AUGUSTINE_0005487

11
     Exhibit 11...............................144

12   Data
     No Bates

13
     Exhibit 12...............................160

14   May 2012 E-mail Chain
     Subject:  Further Infection Data

15   Bates Albrecht_0003579 - Albrecht_0003580,
     Albrecht_0003576 - Albrecht_0003578

16
     Exhibit 13...............................213

17   HotDog Patient Warming Website Screenshot
     No Bates

18
     Exhibit 14...............................229

19   Color Photograph
     No Bates

20

21

22

23

24

25

1                      ALBRECHT

2        THE VIDEOTAPED DEPOSITION OF MARK ALBRECHT,

3    VOLUME 1, taken on this 7th day of October, 2016,

4    at the Law Offices of Blackwell, Burke, LLP,

5    431 South Seventh Street, Suite 2500, Minneapolis,

6    Minnesota, commencing at approximately 9:17 a.m.

7

8              P R O C E E D I N G S

9

10              THE VIDEOGRAPHER:  This is the

11       start of tape labeled number 1 in the

12       videotaped deposition of Mark Albrecht in the

13       matter of In Re:  Bair Hugger Forced Air

14       Warming Products Liability Litigation, in the

15       U.S. District Court, District of Minnesota.

16       The MDL case number is 15-2666 (JNE/FLN).

17              This deposition is being held at

18       Blackwell, Burke law firm in Minneapolis,

19       Minnesota on October 7th, 2016.  The time is

20       9:18 a.m.  My name is Kraig Hildahl, I'm a

21       legal video specialist from TSG Reporting.

22       The court reporter is Amy Larson also with

23       TSG Reporting.

24              Will counsel please introduce

25       themselves for the record.

ALBRECHT

1

2          MR. C. GORDON:   Corey Gordon and

3     Peter Goss on behalf of defendant 3M.

4          MR. B. GORDON:   Ben Gordon for the

5     plaintiffs.

6          MR. ASSAAD:   Gabriel Assaad for

7     the plaintiffs.

8          MS. ZIMMERMAN:   Genevieve

9     Zimmerman for the plaintiffs.

10          MR. PAREKH:   Behram Parekh for

11     plaintiffs.

12          THE VIDEOGRAPHER:   Will the court

13     reporter please swear in the witness and we

14     can proceed.

15

16               MARK ALBRECHT,

17          a witness in the above-entitled action,

18          after having been first duly sworn, was

19          deposed and says as follows:

20

21               EXAMINATION

22     BY MR. C. GORDON:

23     Q.  Good morning, Mr. Albrecht.

24     A.  Hello.

25     Q.  To reintroduce myself, I'm Corey Gordon, and

1                         ALBRECHT

2        I -- I represent 3M in a multi-district

3        litigation involving claims over the 3M

4        Bair Hugger warming device.

5    A.  Uh-huh.

6    Q.  I'm here to ask you questions about some of

7        the work you -- you did in connection with

8        that.  First of all, let's -- have you ever

9        had your deposition taken before?

10   A.  No.

11   Q.  Okay.  Just some ground rules that will make

12       everything smoother.  You can see the court

13       reporter is using the machine to take down

14       everything I say, everything you say.  Your

15       testimony is sworn, it's as if you are in

16       court.  So you need to -- I need to wait

17       until you're done with your answers, you need

18       to wait until I'm done with my questions, in

19       order for her to be able to transcribe what

20       is being communicated.  You need to give

21       verbal answers, a yes or a no or whatever,

22       rather than a uh-huh or huh-uh or a shake of

23       the head that would ordinarily communicate if

24       we were just talking to each other.

25               So it's -- there's a little --

1                           ALBRECHT

2    A.   I understand.

3    Q.   -- a little bit of formality.

4              And it's just -- I can tell you,

5         it's human nature to start an answer before a

6         question is finished or start a question

7         before an answer is finished.  I'll try my

8         best not to, and we may have to back up

9         occasionally to make sure that only one

10        person is talking at a time.

11             Because this is as if you are in

12        court, there's no judge here, as you can see,

13        but from time to time either side may make

14        objections, if I ask a question and they make

15        an objection, same thing when they ask you

16        questions.

17             You're not represented by an

18        attorney; is that correct?

19   A.   Correct.

20   Q.   So nobody -- nobody here is representing you,

21        nobody here can instruct you not to answer a

22        question, so objections are for the record.

23        And even if there's an objection, go ahead

24        and answer the question unless an objection

25        is made and the asking attorney decides to

ALBRECHT

1

2      withdraw or -- or change the question.  But

3      just -- you know, it's an unusual procedure,

4      I'm sure, for people who don't experience it

5      regularly.

6                  MR. B. GORDON:  And if I could

7      interject, Corey.

8                  MR. C. GORDON:  Sure.

9                  MR. B. GORDON:  Since this is your

10     first time, Mark, there is an exception for

11     privileged information, which is a legal

12     issue, which we may or may not get into here.

13     And if that happens, we'll talk about it.

14     But if there's information that may be

15     legally privileged that you don't have to

16     answer then we may have to take that up with

17     the court.

18  BY MR. C. GORDON:

19  Q.  Let's start with your -- your background.

20               Where did you go to high school?

21  A.  Chaska, Minnesota.

22  Q.  When did you graduate?

23  A.  1998.

24  Q.  And did you go on to post high school

25     education right away?

1                            ALBRECHT

2    A.   Yeah, I went to Madison, Wisconsin.

3    Q.   So how long were you a Cheesehead?

4    A.   Never.

5    Q.   Good answer.

6    A.   But I was a Badger -- that's right, I was a

7         Badger for four-and-a-half years, did a

8         mechanical engineering degree.

9    Q.   So you got that in 2002?

10   A.   Give -- thereabouts.  I think it was the

11        January of '03, '02 flip-over, so...

12   Q.   So that's a BSE?

13   A.   Yeah, it's a bachelor of science.

14   Q.   Are you -- did you ever become a professional

15        engineer?

16   A.   I did not.

17   Q.   Okay.  So after you got your mechanical

18        engineering degree, did you go on for any

19        additional postgraduate work?

20   A.   I did later on in life.  I started work

21        first.

22   Q.   Okay.  Let's finish with the education and

23        then we'll circle back --

24   A.   Sure.

25   Q.   -- to the work stuff.

ALBRECHT

1   
2            What -- what postgraduate work have
3       you done?
4   A.   So I did an MBA at the University of
5       Minnesota Carlson School of Management.
6   Q.   When -- what period of time were you a
7       student there?
8   A.   That was probably '07 to 2010, thereabouts, I
9       think.  I'd have to look carefully.  I think
10      on the resume that I provided it would have
11      the exact dates for that.
12  Q.   Okay.  So I just kind of want to get a quick
13      overview.  So you have -- you have an MBA
14      from the U of M?
15  A.   I do.
16  Q.   Did that involve any kind of specialization?
17  A.   Yeah, statistics specialization and market
18      research.  And I also have another graduate
19      degree in statistics.
20  Q.   And when did you get that?
21  A.   Following the MBA.  So it was kind of joint
22      work with the two.  So from 2010 on to 2012 I
23      would say, I think it was, 2011, somewhere in
24      there, 2012 to 2011, I completed my master's
25      of statistics from the School of Statistics.

1                                 ALBRECHT

2     Q.  At the U of M?

3     A.  Yes.

4     Q.  So now you're a Gopher?

5     A.  Yeah, well, it's hard to cheer for anything,

6         but -- sports are...

7     Q.  Okay.  So you have a master's of statistics,

8         a master's of business administration --

9     A.  I do.

10    Q.  -- and a BS in mechanical engineering?

11    A.  Yup.

12    Q.  Any other degrees --

13    A.  Nope.

14    Q.  -- that I missed?  Okay.

15              Let's go back now and sort of

16        summarize your work history.

17    A.  Uh-huh.

18    Q.  Did you work while you were in college?

19    A.  Just internships.  So I had a couple at

20        Arizant Healthcare, which you guys own.  Not

21        you, but 3M.

22    Q.  3M wouldn't have owned it at the time, right?

23    A.  No, no.

24    Q.  Okay.  And so we'll -- we'll get some details

25        on that.  But then anything else that you did

Page 13

1                          ALBRECHT

2        while you were in college?

3   A.   That relates to this, I don't know.  I ran

4        sailboat races during the summers, it was a

5        part-time job too on Lake Minnetonka, had a

6        one year internship at Entegris, which used

7        to be Fluoroware, so that's like a

8        semi-conductor company, and that was it.

9   Q.   Okay.  And then after you graduated from the

10       University of Wisconsin what was your first

11       full-time job?

12  A.   It was as a research and development engineer

13       at Arizant Healthcare.

14  Q.   Was that essentially immediately after

15       graduation?

16  A.   Yeah.

17  Q.   So starting in two thousand -- early -- early

18       2003?

19  A.   Yeah, that sounds right.

20  Q.   And at that point was Scott Augustine still

21       involved in the company?

22  A.   Yeah.

23  Q.   He was a CEO?

24  A.   Yeah, he would have been.

25  Q.   How long have you known Scott Augustine?

1                          ALBRECHT

2    A.   I only knew him from the internship on.

3    Q.   How had you gotten connected with Arizant for

4         the internship?

5    A.   Sure.  My dad was -- shared a dorm with him

6         in college.  And they weren't close or

7         anything, he just saw this guy in the paper

8         that he used to know and said hey, if you're

9         looking for internships, why don't you throw

10        a resume in there and see if you get an

11        internship.  So I was given a tour of the

12        company by Scott, and that was about it for a

13        while of seeing him.

14   Q.   And your internship, was that in the research

15        and development area?

16   A.   Yes, it was.

17   Q.   Okay.  So you -- you started in 2003 as a

18        full-time employee.  What was your title?

19   A.   Research and development engineer.

20   Q.   Okay.  And how long did you work in that

21        capacity for Arizant?

22   A.   It was two-and-a-half years probably.  I'd

23        have to figure out the exact dates.  It was

24        two to three years, somewhere in there.

25   Q.   And was -- did Scott Augustine remain the CEO

1                        ALBRECHT

2        the entire time you were there?

3    A.  No.

4    Q.  Approximately what time did Dr. Augustine

5        leave Arizant?

6    A.  It would have been a little over a year

7        before I took off, so I was only there for

8        maybe a year and a half while he was CEO,

9        year, year and a half.

10   Q.  And then how long were you there when -- how

11       long were you part of Arizant when

12       Dr. Augustine was no longer part of Arizant?

13   A.  I think a little over a year, maybe a year

14       and a half.  So somewhere in the two- to

15       three-year range all that stuff happened

16       before I switched jobs and went to work for

17       him.

18   Q.  Okay.  And you stayed at Arizant in the --

19       after Dr. Augustine left in the same

20       capacity?

21   A.  Yup.

22   Q.  Okay.

23   A.  Yup.

24   Q.  When you left Arizant, what was your next

25       employment?

1                        ALBRECHT

2   A.  It was at Augustine Biomedical & Design, so

3       that was with Scott Augustine.

4   Q.  And how did it -- how did it come to pass

5       that you went from Arizant to working for

6       Augustine Biomedical?

7   A.  I sought him out.  He was recruiting

8       engineers once his noncompete was up in terms

9       of working with people from the company, so

10      we had some discussions and it seemed like a

11      fit.

12  Q.  So when did you start at Augustine

13      Biomedical?

14  A.  I would have to look at dates on a resume if

15      you have one.  I think I provided one.  But

16      it would have been, I don't know, let's see

17      here, 2002 -- '05, '06, somewhere in there, I

18      believe.

19  Q.  And what was your first position?

20  A.  It was an engineer.

21  Q.  In research and development?

22          MR. B. GORDON:  And, Mark, you

23      don't have to guess on things.  If at any

24      point you need to see a document to answer a

25      question, just let us know.

1                              ALBRECHT

2                  THE WITNESS:  Yeah, I think I

3        provided a resume as part of the documents.

4        Do you have that handy?  Because I think it

5        would be a lot easier for me to go through

6        that way.

7   BY MR. C. GORDON:

8   Q.  We can pull a copy.  And I'm not looking for

9        precision.

10  A.  Okay.

11  Q.  But I'll --

12  A.  That's fine.

13  Q.  But in fairness to you, when we take a break

14       I'll get a copy it --

15  A.  Okay.

16  Q.  -- and you can make the record precise.

17       But -- so I'm just now trying to get a

18       general 50,000 foot overview.

19                  So you worked in R&D at Augustine

20       Biomedical for how -- roughly how long a

21       period of time?

22  A.  At Augustine Biomedical, I think two years,

23       and I did a little bit of marketing product

24       management for them for a while.  That was

25       still kind of -- it's a blended job.  It's a

ALBRECHT

1
2     startup.  You wear a lot of hats, right, and
3     so I transitioned from an R&D engineer to a
4     product marketer for a while as I was doing
5     my MBA.  And then as I got through the MBA
6     and realized that the clinical research was a
7     little more in line with what I wanted, I
8     switched over and did their clinical research
9     studies as I completed out my graduate degree
10    in statistics.  So it kind of lined up with
11    where I was at in school how things went.
12 Q. So you were still an employee of Augustine
13    Biomedical when you were attending the
14    University of Minnesota?
15 A. Yes.
16 Q. For both the Carlson School of Business MBA
17    and the master's of statistics?
18 A. Yes.
19 Q. And so when you were -- when you were at the
20    U of M as a student, were you a full-time
21    employee of Augustine Biomedical?
22 A. Three-quarter time.  I was listed as
23    full-time, but they were allowing me to
24    attend school full-time, so you kind of do
25    two jobs.  It's life.

ALBRECHT

1

2  Q.  Okay.  And you were doing clinical research

3      for Augustine Biomedical --

4  A.  Yup.

5  Q.  -- during that period of time?

6  A.  I was.  A blend of clinical and engineering

7      research, we'll call it.  It was kind of

8      50/50 if you think about what's in the

9      studies.

10  Q.  When you first started Augustine Biomedical,

11      what products, if any, were already

12      developed?

13  A.  There were a number of ideas that were

14      thought of, but there wasn't a lot that was

15      developed at that time.

16  Q.  So you were essentially on the ground floor

17      of the product development?

18  A.  I was.  I was not allowed to work on anything

19      that was patient-warming related though for

20      several years, because I had a noncompete

21      with 3M.  So I had worked on an allergy

22      relief pillow for that period of time and

23      also some catheterization-type ideas.

24  Q.  Is this the pillow that has a --

25  A.  Yeah.

1                        ALBRECHT

2    Q.  -- airflow of Hepa air over it?

3    A.  Yeah, that's the one.

4    Q.  Is that on the market?

5    A.  You know, I don't think it ever got out.

6    Q.  Okay.

7    A.  It was kind of a pilot test and it never

8        went.

9    Q.  Dr. Gauthier mentioned it and --

10   A.  Yeah, it's --

11   Q.  -- I was kind of curious.

12   A.  It was a great idea, but like a lot of great

13       ideas, you know.

14   Q.  So do you recall roughly what the period of

15       your noncompete was with Arizant?

16   A.  One year.

17   Q.  Okay.  So after that one year did you start

18       working on any patient-warming devices?

19   A.  It was longer than that.  I was off on that

20       allergy pillow piece not really doing much

21       with the patient warming for several years.

22   Q.  And what was your first involvement in -- in

23       patient warming?

24   A.  You know, it's hard to recall, but it was

25       probably some stuff in the areas -- we were

```
 1                        ALBRECHT
 2      using a heating fabric for a cannulization
 3      product that was related to patient warming,
 4      so I did some technology development with
 5      that, but it wasn't directly aimed at that.
 6      So that may have been the first thing that
 7      maybe crossed over, I don't know.
 8  Q.  Did there ever come a point in time when you
 9      did engineering research and development-type
10      work as opposed to clinical research or
11      marketing for HotDog, the HotDog product?
12              MR. B. GORDON:  Object to the
13      form.
14              THE WITNESS:  No, I don't think I
15      explicitly did that.
16  BY MR. C. GORDON:
17  Q.  Did there ever come a point in time where you
18      did any work of any kind in connection with
19      the HotDog product?
20  A.  Yeah.  Yeah, the clinical research piece is
21      directly related to that.
22  Q.  Okay.  And I guess what I'm -- obviously,
23      we're going to talk about --
24  A.  Sure.
25  Q.  -- the clinical research for the bulk of
```

1                              ALBRECHT
2           this, but I'm just trying to understand if
3           you had any other work activities involving
4           HotDog before you started doing clinical
5           research?
6      A.   You know, it's hard to exactly remember,
7           because the blend-over was kind of gradual
8           and we used some technologies in different
9           products that related.  So, yeah, there was a
10          little bit, I'm sure, of engineering advice,
11          guidance, design that happened on things that
12          were put into the HotDog at some point.
13     Q.   Let me --
14     A.   If you have specifics I can --
15     Q.   Well, I'm going to -- I'm going to -- I'm
16          going to see if this helps narrow the time
17          frame a little bit.
18                    (Whereupon, Exhibit 1 was
19                    marked for identification.)
20     BY MR. C. GORDON:
21     Q.   I'll show you what's been now marked as
22          Albrecht Exhibit 1.
23     A.   This is a clinical research document.
24     Q.   Yeah.  And -- and the reason I -- I -- I
25          picked this one is because it's -- the date

Page 23

ALBRECHT

1      on it is -- is September 14th, 2007, and

2      that's the earliest document I've seen with

3      your -- with your involvement --

4  A.  Uh-huh.

5  Q.  -- clear on its face, and I'm just -- and

6      just looking at this I'm wondering if this --

7      this gives you any time frame as to yeah,

8      okay, this is about when I would have started

9      being involved in clinical research with the

10     HotDog product or if there might have been

11     stuff prior to this?

12  A.  Yeah, maybe.  I mean, the things with some of

13     these documents, the dates on them too

14     sometimes are off, because we use file

15     reports that we just pull from other ones and

16     put text in.  So, like, I'm looking at the

17     date on this and I'm thinking, you know, that

18     might be right, '07, but it might have been a

19     little bit later too.  And so it's kind of

20     ridiculous how that works, but you take a

21     template and you smack stuff into it.

22  Q.  Okay.  And -- and Exhibit 1 is a report

23     for -- from certain work -- research

24     activities that were done at the

1                            ALBRECHT

2       Regina Surgery Center --

3    A.   Yup.

4    Q.   -- in Hastings?

5    A.   Yup.

6    Q.   Do you recall doing work there?

7    A.   Uh-huh.  So that date --

8    Q.   This is one of those examples you have to say

9         yes or no.

10   A.   Yes, I did do work there.

11   Q.   It's -- it's stilted, and I apologize for it.

12             So -- and this is what I'm -- I

13        guess what I hope seeing if it jogs your

14        memory.  Was the Regina Surgery Center, was

15        that the first site that you recall doing

16        work, research work in connection with the

17        HotDog?

18   A.   Yes, I think so.  Yes.

19   Q.   And I -- and I -- I don't mean to

20        misrepresent it.  I don't think this was

21        actually specifically HotDog research, but

22        research in the patient-warming area,

23        clinical research?

24   A.   I'll say yes.

25   Q.   Okay.  The -- now, there's a -- there's a

Page 25

1                              ALBRECHT

2        reference here in that very first paragraph

3        under, "Test Objective," to, "Test protocol

4        2007-044."  Do you see that?

5   A.   Uh-huh.

6   Q.   That's obviously not -- well, I shouldn't say

7        that.  Strike that.

8               Is -- do you have access yourself to

9        test protocol 2007-044?

10  A.   These are all company property, so no.

11  Q.   Is that a document that you would expect

12       to -- to still exist at the Augustine

13       Biomedical & Design Company?

14              MR. B. GORDON:  Objection; calls

15       for speculation.

16              THE WITNESS:  Let me read through

17       this carefully, if you don't mind.

18              MR. C. GORDON:  Please do.

19              THE WITNESS:  If I have a little

20       bit of time --

21              MR. C. GORDON:  Absolutely.  I'm

22       going to ask you some questions about it, so

23       that's a good idea.

24              THE WITNESS:  (Reviews document.)

25       Yeah, I would expect that protocol to exist

1                          ALBRECHT

2       at the company, yes, 2007-044.

3                    MR. C. GORDON:  Okay.

4                    THE WITNESS:  And so I would

5       imagine that the date on that would be before

6       the date on this, one would think.

7  BY MR. C. GORDON:

8  Q.   Would you have -- do you recall having any

9       input or involvement in the development of

10      the -- of the protocol that was implemented

11      in this particular test?

12 A.   I would have to see the protocol to know.

13      This is a while back in time.

14 Q.   Sure.  Do you -- did you actually go to the

15      Regina Surgery Center in Hastings?

16 A.   Yes.

17 Q.   And you did some testing in their operating

18      rooms, right?

19 A.   Uh-huh.  Yes.

20 Q.   Was that the first time you had done any

21      testing in actual operating rooms?

22 A.   I believe so.

23 Q.   And we'll -- we'll get into the details, but

24      would it be a gross but fair characterization

25      that there were two areas of testing, one was

Page 27

ALBRECHT

1

2     the ambient OR air and the HVAC system at the

3     hospital, and the other was the Bair Hugger

4     warming units that were there?

5  A.  Yes.

6  Q.  Okay.  What -- what was the genesis of this

7     research?  How did -- how did this come to

8     pass?

9  A.  Why were we investigating operating theater

10    airflows?

11 Q.  Yes, start with that.

12 A.  Sure.  Physicians had mentioned through

13    feedback channels that came into the company

14    that they'd feel warm air flowing around the

15    operating theater and they wanted, and

16    orthopedics particularly, and I can't

17    remember any of the names, because this is

18    just general feedback that kind of filters

19    in, were a little concerned because they care

20    a lot about their laminar ventilating flow

21    fields.  And so the question was how does

22    this stuff work and, you know, where -- we

23    wanted to get an understanding of ventilation

24    systems and how any hot air might be

25    interacting with them based on that feedback.

1                          ALBRECHT

2   Q.  So this was prompted more by your -- and by

3       "your" I mean Augustine Biomedical's

4       interests, as opposed to the hospital asking

5       for -- for particular inspection or -- or

6       analysis?

7                  MR. B. GORDON:  Object to form.

8              By the way, I may object from time

9       to time.  It's just for the record.  You can

10      go ahead and answer unless someone says

11      otherwise.

12                 THE WITNESS:  No, this was

13      following physician feedback and just

14      investigating if something was there.

15  BY MR. C. GORDON:

16  Q.  So one of the things you did was to measure

17      actual airflow from the -- the HVAC system;

18      is that correct?

19  A.  Correct.

20  Q.  Was -- do you recall, was the surgery center

21      in Hastings, was that a laminar system?

22  A.  I do not believe that one was.  I'm unsure

23      though.

24  Q.  Do you know why Hastings was selected for

25      your work?

1                          ALBRECHT

2    A.  We had physician contacts there that we could

3        access the operating rooms through and the

4        hospital staff was willing to work with us.

5    Q.  Was this one that Dr. Gauthier was the

6        primary contact?

7    A.  He had put us in touch with the hospital

8        administration.

9    Q.  Okay.

10   A.  So he was involved in facilitating it, yes.

11   Q.  So one of the things you did was to use an

12       optical particle counter to count, measure

13       the number of particles in the -- in the air

14       in the operating room; is that correct?

15   A.  Yes.

16   Q.  And you also did some bacterial culturing to

17       see if there were colony-forming units or

18       CFUs of bacteria in the ambient air; is that

19       correct?

20   A.  Yes.

21   Q.  And do you recall that one of the -- you

22       found that there was a problem with the

23       Hastings HVAC system?

24   A.  Yes.  Uh-huh.

25   Q.  Why don't you tell me what the problem was

1                              ALBRECHT

2        that you found out.

3    A.  I believe that their plenums, the filter was

4        pushed out and not operating correctly.

5    Q.  And some day this may be played back to a

6        jury and there may be one or two people who

7        don't know what a plenum is, or me too.

8        Could you explain what a plenum is?

9    A.  I believe there was a leak in their

10        filtration system where it was bypassing the

11        filter is what the cause was identified as

12        their engineering group.

13            What we did is we presented to them

14        the results that here are the counts and

15        their engineering team went in there and did

16        a remedial action.  I don't recall exactly

17        what it was that the design flow was, and it

18        might be written down in the report.  If you

19        have that handy I would like to see it and I

20        can further elaborate on what it is.

21    Q.  I may.  Help me out here.

22                    (Whereupon, Exhibit 2 was

23                    marked for identification.)

24    BY MR. C. GORDON:

25    Q.  I'll give you what's marked as Exhibit 2 --

1                          ALBRECHT

2    A.   Okay.

3    Q.   -- titled as, "Hastings Ventilation

4         Assessment."  And I'm not -- I'm not

5         representing that this is the report from

6         Exhibit 1, but you tell me, basically.

7    A.   I don't have my name on this.

8                   MR. B. GORDON:  So that's the

9         question, is this the report?

10                  MR. C. GORDON:  Yeah.

11   BY MR. C. GORDON:

12   Q.   Is this -- is Exhibit 2 the report that would

13        have been generated from the research that's

14        referenced in Exhibit 1?

15   A.   Let's take a look through here.

16        (Reviews document.)

17                  I believe this was the report that

18        we had provided them to identify the problem

19        upon which they took action.

20   Q.   Okay.

21   A.   So I think the source data for this report

22        did likely come from this.

23   Q.   And so the record is clear, the source data

24        in Exhibit 1 is what the Exhibit 2 was based

25        on?

                              ALBRECHT

1

2   A.   To the best of my knowledge.

3   Q.   Okay.  So Exhibit 1 would not have been

4        provided to Hastings, that was an internal

5        document?

6   A.   Yes.

7   Q.   Okay.  Going back to Exhibit 1, let's -- I

8        want to talk about the measurements that were

9        performed on the convective-warming units.

10       First of all, when it refers to

11       convective-warming units, that -- those are

12       Bair Hugger units, right?

13  A.   We'd have to look at the list of units

14       sampled, but I believe they all were.

15       (Reviews document.)  Yes.

16  Q.   Generally, you've done a number of research

17       projects and studies involving Bair Hugger,

18       correct?

19  A.   Uh-huh.  Yes.

20  Q.   Have you -- as you sit here today, can you

21       recall any research projects that involved

22       other forced-air warming devices other than

23       the Bair Hugger unit?

24  A.   I believe in Europe we did look at some of

25       the filter flow blowers.  I do not recall if

1                         ALBRECHT

2        they ever made it into the studies.

3   Q.   Okay.  In terms of the -- well, strike that.

4              You -- what you did in Hastings, you

5        did similar things in other hospitals in the

6        United States, correct?

7   A.   Yes.

8   Q.   And in those other hospitals in the

9        United States, if you looked at a forced-air

10       warming device, it was always the

11       Bair Hugger, right?

12  A.   I believe so, yes.

13  Q.   Okay.  Going back to Exhibit 1 now, so you --

14       it looks -- you did four things in looking at

15       the -- the Bair Hugger units.  The first

16       would be you did optical particle counting

17       by -- and counting particles that were

18       coming --

19  A.   Yes.

20  Q.   -- out of the airstream, correct?

21  A.   Yes.

22  Q.   Number two, you -- you did what's referred to

23       as swabbing and plating, where you took swabs

24       from the outside of the intake filter and

25       inside the hose and then those swabs were

ALBRECHT

1
2      then cultured out on -- on plates to see if
3      they had bacteria, right?
4   A. Correct.
5   Q. And then you did a -- something referred to
6      as liquid extraction and plating where the
7      hose of the Bair Hugger was rinsed with a
8      sterile liquid and then that liquid, with
9      whatever it mobilized from inside the hose,
10     was cultured to see if there were any
11     bacteria, correct?
12  A. Correct.
13  Q. And finally you did --
14  A. I want to stop.  On three, I didn't do that
15     necessarily.
16  Q. Okay.
17  A. Pace Analytical ran those results.
18  Q. Pace Analytical did the actual culturing; is
19     that right?
20  A. Well, we brought a technician on-site too to
21     do a lot of the liquid extraction.
22  Q. Okay.  So liquid -- the actual liquid
23     extraction itself was done by Pace?
24  A. On a number of the studies, I believe.
25  Q. How about the swabbing, who did that?

1                          ALBRECHT

2    A.   On the studies -- I believe Pace did it on

3         the studies.  I'm trying to recall, but I did

4         bring one of their technicians on-site to do

5         those activities.

6    Q.   Okay.  And whatever was taken out of the --

7         with the swabs or the rinse, that was

8         analyzed then off-site on -- in Pace's --

9    A.   Yes.

10   Q.   -- laboratories?

11   A.   Yes.

12   Q.   And then Augustine Biomedical would have

13        gotten some sort of written report from Pace;

14        is that correct?

15   A.   Yeah.

16   Q.   And the fourth thing you did with Bair Hugger

17        units in Exhibit 1 was impaction sampling of

18        the airstream of the Bair Hugger, right?

19   A.   Uh-huh.  Yup.

20   Q.   Could you explain what impaction sampling

21        was?

22   A.   Yeah.  We rented a device that takes an

23        airflow that it brings into it and it fires

24        it into a gel medium to see if there's any

25        airborne bacterium and the idea is that it's

1                         ALBRECHT

2       designed in such a way that it captures those

3       on the agar plate with a reasonable

4       efficiency.

5   Q.  So you were looking for particles coming

6       out, that were being blown out of the

7       Bair Hugger --

8   A.  Uh-huh.

9   Q.  -- right --

10  A.  Yes.

11  Q.  -- that was the particle counting?

12             But with the impaction counting you

13      were looking to see if there were any actual

14      bacteria that were being blown out of the

15      Bair Hugger?

16  A.  Correct.

17  Q.  And the other, the swabbing and the liquid

18      extraction, that was to see if there was any

19      bacteria inside the Bair Hugger?

20  A.  Resident, yes.

21  Q.  Resident bacteria, okay.

22             And if you would turn to page 4 of

23      Exhibit 1, that reflects the -- there are two

24      tables there, but the top table, table 2,

25      that reflects the -- the results from the

1                         ALBRECHT

2      impaction --

3  A.  You're looking at page 5?  I'm sorry.

4  Q.  I think it's page 4 of 11.

5  A.  Page 5 of 12, 4 of 12.

6  Q.  Maybe we're looking at the wrong thing.  I

7      may have the wrong copy.

8                  MR. ASSAAD:  I have 12 as well.

9                  MR. B. GORDON:  Yeah, same here.

10     Do you have a different version?

11                 MR. C. GORDON:  Apparently I do.

12     May I see your version?

13                 THE WITNESS:  (Hands document.)

14                 MR. C. GORDON:  Oh, yeah,

15     something is different here.  That's weird,

16     the text looks the same, but for some reason

17     it's different pagination.

18                 MR. ASSAAD:  What's the Bates

19     number that you're looking at?

20                 MR. C. GORDON:  000157.

21                 MR. ASSAAD:  Just 157?

22                 MR. B. GORDON:  77?

23                 MR. C. GORDON:  Through 1588.  The

24     page I want to talk about now is 1581.

25                 Thank you for calling that page --

1                      ALBRECHT

2                 THE WITNESS:  Sure.

3                 MR. C. GORDON:  -- discrepancy to

4       my attention.

5    BY MR. C. GORDON:

6    Q.  So the table -- it still says table 2, right?

7    A.  Yes.

8    Q.  And those are the -- that -- that table 2

9        there is the -- reflects the results of the

10       impaction testing from what was actually

11       coming out of the Bair Hugger, right?

12   A.  Yes.

13   Q.  And in describing the impaction results --

14       first of all, who -- strike that.

15            Who actually authored the -- the --

16       the text that's in here?

17   A.  Well, my name is on it, so it's probably

18       myself.

19   Q.  Okay.  So in describing what's shown in table

20       2, you -- you said, "Little or no growth

21       occurred on the agar plates"; is that

22       correct?

23   A.  In this situation it appears that way.  There

24       are standards you can reference for what they

25       allow for impaction, I believe.  It's been a

ALBRECHT

1
2      while since I've looked at the standards for
3      the European ventilation tests.  Most of
4      these tests come from European sources.
5  Q.  Why is that?
6  A.  Because the NHS, they have stricter
7      guidelines on their operating construction
8      and testing there, I believe, than here.
9  Q.  So when you say the NHS, you're talking
10     about the National Health Service in the
11     United Kingdom?
12 A.  I believe so.
13 Q.  Okay.  So and in -- were the impaction -- was
14     the impaction testing that you did on the --
15     the Bair Hugger airstream, was that an
16     attempt to find out if the -- the air coming
17     out of the Bair Hugger would -- would comply
18     with NHS standards?
19 A.  I don't believe there are NHS standards for
20     convective-warming equipment, but we were
21     just observing what would be there.  This is
22     one of the earlier studies and we were unsure
23     as what would even be found.
24 Q.  And -- so, basically, to -- to kind of put it
25     in simplistic terms, you're looking at three

ALBRECHT

1
2     things with respect to the Bair Hugger,
3     particles that were coming out of it, bugs
4     that were resident inside of it, and bugs
5     that were coming out of it?
6              MR. B. GORDON:  Object to form.
7  BY MR. C. GORDON:
8  Q.  Is that accurate?
9  A.  We were assessing filtration efficiency and
10    that dealt with particles on the in and out
11    stream, because that's very important in case
12    there are resident airborne microbes that
13    could be sucked in and delivered through.
14             We were looking to see if there were
15    resident bacteria in the Bair Hugger or
16    anything pathogenic.  And we were interested
17    in whether or not those were on the surfaces
18    or whether we could detect them in the
19    airflow.
20 Q.  Okay.  And, basically, you couldn't detect
21    them in the airflow, correct?
22 A.  In this study I don't see high counts, so,
23    yes, it looks like they were -- well, we did
24    have one or two counts, it looks like, but
25    the control also had a count.

1                          ALBRECHT

2    Q.   Okay.  So there were -- it looks like there

3         were three Bair Huggers sampled?

4    A.   Yup.

5    Q.   Tell me what the -- the different sampling

6         things mean there.  There are -- for example,

7         on the first one there's three actives and

8         then there's a control.  What's -- what do

9         those mean?

10   A.   So one would be sampling the air out of the

11        Bair Hugger three times, and then the control

12        I think would be an ambient sample of the

13        operating theater air.

14   Q.   Okay.

15   A.   And I'd have to read carefully if you want a

16        very precise answer.

17   Q.   Actually, I do on this, yeah.

18   A.   All right.  (Reviews document.)

19             Okay.  Go ahead and reask me the

20        question.

21   Q.   I'm just trying to understand the different

22        counting lines.  For example, in the first

23        one for the Bair Hugger 505 CW 19808, the

24        first line says, "Active," and under, "Sample

25        start time," it says, "Zero," in brackets,

ALBRECHT

1
2   "Seconds," and then there's a, "CFU/Volume
3   Sample" --
4   A.  Yup.
5   Q.  -- and that's 1.  What is the -- and then on
6       the next -- the next line under that it's --
7       under, "Sample start time," it's 1,276 --
8   A.  Yup.
9   Q.  -- but the impaction volume is --
10  A.  Less.
11  Q.  -- 625 versus a thousand.  I'm trying to
12      understand what -- what's the difference
13      between the sample start time of zero and
14      then 1,276 seconds, and then the next one is
15      2,103.
16  A.  Yeah.  So it's kind of coming back to me.
17      It's been a while since we've done this.
18      There's an argument of when you do impaction,
19      how much air do you sample, what drys out the
20      plates type of thing.  So there's some
21      guidance on how much you should be pushing
22      into the agar plates.  And so I believe in
23      this case we tried -- it looks like it was
24      varied in some kind of order.  We tried three
25      different levels of impaction sampling

Page 43

ALBRECHT

1

2      different air amounts, so we sampled a

3      thousand liters, 625, 250.

4              The sample start time, I believe

5      that was just a value that was put in there

6      to correlate with the particle counting to

7      help join the tables in the information

8      that's presented.

9  Q.  So it doesn't -- the zero -- zero start time,

10     that isn't when you -- the machine was first

11     switched on, or is it?

12 A.  The pump itself.  The convective-warming unit

13     may have been running ahead of time.

14             So there's -- this is a complicated

15     apparatus, so it's got a huge, like,

16     compressor, right, to draw the air through

17     the impaction plate, and that gets turned on

18     and off, the agar plate is positioned into it

19     and that has got to be switched out, you

20     know, a couple of times.  And then how long

21     you leave the apparatus on as you're blowing

22     air into it, that is what this timer is

23     related to, I believe.

24 Q.  Let's take a detour for a minute, because

25     I -- I'm not understanding this machine.

Page 44

ALBRECHT

1

2          An agar plate, you know, in layman's

3     terms, it's kind of like just, basically, a

4     Petri dish that's got some gucky stuff in

5     it --

6  A.  Yes.

7  Q.  -- that collects whatever is blown into it or

8     poured into it or placed in it?

9               MR. B. GORDON:  Object to form.

10              THE WITNESS:  A Petri dish, if

11    left out in just a room or whatever, would

12    settle into it.  That's not necessarily the

13    airborne contaminants that are always -- it's

14    not an efficient way of sampling.

15  BY MR. C. GORDON:

16  Q.  So in -- in -- one way of seeing what's

17    coming out of the Bair Hugger hose would be

18    to just hold it over an agar plate and

19    blow -- blow air right into the agar plate,

20    right?

21              MR. B. GORDON:  Object to form.

22              THE WITNESS:  One could do that.

23  BY MR. C. GORDON:

24  Q.  That's -- apparently, that's not what this

25    is?

1                          ALBRECHT

2    A.   No, it's a more scientific method.

3    Q.   All right.  So that's -- can you explain to

4         me how that works, because I was thinking it

5         was more just blowing it right onto an agar

6         plate.

7    A.   Sure.  So the setup, the actual interesting

8         piece of it, it's this aluminum

9         hockey-puck-looking disk that an agar plate

10        goes into, and on top of it there's a grid.

11        And this grid has small holes drilled into it

12        and you apply a vacuum to that to get the air

13        moving very fast.

14             And the idea is if particles are

15        trapped in a fast-moving airstream and you

16        turn it, the momentum of the particle will

17        carry it into the agar dish.  So it's an

18        efficient means sampling airborne particles,

19        whether you want to get that to impact on a

20        plate or bacterium to impact on a plate,

21        different things like that, you can capture

22        it with higher efficiency then just setting

23        out a dish.

24   Q.   Does the suction or the vacuum on the

25        apparatus create a pressure differential

                          ALBRECHT

1

2      between the -- the airstream as it's coming

3      out and the apparatus for the agar plate?

4    A.   Yes.   It samples air at a certain rate.   I

5         would have to look at what it draws through,

6         but they are calibrated when this pump is

7         running in the device that it'll pull in a

8         given amount of air volume to sample.   And so

9         you've got a hose blowing out a much greater

10        supply of air than what this device is

11        designed to pull in, so it's sampling a

12        fraction of the air that's coming out of the

13        convective-warming unit.

14   Q.   And it's basically sucking out whatever

15        portion of that air it's sampling, right?

16   A.   It's pulling the air in, and once it has it

17        captured in the device, then it accelerates

18        it very quickly through those little pinholes

19        we talked about.   And then as the air turns

20        out of the agar, it lets it deposit things

21        more efficiently into the agar than just

22        simply setting a plate out in the room.

23   Q.   And what's the significance of the different

24        impaction volumes, why -- why would you

25        get -- why would you want to use a thousand

1                          ALBRECHT
2        or 625 or 250?
3    A.  There's some suggestion that it can dry out
4        the agar dish.  There's some other
5        suggestion --
6    Q.  If it's too high?
7    A.  If there's too long of a jet put going on,
8        yes.  If you run too much air through, it can
9        dry it out.  These airstreams are also very
10       damaging to what they're collecting, because
11       they're high velocity, so they have been
12       known at times to rip the bacteria apart.
13       And so even though you're collecting things,
14       they may not survive, and so it's to limit
15       the balance of that.
16   Q.  So was this the same apparatus, then, that
17       was used for the operating room HVAC
18       ventilation results?  I think it's --
19   A.  Do you have the test protocol 2007-044?
20   Q.  No, I don't.  I'd like to.
21   A.  Okay.  Because the complete description of
22       that should be provided there.
23   Q.  Yeah, I agree.
24   A.  Because this alone by itself is somewhat
25       incomplete.

1                          ALBRECHT

2    Q.  Okay.  If you flip ahead, like, five pages

3        to -- I guess is it 9 of 11, where it says,

4        "OR HVAC ventilation results"?

5    A.  I've got 9 of 12.  Yes.

6    Q.  Nine of 12, I'm sorry.

7                And there it looks like there were

8        five different measurements in the OR itself?

9    A.  There's four different operating theaters

10       that were measured.

11   Q.  Oh, four different operating theaters.  Okay.

12   A.  There were two measurements in one of the

13       rooms, it looks like.

14   Q.  Okay.  And in each case, was it the same

15       apparatus that was used?  That's what I'm

16       asking.

17   A.  Yes.

18   Q.  Okay.  So in each of these cases, each of

19       these five measurements, the impaction volume

20       was a thousand liters?

21   A.  Yes.

22   Q.  And it looks like -- so in the first three

23       operating rooms --

24   A.  They were at rest.

25   Q.  They were -- the laminar -- or the --

1                          ALBRECHT

2        whatever the HVAC system was, it wasn't

3        turned on?

4   A.   There were no personnel in the room.

5   Q.   Okay.

6   A.   So at rest refers to no occupants in the

7        room.

8   Q.   So in that -- the first three rooms, that

9        apparatus with the agar plates got no

10       bacteria, right?

11  A.   Correct.

12  Q.   But in operating room 4 there were two

13       different measurements, one was at the center

14       of the operating room table, and there were

15       19 bacterial colony-forming units measured;

16       is that right?

17  A.   Yes.  And that is in an operating room under

18       working conditions with personnel moving

19       around.

20  Q.   Oh, okay.

21  A.   So it's not at rest.  So that's the

22       difference between --

23  Q.   I see.

24  A.   -- 1 through 3 and 4.

25  Q.   Did you -- do you recall if you did tests of

Page 50

1                          ALBRECHT

2         1, 2, 3 -- 1, 2 and 3 where -- with working

3         personnel?

4    A.   We did not.  Those were tested at rest and we

5         intentionally chose a room with people

6         working to see if there -- if this equipment

7         was sensitive.

8    Q.   And if -- when you say they were working,

9         were they -- were these real surgeries that

10        were going on or just people moving in and

11        out?

12   A.   We may have had the staff perform a mock

13        surgery, I'm guessing.  I need to look

14        carefully here to answer that.

15   Q.   Okay.

16   A.   (Reviews document.)  So the detail is

17        operating room 4 was sampled as a working

18        room with two occupants moving about.  From

19        my memory, I'm unsure if I had asked the

20        surgical staff to do that or if I had some of

21        the personnel there who were gowned up

22        similarly walking around, I'm unsure.

23   Q.   So having two people moving within operating

24        room 4 when you took the same measure -- same

25        type of measurements, in one case there were

1                          ALBRECHT

2       19 bacteria colony-forming units on the

3       table, and in the other measurement 12 inches

4       from the ceiling where the air was -- would

5       be -- clean air was coming in; is that right?

6   A.  Yes.

7   Q.  There were five colony-forming units?

8   A.  Correct.

9   Q.  Was the Bair -- was there a Bair Hugger on

10      during these measurements?

11  A.  No.

12  Q.  Okay.  These are measurements of a -- of a --

13      of an OR with its ventilation system -- I'm

14      sorry, was the ventilation system on?

15  A.  Yes.

16  Q.  Okay.  And just two people moving -- moving

17      around inside the OR, and you got 19 CFUs and

18      5 CFUs respectively?

19  A.  In a turbulent ventilation system, which this

20      is called out as, yes.

21  Q.  Okay.  And turbulent is different from

22      laminar?

23  A.  Very much so.

24  Q.  I'm trying -- so help me correlate here.  You

25      also did particle sampling.  Was that done at

ALBRECHT

1

2      the same time as the -- the impaction

3      sampling?

4   A.  So if I recall correctly, this is five years

5      ago, once again, or more, so your memory

6      isn't always a hundred percent, we had a

7      fitment design that I think sampled both at

8      the same time.  So we had an apparatus that

9      would hook to the edge of the Bair Hugger, a

10     hose or the convective-warming unit, and then

11     a sample for particles was drawn concurrently

12     with the impaction sample.

13  Q.  Okay.  How about in the OR when you -- if you

14     look to --

15  A.  These were all tested in the OR.

16  Q.  I'm talking about the OR air, I'm sorry.

17          If you look at the table of page 10

18     of 12, table 8, it looks like particle counts

19     in those same four operating rooms.

20  A.  So this is prior particle counts, if you read

21     the table subscript in table 8.

22  Q.  What does prior mean in this context?

23  A.  So we were there two times to that site, once

24     with the ventilation system where it had an

25     issue and then once after it was corrected.

1                              ALBRECHT

2    Q.   So table 7, would that have been the first

3         time or the second time?

4    A.   Second time, I believe.

5    Q.   So table 7 reflects after the problem with

6         the ventilation system was corrected?

7    A.   To the best of my knowledge, yes.

8    Q.   Okay.  So is table 5 the one that would show

9         the particle counts in the OR -- ORs that

10        correspond to table -- the impaction results,

11        table 7?

12   A.   I would -- yes, I would conclude that.

13   Q.   So in operating room 1, for example, there

14        are four different measurements, three of

15        them a little bit higher than 22,000, and one

16        of them 19,500; is that right?

17   A.   Correct.

18   Q.   And those were particles greater than .3

19        microns, right?

20   A.   Yup.  Yes.

21   Q.   And -- but particles greater than .5 microns

22        in operating 1, those were generally around a

23        thousand?

24   A.   Yes.

25   Q.   Basically, the difference between the

1                          ALBRECHT

2       point -- the particles greater than .3

3       microns was about roughly 20 times as many as

4       the particles greater than .5 microns?

5  A.   Yes.

6                 MR. B. GORDON:  Object to form.

7  BY MR. C. GORDON:

8  Q.   And in operating room 1, at least, particles

9       greater than 5 -- 5 microns, three of the

10      four measurements were 0, but one of them was

11      60; is that right?

12 A.   Correct.

13 Q.   So there -- why -- why did you do

14      different -- the measurements of particles at

15      greater than .3, greater than .5 and greater

16      than 5?

17 A.   That's all simultaneously reported by the

18      device.  So this is its native output.  So

19      the sampler, the laser -- laser air particle

20      counter, it measures a count of these things

21      simultaneously.  This is the raw data output.

22 Q.   What are the sizes of -- of bacteria?

23                 MR. B. GORDON:  Object to form.

24                 THE WITNESS:  It depends.  They

25      come in many ranges.

1                         ALBRECHT

2    BY MR. C. GORDON:

3    Q.  Well, what's the smallest bacteria that you

4        are aware of?

5    A.  In some of the research studies we highlight

6        that very carefully, and so I'd like to point

7        to one of those documents.  If you'd like to

8        pull some of those out I can -- I'm aware of

9        them, though, I believe, and I'll have to

10       check because it's been a while, .5 microns

11       is a size that can be a bacteria.

12   Q.  Okay.  Does that look like one of the ones

13       that might have that information,

14       (indicating)?

15   A.  Possibly.

16   Q.  Or -- well, that would be my best guess.

17              MR. B. GORDON:  Well, if he needs

18       studies to answer a question --

19              THE WITNESS:  I do.

20              MR. B. GORDON:  -- just give them

21       to him.

22              MR. C. GORDON:  No, no, I just

23       want to give him the right one.

24              MR. B. GORDON:  Maybe he can pick

25       from your stack.

Page 56

1                         ALBRECHT
2              THE WITNESS:  I have a reference
3       for that and I'd rather not speculate.
4              MR. C. GORDON:  Sure.
5  BY MR. C. GORDON:
6  Q.  In operating 4, operating room 4 on table 5,
7       it looks like all the particle counts in
8       the --
9              MR. B. GORDON:  So before -- are
10       you withdrawing that question, the prior
11       question?
12              MR. C. GORDON:  Yeah, we'll get
13       the copies of the study and get back to that.
14              MR. B. GORDON:  It was just
15       hanging out there, I just want to be sure
16       it's not on the table.
17              MR. C. GORDON:  Yeah, I withdraw
18       it if there's anything out there.
19  BY MR. C. GORDON:
20  Q.  In the particle counts in operating 4, for
21       the particles greater than .3 microns, the --
22       the four -- the five different measurements
23       look like they're roughly about 25 percent
24       less than the particle counts in operating
25       room 1; is that right?

1                          ALBRECHT

2    A.   That's what the data suggests, yes.

3    Q.   And, similarly, in the particle counts

4         greater than .5, they're somewhere between

5         roughly half and 80 percent of the particle

6         counts in that same range for operating room

7         1; is that right?

8    A.   Can you please repeat?

9    Q.   The -- in the column for the greater than .5

10        microns, the particle counts in operating

11        room 4 are about somewhere between 50 and

12        80 percent of the particle counts for that

13        size range in operating room 1, right?

14   A.   Fifty to 80 percent?

15             MR. B. GORDON:  Objection to form,

16        mischaracterizes the table.

17             THE WITNESS:  I'm not exactly

18        following, if you could phrase one more time.

19   BY MR. C. GORDON:

20   Q.   Rather than quantifying them, would you agree

21        that the -- that the particle counts you

22        measured in operating room 4 were less than

23        the particle counts in operating room 1?

24   A.   The average of that, yes, but there is some

25        dispersion to the data that overlaps.  So if

ALBRECHT

1   you look, you can see, for example, at .5

2   microns there's a count of 1,080, and that is

3   above the range of the minimum that was

4   measured in operating room 1 of 820.

5           So I'm not sure that they're -- what

6   differences might exist looking at the spread

7   of the data.

8   Q.  Yeah.  And as a statistician, you're going

9       to -- you're going to be more concerned with

10      the -- the spread of the data rather than

11      just the raw numbers?

12  A.  Correct.

13  Q.  Okay.  So just looking at this, you can't say

14      whether these counts demonstrate that

15      operating room 4 had more or less particle

16      counts in the .3 and .5 range than operating

17      room 1?

18  A.  In the .3, I think it would.  In the .5, I'm

19      unsure.

20  Q.  Can you -- are you -- are you confident,

21      though, that .4 -- that the operating room 4

22      in the .5 micron range, if you were to do the

23      proper statistical analysis, wouldn't have

24      more particles than operating room 1?

Page 59

1                              ALBRECHT

2    A.   No, it would not.

3    Q.   Okay.  But if we go to the ventilation

4         results, table 7 on page 9, the -- for the

5         impaction, in operating room 1, which had at

6         least as many particles, if not more than

7         operating room 4, you got no bacteria.  But

8         in operating room 4 you counted 19

9         colony-forming units in one case and 5

10        colony-forming units in the other; is that

11        right?

12   A.   Let me make sure that operating room 4 was

13        measured at the same time.  So in looking at

14        these tables, these particle counts in table

15        5 may have been taken at a different time

16        than the impaction results, if there's a

17        working condition listed.  Sorry, let me look

18        through here.  These are very complicated to

19        look at.

20   Q.   I'll stipulate to that.

21   A.   (Reviews document.)  Concurrent with

22        impaction.  Okay.  So for the

23        convective-warming units it was done

24        concurrent, but I don't know about the

25        operating theater.

1                       ALBRECHT

2            MR. ASSAAD:  Corey, are you

3    looking at -- just I know we're on the same

4    page, you're looking at page 9 of 12?

5            MR. C. GORDON:  For the CFU --

6    yeah, table 7.

7            MR. ASSAAD:  For the CFU?  Okay.

8            THE WITNESS:  (Reviews document.)

9            MR. B. GORDON:  While he's

10   looking, I'm going to just put an objection

11   on the record to the form in that the

12   question is conflating particle counts in one

13   table and colony-forming units in another

14   table.  I don't know if there's -- what the

15   correlation is, but it seems --

16           MR. C. GORDON:  Well, I'll

17   stipulate that there isn't any.  Do you want

18   to stipulate to that?

19           MR. B. GORDON:  Well, I object to

20   the form of the question then, because I

21   think it's a complex, confusing question and

22   conflates two different data points.  I'm not

23   sure it can be answered, but...

24           THE WITNESS:  So this was measured

25   at rest near the ceiling.

1                      ALBRECHT

2    BY MR. C. GORDON:

3    Q.   Which -- which was measured at rest?

4    A.   So these particle counts of the operating

5         room ventilation system in table 5 were

6         measured up inches from the plenum at the top

7         of the ceiling in four locations.

8    Q.   Okay.

9    A.   This is when the room was at rest.  At a very

10        different time this impaction was done --

11   Q.   Okay.

12   A.   -- in the operating theaters, so these do not

13        line up.  Because if it's at rest, we can't

14        be in there measuring the particles, because

15        we'd be disturbing the field.

16             So how the experiment went, now that

17        I've kind of got my head around this, it

18        takes a long time, sorry, it's been seven

19        years, you know --

20   Q.   Honestly, that's partly why we're spending a

21        lot of time on this one, because I thought it

22        would get you back familiar with that,

23        because I've got some other ones like this

24        that --

25   A.   Okay.  So I will rehash what's here then just

1                          ALBRECHT

2     so we're very clear.

3              So in table 5, this was all done at

4     rest, and it followed a sampling pattern

5     where you go to the ceiling of the room, and

6     you're just below 7 foot 6, right above the

7     floor, right, so you're 6 inches below four

8     of the diffuser panels, and you measure each

9     of them.

10             And the point of this is to make

11    sure you know the air quality coming into the

12    room.  Now, these are done at rest, no one is

13    in the room except for the technician with

14    the particle counter over their head, so

15    there shouldn't be any introduction of

16    contaminants from a person's skin or things

17    like that.

18             Now, here when we did the impaction

19    to sample for airborne colony-forming units,

20    these are rooms at rest.  We're not in there

21    sampling particles at that time for 1, 2 and

22    3, we're out outside the room, we turn it on,

23    we go kind of from the edge of the door and,

24    you know, shut the door and don't let anybody

25    go in there while it runs.

1                          ALBRECHT

2    Q.   Is the HVAC system on though?

3    A.   It's always on.

4    Q.   Okay.

5    A.   They never turn those off.

6              In operating room 4, this was at a

7         different time when the particles were

8         counted, okay?  So this was, like, maybe

9         hours before.  And people were in there for a

10        mock surgery and we wanted to see if the

11        device would detect colony-forming units in

12        the air should there be personnel activity.

13             I'm sorry it took me a while to get

14        this organized.

15   Q.   And -- and -- and let me see if I understand.

16        Hastings was -- was, as I understand it, an

17        unusual situation where you discovered a -- a

18        problem with the HVAC system?

19   A.   We did.

20   Q.   Was it -- do you recall that the Hepa filter

21        was upside down?

22   A.   No, it doesn't work like that, I don't

23        believe.

24   Q.   Okay.

25   A.   It would be busted out of the frame that

ALBRECHT

1

2      houses it so air could bypass, would be my

3      guess what the problem was that they fixed.

4   Q.  And looking at table 8, which you pointed out

5      was the prior particle -- particle counts, it

6      looks like --

7   A.  Up by the top of the ceiling, yes.

8   Q.  Right.  Those -- and it looks like those were

9      done on July 24th, 2007?

10  A.  That looks correct.

11  Q.  So those particle counts were over half a

12     million each for the .3 --

13  A.  Yes.

14  Q.  -- as compared -- as compared to the -- you

15     know, to those in the --

16  A.  The proper level.

17  Q.  -- the 20,000 range?

18  A.  Yes.

19  Q.  So there's a huge difference, right?

20  A.  Yes.

21  Q.  And so the table 5 represents a properly

22     functioning ventilation system?

23  A.  Properly functioning turbulent ventilation

24     system.

25  Q.  Okay.  And with this properly functioning

1                           ALBRECHT

2          turbulent ventilation system, it's in the .3

3          micron range, each one of these ORs is

4          putting out 10 to 20,000 particles every

5          place that it's measured, right?

6     A.   Yes, and the supplier and the ceiling coming

7          in, correct.

8     Q.   And -- and is that what you would expect in a

9          properly functioning turbulent system?

10    A.   There are guidelines on what's considered

11         acceptable on European standards, and I

12         believe this was within the limits for a

13         turbulent system.

14    Q.   Okay.  So with a properly functioning

15         turbulent system and thousands of particles

16         being emitted from the -- the -- the HVAC

17         system into the room, when you introduce --

18         when nobody is in the room, you can't -- you

19         didn't culture out any bugs?

20    A.   Correct.

21    Q.   But when two people were in the room moving

22         around, then you were able to culture out 19

23         CFUs in one case and 5 CFUs is in the other

24         case?

25    A.   Correct.  Different kinds of particles are

```
 1                          ALBRECHT
 2        likely in the air.
 3   Q.   Okay.  So did it surprise you that, you know,
 4        with -- with -- with operating rooms 1 and 3
 5        having tens of thousands of particles being
 6        emitted, you couldn't culture out any bugs?
 7                  MR. B. GORDON:  Objection to form,
 8        conflating particles and bugs again, but...
 9                  THE WITNESS:  So to answer that, a
10        large amount of the particles are going to be
11        atmospheric dust that come in and so the --
12        it is not exactly surprising, because
13        atmospheric dust is not bacteria always, it's
14        not, it's just particles that are in the air.
15   BY MR. C. GORDON:
16   Q.   And -- and to Mr. Ben Gordon's objection,
17        particles don't correlate to bacteria,
18        correct?
19   A.   Correct.
20                  MR. B. GORDON:  Object to form.
21   BY MR. C. GORDON:
22   Q.   And in, you know, kind of in lay terms, if
23        we -- if somebody looks at a window on a very
24        bright, sunny day and you see a bunch of
25        stuff in the air, if you close the shades
```

Page 67

ALBRECHT

1

2     that stuff seems to disappear, it's not that

3     that stuff is really disappearing, it's just

4     that there's particles in the air that --

5     that are not ordinarily visible to the naked

6     eye, right?

7               MR. B. GORDON:  Object to form.

8     I'm not sure what the question is.

9               THE WITNESS:  Yes, there are

10    particles that you cannot see with your eye.

11 BY MR. C. GORDON:

12 Q.  And even in a clean surgical environment with

13    a properly functioning turbulent system,

14    there are going to be thousands of particles,

15    right?

16               MR. B. GORDON:  Object to form.

17               THE WITNESS:  I would expect

18    atmospheric dust to be present, yes.

19 BY MR. C. GORDON:

20 Q.  So let's talk about the particles that you

21    counted in the Bair Hugger.  In this -- in

22    the tests you did at Regina Hospital in

23    Hastings, is that table 1, page 4 of 12?

24 A.  Yes.

25 Q.  And so the -- the measurements here are --

Page 68

ALBRECHT

1    well, one of the things that these

2    measurements were attempting to do was to

3    determine filtration efficiency, correct?

4 A. Correct.

5 Q. So there's particles before the filter and

6    particles coming out after the filter, right?

7 A. Correct.

8 Q. And then it's just a numerator and

9    denominator to develop a percentage of

10    efficiency, right?

11 A. Yes.

12 Q. Okay.

13 A. With a non-quantitative challenge.  This is

14    not how you'd properly rate the filter.  They

15    have other studies that pertain to that.

16 Q. Okay.  In this -- in the case of what you're

17    measuring at -- at the Regina Hospital, you

18    were -- just as you did in the OR, you

19    measured particles greater than .3 microns,

20    greater than .5 microns, and 5 -- greater

21    than 5 microns, right?

22 A. Yes.

23 Q. I should say greater than or equal to --

24 A. Yup.

ALBRECHT

1

2  Q.  And in -- in -- in each case the measurement

3      of the point -- of the greater than or equal

4      to .3 microns was higher than the greater

5      than or equal to .5 microns, right?

6  A.  Correct.

7  Q.  And I guess we can use the average.  It

8      was -- the average particles counted of the

9      greater than .3 microns was about roughly

10     five times as many as the greater than .5

11     microns, right?

12 A.  It depends on the measurement.

13 Q.  I'm just looking at the average.

14              MR. B. GORDON:  You're talking

15     about the average of all the experiments or

16     just the top one?

17              MR. C. GORDON:  You know, that's a

18     good point.  I actually don't understand what

19     the difference is.

20 BY MR. C. GORDON:

21 Q.  At the bottom of this table it says, "Average

22     counts with fitment concurrent particle

23     counting and impaction," and then there's

24     another line that says, "Average particle

25     counts" -- "average counts particle counter

ALBRECHT

1

2      only held in distal hose end."  What -- what

3      do those two different things mean?

4  A.  Sure.  Let me look here.  (Reviews document.)

5            So we did a control measurement just

6      to make sure the impaction equipment wasn't

7      causing any additional particles, and so we

8      ran one where we concurrently sampled the air

9      particles along with doing impaction, and we

10     did a subsequent test where we just hand --

11     held the rod device in the airflow stream.

12 Q.  And what did you determine in terms of what

13     you were trying to find out whether the

14     equipment was having any affect on the

15     measurement?

16 A.  It appears that it wasn't, looking at the

17     spread of the data.

18 Q.  Well, help me out here.  For the point -- the

19     greater than or equal to .3 micron particles,

20     it looks like the -- the two numbers are

21     pretty close.  But in the point -- greater

22     than or equal to .5 numbers, it looks like

23     one of them is an order -- roughly an order

24     of magnitude higher than the other.

25 A.  On the average it is.  But I'm looking,

1                          ALBRECHT

2          again, at the spread of the data.

3    Q.    Okay.

4    A.    Let me look at this.  (Reviews document.)

5    Q.    And -- and help -- help me out with the

6          spread, because if --

7    A.    No, I'm assessing it right now.

8    Q.    Oh, okay.

9    A.    Just give me a second to look.

10   Q.    Absolutely.

11   A.    (Reviews document.)  There's a really large

12         range to what we're seeing here.  So in some

13         of the experiments with the impaction, the

14         counts around 20, 21, and other ones I see it

15         as high as 700, and so I'm not sure what the

16         process that's generating that, but it

17         doesn't follow -- follow any kind of like the

18         normal statistical patterns.  You shouldn't

19         be able to have counts bouncing around that

20         much if it's the same thing over and over.

21         So I'm unsure of any conclusion I can make on

22         that.

23   Q.    Kind of a Heisenberg uncertainty principle of

24         particle measurements?

25   A.    It's not that.  It's -- maybe there's slight

1                              ALBRECHT

2        changes in the experimental setup, maybe

3        there's something different with what's going

4        on in the room, you just don't know.

5                    Again, these studies were not

6        designed to detect statistical differences

7        necessarily on this set of them.  This

8        doesn't have, like, a sampling plan or

9        anything in place that's a stat plan, other

10       ones do.

11   Q.  You did that, yeah, we'll get to -- that was

12       done later.

13                    So, basically, you were just looking

14       to see are there any particles coming out

15       and, you know, what -- in the -- in the -- in

16       the three different size ranges?

17   A.  Correct.

18   Q.  And that's what you looked at in the OR

19       ventilation system as well, right?

20   A.  You do, but the source of particles are

21       anticipated to be a little different.  You

22       know, the OR ventilation system is filtering

23       out largely atmospheric dust as it comes from

24       the outside.

25                    The operating room has a very

Page  73

ALBRECHT

1
2      different particle source that would be
3      pulled into these units and put through, and
4      that is -- a lot of the dust matter that you
5      find in the actual operating theater after
6      the atmospheric stuff has been cleaned
7      relates to shed skin cells.
8               So the sources of the dust that the
9      filters are acting on is different and so
10     it's hard to draw conclusions and draw
11     parallels between atmospheric dust when one
12     system is intended to filter that out and
13     skin cells and another system that's kind of
14     pointed at a different kind of dust that it's
15     assuming would be in the environment.
16  Q. Okay.  Did -- so you -- you found that there
17     were particles of various sizes, various
18     counts coming out of the Bair Hugger?
19  A. We did.
20  Q. But you really didn't find much in the way of
21     bacteria coming out?
22  A. We did not.
23               MR. B. GORDON:  Object to the
24     form.
25               MR. C. GORDON:  Okay.

1                           ALBRECHT

2     BY MR. C. GORDON:

3     Q.   Did that surprise you?

4     A.   No.  We were unsure what we were looking for.

5          We had no prior assumptions on what we should

6          even expect.

7     Q.   So --

8     A.   What surprised me was the operating theater

9          counts that we saw here that they needed to

10         do a corrective action.

11    Q.   Sure.

12    A.   That was the surprising finding.

13    Q.   So on this, which was probably the first

14         study you did on Bair Huggers, you found

15         particle emissions, but not much in the way

16         of bacteria, virtually no bacteria?

17    A.   In this study the counts were not elevated.

18    Q.   Okay.  With all that -- well, let me -- let

19         me just actually -- actually ask you,

20         Exhibit 2, the Hastings ventilation

21         assessment, I'm -- I'm wondering about that

22         second line.  It says, "To get conclusive

23         data, we analyzed three interrelated areas,

24         the operating room's ventilation system air

25         quality, the Bair Hugger unit's quality, and

Page 75

1                        ALBRECHT

2          the presence of microbes within the

3          Bair Hugger units."

4                    MR. B. GORDON:  You left out the

5          word "air."

6                    MR. C. GORDON:  Thank you.

7    BY MR. C. GORDON:

8    Q.   Do you want me to -- I'm just calling your

9          attention to that sentence.  I can read it

10         again if you want, but it's -- it's the three

11         things that are being referenced there, the

12         air -- air quality from the OR ventilation

13         system, the Bair Hugger unit's air quality,

14         and microbes inside -- within the -- or

15         microbes within the Bair Hugger unit, right?

16   A.   Yes.

17   Q.   But, actually, you looked at four things,

18         right, when you -- when you did the study,

19         you -- you looked at the operating room

20         ventilation air quality, you looked at the

21         Bair Hugger air quality, you looked at the

22         presence of microbes within the Bair Hugger,

23         and you looked at the presence of microbes

24         coming out of the Bair Hugger in its

25         airstream, right?

1                          ALBRECHT

2    A.   So I'm unsure if this report was prior to

3         this that you see here.  This could have been

4         generated off a different set of data that

5         wasn't formally published.  I'm trying to

6         understand the order of events in my head as

7         this relates to this.  I know this test data

8         spurred us to take action with them.  And we

9         obviously couldn't have had the final result

10        until -- let me look through this one more

11        time.  (Reviews document.)

12   Q.   And in fairness, you weren't certain that

13        Exhibit 2 was -- was the report that emerged

14        from Exhibit 1, so...

15   A.   I'm unsure.

16   Q.   And we'll leave it at that for now.

17                   (Whereupon, Exhibit 3 was

18                   marked for identification.)

19   BY MR. C. GORDON:

20   Q.   We'll show you what's been marked as

21        Exhibit 3.  And I'm going to ask you several

22        questions about this, so if you want to take

23        the time to review it, that's fine.

24   A.   (Reviews document.)  Okay.

25   Q.   Okay.  This Exhibit 3 is a document dated

1                          ALBRECHT

2        October 12th, 2007, and compiles results from

3        three different hospitals, including the

4        Regina Surgery Center in Hastings that we

5        just spent some time looking at, right?

6    A.  Uh-huh.

7    Q.  Yes?

8    A.  Yes, yes.

9    Q.  And the -- the results we've gone over from

10       the -- the Regina Surgery Center, those are

11       contained in Exhibit 3, correct?

12   A.  I see elements of them there, yes.

13   Q.  Okay.  And in addition, there are two other

14       hospitals, the DC Hospital in Alexandria and

15       the St. Cloud Hospital in St. Cloud?

16   A.  Correct.

17   Q.  Now, if you would turn to page 7 of 9 -- I'm

18       sorry -- well, yeah, 7 of 9.

19   A.  Table 4?

20   Q.  Say again?

21   A.  Table 4?

22   Q.  Yes, table 4.  This is the -- this table

23       shows the number of colony-forming units that

24       you -- you cultured out from each -- each of

25       the Bair Huggers from these three hospitals

1                             ALBRECHT

2          using swabbing and liquid extraction,

3          correct?

4     A.   Correct, the internal surfaces, yes.

5     Q.   The internal surfaces of the -- it looks like

6          three different Bair Huggers at each of the

7          hospitals; is that right?

8     A.   Correct.

9     Q.   And in -- in all but three of the

10         measurements you found somewhere between 1

11         and greater than 300 CFUs, right?

12    A.   It looks like 0 is one that was found too, so

13         between 0 and greater than 300.

14    Q.   Well, am I reading this right that there

15         were -- at the Bair Hugger ones at -- at the

16         Regina -- the Hastings hospital, the CFUs

17         from the swabbing and extraction from the

18         internal surfaces from those three

19         Bair Hugger range from 1 to 7 -- 1 to 8

20         colony-forming units?

21    A.   Correct.

22    Q.   And at Alexandria one of the swabs had 0 --

23    A.   Correct.

24    Q.   -- but all of the other measurements ranged

25         from 2 to 102?

1                          ALBRECHT

2     A.   Correct.

3     Q.   And at St. Cloud Hospital, it looks like two

4          of the measurements, one a swab of one and

5          one a liquid extraction of another

6          Bair Hugger, had 0, but the others ranged

7          from 1 to greater than 300?

8     A.   Correct.

9     Q.   So that -- those are the internal surfaces,

10         right?

11    A.   Correct.

12    Q.   And then table -- I guess it's table 3 on

13         page 5.

14    A.   Okay.

15    Q.   Those were the particle counts that you

16         measured for those same Bair Hugger units,

17         right?

18    A.   Let me just make sure the numbers line up

19         here.  (Reviews document.)  So Regina 14,503.

20         That looks correct.

21    Q.   And, you know, for example, the particles

22         that are greater than .3 microns, it looks

23         like the lowest number is 148 and --

24              MR. B. GORDON:  Which hospital are

25         you talking about or are you talking about

1                          ALBRECHT

2        all of them?

3                  MR. C. GORDON:  All three of them.

4    BY MR. C. GORDON:

5    Q.  The lowest number --

6    A.  St. Cloud Hospital, yes.

7    Q.  -- is 148 and then there's --

8    A.  Coming out, yup, of the distal hose.

9    Q.  And then the -- okay.  You know what, I --

10       let me ask you:  When it says filter intake,

11       what is that?  What are you measuring there?

12   A.  Sure.  So the convective-warming unit has an

13       intake filter that's housed in the bottom end

14       and it draws air in through that, it goes

15       through a blower and a heater mechanism and

16       it passes out through a hose, right, to the

17       convective-warming blanket.

18               So when we say the intake, we are

19       holding the particle counter -- when we're

20       away from the unit, but we have something to

21       position it on, we're taking counts of what's

22       going in from the ambient outside air into

23       the front of the filter.

24               And then the distal hose end is

25       after it's passed through everything within

1                            ALBRECHT

2        the system.

3    Q.  So what -- what -- the -- the -- the numbers

4        for the filter intake, that's not what --

5        what's actually coming out of the

6        Bair Hugger, it's what's going into the

7        Bair Hugger --

8    A.  Correct.

9    Q.  -- essentially?

10              So the measurements of what was --

11       the particles that were coming out of the --

12       these Bair Huggers would range from a low of

13       148 to --

14   A.  Some of these had elevated counts coming out.

15   Q.  Yeah, like there's 29,340, am I reading that

16       right, is that a --

17   A.  Yeah, that looks correct.

18   Q.  Okay.

19   A.  There's a lot of variation as you look

20       across.

21   Q.  If we turn to page 7 of 9, table 4 --

22   A.  Okay.

23   Q.  I'm sorry, wrong one.  Table 5 --

24   A.  Okay.

25   Q.  -- page 8 of 9, that's the -- these tables

1                          ALBRECHT

2        represent the measurements of the actual

3        bacteria coming out of the -- of the

4        Bair Hugger, all nine of these Bair Huggers,

5        right?

6   A.   Correct.

7   Q.   And as with the -- just what we looked at

8        with Regina, same thing at the Alexandria and

9        St. Cloud Hospitals, these Bair Huggers were

10       not omitting any bacteria?

11  A.   Again, there's no standard to compare that

12       to, but the counts are not elevated.

13  Q.   Okay.  Well, in the case of St. Cloud --

14  A.   There were none.

15  Q.   There were absolutely zero, right?

16  A.   Correct.

17  Q.   And in the case of the Regina hospital, at

18       sample start time 0, and an impaction volume

19       of 1 -- of 1,000, there was 1 in two of them

20       and --

21  A.   Correct.

22  Q.   -- 0 in the third -- in the third one and,

23       then the other two measurements for each of

24       the -- I'm sorry --

25  A.   We also had a control that had a fail, do you

ALBRECHT

1
2    see that?  I do want to point that out just
3    to be --
4    Q.  I just caught that.  So there's only two
5        measurements, two active measurements.  And
6        in one of the Bair Huggers, both active
7        measurements were 0, one of the -- in the two
8        of the -- the other two, one of the two
9        active measurements was 0 and the other two
10       were 1 each at impaction volume of 1,000,
11       right?
12   A.  Correct.
13   Q.  So in all three of these hospitals, Hastings,
14       Alexandria and St. Cloud, you did four basic
15       measurements, you measured the particles
16       coming out of the HVAC system --
17   A.  Correct.
18   Q.  -- you measured the particles coming out of
19       the Bair Hugger, and the -- and the related
20       filtration efficiency, particles in,
21       particles out?
22   A.  Yeah, we measured it at two points, correct.
23   Q.  You measured or you investigated whether
24       there were bacteria colony-forming units on
25       internal surfaces of the Bair Hugger?

1                          ALBRECHT

2    A.   Correct.

3    Q.   And you measured whether there were actual

4         bacteria, CFUs coming out of the Bair Hugger

5         in its airstream?

6    A.   Correct.

7    Q.   And with respect to the Bair Hugger, forget

8         what -- put aside what you did with the ORs,

9         those three areas of measurement, particle

10        passthrough, internal surface bacteria, and

11        bacteria in the airstream, did you -- is

12        there any -- any other time that you did all

13        three of those types of studies of the

14        Bair Hugger other than these three hospitals?

15   A.   I'm unsure.  It's been a while.  We may have

16        additional data sources where we did more

17        studies like that.  Do you have any documents

18        that could help jog my memory on that?

19   Q.   Well, I'll go the other way.

20   A.   Okay.

21   Q.   You did publish some research --

22   A.   Correct.

23   Q.   -- that you did involving Bair Huggers,

24        right?

25   A.   Yes.

1                          ALBRECHT
2   Q.  And some of the research you did looked at
3       filtration efficiency, particles going in,
4       particles going out, right?
5   A.  Yeah, and it was not this data for the
6       efficiency measures, yes.
7   Q.  I understand.  But that was one of the
8       measurements that you published on --
9   A.  Correct.
10  Q.  -- particles?
11  A.  I was a coauthor on a paper that was involved
12      in that, yes.
13  Q.  And one of the things you published on was
14      bacterial CFUs that you were able to swab or
15      rinse out of the internal surfaces of the
16      Bair Hugger, right?
17  A.  Correct.
18  Q.  But you've never published anything about the
19      presence or absence of bacteria in the actual
20      airstream of the Bair Hugger, right?
21  A.  I'm unsure.  I'd have to look through our
22      body of publications to confirm that.
23  Q.  And as you sit here today, Mr. Albrecht, do
24      you recall of any discussions after you had
25      done these -- done these studies and gotten

ALBRECHT

1
2     these results where somebody suggested, you
3     know, let's not look at the actual bacteria
4     coming out of the Bair Hugger anymore?
5              MR. B. GORDON:  Object to form,
6     lack of foundation, calls for speculation.
7              THE WITNESS:  I'm unsure.  There
8     may be discussions that were had.  My
9     memory -- it's a long time ago, I'm not sure.
10    If you have something to help me pinpoint
11    something, I'd be happy to discuss it.
12   BY MR. C. GORDON:
13   Q.  Well, you were -- when you were doing the --
14       the studies on the Bair Hugger, that was at
15       a -- that was at a time when
16       Augustine Biomedical & Design was launching
17       and trying to sell its -- its warming device
18       in the marketplace, right?
19              MR. B. GORDON:  Objection to form,
20       vague as to time what studies you're
21       referring to.
22   BY MR. C. GORDON:
23   Q.  All the studies you've done on Bair Hugger.
24   A.  Yes --
25   Q.  I'm -- that's a good point.  All the studies

Page 87

ALBRECHT

1
2      you've done on Bair Hugger when you were
3      employed by Augustine Biomedical & Design,
4      not when you were at Arizant.
5   A.  There was a market launch and there was a
6      product on the market at the time these
7      studies were done, yes.
8   Q.  And that product was HotDog, right?
9   A.  Correct.
10  Q.  Which is a competitive product to the
11     Bair Hugger, right?
12  A.  Correct.
13  Q.  And any research that you might have done
14     that raised any kind of questions about
15     the -- either the safety or the efficacy of
16     the Bair Hugger, that kind of research would
17     have the potential to help out HotDog sales,
18     wouldn't it?
19             MR. B. GORDON:  Objection to form.
20             THE WITNESS:  It's a promotional
21     tool as to sales, yes.
22  BY MR. C. GORDON:
23  Q.  And, certainly, you're aware that
24     Augustine Biomedical and Dr. Augustine has
25     promoted the HotDog as a safer alternative to

Page 88

1                          ALBRECHT

2        the Bair Hugger, correct?

3                    MR. B. GORDON:  Object to form.

4                    THE WITNESS:  Yes.

5    BY MR. C. GORDON:

6    Q.  And one of the arguments that has been

7        advanced by Augustine Biomedical and

8        Dr. Augustine as to why the HotDog is safer

9        than the Bair Hugger, is because the

10       Bair Hugger emits a lot of particles --

11                   MR. B. GORDON:  Object to form.

12   BY MR. C. GORDON:

13   Q.  -- and that doesn't -- there's no -- nothing

14       that can emit particles from the HotDog

15       system, right?

16                   MR. B. GORDON:  Object to form.

17                   THE WITNESS:  If you could show me

18       the marketing research you're referring to

19       for that or the advertisement, I'd feel free

20       to comment, but that's kind of an open-ended

21       statement.

22   BY MR. C. GORDON:

23   Q.  So just as a general proposition, as you sit

24       here today, you can't remember any kind of

25       marketing activities undertaken by

1                        ALBRECHT

2        Augustine Biomedical or Dr. Augustine that

3        suggested that the particles coming out of

4        the Bair Hugger made it less safe than a

5        HotDog?

6                    MR. B. GORDON:  Objection to form,

7        asked and answered.

8                    THE WITNESS:  There was marketing.

9        There was a campaign that was out there, yes.

10   BY MR. C. GORDON:

11   Q.  And do you -- do you similarly recall that

12        one of the arguments advanced for why the

13        HotDog was safer than the Bair Hugger, or is

14        safer than the Bair Hugger, is because the

15        Bair Hugger had -- is a reservoir of bacteria

16        that can be cultured out of the internal

17        surfaces?

18                    MR. B. GORDON:  Objection to form.

19                    THE WITNESS:  Those are not my

20        words, that -- that's marketing.

21   BY MR. C. GORDON:

22   Q.  And I'm not suggesting they're your words,

23        I'm just asking if you --

24   A.  I'm aware of an ad campaign called

25        Blowing Air Is Risky that was out there.

1                         ALBRECHT

2   Q.   And that Blowing Air Is Risky campaign, based

3        on, in part at least, on research that you

4        did, argued that Bair Huggers blow out a lot

5        of particles and have a lot of bacteria

6        inside them, right?

7                    MR. B. GORDON:  Object to the

8        form, mischaracterizes the evidence.

9                    THE WITNESS:  I would need to see

10       the specific statement that you'd like me to

11       comment on, if you have something.

12  BY MR. C. GORDON:

13  Q.   Are you aware of any marketing material or

14       any statement that's ever come out of

15       Augustine --

16  A.   I am, Blowing Air Is Risky, but I'd like to

17       see the numbers you're looking at.

18  Q.   Let me finish.  Are you aware of any

19       statement from Augustine Biomedical or

20       Dr. Augustine that ever said, We did some

21       internal studies, and even though there are

22       bacteria inside the unit, even though

23       particles blow out of it, we weren't able to

24       culture any bugs actually coming out of the

25       Bair Hugger?

1                        ALBRECHT

2              MR. B. GORDON:  Objection to form,

3        argumentative, calls for speculation.

4              THE WITNESS:  I'm not sure.

5  BY MR. C. GORDON:

6  Q.  Well, would you agree that disclosing that

7        even though there's particles being emitted

8        and even though there are bacteria inside the

9        unit, it doesn't blow out any bacteria that

10        would tend -- that information would tend to

11        make any claim that the Bair Hugger is

12        unsafe, less potent?

13              MR. B. GORDON:  Objection to form,

14        misstates the record.

15              THE WITNESS:  There are multiple

16        vectors of how hot air in the operating

17        theater affects contaminant flow, and

18        particles out of the unit are one source of

19        probable issue.  The other one is the

20        disruption of the ventilation system and how

21        that affects the movement of skin cells

22        around the operating theater.

23              And so I -- if I'm going to be

24        honest with you, there's a couple of

25        different facets to this.  It's a very

1                        ALBRECHT

2        complicated problem.

3    BY MR. C. GORDON:

4    Q.  And -- and we're going to -- we're going to

5        talk --

6    A.  Okay.

7    Q.  -- we're going to talk about the

8        convection --

9    A.  Okay.

10   Q.  -- currents and the thermal stuff.

11   A.  All right.

12   Q.  But would -- would -- would -- would you

13       agree that research that shows there's a lot

14       of bacteria in the Bair Hugger and a lot of

15       particles being blown out, if that's all you

16       know, the implication is that bacteria are

17       being blown out of the Bair Hugger?

18              MR. B. GORDON:  Object to form.

19              THE WITNESS:  I think some of the

20       marketing materials, I'm not sure what exact

21       claims were made, may have mentioned lines

22       like that.

23   BY MR. C. GORDON:

24   Q.  I'm not even asking if anything was -- was

25       explicitly said.  I'm just saying if -- if

ALBRECHT

1

2      those are the only two pieces of information

3      that you provide to somebody, bugs inside,

4      lots of particles blowing out, wouldn't you

5      think that most people would think, well,

6      then there's probably bacteria being blown

7      out too?

8   A.  I don't know.  That's speculation on my part

9      to make any answer to that.

10  Q.  Sure.  Other than these three internal

11     studies that you never published that

12     actually looked at bugs being blown out --

13  A.  Okay.

14  Q.  -- of the Bair Hugger, and you found

15     basically none --

16          MR. B. GORDON:  Object -- object

17     to the characterization.

18          THE WITNESS:  With the small

19     sample of units we were unable to detect

20     anything.

21  BY MR. C. GORDON:

22  Q.  Did you ever do a large sample where you

23     tried to detect bugs coming out of the

24     Bair Hugger?

25  A.  I would like to review the research studies

Page 94

                              ALBRECHT

1

2      so I can see what sources.  There's a couple

3      of them that would help me remember what we

4      did.  So there's an American Journal of

5      Infection Control article that I think would

6      be helpful if I could look through that.

7  Q.  Sure.

8                  MR. B. GORDON:  And he's asked for

9      those a couple of times, Corey.

10                 MR. C. GORDON:  Yeah.  We'll --

11     we'll -- we'll take a break and we'll --

12     we'll put all your --

13                 MS. ZIMMERMAN:  Counsel --

14                 MR. C. GORDON:  -- your published

15     studies on the record.

16                 MR. B. GORDON:  We'll give them to

17     him on the break.  We've got to take a break.

18                 MR. C. GORDON:  My timing is

19     perfect.

20                 THE VIDEOGRAPHER:  We're going off

21     the record at 11:11 a.m.

22                 (Whereupon, a brief recess

23                 was taken.)

24                 THE VIDEOGRAPHER:  This is video

25     number 2 in the deposition of Mark Albrecht.

Page 95

1                              ALBRECHT

2          Today is October 7th, 2016.  We're going back

3          on the record at 11:42 a.m.

4                       (Whereupon, Exhibit 4, Exhibit 5,

5                       Exhibit 6, Exhibit 7, Exhibit 8

6                       and Exhibit 9 was marked for

7                       identification.)

8    BY MR. C. GORDON:

9    Q.   Mr. Albrecht, I've given you several

10         exhibits, and I just want to go through them

11         for the record.  Exhibit 4 is a 2009 article,

12         Forced Air Warming:  A Source of Airborne

13         Contamination in the Operating Room, by

14         Albrecht, Gauthier and Leaper, correct?

15   A.   Correct.

16   Q.   Exhibit 5 is a 2013 article, Forced-Air

17         Warming Design:  Evaluation of Intake

18         Filtration, Internal Microbial Buildup, and

19         Airborne Contamination Emissions, by Reed,

20         Kimberger -- Kimberger, McGovern and

21         Albrecht, correct?

22   A.   Correct.

23   Q.   Exhibit 6 is a 2011 publication, Forced-Air

24         Warming Blowers:  An Evaluation of Filtration

25         Adequacy and Airborne Contamination Emissions

1                         ALBRECHT

2        in the operating room, by Albrecht, Gauthier,

3        Belani, Litchy and Leaper, correct?

4   A.   Yup.  Correct.

5   Q.   And number -- Exhibit 7 is a 2013

6        publication, Patient Warming, Excess Heat,

7        the Effects on Operating -- Orthopedic

8        Operating Room Ventilation Performance, by

9        Belani, Albrecht, McGovern, Reed and

10       Nachtsheim, correct?

11  A.   Correct.

12  Q.   Number 8 is a 2011 publication, Forced-Air

13       Warming and Ultra-clean Ventilation Do Not

14       Mix, An Investigation of Theater Ventilation

15       in Patient Warming and Joint Replacement

16       Infection in Orthopaedics, by McGovern,

17       Albrecht, Belani, Nachtsheim, Partington,

18       Carluke, and Reed, correct?

19  A.   Correct.

20  Q.   And Exhibit 9 is a 2012 publication, Effect

21       of Forced-Air Warming on the Performance of

22       Operating Theater Laminar Flow Ventilation,

23       by Dasari, Albrecht and Harper, correct?

24  A.   Correct.

25  Q.   The -- so you are a coauthor on all six of

                              ALBRECHT

 1
 2      these studies, published studies from
 3      Exhibits 4 through 9, correct?
 4   A.  Correct.
 5   Q.  Are there any other published studies of
 6      which -- on which you appear as a coauthor
 7      that in any way involve the Bair Hugger
 8      specifically or forced-air warming generally
 9      other than these six?
10   A.  I don't think so, but I would have to do a
11      literature search to make sure.
12   Q.  Okay.  How would you go about doing that
13      literature search?
14   A.  We'd have to go through PubMed and look
15      through for the articles and see what comes
16      up.  I could also look on a resume if we had
17      one handy.
18   Q.  That's right, my -- I promised you a resume.
19   A.  I think they're complete on there, but you
20      never know.
21   Q.  No, and -- and -- and we want to be complete,
22      that's fair.
23          I want to see if we can kind of
24      create baskets to put these different studies
25      in.  One basket would be a study that

1                         ALBRECHT

2         actually looks at infection rates.

3    A.   Okay.

4    Q.   Am I correct that the only study that has

5         that as a component is Exhibit 8?

6                   MR. B. GORDON:  I'll object to the

7         form as being overbroad.  It might take him

8         time to know for sure.

9                   MR. C. GORDON:  No, I want him to

10        take the time.

11                  THE WITNESS:  (Reviews document.)

12        Yeah, so this study does have observational

13        infection data.  That's not a properly

14        controlled trial.

15             This does not, (indicating).

16             (Reviews documents.)

17                  MR. B. GORDON:  I don't think our

18        feed is updating.  Okay, it is.  I'm sorry.

19        We're good.

20                  THE WITNESS:  That's not,

21        (indicating).

22             This one shouldn't, (indicating).

23             That is the only one, yes.

24                  MR. C. GORDON:  Okay.

25    BY MR. C. GORDON:

1                         ALBRECHT

2    Q.  So we'll call that an infection rate basket,

3        if you will.

4                And then some of these studies

5        address issues related to the -- the impact

6        that the Bair Hugger may have on operating

7        room airflow.

8    A.  Yes.

9    Q.  Okay.

10   A.  They do.

11   Q.  So I'll -- I'll call that, just for

12       shorthand, my airflow basket.

13   A.  Sure.

14   Q.  And Exhibit 8, which has an infection rate

15       component to it, also has an airflow

16       component to it, correct?

17   A.  Yes, it does.

18   Q.  And Exhibit 9 --

19   A.  Yup.

20   Q.  -- would be an airflow study, right?

21   A.  I agree.

22   Q.  And Exhibit 7 would be an airflow study,

23       right?

24   A.  Yes.

25   Q.  And then the third basket, I'll actually use

Page 100

1                          ALBRECHT

2          your phrase, the crud and bug.

3     A.   Is that my phrase?

4     Q.   Do you remember using that phrase?

5     A.   I don't know.  Maybe I did.

6     Q.   Okay.

7                    MR. B. GORDON:  I don't remember

8          that.

9                    THE WITNESS:  I think that's

10         Scott Augustine's phrase.

11                   MR. B. GORDON:  Did I step out or

12         something like that?  Accordingly, I object

13         to the form of that question.

14                   MR. C. GORDON:  I'm sorry.

15                   MR. B. GORDON:  I object to the

16         form of the "crud and bug" to the extent

17         it --

18                   MR. C. GORDON:  Well, if he

19         doesn't remember --

20                   MR. B. GORDON:  --

21         mischaracterizes his testimony.

22                   THE WITNESS:  I may have.  Do you

23         have an e-mail with that?

24                   MR. C. GORDON:  Yeah, but it's no

25         big deal.

1                        ALBRECHT
2    BY MR. C. GORDON:
3    Q.  Studies that look at the Bair Hugger itself
4         as a potential source of air contamination.
5    A.  Okay.
6    Q.  Okay?
7    A.  Yup.
8    Q.  And that would be 4, 5 and 6, right?
9    A.  Yup.
10   Q.  So the studies that we spent a good portion
11        of the morning looking at in the hospitals in
12        Hastings and Alexandria and St. Cloud,
13        those -- none of those had an infection rate
14        component to it, correct?
15   A.  They did not.
16   Q.  And none of those had an airflow disruption
17        aspect to it, correct?
18   A.  Let me look carefully here.
19        (Reviews documents.)
20             No, these were filtration based.
21   Q.  Okay.  And the -- let's talk about the
22        filtration-based study, you referred to it as
23        filtration based.  There were three basic
24        components to the studies you did at those --
25        those Minnesota hospitals looking at, one,

Page 102

                        ALBRECHT

1

2    particle emissions both in incoming and

3    outgoing and --

4    A.  Correct.

5    Q.  -- calculating filtration efficiency, but

6    still those were particles, right?

7    A.  Yup.

8    Q.  Number two, you looked at internal surface

9    bacteria by swabbing --

10   A.  Correct.

11   Q.  -- and rinsing, right?

12   A.  Yup.

13   Q.  And number 3, you looked at bacteria in the

14   airstream?

15   A.  On some of the units that appear in these

16   studies, not all.

17   Q.  Some of the units at those three hospitals in

18   Minnesota?

19   A.  Yes.

20   Q.  Okay.  And in those three Minnesota hospitals

21   you -- you found particle emissions with

22   vary -- varying -- varying efficiency of the

23   filter, you found internal surface

24   contamination in many of the units, right?

25   A.  Correct.

1                              ALBRECHT

2    Q.   But you didn't find any bacteria blowing out

3         of the units?

4    A.   When sampled at rest.  So these studies of

5         the impaction weren't run with the

6         Bair Hugger in a working operating theater

7         with a lot of skin cell load in the air that

8         could have been pushed in and sucked through,

9         and so we had very inconclusive results with

10        the colony-forming unit counts, because

11        there's a lot of mechanics that have to

12        happen to make that go when it came to the

13        airborne.

14   Q.   Okay.  So of the -- the three studies that

15        looked at the Bair Hugger as a possible

16        source, Exhibits 4, 5 and 6, all four of them

17        looked at particle emissions, right?

18   A.   They did.

19   Q.   And filtration efficiency based on particles

20        entering and particles exiting, right?

21   A.   Yup.

22   Q.   All three of these studies looked at internal

23        surface contamination based on swabbing and

24        rinsing, right?

25   A.   Correct.

ALBRECHT

1

2   Q.   But none of them looked at actual bacteria in

3        the airstream, correct?

4   A.   Yes, because these were done -- most of the

5        these studies, the intent was to look at the

6        theaters at rest and see what was in the

7        units, and air sampling results were

8        inconclusive, as you can see here.

9             For example, the impaction device,

10       you need a working theater to look at

11       colony -- colony-forming units with viable

12       bacteria entering and passing.  And so it was

13       a more complicated set up to do the full air

14       impaction study and we would have needed to

15       have some kind of surgical component going

16       on.

17  Q.   Well, do any of these studies involve a

18       simulated surgical activity?

19  A.   These here do, (indicating).

20  Q.   You're talking about 7, 8 and 9?

21  A.   Yup.

22  Q.   But not --

23  A.   Let me look --

24  Q.   -- 4, 5 and 6?

25  A.   Let me look through carefully.

```
 1                       ALBRECHT
 2      (Reviews documents.)
 3             I believe this was all at rest
 4      testing, yes.
 5 Q.   Which ones were at rest testing?
 6 A.   Let me look through them all for you.  If you
 7      want a very specific answer, let me sort for
 8      that, please.
 9 Q.   Please.
10 A.   (Reviews documents.)  This one, (indicating),
11      I believe was all at rest testing.
12 Q.   You're pointing to Exhibit 4?
13 A.   Yup.  Let's look at Exhibit 5 here.
14      (Reviews documents.)  This one looks at rest,
15      so that's Exhibit 5.  (Reviews documents.)
16      After hours once again, so, yeah.  (Reviews
17      documents.)  These were all at rest.
18 Q.   And in none of these studies do you reference
19      any research that demonstrated no bugs in the
20      air?
21             MR. B. GORDON:  Object to form.
22             THE WITNESS:  We felt to do that
23      we would need to have some kind of simulated
24      surgery going on and it couldn't be done at
25      rest.  We thought instead to look at some of
```

1                         ALBRECHT

2      the more fundamental engineering components

3      you could measure first, such as the filter,

4      which is easily quantifiable and doesn't have

5      a lot of additional sources to go on, such as

6      bugs being released by people in taking to

7      the stream, things like that that have to

8      happen for the mechanism to occur, so we

9      started with the first engineering

10     principles.

11             And so, no, we did not present the

12     impaction data in these studies, because we

13     weren't sure to make of it because it was

14     done at rest and it did not have the load

15     component that would make it appropriate.

16  BY MR. C. GORDON:

17  Q.  Well, the -- the particulate emissions was

18      done at rest too, wasn't it?

19  A.  Yup, and the thinking is a little different

20      on that, that a unit can collect things over

21      time inside of it and we were looking for --

22      I'm sorry, the filtration piece or the swab

23      piece internally, which would you like to

24      talk about?

25  Q.  Let's go to Exhibit 4.

1                         ALBRECHT

2    A.   Okay.

3    Q.   In the second paragraph it says, "We measured

4         the emission of viable and nonviable forms of

5         airborne contamination from an arbitrary

6         selection of FAW blowers in the operating

7         room"; do you see that?

8    A.   Where?

9    Q.   Second paragraph.

10   A.   Okay.

11   Q.   How did you measure the viable emissions?

12   A.   Through means of a particle counter, and

13        inferring if it's of a certain size of

14        particulate, that it could be viable.

15   Q.   You had data from those three hospitals that

16        showed that even when you had particulate

17        emissions of various sizes, a wide range of

18        sizes, you couldn't get any bugs to culture

19        out on a -- on an agar plate, right?

20                   MR. B. GORDON:  Object to form.

21                   THE WITNESS:  We did get some.

22        There were colony counts coming out of the

23        units, just low numbers.

24   BY MR. C. GORDON:

25   Q.   Well, you can't get too much lower than 1,

1                           ALBRECHT
2       right?
3    A.  No, you cannot.
4    Q.  And almost all of the measurements were 0,
5       right?
6    A.  We can look at that statistically, if you'd
7       like.
8    Q.  Well, there were a couple that said -- there
9       were a couple that were 1, and every other
10      one was 0, right, and a control was 1 in one
11      instance, right?
12                  MR. B. GORDON:  You're talking
13      about for the hospitals?
14                  MR. C. GORDON:  Yup.
15                  THE WITNESS:  So we do have that
16      in the table, let's look at that.
17   BY MR. C. GORDON:
18   Q.  You have that in the table that no one
19      outside of August Biomedical saw, right?
20                  MR. B. GORDON:  Object to form,
21      argumentative, move to strike.
22                  MR. C. GORDON:  Well, yeah, I'll
23      withdraw that.
24   BY MR. C. GORDON:
25   Q.  Did anyone ever -- did anyone within the

1                         ALBRECHT

2       Augustine Biomedical ever share the table

3       that showed almost all zeros with anyone

4       outside of Augustine Biomedical?

5                   MR. B. GORDON:  Objection to form.

6       It was asked and answered earlier.

7                   THE WITNESS:  The coauthors

8       reviewed the data, so David Leaper and

9       Robert Gauthier would have had a chance to

10      look at this.  I don't know if they saw that

11      report as part of the body of evidence, or I

12      should say part of the data set.

13   BY MR. C. GORDON:

14   Q.  Under, "Sampling Procedures," on Exhibit 4,

15      it says, "FAW blowers from hospitals in the

16      vicinity of Minneapolis and St. Paul were

17      sampled after hours," et cetera, et cetera.

18                  Did -- does -- do any -- are any of

19      the data in Exhibit 4 based on any of those

20      three hospitals that we spent the morning

21      looking at, Hastings, St. Cloud and --

22                  MR. B. GORDON:  Alexandria.

23   BY MR. C. GORDON:

24   Q.  -- Alexandria?

25   A.  I believe -- yes, there should be.  Let me

1                         ALBRECHT

2      look carefully, but I would imagine.

3      (Reviews documents.)  Let me look at the

4      methods very carefully.  (Reviews documents.)

5              Yes, I would expect those hospitals

6      to be a part of this.

7   Q.  So it's your recollection that Dr. Leaper and

8      Dr. Gauthier both would have had access to

9      the information that showed that of the three

10     Bair Hugger units sampled from St. Cloud

11     Hospital, not a single one cultured out a

12     single CFU; and the three samples -- or three

13     Bair Huggers sampled at Alexandria, of the

14     six measurements, two of the measurements had

15     one CFU and the other four were zeros; and at

16     the Regina center, of the three units tested,

17     there were nine measurements, and one unit

18     had all zeros, one unit had one -- one CFU on

19     one measurement and zero CFUs on the other

20     two, at the same time the control had one CFU

21     measured; and the third unit had one -- one

22     CFU measured at the start and two zeros?

23              MR. B. GORDON:  Object to form,

24     compound, misstates the record.

25              THE WITNESS:  If I recall

1                          ALBRECHT

2        correctly, it was a while ago, we had a

3        discussion about the impaction results and

4        felt that the fact that we weren't doing the

5        operating theater under load makes those

6        difficult to interpret.

7   BY MR. C. GORDON:

8   Q.   Is there anywhere in Exhibit 4 where you

9        alerted the reader to the fact that you had

10       had these results from the actual attempt to

11       measure viable airborne contamination?

12  A.   I do not believe so, and we didn't think it

13       was relevant because it wasn't under load,

14       but let me look.  (Reviews documents.)

15            No, we do not reference that in the

16       discussion.

17  Q.   But you had a discussion with your coauthors

18       about the fact that you had attempted to --

19       to actually culture out bacteria from the

20       airstream of the various Bair Huggers that

21       you sampled and you found little or no growth

22       occurred on the agar plates?

23  A.   I don't recall if that discussion was

24       directly had in that manner with the

25       coauthors.  It was a long time ago.  I know

```
 1                         ALBRECHT
 2         internally we had some discussions in the
 3         company about thinking through this.  And the
 4         fact that the OR was at rest versus under
 5         load was our reason for saying, hey, we can't
 6         go this far along in the chain to recording
 7         bacteria, we need to start with some of the
 8         further up fundamentals, such as what's the
 9         quality of the filter, are things building up
10         inside the unit, what's coming out, and we
11         were uncertain that this kind of sampling was
12         reflective of what would happen under normal
13         operating conditions in the theater.
14    Q.   Could be, maybe it wasn't, right?
15                   MR. B. GORDON:  Object to form.
16                   THE WITNESS:  I'm uncertain if we
17         talked about this.
18    BY MR. C. GORDON:
19    Q.   No, I'm sorry, whether the -- your earlier
20         measurements where you found little or no
21         growth in the actual airstream for the
22         Bair Huggers, you're not -- you're saying you
23         weren't sure whether that was or was not
24         representative of what actually occurs in the
25         operating room?
```

1                          ALBRECHT

2              MR. B. GORDON:  Object to form,

3       misstates the evidence, asked and answered.

4                 THE WITNESS:  Can you ask that in

5       a different way?

6  BY MR. C. GORDON:

7  Q.  Well, you said you had a discussion about how

8       this was not under load so that didn't

9       necessarily represent what was actually

10      happening in an OR?

11 A.  We were unsure how to interpret this result,

12      so we chose to study the things that were

13      easier to define.

14 Q.  Okay.  And you had the -- did you have that

15      discussion with Scott Augustine?

16 A.  I believe we did at some point.

17 Q.  And when you say the things that are easier

18      to find, you found particles --

19 A.  Easier to study, not to find.

20 Q.  Easier to study.

21 A.  To quantify.

22 Q.  To quantify.

23 A.  Because this is an operating room at rest,

24      there are a lot of factors at play that make

25      it nonrepresentative, so we wanted to

1                        ALBRECHT

2        quantify the things we felt we could in a

3        rest theater.

4   Q.   And one of the things you knew you could

5        quantify was particle emissions from the --

6        from a Bair Hugger, right?

7   A.   Yes.

8   Q.   And one of the things you knew you could

9        quantify were bacteria inside adhering to the

10       surfaces, right?

11  A.   Correct.

12  Q.   And one of the things you knew you couldn't

13       quantify were actual bugs, bacteria actually

14       coming out of the Bair Hugger?

15               MR. B. GORDON:  Objection to form,

16       misstates his testimony.  He said it wasn't

17       under load.  He's answered that six times.

18               THE WITNESS:  We're unsure of the

19       proper way to quantify that in the theater at

20       rest that translates to one that would be

21       under load.

22  BY MR. C. GORDON:

23  Q.   In Exhibit 4 you said you measured emission

24       of viable forms of airborne contamination,

25       but you really didn't measure it, right?

1                         ALBRECHT

2   A.  We inferred.

3   Q.  Do you say anywhere in Exhibit 4 that your

4       measurements of the emission of viable

5       airborne contamination was inferred?

6   A.  "Common operating airborne microbes in the .5

7       to 5 micron science range include unclumped

8       bacteria and fungi.  Nonviable sources may

9       have included particles generating from

10      moving components, which can become buoyant

11      airborne carriers of microbes.  Additionally,

12      CFUs detected by rinsing were lower than CFUs

13      detected by swabbing."  Okay.  Let's see

14      here.  (Reviews document.)

15              "The presence of microbes on air

16      passed surfaces in 94 percent of the blowers

17      suggest that a viable component could be

18      present in the emitted contaminants."

19              MR. B. GORDON:  That sounds like

20      an inference to me.

21              THE WITNESS:  And the inference in

22      context is, "Common operating room airborne

23      microbes in the .5 to 5 micron science range

24      include unclumped bacteria and fungi."

25  BY MR. C. GORDON:

1                           ALBRECHT

2    Q.   And you didn't feel it was important to tell

3         the readers of this that you actually had

4         tried to measure the bacteria and found, with

5         the methodology you were using, little or no

6         actual bacterial omissions?

7                    MR. B. GORDON:  Object to form,

8         argumentative, misstates the evidence.

9                    THE WITNESS:  We decided to scope

10        this research around the pieces that we had

11        complete coverage on and felt that we could

12        more accurately measure.

13   BY MR. C. GORDON:

14   Q.   And --

15                    THE WITNESS:  To do that

16        accurately, we thought we needed something

17        that was not at rest.

18   BY MR. C. GORDON:

19   Q.   You had seen the data from the operating

20        rooms where there were thousands and

21        thousands of particles being emitted, but

22        none -- none -- no bacteria being cultured,

23        right?

24   A.   Atmospheric particles, which is a different

25        source than what is likely to be resident in

1                              ALBRECHT

2        a Bair Hugger filter that is in the operating

3        theater where there's a large quantity of

4        skin cells.

5    Q.  What's your basis for saying that it's --

6        that it's different?

7    A.  So the filtration system in a hospital

8        removes a lot of atmospheric contaminants,

9        pollens, things like that that are coming in

10       from the outside.  Once that clean air is

11       into the hospital, there's a lot of research

12       suggesting that the bulk of the dust you see

13       in airborne contaminants actually in the

14       theater that the Bair Hugger would be

15       operating are shed skin cells that have

16       fomites on them, you know, bacteria, and so

17       the particle concentration coming out of the

18       two is hard to relate to one another.  And

19       the particle counts were much lower out of

20       the Bair Huggers than they were out of the

21       plenum, in a lot of these cases.

22   Q.  What's a fomite?

23   A.  It's an airborne carrier of bacteria, like a

24       floating skin cell.

25   Q.  How big are fomites?

1                          ALBRECHT

2    A.   The fomites themselves is large, 20 to 30

3         microns in size, but they can break off and

4         have bacteria fall from them, they can have

5         airborne bacteria floating around without a

6         fomite, but skin cells tend to be larger.

7    Q.   So you're saying that the little or no

8         bacterial growth that you got when you

9         actually tried to measure what was coming out

10        of the -- the Bair Hugger, that -- that was

11        inconclusive because it wasn't -- there

12        wasn't air --

13   A.   There wasn't a concurrent challenge --

14   Q.   Let me finish my -- there wasn't a concurrent

15        challenge from what was coming from what

16        could be in the operating room?

17   A.   Yes.

18   Q.   But you measured bacteria that was inside the

19        Bair Hugger, right?

20   A.   Yup, that might have been adhered to the

21        surface, yes.

22   Q.   Right.  And -- and you found bacteria that

23        had adhered to the surface?

24   A.   Suggesting that bacteria does penetrate the

25        filter and can be flowing through the unit.

1                          ALBRECHT

2   Q.  But you couldn't find any?

3   A.  When sampled at rest, we did not find.

4   Q.  Okay.  But what's the rationale for doing, in

5       fact, several articles showing bacterial

6       contamination in internal surfaces that could

7       only be dislodged by swabbing or rinsing?

8                  MR. B. GORDON:  Objection; asked

9       and answered.

10                 THE WITNESS:  They could be

11      dislodged by other factors too.

12                 MR. C. GORDON:  Okay.

13  BY MR. C. GORDON:

14  Q.  Well, if your concern -- if your -- if your

15      theory is that bacteria inside the -- the

16      Bair Hugger could somehow become mobilized

17      and enter the airstream, that would be true

18      whether it's at rest or there's other stuff

19      coming in, right?

20                 MR. B. GORDON:  Objection to form,

21      argumentative.

22                 THE WITNESS:  It's possible, yes,

23      that is one source.

24  BY MR. C. GORDON:

25  Q.  Do you think anyone reading this article

1                        ALBRECHT

2        would think, well, gees, if there's bacteria

3        on the inside and there's particles coming

4        out, maybe there's -- those particles contain

5        bacteria?

6                    MR. B. GORDON:  Objection; calls

7        for speculation as to what people think.

8                    THE WITNESS:  Readers are going to

9        infer what they're going to infer.

10   BY MR. C. GORDON:

11   Q.  Well, isn't that what you intended them to

12        infer?

13   A.  No.

14   Q.  Your -- the title of this is, "Forced-Air

15        Warming:  A Source of Airborne Contamination

16        in the Operating Room?"

17   A.  Yes.  There's a large number of particles

18        coming out and we want to pose the question

19        what are they and spur on further research.

20        That's kind of the point of an article like

21        this, is to introduce a topic to get the next

22        phase going.

23   Q.  Is there somewhere where you -- where you say

24        we need to spur on further research and see

25        if what's coming out of the Bair Hugger is

1                          ALBRECHT

2      actually -- actually contains bacteria?

3                 MR. B. GORDON:  Objection to form,

4      argumentative.

5                 THE WITNESS:  Based on the

6      findings of other authors that have looked at

7      this too, we highlight essentially two

8      components that the filters should be looked

9      at and the internal paths should be able to

10     be decontaminated, those are the major

11     conclusions that are here.

12  BY MR. C. GORDON:

13  Q.  If there are no bugs actually blowing out of

14      the Bair Hugger --

15  A.  We don't have conclusive data to know that,

16      this isn't enough.

17  Q.  Is there anywhere you suggest that you have

18      inconclusive data on what actually comes out

19      of the Bair Hugger?

20  A.  We specify the particulate distribution

21      coming out and we specify the size of

22      microbes coming out.

23  Q.  But nowhere do you say we also have

24      inconclusive data that suggests that bacteria

25      actually don't come out of the Bair Hugger,

```
                         ALBRECHT
1
2      but more research is needed?
3                  MR. B. GORDON:  Objection to form.
4      He explained that several times about the --
5                  THE WITNESS:  We did not include
6      that.  We did not want to compare what we
7      thought needed to be studied in an active
8      theater to a study that was done at rest.
9  BY MR. C. GORDON:
10  Q.  And you did at least two more studies, 5 and
11      6, where you did basically the same thing?
12                  MR. B. GORDON:  Objection to the
13      characterization.
14                  THE WITNESS:  No, these were very
15      different.
16  BY MR. C. GORDON:
17  Q.  How were they different?
18                  MR. B. GORDON:  Objection to form,
19      overbroad.
20                  THE WITNESS:  One of the studies
21      did a quantitative filter rating by an
22      independent lab on what the true efficiency
23      was of the intake filters of two popular
24      Bair Hugger models, the 505 and the 750, and
25      we wanted a formal efficiency rating in
```

Page 123

1                          ALBRECHT
2          conjunction with looking at what is coming
3          out of these units to better understand how
4          the internal surfaces could be getting
5          contaminated.
6     BY MR. C. GORDON:
7     Q.  Filtration efficiency doesn't matter if no
8          bugs get out of the Bair Hugger, right?
9     A.  We don't know that.
10    Q.  If that were -- if that were the case, if --
11         if bugs don't escape the Bair Hugger, then
12         the filter efficiency doesn't matter, right?
13                    MR. B. GORDON:  Objection to
14         the --
15    BY MR. C. GORDON:
16    Q.  From a -- from a bacteria standpoint.  It may
17         matter for protecting the motor, the
18         efficiency of the unit.
19                    MR. B. GORDON:  Objection to form,
20         mischaracterizes the evidence, calls for
21         speculation.
22                    THE WITNESS:  Say that clearly one
23         more time.
24    BY MR. C. GORDON:
25    Q.  If it were a fact that your inconclusive

1                          ALBRECHT

2       results really were conclusive and --

3  A.   But that's not a fact.

4  Q.   I understand.  I'm asking you, though, if

5       somebody else were to do what you did

6       inconclusively and demonstrate conclusively

7       that bugs don't come out of the Bair Hugger,

8       the -- the efficiency of the filter is

9       irrelevant, right?

10                MR. B. GORDON:  Objection to form,

11       improper hypothetical, calls for speculation.

12                THE WITNESS:  So there is an

13       article, Number 21, Avidan, Jones and Ing,

14       Convection Blowers, Not Just Hot Air,

15       published in Anesthesia in 1997 that did find

16       airborne bacteria coming out of the blowers.

17                MR. C. GORDON:  Right.

18  BY MR. C. GORDON:

19  Q.   They -- they blew the -- they blew the

20       airstream onto agar plates and cultured out

21       some CFUs, correct?

22  A.   Correct.

23  Q.   Then they put the -- the hose into the

24       blanket, attached it to the blanket as it is

25       supposed to be --

1                          ALBRECHT

2    A.  They did.

3    Q.  -- and they got zero, right?

4    A.  In a small study in a limited number of

5        units.

6    Q.  They got zero, right?

7    A.  In that study, yes.

8    Q.  Okay.  And you got zero?

9    A.  No, not true --

10             MR. B. GORDON:  Objection to

11        mischaracterization of the evidence, asked

12        and answered.

13             THE WITNESS:  -- there were a

14        number of colony-forming units that were

15        detected airborne with the impaction device.

16   BY MR. C. GORDON:

17   Q.  In the majority of the -- in almost all of

18       the units there was zero --

19   A.  The data states that two out of nine had a

20       colony-forming unit detected -- sorry, two

21       out of three had a colony-forming unit

22       detected in the experiments.

23   Q.  And one of those the control also had one

24       colony-forming unit in it, right?

25   A.  It did, in one study.  I'm just looking

Page 126

ALBRECHT

1

2      through this if you want clear answers.

3   Q.  In Exhibit 4 you say, in the third column on

4       the front page just above, "Materials," and,

5       "Methods," "Therefore, in this study we

6       investigated the emission of both viable and

7       nonviable forms of airborne contamination."

8       What did you do to investigate the emission

9       of viable forms of airborne contamination?

10  A.  In this study and what was done here?

11  Q.  Yeah.

12  A.  We used a particle counter and we swabbed the

13      internal surfaces of the unit, and those are

14      the two points of data that comprised the

15      study.

16  Q.  That was your investigation of actual

17      emission of viable -- viable forms of

18      airborne contamination?

19  A.  Yes.

20  Q.  Okay.  And this was based, in part, on

21      research where you actually did do something

22      to investigate the emission of viable forms

23      of bacteria, which is to measure CFUs in the

24      airstream?

25  A.  We had an impaction apparatus that we

1                        ALBRECHT

2        measured at rest, yes.

3   Q.   And nowhere is that disclosed in Exhibit 4?

4   A.   I do not see it in the paper, no.  We felt it

5        was out of scope.

6   Q.   And nowhere is that mentioned in Exhibit 5 or

7        Exhibit 6?

8   A.   No, it is not mentioned.

9   Q.   So you just -- you did these studies to let

10       the -- let the readers know that, hey, these

11       filters aren't very efficient and that

12       there's bacteria inside the Bair Hugger?

13  A.   That is not my motive for doing the studies,

14       no.

15  Q.   What was your motive?

16  A.   To look at the engineering principles and ask

17       the question is the filter Hepa, what is the

18       filter efficiency, because no one has looked

19       at it, are contaminants inside these units

20       building up, can they be cleaned, is there a

21       way to access those internal surfaces that,

22       you know, are inside the blower and

23       decontaminates them, is there a reason to.

24       So we're looking at items like that to start.

25  Q.   Why?  What's the concern?

1                          ALBRECHT

2   A.   The concern is that you could have viable

3        contaminants coming out of the unit and we

4        don't have enough evidence to say yes or no

5        on that completely.

6   Q.   But you didn't disclose any of the --

7        anywhere the inclusive evidence that you had

8        on the only thing that really matters?

9             MR. B. GORDON:  Objection; asked

10       and answered at least three times, maybe

11       four.  You know, if you asked every question

12       that you don't like the answer to four times,

13       we'll be here four times as long, Corey.

14       It's not fair.

15            MR. C. GORDON:  Your objection is

16       noted and --

17            MR. B. GORDON:  Well, it's not

18       fair --

19            MR. C. GORDON:  -- I think it

20       violates the --

21            MR. B. GORDON:  You're scowling at

22       him and you're --

23            MR. C. GORDON:  It violates the

24       order for nonspeaking objections.

25            MR. B. GORDON:  -- hostile to him,

1                    ALBRECHT

2    and I don't understand why --

3              MR. C. GORDON:  I'm not scowling.

4              MR. B. GORDON:  -- he's a fact

5    witness.

6         We're going to get a video camera on

7    you next time.  You have been scowling at

8    him.

9              MR. C. GORDON:  Okay.

10        Strike counsel's comments.

11             MR. ASSAAD:  You have to move to

12   strike.  You have to strike it.

13             MR. C. GORDON:  Move to strike

14   counsel's comments.

15             MR. B. GORDON:  Move all you want,

16   just be nice to him and move on.

17             MR. C. GORDON:  And -- and -- and,

18   you know, the rule is one lawyer talks and

19   the rules also prohibit speaking objections.

20        Could you read my question back from

21   a couple years ago.

22             (Whereupon, the last question

23             was read by the court reporter.)

24             MR. B. GORDON:  Same objection.

25             THE WITNESS:  We didn't study a

1                          ALBRECHT
2          theater -- the theater we studied was at
3          rest, we felt that that wasn't appropriate to
4          include.  We didn't think it was
5          representative of the issue that we're
6          measuring.
7     BY MR. C. GORDON:
8     Q.  Did you ever suggest to anyone that they
9          conduct a study with a theater not at rest
10         and see if there's actually airborne bacteria
11         coming out of the -- the Bair Hugger?
12                    MR. B. GORDON:  Objection; asked
13         and answered several times.
14                    THE WITNESS:  We would love other
15         people to do those studies.
16    BY MR. C. GORDON:
17    Q.  Did you ever suggest it to anyone that they
18         do that kind of a study?
19    A.  In the body of the text here, no.
20    Q.  Any -- any time in your entire life?
21    A.  No, I have not talked to researchers to do
22         that.  Instead, we chose to go after the
23         things that were simpler and could be
24         quantified from first principles to kind of
25         start at the bottom of the pyramid; filter,

1                          ALBRECHT

2        filter efficiency, are things passing through

3        the filter before we try and connect all the

4        elements together and say, hey, are there

5        bugs coming out of the airstream.

6   Q.   Did you ever suggest to anyone that they try

7        to connect those things that you looked at

8        to -- to what actually matters, bacteria

9        coming out of the --

10  A.   Yes, we've had lots of discussions.  We had

11       them with the orthopedists as we designed

12       these other studies, you know, how do we go

13       about answering the question is there a risk.

14       You know, one vector of contamination is

15       what's coming out of the unit, that's a

16       possible source we have to look at.  There

17       are other vectors too that are examined.

18  Q.   We're going to talk about those other

19       vectors.  But I -- I -- so did anyone have

20       these discussions --

21                  MR. B. GORDON:  Object to the

22       sidebar.

23  BY MR. C. GORDON:

24  Q.   Did anyone have these discussions that you

25       had these discussions with suggest any kind

1                         ALBRECHT

2        of study or methodology for actually looking

3        at connecting these dots and seeing if any of

4        the bacteria that's -- you're finding inside

5        and the particles that are coming out

6        actually contained bacteria?

7   A.   I'm not sure.  We kind of started down the

8        path and we looked at the filter first, and

9        that's what these studies are about, then we

10       looked at the next thing to answer the

11       question is there buildup inside.  We wanted

12       to see if that buildup was biological in

13       origin, because there are decontamination

14       issues that are present if you can't clean

15       surfaces.  And I don't know if we got to that

16       point before we started chasing other

17       butterflies on this.

18  Q.   Take a look at Exhibit 8.

19  A.   Okay.

20  Q.   That's the -- the one study that you agreed

21       had a component of it that actually looked at

22       infection rates.

23  A.   Observational.

24                MR. B. GORDON:  Object to the

25       characterization by counsel.

1                      ALBRECHT

2    BY MR. C. GORDON:

3    Q.   What do you mean by observational?

4    A.   Well, this isn't a randomized clinical trial

5         that was conducted here.  Let me read the

6         point in the discussion I think around that.

7                    MR. B. GORDON:  For the record, I

8         want the record to reflect there are

9         highlights in this document that I don't know

10        where they came from, I don't think they're

11        the witness's.

12                   MR. C. GORDON:  Yeah, your point

13        is well-taken.  Maybe we can -- we'll find a

14        clean copy.

15                   MR. B. GORDON:  And, actually,

16        there's some writing in here too, page 1542.

17                   MR. C. GORDON:  Yeah, I don't know

18        where that came from but we'll just...

19                   THE WITNESS:  Yeah, sorry, I lost

20        my track here.  Go ahead and repeat what

21        we're -- so you wanted a comment about the

22        observational versus --

23   BY MR. C. GORDON:

24   Q.   What -- what -- what do you mean by an

25        observational study?  You said it was not a

Page 134

ALBRECHT

1  randomized clinical trial.

2  A.  Yeah.  There wasn't a control group in place

3      at the same time where you give half a device

4      to one group and half to the other in a

5      randomized manner to see if the treatment

6      effect is real.  And, in fact, that would be

7      very difficult to do in something like this,

8      because the infection rates are very low, so

9      you need a huge sample size.

10          This study simply looked at trends

11      over time and infection rates.  And the

12      reduction in infection rates shown in the

13      study could be due to the adoption of

14      conductive fabric warming or it could be due

15      to other outside factors.

16  Q.  What other outside factors could have

17      influenced it?

18  A.  Well, it could be anything.  Improvement in

19      surgical practices, perhaps.  There's an

20      antibiotic switch that was occurring

21      somewhere in the study's period.  You could

22      have a different group of physicians

23      operating.  These are all uncontrolled things

24      that don't get caught with observational

1                         ALBRECHT

2        research.

3   Q.   There's statistical methodology to at least

4        account for known variables for different

5        periods of time, aren't there?

6   A.   Yeah.

7   Q.   For -- for example, you could do a

8        multivariate analysis, right?

9   A.   And one was performed.

10  Q.   In the paper itself, on table, is that, 11

11       on page 15 -- no, table -- table Roman

12       Numeral II, page 1542 --

13  A.   Okay.

14  Q.   -- that was a univariate analysis, right?

15  A.   Yes.

16  Q.   And nowhere in the -- the text of the -- the

17       paper do you indicate that the analysis that

18       is performed there is univariate, right?

19  A.   I'm not sure that that distinction matters.

20       So one at a time versus many at a time

21       variable, it doesn't change the design of the

22       study being observational versus randomized,

23       because that's what you need to make a

24       definitive conclusion.

25  Q.   You could have done a multivariate analysis,

Page 136

1                          ALBRECHT

2        couldn't you?

3   A.   Not exactly.

4   Q.   Because you didn't have enough information of

5        the variables?

6   A.   Well, to prove what?  What would the result

7        be?  How would it be different if we did a

8        multivariate analysis?

9   Q.   Are you saying it wouldn't make any

10       difference?

11  A.   It would present a similar picture, I

12       believe.

13  Q.   Did you try a multivariate analysis to --

14  A.   Well, what factor did you need adjustment

15       for?  Because that's what multivariate

16       analysis does.

17  Q.   So did you -- let's -- first of all, you did

18       the statistical analysis that's presented in

19       this paper, correct?

20  A.   I did, yes.

21  Q.   Okay.  What efforts did you undertake to see

22       if there were other variables that could have

23       influenced the infection rate that you could

24       then account for through a multivariate

25       analysis?

1                          ALBRECHT

2    A.   I asked the coauthors who had the infection

3         data, so McGovern, Reed, from the estates

4         over there, what factors would be important

5         to look at in doing an analysis, and we

6         pretty much followed the standard path you

7         would in a clinical paper for looking at

8         things.  You start with a univariate analysis

9         and kind of say, Are effects there.  And I'm

10        looking through the research here -- just

11        hold on.  Let me reacquaint myself with how

12        we did this.  (Reviews documents.)

13             No, we did -- this is a multivariate

14        analysis, if you look at this.  Because if

15        you look at the patient-warming device in

16        table 2 --

17   Q.   Yeah.

18   A.   -- I think we give the odds ratios for the

19        outcome both for knee and hip in the text of

20        the body, which would be in one group versus

21        the other, I believe.  Let me look through

22        real carefully.  I'm going to have to -- in

23        fact, if you give me a minute to just read

24        this, I can respond a little more clearly to

25        what your questions will be.

Page 138

1                              ALBRECHT

2     Q.   Absolutely.

3                    MR. C. GORDON:   What we'll do is

4          we'll take a break and print out clean

5          copies.

6                    THE VIDEOGRAPHER:   We're going off

7          the record at 12:34 p.m.

8                    (Whereupon, a brief recess

9                    was taken.)

10                   THE VIDEOGRAPHER:   This is video

11         number 3 in the deposition of Mark Albrecht.

12         Today is October 7th, 2016.   We're going back

13         on the record at 1:02 p.m.

14    BY MR. C. GORDON:

15    Q.   Before we went off the record we were

16         starting to talk about the Exhibit 8, which

17         was one of your papers and the one that had

18         the observational study component to it --

19    A.   Yup.

20    Q.   -- right?

21                   And I want to focus on the

22         observational component right now --

23    A.   Okay.

24    Q.   -- and talk about the other stuff later.

25                   You -- you obtained the data from

1                          ALBRECHT

2        Dr. Reed, right?

3    A.  The hospital he's at, yes.

4    Q.  Okay.  When -- when did you first meet

5        Dr. Reed?

6    A.  I can tell by the papers here what a date

7        would be, but I'm guessing around 2010 would

8        the first time we met up, something like

9        that, 2009.  I wish I could tell you exactly.

10       That stuff is kind of fuzzy for people.  I'm

11       not a big date rememberer --

12   Q.  And -- and --

13   A.  You probably figured that out by now.

14   Q.  I'm not looking for precision, just how

15       did -- how you meet him?

16   A.  Well, there's a network of folks that do

17       research in patient warming and people have

18       interest in it, so just kind of pinging

19       around here and there and people know each

20       other and he got introduced to us.  Maybe it

21       was through Scott Augustine, I believe.

22       That's probably who made the introduction.

23       But I could be wrong, it could have been some

24       other path too.  It's kind of one community.

25   Q.  Where -- where did you first meet him, in

1                         ALBRECHT

2        England, the U.S.?

3   A.   Probably the U.S.  I think -- boy, I'm trying

4        to get the order of events, did I go out

5        there first to meet with him or did he come

6        here.  I would guess he probably came here

7        first.

8   Q.   The -- the study that's in Exhibit 8, that's

9        got the two components to it --

10  A.   It does.

11  Q.   -- from the outset was it planned that there

12       would be two components or did it start out

13       as one and the other one was added?

14  A.   That's a great question.  As we were kind of

15       embracing the problem and thinking it through

16       wondering what would we need in terms of data

17       that's available and what would we like to

18       assess, this was brought up as something that

19       was of interest, the observational component.

20             We definite -- definitely planned to

21       look at the airflow characteristics in a

22       laminar theater in some of the

23       higher-performing ones like the UK has, so

24       that was thought of.  And I think -- I -- I

25       think Mike Reed brought the infection data to

1                         ALBRECHT

2       the table that he had, some of that

3       available, and he would like to look at that

4       too just to see how it kind of all painted

5       together in a picture.

6    Q.  Did you go over to England for the actual --

7       the airflow study part of it?

8    A.  Yes.

9    Q.  At -- at that point when you were in England

10      for that part, was it already contemplated

11      that you would be doing the observational

12      study on the infection data?

13   A.  In all truthfulness, I don't know when that

14      came in.

15   Q.  Okay.

16   A.  That's a big e-mail log, huh?

17   Q.  It is.

18                  (Whereupon, Exhibit 10 was

19                  marked for identification.)

20   BY MR. C. GORDON:

21   Q.  Exhibit, what is that, 10?

22                  MR. B. GORDON:  Ten.

23                  THE WITNESS:  What is this?  Oh,

24      this is the data, okay.

25                  MR. B. GORDON:  So you can read

1                          ALBRECHT

2       this.

3                    THE WITNESS:  Well, now that I

4       know what I'm looking at.

5                    MR. B. GORDON:  No, I meant old

6       guys like me and Corey.  I need glasses to

7       read this.

8                    MR. C. GORDON:  (Indicating.)

9                    MR. B. GORDON:  Oh you have

10      bifocals okay.

11                   MR. C. GORDON:  I also have a

12      magnifying glass.

13                   THE WITNESS:  I don't think that

14      will help either.

15  BY MR. C. GORDON:

16  Q.  I have something that's going to help.  But

17      first I want to establish that -- that is a

18      printout of the data that Dr. Reed would have

19      provided to you and from which you generated

20      your statistical analysis that became the

21      observational component of Exhibit 8?

22  A.  I'm assuming, but there's no way for me to

23      verify something like this.

24  Q.  I want to walk you through a little bit of it

25      and see if it rings -- rings a bell.

1                          ALBRECHT

2              There -- there appear to be three

3       different hospital -- hospitals involved

4       there, three different two digit -- two

5       initial codes there, do you see that?

6    A.  Okay.  Op code or -- let's see.

7    Q.  I don't have it in front of me but --

8                 MR. B. GORDON:  Is there a legend?

9                 THE WITNESS:  It's a big table.

10      Wow.  Okay.  There probably is a number or --

11      well, I wonder if there is with this one or

12      not.  Okay.

13   BY MR. C. GORDON:

14   Q.  The -- I don't have -- oh, I do have a copy.

15              Under, "B, Site"?

16   A.  Oh, yeah.  Okay, cool.

17   Q.  You have, "HX, MT," and, "WG"?

18   A.  That sounds right.

19   Q.  WG is for Wansbeck General, right?

20   A.  I believe so.

21   Q.  And the data that you based Exhibit 8 on were

22      data only from Wansbeck General, right?

23   A.  Boy, I've got to look now.  I think so.  Just

24      hold on.  These are very detailed questions,

25      you have to think back.  (Reviews documents.)

Page 144

                        ALBRECHT

1

2          At our hospital, yeah, I believe so.

3   Q.  Okay.  And with that I think I'll see if I

4       can make things a little easier.

5                   (Whereupon, Exhibit 11 was

6                   marked for identification.)

7   BY MR. C. GORDON:

8   Q.  I'll give you Exhibit 11.

9               MR. C. GORDON:  Careful, the

10      staple is sharp.

11              MR. B. GORDON:  Okay.

12  BY MR. C. GORDON:

13  Q.  And I will represent to you that Exhibit 11

14      is a document that we created from the

15      original source file that was Exhibit 10.

16  A.  All right.

17  Q.  And what we did was limit the site field to

18      just WG, Wansbeck General.

19  A.  Okay.

20              MR. B. GORDON:  When you say,

21      "We," you mean --

22              MR. C. GORDON:  My paralegal.

23              MR. B. GORDON:  Okay.

24              MR. C. GORDON:  Okay?

25  BY MR. C. GORDON:

1                          ALBRECHT

2    Q.   So -- and you -- you have the full --

3         Exhibit 10 is the full document, so you don't

4         have to take my word for it, you can, you

5         know, we can go back and forth to compare.

6    A.   I would have no means to do so with something

7         like this, but, yeah.

8    Q.   It would take a long time.  But on the things

9         that -- that are going to matter, you --

10        you -- you know, can cross reference it,

11        because they -- every one of them has a -- a

12        unique identifying number --

13   A.   All right.

14   Q.   -- on the first column.

15             We also limited the columns in order

16        to get the --

17   A.   Sure.

18   Q.   -- information on one page that I -- that

19        wanted to talk to you about.  Again, all the

20        information is available for you.  Somewhere

21        we do have a sheet that I think is the field

22        codes, and I can find that if that matters.

23             But what I believe Exhibit 11

24        reflects, called out from Exhibit 10, are all

25        the hip and knee procedures performed at

1                          ALBRECHT

2       Wansbeck from October 2nd, 2007, to

3       December 23rd, 2010.  And I believe, if you

4       look at Exhibit 10, that is also the date

5       range of the Wansbeck General --

6    A.  Okay.

7    Q.  -- data.

8               In the far right field under, "Deep

9       Infection" --

10   A.  Uh-huh.

11   Q.  -- you'll see periodically --

12   A.  Yup.

13   Q.  -- a deep infection or a bacterial strain and

14      then it -- a date.  And that date -- just so

15      you see what we're doing, let's -- let's take

16      a look at the first one that shows up.  It --

17      it -- it has the unique identifier 145.

18   A.  Yup.

19   Q.  And if you look at --

20              MR. B. GORDON:  Where -- where are

21      you, Corey?  Okay.

22              MR. C. GORDON:  I'm sorry, you

23      know what, I don't think the numbers did

24      stay.  I thought they did.

25              MR. B. GORDON:  You're talking

1                     ALBRECHT

2      about this enterococcus, whatever?

3                    MR. C. GORDON:  Yeah.

4                    THE WITNESS:  It's a type of

5      bacteria.  Okay.  So 145 is WG 72.  What is

6      the hell is 72?  Yeah, it looks like it's

7      crossing.

8  BY MR. C. GORDON:

9  Q.  So I think if you look at Exhibit 10,

10      starting at page Bates numbers

11      AUGUSTINE_ 00005198 because this is a

12      humongous Excel spreadsheet it goes across --

13  A.  I do see it here, 30th of October, 2007.

14  Q.  And you have to go five pages in on the

15      Exhibit 10 to see the data we extracted,

16      which is the -- the bacterial strain and the

17      date of diagnosis.

18  A.  Yup.

19  Q.  The date of the procedure, I think, is under,

20      "Op Date."  And, again, I apologize if I -- I

21      may not be able to locate it very quickly,

22      but I know I've seen somewhere what looked

23      like the descriptions of the fields.

24  A.  Okay.

25  Q.  But focusing on the procedure, the operation

1                         ALBRECHT

2         date, the date of the infection, I think I'll

3         be -- you know, I'm going to ask -- I'll be

4         able to ask --

5    A.   Okay.

6    Q.   -- the questions I want to ask.  And if

7         there's anything in there that you want to

8         know more about, you can look --

9    A.   Okay.

10   Q.   -- at the full set of data or you want me to

11        go find the -- what I believe are the field

12        identifiers, I'm happy to do that, but --

13   A.   Okay.

14   Q.   -- I think we might be able to get through

15        that.

16                  The study that the -- Exhibit 8, the

17        study that you actually published in the

18        observational component of it, you started

19        the -- well, strike that.

20                  For the observational study, you

21        looked -- you divided the retrospective data

22        you had into three components, right?

23   A.   Yup.

24   Q.   One was Bair Hugger only, one was a

25        transition or crossover period --

Page 149

1                          ALBRECHT

2    A.   Yup.

3    Q.   -- and one was a period when only HotDog was

4         used, right?

5    A.   Yup.

6    Q.   And as I understand it, you disregarded, for

7         purposes of any of your statistical analysis,

8         that crossover period?

9    A.   That's what as a group we decided to do, yup.

10   Q.   Okay.  So you were just comparing the -- the

11        first period when Bair Hugger was the warming

12        modality used and the period when HotDog

13        was --

14   A.   Conductive fabric, yes.

15   Q.   Conductive fabric.  It was HotDog, wasn't it?

16   A.   Yes.

17   Q.   And you started the Bair Hugger only period

18        as of July 1st, 2008, correct?

19   A.   Boy, I would have to -- it looks like it here

20        on the graph, yes.

21   Q.   The -- the -- the -- from here on out or for

22        the next few minutes for sure we will

23        probably want precision, so please

24        consult --

25   A.   Okay.

Page 150

1                          ALBRECHT

2   Q.  -- whatever you need to consult to --

3   A.  Looking here, yes, July.

4   Q.  The data you had available to you started in

5       October of 2007, right?

6   A.  I don't know, because I don't have the exact

7       data in front of me that was used.  I've been

8       given this table telling me that this is it.

9   Q.  The Exhibit 10, I will represent to you was

10      produced by Augustine -- I don't know if it

11      was Dr. Augustine personally, but I think it

12      was Augustine Medical, pursuant to a

13      subpoena.

14  A.  Uh-huh.  Did that come from the test report

15      folders, was that the actual analysis file?

16  Q.  Electronically I have no idea.

17  A.  Because that's very important to know,

18      because that would govern why the decisions

19      for the time periods are what they are.

20  Q.  Tell me the two different files you said.

21  A.  So there was a file that was used for

22      analysis that was agreed upon by the group.

23      So there's -- there's actual statistical code

24      that runs this and there's data that

25      underlies that.  And for me to be certain on

1                    ALBRECHT

2   anything that's going on, I would need access

3   to that.

4              MR. B. GORDON:  Well, and I -- for

5   that reason I'm going to interpose an

6   objection to the reliability of this chart,

7   Exhibit 11, prepared by your paralegal and

8   you, as being an adequate and fair

9   representation of the statistical data that

10  would be comprised in Exhibit 10.  I just

11  want a standing objection to the use of this,

12  because I don't know that it's the same

13  thing.

14             THE WITNESS:  That's -- I see the

15  date in this and I'm not sure what that's

16  about.

17             MR. C. GORDON:  I think we're

18  talking about two different things.

19             Ben, to the extent you -- you know,

20  I mean, we prepared Exhibit 11, and if there

21  are any discrepancies between it and --

22             MR. B. GORDON:  Right, because he

23  can't authenticate anything in --

24             MR. C. GORDON:  He can't

25  authenticate Exhibit 11, clearly.

1                          ALBRECHT

2   BY MR. C. GORDON:

3   Q.   Do you recall looking at data in the form of

4        an Excel spreadsheet?

5   A.   Yeah, at some point something came over as an

6        Excel spreadsheet that we started from.

7   Q.   And as you sit here today, you don't have any

8        recollection of whether there was or was not

9        data provided to you prior to July 1st, 2008?

10  A.   I don't know.  I have no recollection on that

11       detail.

12  Q.   Okay.  So would it be -- let's see if this

13       jogs your memory.  If you -- if you -- if you

14       look at either Exhibit 10 or 11, although 11

15       is a lot easier --

16            MR. B. GORDON:  Just give me a

17       standing objection to 11 and then you can use

18       it, if he can make sense of it, that's fine.

19  BY MR. C. GORDON:

20  Q.   Yeah, and -- and -- what I'm going to -- all

21       I'm doing this is to -- to -- to jog your

22       memory, you know, I'm not -- I'm not asking

23       you to authenticate about what I'm about to

24       say.  But if you were to count the number

25       of -- of infections that arose within 60 days

1               ALBRECHT

2      of the operating procedure, which was the

3      criteria used, right?

4  A.  I believe so.  I'd have to look through here

5      and what was sent to me for the data and the

6      definitions.  Hold tight.  Again, without the

7      exact code in front of me, it's very hard for

8      me to faithfully answer some of these

9      questions, because if they're very detail

10     oriented, I sometimes won't be able to tell

11     you because I just simply don't know the

12     detail.  Let's see here.  (Reviews document.)

13     Okay.  "In order to standardize a duration of

14     follow-up, only infections presenting within

15     60 days of surgery were included," okay.

16     Yup.

17  Q.  And, again, I'm not asking you to -- to

18     verify this or refute it or anything, but if

19     you were to count from Exhibit 10 --

20  A.  Okay.

21  Q.  -- which it's a lot easier to do on

22     Exhibit 11, the number of procedures

23     performed at Wansbeck between October 1st,

24     2007, and June 30th, 2008, the total number

25     of -- of hip and knee prostheses -- or joint

ALBRECHT

1
2     replacements, arthroplasties, is 534.  And if
3     you count the number of infections that
4     appear on Exhibit 10 for Wansbeck General
5     Hospital during that period of time that
6     occurred within -- within -- within 30
7     days -- or 60 days within the operation date,
8     there are a total of 5.
9  A.  Well, and this is the data pool that's used
10     here then the broader file, I would imagine.
11  Q.  Exhibit 10?
12  A.  I would think so.  See, it says, "Our data,"
13     it doesn't say -- let me look here.
14     (Reviews document.)  I want to be very
15     precise if you're asking this question.  I
16     see where you're going.
17  Q.  And -- well, on this issue, let me just tell
18     you that -- that -- you don't have to believe
19     me, you can do it yourself, but I spent a lot
20     of time trying to correlate the data as
21     reflected in the paper with the data in the
22     data file.
23  A.  All right.
24  Q.  And if it's not just Wansbeck General,
25     there's no -- it isn't even close.  But if it

ALBRECHT

1

2    is Wansbeck General only, then it's really

3    close, although not exact.

4  A.   Okay.

5  Q.   And I'm not going to show you now, but I

6       think there's -- you had a subsequent e-mail

7       exchange with Dr. Reed where you talked about

8       how the data was not exactly a hundred

9       percent accurate.

10             MR. B. GORDON:   Objection to

11       counsel's testimony.

12             MR. C. GORDON:   And -- and I'll

13       sustain the objection, I'm not --

14             THE WITNESS:   Can you show me the

15       e-mail, please?

16             MR. C. GORDON:   Yeah, we -- we can

17       pull that out.

18             MR. B. GORDON:   There's not a

19       question, so...

20  BY MR. C. GORDON:

21  Q.   My whole point in raising this is do you

22       remember any discussion about let's start in

23       the middle of 2008, because that if we start

24       it as early as October 2007, the infection

25       rate is pretty low?

1                          ALBRECHT

2    A.  I don't recall.  But if you have an e-mail,

3        it obviously happened.

4    Q.  No, I'm not saying I have an e-mail that says

5        that.  I'm just --

6    A.  No, I don't recall that.

7    Q.  Okay.  So you have no recollection of any

8        discussion about moving the -- the -- you

9        know, or -- or adjusting the start --

10   A.  Not to my knowledge, no.

11   Q.  Okay.  All right.  So the study period --

12   A.  Keep in mind, all these were very carefully

13       talked about amongst us as a group, you know,

14       the author, as what we chose for the

15       analysis.

16   Q.  Okay.  And the group you're talking with was

17       who?

18   A.  Closely working with McGovern and Reed on how

19       to think about this stuff, and Carluke,

20       Partington, yes.

21   Q.  And Scott Augustine too?

22   A.  Yes, he was involved in discussions.

23   Q.  He was copied on all the e-mails too, right?

24   A.  He may have been on some of them.

25   Q.  Okay.  The Bair Hugger only period --

Page 157

1                          ALBRECHT

2    A.   Okay.

3    Q.   -- and we need to be precise, was 7/1/08 to

4         2/28/10, correct?

5    A.   7/1/08 to 2/28/10.  Okay, yeah, that might be

6         about right.

7    Q.   The crossover period was 3/1/10 to 5/31/10;

8         is that right?

9    A.   That looks about correct.

10   Q.   Well, I don't want to be about correct on

11        this one --

12   A.   Are there dates in the paper?

13   Q.   Yeah.

14   A.   Okay.  If those are the dates that are in the

15        paper, then that's what it was.

16   Q.   I think that appears on page 1540.

17   A.   Okay.  Okay.  July 1st.  So, yeah, if these

18        are the numbers or the dates here, we can be

19        as accurate as we can be.

20   Q.   And then the HotDog only period was 6/1/10 to

21        12/30 -- excuse me, 12/31/10, correct?

22   A.   6/1/10 to 12/31/10, let's see here.

23        (Reviews document.)  Yes, 1st of June, 2010.

24   Q.   Let's work backwards in time.  In the paper

25        you report that in the HotDog only period

Page 158

1                          ALBRECHT
2          there were three infections that -- that met
3          the criteria, correct?
4                    MR. B. GORDON:  Could you reread
5          that?  I'm sorry, I missed it.  I can read it
6          right here, that's okay.
7                    THE WITNESS:  It's based on the
8          table, yes, I have three infections.
9                    MR. C. GORDON:  Okay.
10    BY MR. C. GORDON:
11    Q.   Now, if you would look at Exhibit 11.
12    A.   Okay.
13    Q.   And, again, feel free to cross-reference to
14          Exhibit 10.
15                    MR. B. GORDON:  Standing
16          objection.
17    BY MR. C. GORDON:
18    Q.   If you count the infections for that time
19          period --
20    A.   Okay.
21    Q.   -- June 1st, 2010, to 12/31/2010, there are
22          actually four, correct?
23    A.   I would have to physically count these, but
24          that's not what our data says here.  The data
25          set that was analyzed there was three.

1                          ALBRECHT

2   Q.  Go ahead and count.

3   A.  I see one in this article --

4   Q.  Be sure you look at the --

5              MR. B. GORDON:  June --

6   BY MR. C. GORDON:

7   Q.  I think there's -- I -- I start at the very

8       end of the study period, so look --

9   A.  Okay.  I've got one here on 10/30/07.

10  Q.  No --

11  A.  I'm sorry.

12  Q.  -- I'm sorry, we'll get to those.  If you

13      jump ahead to -- I guess they're not

14      page-numbered, but way in where it's -- where

15      sort of towards the very bottom of the page

16      it starts with 6/1/2010 there.

17  A.  Okay.

18              MR. B. GORDON:  Unfortunately, the

19      pages aren't numbered.

20              THE WITNESS:  Okay.  So 6/1.  So

21      we got one, two, three.  Yeah, I count four,

22      and the fourth one occurring on 11/22/10.

23              MR. B. GORDON:  Just, again, I

24      want to object to the extent that we can't

25      know definitively that this is an accurate

1                          ALBRECHT

2        reflection of what's actually in the data

3        set, because it's not from the data set or

4        it's an extraction from counsel from the data

5        set.

6    BY MR. C. GORDON:

7    Q.  Yeah, and for the four infections, if you --

8        you know, go ahead and look at --

9    A.  Well, that's what I was going to say, because

10       there may have been a reason --

11   Q.  Yeah, and that's exactly why -- if there's a

12       reason, I'd like to know.  That's --

13   A.  And I -- honestly, in those calls I probably

14       sent the e-mail to Mike or Paul about someone

15       on this and there was a determination, but

16       it's so long ago you can't tell.

17       (Reviews document.)

18               Yeah, I don't know.  I can't tell if

19       anything on here gives me any insight into

20       this.

21   Q.  Let's see if this jogs your memory about --

22   A.  Please.

23   Q.  -- issues.

24                   (Whereupon, Exhibit 12 was

25                   marked for identification.)

1              ALBRECHT

2    BY MR. C. GORDON:

3    Q.   I'm showing you Exhibit 12.  And this is

4         some -- a document you produced, a series of

5         e-mails between you and Dr. Reed from 2012,

6         right?

7    A.   Yeah.

8    Q.   Or two -- so I guess 2011, 2012.

9    A.   So we start at the back, forward here.

10   Q.   It looks like it.  In fact, let's start at

11        the -- at the back page, which --

12   A.   Yeah, please.

13   Q.   -- the first e-mail where -- and the subject

14        says, "Hi, Mike.  Say, the data file you sent

15        me doesn't match the earlier one for

16        overlapping cases"; do you see that?

17             MR. B. GORDON:  Which page are you

18        on?

19             MR. ASSAAD:  Which page are you

20        looking at?

21             MR. C. GORDON:  The Bates number

22        3576.

23             MR. ASSAAD:  Which e-mail?  The

24        last page?

25             MR. C. GORDON:  It's the last

Page 162

1                        ALBRECHT
2         e-mail, but it starts at the bottom of the
3         second page or second to last page.
4                   MR. B. GORDON:  The subject says,
5         "Hi, Mike."
6                   THE WITNESS:  "Mike, I've done a
7         quick analysis of the new data trends"; is
8         that what you're looking at?
9                   MR. C. GORDON:  Yes.
10   BY MR. C. GORDON:
11   Q.   And you say, "The data files are not totally
12        consistent in regards to the data that the
13        BR, JB, JS article was based upon."
14        That -- that's a reference to Exhibit 8,
15        right?
16   A.   Okay.  So this e-mail is after the analysis
17        of this, yes.
18   Q.   Okay.  And the second to the last paragraph
19        of your first e-mail that starts this chain
20        is you -- you tell Dr. Reed, "So I'm giving
21        you a graphic for the Wansbeck data, but do
22        not distribute it for it," quote, "Slightly,"
23        close quote, "Conflicts with study data due
24        to different reporting practices in your
25        data.  The relevant info supported in your

Page 163

1                          ALBRECHT

2          figure is," and then you go on to give odds

3          ratios, confidence intervals.

4                  Does this reflect -- refresh your

5          recollection that you had seen data that you

6          thought slightly conflicted with the study

7          data?

8    A.    Well, we did an analysis on the file that

9          went into here, right, and then we got a new

10         file that he wanted updated statistics on

11         after the article was published and

12         everything was done.  And it looks like it

13         didn't line up a hundred percent, so I ran

14         the analysis, I'm not sure what's going on,

15         and that's kind of where this thread comes

16         from.

17   Q.    And I want to make it very clear, I have no

18         idea if Exhibit 10 is the original data --

19   A.    I don't either.

20   Q.    -- or the -- the newer data that's slightly

21         conflicted.

22   A.    It's probably the slightly conflicted,

23         because this one would match up, whatever it

24         is.

25   Q.    Okay.  Going back to what you report for the

Page 164

ALBRECHT

1

2      number of infections of Bair Hugger only

3      study period --

4  A.  Okay.

5  Q.  -- in -- on Exhibit 8, and I think that's on

6      page 1542, you report 31 -- 32, correct?

7  A.  Excuse me.  Okay.  So patient-warming device,

8      infections, developing infection for forced

9      air, 32.

10 Q.  Okay.  And you're more than welcome to take

11     the time to do that, but my -- I -- I count

12     in that Bair Hugger only period on the data

13     on Exhibit 10 that there were actually 31

14     infections in -- at Wansbeck.

15 A.  All right.

16 Q.  As you -- again, as you sit here today --

17 A.  I don't know.

18 Q.  I guess -- well, number one, you can go back

19     and look at Exhibit 12.  You did a

20     recalculation of the odds ratio --

21 A.  With the updated data, yes.

22 Q.  Yeah, and --

23 A.  That would be different than the data here.

24 Q.  Right.  What was the odds -- what was the

25     odds ratio as you reported in the paper?

1                          ALBRECHT

2    A.   Okay.  So the paper odds ratio was 3.8 with a

3         confidence interval of 1.2 to 12.5.

4    Q.   Okay.

5    A.   And the updated one here had an odds ratio of

6         2.98, and a confidence interval that's still

7         significant.

8    Q.   So the odds ratio going down --

9    A.   It did.

10   Q.   -- would be -- would be consistent with too

11        high a number on the Bair Hugger side and too

12        low a number on the HotDog only side, right?

13   A.   There's not too high a number, too low a

14        number.  The data file that was assessed that

15        was screened by the clinicians, these are the

16        numbers that represent it.

17   Q.   I -- right.  I didn't mean to say a mistake

18        was made.  I'm saying that the -- the

19        difference between 3.8 and 2.9 --

20                  MR. B. GORDON:  Eight.

21   BY MR. C. GORDON:

22   Q.   -- 8, could be accounted for by having

23        lesser infections in the forced -- in the

24        Bair Hugger only period and more infections

25        in the HotDog period, correct?

                              ALBRECHT

1

2    A.  It could be due to a reduction in Bair Hugger

3        infections, HotDog stays the same.  It could

4        be due to an increase in HotDog infections,

5        Bair Hugger stays the same.  You know,

6        there's many ways to get an odds way to move.

7    Q.  And but the odds -- if -- if in fact there

8        were -- the data you analyzed the second time

9        around had fewer infections in the HotDog

10       period and more infections in the

11       Bair Hugger -- sorry.  Strike that.

12   A.  The infections could have been the same, the

13       number of controls could have changed, so we

14       have fewer -- more non-infections and that's

15       going to push it down, because you're looking

16       at odds ratios.

17   Q.  But one way that the odds ratio might have

18       changed is if the total number of infections

19       attributed to the Bair Hugger only period

20       went -- was lower and the total number of

21       infections attributed to the HotDog only

22       period was higher?

23            MR. B. GORDON:  Objection to form,

24       calls for speculation, not supported by the

25       facts in evidence.

Page 167

1                          ALBRECHT

2              THE WITNESS:  If you add

3    infections to the one group and not to the

4    other, you will move the odds ratio.

5              MR. C. GORDON:  Okay.

6              THE WITNESS:  There's about four

7    different mechanisms to push it in different

8    directions.

9              MR. C. GORDON:  Right.

10   BY MR. C. GORDON:

11   Q.  And I -- I don't want to spend a lot of time,

12       you know, on 31 versus 32 or 3 versus 4, I

13       just --

14   A.  Sure.

15   Q.  -- does that --

16   A.  Yeah, they paid me to -- this is after my

17       time.  I was out at a new job.  They wanted

18       the file updated, so I did that for them

19       using the same methods with the new data

20       file, and this is what was returned.

21   Q.  Okay.  Are you aware of any letters to the

22       editor or any efforts undertaken to correct

23       the odds ratio that was reported?

24              MR. B. GORDON:  Object to form.

25              THE WITNESS:  This isn't a

1                         ALBRECHT

2       correction needed, because the new data was

3       added, so the cohort is different in this

4       versus what's in the paper.  So the new data

5       and the trend does persist.  So Mike is

6       asking, "I'm keen to see what's happened

7       since we looked at this last, so there's an

8       old file attached in case you don't have it

9       and the new data."  So he augmented the data

10      set and that's why there's the different

11      number.

12                    MR. C. GORDON:  Okay.

13  BY MR. C. GORDON:

14  Q.   So what -- what was it that's slightly

15       conflicted with the study data?

16  A.   I have no clue.  I've got to look at this

17       very carefully.  (Reviews document.)

18              So it looks like in the new file

19       they sent me there was that 60 days concern.

20       He didn't have a date, so he couldn't clip it

21       in the same manner, and I think that was part

22       of it.

23              So he sent me a file that wasn't as

24       complete as the one we initially used and it

25       was missing one of the fields we did to

ALBRECHT

1

2     figure out the number of infections, and so

3     this was just an internal update for him.

4           This wasn't reanalysis of the

5     original study.  This was just, Hey, Mark,

6     I've got a data file here, I wanted to see

7     for my own knowledge if this trend is

8     persisting given a little more data, could

9     you help me out.

10  Q.  Did you write up a paper that had a revised

11     analysis or an updated analysis of the

12     additional data?

13  A.  Yeah, and it was in my -- let's see here.

14     You guys should have got that somewhere.  In

15     my Gmail dump I would have expected it, but

16     this might not have come from Gmail, this

17     might have been from my U of M account, which

18     is toast.

19  Q.  What do you mean it's toast?

20  A.  It doesn't exist anymore, so in doing the

21     document pull I couldn't get anything from

22     there.

23  Q.  Okay.  Well --

24  A.  Do you have that updated study document?  I

25     would be happy to walk you through it and try

ALBRECHT

1

2        and understand why they're different.

3    Q.  Again, I don't want to focus too much on the

4        difference between 31 and 32 and 3 and 4,

5        because I don't think that is a good use of

6        time at this point.

7    A.  Okay.

8                    MR. B. GORDON:  Then we'll object

9        to your use of it for any other reason.

10   BY MR. C. GORDON:

11   Q.  What I do want to focus on, though, is let's

12       start with Figure 7 --

13   A.  Okay.

14   Q.  -- in this study on page 1543.

15                   MR. ASSAAD:  Exhibit 8?

16                   MR. C. GORDON:  Correct.

17   BY MR. C. GORDON:

18   Q.  And there's a -- this figure is a -- is a

19       depiction of infection rates in the

20       Bair Hugger period, the transition period and

21       the conductive -- or the HotDog period,

22       right?

23   A.  Yup.

24   Q.  Now, for the Bair Hugger only period, the

25       infection rate is drawn as a uniformed

1                           ALBRECHT

2        straight line, correct?

3    A.  It's an average of the period.

4    Q.  It's an average that -- that was my question.

5              And if you look at the plots on

6        the -- at the very top, I assume those

7        plots -- the -- the little circles are the

8        individual infections corresponding to the

9        time period in which they occurred?

10   A.  Yup, those are the raw data points plotted

11       and they're moved up and down a little bit,

12       it's called jittering, so they try not to lay

13       on top of one another so you don't over plot.

14   Q.  Could you, if you had wanted to, plotted

15       these infection rates, rather than as an

16       average over this entire time period, as

17       broken it down into smaller time periods?

18   A.  So like a -- a smoothed curve?

19   Q.  Yes.

20   A.  You could, but it wouldn't correspond with

21       the model results in the contingency table.

22       We like to match the contingency table

23       whenever possible to the raw data figure so

24       the results kind of all tie up.

25              So if you look here, the infection

Page 172

ALBRECHT

1
2   rate that's presented here is the estimate is
3   the same infection rate that's used to get
4   your odds ratio in table number 2, and that's
5   why we kind of chose to present the data with
6   that type of a picture.  It's just so the
7   model matches up and you can plot the model
8   and its air bounds.
9   Q.  Okay.  Looking at the -- those plots, would
10      you agree that the -- the spacing of those --
11      of the infections is not uniform throughout
12      that Bair Hugger period?
13  A.  Absolutely.
14  Q.  They seem to be clustered a little bit at the
15      beginning and a little bit more at the end,
16      right?
17  A.  They could be due to a random process.  It's
18      sometimes hard to tell.  The eye always picks
19      out a pattern where none is sometimes
20      present.
21  Q.  Okay.  I think you mentioned this before, but
22      there was a change in -- in antibiotics?
23  A.  Oh, yeah.
24  Q.  When did that change occur?
25  A.  Let's see here, so it's actually in the

ALBRECHT

1  

2     paragraph right below it to the left.  And,

3     again, this is -- Mike Reed would give a lot

4     more context to this, if you want, or

5     Paul McGovern but --

6  Q.  We'll all stipulate to that.

7  A.  Yup.

8           MR. C. GORDON:  Certify that,

9     please, as a submission to the high court in

10    London.

11          THE WITNESS:  Okay.  So although

12    no infection control changes were made after

13    2010.  So in the methods part that you talk

14    about the prophylaxis change, there's a very

15    clear -- I believe.  Let me read through

16    this.  (Reviews document.)  Okay, so that's

17    that piece.  Where is the data stuff?  Joint

18    infection data, here we go.  (Reviews

19    document.)  Okay.  From July 2008 to February

20    2009 they had one regimen.  In March 2009

21    onward they changed.

22  BY MR. C. GORDON:

23  Q.  You're talking about the antibiotic?

24  A.  Well, that, and it looks like they had a

25    blood clotting drug change too.

1                        ALBRECHT

2    Q.   For the moment, let's -- let's focus on the

3         antibiotic change.

4    A.   Okay.

5    Q.   The -- during the Bair Hugger only period,

6         the only antibiotic used for the -- the

7         period of July 1st, 2008 to February --

8                   THE WITNESS:  Do you have a pencil

9         I could borrow?  Is that okay?

10                  MR. B. GORDON:  Yeah.

11                  THE WITNESS:  Sorry, I want to

12        draw a line on this graph just so --

13                  MR. C. GORDON:  Yeah.

14                  THE WITNESS:  So go ahead and tell

15        me again what you're saying.

16   BY MR. C. GORDON:

17   Q.   From February -- excuse me, July 1st, 2008,

18        to 2/28/09, the only prophylactic antibiotic

19        used was Gentamicin, correct?

20   A.   2/28.

21                  MR. B. GORDON:  Object to I just

22        want to make sure that's accurately stating

23        the facts.

24                  THE WITNESS:  Let's see what we

25        got here.  (Reviews document.)  Okay.  Okay.

Page 175

1                           ALBRECHT

2          We've got a line.  All right.

3                     MR. C. GORDON:  Okay.

4     BY MR. C. GORDON:

5     Q.   And then from March 1st, 2009, to the end of

6          the -- the study period, the prophylactic

7          antibiotic regimen was a combination of

8          Gentamicin and Teicoplanin, right?

9     A.   In February 2010 they went back to

10         Tinzaparin --

11    Q.   No, that's the -- the --

12    A.   The blood clotter?

13    Q.   The blood clotter, yeah.

14    A.   Okay.  So let's just say that that's the

15         case.

16    Q.   Well --

17    A.   Again, this is the details that the surgeons

18         are more familiar with.

19    Q.   Well, the question I want to ask you is

20         whether you had any discussion with Mike Reed

21         or anyone else about why they switched from

22         having just one antibiotic to a combination

23         of two antibiotics?

24    A.   The reasons for that switch, I'm unsure.

25         Surgical practice changes all the time, so I

1                        ALBRECHT

2        think they're probably just following

3        protocol changes, but that would be a guess

4        on my part.  I don't know why they would

5        change.

6    Q.  Did you ask?

7    A.  I didn't -- I didn't ask why they changed,

8        no, at least to my knowledge, I'm not sure.

9    Q.  So did you have any discussion with Mike Reed

10       as to whether he thought the use of

11       Gentamicin alone was potentially a problem?

12              MR. B. GORDON:  Object to form,

13       calls for speculation, asks for a medical

14       opinion he's not qualified to answer.

15              THE WITNESS:  We talked about it

16       as it pertained to the analysis of the data,

17       and that's why there's a big caveat here in

18       the discussion that outlines the study does

19       not establish a causal basis for this

20       association and calls out the antibiotic

21       change.

22   BY MR. C. GORDON:

23   Q.  That was actually something that a -- that a

24       peer reviewer from the journal asked you to

25       include, right?

1                          ALBRECHT

2   A.  I'd have to see the e-mails.  I don't recall.

3   Q.  Did -- in any of your communications with

4       Dr. Reed, did he ever tell you that he had

5       come to the conclusion that there is no

6       evidence for the use of systemic Gentamicin

7       as prophylaxis in primary elective total hip

8       arthroplasty and total knee arthroplasty

9       surgery?

10  A.  Not to my knowledge, unless there is an

11      e-mail on that.  It's a long time ago.  I

12      don't remember.

13  Q.  Well, if -- if today you were to be told that

14      Dr. Reed had concluded that Gentamicin --

15      there's no evidence for using Gentamicin

16      alone was an antibiotic for prophylaxis in

17      arthroplasties, would that impact how you

18      view the validity of the comparison of the

19      Bair Hugger only to the HotDog only period

20      given that there was a period of time when in

21      the Bair Hugger portion when only Gentamicin

22      was used?

23              MR. B. GORDON:  Objection to form,

24      compound, assumes facts not in evidence,

25      improper foundation, calls for medical

                              ALBRECHT

 1

 2      opinion.

 3                    THE WITNESS:  As a factor in the

 4      model, there's a transition period here that

 5      happened.  This is an observational study.

 6      These things aren't controlled for.  You

 7      can't make a causal inference, and we did

 8      not.  The study does not establish a causal

 9      basis and that's -- there's a lot of

10      compounding factors that could be at play.

11  BY MR. C. GORDON:

12  Q.  And you, in this paragraph on page 1545, the

13      first full paragraph on that page, you

14      mentioned that there are --

15  A.  1545?

16                    MR. B. GORDON:  45?

17                    THE WITNESS:  Forty-three?

18                    MR. C. GORDON:  1543, yeah.  Ben's

19      point about my eyes.

20                    THE WITNESS:  Which one now?

21  BY MR. C. GORDON:

22  Q.  The -- the line, "The study does not

23      establish the causal basis for the

24      association," and you go on to say that, "The

25      data are observational and may be compounded

1                         ALBRECHT

2        by other infection control measures

3        instituted by the hospital"; do you see that?

4   A.   Yes.

5   Q.   The next sentence starts, "For example," and

6        then you talk about the change in antibiotic

7        and thromboprophylaxis protocols, right?

8                    MR. B. GORDON:  Is there a

9        question?

10                   THE WITNESS:  This wouldn't be me

11       talking, this would be the clinical

12       researchers writing their sections of the

13       article.

14  BY MR. C. GORDON:

15  Q.   Do you know why two examples were given as

16       opposed to an attempt to comprehensively list

17       other infection control measures instituted

18       by the hospital that may have confounded the

19       results?

20                   MR. B. GORDON:  Objection to form,

21       calls for speculation.

22                   THE WITNESS:  I wouldn't know.

23       I'm not an employee of the hospital.  You'd

24       have to ask someone who is to know what they

25       were.  I listed the ones that were important

1                          ALBRECHT

2        in their minds.

3    BY MR. C. GORDON:

4    Q.  So that was your determination to only

5        mention antibiotic and thrombo --

6    A.  No, it was not my determination.  This

7        article is a joint collaboration between six

8        authors.  They all had the same conclusion in

9        reading through the manuscript, drafting it

10       and approving what went out.

11   Q.  Well --

12   A.  So, no, it's not mine.

13   Q.  Would you agree that one possible conclusion

14       that this paper suggests is that the change

15       in infection rates that you report was a

16       result of changing from the Bair Hugger to

17       the HotDog?

18                MR. B. GORDON:  Objection to form.

19                THE WITNESS:  We report a

20       difference, a significant difference in the

21       odds ratio for those time periods knowing

22       that there are other things that could have

23       been associated with that change, such as

24       those you've highlighted here, the change in

25       antibiotic and the change in blood clotting

1                        ALBRECHT

2        drugs.

3   BY MR. C. GORDON:

4   Q.  Did you -- and as a -- as the statistician

5        doing the -- the -- the statistical analysis

6        here, could you have done a multivariate

7        analysis that would have accounted for the

8        changes in infection control measures

9        instituted by the hospital?

10                    MR. B. GORDON:  Objection to form,

11        asked and answered.

12                    THE WITNESS:  Not easily.  We had

13        talked about that.  And I think the reasoning

14        was that the data was pretty sparse.  And I

15        need to look carefully at that.  We did

16        discuss it.  (Reviews document.)

17                In fact, I think that follow-on

18        e-mail, we have one here where we have enough

19        data that we can kind of take out some of the

20        data for the period of the difference in --

21        well -- we did our best to control for it

22        with the data at hand.  I'm trying to

23        remember the exact reasoning we chose.  Let

24        me think about that question for just a

25        second.

                              ALBRECHT

1

2            If we had more data, yes, the answer

3       would be it's simple to do that.

4    BY MR. C. GORDON:

5    Q.  And by more data, that would include more

6        data on what the infection control measures

7        were and when they were instituted, right?

8    A.  Well, if you want a simple thing on just the

9        antibiotics --

10   Q.  Okay.

11   A.  -- we can think about that.  Again, this is a

12       while ago some of these decisions were made,

13       so it takes a while for me to get back to the

14       place we were at.

15   Q.  Understood.

16   A.  So I don't really want to ramble here, so let

17       me just think for a second about your

18       question.  (Reviews documents.)

19            Given that I'm not as close to the

20       data as I once was and the decision-making

21       process around why the analysis is or was

22       what it is, you know, this is five years plus

23       ago, my recollection is there was something

24       to do with the number of observations in the

25       grouping making that very difficult to do,

1                        ALBRECHT

2        but I can't recall exactly what our choices

3        were.

4   Q.   Let's go back to the -- to the changes that

5        you did talk about in the -- in the study.

6        In addition to the antibiotic change, there

7        was a change in the -- what -- what the paper

8        describes as thrombo -- thromboprophylaxis.

9   A.   Yeah.  That's blood clotting, right?

10  Q.   An anti-blood clotting --

11  A.   Yeah.

12  Q.   And the change was from Tinzaparin to -- it's

13       Rivaroxaban in the United States.  Or

14       Rivaroxaban -- I'm sorry.  The change was

15       from Tinzaparin to Rivaroxaban, which is also

16       known as Xarelto, back to Tinzaparin.  And do

17       you recall --

18  A.   I'm looking at this.

19  Q.   Read it if you want, I just --

20  A.   Give me the dates on that so I can draw them

21       on my graph.

22  Q.   Well, I want it to be your testimony, but it

23       appears to me that the Rivaroxaban period was

24       August 1st, 2009, to February 28th, 2010.

25                   MR. B. GORDON:  And you can point

```
 1                        ALBRECHT
 2      him to the page 1540 to be fair.
 3                  MR. C. GORDON:  I could --
 4                  THE WITNESS:  Yeah, I'm just
 5      trying --
 6                  MR. C. GORDON:  -- but you did.
 7                  MR. B. GORDON:  Okay.  Thank you.
 8                  THE WITNESS:  Okay.  So we've got
 9      another period in there.  Okay.
10                  MR. C. GORDON:  Okay.
11  BY MR. C. GORDON:
12  Q.  Do you recall having any discussions about
13      the fact that they had switched from one
14      anti-clotting drug to another, and after
15      seven months they went back to the original
16      anti-clotting drug they were using?
17  A.  I was informed of this and we talked about
18      it, but the reason why they did that I don't
19      know.  Things change all the time in the
20      hospital.
21  Q.  You never had any discussion with Mike Reed
22      or Paul McGovern about why they -- they went
23      back to the original one after seven months?
24  A.  Not that I recall on what the reasoning was.
25  Q.  And so you didn't have any discussion as to
```

1                            ALBRECHT

2         whether that could have impacted infection

3         rates, right?

4                  MR. B. GORDON:  Objection; calls

5         for speculation, asked and answered and calls

6         for a medical opinion.

7                  THE WITNESS:  I'm not the

8         clinician in this case, and it's their

9         judgment to figure out, you know, what the

10        treatment regimens are and how those relate

11        to the risks a patient -- a patient faces and

12        what choices they make.

13                 So in doing the analysis we talked

14        about the fact that there was a change, but

15        what that change means clinically, I have no

16        way to interpret.

17                 MR. C. GORDON:  Okay.

18    BY MR. B. GORDON:

19    Q.  If you wanted to eliminate the antibiotic and

20        the anti-blood clotting changes as potential

21        factors, would the -- would the best way be

22        to look at a period in the Bair Hugger only

23        period when the same antibiotic and

24        anti-clotting prophy -- prophylaxis regimen

25        was used that was used in the HotDog period?

1                          ALBRECHT

2    A.   If there is such data, yes.

3    Q.   As you -- as you sit here today, are you

4         aware that there -- that there was such data?

5    A.   Well, so let me look at this here.  I recall

6         us redoing something after the fact as a

7         follow up to even this article here that we

8         had further updated data, and I don't know if

9         you have had in your hands, but I think we

10        should talk about that if you have it,

11        because that would highlight this question a

12        little more.

13   Q.   I just want to -- for the moment I want to

14        stick to the data that are in --

15   A.   Okay.

16   Q.   -- that actually reported in the paper.

17   A.   Yeah.  It's an observational study.  We're

18        looking for things at this point and we're

19        doing univariate tests, because the data

20        isn't that deep, there's factors changing

21        under foot, it's not properly controlled

22        where you're adjusting for these factors in a

23        statistically valid sense, and so it's

24        just -- single tests were done, things were

25        highlighted, the patient-warming device did

ALBRECHT

1
2    stick out, the caveats were listed, and you
3    can see the -- the rate of infection over the
4    periods, and there are some issues that, yes,
5    there was a confounder of antibiotic change,
6    yes, there was a confounder of clotting agent
7    change.
8  Q.  Okay.  Let's talk about those two
9    confounders.  During the Bair Hugger only
10   period, there -- the antibiotic protocol was
11   a combination of Gentamicin and Teicoplanin,
12   right?
13 A.  Okay.
14               MR. B. GORDON:  Objection; asked
15   and answered.
16 BY MR. C. GORDON:
17 Q.  And during the Bair -- the HotDog only
18   period, the anti-clotting agent that was used
19   was Tinzaparin, correct?
20               MR. B. GORDON:  Asked and
21   answered.
22               THE WITNESS:  Okay.
23 BY MR. C. GORDON:
24 Q.  And if -- well, during the period of
25   March 1st, 2009, to July 31st, 2009, it was

1                          ALBRECHT

2        a -- it was a Bair Hugger only -- it was

3        Bair Hugger only at that point still,

4        correct?

5                    MR. B. GORDON:  Asked and

6        answered.

7                    THE WITNESS:  Yes, it looks that

8        way.

9   BY MR. C. GORDON:

10  Q.   And the antibiotic prophylaxis was the same

11       Gentamicin and Teicoplanin that was used in

12       the HotDog only period, correct?

13                   MR. B. GORDON:  Asked and

14       answered.

15                   THE WITNESS:  I'm going to have to

16       map this out here.  Do you have a sheet of

17       paper I could borrow?

18                   MR. C. GORDON:  Oh, absolutely.

19       I'll give you a whole pad.  (Hands paper.)

20              And I understand I --

21                   THE WITNESS:  There's a lot of --

22                   MR. C. GORDON:  I killed many

23       trees doing this.

24                   THE WITNESS:  Yeah.  Well, if you

25       want an answer that makes any kind of sense.

Page 189

1                      ALBRECHT
2           Okay.  I don't catch the switchback
3      you're talking about.  I see the Gentamicin,
4      the Gentamicin plus Tinzaparin for the
5      antibiotic, and then that holds, unless I
6      missed something in the reading.
7  BY MR. C. GORDON:
8  Q.  Which -- I'm sorry, which switchback?
9  A.  So reading this out, all right,
10     unfortunately, the prophylactic antibiotic
11     regimen was not constant during the study
12     period from July 2008, which is the start,
13     right, to February 2009.  A single dose of
14     Gentamicin was given at induction.
15 Q.  Right.
16 A.  Okay.  So we have Gentamicin up to February
17     of 2009.  Okay.  In March of 2009, so right
18     then, this was changed to Teicoplanin, I
19     don't even know how you pronounce that, and
20     Gentamicin --
21 Q.  And that stayed the same for the rest of the
22     period?
23 A.  Yes, yes.
24 Q.  So from March 1st on there's no difference in
25     the antibiotic prophylaxis, right?

1                          ALBRECHT

2   A.   Yes.  From March 1st, yes.

3   Q.   So let's overlay now the change in the --

4                  MR. B. GORDON:  Blood thinner.

5   BY MR. C. GORDON:

6   Q.   -- the anti-blood clotting.

7   A.   Okay.

8   Q.   According to your paper, it says from August

9        2009 to February 2010 Rivaroxaban was

10       provided, but in February 2010 to the end of

11       the study this reverted to Tinzaparin.

12  A.   August 2009 to February 2010, they flip it

13       and they go back, right?  Okay.  So August

14       2009 to 2010, let's see how that lines up.

15                  Yeah, so we always have something

16       changing under foot, because antibiotics

17       aren't the same before March 2009 or whatever

18       and after, and then we do have a clotting

19       agent that is the same at the beginning and

20       at the very end, but in the middle there's a

21       difference.

22                  So we do have one thing that did

23       change under foot, though, that, you know, it

24       doesn't revert back, right?

25  Q.   Well, no, I -- I'm trying to understand this,

Page 191

ALBRECHT

1

2    but I -- it looks to me like there are five

3    months in the Bair Hugger only period when

4    the patients were getting the same

5    antibiotics and the same anti-clotting agent

6    the patients got in the HotDog only period.

7    From March 1st, 2009, to July 31st, 2009,

8    patients got Gentamicin and Teicoplanin and

9    Tinzaparin, right?

10   A.  March 1st, 2009, to -- say again?

11   Q.  July 31st, 2009.

12   A.  That's a pretty short time period, March 1st,

13       2009, to July 31st, 2009.

14   Q.  Yeah, how many months is that?

15   A.  What would that be, five, six-ish.  That's

16       not a lot of data.

17   Q.  Yeah.  How many months was the HotDog only

18       period?

19   A.  Let's see, what did that run here?  Hold on.

20       (Reviews document.)  So it was June 1st,

21       2010, to January 1st, 2011; is that right?

22       Yes?

23   Q.  It's your study.

24   A.  That's what it looks like.  No, I'm looking

25       at it quick.

1                              ALBRECHT

2   Q.   There's a 2.5 year period starting

3        July 30th -- or July 1st, 2008, so I'm

4        assuming that that's -- the 2.5 year period

5        would have ended on December 31st, 2010.

6                MR. B. GORDON:   Objection to

7        counsel's testimony.   It's not a question.

8   BY MR. C. GORDON:

9   Q.   But it's your study, so tell me.

10  A.   Yeah, it looks like June to the first of the

11       year, yup.

12  Q.   So how many months is that?

13  A.   Seven-ish, right.   Well, and again, this is

14       an observational study and we present all

15       these factors that are at play.

16  Q.   Okay.

17  A.   And there are confounders, you've clearly

18       identified them.

19  Q.   Well, but my -- my point is or my question is

20       would you agree that if you just looked at

21       the period of March 1st, 2009, to July 31st,

22       2009, in the Bair Hugger only period and

23       compared that to the HotDog only period,

24       you'd be eliminating the confounders of

25       antibiotics and anti-blood clotting right?

1                         ALBRECHT

2                  MR. B. GORDON:  Object to form.

3                  THE WITNESS:  Maybe assuming other

4        things didn't change under foot too that

5        aren't accounted for.

6    BY MR. C. GORDON:

7    Q.  I'm just talking about those two confounders,

8        which are the -- the -- well, strike that.

9             Those are the only two confounders

10       you actually mentioned in your paper, right?

11   A.  Well, there's more.

12                 MR. B. GORDON:  Objection to form.

13                 THE WITNESS:  There is something

14       here that talks about -- well, other factors

15       such as details of blood transfusion,

16       obesity, incontinence, you know, those kind

17       of predictors were also left out.

18   BY MR. C. GORDON:

19   Q.  But those aren't changes in infection control

20       practices, right, those are patient-specific

21       host immunity factors?

22   A.  Yeah.  So there is a period where there is

23       similar antibiotic use in both groups and

24       similar blood-clotting agent use.

25   Q.  Not similar, it's identical?

Page 194

1                              ALBRECHT

2    A.   Identical.

3    Q.   Okay.  So if you compared those two periods,

4         then antibiotics and anti-blood clotting

5         wouldn't be potential confounders, right?

6    A.   Assuming other things didn't change.  Again,

7         this isn't a design trial.

8    Q.   Right.  Just those two things, though.

9    A.   Because in a period of that time to that

10        time, other factors are going to change under

11        foot.  Yes, if you wanted to have those two

12        factors be the same, that's what you'd do.

13   Q.   Okay.  So can you tell from the lines you

14        drew on the chart how many infections there

15        were in the Bair Hugger period when the

16        antibiotics and the anti-blood clotting were

17        the same as in the HotDog period?

18   A.   I don't have a clue.  You may have run that

19        number.

20   Q.   Well, I'm just -- can you tell from the

21        chart?  Didn't you draw lines?

22   A.   So March 1st, 2009 -- as best I can.  So

23        March 1st, 2009, to July 31st -- wait a sec.

24        March -- there's only a handful.

25   Q.   Does that graph have enough detail that

1                    ALBRECHT

2       you -- that you could count?

3   A.  It looks like two or three.

4   Q.  Okay.

5   A.  Maybe four.  I'm unsure.  I'd have to get

6       that date just right.

7   Q.  Okay.  And here's where Exhibit 10 and

8       Exhibit 11 can come into play.

9   A.  Okay.

10  Q.  If you -- as I say, if you want to look at

11      Exhibit 10, that's fine.  I believe the data

12      are going to be the same as Exhibit 11.

13  A.  I don't know what this is, yeah.

14  Q.  If you look at Exhibit 11, it's a little

15      easier to count them up.

16              MR. B. GORDON:  Same objection

17      raised before about Exhibit 11 not being

18      authentic.

19              THE WITNESS:  I'm assuming you've

20      done the count.  How many did you see?

21              MR. C. GORDON:  I see three.

22              THE WITNESS:  Three, okay.  I see

23      three or four there, so...

24              Okay.  We're looking for March 1st

25      through July 31st.  I count three from this

1                        ALBRECHT

2      file, yes.

3              MR. C. GORDON:  Okay.

4   BY MR. C. GORDON:

5   Q.  And that's based on your -- the graph that

6       you plotted, that's in the range of what --

7       what --

8   A.  Three to four, yes.

9   Q.  There's not a lot of detail in that graph, so

10      you can't, with precision, know the dates,

11      but one thing you can't tell from the graph

12      regardless of the precision of the -- of when

13      exactly the individual dots are falling on

14      the timeline, is you can't tell how many

15      procedures were being performed, right?

16  A.  On the bottom, no, that's hard to do.

17  Q.  And in order to come up with an infection

18      rate, you've got to have both the enumerator

19      and the denominator, right?

20  A.  Correct.

21  Q.  So in order to know how many -- what the

22      infection rate was in that window of time

23      when during the Bair Hugger period the

24      patients were getting the same antibiotics

25      and the same anti-blood clotting as in the

                              ALBRECHT

1
2        HotDog only period, you'd have to know --
3        you'd have to count up the number of
4        procedures that were done in that same
5        period?
6   A.   Yes, you would.
7   Q.   Please do.
8   A.   From here, (indicating)?
9   Q.   Yes.
10  A.   You literally want me to do this?  Have you
11       done this?
12  Q.   I have.
13  A.   Okay.  What's the number you come up with?
14  Q.   Three seventeen.
15  A.   Okay.  So 3 in 317 --
16  Q.   I'm sorry, 317, that's HotDog.  Two
17       ninety-three?
18  A.   Okay.  So 3 and 293.  So this is 3 versus
19       368.  Okay.
20  Q.   Where do you get 368?
21  A.   I'm looking at the paper.  I just wanted to
22       see what the conductive fabric had for number
23       of operations.
24  Q.   And -- and, I'm sorry, where -- can you just
25       point me to --

1                        ALBRECHT

2    A.   Table 2.

3    Q.   Table 2?

4    A.   Yup.

5    Q.   That says 371, doesn't it?

6    A.   Well, I have 3 and 368, so for conductive

7         fabric.

8    Q.   It's the 368 I'm not getting.

9              MR. B. GORDON:  Three plus --

10             THE WITNESS:  Oh, I'm just --

11        sorry, I'm giving you the number of successes

12        and failures.  Yes, that would be 371 in

13        total.

14   BY MR. C. GORDON:

15   Q.   By the way, if you -- if you count the number

16        of Wansbeck procedures for HotDog only in

17        Exhibit 10 --

18   A.   Okay.

19   Q.   -- there's only 317.  Any idea why the 371

20        reported in the paper, but 317 --

21             MR. B. GORDON:  Objection --

22             THE WITNESS:  I don't have the raw

23        data.

24             MR. B. GORDON:  Just for the

25        record, we don't know if it's the same data,

Page 199

1                         ALBRECHT
2        we established that earlier.
3                   MR. C. GORDON:  Okay.
4   BY MR. C. GORDON:
5   Q.   So what's -- what's -- what's the infection
6        rate for 3 out of 293?
7   A.   Well, you have a calculator.  It's virtually
8        comparable in this cut of time.
9   Q.   I'm sorry?
10  A.   It's virtually comparable to the other group
11       in this cut of time.  So we're at 1.02
12       percent.
13  Q.   Okay.
14  A.   And for 371 you want?  That's where I assume
15       you're going.
16  Q.   Do -- do -- sure, do -- well, you already did
17       that.  That's already in the paper.
18  A.   Yeah.  So that's .8 percent.  All right.
19  Q.   And if you were to do -- count 4 infections
20       in that Bair Hugger period, and we'll say it
21       was 371, what would the infection rate be?
22                   MR. B. GORDON:  Objection to the
23       mischaracterization of the data and he's
24       already testified he doesn't know if it's the
25       same data.

Page 200

1                        ALBRECHT

2              THE WITNESS:  So if you want me to

3       tell you what 4 divided by what?

4              MR. C. GORDON:  Well, use 371.

5              THE WITNESS:  Okay.  You're at

6       10 percent.  I'm sorry, you're at 1 percent.

7              MR. C. GORDON:  It may be 371.

8    BY MR. C. GORDON:

9    Q.  So if you had compared the five-month period

10       when Bair Hugger was used with the same

11       antibiotic and same anti-thromboembolism

12       drugs as was used in the seven months of the

13       HotDog period, you're the statistician --

14   A.  Those would not be significant for that cut

15       of time, significantly different.

16   Q.  Not even close to significantly different,

17       right?

18   A.  They would not be significantly different.  I

19       don't need to run an analysis to figure that

20       part out.

21   Q.  Why didn't you do that, what we just did?

22   A.  It's an observational study.  We plotted the

23       data, we put the concerns in, we talked as a

24       group what to do and we looked at the

25       timeline.

1                          ALBRECHT

2    Q.   When you say you plotted the data, there's no

3         way somebody reading that paper could know

4         what the infection rate was during the

5         Bair Hugger only period when the same -- you

6         have the same prophy -- antibiotic and

7         anti-blood clotting regimen was used, right?

8                    MR. B. GORDON:  Objection to form,

9         assumes facts not in evidence, misstates the

10        record.

11                   THE WITNESS:  As a group, this is

12        where the data analysis landed.  We did a

13        bunch of univariate tests on the basic

14        things, we did a transition period on the

15        devices, and we reported it as observational

16        data.  This is not a clinical trial with a

17        definitive answer.

18   BY MR. C. GORDON:

19   Q.   Well, and in response to a reviewer's

20        comments, you noted that there were changes

21        to the antibiotics and thromboprophylaxis

22        during the periods, right?

23   A.   Yes.

24   Q.   But you could have completely eliminated

25        those as confounders by doing what we just

1                         ALBRECHT

2       did, right?

3    A.  If you throw away the other parts of the

4        data.  Again, it's an observational graph and

5        we're just looking at trends.

6    Q.  Well, and you would agree that the trends for

7        the Bair Hugger period and the HotDog period

8        using the same antibiotics and same

9        anti-blood clotting drugs --

10   A.  I don't know what else is going on.

11   Q.  -- are the same?

12                  MR. B. GORDON:  Objection --

13                  THE WITNESS:  I don't know what

14       else is going on under the surface though.

15                  MR. B. GORDON:  -- argumentative,

16       asked and answered.

17                  THE WITNESS:  I mean, we see -- we

18       see a reduction in infection over time here,

19       a time based trend to this component too

20       that's going on, and who knows what did it.

21       We provide a couple hypotheses about it, we

22       state that this is not a causal basis --

23       casual -- or causal basis.  We identify

24       looking for some of these stat tests what was

25       here.  The antibiotic, unfortunately, was not

1                        ALBRECHT

2        tested in the way that you described.

3    BY MR. C. GORDON:

4    Q.   What do you mean it wasn't tested?

5    A.   That analysis or that cut of the data was not

6         presented in the table.  And now that you

7         bring that up, it would have been nice to

8         have that in there.

9    Q.   If you had presented that, it wouldn't have

10        been very interesting, would it?

11                   MR. B. GORDON:  Object to the

12        form, argumentative.

13                   THE WITNESS:  Not true.  This was

14        about an airflow disruption paper that also

15        had some joint data accompanying it.  The

16        major focus of this paper was about the

17        surgical field and how the airflow is

18        affected by ways.

19   BY MR. C. GORDON:

20   Q.   You know that Scott Augustine has been

21        marketing the HotDog with the claim that this

22        paper demonstrates that switching from

23        Bair Hugger to HotDog results in a 76 percent

24        reduction in surgical site --

25                   MR. B. GORDON:  Objection to form,

1                      ALBRECHT

2        misstates the facts --

3    BY MR. C. GORDON:

4    Q.  -- don't you?

5                  MR. B. GORDON:  -- misstates the

6        evidence.  It doesn't say 76 percent, you

7        need to check your facts.

8                  MR. C. GORDON:  Seventy-four

9        percent.  I'm sorry.  Thank you.

10                 THE WITNESS:  I'm not sure what

11       he's been doing for marketing nowadays.  I

12       have not been in touch with that company in

13       some time except for updating the analysis.

14   BY MR. C. GORDON:

15   Q.  Would you agree that if -- if he were to

16       claim that your paper, Exhibit 8, stands for

17       the proposition that switching from

18       Bair Hugger to HotDog can result in a

19       74 percent reduction in surgical site

20       infections, that that would be wrong?

21                 MR. B. GORDON:  Objection to form,

22       calls for speculation, argumentative.

23                 THE WITNESS:  It depends on your

24       interpretation of the data.  I see a time

25       trend here, I see a period when two devices

Page 205

1                           ALBRECHT

2        are in use, I see other confounding factors

3        that might be at play.  I don't know.  It's

4        uncertain, like a lot of these things are.

5   BY MR. C. GORDON:

6   Q.  Well, one thing that is certain, though, is

7        that if you factor out the antibiotics and

8        the anti-thromboembolism drugs as potential

9        confounders, there's no difference?

10  A.  If you cut your data --

11                  MR. B. GORDON:  Objection; asked

12       and answered.  Sorry.

13                  THE WITNESS:  If you cut your data

14       to the period we just discussed and run the

15       analysis on the cut of time there to there

16       and compare those two groups in the way we

17       just did, yes, there is not a significant

18       difference.

19                  MR. C. GORDON:  Okay.

20  BY MR. C. GORDON:

21  Q.  And let's spend a little bit more time on

22       the -- the change in the thromboprophylaxis.

23  A.  Okay.

24  Q.  That period was August 1st, 2009, to

25       February 28th, 2010, right?

1                          ALBRECHT

2   A.  So August 1st, 2009, okay.

3   Q.  To 2/28/2010.  I'm -- I'm -- can you tell

4       from your little scatter plot there how many

5       infections occurred during that period of

6       time?

7   A.  Which period, say again?

8   Q.  August 1st, 2009, to 2/28/2010.

9   A.  2/28 to 2010.  Sorry, this isn't ordered like

10      that, I've got to look at the months.  So

11      that would be March 1st, 2010?

12  Q.  Yeah.

13  A.  Okay.  So August 1st, 2009.  August 1st,

14      2009, okay, to March 1st, 2010.  Sorry.

15      Okay, I've got a rough cut on that.  Is that

16      the start of the transition?

17  Q.  That's correct, yes.

18  A.  Okay.

19  Q.  Can you -- can you count the number of dots

20      in that Rivaroxaban time period?

21  A.  Seventeen-ish, if I got that right.

22  Q.  If you count the -- on Exhibit 11, or go

23      through Exhibit 10, I come up with 18, but

24      whether it's --

25  A.  Okay, 17 or 18, very similar.

1                          ALBRECHT

2    Q.   Of course, again, the reader of your paper

3         wouldn't have the denominators, so there we'd

4         have to go to Exhibit 10, or the data that's

5         extracted from it on Exhibit 11.

6    A.   Uh-huh.

7    Q.   And, again, feel free to count it, but I'll

8         represent to you that every time I counted

9         it, and it was several, it was 401 procedures

10        done in that time period.

11   A.   Okay.

12   Q.   So what's the rate of infection using --

13        yeah.

14   A.   4.2 to 3 percent.  Call it 4.3 percent.

15        Okay.

16   Q.   And, you know, again, I understand this --

17        this is a complex statistical thing that

18        you -- you would need to do, but if you were

19        to compare the period, that Tinzaparin period

20        when the antibiotics were the same to the

21        Rivaroxaban time period we were just saying

22        where you would have a -- in other words,

23        1.02 percent to what did you say 4 point --

24   A.   Three.  4.3 we'll call it.

25   Q.   Okay.  Would that, just eyeballing it, and

1                          ALBRECHT

2        I -- again, I understand you need to do a

3        sophisticated analysis to really say but --

4   A.   Not in this case.  So you said 4.3 percent

5        for this period versus which period are we

6        talking about?

7   Q.   The -- the 1.02 when it was Tinzaparin, but

8        it was still the same antibiotics.

9   A.   Well, no, if it's 1 -- 1 percent versus

10       4 percent, I can tell you that those are

11       different, yeah.

12  Q.   Maybe that explains why they went back to

13       Tinzaparin?

14  A.   Could be.

15                  MR. B. GORDON:  Objection to form.

16  BY MR. C. GORDON:

17  Q.   You never had a discussion about that?

18  A.   We talked that the antibiotics changed and we

19       would do some tests here, show the different

20       devices.  We did want to do the forced-air

21       warming versus conductive-fabric warming

22       because we saw an airflow difference, so we

23       wanted to present that, and this

24       observational data was presented as such.

25  Q.   You keep -- you kept talking about -- I don't

ALBRECHT

1
2      recall your exact words, but that this was a
3      trendline or --
4   A.  It's a mean.
5   Q.  Yeah.  But -- and if you compare the
6      Tinzaparin, same antibiotics, to the
7      Rivaroxaban, same antibiotics period, it
8      wouldn't be a straight line, would it?
9   A.  No.
10  Q.  One would be way down and one would be way
11     up, right?
12  A.  Uh-huh.  Yup.
13  Q.  And, in fact, when they switched back from
14     the Rivaroxaban, which is also the time they
15     started switching over to Bair Hugger,
16     infection rates went way back down, right?
17  A.  There is an up/down swing here that
18     corresponds with multiple things happening,
19     yeah.
20  Q.  Just factoring in the change in Rivaroxaban,
21     would you agree that -- strike that.
22         You said there are multiple things
23     going on.  What else are you aware of?
24             MR. B. GORDON:  Objection; asked
25     and answered three or four times.

Page 210

1                     ALBRECHT

2           THE WITNESS:  So let's draw the

3      timeline on a sheet of paper so we can talk

4      about it a little more concretely, because

5      I'm jumping around in my head here with this

6      stuff as we're going to different pieces --

7           MR. C. GORDON:  Fair enough.

8           THE WITNESS:  -- and it doesn't

9      help make this very clear.

10          Okay.  So we've got antibiotic,

11     blood and device, right, are the three

12     factors we're talking about here in our

13     discussion.

14          MR. C. GORDON:  Uh-huh.  Yes.

15          THE WITNESS:  Okay.  I'm just

16     going to make some hashes on the thing here.

17     Christ, I need a Gantt chart to do this.

18     It's ridiculous.

19          MR. C. GORDON:  I'm sorry?

20          THE WITNESS:  I need a Gantt chart

21     to do this on a computer almost it's like --

22     all right.

23  BY MR. C. GORDON:

24  Q.  I guess you guys don't use graph paper

25      anymore, huh?

1                         ALBRECHT

2    A.   No, it's been a while.

3    Q.   You probably don't even use a slide rule?

4    A.   I don't do engineering anymore, I do data

5         science nowadays.

6    Q.   You didn't use a slider rule.

7    A.   No.

8                    MR. C. GORDON:  Ben, you didn't

9         even use a slider rule.

10                   MR. B. GORDON:  No.  I remember

11        them, but I didn't use them.

12                   MR. C. GORDON:  I used a slider

13        rule.

14                   MR. GOSS:  I have my grandfather's

15        slide rule at home.  I'm not implying

16        anything, Corey.

17                   MR. C. GORDON:  Well, son, my

18        yellow picket slide rule is packed away in a

19        box somewhere that my kids will have to get

20        rid of it when I die.

21                   THE WITNESS:  So that goes on from

22        that point forward, that's what I was missing

23        in my head.

24                   THE VIDEOGRAPHER:  Corey, we've

25        got about 15 minutes left on this tape.

1                        ALBRECHT

2        Would now be a good time to change it out.

3                   MR. C. GORDON:  Yeah, why don't

4        want you change it out.

5                   THE VIDEOGRAPHER:  We're going off

6        the record at 2:40 p.m.

7                   (Whereupon, a brief recess

8                   was taken.)

9                   THE VIDEOGRAPHER:  This is video

10       number 4 in the deposition of Mark Albrecht.

11       Today is October 7th, 2016.  We're going back

12       on the record at 2:49 p.m.

13  BY MR. C. GORDON:

14  Q.  I don't remember if there was a question

15       pending, but you had wanted to --

16  A.  I did, and I understand exactly what you're

17       bringing up now.  There was a period of

18       capable antibiotic regimen in both groups and

19       similar prophylaxis for blood clotting, yup,

20       and one could compare those two periods and

21       come to the conclusion that that also could

22       be the result of these differences in

23       infection rates, the data does support that,

24       that's a possibility too.

25  Q.  When you say, "Possibility too," what --

ALBRECHT

1

2    A.   Well, you don't know what it is.  How are you

3         to say that that's any more likely than it is

4         the difference in device.  It's not a

5         randomized controlled trial, it's an

6         observation study.  We saw infection rates go

7         kind of up and down and you're doing your

8         best guess at it, and that's observation,

9         it's imprecise it's not perfect.  It's not a

10        randomized controlled trial, which would give

11        you a definitive answer.  You just simply

12        can't get one out of this type of data.  And

13        what someone else chooses to do with the data

14        is up to them.

15                   (Whereupon, Exhibit 13 was

16                   marked for identification.)

17   BY MR. C. GORDON:

18   Q.   Let me show you Exhibit 13.  What I

19        particularly want to direct your attention to

20        is the -- well, the graph that shows -- the

21        graphic that shows the 3.1 percent, and then

22        the arrow to 0.8 percent, and the line,

23        "Forced-air warming discontinued, joint

24        infections reduced 74 percent."

25   A.   Okay.

1                           ALBRECHT

2    Q.   That -- and it's your study that's cited

3         there, right?

4    A.   Uh-huh.

5    Q.   Do you -- you said people can do what they

6         want with the data, but do you think that

7         what you see here in Exhibit 13 is

8         scientifically supported by your study?

9    A.   In an observational sense, yes, it is, those

10        are the numbers for the periods.  This isn't

11        the result of a randomized clinical trial.  I

12        don't know what constitutes sufficient data

13        for marketing.  A lot of people use data in

14        different ways.

15   Q.   Can you -- do you believe your study can in

16        any way be used to support the conclusion

17        that switching from Bair Hugger to HotDog

18        will reduce surgical site infections?

19             MR. B. GORDON:  Objection to form,

20        asked and answered, calls for a medical

21        conclusion.

22             THE WITNESS:  There's

23        observational data in here that shows a

24        decrease in infection rates with the switch

25        between devices, that is true, that is

1                              ALBRECHT

2        confounded with antibiotics.

3   BY MR. C. GORDON:

4   Q.  It's also confounded with prophylaxis --

5        thromboprophylaxis?

6   A.  Yes.  It's observational in nature.

7   Q.  And if you eliminate just those two

8        confounders, there is no statistical --

9        statistically meaningful difference --

10                    MR. B. GORDON:  Objection to form.

11  BY MR. C. GORDON:

12  Q.  -- between Bair Hugger and HotDog, right?

13  A.  This is not a randomized clinical trial.  I

14       don't know what effect led to what.

15                    MR. B. GORDON:  Object to form,

16       misstates his testimony.

17                         THE WITNESS:  This is

18       observational data.

19  BY MR. C. GORDON:

20  Q.  Why do observational data?  What's -- what's

21       the purpose?

22  A.  It's to identify trends that you may suspect

23       in the data and bring it to question so

24       someone can do a proper experiment further

25       on, like a randomized trial.

1                          ALBRECHT

2    Q.   Your trendline was just an arithmetic mean

3         across 23 months --

4    A.   Uh-huh.

5    Q.   -- right?

6              What -- having gone through the

7         exercise that you've gone through now to

8         compare one time period, just the Rivaroxaban

9         versus the no Rivaroxaban, would you agree

10        that a trendline that shows an arithmetic

11        mean across the -- that entire time period is

12        pretty misleading?

13                  MR. B. GORDON:  Objection to form.

14                  THE WITNESS:  I would have liked

15        to have added that to the effects here so

16        it's more clear what that did over the time

17        period.  Having you make me drill into it a

18        little more clearly like that and not treat

19        it as just a confounder that, well, it's

20        there, so you can't truly trust this, you

21        know, I would have dug in a little deeper and

22        put an effect in the table, I think.

23   BY MR. C. GORDON:

24   Q.   And if you had done that, tell me what --

25        would that -- would you have been able to do

1                        ALBRECHT

2      a multivariate analysis with that, is that

3      the right term?

4  A.  I still don't think we would have.  I think

5      we would have presented it that we looked for

6      this effect, saw nothing, we looked for that

7      effect, saw nothing, oh, antibiotics had an

8      effect, forced air had an effect, now we need

9      to figure this out with a trial.

10          So you'd do this in a univariate

11     fashion still with observational data, in my

12     opinion.

13 Q.  If you were to analyze the data factor --

14     taking into consideration antibiotics and

15     the -- the Rivaroxaban, and -- and, in

16     effect, factored those out, do you still

17     think that there would -- even with

18     observational data it would show a difference

19     between Bair Hugger and HotDog?

20          MR. B. GORDON:  Objection to form,

21     misstates his earlier testimony.

22          THE WITNESS:  I don't know.  I

23     would have to run a model.  There's a period

24     of time here which comes into play.  This

25     data, there's possibly not enough

1                         ALBRECHT

2       infections -- infections to do a multivariate

3       analysis like that where it's properly

4       powered, just kind of looking at this.  I'm

5       not so sure we'd be able to tease out the

6       effect of multiple factors at the same time

7       with a data set that has, you know, few

8       infections like that over multiple cuts of

9       variables.  So that can be difficult.  You'd

10      have to try.

11   BY MR. C. GORDON:

12   Q.  Well, you'd agree with me that what we just

13      teased out with just those two -- two

14      variables, the antibiotics and the

15      anti-thrombophylaxis -- thromboprophylaxis,

16      resulted in two periods that were pretty

17      comparable in both in duration and in number

18      of procedures, right?

19   A.  Yeah.  I'd like to add that to a table as a

20      univariate effect and do further

21      experimentation to see what led to what.

22   Q.  One of my associates grew up in California.

23   A.  Sure.

24   Q.  And in his -- his fond young -- young

25      childhood memory is his family going to

1                      ALBRECHT

2      Disneyland and his brother leaning over to

3      him as they were driving to Disneyland and

4      said, "Everybody who goes to Disneyland

5      dies."

6   A.  Okay.

7   Q.  That's actually true, right?

8   A.  All right.  How is that relevant to this?

9               MR. B. GORDON:  Object to the form

10      of the question.

11  BY MR. C. GORDON:

12  Q.  Well, you'd agree that it would be absurd to

13      conclude from the fact that everybody who

14      goes to Disneyland dies, that Disneyland has

15      anything to do with people dying?

16              MR. B. GORDON:  Object to form,

17      calls for speculation, improper hypothetical.

18              THE WITNESS:  I can't tell you

19      from observational data if it's in change in

20      device or if it's a change in antibiotics

21      clearly, because other things are going on

22      behind the scenes.  This is a hypothesis.

23      It's presented as such that there are these

24      factors and if you compare the data in the

25      way presented from here to here, you get that

1                         ALBRECHT

2        effect.

3               I agree that an antibiotic effect

4        would be nice to add to this graph and help

5        explain the challenge a little more clearly

6        that we're facing here.

7    BY MR. C. GORDON:

8    Q.  Well, not just the antibiotic fact, but the

9        anti-thromboprophylaxis fact, right?

10              MR. B. GORDON:  That's just blood

11       thinner.

12              THE WITNESS:  Yeah.  And a

13       clinician would have to tell you what's

14       relevant.  I mean, you could put a lot of

15       things in here too and say, Well, Larry was

16       mopping the floors in this room for these

17       days and that, and you can make this data so

18       high dimensional you'll find all sorts of

19       things that relate.

20              But I agree that the antibiotic

21       piece is a real thing and some kind of an

22       effect here, univariate effect presented in

23       the same way as the other effects would be

24       nice to have.

25   BY MR. C. GORDON:

1                           ALBRECHT

2    Q.   Were you ever made aware that at the

3         beginning of the Bair Hugger period the

4         laminar airflow system in one of the Wansbeck

5         operating theaters was not functioning

6         properly?

7    A.   Not that I recall.  I may have or may not, I

8         don't know.

9    Q.   Were you ever made aware of the fact that in

10        2008 and 2009 the Northumbria Trusts were

11        repeatedly advised by the National Health

12        Service that their SSI rates for orthopedic

13        procedures made them a high outlier compared

14        to other trusts in the -- in the UK?

15   A.   I had heard they were having infection

16        problems, I was not sure of the details.

17   Q.   Did anyone ever tell you that as a result of

18        those infection problems, they instituted a

19        wide range of infection controlled

20        procedures?

21             MR. B. GORDON:  Object to form,

22        lack of foundation, calls for speculation.

23             THE WITNESS:  No, I don't know the

24        exact procedures they implemented.

25   BY MR. C. GORDON:

1                         ALBRECHT

2    Q.   Do you know any of them?

3    A.   Well, we have a couple here, they are

4         antibiotic changes.  I'm not the clinical

5         expert and I'm not close enough to this to

6         know exactly what's going on behind the

7         scenes at the hospital.  You know, I

8         really -- I'm unsure of what has happened.

9    Q.   And -- and I know this is -- it is several

10        years later, so I'm not expecting you to have

11        a clear memory, but as a statistician doing

12        this analysis, would it have been important

13        to you to -- to know that in December of 2008

14        the Wansbeck -- or the Northumbria Trust

15        formed a committee specifically to develop

16        ways to address the -- this outlier status of

17        high infection rates?

18             MR. B. GORDON:  Objection to form,

19        calls for speculation, outside his expertise.

20        He said he doesn't have the clinical

21        background to answer.

22             THE WITNESS:  This highlights the

23        need for randomized studies of these things,

24        so background factors like you're bringing up

25        aren't confounded with the results we see.

1                         ALBRECHT

2    BY MR. C. GORDON:

3    Q.   Were you aware that during the Bair Hugger

4         only period the -- they changed the surgical

5         dressings that they used to a particular type

6         of dressing that Mike Reed had believed,

7         based on randomized clinical controls,

8         reduced infection rates by about two-thirds?

9    A.   I don't recall that detail.

10   Q.   Would that have made any difference?

11                  MR. B. GORDON:  Objection to form.

12                  THE WITNESS:  I think details like

13        that could have made it into the discussion

14        about the other things that are confounding

15        factors.  Again, it's observational.  None of

16        these things are causative.

17   BY MR. C. GORDON:

18   Q.   Is -- is there a point in time where all the

19        observational data, or whatever observational

20        data you're presenting, are confounded by so

21        many cofounding factors that there's no point

22        in drawing -- even presenting observational

23        data?

24                  MR. B. GORDON:  Objection to form.

25                  THE WITNESS:  There's kind of an

1                          ALBRECHT

2        art to that in publications.  If you have

3        some data and even if it might be wrong or it

4        might not tell the truth -- not the truth,

5        but tell the picture that's really

6        underlying, right, sometimes you've presented

7        in the hopes that you can get other people

8        looking at it and that people can help

9        explain the story.

10   BY MR. C. GORDON:

11   Q.   And what -- what is -- what is the story that

12        you told in this paper?

13   A.   Well, it's not exactly a story, but it's a

14        connection of a couple of research --

15        research hypotheses, one of which is, you

16        know, is there any kind of disruption to the

17        airflow in the ventilation theater.

18              And then the other part is, well, if

19        we're going to look at that and we have an

20        effect of something that does that, you know,

21        demonstrated here, is there a change in

22        infection data that coincides with that.  And

23        so it had a focus like that, because we want

24        to look and ask those direct questions that

25        are linked.

Page 225

1                              ALBRECHT

2    Q.  And the reasonable conclusion from people

3        just reading that paper is that they are

4        linked, right?

5    A.  Well, it's a research article and it's an

6        observational study, the data is.   I

7        believe -- let's see if we call it the need

8        for a randomized clinical trial here.  We may

9        have well commented on that in the

10       discussion.  (Reviews documents.)

11            And there have been national studies

12       that look at the effect of, you know, airflow

13       and cleanliness in relationship of

14       ventilation to improved outcomes, and that's

15       kind of the piece that ties into this and why

16       we're looking at this question, because we

17       have something that we observe to disrupt

18       airflow and we want to see if there was a

19       change in infection period over that time

20       given we had a device with some kind of

21       mechanism that may or may not have done

22       something to infection rates.  It's a logical

23       link to try and ask this question and see if

24       there's a change.

25   Q.  And now that we've gone through this

ALBRECHT

1

2      exercise, do you think if you had presented

3      the data that would -- that showed that the

4      infection rate when Bair Hugger was -- was

5      used with the same antibiotics and the same

6      anti-blood clotting regimen has -- in the

7      HotDog period, there was no statistically

8      significant difference between the infection

9      rates, do you think that would have changed

10     the -- the impact that this -- this paper

11     would have had?

12 A.  I wouldn't have done a multivariate analysis

13     as you suggest there off the cut.  I would

14     have added the antibiotic effects to this

15     table of univariate effects and left someone

16     with the observational data to do some of

17     their own thinking.

18          Typically, in an observational

19     study, doing multivariate adjustments can be

20     kind of tricky and you tend to stay away from

21     them and use one test at a time just to kind

22     of say, hey, is there a trend or not, does

23     that trend look significant, I don't know

24     what caused it.

25          So we'll just look at one trend a

Page 227

ALBRECHT

1
2      time to kind of screen things that you're

3      looking for, and that's all you're left with

4      is a screening, well, is it associated or is

5      it not, you don't know if it's the cause.  So

6      I don't know if it's the device, if it's

7      antibiotics.

8  Q.  If you had presented the analysis of

9      antibiotics and -- and you keep saying

10     antibiotics and I want to make sure that

11     you --

12 A.  And blood clotting.

13 Q.  Okay.  That's what I thought.

14          Whatever thought someone might have

15     reading the paper as it exists now as to

16     whether it's the device or something else,

17     would you agree that if you had presented the

18     information that we just went through about

19     antibiotics and blood clotting, that the

20     thoughts about the likely answers to that

21     question might be different?

22          MR. B. GORDON:  Objection; calls

23     for speculation and invades into an area of

24     medical expertise that he doesn't possess.

25          THE WITNESS:  From a statistical

1                        ALBRECHT

2        point of view, it would have identified two

3        clear effects that probably need deeper

4        investigation that do call into question, you

5        know -- it highlights the fact that it's

6        observational data.

7   BY MR. C. GORDON:

8   Q.   And it would have made it a lot harder for

9        anyone to --

10  A.   They still could have done that if they

11       wanted to, because the effect would be listed

12       here along with the other two effects, and

13       that's their interpretation of the research.

14  Q.   You're the statistician on -- on this

15       project.  Do you believe that Exhibit 13, the

16       representations there, is an accurate

17       representation of what your research

18       concluded?

19            MR. B. GORDON:  Objection; asked

20       and answered already.

21            THE WITNESS:  The rates and the

22       decreases are accurate and line up with

23       what's in the paper.

24            MR. B. GORDON:  Same answer you

25       got last time.

```
1                        ALBRECHT
2           And, Corey, I don't want to cut you
3      off, you probably got some more left, if --
4      if you happen to be getting close to a
5      stopping point, if we're going to quit
6      anyway --
7                 MR. C. GORDON:  Yeah, let --
8                 MR. B. GORDON:  -- this would
9      allow me to make my flight.  It's up to you.
10                MR. C. GORDON:  I'm going to do
11     one more thing, because I did promise you I
12     would do that.
13                (Whereupon, Exhibit 14 was
14                marked for identification.)
15  BY MR. C. GORDON:
16  Q.  I'm going to show you Exhibit 14.  And can
17      you -- can you identify the person on the
18      left in the --
19  A.  Yeah.
20  Q.  -- what look like surgical scrubs?
21  A.  Yeah, Reed.
22  Q.  That's Dr. Mike Reed?
23  A.  Yes.
24  Q.  Do you know any of the other people in the
25      picture?
```

Page 230

1                              ALBRECHT

2    A.   Not off the top of my head.

3    Q.   And you were -- you were at Dr. Reed's

4         hospital in England, right?

5    A.   Yes, I was.

6    Q.   Okay.  Do you see that chart on the wall

7         there behind -- behind these four people?

8    A.   Yeah, I can roughly make it out.

9    Q.   Can you --

10   A.   Yup.

11   Q.   Can you -- even with my old tired eyes it

12        looks like --

13   A.   Yeah, no, I'm reading it.

14   Q.   -- "Trust wide surgical site infection

15        intervention timeline for orthopedic lower

16        limb surgery combined."  Do you see that?

17   A.   Yes, I do.

18   Q.   Do you recall seeing that chart or anything

19        like that either on the wall when you were

20        there or in printed form?

21   A.   I don't recall.  I don't recall.

22   Q.   Okay.

23   A.   I wasn't looking for it if I had.

24   Q.   Okay.  And would that -- well, strike that.

25             Do you see that -- that blue line

1                    ALBRECHT

2        that goes down, up a little bit --

3   A.   I do.

4   Q.   -- and then goes down?  Would you agree that

5        that conveys more information about what

6        might have been happening in terms of SSI

7        trends than an average -- an arithmetic mean

8        average of SSI rates over whatever that time

9        period is?

10                  MR. B. GORDON:  I'm going to

11       object to the fact that you can't read

12       anything on this except for the very first

13       top line.  I have no idea what you're talking

14       about.

15                  THE WITNESS:  I understand the

16       trendline and the series of events that

17       follow with it that are showing on the graph.

18       And from a graphic like this, one can look at

19       a trendline from their eye on the top, it's

20       hard to see on the bottom what's going on,

21       though, in terms of the data.

22                  I don't know.  If you group

23       everything at a very small granular level,

24       things get kind of wonky too up and down.  I

25       think that adding to this paper those other

1                          ALBRECHT

2        two effects would be reasonable, but other

3        than that, I don't know if I would change

4        anything based on that.

5    BY MR. C. GORDON:

6    Q.  Well, I -- and I -- to Mr. Ben Gordon's

7        point, you can't tell what those

8        interventions --

9    A.  It's observational data too.  None of these

10       are tested interventions.  And because the

11       rate went down may not be due to the fact

12       that that happened there, and that's the

13       devil of the details with these kind of

14       things, they're observational.  You don't

15       know if that did it or something else, so,

16       really, you need that randomized trial.  And

17       this data suffers from the same problem, it

18       is observational.  It is not controlled in a

19       randomized trial.

20   Q.  When did you first meet Andrew Legg?

21   A.  It would have had to have been in the UK when

22       I was there.  I don't think he was stateside

23       when I first met him.  I think it was

24       correspondence by e-mail maybe.

25   Q.  How did you first get in touch with him?

1                              ALBRECHT

2    A.   Similar to McGovern and Paul, I'm sure it

3         would be that same channel.  So it was either

4         through Scott Augustine, maybe David Leaper.

5         I'm not sure who kind of hooked us up.

6    Q.   And you went to Sheffield where --

7    A.   Yes.

8    Q.   -- where he was, right?

9    A.   Uh-huh.  Yes.

10   Q.   And you met Dr. Hamer as well?

11   A.   Yes.  I don't remember if I shook his hand or

12        if I just met him over e-mails.

13   Q.   Okay.  But you and Legg collaborated on -- on

14        research involving forced-air warming?

15   A.   We did.  I was not a listed author in those

16        studies.

17   Q.   And by, "Those studies," I just want to be

18        clear, there's Legg and Hamer, and then

19        there's Legg, Cannon and Hamer.

20   A.   Yes.

21   Q.   You collaborated on both of those, right?

22   A.   I collaborated, I believe, on one of the two.

23        You'd have to show me the studies so I can

24        look at the setup on them, if you have them.

25        I could tell you then which elements I was

Page 234

1                          ALBRECHT

2       involved in and not.  We did provide them

3       with some research materials.

4   Q.  And -- in the interest of time, I'm not going

5       to looking for them so we can delay this, but

6       did the -- well, strike that.

7                     MR. C. GORDON:  We'll suspend for

8       now.

9                     MR. B. GORDON:  Okay.  We're going

10      to reserve questions for another day.  Thank

11      you very much.

12                    MR. C. GORDON:  Do you want to try

13      and schedule now or --

14                    THE WITNESS:  Yeah, I think now

15      would be best just so we know.

16                    THE VIDEOGRAPHER:  We're going off

17      the record at 3:11 p.m.

18                        (Whereupon, the foregoing

19                        deposition adjourned at 3:11 p.m.)

20

21

22

23

24

25

Page 235

1          DEPOSITION CORRECTION SHEET

2    TITLE: In Re:  Bair Hugger Forced Air Warming

         Products Liability Litigation

3    WITNESS:  Mark Albrecht

4    PAGE   LINE   DESIRED CHANGE

5    _____  _____  _____

6    _____  _____  _____

7    _____  _____  _____

8    _____  _____  _____

9    _____  _____  _____

10   _____  _____  _____

11   _____  _____  _____

12   _____  _____  _____

13   _____  _____  _____

14   _____  _____  _____

15   _____  _____  _____

16   _____  _____  _____

17   _____  _____  _____

18   _____  _____  _____

19   _____  _____  _____

20   _____  _____  _____

21   _____  _____  _____

22   _____  _____  _____

23   _____  _____  _____

24   _____  _____  _____

25

Page 236

1

2

    I, Mark Albrecht, have read this

3

deposition transcript and acknowledge

4

herein its accuracy except as noted:

5

6

              _____

7

              Witness Signature

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 237

1  STATE OF MINNESOTA    )
                         ) ss
2  COUNTY OF ANOKA       )

3

4          Be it known that I took the foregoing
   deposition of Mark Albrecht, Volume 1, on
   October 7th, 2016, in Minneapolis, Minnesota;

5

6          That I was then and there a notary public
   in and for the County of Anoka, State of Minnesota,
   and that by virtue thereof, I was duly authorized
7  to administer an oath;

8          That the witness was by me first duly
   sworn to testify to the truth, the whole truth and
9  nothing but the truth relative to said cause;

10         That the foregoing transcript is a true
   and correct transcript of my stenographic notes in
11 said matter;

12         That the witness reserved the right to
   read and sign the transcript;

13

14         That I am not related to any of the
   parties hereto, nor interested in the outcome of
   the action;

15

16         WITNESS MY HAND AND SEAL this 19th day of
   October, 2016.

17

18         _____

              Amy L. Larson, RPR
19            My Commission Expires 1/31/2020

20

21

22

23

24

25

Page 238

1              UNITED STATES DISTRICT COURT
                 DISTRICT OF MINNESOTA
2    -----------------------------------------------
3    In Re:
4    Bair Hugger Forced Air Warming
     Products Liability Litigation
5

     This Document Relates To:
6

     All Actions                    MDL No.
7                                    15-2666 (JNE/FLM)
8    -----------------------------------------------
9

                   VIDEOTAPED DEPOSITION
10

                           OF
11

                     MARK ALBRECHT
12

                       VOLUME 2
13

                 Minneapolis, Minnesota
14

               Saturday, November 12th, 2016
15

16   -----------------------------------------------
17
18
19
20
21
22
23
24   Reported by:
     Amy L. Larson, RPR
25   Job No. 115236

```
 1                        ALBRECHT
 2    APPEARANCES:
 3        ON BEHALF OF 3M:
 4        COREY GORDON, ESQUIRE
          PETER GOSS, ESQUIRE
 5        BLACKWELL BURKE
          431 South Seventh Street
 6        Minneapolis, MN 55415
 7
 8
 9        FOR THE PLAINTIFF:
10        GABRIEL ASSAAD, ESQUIRE
          KENNEDY HODGES
11        4409 Montrose Boulevard
          Houston, TX 77006
12
13        GENEVIEVE ZIMMERMAN, ESQUIRE
          MESHBESHER & SPENCE
14        1616 Park Avenue South
          Minneapolis, MN 55404
15
16
17        ALSO PRESENT:  Kraig Hildahl, Videographer
18
19
20
21
22
23
24
25
```

1                       ALBRECHT
2    INDEX:
3    EXAMINATION BY:                          PAGE
4    Mr. Gordon.................................245
5    EXHIBITS MARKED FOR IDENTIFICATION:
6    Exhibit 15.................................245
     Agreement Governing Promissory Notes
7    Bates Albrecht_0000008
8    Exhibit 16.................................245
     Agreement Governing Promissory Notes
9    Bates Albrecht_0000009
10   Exhibit 17.................................246
     Agreement Governing Promissory Notes
11   Bates Bates Albrecht_0000011
12   Exhibit 18.................................253
     Anesthesia & Analgesia
13   Author of Conflict of Interest Checklist
     Bates AUGUSTINE_0004725 - AUGUSTINE_0004726
14
     Exhibit 19.................................255
15   2/14/12 E-mail Chain
     Subject:  Well, I wish I had better news on
16   the 3M situation
     Bates Albrecht_0013733 - Albrecht_0013735
17
     Exhibit 20.................................259
18   2/21/12 E-mail Chain
     Subject:  Bit of a wild ride with the job
19   search
     Bates Albrecht_0016535
20
     Exhibit 21.................................263
21   May 2012 E-mail Chain
     Subject:  Well, let's see if the fish bites on
22   this (although, I'm not sure I want to do the
     work even for big $$)
23   Bates Albrecht_0003474 - Albrecht_0003476
24
25

1                          ALBRECHT
2    INDEX:  (Cont'd.)
3    EXHIBITS MARKED FOR IDENTIFICATION:       PAGE
4    Exhibit 22...............................265
     November 2011/May 2012 E-mail Chain
5    Subject:  Hook, line and sinker
     Bates Albrecht_0003515 - Albrecht_0003518
6
     Exhibit 23...............................269
7    May 2012 E-mail Chain
     Subject:  FAW Facts
8    Bates Albrecht_0003428 - Albrecht_0003430
9    Exhibit 24...............................273
     May 2012 E-mail Chain
10   Subject:  FAW Facts
     Bates Albrecht_0003423 - Albrecht_0003424
11
     Exhibit 25...............................276
12   A Critical Analysis of "Forced-Air Warming
     Does not Worsen Air Quality in Laminar Flow
13   Operating Rooms" by Sessler, et al.
     Bates Albrecht_0003353 - Albrecht_0003361
14
     Exhibit 26...............................289
15   March 2010/February 2011 E-mail Chain
     Subject:  First Publication I'd like to
16   include you on
     Bates Nachtsheim_0000364 - Nachtsheim_0000365,
17   Nachtsheim_0000447 - Nachtsheim_0000450
18   Exhibit 27...............................302
     February 2014 E-mail Chain
19   Subject:  Saw your article in the Star Trib
     Bates Albrecht_0001266
20
     Exhibit 28...............................304
21   February 2011 E-mail Chain
     Subject:  British Hip Society Presentation
22   Bates Nachtsheim_0000238 - Nachtsheim_0000244
23   Exhibit 29...............................305
     Outline of BHS Presentation
24   Bates Nachtsheim_0000251 - Nachtsheim_0000256
25

```
 1                      ALBRECHT
 2   INDEX:  (Cont'd.)
 3   EXHIBITS MARKED FOR IDENTIFICATION:      PAGE
 4   Exhibit 30...................................320
     1/23/10 E-mail
 5   Subject:  Article nearly ready for
     submission
 6   Litchy_0000002
 7   Exhibit 31...................................324
     6/9/10 E-mail
 8   Subject:  Publication Factory Continues
     Bates Nachtsheim_0000838 -
 9   Nachtsheim_0000839
10   Exhibit 32...................................331
     9/10/10 E-mail
11   Subject:  Manuscript Ready for Review
     Bates Nachtsheim_0000689 -
12   Nachtsheim_0000708
13   Exhibit 33...................................335
     October/November 2010 E-mail Chain
14   Subject:  Manuscript for British
     Association for Surgery of the Knee 2011
15   Annual Meeting in Cardiff - Wednesday 6th &
     Thursday 7th April
16   Bates Nachtsheim_0000682 -
     Nachtsheim_0000684
17
     Exhibit 34...................................339
18   10/25/12 E-mail
     Subject:  Check this article out...
19   Bates Albrecht_0013943
20   Exhibit 35...................................339
     Medtronic's pull influenced Infuse articles,
21   report finds
     No Bates
22
     Exhibit 36...................................343
23   1/4/2011 E-mail Chain
     Subject:  Article I was talking about
24   Bates Nachtsheim_0000177 -
     Nachtsheim_0000179
25
```

Page 243

1                        ALBRECHT

2       THE VIDEOTAPED DEPOSITION OF MARK ALBRECHT,

3  VOLUME 2, taken on this 12th day of November,

4  2016, at the Law Offices of Blackwell, Burke, LLP,

5  431 South Seventh Street, Suite 2500, Minneapolis,

6  Minnesota, commencing at approximately 9:05 a.m.

7

8            P R O C E E D I N G S

9

10            THE VIDEOGRAPHER:  We're on the

11      record.  This is the start of tape labeled

12      number 1, volume 2 of the videotaped

13      deposition of Mark Albrecht In the Matter of

14      In Re:  Bair Hugger Forced Air Warming

15      Products Liability Litigation filed in the

16      U.S. District Court for the District of

17      Minnesota, case number 15-2666 (JNE/FLN).

18            This deposition is being held at

19      Blackwell & Burke Law Firm in Minneapolis,

20      Minnesota on November 12th, 2016.  The time

21      is 9:06 a.m.  My name is Kraig Hildahl, I'm

22      the legal video specialist from TSG

23      Reporting, Incorporated.  The court reporter

24      is Amy Larson also in association with

25      TSG Reporting.

1                         ALBRECHT

2            Will counsel please introduce

3    themselves for the record.

4                    MR. ASSAAD:  Gabriel Assaad on

5    behalf of the plaintiff.

6                    MS. ZIMMERMAN:  Genevieve

7    Zimmerman for the plaintiffs.

8                    MR. COREY GORDON:  Corey Gordon

9    for the defendants.

10                   MR. GOSS:  Peter Goss for the

11   defendants.

12                   MR. COREY GORDON:  Okay.

13                   THE VIDEOGRAPHER:  Will the court

14   reporter please swear in the witness and then

15   we can begin.

16                   MR. COREY GORDON:  Well, he's

17   been -- he's still sworn in, but go ahead.

18

19                     MARK ALBRECHT,

20        a witness in the above-entitled action,

21        after having been first duly sworn, was

22        deposed and says as follows:

23

24

25

1                        ALBRECHT

2                        EXAMINATION

3    BY MR. COREY GORDON:

4    Q.  Good morning, Mr. Albrecht.

5    A.  Hello.

6    Q.  We're going to finish up your deposition that

7        we started a couple of weeks ago.

8    A.  Okay.

9    Q.  Let me start out by showing you two documents

10       that I've marked as Exhibits 15 and 16.

11   A.  Okay.

12                   (Whereupon, Exhibit 15 and

13                   Exhibit 16 was marked for

14                   identification.)

15   BY MR. COREY GORDON:

16   Q.  And could you just briefly tell -- tell us

17       what these two documents represent?

18   A.  Yeah.  These are an agreement between myself

19       and the employer for funding graduate school.

20       One is for an MBA at the Carlson Business

21       School, and the other is for a Ph.D. program,

22       but we ended up rolling that to be a master's

23       in statistics instead.

24   Q.  So the dollar figures in Exhibit 16 that

25       refer to the Ph.D. program, year one, year

Page 246

1                              ALBRECHT

2        two, year three --

3   A.   Yup.

4   Q.   -- how did that change when you changed to a

5        master's in statistics?

6   A.   It was similar.  I think the all-in cost for

7        the master's came 20 to $25,000.  I think it

8        was 20,000.

9   Q.   Okay.  And that was Augustine Biomedical that

10       was agreeing to pay for your graduate

11       program?

12  A.   Yup, and they did.

13                    (Whereupon, Exhibit 17 was

14                    marked for identification.)

15  BY MR. COREY GORDON:

16  Q.   And then I'm going to show you Exhibit 17,

17       and this is a document from -- is that

18       March 1st, 2012?

19  A.   That looks correct.

20  Q.   Okay.  And this -- the promissory notes that

21       Exhibit 17 refers to, those would be

22       Exhibits 15 and 16; is that correct?

23  A.   That looks correct, although, this one here

24       for the Ph.D. program, I do not recall if we

25       made a different set.

1                           ALBRECHT

2    Q.  Okay.  If you -- if you had made a different

3        set, would that have been something you still

4        would have had copies of?

5    A.  Yeah.  And I -- that's true, I would have

6        submitted all that, so this must be it.

7    Q.  Well, I might have missed it too.  I was

8        noticing that sequentially in your Bates

9        numbers there seems to be a -- I don't have

10       Bates number 10.

11              But in any event, just tell -- tell

12       me the circumstances under which the

13       Exhibit 17 came into being, why -- why was

14       this --

15   A.  So why did I resign?

16   Q.  Well, is -- so -- well, I guess maybe that's

17       the answer.  This was prompted by your

18       resigning from Augustine Biomedical?

19   A.  I did resign, yes.

20   Q.  Okay.  And when was that?

21   A.  It should have been the date on the document,

22       I would imagine.  So 3/1/12, thereabouts,

23       maybe a week before or two.

24   Q.  And why did you resign?

25   A.  They had cut our pay.  They were on hard

Page 248

1                            ALBRECHT

2          times and I had to go find gainful employment

3          elsewhere.

4    Q.    Okay.  Now, looking back at Exhibits 16 -- 15

5          and 16, it looks -- there's -- in each case

6          there's a paragraph 10 that refers to

7          termination as a result of reduction in force

8          unrelated to causes --

9    A.    Uh-huh.

10   Q.    -- and then the amounts are being forgiven.

11         So was your -- your -- your leaving in 2012,

12         was that considered a reduction in force or

13         just a voluntary --

14   A.    It was -- I never had employment more

15         involved, but we went from 40 hours a week to

16         32 being paid, so that probably doesn't

17         constitute, although I don't know, I am not

18         an employment lawyer.

19               Instead, we thought, or at least I

20         thought, that it would be easier to work out

21         an agreement, and so the MBA business loan,

22         I've been there long enough that that was

23         forgiven.

24               And then the outstanding for the

25         $21,000 that you see here for the master's

1                          ALBRECHT

2          program, that was still on the table, so to

3          speak, and so we worked out something that

4          worked for both parties.

5    Q.    And the -- the workout for you to repay

6          the -- the value of the 21,000 or so, is set

7          forth in paragraph 5 of Exhibit 17; is that

8          right?

9    A.    Correct.

10   Q.    And that was for you to complete the

11         successful application of three research

12         projects; is that right?

13   A.    Yes.

14   Q.    And one was -- the first one was the Belani

15         that was at that time under review by the

16         Anesthesia & Analgesia Journal?

17   A.    Correct.

18   Q.    And that -- that you had published?

19   A.    I believe so, yes.

20   Q.    The second one was the Reed, et al.,

21         published -- being reviewed by the

22         AANA Journal, right?

23   A.    Yup.

24   Q.    And that also got published?

25   A.    It did.

1                         ALBRECHT

2    Q.   But the third one is something that -- strike

3         that.

4                  The third one is -- references an

5         article by Barnett, et al., that reports deep

6         joint infection from Ridgeview Hospital in

7         Waconia?

8    A.   Uh-huh.

9    Q.   Did that ever get published?

10   A.   It never ever really got constructed, so that

11        was something where the employer thought

12        about doing this and had discussed some

13        agreements with some physicians.  I wasn't

14        that deeply involved in this one.  And just

15        it never really came to be.

16   Q.   Okay.  So where it says, "The data needs to

17        be compiled and analyzed," as far as you know

18        you -- well, from -- you weren't involved in

19        actually compiling or analyzing any data then

20        from --

21   A.   Not for this direct study that's listed here.

22        I did update, for example, some of the

23        infection data, as you've seen in e-mails,

24        after my time there.

25   Q.   You're talking about the McGovern study?

Page 251

                              ALBRECHT

1

2   A.   Yeah, the one that we had talked about last

3        time.  So augmenting the data, for example,

4        things like that.

5   Q.   And we'll talk about that in more detail.

6             But other than this reference to --

7        in Exhibit 17 to this Barnett, et al.,

8        Ridgeview Hospital, have you -- do you recall

9        any other discussions or involvement in

10       anything related to that project?

11  A.   If it's defined as something else, I don't

12       know, this is a while ago.  My memory on

13       stuff like this where it doesn't get

14       executed, put into a publication, I have a

15       hard time giving anything that's really

16       accurate here.  If we have some documents

17       that we could look at, maybe I could help you

18       out.  I don't know if you have anything.

19  Q.   Well, we'll see if anything relates to that.

20       Did -- did you have any discussions with --

21       with Scott Augustine that, you know, Hey,

22       this Ridgeview project never went anywhere,

23       so instead of that I'll do this or --

24  A.   I've given him help analyzing other data and

25       completing other data from, for example, Reed

1                         ALBRECHT

2      and McGovern at times to kind of compile

3      statistics.  So we've kind of done that in

4      place flexibly of this Article C.

5   Q.  At this point do you consider your

6      obligations to Augustine Biomedical to be

7      under the agreement to -- in Exhibit 17, are

8      those complete now?

9                   MR. ASSAAD:  Objection to form.

10                  THE WITNESS:  I don't know.  It's

11     hard to say.

12  BY MR. COREY GORDON:

13  Q.  Is it -- well, at this point do you feel --

14     do you believe you still have any continuing

15     obligation to Augustine Biomedical to do any

16     work for them in satisfaction of your

17     repayment of the promissory notes for your

18     educational expenses?

19                  MR. ASSAAD:  Objection to form.

20                  THE WITNESS:  If asked, I would

21     have to deal with that bridge at that time.

22     I -- it's a gray area.  I don't know.

23     Depending on what would be asked.

24                  MR. COREY GORDON:  Okay.

25  BY MR. COREY GORDON:

ALBRECHT

1  
2  Q.  Let me show you Exhibit 18.
3         (Whereupon, Exhibit 18 was
4         marked for identification.)
5  BY MR. COREY GORDON:
6  Q.  And if you could help me out here, I'm trying
7      to understand, this is a -- a conflict of
8      interest for the Anesthesia & Analgesia
9      Journal, right?
10 A.  Yeah.
11 Q.  And it lists the first author as Gauthier.
12 A.  Okay.
13 Q.  But I'm not sure what that refers to.
14 A.  I don't know.
15 Q.  If you look at exhibit -- in the pile there's
16     the exhibits from the last -- the first day
17     of your deposition, and I think Exhibits 4,
18     5, 6, 7, 8 and 9 are documents we've
19     previously marked that you had identified as
20     publications on which you are identified as a
21     coauthor.
22 A.  Okay.
23 Q.  And the only Anesthesia & Analgesia one I see
24     is Exhibit 7.
25 A.  Excuse me.  Okay.

Page 254

ALBRECHT

1

2   Q.  So I'm -- was -- is there some other
3       publication for Anesthesia & Analgesia where
4       Robert Gauthier was the first author?

5   A.  I don't believe so.  This may be a form that
6       was never submitted to the journal too.  I'm
7       unsure where this came from.

8   Q.  And the -- the title, "Forced-Air Warming, An
9       Evaluation of Laminar Operating Room
10      Ventilation Disruption," I -- again, I don't
11      see any -- any of the ones that -- that have
12      been published that has that same title.

13  A.  Uh-huh.

14  Q.  So you -- but you can't help me out on --
15      is -- do you -- do you have any recollection
16      that at one time Dr. Gauthier was going to be
17      an author on a publication that ended up
18      being Exhibit 7?

19          MR. ASSAAD:  Objection to form,
20      lack of foundation.

21          THE WITNESS:  I don't know.  We
22      have a lot of discussions with physicians
23      when we're planning these, and sometimes we
24      start a manuscript and stop it and then we
25      brand some of the data and put it in

1                         ALBRECHT
2      something else and reform it.  I have a hard
3      time answering that, I'm unsure.
4                    MR. COREY GORDON:  Okay.
5                    (Whereupon, Exhibit 19 was
6                    marked for identification.)
7  BY MR. COREY GORDON:
8  Q.  Now I'll show you Exhibit 19.  This is a
9      series of e-mails back and forth between you
10     and Christopher Nachtsheim; is that right?
11 A.  It looks that way.
12 Q.  And he -- he was a professor of yours at the
13     University of Minnesota; is that right?
14 A.  He was.
15 Q.  And these look like they're all taking place
16     in February or so of 2012.  Is that -- were
17     you a student at that time?
18 A.  Probably not.  I probably graduated at that
19     time.
20 Q.  Okay.  And this is -- it's just a little bit
21     before the -- the March promissory note
22     document that we looked at before, but it
23     appears that -- from this that you were
24     already gone from Augustine Biomedical; is
25     that right?

                              ALBRECHT

1

2    A.   No.  3M had given me a job offer in a

3         staff-related position.  I had explained to

4         the folks all my conflicts upfront, and they

5         were going to extend the offer and they even

6         told me to put in your two weeks, and I said,

7         nope, I'm going to wait for your legal to

8         clear, and thank God I did that.

9    Q.   So you were still employed by Augustine as

10        of --

11   A.   Yeah.

12   Q.   -- March 14th, 2012?

13   A.   Yup.

14   Q.   Okay.  And Dr. Nachtsheim, or Professor

15        Nachtsheim, says -- said to you in the middle

16        of the first page, "I'm presuming you

17        couldn't get the noncompete removed by

18        Scott"; do you see that?

19   A.   Uh-huh.

20   Q.   What was that a reference to?

21   A.   My current -- it was a reference to the 3M

22        lawyers reviewing my noncompete with

23        Augustine and decided that they didn't want

24        to take on any of the legal challenges of

25        having me work in that organization.

Page 257

                              ALBRECHT

1

2   Q.   But what -- what -- what's your -- what was

3        your understanding of what the noncompete

4        referred to?

5   A.   Patient-warming products.

6   Q.   Okay.  Are you -- I mean, I'm sorry, maybe

7        I'm being obtuse.

8             Are -- did you -- do you understand

9        that there was some contractual obligation

10       that you had to Augustine that precluded you

11       from doing certain work that could

12       potentially be competitive with what --

13  A.   Yeah.

14  Q.   -- you had done when you were there?

15  A.   Oh, absolutely.

16             MR. ASSAAD:  Objection to form.

17             MR. COREY GORDON:  Okay.

18  BY MR. COREY GORDON:

19  Q.   And when -- when you say to Professor

20       Nachtsheim, "No, he wouldn't go for that, I'm

21       as certain about that as I am about death and

22       taxes," was that referring to the noncompete?

23  A.   Yes.

24  Q.   And why were you certain that he would not

25       remove the noncompete?

ALBRECHT

1

2  A.   It's speculation on my part.  I never asked

3       him.  I don't know.  I was in a place of

4       frustration with this e-mail.  I got offered

5       a board job that was in a Six Sigma group

6       that had no relation to patient warming, and

7       they were okay with me not working on patient

8       warming or any related products for the

9       duration of my noncompete, and we had talked

10      about that during my interview.  So all the

11      parties thought this shouldn't be an issue.

12      I was told by the internal 3M folks that,

13      Hey, we don't see this is going to be an

14      issue at all, yet it was.  So here is a

15      little frustration that's captured in the

16      e-mail.

17  Q.   And even though you were -- it was a

18      completely unrelated at a part of 3M that had

19      nothing to do with patient warming --

20  A.   I believe that, yes.

21  Q.   -- you were certain that Scott Augustine

22      would not agree to waive the noncompete

23      agreement to allow you to work for 3M?

24              MR. ASSAAD:  Objection to form,

25      misstates prior testimony.

Page 259

ALBRECHT

1
2      THE WITNESS:  I don't know.  I
3   never asked him.  Again, this is me venting.
4      MR. COREY GORDON:  Okay.
5      THE WITNESS:  That's speculation
6   on my part.
7         (Whereupon, Exhibit 20 was
8         marked for identification.)
9   BY MR. COREY GORDON:
10  Q.  Let me show you Exhibit 20.  This is an
11      e-mail -- well, I guess it looks like a
12      couple of e-mails to you from Paul McGovern;
13      is that right?
14  A.  It appears that way.
15  Q.  And Paul McGovern would be the -- the first
16      author on the McGovern study that we
17      previously marked as Exhibit 8; is that
18      right?
19  A.  Yes.
20  Q.  Now, in the first e-mail, the one from
21      February 21st at 5:52 p.m., you told
22      Dr. McGovern that you had accepted a job at
23      the National Marrow Donor Program; is that
24      right?
25  A.  Yes.

1                          ALBRECHT

2   Q.   This was roughly a week or so after the

3        exchange with Nachtsheim that we just talked

4        about that -- after you had learned that you

5        couldn't take the job at 3M because of the

6        noncompete; is that right?

7   A.   Say that one more time.  I was just reading

8        this, I was distracted.

9   Q.   That's okay.

10            This is just -- this is about a week

11       after the Nachtsheim e-mail where you had --

12  A.   Yeah.

13  Q.   -- you were venting, as you said.  So in that

14       intervening week apparently you got the job

15       at the National Marrow --

16  A.   I continued the job search and circled back

17       to when I had shut down, yeah.

18  Q.   Now, at the very -- very bottom of your --

19       the first e-mail on Exhibit 20, you say to

20       Dr. McGovern, "Also, you don't know the

21       company I accepted an offer with, if Scott

22       asks, just said I took a bioinformatics

23       person.  I can't share that information until

24       I start or I risk him placing an angry phone

25       call trying to spoil it.  Trust me, it's not

Page 261

1                                ALBRECHT
2         above him."
3                   Why did you ask Dr. McGovern not to
4         tell Scott Augustine where you had accepted
5         an offer if he talked to him?
6    A.   Because the offer hadn't gone through yet and
7         I didn't have all the pieces in place where I
8         had signed an offer letter.
9    Q.   Well, why did you think that there was a risk
10        that Scott Augustine would place an angry
11        phone call to spoil it?
12   A.   Well, you know, at this time we have yet to
13        have gone through any of resolving promissory
14        notes or details like that, so -- you know,
15        again, this probably could have been done
16        with a little more tact, but this is a
17        personal communication that's intended to be
18        private, yet, they never are when you do
19        this, I'm learning that.
20                   Again, it's speculation on my part.
21        I just -- there were some things hanging over
22        my head with this, there were some conflicts
23        that Scott obviously wouldn't want me to
24        leave, and there were some pieces in play, as
25        you show here, in terms of agreements that

1                              ALBRECHT

2        were made that I have to rework, so that's

3        what that was about.

4   Q.   Now, apparently, Dr. McGovern had provided a

5        reference for you for your --

6   A.   He did.

7   Q.   -- job search?

8             And he -- in this exchange of

9        e-mails on Exhibit 20, he asked you if

10       Scott Augustine was aware that Dr. McGovern

11       had provided a reference for you, right?

12  A.   No, I did not tell Scott that McGovern

13       provided a reference at that time.

14  Q.   Right.  And Dr. McGovern was asking you if

15       you had told Scott -- or if Scott was aware

16       that Dr. McGovern had provided a reference

17       for you?

18  A.   He did ask, yes.

19  Q.   And you told him that Scott did not know that

20       Dr. McGovern provided a reference and you

21       asked Dr. McGovern to, "Just play dumb"?

22  A.   Yeah, those are the words there.

23  Q.   Why did you not want Dr. McGovern to disclose

24       to Dr. Augustine that he had provided a job

25       reference for you?

Page 263

1                          ALBRECHT

2   A.  Because I had not yet accepted an offer and

3       things are still at risk.

4   Q.  And what was it that you thought was at risk?

5   A.  You don't want your current employer to know

6       that you're looking for a job until you've

7       accepted one, so that's what I think is a

8       risk.  You risk losing your job.

9              And, again, this is a little

10      frustration, venting too, in these e-mails,

11      and it's not as tactful as I could be.

12  Q.  Were you afraid that Dr. Augustine would be

13      vindictive?

14              MR. ASSAAD:  Objection to form,

15      calls for speculation.

16              THE WITNESS:  No, it didn't turn

17      out to be that way, he was very reasonable.

18      And when you haven't dealt with something,

19      you assume the worse.  And we actually were

20      able to come to an amicable agreement.

21              MR. COREY GORDON:  Okay.

22              (Whereupon, Exhibit 21 was

23              marked for identification.)

24  BY MR. COREY GORDON:

25  Q.  I'll show you Exhibit 21.  The very top

Page 264

1                          ALBRECHT

2       e-mail is to a TAA [sic] Albrecht.  Who is

3       that?

4  A.   That is my brother Tom, it looks like.

5  Q.   Okay.  Okay.  And what does the subject line

6       mean, "Well, let's see if the fish bites on

7       this, although I'm not sure I want to do the

8       work even for big," dollar sign dollar sign?

9  A.   Let me read through the e-mail first --

10  Q.   Sure.

11  A.   -- and then I will comment on that, please.

12       (Reviews document.)

13            Honestly, I'm not sure what I meant

14       by that.

15  Q.   Okay.  Well, at the time of -- well, at least

16       as of May 2012, you were already gone from

17       Augustine, right?

18  A.   That would appear to be correct.

19  Q.   And you had already worked out the deal on

20       the promissory note --

21  A.   Yup.

22  Q.   -- correct?

23            So if you look at the earlier

24       e-mails, there's -- there's -- there's an

25       exchange between you and Dr. Mike Reed, one

ALBRECHT

1

2    of the coauthors on a couple of the papers,

3    right?

4   A.   Correct.

5   Q.   And the more recent one from Reed May 19th,

6        2012, to you with a carbon copy to

7        Scott Augustine asks for your help in seeing

8        if there's been any change in the -- since --

9        in the data you examined, the McGovern study,

10       the Exhibit 8, right?

11  A.   Uh-huh.

12  Q.   And this -- and Dr. Augustine forwarded this

13       to you and was asking you if you could help

14       out in analyzing the additional data,

15       correct?

16            MR. ASSAAD:   Object to the form of

17       the last question.

18  BY MR. COREY GORDON:

19  Q.   You know, actually, I'm going to withdraw it

20       and -- because I realize it was probably a

21       little bit confusing without this.

22            (Whereupon, Exhibit 22 was

23            marked for identification.)

24  BY MR. COREY GORDON:

25  Q.   Let me show you Exhibit 22.   And the -- much

Page 266

ALBRECHT

1

2    of the earlier e-mail chain is the same, but

3    on Exhibit 22 if you look at -- in the middle

4    of the first page there's a -- a May 4th,

5    2012, e-mail from Augustine to you asking

6    you, "How much are you charging for a day's

7    work"; do you see that?

8  A.  Say that one more time.  Sorry.  Okay, "Mark,

9    How much are you charging for a day's work,"

10   got it.

11 Q.  And if you look below that, it looks like

12   it's essentially the same or a good part of

13   the same e-mail chain in Exhibit 21?

14 A.  Yes, it does.

15 Q.  And you had -- well, strike that.

16        So Dr. Augustine -- it was your

17   understanding that Dr. Augustine was asking

18   you to do some additional work on the more

19   recent Reed/McGovern data, correct?

20 A.  Yup.

21             MR. ASSAAD:  Objection to the

22   form.

23 BY MR. COREY GORDON:

24 Q.  And you forwarded this to your brother at --

25   on the same day at about, well, three minutes

1                         ALBRECHT

2       after you got it from Dr. Augustine.  The

3       subject line on that is, "Hook, line and

4       sinker," right?

5  A.   Correct.

6  Q.   What did you mean by, "Hook, line and

7       sinker"?

8                    MR. ASSAAD:  Objection to form.

9                    THE WITNESS:  That the work was

10      available, it looks like.

11  BY MR. COREY GORDON:

12  Q.   And why -- what does, "Hook line and sinker,"

13      mean?

14  A.   It means that you'd have an ability to catch

15      a fish and charge consulting dollars.

16  Q.   Okay.  And your brother's response to this in

17      Exhibit 22 was, "Thinking of reeling it in or

18      is this more of a catch and release day for

19      you"?

20  A.   Uh-huh.

21  Q.   What did you understand him to mean by that?

22                    MR. ASSAAD:  Objection; calls for

23      speculation.

24                    THE WITNESS:  Do you want the work

25      or not.

Page 268

1                               ALBRECHT

2    BY MR. COREY GORDON:

3    Q.   And your response was to say, "Sadly, I'm not

4         sure."  And you say you're thinking of

5         charging a higher rate, and, "If he goes for

6         it fine, if not, whatever," right?

7    A.   Yeah, I see that.

8    Q.   And then you go on to say, "The only problem

9         is that I don't trust him to pay me."

10   A.   Uh-huh.

11   Q.   Why did you not trust him to pay you?

12   A.   Because when I left the company, it was

13        having financial difficulties.  So it's not a

14        statement about him, it's about the state of

15        the health of the company.

16   Q.   So you were concerned that the company was in

17        such dire financial straits that you might

18        not end up getting paid for your work --

19                  MR. ASSAAD:  Objection to form.

20   BY MR. COREY GORDON:

21   Q.   -- is that right?

22                  MR. ASSAAD:  Objection to form.

23                  THE WITNESS:  I don't know.

24        Again, I didn't have access to all that, but

25        they did cut our hours.

```
1                          ALBRECHT
2               (Whereupon, Exhibit 23 was
3               marked for identification.)
4  BY MR. COREY GORDON:
5  Q.  I'll show you Exhibit 23.  The very top part
6      of this is an e-mail exchange -- or an
7      e-mail -- well, e-mail exchange between you
8      and Dr. McGovern; is that correct?
9  A.  Yes, it is.
10 Q.  And could you just generally summarize what
11     the -- the general back and forth of this
12     e-mail chain refers to?
13 A.  Maybe you could help ask what you're looking
14     for a little more clearly.
15 Q.  Well, you recall that there was a -- a study
16     that -- in which a Dr. Dan Sessler was one of
17     the coauthors that addressed some of the
18     issues related to the use of forced-air
19     warming in laminar airflow rooms?
20 A.  In a different viewpoint, yes.
21 Q.  And there was -- and Scott Augustine was not
22     happy about that, right?
23 A.  In this e-mail here, he appears not to be.
24 Q.  Is this -- do you recall independently of
25     this e-mail that Dr. Augustine was upset
```

Page 270

ALBRECHT

1

2        about the Sessler study?

3   A.   Upset is not the correct word, I don't think.

4        I think he didn't agree with the methods in

5        the data.

6   Q.   Well, you said to Dr. McGovern in Exhibit 23

7        that, "The letter Scott sent is disturbing,"

8        right?

9   A.   I did.

10  Q.   What did you mean by disturbing?

11  A.   It's an open research community, people are

12       allowed to have a disagreeing opinion.  I

13       sometimes think he can take it a little too

14       far.

15  Q.   In fact, you went on to say, "He keeps

16       attack" -- "attacking these people without

17       cause," right?

18  A.   I do.

19  Q.   What -- what attack was he -- were you

20       referring to?

21  A.   Well, down in the e-mail below.

22  Q.   The one that you just moments ago described

23       as a difference of opinion and methodology?

24  A.   Statements like, "Nonetheless, we will

25       continue to publicly call it fraud," things

Page 271

                              ALBRECHT

1
2      like that seem a little over the top.
3   Q.  Okay.  And, in fact, Dr. Augustine was
4      accusing Dr. Sessler of committing scientific
5      fraud, right?
6   A.  Those are his words, not mine.  I'm not able
7      to make that statement.
8   Q.  Well, in this e-mail to Dr. McGovern you
9      said, "Calling someone a fraud in public is
10      not something to take lightly, particularly
11      since it is just a disagreement in research
12      opinion," right?
13  A.  That is my opinion, possibly, of the e-mail,
14      yes.
15  Q.  So as of May 30th -- or May 20th, 2012, isn't
16      it a fact that you were of the view that
17      Dr. Augustine was calling Dr. Sessler a fraud
18      in public?
19  A.  This was an internal communication between
20      myself and Paul.  Scott Augustine is a
21      controversial figure and he does push some
22      buttons.  I may have a little bit of
23      hyperbole here, because this isn't in public
24      necessarily, this is a closed discussion
25      between a couple of individuals.

Page 272

                              ALBRECHT

1

2    Q.   One of those individuals is somebody whose

3         done a lot of -- or been involved in a lot of

4         research funded by Dr. Augustine, right?

5                        MR. ASSAAD:  Objection.  Object to

6         the form.

7                        THE WITNESS:  In the past I'm

8         aware that, yes, he has been funded by

9         Dr. Augustine's companies that he's worked

10        for.

11                       MR. COREY GORDON:  Okay.

12   BY MR. COREY GORDON:

13   Q.   And when you say it was a confidential

14        communication, you and Dr. McGovern had

15        developed a friendship by this point, right?

16   A.   A rapport, yes.

17   Q.   Okay.  Well, and that's why you were able to

18        ask him to not disclose to Dr. Augustine what

19        your new job was or to confide -- or to share

20        with Dr. Augustine that he had given you a

21        reference?

22   A.   He was a professional colleague --

23                       MR. ASSAAD:  Objection to form.

24                       THE WITNESS:  -- Dr. McGovern.

25                       MR. COREY GORDON:  Okay.

1                              ALBRECHT

2      BY MR. COREY GORDON:

3      Q.  One you felt comfortable saying that the

4          letter Scott sent was disturbing, right?

5      A.  My opinion of it is yes, it is disturbing.

6      Q.  Okay.

7                          (Whereupon, Exhibit 24 was

8                          marked for identification.)

9      BY MR. COREY GORDON:

10     Q.  I'll show you Exhibit 24.  First of all, who

11         is Thomas Neils?

12     A.  He was a fellow employee I had worked with.

13     Q.  At what company?

14     A.  Augustine.

15     Q.  Was he still as Augustine as of --

16     A.  No.

17     Q.  Okay.  Where was he working in May of 2012?

18     A.  Likely Medtronic, I believe.

19     Q.  Okay.  And on May 16th of 2012, at 2:46, you

20         sent him a copy of the Augustine e-mail, an

21         Augustine e-mail talking about the Sessler

22         study, right?

23     A.  I did.

24     Q.  And you said that, "By the way, Scott also

25         copied me on this about two days ago.  He

ALBRECHT

1       actually sent this to the doctors that do our
2       research, Mike and Paul.  How crazy is this."

3       Did I read that correctly?

4  A.  That's what's in the e-mail.

5  Q.  Okay.  And the Mike and Paul, that refers to

6       Mike Reed and Paul McGovern; is that correct?

7  A.  Correct.

8  Q.  And what did you mean by, "Doctors that do

9       our research"?

10  A.  That we had worked with in the past at the

11       company we had been employed at.

12  Q.  Augustine?

13  A.  Yes.

14  Q.  So when you -- you as a former Augustine

15       employee were writing to Thomas Neils,

16       another former Augustine employee, and you

17       were referring to Dr. Reed and Dr. McGovern

18       as the doctors that, "Do our research," you

19       were talking about doctors that do Augustine

20       research, right?

21  A.  We had worked with them in the past, that's

22       what was meant by that.

23  Q.  And by, "We," I just want to make it clear,

24       it's not you and Mr. Neils, it's Augustine?

1                         ALBRECHT

2   A.   Mike and Paul have been funded by Augustine

3        to do research.

4   Q.   And when you said, "The doctors that do our

5        research," you weren't talking in this e-mail

6        to Mr. Neils about doctors who do research

7        for you and Mr. Neils, correct?

8   A.   No.

9   Q.   You were talking about doctors that do

10       research for Augustine?

11  A.   That we had been employed at in the past,

12       yes.

13  Q.   Okay.  And what did you mean by, "How crazy

14       is this"?

15  A.   Well, again, this is kind of backdoor

16       communications, but it's the -- and goes back

17       to what you asked me before, that I find the

18       letter a little bit disturbing and we deal

19       with that.  He's a controversial figure.

20  Q.   Okay.  And what did you understand Mr. Neils

21       to be saying to you when he said, "Yes, there

22       will be flames"?

23  A.   I can't speculate.

24              MR. ASSAAD:  Objection; calls for

25       speculation.

1                         ALBRECHT

2                THE WITNESS:  I don't know.

3    BY MR. COREY GORDON:

4    Q.  Did you ask him what he meant by that?

5    A.  No.

6                    (Whereupon, Exhibit 25 was

7                    marked for identification.)

8    BY MR. COREY GORDON:

9    Q.  Let me show you Exhibit 25.  This is a

10       document that was produced by you.  It bears

11       Bates numbers Albrecht_003353 [sic] through

12       0003361, and it has -- the title is, "A

13       Critical Analysis of Forced-Air Warming Does

14       Not Worsen Air Quality in Laminar Flow

15       Operating Rooms," by Sessler et al., and the

16       author appears to be Scott Augustine, M.D.

17                My first question is:  Did you have

18       anything to do with the drafting of this?

19   A.  I'm unsure.

20   Q.  Is it possible that you did?

21   A.  Maybe elements of this, I don't know.

22   Q.  Do you recall doing any work to analyze the

23       Sessler study that's referred to in this in

24       providing Dr. Augustine with your analysis of

25       it?

Page 277

1                          ALBRECHT

2    A.   I may have.  I'm unsure.

3    Q.   Okay.  Why don't you look through this --

4    A.   There's a lot here.

5    Q.   -- document and -- I agree -- see if you can

6         identify anything that appears to be based in

7         whole or in part on work you might have done.

8    A.   (Reviews document.)  Okay.

9    Q.   Can you identify any areas that you think you

10        would have had input in?

11   A.   He may have asked me for information in

12        respect to reviewing some of the ventilation

13        standards possibly.  It looks like some of

14        the results of a couple of the studies

15        here -- excuse me -- were a part of that.

16   Q.   Let me direct you to the page that's marked

17        at the bottom Albrecht_0003360.

18   A.   Okay.

19   Q.   Under the section, "Discussion," do you see

20        that?

21   A.   Yup.

22   Q.   There's -- the first study that is discussed

23        is the McGovern study that's -- we previously

24        marked as Exhibit 8, correct?

25   A.   I believe so.

1                          ALBRECHT

2    Q.   Okay.  And it talks about the -- the -- the

3         part of the study addressing airflow

4         ventilation disruption, but then in the next

5         paragraph Dr. Augustine writes, "More

6         important, forced-air warming was shown to

7         cause a 3.8 times increase in deep joint

8         infection rates."  Did I read that correctly?

9    A.   Okay.

10   Q.   You would agree that the -- that the McGovern

11        paper in which you were a coauthor, it did

12        not show that forced-air warming caused a

13        3.8 times increase in deep joint infection

14        rates, right?

15                  MR. ASSAAD:  Objection to form.

16                  THE WITNESS:  It was an

17        observational study, so whatever caveats come

18        with that.

19   BY MR. COREY GORDON:

20   Q.   Well, would you agree with Dr. Augustine's

21        characterization of the study that you were a

22        coauthor of that it found that forced-air

23        warming caused a 3.8 times increase in deep

24        joint infection rates?

25                  MR. ASSAAD:  Objection to form.

1                          ALBRECHT

2                    THE WITNESS:  It depends on what

3          you define as "cause."  It was associated

4          with.

5    BY MR. COREY GORDON:

6    Q.   In your professional experience as a

7          statistician dealing in the field of medical

8          and biological issues, is there any

9          difference to you between something that's

10         associated with and something that causes?

11                   MR. ASSAAD:  Objection to form.

12                   THE WITNESS:  Yes, there is a

13         difference between association and cause, and

14         causation.

15   BY MR. COREY GORDON:

16   Q.   And you were one of the coauthors of the

17         McGovern study that's being characterized

18         here.  Do you agree with the characterization

19         that your study found that forced-air warming

20         caused a 3.8 times increase in deep joint

21         infection rates?

22                   MR. ASSAAD:  Objection to form.

23                   THE WITNESS:  I would agree that

24         it's associated with the 3.8 times increase,

25         that's what the study would say.

1                              ALBRECHT

2      BY MR. COREY GORDON:

3      Q.   So you would -- you would -- you would agree,

4           then, that you did not conclude or show that

5           it caused a 3.8 times increase in deep joint

6           infection rates?

7                      MR. ASSAAD:  Objection to form.

8                      THE WITNESS:  We did not prove

9      causation.

10     BY MR. COREY GORDON:

11     Q.   So -- and you would agree that this statement

12          by Dr. Augustine is a mischaracterization of

13          the study on which you were a coauthor?

14                     MR. ASSAAD:  Objection to form.

15     BY MR. COREY GORDON:

16     Q.   Correct?

17     A.   It's speculation, because it didn't use the

18          exact word "causation."  If I were to look

19          for association versus causation, I'd need to

20          have that word, if you want me to be frank

21          with you on statistical terms.

22     Q.   I just want you to be frank with me on

23          whether you think that Dr. Augustine

24          accurately characterized your study when he

25          said, "Forced-air warming was shown to cause

Page 281

1                         ALBRECHT

2        a 3.8 times increase in deep joint infection

3        rates."

4                     MR. ASSAAD:  Objection to form,

5        asked and answered.

6    BY MR. COREY GORDON:

7    Q.  Is that a correct characterization or not?

8                     MR. ASSAAD:  Same objection.

9                     THE WITNESS:  It depends on the

10       context.  It's not causation, it's

11       association.

12                    MR. COREY GORDON:  Okay.

13   BY MR. COREY GORDON:

14   Q.  I can't give you any more context on what

15       Dr. Augustine's words are here.  "Forced-air

16       warming was shown to cause a 3.8 times

17       increase in deep joint infection rates," is

18       that, in your view as one of the coauthors of

19       the study, accurate or not accurate?

20                    MR. ASSAAD:  Objection to the

21       form, asked and answered.  Object to the

22       preamble.

23                    MR. COREY GORDON:  But you've got

24       to move to strike it, Gabriel.

25                    MR. ASSAAD:  I'm not moving to

Page 282

1                              ALBRECHT

2          strike it, I'm just objecting to it.

3                    THE WITNESS:  "More importantly,

4          forced-air warming was shown to associate

5          with a 3.8 times increase in deep joint

6          infection rates," that I would agree with.

7          With what's written there, it seems a

8          little -- I would have to say probably not,

9          no.

10    BY MR. COREY GORDON:

11    Q.   And -- and, in fact, you recall the exercise

12         we went through at some length in your first

13         deposition?

14    A.   Oh, yes.

15    Q.   The association between forced-air warming

16         and infection rates maybe would not be very

17         strong if you factored out the deep vein

18         thrombosis treatment change?

19    A.   If you had reason to believe --

20                    MR. ASSAAD:  Objection; asked and

21         answered.

22                    THE WITNESS:  If you had reason to

23         believe that the standard of care was lowered

24         for those patients in those areas, maybe.  So

25         it wasn't no thrombosis agent versus

                              ALBRECHT

1

2      thrombosis agent, it was different kinds.  It

3      was not no antibiotic versus some antibiotic,

4      it was different types.

5  BY MR. COREY GORDON:

6  Q.  Well, you recall that we went through at some

7      length at your last deposition and compared a

8      period of time when the -- when the

9      Bair Hugger forced-air warming unit was used

10     with the exact same antibiotic regimen and

11     the exact same anti-thrombosis --

12     thromboembolism medication --

13  A.  Yup.

14  Q.  -- as the HotDog only time period, right?

15  A.  Yes.

16  Q.  And you agreed that there was no difference

17     in the rate of infection?

18          MR. ASSAAD:  Objection to form,

19     misstates prior testimony.

20          THE WITNESS:  For those periods,

21     yes.

22  BY MR. COREY GORDON:

23  Q.  And, in fact, there was a huge difference

24     when there was a different drug used for

25     prevention of deep vein thrombosis during the

Page 284

ALBRECHT

1        Bair Hugger only period?

3   A.   I don't know if it was due to that, but it

4        was associated with that period where it was

5        the same prophylaxis regimen, okay, on both

6        terms there wasn't a difference, that's all I

7        can say on the data.

8   Q.   And the period where the -- there was a

9        seven-month period where the hospital had

10       switched to a different drug, Xarelto, and

11       the infection rates during that period were

12       significantly higher than they were before

13       and after --

14                 MR. ASSAAD:   Objection to the

15       form.

16  BY MR. COREY GORDON:

17  Q.   -- right?

18  A.   I don't know about before and after, but the

19       period of higher infection rates were

20       associated with the use of that drug you talk

21       about, Xarelto.

22  Q.   Okay.

23  A.   Not caused, but associated.

24  Q.   Right.  Okay.  Now, who were the -- who would

25       you describe as the principal people involved

ALBRECHT

1
2      in the McGovern study, Exhibit 8?  There are
3      seven authors listed.
4  A.  Let me pull it up here.  (Reviews document.)
5      Everybody was heavily involved in this one.
6  Q.  Heavily, okay.  Did Dr. Belani go to England?
7  A.  He did not.
8  Q.  Okay.  Did Dr. Nachtsheim go to England?
9  A.  He did not.
10 Q.  Did Dr. Nachtsheim even know about the study
11     when it was being done?
12 A.  Dr. Nachtsheim commented on the statistics of
13     the study and reviewed them.
14 Q.  Yeah, after it was all done and written up,
15     right?
16 A.  You'll have to define what you mean by "heavy
17     involvement."  Dr. Nachtsheim would be for
18     statistical reasons.  Different authors
19     provide different perspectives.
20 Q.  Did Dr. Nachtsheim have anything to do with
21     the study -- design of the study before it
22     was commenced?
23 A.  I'm unsure.
24 Q.  Okay.  Did Dr. Belani have anything to do
25     with the design of the study before it was

Page 286

ALBRECHT

1

2      commenced?

3   A.  I don't recall.

4   Q.  How about Dr. Partington, what was his role?

5   A.  He was a surgeon in the UK and was heavily

6       involved in the manuscript revision process,

7       if I recall right.

8   Q.  When you say, "Heavily involved," what did he

9       do?

10  A.  Himself, Paul and Mike went through -- or I

11      should say Dr. Reed, Dr. McGovern and

12      Dr. Partington and Dr. Carluke read through

13      the study and worked through the clinical

14      messaging and what the appropriate themes

15      were based on the data.

16  Q.  Okay.  Who were the people actually in the

17      operating room at -- where the bubble part of

18      the study was done?

19  A.  Sure.

20              MR. ASSAAD:  Objection to the

21      form.

22              THE WITNESS:  It was myself,

23      Dr. McGovern, Dr. Reed, I think that

24      Dr. Partington and Carluke were present for

25      part of it, if I remember.

1                        ALBRECHT

2   BY MR. COREY GORDON:

3   Q.   Mr. Albrecht, wouldn't it be correct to say

4        that you and Dr. McGovern and Dr. Reed were

5        the principal people involved in designing,

6        implementing and writing up the study in

7        Exhibit 8?

8                    MR. ASSAAD:  Objection to form.

9                    THE WITNESS:  We contributed in

10  our different areas.  There was quite a bit

11  of discussion between Partington and Carluke,

12  if I remember right, so no.

13  BY MR. COREY GORDON:

14  Q.   And you think Partington and Carluke were

15       involved at the early design stages of this?

16                   MR. ASSAAD:  Objection to form.

17                   THE WITNESS:  I don't recall,

18  because a lot of the design happened through

19  the group talking over in England and

20  thinking through the issues.  These are very

21  iterative in nature in how they get thought

22  out and planned.

23                   MR. COREY GORDON:  Okay.

24  BY MR. COREY GORDON:

25  Q.   Let's go back to Exhibit 25 --

Page 288

1                          ALBRECHT

2    A.   Okay.

3    Q.   -- the same page we were looking at.

4              After the discussion of McGovern's

5         paper he -- Dr. Augustine writes, "Similar

6         infection reduction results were found at

7         Ridgeview Medical Center, Waconia, Minnesota.

8         These surgeons found that switching from FAW

9         to air-free HotDog warming reduced their deep

10        joint infection rate by 81 percent,

11        1.55 percent of .29 percent"; do you see

12        that?

13   A.   Yeah, I do.

14   Q.   Now, the Ridgeview, Waconia, Ridgeview

15        Medical Center, Waconia, that was one of the

16        three projects that you had agreed less than

17        two months before the Exhibit 25 is dated to

18        review the data and participate in writing up

19        a publication, right?

20   A.   Correct.

21   Q.   And that's -- that's the same one that you

22        say you don't recall ever seeing the data,

23        correct?

24   A.   I may have.  It's difficult without some

25        documentation.  It's a long time ago.

Page 289

1                           ALBRECHT

2   Q.  So between March 1st when you were -- agreed

3       as part of your satisfaction of promissory

4       notes to write up the study on Ridgeview,

5       Waconia, and April -- this Exhibit 25 dated

6       April 21st, 2012, where Dr. Augustine cites

7       an 81 percent reduction in deep joint

8       infection rates at Ridgeview Medical Center,

9       Waconia, did you do any analysis of any data

10      that would have formed the basis of -- of

11      this 81 percent reduction claim?

12                  MR. ASSAAD:  Objection to form,

13      lack of foundation.

14                  THE WITNESS:  I may have.  I don't

15      know.  There are many different data sets we

16      work with.

17                  (Whereupon, Exhibit 26 was

18                  marked for identification.)

19  BY MR. COREY GORDON:

20  Q.  I'm going to show you what I've marked as

21      Exhibit 26.  This is -- the front page is

22      An e-mail exchange between you and

23      Professor Nachtsheim; is that correct?

24  A.  Yes.

25  Q.  And in this you are saying, to

1                        ALBRECHT

2        Dr. Nachtsheim, "Here is a publication we

3        will be submitting in a couple of weeks.  I'm

4        currently adding the references, but the

5        material is done.  The abstract will also be

6        written this week.  I'd be thrilled if you'd

7        like to be a part of this.  All you need to

8        do is take a look at the stats and

9        conclusions and provide some overview and

10       guidance.  Let me know if you are

11       interested," right?

12   A.  Okay.

13   Q.  And the study that you were going to be

14       submitting in a couple of weeks where the

15       material was done, that's the McGovern study,

16       right?

17   A.  I'm assuming.  I don't know.

18   Q.  Well, why don't you --

19   A.  I can't tell from this.

20   Q.  Why don't you look at the attached e-mail

21       chain and see if you can figure it out?

22   A.  Okay.  (Reviews document.)  Yup, I would

23       assume it is that paper.

24   Q.  Okay.  And, in fact, the title -- or the

25       subject line, apparently, of the -- this

1                        ALBRECHT

2        exchange with you and Professor Nachtsheim

3        is, "First publication I'd like to include

4        you on"; is that correct?

5   A.   Yes.

6   Q.   So does this refresh your recollection as to

7        when Professor Nachtsheim became involved in

8        the McGovern paper?

9   A.   In a detailed manner, yes, in terms of

10       looking through the data with a statistical

11       lens.

12  Q.   After it was all done and written up, right?

13  A.   Well, there's still time for revision on

14       this.

15  Q.   But he wasn't involved until you had already

16       done the material and written it up for

17       submission with two -- within two weeks,

18       right?

19  A.   Perhaps.

20  Q.   Now I want to -- oh, before I go to that,

21       have you had any contact with Dr. Scott

22       Augustine since your -- the first day of your

23       deposition?

24  A.   Not to my knowledge.

25  Q.   Have you had any contact with anyone

ALBRECHT

1
2     currently employed by Augustine Biomedical?
3  A.  Since the first day of my deposition?
4  Q.  Since the first day of your deposition.
5  A.  I had a phone call with Andreas just to say I
6     was being deposed.
7  Q.  Andreas Deibel, is it?
8  A.  Yes.
9  Q.  And what's his role at the company?
10 A.  He at the time was running the research and
11     development arm.
12 Q.  Is he still employed by Augustine?
13 A.  Yeah, at the time I called.
14 Q.  You called him?
15 A.  I did.
16 Q.  Why did you call him?
17 A.  Just to mention I was getting deposed.
18 Q.  Oh, this was before your -- the first day of
19     your deposition?
20 A.  Yeah.
21 Q.  Okay.  You also had an exchange of e-mails
22     with Dr. Augustine directly before your
23     deposition, right?
24 A.  I believe so.
25 Q.  And we'll get to that, I just -- I -- I was

ALBRECHT

1  
2  focusing on the time since -- since your --

3  the first day of your deposition, I just want

4  to -- it's your testimony that you had no

5  contact with anybody connected to Augustine?

6  A.  Employees with Augustine, no.

7  Q.  How about Randy Benham?

8  A.  I've not talked to Randy.

9  Q.  Now, let's go back to Exhibit 26.  And turn

10     to page -- where at the bottom it's

11     Bates-stamped Nachtsheim_0000447.

12  A.  Okay.

13  Q.  It looks like the top subject line is,

14     "Infection Data Results"; is that right?

15  A.  Yes.

16  Q.  And the first part is an e-mail from you to

17     Dr. Reed with carbon copies to Dr. McGovern,

18     Professor Nachtsheim, Scott Augustine,

19     T. Neils and Kumar Belani, right?

20  A.  Correct.

21  Q.  Why were you sending -- why were you copying

22     Dr. Augustine on this?

23  A.  Because he's a study sponsor, he's paying the

24     bill.

25  Q.  Well, in fact, Dr. Augustine reviewed and

1                        ALBRECHT

2        offered editorial input on all of the papers,

3        right?

4                    MR. ASSAAD:  Objection to form,

5        lack of foundation, assumes facts not in

6        evidence.

7                    THE WITNESS:  He may have given

8        his input on some areas.

9   BY MR. COREY GORDON:

10  Q.   If you drop down to -- towards the bottom,

11       there's an e-mail from Dr. Reed to you with a

12       carbon copy to McGovern, Nachtsheim,

13       Scott Augustine and T. Neils and Dr. Belani,

14       right?

15  A.   Yup.

16  Q.   Okay.  And Dr. Reed says, "The trans" --

17       "transfusion data is unreliable, I'm afraid.

18       It just shows errors we are making in coding

19       and billing.  It is actually about

20       10 percent.  I can get the reliable data, but

21       it would take quite a lot of work.  Likewise,

22       I can get ASA grade, but possibly BMI by

23       pulling the charts/notes.  I suggest we don't

24       do that, as I don't have the resource.  What

25       do others feel?"  Did I read that correctly?

Page 295

1                             ALBRECHT

2    A.  Yes, you did.

3    Q.  What -- what was Dr. Reed -- what did you

4        understand Dr. Reed to be referring to when

5        he was talking about transfusion data?

6                    MR. ASSAAD:  Objection to form.

7                    THE WITNESS:  This is one of those

8        outside factors with observational data that

9        he might want some information about.

10   BY MR. COREY GORDON:

11   Q.  What did you understand the ASA grade to

12       refer to?

13                   MR. ASSAAD:  Objection to form,

14       lack of foundation.

15                   THE WITNESS:  I think that has

16       something to do with their status prior to

17       surgery, like how at risk they are, I

18       believe.

19   BY MR. COREY GORDON:

20   Q.  Is that a factor that you would consider in

21       comparing two groups for surgical site

22       infection rates?

23                   MR. ASSAAD:  Objection to form,

24       lack of foundation, outside the scope.

25                   THE WITNESS:  Perhaps.  I looked

Page 296

1                        ALBRECHT
2        at the clinicians for inclusion/exclusion
3        criteria for these types of studies to make
4        determinations on that.
5                    MR. COREY GORDON:  Oh, okay.
6    BY MR. COREY GORDON:
7    Q.  Not your -- not -- not something that you
8        have the expertise in, is that what you're
9        saying?
10   A.  In some areas, no.
11   Q.  Okay.  Jump to the next page.  Towards the
12       bottom you say to -- in an e-mail to
13       Dr. Reed, "Mike, I do agree that it doesn't
14       make sense for you to chase things when this
15       is an addition to the paper."  Do you see
16       that?
17   A.  Okay.
18   Q.  What did you mean by, "This is an addition to
19       the paper"?
20   A.  I don't know.
21   Q.  Could it be that the -- the original intent
22       of the study was the airflow disruption issue
23       and the bubbles and the looking at the -- the
24       observational data using surgical site
25       infection rates was a -- was the addition you

Page 297

1                          ALBRECHT

2       were talking about here?

3                    MR. ASSAAD:  Objection to form,

4       calls for speculation, lack of foundation.

5                    THE WITNESS:  It may have been,

6       I'm unsure.

7                    MR. COREY GORDON:  Okay.

8   BY MR. COREY GORDON:

9   Q.  And you go on to say that, "You appear to

10      have reliable data on the following

11      predictors that might be of interest, COPD,

12      hypothyroidism, hyperthyroidism,

13      hypertension, preoperation days stay before

14      surgery."  Did I read that right?

15  A.  Yeah.

16  Q.  You go on to say, "I think we could make a

17      case for hypothyroidism and hyperthyroidism

18      as risk factors, but I'm less sure whether

19      COPD or hypertension could be seen as

20      reasonable.  What do you think?"  And then

21      you can read the rest of it, but my -- my

22      question is why would you have any idea

23      whether COPD or hypertension or

24      hyperthyroidism or hypothyroidism would be

25      risk factors?

Page 298

ALBRECHT

1

2   A.   From scanning comparable studies, I'm sure

3        that's where that comes from.  So you look at

4        the design and the inclusion/exclusion

5        criteria from other studies, so I'm making a

6        list here, it looks like.

7   Q.   Okay.

8   A.   Now, whether or not I'm able to clinically

9        interpret that is a different story.

10  Q.   Now, if you drop down to the -- towards the

11       bottom of this page, Dr. Reed replies to you

12       and says, "I agree hypo and hyperthyroidism

13       and COPD would be useful, but only if the

14       list was more complete.  I think it would

15       highlight the fact that we don't have ASA

16       data, obesity and transfusion.  We should

17       leave out."  Did I read that correctly?

18  A.   Yes, you did.

19  Q.   So those are all factors that could impact

20       the comparative data between two groups,

21       right?

22                 MR. ASSAAD:  Objection to form,

23       lack of foundation.

24                 THE WITNESS:  It's observational

25       data.  There's many confounders that could be

Page 299

1                        ALBRECHT
2        present and those could be in the list.
3                   MR. COREY GORDON:  All right.
4    BY MR. COREY GORDON:
5    Q.  Well, if you turn to the last page of this --
6        well, before you get to that, that's -- I
7        guess the very bottom of the page before,
8        Dr. Reed wonders "if we should Charlson
9        score, that is generally what we use when we
10       analyze this type of data nationally."  Do
11       you see that?
12   A.  Okay.
13   Q.  Okay.  Now, Dr. Reed is the clinician that
14       you're relying on, right?
15   A.  He is.
16   Q.  And he's saying, "Let's use the Charlson
17       score, because that's what they use to
18       analyze these data nationally," right?
19                   MR. ASSAAD:  Object to the form.
20                   THE WITNESS:  Say that one more
21       time.
22   BY MR. COREY GORDON:
23   Q.  Well, Dr. Reed is the clinician you're
24       relying on for deciding what's an important
25       comorbidity factor or comparative factor --

1                          ALBRECHT

2   A.   We're having a discussion back and forth

3        about what we should think about, yes.

4   Q.   Well, you -- you said you relied on the

5        clinicians, right, because that's not your

6        area of expertise, right?

7                      MR. ASSAAD:   Objection to form,

8        misstates prior testimony.

9                      THE WITNESS:   In terms of

10       comparable studies, my area in these studies

11       is typically to look at other study designs

12       and see how they compare up, and so I have

13       some opinion at times on what factors make

14       sense and what don't, and I have a discussion

15       with the clinicians about that.

16                      MR. COREY GORDON:   Okay.

17  BY MR. COREY GORDON:

18  Q.   Well, in fact, your reaction to Dr. Reed

19       suggestion of using the Charlson score was to

20       say that, "It was an interesting idea, but we

21       will probably get nicked, because Charlson

22       score is an validated indicator of mortality

23       risk, not infection risk," right?

24  A.   Okay.

25  Q.   And you go on to say, "I think we have enough

```
1                        ALBRECHT
2      given the data collection and accuracy
3      constraints."  Did I read that correctly?
4                  MR. ASSAAD:  Objection to form.
5      You did not read that correctly.
6                  THE WITNESS:  "I think we have
7      done enough given the data collection and
8      accuracy constraints."
9                  MR. COREY GORDON:  I'm sorry, what
10     did I say?
11                 MR. ASSAAD:  You said, "I think we
12     have enough."  You forgot the word "done."
13                 THE WITNESS:  "I think we have
14     done enough."
15                 MR. COREY GORDON:  "I think we
16     have" -- okay.  Thank you.
17                 THE WITNESS:  Those are my words.
18  BY MR. COREY GORDON:
19  Q.  And the data collection and accuracy
20     constraints, that refers to the inability
21     either because of resources or availability
22     of information to collect relevant
23     comorbidity data --
24                 MR. ASSAAD:  Objection to form.
25  BY MR. COREY GORDON:
```

1                          ALBRECHT

2    Q.  -- right?

3    A.  There were some constraints on what you can

4        pull in, yes.

5    Q.  And the accuracy constraints, what -- what

6        does that refer to.

7    A.  Well, I believe the accuracy constraints were

8        what were highlighted above, right, "The

9        transfusion data is unreliable, I'm afraid."

10   Q.  Okay.

11                      (Whereupon, Exhibit 27 was

12                      marked for identification.)

13   BY MR. COREY GORDON:

14   Q.  I'll show you Exhibit 27.

15   A.  Okay.  Right here, (indicating)?

16   Q.  Yes.  That's an e-mail from you to -- well,

17       it's an e-mail exchange between you and

18       Keith Leland; is that right?

19   A.  It appears that way.

20   Q.  Who is Keith Leland?

21   A.  I used to work with him at Augustine.

22   Q.  And as of February 2014, was he still an

23       employee at Augustine?

24   A.  At that time, no.

25   Q.  Another member of the Augustine alumni club?

1                         ALBRECHT

2                MR. ASSAAD:  Objection to form.

3                THE WITNESS:  Well, a lot of the

4       places you work, you do have colleagues that

5       you've worked with in the past.

6                MR. COREY GORDON:  Sure.

7   BY MR. COREY GORDON:

8   Q.   And the one thing I just want to ask you

9        about on this, one you say in the last line

10       of the first paragraph, "Just stay away from

11       places with an $UGUSTIN# in the building

12       name."

13  A.   Okay.

14  Q.   What does that refer to?

15  A.   There's some shared frustrations we had, I

16       believe, working there at times.

17  Q.   By "there" you mean Augustine?

18  A.   Yes.

19  Q.   So was -- I'm just -- was this, "$UGUSTIN#,"

20       was that a typo or just avoiding typing up

21       the full -- the full name Augustine?

22  A.   I don't know, it's probably me trying to be

23       clever and funny.

24  Q.   So like Voldemort, he who should not be

25       named?

Page 304

1                          ALBRECHT

2                  MR. ASSAAD:  Objection to form.

3                  THE WITNESS:  No, it's just a

4      joke.

5                  MR. COREY GORDON:  Okay.

6   BY MR. COREY GORDON:

7   Q.  And why were you joking to Mr. Leland that it

8       would be good to stay away from places with

9       Augustine in the building name?

10  A.  Because we never -- I never had any equity in

11      the company, he never got material equity in

12      the company, so that's kind of the reason

13      why.

14  Q.  Let me show you Exhibit 28.

15              (Whereupon, Exhibit 28 was

16              marked for identification.)

17  BY MR. COREY GORDON:

18  Q.  Okay.  This is a series of e-mails among

19      Dr. McGovern, you, Dr. Reed, Scott Augustine,

20      Brent Augustine, and Professor Nachtsheim,

21      correct?

22  A.  It appears that way.

23  Q.  Say that again.

24  A.  It appears that way, yes.

25  Q.  Okay.  First of all, who is Brent Augustine?

Page 305

1                          ALBRECHT

2    A.   Scott Augustine's kid.

3    Q.   Did he have any involvement in any of the

4         studies you did?

5    A.   I believe he provided some of the graphics.

6    Q.   Okay.  And do you recall what the British Hip

7         Society presentation was about?

8    A.   Not off the top of my head, no.

9    Q.   Let's see if this helps.

10                    (Whereupon, Exhibit 29 was

11                    marked for identification.)

12   BY MR. COREY GORDON:

13   Q.   I'll show you Exhibit 29 now.  This is a

14        document that at the top says, "Outline of

15        BHS presentation."  Does this appear to be

16        the British Hip Society presentation referred

17        to in Exhibit 28?

18                    MR. ASSAAD:  Objection; calls for

19        speculation.

20                    THE WITNESS:  Why don't you give

21        me a minute to read through this and I'll

22        look at this and I can tell you.

23                    MR. COREY GORDON:  That would be

24        fine.  And if you wouldn't mind, let's go off

25        the record.

1                        ALBRECHT

2                MR. ASSAAD:  Actually, if he's

3    going to review it, I want it on the record.

4                MR. COREY GORDON:  Well, I need to

5    go to the bathroom.

6                MR. ASSAAD:  Let's go off the

7    record.  Don't review it until we get back on

8    the record.

9                THE WITNESS:  That's fine.

10                MR. COREY GORDON:  Wait, wait,

11   wait, wait, wait, wait a minute.

12            Mr. Assaad, are you representing

13   him?

14                MR. ASSAAD:  No, but he doesn't

15   have to review anything on his own time.  You

16   have seven hours, and we're already at five

17   hour -- five-and-a-half hours or six.  You

18   can't ask him to do functioning of a

19   deposition off the record because you want

20   more time for your deposition.

21            So he has a choice, he can do

22   whatever he wants.  I'm just saying that he

23   doesn't have to look at anything off the

24   record.

25                MR. COREY GORDON:  I agree, he has

```
1                         ALBRECHT
2    a choice, he can do whatever he wants and --
3              THE WITNESS:  I will be looking at
4    this on the record.
5              MR. COREY GORDON:  That's fine.  I
6    just want to point out, you know, sauce for
7    the goose, sauce for the gander.  You've got
8    a lot of depositions of our witnesses coming
9    up, and I can tell you the one that I was
10   just recently in, documents were reviewed off
11   the record, lengthy documents.  If -- you
12   know, if the Assaad rule now is that all
13   things shall be on the record, all reviewing
14   time shall be on the record, sauce for the
15   goose, sauce for the gander.
16             THE WITNESS:  So are we off the
17   record here?  Are we taking a break?
18             MR. COREY GORDON:  You're now off.
19             THE WITNESS:  Okay.
20             THE VIDEOGRAPHER:  We're going off
21   the record at 10:30 a.m.
22             (Whereupon, a brief recess
23             was taken.)
24             THE VIDEOGRAPHER:  This is
25   volume 2, video number 2 in the deposition of
```

                          ALBRECHT

 1

 2        Mark Albrecht.  Today is November 12th, 2016.

 3        We're going back on the record at 10:42 a.m.

 4                   THE WITNESS:  So where did we

 5        leave off?

 6   BY MR. COREY GORDON:

 7   Q.   Okay.  Well, Exhibit 28 is a chain of e-mails

 8        talking about the British Hip Society

 9        presentation, and there was an attachment

10        to --

11   A.   Okay.

12   Q.   -- this chain that says, "Outline of BHS

13        presentation doc."  And Exhibit 29 is an

14        outline of BHS presentation.  I'll represent

15        to you it's my -- my understanding that from

16        the production from Professor Nachtsheim, and

17        you can see the -- the numbering that -- it's

18        something in between, but I believe the

19        printout of the attachment is Exhibit 29.

20        But, you know, feel free to look.  I just --

21        there's just a couple of questions I have

22        about these documents, so --

23   A.   All right.  Let me skim through it real quick

24        and I'll be right with you.

25                   MR. ASSAAD:  Objection to the

1                          ALBRECHT

2          preamble, I guess, assumes facts not in

3          evidence, lack of foundation.

4                    THE WITNESS:  (Reviews document.)

5          Okay.  So I've read the e-mail.

6                    MR. COREY GORDON:  Okay.

7                    THE WITNESS:  I have no way to

8          confirm, but this seems appropriate as the

9          attachment.

10                   MR. COREY GORDON:  Okay.

11     BY MR. COREY GORDON:

12     Q.  And if you -- on Exhibit 28, if you turn

13         to -- well, let's go -- let's start with

14         Exhibit 29 and we'll go back to 28.

15     A.  Okay.

16     Q.  Exhibit 29, there are a series of comment

17         boxes on the -- the right-hand side of each

18         page with initials, and I just want to get

19         confirmation.  It looks like the only sets of

20         initials are MRR and M; is that right?

21     A.  I've got MRR, M2.  (Reviews document.)  I

22         think I only see those two.

23     Q.  And MRR, that would be Michael R. Reed, or

24         Mike R. Reed, right?

25     A.  I believe so.

1                         ALBRECHT

2   Q.   And M is you, right?

3                   MR. ASSAAD:   Objection; lack of

4        foundation, assumes facts not in evidence.

5                   THE WITNESS:   I don't know.

6                   MR. COREY GORDON:   Okay.

7   BY MR. COREY GORDON:

8   Q.   Is there --

9                   THE WITNESS:   It might be.

10  BY MR. COREY GORDON:

11  Q.   Well, is there anyone else on the list of

12       people back and forth whose -- whose comments

13       might have been offered on the BHS

14       presentation who has an M as either their

15       first or last initial?

16  A.   No, it does not appear that way.

17  Q.   Okay.

18  A.   So maybe.

19  Q.   All right.  Well, let's -- let's take a look

20       at the -- on Exhibit 29 comment M3 --

21  A.   Okay.

22  Q.   -- on the first page, bottom of the first

23       page.  So that comment is, "I suggest you add

24       this as an additional slide to focus the

25       direction of where you are going in the

Page 311

1                             ALBRECHT

2        broader context that you are only looking at

3        one potential factor among many possibly

4        culprits."

5   A.   Okay.

6   Q.   "This makes it look impartial and hides our

7        agenda, so to speak," all right?

8   A.   Okay.

9   Q.   Now, if you look back at Exhibit 28 --

10  A.   Okay.

11  Q.   -- on page Nachtsheim_0000242, in the middle

12       there's an e-mail from you, Mark Albrecht, to

13       Paul McGovern with a cc to Mike Reed, Scott

14       Augustine, Brent Augustine and Professor

15       Nachtsheim, right?

16  A.   Okay.  Which one, 00 what?

17  Q.   242.

18  A.   Okay.  All right.  I'm there.

19  Q.   And in the middle of the page there in your

20       e-mail you -- you say, "Much better, Paul.

21       You did a good job of hiding the," quote,

22       "agenda," close quote, "and making this look

23       much more impartial.  I'll give you an update

24       infection graph and summary tomorrow."  Do

25       you see that?

1                         ALBRECHT

2    A.   Uh-huh.

3    Q.   So --

4    A.   That seems to line up, I agree.

5    Q.   Okay.  What was the agenda?

6    A.   That's a good question.  Generally, in these

7         presentations you want to have some kind of

8         strong statement that you're thinking about,

9         some conclusions, since you've looked through

10        the data in the past and you've maybe come to

11        it.  So it's -- it's -- after your ability to

12        deeply study the issue, kind of what your

13        thoughts on it are, that's generally what the

14        agenda on it is.

15   Q.   And why is making some look more impartial

16        important?

17   A.   Because you want the reader to make their own

18        determination on this, you don't want to try

19        and have them go down your direction right

20        away.  You would get a knee-jerk reaction by

21        doing so.

22   Q.   Why would you want to hide your agenda?

23   A.   You don't hide it.  What you do is make sure

24        they are aware of all the possible items that

25        could contribute to it.

ALBRECHT

1

2  Q.  Well, in both -- in Exhibit 29 and Exhibit 28

3      you talk about hiding the agenda.

4  A.  Yup.  You call it an agenda to highlight to

5      the person when you're giving feedback on a

6      presentation like this to be very careful and

7      think though as someone is going to find you

8      that have an agenda, because it helps you as

9      a researcher make sure you've considered all

10     the possible factors.

11 Q.  Okay.  Turn to page -- the second page of

12     Exhibit 29, and comment M4 -- well, first of

13     all, read the --

14 A.  Where are we at here?

15 Q.  Second page.  Yeah, you're there.  The --

16     what -- the slide that this is apparently

17     commenting on, it simply says,

18     "Intraoperative patient warming significantly

19     improves patient outcomes."  And your comment

20     is, "Drop this slide.  I'd suggest moving

21     this information down to your ? mark slide,

22     and use a compound sentence to introduce the

23     idea, something like, 'Forced-air warming has

24     many established clinical benefits such as XX

25     and YY.  However, the heated airflow presents

1                         ALBRECHT
2       a ventilation disruption risk, therefore, we
3       evaluated.'"
4              And then you go on to say, "As it
5       stands, this slide," meaning, Intraoperative
6       Patient Warming Significantly Improves
7       Patient Outcomes, "is simply stating facts
8       and not making an argument.  To capture
9       attention an argument must be made" -- "must
10      be carried forward in every slide, we think
11      this because X and Y."
12  A.  Okay.
13  Q.  So you didn't want just neutral facts, you
14      wanted to make the argument -- you wanted
15      this presentation to make an argument?
16  A.  I would like someone to consider all the
17      broader topics and then make an argument of
18      what their interpretation is.
19  Q.  To advance the agenda that you're trying to
20      hide, right?
21  A.  Not to hide --
22              MR. ASSAAD:  Objection to lack of
23      foundation, misstates prior testimony.
24              THE WITNESS:  Agenda is a keyword
25      to tag someone's thinking so they make sure

1                              ALBRECHT

2        to say, Hey, I don't want to have this come

3        across like I have an agenda, so what are all

4        the things so someone can see it.  That's how

5        we talk about that in research, just to make

6        sure that you presented all the context --

7                    MR. COREY GORDON:  Okay.

8                    THE WITNESS:  -- that's what

9        that's about.  And it comes off very strange

10       in the way it's worded here, but that's the

11       intent of it.

12                   MR. COREY GORDON:  Okay.

13   BY MR. COREY GORDON:

14   Q.   And if you drop a little bit further down to

15        the middle of the page, it says, "Our

16        clinical concern" -- the slide --

17   A.   Where are we looking?

18   Q.   It would be, I guess, the second from the

19        bottom up slide.

20   A.   Okay.

21   Q.   "Our clinical concern was that a potential

22        for hot-rising air from the forced-air system

23        to disrupt laminar airflow with possible

24        consequences for airborne pathogenic

25        contamination."  Did I read that right?  I

```
 1                        ALBRECHT
 2      probably screwed up something.
 3                    MR. ASSAAD:  I wasn't paying
 4      attention.
 5                    THE WITNESS:  I will read it.
 6      "Our clinical concern was that there was a
 7      potential for hot-rising air from the
 8      forced-air system to disrupt laminar airflow
 9      with the possible consequences for airborne
10      pathogenic contamination."
11                    MR. COREY GORDON:  Okay.
12  BY MR. COREY GORDON:
13  Q.  And then Mike Reed's comment, or MRR6, is,
14      "I'm attempted to say the driver for this was
15      the need to verify the smoke DVD produced by
16      Augustine.  Remind them this DVD was posted
17      to all ortho surgeons in the UK last year,
18      assuming that is correct."
19  A.  Okay.
20  Q.  Okay.  And you -- you commented, apparently,
21      in response to that.
22  A.  Would you like me to read it?
23  Q.  Yeah, what was your comment?
24  A.  My comment here in the writing is, "I'd be
25      careful" --
```

1                          ALBRECHT

2                    MR. ASSAAD:  Objection; lack of

3          foundation, assumes that these are his

4          comments.  You may answer.

5                    THE WITNESS:  Go ahead and read it

6          for me.

7     BY MR. COREY GORDON:

8     Q.  No why don't you read comment M7.

9     A.  I'd rather not.

10    Q.  Okay.  "I'd be careful here.  That might

11         imply a strong corporate agenda behind these

12         activities and raise questions to the

13         credibility of the result."

14    A.  Yeah.

15    Q.  Okay.  Now, so Dr. Reed was saying the driver

16         behind the study was the DVD -- the smoke DVD

17         produced by Augustine.  And you were saying

18         no, don't -- don't say that, because that

19         might imply a strong corporate agenda behind

20         these activities --

21                    MR. ASSAAD:  Objection; lack --

22    BY MR. COREY GORDON:

23    Q.  -- and raise questions as to the credibility

24         of the results.

25                    MR. ASSAAD:  Sorry.  Objection;

Page 318

1                          ALBRECHT

2          lack of foundation, assumes facts not in

3          evidence.

4                    THE WITNESS:  So there is a

5          comment here, I presume it to be mine.

6     BY MR. COREY GORDON:

7     Q.   But the comment you specifically were saying,

8          "Let's not say that it was the Augustine

9          smoke DVDs that we were trying to verify."

10    A.   That's my opinion here, that I think you get

11         a knee-jerk reaction from people that don't

12         consider the whole piece impartially if you

13         focus it on a company being the motivating

14         reason.

15    Q.   Okay.  And when you refer to, "These

16         activities," and the -- and the, "Credibility

17         of the results," we're talking about the --

18         the McGovern paper, Exhibit 8, right?

19                    MR. ASSAAD:  Objection to form.

20                    THE WITNESS:  No, we are not.

21         We're talking about what's in the body of the

22         presentation.

23                    MR. COREY GORDON:  Okay.

24    BY MR. COREY GORDON:

25    Q.   Well, is -- what was the presentation based

1                              ALBRECHT

2          on other than -- if not the McGovern -- the

3          work you did for the paper that ended up

4          being Exhibit 8, what other work was this

5          based on?

6    A.    Whatever cut of that we're presenting as part

7          of this presentation.

8    Q.    Well, what -- what was -- what were the

9          activities and what were -- what the results

10         that you're presenting?

11   A.    This looks like it's a study based on the

12         airflow disruption component for the

13         presentation.

14   Q.    Did you do any other activities with Reed and

15         McGovern on airflow disruption besides the

16         work that you present in Exhibit 8?

17   A.    I believe we did a study at the University of

18         Minnesota at one point in time.

19   Q.    Was that before or after the work that you

20         did at Northumbria?

21   A.    I'm unsure.

22   Q.    And was that ever published?

23   A.    Yes, we have one of these published papers

24         here.  Sorry, it's hard to find through the

25         exhibits what we've got here.  (Reviews

Page 320

1                        ALBRECHT

2       document.)  So I see this, "Patient Warming

3       Excess Heat:  The Effects on Orthopedic

4       Operating Room Ventilation Performance, the

5       NA article.

6   Q.  That's Exhibit 7?

7   A.  Yup.

8   Q.  And that was published in 2013?

9   A.  Yup.

10  Q.  And when you were preparing this BHS Hip --

11      the British Hip Society presentation in

12      February of 2011, was that -- do you think

13      that might have been talking about the work

14      you did at University of Minnesota?

15  A.  I don't believe so.  Unless there's some note

16      on the bottom, I'm unsure.

17  Q.  It was about the stuff you were doing -- you

18      had done at Northumbria, right?

19  A.  This is a long time ago.  I'm not sure what's

20      getting rolled in here and what comments are

21      a part.  I can look through in more detail,

22      if I'd like.

23  Q.  No, let's move on.

24                  (Whereupon, Exhibit 30 was

25                  marked for identification.)

1                           ALBRECHT

2    BY MR. COREY GORDON:

3    Q.   I'm going to show you Exhibit 30.

4    A.   Okay.

5    Q.   That's an e-mail from you to Professor David

6         Leaper, right?

7    A.   Okay, in 2010.

8    Q.   And Dr. Leaper's name appears as a coauthor

9         on a couple of your -- your papers, right?

10   A.   He does.

11   Q.   Okay.  And in the middle of this you say, "As

12        mentioned, we need you to be the

13        corresponding author."  Do you see that

14        sentence?

15   A.   Okay.

16   Q.   What did you mean by, "We need you to be the

17        corresponding author"?

18   A.   He's going to handle the submission details.

19   Q.   And now drop a little further down.  You say,

20        "Also, we need to be critically careful that

21        this document appears to be impartial."

22   A.   As with all research.

23   Q.   Well, why were you asking Dr. -- and then you

24        ask Dr. Leaper to, "Please reread and let me

25        know if there is" -- "are any reasons

1                         ALBRECHT

2        suggesting that it may appear otherwise."

3   A.   That's just checking the quality of your

4        work.  You want your writing, your research,

5        things like that, to be as impartial as you

6        can, especially in the work that you present.

7   Q.   Well, you didn't say you wanted the document

8        to be impartial.  You said you wanted it to

9        appear to be impartial, right?

10  A.   That's not what I interpret that as, but I do

11       see what you're saying.

12  Q.   Okay.  And, you know, we've gone through some

13       documents now, you talked about hiding

14       agendas and appearing to be impartial.

15  A.   I am not talking about --

16                  MR. ASSAAD:  There is nothing

17       about hiding agendas.

18                  THE WITNESS:  My definition --

19                  MR. ASSAAD:  Objection to form,

20       misstates prior testimony, lack of

21       foundation, assumes facts not in evidence, a

22       preamble and argumentative.

23                  THE WITNESS:  On the record, when

24  we use the word agenda, we do so to talk

25  about what someone who is looking for

ALBRECHT

1

2  conflicts would think about to highlight that

3  to someone that, Hey, think about it, you may

4  have an agenda at play here, because it

5  highlights their need to think through

6  carefully and critically about what that

7  might be.

8  BY MR. COREY GORDON:

9  Q.  And in Exhibit 28 you said to Paul McGovern,

10     "You did a good job of hiding the," quote,

11     "agenda," close quote, "and making this

12     document look much more impartial," right?

13 A.  Yeah, he did a good job --

14              MR. ASSAAD:  Objection; asked and

15     answered.

16              THE WITNESS:  -- of bringing in

17     surrounding issues that could be a possible

18     contributor so people get the broad picture

19     and can make their own conclusion.

20 BY MR. COREY GORDON:

21 Q.  Well, if he hadn't hidden the agenda, it

22     wouldn't have looked quite as impartial,

23     right?

24              MR. ASSAAD:  Objection to form --

25 BY MR. COREY GORDON:

1                          ALBRECHT

2    Q.   Isn't that what you were saying?

3                    MR. ASSAAD:   Sorry.

4                    THE WITNESS:   No.

5                    MR. ASSAAD:   Sorry to cut you off,

6        Corey.   Objection to form, argumentative,

7        assumes facts not in evidence, lack of

8        foundation, assumes facts -- that's it.

9                    THE WITNESS:   That was slang for

10       saying you made this look much more impartial

11       and did a good job bringing in the

12       surrounding elements that could be relevant.

13                   MR. COREY GORDON:   Okay.

14                   (Whereupon, Exhibit 31 was

15                   marked for identification.)

16   BY MR. COREY GORDON:

17   Q.   I'm going to show you Exhibit 31.

18   A.   Yeah.

19   Q.   This is a -- an e-mail from you to Mike Reed,

20       Paul McGovern, carbon copies to Scott

21       Augustine, Andreas Deibel, Keith Leland,

22       R. Humble, and Christopher Nachtsheim, right?

23       It's July 9th, 2010, right?

24   A.   Okay.

25   Q.   And at the time of July 9th, 2010,

1                          ALBRECHT

2        Andreas Deibel, Keith Leland, and R. Humble,

3        in addition to Scott Augustine, were all

4        employees of Augustine Biomed, right?

5   A.   Yeah, Andreas, Keith, this is 2010, yeah,

6        that would be correct.

7   Q.   Who is R. Humble?

8   A.   He's a sales rep in Europe.

9   Q.   Oh, okay.  Do you know if he's still with the

10       company?

11  A.   I don't presume to know.

12  Q.   Okay.

13  A.   In fact, I'm not ever sure he was directly

14       employed, he could have been a distributor.

15  Q.   And the -- your subject line on your e-mail

16       is, "Publication factory continues," right?

17  A.   Yes, it is.

18  Q.   Okay.  And you say to Paul and Mike, that

19       would be Paul McGovern and Mike Reed, right?

20  A.   Yeah.

21  Q.   And that -- those are the same two people

22       that you -- in that earlier e-mail that we

23       looked at today you refer to as "our

24       researchers," right?

25  A.   In the earlier e-mail those are folks that

1                           ALBRECHT

2          we've worked with in the past.

3     Q.   Yeah.  And you refer to them as, "Our

4          researchers," right?

5                    MR. ASSAAD:  Objection to form.

6                    THE WITNESS:  That was not what

7          was implied by that.

8     BY MR. COREY GORDON:

9     Q.   I don't know what -- I'm not asking you what

10         was implied, I'm asking you how you referred

11         to them.

12                   MR. ASSAAD:  Objection to form.

13                   THE WITNESS:  I'm happy to read

14         that e-mail.  Which exhibit?  Which spot?  I

15         know which one you're talking about, but I

16         want to look at that carefully if you want a

17         statement like that.  (Reviews document.)

18              No, I did not refer to them as, "Our

19         researchers."  "He actually sent this to the

20         doctors that do our research."

21    BY MR. COREY GORDON:

22    Q.   I'm sorry, "The doctors that do our

23         research."

24    A.   So that is a misstatement.

25    Q.   Well, thank you for correcting me.

ALBRECHT

1
2      So, "The doctors that do our
3   research," the Paul -- that's Paul McGovern
4   and Mike Reed?
5   A.  Among others.  But, yes, we have definitely
6       given them paid support to work with them on
7       research products.
8   Q.  And the, "Publication factory that
9       continues," e-mail, you tell Paul and Mike,
10      "At this point we have three completed
11      manuscripts that are ready to be submitted
12      for publication that you are both authors
13      on," right?
14  A.  Okay.
15  Q.  And you list three documents, right?
16  A.  I see that.
17  Q.  You say, "I've already sent both of you
18      articles 1 and 2.  Article 3 is a new one
19      and, arguably, the best of the three."  Do
20      you see that?
21  A.  Okay.
22  Q.  How were -- how is it that you were sending
23      them an article that was new that they were
24      coauthors on?
25  A.  It was probably a start of a draft as a

1                              ALBRECHT

2        placeholder for us all to work from, it may

3        have been, or it may have had some input or

4        may have been other manuscripts that have

5        been rehashed together to form a more

6        cohesive story.

7   Q.   You were the primary author of -- of these

8        studies, right?

9   A.   Not true.  I was the person that did the

10       engineering studies, I'm the person that did

11       a portion of the statistics under oversight

12       from others.

13  Q.   You -- you did the drafting and sent it to

14       other people for review, right?

15              MR. ASSAAD:  Objection to form,

16       asked and answered.

17              THE WITNESS:  No.  I would

18       construct parts of these and then we'd work

19       as a team to collaboratively figure it out.

20  BY MR. COREY GORDON:

21  Q.   Well, so what was -- where was the

22       publication factory?

23  A.   Where was the publication factory?

24  Q.   Yeah.

25  A.   That refers to the fact that we've got three

ALBRECHT

1
2      articles that we're targeting clinical

3      journals with, and that's a point of pride,

4      that we can produce research at a rate like

5      that.

6  Q.  Okay.  Now drop down to the bottom of

7      Exhibit 31 --

8  A.  Okay.

9  Q.  -- where you say, "Also, Dr. Andrew Legg has

10     invited you guys to Sheffield Hospital the

11     weekend of July 17th and 18th to help with

12     the research effort there.  If you are

13     interested the company would be willing to

14     cover your hotel and expenses."  Do you see

15     that?

16 A.  Yeah.

17 Q.  Do you know, first of all, if either

18     Paul McGovern or Mike Reed took you up on

19     that offer and went to Sheffield and --

20 A.  I'm trying to remember.

21 Q.  -- helped with Dr. Andrew Legg's research

22     effort?

23 A.  I don't recall them being there.

24 Q.  You were there though, right?

25 A.  I was for part of it.

ALBRECHT

1
2  Q.  Okay.  Anyone else from the Augustine company
3      there that you can recall?
4  A.  No.
5  Q.  Who else was there -- who else participated
6      in the research effort that you're referring
7      to there?
8  A.  Which one?  The Sheffield one?
9  Q.  Yup.
10 A.  That would be myself and Dr. Andrew Legg.
11     And they look the data and they made a
12     manuscript anova with -- really, without my
13     involvement and went a separate path.
14 Q.  And when you say they took the data, what --
15     what -- strike that.  What --
16 A.  We lended [sic] them a study kit to work
17     with.
18 Q.  What do you mean by study kit?
19 A.  Equipment.
20 Q.  What kind of equipment?
21 A.  Airflow measurement devices.
22 Q.  So you just -- did you just drop them off or
23     did you actually participate in doing the
24     measurements?
25 A.  Participated in some.

1                            ALBRECHT

2    Q.   And you -- but you didn't have anything to do

3         with any of the drafting of the research?

4    A.   I'm trying to remember that one.  I believe

5         that we might have done some drafting, but at

6         some point they decided that they were going

7         to write their own.  I'm trying to recall the

8         details on that.

9                    (Whereupon, Exhibit 32 was

10                   marked for identification.)

11   BY MR. COREY GORDON:

12   Q.   I'll show you Exhibit 32.  It's the

13        document produced from the files of

14        Professor Nachtsheim.

15   A.   Okay.

16   Q.   And the cover page is a -- an e-mail from you

17        to a Dr. Andrew Legg, Scott Augustine and

18        Christopher Nachtsheim.

19   A.   Okay.

20   Q.   And the date of this is September 10th, 2010.

21        That would be after you went to Sheffield and

22        worked with Dr. Legg, right?

23   A.   I believe so.

24   Q.   Okay.  And the attached manuscript is

25        entitled, "Forced-Air Warming, Effective, but

1                           ALBRECHT

2        Risky?  Patient Warming Systems and Their

3        Effect on Orthopedic Laminar Ventilation,"

4        right?

5   A.   That is what's here.

6   Q.   And it lists four authors, Andrew Legg,

7        Andy Hamer, Mark Albrecht and Christopher

8        Nachtsheim, right?

9   A.   I see that.

10  Q.   And you sent this manuscript to Dr. Legg,

11       Dr. Augustine and Professor Nachtsheim,

12       right?

13  A.   That appears to be correct.

14  Q.   You are the one who wrote this first draft,

15       right?

16  A.   Big parts of it, it appears that way, yes.

17  Q.   Well --

18  A.   Yes.

19  Q.   Okay.  And why were you sending it to

20       Scott Augustine?

21  A.   Because he's a research sponsor.  He is

22       paying the bill for my salary and others, and

23       so we do keep him informed with the research

24       we're doing and the progress we're making.  I

25       am an employee there.

ALBRECHT

1

2  Q.  Did -- has anyone ever informed the -- the

3      public that Dr. Augustine was somehow

4      involved in the Legg research?

5  A.  Dr. Augustine in the Legg research, I don't

6      know.  They did not use this manuscript, by

7      the way, this one was torpedoed.

8  Q.  Who torpedoed it?

9  A.  The doctors, Legg and Hamer.  They decided

10     that they wanted a different message and so

11     they crafted their own.

12 Q.  Based on the research that you had helped

13     them with, right?

14 A.  That I don't know.

15              MR. ASSAAD:  Objection; calls for

16     speculation.

17 BY MR. COREY GORDON:

18 Q.  Well, do you know if they completely threw

19     out the research that you went to Sheffield

20     and worked with them on?

21              MR. ASSAAD:  Objection to form.

22              THE WITNESS:  Do you have a

23     publication we can look at to assess that or

24     do you have any details?  It's been a while.

25 BY MR. COREY GORDON:

1                          ALBRECHT

2    Q.   I'm just asking you if you have any

3         recollection that, you know, you --

4    A.   I don't without written record to help me

5         with this.

6    Q.   Okay.  But you -- you -- you recall going to

7         Sheffield?

8    A.   Yes.

9    Q.   You recall participating in -- in experiments

10        using bubbles, right?

11   A.   I recall helping with a draft and I recall

12        them deciding that we're going to go a

13        different direction.

14   Q.   Okay.  But I want to focus on the -- the --

15        the stuff you did in Sheffield in July of

16        2010.

17   A.   Okay.

18   Q.   You -- the -- one of the things you were

19        doing was airflow study with bubbles, right?

20   A.   I had lent a research kit and showed how to

21        use it, yeah.

22   Q.   Well, you say you showed how to use it.  You

23        actually did it, right?  You actually

24        generated -- turned on the bubble generator

25        and worked with them in terms of moving

1                        ALBRECHT

2        the --

3                  MR. ASSAAD:   Objection to form.

4                  THE WITNESS:   Under the direction

5        of Dr. Hamer -- actually, not Dr. Hamer,

6        Dr. Legg, I assisted him.

7    BY MR. COREY GORDON:

8    Q.  But you --

9                  THE WITNESS:   I was physically in

10       the operating room at times, yes.

11   BY MR. COREY GORDON:

12   Q.  And you were assisting him doing the actual

13       airflow studies, right?

14   A.  The studies that were described here, yes.

15   Q.  Okay.  Let me show you Exhibit 33.

16                  (Whereupon, Exhibit 33 was

17                  marked for identification.)

18   BY MR. COREY GORDON:

19   Q.  This is from October 4th, 2010, and it's

20       from you to Andrew Legg, Andrew Hamer,

21       Thomas Cannon, Scott -- with a cc to

22       Scott Augustine, Mike Reed, Paul McGovern,

23       Robert Gauthier and Christopher Nachtsheim,

24       right?

25   A.  That appears correct.

                          ALBRECHT

1

2  Q.  And you said to, "Andrew, Andrew and Thomas,"

3      and I -- that would be Andrew Legg, Andrew

4      Hamer and Thomas Cannon, right?

5  A.  Yes.

6  Q.  You said you, "Wanted to send out a group

7      e-mail to all of the investigators involved

8      in the Sheffield study that Andrew Legg was

9      kind enough to host and supervise.  As you

10     know, we collected some compelling results at

11     Sheffield related to forced-air warming and

12     laminar flow disruption that need to be

13     shared with the orthopedic community at

14     large.  These results are a piece of a larger

15     body of work which has involved the other

16     investigators copied on this e-mail.

17     Mr. Mike Reed, Northumbria, Wansbeck;

18     Mr. Paul McGovern, Northumbria, Wansbeck;

19     Dr. Robert Gauthier, Minneapolis, Minnesota;

20     and Dr. Christopher Nachtsheim, University of

21     Minnesota."

22             And then if you drop down to the

23     bottom of this paragraph -- well, first of

24     all, did I read all that right?

25 A.  So far.

1                         ALBRECHT

2   Q.   Okay.  And at the bottom of this first page

3        you say, "I'll also be sending out a revised

4        manuscript that includes Andrew Legg's

5        comments, suggestions in the next week or

6        two."

7   A.   Uh-huh.

8   Q.   Okay.  What manuscript was that?

9   A.   It's possible I was looking for feedback on

10       this one.  But, again, like I said, they

11       decided to go a different direction and broke

12       off the relationship.

13  Q.   How did they break off the relationship?

14  A.   They broke off the relationship, as I recall,

15       and, again, it's fuzzy, but I remember

16       Dr. Hamer, who is a senior physician, felt

17       that they would like to have their own

18       independent ability to work with these

19       results without any kind of influence from

20       our research group, is essentially what it

21       came down to, and they wanted to have their

22       own message and crafted in their own way.

23  Q.   Based on the --

24  A.   That I don't know.

25  Q.   -- experiments that you assisted in, correct?

1                           ALBRECHT

2    A.   As far as I can tell, yes, that's the data

3         that they used when they broke off the

4         relationship.

5    Q.   Okay.  And -- well, what was the time period

6         when they broke off the relationship?

7    A.   Obviously, it would be after this, because we

8         kind of did some back and forth.  I believe

9         we had a couple of phone calls and then it

10        was decided that we're going to go different

11        ways.

12   Q.   And did you -- are you saying you had no

13        further contact with him at that point?

14   A.   Nothing material, I don't believe.  It's hard

15        to say without written record.  They may have

16        presented us with the draft when it was done,

17        but they went about it their way.

18   Q.   And who did they communicate with to indicate

19        that they were breaking off the relationship?

20                   MR. ASSAAD:  Objection to form.

21                   THE WITNESS:  I do not recall.  I

22        believe it was with myself and the research

23        group.  I don't remember if it was via e-mail

24        or telephone call.  I'm trying to recall.

25        They may better remember that when you talk

Page 339

1                         ALBRECHT

2        to them.

3    BY MR. COREY GORDON:

4    Q.  Did you discuss with Scott Augustine that

5        they were breaking off the relationship?

6    A.  Oh, yes.

7    Q.  Well, what do you recall that discussion

8        entailing?

9                    MR. ASSAAD:  Objection; lack of

10       foundation.

11                   THE WITNESS:  I would need some

12       written record to help jog my memory on that.

13       If you have something, I'd be appreciative.

14                       (Whereupon, Exhibit 34 and

15                       Exhibit 35 was marked for

16                       identification.)

17   BY MR. COREY GORDON:

18   Q.  I'm going to show you Exhibits 34 and 35.

19   A.  Okay.

20                   MR. ASSAAD:  Which one is 34 and

21       which one is 35?

22                   MR. COREY GORDON:  Thirty-four is

23       the e-mail, 35 is the article.

24   BY MR. COREY GORDON:

25   Q.  Exhibit 34 is an e-mail from you to

Page 340

1                          ALBRECHT

2          Keith Leland dated October 25th, 2012,

3          correct?

4     A.   Yes.

5     Q.   And in it you hyperlink to an article in the

6          Star Tribune, and Exhibit 35 is that article,

7          correct?

8     A.   I'm assuming it is.  It looks like the links

9          match.

10    Q.   Okay.

11    A.   Actually, no, they don't, but I don't know.

12         I couldn't tell you.

13    Q.   Okay.  Well, I'll represent to you that on

14         November 10th, 2016, at 4:19, I put that

15         hyperlink from your e-mail, Exhibit 34, into

16         my browser, and that -- what came up was

17         Exhibit 35.

18    A.   Yeah.

19    Q.   And Exhibit 34 refers to a Medtronic article,

20         right?

21                   MR. ASSAAD:  Objection.  Objection

22         to form, assumes facts not in evidence, lack

23         of foundation that this article is the same

24         as what's being referenced here in the

25         e-mail.

1                        ALBRECHT

2  BY MR. COREY GORDON:

3  Q.  Exhibit 34 refers to a Medtronic article,

4      right?

5  A.  It appears to.

6  Q.  And Exhibit 35 is an article about Medtronic,

7      right?

8  A.  Yes, that you provided me with, yes.

9  Q.  Okay.  And the article is about Medtronics'

10      role in influencing articles authored by

11      physician consultants where that role was not

12      disclosed, right?

13  A.  I don't know, I'd have to read it.  Hold

14      tight.  (Reviews document.)  I'm done reading

15      the article.

16  Q.  Okay.  And in your e-mail to Keith Leland --

17      and at this time Keith Leland was also an

18      ex-Augustine employee; is that correct?

19  A.  Yeah, it appears that way.

20  Q.  And you say, "Ha, the Medtronic article

21      sounds scarily familiar.  Hum, we were never

22      part of a company that did that," dot, dot,

23      dot, right?

24  A.  Yup, those are the words.

25  Q.  What about the article was scarily familiar?

1                         ALBRECHT

2                    MR. ASSAAD:  Objection; lack of

3         foundation, assumes facts not in evidence.

4                    THE WITNESS:  That there's company

5         funding involved in research.

6    BY MR. COREY GORDON:

7    Q.   An undisclosed influence, right?

8    A.   No, we always disclosed our influences.

9    Q.   Always?

10   A.   I have in anything I've submitted.

11   Q.   Okay.  So what was scary, or scarily

12        familiar, to use your exact words?

13   A.   It's not scary.  It's that funding comes from

14        device companies at times.

15   Q.   You used the word scarily.  What was scarily

16        about -- about companies funding research?

17                   MR. ASSAAD:  Objection to form,

18        assumes facts not in evidence, lack of

19        foundation.

20                   THE WITNESS:  It sounds familiar.

21        I mean, I -- scarily is just an adjective.  I

22        don't know what to tell you what it means

23        there.

24                   MS. ZIMMERMAN:  Can you tell us

25        how much time we have left?

1                              ALBRECHT
2                    THE VIDEOGRAPHER:  So both
3          volumes, we're at 6:53 on record.
4                    MS. ZIMMERMAN:  Thanks.
5                    (Whereupon, Exhibit 36 was
6                    marked for identification.)
7     BY MR. COREY GORDON:
8     Q.  I'm going to show you Exhibit 36.  It's an
9          exchange of e-mails between you and
10         Professor Nachtsheim, correct?
11    A.  Okay.  Yes, it is.
12    Q.  Okay.  And I want to direct your attention to
13         the second page where Professor Nachtsheim
14         says to you, "Hard to disagree with the last
15         quote where the guys said that the data are
16         compelling, but they don't prove the link to
17         infections in practice and a clinical trial
18         would be needed to do that, do you agree,"
19         question mark.  Did I read that correctly?
20    A.  I will read it just to make sure.
21         "Interesting article.  Even though they were
22         petty hard on Scott, hard to disagree with
23         the last quote where the guy said that the
24         data are compelling, but they don't provide
25         the link to infections in practice and that

1                          ALBRECHT

2        clinical trial would be needed to do that; do

3        you agree?"

4   Q.   You said, "Provide."  I think it says,

5        "Prove."

6   A.   My apologies.

7   Q.   And your response was, "Yes, I do agree with

8        that."  And, in fact, why don't you read your

9        response.

10  A.   Okay.  "Yeah, I do agree with that.

11       Personally, I don't think it's a good idea to

12       use forced-air warming in implant cases

13       sensitive to airborne contamination based

14       off" -- "based upon its effects on clean

15       airflow occurrence over the surgical site,

16       but we do not have conclusive proof at this

17       time that increased infections are the result

18       of such ventilation disruption, nor are we

19       likely to ever have such proof.  Such a trial

20       would involve upwards of thousands of

21       patients and carry a $2 million price tag, at

22       minimum cost of 2,000 a patient I'm guessing.

23       This is one of those things where we can step

24       close to the line, and we do have important

25       information to present that clinicians should

1                       ALBRECHT
2    be aware of, but we also have to be careful
3    that we do not state claims regarding proof
4    of infection reduction.  Unfortunately, Scott
5    likes to say that he's convinced of such a
6    relationship, even though I tell him it is
7    unsupported and I do not agree.  Well, that
8    is the difference between research and
9    marketing.  However, he knows better than to
10   make such statements in journal articles and
11   does not pressure me/us to do so.  As such, I
12   figure he can do as he pleases without harm
13   as long as he respects the research
14   boundaries, which he has to date."
15               MR. COREY GORDON:  Okay.  Here's
16   the deal.  I have probably about two hours
17   more of questioning for you.  I know I'm
18   bumping up to the seven-hour limit.  I -- I
19   would ask you to let me go ahead and finish
20   up.  If you want to say no, you know, absent
21   special provisions from the court, it's a
22   maximum of seven hours, that -- that is your
23   privilege, and I will -- I will likely ask
24   the -- the court to give some -- give me some
25   additional time.  They're going to have

1                         ALBRECHT

2    questions for you and, you know, I'm sure

3    they don't want me to go on any further.

4            So, you know, I'm going to -- it's

5    probably partially up to you.  But even if

6    you say, yeah, why don't you just go ahead

7    and finish with me, they're probably going to

8    object.

9            MR. ASSAAD:  We --

10           MS. ZIMMERMAN:  Should we go off

11   the record for a minute?

12           MR. ASSAAD:  Yeah, let's go off

13   the record.

14           THE VIDEOGRAPHER:  We're going off

15   the record at 11:26 a.m.

16           (Whereupon, a brief recess

17           was taken.)

18           THE VIDEOGRAPHER:  We're going

19   back on the record at 11:31 a.m.

20           MR. ASSAAD:  It's my understanding

21   that the seven hours are up at this time,

22   give or take a couple of minutes.  I don't

23   know if Mr. Gordon has any questions.

24           We definitely want to ask -- we

25   definitely object to defense counsel moving

1                       ALBRECHT

2   forward over the seven-hour time limit that's

3   been allowed to him by the Federal Rules of

4   Civil Procedure.

5            However, I will likely go to the

6   court and ask for a couple of hours for me to

7   follow up on some of the questions he had

8   with the -- with the -- with the objection

9   that they have no more time with regard to

10  the deposition.  Seven hours has been ample

11  time.  You can only -- you know, in your role

12  with 3M and Arizant does not allot for more

13  than a seven-hour deposition.

14           Therefore, I think we'll close this

15  deposition for now and then we'll come back

16  at a later time after court's guidance and

17  figure out, you know, what the court is going

18  to allow us to do with regards -- with

19  regards to the plaintiffs asking questions

20  and with respect to the defendants asking

21  questions.

22           MR. COREY GORDON:  I understood

23  Mr. Albrecht was saying that he wanted to --

24  wanted me to abide by the seven-hour cutoff.

25  I don't know if he's willing to stay if you

Page 348

1                        ALBRECHT

2     have another hour or two of examination.

3                THE WITNESS:  I'm -- I'm going to

4     abide by the seven-hour cutoff.

5                MR. COREY GORDON:  Okay.

6                THE WITNESS:  So that is my

7     choice, yes.

8                MR. ASSAAD:  Okay.

9                THE WITNESS:  And this is my

10    Exhibit 30 to add to the pile, right?  It's

11    got a flag on it.  Just so we keep them all

12    together.

13                MR. ASSAAD:  We can close, I'll

14    ask you off the record.

15                THE VIDEOGRAPHER:  We're going off

16    the record at 11:32 a.m.

17                (Whereupon, the foregoing

18                deposition adjourned at 11:32 a.m.)

19

20

21

22

23

24

25

Page 349

1                    DEPOSITION CORRECTION SHEET

2     TITLE: In Re:  Bair Hugger Forced Air Warming

             Products Liability Litigation

3     WITNESS:  Mark Albrecht

4     PAGE    LINE    DESIRED CHANGE

5     _____   _____   _____

6     _____   _____   _____

7     _____   _____   _____

8     _____   _____   _____

9     _____   _____   _____

10    _____   _____   _____

11    _____   _____   _____

12    _____   _____   _____

13    _____   _____   _____

14    _____   _____   _____

15    _____   _____   _____

16    _____   _____   _____

17    _____   _____   _____

18    _____   _____   _____

19    _____   _____   _____

20    _____   _____   _____

21    _____   _____   _____

22    _____   _____   _____

23    _____   _____   _____

24    _____   _____   _____

25

Page 350

1

2

    I, Mark Albrecht, have read this

3

deposition transcript and acknowledge

4

herein its accuracy except as noted:

5

6

               _____

7              Witness Signature

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 351

1   STATE OF MINNESOTA   )
                         ) ss
2   COUNTY OF ANOKA      )

3

            Be it known that I took the foregoing
4   deposition of Mark Albrecht, Volume 2, on
    November 12th, 2016, in Minneapolis, Minnesota;

5

            That I was then and there a notary public
6   in and for the County of Anoka, State of Minnesota,
    and that by virtue thereof, I was duly authorized
7   to administer an oath;

8           That the witness was by me first duly
    sworn to testify to the truth, the whole truth and
9   nothing but the truth relative to said cause;

10          That the foregoing transcript is a true
    and correct transcript of my stenographic notes in
11  said matter;

12          That the witness reserved the right to
    read and sign the transcript;

13

            That I am not related to any of the
14  parties hereto, nor interested in the outcome of
    the action;

15

            WITNESS MY HAND AND SEAL this 23rd day of
16  November, 2016.

17

18          _____
                Amy L. Larson, RPR
19

20

21

22

23

24

25