EXHIBIT 39

1         UNITED STATES DISTRICT COURT
           DISTRICT OF MINNESOTA
2   --------------------------------------------------
3   In Re:
4   Bair Hugger Forced Air Warming
    Products Liability Litigation
5
    This Document Relates To:
6
    All Actions                    MDL No.
7                                  15-2666 (JNE/FLM)
8   --------------------------------------------------
9
              VIDEOTAPED DEPOSITION
10
                     OF
11
            CHRISTOPHER NACHTSHEIM
12
            Minneapolis, Minnesota
13
          Tuesday, November 29, 2016
14
15  --------------------------------------------------
16
17
18
19
20
21
22
23
24  Reported by:
    Amy L. Larson, RPR
25  Job No. 113495

```
1                      NACHTSHEIM
2   APPEARANCES:
3       ON BEHALF OF 3M:
4       CHRISTIN GARCIA, ESQUIRE
        FAEGRE BAKER DANIELS
5       2200 Wells Fargo Center
        90 South Seventh Street
6       Minneapolis, MN 55402
7
        DEBORAH LEWIS, ESQUIRE
8       BLACKWELL BURKE
        431 South Seventh Street
9       Minneapolis, MN 55415
10
11
        FOR THE PLAINTIFF:
12
        MICHAEL SACCHET, ESQUIRE
13      CIRESI CONLIN
        225 South Sixth Street
14      Minneapolis, MN 55402
15
16
17      ALSO PRESENT:  Kraig Hildahl, Videographer
18
19
20
21
22
23
24
25
```

```
 1                        NACHTSHEIM
 2   INDEX:
 3   EXAMINATION BY:                        PAGE
 4   Ms. Garcia..............................8, 372
 5   Mr. Sacchet..............................254
 6   EXHIBITS MARKED FOR IDENTIFICATION:
 7   Exhibit 1...............................10
     Acknowledgment and Agreement to be Bound
 8   No Bates
 9   Exhibit 2...............................10
     Notice of Videotaped Deposition of
10   Christopher Nachtsheim
     No Bates
11

     Exhibit 3...............................12
12   Christopher Nachtsheim, Ph.D.,
     Curriculum Vitae
13   No Bates
14   Exhibit 4...............................15
     Forced-Air warming and ultra-clean
15   ventilation do not mix
     No Bates
16

     Exhibit 5...............................15
17   Patient Warming Excess Heat:
     The Effects on Orthopedic Operating
18   Room Ventilation Performance
     No Bates
19

     Exhibit 6...............................29
20   Statistical Analysis for HPS Protocol 003
     Bates Albrecht_0016008 - Albrecht_0016012
21

     Exhibit 7...............................34
22   Research Agreement
     Bates Belani_000054 - Belani_000061
23

     Exhibit 8...............................37
24   Logistic Regression -
     Mark Albrecht - March 11, 2016
25   Bates Albrecht_0002275 - Albrecht_0002278
```

```
 1                      NACHTSHEIM
 2   INDEX:  (Cont'd.)
 3   EXHIBITS MARKED FOR IDENTIFICATION:       PAGE
 4   Exhibit 9....................................38
     11/1/2013 E-mail Chain
 5   Subject:  Re:  Analytically speaking
     Bates Albrecht_0000101 - Albrecht_0000102
 6
     Exhibit 10...................................53
 7   3/24/10 E-mail Chain
     Subject:  First Publication I'd Like to
 8   Include you on
     Bates Nachtsheim_0000364 - Nachtsheim_0000382
 9
     Exhibit 11...................................58
10   April 2010 E-mail Chain
     Subject:  Testing
11   Bates Nachtsheim_0001408 - Nachtsheim_0001410
12   Exhibit 12...................................62
     4/8/10 E-mail
13   Subject:  Update on testing
     Bates Nachtsheim_0001571
14
     Exhibit 13...................................78
15   4/9/10 E-mail
     Subject:  Problem with laminar flow lab
16   Bates Nachtsheim_0000832 - Nachtsheim_0000833
17   Exhibit 14...................................84
     April 2010 E-mail Chain
18   Subject:  Update
     Bates Nachtsheim_0001545 - Nachtsheim_0001547
19
     Exhibit 15...................................95
20   May 2010 E-mail Chain
     Subject:  Abstract "crud and bug"
21   !!Important!!
     Bates Nachtsheim_0000118 - Nachtsheim_0000120
22
     Exhibit 16..................................100
23   5/29/10 E-mail
     Subject:  Both abstracts,
24   Statistical files and data files
     Bates Nachtsheim_0000191 - Nachtsheim_0000192,
25   Nachtsheim_0000211 - Nachtsheim_0000223
```

1                        NACHTSHEIM

2    INDEX:

3    EXHIBITS MARKED FOR IDENTIFICATION:       PAGE

4    Exhibit 17...............................114
     July 2010 E-mail Chain
5    Subject:  Manuscript drafts for meeting
     Bates Nachtsheim_0000548 - Nachtsheim_0000549,
6    Nachtsheim_0000556 - Nachtsheim_0000576,
     Nachtsheim_0000600 - Nachtsheim_0000608,
7    Nachtsheim_0000577 - Nachtsheim_0000599,
     Nachtsheim_0000613 - Nachtsheim_0000615

8
     Exhibit 18...............................146
9    7/8/10 E-mail
     Subject:  Arizant FDA Warning Ltr
10   Bates Nachtsheim_00000385

11   Exhibit 19...............................188
     1/4/11 E-mail Chain
12   Subject:  Article I was talking about
     Bates Nachtsheim_0000177 - Nachtsheim_0000179

13
     Exhibit 20...............................192
14   December 2010/January 2011 E-mail Chain
     Subject:  Rough Copy
15   Bates Nachtsheim_0001110 - Nachtsheim_0001115,
     Nachtsheim_000127 - Nachtsheim_000130,
16   Nachtsheim_0001199 - Nachtsheim_0001201,
     Nachtsheim_0001206

17
     Exhibit 21...............................195
18   Forced Air Warming versus Conductive
     Fabric Warming - An Evaluation of
19   Laminar Operating Room Ventilation Disruption
     Bates Nachtsheim_0001206 - Nachtsheim_0001229

20
     Exhibit 22...............................205
21   Implementing Effective SSI Surveillance
     No Bates
22
     Exhibit 23...............................226
23   1/25/11 E-mail Chain
     Subject:  Minor Changes and a Query
24   Bates Nachtsheim_0000750 - Nachtsheim_0000751,
     Nachtsheim_0000727 - Nachtsheim_0000749

25

```
 1                    NACHTSHEIM
 2   INDEX:  (Cont'd.)
 3   EXHIBITS MARKED FOR IDENTIFICATION:      PAGE
 4   Exhibit 24................................231
     January 2011 E-mail Chain
 5   Subject:  Papers you are involved in
     Bates Nachtsheim_0000819 - Nachtsheim_0000821
 6
     Exhibit 25................................277
 7   April 2015 E-mail Chain
     Subject:  Statistical Practitioners Forum:
 8   Advanced DOE Class
     Bates 3MBH01293497 - 3MBH01293499
 9
     Exhibit 26................................322
10   Doctor Says a Device He Invented
     Poses Risks
11   No Bates
12   Exhibit 27................................333
     Table
13   Bates Albrecht_0002298
14   Exhibit 28................................341
     Would Complications Following Rivaroxaban
15   Administration - A Multi-Centre Comparison
     with Low Molecular Weight Heparin for
16   Thromboprophylaxis in Lower Limb
     Arthroplasty
17   Bates Nachtsheim_0000451 - Nachtsheim_0000466
18   Exhibit 29................................369
     Forced-Air Warming Does Not Worsen Air
19   Quality in Laminar Flow Operating Rooms
     Bates 3MBH00985628 - 3MBH00985633
20
     Exhibit 30................................377
21   Curriculum Vitae
22
23
24
25
```

1                    NACHTSHEIM

2       THE VIDEOTAPED DEPOSITION OF CHRISTOPHER

3   NACHTSHEIM, taken on this 29th day of November,

4   2016, at the Law Offices of Faegre Baker

5   Daniels, LLP, 2200 Wells Fargo Center, 90 South

6   Seventh Street, Minneapolis, Minnesota, commencing

7   at approximately 9:11 a.m.

8

9             P R O C E E D I N G S

10

11            THE VIDEOGRAPHER:  This is the

12      Start of tape labeled number 1 of the

13      videotaped deposition of Christopher

14      Nachtsheim in the matter of In Re:  Bair

15      Hugger Forced Air Warming Products Liability

16      Litigation in the U.S. District Court for the

17      District of Minnesota, Case Number 15-2666

18      (JNE/FLM).

19            This deposition is being held at the

20      Faegre Baker law firm in Minneapolis,

21      Minnesota, on November 29th, 2016.  We are

22      going on the record at 9:11 a.m.  My name is

23      Kraig Hildahl, I'm the legal video specialist

24      from TSG Reporting.  The court reporter is

25      Amy Larson also in association with

1                           NACHTSHEIM

2        TSG Reporting.

3                    Will counsel please introduce

4        themselves for the record.

5                        MS. GARCIA:  Christin Garcia,

6        counsel for defendants 3M and Arizant.

7                        MS. LEWIS:  Deborah Lewis also

8        counsel for defendants 3M and Arizant.

9                        MR. SACCHET:  Michael Sacchet for

10       plaintiffs.

11                       THE VIDEOGRAPHER:  Will the court

12       reporter please swear in the witness and then

13       we can proceed.

14

15                   CHRISTOPHER NACHTSHEIM,

16            a witness in the above-entitled action,

17            after having been first duly sworn, was

18            deposed and says as follows:

19

20                         EXAMINATION

21       BY MS. GARCIA:

22       Q.  Hello, Professor Nachtsheim.

23       A.  Hello.

24       Q.  Thank you for coming here today.  Could you

25            start by, for the record, just providing your

1                         NACHTSHEIM

2          full name and spell your last name and let us

3          know your address.

4    A.    Christopher John Nachtsheim.  And it's N as

5          in north, A-C-H-T, S as in Sam, H-E-I-M.

6          Address is 1789 Summit Avenue, St. Paul,

7          Minnesota 55105.

8    Q.    Thank you.  Have you ever been deposed

9          before?

10   A.    Yes.

11   Q.    Okay.  The one rule of deposition I just want

12         to reinforce today is if you have any

13         difficulty understanding -- well, if you

14         don't understand my question, if you would

15         like me to clarify something, will you please

16         let me know that?

17   A.    Uh-huh.  Yes.

18   Q.    Yes?

19   A.    Yes.

20   Q.    There's rule number 2.

21   A.    That's rule number 2, I knew that.

22   Q.    You will need to say things out loud so that

23         we can get an accurate transcription of the

24         record in writing where your head movements

25         can't be taken down, and then we will try not

                         NACHTSHEIM

1

2      to speak over each other so that we can get a

3      clear record.

4              If at any time you need a break for

5      any reason, please let me know.

6   A.  Yes.

7                   (Whereupon, Exhibit 1 was

8                   marked for identification.)

9   BY MS. GARCIA:

10  Q.  I would -- we have marked as Exhibit 1 your

11      signature on the Attachment A to the

12      protective order, is that correct that you

13      filled this out here this morning and signed

14      this?

15  A.  I did, yes.

16  Q.  And you had the opportunity to review that

17      before today?

18  A.  Yes.

19  Q.  I would like to also mark as Exhibit 2 the

20      notice of this deposition.  This is the

21      original notice for the original day and

22      attached to it is our request for you to

23      provide certain documents.

24                   (Whereupon, Exhibit 2 was

25                   marked for identification.)

                            NACHTSHEIM

1

2    BY MS. GARCIA:

3    Q.  Did you receive a notice for your deposition

4        here?

5    A.  I -- yes, I did.

6    Q.  And did you receive Exhibit A with the

7        request for documents?

8    A.  Yes, I did.

9    Q.  You did produce documents?

10   A.  Yes, I did.

11   Q.  Did you review all of the requests 1 through

12       39 and make an effort to locate items that

13       are responsive to those requests?

14   A.  Yes, I did.

15   Q.  And did you provide those to us?

16   A.  Yes, I did.  Could I just double-check on

17       something?

18   Q.  Sure.

19   A.  (Reviews document.)  I was just looking for

20       my notes on this.  But, anyway, it's okay.

21   Q.  You're sure?

22   A.  Yeah.

23   Q.  Okay.  Is there any category for which you

24       believe you have documents that would respond

25       to the category that you've not provided?

```
 1                      NACHTSHEIM
 2   A.   Not that I know of.
 3   Q.   I'm not going to go through the documents at
 4        this time.  I may come back to certain
 5        requests after we talk through some things,
 6        because I do have the documents that you
 7        provided.
 8              So I'm going to mark as Exhibit 3 a
 9        copy of your curriculum vitae and --
10              MR. SACCHET:  Do you needs copies?
11              MS. GARCIA:  Well, I don't think I
12        have copies.  If you have one -- I'm okay
13        without -- I brought copies, but I'm not
14        locating them, so I'm okay to just provide
15        the witness with this copy.
16              MR. SACCHET:  It might be helpful
17        for me just to know that it's the same copy
18        that at least I'm working off of.
19              MS. GARCIA:  (Hands document.)
20              (Whereupon, Exhibit 3 was
21              marked for identification.)
22              MS. GARCIA:  Oh, I have them.
23              MR. SACCHET:  (Reviews document.)
24        Okay.  Yeah, it's the same.
25              MS. GARCIA:  Here you go.
```

                          NACHTSHEIM

1

2        (Hands document.)

3    BY MS. GARCIA:

4    Q.  Exhibit 3 is a copy of your curriculum vitae

5        that I obtained on the Internet, and I

6        understand you may have provided your CV to

7        someone electronically in response to the

8        subpoena, but I did not see it.  I do not

9        recall having seen it.  So I would ask if you

10       take a look at Exhibit 3 and see if it

11       appears to be up to date.  I do believe 2011

12       was the date --

13   A.  Yeah, this is -- it's not up to date at all.

14   Q.  It's not up to date at all.  Okay.  Do you

15       believe that you did provide an up-to-date

16       CV?

17   A.  Well, I believe I did.  In fact, I looked

18       yesterday and I noticed that I had updated it

19       on August 28th or something like that and --

20       but I didn't -- I didn't check the e-mail to

21       see if I had sent it.  I think I did.

22   Q.  We will check on that.

23              MS. GARCIA:  I wonder if you might

24       e-mail to Mary, Deborah, and see if she has

25       it and if she e-mails it to Jeff Woshihowski

NACHTSHEIM

(phonetic) then we could print it out and have it come down.

BY MS. GARCIA:

Q. But could you let me know now while we're on the subject if there are any additional papers that would appear on your updated CV that relate to patient-warming devices?

A. If this -- does this have the two -- well, let me check.

Q. McGovern and Belani? It does have McGovern and Belani.

A. Yeah, McGovern, Albrecht, Belani, and then the other one was Belani, Albrecht, McGovern.

Q. Why don't you check on the --

A. I'll check.

Q. -- to confirm that it is what you think. If you look at item number 54 on page 5 --

A. Uh-huh.

Q. -- why don't you check that against the article you were looking at --

A. Sure.

Q. -- to make sure that's the same thing.

A. (Reviews document.)

Q. And item number 58.

                              NACHTSHEIM

1

2  A.  Fifty-four and 58.  (Reviews document.)

3      Yeah, although I think the title has changed.

4      So 54 looks the same as -- that's the one,

5      Do not mix, right, and -- and I believe that

6      58 is the other one, although the -- I guess

7      the title changed along the way.  It doesn't

8      match, does it?  Excess heat -- no, they

9      changed the title a little bit on it and I

10     have this -- it's incorrect in this.

11 Q.  Okay.  But you believe --

12 A.  But I believe that's the paper.

13 Q.  Why don't we mark the two papers so that we

14     can just be clear on the record.

15 A.  Okay.

16                 (Whereupon, Exhibit 4 and

17                 Exhibit 5 was marked for

18                 identification.)

19 BY MS. GARCIA:

20 Q.  Is Exhibit 4 which study?

21 A.  Exhibit 4 is the, Forced Air Warming and

22     Ultra Clean Ventilation Do Not Mix.

23 Q.  And Exhibit 5 is Belani --

24 A.  Patient warm -- patient warm -- yeah, Belani,

25     Albrecht, et al.

                              NACHTSHEIM

1

2   Q.  As the first author.  Okay.

3            So do you believe that Exhibit 4

4       corresponds to item number 54 on your CV

5       which we have marked as Exhibit 3?

6   A.  I do.

7   Q.  And do you believe that -- thank you --

8       Exhibit 5 corresponds to item 58 we have

9       marked on your -- that's on your CV?

10  A.  I do.

11  Q.  And I notice that item 60 lists a research

12      article in process.  Do you believe that

13      article was ever published?

14  A.  I do not.

15  Q.  Are there any other research articles that

16      have been published for which you're an

17      author that relate to patient-warming

18      products?

19  A.  No.

20  Q.  And are there any articles in process that

21      you are seeking publication for on which you

22      are an author?

23  A.  No.

24  Q.  That relate to patient-warming products.

25  A.  Right.  No.  Yeah, I --

1                           NACHTSHEIM

2    Q.   Thank you.  I just wanted to complete that.

3    A.   Yeah.

4    Q.   We -- we understood each other, but the

5         record only records it if it happens.

6    A.   Okay.

7    Q.   Thank you very much.

8              Any other work of any kind related

9         to patient-warming devices that appears on

10        your updated CV?

11   A.   No.

12   Q.   Thank you.

13             Is Exhibit 3 a complete statement of

14        your professional work and publication

15        through approximately late 2011?

16   A.   Yes.

17   Q.   Before receiving your notice for deposition

18        in this lawsuit, were you aware of any

19        lawsuits related to the Bair Hugger

20        patient-warming system?

21   A.   No.

22   Q.   Have you and I ever spoken before I walked in

23        the room this morning?

24   A.   No.

25   Q.   Have you ever spoken with any other lawyers

                              NACHTSHEIM

1

2      representing 3M or Arizant for purposes other

3      than logistics of arranging the deposition?

4  A.  No.

5  Q.  Have you ever had any kind of communication

6      with me at all other than today?

7  A.  No.

8  Q.  And have you ever had any communication with

9      lawyers for 3M or Arizant in the Bair Hugger

10     litigation other than arranging for your

11     deposition and production?

12 A.  No.

13 Q.  Thank you.

14          Have you ever spoken with anyone who

15     you understand to be a lawyer for the

16     plaintiffs in this litigation?

17 A.  No, although I've done work with the Ciresi

18     law firm.

19 Q.  Okay.  Can you tell me about that, please.

20 A.  Well, this must have been, I don't know, five

21     or six years ago, maybe even seven, and there

22     was a -- it was a lawsuit by Delta dental

23     against some -- some -- a practice, and so I

24     was brought on as an expert to look at the

25     data and kind of give my opinion about

1                        NACHTSHEIM

2       whether or not there was systematic

3       overcharging going on and -- and so I served

4       in that capacity.

5   Q.  Which party did the Ciresi law firm

6       represent?

7   A.  Delta Dental.

8   Q.  Have you spoken with anyone from the Ciresi

9       law firm about the Bair Hugger litigation?

10  A.  No.

11  Q.  Have you spoken with anyone who you

12      understand to be -- well, have you

13      communicated in writing with anyone who is a

14      lawyer for the plaintiffs, including the

15      Ciresi law firm, about the Bair Hugger

16      litigation?

17  A.  No.

18  Q.  Have you communicated with anyone who you

19      understand to be an expert for the plaintiffs

20      in the Bair Hugger litigation?

21  A.  No.

22  Q.  Did you speak with anyone about the fact that

23      you were going to have a deposition?

24  A.  My wife.

25  Q.  Anyone else?

1                        NACHTSHEIM

2   A.  Maybe a couple of friends, I don't know,

3       just -- just -- yes, I did -- wait.  I

4       just -- a friend of mine is a lawyer and I

5       called when I -- and I asked --

6   Q.  Well, if you were seeking legal advice, you

7       shouldn't tell me about it.

8   A.  Okay.

9   Q.  So that's -- that's fine.

10  A.  I'm okay.

11  Q.  Other than something -- other than speaking

12      with a lawyer about counseling or advice that

13      you might take into the deposition, anyone

14      else that you spoke with?

15  A.  No.

16  Q.  Did you do anything to prepare for your

17      deposition?

18  A.  The only thing I've done is review the --

19      review my e-mails that I -- the materials

20      that I submitted and review the papers.

21  Q.  Okay.  Thank you.

22              Do you know Dr. Scott Augustine?

23  A.  Yes.

24  Q.  How?

25  A.  Well, I worked -- when I began working with

NACHTSHEIM

1
2      Mark Albrecht and we began working on the

3      forced-air warming sort of project, I met him

4      once at his house.

5  Q.  Only once ever you've met him?

6  A.  Only once ever.

7  Q.  Okay.  Was that a social occasion or did you

8      also --

9  A.  Yes.

10  Q.  It was?

11  A.  It was a social occasion.

12  Q.  Did you happen to speak about the patient

13      warming work while you were there?

14  A.  You know, I don't remember.  You mean to him?

15  Q.  Yes.

16  A.  I don't remember that we did.  I didn't get

17      much time with him.  It was a big group.

18  Q.  Have you --

19  A.  I might have.  I don't know.

20  Q.  Okay.  That's fine.

21            Have you ever spoken with him before

22      on the telephone?

23  A.  Not that I recall.

24  Q.  And other than I have seen some e-mails

25      produced by you or produced by Mr. Albrecht

NACHTSHEIM

1

2     that have Scott Augustine as a copy on the

3     e-mail, other than those type of e-mail

4     communications that involved Mark Albrecht

5     and you and perhaps Dr. Augustine, have you

6     had written communications with him?

7  A.  The only thing -- I don't -- I don't

8     remember.  There might -- there might have

9     been a communication with him directly,

10    although, you know, I'm not sure about this.

11    There -- there was a time when Mark was

12    looking at getting his doctorate at the

13    Carlson School and -- and he -- he applied

14    and was accepted and there was a -- sort of

15    a -- there was a -- he had an arrangement

16    with Dr. Augustine to cut his hours back a

17    bit, to keep working but cut his hours back

18    so that he could, you know, pursue his

19    doctorate.

20          And I do recall meeting -- I do

21    recall -- I do recall meeting him to

22    discuss -- Mark was present, to -- to talk

23    about that arrangement and how that all --

24    how that would all work.

25 Q.  I believe by "him" you mean Dr. Augustine --

                            NACHTSHEIM

1

2    A.   Dr. Augustine.

3    Q.   -- is that correct?

4    A.   Yeah.  I believe the three of us met and --

5         to -- to discuss that arrangement and how

6         that was going to work.

7    Q.   Why were you part of that arrangement?

8    A.   Well, I was going -- at the time I was

9         department chair to the department that Mark

10        was applying, first of all.  And, secondly, I

11        was going to be his thesis advisor.

12   Q.   What was the department?

13   A.   At that time it was operations and management

14        science at the University of Minnesota in the

15        Carlson School of Management.

16   Q.   Did he complete his thesis or earn a Ph.D.?

17   A.   No, he -- he began the semester and decided,

18        to my great disappointment, that he -- he

19        really didn't want to get a Ph.D., that he

20        was more interested in -- he was more

21        interested in business.

22   Q.   How did you know Mark Albrecht?

23   A.   Okay.  Mark got his MBA at the University of

24        Minnesota.  And I didn't have him in class

25        originally.  My colleague William Lee had him

```
 1                         NACHTSHEIM

 2        in a -- in a -- actually, a doctoral level

 3        statistics class.

 4                And Mark was interested in doing

 5        research, and so my colleague, William Lee,

 6        came to me and said, "I've got this great

 7        student who would like to do research in

 8        discrete choice experiments, why don't we

 9        form a little research group and we'll start

10        working together," and that's what we did and

11        that's how I met Mark.

12   Q.   Did you work with Mark on -- I see that

13        you've published with Mark.

14   A.   Right.

15   Q.   Separate from the patient warming lawsuits --

16        or, I'm sorry, let me start that question

17        over.

18                Separate from papers that address

19        specifically patient-warming devices, it

20        appears from your CV that you have published

21        articles with Mark Albrecht?

22   A.   Absolutely.

23   Q.   If we would refer for a moment to Exhibit 4,

24        which is the paper with McGovern as the lead

25        author.  And I may at many points today refer
```

1                         NACHTSHEIM

2          to this as the McGovern article.

3     A.   Okay.

4     Q.   Do you know any of the other people who are

5          listed as a coauthor besides Mark Albrecht?

6     A.   You know, I don't.  I remember the -- the

7          social engagement at Dr. Augustine's that I

8          mentioned, I think one or two of these were

9          there and I think I might have met them

10         there, but I wouldn't be able to identify

11         them now.

12    Q.   Do you recall when the social gathering at

13         Dr. Augustine's house was?

14    A.   You know, it -- I do not recall the year, but

15         I think it was when these papers were in

16         progress.

17    Q.   Meaning they had been submitted to journals?

18    A.   They may have been or we -- it was around the

19         time we submitted one of them, anyway, I

20         think it was around that time.

21    Q.   And if you would look at exhibit --

22    A.   It might have been before, we may have still

23         gathering data, you know, we may have still

24         been writing the papers.  I can't -- I'm not

25         absolutely certain.

NACHTSHEIM

1

2  Q.  Was there ever any time that you met in

3      person with any of the coauthors on either

4      Exhibit 4 or 5 to discuss the substance of

5      the papers or the work that underlied the

6      papers?

7  A.  Not outside of Mark Albrecht.

8  Q.  So then turning to Exhibit 5, which has

9      Belani has the first author, and I may refer

10     to this as the Belani paper --

11  A.  Okay.

12  Q.  -- at certain points.  Well, I was going to

13     ask you if you know any of those coauthors,

14     but they're the same people, so --

15  A.  Yeah.

16  Q.  -- I take it the answer is the same?

17  A.  Better be, yeah.

18  Q.  Dr. Belani is, I believe, affiliated with the

19     University of Minnesota, but you've not known

20     him?

21  A.  That's right, I've not known him.

22  Q.  Outside of perhaps speaking with one of these

23     gentleman at Dr. Augustine's house at the

24     gathering you've mentioned, have you ever

25     spoken by phone with any of the coauthors

NACHTSHEIM

1
2       on either Exhibit 4 or 5 other than
3       Mark Albrecht?
4   A.  Not to my knowledge.  I don't remember ever
5       having done that.
6   Q.  In terms of the contributions that you made
7       or the investigations that you undertook
8       related to the work that formed the basis for
9       these two papers, Exhibits 4 and 5, is all
10      of that work either occurring in meetings
11      with Mark Albrecht or phone calls with
12      Mark Albrecht or reflected in the e-mails
13      that you produced in the attachments to those
14      e-mails?
15  A.  That's the way I see it.  It was all with
16      Mark, and it's probably laid out in those
17      e-mails.
18  Q.  Before beginning work -- actually, I'm going
19      to hold that question, excuse me.
20              Outside of your work that related to
21      the papers identified as items 54, 58 and 60
22      on your CV or that may be reflected in the
23      e-mails you've produced in this case, have
24      you ever done any other work for Dr. Scott
25      Augustine or any of his companies, including

<div align="center">NACHTSHEIM</div>

1
2      Augustine Biomedical?

3  A.  Yes.

4  Q.  Can you tell me about that, please.

5  A.  So there was work on -- there was work on a

6      product called -- oh, heck, Pure -- Pure

7      Zone, Pure Air, something like that.  It

8      was -- it was a product that -- so -- so the

9      idea of the product was for people with

10     allergies who have difficulty sleeping to be

11     able to put this -- this -- essentially, a

12     pillow case over their pillow and then pure

13     air was piped into that pillow case and

14     filtered up so that the patient is breathing

15     pure -- pure air all night long.

16 Q.  Okay.  I think I may have a protocol from

17     that study, and I was going to ask you about

18     that.

19              Well, first of all, before I get

20     that out, was that the only other work you've

21     done for Dr. Augustine or one of his

22     companies?

23 A.  Yes.

24 Q.  Okay.  Did that result in a publication?

25 A.  I believe it did.  And it would have --

```
                          NACHTSHEIM
```
1        should have -- should have predated these.
2                    MR. SACCHET:  If you don't mind me
3        interjecting, I'm getting texts that the
4        video is frozen or extremely buggy.  I don't
5        know if there are ways to remediate that
6        before, you know, going forward.  It's not an
7        issue on our part, but I just thought I'd
8        note it for the record.
9                    MS. GARCIA:  Thank you.  I assume
10       Kraig will look into -- or keep going?  Okay.
11                   THE WITNESS:  Number 49 on -- on
12       this CV -- CV.
13   BY MS. GARCIA:
14   Q.  Is the published article related to that
15       work?
16   A.  Uh-huh.  Yes.
17   Q.  What was your role in that work?
18   A.  To help design the study and analyze the
19       data.
20                    (Whereupon, Exhibit 6 was
21                     marked for identification.)
22   BY MS. GARCIA:
23   Q.  This is not a complete document, Exhibit 6.
24       It was a long document, and since it doesn't

1                         NACHTSHEIM

2        relate directly to patient warming, I just

3        copied off the first few pages.  This is

4        produced by Mark Albrecht, as indicated by

5        the Bates number on the bottom.  And I just

6        wanted to ask if this is the protocol for the

7        study you were just referencing.  Or at least

8        it's -- the document is titled, "Statistic

9        Analysis for HPS Protocol 003."  Does this

10       relate to the study we were --

11   A.  Yes, it does.

12   Q.  Is this type of document, a statistical

13       analysis detail provided in this type of

14       document -- let me take that question back

15       and ask you a different question.

16              Was this document created before or

17       after the statistical analysis was done for

18       the study?

19   A.  You know, I don't know.  I'm not -- I'm not

20       actually familiar with this.  I'm familiar

21       with the study and I recognize -- I recognize

22       the design, but I don't -- I don't recall --

23       well, wait.  It's been a while.  So your

24       question was?

25   Q.  Let me back up and ask a different question

                            NACHTSHEIM

1
2      first, which is do you recall seeing this

3      document?

4   A.  Well, I -- I actually don't recall, but my

5      name is on it, so I probably did.

6   Q.  Well, your name is on it as an author of the

7      study, correct?

8   A.  Okay.  Right.

9   Q.  Is that right?

10  A.  Yes.

11  Q.  Is that what you're referring, to the authors

12      line on the first page?

13  A.  Yeah, the authors line on the first page.

14  Q.  Okay.  Do you believe this is the type of

15      document that would be created before the

16      study was conducted or after the study was

17      conducted?

18              MR. SACCHET:  Object to form,

19      calls for speculation.

20  BY MS. GARCIA:

21  Q.  Do you have any understanding about that one

22      way or the other?

23  A.  I don't.  I really would have to study this

24      document that --

25  Q.  Well, and I have not even copied the whole

1                           NACHTSHEIM

2          document so --

3     A.   Okay.

4     Q.   -- I just wanted to use this as a grounding

5          to -- by comparison.  I did not see anything

6          like this for either Exhibit 4 or Exhibit 5

7          or item 60 on your CV, any of the

8          patient-warming studies, I did not see

9          anything that looked to me similar to this

10         type of statistical analysis plan or

11         document.

12    A.   Okay.

13    Q.   Do you believe that anything like that exists

14         for those studies, the patient-warming

15         studies?

16                    MR. SACCHET:  I'm going to object

17         to form again.

18                    THE WITNESS:  I -- I don't --

19         yeah, I don't -- I'm not aware of anything

20         like -- like -- you know, like this document

21         existing for those studies, I'm just not

22         aware of it.

23    BY MS. GARCIA:

24    Q.   Did you see any written statistical analysis

25         plan for any of the patient-warming studies

                          NACHTSHEIM

1

2    at any time?

3    A.  I don't believe I saw a written plan.  There

4        were -- yeah, I don't believe I saw a written

5        plan.

6    Q.  Have you seen anything -- you seem to be

7        pausing and so I want to --

8    A.  Sure.

9    Q.  -- ask for what you are thinking of.

10   A.  Well, the -- the analysis of a well-designed

11       study like this is fairly standard and, I

12       mean, there are standard methods for doing --

13       for analyzing a particular clinical trial as

14       this is.  And so when -- I do recall that

15       when we got to analyzing the data, Mark

16       shared his initial analyses with me and asked

17       me to go through them and -- and to -- to be

18       sure he was doing things correctly and so

19       forth.

20   Q.  Okay.  I will -- we have e-mails with

21       attachments for that and we'll take that up

22       when we get to those particular studies.

23   A.  Okay.

24   Q.  Thank you.

25                   MS. GARCIA:  I would like to mark

1                       NACHTSHEIM

2       as Exhibit 7 this document.

3                  (Whereupon, Exhibit 7 was

4                  marked for identification.)

5   BY MS. GARCIA:

6   Q.  Exhibit 7 is something that was produced by

7       Dr. Belani.  It is a research agreement

8       between he and Augustine Biomedical, and

9       there is a protocol attached for a randomized

10      trial.

11              Did you ever have a written research

12      agreement with Augustine Biomedical or any

13      other company related -- or entity or person

14      related to your patient warming work?

15  A.  I don't -- I don't recall outside of, of

16      course, when I started working with Augustine

17      on sort of a consulting agreement of some

18      kind.  But I don't recall a -- I just don't

19      recall a particular research agreement for,

20      you know, one of the studies.

21  Q.  So you did have a consulting agreement with

22      Augustine related to -- to what?

23  A.  You know, I don't think I was able to find

24      it, but it was -- it was basically related

25      to -- originally, it was to the Pure Air --

1                    NACHTSHEIM

2       the Pure Air work and I think to work with

3       Mark in the statistical studies that he was

4       carrying out.

5    Q.  Do you recall anything about the terms of the

6       agreement?

7    A.  Very little.  I really don't recall a lot.  I

8       think it was an hourly basis for my work.

9    Q.  Do you recall what you were being paid an

10      hour?

11   A.  I don't.

12   Q.  Can you ballpark it for me?

13                  MR. SACCHET:  Calls for

14      speculation.

15                  THE WITNESS:  It does.  Two

16      hundred and fifty, $300 an hour, something

17      like that.

18   BY MS. GARCIA:

19   Q.  Do you feel confident that it was less than

20      $500 an hour?

21   A.  Oh, yes.

22   Q.  Do you feel confident that it was more than

23      $150 an hour?

24   A.  Yes.

25   Q.  Do you believe you were -- do you recall that

                              NACHTSHEIM

1

2       you were paid for your work on the

3       patient-warming studies on an hourly basis?

4   A.  Yes.

5   Q.  Is there -- do you recall the total amount of

6       money, can you ballpark for me in any way the

7       total amount of money that you earned for

8       working on any project that was for

9       Augustine?

10  A.  That's a really good question.  On any --

11      were you asking about any particular -- there

12      was the two -- sort of two --

13  Q.  Total together or separate, however you

14      recall it.

15  A.  I really -- I really can't.  I mean, I'm --

16      I'm quite confident it was less than $20,000,

17      probably more than a few thousand dollars,

18      but I just -- I don't remember the exact

19      amounts.

20  Q.  Have you ever had any type of ownership

21      interest in any Augustine company?

22  A.  No.

23  Q.  Have you ever had any type of ownership

24      interest for any patient-warming product?

25  A.  No.

1                         NACHTSHEIM

2   Q.   Did you ever see any protocol -- to your

3        knowledge, did you ever see this protocol, to

4        your knowledge, that's within Exhibit 7?

5   A.   I never saw this, to my knowledge.

6                     (Whereupon, Exhibit 8 was

7                     marked for identification.)

8   BY MS. GARCIA:

9   Q.   Exhibit 8 is a recent document produced by --

10       recent in date produced by Mark Albrecht, and

11       I just wanted to see if you know anything

12       about what this is referring to?

13  A.   (Reviews document.)  I'm not familiar with

14       this.

15  Q.   Do you believe that this applies to -- are

16       you able to make a judgment by look -- well,

17       okay.  Let me -- let me set a better

18       foundation than that.

19            This is titled, "Logistic

20       Regression," and there's a series of, I take

21       it, statistical analysis results attached; is

22       that right?

23  A.   Yes.

24  Q.   By looking at this document, are you able to

25       tell me one way or another whether this

1                          NACHTSHEIM

2          statistical analysis applies to either

3          Exhibit 4 or Exhibit 5?

4                    MR. SACCHET:  Object to form.

5                    THE WITNESS:  I'm not aware of any

6          way that this is connected to those two

7          papers.  This -- this looks to me like a

8          different analysis.

9     BY MS. GARCIA:

10    Q.   And I am -- based on your statistical

11         expertise, are you able to make a good

12         estimation of that by looking at the type of

13         information that's available on Exhibit 8?

14    A.   Yes.

15                   MR. SACCHET:  Objection;

16         foundation.

17    BY MS. GARCIA:

18    Q.   You may be noticing I have a series of just

19         miscellaneous documents I'm beginning with

20         before we get into the meat of your work, and

21         here is another one, Exhibit 9.

22                   (Whereupon, Exhibit 9 was

23                   marked for identification.)

24    BY MS. GARCIA:

25    Q.   This is a November 1st, 2013, e-mail produced

NACHTSHEIM

1
2     by Mark Albrecht.  And in the third paragraph
3     he is talking about, "You guys could have
4     mentioned that you had a bonehead MBA student
5     engineer that was running thermo-regulatory
6     experiments that was sorting the randomizer
7     run order" -- "randomized run order of course
8     in a garage and operating theater made of
9     garbage bags.  Maybe mention that this is the
10    norm for the industry or at least what you
11    might expect from a guy that runs experiments
12    in a garage, ha ha."
13            Do you know what he's speaking about
14    there?
15 A. Yes, I do.  I think I do.  So the -- the
16    original work when -- when he started to work
17    on the forced-air warming problem, they
18    had -- he had built a simulated operating
19    room and ran some experiments with that.  And
20    it wasn't a garage, but it was a -- it was a
21    warehouse that they had rented so they could
22    build this simulated operating room, I think
23    that's what this is referring to, and -- and
24    there were some experiments run there and --
25    and -- so, yeah.

1                          NACHTSHEIM

2   Q.   Okay.  First you say they've built and you

3        also said they rented, and I just want to

4        make sure I understand what you're saying.

5        Do you believe there was a preexisting

6        warehouse that they rented and then did some

7        modification to the inside?

8   A.   That's my understanding.

9   Q.   Okay.  Did you have anything to do with that

10       design or construction work?

11  A.   Not with the construction work, no.

12  Q.   Or the design of the operating room, whatever

13       they did to modify the inside?

14  A.   I did -- I did not.

15  Q.   Okay.  And when you say they built an

16       operating, can you give me a better sense of

17       what you mean, what did they do inside the

18       warehouse?

19  A.   Well, as I recall, there was an area closed

20       off and there -- I don't remember the

21       technical term for the fan that brings air

22       down and causes the -- the downward gradient,

23       and so there was -- so as I recall, that was

24       part of the -- part of the sort of simulated

25       operating room.

                            NACHTSHEIM

1

2  Q.  And we will get to an e-mail discussing this

3      later, but I do have an under -- well, let me

4      strike that and start over.

5                Were you ever in this warehouse?

6  A.  Yes.

7  Q.  Did you observe an experiment being conducted

8      in the warehouse?

9  A.  Yes.

10 Q.  Do you --

11 A.  I observed part of an -- I did not observe an

12     entire experiment, I observed part of an

13     experiment.

14 Q.  Did you observe an experiment that involved

15     the operation of a forced-air warming device?

16 A.  I believe I did.  I think I did.

17 Q.  Do you know if it was a Bair Hugger device?

18 A.  I think it would have been a Bair Hugger,

19     yes.  I'm just not positive whether I was

20     watching -- you know, when I -- I believe

21     that -- I believe that they were doing

22     experiment -- part of the experiment involved

23     the Bair Hugger device and -- and I would

24     guess the -- the HotDog or something like

25     that.  So I don't recall with a hundred

                              NACHTSHEIM

1

2      percent certainty that there was a

3      Bair Hugger when I happened to be there

4      watching.

5  Q.  Do you recall anything about how long you

6      were there in the warehouse watching?

7  A.  I -- I believe I was just there for a couple

8      of hours.

9  Q.  Were you there to provide any type of advice

10     or consultation to them about the way they

11     conducted their study?

12 A.  Yes.  I think Mark -- Mark wanted me to

13     observe how they were carrying out the study

14     and just to give my opinion about was it --

15     were they doing this correctly and so forth.

16 Q.  Do you have any expertise in what they were

17     doing in the warehouse?

18 A.  Oh, no.

19 Q.  So what is it that you were providing advice

20     about?

21 A.  Well, for example, making sure that the runs

22     were being carried out in a random order,

23     that they were properly randomized, that the

24     changeover from one run to the next was done

25     appropriately and so forth.

1                          NACHTSHEIM

2    Q.   Do you know --

3    A.   Oh, and also how the measurements were being

4         taken.  I mean, Mark wanted me to see how

5         they were doing measurements from each of the

6         runs.

7    Q.   When you say, "How the measurements were

8         being taken," can you tell me more about what

9         you mean?

10   A.   Well, this is all vague in terms of the

11        warehouse, but the -- how you go about

12        counting bubbles in certain areas of the

13        room.

14   Q.   Did you provide any expertise or advice about

15        the particular method they were using to

16        generate or track or count the bubbles from a

17        mechanical perspective?

18   A.   No, no.

19   Q.   So what you were providing insight -- or

20        you -- you were reacting to the way they were

21        documenting their counts?

22   A.   I think that's -- that's pretty accurate.  I

23        think that's accurate.  I -- I was there to

24        observe how they were recording things, how

25        they were carrying out the experiment.

NACHTSHEIM

1

2   Q.   Do you know if the work that you observed

3        became part of any paper that you were a

4        coauthor on either that became published or

5        was in process?

6   A.   You know, I think there was a draft of a

7        paper that I don't believe ever was

8        published.  I think -- that's -- that's my

9        answer.  I -- I believe there -- I think were

10       was -- I seem to recall there was a draft

11       and -- but it was not published.

12  Q.   Was anyone else in the warehouse when you

13       were there other than Mark Albrecht?

14  A.   There was -- I don't recall his name, but

15       there was one other person who I believe

16       worked or reported to Mark or also worked for

17       Dr. Augustine kind of helping to run the

18       experiment, the -- the experiment.

19  Q.   Was there anything within the warehouse that

20       you identified as having been constructed to

21       resemble or to be an operating theater?

22  A.   Was there anything constructed -- I'm sorry,

23       could you ask me again?

24  Q.   Within -- do you have a sense for how big the

25       room was that you were in in the warehouse?

1                         NACHTSHEIM

2    A.   I have a sense for how big it was.

3    Q.   Can you give me a ballpark?

4    A.   Maybe it was -- this is -- maybe it was

5         15 by 15.  I'm not sure.  Twenty by 20.  I'm

6         not sure.

7    Q.   So the size of a large living room?

8    A.   Something like that or a dining room.

9    Q.   Was there any structure within the room or

10        was it just the four walls of the room?

11   A.   I don't recall structure inside.  I don't

12        recall that.  I just don't recall.  There was

13        a -- I believe there was a table, but that's

14        all I recall.

15   Q.   So you recall a table.  Do you recall any

16        type of draping?

17                  MR. SACCHET:  Objection; asked and

18        answered.

19                  THE WITNESS:  Yeah, I don't recall

20        draping.  I just don't recall.

21   BY MS. GARCIA:

22   Q.   Do you recall anything in the room at all

23        other than a table?

24   A.   You know, I recall the -- I recall the device

25        that produced the bubbles.  I think I -- I

1                          NACHTSHEIM

2          believe I recall a camera.  That's about all

3          I recall.

4     Q.   Video or still camera?

5     A.   I think it was still, but I'm not sure.  I

6          think it was still.

7     Q.   And you said that you recalled that there was

8          air coming down from the ceiling?

9     A.   Yes.

10    Q.   Did you provide any insight or expertise

11         about the way that airflow in the room was

12         being produced or managed?

13    A.   No.

14    Q.   Did you do any research about what the

15         airflow in the room should be to reflect an

16         accurate operating room setting?

17    A.   No, I did not.

18    Q.   There's a comment in here about, "Operating

19         theater made of garbage bags."  Did you see

20         anything like that?

21    A.   I don't recall garbage bags.  I don't recall

22         that.

23    Q.   Do you recall anything that was an operating

24         theater?

25    A.   Do I recall anything that was an operating

1                        NACHTSHEIM

2        theater?

3    Q.  Uh-huh.

4    A.  Just as I said, a table.  I recall the -- I

5        recall the -- I think I recall the fan up

6        above.  I think there may have been a way to

7        pull the air out, and it was -- as it came

8        down, which was I believe another attempt to

9        simulate an operating room, but I don't

10       recall much more than that.

11   Q.  And as you said that, you were moving your

12       arm down towards the floor.  Is that what you

13       meant, a way for the air to come down at

14       floor level?

15   A.  Down at floor level, yes.

16   Q.  Thank you.

17            Do you recall anything about the way

18       the bubbles were moving and how that might

19       relate to a comparison of different

20       patient-warming devices based on your

21       personal observation?

22   A.  Based on my personal observation.  I -- I --

23       I have recollections of the bubbles moving

24       up, I have recollections of them swirling at

25       times, but I have -- it's very vague.  What I

1                         NACHTSHEIM

2      recall is very vague.

3  Q.  When you were there was there any mannequin

4      on the table?

5  A.  I don't remember.

6  Q.  And do you recall --

7  A.  There may have been, but I don't -- I don't

8      really remember that.

9  Q.  Okay.  And do you recall any person standing

10     by the table during the time when bubbles

11     were generated to simulate being either --

12 A.  Yes.

13 Q.  -- to simulate being a doctor?

14 A.  I do remember that.  Yes.

15 Q.  Do you know where around the table that

16     person was standing?

17 A.  Well, I -- I'm not sure.  I think I remember

18     one person standing by the side perhaps

19     being -- you know, simulating the -- the

20     surgeon, but I -- you know, in the -- in the

21     kind of the middle of the table, but I don't

22     have a great recollection.

23 Q.  Okay.  Are you an industrial hygienist?

24 A.  Am I --

25 Q.  An industrial hygienist?

1                          NACHTSHEIM

2    A.  No, I'm not.

3    Q.  Do you have any expertise in the proper

4        filtration or ventilation in hospital

5        operating rooms?

6    A.  No, I do not.

7    Q.  Are you a medical doctor?

8    A.  No.

9    Q.  Do you have any specialized training in

10       microbiology?

11   A.  No.

12   Q.  Do you claim any expertise in microbiology?

13   A.  I do not.

14   Q.  Do you claim any expertise in evaluating the

15       tests for potential contamination of biologic

16       pathogens in an operating room environment?

17   A.  Do you mean -- the tests, do you mean the --

18       the -- evaluating assays?

19   Q.  Yes.

20   A.  No.

21   Q.  Something biologic or microbiologic.

22   A.  Numeric is another issue, but -- but no.

23   Q.  Have you published anything in the peer

24       review literature about the causes of

25       surgical site infections?

1                          NACHTSHEIM

2    A.   No.

3    Q.   Have you published anything in the peer

4         reviewed literature about filtration of

5         either a room or a medical device?

6    A.   Outside of the pure air filtration system,

7         no.

8    Q.   Thank you.

9              Have you published any articles on

10        medical device design?

11   A.   No.

12   Q.   Outside of the work that we've discussed here

13        today, have you worked for a medical device

14        company?

15   A.   Yes.

16   Q.   Is that something you're able to disclose?

17   A.   Yes.

18   Q.   Who you worked for?

19   A.   Yes.

20   Q.   Okay.

21   A.   Oh, you want to know?

22   Q.   Yes, that would be great if you're able to

23        disclose it.

24   A.   I've worked for -- I've worked for Medtronic,

25        I've worked for Guidant, Boston Scientific,

NACHTSHEIM

1
2      I've worked for St. Jude Medical.

3  Q.  Has your work involved statistical analysis?

4  A.  Yes.

5  Q.  Has your work been related to the design of

6      medical devices?

7  A.  Yes.

8  Q.  Have you published any of that work?

9  A.  No.

10  Q.  Are you an expert in the substantive design

11      of a medical device?

12  A.  No.

13  Q.  The process by which we would decide, other

14      than statistical analysis, have you played

15      any role in device design?

16  A.  No.

17  Q.  Have you done any kind of work on any kind of

18      patient-warming device other than what is

19      reflected in the subject matter we're talking

20      about here today, including the documents

21      that you produced?

22  A.  No.

23  Q.  Have you ever participated in the design of a

24      patient-warming device?

25  A.  No.

1                          NACHTSHEIM

2    Q.  Do you know what regulations apply to the

3        design and manufacturing of patient-warming

4        devices?

5    A.  No.

6    Q.  Do you know what standards apply to operating

7        room environments?

8    A.  No.  I should say outside of what I read in

9        these papers that was provided by the -- that

10       was not provided by me.

11             MS. GARCIA:  Can you remind me of

12       my question?  I'm sorry.

13             (Whereupon, the last question

14             was read by the court reporter.)

15   BY MS. GARCIA:

16   Q.  To the extent that Exhibits 4 or 5 reflect

17       any statements about the standards that might

18       apply to operating room environments, do you

19       claim expertise about those things?

20   A.  No, I don't.

21   Q.  Before your work for Mark Albrecht --

22       before your work with Mark Albrecht and

23       Scott Augustine, did you have any knowledge

24       about patient-warming devices?

25   A.  No.

1                        NACHTSHEIM

2                   (Whereupon, Exhibit 10 was

3                   marked for identification.)

4   BY MS. GARCIA:

5   Q.  I have marked as Exhibit 10 an e-mail

6       from Mark Albrecht to you copied to

7       Scott Augustine dated March 24th, 2010.

8   A.  Uh-huh.

9   Q.  This is marked with your Bates number, which

10      means it would have been produced by you.

11  A.  Uh-huh.  Yes.

12  Q.  It says, "Chris, here is a publication we

13      will be submitting in a couple of weeks.  I'd

14      be" -- I'm reading an excerpt from this.

15      "I'd be thrilled if you would like to be a

16      part of this.  All I need you to do is take a

17      look at the stats and conclusions and provide

18      some overview and guidance.  Let me know if

19      you're interested."  Have I read the parts

20      I've read correctly?

21  A.  Yes.

22  Q.  Is this the first time that you began working

23      with Mark Albrecht on a patient warming

24      paper?

25  A.  Well, no.  I believe -- well, the work that I

                              NACHTSHEIM

1
2       believe we did on the paper that I don't
3       think ever went anywhere, some of the earlier
4       experimentation, but -- but I think this is
5       probably the first that I became involved in
6       this particular product -- this particular
7       project.
8    Q.  Okay.  Well, this particular --
9    A.  And I don't know how to say project, but I
10      mean just what led to this paper.
11   Q.  Well, this particular draft publication that
12      is attached to Exhibit 10 I believe is not
13      one that resulted in publication.  If you
14      would take a look at the attachment to
15      Exhibit 10 --
16                  MR. SACCHET:  Objection; move to
17      strike the preamble.
18   BY MS. GARCIA:
19   Q.  Would you please look at the document
20      attached to Exhibit 10 --
21   A.  Uh-huh.
22   Q.  -- and tell me if you believe that this
23      manuscript became either Exhibit 4 or
24      Exhibit 5?
25   A.  (Reviews document.)  I agree, I don't -- I

NACHTSHEIM

1        don't believe this led -- this became either

2        of these publications.

3  Q.  Okay.  And by, "These publications," you're

4        referring to Exhibits 4 and 5?

5  A.  Exhibits 4 and 5, right.

6  Q.  If you would look at the page ending 370,

7        which is the Methods section.

8  A.  Oh, I see the numbers, okay.

9  Q.  I will refer often today to the Bates numbers

10       and so I'll just be using the last numbers --

11  A.  Right.

12  Q.  -- to make it shorter for us.

13  A.  Got it.  Okay, 370 I'm there.

14  Q.  The Methods section.  Do you believe that

15       this describes the same setting that you were

16       describing a moment ago when you went to the

17       warehouse and observed the experiment that

18       you described?

19  A.  (Reviews document.)  This very well could

20       have been related to the experiment in the

21       simulated operating room.

22  Q.  Are you able to tell for sure one way or the

23       other?

24  A.  I -- I can't tell for sure one way or the

NACHTSHEIM

1

2    other.  Do they -- I can't tell for sure.

3  Q.  Do you -- have you ever been to any other --

4    have you ever been to any -- this describes a

5    laminar flow laboratory on page 370.  Have

6    you ever been to anything other than the

7    warehouse that you just described?

8  A.  No.

9  Q.  Are you aware of any other type of structure

10    in which Mark Albrecht has done any bubble

11    testing other than when you visited?

12  A.  No, outside of --

13  Q.  And at -- at hospitals.

14  A.  Outside of hospitals, no.

15  Q.  Okay.  I do believe this is the earliest work

16    referenced in the e-mails you provided.  Do

17    you believe there is something earlier -- let

18    me ask this a different way.

19        If Mark Albrecht had sent you a

20    draft publication relating to patient warming

21    work at any point before March 24th of 2010,

22    and if you still had it, would you have

23    produced it to us?

24  A.  I would have produced it.

25  Q.  Okay.  Do you believe, independently of what

NACHTSHEIM

1
2     this paper says, that you received any draft
3     publication from Mark Albrecht before
4     March 24th, 2010?
5  A.  I don't believe I received anything before
6     then.
7  Q.  Do you believe that this e-mail from Mark is
8     the first notice you received of this
9     particular study?
10 A.  Well, again, if this -- if this -- I think
11    this study -- I -- I think this study was
12    evolved from some of the original
13    experimentation that I had talked about
14    previously that I had been observing.
15 Q.  Let me ask this a different way.  Have you
16    ever been to the lab more than -- had you
17    ever been to the warehouse where you observed
18    bubble testing more than once?
19 A.  No, I don't believe so.
20 Q.  I have another e-mail that might help us
21    place it in time.
22 A.  I might have been there twice.
23 Q.  Do you believe you were there twice or are
24    you not sure?
25 A.  I seem to -- I'm just not sure.  I --

1                        NACHTSHEIM

2   Q.  Do you have any recollection --

3   A.  -- seem to remember having gone back again

4       and met him there, but I'm not sure that we

5       actually did work there.  I just don't -- I'm

6       sorry, I don't recall.

7   Q.  Okay.  Okay.

8                   (Whereupon, Exhibit 11 was

9                   marked for identification.)

10  BY MS. GARCIA:

11  Q.  If you would take a look at exhibit -- are we

12      at 11 now?

13  A.  Yes.

14  Q.  Okay.  Exhibit 11 begins with an April 5th,

15      2010, e-mail from Mark to you saying, "You

16      could stop by either on Wednesday or Thursday

17      to observe the laminar flow lab in testing.

18      Let me know what might interest you.  PS,

19      bring clothes that can smell like smoke,

20      because our smoking machine makes it stink

21      like cigarettes."  Do you believe -- have I

22      read that correctly?

23  A.  Yes.

24  Q.  And do you believe this reflects an

25      invitation for you to come the first time to

NACHTSHEIM

1
2       the laminar flow location?

3   A.  I do believe that, yes.  I think this is the

4       first one.

5   Q.  And so now that we have that date in mind,

6       would you agree that you had not been to the

7       lab to observe any laminar flow testing until

8       after the point when you received the

9       March 24, 2010, e-mail?

10  A.  Yes.

11  Q.  Knowing that, do you believe you had any

12      prior conversation with Mark Albrecht about

13      the study reflected in Exhibit 10 before you

14      received this e-mail from him?

15  A.  I would think I had had some conversations

16      with him.

17  Q.  Why do you say --

18  A.  Because I -- well, I don't -- I mean, the way

19      he introduced this, "You can stop by to

20      observe the laminar flow lab and testing," I

21      think there's kind of an assumption in there

22      that I -- I kind of know what this is about

23      and -- and again -- and, again, I -- but I

24      just -- I'd never -- but I hadn't worked on

25      the project at this point.  I think he might

NACHTSHEIM

1
2      have given me some introduction to what he
3      was doing, but I hadn't -- I hadn't done any
4      work on the project before this.
5   Q.  Did you contribute at all to the design of
6      this study?
7   A.  To this -- to the -- to the experiment design
8      of the study, yes.
9   Q.  How would you have contributed to the
10      experiment design if this article came to you
11      drafted?
12  A.  Well, I think usually Mark would -- would
13      say, Here's what I'm proposing, what do you
14      think.  He -- and I just don't remember
15      exactly here, but he -- could I -- could I
16      read this for a second?
17  Q.  Sure.
18  A.  (Reviews document.)  Yeah, so on the last
19      piece on -- on this Exhibit 11, Mark -- Mark
20      wrote to me and said, "Okay, this afternoon
21      will be fine, whenever you can make it.
22      Attached is the design.  I used a full
23      factorial design with four replicates for
24      each treatment combination.  For each
25      replicate there will be two measures and the

NACHTSHEIM

1
2    plan is to analyze the data with a repeated
3    measures model like the Pure Zone clinical."
4    So while Mark set the design up, usually what
5    he wants me to do is review it and say is
6    this making sense.  That's all I meant by
7    contributing to the design.
8  Q.  So to be clear, the piece that you just read
9    to me is from Exhibit 11 and it's dated
10    April 6th of 2010, which is after you
11    received the draft of the manuscript,
12    correct?
13  A.  Correct.
14  Q.  So the first time you would have received
15    from Mark an indication of the design other
16    than what's embedded within the manuscript,
17    is this April 6th e-mail?
18  A.  I believe that's correct.
19  Q.  Okay.  And what he would be doing is asking
20    you to give him feedback on the design?
21  A.  Yes.
22  Q.  Do you recall having read this excerpt from
23    April 6th of 2010, whether you did or did not
24    have any comment on the design?
25  A.  I recall having comment on the design

1                          NACHTSHEIM

2        after -- I believe -- I believe when I went

3        out to see it, when I went out to see what

4        they were doing.

5   Q.   What do you recall having to say?

6   A.   Well, I seem to recall that -- this is vague

7        for me, but I seem to recall that I was

8        unhappy with the way the randomization was

9        being carried out, I didn't think it was

10       quite correct.

11  Q.   Can you give me any more detail about what

12       you mean by that?

13  A.   They may -- they might not have been changing

14       all the factors the way they should between

15       runs.  I can't recall, but I -- I seem to

16       recall that I was -- that I said I don't

17       think is -- this is not good enough, this

18       needs to be redone, and I believe that -- and

19       I believe it was redone as a result of that,

20       and I think there was some discussion between

21       Mark and Dr. Augustine about that and I think

22       there was some sort of a restart on -- on it.

23  Q.   Okay.  I wonder if that would relate to --

24                     (Whereupon, Exhibit 12 was

25                      marked for identification.)

1                         NACHTSHEIM

2    BY MS. GARCIA:

3    Q.  -- Exhibit 12, by chance?  Do you have any

4        idea if Exhibit 12 relates to what you just

5        described?

6    A.  I think it does.

7    Q.  So this is an e-mail sent by Mark to you two

8        days after -- well, actually, let me back up.

9                Exhibit 11 reflects an invitation of

10       you to stop by the lab on Wednesday or

11       Thursday, so that's the 5th, which is a

12       Monday, according to the e-mail, so that

13       means the 7th or 8th is the day you were

14       invited to come over.

15   A.  Uh-huh.

16   Q.  And then Thursday the 8th the e-mail to you

17       says, from Mark, "I laid out our results

18       today with Scott and he took the news well.

19       He wants us to really start understanding the

20       problem before pushing forward with research

21       publication efforts."

22               Do you believe Scott refers to

23       Scott Augustine?

24   A.  Yes, I do.

25   Q.  And do you -- do you believe this relates to

NACHTSHEIM

1

2          the randomization issue or do you have any

3          other sense of what this would relate to?

4    A.   Again, I'm not positive it was just a

5          randomization, that's -- I'm just a little

6          vague about what it was I didn't like.  I --

7          I think that I was -- I think I felt the way

8          that it was running, and maybe it was because

9          of the randomization, that it might not be

10         reproducible, and so I just felt they needed

11         to improve the way they were running the

12         experiment and the technique.

13   Q.   And no more detail that you can think of

14         other than that?  I'm not saying you should,

15         I'm just asking.

16   A.   I just don't -- I -- I -- yeah, I just -- I

17         just don't recall.  I just -- I think I felt

18         that -- again, I -- I think as I looked at

19         the technique, I didn't -- I was not happy

20         with it and I didn't think that it would be

21         sort of reproducible the way things were

22         going.

23   Q.   Okay.  You do say, if we look back at

24         Exhibit 10, you say, "Happy to help, I'll

25         have a look," and you did indicate an

1                        NACHTSHEIM

2       interest in participating in the publication,

3       correct?

4   A.  Yes.

5   Q.  How did you envision your role then for that

6       study?

7   A.  I saw my -- I saw my role at that time as, at

8       a minimum, overseeing the experimental design

9       and overseeing the analysis of the results.

10  Q.  And when you say, "Overseeing," how do you

11      select that word?  What do you mean by that?

12  A.  Well, Mark is -- I would -- Mark -- I would

13      see Mark taking a first crack at things,

14      whether it's a design or an analysis, and

15      then usually I would then get it and look at

16      it and make suggestions for changes or say

17      this is -- this looks just fine.

18  Q.  Okay.  At this point in time did Mark have

19      already a master's degree in statistics?

20  A.  You know, I don't -- I don't recall.  I don't

21      believe he had a master's in statistics at

22      this point.

23  Q.  I think I've seen somewhere that he does.  Do

24      you believe he does currently have a master's

25      in statistics?

1                      NACHTSHEIM

2    A.   Oh, yes.

3    Q.   Okay.  Did you supervise his work to obtain

4         his master's degree?

5    A.   I did.

6    Q.   Do you believe this work may have been part

7         of that supervision?

8    A.   No, this was not.

9    Q.   This was for the Ph.D. process?

10   A.   This particular work?

11   Q.   Yes.

12   A.   It had nothing to do with his academic.

13        This was just -- just for his boss,

14        Scott Augustine.  It was for his work.

15   Q.   So the work he was doing on -- the work that

16        you -- let me be clear.  When you say, "This

17        work," do you include everything here

18        including Exhibits 4 and 5, that that had

19        nothing to do with his academic career?

20   A.   Yes.  I mean, it did not have anything to do

21        with his academic career.

22   Q.   So the patient warming work was all in

23        connection with his employment and your role

24        was to supervise --

25   A.   Yes.

1                         NACHTSHEIM

2    Q.   -- that?

3    A.   Yes.

4    Q.   And why did -- did you consider that he was

5         asking for a supervisor?

6    A.   In terms of this work?

7    Q.   Any of the patient warming work.

8    A.   Yes, I -- I think -- yes, he -- he wanted to

9         work with an expert from the University of

10        Minnesota to be sure he was doing things

11        correctly.

12   Q.   Did you -- and you believed that this work

13        ultimately fell within the umbrella of your

14        consulting agreement with Augustine?

15   A.   Yes.

16   Q.   And the reason I say Augustine is do you know

17        if your agreement was with Dr. Augustine

18        personally or with an Augustine company?

19   A.   Oh, it was with an Augustine company, as I

20        recall.

21   Q.   Did you -- were the e-mails and the

22        attachments that you produced to us in

23        response to the subpoena, documents that you

24        kept in the ordinary course of your work for

25        the Augustine company for which you were

NACHTSHEIM

1
2      consulting and for Mark Albrecht?

3  A.  You mean if I kept them in an organized

4      fashion relating --

5  Q.  Organized -- go ahead and finish your --

6  A.  Because, no, it wasn't --

7  Q.  It wasn't organized.  No, I don't mean

8      organized.  I said in the ordinary course.

9      You kept these e-mails as part of the

10     ordinary course of your work for

11     Mark Albrecht and for the Augustine

12     companies?

13 A.  Yes.

14 Q.  And do you believe that the e-mails and the

15     attachments that you produced to us

16     accurately reflect those that were originally

17     provided to you in the course of doing that

18     work?

19 A.  Could you ask that again?  I'm not sure --

20 Q.  Yes.

21 A.  -- what you're getting at.

22 Q.  The documents and -- the e-mails and their

23     attachments, the documents that you provided

24     to us are an accurate set of those documents

25     that you kept during the course of your

1                          NACHTSHEIM

2       work --

3   A.  Yes.

4   Q.  -- for Albrecht --

5   A.  Yes.

6   Q.  -- Mark Albrecht and the Augustine companies?

7   A.  Yes.

8   Q.  Thank you.  I understand this is one of those

9       moments where we're reaching agreement, or

10      understanding, I should say, but we'll have

11      to try to separate our speaking so that Amy

12      will be able to take it down.  Thank you.

13              When you wrote communications and

14      received communications, were those writings

15      made at or near the time when the work was

16      being done?

17  A.  Yes.

18  Q.  Do you know Dr. David Leaper?

19  A.  No.

20  Q.  Did you ever talk with Dr. David Leaper or

21      have any communication with him about the

22      work that is reflected in the manuscript

23      attached to Exhibit 10?

24              MR. SACCHET:  Asked and answered.

25              THE WITNESS:  Dr. Leaper may have

                         NACHTSHEIM

1

2      been on some of the e-mails, but I never had

3      direct communication with him.

4  BY MS. GARCIA:

5  Q.  If you -- the way you -- start over.

6           The way you described your role

7      supervising Mark Albrecht's design work and

8      statistical analysis work, does that apply to

9      all of the patient warming work that you did,

10     including Exhibits 4 and 5?

11  A.  Yes.

12  Q.  Did you understand it to be your role to let

13     Mark Albrecht know if you thought there was

14     some type of issue or problem in the design

15     of the study?

16  A.  Yes.

17  Q.  And, likewise, in the statistical analysis

18     that he had planned for the study or had

19     conducted?

20  A.  Yes.

21  Q.  Do you have any substantive knowledge about

22     the comparative effectiveness of a forced-air

23     warming device versus a convective-warming

24     device?  Or, I'm sorry, I said that wrong.

25           Do you have substantive knowledge of

1                       NACHTSHEIM

2        the effectiveness comparatively between any

3        patient-warming devices at keeping a patient

4        warm?

5    A.  I do not.

6    Q.  Do you have any substantive knowledge about

7        the different airflow patterns that are used

8        in operating rooms?

9    A.  And by, "Substantive" -- by, "Substantive

10       knowledge," do you mean at the mechanical

11       level or --

12   Q.  Yes.

13   A.  No, I don't.

14              While you're looking, may I grab

15       some more water?

16              MS. GARCIA:  Let's just take a --

17       let's take a short break.  I could use a

18       break too.

19              THE WITNESS:  Okay.

20              THE VIDEOGRAPHER:  We're going off

21       the record at 10:24 a.m.

22              (Whereupon, a brief recess

23              was taken.)

24              THE VIDEOGRAPHER:  This is video

25       number 2 in the deposition of Christopher

                        NACHTSHEIM

1

2       Nachtsheim.  Today is November 29th, 2016.

3       We're going back on the record at 10:35 a.m.

4   BY MS. GARCIA:

5   Q.  Thank you.  I'm going to ask just a few more

6       questions to take a break from documents

7       clarifying to be sure that I understand the

8       scope of your expertise.

9               Did you contribute medical or

10      surgical expertise to either the McGovern or

11      Belani studies, Exhibits 4 or 5?

12  A.  No.

13  Q.  Do you have any medical, surgical or

14      infectious disease training?

15  A.  No.

16  Q.  Your Ph.D. is, I understand it, in operations

17      research?

18  A.  Yes.

19  Q.  Have you ever consulted with medical device

20      manufacturers about product design or

21      performance?

22  A.  Yes.

23  Q.  That's the work you were talking about

24      earlier?

25  A.  Yes.

1                          NACHTSHEIM

2   Q.   Okay.  The statistical analysis related to,

3        in each case, a medical product?

4   A.   Yes, yes.  Either statistical design or

5        analysis or both.

6   Q.   Sometimes you were consulting about the

7        design of a study?

8   A.   Exactly.

9   Q.   Have you ever consulted with a hospital about

10       the design or ventilation of an operating

11       room?

12  A.   No.

13  Q.   Do you know anything about how a surgical

14       operating room or surgical theater typically

15       is set up in the United States?

16  A.   Only what I've learned working with Mark

17       and -- and -- and -- and -- and the

18       colleagues on these papers, just -- just a

19       little bit about drapes, things of that

20       nature, but that all came from -- from my

21       exposure on these studies.

22  Q.   Okay.  Before you began to work on Exhibits 4

23       and 5 -- before the began to work on the

24       studies that were reflected in Exhibits 4 and

25       5, you knew nothing about --

1                           NACHTSHEIM

2    A.   I knew nothing --

3    Q.   -- operating rooms?

4    A.   I knew nothing.

5    Q.   Thank you.  We'll get back into the rhythm of

6         waiting for each other to finish.

7              Did you happen to see the -- let me

8         start over.

9              Did you ever observe any of the

10        hospital settings where work took place that

11        is captured in Exhibits 4 and 5?

12   A.   No.

13   Q.   Did you help to decide how that experimental

14        environment would be set up for either

15        Exhibit 4 or 5?

16   A.   No.

17   Q.   And if we would look at Exhibit 5, which is

18        the Belani study -- no, I'm sorry, for both

19        studies, both studies reflect also -- both

20        studies reflect -- let me start over again.

21              Both studies reflect that there were

22        bubble experiments conducted.  Do you know

23        where the bubble experiments were conducted

24        for either study, Exhibits 4 and 5?

25   A.   Well, I know where the hospitals were, if

1                              NACHTSHEIM

2          that's -- is that what you mean?

3     Q.   Sure.  That would be helpful.

4     A.   I mean, there was one at the

5          University of Minnesota and one at -- in the

6          United Kingdom.

7     Q.   For the University of Minnesota, do you know

8          what hospital it was?

9     A.   I don't.

10    Q.   Do you understand that the bubble experiment

11         was conducted in only one hospital

12         environment or in more than one?

13    A.   When you say, "The bubble experiment" --

14    Q.   Any bubble experiment.

15    A.   Any bubble experiment?

16    Q.   For Exhibit 5.

17    A.   For -- oh, for Exhibit 5.  Okay.

18    Q.   Which I believe is the study that references

19         a University of Minnesota hospital.

20    A.   I -- my understanding was it was done in one

21         site.

22    Q.   But you don't know which hospital?

23    A.   I do not.

24    Q.   And you don't know anything about how it was

25         set up?

                        NACHTSHEIM

1

2    A.   I do not.

3    Q.   For Exhibit 4, which is the McGovern study,

4         do you know anything about where the bubble

5         experiments were conducted there?

6    A.   I don't have any particular knowledge about

7         those.

8    Q.   Did you have any input into the selection of

9         neutral buoyancy detergent bubbles as a way

10        to measure air movement in the tests?

11   A.   I did not.

12   Q.   And were you present for any of the

13        experimental testing that became part of

14        Exhibits 4 or 5?

15   A.   I was not.

16   Q.   Did you ever prepare an initial draft of any

17        patient warming abstract or article?

18   A.   No.

19   Q.   And by, "Prepare," I mean write.  Was that

20        clear to you?

21   A.   Yes, it was.  Yes, it was.

22   Q.   You did review both the McGovern and the

23        Belani articles before they were submitted

24        for publication?

25   A.   I did, yes.

1                          NACHTSHEIM

2    Q.  Did you read the complete manuscripts that

3        you were provided?

4    A.  Yes.

5    Q.  Were you given the opportunity to make edits

6        to both of these articles, Exhibits 4 and 5,

7        before they were submitted for publication?

8    A.  Yes.

9    Q.  Did you make any edits that you felt were

10       needed?

11   A.  Yes.

12   Q.  Did you feel comfortable -- oh, go ahead.

13   A.  I mean, they were minor edits --

14   Q.  Okay.

15   A.  -- as I recall.

16   Q.  The edits you made were minor edits?

17   A.  Yes.

18   Q.  Did you feel comfortable enough with

19       Mark Albrecht that if you felt some type of

20       revision was needed to either one of papers

21       Exhibits 4 or 5, you would feel comfortable

22       raising that?

23   A.  Yes.

24   Q.  Is it standard in your profession for authors

25       to identify places where their work has

1                        NACHTSHEIM

2        limits?

3    A.  Did you say places where their work has

4        limits?

5    Q.  Yes.

6    A.  I don't know what you mean.

7    Q.  Is that not a clear question?

8    A.  It's not a clear question to me.

9    Q.  Is it standard in your profession for authors

10       to identify limits to their work and to the

11       generalizability of their work?

12   A.  Yes.

13   Q.  And, in fact, Exhibits 4 and 5 both reflect

14       limitations expressed by the authors?

15   A.  Yes.

16   Q.  Did you review those?

17   A.  I did, yes.

18   Q.  And if you disagreed with any of the

19       expressed limits, would you have raised that?

20   A.  Yes, I would have.

21                        (Whereupon, Exhibit 13 was

22                        marked for identification.)

23   BY MS. GARCIA:

24   Q.  Exhibit 13 is an April 9th, 2010, e-mail from

25       Mark to a group of people including you; is

1                           NACHTSHEIM

2          that correct?

3     A.   (No response.)

4     Q.   Did you hear my question?

5     A.   No, I'm sorry, I didn't.

6     Q.   That's okay.  I thought you may not have.

7                    Exhibit 13 is an April 9, 2010,

8          e-mail from Mark Albrecht to a group of

9          people including you; is that correct?

10    A.   That's correct.

11    Q.   This is, if you'll recall by reference to

12         Exhibits 11 and 12, within a few days of when

13         you visited the lab, correct?

14    A.   Correct.

15    Q.   There is a beginning address of capital A,

16         capital D.  Do you know what that means?

17    A.   I do not.

18    Q.   The statement that Mark Albrecht makes is

19         that, "Randy, Scotty, Keith and I examined

20         the flow uniformity in the laminar flow

21         laboratory today with smoke tracers.  We now

22         know why our results have been coming out so

23         goofy.  There are jets and stagnation points

24         all over the flow field.  Further, even a

25         portion of the plenum had partially collapsed

                              NACHTSHEIM

1
2      and was fully blocked.  Scott would like

3      Randy and Scotty to reconstruct the blower

4      plenum on Monday.  I'll help as best I can."

5              Do you know what they're referring

6      to in any more detail than this provided

7      here?

8   A.  Not in any more detail than this.

9   Q.  Do you recall talking to Mark Albrecht about

10      this?

11  A.  I think this relates to my point earlier that

12      when I watched -- when I watched the

13      experiment I -- I just -- I was unhappy with

14      the way it was being run, the order it was

15      being run, and I was unhappy with the -- I

16      was unhappy with the experimental setup.  As

17      I said, I didn't think it was reproducible.

18      And I didn't know -- I didn't necessarily

19      know why, I just didn't think it was

20      reproducible.

21  Q.  You think that your concern about

22      reproducibility had to do with airflow and

23      the reproducibility of airflow?

24  A.  I would conclude that by looking at this.

25      They were going to look at what was wrong,

NACHTSHEIM

1
2    what was going on that was leading to these
3    results that were not sort of reproducible.
4    And I -- when I saw this e-mail, I assume
5    that that was -- that was their solution to
6    the problem.
7    Q.  You have a recollection sitting here today of
8        seeing this e-mail and that connecting in
9        your mind to whatever you identified as a
10       problem?
11   A.  You know, I -- yes, I do have a recollection
12       of seeing this e-mail, but I may have -- my
13       recollection may be -- this was in my group
14       of e-mails, I think.
15   Q.  Yes.
16   A.  And -- and what I do -- what I most remember
17       is talking to Mark at some point.  And I
18       thought it was actually on a phone call or
19       maybe in person and him saying, Well, we kind
20       of have to rebuild this thing, we had some
21       problems with -- with it and so that's going
22       to take some time.
23   Q.  How would you know in the couple of hours
24       that you were there in the warehouse that
25       there was going to be an issue with

                          NACHTSHEIM

1

2    reproducibility?  What were you observing?

3    A.  You know, I think what I was observing -- I

4        don't recall for sure.  It seems to me what I

5        was observing was running maybe the same test

6        condition a couple of -- twice and -- and

7        seeing different kinds of results or

8        seeing -- seeing different things and -- and

9        I -- that would be a way where I would say --

10       I mean, that would be a reason I would say I

11       don't think is reproducible, it doesn't seem

12       to be reproducing, so something seemed amiss,

13       that's all.

14   Q.  And then if we go down to the second

15       paragraph, it says, "As a second" -- on

16       Exhibit 13.  The second paragraph on

17       Exhibit 13 --

18   A.  Okay.

19   Q.  -- says, "As a second point, Scott and I

20       think it would be a prudent idea to delay the

21       testing by two to three weeks in Europe given

22       that all of the data we have collected has

23       been flawed to date.  We need to get a good

24       grip of the situation in a properly

25       functioning ventilation field before doing

Page 83

1                          NACHTSHEIM

2          any experiments in an OR at this point."

3                  Is that consistent with what you've

4          just been saying?

5     A.   Yes.

6     Q.   The same issue?

7     A.   Yes.

8     Q.   Do you know what was done in the warehouse to

9          try to address this issue with the

10         ventilation field?

11    A.   I don't know -- I don't have the particulars.

12         My impression was it was almost completely

13         rebuilt.

14    Q.   The external building or the --

15    A.   No, the internal -- the simulated -- the

16         simulated operating room.

17    Q.   Did the external walls of the warehouse

18         change, to your knowledge?

19    A.   No.

20    Q.   Do you know anything about the

21         reproducibility or validity of the airflow

22         within the simulated laboratory once that

23         construction was done?

24    A.   Actually, no, I was not -- I never saw the

25         reconstructed room.  I never saw any

1                          NACHTSHEIM

2         experiments going on in that reconstructed

3         room.

4    Q.   Do you believe the room was reconstructed?

5    A.   I believe it was.

6                    (Whereupon, Exhibit 14 was

7                    marked for identification.)

8    BY MS. GARCIA:

9    Q.   Exhibit 14 is an April 26th, 2010, e-mail

10        from Mark Albrecht to Robin Humble,

11        Scott Augustine and you; is that correct?

12   A.   Yes.

13   Q.   Who is Robin Humble?

14   A.   I don't know.

15   Q.   Mark says, "Bubble machine came in today,"

16        and emphasizing, "It is the tool we have been

17        looking for."  And then he says, "In two

18        hours we figured out how to create a very

19        compelling demo of the laminar flow

20        disruption as follows," and then he describes

21        particular steps about draping and

22        introducing bubbles; is that correct?

23   A.   Yes.

24   Q.   Did you have any discussion with Mark about

25        this?

1                        NACHTSHEIM

2    A.  I did not.

3    Q.  Did you have any input or involvement in

4        figuring out how to create this situation?

5    A.  I did not.

6    Q.  Do you know how many different arrangements

7        they tried of draping and placement of a

8        surgeon and introduction of the bubbles

9        before they landed on this one?

10   A.  I do not.

11   Q.  Did you ever ask Mark about that?

12   A.  No, I did not.

13   Q.  Do you have any idea how true to an actual

14       operating room or surgical setting this

15       particular arrangement of factors is?

16   A.  I do not know that.

17   Q.  And do you know if any of the other setups

18       they tried during that two hours were more

19       realistic in terms of reflecting an operating

20       room?

21   A.  I am unaware of that.

22   Q.  This is not something you asked about?

23   A.  No, I did not.

24   Q.  Were you ever involved in creating or proving

25       or reviewing any videotaped demonstration of

                          NACHTSHEIM

1
2        air movement for posting on the Internet?
3   A.   I was not involved in producing or reviewing
4        those.   I was -- I believe I was copied on --
5        on them at some point to say here's a -- it
6        came across my e-mail so I could go view it,
7        but I was not involved in creating it.
8   Q.   And you were not involved in confirming that
9        any situations depicted in any videotapes
10       showing air movement are valid or accurate or
11       reproducible?
12  A.   No, I was not.
13  Q.   Did you have any involvement in -- let me ask
14       that differently.
15            Did you any -- did you have any
16       conversations with Mark Albrecht or anyone
17       else about how they decided the setup in the
18       hospital settings that are reflected in
19       Exhibits 4 or 5?
20  A.   I -- I was not involved in those setups.
21  Q.   Do you know what they did to determine what
22       would be the way they set up the mannequin or
23       the draping or where they introduced the
24       bubbles?
25  A.   No, I do not.

NACHTSHEIM

1
2  Q.  Do you know if they did any similar exercise
3      of trying for a couple of hours to find the
4      perfect setup?
5  A.  I'm not aware of that.
6  Q.  Do you know if in connection with either the
7      McGovern or Belani papers, they tried
8      multiple different setups before landing on
9      the one that was reflected in the paper?
10                 MR. SACCHET:  Asked and answered.
11                 THE WITNESS:  I'm not aware of
12     that.
13 BY MS. GARCIA:
14 Q.  Is that something you asked about?
15 A.  I did not.
16 Q.  Did you consider it any part of your role to
17     do any investigation about the validity or
18     reproducibility of the operating room setups
19     that were used for the bubble experiments in
20     either Exhibit 4 or 5?
21                 MR. SACCHET:  Asked and answered.
22                 THE WITNESS:  Yeah, I didn't --
23     could you ask it again?  You're asking did
24     I -- was it my responsibility -- I'm sorry.
25                 MS. GARCIA:  If I could just have

1                          NACHTSHEIM

2       the question read back, that would be

3       terrific.  Thank you.

4                    (Whereupon, the last question

5                    was read by the court reporter.)

6                    THE WITNESS:  So I didn't consider

7       it my role to be involved in the physical

8       setup of the -- of the experiments.  As part

9       of the design and the statistical analysis,

10      one can determine reproducibility and -- and

11      that's part of my job in terms of analyzing

12      the data.

13   BY MS. GARCIA:

14   Q.  That would be once the data is generated?

15   A.  That's right, after the data has been

16      generated.

17   Q.  And that would be based on a particular setup

18      in the operating room?

19   A.  Correct.

20   Q.  But in terms of the fidelity in the operating

21      room setup used for the experiment versus an

22      actual operating room, did you consider it

23      any part of your role to investigate that?

24   A.  I -- I did not.  When things moved to the

25      operating rooms and there were -- the

NACHTSHEIM

1
2          physicians involved, I expected that that was
3          kind of in their realm of expertise.
4    Q.    Having seen that Mark Albrecht spent a couple
5          of hours in the laminar flow lab landing on
6          something that would provide the perfect
7          demo, did you have any concern about what was
8          done in these operating rooms?
9    A.    I did not.
10   Q.    You never asked him about it?
11   A.    I never did.
12   Q.    And who did you understand was providing the
13         medical expertise about the way that
14         operating rooms would be constructed for the
15         bubble experiments reflected in Exhibits 4
16         and 5?
17   A.    I can't recall the -- well, the -- I can't --
18         there were e-mails that came across talking
19         about the physicians that would be involved
20         in the setup and the use of the -- and
21         arranging for the operating room and so
22         forth.  I don't remember exactly which people
23         on these papers did that, but that was my
24         under -- but I just -- I guess I just assumed
25         there were a few -- that these physicians who

Page 90

NACHTSHEIM

1
2       participated in the experiment and got access
3       to the operating rooms were helping with the
4       setup.
5  Q.   Do you know if the bubbles were introduced
6       under the drape in the same way when the
7       HotDog device was being tested as when the
8       Bair Hugger device was being tested?
9  A.   That -- my assumption is that they were
10      introduced under the same -- the same -- the
11      same circumstances.  I assume they were the
12      same.
13 Q.   And why would you assume that?
14 A.   Good experimental practice.
15 Q.   Okay.  It would be good experimental practice
16      for everything else to be held constant --
17 A.   That's right.
18 Q.   -- except for the warming device?
19 A.   Yes.  Well, when you run an experiment
20      sometimes you may be changing -- you may be
21      changing two factors at the same time,
22      depending on the randomization and how that
23      works, but everything else should be held
24      constant.
25 Q.   In this -- in these particular experiments

1                          NACHTSHEIM

2      reflected in Exhibits 4 and 5, would you

3      believe that good experimental practice

4      should have included bubbles being introduced

5      under the drapes in the same way for both the

6      warming devices being tested?

7   A.  Yes.

8   Q.  What do you understand the point of the

9      bubble experiments was for these studies?

10  A.  I think the point was to investigate if

11      the -- the waste heat generated from the

12      Bair Hugger had any effect on the -- the flow

13      of the air, if it would interrupt the sort of

14      downward, I don't know what they call that,

15      but the laminar flow, I guess, if there would

16      be disruptions as a result of the -- of the

17      Bair Hugger.

18  Q.  When you say, "Waste heat," what do you mean?

19  A.  What I mean, I just mean the -- my

20      understanding is that the -- well, the

21      Bair Hugger takes warm air in and blows it

22      out down onto the patient and into the room,

23      that's all I mean.

24  Q.  When you say, "Blows it out, you moved your

25      hands down.  Do you have any understanding

                         NACHTSHEIM

1

2        about where on the device the warm 'air is

3        being blown from"?

4   A.   Only from an operation that I had about a

5        year ago or two years ago where I was -- I

6        think I was put under a Bair Hugger for that.

7   Q.   Does that give you any understanding of --

8   A.   No.

9   Q.   Do you --

10  A.   No, no.

11  Q.   Do you, even today, have any understanding

12       about where in the Bair Hugger device air is

13       blown from that you're talking about that

14       might be hot air?

15  A.   I don't have good knowledge of that, no.  You

16       know, my -- just my understanding was that

17       it -- when I say down, it blows it onto the

18       patient.  I mean, the point is to keep the

19       patient warm.  So, no, I don't have

20       particular knowledge about how that works.

21  Q.   In your mind, is the point of the

22       observation, if it were well done, to be

23       accurately -- accurately reflecting a real

24       operating room environment?

25  A.   Yes.

1                         NACHTSHEIM

2    Q.   Would you consider it good experimental

3         practice to spend a couple of hours moving

4         things around to see how you can demonstrate

5         the most difference between the two devices

6         and the airflow?

7    A.   No, I wouldn't consider that good practice.

8    Q.   Why not?

9    A.   Because I think that moves away from -- you

10        know, we just said what we're trying to do is

11        simulate the -- the real conditions and we're

12        not trying to bias our results, so I think

13        you want to have the simulation, and it is a

14        simulation as real as possible --

15   Q.   When you --

16   A.   -- as -- as representative as possible.

17   Q.   Thank you for that clarification, that's a

18        good word.

19             Would you expect the experimental

20        setup to be determined in advance before the

21        experiment was run based on what is

22        representative for the environment to which

23        they were conducting the test?

24   A.   Yeah.  Yes, I would expect that.

25   Q.   Is it your understanding that Exhibits 4 and

NACHTSHEIM

5 report on the results of experiments

actually conducted in the hospital settings

identified in the papers?

A.   Yes.

Q.   Was that always your understanding that

that's what would be done?

A.   That there would be an experiment carried out

in a hospital operating room and we would

report the results on that.

Q.   Yes.

A.   That was my understanding.

Q.   Would you consider it appropriate to use

pictures of the bubbles in the operating room

setting and combine that with quantitative

data from the warehouse testing to provide

quantitative results for either Exhibits 4 or

5?

          MR. SACCHET:  I'm going to object

to the form.

          THE WITNESS:  I think it depends

on how it's reported.  I -- I certainly

wouldn't report it -- I wouldn't -- wouldn't

report it as part of the write-up on the

analysis of a particular -- of the experiment

1                        NACHTSHEIM

2          that went on in the operating room, but --

3          but there -- in any -- in -- in any paper

4          such as this there are -- there may be a

5          justification for bringing up other -- other

6          data that's sort of related.

7                    MS. GARCIA:  Okay.

8     BY MS. GARCIA:

9     Q.   It would depend on how it's written up?

10    A.   It would depend on how it's written up.

11                   (Whereupon, Exhibit 15 was

12                   marked for identification.)

13    BY MS. GARCIA:

14    Q.   Exhibit 15 is an e-mail from Mark Albrecht to

15         Scott Augustine and you and Robin Humble on

16         May 25th, 2010, with an abstract attached; is

17         that correct?

18    A.   Yes.

19    Q.   What Mark says is, "Scott and Chris, here is

20         a draft of one of two abstracts I'm going to

21         submit on June 1.  Here is my plan:  Chris,

22         I'm planning on making you an author on both

23         abstracts, this is the first"; is that

24         correct?

25    A.   Yes.

                        NACHTSHEIM

1

2   Q.  If you would look at the attached abstract,

3       it talks about evaluation of filtration

4       adequacy and internal contamination

5       detection.  Do you recall ever working on a

6       study like this?  And by, "Working on," I

7       mean providing any type of consultation or

8       advice.

9   A.  I did not work on this.

10  Q.  Was this e-mail from Mark on May 25th the

11      first time you learned of this study?

12  A.  Yes.  Well, I believe so.  Yeah.

13  Q.  When you say, "With confidence," as I am

14      interpreting it, you did not work on this --

15      I take it one thing you mean is you were not

16      involved in any publication reflecting this

17      work?

18  A.  Correct.

19  Q.  You don't recall providing any advice ever

20      about either the set up or the -- the design

21      or the statistical analysis for this study?

22  A.  I don't.  I don't recall doing that.  I

23      remember reading this abstract and thinking I

24      would maybe be involved, but I don't -- I

25      don't recall actually be involved in this

Page 97

1                        NACHTSHEIM

2          study.

3     Q.   Do you know what happened with it?

4     A.   Not really.  I'm aware there was some

5          publications.  I don't know if it came from

6          this or not, but I'm aware there were

7          publications having to do with contamination

8          and so forth, maybe in the hoses and inside

9          the -- the --

10    Q.   Do you recall -- oh, I'm sorry, I didn't mean

11         to cut you off.

12    A.   -- the blower.

13    Q.   The -- the blower?

14    A.   Yeah.

15    Q.   Do you recall why it was that you weren't

16         involved in that work?

17    A.   I don't.

18    Q.   Do you recall whether you declined or --

19    A.   I don't think I declined.  I think -- I --

20         I -- I just don't remember what happened.

21    Q.   Okay.  If we look back at the e-mail, you've

22         asked Mark to show you the analysis, and on

23         the next page he says that he will send it.

24         He also, in the May 26th e-mail that's the

25         last one on the second page, says, "I'll need

                        NACHTSHEIM

1
2       your approval on the stats for the abstract
3       we are submitting by Tuesday at the latest,"
4       and in parenthesis, "Data collection is on
5       Sat.," meaning Saturday and Sunday.
6               Can you help me understand how that
7       reference to data collection fits with the
8       fact that there's an abstract attached to
9       this e-mail?
10              MR. SACCHET:  Object; calls for
11      speculation.
12              THE WITNESS:  I can't comment on
13      it.  I really don't -- I really don't know.
14      He's clearly already done what appears to be
15      some data analysis, but then he's talking
16      about data collection, so I'm a little -- I'm
17      not -- I'm not clear on what's -- what the
18      sequence of events are here.
19              MS. GARCIA:  Okay.
20   BY MS. GARCIA:
21   Q.  Are you ever aware of a situation where Mark
22      provided you with -- Mark Albrecht provided
23      you with an abstract for work that had not
24      yet been done?
25   A.  No, unless it was talking about plans to do

1                      NACHTSHEIM

2        it or, you know, what was -- what was

3        intended, no, I'm not aware of that.

4   Q.   Is it typical, in your profession, to write

5        up an abstract including results before

6        you've actually done the work?

7   A.   No.

8   Q.   And why not?

9   A.   If you're giving results -- I guess that's

10       not ethical if you're giving results that --

11       if you're making things up, if that's what

12       you're kind of what you're talking about.

13  Q.   Well, that would be if you published it.  I'm

14       talking about drafting it even.

15  A.   It's just not -- that's not -- that's just

16       not done unless there were some proto --

17       proto -- some -- some -- I've done things

18       where I've run some small experiments and

19       said, Here's what we think things are going

20       to look like, I suppose, but we still have to

21       run the full -- the full simulations to get

22       the actual data, so here's a draft of what

23       this could look like, but certainly, you

24       know, not for publication.

25                 I'm talking about some -- some sort

1                          NACHTSHEIM

2          of prototype research that you might have

3          done that's kind of quick and dirty, say,

4          Well, I think this is what it's going to look

5          like, let's write this up and see what it

6          looks like, but we still have to carry out

7          the real study.

8     Q.   Sure.  Thank you.

9                    (Whereupon, Exhibit 16 was

10                   marked for identification.)

11    BY MS. GARCIA:

12    Q.   I've marked as Exhibit 16 a May 29, 2010,

13         e-mail from Mark Albrecht to Mike Reed,

14         Scott August -- Scott Augustine, A. Deibel is

15         the e-mail address, you, and Robin Humble

16         again.  Do you know who A. Deibel is?

17    A.   I don't.

18    Q.   Both Robin Humble and, I believe it is

19         Andreas Deibel, have Aug Biomed addresses.

20         Did you ever deal with anyone at

21         Augustine Biomedical other than occasionally

22         Scott Augustine and Mark Albrecht?

23    A.   I did not.  You know, as I said, I might

24         have -- I might have met this person at that

25         social gathering I talked about.  There

NACHTSHEIM

1

2       were -- there were people from Europe at

3       that, and I'm not -- I don't know for sure,

4       but this might have been one of those

5       persons.

6   Q.  Tell me more about how that gathering came to

7       be.

8   A.  I think there were some people and maybe

9       physicians that were going to be in town, and

10      I think Scott felt it was a nice opportunity

11      to sort of get everybody together and -- and

12      so had -- had a number of us over to his

13      house in the evening.

14  Q.  I have been assuming that you mean Minnesota,

15      but I should ask, where is his home?

16  A.  It's in Minnesota.

17  Q.  Okay.

18  A.  It's in western -- the western suburbs of the

19      Twin Cities.

20  Q.  And there were some physicians there from

21      Europe?

22  A.  Well, there was -- there were -- yes, I

23      believe so.  There were certainly people --

24      there was -- there were one or two -- maybe

25      even just one.  There was at least one person

1                          NACHTSHEIM

2         there from Europe.

3    Q.   The collection of people at Scott Augustine's

4         house that evening included authors on

5         Exhibits 4 and 5, people who were authors on

6         Exhibits 4 and 5?

7    A.   You know, for sure, I was there.

8    Q.   True.

9    A.   I think there were -- yes, I think there were

10        one or two others.  I'm just very bad at

11        names and so -- you know, if they had given

12        me their social security numbers, I'd -- I'd

13        remember them.

14   Q.   You'd remember them.  Scarey.

15             But are you -- are you --

16   A.   I'm just kidding.

17   Q.   No, that's fine.

18   A.   I'm not -- I'm -- I'm -- sorry, I'm not good

19        with names.

20   Q.   You had previously said that the people who

21        were there, though, were -- were gathered as

22        people who had been working on the patient

23        warming research?

24   A.   Yes.  And I think there were also just other

25        employees from Scott's company.

1                         NACHTSHEIM

2    Q.  And you're not recalling any conversations

3        about the research or the publications?

4    A.  I'm not recalling any at that -- I'm not

5        saying there wasn't, I'm just not recalling.

6    Q.  Do you recall there being any formal

7        presentation or kind of announcement of good

8        news?

9    A.  No.

10   Q.  This e-mail references, "Nearly completed

11       drafts of two abstracts that Mark Albrecht

12       would like you and Mike Reed to be a part

13       of."  Do you see that in the beginning of the

14       e-mail?

15   A.  I do.

16   Q.  Was this e-mail communication on May 29th the

17       first time that you had any notice about

18       these studies?

19   A.  Well, I guess except Exhibit 15, right,

20       the -- I think -- I don't -- this may be --

21       I'm thinking that --

22   Q.  I think you're right.  And if you look at

23       page 213, there is an abstract about the

24       filtration adequacy.

25   A.  Right.

1                          NACHTSHEIM

2    Q.   Okay.

3    A.   And isn't that the same -- is that the same

4         one?  It looks familiar.

5    Q.   It sure may be.

6    A.   (Reviews document.)  It's a little bit

7         changed, but it looks like maybe a new

8         version of that.

9    Q.   And then the last page of Exhibit 16 is

10        another abstract and talks about, "Laminar

11        ventilation being tested in an orthopedic

12        operating theater."

13   A.   I'm sorry, could you give me the number,

14        the page, is it --

15   Q.   223.

16   A.   Oh, I'm sorry, 223.

17   Q.   It's the last -- it should be the last page

18        in the exhibit.

19   A.   Mine goes on to 277.

20   Q.   Oh, that might be an error.  Can I see the

21        exhibit?

22   A.   I think there are two hooked together maybe.

23        (Hands document.)

24   Q.   Thank you.

25                  MR. SACCHET:  Do you want it back?

1                        NACHTSHEIM

2                    MS. GARCIA:  Ah, there is an

3       error.  Okay, could I --

4                    MR. SACCHET:  Do you want it back?

5                    MS. GARCIA:  Yeah.  Thank you.

6                    MR. SACCHET:  (Hands document.)

7    BY MS. GARCIA:

8    Q.  All right.  Now try the last page.

9    A.  223?

10   Q.  Yes.  I was going to ask if you have any

11      recollection of this work from an earlier

12      time?

13   A.  I do not.

14   Q.  And, actually, do you believe by looking at

15      the abstract that's on page 223, can you

16      determine one way or another whether this

17      work being described here ultimately became

18      Exhibit 4?

19                   MR. SACCHET:  Asked and answered.

20                   MS. GARCIA:  Can I ask you to just

21      stick with objections to form, please.

22                   MR. SACCHET:  Sure.

23                   MS. GARCIA:  That would be great.

24                   THE WITNESS:  Yeah, this does look

25      like it led to one of these, I'm not sure

1                          NACHTSHEIM

2        which.  Yes.

3   BY MS. GARCIA:

4   Q.  And on what basis are you saying it looks

5        like it became one of those?

6   A.  Well, the -- where he says -- or where the

7        abstract says, "Replicated factorial

8        experiment was used for the two different

9        types of blanket, FAW or CFB," and then the

10       anesthesia drape position at 1.5 meters and

11       2.0 meters, that's -- that's exactly the

12       experiment that was carried out in one or

13       both of these studies.

14  Q.  Do you want to take a look at them --

15  A.  Sure, yeah.

16  Q.  -- and see which one or both?

17  A.  Yes.

18  Q.  That would be great.  Thank you.

19  A.  So this corresponds to the -- the McGovern

20       paper.

21  Q.  Exhibit 4?

22  A.  I'm sorry, I shouldn't be looking at my

23       copies, but, yes, I believe so.  Hold on.

24       (Reviews documents.)  There we go.

25       Exhibit 4.

1                           NACHTSHEIM

2    Q.  Thank you.

3              If you'd turn to the first page of

4         the e-mail on Exhibit 16, after he says,

5         "Okay," in the middle of page, there is a

6         reference to the, "First crud and bug story

7         about inadequate filtration."

8    A.  Uh-huh.

9    Q.  That is the abstract for which you never

10        became a part of the study?

11   A.  Correct.

12   Q.  And then second he talks about, "The work

13        completed today with the bubble helium

14        pictures," and then he gives you a note on

15        the statistics and says, "There was a data

16        degeneracy problem in estimating a full ANOVA

17        model because the counts for multiple

18        treatment combinations were zero.  Instead, I

19        did separate Poisson models for specific

20        tests of interest.  That worked just fine and

21        should be defensible.  That is why there are

22        three attached model printouts for the second

23        abstract."  That comment relates to the

24        McGovern study Exhibit 4?

25   A.  Yes.

1                          NACHTSHEIM

2   Q.   And can you explain to me what that means?

3   A.   Sure.  The -- I've got to think about how he

4        was doing the ANOVA model.

5   Q.   If it would help you, the three model results

6        are actually within Exhibit 16 in the middle.

7        I have included within Exhibit 16 the three

8        results that he references.

9   A.   He was doing the -- the different models

10       considered were logistic regression versus --

11       and Poisson regression.  And in logistic

12       regression, you're looking at failures and

13       successes and/or percentages, things like

14       that.  If you have a case where there's never

15       any failures, everything is just all

16       successes, then that's what's called a

17       degeneracy problem.  And so the alternative

18       with the Poisson model, which is just counts,

19       zero is fine.

20  Q.   Okay.  So putting that in the context of this

21       study, would that relate to the bubble

22       counting experiment or to infection data?

23  A.   My initial impression was this was for the

24       bubble, but can I -- I better look.

25  Q.   Sure.

1                        NACHTSHEIM

2    A.  Maybe I better have a look just to be sure.

3        (Reviews document.)

4    Q.  There are also data sheets in here

5        referencing ether.  I don't know if that

6        helps or not.

7    A.  (Reviews document.)  I'm -- it's interesting,

8        because the first study seems to be different

9        than the others.  I mean, there's -- there's

10       four different models being run here.

11   Q.  Okay.

12   A.  The first one seems to be dealing with filter

13       types.

14   Q.  Okay.  And perhaps that relates to the other

15       abstract?

16   A.  That -- right, that would -- that would have

17       to do with the crud and bug, I think.

18   Q.  Okay.  So the other three --

19   A.  The other three are -- are different ways of

20       analyzing the -- the Bair Hugger versus the

21       HotDog, it looks like that's all that's being

22       done here.

23   Q.  And, actually, now that I look at it, the

24       dependent variable is bubble count, right?

25   A.  Right.

1                          NACHTSHEIM

2   Q.  So these -- are -- is it your understanding

3       these models to -- is it your understanding

4       that these models relate to the bubble

5       counting experiment?

6   A.  The third, fourth and fifth --

7   Q.  Yes.

8   A.  -- analyses, I would -- well, I would think

9       so.

10  Q.  Okay.  How do you randomize in a bubble

11      study?  What are you randomizing?

12  A.  Well, it's -- it's -- so there was a -- it

13      was a 2 by 3 factorial design, and the --

14      the -- the 3 level factor was the height of

15      the -- the drape, and the 2 level factor was

16      the -- whether the -- the Bair Hugger versus

17      the HotDog or the two -- two different types

18      of blankets.  And so all randomization means

19      is since there were going to be essentially

20      two replicates of the experiment, that means

21      there are going to be 12 runs, 2 by 3's, so

22      there's -- there's 6 combinations.

23  Q.  A device with a table height --

24  A.  Yeah.

25  Q.  -- three different ways --

                         NACHTSHEIM

1

2    A.  Yeah.  Yes, so two times three ways of doing

3        that.

4    Q.  And then they were going to replicate the

5        whole thing once more?

6    A.  They were going to do it one more time.  So

7        it's 12 setups, and so basic -- basically,

8        one lists the 12 setups and randomizes the

9        order.

10   Q.  In which you combine the devices with the

11       table heights?

12   A.  Exactly.

13   Q.  And what are the failures or successes that

14       are being counted, what -- what is -- what

15       would be a failure or a success for purposes

16       of considering an ANOVA model?

17   A.  Well, if -- if -- so if a logit analysis is

18       being done, then you're right, there has to

19       be a success and a failure, and I don't -- I

20       don't know for sure what's going on here,

21       because I'm -- I'm -- I'm just thinking about

22       bubble counts.  It could be that -- I'm

23       speculating, but it could be that one is

24       saying, well, if there were bubbles that got

25       into a particular region, yes or no, that's a

1                        NACHTSHEIM
2       success or a failure.  But that's complete
3       speculation.  I don't know exactly what --
4       what Mark was looking at for the -- for the
5       logit analysis.  To me, the Poisson analysis
6       would be the right analysis to be doing, and
7       he moved quickly to that.
8    Q.  Why would the Poisson analysis be the right
9       analysis?
10   A.  Because the Poisson is modeling counts, it's
11      not just success/failure, but it's counts.
12      One -- yeah.
13   Q.  Counts of bubbles?
14   A.  Counts of bubbles.
15   Q.  Where?
16   A.  So --
17   Q.  Meaning where would the bubbles be located
18      when you're counting?
19   A.  Yes.  So that has to be carefully defined as
20      a point in space.  And I believe what they
21      were doing, and I know what the intention
22      was, that there was a space above what might
23      be the wound or the -- the surgical site and
24      so you would count how many bubbles came into
25      that site.  And I didn't pay a lot of

                              NACHTSHEIM

1
2      attention to the -- he had a problem with the
3      binomial logit, and I didn't think it was the
4      right way to go anyway, so he moved to the
5      Poisson and that was fine.
6  Q.  Okay.  And that's what was reported on?
7  A.  Yes.
8  Q.  Okay.  Did you ever have any involvement with
9      a communication -- with any -- let me start
10     over.
11              Did you ever have any involvement
12     with any communication submitted to the FDA,
13     the Food and Drug Administration of the
14     United States, concerning any patient-warming
15     device?
16 A.  I did not.
17 Q.  If Mark Albrecht or Scott Augustine submitted
18     such a communication, do you believe you
19     provided any advice or consultation about the
20     substance of that?
21 A.  I don't recall ever having provided any such
22     advice.
23 Q.  Do you recall ever having reviewed a draft of
24     any communication prepared by anyone for
25     purposes of submission to the FDA --

1                       NACHTSHEIM

2    A.   I don't -- sorry.

3    Q.   Go ahead.

4    A.   I don't recall ever reviewing any documents

5         that were going to be submitted to the FDA.

6    Q.   And I am being specific in my questions to

7         the patient -- to any patient-warming device.

8         Is that how you understood me?

9    A.   Yes.

10   Q.   Do you recall talking with Mark Albrecht

11        about his effort to submit a complaint letter

12        to the FDA related to forced-air warming use?

13   A.   No.

14   Q.   Okay.  All right.

15                   (Whereupon, Exhibit 17 was

16                   marked for identification.)

17   BY MS. GARCIA:

18   Q.   Exhibit 17 is an e-mail from Mark to you

19        attaching two draft manuscripts and some data

20        results, and a response from you to Mark

21        attaching a couple of statistical analyses;

22        is that correct?

23   A.   Correct.

24   Q.   And I have included everything here.  I was

25        going to ask you essentially to explain your

                        NACHTSHEIM

1

2    comment.  Your e-mail back to him says, "Some

3    new Poisson results, Box-Cox," B-O-X, C-O-X,

4    "didn't get me to normality.  We should talk

5    about presentation."  And I'm just wondering

6    if you can take a look at this information

7    and tell me what you meant by that.

8  A.  (Reviews document.)

9          MS. GARCIA:  Can we go off the

10   record for one moment.

11          THE VIDEOGRAPHER:  We're going off

12   the record at 11:35 a.m.

13          (Whereupon, a brief recess

14          was taken.)

15          THE VIDEOGRAPHER:  This is video

16   number 3 in the deposition of Christopher

17   Nachtsheim.  Today is November 29th, 2016.

18   We're going back on the record at 11:41 a.m.

19 BY MS. GARCIA:

20 Q.  Professor Nachtsheim, are you able, having

21   reviewed the materials, to explain for me

22   your comments on the bottom of the first page

23   of Exhibit 17?

24 A.  Yes, I think so.

25 Q.  Is it right there, (indicating)?

1                         NACHTSHEIM

2    A.   Thank you.

3    Q.   Yes.

4    A.   So I -- Mark sent -- apparently Mark sent me

5         the data, and I think there are a couple of

6         different ways of analyzing the data.  One is

7         with a Poisson regression, and another is

8         with the standard sort of normal least

9         squares analysis, which is when we talk about

10        normality, that's one of the assumptions.

11   Q.   Normality is an assumption?

12   A.   Normality, the -- the errors are -- are

13        assumed to be normally distributed when we

14        do -- typically when we do the standard

15        regression, least squares analysis.

16   Q.   Are you saying least, L-E-A-S-T --

17   A.   Yes, I am.

18   Q.   -- squares regression?

19   A.   Yes.  And so one of the things we do when we

20        run a -- if I could call that the standard

21        regression.

22   Q.   Sure.

23   A.   When we're on a standard regression is we

24        check that assumption, the assumption that

25        the errors are distributed normally.  And if

                        NACHTSHEIM

1

2       they're not, we need to either do some

3       different kind of regression or we need --

4       need to make a transformation of the data to

5       try to fix that problem.  And one of the best

6       ways to do that is called a Box-Cox

7       transformation, and that's -- that's what I'm

8       referring to here.  And, apparently, I tried

9       a Box-Cox transformation and I said that

10      didn't get me to normality.  So what I -- I

11      guess what I was concluding, I assume, was we

12      don't want to do a standard regression of

13      this data, so I guess I did some Poisson, I

14      changed the model to the Poisson model and

15      talked -- and did some analysis, which I

16      guess I've attached here.

17  Q.  Okay.

18  A.  Yeah.

19  Q.  I have several -- thank you for that.  I have

20      several questions in follow up.

21              First of all, the foundation of what

22      you said then is that the errors in the data

23      were not normally distributed?

24  A.  Yes.

25  Q.  What do you mean by errors?

1                          NACHTSHEIM

2     A.   Good question.  Right.  What I mean by

3          errors, when we -- when we build a model --

4          so we may -- for example, we may say -- if a

5          bubble count or model may say, well, our --

6          it models what we expect to see, let's take a

7          particular drape height and -- thinking of

8          that experiment, and one of the two modes are

9          the blankets.

10    Q.   Yes.

11    A.   So maybe I have the -- the Bair Hugger, and

12         two mirror high, now what -- what do we

13         expect to see in terms of number of bubble

14         counts in a particular area.  And so the

15         model gives you an estimate of kind of what

16         the -- the average value should be, but the

17         data will not be exactly equal to that, it'll

18         be a little bit higher or a little bit lower.

19    Q.   How does the model give you an upfront

20         evaluation of what to expect?

21    A.   So when we -- when we -- well, first of all,

22         it gives us a mathematical equation.  So I

23         can plug in, for example, what is the height,

24         1.5 to 0, and then I can plug in perhaps a 0

25         or a 1 --

1                         NACHTSHEIM

2    Q.   For the warming unit?

3    A.   -- for the warming.  And I plug those right

4         into an equation.  That's what I mean by a

5         model, there will be an equation.  And it'll

6         then -- what comes out is the predicted

7         number of bubble -- bubble counts, but we're

8         never going to get those exactly right.  It's

9         not a mathematical model, it's a statistical

10        model.  And so you actually have the

11        experiment so you know what the actual counts

12        were, so you can look at what the difference

13        was between what your model said you should

14        get and what you actually got.

15   Q.   Are Exhibits 4 and 5, or reference 60 on your

16        CV, which is the study that was not published

17        related to patient warming, do any of those

18        report on model predictions of bubble counts

19        or do they all report on actual observations

20        of bubble counts or is there some way those

21        two things relate?

22   A.   Well, they very much relate, so the -- the

23        actual observations are input to a

24        statistical procedure which then produces the

25        model, so they're the inputs that lead --

1                         NACHTSHEIM
2        lead to the model.
3    Q.  That was going to be another question I had.
4        Does the model come first or the observations
5        come first?
6    A.  Observations come first.
7    Q.  So you start with the observed bubble counts
8        from the experiments, you feed them into the
9        model, and then the model averages that and
10       tells you what to expect in certain
11       configurations of unit and table height?
12   A.  In a sense.  I mean, that's -- that's --
13       that's -- that's fairly accurate.  We're
14       going to -- we're -- we have a -- we have a
15       model which is a mathematical equation, but
16       there are some constants in the model that
17       are undetermined, slopes, things of that
18       nature.
19               And when we feed the data in, the
20       statistical procedure then uses the data to
21       determine what those are.  Now I have a full
22       equation and so now I actually have values in
23       my equation.  The only thing that's unknown
24       in the equation are the inputs, what do you
25       want to predict for, do you want to predict

1                          NACHTSHEIM
2         for the -- the -- the heat blanket or the not
3         or what height do you want to predict at, and
4         so you just put those two values into the
5         equation and out comes your prediction.
6    Q.   Is the model constructed based on all
7         observations that are input initially, all
8         the observed bubble counts at all the
9         combinations?
10   A.   Yes, it is.
11   Q.   This model, that it -- when you say, "The
12        model," what you mean is an algorithm or an
13        equation essentially; is that right?
14   A.   That's right.
15   Q.   Who came up with that equation?  Is it a
16        standard statistical package or is it
17        something that you or Mark wrote?
18   A.   Oh, no, it's an absolutely standard
19        statistical equation and it's a standard --
20        there's a standard, if you will, formula or
21        algorithm for -- for producing that.
22   Q.   Other than the observations about bubble
23        counts and parameters of table height and
24        warming-unit device, are there any other
25        parameters or assumptions you need to provide

NACHTSHEIM

1
2      for that model?

3  A.  So -- and that's one of the things I was

4      looking at.  I think you're getting to one of

5      the things that I -- that I provided in -- in

6      the output at the end of this exhibit.

7  Q.  Okay.

8  A.  So when we have two factors, you can imagine

9      that if they -- if they are having an effect,

10     as you raise the drape from zero height to .5

11     meter height to 1 -- I can't remember what it

12     was, but from the low, medium to high height,

13     that should -- that may have an effect on how

14     many bubbles reach a particular spot, so

15     that's one effect.

16          Another effect might -- would be

17     which -- which blanket am I using.  So maybe

18     one blanket leads to more bubble count,

19     more -- a higher bubble count than the other

20     blanket.  So you have these two factors

21     working.

22          One of the questions we always ask

23     is -- when we begin to analyze is do they

24     work synergistically, that is, are they --

25     are these factors operating independently.

NACHTSHEIM

1
2       And so it might be that, for
3   example, when you're -- when you're -- when
4   you're working with one blanket, the bubble
5   count goes from -- as you go up the three
6   levels, let's suppose it goes from 0 to 10 to
7   20, when you move to the other one, it
8   doesn't any longer go from 0 to 10 to 20, it
9   maybe goes from 0 to 50 to a hundred, and so
10  the level of one factor impacts the effect
11  that the other variable has, and that's
12  called an interaction.
13      So when the variables, in effect,
14  don't operate independently, there's what we
15  call an interaction.  And it's very important
16  for us to figure out, when we do the
17  analysis, is there an interaction.
18      Because if -- if there is not an
19  interaction and we -- I mean, if there is an
20  interaction and we leave it out, our -- our
21  predictions are not going to be good --
22  Q.  So what you --
23  A.  -- the model won't be valid.
24  Q.  So what you mean is then you determine if
25  you're seeing an interaction based on the

1                           NACHTSHEIM

2          initial output of the model, and if you see

3          an interaction, you change the model?

4     A.   Right.  But usually what's done is sort of

5          the opposite direction, we usually start

6          assuming there will be an interaction and

7          then we do a -- so we fit that model and then

8          we can do a statistical test for the

9          significance of the interaction.

10                    And if it's not statistically

11         significant, then we can say, ah, it's a

12         simpler situation, they operate -- these two

13         factors operate independently, we can analyze

14         them separately.

15    Q.   So you began in the patient-warming work by

16         assuming there would be an interaction

17         between the warming device used and the

18         height of the drape?

19    A.   Yes.

20    Q.   Why?

21    A.   When I say assume, I don't -- I don't -- I

22         don't say that I -- hey, I believe there's

23         going to be -- you know, scientifically I

24         believe there's going to be an interaction.

25         It's -- it's -- it's more standard

1                        NACHTSHEIM

2        statistical practice to first start with a

3        more complicated situation, a complicated

4        model, and then try to simplify it if

5        that's -- if the data permits that.

6              So -- so we start by saying -- the

7        model is the most -- the most complicated

8        version can contain -- contain the

9        interaction, so what we try to do is fit an

10       initial model with the interaction so that we

11       can answer the question is there really an

12       interaction or not.

13   Q.  And you do that through a statistical test?

14   A.  Exactly.

15   Q.  When you fit the model to include the

16       interaction, are you telling the model which

17       warming device is likely to have what effect?

18   A.  No, no.

19   Q.  Here did the statistical test confirm that

20       there was an interaction or show that there

21       was not?

22   A.  If I could look again.

23   Q.  Sure.

24   A.  (Reviews document.)  This confirmed the

25       presence of interactions.

                              NACHTSHEIM

1

2   Q.   And could you please tell me the Bates number

3        of the document you're looking at to say

4        that?

5   A.   614.

6   Q.   Okay.  Is 614 the test -- does 614 and 615

7        reflect the statistical test for interaction,

8        is that all that they reflect?

9   A.   They reflect the test for interaction, but

10       also the test -- also the -- asking the

11       question is the device having -- having an

12       effect on its own, so it's -- it's -- it's

13       looking at each of the components of the

14       model and asking is it statistically

15       significant, is it real.

16  Q.   So then let's come back to the error

17       distribution.  Does that have anything to do

18       with 614 and 615, either does it impact them

19       or is it revealed by these pages?

20  A.   And you're coming back to the -- to the

21       errors where I was talking about --

22  Q.   Yes.

23  A.   -- the transformations and so forth?

24  Q.   Yes.

25  A.   Sure.  So if we have -- if we -- what we're

NACHTSHEIM

1

2     trying to do is remove all the real

3     systematic components, so if there's --

4     from -- from the data.  What -- we want to

5     look at what -- what were the effects of the

6     blanket, say, and what were the effects of

7     the drape so that any differences between the

8     prediction and what we got is simply

9     experimental error, there's no systematic

10    errors.

11          For example, if I fit a model that

12    did not have interaction, did not account for

13    interaction and there really was one, then

14    our predictions are wrong and then the errors

15    are wrong, because if we don't have the right

16    predictions, we can't know what the errors

17    really are.

18          So we want to get the right model

19    and then we want to look what's leftover,

20    what we can't explain is the experimental

21    error.  And how that's distributed is what's

22    key.  And so I found, apparently, that it was

23    not normally distributed.

24    Q.  And what does that mean?

25    A.  Well, that means that if you -- so we had two

1                          NACHTSHEIM

2       times three, there were six, and we --

3       actually, that's not this experiment, but

4       let's -- this is a more complex experiment,

5       but let me keep it in that terms.

6                So we had 2 times 3 and we ran each

7       combination twice, we had 12 runs, okay?  So

8       what we will do, there will be 12 errors,

9       because there's 12 observations, and they

10      will be a little bit away from what they were

11      predicted to be, each of those observations.

12               So I will have 12 errors and their

13      average will be 0, some will be positive,

14      will be too high, some will be negative, on

15      average they will be 0.  And we look at the

16      distribution of those errors.  Are most of

17      them small, but then we have a few large

18      ones, does it look like it follows a

19      bell-shaped distribution when we just look at

20      the errors themselves, then it follows a

21      normal distribution.  And if that's not the

22      case, perhaps they're highly skewed, that's

23      not a bell-shaped curve, then we need some

24      different kind of analysis.

25  Q.  Because they should be normally distributed

                              NACHTSHEIM

1

2        if the model is correctly working?

3   A.   That's right.  We -- we -- if the model is

4        correct, then they should be normally

5        distributed.

6   Q.   So when you transform the errors through one

7        of these different kinds of analysis, you're

8        changing something about the model?

9   A.   Yes, I'm -- I am changing -- well, I'm

10       changing the data.  So we have a lot of

11       counts, they're all positive, I might look

12       at -- for example, someone might take the

13       inverse of the numbers or the square root of

14       the numbers or the log rhythm of the numbers

15       and -- so if I -- if I take the log rhythm of

16       these numbers, and log tends to make big

17       numbers really small, so it -- it would take

18       the really big errors -- actually, I'm sorry,

19       I would take the log rhythm of the counts,

20       then I would rerun the analysis, then I would

21       get a new set of errors, and those errors may

22       follow a bell-shaped curve.

23  Q.   Can you tell -- okay.  So you're telling me

24       that it's standard to take the actual

25       observed data counts and transform them in an

1                           NACHTSHEIM

2          effort to get a normal distribution?

3     A.   That is standard.

4     Q.   Is there any type of restriction on how you

5          do that, I mean, what you can do under what

6          circumstances?

7     A.   I wouldn't say there's any -- any real

8          restriction on that.  That's a very standard

9          kind of procedure, as is -- and this Box-Cox

10         procedure actually looks at essentially all

11         possible transformations we could make.  One

12         is a log rhythm, one might be a square root.

13         They all come under -- and it finds the

14         transformation that leads to errors that are

15         most as normally distributed as we can find.

16    Q.   And you did that and you still couldn't get

17         to a normal distribution?

18    A.   That's right.

19    Q.   So what does that mean?

20    A.   So that means that -- that means that that

21         particular fix, and it's not guaranteed, that

22         particular fix, the Box-Cox transformation,

23         was inadequate to get us where we want in

24         order to carry out the analysis.

25    Q.   But why would it be?  Is there anything about

1                          NACHTSHEIM

2          the underlying data, the underlying test, the

3          assumptions of the model, the appropriateness

4          of the model, these are the factors I can

5          identify, that might lead you to not be able

6          to get to a normal distribution of the

7          errors?

8     A.   I think that there is often a connection

9          between how these things are distributed and

10         sort of the physics of the observation.  For

11         example, we're doing counts and counts tend

12         to be Poisson -- they tend to follow a

13         Poisson distribution.

14    Q.   Which is not normal?

15    A.   It's not normal, it's -- it's -- it's skewed

16         to the right.  Now, depending on the sample

17         size, usually or often a transformation of

18         Poisson will solve the problem.  I mean, you

19         can get it back to looking like a normal

20         distribution, but that's not always

21         guaranteed.

22    Q.   If that won't happen, is that an indicator

23         that your sample size may be too small?

24    A.   No, no.  In fact, small sample sizes

25         would -- would tend to leave you in a

1                          NACHTSHEIM

2        position where you would probably conclude

3        that -- that the data are normal -- that the

4        errors are normally distributed.  With

5        smaller sample sizes you tend to conclude

6        that, whether it's true or not, because you

7        don't have the power to -- to -- you don't

8        have enough data to determine is it really

9        not normally distributed, that's the way we

10       kind of approach that.

11              So, you know, my -- my approach was

12       then to say let's -- let's -- let's do the

13       Poisson regression analysis, which even going

14       into this probably would have been my bias

15       anyway, because -- because we're dealing with

16       counts.

17  Q.   Okay.  What is page 613?

18  A.   613 is a picture of the -- it's called a set

19       of interaction plots.  So, for example, if

20       you look at -- if you look at the second

21       square in the first row where it says, "High

22       0.5," and, "Low 0.3" --

23  Q.   Uh-huh.

24  A.   -- that characterizes the interaction between

25       airflow and the position of the surgeon.

                          NACHTSHEIM

1        What that -- now, what is that doing.  What

2        it's -- what it's -- what it's saying is that

3        when airflow is low at the .3, you notice

4        that the line is almost flat?

5   Q.   Yes.

6   A.   It's saying the surgeon doesn't have -- where

7        you put the surgeon doesn't have much effect

8        on counts, but the end points of that are

9        line are the first level -- you know, the

10       first -- or was it one versus two surgeons in

11       this experiment?  I think it was one versus

12       two surgeons in this particular experiment,

13       not the physician, but the surgeon, we looked

14       at one or two.

15               So when there's one surgeon and you

16       move to two surgeons, there isn't much effect

17       but when the airflow is high you have a

18       steeper slope so there's a bigger difference

19       between having one surgeon and two surgeons

20       and that's why the effect of one factor

21       depends on the level of the other factor so

22       they're not independent.

23  Q.   If you look at the next line, I'm sorry, it

24       says, "Two present versus absent," for

1                        NACHTSHEIM

2        surgeon, "Two present versus absent."  And

3        I'm wondering, can you tell which -- there's

4        two manuscripts actually attached here.

5   A.   Yeah.

6   Q.   One of them has non-laminar conventional flow

7        and one of them has laminar operating room

8        ventilation.  And, actually, if we look at

9        the laminar one, which is starting on page

10       577 in the, Methods, section on the second

11       page, it says that, "The experiments included

12       either an empty room or two surgeons."

13  A.   Okay.

14  Q.   Do you think that matches?

15  A.   I think that probably matches.  It's probably

16       zero versus two.

17  Q.   Okay.  And then I guess if we look at the

18       other one, which is conventional and

19       non-laminar flow, the second page of that

20       manuscript, which is page 557 says with --

21       "Tested with and without the presence of a

22       surgeon."

23  A.   Of a surgeon.

24  Q.   This conventional non-laminar flow paper, do

25       you recall ever talking about Mark Albrecht

                         NACHTSHEIM

1

2       with -- about that paper at any time?

3   A.  I -- I do not recall talking to him about

4       that paper.

5   Q.  I think that's all I have right now on this.

6       Thank you.

7           Do you recall that using a Poisson

8       analysis worked for either one of these

9       papers?

10  A.  I -- I believe it worked when I -- when I

11      gave up on the Box-Cox and then said let's do

12      the Poisson, and those are the results that I

13      provided.  And one could ask did I do a test

14      of the appropriateness of the Poisson model,

15      I don't think I did that.

16  Q.  How would you test for that?

17  A.  That's a good question.  One -- well, again,

18      one would look at -- one would look at the --

19      the distribution of the counts and one would

20      try to verify whether it, yes, is or not

21      Poisson.  And the nature of the -- and,

22      anyway, I -- you know, I don't know whether I

23      did that or not, but when one has count data

24      of this type, Poisson is -- the Poisson

25      regression model is kind of the standard

1                         NACHTSHEIM

2          approach to modeling it.

3     Q.   If you're going to report results, should

4          somebody do the test to make sure the

5          distribution really is Poisson?

6     A.   Yes, there should be some diagnostics, there

7          should be some looking at do the residuals

8          that result have the right -- have the right

9          distribution.

10    Q.   Do you know if that was ever done?

11    A.   I don't -- on this paper it doesn't look like

12         it was done.

13    Q.   Okay.

14    A.   I don't see -- at least I don't see any

15         reports of that.

16    Q.   When you say, "On this paper," are you

17         referring to both of the abstracts --

18    A.   No, no.

19    Q.   -- included in this exhibit --

20    A.   No, I'm sorry, I was referring to the -- to

21         the one that I was involved in.

22    Q.   The two versus zero?

23    A.   Yes.

24    Q.   Did the two versus zero become either Belani

25         or McGovern or the exhibit -- or, I'm sorry,

NACHTSHEIM

1
2      item 60 on your CV?

3   A.  No.

4   Q.  No?

5   A.  No.

6   Q.  If you wouldn't mind reassembling Exhibit 17

7       with the e-mail on top, that would be great.

8   A.  I'm --

9   Q.  I think if the documents go in Bates number

10      order it'll be perfect.

11  A.  556, 577 -- these are -- I'm sorry -- 548, is

12      this all one?  Yes.

13  Q.  I think you might have -- that goes -- yeah.

14      Oh, I think, actually, that's okay.

15  A.  548, 556, this would be 600.

16  Q.  Okay.

17  A.  And then I believe this was --

18  Q.  Perfect.  Thank you.

19  A.  -- at the end, right?  And it's --

20  Q.  Yes.

21  A.  -- 613, 614.

22  Q.  Thank you.

23  A.  Not one of my skills.

24  Q.  Well, you did it.

25              If you would take a look at

1                        NACHTSHEIM

2        Exhibits 4 and 5, please, and see if you're

3        able to determine if what type of modeling --

4        well, okay.  So if we look at Exhibit 4,

5        which is McGovern, on the bottom of page

6        1540, Statistical Analysis.  I'll wait for

7        you to get there.  Bottom of page 1540.

8    A.  Oh, yeah, this is --

9    Q.  No, you have the right one in front of you,

10       Exhibit 4, McGovern.

11   A.  Okay.  Oh, yeah, got it.  All right.

12   Q.  It says, "A Poisson regression model was

13       fitted to the hip replacement data having the

14       sum of bubble counts for each experimental

15       run, five photographs as the response, and

16       the factors identified in the experimental

17       design as predictors."  Is that consistent

18       with the description you just gave about a

19       model?

20   A.  Yes, it is.

21   Q.  And it says, "Differences in demographics and

22       comorbidities between the patient-warming

23       groups were assessed by analysis of variance,

24       ANOVA, or log-linear contingency table

25       methods."  What does that mean?

1                          NACHTSHEIM

2   A.   Okay.  So if -- right, this has -- can you

3        tell me where it says that?  I just want to

4        be sure I'm --

5   Q.   Yes, on page 1540, top of the right column.

6   A.   Top of the right column.  Okay.  Good.

7   Q.   Just that one sentence.

8   A.   Uh-huh.  So what we're trying to determine

9        there, are there -- are there differences in

10       the -- in the -- and I believe this has to

11       do -- I want to be sure about this.  This has

12       to do with the hospital data.

13  Q.   Okay.  Then I want to hold it.  I want to

14       hold that for later.  Thank you.

15  A.   Okay.

16  Q.   So for the statistical analysis going back to

17       the Poisson regression model, that has to do

18       with the bubble counts?

19  A.   Correct.

20  Q.   Can you determine from the statement in this

21       paper whether the distribution was tested to

22       see if it really was Poisson?

23  A.   I can't determine that.  Yeah, I -- I don't

24       believe that was reported.

25  Q.   Do you have any belief about whether it was

1                         NACHTSHEIM

2        done?

3   A.   I really -- I don't know and I don't

4        recall -- I don't recall seeing -- I don't

5        recall seeing it done.

6   Q.   What would it mean if the distribution were

7        tested and it was not really a Poisson

8        distribution, but you used a Poisson model?

9   A.   That could mean that there would be some --

10       some bias, for example, in the p-values, the

11       statistical significance levels reported,

12       they might not be -- they might not be as

13       accurate.  They may not be accurate.

14  Q.   Does it tend to bias them high or low?

15  A.   I -- I think that really depends on the

16       nature of the -- the real distribution.

17  Q.   Okay.  So you could get a statistically

18       significant difference when, in fact, there

19       isn't one if you've used a Poisson model and

20       the distribution of bubbles is actually not

21       fitting a Poisson distribution?

22  A.   That's possible.

23  Q.   If we would look at Exhibit 5, which is the

24       Belani paper, on page 408, Statistical

25       Analysis --

1                          NACHTSHEIM

2    A.   Yup.  Yes.

3    Q.   -- the first sentence is, "A Poisson

4         regression model for overdispersed data was

5         fit having the sum of bubble counts for each

6         experimental run, ten pictures as the

7         response and the factors identified in the

8         experimental design as predictors, plus an

9         interaction term."  What does that tell you?

10   A.   So we counted the -- there was a series of

11        pictures taken over time, they added up all

12        the bubbles in all the pictures to get a

13        response, and so those are the responses --

14        responses that were being modeled.  A Poisson

15        regression model was used.

16             Again, it's -- it's standard to use

17        a Poisson regression model for count data.

18        And often, probably more often than not, the

19        Poisson model -- there's an interesting thing

20        about the Poisson model, that the variance of

21        the errors, how big -- how big those errors

22        are around the point you're -- you're

23        estimating are -- is actually equal to the --

24        to the actual value that you're -- your

25        prediction.

1                        NACHTSHEIM

2              So the mean at a -- at a particular

3       combination of factors, you know, drape

4       height and what -- what blanket you're using,

5       the mean and the variance -- the mean,

6       meaning the prediction value, and then the

7       variance around that are the same.

8  Q.   Okay.

9  A.   That's a -- that's a consequence of the

10      Poisson -- Poisson distribution.

11 Q.   Is that overdispersion?

12 A.   When that's not true --

13 Q.   Okay.

14 A.   -- when -- and often -- in fact, it's almost

15      standard that -- that that variance is

16      actually larger than it would be under a pure

17      Poisson model.  And if that's the case, then

18      we use what's called an overdispersed model

19      and -- and we want to -- basically, what

20      we're saying is that the variance -- if we

21      just used a pure -- pure Poisson model, the

22      variance of the errors would be too small.

23      That has the effect of making things

24      statistically significant.

25 Q.   When they aren't?

1                     NACHTSHEIM

2  A.  When they aren't.

3  Q.  Okay.

4  A.  So a smaller variance can tend to make things

5      more statistically significant.  So these --

6      it can magnify the effects, and that would be

7      a bias.

8              So in this case we saw some evidence

9      of overdispersion and so we used what's

10     called the overdispersed model, and that

11     allows the variance to be larger than that

12     mean.  We kind of use the data to determine

13     how large that variance should be and

14     hopefully remove any bias that you might have

15     in terms of the statistical tests.

16 Q.  Can you determine from the write-up of the

17     statistical analysis in Exhibit 5 if the

18     testing was done that you earlier described

19     to determine if there really was a Poisson

20     distribution in the bubble counts?

21 A.  I -- I -- I don't -- I don't see that.

22 Q.  Do you have any knowledge of whether that was

23     done for the Belani study?

24 A.  I don't.

25 Q.  If --

1                         NACHTSHEIM

2  A.   I don't.

3  Q.   -- you had -- if the -- let me start over.  I

4       apologize.

5               If anyone had done the testing to

6       determine if there really was a Poisson

7       distribution, would it be standard to report

8       that in a peer reviewed article?

9  A.   It would be standard.  And, in fact -- and,

10      in fact, if you found that things were not

11      following a Poisson distribution, then we

12      would need to resort to transformations or

13      some other kind of approach, some other model

14      that would -- that would try to better

15      reflect the nature of the errors.

16 Q.   You should do that if you had determined that

17      there wasn't a Poisson distribution?

18 A.   That's right.  That's right.

19 Q.   But in terms of what if you determined that

20      there either -- let me -- if you determined

21      that there was a Poisson distribution, would

22      that normally be reported in a peer reviewed

23      paper?

24 A.   Not -- I don't think so, in the sense that --

25      and I'm not saying it shouldn't be.  I'm just

1                           NACHTSHEIM

2          saying I don't think it's standard practice

3          to go that deep when we're dealing with

4          counts, Poisson, when you're dealing with

5          success/failure logistic.  I mean, it's kind

6          of the way -- the way -- those are sort of

7          standard operating procedures.

8     Q.   So a peer review -- a peer reviewer or a

9          knowledgeable person reading the paper would

10         not find it surprising to have a Poisson

11         analysis for the counts?

12    A.   Right.

13    Q.   But behind the scenes, the person actually

14         conducting the study still should be testing

15         the distribution to be sure that it is

16         Poisson or you're --

17    A.   I think it's --

18    Q.   -- using a Poisson model?

19    A.   Yes.  There are various diagnostic things one

20         looks at and looks for outliers and things of

21         that nature.

22    Q.   Is there a standard name of that test that

23         you're talking about or those tests?

24    A.   Well, these are -- there's a family of tests

25         for -- for goodness of fit, called goodness

                        NACHTSHEIM

1

2     of fit tests.

3  Q.  Okay.  Is that the term by which they would

4     normally be?

5  A.  I think so.

6  Q.  Goodness of fit test.  Okay.  Thank you for

7     all of that statistics.

8  A.  That's my favorite part.

9  Q.  I know.  Or I -- I -- I'm gathering, I should

10     say, not I know.  That was imprecise of me.

11          I just want to show you this and see

12     if you have any memory of it.

13               (Whereupon, Exhibit 18 was

14               marked for identification.)

15  BY MS. GARCIA:

16  Q.  So for -- Exhibit 18 is an e-mail from Mark

17     to you referring a warning letter to Arizant.

18     And it says, "Whoa, didn't expect to see that

19     they are already in trouble for past

20     offenses."  Do you recall talking with Mark

21     about this?

22  A.  No.

23  Q.  Do you recall reading it?

24  A.  I do recall reading it.

25  Q.  And do you have any -- did you have any

1                          NACHTSHEIM

2         context for it, any understanding about it

3         beyond the words?

4    A.   No.  No, I read it -- I read it with

5         interest.  There was the link provided down

6         below and the report from the FDA, as I

7         recall.  I just read it.  I -- I didn't have

8         any comment on it, I just -- I thought it was

9         interesting.

10   Q.   You don't have any knowledge about what led

11        to it or --

12   A.   I did -- I did not.

13   Q.   Okay.

14   A.   There -- there appeared to be some slaps on

15        the wrist or some difficulties.  I -- you

16        know, I just read it and, oh, that's

17        interesting.

18   Q.   Whatever you knew about it was in the context

19        of the warning letter -- in the content of

20        the warning letter itself?

21   A.   Exactly.  I knew nothing else about it.

22   Q.   Okay.  Let me just take a second while we sit

23        here and look at my notes to see -- sorry,

24        I'm just looking for some paper in the midst

25        of paper.

1                        NACHTSHEIM

2              MR. SACCHET:  Do you want to take

3        a lunch break or something?

4              MS. GARCIA:  Well, yeah, but I was

5        just -- we will take a lunch break, thank you

6        for asking, but I just wanted to do a few

7        things if people are okay to go a little bit

8        longer.  But I'm looking for an outline and

9        I'm not finding it.  If I don't find it

10       soon -- it must be in front of me.  My

11       goodness.  I know I had it this morning.

12       I've seen it since we've been sitting in this

13       room, so this is not a goose chase.  All

14       right.  Well, shoot.  Oh, there it is.  Thank

15       you.  Okay.

16  BY MS. GARCIA:

17  Q.  So if we would look at, please, Exhibit 4,

18       which is the McGovern study we've been

19       spending so much time with today.  Do you

20       have any belief that you spoke with

21       Mark Albrecht about that study before he sent

22       you a draft manuscript?

23  A.  I don't recall that -- before I saw a draft

24       manuscript that I had seen any -- any of

25       this.

1                          NACHTSHEIM

2    Q.   Do you recall any participation in the design

3         of the study before the bubble experiments

4         were conducted?

5    A.   No, only inasmuch as we -- we may have talked

6         about the design in the sense that there's --

7         it's a simpler experiment going to be

8         performed than the previous work we had done.

9         It was just a couple of factors and so forth,

10        but -- so I had -- until I saw a draft of

11        this, pretty much, no, I'll say no.

12   Q.   Involvement in it?

13   A.   No involvement.

14   Q.   Okay.  With respect to the -- we've talked a

15        lot about bubble counts here today.  But as

16        you noted -- as you noted earlier, the

17        McGovern paper also includes reference to

18        infection data from a -- from someplace, from

19        one or more hospitals.  Do you know the

20        source of the infection data?

21   A.   My -- my understanding it was -- it was one

22        hospital and it was one of the hospitals

23        where one of the physicians worked.

24   Q.   Who was an author on the paper, do you mean?

25   A.   I think so.  That's what I thought.

1                        NACHTSHEIM

2   Q.  Did you have any contribution to the design

3       of that portion of the study?

4   A.  No.

5   Q.  Either before or after you saw an abstract --

6       I mean, I'm sorry, either before or after you

7       saw a draft manuscript?

8   A.  And you're really talking about the -- the

9       infection data?

10  Q.  Yes.

11  A.  I -- and -- and so I tend to -- I tend to not

12      think of it as a design study.  I tend to

13      think of it as an observational study just --

14      we're just collecting data through time, so

15      I -- I just -- I'm making a small point.

16  Q.  No, that's -- thank you for clarifying that.

17  A.  And I -- I didn't have -- but I had no input

18      when they were starting collecting data and

19      when they were going to end, any of that.

20  Q.  The phrase you're using and the motion of

21      your hands would indicate a forward-looking

22      study, but was this prospective or

23      retrospective data collection?

24  A.  So my understanding was that part of this

25      data had -- was already in the records when

NACHTSHEIM

1
2    they decided to start collecting this data
3    and that -- so they had been using forced
4    air, they went through a transition and then
5    they started using conductive fabric.
6            And the first time I saw the data,
7    there actually had not been any -- any
8    infections, it was a time period following
9    this -- this -- this time and there
10   weren't -- the actual number of infections
11   was zero when one of the manuscripts was
12   completed.
13           But the study continued on for
14   another period of time, I don't know, for
15   another year, and then -- and then there were
16   some infections that showed up so the
17   analysis was redone.
18   Q.  So first of all, to be clear, you're
19       referring to page 1543 in the McGovern
20       article, right?
21   A.  Yes.
22   Q.  And the figure there shows a couple of
23       vertical lines to mark the beginning and end
24       of a transition period -- of a labeled
25       transition period, correct?

Page 152

1                          NACHTSHEIM

2    A.  Correct.

3    Q.  And when you were originally saying that

4        there was a time frame when there was zero

5        infections, you were referring to a time when

6        the conductive fabric was being used?

7    A.  I'm sorry, that's exactly what I meant.

8    Q.  No need to apologize.  I just want to make

9        sure the record is clear for -- for -- for

10       folks who aren't looking at the picture, the

11       graphic.

12               Do you understand which -- whether

13       forced air or conductive fabric is the

14       Bair Hugger device?

15   A.  Well, my understanding was it was the

16       Bair Hugger device.

17   Q.  Do you understand what device was used as a

18       conductive fabric device?

19   A.  No, I don't, actually.  I think I made an

20       assumption that it was this HotDog.

21   Q.  Well, and it might say so right in the --

22   A.  It might say so.

23   Q.  -- right in the study.  In fact, I -- I sure

24       believe it might.  If we take a look at --

25               MR. SACCHET:  1538.

                            NACHTSHEIM

1                    MS. GARCIA:  1538.

2                    MR. SACCHET:  Right-hand side

3       about halfway down.

4                    MS. GARCIA:  "The upper body

5       warming treatment was introduced under the

6       drape," well, that's the bubble count.  Thank

7       you.  I'm looking for the infection data.

8       (Reviews document.)

9    BY MS. GARCIA:

10   Q.  I'm not seeing the word HotDog yet.  Do you

11       believe that the infection data reflects the

12       use of a HotDog as the conductive fabric

13       blanket or do you have any belief about that

14       at all?

15   A.  I don't have any belief about it at all,

16       unless I can find it documented in the paper.

17       I mean -- so I don't -- and I haven't found

18       it, so I have no belief about what kind of

19       forced-air warming we're using.  I just

20       always assumed this was going to be the

21       Hot -- the Bair Hugger.

22   Q.  And --

23   A.  It doesn't -- if it doesn't say that, I don't

24       know.

NACHTSHEIM

1

2  Q.  And you do know that the Augustine company

3      makes and sells or sells the HotDog

4      patient-warming device?

5  A.  I do.

6  Q.  And you knew that at the time that you worked

7      on this?

8  A.  I did.

9  Q.  And you know that the HotDog warming device

10     is in competition with the Bair Hugger

11     warming device?

12 A.  Yes.

13 Q.  You said something about the study continued

14     for a year.  But if I look at the conductive

15     fabric timeline back on page 1543, the entire

16     time period during conductive fabric is only

17     July 2010 to January 2011; is that right?

18 A.  Yes, and I misread that.

19 Q.  So what's the -- what is the length of that

20     entire time frame?

21 A.  So it looks like it's -- I don't know the

22     exact number.  It looks like it's a little

23     bit over -- it would be a little bit over six

24     months, correct?

25 Q.  That's how I would read it.

1                      NACHTSHEIM

2    A.   Yeah, yeah.  My mistake.

3    Q.   And what is the length of the time frame

4         attributed to forced-air warming?

5    A.   So it looks like it started around July 2008

6         and ended in January 20 -- a little after

7         January 20 -- maybe a month or two after

8         January 2010, so it looks like three --

9         three-plus -- or I'm sorry, two-plus years.

10                  Oh, no, no, no, no, no.  Let's see.

11        No, I see how they're doing it, one and a

12        half -- it's over one-and-a-half years,

13        right?  So July 2008 until perhaps March of

14        2010.

15   Q.   There were -- there was statistical

16        comparison made between the infections

17        observed and recorded during the time when

18        the forced-air warming was used and during

19        the transition time and during -- let me take

20        that question back.

21                  You said earlier that you don't

22        think of an observational study having a

23        design, and I'm kind of confused by that.

24                  An observational study certainly has

25        some constructs or frameworks under which

                          NACHTSHEIM

1

2      it's being conducted, right?

3   A.  Well, it depends on the observational study.

4      Sure, that's true.  I mean, we have

5      prospective and retrospective and -- and so

6      forth, and that implies a lot of design.

7      There's also simply analysis of historical

8      data, which I don't think -- which I don't

9      tend to think of as being designed.

10          The only -- you know, I think the

11     only thing that matters here is when did

12     the -- when did these -- the only design part

13     of this is how long -- I suppose how long did

14     it go on, when did it start and when were the

15     transitions and when did it end.

16          And I don't know -- I don't know

17     that the transition points were -- were --

18     I'm not aware that the transition points were

19     dictated by our study.  I -- I always

20     assumed, and this may be just a bad

21     assumption, that this was something that came

22     from the hospital administration and it was a

23     convenient -- you know, in a way, it's a

24     pseudo experiment, because you're changing

25     something and you can see does it change in

Page 157

NACHTSHEIM

1
2    time, do things change along with it.

3            So I'm being a little pedantic here,

4    but I'm not sure -- I don't know who made the

5    decisions about when it starts, when it ends

6    and when those transition points were to

7    occur.

8    Q.  Is prospectively collected data generally

9        considered to be of higher value and to offer

10       a study more strength and validity than

11       retrospectively-collected data?

12   A.  I think it has some strengths that

13       retrospective data does not have.

14   Q.  Can you explain that for me, please.

15   A.  Well, so in a prospective study we're going

16       to -- we may take a group of people and move

17       forward in time, we may monitor how they

18       behave, we may monitor the incidence of

19       diseases and so forth, right?

20               And so is -- and we may even --

21       let's see, why am I blanking on this.  When

22       we go back in time we, in a sense, have to

23       pick people to observe and then we have to

24       then look at -- look at their records and go

25       forward with it.  So I think there's an added

NACHTSHEIM

1

2      complication going back in time about who do

3      you pick and when do you start and so forth.

4  Q.  And whether you can even identify those

5      people who would otherwise be included in

6      your data set?

7  A.  Yes.

8  Q.  So looking backward in time, there may be,

9      for example, some people who had hip and knee

10     surgery who aren't included in the data set

11     because the way the hospital records were

12     being kept and the way the data set is being

13     selected you just can't match them up?

14 A.  You can't go back and control for that.

15 Q.  If you were going forward saying I'm going to

16     look at all hip and knee surgeries, you could

17     more carefully make sure you get them all?

18 A.  I agree, yes.

19 Q.  If it were important to you to know about

20     certain risk factors that people have that

21     could influence their chances of getting an

22     infection, that's also something you could

23     make sure you're carefully recording?

24 A.  Yes.

25 Q.  And you could make sure that you're recording

1                          NACHTSHEIM

2        that in a more specifically defined way so

3        that you're comparing like to like?

4   A.   Yes.

5   Q.   When you look retrospectively, you may find

6        that that data wasn't recorded --

7   A.   Wasn't -- I'm sorry.  Yes, you may find it

8        was not recorded.

9   Q.   Or that it wasn't recorded in a uniform way?

10  A.   Correct.

11  Q.   Why is it important in an observational study

12       to account for factors that may predispose a

13       person to infection risk if what you're

14       looking at is infection risk?

15  A.   So the -- the concern could be in -- in a

16       study like this, to make -- to make this

17       very, very simple, suppose that -- suppose

18       that as you look -- as you looked back --

19       because I think this is -- I think this is

20       kind of both, I think there was some lookback

21       and then I think there was some going forward

22       involved in this study.

23  Q.   In the McGovern study?

24  A.   Yeah, in the McGovern study.  So we would --

25       we would like to think that the subjects

1                          NACHTSHEIM

2    involved going forward were not different

3    than the subjects involved -- going backward

4    and going forward are the same, so that

5    these -- so that any difference -- you would

6    like to -- you would like for them to be

7    essentially homogeneous so that any

8    differences you see, you can ascribe to what

9    you know changed in this case, the -- the

10   conductive fabric, but you can't control that

11   and there -- there -- there -- so there could

12   be other changes going on that you're not

13   taking into account, you know.  And I made a

14   bad example saying maybe the people before

15   the change were -- were older and we suddenly

16   had a lot of younger people in the next --

17   and so maybe the older people were more

18   likely to get infection.  So you'd like to

19   believe that the two groups are homogeneous

20   and the only difference is the -- is the

21   fabric in this case, is the treatment, but

22   this is not a randomized experiment, so you

23   can't absolutely -- you can't -- you can't --

24   you don't have the same power, you don't have

25   the same ability to ascribe cause and effect

<div align="center">NACHTSHEIM</div>

1
2   as you would if you had run an experiment.

3   Q.  Okay.  And --

4   A.  That's the main -- when I say observational

5       study versus experimental study, we really

6       have the ability when we run experiments to

7       be sure that essentially the only difference

8       between the treatment groups is the

9       treatment.  We don't have that power

10      necessarily in an observational study.

11  Q.  So would that be, for example, why, looking

12      at page 1543 of the McGovern paper, in the

13      left-hand column, the first full paragraph

14      says, "This study does not establish a causal

15      basis for this association.  Although the

16      demographics were similar between the patient

17      and groups in terms of risk factors for

18      infection, the data are observational and may

19      be confounded by other infection control

20      measures instituted by the hospital," would

21      that be one -- one reason behind that --

22  A.  Exactly.

23  Q.  Okay.  Did you read this limitation -- or,

24      I'm sorry, did you read this language in the

25      abstract -- let me start way over.

1                         NACHTSHEIM

2            Did you read this portion of the

3      paper before it was submitted for

4      publication?

5   A.  Yes, I did.

6   Q.  And do you agree that the McGovern paper by

7      itself could not establish -- or let me start

8      over.

9            Do you agree that the McGovern paper

10     by itself does not establish a causal

11     relationship between the selection of

12     patient-warming device and infection risk?

13  A.  I believe that.

14  Q.  Do you believe that the McGovern paper, taken

15     together with the other papers cited within

16     it, collectively do not establish a causal

17     association between or a causal effect

18     between selection of warming device and

19     infection risk?

20            MR. SACCHET:  Objection;

21     foundation.

22            THE WITNESS:  I don't believe that

23     a causal basis has been established.

24  BY MS. GARCIA:

25  Q.  Are you aware of any randomized clinical

1                      NACHTSHEIM

2        trial that has been controlled that has

3        demonstrated an increased infection risk when

4        the Bair Hugger device is used as opposed to

5        a different kind of warming device?

6    A.  No, I'm not aware of any such study.

7    Q.  Are you aware of any study showing any type

8        of forced-air warming device causes an

9        increase in infection risk as compared to a

10       device that doesn't use forced-air warming?

11   A.  Again, I'm not aware of any such study and

12       I -- yeah.

13   Q.  Why would it be important in an observational

14       study -- well, you've mentioned why,

15       actually, it would be important in an

16       observational study to -- let me start that

17       over again too.  I apologize.

18               There are some tools available in

19       observational studies to try to account for

20       underlying differences in people or in

21       circumstances if you had the data available;

22       is that right?

23   A.  Yes.

24   Q.  Is multivariate regression analysis one of

25       those tools?

1                        NACHTSHEIM

2    A.   Yes.

3    Q.   Did you ever discuss with Mark Albrecht or

4         anyone else the possibility that multivariate

5         analysis be used on the infection data in the

6         McGovern paper?

7    A.   I did not.  There are -- because -- well,

8         there are a couple of approaches that can be

9         used, and I think one is a multivariate

10        regression approach.

11             Another thing that's done in a case

12        like this often is simply going back and --

13        and comparing characteristics of the subjects

14        in the two groups and looking for -- for

15        differences that might explain the results,

16        and that's very much related to what

17        multivariate regression would do.

18             So if there are differences -- in

19        the multivariate regression, if there really

20        were differences, one could adjust for those.

21   Q.   Statistically?

22   A.   Statistically, and still maybe able to answer

23        the question were there differences in

24        infection rates that are -- that go beyond

25        the differences in -- in demographic factors.

1                         NACHTSHEIM

2   Q.   But that wasn't done here for the McGovern

3        paper?

4   A.   That wasn't done.  And I think the reason was

5        that looking at -- that they didn't find

6        differences in the demographic factors that

7        they had.

8   Q.   Are you saying that based on the statement we

9        just read in the article?

10  A.   No, I'm saying it on the basis of the -- of

11       the -- of the -- the ANOVAs and -- and -- and

12       the sort of comparisons that were doing

13       between the -- between the groups.

14  Q.   Okay.  Can you show me what you're referring

15       to?

16  A.   Okay.

17  Q.   I think by the fact that you're turning the

18       page, you mean something within this article?

19  A.   I think it's this article.  I hope -- yeah.

20       Yes, it's this article.

21  Q.   Page 1540, is that what you mean?

22  A.   I think so.  (Reviews document.)

23  Q.   I believe it's page 1540.

24  A.   So one of the -- one of the statements is,

25       "The demographics of 1,437 patients

1                         NACHTSHEIM

2          undergoing hip or knee replacement revealed

3          no significant difference between the two

4          types of warming for SSI risk factors of age,

5          type of surgery, diabetes, length of

6          preoperative stay," referring to table 1.

7     Q.   Okay.  You've read that from page 1541?

8     A.   I did.

9     Q.   Do you have any understanding about what are

10         the significant risk factors that would

11         influence infection risk in a person

12         undergoing hip and knee surgery?

13    A.   No.

14    Q.   Are you able to judge whether this list

15         captures the important risk factors one would

16         care about if one wanted to determine if the

17         patients in one group versus another really

18         were similarly situated as to infection risk?

19    A.   No.

20    Q.   Did you ever ask anyone about that to say to

21         Mark Albrecht or anyone else, Are we

22         accounting here for the significant risk

23         factors that people might bring into the

24         operating room?

25    A.   No.

1                          NACHTSHEIM

2    Q.   And if you look at the next sentence, it

3         says, "Unfortunately record-keeper" --

4         "recordkeeping was incomplete for the

5         additional risk factors of blood transfusion,

6         obesity, incontinence and fitness for surgery

7         which have been identified elsewhere as

8         important predictors for deep infection"; is

9         that correct?

10   A.   That's correct.

11   Q.   And if they are important predictors for deep

12        infection, those are things you would ideally

13        like to be able to adjust for or evaluate if

14        you're comparing the groups?

15   A.   You'd like to -- right, you'd like to

16        evaluate, and if there really was a

17        difference, then you'd want to adjust for it.

18   Q.   Are you saying that -- and that is because if

19        people are different on those factors, they

20        might bring a different infection risk into

21        the operating room, which could account for

22        differences in observation?

23   A.   Correct.

24   Q.   Are you saying that if you just look at the

25        absolute count and percentage of people who

1                       NACHTSHEIM
2        have these different risk factors between the
3        two groups and they look similar, you would
4        not do a multivariate analysis, there
5        wouldn't need to be a multivariate analysis?
6    A.  Correct.
7    Q.  Would you do any type of statistical testing
8        to see if those observed differences were
9        statistically similar to each other -- I'm
10       sorry, if the observed conditions were
11       statistically similar to each other?
12   A.  I would certainly want to do the -- the
13       analysis to see for every -- all the people
14       we have in these groups, are we seeing
15       systematic differences.
16   Q.  And how would you do that?
17   A.  Well, the methods are two-sample T-test,
18       two-sample proportion, tests of proportion,
19       are the proportions different, the proportion
20       that have, for example, diabetes, is that --
21       is that -- is that statistically different in
22       the groups or not, so those kinds of
23       questions.
24   Q.  Do you know if any of that work was done?
25   A.  That work was done for these variables.

<center>NACHTSHEIM</center>

1

2  Q.  And how do you know that?

3  A.  Well, it -- the -- it's -- it's reported

4      here.  Well, it said that the demographics --

5      again, the sentence that I read previously.

6  Q.  It refers to table 1.  If you look at

7      table 1 --

8  A.  Right.

9  Q.  -- does that tell you?

10 A.  Right.  Right.  Yes.  Oh, as a matter of

11     fact, it does.  So the p-values -- right.  So

12     there's a T-test done for the difference in

13     age in years and the p-value was .867, which

14     indicated no difference.  And then down below

15     there were tests of proportions and the

16     p-values of .261, .976, .240 indicated no --

17     and .075 indicated no statistically

18     significant difference.

19 Q.  So for the mean age in years, for the number

20     of procedures, for diabetes and for the

21     duration of preoperative hospital stay zero

22     or greater than one days, tests were done to

23     show that the groups were statistically

24     similar to each other?

25 A.  Correct.

1                         NACHTSHEIM

2   Q.   Are you aware of any other factors on which

3        the groups were compared?

4   A.   I am not aware of any other factors.

5   Q.   Would you expect, if there were other factors

6        that they were able to compare the groups on,

7        that would have been included in the

8        published paper?

9   A.   Absolutely.

10  Q.   And then if you turn back to page 1540 where

11       we were looking before, at the top of the

12       right column, it says, "Differences in

13       demographics and comorbidities were assessed

14       by analysis of variance ANOVA or log linear

15       contingency table methods and univariate odds

16       ratios for the development of joint substance

17       were computed."

18            Is this something that's reported in

19       the paper, the data from those analyses?

20  A.   Can you show me where you're -- I'm sorry.

21  Q.   Yeah.  Right underneath this bar graph, the

22       top right paragraph.

23  A.   Sorry, what -- what -- I'm on the wrong page.

24  Q.   1540.

25  A.   1540?

1                      NACHTSHEIM

2   Q.  Flip it the other -- flip your --

3   A.  Oh, the other way.

4   Q.  Just take your stack and flip it.

5   A.  1540.  I went the wrong way.  Got it.  Okay.

6       And it's right in that -- underneath that.

7   Q.  Top right paragraph.

8   A.  Got it.

9   Q.  Are the results of this univariate analysis

10      reported somewhere in this paper?

11  A.  I believe that refers to that -- to the table

12      we were just talking about in table 1.

13  Q.  And then I guess if we look at table 2?

14  A.  And then table 2 -- okay.  And so then

15      they're breaking it down.

16  Q.  And if we would look at --

17  A.  So table 2 is looking at the differences, I

18      guess -- hold on.  (Reviews document.)

19      Differences in people who developed

20      infections versus did not develop infections.

21  Q.  The --

22  A.  But it --

23  Q.  The odds ratio for developing an infection

24      was much higher in a hip surgery than in --

25      the -- the -- I'm sorry.

1                    NACHTSHEIM

2          The observed risk for developing

3     infection was four times higher in a hip

4     surgery than a knee surgery, correct?

5  A.  Yes.

6  Q.  And that was statistically significant, that

7     difference?

8  A.  Yes.  The p-value was less than .001, I

9     guess.

10              MS. GARCIA:  I would like to

11     propose that we go ahead and -- actually,

12     before I -- before I break for lunch, I just

13     want to make sure I understand.  I've gone so

14     many different places.  I'm going to come

15     back and have some more questions about this

16     study.

17  BY MS. GARCIA:

18  Q.  But the statistical analysis that was

19     conducted on these infection data that's

20     ultimately reflected in the McGovern paper,

21     do you recall having any conversations with

22     Mark Albrecht about that analysis before he

23     did it?

24  A.  There are sort of three different -- I mean,

25     there's sort of three different analyses, one

1                         NACHTSHEIM

2          has got to do with the experiment itself.

3     Q.   I mean the infection data.

4     A.   The infection data.  I -- I did not consult

5          with him regarding the -- you know, the kind

6          of -- the kind of before and after

7          demographic kind of thing that we've been

8          looking at, I did not talk to him about that.

9          I talked to him a bit about how to do this

10         analysis, the analysis of the -- providing

11         the confidence intervals and so forth that

12         are shown in Figure 7.

13    Q.   And I do believe, and we can look at those

14         after lunch, I do believe there were a couple

15         of e-mails about that, and my recollection is

16         he presented the data to you that's reflected

17         in Figure 7, the graphic, and you suggested

18         that he added confidence intervals; does that

19         sound right?

20    A.   Yes.

21    Q.   So did you discuss the analysis he did before

22         he did it?

23    A.   And by, "Analysis," do we mean adding the

24         confidence intervals or simply -- because the

25         analysis is basically here, it's basically

                          NACHTSHEIM

1
2      computing the -- the infection rates for the

3      three areas, the infection rate for sort of

4      before transition --

5   Q.  Right.

6   A.  -- and after.  I didn't talk with him about

7      that before I saw the original sort of

8      analysis that did not have confidence

9      intervals on it.

10  Q.  And the choice to do univariate or

11     multivariate regression analysis, did you

12     speak with him about that at any time?

13  A.  Did not.  I did not.

14  Q.  Okay.  The decisions about which factors to

15     evaluate that might predispose a person to

16     infection risk, did you have any input into

17     that decision?

18  A.  I did not.

19  Q.  The decision about where to draw the lines in

20     the period where forced-air warming

21     transition and conductive warming, you --

22  A.  No, I --

23  Q.  -- did not have --

24  A.  No.

25  Q.  -- any involvement in those -- any discussion

1                      NACHTSHEIM

2        about that?

3    A.  I had no involvement, there was no

4        discussion.  This was just -- the data were

5        presented to me, Here it is, you know, this

6        is the transition period and here's before

7        and after.

8    Q.  Other than suggesting to Mark Albrecht that

9        he add the confidence intervals to results

10       that are presented on Figure 7, do you recall

11       providing Mark with any input or guidance or

12       suggestion about either the design or the

13       statistical work that's reflected in

14       Exhibit 4 with respect to infection data?

15   A.  No.

16   Q.  And I just cannot recall, so please remind me

17       if you recall having given him any input or

18       guidance or advice about the design or

19       analysis reflected in the bubble count data

20       in Exhibit 4?

21   A.  I'm sorry, is the question -- could you

22       repeat the question for me?

23                 (Whereupon, the last question

24                  was read by the court reporter.)

25                 THE WITNESS:  So originally -- oh,

1                          NACHTSHEIM

2        in Exhibit 4.

3                    MS. GARCIA:  The McGovern paper.

4                    THE WITNESS:  Oh, the McGovern

5        paper.  This is the McGovern paper, right?

6        So exhibit -- I was looking at Figure 7.

7        Exhibit 4, I'm sorry.  That's why I didn't

8        understand.

9                    I may have -- may have urged him to

10       add the confidence intervals to -- oh, that's

11       Figure 5.  Figure 4, no.  Sorry.  You finally

12       got me to Figure 4.  No, I did not have any

13       input into that figure.

14                   MR. SACCHET:  I just want to be

15       clear, are we talking about Figure 4 or

16       Exhibit 4?

17                   MS. GARCIA:  Both.

18                   MR. SACCHET:  Okay.

19                   MS. GARCIA:  I believe.

20       BY MS. GARCIA:

21       Q.  Is that correct?

22       A.  Yeah, they're --

23       Q.  Figure 4 of Exhibit 4?

24                   MR. SACCHET:  That's what you were

25       asking or just bubble count --

1                        NACHTSHEIM

2                  THE WITNESS:  Let's be absolutely

3        sure here.

4                  MS. GARCIA:  Yeah, let's be

5        absolutely sure.

6                  THE WITNESS:  Exhibit 4, Figure 4

7        I did not have any input to -- I don't recall

8        having input to that figure.

9                  MS. GARCIA:  Okay.

10   BY MS. GARCIA:

11   Q.  I think my question -- what about Exhibit 4,

12        Figure 5?

13   A.  I may have urged him to add the confidence

14        intervals to the -- to the bars, but I can't

15        say for sure.

16   Q.  Okay.  Other than that possibility, do you

17        believe that you provided any insight or

18        guidance to Mark Albrecht or anyone else

19        about any aspect of the bubble count

20        experiments and their analysis that is

21        reported in Exhibit 4, the McGovern article?

22   A.  I don't believe so.

23                  MS. GARCIA:  Why don't we break

24        and I will come back organized after the

25        break with some more questions.

```
 1                        NACHTSHEIM

 2              THE VIDEOGRAPHER:  We're going off

 3       the record at 12:57 p.m.

 4                  (Whereupon, a lunch recess

 5                  was taken.)

 6              THE VIDEOGRAPHER:  This is video

 7       number 4 in the deposition of Christopher

 8       Nachtsheim.  Today is November 29th, 2016.

 9       We're going back on the record at 1:54 p.m.

10   BY MS. GARCIA:

11   Q.  Good afternoon.

12   A.  I was just waiting for --

13   Q.  Oh, for the send?

14   A.  For a confirmation that it got there, but

15       I'll shutdown.

16   Q.  You're -- you were trying to send the CV?

17   A.  I did send the CV and I just -- I had asked

18       for a confirmation.

19   Q.  Oh, oh, I called to make her aware that it's

20       coming.

21   A.  Okay.  Thank you.  Let me shut this down.

22   Q.  She'll let me know if it doesn't come.

23   A.  Okay.

24   Q.  So what we're talking about here is over the

25       lunch break you were able to get your
```

NACHTSHEIM

1    

2    computer that had a copy of your CV on it and

3    you're going to give us an updated copy,

4    right?

5    A.  Correct.

6    Q.  Thank you very much.

7    A.  And it was dated August 28th.  I currently

8    updated it and then forgot -- promptly forgot

9    to send it, so I apologize for that.

10   Q.  No problems.  That's okay.  That's why we

11   have a deposition.

12           Turning back to Exhibit 4, the

13   McGovern paper.

14   A.  Okay.

15   Q.  Let's get that in front of us again.  Thank

16   you.

17           On page 1543, in the left column,

18   the first full paragraph beginning, "This

19   study does not establish a causal basis."

20   A.  Yes.

21   Q.  The second sentence in that paragraph ends

22   with the clause, "The data are observational

23   and may be confounded by other infection

24   control measures instituted by the hospital."

25   Do you see that?

1                          NACHTSHEIM

2   A.  Yes, I do.

3   Q.  And are you familiar with hospital practices

4       concerning infection control?

5   A.  Only -- only a little bit, yes.  But, I mean,

6       I'm not intimately.  Our -- my department at

7       the university has people who work in

8       infection control and quality and within

9       healthcare, so I hear talks about it.

10  Q.  Okay.  So you're aware, generally speaking,

11      that hospitals do make very concerted efforts

12      to control infection rates during surgery?

13  A.  Absolutely.

14  Q.  Do you have an understanding that infection

15      remains, to this day, an ineradicable risk

16      associated with surgery?

17  A.  Yes.

18              MR. SACCHET:  Objection;

19      foundation.

20              THE WITNESS:  Well, I -- to this

21      day meaning it certainly hasn't been

22      eradicated?

23              MS. GARCIA:  Yes.

24              THE WITNESS:  Yes.

25              MS. GARCIA:  That's what I meant.

1                         NACHTSHEIM

2          Thank you for clarifying that.

3     BY MS. GARCIA:

4     Q.   In a study designed to assess and compare

5          infection risk, would you agree with me that

6          it's very important to try to control for

7          differences in measures that might be taken

8          at the hospital where data is being collected

9          from to address infection risk?

10    A.   It's -- it's important to -- are you asking

11         about collecting data on other factors that

12         might -- might be affecting --

13    Q.   Yes.

14    A.   -- infection risk?

15    Q.   Well, let me be more specific.  In the

16         McGovern paper, what is being compared is

17         infection risk observed during a time when

18         forced-air warming is used versus a time when

19         convective -- conductive fabric is used,

20         correct?

21    A.   Correct.

22    Q.   And if there were changes -- let me ask that

23         differently.

24              If there were differences in the

25         infection control practices being followed by

1                     NACHTSHEIM

2       the hospital, that would be an important

3       factor that could impact the results?

4               MR. SACCHET:   Objection; calls for

5       a medical opinion.

6               THE WITNESS:   There -- there are

7       always -- you know, the problem with

8       observational studies is that there can be

9       other factors changing that could be

10       affecting results that you don't know about,

11       and so that's why -- that's basically why we

12       can't say we see a cause and effect.

13    BY MS. GARCIA:

14    Q.  But even to make an observational study, even

15       to make an observational comparison, it is

16       important to account for factors that could

17       impact the results on which you're reporting?

18    A.  You always want to do the best you can.

19    Q.  And, in fact, that's discussed in the paper,

20       right?

21    A.  Yes.

22    Q.  So if we would look at the next sentence

23       after the one we were just looking at --

24       well, the clause we were just looking at

25       says, "The data are observational and may be

NACHTSHEIM

1

2      confounded by other infection control

3      measures instituted by the hospital."  What

4      does that mean, "May be confounded by"?

5  A.  Oh, I just found it again.  So confounded

6      means that the variables, the factors,

7      whatever they are, are changed at the same

8      time.  And if they're changed at the same

9      time, then if there's -- if we see a change

10      in a variable we're measuring, it could be

11      due to one, it could be due to the other, it

12      could be due to both, and we really have no

13      way of disentangling them when two variables

14      are confounded.

15  Q.  So in this particular instance this is

16      referring to a change in warming unit

17      device -- I'm sorry, a change -- in this

18      particular instance, there's a change in the

19      patient-warming device being observed?

20  A.  (Nods head.)

21  Q.  Correct?

22  A.  Correct.

23  Q.  And there's the observation in the article

24      that there could also be confounding by

25      changes in infection control practices being

1                         NACHTSHEIM

2        instituted at the hospital?

3    A.   Correct.

4    Q.   If the changes in infection control practices

5         are being instituted at the same time as the

6         change in choice of patient-warming system

7         and you see a difference in infection rates,

8         you can't determine whether that difference

9         in infection rates is due to the change in

10        infection control procedures, patient-warming

11        device or both?

12                    MR. SACCHET:  Object to form.

13                    THE WITNESS:  Correct.

14   BY MS. GARCIA:

15   Q.   The next sentence says, "For example, changes

16        were made to the antibiotic and

17        thromboprophylaxis protocols used during the

18        study, although no infection control changes

19        were made after February 2010"; do you see

20        that?

21   A.   Where -- same paragraph, right?

22   Q.   Yes.

23   A.   "For example, changes are made to the" --

24        okay, now I've got it.  "Used during --

25        although no infection control," okay, I've

Page 185

1                          NACHTSHEIM

2        got it, right.

3   Q.   Okay.  After February 2010 is at the very

4        conclusion of the forced-air warming device

5        period, correct?

6   A.   Correct.

7   Q.   All of the conductive fabric warming device

8        period occurs after February 2010, correct?

9   A.   Correct.  All of the conductive fabric.

10  Q.   Measurements are made?

11  A.   Correct.

12  Q.   Okay.  Do you know how significantly

13       antibiotic and thromboprophylaxis protocols

14       connected to surgery have on infection rates?

15  A.   I don't know.

16  Q.   Is that something that you asked about?

17  A.   I -- I was not involved in that part, so I --

18       I didn't ask about it.

19  Q.   Well, when you say you weren't involved in

20       that part, what do you mean?

21  A.   What I mean by that is simply that, you know,

22       it was -- it was important to address, as

23       best one can at least, are we aware of other

24       changes going on.

25  Q.   And this would indicate there are changes

1                          NACHTSHEIM

2       going on?

3    A.  There are changes going on.  And if that's

4        the case, one would want -- one would want to

5        take those into account as best one could.

6        But I was not involved in, you know, sort of

7        identifying the variables that might have

8        been changing.  That all seemed to be part of

9        the job of the people at the hospital.

10   Q.  Do you recall ever asking anyone either at

11       the hospital or Mark Albrecht or anyone else

12       how significant were the changes being made

13       to hospital infection protocols and how

14       likely were those to cause confounding?

15   A.  I don't think I would put it as a question.

16       I think we certainly discussed the -- the

17       possibility that other things were changing

18       that could explain the -- the change in the

19       infection rates, but I didn't ask specific

20       questions about can you tell me what else

21       changed and when.

22   Q.  Who did you discuss it with?

23   A.  Mark.  And, again, I didn't -- I didn't ever

24       ask him what changed, what else changed

25       besides this.  We just -- we just talked in

NACHTSHEIM

1

2  general about could this be causal or we

3  e-mailed could this be causal or not, could

4  things be changing.  And, I mean, I think we

5  agreed that yes, there could have been other

6  things changing that could explain this, we

7  just -- we don't know what they are.

8  Q.  Well, would you expect that some of the

9      coauthors on the study know what they are?

10              MR. SACCHET:  Calls for

11      speculation.

12              THE WITNESS:  I -- they'd have a

13      better idea than I would, they're -- since

14      they're -- I think one or two was employed by

15      the hospital.  They may have a better idea of

16      what's going on at the hospital, but I

17      certainly did not.

18  BY MS. GARCIA:

19  Q.  Well, and you -- you were actually counting

20      on them to be knowing that information,

21      right?

22  A.  Yes.

23  Q.  That's something you believed they did know?

24  A.  Yes, yes.

25  Q.  Did the conversation with Mark about what

1                        NACHTSHEIM

2       else might be changing, do you recall who

3       brought that up?

4    A.  I don't know for sure.  I think -- I know I

5       asked him at one point about, you know, what

6       are your thoughts on causality and so forth

7       in all this.

8    Q.  I do have an e-mail that you might be

9       referring to, and let me see if I can find

10      that.

11                      (Whereupon, Exhibit 19 was

12                      marked for identification.)

13   BY MS. GARCIA:

14   Q.  Exhibit 18 is --

15                      MS. GARCIA:  Is this 18?  Let me

16      make sure I'm right.

17                      THE COURT REPORTER:  Nineteen.

18                      MS. GARCIA:  Nineteen.  Okay.

19      Thank you.

20   BY MS. GARCIA:

21   Q.  Exhibit 19 begins with an e-mail from Mark to

22      you on January 24th, 2011, forwarding a

23      New York Times article; is that correct?

24   A.  Correct.

25   Q.  Or a link to it, an Internet link to a

NACHTSHEIM

1
2     New York Times article.  At the second page
3     you've responded to him, and at the top what
4     you say is, "Interesting article, even though
5     they were pretty hard on Scott.  Hard to
6     disagree with the last quote where the guy
7     said that the data are compelling, but they
8     don't prove the link to infections in
9     practice and that a clinical trial would be
10    needed to do that"; do you agree?  Is that
11    what you said?
12  A.  I did.
13  Q.  And that was your opinion at the time?
14  A.  Yes.
15  Q.  That remains your opinion today?
16  A.  Yes.
17  Q.  Are you referring here to the McGovern study?
18  A.  Yes.
19  Q.  Why would a clinical trial be needed to prove
20      a link to infections?
21  A.  Excuse me.  In the clinical trial, the
22      patients that are selected for the different
23      treatments are chosen -- are chosen at
24      random, so there's two things we need.  We
25      need a large enough sample size and we need

NACHTSHEIM

1
2     to choose them at random.  And the random --
3     the randomization mechanism gives us very
4     high assurance that the groups that we -- the
5     two different groups, think of a placebo and
6     treatment group, have roughly the same
7     characteristics, that they're balanced on
8     just about any demographic kind of feature
9     you could imagine, and that's because of the
10    random -- the random -- the random mechanism
11    by which they're chosen for the groups.
12 Q. And in connection to the McGovern paper,
13    would you mean a randomization for an
14    assignments either received forced-air
15    warming or conductive fabric warming?
16 A. Yes.
17 Q. Have you ever calculated the number of
18    patients that would be needed or the length
19    of time that a study would need to be
20    conducted in order to estimate -- or, I'm
21    sorry, in order to establish a causal
22    connection between the selection of
23    patient-warming device and infection risk?
24 A. I did not do that, never done that.
25 Q. If you look at Mark's response to you, he

1                        NACHTSHEIM

2        says, "Yeah, I do agree with that"; is that

3        correct?

4    A.  Yes, he does.

5    Q.  Do you recall, outside of this e-mail

6        exchange, ever having a conversation with him

7        about this topic?

8    A.  No.

9    Q.  And are -- you were, in your mind, linking

10       this e-mail exchange to my questions about

11       the inability to sort out confounding by

12       infection control practices?

13   A.  Right.

14   Q.  Why is that?  Why are you linking those two

15       things together?

16   A.  Why am I linking those two things?  Well,

17       the -- the -- you know, the achilles heel of

18       observational studies is that you -- you --

19       you can't ascribe cause and effect to

20       observational studies, whereas, in an

21       experimental study, clinical trials and

22       experimental study where randomization is

23       employed, we generally agree one can ascribe,

24       at least with very high levels of

25       probability, one can ascribe causal effect to

                          NACHTSHEIM

1

2     the result.  So these are causal studies,

3     whereas, observational studies are generally

4     seeking association.

5  Q.  And are you saying in your -- I just want to

6     be sure I'm understanding what you're saying.

7     In your mind, one of the primary

8     illustrations of that problem here was the

9     inability to correct for potential

10    differences in hospital infection control

11    measures?

12 A.  Right, right.  Yes.

13 Q.  Thank you.

14              (Whereupon, Exhibit 20 was

15              marked for identification.)

16 BY MS. GARCIA:

17 Q.  I also wanted to show you Exhibit 20, which

18    is an e-mail with some data attached, and the

19    first page of a draft manuscript.  And I

20    guess -- you know, my question is actually

21    only about the e-mail.

22 A.  Okay.

23 Q.  Why don't -- I don't care if folks keep the

24    other pages, but for simplicity let's just

25    have the e-mail chain itself going from pages

                          NACHTSHEIM

1

2      1110 through 1115 be the Exhibit 20.  So if

3      you could just remove the other pages.  Could

4      you remove that clip, please?

5    A.  (Complies.)

6    Q.  Thank you.  I just want to make sure we're

7      accurate here.  Feel free to look at the

8      attached pages, and when you're done give

9      them back to me if you'd like so that --

10   A.  I'll set them aside.

11   Q.  -- so that we got a clear exhibit.  Okay.

12              Exhibit 20, at the bottom of the

13      page --

14   A.  The very first page, 1110?

15   Q.  Yes, 1110, thank you.

16   A.  Okay.

17   Q.  So this begins on December 30th, 2010,

18      shortly before the e-mail we were just

19      discussing with Mark Albrecht writing to

20      Mike Reed, Paul McGovern and copying

21      Scott Augustine and you and attaching the

22      first official rough draft for the paper.  Is

23      that correct, just what I've said so far?

24   A.  Yes.  So...

25   Q.  So you could refer to the --

1                         NACHTSHEIM

2    A.   I'm -- I'm -- I'm --

3    Q.   You could refer to the attachments then --

4    A.   I'm -- I'm confused.

5    Q.   Go ahead.

6    A.   Sorry, maybe I wasn't listening well enough.

7         I was trying to read, this was to

8         Mark Albrecht --

9    Q.   From Mark Albrecht.

10   A.   Oh, the first one is --

11   Q.   The top one?

12   A.   Oh, yeah, the top one.

13   Q.   From Mark Albrecht.

14   A.   From Mark Albrecht, and I'm on that one.

15   Q.   Okay.  Yes.

16   A.   Right.

17   Q.   And, actually, I apologize, I'll clarify my

18        mind here.  Go ahead and look at the

19        attachments and put them back with

20        Exhibit 20, because what I do want to confirm

21        is that this is referring to the paper that

22        became the McGovern paper, Exhibit 4.

23   A.   So I don't know -- I have this one page at

24        the end --

25   Q.   Yeah.

1                        NACHTSHEIM

2    A.   -- that's --

3    Q.   And we can mark as Exhibit 21 the full thing.

4    A.   And --

5    Q.   That matches with that one page.

6    A.   Okay.  Because I'm not sure what's in this

7         paper.

8    Q.   Yeah, go ahead and see Exhibit 21.

9    A.   All right.

10                       (Whereupon, Exhibit 21 was

11                       marked for identification.)

12                       THE WITNESS:  (Reviews document.)

13        Right, so this paper did not lead to either

14        of these two papers.

15                       MS. GARCIA:  Okay.

16   BY MS. GARCIA:

17   Q.   So Exhibit 21 is not the same.  Really my

18        point is the bottom of the first page of the

19        e-mail.

20   A.   Okay.

21   Q.   So apparently maybe the draft is -- maybe I

22        don't have the draft right.  But if we look

23        at Mike Reed's comments on the bottom of the

24        page, he says, "The infection reduction data

25        has been given too much prominence.  Whilst

1                          NACHTSHEIM

2       the data is real and can be used in the

3       discussion, it is potentially controlled by

4       many factors, and I am not prepared to imply

5       that this is solely an FAW effect.  We have

6       made lots of interventions," dash, "it could

7       be any, although I agree it could largely be

8       an FAW effect."  Do you see that there?

9    A.  I do.

10   Q.  And do you understand him to be raising the

11      same issue that you and I have just been

12      discussing about potential confounding?

13   A.  Yes, it's the same issue.

14   Q.  I see the issue we may have about the

15      attachment, because that e-mail came from

16      Mike Reed to Mark Albrecht and Paul McGovern

17      and then Mark forwarded it to you.  Do you

18      see that?

19   A.  Uh-huh.  Yes.

20   Q.  Okay.  Did you ever have any communication

21      with either Mike Reed, Paul McGovern or are

22      Mark Albrecht about the prominence of the

23      infection reduction data in the article that

24      became Exhibit 4?

25   A.  I -- I discussed it in as much as I was --

NACHTSHEIM

1
2        you know, I was given the data and we talked
3        about how to analyze it and -- and we talked
4        about, you know, how it came about and how it
5        was -- a little bit about how it was
6        collected, but -- but that's -- that's about
7        it.
8                I don't think that Mark and I got
9        into discussions about well, what are the
10       other variables that could have been changing
11       that are mentioned here.  I mean, I guess
12       Mike Reed says there are other -- other
13       factors, I'm not -- I'm not -- I'm not
14       prepared to imply this is solely an FAW
15       effect.  And in the paper they mention the
16       changes in the antibiotics, I guess.
17   Q.  Right.
18   A.  So --
19   Q.  And they mention a few other things as well.
20   A.  And I -- I just wasn't part of those
21       discussions.
22   Q.  Okay.  If we look at the first page of
23       Exhibit 4 we can see that Mike Reed is a
24       physician, correct?
25   A.  Yes.

1                         NACHTSHEIM

2    Q.  And he's identified as the consultant

3        orthopedic surgeon?

4    A.  How do you know that?

5    Q.  I'm looking at the bar on the left-hand side.

6    A.  Oh, at the paper.  I'm sorry.  Yes.

7    Q.  Looking at Exhibit 4 on the first page.

8    A.  Correct.

9    Q.  He's identified as consultant orthopedic

10       surgeon?

11   A.  Yes.

12   Q.  Is there anyone else here identified as a

13       physician in connection with the -- the

14       hospitals or the healthcare systems in the

15       UK?

16   A.  Well, Carluke and Partington --

17   Q.  Okay.

18   A.  -- orthopedic surgeons, but --

19   Q.  Okay.

20   A.  Yeah.

21   Q.  Do you know the respective roles that those

22       played, Carluke and Partington?

23   A.  I don't.

24   Q.  Did it concern you that the physician who was

25       coordinating this study and whom you were in

1                        NACHTSHEIM

2          e-mail communication with, at least as a copy

3          on many e-mails, was raising this issue that

4          they've made lots of interventions and he

5          doesn't know whether the observed change in

6          infection rate is due to those changes or due

7          to the choice of patient-warming system?

8    A.    Does it concern me?  It -- I wouldn't say I

9          have a major concern about this.  I think

10         it's relevant to provide some data as long as

11         it's represented appropriately, and I

12         think -- I mean, when one -- when one thinks

13         back to things like smoking and cancer, we

14         never -- we were never able to run a clinical

15         trial on that, and so there's always

16         observational data.  And so sometimes what's

17         required is many, many, many observational

18         studies and replication studies and so forth

19         to see, before someone really can kind of

20         come to the conclusion, well, yeah it's

21         probably causal.

22   Q.    That is not really what I'm getting at.

23   A.    Okay.

24   Q.    What I'm getting at is when the gentleman who

25         is the physician leading the effort to do

NACHTSHEIM

1
2     this study is raising a concern that the
3     manuscript is giving too much impact to
4     infection reduction as between selection of
5     patient-warming device, given all the other
6     interventions that were happening at the
7     hospital, does that make you consider -- did
8     that make you at the time consider how are we
9     presenting these data and are we being fair
10    in our presentation?
11                    MR. SACCHET:  Objection to form.
12                    THE WITNESS:  I didn't -- I mean,
13    it certainly didn't occur to me to jump in at
14    that point and say I don't think we can
15    present that data, just because I thought
16    it's observational.
17                    And as we move forward with the
18    paper my thought was let's -- you know,
19    let's -- we need to finish it, we need to
20    present it and say what we're going to say
21    about it and then people are going to weigh
22    in on whether that should be part of the
23    paper or not.
24    BY MS. GARCIA:
25    Q.  Who would those people be?

1                           NACHTSHEIM

2    A.  Any of the authors.

3    Q.  Okay.  And -- well, you're one of the

4        authors.

5    A.  I am.

6    Q.  So when you say let's finish it and present

7        it, you mean present to each other?

8    A.  That's what I meant.

9    Q.  Okay.  But you are presenting it to each

10       other here --

11   A.  Uh-huh.

12   Q.  -- and what Dr. Reed is saying is we're

13       putting too much emphasis on infection

14       control reduction -- or, I'm sorry, we're

15       putting too much emphasis on infection

16       reduction, because we really can't sort out

17       what's causing it.

18   A.  What he's saying is I'm not prepared to imply

19       that this is solely an FAW effect.  I mean, I

20       just read it.  That -- that's what he's

21       saying.

22   Q.  And do you understand FAW to stand for

23       forced-air warming?

24   A.  Yes.

25   Q.  And does he also say, "We have made lots of

1                         NACHTSHEIM

2          interventions, it could be any, although I

3          agree it could largely be FAW effects"?

4     A.   I understand that.

5     Q.   He says that?

6     A.   He said that.  Yes, he said that.

7     Q.   And you've mentioned quite a few times that

8          there's a difference between an observational

9          study and a randomized clinical trial and

10         somebody reading that would know it.  But

11         there are times when even observational data

12         shouldn't be presented if you really can't

13         sort through and isolate the factor or the

14         variable that you're interested in.

15                    MR. SACCHET:  Objection; leading,

16         assumes facts not in evidence.

17    BY MS. GARCIA:

18    Q.   Would you agree with that?

19    A.   No, I actually do not agree with that.  Let

20         me go back to what I tell my students when we

21         talk about regression correlation, and that

22         is that any time you have an association

23         you're doing -- sorry.  Any time you're doing

24         an observational study, what comes out of

25         that are hypotheses.

1                          NACHTSHEIM

2    Q.   Okay.

3    A.   Okay.  We don't get cause and effect, but we

4         get hypotheses, and those hypotheses, they're

5         hypotheses and they need further work.

6         And -- and maybe you follow up with an

7         experiment and you can prove it.

8              Like in this case maybe you would

9         follow up with a -- with a -- you know, with

10        a clinical trial.  Maybe you can't.  I mean,

11        there are plenty of situations where you

12        simply can't do it.

13             And -- and so -- and so one either

14        has to make a decision based on the

15        association whether you -- whether you

16        believe it's causal or not, you know, or just

17        say I don't -- you know, I just -- I

18        simply -- I don't want to act on that because

19        it's not of sufficient -- of a sufficiently

20        rigorous, sort of, level and I -- I don't

21        want to act on it.

22             And, remember, I teach -- I teach a

23        lot in a business school.  And in business

24        it's often very difficult to run experiments

25        and so we're looking at past data and we're

NACHTSHEIM

1
2     looking at changes that were made in

3     management practice and we're trying to

4     understand did that cause something to

5     happen, did that -- did that change the way

6     we operate as a business, and we -- and we

7     never get that, that causation from those

8     kinds of empirical studies and so -- but

9     sometimes we have to act on it.

10  Q.  Okay.  And one thing you might do if you saw

11      an association, but you were concerned based

12      on factual information that there might be a

13      serious issue with confounding, is you might

14      decide to look back at your data and clarify

15      what do I know about these things that were

16      changing, and it might be very important, at

17      a minimum, to report that if you were

18      reporting your results; would you agree with

19      that?

20              MR. SACCHET:  Object to form.

21              THE WITNESS:  I would agree.

22  BY MS. GARCIA:

23  Q.  In fact, have you ever understood that the

24      hospital at which these infection data were

25      collected was undergoing major efforts to

NACHTSHEIM

1

2      control infection rates during the time

3      period of the study reflected in McGovern,

4      Exhibit Number 4?

5  A.  I -- I wasn't aware that this hospital had

6      more going on infection control-wise than

7      other hospitals, certainly wasn't aware of

8      that.

9              (Whereupon, Exhibit 22 was

10             marked for identification.)

11 BY MS. GARCIA:

12 Q.  Have you ever seen Exhibit 22?

13 A.  I have never seen Exhibit 22, no.

14 Q.  Do you have -- do you see that this is

15     referring to Northumbria Health --

16 A.  I do.

17 Q.  -- Healthcare --

18 A.  I'm sorry.

19 Q.  -- NHS Foundation Trust?

20 A.  Yes, I do.

21 Q.  And do you see that that is also the location

22     or group with which Dr. Reed is affiliated,

23     on Exhibit 4?

24 A.  It seems -- yes, I'm going to say it sure

25     seems the same to me.

1                          NACHTSHEIM

2    Q.   Okay.  Do you see the statement, "During the

3         last two quarters of 2008, 2009, Northumbria

4         Healthcare NHS Foundation Trust was reporting

5         SSI rates in the combined total of surgeries

6         in THR, TKR and repair neck of femur between

7         3.5 to 5 percent and was regularly receiving

8         letters from the HPA informing the trust of

9         its high outlier status for SSI"?

10   A.   I see that.

11   Q.   And do you see, "As it was performing

12        approximately 2,200 hip and knee replacements

13        every year, implementing a robust

14        surveillance in SSI became a priority for the

15        orthopedic team and the Trust"?

16   A.   I see that.

17   Q.   Do you see on the second page there is a

18        large box diagram that takes up the bottom

19        half of the page that is labeled, "Trust wide

20        surgical site infection intervention timeline

21        for orthopedic THR and TKR surgery" --

22   A.   Referring to --

23   Q.   -- with a few more words after that?

24   A.   You're referring to the -- the Figure 2?

25   Q.   Yes.

1                          NACHTSHEIM

2    A.   Okay.  Yes.

3    Q.   And do you see where it says, "Figure 2," the

4         explanation for this diagram is, "The,"

5         quote, "timeline illustrates the

6         interventions undertaken from 2008 to present

7         day"?

8    A.   Yes.

9    Q.   And do you see that there are -- I know this

10        is -- I, at least, do not have eyes that can

11        read this diagram, but I can make out some of

12        the years in this diagram, and there are

13        changes being made in 2008, in 2009, in 2010,

14        in 2011, and then in later years; is that

15        right?

16   A.   Yeah, I'm having a hard time reading it too,

17        but, yes.

18   Q.   You can see those years?

19   A.   Yeah, I can see the years.

20   Q.   Do you see any indication in Exhibit 4 that

21        would give a reader any sense about the scope

22        and nature of the changes being made to the

23        infection control procedures at the hospital

24        or hospitals where the study took place?

25                MR. SACCHET:  Object to form.

```
 1                        NACHTSHEIM
 2              THE WITNESS:  I'm sorry, can
 3       you -- can you help me with that question a
 4       little bit?
 5              MS. GARCIA:  Why don't we read it
 6       back and see if you understand it.
 7                   (Whereupon, the last question
 8                   was read by the court reporter.)
 9              THE WITNESS:  I do see that there
10       are apparently a lot of changes going on.
11  BY MS. GARCIA:
12  Q.   And that's not reflected the scope and
13       nature, that is not reflected in Exhibit 4;
14       would you agree with that?
15  A.   I would agree with that.
16  Q.   And if we -- I would like to give you a
17       moment to look at Exhibit 22, which is
18       titled, "Implementing Effective SSI
19       Surveillance," and which is reporting on how
20       the Northumbria Healthcare NHS Foundation
21       Trust reduced its infection rate within the
22       orthopedic department, and ask you if you see
23       any indication from the legible portions of
24       this article that reference a change in
25       patient-warming device being used?
```

1                          NACHTSHEIM

2   A.  (Reviews document.)  Well, again, I'm afraid

3       I can't read all those boxes.

4   Q.  Separate from the boxes, there's a lot of

5       text describing -- there's a lot of text

6       describing --

7   A.  I can read the text, yes.

8   Q.  So just take a moment and see if in the text

9       you see any reference to that.

10  A.  (Reviews document.)  Okay.  I've -- I've kind

11      of skimmed it and I don't see any mention --

12  Q.  Okay.

13  A.  -- to the change in blanket.

14              MR. SACCHET:  For the record, I'm

15      going to object and note that in the table in

16      the small print a difference is noted between

17      conductive fabric warming and forced-air

18      warming.

19              MS. GARCIA:  I was just going to

20      point that out actually.

21  BY MS. GARCIA:

22  Q.  I was -- I was looking at the table as you

23      were skimming, and I do see -- I don't know

24      if you can read it, so let me show you where

25      I'm looking, "Quarter 1, 2010."

1                          NACHTSHEIM

2    A.   Okay.

3    Q.   I'm not sure if that's quarter 1 or not.

4         Yeah.  To the best of my ability, my eyes

5         would read this as, "A transition in

6         patient-warming systems from forced" --

7    A.   Oh, I see it.

8    Q.   -- "air to conductive fabric was made in all

9         three elective orthopedic theaters commencing

10        March 2010 and completing June 2010."  Do you

11        see that?

12   A.   I do.

13   Q.   Okay.  So that is one of three things noted

14        in quarter 1, 2010, correct, to the best of

15        my eyes?

16   A.   Quarter 1, 2010, yes, best of three, right.

17        I mean, one of three.

18   Q.   And I count 22 boxes on this graph.  Do you

19        count a similar number?

20   A.   In there.

21   Q.   Roughly?

22   A.   Approximately.

23   Q.   Okay.  And each box contains at least one

24        item?

25   A.   Uh-huh.

                              NACHTSHEIM

1

2   Q.  Yes?

3   A.  Yes.

4   Q.  And many boxes contain three or more items?

5   A.  Correct.

6   Q.  And in the two-and-a-half pages of text that

7       describe the changes that were made by this

8       team and the results that they saw, you have

9       not, in scanning it here today and reading

10      through it here today, seen any mention of

11      the change of patient-warming device; is that

12      right?

13                  MR. SACCHET:  Object.

14                  THE WITNESS:  I have not.

15  BY MS. GARCIA:

16  Q.  And I would advise you that I don't see it

17      either, but do you see it?

18                  MS. GARCIA:  You're objecting?

19                  MR. SACCHET:  Oh, you used the

20      word text, so I would assume that text

21      implies the notation in the box.

22                  MS. GARCIA:  Oh, thank you.  Okay.

23  BY MS. GARCIA:

24  Q.  Setting aside the box, if we would look at

25      the two-and-a-half pages of narrative text

                        NACHTSHEIM

1
2      that describes the efforts that were taken by

3      this team and the results that they saw, have

4      you seen here today any reference to the

5      patient-warming devices?

6   A.  I do not see anything.

7   Q.  Would you --

8   A.  Outside of the -- outside of the Figure 2.

9   Q.  Correct.  And would you agree with me that

10     the focus of their description of their

11     efforts is the conduct of the surgical teams

12     and the conduct of their approach to surgery,

13     including things like what clogs they're

14     wearing, hour they're washing themselves and

15     their clogs, how patients are being prepared

16     for surgery?

17             MR. SACCHET:  I'm going to object

18     for foundation.

19             THE WITNESS:  You know, I

20     don't have a good summary of all these

21     things, because I'm seeing -- I'm seeing

22     patient experience, 30-day phone calls,

23     surveillance -- I don't know how to -- I just

24     don't have time to --

25             MS. GARCIA:  Okay.

1                      NACHTSHEIM

2              THE WITNESS:  I just don't have

3      time to summarize it all.

4              MS. GARCIA:  To summarize it all,

5      sure.

6  BY MS. GARCIA:

7  Q.  And if we look on page -- the second page of

8      the article, it starts off with, "The SSI

9      bundle"; do you see that?

10  A.  I do.

11  Q.  Do you understand SSI to mean surgical site

12      infection?

13  A.  I did not understand that.

14  Q.  Okay.  You don't know that?

15  A.  I don't know that.

16  Q.  Okay.

17  A.  But I --

18  Q.  It's probably defined in here somewhere.

19  A.  Here it is, "Surgical site infection," first

20      sentence.

21  Q.  Okay.

22  A.  Okay, now I understand it.

23  Q.  And do you see that they first published what

24      they're calling an SSI bundle in 2009?

25  A.  Uh-huh.  Yes.

1                        NACHTSHEIM

2   Q.  And it gave a, "Checklist and how-to guide

3       aimed not only at clinicians, but also at

4       managers and allied health professionals to

5       enable a multidisciplinary approach to the

6       worrying trend of increased SSIs"?

7   A.  Yes, I see that.

8   Q.  Okay.  And then they go through two full

9       pages of describing the efforts that they're

10      doing.  And do you see that at the present --

11              MR. SACCHET:  I'm going to object

12      to the preamble and move to strike it.

13  BY MS. GARCIA:

14  Q.  Would you agree with me that there are two

15      full pages here altogether of description in

16      narrative of the efforts that they're taking,

17      beginning at the, "SSI bundle," and going

18      through, "Patient experience" -- or, I'm

19      sorry, "30-day phone call," going through,

20      "30-day phone call," that's approximately two

21      pages of text?

22  A.  Yes, it's approximately two, I agree.

23  Q.  If you see the reference to the present on

24      the last page of the article, what is the

25      infection rate in 2014?

1                          NACHTSHEIM

2    A.   Five percent to .9 percent, is that what --

3         "The SSI group has been successful in

4         reducing" -- oh, "Reducing the infection rate

5         from 5 percent to 0.9 percent April to June

6         2014."

7    Q.   Do you know what time frame the April to June

8         2014 refers to, whether that's the total time

9         frame of the article, the time frame for

10        the .9 percent or some other thing?

11   A.   The total time frame of this article?

12   Q.   Yeah.

13   A.   I don't know.

14   Q.   Had you known about the --

15   A.   And --

16   Q.   Oh, go ahead.  By context it has to be longer

17        than 2014, right?

18   A.   Right.  And I would very much like to know

19        what the standard errors of those statistics

20        are.  They may tell me nothing.

21   Q.   Okay.  Well, nothing?

22   A.   There may -- there may be no statistical

23        difference between 5 percent and .9 percent.

24        It all depends on the sample sizes they used

25        and how it was collected and so forth.  I'm

1                          NACHTSHEIM

2        just --

3   Q.   Sure.

4   A.   I'm just -- I just don't know what that

5        means.

6   Q.   Fair enough.

7                If you had known the extent -- if

8        this does -- if this paper does reflect

9        changes that were made at locations where

10       infection data were gathered for

11       incorporation in Exhibit 4 --

12  A.   Uh-huh.

13  Q.   -- would you have wanted to provide more

14       detail in Exhibit 4 about the extent of these

15       changes?

16                MR. SACCHET:  Objection;

17       foundation.

18                THE WITNESS:  I think if -- I

19       think if we had known about these, and I

20       can't -- I mean, I can't comment on how --

21       how important one is versus another.  I mean,

22       it could be none of these make any difference

23       whatsoever, I just don't -- I don't know.

24                But I certainly -- yes, I certainly

25       would have wanted perhaps more examples of

NACHTSHEIM

1
2    changes that are going on if we had known
3    about it.  I think that -- I think that helps
4    inform the reader, so, yes.
5  BY MS. GARCIA:
6  Q.  Have you ever seen any analysis of -- if we
7    go back to Exhibit 4, there's a reference to
8    the -- other than a general reference to
9    other -- okay.  Let me -- let me start over
10    and get clear.
11            In Exhibit 4, on that same page
12    we've been looking at, 1543, there is a
13    general statement that, "The data are
14    observational and may be confounded by other
15    infection control measures instituted by the
16    hospital," there's that reference, and then
17    there's a, "For example," and it says,
18    "Changes were made to antibiotic and
19    thromboprophylaxis protocols used during the
20    study," right --
21  A.  Right.
22  Q.  -- just to get us regrounded?
23  A.  And I remember that sentence, but I forgot
24    where you are right now.
25  Q.  Okay.  Page 1543.

1                          NACHTSHEIM

2    A.   Oh.

3    Q.   So the two changes are that specifically

4         identified in this article are antibiotic and

5         thromboprop -- prophylaxis protocols, right?

6    A.   Yes.

7    Q.   Are you aware of any analysis of the data

8         about infections that was used to create

9         Exhibit 4 that holds constant the antibiotic

10        and thromboprophylaxis protocols and then

11        compares a patient-warming device during a

12        period when they had comparable drug use?

13   A.   No.

14   Q.   If it were the case that when the drug use,

15        both antibiotic and anticlotting drugs, are

16        the same, the two patient-warming devices,

17        forced air or conductive fabric, also have

18        the same infection rate, would that be

19        important for you?

20                   MR. SACCHET:  Object to form.

21                   THE WITNESS:  Yes, that would -- I

22        think that -- that's -- that's important.  I

23        think that that's the kind of thing that

24        should be reported.

25   BY MS. GARCIA:

<div align="center">1                      NACHTSHEIM</div>

2    Q.   And why is that?

3    A.   You've just described a situation where two

4         variables are -- are confounded.  And so from

5         the data -- I mean, if they're perfectly

6         confounded in that fashion, we cannot --

7         again, it may have been one factor, the other

8         factor or a combination of the factors that

9         led -- and it could be something else besides

10        that.

11   Q.   Okay.

12   A.   I mean, there could be other interventions or

13        other changes that led to these -- led to

14        changes --

15   Q.   Sure.

16   A.   -- as well.

17   Q.   But you just don't know?

18   A.   But I just don't know.  If I had known

19        that -- if I knew that there -- that there

20        was a change that was sort of coincident, I

21        think it would be worth reporting.

22   Q.   Let me be clear in my question.  I am not

23        asking you to assume that the change in drug

24        protocol was made exactly at the same time --

25   A.   Okay --

                              NACHTSHEIM

1
2  Q.  -- that the warming device selection was
3      made.  I'm asking you -- although that --
4      that could be a different question.
5              If you were able to sort through the
6      data and determine that there -- there were
7      data collected at a time when the two drugs
8      were the same for the forced-air warming and
9      for the conductive fabric, and when the drug
10     use was the same, those two warming devices
11     were -- had the same infection rate, would
12     that be important to you?
13             MR. SACCHET:  Object to form.
14 BY MS. GARCIA:
15 Q.  Even if the change wasn't made at the same
16     time?
17 A.  So let me make sure I understand your
18     question.  So -- which stayed constant?
19     The -- the drug stayed constant?
20 Q.  No, the drug actually changed twice.  What I
21     understand based on Mark Albrecht's testimony
22     is that there was -- and also based on other
23     documents I've seen, that there was a change
24     in the antibiotic.
25 A.  Yes.

NACHTSHEIM

1

2  Q.  There was also a change in the anticlotting

3      drug, and then -- then the anticlotting drug,

4      they went back to what they had originally --

5      they went back to -- let me figure out how to

6      say this, because I'm not sure I have the

7      details perfectly correct.  But what I

8      understand from Mark Albrecht's testimony is

9      that there is a way to isolate the

10     patient-warming unit so that there was a time

11     in which forced-air warming was used with a

12     particular regimen with both antibiotic and

13     prophylaxis clot control, and there was a

14     time when conductive fabric warming was used

15     with the same drug protocol, and at that time

16     the infection rate was the same between the

17     two devices.  Is that important to you?

18              MR. SACCHET:  Object to form.

19              THE WITNESS:  Oh, boy.  So there's

20     certainly -- dang.  So the -- the -- we went

21     from -- there was -- I'm sorry, you said

22     there was a time when -- I'm wondering, did

23     we -- did we change the -- or the -- the

24     blanket?

25  BY MS. GARCIA:

1                          NACHTSHEIM

2    Q.  We are comparing the use of forced-air

3         warming --

4    A.  To --

5    Q.  -- with a particular drug regimen --

6    A.  Okay.

7    Q.  -- with the use of conductive fabric warming

8         with the same drug regimen --

9    A.  With the same drug regimen.

10   Q.  -- and those two warming devices have the

11        same infection rate.  That's important, isn't

12        it?

13                  MR. SACCHET:  Object to form.

14                  THE WITNESS:  So there's a subset

15        in time, in other words, when the -- okay,

16        when the forced air and the conductive fabric

17        have the same infection rates and the drug

18        hadn't changed in those -- or the --

19   BY MS. GARCIA:

20   Q.  The drugs -- you could compare a time, you

21        could isolate and compare a time where they

22        had the same drug regimen, yes.

23   A.  Yeah.  Is that important to me?

24   Q.  Yeah.

25   A.  I certainly think it would be interesting

NACHTSHEIM

1
2    and -- and -- and we could analyze that.  I
3    mean, that's -- there are ways to analyze
4    that.
5  Q.  And you would want to analyze that before
6      presenting to the public a paper that says,
7      we saw this drop in infection rate when the
8      patient-warming device, was made?
9  A.  I certainly would want -- again, you may
10     not -- you may not be able to -- to -- when
11     you -- when you're cutting down -- when
12     you're cutting this interval into smaller
13     intervals where -- where the -- the drug was
14     the same, but the treatment -- but the -- but
15     the conductive fabric was different, you may
16     be in a very small area, you might not be
17     able to show statistically significant
18     differences.  I mean, you have very little
19     power.  I'm just saying yes, I'd want to look
20     at it if I had that data.  I mean, I think
21     I'd want to -- I'd want to eliminate --
22     again, it goes back to wanting to eliminate
23     as much as you can confounding effects.
24 Q.  And would -- would you --
25 A.  Absolutely.

NACHTSHEIM

Q.   -- agree that because the drug regimens are

specifically mentioned in the paper, that's

something that the team of authors considered

important to infection risk?

MR. SACCHET:  Object to form.

THE WITNESS:  I think -- yeah, the

way -- how is it stated again?  It was on

page --

MS. GARCIA:  1543.

THE WITNESS:  1543.

(Reviews document.)

MR. SACCHET:  I'll add foundation

too.

THE WITNESS:  "For example,

changes made to the antibiotic

thromboprophylaxis protocols used during the

study, although no infection control changes

were made after February 2010."  If you're

asking should there have been -- have been an

analysis done, we -- statisticians generally

want to do more analysis the better, we want

to answer all the questions we can.

I suppose that when I read that I

came to the conclusion that we didn't have

1                          NACHTSHEIM

2       sufficient -- that the -- that other people

3       from the hospital who knew this data better

4       than I did concluded that these are examples

5       of other things that changed and we really

6       couldn't carry out -- we weren't going to

7       have the data to carry out the analysis.

8  BY MS. GARCIA:

9  Q.   If you had known the data were there, you

10      would have wanted to carry out the analysis?

11 A.   I -- I think -- I think, yeah, I would have

12      wanted to carry out the analysis.

13 Q.   And if the results showed that when you could

14      control for the drug regimen by comparing

15      like to like, the patient-warming devices

16      were no longer different from each other,

17      that would be relevant to a reader of this

18      paper based on the statements that are made

19      in this paper, Exhibit 4?

20                  MR. SACCHET:  Object to form.

21                  THE WITNESS:  It might be

22      relevant -- it would be relevant.  If we

23      saw -- if we saw no difference we would also

24      have to conduct what's called a power

25      analysis to say did we really have sufficient

1                         NACHTSHEIM

2       data in these windows to make any kind of

3       conclusion.

4                   MS. GARCIA:  Okay.

5    BY MS. GARCIA:

6    Q.  Going back for a moment to the bubbles --

7       actually, I'm going to set this aside for a

8       moment.  I need to talk with you about the

9       other paper.  I think I would like to get to

10      the other paper for a moment.

11                  Well, actually, I wanted to show you

12      this just as a final --

13                  (Whereupon, Exhibit 23 was

14                  marked for identification.)

15   BY MS. GARCIA:

16   Q.  I don't believe I have a colored -- I -- I

17      would have brought it had I thought I had a

18      colored version.  But Exhibit 23 --

19                  MS. GARCIA:  Is that right?

20                  THE COURT REPORTER:  (Nods head.)

21                  MS. GARCIA:  Thank you.  I'm

22      sorry, somehow my exhibits are disappearing.

23   BY MS. GARCIA:

24   Q.  Exhibit 23 is an e-mail from you to

25      Mark Albrecht forwarding your edits to the

1          NACHTSHEIM

2     McGovern paper; is that correct?  And I have

3     both the e-mail and the attached redline as

4     part of Exhibit 23.

5          Actually, let -- let me clarify my

6     question.  The first line of your e-mail

7     says, "Attached are some additional small

8     changes tracked in blue," correct?

9  A.  Yes.

10 Q.  And then there is a copy of a redline

11    manuscript, although we don't have the color

12    available, is that right, here in this room?

13 A.  Okay.  So I think you were asking if this was

14    the McGovern paper?

15 Q.  Yes.

16 A.  And it looks like it is, yes.

17 Q.  And if we looked on the first page of the

18    attachment, which has the ending number 727,

19    there's a redline to Dr. Belani's e-mail

20    address.  Would you have made that?

21 A.  No.

22 Q.  So that's why I'm wanting to clarify.  I

23    think this document might contain some

24    redlines from more people than just you.  But

25    do you believe that this document contains

1                       NACHTSHEIM

2       the edits you did make?

3   A.  So I just found -- finally found some that

4       I'm pretty sure I put in there.

5   Q.  Okay.

6   A.  There were other changes where it was

7       possible, but they were a little more

8       generic, these having more to do with the

9       statistical analysis.

10  Q.  So are you on page 734 where you think you

11      made the redlines?

12  A.  Yes.

13  Q.  And those are in the, Statistical Analysis,

14      section?

15  A.  Yes.

16  Q.  Page 736, in the, Joint Substance Rates,

17      section, there is a section about

18      asymptomatic, and I think you referenced that

19      as having deleted it in your e-mail?

20  A.  Uh-huh.  Yes.  I'm just trying to locate it

21      here.

22  Q.  Page 736 in, Joint Sepsis Rates.

23  A.  Joint Sepsis Rates.  (Reviews document.)

24      Right, I see it now.

25  Q.  At the end of that paragraph there's some

NACHTSHEIM

1
2     revisions to a sentence about the antibiotic
3     regimen and the thromboprophylaxis protocol.
4     Do you believe you made those changes?
5  A. To me that's a fairly cosmetic change, and I
6     might have made it, but I -- I can't say for
7     sure.
8  Q. Okay.  Looking at page 746.
9  A. Okay.
10 Q. Below the figure there's a statement redlined
11    in, "Mark, you don't mean standard error here
12    because the interval is not symmetric, you
13    really mean upper and lower XX percent
14    confidence limits for the mean, I think."  Do
15    you believe you --
16 A. I made that.
17 Q. You did?
18 A. I did.
19 Q. Okay.  Is there any other edits you believe
20    you've ever made to the McGovern paper that
21    are not reflected in this document?
22 A. I don't think of substance.  And -- and --
23    and maybe I -- I know I made more than just
24    those two or three that we talked about, but
25    I know there were a lot of cosmetic changes

<center>NACHTSHEIM</center>

1
2    that I suggested.  And -- and by a lot I mean
3    like nine or ten or something like that.
4  Q.  Okay.
5  A.  But I don't think anything of substance.
6  Q.  Okay.  So they may or may not be included in
7    here, but the only other changes that we
8    don't see in this document would be very
9    minor?
10  A.  It would be -- I think they would be very
11    minor, right.
12  Q.  Okay.  Thank you.  All right.
13        I'd like to switch for a moment to
14    the Belani paper, Exhibit 5.
15  A.  I know I've messed up one of these exhibits.
16  Q.  Oh, do you need help?
17  A.  I need help.  I mean, I've got -- I've got --
18  Q.  I think those two just get clipped together,
19    the two you're holding in front of you.
20  A.  These just get clipped together?
21  Q.  Well, let me -- let me clarify.
22  A.  It's Exhibit 20.
23  Q.  Oh, 20?  Okay.  Let me check on that.
24    According to my record, Exhibit 20 has the
25    first as an e-mail with 1110 on the bottom.

1                          NACHTSHEIM

2   A.   Yes.

3   Q.   And then there is several items, then there's

4        data --

5   A.   1127, 28, 29, 30.

6   Q.   3/12/06, and it ends on a single page.

7   A.   1130.

8   Q.   Yup, 1130.  Yup?

9   A.   And 1199, 1200, 1201 --

10  Q.   Yup.

11  A.   -- 1206.

12  Q.   Yes, and that's the last page.

13  A.   Oh, good.

14  Q.   So if you clip those together, you'll be

15       perfect.

16  A.   I'm stunned.

17  Q.   You got it.

18                What was 21?  Oh, 21 was a copy of

19       the paper.

20                MR. SACCHET:  Was the paper, yeah.

21                MS. GARCIA:  Yeah.  Thank you.

22            So let's mark one more.

23                (Whereupon, Exhibit 24 was

24                marked for identification.)

25  BY MS. GARCIA:

1                          NACHTSHEIM

2    Q.   Exhibit 24 is an e-mail chain, and on the

3         second page is a January 27, 2011, e-mail

4         from Mark to you saying, "Chris, I also have

5         two more in progress that I'm currently

6         writing up that you certainly could be a part

7         of.  The first deals with temperature

8         increases in the laminar flow field due to

9         forced-air warming use."

10              And then I want to skip that, and

11        then the second says -- second study, "We

12        recently completed at the University of

13        Minnesota Hospital two weeks ago assessing

14        laminar flow disruption in the hospital

15        there.  I'll show you the videos from that

16        one when we get together sometime.  Since

17        this was done on your home turf, so to speak,

18        it would be fun to have you as an author on

19        this one also.  The doctors I did this with

20        were Kumar Belani and Paul McGovern."  Do you

21        see that?

22   A.   Yes.

23   Q.   Do you believe that this was your first

24        notice of the work that became Exhibit 5, the

25        Belani study?

1                              NACHTSHEIM

2      A.   Yes.

3      Q.   Did you ever have a conversation with

4           Mark Albrecht or any kind of communication

5           with him about this study before January 27,

6           2011?

7      A.   Not that I recall, no.

8      Q.   So when he first spoke to you about it, the

9           experimental work had already been conducted?

10     A.   Yes.

11     Q.   Do you recall at any time giving

12          Mark Albrecht any feedback, insight, comments

13          about the design or analysis that is

14          reflected in Exhibit 5?

15     A.   I remember -- I believe I remember kind of

16          looking at the data after it had been in and

17          talking about how to present it and so forth,

18          but the experiment had been carried out, I

19          believe, so I -- I guess I was more

20          consulting on the analysis.

21     Q.   And I am -- just to be clear, you produced

22          hundreds of documents that I am in no way

23          representing that I brought all of them down

24          here.  I had to make choices about which ones

25          I wanted to ask about.  So there may well be

NACHTSHEIM

1  
2       a document in which you're providing comments

3       on this study and I don't have a current

4       recollection of that sitting here.

5            But I'm just wondering separate

6       from -- and, obviously, the documents are

7       whatever they are.  Separate from whatever

8       the documents would show, do you have any

9       memory, and I'm thinking of the one you

10      shared earlier this morning, about observing

11      the laminar flow study that you observed, you

12      had some comments on the way that was done,

13      do you have any memory about the way this

14      study was done?

15  A.  No.

16                  MR. SACCHET:  Object to form.

17                  THE WITNESS:  I -- I don't have

18      any memory of commenting on sort of the

19      design or the execution of this.

20  BY MS. GARCIA:

21  Q.  And in terms of the statistical analysis, do

22      you have any memory concretely about what you

23      may have said?

24  A.  I don't have any particular memory about it.

25  Q.  Okay.

1                          NACHTSHEIM

2    A.   It's -- I will say the analysis is going to

3         be very, very similar to -- to the one that

4         was carried out in the other paper.

5    Q.   Okay.  If you'd turn to the last -- well,

6         page 410 of Exhibit 5.  I'm sorry, it's not

7         the last page, it's the last page with text

8         on it --

9    A.   Got it.

10   Q.   -- other than with references.

11             The first full paragraph in the left

12        column says, "It is worth mentioning,

13        however, that the observed disruption was

14        dependent on our exact setup, i.e.,

15        arrangement of draping, lights and personnel,

16        which did not include the presence of

17        instrument trays and a working surgical

18        team."  Do you see that?

19   A.   Yes.

20   Q.   And then the next sentence is, "Thus, we are

21        unsure of the exact degree of ventilation

22        disruption that might occur in a working OR

23        during orthopedic surgery."  Do you see that?

24   A.   I do.

25   Q.   Did you recall -- do you recall having read

                          NACHTSHEIM

1
2       those statements when you reviewed the

3       article?

4   A.  Yes.

5   Q.  Do you agree that including statements like

6       that are important?

7   A.  Yes.

8   Q.  And why is that?

9   A.  I think it's always important to identify

10      the -- there are always study limitations and

11      it's important to identify them.  It can spur

12      either -- additional research by people who

13      read the article in replication follow-up and

14      so forth.

15  Q.  And in particular here, would this kind of a

16      limit mean that the results from the study

17      reported in Exhibit 5 --

18  A.  Okay.

19  Q.  -- could not be generalized to other

20      situations, even an operating room in the

21      University of Minnesota Hospital during

22      actual surgery?

23              MR. SACCHET:  Object; foundation.

24              THE WITNESS:  I think -- in a --

25      in a very strict sense we -- we can talk

NACHTSHEIM

1
2       about the experiment we ran and the changes

3       we ran and -- and the experimental setup, and

4       one can always say well, my -- my room is

5       shaped differently, where -- where someone is

6       standing is going to be different, and that

7       might or might not have an impact on the

8       results.

9   BY MS. GARCIA:

10  Q.  Well, and specifically here, one of the

11      things that's commented on, if we go to that

12      same first full paragraph on the left column,

13      the experimental setup in this study didn't

14      include an instrument tray or a working

15      surgical team, right?

16  A.  Correct.

17  Q.  So during an actual surgery would you expect

18      there to be instrument trays and a working

19      surgical team?

20              MR. SACCHET:  Objection;

21      foundation.

22              THE WITNESS:  I'm really not an

23      expert on that.  I mean, as a layperson, I

24      would probably expect that, yes.

25  BY MS. GARCIA:

1                        NACHTSHEIM

2    Q.   I mean, certainly you would agree that there

3         has to be a surgical team if there's a

4         surgery?

5    A.   I would agree with that, yes.  I was thinking

6         about the tray.

7    Q.   The tray, the instrument tray, okay.

8              But there would be -- the fact that

9         they're identifying in here instrument trays,

10        would indicate to you that there are

11        instrument trays involved in surgery?

12   A.   Right.

13   Q.   And if you read it further down in that

14        paragraph, there's a discussion of, "The

15        head-end surgical light being positioned

16        close to the raised anesthesia drape

17        attributable to the height of our surgeon,

18        six foot three inches, who needed sufficient

19        head room to operate.  Thus, for shorter

20        surgeons, different results might be

21        expected."  Do you see that?

22   A.   I do.

23   Q.   So here they're not only identifying the

24        presence of a surgical team that's working,

25        they're saying even the height of the doctor

1                           NACHTSHEIM

2        we've got might affect the airflow we're

3        observing, right?

4   A.   Exactly.

5   Q.   Okay.  So --

6   A.   If I could add --

7   Q.   Yes.

8   A.   -- it might and it might not.

9   Q.   Sure.

10  A.   We just don't know.

11  Q.   We don't know.  Well, the -- and the wording

12       is, "Might be expected," right?

13  A.   Right.  Exactly.  Right.  But I'm just saying

14       I don't want to say we would expect to see

15       changes if we had a different surgeon.

16  Q.   Sure.

17  A.   I can't say that as a result of this, but I

18       can say it's a possibility.

19  Q.   And it's a possibility significant enough

20       that it was referenced in the paper?

21  A.   Yes.

22  Q.   And then the next thing that's referenced in

23       the paper is saying, "It was necessary to

24       turn surgical lights off during the

25       experiment to allow for consistent bubble

1                        NACHTSHEIM

2       counts in the intersecting light plane.

3       Given that lighting heat sources tend to

4       adversely affect ventilation performance, our

5       results should be considered conservative."

6       Do you see that?

7   A.  Yes.

8   Q.  So lighting is going to make a difference?

9                MR. SACCHET:  Object; foundation.

10               THE WITNESS:  Lighting might

11      possibly make a difference.

12               MS. GARCIA:  Okay.

13               THE WITNESS:  I agree.

14  BY MS. GARCIA:

15  Q.  There is a conclusion here that says,

16      "Therefore," on the last paragraph, "It

17      seems" -- oh, I'm sorry, before we get to the

18      last paragraph, the next paragraph talks

19      about the positioning of the surgical lights,

20      whether it's either in line with the OR table

21      or at the sides of the OR table, which varies

22      by practice in different countries; do you

23      see that?

24  A.  I -- "lights were positioned to the sides of

25      the OR table in the Netherlands study," I see

NACHTSHEIM

1
2     that.  Are you in the -- are you in the --
3  Q.  Yeah, you're right there.
4  A.  Okay.  Yeah.
5  Q.  In the above paragraph -- I'm sorry, I'm
6      going backwards.  Just -- we're climbing up
7      here.
8              "The most recent articles published
9      on the association between Patient Warming
10     Excess Heat:  Ventilation Disruption, present
11     contradictory conclusions.  Two studies in
12     the UK have characterized the airflow
13     patterns," I'm paraphrasing here a little
14     bit, "Supporting the physics behind
15     ventilation disruption in laminar flow ORs,
16     and then in contrast a published study in the
17     Netherlands found no evidence of ventilation
18     disruption due to forced-air excess heat when
19     evaluated with a particular standard that's
20     identified by number"; do you see that?
21  A.  I see that.
22  Q.  And then there's further comments about these
23     differences in placement of the lights,
24     there's comments about differences in the
25     release of bubbles.  And the concluding

1                    NACHTSHEIM

2       paragraph is, "Therefore, it seems that

3       future research is warranted to characterize

4       the clinical conditions under which

5       forced-air warming excess heat results in

6       ventilation disruption during surgery."

7       Would you agree with that statement?

8  A.   I agree.

9  Q.   And the -- the factors they're identifying

10      that one should account for are draping,

11      ventilation airflows, flow obstructions

12      including lighting, instrument trays and

13      personnel movements, each of which has been

14      identified as affecting the phenomenon; do

15      you see that?

16 A.   I do.

17 Q.   Do you agree with that?

18                  MR. SACCHET:  Objection;

19      foundation.

20                  THE WITNESS:  I'm -- I'm -- it's

21      beyond -- it's been a long time and so I'm a

22      little bit unclear.  It says that all these

23      things, draping, ventilation -- draping for

24      sure, we -- we've done that in some of the

25      experiments.  Ventilation airflow, flow

1                      NACHTSHEIM

2      obstructions, personnel movements and all

3      those things, I'm presuming that we were

4      referring to some other studies, because it

5      wasn't part of our -- wasn't part of our

6      work.

7                   MS. GARCIA:  Right.

8                   THE WITNESS:  And I wasn't aware

9      that any of the studies had included

10     personnel movements and -- and different

11     ventilation airflows.  I'm not saying they

12     weren't, I'm just saying I'm not aware of

13     that.

14  BY MS. GARCIA:

15  Q.  Would you agree that the Belani study by

16      itself does not establish that the use of

17      forced-air warming causes any impact on the

18      airflow in an active surgical operating room?

19                  MR. SACCHET:  Object to form.

20                  THE WITNESS:  Would I -- please

21      read the question.

22                  (Whereupon, the last question

23                  was read by the court reporter.)

24                  THE WITNESS:  That the Belani

25      study --

```
 1                         NACHTSHEIM
 2               (Whereupon, the last question
 3               was read by the court reporter.)
 4               THE WITNESS:  I'm not sure what
 5       basis I have to make that conclusion.  It
 6       certainly seems to establish that under
 7       certain conditions it -- there's an effect on
 8       airflow.
 9               MS. GARCIA:  Okay.
10   BY MS. GARCIA:
11   Q.  And whatever -- that's the experimental
12       conditions reflected in the paper?
13   A.  Right.
14   Q.  Okay.  And are you, though -- the paper
15       itself expresses as a limit that it is not
16       able to -- the paper itself expresses the
17       limit that the results are dependent on the
18       exact setup of the experiment, right?
19   A.  I think -- I think we're saying it's -- yes,
20       to a certain degree.  We're very -- we're
21       aware of the fact that moving -- moving
22       people around and so forth could lead to
23       different -- different results, could
24       potentially lead to different results.
25   Q.  Well, the sentence in the article is, "It is
```

NACHTSHEIM

1

2      worth" -- let's get there together.  Left

3      column.  "It is worth mentioning" --

4  A.  Wait a minute.

5  Q.  Oh, sorry.

6  A.  Where are we again?  "It is worth

7      mentioning," okay, got it.

8  Q.  "It is worth mentioning, however, that the

9      observed disruption was dependent on our

10     exact setup, i.e., arrangement of draping,

11     lights and personnel, which did not include

12     the presence of the instrument trays and a

13     working surgical team, thus, we are unsure of

14     the exact degree of ventilation disruption

15     that might occur in a working OR during

16     orthopedic surgery," right, that's what the

17     article says?

18 A.  Yeah, it does say that, and my name is -- my

19     name is on this paper.  I think -- I think

20     that sentence was just a little bit too

21     strong, because they say that the observed

22     disruption -- disruption was dependent on our

23     exact setup.

24 Q.  Uh-huh.

25 A.  We really didn't show that.  You would need

Page 246

                              NACHTSHEIM

1

2      to use a different setup or you'd need to

3      change that setup and see changes to say

4      that -- you know, that we've demonstrated

5      that it's dependent on this exact setup.  I

6      think what -- what's -- what's really being

7      said here is that there's a possibility that

8      changing the setup will change the results.

9   Q.  That's actually an excellent point that I

10     wanted to ask you about.

11            Are you aware of how many different

12     setups they tried before arriving at the one

13     that was used to generate the data reflected

14     in this paper?

15            MR. SACCHET:  Asked and answered.

16            THE WITNESS:  I have -- yeah,

17     it's -- I -- I'm not aware.

18            MS. GARCIA:  Okay.

19  BY MS. GARCIA:

20  Q.  And if one were to draw conclusions about the

21     impact of forced-air warming devices on

22     surgical operating rooms in general, separate

23     from the exact experimental setup represented

24     here --

25  A.  Okay.

1                          NACHTSHEIM

2   Q.  -- would it be important to conduct some

3        additional experiments to change some of

4        those variables and see how replicable the

5        results were?

6   A.  I think so, yes.

7   Q.  And is the importance of that highlighted by

8        some of the different results that are

9        reported in the context of the rest of this

10       paper?

11                  MR. SACCHET:  Object to form.

12                  THE WITNESS:  I -- I think we're

13       saying that that's something that's -- that

14       could very well impact how all this works.

15  BY MS. GARCIA:

16  Q.  So based on the work that is reported in

17       Belani and the work that is collected in

18       Belani from other papers, would one be able

19       to take away any particular expectation that

20       they could apply to their own operating room

21       and say this work tells me what I'm going to

22       see if I use a forced-air warming device in

23       my operating room?

24                  MR. SACCHET:  Object to form,

25       object to foundation, calls for a medical

1                         NACHTSHEIM

2        opinion.

3                     THE WITNESS:  Well, I think we

4        know that when you say, "In my operating room

5        it's going to be different," then it's

6        probably going to be -- there has to be some

7        differences.  And so could those differences

8        lead to different -- changes in the way

9        things are disrupted or if they're disrupted

10        at all, well, we certainly can't answer that

11        from this study and -- and so someone

12        would -- someone could probably say my -- my

13        operating room is set up a little

14        differently, so this doesn't apply to me.

15        But there's -- we don't have any -- we don't

16        have data that -- that says that is

17        necessarily the case.

18   BY MS. GARCIA:

19   Q.  We don't know one way or the other?

20   A.  We don't know one way or the other.

21   Q.  The Belani study does not report on any

22        infection risk at all --

23   A.  Right, no.

24   Q.  -- at the University of Minnesota Hospital,

25        correct?

1                          NACHTSHEIM

2   A.  No.

3   Q.  I'm sorry, that was a bad question, because I

4       said correct and you said no.

5   A.  I'm sorry.  My fault.

6   Q.  Does -- no, it was mine.

7              Does the Belani study report on any

8       infection data at all?

9   A.  No.

10  Q.  Thank you.

11             Would you agree with me that the

12      Belani study does not establish that the use

13      of a forced-air warming device to warm

14      patients during surgery causes any increase

15      in infection risk?

16             MR. SACCHET:  Object to form.

17             THE WITNESS:  It does -- it does

18      not show any increase in infection rates.

19  BY MS. GARCIA:

20  Q.  That's what you agree with?

21  A.  I agree with that.

22  Q.  And would you agree that that is true whether

23      we look at the Belani study alone or whether

24      we look at it also in connection with the

25      other papers cited within it?

1                    NACHTSHEIM

2              MR. SACCHET:  Object to

3      foundation.

4                  THE WITNESS:  The last phrase

5      threw me a little bit, because you mentioned

6      all the other papers mentioned within it.

7                  MS. GARCIA:  There's a reference

8      list attached to --

9                  THE WITNESS:  But I would say

10     that -- I don't -- hold on.  I don't recall

11     that any of the other papers that are

12     mentioned actually have -- have a -- even

13     looked at infection rates or certainly didn't

14     establish any causal links, infection rates.

15     Again, that comes back to needing to do a

16     clinical trial of some kind.

17  Q.  I don't believe I asked you -- with respect

18     to going back again to Exhibit 4, McGovern.

19     We've talked a lot about the bubbles in

20     general, but I don't believe I asked you, I

21     just want to be clear, the same limits that

22     we just talked about for the Belani paper

23     about whether or not the observed effects on

24     airflow in an operating room -- I'm sorry,

25     let me ask this again.

1                         NACHTSHEIM

2              I apologize if I've already asked

3       this before, but then let's strike that

4       predicate and let me just start a clean

5       question, which is, the McGovern paper,

6       Exhibit 4, does also report on impacts on

7       airflow that are observed through bubble

8       counting depending on the warming device

9       used, correct?

10   A.  Correct.

11   Q.  For the same reasons we discussed in

12       connection with the Belani paper, Exhibit 5,

13       is it correct to say that one would not know

14       if what was observed in the McGovern study

15       would apply to some active operating surgical

16       room?

17                   MR. SACCHET:  Object to

18       foundation.

19                   THE WITNESS:  In the same way, I

20       think that's correct.  There was -- there was

21       one particular setup in that paper.  I mean,

22       they changed the height of the drape, but

23       otherwise there was one setup and -- and so

24       the same qualifications apply.

25                   MS. GARCIA:  I think I may be

1                    NACHTSHEIM

2  done, but if -- why don't we go off the

3  record for five minutes and just let me

4  review my notes and check in with Deborah

5  real quick, if that would be okay.

6            THE VIDEOGRAPHER:  We're going off

7  the record at 3:21 p.m.

8              (Whereupon, a brief recess

9              was taken.)

10           THE VIDEOGRAPHER:  This is

11 video number 5 in the deposition of

12 Christopher Nachtsheim.  Today is November

13 29th, 2016.  We're going back on the record

14 at 3:30 p.m.

15           MS. GARCIA:  Professor Nachtsheim,

16 thank you, I have nothing further.

17       Do you have questions?

18           MR. SACCHET:  I do.

19           MS. GARCIA:  Okay.  I just wanted

20 to make clear, under the Federal Rules of

21 Civil Procedure you do have an ability to

22 read the transcript and make any corrections

23 that you feel are needed.  You have the

24 opportunity to waive that right.  And at the

25 conclusion of today, you just let us know

1                    NACHTSHEIM

2  what you would prefer, or now, just let us

3  know if you'd prefer to read the transcript.

4           THE WITNESS:  I'd like to read it.

5           MS. GARCIA:  And can I please

6  have -- just to make this clear on the

7  record, because we had a confusion about it

8  before, would you directly provide the

9  transcript to him?

10          THE COURT REPORTER:  I will.

11          MS. GARCIA:  Thank you.

12       And the address you provided, I

13  can't remember if you provided -- you did say

14  St. Paul.  What's the zip code, just to make

15  it easy?

16          THE WITNESS:  It's St. Paul.

17          MS. GARCIA:  Okay.  The zip code?

18          THE WITNESS:  1789 Summit Avenue.

19          MS. GARCIA:  I'm sorry, the zip

20  code?

21          THE WITNESS:  55105.

22          MS. GARCIA:  Thank you.

23          MR. SACCHET:  Okay.  Just give me

24  one second.

25                    EXAMINATION

1                          NACHTSHEIM

2    BY MR. SACCHET:

3    Q.   Professor Nachtsheim, as I mentioned this

4         morning, my name is Michael Sacchet.  I

5         represent the plaintiffs in this matter.

6                  For the sake of just, you know,

7         laying out the ground rules once more to

8         mention, if I ask questions, please respond

9         verbally just as you did for Ms. Garcia.  And

10        in the same vein, please let me answer -- or

11        ask the questions before you answer them as

12        well, okay?

13   A.   (Nods head.)

14   Q.   I'd like to turn back to the CV, which was

15        previously marked as Exhibit 3.

16                  MS. GARCIA:  Would you like me to

17        go get the updated one?

18                  MR. SACCHET:  No, that's fine.

19                  MS. GARCIA:  Okay.  Before we

20        leave today we should probably go get that.

21                  MR. SACCHET:  Yeah.

22                  MS. GARCIA:  I'm sorry.  I

23        apologize for interrupting.

24                  MR. SACCHET:  Yeah, no worries.

25                  MS. GARCIA:  I'll do that before

1                         NACHTSHEIM

2      we sign-off.

3                  MR. SACCHET:  Yeah.  We'll just

4      work off the --

5                  MS. GARCIA:  Okay.

6                  MR. SACCHET:  -- the one that you

7      were working off of.

8   BY MR. SACCHET:

9   Q.  So from what I can tell in the document,

10      you've delineated your education,

11      professional experience, honors and awards,

12      elected offices, editorial awards, textbooks,

13      publications, courses taught and some

14      conferences you've presented; is that

15      correct?

16  A.  Correct.

17  Q.  Let's start at the top of the document with

18      respect to your education.  If you wouldn't

19      mind just providing a quick background of

20      your BA, MS and Ph.D., please.

21  A.  I received my bachelor's degree in

22      mathematics and quantitative methods at the

23      University of St. Thomas, college of

24      St. Thomas at that time.  Went from there to

25      Rensselaer Polytechnic Institute for a

1                         NACHTSHEIM

2       master's degree in -- in operations research

3       and statistics.  Returned -- returned to

4       Minnesota, went to the University of

5       Minnesota where I did a Ph.D. in operations

6       research.

7  Q.   What does the term operations -- operations

8       research exactly mean?

9  A.   Operations research really means -- it's

10      really mathematics applied to operations

11      problems in -- usually in business, large

12      operations.  It started in World War II with

13      logistics and so forth with regard to troops

14      and so forth, but it has to do with

15      optimizing business processes and so forth.

16            But much of the -- much of the

17      background that one gets in operations

18      research, for Ph.D.s in operations research,

19      can be very, very similar to what people get

20      in Ph.D.s in statistics.

21            And, in fact, most of my coursework,

22      because I already had a master's in

23      operations when I came, most of my coursework

24      was in the statistics department.  And --

25      and, in fact, my thesis advisor is a

NACHTSHEIM

1
2       statistician and was in the stat -- was in
3       the statistics department.
4   Q.  And your thesis advisor is Professor
5       Dennis Cook?
6   A.  Correct.
7   Q.  And your thesis was entitled, "Contributions
8       to Optimal Experimental Designs"?
9   A.  Correct.
10  Q.  What do you mean by the term, "Optimal
11      experimental designs"?
12  A.  So when we design an experiment we want to
13      get as much information as we can with the
14      fewest number of observation possible.  And
15      so we can actually formulate this as a
16      mathematical problem and -- and find an
17      optimal solution to the mathematical problem,
18      and that's called an optimal experimental
19      design.
20  Q.  And after you graduated with your Ph.D. you
21      spent two or three years in the private
22      sector, correct?
23  A.  I did.  I first was in Los -- at Los Alamos
24      National Laboratory for three years in
25      the statistics group, and then went to

Page 258

1                          NACHTSHEIM

2        General Mills.

3   Q.   And from there you entered academia?

4   A.   Yes.

5   Q.   When did you receive tenure?

6   A.   I received tenure, I believe it was 1988.  Is

7        that right?  I think I have it here.

8        (Reviews document.)  Let's see, I came

9        in '84.  Yeah, I believe it was 1988.

10  Q.   It says it in the last line.

11             And you were appointed the Associate

12       Dean of Faculty and Research in 1996?

13  A.   Nineteen ninety -- yes, 1996.  I was

14       appointed Department Chair in '93 and then

15       Associate Dean of Faculty in '96.

16  Q.   What were your responsibilities as the

17       Associate Dean of Faculty?

18  A.   I was the COO of the business school.  When

19       you're Associate Dean of Faculty, you're the

20       number two person in the business school, you

21       report to the Dean, and all of the faculty

22       report through the departments to you.  I was

23       also in charge of information systems and

24       personnel and nearly everything.

25             The way it was set up, you basically

Page 259

NACHTSHEIM

1

2      run the business school, the Dean is

3      responsible for raising funds and -- and

4      external relations and so forth.

5  Q.  And how long were you in that position for?

6  A.  I was in that for four years.

7  Q.  Okay.  And then what did you transition to?

8  A.  So I transitioned to -- I had two years as a

9      regular faculty member, full professor, and

10     then I was asked to be department chair

11     again, and so I became department chair, I

12     did that for the next 12 years.

13 Q.  And you were a department chair in operations

14     management?

15 A.  It's called operations, and we changed names,

16     operations in management science, and the

17     name was changed to supply chain and

18     operations a few years ago.

19 Q.  Okay.  And I think we've established that

20     Exhibit 3 is not up to date.  Are you still

21     in that position now or have you changed to

22     something new since 2011, 2012?

23 A.  Oh, it's -- this has me as the -- as chair of

24     supply chain and operations, and I'm no

25     longer chair.

1                          NACHTSHEIM

2    Q.   Okay.

3    A.   In 2014 I reverted to being a faculty member,

4         and also somewhere in there I became a

5         chaired professor.  So those things would be

6         reflected in the -- in the new guide, the new

7         version of the resume.

8    Q.   So for the past 20 years or so in academia,

9         it appears that you've received a number of

10        honors and awards, correct?

11   A.   Correct.

12   Q.   You've received the Brumbaugh Award three

13        times, at least?

14   A.   Four times now.  It's reflected in -- in the

15        new resume.

16   Q.   What was that award given to in the most

17        recent year?

18   A.   I believe it was 2015.

19   Q.   Okay.  And for what?

20   A.   It's for the paper published in the area of

21        quality that has the biggest impact on -- no,

22        no, that's a different award.  It's basically

23        the best paper published in the area of

24        quality.

25   Q.   And by, "Quality," does that involve

1                          NACHTSHEIM

2      statistics?

3   A.  Yes, it does.  Because we have things like

4       statistical process control and business

5       process -- or process improvement, these are

6       all heavily statistics.

7   Q.  Would it be fair to say that you've earned at

8       least eight awards for publishing papers in

9       the field of statistics?

10  A.  Yes.

11  Q.  And you've also been elected as the fellow of

12      the American Statistical Association?

13  A.  Yes.

14  Q.  What do your responsibilities as a fellow

15      entail?

16  A.  It's really an honor.  It's -- I think it's

17      less than 1 percent of -- of professional

18      statisticians are elected as fellows.

19  Q.  Do you view the other fellows in the

20      association as luminaries in the field?

21  A.  I do.

22                  MS. GARCIA:  Object to the form of

23      that question.

24  BY MR. SACCHET:

25  Q.  Do you -- do you view them as experts in the

1                          NACHTSHEIM

2      field?

3   A.  I view them --

4                  MS. GARCIA:  Object to the form of

5      the question.

6                  THE WITNESS:  I -- I -- I view

7      them as experts in the field.

8   BY MR. SACCHET:

9   Q.  And prior to that you were the chair of the

10      section on physical and engineering sciences

11      for the association, and then thereafter you

12      were the president of the Twin Cities

13      Chapter, correct?

14  A.  Yes.

15  Q.  Were you elected as the president of the

16      Twin Cities Chapter?

17  A.  Yes, I was.

18  Q.  How many people are in the Twin Cities

19      Chapter?

20  A.  I -- I don't know, but I'm -- I'm going to --

21      I'm going to guess the number is probably

22      200, something like that.

23  Q.  Is Professor Cook a member?

24  A.  Yes.

25  Q.  And Professor Cook is a nationally-known

Page 263

1                          NACHTSHEIM
2       statistician?
3   A.  Yes, he is a nationally -- he's a -- he's an
4       internationally known statistician.
5   Q.  So at least one internationally-known
6       statistician, presumably, nominated you to
7       become president of the Twin Cities Chapter
8       of the American Statistical Association?
9   A.  Yes.  Well -- well, you know, frankly, I'm --
10      I don't know who nominated me and I don't
11      know how Dennis -- how Professor Cook voted,
12      so I can't really say anything about that,
13      but...
14  Q.  You were elected by a body of people who were
15      all members?
16  A.  But I was elected by a body of people,
17      correct.
18  Q.  And you were also on various editorial
19      boards?
20  A.  Yes.
21  Q.  And some of those boards involve statistical
22      papers?
23  A.  So it -- yes, those are all -- those are all
24      statistics journals, they're all top
25      statistics journals and it involves

1                          NACHTSHEIM

2          conducting peer review and making

3          recommendations about publications in those

4          journals.

5     Q.   Is the American Statistician a preeminent

6          journal?

7     A.   Yes, it is.

8     Q.   And you receive papers every now and then to

9          evaluate and determine whether they should be

10         published or not?

11    A.   Correct.

12    Q.   And you've been doing that for at least five

13         years?

14    A.   I've been doing -- yes, I've been doing that

15         off and on probably for 25 years.

16    Q.   So you're well familiar with the peer review

17         process?

18    A.   I am.

19    Q.   And you've also published at least two

20         textbooks, potentially three, based on the

21         business statistics data driven

22         decision-making that was in progress at the

23         time this resume was --

24    A.   And I've kind of -- that's been on the --

25         it's two-thirds completed and it's been on

                        NACHTSHEIM

1

2      back burner because I've been so busy with

3      research, but the other two books.   So

4      there's really just two books.

5  Q.  Okay.   And you've published at least 58 peer

6      reviewed articles, correct?

7  A.  Yes.

8  Q.  What percentage of these -- of those articles

9      would you determine to be related to

10     statistics?

11              MS. GARCIA:   Object to the form of

12     the question.

13              THE WITNESS:   So I -- I -- I --

14     I -- I -- I think probably 95 percent of them

15     are purely in statistics methodology, then

16     there are some application papers, and these

17     papers -- the papers, for example, Exhibits 4

18     and 5, are examples of applications papers

19     that are related to statistics, but are not

20     published in a statistics journal.

21  BY MR. SACCHET:

22  Q.  What is your understanding of the peer review

23      process?

24  A.  My -- the peer review -- my understanding of

25      the peer review process is that a paper is

1                         NACHTSHEIM

2          submitted to a journal, the journal editor

3          generally looks at it and decides whether it

4          is -- has a chance of being published, and --

5          and if not, rejects them out of hand.

6                    If they -- if he feels -- he or she

7          feels that it's a -- has potential, it may

8          be -- it may be a rigorous, useful study,

9          it's either passed on to a board of -- in my

10         field, generally, it's an editorial board,

11         and he can -- and he or she can pick people

12         from the board and ask them to conduct a --

13         be referees of the paper, review the papers,

14         or it's handed off to an associate editor who

15         then brings in experts, and those experts are

16         always experts in the particular field

17         related to the paper, in the subfield related

18         to the paper.

19    Q.   So there's at least one referee expert or

20         another individual, whatever their title may

21         be, that evaluates the paper and determines

22         whether it has met specific scientific

23         criteria in order to be published as a peer

24         reviewed publication?

25    A.   Correct.  Usually there's -- there's an

NACHTSHEIM

1

2       editor review and associate editor review and

3       two -- two -- two referees, so there's

4       generally three or four reviews.

5   Q.  And Exhibits 4 and 5, namely, the McGovern

6       article and the Belani article, went through

7       that process, correct?

8   A.  Yes.

9   Q.  And at least one independent person reviewed

10      those manuscripts and determined that they

11      were suitable to be published in the

12      respective journals?

13  A.  Yes, they did go through -- they went through

14      the peer review process.

15  Q.  You've also performed funded research before,

16      correct?

17  A.  I've performed funded research, yes, some.

18  Q.  And you've done some --

19  A.  But I do want to make a distinction.  My

20      colleagues in the statistics department or

21      industrial engineering departments do much --

22      or biostatistics do much, much more of this.

23      I happen to be in a business school where our

24      focus is -- we need to focus -- we focus on

25      teaching and much of our research is funded

NACHTSHEIM

1
2      by the school, so there's not -- there isn't
3      the same kind of expectation of -- of raising
4      external funds --
5   Q.  Okay.
6   A.  -- in a -- in a business -- that's standard
7      in -- in top business schools.
8   Q.  And you have received funding from private
9      organizations and public, i.e., governmental
10     entities, correct?
11  A.  Right.  Yes, I have.
12  Q.  And one of those private entities was 3M,
13     correct?
14  A.  Well, I don't know that I did research for
15     3M.  They -- they paid me to come and give
16     workshops, things of that nature, but I --
17     and I've done -- I've maybe done some
18     consulting.  Is there something in particular
19     which you --
20  Q.  Yeah.  If you want to turn to page 9, there's
21     a 3M McKnight Foundation grant that was
22     awarded in 1987.
23  A.  Ah, right.  So 3M provides the funds, and the
24     McKnight Foundation awarded the -- the
25     research money, so it wasn't directly for 3M.

1                          NACHTSHEIM

2   Q.  Fair enough.

3             And you also have taught numerous

4        courses at both the University of Minnesota

5        and the Carlson School, correct?

6   A.  Yes, I have.

7   Q.  And the majority of those courses involved

8        statistics?

9   A.  All of them involved statistics.

10  Q.  And they also involve optimal design of the

11       experiments?

12  A.  The doctoral courses that I teach in

13       experimental design involve optimal design.

14       I -- I -- I teach MBA classes and executive

15       MBA classes, and that's a little too

16       advanced.

17  Q.  Okay.

18  A.  So -- so I don't teach optimal design in

19       those, but I do teach some experimental

20       design at a simplified level and then all of

21       the other materials that go into a statistics

22       class for analyzing data and regression

23       analysis, things of that nature --

24  Q.  And you've --

25  A.  -- hypothesis testing, all that.

1                              NACHTSHEIM

2    Q.   And you've taught at least ten different

3         classes involving statistics in your career

4         at the University of Minnesota?

5    A.   Yes.

6    Q.   And some of those classes involve

7         multivariate analysis?

8    A.   Yes.

9    Q.   And some of them involve univariate analysis?

10   A.   Correct.

11   Q.   Some of them touch on observational studies?

12   A.   Yes.

13   Q.   And some of them involve Poisson regression?

14   A.   Yes.  Let me be -- let me be careful about

15        Poisson -- yes, I have taught -- in my

16        regression class I have taught Poisson

17        regression, yes.

18   Q.   Based on --

19   A.   That's at a doctoral level.  That's at a

20        doctoral level.

21   Q.   Based on your experience as a professor, the

22        publications that you've contributed to the

23        textbooks that you've published, you've been

24        asked to serve as an expert witness in a

25        variety of matters, correct?

NACHTSHEIM

1

2  A.  Correct.

3  Q.  And you've done so for a variety of different

4      clients whether they be defendants or

5      plaintiffs, correct?

6  A.  Correct.

7  Q.  And at no point in time had you received

8      compensation for that consulting, did that

9      taint your views as to the legitimacy or

10     truth of what you were testifying in those

11     cases, did it?

12 A.  I'm not aware that it did.

13 Q.  So I assume that there are some items on your

14     resume, current resume that are not reflected

15     in this version that we've been discussing,

16     and I'd like to touch on those a little bit.

17     You wrote and contributed to an article that

18     was published in Technometrics, correct,

19     entitled, "Optimal Design for Engineering

20     Dimensional Analysis"?

21 A.  Yes, I did.  Yes.

22 Q.  The paper was nominated and both selected to

23     be a discussion paper?

24 A.  It was.

25 Q.  Had you, prior to that time, ever been

                          NACHTSHEIM

1

2      awarded that designation for publishing --

3   A.  Yes, I had, a couple -- probably two or three

4      times.

5   Q.  Okay.  What does it mean to have a discussion

6      paper?

7   A.  For that particular paper, the editor looked

8      at -- the editor tends to look at the papers

9      that have been published within the last year

10      and selects one of the top maybe two or three

11      papers and asks that paper to -- asks that --

12      those authors to present the paper in

13      what's -- in a -- in a special session at the

14      national conference.

15   Q.  The national conference of statisticians?

16   A.  Yeah.

17   Q.  So the Technometrics article entitled,

18      "Experimental Design for Engineering

19      Dimensional Analysis," was a statistical

20      paper?

21   A.  Yes, it is.

22   Q.  And by being asked to present it as a

23      discussion paper, it presumably had notable

24      impact on the field, correct?

25   A.  Yes.

1                        NACHTSHEIM

2   Q.   And were there members of the panel whom

3        discussed the paper with you at that national

4        convention on statistics?

5   A.   Yes.

6   Q.   Who were those members?

7   A.   There were three -- I think there -- I

8        believe there were three or four other

9        statisticians globally famous in the area of

10       experimental design.  There was one from

11       England, Professor Jeff Wu from Georgia Tech.

12       There are a couple others, but they're all

13       very big names.  They're all --

14  Q.   Was the discussion well-received?

15  A.   It was very well-received.  And by the way,

16       that paper, and I just checked on this about

17       a month ago, that paper won the -- first of

18       all, won something called the Youden --

19  Q.   Yeah, I'm going there.

20  A.   Oh, you're getting there.

21  Q.   But go ahead.

22  A.   It's also -- it's also the most downloaded

23       paper in the history of Technometrics.  It's

24       still number one in terms of the most

25       downloaded.

1                          NACHTSHEIM

2    Q.   And Mark Albrecht was a coauthor of that

3         study, correct?

4    A.   Correct.

5    Q.   And he was similarly entitled to receive the

6         discussion paper nomination that you had

7         received?

8                   MS. GARCIA:  Object to the form of

9         the question.

10                  THE WITNESS:  He -- we received it

11        together.

12   BY MR. SACCHET:

13   Q.   And as you mentioned, the paper was selected

14        to receive the Youden award, correct?

15   A.   Yes, it received the -- the Youden prize,

16        which is given for the best paper in

17        Technometrics that year.  And by the way, I

18        should mention, this was his master's thesis.

19   Q.   Yeah.

20   A.   Okay.

21                  MS. GARCIA:  Can we pause?  Are

22        you going to ask more questions about the

23        updated CV?  Because if you are, I'd really

24        like to go get it so I have it in front of

25        me.

1                      NACHTSHEIM

2                 MR. SACCHET:  No, I'm -- I'm

3      basically moving on right now.

4                 MS. GARCIA:  Okay.

5                 MR. SACCHET:  I've got about two

6      more questions on -- on -- on the CV.

7                 MS. GARCIA:  Okay.  Do you have it

8      in front of you?

9                 MR. SACCHET:  The updated CV?

10                 MS. GARCIA:  Yes.

11                 MR. SACCHET:  I do not.

12                 MS. GARCIA:  Okay.

13                 MR. SACCHET:  I've just read the

14      documents and found out that all these awards

15      occurred in the time period in which --

16                 MS. GARCIA:  Thank you.

17                 MR. SACCHET:  Yeah.

18   BY MR. SACCHET:

19   Q.  You were also asked to be a guest speaker at

20       the 2013 Randy Sitter Techno -- Technometrics

21       conference, were you not?

22   A.  I was.

23   Q.  What types of individuals give that

24       presentation on a yearly basis?

25   A.  Well, if you're asked to -- to speak at a

1                         NACHTSHEIM

2        conference of that level, you have to have a

3        fairly wide reputation as an active

4        contributor to current research.

5    Q.  Based on the honors you've received, the

6        awards that you've received on your

7        publications, would you consider yourself an

8        expert in statistics?

9    A.  Yes.

10   Q.  What about experimental design?

11   A.  Yes.

12   Q.  Third parties recognize you, similarly, to be

13       expert in statistics, correct?

14   A.  Yes.

15   Q.  The Carlson School holds you out to be an

16       expert in statistics?

17   A.  Yes.

18   Q.  The Carlson School holds you out to be an

19       expert in experimental design, regression

20       analysis, and analysis of variance, quality

21       improvement methods, data mining and

22       predictive modeling; isn't that true?

23   A.  This is true.

24                   MS. GARCIA:  Object to the form of

25       the question.

1                          NACHTSHEIM

2                    THE WITNESS:  Yes, it's true.

3    BY MR. SACCHET:

4    Q.  And a newspaper or news source called,

5        The Motley Fool, recently interviewed you

6        to opine on data regarding Tesla --

7        Tesla Motors, correct?

8    A.  Yes.

9    Q.  And do you know whether in that article you

10       were named an expert in the design of

11       experiments?

12   A.  I believe I was.

13   Q.  Did you know that 3M has recently sought out

14       your expertise in terms of design and

15       statistics-related issues?

16                   MS. GARCIA:  Object to the form of

17       the question.

18                   THE WITNESS:  They have asked me

19       to give -- yes, they have.  Yes, they have

20       recently in a -- in a couple of different

21       forms.

22                   (Whereupon, Exhibit 25 was

23                   marked for identification.)

24   BY MR. SACCHET:

25   Q.  Do you see at the top of the document there

                         NACHTSHEIM

1

2       is an e-mail from a woman named Jennifer Yi?

3    A.    I do.

4    Q.    Based on the document, can you see that

5          Jennifer Yi is a senior technical manager of

6          the patient-warming infection prevention

7          division of 3M?

8    A.    I do.

9    Q.    Can you see that Jennifer Yi wrote an e-mail

10         to an individual named Al Van Duren along

11         with numerous other individuals on 4/30/2015

12         at 6:10 p.m.?

13   A.    Six -- oh, in the middle, 6 -- oh, wait a

14         minute.

15   Q.    At the top.

16   A.    At the top, sorry.  Sorry, I jumped down.

17         Okay.  Yes, I see that.

18   Q.    And the subject line is forwarding an e-mail

19         entitled, "Statistical Practitioners Forum

20         Advanced DOE Class."

21   A.    Yes, I see that.

22   Q.    And below that e-mail do you see an e-mail

23         from a Jennifer Zoller?

24   A.    I do.

25   Q.    And it is sent to US-IP Lab, correct?

1                      NACHTSHEIM

2   A.   Yes.  US-IP Lab, yes.

3   Q.   And the text of the e-mail states -- of that

4        e-mail states, "Mike Besser highly recommends

5        this web stream and associated class, Jen";

6        do you see that?

7   A.   Yes.

8   Q.   And the e-mail below that is an e-mail from

9        Mike Besser, correct?

10  A.   Yes, it is.

11  Q.   Same subject title, "Statistical

12       Practitioners Forum Advanced DOE Class,"

13       correct?

14  A.   Yes.

15  Q.   And Mr. Besser states, "I'm not sure if

16       anyone attended the Intro on Definitive

17       Screening Designs.  I've listened to the

18       recording link below and found this to be a

19       very intriguing and practical concept that

20       our stats practitioners may find useful.

21       There's a follow-up two-day course exclusive

22       to 3M'ers per Stu's attached e-mail"; do you

23       see that as well?

24  A.   Yes.

25  Q.   And below that there's a link?

1                          NACHTSHEIM

2    A.  Yes.

3    Q.  If you turn the page, there's an e-mail from

4        Stuart Janis, who is mentioned in the prior

5        e-mail?

6    A.  Yes.

7    Q.  And that e-mail states, "The statistical

8        practitioners forum and the tech forum

9        product design and development chapter are

10       hosting a class on advanced DOA covering

11       definitive screening designs, custom designs

12       and split plot designs for hard to change

13       factors.  This class will be taught by

14       Professor Chris Nachtsheim."  Do you see

15       that?

16   A.  I do.

17              MS. GARCIA:  Object.  It also

18       says, "And Brad Jones."

19              MR. SACCHET:  That is correct.

20       Noted.

21   BY MR. SACCHET:

22   Q.  And on the final page bearing Bates number

23       3MBH01293499 --

24   A.  Uh-huh.

25   Q.  -- under, "Instructors," it notes, "Brad

                        NACHTSHEIM

1
2      Johnson and Chris Nachtsheim are globally

3      recognized experts in the optimal design of

4      experiments and the inventors of definitive

5      screening designs.  Together they were

6      recipients of the 2009 Brumbaugh award and

7      the 2009 Lloyd Ellis Nelson award of the

8      American Society for Quality for their paper

9      Split Plot Designs"; do you see that?

10  A.  Yes.

11  Q.  Were you aware that 3M was distributing your

12      webcast to its employees among whom were

13      members of the IP lab in order to presumably

14      learn from your instruction about the proper

15      design of experiments?

16  A.  I know that we had given them permission to

17      do that, so I -- I -- I thought they might do

18      it.  I wasn't aware.

19  Q.  Were you surprised earlier this afternoon

20      when you were questioned about your

21      contributions to the Belani and McGovern

22      paper given the fact that the same company is

23      recommending your expertise elsewhere?

24              MS. GARCIA:  Object to the form of

25      the question.

1                          NACHTSHEIM

2                THE WITNESS:  I wasn't surprised.

3                MR. SACCHET:  Fair enough.

4    BY MR. SACCHET:

5    Q.  I'd like to turn now away from your resume

6        and towards your relationship with

7        Mr. Albrecht, who I may occasionally refer to

8        as Mark, but if I do, excuse me.

9                Approximately when did you meet

10       Mr. Albrecht?

11   A.  I think it's been about -- I think it was

12       early 2000s.  I think it's probably been

13       maybe 13 years ago.  I'm not positive about

14       that, but I think it was right around then.

15   Q.  In what capacity did you first meet him?

16   A.  Mark -- I can refer him as Mark?

17   Q.  Yeah, sure.

18   A.  Mark was the -- was a student in our MBA

19       program and had taken the design of

20       experiments class from my colleague

21       William Lee, and Mark got very, very

22       interested in it and wanted to learn -- he

23       wanted to learn advanced marketing research

24       techniques, and there was no opportunity to

25       do that in the MBA program.

1                      NACHTSHEIM

2           And so he came to us and said, "I

3    would like to learn more about this, could we

4    work together and perhaps I can do this as an

5    independent study," with both Professor

6    William Lee and with me, and so we began

7    working -- we put together a study group and

8    it also involved one practitioner, a person

9    who owns a marketing research company, and we

10   met weekly for, I think, a couple of years.

11           And a couple of papers came out of

12   that.  One didn't get published yet.  We kind

13   of forgot about it.  But another one was

14   published with Mark in this area, it's

15   called, Conjoint Analysis, and -- so that

16   was -- that was the -- that was how I first

17   began to work with Mark.

18           I think nearly half of his MBA

19   program was independent study with me, which

20   was -- so we did a lot of work, you know.

21   Then we tried to talk him into getting a

22   Ph.D., and we failed at that, but he decided

23   he wanted to get a master's degree in

24   statistics, and so he wanted to have me as

25   his advisor for that.

1                         NACHTSHEIM

2    Q.   Let me back up just a moment.  So when

3         Mr. Albrecht was in the MBA program, would it

4         be fair to say that he took courses or

5         received instruction that were more at a

6         Ph.D. level?

7    A.   Yes.

8    Q.   Would you agree that he quickly came up to

9         doing doctoral level work even though he was

10        only an MBA?

11   A.   I would agree with that, absolutely.

12   Q.   And while he was an MBA student, both you and

13        Mr. Albrecht coauthored at least one paper

14        that was peer reviewed in the scientific

15        literature?

16   A.   Yes.

17   Q.   And during that time did you work on the

18        forced-air warming papers?

19                   MS. GARCIA:  Objection; asked and

20        answered.

21                   THE WITNESS:  That was later.

22        That was -- that -- that -- that came later.

23        I believe Mark -- well, he certainly wasn't

24        in the MBA program anymore at the time, I

25        don't believe, that we did the -- that we

1                      NACHTSHEIM

2       were working on the forced air.

3               That was -- do you know when he got

4       his P -- his master's degree?  Well, he had

5       to -- well, wait a minute, I know, we

6       published that paper in 2011, so he was

7       pretty well through with his master's

8       probably in 2010.

9               So by -- by 2010, I'm not sure about

10      the Pure Air work, he may still have been

11      working on his master's degree at that time.

12                     MR. SACCHET:  Okay.

13  BY MR. SACCHET:

14  Q.  And you mentioned the conjoint paper?

15  A.  Yes.

16  Q.  Was that submitted to Technometrics?

17  A.  No, we submitted that to the Journal of

18      Quality Technology.

19  Q.  Okay.  But the dimensional analysis paper was

20      published in Technometrics when Mark Albrecht

21      was your master's in statistics student?

22  A.  Correct.

23  Q.  Okay.  And we've established that he was a

24      coauthor on the paper, but what was his

25      contribution to the paper?

                          NACHTSHEIM

A.   First of all, it was kind of interesting that
     the -- the idea came, in part, because of a
     problem that his brother Tom had working
     at -- was he at Medtronic at the time, I'm
     not -- I think he was at Boston Scientific at
     the time.  And so we went out to visit him to
     talk about the problem, and then we realized
     there was a very, very important problem that
     hadn't been addressed in the literature, this
     whole problem of how do you design an
     experiment for something -- for something
     called engineering dimensional analysis.  And
     I asked Mark to do a literature review, and
     he did and he came up with nothing.  And I
     said, Wow, this is -- this is an amazing -- I
     just can't believe no one has tackled this
     area, and so we wrote that paper.  And so
     what was -- I would say -- I mean, Mark and I
     worked -- Mark did all the hard work, did the
     programming, did a lot of writing, it was his
     master's paper.  I certainly was heavily
     involved in the direction of the research
     and -- and -- and kind of teaching him about
     some of the -- some of the stuff as we went

1                          NACHTSHEIM

2        along.

3    Q.  So Mr. Albrecht's master's paper was the same

4        paper that was the DA paper published in

5        Technometrics?

6    A.  Yes.

7    Q.  And that was the paper that both you and

8        Mr. Albrecht received the Youden award for?

9    A.  Yes.

10   Q.  And the Youden award is the best expository

11       paper that was published in Technometrics in

12       that year?

13   A.  That's correct.

14   Q.  Would that be a major honor for a tenured

15       faculty member to receive --

16   A.  A major -- a major honor for a tenured

17       faculty member.

18   Q.  Had you ever received it before?

19   A.  Yes, I had received it -- I'm trying to get

20       my years correct here.  I believe I had

21       received it once before.

22   Q.  Would it be unusual --

23   A.  In fact, only recent.

24   Q.  Would it be unusual for a graduate student to

25       be awarded the Youden award?

NACHTSHEIM

1

2   A.   It's unheard of.  And -- and, in fact, the

3        statistics department made a very, very big

4        deal out of it and had a -- on their website

5        they made a big showing of Mark having won

6        the Youden prize for his master's paper.

7   Q.   Isn't it true that Professor Dennis Cook, who

8        is your mentor and advised your thesis paper

9        when you received a Ph.D., was the individual

10       who recommended that Mr. Albrecht be

11       publicized on the Carlson School's website?

12  A.   I think that's -- yes, it is, that's correct.

13  Q.   And Mr. Cook, as you mentioned, is a

14       nationally, if not internationally, known

15       statistician, correct?

16  A.   He's an internationally-known statistician.

17  Q.   Was this Mr. Albrecht's first peer stats

18       paper?

19  A.   Yes, I think this was his first peer stats

20       paper.  There was a lot of statistics in the

21       conjoint paper that we published in the

22       Journal of Quality Technology, and the other

23       paper was pretty much pure statistics that we

24       wrote when he was a master's degree that we

25       never published.

1                         NACHTSHEIM

2   Q.   Okay.  So to pull it all together,

3        Mr. Albrecht's first peer stats paper was the

4        same paper that he received an honor which

5        would be noteworthy for a tenured faculty

6        member to receive, but he received when he

7        was a graduate student, right?

8   A.   Correct.

9                    MS. GARCIA:  Object to the form of

10       the question.

11  BY MR. SACCHET:

12  Q.   When Mr. Albrecht graduated from the master's

13       and statistics program, did he earn a 4.0?

14  A.   I think he -- I believe he did.  I -- as far

15       as I know he did.

16  Q.   Based on your recollection, did Mr. Albrecht

17       publish more original statistics research

18       than most of your Ph.D. students would during

19       their five years of study?

20  A.   Yes.

21  Q.   After Mr. Albrecht graduated with his MBA and

22       MS in statistics, did you ever seek

23       Mr. Albrecht's assistance as to your work?

24  A.   I'll tell you what, the paper on -- the

25       earlier paper that we -- we sent to the

1                          NACHTSHEIM

2        Journal of Quality Technology, I was working

3        with my colleague, William Lee, who was also

4        a fellow of the American Statistical

5        Association, and I felt that the draft we had

6        didn't go deep enough in certain areas.  And

7        apparently William and I didn't have time

8        to -- to do that and we weren't getting this

9        paper done, so I called -- I asked -- I said

10       to William, "I think we need to bring Mark

11       in, because Mark can do a good job on this

12       for us," and so William agreed and we brought

13       Mark in as part of the team and Mark wrote

14       the last, I would say, one-third of the paper

15       and did the methodology, so, yes.

16   Q.  And that paper involved statistics?

17   A.  Absolutely.

18   Q.  Did you ever ask Mr. Albrecht how it would be

19       best to teach MBA statistics from a --

20   A.  Yes, I have.

21   Q.  -- pedagogical perspective?

22   A.  Yes, I have.

23                  MS. GARCIA:  I'm sorry, I didn't

24       hear the end of your question.

25                  MR. SACCHET:  From a pedagogical

1                         NACHTSHEIM

2        perspective.

3                    MS. GARCIA:   Thank you.

4   BY MR. SACCHET:

5   Q.   Did you ever ask Mr. Albrecht to edit any of

6        the textbooks that were pending publication?

7   A.   You know, I very well may have.   They were

8        last published in 2005 and 2006.   You know, I

9        can't remember doing that, but I wouldn't be

10       a bit surprised if I had, because we were

11       working so closely together that -- at that

12       time that I very well may have.

13  Q.   Do you recall in about February 2012 asking

14       Mr. Albrecht to mark up book chapters,

15       perhaps it wasn't related to a textbook?

16  A.   I don't recall that.   I -- but that was when

17       I was writing the textbook for -- for

18       statistics, so I -- it certainly -- I would

19       do that, it wouldn't surprise me a bit,

20       because I -- he had a master's -- he had done

21       the MBA, this is a book aimed at MBAs.   I

22       wouldn't be surprised.   I just -- I'm trying

23       to remember.   I just don't remember doing it.

24  Q.   Given Mr. Albrecht's performance as one of

25       your MBA students and MS students and the

1                        NACHTSHEIM

2         honors that he received while he was your

3         student, you hold Mr. Albrecht in high

4         regard?

5    A.   I -- I hold him in very, very high regard.

6         He's by far the smartest, the best student I

7         have ever had in my life and I am continually

8         impressed with what he accomplishes not just

9         in the publishing realm or in the writing

10        realm, but in his business endeavors.

11   Q.   And, in fact, when Mr. Albrecht applied to

12        the national marrow donors program, you

13        informed the hiring person there that

14        Mr. Albrecht was without question the best MS

15        student, i.e. master's in statistics, student

16        with whom you've ever had the opportunity to

17        work with, correct?

18   A.   Absolutely.

19   Q.   You've also told your colleagues such as

20        Professor Dennis Lynn that Mr. Albrecht is a

21        genius?

22   A.   I -- I don't know if I used the word genius,

23        but -- but I certainly said that he's very,

24        very bright, absolutely.

25   Q.   Did Mr. Albrecht win the 2013 MFESTS Young

1                          NACHTSHEIM

2       Science and Technology Professional of the

3       Year award?

4  A.   Yes, he did.

5  Q.   Who generally receives that award?

6  A.   Only the very best young engineers.

7  Q.   And did Mr. Albrecht's contribution to the

8       field of statistics have anything to do with

9       winning the award?

10  A.   It did.

11               MS. GARCIA:  Object to the form

12       and foundation for that question.

13  BY MR. SACCHET:

14  Q.   On what grounds?

15               MS. GARCIA:  Object to the form

16       and foundation for that question.

17               THE WITNESS:  I nominated him for

18       that, for that award, and so part of what was

19       I think -- I thought compelling at the time

20       was his master's thesis and the other paper

21       that he had already published.  So in

22       addition -- in addition to some of the

23       purely -- pure engineering things he had been

24       doing, I think by that time he had already

25       run the clinical trial -- I mean, he -- he

NACHTSHEIM

1

2    had done some of the work on these papers and

3    so as an accomplished engineer who was also

4    publishing in statistics journals and -- do

5    you happen to have what year that was that he

6    won the --

7              MR. SACCHET:  Yeah.  Well,

8    you recommended him in November -- on

9    November 28th, 2012.

10             THE WITNESS:  Yeah, so he had

11   already -- he had been publishing in medical

12   journals and statistics journals and doing

13   engineering and so forth, so...

14  BY MR. SACCHET:

15  Q.  And some of those publications were the

16      McGovern paper and the Belani paper, i.e.,

17      Exhibits 4 and 5 that we've discussed today,

18      correct?

19  A.  Correct.

20  Q.  Based on those publications and the other

21      work that Mr. Albrecht did, would you

22      consider Mr. Albrecht an expert in

23      statistics?

24  A.  Yes, absolutely.

25  Q.  You have referred to Mr. Albrecht as an

Page 295

1                              NACHTSHEIM

2          expert in regression, correct?

3     A.   Yes.

4                    MS. GARCIA:  Object to the form of

5          the question.

6     BY MR. SACCHET:

7     Q.   You have referred to Mr. Albrecht as an

8          expert in multivariate dimensional analysis,

9          correct?

10    A.   Correct.

11                   MS. GARCIA:  Object to the form of

12         the question.

13    BY MR. SACCHET:

14    Q.   At the time that Mr. Albrecht coauthored the

15         McGovern and Belani studies, he was there for

16         an expert in the statistical methods,

17         correct?

18    A.   Yes.

19                   MS. GARCIA:  Object to the form of

20         the question.

21    BY MR. SACCHET:

22    Q.   You had no reason to doubt Mr. Albrecht's

23         skills in the field of statistics, do you?

24    A.   I have no reason to doubt his skills in

25         statistics.

1                      NACHTSHEIM

2    Q.  You have no reason to doubt his credibility

3        in publishing scientific literature, do you?

4    A.  I do not.

5    Q.  You have all the confidence that you could

6        have that Mr. Albrecht did his homework and

7        reviewed the data and published through

8        accurate results in both the McGovern and

9        Belani papers, correct?

10                 MS. GARCIA:  Object to the form of

11       the question.

12                 THE WITNESS:  I absolutely do.

13   BY MR. SACCHET:

14   Q.  After Mr. Albrecht graduated from the

15       Carlson School, where did he seek employment?

16   A.  So his -- I don't know what you mean by,

17       "Seek."  I know that he -- he went to -- he

18       went to be the match -- the National Marrow

19       Donor Program.  I think that was his first

20       job after getting his master's degree and

21       having worked at Augustine Biomedical.

22   Q.  Do you know whether Mr. Albrecht ever applied

23       to work at 3M?

24   A.  Yes, he did.

25   Q.  Do you know whether 3M accepted his

1                         NACHTSHEIM

2        application?  Or I guess I should

3        rearticulate the question to say do you know

4        whether Mr. -- or 3M offered Mr. Albrecht the

5        position at 3M?

6    A.  Yes, they did.  Now I remember.  Yes, they

7        offered him a position.

8    Q.  Do you know what position Mr. Albrecht

9        applied for?

10   A.  Well, it was -- I believe it was a statistics

11       position.

12   Q.  Do you know whether Mr. Albrecht accepted the

13       position in statistics at 3M?

14   A.  Yes, he did.  He did, he accepted it.

15   Q.  Do you know whether Mr. Albrecht worked at 3M

16       in that statistics position?

17   A.  I don't believe he worked -- I don't remember

18       whether he worked in it.  I know that they

19       determined that they had to renig on the

20       offer they made him for legal reasons, so

21       I -- I don't -- I don't think he had -- he

22       may have started there, I just don't -- I

23       don't remember the details.

24   Q.  Were you surprised that a company like 3M

25       would offer Mr. Albrecht a position in their

1                         NACHTSHEIM

2       statistics department?

3    A.  Not a bit.

4    Q.  Why?

5                 MS. GARCIA:  Let me object to the

6       form of that question.

7                 THE WITNESS:  Well, first of all,

8       they called me, they had an opening and they

9       called me to ask me if I had anyone that I

10      could recommend for them for that position.

11      And, in fact, it might have even been

12      Stu Janis, who was in one of the e-mails you

13      mentioned earlier.

14                And I said, "I have somebody who is

15      absolutely perfect for you, but I think

16      you're too late," because I think by that

17      time he was about to accept a position maybe

18      at the Donor Marrow Program, I don't know,

19      but they had kind of gone through the --

20      through the interview process.

21                And he had -- Stu had just described

22      to me the -- the search procedure they were

23      going to go through and it was -- it was

24      going to take, you know, another couple of

25      months.  I think they were going to do kind

1                          NACHTSHEIM

2       of a national search, I guess, I don't know.

3              I said, "I think you would have

4       about ten days to decide on this person," and

5       I said, "If I were you, I would have him out

6       tomorrow for an interview and -- and do

7       things differently than you usually do them,

8       make a quick decision."

9              And I think that was on a Monday or

10      a Tuesday.  That Friday they had Mark -- I

11      think it was Friday, Thursday or Friday, they

12      had Mark out for an interview and Monday they

13      had a job offer for him.

14   BY MR. SACCHET:

15   Q.  Have you been deposed before?

16   A.  Yes.

17   Q.  Have you ever been deposed by a company who

18      offered you a job but later deposed your

19      ability to accurately perform the

20      responsibilities that you were offered a job

21      for?

22   A.  No.

23              MS. GARCIA:  Object to the form of

24      the question.  That misstates the record in

25      multiple ways.

1                         NACHTSHEIM

2                    THE WITNESS:  That's never

3        happened to me.

4    BY MR. SACCHET:

5    Q.  I'd like to turn to the McGovern study, which

6        was marked as Exhibit 4.  The study involved

7        two components, an experimental part and an

8        observational data component, correct?

9    A.  Correct.

10   Q.  And you previously testified that you had no

11       role in the design or setup as to the

12       experimental portion of the study, correct?

13                    MS. GARCIA:  Objection to the

14       extent that you're going to go through

15       questioning that we've been through all day,

16       asked and answered.

17   BY MR. SACCHET:

18   Q.  You can answer the question.

19   A.  Oh, which?  This is Belani?

20   Q.  No, McGovern.

21   A.  It's McGovern, okay.  Yeah, I did -- I did

22       not have a direct input to the design of that

23       study, and I'm just talking about the 3 by 2

24       experiment and two replicates.

25   Q.  You were involved in the statistical --

1                          NACHTSHEIM

2    A.   Although, I may maybe have merged the two

3         replicates, I'm not sure.

4    Q.   You were involved in the statistical analysis

5         portion of the study, correct?

6    A.   I was.

7    Q.   If you could turn to page 1540 of the study.

8    A.   (Complies.)

9    Q.   On the bottom left-hand column it states, "A

10        Poisson regression model was fitted to the

11        hip replacement data having the sum of bubble

12        counts for each experimental run," parens,

13        "Five photographs," end parens, "As the

14        response and the factors identified in the

15        experimental design as predictors"; is that

16        what it says?

17   A.   Yes, it does.

18   Q.   And above that paragraph there are two

19        figures, Figures 4 and Figure 5, correct?

20   A.   Correct.

21   Q.   In both figures, whether it's a pure bubble

22        count or a sum bubble count, there were

23        largely zero values for bubbles produced from

24        conductive fabric warming, correct?

25   A.   Correct.

1                        NACHTSHEIM

2    Q.   The fact that there were numerous zero values

3         within the data set meant that it would be

4         most proper to perform a Poisson regression,

5         correct?

6    A.   I think the -- the existence of zeros isn't

7         what does it, it's the existence of counts.

8         Zeros are fine.

9    Q.   Would the fact --

10   A.   Having zeros does not -- is totally -- is

11        appropriate --

12   Q.   Okay.

13   A.   -- when doing a Poisson regression.

14   Q.   Does the fact that photographs were taken in

15        even increments further justify the use of a

16        Poisson regression?

17             MS. GARCIA:  Object to the form of

18        the question.

19             THE WITNESS:  I think it -- I

20        think it's perfectly -- I think it justifies

21        the use of Poisson regression, yes.

22   BY MR. SACCHET:

23   Q.   And the use of a Poisson regression made more

24        sense than using a full ANOVA model, correct?

25   A.   Correct.  And -- and if I may, ANOVA is just

                         NACHTSHEIM

1
2      a special case of regression, so one could
3      also say standard regression versus Poisson
4      regression.
5   Q. Okay.  Thanks for the clarification.
6   A. But yes.
7   Q. If we can look at the, Results, section on
8      the same page, the first sentence states,
9      "Bubble counts per photograph show that
10     forced-air warming mobilized under drape air
11     so that it passed over the anesthesia surgery
12     drape and into the surgical site," parens,
13     "Figure 4," end parens, "But conductive
14     fabric did not have a mobilizing effect"; do
15     you see that?
16  A. I do.
17  Q. It then says, "Based upon Wald tests,
18     differences in the sum of bubble counts for
19     each experimental run," parens, "Figure 5,"
20     end parens, "Were significant between
21     conductive fabric and forced-air warming for
22     the drape configuration of half drape,"
23     parens, "0 versus 68 with a p-value of less
24     than .001," end parens, "And laid down,"
25     parens, "0 versus 3 p-value of .01," end

NACHTSHEIM

1

2      parens; do you see that?

3   A.   I do.

4           MS. GARCIA:  And object that the

5      remainder of the sentence says, "Differences

6      for full drape," paren, "0 versus 1 P

7      equals .283," close paren, "Did not reach

8      statistical significance"; is that also

9      correct?

10          THE WITNESS:  Yes.

11          MS. GARCIA:  Thank you.

12  BY MR. SACCHET:

13  Q.   What does the p-value with respect to the

14      draping at half height and laid down suggest

15      or mean?

16  A.   So it suggests that the difference in counts

17      for the conductive fabric and forced-air

18      warming are not due to chance.

19  Q.   And by not being due to chance, that means

20      that they are statistically significant --

21  A.   That's means, they -- yes, they are

22      statistically significant.  The differences

23      that are observed from those two conditions

24      is a statistically significant difference.

25  Q.   And so if you employed this same experiment

1                        NACHTSHEIM

2      numerous times over, you would very likely

3      generate the same significant data --

4   A.  Yes.

5   Q.  -- as to the bubble counts?

6   A.  Yes.

7                  MS. GARCIA:  Object to the form of

8      the question.

9   BY MR. SACCHET:

10  Q.  You submitted this paper to the Journal of

11     Bone and Joint Surgery, correct?

12  A.  Yes.

13  Q.  And when you submitted it to that journal, it

14     went through the peer review process,

15     correct?

16  A.  Yes, it did.

17                  MS. GARCIA:  I just object for

18     clarity.  Do you mean he personally submitted

19     it?

20  BY MR. SACCHET:

21  Q.  Your team, the coauthors of this paper

22     submitted this paper to the journal, correct?

23  A.  The paper was submitted and it went through

24     the peer review process.

25  Q.  And you testified earlier that as part of the

                         NACHTSHEIM

1

2      peer review process, there is always at least

3      one independent reviewer who reviews the

4      manuscript and determines whether it's worthy

5      of publication?

6   A.  Correct.

7   Q.  And this paper was, in fact, determined to be

8      worthy of publication in this journal,

9      correct?

10  A.  Correct.

11  Q.  Do you continue to stand by the results of

12     the bubble count data that is presented in

13     this study?

14  A.  I do.

15  Q.  Do you have any doubts as to the statistical

16     analysis that was performed as to the bubble

17     count data?

18  A.  I have no doubts.

19  Q.  Do you continue to stand by the conclusion

20     that the increase in bubble counts may be a

21     proxy for demonstrating increased bacteria at

22     the surgical site caused by the Bair Hugger?

23            MS. GARCIA:  Object to the form of

24     the question.

25            THE WITNESS:  I think the -- the

                    NACHTSHEIM

1

2        increase in bubble counts suggests there's a

3        potential for particles coming from lower up

4        over and into the -- the -- or the -- what do

5        you call it, the incision spot.  It shows

6        that there are airflows that can lead

7        particles into those sites, and I -- from

8        what I understand, some of those particles

9        could be bacteria.

10   BY MR. SACCHET:

11   Q.  The fact that only two runs of each factor

12       were performed did not pose a statistical

13       issue, because the null hypothesis was

14       ultimately rejected, correct?

15   A.  Right.  Yes, the -- the -- the fact that

16       the -- the effect was so powerful, we only

17       required two replicates of the experiment.

18   Q.  And by, "So powerful," you mean that the

19       p-value was so significant for this data set

20       that you -- there was no point in performing

21       additional runs?

22   A.  Right.  And -- and really what I mean by that

23       is the effect of changing from one -- from

24       one blanket to the other was large enough

25       such that you can -- you can prove it's not

NACHTSHEIM

1
2      due to chance with just two replicates, and
3      that's not at all common in well-designed
4      experiments.
5  Q.  So you would consider this to be a
6      well-designed experiment?
7  A.  Yes.
8  Q.  In the context of the Belani study, you
9      mentioned that certain variables were not
10     analyzed in this type of experimental setup,
11     correct, such as the lighting, surgical
12     tools, surgeons in the room and things of
13     that nature, correct?
14 A.  Correct.
15 Q.  Is it your understanding that the presence of
16     those types of obstacles could either disrupt
17     the laminar flow to a greater degree or
18     potentially reduce it, but you have no view
19     one way or the other as to the effect?
20 A.  Yes.
21 Q.  So it's possible that if those obstacles had
22     been presented in the McGovern study, that
23     the results would even be more powerful?
24              MS. GARCIA:  Object --
25              THE WITNESS:  It's possible.

                      NACHTSHEIM

1                  MS. GARCIA:  Object to the form of

2          the question.

3      BY MR. SACCHET:

4      Q.  Let's take a look at the observational

5          component of the study.

6                      MS. GARCIA:  Which study?

7                      MR. SACCHET:  Of the McGovern

8          study, Exhibit 3.

9                      MS. GARCIA:  Exhibit 4.

10                     MR. SACCHET:  Four, excuse me.

11                     THE WITNESS:  (Complies.)

12     BY MR. SACCHET:

13     Q.  If we could turn to page 1541, would you

14         agree that the final data set involved 1,437

15         patients?

16     A.  Yes.

17     Q.  And if you turn back a page to -- actually,

18         one page over to 1542, viewing table 2, would

19         you agree that 371 of those patients received

20         conductive fabric warming, whereas, 1,066 of

21         those patients received forced-air warming?

22     A.  This is in table 2?

23     Q.  Yes.  You'll need to add the -- those

24         developing an infection with those not

1                        NACHTSHEIM

2        developing an infection.

3    A.  Ah.  (Reviews document.)  Okay.  And what

4        were your numbers again?

5    Q.  Three out of 371 patients -- oh, actually, I

6        should backtrack.  Three hundred and

7        seventy-one patients received conductive

8        fabric warming, whereas 1,066 received

9        forced-air warming, correct?

10   A.  I'm -- I'm being dense here, because I'm not

11       seeing --

12   Q.  Yeah, let me help you out.  So in table 2 --

13   A.  Yeah, please do.

14   Q.  -- if you go about almost to the bottom of

15       the table, there is a header that says,

16       "Patient-warming device" --

17   A.  Right.

18   Q.  -- with number and then percent, "Conductive

19       fabric," there's a 3, which presumably is the

20       N, i.e., the sample, correct?

21   A.  Right, that developed the infections, right.

22   Q.  Yeah.  And then in the next column over is

23       368, which stands for those who did not

24       develop an infection, correct?

25   A.  Correct.

NACHTSHEIM

1

2   Q.   So the total patient population for those

3        received conductive fabric warming was 371,

4        correct?

5   A.   Now I get it.

6   Q.   Yeah.  I probably shouldn't move so fast, but

7        now that we're together, that's good.

8   A.   Yeah, good.

9   Q.   And for forced-air warming, I guess I'll just

10       jump to it, 1,066, correct?

11  A.   Correct.

12  Q.   Okay.  And from those patient populations, 3

13       out of the 371 who received conductive fabric

14       warming developed an infection?

15  A.   Correct.

16  Q.   While 32 out of the 1,066 who had forced-air

17       warming developed an infection, correct?

18  A.   Correct.

19  Q.   And the differing infection rates are 0.8

20       percent for those who received conductive

21       fabric warming versus about 3 percent --

22  A.   Correct.

23  Q.   -- for those who received forced-air warming,

24       correct?

25  A.   Yes.

1                        NACHTSHEIM

2    Q.  Just so we are on the same page, the

3         infection rates discussed in the McGovern

4         article pertain only to periprosthetic joint

5         infections, correct, hip or knee?

6    A.  Hip -- hip or knee, yes.

7    Q.  Table 3 reflects that?

8    A.  I believe it does.  Hold on.

9         (Reviews document.)  Oh, yeah.  Yes, it does.

10   Q.  So the McGovern study did not analyze or

11        collect data for a broader category of wound

12        infections more generally?

13   A.  No.

14   Q.  So it did not account for things such as

15        hematoma?

16   A.  Correct.

17   Q.  It did not account for superficial

18        infections?

19   A.  Correct.

20   Q.  The study does account for some patient

21        specific demographics, correct?

22   A.  I just couldn't hear the last part.

23              MS. GARCIA:  Objection --

24   BY MR. SACCHET:

25   Q.  Some patient specific demographics?

1                        NACHTSHEIM

2   A.  Yes, it does.

3                   MS. GARCIA:  Object to the form of

4       the question.

5   BY MR. SACCHET:

6   Q.  Some of those factors include age, correct?

7   A.  Correct.

8   Q.  Number of procedures, correct?

9                   MS. GARCIA:  I object to the form

10      of both of those questions.

11  BY MR. SACCHET:

12  Q.  If I can direct your attention to table 1 --

13  A.  Yeah, direct me.

14  Q.  -- on page 1541.

15  A.  Oh, table -- table 1, page 1541.

16  Q.  Correct, number of -- yes.

17                  MS. GARCIA:  Could you clarify

18      what you mean by, "Account for"?

19                  MR. SACCHET:  They had collected

20      data from and analyzed whether those

21      demographics had statistical significance.

22                  THE WITNESS:  Yes.

23  BY MR. SACCHET:

24  Q.  Another is diabetes, correct?

25  A.  Correct.

1                          NACHTSHEIM

2   Q.  And the last is the duration of preoperative

3       hospital stay, correct?

4   A.  Correct.

5   Q.  And as to all four of those patient-specific

6       demographics, none of them were determined to

7       be statistically significant in terms of

8       affecting the infection rates that were

9       analyzed in the paper, correct?

10                  MS. GARCIA:  Object to the form of

11      that question, it misstates the paper.

12                  THE WITNESS:  What these showed

13      was that there were no statistically

14      significant differences in the groups for

15      age -- for the percentages of -- the

16      percentages of the procedures, the

17      percentages of diabetes and so forth.

18  BY MR. SACCHET:

19  Q.  And if we turn back to table 2 on page 1542.

20  A.  (Complies.)

21  Q.  Although those factors were not significant

22      between each factors, for example, age is not

23      significantly different -- did not

24      significantly affect infection rates between

25      those age populations, there was a

                          NACHTSHEIM

1

2       significant difference between the device

3       that was used, correct?

4                   MS. GARCIA:  Object to the form of

5       the question.

6                   THE WITNESS:  Correct.

7    BY MR. SACCHET:

8    Q.  Based on your review and expertise in the

9        field of statistics, do you continue to stand

10       by the calculations that were made in this

11       study?

12   A.  I do.

13   Q.  Do you have any reason to doubt

14       Mr. Albrecht's calculations or your review of

15       the calculations that are presented in this

16       paper?

17   A.  I do not.

18   Q.  This paper and this section of the paper was

19       also part of the peer review process,

20       correct?

21   A.  Correct.

22   Q.  So at least one third party looked at the

23       data presented and determined that it was

24       suitable for publication in this journal,

25       correct?

1                        NACHTSHEIM

2   A.  Correct.

3   Q.  Although the data was observational in

4       nature, you still deemed the data worthy of

5       publication, correct?

6   A.  Yes.

7   Q.  And although observational data does not

8       necessarily equate to data that would be

9       derived from a randomized controlled trial,

10      observational data still has scientific

11      weight, correct?

12  A.  Yes.

13  Q.  Some statisticians view observational data as

14      level 3 or level 2 evidence compared to

15      level 1 evidence being generated from a

16      controlled trial, correct?

17              MS. GARCIA:  Object to the form of

18      the question.

19              THE WITNESS:  I had never heard

20      the terminology level 1, level 2, level 3,

21      but -- but certainly many of my colleagues

22      would -- would consider observational data as

23      secondary to experimental data in terms of --

24      in terms of showing an effect.

25  BY MR. SACCHET:

1                        NACHTSHEIM

2   Q.  And from observational studies you can derive

3       an association, correct?

4   A.  Yes.

5   Q.  And there are many circumstances in which

6       randomized controlled trials are not possible

7       to conduct, correct?

8   A.  Correct.

9   Q.  One of those circumstances, as you previously

10      mentioned, was with tobacco, correct?

11  A.  Correct.

12  Q.  And we're all well familiar with the fact

13      that tobacco causes cancer, correct?

14  A.  Correct.

15  Q.  But at the time there were only

16      observation --

17              MS. GARCIA:  Object to the form of

18      the question.

19  BY MR. SACCHET:

20  Q.  -- there were only observational studies in

21      order to demonstrate that association,

22      correct?

23  A.  Correct.

24  Q.  Why were -- why were randomized controlled

25      trials not possible with respect to the

1                          NACHTSHEIM

2          tobacco subject matter?

3                    MS. GARCIA:   Object to the form of

4          the question.

5                    THE WITNESS:   Because of the

6          ethics involved, because you would need to

7          take a group of people and randomly split

8          them into two groups and tell one that you're

9          going to have to smoke two packs a day for

10         the rest of your life and the other group say

11         you can't smoke, so you can't do that.

12   BY MR. SACCHET:

13   Q.    Are you aware of any reasons why it would be

14         difficult to conduct a randomized controlled

15         trial evaluating infection rates among

16         patients who receive different types of

17         patient-warming therapy?

18   A.    I'm not -- I'm not aware of any technical

19         reasons why it couldn't be done, so I -- I

20         don't see why it couldn't be done.

21   Q.    Have you --

22   A.    Yeah --

23   Q.    -- heard from anyone that it would be nearly

24         impossible to conduct such a randomized

25         controlled trial?

1                          NACHTSHEIM

2    A.   No.   The only thing I heard was what -- is

3         what Mark mentioned in an e-mail saying he

4         thought it might cost $2 million, but I don't

5         know where that number came from.

6    Q.   Uh-huh.  If we could turn back to Exhibit 19,

7         which is the e-mail that you were just

8         discussing.

9    A.   Okay.

10   Q.   Do you recall the specifics of the statement

11        that was made in the last quote that you

12        mention in this e-mail?

13                  MS. GARCIA:  I'm sorry, if you

14        could pause, because I don't think my Exhibit

15        19 is matching up with your conversation.  Do

16        you have Exhibit 19 matching up with these

17        questions?  Oh --

18                  THE WITNESS:  Oh, yes.

19                  MS. GARCIA:  -- I'm sorry, are you

20        on the last sentence of the first paragraph

21        of Mark's January 4, 2011, e-mail, is that

22        what you're referring to?

23                  MR. SACCHET:  Yeah.

24                  MS. GARCIA:  Okay.  Thank you.  It

25        took me a minute to get there.

```
 1                        NACHTSHEIM

 2              MR. SACCHET:  Yeah, no worries.

 3   BY MR. SACCHET:

 4   Q.  Do you recall the specifics of the article

 5       that you and Mr. Albrecht were discussing?

 6              MS. GARCIA:  Object to the form of

 7       the question.

 8              THE WITNESS:  You know what, I

 9       don't remember that we were discussing a

10       particular article.

11   BY MR. SACCHET:

12   Q.  Do you see on the first page where

13       Mr. Albrecht sends you a hyperlink with a

14       New York Times --

15   A.  Yes.

16   Q.  -- website?

17   A.  Yes.  Oh, yes, and -- right.  That was a

18       New York Times article.  But I think we were

19       discussing what came from that article was

20       generally the discussion about could -- could

21       the use of the Bair Hugger and forced-air

22       warming lead to higher infection rates --

23   Q.  And --

24   A.  -- is there a causal link kind of thing.

25   Q.  -- when you were previously asked a question
```

                          NACHTSHEIM

1

2      about this article, you mentioned that you

3      thought that the data referred to in the

4      article pertained to the McGovern article,

5      correct?

6                 MS. GARCIA:  Object to the form of

7      the question.

8                 THE WITNESS:  I don't remember.

9      And you're talking about the observational

10     data?

11                MR. SACCHET:  Yeah.

12                THE WITNESS:  I'm afraid I just

13     don't remember right now.  Did I --

14                MR. SACCHET:  That's okay, we'll

15     just --

16                MS. GARCIA:  That's not what I

17     intend with my question.

18                MR. SACCHET:  I just want to

19     clarify it for the record, because I think

20     the record reads differently.

21     BY MR. SACCHET:

22     Q.  Does this article in the bottom left-hand

23         portion of the page reflect the web address

24         noted on the first page of Exhibit 19?

25                MS. GARCIA:  Can we mark this?

1                         NACHTSHEIM

2                  MR. SACCHET:  Sure.

3                  THE WITNESS:  Yes.

4                  (Whereupon, Exhibit 26 was

5                  marked for identification.)

6                  MR. SACCHET:  I believe it was

7        marked, was it?

8                  THE WITNESS:  Yeah, this is

9        Exhibit 26.

10   BY MR. SACCHET:

11   Q.  So does the website address at the bottom

12       left-hand corner of Exhibit 26 --

13   A.  Oh, does it match, I see what you're saying.

14   Q.  -- match the --

15   A.  Yes, it does.  It does.

16   Q.  If you could take a moment to just scan the

17       three odd pages of the article.

18   A.  (Reviews document.)

19                  MS. GARCIA:  Is there a question?

20                  MR. SACCHET:  There's not one

21        pending.

22                  MS. GARCIA:  Okay.  Thank you.

23                  THE WITNESS:  (Reviews document.)

24        Okay.

25   BY MR. SACCHET:

1                          NACHTSHEIM

2    Q.  Just a few quick questions about the article.

3              Did you find any reference to the

4        McGovern study or the McGovern data in the

5        article?

6    A.  I did not.

7    Q.  This study was -- or this article from the

8        New York Times was in fact published

9        approximately 11 months before the McGovern

10       article was published, wasn't it?

11   A.  Yes, it was.

12   Q.  The only data mentioned in the article are

13       those presented to the ECRI Institute that

14       you can find at the top of the last full text

15       page, correct?

16   A.  Yes.

17   Q.  And at the bottom of the article is

18       presumably what you and Mr. Albrecht were

19       referring to in your correspondence marked in

20       Exhibit 19 in which you say something to the

21       effect of, "His statement is hard to argue

22       with," correct?

23              MS. GARCIA:  Object to the form of

24       the question.

25              THE WITNESS:  I just wanted to

1                        NACHTSHEIM

2        review where that shows up.  Is that --

3                    MR. SACCHET:  That's --

4                    THE WITNESS:  That's what --

5                    MR. SACCHET:  Exhibit --

6                    THE WITNESS:  Oh, yes, "Hard to

7        disagree with the last quote" --

8                    MR. SACCHET:  The last quote.

9                    THE WITNESS:  -- "where the guy

10       said the data are compelling, but they don't

11       prove a link to infections in practice and a

12       clinical trial would be needed to do that?

13                    MR. SACCHET:  Yup.

14   BY MR. SACCHET:

15   Q.  And the last quote also says that, "Proving

16       such a link might be impossible, because it

17       would require mounting a huge clinical

18       study," correct?

19   A.  Correct.

20   Q.  In the absence of a clinical study, is the

21       next best evidence observational data?

22                    MS. GARCIA:  Object to the form of

23       the question.

24                    THE WITNESS:  Yes.  In the absence

25       of a -- of an experimental or a clinical

1                        NACHTSHEIM

2          study, it's the -- the only evidence you

3          would have would be observational data.

4    BY MR. SACCHET:

5    Q.   And you agreed with the statement made by

6          Dr. Jeffrey Gumprecht that it would be

7          impossible to mount a huge clinical study,

8          correct?

9                 MS. GARCIA:  Object to the form of

10         the question.

11                THE WITNESS:  I -- I really -- I

12         really don't know for sure that it would be

13         impossible.  I don't know what -- first of

14         all, I think it's possible.  I don't know

15         what it would cost.  I don't know -- I'd have

16         to think through how that kind of study would

17         be designed and -- and -- and the logistical

18         problems that might present themselves.  I

19         don't see any impossibility.

20                MR. SACCHET:  Okay.

21   BY MR. SACCHET:

22   Q.   Assuming a randomized control trial could not

23         be conducted, observational data would be the

24         next best alternative?

25                MS. GARCIA:  Object to the form of

1                        NACHTSHEIM

2          the question.

3                    THE WITNESS:  That would be the

4          next best alternative.

5     BY MR. SACCHET:

6     Q.  Why is that?

7     A.  Here what we're doing with the -- with the

8          randomized -- with a clinical trial is that

9          we're going to actually put both -- both

10         types of blankets in practice and we can look

11         at -- look directly at infection rates that

12         result from the two different conditions, and

13         that's the -- that's the clinical study.  If

14         you're looking at -- if you want to know

15         about infections, I think you're limited to

16         looking at observational studies such as --

17         such as the one that we report on.

18                    We did -- we did experimental

19         studies on bubbles, but we can't do

20         experimental studies on infections without --

21         without resorting to a clinical trial of some

22         kind.

23                    So I think that, yeah, I think you

24         probably -- if you want to look at

25         infections, I think you're -- I think you're

1                      NACHTSHEIM

2       probably limited to observational data.

3    Q.  Isn't it true that a well-designed

4       observational study can render results

5       extremely similar to a properly conducted

6       randomized trial --

7                 MS. GARCIA:  Object --

8    BY MR. SACCHET:

9    Q.  -- on the same subject matter?

10                MS. GARCIA:  Object to the form of

11       the question.

12                THE WITNESS:  I think that can

13       happen, but I don't believe that the level of

14       proof reaches the same -- I don't think that

15       the proof reaches the same level of rigor.

16       There's just always that chance in

17       observational studies that -- I mean, I think

18       there's a greater chance that something -- a

19       confounding factor might be present,

20       something you just hadn't thought of.

21    BY MR. SACCHET:

22    Q.  But it is possible that if statistical

23       significance is found based on observational

24       data, that that significance may be

25       replicated in a randomized control trial?

1                          NACHTSHEIM

2    A.   Yes.

3    Q.   So the observational data that is presented

4         in the McGovern study is certainly valuable,

5         is it not?

6                   MS. GARCIA:  Object to the form of

7         the question.

8                   THE WITNESS:  I think it's

9         valuable.

10   BY MR. SACCHET:

11   Q.   That's why you published the observational

12        data, correct?

13   A.   Yes.

14   Q.   You were previously asked about potentially

15        confounding factors with respect to the

16        observational data that was presented in the

17        McGovern study, correct?

18   A.   Correct.

19   Q.   And some of those potentially confounding

20        factors dealt with infection control

21        measures, correct?

22   A.   Correct.

23   Q.   If we could turn to page 1540 of Exhibit 4,

24        the McGovern study.

25   A.   (Complies.)

1                         NACHTSHEIM

2    Q.   I want to make sure that we are on the same

3         page with respect to the change that occurred

4         as to the antibiotic regime.  Would you agree

5         that an antibiotic called Gentamycin was

6         applied during the forced-air warming period

7         from July 1st, 2008, to the end of February

8         2009?  It's about halfway down the paragraph.

9    A.   I see it.  From July 2008 to February 2009 a

10        single dose of Gentamicin 4.5 was given at --

11        at induction.

12   Q.   Whereas, a combination of Gentamycin and

13        Teicoplanin -- and I'd be surprised if any of

14        us know how to pronounce it, but that's how

15        I'm going to say it -- was applied during the

16        end of the forced-air warming period and

17        throughout the entire conductive fabric

18        warming period, which would namely be

19        March 1st, 2009, until January 2011, correct?

20                  MS. GARCIA:  Can you please point

21        to where you're reading from?

22                  MR. SACCHET:  So I am interpreting

23        what's said in this paragraph and based on

24        what's presented in Figure 7 so --

25                  MS. GARCIA:  Okay.  Then I'll

1                        NACHTSHEIM

2       object to the form of the question.

3                    THE WITNESS:  I -- I read this --

4                    MR. SACCHET:  I can walk through

5       it slower.

6                    THE WITNESS:  Well, I read this to

7       say that in March 2009 there was a change to

8       the combination of the two drugs you've

9       pronounced, and I don't believe there were

10      any changes until the end of the study.

11                   MR. SACCHET:  Okay.

12  BY MR. SACCHET:

13  Q.  So -- so we're clear, there was a period in

14      which Gentamycin was applied to some

15      forced-air warming patients, and then the

16      antibiotic changed to a combination of

17      Gentamycin and Teicoplanin that applied to

18      some forced-air warming patients and all of

19      the conductive fabric warming patients,

20      correct?

21  A.  Correct.

22  Q.  Assuming the change in antibiotic did not

23      affect infection rates between warming

24      devices, would you still consider the

25      antibiotic a confounding variable?

```
 1                        NACHTSHEIM
 2                  MS. GARCIA:  Object to the form of
 3        the question.
 4                      THE WITNESS:  I'm going to assume
 5        that it has -- the change had no effect?
 6   BY MR. SACCHET:
 7   Q.   Yeah, assume that the antibiotic had no
 8        effect on the infection rate.  Would it still
 9        be a confounding variable?
10                  MS. GARCIA:  Object to the form of
11        the question.
12                      THE WITNESS:  I don't think it
13        would be -- I don't think it would be
14        considered a confounding variable.  I'm
15        trying to think of how else it might have an
16        impact, if it's not having an effect.  I
17        guess it -- no, I don't think it would be,
18        yeah.
19   BY MR. SACCHET:
20   Q.   One way that we could control for the -- let
21        me strike that.
22                  In order to determine whether the
23        antibiotic had an effect on infection rates,
24        we could control for the warming device --
25   A.   Yes.
```

1                         NACHTSHEIM

2   Q.  -- and evaluate whether infection rates

3       between the changed antibiotic stayed the

4       same or went up or down --

5   A.  Correct.

6   Q.  -- with that control device, correct?

7   A.  (Nods head.)

8               MS. GARCIA:  I'm going to object

9       to the form of the question.

10  BY MR. SACCHET:

11  Q.  Did you understand it?

12  A.  Yes.

13  Q.  If infection rates between the two groups

14      were similar, that would tend to show that

15      the antibiotic was not a confounding factor?

16  A.  Correct.

17              MS. GARCIA:  Object to the form of

18      the question.

19  BY MR. SACCHET:

20  Q.  Assume that Mr. Albrecht, who you previously

21      mentioned was an expert in statistics and you

22      had full confidence in his ability to analyze

23      data presented in this article, informed you

24      that he found a 2.8 percent infection rate in

25      those who received Gentamycin, a single drug,

1                        NACHTSHEIM

2        but 3.1 percent of patients who received the

3        combination of antibiotics, but also

4        forced-air warming patients, with a nearly

5        identical infection rate, would you determine

6        that the antibiotic was a confounding factor?

7                     MS. GARCIA:  Object to the form of

8        the question.

9                     THE WITNESS:  That would be strong

10       evidence that it was not a confounding

11       factor.

12                    MR. SACCHET:  Let's mark this.

13                    (Whereupon, Exhibit 27 was

14                    marked for identification.)

15   BY MR. SACCHET:

16   Q.  So just to be clear, if we look at this table

17       that's presented here, we can see in the

18       first line it presents antibiotic protocol 1

19       versus 2 for FAW, does it not?

20   A.  It does.

21   Q.  Assume that protocol 1 is the singular

22       antibiotic, i.e. Gentamycin, and that

23       protocol 2 is the combination of Gentamycin

24       and Teicoplanin.

25   A.  Uh-huh.  Yes.

1                           NACHTSHEIM

2    Q.  In this particular analysis, forced-air

3         warming is held constant, correct?

4    A.  Correct.

5    Q.  And for forced air, protocol 1, the percent

6         of patients developing infection was 2.8?

7    A.  Correct.

8    Q.  And for forced air, protocol 2, involving

9         patients who received both Gentamycin and

10        Teicoplanin, the infection rate was 3.1,

11        correct?

12   A.  Correct.

13   Q.  And the p-value was 0.839, correct?

14   A.  That's what's reported here.

15   Q.  That's what's reported here.  We could

16        conclude, based on this data set of these

17        numbers, that when the patient-warming device

18        is held constant, that the change in

19        antibiotic had no effect on infection rates,

20        correct?

21              MS. GARCIA:  Object to the form of

22        the question.

23              THE WITNESS:  Assuming there's

24        sufficient power in those sample sizes,

25        although they look fairly large to me, yes.

1                          NACHTSHEIM

2    BY MR. SACCHET:

3    Q.  The patient population for forced-air

4        protocol 1 was 389 patients, correct?

5    A.  Correct.

6    Q.  And the patient population for those

7        receiving the combination was 678, correct?

8    A.  Correct.

9    Q.  Those are fairly large patient populations,

10       correct?

11   A.  Correct.

12                MS. GARCIA:  Object to the form of

13       the question.

14   BY MR. SACCHET:

15   Q.  Another way to determine whether the

16       antibiotic was a confounding variable would

17       be to control the antibiotic, but evaluate

18       different infection rates between different

19       forced-air -- or different warming devices,

20       correct?

21   A.  Yes.

22                MS. GARCIA:  Object to the form of

23       that question also.

24   BY MR. SACCHET:

25   Q.  And if the infection rates were still higher

1                        NACHTSHEIM

2        among those who received forced-air warming

3        compared to those who received conductive

4        fabric warming, that would tend to show the

5        antibiotic did not substantially affect

6        infection rates, correct?

7   A.   Correct.

8                    MS. GARCIA:  Object to the form of

9        the question.

10  BY MR. SACCHET:

11  Q.   And if that's true, the change in antibiotic

12       would also not be a confounding factor,

13       correct?

14  A.   Correct.

15                   MS. GARCIA:  Object to the form of

16       the question.

17  BY MR. SACCHET:

18  Q.   If I could --

19                   MR. SACCHET:  Could I ask your

20       basis for the objection?

21                   MS. GARCIA:  I'm sorry?

22                   MR. SACCHET:  Could I ask your

23       basis for the objection on form?

24                   MS. GARCIA:  Yes.  You keep using

25       the word, "determine," and you keep using the

NACHTSHEIM

1
2     word, "show," and you keep using the word,
3     "establish," and I'm objecting to the form of
4     the question based on those terms.
5               MR. SACCHET:  That's not going to
6     pass muster in the court.
7  BY MR. SACCHET:
8  Q.  As to the hypothetical I just presented, if
9     you could turn your attention to the second
10    line of the table.
11              MS. GARCIA:  I'm sorry, to just be
12    complete with my form objection, it's also an
13    incomplete hypothetical.
14              MR. SACCHET:  Fair enough.
15 BY MR. SACCHET:
16 Q.  Antibiotic protocol 2 involved a combination
17    have Gentamycin and Teicoplanin, correct?
18              MS. GARCIA:  Object to
19    foundation --
20 BY MR. SACCHET:
21 Q.  -- for the sake of --
22 A.  Yes.
23              MS. GARCIA:  Excuse me.  Object to
24    foundation for that.
25 BY MR. SACCHET:

1                        NACHTSHEIM

2   Q.  And the data here shows that 3.1 percent of

3       patients who received forced-air warming in

4       the combination antibiotic developed joint

5       infections, correct?

6   A.  Correct.

7   Q.  Whereas, .9 percent of patients who received

8       conductive fabric warming and the combination

9       of antibiotics developed joint infections,

10      correct?

11  A.  Correct.

12  Q.  By holding the antibiotic constant and

13      discontinuing the use of forced-air warming,

14      that resulted in a 71 percent decrease in

15      joint infections, did it not?

16              MS. GARCIA:  Object to the form of

17      the question.

18              THE WITNESS:  Yes, it did.

19  BY MR. SACCHET:

20  Q.  That essentially matches the 73 percent

21      decrease in infections that was noted in the

22      McGovern article itself, does it not?

23  A.  Correct.

24              MS. GARCIA:  Object to the form of

25      the question.

1                          NACHTSHEIM

2    BY MR. SACCHET:

3    Q.  And based on the p-value of .0008, which is

4        far less than .05, you would determine that

5        difference to be statistically significant,

6        would you not?

7    A.  I would.

8    Q.  So whether we control for the device or

9        control for the antibiotic, based on this

10       data set in Exhibit 27, would you determine

11       that the antibiotic was not a confounding

12       factor?

13                    MS. GARCIA:  Object to the form of

14       the question, it's a lack of foundation, it's

15       an incomplete hypothetical.

16                    THE WITNESS:  This data certainly

17       supports that hypothesis.

18   BY MR. SACCHET:

19   Q.  And if it were not a confounding factor,

20       would there be any reason to deselect

21       patients from the population of 1,437

22       accounted for in the McGovern study in order

23       to exclude those who received a single

24       antibiotic?

25   A.  No.

                            NACHTSHEIM

1

2                    MS. GARCIA:  Object to the form of

3          the question.

4    BY MR. SACCHET:

5    Q.   And if we were to do that and reduce the

6          population, let's say, from the 1,473, or 37,

7          I've forgotten which number it is, down to a

8          number of let's say 500 patients, there could

9          be concern about the powering of that

10         population?

11   A.   There could.  There could be.

12   Q.   Another confounding factor that was discussed

13         this afternoon was a change in the

14         thromboprophylaxis protocol, correct?

15   A.   Yes.  Can -- can you just remind me where

16         that --

17   Q.   Yeah, if we could turn to page 1540.

18   A.   (Complies.)

19   Q.   If you look at the bottom of the first full

20         paragraph in the left-hand column, it states

21         the thromboprophylaxis regimen from

22         July 2008 to the end of July 2009 was

23         Tinzaparin.

24   A.   Uh-huh.

25   Q.   Then it says from August 2009 to February

NACHTSHEIM

1
2    2010, Rivaroxaban, which I'll represent is
3    otherwise known as Xarelto, was provided from
4    day one, but in February 2010 to the end of
5    this study, patients were reverted to
6    Tinzaparin, correct?
7  A.   Yes.
8  Q.   Assuming the change in the prophylaxis did
9       not affect infection rates during the time of
10      this study, i.e., Exhibit 4, would you still
11      consider it a confounding variable?
12 A.   No.
13              MS. GARCIA:  Object to the form of
14      the question.
15              (Whereupon, Exhibit 28 was
16              marked for identification.)
17              MS. GARCIA:  What number are we
18      on?
19              MR. SACCHET:  Twenty-eight, I
20      believe.
21              THE COURT REPORTER:  Correct.
22              MS. GARCIA:  Thank you.
23 BY MR. SACCHET:
24 Q.   Have you seen this document before,
25      Professor?

1                         NACHTSHEIM

2    A.   No, I have not.

3    Q.   Was this document produced with the set of

4         documents that you provided to 3M in response

5         to the subpoena?

6    A.   No.

7    Q.   Does the bottom right-hand label of this

8         document bear a Bates number of Nachtsheim --

9    A.   It does.

10   Q.   -- space 0000451?

11   A.   It must have been attached to one of my

12        e-mails.  I -- I -- I don't remember seeing

13        the document.

14   Q.   Since you don't remember receiving or reading

15        the document, let's go through it.

16   A.   Okay.

17   Q.   If you'd turn to the second page of text that

18        bears the heading, "Introduction"; do you see

19        that?

20   A.   I do.

21   Q.   Do you see the last paragraph at the bottom

22        of that page?

23   A.   "This multicenter study"?

24   Q.   Correct.  I'll read it out loud and you just

25        confirm that we're on the same page.  "This

NACHTSHEIM

1
2    multicenter study based on prospectively
3    collected national data aims to evaluate the
4    surgically relevant complications of using
5    either Rivaroxaban, or LMWH," which I'll
6    represent means low molecular weight
7    heparins, "as thromboprophylaxis, including
8    wound complications, readmission and return
9    to theater for deep infection, in addition to
10   the incidents of major bleeds and EVT,"
11   correct?
12 A.  Correct.
13 Q.  Based on that statement, do you agree that at
14   least two or three outcomes were measured,
15   one being wound complications, another being
16   return to theater for deep infection, and
17   another being major bleeds?
18 A.  I agree.
19           MS. GARCIA:  I object to lack of
20   foundation.
21 BY MR. SACCHET:
22 Q.  If you could turn to the next page under,
23   "Methods," in the third paragraph it states,
24   "The primary outcome measure was wound
25   complications," parens, "Including hematoma,

1                         NACHTSHEIM

2        superficial wound infection and deep

3        infection requiring return to theater, RTT,

4        within 30 days of procedure"; do you see

5        that?

6    A.   I do.

7    Q.   And you see the designation that RTT involves

8        a deep infection requiring a return to

9        theater, correct?

10   A.   Correct.

11   Q.   Which is one of the independent variables

12       that was mentioned in the prior paragraph

13       that we read, correct?

14                 MS. GARCIA:  Object to the form of

15       the question.

16                 THE WITNESS:  Correct.  I think

17       dependent variables.

18                 MR. SACCHET:  Okay.  Noted.

19   BY MR. SACCHET:

20   Q.   If we can now turn to the next page under,

21       "Results," do you see that heading?

22   A.   Yes, 456.

23   Q.   It says, "During the study period, 2,762

24       patients received Rivaroxaban, and 10,361

25       received LMWH.  Patient demographics are

1                        NACHTSHEIM

2        shown in table 1.  There were significantly

3        fewer wound complications in the LMWH group,"

4        parens, "2.81 percent versus 2.85 percent, OR

5        equals .72, 95 percent confidence intervals

6        between 0.58 to 0.90 with a p-value of .005.

7        However, rates of RTT for infected wound

8        washout were not significantly different."

9        Do you see that?

10   A.   I do.

11   Q.   Assuming the truth of this study in what we

12        just read, would you agree that Rivaroxaban,

13        otherwise known as Xarelto, increased wound

14        complications compared to low weight

15        molecular heparins like Tinzaparin?

16             MS. GARCIA:  Object to the form of

17        the question, to an incomplete hypothetical

18        and to a lack of foundation for this witness

19        to opine about the meaning of this article.

20             THE WITNESS:  It says there were

21        significantly fewer wound complications in

22        the LMH -- LMWH group.  Is that what you're

23        referring to?

24   BY MR. SACCHET:

25   Q.   That's what I'm referring to.  And the

1                          NACHTSHEIM

2      p-value was a statistically significant

3      value, correct?

4  A.  Yes, correct.

5  Q.  So there were fewer wound complications as a

6      result of the use of a low weight molecular

7      heparin --

8  A.  Correct.

9  Q.  -- compared to Rivaroxaban, correct?

10 A.  Yeah, correct.

11              MS. GARCIA:  Object to the form of

12     the question.

13 BY MR. SACCHET:

14 Q.  However, the study notes that rates for RTT,

15     which we established to be a return to

16     theater for --

17 A.  Uh-huh.

18 Q.  -- infections, were not significantly

19     different; do you see that?

20 A.  Correct.  Yes, I do.

21 Q.  Assuming the truth -- well, let me back up.

22              Would you also agree that the

23     McGovern study, Exhibit --

24              MS. GARCIA:  Four.

25 BY MR. SACCHET:

1                          NACHTSHEIM

2    Q.  -- 4, evaluated joint infections?

3    A.  Yes.

4    Q.  It did not evaluate wound complications, did

5        it?

6    A.  Correct, it did not.

7    Q.  Assuming the truth of this study, would you

8        ultimately agree that the change in protocol

9        from Tinzaparin, which is an LMWH, to

10       Xarelto, otherwise known as Rivaroxaban, and

11       then back to Tinzaparin, did not

12       significantly affect the infection rate?

13               MS. GARCIA:  Object to the form of

14       the question, to lack of foundation, and it's

15       an incomplete hypothetical.

16               THE WITNESS:  Assuming the study

17       was carefully done and generalizable, yes.

18   BY MR. SACCHET:

19   Q.  And assuming the study was well done and

20       generalizable, would you agree that the

21       change in thromboprophylaxis noted in the

22       McGovern study, Exhibit 4, did not confound

23       the infection rates?

24               MS. GARCIA:  Object to the form of

25       the question.

1                        NACHTSHEIM

2              THE WITNESS:  Assuming -- yes.

3   BY MR. SACCHET:

4   Q.  And would you also conclude that, assuming

5       the truth of this study, it would be improper

6       to deselect all of the patients who received

7       Xarelto, otherwise known as Rivaroxaban, from

8       the patient population if the

9       thromboprophylaxis was not a confounding

10      variable?

11              MS. GARCIA:  Object to the form of

12      the question.

13              THE WITNESS:  It doesn't seem

14      justified in -- on the basis of these

15      results.

16  BY MR. SACCHET:

17  Q.  And, in fact, when the coauthors of the

18      McGovern study were in the process of

19      publication, are you aware that at numerous

20      times they sought to collect additional data

21      in support of the study?

22  A.  I was not aware of that.  I knew that -- I

23      knew that they sought to run this study out

24      in time.

25  Q.  Are you aware that when Mr. Albrecht and

1                         NACHTSHEIM

2        Dr. Reed collected additional data that went

3        beyond January 2011 in the conductive fabric

4        warming population, that the data still

5        showed a significant decrease in infections

6        when conductive fabric warming was used?

7   A.   I'm aware of that.

8   Q.   Assuming that --

9                   MS. GARCIA:  Can we take a break

10       shortly?

11                  MR. SACCHET:  Yeah, give me two

12       minutes.

13  BY MR. SACCHET:

14  Q.   Assuming that neither the antibiotic nor the

15       thromboprophylaxis protocol required control

16       because they were not confounding factors as

17       we discussed, you would be confident in the

18       results of the observational study presented

19       in the McGovern data?

20                  MS. GARCIA:  Object to the form of

21       the question.

22                  THE WITNESS:  I'm confident that

23       those weren't confounding factors, that those

24       studies are well done.  It doesn't rule out

25       the potential for other confounding factors.

1                          NACHTSHEIM

2                    MR. SACCHET:  Fair enough.

3    BY MR. SACCHET:

4    Q.  And you continue to stand by the results of

5        the observational studies --

6    A.  Yes.

7    Q.  -- in the McGovern publication?

8    A.  I do.

9                    MR. SACCHET:  Let's take a break.

10                   THE VIDEOGRAPHER:  We're going off

11       the record at 5:07 p.m.

12                   (Whereupon, a brief recess

13                   was taken.)

14                   THE VIDEOGRAPHER:  This is video

15       number 6 in the deposition of Christopher

16       Nachtsheim.  Today is November 29th, 2016.

17       We're going back on the record at 5:18 p.m.

18   BY MR. SACCHET:

19   Q.  Professor Nachtsheim, if we could turn to

20       Exhibit 5, which is the Belani study.

21   A.  I have it.

22   Q.  Great.  And as to this study, your role was

23       to exclusively review the statistical portion

24       of this study, correct?

25   A.  Correct.

1                            NACHTSHEIM

2  Q.  You had no involvement in the setup of the

3      experiment?

4  A.  I did not.

5  Q.  You had no role in the execution of the

6      physical experiment?

7  A.  I did not.

8  Q.  You had seen, whether by video or in person,

9      disruption of laminar flow caused by the

10     Bair Hugger before, correct?

11 A.  I had, yes.

12          MS. GARCIA:  I'm sorry, can I hear

13     that question again?  I was thinking and I

14     did not hear the question.

15          MR. SACCHET:  Can you -- do you

16     mind repeating it.

17              (Whereupon, the last question

18              was read by the court reporter.)

19          MS. GARCIA:  Object to the form of

20     the question, asked and answered.

21 BY MR. SACCHET:

22 Q.  So you were familiar with the possibility,

23     based on your personal experience, that the

24     Bair Hugger could disrupt laminar airflow,

25     correct?

1                        NACHTSHEIM

2                   MS. GARCIA:  Object to the form of

3        the question, misstates the record and lack

4        of foundation.

5                   THE WITNESS:  Correct.

6   BY MR. SACCHET:

7   Q.   If we could turn to the third page of the

8        study.

9   A.   (Complies.)  408?

10  Q.   Yes.  Do you see the header entitled,

11       "Statistical Analysis"?

12  A.   I do.

13  Q.   And it reads, "A Poisson regression model for

14       overdispersed data was fit having the sum of

15       bubble counts for each experimental run,"

16       paren, "ten pictures," end parens, "as the

17       response, and the factors identified in the

18       experimental design as predictors plus an

19       interaction term."  Do you see that?

20  A.   I do, yes.

21  Q.   Did you determine that a Poisson regression

22       was the most appropriate statistical model to

23       employ because you were dealing with counts

24       data -- or data counts?

25  A.   Yes.

1                          NACHTSHEIM
2                 MS. GARCIA:  Object to the form of
3        the question, previously asked and answered.
4   BY MR. SACCHET:
5   Q.   And that Poisson regression was a better
6        model to use than, let's say, an ANOVA model?
7                 MS. GARCIA:  Object to the form of
8        the question, previously asked and answered.
9                 THE WITNESS:  Yes.
10  BY MR. SACCHET:
11  Q.   And if we could just turn our attention one
12       paragraph above that, it says, "For the
13       experimental design, a replicated and equals
14       to 2 by 3 full factorial design was used to
15       assess changes in bubble counts over the
16       surgical site," correct?
17  A.   Correct.
18  Q.   And what were the factors?
19  A.   So the first factor is the anesthesia screen,
20       low grade/high grade, those are the two
21       levels, and then there were three
22       patient-warming devices, conductive fabric,
23       forced-air or no warming device, and that
24       would -- that was considered a control.
25  Q.   Does Figure 3, directly above that paragraph,

1                         NACHTSHEIM

2        reflect the full factorial design of this

3        study?

4   A.   Yes, it does.

5   Q.   The Y axis designates the drape height,

6        correct?

7   A.   Yes, it -- it -- the Y axis designates the

8        drape height, right.  But also going up the Y

9        axis, we're changing the three -- the three

10       levels of fabric, if you will.

11  Q.   And the X axis designates the bubbles that

12       were counted for each run at a particular

13       drape height for a particular warming device,

14       correct?

15  A.   Correct.

16  Q.   Looking at the control for both drape heights

17       low and high, zero bubbles were counted,

18       correct?

19  A.   Correct.

20  Q.   And for conductive fabric, most of the runs

21       generated zero bubbles, correct?

22  A.   Correct.

23  Q.   It appears that there was only two instances

24       in which one bubble was generated, correct?

25                 MS. GARCIA:  Just -- I'm sorry, I

NACHTSHEIM

1

2      would just like to object to the form of

3      these questions for the use of the term

4      "generated."

5                    THE WITNESS:  Yes, that's -- that

6      is correct.

7   BY MR. SACCHET:

8   Q.  In contrast to that data set, the bubble

9       counts for forced-air warming at both a low

10      and high drape count generally exceeded one

11      bubble, correct?

12  A.  Correct.

13  Q.  In fact, for one run there were nearly 7

14      bubbles counted, correct?

15  A.  Correct.

16  Q.  And for the majority of runs, at least two to

17      four bubbles were counted, correct?

18  A.  At least, yes, correct.

19  Q.  Based on the differences in bubble counts

20      between the use of a forced-air warming

21      device compared to a conductive fabric

22      warming device, the study concluded that

23      there was a statistically significant

24      difference, correct?

25  A.  Correct.

1                          NACHTSHEIM

2    Q.   And that statistically significant difference

3         held a p-value of .001 for patient-warming

4         device, correct, as reflected in table 1?

5    A.   Actually, less than .001.

6    Q.   And such a low p-value would suggest that

7         there would be less than a 1 percent chance

8         of finding a false positive, otherwise known

9         as a difference that actually, in fact, does

10        not show a difference, correct?

11   A.   Less than a .1 percent.

12                  MS. GARCIA:  Object to the form of

13        the question.

14   BY MR. SACCHET:

15   Q.   The fact that only two trials were performed

16        with respect to each factor did not impact

17        the statistical significance of the result,

18        did it?

19   A.   No.  Let me answer -- let me be more careful

20        in my answer.  We had two replicates of the

21        experiment, so each -- each experimental

22        condition was run twice, and yet the results

23        led to highly significant effect due to the

24        patient-warming device.  So even with just

25        a -- just two replicates at each, we were

1                         NACHTSHEIM
2        able to find highly statistically significant
3        results.
4   Q.   So in other words, even though there were
5        only two trials, the study was still
6        adequately powered?
7   A.   Yes.
8   Q.   Because you could reject the null hypothesis
9        of equivalent bubble counts --
10  A.   Correct.
11  Q.   -- between the two devices?
12  A.   Correct.
13  Q.   If we could look at the, "Results," section
14       on the same page, it states, "In reviewing
15       the raw bubble count data," parens, "Figure
16       3," end parens, "It is apparent that there is
17       a large increase in the number of bubbles
18       reaching the surgical site when forced-air
19       warming is in use versus either conductive
20       fabric warming or control conditions.
21       Furthermore" --
22                    MS. GARCIA:  I'm sorry, I can't
23       find where you are.
24                    MR. SACCHET:  Okay.  I'm at the
25       bottom left-hand corner of the same page --

1                     NACHTSHEIM

2                MS. GARCIA:  Thank you.  I've got

3        it now.

4                MR. SACCHET:  Okay.  Do you want

5        me to read it again?

6                MS. GARCIA:  You can continue.

7                MR. SACCHET:  Okay.

8     BY MR. SACCHET:

9     Q.  -- "or controlled conditions.  Furthermore,

10        this increase seems to be independent of

11        drape height."  Do you stand by --

12    A.  Yes.

13    Q.  -- the text of this paragraph?

14    A.  Yes, I do.

15    Q.  And the paragraph goes on to state on the

16        right-hand column, the carry-over paragraph,

17        "With the full additive model, the use of

18        forced-air warming was found to result in

19        a" --

20    A.  Wait, excuse me -- oh, I see where you are

21        now.  Okay.  I'm sorry.  Continue.

22    Q.  -- "With the full additive model," parens,

23        "Figure 4," end parens, "The use of

24        forced-air warming was found to result in a

25        predicted mean sum of bubble counts equal to

NACHTSHEIM

1
2      132.5 when averaged across both anesthesia
3      drape heights.  Such a count represents a
4      significant increase in the number of bubbles
5      reaching the surgical site versus both
6      conductive fabric warming, the p-value of
7      .003 and control conditions with the p-value
8      .008, which had predicted mean sum of bubble
9      counts equal to 0.48 and 0.01 respectively."
10     Do you agree with that statement?
11  A.  I do.
12  Q.  Is my understanding correct that the sum of
13      bubble counts for forced-air warming was 132
14      versus a sum of bubble counts for conductive
15      fabric warming of 0.48?
16  A.  The -- the -- the predicted sum of bubble
17      counts was 132.5.  And, I'm sorry, what was
18      the other one you --
19  Q.  0.48 corresponding to conductive fabric
20      warming.
21  A.  Right.  Yes.
22  Q.  Assuming that bubbles were a proxy for
23      bacteria, would you stand by the conclusion
24      that there was a difference of nearly 132
25      bacterial particles with the use of

1                    NACHTSHEIM

2       forced-air warming versus conductive fabric

3       warming?

4                    MS. GARCIA:  Object to the form of

5       the question, it's an incomplete

6       hypothetical, it misstates the paper and

7       there is a lack of foundation.

8                    THE WITNESS:  If bubbles could be

9       used as a proxy, then that's true.

10   BY MR. SACCHET:

11   Q.  This paper, like the McGovern paper, was

12       submitted to a scientific journal, correct?

13   A.  Correct.

14   Q.  Unlike the McGovern study, it was submitted

15       to Anesthesia & Analgesia journal, correct?

16   A.  Correct.

17   Q.  Do you know whether an independent referee or

18       a third party reviewed the manuscript that

19       was submitted to the journal?

20   A.  There -- there was a review.

21   Q.  And the paper was ultimately published in

22       that journal, correct?

23   A.  Correct.

24   Q.  So a third party found that this data was

25       worthy of publication in a scientific

1                           NACHTSHEIM

2          journal, correct?

3     A.   Yes.

4     Q.   Do you have any doubt about the statistical

5          work that Mr. Albrecht performed with respect

6          to this study?

7     A.   I have no doubts about this, the statistical

8          work, I think it's fine.

9     Q.   Would you consider the statistical model of

10         this study fairly straightforward?

11    A.   Yes, very -- yes.

12    Q.   And you were previously asked whether the

13         absence of particular variables in this

14         study, including lighting, instrument trays

15         and the like, might have an effect on the

16         bubble counts, correct?

17    A.   Correct.

18    Q.   It is possible that the presence of those

19         variables might increase bubbles or decrease

20         bubbles based on the use of a patient-warming

21         device, correct?

22    A.   Correct.

23    Q.   You have no knowledge as to whether the

24         inclusion of those variables would have

25         resulted in a reduced bubble count with

1                        NACHTSHEIM

2        respect to the forced-air warming device, do

3        you?

4    A.   No.

5    Q.   The fact that you received consulting fees

6        from Augustine Biomedical or a successor

7        company did not influence your ability to

8        analyze this data, did it?

9    A.   I hope not.  I don't believe it did.  We try

10       to be objective about everything we do.  But,

11       no, it wouldn't have affected my analysis of

12       this data.

13   Q.   The amounts that you received were normal

14       consulting fees, correct?

15   A.   Correct.

16                 MS. GARCIA:  Object to the form of

17       the question.

18   BY MR. SACCHET:

19   Q.   They were nothing out of the ordinary in

20       terms of other fees that you charged other

21       third parties to perform statistical

22       analysis, correct?

23   A.   Correct.

24   Q.   You were previously asked a series of

25       questions regarding an operating room in a

1                          NACHTSHEIM

2      warehouse of sorts, correct?

3  A.  Yes.

4  Q.  And there were statements to the effect that

5      the results from the testing that had been

6      performed in that warehouse were,

7      quote/unquote, "goofy"; is that correct?

8  A.  Correct.

9  Q.  And you had mentioned that you were concerned

10     by some of the testing that had in fact

11     occurred in that warehouse, correct?

12 A.  Correct.

13 Q.  The experimental portion of the McGovern

14     study involving the simulated hip and lumbar

15     spine surgeries were not performed in that

16     warehouse, were they?

17 A.  They were not performed in that warehouse.

18 Q.  The experimental --

19              MS. GARCIA:  Object to lack of

20     foundation on that.

21 BY MR. SACCHET:

22 Q.  Where was the McGovern study performed?

23 A.  I believe that was in the hospital.  That was

24     the UK hospital, I believe.

25 Q.  And the UK is not the same place as the

```
                          NACHTSHEIM
 1

 2      warehouse that you visited, is it?

 3   A.  Correct.

 4   Q.  With respect to the Belani study, do you know

 5      where the experimental portion of the study

 6      was performed?

 7   A.  It was performed in a University of Minnesota

 8      Hospital.

 9              MS. GARCIA:  Objection; asked and

10      answered.  And I would note for the record

11      that before we came on after this break you

12      told us that you were instructed by your

13      co-counsel, who you had called, to use up and

14      run out your time after I had asked for time

15      to redirect.  And the video record will

16      reflect that there's been a marked decrease

17      in the pace of your questions.  And at this

18      point you are simply going over things that

19      we have discussed extensively this morning

20      and all day long, and I do have a few

21      follow-up questions simply to clarify a

22      couple of things, and Professor Nachtsheim, I

23      would appreciate the opportunity to ask

24      those --

25              MR. SACCHET:  I'm going to --
```

1                    NACHTSHEIM

2             MS. GARCIA:  -- just a few

3    questions.

4             MR. SACCHET:  I'm going to object

5    to the recitation of what I represented

6    during the break --

7             MS. GARCIA:  Did you say that?

8    Did you say that?

9             MR. SACCHET:  -- because I

10   represented that I would be using the rest of

11   the time and that it was not going to be for

12   an improper purpose, but seven hours are

13   allotted for the deposition --

14            MS. GARCIA:  You did say it was

15   your marching orders.

16            MR. SACCHET:  -- and that seven

17   hours has been noted --

18            MS. GARCIA:  You also said it was

19   your marching orders --

20            MR. SACCHET:  -- and it's also my

21   choice.

22            MS. GARCIA:  -- everyone in this

23   room heard it.

24            MR. SACCHET:  And it's also my

25   choice.

1                        NACHTSHEIM

2              MS. GARCIA:  That's fair enough.

3    It is your choice.  And your rate of

4    questioning has decreased markedly, and I'm

5    asking Professor Nachtsheim if he would be

6    willing to stay for a few moments so that I

7    can clarify a few things on the record.

8              MR. SACCHET:  It's not the

9    deponent's choice.

10             MS. GARCIA:  He can make a choice,

11   sure he can.  He's allowed to make a choice,

12   absolutely.

13             MR. SACCHET:  You want to subject

14   the deponent to the choice of whom he'd like

15   to receive questions from?

16             MS. GARCIA:  I'm saying I have a

17   few clarifying questions based on questions

18   you asked him that are outside his area of

19   expertise, and I want to make sure the record

20   is clear about that.

21             MR. SACCHET:  Well, I'd like to

22   finish my set of questions, and if there's

23   time for you to do that, I respect that.  But

24   I'm not done with my line of questions.  In

25   fact, I have a 30-page outline, which I've

<div align="center">NACHTSHEIM</div>

1
2    addressed maybe 10 percent of it.  So if
3    you're doubting the scope of my examination,
4    I can show you this and prove that my
5    examination would have lasted seven hours.
6           MS. GARCIA:  Go right ahead.
7           MR. SACCHET:  Do you want to see
8    it?
9           MS. GARCIA:  No, I can see you
10    holding it.
11           MR. SACCHET:  Okay.  So --
12           MS. GARCIA:  I would like you to
13    go ahead and ask your questions.
14           MR. SACCHET:  I will.
15  BY MR. SACCHET:
16  Q.  So going back to the question that I just
17    answered [sic], this study, the Belani study,
18    namely, was not conducted in the warehouse
19    that you previously mentioned --
20  A.  Correct.
21  Q.  -- this afternoon, correct?
22  A.  Correct.
23  Q.  Okay.  And in the last paragraph, or the
24    second to last paragraph of the Belani study,
25    if you can turn your attention to the last

1                         NACHTSHEIM

2       page.

3   A.  Second to last paragraph?

4   Q.  Actually, the third to last paragraph.

5   A.  Okay.

6   Q.  It states, "The most recent articles

7       published on the association between patient

8       warming excess heat and ventilation

9       disruption present contradictory conclusions.

10      Two studies conducted in the United Kingdom

11      that characterized both the thermal basis and

12      the airflow patterns supporting the physics

13      behind ventilation disruption in laminar

14      airflow ORs.  In contrast, a published study

15      in the Netherlands found no evidence of

16      ventilation disruption due to forced air

17      excess heat when evaluated with the

18      DIN 1946:2008-12 standard.  This discrepancy

19      in findings is likely related to two primary

20      differences in test methods"; do you see

21      that?

22  A.  I do.

23  Q.  Do you know what study is referred to by the

24      Netherlands study?

25  A.  I'm actually not familiar with it.  I've not

1                           NACHTSHEIM

2          read it.

3     Q.   If you turn to footnote 19, can you determine

4          what that study is?

5     A.   Footnote 19 or reference 19?  I'm --

6     Q.   Yeah, I apologize, reference 19.

7     A.   Sessler, Olmstead, Kuelpmann, "Forced-air

8          warming does not worsen air quality in

9          laminar flow operating rooms," is that --

10    Q.   Have you ever read that study before?

11    A.   I've not read that.  I've not read that

12         study.

13    Q.   Okay.

14                    (Whereupon, Exhibit 29 was

15                    marked for identification.)

16                    MR. SACCHET:  Well, I'll try to, I

17         guess, rush it up.

18    BY MR. SACCHET:

19    Q.   If you could turn to the third page of this

20         study bearing the Bates number 3MBH0095630.

21    A.   Okay.  Where do you want me to focus?

22    Q.   There are two figures there, one --

23    A.   Oh, okay.

24    Q.   -- presented at the top right-hand corner and

25         one directly beneath that.

1                          NACHTSHEIM

2    A.   Yup.

3    Q.   Do you see that the X axis measures no air,

4         ambient air and warm air?

5    A.   I do.

6    Q.   And do you see that the Y axis measures

7         particle concentration?

8    A.   I do.

9    Q.   Do you see that the Y axis ranges in -- in

10        term from 1 to 10, to a hundred to a

11        thousand, to 10,000, a hundred thousand,

12        1 million, 10 million to a hundred million?

13   A.   Yes, I do.  It's on a log scale.

14   Q.   Is it normal in the field of statistics to

15        present a Y axis that has such a large

16        variance in increments on the Y axis?

17   A.   It is normal.

18   Q.   It is.  If the scale of the Y axis had been

19        reduced to something like 1 to 10,000, would

20        the difference between no air, ambient air

21        and warm air appear to be more significant

22        than it does on the graph as it is?

23   A.   Yes, they would -- it would appear to be --

24        oh, wait, it -- oh, between no air, ambient

25        air and warm air?

1                          NACHTSHEIM

2    Q.   Uh-huh.

3    A.   It would look like a larger difference.

4    Q.   And if you look at the graph beneath that and

5         we compare no air, ambient air and warm air,

6         what is the value of the particle

7         concentration at no air?

8    A.   One thousand.

9    Q.   What is the particle concentration for warm

10        air?

11   A.   For warm air it's a little hard to tell,

12        because of the log scale, but it's -- I don't

13        know, it's probably -- probably -- it might

14        be 5 or 6,000, I'm not sure.

15   Q.   So it appears that there is about a five

16        times increase in particle concentration

17        compared to no air?

18   A.   Correct.

19   Q.   If the underlying raw data of this study

20        showed there to be a p-value of 0.06 with

21        respect to the difference in particle

22        concentration between the use of no air and

23        warm air from the Bair Hugger, would you

24        consider that to show statistical

25        significance?

NACHTSHEIM

1

2  A.  0.06, we tend to call that marginal

3      significance.

4  Q.  If you had generated a p-value of 0.06 in one

5      of your own studies that you were a coauthor

6      of, would you have noted in the paper

7      addressing that data that there was a nearly

8      statistical significant result?

9              MS. GARCIA:  Object to the form of

10     the question.

11             THE WITNESS:  I very well might.

12     And, particularly, if it went in the

13     direction of, say, theory or there was some

14     expectation, but anyway, it's common to

15     say -- say marginal.

16             MR. SACCHET:  I have hours of more

17     questioning, but for the sake of being

18     gracious, I will allot the last remaining

19     minutes to you to ask whatever you need to

20     ask.

21             MS. GARCIA:  Thank you.

22

23                   EXAMINATION

24  BY MS. GARCIA:

25  Q.  I just wanted to clarify a couple of things

1                          NACHTSHEIM

2        with respect to Exhibit 27, please.  This is

3        the one page that bears the Albrecht number

4        on the bottom.

5                   I just wanted to be sure I

6        understand, do you have any knowledge about

7        this analysis or what it represents beyond

8        simply looking at the piece of paper?

9   A.   No.

10  Q.   Do you know what antibiotic protocol 1 or

11       antibiotic protocol 2 is?

12  A.   I think those -- those refer to --

13  Q.   Do you know?

14  A.   It's what we talked about in the paper.

15  Q.   Well, we have -- I understand that there was

16       a connection made to what's in the paper, but

17       do you know for sure which is antibiotic

18       protocol 1 or 2 or whether either of it

19       relates to what's in the paper, do you

20       actually know that?

21  A.   I -- I suppose I -- well, I assumed that it

22       had to do with what we read in the paper

23       about the change in protocols.

24  Q.   Do you have any information about what it

25       actually represents?

1                         NACHTSHEIM

2    A.   No, there's nothing here.

3    Q.   And do you know when in time this analysis

4         was conducted?

5    A.   I do not.

6    Q.   And do you know for sure that the data set on

7         which it was conducted is the same data set

8         as the McGovern paper?

9    A.   I do not.

10   Q.   And you were asked a series of questions

11        about antibiotics and anti prophylaxis.

12        Exhibit 28 is a paper that was apparently --

13        that was -- is marked as having been produced

14        from your files.  Do you know any of the

15        authors on this paper?

16   A.   Let's see, I don't believe I do.  I mean, I

17        know who Mike Reed is.

18   Q.   Okay.

19   A.   But I don't know any of the other authors.

20   Q.   Do you have any information about how well

21        this study was designed or conducted?

22   A.   No, and that's why I think I answered some of

23        the questions saying assuming this was a

24        well-done study then --

25   Q.   You also said assuming it was generalizable,

1                       NACHTSHEIM

2        you might be able to make some conclusion

3        based on that.  Do you have any information

4        about whether this study is generalizable?

5    A.  I have none at this moment.

6    Q.  Okay.  And do you have any information about

7        whether the findings in this study would be

8        relevant to the analysis or investigation

9        that you made in the McGovern study?  Not

10       that you made, that was made in the McGovern

11       study.

12   A.  That was made in the McGovern study.  Well,

13       it seems relevant since they were looking at

14       infections.

15   Q.  Do you have any expertise in medicine and the

16       treatment of infection?

17   A.  No.

18   Q.  Do you have any infectious disease expertise?

19   A.  No.

20   Q.  Do you know enough about this paper to give

21       any type of opinion about whether what it

22       represents is in fact relevant to what was

23       done at the Northumbria Health System?

24   A.  Yeah, so my opinions were under the

25       assumptions that this was -- these were the

NACHTSHEIM

1
2      same -- these were the same drugs and we were

3      counting the same kinds of infections.

4   Q.  Do you know that to be the case?

5   A.  I don't know that to be the case.

6   Q.  And even if there were findings about the

7      effect of a drug in one particular study,

8      perhaps Exhibit 28, would that necessarily

9      translate to the content -- the context of

10      Northumbria?

11   A.  Not necessarily.

12   Q.  And the other confounding factors,

13      potentially founding -- confounding factors

14      that we discussed, still exist with respect

15      to the McGovern paper, correct?

16   A.  The others, yes.

17   Q.  And would knowledge about how those changes

18      might relate to either the data presented in

19      exhibits -- in Exhibit 27, or any antibiotic

20      drug effect presented in Exhibit 28, be

21      important?

22   A.  Now, you're -- and you're talking about the

23      other --

24   Q.  Yes.

25   A.  -- confounding factors, not -- other

1                      NACHTSHEIM

2      potential factors that we may or may not know

3      about?

4   Q.  Yes.  Those would still be important?

5   A.  Those could still be important.

6   Q.  Okay.

7                   MS. GARCIA:  That's all I have.

8      Thank you.

9                   THE VIDEOGRAPHER:  We're going off

10     the record at 5:45 p.m.

11                  (Whereupon, a brief discussion

12                  was held.)

13                  THE WITNESS:  This is my updated

14     CV.

15                  MS. GARCIA:  Yes, that will be the

16     record copy.

17                  (Whereupon, Exhibit 30 was

18                  marked for identification.)

19                  (Whereupon, the foregoing

20                  deposition concluded at 5:48 p.m.)

21

22

23

24

25

Page 378

1                         ERRATA SHEET

2     Case Name:

3     Deposition Date:

4     Deponent:

5     Pg.  No. Now Reads      Should Read   Reason

6     ____ ____ _____   _____   _____

7     ____ ____ _____   _____   _____

8     ____ ____ _____   _____   _____

9     ____ ____ _____   _____   _____

10    ____ ____ _____   _____   _____

11    ____ ____ _____   _____   _____

12    ____ ____ _____   _____   _____

13    ____ ____ _____   _____   _____

14    ____ ____ _____   _____   _____

15    ____ ____ _____   _____   _____

16    ____ ____ _____   _____   _____

17    ____ ____ _____   _____   _____

18    ____ ____ _____   _____   _____

19    ____ ____ _____   _____   _____

20

                                  _____

21

                                  Signature of Deponent

22

      SUBSCRIBED AND SWORN BEFORE ME

23    THIS _____ DAY OF _____, 2016.

24    _____

25    (Notary Public)   MY COMMISSION EXPIRES:_____

Page 379

1
2

     I, Christopher Nachtsheim, have read this

3

     deposition transcript and acknowledge

4

     herein its accuracy except as noted:

5
6

                    _____

7                         Witness Signature

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 380

1    STATE OF MINNESOTA   )
                          ) ss
2    COUNTY OF ANOKA      )

3

4           Be it known that I took the foregoing
     deposition of Christopher Nachtsheim, on
     November 29th, 2016, in Minneapolis, Minnesota;

5

6           That I was then and there a notary public
     in and for the County of Anoka, State of Minnesota,
     and that by virtue thereof, I was duly authorized
7    to administer an oath;

8           That the witness was by me first duly
     sworn to testify to the truth, the whole truth and
9    nothing but the truth relative to said cause;

10          That the foregoing transcript is a true
     and correct transcript of my stenographic notes in
11   said matter;

12          That the witness reserved the right to
     read and sign the transcript;

13

14          That I am not related to any of the
     parties hereto, nor interested in the outcome of
     the action;

15

16          WITNESS MY HAND AND SEAL this 9th day of
     December, 2016.

17

18          _____

                  Amy L. Larson, RPR
19                My Commission Expires 1/31/2020

20

21

22

23

24

25