# EXHIBIT 40

Page 1

1                IN THE UNITED STATES DISTRICT COURT
                         DISTRICT OF MINNESOTA
2
     - - - - - - - - - - - - - - - - - - - -
3    IN THE MATTER OF                    )
                                         )
4    IN RE BAIR HUGGER FORCED AIR        )
     WARMING                             )
5    PRODUCTS LIABILITY LITIGATION       )
                                         )
6                       Plaintiff,       )
                                         )PRETRIAL ORDER NO: 7
7    v.                                  )Protective Order
                                         )MDL No. 15-2666
8    3M COMPANY AND ARIZANT              )(JNE/FLN)
     HEALTHCARE INC.                     )
9                       Defendant.       )
     - - - - - - - - - - - - - - - - - - - -
10                   DEPOSITION OF PAUL MCGOVERN

11                          VOLUME I

12                  Wednesday, January 4, 2017

13                 AT:  FAEGER BAKER DANIELS

14                       Taken at:

15                    7 Pilgrim Street
                      London EC4V 6LB
16                     United Kingdom

17

18

19

20   Court Reporter: Louise Pepper

21   Videographer: Simon Addinsell

22

23

24

25   Job No: 117119

```
 1                    A P P E A R A N C E S

 2    Appearing for the Plaintiff:

 3               MR. MICHAEL SACCHET
                 CIRESI CONLIN
 4               225 South 6th Street
                 Minneapolis, MN 55402
 5

 6

 7
                 GENEVIEVE ZIMMERMAN
 8               MESHBESHER & SPENCE
                 1616 Park Avenue
 9               Minneapolis, MN 55404

10

11
      Appearing for the Defendant:
12
                 MR. COREY GORDON
13               BLACKWELL BURKE
                 431 South Seventh Street
14               Minneapolis, MN 55415

15

16

17               MS. KATHERINE NEWMAN
                 FAEGRE BAKER DANIELS
18               7 Pilgrim Street
                 London EC4V 6LB
19

20

21    Appearing for the Witness:

22               MR. ANDREW HEAD
                 MR. BRYAN SHACKLADY
23               FORSTERS
                 31 Hill Street
24               London W1J 5LS

25
```

Page 3

1              W I T N E S S   I N D E X

2  PAUL MCGOVERN (sworn) ...............................6

3      Examination by MR. GORDON  .....................6

4              E X H I B I T   I N D E X

5

6  Exhibit 1A Bundle of emails .........................8
             provided by Dr. Paul McGovern,
7            volume 1 of 2, pages 1-493

8  Exhibit 1B Index to Exhibit 1A .....................9

9  Exhibit 2A Bundle of emails ........................10
             provided by Dr. Paul McGovern,
10           volume 2 of 2, pages 494-793

11 Exhibit 2B Index to Exhibit 2A .....................10

12 Exhibit 3A Bundle of documents .....................26
             provided by Dr. Paul McGovern,
13           volume 1, pages 1-506

14 Exhibit 3B Index to Exhibit 3A .....................26

15 Exhibit 4A Bundle of documents .....................28
             provided by Dr. Paul McGovern,
16           volume 2, pages 507-995

17 Exhibit 4B Index to Exhibit 4A .....................28

18 Exhibit 5A Bundles of documents ....................29
             provided by Dr. Paul McGovern,
19           volume 3, pages 996-1508

20 Exhibit 5B Index to Exhibit 5A .....................29

21 Exhibit 6A Bundle of documents .....................29
             provided by Dr. Paul McGovern,
22           volume 4, pages 1509-1986

23 Exhibit 6B Index to Exhibit 6A .....................29

24 Exhibit 7A Bundle of documents .....................29
             provided by Dr. Paul McGovern,
25

1                    DR. PAUL MCGOVERN
                 volume 5, pages 1987-2528
2

Exhibit 7B Index to Exhibit 7A .....................30
3

Exhibit 8A Bundle of documents ....................30
4          provided by Dr. Paul McGovern,
           volume 6, pages 2529-2989
5

Exhibit 8B Index to Exhibit 8A ....................30
6

Exhibit 9A Bundle of documents ....................30
7          provided by Dr. Paul McGovern,
           volume 7
8

Exhibit 9B Index to Exhibit 9A ....................30
9

Exhibit 10A Bundle of documents ...................30
10          provided by Dr. Paul McGovern,
            volume 8, pages 3539-3717
11

Exhibit 10B Index to Exhibit 10A ..................31
12

Exhibit 11 Document entitled ......................121
13          "Implementing effective SSI
            surveillance", dated October
14          2014

Exhibit 12 Document entitled "The .................124
15          'How To' Guide for Reducing
16          Harm in Perioperative Care".

Exhibit 13 Email chain between ....................226
17          Scott Augustine, Tom Durick
18          and Paul McGovern, dated
            August 2, 2016, Bates stamped
19          AUGUSTINE 0019943-44

20

21

22

23

24

25

1              DR. PAUL MCGOVERN

2                   P R O C E E D I N G S

3        THE VIDEOGRAPHER:  This is the beginning of DVD 1

4   in volume 1 of the deposition of Dr. Paul McGovern in the

5   matter of the litigation for In Re Bair Hugger Forced Air

6   Warming Products Liability Litigation.  This matter is in

7   the United States District Court, the District of Minnesota,

8   and the number is MDL 15-2666(JNE-FLN).  Today's date is

9   4 January 2017 and the time is currently a quarter to

10  10 a.m.  The deposition is taking place at the offices of

11  Faeger Baker Daniels in London.  The court reporter is

12  Louise Pepper, the videographer Simon Addinsell, both with

13  TSG.  Can we just go off the recording a second?  I'm

14  getting bad interference.

15  (9:45 a.m.)

16                    (Off the record.)

17  (9:46 a.m.)

18        THE VIDEOGRAPHER:  Back on the record at 9:46 of

19  the read-in.  Could counsel in the room please introduce

20  themselves and say who they are representing today, please.

21        MR. C. GORDON:  Corey Gordon on behalf of

22  defendant, 3M company.

23        MS. NEWMAN:  Katherine Newman on behalf of 3M.

24        MR. HEAD:  Andrew Head, partner at Forsters, on

25  behalf of Dr. McGovern.

```
 1                    DR. PAUL MCGOVERN

 2            MR. SACCHET:  Michael Sacchet on behalf of the

 3   plaintiffs.

 4            MS. ZIMMERMAN:  Genevieve Zimmerman on behalf of

 5   the plaintiffs.

 6            THE VIDEOGRAPHER:  Could the court reporter please

 7   swear the witness in now, please.

 8                         PAUL MCGOVERN

 9   having been sworn testified as follows:

10            THE VIDEOGRAPHER:  It's 9:47, you're on the

11   record.  Please begin, counsel.

12   EXAMINATION BY MR. C. GORDON

13   BY MR. C. GORDON:

14        Q.  Good morning, Dr. McGovern.

15        A.  Good morning.

16        Q.  We met briefly before.  I'm Corey Gordon; I

17   represent 3M company in connection with proceedings in the

18   United States involving litigation over the 3M Bair Hugger

19   warming product.  Have you ever had your deposition taken

20   before?

21        A.  No.

22        Q.  Have you ever given testimony in court?

23        A.  No.

24        Q.  Okay.  The main thing that makes this different

25   than a normal conversation is we have a court reporter
```

taking down testimony. So that means a couple of things. Number one, a nod or a shake of the head, which would communicate something to me, can't be transcribed. So if you would try to remember to answer "yes", "no", whatever, verbally as opposed to a shake or nod of the head.

The other important thing is that I have to wait for you to finish your answer before I begin another question. You have to wait until I'm done with the question completely before you begin your answer. Again, just so the court reporter is able to cleanly transcribe what is being said. Sometimes that gets a little uncomfortable because in normal human communication we talk back and forth, and often times will start answering before somebody finishes, et cetera.

You are here today originally pursuant to an agreement that was worked out between the parties; is that your understanding?

A. Yes.

Q. And as part of that agreement, both the plaintiffs and the defendants have agreed to pay your attorneys' fees and to reimburse you for the time you have spent preparing, and the time you are here giving testimony; is that your understanding?

1                    DR. PAUL MCGOVERN

2        A.   Yes.

3        Q.   Does the fact that your time is being paid for, or

4    your attorneys' time is being paid for, the fact that it is

5    being paid for jointly by the parties to these proceedings,

6    the plaintiffs and the defendant, do you think that in any

7    way influences your testimony?

8        A.   I do not.

9        Q.   And as part of the agreement, you undertook to

10   collect certain documents that we had requested; is that

11   correct?

12       A.   Yes.

13       Q.   We're going to -- just to get the administrative

14   stuff out of the way, we're going to go through and identify

15   on the record and formally mark the multiple volumes of

16   documents that are seated before you, and then hopefully get

17   at least some of them out of the way while we ask the

18   questions.  But I'm going to start with the first one that

19   we marked, which is volume 1A, or exhibit 1A.  And if you

20   could just tell us just briefly what that is.

21            (Exhibit 1A marked for identification)

22       A.   This appears to be a record of e-mails that I have

23   sent and received in relation to this matter.

24       Q.   And by "this matter", you're talking about

25   generally the activities that you have been involved in that

1              DR. PAUL MCGOVERN

2    relate to the Bair Hugger?

3         A.  Correct.  So it --

4              THE VIDEOGRAPHER:  Sorry, can I stop you.  Your

5    microphone, sir.  It is inside your jacket.  Thank you.

6    Okay, sorry about that.

7         A.  Where were we?

8              THE VIDEOGRAPHER:  I beg your pardon.

9         A.  Where were we?

10   BY MR. C. GORDON:

11        Q.  The e-mails that relate to the Bair Hugger.

12        A.  Yes.  So they are e-mails that were sent and

13   received by me in relation, generally, to research that

14   I have done into the Bair Hugger system, and also into

15   infection, or the potential for infection, in operating

16   rooms.

17        Q.  Okay, and yesterday we received from your attorneys

18   a set of indices.  I'm going to show you what I've marked as

19   exhibit 1B.  Is that now the index to what we've marked as

20   1A?

21             (Exhibit 1B marked for identification)

22             MR. HEAD:  Can I clarify, is 1A and 1B what we

23   call 1 and 2?

24             MR. C. GORDON:  No.  This is going to get

25   confusing.  Exhibit 1A is the documents itself, the folder

1                        DR. PAUL MCGOVERN

2    with the -- it's your volume 1 of 2.

3                MR. HEAD:  Right.  That's the e-mails, yes?

4                MR. C. GORDON:  Of the e-mails.

5                MR. HEAD:  Right.

6                MR. C. GORDON:  1B I've marked -- what I've marked

7    as just the index itself.

8                MR. HEAD:  Of the e-mails?

9                MR. C. GORDON:  Of exhibit 1A, of just volume 1 of

10   2 of the e-mails.  I know it's going to get confusing.

11        A.  I haven't cross-correlated all of these, but this

12   appears to be representative of the e-mails that I've sent.

13   BY MR. C. GORDON:

14        Q.  I'm guessing that was sent by your counsel's

15   office?

16        A.  The?

17        Q.  The index.

18        A.  Yes.

19            (Exhibit 2A marked for identification)

20        Q.  The next thing I've marked is 2A.  That would be

21   the second volume of e-mails you collected relative to this

22   matter; is that right?

23        A.  Yes, yes.

24            (Exhibit 2B marked for identification)

25        Q.  Similarly, then, 2B would be the index; is that

1                    DR. PAUL MCGOVERN

2    right?  The index for what we've marked as exhibit 2A?

3         A.  Yes.

4         Q.  Okay.  Now, I believe those are the -- those two

5    volumes, exhibits 1A and 2A, comprise the e-mails that you

6    collected and produced in connection with this; is that

7    correct?

8         A.  Yes.

9         Q.  Let's stop for one moment and briefly -- what were

10   your search parameters?  How did you go about collecting

11   these e-mails?

12        A.  I looked through the -- these e-mails are from my

13   personal e-mail account, which draws in e-mails from some of

14   the work e-mails that I've had over the period of time in

15   question.  I searched based on who the correspondence was

16   with, and the idea of that search was to catch any relevant

17   e-mails.  I can't remember the exact search terms I used.  I

18   have provided them at some point.  So I searched for words

19   which would have -- mainly names of correspondents which

20   would have been included in this discussion.

21        Q.  Did you ever use an e-mail account in connection

22   with an employment situation, or otherwise, that was not

23   searched as part of this?

24        A.  I may have used my e-mail account for the NHS,

25   which is the UK National Health Service, for some of the

1                         DR. PAUL MCGOVERN

2    correspondence.  However, the vast majority of my

3    correspondence, and I suspect all correspondence, would have

4    been on this e-mail account, to the best of my knowledge.

5    My practice is to try to keep things in one account, and so

6    while people will have e-mailed me while I was working for

7    Northumbria Healthcare Trust on my NHS e-mail account, which

8    is now inactive and I don't have access to, it is very

9    unlikely that any significant amount of correspondence will

10   have been on other accounts, although it is possible.

11        Q.  Before we go any further, let's just get an

12   overview of your background.  You are a physician; is that

13   correct?

14        A.  That's correct.

15        Q.  When did you complete your medical training?

16        A.  I qualified my -- I qualified as a doctor in 2006.

17        Q.  And at that point did you do what we would call a

18   residency?

19        A.  So in the UK doctors will undertake two years of

20   foundation training in which they are registered as doctors

21   and they are working as doctors.  And that, I think, would

22   correspond to an internship.  And then I moved into surgical

23   practice, which I think corresponds to a residency, in

24   what's termed basic, and then -- basic for two years and

25   then higher surgical training in trauma and orthopedics.

1                    DR. PAUL MCGOVERN

2          Q.   So your -- first of all, where did you get your

3     medical degree?

4          A.   UCL, University College London.

5          Q.   That first two years of foundation training, where

6     was that done?

7          A.   That was in the North Central Thames Foundation

8     School, which is an organization which administers and

9     provides junior level doctors to hospitals, and my first

10    year of training was in Basildon, B-A-S-I-L-D-O-N, Hospital

11    in Essex just outside London.  And my second year was in

12    University College Hospital in Central London.

13         Q.   And where did you begin your orthopedic training?

14         A.   My basic surgical training, so --

15         Q.   -- just need your surgical training.

16         A.   Well, they're the same thing.  Orthopedic training

17    and basic surgical training, they are the same program.

18    I started in the northern regions, so around Newcastle in

19    the North of England, and I started working in Durham on

20    a two-year basic surgical training program administered

21    centrally in the North East of England, which saw me go to

22    various hospitals in various different training programs.  I

23    worked in Durham Hospital for eight months, working in

24    trauma and orthopedics for four months and then plastic

25    surgery for four months, and then I worked in a hospital in

```
 1                    DR. PAUL MCGOVERN
 2   Stockton Upon Tees for four months in general surgery and
 3   breast cancer surgery, and oncoplastic surgery.  Then I
 4   worked in Wansbeck Hospital in Ashington in Northumberland
 5   to the north of Newcastle for six months, and then I was in
 6   the University Hospital of -- North Tees or North
 7   Tyneside? -- I think North Tyneside -- for another six
 8   months.
 9        Q.   And Wansbeck is part of the Northumbria Trust?
10        A.   That's correct.  So the whole of that second year
11   of basic surgical training, even though I was in two
12   different hospitals, both hospitals are part of Northumbria
13   Healthcare NHS Trust.
14        Q.   Both Wansbeck and North Tyneside?
15        A.   Yes.
16        Q.   So what year would you have started doing anything
17   in north --
18        A.   2009 to 10.
19        Q.   And when you were through with your higher training
20   in trauma and orthopedics --
21        A.   Yeah, that was my basic trading.  So you have two
22   years of foundation training, two years of basic training,
23   and then six years of higher training.
24        Q.   Okay.  Where was the six years of higher training?
25        A.   So I haven't completed -- I've since changed
```

1                    DR. PAUL MCGOVERN

2  specialties, so I'm no longer in trauma and orthopedics, but

3  after finishing in Northumbria Healthcare I worked at UCL

4  Medical School as a teaching fellow and lecturer for eight

5  months, that was a post split between Basildon Hospital in

6  Essex and UCL Medical School.  And then after that, I

7  entered higher surgical training for the South London or

8  South East Thames Region for that, for orthopedic higher

9  surgical training.

10      Q.  Was that at a particular hospital?

11      A.  So that was Princess Royal University Hospital in

12  South London for six months, and then Medway Hospital in

13  Gillingham, Kent, for two years.

14      Q.  At what point did you decide to switch

15  specialities?

16      A.  So, after two years in Medway Hospital in

17  Gillingham, I became a lecturer again at UCL Medical School

18  in post-graduate medical education and education

19  consultancy, and that was initially for a single-year post

20  out of my training program as a programmed or approved

21  activity -- the intention to be to return to orthopedic

22  training.  But that role was extended, and during that

23  period I changed specialty to occupational medicine.  So

24  I worked for three years for UCL Medical School in

25  post-graduate education and medical education consultancy,

1                    DR. PAUL MCGOVERN

2   and started working as an occupational physician/trainee, or

3   occupational physician, in August 2016.

4        Q.   Still at University College London?

5        A.   No, that for a company called Medigold Health or

6   Medigold Healthcare.

7        Q.   That's a private company?

8        A.   Correct.

9        Q.   Not associated with the National Health Service?

10        A.   Correct.

11        Q.   How long will your program be in occupational

12   medicine?

13        A.   That's a four-year training and working while

14   training program.

15        Q.   And when you complete that, you would be

16   a specialist in occupational medicine?

17        A.   That's correct.  The plan will be to complete that

18   training and become a specialist.  That would be, to my

19   understanding, an attending-level occupational physician or

20   a consultant.  Occupational physician, as we'd say in the

21   UK.

22        Q.   When was the last time you performed any orthopedic

23   surgery?  Or maybe where?

24        A.   It would be Medway in Kent, was the last time

25   I performed any orthopedic surgery.

1                    DR. PAUL MCGOVERN

2        Q.   Is Medway part of a trust?

3        A.   That is, I think, Medway NHS Foundation Trust.

4   I think that's the name of the trust.

5        Q.   And when you were at Medway, did you perform any

6   hip or knee joint replacements?

7        A.   Yes.

8        Q.   What type of warming, patient-warming systems were

9   being used at Medway when you were there?

10       A.   The type of warming systems used at Medway at the

11  time I was there were Bair Huggers.  And while I was there,

12  there was a period of looking at other warming devices, one

13  of which was HotDog, and another one was I think

14  a conductive warming technology that was not HotDog.  It was

15  from a different company, but I don't remember the name of

16  it.

17       Q.   Is that possibly Indotherm?

18       A.   It may have been Indotherm.  The blankets were

19  orange, as I remember.  But it may have been another

20  company.

21       Q.   As a result of the -- that period of looking at the

22  other warming devices, did -- while you were there, did

23  Medway switch to a different device?

24       A.   I don't know if they formally and finally switched.

25  There was a period when they were using other devices, but I

                      DR. PAUL MCGOVERN

1

2  don't know if the hospital or the trust made a whole scale

3  or a wholesale switch to a different device or different

4  technology.  I don't know.

5      Q.  And when you left there, was Bair Hugger still

6  being used for arthroplasties?

7                  (Reporter clarification.)

8      A.  I don't remember.

9      Q.  Okay.  So, let's go back to 2009 when you started

10  at Wansbeck.  Was that the first time you would have had any

11  contact with Mr. Mike Reed?

12      A.  Yes.  Err ... no.  Any contact whatsoever would

13  probably have been in 2008 because he is -- or was -- fairly

14  senior in the training of -- involved in the training of

15  orthopedic surgeons in the northern deanery.  So it is

16  likely I would have received e-mails from him prior to 2009,

17  probably in 2008.  They would have been not to me

18  personally; they would have been group e-mails.  I don't

19  remember the content of them, but it is likely I would have

20  had received communication from him before then, but the

21  first time that I started working with him was in 2009.

22                  (Reporter clarification.)

23      Q.  What month in 2009 did you start at Wansbeck?

24      A.  August.

25      Q.  Using that as kind of a benchmark time frame, when

1                    DR. PAUL MCGOVERN

2    you started at Wansbeck in August 2009, had you had any

3    involvement in any activity or attending any seminar,

4    reading any material, anything that would have raised any

5    questions about the use of forced-air warming of Bair Hugger

6    in orthopedic surgery?

7         A.   I don't remember.

8         Q.   Now, certainly subsequent to the time you started

9    at Wansbeck, something got you involved in, and

10   interested in, forced-air warming?

11        A.   Yes.

12        Q.   What was -- do you recall what it was that first

13   attracted your interest?

14        A.   As a training surgeon, there is -- one is

15   encouraged to undertake audit activity and research

16   activity.  And so it's common practice for a surgical doctor

17   to speak to their boss, their consultant, or someone senior

18   to them, to ask if any research is ongoing in the

19   department.  And one of Mike Reed's research interests is

20   infection in the operative or the perioperative period.  And

21   in fact, it's something that is taken very seriously in all

22   hospitals, in all orthopedic departments, but Wansbeck --

23   there was a culture in the department of being very vigilant

24   for possible sources of infection to -- with a view to

25   reducing overall infection rate.

1                    DR. PAUL MCGOVERN

2          And so I was introduced to the research in

3    question by Mike Reed, following an approach from

4    myself to get involved with some research that was

5    ongoing in the department.

6       Q.  When you started in August of 2009 at Wansbeck,

7    were you aware of any concerns that the NHS had expressed

8    about the rate of infections in the orthopedics department

9    at the -- in the Northumbria Trust hospitals?

10      A.  I was not there that the NHS had expressed any

11   concerns.

12      Q.  And as you sit here today, you never heard that

13   there had been concerns expressed about how high the rates

14   of infection had been?

15      A.  So, you say the NHS.  What I took to mean by that

16   was the higher body of the NHS.  I wasn't aware if they had

17   particularly expressed concerns.  However, I was aware that

18   there were concerns within the department that the infection

19   rate at that trust was higher than would have been

20   considered ideal, and there were efforts to bring it down.

21      Q.  And when you started, were -- had all those efforts

22   to bring it down already been undertaken, or were there

23   still some efforts that were ongoing or yet to be

24   implemented?

25          MR. SACCHET:  Object to form.

1             DR. PAUL MCGOVERN

2             (Reporter clarification.)

3        MR. C. GORDON:  That's actually a good objection.

4   I'll rephrase the question.

5   BY MR. C. GORDON:

6        Q.  When you started in August 2009, are you aware of

7   steps that had already been taken prior to August 2009 to

8   reduce the infection rates at those hospitals, the

9   Northampton Trust hospitals?

10       A.  I was not aware of steps at the time.

11       Q.  Okay.  Subsequent to your starting there in

12  August 2009, were you aware of any steps that were taken or

13  procedures that were implemented, practices that were

14  implemented, to attempt to reduce the infection rate?

15       A.  There's a constant and ongoing effort, in any

16  responsibly-run surgical department, to reduce infection

17  rates, particularly in orthopedics.  And so it's not

18  a question, to my recollection, that there was a period

19  where there weren't steps to reduce infection rates, and

20  subsequent change.  There are always efforts to reduce

21  infection in orthopedics departments.  So I don't remember

22  a specific time when practice was -- where one could draw

23  a line in the sand.  I don't remember a specific time when

24  that was.  My recollection is of a department that was

25  always trying to reduce infection rates.

Page 22

1                    DR. PAUL MCGOVERN

2        Q.   We'll come back to that soon, in some detail,

3    later.  So, when you started in August 2009, Mike Reed was

4    your supervisor?

5        A.   Yes.

6        Q.   And you asked him what kind of research he was

7    doing that you might become involved in; is that fair?

8        A.   Yes.

9        Q.   And what was the first thing that he involved you

10   in?

11       A.   The first thing I remember is -- was a discussion

12   about infection rates and a project to investigate the

13   possibility of infection, or the possibility of

14   a Bair Hugger influencing bacterial load in an operating

15   room, possibly increasing infection rates.

16       Q.   And what was your understanding of how that

17   research issue had arisen?  Because that's -- what was the

18   genesis of it, to your understanding?

19       A.   Sorry, could you repeat the question?

20       Q.   As I understand it, you asked Mr. Reed: "What

21   research can I get involved in?"

22            And he said: "We're looking at Bair Hugger and its

23   possible impact on influencing the bacterial load."

24            Do you know how that it came to be that that was

25   a -- that was something that Mr. Reed was looking at?

1                      DR. PAUL MCGOVERN

2      A.   No, I don't know how that specifically came to be.

3      Q.   At any time, had you -- strike that.

4           When you talk about the bacterial load, could

5  you explain what you mean?

6      A.   Yes.  So, an operating room is a clean environment

7  and one in which the presence of any possible source of

8  infection to the patient must be reduced so far as is

9  possible.  And when I say bacterial load in this specific

10  case, what I refer to are particles in the air which may

11  have bacteria on them.  Generally, these include dust

12  particles from the patient, from circulating theater staff

13  and the scrubs team, skin cells, water droplets or moisture

14  droplets from exhaled air from the surgical team, from the

15  patient, from the process of surgery.  All particles which

16  may be in the air which may themselves carry bacteria which

17  have the potential to settle in an operative wound and the

18  potential to cause infection.

19      Q.   Is it the bacteria that actually causes the

20  infection, or the particles?

21      A.   The bacteria causes the infection.  The particles

22  are the vector for the infection, and so the bacteria will

23  stick to particles.  They are all around us right now.  The

24  air is loaded with particles anywhere you are, unless you

25  have a device or an environment which is specifically

1                    DR. PAUL MCGOVERN

2  controlled to reduce the count of airborne particles.

3       Q.  Do all particles carry bacteria?

4       A.  No.

5       Q.  Is there some generally accepted rule of thumb as

6  to what percentage of particles carry bacteria?

7       A.  Not that I'm aware of, because it depends on the

8  situation.  It depends on the environment.

9       Q.  So, in an operating room, if there are particles

10 present, they may or may not carry bacteria?

11      A.  Correct.

12      Q.  And if particles that don't carry bacteria settle

13 on the surgical wound, do they increase the risk of

14 infection?

15      A.  If particles that don't carry bacteria settle on

16 the surgical wound, do they increase the chance of

17 infection?  Potentially, yes, but that's not something

18 which -- potentially, yes.

19      Q.  How would a bacteria-free particle potentially

20 increase the risk of infection?

21      A.  It could cause irritation.  If a particle were

22 toxic, if it were -- if it caused a reaction in the patient,

23 to the patient's immune system, then that could cause

24 inflammation and -- which could contribute to infection,

25 because excess of inflammation can reduce the body's ability

Page 25

1                    DR. PAUL MCGOVERN

2   to fight infection.  So in itself it would not cause

3   infection, but it could create or assist the creation of

4   a condition which could increase predisposition to

5   infection.  However, it's very unlikely.

6        Q.  So when you speak of bacterial load in connection

7   with this initial research activity that you became involved

8   in, was the focus on transmission of actual bacteria that

9   would -- that could be settled, or that could settle on the

10  operative site?

11       A.  So ... just repeat the question, please?

12       Q.  It was a very poorly phrased question.  I'll

13  rephrase it.

14            In your initial research activities at

15  Wansbeck under Mr. Reed where you looking at bacterial

16  load and the impact of the Bair Hugger, is it correct

17  to say that the bacterial load you're talking about is

18  actual bacteria that could potentially be transmitted

19  to the operative site?

20       A.  Initially, we looked at -- we attempted to measure

21  bacteria directly, as well as indirectly.  So we've used

22  particles, airborne particles, as a model or as -- almost as

23  a way of measuring potential for infection.  Initially we

24  did an experiment which attempted to pick up or detect

25  bacteria -- excuse me -- as well as attempting to detect

1                    DR. PAUL MCGOVERN

2    particles in the air.

3        Q.  At this point I'm going to stop and go back to my

4    administrative tasks of identifying the other documents you

5    brought so that we -- when you start, because I'm going

6    to -- I can see we're going to start referring to them

7    fairly quickly.  And I think we are up to 3A, which I'm

8    going to mark here.

9                    (Exhibit 3A marked for identification)

10                   In addition to the two volumes of e-mails

11   that you have produced for us, there are -- your

12   attorneys produced eight volumes of additional

13   materials, and I am going to start with what I've

14   marked as exhibit 3A, which I believe is identified as

15   volume 1 of documents produced by Dr. Paul McGovern,

16   that we received from your attorneys.  And just to

17   match things up here, I'm going to give you exhibit 3B,

18   which I understand is the exhibit to exhibit 3 -- or

19   excuse me, the index to exhibit 3A.

20                   (Exhibit 3B marked for identification)

21       A.  Right.

22       Q.  I don't want to take a lot of time, you know, going

23   through each of the documents in detail; I just want to get

24   a general sense of what the document -- what that document

25   folder consists of.

1                    DR. PAUL MCGOVERN

2        A.  This consists of documents which I retrieved from

3   my computer systems and from my e-mail record which were

4   related to this research.

5        Q.  Were all these retrieved electronically, or did you

6   have any hard copies?

7        A.  I did not have any hard copies.  All of these were

8   retrieved electronically.

9        Q.  I'm assuming at least some of them were attachments

10  to the e-mails?

11       A.  Yes.  So the -- there are two groups of documents.

12  Some will be repeated.  The strategies I used to retrieve

13  the documents was to attach, or to provide any attachments

14  to the e-mails, and I've also separately trawled hard drives

15  of various computers that I've had since 2009/10 and

16  identified the files which were related to this and provided

17  them, as well.

18       Q.  And to that point, there are often multiple copies

19  of the same document?

20       A.  That's correct.  It would have been extremely time

21  consuming to go through and identify, to cross-correlate

22  each version to ensure there were no duplicates.  I thought

23  it was not an efficient use of time, given the time

24  constraints, and so I provided all the files which were

25  referred to in the e-mails and, as well, in my hard drive.

1                    DR. PAUL MCGOVERN

2    So by the very nature of it, some of them will be

3    duplicated.

4         Q.  So, as I understand it, when -- every e-mail that

5    you collected that had an attachment, you also included the

6    attachment in these documents volumes?

7         A.  Correct, correct.

8         Q.  Okay.  And I think the next one is -- I'm going to

9    mark as 4A.  And if you want to use that chair next to you

10   to start moving stuff over ... just so you don't get buried

11   in too much stuff.  Could you tell us what 4A is?

12             (Exhibit 4A marked for identification)

13        A.  4A appears to be further files that I've retrieved,

14   either via e-mail or via trawling my own computers, which

15   those files are related to this matter, this research.

16        Q.  And this was produced by your attorneys and labeled

17   as volume 2?

18        A.  Mm-hm.

19        Q.  Yes?

20        A.  Yes.

21        Q.  Okay.  The sequencing, and whether it is volume 2

22   or 1, I'm assuming that was done by your attorneys, not you?

23        A.  Yes.

24             (Exhibit 4B marked for identification)

25        Q.  Okay.  And exhibit 4B, that is the index to 4A; is

Page 29

1                    DR. PAUL MCGOVERN

2    that right?

3         A.   Yes.

4              (Exhibit 5A marked for identification)

5         Q.   I'm going to show you 5A.   Is that volume 3 of the

6    document you pulled together?

7         A.   Yes.

8              (Exhibit 5B marked for identification)

9         Q.   Okay.   And is exhibit 5B the index to that?

10        A.   Yes.

11             (Exhibit 6A marked for identification)

12        Q.   We're getting there.   6A, that's your volume 4 of

13   the documents you've collected?

14        A.   Yes.

15             (Exhibit 6B marked for identification)

16        Q.   And volume 6B -- or excuse me, exhibit 6B, is the

17   index to volume -- the volume we've marked as 6A.   Is that

18   correct?

19        A.   I think you've given me two.

20        Q.   Sorry.

21        A.   Yes.

22             (Exhibit 7A marked for identification)

23        Q.   And the next is -- sorry, I put the exhibit sticker

24   on upside down.   Exhibit 7A is volume 5 of the documents you

25   collected; correct?

1                    DR. PAUL MCGOVERN

2        A.   Yes.

3               (Exhibit 7B marked for identification)

4        Q.   And exhibit 7B is the index to the volume we've

5   marked as exhibit 7?

6        A.   Yes.

7               (Exhibit 8A marked for identification)

8        Q.   And exhibit 8A, that would be your volume 6 of the

9   documents you've collected; is that right?

10       A.   Yes.

11              (Exhibit 8B marked for identification)

12       Q.   And exhibit 8B is the index to exhibit 8A; correct?

13       A.   Correct.

14              (Exhibit 9A marked for identification)

15       Q.   Almost done.  Exhibit 9A, that would be your

16  volume 7 of the documents you collected; is that right?

17       A.   Yes.

18              (Exhibit 9B marked for identification)

19       Q.   And exhibit 9B would be the index to the document

20  which was marked as exhibit 9A; is that right?

21       A.   Yes.

22              (Exhibit 10A marked for identification)

23       Q.   And finally exhibit 10A.  That will be the volume

24  that the -- the eighth and final of the volumes you

25  collected and your attorneys produced; is that right?

1                     DR. PAUL MCGOVERN

2      A.  Yes.

3           (Exhibit 10B marked for identification)

4      Q.  And exhibit 10B would be the index to exhibit 10A?

5  Is that right?

6      A.  Yes.

7      Q.  All right.  Let's start with exhibit 10A.

8           MR. HEAD:  Is it all volume 8?

9           MR. C. GORDON:  It is volume 8, right.  If you

10 want to turn to the page numbered 3541.  It looks like this

11 particular document goes through page 3552; is that right?

12     A.  Yes.

13     Q.  And the cover page identifies this as "Bair Hugger

14 Study, Wansbeck Hospital, Ashington 28/11/09"?

15     A.  Yes.

16     Q.  For those of us across the Atlantic, that would be

17 November 28, 2009?

18     A.  Yes.

19     Q.  So can you tell us what this document is, or what

20 it reflects?

21     A.  This is a draft write-up of an experiment conducted

22 at Wansbeck Hospital, which attempted to -- well, which

23 examined the influence of Bair Hugger systems in a laminar

24 flow operating room.

25     Q.  Were you involved in any of the underlying research

1                    DR. PAUL MCGOVERN

2  activities that are discussed in this document?

3       A.  Yes.

4       Q.  And were you involved in the drafting of this

5  document?

6       A.  Yes.

7       Q.  Okay.  Was anyone else involved in the drafting?

8       A.  They were.  I think that this version -- yeah,

9  other people were involved in the drafting of this.  Yes.

10      Q.  Maybe this will help clear it up one way or the

11 other.  Turn to page 3615, please.

12      A.  Yeah.

13      Q.  And this is a document that's titled "DO FORCED AIR

14 WARMING DEVICES INCREASE BACTERIAL CONTAMINATION OF

15 OPERATIVE FIELD? - Simulated experimental analysis."

16      And then there are several names listed there.

17      Is this -- the document 3615, is this concerning

18 the same experiment that is reflected in the document

19 that starts at 3541?

20      A.  It is.

21      Q.  Okay.  So I see a series of names at the top of

22 3615?

23      A.  Yes.

24      Q.  Are these other individuals, people who

25 participated in some way in the -- either the conduct of the

1                    DR. PAUL MCGOVERN

2    experiment or the writing of it?

3         A.   Yes.

4         Q.   And there are it looks like six names listed?

5         A.   Correct.

6         Q.   You're the first name listed.

7         A.   Correct.

8         Q.   Who was the second person?

9         A.   Dr. Shreya Srinivas.

10        Q.   And who was he or she?

11        A.   She was a senior -- or well, a more senior

12   orthopedic trainee than myself.  So another trainee level

13   surgeon who was, I don't know how many years senior to me,

14   but -- not an attending level, but a more senior trainee.

15        Q.   And how about the next person listed?

16        A.   The next -- I can't remember the first names.  They

17   were both male, name P. Sutaria and D. Bull.  They were

18   junior doctors, I -- yeah, they were doctors who were

19   working in the department who were junior to me.

20        Q.   Were they orthopedic trainees?

21        A.   I don't remember.

22        Q.   And the next name?

23        A.   Valerie Edwards-Jones, a professor of microbiology.

24        Q.   The University of Manchester?

25        A.   It may have been the University of Manchester.  It

1                          DR. PAUL MCGOVERN

2    may have been Manchester Metropolitan University.  They were

3    two separate institutions.  I think she was from Manchester

4    but I can't remember the institution.

5        Q.   Actually Manchester?

6        A.   Manchester Metropolitan.

7        Q.   Metropolitan.

8        A.   Yeah.

9        Q.   MMU?

10       A.   That's the one.  That rings a bell.

11       Q.   Did you ever meet Professor Edwards-Jones?

12       A.   I did.

13       Q.   And the last name there is?

14       A.   Mike Reed.

15       Q.   And we refer to him as "Mr. Mike Reed"?

16       A.   Mr. Mike Reed.

17       Q.   Because he is a ...

18       A.   Surgeon.

19       Q.   Fully accredited senior surgeon?

20       A.   Yes.

21       Q.   This is really weird to us, from the United States.

22       A.   I can be "Mr. McGovern" as well, because I have

23   that surgical qualification too.  It is archaic.

24       Q.   If we were to call a doctor in the United States

25   Mr. or Ms., it would be the slap in the face.  But we've

1                    DR. PAUL MCGOVERN

2    learned.  All right.

3              So -- can you think of any other people that

4    were involved, directly or indirectly, in either the

5    development and design of a protocol for the study, the

6    implementation of this study, or the drafting of this

7    study?

8         A.  Not that I can remember.

9         Q.  Did you ever meet Dr. David Leaper, Professor David

10   Leaper?

11        A.  I did.  I have met Dr. David Leaper.

12        Q.  Do you know if he had any involvement in this?

13        A.  I've met Dr. David Leaper and he ... he introduced

14   me to the particle counter that was used in this study and

15   told me what it was.

16        Q.  Do you recall the name of that particle counter?

17        A.  Handilaz.

18        Q.  When you say introduced you to it, he brought the

19   unit to Wansbeck and showed you how to use it, or?

20        A.  He didn't show me how to use it.  He had a flight

21   case with it in, in a meeting, and said "See if you can work

22   out how to use it," I think.

23        Q.  Okay.  Was that Handilaz particle counter something

24   that was capable of identifying bacteria?

25        A.  No.

1                    DR. PAUL MCGOVERN

2        Q.   What steps, if any, were incorporated in the

3    protocol to identify bacteria?

4        A.   This experiment used two methods to attempt to

5    identify bacteria.  Both centered around bacterial plates,

6    that is plastic dishes with a substance on them which

7    encourages the growth of bacteria, such that when bacterias

8    settle on the plates and they are incubated for an

9    appropriate time in an appropriate environment, bacterial

10   growth occurs which allows the identification of bacteria

11   having formed on the plate three days previously.

12        Two methods that were used were to put plates in

13   various positions around the operating room.  Different

14   plates contained different materials or different media

15   to isolate different strains of bacteria, and these were

16   placed around the room with the lids off, so that if any

17   bacteria settled on them, they would be identified.

18   That was one method.

19             The second method was using a device which is

20   designed to draw air over the plate, so to ingest air

21   from the surrounding environment and deposit it on the

22   bacteria -- bacterial growth plate.  So both those

23   methods were used in this experiment.

24        Q.   Did you ever hear the terms "active" and "passive

25   sampling" in connection with these two techniques?

1                    DR. PAUL MCGOVERN

2        A.   They sound familiar.  I don't remember if they

3   were -- those specific words were used, but that is what

4   I understand these types of sampling to be.  The former,

5   which I described, would be passive, and the latter would be

6   active.

7        Q.   The settle plates would be the passive?

8        A.   That would be my understanding.  Although I don't

9   recall if that was the terminology used at the time.

10       Q.   What was your understanding of why the two

11  different techniques were incorporated?

12       A.   The -- there's only one device to draw air over

13  a settle plate, and that device -- there's a certain amount

14  of -- the chances of a bacterium, a single cell landing on

15  a settle plate, are low.  And active sampling allows the

16  sampling of a larger volume of air than a settle plate does.

17       Q.   Do you recall any discussion as to whether floating

18  bacteria that didn't settle is of less concern from

19  a surgical infection standpoint than bacteria that do

20  settle?

21       A.   Could you repeat the question, please?

22       Q.   I will ask the question.  Have you read any

23  literature that discusses the pluses and minuses of using

24  a settle-plate technique as opposed to an active-sampling

25  technique?

1                    DR. PAUL MCGOVERN

2        A.   At the time I had, but I haven't since 2009.

3        Q.   Do you remember the -- any kind of a discussion or

4    debate, if you will, as to whether it mattered more for

5    surgical site infections if it was something that was

6    airborne and collected by active sampling versus something

7    that settled out on a settle plate?

8        A.   Right.  So the -- these are techniques to

9    investigate if bacteria are in the environment, and the

10   sampler, the active sampler, was placed in a region that was

11   as close as we could get it to a simulated operating site.

12   So it was appropriate that that sampled a larger amount of

13   air because that was the -- seemed to be the most important

14   area.  That is to say that bacteria in that area would be

15   the least desirable from a surgical point of view because

16   bacteria anywhere else -- if bacteria don't get into the

17   operating field, into the operating site, that is the most

18   important thing to avoid.  And so that is the area that was

19   looked at, the focus of the investigation in that part

20   of it, and that's why the sampling unit was placed near the

21   simulated operating site.

22       Q.   Were there any settle plates also placed near the

23   simulated operating site?

24       A.   I don't remember.  They may have been -- no, I

25   don't remember.

1                    DR. PAUL MCGOVERN

2         Q.  Okay.

3         A.  They were placed in the room, but I don't remember

4    if they were placed near the operating site.

5         Q.  It's not a memory test.  So I am wondering if the

6    document we've been looking at that starts at page 3541

7    helps you recall where the settle plates were placed?

8         A.  Yes.  That's right.  So the air-sample plates from

9    this method were -- the sampling plates were placed closest

10   to the operating site and the settle plates were further

11   away.

12        Q.  Okay.  And I think you're looking at page 3543?

13        A.  I am.

14        Q.  And it looks like there's something labeled "ASL"

15   and then something labeled "ASR"?

16        A.  Yes.

17        Q.  What are those?

18        A.  Those are the positions that the air-sample plates

19   were put in, in relation to the simulated patient.

20        Q.  And that's that active air sampler?

21        A.  Correct.

22        Q.  Kind of sucking in air?

23        A.  Correct.

24        Q.  Were there two samplers, then?

25        A.  No, there was one unit and it was moved between

1                    DR. PAUL MCGOVERN

2    different experiment runs.

3         Q.   Okay.  And then the other letters on this page 343,

4    A, B, C, D, E, F, G and H, those represent just the settle

5    plates?

6         A.   That's correct.

7         Q.   And those are also called agar plates?

8         A.   Agar plates, yeah.

9         Q.   Who determined how many settle plates, and where to

10   locate them?

11        A.   The number of settle plates and the precise make-up

12   was determined by Professor Valerie Edwards-Jones as the

13   microbiology expert.  The position of the settle plates

14   I will have decided in conjunction with my co-investigators.

15   The rationale for this is that on this image on the page

16   3543, is you see a red box surrounding the simulated patient

17   in the diagram.  That red box marks the position of the

18   laminar flow boundary, laminar flow being a device in the

19   ceiling of the operating room to minimize or reduce the

20   likelihood of particles getting into operating fields.  The

21   idea being within that box, ideally bacterial counts would

22   be lower, and outside they would be higher.  And therefore,

23   the sampling was done in different positions relative to

24   that boundary zone outside, which are A, B, C and D, and

25   inside, which are E, F, G and H.

1                    DR. PAUL MCGOVERN

2        Q.   Just so we're clear on what you mean by the red

3   box, you are talking about the single red line that goes all

4   the way around the what appears to be a patient?

5        A.   Correct.

6        Q.   Because there's also a solid red box on the inside?

7        A.   The solid red box corresponds to the area on the

8   simulated patient which was marked out as a simulated

9   operating field, which is in the photo on page 3544.

10       Q.   So that internal solid red box on 3543, that's the

11  area of concern; that's where you don't want the bacteria,

12  right?

13       A.   Correct.

14       Q.   And the active sampling, the ASL and ASR, how far

15  away from the -- that area of concern, that specific --

16  I think it is referred to on 3544 as the "sterile field"?

17       A.   Yeah, it is.  And the distance is -- I can't

18  measure it, but they were as close as we could get it.  And

19  you can see on the lower image on 3544 the distance that the

20  air sampler was from the operative field when in position

21  ASL.  When in position ASR, it was on the other side of the

22  operating table as close as it could be to the patient, but

23  obviously slightly further away, given the fact that the

24  patient's left -- or the simulated patient's left leg was in

25  the way.

Page 42

1                    DR. PAUL MCGOVERN

2       Q.  As long as we're on 3544 in that lower picture,

3  there's some sort of an apparatus on the right-hand side

4  that looks like it's wrapped in plastic?

5       A.  Yes.

6       Q.  What's that?

7       A.  That is the particle counter.

8       Q.  And that's the -- is that the Handilaz?

9       A.  Yes.

10      Q.  And that looks like the -- is that a nozzle of some

11  sort that actually does the -- that's where the counting is

12  done?

13      A.  That is the intake port for the particle counter.

14      Q.  That looks like it is right over the sterile field.

15      A.  It is right over the sterile field.

16      Q.  And the air sampler, where is the intake for that?

17  It's in the top, or --

18      A.  It's on the top.  So that shiny metallic apparatus

19  on the top is the sampling area.  The plate, which is

20  a disc, fits into that apparatus on the top.  The apparatus

21  is in two parts.  The top comes off and the top half is

22  perforated.  So it is a block of metal which is perforated,

23  and the plates sit in that but the top screws back on, or

24  fits back on, and air is drawn over the plate through those

25  holes onto the agar plate.

Page 43

DR. PAUL MCGOVERN

1

2    Q.   And on the top picture on 3544 it looks -- there's

3    something identified as "Settle Plate F"?

4    A.   Yes.

5    Q.   It looks like that's on the floor?

6    A.   That's correct.

7    Q.   Is it -- how many plate are there on the floor?

8    A.   On that image there are four plates.  There may

9    have been another one out of view.  Each -- the groups of

10   plates are counted as one settle plate because they each

11   contain different ...

12   Q.   Growth media?

13   A.   Growth media.  Exactly right.  So they would

14   isolate different strains of bacteria.

15   Q.   So, on 3543 where it identifies the settle plates A

16   through G, that's -- each location is actually cluster --

17   A.   That's right.

18   Q.   -- of five different plates?

19   A.   Of however many.  I can't remember how many plates

20   there were, but yeah, that's a cluster.

21   Q.   The attempt, the goal there was whatever species of

22   bacteria might find their way to that particular area, one

23   of the growth media would pick it up?

24   A.   That was the intention.

25   Q.   Okay.  Now where would the Bair Hugger unit have

1               DR. PAUL MCGOVERN

2   been placed during this experiment?

3       A.  The Bair Hugger -- you mean the blower or the

4   blanket?

5       Q.  Good question.  Let's start with the blower.

6       A.  The blower?  It doesn't look like we've recorded

7   where the blower was in this method.  Let me check that we

8   haven't recorded it.  The blower was positioned somewhere

9   near the head end -- oh, no.  The head end of the patient,

10  in all likelihood.

11      Q.  Was an attempt -- strike that.

12          When you set up this experimental setting,

13  was an attempt made to replicate standard operating

14  protocol as much as possible?

15      A.  In some ways, yes.  Attempts were made, but in

16  several ways this did not simulate an operation accurately.

17  So we attempted to simulate it as accurately as possible,

18  but on reflection, there are some areas which are not

19  consistent with what you'd normally expect in an operation.

20      Q.  Can you list those areas of inconsistencies?

21      A.  First, there were far fewer personnel in the

22  operating room than there would be in a usual operation.

23  As -- yeah.  There was at most, to my recollection, one

24  person within the laminar-flow boundary at any one time that

25  was the simulated surgeon, which is very unrealistic.

 1                    DR. PAUL MCGOVERN

 2    Second, the simulated patient was not positioned for any

 3    common operation.  They were not positioned for a hip

 4    replacement or for a knee replacement.  They were draped in

 5    a way which would be reasonable, were someone to access the

 6    front of the thigh, but the number of operations requiring

 7    that would be very low.  And the result of that is that the

 8    way the simulated patient was set up was not representative

 9    of virtually all real operations, specific -- particularly

10    hip or knee arthroplasty procedures.

11              There were no trays of equipment in the

12    operating room.  And the position of the lights, your

13    overhead operating lights, was not recorded and it was

14    not consistently controlled for.  So, while it is

15    likely that the overhead operating lights were moved

16    out of the way for convenience, their position was not

17    accurately recorded and it was not necessarily kept

18    consistent between experimental runs, although there is

19    no reason why they would have been moved.  But it

20    wasn't something which was taken into consideration

21    during the experimental design.

22         Q.  Was the laminar flow system on?

23         A.  The laminar flow system was on.

24         Q.  And the patient there, is that a real person or

25    a mannequin?

1                    DR. PAUL MCGOVERN

2        A.   That's a real person.   It was one of the

3   co-investigators.

4        Q.   One of the people junior to you?

5        A.   Absolutely.   Well, in this image it is.   I was on

6   that table at points of it, but I don't remember if it was

7   for these experimental runs or if it was when we were

8   setting up.

9        Q.   Okay.   Getting back to the location of the

10  Bair Hugger, would it have been within the -- the fan

11  unit -- within or without the laminar flow curtain?

12                    (Reporter clarification.)

13       Q.   Or the laminar flow boundary, I should say?

14       A.   Based on the information here, there's no way of

15  knowing.

16       Q.   What would have been the standard practice?

17       A.   Standard would have been to have it within the

18  laminar flow boundary.   However, this schematic on page 3543

19  may not -- is not to scale, and so may not accurately

20  reflect the distance between the head end of the patient and

21  the -- that corresponding laminar flow boundary.   In

22  practice, it is not uncommon for the head end of the patient

23  to be very close to the laminar flow boundary because of the

24  anesthetic equipment, because the operating table needs to

25  be positioned appropriately for both the operation and for

1                      DR. PAUL MCGOVERN

2    the position of the anesthetic equipment.  And so there is

3    every possibility that that operating table in real -- in

4    the experimental set-up would have been closer to the

5    corresponding laminar flow boundary relating to the head end

6    of the patient.  That's why I can't say with certainty

7    whether the blower unit for the forced-air warming device

8    was within or outside, or on the boundary level of the

9    laminar flow zone, because it depends how the operating room

10   was set up and I -- we did not record that in this

11   experiment.

12       Q.   Okay.  Where was the Bair Hugger blanket itself?

13       A.   The Bair Hugger blanket was in the yellow position

14   marked on page 3543 over the torso of the simulated patient.

15       Q.   Was that under the torso or over the torso?

16       A.   Over the torso.

17       Q.   And the perforated holes out of which the warm air

18   is blown, that would have been facing down towards

19   the patient?

20       A.   That would have been down towards the patient.  The

21   Bair Hugger was positioned on the patient, as would be usual

22   practice for an operation.  The Bair Hugger has an adhesive

23   strip -- one or more adhesive strips on it, depending on the

24   design of the blanket, and they correspond to the correct

25   orientation of the warming blanket.  And so those blankets

1                    DR. PAUL MCGOVERN

2   were put on with the adhesive strip facing downwards, as

3   would be standard practice for them.

4        Q.  Was there any additional draping on top of the Bair

5   Hugger?

6        A.  Yes.  So, as can be seen in the image on 3544,

7   standard sterile surgical drapes were positioned over the

8   patient and over the Bair Hugger blanket, as would usually

9   be the case for an operation.

10        Q.  So at least in terms of where the Bair Hugger

11   blanket was positioned and how it was set up and draped,

12   that was done in accordance with standard procedure; is that

13   correct?

14        A.  Yes.

15        Q.  Where would any heat that wasn't being transferred

16   to the patient go from the -- from a blanket?

17        A.  Heat energy would be transmitted to the drape over

18   the patient and to the areas surrounding the blanket.  And

19   so that would -- any leaked heat would -- any energy from --

20   any heat energy which did not go into the patient would go

21   into the surrounding environment.

22        Q.  And was there anything different about where the --

23   that excess heat energy went, in this experimental set-up,

24   than would have been the case in a real surgery?

25            MR. SACCHET:  Object to form.

Page 49

1                    DR. PAUL MCGOVERN

2      A.  Repeat the question, please?

3  BY MR. C. GORDON:

4      Q.  However the heat energy that wasn't transferred to

5  the patient escaped into the surrounding environment, was

6  there anything different about that in this experimental

7  set-up than would have been the case in an actual surgery?

8           MR. SACCHET:  Object to form.

9      A.  What sort of surgery?

10 BY MR. C. GORDON:

11     Q.  Well, I guess any surgery where an upper-body torso

12 blanket was used.

13     A.  So, were a surgery taking place on the front

14 portion of a patient's thigh, and were it draped in exactly

15 this way, then the -- any heat dissipation would be the same

16 or similar to that found in this -- in this set-up.  The

17 differences are in the interaction of the -- of any heat

18 with the environment, because there is a suction unit --

19 there are two suction units next to the operative field, one

20 for the bacterial plate and one for the particle counter,

21 although the airflow through the particle counter is low.

22 And there would be a difference in the environment, as

23 previously described, with regards to the number of site

24 staff around the area.

25     Q.  In an actual surgery, in addition to staff, there

1                      DR. PAUL MCGOVERN

2    would be other requirement that would be generating --

3         A.   Yeah.

4         Q.   -- heat and air currents; right?

5         A.   Generating heat, not so much.  Surgical tools do

6    exist which generate heat, absolutely.  Air currents,

7    generating air currents: again, a human will generate air

8    currents by moving, but the air current will be disrupted or

9    altered by other equipment in the area.

10        Q.   There's a presence of a -- a mass in an airstream?

11        A.   Yeah, depending on its location within the

12   airstream and depending on its location with relation to

13   other objects nearby.

14        Q.   Do you ever -- did you ever have occasion to use

15   fiberoptic light?

16        A.   I have in my practice.

17        Q.   And I'm talking about the headlamps.

18        A.   The headlamps.

19        Q.   Where is the light source for those headlamps?

20        A.   The light source is -- you're attached through

21   fiberoptic cable to a box which stands at least 3 feet

22   behind the user.

23        Q.   Does that box generate any heat?

24        A.   Does the?

25        Q.   The fiberoptic light box generate --

1                    DR. PAUL MCGOVERN

2        A.   That does generate heat, yes.

3        Q.   Does it have any kind of fan inside it to dissipate

4    the heat?

5        A.   Depending on the design, some do.

6        Q.   Okay.  Back to this experiment.  So who was present

7    when the experiment was actually conducted?

8        A.   Myself, Dr. Bull, Dr. Sutaria,

9    Professor Edwards-Jones, and occasionally Mr. Reed.  He was

10   on site and would pop in, but he wasn't there throughout the

11   entire experiment -- experimental undertaking.

12       Q.   How many times was the experiment run?

13       A.   I don't remember.

14       Q.   I think -- I'm at 3541 -- it says "The experiment

15   was run 4 times" at the bottom.

16       A.   Four times.

17       Q.   Is that consistent with your recollection?

18       A.   I don't recall how many times it was run, but

19   I've written "4 times" and so that's --

20                    (Reporter clarification.)

21       A.   It was run -- I didn't say "three or four".

22   I don't recall what happened, but I've written "4 times" and

23   so that is ...

24       Q.   Was that four times over the course of one day?

25   Multiple days?

1                    DR. PAUL MCGOVERN

2       A.   I don't remember.

3       Q.   Do you recall approximately how long each run took?

4       A.   The runs are recorded.  I believe each run took 30

5   minutes.

6       Q.   And in sort of general terms, what you were looking

7   at was about the number of particles and the bacteria with

8   and without the Bair Hugger on; is that correct?

9       A.   Yes.

10      Q.   And you described a null hypothesis.  For the

11  benefit of the jury, what is the null -- what do you mean by

12  a null hypothesis?

13      A.   A null hypothesis is a way of framing a scientific

14  investigation such that you have an idea, or a hypothesis,

15  and you test it, and if -- the null hypothesis is

16  a condition in which your suspicion or your proposal is not

17  found to be upheld on the evidence -- on the experiment that

18  you conduct.

19      Q.   So here, where you describe the null hypothesis

20  being that the use of the Bair Hugger forced-air warming

21  device results in no particular bacteria or particular

22  contamination to the operative field, does that mean that,

23  going into this, what you really were thinking was that the

24  Bair Hugger warming device was going to result in additional

25  bacteria or particulate contamination?

1                    DR. PAUL MCGOVERN

2           MR. SACCHET:  Object to form.

3      A.  That phrasing implies that the result had been

4   predicted.  This is the -- the scientific purpose of the

5   investigation was to test that hypothesis.  And so the

6   hypothesis to be tested was whether this experiment provided

7   an indication that the Bair Hugger in this set-up resulted

8   in additional bacterial particulate contamination to this

9   operative field.

10  BY MR. C. GORDON:

11     Q.  And I'm sure my questions aren't clear.  What I'm

12  trying to say, going into this experiment, was it your

13  working assumption that use of the Bair Hugger would

14  increase particles or bacteria?

15          MR. SACCHET:  Object to form.

16     A.  The question of whether the Bair Hugger influenced

17  bacteria or particulate contamination was what was being

18  tested.  And that -- the aim of the experiment, the aim of

19  the process, was to test that hypothesis.

20  BY MR. C. GORDON:

21     Q.  And I'm assuming that the protocol was developed

22  and designed to be as scientifically robust as the

23  collective wisdom of the participants could bring to bear?

24          MR. SACCHET:  Object to form.  Misstates the

25  evidence.

1                      DR. PAUL MCGOVERN

2       A.  The attempt was -- at the time, the intention was

3   to make it as robust as possible.

4   BY MR. C. GORDON:

5       Q.  And particularly in terms of the microbiological

6   complement, you worked with a fairly prominent expert in

7   microbiology, right?

8              MR. SACCHET:  Object to form.

9       A.  I worked with a Professor of microbiology.

10  BY MR. C. GORDON:

11      Q.  And turn to page 3547.

12      A.  Yes.

13      Q.  There it says:

14           "It was hypothesised that turning on the

15  Bair Hugger blanket would create warm air currents

16  that, despite the influence of laminar air flow, would

17  contaminate the operative field with particles,

18  possibly including pathogenic bacteria."

19      A.  Yes.

20      Q.  That's what you were -- that was the working

21  hypothesis.  That's what you're going in to test?

22      A.  That's the hypothesis that the intention of the

23  study was to test.

24      Q.  Okay.  And one of the things you found was that the

25  introduction of the surgeon to the vicinity of the field

1                     DR. PAUL MCGOVERN

2    raises the particle count in the zone of the field?

3         A.   That is what this experiment found.

4         Q.   And when you talk about the introduction of the

5    surgeon, does that mean just the surgeon walking up to the

6    table?

7         A.   Yes.

8         Q.   Okay.  And you also found that that was most marked

9    when the surgeon touches the disinfected skin within the

10   field.  And you wrote:

11        "It seems reasonable to suppose that these detected

12   particles represent shed epithelial particles from

13   the patient."

14        Is that right?

15        A.   That's what was written.

16        Q.   So how -- what did the surgeon do?  He or she

17   touched the skin with --

18        A.   I think a gloved finger.  The simulated surgeon

19   approached the operative field and I think touched, drew

20   their finger across, the sterilized surgical field with

21   a hand that was gloved, with a surgical glove.

22        Q.   But then you went on to say:

23             "However, there is no suggestion from these

24   results that turning on the bair hugger makes any

25   difference to operative field particle counts under

1                    DR. PAUL MCGOVERN

2    controlled conditions."

3         A.   That's what's been said there.

4         Q.   So whether the Bair Hugger was on or off didn't

5    have any impact on the particle counts?

6              MR. SACCHET:   Object to form.

7         A.   It's actually not possible to say whether it had

8    any statistically significant influence because the data has

9    not been statistically analyzed.   The data has been

10   presented but not analyzed.

11   BY MR. C. GORDON:

12        Q.   Okay.   Then on page 3548, where you are discussing

13   the microbiology sampling.

14        A.   Mm-hm.

15        Q.   That would be the sampling for the bacteria, right?

16        A.   Correct.

17        Q.   And you -- under "Results" it says:

18             "Table 1 shows that there was minimal number

19   of bacteria isolated from settle plates opened for

20   4 hrs."

21        A.   Yes.

22        Q.   "The settle plates from position C showed the

23   highest numbers of bacteria.   There were no fungi isolated."

24        A.   Yes.

25        Q.   And position C would have been away over in the

1                    DR. PAUL MCGOVERN

2   corner, outside of the laminar airflow field?

3        A.   Correct.

4        Q.   Okay.  Now on page 3549, the -- you describe the

5   bacteria that were isolated from the settle plates as

6   being -- consisting as coagulase negative staphyloccoci,

7   diphtheroids and micrococci -- micrococci?  Which you

8   characterize as skin organisms; is that right?

9        A.   Yes.

10       Q.   Then you wrote:

11       "No [and the "no" is boldfaced] coliforms, MRSA,

12   staphylococcus aureus, Clostridium difficile, or candida

13   albicans were isolated. "

14       A.   Yes.

15       Q.   Why was that significant for you to note the

16   absence of those?

17       A.   Those types of bacteria are particularly relevant

18   for joint infection.  Were an infection with staphylococcus

19   aureus or MRSA, which is a type of staphylococcus aureus, or

20   coliforms to find their way into a wound, they can have very

21   significant consequences.  I'm not so sure about the

22   consequences of clostridium difficile or candida albicans.

23   That would be less common, but still very concerning if they

24   found their way into a surgical wound.

25       Q.   Okay.  The -- another part of this test was that

1             DR. PAUL MCGOVERN

2    you actually took the hose of the Bair Hugger and blew that

3    on to the settle plates; is that right?

4             MR. SACCHET:  Object to form.

5         A.  Where is that written?

6    BY MR. C. GORDON:

7         Q.  Page 3551 at the bottom.

8         A.  Yes.

9         Q.  And at the very bottom it says:

10        "The air from Bair Hugger 4 (present in the

11   operating theater) was sampled over a 1 minute period by

12   blowing air directly onto CBA at 20 second intervals."

13        A.  (The witness nodded).

14        Q.  What's CBA?

15        A.  Yeah, CBA is a growth medium.  It's one of the

16   types of agar plate that is used to isolate and culture

17   bacteria.

18        Q.  And you found no growth of microorganisms; right?

19        A.  That's correct.

20        Q.  Otherwise none that culture medium -- media did not

21   catch -- did not show any bugs in the airstream of the

22   Bair Hugger?

23        A.  That's correct.

24             MR. SACCHET:  Object to form.

25   BY MR. C. GORDON:

1               DR. PAUL MCGOVERN

2      Q.  And the ultimate conclusion of the experiment on

3   page 3552 was:

4      "Settle plates, air sampling, wound sampling, and

5   swabbing Bair Huggers showed there was only very low

6   numbers of skin bacteria found within various areas of

7   the operating theater during the operating procedure if

8   correct procedures are carried out."

9           Correct?

10     A.  That is the conclusion that was written there.

11     Q.  Do you know who funded this study?

12     A.  No.

13     Q.  So, sitting here today, you are unaware that

14  Augustine --

15          MR. SACCHET:  Object to form.  Asked and answered.

16          MR. C. GORDON:  You may want to wait until I am

17  done with my question.

18          MR. SACCHET:  Yeah, but you've said what --

19          MR. C. GORDON:  Yeah, but just out of courtesy you

20  may to wait until I'm done with before you interpose your

21  objection.  Thanks.

22  BY MR. C. GORDON:

23     Q.  To this day, you're unaware that Scott Augustine's

24  company, at the time in 2009, provided £5,000 of funding to

25  Mr. Reed and his team to carry out this experiment?

1                    DR. PAUL MCGOVERN

2        A.  I did not know that any money had been provided for

3   this experiment.  I now know that the particle counter was

4   owned by -- or I believe that the particle counter was owned

5   by the company, but I did not know that at the time.  But

6   I did not know, until you've just told me, that any money

7   had been received in relation to this experiment.

8        Q.  Okay.  If I could ask you to turn to page 3568.

9   How would you describe this document?

10       A.  This is a different write-up of the experiment that

11  we have been discussing.  Yes.

12       Q.  So it -- and it looks like this -- the document

13  that we're talking about goes from page 3568 to 3572; is

14  that right?

15       A.  Yes.

16       Q.  So this involves the same experiment?

17       A.  Yes.

18       Q.  Did you also write this?

19       A.  I was involved in the writing of this.  I don't

20  know exactly what proportion of this I wrote.  This write-up

21  went through multiple versions, and so the proportion of

22  this which was written by me is not something that I can

23  remember.  But I was involved in the writing of this.

24       Q.  Do you know which came first, the one we've just

25  been looking at, or the one we're looking at now?

Page 61

1                    DR. PAUL MCGOVERN

2        A.   I think, to the best of my recollection, the

3   version which we have been looking at came first.

4        Q.   Okay.  And on the version we're looking at now, in

5   the conclusion on page 3568, the conclusion is that the use

6   of forced-air warming devices does not increase the

7   bacterial count in the vicinity of the operative field.

8   Right?

9        A.   That is what is written there.

10       Q.   And if that's the case, in other words if you were

11  to do this experiment in every conceivable configuration and

12  repeat it multiple times in multiple centers and

13  consistently find the same results, if the ultimate

14  conclusion is that forced-air warming devices do not

15  increase the bacterial counts in the vicinity of the

16  operative field, that would mean that all the stuff about

17  convection currents and excess heat and waste heat and all

18  that other stuff really doesn't mean anything, in terms of

19  surgical site infection risk; right?

20            MR. SACCHET:  Object to form.

21       A.   Could you repeat that, please?

22  BY MR. C. GORDON:

23       Q.   If the ultimate conclusion is that using

24  Bair Hugger does not increase the bacteria in the operative

25  field, then all the other stuff, the bubbles and the smoke

1                    DR. PAUL MCGOVERN

2    and air currents, none of that matters, does it?

3              MR. SACCHET:   Object to form.

4         A.   You're saying if Bair Huggers don't increase or

5    don't have an influence in the levels of bacteria in the

6    operative field, you're saying that none of that matters.

7    But I am not quite sure what you're saying.

8    BY MR. C. GORDON:

9         Q.   Well, a lot of your subsequent research was in air

10   currents and movement of bubbles and smoke, and things like

11   that.

12        A.   Yes.

13        Q.   But if there's no increase in bacteria as a result

14   of the use of Bair Hugger, then the Bair Hugger can't be

15   responsible for increasing the risk of bacterial infections

16   in surgical sites; right?

17             MR. SACCHET:   Object to form.

18        A.   Do you mean if Bair Huggers never caused bacteria

19   to go into surgical sites?

20   BY MR. C. GORDON:

21        Q.   Right.  If the use of Bair Huggers does not

22   increase the bacterial count in the vicinity of the

23   operative field, then anything else it does --

24        A.   Well, no, if Bair Huggers don't increase the

25   bacterial count in the vicinity of the operative field,

Page 63

1                    DR. PAUL MCGOVERN

2   that's not the same as Bair Huggers not increasing the

3   bacterial count in operative fields.  There's a significant

4   difference, or potentially a significant difference, because

5   the vicinity of the operative field could be a zone an inch

6   above the operative field.  It's a vague -- it's a vague

7   classification.  And what matters is if bacteria find their

8   way into an operative field and ultimately cause infection.

9   Bacteria do land in operative fields in different sorts of

10  operations, but in different operations, the consequences to

11  the patient are very different.  And so the use of

12  forced-air warming devices not increasing the bacterial

13  count in the vicinity of the operative field is different

14  from increasing the bacterial count in the operative field,

15  or in the operative wound, or on an implant.  So they are

16  related but they are not the same.

17      Q.  Did you conduct any experiments to see if the use

18  of the Bair Hugger increased the bacterial count in the

19  operative field?

20      A.  No.

21      Q.  In terms of relevance to the risk of surgical-site

22  infections, would you agree that bacteria in the vicinity of

23  the operative field is of greater relevance than particles?

24          MR. SACCHET:  Object to form.

25      A.  Would I agree that bacteria is of greater relevance

Page 64

1                    DR. PAUL MCGOVERN

2  than particles?  It depends.  It depends if you mean

3  bacteria that we know are there, or bacteria that we see;

4  and particles that we know are sterile, or particles that we

5  know may contain bacteria.  We're talking about

6  probabilities here, and so it depends.

7  BY MR. C. GORDON:

8      Q.  I'm talking about particles that don't contain

9  bacteria versus actual bacteria.

10     A.  Well, to my understanding of it, bacteria do exist

11 on their own in air, but generally it's -- bacterias are

12 carried by a vector: droplets of water, droplets of

13 moisture, droplets of blood, or skin cells or dust.  And so

14 if you can guarantee that particles are sterile, have no

15 bacteria and have no harmful effects, then bacteria are more

16 important than particles.  But until you can guarantee that

17 all particles in the air are sterile, I, as a surgeon, would

18 not want airborne particles in my operative field.  And so

19 it's difficult to completely separate the two, to completely

20 separate particles from bacteria, because the form that

21 bacteria take in an operative -- in an operating room are

22 stuck to particles.

23     Q.  When you were sampling the bacteria in this

24 experiment, were you only sampling free-floating bacteria or

25 were you also sampling bacteria that were traveling on

1              DR. PAUL MCGOVERN

2  particles?

3      A.  We would have sampled both.

4              (Reporter clarification.)

5      A.  This would have sampled both.

6          MR. C. GORDON:  Let's turn to 3615.

7          THE COURT REPORTER:  Would it be possible to have

8  a short break?

9          MR. C. GORDON:  I am sorry.  I apologize.  We'll

10  take a break.

11         THE VIDEOGRAPHER:  This is the end of DVD 1 in

12  volume 1 in the deposition of Dr. McGovern.  We are going

13  off the record at 11:28.  The recording has stopped.

14  (11:28 a.m.)

15             (Break taken.)

16  (11:42 a.m.)

17         THE VIDEOGRAPHER:  Okay.  This is the beginning of

18  DVD 2 in volume 1 of the deposition of Dr. Paul McGovern.

19  We're back on the record at 11:42.

20  BY MR. C. GORDON:

21     Q.  Dr. McGovern, if I could direct you to page 3615

22  through 3626.

23     A.  Yes.

24     Q.  Is this another draft of the same study we've been

25  talking about this morning?

Page 66

1                        DR. PAUL MCGOVERN

2         A.  It is indeed, yes, another draft of this study that

3    we've been talking about.

4         Q.  And does the fact that this one has a list of

5    names -- author names on it, suggest where it comes in the

6    sequence of drafts?

7         A.  It is likely to be after the first document we've

8    discussed, but I do not know if this is before or after the

9    second document that we've discussed.  I can't tell.

10        Q.  If you turn to page 3626, there are a couple of

11   notes highlighted in yellow.  One notes:

12        "Haven't re-done the references yet, will do so.

13        "Results, I haven't swapped round experiment 2 and

14   4."

15        A.  Yes.

16        Q.  Are those your notes?

17        A.  I don't remember.

18        Q.  You described a process whereby this the write-up

19   of this experiment went through several versions with input

20   from several different people; is that right?

21        A.  Yes.

22        Q.  Do you know who had input in addition to the people

23   listed on 3615?

24        A.  I am not aware that anyone else had any -- I don't

25   recall anyone else having any input into the write-up.

Page 67

1            DR. PAUL MCGOVERN

2            THE VIDEOGRAPHER:  Can I pause you a second.  Your

3    mic has fallen off.

4    BY MR. C. GORDON:

5        Q.  Was this paper ever finalized?

6        A.  Define "finalized".

7        Q.  Where everybody who was involved in its authorship

8    said, "Yep, this is a final version.  I'm good with this."

9        A.  No, I don't think so.  A finalized paper would be

10   one which had been accepted and published in a peer-reviewed

11   journal.

12       Q.  Okay.  Was this ever submitted to any journal for

13   publication?

14       A.  This experiment was submitted to a meeting as

15   a presentation.  I can't remember which meeting, but it was

16   rejected -- I think it was the American Academy of

17   Orthopedic Surgeons.  I would have to check that, but that

18   was the meeting it was submitted to.  So it was submitted

19   and rejected.

20       Q.  And when you say it was submitted, you're talking

21   about a one-page summary?

22       A.  An abstract of this.  The form for such

23   presentations is that an abstract is submitted and the study

24   is accepted or rejected, based on that abstract.

25       Q.  Was it submitted to more than one?  Was the

1                  DR. PAUL MCGOVERN

2    abstract submitted to more than one group?

3        A.  Not to my recollection.

4        Q.  Was there any discussion about submitting the full

5    paper, with the complete results and the analysis and the

6    discussion, to a journal for publication?

7        A.  Well, the process of writing up is with the

8    intention of submitting it to a journal.  But I think most

9    clinicians would agree that the barrier of entry, or the --

10   we would agree that it is harder to get something published

11   in a journal than it is to have something presented at

12   a meeting.  And so all these documents that we've been

13   discussing were working towards the intention of having it

14   published in a journal.  But having been peer reviewed by

15   the review process, the abstract being reviewed and

16   rejected, at that point it wasn't taken further.

17       Q.  Who made the decision not to pursue this any

18   further by trying to submit it to a publication, or submit

19   the abstract to other organizations?

20       A.  I don't remember.

21       Q.  At what point did you first meet Mark Albrecht?

22       A.  I don't remember.

23       Q.  Do you recall the circumstances under which you

24   first met him?

25       A.  It would have been in the U.K. and it's likely that

Page 69

1                    DR. PAUL MCGOVERN

2   it was -- well, in the Newcastle area.  It would have been

3   in relation to a subsequent experiment looking at airflows

4   in operating rooms, operating theaters.

5        Q.  Was Professor Edwards-Jones involved in any

6   discussions about whether to try to submit this to any

7   publication?

8        A.  I don't remember if professor Edwards-Jones was

9   involved in discussions about submission, or which

10  publications or meetings would be targeted for submission.

11  I remember the discussions with Professor Edwards-Jones were

12  regarding the microbiology and plates, things of that

13  regard, but I don't remember if discussions with

14  Professor Edwards-Jones involved a submission.

15       Q.  I want to be sure I understand.  Your testimony is

16  that because one conference group rejected a one-page

17  summary for a presentation to that conference, you decided:

18  that's it.  We're not going to do anything further with this

19  research?

20            MR. SACCHET:  Object to form.

21       A.  I think that is part of the reason that this wasn't

22  pursued further.  I think that in this case the experiment

23  is poorly designed, and because the -- because presenting

24  something in a meeting is generally easier than getting

25  something published, it seemed extremely unlikely, so as to

1                    DR. PAUL MCGOVERN

2  be effectively impossible, that this study would be accepted

3  for publication, to my recollection.

4  BY MR. C. GORDON:

5      Q.  In connection with some of your subsequent studies

6  of Bair Hugger, your initial attempts to get them published

7  were rejected by multiple journals; right?

8      A.  Correct.

9      Q.  And you kept trying them until you found a journal

10 that was willing to publish them?

11     A.  Correct.

12     Q.  Why the difference?

13     A.  The difference being that when you do an experiment

14 and get it -- try to get it published, you have to go

15 through a peer-review process, entirely appropriately.  It

16 is known that experiments with negative findings, or with no

17 findings, generally are accepted less frequently than those

18 with positive findings.  Furthermore, this is the first

19 experimental study that I'd ever done in clinical practice.

20 I'd done audits, but I had not been closely involved with

21 designing an experiment of this nature before.  And it

22 became clear to me, and I believe my co-authors, that the

23 design of the experiment was really not representative of

24 surgical practice.

25         And so, to summarize, the reason that this paper

1                    DR. PAUL MCGOVERN

2    was not pursued, and the others were, is that the other

3    papers were good papers and good studies, and this

4    wasn't a good study.

5         Q.   Tell me why this was not a good study.

6         A.   This study did not take into account any

7    statistical significance of any data.  The way it was

8    designed was we had an idea and put some bacterial plates

9    out, and I had a particle counter and learnt how to use it,

10   and thought: I'll look and see if I can see anything.  And

11   really, a study of this nature requires planning with

12   a statistician to work out what potential results may be,

13   and how one may produce a statistically significant result.

14        Also, I think that it would have been worth doing

15   some preliminary studies in real life to get a baseline.

16   What I mean by that is putting some bacterial plates in

17   a real operation in the corner of an operating room to

18   see whether there was a difference between a real

19   operation and whether -- sorry, bacterial settle rates

20   in a real operation, or a set-up which was closer to a

21   real operation, so a simulated set-up which was closer

22   to a real operation when compared with this design,

23   which really didn't have many people in the room, did

24   not set the patient up in a way which was representative

25   of an operation which we'd be interested in looking at.

1              DR. PAUL MCGOVERN

2    It looked for bacteria in an environment which is

3    designed to minimize bacterial load in the air.  And

4    it's not really surprising that there were very few

5    bacteria.

6         But all this together means that a peer reviewer

7    would, in all likelihood, look at this study, see that

8    it was a very flawed design, and conclude that it wasn't

9    worth publishing.

10        Q.  I'm sorry, I'm not understanding what you meant by

11   "minimizing the bacterial load in the air."

12        A.  So, a laminar flow operating room, the purpose

13   of it is to -- or one of the purposes of it -- is to clear

14   bacteria, or potentially bacterial-laden particles away from

15   the operative field.  That is one of the reasons for having

16   a laminar flow operating room in the first place.  And so,

17   given that the operating room is a clean environment, if

18   there are no, or very few, sources of potential particles

19   which are the operating room staff, the procedure itself,

20   the moisture thrown up from the procedure, the patient, the

21   equipment used by the patient, then it's not surprising that

22   there were any particles there.  It is not representative of

23   real life.

24                   (Reporter clarification)

25        A.  To continue the theme, if I put bacterial settle

1                    DR. PAUL MCGOVERN

2  plates down in an operating room I'd expect to find zero

3  bacteria, and the experiment that we set up, given my

4  inexperience at the time, was one which I thought would be

5  representative of an operating environment, but really

6  wasn't.  It was more representative of an empty operating

7  room because of the controls that were put in place by

8  limiting the number of people in the operating room, keeping

9  people outside the laminar flow boundary and minimizing

10  movement and any sources of air disruption in the operating

11  room.

12      Q.  Do you recall having any discussions with

13  Professor Edwards-Jones about the likelihood of finding

14  bacteria under these circumstances?

15      A.  I don't remember.

16      Q.  Do you recall any discussions, after this was done,

17  about "Maybe we should try it again and do it a different

18  way to make it more realistic in terms of what a real

19  operation would be"?

20      A.  I don't remember.  I -- the reason that we -- I

21  mentioned previously putting bacterial collection plates in

22  a real operation, but there are ethical issues with that,

23  understandably, because doing any research in the vicinity

24  of a patient is one which rightly needs a lot of oversight,

25  and to -- it would be unrealistic to do that, and probably

1                    DR. PAUL MCGOVERN

2    not permissible to put bacterial plates in a real operating

3    room to collect -- to sample bacteria without full ethical

4    approval, which is a different -- would be a completely

5    different experiment.  So it wasn't something which we could

6    just try and see if we saw anything.

7        Q.   Okay.  Going back to your discussion about the

8    statistical analysis, what data would you have, in

9    hindsight, wanted to subject to some sort of statistical

10   analysis?

11       A.   What I would have done is designed the experiment

12   with a statistician, or with someone who had much more

13   experience of statistics than I, to establish what numbers

14   we might be expecting and what statistical tests, if any,

15   would be appropriate.  Now, in an area in which we have very

16   little experience, such as this, a scoping experiment might

17   be appropriate to simply use the equipment and see what you

18   see, as I've said before, to get an idea for whether there

19   were any particles in the air, whether there were any

20   bacteria, because if you have zero bacteria, you can't do

21   a statistical analysis.  If you have one or two, it might

22   require a different statistical test.  If you have

23   thousands, it might require a yet different statistical

24   test, which influences the study design.  My expertise would

25   be in relating something to surgical practice, but my

1                    DR. PAUL MCGOVERN

2   expertise would not be in designing a study to make it

3   statistically significant.  So that's why I would

4   collaborate with someone who had expertise in that area, in

5   the future, were I going back over this research, to make

6   the data as valid as possible and as useful as possible.

7       Q.  Okay.  I guess I'm having trouble understanding

8   what kind of statistical analysis you'd do if you're looking

9   to see if something causes an increase, and all you get are

10  zeros.

11          MR. SACCHET:  Object to form.

12  BY MR. C. GORDON:

13      Q.  What is the statistical issue there?

14          MR. SACCHET:  Object to form.

15      A.  Statistical issue with what?

16  BY MR. C. GORDON:

17      Q.  Well, for example, when you blew the air from

18  a Bair Hugger onto a settle plate, you got zero bugs?

19      A.  Correct.

20      Q.  What is -- what statistical analysis could be done

21  there?

22          MR. SACCHET:  Object to form.

23      A.  In that experiment, where you simply blow something

24  over a settle plate, none.  There is no statistical test,

25  which is why perhaps an experiment may involve -- and this

```
 1                      DR. PAUL MCGOVERN
 2   why I would collaborate with a statistician -- were I to
 3   look in detail at bacteria particles from a Bair Hugger
 4   unit, I would maybe use multiple units, adjust the
 5   conditions they were in.  This experiment was not conceived
 6   to look at the outflow ports of Bair Huggers.
 7                Really, I mentioned earlier a scoping
 8   exercise.  In retrospect, this was a scoping exercise
 9   which I hoped would be publishable; but in doing this
10   scoping exercise I learned a little about how
11   experiments are conducted, how not to conduct
12   experiments, and what -- how to approach designing
13   a scientific study so that the data are valid and so it
14   is publishable in some context.  The outflow of the
15   Bair Hugger, those data would not have been publishable
16   because they are an aside.  They are something that we
17   did because we had some settle plates, and we had a
18   Bair Hugger.  And so we were looking to see if we could
19   see anything.  It was an informal look, a glance, at
20   a scoping exercise to see if we could find anything
21   interesting.
22   BY MR. C. GORDON:
23        Q.  Let's see if we can summarize what you learned in
24   doing this as to how not to do it, or what's the right way
25   to do an experiment.  One of the things you mentioned was
```

1                         DR. PAUL MCGOVERN

2    that there were fewer personnel than would ordinarily be

3    present in a surgery; is that right?

4         A.   Yes.

5         Q.   So for further research, you'd want to have the

6    normal number of personnel; right?

7         A.   Ideally, this -- what would be done would be

8    collecting bacterial samples in real operating -- in

9    hundreds, probably, of real operations, and using -- gaining

10   a large amount of data, strategically gaining that data to

11   establish what was a necessary amount of data to be able to

12   statistically analyze.  So yeah, you would -- you might

13   particle count, you may bacteria count.  You may use active

14   sampling, passive sampling, and ideally it would be in

15   a real operating environment.  The design of the particle

16   counters would have to be different from the one that was

17   used because it was quite bulky.  It would have got in the

18   way of the operation.  It would be very difficult to

19   accurately sample bacteria.

20        You would also take a bacterial swabs from the

21   wound, and you would randomize patients to being warmed

22   with a Bair Hugger or not.  You may have different arms

23   of the study.  You would need to control for patient's

24   age, the operation they were having, the length of the

25   procedure, the patient's temperature.  It would be

1                    DR. PAUL MCGOVERN

2   a huge and very complex study, and one which, without

3   a very, very large amount of funding, would be

4   unfeasible.

5        Q.   Do you recall any discussions with anyone about

6   trying to accomplish a study along the lines you've just

7   described?

8        A.   I've had frequent discussions with Mike Reed, but

9   not in terms of actually trying to plan a study, but in

10  terms of mentioning that that would be desirable.  That

11  would -- a well designed, multicenter, randomized control

12  study would provide more robust information which would be

13  valuable.

14       Q.   So at what point after you had done this study did

15  you decide to do further research on the Bair Hugger?

16       A.   In terms of time, I don't remember.  It was

17  sometime after the experiment was conducted.  This, as you

18  can see, went through multiple revisions.  So I spent some

19  effort trying to get this up to standard.  But the process

20  of a junior doctor writing their first paper is a torturous

21  one, and a long one, as can be seen by the many slightly

22  varying revisions that I've produced.  I don't remember when

23  the next study started.  I don't remember if writing up of

24  this continued after, during or before the subsequent

25  investigations took place.

1              DR. PAUL MCGOVERN

2        I had the particle counter and I was continuing to

3   try to learn how to use it.  I would informally sample

4   air in operating rooms at home to see what type of

5   scenarios produced what type of results with it, to try

6   and learn how to use it better.  But I don't remember

7   the exact timescales of those.

8        Q.  What was the next Bair Hugger related research

9   activity you undertook?

10       A.  I think it was the study in which we used the --

11  well, the next experiment that I was involved in.  So I was

12  involved in writing up several papers and involved in the

13  writing phase of those, but the next experiment that I was

14  involved in was, to the best of my recollection, one in

15  which we used a bubble generator to visualize airflow in the

16  presenting room, in an experimental set-up.

17       Q.  Whose idea was that?

18       A.  Whose idea was?

19       Q.  To use a bubble generator to visualize airflow?

20       A.  I don't remember.

21       Q.  Was it yours?

22       A.  It was not mine.

23       Q.  Was it somebody connected with Augustine?

24       A.  I don't --

25           MR. SACCHET:  Objection to form.

1            DR. PAUL MCGOVERN

2   BY MR. C. GORDON:

3        Q.   Was Mark Albrecht involved in this bubble

4   visualization?

5        A.   Yes.

6        Q.   How was he involved?

7        A.   Mark Albrecht was involved, was in the UK for the

8   experiment, for collection of some of the data, and helped

9   to design the experiment, helped conduct the data

10  collection, helped -- well, he was the person who knew how

11  to use the bubble generator.  And so he used that, directed

12  its use, and was involved in statistical analysis and

13  writing up.

14       Q.   What was your role in that?

15       A.   My role was to help design the theater layout, the

16  operating room layout, and to advise on patient positioning,

17  on surgeon positioning, anesthesia screen positioning,

18  anesthesiologist positioning, and to advise on how an

19  operation was set-up in real life, in an effort to best

20  simulate a situation which was as realistic as possible.

21       Q.   Do you know Robin Humble?

22       A.   I do.

23       Q.   When did you first meet him?

24       A.   I don't remember.  I don't remember if it was

25  before this bacterial particle sampling experiment we've

Page 81

1                      DR. PAUL MCGOVERN
2  been discussing.  I don't remember if it was before that or
3  after that.
4       Q.  In what context did you meet him?
5       A.  I don't remember when I met him.  I don't remember
6  the context I met Robin Humble in.
7       Q.  Whenever you first met him, what was your
8  understanding of who he was?
9       A.  My understanding now is that he is -- he works with
10  HotDog, the company HotDog, to distribute it in the U.K.  I
11  don't remember what my understanding of his role was at that
12  time.
13       Q.  Did you meet him in a professional context or a
14  social context?
15       A.  I remember working -- I remember him being present
16  during the experiments with the -- or some of the
17  experiments at Wansbeck Hospital using the bubble generator.
18  I don't remember if I have met him before in another
19  context.
20       Q.  Did he have anything to do with the actual running
21  of the experiment, the microbiology one that we've been --
22       A.  Not to my recollection.
23       Q.  Did you meet him before or after you met Albrecht?
24       A.  I don't remember.  It may have been around the same
25  time, but I don't remember if I met him before or after Mark

Page 82

1                    DR. PAUL MCGOVERN

2   Albrecht.  I don't remember who was at Wansbeck Hospital

3   first.  I don't remember if I met one of them and another

4   one came on a different day.  I don't remember if it was in

5   the same day, a couple of days, weekends.  I don't remember

6   meeting Robin Humble.  I remember him being at Wansbeck

7   Hospital.

8        Q.  In the first bubble experiment you did, you

9   actually compared Bair Hugger to HotDog, right?

10       A.  I believe so, yes.

11       Q.  Had Wansbeck Hospital acquired a HotDog unit prior

12  to that?

13       A.  I don't remember.  I remember that Wansbeck

14  Hospital did look at and eventually transfer over to HotDog

15  as their warming solution of choice.  I don't remember if

16  that process had occurred, or if it had started at the time

17  of the bubble experiment.  I think it had not happened.

18  I don't think Wansbeck was running HotDogs as part of their

19  general practice at the time of that experiment, but I can't

20  remember the exact dates.

21       Q.  Do you know how it came to be that Wansbeck had

22  a HotDog unit to even use when you did that bubble -- that

23  first bubble experiment?

24       A.  I don't.

25       Q.  Did you have any input into the initial decision to

1                    DR. PAUL MCGOVERN

2    do the bubble experiment?

3         A.   I was working on the -- this project, and it

4    seemed -- as I'd been working with Mike Reed in the area,

5    I was a junior doctor under him, and I worked -- he asked me

6    if I wanted to be involved in more research in it.  I

7    haven't -- my aim was to get a paper published.  That's

8    the -- that was the prime reason to get involved in the very

9    first place, was because I wanted to get a paper, or more

10   than one paper, published, which is why I went through so

11   many iterations of this, because I did want to publish

12   something.  I was offered to be involved with more studies,

13   and so I agreed.

14        Q.   Going back to the microbiology study, given your

15   eagerness to publish a paper and all the effort you put into

16   the various versions of it, why didn't you just try

17   submitting it somewhere?

18        A.   A couple of reasons.  First, it seemed futile.

19   Second, I haven't finished every piece of audit or research

20   work that I've started.  I've got quite a lot of things

21   which fall by the wayside.  It's not uncommon for me, and

22   I think many of my colleagues, to start something and

23   realize that you're barking up the wrong tree or going down

24   a dead end.  And so this is one of several efforts.  I've

25   had other audits and other -- no research in this field, but

1                    DR. PAUL MCGOVERN

2    in other areas which I've started, and then realized that it

3    wasn't going to achieve anything, and then not continued

4    with it.

5         Q.   Had you published anything prior to the time you

6    did the microbiology study?

7         A.   I had been a very junior author on one paper which

8    looked at the development of electronic software in a trauma

9    unit.  That was in 2007, and my involvement in that was

10   performing an audit on, I think, surgeons' perceptions of

11   how trauma meetings are performed in the morning meeting in

12   a surgical unit that I worked in in UCLH, when I was

13   a second-year doctor.  And so this is the first experiment

14   which I was more closely involved with in the design of.

15   I had not done any research or anything in this area, and

16   tried to design anything before.  I had one publication but

17   was a very junior author and did a very small part of the

18   larger projects.

19        Q.   Did there come a point in time with the

20   microbiology study, when you'd gone through various drafts

21   and put all this effort in, that somebody put their hand on

22   your shoulder and said, "Mark, give this one up.  Move on to

23   something else."

24        A.   Mark?

25        Q.   I'm sorry.  "Paul".

Page 85

1                    DR. PAUL MCGOVERN

2        A.   No.   At no point did anyone say "This is a" -- you

3   know, "Give this up."   I -- as a more senior trainee,

4   Ms. Srinivas was not involved initially, but helped me quite

5   a lot with trying to get this up to a standard which we

6   thought might be publishable.   But really, this was not

7   a situation of anyone discouraging me; this was a situation

8   of me realizing that it wasn't going to get published,

9   particularly after it had been rejected for a scientific

10  meeting.   And going through all the iterations, seeing that

11  there was very little substance which a reviewer would grab

12  on to and think: this is worth publishing.

13       And I think that -- I still have that opinion.

14  Having been involved with the review process more, as

15  I've got more senior, if this were presented to me as

16  a reviewer, I'd reject it.   It doesn't -- it's -- I'd

17  try and, if I were reviewing it, offer some helpful

18  advice and say that "You need to be a bit more focused

19  as to what you're trying to show and have an idea of how

20  you're going to show it," but in this form, and any

21  forms that we got to, it is not something that would be

22  in a peer-reviewed journal that would be of sufficient

23  note to be worth my career.

24            You can get something published in some

25  journals, but if they're not listed on PubMed, if

1                        DR. PAUL MCGOVERN

2    they're not of a certain standard, then they're not

3    declarable as a trainee, they don't count towards your

4    professional development as a trainee, and they're not,

5    therefore, a line on your CV which is worth putting,

6    which is worth including.  And so, if I'm to publish

7    something, I want it to be published in a respected

8    peer-reviewed journal, not one of these journals that

9    takes a fee and publishes anything.  And I came to the

10   conclusion that this was only publishable in one of

11   those journals and therefore not worth pursuing any

12   more.

13       Q.  Before luncheon, I'll take what should be a pretty

14   quick topic.

15           If you turn to page 3671.

16       A.  Yes.

17       Q.  When you were sharing with us your background and

18   you talked about your experience at Medway, I thought

19   I heard you say that you had been involved in an audit of

20   Bair Hugger versus HotDog, or something involving the --

21   that Medway was looking at Bair Hugger, HotDog, and some

22   other warming modality?

23       A.  I didn't say I'd been involved in an audit like

24   that.

25       Q.  Okay, then I misspoke.  What does page 3671 refer

```
1                    DR. PAUL MCGOVERN
2   to?
3         A.   This was -- let me see.
4         Q.   I guess it goes on to 3673.
5         A.   Yeah.  This was a proposal for an audit in which
6   the -- an audit into whether different warming technologies
7   altered ambient temperatures in operating rooms.
8         Q.   What were the different technologies?
9         A.   I believe -- yeah, HotDog and Bair Hugger.
10        Q.   What's the difference between an audit and -- well,
11  strike that.  What's an audit?
12        A.   So, an audit is -- I mean, it seemed like you were
13  starting to ask what the difference between audit and
14  research is, and it's probably worth discussing the
15  difference in terms of each other.  An audit is where you
16  collect data and you examine it against a standard, and
17  research is where you -- generally where you make a change
18  to practice and monitor that change.  An audit, therefore,
19  is collecting data but not changing practice at all.  And
20  research generally changes something.
21             Now, this is particularly relevant for
22  anything involving patients, because with an audit, you
23  don't make any change to a patient's care or anything
24  about the environment of a patient that you weren't
25  already doing.  You are looking at what is done.  With
```

1               DR. PAUL MCGOVERN

2    the research, you change something and look at the

3    impact that change has.

4              A big difference between them is the ethical

5    considerations of the two, because if you're changing

6    something with relation to patients, there comes into

7    play a potential conflict of interest if I were to --

8    if anyone, a clinician, were to change any aspect of

9    patient care, there is a potential to change care to

10   the detriment of the patient.  And that being the case,

11   any research needs to be examined by an ethics

12   committee.  Audit does not need to be examined by an

13   ethics committee because it does not change the patient

14   experience, or change anything that happens to

15   patients.

16             So in this case, this is an audit, because

17   temperatures are taken in theaters for general

18   monitoring anyway.  Ambient temperatures are monitored

19   because there is a temperature sensor on the wall.  And

20   so it really, from my recollection -- I haven't read

21   this in detail for a while, but from my recollection --

22   it was asking staff to note down the temperature in the

23   operating room and which warming technology was used.

24   It did not attempt to alter the warming technology

25   which was used.  Medway happened, through no -- through

1                          DR. PAUL MCGOVERN

2      circumstance, to be using both HotDogs and Bair Huggers

3      at the time I was working there.

4           Q.  When you first started there, were they using both?

5           A.  I don't remember if they started using both

6      when I -- if they were using both when I started there.

7           Q.  Did you have any input into the decision on

8      Medway's part to give HotDog a try?

9           A.  No.

10          Q.  Do you recall having any communications with anyone

11     connected with Augustine, suggesting that they provide them

12     with some cost benefit analysis as a way of persuading them

13     that they should try HotDog?

14          A.  I may have -- I don't remember if I'd -- have ever

15     asked about cost benefit analysis with regard to Medway.

16     I have asked about costs of Bair Huggers and HotDogs and

17     other technologies -- well, anywhere I've worked, which has

18     looked at both.  So it was something I was interested in.

19     So I may have asked what prices Medway was paying.  I may

20     have ask the theater staff what prices they were paying for

21     HotDogs, for Bair Huggers, because I generally am interested

22     in how much things cost, anyway.  I'd ask how much

23     orthopedic implants cost, or how much an operation costs.

24     It is just something that interests me.  So it is quite

25     possible that I'd have asked about the cost of Bair Huggers

1                       DR. PAUL MCGOVERN

2    and HotDogs, although I don't remember a specific incident

3    of doing so.

4         Q.  Well, to be more specific, you don't recall

5    communicating with Robin Humble and suggesting that he

6    provide Medway with a cost benefit analysis?

7         A.  I was in contact with Robin Humble when I was at

8    Medway, but -- I don't remember any communication to that

9    effect, but it's possible.  I don't remember.

10        Q.  Okay.  What happened with the -- your audit

11   proposal you see on 3671?

12        A.  I don't think this was the only audit that I did or

13   tried to do in Medway.  I don't recall outputting anything

14   with regards to patient warming when I was at Medway.

15   I think I tried to -- there was this audit, and there was

16   another one in which different theaters were trialing

17   HotDog, and they were alternating between Hotdogs and

18   Bair Huggers; and I thought that would be an opportunity for

19   an audit, because I had not instigated use in different

20   theaters or anything, and I thought this was an opportunity

21   to sample, I think, temperatures, maybe particles, but I had

22   some ideas, but nothing got produced.  Nothing became of any

23   of these ideas, as far as I remember.

24        Q.  So no audits were actually performed?

25        A.  Data may have been collected but nothing was

1                      DR. PAUL MCGOVERN

2    completed.  Because there's this audit form.  I -- you know,

3    this 3673.  I do not remember if this sheet moved out of

4    draft stage and was put in any operating rooms, and if any

5    that was collected.  I don't remember if I picked any sheets

6    up or did anything with any of the data.  But this did

7    not -- whatever stage it got to, it did not get to a stage

8    of me having written anything for presentation, as far as

9    I remember.

10                      (Reporter clarification.)

11        Q.  So you don't remember even compiling any

12   comparative data?

13        A.  I -- I don't remember if I did.  I remember having

14   meetings with senior nursing staff to try to set this up,

15   and I remember that some seniors were interested in it.

16   They thought this was something worth pursuing, and some

17   weren't interested.  And so I remember a lot of meetings

18   about whether this could go ahead, because in this sort of

19   audit you need buy-in from all staff, because they can't be

20   distracted from their core job.  This is something that they

21   would only do if they had a moment to do it, and that

22   requires all staff to be aware of it, and that requires

23   senior staff to be happy that you're alerting more junior

24   staff to it, and for them to be on board, and to be

25   cooperating.

1                    DR. PAUL MCGOVERN

2        I don't -- I remember a lot of meetings with more

3   senior surgical theater staff about whether this could

4   go ahead, but I don't remember where we got to in this

5   audit, or in this proposed audit.  I don't remember at

6   what stage, if any, data was collected at all, or if

7   some data was collected, or if I compiled any data or

8   anything.  I've got lots of -- well, as I say, there's

9   been lots of audits that I -- obviously I've started in

10  the past, which I've then realized, for practical

11  reasons or logistical reasons, have not gone anywhere.

12  And I don't remember if this is one of those that got

13  nearly done and fell at the last hurdle, or didn't get

14  past this stage.

15       Q.  And so, as you sit here today, you don't remember

16  that there -- whatever you did, did or did not show any

17  difference between HotDog and the Bair Hugger?

18            MR. SACCHET:  Objection to form.

19       A.  I did -- nothing that I did at Medway showed

20  anything interesting.  Whatever stage I got to, there was no

21  point at which I found an interesting -- whether or not --

22  I mean, it wouldn't have been statistically significant

23  because it was not researched, but whether I found anything

24  which was noteworthy either way.  Because if I had found

25  something noteworthy either way, then I would have taken it

1                    DR. PAUL MCGOVERN

2    forward.  But yeah, as I sit here today, there's nothing

3    I recall which was worth -- which is worth mentioning.

4    BY MR. C. GORDON:

5        Q.  And when you say, you know, something worth

6    mentioning, that would be if there was a difference?

7        A.  Or if there wasn't.  If -- you see, this is -- the

8    problem with this audit, looking at it now, with

9    a reviewer's mind, my question to my more junior, less

10   experienced self, is: what's the point?  What's the point of

11   looking at whether temperatures go up and down in

12   a small-scale thing?  Temperatures fluctuate quite a lot in

13   operating rooms, and it is a constant complaint of surgeons

14   and circulating staff that it is either too hot or too cold,

15   and there are lots of things that can confound the

16   temperature in the operating room.

17        And again, it is a sort of speculative thing.  If

18   you see that temperatures are on average 5 degrees or

19   10 degrees higher when using one technology or another,

20   that may be of interest.  And if you don't find

21   anything, then it's almost what you would expect.  But

22   again, in this sort of thing, I'm motivated partly by

23   the fact that I am encouraged to have audits produced,

24   and I am encouraged to have presented audits locally.

25   And so there is a certain amount of looking for things

1                    DR. PAUL MCGOVERN

2    that I can audit as a training surgeon, and there is

3    a -- yeah, you're looking for things that might be

4    interesting to report on.  But I -- as I say, I don't

5    remember if anything noteworthy came of this, and

6    I don't remember what stage it got to.

7              MR. C. GORDON:  That's a good spot to take

8    a break, or a lunch hour.

9              THE VIDEOGRAPHER:  Going off the record at 12:33.

10   (12:33 a.m.)

11                         (Break taken.)

12   (1:40 p.m.)

13             THE VIDEOGRAPHER:  We're back on the record at 20

14   to 2.  The deposition has been joined by ...

15             MR. SHACKLADY:  Bryan Shacklady.  I am English

16   solicitor from Forsters LLP, representing Mr. McGovern.

17             THE VIDEOGRAPHER:  Okay, which means that Andrew

18   Head has left for the time being.  On the record at 1:41,

19   counsel.

20   BY MR. C. GORDON:

21        Q.  Dr. McGovern, have you talked to Mike Reed since he

22   had his deposition taken?

23        A.  When did he have his deposition taken?

24        Q.  In December.

25        A.  Not to my recollection, no.

1                        DR. PAUL MCGOVERN

2        Q.   Okay.  You know who Scott Augustine is; correct?

3        A.   I do.

4        Q.   When is the last time you spoke with Scott

5   Augustine?

6        A.   A few months ago.  It was some time in 2016.  I'd

7   say four to six months ago, but it's a bit of a guess.

8        Q.   There are some e-mails with him.  We'll get to

9   them, and we can talk about that.  But I take it, then, you

10   have not spoken with him about your deposition?

11        A.   No, that's correct.  I have not spoken with Scott

12   Augustine about this deposition.

13        Q.   Have you spoken with Mark Albrecht at all about

14   this deposition?

15        A.   No, I've not.  I haven't spoken to Mark Albrecht

16   for -- I don't think I've spoken to Mark Albrecht since this

17   whole process started, so no.

18        Q.   By "this whole process", what do you mean?

19        A.   Since -- certainly in the last year, I don't recall

20   speaking to Mark Albrecht.

21        Q.   Okay.  Have you had any communication with

22   Mr. Albrecht via e-mail in the past year?

23        A.   In the past ... I don't think I have, in the past

24   year.  I don't remember the last time I spoke to Mark

25   Albrecht.  It may have been a year or more ago.  I think it

1                    DR. PAUL MCGOVERN

2   was -- he asked me to do reference for him, it could be

3   a year, two years ago, and we've had some communication, but

4   I can't remember the dates when I last spoke to him.  Not

5   recently.  I haven't spoken to Mark Albrecht recently.

6        Q.  Okay.  I'd like to direct your attention to

7   exhibit 1A, page 350.  Is that an exchange of e-mails

8   between you and Mike Reed?

9        A.  It is.

10       Q.  In the top e-mail he -- apparently Mike -- is

11  writing to you.  He refers to the "Need to get the Wansbeck

12  bubble experiment written up ASAP"?

13       A.  Yes.

14       Q.  What is the Wansbeck bubble experiment?

15       A.  That is the -- to my recollection, the second

16  experiment we were speaking about earlier, in which the

17  bubble generator was used in an operating room in an

18  experimental set-up to better understand the flow of air in

19  the operating room.  That was a study which Mark Albrecht

20  was involved with.

21       Q.  Okay.  And as of July 18, 2010, had that bubble

22  experiment already been done?

23       A.  I believe so, just by the content of the e-mail.

24  I don't remember when the bubble experiment was completed,

25  but given that Mike Reed, in that e-mail, is speaking in the

1                    DR. PAUL MCGOVERN

2   past tense, or referring to it as though it were in the

3   past, it would seem that that experiment had finished at

4   that point.

5        Q.  Your response to him was: "The one we did with all

6   the video?  I thought mark was writing that one up."  Is

7   that right?

8        A.  Yes, yes.

9        Q.  "Mark" refers to Mark Albrecht?

10       A.  That's right.

11       Q.  You thought he was going to be doing the principal

12  authorship of the bubble study?

13       A.  Well, part of it.  Different parts of the paper are

14  written by different individuals.  And so we all had

15  different sections of the paper to complete.  Mark Albrecht

16  specifically dealt with the statistical results section.  I

17  was more involved with the preamble, the introduction, and

18  the methods.  But in terms of the exact delineation of work,

19  I don't remember what proportion of was which, but I was

20  involved in writing some sections more, and some sections

21  Mark was involved with writing more.

22       Q.  Who was primarily involved with writing the section

23  of that paper that compared the infection rates from the

24  Bair Hugger period to the HotDog period?

25       A.  That was part of the paper which I was not really

1                    DR. PAUL MCGOVERN

2   particularly involved with.  The infection rates were part

3   of data that Mike Reed had, and I did not really have much

4   to do with that data.  I didn't process it, or I knew it was

5   there, and it was probably included in some e-mails --

6   including it -- but I didn't process that data or have much

7   to do with that section of the experiment.  My main

8   involvement with that study in that paper was the

9   experimental phase in the operating room.

10        Q.  Going further on this e-mail on page 350, you said:

11        "Have sent a couple more versions of the original

12   one we did with Val, can resend the latest this evening

13   when I get home if you want."

14        What does that refer to?

15        A.  That refers to the first experiment we were

16   speaking about earlier, which was the one with bacterial

17   sampling with settle plates and the bacterial sampling

18   device.

19        Q.  So does this indicate that even after you had done

20   the first bubble study, you were still working on trying to

21   finalize the bacteria study?

22        A.  It does.

23        Q.  Okay.  In fact you go on to say:

24        "Am keen to push that through as well as all the

25   other stuff asap."

Page 99

1                      DR. PAUL MCGOVERN

2        A.   Yes.

3        Q.   And that refers to the bacteria.  So as of

4   July 2010, you were still keen to work on and get the

5   bacteria study published?

6        A.   Yes.

7        Q.   Okay.  The next paragraph you said:

8             "I think Augustine will help me to present

9   this stuff round and about, am going to do a big

10  submission run to various conferences to spread the

11  word."

12       A.   Yes.

13       Q.   What was that a reference to?

14       A.   That was a reference to attending a meeting in,

15  I think, Copenhagen.  There are many orthopedic meetings

16  around the country and around the world, and they have

17  associated fees with regards traveling to them, and joining

18  fees and such.  And my understanding was that Augustine's

19  company would help me with those fees to present papers,

20  were they accepted by the peer-review process.

21       Q.   And when you talk about Augustine helping you to

22  present "this stuff", does "this stuff" refer to the

23  bubbles, the bacteria, or both?

24       A.   It's not clear from that, and I don't remember what

25  I meant at that time.

1                    DR. PAUL MCGOVERN

2        Q.   Okay.   If you'd flip over to the other e-mail

3   volume and turn to page 662.

4        A.   Is this 2A?

5        Q.   Yes.

6        A.   662?

7        Q.   Yes.   In the bottom, is that an e-mail from you to

8   you?

9        A.   At the bottom, er, yes.

10       Q.   Is this kind of a way of keeping track of some

11  notes?

12       A.   Probably notes, yeah.

13       Q.   Okay.   And this is all in reference to that

14  bacteria study; correct?

15       A.   I don't know, because I haven't written what it's

16  in reference to.

17       Q.   Well, if you look further up, the couple of

18  attachments are the "Particle and microbiology writeup draft

19  3."

20       A.   Where are we, sorry?

21       Q.   Just on the Word document attachments.   The

22  attachments themselves aren't there, just to show.

23       A.   Right, sure, yeah.   "Particle and microbiology

24  writeup draft 3", yes.

25       Q.   Then if you look at page 663 also in this string,

1                    DR. PAUL MCGOVERN

2    it's from you to Mike Reed: "This is the latest version

3    (attached)."

4         A.  Yes.

5         Q.  "Having gone over it with" -- is it Shreya?

6         A.  Shreya is Ms. Srinivas, the collaborator I

7    mentioned earlier who wasn't involved in the experimental

8    phase, but was helping with the write-up phase, the more

9    senior trainee.

10        Q.  And is there any doubt in your mind that these

11   notes have something to do with that microbiology study?

12        A.  No, these are related to the first study that we

13   discussed earlier.

14        Q.  Okay.  There's one line that I -- in sort of the

15   middle of your e-mail to yourself:

16             "In expert opinion of senior author (val)

17   considered ideal simulation."

18             What does that mean?

19        A.  I don't know.

20        Q.  "Val" refers to Professor Valerie Edwards-Jones?

21        A.  Valerie -- yeah, that's correct.

22        Q.  And do you recall discussing with Professor Jones

23   whether she thought the simulation that you conducted was an

24   ideal simulation?

25        A.  I don't remember what the discussion I had with

1                    DR. PAUL MCGOVERN

2    Dr. Edwards-Jones in that regard was.

3    Professor Edwards-Jones's role was microbiological, rather

4    than surgical, but I don't know what I'm referring to in

5    that brief note.

6         Q.  If you flip to page 735, a series of e-mails among

7    you, Mr. Reed, and Val Edwards-Jones.  In particular I want

8    to draw your attention to one at the bottom where Val

9    Edwards-Jones writes to you and Mr. Reed several things, but

10   the one line in particular is:

11            "I want to put lots of settle plates down too

12   so I will have the plan marked to place them in

13   appropriate positions."

14            Do you see that?

15        A.  Mm-hm, yeah.

16        Q.  Were the settle plates placed pursuant to the

17   determination of Professor Edwards-Jones as to what were the

18   appropriate positions?

19        A.  To the best of my recollection, it was discussed at

20   the time.  I don't remember if Professor Edwards-Jones

21   insisted.  I don't remember any disagreement.  We all would

22   have had an opinion on where the plates would go, and the

23   reason for those choices would have been related to being

24   inside and outside the laminar flow boundary, and practical

25   position placements based on the experiment we were doing.

1                    DR. PAUL MCGOVERN

2  But in terms of whether there was discussion or whether that

3  was decided by Professor Edwards-Jones, I don't remember.

4      Q.  If you'd turn to page 738, it looks like the top

5  e-mail from you to Professor Edwards-Jones with a CC to

6  Professor David Leaper and Mike Reed.  A couple of phrases

7  into this, you say:

8          "I'm surprised we got nothing from the plates

9  set up next to the field.  Even though the particle

10 counter didn't pick [up] anything significant up here,

11 I suppose it's possible that the table the micro

12 sampling unit was on could block 'dirty' air flow from

13 under the table.  That might be clutching at straws

14 though, particularly if plates placed under the table

15 (where dirty air ought to land) didn't grow anything.

16          "I will have to think about any other

17 potential errors in the design and discuss with

18 Mr. Reed."

19          Did I read that correctly?

20     A.  Yeah.

21     Q.  Did you discuss any other potential errors in the

22 design with Mr. Reed?

23     A.  I had many discussions with Mr. Reed about the

24 design of the experiment and the way that it was conducted,

25 and the flaws and benefits of it.  I don't remember

1                    DR. PAUL MCGOVERN

2    a specific discussion, but I discussed this and other

3    experiments frequently with Mr. Reed, as he was my

4    supervisor.

5                    (Reporter clarification.)

6         Q.  Based on the timestamp, it looks like the e-mail

7    that we've just -- that I just read from was in response to

8    an e-mail from Mr. Reed to you and Professor Edwards-Jones

9    and Professor Leaper, where Mr. Reed said:

10        "Isn't this surprising, and very valuable.  I'm not

11   sure whether it is reassured (I've been using them for

12   years) or disappointed."

13             Did I read that correctly?

14        A.  That's -- I read the same.

15        Q.  What was your understanding, when you saw this, as

16   to why Mr. Reed wasn't sure whether he should be reassured

17   or disappointed?

18             MR. SACCHET:  Object to form.

19        A.  What was my understanding?

20   BY MR. C. GORDON:

21        Q.  Yeah, when you read that, did you read that and

22   just say "I haven't a clue what he's talking about," or did

23   you have an idea what you thought he was referring to?

24        A.  It was approximately seven years ago.  I don't

25   remember what I thought at the time.

1                    DR. PAUL MCGOVERN

2        Q.   Okay.   Do you recall having any discussion with

3    Mr. Reed as to what he thought was very valuable about the

4    findings in this study?

5        A.   I don't.   If I did, I don't remember the content of

6    such a discussion.

7        Q.   If you turn to page 642, there's an e-mail from

8    January 29, 2010, from Mr. Reed to you, and it looks like

9    one other person, Sunit Patil?

10       A.   Mm-hm, yes.

11       Q.   Regarding a unique research opportunity?

12       A.   Yes.

13       Q.   And he refers to having a use of a thermal imaging

14   camera from a Northumbria Fire Brigade.   Are you aware of

15   whether any experiments or demonstrations were done using

16   a thermal imaging camera?

17       A.   I recall this -- that discussions took place about

18   a thermal imaging camera, but I was not present.   I think

19   I had another engagement and I was not available to partake

20   in that "one night only" that is referred to in this e-mail.

21   I wasn't around.

22       Q.   Did you later hear that anything was ever done with

23   the thermal imaging camera?

24       A.   I can't remember.   I can't remember what came of

25   that.

1                    DR. PAUL MCGOVERN

2         Q.  Now when you initially wrote up the bubble study,

3    was there, in the very first draft, a discussion comparing

4    infection rates from the Bair Hugger period to the HotDog

5    period?

6         A.  I don't remember.  I don't remember the content of

7    different drafts, of draft 1 to however many drafts we had.

8         Q.  When you initially conceived of the bubble study,

9    from the very outset, did you plan to also do some sort of

10   an observational retrospective comparison of infection

11   rates?

12        A.  No, not to my recollection.

13        Q.  So, at some point after the initial conception of

14   the bubble study, somebody came up with the idea of doing an

15   observational look at the infection rates; is that right?

16        A.  I don't know if the idea was floated after that,

17   but my involvement was regarding the experimental phase.  I

18   don't know if it had always been planned, or if it was

19   ongoing, or if it happened afterwards.  But from my point of

20   view, my initial involvement was with the experimental part

21   of the study that involved setting up experimental

22   operations and using the bubble counter; so not using

23   infection data.

24        Q.  At what point did you learn that infection data

25   were being analyzed?

1                    DR. PAUL MCGOVERN

2         A.   I don't remember.

3         Q.   Were you concerned about incorporating a discussion

4    of infection rates into the paper on bubbles?

5         A.   Not to my recollection.

6         Q.   Could you turn to page 381.  At the very bottom of

7    the page there is an e-mail from you to Mark Albrecht with

8    a blind carbon copy to Mike Reed; do you see that?

9         A.   Yes.

10        Q.   You say:

11             "Hi Mark.

12             "Looks good so far.  Could you send as a word

13   document so I can track some changes?  In terms of flow

14   I think it's good.  My main concern at the moment is

15   the statement about dropping of infection rates while

16   using CFW, I think if we go into that we need more data

17   and an in-depth discussion.  I acknowledge the

18   disclaimer about there being no evidence of

19   a relationship, but it is contentious.  It may be too

20   easy for a reader/reviewer to pick holes in."

21             Did I read that correctly?

22        A.   Yes.

23        Q.   What was your -- so, what was your concern about

24   the statement about the dropping of infection rates?

25        A.   I recognized at the time that -- or even if there

1                    DR. PAUL MCGOVERN

2   was an observation of a reduction in infection rates, that

3   was not the same as proving causation.  And we made very

4   clear, I think, in the final paper, that this was not

5   evidence of causation; it was a correlation.  And this

6   seems, to me, to be part of a conversation in which we

7   ensure that the paper does not claim any more than it is

8   able to do, which is that we observed a correlation but that

9   doesn't prove causation in a drop in infection rates.

10        Q.  Why did you believe it might be contentious?

11        A.  Well, it's contentious if you claim something you

12   cannot back up.  So we -- if it appeared that we had claimed

13   causation, that would not be correct unless we could prove

14   causation.  And so anything which -- any claim or statement

15   made without adequate supporting evidence would be

16   contentious if not correctly phrased, and with the

17   appropriate qualifications as necessary being applied.  And

18   so that's what I meant by being contentious.

19        Q.  And at this point, your thought was: let's just

20   leave it out?

21            MR. SACCHET:  Object to form.

22        A.  I don't know what my thought at that time was.

23   I couldn't say that that was my thought at the time.

24                (Reporter clarification.)

25   BY MR. C. GORDON:

1               DR. PAUL MCGOVERN

2     Q.  In any event, Mark Albrecht's response was to

3  basically say, "Let's -- we'll just leave it in, and see if

4  the reviewers call us on it."  Right?

5          MR. SACCHET:  Object to form.

6     A.  I don't remember that.  Oh, was that here?

7  BY MR. C. GORDON:

8     Q.  Yeah, page 382, an e-mail where he says:

9          "The whole review process is really

10  a negotiation; if they are uncomfortable with what we

11  have, they typically ask one to remove it and will not

12  summarily dismiss the article.  I'd suggest we try to

13  include the infection data and only remove it should

14  they require that."

15          Accurate?

16     A.  That's what's written there.

17     Q.  Is it your recollection that Mark Albrecht was the

18  primary moving force to include infection data?

19          MR. SACCHET:  Object to form.

20     A.  I don't recall if that was the case.

21  BY MR. C. GORDON:

22     Q.  You weren't only the one who had some concerns

23  about including infection data --

24          MR. SACCHET:  Object to form.

25  BY MR. C. GORDON:

1                    DR. PAUL MCGOVERN

2      Q.  -- were you?

3      A.  I don't remember.

4      Q.  Okay, turn to page 379.  In the middle of the page

5  there's an e-mail from Mike Reed to Mark Albrecht and to

6  you.  And in the middle of that he says:

7           "The infection reduction data has been given

8  too much prominence.  Whilst the data is real and can

9  be used in the discussion, it is potentially controlled

10  by many factors and I am not prepared to imply that

11  this is solely an FAW effect.  We have made lots of

12  interventions -- it could be any, although I agree it

13  could largely be a FAW effect."

14           Did I read that correctly?

15      A.  Yes.

16      Q.  Was he -- did you read that as having him trying to

17  convince you that the infection data was being given too

18  much prominence?

19           MR. SACCHET:  Object to form.

20      A.  You'd have to ask Mike Reed what he meant.  I don't

21  know what -- I don't know.

22  BY MR. C. GORDON:

23      Q.  Well, you had expressed concern earlier, and Mike

24  Reed is expressing concern about the infection reduction

25  data being given prominence.  You were part of the team.

1              DR. PAUL MCGOVERN

2  Was -- were you the driver, was Mike Reed the driver, or was

3  Mark Albrecht the driver of including the infection data?

4         MR. SACCHET:  Object to form.

5     A.  I don't remember.

6  BY MR. C. GORDON:

7     Q.  And --

8     A.  Well, no -- well, the -- I did not originate

9  including infection data into this paper, so I wasn't the

10  driver of including it in the first place.  I can say that.

11    Q.  Is it your recollection that Mike Reed was?

12    A.  I don't remember.

13    Q.  In this e-mail Mike Reed says, "We have made lots

14  of interventions -- it could be any."  Do you see that?

15    A.  Yes.

16    Q.  What interventions that could have impacted

17  infection rates were you aware of at this time?

18    A.  It's very difficult to say, at this time, because

19  as I said earlier, infection control in trying to reduce

20  infection rates is an ongoing process in any responsible

21  orthopedic department.  Therefore, efforts to reduce

22  infection are always ongoing.  I can't, therefore, specify

23  which interventions were made in this precise timescale.  I

24  can only speculate as to what those interventions might be.

25    Q.  Did you think it was important, for a full

1                    DR. PAUL MCGOVERN

2   understanding of the significance of the infection rates

3   that you did report in the article, for the reader to

4   understand all of the various interventions that had taken

5   place?

6              MR. SACCHET:  Object to form.

7        A.  Did think it was important?  Repeat that, please.

8   BY MR. C. GORDON:

9        Q.  In the article that was ultimately published, you

10  reported that the infection rate for the period of time when

11  Bair Hugger only was being used was about 3.8 times higher

12  than the seven-month period when HotDog only was being used?

13       A.  Yes.

14       Q.  Okay.  The only interventions that you disclosed in

15  the paper was a change in antibiotic prophylaxis and

16  anti-thromboembolism prophylaxis; correct?

17       A.  I don't remember the exact content of the paper but

18  I do remember that both those were mentioned.

19       Q.  And in fact they were mentioned because a reviewer

20  had said "You need to mention them"; right?

21              MR. SACCHET:  Object to form.

22       A.  I don't recall what the reviewer said.

23  BY MR. C. GORDON:

24       Q.  Do you feel -- did you feel, at the time, that if

25  you were reporting a fairly dramatic drop in infection

1                    DR. PAUL MCGOVERN

2    rates, nearly -- more than a 75 percent drop, that it would

3    be important to appraise the reader of other interventions

4    that had taken place during the Bair Hugger-only period that

5    might have accounted for some of the infection reduction?

6         A.   It's important to --

7              MR. SACCHET:   Objection to form.

8         A.   It's important to mention confounding factors,

9    which is part of the whole purpose of not attempting to

10   imply that this is causation, merely correlation.

11   Confounding factors such as different types of

12   thromboembolic prophylaxis, different antibiotic prophylaxis

13   regimens, and any other measures that may be taken.  So it

14   is important to ensure that no claims are made which are not

15   reasonable.

16   BY MR. C. GORDON:

17        Q.   So if you say this doesn't necessarily show

18   causation, is that, in your view, is that sufficient to

19   disclaim any possible implication of causation?

20             MR. SACCHET:   Object to form.

21        A.   What's your question?

22   BY MR. C. GORDON:

23        Q.   Well, you used the word "imply".  There's obviously

24   a difference between saying, "We have demonstrated

25   causation" versus "We have demonstrated an association."

1                    DR. PAUL MCGOVERN

2    Right?

3        A.  Yes.

4        Q.  And if you just say, "We've demonstrated an

5    association", depending on what else you say about that, it

6    could -- you could imply that there's a causal connection;

7    right?

8              MR. SACCHET:  Object to form.

9        A.  Yes.

10   BY MR. C. GORDON:

11       Q.  And if I understood what you just said, you wanted

12   to avoid even implying that there was a causal connection?

13       A.  I don't remember the precise words I used.  What

14   I mean to say is that I would not want to make a claim which

15   was not reasonable in a paper, and based on the evidence

16   that we had, I would not want to claim that there was

17   a causation, or that we that proved or demonstrated

18   a causation.

19       Q.  Based on the evidence you had, do you believe it

20   would have been reasonable to imply that there was

21   a causation?

22       A.  Um --

23              MR. SACCHET:  Object to form.

24       A.  Just repeat that again?

25   BY MR. C. GORDON:

1                    DR. PAUL MCGOVERN

2        Q.   Based on the evidence that you had, do you believe

3    it would have been reasonable for your paper to imply

4    a causal connection?

5             MR. SACCHET:   Object to form.

6        A.   If properly qualified, yes.

7    BY MR. C. GORDON:

8        Q.   What would the proper qualifications be?

9        A.   We -- if we have said that we believe, or think,

10   that there is evidence that suggests that forced-air warming

11   has an influence on infection, but that we recognize there

12   are confounding factors, then that implication is tempered

13   with the recognition that there are other effects that could

14   be at play.

15       Q.   And was it your intent, in your paper, to imply

16   a causal connection?

17            MR. SACCHET:   Object to form.

18       A.   The intent was -- well, what the paper did was

19   report a correlation.

20   BY MR. C. GORDON:

21       Q.   And was it your intent, as one of the authors, to

22   imply that that correlation represented a causal

23   relationship?

24            MR. SACCHET:   Object to form.

25       A.   Was it my intent to imply that ... I don't know if

1              DR. PAUL MCGOVERN

2    you can separate implication and correlation.  To imply

3    a causation is to suggest a correlation.  And I suppose

4    you'd have to delineate very clearly what you mean by

5    "imply", because I'm not sure I understand what you -- what

6    you're referring to.  An implication could be a suggestion,

7    or it could be a claim that one -- that A affects B, but I'm

8    not sure that we have established what you mean exactly by

9    "imply" in this case.

10   BY MR. C. GORDON:

11        Q.  I guess I'm just wanting to use the word as you

12   used it, when you earlier -- your earlier testimony about

13   implying.

14        A.  Mm-hm.

15        Q.  Let me see if we can approach this from another

16   way.  If you would take out volume 5, so I guess that's

17   exhibit 7A.

18        A.  7A?

19        Q.  Yes.

20        A.  Volume 5, yes.

21        Q.  If you turn to page 2419, this is identified as

22   figure 7, showing infection data for 1,597 joint replacement

23   cases with the average infection rate shown as a straight

24   line from the vertical axis reflecting the Bair Hugger-only

25   period, and then another line for the transition period,

1                    DR. PAUL MCGOVERN

2  then another line for the conductive fabric period; correct?

3      A.  Yes.

4      Q.  That would be the HotDog-only period; right?

5      A.  Yes.

6      Q.  Now this version of figure 7 that we see on 2419,

7  that would show an average infection rate during the

8  HotDog-only period of roughly 1 percent or so, right?

9      A.  Yes.

10     Q.  And that's basically what you reported in the final

11 publication; right?

12     A.  Yes.

13     Q.  Now if you turn to page 2262, that's an earlier

14 version of this same figure 7, right?  That only shows

15 infection data for 1,290 joint replacement cases?

16     A.  Okay.

17     Q.  And at that point the cut-off looks like it was

18 December 2010 as opposed to January 2011.

19     A.  Right.

20     Q.  And at this point it looks like it's showing

21 a 0 percent infection rate for the conductive fabric for

22 HotDog period; right?

23     A.  Yeah.

24     Q.  And now, if you would turn to page 2218, this is

25 another version of figure 7, apparently covering the same

1                    DR. PAUL MCGOVERN

2   period of time, September 2008 through September 2010; is

3   that right?

4        A.   Mm-hm.

5        Q.   And also 1290 joint replacement cases?

6        A.   Yes.

7        Q.   But the data are presented differently in this

8   figure 7; right?

9        A.   Yes.

10        Q.   Instead of an average infection rate across the

11   entire time period, it's a moving average of infection rate

12   plotted on the left-hand axis; right?

13        A.   Yes.

14        Q.   And in the version of figure 7 that appears on

15   page 2218, in September 2008 the infection rate is about 3

16   percent.  It dips down over the next several months to

17   somewhere around 2 percent, but then sometime after March of

18   2009 it starts climbing up, and by sometime in between

19   September 2009 and March of 2010, it's up to about

20   4 percent; is that right?

21        A.   That's what the graph shows, yes.

22        Q.   And if you look at the little dots that are on top,

23   those represent the actual incidents of infection plotted on

24   a time axis; right?

25        A.   Yes.

1              DR. PAUL MCGOVERN

2        Q.   And where it starts heading up to 4 percent, that

3   appears to be quite a cluster of infections right around

4   those -- that several-month time period?

5        A.   Yes.

6        Q.   Do you recall that that several-month time period

7   actually corresponded with the time that the hospital had

8   switched to using rivaroxaban instead of the tinzaparin as

9   the anti-thromboembolism prophylaxis?

10       A.   I don't recall.

11       Q.   Do you remember that there was a time the hospital

12  switched from tinzaparin to rivaroxaban?

13       A.   I am aware that there was a transition, yes.

14       Q.   And do you remember that after some period of time,

15  the hospital switched back to tinzaparin?

16       A.   That sounds familiar to me.  I wasn't aware that

17  they had switched back wholesale.  I knew that there were

18  changes in thromboprophylactic medications.

19       Q.   When did you leave Wansbeck?

20       A.   It would have been about February 2010.  Yes.

21       Q.   Okay, so that would have been --

22       A.   No, it might have been earlier.  Around

23  February 2010.

24       Q.   And you don't recall, around the time that you were

25  leaving, that there were -- hearing any conversations about

1                    DR. PAUL MCGOVERN

2   "Wow, we've got a real spike in issues with this, with the

3   rivaroxaban"?

4        A.  I have a recollection that some patients who'd

5   had -- well, various orthopedic operations, had more

6   strike-through on their dressings, that is to say more ooze

7   from post-operative wounds, but I don't remember any

8   discussions about infection rates around that time.

9        Q.  Why was figure 7, as it appears on 2218, changed to

10   the flatline averages that appear in the subsequent ones,

11   and the one that was ultimately published?

12            MR. SACCHET:  Object to form.

13        A.  I don't know.

14   BY MR. C. GORDON:

15        Q.  Did you have any input into that decision?

16        A.  No.

17        Q.  Do you recall ever seeing the version that we see

18   on page 2218?

19        A.  I don't recall seeing it at the time.  I've flicked

20   through all of these documents but I don't remember

21   a discussion around changing this, or the process of it

22   being changed.

23        Q.  And you don't recall anyone expressing the view

24   that "Hey, the way it looks on" -- as we see it on 2218 --

25   "it looks like there's some problem going on there in that

1               DR. PAUL MCGOVERN

2  last few months of the Bair Hugger-only period"?

3            MR. SACCHET:  Object to form.

4            MR. C. GORDON:  I actually need another exhibit

5  sticker.

6            THE COURT REPORTER:  Do you want me to mark it

7  first?

8            MR. C. GORDON:  Sure.  Your handwriting is better.

9       A.  I don't remember any discussions of that nature.

10           (Exhibit 11 marked for identification)

11      Q.  Dr. McGovern, I'm going to show you what has been

12  marked as exhibit 11.  I'll give you a moment to look at

13  that and see if you've ever seen it before.

14      A.  It's possible that I've seen this, but I don't

15  recall it.

16      Q.  Do you know who Julie Jillson is, or Gillson?

17      A.  I do not.  I don't know who they are.

18      Q.  So you don't know who Gail Lowdon is either?

19      A.  No, I don't know who Gail Lowdon is.

20      Q.  Okay.  On the first page, I'm going to direct your

21  attention to the very last paragraph where it says:

22           "During the last two quarters of 2008/2009,

23  Northumbria Healthcare NHS Foundation Trust was

24  reporting SSI rates in the combined total of surgeries

25  in THR/TKR and Repair Neck of Femur between 3.5%-5% and

1                    DR. PAUL MCGOVERN

2   was regularly receiving letters from the HPA informing

3   the Trust of its high outlier status for SSI."

4            Did I read that correctly?

5        A.  Yes.

6        Q.  Does that trigger any recollections from when you

7   started there, as to concerns that were -- that they -- that

8   the Trust was in an outlier status in terms of its SSI

9   rates?

10       A.  It does.  There were discussions and concerns about

11  the infection rate, as I remember, in the Trust, and as a

12  result, there was certainly an effort to implement good

13  theater discipline to try to minimize the infection rate.

14       Q.  Were you aware of any specific interventions that

15  took place during the time that you were there?

16       A.  Yes.  I don't remember if they started before or

17  after I arrived, but for example, in this healthcare trust,

18  there was a red line beyond -- in the operating department

19  beyond which you had to change into different scrubs.  So

20  frequently it's -- in some hospital trusts, it's standard

21  to -- for doctors, or for healthcare professionals, to wear

22  scrubs around the hospital and enter the operating

23  department in the same scrubs.  But on crossing the red line

24  in Northumbria, one had to completely change, even if going

25  in for 20 seconds.  Even if you were going in to speak to

1                    DR. PAUL MCGOVERN

2  someone.  So there was a barrier.

3        All footwear was not individualized, it was --

4  there were racks of new footwear provided in the special

5  footwear-washing station, so footwear was washed every

6  day.  Particular attention was paid to good theater

7  discipline, which is standard practice, but there was

8  definitely a -- efforts were definitely made to maintain

9  the very highest standards of care.  And I don't

10 remember any other specific interventions, but I'm sure

11 there were more.

12       Q.  Do you remember a time when the Trust implemented

13 screening for methicillin susceptible staphylococcus?

14       A.  It rings a bell.  I don't remember at what time

15 they did that.  I don't remember a particular crossover

16 point when screening for MRSA and MSSA was different, so

17 I don't have a specific recollection of that happening,

18 although it seems familiar to me to -- that MSSIs were --

19 methicillin-sensitive staphylococcus aureus was screened

20 for.  I don't remember the specifics around that, though.

21       Q.  Do you remember a time when the laminar flow system

22 in one of the operating theaters was not functioning

23 properly and had to be repaired?

24       A.  I do not remember that.

25       Q.  If you turn to the second page of exhibit 11, in

1                    DR. PAUL MCGOVERN

2   the middle there it talks about -- the headline is "The SSI

3   bundle."

4        A.  Yes.

5        Q.  And it talks about Patient Safety First published

6   in SSI bundle in 2009.

7        A.  Yes.

8        Q.  Now if I could have another exhibit sticker.

9            (Exhibit 12 marked for identification)

10           I'm showing you what has been marked as

11  McGovern exhibit 12.  It's like a 32-page document

12  called "The 'How to' Guide for reducing Harm in

13  Perioperative Care, Patient Safety First."

14           I first ask if you recognize this document.

15       A.  It's quite likely that I've come across it before,

16  but I don't specifically recall it.

17       Q.  Going back to exhibit 11, where it says "The SSI

18  group decided to utilise this tool to develop a strategy to

19  reduce the Trust's SSI rate."

20       Do you recall there being a period of time -- and

21  you were there in 2009, right?

22       A.  I was there from August 2009.

23       Q.  Okay.  So do you recall whether, while you were

24  there, something similar to exhibit 12 was somehow

25  distributed or utilized by the surgical staff?

1                    DR. PAUL MCGOVERN

2      A.   In terms of --

3           MR. SACCHET:   Object to form.

4      A.   -- in terms of documentation, not that I recall.

5  As I said, there was an acknowledgment in the department

6  that the infection rate was higher than what would be --

7  well, preferred, and there were efforts to reduce it, though

8  I don't recall documentation to that effect, but there was

9  certainly a cultural drive within the orthopedic department

10  and within the surgical department in general, to minimize

11  infection rates.

12  BY MR. C. GORDON:

13      Q.   Do you recall a period of time when the type of

14  wound dressings were switched?

15      A.   I do recall that, yes, there was a different type

16  of wound dressing used at some point.  Yes, I do recall

17  different wound dressings being used.

18      Q.   Do you recall a wound dressing referred as to the

19  Jubilee dressing?

20      A.   I'd forgotten the name, but I remember vaguely the

21  technique.

22      Q.   What was your understanding of the reason for the

23  change in wound dressing?

24      A.   I think the dressing was -- I don't remember what

25  the intention of the dressing was, apart from to make sure

1                      DR. PAUL MCGOVERN

2    that it was as an effective a dressing as possible.  But the

3    appearance of it was one which was more robust than the

4    predecessor.  It was made of thicker material; it was more

5    padded.  But I don't remember what the rationale behind the

6    switch was, in terms of what was theorized as the benefit or

7    was marketed as the benefit of that dressing.  I don't

8    remember the process that went into that.

9         Q.  Do you recall whether there was any research

10   supporting the switch?

11        A.  I don't, no.

12        Q.  What's an Octenisan wash?

13        A.  That is a wash which was given to patients to

14   reduce the amount of naturally existing bacteria on their

15   skin.  The idea being that it would reduce the chance of

16   them getting a postoperative infection.

17        Q.  Is that different from chlorhexidine?

18        A.  I don't know what the formulation of Octenisan is.

19   I don't know what the active ingredient in that substance

20   is.  It could be chlorhexidine.  It depends on the

21   specific -- on what the manufacturing sheet says.

22        Q.  Do you recall there being any kind of staff

23   development training session on scrub technique?

24        A.  As a surgical trainee, I was carefully monitored

25   generally.  So I'd received a lot of instructional scrub

1                    DR. PAUL MCGOVERN

2    technique, and was expected to do it meticulously, and

3    would.  I don't remember being formally taught how to do it

4    at Northumbria but I was very closely watched.  And so to

5    answer your question, I don't recall specific training that

6    I received, although I may have -- someone may have taken

7    a group of trainees aside and said, "This is how we want you

8    to do it," but I don't remember.

9         Q.  Do you remember there being a time when pre-warming

10   of patients was introduced?

11        A.  I remember it being discussed.  I remember the

12   principles being discussed of the importance of

13   perioperative normothermia, that is keeping patients warm

14   before and after and during surgery, the importance of that.

15   And I remember that the idea of pre-warming was discussed.

16   I don't remember if that was a new initiative or if it was

17   something which was in place when I started at Northumbria.

18        Q.  I'm not going to go through in detail all the other

19   things that are referenced in exhibit 11, or the detailed

20   timeline, but would you agree that to have a real

21   understanding as to whether that apparent correlation that

22   you recorded between switching from Bair Hugger to HotDog,

23   and a reduction in infection rate, in order to have a really

24   accurate understanding of that, a reader would have to know

25   not just the change in antibiotics and anti-thromboembolism

1                        DR. PAUL MCGOVERN

2   medications, but all of the interventions aimed at reducing

3   surgical-site infections that we've just talked about?

4             MR. SACCHET:  Object to form.

5        A.   In the list of all the interventions one can make

6   to reduce infection, I think the most important are the

7   antibiotic prophylaxis, and I think in this case

8   specifically, especially given the problems on that site, in

9   that trust with rivaroxaban, those are by far the most

10  important things to mention.  One could argue that every

11  intervention could be mentioned, but there is the question

12  of, as authors of a paper, one wants to include every bit of

13  detail that one can.  But there is a tension between doing

14  that and what the paper will publish, about what the journal

15  will publish.  There is a limit on how much information you

16  can include in a paper, and space is at a premium.  For some

17  journals, for some disciplines, papers can be in extremely

18  long form.

19        So for this type of paper, for this type of study,

20  for this type of journal, I do think that confounding

21  factors need to be mentioned, and I think that the most

22  important confounding factors in this case have been

23  mentioned, those being antibiotic prophylaxis regimens

24  and thromboprophylaxis regimens.

25        Q.   Well, given that you think those are the two most

1                    DR. PAUL MCGOVERN

2    important, would you agree that the best way to see if they

3    are confounding factors or not is to compare these infection

4    rates, when the Bair Hugger was being used, with the same

5    antibiotics and anti-thromboembolism drugs as were being

6    used in the HotDog-only period?

7              MR. SACCHET:  Object to form, foundation.

8        A.  If I were conducting a study and I had complete

9    control over such things, and it was ethically approved,

10   absolutely.  Controlling a single variable is ideal.

11   BY MR. C. GORDON:

12       Q.  I'm talking about the same kind of observational

13   retrospective study that you did do.

14       A.  Right.

15       Q.  If there was a period of time during the

16   Bair Hugger-only period when the antibiotics and

17   anti-thromboembolism regimen was identical to what was used

18   in the HotDog-only period, would you agree that that would

19   be a comparator that would eliminate those as confounders?

20             MR. SACCHET:  Object to form, foundation,

21   incomplete hypothetical.

22       A.  It wouldn't eliminate them as factors, because it

23   is extremely complicated, the factors that influence

24   infection.  However, it would be preferable to have

25   a situation which you could have equivalent data and adjust

1                    DR. PAUL MCGOVERN

2    one variable, or have only one variable change.  That would

3    be preferable in a retrospective study.  Whether or not

4    that's possible, that's questionable, but if that were

5    possible, that would be preferable.

6    BY MR. C. GORDON:

7        Q.   Okay.  The period of time that you recorded for the

8    HotDog-only period, that was seven months; right?

9        A.   I believe so.  I would have to check back through

10   the paper to confirm that.

11       Q.   However many months it was, the antibiotics that

12   were being used were a combination of gentamicin and

13   teicoplanin; right?

14       A.   I would have to read the papers to confirm that.

15   I don't remember, off the top of my head.

16       Q.   Okay.  For the purposes of my question, let's just

17   assume that that's what your paper says.

18       A.   Okay.

19       Q.   A combination of gentamicin and teicoplanin.  And

20   for the anti-thromboembolism prophylaxis, it was tinzaparin.

21       A.   Okay.

22       Q.   Okay?  Are you aware of whether there were any

23   periods of time during that 23 months of Bair Hugger-only --

24   or not 23 -- 20 months of Bair Hugger-only period when the

25   same antibiotics and anti-thromboembolism drugs were being

1                    DR. PAUL MCGOVERN

2   used on the Bair Hugger patients?

3          MR. SACCHET:  Object to form.

4      A.  I don't know.

5   BY MR. C. GORDON:

6      Q.  Assume, for the purposes of this question, that

7   there was such a period of time.

8      A.  A period of time in which?

9      Q.  The antibiotics being used were gentamicin and

10  teicoplanin.

11     A.  Okay.

12     Q.  And the anti-thromboembolism drug was tinzaparin.

13     A.  Okay.

14     Q.  Would you agree that, if you looked at the

15  infection rates from that period and compared them to the

16  infection rates from the HotDog period, then you would have

17  eliminated antibiotics and anti-thromboembolism as

18  a confounding factor?

19     A.  Over what period of time?  Over seven months?

20     Q.  Whatever period of time.

21          MR. SACCHET:  Object to form.  Incomplete

22  hypothetical.

23     A.  No, I don't think you could eliminate it, because

24  to eliminate from a scientific standpoint would be to have a

25  statistically significant result.  And to have a

1                         DR. PAUL MCGOVERN

2    statistically significant result for something as rare as

3    infection requires a great number of cases.  And what you're

4    asking me is an opinion on whether the study was

5    statistically powered sufficiently to demonstrate a change,

6    and I don't know that, because I'm not a statistician.  And

7    I don't know what the numbers we're talking about are, and I

8    don't know what statistical tests would be applied.  So the

9    answer to your question is, if there are sufficient numbers

10   in one arm of the study compared with another, and they can

11   demonstrate an effect that demonstrates statistical

12   significance, then that will eliminate confounding factors

13   if those confounding factors are adjusted for statistically.

14   But I cannot speculate as to whether those factors would be

15   eliminated here, because I don't have enough information to

16   be able to do that.

17   BY MR. C. GORDON:

18       Q.  So if you only -- if you didn't have enough time of

19   Bair Hugger -- apples to apples -- to compare with HotDog,

20   where the prophylanti -- where the antibiotics and the

21   thromboembolism were the same, you don't see any problem in

22   lumping in together, with the Bair Hugger-time period, the

23   time when Bair Hugger patients were getting a completely

24   different regimen?

25                 MR. SACCHET:  Object to form.

1                    DR. PAUL MCGOVERN

2        A.  It depends how it's described.  If I were to -- if

3    one word to misrepresent the data, that would be a problem.

4    If one were to say that there were confounding factors, and

5    this is what the data shows, then that's what the data

6    shows.

7    BY MR. C. GORDON:

8        Q.  With respect to misrepresenting the data, do you

9    think that the figure 7 graph on 2218, where it is a moving

10   average, is a better representation of the data than a

11   flatline average over 20 months?

12            MR. SACCHET:  Object to form.

13       A.  Define "better".

14   BY MR. C. GORDON:

15       Q.  Well, less -- strike that.

16            Let me ask the question the other way.  Do

17   you think showing a flatline average over a 20-month

18   period, when there's obviously variation, as depicted

19   on the earlier drawing, do you think that's a fair and

20   accurate representation?

21            MR. SACCHET:  Object to form and foundation.

22       A.  It is a representation of the data, and it has

23   been -- the data has been put into a statistical package and

24   a graph has been produced from that.  They are -- they both

25   show the same thing in different forms, with different

1              DR. PAUL MCGOVERN

2    levels of resolution on the graph.  They're -- the

3    difference between taking an average over a day, or a week,

4    or a month, they're averages.  And to say one is better or

5    not is a subjective thing.  I don't really have an opinion

6    on whether one is better than the other.  Both graphs show

7    a certain number of infections in one period and a certain

8    number of infections in another period and transition

9    period, and both are accurate, as far as -- to the best of

10   my knowledge.

11   BY MR. C. GORDON:

12       Q.  You don't think it is misleading to show, over

13   a 20-month period, a flatline of 3 percent?

14           MR. SACCHET:  Objection.  Form, asked and

15   answered.

16       A.  Do I think it is misleading to represent the data

17   accurately?  Is that what you're saying?

18   BY MR. C. GORDON:

19       Q.  To represent 20 months of infection data that

20   varies, as we see on the earlier version of the graph,

21   a flatline at 3.1 percent?

22           MR. SACCHET:  Objection.  Assumes facts over the

23   evidence.

24   BY MR. C. GORDON:

25       Q.  Over the entire 20-month period?

1                    DR. PAUL MCGOVERN

2        A.   But it's an average.

3             MR. SACCHET:   Argumentative.

4        A.   So if it's an average and it's representing over

5    the average period, then it is accurate.   So it's not

6    misleading; it is accurate.   And especially if the data

7    there is -- the individual infection rates are there,

8    I don't think they're excluded from the other graph.   You'll

9    correct me if I'm wrong, but they show the frequency of

10   infections.   So you can see, represented in graphical form,

11   that there are a cluster of infections in September 2008 to

12   early 2009, then relatively few, then a cluster later on.

13   I think both graphs show that.   But you'll correct me, I'm

14   sure, if I'm mistaken.

15             MR. C. GORDON:   We're running out of tape so we'll

16   take a break here.

17             THE VIDEOGRAPHER:   This is the end of DVD 2 in

18   volume 1 in the deposition of Dr. Paul McGovern.   Going off

19   the record at 2:48.

20   (2:48 p.m.)

21                       (Break taken.)

22   (2:59 p.m.)

23             THE VIDEOGRAPHER:   This is the beginning of DVD 3

24   in volume 1 of the deposition of Dr. Paul McGovern.   Back on

25   the record at 2:59.   You're on the record, counsel.

1                    DR. PAUL MCGOVERN

2    BY MR. C. GORDON:

3        Q.   Thank you.

4        Dr. McGovern, if you could turn to page 288 in the

5    e-mails volume 1.

6              MR. SHACKLADY:  Which exhibit is that, Corey?

7              MR. C. GORDON:  One.

8              MR. SACCHET:  Do you mind saying the page again?

9              MR. C. GORDON:  288.  This is an e-mail from Mark

10   Albrecht to Dr. Oliver Kimberger and several other people

11   including you; is that correct?

12       A.   Yes.

13       Q.   Do you know Dr. Oliver Kimberger?

14       A.   I'm not certain I've met him.  He was -- he's been

15   on research that I've done, and I've corresponded with him

16   through these group e-mails, but I don't recall ever meeting

17   Oliver Kimberger.

18       Q.   And you appear as a co-author on a paper with him?

19       A.   Yeah.

20       Q.   And in this e-mail -- it is titled "A little help

21   'Sanitizing' this" -- Mark Albrecht says to Dr. Kimberger:

22              "Oliver.

23              "Thanks for your help on this.  I think the

24   research is good, but our conclusions appear to be over

25   reaching.  I'm sure you will be able to help us get

1                    DR. PAUL MCGOVERN

2    back on track here.

3              "FYI -- Paul, Mike, and Bob, I've asked

4    Oliver to help us sanitize the manuscript.  Once he has

5    done, we can try to re-submit elsewhere."

6              What did you understand Mark Albrecht to be

7    telling you when he'd told you that he had asked Oliver

8    to help "sanitize" the manuscript?

9         A.  I don't know what Mark Albrecht meant by that.

10        Q.  Did you ask him?

11        A.  Not to my recollection.

12        Q.  Did that strike you as kind of an odd use of

13   a phrase for a scientific manuscript?

14        A.  I don't recall.

15        Q.  A little bit further down, there's an e-mail from

16   Albrecht to Dr. Kimberger, where he says:

17        "Oliver.

18        "Say, would you be able to do me a small favor.

19   I'm hoping you could go through the attached manuscript

20   and identify what needs to be removed to get rid of the

21   'agenda.'  All of us at the company here are too close

22   to this and are not being subjective as to what the data

23   supports.  We would be appreciative of any advice you

24   can offer."

25              Do you see that?

```
 1                    DR. PAUL MCGOVERN

 2        A.  Yes.

 3        Q.  Did you have any idea, at the time, of what Mark

 4   Albrecht was talking about when he referred to the "agenda"?

 5        A.  I don't know what Mark Albrecht was talking about.

 6        Q.  Did you ask him?

 7        A.  Not to my recollection.

 8        Q.  If you could turn back to 2481, exhibit 7A.

 9   I think it's that one.  Actually, if you look at page 2480,

10   I think that identifies the document.

11        A.  "Outline of BHS presentation", yes.

12        Q.  Okay.  What is the "Outline of BHS presentation FAW

13   vv CFW"?

14        A.  This is a presentation that I gave to the British

15   Hip Society, the precise date I don't remember.  I think it

16   was in Torquay in the south of England, and this was the --

17   basically my script for the presentation.

18        Q.  Did you actually give the presentation?

19        A.  Yes.

20        Q.  And there appear to be several comments along the

21   right-hand side of the presentation?

22        A.  Yes.

23        Q.  "MRR" comments, those would be from Mike Reed?

24        A.  Yes.

25        Q.  And the "m" comments, those are from Mark Albrecht?
```

1                    DR. PAUL MCGOVERN

2        A.   I don't know.   I'm sure there's a way of checking

3    if that's certainly the case or not, but from what I see

4    there, it just says "m".   So without any further

5    information, I couldn't say, because I don't remember.

6        Q.   Okay.   Number -- the comment m3, which appears to

7    refer to the text:

8        "What might be responsible?

9        "- changes in infection reporting

10       "- changes in surgical practices

11       "- rise in drug resistant pathogens.

12       "- lastly, the adoption of forced air warming."

13       A.   Sorry, drug resistant pathogens?   M3?   Where are

14   we, page 2481?

15       Q.   2481.

16       A.   Oh, I was reading the comments.

17       Q.   If you look at M3, the dashed line over to the

18   text, I was reading the text that it was commenting on.

19       A.   Yes.

20       Q.   And the comment is:

21       "I suggest you add this as an additional slide to

22   focus the direction of where you are going in the

23   broader context, that you are only looking at one

24   potential factor among many possible culprits."

25            MR. SACCHET:   Objection.   Misstates the document.

1                     DR. PAUL MCGOVERN

2            MR. C. GORDON:  I wasn't finished, but --

3            MR. SACCHET:  Well, it doesn't say "many".

4            MR. C. GORDON:  Well then, I'll start again.

5     Thank you.

6            "I suggest you add this as an additional

7     slight to focus the direction of where you are going in

8     the broader context, that you are only looking at one

9     potential factor among may possible culprits.  This

10    makes it look impartial and hides our agenda, so to

11    speak ..."

12           Did I read that correctly?

13       A.  Yes.

14       Q.  And do you share my assumption that the "may" is

15    a mistyped attempt at the word "many"?

16       A.  I do.  I read it as that as well.

17       Q.  The last line there is what I want to ask you

18    about.  "This makes it look impartial and hides our agenda,

19    so to speak."  What did you understand your agenda to be

20    that you were trying to hide?

21       A.  My agenda?

22       Q.  Well, the -- with the -- what -- who is the "our"

23    referring to?

24       A.  I don't know because I didn't write that.

25       Q.  This is your -- these are comments on your

1                    DR. PAUL MCGOVERN

2    presentation; right?

3        A.  They are, but they're not -- that's not my comment.

4    The comment by me would be "PDM".

5        Q.  But when you read "This makes it look impartial and

6    hides our agenda," what did you think that referred to?

7        A.  I don't remember.

8        Q.  Did that strike you as troubling, that somebody

9    would suggest that you should try to make something look

10   impartial, and hide an agenda?

11            MR. SACCHET:  Objection to form.

12       A.  Are you asking me if being impartial is troubling?

13   BY MR. C. GORDON:

14       Q.  That somebody, whoever it was that made this

15   comment on your draft, suggesting that you try to do

16   something to make your presentation look impartial "and hide

17   our agenda"?

18       A.  I don't remember if that troubled me at the time.

19            THE COURT REPORTER:  Sorry, was there an

20   objection?

21            MR. SACCHET:  Form.

22   BY MR. C. GORDON:

23       Q.  Turn to the next page, 2482.  In your text it says:

24       "Our clinical concern is that there was a potential

25   for hot rising air from the forced air system to disrupt

1              DR. PAUL MCGOVERN

2    laminar airflow, with possible consequences for airborne

3    pathogenic contamination."

4         The comment from Mike Reed is:

5              "I'm tempted to say the driver for this was

6    the need to verify the smoke DVD produced by

7    Augustine -- remind them that this DVD was posted to

8    all orthosurgeons in UK last year (assuming that is

9    correct)."

10             Then the comment from "m7" is:

11             "I'd be careful here.  That might imply

12   a strong corporate agenda behind these activities and

13   raise questions as to the credibility of the results."

14             When you read that, what was your

15   understanding of why referencing in the Augustine smoke

16   DVD might imply a strong corporate agenda behind these

17   activities?

18        A.   I don't know why referencing a smoke DVD that had

19   been sent to all orthosurgeons would be concerning or --

20        Q.   Do you know what that DVD refers to?

21        A.   Yes I do, yeah.

22        Q.   Have you seen it?

23        A.   Yes.

24        Q.   When did you first see it?

25        A.   I don't remember when I first saw it.  It was --

1                 DR. PAUL MCGOVERN

2    I mean, around the time that I was at Wansbeck, but I don't

3    remember where in the timeline my first seeing it lies.

4         Q.  Was verifying that smoke DVD video the driver

5    behind your bubble experiment?

6         A.  Not to my knowledge.  Not as far as I was aware.

7    That wasn't my motivation for working on this project.

8         Q.  Page 2486, and you've written:

9         "Notes - ? for discussion, or to fit into main

10   body."

11        And the third one down is:

12        "Mention infection data from Northumbria."

13        And the comment from Mike Reed is:

14        "Suggest you hold this as the very last slide, one

15   that is placed after your thank you slide at the end.

16   If you are lucky you can steer a question to exposing

17   it.  Normally work a treat and can be introduced with

18   'I thought you might ask that ...'"

19        Did I read that correctly?

20        A.  Yes.

21        Q.  Is that in fact how you presented it?

22        A.  I don't remember if that slide was presented.

23   I think it wasn't.  But that slide was put at the end of the

24   presentation, but the reason for that being, as far as

25   I recall, there's an extremely limited amount of time to

1                    DR. PAUL MCGOVERN

2  present such research, I think six minutes or seven minutes,

3  or something of that order, and they're extremely strict

4  with time.  And that's why I've written a script.  Normally

5  I wouldn't.  Normally, I'd just present.  But to make sure

6  that I fit everything in that I wanted to, I was very clear

7  about what I was going to say, when.  And to put that extra

8  slide in would have resulted in me running out of time or

9  speaking too quickly, so as not to be clear.  But after such

10 presentations are given, there is time for questions.  And

11 so it was really something which I wanted to include, but

12 you basically have extra time to present more slides if

13 someone asks questions.

14      I think, in the event, the way that this

15 presentation was organized was that all four presenters

16 in the -- in my group presented sequentially, and then

17 questions were asked of the whole group at the end.  So

18 I don't think I'd had an opportunity to present that

19 slide.  I think there was another slide, as well, in the

20 presentation.  It's likely that you have that

21 presentation, actually, in the documents somewhere.

22      Q.  If you could turn to 2494.

23      A.  Yes.

24      Q.  Where it says, "Bonus slide"?

25      A.  Yes.

1                    DR. PAUL MCGOVERN

2          Q.   Is this, or something reasonably close to this,

3    what you are referring to as the extra slide that you didn't

4    have time to present?

5          A.   This is -- yeah, I mean this does not look like

6    a script; this looks more like notes.  It looks like a later

7    version, probably in response to the earlier comment.  But

8    yeah, this is a note of what I would say, were I asked about

9    this, because if -- giving a presentation, I always try to

10   anticipate questions that might be asked.

11         Q.   Who is Dr. Imiak?  And if you need help, look at

12   2523.  In there, I can point you to some more e-mails or

13   some e-mails with --

14         A.   Yeah, you may have to.  I do remember the name, but

15   I don't --

16         Q.   I believe he's a doctor in Florida, perhaps.

17         A.   Right.  Yeah, I've seen the name before but I don't

18   remember if I've conversed with him, communicated with him,

19   or collaborated with him.  I'm not sure.

20         Q.   Did you end up doing any research activities in the

21   United States?

22         A.   I did, yes.

23         Q.   Where?

24         A.   The University of Minnesota in Minneapolis.

25         Q.   Anything other than what you did at the University

1                    DR. PAUL MCGOVERN

2    of Minnesota?

3         A.   Research in the States?

4         Q.   Yeah.

5         A.   No, I think I've had one trip to the States for

6    research purposes.  I may have had two.

7         Q.   Do you --

8         A.   I think I've had one, and that was at the

9    University of Minnesota.  I'm pretty sure that's correct.

10        Q.   I can dig them out, but there were some e-mails

11   where Mark Albrecht was talking about doing a cross-country

12   drive?

13        A.   That's right.  That didn't happen.

14        Q.   And that didn't happen?

15        A.   That didn't happen, sadly.

16        Q.   What was the reason it didn't happen?

17        A.   I think it was a logistics thing.  I think he was

18   getting equipment somewhere in a hospital, or an operating

19   room being available or something.  It was just

20   a practicalities issue, as I remember.

21        Q.   Could you turn back to page 155 now, in exhibit A.

22   The volume you have in front of you, I think you can put it

23   aside for the time being.  Perhaps forever.

24        A.   155?

25        Q.   Correct.  155, which is not fair, because it's in

1                    DR. PAUL MCGOVERN

2   the middle.  It's actually starts on -- it's a long e-mail

3   chain.

4        A.  146?

5        Q.  Is that the beginning of it?

6        A.  It may be.  I'm sure you'll correct me if I'm

7   wrong.

8        Q.  I think you're right.  It's a long e-mail chain

9   that starts at 146.

10        A.  Yes.

11        Q.  And this is a good deal of back and forth

12   concerning one of your papers that was submitted to a

13   publication, and these are reviewer comments?

14        A.  Yes.

15        Q.  And it's one reviewer comment in particular I want

16   to direct your attention to, and that's page 155.

17        A.  Right.

18        Q.  At the top -- and I'm having trouble following what

19   text is the reviewer comment, what text is people within

20   your writing group offering comments.

21        A.  I would imagine that anything which is in red or

22   green is a comment, but I -- it is not perfectly clear, is

23   it?  I think the colored text is comments, but --

24        Q.  And fortunately, what I want to ask you about is

25   color, so we can probably assume that that's not a reviewer

1                    DR. PAUL MCGOVERN

2    comment itself.  It's specifically the line:

3         "Due to the clinical nature of these studies the

4    authors were not able to assess contamination by wound

5    wash out samples or by the use of airborne microbial

6    sampling techniques such as a slit sampler."

7              Did I read that correctly?

8         A.  You did.  I think that might be -- that could well

9    be a reviewer comment, because there's -- immediately below

10   it, someone has written:

11        "Say to the reviewer 'We have addressed this point

12   in the manuscript'."

13        So it looks like the formatting has gone wrong.

14   But I think you read that correctly, but it looks like

15   a reviewer comment to me, but I can't say with

16   certainty, I'm afraid.

17        Q.  Well, actually there are some other versions of it,

18   so we can find that.  If you look back at page 147.

19        A.  Yes.

20        Q.  Under "Reader 1" it says:

21        "The authors refer to the several publications that

22   tend to disparage, or even deny, the efficacy of the

23   clean air facility.  None of the recent such

24   publications are conclusive because not all sources of

25   potential contamination are taken into consideration:

1                          DR. PAUL MCGOVERN

2      the large New Zealand Registry findings are notable in

3      this respect.   Comment by the authors regarding the

4      assessment of contamination by bacterial culture of

5      wash-out samples or simple use of the slit sampler

6      should be added, these being basic endpoints of air

7      pollution."

8                Now if you flip to page 155, what I just read

9      is there, but then it begins in a little bit different

10     font:

11               "OK.   I think we need to add the following to

12     the text years.   These studies have shown either an

13     upwards trend towards or significantly higher infection

14     rates in laminar flow."

15          A.   Yeah.

16          Q.   And it begins:

17               "Due to the clinical nature of these studies

18     the authors were not able to assess contamination by

19     wound wash out samples or by the use of airborne

20     microbial sampling techniques such as a slit sampler.

21     In these studies mobilization of non-sterile air with

22     forced air warming may be the explanatory factor, since

23     say to the reviewer 'we have addressed this point in

24     the manuscript."

25          A.   I'd agree, therefore, that this appears to be

1                    DR. PAUL MCGOVERN

2   a comment by a researcher rather than a reviewer comment.

3   I would agree with that.

4        Q.   And the way it comes together kind of looks like it

5   is an iterative process with different people putting in

6   different comments?

7        A.   It's inconsistently formatted; I can say that.

8        Q.   Do you know who wrote the "Due to the" -- it's

9   actually "Due the the", to be correct:

10        "Due the the clinical nature of the studies the

11   authors were not able to assess contamination by wound

12   wash out samples or by the use of airborne microbial

13   sampling techniques such as a slit sampler."

14        Do you know who wrote that?

15        A.   I do not know who wrote that.

16        Q.   In what way were these studies different than the

17   study -- the very first study you did using a slit sampler?

18             MR. SACCHET:   Object to form.

19        A.   The -- okay.   So the initial -- if we look at the

20   bubble study in two parts, the section with the infection

21   data is effectively an audit on patient activity, because it

22   looks at data which has been collected anyway, and the

23   experimental phase with the bubbles is an experiment.

24             This refers to the section which involved

25   patients to the audit, and because this was looking at

1                    DR. PAUL MCGOVERN

2   data which was collected anyway, i.e. infection rates

3   which the Trust was looking at, there weren't, as I'm

4   aware, programs to test washout samples, because that

5   would have been a prospective study design.  That would

6   have been one in which it was pre-planned to look at

7   washout samples.  Now, maybe that data was available,

8   but I don't know.

9             In terms of a slit sampler, we did not have

10  what I understand to be a slit sampler.  We did have

11  a -- the type of sampler which has been discussed in

12  the first experiment, but a slit sampler is slightly

13  different.  It's one that we had discussed using, and

14  we had tried to get hold of one but they were very

15  expensive and we couldn't get hold of one, so we used

16  the one which we ended up using which was, to my

17  understanding, seen as less good.  I don't know if that

18  answers your question.

19  BY MR. C. GORDON:

20     Q.  Is there any reason, when you were doing the bubble

21  experiment, you couldn't have used a slit sampler?

22     A.  Yeah, well a slit sampler, if we had access to one,

23  potentially, because it's a much -- it's a large machine

24  which has a very small inner nozzle attached to a hose, so

25  it wouldn't disrupt the positioning of personnel, the model

1                    DR. PAUL MCGOVERN

2   patient, very much.  But as you see from the images from the

3   previous study, it was quite a bulky machine that needed to

4   sit on a table next to the operative field, which itself

5   causes air disruption.  So, in itself, it is an unrealistic

6   model or an unrealistic component of a sample operation.

7                    In addition, it would be less relevant to use

8   a bacterial sampling technique in an operating room

9   which isn't having an operation going.  The purpose of

10  the bubble experiment was to look at airflow, was to

11  look at how air flows around the room.  And without any

12  movement, you know, because there was no skin -- it was

13  a mannequin that was used in those experiments --

14  you're not disrupting and moving bacteria from

15  a patient; and so it would have required a significant

16  change in study design, which would have probably

17  reduced the value of air-movement data that we

18  collected.

19                    You could use a slit sampler for clinical

20  studies.  I think there have been papers in which slit

21  samples or similar devices have been placed near

22  patients to look at contamination, but we didn't have

23  one, and that would require ethical approval and would

24  be researched, because you would be introducing a -- an

25  object to the operating room which could potentially

1                    DR. PAUL MCGOVERN

2   get in the way, that would need its own risk

3   assessment, its own hazard assessment of any harm to

4   the patient, any compromise in the way the operation

5   was conducted.  And that was not what we were doing.

6        Q.  In your bubble study, when you turned on the

7   HotDog, how long did -- was the HotDog on before you started

8   using the bubble wand?

9        A.  I don't remember the precise time, but before each

10  run, everything was allowed to warm up and get to

11  temperature.  So I don't remember the precise times, but

12  I do remember that the runs were randomized.  So we didn't

13  choose which order the different protocols went in.  And

14  there was a warm-up period for everything, so there was --

15  the actual data collection was a small slice of the total

16  time for each run, because there was a period of setting the

17  experiment up, making sure everything was similar to

18  previous runs, and then allowing things to get to sort of a

19  steady state.

20       Q.  On the video that has been posted on your blog of

21  the bubble experiment, there's like a tube or a wand?

22       A.  Yes.

23       Q.  Who is holding that?

24       A.  I don't remember who is holding that.  There were

25  lots of videos taken.  I mean, if you showed me, I'd

1                         DR. PAUL MCGOVERN

2    probably be able to tell you, but I don't remember who in

3    that video, on the blog, had the wand in their hand.

4         Q.  And how was it determined what the angle of that

5    wand should be, relative to the heating device?

6         A.  The angle wasn't determined.  Basically, the way

7    the bubbles work is that they're neutral density.  That

8    means they hover, suspended in still air.  So if there is

9    zero airflow in a room, a helium bubble will hang there

10   motionless.  If it's positive density, it sinks, and if it's

11   negative density, it rises.  And these bubbles are

12   configured so that they're neutral density, so they hover

13   there.  So when air flows anywhere in the room that disturbs

14   the bubble, it moves.  It moves, and the idea is that it

15   represents where air is flowing.

16        And so, to my understanding of how the bubble

17   machine works, the angle of attack, as it were, the

18   angle of the outlook port of that bubble machine,

19   doesn't really matter.  It may make a tiny difference,

20   but because the bubbles are so very light and because

21   they are neutral density, any airflow will overcome the

22   momentum that they have coming out of the bubble port

23   fairly quickly.

24        Q.  What is the velocity of the bubble coming out of

25   the port?

1                      DR. PAUL MCGOVERN

2        A.   I don't know what the velocity of the bubbles

3   coming out of the port is.

4        Q.   They have some momentum; right?

5        A.   They have some, yeah.  They are moving when they

6   come out of the outlet, because that's how they get from the

7   machine to the air.

8        Q.   And to the -- to your point of the angle of attack,

9   if there's momentum, even if they're neutrally dense,

10  neutrally buoyant, if the angle is such that, with its

11  momentum it hits something, that's going to deflect --

12            MR. SACCHET:   Objection --

13  BY MR. C. GORDON:

14       Q.   I don't remember the formula any more.  You did

15  A-level physics.

16       A.   I did.  That would be the case if flow were

17  laminar.  Laminar flow means if you -- it means the flow is

18  in a predictable pattern from an outlet.  But the flow from

19  that outlet in question is likely to be turbulent, so it is

20  likely that if you look at any particle coming out of

21  a bubble generator in a room with no airflow, it's likely

22  that their movement will be quite random.  It's likely that

23  they would not just come out in a steady stream, because the

24  nature of the airflows at low velocity and the nature of the

25  outlet is such that it's, as I understand it, not designed

1                    DR. PAUL MCGOVERN

2    to produce a laminar flow.  It is designed to produce --

3    well, it just produces a turbulent flow of bubbles.  So it's

4    not really possible to predict how each individual particle

5    will react when it comes out of the outlet.

6         Q.  At some point --

7         A.  Suffice to say, it's not likely to go back in.

8    It's likely to come out in some direction, but it could go

9    up, it could go down, it could go forward.  It depends on

10   the external conditions.

11        Q.  But at some point it has a laminar flow to it

12   before it becomes turbulent; right?

13        A.  It will do when it is in the pipe, but --

14             MR. SACCHET:  Object to form.

15        A.  -- but when it's out -- and bear in mind that I'm

16   not an aerodynamicist or a flow physicist, so -- but my

17   understanding of it is that the flow becomes turbulent very

18   shortly after exiting the outlet unless it's taken up by

19   a laminar flow system, or unless it's influenced by

20   something else.  But I don't know what the zone of -- I

21   don't know at what point the influence of the bubble machine

22   stops or reduces, and the influence of the external

23   environment takes over.  I don't know if it's an exponential

24   decay or if it's a linear decay in terms of the influence.

25             I mean, going back to your original question,

```
 1                    DR. PAUL MCGOVERN
 2    the bubble generator was, from my memory of the video,
 3    was generally held at a fairly horizontal sort of
 4    level.  It was held at hip height.  There were some
 5    other videos done in which it was held above head
 6    height, but that wasn't with specific relation to
 7    warming blanket technology.  That was looking at the
 8    overhead operating lights and their influence on
 9    laminar flow.  But from my memory of those videos, the
10    outlet was relatively horizontal, but there may have
11    been 5, 10, or more degrees deflection, because that
12    was not -- that video is of us seeing what effect we
13    could observe with that equipment in that situation.
14    BY MR. C. GORDON:
15         Q.  Was the -- in the set-up, did you -- had you draped
16    off the heating units, whether it was the Bair Hugger or the
17    outlet?
18         A.  What do you mean?  Do you mean in the experimental
19    set-up, or?
20         Q.  Yes.
21         A.  Yes.  In the experimental set-up they were draped
22    as close to reality as possible.  So it was, for this
23    experiment, it was a mannequin which had flexible limbs, so
24    it could be positioned relatively realistically, although
25    there are always going to be differences between mannequins
```

1                    DR. PAUL MCGOVERN

2    and humans.  But the draping technique was as it would be

3    for hip replacements or knee replacements, or the operations

4    that we were doing.  We tried to use exactly the same drapes

5    and use the same draping techniques that we would for a real

6    patient.

7        Q.  I want to turn to page one seventy -- so where

8    does it start?  It looks like it starts at page 174.  This

9    is -- it looks like an e-mail chain addressing a rejection

10   from the Journal of Hospital Infections.

11       A.  Mm-hm.  Sorry, yes.

12       Q.  And -- I won't go through the comments, but I want

13   to turn to page 177.  This is in response to somebody

14   suggesting that this paper be submitted to Anesthesiology.

15       Mark Albrecht writes:

16       "Oliver.

17       "Yea, Anesthesiology is a very tough journal to get

18   into, but that also makes them a thought leader."

19            If you jump down, that same paragraph:

20            "They might very well reject this at first

21   pass also, but it's worth a shot before we just dump

22   this into a nursing journal or something like that."

23            Do you see that?

24       A.  I do see that.

25       Q.  And where was this paper ultimately published?  Do

Page 159

1                      DR. PAUL MCGOVERN

2    you recall?

3              MR. SACCHET:  For the record, can we establish

4    which paper we're talking about?

5    BY MR. C. GORDON:

6         Q.  Do you know which paper this was?

7              MR. SACCHET:  I can tell you, but I'm not going

8    to.

9                   (Reporter clarification.)

10        A.  This paper, going over to page 175, appears to

11   refer to "An Evaluation of Intake Filtration, Internal

12   Microbial Build-Up, and Airborne-Contamination Emissions."

13        I have a suspicion this was published in Anesthesia

14   and Analgesia, but I'd need to check.  I can't remember.

15        Q.  Do you recall this being referred to by Mark

16   Albrecht as "The European Crud and Bug Study"?

17        A.  That term has been used, but I don't remember if

18   that specifically refers to this paper.

19        Q.  Do you recall any paper in which you were an author

20   being published in the American Association of Nurse

21   Anesthetists Journal?

22        A.  It may have been, but I can't remember.

23        Q.  In August of 2013?

24        A.  I can't always remember the journals they are

25   published in.  So it seems plausible, but I'd need to check

1                    DR. PAUL MCGOVERN

2   and actually look.

3        Q.  Do you know if the American Association of Nurse

4   Anesthetists Journal is a nursing journal into which you

5   could "dump something", to use Mark Albrecht's phraseology?

6             MR. SACCHET:  Object to form.

7        A.  I have no idea.

8   BY MR. C. GORDON:

9        Q.  Down at the bottom of 177, this is April of 2011,

10  it says -- it is from Mike Reed to Mark Albrecht, and it

11  says:

12            "Mark.  The letter of submission reads well

13  although I am not sure how much influence these letters

14  have.

15            "My conflicts are departmental funding of

16  unrelated research from Augustine Temp Management (£5K

17  if they need that).  No personal gain."

18            Do you have any idea of what the unrelated

19  research from Augustine Temp Management of £5,000 was

20  that Mr. Reed was referring to?

21        A.  I don't, although you mentioned earlier today that

22  there was a sum of £5,000 received for another study.

23  I would assume it was referring to that, but I don't --

24  prior to what you've said to me earlier, I had no knowledge

25  of that sum in relation to this, or what is being referred

1              DR. PAUL MCGOVERN

2    to specifically in this e-mail.

3         Q.  If you'd turn to page 178, at the very bottom

4    there's an e-mail from you to Mark Albrecht with a copy to

5    Reed and Kimberger, where you say:

6              "I can't see anything objectionable in the

7    paper, it looks good.  I've put a couple of suggested

8    changes in the cover letter, they make it sound a bit

9    less partisan to me."

10             What did you mean by "a bit less partisan"?

11             MR. SACCHET:  Object to form.

12        A.  What I'd mean is that if language in a paper sounds

13   partisan, or biased, that's generally something that

14   would -- one would wish to avoid.  And I don't remember the

15   specific suggested changes, perhaps they're in -- perhaps

16   you have a reference to them -- but my aim would always be

17   to take a neutral tone in a paper, where appropriate, and so

18   that is what I believe I was referring to there.  It may

19   have been that the language did not take what I considered

20   to be the appropriate tone, and I made an adjustment to that

21   effect.

22   BY MR. C. GORDON:

23        Q.  Turn to page 283, please.  It's an e-mail from Mark

24   Albrecht to you and Mr. Reed.

25        A.  Yes.

1                    DR. PAUL MCGOVERN

2        Q.  With a carbon copy to several other people, and it

3    is entitled "Publication Factory Continues"?

4        A.  Yes.

5        Q.  What did you understand the Publication Factory to

6    be, when you got this e-mail?

7        A.  I don't remember what I thought of it at that time,

8    but what I understand by it now is that the research effort

9    was producing several publications; and this was in

10   reference to that ongoing effort to produce publications.

11       Q.  And the writing was primarily coming out of Mark

12   Albrecht and his colleagues at the Augustine Company; right?

13           MR. SACCHET:  Object to form.

14       A.  Sorry, you were saying the writing was -- what was

15   the question?

16   BY MR. C. GORDON:

17       Q.  Where was the Publication Factory?

18       A.  I'm not sure there was a physical location.

19       Q.  Turn to page 398, please.  It's an e-mail from

20   Scott Augustine to Robert Gauthier, Mike Reed, you,

21   Professor Nachtsheim, and a carbon copy to Mark Albrecht.

22   And in this e-mail Dr. Augustine says:

23       "Bob, Mike, Paul, and Chris,

24       "Mark asked me to pass on this completed draft to

25   all of the authors after I made any last minute changes

1                    DR. PAUL MCGOVERN

2    (see attached)."

3              Why was Scott Augustine making changes to

4    your publication?

5              MR. SACCHET:  Object to form.

6        A.  I don't recall.

7    BY MR. C. GORDON:

8        Q.  Does it strike you as odd that the owner of

9    a company that manufactured a product that stood to benefit

10   by research, that raised safety issues about its competitor,

11   was finalizing a draft of your independent research and

12   sending it to you?

13             MR. SACCHET:  Objection.  Argumentative.  Move to

14   strike to preamble.

15       A.  Where would you -- you said "finalize a draft".

16   Where is that?

17   BY MR. C. GORDON:

18       Q.  Complete a draft.  The completed draft.

19       A.  Right, but Scott Augustine can send any e-mail that

20   he wants to.  That doesn't mean that that's what was

21   submitted.  I'm not sure if that was or not, but Scott

22   Augustine is free to send whatever he wishes.

23       Q.  So when you got this, it didn't strike you as odd

24   that Scott Augustine was sending you something that he

25   described as a completed draft to all of the authors after

1                DR. PAUL MCGOVERN

2  he, Scott Augustine, had made last minute changes?

3      A.  It doesn't strike me as odd.  I think that I, on

4  receiving an e-mail like this, I would be mindful of the

5  potential conflict of interest, and I would be keen to

6  review what changes were made, to establish if the message

7  of the paper was still what I and my colleagues, as

8  scientists, felt was appropriate.  It didn't strike me as

9  odd that someone who is involved in an e-mail chain

10 regarding a paper would suggest changes, but -- yeah, it

11 doesn't strike me as odd inherently, because this is not

12 finalizing a draft.  This is not the last say on what is

13 finally submitted.

14             MR. SACCHET:  Can we clarify which paper we're

15 talking about, for the record?

16 BY MR. C. GORDON:

17     Q.  Do you know which paper this refers to?

18     A.  I do not.  You would have to look for "Cover Letter

19 8-25.doc" and  "manuscript__Laminar__8-25.doc" because that

20 will have the relevant paper.

21             MR. SACCHET:  I'll excuse the speaking objection,

22 but it is an unpublished laminar-flow paper that was never

23 published in the journal.

24 BY MR. C. GORDON:

25     Q.  Can you turn to page 574, please.

1                    DR. PAUL MCGOVERN

2        A.   Yes.

3        Q.   And this begins a several page e-mail chain

4   starting on March 25, 2016.

5        A.   Yes.

6        Q.   From Robin Humble to Scott Augustine and to you,

7   with a carbon copy to Steve Hammant-Stacey.  First of all,

8   remind me again who Robin Humble is?

9        A.   Robin Humble is -- works, I think, as a sales

10  representative for Augustine, or he works in distribution

11  for Augustine products, as far as I'm aware.

12       Q.   Had you had any pre-warning or pre-notice that

13  you'd be hearing from Robin Humble before you got this

14  March 25, 2016, e-mail?

15       A.   Not to my recollection.  No, I don't think so.

16       Q.   Okay.  And he tells you that Scott Augustine wants

17  to contact you; right?

18       A.   Yes.

19       Q.   And your reply is that -- you tell him where you're

20  working now, and that you look forward to hearing from

21  Scott; right?

22       A.   Yes.

23       Q.   And drop to the very bottom, on March 28 Scott

24  Augustine e-mails you directly and says:

25            "Hi Paul, it has been a long time!  I hope

1                    DR. PAUL MCGOVERN

2    that all is well with you."

3              Then it goes on for a page and a half or so;

4    right?

5         A.  Yes.

6         Q.  And if you turn to page 576, he -- after discussing

7    what's happening with the Bair Hugger litigation and things

8    related to your original paper, the bubble paper, he says:

9              "... I took the liberty of knocking out

10   a first draft of a possible paper recording your data

11   (attached).  My question is simple -- would you be

12   willing to edit, change, add or subtract as you see fit

13   and then be the author?  My name tends to be

14   distracting in situations and therefore I prefer not to

15   be an author -- I'll have to stick with being an

16   inventor.  If Mike would want to join you, that would

17   be great."

18              Did I read that correctly?

19        A.  Yes.

20        Q.  And attached to this was a fully drafted paper with

21   your name on it?

22        A.  Yes.

23        Q.  That you hadn't written?

24        A.  Correct.

25        Q.  Did that surprise you, when you got it?

1                    DR. PAUL MCGOVERN

2         A.   I wasn't expecting it.

3         Q.   And having received it, did it in any way disturb

4    you that Dr. Augustine would write a paper and put your name

5    on it, and then send it to you?

6         A.   It didn't disturb me.  It would disturb me if

7    I found it in a peer-reviewed journal under my name.  That

8    would disturb me.  But sending me a draft with my name on it

9    isn't something that I would do.  It is a little more

10   forward than my personal style would be; but it's a document

11   to me, with a suggestion.  So I wasn't expecting it, but it

12   didn't disturb me, no.  If my name had been misrepresented

13   and it had been stated that I had written it, in public,

14   then that would have been an issue.  But it wasn't.

15        Q.   So Scott Augustine writing up a paper and putting

16   your name on it and sending it to you, that's kind of what

17   you expect out of a publication factory; right?

18             MR. SACCHET:  Objection to form.  Argumentative.

19        A.   No.  As I said, I didn't expect it.

20   BY MR. C. GORDON:

21        Q.   And how did you respond to Dr. Augustine's inquiry?

22        A.   I forwarded the e-mail to Mike, telling him my

23   inclination is not to do this, and not to be involved at

24   this stage.  But that I thought -- sorry, Mike Reed.  But

25   I thought it was worth drawing to his (Mike's) attention.

1              DR. PAUL MCGOVERN

2      Q.  In fact, on page 577 you said, after telling him

3  your inclination was "not to do it at this stage," you said:

4      "Just to be clear, I have had zero input on the

5  attached paper, despite my name being on the top.  Scott

6  sent this to me."

7      A.  That is correct.

8      Q.  Why did you want to be clear about that?

9      A.  Because I had zero input on that paper.  Because

10 that was fact, and I didn't want to give the impression

11 that I had written it.  I hadn't actually read the paper in

12 any detail.  I had read the name of the -- I still haven't

13 read it in any detail.  I skimmed it and sent it to Mike,

14 because, as I said in the e-mail, my inclination was "not to

15 do so at this stage".  And so I thought Mike would be

16 interested -- Mike Reed would be interested, so I sent it to

17 him.

18     Q.  So you told Augustine that you'd forwarded it to

19 Mike; right?

20     A.  I'm not sure if I told -- I don't know if I told

21 Augustine.  I'm pretty sure I told him that I'd discussed it

22 with Mike.

23     Q.  Look at 578.  It is an e-mail from you to

24 Augustine.  You say:

25         "With regards publishing further forth in

1                    DR. PAUL MCGOVERN

2    orthopeadics, it's not really my area any more.  I've

3    contacted Mike and forwarded him the draft."

4         A.  Right, so I did.  I did tell him that I'd forwarded

5    Mike the draft, yes.

6         Q.  And he got back to you on April 4 and said:

7         "Interesting.  I'm reviewing periop hypothermia for

8    nice so don't want to embark on any related research at

9    the mo.  Likely that this will come out in any

10   depositions anyway.  We did analyse this before and

11   I presented it at the Mayo (I think) as one of their

12   anaesthetists raised it ahead of a PPT I did there.  It

13   looked like antibiotics has no effect.  Tell Scott to

14   fund an RCT.  One has been designed in the uk but I'm

15   not leading on it."

16            Did I read that correctly?

17        A.  Yes.

18        Q.  Did you have any communications there with Scott

19   Augustine about Reed's situation?

20        A.  I have mentioned to Scott Augustine that he didn't

21   really want to be involved, that he wasn't able to be

22   involved.  I -- yeah, I did mention that to Scott.  I can't

23   remember how or when, but --

24        Q.  Was that in a phone call?

25        A.  It may have been in a phone call.  I don't remember

1              DR. PAUL MCGOVERN

2    if it was an e-mail or phone call, or both.

3         Q.  On page 580 you, in an e-mail to Reed, you say

4    that:

5         "I will probably go ahead and work with Scott on

6    this on my own then, if you've no objections."

7         A.  Yes, I did say that.

8         Q.  And have you done anything further with Scott

9    Augustine since April 4?

10        A.  So I've had a conversation with Scott Augustine and

11   he has -- I said to him that I considered being involved,

12   because the concern with the data, the reason that I sent

13   this to Mike is, as I said before, I didn't really have

14   anything to do with the section of my paper -- or I had

15   something to do, but I didn't lead on the section of my

16   paper which was involved with this data, with the infection

17   data.  And so I wanted to get some more information, but

18   I said I wouldn't be happy to publish it without it being

19   very clear that any publication came from Scott Augustine.

20   If there was -- I wasn't prepared to be involved if -- and

21   to try and -- if there was any appearance that we were

22   trying to not disclose that there had be involvement from

23   the Augustine company.

24        Q.  How did you communicate that?

25        A.  It was -- I -- it was either a telephone call or an

```
 1                    DR. PAUL MCGOVERN
 2   e-mail.  I can't remember which.
 3        Q.  On page 580, at the very bottom, there's an e-mail
 4   from Robin Humble to you on June 17, 2016?
 5        A.  Yes.
 6        Q.  Where he says:
 7            "Hi Paul,
 8            "Hear you're going to meet with the
 9   Augustines on Sunday?"
10        A.  Yes.
11        Q.  Did you meet with the Augustines?
12        A.  Yes.
13        Q.  Was that in England?
14        A.  Yes, they were in England for some -- they had
15   several meetings, and they were very close to where I live,
16   where they were staying in London, so I met up with them.
17        Q.  That was Sunday in mid-June of 2016?
18        A.  Yes, yes.
19        Q.  Where did you meet them?
20        A.  Euston Square.
21        Q.  Is that a restaurant?
22        A.  At their hotel, and then we had a meal at the
23   restaurant.
24        Q.  Did you discuss any of the research stuff?
25        A.  Yes.  So we would have discussed this at that
```

1                    DR. PAUL MCGOVERN

2   meeting as well as in a phone call, or any e-mails we may

3   have had.

4        Q.  And have you had any communication with Augustine,

5   Scott Augustine -- well, yeah, since then?  Since that

6   dinner?

7        A.  Yes, so I -- my recollection is that at or around

8   this point, either of arranging this meeting or having this

9   meeting, I made clear that I wouldn't be involved unless it

10  was very clear that Scott Augustine's company was involved,

11  and that -- Scott Augustine said that he would put me in

12  touch with a colleague of his who would be happy to work on

13  the paper.  My thought of this was that I didn't really have

14  a problem with reporting this data, but I'd need to

15  completely rewrite the paper, as in start from scratch and

16  look at the data go and through the whole process.  So I was

17  quite cool on the idea because it's, as I've said in this

18  e-mail, I'm out of that area of practice, and I don't need

19  publications in orthopedics any more for my career.  I'm not

20  particularly motivated to do this sort of work.

21        And while a publication is always a string to my

22  bow, and always useful to have, because it had been

23  written and my name had been put on it, I was thinking

24  that if I were to be involved in the project in any way,

25  the involvement of Augustine's company would have to be

1                    DR. PAUL MCGOVERN

2   very clear, and I would have to rewrite it.  So I would

3   have to completely redo the paper and have to discuss

4   with Mike Reed the relevance of any infection data.  And

5   it seemed to me that this was not really something which

6   I was that interested in doing, because it would take a

7   lot of effort.

8        Q.  Why was it important to you to make sure that it

9   would be really, really clear that Augustine's company was

10  involved?

11       A.  Because it would be a potential conflict of

12  interest.  It's important that if -- if research involve --

13  research involves an author with a potential conflict of

14  interest, that that is declared in the peer-review process.

15       Q.  Why don't you turn to page 587.  It is an e-mail

16  from June 11, 2016, from Scott Augustine to you.

17       A.  Yes.

18       Q.  Where he introduces you to Dr. Tom Durick?

19       A.  Yes.

20       Q.  Who is Dr. Durick?

21       A.  I think he's an anesthesiologist.  I've never met

22  him.  I think I might have exchanged a couple of e-mails

23  with him, but -- I don't know if there's any more than this,

24  but really not more than one or two more than this.  So I've

25  never met the guy.

1                DR. PAUL MCGOVERN

2        Q.  Was Dr. Durick the person that Dr. Augustine had

3   said he was going to introduce you to?

4        A.  Yes, I think so.  I wasn't aware of the name at

5   that time, but this followed on from that conversation, or

6   those conversations, yes.

7        Q.  And what's happened with that?

8        A.  Nothing.  Tom Durick hurt his arm or his shoulder

9   or something, and didn't answer any e-mails for a while, and

10  Scott sent an e-mail saying, "What's going on with this?"

11  And I might have e-mailed Tom, and Tom e-mailed me, and then

12  it's just sort of gone by the wayside, and nothing has come

13  of it. I haven't -- I still haven't read the draft paper in

14  its entirety, and I don't really have any interest, now, in

15  getting another paper, because I have other projects to do

16  and other research that is more interesting to me.

17       Q.  The latest e-mail -- and I could be wrong, but the

18  latest e-mail I see in what you produced -- was June 12,

19  2016.  Do you think you've had e-mail communications either

20  with Augustine or Durick since June 12?

21       A.  Yeah, I think -- yeah, I think -- I can't remember

22  if I've spoken to -- I don't think I've ever spoken to Tom

23  Durick on the phone.  I might have done, but I don't think

24  so.  I might have spoken to Scott Augustine, but I think

25  there's been one more back and forth, or -- because I don't

1                    DR. PAUL MCGOVERN

2    think it says here that Tom Durick hurt his shoulder or

3    something, and I somehow know that.  So there's been some

4    communication at some point, but not in any detail, not

5    actually progressing towards any sort of plan.

6         Q.  Where do you think it stands now, in the eyes of

7    either Dr. Durick or Scott Augustine?

8              MR. SACCHET:  Object to form.

9         A.  I don't know how it stands in the eyes of

10   Dr. Durick or Scott Augustine.  In my eyes, it is something

11   which is suggested, but I don't particularly have an

12   interest in taking it forward.  It is possible that I will

13   at some point in the future become interested in it, but

14   I have quite a lot of things on, and I can't really see this

15   rising to the top of the piles of work that I have to do, to

16   the extent that I complete it.

17   BY MR. C. GORDON:

18        Q.  I'd ask you to turn to page 609.  It is an e-mail

19   from you dated August 27, 2013.

20        A.  Yes.

21        Q.  To Mike Reed, and the heading is "Brandon Meeting"?

22        A.  Yes.

23        Q.  What does "Brandon" refer to?

24        A.  Brandon is --

25        Q.  I don't know if it is Brandon or Bradford, because

1                    DR. PAUL MCGOVERN

2    there is "Bradford" in the text?

3        A.   Yes.  So Brandon, as I remember, is a company based

4    in Bradford.  A city.

5        Q.   Okay.

6        A.   And I can't remember why I contacted these guys.

7    I think I contacted them in the first place, but I seem to

8    remember that they had operating lights which they

9    advertised as being less disruptive to laminar flow than

10   other designs.  And so I got in touch with them, and

11   I can't -- I went to a meeting and spoke to this Adrian Hall

12   and someone else; there was a prof at a meeting.  I had

13   a chat with them about possibly doing some research into

14   airflow -- the effect that operating lights have on laminar

15   airflow.  And we discussed the possibility of doing some

16   research in an experimental operating room that this company

17   was talking about building, but it never really went to

18   anything.  We had one, maybe two, meetings, a couple of

19   e-mails exchanged, and it didn't really go anywhere.

20   Although I have since done some research into the influence

21   that overhead operating lights have on laminar airflow; but

22   not with this group.

23       Q.   There's one line in particular I want to ask you

24   about.

25       A.   Mm-hm.

1                    DR. PAUL MCGOVERN

2        Q.   In this e-mail at the second-to-last paragraph, you

3   say:

4        "Not in a great rush to do that as I think equating

5   particles to bugs should come first."

6        A.   Yes.

7        Q.   What do you mean by that?

8        A.   I can't remember what I meant by that.  But it's --

9   particles can only ever be a model, and I was aware that the

10  videos that we've done show bubbles moving into operating

11  wounds, but that did not mean that bacteria were going into

12  operating rooms -- into wounds, necessarily.  And so

13  I think, for the progress of this research, it is worth

14  developing a model which shows how particles deposit, what

15  type of particles carry organisms which may cause infection,

16  and how they can be tracked.  But I'm not sure I agree with

17  myself in terms of saying "equating particles to bugs should

18  come first."  I think it is an important thing to examine,

19  but if -- in the event the next piece of research that I

20  did, or the most recent piece of research I'd done in this

21  area was looking at, again, particles or bubbles as a marker

22  for particles which could act as vectors for infection.

23       Q.   If you turn to the next page, there's a continuing

24  back and forth between you and Mr. Reed.  And in the middle

25  of the page on September 11, 2013, apparently you met again

1                    DR. PAUL MCGOVERN

2   with Adrian Hall of Brandon, and a Professor Jonathan

3   Sackier?

4        A.  Yes, that was the chap that I mentioned previously.

5        Q.  Okay.  And you say:

6        "It's not really aerodynamics we're looking at when

7   Bair Huggers and lights mess up laminar airflow, as the

8   velocities are too low.  It's another form of fluid

9   dynamics that is the relevant expertise."

10           What did you mean by that?

11       A.  That is someone who has done a very small -- well,

12  done as much reading as I can on the subject, and not really

13  grasped the full meaning of how lights and laminar flow and

14  aerodynamics works.  The physics behind airflow in these

15  areas is extremely complicated, and that was part of the

16  conversation that I'd had with professor Sackier and Adrian

17  Hall.  And I think I was trying to summarize the fact that

18  airflow is not obvious.  The way air flows in operating

19  rooms is not obvious.  What I meant by that is if you think

20  of a car or an aircraft, those systems deal with fairly

21  high-speed airflow, which is quite predictable.  But when

22  you are looking at low-speed airflow, it is much more

23  susceptible to changes in temperature, humidity, and

24  other -- and turbulence in the area.  And so, basically,

25  what I meant is it's very complicated and it needs further

1                    DR. PAUL MCGOVERN

2    study.  Yeah.

3         Q.  And you also came to the conclusion that bubbles

4    were quite a coarse measurement?

5         A.  Of?

6         Q.  Airflow.

7         A.  They're --

8              MR. SACCHET:  Objection to form.

9         A.  I don't know what you mean by "coarse".

10   BY MR. C. GORDON:

11        Q.  If you flip to page 772, please.

12        A.  Yes.

13        Q.  An E-mail from you to Mike Reed, dated May 28,

14   2013.

15        A.  Yes.

16        Q.  Towards the middle of the second paragraph of your

17   e-mail, you say:

18              "Certainly, with the particle counter,

19   I observed occasional particle jumps for no obvious

20   reason, in an empty theater ..."

21        A.  Yes.

22        Q.  "... in the middle of a laminar flow zone.  We

23   haven't seen these in these experiments, as the bubbles are

24   quite a coarse measurement method, but it's likely they

25   happen."

1                    DR. PAUL MCGOVERN

2        A.   Yeah, so --

3        Q.   So what did you mean by "a coarse measurement

4   method"?

5        A.   So we're dealing with microscopic particles,

6   particles that are too small for the naked eye to see.  And

7   what bubbles do is show flow, but they don't show particles.

8   And the way -- given that we're actually looking at -- what

9   we're interested in is particles, I would describe particle

10  counter as something which has a little more precision in

11  terms of the sizes of particles that are drawn into its

12  field.  The good thing about using bubbles is that they can

13  be seen.  They can be visualized, and you can actually

14  visualize airflows in the room, because there aren't many

15  methods which will accurately do that.  Using smoke has its

16  own problems, using dry ice has problems.  And so these are

17  probably the most accurate way to measure low-speed air flow

18  in this area.

19       But what I mean by "coarse" is that they're not the

20  be all and end all.  I think this sort of investigation

21  really needs to use several methods in tandem, or

22  working together to try to drive forward understanding

23  of the area.  I think bubbles is one, and I think it's

24  very valid, but I think particle measuring is valid and

25  useful, I think bacterial sampling is useful, I think

1                    DR. PAUL MCGOVERN

2    statistical data from real operations is useful.

3    A randomized control trial would be the very best.  But

4    it's data which is useful, but does not give us the

5    whole story.

6         Q.  And even particles are a surrogate for what may or

7    may not be bacteria?

8         A.  Particles are a surrogate for what may or may not

9    be bacteria, and also, different particle sizes have very

10   different flow characteristics.  There is -- there is a

11   concept of a particle in terms of its diameter, its physical

12   size, but there's also the aerodynamic diameter of

13   a particle.  So a particle can behave as though it is

14   a smaller or larger particle, depending on its density or

15   depending on the way it interacts with the environment

16   around it.  So the physical size of a particle may not be

17   the same as the aerodynamic size, which may affect its

18   settling rate, it may affect its deposition rate, it may

19   affect its likelihood to be blown off course by a gust of

20   wind or a gust of heat.

21        And so these are -- the bubbles show airflow; they

22   don't show particles.  They show where air currents are

23   moving throughout the room, and because particles are

24   very light, we extrapolate that data to give us an idea

25   of where particles are likely to be flowing.  But this

1                    DR. PAUL MCGOVERN

2   is still a probability exercise.  We can't say that

3   a particle that starts here -- sorry, that a bubble that

4   starts here and ends here, will a hundred percent be

5   tracked by a skin flake or a piece of dust that starts

6   there and ends there.

7        Q.  If you flip back to page 610, in your September 11

8   e-mail of 2013 to Mr. Reed.  This again, apparently, is to

9   do with whatever you were talking about with the Brandon

10  group.  You say:

11           "The target has to be equating our particle

12  transfers to actual colony forming units to drive the

13  message home."

14           Did I read that correctly?

15       A.  Yes.

16       Q.  What did you mean by "equating particle transfers

17  to the actual colony forming units"?

18       A.  So the advantage, the reason that I was speaking to

19  this company, was because I wanted to try to do experiments

20  in an experimental operating room.  There are techniques

21  that you can use where you put non-harmful bacteria in the

22  air, but you spray them around and see where they settle.

23  You can't do that, obviously, in a real operating room

24  because there's a risk of infection to patients.  So if you

25  have an experimental operating room that's built to the same

1                    DR. PAUL MCGOVERN

2    specifications as a real operating room, then you can design

3    experiments which let us investigate this more closely.  And

4    what I wanted to do with this line of investigation was

5    a more advanced, sophisticated version of the very first

6    experiment, which is to see if -- you know, if I put

7    particles on my skin, say, and rub my hands together, or do

8    something which disrupts particles or creates particles in

9    the room, and I know they are tagged with harmless bacteria,

10   if I can show where bacteria go and correlate those with

11   where air is flowing, that would be a very -- that would be

12   an important step in understanding how particles move

13   through an operating room and how particles may settle in

14   a patient or in a wound.

15        Q.   What came of the Brandon stuff?

16        A.   It didn't go anywhere.

17        Q.   Why?

18        A.   I think -- I can't quite remember.  I think Brandon

19   was keen.  I was keen.  I think I was -- they hadn't built

20   this experimental operating room.  Brandon's interest was

21   that they had designed operating lights which were -- I use

22   the word "aerodynamic" carefully, but aerodynamic, which

23   presented a lower interference area to laminar flow than

24   other lights.  And what I was interested in doing was trying

25   to develop lights which would not disrupt laminar flow at

1                    DR. PAUL MCGOVERN

2   all.  And I think they were interested in looking at that

3   because, from a marketing point of view, if a company can

4   demonstrate that its lights don't disrupt laminar flow, that

5   would be a good marketing thing.  So I figured we had some

6   aligned interests in demonstrating how to reduce infection;

7   and if I could be involved in developing lighting systems

8   which were safer, then that's -- that was why I was

9   interested.

10       But as far as I'm aware, the experimental operating

11  theater hasn't been built.  If it has, then they haven't

12  told me about it.  And we couldn't really proceed

13  without that experimental facility being available.

14       Q.  So the absence of the facility is what stopped this

15  from going any further?

16       A.  Yeah, I think so.  I think that -- I mean, I can't

17  remember the exact chain of events, but it's one of those,

18  the oft repeated story of starting a project and then having

19  an idea and then letting it fall by the wayside because it

20  just doesn't go anywhere.  Had I stayed in orthopedics, this

21  would very likely be the sort of thing that I would be

22  chasing up probably about now, because there is long lead

23  time to such things.  But in 2013 I had just started working

24  as a teaching fellow at a university, and so I was still --

25  I still am doing some of this research in this area, but I

1              DR. PAUL MCGOVERN

2  had other priorities, and so they took over from this sort

3  of research.  These things come in peaks and troughs.

4       Q.  Flip back to 772, if you would.  That's your

5  May 28, 2013, e-mail.

6       A.  772?

7       Q.  772, yes.

8       A.  Yes.

9       Q.  Correct me if I'm wrong, but I believe you're still

10  talking about the Brandon research?

11       A.  No, this may be -- there was no research -- no,

12  right.  There was no research going on with Brandon.

13  Brandon was just speculative in scoping, and we wanted to do

14  something and we never did it.  This was research done at

15  Wansbeck Hospital in an operating room, another experimental

16  set-up with a mannequin, but this looked at the influence

17  that lights have on laminar flow.  So this, as far as

18  I remember, does not have any -- anything to do with

19  Bair Huggers or HotDogs, or anything like that.  This purely

20  looks at the influence that operating lights have on laminar

21  flow and uses bubbles to visualize airflows and see if

22  laminar flow is able to clear bubbles if operating lights

23  are in the way.  And what we found is that it doesn't.  The

24  laminar flow has an effect on operating lights.

25       Q.  Okay, if you back up to 770, there's a May 23

1                    DR. PAUL MCGOVERN

2      e-mail where you make reference to Adrian Hall at Brandon?

3          A.  Yes.

4          Q.  But so -- but what you're talking about on May 28

5      is unrelated to that?

6          A.  May 28?  Hang on.  28th, where is the 28th?

7          Q.  772.

8          A.  Oh yeah.  I think this is the -- yeah, this is an

9      e-mail chain discussing that experimental study in Wansbeck

10     which looked at the influence that lights have on laminar

11     flow.

12         Q.  And one of the reasons for doing that study, you've

13     described to Mr. Reed, was to build an understanding of how

14     laminar flow works?

15         A.  Yeah.

16         Q.  You go on to say that:

17             "It's clear that no-one really has a clue

18     what's going on beyond the diagrams they remember from

19     FRCS prep, and these experiments help us get some small

20     insight into airflows in these systems."

21             Did I read that correctly?

22         A.  Yeah.  What I meant by that is most surgeons.

23         Q.  FRCS is Fellow of the Royal College of Surgeons?

24         A.  Yes.

25         Q.  So what kind of a prep are you referring to there?

                          DR. PAUL MCGOVERN

1

2        A.   Prep ... err, yeah.  What I mean is when you're

3    studying for exams, you have some books which show operating

4    rooms.  When you do surgical exams, there are things that

5    you should know.  There are just bits of trivia which aren't

6    particularly relevant to how you practice medicine, but

7    there are things that it's generally accepted that one

8    should know.  For example, the number of changes of air per

9    hour in an operating room, and some very basic principles of

10   how laminar flow works.  And I think what I was referring to

11   there is the -- is a diagram -- I have an image in my head

12   of a diagram of a side view of a laminar flow operating

13   theater showing a laminar flow unit in the ceiling and

14   columns of air moving down at exactly the same rate, which

15   is inaccurate.  That's not what laminar flow looks like.

16   But it's just a diagram, and it's a model that people have

17   in their heads which is not -- it's not -- I mean it's based

18   in reality, but it is not accurate.  It is a model.

19        And so I think what I was saying there is that this

20   is very complex, and it is simplified, and rightly so.

21   There is no reason for most people to understand it in

22   any detail, but the more we investigate it, the more we

23   find out about how very complex it is, and how very

24   fragile laminar flow is, and how easily it can be

25   disrupted and how what we assume to be the protected

1                    DR. PAUL MCGOVERN

2  benefits of laminar flow require more investigation.

3       Q.  There are lots of things that can disrupt laminar

4  flow; right?

5       A.  There are many things that can disrupt laminar

6  flow; I agree.

7       Q.  And in a typical surgery, whether there is

8  a Bair Hugger, or HotDog, or no warming at all, there are

9  lots of different things that disrupt laminar flow?

10      A.  There are lots of other things in addition to any

11  sort of warming device, whether it is used or not, and what

12  technology.  There are many factors which affect laminar

13  flow.

14           THE COURT REPORTER:  Could we have a break soon?

15  Is that okay?

16           MR. C. GORDON:  Yes, let's have a break.

17           THE VIDEOGRAPHER:  This is the end of DVD 3 in

18  volume 1 in the deposition of Dr. McGovern.  Going off the

19  record at 20 past 4.

20  (4:20 p.m.)

21                     (Break taken.)

22  (4:29 p.m.)

23           THE VIDEOGRAPHER:  This is the beginning of DVD 4

24  in volume 1 of the deposition of Dr. Paul McGovern.  We're

25  back on the record at half past four.

1               DR. PAUL MCGOVERN

2    BY MR. C. GORDON:

3         Q.  If I could have you turn to page 767.  It's an

4    e-mail from you to Mark Albrecht, dated October 19, 2011.

5    Apparently you had just started at the Medway Trust?

6         A.  Yes.

7         Q.  You say:

8              "I'm going to do a little 'real world' study,

9    just thought you guys might be interested to see.  If

10   you can think of any other data we should be

11   collecting, let me know."

12             What does that refer to?

13        A.  That remembers to the one or more audits that I was

14   attempting to do at Medway, in which I noted that they were

15   using both Bair Huggers and HotDogs, and that this

16   correlated with the research that I'd done previously, and

17   that I was letting Mark Albrecht know that I was considering

18   doing that, or trying to do that.

19        Q.  But other than what we've talked about, nothing was

20   actually done at Medway?

21        A.  I mean, I made a lot of effort to try and do things

22   at Medway, but nothing ended up being outputted from Medway

23   which was completed.  So, as we've discussed previously,

24   I've produced draft, I've produced proposals, and -- for at

25   least two things.  One of them was temperatures in operating

1                    DR. PAUL MCGOVERN

2  rooms and one of them was, I think, patient temperatures pre

3  and post-operation.  But nothing -- yeah, nothing was --

4  nothing came of that in the end.

5      Q.  If I could have you turn to, and now in volume 1A,

6  to page 80.  This is an e-mail from Mike Reed to Mark

7  Albrecht with a copy to you and Scott Augustine.  It says:

8          "Mark.  This is a great paper.  I have made

9  some comments.

10         "I know we will be going over the data

11 tomorrow.  My concern here is that we couldn't

12 replicate this effect in our own OR.  I wonder if you

13 would consider setting the experiment up again and

14 simply demonstrating the effect to Paul and I via

15 Skype.  Not suggesting at all that it is repeated but

16 that we can simply see the bubbles rising into the

17 surgical site with this set up, and that we can see the

18 particle counts measured so high in the surgical field.

19 We could use that video in our blog anyway.  Sound

20 plausible?  If we are publishing/speaking on this we

21 need to have witnessed the phenomenon if our own OR

22 didn't show that effect (although the air bubbles did

23 rise to some extent with us)."

24         Did I read that correctly?

25     A.  Yes.

1                    DR. PAUL MCGOVERN

2        Q.   What effect were you and Mr. Reed not able to

3   replicate in your own OR?

4        A.   I don't know, because I don't know what the paper

5   which is referred to contains.  So I'd need to look through

6   that paper to know what -- or to have idea of what Mike Reed

7   is referring to.

8        Q.   Can you tell, from this e-mail, what the -- what

9   paper we should be looking for?

10       A.   The filename is Manuscript_Laminar_7-9(2).doc.  But

11   I don't know what paper this is.

12       Q.   Well, the Manuscript_Laminar_7-9, that's something

13   we should be able to find in the index?  I mean, that's

14   something --

15       A.   I imagine so.  I mean it's -- I've done my best to

16   include every file that was attached.  It's likely to be

17   there.

18       Q.   Let me just say, by the way, I love the way your

19   attorneys produce documents with an index.  This is

20   wonderful.  It looks like it should be in volume 5, which is

21   exhibit 7A.  Apparently one of the first documents.

22       A.   Volume 5, 7A.  Ah, it is.

23       Q.   Is that it?

24       A.   This version 1, so --

25       Q.   According to the index, version 2 comes next.

1                    DR. PAUL MCGOVERN

2        A.  It does.  That looks like the right one.  Okay.  So

3   your question was?

4        Q.  Well, let's first take a look at what this document

5   is.  So in exhibit 7A, this begins on page 2012 and goes

6   through 2036; is that right?

7        A.  Yes.

8        Q.  And the title on this draft, at least, is "Forced

9   Air Warming Versus Conductive Fabric Warming -- An

10  Evaluation of Laminar Operating Room Ventilation

11  Disruption"?

12       A.  Yes.

13       Q.  And it lists as authors: Reed, McGovern, Gauthier,

14  Albrecht and Nacthsheim?

15       A.  Yeah.

16       Q.  Was this something that was published?

17       A.  I can't remember.

18       Q.  Looking at the method section on page 2017, it

19  refers to: "A laminar flow OR environment was constructed

20  for this experiment ..."

21       A.  Yes.

22       Q.  "... because most hospitals will not allow the use

23  of tracer smoke or permit an open flame in the OR."

24       A.  Yeah.

25       Q.  Were you involved in any experiment in a specially

1                     DR. PAUL MCGOVERN

2     constructed laminar flow environment?

3         A.  I was not.

4         Q.  Are you aware of any that were done that you

5     weren't -- that you weren't physically --

6         A.  Yeah, I was aware that Augustine, the company, had

7     a laminar flow environment -- a lab -- and that they did

8     experiments in that place.

9         Q.  Is that what this refers to, this document --

10        A.  I don't know.

11        Q.  -- that begins on 2014?

12        A.  I -- yeah, I don't know.

13        Q.  So, does this help you interpret or explain what

14    effect you couldn't replicate in your own OR?

15        A.  It does not, because I don't know what Mike Reed is

16    referring to in this e-mail.

17        Q.  Okay.  Do you recall a video being sent to you

18    showing anything that was -- any activity that was being

19    done in the mock OR?

20        A.  So the video that was referenced previously, which

21    was sent to lots of orthopedic surgeons in the U.K., is one

22    which I think was filmed in an experimental environment

23    which involved traces of smoke and light, and lighting to

24    visualize airflows.  But I do not know if this refers

25    specifically to that video or that place, or that set-up.

1                    DR. PAUL MCGOVERN

2    They all seem similar, but I don't know if they are one and

3    the same.

4         Q.   Okay.  This was -- page 80 was July 18, 2010.

5         A.   Yes.

6         Q.   If I could have you turn now to page 201.

7         A.   Shall I keep this one open?

8         Q.   I don't know that you need to.

9         A.   We'll get back to it.  So say the page number

10   again?

11        Q.   201.

12        A.   Yes.

13        Q.   And this is an e-mail from Mark Albrecht to

14   Mr. Reed and yourself, cc'd to a few people.  It is dated

15   August 20, 2010.  And Mr. Albrecht says:

16             "Mike and Paul,

17             "I'm trying as best I can to get that helium

18   bubble generator back into the States here, but it is

19   still caught up in customs."

20             Talks about that for a little bit, and then

21   he says:

22             "I fear that our ability to get this

23   completed manuscript in (see attached) will continue to

24   be delayed for some time if we rely upon that equipment

25   to demonstrate the effects for both of you in our

1                    DR. PAUL MCGOVERN

2    laboratory."

3              And the title on this is "Laminar Flow

4    Manuscript".

5              He then goes on to say:

6              "I'm hoping we can take a different approach

7    here.  OK, both Chris Nachtsheim (faculty at the

8    University of Minnesota) and Bob Gauthier (independent

9    anesthesiologist) have seen the effects first hand

10   shown in the photographs (Figure 6 in the manuscript)."

11             Maybe it would be helpful to have the

12   manuscript.  If you go to page 2033, go to Figure 6.

13        A.   Hang on, do you mean -- I think you mean a

14   different one.  This is 819, and so that should be 20 ... do

15   you mean 2053 or 54?

16        Q.   Say again?

17        A.   Do you mean 2053 or 54?  Because you're looking at

18   the previous version, and this is referring to Manuscript

19   Laminar 8-13, this e-mail, that's the attached one.

20        Q.   Oh, so it's a later version?

21        A.   Yes.

22        Q.   I think Figure 6, then, would be page 2058.

23        A.   Yes, 2058.

24        Q.   Okay.  So Albrecht goes on to say:

25             "Bob is more than happy to assume the lead

1                     DR. PAUL MCGOVERN

2    authorship role and verify the fidelity of our research

3    (he has seen it first hand)."

4            Do you recall -- and I recognize this six and

5    a half years ago, but do you recall that you were being

6    asked to sign off on something based on representations

7    of others who had actually seen the effect that you

8    weren't able to replicate yourself?

9        A.  I don't recall that.

10       Q.  If you turn to the next page, 202, there's an

11   e-mail that appears to be from Robert Gauthier to Albrecht

12   and Reed, and you.  And basically he's saying he has seen

13   this effect many times?

14       A.  Yes, yes.

15       Q.  And do you recall seeing this e-mail ever?

16       A.  I don't recall it, but I -- well, I did see it

17   because I replied to it.  But I don't recall it.

18       Q.  When you replied to it, were you aware that Mark

19   Albrecht had drafted the e-mail that appears over Bob

20   Gauthier's signature?

21           MR. SACCHET:  Objection to form.

22       A.  Was I aware that Mark Albrecht had written the

23   e-mail that -- what, the e-mail on -- dated 20th August?

24   BY MR. C. GORDON:

25       Q.  20 August 2010, at 19:23.

1                    DR. PAUL MCGOVERN

2      A.  Was I aware that Mark Albrecht had written that

3  e-mail?

4      Q.  Yes.

5      A.  I'm not aware now.  I can't imagine why I would

6  have been then.

7      Q.  Okay.  Do you know what happened subsequent to the

8  exchange e-mails in terms of the laminar flow manuscript?

9      A.  I don't remember what happened to this project, if

10 anything.

11     Q.  Do you recall there being a decision not to try and

12 get the laminar flow manuscript published?

13         MR. SACCHET:  Objection to form.

14     A.  I don't recall if -- what happened with this

15 document we're referring to after this point.

16 BY MR. C. GORDON:

17     Q.  And as you sit here, you don't recall anything like

18 you and Mr. Reed saying, you know, "Since we haven't been

19 able to replicate this ourselves, and haven't actually seen

20 it, we'd just as soon not be part of this"?

21         MR. SACCHET:  Object to form.

22     A.  I don't recall that conversation.  The e-mail that

23 I've written back is very much palming off the question.

24 We're being asked to comment on it, and I have said I'm not

25 commenting on it until Mike comments on it.  And I don't

1                      DR. PAUL MCGOVERN

2    have any other information as to what Mike Reed said after

3    that, but I don't recall any conversations about this.

4    BY MR. C. GORDON:

5         Q.   Okay.  If I could now have you turn to 241.  An

6    e-mail from Scott Augustine to several people, including

7    you, dated September 23, 2010.

8         A.   Yes.

9         Q.   And this concerns an interview that Augustine had

10   with the New York Times.  Do you recall receiving this

11   e-mail?

12        A.   Yeah, I received this e-mail, and I don't remember

13   the first time I saw it, but I did receive this e-mail.

14        Q.   Were you contacted by a reporter from the New York

15   Times?

16        A.   No, I wasn't contacted by anyone from the New York

17   Times.

18        Q.   Prior to receiving this e-mail, did you know who

19   Randy Benham was?

20        A.   I don't think I did.  I don't -- oh, in 2010?

21   I think he is, or was, a lawyer working for Augustine, but

22   I'm not 100 percent sure on that.  I don't know if I knew

23   who he was before this point.

24        Q.   I've just realized your lawyer has stepped out.  In

25   fairness, I want to hold off until he comes back.

1              DR. PAUL MCGOVERN

2         THE VIDEOGRAPHER:  Go off the record?

3         MR. C. GORDON:  I don't know.

4         MR. SACCHET:  He's coming in.

5         THE VIDEOGRAPHER:  Deposition is being rejoined by

6    Andrew Head.

7         MR. HEAD:  Hello again.

8         MR. C. GORDON:  Oh, goodness, we don't want to be

9    headless.  Thank you.

10        MR. HEAD:  (inaudible)

11        MR. C. GORDON:  I'm sure that's the very first

12   time you've ever heard that comment.

13        MR. HEAD:  Two heads are better than one.

14        MR. C. GORDON:  I'm sorry, I noticed your absence

15   so we kind of altered things.  What was the last question

16   and answer?

17                   (Record read.)

18   BY MR. C. GORDON:

19        Q.  Have you ever met Randy Benham?

20        A.  I think so.  I couldn't put a name to the face, but

21   when I was in the States doing the research at the

22   University of Minnesota, I think I met him.  But I don't

23   remember clearly.

24        Q.  Have you had any communications with Mr. Benham

25   subsequent to meeting him in Minnesota?

1                    DR. PAUL MCGOVERN

2        A.   Subsequent to -- um, I don't think so.  It's

3   certainly possible that he's been copied in on other

4   e-mails, because that's not something I would have noted on

5   lots of e-mails.  I don't remember having a conversation

6   with him.  If I have, it's short and brief.  I don't --

7   I haven't been in significant contact with him, to my

8   recollection, no.

9        Q.   Have you had any communication with any of the

10  lawyers representing the claimants in the United States?

11       A.   The claimants?  I got an e-mail on Linkedin from

12  someone, but I think they were for -- they were representing

13  3M, from my memory.  No, I haven't had any e-mails from

14  lawyers representing the claimants, to my knowledge.

15       Q.   Have you had any -- no phone calls?

16       A.   No.

17       Q.   No face-to-face meetings?

18       A.   No.

19       Q.   Okay.  If you turn to 426, please.  It is a May 31,

20  2010, chain of e-mails between you and Mr. Reed.

21       A.   Yes.

22       Q.   Subject is the "AAOS draft".  Do you know what that

23  is, off the top of your head?

24       A.   Yeah, this was the submission for the initial study

25  that we talked about, the experimental study which involved

1          DR. PAUL MCGOVERN

2    plate sampling for bacteria and particle counting.  This

3    relates to the abstract submission to the American Academy

4    of Orthopedic -- or American Association or Academy of

5    Orthopedic Surgeons -- to try and get this research

6    presented at a peer-reviewed meeting.

7         Q.  And if you look at the bottom of page 426, you

8    write to Mr. Reed:

9              "... funding wise we have nothing to declare

10   from this one?"

11        A.  Yes.

12        Q.  Right.  If you turn to the next page, Mr. Reed

13   replies:  "Yes, Augustine Biomedical."

14        A.  Yes.

15        Q.  What was your understanding of Augustine

16   Biomedical's funding, or what was your understanding of why

17   you -- why Mr. Reed thought you needed to declare that

18   Augustine Biomedical?

19             MR. SACCHET:  Object to form.

20        A.  I don't know what my understanding of that was at

21   the time.  I asked the question of Mike Reed because I had

22   been asked the question by the AAOS, and I wanted to make

23   sure my declaration was correct, and the answer was provided

24   for me by Mr. Reed.

25   BY MR. C. GORDON:

1                    DR. PAUL MCGOVERN

2          Q.   If I could have you turn to page 150 in volume 1 of

3     your documents, so that's exhibit 3A.

4          A.   Sorry, volume which?

5          Q.   It's exhibit 3A, or volume 1 of your documents.

6          A.   Which page, sorry?

7          Q.   150.

8          A.   Yes.

9          Q.   Just tell us what that is.

10         A.   This is the -- this is an abstract submission,

11    whether it is a draft or the final, I don't know, to the

12    British Hip Society for the bacterial sampling and particle

13    sampling study that we were talking about initially.

14         Q.   What -- do you recall whether you did submit this

15    to the British Hip Society?

16         A.   I don't recall whether -- this meeting, there was

17    more than one submission.  I presented one podium

18    presentation and at least one poster.  I believe that this

19    was submitted, but I don't remember if this was submitted.

20         Q.   Do you recall submitting the presentation on the

21    bacterial study to more than one group?

22         A.   I don't recall doing that.  It's quite likely that

23    I did, because that is -- I would -- if I've produced an

24    abstract for one meeting, then that work to produce an

25    abstract is effectively done, and so it is a very low amount

1                    DR. PAUL MCGOVERN

2    of work to submit something to another meeting in the hope

3    that it gets accepted.  But I don't remember whether

4    I submitted that study to more than one meeting.

5         Q.  The -- is it the AAOS one, or the -- or you know

6    you submitted it, and they rejected it?

7         A.  Yes, because we've already looked at the AAOS

8    rejection e-mail earlier today.

9         Q.  Would you, if you had submitted it to BHS and they

10   had sent you a rejection e-mail, would you expect that to be

11   in the materials that you produced?

12        A.  It may be.  I can't remember.  The thing is,

13   because I know that I got an acceptance e-mail from BHS, it

14   may be included in the acceptance e-mail, or it may not have

15   come through at the same time.  Because if you get two

16   e-mails from an auto-send, it may have gone to spam or

17   something.  I just don't know if that's that rejection

18   e-mail, or the confirmation that I sent it is included in

19   this, because I don't remember if I submitted it.

20        Q.  If you would turn to page 445 in exhibit 1A,

21   volume 1 of the e-mails.

22        A.  445?

23        Q.  Correct.

24        A.  Yes.

25        Q.  And looking at the chain of e-mails and trying to

1              DR. PAUL MCGOVERN

2  translate the dates from American to British, and vice

3  versa, it looks like this goes from -- it's a long one.  Am

4  I right that this -- oh, no.

5      A.  452?

6      Q.  Yeah, so 452 is the beginning of it.  And this is

7  a series of e-mails that start discussing the bacteria study

8  that had been completed; is that right?

9      A.  Well, Valerie Edwards-Jones is included, which

10  suggests that it is that study.  But I don't know if this is

11  related to the study that was already done, or discussion of

12  a future study which -- it doesn't look like it's discussing

13  particularly the bacterial sampling study.  It looks like it

14  may be discussing a possible further study.

15      Q.  The only reason I am wondering if it was after this

16  study was on page 452, there is a line from Mr. Reed that

17  says:

18          "There is also the issue of where the hot air

19  goes from the forced air, but I appreciate we didn't

20  find bugs/particles in the field."

21      A.  Yes.

22      Q.  Would there have been some other experiment or

23  study that you did?

24      A.  Not that I know of.  I think this is -- it's

25  difficult to be absolutely sure what this refers to, but it

1              DR. PAUL MCGOVERN

2  looks to me as though this is referring to -- or this is

3  a discussion about a potential future study and is

4  referencing the past study that we've already discussed

5  involving bacterial sampling, which didn't show bugs in the

6  field.  Although that's inaccurate, because we couldn't test

7  for bugs in the field, only in the vicinity of the field.

8       Q.  And on further research, if you look to page 446,

9  there's a fairly long e-mail from Augustine to Reed, Leaper,

10  Robin Humble, cc'd to Val Jones, Laura Ludman, Keith Leland,

11  Mark, Randy Benham?

12       A.  Yes.

13       Q.  And I guess you ended up with it as part of

14  a chain?

15       A.  Yeah, it looks like it, because it wasn't sent to

16  me.

17       Q.  Augustine says:

18          "My suggestion for further research would be

19  to start by basically replicating and thus verifying

20  the research that we have done in our lab.  Maybe not

21  too exciting but practical and very useful.

22          "1.)  Use tracer smoke under the table and

23  particle counting above the table (after-hours with a

24  mannequin instead of a patient), both in a laminar flow

25  and non-laminar flow OR.

1                     DR. PAUL MCGOVERN

2              "2.)   In the UK laminar flow lab, replicate

3    the DVD with smoke and laser lights."

4              Augustine goes on to say:

5              "I like this plan because we know the

6    outcomes before we do the studies and yet they are

7    scientifically and clinically important questions that

8    need verification in multiple studies.  I should

9    mention that we repeated the experiment of tracer smoke

10   under the table and particle counting over the wound

11   with BH on high and one person standing next to the

12   table pretending to be a surgeon.  This time we

13   measured 61% of the particles ending up over the wound

14   compared to the concentration under the table!  We had

15   a hose-end filter on the BH, so none of the particles

16   were being emitted from the blower and all represented

17   simply the 'dirty air near the floor' being picked up

18   by the waste heat and carried into the wound.  The

19   particles in the background laminar flow were

20   essentially zero.  Stunning!

21              "I personally am not too excited about

22   culturing the wound at the end of the case, either

23   directly or by irrigation.  Without having done a pilot

24   study, this is a 'crap shoot' that could go either way.

25   I think it is important to consider that even if this

1                    DR. PAUL MCGOVERN

2    type of study were to turn out positive, it could be

3    considered to simply be another intermediate step

4    similar to particle detection over the wound.  In other

5    words it does not conclusively answer the question of

6    'does FAW cause wound infections?' Therefore, I'm not

7    sure that it really adds enough to our case to take the

8    risk of a negative study."

9            Did I read that all correctly?

10   A.  Yes.

11   Q.  Do you recall reading this back in 2010?

12   A.  I do not.

13   Q.  Is your approach to doing tests to try to know the

14   outcome before you do the studies?

15   A.  No.

16   Q.  I see.

17   A.  Although, in practice, the whole point is to have

18   a null hypothesis, so you are testing an outcome.  You may

19   have idea of what the outcome might be, but the whole point

20   of scientific investigation is to have an idea and then to

21   test whether you are right or wrong.  So I would not -- I

22   wouldn't say I would know what the outcome is of any test,

23   otherwise there's no point doing it.  But you may have an

24   idea, because you may be testing something that you've

25   observed clinically, and then are trying to get that

1                   DR. PAUL MCGOVERN

2    statistically proven.

3        Q.   Okay.  And is it -- in your approach to research,

4    you balance the risk of getting a negative study if you

5    haven't done some sort of a pilot study?

6        A.   It's not -- no.  The term "risk of a negative

7    study" is not one which I would use because, to me, there

8    isn't a risk in itself of having a negative study.  It's not

9    something that I'd see as a negative thing.  Having said

10   that, negative studies are -- it's well recognized --

11   published less frequently than studies with positive

12   findings, which is really a flaw of the peer-review process

13   and of research in general.  But, as a researcher, if I were

14   testing something important which were up for debate, and

15   I were to find something negative, I would try to publish

16   it.

17       Q.   In his reply to Augustine, which he shared with

18   you -- or did he?  At what point were you brought into this

19   back and forth?

20       A.   I don't -- it doesn't look like I was brought into

21   it until Mike sent me an e-mail asking me to send my latest

22   version, but I don't know what that latest version is of.

23       Q.   Okay.

24       A.   I suspect that, as we've seen, some -- the paper

25   had been sent to me, and I had -- I don't know if this is

Page 209

1              DR. PAUL MCGOVERN

2  before or after this -- said "I want to wait to see what

3  Mike Reed says," but I hadn't commented on it.  I had not

4  marked up the document or edited it.  So it may be that Mike

5  Reed meant that.  But I wasn't involved in this

6  conversation.  I don't remember reading any of this.

7      Q.  And the title, "Turbulent flow from the hot

8  dinosaur," do you know what that means?

9      A.  I don't know what it means.  I could speculate.

10     Q.  Okay.  Well, going back to page 445, in response to

11  Augustine's proposals for further research, Mr. Reed says:

12         "Scott -- I am fully with you -- the combined

13  effect is what matters clinically.  As a surgeon I am

14  unconcerned (although I am interested) as to whether

15  the disruption is caused by one or both methods.

16         "I agree the DVD is compelling but there is

17  no data to get it into a meeting or a journal.  What is

18  needed is data to write abstracts for meetings and

19  papers -- that way the DVD will get an audience."

20         Did you have any discussion with Mr. Reed

21  about trying to generate an audience for the Augustine

22  DVD?

23     A.  No, not to my recollection.

24     Q.  Continuing on to page 446, Mr. Reed says:

25         "All that said I am keen to re-do/verify the

1                    DR. PAUL MCGOVERN

2   smoke studies as per your plan 1 and 2.  61% of

3   particles is very compelling -- I guess my only concern

4   with pushing this is that when we did this on a patient

5   model in a real OR there were actually no particles --

6   so I guess 61% of that doesn't sound much."

7        A.  Yes.

8        Q.  Do you know what he was referring to there?  Is

9   that the study that -- the microbiology study?

10       A.  Yeah.  The difference with that is that, from my

11  understanding of reading this e-mail just now, 61 percent

12  refers to particles that are introduced into an area, so

13  there are lots of particles around.  It seems to be

14  referring to movement of particles which have been

15  introduced, whereas the study we were talking about

16  previously looks at particles which weren't there in the

17  first place, or may not have been there in the first place.

18  So they're very different.

19       Q.  So was your -- did you have any discussions about

20  trying to do airflow visualization studies with smoke?

21       A.  When I was initially looking at this whole area,

22  when Mike Reed asked me to come up with the design of

23  a study which turned into the bacterial -- bacterial

24  sampling study we've been looking at which wasn't published,

25  at some point, either during, before or after that, I tried

1                    DR. PAUL MCGOVERN

2     to work out how to visualize airflows.  And I did hire

3     a dry-ice machine used in theaters to try to visualize how

4     air flowed around the room.  But that didn't work because

5     dry ice sinks and cools.  So I attempted to use that method

6     to see how air was flowing, but it was ultimately a failure.

7     So it was not even a study; it was just playing around in an

8     operating theater which wasn't in use.

9               I have also, at some point, used not just

10    a dry-ice smoke machine but a theatrical fogging

11    machine, which uses, I think, very fine oil mist heated

12    up which suspends particles in the air, and attempted

13    to use that to visualize laminar air flow.  But it

14    wasn't particularly effective.

15         Q.  When was this, in relation to when you did the

16    bubble study?

17         A.  I can't absolutely remember, but I think the dry

18    ice -- well, it wasn't an experiment, but the experimenting

19    with dry ice was -- previously, that was a separate idea

20    which I did, I think just myself and Mike Reed, because the

21    dry ice expires.  It boils off, so you have to do it

22    quickly.  And I think the fogging with the theatrical

23    material was done when Mark Albrecht was in Wansbeck.  It

24    may have been done at other times as well, but I can't

25    remember exactly the time.  I think around the time of the

1                    DR. PAUL MCGOVERN

2  bubble study.

3        Q.  Tell me again, does something like Rocket PS2 sound

4  familiar?

5        A.  No.

6        Q.  For a machine?

7        A.  It might be the fogging machine, but I can't

8  remember.

9        Q.  Okay.  In any event, this fogging machine, that was

10  something that Mark Albrecht brought to Wansbeck?

11        A.  I guess so.  I don't know.  I did hire some

12  equipment to try and play around with visualizing airflow.

13  I don't think I hired that.  Or I might have done; I don't

14  remember.

15        Q.  So who actually tried it out?  Just you and Mark?

16        A.  I don't think I was ever there with Mark on my own,

17  from memory, but yeah, I think we just set the smoke off in

18  a controlled way to see what would happen.

19        Q.  In a laminar flow room?

20        A.  Yeah.

21        Q.  And what happened?

22        A.  I think the laminar flow cleared the smoke away.

23  This is without an operating table in the area, as

24  I remember.  The problem with that was it was going to set

25  the fire alarms off, so we very quickly gave up on that idea

1                      DR. PAUL MCGOVERN

2    because we didn't want to cause disruption to the work in

3    the hospital.  It was at the weekend and the hospital was --

4    the operating room was due for a deep clean anyway, so

5    that's why we had equipment in there.  But we saw the amount

6    of smoke that this thing could produce, and thought we

7    didn't really want to risk setting the fire alarms off and

8    calling the fire service out, and so we sort of abandoned

9    that.

10       Q.  Because the laminar flow was sufficient to clear

11   the room?

12       A.  It was so -- it was such a short lived thing, as

13   far as I remember, that we didn't really get an opportunity

14   to properly use smoke in a real operating room to visualize

15   laminar flow, because it became apparent fairly quickly that

16   as laminar flow was clearing the smoke, it was going into

17   external vents which would have risen outside the operating

18   room into the corridors and caused problems.  So we started

19   it up, and very quickly just gave up on it.

20       Q.  And whose idea was it, then, to explore the

21   possibility using a neutral buoyancy bubble generator?

22       A.  Well, I don't remember whose idea it was, but my

23   understanding now is that machine belongs to Augustine's

24   company.  I didn't know, as far as I recall, where the

25   machine originated from at the time.  I knew at some point

1                          DR. PAUL MCGOVERN

2     throughout the research that it had been sent over by

3     Augustine, or Augustine's company, because of the discussion

4     we've already mentioned about it getting back through

5     Customs and such.  But I don't remember who suggested helium

6     bubbles.  I don't remember if Mike Reed suggested it, and

7     the machine was available, or if it was suggested by

8     Augustine or by Mark Albrecht.  I don't know who suggested

9     it.

10         Q.  The first time you were involved in it being used,

11    did you do something similar to what you did with the smoke

12    machine?  In other words just go into an OR and see what the

13    laminar flow did with it?

14         A.  Absolutely.  So the first -- with any of this

15    equipment, with the particle counter, with the bubble

16    generator, it's quite a temperamental piece of equipment.

17    They're all temperamental pieces of equipment, and you spend

18    a while getting the thing to work, and then understanding

19    how it works, and then understanding how it -- how air flows

20    around the room.  And so, actually, some of the first videos

21    on my blog were not of experiments, as such; they were of

22    those scoping exercises where we would put the bubble outlet

23    underneath a light, say, under the laminar flow and then

24    move the light away and show the disruption that the light

25    was having on laminar flow.

1                    DR. PAUL MCGOVERN

2        So there was quite a lot of experimenting with --

3   to better understand how air was flowing in the room,

4   because it's -- well, it's interesting.  It was

5   something which people who were in the hospital at the

6   time would come in and look at, and find very -- well,

7   find fascinating, because airflow isn't something that

8   most people think about.  Surgeons think about it quite

9   a lot, and to be able to see it is very interesting.  So

10  we spent quite a lot of time experimenting.

11       Q.  Was the laminar flow clearing the bubbles similarly

12  to the way it cleared the smoke?

13       A.  I don't remember how the laminar flow cleared the

14  smoke.  I can't -- my memory of the smoke is really

15  restricted to the thing turning on, and us being pretty

16  concerned that the smoke detectors were going to go off.  So

17  I don't really remember how the smoke was dealt with by

18  laminar flow.  In terms of the bubbles, when laminar flow is

19  unobstructed, it was extremely effective at clearing

20  bubbles.  And some of our videos demonstrate that.  You can

21  see a column of air, of clean air, clearing bubbles away

22  very quickly, within seconds.  And you can see the

23  significant disruption that operating lights have on laminar

24  flow very clearly with the bubble generate generator.

25       Q.  Did you do any bubble studies with any other pieces

1                    DR. PAUL MCGOVERN

2    of OR equipment, anesthesia machine?

3         A.   Not with an anesthesia machine.  We would put the

4    outlet near to machines to see if they were warm, or if they

5    created turbulence.  Anything -- you get a flow boundary

6    near any piece of equipment in the way of the laminar flow;

7    so you'll get deflection of air off it, depending on where

8    it is in the laminar flow zone, and how fast the air is

9    moving, and the temperature.  But we have since done

10   experiments looking specifically, as I've mentioned

11   previously, at the influence that the overhead operating

12   lights have on laminar flow, and how the position of those

13   lights affects clearance of bubbles, and therefore clearance

14   of air from the region of the operative field.  But that was

15   subsequent to this.

16        Q.   At some point, did you also -- would I understand

17   that you were using the bubble machine to see if there were

18   heat-generated convection currents emanating from other

19   pieces of equipment?

20        A.   To -- only sort of informally, where you've got

21   this wand but it is picking bubbles out, and you sort of put

22   it against people's faces and near their -- over the top of

23   their heads and see how air flows over surgeons.  It is

24   quite interesting to see what airflow -- how airflow changes

25   when you move your hand through an area.  We didn't really

1                    DR. PAUL MCGOVERN

2    focus specifically on other machines, apart from operating

3    lights, as far as I remember.

4         Q.   So, what do you call the electrocautery device?

5         A.   A diathermy.

6         Q.   Diathermy.  Have you ever heard it referred as to

7    a Bovie?

8         A.   No.

9         Q.   I think that's a brand in the U.S.

10        A.   No, we don't tend to do brands in the U.K.  We're

11   pretty resistant to it.

12        Q.   You didn't try to see how turning on a diathermy

13   machine would affect the bubbles?

14        A.   The machine?  No, because -- well, no, we didn't.

15   Because to actually use the machine, you'd need some meat,

16   and we didn't have any meat.

17        Q.   Any saws or drills?

18        A.   Not to my recollection.

19        Q.   But you did say you ran it over by the anesthesia

20   machine?

21        A.   Yeah.  I mean, anything that was there in the room,

22   we would have put the thing near.  Because you're wandering

23   around with this hose, basically playing and seeing what's

24   happening.  So anything which was anywhere near -- because

25   the anesthesia machine sits -- tends to sit and straddle the

1                    DR. PAUL MCGOVERN

2    boundary between the laminar flow zone and not, we were

3    interested in how -- in the drop-off, because you would

4    expect that, outside the laminar flow boundary, bubbles

5    would circulate and collect, but they don't.  It's a rather

6    smoother area of clearance.  The laminar flow zone has an

7    area of influence just outside the boundary, so we would

8    have looked informally at what the anesthesia machine does,

9    but the anesthesia machine wouldn't have been on.  It

10   wouldn't have been active.  It was just sitting there.

11        Q.  It is just the mass --

12        A.  Yeah, it is just the mass.  You know, when the

13   operating table was there, we would move that out of

14   position, move it into position to see what -- how air flows

15   around it.  The specifics of exactly what we saw, I don't

16   remember.

17        Q.  I take it you never tried to do an airflow

18   visualization in a simulated OR where basically everything

19   was happening: the circulating nurse was moving, all the

20   equipment was on?

21        A.  Not to that extent.  When we were actually doing

22   experimental runs, everything was pretty controlled.  So

23   there weren't lots of people moving around the room.  There

24   was not a lot of equipment there.  There was one person in

25   the position of the surgeon, but there was no scrub nurse or

1                      DR. PAUL MCGOVERN

2    trays, or anything like that.  When we were experimenting,

3    lots of people would be milling in and out of the room, so

4    when we were working out what would be a set-up which was

5    worth investigating, there were lots of people there, but

6    that's not what we collected data on, because people moving

7    around the room is not -- is a variable that you can't

8    control for.  So we wouldn't know if a particular result was

9    because someone had walked through the laminar flow zone at

10   the time, or if it was controlled.  So in an experimental

11   study, it was important to keep things as consistent as

12   possible so the results were as valid as possible.

13        Q.  Did you repeat the bubble experiment in more than

14   one of the ORs at Wansbeck?

15        A.  The bubble experiment, as reported, was in one OR,

16   as I remember.  That bubble generator, I'm sure, has been in

17   more than one room -- more than one operating room.  I can

18   think of two that I think it's been in.  Ah, no -- yes.  The

19   recent study looking at lights and laminar flow was in

20   a different operating room to the one which was published in

21   the Journal of Bone and Joint Surgery.  That was the same

22   operating room as the settle plates microbiology study.  But

23   Wansbeck bubble study, looking at the influence of

24   Bair Huggers and HotDogs, was only done in one operating

25   room, as far as I can remember.

1                    DR. PAUL MCGOVERN

2      Q.   So the settle plate microbiology study was done in

3   a different OR than the bubble study?

4      A.   As far as I remember, yes.

5      Q.   Do you remember the numbers?

6      A.   What numbers?

7      Q.   Of the theater suites?  The operating theaters?

8      A.   No.

9      Q.   So you wouldn't remember which one was Theater 2?

10     A.   No.

11          MR. SACCHET:  Object to form.

12          MR. C. GORDON:  I am at a point where I would

13   like -- I would say let me take a break, go through my

14   remaining stuff, and I am sure I have just a few minutes

15   left.  Are you happy to do that, or do you want to just take

16   a break for the evening?  And then I promise you, when we

17   start tomorrow, I will have less than 30 minutes.

18          MR. HEAD:  Carry on.

19          MR. SACCHET:  I think it is preferable to us for

20   you to take a look and decide what you still have to ask,

21   and then finish for the night.

22          THE VIDEOGRAPHER:  Going off the record at 5:27.

23   (5:27 p.m.)

24                    (Break taken.)

25   (5:39 p.m.)

1                    DR. PAUL MCGOVERN

2                THE VIDEOGRAPHER:  Back on the record at 5:39.

3    BY MR. C. GORDON:

4         Q.  Dr. McGovern, if you could now turn to page 978

5    through 986.  I think that's volume 3.

6         A.  No.

7         Q.  4?

8                MR. SACCHET:  I think it might be 2, because it's

9    preceding --

10               MR. C. GORDON:  Yeah, it's 2.  Sorry.

11               MR. SACCHET:  Page, sorry?

12               MR. C. GORDON:  978.

13        A.  978.

14   BY MR. C. GORDON:

15        Q.  And it goes on through 986, I believe?

16        A.  Okay.

17        Q.  Can you tell me what this document is?

18        A.  It's a document by Professor David Leaper dated

19   August 2009, a draft document titled "Augustine Biomedical

20   Summary of Study Proposals".

21        Q.  And are these -- do these proposals come out from

22   Professor Leaper before you did the first microbiological

23   and particle test?

24               MR. SACCHET:  Object to form, foundation.

25        A.  I don't know.  I don't know the -- well, this

1                    DR. PAUL MCGOVERN

2  document is dated before August 2009, and so I don't

3  remember when the studies were done, but it seems unlikely

4  they were done before August 2009, because that's when

5  I started at Wansbeck.

6  BY MR. C. GORDON:

7       Q.  Does the summary in 3, number 3, basically describe

8  what you ended up doing in Northumbria?

9       A.  Not really.  There are similarities, but it's --

10  this mentions a slit sampler which, I've said before, is --

11  would have been a much more effective device/apparatus to

12  use for such an experiment than the one that we ended up

13  using.  I don't think we made any evaluation of the local

14  ambient temperature.  It's similar in the sense that there

15  is an attempt to sample for bacteria count -- bacterial

16  counts around the wound.  It's not similar because this

17  discusses all available forced-air warmers in sequential

18  experiments.  So there are similarities, but it's not the

19  same study.

20       Q.  And of the other study proposals, 1 through 9, you

21  didn't participate in any doing any of them; right?

22       A.  "Two-centre microbiological evaluation."  That's

23  number 1.  No.

24       "Single-centre evaluation of air emerging from

25  a forced-air former hose."

1                    DR. PAUL MCGOVERN

2          No.  We did direct air from a forced-air warmer

3   hose onto a plate, but that's not really a study, that's

4   just directing air --

5          Q.  And that was part of the microbiological study --

6          A.  And we did it at the same time.  It wasn't really

7   a study; it was just blowing some air onto a plate.

8              Number 4: Two-center evaluation of particle

9   counts, and temperature and slit sampling, during an

10  operation?  No.

11             Tracking -- number 5: tracking study of

12  bacterial isolates from surgical site infections.  No.

13             Number 6: Two pilot randomized control

14  trials?  No.

15             7: powered randomized control styles above

16  pilot studies?  No.

17             8:  Pilot, randomized evaluation of patients

18  with abdominal pain?  No.

19             9:  Pilot, randomized evaluation of systemic

20  warming during initial hospital admission phase?  No.

21         Q.  And are you aware of any of those other studies

22  being done --

23         A.  No.

24         Q.  -- by anyone else?

25         A.  No.  Mike Reed mentioned that a randomized control

1                    DR. PAUL MCGOVERN

2     trial is being done which he's not leading on, but that's

3     the only knowledge I have of any similar study going on at

4     the moment.

5          Q.  Did he tell you who was funding that?

6          A.  Excuse me?

7          Q.  Did he tell you who was funding that study?

8          A.  The only information I have on it is the e-mail

9     that you've seen, so I haven't had any further information

10    that there is no information on funding.

11         Q.  Okay.  Now I think if you would turn to -- so, of

12    the nine proposals from Professor Leaper, only one was

13    actually done, sort of?

14         A.  Yeah.

15         Q.  The microbiological study.

16             MR. SACCHET:  Object to form.

17         A.  I would say, of these nine, none were done.

18    Something that is vaguely similar superficially to number 3

19    was done, but it's not really the same study.

20             THE COURT REPORTER:  Was there an objection there?

21             MR. SACCHET:  Form, yeah.

22    BY MR. C. GORDON:

23         Q.  So if you could turn to volume 6, so it is exhibit

24    8A.

25         A.  Yes.

Page 225

1                    DR. PAUL MCGOVERN

2        Q.   If I could direct your attention to page 2836.

3        A.   2836.

4        Q.   Can you tell me what this is?

5        A.   This looks like a poster discussing a product

6   called Purezone, and discussing a study with regards to

7   Purezone.

8        Q.   What's Purezone?

9        A.   I think it's a pillow which intends to reduce

10  allergies, or reduce symptoms of allergies, when sleeping.

11       Q.   What's your connection to it?

12       A.   I don't have any connection to it.  I know that it

13  exists, and I think Mike Reed was interested in it, or

14  expressed an interest in it.  But I don't -- I've not done

15  any work with it.  I've never -- I don't think I've ever

16  seen one in the flesh.  I don't have any connection to

17  Purezone.

18       Q.   If you turn to page 2854.

19       A.   Yes.

20       Q.   And what is this?

21       A.   It looks like a draft paper entitled "Laminar Flow

22  And Particles" authored by myself, Mark Albrecht and Mike

23  Reed.  Ah, yes.  This is a study that I designed and

24  conducted, in which I used the previously mentioned particle

25  counter to look at particle counts in a laminar flow

1                    DR. PAUL MCGOVERN

2   operating room, specifically with a reference to the

3   boundary of the laminar flow zone.

4       Q.  When was this done?

5       A.  I do not remember, but it's likely it was done

6   after February 2010, because this was done in -- not

7   Wansbeck Hospital.  In North Tyneside Hospital?  Another

8   trust.  Another trust, another hospital in the same trust.

9       Q.  Was it ever published?

10                  (Reporter clarification.)

11      A.  I said another hospital in the same trust.  I don't

12  remember if this was ever published.  There was a similar

13  experiment which I did, looking at particle counts in

14  relation to different surgical garments that healthcare

15  professionals could wear in an operating room, which was

16  published, but I don't think this one was published.

17      Q.  Do you know if it was presented at any --

18      A.  I don't -- I don't think so.

19      Q.  Can I have that exhibit sticker please?  There we

20  go, lucky 13.

21                  (Exhibit 13 marked for identification)

22      Q.  Dr. McGovern, I'm going to show you what has been

23  marked as exhibit 13.  It is a document bearing Bates number

24  Augustine 0019943 through 44.

25      A.  Yes.

1                    DR. PAUL MCGOVERN

2       Q.  -- it looks like it's an exchange of e-mails

3   between Dr. Augustine and Tom Durick, and you were copied on

4   them.

5       A.  Yes.

6       Q.  Do you recall getting these?

7       A.  I do.

8       Q.  And this is dated August 2, 2016.

9       A.  Yes.

10      Q.  So it is a little later than the June ones we were

11  looking at.

12      A.  Yes.

13      Q.  In the last e-mail, or the latest e-mail, he says:

14          "Paul, if you could get back to Tom and

15  perhaps get your draft to him for comments, that would

16  be fantastic."

17      A.  Yes.

18      Q.  Do you know what draft he was referring to?

19      A.  I believe he's referring to the paper which was

20  sent to me with my name on it, which I had no involvement in

21  writing.

22      Q.  You mean the one that Augustine ghost wrote?

23      A.  The one that was sent to me.  I don't know if it

24  was Augustine or one of his employees or colleagues that

25  wrote it, but the one that was sent to me with my name on

Page 228

1                      DR. PAUL MCGOVERN

2  it, that I had no involvement in writing.

3       Q.  You hadn't subsequently written your own draft; is

4  that right?

5       A.  That is correct.  I had not edited that document in

6  any way, or started work on looking at it in any detail at

7  all.

8       Q.  Since August 2, have you had any further

9  communications with Augustine or Durick?

10      A.  Not to my memory.  It's possible that Tom Durick

11 and I may have exchanged e-mails again, as I mentioned

12 before.  But if we have, it's not progressing things any

13 more than this.  It would have been a check-in to say, "How

14 are you getting on?  What's going on with this?"  But this

15 has not progressed in any way from this point.

16      Q.  Would either Durick or Augustine have any reason to

17 think that you're not doing anything further on it?

18           MR. SACCHET:  Objection to form.

19      A.  Would they have any reason to think I was not doing

20 anything on it?

21 BY MR. C. GORDON:

22      Q.  Right.

23      A.  I haven't told them that I'm not doing anything on

24 it.  My silence is really speaking volumes, I suspect.

25 I mean, I don't know how they've interpreted my lack of

1                    DR. PAUL MCGOVERN

2  communication on it.  They may think I'm furiously beavering

3  away, toiling night and day on it, but I don't see why

4  they'd think that.  This has fallen by the wayside for me,

5  and it's not really something that I'm interested in.

6            MR. C. GORDON:  Okay, thank you.  I have no

7  further questions.

8            THE WITNESS:  Thank you.

9            THE VIDEOGRAPHER:  This is the end of DVD 4 in

10  volume 1 of the position of Dr. Paul McGovern.  Going off

11  the record at 5:54.  The recording has stopped.

12  (5:54 p.m.)

13            (Whereupon, the deposition concluded.)

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF COURT REPORTER

2

3    I, Louise Pepper, an Accredited Real-time Reporter, hereby

4    certify that the testimony of the witness Dr. Paul McGovern

5    in the foregoing transcript, numbered pages 1 through 229,

6    taken on this 4th day of January, 2017 was recorded by me in

7    machine shorthand and was thereafter transcribed by me; and

8    that the foregoing transcript is a true and accurate

9    verbatim record of the said testimony.

10

11

12   I further certify that I am not a relative, employee,

13   counsel or financially involved with any of the parties to

14   the within cause, nor am I an employee or relative of any

15   counsel for the parties, nor am I in any way interested in

16   the outcome of the within cause.

17

18

19   Signed:  ........................

20   Name:    Louise Pepper

21   Date:    January 10, 2017

22

23

24

25

Page 231

1                    CERTIFICATE OF DEPONENT

2

3    I, Dr. Paul McGovern, hereby certify that I have read the
     foregoing pages, numbered 1 through 229, of my deposition of
4    testimony taken in these proceedings on Wednesday, January
     4, 2017 and, with the exception of the changes listed on the
5    next page and/or corrections, if any, find them to be a true
     and accurate transcription thereof.

6

7

8

9

10   Signed:  ........................

11   Name:    Dr. Paul McGovern

12   Date:    ........................

13

14

15

16

17

18

19

20

21

22

23

24

25

1    NAME OF CASE:

2    DATE OF DEPOSITION:

3    NAME OF WITNESS:

4    Reason Codes:

5         1.   To clarify the record.

6         2.   To conform to the facts.

7         3.   To correct transcription errors.

8    Page _____ Line _____ Reason _____

9    From _____ to _____

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24

25                    _____

Page 233

1

2               IN THE UNITED STATES DISTRICT COURT
                     DISTRICT OF MINNESOTA
3

    - - - - - - - - - - - - - - - - - -
4   IN THE MATTER OF                    )
                                        )
5   IN RE BAIR HUGGER FORCED AIR        )
    WARMING                             )
6   PRODUCTS LIABILITY LITIGATION       )
                                        )
7                       Plaintiff,      )
                                        )PRETRIAL ORDER NO: 7
8   v.                                  )Protective Order
                                        )MDL No. 15-2666
9   3M COMPANY AND ARIZANT              )(JNE/FLN)
    HEALTHCARE INC.                     )
10                      Defendant.      )
    - - - - - - - - - - - - - - - - - -
11               DEPOSITION OF PAUL MCGOVERN
12                        VOLUME II
13              Thursday, January 5, 2017
14              AT:  FAEGRE BAKER DANIELS LLP
15                      Taken at:
16                  7 Pilgrim Street
                   London EC4V 6LB
17                  United Kingdom
18

19

20  Court Reporter:
21  Louise Pepper: Accredited Real-time Reporter
22  Videographer: Simon Addinsell
23

24

25  JOB NO. 117121

1
2                    A P P E A R A N C E S
3   Appearing for the Plaintiff:
4             MR. MICHAEL SACCHET
            CIRESI CONLIN
5             225 South 6th Street
            Minneapolis, MN 55402
6
7
8

            GENEVIEVE ZIMMERMAN
9           MESHBESHER & SPENCE
            1616 Park Avenue
10          Minneapolis, MN 55404
11
12

    Appearing for the Defendant:
13
            MR. COREY GORDON
14          BLACKWELL BURKE
            431 South Seventh Street
15          Minneapolis, MN 55415
16
17
18          MS. KATHERINE NEWMAN
            FAEGRE BAKER DANIELS
19          7 Pilgrim Street, London EC4V 6LB
20
21
22  Appearing for the Witness:
23          MR. ANDREW HEAD
            MR. BRYAN SHACKLADY
24          FORSTERS
            31 Hill Street
25          London W1J 5LS

Page 235

1

2                    W I T N E S S   I N D E X

3      Examination by MR. SACCHET  ...................239

4      Examination by MR. C. GORDON  ................459

5                    E X H I B I T   I N D E X

6  Exhibit 1 Email chain between P. ..................263
             McGovern and M. Albrecht,

7            Bates stamped Albrecht_0016487

8  Exhibit 2 Email chain between Mark ................287
             Albrecht, Paul McGovern, Mike

9            Reed and others, dated 30 June
             to 3 July, 2010

10

     Exhibit 3 Forced Air Warming .....................289

11            Demonstration DVD

12  Exhibit 4 CDC document entitled ...................298
             "Healthcare Infection Control

13            Practices Advisory Committee
             Record of the Proceedings",

14            dated November 5-6, 2015,
             previously marked as Exhibit

15            208, Bates stamped
             3MBH01344612-01344685

16

     Exhibit 5 Document entitled .......................306

17            "Forced Air Warming (FAW) and
             Surgical Site Contamination

18            First Draft" dated 27/9/09

19  Exhibit 6 Document entitled "Do ...................308
             Forced Air Warming Devices

20            Increase Bacterial
             Contamination of Operative

21            Field? - Simulated
             experimental analysis".

22

     Exhibit 7 Email chain dated 8-11 ..................309

23            November, 2009, subject line:
             "FAW"

24

     Exhibit 8 Document Bates stamped ..................316

25            3MBH00107863-00107870

Exhibit 9 Document entitled "Do ...................324
            Forced Air Warming Devices
            Increase Bacterial
            Contamination of Operative
            Field? - Simulated experiment
            analysis".

Exhibit 10 Email chain between ....................336
            Paul McGovern and Val
            Edwards-Jones"Re Saturday",
            dated 26 November - 20
            December 2009

Exhibit 11 Email chain between ....................337
            Paul McGovern, David Leaper,
            Andrew Sprowson and Thomas
            Symes, "Prof David Leaper
            Visit", dated 10 September - 2
            December 2009

Exhibit 12 Email chain between ....................342
            Paul McGovern and Mike Reed,
            dated 21 February 2010,
            "Laminar flow tests".

Exhibit 13 Article co-published by ................347
            Paul McGovern and others,
            entitled "Forced-air warming
            and ultra-clean ventilation do
            not mix." Bates stamped
            Belani_000190-000197

Exhibit 14 Article entitled ...................353
            "Patient Warming Excess Heat:
            The Effects on Orthopedic
            Operating Room Ventilatio
            Performance", Bates stamped
            Belani_000040-000045

Exhibit 15 Email chain between ....................359
            Mark Albrecht, Paul McGovern
            and others, dated 1 February
            2011, "Manuscript with updated
            joint infection data covering
            an additional 200 or so".

Exhibit 16 Excel spreadsheet with ................365
            data analysis

1
2
Exhibit 17 Email chain between ....................372
          Mark Albrecht, Mike Reed, Paul
          McGovern and others, dated 18
          February - 1 March 2011,
          "Signatures on Transmittal
          Letter".
Exhibit 18 Email chain between ....................373
          Paul McGovern and Mark
          Albrecht, dated 19 May - 23
          May, 2011, "Fwd: JBJS [BR] log
          No. 27124 - Invitation to
          resubmit
Exhibit 19 Email chain "Re ........................382
          McGovern" between Robin
          Humble, Scott Augustine, Paul
          McGovern and others plus
          attachment entitled "Observed
          reduction in periprosthetic
          joint infections: Antibiotics
          or warming technique?", dated
          25 March - 17 June 2016.
Exhibit 20 Journal of Bone and ....................391
          Joint Surgery document
          entitled "Wound Complications
          Following Rivaroxaban
          Administration".
Exhibit 21 Paper entitled "Return .................396
          to theatre following total hip
          and knee replacement, before
          and after the introduction of
          rivaroxaban".
Exhibit 22 Journal of ............................403
          Tissueviability paper entitled
          "A prospective randomised
          study comparing the jubilee
          dressing method to a standard
          adhesive dressing for total
          hip and knee replacements",
          authored by Neil G. Burke and
          others.

Page 238

Exhibit 23 Email chain between ......................410
          Mark Albrecht and Mike Reed,
          "Full workup of stats you
          requested", dated 29 November,
          2011.

Exhibit 24 Email from Mark ........................416
          Albrecht to Scott Augustine,
          with attachment, dated
          11/22/2015, Bates stamped
          Albrecht_0002079-0002086

Exhibit 25 Anesthesia & Analgesia .................445
          document entitled "Patient
          Warming Excess Heat: Effects
          on OR Ventilation Performance
          During Total Knee
          Replacement", Bates stamped
          Belani_000002-000039

Exhibit 26 Email from Mark ........................454
          Albrecht to Paul McGovern and
          others, "Fwd: A&A Decision for
          MS#: AA-D-11-01334", dated 25
          October 2011

Exhibit 27 Email chain between ....................455
          Mark ALbrecht, Mike Reed and
          others, "Fwd: A&A DEcision for
          MS#: AA-D-11-01334R1", dated
          11 January 2012.

Exhibit 28 Spreadsheet, Bates .....................461
          stamped
          AUGUSTINE_0005193-0005487

Exhibit 29 Printout of spreadsheet ................463
          data

Exhibit 30 Screenshots of FAW v ...................500
          CWB YouTube video

Page 239

1                    DR. PAUL MCGOVERN

2                 P R O C E E D I N G S

3          THE VIDEOGRAPHER:  This is Day 2 of the deposition

4  of Dr. Paul McGovern.  The deposition started yesterday

5  4 January, today is 5 January 2017, and it is 9:24 a.m.

6  This is the beginning of DVD 1 in volume 2 of Dr. McGovern's

7  deposition.  Everybody who was in the room yesterday is here

8  today.

9          Can I remind the witness he was sworn in

10  yesterday and is still under oath.  Can you --

11          THE WITNESS:  Yes.

12          THE VIDEOGRAPHER:  You're on the record, counsel.

13  It is 25 past 9.

14  EXAMINATION BY MR. SACCHET:

15  BY MR. SACCHET:

16     Q.  Good morning, Dr. McGovern.

17     A.  Good morning.

18     Q.  As I mentioned yesterday, my name is Mr. Sacchet,

19  and I represent the plaintiffs 3M.  Yesterday my learned

20  friend on the other side reviewed some of the ground rules

21  for the deposition.  I'm going to go through few more today,

22  just to make sure we're on the same page with respect to the

23  procedures for our conversation.  As you know, I'll be

24  asking you questions under oath and you'll be responding to

25  them.  If at any time you don't understand a question or if

1                       DR. PAUL MCGOVERN

2  you don't hear the question, please let me know, okay?

3       A.  Yes.

4       Q.  As was mentioned yesterday, it's best for the

5  record and the court reporter, if I ask a question, that you

6  let me finish asking the question before you answer, and

7  I'll do the same with respect to you in refraining from

8  asking a question before you've finished your answer.

9  Please provide audible "Yes" or "No" answers with respect to

10 the questions as opposed to a nodding or shaking of the

11 head.  Is that agreeable?

12      A.  Yes.

13      Q.  And if at any time you need a break, just let me

14 know, and I'll find an appropriate spot to pause.

15      A.  Sure.

16      Q.  Before we jump into your background, with respect

17 to your educational and professional history, just a few

18 preliminary items.  You've never met me before, have you?

19      A.  Not before yesterday, no.

20      Q.  And prior to yesterday, you'd never spoken to me

21 before, be it via e-mail or phone?

22      A.  That is correct.

23      Q.  You've never spoken to any members of the

24 plaintiff's counsel in this matter, have you?

25      A.  That is correct.

1                    DR. PAUL MCGOVERN

2       Q.  Have you ever spoken to anyone on the side of the

3   defense, prior to yesterday?

4       A.  I'd received communications from various people on

5   the side of the defense.  I have only communicated with them

6   through my lawyers.

7       Q.  Okay.  Do you recall who those individuals were

8   that attended the --

9       A.  Stephen Llewellyn, from Faeger Baker Daniels.

10  I received a Linkedin message from a lawyer in the United

11  States, but I don't remember their name.

12      Q.  Do you recall the content of the message?

13      A.  It was similar to the initial contact from Stephen

14  Llewellyn, saying that 3M would like to depose me, and

15  asking me to get back in touch to arrange that.

16      Q.  And did you get back in touch to arrange that?

17      A.  I did not reply to the Linkedin message at all, and

18  I replied to Stephen Llewellyn through my lawyers when

19  I arranged legal representation.

20      Q.  Okay.  So other than contact via your attorney,

21  you've had no personal contact with anyone on the other

22  side?

23      A.  That is correct.

24      Q.  I know you spoke a little bit yesterday about your

25  background as well, and I'm going to review some of that

                        DR. PAUL MCGOVERN

1

2  material with you.  So to the extent that any of my

3  questions repeat questions that were asked, I appreciate

4  your patience, but I'd like to make sure that we're on the

5  same page with respect to both your educational and

6  professional background.

7      A.  No problem.

8      Q.  You enrolled to University College of London

9  otherwise known as UCL; correct?

10     A.  Correct.  At the time I enrolled, it was known as

11 Royal Free and University College Medical School.  It's now

12 known as University --

13                  (Reporter clarification.)

14     A.  That's now changed its name to University College

15 London Medical School, and it's in the University of London.

16     Q.  And you first enrolled in 2000?

17     A.  Correct.

18     Q.  What was your academic focus at the time?

19     A.  In the UK, medical students enter medical school

20 straight from school.  So I finished school at 18 and

21 immediately went to medical school.  The program is rather

22 different in the UK compared with what I understand it is in

23 the States.  There is no pre-degree program.

24     Q.  Okay.

25     A.  You go straight to medical school, and so the focus

DR. PAUL MCGOVERN

1

2   then was medicine.  I did do an undergraduate degree, in

3   addition to my medical degree, in the University of

4   Manchester, in Healthcare Ethics and Law in 2003/4, and then

5   returned to my studies in medicine, completing in 2006.

6        Q.   So when you went to University of Manchester, is

7   that when you obtained your BSC?

8        A.   Correct.

9        Q.   Okay.  And the BSC was specializing in healthcare

10  and ethics law?

11       A.   Healthcare ethics and law.

12       Q.   Okay.  When you obtained your BSC, was part of the

13  curriculum taking courses, I assume in science, but more

14  specifically surgery?

15       A.   The way the BSC works is it's called an

16  intercollated BSC, and that's a BSC on offer to medical

17  students.  The first two years are in basic medical sciences

18  and were undertaken at UCL.

19       Q.   Okay.

20       A.   The third year BSC may have the appearance of doing

21  a Bachelor's Degree in one year, but you have some credit

22  from the first two years of basic medical sciences.  And so

23  the BSC year itself was only in healthcare ethics and law.

24  But my basic medical training gave me medical related

25  background, as it would for any other doctor in the UK.

DR. PAUL MCGOVERN

1
2  Q.  So what were some of the classes with respect to

3  the basic scientific training that you undertook?

4  A.  So medical training at the medical school I went to

5  is integrated.  It is a course which focuses on systems, but

6  within that, the traditional disciplines of physiology,

7  biochemistry, microbiology, immunology, basic medical

8  statistics, ethics, relevant medical law, men's health,

9  women's health, will have been taught -- were taught --

10  organized by Body Systems.  So foundations of health and

11  disease, foundation of medical practice, looking at cell

12  function, cell biology, pharmacology.  So the actions of

13  drugs on the body, and the actions of the body on drugs.

14  Infection and defense.  Cardiorespiratory systems and

15  digestive systems.  That will be in the first year.

16  And in the second year, from memory, I can't

17  remember the exact --

18  Q.  That was a long list.  You can just give me a few.

19  A.  That's fine, I can keep going.

20  Q.  So with respect to the class you took in medical

21  statistics, was that kind of a foundational class where you

22  learned rudimentary statistics?

23  A.  Very basic.  It was a very basic class.

24  Q.  So you're familiar with confidence intervals?

25  A.  I'm familiar with terms, but I don't pretend to

1                         DR. PAUL MCGOVERN

2     have any expertise in statistics.

3          Q.  Are you familiar with P values?

4          A.  Yes.

5          Q.  And you understand that P values generally,

6     statistical significance is determined at 0.05 --

7                    (Reporter clarification.)

8          Q.  With respect to P values, you're aware of the fact

9     that statistical significance is generally determined at a P

10    value of 0.5?

11         A.  By convention, yes.  Statistical significance is

12    determined at a P value of 0.5.  That's essentially an

13    arbitrary figure, but it's been accepted at what is

14    generally considered to be statistical significance.

15         Q.  Would a P value of 0.6, or something to the effect

16    of .09, still in your mind be something enough to be nearly

17    significant, even though it's not at 0.05, the traditional

18    cut-off?

19         A.  The question of nearly significant is -- although

20    the cut-off is arbitrary, something is not quite as

21    significant -- as statistically significant unless it

22    reaches a P value of 0.05.  So I would not use terms in

23    a scientific or in an professional sense such as "nearly

24    significant" or "nearly statistically significant".  I may

25    talk about -- I may use those terms informally in

1                    DR. PAUL MCGOVERN

2  discussions with colleagues, but in scientific discourse,

3  something statistically significant or it is not, as far as

4  I'm concerned.

5       Q.  Okay.  When you went back to UCL, was your training

6  similar to kind of the scientific curriculum that you did

7  prior to going back to UCL?

8       A.  It was a continuation of the same program.  The

9  first two years, at the time that I trained, were more

10 pre-clinical in their focus, but there was still clinical

11 exposure -- early clinical exposure at that medical school.

12 When I went back, yeah, in the first -- one year before

13 I went to Manchester, I started clinical training.  I went

14 to Manchester and then came back and completed two further

15 years of clinical -- clinically focused training.  So that

16 was an apprentice-style training where I learned on wards in

17 family doctors' surgeries in a practical environment.

18      Q.  Okay.  And when you were at UCL in 2006, that's

19 when you obtained your MBBS?

20      A.  Correct.  MBBS: Bachelor of Medicine and Bachelor

21 of Surgery.

22      Q.  After you obtained your MBBS, were you required to

23 take any examinations similar to what we'd have in the

24 States called board exams, to take a further step, or had

25 you already taken those types of exams to enroll at UCL and

1                    DR. PAUL MCGOVERN

2    the University of Manchester?

3         A.  The -- do you mean to become -- to qualify as

4    a doctor?

5         Q.  Yes.

6         A.  So at the end of the program of medical training,

7    one has to sit final medical school exams to be awarded the

8    degree of MBBS.

9         Q.  Okay.

10        A.  Once awarded that degree, assuming that there are

11   no fitness to practice issues or other issues which would

12   question the fitness of the doctor to practice in the UK,

13   one is awarded provisional registration with the General

14   Medical Council, which is the professional body regulating

15   doctors in the UK.  And so I was allocated a place in

16   a hospital to become a doctor before I qualified, but I

17   passed my final exams, and that gave me access to that post,

18   and received provisional registration with the GMC, which is

19   standard practice in the UK.

20        Q.  Got it.  When you were given this provisional

21   position that eventually turned into a position once you

22   pass these exams, were you what is called a foundation

23   doctor?  A house doctor?

24        A.  When I started in August 2006 at Basildon Hospital,

25   I was a foundation year one doctor; that's correct.

1                      DR. PAUL MCGOVERN

2       Q.   And as a foundation year one doctor, what did your

3  surgical training entail?

4       A.   My foundation year one training was split between

5  six months of surgery and six months of other medical

6  specialties.  So I did six months in breast and general

7  surgery -- sorry, incorrect -- three months in breast and

8  general surgery; three months in gastroenterology, that's

9  medicine; three months in psychiatry, in adult psychiatry;

10 and three months in trauma and orthopedics.

11      Q.   Okay.  And the three months in trauma and

12 orthopedics, that was surgically related, not just studying

13 abstractly?

14      A.   Correct.  Those three months -- or the six months

15 in surgery, those in general surgery and breast surgery and

16 trauma and orthopedics, were mainly ward-based, as a junior

17 doctor, but also in the operating room assisting with

18 surgical procedures.  So I was a practicing doctor under

19 supervision.

20      Q.   In total, whether they were breast surgeries,

21 orthopedic surgeries, whatever they may have been, how many

22 surgeries do you believe you witnessed?

23      A.   Witnessed in those six months?

24      Q.   Yeah.

25      A.   Dozens.

1                    DR. PAUL MCGOVERN

2        Q.  Hundreds?

3        A.  Probably not hundreds.  Probably -- it's very

4   difficult to say accurately, because I did not start keeping

5   a logbook until later on in my career.  I would say in the

6   order of 50 to 100, but that's quite a guess.

7        Q.  When you were just a house doctor, prior to

8   becoming a registrar, did you assist in any surgeries?

9        A.  Yes.

10       Q.  You did.  And how many, approximately, do you think

11  you assisted in?

12       A.  I would assist, in the six months I was in surgical

13  practice, and also sometimes I was -- when I was working in

14  psychiatry, I would assist in theaters, in the operating

15  room, two or three times a week, maybe for two surgeries.

16       Q.  Okay.

17       A.  It's very difficult to know exactly how many

18  surgeries I assisted in.  I would try to assist as much as

19  possible.  I would tend not to observe on the sidelines.  I

20  would -- the term is "being scrubbed", but actually being in

21  the operation and assisting as first or second assistant.

22  And I would -- as I was interested in surgical practice, I

23  made every effort to be as involved in, and to scrub for, as

24  many procedures as I could.

25       Q.  During the three-month stint where you were first

                          DR. PAUL MCGOVERN

1

2    involved in orthopedic surgery as a foundation doctor, were

3    you training with Mr. Mike Reed at that time?

4         A.  I was not.

5         Q.  So you only trained with Mr. Mike Reed when you

6    were a registrar?

7         A.  No, I only trained with Mr. Mike Reed when I was

8    what's called a core surgical trainee, when I moved to the

9    North of England in two thousand and -- well, I moved to the

10   north of England in 2008 and I started working with Mike

11   Reed in 2009.

12        Q.  Okay.  Would you consider Mr. Mike Reed an expert

13   in orthopedics?

14        A.  I would.

15        Q.  He has published tens, if not hundreds, of

16   peer-reviewed articles on orthopedics?

17        A.  He's published many articles.  I don't know how

18   many.

19        Q.  And you obtained your certificate of completion,

20   I believe it's called, in 2010; is that correct?

21        A.   I obtained a certificate of basic -- I completed

22   basic surgical training in 2010.  That's very different from

23   a certificate for completion of training.  I have not

24   received what's called a CCT in surgery.  That would mean

25   that I was at an attending level, and I have not received

1                    DR. PAUL MCGOVERN

2   a CCT.  But I did complete successfully, and received the

3   relevant documentation that I had completed basic surgical

4   training.

5        Q.  And you eventually became a registrar specializing

6   orthopedics; correct?

7        A.  That's correct.

8        Q.  Okay.  And that occurred in 2010?

9        A.  That occurred -- I think it may be April 2011.

10       Q.  Okay.

11       A.  Yeah, I started in that role in April 2011.

12       Q.  And that was after the time in which you first

13  conducted the experiment regarding particles and bacteria

14  that was discussed yesterday; correct?

15       A.  That is correct.

16       Q.  So when you performed that study, you were

17  a foundation doctor?

18       A.  No, when I -- so in the UK, the first two years of

19  practice are foundation year, foundation year one and two.

20  Some doctors, confusingly, do a foundation year three, but

21  the general track is to go from a foundation year two to

22  core training year one.  And I did core training year one

23  and two, so I was a core surgical trainee, sometimes known

24  as a senior house officer.  There are two different

25  terminology systems that -- senior house officer grade is an

DR. PAUL MCGOVERN

1  old grade which has been superseded, but is still used in

2  common parlance in hospitals.  But I was a core surgical

3  trainee at the time that I was working with Mr. Mike Reed

4  and doing these studies.  So I had specialized in surgery at

5  that point.

6  

7      Q.  So whether you were a core trainee or a registrar

8  specializing in orthopedics, how many surgeries do you think

9  you performed during that time?

10     A.  During the time as a registrar, or?

11     Q.  Maybe all told, both as a core trainee and

12  a registrar?

13     A.  In total, as a doctor, I've performed over

14  a thousand surgeries.  I would have to check my logbook to

15  confirm that number, but I have performed, supervised or

16  unsupervised, probably over a thousand surgeries.

17     Q.  And the majority of those relate to orthopedics?

18     A.  The majority will relate to orthopedics.  Or there

19  is some in plastic surgery which are fairly relatable to

20  orthopedics, because there is quite a lot of hand surgery in

21  that.  Some are in general surgery, but the majority are in

22  trauma and orthopedics.

23     Q.  And of those, the majority of those are hip and

24  knee arthroplasties?

25     A.  No, there is a sizable proportion that are hip and

DR. PAUL MCGOVERN

1
2 knee arthroplasties, but probably the bulk of the work was
3 trauma.  So that was emergency surgery which does include
4 a large amount of hip arthroplasty or hemiarthroplasty,
5 which is a similar operation but has a slightly different
6 focus when doing it in a trauma situation.  But I have
7 worked specifically in hip firms, or hip jobs, and knee jobs
8 throughout -- through my training.  So I have had periods of
9 six months focused on the knee and focused on the hip, in my
10 training.
11      Q.  In addition to performing surgeries on both hips
12 and knees and other orthopedic matters, you've done a number
13 of academic presentations to various organizations or
14 entities; correct?
15      A.  That's correct.
16      Q.  One of those includes the British Hip Society?
17      A.  That's correct.
18      Q.  One of those includes the European Federation of
19 National Associations of Orthopaedics and Enterology?
20      A.  E4 -- yes.
21      Q.  One of those includes the American Association of
22 Orthopedics and Surgery?
23      A.  Orthopedic surgeons, yes.
24      Q.  Any others?
25      A.  I've presented at several regional meetings.  I've

1                    DR. PAUL MCGOVERN

2  presented at the Association for the Study of Medical

3  Education.  I've presented at the -- another medical

4  education conference in Milan called AMEE.  I can't remember

5  what that stands for.  I think I've presented at another

6  meeting, but I can't quite remember where that was.

7  I think, yes, the British Trauma Society I presented at, and

8  several presentations in the course of my work as an

9  education consultant and an academic -- well, a Medical

10 Education Fellow at UCL.  But in orthopedics, those are the

11 ones that I can remember off the top of my head.

12      Q.  You've published at least six or seven

13 peer-reviewed articles in your career thus far; correct?

14      A.  Yes, at least.

15      Q.  One of those includes Forced-Air Warming and Ultra

16 Clean Ventilation Do Not Mix, in which you were the first

17 author, correct?

18      A.  Yes, correct.

19      Q.  Another is Development of Electronic Software for

20 the Management of Trauma Patients on the Orthopaedic Unit?

21      A.  Correct.

22      Q.  And another is Patient Warming Excess Heat: the

23 Effects of Orthopedic Operating Room Ventilation

24 Performance?

25      A.  Yes.

1                    DR. PAUL MCGOVERN

2       Q.   Another is Forced-Air warming Design Evaluation of

3  Intake Filtration, Internal Microbial Build-up and Airborne

4  Contamination Emissions?

5       A.   Yes.

6       Q.   Another is Surgical Excision of Ununited Hook of --

7       A.   Hamate.

8       Q.   -- Hamate fractures, the Other Carpal Tunnel

9  Approach?

10      A.   Yes.

11      Q.   Another is the Influence of Surgical Hoods and

12  Togas on Airborne Particle Concentration at the Surgical

13  Site, an Experimental Study?

14      A.   Yes.

15      Q.   Another is Bilateral DCIS Following Gynaecomastia

16  Surgery?

17      A.   Gynaecomastia surgery, yes.

18      Q.   You know, when I was searching Google Scholar I saw

19  another paper that I don't think was authored by you, but

20  I want to be sure, even though a "P McGovern" appeared on

21  the paper.  And it is entitled, or it deals with

22  thromboembolisms?

23      A.   Is it hematology?

24      Q.   Yes?

25      A.   That's not me.

DR. PAUL MCGOVERN

1

2    Q.   Okay.  I didn't think it was.

3    A.   Can you just read the name of the paper?

4    Q.   Yeah.  Anticardio Lipin Antibodies --

5    A.   No, that's not me.

6    Q.   The purported "P McGovern" was a student at the

7    University of Minnesota, which I assumed you didn't attend,

8    but I know you had traveled there.  So I was curious if at

9    one point in time you'd had maybe a short stint there.

10   Thanks for clarifying that.  Any other publications

11   involving orthopedics other than the ones I've mentioned?

12   A.   I have co-authored a textbook which is regarding

13   surgery, and I was particularly focused on orthopedics.

14   That was a revision aid for medical students published by

15   Oxford University Press.  One of the poster presentations at

16   the British Hip Society in -- regarding this area won

17   a prize.  I think that was looking at filtration adequacy of

18   forced-air warming units.  I don't have the name of the

19   poster off the top of my head, but --

20   Q.   Do you know the name of the prize?

21   A.   No, I can't remember the name of the prize.  It was

22   commended.

23   Q.   With respect to the textbook that you mentioned,

24   who invited you to edit the textbook that was eventually

25   published in Oxford University Press?

DR. PAUL MCGOVERN

1

2     A.   The series editor of the -- yeah, the series editor

3  of the textbook series representing Oxford University Press.

4     Q.   Do you know why that individual reached out to you

5  specifically?

6     A.   Yes.  I have quite a lot of experience in examining

7  and writing and designing test assessment exercises for

8  medical students and for doctors, and I had worked with this

9  individual in constructing and designing assessments for the

10  General Medical Council to assess doctors who -- whose

11  fitness to practice has been called into question.  And

12  because I had done quite a lot of work in designing those

13  assessments, the series editor asked me to help with this

14  project as it had somewhat stagnated; and I was asked to

15  come in and help finalize reviewing and get the project

16  moving again so that it could be published.

17     Q.   Did -- I think you mentioned this, but I want to be

18  sure.  Did any of the content in that textbook specifically

19  relate to orthopedics?

20     A.   It did.

21     Q.   In what way?

22     A.   The textbook is a question -- a 'single best

23  answer' question book for medical students to practice

24  answering exam questions for medical school finals.  Some of

25  the questions are written above the level of medical school

1                    DR. PAUL MCGOVERN

2    finals, for bright students to be able to test themselves.

3    But it covers all areas of surgery that are likely to be

4    encountered by medical students in final exams, and

5    orthopedics is a component of that.  And so, some of the

6    questions in that book, to my recollection, were on

7    orthopedics and trauma.

8         Q.   Okay.  And some of those questions dealt with

9    surgical procedure, in terms of how to perform surgeries or

10   more academic content base of --

11        A.   The content of those questions, I would have to

12   revisit it to be absolutely sure, but generally, if I'm

13   teaching medical students, I want them to understand the

14   principles behind surgical practice rather than operative

15   procedures.  And so any focus for questions, testing medical

16   students would be aligned with that -- with that aim.

17        Q.   Was the textbook published?

18        A.   It was.

19        Q.   Back a little bit to the articles we were

20   discussing further, do you consider yourself to have

21   a well-rounded understanding of the peer-review process?

22        A.   Yes.

23        Q.   Do peer-reviewed articles hold more weight than

24   non-peer-reviewed articles?

25        A.   I think the general consensus among clinicians

DR. PAUL MCGOVERN

1

2   would be yes, peer-reviewed articles hold more weight than

3   non-peer-reviewed articles.

4       Q.  And is that because independent editors of those

5   journals evaluate the articles and determine whether they

6   are worthy of publication in a journal?

7       A.  Yes.  Well, the peer-review process will tend not

8   to start with the editor.  Some journals will -- the editor

9   will screen things; some journals will have an automatic

10  peer-reviewed process.  The article will go to peer review

11  and be scrutinized, generally anonymously, by appropriately

12  qualified specialists in the field, and they will comment as

13  to whether they think the paper is not appropriate for

14  publication, or may be appropriate for publication pending

15  changes, which is the most common option, or appropriate for

16  publication wholesale.  That feedback will go back to the

17  editor, who will generally make a final decision as to

18  whether the article should be recommended for publication

19  pending alteration, or rejected but the authors being

20  invited to resubmit -- depending on the process of the

21  individual journal.

22      Q.  When an article actually is published in a journal

23  that has been peer-reviewed, that signifies that experts

24  have reviewed the article and determined it should be

25  published; correct?

1                       DR. PAUL MCGOVERN

2        A.   Correct.

3        Q.   And you've worked with Mr. Reed on some of the

4   articles that you participated in authoring that had been

5   published in peer-reviewed journals; correct?

6        A.   That's correct.

7        Q.   You have the utmost confidence in -- you have the

8   utmost confidence in Mr. Reed's ability to publish papers

9   regarding orthopedic matters?

10       A.   Yes, I have a great deal of respect for Mr. Reed's

11   clinical acumen and experience.

12       Q.   You have no reason to doubt Mr. Reed's expertise in

13   the field of orthopedics?

14       A.   None whatsoever.

15       Q.   You have no reason to doubt anything that Mr. Reed

16   might publish in a peer-reviewed journal?

17       A.   No, none whatsoever.

18       Q.   Did you know that 3M recently sponsored Mr. Reed to

19   conduct a study in the UK with regarding orthopedics?

20            MR. C. GORDON:   Object to the form of the

21   question.   Assumes facts not in evidence.

22       A.   Could you repeat the question, please?

23   BY MR. SACCHET:

24       Q.   Did you know that 3M recently sponsored Mr. Reed to

25   conduct a study regarding orthopedics in the United Kingdom?

1                     DR. PAUL MCGOVERN

2          A.  I did not.

3          Q.  But you would consider Mr. Reed an expert in

4     orthopedics?

5          A.  I would consider Mr. Reed an expert in orthopedics.

6          Q.  You've also worked with Mr. Mark Albrecht on some

7     of the articles we mentioned a few minutes ago; correct?

8          A.  That's correct.

9          Q.  Mr. Albrecht helped design, conduct or write the

10    papers that were eventually published in those journals?

11         A.  The ones which had his name attached, yes.

12         Q.  You have no reason to doubt Mr. Albrecht's ability

13    to perform statistical analysis, do you?

14         A.  None whatsoever.

15         Q.  You have no doubt about Mr. Albrecht's ability to

16    design a methodologically sound study, do you?

17         A.  None whatsoever.

18         Q.  You have no reason to doubt Mr. Albrecht's honesty

19    in writing and navigating through the peer review process to

20    publish a paper in a journal, do you?

21         A.  No.

22         Q.  You have the utmost confidence in Mr. Albrecht?

23         A.  Yes.

24         Q.  Mr. Reed similarly has confidence in Mr. Albrecht,

25    and he has told you that before; correct?

DR. PAUL MCGOVERN

1
2     A.   My impression is that Mr. Reed has confidence in
3  Mr. Albrecht and holds him in high regard, but you'd have to
4  ask Mr. Reed what his opinion of him is.
5     Q.   Do you recall Mr. Reed informing a group of people,
6  including you, that he was extremely impressed with
7  Mr. Albrecht?
8     A.   I -- that is consistent with -- I don't remember
9  the specific event, but Mr. Reed has expressed that he has
10  been impressed by Mr. Albrecht in the past, yes.
11     Q.   You've served as a reference for Mr. Albrecht
12  before in a professional capacity; correct?
13     A.   That's correct.
14     Q.   And that reference was with respect to
15  Mr. Albrecht's application to the National Marrow Program?
16          (Reporter clarification.)
17     A.   That's correct.
18     Q.   You were aware, as well, that at one point in time
19  3M offered Mr. Albrecht a job; correct?
20     A.   I might have been told that.  I don't remember
21  that, speaking about it now, but it rings a bell.  I can't
22  remember if Mark Albrecht worked for, or was offered a job
23  by, 3M.
24     Q.   Would a document help refresh your memory?
25     A.   That would help refresh my memory, yeah.

                    DR. PAUL MCGOVERN

1

2          (Exhibit 1 marked for identification)

3     A.   Thank you very much.

4     Q.   Do you see at the top of the e-mail there is --

5     A.   Yes.

6     Q.   -- a message to you from Mr. Albrecht, dated

7   February 21, 2012, at 5:56 pm?

8     A.   Yes.

9     Q.   The subject line is "Bit of a wild ride with the

10   job search"; correct?

11    A.   Yes.

12    Q.   And in the e-mail below that, which actually

13   precedes the one that I just mentioned by just a few

14   minutes, Mr. Albrecht wrote to you; correct?

15    A.   He did, yes.  That's right.

16    Q.   And he says:

17         "So I thought I'd give you an update."

18    A.   Yes.

19    Q.   "Today I accepted a position as a Program Manager

20   with National Marrow Donor Program in the bio-informatics

21   group.  Before that, I had an offer from 3M that I accepted,

22   an offer that was rescinded based on my non-compete a week

23   after I signed."

24         Do you see that?

25    A.   I do see that, and I remember that now.

DR. PAUL MCGOVERN

1

2    Q.   And that refreshes your recollection?

3    A.   That does refresh my recollection.

4    Q.   Would you consider Mr. Albrecht to be an expert in

5    statistics?

6    A.   Yes.

7    Q.   Jumping back to your background just for a few more

8    minutes, while you were at UCL, you were deemed an honorary

9    lecturer; correct?

10   A.   For a period of time, yes.  I was initially

11   appointed an honorary lecturer during my FY2 year, so that

12   was 2007, I believe.  And I have held an honorary or

13   substantive post at UCL Medical School in some form, ever

14   since.

15   Q.   Is that common thing, for people that trained at

16   UCL to be given that type of honorary position?

17   A.   It's not.  It's not common, and it is -- it's

18   something I consider to be a significant privilege.

19   Q.   I assume that to be nominated, and to hold such

20   a position, the university recognizes some type of expertise

21   that you hold?

22   A.   Yes.

23   Q.   And what do you think that expertise entails?

24   A.   My original appointment was for anatomy

25   demonstrating.  So, I led a program organizing anatomy

DR. PAUL MCGOVERN

1  demonstrators in the region to come and provide surgical

2  trainees to the medical school to demonstrate on anatomy and

3  assist surgical trainings in their own training, because

4  demonstrating is an excellent way to boost your own

5  anatomical skills.  I also developed, and ran for several

6  years, a revision website based at the medical school for

7  final-year medical students which involved mentoring

8  students online, and editing and providing assessment

9  exercises, exam style questions, for students so they could

10  practice before their exams, answering questions based on

11  those assessment exercises, and providing advice documents

12  for students.

13      I also set up an education program at Basildon

14  Hospital in Essex, which was the first of its kind with

15  one -- with two colleagues, which was then rolled out to

16  hospitals throughout the region, and is a model of best

17  practice in medical education for what's known as

18  near-peer learning in the region.  And so my initial

19  appointment, as a lecturer, was for surgical anatomy

20  demonstrating, and my continued appointments were for

21  medical education, both in general assessment and in

22  orthopedic and surgical practice.

23      Q.  So, all of that did involve orthopedic surgical

24  practice?

25

Page 266

1                    DR. PAUL MCGOVERN

2        A.   Yes.   Well, it involved practice relevant to

3    orthopedic surgery.

4        Q.   Okay.

5        A.   In some form, yes.

6        Q.   Is any of the material you've just discussed the

7    same as when you were a clinical teaching fellow, or was

8    that a separate responsibility that entailed separate

9    duties?

10       A.   There is a crossover.   So I have been an honorary

11   teaching fellow for some years.   I don't remember exactly

12   when my lecturer position was changed to teaching fellow

13   after my surgical role finished.   In terms of academic rank,

14   they are effectively the same.   But I've been an employed

15   substantive teaching fellow on two separate occasions, which

16   had similar roles; but the first time I was employed in that

17   role between August 2010 and April 2011, my role was leading

18   undergraduate teaching in a hospital.   And on the second

19   occasion, between October 2013 and August 2016, I was

20   working in post-graduate education and education

21   consultancy.

22            There is a crossover between all of them,

23   because, right up until 2016, I was still examining

24   final-year medical students, teaching them orthopedics,

25   teaching ethics and law to students.   So, right

1                       DR. PAUL MCGOVERN

2    throughout the whole of my teaching, there has been an

3    orthopedic component to what I do in an educational

4    capacity.  But the amount varies, depending on the

5    particular role that I'm engaged in at the time.

6         Q.  Got it.  Have you obtained an MRCS?

7         A.  I have.

8         Q.  What does that stand for?

9         A.  MRCS is Membership of the Royal College of

10   Surgeons.

11        Q.  And being a Member of the Royal College of Surgeons

12   designates what, to someone who has no understanding of the

13   term?

14        A.  It designates that someone has passed an exam set

15   by all the Royal Colleges of Surgeons -- there are three

16   Royal Colleges of Surgeons in the UK -- to meet the academic

17   standards required to enter higher surgical training in the

18   UK.

19        Q.  And I assume some people that train initially in

20   orthopedics don't pass the exam that would ultimately enable

21   them to have the MRSC degree?

22        A.  That's correct.  So, when I did the exam, they were

23   changing the exam style, and there were two styles.  One was

24   a new style and one was the old style.  And the old style

25   had a pass rate -- the new style had a pass rate of about 60

1                          DR. PAUL MCGOVERN

2    percent and the old style had a pass rate of about 30

3    percent.  And I chose to take the old style, and passed that

4    first time.

5         Q.  So you were one of the approximately 30 percent of

6    people who pass that exam?

7         A.  Correct.

8         Q.  Why did you choose to take the old style?

9         A.  Because it was more of a challenge.

10        Q.  Do you know anyone else that chose to take the old

11   style, as opposed to taking the new style?

12        A.  I don't.

13        Q.  In your --

14        A.  There were other people, because there were other

15   people in my cohort, so presumably it has happened, but

16   I don't personally know anyone.

17        Q.  At one point in time, or potentially at the

18   present, you were designated as an honorary orthopedic

19   registrar; correct?

20        A.  That's correct.

21        Q.  And what does that mean, for the ladies and

22   gentlemen of the jury?

23        A.  Yes, so while I was a teaching fellow, I was

24   still -- I still retained my status as a trainee orthopedic

25   surgeon.  This is in the second period of being an academic

DR. PAUL MCGOVERN

1
2    at UCL.  There is a system called Out of Program Experience,

3    or Out of Program Training, that allows doctors in training

4    to retain their -- what's known as a National Training

5    Number, their status as a training registrar, while doing

6    academic work.  And I received an honorary position at UCL

7    hospitals which allowed me to continue to practice in

8    orthopedics while I was doing academic work.

9         Q.  I mean, can anyone get this designation that wants

10   it, or is there a selection process by which UCL and the

11   hospitals determine you can be an honorary orthopedic

12   registrar?

13        A.  The primary method of selection, the reason that

14   I was able to get that role, was because I had completed the

15   selection process for registrar training, which is extremely

16   competitive.  Once I have that status of becoming

17   a registrar, then it is generally accepted that one can gain

18   an honorary contract in the position that I was.  The

19   barrier to entry for that is becoming a registrar in the

20   first place, which is extremely competitive.

21        Q.  Given all your training that you had in orthopedic

22   surgeries and other types of surgeries, you're well familiar

23   with laminar flow?

24        A.  I am -- I would consider myself with very familiar

25   with laminar airflow.

1              DR. PAUL MCGOVERN

2      Q.  For the ladies and gentlemen of the jury, can you

3  briefly explain basic concepts about laminar airflow?

4      A.  I can.  So, with -- relevant to an operating room,

5  a laminar airflow system is one in which the operating room

6  has an area in the middle of it which is designated as

7  specifically -- or as an especially clean area; and there is

8  a device in the ceiling, in the roof of the operating room,

9  which blows filtered air down over the patient and over the

10 surgeons and the surgical staff.  And the idea is that

11 sterile air is blown down and clears away any contaminants,

12 any airborne particles which could land in the wound of the

13 patient and subsequently cause an infection.

14     Q.  What types of filters are generally used in the

15 ceiling vents by which the laminar airflow comes downward?

16     A.  By my understanding, they are generally HEPA

17 filters, which are filters specifically designed to filter

18 out microbes or any particles which could be large enough to

19 cause infection, or to have bacteria stick to them, which

20 could cause infection.  I would assume, in a correctly

21 functioning laminar flow operating room, that the air that

22 comes out of the laminar flow device is effectively sterile.

23     Q.  HEPA filters block approximately 99.9 percent of

24 particles size 0.3 microns or larger; is that your

25 understanding?

1                    DR. PAUL MCGOVERN

2        A.   That is my understanding.   There is a definition of

3   the performance that a HEPA filter should meet to be

4   classified as a HEPA filter.   I don't remember the exact

5   classification, but what you've just described sounds pretty

6   much exactly what I would expect a HEPA filter to perform

7   as.

8        Q.   The basic purpose of laminar airflow is to decrease

9   airborne microbial counts and move particles away from the

10   surgical site; correct?

11        A.   The fundamental reason for having laminar flow is

12   to reduce infection rates.   The mechanism by which it is

13   thought to do that, is to reduce the concentration of

14   airborne particles containing bacteria from the region of

15   the patient and from the operative wound.

16        Q.   No matter what surgical staff try to do, there is

17   always going to be particles in the operating room; correct?

18        A.   That is -- practically, yes.

19        Q.   And some of those particles, whether they are, or

20   whether they carry, have bacteria on them?

21        A.   Yes.

22        Q.   -- in the operating room.   And bacteria pathogens,

23   whatever you might call them, those are the things, the

24   bugs, that cause the infection; correct?

25        A.   Yes.

DR. PAUL MCGOVERN

1

2    Q.   Large inoculums of germs are required to cause

3  soft-tissue infections; correct?

4    A.   It depends on the clinical make-up.  If a patient

5  has some degree of compromise to their immune system, if

6  they have a pre-existing infection, if they have

7  inflammation, if there is a problem in the soft tissue, then

8  you -- then an infection may be precipitated by a relatively

9  small inoculum or a relatively small dose of bacteria.

10  However, in soft tissue, the chance of infection with

11  a small amount of bacteria is very, very much lower than it

12  is with implant or bone.

13    Q.   In a normal, let's say -- call them healthy

14  patient?

15    A.   Yes.

16    Q.   That doesn't have, you know, particular specific

17  demographics that would make them particularly susceptible

18  to an infection, you need a large inoculum of bacteria to

19  cause a soft-tissue infection?

20    A.   Generally.

21    Q.   And as you mentioned, that's in stark contrast to a

22  deep joint infection, which I'll probably refer as to "DJIs"

23  in our conversation.  But in a DJI, you only need a small

24  load of bacteria to cause an infection?

25    A.   The potential for causing infection with a small

1                    DR.  PAUL  MCGOVERN

2    load of bacteria is very much higher when dealing with bone

3    or artificial implants, yes.

4         Q.   A single bacterium can cause a DJI?

5         A.   As far as I'm aware, a single bacterium can cause

6    a deep joint infection if it is in the wrong place.

7         Q.   And the reason for that is a bacterium on an

8    implant can and often does create biofilm?

9         A.   It can create a biofilm.  It depends on the

10   bacterium and whether it creates a biofilm, so I wouldn't --

11   it's quite a general description, and some bacteria are very

12   prone to causing biofilms, which can cause more problems and

13   make them -- make the infections they produce harder to

14   treat.

15        MR. C. GORDON:  Let me just interpose an

16   objection.  I think we've gone well beyond fact witness

17   questions, and we have strayed into expert testimony, which

18   I understood was to be off the --

19        MR. SACCHET:  I'll note for the record yesterday

20   that the same types of questions were asked of Mr. McGovern

21   that even exceeded the style of question that I have asked

22   today, such as the specific types of components of types of

23   medications and what they are comprised of.  So I don't

24   believe I have exceeded any precedent that was asked of

25   yesterday.

DR.  PAUL  MCGOVERN

BY MR. SACCHET:

1    Q.   In any case, biofilms protect bacterium from
antibodies and antibiotics; correct?

5    A.   They can do.

6    Q.   And biofilm allows for a long latency periods with
respect to the proliferation of an infection; correct?

8    A.   With long?

9    Q.   Long latency periods.

10   A.   What do you mean by that?

11   Q.   An infection could be dormant, and not necessarily
rise to a level in which it would be detectable for a number
of months?

14   A.   I think that the interaction between biofilms and
how rapidly infection appears is probably beyond my --
beyond the remit of what I would confidently be able to
discuss.

18   Q.   Fair enough.  Have you ever heard of, or observed,
an infection that arose many months after a arthroplasty was
performed?

21   A.   Yes.

22   Q.   How long?

23   A.   It can happen six months afterwards.

24   Q.   Have you heard of year-long latency periods?

25   A.   Yes.

1                    DR. PAUL MCGOVERN

2        Q.   What's the longest you've heard of?

3        A.   I would say within the order of a year.

4        Q.   And you mentioned this before, but some particular

5   patients have particular susceptibility to deep joint

6   infection; correct?

7        A.   Yes.

8        Q.   But even in those types of patients, the infection

9   still requires a bacterium to enter the surgical site;

10  correct?

11       A.   Any infection will require a bacterium to be in

12  a place that it shouldn't be initially, yes.

13       Q.   Deep joint infections can have devastating

14  consequences for a patient; correct?

15       A.   Absolutely.

16       Q.   The artificial joint might need to be explanted?

17       A.   Absolutely, yes.

18       Q.   If it's explanted, the patient might need to stay

19  in a hospital for an extended period of time in order to

20  recover from the infection?

21       A.   Absolutely.

22       Q.   And there may very well need to be a reimplantation

23  if there were an explantation; correct?

24       A.   Correct.

25       Q.   The total cost of that process can exceed £100,000?

                    DR. PAUL MCGOVERN

1

2      A.  We tend not to deal in costs in the UK too much,

3   because treatment is free, but the costs, to my

4   understanding of deep joint infection, are gigantic, and

5   I would not be surprised at a figure in excess of £100,000.

6      Q.  Have you ever heard of a deep joint infection

7   causing an amputation -- or requiring an amputation, I

8   should say?

9      A.  Yes, yes.

10      Q.  How about death?

11      A.  Yes.

12      Q.  Given these devastating consequences, whether they

13   be a reimplantation, an amputation, possible death, the

14   quality of airflow in an operating room in an orthopedic

15   procedure is of critical concern, is it not?

16      A.  It is of significant concern to me as a surgeon in

17   an operating room, yes.

18      Q.  And the maintenance of the sterile field requires

19   isolation from potential sources of contamination in the

20   operating theater; correct?

21      A.  Yes.

22      Q.  You've said that statement to the Academy of

23   Orthopedic Surgeons; correct?

24      A.  I don't remember, but -- I don't remember saying

25   that, but I agree with that sentiment.

1                    DR. PAUL MCGOVERN

2        Q.   So, at the end of the day, the bottom line is you

3   want to reduce the presence of pathogens near the surgical

4   site; right?

5        A.   Correct.

6        Q.   And that is the purpose of laminar airflow?

7        A.   Yes.

8        Q.   Laminar airflow is nearly universal in the UK in

9   orthopedic procedures?

10       A.   To my understanding, particularly in joint

11  procedures.  Not all orthopedic procedures will require

12  laminar airflow, but it is predominant, in my understanding,

13  for a joint-replacement surgery.

14       Q.   And numerous studies have proven the efficacy of

15  laminar airflow in decreasing bacterial counts near the

16  surgical site; correct?

17       A.   "Proven" is a very strong word.

18       Q.   Found to be statistically significant?

19       A.   To my knowledge, yes.

20       Q.   One of those studies, and perhaps the first study,

21  was the 1980s study by Lidwell, in which a randomized

22  control style was conducted --

23                    (Reporter clarification.)

24       Q.   Lidwell conducted a randomized controlled trial and

25  found a decrease in deep joint infection rates as a result

1                        DR. PAUL MCGOVERN

2    of laminar airflow; correct?

3         A.   Yes, I'm familiar with that paper.

4         Q.   Your own research has shown that the concentration

5    of airborne particles increases significantly outside the

6    laminar airflow boundary?

7         A.   Yes.

8         Q.   That paper, or presentation, was entitled The

9    Concentration of Airborne Particles Increases Significantly

10   Outside the Laminar Airflow Boundary; correct?

11        A.   That is the paper.  I'm not sure if that's been

12   peer-reviewed and published in a journal.  If you can find

13   that it has, then I am willing to accept it; but I don't

14   remember if it has been.

15        Q.   You would, I assume, be happy if I could find that?

16        A.   I would be very happy if you could find it.

17        Q.   In any case, you presented a presentation entitled

18   as such to the American Academy of Orthopedic Surgeons?

19        A.   I probably did.  I can't remember all of the things

20   that I've -- there's so many projects, that I can't remember

21   which has been presented; but if I have, then I have, yes.

22        Q.   Over time, the procedures for reducing particles

23   near the surgical site have improved.  Let me give you an

24   example.  The use of togas or spacesuits, as they're

25   sometimes called, sometimes happens now, whereas it wasn't

DR. PAUL MCGOVERN

1

2  even a thing a couple of decades ago?

3      A.  Yes.  The manufacturer specifications for togas and

4  spacesuits are often not declared as having reducing

5  particle concentrations as an aim.  They are marketed, to my

6  understanding, as personal protective equipment.  And

7  however, they are used by orthopedic surgeons, in my

8  anecdotal experience, to reduce shedding of particles and --

9  because there is a perception that they increase -- or that

10 they reduce the likelihood of infection.  I am not sure that

11 togas and hoods are designed to reduce particle counts.

12 I believe exhaust suits are.  I've not worked in an

13 organization that uses exhaust suits.  I'm aware that they

14 have been used, and they are used, in some place places.

15 But the intention of the surgeon in many cases in using

16 hoods, togas, et cetera, is to reduce the possibility for

17 infection.

18     Q.  I mean, you published a paper evaluating particle

19 counts with respect to the use of togas versus surgical

20 gowns versus masks; correct?

21     A.  Correct.

22     Q.  And that study, which was peer-reviewed, found that

23 the toga is the most effective in reducing particles near

24 the wound site; correct?

25     A.  It reduced particles in front of the surgeon at

1                    DR. PAUL MCGOVERN

2    a position which was corresponding to where the wound site

3    would be, yes.

4         Q.  And togas, or spacesuits, whatever one calls them,

5    were not typically used 20 years ago?

6         A.  I don't know when they became more common, more

7    commonly used.  I don't know what timescale they have become

8    more prevalent.

9         Q.  Okay.  In the toga study, as I may sometimes call

10   it, you had a statement to the effect that particles could

11   serve as a proxy for bacteria; correct?

12        A.  That was the assumption that was used in the paper

13   as a proxy for bacteria, or bacteria containing particles.

14        Q.  And in addition to your own study, other scientists

15   have similarly concluded that particles can be used to

16   determine a percentage of bacteria from those particles;

17   correct?

18        A.  Correct.

19           MR. C. GORDON:  Object to the form of the

20   question.

21        A.  I believe that other researchers and many surgeons

22   would agree that particles can be used to infer likely

23   bacterial loads.

24   BY MR. SACCHET:

25        Q.  Are you familiar with the paper by Doctor Stocks,

1                    DR. PAUL MCGOVERN

2  which you cited in your toga article?

3       A.  I have seen it, but I don't remember the contents

4  of it.

5       Q.  But you are aware of other authors who have made

6  the same conclusion that particles can be used as

7  a measurement, whether --

8       A.  I'm aware that that has been used in the past, and

9  that that parallel has been drawn.

10      Q.  In addition to the use of spacesuits, there are

11 other things that can be done in orthopedic operating rooms,

12 or otherwise, to reduce particles and bacteria at surgical

13 site; correct?

14      A.  Yes.

15      Q.  One of those things are limiting movement in the

16 operating room among surgical staff; correct?

17      A.  Yes.

18      Q.  Are there other procedures that you're aware of

19 that have -- do the same?

20      A.  That do the same?  What --

21      Q.  With respect to reducing particles, beyond

22 spacesuits, beyond limited movement; things like that?

23      A.  Controlling the temperature in the operating room

24 may have effect.  Humidity may have an effect.  Reducing

25 opening and closing of doors.  The position of operating

                    DR. PAUL MCGOVERN

1
2   lights, in my research, has a marked effect on particle
3   concentration.  The use of forced-air warming device --
4   devices, in my experience, has an influence on particle
5   counts near the operative site, particularly when combined
6   with overhead operating lights.  And the presence of -- the
7   number of people in the operating room, as well as their
8   movement, influences it.  The amount of kit, the heat
9   emitted by the kit, the amount -- the type of surgery,
10  because some surgeries produce particles: if you're
11  operating on bone, then dust is produced.  Sometimes there
12  can be mists from electrocautery machines, from other
13  equipment.  Fluids can spray.  All these things can
14  influence airflows and particle counts in the region of the
15  operative field.

16       Q.  Okay.  Are you aware that deep joint infection
17  rates in operating rooms increased in the late 1980s up
18  until the 2000s?

19       A.  I am aware --

20           MR. C. GORDON:  Object to the form of the
21  question.  Assumes facts not in evidence.

22       A.  I'm aware that studies have shown that, or have
23  indicated that.

24  BY MR. SACCHET:

25       Q.  Do you think, given your experience in orthopedic

1                     DR. PAUL MCGOVERN

2  operating rooms and your knowledge of laminar airflow, that

3  laminar airflow is the culprit of the rising infection rates

4  from the 1980s to 2000?

5           MR. C. GORDON:  Same objection.

6     A.  Laminar airflow in itself?

7  BY MR. SACCHET:

8     Q.  Yeah.

9     A.  I do not.

10    Q.  Do you think that forced-air warming, which

11 I believe you mentioned just a couple of minutes ago, has

12 impacted the rising infection rate during that time period?

13           MR. C. GORDON:  Same objections.

14    A.  I believe it's possible.

15 BY MR. SACCHET:

16    Q.  You've encountered a lot of orthopedic surgeons who

17 are concerned about the use of forced-air warming in

18 orthopedic procedures; correct?

19    A.  That is correct.

20           MR. C. GORDON:  Please note a form objection.

21 BY MR. SACCHET:

22    Q.  The Bair Hugger is a forced-air warming system;

23 correct?

24    A.  Yes.

25    Q.  The filter of the Bair Hugger is on the bottom of

DR. PAUL MCGOVERN

1
2 the device?

3      A.   I believe -- I think there are various designs of

4 Bair Hugger blower devices, and I'd need to look at one to

5 confirm exactly the location of the filter.  I don't

6 remember.

7      Q.   Have you ever seen a Bair Hugger with a filter on

8 the bottom?

9      A.   I've seen many Bair Huggers, Bair Hugger blower

10 units, and I remember the control panels and what they look

11 like, but I don't remember where -- if the filter was on the

12 bottom or the side.

13      Q.   Whether it's on the bottom or the side, the device

14 is often placed on the ground of the operating floor?

15      A.   Can I clarify: are you asking where the exhaust --

16 the blower unit is, or the intake is?

17      Q.   The intake.

18      A.   Yeah, the intake.  I can't remember where the

19 intake is.  You asked if --

20      Q.   Whether the blower itself is often placed on the

21 floor?

22      A.   It will be placed on a -- generally, on a stand

23 which is very close to the floor.  So less than a foot from

24 the floor, generally.

25      Q.   So whether the filter is on the side of the device

1               DR. PAUL MCGOVERN

2    or under the device, it's taking in air close to floor

3    level; correct?

4            MR. C. GORDON:  Object to the form of the

5    question.

6        A.  Generally, yes.

7    BY MR. SACCHET:

8        Q.  And some of that air bypasses the filter; correct?

9            MR. C. GORDON:  Object to the form of the

10   question.  Lack of foundation.

11       A.  It depends on the specific filter unit, and I do

12   not know if that's always the case.  It's possible that air

13   bypasses the filter, but I don't know what proportion of it

14   does.

15   BY MR. SACCHET:

16       Q.  You were a co-author on a paper that dealt with

17   filtration efficiencies; correct?

18       A.  I was, yes.

19       Q.  And that paper, which we'll talk about later, found

20   that the air filtration efficiency of the model 700

21   Bair Hugger blower was approximately 63 percent; correct?

22       A.  It did find that, yes.

23       Q.  So if that's the filtration efficiency at the -- at

24   let's say 0.2 microns, some particles are then passed

25   through the filter; correct?

1              DR. PAUL MCGOVERN

2      A.  Yeah, if the filtration efficiency is reduced, then

3  some particles which the filter is intended to block are

4  passing through that filter.  That is how I understand that

5  result.

6      Q.  If some of those particles had bacteria on them

7  that bypassed the filter, the bacteria could colonize inside

8  the blower?

9      A.  It's possible, yes.

10     Q.  You're not aware of any other filters on the device

11 beyond the intake filter, are you?

12     A.  I am not.  I don't have an intimate knowledge of

13 the anatomy of a Bair Hugger blower unit, but I'm not aware

14 of further filtration stages.

15     Q.  You've never seen a filter at the hose end of the

16 device?

17     A.  No, that's correct.

18     Q.  And you've never seen a filter inside the blanket?

19     A.  That's correct.

20     Q.  So it's possible that particulates or bacteria

21 could pass through the blanket?

22         MR. C. GORDON:  Object to the form of the

23 question.  Lack of foundation.

24     A.  It is possible.

25 BY MR. SACCHET:

Page 287

1                     DR. PAUL MCGOVERN

2       Q.  It's also possible, and in fact you have been in

3   correspondence suggesting the same, that a large percent of

4   the heat from the blower does not enter the body but is

5   exhausted into the operating room; correct?

6           MR. C. GORDON:  Object to the form of the

7   question.

8       A.  I do believe that, yes.

9   BY MR. SACCHET:

10      Q.  More than 800 watts of what I'll say waste heat can

11  enter the operating room from the Bair Hugger; correct?

12          MR. C. GORDON:  Object to the form of the

13  question.  Lack of foundation; assumes facts not in

14  evidence.

15      A.  Yes, all the power of a blower unit, all of the

16  heat is going into the operating room in some form.  Even if

17  it goes into the patient, there's a -- the patient is within

18  the operating room as well.  So, a proportion of heat will

19  go into the operating room.  A proportion of heat energy

20  will go into the operating room, yes.

21          (Exhibit 2 marked for identification)

22      Q.  I'm just going to try to refresh your recollection

23  for a moment with the document that's being marked.

24      A.  Thank you.

25      Q.  If you could turn to page 3 of 3.

DR. PAUL MCGOVERN

1

2     A.   Yes.

3     Q.   The last e-mail is dated July 3, 2010, from you.

4     A.   Yes.

5     Q.   To Mark Albrecht?

6     A.   Yes.

7     Q.   In the penultimate paragraph, the e-mail states:

8          "The energy paper has a nice bit on the

9     significantly higher efficiency of Augustine CWB than

10    Arizant FAW."

11         What does "Augustine CWB" mean?

12    A.   "Augustine" refers to the company, I believe

13    Augustine Biomedical & Design, and "CWB" refers to, I think,

14    conductive warming blanket.

15    Q.   And is "Arizant FAW" likely the Bair Hugger?

16    A.   "Arizant FAW" refers in this e-mail to the

17    Bair Hugger device.

18    Q.   You continue:

19         "I think the message can still be put

20    strongly in the terms you mentioned i.e. FAW is

21    inefficient and has a high power draw ask (compared

22    with CWB), resulting in a potential loss into the OR

23    environment in excess of 800W."

24         So would you agree that in some cases, the

25    Bair Hugger does result in excess heat of 800 watts of

Page 289

1                    DR. PAUL MCGOVERN

2    energy?

3         A.  Yes.

4              MR. C. GORDON:  Object to the form of the

5    question: lack of foundation, assumes facts not in evidence.

6         A.  Yes.

7    BY MR. SACCHET:

8         Q.  So whether by blowing air in the operating room, or

9    allowing air through the blanket, it's possible that the

10   Bair Hugger moves bacteria toward the surgical site;

11   correct?

12             MR. C. GORDON:  Object to the form of the

13   question: lack of foundation, calls for speculation,

14   incomplete hypothetical.

15        A.  It is possible.

16   BY MR. SACCHET:

17        Q.  You have demonstrated this effect with respect to

18   bubbles in a number of videos that were posted on a blog for

19   Northumbria; correct?

20        A.  That's correct.

21        Q.  One of those videos is this one, which I'll play

22   for you, and counsel is welcome to walk around and watch it

23   if he pleases.  I have DVDs that can be marked the same.

24             (Exhibit 3 marked for identification)

25        Q.  I'll play it first, and then we can talk about it.

1           DR. PAUL MCGOVERN

2           THE VIDEOGRAPHER:  Do I need to record this?

3           MR. SACCHET:  I'm not entirely sure how to do

4      that.  The sound will come through, so you will be able to

5      hear it on the video, and it can be transcribed the same

6      way.

7           (Audio from DVD):

8           "In this clip, the forced-air warming blanket

9      is turned on and the light is positioned under laminar

10     flow to illuminate the operative field.  The majority

11     of the contaminated air from beneath the drapes is

12     cleared by laminar flow.  However, potentially

13     contaminated air can be seen in the disrupted laminar

14     flow underneath the operating light.  At this stage,

15     very little contaminated air is seen in front of the

16     surgeon in the region of the operative field.  The

17     presence of the anaesthetist further disrupts the

18     laminar flow, allowing hot air from the forced-air

19     warming blanket to rise.  Within 10 seconds, there is

20     an increase in the contaminated air underneath the

21     operating light.  Less than 20 seconds after the

22     anesthetist stands in front of the patient, there is

23     a clear increase in contaminated air in front of the

24     surgeon and in the region of the operative field."

25          MR. C. GORDON:  Is that the whole --

Page 291

1                    DR. PAUL MCGOVERN

2          MR. SACCHET:  That's the whole clip.

3          MR. C. GORDON:  Did you just excerpt it yourself?

4          MR. SACCHET:  No, this was taken directly from the

5    production.

6          MR. C. GORDON:  And that was the entire thing that

7    was on the --

8          MR. SACCHET:  This is entitled "The final

9    demonstration of FAW."  I think it is labeled on the

10   envelope I gave you.  And you're welcome to look at it later

11   and determine that this is the accurate copy of such.

12                    (Reporter clarification.)

13         MR. SACCHET:  It's labeled on the --

14      A.  "The accurate copy of such."

15   BY MR. SACCHET:

16      Q.  Mr. McGovern, do you have any doubt that that is

17   the full and complete copy of the video?

18      A.  No, I recognize that as the video that I produced

19   and placed on the Northumbria orthopedics blog.

20      Q.  Did you narrate the video?

21      A.  I did.

22      Q.  Were you the anesthesiologist that appeared next to

23   the screen?

24      A.  I was taking the role of the anesthesiologist in

25   that video, yes.

1                    DR. PAUL MCGOVERN

2        Q.   Was Mr. Reed the individual in the spacesuit?

3        A.   Yes.

4        Q.   To the extent anything was not evidenced by the

5    narration that you provide, can you provide a quick summary

6    of what was observed in the video?

7        A.   What that video shows is a set-up in which

8    a mannequin is placed on an operating table as though -- and

9    prepared as though for surgery, in terms of surgical

10   draping.  A Bair Hugger blanket is placed over the mannequin

11   in the position that it usually would be for surgery.  And

12   the drapes have been positioned to fashion an anesthesia

13   screen which takes the form of surgical drapes being clipped

14   to a higher level, which often happens in operating rooms;

15   the idea being to slightly reduce the chance of any spatter

16   from the operative site going on to the anesthetist or their

17   equipment.  The forced-air warming blanket is turned on in

18   that clip, and the bubble generator discussed yesterday is

19   active.  The outlet of the bubble generator is near the head

20   end of the simulated patient.

21            What the clip shows is that with the

22   operating lights in a position which they may well be,

23   to illuminate an operative field, the presence of the

24   anesthetist, in combination with the position of the

25   operating light, in combination with the energy emitted

1                    DR. PAUL MCGOVERN

2   by the forced-air warming blanket, encouraged

3   particles -- or encouraged, in this case, neutral

4   density helium bubbles -- from the region of the

5   patient or the model patient's head to find their way

6   up, the front of the anesthetist, along the operating

7   lights, and down into the region of the operative

8   field.

9        Q.   Were standard particles performed with respect to

10  draping and placement of the patient and the Bair Hugger,

11  and any other steps that were performed in the simulation?

12       A.   The draping, the positioning of the Bair Hugger,

13  the position of the operating lights, the position of the

14  anesthesia screen, were all designed -- were all intended to

15  replicate those which would be seen in a real operation.

16       Q.   Mr. Reed supervising is in fact in the simulation;

17  correct?

18       A.   Could you repeat that, please?

19       Q.   Mr. Reed supervised and was in fact present in the

20  simulation?

21       A.   That's correct.  Mr. Reed was -- yeah, supervised

22  the positioning of the patient and the draping, and the

23  positioning of the Bair Hugger, and the position of the

24  operating lights, and the positioning of the anesthetist,

25  and of the operating table.

1                        DR. PAUL MCGOVERN

2        Q.   He had no concerns about the set-up?

3        A.   None that I'm aware of.

4        Q.   And you used bubbles in this video; correct?

5        A.   That's correct.

6        Q.   Bubbles are a type of particle; right?

7        A.   The bubbles are, I would agree, a type of particle.

8        Q.   And, as we discussed before, with respect to your

9   toga study and other papers that have been published,

10  particles can be a measurement of bacteria?

11       A.   That is the assumption that we are using and that

12  is the inference we are drawing when we are measuring

13  particles and measuring bubbles in these experiments.

14       Q.   So, if bubbles are a type of particle, and

15  particles can measure bacteria, presumably the bubbles were

16  attempting to measure bacteria; correct?

17       A.   The bubbles were attempting to demonstrate the way

18  air flows.  Bubbles are not -- they are more a measure of

19  where air flows, and they show where air has flown from and

20  to.  The inference, therefore, is that particles would be

21  carried on the airflows, and the bubbles enable us to

22  visualize where air starts and where air ends up.  And so,

23  the inference that we took from that experiment was that air

24  was flowing from the area of the patient's head, a

25  non-sterile zone, to what was considered a sterile zone, and

DR. PAUL MCGOVERN

2  that any light, airborne particles, we assumed would have

3  been carried along that air current.

4      Q.  And air generated from a non-sterile zone could

5  have bacteria?

6      A.  That's correct.

7      Q.  And so it's possible that some of the particles

8  that were being demonstrated through bubbles could have had

9  bacteria on them?

10     A.  Absolutely correct.

11     Q.  You've posted other videos showing the same effect?

12     A.  A similar effect, yes.

13     Q.  Have you ever heard of another medical device,

14  other than the Bair Hugger, that takes in air from the floor

15  area and blows it on to a patient?

16     A.  There is, I believe, a dressing gown type apparatus

17  which performs a similar role, the idea of it being to warm

18  a patient before or after surgery, when they're sitting in

19  a chair.  And I believe that uses similar blower technology

20  but has a different form of blanket.

21     Q.  Is that the Bair Paws?

22     A.  I think it may be.  I've not used one myself, but

23  I know of their existence.  We discussed yesterday -- sorry,

24  could you just repeat the question that you asked?  Any?

25     Q.  There's another medical device that sucks in air

                    DR. PAUL MCGOVERN

1

2  from near the floor area and blows it on to the patient

3  during a surgery?

4      A.  During surgery?  No.

5      Q.  No?

6      A.  Not to my knowledge, no.

7      Q.  So, when you were previously discussing the gown

8  that could be worn, that may have a similar purpose, that's

9  used in pre and post?

10     A.  I don't know how it's used.  I don't know if people

11  would use that during surgery.  I don't have any experience

12  of that.  I believe that's compatible with the Bair Hugger

13  forced-air warming blower units, but I haven't seen it used.

14  I'm aware of its existence.

15     Q.  Isn't the fact that the Bair Hugger is blowing air

16  on to the patient inimical to the purpose of laminar

17  airflow?

18          MR. C. GORDON:  Object to the form of the

19  question.

20     A.  It potentially compromises what is a very fragile

21  system.  Laminar airflow is far more fragile than, I think,

22  many people believe, and warm air blowing in the region of

23  laminar airflow can, in my opinion, disrupt laminar airflow,

24  especially if the conditions are correct to do it, such as

25  if laminar airflow is blocked by overhead operating lights

DR. PAUL MCGOVERN

1   or other equipment, or surgeons, or any other thing in the

2   way of the laminar airflow.

3   BY MR. SACCHET:

4       Q.   And speaking of fragility, the situation is also

5   very fragile because just us single bacterium could cause

6   a deep joint infection; correct?

7       A.   Correct.

8       Q.   So, over a hour-long surgery or more, all it takes

9   is one bacterium from air disruption, as a result of the

10  Bair Hugger, to cause a surgical site infection?

11      A.   That is possible.

12      Q.   Have you seen the recent guidance from the

13  Healthcare Infection Control Practice Advisory Committee

14  regarding water heater-cooler devices?

15      A.   Regarding?

16      Q.   Water heater-cooler devices.

17      A.   I have not.

18      Q.   So unfortunately I only have two copies of this

19  document, so Mr. Head and Mr. Gordon can potentially share,

20  or Mr. Head can share with Mr. McGovern.

21          MR. C. GORDON:   Is it about the heater-cooler

22  units?

23          MR. SACCHET:   Yeah.

24          MR. C. GORDON:   I don't need that.

1              DR. PAUL MCGOVERN

2         (Exhibit 4 marked for identification)

3         MR. SACCHET:  If Mr. Head wants one, he is welcome

4    to it.

5         A.  Okay, I see the document.  I have not read this, to

6    my memory.

7    BY MR. SACCHET:

8         Q.  Yes.  On the first page, you see that the caption

9    bears "Department of Health and Human Service Centers for

10   Disease Control and Prevention"; correct?

11        A.  Correct.

12        Q.  And beneath that is annotation of the Healthcare

13   Infection and Control Healthcare Advisory Committee

14   November 5 to 6, 2015, in Atlanta, Georgia?

15        A.  Yes.

16        Q.  "Record of Proceedings"?

17        A.  Yes.

18        Q.  If you could turn to page 24.

19        A.  Yes.

20        Q.  The top of the page states:

21            "Nontuberculosis Mycobacterium Infections

22   Associated with Heater-Cooler Devices"; correct?

23        A.  "Nontuberculosis Mycobacterium Infections

24   Associated with Heater-Cooler Devices."  Yes.

25        Q.  You're more qualified to say that.  In any case,

1                     DR. PAUL MCGOVERN

2  beneath that we have two individuals: Joseph Perz, the

3  leader of Quality Standards and Safety Team, Division of

4  Healthcare Quality Promotion; and we have Doctor Michael

5  Bell, Deputy Director, Division of Healthcare Quality

6  Promotion; correct?

7       A.  Correct.

8       Q.  And the section leads off with a statement of the

9  effect:

10          "Dr. Perz reviewed points about

11 Nontuberculosis Mycobacterium (NTM) and infections

12 associated with heater-cooler devices"; correct?

13      A.  Correct.

14      Q.  And the last sentence on that page states --

15 actually the second-to-the-last sentence and the last

16 sentence state:

17          "Investigators in a Swiss hospital identified

18 six cases of invasive M. Chimaera in patients who had

19 received implants as part of their open-heart cardiac

20 procedures.  The investigation focused on possible

21 water sources, since the outbreak was of an NTM

22 infection."

23          Correct?

24      A.  Yes.

25      Q.  Turning to the next page, second-to-last sentence

1                           DR. PAUL MCGOVERN

2       states:

3                    "Preliminary epidemiologic and laboratory

4       findings point to the heater-cooler unit as the source

5       of the NTM."

6                    Correct?

7            A.   Yes.

8            Q.   And turning to the next page, the first full

9       paragraph begins:

10                   "The investigation is public.  Even with

11      preliminary results, there was a sense of urgency that

12      the findings were important to share, especially with

13      the patients."

14                   And the last sentence of that paragraph says:

15                   "The recommendations from FDA include the

16      following:"

17                   The third bullet says:

18                   "Direct the exhaust away from the sterile

19      field."

20           A.   Yes.

21           Q.   I know you may not be familiar with water

22      heater-cooler devices, but do you believe that that

23      recommendation would be well taken, with respect to

24      forced-air warming devices?

25                   MR. C. GORDON:  Object to the form of the

DR. PAUL MCGOVERN

1  question: lack of foundation, incomplete hypothetical,

2  assumes facts not in evidence.

3  (Reporter clarification.)

4  A.  I'm not familiar with this study, this situation,

5  or these units.  I would say that it is well advised to

6  direct any air exhaust unit from any medical, or any

7  electronic or electric device, away from a sterile surgical

8  field.

9  BY MR. SACCHET:

10  Q.  And to the extent there's been a objection about

11  foundation, you performed studies with the respect to the

12  disruption of laminar flow from the forced-air warming

13  devices; correct?

14  A.  I have.

15  Q.  And you've seen the conduction currents that have

16  been created as a result of the device; correct?

17  A.  I have.

18  Q.  So, as a result, you would recommend that those

19  convection currents be directed elsewhere, away from the

20  surgical site; correct?

21  A.  I would.

22  Q.  Turning to the next page, at the top, it states:

23  "Dr. Bell said that learning of an event such

24  as this outbreak presents an opportunity to ensure that

1                    DR. PAUL MCGOVERN

2    no one else is exposed."

3         A.  Yes.

4         Q.  And the last paragraph begins:

5              "The heater-cooler unit appears to be

6    harmless from an infection perspective, but the water

7    overflow bottle is likely rarely, if ever, sanitized

8    and is situated in front of a fan."

9              This is the statement I want you to focus on:

10             "Nothing that blows air should be in an

11   operating room -- theater [I apologize.  I said "room"

12   but it should be "theater"] if possible."

13        A.  Yes.

14        Q.  The plain language of that statement has nothing to

15   do with water heater-cooler devices, does it?

16             MR. C. GORDON:  Object to the form of the

17   question: lack of foundation.

18        A.  As far as I can tell, this statement refers to

19   anything blowing air in an operating theater.

20   BY MR. SACCHET:

21        Q.  You can read English; correct?

22        A.  I can.

23        Q.  You have foundation to understand the words written

24   on the page?

25        A.  I can.

1                        DR. PAUL MCGOVERN

2       Q.   And nothing in it says anything about water

3  heater-cooler devices?

4       A.   Nothing in that sentence says anything about water

5  heater-cooler devices.

6       Q.   Do you agree that forced-air warming units should

7  not be in orthopedic operating procedures?

8       A.   It depends.  If I were given a choice between no

9  warming and forced-air warming, I'd choose forced-air

10  warming, because hypothermia is also a significant problem.

11  However, ideally, if a patient can be warmed, I would

12  choose, were I having an operation, to avoid forced-air

13  warming devices being in an operating room that I was having

14  an operation in.

15      Q.   And there are other warming devices; correct?

16      A.   There are other warming devices.

17      Q.   So, if there are other warming devices, you

18  wouldn't need to use forced-air warming?

19      A.   If it were my choice and it was my operation, or

20  I had free rein over the budget of the operating

21  environment, I would avoid using forced-air warming.

22           MR. SACCHET:  Let's take a break.

23           THE VIDEOGRAPHER:  This is the end of DVD 1 in

24  volume 2 of the deposition of Dr. Paul McGovern.  We're

25  going off the record at 10:47.

1              DR. PAUL MCGOVERN

2    (10:47 a.m.)

3                        (Break taken.)

4    (11:04 a.m.)

5         THE VIDEOGRAPHER:  This is the beginning of DVD 2

6    in volume 1 of the deposition of Dr. Paul McGovern.  Back on

7    the record at four minutes past eleven.

8    BY MR. SACCHET:

9         Q.  During the deposition yesterday, you were asked

10   questions about a microbiology study that you conducted in

11   approximately 2009; correct?

12        A.  Correct.

13        Q.  You mentioned yesterday that prior to participating

14   in the microbiology study, you had very limited experience

15   with respect to conducting experiments?

16        A.  Correct.

17        Q.  Your only exposure was in the role of a co-author

18   on a paper in which you played no part in the experimental

19   set-up or design; correct?

20        A.  That was not an experimental paper; that was one

21   which looked at using computer software to organize systems.

22   It was not a directly clinical or experimental paper, and my

23   involvement in that was to perform a paper-based audit.  So

24   it was not -- my role was not clinically focused.  Although

25   it had clinical relevance, it was not really a clinical

1                    DR. PAUL MCGOVERN

2     paper.

3          Q.   It would be fair to say that the microbiology study

4     in 2009 was the first study in which you were involved in

5     designing, setting up and conducting an experiment; correct?

6          A.   That is correct.

7          Q.   And it was, as a result, the first study in which

8     you examined forced-air warming devices; correct?

9          A.   Correct.

10         Q.   And at that point in time you had taken a course in

11    microbiology but you certainly had not conducted

12    microbiological experiment before?

13         A.   That's correct.

14         Q.   This was before the time in which you collaborated

15    with Mr. Mark Albrecht; correct?

16         A.   Yes, yes.

17         Q.   Mr. Albrecht was not involved in this study;

18    correct?

19         A.   Not to my recollection, no.

20         Q.   So, as of August 2009, you had very limited

21    experience in designing and conducting studies of this sort?

22         A.   That's correct.

23         Q.   And as you mentioned yesterday, as a result of

24    that, you had little idea as to how to set up a proper

25    methodologically sound experiment; correct?

1                    DR. PAUL MCGOVERN

2        A.   Correct.

3        Q.   You played some role, however, in designing the

4   protocol for the experiment; correct?

5        A.   Yes.

6        Q.   You were asked by Mr. Reed to submit a protocol to

7   him and others that would be involved in the experiment;

8   correct?

9        A.   Correct.

10       Q.   That protocol -- in that protocol, did you

11  collaborate with an individual named Tom Symes, or was it

12  purely your product?

13       A.   I did collaborate with an individual called Tom

14  Symes.  He, from my memory, was vaguely involved in it.  I

15  may -- he, at the time, was a very senior trainee about to

16  become an attending level surgeon within a year, I think, of

17  that period of time -- maybe two.  I remember that he was

18  working in my department.  I may have discussed potential

19  designs with him, but to my recollection, the vast majority

20  of the work in designing the protocols, or the study design

21  for that experiment, was mine.

22            (Exhibit 5 marked for identification)

23       A.   Thank you.

24       Q.   Is the document before you a draft protocol that

25  you helped write and design?

DR. PAUL MCGOVERN

1

2      A.   Yes.

3      Q.   Does experiment 1, which states:

4      "Set up a Bair Hugger device in simulated

5  intra-operative conditions with sampling air from

6  surgical field to culture distributed bacteria."

7      A.   Yes.

8      Q.   Is that likely the microbiology study that was

9  conducted?

10     A.   That is likely the microbiology study that was

11 conducted, or a draft of the proposal.  Not having read

12 through this, I don't know if it exactly correlates to it,

13 but this is what I was referring to in experiment 1.  It is

14 the same study.

15     Q.   There appears to be comments from Mike Reed in the

16 right-hand column; correct?

17     A.   Correct.

18     Q.   And there are also appears to be comments stated in

19 capital letters in the text of the document; correct?

20     A.   Correct.

21     Q.   Are those comments in capital letters from

22 Professor Leaper?

23     A.   I do not recall.

24     Q.   In any case, the first comment under "Experiment 1"

25 following the first sentence, says:

                          DR. PAUL MCGOVERN

1

2          "It will be important to state which FAW

3    unit/model (750?  550?) you are using and if it is in

4    current use (i.e. contaminated) or new ..."

5          A.  Yes, it says that.

6          Q.  Do you recall which model device you used in

7    conducting the microbiology study?

8          A.  I do not.

9          Q.  So we'll have to toggle back and forth between

10   these two documents.

11              (Exhibit 6 marked for identification)

12         A.  Thank you.

13         Q.  Is this document the draft of the microbiology

14   study?

15         A.  It is.

16         Q.  On the second, or I guess the third page under the

17   heading entitled "Methods", do you see in the first

18   paragraph the notation of use of "Bair Hugger Model 505,

19   Arizant Healthcare, USA"?

20         A.  I do.

21         Q.  Does that refresh your recollection that a model

22   505 Bair Hugger was used in the microbiology study?

23         A.  It does.

24         Q.  At the time you conducted this study, you were

25   aware of the fact that the 505 was a less powerful device

DR. PAUL MCGOVERN

1

2  than the 750; correct?

3       A.  I don't know if I was aware of that at that time.

4  I think it's likely I was aware of that, because it's

5  physically smaller and older, and looks it, and I'm

6  certainly aware of that now.

7       Q.  Would it refresh your recollection if I showed you

8  a document from an approximate time period similar to the

9  one in which the study was designed in which you made

10  statements to that effect?

11       A.  It doesn't surprise me that I would have made that

12  statement, and it would refresh my recollection, yeah.

13            (Exhibit 7 marked for identification)

14       A.  Thank you.

15       Q.  If you could turn to the very last page, which

16  would be 14 of 14 of this e-mail thread.  In the middle of

17  the page, do you see an e-mail dated November 11, 2009, from

18  you to Mike Reed?

19       A.  Yes.

20       Q.  And in this e-mail, you state:

21            "Models of Bair Huggers are 505 -- the one

22  most commonly used in theater.  There is also the 750

23  which is bigger, and powerful enough to power a whole

24  body warming blanket.  The 505 is for half body."

25       A.  Yes.

1                    DR. PAUL MCGOVERN

2        Q.  You then continue to state:

3            "I don't think they have records of which

4    were used for which patient, though could look into

5    this -- be interesting if the use of the big powerful

6    one has been used in lots of cases that eventually got

7    infected."

8        A.  Yes.

9        Q.  Does that refresh your recollection that around the

10   time in which this study was conducted, you were aware that

11   a 505 was less powerful than a model 750?

12       A.  It does.

13       Q.  If the 750 is more powerful than a 505, would it

14   generate more excess heat in the operating room environment?

15            MR. C. GORDON:  Object to the form of the

16   question: lack of foundation, incomplete hypothetical.

17       A.  It's possible.  It would depend on where the power

18   went -- if the power was in the blower unit, or the heater

19   unit, or both.  Because I don't know the precise design of

20   each, I can't comment on the likely power output into the

21   operating room.

22   BY MR. SACCHET:

23       Q.  You had an interest in whether the 750 had been

24   linked to infections; correct?

25       A.  Correct.

1                    DR. PAUL MCGOVERN

2       Q.   And you stated that in the document to Mr. -- in

3   the e-mail to Mr. Mike Reed; correct?

4       A.   Correct.

5       Q.   Were you aware, at the time of this study, that the

6   model 505 had different filtration than the model 750?

7       A.   Not to my recollection.

8       Q.   You're aware of that now?

9       A.   Yes.

10      Q.   You only tested the model 505; correct?

11      A.   I believe so.

12      Q.   So the 700 was never tested -- the 750 was never

13  tested?

14      A.   For this experiment, I do not believe the 750 was

15  used at all.

16      Q.   In the past, you have said that the model 505 is

17  obsolete.  Do you recall making that statement?

18      A.   I don't directly recall it, but think it was being

19  superseded and that, to my recollection, the 505s were

20  replaced gradually by 750s and so were made obsolete, yes.

21      Q.   Even if the results of this study had statistical

22  significance, which you said yesterday that it did not, it

23  would have no relevance whatsoever to the model 750 or 775,

24  would it?

25           MR. C. GORDON:  Object to the form of the

DR. PAUL MCGOVERN

1   question.

3   BY MR. SACCHET:

4        Q.   Let me back up.   The model 750 is a different model

5   than the 505; correct?

6        A.   That is correct.   They're different models.

7        Q.   You know that it has different filtration than the

8   505?

9        A.   Correct.

10       Q.   And in the prior emails, you stated that the 750

11  had greater airflow than the 505?

12       A.   I said that, yes.

13       Q.   Would it be reasonable to assume, based on those

14  facts, that the results of this study, which involved the

15  505, would not relate directly to the model 750 Bair Hugger,

16  based on those differences?

17       A.   It's possible that results, whether positive or

18  negative, could correlate between the two, because there are

19  two possible mechanisms for bacteria getting into settle

20  plates, or into the bacterial detection unit that were used.

21  One could be that were bacteria were dawn directly from the

22  blower unit to the patient, but another is that bacteria

23  could have been drawn from the patient because of the

24  airflow to the sterile field.   The mechanism of bacteria

25  transfer from the patient's own skin, or from a surgeon, or

DR. PAUL MCGOVERN

1   from another person, to the operative field, may not have

2   been affected.  And were that the origin of any bacteria,

3   then that would have been applicable to both models; but any

4   conclusions that could be drawn about whether the model 505

5   was blowing air from itself into an operative field could

6   not, in my opinion, be applicable to the 750.

7       Q.  So, with respect to particles that may enter the

8   surgical field as a result of the Bair Hugger, the results

9   from the 505 may not translate to the 750?

10      A.  Results of bacteria which started in the blower

11  unit getting to the operative site may not be applicable

12  between investigations involving two different types of

13  units, in my opinion.

14      Q.  If we go back to the protocol, there was a

15  statement which I had read before, which said -- and

16  questioned whether you would be using used or a new devices?

17      A.  Yes.

18      Q.  Do you recall whether you used used or new devices

19  in this study?

20      A.  I do not recall whether used or new devices were

21  used in this study.

22      Q.  If you had used new devices, would you be surprised

23  by the fact that the air which came out of the hose resulted

24  in no bacteria?

1                    DR. PAUL MCGOVERN

2        A.   I would not be surprised by that.  I would expect

3   a new device to have zero bacteria when sampling the air

4   directly from the outlet.

5        Q.   Going back to the protocol, at the bottom of the

6   page in the third-to-the-last bullet point.

7        A.   Which exhibit are we on?

8        Q.   This is exhibit 5.

9        A.   Last page, bottom?

10       Q.   First page, bottom.

11       A.   Yes.

12       Q.   The third-to-last bullet point, which is kind of

13  a sub-bullet point of sorts, says, "Use Ioban"?

14       A.   Yes.

15       Q.   Are Ioban drapes the same as in-size adhesive

16  drapes?

17       A.   I don't know exactly what an in-size drape is, but

18  an Ioban drape is a thin plastic membrane with adhesive on

19  one side, and impregnate with iodine.  The idea is that that

20  drape is slightly thicker than saran wrap -- or what we

21  would call clingfilm -- and sticks to the patient.  And when

22  the incision is made, the incision is made through that

23  substance, through that plastic sheet; and the edges of the

24  wound remain adherent to the plastic, the idea being that

25  bacteria from the skin are less likely to migrate into the

DR. PAUL MCGOVERN

1  wound.  It is not clear to me whether they are actually

2  effective, and whether they actually reduce infection rates,

3  but that is the principle behind that equipment.

4  Q.  Do you recall whether the Ioban drape you used in

5  this experiment was manufactured by 3M?

6  A.  To my recollection, we did not use an Ioban drape

7  in this experiment.

8  Q.  You did not?

9  A.  To my -- in the actual experiment, Ioban was not

10  used.  I think, from looking at the image yesterday of that

11  experiment, or photographs that were taken at the time,

12  there was certainly no Ioban drape on that.  I don't

13  remember if it is mentioned in the methods, but this was

14  a plan.  And this, the methods discuss -- discusses what was

15  actually done.

16  Q.  Fair enough.

17  A.  I don't think an Ioban drape was used.

18  Q.  With respect to the blanket itself, you did not use

19  what is known as an underbody blanket; correct?

20  A.  Correct.  It was an overbody blanket.

21  Q.  Do you know what an underbody blanket is?

22  A.  Yes.  Although I was not aware that there was an

23  underbody blanket available as a Bair Hugger.

24  Q.  Are you aware that 3M now manufactures an underbody

1                    DR. PAUL MCGOVERN

2   blanket?

3        A.   I was not aware of that.

4        Q.   Are you aware of whether underbody blankets use

5   drapes?

6        A.   Use drapes?

7        Q.   Are drapes used in combination with underbody

8   blankets when surgeries are performed?

9        A.   I have no experience of using underbody blankets,

10  but I can't envisage a situation in which surgical drapes

11  would not be used if an underbody blanket was used as well.

12  Surgical drapes are necessary to maintain a sterile field,

13  and I cannot imagine a situation in which the drapes would

14  not be used in surgery of this type.

15       Q.   So, in a moment you'll receive a document, and I'm

16  going to ask you to turn to the last page of the document,

17  even though the preceding pages are the study you

18  co-authored with Mr. Mike Reed involving the design of

19  forced-air warming devices.

20            (Exhibit 8 marked for identification)

21            MR. C. GORDON:   Which page are you?

22            MR. SACCHET:   Last page.

23            MR. C. GORDON:   What's the Bates number?

24  BY MR. SACCHET:

25       Q.   One moment.   Do you see the Bates number in the

1                          DR. PAUL MCGOVERN

2      bottom right-hand corner labeled 3MBH00107870?

3          A.  I do.

4          Q.  Do you see a picture of an individual on an OR

5      stand with a blanket underneath the individual?

6          A.  I do.

7          Q.  Do you see the designation on the right-hand side

8      of the page which says, "Underbody series", and six

9      different underbody blankets are pictured therein?

10         A.  I do.

11         Q.  The text of the document states: "Warm from Below."

12         A.  It does.

13         Q.  "The 3M Bair Hugger underbody blanket series offers

14     warming for virtually any surgery, routine to complex,

15     without the risk of heating pressure points.  Our seven

16     underbody series blankets deliver all the benefits of

17     forced-air warming with the convenience of unrestricted

18     patient access and smart design features like unique surface

19     outlets that prevent fluid pooling."

20         A.  Yes.

21         Q.  Do you see, in this picture, any drapes on the

22     patient?

23         A.  I do.  There appears to be a plastic drape over the

24     head end of the patient, but not a surgical drape as I would

25     recognize it.

1          DR. PAUL MCGOVERN

2     Q.  If this were performed in "virtually any surgery",

3  as the document states, there are certainly areas of the

4  body on this picture that could be operated on, but would

5  not have draping around the area; correct?

6     A.  Sorry, I don't understand.

7     Q.  Sure.  So, if this individual were to have a TKA,

8  total knee arthroplasty?

9     A.  Right.

10    Q.  There is no indication that draping would be over

11 the opposite leg, or the torso, or the breast area of this

12 individual; correct?

13    A.  You mean surgical draping?  In this picture?

14    Q.  Yeah.  Does there appear to be any draping over

15 other areas of --

16    A.  There is no draping in that picture, that I can

17 see, that is consistent with an operation.  There is no

18 sterile surgical draping I can see, no.

19    Q.  And the text states "For unrestricted patient

20 access"; correct?

21    A.  It does.

22    Q.  Assuming that drapes are not used with this

23 particular style of blanket ...

24    A.  Right.

25    Q.  ... would the results of your microbiology study

DR. PAUL MCGOVERN

1

2   have any impact on the use of this kind of blanket?

3        A.  I have no idea.

4             MR. C. GORDON:  Object to the form of the

5   question: lack of foundation, assumes facts not in evidence,

6   calls for speculation.

7        A.  I have no idea.

8   BY MR. SACCHET:

9        Q.  Would you be concerned if -- as an orthopedic

10  surgeon, would you concerned, during your training, if

11  draping was not used in a blanket that was underneath a

12  patient that blew air upward toward the patient?

13       A.  I'd be concerned if draping wasn't used in an

14  operation.

15       Q.  Okay.  Why?

16       A.  Because, in an arthroplasty procedure, draping is

17  essential to isolate the sterile surgical field and minimize

18  the possibility of infection.

19       Q.  So, if draping were not used, it may allow

20  particles or bacteria to enter the surgical site that

21  draping would otherwise prevent?

22             MR. C. GORDON:  Same objections.

23       A.  If draping were not used in an operation, then -- I

24  mean, it's inconceivable that draping wouldn't be used in an

25  arthroplasty operation, as far as I'm concerned, but if

1                         DR. PAUL MCGOVERN

2     draping were not used, then the -- there would be a

3     significantly higher chance of infection in any surgical

4     set-up, with any equipment.

5     BY MR. SACCHET:

6         Q.   Okay.  Let's go back to exhibit 5, which is the

7     protocol.

8         A.   Yes.

9         Q.   Don't worry about that.  Exhibit 5.

10        A.   Yes.

11        Q.   The second-to-last and last bullet points state

12    that:

13              "Bacteria sampler set up in standardised

14    position next to 'operative field'."

15        A.   Yes.

16        Q.   "Casella hose near 'operative field', sampling unit

17    to be outside laminar flow zone if possible."

18        A.   Yes.

19        Q.   Were you concerned at any time, during the study or

20    afterward, about the position of the bacterial sampler in

21    this study?

22        A.   In the study as it was performed, yes, the

23    bacterial sampler position, in my opinion, was not ideal.

24    It was probably in the order of a foot away from the

25    operative field itself.  Ideally, it would have been very

1                    DR. PAUL MCGOVERN

2   close to the operative field, within an inch of it, but it

3   was not possible with the design of sampler we eventually

4   used.  The Casella sampler, which is mentioned in the plan,

5   was not available to us.

6        Q.  The table in which the sampling unit was placed on

7   had the potential to block dirty air from rising upward;

8   correct?

9        A.  Were airflow -- yeah, the table upon which the

10  bacterial sampling unit was placed did, in my opinion, have

11  the potential to disrupt airflow, whether from above or

12  below.

13       Q.  And the position of the table was certainly not

14  a realistic set-up of a normal OR environment; correct?

15       A.  The position --

16            MR. C. GORDON:  Object to the form.

17       A.  -- of the table upon which the bacterial sampler

18  was, yes, was not representative of an OR environment,

19  because where the table was was where a surgeon would stand,

20  usually.

21  BY MR. SACCHET:

22       Q.  If you had to redo the experiment in order to

23  determine particle and bacterial counts from the use of the

24  Bair Hugger model 505, would you have put the table in the

25  same place?

1                    DR. PAUL MCGOVERN

2       A.  I would use a different piece of equipment

3   entirely, if I could redo the experiment.  I would not use

4   the equipment that was used.

5            THE VIDEOGRAPHER:  Sorry, someone is flicking a

6   biro or something into the microphones, and it is going

7   "click click".

8            MR. C. GORDON:  Sorry.

9   BY MR. SACCHET:

10      Q.  The other way in which you attempted to test the

11  presence of bacteria was through settle plates; correct?

12      A.  Correct.

13      Q.  You're aware of the fact that settle plates have

14  a very low chance of finding particles or bacteria on the

15  plates; correct?

16            MR. C. GORDON:  Object to the form of the

17  question.

18      A.  Well, yeah, they have -- I don't know what the

19  statistical likelihood of a bacteria landing on a plate in

20  a colony-forming unit producing a result is.  I don't know

21  what the size of the bacterial load needs to be, for

22  a positive result on a settle plate.  You'd need to ask a

23  microbiologist that.

24  BY MR. SACCHET:

25      Q.  But you testified yesterday that there was a lower

1                    DR. PAUL MCGOVERN

2   chance of finding bacteria on a settle plate?

3        A.  In the experiment that we used, yes, I believed at

4   the time that it was a low chance of finding bacteria.

5        Q.  There were no settle plates placed directly on top

6   of the wound site; correct?

7        A.  Of the -- the simulated operative site, that's

8   correct.  There were no bacteria settle plates placed on

9   that area.

10       Q.  You only had bacterial plates in the vicinity of

11  the laminar flow boundary; correct?

12       A.  They were outside the laminar flow boundary, or

13  they were within the laminar flow boundary approximately at

14  the corners of the operating table.

15       Q.  And because those plates were at the corners of the

16  operating table, you could not conclude whether there was

17  increased bacteria at the surgical site itself?

18       A.  That's correct.  I could not conclude from the

19  design of that study, or from that study, whether there were

20  bacteria at the surgical site.

21       Q.  On the next page of the protocol, which is

22  exhibit 5, in the third bullet, you state:

23            "Particle counts taken (using handheld laser

24  particle counter) from various positions around

25  patient."

1                      DR. PAUL MCGOVERN

2        A.   Yes.

3        Q.   Do you recall what type of particle counter you

4   used in the actual study?

5        A.   Handilaz Mini.

6        Q.   Do you recall any of the potential authors of this

7   experiment, even though it was never published, to have

8   expressed concern about the use of that particular type of

9   particle counter?

10       A.   No.

11            (Exhibit 9 marked for identification)

12       Q.   Exhibit 9 is a document entitled "Do Forced Air

13  Warming Devices Increase Bacterial Contamination of

14  Operative Field?"

15            Do you recognize this document, Mr. McGovern?

16       A.   I do.

17       Q.   Do you see, on the third page of the document under

18  the section entitled "Methods", there are comments from

19  someone bearing the acronym "PS1"?

20       A.   I do.

21       Q.   Does "PS1" correspond to Sutaria P, named in the

22  caption of this draft --

23       A.   I believe so, yes.

24       Q.   Who is Sutaria P?

25       A.   Dr. Sutaria is a doctor who said was slightly

1                     DR. PAUL MCGOVERN

2   junior to me at Wansbeck Hospital, working in the orthopedic

3   department, who collaborated in the experimental phase, or

4   collaborated in all phases of this study.

5        Q.   Do you see comment "PS3" that states:

6             "Is there any info about the sensitivity of

7   the device?  I.e. size of particles it can pick up and

8   relevance to pathogenicity?"

9        A.   I do see that, yes.

10        Q.   Are you aware of the fact that the Handilaz

11   handheld particle counter was only able to detect particles

12   sized 0.3, 0.5 and 5 microns?

13        A.   Yes.

14        Q.   As a result, there was no way that the particle

15   counter you used in this study would have detected particles

16   of size 0.2 microns?

17        A.   It's impossible to say if it would pick up any

18   particles of 0.2 microns.  You'd have to ask an expert on

19   that particular machine.  The way these machines work is

20   they have a laser array, and they draw air over the laser

21   array, and it measures light bouncing off particles, and it

22   calculates a probability that that number of particles has

23   been produced.  So, if it detects ten particles at

24   0.5 microns, it doesn't necessarily mean that there are

25   exactly ten particles; it means it has detected the number

1                       DR. PAUL MCGOVERN

2    of light scatterings that there are which correspond to

3    a likely particle size of that.  Therefore, it's possible

4    that it can -- it will register a result for smaller

5    particles, but I don't know, and you'd have to ask an expert

6    on that to confirm or refute that.

7         Q.  You don't doubt, do you, that the preliminary

8    results of this experiment only tracked particles of 0.3,

9    0.5 and 5 microns in size?

10        A.  I don't doubt that the machine was designed do

11   that, and that is the -- those are the results that it

12   outputted, and that is the best information that we had,

13   based on the experimental procedure that we used.

14        Q.  So there were no results in this study about

15   particles smaller than 0.3, between 0.3 and 0.4, and between

16   0.4 and 5, and greater than 5 microns in size?

17        A.  Exactly right.  That is correct.

18        Q.  You're aware of the fact that the most penetrating

19   particle size of Bair Hugger filters is 0.2 microns?

20        A.  I was not aware of that.  I may have been, at some

21   point, but I didn't remember that immediately now.

22        Q.  Does it refresh your recollection, upon hearing

23   that that might be the case?

24        A.  It sounds familiar, but I don't remember --

25   remembering specific particle sizes in filtration rates is

1                    DR. PAUL MCGOVERN

2     not something I make attempts to do.

3          Q.   Okay, check out exhibit 8.  The second page of this

4     document has a title of "Forced-Air Warming Design:

5     Evaluation of Intake Filtration, Internal Microbial Buildup,

6     and Airborne Contamination Emissions"; correct?

7          A.   Yes.

8          Q.   It was authored by Mr. Reed, yourself, and two

9     other individuals; correct?

10         A.   That's correct.

11         Q.   On the third page of the document, bearing the

12    internal pagination 277, there is a table on the top;

13    correct?

14         A.   Yes.

15         Q.   And the Figure 1 stands for "Mean Retention

16    Efficiencies"; correct?

17         A.   Yes.

18         Q.   The lowest retention efficiency demarcated in this

19    graph is 0.2 microns in diameter; correct?

20         A.   This is a log scale.  It's difficult to, because of

21    the copy, to say with absolute certainty, but --

22         Q.   If you count the intervals, you'll be able to tell

23    there are corresponding increments in 0.1 intervals adding

24    up to 1 micron in total; correct?

25         A.   There are corresponding intervals going up to 0.1,

DR. PAUL MCGOVERN

1

2  and the lowest retention efficiency is between 0.1 and 1, on

3  the log scale, and closer to 0.1.  But my copy does not show

4  the ticks clearly, so although it looks like it is 0.2,

5  I can't --

6      Q.  Sure.

7      A.  You'd need a better copy to confirm that.

8      Q.  Beneath the Figure 1 do you see the section bearing

9  the name "Results"?

10     A.  Yes.

11     Q.  And it states:

12         "Intake Filter Retention Efficiency."

13     A.  Yes.

14     Q.  "The mean efficiency for intake filter model

15  750093D (n=5) was found to be 63.8% [efficient] at the MPPS

16  of 0.2-micron."

17         Do you see that?

18     A.  Yes.

19     Q.  What does "MPPS" stand for?

20     A.  I --

21     Q.  Does "most penetrating particle size" ring a bell?

22     A.  It does, but I'd have to -- there should be a

23  definition earlier in the paper of the abbreviation.

24     Q.  If you look at the second page of the study, in the

25  first full paragraph beginning "Filtration efficiency"?

1                    DR. PAUL MCGOVERN

2      A.  Yes.

3      Q.  The last sentence says --

4      A.  Yeah --

5      Q.  "The most penetrating particle size (MPPS) is

6  defined as the particle size at which the filter displayed

7  the minimum efficiency."

8      Do you see that?

9      A.  Yes, I do see that, and that's what I understand by

10  MPPS, yes.

11      Q.  Would you agree that, based on the text of the

12  study in which you co-authored, that the MPPS of this model

13  filter of the Bair Hugger is 0.2-micron?

14      A.  Yes, that is what the study says.

15      Q.  So, to be clear, the results of the microbiology

16  study conducted in 2009 did not report directly on the most

17  penetrating particle size of that particular Bair Hugger

18  filter?

19      A.  That is correct, in my opinion.

20      Q.  Would it also be fair to say that the output of

21  counted particles from the Handilaz particle counter "do not

22  represent a true count of undivided particles"?

23          MR. C. GORDON:  Object to the form of the

24  question.

25          MR. SACCHET:  What's the basis of the form of the

1                    DR. PAUL MCGOVERN

2    objection?

3             MR. C. GORDON:  Vague and -- basically using

4    terminology that doesn't have any intrinsic meaning.

5             MR. SACCHET:  Okay, well, we can get through that.

6        A.  Repeat the question, please?

7    BY MR. SACCHET:

8        Q.  Would it be fair to say that the output of counted

9    particles from the Handilaz particle counter do not

10   represent a true count of undivided particles?

11       A.  Well, my understanding of the way that particle

12   counter works, the results to outputs are approximations and

13   extrapolations of laser defractions, and therefore may or

14   may not represent true absolute values of the number of

15   particles in the detection chamber at that time.  However,

16   that would be better answered by someone who has specific

17   training and understanding of that device.

18       Q.  So, in other words, particle counters express

19   numerical values of counted particles of varying size, but

20   due to the technique of counting, the output does not

21   represent a true count of individual particles?

22            MR. C. GORDON:  Object to the form.  Also, lack of

23   foundation.

24       A.  Yes, in my opinion.

25   BY MR. SACCHET:

1                     DR. PAUL MCGOVERN

2        Q.   I could cure the foundation by showing you

3    a document, but I'm not going to.

4             Moving on to the protocol, exhibit 5.

5        A.   Yes.

6        Q.   Under the section bearing the title "Experiment".

7        A.   Yes.

8        Q.   Does it state that the experiment was performed for

9    30 minutes in duration?

10       A.   Sorry, in exhibit 5?

11       Q.   Under the heading entitled -- Oh, on the second

12   page under the heading entitled "Experiment".

13       A.   Yes.  This doesn't say it was.  It says this was

14   the plan.  I think, in reality, it was performed for 30

15   minutes, but this document doesn't say that.

16       Q.   Yes.  And it then goes on to say that:

17       "10 minutes fully set up with Bair offered to act

18   as control.

19       "10 minutes with Bair Hugger on

20       "10 minutes with equipment turned off."

21       Correct?

22       A.   Yes.

23       Q.   Why use 10-minute increments for particle counting?

24       A.   To allow sufficient time for systems to equilibrate

25   to reduce the chance of a single movement, say a cough or

DR. PAUL MCGOVERN

1

2  a door opening, or any unpredictable event, significantly

3  affecting any data that we collected.  The idea behind that

4  was ten minutes, chosen arbitrarily, was a long enough

5  period of time to smooth out any unexpected spikes of

6  particles.

7      Q.  So the 10-minute period was used to cure any spikes

8  in particles, but you would agree that 10 minutes is not the

9  normal time for an orthopedic surgery; correct?

10     A.  I would very much agree that that is a -- very much

11 shorter than most orthopedic surgeries.

12     Q.  Do you recall that bacterial samples were only

13 collected for five minutes?

14     A.  I don't recall exactly how long they were collected

15 for.  I imagine it is in the methods of that write-up.

16     Q.  Yeah, do you want to turn back to that?  Exhibit 6.

17     A.  Yes.

18     Q.  On the third page of the document, in the "Methods"

19 section, in the third-to-last paragraph, it says: "Samples

20 were collected for five minutes."  Do you see that?

21     A.  Which paragraph, sorry?

22     Q.  Third-to-last paragraph.

23     A.  Yeah, yes.  Same.

24     Q.  That's vastly shorter than a typical orthopedic

25 surgery; correct?

1                    DR. PAUL MCGOVERN

2        A.   I agree that's --

3             MR. C. GORDON:   Object to the form of the

4    question.

5        A.   I agree, that's significantly shorter than the

6    typical orthopedic surgery.

7    BY MR. SACCHET:

8        Q.   How much shorter?

9        A.   Depends on the operation.   For hip or knee

10   arthroplasty, I would expect operation time in the order of

11   an hour, but could be 90 minutes, could be 2 hours.   No

12   shorter, in general, than 40 minutes to half an hour -- 40

13   minutes.   But that would be exceptional.

14       Q.   If you had increased the duration of the testing

15   from 10 minutes to a longer period, or 5 minutes to a longer

16   period, might you have seen increased particles of bacteria?

17            MR. C. GORDON:   Object to the form of the

18   question.   Calls for speculation.

19       A.   I've no idea.

20   BY MR. SACCHET:

21       Q.   In other studies that you drafted protocols for,

22   you used longer testing periods; correct?

23       A.   Correct.

24       Q.   More than -- equal to, or more than, 20 minutes?

25       A.   Over various different experimental runs, I'd have

1                      DR. PAUL MCGOVERN

2   to look at the specific protocols, but the total testing

3   time was, as far as I can remember, longer than for this

4   study.

5        Q.  Why did you have longer testing periods in other

6   studies?

7        A.  They were longer, or more -- a longer total period

8   of testing to provide a greater quantity of results, and

9   because those studies were designed from the outset to

10  provide data that could be analyzed statistically.

11       Q.  So, with a longer time period, you would naturally

12  accumulate more data?

13       A.  That would generally be what I would expect for

14  this type of study.

15                  (Reporter clarification.)

16       Q.  And with more data, there is a greater likelihood

17  of better powering of the study?

18            MR. C. GORDON:  Object to the form of the

19  question.

20       A.  Not -- there's not a direct correlation.  The study

21  needs to be designed appropriately, according to what it is

22  showing.  More data is not necessarily better, because data

23  can be flawed and can be useless.  So collecting more -- it

24  is quality not quantity.  For these types of studies,

25  a longer period of time collecting data may be helpful, but

1                    DR. PAUL MCGOVERN

2    if the study is well designed, then a shorter period of time

3    could be useful.  It really depends on the specific design

4    of the study and what it's trying to test.

5    BY MR. SACCHET:

6        Q.  On a related note, do you recall that only four

7    runs were conducted in this study; correct?

8        A.  Yes, that's right.

9        Q.  Three of those runs were the exact same, in which

10   the Bair Hugger was off and then the Bair Hugger was on, and

11   then the surgeon entered the room, and one of them, of the

12   four runs, involved the surgeon tracing his or her hand over

13   the wound site with a glove?

14       A.  Yes.

15       Q.  So, in effect, there were really only three runs

16   that were exactly the same?

17       A.  I don't remember if the three runs were identical

18   to each other, and if one was different, then -- I'll have

19   to go and check the methods.  Yes, that is correct.  So what

20   I've said here is the method was repeated for four

21   experiments, but the implication is that three experiments

22   were the same, and experiment 4 was a variation of that, in

23   that the surgeon continually drew their gloved hand over the

24   skin of the operative field throughout the sampling period.

25       So yes, three experiments were repeat -- well, were

1                    DR. PAUL MCGOVERN

2    the same, and experiment 4 was variant to the others.

3         Q.  Three runs isn't a lot, is it?

4            MR. C. GORDON:  Object to the form of the

5    question.

6         A.  No.

7    BY MR. SACCHET:

8         Q.  The original proposal for this study called for

9    a minimum of ten runs; do you recall that?

10        A.  I didn't recall that.  I can look at it.

11        Q.  Not the one before you, but do you ever recall

12   learning that ten runs were supposed to be performed?

13        A.  I don't remember --

14           MR. C. GORDON:  Object to the form of the

15   question.

16        A.  -- that being mentioned.  It may well have been,

17   but I'd need to check a document to verify that.

18   BY MR. SACCHET:

19        Q.  Do you recall intending to perform ten runs?

20        A.  I do not.

21           (Exhibit 10 marked for identification)

22        Q.  This is an e-mail thread among you, Ms. Val

23   Edwards-Jones, or rather Professor Edwards-Jones, and

24   yourself; correct?

25        A.  Correct.  And I have said that we will hopefully

1                        DR. PAUL MCGOVERN

2     get up to ten cycles completed.

3          Q.  So your intention, or your hope, was to run at

4     least ten runs of this experiment?

5          A.  That's correct.

6          Q.  Moreover you considered performing additional runs

7     after the initial results came in; correct?

8          A.  I don't remember.

9               (Exhibit 11 marked for identification)

10         Q.  Let's go to -- I believe it's the last page, if

11    memory serves.  Yes.

12         A.  I did consider doing additional runs after the

13    first set of experiments were completed.

14         Q.  That's what you told your colleague, Mr. Sprowson?

15         A.  Yes.

16         Q.  You never performed additional runs, did you?

17         A.  No.

18         Q.  Based on the fact that you never performed

19    additional runs, and only three runs were actually performed

20    when you intended to perform ten runs, were you happy with

21    the number of runs that were actually performed in this

22    study?

23         A.  No.

24         Q.  Since you never performed additional runs in this

25    study, you would agree that you cannot evaluate the

1                    DR. PAUL MCGOVERN

2    statistical significance of the data presented in this

3    manuscript; correct?

4         A.   Since there weren't that many runs, and because the

5    study was not designed to allow for statistical analysis.

6    It may have been possible with more runs, but the whole

7    premise of the study did not lend itself to further

8    analysis.

9         Q.   There's nothing in this study that is statistically

10   significant?

11        A.   Nothing was found in this study which was

12   statistically significant; that is correct.

13        Q.   You never planned, with a statistician, to design

14   this study?

15        A.   That's correct.

16        Q.   You never had Mr. Albrecht's expertise to

17   appropriately design this study to be adequately powered?

18        A.   That is correct.

19        Q.   This study wasn't even conceived to produce

20   statistically powered results?

21        A.   Correct.

22        Q.   The study wasn't even randomized, was it?

23        A.   I don't believe so, no.

24        Q.   You're certain of that?

25        A.   There was no -- there was nothing to randomize.

1                    DR. PAUL MCGOVERN

2  There were three sequential experiments which were the same,

3  and another one which was done as a variation to that

4  experiment.  So there was nothing random about that.  So no,

5  it wasn't.  It wasn't randomized.

6      Q.  And because it wasn't randomized, and because there

7  weren't enough runs in the study, you wouldn't be able to

8  determine a P value for the data; correct?

9          MR. C. GORDON:  Object to the form of the

10  question.

11      A.  I don't know if not being able to determine a P

12  value is a direct consequence of not randomizing the

13  experimental runs, but in this case, as far as I'm aware, a

14  P value can't be derived from this data.  It may be that

15  a statistician could derive something, but it is not

16  something I've ever attempted to do, and not something that

17  I believe was worth pursuing.

18  BY MR. SACCHET:

19      Q.  Because this study did not lend itself to

20  statistically significant results, you said yesterday that

21  this is not a good study.  Do you stand by that statement?

22      A.  I stand by it.  I do not believe this is a good

23  study.

24      Q.  You would also hope to use a Casella bacterial

25  sampler in this study; correct?

1                    DR. PAUL MCGOVERN

2        A.   Were nothing else changed, I'd want to use

3    a Casella.  But I would want to change quite lot about the

4    design of the study, but a Casella would be preferable than

5    the equipment that was used.

6        Q.   A Casella is similar to a slit sampler?

7        A.   I believe so.  It is a bacterial sampler which

8    draws air from a small hose unit which goes near the area to

9    be sampled, as far as I'm aware.

10        Q.   Was the sampler that you used, which is called

11    a Sarstedt sampler, that was noted in the method section of

12    the manuscript, was that the sampler that was provided to

13    you at the time by NHS?

14        A.   Yes, I believe so.

15        Q.   Do you recall learning that if you used that

16    sampler, the data would not be of a high enough standard to

17    produce publishable data?

18        A.   I was not aware of that when I was using it.

19        Q.   Do you recall learning that?

20        A.   I do not.

21        Q.   If you could go back to exhibit 11.

22        A.   Yes.

23        Q.   Do you see, on page 4 of 11, an e-mail dated

24    13th September 2009, from you to Mr. Reed?

25        A.   Yes.

                    DR. PAUL MCGOVERN

1

2     Q.  The e-mail states:

3          "Mr. Reed spoke to Dr. Oswald on Friday but

4     she was snowed under and couldn't give me more than

5     a couple of minutes.  I'm booked for a proper meeting

6     with her in the coming week."

7          Who is Dr. Oswald?

8     A.  I think she was a microbiologist working at the

9     Hospital Trust at the time, but I would need to check.

10    Q.  Fair enough, but she was a doctor; correct?

11    A.  Yes.

12    Q.  You then state:

13         "We did discuss the slit sampler and she said

14    the one the department has is not ideal for the task,

15    and may not be of a high enough standard to produce

16    publishable data."

17         Do you see that?

18    A.  I do see that.

19    Q.  So at one point in time, specifically September 13,

20    2009, you were advised of the fact that the sampler that you

21    used in this study may not lend itself to publishable data?

22    A.  It may not have done.

23    Q.  Yeah.  It may not.

24    A.  It may not have done.  That was what I learned at

25    the time.

1                     DR. PAUL MCGOVERN

2       Q.   And you never used the Casella sampler; is that

3   correct?

4       A.   I've never used a Casella sampler.  I've seen

5   pictures of one, but I've never used one.

6       Q.   As a result of not using the Casella sampler or

7   a slit sampler, did you tell Mr. Reed that:

8       "The experiment suffered from having to make up the

9   bacterial side of things on the day.  A Casella or

10  similar might yet have shown the bacterial contamination

11  we were looking for"?

12      A.   I don't remember saying that.  Perhaps you could

13  direct me to where I have?

14      Q.   It's not in there.

15           (Exhibit 12 marked for identification)

16      A.   Thank you.

17      Q.   Do you see, at the top of the page, an e-mail from

18  you to Mr. Reed dated February 21, 2010?

19      A.   Yes.

20      Q.   The last sentence of the second paragraph states:

21           "I think the Bair Hugger thing suffered

22  a little from having to make up the bacterial side of

23  things on the day -- a casella or similar might yet

24  have shown the bacterial contamination we were looking

25  for."

1                    DR. PAUL MCGOVERN

2            Do you see that?

3       A.   I do see that, and I did say that.

4       Q.   Does this statement refer to the microbiology study

5  that was conducted in 2009?

6       A.   Yes.

7       Q.   What did you mean by "having to make up the

8  bacterial side of things on the day"?

9       A.   What that means is that there was not

10  a pre-ordained plan for how the microbiology sampling would

11  work.  The plan was formulated on the day of the experiment

12  when it was apparent what the equipment we had was, how we

13  would utilize it, and how we might use any results.

14       Q.   So there was no advance planning with respect to

15  the bacterial side of things in this experiment?

16       A.   The advance planning came in the form of having

17  appropriate plates produced and brought to the operating

18  room, and providing the machine itself, or acquiring the

19  machine, or getting it to the right area.  But in terms of

20  how plates were positioned, how they were used, and how the

21  sampling was done, that was decided on the day.

22       Q.   Given the issues associated with the location of

23  the sampler, the failure to use a Casella sampler, the

24  limitations of the Handilaz particle counter, the duration

25  of the experiment, you don't stand by the results of this

1                    DR.  PAUL  MCGOVERN

2   other study, do you?

3        A.   The results are the results.   I don't -- the

4   experiment was performed in a way which seemed appropriate

5   at the time, but I don't think the results are

6   representative of real clinical practice.   The results were

7   honestly acquired and obtained, but in my opinion they don't

8   show anything that is particularly relevant to clinical

9   practice.   So the process of gaining these results was a

10  good learning experience for me, in terms of producing

11  further study and research, and that's how I consider this

12  exercise to be: a good learning experience.   But the results

13  that were outputted from it were not sufficient, in terms of

14  quantity and quality, to draw any meaningful conclusions.

15  And that is why -- it is likely to be why it was rejected,

16  in my opinion, and why I did not pursue it further.

17       Q.   You also mentioned yesterday that the patient was

18  not positioned under standard protocol for a total knee

19  arthroplasty or total hip arthroplasty; correct?

20       A.   That's correct.

21       Q.   There were no trays in the OR during this

22  experiment?

23       A.   That's correct.

24       Q.   The overhead light position was neither recorded

25  nor controlled during the experiment?

1                          DR. PAUL MCGOVERN

2        A.   Correct.

3        Q.   There was only one person in the in operating room

4    at the time in which the experiment was conducted, when in

5    other situations there would be more?

6        A.   There was more than one person in the room.  There

7    was not more than one person within the laminar flow

8    boundary, and there were no more than, I think, four people

9    in the room at any one time.  And they were standing well

10   away from the laminar flow boundary, which is not standard

11   practice, and would not be what I would expect in a surgery.

12       Q.   To the extent that this data shows that there were

13   more particles in the room when the surgeon entered than

14   when the Bair Hugger was on without the surgeon, did you

15   control for the Bair Hugger being off when the surgeon was

16   in the room?

17            MR. C. GORDON:  Object to the form of the

18   question.

19       A.   Not as far as I can remember.

20   BY MR. SACCHET:

21       Q.   So, even if there were increased particle counts

22   when a surgeon entered the room, there would be no way of

23   telling whether those increased particle counts were

24   a product of the Bair Hugger by itself, the Bair Hugger in

25   combination with the surgeon, or the surgeon by him or

```
1                    DR. PAUL MCGOVERN
2   herself?
3        A.  There's no way of proving a correlation, or
4   demonstrating statistically significant correlation between
5   those conditions.
6        Q.  So the increase, if any, in particle counts when
7   the surgeon entered the room versus when the Bair Hugger was
8   on by itself, did not have -- no determination of
9   statistical significance was made?
10       A.  No statistical analysis performed, and so no
11  statistical -- statistically significant conclusions can be
12  drawn from it.
13           MR. SACCHET:  Why don't we take a break?
14           THE VIDEOGRAPHER:  Going off the record at three
15  minutes past twelve.
16  (12:03 p.m.)
17                        (Break taken.)
18  (1:06 p.m.)
19           THE VIDEOGRAPHER:  Back on the record at six
20  minutes past one.
21  BY MR. SACCHET:
22       Q.  Mr. McGovern, we're going to move now to the
23  article you co-published, entitled "Forced-air warming and
24  ultra-clean ventilation do not mix."
25       A.  Yes.
```

1                    DR. PAUL MCGOVERN

2          (Exhibit 13 marked for identification)

3     Q.   You are a co-author of this paper; correct?

4     A.   Correct.

5     Q.   As are Mr. Albrecht, Mr. Belani, Mr. Nacthsheim,

6  Mr. Partington, and Mr. or Ms. Carluke?

7     A.   Mr. Carluke.

8     Q.   Mr. Carluke and Mr. Reed; correct?

9     A.   Correct.

10     Q.   There were two parts to this study: one

11  experimental regarding bubble counts, and another regarding

12  observational data; correct?

13     A.   Correct.

14     Q.   And with respect to the experimental part, you

15  analyzed a hip replacement surgery and lumbar spine surgery?

16     A.   Simulated versions of those, yes.

17     Q.   Were you involved in the design and set-up of those

18  two simulations?

19     A.   Yes.

20     Q.   What was your role in designing those two

21  simulations?

22     A.   My role was to work with Mike Reed and Mark

23  Albrecht to set the operating room up to understand how

24  helium bubbles were flowing in the room, to suggest set-ups

25  which were representative of real surgical situations, and

DR. PAUL MCGOVERN

1
to ensure that the simulation that was undertaken was as

2
close as practicable to a real-world scenario.

4      Q.  Was the operating room in which the simulations

5  were performed a actual orthopedic operating room?

6      A.  It was indeed.

7      Q.  And in that operating room, was there laminar flow?

8      A.  There was.

9      Q.  Based on the text of the study, isn't it true that

10 the laminar flow exceeded minimum standard requirements for

11 laminar flow in operating rooms?

12     A.  It did.  Laminar flow in that hospital trust is

13 regularly tested and was a -- that the laminar flow unit was

14 functioning correctly and adequately for orthopedic

15 operating procedures.

16     Q.  The bubble generator that you used was specifically

17 designed for, and validated for, testing air currents;

18 correct?

19     A.  I understand that it was, yes.

20     Q.  And for both procedures -- simulations, rather --

21 you testified yesterday that they were draped according to

22 realistic protocols and procedures?

23     A.  That is correct.

24     Q.  The adhesive edges of the drape were sealed in

25 accordance with standard protocol?

DR. PAUL MCGOVERN

1

A.   They were attached to the mannequin as they usually

2

would be to a real patient, yes.

3

Q.   And you and Mr. Albrecht even checked to make sure

4

that there were no air tunnels for air to escape prior to

5

performing the experiment; correct?

6

A.   We made every effort to ensure that the seal was as

7

effective as it could be, and we made every effort to avoid

8

the possibility of any air tunnels under the drapes blowing

9

directly into the operative field, yes.

10

Q.   And the simulations were randomized, were they not?

11

A.   The simulations were randomized, yes.

12

Q.   In terms of the design of the experiment, you

13

tracked bubble counts using a sequence of five photographs

14

at 10-second intervals; correct?

15

A.   Yes, we used photographs at intervals to track

16

bubbles in a specific area, yes.

17

Q.   And the specific design of the experiment is what

18

is known as a 2x3 vectorial design?

19

A.   Yes.

20

Q.   And the factors within the 2x3 vectorial design

21

were 2 being the Hotdog versus the Bair Hugger?

22

A.   Yes.

23

Q.   And the 3 being the height of the drape, 1 at no

24

drape, the other at half drape, and the final at full drape;

25

1                    DR. PAUL MCGOVERN

2    correct?

3        A.   Correct.

4        Q.   If we could turn to Figure 5 on internal page 1540.

5        A.   Yes.

6        Q.   Figure 5 displays the sum of bubble counts for each

7    run of the 2x3 vectorial design; correct?

8        A.   Yes.

9        Q.   And with respect to no drape, otherwise known as

10   "laid down", conductive fabric warming resulted in zero

11   bubbles over the surgical site; correct?

12       A.   Yes.

13       Q.   In contrast to zero bubbles over the surgical site,

14   the use of a forced-air warming, namely the Bair Hugger,

15   resulted in three bubbles over the surgical site?

16       A.   It shows some bubbles.  I don't remember -- it

17   doesn't show that on this table, as far as I can see.

18       Q.   If you look at the second paragraph of the

19   "Results" section of the study on the same page, do you see,

20   in the last clause of that paragraph --

21       A.   Yes.

22       Q.   -- it states: "... and laid-down (0 versus 3 ..."

23       A.   It does a lay down 0 versus 3, yes.

24       Q.   So there were three bubbles with the use of

25   a forced-air warming device, namely the use of a Bair Hugger

1                    DR. PAUL MCGOVERN

2   when the drape is laid down, yes?

3       A.  To the best of my knowledge, yes.

4       Q.  At half height, there were zero bubbles over the

5   surgical site with respect to the use of the Hotdog

6   conductive fabric warming device; correct?

7       A.  Yes.

8       Q.  And in contrast to zero bubbles at the surgical

9   site, the forced-air warming device --

10                  (Reporter clarification.)

11          MR. SACCHET:  Why don't I -- we'll just strike the

12  question and I'll re-ask it for the purposes of the record.

13  BY MR. SACCHET:

14      Q.  At half height, the forced-air warming device,

15  namely the Bair Hugger, resulted in 68 bubbles over the

16  surgical site; correct?

17      A.  Could you just direct me to that?  Ah, no, could

18  you direct me to that paragraph in the text, please?

19      Q.  Sure.  So, in the second paragraph of the "Results"

20  section, the third-to-last clause states:

21      "Drape configurations at half height (0 versus

22  68 ..."

23      A.  Yes, seen.  Yes.

24      Q.  And finally, at the full drape height, we can just

25  refer -- instead of Figure 5, which seems to be more

1                      DR. PAUL MCGOVERN

2   confusing than helpful -- back to the text.  There were zero

3   bubbles with respect to conductive fabric warming and one

4   bubble with respect to forced-air warming, in the last

5   sentence of that paragraph; do you see that?

6        A.  Yes.

7        Q.  So, all told, with respect to the drape laid down,

8   the drape at half height, and the drape at full height,

9   there were no bubbles produced by the conductive fabric

10  warming device during any of the runs; correct?

11       A.  That is what these results indicate.

12       Q.  And with respect to the drapes at half height, and

13  laid down, the differences in bubble counts between the

14  Hotdog and the Bair Hugger were statistically significant?

15       A.  That is what these results and the statistical

16  analysis indicates.

17       Q.  This study was submitted to the Journal of Bone and

18  Joint Surgery; correct?

19       A.  The British volume of that journal, yes.

20       Q.  And some of the reviewers, or all of the reviewers,

21  have expertise in the field of bone and joint surgery;

22  correct?

23       A.  Yes.  The reviewers will have been selected for

24  their specific expertise and their ability to peer review

25  papers in this field for this journal.

Page 353

DR. PAUL MCGOVERN

1
2      Q.   And the paper was accepted for publication after
3  the peer-review process in this journal; correct?
4      A.   Correct.
5      Q.   Do you recall one of the reviewers stating that the
6  study was conducted in a clear, methodical and productive
7  fashion?
8      A.   Yes.
9      Q.   So the editors of this journal ultimately accepted,
10  as stated in this study, that the Bair Hugger produced more
11  bubbles over the surgical site than a conductive fabric
12  warming device?
13      A.   The experiment in which the Bair Hugger was
14  compared with the conductive fabric forming device resulted
15  in more bubbles in the vicinity of the operative field for
16  the Bair Hugger condition than for the conductive fabric
17  warming condition.
18      Q.   Albeit not in this study, but a different study, do
19  you recall stating that smaller airborne particles, such as
20  free-floating bacteria and skin cell fragments, had similar
21  airborne characteristics as neutrally buoyant detergent
22  bubbles?
23      A.   I may have stated that, but I would need to be
24  directed to the document to refresh my memory.
25              (Exhibit 14 marked for identification)

1                    DR. PAUL MCGOVERN

2        Q.  If you could please turn to internal page 409, the

3   last paragraph.  The last full paragraph, I should say, in

4   the right-hand column.  The sentence states:

5             "These concerns are most relevant for smaller

6   airborne particles, less than or equal to 10 microns,

7   such as free-floating bacteria and skin cell fragments,

8   having similar airborne characteristics to the

9   neutrally buoyant detergent bubbles studied ..."

10            Do you see that?

11       A.  I do see that.

12       Q.  This paper was authored by you and others; correct?

13       A.  Correct.

14       Q.  Do you stand by that statement?

15       A.  That statement is reasonable me.  It does not have

16   a reference for the relationship between free-floating

17   bacteria, skin cell fragments and helium bubbles having

18   similar airborne characteristics.  I believe that to be the

19   case, but it would be preferable, in my opinion, for that

20   statement to be referenced to a peer-reviewed paper.  And

21   although I believe that to be the case, I could not say that

22   that is fact without further evidence.

23       Q.  This paper, namely Patient Warming Excess Heat by

24   you and Mr. Belani and others, was peer-reviewed; correct?

25       A.  It was peer-reviewed, yes.

Page 355

                    DR. PAUL MCGOVERN

1    Q.  It was published in Anesthesia & Analgesia;

2  correct?

3    A.  Analgesia, yes.

4    Q.  So had this statement been of great concern to the

5  editors, they would have asked for a revision of that

6  statement; correct?

7    A.  I think that would probably -- (overspeaking) --

8            (Reporter clarification.)

9         MR. C. GORDON:  The objection again?  Both form

10  and lack of foundation.

11    A.  Could you just repeat the question, please?

12  BY MR. SACCHET:

13    Q.  Sure.  Had there been a great issue with this

14  particular statement, the editors may have required you to

15  alter it in some way; correct?

16    A.  The action of the editors would be their decision,

17  but I would expect that a statement which, were I reviewing

18  a paper, if I had identified a statement which I felt to be

19  questionable, I would have challenged it and expected it to

20  be justified or removed.

21    Q.  And in other papers you have co-authored and

22  participated in the peer-review process, editors have asked

23  for revisions of particular sentences?

24    A.  Yes, that's absolutely true.

Page 356

DR. PAUL MCGOVERN

1

2    Q.  And this particular sentence was published in final

3    form, as it says in this paper?

4    A.  This sentence, as part of this paper, was

5    peer-reviewed and approved for publication.

6    Q.  Do you have any reason to doubt the bubble count

7    results of the McGovern paper?

8    A.  I do not.

9    Q.  You did not receive any compensation from Augustine

10   Biomedical & Design, or any of its predecessor entities,

11   with respect to conducting this study?

12   A.  No.

13   Q.  In fact, it cost you a sum of money to conduct this

14   study?

15   A.  Overall, this study -- the conducting of this study

16   involved me working at weekends in my own hours, traveling

17   to and from the hospital on my own time, and at my own

18   expense.  There were -- some equipment was purchased, and at

19   the time, I received expenses for that equipment to be

20   purchased, I did -- but I received that from the healthcare

21   trust that I worked for.  I did not receive any money

22   directly from Augustine at this time for this paper, to my

23   knowledge.

24   Q.  The fact that Mr. Albrecht may have been employed

25   by Augustine Biomedical & Design, or any of its predecessor

1                    DR. PAUL MCGOVERN

2  entities at this time, had no influence on your

3  participation in this study?

4       A.  It had no influence on my participation in this

5  study.

6       Q.  Let's now move to the observational aspect of the

7  study.  Were you involved in the collection of any of the

8  data with respect to the observational information present

9  in this study?

10      A.  I was not.

11      Q.  Were you aware that other co-authors of this study,

12 such as Mr. Reed, made great efforts to collect as much data

13 as possible before publishing the paper?

14      A.  Yes.

15           MR. C. GORDON:  Object to the form of the

16 question.

17 BY MR. SACCHET:

18      Q.  For example, in prior manuscripts of this study,

19 one of which you looked at yesterday, the period of time in

20 which infection rates were analyzed was from September 2008

21 to September 2010, a two-year period; correct?

22      A.  Yes.

23      Q.  Whereas the published paper, as shown in figure 7

24 of the study, the date range was July 2008 to January 2011;

25 correct?

1                    DR. PAUL MCGOVERN

2        A.   Correct.

3        Q.   That period is longer than the original period in

4   one of the initial manuscripts of this paper; correct?

5        A.   Indeed it is.

6        Q.   In the prior manuscript of this study, the

7   infection data for conductive fabric warming devices showed

8   zero infections; correct?

9        A.   In the previous draft that you've mentioned, that's

10  correct.

11       Q.   Whereas in this study, there were three infections

12  that occurred when a conductive fabric warming device was

13  used; correct?

14       A.   That is correct.

15       Q.   So there was no intent or effort on the part of the

16  co-authors to artificially limit the dataset or time period

17  in which this data was analyzed, in order to skew the

18  results?

19       A.   That is correct.  As much data as was available was

20  included in the paper.  When the process of writing and

21  reviewing the paper went beyond the earlier limit that you

22  discussed, and more data was available, it was included, so

23  that as much data as possible could be included, to my

24  memory.

25       Q.   And yesterday you were asked about being concerned

Page 359

DR. PAUL MCGOVERN

with the data that was prevented in the initial draft of the
paper; correct?

   A.  Yes.

   Q.  And do you recall, upon reviewing updated data,
being pleased with the dataset?

        MR. C. GORDON:  Object to the form of the
question.

   A.  I don't recall being pleased or displeased with the
dataset.

BY MR. SACCHET:

        (Exhibit 15 marked for identification)

   Q.  This is an e-mail dated -- or e-mails dated
February 1, 2011; correct?

   A.  Yes.

   Q.  In the first e-mail, Mr. Albrecht writes to
Mr. Reed, yourself and others; correct?

   A.  Yes.

   Q.  And he says:

        "Guys,

        "Here it is, including the updated joint
infection data covering about 6-9 months of conductive
fabric warming usage."

        Do you see that?

   A.  I do.

Page 360

1                    DR. PAUL MCGOVERN

2         Q.   And below that, you respond directly to

3    Mr. Albrecht; correct?

4         A.   That is correct.

5         Q.   And you say:

6              "Looks fantastic, particularly with the new

7    data... thanks!"

8         A.   Correct.

9         Q.   So, based on the updated data, had you been

10   concerned prior to that time, at this point you were pleased

11   with the data?

12             MR. C. GORDON:   Object to the form of the

13   question.

14        A.   I don't believe that indicates that I was concerned

15   with the data.  That statement represents a sense of my

16   being pleased that the paper had been finished and

17   completed, it was ready for submission, and that I was

18   satisfied with the quality of the paper and I felt that it

19   was a good piece of work.

20   BY MR. SACCHET:

21        Q.   And you were satisfied with the new data?

22        A.   I was satisfied with the new data.

23        Q.   Let's actually look at some of the specifics about

24   the observational data that was collected.

25        A.   Okay.

1                     DR. PAUL MCGOVERN

2        Q.   I don't necessarily expect you to remember all this

3   from memory, so I'm happy to direct you to particular pages.

4   But do you recall that the final dataset had 1,437 patients?

5        A.   That sounds about in the right ballpark, but I

6   don't remember the exact number.

7        Q.   If you look at page 1541 internally of the study.

8   Sorry, going back to exhibit 13.

9        A.   Yes.

10       Q.   The column on the left bears a bold section header

11   entitled "Joint infection risks", and it states:

12            "The demographics of 1437 patients undergoing

13   hip and knee replacements revealed no significant

14   difference between the two types of warming for SSI

15   risk factors of age, type of surgery, diabetes and

16   length of pre-operative stay."

17            Correct?

18       A.   Yes, correct.

19       Q.   So the final dataset involved 1,437 patients;

20   correct?

21       A.   Yes.

22       Q.   If I can draw your attention to table II, which is

23   on the next page.  And if you look at, I guess, the bottom

24   third of that table, there are lines entitled "Patient

25   warming device."

1              DR. PAUL MCGOVERN

2      And beneath that: "Conductive [warming] fabric

3 [subset] knee [subset] hip."

4      And then: "Forced air [subset] knee [subset] hip";

5 correct?

6      A.  Yes.

7      Q.  And then the first column of data relates to

8 developing an infection; correct?

9      A.  Yes.

10      Q.  And the second set relates to not developing an

11 infection?

12      A.  Yes.

13      Q.  Correct.  So, in order to determine how many

14 patients were in each group, whether it be conductive fabric

15 or forced-air warming, one would need to add those

16 developing an infection with those not developing an

17 infection; correct?

18      A.  Could you repeat that, please?

19      Q.  In order to determine the total population of those

20 who received conductive fabric warming, one would need to

21 add the three patients who developed an infection with the

22 368 who did not develop an infection; correct?

23      A.  Yes.

24      Q.  So the total population of those receiving

25 conductive fabric warming was 371 patients; correct?

Page 363

1                    DR. PAUL MCGOVERN

2        A.   Yes.

3        Q.   And with respect to forced-air warming, the total

4   population was 1,066; correct?

5        A.   1,034 plus 32, yes.

6        Q.   On the same table, 3 out of the 371 patients who

7   received conductive fabric forming developed an infection;

8   correct?

9        A.   Yes.

10       Q.   And those infections are specific to deep joint

11  infections; correct?

12       A.   That information is not in this table.  You'd have

13  to direct me to where it specifically says that in the paper

14  for me to be able to confirm that.

15       Q.   So the subsets of each warmer are knee and hip, and

16  knee and hip; correct?

17       A.   Correct.

18       Q.   So those would be joint infections; correct?

19       A.   They ... they indicate an infection in a knee

20  operation and a hip operation.  But your comment as to

21  whether it was a deep joint infection, I don't know if that

22  has been specified in the text.  I don't remember.

23       Q.   If you could look at the first page of the study,

24  in the third paragraph in bold, it states:

25                "A significant increase in deep joint

1                      DR. PAUL MCGOVERN

2    infection, as demonstrated by an elevated infection

3    odds ratio [of 3.8 with a p value 0.24] was

4    identified."

5              Do you see that?

6         A.  Yes, and I agree, then, that these refer to deep

7    joint infection.

8         Q.  So 3 out of the 371 patients receiving conductive

9    fabric warming developed a deep joint infection; correct?

10        A.  That is what this data appears to show.

11        Q.  And 32 out of the 1,066 patients receiving

12   forced-air warming developed an infection; correct?

13        A.  That is how I interpret this data.

14        Q.  And the corresponding percentages, with respect to

15   infections for each warming group, was 0.8 percent

16   infections for conductive fabric warming versus 3.0

17   infections for forced-air warming; correct?

18        A.  That is what this data shows.

19        Q.  Because the data was specific to deep joint

20   infections, the data did not analyze wound infections more

21   generally?

22        A.  That is correct, to the best of my knowledge.

23        Q.  So, things like superficial infections and hematoma

24   were not analyzed by these particular figures?

25        A.  That is what I understand from this, yes.

1                    DR. PAUL MCGOVERN

2           (Exhibit 16 marked for identification)

3      Q.  So it is a bit of in unwieldy document but we'll do

4  our best.  As you can see, it is an Excel spreadsheet?

5      A.  Yes.

6      Q.  That was included in your production of documents;

7  correct?

8      A.  Yes.

9      Q.  The cells have various labels, the first being in

10  column AWG; do you see that?

11      A.  I do.

12      Q.  Does "WG" likely stand for Wansbeck Hospital?

13      A.  Yes.

14      Q.  Column B has numbers ranging from, I believe, 39 to

15  87.  I suspect that they are patient ages; is that correct?

16      A.  That seems likely, yes.

17      Q.  Column C has various letters with numbers, all with

18  the first letter W.  Is that some type of patient code?

19      A.  It may be, because some of them are the same.  Ah,

20  it appears, actually, that they correspond to the operation

21  code.

22      Q.  Okay.

23      A.  So 371 appears to correspond to hip, and I suspect

24  that --

25      Q.  Oh, yes.  There are only two types: 401 versus 371.

Page 366

1                    DR. PAUL MCGOVERN

2        A.   So I suspect that is what that means.

3        Q.   Okay.  And in column D, in fact, the type of

4   arthroplasty is labeled as either hip or knee; correct?

5        A.   Yes.

6        Q.   And in column E, the date in which the surgery

7   occurred?

8        A.   Most likely, yes.

9        Q.   Okay.  Now if we flip the page, in column --

10  actually, flipping to the final page.

11       A.   Yes.

12       Q.   Column BA indicates whether it was an intestinal or

13  skin carried pathogen?

14       A.   BA?  No.

15       Q.   What are the markings "Intestinal" versus "Skin

16  Carried"?

17       A.   I'm on sheet 2, page 2.  Are we on sheet 1?

18       Q.   Let's look at sheet 3 -- I mean sheet 1, page 3.

19       A.   Right, okay.  So that's column BA, yes.

20       Q.   And the "B" specifies the type of bacteria?

21       A.   Yes.

22       Q.   And "BC" is the type of warming device?

23       A.   Yes.  I don't understand why -- okay, yeah, it

24  does.  It states the type of warming device, yes.

25       Q.   Okay.  Are you familiar with the fact that the

                    DR. PAUL MCGOVERN

1
2   study period of the McGovern study started on July 2008?

3       A.  I would have to check the paper to confirm that.

4       Q.  If you go back to tab 44 and look at the -- I'm

5   sorry, if you can go back to your exhibit 13.

6       A.  Yes.

7       Q.  There is the infection graph?

8       A.  Yes, July 2008.

9       Q.  Okay.  And the first five procedures that were

10  performed, as designated in column E on page 1 of sheet 1,

11  all precede July 2008; correct?

12      A.  Yes.

13      Q.  So those particular infections were not included in

14  the published McGovern study; correct?  Because --

15      A.  Because?

16      Q.  Because it preceded the time in which the McGovern

17  study analyzed the data; correct?

18      A.  It looks that way, yes.

19      Q.  Okay.  However, the sixth entry started on July 1,

20  2008, which is within the period of the study; correct?

21      A.  That appears to be so.  It could be that the date

22  started just after the first -- but no, it is July, because

23  the next one is August, so yes.

24      Q.  Okay.  And as you can see on sheet 1, page 3, in

25  column BC, there are six cells entitled "Transition"; do you

1                    DR. PAUL MCGOVERN

2    see that?

3         A.  Yes.

4         Q.  There was also a transition period in the McGovern

5    study, was there not?

6         A.  Yes.

7         Q.  And those particular infections that occurred in

8    the transition period were not part of the conductive fabric

9    warming period or the forced-air warming period; correct?

10        A.  Yes, I believe so.

11        Q.  So, now that we have established that, if we

12   exclude the first five cells which occurred prior to 1 July

13   2008, and we exclude the six cells bearing the label

14   "Transition", how many cells do you count in between, which

15   would be cells 6 through 35?

16        A.  29.  Huh?  Yeah.

17        Q.  You might want to count them out, just to be sure.

18   So 6 through 35.

19        A.  Inclusive?

20        Q.  Yes.?

21        A.  Well, inclusive, 26.

22        Q.  So we've got 6, 7, 8, 9, 10.  That's 5, right?

23        A.  Yes.

24        Q.  11, 12, 13, 14, 15, another 5 to make 10?

25        A.  Yes.

1          DR. PAUL MCGOVERN

2     Q.   16, 17, 18, 19, 20, another 5 to make 15?

3     A.   Yes.

4     Q.   21, 22, 23, 24, 25, another 5 to make 20?

5     A.   Yes.

6     Q.   26, 27, 28, 29, 30, another 5 to make 25?

7     A.   Yes.

8     Q.   And 31, 32, 33, 34, 35, to make 30?

9     A.   Yes.

10    Q.   And then 36 is February 23, 2010, which
11  I improperly excluded, but it is not part of the transition
12  cell, correct?  Cell 36, with BC?

13    A.   37 is transition, so 36 is part of that.

14    Q.   So it would be 31 --

15    A.   Right, okay.

16    Q.   -- FAW infections; correct?

17    A.   Okay.

18    Q.   And now if we look at cell 44 in column BC, what is
19  the marking of that device?

20    A.   FAW.

21    Q.   In total, how many forced-air warming device
22  related infections were there?  31 plus 1?

23    A.   32.

24    Q.   32 infections for forced-air warming; correct?

25    A.   Yes.

Page 370

1                    DR. PAUL MCGOVERN

2          MR. C. GORDON:  What was the last number you had?

3          MR. SACCHET:  Yes, cell number 44.

4          MR. C. GORDON:  44?

5          MR. SACCHET:  Yes.

6          THE WITNESS:  Row number.

7          MR. SACCHET:  Oh, I apologize.  44C, labeled

8    "FAW".

9          MR. C. GORDON:  From September 15?

10   BY MR. SACCHET:

11       Q.  Labeled "FAW".  If we could now look at the cells

12   43, 45 and 46, what is their label in the BC column?

13       A.  "CFW".

14       Q.  How many total CFW infections is that?

15       A.  3.

16       Q.  So there are 32 forced-air warming infections and 3

17   conductive fabric warming infections; correct?

18       A.  Yes.

19       Q.  If we turn back to the McGovern study, exhibit 13,

20   and look back to table 2.

21       A.  Yes.

22       Q.  Are there three conductive fabric warming related

23   infections?

24       A.  Indeed there are.

25       Q.  Are there 32 forced-air warming related infections?

1                    DR. PAUL MCGOVERN

2        A.   Yes.

3        Q.   Does the data presented in this Excel spreadsheet

4   match the data presented in the published study?

5        A.   The data we've discussed matches the data in the

6   published study.

7        Q.   Now let's look at the significance of the data.

8   Table 2 shows a P value of 0.024 with respect to patient

9   warming device; correct?

10       A.   Yes.

11       Q.   A P value of 0.024 is statistically significant, is

12  it not?

13       A.   Yes.

14       Q.   That would indicate that there was a sufficiently

15  powered difference between infection rates in patients who

16  received conductive fabric warming devices versus those who

17  received forced-air warming devices; correct?

18       A.   That is what this analysis would suggest, yes.

19       Q.   Table 2 also bears the number 3.8 under "Odds

20  ratio"; do you see that?

21       A.   Yes, yes.

22       Q.   What does that number signify?

23       A.   I am not happy to define that at the moment,

24  because I may make a mistake.

25       Q.   Does it relate to, on the first page of the study,

1          DR. PAUL MCGOVERN

2   in the line that I previously read, which is in bold in the

3   third paragraph, where it states "A significant increase in

4   deep joint infections as demonstrated by an elevated

5   infection odds ratio of 3.8 was identified during a period

6   when forced-air warming was used compared to a period when

7   conductive fabric warming was used"?

8          A.  That is what this refers to.

9          Q.  So there was a 3.8 times more likely rate that

10  a patient would incur a deep joint infection with the use of

11  a forced-air warming device than with a conductive fabric

12  warming device; correct?

13         A.  That is what I understand from these data and from

14  this analysis.

15         Q.  Do you recall Mr. Reed informing you that "The data

16  was dramatic and will demonstrate to reviewers that there

17  was a genuine change with conductive fabric warming rather

18  than a steady decline due to other reasons"?

19         A.  I don't recall him saying that.

20             (Exhibit 17 marked for identification)

21         Q.  If I could direct your attention to page 2 of 3.

22  There is an e-mail dated February 19, 2011, from Mike Reed

23  to Mr. Albrecht and yourself and Mr. Belani and

24  Mr. Nachtsheim; correct?

25         A.  Yes.

1                    DR. PAUL MCGOVERN

2        Q.  The final two lines of the large paragraph in the

3   middle of the page states:

4            "It is quite dramatic and will demonstrate to

5   reviewers that there was a genuine change with CFW

6   rather than a steady decline due to other reasons."

7            Do you see that?

8        A.  That is what it says here, yes.

9        Q.  Does that refresh your recollection that Mr. Reed

10  stated that the data showed a genuine change with conductive

11  fabric warming, rather than a steady decline due to other

12  reasons?

13       A.  It does refresh my memory to that effect.

14       Q.  Do you have any reason to doubt Mr. Reed's ability

15  to make such a statement?

16       A.  I do not.

17       Q.  You have all the confidence that you could that

18  Mr. Reed would accurately state such a statement?

19       A.  Yes.

20       Q.  Do you recall the reviewers from the Journal of

21  Bone and Joint Surgery stating that there were -- that the

22  data in your study supported serious issues with forced-air

23  warming devices?

24       A.  I don't recall their comments to that effect.

25            (Exhibit 18 marked for identification)

1                     DR. PAUL MCGOVERN

2        A.   Thank you.

3        Q.   This is a initial e-mail from Mr. Albrecht to

4   yourself on May 19, 2011; correct?

5        A.   Yes.

6        Q.   He says, "See reviewer's comments below (only

7   minor)."

8        A.   Yes.

9        Q.   Below that is an e-mail from -- actually a letter

10  from James Scott, an editor of the journal?

11       A.   Yes.

12       Q.   To Mr. Albrecht?

13       A.   Yes.

14       Q.   It says:

15            "Thank you for submitting your paper for

16  consideration by the Journal of Bone and Joint Surgery.

17  It has been reviewed by experts in the field and by

18  members of the editorial staff";

19            Does it not?

20       A.   It does.

21       Q.   On the third page of this e-mail there are comments

22  from reviewer 2, correct?  Which is designated on the second

23  page but carrying over on to the third page?

24       A.   Correct.

25       Q.   In the first full paragraph, the reviewer states:

1                    DR. PAUL MCGOVERN

2            "The second part of the paper is a study of

3    the infection in the cases done in their unit over

4    a period of years before, during and after the

5    transition from the forced-air warming apparatus to the

6    conductive material heating apparatus."

7            Do you see that?

8    A.   I do.

9    Q.   The reviewer goes on to state:

10           "This demonstrates that there were actual

11   changes in infection rates which would fit well with

12   the experimental data and therefore support the

13   contention that there is a serious issue to be

14   addressed with some of the warming devices."

15           Do you see that?

16   A.   I do.

17   Q.   Does that refresh your recollection that one of the

18   editors of the Journal of Bone and Joint Surgery said that

19   the study supported serious issues with respect to warming

20   devices?

21   A.   One of the peer reviewers said that.

22   Q.   One of the peer reviewers?

23   A.   Yes.

24   Q.   Yesterday you were asked about some of the

25   potential limitations of the study; correct?

1                    DR. PAUL MCGOVERN

2        A.   Yes.

3        Q.   You were asked about particular patient

4   demographics?

5        A.   Yes.

6        Q.   And table 1 of the study itself shows that some

7   patient-specific demographics were similar between the

8   patient groups who received forced-air warming versus

9   conductive fabric warming; correct?

10       A.   Yes.

11       Q.   And table 2 shows that, as to those particular

12   patient-specific demographics, including age, diabetes and

13   length of pre-operative stay, that they did not

14   significantly impact infection rates; correct?

15       A.   That is what I understand from this data.

16       Q.   With regard to other potential patient-specific

17   demographics, including things like obesity, or

18   incontinence, or fitness for surgery, do you have any reason

19   to doubt that the two patient groups between forced-air

20   warming and conductive fabric warming were different?

21       A.   No.

22       Q.   This data was observational in nature; right?

23       A.   Correct.

24       Q.   Observational data is a legitimate scientific

25   methodology; correct?

1                    DR. PAUL MCGOVERN

2         MR. C. GORDON:  Object to the form of the

3    question.

4         A.  It is -- well, data is not a methodology.

5    BY MR. SACCHET:

6         Q.  Studies.

7         A.  But observational studies are legitimate scientific

8    studies, in my opinion.

9         Q.  In the absence of a randomized controlled study,

10   observational studies are considered to be the next best

11   alternative; correct?

12        A.  I wouldn't know if they were the next best

13   alternative, but they are a valuable component of the total

14   body of knowledge on a subject.

15        Q.  Are you aware that in other healthcare

16   circumstances, such as the use of tobacco and cancer rates,

17   that for a very long period of time there was never

18   a randomized controlled trial that proved causation between

19   the use of tobacco and cancer?

20        A.  Absolutely, yes.

21        Q.  And all that there was to rely on for many, many

22   years, were observational studies?

23        A.  Absolutely, yes.

24        Q.  And we all know, beyond peradventure, that tobacco

25   causes cancer?

                        DR. PAUL MCGOVERN

1

2      A.  Yes.

3      Q.  In order to conduct a randomized controlled trial

4  with respect to infection rates in orthopedic procedures,

5  you'd need a huge amount of funding, wouldn't you?

6      A.  Yes.

7      Q.  The patient population would have to be massive for

8  it to be sufficiently powered?

9      A.  Yes.

10     Q.  Those two factors would make it difficult for a lot

11 of scientists to conduct a randomized controlled trial on

12 the rates of infection in joints between the use of

13 a forced-air warming device and a conductive fabric warming

14 device; correct?

15     A.  Yes, amongst others.

16     Q.  In fact, there is no study to this day that's

17 a randomized controlled trial.  I'll strike that.

18          So, despite the fact that a randomized

19 controlled trial has not been conducted, this

20 observational data is valuable?

21     A.  Yes, I believe this observational data is valuable.

22     Q.  You were also asked yesterday about the change in

23 antibiotic protocol, were you not?

24     A.  Yes.

25     Q.  And we now know, through our conversation, that the

                         DR. PAUL MCGOVERN

1  period of data that was collected for this study began on

3  July 1, 2008; correct?

4      A.  Yes.

5      Q.  And there was a transition in the middle between

6  forced-air warming to conductive fabric warming; correct?

7      A.  Yes.

8      Q.  Okay.  If we can turn to page 1540 of exhibit 13,

9  there is a column on the left-hand side entitled "Joint

10  infection data"; do you see that?

11      A.  I do.

12      Q.  Do you see where it states, kind of in the middle

13  of that large paragraph:

14      "From July 2008 to February 2009, a single dose of

15  gentamicin 4.5 mg/kg was advantage given at induction."

16      A.  I do.

17      Q.  "In March 2009 this was changed to teicoplanin

18  400 mg and gentamicin 3 mg/kg."

19      Do you see that?

20      A.  Yes.

21      Q.  So, in other words, gentamicin was applied during

22  the forced-air warming period from July 1 to the end of

23  February 2009, and then there was a combination of

24  gentamicin and teicoplanin administered thereafter; correct?

25      A.  For -- yes, there was, yeah.

1                    DR. PAUL MCGOVERN

2       Q.   For the purposes of our conversation, let's refer

3   to the administration of only gentamicin as protocol 1;

4   okay?

5       A.   Okay.

6       Q.   And let's refer to the combination of gentamicin

7   and teicoplanin as protocol 2, okay?

8       A.   Okay.

9       Q.   Assuming the change in protocols did not affect

10  deep joint infection rates between the warming devices,

11  would you consider the change in antibiotic to be

12  a confounding variable?

13            MR. C. GORDON:   Object to the form of the

14  question: incomplete hypothetical, assumes facts not in

15  evidence.

16      A.   I can't comment on that.   I can't predict what the

17  outcome would be, given an assumption which hasn't been

18  tested.

19  BY MR. SACCHET:

20      Q.   But if there was no difference in infection rates

21  between the use of protocol 1 and 2, how could it be

22  a confounding variable?

23      A.   If there was no difference in infections caused by

24  protocol -- infections in the situation of protocol 1 and

25  protocol 2, then there was no difference in the infections

1      DR. PAUL MCGOVERN

2  between protocol 1 and protocol 2.  But that's --

3      Q.  A change in antibiotic protocol would not be

4  a confounding factor with respect to infection rates?

5          (Reporter clarification.)

6      A.  If the change in antibiotic protocol made no

7  difference to infections, then the change in antibiotic

8  protocol would make no difference to infection rates.

9      Q.  And let's say, with respect to protocol 2, that

10  there is actually an increase in infections between those

11  who received the same warming therapy versus those who

12  received protocol 1.

13      A.  Right.

14      Q.  Would the change to protocol 2 be the reason for

15  increased infections?

16          MR. C. GORDON:  Same objections.

17      A.  I don't know.  The hypothetical, 'what would happen

18  if this antibiotic had an affect' question, is not something

19  that I can unpick and predict in terms of what did happen or

20  what would happen.  I don't feel able to comment on what

21  would happen if a -- if part of this data were different or

22  were removed from this, because the -- a confounding

23  variable is so complex, and the influence that a confounding

24  variable has is so complex, that I don't think it is

25  possible for me to predict what would happen if

1                    DR. PAUL MCGOVERN

2    a potentially confounding variable were altered.

3    BY MR. SACCHET:

4         Q.  Let's look at a document that might help you.

5              (Exhibit 19 marked for identification)

6         A.  Thank you.

7         Q.  Could you turn to the very last page of this

8    document.  Do you see a table with four rows?

9         A.  Yes.

10        Q.  Have you seen this table before?

11        A.  Not to my recollection.

12        Q.  Do you recall being on a string of e-mails in which

13   you received an attachment called "McGovern data redone"?

14        A.  Yes.

15        Q.  That's on the third page of this e-mail thread?

16        A.  Yes.

17        Q.  Does the final page of this set of documents look

18   like it involves data?

19        A.  It looks like it contains numbers which could be

20   data.

21        Q.  And the first row is entitled "Ab Protocol 1/Forced

22   Air"?

23        A.  Yes.

24        Q.  Could that mean antibiotic protocol 1 forced air?

25        A.  I can't speculate on what this might mean.

1                    DR. PAUL MCGOVERN

2       Q.  Okay.  Assuming that it means antibiotic protocol 1

3  forced-air warming, what is the percent of infections

4  labeled therein?

5            MR. C. GORDON:  Object to the form of the

6  question: lack of foundation, assumes facts not in evidence.

7       A.  The number on that row under "No.(%) Developing

8  Infection" is 11.

9  BY MR. SACCHET:

10      Q.  And the parenthetical next to it is numbered what?

11      A.  2.8.

12      Q.  And above that, in the dark blue column, there is a

13 parenthesis bearing a percent mark; correct?

14      A.  Yes.

15      Q.  And the title of that column is "Number developing

16 an infection"; correct?

17      A.  Yes.

18      Q.  So the parenthetical notation of "2.8" means 2.8

19 percent developing an infection; correct?

20            MR. C. GORDON:  Same objection.

21      A.  That is what this number appears to show, from my

22 reading of this table.

23      Q.  And the next line is "Ab Protocol 2/Forced Air"; do

24 you see that?

25      A.  I do see that.

DR. PAUL MCGOVERN

1
2     Q.   Assuming that means antibiotic protocol 2 forced
3  air, what is the number of those developing an infection?
4          MR. C. GORDON:   Same objection.
5     A.   The number written in the table in front of me is
6  21.
7  BY MR. SACCHET:
8     Q.   And what is the percent of those individuals
9  developing an infection?
10    A.   The number in parenthesis next to "21" is "3.1".
11    Q.   What is the P value on the far right-hand side with
12  respect to this row of data?
13    A.   The number on the right-hand side of the first row
14 of this table labeled "P value" is 0.839.
15    Q.   That figure is not a statistically significant
16 P value; correct?
17    A.   It's, at the moment, just number in a table which
18 I have not seen before and can't interpret.  So I can't say
19 anything is statistically significant or not, because I
20 don't know to what the data refers, and I'm not familiar
21 with the data.  So I cannot say whether this is
22 statistically significant or not because the data, to me,
23 doesn't mean anything at the moment.
24    Q.   Okay, fair enough.  Assuming that there were --
25 assuming that the change in antibiotic was not a confounding

1                    DR. PAUL MCGOVERN

2    variable ...

3        A.  Right.

4        Q.  ... would there be any reason to deselect patients

5    from the population presented in this study for those who

6    received a different type of antibiotic than others?

7        A.  No, I --

8            MR. C. GORDON:  Object to the form of question:

9    lack of foundation, assumes facts not in evidence,

10   incomplete hypothetical.

11       A.  No, I think that it is not necessary in this case

12   to exclude patients receiving different antibiotic

13   prophylaxis regimens from the study, because that change has

14   been declared in the study.  It is for the peer reviewer

15   and, ultimately, the reader, to decide if that confounding

16   factor significantly affects the data and how to interpret

17   that data.  But the point in this instance, in my opinion,

18   is that this is an observational study, and what was

19   observed was declared and presented clearly.  And so, in

20   that case, to the best efforts of the authors of this paper,

21   what has happened has been reported, and the results that

22   have been noted have been reported.  And so, that being the

23   case, I think it is appropriate that the data which was

24   presented was presented in the way that it was.

25   BY MR. SACCHET:

DR. PAUL MCGOVERN

1

Q.  With respect to bacteria that formed biofilm, does

2
the biofilm protect the bacteria from antibiotics?

3

A.  To my understanding, yes.

4

MR. SACCHET:  Why don't we switch the DVD?

5

THE VIDEOGRAPHER:  This is the end of DVD 2 in

6
volume 2 of the deposition of Dr. Paul McGovern.  Going off

7
the record at three minutes past two.

8

(2:03 p.m.)

9

(Break taken.)

10

THE VIDEOGRAPHER:  This is the beginning of DVD 3

11
in volume 2 of the deposition of Dr. Paul McGovern.  We're

12
back on the record at twenty past two.

13

BY MR. SACCHET:

14

Q.  Mr. McGovern, in your view, what is a confounding

15
variable?

16

A.  A confounding variable is, in my view, a condition

17
or a factor, or something which could affect the results of

18
an experiment or alter them in a way that may or may not be

19
predictable.

20

Q.  You're not aware of any information that protocol 1

21
(gentamicin) versus protocol 2 (gentamicin plus teicoplanin)

22
introduced contamination into patients, did it?

23

A.  Um --

24

MR. C. GORDON:  Object to the form of the

25

                        DR. PAUL MCGOVERN

1

2    question.

3         A.   Altering antibiotics, as you mentioned, between

4    protocol 1 and protocol 2, would not, in my opinion,

5    introduce infection into patients in any way.

6    BY MR. SACCHET:

7         Q.   If you could look back at the last exhibit that we

8    marked, which I believe is 19, and turn to page 6 of 8, at

9    the bottom of this chain is an e-mail from Mr. Reed to

10   yourself on April 4, 2016; correct?

11        A.   Yes.

12        Q.   He says:

13            "I'm reviewing periop hypothermia for nice so

14   we don't want to embark on any related research at the

15   mo.  Likely that will come out in depositions anyway.

16   We did analyze this before and I presented it at the

17   Mayo (I think) as one of their anaesthetists raised it

18   ahead of a PPT I did there.  It looked like antibiotics

19   had no effect."

20            Do you know what that refers to?

21        A.   I can speculate, but I don't know with certainty

22   what this is referring to.

23        Q.   So you can see, on page 3 of 8, that there are two

24   attachments, one entitled "McGovern paper" and the other

25   entitled "McGovern data redone"; yes?

1                    DR. PAUL MCGOVERN

2        A.   Yes, correct.

3        Q.   And on page 2 of 8 there is an e-mail from Scott

4   Augustine to you?

5        A.   Yes.

6        Q.   Asking if, or stating:

7             "As you are probably aware, the most common

8   critique of your paper is the switch in antibiotic

9   protocols during the FAW period."

10       A.   Yes.

11       Q.   And then he goes on to, you know, ask whether you

12  are interested in doing further work on the McGovern paper;

13  correct?

14       A.   Yes.

15       Q.   So this statement from Mike Reed, or Mr. Reed,

16  follows up on that thread, and makes the statement we just

17  discussed; correct?

18       A.   Correct.

19       Q.   Is it your understanding that Mr. Reed's statement

20  related to the McGovern study?

21       A.   It's my understanding that Mr. Reed's statement is

22  likely to refer to antibiotics not having an influence on

23  infection rate -- or changes in antibiotics not having an

24  influence on infection rate in the McGovern study.

25       Q.   Do you have any reason to doubt Mr. Reed's

1                    DR. PAUL MCGOVERN

2    expertise in the making of such a statement?

3         A.  I do not have any reason to doubt Mr. Reed's

4    expertise in making such a statement.

5         Q.  If we could go back to the study itself, which is

6    tab -- excuse me, exhibit number 13.

7         A.  Yes.

8         Q.  And if we turn back to page 1540 internally.

9         A.  Yes.

10        Q.  We see again the section on the left-hand column

11   entitled "Joint infection data"; correct?

12        A.  Yes.

13        Q.  Just down from the prior sentences we reviewed, it

14   states:

15             "Similarly the thromboprophylaxis regimen

16   from July 2008 to the end of July 2009 was tinzaparin."

17             Do you see that?

18        A.  Tinzaparin, yes.

19        Q.  I promise I will keep saying "tinzaprin" but

20   I apologize for doing so.

21        A.  No problem.

22        Q.  It then goes on to say:

23             "From August 2009 to February 2010

24   rivaroxaban was provided from day one post-operatively,

25   but in February 2010 to the end of the study, this

1                    DR. PAUL MCGOVERN

2   reverted to tinzaparin from day one post-operatively."

3       A.  Yes.

4       Q.  Do you see that?

5       A.  Yes.

6       Q.  Tinzaparin is a low-weight-molecular heparin;

7   correct?

8       A.  Low-molecular-weight heparin, yes.

9       Q.  Apologies.  Low-molecular-weight heparin.  Have you

10  ever heard of rivaroxaban being referred to as Xarelto?

11      A.  Yes.

12      Q.  And you're comfortable with the fact that the two

13  are one and the same?

14      A.  Yes.

15      Q.  Are you aware that the NHS changed from Xarelto

16  back to tinzaparin because of wound bleeding, as opposed to

17  increase infections?

18          MR. C. GORDON:  Objection to the form of the

19  question.  Lacks foundation, assumes facts not in reference.

20      A.  You say NHS?

21  BY MR. SACCHET:

22      Q.  NHS.

23      A.  Are you referring to NHS Northumbria Healthcare and

24  Trust?

25      Q.  Yes.

1                    DR. PAUL MCGOVERN

2        A.   I know that the thromboprophylaxis medication of

3   choice was changed from tinzaparin to -- sorry, from

4   rivaroxaban back to tinzaparin.  I know that bleeding was

5   the primary concern for that change.  I am not sure if there

6   was any component of that change that was related to

7   infection.  I don't know.

8        Q.   If Mr. Reed told you that the change was due to

9   increased wound bleeding, would you have any reason to doubt

10  Mr. Reed's understanding?

11       A.   I'd have no reason to doubt that, no.

12            (Exhibit 20 marked for identification)

13       Q.   Have you seen this paper before?

14       A.   I may have done.  When is it from?  2012.  It is

15  likely that I've seen this before, but I don't remember the

16  details of it.

17       Q.   Do you see, at the top of the paper, one of the

18  authors is Mr. Mike Reed?

19       A.   I do.

20       Q.   And another is Simon Jameson, who I believe was a

21  colleague of sorts to you at one particular time, or was

22  also a trainee at NHS?

23       A.   I have heard the name before.  I believe he was --

24  well, I've heard the name before.  I have not, to my

25  recollection, worked with Simon Jameson before.

1                     DR. PAUL MCGOVERN

2        Q.   Okay.  What journal was this published in?

3        A.   The Journal of Bone and Joint Surgery American

4    edition, or --

5        Q.   So is this the American counterpart to the British

6    version that the McGovern study was published in?

7        A.   It is.  They now are named -- or the British one is

8    now named differently.  Its name has changed, but these

9    are -- this is the American Journal of Bone and Joint

10   Surgery -- journal, yes.

11       Q.   And this is a peer-reviewed publication; correct?

12       A.   It is.

13       Q.   And the reviewers have expertise in the field in

14   determining whether particular articles such as this should

15   be published in the journal; correct?

16       A.   Yes.

17       Q.   If we could look at the introduction on page 1555.

18   In the right-hand column, last full paragraph says:

19            "The aim of the present multicenter study,

20   based on prospectively collected national data, was to

21   evaluate the surgically relevant complications of using

22   either rivaroxaban or an LMWH as thromboprophylaxis.

23   These complications included wound complications,

24   readmission, and return to surgery for deep infection

25   as well [as] the incidents of major bleeding and VTE.

1                     DR. PAUL MCGOVERN

2     We believe this [is the] first study to describe the

3     impact of using rivaroxaban for patients undergoing hip

4     or knee arthroplasty across the English NHS."

5              Do you see that?

6         A.  Yes.

7         Q.  So to be clear, this study involved hip and knee

8     arthroplasties; correct?

9         A.  That is what this states.

10        Q.  And two different types of thromboprophylaxis were

11    evaluated, one being rivaroxaban and the other a

12    low-molecular-weight heparin; correct?

13        A.  Yes, this is what this appears to say.

14        Q.  And the complications included wound complications

15    in general, versus returns to surgery for deep infection,

16    among other things; correct?

17        A.  That is what this says, yes.

18        Q.  If we could now turn to the "Methods" section on

19    page -- it starts on page 1555 and follows into 1556.  The

20    left-hand column at the bottom begins:

21              "The primary outcome measure was wound

22    complications (including hematoma, superficial wound

23    infection, and deep infections requiring return to

24    surgery within 30 days of procedure."

25              Do you see that?

1                       DR. PAUL MCGOVERN

2          A.   Yes.

3          Q.   And now, directly under the "Results" section, it

4     states:

5                "During the study period, 2762 patients

6     received rivaroxaban and 10,361 received

7     a [low-molecular-weight heparin] (Table 1)."

8          A.   Sorry, I've lost you.

9          Q.   On the same page as what we just read, which is

10    page 1556, under the section entitled "Results", which is in

11    the bottom right-hand column of the page.

12         A.   Yeah, yeah.   Seen.

13         Q.   You see that?

14         A.   Yeah.

15         Q.   And it directs us to Table 1; correct?

16         A.   Yes.

17         Q.   And if we look at Table 1, that involves patient

18    demographics on the other page; correct?

19         A.   Yes.

20         Q.   And sorry to make you switch again, but if we go

21    back to Table 2, Table 2 is entitled "Complications

22    Following Lower Limb Arthroplasty"; correct?

23         A.   It is.

24         Q.   And the first entry is "Total wound complications"?

25         A.   It is.

1                        DR. PAUL MCGOVERN

2       Q.   And the data shows a P value of 0.005?

3       A.   Yes.

4       Q.   Which is statistically significant; correct?

5       A.   That would be the implication from this data, yes.

6       Q.   And that signifies that there was a statistically

7    significant difference in the percent of infections among

8    those patients who received a low-molecular-weight heparin

9    versus those who received the rivaroxaban?

10      A.   That is my understanding of this data and its

11   interpretation, yes.

12      Q.   In the third line there is data corresponding to

13   return to surgery for infection; correct?

14      A.   Yes.

15      Q.   And for the low-molecular-weight heparin group, the

16   percent of infection was 0.53; correct?

17      A.   The ... yes.

18      Q.   For the rivaroxaban group, the corresponding rate

19   was 0.62 percent; correct?

20      A.   Yes, yes.

21      Q.   And the P value was 0.586; correct?

22      A.   That's what this data shows, yes.

23      Q.   And that P value is not statistically significant,

24   unlike the P value for total wound complications; correct?

25      A.   I would agree that that is what this appears to

1                DR. PAUL MCGOVERN

2    say.

3        Q.  So this paper, based on this data, shows that there

4    is not a difference in infection rates between the use of

5    rivaroxaban and low-molecular-weight heparins; correct?

6        A.  This data appears to show that there was no return

7    to surgery for infection between the low-molecular-weight

8    heparin and the rivaroxaban group that was statistically

9    significant for the data.  That's what it appears to show.

10       Q.  Okay.  And the returns to surgery specifically

11   involved orthopedic procedures; correct?

12       A.  Lower limb arthroplasty, yes.  These are orthopedic

13   procedures.

14       Q.  And just to be clear, tinzaparin is

15   a low-molecular-weight heparin; correct?

16       A.  That is correct.

17       Q.  We'll look at one more study.  I guess one last

18   question is we've established that Mr. Reed is an author of

19   this paper; correct?

20       A.  Yes.

21       Q.  You would have no reason to doubt the data

22   presented in this paper; correct?

23       A.  I would not.

24           (Exhibit 21 marked for identification)

25       Q.  This study is entitled -- I guess I should say this

<sup>1</sup>                     DR. PAUL MCGOVERN

<sup>2</sup> paper is entitled "Return to theatre following total hip and

<sup>3</sup> knee replacement, before and after the introduction of

<sup>4</sup> rivaroxaban"; correct?

<sup>5</sup>      A.   Yes.

<sup>6</sup>      Q.   The first author is C Jensen?

<sup>7</sup>      A.   That's right.

<sup>8</sup>      Q.   And the fourth author is M.R. Reed?

<sup>9</sup>      A.   That's correct.

<sup>10</sup>      Q.   That is Mr. Mike Reed; correct?

<sup>11</sup>      A.   That is correct.

<sup>12</sup>      Q.   Again, you have no reason to doubt Mr. Reed's

<sup>13</sup> publications; correct?

<sup>14</sup>      A.   That's correct.

<sup>15</sup>      Q.   In the abstract of the paper -- actually, I'm going

<sup>16</sup> to ask you this first: was this published in the British

<sup>17</sup> version of Bone and Joint Surgery or the American version?

<sup>18</sup> Can you tell?

<sup>19</sup>      A.   This is the British version.

<sup>20</sup>      Q.   And that's the same publication that you studied

<sup>21</sup> your first author paper?

<sup>22</sup>      A.   This is the same publication that I was published

<sup>23</sup> in before that study, yes.

<sup>24</sup>                     (Reporter clarification.)

<sup>25</sup>      A.   This is the same publication that the previous

Page 398

1                  DR. PAUL MCGOVERN

2   study was published in -- my previous study was published

3   in.  Sorry.

4        Q.  The third sentence of the abstract states:

5             "This study of 1048 total hip/knee

6   replacements records the rate of return to theatre and

7   infection before and after the change from a low

8   molecular weight heparin (tinzaparin) [I said it

9   incorrectly] to rivaroxaban as the agent of chemical

10  thromboprophylaxis in patients undergoing lower-limb

11  arthroplasty."

12            Do you see that?

13       A.  I do.

14       Q.  "During a period of 13 months, 489 consecutive

15  patients undergoing lower-limb arthroplasty received

16  tinzaparin and the next 559 consecutive patients received

17  rivaroxaban as thromboprophylaxis."

18            Do you see that?

19       A.  I do.

20       Q.  If we could now turn to page 523, in the bottom

21  right-hand corner, and the left-hand column which is

22  entitled "Results"?

23       A.  Mm, yes.

24       Q.  The third paragraph states:

25            "Of those patients who returned to theatre,

pPage 399

DR. PAUL MCGOVERN

1

2  microbiology results showed that five of nine (55.5%)

3  in group 1 had a deep infection, compared with 14 of 22

4  (63.6%) in group 2 (p=0.7)."

5      A.  That's what this says, yes.

6      Q.  Based on the abstract we read, is it clear that

7  group 1 refers to patients who received one type of

8  thromboprophylaxis, whereas group 2 received another type?

9      A.  Not from the abstract, but it is from the methods

10  section --

11      Q.  Second paragraph?

12      A.  Yeah.  Yeah, it is clear that group 1 is the

13  tinzaparin group and group 2 is the rivaroxaban group.  Yes.

14      Q.  And in the paragraph that I just recited, the

15  P value for the differences in returns to theater for

16  infection was 0.7; correct?

17      A.  Where are we?

18      Q.  Um, the third paragraph of the results column?

19      A.  Yes.  That is of the patients who returned to

20  theater.  Yeah, it does not show a statistically significant

21  difference between the group, according to this sentence --

22  between the groups.

23      Q.  So, in other words, based on the data presented

24  here, there was no statistically significant difference in

25  infections between patients who received rivaroxaban

DR. PAUL MCGOVERN

1

compared to patients who received tinzaparin; correct?

3     A.   That is what that sentence appears to say.  I would

4   normally want to read and digest the whole paper before

5   drawing conclusions from it, but that is what that result

6   reports, to my understanding.

7     Q.   And in the McGovern study, as we talked about five

8   minutes ago, there was similarly a change between

9   rivaroxaban and tinzaparin; correct?

10    A.   Yes, there -- I believe that during the course of

11  the data collection -- or the monitored period, rather,

12  there was a change between thromboprophylactic medications.

13    Q.   Based on the data that Mr. Reed has presented in

14  the paper first authored by Jensen, and the second paper we

15  discussed, which was first authored by Jameson ...

16    A.   Yes.

17    Q.   ... does that data show that the change in

18  thromboprophylaxis from tinzaparin to rivaroxaban and back

19  to tinzaparin was a confounding factor in the study?

20    A.   Could you repeat the question, please?

21    Q.   Are you able to read it back?

22                    (Record read.)

23    A.   This data does not, in my opinion, show that -- or

24  does not, in my opinion, confirm or deny that either of

25  these -- that the change in thromboprophylaxis was or was

1                    DR. PAUL MCGOVERN

2    not a confounding factor.

3        Q.  So, if the data shows in these two papers that

4    there was no statistically significant difference between

5    returns to theater for infections in orthopedic replacement

6    surgeries between rivaroxaban and tinzaparin, how could the

7    change in thromboprophylaxis still be a confounding factor

8    with respect to infection rates?

9            MR. C. GORDON:  Object to the form of the

10   question.

11       A.  A confounding factor is something which could alter

12   infection rates.  And this data, in my opinion, reduces the

13   chance that this is due to infection rates, but it does not

14   eliminate this as a confounding factor.  These two papers

15   provide evidence that suggest that rivaroxaban did not, in

16   these -- for these series of patients, increase infection

17   rates; and so the data is likely to be relevant to our

18   reading of the paper in question, the bubble experiment.

19   They are relevant, and in my opinion would reduce the

20   likelihood that the change in thromboprophylaxis altered

21   infection rates, but do not eliminate it as a possible

22   confounding factor.

23   BY MR. SACCHET:

24       Q.  If the data presented in these two factors reduces

25   the likelihood that the change in thromboprophylaxis was

DR. PAUL MCGOVERN

1   a confounding factor, would there be any reason to deselect

2   patients from the population of persons who were presented

3   in your McGovern study?

4      A.  No, I --

5      Q.  To, you know, eliminate those who received one

6   thromboprophylaxis versus those who received a different

7   thromboprophylaxis?

8      MR. C. GORDON:  Object to the form of the

9   question.

10     A.  No, in my opinion it would not be necessary or

11  appropriate to exclude those patients in the sort of study

12  that was performed.  I remain of the opinion that it was

13  appropriate to include those patients in that study, and for

14  the data to be presented as it was in that study.

15  BY MR. SACCHET:

16     Q.  Yesterday you were also asked about other

17  intervention measures that may or may not have occurred as

18  part of an SSI bundle implemented at NHS; correct?

19     A.  At Northumbria Healthcare NHS Trust, yes.

20     Q.  One of those suggestions from the deposition

21  yesterday was that there might have been a change in

22  dressing?

23     A.  Oh, the wound dressing?  Yes.

24     Q.  And particularly, there might have been a change to

404 of 506

1                    DR. PAUL MCGOVERN

2    a jubilee dressing?

3         A.  There was, at some point, a change to the jubilee

4    dressing, in my recollection, yes.

5              (Exhibit 22 marked for identification)

6         Q.  This is a paper entitled "A prospective randomised

7    study comparing the jubilee dressing method to a standard

8    adhesive dressing for total hip and [total] knee

9    replacements," authored by Neil G. Burke and others;

10   correct?

11        A.  Yes, that is correct.

12        Q.  Have you ever seen this paper before?

13        A.  I may have seen it, but I don't remember.  It is

14   likely I looked at it, but -- in fact I think I have seen

15   this paper before, but it was quite a long time ago.

16        Q.  Okay.  Let's take a look quickly at the method as

17   described in the abstract on the first page.  It states:

18        "124 patients (62 total hip replacements and 62

19   total knee replacements) were randomly selected to have

20   either a standard adhesive dressing or a jubilee method

21   dressing.  The number of dressing changes, incidence of

22   blistering, leakage, appearance of inflammation,

23   infection rate and the average stay in hospital was

24   recorded for each patient."

25              Do you see that?

1                    DR. PAUL MCGOVERN

2        A.   I do.

3        Q.   So one of the variables that was considered was

4   infection rate, was it not?

5        A.   Yes.

6        Q.   And that was determined based on whether a standard

7   dressing was used or a jubilee dressing was used; correct?

8        A.   Those were the two variables that were examined in

9   this study from how I read this, yes.

10       Q.   And if you would turn to internal page 86, which is

11   the third page, in the left-hand column in the first full

12   paragraph it begins "Table 1"; do you see that?

13       A.   I do.

14       Q.   Approximately halfway down there is a statement

15   that says: "No patients developed a deep infection."  Do you

16   see that?

17       A.   I do see that.

18       Q.   And now if we direct our attention to Table 1 at

19   the top of that page, the title of that table bears the

20   label "Wound complications and number of dressing changes

21   for the two different types of dressing."  Correct?

22       A.   Yes.

23       Q.   And we see the jubilee dressing is in the middle of

24   that table, and next to that is the standard adhesive

25   dressing; correct?

1                     DR. PAUL MCGOVERN

2          A.   Yes.

3          Q.   On the left are the different complications that

4     may have arisen as a result of, I guess you could say that

5     analyzed whether there was significance between the two

6     dressings; correct?

7          A.   Yes.

8          Q.   The fourth one down states "Infection"; correct?

9          A.   Yes.

10         Q.   And for jubilee dressing there was a 0 percent

11    infection rate?

12         A.   In these data, yes.

13         Q.   And in these data, there was a 0 percent infection

14    rate with respect to standard adhesive dressings; correct?

15         A.   Yes.

16         Q.   The two percents of infection were the same;

17    correct?

18         A.   In these data, yes.

19         Q.   When you have two values of zero, there is no

20    statistical significance; correct?

21         A.   You can't state that there is a statistical

22    significance, because there is no difference and there's no

23    data to state that.

24         Q.   Based on that understanding of this paper, and the

25    data presented therein, does this study show that the change

DR. PAUL MCGOVERN

1

in jubilee dressing that occurred during the time in which

2

the data was collected for the McGovern study impacted

3

infection rates?

4

5          MR. C. GORDON:  Object to the form of the

6    question: lack of foundation, incomplete hypothetical.

7          A.  It's not possible to say, in my opinion.  The

8    numbers in this study are too small.  You have a number of

9    patients that is 124, and the numbers are too small to be

10   able to draw a meaningful conclusion in terms of infection,

11   with regard to these two variables, in my opinion.

12   BY MR. SACCHET:

13         Q.  So if I could point out, to the extent that this

14   would change your mind, the asterisks which are denoted in

15   the right-hand column of the standard adhesive dressing

16   column; do you see those?

17         A.  Yes.

18         Q.  And a single asterisk stands for a P value of less

19   than 0.05; correct?

20         A.  Mm-hm, yes.

21         Q.  And a double asterisk stands for a P value of 0.01

22   and less?

23         A.  Yes.

24         Q.  And three asterisks stands for a P value of 0.001

25   or less; correct?

1                    DR. PAUL MCGOVERN

2       A.   Yes.

3       Q.   The infection row has no such asterisk in it,

4  does it?

5       A.   That's correct.

6       Q.   So, because we established earlier that statistical

7  significance begins at 0.05, which is a single asterisk ...

8       A.   Right.

9       Q.   ... presumably this 0 percent infection rate, the

10 difference between 0 and 0 is non-significant; correct?

11      A.   No, that's not how I would interpret this.  There

12 is no data to draw a meaningful conclusion from.  You need

13 to have some data, by my understanding, to be able to draw

14 a conclusion of statistical significance.  You can't comment

15 on whether these data are statistically significant.  If one

16 were designing this study purely to look at infection rates

17 between the two dressings, it is likely that the study would

18 need to include more patients and the study -- and to ensure

19 it was sufficiently powered to be able -- "powered" meaning

20 to have enough patients in it -- to see enough infections to

21 be able to draw a meaningful conclusion.

22           The fact that there were no infections in 124

23 patients is not surprising, because infection rates are

24 generally low.  This is a problem of research in this

25 area.  Because infection is rare, thankfully, you need

DR. PAUL MCGOVERN

1  
2  large numbers of patients in studies to see if one

3  intervention has a difference with another

4  intervention, in terms of infection rates.  In my

5  opinion, this study does not demonstrate superiority of

6  one adhesive dressing over another, purely in terms of

7  infection.

8      Q.  Fair enough --

9      A.  It may for other conditions, such as blistering and

10 leakage, but for infection -- because those are more

11 common -- consequences post-operation, and the study appears

12 to have been adequately powered to identify those

13 differences and state statistical significance.  But for

14 infection, there were not enough incidences of infection to

15 be able to draw meaningful conclusions, or a difference

16 between the two.

17     Q.  Are you aware of any paper that is adequately

18 powered that shows that a change from a standard adhesive

19 dressing to a jubilee dressing would statistically

20 significant -- significantly alter infection rates among

21 arthroplasties?

22     A.  I am not aware of any such paper.

23     Q.  Are you aware of any published papers that

24 suggest -- I should say that find statistically significant

25 differences between joint infection rates from the use of

1                    DR. PAUL MCGOVERN

2    MSSA screening versus non-screening?

3         A.  Sorry, could you say that again, please?

4         Q.  Are you aware of any evidence that is statistically

5    significant that suggests that the use of MSSA screening

6    significantly impacts the rate of deep joint infections

7    among patients?

8         A.  I'm not aware of any such papers.

9         Q.  Are you aware of any evidence that pre-warming,

10   when used in combination with intraoperative warming,

11   significantly impacts deep joint infection rates among

12   patients?

13        A.  I am not aware of papers which provide evidence of

14   that.

15        Q.  Have you seen an article by Mr. Reed and another

16   individual, bearing the last name Refaie, which analyzed the

17   NHS SSI bundle?

18        A.  I presume you mean Northumbria Foundation Trust.

19   I am aware that Mr. Reed and Mr. Refaie have done research

20   together.  I may have seen such paper but I don't remember.

21        Q.  Do you recall Mr. Reed, in that paper, making the

22   statement: "A switch to the alternative conductive fabric

23   warming led to a significant decrease in deep joint

24   infections"?

25        A.  I -- that statement sounds familiar but I don't

1              DR. PAUL MCGOVERN

2   remember reading it in a paper.

3       Q.  Would you have any reason to doubt, if Mr. Reed

4   made such a statement, the accuracy of such a statement?

5           MR. C. GORDON:  Object to the form of the

6   question: lack of foundation, assumes facts not in evidence.

7       A.  If Mr. Reed indeed made that statement in a paper,

8   I'd have no reason to doubt the veracity of that statement.

9   BY MR. SACCHET:

10      Q.  Are you aware of the fact that after the McGovern

11  paper was published in the Journal of Bone and Joint

12  Surgery, that additional data supported an elevated

13  odds-risk ratio?

14          MR. C. GORDON:  Object to the form of the

15  question: assumes facts not in evidence, incomplete

16  hypothetical.

17      A.  I was not.

18  BY MR. SACCHET:

19      Q.  Okay.

20          (Exhibit 23 marked for identification)

21      Q.  That's an e-mail entitled "Full workup of the stats

22  you requested"; correct?

23      A.  Yes.

24      Q.  And there is an e-mail from Mr. Albrecht to

25  Mr. Reed, and you are cc'd on the e-mail on November 29,

DR. PAUL MCGOVERN

1

2  2011; correct?

3      A.  Yes.

4      Q.  And there is an attachment called "Results";

5  correct?

6      A.  Yes.

7      Q.  And if you turn the page, there is a table.  Does

8  this table resemble the table in the published McGovern

9  study?

10     A.  It does resemble it.  I'll check if it is the same.

11     Q.  There are different data points, but just in terms

12 of the style and form of the table?

13     A.  Err ...

14     Q.  It is exhibit 13, to make sure you're on the right

15 one.

16     A.  I'm there.  I'm on exhibit 13.  Which table are you

17 referring to?  Table 1 in exhibit 13?

18     Q.  I am looking at -- yes.  No.

19     A.  Table 2.

20     Q.  Yeah, the lower half of Table 2.  I mean with parts

21 of the lower half, as well.

22     A.  Yes, I would agree this is similar in form to part

23 of Table 2 in what you refer as to the "McGovern paper".

24     Q.  Okay.  And if we look at that table in the e-mail

25 thread, for a conductive fabric, number developing

Page 412

1                      DR. PAUL MCGOVERN

2   infection, 7; correct?

3        A.   Oh, yes.

4        Q.   Number not developing infection, 792; correct?

5        A.   Yes.

6        Q.   For a total population of 709 patients who received

7   conductive fabric warming; correct?

8        A.   Yes.

9        Q.   That number is significantly larger than the total

10  population of individuals who received conductive fabric

11  warming in the final published paper, exhibit 13; correct?

12       A.   That number is larger.   To say it was significantly

13  larger would require a statistically significant test.   So

14  be careful about using the words "statistically

15  significantly", but it is a larger number.

16       Q.   How about double?

17       A.   Let's see.   Conductive fabric 792 versus 368.   Yes,

18  I think that's a reasonable thing to say.

19       Q.   Okay.   And if we go back to the text of the e-mail,

20  Mr. Reed writes back to Mr. Albrecht and copies you in and

21  says, in the last line of the first paragraph:

22            "You are 3.6 times more likely to get an

23  infection on FAW than CFW."

24            Do you see that?

25       A.   Yes.   It phrases a question, but yes.

1                    DR. PAUL MCGOVERN

2      Q.  Yes.  Do you have any reason to doubt Mr. Reed's

3  statement to that effect?

4      A.  It appears that Mr. Reed is asking if that is what

5  the data is showing in this table.

6      Q.  And do you see, in the table itself, a demarcation

7  of 3.6 on the right-hand side of the odds ratio?

8      A.  I do.

9      Q.  So in fact Mr. Reed was referring to this table;

10 correct?

11     A.  That is -- seems likely.

12     Q.  And this table was sent as a results attachment

13 from Mr. Albrecht?

14     A.  Yes.

15     Q.  You have no reason to doubt Mr. Albrecht's ability

16 to conduct statistical analysis of data, do you?

17     A.  None whatsoever.

18     Q.  You have no reason to doubt that, based on this

19 patient population of those who received conductive fabric

20 warming, which is double the size of the patient population

21 in the McGovern study, that there was a 3.6 odds ratio?

22     A.  That is what this data appears -- (overspeaking) --

23          MR. C. GORDON:  Object to the form of the

24 question.

25          THE COURT REPORTER:  Sorry, can you repeat the

Page 414

1                   DR. PAUL MCGOVERN

2    objection, please.

3              MR. C. GORDON:   Form.

4         A.  That is what this data appears to show.

5    BY MR. SACCHET:

6         Q.  So this data shows there is a 3.6 times increase in

7    infection as a result of using forced-air warming devices

8    compared to conductive fabric warming devices; correct?

9         A.  That is what --

10             MR. C. GORDON:   Object to the form of the

11   question.

12        A.  That is what this table appears to show.

13   BY MR. SACCHET:

14        Q.  And both this odds ratio and the odds ratio

15   presented in the final published McGovern study are both

16   above 3.0; correct?

17        A.  Yes.

18        Q.  So, based on this data in the increased patient

19   population of those who received conductive fabric warming,

20   this data corroborates the fact that there is at least

21   a three times more likely chance that patients who received

22   forced-air warming developed an infection, compared to those

23   who received conductive fabric warming?

24             MR. C. GORDON:   Object to the form of the

25   question.

1                    DR. PAUL MCGOVERN

2        A.  This data -- I can't agree with the term

3   "corroborates the fact".  The fact is not --

4   BY MR. SACCHET:

5        Q.  Also shows?

6        A.  Yeah.  Could you just repeat the phrase, please, or

7   rephrase that?  Or --

8        Q.  I'll rephrase the question.

9        Based on the data presented in this table and the

10  data presented in the McGovern study, both studies for

11  both datasets show that there was a three -- at least

12  a three times more likely chance that a patient

13  developed an infection after using forced-air warming

14  than conductive fabric warming?

15            MR. C. GORDON:  Object to the form of the

16  question.

17       A.  Yes.  Patients who were in the group with

18  forced-air warming on this data appear to have had a three

19  times or more higher incidence of infection compared to the

20  conductive fabric group of patients for this study.

21            THE COURT REPORTER:  Can I just ask you to stop

22  for 30 seconds, sorry.

23            THE VIDEOGRAPHER:  Going off at two minutes past

24  three.

25  (3:02 p.m.)

1                    DR. PAUL MCGOVERN

2                        (Break taken.)

3    (3:04 p.m.)

4            THE VIDEOGRAPHER:  Back on the record at four

5    minutes past three.

6            (Exhibit 24 marked for identification)

7    BY MR. SACCHET:

8        Q.  Mr. McGovern, are you aware of any data that's been

9    collected regarding other healthcare facilities that have

10   shown a decreased rate of infection after the switch from

11   forced-air warming devices to conductive fabric warming

12   devices?

13       A.  I am not.

14       Q.  If you could take a look at the exhibit which was

15   just marked.  The first page is an e-mail; is that correct?

16       A.  Yes.

17       Q.  From Mr. Albrecht to Scott Augustine, bearing the

18   subject line "Results" with attachments "MA_edits"; correct?

19       A.  Yes.

20       Q.  And Mark Albrecht states:

21           "I've updated the statistics in the white

22   paper under **MA_edits.doc**."

23       A.  Yes.

24       Q.  "The updates include:

25           "The statistics in the Table for all centers and

1              DR. PAUL MCGOVERN

2  the pooled result[s]

3       "The statistics in the discussion for the updated

4  McGovern numbers provided as provided [sic] in the

5  text."

6       Do you see that?

7       A.  Yes.

8       Q.  In the third paragraph it says:

9           "I think this is the best modeling approach

10 (i.e. a conservative one) for the data you have,

11 especially if you expect these results to be critically

12 questioned down the road."

13           Do you see that?

14      A.  Yes.

15      Q.  Okay.  And the next page is a document entitled

16 "Forced-air warming link to periprosthetic total joint

17 replacement infections"; correct?

18      A.  Yes.

19      Q.  And the "Methods" says:

20           "To investigate whether the rising

21 contaminants from the waste FAW heat are linked to

22 PJIs, we retrospectively collected joint implant

23 infection data from three hospitals.  We compared PJI

24 rates during a period of forced-air warming to PJI

25 rates during a period of free-air conductive fabric

1               DR. PAUL MCGOVERN

2   warming.  Surgical and antibiotic protocols were held

3   constant."

4           Do you see that?

5       A.  I see that.

6           MR. C. GORDON:  I'm going to object on foundation

7   grounds to any questions about this, unless it is

8   established that he did in fact write it, as it indicates on

9   it.

10          MR. SACCHET:  My questions won't pertain to

11  Mr. McGovern's contribution to this study or not.

12  BY MR. SACCHET:

13      Q.  This document was attached to the e-mail from

14  Mr. Albrecht to Mr. Augustine; correct?

15          MR. C. GORDON:  Objection: lack of foundation.

16      A.  There's no way for me to know if that's the case.

17  BY MR. SACCHET:

18      Q.  Do the Bates numbers in the bottom right-hand

19  corner follow one another?

20      A.  They are sequential numbers, yes.

21      Q.  Assuming that this document was attached to the

22  cover e-mail, does it appear that Mr. Albrecht analyzed the

23  statistics presented in this document?

24          MR. C. GORDON:  Objection: lack of foundation.

25      A.  If these documents are indeed related, it would be

1                    DR. PAUL MCGOVERN

2  reasonable to assume that Mr. Albrecht is referring to this

3  document, but I've no way of verifying if that's the case.

4  BY MR. SACCHET:

5       Q.  And that's why I ask for the assumption.

6       A.  If we're assuming that, then we'll assume that.

7       Q.  And you have no reason to doubt Mr. Albrecht's

8  ability to analyze data; correct?

9            MR. C. GORDON:  Same objection.

10      A.  That's correct.

11  BY MR. SACCHET:

12      Q.  If we could turn to page 3 in the Results section,

13  there is a table; do you see that?

14      A.  Yes.

15      Q.  And Center 1 says "Patient Warming Device" and

16  under that there's "Conductive Fabric and Forced Air".  Do

17  you see that?

18      A.  I do.

19      Q.  And in the columns there are four labels: "No.(%)

20  Developing Infection", "No.(%) Not Developing Infection",

21  "Odds Ratio" and "P value"; do you see that?

22      A.  I see that.

23      Q.  For Center 1, in conductive fabric warming, based

24  on this dataset, it appears that two persons developed an

25  infection; correct?

Page 420

1          DR. PAUL MCGOVERN

2          MR. C. GORDON:  Objection: lack of foundation.

3          MR. SACCHET:  I said based on this dataset.

4          MR. C. GORDON:  Same objection.

5     A.  I haven't read the results or methods of this

6  paper, so at the moment all I can see is that a number 2 is

7  next to a row heading "Patient Warming Device Conductive

8  Fabric" in a cell whose column is "No. Developing

9  Infection", but I don't know what this refers to because

10  I don't recall ever seeing this before.

11  BY MR. SACCHET:

12     Q.  And next to that, there is a number -- I should say

13  underneath that, there is a number 6; do you see that?

14     A.  A number 6, yes.  I see the number 6.

15     Q.  And it appears that that number 6 corresponds to

16  the label "Forced air" and "No.(%) Developing Infection";

17  correct?

18     A.  The number 6 is within the cells with those labels,

19  yes.

20     Q.  So it appears, based on this table and the way that

21  it has been formatted, that two patients who received

22  conductive fabric developed an infection, whereas six

23  patients who received forced-air warming developed an

24  infection?

25          MR. C. GORDON:  Objection: lacks of foundation.

                    DR. PAUL MCGOVERN

1  Also, this goes pretty far beyond the fact witness

2  limitation.

3       A.  I can't make that statement because I have not read

4  the rest of the paper, and I -- this doesn't -- numbers in a

5  table does not let me say that patients have received one

6  thing or another.  I need more information to be able to

7  make that statement.

8  BY MR. SACCHET:

9       Q.  Okay, let's look at the page 4 in the "Discussion"

10  section.

11      A.  Page 4 in the "Discussion" section.  Okay.

12      Q.  The fourth paragraph, second line, says:

13         "The FAW patients who received the first

14  antibiotic were drop from the results.  This left 677

15  patients with 22 PJIs in the FAW group receiving the

16  second antibiotic (3.2% PJI rate).  Then 14 more months

17  of CFW patients were added for a total of 1097 CFW

18  patients, which included 10 PJIs, all of whom received

19  the second antibiotic."

20      A.  That's what it says.

21      Q.  "These new data show that the PJI rates decreased

22  72% when FAW was discontinued and CFW initiated," totaling

23  1774 patients with a P value of 0.004.

24          Do you see that?

DR. PAUL MCGOVERN

1

2     A.  This says "0.0004", but I see that, yes.

3     Q.  "This 72% reduction compares favorably with the

4  previously reported 74% reduction, indicating that the

5  switch in antibiotics was not a significant variable."

6     Do you see that?

7     A.  I see that.

8     Q.  If this data was presented by Mr. Albrecht, would

9  you have any reason to doubt it?

10        MR. C. GORDON:  Object to the form of the

11  question.  Also lack of foundation, incomplete hypothetical,

12  and assumes facts not in evidence.

13     A.  This data is not interpretable by me at the moment

14  because I have not read the paper.  Data in isolation

15  doesn't mean anything to me, so I can't make any comment on

16  that data.

17  BY MR. SACCHET:

18     Q.  Fair enough.  Based on what we reviewed, the data

19  presented in your paper, the McGovern paper ...

20     A.  Yes.

21     Q.  ... and the follow-up data that we reviewed, which

22  Mr. Reed had commented on ...

23     A.  Yes.

24     Q.  ... do you have any doubt that the study period

25  analyzed in the McGovern study recorded a 3.8 odds risk

Page 423

1                    DR. PAUL MCGOVERN

2  ratio?

3            MR. C. GORDON:  Object to the form of the

4  question.

5       A.  The study data reported that odds ratio.

6  BY MR. SACCHET:

7       Q.  And that data shows that there is a 3.8 more likely

8  chance of developing a deep joint infection from the use of

9  forced-air warming, compared to conductive fabric warming?

10      A.  It showed that the odds ratio for these patients in

11 these circumstances for this data was 3.8.  That's what that

12 showed.  It did not necessarily show there was a higher

13 chance; it just showed that that is what happened.

14           MR. SACCHET:  OK.  Do we need a break, or are we

15 okay?  Why don't we take one now, because I'm going into

16 a new section.

17           THE VIDEOGRAPHER:  Going off the record at

18 thirteen minutes past three.

19 (3:13 p.m.)

20                        (Break taken.)

21 (3:21 p.m.)

22           THE VIDEOGRAPHER:  Back on the record at

23 twenty-one minutes past three.

24 BY MR. SACCHET:

25      Q.  Mr. McGovern, we're going to transition to what has

Page 424

DR. PAUL MCGOVERN

1  been previously marked as exhibit 8.  And again, put

2  essentially everything else to the side.

3      A.  Okey dokey.

4      Q.  Okay.  Beyond the first page, the second page

5  begins a copy of a study entitled "Forced-Air Warming

6  Design: Evaluation of Intake Filtration, Internal Microbial

7  Buildup, and Airborne Contamination Emissions."

8          MR. C. GORDON:  What page are you on?

9          MR. SACCHET:  I am on 275, internal Bates number

10  3MBH00107864.  Exhibit 8.

11          MR. C. GORDON:  The binder?

12          MR. SACCHET:  No.  This is my binder.

13          MR. C. GORDON:  I'm sorry, which exhibit was it?

14          MR. SACCHET:  Exhibit 8.

15      A.  I can see that.

16  BY MR. SACCHET:

17      Q.  This article was co-authored by Mr. Reed,

18  Mr. Kimberger, yourself and Mr. Albrecht; correct?

19      A.  Correct.

20      Q.  And if we could turn to the "Methods" section of

21  the paper, which is still on that same page.

22      A.  Yes.

23      Q.  There are a number of boldface and italicized

24  headings?

1                     DR. PAUL MCGOVERN

2        A.   Yes.

3        Q.   The second one says: "Intake Filter Efficiency".

4        A.   Yes.

5        Q.   On the next page there's one entitled "Intake

6   Filter Performance in the Operating Theater"?

7        A.   Yes.

8        Q.   And the third is entitled "Generation of airborne

9   Contamination"?

10       A.   Yes.

11       Q.   These were the three variables that you examined in

12  this study; correct?

13       A.   Yes.

14       Q.   And you examined a Bair Hugger model 750; correct?

15       A.   That is what I understand was examined in this

16  study, yes.

17       Q.   And if you refer to internal page 275, the

18  right-hand column at the top says:

19            "Prior research has rated the intake

20  filtration efficiency of legacy FAW devices

21  (Bair Hugger 505) at 93.8% for a 'older' filter model

22  in clinical use (200708C) and 61.3% for a 'newer'

23  filter model (200708D) scheduled to replace the older

24  filter in clinical use."

25            Correct?

1                          DR. PAUL MCGOVERN

2        A.   Yes.

3        Q.   Do you know what study that refers to?

4        A.   It refers to the study that we were discussing

5   earlier.

6        Q.   Let's look at footnote 3, which is the citation to

7   that proposition.   Are you on page 280 internal?

8        A.   Yes.

9        Q.   And footnote three bears the names: Albrecht,

10  Gauthier, Belani, Litchy, Leaper.   Title: "Forced-air

11  warming blowers: an evaluation of filtration adequacy and

12  airborne contamination emissions in the operating room."

13       Do you see that?

14       A.   Yes.

15       Q.   Published in the American Journal of Infection

16  Control; correct?

17       A.   Yes.

18       Q.   We haven't talked about that paper yet today, have

19  we?

20       A.   Haven't we?   No, we must not have.

21       Q.   Are you familiar with that paper by Mr. Albrecht?

22       A.   Yes, I've seen it before.

23       Q.   And as stated in the paragraph we just read, that

24  study, based on the citation in this paper that you were

25  co-author of, found that the old filter was 93.8 percent

1                    DR. PAUL MCGOVERN

2    efficient, whereas the newer filter was 61.3 percent

3    efficient for the model 505; correct?

4         A.  Yes, we were discussing filtration efficiencies at

5    61.3 percent of the 57 today, were we not?

6         Q.  Yes, but we were actually looking at this same

7    study, the --

8         A.  This study?  Right, okay.  Sure, okay.

9         Q.  And now bringing us back to this study, under

10   "Intake Filter Efficiency" in the "Methods" section at the

11   bottom of 275 it says:

12        "New intake filters were acquired from the

13   manufacturer, which was measured by challenging the

14   filters with sodium chloride particulate" --

15        A.  Sorry, I've lost that.

16        Q.  On the carryover paragraph.

17        A.  Yes, "New intake filters were acquired ..."  Yes.

18        Q.  So, just to be sure, you tested new intake filters

19   for filter efficiency?

20        A.  That's what was tested in this study, yes.

21        Q.  Okay.  And with respect to the next title in bold

22   and italics, it says, "Intake Filter Performance in the

23   Operating Theater"; do you see that?

24        A.  Yes.

25        Q.  And it says:

1               DR. PAUL MCGOVERN

2        "Twenty-three FAW blowers, in a single hospital in

3    Vienna, Austria, were sampled after-hours in the

4    operating theaters to quantify the performance of the

5    intake filter in the clinical environment."

6        A.  Yes.

7        Q.  And finally, for the next heading, "Generation of

8    Airborne Contamination" it states:

9            "The filters were replaced, and these same 23

10   FAW blowers were sampled for generation of airborne

11   contamination, which was determined by comparing

12   observed particle counts in the airstream exiting the

13   FAW blower with what would be predicted based on the

14   measured filtration efficiency of each intake filter.

15   Specifically, we measured particle counts greater than

16   0.3 micron in the intake and distal airstreams."

17           Do you see that?

18       A.  Yes.

19       Q.  Okay, so those are the methods in this paper that

20   you co-authored; correct?

21       A.  Yes.

22       Q.  Okay.  Turning to the results of this paper on

23   internal page 277.  In the first paragraph, regarding

24   "Intake Filter Retention Efficiency", we see:

25           "The mean efficiency for intake filter models

DR. PAUL MCGOVERN

1  75093D (n=5) was found to be 63.8% at the MPPS of 0.2μm

2  (Figure 1) using a test method in accordance with [the]

3  ventilation industry standards."

4          Do you see that?

5      A.  Yes.

6      Q.  Do you have any reason to doubt the accuracy of

7  that conclusion?

8      A.  No.

9      Q.  Based on the Figure 1 directly above that, the 63.8

10 percent figure is specifically denoted on the graph;

11 correct?

12     A.  Yes.

13     Q.  And to the right of that graph, the size of the

14 particles increases in terms of diameter; correct?  On the X

15 axis?

16     A.  Yes.

17     Q.  For -- there are specific points in the dataset

18 between 0.1 and 1, correct?

19     A.  Yes.

20     Q.  That are labeled on this graph?

21     A.  There are.

22     Q.  And for both of those data points between 0.1 and

23 1, their retention efficiency is below 80 percent; correct?

24     A.  Correct.

1                    DR. PAUL MCGOVERN

2       Q.   And beyond 1.0, there are also two discrete data

3  points between 1.0 and 10.0; correct?

4       A.   There are two discrete data points between 1.0 and

5  10.0, yes.

6       Q.   And for both of those data points, the retention

7  efficiency percentage is less than 90 percent?

8       A.   Yes.

9       Q.   Do you have any reason to doubt the accuracy of the

10  data presented in Figure 1?

11      A.   I do not.

12      Q.   Based on the data presented in Figure 1, would it

13  be fair to state that for particles sized 0.1 to 10 microns

14  in diameter, that 10 percent of microns, 10 percent of

15  particles could pass through the filter, at least?

16           MR. C. GORDON:   Object to the form of the

17  question: lack of foundation.

18      A.   I think that's a reasonable assertion to state

19  based on this data.  I believe that is what this chart

20  displays.

21  BY MR. SACCHET:

22      Q.   And in some cases, with respect to the most

23  penetrating particle size of 63.8 percent, more than 30

24  percent of particles of that size would pass through the

25  filter?

1                    DR. PAUL MCGOVERN

2          MR. C. GORDON:  Same objection.

3     A.  That is what I understand from this data, yes.

4  BY MR. SACCHET:

5     Q.  As we've established earlier today, you're not

6  aware of any other filters on a model 750 Bair Hugger than

7  the one at the intake; correct?

8     A.  That is correct.  I'm not aware of any other

9  filters.

10    Q.  Now let's take a look at the section of the results

11 entitled "Airborne Contamination Emissions in the Operating

12 Theater."

13    A.  Okay.

14    Q.  In the second paragraph of that section, which is

15 the first paragraph in the right-hand column, it states:

16        "Distal hose end air stream particle

17 emissions were well above what would be expected for

18 most FAW blowers (n=22) based on intake filter

19 performance (Figure 2); 96% of FAW blowers were

20 generating significant levels of contamination greater

21 than 0.3 μm in size."

22        Do you see that?

23    A.  I do.

24    Q.  Do you have any reason to doubt the accuracy of

25 that finding?

1                   DR. PAUL MCGOVERN

2       A.   It says 96 percent of FAW blowers, the number of

3   the 22.  Yeah, so that would mean that all but one were

4   generating -- is that right?  Four, five -- yeah.  No,

5   I don't have any reason to doubt that.

6       Q.   The statement continues:

7            "These FAW blowers were generating up to

8   110,000 particles per cubic foot downstream of the

9   intake filter, which [is] at an airflow of 1,274 liters

10  a minute [or] (45cu feet per minute) translates to

11  82,500 particles per second being emitted from the FAW

12  blower hose end."

13           Do you see that?

14      A.   I do see that.

15      Q.   And if we look at Figure 2 on the next page, as one

16  example of one of the forced-air warmers that was evaluated

17  in this study, specifically forced-air warmer blower ID 14,

18  which is on the right-hand side of that graph.

19      A.   Yes.

20      Q.   That particular blower was generating almost

21  120,000 airborne particles; correct?

22      A.   Yes.  It doesn't say how long over ... it mentions

23  that many particles, but it doesn't say over what period of

24  the time on the table.  No, it is per cubic foot.  Yeah, it

25  does say.  Yeah, 120,000 particles of greater than or equal

1                    DR. PAUL MCGOVERN

2    to 0.3 microns per cubic foot.  Yeah, that is what

3    I understand from that graph, with reference to blower unit

4    14.

5         Q.  And you have no reason to doubt the accuracy of

6    that finding?

7         A.  I do not.

8         Q.  In the next paragraph in the "Results" section, do

9    you see the bold italicized face type bearing the title

10   "Internal Air Path Microbial Colonization"?

11        A.  Where is that?

12        Q.  On page 277, internal.  The last paragraph in the

13   right-hand column.

14        A.  Yes, yes, I see that.

15        Q.  Okay.  It says:

16        "Air path swabs revealed the presence of viable

17   microorganisms in 100% of FAW blowers (Table), with the

18   heaviest growth reported on the internal air path

19   surfaces of the elbow.  Isolates of coagulase-negative

20   staphylococci, mold, and micrococci were detected inside

21   74%, 26% and 9% of FAW blowers respectively."

22            Do you see that?

23        A.  I do see that.

24        Q.  And the table for that data is presented on

25   internal page 278 on the right-hand side; do you see that?

1                    DR. PAUL MCGOVERN

2       A.   Yes.

3       Q.   Do you have any reason to doubt the findings in

4  this paper with respect to the internal air path microbial

5  colonization of the model 750 Bair Hugger devices tested in

6  this study?

7       A.   I do not.

8       Q.   Some of the organisms delineated in the table in

9  page 278 could colonize deep joint infections; correct?

10       A.   Yes.

11       Q.   Given the low level of filtration, I guess you'd

12  say the 63.8 percent level of filtration in the devices that

13  were tested in this study, would you be concerned by

14  particles passing through the filter to the inside of the

15  device?

16            MR. C. GORDON:   Object to the form of the

17  question.

18       A.   Yes.

19  BY MR. SACCHET:

20       Q.   Why?

21       A.   Because there is a potential, if particles were

22  drawn into the device and then were blown out of the device,

23  that those particles and those bacteria could, in theory, be

24  drawn towards the patient and then on to the operative site.

25       Q.   That's a risk, at least, of using the devices that

1          DR. PAUL MCGOVERN

2    were tested in this study; correct?

3          MR. C. GORDON:  Object to the form of the

4    question.

5          A.  That is a potential risk.

6    BY MR. SACCHET:

7          Q.  And that risk relates to the risk of developing

8    deep joint infections; correct?

9          A.  It may do.

10         Q.  And that's because just a single bacterium could

11   cause a deep joint infection in orthopedic surgeries;

12   correct?

13         A.  A single bacterium can cause a deep joint infection

14   in orthopedic surgery, yes.

15         Q.  On the last page of the study, bearing internal

16   page number 280, the last paragraph states:

17         "To address the identified design

18   deficiencies, manufacturers should redesign FAW blowers

19   to allow for regular cleaning and decontamination in

20   accordance with the governmental guidelines for

21   reusable medical equipment."

22         Do you see that?

23         A.  I do see that.

24         Q.  In your view, and given your training in orthopedic

25   surgeries, why did you make this recommendation as

1                      DR. PAUL MCGOVERN

2    a co-author of this study?

3         A.  That recommendation is one which I think is

4    appropriate, given the results of the study, and it was made

5    because effective cleaning and decontamination of any piece

6    of equipment in an operating room is, in my opinion,

7    important to minimize opportunity for bacteria to colonize

8    any area, be distributed into any part of the operating

9    room, and therefore minimize the risk of bacteria finding

10   their way into a place where they shouldn't be, namely the

11   operative field.

12        Q.  So, given that the results of this study which we

13   just discussed showed that, for the Bair Huggers sampled in

14   the study, that 100 percent of them had growth of bacteria

15   inside of the device, would you be concerned about that in

16   practicing orthopedic surgery?

17        A.  Yes.

18        Q.  And that's because the bacteria inside of those

19   devices could make their way to the surgical site?

20        A.  Yes.

21        Q.  In addition to that statement, in the final

22   paragraph you go on to say:

23            "Second, inlet filtration could be upgraded

24   to HEPA quality (99.97% efficient) to prevent microbial

25   ingress."

1                    DR. PAUL MCGOVERN

2         Do you see that?

3       A.  I do see that.

4       Q.  As a coauthor of this paper, why did you make that

5   recommendation?

6       A.  That recommendation was made to minimize the --

7   well, following that recommendation, would, in theory,

8   minimize the opportunity for bacteria to gain access to the

9   internal workings of the blower unit, and therefore minimize

10  the chance that bacteria could colonize, or even exist,

11  within the blower unit.

12      Q.  And that's because there is also a chance that

13  those bacteria that might colonize inside the unit could

14  make their way to the surgical site?

15      A.  That is the ultimate concern, yes.

16      Q.  And this is especially important in orthopedic

17  procedures because, again, just a single bacterium could

18  cause a deep joint infection?

19      A.  That is correct.  It is important not only to

20  reduce the opportunity for colonization, but also to reduce

21  the opportunity for a bacteria to be drawn into the unit not

22  caught by a filter, and directly to be exhausted from the

23  unit, as well as the risk of bacteria collecting and

24  colonizing in an area.

25      Q.  And based on these statements that we've just

DR. PAUL MCGOVERN

1  discussed in this paper, you're aware of the fact that the

2  Bair Hugger 750, at least, cannot be cleaned inside of the

3  device?

4      A.   I am not familiar with the details of the design of

5  the Bair Hugger 750, so I don't know how possible it is to

6  clean the inside of the device.  I don't remember.

7      Q.   But, I mean, you stand by the statement that the

8  device should be redesigned to allow for regular cleaning

9  and decontamination; correct?

10     A.   I stand by any recommendation which improves the

11 likelihood of operating room equipment being appropriately

12 cleaned.

13     Q.   So you stand by the fact that patient safety is of

14 paramount concern when using a medical device in an

15 orthopedic surgery; correct?

16     A.   Absolutely correct.

17     Q.   And one way to improve the safety of the

18 Bair Hugger device would be to allow for internal cleaning

19 of the device?

20     A.   In my opinion, yes.

21     Q.   And another way to do that would be to equip the

22 Bair Hugger device with a HEPA filter; correct?

23     A.   Yes.

24     Q.   Are you aware that studies dating back to 1997,

1                     DR. PAUL MCGOVERN

2    authored by a scientist with the last name Avidan, also

3    recommended the use of HEPA filtration on Bair Hugger

4    devices?

5              MR. C. GORDON:  Object to the form of the

6    question, assumes facts not in evidence.

7         A.  I was not.

8                   (Reporter clarification.)

9              MR. SACCHET:  I don't recall the end of the

10   question, probably because of the speaking objection, so

11   I'll restate it.

12   BY MR. SACCHET:

13        Q.  Are you aware -- well, there's no point.  You told

14   me the answer.

15             THE COURT REPORTER:  Can you restate the

16   objection?

17             MR. C. GORDON:  Form, foundation, assumes facts

18   not in evidence.

19   BY MR. SACCHET:

20        Q.  You're not aware that the Bair Hugger has been

21   equipped with a HEPA filter, are you?

22        A.  I was not aware of that, no.

23        Q.  Let me now turn to the Belani study.  If you could

24   turn to exhibit 14.

25        A.  I presume I've got it somewhere.

Page 440

1                     DR. PAUL MCGOVERN

2        Q.   I mistakenly told you to put the other exhibits to

3   the side.

4        A.   There it is.

5        Q.   All right.   This document is a copy of the study

6   entitled "Patient Warming Excess Heat"; correct?

7        A.   Yes.

8        Q.   And it was authored by you and Dr. Belani,

9   Mr. Albrecht, Mr. Reed and Professor Nachtsheim; correct?

10       A.   Yes.

11       Q.   And it was published in Anesthesia & Analgesia;

12   correct?

13       A.   It was.

14       Q.   Okay.   Did Mr. Albrecht invite you to participate

15   in this study?

16       A.   Yes.

17       Q.   Okay.   Did you travel to Minnesota to conduct this

18   study?

19       A.   I did.

20       Q.   Did you help design the experiment itself?

21       A.   Yes.

22       Q.   And there were two parts of this study, one

23   component involving bubble counts with respect to simulated

24   knee surgery, and another part involving photos of

25   convection currents generated by the Bair Hugger; correct?

1                    DR. PAUL MCGOVERN

2       A.  Yes.

3       Q.  Let's focus on the simulated knee procedure.  On,

4  if you need it as a reference, internal page 408, the

5  experimental design of this study was a 2x3 vectorial

6  design; correct?

7       A.  Yes.

8       Q.  And like the McGovern study, two of the factors

9  were a type of warming device, one being the Bair Hugger and

10  the other being the Hotdog; correct?

11      A.  Yes.

12      Q.  And the three factors -- actually, I take that

13  back.  The three variables were Hotdog versus Bair Hugger

14  versus control.

15      A.  Oh yes.  That's right, yes.

16      Q.  And the drape heights were in two forms, one being

17  low drape and the other being high drape?

18      A.  Yes, that's right.

19      Q.  Okay.  And in this study you examined bubble counts

20  on -- using a sequence of ten photos at 10-second intervals

21  for each run; correct?

22      A.  Yes.

23      Q.  And you determine the number of bubbles reaching

24  the surgical site by counting the number of bubbles

25  intersecting a vertical light curtain?

Page 442

DR. PAUL MCGOVERN

1

2    A.   Yeah, by -- yes.   Yeah, that's right.   Well,

3    counting the number of bubbles within a specified area of

4    a photo frame, I think.   Yeah.

5    Q.   Okay.   Dr. Belani was present during the

6    simulation; correct?

7    A.   He was present for some parts of the simulation.

8    If he was present for 100 percent of the time, but he was

9    there present while the spent was being set-up and taking

10   place.

11   Q.   And he is an experienced anesthesiologist at the

12   University of Minnesota; is that correct?

13   A.   To my understanding, yes, he is an attending level

14   anesthesiologist at the University of Minnesota Hospital.

15   Q.   He took no issue to the design of the simulations,

16   in any respect; correct?

17   A.   None that I was aware of.

18   Q.   And you similarly witnessed the simulations and you

19   took no issue with respect to the design as it was presented

20   in this paper?

21   A.   None whatsoever.   I helped design the study and

22   I believe this to be appropriate.

23   Q.   This study, like the bubble-count study performed

24   in the UK, was conducted in a laminar flow operating room;

25   correct?

1                         DR. PAUL MCGOVERN

2          A.   It was.

3          Q.   And like the laminar flow operating room in the

4     McGovern study, this laminar flow exceeded basic

5     requirements; correct?

6          A.   As far as I understand, yes.

7          Q.   The experimental design is replicable?

8          A.   I believe it was, given the information that we

9     provided in the paper.

10         Q.   And an anesthesiologist stood motionless at the

11    head of the table?

12         A.   As far as I remember, yes.

13         Q.   In terms of drape height, that was measured by

14    clipping the drape to an IV pole; and for the high drape it

15    was measured at 0.75 meters above the OR table, and the

16    lower drape was measured at 25 meters above the OR table;

17    correct?

18         A.   Yes.

19         Q.   The mannequin, which was placed on the table for

20    the purposes of the simulation, was draped according to the

21    protocol used by this particular hospital; correct?

22         A.   Yes, it was -- it was draped -- well, by the

23    protocol that I would use.  I don't remember if I consulted

24    Dr. Belani about the way that draping would be done, if

25    indeed, it was any different.  Generally, draping for such

Page 444

1                      DR. PAUL MCGOVERN

2   operations is similar, as far as I know, but I don't

3   remember if this was one which had been written or

4   designated as an approved method for this hospital.

5        Q.   Okay.  Just so we're clear, on the bottom of

6   internal page 407 in the left-hand column, do you see the

7   title that says, "Total Knee Replacement Experimental

8   Setup"?

9        A.   Yes.

10       Q.   It says:

11       "A mannequin was laid in the supine position and

12  draped in accordance with the standard draping protocol

13  used by the hospital for knee replacement procedures."

14       A.   In that case, that was what was done.

15       Q.   And this hospital is a hospital at the University

16  of Minnesota?

17       A.   Yes, that's correct.

18       Q.   The lighting arrangement was also according to

19  standard protocol?

20       A.   Yes.

21       Q.   And the blanket from the Bair Hugger was affixed

22  according to the manufacturer's instructions; correct?

23       A.   It was.

24       Q.   And this bubble diffuser was the same bubble

25  diffuser used in the bubble-count experiment for the

1                    DR. PAUL MCGOVERN

2  governmental study; correct?

3       A.   Yes.

4       Q.   So it too was designed and validated for

5  visualization of air currents; correct?

6       A.   Correct.

7       Q.   Although a picture in the study shows the

8  anesthesiologist holding the bubble wand, if you can call it

9  that, when the study was actually performed, the wand was

10 laid down on the OR table; correct?

11      A.   That's correct.

12      Q.   So the only time in which it was actually picked up

13 was just for purposes of the photograph in Figure 6,

14 displaying the anesthesiologist holding it?

15      A.   Yes, that was not the position that was taken for

16 data which was analyzed as -- well, statistically analyzed

17 for this paper.

18      Q.   And the position of the Bair Hugger device within

19 the operating room was marked on the floor of the operating

20 room?

21      A.   Could you refer to the place that that's written,

22 please?

23      Q.   Yeah, it's not actually in the study, but ...

24           (Exhibit 25 marked for identification)

25      A.   Thanking you.

Page 446

DR. PAUL MCGOVERN

1

2      Q.   Does this document bear a title "Anesthesia &

3   Analgesia.   Patient Warming Excess Heat"?

4      A.   Yes.

5      Q.   Does this appear to be a document in which it

6   catalogs the reviewers' comments and the authors' response

7   to the reviewer comments?

8      A.   It does.

9      Q.   If I could draw your attention to the page bearing

10  the Bates label in the bottom right-hand corner,

11  Belani_000013.

12     A.   Yeah.

13     Q.   The middle of the page, it says:

14     "Yes, the position of all devices was marked with

15  tape on the floor to ensure repeatable placement of the

16  experimental equipment."

17     A.   Yes.   So, in between experimental runs, all

18  equipment was placed in the same position as it had been for

19  other runs, and those pieces of equipment, such as IV drip

20  stands to hold the anesthesia screen, the Bair Hugger, all

21  the movable equipment, was marked with some tape to ensure

22  that no alteration occurred between different experimental

23  runs.

24     Q.   You have no doubts about the adequacy of the

25  experimental setup in terms of replicating an orthopedic

                    DR. PAUL MCGOVERN

1

2  surgery, do you?

3      A.  No, I believe that the experiment is repeatable in

4  different environments.

5      Q.  Let's look at the actual results of the experiment

6  as depicted in Figure 3, which is on internal page 408.

7  There are three headers, one bearing the name "Control", the

8  other "Conductive Fabric" and the other "Forced Air";

9  correct?

10     A.  Yes.

11     Q.  And in each row there are data points which have

12  been -- is "jigged" the right word? -- in order to prevent

13  overlap of those points?

14     A.  Jittered.

15     Q.  Jittered.  Yeah, there we go.  In figure 3, the

16  text says "jittered".  With respect to -- in this graph it

17  shows bubble counts; yes?

18     A.  Yes.

19     Q.  With respect to the section on forced-air warming,

20  the data shows that in all-but-one run, FAW, or forced-air

21  warming, generated at least two 250 bubbles; correct?

22     A.  More than that.  These are root values, so root 2

23  to root 50 bubbles.  So -- well, it is an adjustment to get

24  the data on the graph in a readable format.

25     Q.  Okay.

1                    DR. PAUL MCGOVERN

2        A.   But it shows that -- yeah, if the forced air is

3   between root 2 to root 50, or just under root 50 bubbles.  I

4   don't know what the absolute values are.  Perhaps they're

5   here.

6        Q.   Yeah, I was looking for that as well, and I don't

7   see them.  But in any case, if we look at Figure 4, which is

8   the root of the sum of bubble counts at the surgical site;

9   do you see that?

10       A.   Figure 4.

11       Q.   On the next page, the predicted mean sum of bubble

12  counts for forced-air warming at both drape heights, i.e.

13  half and full drape, was well over the root of 120; correct?

14       A.   Yes.

15       Q.   Okay.  And now, speaking of conductive fabric

16  warming, I apologize for sending you back to Figure 3 on the

17  prior page, but the data shows that only two runs of

18  conductive fabric warming resulted in a bubble over the

19  surgical site, whereas all other runs had zero bubbles;

20  correct?

21       A.   That is what this appears to show, yes.

22       Q.   And with respect to the sum depicted in Figure 4

23  for conductive fabric warming at both drape heights, the

24  root sum appears to be 0.5?

25       A.   I can't say what the actual number is, because the

DR. PAUL MCGOVERN

1

2  graph is a root graph, and there are arrow bars, but it is

3  low.

4      Q.  Okay.

5      A.  Or lower than forced air.  I can't give you the

6  absolute number.

7      Q.  If I can draw your attention to the prior page,

8  directly under Table 1 is a paragraph; do you see that?

9      A.  Yes.

10      Q.  And in the penultimate sentence it says:

11          "Such a count represents a significant

12  increase in the number of bubbles reaching the surgical

13  site versus" --

14      A.  Sorry, I'm lost again.  Hang on.  Under table?

15      Q.  Directly under Table 1, not Figure 1.

16      A.  Oh, where are we?  Okay, yeah.  Right.  Under Table

17  1, yeah.

18      Q.  And just above the last sentence, it says:

19          "Predicted mean sum of bubble counts equal to

20  0.48 ..."

21      A.  Yes, yes.  0.01 respectively, yes.

22      Q.  So in Figure 4, it is approximately 0.5 in terms of

23  the bubble counts for conductive fabric warming with respect

24  to both drape heights; correct?

25      A.  That's what this appears to say.

1               DR. PAUL MCGOVERN

2      Q.  Okay.  And based on that same textural paragraph we

3  were just looking at -- actually, let's go to Table 1.

4      A.  Okay.

5      Q.  We see:

6       "Poisson Bubble Count Model Parameters and Their

7  Significance."

8      And the second model parameter is "patient warming

9  device" and it has a p value of less than 0.001?

10     A.  Yes.

11     Q.  Does that indicate that there was a statistically

12 significant difference between the number of bubbles at the

13 surgical site between different types of warming devices?

14     A.  That's what this would indicate, as far as

15 I understand it, yes.

16     Q.  And the warming devices here were the Bair Hugger

17 versus the Hotdog; correct?

18     A.  And versus no warming device, yeah.

19     Q.  Okay.  And in contrast to the McGovern study, this

20 study found that at full drape height, there was

21 a statistically significant difference?

22         MR. C. GORDON:  Object to the form of the

23 question.

24     A.  I believe it did.  I --

25 BY MR. SACCHET:

1                       DR. PAUL MCGOVERN

2         Q.   If you go to the paragraph of text under Table 1

3    again.

4         A.   Yes, yeah.  I've got warming and control

5    conditions, yes.  So, yeah with this model, this says that:

6         "The use of forced air warming was found to result

7    in a predicted mean sum of bubble counts equal to 132.5

8    [which] represents a significant increase in the number

9    of bubbles reaching the surgical site ..." for the

10   condition of forced-air warming when compared with both

11   conductive fabric warming and the controlled conditions

12   where there was no warming device used.  Yes.

13        Q.   And the paragraph also says the factor of drape

14   height was insignificant.

15        A.   The factor of drape height was ... were not

16   significant, yes.  Were insignificant, yes.

17        Q.   And we have established before, when we looked at

18   this study, that there was a statement to the effect of

19   bubbles having similar airborne characteristics as neutrally

20   buoyant detergent bubbles?

21        A.   That's what we were discussing earlier.

22        Q.   So, based on that statement, this study would tend

23   to show that, as a result of forced-air warming, there would

24   be an increase in bubbles at the surgical site; correct?

25        A.   This would show that in experimental conditions

                        DR. PAUL MCGOVERN

1

2    such as this, the used of forced-air warming in a simulated

3    operation designed to replicate, as closely as practicable,

4    an operative procedure.  In that situation, forced-air

5    warming had a significant -- resulted in a significantly

6    increased transfer of air, and therefore bubbles, to the

7    operative field compared with conductive fabric warming and

8    no warming.

9        Q.  And those results give support to the fact that the

10   Bair Hugger could cause increased bacteria at the surgical

11   site in comparison to conductive fabric warming?

12       A.  They give support to the concept, to the theory,

13   that the Bair Hugger may encourage air to flow from

14   non-sterile areas, i.e. the area around the patient's head,

15   to a sterile area, i.e. the operative field in these

16   conditions.

17       Q.  Thank you.  And the results of this study are

18   actually rather conservative in nature, given the

19   experimental set-up; correct?

20           MR. C. GORDON:  Object to the form of the

21   question.

22       A.  Can you clarify what you mean by that, please?

23   BY MR. SACCHET:

24       Q.  So, some potential obstructions in the operating

25   room were not present during this study that would have

<sub>1</sub>                   DR. PAUL MCGOVERN

<sub>2</sub> otherwise potentially interacted with the use of

<sub>3</sub> a forced-air warming device to create additional convection

<sub>4</sub> problems?

<sub>5</sub>      A.   I don't think it's possible to speculate on that,

<sub>6</sub> because any additional devices could, when put in one

<sub>7</sub> position, reduce the likelihood of air -- contaminated air

<sub>8</sub> reaching the surgical site, or it could increase it.  But

<sub>9</sub> it's not possible to say with certainty what a unknown

<sub>10</sub> condition, such as the one you state, what influence that

<sub>11</sub> would have.

<sub>12</sub>      Q.   The lights were turned off during much of the

<sub>13</sub> simulation; correct?

<sub>14</sub>      A.   I believe so.  I can't remember; I'd need to check.

<sub>15</sub> I think they were positioned, certainly as for ... yeah,

<sub>16</sub> surgical lighting was provided by some overhead lights which

<sub>17</sub> were turned off during experiments.  That's correct.

<sub>18</sub>      Q.   And you stated earlier today that lighting can

<sub>19</sub> disrupted laminar airflow?

<sub>20</sub>      A.   Yeah, other experiments that I've done -- I'm

<sub>21</sub> working on a publication at the moment which, in my opinion,

<sub>22</sub> indicates that operating lights have a marked effect on

<sub>23</sub> laminar flow.

<sub>24</sub>      Q.   There was no surgical team present during the

<sub>25</sub> simulation; correct?

Page 454

1                    DR. PAUL MCGOVERN

2      A.   That is correct.

3      Q.   And there were no instrument trays?

4      A.   That is correct.

5                 (Reporter clarification.)

6      Q.   Given the absence of those variables, the results

7    are probably applicable to a variety of procedures.  That's

8    what you said a few minutes ago; correct?

9      A.   They may be applicable to a variety of procedures,

10   yes.

11     Q.   And this study was published after the peer-review

12   process; correct?

13     A.   It was.  It was peer-reviewed before publication,

14   yes.

15     Q.   And the editor of the section on patient safety,

16   Dr. Sorin Brull, informed members of your team that this

17   paper would be subject to rigorous review?

18     A.   You'll have to show me where that is stated, if you

19   could.

20                (Exhibit 26 marked for identification)

21     A.   Thank you.

22     Q.   In this document, dated October 25, 2011, Mark

23   Albrecht sent you and other co-authors a forwarded letter

24   from the Anesthesia & Analgesia editorial office; correct?

25     A.   Yes, that's right.

DR. PAUL MCGOVERN

1

2    Q.   And the particular editor, as denoted on the second

3    page at the top, is "Sorin J. Brull, MD, Section Editor,

4    Patient Safety, Anesthesia & Analgesia"; correct?

5    A.   Yes.

6    Q.   And she copied in the editor in chief of the

7    journal, Steven Schafer; correct?

8    A.   Yes.

9    Q.   And in the text of this letter, Dr. Brull, in the

10   second paragraph, says:

11        "Before I can make a decision about

12   acceptance, I wanted to underscore the need for

13   complete responses to the reviewers' comments.  This is

14   an interesting and potentially controversial study, and

15   one that may place into question current practice.  For

16   this reason, I think we have a duty to ensure that the

17   methodology is beyond reproach."

18   A.   Yes, that is stated there.

19   Q.   And I'll show you the document, I don't have to ...

20   oh yes.  If you could turn back to exhibit 25.  I apologize,

21   Mr. McGovern; I'll have to mark a different document.

22        (Exhibit 27 marked for identification)

23   A.   Thank you.

24   Q.   Okay.  This e-mail, from Mr. Albrecht to you and

25   other co-authors, is entitled "A&A Decision"; correct?

Page 456

DR. PAUL MCGOVERN

1    A.   Yes.

3    Q.   And it is dated January 11, 2012?

4    A.   Yes.

5    Q.   And that came after the letter that we just looked
6  at from Dr. Brull, correct, which is dated October 25, 2011?

7    A.   Yes.

8    Q.   And in this message Dr. Brull writes again to
9  Mr. Albrecht; correct?  As shown on the --

10    A.   Yeah.  That's right, yeah.

11    Q.   And in the text of the letter, she states:

12       "First of all, I want to join the reviewers
13  in thanking you for the significant changes you made to
14  this manuscript.  It deals with a very important topic,
15  and this study could potentially change surgical and
16  anesthetic practice.  For this reason, we must ensure
17  that the data are presented correctly, that the study
18  supports the conclusions, and that the recommendations
19  are based on irrefutable data."

20       Do you see that?

21    A.   I do.

22    Q.   This study was ultimately published in the same
23  journal that Dr. Brull worked for?

24    A.   Yes, that's correct.

25    Q.   You would agree that the data presented in the

1                    DR. PAUL MCGOVERN

2    study was irrefutable?

3              MR. C. GORDON:   Object to the form of the

4    question.

5         A.   I would tend not to use the word "irrefutable", but

6    I think the data is -- I think the study is a good study.

7    BY MR. SACCHET:

8         Q.   Dr. Brull said that the recommendations in the

9    study must be based on irrefutable data?

10        A.   That's what Dr. Brull said, yes.

11        Q.   And she ultimately decided, along with potentially

12   other co-editors or reviewers of the journal, to publish the

13   study?

14        A.   Yes.

15        Q.   So, in her view, it is fair to say that it was

16   based on irrefutable data?

17        A.   That's what she said, and it is very nice of her to

18   say so.

19        Q.   You continue to stand by the conclusions in the

20   Belani paper?

21        A.   I do.

22        Q.   And you have no conflict of interest other than

23   whatever was recorded in the study, which I believe shows

24   none with respect to -- (overspeaking) --

25        A.   No, well I was funded to travel to Minnesota to

1                      DR. PAUL MCGOVERN

2    conduct the study, but I didn't receive any remuneration

3    myself.  My expenses were paid for this study, but -- most

4    of them, not all, but I didn't receive payment for my

5    involvement in this study.

6            MR. SACCHET:  Let's take a break.

7            THE VIDEOGRAPHER:  Shall I change the tape now,

8    or -- we've got 20 minutes.

9            MR. SACCHET:  Why don't you leave it in?

10           THE VIDEOGRAPHER:  Going all off the record at

11   eleven minutes past four.

12   (4:12 p.m.)

13                          (Break taken.)

14   (4:18 p.m.)

15           THE VIDEOGRAPHER:  Back on the record at eighteen

16   minutes past four.

17           MR. SACCHET:  Mr. McGovern, at this point in time

18   I pass you, as the witness, to Mr. Gordon for him to finish

19   the remaining part of his examination if he so wishes, and

20   I reserve the rest of my time to respond if necessary.

21           MR. C. GORDON:  I'm sorry, we should have done

22   that in the break.

23           THE VIDEOGRAPHER:  Going off the record at

24   nineteen minutes past four.

25   (4:19. p.m.)

Page 459

1           DR. PAUL MCGOVERN

2                 (Break taken.)

3    (4:20 p.m.)

4           THE VIDEOGRAPHER:  Back on the record at twenty

5    past four.  This is the end of DVD 3 in volume 1 of the

6    deposition of Dr. Paul McGovern, going off the record at

7    twenty past four.

8    (4:20 p.m.)

9                     (Break taken.)

10   (4:34 p.m.)

11          THE VIDEOGRAPHER:  This is the beginning of DVD 4

12   in volume 2 of the deposition of Dr. Paul McGovern.  We're

13   back on the record at 2:34.  Andrew Head has left the

14   deposition and been replaced by Bryan Shacklady.

15          THE WITNESS:  It's 4:34.

16          THE VIDEOGRAPHER:  Did I say 4:34?

17          THE WITNESS:  You said 2:34.

18          THE VIDEOGRAPHER:  It's 4:34.  Thank you very much

19   for the correction.  Thank you.

20          MR. C. GORDON:  It's 2:34 somewhere.

21   EXAMINATION BY MR. C. GORDON:

22   BY MR. C. GORDON:

23      Q.  Dr. McGovern, I hopefully have a few questions to

24   follow up from some of the things you were asked.  Earlier

25   today you were asked regarding the collection of the

Page 460

DR. PAUL MCGOVERN

1

2  infection data that went into the 2011 paper.

3       A.  Yes.

4       Q.  And I believe you were asked if Mr. Reed had

5  collected as much data as possible, and you had said -- you

6  had affirmed that that was your understanding.

7       A.  Yes.

8       Q.  Okay?  And you agreed with the statement that no

9  attempt to -- there was no attempt to artificially limit the

10 data?

11      A.  None that I know of.

12      Q.  Okay.  Could you take a look at exhibit 16, please.

13      A.  Yes.

14      Q.  The first date on exhibit 16 appears to be from

15 October 2007; is that right?

16      A.  Yes.

17      Q.  And the actual study period of what you reported

18 started in July 2008; right?

19      A.  Yes.

20      Q.  So in fact there were nine months of data that you

21 all had, prior to when you decided to start the study

22 period; right?

23      A.  I don't know if that's the case.

24           MR. SACCHET:  Objection to foundation.

25           (Reporter clarification.)

1                    DR. PAUL MCGOVERN

2    BY MR. C. GORDON:

3         Q.  Let me show you what's been marked as exhibit 28.

4              (Exhibit 28 marked for identification)

5              MR. SACCHET:  Just for the record, I'm going to

6    have a standing objection of assumes facts not in evidence

7    with respect to this document.

8    BY MR. C. GORDON:

9         Q.  This is a printout of a long spreadsheet, so

10   there -- sort of track the numbers; you have to follow them

11   all the way through.  But the very first one on your

12   exhibit 16 was a 72-year old hip on October 30, 2007.  And

13   if you turn ahead to page marked at the bottom

14   Augustine_0005198 --

15        A.  Yes.

16        Q.  Are you already ahead of me?

17        A.  5198, yes.

18        Q.  And the 30 October 2007, there were several

19   procedures performed, but I think, if we look over at the

20   procedure listed as 145, that would -- does that correspond

21   to the one you've got there?

22             MR. SACCHET:  Object to form.

23        A.  It is not possible to say with certainty, because

24   there aren't enough data points to identify an individual

25   patient.  However, the data in row 145 of exhibit 28

Page 462

1                       DR. PAUL MCGOVERN

2    appears, as far as I can tell, to match the data in row 1 of

3    exhibit whatever it is -- 16.

4    BY MR. C. GORDON:

5        Q.  And just to further illustrate that, if you'd look

6    ahead to 5202.  Again, this is a long spreadsheet that has

7    been printed on several different pages, but if you track

8    the number 145, that reflects a -- an infection of

9    enterococcus on -- well, I guess there's a date on

10   exhibit 28, but not on -- maybe there is, on yours.  But for

11   that same October 30, 72-year-old hip, the infection is

12   enterococcus; right?

13           MR. SACCHET:  Object to form.

14       A.  I mean the cells -- the data cells on both

15   spreadsheets that you mentioned, both say "enterococcus" on

16   them.

17   BY MR. C. GORDON:

18       Q.  And your exhibit 16 just is a compilation of the

19   procedures where there was a deep joint infection that met

20   your criteria for inclusion in the study; right?

21           MR. SACCHET:  Object to form; foundation.

22       A.  It appears to be so.  It's not labeled as such, so

23   I can't absolutely confirm it, but that's what it appears to

24   be.

25   BY MR. C. GORDON:

Page 463

1                     DR. PAUL MCGOVERN

2        Q.  But all of the ones on exhibit 16 have infections;

3    right?

4        A.  That appears to be the case, yeah.  They all

5    mention some sort of infection, as far as I can tell.

6        Q.  And I'm going to, just in the interests of speeding

7    through this, I'm going to show you exhibit 29.

8              (Exhibit 29 marked for identification)

9              I will represent to you that exhibit 29, as

10   difficult as it is to read, is a printout of the same

11   spreadsheet data that we just looked at in exhibit 28,

12   limited to WG only, as the site of Wansbeck General.

13       A.  Right.

14                   (Reporter clarification.)

15             MR. SACCHET:  For the record, I note a standing

16   objection to this exhibit.

17             MR. C. GORDON:  You have it, counsel --

18             MR. SACCHET:  Assumes facts not in evidence, and

19   an incomplete hypothetical.

20             MR. C. GORDON:  Yep, you got it.

21             MR. SACCHET:  Thank you.

22   BY MR. C. GORDON:

23       Q.  A little easier on the front page there, you can

24   see 145, and you can track it all the way across to

25   "enterococcus" on the far right.

Page 464

DR. PAUL MCGOVERN

2    A.   Where are we?  Okay, 145, yes.

3    Q.   Just to further verify it, let's take a look at the

4    15 January 2008, which would be, I think, the third page?

5    A.   Of?

6    Q.   Of exhibit 29.

7    A.   Okay.  Page 3, which line?

8    Q.   It looks like it corresponds to 476.

9    A.   Right.

10   Q.   And just as on your exhibit 16, that's

11   a 69-year-old hip?

12   A.   Yeah.

13   Q.   And the exhibit 29 printout describes that

14   condition as "staph aureus"?

15   A.   Yes.

16   Q.   And as does your exhibit 16.  I don't want to take

17   up a lot more time going through here.  We can go back to

18   your exhibit 16.

19   A.   Right.

20   Q.   And we'll focus on that, but to the extent, you

21   know, there are questions about the full dataset ...

22   A.   Right.

23   Q.   ... I wanted to put exhibits 28 and 29 in front of

24   you.

25   A.   Okay.

1                    DR. PAUL MCGOVERN

2        Q.  So for exhibit 16, from October 2007 to June,

3   through June, that would be a total of nine months, right?

4   October 2007 through June 2008?

5        A.  Eight.  Yeah, it all depends if you're counting

6   October.

7        Q.  Counting October and June.

8        A.  Inclusive?  Then that covers a period including

9   nine different months, yes.

10       Q.  And just if you look at exhibit 28, you can see

11  that the very first procedure starts on October 1.

12       A.  Right, okay.  Yes, yes.

13       Q.  So, on your exhibit 16, in those nine months, how

14  many infections were there?

15       A.  Between October 2007 and when?  August 2008?

16       Q.  July of 2008.  Prior to --

17       A.  Six.  Six.

18       Q.  And -- I'm sorry, not including July.  The study

19  started July; or you used, as a study period, starting

20  July 1; right?

21       A.  Right.

22       Q.  So --

23       A.  I don't remember.  I'd need to check the --

24       Q.  And that's exhibit 13?

25       A.  Right.

Page 466

                    DR. PAUL MCGOVERN

1

2       Q.   I want you to take a look, because I want to make

3   sure we're on the same page on this.  Literally.  And

4   I think it is on internal page 1540, under "Joint infection

5   data".

6       A.   What exhibit are we on again?

7       Q.   I think it is 13.

8       A.   All right, hang on.  Okay, here we are.  Yes.  What

9   page internally?

10      Q.   1540.

11      A.   1540.  Yes, okay.

12      Q.   So it's the -- under "Joint infection data", it's

13  the -- you looked at the 2.5-year period starting 1 July,

14  2008; right?

15      A.   Yes.  It doesn't specify 1 July.  It says July

16  2008.

17      Q.   The copy I'm looking at, it doesn't say "starting 1

18  July 2008?"  Which I think is the way you folks say July 1?

19      A.   I think we're lost in translation.

20      Q.   I'm going to just show you what I'm looking at.

21      A.   Okay.  Yes, you're right.

22      Q.   Okay.

23      A.   Agreed.

24      Q.   So, starting July 1, 2008, you looked at 2.5 years

25  or 30 months' worth of data; right?

Page 467

1                     DR. PAUL MCGOVERN

2        A.   Right.

3             MR. SACCHET:   Object to form.

4    BY MR. C. GORDON:

5        Q.   Why did you not include the nine months of data you

6    had from October 2007 to June of 2008?

7             MR. SACCHET:   Objection: foundation.

8        A.   I do not know.

9    BY MR. C. GORDON:

10       Q.   Do you know who made the decision?

11            MR. SACCHET:   Objection: foundation.

12       A.   I do not know.

13   BY MR. C. GORDON:

14       Q.   Okay.  So in that nine-month period that you didn't

15   include, there were five infections in nine months; right?

16       A.   It appears that's the case.

17       Q.   Okay.  Let just randomly start with July 1, and

18   count nine months.  It would be July, August, September,

19   October, November, December, January, February, March.

20   Right?

21       A.   Yes.

22       Q.   Okay.  Can you tell me how many infections you

23   recorded from July 1 of 2008 to March -- well, through March

24   of 2009?

25            MR. SACCHET:   Objection: foundation.

                        DR. PAUL MCGOVERN

1

2       A.  July 2008 through to March 2009.  1, 2, 3, 4, 5, 6,

3   7, 8, 9, 10, 11, 12, through to end of March 2009.

4   BY MR. C. GORDON:

5       Q.  Okay.  So the first nine months of the full dataset

6   that you had, there are only five infections?

7       A.  Yes.

8       Q.  But the first nine months of the period that you --

9   where you chose to start it, there were 12 infections in

10  a nine-month period; right?

11      A.  That is what this data shows.

12      Q.  Okay.  There's quite a difference between 5 and 12,

13  isn't there?

14          MR. SACCHET:  Objection to form.

15      A.  There is a difference between 5 and 12.

16  BY MR. C. GORDON:

17      Q.  Okay.  And I'm not going to take the time now to

18  have you actually go through and count the number of

19  procedures, because I understand that the number of

20  procedures can vary, month to month.  But I want to do one

21  more exercise with this exhibit 16.  And looking at

22  exhibit 13, the period in which rivaroxaban was used.

23      A.  That's 13.  Okay.

24      Q.  That was beginning of August 2009 through the end

25  of February 2010; correct?

1                    DR. PAUL MCGOVERN

2        A.   Beginning of August 2009 to -- you will have to

3   take me back to the document because I don't remember.

4        Q.   I think the rivaroxaban part is -- yes, it's in

5   that same joint infection data section, towards the bottom.

6   The thromboprophylaxis regimen, from July 2008 to the end of

7   July 2009, was tinzaparin.

8        A.   Right.

9        Q.   And so where is the rivaroxaban?  Oh, I'm sorry.

10  There it is: the next line.  From August 2009 to

11  February 2010, Rivaroxaban was provided.

12       A.   Right.

13       Q.   Okay.  And actually, if you look at exhibit 21.

14       A.   Yes.

15       Q.   On the first page there, it says "between

16  February 2009 and February 2010."

17       A.   Yes.

18       Q.   So if -- go back to your exhibit 16.  If you look

19  at that period of August through February -- August 2009

20  through February 2010, that's August, September, October,

21  November, December, January, February.

22       A.   Yes.

23       Q.   Seven months.

24       A.   Yeah.

25       Q.   And if you look at exhibit 21, Dr. Reed also talks

1                    DR. PAUL MCGOVERN

2  about it being a seven-month period.  Could you please count

3  up the total number of infections that you, your dataset,

4  had for that seven-month period.

5      A.  From August to?

6      Q.  February.  To the end of February.

7      A.  To the end of February.

8          MS. ZIMMERMAN:  Do you have a copy of that?  We

9  can't find it in the binder.

10         MR. C. GORDON:  Which one?

11         MS. ZIMMERMAN:  The chart, the spreadsheet you're

12 referring to.  I don't know if it's in one of these binders.

13         MR. C. GORDON:  16?  You marked it.

14         MS. ZIMMERMAN:  Our 16 is what you're using?

15         MR. C. GORDON:  Yeah.

16     A.  From the beginning of August 2009 to the end of

17 February 2010: 18.

18 BY MR. C. GORDON:

19     Q.  Now if you'd look at exhibit 21, that was the

20 Jensen et al study, including Dr. Reed?

21     A.  Yeah.

22     Q.  How many infections did they report for that, the

23 same seven-month period?

24         MR. SACCHET:  Objection to form: foundation.

25     A.  How many infections did you ...

1                    DR. PAUL MCGOVERN

2    BY MR. C. GORDON:

3         Q.  Again, this is exhibit 21.  We'll look at page 523.

4         A.  Right.

5         Q.  I guess it's internal 93.

6         A.  Yes.

7         Q.  And there, group 1 is previously defined as the six

8    months prior to the switch to rivaroxaban.

9         A.  Right.

10        Q.  And group 2 is the seven-month rivaroxaban?

11        A.  Right.

12        Q.  And under "Results", the third paragraph down.

13        A.  Yes.

14        Q.  There are 14 infections reported; right?

15             MR. SACCHET:  Object to the form.

16        A.  That shows that microbiology was cultured in 14

17    locations.

18        Q.  And the comparator that was used in this study, and

19    exhibit 21, to determine whether rivaroxaban did or did not

20    have a statistically significant impact on joint infection

21    rates, that's the number.  It was 14 versus 5 in group 1;

22    right?

23             MR. SACCHET:  Objection to form.

24        A.  I'm not following you.

25    BY MR. C. GORDON:

1                      DR. PAUL MCGOVERN

2      Q.  Again, look at page 523, and it says:

3           "Of those patients who returned to theatre,

4  microbiology results showed that five of the nine (55%)

5  in group 1 had a deep infection compared with 14 of 22,

6  (63.6) in group 2."

7      A.  Right, yeah.

8      Q.  "The overall deep infection rate in group 1 was 1%

9  (95% CI 0.4 to 2.4), compared with 2.5% (95% CI 1.5 to 4.2)

10  in group 2 (with a P value of 0.102)."

11     A.  Right.

12     Q.  So the comparator in this study was 1 percent based

13  on 5, versus 2.5 percent based on 14; right?

14     A.  That's microbiology confirmed deep joint infection.

15  That's not the only way of measuring deep joint infection.

16          MR. SACCHET:  Objection to form.

17              (Reporter clarification.)

18  BY MR. C. GORDON:

19     Q.  Thank you.  I'm not trying to cast aspersions on

20  the authors of exhibit 21.  There is that difference.  There

21  was also -- I want to, just in fairness, point out the

22  criteria for deep joint infections in exhibit 21.  And that

23  paper was infections presenting within 30 days.

24          MR. SACCHET:  Objection: move to strike a

25  preamble, no question pending, testimony from counsel.

Page 473

1                    DR. PAUL MCGOVERN

2    BY MR. C. GORDON:

3        Q.  Was the 30-day -- was that the same cut-off period

4    that you used?

5        A.  I cannot remember.

6            MR. SACCHET:  Objection to the foundation.

7    BY MR. C. GORDON:

8        Q.  Let's take a look at your exhibit 13 and see what

9    your definition was, or your cut-off period.  Again, it is

10   all in that -- everything seems to be in that one paragraph

11   showing infection data.

12       A.  Which page are we on in exhibit 13?

13       Q.  It is internal page 1540.

14       A.  Yes.  Yes, so: "Infection was diagnosed by surgical

15   site infection nurses according to english Health Protection

16   Agency criteria for deep infection ... Only infections

17   presenting within 60 days of surgery were included.

18       Q.  So your period of surveillance was a little longer

19   than exhibit 21, and in exhibit 21 they were using

20   microbiology as the --

21       A.  Different methods were used in different studies to

22   define when a patient had infection.

23       Q.  Okay.  So for the -- for that rivaroxaban period

24   using your criteria, there were, in fact, 18 infections?

25           MR. SACCHET:  Objection --

1                    DR. PAUL MCGOVERN

2   BY MR. C. GORDON:

3        Q.  -- in that seven-month period; right?

4        A.  Which data are you using?

5        Q.  Exhibit 16.

6        A.  On exhibit 16, we're saying that between 1 August

7   and the end of February 2009, I think --

8        Q.  2010.

9        A.  2010, correct.  1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11,

10  12, 13, 14, 15, 16, 17, 18 infections, yes.

11       Q.  Okay.  And in the exhibit 21, where they ended up

12  comparing that 1 percent to the 2.5 percent, the period

13  of -- what they defined as group 1, the pre-rivaroxaban time

14  period, that began in February 2009 for six months; right?

15            MR. SACCHET:  Objection to form: foundation.

16  BY MR. C. GORDON:

17       Q.  February, March, April, May, June -- I'm sorry,

18  five months.  February, March, April, May, June.

19       A.  Sorry, what began it?  This is the --

20       Q.  No, my math is off.  Don't rely on me.  Look on the

21  front page of exhibit 21.

22       A.  The front page of --

23       Q.  Page 91.

24       A.  -- of exhibit 21 --

25       Q.  Under "Patients and Methods".

Page 475

```
                        DR. PAUL MCGOVERN
```
1
2      A.   Yeah.

3      Q.   What was the period that would -- that was group 1?

4      A.   1 February 2009 and 31st July 2009 was group 1.

5      Q.   Okay, and that is six months.  Now let's look at

6   your exhibit 16 and count the number of infections that

7   report for the period of February 1, 2009, through

8   31st July 2009.

9      A.   February 1, 2009 ...

10          MR. SACCHET:  I don't see that on the --

11     A.   To when?

12  BY MR. C. GORDON:

13     Q.   31 July, 2009.

14     A.   Three.

15     Q.   Okay.  So, for that six-month period that the study

16  exhibit 21 refers to is a group 1, when they were still on

17  tinzaparin, your data show three infections; right?

18          MR. SACCHET:  Objection to form.

19     A.   Between 1 February 2009 and 31st July 2009, the

20  data from the study shown in the exhibit 16 showed three

21  infections.

22  BY MR. C. GORDON:

23     Q.   And in the study in exhibit 21, they reflect five

24  microbiology confirmed infections in that time frame; is

25  that right?

DR. PAUL MCGOVERN

1  DR. PAUL MCGOVERN

2      MR. SACCHET:  Objection: foundation.

3  BY MR. C. GORDON:

4      Q.  Internal page 93 are the results.

5      A.  93.  Yes.

6      Q.  Okay.

7      A.  Well, yeah, five have a microbiology confirmed

8  infection.

9      Q.  I understand how the different methods result in --

10  resulted in undercounting in exhibit 21, but how -- do you

11  have any understanding as to how they would have gotten five

12  when you only got three?

13      MR. SACCHET:  Objection to the preamble, and move

14  to strike the comments that they were undercounting; made by

15  counsel as opposed to the witness.

16      A.  Could you repeat the question, please.

17  BY MR. C. GORDON:

18      Q.  Do you have any understanding as to why, in the

19  study in exhibit 21, they recorded five infections in the

20  pre-rivaroxaban period, when your data show only three in

21  that same period?

22      MR. SACCHET:  Objection: form.  Objection:

23  foundation.

24      A.  The criteria used for deciding what is and is not

25  an infection is not black and white.  I don't know what

1           DR. PAUL MCGOVERN

2  happened with -- really, with the methods used -- sorry, the

3  criteria are different, and the decision of whether an

4  infection exists or not can be made through several

5  different methods.  It is stated in both papers that

6  different methods were used to decide if patients had an

7  infection or not, and it seems likely to me that the

8  discrepancy in the reported rate of infection in the date

9  ranges concerned can be accounted for by the fact that

10 completely different definitions of infection and criteria

11 for the diagnosis of infection in these papers were used for

12 the two different studies.

13 BY MR. C. GORDON:

14     Q.  Okay.  So, just using your -- the criteria you

15 used, in the six months of tinzaparin before the switch to

16 rivaroxaban, there were only three infections; and during

17 the rivaroxaban period of seven months, there were a total

18 of 18 infections; right?

19        MR. SACCHET:  Objection to form, foundation.

20     A.  In those two ... without original data for these

21 two, I can't say for sure that, even though they're in the

22 same hospital, that the patients we're counting here

23 definitely fall into this group in this paper.  I can't say

24 that they're the same thing.  And so I can't draw that

25 conclusion, because I haven't got -- the data are -- the

1                    DR. PAUL MCGOVERN

2    patient cohorts may be similar, but I don't have enough

3    evidence to draw a parallel, because the data have not been

4    analyzed together and not been presented together.

5    BY MR. C. GORDON:

6        Q.  Putting aside whatever was recorded in exhibit 21,

7    based on your published paper --

8        A.  Yes.

9        Q.  -- the rivaroxaban period coincides with 18

10   infections; right?

11       A.  During --

12           MR. SACCHET:   Objection to form.

13       A.  During the rivaroxaban period, if it's stated that

14   ... right, where is the rivaroxaban?  Right, August 2009 to

15   February 2010, 18.  That's stated as the rivaroxaban period,

16   and this reverted to tinzaparin from day one,

17   postoperatively, in February.  And in that period mentioned

18   in the paper, there were 18 infections recorded for that

19   study, yes.

20   BY MR. C. GORDON:

21       Q.  Okay.  Now on your exhibit 16, if you turn to the

22   third page in, toward the bottom it looks like there are six

23   infections listed there, and under "BC" it says

24   "Transition".  Do you see that?

25       A.  Yes, yes.

1                   DR. PAUL MCGOVERN

2       Q.   So those would have occurred during the period when

3   you were transitioning from Bair Hugger to Hotdog; right?

4       A.   Yes.

5       Q.   Is it possible that any of those transition

6   procedures were done with a Hotdog?

7            MR. SACCHET:   Objection: foundation.

8       A.   I do not know.

9   BY MR. C. GORDON:

10      Q.   Would that data have been available to you when you

11  wrote the paper?

12           MR. SACCHET:   Objection to form: foundation.

13      A.   I do not know.

14  BY MR. C. GORDON:

15      Q.   Okay.   Is there any reason why you decided not to

16  try and figure out whether those six infections were

17  involving Hotdog patients or Bair Hugger patients?

18           MR. SACCHET:   Objection: foundation,

19  argumentative.

20      A.   Could you repeat the question, please?

21  BY MR. C. GORDON:

22      Q.   Well I guess I missed a step here.   Did you do

23  anything, when you were writing the paper, to try and see if

24  the infections that arose during the transition period

25  occurred in patients who had been warmed with the

1                    DR. PAUL MCGOVERN

2   Bair Hugger or the Hotdog?

3              MR. SACCHET:   Objection to form.

4        A.   So you're asking if it was documented, or if it was

5   recorded anywhere, if those patients were using Bair Huggers

6   or -- had Bair Huggers or HotDogs used for their procedures,

7   and if that data was available, and if that data was or

8   could have been put in the paper?   Is that what you're

9   saying?

10  BY MR. C. GORDON

11       Q.   Right.

12       A.   Right.   Well, I don't know what happened; I did not

13  collate this data.   But to my knowledge it's not, or wasn't,

14  routine practice to record the technology of warming used

15  during a procedure.   That would not be standard practice,

16  and because this was a retrospective study, it was not known

17  at the time of the procedures that this data would be

18  looked at.

19       Q.   So whether all six of those were Bair Hugger, all

20  six were Hotdog, or some combination thereof, you just don't

21  know?

22       A.   And that's why they're marked clearly as

23  a transitionary period, because it's not clear whether they

24  are Hotdog or Bair Hugger procedures.

25       Q.   Okay.   Line 44, you indicated was a procedure that

1                    DR. PAUL MCGOVERN

2    involved the Bair Hugger; is that right?

3        A.  Yes.

4            MR. SACCHET:  Objection to form, foundation.

5    BY MR. C. GORDON:

6        Q.  And if we go back to the front page of exhibit 16,

7    it looks like number 44 occurred on September 15, 2010; is

8    that right?

9        A.  One, two, three; one, two, three.  Yes.

10       Q.  Why was there a procedure using Bair Hugger in

11   September 2010?

12           MR. SACCHET:  Objection: foundation.

13       A.  I don't know.

14   BY MR. C. GORDON:

15       Q.  Right, and you didn't report that anywhere in your

16   paper, did you?

17       A.  Not to my knowledge.

18       Q.  In fact, if you look at exhibit 13 on internal

19   page 1343.

20       A.  Exhibit 13, what page?

21       Q.  1543; I'm sorry.  Bad eyes.  Figure 7, which we

22   talked about a little bit yesterday.

23       A.  Right.

24       Q.  At the top of Figure 7, those little circles, those

25   are representations of when infections occurred; right?

Page 482

1                    DR. PAUL MCGOVERN

2       A.   Right.

3       Q.   Where is the infection that's on your exhibit 16,

4  as identified as number 44, where would one find that on

5  that Figure 7?

6            MR. SACCHET:   Objection: foundation.

7       A.   Sorry, repeat that, please?

8  BY MR. C. GORDON:

9       Q.   Figure 7, at the top, shows circles reflecting

10  infections along the time axis on the bottom.

11      A.   Yes, yes.

12      Q.   And you've indicated that number 44, a September 15

13  2010 procedure, used a Bair Hugger and resulted in an

14  infection.  And I'm wondering where that particular one

15  would be reflected on that timeline?

16      A.   That would be reflected --

17           MR. SACCHET:   Objection to form.

18      A.   -- in -- well, it would be reflected in that

19  timeline in September 2010.

20  BY MR. C. GORDON:

21      Q.   Okay.  Well, looking at the Figure 7, how many

22  total infections are reflected in the conductive fabric

23  period from July 2010 to January 2011?

24           MR. SACCHET:   Objection to form.

25      A.   On Figure 7?

1                      DR. PAUL MCGOVERN

2       Q.  Yes.

3       A.  Well, I can see three, maybe four, marks.  It's not

4  clear from the copy.

5       Q.  Okay.  Well, you report three, right, in the text?

6       A.  Right, yeah.

7            MR. SACCHET:  Objection to form.

8  BY MR. C. GORDON:

9       Q.  And the dates of the three on exhibit 16 would be

10  September 1, October 18, and November 22 of 2010; right?

11      A.  October -- well, September 1, September 15 and

12  November 22, yes.

13      Q.  So what I'm trying to understand is, if there are

14  three dots in that -- in the conductive fabric box, what

15  happened to the September 15, 2010, forced-air warming?

16            MR. SACCHET:  Objection: misstates the testimony.

17  And form.

18      A.  It depends if the data was jittered.  This doesn't

19  say -- oh no, it does say the data were jittered to avoid

20  overprinting.  It is not apparent to me if the 15th and the

21  1st September data points on this graph, due to the low

22  resolution of the graph, are overlaid on each other, or if

23  that data point is not there.  I can't tell.

24  BY MR. C. GORDON:

25      Q.  If you didn't have information available to

DR. PAUL MCGOVERN

1  determine which of the transition procedures involved

2  Bair Hugger versus Hotdog, how are you able to tell that the

3  September 15 procedure, which was after you had transitioned

4  to Hotdog, for some reason used a Bair Hugger?

5       A.  I don't know.

6            MR. SACCHET:  Objection to form, foundation,

7  assumes facts not in evidence.

8       A.  I don't know how you would.

9  BY MR. C. GORDON:

10      Q.  I didn't write down the exhibit number, but it's

11  your -- it was marked as the write-up of the microbiology

12  study earlier on.

13      A.  Oh, yeah.

14           MS. ZIMMERMAN:  Oh, I'm sorry.  Exhibit 6 was

15  tab 24.

16           MR. C. GORDON:  Exhibit 6?

17           MR. SACCHET:  It looks similar, probably.  Is that

18  the one that the --

19           MR. C. GORDON:  That's your copy.

20           MR. SACCHET:  Okay, yeah.

21           MR. C. GORDON:  That's the only other one I need

22  to know.

23           MR. SACCHET:  The date is June 30, 2010.  I don't

24  know the text.  Can I see?  Okay.  It's going to take me

Page 485

1                          DR. PAUL MCGOVERN

2    a moment to find.

3    BY MR. C. GORDON:

4         Q.  If you look at exhibit 6 now, switch gears.  What

5    was this?

6              MR. SACCHET:  I think that's 2.

7              MR. C. GORDON:  Okay.  Have you got 6?

8         A.  It's here somewhere.  Six.

9         Q.  If you'd turn to the second page, comment PS3: "Is

10   there any info about the sensitivity of the device, i.e." --

11        A.  Exhibit 6 doesn't have --

12             MR. SACCHET:  This isn't actually -- is this the

13   comment draft one?

14             MR. C. GORDON:  Yes, the comment one.

15             MR. SACCHET:  That's not --

16             MR. C. GORDON:  Sorry.  You know what, without

17   looking at the documents, I think I can just tee this up.

18   BY MR. C. GORDON:

19        Q.  You remember being asked questions about the

20   Handilaz capability of measuring only 0.3, 0.5, and

21   5 microns?

22        A.  Yes.

23        Q.  And your colleague -- one of your colleagues had

24   raised a question about the sensitivity of the device;

25   right?

Page 486

1                    DR. PAUL MCGOVERN

2       A.   Yes.

3       Q.   And she had -- I believe it's she --

4       A.   He.

5       Q.   He.   I apologize.   He had asked about its relevance

6  to the pathogens; right?

7       A.   Right.

8       Q.   And we, counsel for the plaintiffs, established

9  that the Handilaz was not, as far as you know, counting

10 particles as small as 0.2 microns?

11      A.   It's not designed to record data in that range,

12 yes.

13      Q.   Okay.   And I would -- with Brownian motion, it

14 might possibly; right?

15      A.   It may, yeah.

16      Q.   But assuming, for the sake of argument, it doesn't

17 pick up a 0.2 size micron, are you aware of any bacteria

18 that causes deep joint infections that is 0.2 microns?

19           MR. SACCHET:   Objection: foundation.

20      A.   I don't know about the size of bacteria in relation

21 to those which are pathogenic for deep joint infection, so

22 I couldn't comment of the diameters of bacteria.

23                (Reporter clarification.)

24 BY MR. C. GORDON:

25      Q.   In your medical training, do you have any kind of

Page 487

DR. PAUL MCGOVERN

1       general sense as to what the range of sizes of bacteria are,

2       as opposed to viruses or fungal spores?

3              MR. SACCHET:  Objection: foundation, asked and

4       answered.

5          A.  Well, bacteria will be significantly larger, orders

6       of magnitude larger than a virus.

7                     (Reporter clarification.)

8          A.  But I would need to look up exact numbers, because

9       I wouldn't want to misspeak.

10      BY MR. C. GORDON:

11         Q.  I appreciate that.  Let's go on to exhibit 6.

12         A.  I'm on exhibit 6.

13         Q.  Okay.  Second page, a variant of your e-mail, you

14      make reference to --

15         A.  E-mail?  This is not an e-mail on exhibit 6.

16         Q.  I apologize.  I guess we're getting the numbers all

17      screwed up.

18             MR. SACCHET:  Which one is that?

19             MR. C. GORDON:  It's the --

20             MR. SACCHET:  I think it's exhibit 2.

21             MR. C. GORDON:  "Next paper for review" is the

22      title of it.

23             MR. SACCHET:  I think it's 2.

24      BY MR. C. GORDON:

Page 488

1                    DR. PAUL MCGOVERN

2       Q.  I apologize, then.  So you can just look at mine.

3   It is just that one line about the 800 watts.

4       A.  Right, yeah.

5       Q.  Where did you get the information that there's 800

6   watts of excess heat?

7            MR. SACCHET:  Objection: foundation.

8       A.  I don't remember.  But if the unit is powered and

9   rated at 800 watts, then it will output that power.

10  BY MR. C. GORDON:

11      Q.  Are you familiar with the difference between

12  a maximum power rating and the actual output of an

13  electrical appliance?

14      A.  To a certain extent.

15      Q.  Are they always -- are they typically the same?

16      A.  No.

17      Q.  Okay.  If you turn to exhibit 24, I'm pretty sure

18  I got this one right.

19      A.  Yes, 24.

20      Q.  On the second page, you were -- counsel for the

21  plaintiff read the title: "Forced-air warming linked to

22  periprosthetic total joint replacement infections."  It then

23  says "Scott D. Augustine M.D., Paul D. McGovern M.D."

24      A.  It does.

25      Q.  Did you write this?

Page 489

1              DR. PAUL MCGOVERN

2       A.   I did not.

3       Q.   Have you ever seen it before?

4       A.   No, not to my recollection.

5       Q.   At the very beginning of today's testimony that we

6  were -- there were some questions about peer review.  The

7  peer-review process.

8       A.   Yes, yes.

9       Q.   Okay.  Peer reviewers can only review what they're

10  presented; right?

11      A.   Yes.

12      Q.   And so, if data are omitted, or things are

13  presented in a way that might be inaccurate or misleading,

14  the reviewers can't figure that out, necessarily; right?

15      A.   That is true.

16           MR. SACCHET:  Objection to foundation.  I'd also

17  like to ask for a time count, and I object to further

18  questioning if it is beyond 7 hours.

19  BY MR. C. GORDON:

20      Q.   Have you ever heard of a Richard Eastil, M.D.,

21  a professor of bone metabolism at the University of

22  Sheffield?

23      A.   I may have, but I don't recall.

24      Q.   Have you ever heard -- recall hearing anything

25  about a study that was published in the Journal of Bone and

1              DR. PAUL MCGOVERN

2   Mineral Research concerning the drug actonel?

3              MR. SACCHET:  I'm going to object again, and ask

4   for a time count before further questioning proceeds, in

5   violation of Federal Rules of Civil Procedure.

6              MR. C. GORDON:  Your objection is noted, counsel.

7              MR. SACCHET:  Well, I'm calling for a time count.

8              THE VIDEOGRAPHER:  I'm doing it.  I'm doing it.

9   Seven hours, two minutes.

10             MR. SACCHET:  You're over.

11      A.  Could you repeat the question, please?

12             MR. SACCHET:  Again, I object to

13  further questioning --

14             MR. C. GORDON:  Your objection is noted, counsel.

15             MR. SACCHET:  Now that we know the time is over,

16  you're continuing to ask questions and it violates the

17  Federal Rules.

18             MR. C. GORDON:  No, I'm continuing to ask

19  questions of this witness, and if your objection is

20  sustained by the court, then all these questions, I guess,

21  are worthless.

22             MR. SACCHET:  Well, I have a continuing objection

23  right now --

24             MR. C. GORDON:  Yes you do.

25             MR. SACCHET:  -- and I'm reading this into the

1                    DR. PAUL MCGOVERN

2    record: the plaintiffs are adjourning this deposition

3    until and unless defendants seek and obtain --

4            MR. C. GORDON:  No.  If you want to leave, go

5    ahead.  I'm going to continue asking questions.

6            MR. SACCHET:  (overspeaking): leave of court

7    enlarging the time beyond 7 hrs allowed by the federal rules

8    of civil procedure --

9            THE COURT REPORTER:  Okay, I can't take any of

10   this down unless you --

11           MR. SACCHET:  I'm going to continue if Mr. Gordon

12   is going to continue speaking.

13           MR. C. GORDON:  All right.

14           MR. SACCHET:  Background here, irrelevant.  Third

15   trip to the UK for this deposition.  The parties have long

16   discussed splitting time equally.  When deposition was

17   continued due to sudden illness of Mr. Gordon, it was

18   re-noticed to commence yesterday, January 4, 2017.

19   Dr. McGovern generously agreed to appear voluntarily and

20   agreed to provide two full days of testimony.  3M examined

21   the witness yesterday for 6 hrs and 17 mins and then passed

22   the witness.  The plaintiffs commenced examination this

23   morning, having prepared three times, with detailed

24   outlines, timed and rehearsed for 7 hours.  Just after

25   3:00 p.m. today, counsel for 3M advised he has several hours

1                         DR. PAUL MCGOVERN

2    of additional questioning and planned to continue the

3    deposition for a third day, knowing plaintiffs booked to

4    return to the United States tomorrow.

5              MR. C. GORDON:  That's a total lie, counsel.

6    I said I had about an hour of questioning.  I never said

7    several hours.  Don't lie.

8              MR. SACCHET:  -- (overspeaking) -- in the

9    interests of allowing 3M the full 7 hrs allowed by the

10   Federal Rules of Civil Procedure, the plaintiff's expedited

11   examination, advised of the potential need to involve the

12   District of Minnesota if 3M needs to enlarge their

13   examination period beyond 7 hours.  Plaintiffs further

14   passed the witness after 5 hours and 1 minute of testimony.

15   Counsel for 3M since re-examined the witness for a total of

16   7 hours and 3 minutes.  Plaintiff's counsel advised that

17   under rule 30D of the Federal Rules Procedure, this requires

18   the parties seeking to extend beyond the 7-hour time period

19   allowed to bear the burden to show good cause to get

20   additional time.  The case citation for this is the District

21   of Minnesota Cardenas v Prudential 99-1421, issued on

22   May 16, 2003.  Another citation is Jenson v Astrazenica

23   bearing case number 02-4844, issued on August 30, 2004.

24              3M advised only have -- 3M advised that they

25   only had 1 hour of questioning.  Plaintiffs reject the

1                        DR. PAUL MCGOVERN

2    gamesmanship in these depositions would continue.

3    Attempts to deny plaintiff's ability for examination.

4    Plaintiffs are adjourning this deposition and are

5    available for call with the court if plaintiffs

6    seek -- if defendants seek an emergency relief.

7              MR. C. GORDON:  This is our deposition.  We're not

8    adjourning.  You're welcome to leave or stay.

9              Dr. McGovern, I'm sorry that you -- your time

10   has been impinged on by that lengthy soliloquy.

11             MR. SACCHET:  The time is being impinged by

12   continuing examination of the witness and violation of the

13   Federal Rules of Civil Procedure.

14             MR. C. GORDON:  Do you recall hearing anything

15   about a study about the drug actonel, an osteoporosis drug?

16        A.   I do not recall such a study.

17        Q.   Okay.  Have you ever heard of a Doctor Andrew

18   Wakefield?

19        A.   I haven't heard of Dr. Andrew Wakefield.

20        Q.   And are you familiar with the research that he

21   published that purported to show a link between the MMR

22   vaccine and autism?

23        A.   I've not read the research itself, but I'm familiar

24   with the media attention that that research has received.

25                  (Reporter interruption.)

1                  DR. PAUL MCGOVERN

2          MR. SACCHET:  We're exiting the room.

3          MR. C. GORDON:  Well then, I'm calling the court,

4  and if you're gone and the judge says to continue, that's

5  your problem.

6          THE VIDEOGRAPHER:  I need to be instructed to go

7  off the record, otherwise I keep running.

8          MR. C. GORDON:  This is outrageous.

9          THE VIDEOGRAPHER:  From both of you.  Sir, can

10  I go off the record?

11          MR. C. GORDON:  Not yet.

12          MS. ZIMMERMAN:  Yes, you can go off the record.

13          THE VIDEOGRAPHER:  Both parties have to say.

14        (Parties for the Plaintiffs exit the room.)

15          MR. C. GORDON:  Is the camera still running?  Just

16  leave it running.  I need to get the phone number.

17          (Off-the-record discussion between Mr. Gordon

18  and the court reporter regarding whether the

19  transcription should continue.)

20          MR. C. GORDON:  I've actually only got five

21  minutes left of questions, and I'm done.

22          THE COURT REPORTER:  The other parties didn't

23  stipulate whether they wanted the note to continue or not.

24          MR. C. GORDON:  Clearly the plaintiffs don't want

25  it to continue, and they were afforded the opportunity to

1                    DR. PAUL MCGOVERN

2    stay here, and I'm running the risk, I guess, of this being

3    excluded.

4              MR. SHACKLADY:  Do you wish to call the court?

5              MR. C. GORDON:  No.

6              MR. SHACKLADY:  I have no objections.

7              MR. C. GORDON:  No.  It doesn't matter.  They're

8    already gone.

9              (off-the-record telephone conversation.)

10   BY MR. C. GORDON:

11       Q.  Earlier you were asked some questions about the 3.8

12   and the increased risk, and you were -- your testimony is

13   what it is, but you were precise in how you responded to

14   that, as to what it meant for there to be an increased odds

15   ratio, or an odds ratio of 3.8.  Do you recall that line of

16   testimony?

17       A.  I do recall that line of testimony.

18       Q.  Here's the question I want to ask you.  You're

19   aware of research that demonstrates that the in-hospital

20   mortality rate for people that have CPR is pretty high,

21   somewhere as high as 70-90 percent; right?

22       A.  Yes, very high.

23       Q.  So, if somebody were to do a study for some reason,

24   and look at in-hospital mortality rate as the endpoint, and

25   divide people into two groups, those that had CPR and those

1                    DR. PAUL MCGOVERN

2    that didn't have CPR, there would probably be a really

3    enormous odds ratio that people with CPR would die in

4    hospital versus people who don't have CPR; right?

5         A.  I think speculating on that without a precise study

6    design, and the statistical analysis that you're referring

7    to, means that I cannot speculate on that.  I can't comment

8    on a hypothetical situation without data in front of me and

9    without a calculated odds ratio.

10        Q.  For the purposes of this question, just assume that

11   there is an odds ratio in excess of three for looking at

12   a subgroup of people who had CPR versus a subgroup of people

13   who didn't have CPR.  And I'm just using this as an example

14   to try and understand what you were saying.  Were you saying

15   that the fact that there is an increased odds ratio just

16   means, on the basis of those data, the people in the CPR

17   group were more likely to die in hospital than the people in

18   the non-CPR group, but that doesn't mean that they -- their

19   increased death rate was because they had CPR?

20        A.  I find it difficult to interpret and understand

21   exactly what you're saying, because I -- as you're speaking,

22   I'm trying to imagine a study with two cohorts.  But to know

23   what an odds ratio is, I need to know what the endpoint of

24   the study is.  If the endpoint of the study is death, then

25   that's one endpoint.  But an endpoint of a CPR study could

                        DR. PAUL MCGOVERN
1
2  be hospital stay; it could be any infection.  So, to answer
3  that question, I require quite a lot more precision to
4  understand what you're trying to delineate.  I can't --
5  forgive me -- grasp what you're trying to specify with the
6  amount of detail you've given me.
7      Q.  I'm trying to set up a hypothetical that I will
8  concede is absurd.  If somebody were -- if somebody did an
9  audit of a hospital and said: "Okay, we want to look at all
10  the in-hospital deaths in the parts 12 months" --
11      A.  You wanted to look at all in-hospital deaths in the
12  last 12 months, okay.
13      Q.  And the only differentiating factors they looked at
14  was whether the patient had CPR or not.
15      A.  So, all in-hospital deaths within 12 months,
16  looking at a group who had CPR and a group that didn't.
17      Q.  And assume that the odds ratio is fairly high; that
18  if you were in the CPR group, you were considerably more
19  likely to die in hospital than if you were in a non-CPR
20  group.
21      A.  As you said, it's absurd.
22      Q.  I agree.  No one would do this study.  But my point
23  is, the fact that there's -- there would be an increased
24  odds ratio, a huge odds ratio, doesn't mean that CPR is the
25  cause of the death; right?

1                    DR. PAUL MCGOVERN

2         A.  At study that examines two variables and

3    demonstrates that one condition has an increased chance of

4    occurring when compared with another condition does not

5    necessarily prove causality.  The study in question would

6    need to be designed and controlled for appropriately to be

7    able to draw a causal conclusion.  So, it's conceivable,

8    within the suspension of disbelief that I'm having to go

9    through, that the CPR study you mention could be designed to

10   demonstrate causality.  CPR -- since we're going down this

11   path -- possibly, in some people, causes some harm; but it's

12   a little bit far out of the realms of reality for me to be

13   able to come up with an answer that's coherent and sensible,

14   but to -- I can't be more specific than that.

15        Q.  Fair enough.  You agree that correlation, in and of

16   itself, does not prove causality?

17        A.  Absolutely.  Correlation does not, in and of

18   itself, prove causality.

19        Q.  And a high odds ratio, comparing two things, does

20   not demonstrate a -- does not prove a causal relationship?

21        A.  A high odds ratio simply means that something

22   happened -- or is likely to happen, depending on the

23   context -- significantly more frequently, or more frequently

24   than another condition.  It does not prove causality unless

25   the study is appropriately designed so that it -- so that

                    DR. PAUL MCGOVERN

1  the question asked, the null hypothesis, that the design of

2  the study is set up to demonstrate, or attempt to

3  demonstrate, causality.

4      Q.  The last thing want to ask you about is there was

5  that video clip that was on a DVD.

6      A.  Yes.

7      Q.  Where was that video clip from?

8      A.  That was filmed in Wansbeck Hospital by myself.

9  I think that was while the study investigators were

10  preparing for what you've heard here as 'The McGovern Study

11  of the 2011 Journal of Join and Bone Surgery of Britain

12  paper.'

13      Q.  Where was it posted?

14      A.  To YouTube and to a blog:

15  Northumbriaorthopedics.blog spot.com, if memory serves

16  correctly.

17      Q.  And on YouTube, there's something called orthopod

18  research; right?

19      A.  That's correct.

20      Q.  Is that something you have some responsibility for?

21      A.  I have created that account and I posted the videos

22  to that account.

23      Q.  And I'll call it up here, because I had it ready to

24  go.  There's a 1 minute, 58 second video on it, on orthopod

1                      DR. PAUL MCGOVERN

2    research, on YouTube?

3         A.   Yes.

4         Q.   Called "FAW versus CWB."

5         A.   Yes.

6         Q.   I assume you're familiar with it, if you want to --

7         A.   No, I am familiar with that video.  I produced it

8    and recorded it and narrated it.

9         Q.   And narrated it.

10        A.   And narrated it, yes.

11        Q.   You have a very distinctive voice.  And just for

12   simplicity's sake, I took the liberty of getting some

13   screenshots, one per second.  This would be exhibit 30.

14             (Exhibit 30 marked for identification)

15             Of this YouTube video, this FAW versus --

16   what's it called? -- CWB.

17        A.   Right.

18        Q.   Perhaps I'll have something in the record.  Was

19   this -- the activities that were depicted in here, was this

20   part of what became the McGovern paper?  The McGovern study?

21        A.   No, this is occurring at a similar time, but none

22   of these images are under controlled conditions.  They're

23   not timed conditions, because there's movement around the

24   area.  So this is filming while setting up and informally

25   experimenting with the equipment to see what effects we

DR. PAUL MCGOVERN

1

2    could see with the equipment that we had.

3        Q.  And the set-up here, that's not the set-up you

4    would use for a hip or a knee --

5        A.  No, it's not.  It's the set-up that you would use

6    for a -- perhaps for an upper-body operation; but rather

7    like the microbiology paper that we were discussing earlier,

8    this is not particularly representative of any particular

9    operation, and it is especially not representative of a hip

10   or knee arthroplasty surgery.

11       Q.  Okay.  And there's no draping over either of the

12   heating devices; is that right?

13       A.  That's correct.

14       Q.  And I notice that the portion of the video that --

15   involving the Bair Hugger, the back area seems to be

16   darkened, whereas with the Hotdog it's -- there's no

17   covering over the door, and it seems quite a bit lighter?

18       A.  That is true.  There's a drape hung up on the --

19   I think near -- I think it might be on the doors, actually,

20   of the operating room.

21       Q.  Why the difference?

22       A.  Because -- to provide visual contrast.

23       Q.  On the Bair Hugger one?

24       A.  It's -- well, on the Bair Hugger ones, the visual

25   contrast is there, yes.

DR. PAUL MCGOVERN

1

2     Q.  Well, why wasn't that done when you did the

3  demonstration on the Hotdog?

4     A.  Because, as I explained earlier, these images were

5  taken while experimenting and while understanding the

6  equipment as it was being used at the time.

7     Q.  So, did you post videos from the actual experiment

8  that you relied on for the paper itself?

9     A.  I did not.

10    Q.  Why?

11    A.  The videos weren't used for the experiment.  These

12  were -- still-frame images were used in the experiment, as

13  I remember.

14    Q.  Why didn't you use video for the experiment?

15    A.  Because it's very difficult to track in realtime,

16  where bubbles are moving.  It is possible to do with

17  software, or with individual frame-advancing techniques, but

18  it would be extremely labor intensive and probably not very

19  accurate.  And so, part of this discovery process, which is

20  seen in the video which we're discussing, was working out

21  the very best way to quantify the number of bubbles in the

22  zone which was being examined at any given time, which is

23  why snapshots at a pre-determined time were chosen as the

24  best method to look at a change in bubble concentration in

25  a certain area over a period of time, over an experimental

1                      DR. PAUL MCGOVERN

2  run.

3       Q.  Were the lighting conditions the same for both the

4  Bair Hugger and the Hotdog?

5       A.  During the experiment?

6       Q.  Yes.

7       A.  Yes.

8       Q.  I'm not sure how to describe the videos that you

9  were taking, as you're just kind of getting a sense of how

10  things might work; is that --

11      A.  This video was taken while experimenting with -- to

12  see the effect that could be visualized when using different

13  equipment in the context that -- that you see here.

14      Q.  Whose idea was it to post the videos of you

15  experimenting with these things?

16      A.  I don't remember.  It's probably my idea, but I

17  don't absolutely remember.

18           MR. C. GORDON:  Thank you.  Nothing further.

19           THE WITNESS:  Thank you.

20           THE VIDEOGRAPHER:  This is the end of DVD 4 of the

21  volume 2 of the deposition of Dr. Paul McGovern.  Going off

22  the recording at 5:38.  Recording has stopped.

23           (Whereupon, the deposition concluded.)

24

25

Page 504

DR. PAUL MCGOVERN
CERTIFICATE OF COURT REPORTER

I, Louise Pepper, an Accredited Real-time Reporter, hereby certify that the testimony of the witness Paul McGovern in the foregoing transcript, numbered pages 233 through 503, taken on this 5th day of January, 2017 was recorded by me in machine shorthand and was thereafter transcribed by me; and that the foregoing transcript is a true and accurate verbatim record of the said testimony.

I further certify that I am not a relative, employee, counsel or financially involved with any of the parties to the within cause, nor am I an employee or relative of any counsel for the parties, nor am I in any way interested in the outcome of the within cause.

Signed:  ........................

Name:   Louise Pepper
Date:   1-11-2017

```
1                    ERRATA SHEET
2   Case Name:
3   Deposition Date:
4   Deponent:
5   Pg.  No. Now Reads      Should Read  Reason
6   ___  ___ _____     _____   _____
7   ___  ___ _____     _____   _____
8   ___  ___ _____     _____   _____
9   ___  ___ _____     _____   _____
10  ___  ___ _____     _____   _____
11  ___  ___ _____     _____   _____
12  ___  ___ _____     _____   _____
13  ___  ___ _____     _____   _____
14  ___  ___ _____     _____   _____
15  ___  ___ _____     _____   _____
16  ___  ___ _____     _____   _____
17  ___  ___ _____     _____   _____
18  ___  ___ _____     _____   _____
19  ___  ___ _____     _____   _____
20
                            _____
21
                            Signature of Deponent
22
    SUBSCRIBED AND SWORN BEFORE ME
23  THIS ____ DAY OF _____, 2017.
24  _____
25  (Notary Public)  MY COMMISSION EXPIRES:_____
```