# EXHIBIT 6

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1

1        UNITED STATES DISTRICT COURT

2           DISTRICT OF MINNESOTA

3   - - - - - - - - - - - - - - - - - - -

4   In Re:

5   Bair Hugger Forced Air Warming

6   Products Liability Litigation

7

8   This Document Relates To:

9   All Actions          MDL No. 15-2666 (JNE/FLM)

10  - - - - - - - - - - - - - - - - - - -

11

12

13        DEPOSITION OF MICHAEL A. MONT

14          VOLUME I, PAGES 1 - 369

15             JULY 28, 2017

16

17

18        (The following is the deposition of MICHAEL

19  A. MONT, taken pursuant to Notice of Taking

20  Deposition, via videotape, at the offices of Weisman,

21  Kennedy & Beris, 101 West Prospect, Cleveland, Ohio,

22  commencing at approximately 9:14 o'clock a.m., July

23  28, 2017.)

24

25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

2

1   APPEARANCES:

2       On Behalf of the Plaintiffs:

3           Ben W. Gordon, Jr.
            LEVIN, PAPANTONIO, THOMAS, MITCHELL,
4           RAFFERTY & PROCTOR, P.A.
            316 South Baylen Street, Suite 600
5           Pensacola, Florida   32502-5996

6           Gabriel Assaad
            KENNEDY HODGES
7           4409 Montrose Boulevard, Suite 200
            Houston, Texas   77006
8
            Christopher L. Coffin
9           PENDLEY BAUDIN & COFFIN
            1515 Poydras Street, Suite 1400
10          New Orleans, Louisiana   70112

11      On Behalf of Defendants:

12          Corey L. Gordon, Peter J. Goss and Micah
            Hines
13          BLACKWELL BURKE P.A.
            431 South Seventh Street, Suite 2500
14          Minneapolis, Minnesota   55415

15   ALSO APPEARING:

16          Ryan M. Stirewalt, Videotechician

17

18

19

20

21

22

23

24

25

*STIREWALT & ASSOCIATES*
*1-800-553-1953  info@stirewalt.com*

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

3

1                          I N D E X

2    EXHIBITS              DESCRIPTION        PAGE MARKED

3    Ex   1    Subpoena                            9

4         2    Handwritten notes, one page        11

5         3    Handwritten reference list         13

6         4    Mont curriculum vitae              15

7         5    Mont expert report                 16

8         6    Invoices                           57

9         7    Invoices                           57

10        8    Exhibit A to expert report         69

11        9    Mont listing of depositions and

12             trials                             69

13       10    Slide, Sources of Heat in Operating

14             Room                               69

15       11    Article, HEPA Filters Do Not

16             Affect Infection Rates following

17             Primary Total Joint Arthroplasty

18             with Forced Air Warmers, by

19             Curtis, et al                      69

20       12    Group of slides                    69

21       13    Slide, Common Sources of

22             Bacteria in Operating Room         69

23    WITNESS              EXAMINATION BY       PAGE

24    Michael A. Mont       Mr. B. Gordon          4

25                          Mr. Assaad            220

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

4

1                    P R O C E E D I N G S

2              (Witness sworn.)

3              MR. B. GORDON:  Do you want to make

4   appearances for the record?

5              Ben Gordon, Ben Gordon for the plaintiffs.

6              You guys want to put your appearance on the

7   record?

8              MR. ASSAAD:  Gabe Assaad for the plaintiffs.

9              MR. COFFIN:  Chris Coffin for the

10  plaintiffs.

11             MR. C. GORDON:  Corey Gordon for the

12  defendant.

13             MR. GOSS:  Peter Goss for the defendant.

14             MS. HINES:  Micah Hines or the defendant.

15                    MICHAEL A. MONT

16             called as a witness, being first duly sworn,

17             was examined and testified as follows:

18                    ADVERSE EXAMINATION

19  BY MR. B. GORDON:

20       Q.   Good morning, Dr. Mont.  My name is Ben

21  Gordon and we met a few minutes ago; did we not?

22       A.   Yes, we did.

23       Q.   You've had your deposition taken before I

24  understand; right?

25       A.   I have.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

5

1      Q.   How many times?

2      A.   Hmm.  Now I have to be --

3      Q.   Approximately.

4      A.   -- precise.  Been in practice for about 30

5   years, and some years zero, some years three or four,

6   so I would just say an average of two a year, so 60.

7      Q.   Depositions, right?

8      A.   Depositions.

9      Q.   And you --

10     A.   Two per year.  Something like that would be

11   a --

12     Q.   And you gave us a testimony --

13     A.   If you want a more -- sorry.  If you want a

14   better answer, I'd have to think about it.

15     Q.   No, just looking for an approximate.  Thank

16   you.

17          So you know the ground rules.  One is that

18   we try not to talk over each other, and I'll try to

19   let you finish if you'll let me finish my questions

20   before you answer.  And answer audibly.

21     A.   Yes.

22     Q.   Thank you.

23          You understand you're under oath; right?

24     A.   Yes.

25     Q.   You're to answer everything to the best of

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

6

1  your ability, but to give us the truth and the entire

2  truth.  You understand that; right?

3        A.   Yes.

4        Q.   You've been retained by 3M to work in this

5  case as an expert witness; correct?

6        A.   I've been retained by a -- a legal firm to

7  represent 3M.  I don't know if I would phrase it that

8  I was directly retained by 3M.

9        Q.   Who is it --

10       A.   Indirect.

11       Q.   -- that you understand retained you

12 specifically?

13       A.   Two different legal firms, members from two

14 different legal firms that are representing 3M.

15            Maybe I'm not answering the question right.

16       Q.   And is it your understanding that your

17 testimony is on behalf of those legal firms or on

18 behalf of 3M?

19       A.   My testimony is for the truth about a

20 specific --

21            In the first -- in the first position it was

22 on two specific cases, that was the first firm, and

23 the next was on a topical issue relevant to a whole

24 series of cases.

25       Q.   Let's back up.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

7

1      A.    But I -- I've been to -- I -- I don't --

2            I want to try to answer you directly and not

3      belabor the point.  I do rep --

4            I do agree that this is all being direct --

5      directly from legal firms that are representing 3M.

6      Does that help you?

7      Q.    And -- and --

8            It does.  I think so.  And so just to be

9      clear, through that analysis you would concede that

10     your testimony in this lawsuit is on behalf of 3M

11     corporation; would you not?

12           MR. C. GORDON:  I object to the form of the

13     question.

14           MR. B. GORDON:  You can answer, doctor.

15     A.    In a general sense, yes.

16     Q.    Okay.

17     A.    We'll just leave it at that.

18     Q.    You said you worked for two different law

19     firms or were retained by two different law firms.

20     Who is the first lawyer who contacted you in this

21     case?

22     A.    I'm almost 100 percent sure her name was

23     Marcela Duca, and it's -- it's spelled D-u-c-a.

24     Q.    Marcela Duca.  Do you know what law firm she

25     works for?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

8

1        A.    I could find out.  But offhand, I didn't --

2              MR. C. GORDON:  Do you want to know?

3        A.    -- prepare --

4        Q.    Was that in the Walton case?  Was that

5   before the MDL, if you know?

6        A.    Yes, it was before the MDL.

7        Q.    Walton and Johnson.

8        A.    Yes.

9        Q.    Okay.

10       A.    Those two.  Tommy Walton.

11       Q.    And what time period was that,

12  approximately, that you were first retained?

13       A.    I don't --

14             If I said two years ago, I'm hazarding a big

15  guess.  I -- I'd like to give you a better answer than

16  that.

17       Q.    Okay.  That's fine.

18       A.    I could get it for you later.  So --

19             By the way, any answers that I can't be that

20  precise, I'm happy to try to get -- get for you later

21  after this deposition.

22       Q.    Thank you, doctor.  Appreciate that.

23             Have you ever done any legal work or

24  consulting work for 3M corporation before these cases?

25       A.    To the best of my knowledge, no.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

9

1      Q.    You mentioned a second lawyer or law firm

2   that contacted you after the initial contact; right?

3      A.    Yes.

4      Q.    And who was that?

5      A.    That's the -- the lawyers represented here.

6      Q.    So Corey Gordon?

7      A.    Yes.  Corey Gordon contacted me, actually at

8   the -- yeah, at a similar time period.

9      Q.    At a similar time period as the first

10  retention?

11     A.    The first retention, Corey Gordon's name was

12  mentioned, but I didn't deal with him until a -- a few

13  months after the first law firm.

14          MR. B. GORDON:  Okay.  Let me do this.

15  We've got a subpoena, and I'm going to have the court

16  reporter mark this as Exhibit 1 to your deposition and

17  have you take a look at it, please.

18          (Exhibit 1 was marked for

19          identification.)

20  BY MR. B. GORDON:

21     Q.    Doctor, if you just leaf through this, this

22  is a subpoena to testify in this case along with an

23  attachment referred to as documents to be produced.

24  Have you seen this before?

25     A.    Yeah, this has a list of 18 things.  Yes, I

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

10

1   have.

2       Q.   And you've reviewed this with counsel I

3   presume?

4       A.   Yes.

5       Q.   And in responses you've produced a number of

6   things that counsel gave to us, some before today and

7   some this morning; is that right?

8       A.   I don't --

9            I wouldn't have knowledge of when they gave

10  you these things.  I -- I would have --

11           My assumption would have been that this was

12  given to you before today, but maybe some of these

13  things were given you -- to you today.  But I don't

14  know when those transactions occurred.

15      Q.   We'll go through the -- the list in a

16  moment, doctor, but you would agree with me that at

17  least some of these things you produced to us just

18  this morning as you walked in; is that fair?

19      A.   I -- I will tell you that I went over these

20  things with counsel, if we're calling that Corey

21  Gordon and crew, and I don't know when that -- but --

22  hmm.

23      Q.   Well let me -- let me -- let me ask a

24  different question, doctor.

25      A.   I'm not the one that handed it to you

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

11

1    directly.  They would have handed this to you.

2        Q.   So one of the things you've come in here

3    with --

4        A.   I --

5        Q.   -- this morning, doctor, is a page of notes

6    that I'm going to grab from you, one page of notes

7    that we're going to mark as Exhibit 2 to your

8    deposition real quick.  Okay?

9             (Exhibit 2 was marked for

10            identification.)

11       A.   Yes.  So that's a page of notes that I came

12   in today with.  Okay.  So agreed that that's on this

13   list, because I haven't looked at --

14       Q.   We'll go over the list in a minute.

15            Let me just ask you a question.  This

16   Exhibit 2 is labeled "Additional" and there is a list

17   of 13 items listed; is that right?

18       A.   Yes.

19       Q.   When did you prepare that list?

20       A.   This morning.

21            So insofar as one of these 18 items is

22   asking for additional materials, then -- then I'll

23   stand corrected for one of my previous answers, that

24   some of this I prepared, gave to you today.  So

25   that --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

12

1      Q.   Fair enough, doctor.

2      A.   -- was an error.

3      Q.   All right.  Let's move on.  We'll come back

4  to that when we need to.

5           Let me ask you first of all before we get

6  into these documents:  What was your assignment in

7  this case as you understand it?

8      A.   To review the facts about a Bair Hugger

9  device, forced-air warming device, and whether it

10  had -- various questions about it, which I don't want

11  to initially say one question or two questions, but

12  whether it was defective or whether it -- it led to an

13  increased incidence of SSIs, surgical-site infections.

14      Q.   And you would agree with me that your role

15  in this case is to be that of an objective, neutral

16  witness; would you not?

17      A.   Yes.

18      Q.   You're not an advocate in this case for 3M;

19  are you?

20      A.   No.

21           (Witness's cellphone dings.)

22      Q.   And in terms of the --

23           MR. B. GORDON:  Well let's just --

24           Let's go ahead and mark as Exhibit 3 your --

25           MR. C. GORDON:  Ben, hang on just one

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

13

1   second.

2           THE WITNESS:  Just answering this.

3           MR. B. GORDON:  You need to look?  Okay.

4           THE WITNESS:  I'm -- I'm --

5           MR. ASSAAD:  Go off the record.

6           THE REPORTER:  Off the record, please.

7           (Discussion off the record.)

8           MR. B. GORDON:  Okay, doctor.  Thank you.

9   And if -- as I said earlier, if you need to take a

10  break at any time for things having to do especially

11  with your medical practice, just -- just say the word.

12  Okay?

13          THE WITNESS:  Okay.

14          MR. B. GORDON:  Let's mark as

15  Exhibit --

16          What are we on, three?

17          THE REPORTER:  Yes.

18          MR. B. GORDON:  -- a list of Mont

19  reference -- Mont reference -- "Michael Mont Reference

20  List," and I'll ask you a question about it.

21          (Exhibit 3 was marked for

22          identification.)

23  BY MR. B. GORDON:

24      Q.   So Dr. Mont, we've marked as Exhibit 3

25  something entitled "Michael Mont Reference List."  Is

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

14

1   this a list of notes that you prepared?

2       A.   Yes.

3       Q.   When did you prepare this, to the best of

4   your recollection?

5       A.   I think it was -- I think it was June.  I

6   could give you an exact date, but I think it was

7   like -- it might have been the weekend of -- I can

8   look at my calendar in the phone, but I would say it

9   was the weekend of maybe the 9th or the 16th.  I'd

10  have to go back, because I have good diaries of what I

11  do.

12      Q.   So just --

13      A.   And which -- which we --

14           It was a weekend I re -- after June --

15  certainly after June 2nd and 3rd.

16      Q.   And to be clear, you're talking about June

17  2nd or 3rd of this year, 2017.

18      A.   Yes.

19      Q.   Would this all have been compiled, to your

20  recollection, in one sitting?

21      A.   This was compiled over --

22           I believe it started on a Thursday night,

23  Friday, Saturday, Sunday, so if we call that one --

24           It was like one sitting.  It was a

25  continuous -- it was a -- a free weekend that I had

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

15

1   to -- to work.

2       Q.    And then, if I'm understanding correctly,

3   doctor, based on what you've testified to already,

4   this would have -- this list, Exhibit 3, would have

5   been compiled after you completed your report in this

6   case; correct?

7       A.    Yes.

8           MR. B. GORDON:  Okay.  Let's mark as Exhibit

9   4 a copy of your recently updated CV that states

10  "(revised July, 2017)," and then we'll get you to take

11  a look at that.

12          (Exhibit 4 was marked for

13          identification.)

14      A.    So in -- in my hand is this Exhibit 4, which

15  is the best representation of the CV that I have

16  com -- redone yesterday just to include a few more

17  published reports, which is about all I do at the

18  present time to update CVs.  I don't put a lot of

19  other material in because I don't generally need --

20  need other material like meetings or different grants.

21      Q.    So Exhibit 4, doctor, would be a complete,

22  up-to-date copy of your curriculum vitae; correct?

23      A.    Yes.

24      Q.    Okay.  Thank you, doctor.  You can hang onto

25  that.  We've got one here.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

16

1              MR. B. GORDON:  Exhibit 5.  I'd like to have

2      the court reporter mark as Exhibit 5 a copy of your

3      expert report in this case.

4              Let me have you look at it first.  Does that

5      look like your expert report?

6              MR. C. GORDON:  Without any attachments;

7      right?

8              MR. B. GORDON:  Correct.

9              THE WITNESS:  Yeah, this looks like my

10     expert report without supplement -- what you -- what

11     was just mentioned, without the supplemental material.

12             MR. B. GORDON:  Okay.  And we're going to

13     mark that as Exhibit 5.  Thank you.

14             (Exhibit 5 was marked for

15             identification.)

16     BY MR. B. GORDON:

17        Q.   And doctor, we'll give you an opportunity to

18     talk about anything else you want to talk about, too,

19     but for purposes of this question I want you to refer

20     to Exhibit 5 as you need to and tell me if Exhibit 5

21     is a complete list of all the opinions that you have

22     in this case.

23        A.   It -- it's a complete list of obviously what

24     is printed here, but I can't answer in the affirmative

25     that it's a complete list of all my opinions.  It --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

17

1    it certainly is not all my opinions, but I felt at the

2    time these were all my relevant opinions to this case.

3    I'd like to think that's a hundred-percent-accurate

4    statement and I -- but I can tell you that if I come

5    up with any other opinions that I think are relevant

6    to the case, I would let you know after this point in

7    time.

8         Q.   And when was this -- sorry.

9         A.   And then in addition, again, for example, I

10   just reviewed a new article that came out after this

11   was written and that would give you -- might give me

12   more opinions.  And then I reviewed a few other expert

13   reports.  So to say that this is all the opinions I

14   have in the case, it's -- it's a -- it's a case in

15   flux, it has new materials that come out, new

16   information, and that might add different opinions

17   or --

18              But in a general sense, just to try to put

19   this to a close, this is generally how I feel about

20   this case in terms of the conclusions.  And at this

21   time when this was put together I thought that this

22   was the best -- best representation of my opinions

23   about this case.

24        Q.   And this -- you mentioned --

25              By the way, you mentioned a new study that

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

18

1  just came out.  Are you referring to the new Dr.

2  Augustine paper?

3       A.   Yes.

4       Q.   And so that paper may change your opinions

5  you say?

6       A.   I don't know if it's a new study, by the

7  way.  I think it's a newly published study of --

8  but -- old work, but a new --

9       Q.   So you believe that that study may affect

10  your opinions.

11       A.   I wouldn't --

12            I'm not even sure I would call it a study.

13  But it -- it just supplements my opinions.  I mean

14  again, it -- I don't want to get involved in

15  semantics.

16       Q.   Well your opinions were already formed at

17  the time you issued this report; correct, doctor?

18  Before that study -- before you ever saw that study;

19  right?

20       A.   Yes.  Yeah.  It may accentuate some of my

21  opinions.  I don't know if that's a -- when you have

22  opinions you -- you --

23            This report is supposed to be these are my

24  opinions and these are why I feel this way, and then

25  further information may add to those or make opinions

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

19

1   more definitive.

2       Q.   When did you prepare that report, doctor?

3       A.   Well I was -- you --

4            You could say that I was preparing this

5   report for many months because a lot of the materials

6   I was reviewing, including most if not all of the

7   articles contained in these two folders, I was

8   reviewing as the months were going by and I was

9   formulating bits and pieces of my opinions in this

10  report which actually made it to the final draft of

11  this report.  So in the -- in the absolute answer,

12  this report, it was done over a few-week period before

13  the due date, which was, I believe, June 1st or 2nd.

14  I don't want to get wrong on that due date.

15      Q.   You mentioned draft.  You have additional

16  drafts of that report?

17      A.   I had drafts, but I discarded those after

18  this report was done.

19      Q.   There's no record of those earlier drafts?

20      A.   No.

21      Q.   You mentioned at the end of that report that

22  you might supplement that report.  Have you issued any

23  supplements to that report?

24      A.   I have not.

25      Q.   So as we sit here today, that's your final

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

20

1    report.

2        A.    As we sit here today --

3        Q.    Okay.

4        A.    -- this is my final report.

5        Q.    Let's set that aside for the moment, and I

6    want to go back to your curriculum vitae, which I

7    think was number four.

8             MR. B. GORDON:  Is that right, Dick?

9        A.    Yeah.

10       Q.    Let's look at your curriculum vitae, and I

11   guess I'll look at this one, although I got --

12            Give me one second.

13            You have your CV in front of you, doctor?

14       A.    Yes, I do.

15       Q.    So I'm going to ask you a couple of specific

16   questions about it, so bear with me.

17            You indicate in one place that -- I think

18   page -- it's three on the copy I'm looking at, it may

19   have changed --

20            Let's see.  Bear with me.  Yeah.  Page three

21   you mention "CLINICAL DUTIES," that you see

22   approximately 4,000 outpatient visits per year;

23   correct?

24       A.    Yes.  So I would -- I would look at this

25   and --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

21

1    Q.   I'm just asking you right now:  Do you see

2  about 4,000 outpatient visits per year?

3    A.   No.  But I want to qualify my answer a

4  little.  So as I said before, basically the only thing

5  I'm changing about this CV, because people want to

6  know articles, that's -- the major purpose is adding

7  articles, but a lot of the other materials I haven't

8  changed since I came to Cleveland Clinic, which was a

9  year ago.  So presently I am --

10         I see what you've just pointed out.  There's

11  a whole section about how many patients I see, how

12  many surgeries I do, and that should be changed.  In

13  fact, the next -- probably by Monday I will change

14  that section in fact, maybe go over this.  My --

15         All the numbers you see there have been

16  reduced by about -- let's just say 50 percent.  So my

17  duties here is that --

18         These are numbers from last year when I was

19  in Baltimore.  I came to Cleveland Clinic and I'm now

20  50 percent to 60 percent clinical, and the 40 percent

21  I use to be the head of the Orthopaedic Department at

22  Cleveland Clinic.

23    Q.   So doctor --

24         MR. B. GORDON:  I'm going to move to strike

25  as non-responsive.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

22

1    Q.    My question was simply is it correct that

2  you see approximately 4,000 outpatients per year, and

3  that was about a three-minute answer for a question

4  that just required you to tell me "yes" or "no," is

5  that an accurate --

6    A.    I -- I --

7    Q.    And let me finish, doctor.  If it's not

8  accurate, then tell me it's not accurate.  We're going

9  to be here a lot longer if you don't try to listen to

10  my question and give me a responsive answer.  And so

11  I'm just asking you --

12            I would appreciate it if you would try,

13  doctor.  That's all I'm asking.  Will you try?

14            MR. C. GORDON:  Objection, asked and

15  answered, and move --

16    Q.    Will you try, doctor?

17            MR. C. GORDON:  -- and move to strike

18  counsel's commentary.

19    A.    The -- the -- the answer is any question

20  that I find, even if it's a yes/no answer, but I find

21  can be taken out of context and to me in my opinion

22  deserves an explanation, which I feel what I said was

23  an appropriate explanation.  In fact, I will amend

24  this CV as of Monday to make sure it's better

25  accurate.  I'm not happy to see that this represents

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

23

1   my clinical productivity from last year, not my

2   clinical productivity, because just as I am trying to

3   answer all of your questions as accurately as

4   possible, I like everything in print, everything that

5   represents me, to be as accurate as possible.  And I'm

6   not a lawyer and I don't know all the rules, but when

7   a question is asked of me and I see that there's a

8   clear discrepancy, I'd like that clarified.  I -- I

9   don't -- I don't like my answers to be potentially

10  taken out of context.

11          MR. B. GORDON:  Objection, move to strike,

12  non-responsive.

13      Q.   My question, doctor, was will you try --

14      A.   I will try the best --

15      Q.   -- and you gave me another oration.

16      A.   I -- I will try the best I can.

17      Q.   I appreciate that.  I think the jury would,

18  too.

19          Doctor, --

20          MR. C. GORDON:  Move to strike counsel's

21  comments.

22      Q.   -- you told us at the beginning of this

23  deposition that you revised this curriculum vitae

24  yesterday, I think; did you not?

25      A.   Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

24

 1      Q.   Okay.  So now you're telling us that, as

 2   soon as we get to page three, it's not complete and up

 3   to date, but you testified earlier it was up to

 4   date, --

 5           MR. C. GORDON:  Object --

 6      Q.   -- so now you're -- you're changing that

 7   answer; correct?

 8           MR. C. GORDON:  Objection, objection, asked

 9   and answered, miscon -- mischaracterizes the

10   testimony, --

11      Q.   Your earlier testimony --

12           MR. C. GORDON:  -- argumentative.

13      Q.   -- that the CV is up to date is in error;

14   correct, doctor?

15      A.   I'm going to answer --

16           MR. C. GORDON:  Same objection.

17      A.   I'm going to answer that your previous

18   question -- which we can read your previous comment

19   and question -- disregards the fact that I said

20   earlier that the only thing I did yesterday to the CV

21   was to add to get the references up to date.  I didn't

22   look at any of the other content because I'm here at

23   Cleveland Clinic as the chairman, I don't need a CV,

24   I'm not shipping this around, and it's not that

25   important to me to put page three, page five, page

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

25

1    seven.  The only thing I've been doing -- and I said

2    this not in as much detail -- is adding references

3    because people like to see what I've published.  So

4    what you said in the previous comment, which was

5    attached to a question to say that I revised this

6    whole thing, I had earlier said that the only thing I

7    did was add things.  I didn't look at the other

8    details to revise that, which is the implication.

9           MR. B. GORDON:  Objection, move to strike,

10   non-responsive.

11      Q.   Doctor, when did you come to the Cleveland

12   Clinic precisely?

13      A.   I've been here a number of times as I --

14   that question --

15           I had to interview -- I had to interview

16   here to get this job, so I was here a number of times.

17   Do you want all the dates that I interviewed?

18      Q.   Doctor, I think my question was clear, but

19   perhaps not.

20           When did you move from Baltimore, at Mount

21   Sinai or wherever you were there, to join the staff at

22   the Cleveland Clinic?

23      A.   I --

24           That's a two-part question.  I moved at a

25   different time when I joined the staff.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

26

1      Q.   When did you become an employee of the

2   Cleveland Clinic?

3      A.   I need a break.

4      Q.   You need a break.  We've been going --

5      A.   I need a break.

6      Q.   -- fifteen minutes.

7      A.   I have to discuss with counsel.

8      Q.   Okay, doc, Let's take a break.

9           MR. B. GORDON:  For the record, doctor needs

10   a break after 15 minutes, nothing to do with a medical

11   emergency, it's simply that he wants to talk with

12   counsel.

13           THE REPORTER:  Off the record, please.

14           (Recess taken.)

15           (Pending question read by the court

16           reporter.)

17           THE WITNESS:  Read the question right before

18   that, please.

19           MR. B. GORDON:  No.  That's the pending

20   question, doctor.

21      A.   Okay.  My first day at work was July 5th.

22      Q.   Of this year, 2017?

23      A.   Of 2016.

24      Q.   Okay.

25      A.   Sorry.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

27

1       Q.    And when --

2             Thank you.

3       A.    July 5th, 2016 was my first day.

4       Q.    And when did you become the chairman of the

5  Orthopaedic Department?

6       A.    That day.

7       Q.    That day.  Okay.

8       A.    Maybe officially, to correct that answer,

9  there was a holiday weekend July 4th and no -- and the

10  July 1st date was a Friday, so theoretically I became

11  the chairman July 1st, 2016.  That would be the better

12  answer.

13      Q.    And as of that time, July of 2016, were you

14  still seeing approximately 4,000 outpatient visits per

15  year?

16      A.    Right the -- the week before, the week

17  before --

18             Actually, that would also be an inaccuracy.

19  The number was probably -- the number from Baltimore

20  was probably closer to 6,000, not 4,000, and the

21  number right now at Cleveland Clinic, when I amend

22  this on Monday, is closer to about 3200, since I just

23  saw the numbers.

24      Q.    So still focused on Exhibit 4, your CV, I

25  want to ask you a couple other things to see if

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

28

1    they're accurate or not.  You mention a number of

2    grants on your CV, and I think these start on

3    approximately page seven --

4            Make sure I'm looking at your current copy.

5            You see where I am, "GRANTS AND OTHER

6    SUPPORT?"

7        A.    Yes, I do.

8        Q.    And a number of these total presently about

9    56 or so; is that accurate?  Fifty-four on this list.

10       A.    Fifty-four on this list.

11       Q.    So in the updated one from today -- from

12   yesterday, that's gone down from the prior one by --

13           No, I -- strike that.  I withdraw that

14   question.

15           So these 54 grants, are these ongoing

16   grants?

17       A.    No.  I can go through each one, but many of

18   them are -- these are --

19           This has not been updated in a long period

20   of time.  I'm looking here, for example, 49, that you

21   could see it says "2008 to present;" that grant was

22   finished.  That same company has a study starting next

23   January.  Many of these are done.  This has not been

24   updated for many years.

25       Q.    So how many of these would you say are

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

29

1  active grants, doctor?

2      A.   Do you want me to go through all them?

3  Right now I'm not --

4      Q.   I'm looking for an approximate --

5           Well let me ask you --

6      A.   Approximately zero.  These were --

7      Q.   So doctor --

8      A.   These have not been -- I --

9           I have over 20 active grants right now, I

10  have not been updating them, and every year I get 10

11  or 15 new ones.  We finish the studies and we do new

12  grants.  This has probably not -- that grant section

13  has not been up -- updated for -- I'd have to give you

14  the exact date, but it may not -- it may have been

15  eight or nine years.

16      Q.   So currently you have approximately 20

17  active grants that are not reflected on this CV; is

18  that fair?

19      A.   Something like that, yes.

20      Q.   And is there any particular reason, when you

21  updated your CV yesterday, that you didn't update this

22  section?

23           MR. C. GORDON:  Objection, asked and

24  answered.

25      A.   I don't use --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

30

1           I don't keep track of my grants.

2      Q.   Well you put on the Cleveland --

3      A.   I don't keep track of my --

4           I keep track of my grants, but not through

5  my CV.  I have other methods that keep track of -- of

6  my active grants.

7      Q.   How many --

8      A.   And in -- sorry.  And in fact, all the

9  grants that I'm involved with are reviewed -- not all.

10  Ninety percent of the active grants that I have at

11  Cleveland Clinic are reviewed on a weekly basis in a

12  morning conference, and it really -- it's not only 20

13  that I have, it's about 30 others that I'm

14  peripherally involved as the chairman of the

15  department, and then there's another 10 grants that I

16  don't review every week but I certainly review

17  every -- every quarter that are grants that I'm

18  involved with -- no, it's probably 20 grants, 30

19  grants -- 30 other grants that I'm involved with other

20  centers around the whole country that are re -- not

21  reviewed on a weekly basis, but I am part of at -- at

22  different medical centers, which I'm happy to name off

23  if you'd like.

24      Q.   I'd just like to know approximately, since

25  this isn't accurate on your CV, how many grants you

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

31

1   believe you're actively involved in today.

2   Approximately, doctor.

3       A.   I still have to think about that.

4       Q.   Well let me see if I can --

5       A.   What -- what does -- what does "actively"

6   mean?  As the chairman, I theoretically have to sign

7   off on every grant in the whole department, so my --

8   my signature goes approving every grant.  So what is

9   "actively?"  Is that that I'm personally one of the

10  investigators?  Is that --

11      Q.   Well let's start with that.  How many grants

12  are you the principal investigator on today?

13      A.   Probably about four or five.

14      Q.   And how many grants are you not the

15  principal investigator on for which you have any kind

16  of regular, consistent, active participation?

17      A.   "Regular," how is that defined?  Is it on a

18  weekly basis or on a quarterly basis?

19      Q.   I gave you three adjectives, doctor.  You

20  can define it how you wish.  I said regular, --

21      A.   On a week --

22      Q.   -- consistent or active.

23      A.   On a weekly basis about -- what I said

24  first, about 20 to 25, and on a quarterly basis, if we

25  include all the other multicenters, another 20.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

32

1      Q.   So let me ask you --

2           Let me read you something, ask you if this

3   would be accurate or inaccurate.  "Dr. Mont actively

4   participates in many research studies in the area of

5   joint preservation arthroplasty with over 100 grants."

6           Based on your testimony a moment ago, I

7   guess that's inaccurate; right, doctor?

8      A.   How --

9           Can you explain to me why you think

10  that's --

11     Q.   Do you actively participate in over 100

12  grants today?  Based on your testimony a minute ago, I

13  presume the answer is no.

14     A.   The second part of that question says that

15  I've had over 100 grants.  I probably have had over

16  500 grants.

17     Q.   Maybe I mis --

18     A.   No, no, no.  I've had over 100 grants

19  because it's not my grants.

20     Q.   Doctor, maybe I -- you misunderstood the

21  question.  I'll read it again.  "He actively

22  participates in many research studies in the areas of

23  joint preservation arthroplasty with over 100 grants."

24          Do you actively participate in the

25  preservation arthroplasty -- I'm sorry -- in the areas

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

33

1    of joint preservation arthroplasty with over 100

2    grants as we sit here today?

3         A.    Depends on how you interpret.  The way

4    you're interpreting it, it's wrong.  It doesn't mean I

5    have a hundred at this moment, that says I've had --

6    I've had over a hundred grants.  That's the way I

7    interpret that sentence.

8         Q.    Well why don't we do this, doctor.  Why

9    don't you tell us -- tell the members of the jury who

10   may read this or see this videotape what an active,

11   average, typical day is like for you on a typical week

12   in your practice.  What do you do in a typical week?

13   Take it however you want, day by day, week by week.

14        A.     Okay.  For the jury, each one of my days is

15   very uniquely different, so in answer to that

16   question, if we really want to hear about what I do --

17   and I'm happy to disclose this.  I actually enjoy what

18   I do and I have a lot of observers that visit me and

19   spend the whole day with me, and I enjoy sharing what

20   I do with them, so I don't mind sharing with the

21   members of the jury what I do.

22             On a Monday morning I get in around 7:30,

23   it's my late day, and I go over some of the work that

24   needs to be done with my research team, and it sort of

25   sets the pace of what we've done over the weekend and

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

34

1   what we're going to try to do over the weekend.  It's

2   the beginning; it doesn't end that part.

3           At 8:30 there is a research conference that

4   goes for two hours where two pages of -- of very

5   active grants are -- and proposals and studies are

6   gone over.  I'm always there for at least the first

7   hour of that conference.  And there are about 25

8   people in the -- in the joint replacement -- it's a

9   joint replacement research-specific conference.  We go

10  over all the studies that we're presently doing.  I

11  also have -- one of the residents is spending the day

12  with me every Monday, so they're also seeing what we

13  do in a -- from a research end and how somebody can

14  meld in a clinical practice with research.  The main

15  things that I do first in the first hour are going

16  over the 20 to 25 grants that I'm directly involved

17  with that I mentioned earlier at any particular time.

18  In addition, there are about 20 grant proposals or

19  things or grants in evolution, grants that were just

20  finished, studies that were just finished; those are

21  the ones that I absolutely do.  If there's --

22  sometimes I go into the second hour and I work through

23  a lot of the other studies that I'm not directly

24  involved with that I can give advice.  Sometimes those

25  conferences are used for other things like how to

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

35

1    prepare a grant.  I just gave a lecture on how to

2    write a research paper.  That was two weeks ago.  I

3    spent 30 minutes teaching this whole group of 25

4    residents/research fellows how to do that.  That's my

5    8:30 to 9:30.

6            At 9:30 I then meet with another team and I

7    go over all the clinical cases that I will be doing

8    for the next month to six weeks.  So we go over all

9    the patients and all the x-rays, and we look at the

10   schedules for the operating room over the next four to

11   six weeks.  So that's an ongoing conference that

12   happens every morning with my PA, my nurse

13   practitioner, sometimes my administrative assistant, a

14   clinical fellow -- not a research fellow -- and

15   myself.  That goes on until 10:30.

16           Around 10:30 I come back and look and see if

17   there's any other issues that my administrative

18   assistant has for the next 30 minutes.  It actually --

19       Q.   We're still on Monday; right?

20       A.   We're still on Monday.

21           And it involves this list that is in my hand

22   that you're seeing.  Right now this is a list of 108

23   items.  When I started this past Monday the list was

24   about 76 items.  About half of them have to do with

25   any one of the 80 orthopedic attendings in my

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

36

1  department, which is my major priority as the

2  orthopedic chairman.  I have the focus on the

3  different orthopedists that are not only on the main

4  campus of Cleveland Clinic, but we have seven other

5  hospitals in the region that are under Cleveland

6  Clinic.  So we go over that until about 11:00.

7           At 11:00 a clinic starts.  The clinic

8  encompasses about 20 to 30 patients; a little bit

9  variable.  I'm doing that clinic typically with my

10  nurse practitioner, my PA, a fellow, and then as I

11  mentioned earlier, I have a visiting resident every

12  Monday -- Monday morning that's seeing my life.

13           I'm seeing patients.  In between seeing

14  patients there are gaps.  I'm also doing reviews.  I

15  have -- there are anywhere from three to seven

16  research fellows that are working for us.  They are

17  all, in the midst of that, showing me different things

18  they're working on, different paragraphs they want

19  to -- me to look at, handing off manuscripts.  I'm

20  doing reviews.  I'm a major -- I'm the assistant

21  editor or the number-two editor for Journal of

22  Arthroplasty, which is the major arthroplasty

23  journal -- or one of the major if not the major

24  arthroplasty journal in the world.  I do all my

25  reviews that morning for that day, which is usually

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

37

1    five to 10.  In the midst of it I'm handling --

2         Q.   You see patients all this time; right?  All

3    in the midst of this.

4         A.   I'm seeing patients.  I do not hem and haw

5    on any patients.  I give them all the appropriate

6    amount of time.  If the patient needs 15 minutes, they

7    get it.  If they need an hour -- hour, they get it.

8    If a clinic --

9         Q.   It's your testimony for this jury today that

10   you see patients for up to an hour?

11        A.   I've seen patients for longer than an hour.

12   In addition --

13        Q.   On a regular basis.

14        A.   On a regular basis every week.  There's no

15   week that goes by that I haven't at least one or two

16   patients I've spent an hour with them.

17        Q.   Doctor, that's pretty tough to do if you're

18   seeing, at the time you left Baltimore, you said,

19   6,000 patients a year; right?

20             MR. C. GORDON:  Object to the form of the

21   question.

22        Q.   Pretty tough to spend an hour with a patient

23   when you're spending -- seeing 6,000 patients a year;

24   isn't it?

25             MR. C. GORDON:  Same objection.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

                                                    38

1        A.   I see plen -- not only to -- not only to --

2        Q.   Do you see patients on weekends, doctor?

3        A.   You're not letting me answer the question,

4   you're just ask --

5        Q.   It's a -- it's a "yes" or "no" answer.

6             MR. C. GORDON:  No, it isn't, and he

7   doesn't --

8        A.   Well I --

9             MR. C. GORDON:  -- need to answer your

10  question "yes" or "no."

11       Q.   Doctor, do you work on weekends?  Do you see

12  patients on weekends?

13       A.   I'm going to answer three questions ago.

14  You can read it back.

15       Q.   Just -- just --

16            I withdraw the prior question.  The question

17  on the table --

18       A.   I'm not -- I'm not -- I'm not going to --

19       Q.   Doctor --

20       A.   -- I'm not going to let any -

21       Q.   Doctor, I can withdraw any question I want.

22       A.   Well I'm going to answer the way I want

23  about seeing patients.

24       Q.   The next question, doctor.  The question

25  is --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

39

1      A.    The -- the number -- the number one thing I

2  do is I take care of patients.

3      Q.    Doctor, I'm not going to allow you to answer

4  questions not pending.  If I withdraw a question, we

5  move on.  It's my deposition.  Now we can get an

6  instruction from the court if you want.

7           The question is:  Do you see patients on

8  weekends?  That's the question I want an answer to

9  right now.

10     A.    I speak to many patients on weekends, so

11  in -- I just --

12     Q.    Do you see patients in clinic on weekends,

13  doctor?

14     A.    I don't physically see patients on weekends.

15     Q.    Okay.  So can we agree that you see patients

16  Monday through Friday?

17     A.    And if the -- if the visit is not done, then

18  there are calls, and I might spend a half hour to an

19  hour and a half talking to patients on weekends over

20  the phone, which is a continuation, theoretically, of

21  the visit that occurred in the weekday, --

22     Q.    Okay, doctor --

23     A.    -- and it gets recorded as such.  And I have

24  lists similar to this of weekend phone calls --

25           MR. B. GORDON:  Objection, --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

40

1      A.    -- of continuations of visits --

2            MR. B. GORDON:  -- non-responsive, --

3      A.    -- on weekends.

4            MR. B. GORDON:  -- move to strike.

5      Q.    Doctor, you have clinic during the week.

6  Are there certain days between Monday and Friday that

7  you have clinic where you see patients and certain

8  days when you do surgery?

9      A.    Yes.

10     Q.    Can you tell us what days those are.

11     A.    The primary days I see patients are Monday

12  and Tuesday on main campus, and every other Friday at

13  another hospital called Euclid Hospital -- that's

14  E-u-c-l-i-d -- I see patients in the morning on that

15  day.  I also see patients, theoretically, on any of

16  the other days, Wednesday and Thursday.  Or the other

17  days there will be patients that on a special basis

18  will come in.  I will -- I am --

19            If any patient had a complaint about any

20  provider, I -- I'm the first person to offer that I'm

21  able to see them.  Some of those are the patients

22  that I -- that had a problem with a provider before

23  me, are the ones that I spend an hour and a half with

24  just to try to make sure every one of their needs are

25  taken care of.  I feel like that's part of my role.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

41

1    We also see sometimes X -- no.  We -- we see

2    various --

3              Strike that.

4              MR. B. GORDON:  Objection, move to strike,

5    non-responsive.

6              Dick, could you read back my last question,

7    please.

8              (Record read by the court reporter.)

9         Q.   So doctor, I'm going to clarify that

10   question and break -- break it down and make it

11   simpler.  What days do you do surgeries?

12        A.   The primary days I do surgery are on main

13   campus on Wednesday and alternating Thursdays, more or

14   less.  I do surgery at Lutheran Hospital --

15   L-u-t-h-e-r-a-n -- and that alternates Thursdays with

16   Euclid Hospital, but in any given week I might -- that

17   can change depending on OR availability, so there are

18   some weeks I've done surgeries at Lutheran on a

19   Tuesday and had a full day.  In addition, on the main

20   campus I may squeeze a case in at the beginning of a

21   day or at the end of the day on any of the days of the

22   week.

23        Q.   So on average, based on that answer, one or

24   two days a week you do surgeries between those two

25   hospitals?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

42

1    A.   No.  On average I do two surgeries -- two

2  days of surgery a week.

3    Q.   Okay.  So let's go with two days of

4  surgeries a week.  And based on Exhibit 4, your

5  curriculum vitae, you perform greater than eight to

6  nine hundred surgeries per year; is that right?

7    A.   We've -- we've already answered that

8  question --

9    Q.   No, sir.  I asked you about visits, not

10  surgeries.  I'm asking about surgeries now.

11    A.   I already answered your questions about

12  surgeries before.

13    Q.   I don't believe so, doctor.

14        Let me ask it again.  You do greater than

15  eight to nine hundred surgeries per year.  That's your

16  testimony?

17    A.   That's not my testimony.  I already answered

18  this question.

19    Q.   It would be pretty difficult to do eight to

20  nine hundred surgeries -- or greater than eight to

21  nine hundred surgeries if you did surgeries only two

22  days a week; wouldn't it, doctor?  It would be

23  impossible; --

24    A.   Yes.

25    Q.   -- wouldn't it?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

43

1        A.    No, it would not be impossible.

2        Q.    All right.  Well let's do the math.  If you

3   did surgery all day, --

4        A.    Yes.

5        Q.    -- which I don't believe you testified you

6   did it all day, in some cases I think you said you

7   squeeze in a case at the beginning of the day or the

8   end of the day, but let's say it's all day two days a

9   week.  How many surgeries would you have to do those

10  two days to do 900 cases a year?

11            MR. C. GORDON:  Object to the form of the

12  question, move to strike counsel's commentary and

13  testimony.

14       Q.    Have you done the math on that, doctor?

15       A.    Easily.  If --

16            Twenty times 50 weeks is a thousand cases,

17  so you -- you could do 10 each day two days a week and

18  you get 900 cases.

19       Q.    Is it your testimony that you do 10

20  surgeries a day two days a week?

21       A.    When that was written I did more than 10

22  surgeries in a day, 10 or 11 or 12.

23       Q.    And on those same days did you see other

24  patients, doctor?

25       A.    On those days, occasionally there might be a

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

44

1  patient that I would squeeze, but generally, no.

2      Q.   Well to do six --

3      A.   In those days.

4      Q.   In those --

5      A.   In those days.

6      Q.   In those days you did 6,000 patient visits a

7  year you said; right?

8      A.   Correct.

9      Q.   To do 6,000 patients Monday through

10  Friday --

11          There's 260 weekdays in a year; right,

12  doctor?

13      A.   I didn't work 260 weekdays in a year.  There

14  were --

15      Q.   How many did you work?

16      A.   I'd have to recalculate it.  If you want,

17  I'll give you --

18      Q.   Well --

19      A.   -- an exact answer.

20      Q.   -- let's just say at 260 days, if you did --

21  if you saw patients every day -- weekday of the year,

22  that would be 23 patients a day every single day of

23  the year, 260 weekdays a year.  Did you see 23

24  patients a day every single day of the year when you

25  were at Baltimore, separate and apart from your

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

45

1    surgeries?

2        A.    I saw more --

3              Your numbers are not an accurate reflection.

4    I saw easily 150 -- 125 to 150 patients on a regular

5    week every week.  If you did the math times 40 weeks,

6    that would be 6,000.  There were some weeks -- as I

7    told you, these become irregular -- that I threw in an

8    extra clinic and we'd see another 60 or 70 patients.

9    So that's what I did.

10       Q.    And you did that while giving conferences,

11   nationally and internationally; right, doctor?

12       A.    You're -- you're -- I --

13             I've always given conferences nationally and

14   haven't done as much internationally, but I do, yes, I

15   do internationally.

16       Q.    Do you take any vacations?

17       A.    I take vacations.

18       Q.    Do you do trips to work for your -- how do

19   you pronounce it -- Molluscan or Molluscan

20   Corporation?

21       A.    Okay.  If your implication is that you think

22   that I can't do all these things that I say on my CV,

23   I think you're mistaken.  I think -- I don't like --

24             Number one, I don't like the implication.  I

25   give -- my number-one thing that I do is my patient

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

46

1   care for the patients.  I give every patient -- every

2   patient I've ever operated on has my cell phone

3   number.  Any visit that -- is rechecked that the

4   patients have adequate time for everything; if they

5   don't, they're brought back even the same day.  I

6   continue this as virtual visits on the weekend.  I

7   speak to them.  So the implication that I don't have

8   enough time to do -- or that I'm not doing what I'm

9   saying is incorrect, that there is plenty of time in

10  the day to do what I'm doing.  The math you're

11  describing is not correct.  You're -- you're

12  averaging --

13      Q.    The math doesn't work; does it, doctor?

14      A.    The math doesn't work the way you have it.

15  It -- it -- one hun --

16          It more than works for me.

17      Q.    Doctor, it's impossible to see 6,000

18  patients in a year five -- if you -- if you see them

19  on clinic days while you're still doing surgery and do

20  anything else the rest of that year, to travel, you're

21  at conferences --

22      A.    Your implication is that I'm seeing --

23      Q.    It's impossible.

24      A.    -- all the patients while I'm doing surgery,

25  and that's incorrect and that's out of context.  And

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

47

1   you're -- you're implying that I do something like

2   that, and I don't do that.

3       Q.   Well the fact is in a lot -- a lot of the

4   surgeries you don't even show up and do the surgery,

5   you have your residents do surgeries; isn't that

6   right?

7       A.   And that's incorrect.

8       Q.   All right.  Let's talk about your patients.

9   You -- you said you have this great relationship with

10  your patients, --

11      A.   Okay.

12      Q.   -- you give them your cell phone number.

13  Let's talk about that.

14      A.   Okay.  You can't make statements --

15      Q.   Do your patients tend to like you, doctor,

16  do you think?

17      A.   Yes, they do.

18      Q.   Okay.  You think you have a good bedside

19  manner?  Do your patients tell you that?

20      A.   Yes, they do.

21      Q.   All right.  Let's talk about some of them.

22  You -- you --

23          Have you seen the reviews your patients give

24  you, doctor?

25      A.   Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

48

1     Q.   Let's read one from May 20th this year, just

2  a couple of months ago.  "Disappointed that Dr. Mont

3  doesn't even come by post surgery to see his

4  patients."

5       Let's look at another one a month before.

6  "Very impressed with everyone and everything at the

7  hospital except Dr. Mont.  He could listen better.  I

8  felt rushed with him.  I know he's a good surgeon so I

9  drive three and a half hours to see him, maybe he had

10  an off day, but his bedside manner leaves a lot to be

11  desired."

12       Let's look at one from January.  "The doctor

13  never even came by to see me after my surgery."

14       Let's look at another one from March of this

15  year.  "I was a patient of Dr. Mont's in Baltimore.

16  He has a terrible bedside manner.  Total knee

17  replacement came out terrible.  I never even saw him

18  after surgery."

19       December 2016:  "Dr. Mont's residents did my

20  total knee replacement in 2008 even after telling me

21  he did the whole surgery."

22       MR. C. GORDON:  Object --

23     Q.   Doctor, the list goes --

24       MR. C. GORDON:  Object -- strike -- excuse

25  me, doc.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

49

1          THE WITNESS:  That's okay.

2          MR. C. GORDON:  Object to the form of the

3  question, move to strike counsel's testifying.

4          If you've got a document you want him to

5  review, please show it to us, but you're just throwing

6  out random comments --

7     A.   You want an answer to this?

8          MR. C. GORDON:  -- and it's inappropriate.

9     Q.   Doctor, --

10    A.   Is this a question --

11    Q.   -- I should ask you a question.

12    A.   -- or is this a statement?

13    Q.   Let me ask you a question.

14         THE REPORTER:  Let's go off the record.

15         (Discussion off the record.)

16  BY MR. B. GORDON:

17    Q.   Doctor, for the record, when counsel

18  objects, I'll try to stop if you'll try to stop.  We

19  need to both let him get his objection on and then

20  I'll ask you a question.

21         I was reading those statements to lay a

22  foundation for the question I'm going to ask you now,

23  and the question is:  Have you seen patient reviews

24  like the kinds I just read, of which there are many,

25  that describes you as having a terrible bedside

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

50

1   manner?

2          MR. C. GORDON:  Objection --

3      Q.   Have you seen those?

4          MR. C. GORDON:  Same objections, also lack

5   of foundation.

6      Q.   Have you seen those, doctor?

7      A.   I've seen hundreds and hundreds of my

8   reviews.  The greater-90-percent preponderance are

9   very positive.  And there are certainly -- you read

10  one from 2008 that was negative and there's

11  certainly -- any practitioner has negative reviews,

12  and we can find that for not only myself, for any

13  practitioner.  And there can be a response to each one

14  of the ones that you read.  And fortunately, the

15  preponderance of my reviews and my ratings in the past

16  and where I am are very -- are extremely high.

17     Q.   Doctor, the review I read, just so it's

18  clear to you, was from December 12th of 2016 and it

19  referred to residents doing surgery for you in 2008 in

20  Baltimore.  It wasn't from 2008.  But let me ask you a

21  question since you mentioned that.

22          Would it surprise you that I found 35

23  reviews of you within the last seven months that are

24  of the same type, talking about how bad your bedside

25  manner is?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

51

 1            MR. C. GORDON:  Object to the form of the

 2     question, lack of foundation, move to strike counsel's

 3     commentary and testimony.

 4            Q.   Would that surprise you, doctor, 35 bad

 5     reviews?

 6            A.   You might have 3500 great reviews.

 7            Q.   All right.  Let me ask you this:  Have you

 8     ever been involved in a lawsuit, doctor?

 9            A.   Yes.

10            Q.   How many?

11            A.   I don't know the exact number.

12            Q.   You've been sued a number of times; haven't

13     you?

14            A.   Yes.

15            Q.   For medical malpractice; right?

16            A.   Yes.

17            Q.   Any of those still pending?

18            A.   I think there may be -- there might be one.

19     I'm not sure where it is.

20            Q.   Okay.  So is it fair to say in the last nine

21     years you've been sued at least 11 times?  Would that

22     surprise you?

23            A.   Potentially.  That's possible.

24            Q.   Okay.  You don't disagree with that number.

25            A.   I don't know the exact number, but I

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

52

1   wouldn't disagree with it.

2       Q.   Okay.  Doctor, I want to follow up on that

3   question about the lawsuits.  Have you had any

4   verdicts rendered against you by juries?

5       A.   I don't know if it's against me or the

6   hospital.

7       Q.   Cases where you were a defendant.

8       A.   I don't --

9            I'm going to answer the same way:  I don't

10  think it's against me personally, or if it is, it's --

11  I don't know the semantics of it.

12      Q.   So it --

13      A.   I've been -- I've been told by the hospital

14  that it's -- if there are settlements, that it's not

15  against me personally.

16      Q.   You are aware that --

17           MR. C. GORDON:  I -- I just want to --

18           You and I know the difference between a

19  verdict and a settlement.  You were asking just about

20  verdicts; right?

21           MR. B. GORDON:  I was in that question.

22  I'll clarify.

23      Q.   So in that last question I was asking about

24  verdicts where a jury or a judge decided against you.

25  So have there been any cases that you're aware of

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

53

1  where you've been a defendant that a judge or a jury

2  has issued an award against you?

3          You're shaking your head.  Is that a no?

4      A.   I don't think any jury or judge, to the best

5  of my knowledge.  I could be mistaken.

6      Q.   Okay.  So you're not sure.

7      A.   I'm pretty sure no.  I haven't --

8          I've only gone to jury once.  Yeah, I've

9  only been in jury once.  Of all these -- these 11

10  cases, it's only gone to jury one time.

11      Q.   Okay.

12      A.   And it was -- and it was, whatever the term,

13  hung jury.

14      Q.   And the other cases have all been

15  settlements, to your knowledge?

16      A.   To the best of my knowledge, yes.  Or -- or

17  dropped.

18      Q.   Or what?

19      A.   Or dropped.

20      Q.   Dropped.  Okay.

21          Do you have any lawsuits that you filed

22  against other physicians?

23      A.   A lawsuit that I filed against a physician?

24      Q.   Where you were a plaintiff and another

25  doctor is a defendant.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

54

1      A.    No.

2      Q.    None?

3      A.    Not --

4            I mean maybe I'm forgetting something, but I

5      don't remember suing --

6      Q.    Well let's be very clear.  It's your

7      testimony before the jury in this case that you've

8      never filed a lawsuit against another doctor in

9      Baltimore.

10     A.    Well, it's a question I haven't really

11     thought about or asked.  Have I ever filed a lawsuit

12     against another doctor?

13     Q.    Who is Martin Binstock?

14     A.    Oh.  Well that's not a doctor.  I mean that

15     would have been in a lawsuit that was against Good --

16     my former employer, Good Samaritan Hospital, so I

17     don't know how that was framed.

18           Martin Binstock was the -- one of the higher

19     executive office -- officers at Good Samaritan

20     Hospital.  If he met me now he would give me a hug.

21     So if the lawsuit in name was -- it was a -- I left --

22           So the details of what your implication is,

23     I left Good Samaritan Hospital, which was -- I was

24     part of Johns Hopkins Medical Institution, and I went

25     to Sinai Hospital around 2000 -- you can see that in

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

55

1  my curriculum vitae -- vitae, which that's correct --

2  and then there was an issue of pay that was -- that I

3  felt that I deserved that wasn't given to me, so there

4  was a lawsuit against Good Samaritan Hospital for

5  payments of the last six months or whatever it was, it

6  might have been -- I don't remember the details of it,

7  which I eventually won.  So if Martin Binstock was

8  part of that lawsuit, it was probably only his name as

9  representing Good Samaritan.  I wouldn't know that his

10 name was on that.

11      Q.   Okay.  My question, just to be clear, was

12 who was Martin Binstock, and that was your answer;

13 right, doctor?

14      A.   Well I was trying to clarify, because to me

15 it came out of nowhere, because Martin Binstock and I,

16 when I've seen him maybe five to seven years ago, are

17 in a great relationship, and I don't think that he

18 would view with me as suing him or --

19      Q.   So you and he --

20      A.   -- relate that.

21      Q.   -- have mended fences.

22      A.   I don't think we didn't ever have mended

23 fences.  I think he was disappointed that I left Good

24 Sam, but he understood some of the reasons.

25      Q.   Doctor, let's talk about your report.  Do

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

56

1  you have Exhibit 5 in front of you, which I think is

2  your report in this case?

3          MR. B. GORDON:  Let's take a five-minute

4  break.

5          THE REPORTER:  Off the record, please.

6          (Recess taken.)

7  BY MR. B. GORDON:

8      Q.   Doctor, I'm going to ask you, for purposes

9  of the court reporter and the judge and the jury who

10  have to read this transcript, probably, or look at

11  this videotape, would you try to meet me halfway and

12  listen to my questions carefully and try to limit your

13  answers as much as you can?

14          MR. C. GORDON:  Object to the form of the

15  question.

16      Q.   Would you do that for us?

17      A.   I will do the best I can.

18      Q.   I appreciate that much very.  Thank you,

19  doctor.

20          Let's look at your report.  Do you have your

21  report in front of you?

22      A.   Yes, I do.

23      Q.   And that --

24          We've got that market as Exhibit --

25          MR. C. GORDON:  Five.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

57

1          Q.   -- 5, right?  Okay.

2          A.   Correct.

3               MR. B. GORDON:  Real quick before we do

4    that, your counsel was kind enough to provide us with

5    some invoices, and I'm going to show you two documents

6    and have those marked as the next two exhibits in

7    order, one from May 16th, 2016, the next from July

8    10th, 2017, and we'll mark those as, I think, six and

9    seven respectively.

10              (Exhibits 6 and 7 were marked for

11              identification.)

12              (Discussion off the stenographic record.)

13   BY MR. B. GORDON:

14         Q.   So doctor, do you have Exhibits 6 and 7 in

15   front of you?

16         A.   Yes, I do.

17         Q.   Have you had a chance to look at those?

18         A.   Yes.

19         Q.   Those appear to be all of the invoices that

20   you submitted to counsel for your work in this case.

21         A.   No.  No.

22         Q.   So there are --

23         A.   There may -- there may be an April 2017

24   invoice.  And --

25         Q.   All right.  And I apologize.  So you think

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

58

1 we may be missing an April of 2017 invoice?

2      A.   Well I don't see it here.

3      Q.   Nor do I.  So bear with me just a minute,

4 doctor.  I thought I had everything.

5           MR. ASSAAD:  Here, it's on the last page.

6           MR. B. GORDON:  Oh.

7      Q.   So if you will, doctor, look at the one

8 we've marked as Exhibit 6.  The third page of that is

9 May of 2017 for work that was presumably submitted, it

10 says, April -- it says "MICHAEL MONT, APRIL INVOICE

11 2017."  Is that the one you're referring to?

12     A.   Yes.

13     Q.   Okay.  Let me ask you about that one first.

14 Setting aside the first two pages of that exhibit,

15 which relate to work you did for science day, as I

16 understand it --

17          Is that right, the first two pages?

18     A.   I haven't looked at this lately.

19     Q.   Let me ask it this way.

20     A.   Please ask the question again.

21     Q.   Yeah, let me ask it this way.  On page --

22          On Exhibit 6, the first two pages are dated

23 two different dates in May of 2016; correct?

24     A.   They're May 16th, May 24th, 2016, correct.

25     Q.   So given that fact, that those are 2016,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

59

1  would that refresh your recollection that this work

2  related to the time you spent on science day --

3      A.  Well --

4      Q.  -- in preparation for --

5      A.  Yes.  And also reading the actual invoice,

6  it says "Rehearsal day," so that sounds like the day

7  before.

8      Q.  Right.  Yeah.  Let's talk about that.  The

9  one you're talking about at the top of the beginning

10 of the first page of Exhibit 6, you -- you've got a

11 couple of things that mention "Dry run with Peter

12 Goss" --

13         What was that about?

14     A.  I don't --

15         I'd have to really wrack my brain to

16 remember exactly, but it probably was just going over

17 some details of what I was presenting.  So on the

18 science day I made a presentation, which you were

19 there for, and it would have been -- is this the

20 correct -- there was a multitude of material that

21 could have been presented.  I had to know exactly what

22 was -- lot of details, my time limit, what are the

23 details to be put into that presentation, et cetera.

24 So that -- that answers your question.

25     Q.  So what does "dry run" connote to you,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

60

1    doctor?

2         A.   This is what I'm going to present at this --

3    close --

4              This is what I'm proposing to present at

5    science day to another party.

6         Q.   And so that, to the best that you can

7    describe it for the jury, was about an hour you spent

8    with Mr. Goss where he -- just sort of a mock

9    examination of you for science day?

10        A.   I don't think he did an examination.  I

11   think I just gave him my presentation, and he

12   critiqued how I did.

13        Q.   And then --

14             MR. C. GORDON:  Ben, I need to impose --

15             You can ask questions, but I want to put --

16             MR. B. GORDON:  I'm asking a question.

17             MR. C. GORDON:  -- put an objection on the

18   record.  But yeah, science day was, per the court, off

19   the record, and I mean it was not -- so --

20             MR. B. GORDON:  I'm not asking the

21   substance.  I won't get into the --

22             I'm almost done here.

23             MR. C. GORDON:  Okay.

24             MR. B. GORDON:  Thank you.  I understand

25   that, Corey.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

61

1      Q.   And then the other thing you mentioned was,

2   quote, "Rehearsal day, 4 hours," so that was half a

3   day that you spent rehearsing what you were going to

4   do at science day; is that fair?

5      A.   Yes.

6      Q.   Okay.  Let's turn to page three of Exhibit

7   6, and this is your April invoice from 2017, April of

8   2017; correct?

9      A.   Oh.  Yes.

10      Q.   And one of the --

11      A.   Sorry.  So --

12      Q.   Sorry.

13      A.   Yeah, I see now.  That's true.

14      Q.   Here's my question.  Yeah.  So we've got the

15   one you -- you thought was missing, and so one of the

16   things I note on here is that about one, two, three,

17   four -- five lines down you say "Initial Review Jarvis

18   report, 30 minutes."  Do you see that?

19      A.   Yes.

20      Q.   Is there anywhere that you have time for

21   additional review of Dr. Jarvis's report?

22      A.   I don't -- we can look at it.  You can -- if

23   you know I didn't, I can --

24           Do you want me to look at the May and

25   June --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

62

1          Q.    Well --

2          A.    -- invoice?

3                The answer is, just as a general, there are

4    a number of reviews.  This is probably understated,

5    some of this.  I did a lot of reviews.  Sometimes I

6    didn't record when I looked at something for 10 or 15

7    minutes -- or 10 minutes or 15 minutes, I just --

8                So -- so these -- these are known time

9    periods that I took out, recorded it.  There are other

10   times I didn't record it.  The Jarvis report was

11   something that -- that to me I looked at, I scanned

12   it, I spent some time on it, and I put "Initial

13   Review" because my brain said potentially I'll come

14   back to this and put a lot more detailed time into it

15   if I think I need it.

16         Q.    And that's really my question, doctor.

17   This -- this says "Initial Review."  Doesn't that

18   denotatively imply there will be more review of Dr.

19   Jarvis's report?  Doesn't it?

20         A.    Potentially.

21         Q.    Okay.  Was there?  Have you done any more?

22               Let's look at Exhibit 7 --

23         A.    I -- I think --

24         Q.    -- if you want to.

25         A.    I think that --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

63

1          Q.    Have you spent any more time on Dr. Jarvis's

2    report as far as anything reflected --

3          A.    I think --

4          Q.    -- in these two invoices?

5          A.    I would say less than 10 minutes.

6          Q.    Okay.  And let's look at --

7          A.    But I have spent --

8                I probably wouldn't have put that into these

9    invoices.

10         Q.    And let's look at Exhibit 7, which are your

11   July and June -- dated July and June but actually your

12   June and May invoices.  You see those?

13         A.    Yes.

14         Q.    And, for example, in the first page dated

15   July 10th, reflecting your June invoice from 2017, the

16   second line you have "Review Richard Wenzel report, 3

17   hours."

18               Who is Richard Wenzel?

19         A.    He is one of our experts.

20         Q.    One of your experts.  One of the defense

21   experts; right?

22         A.    Yes.

23         Q.    He's a defense infectious disease doctor;

24   right?

25         A.    Yes.

64

1         Q.    And Dr. Jarvis is the plaintiffs'

2    infectious --

3         A.    Yes.

4         Q.    -- disease doctor; right?

5         A.    Yes.

6         Q.    And you spent three hours on Dr. Wenzel's

7    report just in this one statement; correct?

8         A.    Correct.

9         Q.    And only 30 minutes plus 10 minutes you said

10   on Dr. Jarvis's report; correct?  My question --

11        A.    Yes.

12        Q.    My question is:  Is that correct?

13        A.    Yes.

14        Q.    So in your mind, before this jury under

15   oath, is it your testimony that you put six times more

16   emphasis and importance on Dr. Wenzel's report as Dr.

17   Jarvis's?

18        A.    Incorrect.  And the explanation is that

19   since I'm sitting here, I don't --

20              There's a lot of different reasons for that.

21   One of the reasons would be if he is covering certain

22   topics as part of this defense, then I would want to

23   know what he's saying very precisely; I wouldn't want

24   to nec -- number one, I wouldn't want to necessarily

25   replicate what he's already doing.  There are --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

65

1   number two, there are degrees of expertise that people

2   have.  I'm supposed to be an expert on orthopedics but

3   I also -- my expertise runs past orthopedics in a lot

4   of different areas.  He's an infectious disease

5   expert.  I have to know infectious disease.  I write a

6   lot of papers and reports on infectious disease, but I

7   certainly want to know what -- his opinions and

8   where -- what topics he might be talking about --

9        Q.   Dr. Wenzel you're talking about.

10       A.   We're talking about Dr. Wenzel.

11       Q.   But not Dr. Jarvis.

12       A.   Well I'm --

13       Q.   He's an infectious disease doctor too;

14   right?

15       A.   Well I glanced at what he --

16       Q.   He was with the CDC for 23 years.  Are you

17   aware of that?

18            MR. C. GORDON:  Object to the form of the

19   question.

20       A.   He mentioned something like that.

21       Q.   Do you not --

22       A.   On science -- science day he mentioned

23   some --

24       Q.   Do you not recognize Dr. Jarvis as a leading

25   authority in the world on infectious disease?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

66

1          MR. C. GORDON:  Object to the form of the

2   question, lack of foundation.

3       A.   I don't -- I don't recognize one way or

4   another.

5       Q.   Okay.

6       A.   So it would be in his report.

7       Q.   Have you talked to Dr. Wenzel about Dr.

8   Jarvis?

9       A.   I'm not sure.  I can't ans --

10      Q.   Have you talked to Dr. Wenzel?

11      A.   I've talked to Dr. --

12           Yes, I have talked to Dr. Wenzel.

13      Q.   Have you asked him what he thinks about Dr.

14   Jarvis?

15      A.   I don't remember.

16      Q.   Would it surprise you that he thinks Dr.

17   Jarvis is one of the leading authorities on infectious

18   disease in this country for sure?

19           MR. C. GORDON:  Object to the form of the

20   question, assumes facts not in evidence.

21      Q.   Does that surprise you?

22      A.   I'd have to think about the answer and --

23      Q.   Okay.

24      A.   -- go over it.

25      Q.   That's fine.  You think about it.  We'll

67

1   come back to it.

2      A.   The ans -- the question --

3           Does that mean --

4      Q.   You think about it.

5      A.   -- at the present time or back in the

6   '90s --

7      Q.   Well --

8      A.   -- or something like that?

9      Q.   -- think about it and we'll come back to it.

10          Let me ask you this:  So you said it was

11  incorrect when I asked you if you thought Dr. Wenzel's

12  report was six times more important to you than Dr.

13  Jarvis's, so that means Dr. Jarvis's report is at

14  least somewhat important to you?

15          MR. C. GORDON:  Object --

16     Q.   How would you characterize it?

17          MR. C. GORDON:  Object to the form of the

18  question.

19     Q.   Is it one-half as important as Dr. Wenzel's,

20  a third?

21          MR. C. GORDON:  Object -- object to the form

22  of the question.

23     Q.   Well you would say it's not as important as

24  Dr. Wenzel's because you spent one-sixth the amount of

25  time reviewing it.  Is that fair?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

68

1     A.   It doesn't -- it doesn't ascribe the

2  importance.  Time spent on something doesn't ascribe

3  whether -- a quality of importance or a rating of

4  importance or not.  Some things that are important you

5  might spend five minutes on because you know it or you

6  see it, other things that you find unimportant for

7  opinions, you might spend a lot of time on it.  So

8  I've never thought of it that way and I don't

9  necessarily agree with that.

10     Q.   Isn't it true, doctor, that you had your

11  mind made up when you came into this case that you

12  thought the Bair Hugger was a perfectly safe device?

13  Isn't that correct?

14     A.   When I -- when I came into this case?

15  No, --

16     Q.   Right.

17     A.   -- that's not -- that's not how I felt.

18     Q.   You didn't come into this case with the

19  preconceived belief that the Bair Hugger device was a

20  safe and effective device to use in surgery?  Is that

21  your testimony before this jury?

22     A.   The best answer is that I came into --

23       I believed that the Bair Hugger was safe

24  because it was used at the hospital that I was at and

25  has continued to be used --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

69

1        Q.    And that was before you were retained in

2   this case; correct?

3        A.    Yes.

4        Q.    Okay.  Thank you.  Let me ask --

5              MR. B. GORDON:  I'm going to mark some

6   additional exhibits, doctor.  I want to mark next in

7   order the exhibits that you had to your report, and

8   I'm going to -- we're going to call these 8, 9, 10,

9   11, 12 and 13, in the order that I'm going to hand

10  them to the court reporter, and then we'll talk about

11  them.

12             Hopefully that works, Dick.

13             (Exhibits 8 through 13 were marked for

14             identification.)

15  BY MR. B. GORDON:

16       Q.    So doctor, I'm going to do my best to

17  describe these and then show them to you and --

18             (Witness texting on cellphone.)

19             MR. B. GORDON:  Do you need to take a

20  minute?

21             THE WITNESS:  I'm okay.

22             MR. B. GORDON:  Okay?

23       Q.    No. 8 I'm going call what you list as

24  "EXHIBIT A - REFERENCES AND MATERIALS CONSIDERED" and

25  ask you if that sounds like a fair description of that

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

70

1    document.

2         A.    Yes.

3         Q.    And No. 9 -- thank you.

4              And No. 9 is entitled "Mike -- Michael A.

5    Mont 6/1/2017 Depositions and Trials," and this

6    appears to be a list of your testimony going back to

7    2013 in other cases.  Does that look right?

8         A.    Yes.

9         Q.    Thank you.

10             No. 10 is a photo compilation of something

11   entitled "Sources of Heat in the Operating Room;"

12   correct?

13        A.    Yes.

14        Q.    No. 11 is a document entitled -- looks like

15   an abstract, a medical abstract entitled "HEPA Filters

16   Do Not Affect Infection Rates Following Primary Total

17   Joint Arthroplasty With Forced Air Warmers;" is that

18   correct?

19        A.    Correct.

20        Q.    No. 12 is a stack of photographs -- some of

21   which I think you presented at science day, but you

22   tell me if I'm wrong -- and it starts out "Bair Hugger

23   Blanket" and looks like it's a depiction of an

24   operating room setting with you on the table, if I'm

25   not mistaken.  Is that right?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

71

1     A.   That's not correct.

2     Q.   That's not you.

3     A.   That's not me.

4     Q.   Okay.

5          MR. C. GORDON:  Were those -- were those the

6     attachments to his report?

7          MR. B. GORDON:  Yes.

8          MR. C. GORDON:  Okay.

9          MR. B. GORDON:  Yeah.

10    Q.   These all have been attachments to your

11    report, so that's --

12    A.   Way younger person.  I wish it was me.

13    Q.   Okay.  So -- so that's --

14         It's fair to say, though, that's a --

15    A.   No.  I don't know --

16    Q.   -- re-creation of an actual patient.

17    A.   I don't -- I don't -- I don't know who that

18    is.

19    Q.   But is it a patient, or is that a mock

20    setup?

21    A.   I believe --

22         To the best of my knowledge this is a mock

23    setup because you're seeing a patient -- I mean you're

24    seeing a per -- an individual on a table, and the way

25    the leg is prepared is not -- for modesty issues

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

72

1   there's -- there's a thing there, and that's not the

2   way you would --

3            So I think it's -- it's just a -- it's a

4   mock demo with a model.  I don't know who the model

5   is.

6       Q.   Okay.  I guess my question is:  As to all of

7   those photos -- and there's one more that we've marked

8   separately as Exhibit 13 entitled "Common Sources of

9   Bacteria in Operating Room" -- and I guess with

10  respect to all of these, did you prepare these photos

11  and these representations of the operating room

12  setting?

13      A.   Inso -- insomuch as I might have helped

14  pick -- I -- I didn't -- I didn't -- the --

15           The true answer is I didn't -- didn't

16  physically prepare it, like I copied this or I did

17  this, but insomuch as I had input on which of these

18  pictures were selected, the answer is yes.  If that

19  answers your question.

20      Q.   It does.  Let me ask a followup question.

21  You --

22           Did you supervise the representation of mock

23  surgical settings that are depicted in these photos,

24  or at least some of these photos?

25      A.   I wouldn't say "supervise."  I was part of

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

73

1   the team that discussed and selected these.  I -- I --

2        Q.   Who else was on that team?

3        A.   I would say Corey Helton.

4        Q.   Corey Helton.  Who is that?

5        A.   Corey.

6        Q.   Oh, Corey Gordon.

7        A.   Corey Gordon.  I'm -- not Helton.  I'm

8   thinking --

9        Q.   Who is Corey Helton?

10        A.   -- of a baseball player.

11        Q.   Oh, okay.

12        A.   I'm sorry.  I'm a baseball person.

13             MR. C. GORDON:  He's a baseball player,

14   Corey Helton?

15             THE WITNESS:  Yeah.  Yeah.  Anyway, my --

16   I -- I --

17        Q.   Okay.  So counsel helped put these together;

18   is that fair?

19        A.   Cor --

20             Yeah, Corey Gordon and counsel.  And let me

21   think.  Is there anybody else that helped us put this

22   together besides --

23        Q.   Any other non-lawyers involved, any like

24   nurses or doctors?

25        A.   I wouldn't know if Dick Wenzel inputted on

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

74

1    that or not, or somebody like that.  So basically it

2    was me and the counsel team.

3         Q.   Who are the people depicted in some of these

4    photos?  Are these staff that work for you?

5         A.   No.  I don't know who these people are.

6         Q.   You don't know who those people are.  Okay.

7    And you're aren't physically --

8         A.   I may -- I may have at one point known where

9    this --

10             This might have been a demo that was done.

11   This potentially is something that is on YouTube and

12   these were pictures from them, or it may have been

13   there was -- maybe it's a -- it's a lab in Florida or

14   a lab in Minnesota.  But --

15             I may have known the answer to those

16   questions earlier, but I don't -- as we're sitting

17   here today --

18        Q.   Okay.

19        A.   -- I don't know where --

20        Q.   You kind of anticipated my followup

21   question.  You don't know as we sit here today with

22   certainty where those operating rooms or mock

23   operating rooms took place.

24        A.   I'm sure --

25             If you want, I'll -- we -- I can find out

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

75

1  later.  We can ask.

2      Q.   Yeah.

3      A.   I believe I would try to figure out, if you

4  want.

5      Q.   Yeah.  And if you figure it out in a

6  break --

7      A.   Let me --

8      Q.   -- and you want to tell us later, then that

9  would be --

10     A.   No, no.  Well I'd have to go and do a little

11 research in the break, if that's what you want me to

12 do.

13     Q.   Well I don't want you to take time away from

14 your testimony here today, doctor, but certainly at

15 some point between now and the time of trial we'd like

16 to know, if you know, where those operating rooms

17 were, who set them up, and who the personnel are

18 depicted in those.

19     A.   Okay.  So where they were --

20     Q.   Who -- who supervised or set up the --

21     A.   Who set up.

22     Q.   -- representations and --

23          So where they were, who's in them, who set

24 it up.  Who, where, what.

25     A.   Okay.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

76

1      Q.   All right.  Thanks, doctor.

2           Now we'll set those aside for the moment and

3  come back.

4           And let's go back to your report, which was

5  Exhibit 5, and turn -- have you turn to page three

6  where you start opinions.  Okay?  And let me ask you

7  first:  Are you familiar with Federal Rule of

8  Evidence -- I'm sorry, Federal Civil Procedure 26 at

9  all?

10     A.   Can you say that again?  Federal what?

11     Q.   Federal Rule of Civil Procedure 26.  You've

12  heard that before; haven't you?

13     A.   No, I have not.

14     Q.   You've heard of a Rule 26 report.  You've

15  done a bunch of them over the years; haven't you,

16  doctor?

17          MR. C. GORDON:  Object to lack of

18  foundation.

19     A.   You may -- you may know better than me

20  because I don't -- this is --

21          I'm not a lawyer and I don't know things

22  like Civil Procedure 26.  I try to --

23     Q.   Okay.  So you just don't know the term Rule

24  26 report.  That's fine.  That's fair.

25          The report you have in front of you, which

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

77

1  we've marked as Exhibit 5, is your complete report and

2  the basis for your opinions in this case up to this

3  point in time; is that fair?

4      A.  I guess that's the report, and then I

5  guess --

6          I don't know where you put the supplemental

7  materials into that answer --

8      Q.  Well let me ask you this --

9      A.  -- but --

10         I guess that and the supplemental materials.

11 But --

12     Q.  You knew there was a deadline to issue your

13 report in this case; right?

14     A.  Yes.

15     Q.  You mentioned June 1st or June 2nd; right?

16     A.  Yes.

17     Q.  And you -- you complied with that deadline;

18 right?

19     A.  Yes.

20     Q.  And you did everything in your power, to the

21 best of your ability, up through and including that

22 date, to include everything in your report that you

23 thought expressed your complete opinions in this case;

24 correct?

25     A.  Correct.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

78

1       Q.    And the support for those opinions; correct?

2       A.    Yes.

3       Q.    All right.  So let's talk about some of

4    those opinions.

5             On page three, the first opinion that you

6    state, your number-one opinion is, quote, "The major

7    source of periprosthetic joint infections (PJIs) is

8    the patient's own skin;" correct?

9       A.    Correct.

10      Q.    So I want to know every single piece of

11   support you can cite as the basis for that opinion.  I

12   need specific citations of authority for that narrow

13   opinion.

14      A.    I -- I don't think that many of these

15   citations are of authority.  This is a whole list of

16   body of literature.  To -- to call one

17   authoritanian -- authoritarian is a misnomer.

18      Q.    Well I didn't say authoritarian.

19      A.    But I -- I -- I view this as more of --

20            (A person enters the deposition room.)

21            THE REPORTER:  Go off the record.

22            (Discussion off the record.)

23      A.    I'd say where to get that opinion, some of

24   that to me is knowledge that I had as -- it's a

25   working knowledge that I had when I first got

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

79

1    introduced to orthopedics as a resident.  There are

2    different documents from --

3            So it's a general knowledge from the CDC and

4    different things.  I think even Dr. Jarvis himself in

5    the '90s wrote a document for -- that talks about

6    sources of infection coming from the patient's skin

7    and -- and body majority-wise.  But I don't know

8    which --

9            There's a whole bunch of articles that are

10   listed here, 11.  I don't know if it's every article

11   that I wrote.  I just put some of them that are

12   dealing with the skin and decontamination.  That's why

13   I spent so much of my life -- no -- a -- a good

14   portion of research -- my research life with studying

15   skin decontamination.  We were able to reduce

16   infection rates by like 60 or 70 percent, sometimes

17   even more.

18       Q.   And -- and we're going to talk about that,

19   but let me just take you back to this question right

20   now, doctor.  The -- the question we're talking about,

21   top of page three, is your one sentence in bold, "The

22   major source of PJIs is the patient's own skin."  I

23   just want to take you to that narrow question right

24   now and ask you to look at Exhibit 8, I think it is --

25   yeah, Exhibit 8, which is your "EXHIBIT A --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

80

1   REFERENCES AND MATERIALS CONSIDERED," and ask me what

2   specific authority, if anything, on this list supports

3   that statement.

4           MR. C. GORDON:  On only --

5           You -- you want to limit him to what's on

6   the reference list --

7           MR. B. BORDON:  Well --

8           MR. C. GORDON:  -- as opposed to what he

9   specifically cited in that specific section?

10      A.   This is in my report.  There's 11

11  references.

12      Q.   Well doctor, you have --

13          You're referring now to 11 references on

14  pages four and five --

15      A.   Correct.

16      Q.   -- relating to chlorhexidine skin prep and

17  control of the skin in an operating setting; right?

18      A.   Skin infections, which is a direct answer to

19  your question.

20      Q.   And we're going to talk about that.  But are

21  you saying that these 11 sources specifically support

22  the statement that the major source of periprosthetic

23  joint infections is the patient's own skin?

24      A.   Some of them say that.

25      Q.   Okay.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

81

1      A.    I'd have to look at the references.  Some of

2   them mention that.

3      Q.    And what these articles reference, do they

4   not, doctor, is a process that you as a surgeon follow

5   and other surgeons follow to try to prevent skin from

6   having infective microorganisms; correct?

7      A.    Correct.

8      Q.    Okay.  So you're trying to control for that

9   possibility, that there might be microbes on the skin;

10  right?

11     A.    Correct.

12     Q.    And so what I'm asking you now is a little

13  different than, I think, and that is:  Are there any

14  specific authorities that say that notwithstanding

15  that prep that you've done with the chlorhexidine that

16  you've been so, you know, scrupulous about in these

17  references, there are patient's own skin flora that

18  still can cause PJI notwithstanding that chlorhexidine

19  prep?  Are there any specific references that say

20  that?

21     A.    I don't really understand the question.

22     Q.    Well let me -- let me rephrase it.

23     A.    You have to --

24           I don't understand the "notwithstanding"

25  part.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

82

1    Q.   So you say, the beginning of page three, you

know, your first opinion in this report --

2

3         In fact, it's in bold; right, doctor?

4    A.   Yes.

5    Q.   You put it in bold; right?

6    A.   I wrote this report.  Yes, I did it.

7    Q.   You intended to emphasize this opinion;

8  right?  It's number one in your report; right?

9    A.   I don't know if the ordering of --

10   Q.   It's the first opinion in your report; isn't

11  it?

12   A.   But that --

13        I don't think the first is necessarily the

14  most important.

15   Q.   Okay.  It's in bold; isn't it?

16   A.   I -- I -- I just put a list of opinions.  I

17  didn't --

18   Q.   All right.

19   A.   -- I didn't put a value equation on which

20  one is more --

21   Q.   Well the jury can decide --

22   A.   -- or less important.

23   Q.   -- if they think it being first has any

24  weight.

25   A.   Okay.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

83

1     Q.   It's in bold.  Does that give it some

2  intended emphasis?

3     A.   Well I --

4          Aren't all them in bold?

5     Q.   Well just the --

6     A.   Yeah, they're all --

7          A lot of the opinions are in bold.  So this

8  whole thing --

9     Q.   So anything in bold you intended to

10 emphasize; did you not?

11    A.   No.  They -- no.

12         MR. C. GORDON:  Object to the form of the

13 question.

14    A.   The bold was to --

15         No.

16    Q.   Okay.  So --

17    A.   The bold was to separate different, in my

18 opinion --

19         The way I intended this report to be is that

20 the bold was separating different concepts --

21    Q.   Okay.

22    A.   -- so that the reader could look at them

23 with a little bit of ease rather than have a single

24 18-page opinion without separations.  And what I could

25 have done was number them, and what I could have done

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

84

1    in reference to your thing, which if I looked at this

2    again I would have written something like "Here are my

3    opinions numerically numbered, not necessarily in

4    order of importance," which is what I usually do on

5    reports.

6        Q.   So the fact that this opinion is in bold and

7    is listed first in your report has no weight in where

8    it stacks among your opinions.

9        A.   I -- I --

10       Q.   Is that fair?

11       A.   I apologize to you and to the jury for not

12   making that -- which is in almost every record that

13   I've ever done before, that the following are my

14   opinions, usually numbered, and I say "not necessarily

15   in order of importance or priority."  That's in --

16            And if you looked at my last five hypes, or

17   whatever opinion, they all have that same sentence.  I

18   don't know why this one didn't.

19       Q.   So this is just one of your opinions;

20   correct?

21       A.   Yeah.  And they're bolded just to -- they're

22   bolded just to separate them.

23       Q.   Yeah.  Separate them but not emphasize them.

24   I got it.

25            So let me ask you this:  There's not a

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

85

1  single citation in that paragraph of any authority; is

2  there?  You mention the 11 citations --

3      A.   Well -- well --

4      Q.   -- two pages later, but is there a single

5  citation of authority in that paragraph for that

6  proposition?

7          MR. C. GORDON:  Object to the form of the

8  question, --

9      A.   There's -- there's 11 --

10         MR. C. GORDON:  -- mischaracterizes the

11 evidence.

12     A.   There's 11 citations after this section that

13 are cited.

14     Q.   One, two, three, four -- five paragraphs

15 down there are 11 citations relating to a paragraph

16 that begins about chlorhexidine prep.

17     A.   Yeah.

18     Q.   And all of those citations concern

19 chlorhexidine prep; don't they?

20     A.   No, I don't think so.

21     Q.   Well they -- they all concern skin prep.

22     A.   No.  Number five says "Preoperative skin

23 disinfection..."

24     Q.   That's not skin prep?

25     A.   Well okay, that is.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

86

1           Let me look at the rest of this.

2      Q.   Show me which one does not concern skin prep

3   in some way.  And the -- and the question I'm asking

4   you about, --

5      A.   Okay, so --

6      Q.   -- your first opinion doesn't relate to skin

7   prep, it's making the skin --

8      A.   All right.  So -- so I didn't --

9           I have published on prevention of

10  perioperative infections.  I didn't put it in those 11

11  references.  To me it's a more common-knowledge

12  statement.  And I'm happy to provide you or the court

13  and the jury with references to that opinion, but I

14  didn't put it here.

15     Q.   Okay.  And now that's why I'm asking.  Since

16  there's not a citation on page three with respect to

17  that first proposition, first opinion about the

18  patient's own skin being the source of maj -- a major

19  source of the PJIs, where in Exhibit A, your list of

20  references and materials considered, do you -- do you

21  find support for that proposition?  Is there

22  anything --

23     A.   I'd have to go through the articles.  And I

24  believe that some of these --

25          First of all, some of these references would

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

87

1   support that proposition of these 11, because --

2        Q.   Can you point to one?

3        A.   I have to look at them, because some of them

4   have it, some of them none.

5        Q.   All right.  Well as we sit here right --

6        A.   Because when you write the paper, the first

7   paragraph of the paper --

8        Q.   Pretty important, first paragraph; right?

9        A.   -- often might say that skin contamination

10  is the major source of infection.  It -- the first

11  paragraph of many of these papers might say that.  So

12  even though you're saying -- and I hear you -- that

13  the major topic is that -- that statement, that bolded

14  statement, it -- that statement is very -- is in some

15  of these papers, --

16       Q.   You're -- you're --

17       A.   -- or very similar to it.

18       Q.   Doctor, you're familiar with the old adage

19  "First impressions are lasting impressions;" right?  I

20  mean you intended for the first thing in this report

21  to be --

22       A.   No, I did not.

23       Q.   -- important; did you not?

24            Okay.  So it's not.

25       A.   No.  As a matter of fact, I didn't --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

88

1              As you're pointing this out, if -- that

2    may -- that may be good, but no, I didn't do it that

3    way.  I should have -- I just told you a few answers

4    back that I should have said --

5              You know, I'm not the one to decide what are

6    the major and critical issues of this case.  I wanted

7    to put all my opinions in.

8         Q.   Who is the one to decide?

9         A.   What?

10        Q.   Who's the one --

11        A.   I think the --

12             You.

13        Q.   The lawyers?

14        A.   Probably.  You're --

15        Q.   So it's --

16        A.   You're the one trying the case.

17        Q.   So it's not the scientists who should decide

18   what the important issues in this case are?

19        A.   Well let's -- let's -- then let's -- let's

20   answer --

21             MR. C. GORDON:  Object to the form of the

22   question, lack of foundation.

23        A.   -- that it's a team effort.  But I'm not --

24             I'm only one member of the team and I just

25   wanted --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

89

1     Q.   The rest of the team were lawyers.

2          MR. C. GORDON:  Object to the form of the

3    question.

4     A.   No, it could be other experts like me, it

5    could be the jury, it can be the judge, --

6     Q.   It's not up to you --

7     A.   -- it could be a whole team of people that

8    are going --

9     Q.   You said you came into this case with an

10   open mind about the answer you were looking at, right,

11   about the answer that you were trying to -- to derive

12   in this case.  What -- what was the question --

13    A.   Answer, yes.

14    Q.   -- you were trying to answer you described

15   at the beginning?

16    A.   I guess two questions, whether -- whether

17   this device led to an increased risk of SSIs or

18   whether it was defective.

19    Q.   And you told us earlier that you believed,

20   based on your history, that it was a safe device.

21    A.   Yes.

22    Q.   Okay.  Let -- let's talk about a little

23   farther down on page three.  There's another

24   statement, doctor, on page three where you state that

25   the factors that are --

90

1        Well bear with me because I think it's a

2    typo.  In the middle of the second paragraph -- do you

3    have that in front of you, the paragraph that starts

4    "A brief discussion...?"

5        A.    I'm looking at it, yes.

6        Q.    Okay.  It says, "The factors that are can

7    cause..."  I think -- I think maybe there's a

8    superfluous "are" there.  I think it means, "The

9    factors that can cause PJIs involve the host and the

10   environment."  Would you agree with me that's the way

11   that should read?

12         Well let's forget about it.  I'm not worried

13   about the "are."  Let's -- let's read it as it is.

14   "The factors that are can cause PJIs involve the host

15   and the environment."

16         The fact is, however you read the "are" and

17   the "can," that's a bit of a misstatement; isn't it,

18   doctor?

19       A.    I -- I don't know.  What are you --

20       Q.    Well --

21       A.    Well if I said "are" and "can," that's a

22   misstatement.  It's obviously --

23       Q.    Well --

24       A.    Thank you for pointing that out.  There's --

25   there's --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

91

1      Q.   I'm not worried about that, that's why I

2  tried to correct it.  I'm not worried about it.  My --

3  my real question is, doctor, even with a correct of

4  that -- correction of that typo, the statement that

5  PJIs are caused by the host and the environment is

6  inaccurate; isn't it?

7      A.   I -- I think in some ways you can say it's

8  semantics.  You --

9      Q.   Well a microbe can cause --

10     A.   I -- I might say it better that --

11          THE REPORTER:  I'm sorry.

12          MR. B. GORDON:  Sorry.  Go ahead.  Go ahead,

13  doctor.

14     A.   Do you want --

15     Q.   Let me start it -- I'll re -- I'll start the

16  question over.

17          Doctor, you have to have a microbe of some

18  kind to cause an infection; don't you?

19     A.   Yes.

20     Q.   Okay.  So like the old adage when we were

21  kids and -- and maybe our moms or parents told us

22  don't go outside without your coat on or without your

23  shoes on, you'll catch cold, that's just --

24  scientifically that's just nonsense; right?

25     A.   Don't go out --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

92

1           MR. C. GORDON:  Object to the form of the

2   question.

3       A.   Not necessarily anyway, but keep going.

4       Q.   Well doctor, you can't catch cold --

5           THE REPORTER:  Off the record.

6           (Discussion off the record.)

7   BY MR. B. GORDON:

8       Q.   All right, doctor, let's start again.  So

9   let me ask you a question.  You can't catch a cold, a

10  rhinovirus, without being exposed to someone else with

11  an infective organism; correct?

12          MR. C. GORDON:  No.

13      A.   That's not correct.

14      Q.   Okay.  So -- so it's your testimony that you

15  can catch a virus without being exposed to the virus?

16  How does that work?

17      A.   I didn't say that.

18      Q.   All right.  Well I'll ask you another

19  question.  Let me ask it this way:  Can you go outside

20  and catch a virus simply because you're not dressed

21  for inclement weather?  Is that possible?

22          MR. C. GORDON:  Object to the form of the

23  question.

24      A.   I don't know how to answer the question.  If

25  somebody has their --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

93

1           If they're not dressed appropriately and

2    their immune system is down, they may be more

3    susceptible to ambient rhinoviruses or parvoviruses in

4    the environment from droplets that they could

5    theoretically be at increased risk, and there are

6    anecdotal studies like that that I've seen, but I'm

7    not -- where they say, "Maybe what mom said was

8    correct," but I'm not an absolute expert on that

9    topic, so I think we should use perhaps a different

10   analogy.  I understand that you're saying that about

11   cause and effect.

12        Q.   Thank you for that clarification, doctor.

13   And I -- I guess that that's really my point, is that

14   those airborne droplets you mentioned of

15   microorganisms, viral or otherwise, whether you have a

16   susceptibility or not, you at least have to have them

17   in order to come down with the virus; don't you?

18           MR. C. GORDON:  Object to the form of the

19   question.

20        A.   The question is --

21           I think you're saying that to get an

22   infection you have to have the antecedent infective

23   particle, DNA, virus, bacteria, and the answer to that

24   question, if that's what you're asking me, is yes.

25        Q.   Thank you, doctor.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

94

1           Let's move on in your report a little

2     farther down.  In the same paragraph on page three you

3     state, quote, "Host factors" -- make sure I get this

4     right.  "These host factors can have an enormous

5     impact on the patient's own bacterial burden, as well

6     as the patient's ability to resist infection from

7     endogenous bacteria (bacteria that come from the

8     patient)."

9           Do you see where I'm reading?

10       A.   Yes.

11           MR. C. GORDON:  You read it wrong.

12           MR. B. GORDON:  Okay.  I'm sorry.  Let me

13    read it again.

14       Q.   "These factors can have an enormous impact

15    on the patient's own bacterial bioburden, as well as

16    the patient's ability to resist infection from

17    endogenous bacteria (bacteria that come from the

18    patient)."

19           MR. C. GORDON:  Now you got it wrong in a

20    different way, but --

21       A.   You left out the word -- the second word

22    "host" this time.  But other than leaving out the word

23    "host" when you read this this time --

24       Q.   "These host factors..."  All right.  I

25    apologize.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

95

1      A.    -- then that's the sentence, yes.

2      Q.    Well my question --

3            I wanted to alert you to that sentence, and

4   my question about that is:  What do you mean by

5   "bacterial bioburden?"

6      A.    Again, I wrote this now --

7            I did read this a few times over again.  I

8   was using this material just as a little bit of a

9   background, so I don't know exactly what I meant.  But

10  when I'm talking about bacterial bioburden, we're

11  talking about the amount of bacteria on the patient's

12  skin, sometimes in their nasal -- their nares and

13  their whole body, sometimes even in their GI tract,

14  sometimes --

15           For example, it would be considered an

16  excess bioburden if somebody had an open sore on the

17  same leg that we're doing a knee replacement.  That

18  might increase the bi -- the bacterial bioburden.  I

19  think this -- these were general comments that I made

20  about patient-specific bacterial bioburden.

21     Q.    So let me ask you, with respect to a

22  patient's own bacterial bioburden:  Their bacterial

23  bioburden in and of itself, regardless of what level

24  that may be at, cannot cause their infection; can it,

25  doctor?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

96

1      A.   I -- I --

2           MR. C. GORDON:   Object to the form of the

3   question.

4      A.   I don't see why not.

5      Q.   Well let --

6      A.   What -- what are you --

7           Unless I'm missing something of what you're

8   asking me here.

9      Q.   Yeah.  Let me ask a followup question.  The

10  bacteria that you're referring to, whether there are

11  few or there are many, the bacteria have to find a

12  route, a mode of transmission to the patient's immune

13  system or to their body internally to cause an

14  infection; don't they?

15     A.   I guess I would agree with that, yes.

16     Q.   Okay.  So, for example, I think you

17  mentioned --

18          Well I don't want to talk about science day.

19          So there are advantageous -- to use a

20  word -- bacteria on our skin; are there not?

21     A.   Yes.

22     Q.   And there's evidence that there are certain

23  symbiotic relationships between bacteria both on our

24  skin and inside of us that are written about; is that

25  fair?

97

1        A.    Yes.

2        Q.    And so just because someone has a particular

3   type of bacterium on his or her skin doesn't mean

4   they're going to get an infection; does it?

5        A.    Correct.

6        Q.    Okay.  On the bottom of page three you talk

7   about a --

8        A.    Ahh.

9        Q.    Sorry.

10       A.    Excuse me.  I'm going to amend that last

11   answer.  Sorry.  I answered a little too quickly.

12            It is potentially possible that a person

13   that has a particular type of bacteria -- I have to

14   think about this answer -- that is pathologic as

15   opposed to a more friendly bacteria, that if they have

16   that particular bacteria on their skin, that could

17   lead to an infection because it's not --

18            I think that's a better answer.  And for the

19   most cases my answer was correct, but there can be a

20   scenario where you have a, quote, bad bacteria that is

21   not good.

22            MR. B. GORDON:  Objection, move to strike as

23   non-responsive everything after the word "yes."

24       Q.    Doctor, at the bottom of page three you talk

25   about exogenous sources of bacteria.  Do you see that?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

98

1  Just before the bottom.  You state, "These host

2  factors can also diminish the ability of the patient

3  to void infection from exogenous sources of bacteria

4  (external to the patient) as well."  Do you see that?

5      A.    I see the sentence.

6      Q.    I'd like to know if you have any specific

7  citations of authority for that sentence.

8      A.    I have to read the sentence more than once

9  because it's a little bit --

10          I have to remember what I was thinking when

11  I wrote this.

12      Q.    And just for the record, while you're

13  reading, doctor, I'm not asking you necessarily what

14  you were thinking or what you're thinking about it

15  right now in terms of what it means, I'm just asking

16  you if there's anything on your Exhibit A references

17  and materials considered or any citation you can give

18  us right now that specifically supports that

19  proposition.

20      A.    I'm looking here --

21          I would have to go through this whole list

22  to see what supports that.  I think Parvizi,

23  "Prevention of Periprosthetic Joint Infection," so

24  it's under Parvizi -- P-a-r-v-i-z-i -- would support

25  that statement.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

99

1       Q.    And Dr. Parvizi is a doctor here at the

2    Cleveland Clinic; isn't he?

3       A.    No, he is not.

4       Q.    He's not -- he's not here?  Was he at one

5    time?

6       A.    Never.

7       Q.    Okay.  Where is he located?

8       A.    To the best of my knowl -- to the best of my

9    knowledge, never.

10       Q.    So where is Dr. Parvizi?

11       A.    He is at The Rothman Institute in

12    Philadelphia, Pennsylvania.

13       Q.    And is he --

14       A.    That's R-o-t-h-m-a-n.

15       Q.    Is he part of 3M's infection prevention

16    team, to your knowledge?

17       A.    I don't know.  He might be.

18       Q.    Okay.  Let me ask --

19       A.    I --

20       Q.    Sorry.  Go ahead.

21       A.    Can I qualify this?  I don't really know

22    what 3M -- what you just asked me in answer to the

23    question.  I didn't know that -- if there is a 3M --

24       Q.    Infection prevention --

25       A.    -- whatever you said, infection prevention

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

100

1  team.  I wouldn't know what that is.

2      Q.  Well what about Dr. Sessler?  You know who

3  Dan Sessler is; right?

4      A.  I know who Daniel Sessler is, if it's the

5  same Dr. Sessler you're talking about in this --

6  that's related to this.

7      Q.  And he's at the Cleveland Clinic; right?

8      A.  He is.

9      Q.  You're not aware that he is part of the

10  infection prevention team at 3M?

11      A.  I'm not.  I didn't even know 3M had an

12  infection prevention team.  It's not part of my

13  review.

14      Q.  So following up on your report, from page

15  three and page four you talk about sources of what you

16  call, again, exogenous bacteria.  For the benefit of

17  the jury, how would you define "exogenous sources of

18  bacteria?"

19      A.  Exogenous can come from any -- anything

20  from, I guess simply -- I don't want to confine my

21  answer but -- outside the patient.  Like from, if

22  we're talking about in the OR, the different -- me as

23  a surgeon, if I shed some bacteria, some skin squames

24  or fomites or things are -- anything outside the

25  patient would --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

101

1          Obviously, the word "exogenous" means

2    outside.

3       Q.    So anything in the operating room that might

4    contribute to an infection other than the patient him

5    or herself; is that fair?

6       A.    That might be fair.  Let me think about it,

7    if that's the only context here.

8          Yeah, I -- I would -- I would say that's

9    fair.

10      Q.    And you say at the top of page four that

11   "The operating room environment has a multitude of

12   sources of potential contamination;" correct?

13      A.    Yes.

14      Q.    And you mention a number of them, such as

15   minimizing operating room traffic; right?

16      A.    Yes.

17      Q.    And contam -- decontamination --

18          Or be -- I'm sorry -- being careful about

19   contamination of necessary equipment, and you list

20   several things there; right?

21      A.    Yes.

22      Q.    So the point of this section is that you do

23   everything in your power and surgeons do everything in

24   their power to minimize the risk of these exogenous

25   sources of contamination; right?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

102

1      A.    What we can, yes.

2      Q.    And you mention a number of things here and

3  then later in your report.  I notice one thing you

4  don't mention are heat -- heater-cooler devices.

5  You're familiar with those; right?

6      A.    I'm familiar with heater-cooler devices.

7      Q.    They're used in cardiac surgery; right?

8      A.    Well I'm not a cardiac surgeon, but I know

9  that they do use these water devices.  Sometimes they

10  use different types of devices.  But I'm not a

11  cardiac -- cardiothoracic surgeon.  Last time I was

12  there was as a resident, which is a few years ago.

13      Q.    But you are aware that they are used in some

14  hospitals in some surgeries to both heat and cool

15  patients; correct?

16      A.    Say what these devices that you're re --

17  this class of devices you're talking about.

18      Q.    Heater-cooler devices.  They are used both

19  for heating and cooling of patients; aren't they?

20      A.    Yes.  But not -- I don't --

21            I'm not an expert on that.  I've seen that

22  written.  I haven't seen those devices personally with

23  my eyes lately.  I will accept it, I've read about it,

24  but I don't --

25            They're not used in orthopedics.  I don't

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

103

1   know the -- the details.  I'm happy to -- to answer

2   your question by looking it up or going to the

3   cardiothoracic room and get better knowledge.

4           There are -- I'll add that there are some

5   other heating devices when we heat up -- that we use

6   in orthopedics just to heat up fluids when we have

7   the, you know, cool fluids that come out of the

8   freezer that we need in the OR, that gets in the OR to

9   heat up --

10      Q.   Doctor, are you aware -- sorry.

11           You're aware, are you not, that

12  heater-cooler devices have been found to be sources of

13  contamination in operating rooms?  You're aware of

14  that; aren't you?

15           MR. C. GORDON:  Object to the form of the

16  question.

17      A.   I think I've heard about that.  And I don't

18  want to answer imprecisely, but certain -- certain may

19  have been.

20      Q.   So doctor, if there are multiple studies

21  over the course of the last two years and FDA and CCD

22  guidelines with respect to contaminated heater-cooler

23  units causing bacterial infections of cardiac

24  patients, are you telling this jury that you just

25  don't know about that?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

104

1          MR. C. GORDON:  Object to the form of the

2    question.

3      A.   I know about that to an ex -- to a very

4    minor extent, because to me they are -- those are

5    different devices.  There are -- there's certainly a

6    lot of different devices in multiple specialties, and

7    I'm trying to confine this to what is used in the --

8    in -- for this device.

9      Q.   Well when you say "for this device," do you

10   mean the Bair Hugger?

11     A.   Or the --

12          We can take it as the Bair Hummer -- Bair

13   Hugger or devices that are -- that are designed to

14   promote normothermia.

15     Q.   So other types of patient warming systems.

16     A.   Yeah.

17     Q.   But in your report, doctor, on page four and

18   later, you mention a number of different devices that

19   are potential sources of exogenous contamination based

20   on your expertise and based on the literature; right?

21          MR. C. GORDON:  Object to the form of the

22   question, it's argumentative, assumes facts not in

23   evidence.

24          He -- he's listing orthopedic devices.

25          MR. B. GORDON:  That's a -- that's a good

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

105

1   speaking objection.  You got onto me about it.

2       Q.    So doctor, I'm going to repeat the question.

3   I don't think it's argumentative.

4       A.    Okay.

5       Q.    The question is whether, in your report, you

6   listed a number of different operating room devices

7   that you believe are things that have to be looked at

8   with respect to potential contamination of the

9   operating room environment.  Isn't that what you said

10  on page four?

11      A.    It -- I used a --

12            Yeah.  You're using the term "devices."

13  Some of these things are -- I don't know what the

14  definition that you have of "devices" -- some of them

15  are blades, --

16      Q.    Well doctor, you said --

17      A.    -- tips -- suction tips.  I mean they can

18  all be considered devices.  Some of them are operating

19  room traffic.  I just -- I just listed a melange of

20  things in the orthopedic theater that are used that

21  are exogenous sources of -- potential exogenous

22  sources of contamination in the operating room theater

23  and --

24            But I'm happy to answer any question you're

25  asking.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

106

1      Q.   Let me read your -- let me read your

2  sentence exactly, doctor, so it's clear for the jury.

3  And I want you to listen for me here and ask you where

4  you limit this to orthopedic cases.

5           Top of page four, quote, "The operating room

6  environment has a multitude of sources of potential

7  contamination.  This should be minimized, as much as

8  possible, by not prolonging surgeries unnecessarily to

9  minimize further skin or wound contamination,

10  minimizing operating room traffic, and being careful

11  about contamination of necessary equipment, e.g.

12  suction tips, blades, saws, light handles, et cetera."

13           Anywhere in those two sentences did you

14  limit your concern about the operating room and

15  potential contamination to just orthopedic cases?

16           MR. C. GORDON:  Object to the form of the

17  question, --

18      A.   I -- I --

19           MR. C. GORDON:  -- it mischaracterizes --

20  wait, wait, wait -- mischaracterizes the -- the -- the

21  evidence, takes it out of context.  And the entire

22  section is about periprosthetic joint infections.

23           MR. B. GORDON:  Object to counsel's side-bar

24  and testifying for the witness.

25      A.   I -- I would have answered it without his

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

107

1   prompting in two manners.  I would have said that

2   the -- what we said, the bold part of this topic is

3   periprosthetic joint infections, so what I'm saying in

4   here primarily applies to -- to joint arthroplasty

5   surgeries, which is the major topic of this whole

6   case, which is what we're talking about.  That would

7   have been my first answer.  But the second part is

8   when you were reading it carefully to me, I was

9   listening and reading it again carefully.  Would I

10  agree with almost all of those statements being

11  correct in a generic sense for the operating room?  I

12  didn't write it in that -- I -- I was writing this

13  more for orthopedics and for joint arthro --

14  arthroplasty when I wrote that.  I know how I was

15  thinking because I was just imagining myself doing a

16  joint arthroplasty case, and that's how I wrote it.  I

17  didn't write this from a book.

18          You're asking for references sometimes.

19  Some of these -- some of these statements here in

20  this -- even in this whole section, they're not

21  referenced because it's from my knowledge.  I believe

22  a lot of it is common knowledge like what I put in

23  there.  But if I read that, unless we nitpick this on

24  something else, I think that statement also applies in

25  general to any surgery.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

108

1      Q.    Doctor, you would agree -- and I think you

2  did earlier -- with the proposition that patient

3  warming devices are potential external sources of

4  contamination in the operating room; --

5           MR. C. GORDON:  Object to the form --

6      Q.    -- correct?

7           MR. C. GORDON:  Object to the form of the

8  question.

9      Q.    In orthopedic cases.

10      A.    No, I don't agree with that.

11      Q.    So you don't agree that patient warming

12  devices are among the pieces of equipment in the

13  operating room, like this litany of others you list,

14  that could be sources of contamination in orthopedic

15  surgery cases?

16      A.    Well you want to go one by one?  What are we

17  defining as patient warming devices?  If you bring --

18  if you bring a little hot -- if you bring a little IV

19  fluid that's a little warm and you call that a patient

20  warming device -- which it shouldn't be, it shouldn't

21  be used for that purpose -- and the thing is

22  contaminated, it could cause bacteria.  Is that

23  what --

24           I mean I don't understand what the question

25  is.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

109

1      Q.   Doctor --

2      A.   Which one are you -- which, quote, patient

3  warming device are we referring to and what are you --

4           Some things heat patients up in the OR.

5  There are different devices.

6      Q.   So doctor, is it your testimony to the jury

7  that some patient warming devices that might be used

8  in cardi -- I'm sorry -- orthopedic surgery may pose a

9  risk of contamination but others do not?

10     A.   I don't think that's my opinion.

11     Q.   Isn't that what you just said?

12     A.   No, that's not what I just said.

13     Q.   So is it your testimony that --

14     A.   What you're saying is -- it's out of

15  context.

16     Q.   So is it your testimony that no patient

17  warming devices can be external sources of

18  contamination, as you've described them in page four

19  of your report?

20          MR. C. GORDON:  Object to the form of the

21  question.

22     Q.   I just want to be clear.  Is it none or is

23  it some?

24     A.   I have to go and think about every patient

25  warming device that's been used and on the market.  I

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

110

1    would go through a review of the --

2            There are a number of review articles on

3    different patient warming devices.  I don't want to

4    answer incorrectly here.  There are ones that go

5    through a whole litany of different types of patient

6    warming devices.

7        Q.   Well doctor, you had --

8        A.   And then I would basically go through that

9    article and go one by one and say do I think that any

10   one of these could potentially pose a risk of

11   increasing bacterial contamination.  On the --

12           In the general sense, my answer is no.

13       Q.   Doctor, you had a lot of days before today

14   to consider whether forced-air warming or other

15   patient warming devices, such as all these other

16   sources of heat and other equipment in the operating

17   room, whether any of these things contribute to or

18   cause infection; didn't you?

19       A.   Yes.

20       Q.   You -- you had hours and hours that you

21   billed Mr. Gordon for, including up through just the

22   last couple of weeks, for reviewing the literature and

23   studying the very question that -- that I just asked

24   you, whether any sources of contamination could be

25   forced-air warming devices.  So you've considered that

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

111

1    question already as you've written your report here;

2    haven't you?

3              MR. C. GORDON:  Object to the form of the

4    question.

5        A.   I don't know what the question -- you -- it

6    keeps -- the --

7              The phrases of your question keep changing

8    if we read the last three statements -- or no, your

9    statements keep changing.  But yeah, I think the

10   answer is:  I've considered different -- I've -- I've

11   considered forced-air warming devices and did a lot of

12   work on this case to look at risk factors.

13       Q.   And your opinion is that forced-air warming

14   devices do not cause or contribute to orthopedic --

15   periprosthetic joint infections; right?

16             MR. C. GORDON:  Object to the form of the

17   question.

18       A.   I didn't look at every forced-air warming

19   device ever in the history of mankind, if that's what

20   you're asking.

21       Q.   How many --

22       A.   I only really looked at the Bair Hugger

23   device.  There's a number of others on the market, and

24   I -- I didn't -- you don't --

25             I didn't do a major assessment of these

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

112

1   other devices, if that's what you're asking.

2       Q.   One of the other ones on the market is the

3   Mistral, marketed in this country by Stryker

4   Corporation.  You're familiar with that one; right?

5       A.   Yes.

6       Q.   In fact, that's the one you use at the

7   Cleveland Clinic; right?

8       A.   Yes.

9       Q.   You don't think that one causes infections;

10  do you?

11      A.   I don't think it causes infections at the

12  pre --

13           I'm a little concerned because there was an

14  increased -- in comparison to the Bair Hugger, in the

15  recent report that we have there was an increased --

16  although not statistically -- there was an increased

17  rate of deep infections when we did a comparison of

18  the Mistral to the Bair Hugger device, so I think that

19  may prompt a further investigation.  Because if that

20  type of numbers keep adding up, then I'd like to know

21  why that occurred.

22           There may be many other factors so I would

23  never want to imply that, but if anything, there was

24  an increased rate using that device.  But that's --

25  but --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

113

1          So let's see.  The overall answer, you're

2     asking do I imply that.

3          Q.   I'm happy to ask you another question,

4     doctor.  I think --

5          A.   I'm -- I'm looking into it, --

6          Q.   Okay.

7          A.   -- but I don't see any difference --

8     statistical difference between those.  And I would say

9     no, they do not increase risk of infection.

10          Q.   Based on your answer, then, I would take it,

11     for the jury who is going to hear this, that you still

12     have an open mind as to whether some forms of forced-

13     air warming may actually contribute to contamination

14     of the surgical site.

15               MR. C. GORDON:  Objection --

16          A.   I have an open mind always to anything -- a

17     lot of things that you may ask me, as you see that I

18     do a lot of research projects, so I'm always looking

19     for signals or ways to -- to help patients increase

20     their safety, be aware of any trends or things --

21          Q.   So as we sit --

22          A.   -- that cause --

23          Q.   Sorry.

24          A.   -- that cause problems with patients.  I

25     have an open mind with all these things.  As we sit

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

114

1   here today, I don't think that there is a problem

2   with -- with those two forced-air warming devices.  I

3   don't have tremendous knowledge of any of the other

4   forced -- forced-air warming devices, so -- which is

5   part of your previous questions that I couldn't answer

6   exactly.

7       Q.   So as we sit here today, you have not ruled

8   out the Mistral or other forms of forced-air warming

9   that you haven't evaluated being a potential

10  contributor to contamination of the surgical site.

11          MR. C. GORDON:  Object to the form of the

12  question.

13      Q.   You haven't looked at those.  You haven't

14  ruled them out.

15      A.   Wasn't part of what I was being asked to do.

16      Q.   So the answer is you have not ruled those

17  out; is that fair?

18      A.   Yes.

19      Q.   Okay.  When did the Cleveland Clinic switch

20  to the Mistral from the Bair Hugger?

21      A.   I can look at this abstract, and I think the

22  exact date --

23          There's an abstract as one of the exhibits,

24  it's Exhibit 11.  This represents a study comparing

25  the --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

115

1       Q.   And -- and doctor, just -- not to interrupt

2    you, let me catch up with what you're saying.  I'm --

3    we're going to ask you about that, but my question

4    right now is just do you know when the Cleveland

5    Clinic switched to that device?

6       A.   I can't --

7            I'd like to give you an exact date --

8       Q.   I don't need an exact date.  Approximately.

9    Couple of years ago?

10      A.   I think around 2014 --

11      Q.   Okay.  And --

12      A.   -- but I don't --

13           I apologize.

14      Q.   Do you know --

15      A.   I think it's about 2014.  I don't know if

16   that's an exact answer, whether it was my orthopedic

17   department that switched or the Cleveland Clinic,

18   because you asked me about Cleveland Clinic, so the

19   better answer would be around 2014 for joint

20   arthroplasties is when the switch was made.

21      Q.   And that's all I'm looking for is your best

22   recollection, doctor.

23      A.   Okay.

24      Q.   That's fine.

25           Do you know why they switched?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

116

1      A.   The best of my knowledge, when I asked this,

2   it was a cost issue.

3      Q.   Okay.  Can you give me any details about

4   that?

5      A.   I think that it was just a matter -- what --

6   what we do at --

7           We have a supply chain department that looks

8   at different devices.  When they see -- they get

9   different bids every few years for different products,

10   and if they see equivalent devices, they get --

11   they -- what they presume are equivalent devices --

12   that's just an example -- they would look at -- they

13   would try to get the best bid.  Cleveland Clinic is a

14   large provider, and when you get competitive bids at

15   reduced prices, they save a lot of money.

16      Q.   Who told you that?

17      A.   So --

18           Who told me?  That's what I -- that's part

19   of my role here, is to be looking at supply chain

20   things for the whole department.

21      Q.   I'm sorry, let me narrow my question,

22   doctor.  My question is if you knew why they switched

23   and you indicated it was a cost issue.  Who told you

24   that?  That's what I'm asking.

25      A.   I don't remember who -- I --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

117

1          I brought it up when I got here at a -- one

2   of the joint arthroplasty clinics.  To the best of my

3   knowledge it -- one of the orthopedic surgeons --

4          There is a supply chain committee that makes

5   these decisions for the whole institution.  I can't

6   tell you exactly how many people are on the supply

7   chain committee.  It's about 15 or 20 would be a

8   guess.  But that group, two of them are

9   orthopedists --

10     Q.    Who are they?

11     A.    I don't know if I should be telling you

12  names of people that are not involved, so I'll --

13  I'll -- I'll ask --

14     Q.    Doctor --

15     A.    -- I'll ask my lawyers.  I don't want to --

16          Two of them are orthopedists, one of them

17  is -- in particular is a joint arthroplasty

18  surgeon, --

19     Q.    Well I'm going to need their names.

20     A.    -- one of them is a pediatric surgeon --

21     Q.    There's nothing privileged about their

22  names, doctor.  I'm going to need their names.

23     A.    I'm going to continue with my answer,

24  please.

25     Q.    No.  So you're refusing --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

118

1      A.   Can -- can I -- can I continue with my

2   answer without being interrupted?  You asked me a

3   question.  I'm trying to answer the question.

4      Q.   The question is:  Who are the doctors?

5      A.   Okay.  I haven't finished my answer and you

6   keep --

7           You've interrupted this answer about five

8   times.  Five.  Would you --

9      Q.   Do you want him to read back the question?

10     A.   I don't need to be --

11          I'm in the middle of answering the question

12  you asked four --

13          Let's -- let's take a time out.

14     Q.   Doctor --

15     A.   Let's take a time out.  We're not going to

16  continue where you ask me a question, in the middle of

17  my answer you've interrupted me five times.

18     Q.   Doctor, if you need a break --

19     A.    In fact, I'm giving this fellow a break

20  because he made the comment as well as me.

21     Q.   I'm trying not speak when you speak, doctor,

22  for his sake.

23     A.   We're taking a timeout.

24     Q.   But for the record, --

25     A.   We're taking a timeout.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

119

1      Q.   -- I'm objecting to the break.  We're still

2   on the record and I'm objecting to the doctor walking

3   out of the deposition.

4           MR. C. GORDON:  And we're on --

5           We're taking a break.

6           THE REPORTER:  Off the record, please.

7           (Recess taken.)

8   BY MR. B. GORDON:

9      Q.   Did you have a good break, doctor?

10     A.   Yes.

11     Q.   Let's back up for a second, maybe make this

12  a little simpler.

13          And one thing I probably forgot, I don't

14  know what we said what the Mistral is.  Could you tell

15  the jury what the Mistral is?

16     A.   I don't know everything about the Mistral,

17  but it's a forced-air warming device that has a

18  HEPA-type filter, would be one of the features.  I'm

19  trying to think of some of their -- of the other

20  features.  There's one I can't remember right now.  I

21  could look at the abstract.  But I'm happy to --

22          I didn't focus a lot of this on that device.

23     Q.   Well for the jury that may read this, one

24  thing is they're quieter than the Bair Hugger; aren't

25  they?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

120

1      A.   I don't know that.

2      Q.   Okay.  Do you know whether they cause

3  lofting of the blanket up off of the patient like the

4  Bair Hugger?

5           MR. C. GORDON:  Object to the form of the

6  question.

7      A.   I can't give you an answer to that.

8      Q.   Well you use them; right?

9      A.   Well I haven't noticed --

10     Q.   Lofting?

11     A.   -- lofting that bothers me with the Bair

12  Hugger or the Mistral.

13     Q.   Well --

14     A.   There hasn't --

15          I don't know what you -- how you term

16  "lofting."  I don't notice it, that it -- it to me

17  affects my surgery or --

18     Q.   To be fair, doctor --

19     A.   -- insurance.

20     Q.   Sorry.

21          To be fair, doctor, you know that the Bair

22  Hugger blankets are well known to loft up off of the

23  patient unless you put extra blankets on top of them;

24  right?

25          MR. C. GORDON:  Object to the form of the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

121

1    question.

2        Q.   You know that.

3        A.   That doesn't typically --

4             It hasn't been something I'm concerned

5    about.

6        Q.   Well, not concerned about it, but it

7    happens; right?

8             MR. C. GORDON:  Object to the form of the

9    question.

10       Q.   Is it your testimony under oath that Bair

11   Hugger blankets do not loft up off of the blanket --

12   off of the patient unless you put extra blankets on

13   top of them?  Is that your testimony?

14            MR. C. GORDON:  Object to the form of the

15   question.

16       A.   I don't have -- I don't have an answer to

17   that one way or the other.

18       Q.   Well do other orthopedic surgeons talk about

19   that?

20       A.   No.

21       Q.   Okay.  So if another orthopedic surgeon

22   comes into trial and testifies if that happens, he's

23   lying, he's mistaken?

24       A.   Excuse my answer to -- when I said "no."  To

25   the best of my knowledge it's not a part of our --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

122

1        I can't say no.  Other orthopedists may talk

2   about what you're talking about, but I haven't

3   witnessed the thousands and thousands of orthopedic

4   surgeons that I encounter talking about that.

5        Q.   You mentioned that the Mistral has a HEPA

6   filter whereas the Bair Hugger does not; correct?

7        A.   Correct.

8        Q.   And that's a higher level of filtration, the

9   HEPA filter, than the MERV 14 filter or the M20

10  filter, or however you want to describe it, that is in

11  the Bair Hugger; isn't that right?

12       A.   I don't know how you're defining "higher

13  level."  You -- you're defining it filters a certain

14  amount -- it --

15            It does have a higher filtration efficiency

16  for certain size particles, if that's how you are

17  defining "higher level."

18       Q.   Are you an expert on filtration efficiency,

19  doctor?

20       A.   No, I'm not an expert on filtration

21  efficiency.

22       Q.   You're not an engineer; right?

23       A.   I am not an engineer.

24       Q.   Have you ever designed a patient warming

25  system of any kind?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

123

1      A.    No, I have not.

2      Q.    And you would then defer to others in terms

3  of the differences in filtration efficiencies between

4  different patient warming devices I assume?

5           MR. C. GORDON:  Object to the form of the

6  question.

7      A.    Not necessarily.

8      Q.    So you would not defer to experts in those

9  areas on the questions of filtration efficiency level?

10          MR. C. GORDON:  Object to the form of the

11  question, lack of foundation.

12     A.    I think there are others, and even in

13  this -- in this trial, who are more expert than me,

14  but that doesn't mean I'm always going to defer to

15  others.  If you were pitting me right now against many

16  other orthopedists, because of the nature of this case

17  I might know a little bit more about the filtration

18  than a standard orthopedist, but --

19          So I don't know what you're asking.  If you

20  want me, I can say that, yes, there are experts in

21  this case that will talk about the filtration --

22  filter that I would defer to --

23     Q.    And you --

24     A.    -- on those issues.

25     Q.    Thank you.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

124

1          And you brought up the fact that the Mistral

2   has a HEPA filter unlike the Bair Hugger; correct?

3          A.   Yes.

4          Q.   And are you aware that HEPA filters cost

5   more than non-HEPA filters, doctor?

6          A.   I would imagine they do, because --

7               I don't know exactly what the costs are, but

8   I imagine -- hmm.

9               Obviously, laminar flow has HEPA filters.

10  I'm trying to think where I would know -- know that.

11              So the question is do --

12         Q.   HEPA filters --

13         A.   -- HEPA filters cost more than what filters?

14         Q.   Non -- non-HEPA filters.

15         A.   It would --

16              You would have to tell me what was the

17  non-HEPA filter.  I mean I -- I don't know the real --

18  I never looked at costs of things like this.  There

19  prob -- there might be --

20              Like what is there, the other filters?

21  There's an ultrafilter.  What is that?

22         Q.   Doctor, would --

23         A.   If there's an ultrafilter, that might be

24  more expens -- would be considered a non-HEPA filter

25  that in the category of your question might be more

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

125

1  expensive than a HEPA filter.  So I don't -- I --

2          The reason I brought it up is because a

3  number of articles that I have seen -- and I'm

4  volunteering something now -- mention the need for a

5  HEPA filter on the device used here, on a forced-air

6  warming device, and yet here is a forced-air warming

7  device that has a HEPA filter and had no difference in

8  infection rates.  That's --

9          (Witness's cellphone rings.)

10     Q.   And we'll talk about that in a moment.

11     A.   I'm volunteering that.

12          THE WITNESS:  I won't answer.

13          MR. B. GORDON:  Do you need to take a break,

14  doctor?

15          THE WITNESS:  No.

16     Q.   Okay.  And we'll talk about that in a

17  moment.  But that's at least one difference between

18  the Mistral and the Bair Hugger that you mentioned.

19  The Mistral has a HEPA filter, the Bair Hugger does

20  not; correct?

21     A.   Correct.

22     Q.   And would it surprise you if an expert came

23  into court and testified that a HEPA filter costs more

24  to manufacture than a non-HEPA filter?  Would that

25  surprise you?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

126

1      A.   It wouldn't surprise me.

2      Q.   And yet it's your testimony that the reason

3 that the Cleveland Clinic switched to use of the

4 Mistral system from the Bair Hugger was strictly a

5 cost-savings issue.  Isn't that what you told us?

6           MR. C. GORDON:  Object to the form of the

7 question.

8      A.   Yes, but the cost might not be only the

9 filter, --

10     Q.   Well --

11     A.   -- might be other reasons.

12     Q.   And that's why I wanted to find out more

13 information.  And now that you had a break and talked

14 to counsel, can you give us the names of -- let me

15 finish, please -- can you give me the names of anyone,

16 orthopedic surgeons or otherwise, who may have been

17 involved, to your knowledge, on the decision to take

18 out the Bair Hugger and replace it with the Mistral at

19 the Cleveland Clinic?

20     A.   So I don't know if they were involved

21 because they're on the supply chain now; they may not

22 have been on it.  Two were Robert Molloy --

23     Q.   Molloy?

24     A.   Molloy, M-o-l-l-o-y, Robert, and David Gurd.

25     Q.   How do you spell that one?

127

1        A.    G-u-r-d, David.

2        Q.    And they're both orthopedic surgeons at the

3   Cleveland Clinic?

4        A.    Yes.

5        Q.    Anyone else you can think of as we sit here?

6        A.    No, I don't know who else is on that supply

7   chain.  And they -- in addition, they may not have

8   been involved when that decision was being made.

9        Q.    Do you know -- and I'll follow up on that

10  last answer -- do you know, then, who made the final

11  decision?

12       A.    If you want as my answers to you, trying to

13  be as responsive to you as possible, these are the

14  type of things I can try to find out if you would

15  like.

16       Q.    I appreciate that.  I -- I would -- I would

17  follow up and ask you, doctor, if you would let

18  counsel know, to provide us with the names of anyone

19  that you believe may have been involved in the

20  decision to switch from the Bair Hugger to the

21  Mistral, we'd be grateful for that.  Thank you.

22  You'll do that for us?

23       A.    I'm writing it down, yes.

24       Q.    Thank you, sir.

25             All right.  Let's talk about that abstract

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

128

1   that you mentioned.  I think it was Exhibit E to your

2   expert report, and I think he's marked it as --

3           MR. B. GORDON:  Sorry, do you want to say --

4           MR. C. GORDON:  Eleven.

5           MR. B. GORDON:  Okay, thank you.

6       Q.   -- Exhibit 11.  You have that in front of

7   you; right, doctor?

8       A.   Yes.

9       Q.   So first of all, this was not --

10          Well let me ask you first:  You were not

11  involved in any way in this study; is that fair?

12      A.   I was not involved with this study.

13      Q.   And this was not a random controlled

14  trial -- a randomized controlled trial; was it,

15  doctor?

16      A.   No, it was not.

17      Q.   So was there any --

18          I mean do you know what they did with

19  respect to issues like -- on the patients involved

20  concerning things like the type of skin prep that was

21  used, whether it was chlorhexidine as you mentioned or

22  something else?

23      A.   Can you ask me the question better?  I -- I

24  don't want to --

25      Q.   Sure.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

129

1     A.    -- give you an answer that I'm giving you

2   that may not be the answer --

3     Q.    Absolutely.

4     A.    -- you want to hear about.  I don't know

5   exactly what you're asking.

6     Q.    I'll be happy -- any time you want, I'll try

7   to rephrase things.

8         Let me ask you first:  Do you know who

9   funded the study?

10    A.    To the best of my knowledge, 3M funded this

11  study.

12    Q.    Okay.  Thank you for that.  Do you know

13  what -- well I --

14        Let me ask you:  This was a retrospective

15  study; right?

16    A.    We have a database that we keep of -- of all

17  the joint replacements that are done.  The database

18  goes back like over 10 years.  Some information is

19  more robust than others; keeps getting better and

20  better.  The -- our -- our database the last -- for

21  example, last year's is -- last year or two is even

22  superior, like '16 and '17, because we have a new

23  database that -- that patients get entered right away.

24  But we have not only --

25        I don't know exactly how they did this, but

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

130

1    we had databases there with great information.  That's

2    part of the pride of what Cleveland Clinic does with

3    their studies.  That's why they're --

4              But in addition, there are a lot of research

5    fellows; namely, I believe, right now as we're sitting

6    here there are eight research fellows that are just in

7    the joint arthroplasty division.  So -- so if you look

8    at this paper, there were two -- the first two authors

9    are research fellows, so to some extent they were able

10   to look at the existing databases.  Again, I don't

11   know this, but I imagine, since I'm involved every

12   week in the studies, that's pretty much probably how

13   it was done, they looked at the databases.  But I

14   could be --

15             Another thing that I -- to finish this

16   answer, Cleveland Clinic keeps a lot of records on --

17   on SSIs, wound infections and deep infections as part

18   of quality control, so some of this data could have

19   been gathered from knowing -- from the quality control

20   records as well.  So there's a combination of

21   different sources for not only getting the data but

22   also confirming that the data was accurate.

23             MR. B. GORDON:  All right.  Objection, move

24   to strike, non-responsive.

25        Q.   And doctor, I'm not meaning any disrespect,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

131

1   but I want to be clear this time.  I didn't say a word

2   in -- during that five-and-a-half-minute answer out of

3   respect for Mr. Stirewalt now, how hard he's working

4   here and how bad the record's going to be if we don't

5   all comply.  So my question -- and he can read it back

6   if you don't believe me -- was simply:  This was a

7   retrospective study; wasn't it, doctor?  Now I'm just

8   asking --

9        A.   But --

10       Q.   Let me finish.  Let me finish.

11            And I'm just asking you to work with me.  I

12   understand your whole answer was intended to give me

13   all this information about how robust the Mayo -- I'm

14   sorry, another robust clinic out there -- the

15   Cleveland Clinic is and all, and that's all well and

16   good, but if you give me a five-minute answer to every

17   question that I'm just asking for is it a

18   retrospective study or not, we'll never get done here,

19   doctor.  Do you understand that?

20       A.   I apologize to you.

21       Q.   Thank you.  I appreciate that.

22            So is it yes, it's a retrospective study?

23       A.   Yes.

24       Q.   And -- and that's okay; right?  I mean it

25   has its value; right?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

132

1      A.   Yes.

2      Q.   Just the fact that it's not a random

3   controlled -- randomized controlled trial doesn't mean

4   it's worthless; does it?

5      A.   Correct.

6      Q.   Okay.  Thank you.

7           Do you know if the differences in this study

8   were stratified by or -- or analyzed by total hip

9   arthroplasty versus total knee arthroplasty?  Did they

10  say that?

11     A.   I'd have to look.  Since I wasn't involved

12  in this study, I don't know all the details of the

13  study, so I -- I'd have to look right now.

14     Q.   All right.

15     A.   Pretty much all the study that I know about

16  is on this page.

17     Q.   Yeah.  It's a one-page abstract and an

18  attachment with three tables on it; right?

19     A.   Right.  So if you want me to answer that

20  question, I'd have to look at this a little more

21  carefully now.

22     Q.   Sure.  And -- and --

23     A.   That's all the knowledge I'm going to know.

24     Q.   Sure.  And while you look at it, I'm going

25  to ask one more question, but then go ahead and look

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

133

1    at it.

2              The full paper is coming out in like a week

3    or so; isn't that right?

4         A.   Well the presentation will be at the MSIS

5    meeting, and I can't tell you when the full paper will

6    come out.  It -- it's not going to be a week or so, it

7    will probably --

8         Q.   I thought there was an indication in looking

9    in your -- in your report or somewhere that it was

10   coming out on August 5th.

11        A.   The presentation is August 5th.  If I said

12   the paper is, then I was mistaken.

13        Q.   And that's MSIS.  Where is that?

14        A.   I don't know where it is this year.  I'm not

15   going.

16        Q.   What does that stand for for the jury?

17        A.   Musculoskeletal --

18        Q.   Something Society?

19        A.   -- In -- Infect --

20             It might be Musculoskeletal Infection

21   Society.  If you want, in the break I can look that up

22   and I'll give that to the court reporter.

23        Q.   That's all right.  But you're not going to

24   it.

25        A.   And I can tell you -- I'll be able to tell

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

134

1   you the exact dates and where it's located because I

2   didn't have those answers for you, but I can get those

3   easily enough.

4       Q.   And when you say "the presentation," you

5   mean there won't be any more written documentation

6   presented in this, or do you know?

7       A.   Not all meetings but this meeting in

8   particular is presented and then it's -- and then the

9   presentation, I would assume, would be some time

10  like --

11          Well, I don't want to go crazy on this

12  answer.  You're asking me can I go and tell you the

13  sequence here about how this will go towards

14  presentation?

15      Q.   Actually, let me withdraw and ask another

16  question because it reminded me while you were

17  talking.

18          What leads you to believe that 3M funded

19  this study?  How do you know that?

20      A.   I don't know whether I got that information

21  from the legal team or I got that from Carlos.

22      Q.   Who is Carlos?

23      A.   Oh, I'm sorry.

24      Q.   One of the authors?

25      A.   Carlos Higuera is the senior author here.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

135

1       Q.    So if I wanted --

2       A.    In fact, no, I know that, that he applied

3   for funding and they give him some funding.  And why

4   do I know that?  Because I have to sign off on all

5   these studies --

6       Q.    All right.

7       A.    -- and proposals, --

8       Q.    As the chairman?

9       A.    -- so they -- so they --

10           Yes.

11      Q.    Okay.  Fair enough.

12      A.    So they would have been --

13           That would have come.

14      Q.    Fair enough.

15           One question I had about this, and I realize

16  it's limited information and if you can't tell it from

17  the paper, that's okay, but I notice they had data on

18  one set of patients from 2013 and one from 2015, which

19  I think, you know, is the non-Bair Hugger group or

20  the -- what they call the FAW-HEPA group, presumably

21  that would be the Mistral group, and that's because

22  they had to wait until after they switched to the

23  Mistral to have those data, I assume; right?

24      A.    Well you -- I --

25           MR. B. GORDON:  Do you have our copy of

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

136

1   this?

2        A.   I don't know what you're asking me exactly,

3   but you do want to wait a year to see the -- is there

4   an infection.  If you're looking at infections, you

5   don't -- you do the procedure and then you wait to see

6   how many infections occur in that year to see an

7   infection rate.

8        Q.   So is your testimony they should look out to

9   a year to see how many people --

10       A.   Not necess --

11       Q.   -- are infected?

12       A.   I don't know what they did, if they looked

13  at 30-day infection rates or 90-day.  It used to be a

14  year by the --

15       Q.   CDC.

16       A.   -- by the CDC, but I think they've changed

17  some of their criteria to 90 days now.  I don't want

18  to say that with a mistake.

19       Q.   And if they only look to 90 days here,

20  wouldn't that be a concern to you as an orthopedic

21  surgeon knowing that sometimes patients don't get

22  followed up on and don't report infection

23  complications until after 90 days?

24       A.   It wouldn't be a concern about the study if

25  they were consistent, they looked at 90 days in the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

137

1   2013 group and 90 days at the 2015, as long as they're

2   reasonably consistent in what they're looking at, --

3       Q.   Well --

4       A.   -- if that's what you're asking.  I -- I

5   don't know if that's what you're asking me.

6       Q.   Not exactly.  Let me ask it this way:  If

7   they only looked at patients out to 90 days, isn't it

8   possible and in fact in your vast experience as an

9   orthopedist isn't it likely that people -- patients

10  after 90 days may have developed and been diagnosed

11  with periprosthetic joint infections after 90 days but

12  in less than one year that -- that aren't going to be

13  found in this?

14      A.   It's likely that that will occur, but a lot

15  of periprosthetic ones -- and that's why the CDC, I

16  believe, changed their stance to 90 days, because the

17  majority -- and I can't tell you whether that's an 80

18  percent majority -- are typically found within the

19  90-day period.

20      Q.   Can you --

21      A.   There are -- there are certainly --

22           The answer to your question, yes, it's

23  likely that there will be cases that occur between 90

24  and a year that would have been undetected before the

25  90 days.  I think that's what you're asking me.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

138

1        Q.   Yes, sir.  Thank you.

2             So the 2013 was the set of patients who were

3    before the Cleveland Clinic switched to the Mistral,

4    that was the Bair Hugger group or the -- what they

5    call the non-HEPA group or -- or the CFAW group I

6    think they refer to it as, the 2015 cohort are the

7    patients who received treatment using what they call

8    the FAW-HEPA or the Mistral that Cleveland Clinic is

9    using now.

10            What about 2014, why didn't they include any

11   patients from 2014?

12       A.   Okay.  First of all, anything you're asking

13   me, I mostly would have to read this very carefully

14   because, number one, it hasn't been presented, I don't

15   know all the details, and a lot of the details of what

16   I know is exactly what you know.  We can read this

17   together if you want me to give you an answer, and I

18   can --

19            Now I can help you because I read abstracts

20   all the time, so if you can -- I could try to read

21   this and try to help you with an answer and say why

22   didn't they do the 2014.  I gave you a guess before

23   about when this switched and I guessed right, I

24   believe, 2014, but I don't know when in 2014, so it --

25            A potential answer to what you just asked me

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

139

1    could be that there was a switch that they didn't want

2    to confuse, or there could have been an irregular

3    switch, that would be a second hypothesis -- again,

4    that's complete conjecture -- that they -- they still

5    had Bair Hugger devices that were being mixed with

6    Mistrals so they didn't want to contaminate their

7    results, and then when they purely switched fully

8    over -- I don't -- I don't --

9           I'm making that up because that's just a

10   hypothesis of an answer very carefully to your -- your

11   question about 2014.  If you want, I'll relook at this

12   abstract to see if I can get a better answer for you.

13       Q.   That's fair enough, doctor.  I mean "I don't

14   know" is a perfectly fair answer.  However, if you do

15   need to read that one page to answer any of these

16   questions definitively, I'm happy to have you to do

17   that in the next couple minutes.

18       A.   Can I read this one paragraph?

19       Q.   Go ahead.  And I'll stretch my legs when you

20   do that.

21       A.   Okay.

22           Okay.

23       Q.   Go ahead, doctor.

24       A.   So I read the abstract and the best -- to my

25   best of knowledge, the abstract says that they

140

1  switched in 2014, there is no knowledge whatsoever,

2  but what it says is they used the 2013 group for

3  the -- which would be pre -- before the 2014 switch,

4  and they used the 2015, and we have no data on why

5  they didn't include 2014.  So some of my previous

6  comments could be any or none of the reasons for why

7  they didn't do that.

8      Q.  You would -- thank you, doctor.

9          You would agree with me there are a number

10 of limitations of this study; right?

11     A.  There are a number of limitations of any

12 published study.

13     Q.  Including this one; right?  And they even

14 talk about some of them.

15     A.  There are always limitations of any study.

16     Q.  First, it's a very weakly-powered study; is

17 it not?

18     A.  I -- I didn't look at that part.  If you

19 want me to look at that, where -- where --

20     Q.  Well can you look -- certainly.  Can you

21 look at the numbers, and they disclose the specifics

22 in passing and then in detail on the second page.  And

23 my question:  As you read those numbers, are they

24 sufficiently powered to give you a definitive answer

25 to the question?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

141

1          A.    Okay.  Let me -- let me take a minute and

2     read the "Results" section and then the next table.

3                Okay.  I can answer.

4          Q.    Thank you, sir.  I'm ready.

5          A.    I don't know where we're saying that --

6     necessarily that this is a weakly-powered study,

7     unless you point that out to me, something that I

8     missed in their methods.  I think that I'm very happy

9     with what I'm seeing here, that they didn't just look

10    at infection rate, they actually adjusted to factors

11    in a logistic regression model for age, gender,

12    Charlson index -- that's C-h-a-r-l-s-o-n -- index

13    score, which is an indication of morbidities, body-

14    mass index and operative times, they did that, so I

15    like the way that was done.  I think that the --

16                What I'm really looking at here is this deep

17    infection rate which was -- which was higher for the

18    Mistral device, 20 versus 13.  I can't tell you about

19    the power of superficial infections or that.  But to

20    me we're talking about a study with -- with thousands

21    of patients in it; the total number of patients are

22    5,400, so it's -- it's pretty good.  Obviously, when

23    you do studies like that, sure, we'd like to have as

24    many patients as possible, but it would be pretty hard

25    for me to imagine with that deep infection rate of

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

142

1   being .77 versus .47 in 2600 patients versus 2700

2   patients, that's pretty reasonably powered for that

3   endpoint right -- right there.

4        Q.   So let me ask you that.  What --

5   specifically, what was the power of this study to

6   detect differences in these two different groups?

7        A.   I don't know the power.

8        Q.   Okay.

9        A.   I don't at this -- as I'm sitting here.

10       Q.   Then I'm going to move on.  I don't want to

11  press on things you're not --

12            If you don't know, that's okay.

13            Let me ask you this:  Did they use the CDC

14  NHSN definitions of SSI and PJI in this study?

15       A.   They would have used the --

16            I don't know which definitions you are

17  referring to.  They would have most likely used the

18  MSIS -- which is the same group where this is being

19  presented -- definitions of SS -- SSI and deep joint

20  infections, but that's in concordance with the CDC.  I

21  think they're equal.

22       Q.   Well what they say, doctor, as you partly

23  stated, is that "Prosthetic joint infection (PJI) was

24  defined as reoperation with arthrotomy or meeting MSIS

25  criteria for PJI.  Surgical-site infection" --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

143

1          A.    All right.

2          Q.    -- "(SSI)" -- let me finish -- "was defined

3     as a wound complication treated with antibiotics or

4     irrigation and debridement."

5               And my question is:  Does that comport with

6     CDC definitions for PJI and SSI?

7          A.    So I'll amend since -- since as --

8               I'm at a disadvantage because I haven't

9     answered your questions and read this abstract for

10    your questions, so I will amend my answer to say that

11    I don't --

12              They obviously expanded their definition of

13    infections to MSIS criteria, and then they added

14    people brought to the OR and what you just read, and I

15    can't -- we'd have to go and look at the CDC

16    guidelines, which change, and see exactly how it

17    corresponds for me to really answer that question.

18         Q.    Fair enough.

19              Do you know what surveillance was done on

20    these patients for SSIs and PJIs?  I mean did they

21    call the patients, did they see them in the clinic at

22    90 days, or -- or did they just see if there was

23    evidence that they got readmitted, or do you know?

24         A.    We have --

25              Well that's where you're asking me how we do

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

144

1  it.  I've been here since 2016 and 2017 and we --

2  we -- we have a followup at three months of as high as

3  anybody -- I can proudly say that -- we have a

4  followup that's -- at three months that's like over 99

5  percent.  Or I -- I won't say 99.  Let's just say at

6  three months we're like in the high nineties, we're as

7  high as anybody not only in the country, in the world.

8  And we're trying to get the six-month followup also

9  close to that level at the present time.  And that is

10  pretty --

11        So that -- that's probably the best answer

12  I -- I can give you.  And there's tremendous quality

13  control.  And that's for the entire cohort of joint

14  arthroplasties, hip and knee, that are done at

15  Cleveland Clinic.

16        So clearly, the best answer is could there

17  have been an infection that we missed?  Yeah, that can

18  al -- that went to another institution.  But it's less

19  likely because we do try to follow up a hundred

20  percent of our patients, and typically the problem

21  patients are seen and not ignored.

22     Q.   But doctor, this is a retrospective

23  analysis.  This is the doctors, probably employing

24  nurses or research assistants, going back

25  retrospectively and looking at patient records, seeing

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

145

1  who was exposed to one product, who got which outcome,

2  who was exposed to another product and got perhaps

3  another outcome.  And what I'm asking is:  Did -- do

4  you know what the process was for surveillance of this

5  retrospective study?

6         MR. C. GORDON:  Object to the form of the

7  question.

8     A.   Well I think I answered I don't know exactly

9  that.  If there were -- for example, if there were

10  negative -- not negative values, if there were open

11  values that they didn't have followup on X patient,

12  did -- did they actively go and look at that?  I

13  believe, based on what they've done in past studies,

14  they proactively went to make this data as robust as

15  possible.  What's --

16         That wouldn't be contained in an abstract,

17  but you would expect that that type of information

18  would be found in the actual paper of what percent

19  followup, in answer to your questions, and I can't --

20  I could only surmise from what I know has been done in

21  my year there and what I know has been done, because

22  I -- I'm not just a year there, I know what they've

23  done in their other studies, so that's why I am able

24  to give you a little bit better than just simple

25  conjecture.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

146

1        Q.   Well that's why I'm asking you though.  They

2   didn't disclose that here specifically; did they,

3   doctor?

4        A.   No.  So we're sitting here with a lot of the

5   information that's me and you looking at this and

6   trying --

7        Q.   Right.

8        A.   -- to surmise what they did.

9        Q.   And another question I have on that -- on

10  that same line is:  Were these patients all cultured,

11  or did they just go by their own review of the records

12  and make a subjective determination of whether it was

13  an SSI or a PJI?

14            Makes a big difference; doesn't it?

15       A.   I -- I think that they are incredibly -- at

16  Cleveland Clinic they are incredibly fastidious about

17  looking at infection rates.  This is an institution,

18  not only for orthopedics but for every -- every

19  department, this is an institution that is number two

20  in the country and they want -- and a major part of

21  that are infection rates, and they have quarterly

22  meetings and they're looking at every single mini

23  spike and looking at quality control and they're

24  looking at different things like that.  So it's not a

25  simple thing of what you just said.  They are -- they

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

147

1  are fastidious at checking every patient and not just

2  a few little blips in a retrospective study.  This

3  was --

4           In some ways you could say that this was all

5  being done prospectively.  This specific was -- right?

6  It was prospectively collected data, but they --

7  they --

8           Another way to look at this is a ret --

9  retrospective review of prospectively collective --

10  prospectively collected data.

11      Q.   Well doctor, I'm not sure I understand what

12  that means, I mean "prospectively collected data."

13  They're looking at the records and retrospectively

14  extracting what was done to crunch their analysis and

15  do their univariate and multivariate analysis.

16  There's nothing in here that says they called these

17  patients back in to do new testing; is there?

18           MR. C. GORDON:  Object to the form of the

19  question, --

20      Q.   Is that what you're saying, --

21           MR. C. GORDON:  -- move --

22      Q.   -- prospectively collected data?

23      A.   That's not what I said.

24      Q.   Well what does that mean?

25      A.   Well when the year is two thousand --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

148

1          Let's even go before the study just to turn

2     this over.  2010 and '11 and '12, before the study,

3     all these patients were being followed like hawks on a

4     quarterly basis institution-wise, and they were doing

5     their best to try to get like a hundred percent

6     followup.  I mean this goes to 90 days.  I looked at

7     this to make sure that we're not missing any

8     infections; they're checking them out, they're keeping

9     the quality control, they're very concerned about

10    infection in this institution.  That's why they are

11    ranked very high.  So therefore, prospectively there

12    is a quality initiative that goes on that looks at

13    every infection and characterizes them.  Often it

14    would go to me or a person in quality control, so it's

15    not totally that we just retrospectively looked at a

16    bunch of these and called people back.

17         Q.   But it's fair to say, isn't it, doctor, that

18    from this abstract, --

19         A.   Yes.

20         Q.   -- because it's all we have right now, we

21    don't know if -- because they didn't tell us -- if

22    they're looking at cultured pathogens versus

23    subjective determinations of SSI versus PJI; do we?

24    We don't have that evidence.

25         A.   So I'm going to just answer that that for

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

149

1    this abstract we have what the abstract says, and I

2    would be -- just as I offered before to give you more

3    information, I would be happy to go back, I would

4    prefer to do it after he presents August 4th, and

5    answer --

6            If you give me a list of questions like

7    this, I'll be happy to answer, you know, any or all

8    the questions you have.  Just give me a list.  I'll go

9    right --

10   Q.   Well doctor, you understand --

11   A.   I -- I hear what you're saying.  I'd love to

12   be responsive to you and I'll answer any of these

13   questions, but again, I have a bit of what you have on

14   this abstract.

15   Q.   You understand this is my day to take your

16   deposition; right, doctor?

17   A.   Yes.

18   Q.   And I appreciate your offer to provide us

19   additional information, and if counsel will let you do

20   that, I'll be happy to get it, but it might involve

21   reopening your deposition.  Do you understand that?

22   A.   Just as I've offered you, I have three other

23   things where you've asked me for questions.  I'm just

24   offering this.  I think it's up to the -- you and

25   counsel to decide what you want to do, and I'm here to

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

150

1   help.  If I have to be open to another deposition, I'm

2   open to another deposition.

3       Q.   Well we appreciate that, doctor.

4            I guess let's just end this discussion of

5   this abstract with the agreement that there's a lot of

6   information that neither one of us has answers to

7   based on what we have in this abstract; is that fair?

8            MR. C. GORDON:  Object to the form of the

9   question.

10      A.   I'm going to say I feel very comfortable

11  with this abstract and the results because I know the

12  quality of the re -- the two of the researchers -- no,

13  three of the researchers and what they put out and how

14  they did this analysis.  So I feel, even though there

15  are questions with this paper as there are with any

16  published paper, any published paper, I feel very

17  comfortable with what this abstract is saying and the

18  message that it's delivering.

19      Q.   And yet you in -- indicated earlier when we

20  first talked about it that -- that you had concerns

21  about the increased or apparent increased infection

22  rate in some of the patients with SSIs found in this

23  study; right?

24           MR. C. GORDON:  Object to the form of the

25  question.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

151

1      A.   It's just me looking at an abstract and

2  seeing that that number is a little higher.  I may

3  not -- have concerns or I may not.  I'm going to --

4  I'll come back after I've looked at this.  Actually

5  this week I said I'm --

6           I think maybe that's worth just a little

7  query.

8      Q.   In terms of your background, real quick,

9  since this is a Stryker product, you do a lot of

10  consulting work or work of one kind or another for

11  Stryker Corporation; don't you?

12     A.   Yes, I do.

13     Q.   In fact, they've paid you well over a

14  million dollars to date; haven't they?

15     A.   Yes.

16     Q.   What about DePuy, a J&J company, how much

17  have they paid you to date?

18     A.   They paid me indirect --

19           They paid me nothing to date, --

20     Q.   Well they've --

21     A.   -- the company.  Indirectly, I've defended

22  them in some of the metal-on-metal cases, if you want

23  me to include that.

24     Q.   When you say "defended them," you've

25  testified in deposition and trial against patients on

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

152

1  behalf of DePuy in those metal-on-metal hip cases,

2  like the ASR case; right?

3      A.   Correction on my answer.  I may have

4  defended them or --

5          I was there as an objective -- as we said

6  earlier -- as an objective witness, fact-finder,

7  subject, person there to -- on their -- whatever you

8  want to say.  I don't want to get caught up in saying

9  the wrong legal terminology because I'm not a lawyer.

10     Q.   So how much have they paid you

11 approximately?  Is it over a million also?

12     A.   No.

13     Q.   Hundreds of thousands though; right?

14     A.   Yes.

15     Q.   Okay.  Fair to say there are a number of

16 other medical device companies and pharmaceutical

17 companies that have paid you significant six-figure

18 sums; is that fair?

19     A.   Other than what we've just said here?

20     Q.   Yes, sir.

21     A.   Not --

22          One or two others maybe over the years in my

23 past.

24     Q.   Well there's some that you talk about just

25 in terms of funding of your grants that are paying you

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

153

1    even through now, I think, tens of thousands --

2         A.   Oh, that's what --

3         Q.   -- per month, separate and apart from

4    consulting.

5         A.   Okay.  So I didn't know what your question

6    was.  I thought your question was talking about me

7    personally versus what is being paid in studies.

8         Q.   Well --

9         A.   So you didn't -- you didn't -- I --

10        Q.   My apology.

11        A.   My answer was personally.  You brought up

12   Stryker, as a consultant for Stryker, you brought up

13   DePuy, and I gave you have an answer as an in -- I --

14             The real answer in DePuy is DePuy, I've

15   never gotten paid personally from them, but through

16   attorneys and through the defense of that.  So I

17   thought all these questions that you just started was

18   for me personally.

19        Q.   Then let's be clear.

20        A.   Now you just pushed it into studies, --

21        Q.   Let's break it down.

22        A.   -- a separate discussion.

23        Q.   Sorry, doctor.

24             MR. B. GORDON:  I'm sorry, Dick.

25        Q.   Let's break it down.  With respect to DePuy,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

154

1    you have done testimonial work for them in defense of

2    the ASR product, a metal-on-metal hip implant, and

3    been paid hundreds of thousands of dollars personally

4    for that testimony; have you not?

5            MR. C. GORDON:  Object to the form of the

6    question.

7        A.   Yes, through a lot of trouble over a number

8    of years.  Yes.

9        Q.   And --

10       A.   It added up to that, yes.

11       Q.   And you recognize that the DePuy ASR product

12   was a defective -- was determined to be a dangerous

13   and defective device for a lot of patients; right?

14       A.   No, I --

15           MR. C. GORDON:  Object to the form of the

16   question.

17       A.   I do not recognize that.

18       Q.   It was recalled; wasn't it, doctor?

19       A.   It was recalled.  That doesn't mean it was

20   defective.

21       Q.   Well doctor, you know Tom Schmalzried;

22   right?

23       A.   I know him.

24       Q.   He helped design that product; right?

25       A.   Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

155

1    Q.   And you're aware that he testified that

2  ultimately his opinion was that the device was

3  defective.

4    A.   I don't --

5    Q.   Do you disagree with the designer?

6    A.   I disagree with -- that he said that.

7    Q.   Well doctor, he was paid millions of dollars

8  to help design and promote that product; wasn't he?

9         MR. C. GORDON:  Object to the form of the

10 question, --

11   Q.   Are you aware of that?

12        MR. C. GORDON:  -- lack of --

13   A.   He was definitely paid millions to design

14 and I -- I guess promote.  Yes, I would say yes.

15   Q.   And he wrote -- he wrote white papers for

16 DePuy on that product; didn't he?

17   A.   He published papers.  I don't know if he

18 particularly wrote the white papers, but I would -- I

19 would agree with you maybe.

20   Q.   He ghost -- testified that he ghost-wrote

21 white papers, which are marketing pieces, for Polly

22 Carey and the other marketing directors at DePuy that

23 were not peer-reviewed published papers; did he not?

24        MR. C. GORDON:  Object to the form of the

25 question.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

156

1     A.   I'll -- I'll accept the answer because I

2  know -- I did all that over a number of years -- I

3  know who wrote the papers.  I'm sure he had input in

4  it.  For you to say that he wrote those things,

5  because I saw all the material that DePuy came out, I

6  went through everything -- not everything, but a good

7  portion of it, and I don't believe that he

8  particularly wrote it.  But I'm sure he oversee'd it,

9  he looked at it, he analyzed it.  Maybe he did testify

10 somewhere that you have and I missed that, so -- but

11 to the best of my knowledge --

12          But fine.  If you want, I'll just agree with

13 what you said.  It's not a -- it's a small point.

14     Q.   And doctor -- thank you, doctor.  And it's

15 nice that we can find agreement where we can.  Thank

16 you.  So --

17          But you don't agree that the consensus of

18 the medical community, the orthopedic community

19 ultimately, was that the ASR was a defectively

20 designed acetabular cup product, that the acetabular

21 component of that product was determined to be

22 defective by everyone who looked at it.  You don't

23 agree with that.

24     A.   I don't agree with it.

25     Q.   And you don't agree that the metal-on-metal

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

157

1   meltdown, if you will -- let me -- let me -- let me

2   withdraw that and start over.

3            You disagree that metal-on-metal

4   articulations, which were once thought to be the way

5   of the future, have now been roundly agreed as -- as

6   being a disastrous result for the patient.  You don't

7   agree with that?

8        A.   For which patients?

9        Q.   For the patients who got metal-on-metal hip

10  implants.

11       A.   Not all.

12       Q.   And you put in how many thousand resurfacing

13  devices?

14       A.   Several thousand.

15       Q.   And how many of those were metal-on-metal

16  resurfacing devices?

17       A.   They were all metal-on-metal resurfacings.

18       Q.   And when you first put those in, you thought

19  they were the best product -- best orthopedic hip

20  product ever created; right?

21       A.   I thought they were an excellent orthopedic

22  hip product for certain specific indications.

23       Q.   And you've given YouTube video presentations

24  in 2006 through 2009 about how great you thought

25  various of those resurfacing devices were; have you

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

158

1   not?

2       A.   I don't -- haven't looked at those lately,

3   but whatever -- if I did --

4            There are some YouTube videos of me talking

5   about resurfacing, that is correct, yes.

6       Q.   And you promoted some of those devices for

7   use in an off-label manner; did you not?

8       A.   Yes.

9       Q.   In so many words.

10      A.   Well I -- I don't know if I --

11           Yes.

12      Q.   In so many words.  You -- you promoted those

13  on YouTube for use in an off-label manner; didn't you

14  doctor?

15      A.   Well I don't know if I'm the one that

16  promoted it because I didn't --

17           First of all, I never made a YouTube video,

18  so -- somebody else did it.  So you keep saying "you

19  promoted it."  I didn't necessarily promote it.  I was

20  on a YouTube video, I had an interview and I talked

21  about it.  If somebody asked me is this off label, I

22  would have said yes, this is off label -- off label.

23  I think that is a service to the patient by telling

24  them you have to realize that this should be used for

25  the right indications.  And --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

159

1      Q.   So is it your testimony, doctor, that you

2  didn't affirmatively raise that as a selling point,

3  that this device can be used in an off-label manner?

4  Is that your testimony?

5      A.   You just asked me a few parts.  "As a

6  selling point?"  What do you mean by "a selling

7  point?"

8      Q.   Did you or did you not have an interview on

9  multiple occasions in which you affirmatively stated,

10  without being questioned specifically first, that use

11  of metal-on-metal resurfacing devices could and should

12  be done in an off-label manner?

13      A.   All right.  I'm going to try to help you

14  with the answer.  Could be done in an off-label

15  manner?  Yes.  Should?  I don't know if that's said

16  because I don't force people.  "Should" is a bad word,

17  so we'll leave that alone.  For the right indications,

18  maybe I said it.

19          In addition, you said "on multiple

20  occasions."  I believe that I was interviewed one time

21  and that was cut in -- by the same lady, if it's what

22  we're talking about -- I could be mistaken -- and that

23  was cut into two parts.  So in fact you said multiple

24  interviews.  I believe it was one time, cut into two

25  parts, which may be two videos.  I haven't looked at

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

160

1    this in a while.  But I'm -- I could be wrong because

2    it's not something I'm focusing on right now.  These

3    videos were done a long period of time ago.  They may

4    be over 10 years old.  They're still up there, but --

5         Q.   You don't dispute that you were interviewed

6    and made statements promoting use of resurfacing

7    metal-on-metal devices in an off-label manner before

8    2010; do you?

9         A.   For a specif -- for a specific company, if

10   they asked me, for example, about Wright Medical, I

11   would have said off label because the cup was approved

12   for use and the head was FDA approved, but off-label

13   use is coupling the two together, and I would have

14   said that.  It's the same way that we use, for

15   example, different medications, different devices off

16   label; we let the patients know that.  Not -- not all

17   medicine is done on label.  We --

18        Like aspirin for certain things is off-label

19   use.

20        Q.   But doctor, you were one of the pioneers in

21   this country of using metal-on-metal resurfacings; are

22   you not?

23        MR. C. GORDON:  Object --

24        A.   Yes, I was.

25        Q.   And that's one of the reasons you were happy

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

161

1    to do these interviews and -- and promote these

2    products, because you wanted them to become

3    mainstream; didn't you?

4              MR. C. GORDON:  Object to the form of the

5    question.

6         A.   I wanted them to be used appropriately.

7              And I don't know what you mean by

8    "mainstream."  I -- I did resurfacing, but in the same

9    period of time at the peak of my doing resurfacing I

10   was still doing way more standard non-metal-on-metal

11   hips in a patient population that needs a hip

12   replacement, if -- and we're calling a resurfacing a

13   type of hip replacement.

14        Q.   Well doctor, it says on one of your

15   websites, doesn't it -- or maybe it was on Sinai's

16   website -- and I quote, "Dr. Mont has been

17   instrumental in bringing a revolutionary hip

18   replacement alternative called metal-on-metal

19   resurfacing to the United States," close quote.  Do

20   you dispute that that has been at least accredited --

21   attributed to you in the past?

22        A.   I'll -- I'll accept that.

23        Q.   And in fact --

24        A.   I mean do you want me to read it?

25        Q.   No.  I -- you accepted it --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

162

1      A.    I accept it --

2      Q.    Well if you accepted it --

3      A.    I accept it as a general thing, yes.

4            MR. B. GORDON:  Sorry, Dick.

5      Q.    Let's move on if we can.  And there was a

6  time when you thought that you could get a 99 percent

7  survivorship rate on these resurfacings out to 10

8  years; isn't that right?

9      A.    I don't know if that's right.  If I said

10  that, I won't deny it.  I would -- probably would --

11         You're saying "thought," so I'll hedge that.

12  I think it's very --

13         When we get to 10 years for any person or

14  device, it's hard to get 99 percent survivorship

15  because -- because if a person got into a car accident

16  on year seven, for example, and they had to -- got a

17  fracture around the prosthesis, it would depend -- and

18  that fails, that would count as a failure of the

19  device.  So it might depend on your definitions of

20  what we call "survivorship."

21         If we include all survivorships of

22  everything, including septic, which is pertinent to

23  this case, aseptic periprosthetic fractures, to think

24  that a population of patients are going to get to 10

25  years and 99 perc -- '9 percent of them are still

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

163

1   going to have it --

2        Q.    Doctor --

3        A.    -- is -- is hard.  So if I said that, I'll

4   hedge it a little bit.

5        Q.    You --

6        A.    I would like to think it was going to do

7   very well.

8        Q.    Do you dispute that you said, in so many

9   words, that you expect to and believe you can get a 99

10  percent survivor rate for resurfacings at 10 years?

11             MR. C. GORDON:  Object --

12       Q.    "Yes" or "no."

13             MR. C. GORDON:  Object to the form of the

14  question.

15       Q.    Did you ever say that?

16       A.    I might or might not.  I'm not sure.

17       Q.    Fair enough.

18             You know as you sit here today, eight years

19  later, that that's not accurate; right, doctor?  You

20  cannot get a 99 percent survivorship rate for any

21  resurfacing device at 10 years; can you?

22             MR. C. GORDON:  Object to the form of the

23  question.

24       Q.    Not even close; can you?

25             MR. C. GORDON:  Same objection.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

164

1      A.   I think some surgeons have gotten very

2 high -- let --

3           Let's not say 99.  Let's say in the upper

4 nineties, okay, because I don't -- if you want me to

5 answer this right.  Because remember, things get --

6 things happen to patients in a -- okay?  So let's just

7 say high survival rates in the high nineties.

8           We can look at registries, and if we looked

9 at certain patient populations, some of them are doing

10 better than total hip.  So the answer to that at --

11 even getting towards 10 years --

12           I have a partner here at Cleveland Clinic

13 that would probably say he's in the high nineties at

14 10 years with -- and that is Peter Brooks,

15 B-r-o-o-k-s.  And there are some people that are still

16 doing resurfacings that get very high --

17           I don't want to use this term 99, and if I

18 said that, I don't like using it now, so --

19           MR. B. GORDON:  Objection, move to strike as

20 non-responsive.

21      Q.   Doctor, let me ask you this:  You mentioned

22 registries.  We don't have a registry in the United

23 States yet; do we?

24      A.   We do have a registry.

25      Q.   Well we have -- we have one that's been

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

165

1   started, but we historically have not had a joint

2   registry maintained by the federal government in the

3   way that the United Kingdom does and Australia does;

4   do we?

5        A.   We have an American Joint Registry.  A lot

6   of effort, time, a mega num -- a lot of patients are

7   in it, but it -- and it's a more recent offering.

8   Some of the data may not be as robust as what they

9   have in the United Kingdom or some other countries.

10  So in a general sense, yes.

11       Q.   And doctor, are you aware as you sit here

12  today of what the --

13            You studied all the DePuy stuff you told us;

14  right?

15       A.   Yes.

16       Q.   So are you aware of what the 10-year

17  survivorship rate is published in the United Kingdom,

18  the British Joint Registry, for the ASR?  Or the

19  five-year data, whichever?

20       A.   I know what the data was when they got to

21  five years and six or seven for the ASR.  However --

22       Q.   Forty-four percent; right?

23       A.   What?

24       Q.   Forty-four percent failure rate; right?

25       A.   No, it wasn't that.  When it was recalled --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

166

1              There is a recall phenomenon that occurs.

2   When things get recalled, then everybody -- there

3   is -- there is a phenomenon that occurs that -- that

4   you get increased revision rates that may or may not

5   be due to the prosthesis.  And I have said that and

6   that's been published, that type of phenomenon.  It

7   actually has a name that I'm forgetting off the top of

8   my head, but it may just be -- "recall phenomenon"

9   might be a name for that.  So I will grant you that

10  the revision rate of that prosthesis you're -- you

11  just said 44 percent.  I think that depends on what

12  you're looking at, what population, who was doing it,

13  what center, how -- how fast people are to revise

14  things, the degree of surveillance, the technique.

15  There's a lot of factors that go into those revision

16  numbers.

17      Q.   Doctor, orthopedic surgeons wouldn't revise

18  a hip implant unless there was some kind of medical

19  indication to do so; would they?

20      A.   I can't always speak for other orthopedic

21  surgeons.

22      Q.   Would you?

23      A.   Well I would never do that.  But there is

24  different levels of what people might consider is

25  appropriate to revise.  For example, some surgeons

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

167

1  might say if metal ions are elevated a little bit --

2      Q.   What did Dr. Schmalzried say on that?

3  What -- what was his threshold for metal-ion levels to

4  indicate a need for revision?

5      A.   I don't know what his --

6      Q.   Two parts per billion; right, doctor?

7           MR. C. GORDON:  Ben, let him finish --

8      A.   I don't --

9           MR. B. GORDON:  I'm trying.

10          MR. C. GORDON:  -- before you step on him.

11     A.   I don't know if he ever said two parts.  I

12  would love for you to show me where he said two parts

13  per billion.

14     Q.   Okay, doctor.

15     A.   I don't believe -- first -- first of all

16  that is -- would be --

17          Most people have two parts per billion -- or

18  a level of two is what I think you're talking about --

19  that have metal-on-metals for an appreciable time, so

20  he wouldn't say that a hundred percent of people that

21  are asymptomatic, have no symptoms, at 10 years has a

22  level of two, need to be revised.  So I -- I don't

23  think that's a correct statement for Dr. Schmalzried.

24     Q.   Doctor, we can agree to disagree, but if I

25  showed you testimony where Dr. Schmalzried changed his

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

168

1  view and indicated that his threshold -- perhaps in

2  combination with other symptoms, I didn't say in the

3  absence of other symptoms -- but that his threshold

4  for a finding on micrograms per nanoliter -- that is,

5  parts per billion -- of cobalt was two or greater as

6  being a criterion for his thoughts on need for

7  revision, that would surprise you as you sit here

8  today.

9        MR. C. GORDON:  Object to the form of the

10  question.

11        Q.  You don't think he said that.

12        A.  I don't think he said that.

13        Q.  Okay.  Fair enough.  We'll move on then.

14  Fine.

15        A.  No, he didn't say that.

16        Q.  Let's -- let's just move past hips.  The

17  point I'm trying to make, doctor, or get your opinion

18  on, is there are medical technologies, there are

19  biomedical devices that have been thought historically

20  to be great technologies that ultimately were

21  determined not to be; isn't that fair?

22        A.  There's many technologies like that, or

23  devices, whether they're medical or non-medical.

24        Q.  And sometimes there may be necessary

25  technologies that are found to have problems later

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

169

1    that, even if they have a benefit, they have risks

2    associated with them that are not known initially;

3    isn't that fair?

4        A.   The vaccines, some of the vaccines that were

5    developed had risks at the beginning.

6        Q.   Great example.

7             What about the heater-coolers that we talked

8    about?  You are aware that Sachs and Sommerstein and

9    others identified, about three years ago now, a

10   problem of contamination with heater-cooler devices.

11   You've seen those papers; haven't you, doctor?

12            MR. C. GORDON:  Object to the form of the

13   question.

14       A.   It -- it's not --

15            I've seen something like that, but it's not

16   something I studied.  So the answer is no.  Why would

17   I see the papers?

18       Q.   Okay.

19       A.   It's not -- it's not in my field of vision

20   that we -- we -- we have a --

21            Sometimes I am aware of things that are

22   outside my scope of practice, but in this case, no, I

23   didn't see those papers.

24       Q.   Let me read you a quote and ask you if you

25   recognize this quote:  "Adequate preclinical trials

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

170

1  should be used to help identify some of the

2  shortcomings of medical devices before widespread

3  marketing of such devices to doctors and patients,"

4  close quote.  Have you ever heard that before?

5       A.   I think you're probably referring to

6  something that I wrote myself.

7       Q.   Do you know if you said that?

8       A.   Sounds like something I might have wrote.  I

9  wrote -- I wrote a few papers on different devices

10  that have been released, prosthetic devices by the

11  way.  I think that's -- you're -- you're talking about

12  one or two articles I wrote on -- on -- on dealing

13  with prosthetic devices that are released into the

14  market, if that's what you are writing.  I mean I

15  think I'm not the only one that -- that wrote similar

16  quotes to that.  I might have been paraphrasing

17  somebody else, or that could be what I'm the prime

18  author of.

19       Q.   It's not -- sorry.

20            It's not a controversial statement; is it,

21  doctor?

22       A.   No.

23       Q.   And in fact, wouldn't you agree with me that

24  if adequate preclinical trials had been done with

25  respect to the Bair Hugger to try to identify some of

171

1   its shortcomings before widespread use, we might not

2   be having this conversation today?

3         MR. C. GORDON:  Object to the form of the

4   question, assumes facts not in evidence.

5       A.    No, I disagree with that.

6       Q.    Do you disagree that it might have been a

7   good idea to use preclinical trials before mass

8   marketing the Bair Hugger system?

9         MR. C. GORDON:  Object to the form of the

10  question, assumes facts not in evidence.

11      Q.    Do you agree or disagree?

12         You can answer.

13      A.    So -- so give me the question again.  What

14  did --

15         I don't disagree with that statement in

16  general for any product.

17      Q.    Fair enough.  That's -- I'll take that.

18      A.    Period.

19      Q.    Let me ask this followup:  If a company were

20  to market a medical device without taking reasonably

21  available measures to minimize potential safety risks,

22  you as a doctor would be against that; wouldn't you?

23      A.    I don't think --

24         I would be against it, and I don't think

25  they would be allowed to do that in a general sense by

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

172

1  different governing bodies, whether it's the FDA or

2  whatever governing body is in charge of that specific

3  device.  Which, obviously, there are many different

4  devices and many different governing bodies that have

5  jurisdiction over those different devices.

6       Q.    So, for example, if a manufacturer produced

7  a device for use in the operating room around patients

8  without fully investigating its potential for spread

9  of contamination, that would be a bad idea; wouldn't

10  it?

11            MR. C. GORDON:  Object to the form of the

12  question.

13       Q.    Hypothetically.

14            MR. C. GORDON:  Same objection.

15       A.    That would be a bad idea.

16       Q.    Thank you.

17            Talking about the Bair Hugger specifically

18  now, did the company do anything, as far as you know,

19  with respect to making representations to the FDA

20  about the level of filtration on the device when it

21  was first approved --

22            MR. C. GORDON:  Object to the form of the

23  question.

24       Q.    -- or cleared?  Have they told you one way

25  or another or have you seen any documents concerning

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

173

1   that issue?

2       A.   I know a little bit about the MERV rating of

3   14.  I know about -- I have read articles on what is

4   required by different devices.

5       Q.   Have you seen any testimony on that in any

6   of the depositions in terms of --

7       A.   I -- I haven't focused on that.

8       Q.   Okay.  Fair enough.  I'll move on.

9       What about evidence of contamination of the

10   Bair Hugger machines.  Have you read studies or case

11   reports or internal documents concerning whether the

12   Bair Hugger or any parts of the Bair Hugger have been

13   found to be contaminated with microorganisms?

14       MR. C. GORDON:  Object to the form of the

15   question.

16       A.   I've read studies on that topic.

17       Q.   Okay.

18       A.   Multiple.

19       Q.   And you are aware, then, that there is no

20   disagreement that some Bair Huggers -- in fact a

21   significant number of Bair Hugger devices have been

22   found to harbor microorganisms.

23       MR. C. GORDON:  Object to the form of the

24   question.

25       A.   I think every piece of equipment in the OR

174

1    harbors organisms.  I don't know -- really understand

2    the --

3            All right.  The relevance of the question

4    and some of those studies to me are -- are --

5            All right.  We'll -- I'll just answer.

6       Q.   That -- that --

7       A.   You want me to just answer.

8       Q.   Yeah.  I'll move on.  That's fine, doctor.

9            (Witness's cellphone dings.)

10      Q.   So -- so since you mentioned other things,

11   those are --

12           MR. B. GORDON:  I'm sorry.  You need to

13   check that?  Go ahead.

14           THE WITNESS:  I'm going to just say

15   "Will" -- just got to say "In deposition and will call

16   later."

17           MR. B. GORDON:  That's great, because I tell

18   you, in the next 15 or 20 minutes I'll be at a good

19   closing point for lunch maybe, so if we can finish

20   this line of inquiry, then we can wrap up and take a

21   break.

22           THE WITNESS:  Okay.

23      Q.   So to go back to that area, we talked a

24   little earlier about exogenous or external -- whatever

25   word you want to use -- sources of potential

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

175

1  contamination in the operating room.  You remember

2  when we talked about that?

3       A.   Yes.

4       Q.   And some of those that you mentioned are --

5  I think was the Bovie.  What's a Bovie for the jury,

6  doctor?

7       A.   That's a cautery device that we use to --

8  when you have bleeding, it -- it heats up a few

9  hundred degrees or more and a -- and a vessel that is

10  bleeding, you hit the vessel with this device and

11  the -- and the vessel will stop bleeding.

12       Q.   And it's kind of like a zzzt.  Is it a very

13  intermittent kind of thing, or how would you describe

14  that?

15       A.   You would use it the least amount just to

16  hit the vessel because you don't want --

17            It burns, it coagulates the vessel.  You

18  don't want to burn regular tissue that is normal

19  tissue, so you minimize use.  And it -- it's just

20  one -- it's --

21       Q.   It's one source of potential or -- or -- a

22  potential contamination.

23       A.   Source of heat, contam -- anything that's --

24            Anything in the OR can be a source in a

25  general sense of contamination, some more likely than

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

176

1   others.

2       Q.   And you mentioned a lot of those.  Lighting

3   you mentioned; right?

4       A.   Yes.

5       Q.   The lighting could have microbes on it;

6   right?

7       A.   Correct.

8       Q.   And that's why you put -- on the handles,

9   you put --

10          What do you put on them, condoms or gloves?

11      A.   We -- we put light handles.  I -- I

12  personally like my lights adjusted.  I don't use the

13  light handles.  I adjust the --

14      Q.   It's a special thing.

15      A.   I adjust the light handles before I start my

16  cases, my knee or hip replacements, so the light's

17  there.  And I don't -- not only do I not want to -- do

18  I not trust reaching up for these -- what you called

19  this -- condoms, or they're -- they're hand --

20  they're -- they're -- they're devices that go over the

21  handle that you -- that are packaged sterilely -- I

22  don't like even the waving of the hand up to grab the

23  light and adjust it.  I think that creates waves that

24  could be moving wind or particles that could be

25  flapping into the wound.  So you brought -- you

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

177

1    brought that example up --

2         Q.    And -- and that's --

3         A.    -- and that's why I don't -- I don't even

4    use the light handles.  I just adjust at the beginning

5    of the day.  It's my -- my thing.

6         Q.    And -- and the idea is that you as, captain

7    of the ship, the orthopedic surgeon in the operating

8    room, are trying to do everything you reasonably can

9    to minimize potential sources of contamination to the

10   patient; right?

11        A.    Yes.

12        Q.    So what are some other examples?  Let's just

13   go through a few more.  What are the --

14        A.    The -- the -- the first source are the --

15             Well again, I've gotten criticized by what's

16   number one, two, three, four, five.  I don't want to

17   say this is the first, it's the most important, so --

18   so I'm going to go into different sources.

19             I think of the -- the -- the people that

20   are -- the surgeon and the team as a big source.  You

21   want to make sure you're -- you're disinfecting your

22   hands to the best that you can, that you -- you put

23   your -- your gown on.  We have -- you do -- you put

24   two -- I --

25             We use two gloves typically.  You make sure

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

178

1    you have the appropriate gloving technique, not only

2    for the surgeon but usually two assistants when

3    they're doing a hip or knee replacement.  Also,

4    there's a surgical person.  So you're trying to

5    minimize that, any breaks in contamination; that's

6    just one of the things.  If we --

7              The better way to look at it would be --

8    what I just said, would be to -- to organize this

9    answer -- would be to say here's the patient walking

10   in the room and what are they doing -- what are you

11   doing first?  Even before you get in the room you're

12   clipping any excess hair.  Often we use the night

13   before and the morning of chlorhexidine, which is what

14   I published on contamination, you're making sure about

15   the patient doesn't have any sores on their body,

16   things like that.  Then you're going in the room, and

17   one of the first things you're doing is applying

18   disinfectants to the patients.  If we're doing a hip

19   or knee replacement, to their whole leg, and often you

20   do two -- at least two coatings and you're waiting for

21   that to dry because that's what the CDC says for

22   effect -- effectiveness.  So --

23             You're asking for other sources.  So any of

24   these are sources of infection.

25             You want me to keep going in all the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

179

1  different things --

2      Q.   No.

3      A.   -- that could be happening in an OR?

4      Q.   I --

5      A.   I mean there's so many different sources,

6  you know, which we did on -- on this, quote, science

7  day.  The instruments, the saw blades.  You

8  mentioned -- you mentioned the cautery, the sucker

9  tip.

10     Q.   You mentioned the doors swinging open.

11     A.   The doors going open, the amount of traffic,

12 people -- the way the -- the gown -- the way the whole

13 patient is draped, the way --

14          As I said, I don't like flapping.  Are

15 drapes being moved back and forth?  Are the surgeons

16 or the team, are they walking too much?  And I say,

17 "Stay still.  Don't create all these winds and -- and

18 currents."  Are people coming in from the outside to

19 deliver blood and they're -- they're creating

20 currents?  But these are all potential sources of

21 waving air currents or creating heat --

22     Q.   And in addition --

23     A.   -- or --

24     Q.   And I'm sorry I interrupted, but my question

25 was kind of -- we've gotten a little off track, but I

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

180

1    appreciate the explanation -- was really with respect

2    to potential sources of contamination. It is your

3    belief that each of those -- and put aside the

4    patients and the -- and the -- and the staff for a

5    moment -- each of those inanimate objects is a

6    potential source of contamination that you need to try

7    to avoid.

8            MR. C. GORDON:  Object to the form of the

9    question.

10       A.   Well --

11       Q.   Miti -- mitigate.

12       A.   -- you need to use them all to do your case.

13       Q.   So to mitigate their --

14       A.   But you want to do the best you can to

15   mitigate those sources that could cause contamination,

16   yes.

17       Q.   And -- and you listed a bunch of them, I

18   don't have to go through all of them right now, you

19   said in no particular order all these devices that you

20   need to use in the operating room.

21           Do you need to use the Bair Hugger in the

22   operating room?

23       A.   You need to use the Bair Hugger or some type

24   of device that maintains normothermia. That -- that's

25   a normal temperature for the patient. We can define

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

181

1    that and talk about that some more if you want --

2        Q.    We may get to that --

3        A.    -- in an OR -- in an OR setting.

4        Q.    -- a little later, but there are other

5    types, as you alluded to, since you brought that up,

6    of -- of warming -- a patient warming that can achieve

7    normothermia without forced air; correct?

8        A.    Yes.

9        Q.    And you've used some of those in the past;

10   right?

11       A.    Well there's -- there -- there's -- there's

12   ancillary devices --

13             Just like you mentioned, just putting

14   blankets on a patient keeps you warm a little bit.  Is

15   that what you're asking me?

16       Q.    Well yes.  You've used sources, if you will,

17   or types of patient warming other than forced air

18   successfully in operations in your career; haven't

19   you?

20       A.    Well in every hospital before here I used

21   the Bair Hugger device, that I ever operated on, as

22   the major -- as major device that maintains

23   normothermia --

24       Q.    Do you miss having the Bair Hugger?

25       A.    -- until the Mistral.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

182

1           Not necessarily.

2       Q.   I mean you got the Mistral now because

3   that's what Cleveland Clinic uses, but you just said

4   you've been using Bair Hugger for how many years?

5       A.   Well I started practice around '89, so --

6       Q.   I mean are you disappointed that you don't

7   have option to use the Bair Hugger now?

8       A.   I just --

9           I don't know what your question is asking.

10  I just want --

11      Q.   I mean it's pretty clear.

12      A.   -- a very effective -- I want an effective

13  device that's going to maintain normothermia, so

14  whether it's the Bair Hugger or this Mistral, assuming

15  this is doing the job, I'm okay with that.

16      Q.   Well let's ask that.  Is -- is the Mistral

17  doing the job?  Is it -- is it warming as well or

18  better than the Bair Hugger?

19      A.   I can't give you that answer from -- from

20  one or two studies.  No, I'd have to --

21      Q.   Have you talked to anyone at the Cleveland

22  Clinic about whether they should consider letting you

23  use the Bair Hugger?

24      A.   No, I haven't.

25      Q.   You used it for a couple of decades; is that

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

183

1   fair?

2        A.   Yes.

3        Q.   And successfully you believe?

4        A.   Yes.

5        Q.   What was your infection rate on average per

6   year during that period of time?

7        A.   Low.  There were some years they were a

8   little higher than others, and then we tried to

9   identify.  Some of them are even reported publicly in

10  these papers I wrote.  They --

11       Q.   Sir --

12       A.   -- at some times, and it depended on my

13  patient composition, for primary joints they were well

14  under one percent.

15       Q.   So fair to say not zero.

16       A.   Not zero.

17       Q.   One percent.  What's --

18       A.   Some --

19            Well some years they were zero, so that's

20  not true.  So reported, some years were zero, some

21  years might have spiked.  Then we try to identify what

22  that is.  And that's why we did -- that's what led to

23  me to doing a lot of the studies that you see in this

24  report.

25       Q.   Do you have any citations of authority or

184

1  evidence that you can point the jury to from your

2  experience or review of the literature that

3  demonstrates that the Bair Hugger was more effective

4  than the Mistral system or any other for -- any other

5  forced-air warming --

6           In fact let me back up.  Ask another

7  question.

8           MR. B. GORDON:  Sorry, Dick.

9      Q.   How many forms of forced-air warming are

10 there?

11     A.   I can't give you the exact answer.  I know

12 that I've seen in print -- because I haven't used

13 these and I can get you the answer if you want

14 later -- but four or five companies that have forced-

15 air warming devices.

16     Q.   There are more than that; aren't there,

17 doctor?

18     A.   Well I imagine there are.

19     Q.   Internationally?

20     A.   I don't know what's being used in Europe or

21 Australia.  But I don't -- I wouldn't know.  Maybe

22 that -- those would be exact -- there are --

23           Could be.  My answer is if exactly there are

24 four companies or five companies that have forced-air

25 warming devices, I can't give you that answer.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

185

1     Q.   Let's take your number.  Let's say there's

2  five.  Let's say there's Mistral, Bair Hugger and two

3  other -- three others.  Of those, do you know how many

4  have a fil -- a HEPA filter and how many don't?

5     A.   I don't know.  I just know --

6          No, I don't know.  I know at least one.

7     Q.   Would it surprise you that the Bair Hugger

8  is the only one without a HEPA filter?

9          Does it matter to you?

10    A.   No, it doesn't matter to me.

11    Q.   Okay.  You would agree with me that forced-

12 air warming is not the only means to effectively warm

13 patients; wouldn't you?

14         MR. C. GORDON:  Object to the form of the

15 question.

16    A.   It's viewed as a very -- as one of the most

17 effective ways if not the most effective way.

18    Q.   My question is:  It is not the only means of

19 effectively warming patients; is it?

20         MR. C. GORDON:  Object to the form of the

21 question.

22    A.   Correct.

23    Q.   Dr. Sessler's stated the same thing

24 explicitly; hasn't he?

25    A.   I don't know what Dr. Sessler --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

186

1           I didn't read his deposition.  I don't know.

2       Q.   Well do you know Dr. Sessler personally?

3       A.   I met him on one occasion.

4       Q.   Your testimony is you haven't talked to him

5   about this at all, Bair Huggers?

6       A.   About what?

7       Q.   About the Bair Hugger issue.

8       A.   We talked about other studies, and the only

9   thing is he mentioned that he had been deposed for

10  five days about this case and that was --

11          Let me see if he -- if anything else was

12  discussed.  And then I basically told him I was -- I

13  had been involved, and I don't think anything else.

14  That was basically it.  We talked about another -- a

15  whole bunch of studies in my one meeting with him.

16      Q.   But you did talk to him about the Bair

17  Hugger case; didn't you?

18      A.   No.  I just said that I --

19          He mentioned that he had been involv -- to

20  the extent of what I just said.  We didn't --

21          There was no detail, so I wouldn't consider

22  that talking about the case.  He told me that he had

23  been deposed for a five-day period, and I told him

24  that I was involved.  That's the --

25      Q.   Has he --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

187

1      A.    -- pretty much --

2            That's not a hundred percent of what I

3      discussed.  We had a lot of things to discuss that

4      day.

5      Q.    Has he told you that he doesn't care how you

6      warm patients as long as you warm patients?

7      A.    I -- he didn't --

8            We didn't have that discussion, as I said,

9      so I wouldn't know --

10     Q.    In fact --

11     A.    -- anything of what you're asking me.

12     Q.    Sorry.

13           In fact, many other orthopedic surgeons use

14     types of patient warming other than the Bair Hugger

15     successfully; don't they?

16           MR. C. GORDON:  Object to the form of the

17     question.

18     Q.    And you know that; don't you?

19           MR. C. GORDON:  Same objection.

20     A.    Other surgeons use other types besides

21     forced-air warming.

22     Q.    And some of them have very low, lower-than-

23     national-average infection rates without use of the

24     Bair Hugger; isn't that true?

25     A.    I imagine some have low, some have higher.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

188

1    Q.   Okay.  You talk in your report about the

2  Bair Hugger and describe it as being far away from the

3  patient or far away from the sterile field.  Do you

4  recall that?

5    A.   Yes.

6    Q.   How far away is the exhaust of the Bair

7  Hugger from the patient typically in your operating

8  room?

9         MR. C. GORDON:  Object to the form of the

10 question.

11   Q.   And when I say that, in the past, obviously.

12        MR. C. GORDON:  Same objection.

13   A.   I can't give you an exact number, but

14 it's -- I would say it's in feet, --

15   Q.   And --

16   A.   -- two feet or more.

17   Q.   Is it your testimony before this jury today

18 that a device that is -- that is within feet of the

19 patient, it's okay with you as the orthopedic surgeon

20 doing those ultraclean prosthetic joint surgeries to

21 have a machine that has known contamination in the

22 machine in that context?  Is that acceptable to you as

23 a surgeon?

24        MR. C. GORDON:  Object to the form of the

25 question.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

189

1    A.   I have machines that are within inches that

2  have known contamination, and we have to deal with

3  that.  So this is well further away and draped off.

4  It's so far removed compared to a number of other

5  things that are within inches --

6    Q.   And you're concerned about --

7    A.   -- or -- or less in the field.

8    Q.   Sorry.

9    A.   I'm always concerned about everything, but

10 not --

11   Q.   Not the Bair Hugger.

12   A.   It's so -- it's far removed and it's --

13 it's --

14        If I put on my list of concerns, if we say

15 that anything is game, if we want to do it that way,

16 then I -- I can probably make a list for you and put

17 it as number 27 out of 28.

18   Q.   Okay.  So -- so it's on the list, it's just

19 way down the list.

20   A.   I wouldn't even put it on the list.

21   Q.   Well you didn't in your report; did you?

22   A.   I don't think it's operative.

23   Q.   You put a litany of things on --

24   A.   Some things, I think that if you -- I think

25 that if you -- if you go into Burger King and you have

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

190

1   a Big Mac, it doesn't make you fat, but if you had --

2   if you had one of those -- two of those a day, then

3   you'll get fat, and so you don't say that the Burger

4   King -- or the Big Mac causes you to be obese when you

5   have one.  And the same way, I don't -- I don't view

6   this Bair Hugger as operative as leading to

7   infections.  It's not in there on the list.  There

8   are -- if -- as if --

9          It's like saying that the -- the garbage --

10  there's a garbage -- there's two or three garbage

11  pails in every operating room and there's one like

12  four feet away that we're putting things in there,

13  that you could say all this stuff that's going into

14  that garbage pail was contaminated, but I'm not

15  putting that garbage pail on the list of things that

16  are causing contamination for my patient even though I

17  would rate that way higher than the Bair Hugger.

18      Q.   Well you said a minute ago that anything is

19  game and then you said it's 27th on the list, or way

20  down the list.  But it's still on the list.  It's

21  still game.  You said that.

22      A.   Well then I'll take that --

23      Q.   Okay.

24      A.   -- and I'll say I don't think it's game.

25      Q.   So you're changing your mind -- you're --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

191

1                As we sit here today --

2       A.    Yeah.   As -- as I --

3       Q.    -- you're changing your testimony.

4       A.    Well it depends on what you're saying.   Is

5    something a one-in-10-million chance?   But no, zero

6    chance.

7       Q.    Well --

8       A.    So I'm going to change that answer.   I

9    have -- I reserve the right to say that I don't think

10   it's operative in causing infections.

11      Q.    Well the jury has a right to know why you're

12   changing your answer.   You -- you just said it's on

13   the list, it's way down the list.   And doctor, in your

14   report you've listed more than a dozen things that are

15   potential sources of exogenous contamination and the

16   only one you haven't mentioned -- or the only two are

17   the Bair Hugger and the heater-cooler devices.

18      A.    No.

19            MR. C. GORDON:   Object to the form of the

20   question --

21      Q.    Okay.

22            MR. C. GORDON:   Wait, wait, wait.   Ben, calm

23   down.

24            -- and assumes facts not in evidence,

25   mischaracterizes the testimony.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

192

1    A.    So let's see how I would answer that.  I am

2  the one that sees patients that have these weird

3  things, that the chances of it happening because of

4  that is like one in -- I'd see the one in 10 thousand

5  or the one in 10 million, these weird things that

6  could have happened for this thing, but 99.9999

7  percent it didn't happen that way.  And I'll just put

8  something like the Bair Hugger is as close to zero as

9  possible as leading to something that creates a

10  bacterial infection.

11    Q.    But not zero.  Okay.  Fair, doctor.  Thank

12  you.  Let me ask you this.

13    A.    The reason I'm going to say it's not zero,

14  you have a device and what if the -- by accident --

15  this could happen in the OR -- the whole drape falls

16  off that's protecting the patient from the wound, that

17  could happen in an OR, and lo and behold patient moves

18  in the middle of the case their thing and their wound

19  touches, something like that.  That's like a -- we

20  could all it an act of God.  So to say -- for anybody

21  to say something -- some weird scenario couldn't

22  happen --

23          But this isn't one of those 99.9999s, it's

24  not in -- it's not operative.  That's what I sort of

25  was trying to imply.  It's not one of those things

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

193

1    that are really known or would be causative in

2    creating an infection.

3        Q.   So this is sort of the anything-can-happen

4    idea.  All these things you've listed, anything can

5    happen.  The -- the Bovie could become contaminated.

6    But you do --

7        A.   Oh, that's a real thing.

8        Q.   Well the Bovie --

9        A.   That does happen.  That does happen.

10       Q.   Do you have --

11            Did you cite any piece of literature --

12       A.   Oh, yes.  Oh, yes.

13       Q.   -- that show me cases where the Bovie had

14   became contaminated and caused an infection of a

15   joint?

16       A.   You don't need to --

17            The answer is, the first part, yes.  I -- I

18   cited literature that shows -- say -- I don't have the

19   exact number, that Bovies are contaminated in 25

20   percent.

21       Q.   Just like Bair Huggers are contaminated.

22   They can be contaminated too; right?

23       A.   No.  But you're using a Bovie on a wound.

24   The Bair Hugger is so far removed from a wound --

25       Q.   You're using it on a wound --

194

1                    THE REPORTER:  Just a moment.

2                    MR. B. GORDON:  All right.

3                    MR. C. GORDON:  Yeah.  Let him finish his

4      answers.

5           A.   You're using a Bovie, which is

6      contaminate -- this 20 percent contamination rate,

7      that's why you have to be very careful.  And often you

8      may want to switch your Bovie tips during the case,

9      which many -- many people do on a regular basis,

10     because you're taking that Bovie and you're -- you're

11     directly putting it into the wound directly where

12     you're concerned.  That's -- and that --

13               So you don't have to do studies that --

14     that -- that have to tell all the surgeons that we

15     don't want to -- we want to minimize the chance of

16     using things like Bovies and saws that get

17     contaminated or things that fall on the floor, and

18     then you put them -- you don't want to put that back

19     in the wound.  They're directly used in there.  That's

20     a far different scenario than you're saying that some

21     of the -- the -- the -- the tubes in the Bair device

22     have contamination, which is the same as all the

23     other -- many of the other pieces of equipment in the

24     OR anyway.  There's no -- that's not a standard

25     that -- that any of these other pieces in the device

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

195

1    need a HEPA filter or anything more than what they're

2    doing, and that any of that contamination that has

3    been found on that device, which is not meant to be

4    sterile, has anything to do with dissemination of

5    bacteria or any problem whatsoever.  And that's what

6    I'm saying.

7         Q.    Thank you, doctor.

8              You -- you need the Bovie to do surgery;

9    right?  Or to -- skin preparation.

10        A.    Actually, no, not all the time.  I -- no, I

11   use --

12             Sometimes I use other cautery devices

13   besides the Bovie.  We're using --

14        Q.    The ultrasonic?

15        A.    We're using a PlasmaBlade now, and then we

16   have this new Cat -- Canady device.  So we're using --

17   we are actually using -- we're -- we're going to get

18   on some studies with that and we're going to start --

19   I have few data on that.  But the answer is you would

20   want some device that minimizes bleeding, like a

21   cautery or some other device, so the answer is yes.

22        Q.    And so I understand and be clear so the jury

23   understands, you don't use those actually in the

24   wound; do you?  You use them to cauterize a vessel.

25   You don't actually stick them into an open wound; do

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

196

1    you?

2        A.   I don't --

3             They definitely go in the open wound.  I

4    don't know what you're asking me.

5        Q.   Okay.

6        A.   I mean you have --

7             The -- the vessel is not outside the wound,

8    the vessel is in the wound.

9        Q.   Okay.

10       A.   Is that what --

11       Q.   Yeah, I think that clarifies it for me.  Do

12   you --

13            The other things in the operating room that

14   you've talked about, they are all essential pieces of

15   equipment.  Like lights, you got to have lights to

16   operate; right?

17       A.   You would not want to do these in the dark.

18       Q.   Okay.  So the point is you've listed a

19   number of things that you as an orthopedic surgeon

20   need to do your job that could be contaminated, but

21   you want to minimize or mitigate the risk of that

22   contamination; right?

23       A.   Yes.

24       Q.   Is the Bair Hugger absolutely essential to

25   operate?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

197

1      A.    What I said before is we're calling Bair --

2            I don't know what your question is.  Is it

3   Bair Hugger or device to maintain normothermia would

4   be considered standard of practice by the CDC, any

5   level, even the latest ruling by the --

6            Yeah.  They just had a new guideline with

7   that guy that I mentioned, Parvizi is like the middle

8   author, that absolutely recommends maintenance of

9   normothermia through -- through devices.

10     Q.    And -- and those devices, just to be clear

11  and go back to this, could be a number of different

12  types of patient warming.  Even Dr. Sessler agreed

13  with that; right?

14     A.    I don't --

15           MR. C. GORDON:  Object to the form of the

16  question.

17     A.    You're asking me --

18           I apologize for the way I answered it.  But

19  you ask me a question, I'm about to answer it, and

20  then you throw in this other clause.

21           The first part of your question is a yes.  I

22  have no idea what -- I've never read Dan -- is it

23  Daniel Sessler?  He has a father also that was a

24  nuclear physicist.  I think it's Dan Sessler.  I have

25  never read his deposition.  I have no idea what he

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

198

1  thinks about this.  So if you can --

2      Q.  Well --

3      A.  If you want to give it to me, I'll be happy

4  to read his deposition, I'll do that afterwards if we

5  want -- if everybody wants me to do so I can answer

6  your questions better.  Because he keeps popping up

7  here.

8      Q.  You're not aware that he's given

9  presentations -- public presentations where he says

10  specifically that he doesn't care what type of patient

11  warming you use as long as you warm the patient?

12      A.  I am not aware.

13      Q.  And so my question -- underlying question

14  is, doctor, --

15          (Witness's cellphone dings.)

16      Q.  -- again, there are numerous different ways

17  to warm the patient to try to prevent hypothermia --

18          THE WITNESS:  Excuse me one second.

19          MR. B. GORDON:  Sure.

20          THE WITNESS:  I apologize.

21          MR. ASSAAD:  Let's go off the record.

22          MR. B. GORDON:  Yeah.

23          THE REPORTER:  Off the record, please.

24          (Discussion off the record.)

25  BY MR. B. GORDON:

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

199

1      Q.   Thank you.  My --

2           Doctor, I was following up on that area

3    about different types of patient warming.  And you

4    would agree with me, would you not, that the forced-

5    air warming provided by Bair Hugger is not absolutely

6    essential to be used in every orthopedic surgery; is

7    it?

8           MR. C. GORDON:  Object to the form of the

9    question, asked and answered.

10     Q.   I'm not sure you've answered that question;

11   that is, is the Bair Hugger specifically required --

12          I mean you talked about this --

13     A.   Is this -- is this the only device, is that

14   what you're asking me?

15     Q.   Correct.

16     A.   It's not the only device.

17     Q.   Fair enough.

18          Do you know who Dr. Kamal -- and I'm going

19   to butcher this -- Maheshwari is?  Ma -- it's

20   M-a-h-e-s-h-w-a-r-i, first name is K-a-m-a-l.

21     A.   K-a-m-e -- a-l.

22     Q.   a-l, yes, sir.  Kamal Maheshwari.

23     A.   There is a Dr. Maheshwari that I'm a

24   co-author on, but I believe -- my brain is not

25   thinking.  Because I haven't authored with him in a

200

1   few years.  And he's at -- downstate in New York and

2   his name --

3        Q.   I'll help you out.

4        A.   --is Atta -- Attatuck.

5        Q.   This is someone else.  So --

6        A.   Oh.

7        Q.   Okay.  So you don't know a doctor of that

8   name at -- who is an anesthesiologist at the Cleveland

9   Clinic?

10       A.   Okay.  Now I have another question here.

11  Kamal Maheshwari.  So if you show me his --

12            Okay.  So here's the deal.  On any given

13  Wednesday, as I told you before, I work with any --

14  from -- could be over 20 anesthesiologists.  There are

15  three or four that I primarily work with.  And it's

16  not ringing a bell, Maheshwari.  Again, I would have

17  mixed it with up with a guy I published with.

18            If you show me a picture of him, if you can

19  get a picture on the internet, I can tell you whether

20  I recognize him.

21            (Mr. B. Gordon displays computer screen to

22            the witness.)

23       Q.   Boom.  Look familiar at all?

24            MR. C. GORDON:  Now you got to put a little

25  surgical mask on.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

201

1          MR. B. GORDON:  Exactly.  A little cap.  No.

2      A.   Somebody like that with a beard looks a

3   little familiar because he does -- somebody like that

4   was asking me about doing a study, and then when I

5   finally said we could do the study, then the company

6   withdrew the support for the study.  But I'm not that

7   familiar.  If it is that person, it's only about doing

8   studies.  I don't know what you're going to ask me,

9   but I got it.

10     Q.   Well are you -- are you familiar with

11  guidelines utilized by the Cleveland Clinic concerning

12  ventilation systems?

13     A.   Guidelines --

14     Q.   Standards or guidelines that are actually

15  published in a book that is used by the Cleveland

16  Clinic?

17     A.   No.  I -- I make an assumption, and if you

18  want I'm happy to go through those, but I make an

19  assumption that they are incredibly strict at the

20  Cleveland Clinic about their ventilation systems.  I

21  don't know all the details about that.  I assume --

22  it's a big assumption -- that they're safe.  They've

23  got a lot of ORs going at one time.  I do --

24          In action, I remember one day where there

25  was just a little bit of a defect in the wall that

202

1    happened over the weekend where there was like a

2    damage to a wall, and they shut down the whole OR, one

3    of our orthopedists.  So they are to me obsessively

4    compulsive about the details of what you just asked

5    about everything.  I've seen that with them.  So there

6    are people doing that.  I'm just not involved in that.

7         Q.   Have you ever opera -- I'm sorry -- designed

8    an operating room manual for oper -- let me --

9              MR. B. GORDON:  That's bad, Dick.  Let me

10   start over.

11        Q.   Have you ever designed an operating room?

12        A.   The closest I could say to designing an OR

13   is when I would do surgery on animals in the '90s and

14   we had to figure out which room we were going to use

15   to operate on rabbits or dogs and say, "Is this

16   ideal?"  And I'd get an anesthesiologist and my vet

17   and we'd sit there and we'd look at different rooms

18   and say where do we think it's best.  So maybe that's

19   a facetious answer, but the answer is no --

20        Q.   So would you --

21        A.   -- in a general sense.

22        Q.   Thank you, doctor.

23             Based on that answer, would you defer to

24   experts on operating room design about the ventilation

25   systems used in those operating rooms?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

203

1      A.   Absolutely.

2      Q.   Okay.  Fair enough.

3           You're not a member of ASHRAE.  You know

4  what ASHRAE is?

5      A.   I -- I don't --

6           I can't give you give you the whole eponym,

7  but yes --

8      Q.   And --

9      A.   -- that determines the standards for --

10     Q.   -- NIOSH is another one.

11     A.   I don't even know that one.  I'm just --

12     Q.   Okay.  What about the American Institute of

13  Architects who help design hospitals, you -- you a

14  member of that?

15     A.   No, I'm not a member of that.

16     Q.   All right.  Let me ask you if you -- if you

17  agree or disagree with this statement.  I'm going to

18  give you two statements.  Number one:  "Infection

19  control is critical in ORs."  Agree or disagree?

20     A.   Have to hundred percent agree.

21     Q.   Number two:  "Studies have demonstrated that

22  most of the causes of wound contamination in the OR

23  are the result of the patient's skin flora and

24  bacteria shed on airborne particles from the OR

25  personnel."  Agree or disagree?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

204

1     A.   Let me write it down.

2     Q.   I'll read it again.

3     A.   "...most of the" --

4          Yeah.

5     Q.   "Studies have demonstrated that most of the

6  causes of wound contamination in the OR are the result

7  of the patient's skin flora and bacteria shed on

8  airborne particles from the OR personnel."

9          MR. C. GORDON:  Object to the form of the

10 question and the way you read it.

11    A.   I'm -- I -- I -- I need --

12    Q.   I read it slowly.  I was trying.

13    A.   Let me read it back to you because I didn't

14 get the part --

15    Q.   Sure.

16    A.   Because I've got to analyze this because

17 it's a --

18          "...most of the studies" --

19    Q.   Well no.  It just starts "Studies..."

20 Sorry.

21    A.   Oh.  What's the beginning of it again?

22    Q.   "Studies have demonstrated that most of the

23 causes" --

24    A.   "...that most of the causes of wound

25 camin -- contamination in the OR are a result of

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

205

1   patient's skin flora or bacteria" --

2        Q.   And bacteria.

3        A.   "And" or "or?"

4        Q.   It's "and" here.  Yes, sir.

5        A.   And bacteria.

6        Q.   "...shed on airborne particles from the OR

7   personnel."

8        A.   On airborne particles.

9        Q.   From the OR personnel.

10            Do you agree or disagree with that

11   statement?

12       A.   Wound contamination, patient's skin flora

13   and bacteria shed --

14            So their skin flora or bacteria is being

15   shed on airborne particles --

16            I can't even understand this.  I have --

17       Q.   That's okay.

18       A.   I have a hard time with this.

19       Q.   That's okay.  You can't answer.

20       A.   You've got a patient's skin flora is what

21   I'm thinking, and bacteria is being shed -- that

22   that's being shed into the air, and then it just says

23   from the OR personnel, so it implies that the -- the

24   OR person -- OR cre -- OR personnel are creating the

25   shedding?  Doesn't make sense.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

206

1           The whole way it's phrased, it doesn't

2    totally make sense and is subject to different

3    interpretation.

4           I'm going to keep trying to give you the

5    benefit of the doubt on this statement.  And I'm sure

6    some authoritarian person said this or they're trying

7    to make these statements, but boy, is this difficult.

8        Q.   If you can't answer --

9        A.   We're not -- we're not saying that --

10   infections, we're saying wound contamination, so you'd

11   have to tell me what that means by "wound

12   contamination," are a result --

13       Q.   What does it mean to you?  I mean you're an

14   orthopedic surgeon.  What does "wound contamination"

15   mean to you?

16       A.   Well this could be anything, just a bacteria

17   or two, or it could be a whole -- something that leads

18   to infection.  They could be two different things.

19       Q.   Well if it's just a bacteria or two, we're

20   not going to worry about it.

21       A.   Not always.

22       Q.   Okay.

23       A.   You would like to avoid that at -- if at all

24   possible.

25       Q.   Not a good idea to even get any bacteria in

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

207

1    the wound, is it, if you can help it?

2         A.   Well we -- we just --

3              What we want to do is minimize that as much

4    as possible and dilute everything as much as possible.

5    There clear --

6              Clearly, there are colony-forming units in

7    every OR.

8         Q.   Doctor, the point of this --

9         A.   You just can't have zero.  But I mean that's

10   such a -- this is such a weird statement that I have

11   trouble reading it.  I -- I don't know what --

12        Q.   Well let me ask --

13        A.   If this was the case, if this was truly the

14   case, then why wouldn't we have every OR personnel --

15   why I don't totally agree with it -- why wouldn't we

16   have every OR personnel that is even working in that

17   OR -- which is not the case -- that even walks in

18   there completely scrub?  Why wouldn't we have -- and

19   there was a study like this.  Why wouldn't we have

20   people prepping the leg, which could be one or two,

21   completely as sterile as possible in their gowns?

22        Q.   So you're not --

23             Is it your testimony you're not concerned

24   about airborne particles around the patient at all?

25        A.   I'm definitely concerned.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

208

1      Q.    Waving your hand, you said you try to

2  minimize that, right, for that very reason?

3      A.    I didn't say I wasn't concerned.

4      Q.    You don't leave the windows open, do you, in

5  the operating room?

6      A.    Part of this is this "most" and --

7      Q.    Most of --

8      A.    -- some of it I don't know and some of the

9  way this is phrased --

10     Q.    You'd be --

11     A.    So I don't have a problem with --

12           Excuse me.  Can I just -- I just want to --

13           I'm concerned about all these things.

14     Q.    You're concerned about air particles around

15  the patient; aren't you?

16     A.    Sure.

17     Q.    Of course.  You -- you don't leave the

18  window open to let the breeze blow in; do you, doctor?

19     A.    What window?

20     Q.    Any O --

21           I'm sorry.

22     A.    We wouldn't --

23     Q.    You don't have operating rooms with windows;

24  do you?

25     A.    No.  We sometimes have operating rooms --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

209

1          But we --

2     Q.    If -- if -- if you have --

3     A.    -- we don't do that.  I agree.

4     Q.    If you have an operating room with a window,

5  you keep it closed during surgery; right?

6     A.    Yes.

7     Q.    Because you don't want particles or debris

8  or pollution or anything blowing in in a sterile

9  environment; right?

10    A.    As an anecdote, if a fly or anything walked

11  in an OR, everything would have to be shut and you'd

12  have to get rid of that fly and close -- you know,

13  cover --

14          I mean it's like a whole thing.

15    Q.    You don't smoke cigarettes in the OR.

16    A.    It doesn't happen too often, like once every

17  five years.

18    Q.    Let me ask you this.  You've been around a

19  little.  Were you around back in the day when I've

20  heard anecdotally that some of the people in the OR

21  would actually light up a cigarette?

22    A.    I couldn't even conceive of it.  It's never

23  been in my --

24    Q.    Never seen that?

25    A.    Never.  Never been in my frame of reference.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

210

1      Q.    Certainly wouldn't be allowed today.

2      A.    Yeah.  I mean it's not even in the ballpark.

3      Q.    Yeah.  Striking a match would be same thing.

4  You'd have to shut down the OR; wouldn't you?

5      A.    You don't --

6            There's so many things that could lead to a

7  fire in the OR, not only --

8            I mean when I said that three-minute thing

9  with the alcohol and the prep, they're concerned with

10  everything.  A Bovie coming in contact with a prep

11  with alcohol that could lead to a fire.  So they are

12  very ultraconservative about all these things.

13     Q.    Doctor, we're going to take a lunch break.

14  Before we do, I want to ask you one just very quick

15  line of questioning.

16            Somewhere in your report or in these papers

17  you indicated that, I think -- tell me if this is

18  wrong -- that you do about 80 percent of your

19  testifying for industry and about 20 percent for

20  plaintiffs.  Is that about right?

21     A.    Industry?

22     Q.    Well --

23     A.    Say it again.

24     Q.    -- defendants.  About 80 percent for

25  defendants, about 20 percent for plaintiffs?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

211

1       A.    Something like that.

2       Q.    80/20.  And the 20 percent for the

3  plaintiffs --

4       A.    Wait, wait, wait.  For -- define --

5             The plaintiff, we're talking about a --

6       Q.    That's what I'm asking you.

7             Sorry.

8       A.    All right.

9       Q.    I want to know what you mean by plaintiff.

10      A.    In that type of answer, it would be 80 -- it

11  would be the type of case where a physician is being

12  sued.  There -- there's a middle ground where I'm just

13  called as an expert on a topic, like I'm an expert and

14  I'm not for either side.  That happens.  I'm a

15  osteonecrosis expert, they call me for both sides.

16  "You're an expert.  We want to hear on these things."

17  But in cases where I'm defending a doctor, let's call

18  it that way, or am I on the side for a patient taking

19  a case, it's about 80/20.

20      Q.    So it's your testimony --

21      A.    Which -- which I think -- I think holds up

22  in that list I gave you.  You know, a small part of my

23  life, but there was a list of 20 cases.  If we looked

24  at that, I could actually tell you what that number is

25  from that list of 20, which was compiled over four

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

212

1    years, and since then I haven't really done much.

2        Q.   Let's take --

3        A.   One or two.

4        Q.   -- a look at that, doctor.  Find that

5    exhibit for me there.  I've got a -- my copy, but

6    there's a marked copy.  You can look at that one.

7        A.   Yeah.  So this would be --

8        Q.   Eleven cases.

9        A.   So right.  And the reason I brought it up,

10   most of the time I'm defending doctors --

11           Well one of them is just a worker's comp

12   case.  That's number three.

13       Q.   So Judith Cherrak, number three, --

14       A.   It's a worker's comp.

15       Q.   -- you were testifying then as a treating

16   doctor for this patient?

17       A.   Treating doctor.  And they wanted to know if

18   she should be out of work X period of time.

19       Q.   So let me ask you about that, doctor.  Was

20   your opinion in favor of the patient and her

21   disability, or contrary to that?

22           MR. C. GORDON:  Object to the form of the

23   question.

24       A.   It was in favor with a lot of provisions,

25   because they --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

213

1          They were happy with me, but ultimately they

2   weren't wholly happy with me.  They wanted to do a lot

3   more, if you want -- if you want, the patient and

4   their lawyer.  But they -- they had what I felt was

5   the truth.

6          Q.   Who was the patient's lawyer?

7          A.   I don't remember.

8          Q.   You don't remember?

9          A.   Just one quick deposition.  It took two

10  hours.  And they wanted to claim that X was due to her

11  injury, and some portion of it -- she had like partial

12  liability due to the jury.  But it was --

13         They probably would have wanted me to say

14  that all her disability was due to this injury, and I

15  basically said some percent that I felt was due to the

16  injury and some percent was pre-existing condition.

17         Q.   Who was her employer?

18         A.   I have no idea.  I don't remember this.

19         Q.   Who noticed your deposition?  Who --

20         Did the plaintiff's counsel notice your

21  deposition or did the worker's comp counsel?

22         A.   I don't know.

23         Q.   Okay.

24         A.   I don't --

25         I mean this is not a big part of my life, so

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

214

1   something like that --

2       Q.   Any other --

3       A.   I do not have the records of this.

4       Q.   All right.  Let's move on.

5            Any others of these 11 --

6       A.   I'm --  I'm --

7       Q.   Let me ask my question.  Any others of these

8   11 where you testified on behalf of a patient?

9            If you want, I'll narrow it, doctor, and

10  save time.  There are five cases I'm most interested

11  about, there's five trials if I'm counting right.  In

12  those five trials were you testifying on behalf of the

13  patient or the doctor or someone else?

14      A.   Number one is the patient.

15      Q.   Okay.  So Ms. -- I'm sorry.  Heather Carter

16  versus Loucks, what kind of case was that?

17      A.   That was a --

18           It was a purported malpractice against a

19  surgeon --

20      Q.   And you --

21      A.   -- and I was -- I was representing Heather

22  Carter in that one.

23      Q.   The patient.  And how did that end up?

24      A.   I don't know.  They were going to appeal it

25  or something.  It -- it did not --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

                                                                    215

1        Q.    So she lost her case?

2        A.    Yes.

3        Q.    Okay.  Next?

4        A.    Mingo versus DePuy  is -- is one of those

5   ASR cases.

6        Q.    You testified for DePuy.

7        A.    Yes.  I'm --

8        Q.    Okay.

9        A.    Or we're just going to say for the truth on

10  all these things.  But then --

11              MR. B. GORDON:  Object, non-responsive.

12       A.    -- who is --

13       Q.    Your testimony was on behalf of DePuy.

14       A.    The lawyers that represented DePuy, yes.

15       Q.    Your testimony was to defend DePuy's medical

16  products; was it not, doctor?

17              MR. C. GORDON:  Object to the form of the

18  question, asked and answered.

19       A.    I don't have an answer to that.

20       Q.    Okay.  That's fair enough.

21       A.    I'm here for both sides.

22       Q.    All right.

23       A.    Say it that way.

24       Q.    Any others where you testified on behalf of

25  the patient, like with Ms. Loucks, out of these 11?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

216

1          If you don't remember, that's okay, doctor.

2     A.   The only one --

3          I think all the other ones are in behalf of

4  a surgeon or doctor, not --

5          I can't remember Wade off -- off my head

6  right now.

7     Q.   So with respect to the last four years at

8  least, the 80/20 doesn't hold true, it's more like --

9     A.   Well this is only --

10    Q.   -- 10 to one.

11    A.   This is only a sampling of 11, and I told

12  you -- what  did I say earlier -- 60.

13    Q.   This -- this is -- I'm sorry.  This is only

14  11 --

15    A.   It's not even 11, it's 10, because the

16  number two is the -- is the DePuy case, and number --

17         It's not even 11, it's -- it's at best nine.

18    Q.   What I'm trying to understand, doctor, is

19  this list is 11 cases where you testified by

20  deposition or trial since June 1st of 2013.  What am I

21  missing?  Is that not right?

22    A.   No.  This is from '13 to '17.

23    Q.   Right.

24    A.   I haven't been doing that much.  I haven't

25  done any --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

217

1          This is the first time I've been here this

2  year and I'm not -- don't plan --

3          I'm the chairman of Cleveland Clinic.  I'm

4  not doing too much now and I've slowed this down.

5  What I'm telling you is I've done 60 or so.  You have

6  a sampling here of nine -- 10 or nine.  Mingo versus

7  DePuy doesn't count.  That's a separate category.  And

8  number three is a -- is what -- is a disability.  I

9  gave you a number of 60 where it's a decision

10  plaintiff versus defendant -- or let's say -- I'll

11  lower it to 50.  This is only a sampling of nine.

12      Q.   Okay.  So this --

13      A.   So I would still say the 80/20 holds up, if

14  you're trying to say that it doesn't hold up.

15          (Mr. Assaad tries to get Mr. B. Gordon's

16          attention.)

17      MR. B. GORDON:  I'm done.  Just let me

18  finish, Gabe.  If you want to walk out, step out.

19  Quit interrupting me.

20      A.   If -- if the implication is that I'm not

21  doing 20, I am doing about 20.  I know that there

22  could be two in a row.  Sometimes it's not a

23  physician, it's an ER or it's a situation.

24      Q.   All right, doctor, I'm trying to understand,

25  I'm just -- and let's to go lunch, but the question

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

218

1    I'm not clear on is these 50 or 60 you're talking

2    about, are we talking about in the last four years?

3    Because all I want to know about is the last four

4    years.

5        A.   No.  This is career.

6        Q.   Correct.  That's what I want to understand.

7             In the last four years you've given us all

8    the cases that you testified in, the 11.

9        A.   Okay.  So my 80/20 would have been lifetime.

10       Q.   Understood.

11       A.   If I implied otherwise in a previous answer,

12   it's a general number.  These are the cases, to the

13   best of my knowledge, that I was able to collect over

14   the four-year period.  It amounts to 11.  Of those,

15   nine -- I don't -- I -- the last two I'm a little

16   questioning of, but I'll give it as ones that I

17   defended doctors.  I can go back and really defin --

18            I might be able to go in my computer.  I'm

19   not sure.  A lot of it I got rid it.  So we'll say of

20   those cases it's one versus eight -- one out of nine.

21       Q.   That's all I was trying to clarify.

22       A.   Okay.  You got it.

23       Q.   So in the last four years, the cases that

24   we've got on this exhibit, it's only one out of nine

25   or 11 on behalf of patients, so the -- just so it's

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

219

1   clear.

2       A.   Well my own patient is two out of 10, --

3       Q.   Okay.  Two out of 10.

4       A.   -- Carter and Cherrak.

5       Q.   Okay.  Doctor, you're not an infectious

6   disease doctor; are you?

7       A.   No.

8       Q.   You don't hold yourself out as an expert in

9   microbiology or infectious disease?

10      A.   I don't hold --

11           I hold myself to the extent, as an

12  orthopedic surgeon, I have to deal with infections and

13  have published a lot on infected hip and knee

14  replacements, which are relevant to the case, to that

15  extent I'm to some extent an expert.  As a -- as a

16  pure infectious disease person, microbiologist, no,

17  I'm not an expert.

18           MR. B. GORDON:  Fair enough.  Thank you,

19  doctor.  We can take lunch.

20           THE REPORTER:  Off the record, please.

21           (Luncheon recess taken.)

22

23

24

25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

220

1                    AFTERNOON SESSION

2              MR. C. GORDON:  And I just want to note for

3    the record that we understand that Mr. Gordon, Ben --

4    Mr. Ben Gordon has unexpectedly left and Mr. Assaad is

5    going to -- has indicated he's going to take over the

6    questioning.  We think this is irregular and

7    inconsistent with the -- with -- with the practice if

8    not specific rules, but I've also indicated in order

9    to finish this out we're going to let Mr. -- Mr.

10   Assaad go ahead and ask -- ask questions.

11             MR. ASSAAD:  Thank you, Mr. Corey Gordon.

12   I'm going to say "Corey Gordon" because I don't want

13   to mix the two Gordons.

14             MR. C. GORDON:  Now it's easy.  I mean I'm

15   the only Gordon in the room.

16             (Discussion off the stenographic record.)

17   BY MR. ASSAAD:

18        Q.   So Dr. Mont, we have met before; haven't we?

19        A.   Yes.

20        Q.   Actually, one of the cases you listed on

21   your deposition or trial list is a case of Victoria

22   Smith, and we met at trial.

23        A.   Smith versus Moskowitz.

24        Q.   Yes.  All right.  I don't recall, but I

25   think I was the one that actually cross-examined you

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

221

1   at trial.

2        A.    Yeah.  But now that I'm thinking about it,

3   maybe there -- you both were doing it.

4        Q.    Maybe.

5        A.    I mean I think you tag-teamed that one.

6   Right?  You came in like a little later.

7        Q.    It's my new -- it's my new MO I guess.

8        A.    I think there were more than one.

9        Q.    Yeah.

10       A.    I think you were --

11       Q.    So --

12       A.    That's why, when you said that, I seemed to

13  remember it.  But I don't -- what do I --

14             I don't remember all these cases.  I'm

15  surprised I remembered --

16       Q.    First thing, sir, I want to go to page two

17  of your report, Exhibit 5.

18       A.    Okay.

19       Q.    It's right there.

20             Now you wrote this report and you submitted

21  it around June 1st or 2nd; correct?

22       A.    Somewhere in that vicinity.

23       Q.    Okay.  And --

24       A.    Well it was being written like a week or two

25  before.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

222

1      Q.    Okay.

2      A.    Final, it was handed in in those days.

3      Q.    Fair enough.

4            And when you wrote this report, I mean

5    you -- you checked it for accuracy to make sure

6    everything was correct.

7      A.    I did to the best of my ability.  Since then

8    I found a few typos or things that --

9      Q.    Forget about --

10           Substantively.

11     A.    -- I might -- I might change.

12           Yes.

13     Q.    And as you testified earlier, this -- this

14   report, which was due by -- by June 2nd, is the

15   totality of your opinions as of the date of filing

16   this report; correct?

17     A.    Depends on, I guess, what are considered the

18   most relevant things.  I mean I have other opinions,

19   but --

20     Q.    Okay.

21     A.    -- that -- that your side should know.

22     Q.    Fair enough.

23           We talked about how many surgeries you did

24   previously per year and how many you -- patients you

25   see per month, and you wrote in your report on page

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

223

1    two, "I routinely take care of lower extremity joint

2    arthroplasty patients.  I have performed during my

3    professional career over 500 to 700 joint replacement

4    surgeries per year for a total of over 15,000 since

5    1999."

6              I take it that was at the time you wrote the

7    report; correct?

8         A.   If you read the last phrase in that

9    paragraph, that's not true.  It says -- look in the

10   paragraph there, it says "...(although with duties as

11   Chairman this past year, my clinical activity has been

12   reduced)."  So what this is referring to is -- is

13   factually right.

14        Q.   Okay.  So --

15        A.   Not every year did I do 700 surgeries.  At

16   the beginning of my career I was doing closer to 500.

17   The later part of my career I was doing closer to 900.

18   I'm giving a general average since 1990.

19        Q.   Up until you went to the Cleveland Clinic?

20        A.   And then -- and then what I said, actually I

21   didn't even realize it says here, so 6,000 was a more

22   factual -- what I said earlier in -- today --

23        Q.   Okay.

24        A.   -- was more right.  But if you see the last

25   parenthesis, when I become chairman, the clinical --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

224

1            Let's call clinical 50/50 now.  Okay?  So

2   whatever number is there, it should be three thousand

3   and --

4            But that's not even right.  I was doing -- I

5   did 865 cases -- I'll do about 400 surgical cases, and

6   I'm seeing, I think, a little over 3,000 cases by the

7   last numbers.  And we -- we get the numbers every

8   month to see.

9        Q.   How long does it take you to do a total hip

10  on average?

11       A.   Skin to skin, about -- we're talking about

12  somebody that does not markedly have a high BMI --

13  about twenty -- the average would be about 22 to 24

14  minutes.

15       Q.   To do a total hip?

16       A.   Without rushing.  Yes.

17       Q.   Okay.

18       A.   Skin to skin.

19       Q.   What about a total knee arthroplasty?

20       A.   Total knee, a little bit longer.  I would

21  say about 40 to 45 minutes.  So --

22       Q.   Okay.  And -- and all those --

23            In all those cases you used some sort of

24  device that maintains normothermia?

25       A.   All of those cases.

225

1          Q.   All.  So you --

2               And while you were at the -- in Baltimore,

3    that device was the Bair Hugger forced-air warmer;

4    correct?

5          A.   If not a hundred percent, then I would say

6    99.99.

7          Q.   Okay.

8          A.   And maybe there was an exception, --

9          Q.   Do you know which Bair Hugger --

10         A.   -- but few.

11         Q.   Sorry.

12              Do you know which Bair Hugger device you

13   used?

14         A.   I know there's a lot of different models or

15   things, but I can't tell you that.

16         Q.   Okay.

17         A.   I can find that out if you want later.

18         Q.   And the blower of the Bair Hugger, that's

19   placed next to the anesthesiologist; correct?

20         A.   Yes.

21         Q.   Underneath the operating room table;

22   correct?  Underneath the head of the patient.

23         A.   If we put it underneath the operating room

24   table, that would be like on the floor.  No.

25         Q.   So --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

226

1    A.    At the head of the -- at the head of the

2  table.

3    Q.    Was it on the floor or on a pole, if you

4  know?

5    A.    It would be over the patient --

6          Oh, the actual --

7    Q.    Blower.

8    A.    Yeah.  The device would be -- I guess would

9  be on the floor.

10   Q.    Okay.  And that device would be close to the

11 anesthes --

12   A.    I'm thinking of what's attached to the

13 patient.

14   Q.    And that's why I referenced the blower.  The

15 blower is on the floor; correct?

16   A.    Yes.

17   Q.    And the blower is placed underneath the head

18 of the -- usually around the head area of the patient,

19 on -- on the floor.

20   A.    Yes.

21   Q.    Okay.  You don't hold yourself out as an

22 expert on normothermia; do you?

23   A.    I don't know what that question means.  I --

24 I mean I've read a number of articles on nor --

25 normothermia in preparation for this -- this case.  I

227

1   don't know if there's any person that would call

2   themselves --

3           It's not a subject in medical school that

4   you study.

5       Q.   I understand.  But you know Dr. Sessler and

6   Dr. Kurz have devoted their life to doing research in

7   the areas of maintaining normothermia.

8       A.   I couldn't tell you that they devoted -- it

9   doesn't seem --

10          Having met Dr. Sessler one time, I don't

11  think he spent his whole life, --

12      Q.   Okay.

13      A.   -- has devoted his life.  I wouldn't

14  charact -- he -- he has a -- in the --

15          In the role that I have at the Cleveland

16  Clinic, he's the director of -- one of the directors

17  of research at Cleveland Clinic.  I don't know the

18  exact title.  He also oversees research for the whole

19  anesthesia department.  I was getting involved with

20  some other studies that are not related to this one,

21  so that's why the meeting was.  But I think he's

22  also -- I -- I don't know --

23      Q.   Okay.

24      A.   -- if I would say --

25      Q.   That's fine.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

228

1      A.   -- what you said.

2      Q.   And to speed things along and -- I mean if
3 you disagree, you don't think he's an expert, just say
4 "I don't think he's an expert" and let's move on.

5           So I want to turn to page 17 of your report.

6      A.   So -- so should I --

7      Q.   You cite -- you cite Dr. Kurz and Dr.
8 Melling as -- as citations for strong evidence of SSI
9 reduction for active warming.  Do you see that in your
10 report on page seventeen?

11     A.   Wait.  I didn't say that Dr. Sessler is not
12 an expert in -- in hypothermia.

13     Q.   You just didn't --

14          You didn't know.

15     A.   I mean he's published on it.

16     Q.   You didn't know.

17     A.   Well I know he has publications on
18 hypothermia, so we're level with that.  Okay.  So
19 let's --

20          What's this question?  I'm sorry.  I
21 apologize.

22     Q.   Now you -- you cite on page 17 the Kurz
23 article of 1996 and Melling -- Melling article 2001
24 as -- to support your statement that strong evidence
25 of SSI reduction for active warming was found.  Page

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

229

1   17.

2        A.    Okay.  Okay.

3        Q.    Do you see that?

4        A.    I see that.

5        Q.    Okay.  Have you read those articles?

6        A.    To the best of my ability, not recently, but

7   yes.

8        Q.    Okay.  Are you aware whether or not Melling

9   supports the proposition --

10       A.    Yeah.

11       Q.    Do you -- do you under --

12             Do you understand that Mellon -- Melling

13   deals with prewarming and not perioperative warming?

14       A.    Yeah.  Melling -- Melling is -- well Melling

15   is on pre -- the whole --

16       Q.    Yeah.

17       A.    The whole article is on prewarming.

18       Q.    Okay.  And that's different than

19   perioperative warming; correct?

20       A.    Well it depends on your definition.  You can

21   call everything perioperative.

22       Q.    Okay.

23       A.    So I mean I -- I don't want to get lost in

24   semantics.  But I'll -- I'll agree with you.  I mean

25   if you want -- I --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

230

1          I wouldn't hang up my whole argument on the

2    beneficial effects -- which is what this is -- on

3    those two articles alone.  I think there's a lot of

4    articles, if you want to hang up -- hang on those two

5    articles.  If you want to delete those, I could give

6    you others articles.  But that is prewarming.

7          My life, I view prewarming -- the whole part

8    as part of the perioperative period.

9        Q.   Do you know whether or not the -- the study

10   in Melling dealt with warming patients while -- before

11   or after the incision?

12       A.   No.  I don't want -- I don't want to rely on

13   memory for --

14       Q.   Okay.

15       A.   -- any of these.  I mean for some of them I

16   will rely on memory.  And I apologize for saying this:

17   Even my own studies where my name is the lead author,

18   I don't want to rely on memory in answering specific

19   questions like that.  If you --

20          I'm very happy to answer this later, or if

21   you want to pull up the article right now, we'll go

22   and look at it.

23       Q.   Well let's just --

24          The article states what it states; correct?

25       A.   Of course.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

231

1       Q.   Okay.  And -- and --

2       A.   Based whatever --

3            If you say that, then I agree that --

4       Q.   And you're aware that Kurz -- you're aware

5  that Kurz dealt with colorectal surgeries; correct?

6       A.   I would say --

7            What I would say, it's not orthopedic, yes.

8       Q.   Okay.

9       A.   I - I don't know which one -- and some --

10           I don't want to mix up ones on colorectal,

11  ones on cardiac.

12      Q.   Sitting here today, are you aware of any

13  study that indicates that maintaining normothermia

14  during the perioperative period reduces the incidence

15  of a periprosthetic joint infection?

16      A.   Any orthopedic study.

17      Q.   Any study that indicates that maintaining

18  normothermia during a -- a total hip or total knee

19  arthroplasty reduces the incidence of periprosthetic

20  joint infection.

21      A.   You just said "any study," but you said

22  periprosthetic, so we're talking -- can't say "any."

23  It's --

24           We're talking about total joint studies, hip

25  or knee arthroplasty.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

232

1      Q.   Whether it's done by anesthes --

2      A.   Periprosthetic means prosthesis.

3      Q.   I understand what it means, sir.  My

4  question is:  Are you aware of any study from any

5  discipline that -- that supports -- strike that.

6          Are you -- do you rely on any -- strike

7  that.

8          Are there any studies that you're aware of

9  that indicates that maintaining normothermia during a

10  total hip or total knee arthroplasty reduces the

11  incidence of periprosthetic joint infection?

12          It's a simple "yes" or "no."

13          MR. C. GORDON:  Well --

14      A.   Well I'm scanning my memory bank here.

15      Q.   Okay.

16      A.   And it's not a simple "yes" or "no."  We

17  know that there's a lot written.  For example, the

18  consensus statement by that Parvizi group with the

19  book, there was a 92 percent concurrence that using --

20  maintaining normothermia would reduce the in -- was --

21  was believed that that would reduce the incidence of

22  periprosthetic infections.  Most -- they did say in

23  the conjecture that most of the -- that's why --

24          The evidence was from three or four studies

25  that were non-orthopedic, in that -- in that statement

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

233

1  which came out, I guess, in '14, okay, so that was --

2      Q.   You mean the one that came out in 2013, the

3  International Concensus?

4      A.   The International Concensus.  That's a

5  book --

6      Q.   Do you think that's authoritative?

7          MR. C. GORDON:  Let him answer the question.

8  Just hold on.

9      A.   I think that's very authoritative.

10     Q.   Okay.

11     A.   That's -- that's what a lot of us are going

12  by.  And there's going to be another meeting of the

13  400 experts in -- and we're not talking about the CDC,

14  we're talking about what you -- in one of your parts

15  of your question you're asking about periprosthetic

16  joint, prosthetic meaning joint.  So they did say that

17  there was a lack of studies in orthopedic literature,

18  but based on the studies that were non-orthopedic, 92

19  percent or maybe higher felt that maintaining

20  normothermia was important to reduce the risk of

21  infection.

22          There was another CDC statement that came

23  out saying similar things.  There may be -- I don't

24  want to say the wrong thing.  And, you know, I do

25  recall the study in Orthopedics on hip fractures by

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

234

1   Frisch that showed a lower periprosthetic infection

2   rate.  The -- I have --

3       Q.   So first, how do you spell Frisch?

4       A.   The last name is F-r-i-s-c-h.

5            And I would have to get back to you on that,

6   because sometimes --

7       Q.   Sir, I understand that you keep on saying

8   you have to get back to me, but today is the time I

9   take the deposition.  This is your report and it's

10  certified; correct?

11           Let me ask you this:  Have you cited --

12           Is there any study in Exhibit 5 that you

13  could cite to that -- that claims that maintaining

14  normothermia reduces the risk of periprosthetic joint

15  infections?

16      A.   Let me look through Exhibit 5, because I

17  don't want to give you the wrong number.

18      Q.   I'm not talking about --

19      A.   Exhibit -- this -- this exhibit.

20      Q.   No.  Exhibit 5, your report.

21      A.   This is part of Exhibit 5.

22           MR. C. GORDON:  Well --

23      Q.   No, that's --

24           MR. C. GORDON:  He separately -- separately

25  marked the reference list --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

235

1          MR. ASSAAD:  Okay.

2          MR. C. GORDON:  -- as eight.

3          MR. ASSAAD:  Withdraw the question.

4      Q.   You've studied periprosthetic joint

5  infections; correct?

6      A.   Yes.

7      Q.   You've actually done studies and have

8  published on the issue; correct?

9      A.   Yes.

10     Q.   And you --

11          And sitting here today, you can't cite a

12  study without looking at Exhibit A, off the top of

13  your head, of any study that shows that normothermia

14  reduces the risk of periprosthetic joint infection.

15          If you can't, you can't, sir.

16     A.   For a real answer, there are some things

17  that if it's already been confirmed in other

18  specialties, it would be unconscionable -- by all

19  three definitions of the word -- to actually do a

20  study would be unethical, unconscionable.  You

21  couldn't get patients to do a study like that.  And

22  because of all the problems that not maintaining

23  normothermia would ensue, there wouldn't be a study

24  like that.  In addition, we know that the lack of

25  normothermia will lead to hematomas and bleeding

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

236

1   risks, all of which lead to infection.

2       Q.   That's not what I asked you.  Let's stick

3   to -- let's stick to --

4       A.   But I -- no.

5            MR. GORDON:  Let him answer the question.

6            MR. ASSAAD:  Corey, you -- you understand

7   where he's going here.

8            THE WITNESS:  But I'm --

9            MR. ASSAAD:  You know what he's doing.

10           THE WITNESS:  But I'm not --

11           MR. ASSAAD:  I'm asking about -- I'm asking

12  you about --

13           THE WITNESS:  But I'm not here to answer --

14           THE REPORTER:  Off the record.  Off the

15  record.

16           (Discussion off the record.)

17  BY MR. ASSAAD:

18      Q.   Sir, I'm specifically -- I want --

19           I'm going to ask you questions and I want

20  you to answer the question that I ask you.  I asked

21  you about periprosthetic joint infection.  I did not

22  talk about hematomas, I didn't talk about any other

23  issues.  I asked are you aware of any peer-reviewed

24  literature that indicates that maintaining

25  normothermia reduces the incidence of periprosthetic

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

237

1    joint infection?

2           That's either a "yes" or "no."

3           MR. C. GORDON:  Hang on.  Gabe, it's --

4    you're not going to get to instruct him whether your

5    question is "yes" or "no."  He's going to answer the

6    question the way he feels fit.

7           I think the answer that he was giving when

8    you interrupted him was directly answering your

9    question.  You may disagree.  You have the right to

10   move to strike after he has finished with his answer.

11   That's the way it works.  If nothing else, as a matter

12   of courtesy to the court reporter.

13          MR. ASSAAD:  I --

14          MR. C. GORDON:  If you -- if you want to be

15   courteous to the witness, wait until he's done with

16   his answer.  If you don't think it's responsive, move

17   to strike.  But let's have a little decorum here.

18          MR. ASSAAD:  I understand that, Mr. Gordon,

19   but I'm asking a specific question of whether he's

20   aware of any pub -- peer-reviewed literature that

21   supports -- or indicates that maintaining normothermia

22   reduces the incidence of periprosthetic joint

23   infection.  If he's --

24          He could say, "Yes, this is the literature,"

25   or, "No, not right now.  I don't know what it is."

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

238

1   So --

2          MR. C. GORDON:  Okay.  You know, Gabe, I

3   just want to point out, in that question you asked

4   "literature that supports."  He was giving you a --

5   a -- a fairly detailed explanation of the literature

6   that supports normothermia's relationship to

7   periprosthetic joint infection.  You may not like it,

8   you may not think it's responsive, that's fine, --

9          MR. ASSAAD:  I want --

10         MR. C. GORDON:  -- just let him finish.

11    Q.   So -- so I want the name of the literature.

12    A.   So I'm -- I'm not going to -- to --

13         My answer is normothermia promotes

14   tremendous health benefits to the patients that have

15   been studied outside of orthopedics.  I would have to

16   look specifically in ortho and see the -- indirectly

17   how it's shown that, but it wouldn't be something

18   studied because of what -- that specific topic because

19   we know that normothermia promotes so many other

20   beneficial effects.  And in fact you asked me for a

21   study and you didn't -- and I don't have to even tell

22   you what I mean by "a study," so I know that published

23   literature is considered studies by many people, so

24   that consensus statement by -- by Parvizi would count,

25   so would the CDC recommendation to reduce

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

239

1    infections -- periprosthetic infections by maintaining

2    normothermia, that would count.  And for all the

3    benefits of normothermia, I don't like a -- an answer

4    that would be taken out of context, so I will maintain

5    that answer.

6         Q.   Do you have an understanding of whether or

7    not using forced-air warming has an effect on

8    hypothermia during the first hour of surgery?

9         A.   I can't give you every detail of it.  I

10   would expect that FAW can help --

11            I'm trying to think of different studies

12   that looked at timing of forced-air warming.  But

13   again, that's not what I was called to be the expert.

14   There are other experts on the device.

15        Q.   And -- and I agree to that.  And you --

16            So you would agree that you are not an

17   expert with respect to maintaining normothermia and

18   its effect on -- all its effects on surgical outcomes.

19        A.   There are articles I've written that show

20   that the FAW was very eff -- extremely effective at

21   maintaining normothermia.  There are a number of

22   published reports; they are part of that exhibit

23   that's in there.  And it's been recommended by

24   association of the nurses.  A lot has been written

25   about it.  So -- and -- and there are a number of

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

240

1   review articles that go through the literature, like

2   Jacofsky's article -- J-a-c-o-f-s-k-y.  So to that

3   extent I'm -- I can give you an answer.  To the extent

4   of knowing the minute-to-minute effects of FAW, I --

5   that's not -- you have other experts to -- to handle

6   that.

7       Q.   Have you read Al Van Duren's deposition?

8       A.   Whose?

9       Q.   Al Van Duren.

10      A.   Why is that not ringing a -- a bell?

11      Q.   So I take it since it's not on your list of

12   exhibits --

13      A.   Who is he?

14      Q.   Doesn't matter who he is.  Have you read his

15   deposition?

16      A.   Unless some -- sometimes I don't know --

17           Can you spell the name, sir?

18      Q.   Let me ask you this:  If it's listed --

19   would it be listed --

20           If you read his deposition, would it be

21   listed on your invoices?

22      A.   Yes.

23      Q.   Okay.  So if it's not listed on your

24   invoice, could we assume you didn't read his

25   deposition?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

241

1      A.   No, I wouldn't read a deposition that didn't

2   get --

3      Q.   Okay.  Have you read the deposition of

4   Andrea Kurz?

5      A.   No, I have not.

6      Q.   Do you know who Andrea Kurz is?

7      A.   Yes.

8      Q.   She's actually a physician at the Cleveland

9   Clinic; correct?

10      A.   Correct.

11      Q.   Okay.  Have you read any of the depositions

12   of Dr. Sessler?

13      A.   I already said that earlier.

14      Q.   Okay.

15      A.   No.

16           I'll be happy, if you want me to read these

17   at a later time, I'll be happy to do that --

18      Q.   Well --

19      A.   -- if you need that.

20      Q.   -- it's not my job to tell you what to rely

21   upon or the materials to give.

22      A.   Okay.

23      Q.   That would have been your -- the people you

24   work for.

25      A.   Okay.

242

1      Q.   Turning to page five of your deposition

2   dealing with the paragraph that starts "The impact of

3   ventilation" --

4           MR. GOSS:  His report?

5           MR. ASSAAD:  I'm sorry.  Correct, your

6   report, Exhibit 5.  Page five Exhibit 5.  Thank you,

7   Corey.

8      Q.   You don't hold yourself out as a ventilation

9   expert; correct?

10     A.   I am not a ventilation expert.  I know of

11  ventilation to some extent, but --

12     Q.   Okay.  You wouldn't know how an operating

13  room ventilation works and maintains positive pressure

14  and the types of filtration used.

15     A.   I would know that --

16          For example, at this consensus conference I

17  was asked questions about the -- the success rate of

18  laminar flow versus ultraviolet versus turbulent

19  versus -- what was the other one -- versus something

20  else.  I had to actually give a few statements, so --

21     Q.   Did you say ultraviolet?  You meant ultra --

22  ultraclean?

23     A.   UV radiation.

24     Q.   Okay.

25     A.   Okay.  So I had to prepare little statements

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

243

1   on the literature at the time.  Now that doesn't make

2   me an expert, it just makes me looking at results of

3   like New Zealand Registry about laminar flow and

4   cup -- and I also had to look up space suits, so --

5   which were related, combination of laminar flow with

6   space suits and the risk of periprosthetic infection

7   for -- I did a little bit of that work for the

8   consensus conference.

9        Q.   Do you know what a Reynolds number is?

10       A.   A what?

11       Q.   A Reynolds number.

12       A.   I've heard of a Reynolds number, but no, I'm

13   not --

14       Q.   Do you know what the Navier-Stokes equations

15   are?

16       A.   No, I don't.

17       Q.   Do you know -- do you know what the

18   Archimedes number is?

19       A.   I know who Archimedes is, but I don't know

20   what the Archimedes --

21       Q.   Do you know --

22       A.   -- number is.

23       Q.   Do you know the difference between a lam --

24   what the Reynolds number would indicate, to know the

25   difference between what's a laminar flow and a

244

1   turbulent flow?

2        A.   These are the parts that I'm not an expert

3   on, and that's why you see that certain -- certain --

4             I don't spend that much time on that part.

5   That's not -- I'm not --

6             On the part of what you're asking me is

7   infection rates with laminar flow versus turbulent

8   flow, but not knowing how many cycles of -- of --

9   are -- are -- of air are coming per minute or at a

10  certain point, what is disrupting the -- the turbulent

11  flow or the laminar flow, what -- what's the effect of

12  people going into the flow rate and things like that,

13  that is not my expertise, which is I -- what I think

14  you're asking.

15       Q.   So sitting here today, would you agree with

16  me that you don't have the expertise to indicate if

17  any medical device that blows air, its effect on the

18  airflow in an operating room?

19            MR. C. GORDON:  Object to the form of the

20  question, misstates his testimony.

21       A.   I think I have been aware when something is

22  blowing air in my face in the OR or things like that

23  on a gross level, and on -- and on a micro level or

24  a --

25            I have read these articles that are

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

245

1    pertinent to the case.  I have my own opinions about

2    what I think is relevant.  I also have some opinions

3    on certain conclusions that were made about different

4    devices that are pertinent to this case.

5              (Witness's cellphone dings.)

6        Q.   So tell me what a large eddy is with respect

7    to flow.

8              THE WITNESS:  Excuse me one second.

9        A.   Say this again.

10       Q.   Do you know -- do you know what a large eddy

11   is with respect to turbulent flow?

12       A.   I mean I know what an eddy is.  It's a

13   current that gets raised up.

14             No.  You're asking me questions, and those

15   are details of that that I would -- would not profess

16   to be an expert on.

17       Q.   Okay.  Let's go to page nine under "Many

18   things in the operating room impact airflow."  What

19   evidence are you relying upon that -- scientific

20   evidence that surgeon traffic disrupts or impacts

21   airflow in the room?

22       A.   There -- there have been a number of papers

23   and reports that have been written on the amount of

24   surgeon traffic that affects infection rates.  I

25   think -- I could be wrong -- I think it's the Lidwell

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

246

1   study -- L-i-d-w-e-l-l -- but I could be wrong on

2   that, where in a -- in a general surgery operating

3   room where the -- there was an average of 18 people

4   per OR case versus a group of cases where there is an

5   average of four, the infection the rate was four-fold.

6           You're asking me about currents.  Some of

7   those articles, like that article, liken it to

8   creating more currents, more doors opening and

9   shutting, and that's --

10      Q.   Well I'm familiar --

11      A.   -- a direct answer.

12      Q.   -- with the article, and wouldn't you agree

13  with me that that article dealt more with the

14  bioburden that's created by having more people in the

15  operating room as compared to disrupting airflow?

16          MR. C. GORDON:  Object to the form of the

17  question, also lack of foundation.

18      A.   Well you --

19          We could argue about that and say that's --

20  that's similar; more people in the OR creates more air

21  currents from the people walking in and out of the OR,

22  things like that.  In our ORs we view that opening and

23  we -- when -- cases in Baltimore, when there were

24  problems, they slammed the door shut and said, "We

25  don't want any flow of air."  That was what our I.D.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

247

1  people said.  "We don't want the door opened or shut.

2  We want no air currents from opening or shutting the

3  door, and we don't want people walking around and

4  throwing more currents."  And that was stated by

5  our -- our infectious disease experts --

6      Q.    So --

7      A.    -- in those periods of time when we wanted

8  to reduce infections.

9      Q.    So you're relying on what the infection

10  disease experts told you in Baltimore in your opinion.

11      A.    That, and reading articles, --

12      Q.    What --

13      A.    -- speaking to people, expert -- expert, and

14  I think there's also some of -- some statements by the

15  CDC.  As well as this consensus statement mentions

16  that, reducing that.

17      Q.    But you have no education with respect to --

18          You're not an engineer; correct?

19      A.    I already answered that question.  I am not

20  an engineer.

21      Q.    Okay.  And you -- and you have not done

22  any --

23          You have no education with respect to how

24  objects that move affect airflow; correct?

25      A.    What do you mean I have no education?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

248

1      Q.   Well what --

2      A.   Formal education?  Scientific?  I didn't

3   write a --

4      Q.   Do you take -- do you take --

5           Did you ever take a class on fluid dynamics?

6      A.   No, I did not.

7      Q.   Did you ever have a class on heat transfer?

8      A.   No.

9      Q.   Okay.  I mean air -- air -- the -- you

10  have --

11          You have no expertise to indicate whether or

12  not someone moving in the operating room will affect

13  the unidirectional or downward airflow of a

14  ventilation system; do you, sir?

15     A.   I -- I can read an article and see --

16          When the article that says a person moving

17  into the room, their head moving this way or that

18  affects laminar flow and causes laminar flow currents

19  to become disrupted or can affect that, I'm -- I may

20  not have an engineering degree, but I'm able to read

21  certain articles, discuss different things with

22  different people and, in my idea, form an opinion.

23  That doesn't mean I have to know Reynolds numbers or

24  be an engineer to be able to form an opinion.

25          Anyone, even if you are an engineer, these

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

249

1  are opinions, but I think that some of this makes

2  sense.

3       Q.   So --

4       A.   It's a logic thing.  Some of these things

5  you do want to have an engineering degree to

6  understand and calibrate ORs the correct way, I agree

7  with you on that, but some of them --

8            Clearly, if you have people running around

9  the OR and creating -- and waving their hands, that's

10  not optimal for surgery.

11           That would be an exaggeration.

12      Q.   What's the velocity of air that's created by

13  waving your hand?

14      A.   I can't give you an exact number right this

15  moment.

16      Q.   So my understanding is if I read an

17  orthopedic article, that makes me an expert in that

18  area of orthopedics --

19           MR. C. GORDON:  Object to the form of the

20  question.

21      Q.   -- by just reading the article?

22           MR. C. GORDON:  Object to the form of the

23  question.

24      A.   I never said that.

25           MR. C. GORDON:  Also lack of foundation.

250

1      Q.    Huh?

2      A.    I never said that.

3      Q.    Well, you're relying on articles you've

4    read, correct, even though they're outside your

5    expertise?

6      A.    I'm -- I'm allowed to have an opinion about

7    many topics that are outside my expertise.  As an

8    orthopedic surgeon, as I said earlier, I can't

9    divorce -- even though I'm not an infectious disease

10   expert or microbiologist, I can't divorce myself from

11   knowledge in taking care of the patients that have

12   infections and working with the microbiologists,

13   infections from the surgeons' points of view, and

14   it -- you work as teams, but it is important for me to

15   have a working knowledge of a lot more topics than are

16   in my exact field of expertise past just general

17   orthopedics or joint -- joint reconstruction about

18   orthopedics.  That would be my answer.

19     Q.    Okay.  On number eight you type -- you --

20   you say, "Many pieces of equipment in the OR generate

21   air currents, including those that have cooling fans."

22            What devices are you referring to?

23            MR. C. GORDON:  Where is that?

24            MR. ASSAAD:  Number eight.

25            MR. C. GORDON:  Oh.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

251

1      A.   There -- there's a device where -- that

2  irrigates wounds.  We have a flow tube that goes into

3  the wound that has a cooling fan on it.

4      Q.   Is the cooling fan directed onto the

5  surgical site?

6      A.   No.

7      Q.   Okay.

8      A.   No.  It's away from.  But it has --

9      Q.   And what's the CFM of that cooling fan, do

10  you know?

11     A.   I wouldn't know that.

12     Q.   Okay.  What other device?

13     A.   I mean I can find any of these things out

14  for you, but that's not to me relevant to knowing

15  that.  Maybe you find it was.

16     Q.   Okay.  What other device, sir?

17          Monitors?

18     A.   Well those are further -- I'm not going to

19  even think about those.  But further away from the

20  field are anesthesia machines, at least one or two,

21  and they're going to have cooling fans that would

22  be -- you'd want to maintain the temperature.

23     Q.   Any evidence that indicates that the cooling

24  fans of an anesthesia machine has caused a

25  surgical-site infection or periprosthetic joint

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

252

1    infection?

2         A.    Not to my knowledge.

3         Q.    Okay.  What else, sir?

4         A.    Irrigation device, cautery.

5               I don't know if the electrocautery machine

6    has something in it that has -- it's a piece of

7    machinery, it can't get overheated.  I --

8               Has some mechanism for maintaining cooling

9    in the machine itself because it's plugged in.  I

10   don't --

11        Q.    Are you speculating or --

12        A.    I don't know if it's a fan or not.

13        Q.    -- you -- or are you -- are you --

14               Do you say that to a reasonable degree of

15   probability, that you are certain that the

16   electrocautery device has some sort of cooling

17   mechanism?

18        A.    I'm speculating --

19        Q.    Okay.

20        A.    -- there, but I would believe that's the

21   case.

22        Q.    Well let's not speculate.  And I think

23   counsel will agree with me that you're not here to

24   guess or speculate.  If you don't know the answer --

25        A.    All right.  I'll -- I'm going to think about

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

253

1    the answer there.

2         Q.    Okay.

3         A.    Okay?  And as we're sitting here, if we have

4    a little break I might think about what has that.

5         Q.    Okay.  Any other -- any other devices that

6    generate air currents -- air currents that you're

7    aware of sitting here today?

8         A.    Well when you're using a saw and you're

9    actually sawing, you're creating air currents, so

10   indirectly the saw is creating currents as you're

11   using it.

12        Q.    Any -- any scientific evidence that

13   indicates that when you use a saw, the air currents

14   that it creates causes any periprosthetic joint

15   infection?

16        A.    The whole -- yes.  The whole --

17        Q.    What's -- what's a citation I could look up?

18        A.    Well if --

19              There's one citation that talks about

20   home -- bringing your homemade drills and saws into

21   the OR are not very sterile.  That in itself is not a

22   good idea, which people were doing in some foreign

23   countries.

24        Q.    Sir, I'm talking about what most people do

25   in the United States of America.  They don't bring in

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

254

1    a --

2            You don't bring in a home saw into the

3    surgical site; do you?

4        A.    There -- there is --

5            MR. C. GORDON:  Gabe, you have got to let

6    him finish his answer.

7            THE WITNESS:  I haven't finished my answer.

8            MR. ASSAAD:  Corey, we are going to the

9    court on this.  He is not answering the questions

10   and -- and --

11           THE WITNESS:  I didn't even finish my --

12           MR. ASSAAD:  -- we're not talking about

13   what's happening --

14           MR. C. GORDON:  Okay.

15           MR. ASSAD:  -- in some Third World country

16   about people bringing in drills and saws --

17           THE WITNESS:  But you interrupted me before

18   my answer was done.

19           MR. ASSAAD:  Let me -- let me finish, sir.

20           We're not talking about --

21           You know, we're talking about what happens

22   here in the United States of America, and he

23   understands the question and he's just trying to

24   delay.

25           Answer my question.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

255

1            THE WITNESS:  I'm not -- not trying to

2  delay.

3       Q.   Name a site that indicates that a surgical

4  saw used in an orthopedic surgery causes air currents

5  that -- that cause periprosthetic joint infections.

6  "Yes" or "no."

7       A.   So --

8            MR. C. GORDON:  No, no.  Gabe, you're not

9  going to tell him "yes" or "no" and you're not going

10  to interrupt him --

11           MR. ASSAAD:  Are you instructing him not to

12  answer?

13           MR. C. GORDON:  No, I'm going to -- I'm

14  just --

15           I'm instructing you to -- to behave

16  yourself.

17           MR. ASSAAD:  I am behav --

18           I just want a -- I just want a cite.  If he

19  has a cite, great.  If he doesn't or he says, "I'm not

20  sure of the name of it," that's fine.  If it's Exhibit

21  A, he could point to Exhibit A.  But I'm only

22  asking -- the only thing I'm asking for, Corey, is a

23  cite.  I'm not asking for an explanation.  A cite.

24           MR. C. GORDON:  Gabe, I understand that

25  tensions are pretty high on your side of the table and

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

256

1    I'm trying to give you some latitude --

2            MR. ASSAAD:  Okay.

3            MR. C. GORDON:  -- so we can get through

4    this deposition.  Please calm down.  Let him finish

5    his answers.  If you don't like them, move to strike,

6    do a followup.  But stop the interrupting, stop the

7    cutting him off and stop the badgering.

8            MR. ASSAAD:  I'm not badgering.  I just want

9    a cite.

10           MR. C. GORDON:  Yeah, you are.

11           MR. ASSAAD:  I just want a cite.

12       A.    All right.  So -- so number one, I'm not --

13   I don't feel tense here and I'm not trying to delay

14   anything, but I'm -- I -- I prefer not to answer

15   questions that I have never had before in some ways I

16   think that are out of context.  Saws --

17           The combination of using saws with the

18   technique of the surgeon using the blades spews --

19   spews bone chips, particles, blood all over the place.

20   The move -- it --

21           You're doing movements.  You have to contain

22   it.  There's differences in technique.  And in my

23   opinion that is a major source of splattering of

24   materials all around the case that could lead to

25   contamination and infection of the cases.  It is one

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

257

1   of the major reasons why some people really do like

2   having hoods so that when they use the saws, it

3   splatters and it doesn't -- some of it con -- is

4   contained and doesn't hit back into the patient.  In

5   terms of -- it --

6           It's just another one of those things where

7   the saw has to be given back and forth by the nurse to

8   the surgeon, back to the nurse and back.  It's

9   creating -- all the things we do in the OR -- OR are

10  creating waves that are pushing air across.

11          I do believe that -- but I don't have it

12  offhand -- that -- that there have been studies

13  looking at different saws related to contamination in

14  the OR and different techniques and different blades.

15  I don't have those off my hand because to me that --

16  what I'm saying all makes sense to a surgeon.

17      Q.   Okay.  So let's go to number one.  You agree

18  with me that on item number one, "Surgeon traffic,"

19  there's no citation listed after number one; correct?

20          There's no citation in Exhibit 5 under

21  number one of page nine, there's no citation listed,

22  correct, to any cite?

23      A.   What's the question?  Right there on the

24  page --

25      Q.   Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

258

1      A.    -- or in -- in the rest of all the

2  references that we've done?

3      Q.    I'm -- I'm not talking about Exhibit A.

4          On number one, you agree with me under

5  "Surgeon traffic," there's no citation listed on --

6  after number one; correct?

7      A.    Out of all due respect, the only way I can

8  really answer is to look at that whole reference list

9  and see if anything relates to surgeon traffic.  And

10  an answer, that's not true because the Parvizi thing

11  there does mention surgeon traffic, so that's

12  incorrect.

13      Q.    What Parvizi thing?  I'm talking about --

14          I mean are you looking at the same page I

15  am, on page nine?

16      A.    I'm looking at this.

17      Q.    Okay.

18      A.    And my whole report cites data.  I don't put

19  a reference on every line here.  I put a number of

20  statements, and a lot of these statements are backed

21  up with what's in the supplemental list of references,

22  which is why I did it, because I was told put a whole

23  group of references that you've been relying on in

24  here that will support a lot of your statements that

25  you placed here.  So for number one, I'd have to go

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

259

1  through this whole thing.  It's definitely mentioned

2  under Parvizi about operating traffic.  Some of these

3  other papers I'm looking at also mention operating

4  room traffic.  So I don't -- I don't really think --

5          I think that's an appropriate way to answer

6  this.

7      Q.   Okay.  Well answer my question.  Do you

8  agree with me that on Exhibit 5 of your report under

9  number one, "Surgeon traffic," and its effect on -- on

10 airflow, there's no reference there; correct?

11         MR. C. GORDON:  Objection, asked and

12 answered.

13     Q.   Correct?

14     A.   I already answered the question.

15     Q.   You have not answered the question, sir.

16 "Yes" or "no."

17     A.   The references --

18         MR. C. GORDON:  Objection, asked and

19 answered.  Move to strike counsel's comments.

20     A.   The references are contained in my list of

21 references.

22     Q.   Okay.  So are you saying that all your

23 references listed in Exhibit A are authoritative and

24 reliable?

25     A.   I never said that either.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

260

1      Q.   Okay.  So sitting here today, if I want to

2   know what you're referring to under "Surgeon

3   traffic" --

4            (Witness's cellphone rings.)

5            THE REPORTER:  Let's go off the record.

6            THE WITNESS:  No.  I'm okay.  I'm not

7   answering that.

8            THE REPORTER:  Back on the record, please.

9   We're on the record.

10     Q.   If I want to know what -- for --

11           For anything that does not have a reference

12   in your report, is it your testimony that it's all

13   supported in articles in Exhibit A, which are -- which

14   is Exhibit 8 to this deposition?

15     A.   I --

16           In this case it was supported, but I agree

17   with you that not everything I stated here was

18   supported.  As I said earlier, some of my statements I

19   feel are common sense, they're statements that any

20   orthopedic resident or surgeon would know, so I didn't

21   support it.  But any of my statements, if you want me

22   to try to substantiate, I can look back and, after

23   this deposition, try to substantiate any sentences

24   like that that you have.  I'd be happy to do that.  I

25   didn't --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

261

1            Okay.

2       Q.   Do you have an opinion -- strike that.  What

3  is the -- the --

4            With respect to all people in the operating

5  room, which is pretty much items one through five, do

6  you know what volumetric flow is created when a person

7  walks?

8       A.   No.

9       Q.   Okay.

10      A.   I can --

11           Happy to look that up for you if you really

12  want me to know that.

13      Q.   Do you know whether or not that volumetric

14  flow would have an effect on the ventilation airflow

15  over the surgical site?

16      A.   I would --

17           Based on what I've read and what I would

18  think, it could have an effect.

19      Q.   Okay.  How much -- how much airflow,

20  volumetric airflow would be required to disrupt the

21  unidirectional airflow in an operating room over the

22  surgical site?

23      A.   Of which type of ventilation?

24      Q.   A unidirectional airflow coming down at

25  about --

262

1      A.    Turbulent airflow or laminar or -- or

2  what -- what --

3           I mean they're all different.  Some of them

4  are horizontal laminar, some of them are vertical

5  laminar.

6      Q.    Unidirectional vertical laminar -- or

7  unidirectional flow.  Well strike that.

8           Do you believe that there are any operating

9  rooms that have laminar flow?

10     A.    Do I believe what?

11     Q.    Is there any operating room that actually

12 has laminar flow?

13     A.    I don't know what your question is, but

14 there are -- there are many operating rooms that feel

15 they use laminar flow, yes.

16     Q.    All right.  What about in the United States?

17     A.    Yes.

18     Q.    Do you use laminar flow?

19     A.    No.

20     Q.    Do you use unidirectional flow?

21     A.    I don't know your def -- definition of it.

22     Q.    Okay.

23     A.    We don't call it that.

24     Q.    Okay.  Well for downward unidirectional

25 flow, turbulent if you want to define it, do you know

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

263

1    what volumetric flow is required --

2              (Mr. C. Gordon sneezes.)

3         Q.   -- to disrupt --

4              THE WITNESS:  Gesundheit.

5         Q.   -- to disrupt the protective effect of the

6    unidirectional airflow in an operating room?

7         A.   No.

8         Q.   Okay.  Would number seven, "Moving of lights

9    and other equipment directly creates waves or currents

10   by individual (surgeon or team), as well as the

11   specific object moving," do you know what volumetric

12   airflow is created when you move lights?

13        A.   No.

14        Q.   Okay.

15        A.   I'd be happy to find out if you really think

16   that's important.

17        Q.   Do you know how --

18             Do you know what the volumetric flow rate

19   coming out of a Bair Hugger?

20        A.   I don't want to say the wrong number, so the

21   answer is no.

22        Q.   Okay.  Do you know what -- how much heat is

23   produced by a Bair Hugger?

24        A.   I have numbers in my head of what was said

25   in articles.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

264

1      Q.   Okay.  What's the number?

2      A.   Some number like 800 milliwatts.

3      Q.   Eight hundred milliwatts?

4      A.   Milli, but the unit may be wrong.

5      Q.   Okay.

6      A.   But I know that in relation to what is

7   generated in a ratio per -- per person on the

8   operating room team.

9      Q.   How -- how many milliwatts does a person

10  create?

11     A.   On the same ratio, if the number without the

12  units is 800, then a person is a -- is a bit over 200.

13     Q.   Okay.

14     A.   And these -- okay.

15     Q.   And have you actually looked at the

16  operating manual or the -- of a Bair Hugger?

17     A.   At some point, yes, but not very -- not in

18  any specifics that I would comment on.

19     Q.   I mean it's not listed on any of the stuff

20  you considered; correct?

21     A.   No.

22     Q.   Correct?

23     A.   That's not my field.  That's not my -- as

24  you would say, that's not my area of expertise.  And

25  other people can comment on that.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

265

1      Q.    Okay.  Do you believe --

2            Do you have any opinion of whether or not

3   heat can affect airflow in an operating room?

4      A.    I have an opinion.

5      Q.    What's your opinion?

6      A.    It can affect.

7      Q.    Okay.  By the way, do you understand what

8   plaintiffs' theory of the case is with respect to how

9   the Bair Hugger increases the risk of surgical -- of a

10  periprosthetic joint infection?

11           MR. C. GORDON:  Well the way it's phrased,

12  I'll object.  You can ask him what he knows of --

13  what -- what his understanding of it is.

14           MR. ASSAAD:   Okay.

15     A.    I --

16           MR. C. GORDON:  Do you understand why?

17  Yeah.

18     A.    You may have a different --

19           I know what some people have said or

20  different -- there are many different things that have

21  been said on it, articles, websites, maybe you, you,

22  what's been said.

23     Q.    You read the report of John Abraham;

24  correct?

25     A.    Very briefly, if -- if --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

266

1     Q.   It says here 15 minutes on Exhibit 7.

2     A.   Yeah.  I looked at it, but I don't --

3     Q.   Have you read the report of Dr. Elghabashi?

4     A.   Yes.

5     Q.   Would you agree with me that Dr. Elghabashi

6  is an expert in computational fluid dynamics?

7          MR. C. GORDON:  Objection, foundation.

8     A.   I can't assess what his level of

9  expertise --

10         Are you talking about considered a legal

11  expert or an expert in the whole field, what his --

12    Q.   Expert in --

13    A.   -- peers think?

14    Q.   Expert in the field.

15    A.   I don't know.  I don't know.

16    Q.   Is there a --

17    A.   That's not my say to say who is an expert or

18  not.

19    Q.   Is there a distinction between a legal

20  expert and an expert in his field?

21    A.   I think there is a distinction between --

22         For example, some people might call an

23  orthopedic surgeon that has an expertise in

24  periprosthetic infections or osteonecrosis an expert

25  in that field, but a board --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

267

1          I believe, legal definition, any -- if

2    you're in a legal case, any board certified pract --

3    you'd have to be --

4          A practicing orthopedic surgeon could be

5    considered a legal expert to opine opinions in the

6    case, and that's a different definition of the first

7    part of what I said was an expert on specific topics,

8    if that's what you're asking me.

9          Q.   So -- okay.

10         Turning to page 10, you indicate on -- under

11   the -- you have the bold that says "There are many

12   sources...," but the first line after that says, "For

13   example, 4 people involved in the operating room, as

14   well as being much closer to the operative site than a

15   Forced Air Warmer, generate much more heat than the

16   Forced Air Warmer..."

17         Is that something that you agree with?

18         A.   Well that's -- that's why I --

19         Those numbers I gave you was the best of my

20   knowledge about heat generation when we -- we -- I --

21         Earlier, that four-questions-ago or so

22   number about the ratios, I don't know the units

23   exactly, but this 200 times four, a little bit more

24   than 200 times four is more than the 800, with the 200

25   times four a lot closer than the 800, which is further

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

268

1  removed from the operative site.  Eight hundred and

2  fifty or 900 is more than the 800 from a Bair Hugger,

3  which is further away, and that heat gets dissipated.

4       Q.   But you're not certain about the numbers of

5  200 or 250; are you?  For --

6       A.   No.  I've seen those numbers printed, I just

7  don't know the -- what I don't know is the --

8            And again, I'm only as good as what I've

9  seen printed in an article, and I'm not an absolute

10  expert in this, but I see it in more than one place.

11  And I don't know the units.

12       Q.   So you were citing off numbers that you

13  looked -- you've seen in articles; correct?

14       A.   Yes.

15       Q.   You've never done any studies or -- or

16  calculated how much heat's coming off --

17       A.   I definitely have not --

18       Q.   Okay.

19       A.   -- done any studies.

20       Q.   Okay.  I'm trying to let you finish my --

21  your answer.  You got to let me finish my question.

22       A.   I'm -- I'm sorry.  I apologize.

23       Q.   What --

24            You also go under "...there are many more

25  heat sources closer to the field."  What other heat

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

269

1    sources are there?

2        A.   Well the --

3            For example, when the cautery is turned on,

4    the machine that actually has the cautery that we are

5    not sure whether it has a fan or not that -- that gets

6    plugged into the wall, that -- that drives the

7    machine --

8        Q.   Are you talking about the electrocautery --

9        A.   Yes.

10       Q.   -- device itself produces heat?

11       A.   Both.  Both.  The device when it's turned on

12   creates like -- like 400 to 600 degrees of

13   temperature.

14       Q.   The control --

15       A.   In fact, when you touch the tissue, it

16   starts smoking up and you get -- you have to often get

17   a sucker to get rid of the smoke.  And if you touch

18   it, it's going to be pretty damned hot I would say.

19       Q.   And that heat is being generated above the

20   operating room table, correct, when you use the

21   device?

22       A.   Directly in the wound of the patient.

23       Q.   But it's not -- it's not heat generated

24   underneath the operating room table; correct?

25       A.   It's not -- it's not underneath the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

270

1    operating room table.

2        Q.   Okay.  So the heat that it generates is

3    above the -- the operating room table; correct?

4        A.   Well yes.  It's -- it's -- it's at the --

5    it's at the operating room table or --

6             It's in the patient's wound, so it's, yes,

7    slightly above the operating room table.  Yes.

8        Q.   Okay.

9        A.   Okay.  Sorry.

10       Q.   And the electrical box that controls the

11   electrocautery device, do you know how much heat that

12   produces?

13       A.   I can't tell you that right now.

14       Q.   Okay.  Now you also mentioned saw blades

15   produce heat; correct?

16       A.   Well when you're hitting the bone and you're

17   doing the case, again the -- the -- the bone is going

18   to smoke up as you're cutting the bone.  These are --

19   these are --

20            Hip or knee replacements generate a

21   tremendous amount of heat.  You're cutting them and

22   you're going through them.

23       Q.   Do you know how much heat that produces?

24       A.   I can't give you a -- the amount.  You can't

25   even touch the blade after using it because you'll

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

271

1    burn your finger.

2        Q.    And you agree with me that the heat that is

3    being produced by the saw blade is above the operating

4    room table.

5        A.    It's above --

6              It's in the patient's wound, so anything in

7    the patient's wound is above the table.

8        Q.    Okay.  And do you know how much heat the

9    batteries that power the saw blades create?

10       A.    I don't know the exact number.  We --

11       Q.    And you -- you --

12       A.    We can get that, but there is certainly

13   heat.

14       Q.    And you --

15       A.    The whole -- the whole --

16             Not only the battery and the saw blade, but

17   the whole instrument can get, as you're using it more

18   time and it's turned on, the whole thing can get

19   really hot.

20       Q.    And that -- that heat is generated above the

21   operating room table; correct?

22       A.    Correct.

23       Q.    Okay.  And the battery pack that -- that --

24   that use the space -- that are on the spacesuits,

25   they're right behind the head of the -- the surgeons,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

272

1   the people that use them; correct?

2        A.   They're behind the head, or they can be

3   hanging down on the shoulder --

4        Q.   Okay.

5        A.   -- across the lower black.

6        Q.   But they're also above the operating room

7   table; correct?

8        A.   Yes.

9        Q.   Okay.  Do you know how much heat they

10  produce?

11       A.   No.

12       Q.   Okay.  The general overhead lights in an

13  operating room, you agree that the heat they -- they

14  produce is above the operating room table; correct?

15       A.   Yes.

16       Q.   Do you know how much heat they produce?

17       A.   Often a watt, but I can't tell you how much.

18       Q.   Okay.  The focused overhead lights directly

19  at field, those are above the operating room table;

20  correct?

21       A.   Yes.

22       Q.   And the heat they produce is above the

23  operating room table; correct?

24       A.   Yes.

25       Q.   And do you know how much heat they produce?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

273

1     A.    No.

2     Q.    Okay.  The ancillary hooded lights that many

3  surgeons wear and the light generating unit,

4  that's -- that's -- that's above the operating room

5  table; correct?

6     A.    Yes.

7     Q.    Do you know how much heat they produce?

8     A.    No.

9     Q.    Okay.  Do you know how much heat a patient

10  produces?

11     A.    I should know and I did know at one point,

12  but I don't know exactly.

13     Q.    Okay.

14     A.    I'm -- I'm sure that's variable depending on

15  the -- the patient.

16     Q.    And you told me before with respect to the

17  surgeons and the people that are moving around, that's

18  roughly about 200?

19     A.    To the best of my knowledge.

20     Q.    Okay.

21     A.    I will --

22     Q.    All right.

23     A.    I will recheck that.

24     Q.    The machine to process fluid -- irrigation

25  fluids, vacuum canisters and more substantial

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

274

1  canisters used nowadays that generate much heat, do

2  you know how much heat they produce?

3      A.   I don't know the exact number.

4      Q.   Okay.  Do you know whether or not they

5  produce heat underneath the operating room table?

6      A.   Well they are on the floor, so if you want

7  to say under or pretty close to the bottom of the

8  operating --

9          They start from the floor, they're --

10 they're sitting on the floor and they go upwards, so

11 they're -- so that would be the closest of all these

12 answers to being on the floor or below the operating

13 room table, those -- that.

14     Q.   Well you -- you -- you mentioned that you

15 read -- on your invoice you saw the report of --

16         Did you receive a copy of -- oh, here it

17 is -- Settles paper?  You read the Settles paper;

18 correct?

19     A.   Very briefly I did.

20     Q.   Fifteen minutes; right?

21     A.   Yes.

22     Q.   Were you aware that he measured that the

23 temperature increased underneath the operating room

24 table when the Bair Hugger was used?

25     A.   I'd have to look at this report with you.  I

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

275

1   wasn't -- I don't remember being -- I don't --

2       Q.   By the way, when did you get the expert

3   reports of Settles, Abraham, Lampotang, Hughes,

4   Holford, the defense experts?

5       A.   You want the exact date?

6       Q.   Was it -- was it this month?

7       A.   No.  It was in June.

8       Q.   Okay.

9       A.   Somewhere like June 10th.  So I -- I read

10  these about a month ago, that's why I can't give you

11  an exact answer.

12      Q.   Number nine --

13      A.   On the Settles paper, which I had read, 15

14  minutes was carefully enough for me to read that

15  paper.

16      Q.   By the way, do you feel any air come out of

17  the Bair Hugger when you use it?

18      A.   No.

19      Q.   What about the --

20      A.   Oh.  Do I feel it when I'm in the case or --

21      Q.   Yes.

22      A.   -- do I feel it right there?

23      Q.   When you're in the operating room.

24      A.   No.

25      Q.   Do you see air coming out of the neck, like

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

276

1   flapping around from the neck with a plastic sheet

2   cover?

3        A.   Not really.

4        Q.   Okay.  Have you noticed a change -- change

5   in temperature when the Bair Hugger is on?

6        A.   No.

7        Q.   Now number nine says, "Often other power

8   sources for special blades used in some surgeries

9   (more often revisions) for burring bone, cement, et

10  cetera - Anspach/Midas Rex devices generates a

11  tremendous amount of heat."

12            Do you agree with me the heat that these

13  devices produce are above the operating room table;

14  correct?

15       A.   Yes.  Some of the -- some of these are

16  plugged into a wall that could be like, say, on the --

17  there could be a wall outlet.  So, for example, the

18  Anspach device is plugged into a wall, but I don't

19  think that's generating that much heat.  It could be

20  creating currents --

21       Q.   Well the ones --

22       A.   -- as it's moved around.

23       Q.   Well the ones that generate a tremendous

24  amount of heat, those are above the operating room

25  table; correct?

277

1      A.    Well an Anspach device --

2            I would say yes, that's correct.

3      Q.    Okay.  And sitting here today, you don't

4  know the exact amount of heat that they produce;

5  correct?

6      A.    Correct.

7      Q.    Okay.  Standard elect -- electrocautery

8  devices, those produce heat above the operating room

9  table; correct?

10     A.    Correct.

11     Q.    And sitting here today, you don't know

12  what -- the amount of heat that they produce; correct?

13     A.    I know how many degrees that a -- in a

14  general sense that an electrocautery hits when it's

15  turned on.  It's like between three and five hundred

16  degrees Fahrenheit.  It's pretty --

17     Q.    But when you're asked about watts or BTUs --

18     A.    No, I don't -- I don't know that.

19     Q.    Okay.  And you don't know whether or not

20  that quick burst of heat affects the unidirectional

21  flow in an operating room; do you?

22     A.    No.

23     Q.    Okay.

24     A.    I'll defer that.

25     Q.    And -- and in fact you don't know --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

278

1      I mean based on your education, training and

2 experience, you haven't studied the effects of heat on

3 unidirectional flow in an operating room; have you?

4      A.   The effects of heat on unidirectional flow.

5 No.

6      Q.   Okay.  Number 11, "Ancillary cautery

7 devices - Plasmablade, Aquamantis, Canady, and

8 others."  You agree with me that all those devices

9 produce heat above the operating room table; correct?

10      A.   Correct.

11      Q.   And sitting here today, you have no idea --

12      A.   I'm going to say that I haven't studied that

13 question about heat and everything like that, but I

14 have read these articles and I see what -- the

15 arguments that are made, so I -- I can still render

16 certain opinions.

17      Q.   Okay.  And I can read orthopedic articles

18 and render opinions as well in a court of law;

19 correct?

20      A.   Yes.

21      Q.   Okay.  Is that the standard --

22           MR. C. GORDON:  Object to the form --

23      Q.   -- that you're going by?

24           MR. C. GORDON:  Object to the form of the

25 question, --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

279

1    A.    No.

2    Q.    Okay.

3          MR. C. GORDON:  -- lack of foundation.

4    Q.    Okay.  Let's talk about --

5          So you agree with me that under 11, you

6    don't know how much heat they produce; correct?

7    A.    Can I say -- I --

8          In terms of what goes on in an operating

9    room, I'm still the primary important person or the

10   primary person in charge, that I have to theoretically

11   be aware of not only my discipline but the

12   anesthesiologist, except certain things, but be aware

13   and understand other things.  So I don't have to be

14   the absolute expert on every single topic, but I still

15   can have an opinion about them and I -- and I think

16   that's very appropriate.

17         MR. ASSAAD:  Move to strike as non-

18   responsive to a non-existent question.

19   Q.    Number 11, you agree with me that the

20   devices under number 11 on page 11 of Exhibit 5, you

21   don't know how much heat those devices produce;

22   correct?

23   A.    I don't know exactly.

24   Q.    Okay.  Number 12, "Various ancillary devices

25   in the operating room by anesthesiologist, example,

280

1   defibrillator, computer, their monitor, their

2   anesthesia machine is a source of heat."

3              Sitting here today, you agree that none of

4   those devices produce heat underneath the operating

5   room table; correct?

6        A.    I wouldn't know that --

7        Q.    Okay.

8        A.    -- one way or the other.

9        Q.    And sitting here today, you don't know how

10  much heat those devices produce; correct?

11       A.    Correct.

12       Q.    Okay.  So don't you think it would be

13  important to know the exact amount of heat being

14  produced by these devices to offer an opinion as to

15  whether or not they have an effect, if any, greater or

16  less than the Bair Hugger device?

17       A.    So my answer is once I knew that the four

18  players that are involved in the surgery generate way

19  more heat than -- directly to the patient than a Bair

20  Hugger device, which is feet away, and that amount of

21  heat would be dissi -- dissipated by the inverse of

22  the distance, then to me all these other things were

23  just further additive events and I didn't feel that I

24  had to study and give you a -- a number for each of

25  these answers.  Nor do I feel that it -- it

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

281

1    necessarily matters whether it's below the table or

2    above the table.  I'm way more interested in heat

3    that's generated right to the wound, which is the

4    point of interest.

5              I certainly don't think that if I had spent

6    a bunch more hours and been able to give you much

7    better answers that would have been --

8              Well anyway, so that's why I felt that this

9    was appropriate.  These are the different devices that

10   generate heat.  I'd be happy to go and -- and read

11   back these questions and give exact numbers and give a

12   much better answer, but my basis of using that opinion

13   was that I already knew that direct heat involvement

14   and what a patient sees, which is what I'm worried

15   about is what's happening in that wound, in that knee

16   replacement or hip replacement, that is way more

17   important in what's hitting that patient than things

18   so far away.  And that --

19             MR. ASSAAD:  Move to strike as --  I'm

20   sorry.  Move to strike as non-responsive.

21        Q.   What methodology -- well strike that.

22             Does the location of where the heat is

23   produced, was that any part of your methodology in

24   formulating your opinions?

25        A.   I just told you it was.  It even says it

282

1   here on page 10.

2       Q.   I'm saying the location in the operating

3   room where the heat is produced, where the device is,

4   did you take that into account with respect to your

5   methodology in formulating your opinions?

6            MR. C. GORDON:   Objection, asked and

7   answered.

8       A.   It's --

9            I just gave you the answer.

10      Q.   Are you not going to answer my -- not going

11  to --

12      A.   I just did.

13      Q.   No.

14      A.   It's on page 10.  Yes.

15      Q.   Page 10?

16      A.   It's further away from the field.  The

17  forced-air warmer is further away and any heat would

18  be dissipated.

19      Q.   I understand --

20      A.   I just said that.

21      Q.   I understand further away from the surgical

22  field.  That's not my question, sir.  My question is:

23  The location of where the heat is generated, besides

24  the distance away from the surgical field, did you

25  take any -- did you take any other consideration of

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

283

1    where -- of the location of the heat?

2         A.   I think you're trying to ask me whether --

3    whether it's on the floor or if it's a thing or if

4    it's disrupting sort of waves.  No.  I'll --

5         Q.   Okay.

6         A.   I'll defer those opinions to other people.

7         Q.   Okay.  What is the velocity of the airflow

8    underneath the drapes when the Bair Hugger is being

9    used?

10        A.   I don't know.  We -- I don't know exactly.

11   I -- I did know at one point.  I don't want to guess

12   here.

13        Q.   Okay.  So what is your basis that you say on

14   page 10, "...any airflow that emerges from under the

15   drapes is so low in velocity that it has no impact on

16   the air currents in the OR?"

17        A.   I guess the basis is -- is a -- is I

18   can't --

19             I can feel so much air flowing from people

20   moving around me and all that, and I can see the

21   drapes moving from different things, but I don't feel

22   anything from -- anything from a -- from a Bair Hugger

23   device that's far away that affects any air currents

24   that does anything to my operative field.

25        Q.   But you don't know the airflow velocity

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

284

1    of -- coming out underneath the drape; correct?

2        A.   I don't know the exact airflow velocity.

3        Q.   Okay.  And -- and what do you wear during an

4    operation?  Do you wear a hood?

5        A.   No, I don't -- I don't use it.  I have a --

6    a gown --

7             I have my regular surgical scrubs, I put on

8    booties, on my pants, I have a -- a bouffant over my

9    hair, I have a -- a mouthpiece that goes over my mouth

10   and my nose that's strapped in, and when I go into the

11   OR I am -- I'm -- we here -- and it's been a move

12   towards paper gowns, so I -- I am paper-gowned, and

13   then I double glove.  And I believe -- I don't believe

14   I missed anything.

15       Q.   Anything over your eyes or anything?

16       A.   Oh.  Thank you.  I did miss something.  Yes.

17   And we -- we would like to have protective eyeware,

18   and I do forget that sometimes and then I'm reminded.

19   I have two people that are supposed to remind me to

20   always --

21            Everybody on the team should have protective

22   eyeware.  That's a new Cleveland Clinic dictum.  So

23   yes, we have these sort of clear-goggle type of things

24   that are disposable that everybody wears.  And that's

25   a new rule, that you're not allowed to be in the OR

285

1  without those.

2      Q.   What are you relying upon with respect to

3  the -- to your understanding that the Bair Hugger

4  filters are MERV 14?

5      A.   There was a whole --

6           There were a bunch of articles.  There was

7  an AORN article about specs which is mentioned in the

8  list of references that I have.  There were -- there

9  were a few of these articles that talked about that.

10  I'm not --

11           I agree that I'm not an expert on those

12  regulations and everything, but I did look at those

13  articles and see what --

14      Q.   So your basis --

15           You think that there's articles that

16  indicate that the Bair Hugger filter is a MERV 14.  Is

17  that my understanding here today?

18      A.   Yes.

19      Q.   Okay.  With respect to the -- the Cleveland

20  Clinic abstract that's being presented next week at

21  MSIS --

22           Would you agree with me that the Cleveland

23  Clinic is a teaching hospital?

24      A.   Among other things.

25      Q.   Okay.  And they -- they have fellows,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

286

1    correct, --

2        A.   Yes.

3        Q.   -- that come in and out?  They -- they're

4    there for -- I think it's five years -- or four years.

5             Is it a five-year residency for -- for

6    orthopedic surgery?

7        A.   No.  Fellows are there --

8             Clinical fellows are there for a year.

9        Q.   Yeah, but residency is five years.

10       A.   The residency is five years.  Some people

11   opt for a sixth-year --

12       Q.   Okay.

13       A.   -- research year.

14       Q.   So it's five-year residency and fellows;

15   correct?

16       A.   Yes.

17       Q.   Okay.

18       A.   It's really four years of orthopedics, one

19   year of an internship where they do a little

20   orthopedics.  Some people opt to do an extra year.  We

21   do have clinical fellows as well.

22       Q.   And you mentioned that there were, I

23   think -- I think there were -- there were a large

24   academic center and two high-volume arthroplasty

25   regional hospitals, correct, part of this study?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

287

1      A.   I didn't do the study, so I don't know what

2   they --

3           What does it say?

4      Q.   It says, "Patients who underwent primary TJA

5   at a large academic center and two high-volume

6   arthroplasty regional hospitals..."

7      A.   Is that what it --

8           Can you give me the report again?

9      Q.   Exhibit No. 11.  I believe it's in here.  It

10  should be --

11     A.   Here.

12     Q.   Okay.  Under "Methods."

13     A.   Okay.  So -- so this would have been main

14  campus, and the two that were picked would have been

15  Lutheran and where the joint replacements -- I'm not

16  sure where the --

17          Lutheran would -- would be one of the two

18  high volume, and I'm not sure which of the other two.

19  It might have been -- it -- it would have either

20  been -- hmm.

21     Q.   Florida?

22     A.   Oh, no.  I don't think it used Florida.

23     Q.   Well isn't W. -- Barsoum, W.K. in Florida?

24     A.   Oh.  So maybe it did.  I don't think so, but

25  maybe.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

288

1      Q.   Do you know -- do you know Wael Barsoum?

2      A.   Yes.

3      Q.   How do you know him?

4      A.   He's the -- he's in my department.  He's an

5   orthopedic surgeon and he's the -- he's also the head

6   of Weston's Cleveland Clinic.

7      Q.   Which is in Florida; correct?

8      A.   Yes.

9      Q.   Okay.

10     A.   So he may --

11          That may have been part of the database.  I

12   don't know.  We can --

13          I can get you the details of the study.

14     Q.   Do you know -- do you know whether or not,

15   with respect to -- with respect to the analysis, they

16   took into account individual resident or surgeon

17   infection rates when they compared the forced-air

18   warming to the forced-air warming with a HEPA filter?

19     A.   I can't tell you that.

20     Q.   Okay.  Because I -- I think you stated in

21   your report that surgeons' experience has an effect on

22   PJI rates; correct?

23     A.   Yes.

24     Q.   I mean if you look at page --

25     A.   I agree with that.  You don't have to look

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

289

1    at the page.

2        Q.   Well I --

3             Just for the record, if you look at page 18

4    of Exhibit 5, you say, "Variations in skill of

5    surgeons or surgical techniques can markedly influence

6    infection rates;" correct?

7        A.   Correct.

8        Q.   Okay.  And if you also look at Exhibit No.

9    11, you agree with me that they looked --

10            They did a univariate analysis; correct?

11       A.   Well I imagine they did a univariate

12   analysis first.  I don't know --

13       Q.   And a multivariate analysis, correct, if you

14   look at the second page?

15       A.   Well what does -- what does it say?  The

16   first page says that --

17       Q.   Well if you look at the second page, you

18   have the table that says "Univariate Analysis" and

19   "Multivariate Analysis."  Okay?

20       A.   Fair enough.

21       Q.   And is it okay to do a univariate analysis

22   here --

23            MR. C. GORDON:  Object to the form of the

24   question.

25       Q.   -- in Exhibit No. 11?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

290

1      A.   It's okay to do univariate anyway.  How much

2  credence it is, you --

3           You do a univariate analysis often first and

4  then see if it's sometimes worth doing a multivariate

5  analysis.

6      Q.   Okay.  So you wouldn't criticize a -- a

7  paper that does a -- that first does a univariate

8  analysis, correct, and then does a multivariate

9  analysis?

10     A.   I wouldn't criticize?

11     Q.   Yeah.

12     A.   Depends on the paper.

13     Q.   Okay.  Do you have any criticisms of this

14  paper, Exhibit 11, this -- this --

15     A.   I don't --

16     Q.   -- abstract?

17     A.   It's just an abstract right now.  I don't --

18     Q.   I understand.  But on the abstract, do you

19  have any criticisms?

20     A.   I'm --

21          I think in a -- in a general sense it's a

22  nice abstract.  Abstracts are not meant to be papers.

23  Every question that you're asking you can't get from

24  an abstract.  I think it -- so --

25     Q.   Has it been accepted for publication?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

291

1       A.   It's a presentation, and usually these

2   presentations will go in to clinical orthopedics and

3   related research X months afterwards.  That's why the

4   paper gets written afterwards.

5       Q.   And A. K. Klika, that's -- that's Alise?

6       A.   Alison.

7       Q.   Alison.

8            Is she in the Cleveland Clinic here?

9       A.   Yes.

10      Q.   Is she a resident, a fellow, attending?

11      A.   No, she's one of the --

12           I don't know her exact title.  She's one

13   research director.  She's a permanent employee that

14   oversees research.

15      Q.   Okay.  So she's not a physician?

16      A.   She's not a physician.

17      Q.   Okay.  And she's the one that's presenting

18   this, correct, at MSIS?

19      A.   I don't know if she's presenting it or -- I

20   would have --

21           My guess -- if you ask me to guess -- before

22   you made that statement would have been that Carlos

23   Higuera is a presenting it.  He's a physician.

24      Q.   Okay.

25      A.   Actually, can I amend that answer?  Excuse

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

292

1    me.  It --

2         Since Carlos Higuera probably has more than

3    one of these presentations at the MSIS, it may be very

4    possible that the very first author here, who is a guy

5    named -- who is a research fellow, his name is Gannon

6    Curtis, he would be the one that may be presenting.

7    He would be the more likely.  But I can certainly find

8    that out.

9         Q.    Looking at page nine --

10        Well let me ask you this:  You've reviewed

11   many studies in this case; correct?

12        A.    Yes.

13        Q.    Research papers; correct?

14        A.    Yes.

15        Q.    And you agree with me that if -- if you're

16   going to make an opinion on a medical device, that you

17   should read studies that pertain to that specific

18   medical device; correct?

19        A.    It's not a bad idea.

20        Q.    Okay.  Like, for example, if you want to

21   know whether or not the Bair Hugger concerned like --

22   strike that.

23        If you want to know what the Bair Hugger

24   750, which is -- or 775, which is the latest Bair

25   Hugger device, you want to look at studies on that

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

293

1  device; correct?

2          MR. C. GORDON:  Object to the form of the

3  question.

4      A.   I don't -- I don't really understand the

5  question.

6      Q.   Well you know that devices change over time.

7  They -- they're either improved or some -- well strike

8  that.

9          Do you know the difference between a -- a

10  Bair Hugger 775 and a Bair Hugger 505?

11      A.   I don't know all those differences.

12      Q.   Okay.

13      A.   I know -- I know that some of them have

14  differences with different --

15      Q.   I -- I don't want you to guess.

16      A.   -- for upper extremity or lower extremity or

17  straps, and there's like -- I've seen pictures of 20

18  different models.  And the answer is no, I don't know

19  those.  And I just --

20      Q.   I'm talking about the blowers.  Forget about

21  the blankets.  Do you know the difference between a

22  model 505 blower and a model 750 blower?

23      A.   There was a difference in filtration

24  efficiency, I don't know the exact numbers, and things

25  like that.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

294

1    Q.   Was there a difference in the heat output?

2    A.   I don't know those numbers.

3    Q.   Well do you think that when you look at a

4    study you should know what device is being used to

5    determine whether or not I could apply that study to

6    the device that's at issue in this case?

7         MR. C. GORDON:  Object to the form of the

8    question.

9    A.   Not necessarily.

10   Q.   Okay.  So --

11   A.   If I -- if I think the device --

12        No, not necessarily.  If I think the device

13   is safe for both of them, I don't necessarily have to

14   analyze what you're asking me to analyze.

15   Q.   Looking at page nine under those -- those

16   articles you cite at the top, which is Hall poster,

17   Zink, Dirkes, Avidan, Tumia, Huang, Moretti,

18   Occhipinti and Oguz, sitting here today do you know

19   what devices that were -- that were being looked at in

20   those studies?

21   A.   Well you can surmise that there might be

22   slightly different models in them because they were

23   from different dates.  So would I agree with you on

24   that?  Yes.

25        So you are also right that sometimes when

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

295

1   you change different features of a device or a model,

2   the change could be for the better, it could have no

3   effect, or it could be for the worse.  Okay?  So I

4   can't disagree with that.  And these -- these are

5   posters that -- or presentations -- most of them were

6   actually published -- over a wide span of years, from

7   60 years with a model that's changing.  But having

8   said that, if I was trying to figure out, oh, this --

9   this device change might have led to this problem and

10  this led to this problem, I didn't have any problems

11  in any of these studies.

12      Q.   You -- you didn't see a problem in the Huang

13  study on the Bair Hugger?

14      A.   No.  No.  I didn't see a problem in any of

15  these studies.

16      Q.   Or Moretti?

17      A.   Moretti, that --

18           These are supporting of the Bair Hugger,

19  these studies.

20      Q.   So you think -- you think Moretti supports

21  the Bair Hugger?

22           MR. C. GORDON:  Objection, asked and

23  answered.

24      A.   Absolutely.  Yes.

25      Q.   You would bet your whole opinion on this

296

1  case that Moretti supports the Bair Hugger.

2          MR. C. GORDON:  Object to the form of the

3  question.

4      A.  I don't have to bet my whole opinion on this

5  case.

6      Q.  Well are you that confident that Moretti

7  supports the Bair Hugger?

8      A.  I don't know what --

9          I looked at the data.  I don't know what the

10 conclusion is.  I'm pretty sure the Moretti study

11 supports --

12     Q.  Well are you --

13     A.  -- with a high degree of probability, yes.

14     Q.  Okay.

15     A.  The same thing that you want from this case.

16 I'm under oath.

17     Q.  So the --

18     A.  Is -- is it --

19         I will say this, because you told me to bet

20 my whole opinions on this case -- that's pretty

21 strange -- everything I'm giving you is to the best of

22 my knowledge at this point.  So yes, if you show me

23 the study right here, maybe I mixed up a study, I

24 don't think so, but I would --

25         And there are more than one Moretti study,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

297

1    to the best of my knowledge, also.

2         Q.   Oh, there is?

3         A.   I thought.

4         Q.   Okay.  So is it --

5              All the opinions you give in this case is to

6    the best of your knowledge; is that -- is that

7    your -- is that your -- is that what I just heard?

8         A.   Yes.

9         Q.   Okay.

10        A.   I mean under oath, this is the best of my

11   knowledge.

12        Q.   Okay.  Are you aware that Oguz showed that

13   the Bair Hugger had an increase in bacterial load over

14   the surgical site than the Hot Dog but not a

15   statistically significant difference?

16        A.   It was absolutely not statistically

17   significant.

18        Q.   But you agree --

19        A.   That's what their conclusion was.

20        Q.   But you agree with me that when you looked

21   at the data, that there was an increased bacterial

22   load over the surgical site with the Bair Hugger than

23   compared to the Hot Dog.

24        A.   It's not statistically different, so the

25   answer is:  That's not --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

298

1          So the answer is:  As a scientist, you

2   couldn't say that.

3      Q.   Well this --

4      A.   No difference.

5      Q.   -- is statistically significant, Exhibit 11,

6   and you're going to go back and do some more

7   investigation; correct?

8          MR. C. GORDON:  Object to the form of the

9   question.

10     Q.   I mean there's something to be said --

11     A.   Well if -- if I'm talking about --

12          In that study, all I have to do as far as --

13          I'm going to answer you on that study.

14     Q.   Exhibit 11.

15     A.   It's true --

16          I can also answer you on the Moretti

17   study, --

18     Q.   We're talking about Oguz.

19     A.   -- not the Oguz study, because --

20          But you said -- acted like Moretti is not

21   supporting Bair Hugger when it does.  So let's go

22   back --

23          You just went to Carlos Higuera's study.

24     Q.   Yeah.

25     A.   To -- to not show statistical difference

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

299

1   between these two devices, you might need not only

2   five thousand, you might need fifty thousand, hundred,

3   two hundred, if there really truly is a difference.

4   So it is not necessarily powered to show a difference

5   between those two devices.

6           But another way to look at this study is:

7   Is this study sufficiently powered to show that the --

8   that the Bair Hugger does not increase infection rates

9   versus the Mistral device?  And in fact the Bair

10  Hugger has a lower infection rate than the Mistral,

11  and for the Bair Hugger to actually get to a point

12  where it would be a statistically higher likelihood of

13  causing infections than the Mistral, based on these

14  numbers, it might be powered for that.  It's not

15  powered to show that the Bair Hugger is superior to

16  the Mistral, but it's incre -- I think it's incredibly

17  powered to show that the -- the Bair Hugger is not

18  inferior to the Mistral because it's actually -- with

19  all these big numbers, it's performing better than the

20  Mistral.

21          Does that answer your question?

22      Q.   Well that's fine.  So if you look at the

23  Oguz study where it shows that there is a difference

24  in the bioburden when you compare the Bair Hugger to

25  the Hot Dog, though it's not statistically

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

300

1  significant, that's because it only looked at 80

2  patients and it's underpowered; correct?

3       MR. C. GORDON:  Object to the form of the

4  question.

5       A.   No.

6       Q.   Okay.

7       A.   Let's look at the study.  I don't agree with

8  you.

9       Q.   All right.  Now you agree with me that when

10  you prep the patient in the operating room by putting

11  on the drapes and -- and moving the patient, there's

12  probably a high amount of bioburden during that time

13  about the surgical site -- surgical table.

14       A.   Some people say that's some of the most

15  bioburden.  I'm not so sure I agree with that, but

16  some people say yes, that's the most right there.

17       Q.   Okay.  Before incision, before anything

18  else, it's when you're moving -- people moving around,

19  a lot of particles and bacteria are -- from not only

20  the patient but also people setting up the patient;

21  correct?

22       A.   Yes.

23       Q.   And these are other people --

24            Those are other colleagues in the field of

25  orthopedic surgery that say that?  You say other

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

301

1    people.  Who -- who are the other people?

2         A.   No.  I'm saying the printed papers --

3         Q.   Oh, okay.

4         A.   -- that -- that mention that, that that may

5    be a --

6         Q.   Okay.

7         A.   -- large source.

8         Q.   Okay.

9         A.   Like this concensus type of paper.  Like

10   Moretti's paper actually says -- Moretti's paper said

11   that, that the -- and it was lower than the amount

12   that was in preparing patients in terms of --

13        Q.   Right.  So -- so you think the consensus

14   done by Parvizi or organized by Parvizi is

15   authoritative.

16        A.   I didn't say anything is necessarily -- I

17   don't --

18             You'd have to define what's authoritative.

19   It's a --

20        Q.   Okay.  I believe --

21        A.   It's a pretty good thing that was put out by

22   a series of -- of several hundred people about a peri-

23   prosthetic infection --

24        Q.   Well do you agree with -- I'm sorry.

25        A.   Okay.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

302

1      Q.   I'm sorry.  Are you done?

2      A.   Well I'll be done.

3      Q.   Do num --

4           Do you agree that the numbers of bacteria

5  arriving at the surgical wound correlate directly with

6  the probability of surgical-site infection?

7           MR. C. GORDON:  Object to the form of the

8  question.

9      Q.   Do you agree with that statement?

10     A.   The number of bacteria --

11     Q.   Arriving in the surgical wound correlate

12  directly with the probability of surgical-site

13  infection.

14          MR. C. GORDON:  Same objection.

15     A.   It would depend on what you're talking

16  about.  So are you talking about two -- two versus one

17  or -- or millions versus hundreds?

18          So the answer is:  millions versus hundreds?

19  The answer is yes.  The answer is:  three versus one?

20  The answer is no.

21     Q.   Well let me ask you this then.

22     A.   What do you --

23          What are you asking?

24     Q.   Question one in the consensus.  "Do numbers

25  of bacteria arriving in the surgical wound correlate

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

303

1  directly with the probability of surgical-site

2  infection?"

3           Consensus answer:  "We recognize the

4  probability of SSI correlates directly with the

5  quantity of bacteria that reach the wound.

6  Accordingly, we support strategies to lower

7  particulate and bacterial counts at surgical wounds."

8           Would you agree, disagree, or abstain?

9      A.   Well I just told you if -- it's -- what my

10 answer was.  You do want to reduce bacteria.  That's

11 what we -- that's what we're trying to do.

12     Q.   And lower --

13     A.   But your question was different than mine.

14     Q.   I'm reading directly from the concensus.

15     A.   No, no.  Now I --

16          Oh.  With that answer, I agree with that.

17     Q.   Okay.  So -- so you would say --

18     A.   Oh, oh, I definitely agree with that.

19     Q.   Okay.

20     A.   Not the first question, which was not

21 phrased that way.

22     Q.   And I'm reading directly from the concensus.

23     A.   Yeah, of course.

24     Q.   So you agree --

25     A.   I agree with that.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

304

1      Q.   Sorry.

2      A.   Sorry.

3      Q.   So you agree that --

4           So you support strategies to lower

5  particulate and bacterial counts in surgical wounds;

6  correct?

7      A.   Yes.

8      Q.   Okay.  And the reason why you want to lower

9  particulates is because particulates carry bacteria;

10  correct?

11      A.   Some --

12      Q.   Or can, can carry bacteria.

13      A.   Some particulates --

14      Q.   Okay.

15      A.   -- can carry bacteria.

16      Q.   And you -- you cited to ASHRAE.  Do you

17  agree with ASHRAE that between one million to nine

18  hundred million squames are -- are disseminated during

19  a two- to four-hour surgery?

20      A.   I don't know the exact number, but it's a

21  lot.

22      Q.   Okay.

23      A.   It is a tremendous amount.  It's sometimes

24  more than you would ever dream of.

25      Q.   Okay.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

305

1        A.    So whatever you're saying, I don't -- you

2   know, if you told me --

3              If your question was do you believe it's

4   fifty to a hundred thousand or five hundred to a

5   million, I mean that's fine.  I don't --

6        Q.    You wouldn't disagree with the studies that

7   ASHRAE cites to.

8        A.    Well I don't know who did the study.  But,

9   you know, I look at some of those studies and -- and

10  there are eight studies and the -- and the

11  variability, like that number you gave me, might be

12  like orders of magnitude between each study.  But I

13  think I would agree with you it still says the same

14  point:  there's a lot of squames that are being shed.

15       Q.    And --

16       A.    So that's --

17             So I think we can agree on that.

18       Q.    It depends on the number of people in the

19  operating room.

20       A.    How the study was done, what were they

21  measuring, what was the technique, things --

22             There's so many different ways to measure

23  particles and sizes and the squames and the -- this

24  and -- what type of procedure.  There's a lot of

25  different answers to -- to that question, but I think

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

306

1  we agree on what you just said.

2      Q.    You -- you cited to the Sessler study;

3  correct?  And you -- you looked at that; correct?

4      A.    I looked at that at one point, sure.

5      Q.    You realize that was funded by 3M; correct?

6      A.    I didn't know who funded it.

7      Q.    Okay.  Well do you know if that study was

8  performed by 3M?

9          MR. C. GORDON:  Which Sessler study are you

10  talking about?

11          MR. ASSAAD:  The Sessler one with particle

12  counts.  I'm sorry.

13      Q.    The 2011 Sessler/Olmstead study.  Are you

14  fam -- are you familiar with that study?

15      A.    You'd have to show me it.

16      Q.    Okay.

17      A.    There's a few Sessler studies.  I'm more

18  familiar --

19          I mean the normothermia study is the one

20  that I really -- that I think I cited.

21      Q.    Are you aware that during the deposition

22  of -- of Andrea Kurz, that she stated that currently

23  there's so -- there's no scientific -- there's no

24  current scientific evidence that maintaining

25  normothermia reduces the risks of a surgical-site

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

307

1  infection?

2      A.   Andrea Kurz --

3           MR. C. GORDON:  I object to the form of the

4  question, mischaract --

5      A.   Andrea Kurz --

6           MR. C. GORDON:  Hang on.

7           -- mischaracterizes the evidence.

8      A.   Andrea Kurz is on -- on an opioid/narcotic

9  reduction at Cleveland Clinic's subcommittee or

10 committee with me and that's where I know the name.  I

11 think I met her, was introduced to her, but other than

12 that I -- I don't -- I don't --

13     Q.   Were you --

14     A.   I don't know what -- I didn't --

15          As I said before a few times now, I've never

16 read her deposition and know what she said.

17     Q.   You're aware --

18          Were you aware that she -- she -- that I

19 took her deposition in this case?

20     A.   I may have been.  Let's see, I -- I know

21 you -- you took the Daniel -- the Sessler one because

22 I told you about that conversation, and I think it was

23 mentioned to me that you took a deposition for her,

24 but it went past me because it's not something that I

25 read.  And it was mentioned five months ago, it wasn't

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

308

1    in my brain, so not -- not there.

2         Q.    If you look at page four of Exhibit No. 3 --

3         A.    Okay.

4         Q.    Here you go.

5         A.    I got it.  I have it.  Oh, the original.

6         Q.    -- under number 15, it says "Does forced-air

7    warming increase the risk of SSI?"  Do you see that?

8         A.    Yes.

9         Q.    Okay.  And this was the Sessler study;

10   correct?  Or no, this was --

11             I -- I don't know what study you're

12   referring to.

13        A.    Alijanipour.  Nine, number nine?  What --

14   what study --

15        Q.    Fifteen.  Fifteen.

16        A.    Oh, I'm looking at number nine.  I'm sorry.

17        Q.    Page four --

18        A.    This is a chapter in the annual review of --

19             Oh, page four.

20        Q.    Yes.

21        A.    I apologize.  I keep --

22             Page four.

23        Q.    I think it's a 15 there.  It's nine --

24   number nine looks like a 15.

25             MR. C. GORDON:  Can I point him to it

309

1    because I --

2              MR. ASSAAD:  Yeah.

3        A.    Well I see your fifteen.

4        Q.    Okay.  It says, "Does forced-air warming

5    increase the risk of SSI?"  And I don't know -- I

6    don't know if you're referring to the article that's

7    number nine, but underneath you say "Contrary

8    Sessler - no decrease..."  Do you see that?

9        A.    It says "Contrary Sessler - no decrease in

10   air quality laminar flow."

11       Q.    Okay.  Where are you -- where are you

12   getting that information from?

13       A.    This is from the --

14             I believe this is from the Parvizi consensus

15   statement.

16       Q.    Okay.  And --

17       A.    So this -- so that this is --

18             This Alijanipour paper that is published in

19   Journal of Orthopedic Research, which you can see in

20   2014, has a supplemental issue.  It says on very top

21   it's from the MSIS meeting, so it's on a section

22   that --

23       Q.    From the consensus?

24       A.    From the consensus.  And it mentions some of

25   the things that were mentioned in the consensus; I'm

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

310

1  not saying it's complete, but it mentions some of the

2  topics.  So on the number 15, you can read it yourself

3  or you -- if -- you can have me read it.

4      Q.   I don't need you to read it.  My question

5  is:  Have you looked at -- have you actually looked at

6  the Sessler article that shows particle counts in an

7  operating room?  Have you read it?

8      A.   I don't know that this article was on the

9  particle counts.

10     Q.   Okay.

11     A.   There was more than one Sessler article, and

12 I read the one on normothermia earlier in his

13 career --

14     Q.   What about Memarzadeh?

15     A.   -- that had the four --

16     Q.   What about Memarzadeh?  Two lines under

17 Sessler, it says, "Memarzadeh - no negligible

18 disruption" or --

19     A.   I don't know if I read that or not.

20     Q.   Okay.

21     A.   So here, "Moretti - increased bacteria but

22 lower than simply placing patient in the OR!" which

23 they used as their -- as positive for favoring FAW.

24     Q.   For Moretti?

25     A.   Yeah.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

311

1      Q.   Okay.  If you were to compare the

2   bioburden --

3            (Witness texting on his cellphone.)

4            MR. ASSAAD:  Am I interrupting you?

5            THE WITNESS:  No.

6            MR. ASSAAD:  Okay.

7            THE WITNESS:  Sorry.

8      Q.   Okay.  If you were to compare the bioburden

9   of -- created by a device being opposite the Bair

10  Hugger, would you compare it to the bioburden when --

11  after the place -- the patient's been prepped and get

12  that as a control, or check the bioburden when the

13  patient is being prepped?

14           MR. C. GORDON:  Object to the form of the

15  question.

16     Q.   Let me -- let me withdraw that question.

17     A.   You could do it both ways.

18     Q.   Okay.  Well you agree --

19           You stated previously that -- that there's

20  literature out there that the bioburden is the most

21  significant during the time the patient is being

22  prepped.

23     A.   There is some literature.  That doesn't mean

24  I agree with it.  And -- and it may also depend on how

25  you prep.  There are different ways to prep patients,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

312

1   et cetera.

2       Q.    But the prepping can have an effect on the

3   bioburden over the surgical table; correct?

4       A.    Yes.

5       Q.    Okay.  Depending on how you prep; correct?

6       A.    Yes.

7       Q.    You prep the patient and the patient is

8   ready to go and the airflow is on and everything's

9   going to settle out in the operating room and any type

10  of bioburden that was increased is going to be removed

11  by the ventilation system; correct?

12          MR. C. GORDON:  Object to the form of the

13  question.

14      A.    Maybe.

15      Q.    You're saying the bioburden is not going to

16  decrease above the surgical-site table after the

17  patient's been fully prepped and left at rest?

18      A.    You hope.  I mean there's still a bioburden

19  that's always there.  Is that what you're asking me?

20      Q.    Is it going to decrease?

21      A.    When the patient is prepped --

22      Q.    After the patient's prepped.

23      A.    We hope it's going to decrease.

24      Q.    Well if you had an opinion today, what would

25  your opinion be?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

313

1      A.    Yes, it's going to decrease.

2      Q.    Okay.

3      A.    With the one on the skin, yes, that

4   bioburden is decreased.

5      Q.    Because the patient is not moving around and

6   there's less people around the operating room table.

7      A.    Patient's enroute, you just put an

8   antibacterial on the operating site, et cetera, and

9   that's -- we -- for that operative site you're

10  reducing the bioburden.

11     Q.    And also the bioburden in the air around the

12  patient, because there are less people moving around

13  prepping the patient.

14        The patient's already been prepped; correct?

15     A.    I will agree with that.

16     Q.    Okay.  So would you agree with me that if

17  you're going to compare whether or not the Bair Hugger

18  has a -- has an effect on the bioburden over a

19  surgical site, that you should compare the bioburden

20  after the patient's been prepped with the Bair Hugger

21  off and then turning the Bair Hugger on afterwards?

22        MR. C. GORDON:  Object to the form of the

23  question.

24     A.    It -- it's different questions that you're

25  asking.  I mean that is one way to do it.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

314

1      Q.   Well you want to get a control that would be

2  the actual bioburden that would occur during a surgery

3  with the Bair Hugger off; correct?

4           MR. C. GORDON:   Object to the form of the

5  question.

6      Q.   With -- with not other confounding factors

7  such as prepping; correct?

8      A.   Let me write it down.   So in one study you

9  have the Bair Hugger is on.   Right?   But you're

10 prepping the patient and you're doing all that stuff.

11     Q.   No.

12     A.   That's what happens.   You do realize that's

13 the reality.

14     Q.   You think the Bair Hugger gets turned on

15 before --

16     A.   It's very --

17     Q.   -- before the Bair Hugger blanket's even

18 placed?

19     A.   No.   It's while some of the prepping is

20 going on the Bair Hugger has been turned on.   It's not

21 done.

22     Q.   Okay.   Before the drapes or after the

23 drapes, the draping?

24     A.   It -- before --

25           During the draping.

315

1      Q.    Okay.

2      A.    During the draping.

3      Q.    Okay.

4      A.    So there is some simultaneous stuff going

5  on.  We don't just do things in series, which is what

6  you're saying.  We do some things in parallel.

7      Q.    Let -- let me --

8      A.    So -- so just --

9      Q.    Let -- I know you --

10     A.    I just want to write down what you're saying

11  there.

12     Q.    Well I want to write down so it's correctly

13  so I don't have to go over this, because I --

14     A.    Okay.

15     Q.    -- I think I see what you're saying and --

16  and with that assumption, my question is simply this.

17     A.    Okay.

18     Q.    If you want to know if the Bair Hugger

19  increases the bioburden during surgery when the

20  patient has a wound, would you agree with me that you

21  need to compare when the patient -- you need to

22  compare with the Bair Hugger on as compared to the

23  Bair Hugger off during the same time period of when

24  the surgical wound exists?

25     A.    You -- you want to --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

316

1          MR. C. GORDON:  Object to the form of the

2   question.

3       A.   You want to compare it at -- yes, on/off at

4   similar --

5       Q.   Time.

6       A.   -- time periods of the case.

7       Q.   Yes.

8       A.   I agree with that.

9       Q.   Okay.  I mean, for example, if the Bair

10  Hugger is on and you're prepping the patient, there's

11  many confounding factors such as people moving around,

12  putting drapes on.  That's going to affect the

13  bioburden over the surgical site; correct?

14      A.   But if your control is when it's off and

15  those same factors are going on, you could do that

16  study.

17      Q.   Okay.  So you have to --

18           But you want to keep the factors the same;

19  correct?

20      A.   No.  I'm -- I just told you that you --

21           I hear what you're saying and I don't mind

22  what you're saying, and you can do the study that way

23  that you're describing to me, but you can always --

24  also do the study the other way, the Bair Hugger on at

25  the same time that things are going.  You still have

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

317

1   the control group.

2       Q.   Would proper --

3       A.   But being prepped and all that stuff, it

4   still represents the control group whether the Bair

5   Hugger is on or off.

6       Q.   But as long as the control group --

7       A.   You might -- I mean your studies --

8       Q.   Okay.

9       A.   Yeah.

10      Q.   But -- but you have to agree with me that as

11  long as the control group, the only thing that changes

12  is that the Bair Hugger is turned on or off, depending

13  on what you consider the control group, you need that

14  single change; correct?  If you make any other

15  changes, it's going to affect -- it may the affect the

16  results.

17          MR. C. GORDON:  Object to the form of the

18  question.

19      A.   I'd have to see what you're saying.  But

20  I --

21          In a general sense, yes.

22      Q.   Okay.

23      A.   You -- you --

24          When you do an experiment, you want to

25  change only one variable; otherwise, they can affect

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

318

1    the results.  I a hundred percent agree with that.

2              MR. C. GORDON:  Can we take a break sometime

3    in the near future?

4              MR. ASSAAD:  Sure.  Let's take a break now.

5              THE REPORTER:  Off the record, please.

6              (Recess taken.)

7    BY MR. ASSAAD:

8        Q.   Dr. Mont, I'm going to read again from the

9    consensus that you're familiar with.

10             Question number two, page 115 of the

11   consensus.  "Do numbers of bacteria in the operating

12   room (OR) environment correlate directly with the

13   probability of SSI?"

14             Consensus:  "We recognize that airborne

15   particulate bacteria are a major source of

16   contamination in the OR environment and the bacteria

17   shed by personnel are the predominant source of these

18   particles.  The focus in our recommendation is to

19   reduce the volume of bacteria in the OR with

20   particular attention to airborne particles."

21             Do you agree, disagree, or would you

22   abstain?

23       A.   I would --

24             I'd want more discussion, so I might

25   abstain.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

319

1      Q.   Okay.  Are you -- are you aware that 93

2  percent agree with that statement?

3      A.   That's fine.

4      Q.   Okay.  And only five percent disagree.

5      A.   I don't think it's terribly bad.  I think

6  that's fine.

7      Q.   But you agree the 93 percent agreement

8  according to the consensus, that's a strong consensus.

9      A.   That's a very strong consensus.

10      Q.   Okay.  You agree with me that the majority

11  of PJIs, periprosthetic joint infections, are

12  initiated through the introduction of microorganisms

13  at the time of surgery.

14      A.   Yes.

15      Q.   Okay.

16      A.   Is that one of the --

17          Oh, never mind.

18      Q.   Why would you abstain, by the way, from --

19      A.   I'm -- I'm only abstaining right now because

20  I don't know the context of what was being discussed

21  since all those questions, they were part of group

22  discussions and meetings.

23      Q.   Okay.

24      A.   And as I said, that, you know, whether it

25  comes directly on the skin or from the air, I don't

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

320

1  totally believe that it's all airborne that leads to

2  infections.

3       Q.   Okay.  Sitting here today, can you tell me

4  what percentage of periprosthetic joint infections

5  come from airborne bacteria as compared to from the

6  skin?

7       A.   I can't give you exact percentages.

8       Q.   Okay.

9       A.   And maybe it's saying the same thing.  It

10  may be that, airborne, but no, I view it more of the

11  skin.  That's why I spent my life disinfecting skin

12  and -- or the -- or the wound itself or what you're

13  doing in the case with your instruments and what

14  you're touching.  So I have a little hard time with

15  that whole statement.

16       Q.   Well --

17       A.   I mean the surgeons, what they're doing in

18  the case and their gloves get penetrated and the

19  instruments may get contaminated and the skin is

20  there, and as the case goes on they're sweating from

21  the skin and --

22       Q.   Would -- would --

23       A.   -- and things like that.  So to make that

24  statement, that's why I might abstain or disagree.

25  But maybe, depending on the context of that statement,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

321

1    I would --

2        Q.   And you would --

3        A.   -- I might agree with them the way it was

4    presented.

5        Q.   You would agree with me that after

6    disruption in the unidirectional flow, the instruments

7    and even the hands of the surgeon might be

8    contaminated; correct?

9        A.   Potentially.

10       Q.   Okay.  And you would also agree with me that

11   if the implant is uncovered, that any disruption in

12   the unidirectional airflow could cause the implant to

13   become con -- contaminated; correct?

14       A.   Correct.

15       Q.   Okay.  On page six --

16            MR. ASSAAD:  Doctor, I have about one hour

17   left, and I'd appreciate your attention --

18            THE WITNESS:  I'm sorry.

19            MR. ASSAAD:  -- to the deposition instead

20   of --

21            THE WITNESS:  Okay.

22            MR. ASSAAD:  -- being on your phone.

23       Q.   On page six of Exhibit 5, bottom of the

24   first paragraph, it says, "...turbulent air systems

25   are not sensitive to airflow disruption in the manner

322

1  purportedly demonstrated in these experiments

2  involving laminar flow."

3        What's your basis behind that statement?

4     A.   It's page six --

5        MR. C. GORDON:  Of his report.

6        MR. ASSAAD:  Of Exhibit 5.

7        MR. C. GORDON:  Yeah.

8        THE WITNESS:  Yeah.  What line?

9        MR. C. GORDON:  I'm sorry, I thought you

10  said the deposition.

11        THE WITNESS:  What line?

12     Q.   The first par -- the par -- paragraph up at

13  the top, the fourth line from the bottom of that

14  paragraph starts with, "However, turbulent air systems

15  are not sensitive to airflow disruption" --

16     A.   I don't --

17        Page six.

18     Q.   Page six.

19     A.   I don't see it on the fourth line.

20     Q.   Fourth line from the bottom of the first

21  paragraph.

22        MR. C. GORDON:  Can I point him to it?

23        MR. ASSAAD:  Yeah.

24     A.   Oh, fourth from the bottom --

25        Okay.  It's not the fourth line, that's the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

323

1   eighth line.

2        Q.   Okay.  I'll read it again.

3             Question:  You state, --

4        A.   Okay.  So --

5        Q.   -- "However, turbulent air systems are not

6   sensitive to airflow disruption in the manner

7   purportedly demonstrated in these experiments

8   involving laminar flow."

9             What is your basis that turbulent air

10  systems are not --

11       A.   I -- I --

12       Q.   -- sensitive to airflow disruption?

13       A.   I was looking at a few articles, and laminar

14  flow is -- is a completely different scenario than

15  turbulent airflow that we would use at Cleveland

16  Clinic, for example.

17       Q.   I'm more specific to your -- your statement

18  that they're not as sensitive to airflow disruption as

19  laminar flow.

20       A.   I saw some reference.  I'd have to find that

21  for you.

22       Q.   Would it be in Exhibit A?

23       A.   It would be in -- it would be in -- it would

24  probably be in one of those.

25       Q.   Okay.  But --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

324

1              I don't want you to look, but you, sitting

2    today, you -- I mean you can't cite the name of the

3    article sitting here right now this instant.

4         A.   No.

5         Q.   Okay.  Do you agree with me that you need

6    fewer CFUs to cause a periprosthetic joint infection

7    than a superficial wound infection?  Correct?

8         A.   Correct.

9         Q.   Okay.  You just disagree with our experts

10   that you only need one.

11        A.   That could be a little bit of a semantic.

12   Are we talking one growing to a million or --

13             Generally, inoculums, when you have small

14   inoculums that are in the hundreds or thousands, they

15   don't create infections.  I did some of this work that

16   wasn't published with fracture work myself personally.

17   When you had small inoculums of bacteria, no

18   infections occurred even though -- and there were --

19   and there were like thousands in fracture-healing

20   scenarios, so I know that you could -- any one could

21   turn into a million, but in a general --

22             When we're talking about creating an

23   infection, you need -- in many of these, even the

24   animal models that I cited, it was still like a

25   thousand before that was inoculated, before infections

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

325

1    occurred in the animal models even with prostheses.

2         Q.    Okay.  But are you aware -- you --

3               Have you ever looked at an implant under an

4    electron microscope?

5         A.    I have looked at implants --

6         Q.    Okay.

7         A.    -- under electron microscope, on scanning

8    electron microscopy with various techniques.

9         Q.    And -- and you agree with me that even

10   though the implant might feel smooth, in some areas

11   there's always crevices because the metal is not

12   perfectly smooth.

13        A.    Well there's no artificial --

14              It's not perfectly smooth.  I mean some

15   people get worn -- things get worn as they're used.

16        Q.    I'm talking about when they are brand-new,

17   like when you put them in.

18        A.    They're pretty smooth.  They meet pretty

19   good standards.  They're pretty smooth, but of course

20   there's crevices.

21        Q.    Okay.  And you agree with me that it's very

22   difficult for the host to -- to fight off a

23   periprosthetic joint infection.

24              MR. C. GORDON:  Object to the form of the

25   question.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

326

1       A.    In a general sense, yes.

2       Q.    And that's why --

3       A.    Yes.

4       Q.    That's why the standard of care is to do

5    a -- a two-stage revision usually.

6       A.    Okay.  You're -- you're -- now you're --

7             I was going to give you the general

8    question.  So let's go back.  The host --

9             What type of infection?

10      Q.    Like --

11      A.    What, where, when, how, deep infections,

12   superficial, this --

13            And we don't always use two stages, we use

14   one stage sometimes.  Now the field is turning into a

15   lot of people where we use debridement, it depends on

16   where the infection is, and now we're even turning

17   into a lot of people saying we would like to do one

18   stage rather than two stage.  So let's go back and ask

19   the questions a little bit more precisely.

20      Q.    Okay.  Well in the past, if there was --

21   if -- if it was found that the prosthetic joint was

22   infected, had infectious material around it, the

23   standard of care was to do a two-stage revision.

24      A.    Are we talking about a hip or a knee?  Are

25   we talking --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

327

1      Q.   A hip.

2      A.   -- an early infection, a late hematogenous

3   one, are we talking about an acute one or subacute?

4           So I published papers on infections in knees

5   caught within 30 days and the standard of care that I

6   developed, which a lot of people follow, is just wash

7   out the plastic, wash out like a maniac, and I was

8   able to save like 80 percent of those prostheses

9   without a two-stage.  That's published in the '90s.

10     Q.   Okay.  And sometimes you would have to do a

11  two-stage.

12     A.   Sometimes, yeah.

13     Q.   Okay.  What about with hip?

14     A.   Hips, again it depends on how early.

15  Sometimes when you catch these really early, within a

16  month, you can bring it back, wash it out.  Sometimes

17  in those cases -- it depends on what it looks like in

18  the OR -- we can do a one-stage right then, just take

19  out the stem and the cup and clean it out and -- or --

20          There's different treatments.  Each -- each

21  one dictates.  But in a general sense, just to cut to

22  the chase here, when you get a deep infection that's

23  caught a little late or it's postoperative and it's

24  caught like two months later, it doesn't look that

25  good, in a general sense the general standard of care

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

328

1    is just take it all out and put an antibiotic spacer

2    and do it as a two-stage, which is I think where you

3    may be leading.

4        Q.    Assuming that, when the Bair Hugger is

5    turned on in an operating room, that the particles

6    increase over the surgical site, would that cause you

7    any concern?

8            MR. C. GORDON:  Object to the form of the

9    question, increased -- incomplete hypothetical.

10       A.    So -- so I don't know --

11           Again, it's the same question that I might

12   have gotten trapped before and I don't know what you

13   were asking me.  Are you talking about like an extra

14   one or two particles?  What do you mean by

15   "increased?"  And we're talking now about particles.

16   It might depend on a lot of different things like the

17   amount of particles, what I just said, the size of the

18   particles or something like that --

19       Q.    Well --

20       A.    -- whether -- whether -- whether those

21   were --

22           It wouldn't be concerning me if they were

23   non-pathogenic particles.  How's that for an answer?

24   But again, you'd have to ask the question differently.

25       Q.    Let me ask you this:  If you found out a

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

329

1  device increased the particles above the surgical

2  site, okay, would you agree with me that you'd want to

3  investigate that as an orthopedic surgeon, to whether

4  or not that could be harmful to your patients?

5       A.   Maybe or maybe not.  I -- I already know

6  that the -- having the lights above my surgical site

7  create these particles, or dust, they're particles

8  that we're -- we're a little concerned about but

9  generally surgeons are not that concerned about.  They

10  think the --

11       You know, there's been UV radiation.  The OR

12  has generally low CFUs and those aren't -- they're not

13  as worried about those types of particles.  So I would

14  be asking more questions.

15       Q.   You'd ask questions; right?

16       A.   Sometimes.

17       Q.   Okay.  And you agree with me that --

18       Well.  You agree with me that people shed

19  skin squames; correct?

20       A.   Yes.

21       Q.   And as a --

22       And the purpose of the ventilation system,

23  unidirectional like the oper -- the circ -- the

24  operating rooms that you use, is to push those skin --

25  skin squames down to the floor and out to the sides;

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

330

1    correct?

2          A.    That's -- that's been described, yes.

3          Q.    Okay.  So you -- and that's one -- one of

4    the reasons why surgeons --

5                Well you -- you do agree that surgeons

6    believe anything under the operating room is -- is not

7    sterile -- operating room table is not sterile.

8          A.    Correct.

9          Q.    Okay.  That's probably --

10               I would assume -- and this is an assumption,

11   you could agree with me or not -- that probably the

12   largest bioburden in the operating room table -- or in

13   the operating room is probably on the sides and

14   underneath the operating room table.

15         A.    I -- I can't totally agree with that.  I

16   mean that's a large part.  What about the garbage

17   pail?

18         Q.    I'm talking about --

19         A.    I mean what about the people themselves?

20   They're walking around, the people that are not even

21   scrubbed and they're walking around.  Look what their

22   bodies look like.

23         Q.    Would you agree there's a large bioburden

24   underneath the operating table and around the

25   operating room table?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

331

1      A.   Yes.

2           MR. C. GORDON:   Object to the form of the

3   question.

4      Q.   And if you found out that a device was

5   bringing up that bioburden from underneath the

6   operating room table and putting it over the surgical

7   site, would that cause you any concern?

8      A.   That would cause me concern.

9      Q.   Okay.  Because you would agree with me that

10  particles -- there's a high probability of particles

11  underneath the operating room table, some of them are

12  going to contain pathogens.

13     A.   No.  They're --

14          We've just done an experiment where we were

15  using a BioTrack device, which is evaluating bioactive

16  particles, and we're finding that there's only like

17  one in a thousand particles are -- are -- have

18  bacteria in them.  Low amount.  And then it also has

19  different size particles, and some particles I

20  wouldn't be concerned about if they are -- because

21  they wouldn't be harboring bacteria.  I don't think

22  they would be harb -- harboring virus; I'm not worried

23  about viral infections.  So if they're particles that

24  are under .3 microns or something like that, I'm not

25  that worried about that.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

332

1      Q.   Do you know --

2      A.   So it would depend on a few things like

3  that.

4      Q.   Do you know what percentage of skin squames

5  contain pathogens?

6           MR. C. GORDON:  Object to the form of the

7  question.

8      A.   Well when they're in the body -- well we

9  don't know what --

10          No.  I don't think anybody knows that.

11     Q.   Okay.  Well I'm not asking if anyone knows

12  that.  Do you know that?

13     A.   What do --

14          How do you define "pathogens?"  Do they have

15  bacteria in them, --

16     Q.   Yes.

17     A.   -- is that what you're asking?

18          When they're in the body, probably a hundred

19  percent have bacteria settle on them.

20     Q.   What about skin squames that are shed from

21  human beings during a surgical procedure, do you know

22  what percentage of those skin squames --

23     A.   I think I've seen different numbers for

24  that, so I wouldn't put any number on that.

25     Q.   Okay.  Would you agree --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

333

1      A.    Nor would I just --

2      Q.    -- it's more than one percent?

3      A.    I'll go for --

4            I don't know.

5      Q.    Okay.

6      A.    Because if it was more than one -- look at

7   your numbers.  If it was more than one percent, you

8   just said nine million are hitting into a body or

9   something, then -- then you're telling me that we're

10  getting 90,000 bacteria that are hitting into a wound?

11     Q.    I didn't say hitting into a wound, sir.  I'm

12  talking about shedding from humans.  What percentage

13  of those skin squames that are -- are shed from a

14  human contain --

15     A.    No.  At some point you said that --

16     Q.    -- contain CFU --

17           THE REPORTER:  Just a moment.

18           THE WITNESS:  I'm sorry.  You're right.

19           THE REPORTER:  "...are shed from a human" --

20     Q.    -- contain CFUs?

21           If you don't know, that's fine.

22     A.    Okay.  We'll pass on that.  I don't want to

23  say a wrong answer.

24     Q.    Okay.  You -- you mentioned something about

25  you're not concerned about viral infections; correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

334

1      A.    I'm concerned about viruses any time, but

2   not -- it's not typically what leads to infections

3   here, periprosthetic infections.

4      Q.    Okay.  But bacteria causes infections;

5   correct?

6      A.    Well there -- there's also -- there's fungal

7   infections also.  They're very rare.

8      Q.    Okay.

9      A.    So that wouldn't be a bacteria.

10      Q.    But the majority of periprosthetic joint

11   infections are caused by bacteria; correct?

12      A.    Yes, the greater majority.

13      Q.    Okay.  You -- you agree with me that the

14   fact that someone's obese, without a bacteria that --

15   that enters the surgical site you're not going to have

16   an infection.

17          MR. C. GORDON:  Object to the form of the

18   question.

19      A.    The fact that somebody's obese --

20      Q.    Obesity doesn't cause infections; correct?

21      A.    Well that was that earlier question that I

22   got asked and some of it is maybe the way I phrased

23   it.  Obviously, a bacteria causes infection in the way

24   that other sentence was phrased, that obesity would be

25   a risk factor, and it would depend on the amount of

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

335

1    obesity --

2        Q.    It makes you more susceptible.

3        A.    It would make you more susceptible.

4        Q.    Just like diabetes, you might be more

5    susceptible.

6        A.    Right.  That's what was meant from the

7    phrase, --

8        Q.    Okay.

9        A.    -- not -- not that --

10       Q.    Okay.

11       A.    -- these risk factors cause the infection,

12   which -- which might have been implied by that --

13       Q.    And that --

14       A.    -- ill-worded sentence in the beginning that

15   I got asked about.

16       Q.    And that's what I was trying to correct, is

17   you're not saying that the fact that somebody is a

18   diabetic or obese or any other type of risk factor

19   is -- is -- is the cause of the infection.  You still

20   need the bacteria to cause an infection.

21       A.    Yeah.  If you -- the only qualify, if you

22   operated --

23             Bacteria is the cause of an infection.

24   There are sometimes we operate -- we have operated on

25   people that might have had an unknown bac -- dental

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

336

1  infection and -- or they had an ulcer that wasn't

2  detected, you find out later, so -- so it's an

3  actual -- a nidus of bacteria that led to the

4  infection.  You might find that out later in certain

5  cases.  Actually --

6         And certainly, yes, periodontal disease and

7  an ulcer disease on somebody's leg --

8     Q.   You still need bacteria though.

9     A.   -- is a risk factor, but it comes from

10 bacteria, just may not --

11        (Witness's cellphone dings.)

12    A.   But that's a risk factor.  Nobody paid

13 attention to it.

14    Q.   It may have not come from the skin or the

15 air, but you still need a bacteria.

16    A.   Yes.

17    Q.   Okay.

18        THE WITNESS:  I'm just going to answer one

19 thing, but I can hear a question.

20    Q.   Have you ever been involved in the design of

21 a patient warming device?

22    A.   No.

23    Q.   Now you agree with me -- well strike that.

24        I know you disagree that the Bair Hugger has

25 an effect on contaminating the sterile field, but if

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

337

1    it did have an effect on contaminating the sterile

2    field, you agree then it would be a defective product;

3    correct?

4                MR. C. GORDON:  Object to the form of the

5    question, calls for a legal conclusion.

6                THE WITNESS:  Does that mean I answer it?

7                MR. ASSAAD:  Yes.

8                MR. C. GORDON:  It's whatever you can

9    answer.

10        A.   If a device -- am I allowed to answer --

11   causes bacteria into a sterile field, would I agree

12   that we shouldn't be using that device?  Is that your

13   question?

14        Q.   Yes.

15        A.   Yes.

16        Q.   Okay.  Now I noticed that you comment in

17   your report -- on pages 13 and 14, 15 and 16 -- on the

18   McGovern article; correct?

19        A.   Yes.

20        Q.   All right.  You mentioned that the McGovern

21   article could be explained by the Hawthorne effect.

22   Do you remember saying that in your report?

23        A.   Yes.

24        Q.   Sitting here today, have you talked to any

25   of the -- any of the physicians or researchers that

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

338

1   did the -- that published the McGovern article and ask

2   whether or not they considered whether or not the --

3   the results could have been affected by the Hawthorne

4   effect?

5       A.   No.  First of all, I haven't talked to any

6   of these physicians in the whole thing, so why are

7   you --

8       Q.   Have you read the depositions?

9       A.   I saw those depositions.

10      Q.   That wasn't my question.  Have you read

11  those depositions?

12      A.   Oh, the --

13           Oh.  The answer is yes, I read them.

14      Q.   Okay.  So you read Dr. McGovern's

15  deposition?

16      A.   Yes.

17      Q.   You read Dr. Reed's deposition?

18      A.   Reed.

19      Q.   Do you know Dr. Reed right now is -- is --

20      A.   And Leaper.

21      Q.   -- is working on a -- a study funded by 3M?

22      A.   Dr. Reed.

23      Q.   Yes.

24      A.   Yeah.

25      Q.   You know Dr. Reed personally?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

339

1      A.    No.  He sounded like he was very interested

2  in some knowledge and interested in this topic, in

3  reading the deposition.

4      Q.    Are you aware --

5      A.    I'm aware of that.

6      Q.    Are you aware that 3M right now is

7  conducting a pilot study with respect to forced-air

8  warming and infection rates on certain types of -- of

9  orthopedic surgeries?

10      A.    Yes, it was mentioned --

11            Well I don't know exactly where it is.  It

12  was mentioned in the deposition.

13      Q.    Okay.  So sitting here today, your -- would

14  you agree with me that your opinion that the results

15  in McGovern could be explained by the Hawthorne effect

16  is just speculation on your part?

17      A.    This --

18            You're asking me about the Hawthorne.  This

19  is one of the worst -- based on looking at this thing,

20  this is one of the worst results articles which could

21  be explained by not only the Hawthorne effect, by

22  multiple, multiple other effects which I elaborated in

23  this report, and many of those effects that are in

24  this report were even further published in one of the

25  citations here from U.K. of all the changes that were

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

340

1    done that weren't mentioned in the McGovern article,

2    all of which had effect in this period of time.  So

3    not only --

4            You said did I speak to these people.  No, I

5    didn't speak to these people, but this is like

6    everything that I put in there, and there's a lot

7    more, and it's even been published about all these

8    things that were done at the time of this study, and

9    they -- and in addition to that publication from U.K.,

10   the same authors published other things about some of

11   the factors that I mentioned like the antibiotic

12   change and the anticoagulant change, et cetera, so you

13   know what, your ques --

14           I never spoke to these people, but it's

15   almost like they spoke to me multiple times in the

16   literature -- it's amazing, they really did -- to tell

17   me all the confounding factors and the reasons why you

18   couldn't take any credence to the results of that

19   study.

20       Q.   Prior to submitting your report by June 2nd,

21   you reviewed under Exhibit A the -- the expert report

22   of -- of Dr. Holford.  Do you recall citing that to

23   Exhibit 8?

24       A.   Exhibit 8 or A?

25       Q.   A of your report, Exhibit 8 of this

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

341

1    deposition.  Defense expert report.

2         A.    Oh, yeah, yeah.  Holford.

3         Q.    Have you relied on his opinions in

4    formulating your opinions?

5         A.    Not really.

6         Q.    Okay.  Now also on Exhibit 8 --

7         A.    You mean A?

8         Q.    Yeah, but it's eight of this deposition.

9    It's been marked as Exhibit 8.

10        A.    Oh, I apologize.

11        Q.    Okay.

12        A.    Sorry.

13        Q.    I know that's probably confusing, but

14   exhibit -- I'm going to use the exhibit depo -- the

15   number for this deposition.

16        A.    Got it.  I got it.

17        Q.    You mentioned that you had Mark Albrecht's

18   deposition; correct?

19        A.    Yes.

20        Q.    But I don't see where you spend time reading

21   it --

22              Oh, never mind.  I do.  You read that in May

23   of 2017?

24        A.    Whenever it was marked as --

25              I tried to be as accurate as I could with

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

342

1   when I read things --

2        Q.   Okay.

3        A.   -- in the -- in the invoice.

4        Q.   Did you have a copy of Dr. Nachtsheim's

5   deposition?

6        A.   Nachtscheim.  Doesn't ring a bell.

7        Q.   Did you receive any internal documents from

8   3M?

9        A.   Internal documents from 3M.  I don't know

10  how --

11           You'd have to define that for me.  The only

12  thing from 3M that I remember reading at the very

13  beginning, I went to the websites and I went to --

14  there were like a lot of things about 3M on the

15  website, there were like 14 different panels and

16  YouTube videos.  I wanted to become familiar.

17           When it comes to 3M, what did -- what else

18  could I potentially have gotten?

19           Can you ask the question again?

20       Q.   Let's may -- maybe --

21       A.   I mean I'm unsure --

22       Q.   -- do it this way.  Is Exhibit 8 everything

23  that you considered prior to submitting your report?

24       A.   Exhibit -- okay.  Exhibit 8, everything that

25  exhibit -- I will --

343

1          To the best of my knowledge, the answer is

2   yes.  But I'm happy, because I don't want to be

3   inaccurate, to --

4       Q.   All right.

5       A.   -- to -- to think in my brain is there

6   something I didn't --

7          It's -- it's certainly possible there's an

8   article or two that I might have just had a lapse and

9   didn't put it in because I just thought it was common

10  knowledge, --

11      Q.   Okay.

12      A.   -- something I had published that I didn't

13  think I needed to put in the report, something like

14  that.

15      Q.   Did you pull all these articles your --

16  yourself, or did people from 3M or their attorneys

17  provide some articles to you?

18          MR. C. GORDON:  Object to the form of the

19  question.

20      A.   Most of these articles I pulled myself or

21  looked at before the report.  Most of -- most of the

22  articles, if -- I looked at the article or the

23  abstract or something online or looked at some

24  internet things.  Sometimes it was internet, sometimes

25  it might have been -- in answer to your other question

344

1   before -- it might have been from a 3M website, it

2   might have been from some other things.  So that was

3   before the report.  There might have been a few

4   exceptions and I'd have to look at this and tell you

5   the few exceptions where --

6        Q.   Well let me ask it --

7        A.   But most of these reports I pulled myself

8   or -- or saw an abstract.  I didn't have every full

9   report before the June 1st or 2nd thing.  I had some

10  that I relied on abstracts.

11       Q.   And you agree with me that some of the

12  articles were provided by 3M or -- or their attorneys.

13       A.   I am not sure.

14       Q.   Okay.

15       A.   I'd have to go through one by one.  It could

16  be that none or both, meaning I had the abstract and

17  then they -- I said, "Do you have this paper?"  Or I

18  saw reference to something and then they got me this.

19       Q.   Now you mentioned that --

20            In the McGovern study you mentioned

21  something about the prophylactic antibiotics and the

22  anti -- or the prophylactic antithrombosis drugs;

23  correct?

24       A.   Yes.

25       Q.   Okay.  Do you agree with me that it is

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

345

1    possible that those -- like, for example, the

2    prophylactic antibiotic -- may have had no effect on

3    infection rates?  Correct?

4        A.    Well in this particular study, when there

5    was pound per pound the same antibiotics used, there

6    was -- there was no difference in infection rates.

7    It's right there, first six- or seven-month period.

8        Q.    So you're saying when the -- when -- when --

9    when the antibiotic switched, there was no difference

10   in infection rates?

11       A.    In data that was provided to me, when

12   they -- when concurrent antibiotics were used, there

13   was no difference -- in the six- or seven-month period

14   there was no difference in infection rates.  When

15   you're mixing and matching antibiotics and in one

16   group you have differences, then --

17       Q.    You're not opining that the -- that the

18   change in the antibiotics had an effect on the

19   infection rates; are you?

20       A.    It certainly could have had an effect.  Yes,

21   I am opining that.

22       Q.    Certainly could or -- or are you --

23            Are you saying it's a possibility or a

24   probability?

25       A.    Probability.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

346

1      Q.   Okay.  And your basis?

2      A.   That when you look pound per pound at

3  patients treated with the same antibiotics, they have

4  not a 3.8- or four-fold difference in infection rates,

5  they're the same.

6      Q.   Okay.

7      A.   So that's -- so that's why it's more likely

8  than not, which is what I said.

9      Q.   You looked at the raw data?

10     A.   Yes, I saw raw data --

11     Q.   And --

12     A.   -- for a six- or seven-month period.

13     Q.   Okay.  And have you read the deposition of

14  Albrecht or Reed or McGovern?

15     A.   I read their depositions.  In addition, they

16  have the same effect for their antico -- they

17  published a difference of infection rates, five to 13,

18  and they called that non -- when they were using

19  anticoagulants, and they didn't account for that as

20  well, and they called that a non-significant increase.

21  Well of course it's non-significant, it's 13 versus

22  five.  Thirteen versus five is a tremendous increase

23  when you're using different anticoagulations, so they

24  even published a paper on that whole effect in terms

25  of infection rates when they were using the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

347

1  anticoagulant with the Bair Hugger device.  So they

2  had a lot of confounding factors.

3          In addition, they even admitted in the

4  deposition that they had cases that they put maybe in

5  the wrong category, and that was admitted by McGovern.

6      Q.   And you also read in the deposition that the

7  data that was provided to them by -- by defense

8  counsel, they weren't sure if that was the final data

9  used for the study; correct?

10     A.   Yeah, that --

11          I mean there was at lot of e-mails like

12 that.

13     Q.   Okay.

14     A.   So -- so if you want to provide me different

15 information to look at --

16          But I certainly looked at a lot of things

17 like that.

18     Q.   Okay.  Have you read Dr. Holford's

19 deposition?

20     A.   To some extent.

21     Q.   When did you receive his deposition?

22     A.   Hmm?

23          MR. C. GORDON:  Deposition or expert report?

24          MR. ASSAAD:  Deposition.

25     A.   I don't know if I read his deposition.

348

1       Q.   By the way, on Exhibit 8 you put down

2   "Plaintiffs' Studies" on page two, and then "Other

3   articles and materials (in addition to those

4   specifically cited in my report)."

5           What makes you believe that those studies

6   under --

7           Why did you title it "Plaintiffs' Studies?"

8       A.   All right.  You're asking me too many

9   questions at once.  Start with this one now?

10      Q.   On page two --

11      A.   Page two of what?

12      Q.   -- of Exhibit 8 --

13      A.   Of eight.

14      Q.   -- you have a title that says "Plaintiffs'

15  Studies."

16      A.   Oh, because -- all right.  Maybe --

17          Because some of these -- I view some of

18  these, as the ones of Albrecht, that he is somebody

19  that worked with the company at the time.

20      Q.   Is there any evidence --

21      A.   Maybe I'm -- maybe I'm mistaken, and if I

22  am, then I can cross that off.

23      Q.   Are you aware of any -- any studies

24  sponsored or funded by any of the plaintiffs or their

25  attorneys in this case?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

349

1     A.   Yes.  There was mention by McGovern and I

2  think by Reed that there were some studies that were

3  being sponsored or -- or --

4        Yes.

5     Q.   By the plaintiffs?

6     A.   By Augustine and that group.

7     Q.   Do you believe Augustine is a plaintiff in

8  this case?

9     A.   All right.  Now we're mix --

10       Okay.  I don't want to get into this

11  discussion right now.

12    Q.   I'm asking you:  Do you think Augustine is a

13  plaintiff in this case?

14    A.   No, he's not a plaintiff.

15    Q.   So --

16    A.   I'm talking about that side of the case, the

17  people that have a --

18       All right.  Let's --

19    Q.   I mean --

20    A.   All right.

21    Q.   -- you put in "Plaintiffs' Studies."  I'm

22  just trying to determine why on Exhibit 8 you put in

23  "Plaintiffs' Studies."  What were -- what were you

24  informed to declare that the eight studies listed

25  there are plaintiffs' studies?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

350

1      A.   I will put Augustine as a person that has a

2  vested interest in his conduction-fabric de -- his Hot

3  Dog device that has put out tremen -- when I got

4  introduced to these studies, tremendous information as

5  if he was a plaintiff against these devices, so that's

6  why I put that in the category.

7      Q.   So --

8      A.   These -- these are -- these are studies that

9  are done by people from that device company.  So if

10  you want, I'll be happy to cross that out.

11      Q.   Does -- does it take away any credibility of

12  those studies?

13      A.   Yes.

14      Q.   So you're saying that a study that's funded

15  by a corporation that has a vested interest in what

16  those studies are saying are not credible studies?

17      A.   No.  But they -- they -- they have to be

18  disclosed.  And perhaps some of those studies were not

19  published.  As we heard from McGovern's testimony, it

20  was pretty interesting how he was a young fellow that

21  wanted to publish papers and multiple times wanted to

22  publish the work that showed non --

23      Q.   You mentioned earlier --

24      A.   So --

25      Q.   -- you had an unpublished study; correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

351

1      A.   Hmm?

2      Q.   You mentioned earlier that you had some

3  unpublished studies.

4      A.   What does that have to do with what I'm

5  saying right now?

6      Q.   I mean the fact that something is

7  unpublished, does that make a difference if it's

8  unpublished or not?

9           THE REPORTER:  Just a moment.

10           MR. ASSAAD:  Sorry.

11           THE REPORTER:  What's the question?

12      Q.   If -- if a published --

13           If somebody does a study and unpublishes it,

14  is that -- do you hold that against them?

15      A.   You're taking it out of context.  This is a

16  person that wanted to publish this multiple times.

17  You can read his deposition, and these were the

18  queries that were made.  But we can keep talking about

19  this if you'd like.

20      Q.   I mean before --

21           You've done tests before to see what's the

22  best way to perform a study, little pilot studies;

23  correct?

24      A.   Yes.

25      Q.   Okay.  And some may work and some might not

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

352

1  work; correct?

2       A.   Correct.

3       Q.   Okay.  For example, if I did a particle-

4  counting test above the surgical site and it showed an

5  increase in particles, you'd come back and say that's

6  not a good study because particles don't equal

7  bacteria; correct?

8            MR. C. GORDON:  Object to the form of the

9  question, incomplete hypothetical.

10      A.   Say it again.

11      Q.   If I had a study that -- that showed the

12 effect of the quantity of particles created by a

13 medical device over the surgical site, you might

14 not -- you might criticize that study or say it's not

15 a valid study because particles don't equal

16 bacteria; --

17           MR. C. GORDON:  Object to --

18      Q.   -- correct?

19           MR. C. GORDON:  Object to the form of the

20 question.

21      A.   It might or might not.  It would depend on

22 the size of the particles, the amount of particles, --

23      Q.   Okay.

24      A.   -- how the study was done.  There's a lot of

25 different effects of it.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

353

1    Q.    There are many reasons why people don't

2  publish studies; correct?

3    A.    Correct.

4    Q.    And sitting here today, you're -- you're not

5  aware of many unpublished tests that 3M performed

6  internally or Arizant performed internally regarding

7  the Bair Hugger and its effect on airflow.

8    A.    I can --

9         No.

10    Q.    Okay.  In the consensus, do you agree with

11  the consensus that further research is required with

12  respect to the significance of patient normothernia --

13  normothermia on orthopedic surgeries?

14    A.    Yes.

15    Q.    Do you agree with the consensus that further

16  study is needed with respect to the theoretical risk

17  posed by forced-air warming blankets?

18    A.    I don't mind the statement.

19    Q.    So you -- you would agree.

20    A.    I would agree.

21    Q.    I'll read the whole thing for you, so --

22    A.    Well there was a study.  The -- the Siguera

23  study was on forced-air warming.

24    Q.    The what study?

25    A.    You just --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

354

1           We just discussed it during this whole

2     deposition.

3           Q.   I didn't hear what you said.  Which study?

4           A.   We discussed the Siguera study.

5           Q.   Siguera?

6           A.   Higuera.  The Cleveland Clinic study --

7           Q.   Oh, Higuera.  Okay.

8           A.   -- was a study done on forced-air warming.

9           Q.   Well let me read the question.  "Do forced-

10    air warming blankets increase the risk of SSI?"

11          Consensus:  "We recognize the theoretical

12    risk posed by forced-air warming blankets and that no

13    studies have shown an increase in SSI related to use

14    of these devices.  We recommend further study but no

15    change to current practice."

16          Do you agree with that?

17          A.   Yes.

18          Q.   Okay.  If there was going to be further

19    study with respect to whether or not forced-air

20    warming increases the risks of surgical-site

21    infection, who do you think would be responsible for

22    funding that study?

23          MR. C. GORDON:  Object to the form of the

24    question.

25          A.   You just saw a study that -- that was funded

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

355

1    by 3M but it was from a ret -- from a prospectively-

2    gathered database of -- from Cleveland Clinic.

3         Q.    But that's --

4         A.    So it might be 3M, it might not be 3M.

5         Q.    Well would you agree with me that the most

6    likely person that would be funding a study such as

7    that would be the manufacturer of the device?

8              MR. C. GORDON:  Object to the form of

9    question, lack of foundation.

10        A.    Sometimes, sometimes not.  But yes, I'm okay

11   with what you said.

12        Q.    And the study funded by 3M between forced-

13   air -- before -- between the Bair Hugger and the

14   Mistral doesn't really answer this question; does it?

15             MR. C. GORDON:  Object to the form of the

16   question.

17        A.    Well it almost does, because there's no

18   increased rate with infections.

19        Q.    Well this is asking, "Do forced-air warming

20   blankets increase the risk of SSI?"  Wouldn't you

21   agree with me that both the Bair Hugger and the

22   Mistral are forced-air warming blankets?

23        A.    Yeah, but look at how low they are, these

24   infection rates at Cleveland Clinic.

25        Q.    Yeah.  But it could -- it could be because

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

356

1  forced-air warming in general increases the risks of

2  SSI.  You can't say --

3          You can't compare two forced-air warming

4  blankets and say, "Oh, since they're close, there's no

5  risk of forced-air warming blankets increasing the

6  risk of SSI;" can you?

7          MR. C. GORDON:  Object to the form of the

8  question.

9      A.  May be a good thing for me to look at, see

10  when they --

11          But I don't know if we can.

12     Q.  I mean, doctor, you can't compare two

13  products with the same form of warming, both

14  forced-air warming, and say they're no different, "Oh,

15  and by the way, they don't increase SSIs" when you

16  have --

17     A.  Well if the rate of infections are so

18  minuscule, you could say it's very unlikely that they

19  increase SSI.  They are so minuscule compared to the

20  national average and national standards that it would

21  be, again, unconscionable to do the study because

22  here's a study of not what you said to me before with

23  your 40 versus 40 -- 80 patients, here you've got

24  5,000 patients and you have such a low rate of

25  infection that maybe that should -- I didn't even

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

357

1    think of it.  Maybe I should remind them that they

2    should mention that it's unlikely that FAW increases

3    infection rates when you have two patient populations

4    with FAW that have such low infection rates.  That

5    might be the proof right there --

6        Q.   What's your control?

7        A.   -- I didn't think about.

8        Q.   What's your control?

9        A.   I don't need a control.

10       Q.   You don't need a control in a study?

11       A.   You do need a control in general, but when

12   the rate is so low, you wouldn't even --

13            Why would you do a control?  You don't want

14   to take a chance.  It would be -- it would be -- it

15   would be un -- immoral and unethical to do it.

16       Q.   But you're looking only at the first 90

17   days, correct, in the study?

18       A.   You can keep saying that all you want, but

19   90 days is --

20       Q.   I'm --

21            It's a study that you're citing to, doctor.

22       A.   That's what the CDC wants us to look at is

23   90 days right now.

24       Q.   But you're aware that periprosthetic joint

25   infections can occur up to a year.

358

1      A.   But they are wanting us to look at 90

2  days --

3      Q.   I don't care.

4      A.   -- right now.

5      Q.   Doctor, you just admitted earlier that these

6  type of infections occur -- occur during the surgery;

7  correct?

8      A.   So this is -- so --

9      Q.   "Yes" or "no?"

10      A.   Fair enough.

11      Q.   Okay.

12      A.   We -- we can look at this up to one year as

13  a future study, and then I might be able to make the

14  conclusion that I did.

15      Q.   Maybe even up to two years.  Sometimes they

16  show up two years later.

17      A.   Sometimes they show up five years later.

18      Q.   Up to five years; correct?

19      A.   Ten years, 15 years.  I've seen people 14

20  years later.  I don't know what you're driving at.

21      Q.   I'm saying a periprosthetic joint infection

22  can occur up to 15 years later after a surgery

23  occurred.

24      A.   Well we --

25           It depends.  Are we going to talk late

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

359

1  hematogenous infections or postoperative infections?

2  They have different definitions.  Clearly, anything

3  could happen that -- that gets harbored.

4       Q.   But you would agree with me that there's a

5  significant number of periprosthetic joint infections

6  that arise after the first 90 days --

7            MR. C. GORDON:  Object to the form of the

8  question.

9       Q.   -- after surgery.

10      A.   Most of the infections arise in the first 90

11 days, so I don't know what your term called

12 "significant" is.

13           When we did the study, the greater majority

14 were in the first 90 days.

15      Q.   Have you --

16           Are you familiar with the article by Parvizi

17 with respect to the economic burden of periprosthetic

18 joint infections that track PJIs over something like

19 2001 to 2012?

20      A.   He has a lot of articles, --

21      Q.   Okay.

22      A.   -- so I don't know which one you're

23 referring to.  He's published, you know, 50 articles a

24 year on -- or some number like that on periprosthetic

25 infections, so you'd have to show me which article.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

360

1    And you can ask me the point you're trying to make.

2            Time check:  It's 10 to 5:00.

3        Q.   What is the national average for primary

4    periprosthetic joint infections?

5        A.   Depends on which database.  I mean some --

6            I don't know what the latest is.  And the

7    hip and knee might be a little different.  But my --

8    and also the data is a little old.

9            I would say it's about 1.5 percent, would be

10   my best guess.  But again, you would have to depend on

11   What population are you looking at?  There would be

12   regional -- regional differences.  What year are you

13   talking about?  The latest data I think is from 2014,

14   so --

15           Yeah.  In fact I'm pretty sure that's the

16   case.

17       Q.   Roughly 1.5 percent, that's --

18       A.   Maybe something like that.  Maybe two

19   percent.

20       Q.   What about revisions?

21       A.   Revisions, much higher.

22       Q.   What percentage?

23       A.   That's too variable for me to give you a

24   number.  I've published on this, but depends on the

25   database you're looking at.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

361

1     Q.   More than two percent?

2     A.   Yes.

3     Q.   What percentage of those revisions are due

4  to infections?

5     A.   What --

6          Most studies show that about 20 percent of

7  revisions of knee or hip are due to infections.  But

8  that's variable also.

9     Q.   Are you familiar with the SCIP protocol?

10     A.   Yes, I am.

11     Q.   Is even using -- for you, who does these

12  surgeries anywhere in between 22 to 45 minutes -- is

13  using a Bair Hugger device indicated for that time and

14  length of surgery?

15          MR. C. GORDON:  Object to the form of the

16  question.

17     A.   Why wouldn't it be?

18     Q.   Well have you read -- have you read the SCIP

19  protocol regarding when you should use a -- a -- a

20  warming device on a patient?

21     A.   I didn't -- from my end --

22          First of all, when I said to -- "skin to

23  skin," that has nothing do when a patient's put on a

24  table and this and then draped and taken off the table

25  as well.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

362

1     Q.   Okay.  By the way, do you use the Mistral

2  device at Cleveland Clinic?

3     A.   Presently that's what's being used.

4     Q.   Have you read the warnings for the Mistral

5  device?

6     A.   No, I have not.

7     Q.   Would you be surprised if the warnings

8  indicate that use of this device may cause airborne

9  contamination?

10    A.   I -- I don't know.  I'd have to read that.

11 I don't want to say anything out of context.

12 Obviously --

13    Q.   I asked would you be surprised.

14    A.   Maybe.  Yeah, maybe --

15    Q.   And you're aware that --

16    A.   -- if you don't use the device right, you

17 don't check -- you don't change the filters right, you

18 don't do certain things correctly, don't apply it

19 right.

20    Q.   Have you looked at the warnings for the Bair

21 Hugger device?

22    A.   No, I haven't.

23    Q.   Okay.  And just so I understand, based on

24 the -- based on the consensus, orthopedic surgeons

25 care about particles over the surgical site; correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

363

1          MR. C. GORDON:  Object, object to the form

2    of the question.

3          A.   In a general sense, yes.

4          Q.   And you would expect a corporation or a

5    company that manufactures a medical device to indicate

6    whether or not there would be an increase in particles

7    over the surgical site if they're aware of scientific

8    data that shows that -- that -- that shows that fact.

9          MR. C. GORDON:  Object to the form of the

10   question.

11         A.   Not necessarily.

12         Q.   I mean wouldn't you want to know the safety

13   of your patients?

14         MR. C. GORDON:  Same objections.

15         A.   You said that in -- in a whole sphere, one

16   or two particles increase, when everything else is

17   increasing particles by thous -- hundreds and

18   thousands, then no, you're -- you're -- you're putting

19   something way out of context.

20         Q.   So you're saying depending on the amount of

21   particles would decide whether or not orthopedic

22   surgeons should be warned?

23         A.   That would be part --

24              That we're talking generically for any

25   device, it would depend on the amount of particles.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

364

1   And are we talking about a particle that's from some

2   object from -- from one that crosses the room seven

3   feet across and hits into the wound, one particle,

4   versus the hundreds that are being shed by the lights

5   and all these other sources?  The answer is no, you

6   wouldn't make a warning on that.

7        Q.   What about --

8        A.   So everything has to do with degree.

9        Q.   What about a device that's placed right next

10  or underneath the operating room table.  As an

11  orthopedic surgeon, would you want to know if that had

12  an effect on the particle count over the surgical

13  site?

14            MR. C. GORDON:  Object to the form of the

15  question.

16       A.   I guess in a general sense I'd want to know

17  about --

18            I'd want to know a lot of different things

19  in my operating room.

20       Q.   Would you want to know that fact?  If you

21  had a medical device that was sitting underneath or

22  next to the operating room table that showed an

23  increase in --

24       A.   Well --

25       Q.   -- particle counts over the surgical site,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

365

1    would you want to know that information?

2         A.    But we have a de --

3              MR. C. GORDON:  Object to the form of the

4    question.

5         A.    We have a device in multiple, multiple,

6    multiple studies, as I enumerate in my report, which I

7    looked at carefully, that showed no increase in

8    bacteria to a surgical site multiple times by the

9    company, that showed negative effects, many studies

10   that didn't show increase in particle counts, et

11   cetera.  So the answer is:  These studies were done

12   and they were done over many years, they were done, as

13   you would say, with many different device types of the

14   same general forced air, and they were -- they were

15   published, not only were they done, they were

16   published, and they showed no study showing increased

17   bioburden at operative sites.  So the answer is yes,

18   you'd want to know that, but in fact there was good

19   diligence done, multiple, multiple studies, they're

20   enumerated there, that do not show increases in

21   bacterial bioburden at the operative site.  So what

22   more can you do?

23        Q.    And the studies that show the opposite that

24   were funded by Augustine -- or -- or not funded, but

25   Augustine donated some of the equipment, you don't

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

366

1  hold that -- you don't hold those studies as being

2  credible studies; correct?

3          MR. C. GORDON:  Object to the form of the

4  question.

5      A.   Some of them I might, but -- but I don't --

6  but -- but he didn't show that.

7      Q.   Are you aware that some of the studies that

8  you use to support your opinions in this case were

9  funded -- also funded by Augustine?

10      A.   Yeah.  So that's why I just said what I said

11  in the previous thing, --

12      Q.   So the --

13      A.   -- that that's not necessarily true.

14      Q.   So the fact that a study is funded by

15  Augustine has no difference on the credibility of the

16  study.  You actually look at the study itself.

17          MR. C. GORDON:  Object to the form of the

18  question.

19      A.   Of course I do.  But when I hear depositions

20  and things being said about some of the studies, I

21  start questioning it.

22      Q.   Okay.

23      A.   Especially like the recent study that just

24  got published.  We --

25      Q.   Okay.  Well I don't want to talk about that

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

367

1    study.

2              MR. ASSAAD:  That's all I have.

3              MR. C. GORDON:  Thank you.  We'll read and

4    sign.

5              THE REPORTER:  Off the record, please.

6              (Deposition concluded.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

368

1                    C E R T I F I C A T E

2              I, Richard G. Stirewalt, hereby certify that

3    I am qualified as a verbatim shorthand reporter, that

4    I took in stenographic shorthand the deposition of

5    MICHAEL A. MONT at the time and place aforesaid, and

6    that the foregoing transcript is a true and correct,

7    full and complete transcription of said shorthand

8    notes, to the best of my ability.

9              Dated at Deerwood, Minnesota, this 3rd day

10   of August, 2017.

11

12

13

14

15

16

17                    RICHARD G. STIREWALT

18                    Registered Professional Reporter

19                    Notary Public

20

21

22

23

24

25

369

1                C E R T I F I C A T E

2            I, MICHAEL A. MONT, hereby certify that I

3  have carefully read the foregoing transcript, and that

4  the same is a true and complete, full and correct

5  transcription of my deposition, except:

6  PAGE/LINE              CHANGE              REASON

7

8

9

10

11

12

13

14

15

16

17                          MICHAEL A. MONT

18                          Deponent

19

20      Signed and sworn to before me this _____ day of

21  September, 2017.

22

23              _____

24                      Notary Public

25