# EXHIBIT 16

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - -

In Re:
Bair Hugger Forced Air Warming
Products Liability Litigation

This Document Relates To:
All Actions          MDL No. 15-2666 (JNE/FLM)

- - - - - - - - - - - - - - - - - -

DEPOSITION OF DR. DANIEL SESSLER
VOLUME I, PAGES 1 - 152
JANUARY 11, 2017

(The following is the deposition of DR.
DANIEL SESSLER, taken pursuant to Notice of Taking
Deposition, via videotape, at the Cleveland Clinic,
P Building, Conference Room P77-013, 2070 East 90th
Street, Cleveland, Ohio, commencing at approximately
10:11 o'clock a.m., January 11, 2017.)

## Page 2

1   APPEARANCES:
2   On Behalf of the Plaintiffs:
3       Jan M. Conlin
        CIRESI CONLIN L.L.P.
4       225 South 6th Street, Suite 4600
        Minneapolis, Minnesota  55402
5
        Gabriel Assaad
6       KENNEDY HODGES
        4409 Montrose Boulevard, Suite 200
7       Houston, Texas  77006
8   On Behalf of Defendants:
9       Corey L. Gordon and Peter J. Goss
        BLACKWELL BURKE P.A.
10      432 South Seventh Street, Suite 2500
        Minneapolis, Minnesota  55415
11
    On Behalf of the Deponent:
12
        Sandra M. DiFranco
13      Cleveland Clinic Law Department
        2070 East 90th Street
14      Cleveland, Ohio  44195
15
16
17
18
19
20
21
22
23
24
25

## Page 3

1                    INDEX
2   EXHIBITS        DESCRIPTION       PAGE MARKED
3   Ex  226  Excel spreadsheet of data,
4       3MBH00049711-3              39
5   227  E-mail string, 3MBH00024866    95
6   228  E-mail string, 3MBH01054232-4   121
7   229  E-mail with attachment,
8       3MBH01621689-95            123
9   230  E-mail, 3MBH01486024          125
10  231  E-mail string, 3MBH01534469-71   131
11  232  E-mail string, 3M00585482-3    143
12  233  E-mail, 3MBH00518536          145
13  234  Sessler deposition transcript
14      dated November 20, 2015      150
15  235  Sessler deposition transcript
16      dated July 9, 2015           150
17  236  Sessler deposition transcript
18      dated May 27, 2015           150
19
20
21
22
23
24
25

## Page 4

1                PROCEEDINGS
2       (Witness sworn.)
3           DR. DANIEL SESSLER
4       called as a witness, being first duly sworn,
5       was examined and testified as follows:
6           ADVERSE EXAMINATION
7   BY MS. CONLIN:
8       Q.  Good morning, Dr. Sessler.  We've not met
9   before; correct?
10      A.  Correct.
11      Q.  Okay.  I represent plaintiffs in an action
12  that's been brought against 3M involving the Bair
13  Hugger device.  Do you understand that?
14      A.  Yes.
15      Q.  Okay.  And you, in fact, were deposed a
16  number of times in connection with this Bair Hugger
17  device in connection with the Walton and Johnson Texas
18  litigations; correct?
19      A.  I was deposed a number of times.  I am not
20  sure what it was about.
21      Q.  Okay.  But you did --
22          You were deposed three times as it relates
23  to your work and advice regarding the Bair Hugger
24  device; correct?
25      A.  Correct.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 5

1      Q.  Okay.  And do you stand by that testimony
2  today?
3      A.  I do.
4      Q.  Okay.  And it was truthful and accurate at
5  the time you gave it?
6      A.  It was.
7      Q.  Okay.  And to the best of your knowledge
8  it's truthful and accurate today; correct, doctor?
9      A.  Correct.
10     Q.  Okay.  Now you are an anesthesiologist;
11  correct?
12     A.  I am.
13     Q.  Okay.  And can you describe your position
14  here at the Cleveland Clinic.
15     A.  I'm a Michael Cudahey Professor and Chair of
16  the Department of Outcomes Research.
17     Q.  Okay.  And what is the Department of
18  Outcomes Research?
19     A.  It's part of the Anesthesia Institute, and
20  we coordinate clinical research.
21     Q.  Okay.  And you do a number of clinical
22  trials; correct?
23     A.  We do.
24     Q.  Okay.  Now you've also -- you're a --
25         You're a consultant at 3M; correct?

Page 6

1      A.  I am.
2      Q.  And that was on an exclusive basis; is that
3  right, doctor?
4      A.  No.
5      Q.  Okay.  Can you describe the other companies
6  for whom you consult.
7      A.  There are roughly 10 of them.
8      Q.  Okay.  And can you list them, please.
9      A.  Not all of them, but --
10     Q.  Okay.
11     A.  -- I can mention some of them.
12     Q.  Okay.  Go ahead.
13     A.  3M, 37Company, CareFusion, VitaHEAT, Mercury
14  Medical.  And there are others, --
15     Q.  Okay.
16     A.  -- but I don't remember them offhand.
17     Q.  And 37Company produces a product called the
18  Mistral; is that right?
19     A.  Correct.
20     Q.  And do you do consulting for them today with
21  respect to the Mistral?
22     A.  I have not --
23         I serve on their advisory board, so once a
24  year, or less often, we meet.  And -- and they pay for
25  my travel expenses, they don't actually give me cash.

Page 7

1      Q.  Okay.  You're aware that 3M is the exclusive
2  distributor for VitaHEAT now; correct?
3      A.  I heard that, yes.
4      Q.  Okay.  What kind of consulting work do you
5  do for them?
6      A.  I'm on their advisory board.
7      Q.  Okay.  And do you meet regularly?
8      A.  We've never met.
9      Q.  Okay.  Who told you that 3M was going to be
10  the exclusive distributor of the VitaHEAT product?
11     A.  Someone from VitaHEAT.
12     Q.  Who was that person?
13     A.  I don't remember.
14     Q.  Were you involved at all in discussions with
15  3M as to become the -- strike that.  Let me start over
16  again.
17         Did you have any discussions with 3M
18  regarding whether they should or should not become an
19  exclusive distributor for VitaHEAT?
20     A.  None whatsoever.
21     Q.  Okay.  Have you ever talked with 3M about
22  VitaHEAT?
23     A.  Never.
24     Q.  Have you ever talked with 3M about Mistral?
25     A.  Never.

Page 8

1      Q.  Okay.  You understand how the Mistral
2  product works as a result of your consulting work for
3  them; correct?
4      A.  It's a generic forced-air cover.
5      Q.  Well, do you have any understanding, for
6  example, of the filtration differences between the
7  Mistral device and the Bair Hugger device?
8      A.  No.
9      Q.  Okay.  Do you know whether the Mistral
10  utilizes a HEPA filter?
11     A.  No.
12     Q.  Do you know whether the Bair Hugger utilizes
13  a HEPA filter?
14     A.  I believe it does.
15     Q.  Okay.  And what's that based on?
16     A.  I have no idea.
17     Q.  Okay.  During the time -- now you --
18         Prior to the time that 3M bought Arizant,
19  you were also consulting for Arizant as it relates to
20  the Bair Hugger; correct?
21     A.  Yes.
22     Q.  Okay.  And that work goes back 'til at least
23  2006; am I right?
24     A.  Yes.
25     Q.  Do you recall when you first started

2  (Pages 5 to 8)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 9

1  consulting with Arizant regarding the Bair Hugger?
2      A.  No.
3      Q.  Okay.  During the course of your consulting
4  work for either Arizant or 3M regarding the Bair
5  Hugger, have you ever had discussions with them
6  regarding the filtration efficiencies of the Bair
7  Hugger?
8      A.  No.
9      Q.  Do you know whether there's been any changes
10  to the filter utilized in the Bair Hugger --
11      A.  No.
12      Q.  -- over the years?
13         Do you know whether that filtration
14  efficiency of the Bair Hugger has been diminished
15  through changes in filters over the years?
16      A.  No.
17      Q.  Okay.  Now you also have a specialty in
18  epidemiology; is that right?
19      A.  I -- I'm not a specialist in epidemiology.
20      Q.  Is it one of your specialties?
21      A.  I've never taken a course in epidemiology.
22      Q.  Oh, okay.  And it's not a trick question,
23  Dr. Sessler.  The reason why I'm asking is because on
24  your LinkedIn site it says your specialties are
25  clinical research, anesthesia, thermal regulation and

Page 10

1  epidemiology.
2      A.  Many -- many of our studies include an
3  epidemiologic aspect.  Epidemiology would claim that
4  it includes clinical research, that all clinical
5  research is a type of epidemiology, and I was the
6  course director for epidemiology for the medical
7  school here for five years.  But I've never taken a
8  course in it, I don't have a degree in it, I'm -- I'm
9  not really an expert in epidemiology.
10      Q.  You don't have a -- a -- an expertise, then,
11  in how bacteria can be aerosolized or moved in the
12  environment?
13      A.  Absolutely not.
14      Q.  Okay.  Now you've spent time with Michelle
15  Hulse Stevens at 3M; is that right, doctor?
16      A.  I -- I know Michelle, yes.
17      Q.  And you've worked with her; correct?
18      A.  Correct.
19      Q.  And have you talked with her at all about
20  the litigation that's going on involving the Bair
21  Hugger?
22      A.  No.
23      Q.  Okay.  Have you talked to her about the
24  issues surrounding the warming/cooling devices?
25      A.  I don't even know what you're referring to.

Page 11

1      Q.  Are you aware --
2         So have you been aware at all of the CDC's
3  investigation of a device -- warming/cooling device
4  manufactured by Sonnenschein that has been claimed to
5  have created infection risks in cardiac patients?
6      A.  I'm sorry, I didn't catch the name of the
7  device.
8      Q.  Sonnenschein.
9      A.  Never heard of it.
10      Q.  Okay.  Are you --
11         Notwithstanding the name, are you aware that
12  the CDC is conducting an investigation regarding the
13  mycobacterium chimaera outbreak that resulted from
14  aero -- aerosol -- aerosolized particles in the
15  exhaust of the warming/cooling units during cardiac
16  surgery?
17      A.  No.
18      Q.  Do you have --
19         You are an expert in normothermia though;
20  correct, doctor?
21      A.  Again, I don't have a degree in it, I've
22  never studied it, but it's been an interest of mine.
23      Q.  Okay.  And a lot of the papers that you've
24  published have -- have talked about the need for
25  maintaining normothermia during surgeries; correct?

Page 12

1      A.  Correct.
2      Q.  Okay.  Now do you know --
3         With respect to Michelle Hulse Stevens, can
4  you describe what your advisory role is to 3M today as
5  it relates to warming devices?
6      A.  I guess I'm theoretically on an advisory
7  board, but the board has not met for several years at
8  least.
9      Q.  When is the last time you saw Dr. Hulse
10  Stevens?
11      A.  I don't remember.
12      Q.  Would it have been in the last couple of
13  years?
14      A.  Oh, yes.
15      Q.  Okay.  And you also know Gary Hansen;
16  correct?
17      A.  I do.
18      Q.  You worked with him when he was part of
19  Arizant and you've worked with him now that he's part
20  of 3M; correct?
21      A.  Correct.
22      Q.  Have you talked with Gary Hansen about this
23  litigation?
24      A.  No.
25      Q.  Have you talked with Gary Hansen about 3M's

3 (Pages 9 to 12)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 13

1    interest in acquiring an exclusive distribution
2    license for VitaHEAT?
3        A.  No.
4        Q.  Would you expect Gary Hansen to be truthful
5    and honest with you as it relates to your advisory
6    work on warming devices for 3M?
7        A.  Yes.
8        Q.  And do you know an Al Van Duren?
9        A.  I do.
10       Q.  And how long have you known Mr. Van Duren?
11       A.  Probably two decades.
12       Q.  Okay.  And when did you first start working
13   or getting to know Mr. Van Duren?
14       A.  Al Van Duren was an early employee of
15   Augustine Medical, and I started working with the
16   company, I think, shortly after it was founded.
17       Q.  And in fact, you were aware as early as the
18   '90s that a study that you had conducted involving
19   normothermia in colorectal surgeries was being used as
20   a basis for saying that Bair Hugger forced-air warming
21   would be appropriate to keep patients warm in surgery;
22   correct?
23       A.  Which dates?
24       Q.  Well the -- I believe that study was in
25   1996.  Right?

Page 14

1        A.  Correct.
2        Q.  Okay.
3        A.  This is Andrea Kurz's New England Journal
4    paper.
5        Q.  Correct.
6        A.  Yes, 1996.
7        Q.  And -- and with your blessing, you've
8    understood that that's been one of the papers that has
9    been utilized to tout the use of Bair Hugger warming
10   during surgery; correct?
11       MR. GORDON:  Object to the form of the
12   question.
13       MS. DIFRANCO:  Go ahead.
14       A.  Not with my blessing.  They just use it.
15       Q.  Well you're -- you --
16       A.  Lots of -- lots of companies use it.
17       Q.  Yeah.  But you've been aware that they've
18   used it in promotional literature; correct?
19       A.  Yes.
20       Q.  And would you expect Mr. Van Duren to be
21   candid and honest with you as it relates to the work
22   that -- in consulting work you've done for them on the
23   Bair Hugger device?
24       A.  Yes, I would.
25       Q.  Okay.  Now you have a confidentiality

Page 15

1    agreement with 3M; correct?
2        A.  I do.
3        Q.  Okay.  And is it fair to state, doctor, that
4    3M has funded studies that -- on Bair Hugger that
5    you've been a part of?
6        A.  Yes.
7        Q.  Okay.  And they've used that work to promote
8    Bair Hugger; correct?
9        A.  I assume, yes.
10       Q.  Okay.  And again, that's been with your
11   approval; correct?
12       A.  They don't need my approval and they don't
13   ask for my approval.  And any company can use any
14   published study in -- in any marketing material.
15       Q.  Let me ask it a different way.  You've never
16   contacted them and said, "I don't want you using my
17   study on Bair Hugger to promote the device;" correct?
18       A.  I've never contacted any company in a
19   similar situation.
20       Q.  And my question is more specific, relates to
21   3M.  You've never contacted 3M and complained about
22   their use of your study on Bair Hugger in connection
23   with promoting the device; correct?
24       A.  I've never contacted any company.
25       Q.  And 3M included; correct, doctor?

Page 16

1        A.  Correct.
2        Q.  And you understand that 3M has promoted the
3    Bair Hugger for use in all types of surgeries;
4    correct?
5        A.  I can't really comment on their marketing.
6    It's not something I follow.
7        Q.  Well you've said that the Bair Hugger is --
8    is safe for use in all surgeries; correct, doctor?
9        A.  I believe that.
10       Q.  Okay.  Including orthopedic implant
11   surgeries; correct?
12       A.  Correct.
13       Q.  I'm going to hand you what's been marked,
14   Dr. Sessler, previously as Exhibit No. 17, which is an
15   excerpt out of a CDC proceeding that took place in
16   November of 2015, and I'd like to direct your
17   attention to page 27 of this and give you a moment to
18   read the last paragraph on this page and see if that
19   refreshes your recollection on issues surrounding the
20   warming/cooling units being used during cardiac
21   surgeries.
22       Does that refresh any recollection of issues
23   going on regarding the warming/cooling units?
24       A.  None whatsoever.
25       Q.  Okay.

4  (Pages 13 to 16)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 17

1    A.  I have no idea what this is about.
2    Q.  Okay.  Have you kept up on whether the CDC
3  is of the viewpoint that things that blow air in
4  operating rooms shouldn't be used?
5    MR. GORDON:  Object to the form of the
6  question.
7    A.  No.
8    Q.  Okay.  Would that be something that would be
9  important to you to know in connection with your
10  promotion of the use of the Bair Hugger device?
11    MR. GORDON:  Same objection.
12    A.  I'm not sure how to answer that question.
13    Q.  Why?
14    A.  What was the question?
15    Q.  Question is:  The fact that the CDC is
16  suggesting that nothing that blows air should be
17  present in an operating room, is that something that
18  you think would be important to know --
19    MR. GORDON:  Object to the --
20    Q.  -- in connection with your promotion and
21  suggestion that the Bair Hugger device is appropriate
22  for use in surgeries?
23    MR. GORDON:  Object to the form of the
24  question.
25    A.  I'd be more interested in the data on which

Page 18

1  their opinions were based.
2    Q.  Okay.  And you haven't done an investigation
3  on that; right?
4    A.  No.
5    Q.  And in fact for years, doctor, you've been
6  suggesting to 3M that they should do a microbial study
7  as it relates to the Bair Hugger; right?
8    A.  I did suggest a study, yes.
9    Q.  On multiple occasions; correct?
10    A.  Possibly.  Probably.
11    Q.  And they've refused to date; correct?
12    A.  Correct.
13    Q.  Have they told you why they've refused?
14    A.  No.
15    Q.  Do you know who made the decision at 3M?
16    A.  No.
17    Q.  Do you know who made the decision at
18  Arizant?
19    A.  No.
20    Q.  Okay.  Do you think the fact that the CDC is
21  recommending that nothing that blows air in an
22  operating theater should be present, if possible, is
23  something that a reasonably prudent manufacturer of a
24  forced-air warming device should take into account?
25    MR. GORDON:  Object to the form of the

Page 19

1  question, also lack of foundation.
2    A.  I don't think I'm qualified to answer a
3  question about what manufacturers should do.
4    Q.  Okay.  If you were a science advisor for 3M
5  and were aware of this, would you think that this
6  would be something that you would want them to
7  investigate in order for you to thoroughly undertake
8  your role as a science advisor to a company?
9    MR. GORDON:  Same objections.
10    A.  I have not been advising them on this issue.
11    Q.  Okay.  But you are advising them on
12  forced-air warming.
13    A.  I am.
14    Q.  Okay.  In connection with advising them on
15  forced-air warming, do you think the fact that the CDC
16  is suggesting that nothing be in an operating room
17  that blows air would be something that you would want
18  to discuss and consult with them on?
19    MR. GORDON:  Same objections.
20    A.  Not necessarily.
21    I'd like -- I'd like to see what this is
22  based on.  This just seems to be free-form opinion as
23  far as I can tell.
24    Q.  Okay.  But in any event, you've never been
25  apprised of the warming/cooling units and the CDC's

Page 20

1  investigation by anyone at 3M; correct?
2    A.  This is the first I've heard of it.
3    Q.  Okay.  Now I'd like to talk with you a
4  little bit, and I -- I don't intend to waste your time
5  here today, doctor, so I'm not going to go back
6  through everything on your prior testimony, that's why
7  I asked you at the beginning, you know, if you're
8  standing by that testimony, but I would like to ask
9  you a few questions about your study.
10    (Discussion off the stenographic record.)
11  BY MS. CONLIN:
12    Q.  I've handed you, Dr. Sessler, what's been
13  previously marked as (Belani) Deposition Exhibit 16,
14  and this is a published study by you, Dr. Olmstead and
15  Dr. Kuelpmann; is that correct?
16    A.  Correct.
17    Q.  And this was published in the International
18  Anesthesia --
19    A.  Analgesia & Anal --
20    Anesthesia & Analgesia.
21    Q.  Thank you.
22    -- publication in 2011; correct?
23    A.  Yes.
24    Q.  Okay.  And you're the lead author on this;
25  is that right, doctor?

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Page 21

1   A.  Yes.
2   Q.  Okay.  And if we could take a look at the
3   bottom of the paragraph on the right-hand side of the
4   page right before the "METHODS" where you say, "We
5   thus tested the hypothesis that laminar flow
6   performing -- performance remains well within rigorous
7   and objective standards during forced-air warming."
8   Do you see that?
9   A.  I do.
10  Q.  And then I take it that includes you in the
11  "We?"
12  A.  Yes.
13  Q.  Okay.  Then you say under "METHODS," "We
14  evaluated the effect of forced-air warming on laminar
15  flow performance under three test conditions," and
16  then you list them there; is that right?
17  A.  Yes.
18      Let me be clear.  I did not do the testing
19  for this.
20  Q.  Well that's what I was going to ask you.
21  Because as I read this article, you talk about "We
22  then quantified tracer particle counts near the site
23  of the putative incision...," and I'm just wondering
24  how you can describe it as "We" if you weren't present
25  for any of the testing.

Page 22

1   A.  Oh.  That's absolutely conventional in
2   writing a paper that the people have different
3   responsibilities within a study.  Sometimes there are
4   hundreds of authors on a paper, literally, and they
5   have different contributions to the study.  For
6   instance, you might have a pathologist and his
7   contribution is to read slides and interpret them, and
8   you would still say we as a corporate authorship did
9   something.
10  Q.  The purpose of this was to evaluate the
11  effect of forced-air warming on the disruption of
12  laminar flow; is that right?
13  A.  Yes.
14  Q.  Okay.  And as you indicated, you weren't
15  there when the testing was done; correct?
16  A.  Correct.
17  Q.  You --
18      3M was in control of this study; correct?
19  A.  Well I think it was Dr. Kuelpmann.
20  Q.  Well you understood that 3M had a commercial
21  interest in it; correct?
22  A.  Of course, uh-huh.
23  Q.  Okay.  And 3M created the protocols;
24  correct, doctor?
25  A.  I don't know who did the -- created the

Page 23

1   protocol.
2   Q.  If you had testified previously that 3M
3   created the protocols, would you stand behind that
4   today?
5   A.  Sure.
6   Q.  Okay.  And you weren't even aware that the
7   study was proposed or conducted until after the
8   testing had been done; correct?
9   A.  That's correct.
10  Q.  Okay.  And you weren't involved in designing
11  the protocols; correct?
12  A.  Correct.
13  Q.  And you don't have an opinion on the design
14  of the study; correct?
15  A.  The design seems fine.
16  Q.  If you had testified previously that you
17  don't have any opinion regarding the design of the
18  study, would you stand behind that testimony?
19      MR. GORDON:  Object to the form of the
20  question.
21  A.  Based on my looking now, the design seems
22  fine.
23  Q.  Okay.  You were in fact sent simply an Excel
24  spreadsheet with the raw data on it; right?
25  A.  Yes.

Page 24

1   Q.  Okay.  And you would agree you're not an
2   expert in laminar flow or particulate counts; correct?
3   A.  Correct.
4   Q.  And you're not an expert on how bacteria
5   travel through the air; correct?
6   A.  Correct.
7   Q.  And bacterial issues that might be present
8   in hip and knee implants are outside your area of
9   expertise; correct?
10  A.  Correct.
11  Q.  And you would assume that the relative risk
12  for an orthopedic surgery by way of infection would be
13  similar to a colorectal surgery or something else;
14  correct?
15  A.  Oh, not at all.
16  Q.  Okay.  So how would you describe the
17  relative risk, as you understand it, of bacterial
18  issues and infections in hip and knee implants?
19  A.  It's less than a tenth of what it is during
20  colorectal surgery.
21  Q.  And how do you know that?
22  A.  The incidence of infection has been
23  published widely.
24  Q.  My question might have been inartful.  Let
25  me ask it a different way.

6 (Pages 21 to 24)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 25

1    You don't have an understanding of how many
2    CFUs is necessary to create an infection in a hip and
3    knee implant versus, as an example, another type of
4    surgery not involving an implant; correct?
5       A. No. No.
6       Q. You don't know if it takes one colony
7    forming unit to create an infection in an orthopedic
8    implant; correct?
9       A. I'm not an expert in this field. My
10   understanding is it takes a whole lot more than one.
11      Q. And I -- I take it that's been your
12   understanding as you've advised companies on the
13   effectiveness and safety of forced-air warming
14   devices.
15      A. Host defense is the critical way that
16   bacterial infections are prevented.
17      Q. Right. And do you know whether that host
18   defense mechanism is impeded or lessened in connection
19   with an orthopedic implant?
20      A. Any implant makes infections not necessarily
21   more likely but more serious and certainly harder to
22   treat.
23      Q. Okay. But it's your belief as you sit here
24   today, doctor, that -- that you don't need -- or that
25   you could have an infection with an orthopedic implant

Page 26

1    with one CFU.
2       A. I didn't say that, and I'm not sure I agree
3    with it.
4       Q. Okay. I'm saying you don't know; right?
5       A. I don't know.
6       Q. That isn't something that you've studied
7    and -- and become an expert on; correct?
8       A. Correct.
9       Q. Do you think that's important to know when
10   you're advising companies on the safety and
11   effectiveness of forced-air warming in all surgeries?
12      A. I can only comment about things I know about
13   in -- in all contexts. I'm not an expert in
14   everything. I -- I comment about what I know about.
15      Q. Right. But you know that you've been saying
16   that forced-air warming is safe for all surgeries --
17      A. Uh-huh.
18      Q. -- and my question is: If you don't know
19   whether in an orthopedic implant it requires very few
20   CFUs to cause an infection, how you can be saying
21   that?
22      MR. GORDON: Object to the form of the
23   question.
24      A. Infections are multifactorial. Probably the
25   single-most-important factor is host defense, and

Page 27

1    keeping people warm enhances host defense.
2       Q. Is it fair to state that you haven't studied
3    the issue of whether forced-air warming is safe for
4    use in orthopedic implants?
5       A. That depends on what you mean by "safe." We
6    have done studies with forced air in hip and knee
7    surgery, and the patients seemed to do just fine.
8       Q. What studies are those, doctor?
9       A. Well the first one was probably Schmid in
10   1996, but there have been a number of others since
11   then.
12      Q. Well you haven't -- I --
13      You're talking about other authors or things
14   that you've read; correct?
15      A. No.
16      Q. What do you -- what --
17      Well then describe the work that you've done
18   on this.
19      A. The study I mentioned was a study of blood
20   loss in patients who were warmed or not warmed who
21   were all having hip surgery.
22      Q. How does that relate to the relative
23   infection risk of Bair Hugger in an orthopedic
24   surgery?
25      A. It doesn't. You asked me if it was safe. I

Page 28

1    said we've studied it and the patients did fine.
2       Q. Have you done any work to ascertain whether
3    a Bair Hugger increases the risk of infection for
4    patients undergoing knee or hip implants?
5       A. No.
6       Q. In fact, doctor, you are agnostic, so to
7    speak, in terms of how you keep patients warm; right?
8       A. Absolutely.
9       Q. It can be an electric blanket, it could be a
10   resistive heating. Your view is a patient does better
11   if they're warm; correct?
12      A. Correct.
13      Q. But you're not saying that a patient does
14   better by way of infection risk if a Bair Hugger is
15   used versus another type of warming device; correct?
16      A. No.
17      Q. And in fact, you don't want patients to get
18   hurt; right?
19      A. Of course not.
20      Q. And if the --
21      If Bair Hugger was killing patients, you'd
22   be the first to state it; right, doctor?
23      A. I would.
24      Q. Now what is Cleveland Clinic using in
25   surgeries today for warming?

7  (Pages 25 to 28)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 29

1     A.  We use forced-air warming.
2     Q.  What type?
3     A.  Mistral.
4     Q.  And why was the decision made to use the
5  Mistral?
6     A.  It was less --
7        MR. GORDON:  Object for lack of foundation.
8        MS. CONLIN:  You may answer.
9     A.  It was less expensive.
10    Q.  Was there a review done as to whether
11  Mistral was safer than the Bair Hugger?
12    A.  I have no idea.  I'm not involved in supply-
13  chain decisions.
14    Q.  Okay.  You didn't have any discussions with
15  anybody who was in the supply chain?
16    A.  I did not.
17    Q.  Okay.  So you were just --
18       You know that at one point in time Cleveland
19  Clinic was using Bair Hugger; right?
20    A.  I --
21       Sure.
22    Q.  And now they've switched to Mistral; is that
23  right?
24    A.  That's correct.
25    Q.  Okay.  Do you know whether it's because

Page 30

1  Mistral has better filtration than the Bair Hugger?
2     A.  I was not involved in the decision-making
3  process, but my understanding is it was purely a cost
4  decision.
5     Q.  Okay.  And who told you it was purely a cost
6  decision?
7     A.  I don't remember.
8     Q.  Now I'd like to go to the study, (Belani)
9  Exhibit 16, and talk with you a little bit about it.
10       You evaluated the effect of the Bair Hugger
11  on laminar flow performance under three conditions;
12  correct?
13    A.  I -- I'd have to review the study.  I
14  haven't looked at this in --
15    Q.  Go ahead.
16    A.  -- since the last deposition.
17    Q.  Go ahead.
18    A.  Yes, we used three conditions.
19    Q.  Okay.  And the -- it was --
20       The control was the Bair Hugger off;
21  correct?
22    A.  Yes.
23    Q.  And then it was also -- second condition was
24  the forced air of the Bair Hugger was sent to -- set
25  to ambient air; correct?

Page 31

1     A.  Yes.
2     Q.  And then the third was set to high or hot
3  air.
4     A.  Correct.
5     Q.  Forty-three degrees Celsius; correct?
6     A.  Correct.
7     Q.  And the people who did the testing basically
8  used two blankets, the Bair Hugger 522 upper body
9  blanket and the 635 underbody blanket; correct?
10    A.  Looks like it.
11    Q.  Okay.  At two hospitals, right, Amersfoort
12  and Utrecht?
13    A.  Yes.
14    Q.  Okay.  Now did you talk with any of the
15  people that actually did the testing?
16    A.  Yes.
17    Q.  Okay.  Who did you talk with?
18    A.  I talked with Ruediger and -- and Russ.
19    Q.  Do you know --
20       And that's Dr. Olmstead?
21    A.  Correct.
22    Q.  Do you know if Dr. Olmstead was even present
23  during the testing?
24    A.  I don't -- I don't know.
25    Q.  Do you know who was present during the

Page 32

1  testing?
2     A.  The testing was primarily done by Ruediger.
3     Q.  By Dr. Kuelp --
4        How do you say that?
5     A.  Kuelpmann.
6     Q.  Kuelpmann?  Do you know whether --
7        Do you know what his involvement was in the
8  testing?
9     A.  He did the tests.
10    Q.  Do you know whether Gary Hansen did the
11  tests, doctor?
12       MR. GORDON:  Object to the form of the
13  question.
14    A.  Gary was there.  My understanding is that
15  Dr. Kuelpmann did the tests.
16    Q.  Okay.  And was that based on him telling you
17  that?
18    A.  No.
19    Q.  What was it based on?
20    A.  I said it was an assumption.
21    Q.  Now if we lake --
22       If we take a look at the second page of
23  this, on the right-hand side, midway down at the
24  bottom of the first full paragraph on page 1417, which
25  is also Bates number 985629, it says that the standard

8  (Pages 29 to 32)

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Page 33

1  DIN 1946 was chosen because it is objective and more
2  rigorous than the United States standard.  Do you see
3  that?
4      A.  No.  I'm in a different place.
5      Q.  It's right here.
6      A.  Okay.  Now I'm with you.
7      Yes.
8      Q.  Okay.  Do you --
9      Now the DIN 1946 standard governs laminar
10  flow rooms --
11     A.  Yes.
12     Q.  -- in Europe; correct?
13     A.  I believe so.
14     Q.  Do you know whether that D -- DIN standard
15  forbids the use of forced-air warming in laminar flow
16  rooms in the EU?
17     A.  At the time we wrote this paper, I'm pretty
18  sure it did not.
19     Q.  And what's that based on?
20     A.  Well I did look at the standard at one
21  point.
22     Q.  So at the time you submitted this paper, you
23  thought that the -- that forced-air warming could be
24  used under the DIN standard in the EU; correct?
25     A.  That was certainly my impression, yes.

Page 34

1      Q.  Now you also write on the right-hand side of
2  this second page, quote, "The forced air blower was
3  positioned on the floor at the volunteer's left side,
4  near where the anesthesiologist would normally sit
5  during surgery."  Do you see that?
6      A.  Yes.
7      Q.  Do you know if these were new machines or
8  used machines?
9      A.  I don't know.
10     Q.  That wasn't something that was of interest
11  or import to you?
12     A.  No.  Because as far as I know, age of the
13  machine is not relevant to the question here.
14     Q.  You don't know whether the machine --
15     Well you understand the air intake is at the
16  bottom of the machine, correct, on the floor?
17     A.  I'll take your word for that.
18     Q.  Okay.  Have you ever examined the machine?
19     A.  I've used these machines thousands of times,
20  but I couldn't testify to where the air intake is.
21     Q.  Okay.  Have you asked 3M or Arizant for any
22  information regarding whether the air intake absorbs
23  bacteria near the floor of the OR?
24     A.  No, I didn't, because it's filtered in the
25  machine.  What comes out is sterile.

Page 35

1      Q.  And how do you know that, doctor?
2      A.  As far as I know, all forced-air warmers
3  contain relatively good filters.
4      Q.  And you're making the assumption that the 3M
5  one does as well; correct?
6      A.  Correct.
7      Q.  If I told you the filtration efficiency was
8  53 percent, would that surprise you?
9      MR. GORDON:  Object to the form of the
10  question.
11     A.  Yes.
12     Q.  Okay.  I'm going to hand you, Dr. Sessler,
13  what's been previously marked as Deposition Exhibit
14  66.  It's actually a two-page document, so I'd ask you
15  to start on the second page and then read up to the
16  first.
17     Have you had a chance to read it?
18     A.  Yes.
19     Q.  Okay.  Were you aware that Arizant and 3M
20  were getting calls from the field from users of the
21  Bair Hugger that were concerned about infectious
22  pathogens that were being found in the machines?
23     MR. GORDON:  Object to the form of the
24  question, lack of foundation.
25     A.  No.

Page 36

1      Q.  Okay.  Do you see at the top there where Mr.
2  Van Duren says, "Remove and discard the filter (in the
3  biohazardous waste)?"  Do you see that?
4      A.  Yes.
5      Q.  Now if the machine that you were using in
6  surgery was contaminated with a microorganism, let's
7  say MRSA, would you want to know whether that filter
8  was going to filter that pathogen properly?
9      MR. GORDON:  Object to the form of the
10  question.
11     MS. DIFRANCO:  Go ahead.
12     A.  It's a two-part question.
13     Q.  In what way?
14     A.  Can -- can we break this apart?  If -- if a
15  machine's contaminated and --
16     Q.  Well all right, that's -- that's a fair
17  correction.  Let me back up.
18     If a machine was contaminated with MRSA,
19  would that be something as an anesthesiologist you
20  would want to know before you decided to use that
21  machine on a patient?
22     A.  Sure.
23     Q.  Okay.  And if --
24     And would you also want to know whether the
25  filter was able to prevent MRSA or some other pathogen

9  (Pages 33 to 36)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 37

1  from moving downstream from the filter into the hose
2  and into the blanket?
3      MR. GORDON:  Object to the form of the
4  question.
5      A.  Yes.
6      Q.  Okay.  Have you ever seen anything where 3M
7  or Arizant have advised publicly that if a machine is
8  con -- found to be contaminated, that the filter
9  should be scrapped and treated as biohazardous waste?
10     A.  No.
11     Q.  Okay.  Have you seen any documents or had
12  any discussions with 3M regarding advice they have
13  given to people who have called in, users of the Bair
14  Hugger, that you should not blow the dust out of the
15  machine?
16     A.  No.
17     Q.  Would that be something that you'd want to
18  know?
19     A.  That -- that sounds pretty technical.
20  I'm -- I'm not sure how to interpret that.
21     Q.  Okay.  If we look back at your study --
22      Well let me ask it a different way.  Let me
23  ask you another question on that.  Do you know
24  whether, as these machines are used in surgery, after
25  surgery, whether the pathogens build up inside?

Page 38

1      A.  No.
2      Q.  And you've just assumed that the filter is
3  going to do its job; right?
4      A.  Yes.
5      Q.  Why do you think the Bair Hugger had a HEPA
6  filter?
7      A.  Presumably, I was told that at some point,
8  but I don't remember how.
9      Q.  Okay.  Now if we can look under the
10  "RESULTS" section of this study, which is on Bates
11  page 985630, under the "RESULTS" section you say,
12  "With the Arizant 522 upper body cover, background
13  par -- particle Cx were reduced to approximately 5 log
14  by the laminar flow system, and there were no
15  statistically significant or clinically important
16  differences among the 3 blower settings: off, ambient
17  air, and high."  Do you see that?
18     A.  Yes.
19     Q.  And how did you go about arriving at the
20  conclusion that there was no clinical -- clinically
21  important differences between the three settings?
22     A.  If you look at Figure 2, the columns for no
23  air, ambient air and warm air are virtually the same
24  height, and they're all way below the two log
25  reduction line.

Page 39

1      Q.  Well you understand the two log reduction
2  line --
3      I mean the DIN standard isn't designed to
4  evaluate Bair Hugger; right?  What you were doing was
5  saying you can use the Bair Hugger and still meet the
6  DIN standard; right, doctor?
7      A.  The question was whether forced-air warming;
8  that is, warm air disturbs laminar flow and makes it
9  substantially less effective than it would be
10  otherwise, so the DIN standard is highly relevant.  In
11  any case, whether or not you believe that, there's no
12  important difference here.
13     Q.  Okay.  And if we look at Figure 2, you've
14  got -- the scale goes from 1, 10, 100 to 1000; right?
15     A.  It's a log scale.
16     Q.  And then 10,000; right?
17     A.  Yes.
18     Q.  All right.
19      (Exhibit 226 was marked for
20      identification.)
21  BY MS. CONLIN:
22     Q.  I've handed you, Dr. Sessler, what's been
23  marked as Exhibit 226, which is the raw data that Gary
24  Hansen produced regarding the study which is reflected
25  in (Belani) Exhibit 16, your paper.

Page 40

1      MS. DIFRANCO:  Have you a chance to look at
2  it?
3      THE WITNESS:  Yes.
4      Q.  Now this is the data that went into the
5  paper that you authored with Dr. Olmstead and Dr.
6  Kuelpmann; correct?
7      A.  I -- I assume.
8      Q.  Okay.  And there were five runs both with
9  the 522 blanket and five runs with the 635 blanket;
10  right?
11     A.  Looks like it.
12     Q.  Okay.  And if we take a look at the 635
13  blanket, which is on the right-hand side of Exhibit
14  226, --
15     A.  Yes.
16     Q.  -- the 625 is the underbody blanket;
17  correct, doctor?
18     A.  I'll take your word for it.
19     Q.  Okay.  If you want to look back at the front
20  of your article, it indicates that it's the underbody
21  blanket, so --
22     A.  I'll take your word for it.
23     Q.  All right.  So in the last run there were 28
24  particles measured over the -- the hypothetical
25  surgical site with the Bair Hugger off; correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 41

1    A.  Yes.  That's the average, right?  It --
2    Q.  Well it says at the top "Off."
3    A.  No, it's -- it's raw data.  Okay.  Thank
4  you.
5    Q.  Okay?  And then with the Bair Hugger at
6  ambient temperature, the particle count over the
7  hypothetical surgical site was 57; correct?
8    A.  Right.
9    Q.  So that would be a two-times increase; is
10  that right?
11    A.  Yes.
12    Q.  Okay.  And then if you turn the Bair Hugger
13  on to warm, the particle count over the surgical site
14  is 349 particles; correct?
15    A.  Yes.
16    Q.  Okay.  So that's about a thousand-percent
17  increase between off and the Bair Hugger on warm;
18  correct?
19    A.  Yes.  It's about a factor of 10.
20    Q.  Okay.  About 12 times as many particles;
21  correct, doctor?
22    A.  Right.
23    Q.  Okay.
24    A.  If you look at the -- the other one -- the
25  other run, though, it has much less effect.  Also, you

Page 42

1  need to look at the average; it's not fair to pick one
2  run.
3    Q.  If --
4      Well, it's got a p-value of .06, correct,
5  for off?
6    A.  Yeah.  But that's the average.  You're
7  looking at one run.
8    Q.  Right.  Well you only did five runs;
9  correct?
10    A.  Yes.  But you have to look at all five of
11  them.
12    Q.  Okay.  Would you agree with me five runs is
13  a pretty small sample?
14      MR. GORDON:  Object to the form of the
15  question.
16    A.  No.
17    Q.  Why?
18    A.  Because this is a mechanical sort of setup
19  and you should get about the same result each time.
20    Q.  Well it has --
21      Looking at this raw data, the use of the
22  Bair Hugger does have an effect on the particulate
23  count over the hypothetical surgery site; correct?
24      MR. GORDON:  Object to the form of the
25  question.

Page 43

1    A.  In this run it had a very small effect, in
2  the other run it had no effect.
3    Q.  Okay.  So how is it that you can say in the
4  title of your paper that forced-air warming does not
5  worsen air quality in laminar flow operating rooms
6  when at least some of the -- well all of the runs
7  showed at least some difference between the Bair
8  Hugger off and the Bair Hugger on?
9      MR. GORDON:  Object to the form of the
10  question.
11    A.  The average performance effect with ambient
12  versus warm was 4.8 versus 4.8 in one test, it was 3.2
13  versus 3.5 in another, it was 4.8 versus 4.8 in the
14  third, and it was 4.7 versus 4.6.  There -- there's no
15  difference there.
16    Q.  Well that -- that's the PE, the protective
17  effect; correct?
18    A.  Yes.
19    Q.  Okay.  And the protective effect went down
20  on average.
21    A.  It was unchanged.  There -- there's no
22  important change here.  Those numbers are virtually
23  identical.
24    Q.  You don't think that a change in the
25  protective effect from 4.0 to 3.2 makes a difference?

Page 44

1      MR. GORDON:  Object to the form of the
2  question.
3    A.  No.  And I especially don't think a
4  difference from 4.8 to 4.8 or from 4.8 to 4.8 in the
5  other study makes a difference.
6    Q.  Why didn't you --
7      Why did you pool the data from Amersfoort
8  and Utrecht?
9    A.  Oh.  Why wouldn't I?
10    Q.  Did you make that decision?
11    A.  Probably.
12    Q.  Okay.  Do you think that a physician would
13  want to know that, with use of the 635 underbody
14  blanket, the particulate count went up 12-fold with
15  use of the Bair Hugger?
16      MR. GORDON:  Object to the form of the
17  question.
18      MS. DIFRANCO:  I'll object.  You're asking
19  what other physicians would want to know?
20    Q.  Would you want to know?
21    A.  That was one run.  That's not an accurate
22  characterization of this study result, not even
23  slightly accurate.
24    Q.  Well it went up --
25      If you look at just the 635, the underbody

11  (Pages 41 to 44)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

---

Page 45

1   blanket between off and warm, in all five runs the
2   particulate count went up ten-fold; right?
3       MR. GORDON: Object to the form of the
4   question, mischaracterizes the -- the data.
5       A. How do you figure?
6       Q. Well in the first run with the Bair Hugger
7   off the particulate count was 23; correct? In the
8   first run.
9       A. I thought we were comparing ambient to warm.
10      Q. Well let's just do it this way. All right?
11         So in the first run with the Bair Hugger
12   off, with -- utilizing the 635 underbody blanket, the
13   particulate count was 23; correct?
14      A. Yes.
15      Q. Okay. And with it on ambient it was 260;
16   correct?
17      A. Yes.
18      Q. And on warm it was 118; correct?
19      A. I'm sorry, I lost you here.
20      Q. I'm right here, doctor.
21      A. Oh, okay.
22      Q. Okay?
23      A. Yeah.
24      Q. So in that run in the 635, both in the
25   ambient and the warm, the particulate counts went up

Page 46

1   dramatically with the Bair Hugger on; correct?
2       A. Yes. But it was half with warming as with
3   ambient, and the general theory here we're testing is
4   that warm air disturbs the laminar flow column.
5       Q. And ambient air doesn't?
6       A. That was the theory.
7       Q. Whose theory?
8       A. I believe Scott Augustine came up with this
9   theory.
10      Q. All right. Well if it was --
11         Let's take the off and warm then. Off it
12   was 23; correct?
13      A. Yes.
14      Q. And warm, the particulate count went up to
15   118; correct?
16      A. In that run, yes.
17      Q. Okay. And you don't consider that
18   clinically significant; correct, doctor?
19      A. Okay. You can't look at one run. You have
20   to look at the averages and you have to look at both
21   tests of the 635. You put them both together,
22   there -- there's very little effect.
23      Q. Well I'm -- I'm --
24         I'd like to do it this way. Okay? So
25   I'm -- I'm focused on the -- the box at the upper

Page 47

1   right-hand corner of Exhibit 226. All right? And I
2   understand that you want to take averages, but my
3   question is this: If a machine, Bair Hugger machine,
4   was contaminated with MRSA and not properly filtering,
5   would that be of clinical significance or importance
6   to you?
7       MR. GORDON: Object to the form of the
8   question.
9       A. Yes.
10      Q. Okay. Now do you know -- do you know
11   whether you saw Exhibit 226 as part of putting
12   together your paper?
13      A. Oh, for sure I did.
14      Q. Okay. Let me ask you something else, then
15   we can take a quick break.
16         Do you think the Mistral is as effective at
17   keeping patients warm as the Bair Hugger?
18      A. I have no basis for knowing.
19      Q. Okay. You have done studies on resistive
20   heating and found those equally effective to the Bair
21   Hugger; correct?
22      A. Yes.
23      Q. What did you do to prepare for your
24   deposition today?
25      A. Nothing.

Page 48

1       Q. Okay. You didn't review any documents?
2       A. None.
3       Q. Did you talk or meet with any of the lawyers
4   representing 3M?
5       A. No.
6       MS. CONLIN: Okay. Let's take a short
7   break. We've been going about an hour. I've got a
8   new area. But we'll definitely be able to accede to
9   your schedule today. Okay?
10      THE WITNESS: Thank you, Jan.
11      MS. CONLIN: Yeah.
12      THE REPORTER: Off the record, please.
13      (Recess taken.)
14   BY MS. CONLIN:
15      Q. If we can turn back for a moment to Exhibit
16   226, doctor, and if we take a look at the 635 testing
17   in the right-hand box, the 635 testing at Amersfoort
18   with the p --
19         Do you see the p-value box there?
20      A. Uh-huh.
21      THE REPORTER: Your answer?
22      THE WITNESS: Yes.
23      Q. You have to say it out loud.
24      A. I said yes.
25      Q. Yes. Okay.

12 (Pages 45 to 48)

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Page 49

1    The p-value for off versus ambient is .06;
2  is that right?
3    A.  Yes.
4    Q.  And the p-value for warm versus off is .09?
5    A.  Yes.
6    Q.  Okay.  So in other words, if the experiment
7  were repeated, there would be an increase in particles
8  with the 635 blanket turned on ambient 94 percent of
9  the time.
10    MR. GORDON:  Object to the form of the
11  question, also lack of foundation.
12    A.  No, that's not what a p-value means.
13    Q.  Okay.  How -- how would you describe that?
14    A.  It means that there was a 94-percent chance
15  that --
16    That six times out of a hundred, the
17  distribution of the data would result from chance.
18    Q.  Okay.
19    A.  That doesn't tell you about repeatability.
20    Q.  Why not?  Isn't a p-value, the -- the whole
21  notion of p-value to figure out whether it's by random
22  or predictable?
23    MR. GORDON:  Object to the form of the
24  question.
25    A.  Not exactly.

Page 50

1    Q.  Okay.  How would you describe the
2  differences in p-value between off and warm for a lay
3  person?
4    A.  That there was one chance in 10 that the
5  observed distribution of data resulted from chance.
6    Q.  Say that again, doctor.
7    A.  There was one chance in 10 that the observed
8  distribution of data resulted by chance.
9    Q.  Okay.  But wouldn't that be saying that 90
10  percent of the time, then, if you ran this again, you
11  would expect to have an increase of particulate counts
12  as reflected in that box?
13    A.  No, --
14    MR. GORDON:  Object to the form of the
15  question.
16    A.  -- that's not what it means.
17    Q.  All right.
18    A.  It -- it's not even close.
19    Q.  I've handed you, Dr. Sessler, what's been
20  previously marked as Deposition Exhibit 12, which
21  appears to be some e-mail exchanges between you, Gary
22  Hansen and Russell Olmstead with respect to your
23  paper.  You can take a moment if you haven't seen it
24  in a while.
25    A.  Yes.

Page 51

1    Q.  Okay.  Have you had a chance to review it?
2    A.  I have --
3    Q.  Okay.
4    A.  -- at -- the top part.  I actually didn't
5  read the bottom part.
6    Q.  Okay.  Now why don't you go ahead and read
7  the bottom part, too, so I can ask you some questions
8  about that.
9    A.  Okay.
10    Q.  Okay.  The bottom e-mail is an e-mail from
11  Gary Hansen to you and Russ Olmstead; correct?
12    A.  It appears to be.
13    Q.  Okay.  And it's talking about sort of how
14  you're going to do the analysis of the data; correct?
15    A.  It doesn't specifically talk about how to do
16  the analysis, but it's that general topic of
17  interpretation I guess.
18    Q.  Well one of the things that Gary Hansen
19  writes to you and Dr. Olmstead is "Concerning
20  statistical treatment of the PE data" --
21    And that's the protective effect data;
22  correct?
23    A.  I -- I'm sorry, I didn't realize there was a
24  back side.
25    Q.  Sure.  Go ahead and take a moment to read

Page 52

1  it.
2    A.  Okay.
3    Q.  All right.  Have you had a chance to read
4  it?
5    A.  I have.
6    Q.  Okay.  Now on the second page of what's been
7  previously marked as Exhibit 12, Mr. Hansen talks with
8  you and Russ Olmstead concerning the statistical
9  treatment of the PE data; correct?
10    A.  Yes.
11    Q.  And that's the protective effect data?
12    A.  Correct.
13    Q.  And he's talking about two possible
14  approaches.  The first is to perform a t-test
15  comparison; correct?
16    A.  Yes.
17    Q.  And what is that?
18    A.  T-test essentially compares the difference
19  in the means --
20    Well, the test is a difference in the means
21  divided by the standard deviation, approximately.
22    Q.  Okay.  And then he writes there, "Note that
23  none of the differences are significant to within 95
24  percent confidence."  Do you see that?
25    A.  Yes.

13  (Pages 49 to 52)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

---

Page 53

1      Q. And what did you understand that to be
2  reference to?
3      **A. Well, doing a bunch of t-tests comparing**
4  **different average results.**
5      Q. Well isn't he noting there, Mr. Hansen, that
6  if you use the t-test on the data that was generated
7  in connection with the Amersfoort and Utrecht testing,
8  that none of the differences are significant to within
9  a 95-percent confidence?
10     **A. That's what the note says, yes.**
11     Q. Okay. And then he writes, "It won't escape
12  notice that the number of samples is small;" correct?
13     **A. Yes.**
14     Q. Meaning that there were five runs for five
15  minutes each; correct?
16     **A. Correct.**
17     MR. GORDON: Object to the form.
18     Q. Are you aware of surgeries that take place
19  over five minutes?
20     **A. That's completely irrelevant.**
21     Q. My question is: Are you aware of any
22  surgeries that take place over five minutes?
23     **A. Sure.**
24     Q. Okay. What?
25     **A. D&C.**

---

Page 54

1      Q. Okay. Anything else?
2      **A. Ear tubes.**
3      Q. I'd say that you're right on that one. I've
4  had -- my kids have had a few.
5      You would agree with me that most surgeries
6  are not five minutes or less; correct?
7      **A. I agree.**
8      Q. And an orthopedic surgery might take an hour
9  as an example; correct?
10     **A. Correct.**
11     Q. Now you've actually also stated that the --
12  whether forced-air warming is effective or necessary
13  in the first hour of a surgery is sort of an open
14  question; right?
15     **A. Depends how you define efficacy.**
16     Q. Okay. But you've in fact stated that
17  previously; correct?
18     **A. Depends how you define efficacy, but yes.**
19     Q. Okay. And you don't have any information to
20  suggest that a Bair Hugger in use for an orthopedic
21  surgery is somehow more effective than, say, a
22  resistive blanket; correct?
23     **A. We've tested two resistive blankets and they**
24  **had comparable efficacy.**
25     Q. Okay. There -- there would be no medical

---

Page 55

1  reason why you'd need to use a Bair Hugger as opposed
2  to one of these resistive blankets; correct?
3      **A. Resistive blankets can cause burns. And**
4  **they haven't been used that much. How safe they are**
5  **in terms of thermal injury remains to be determined.**
6      Q. Okay. Setting aside thermal injury and
7  assuming you have a safe blanket, there would be no
8  medical reason to choose a Bair Hugger over a
9  resistive therapy; correct?
10     MR. GORDON: Object to the form of the
11  question.
12     **A. Well if you stipulate that safety is the**
13  **same, the efficacy is comparable.**
14     Q. Okay. What if the safety of the Bair Hugger
15  was less because it increased the possibility that
16  bacterial pathogens could enter the surgical site?
17     MR. GORDON: Object to the form of the
18  question.
19     **A. If -- if forced air causes harm, causes**
20  **complications, and you stipulate, based on nothing,**
21  **that some other tech -- technique doesn't, sure.**
22  **But -- but there's no basis for either of those**
23  **assumptions.**
24     Q. Okay. And in fact one of the things that
25  you're on record as saying is that the Bair Hugger has

---

Page 56

1  been used in lots of surgeries with no evidence of
2  injury or infections; correct?
3      **A. As far as I know, forced air has not caused**
4  **thermal injury, used correctly.**
5      Q. Well I meant --
6      My question was a little different.
7      **A. I'm sorry.**
8      Q. You're on record stating you think
9  forced-air warming, Bair Hugger, is safe in surgeries
10  and doesn't increase the risk of infection; correct?
11     **A. I believe it reduces the risk of infection.**
12     Q. And in --
13     **A. Based -- based on available data, that's**
14  **what you have to conclude.**
15     Q. Okay. And in fact, one of the reasons you
16  say that is because you say it's been used in lots of
17  surgeries and there haven't been complaints; correct?
18     **A. No.**
19     Q. You haven't said that?
20     **A. That isn't the reason.**
21     Q. What isn't the reason, doctor?
22     **A. I -- I believe you said that I've said**
23  **that --**
24     Let -- let's go back to your question
25  **because it was a two-part question and you -- you**

---

14  (Pages 53 to 56)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 57

1    attributed a thought process to me.
2         MS. CONLIN:  Could we have the question
3    back?
4         (Record read by the court reporter.)
5    A.  No.
6    Q.  Okay.  So when you say the Bair Hugger
7    reduces the risk of infection, you're talking about
8    maintaining normo -- normo -- normothermia in the
9    patient; correct?
10   A.  No.
11        Well, that's the presumed mechanism, but in
12   fact two randomized trials compared forced-air warming
13   to no warming and both showed that infection risk was
14   reduced.  That's the only clinical evidence I'm aware
15   of.
16   Q.  Okay.  And what -- what studies are those?
17   A.  Kurz and Melling.
18   Q.  Can you spell the name on the second one?
19   A.  M-e-l-l-i-n-g-s --
20   Q.  Okay.
21   A.  -- I think.  I'm not sure about the "s".
22   Q.  Well Melling was prewarming; correct?
23   A.  And intraoperative warming I believe.
24   Q.  Do you know?
25   A.  I believe there was an intraoperative

Page 58

1    warming group in that study.
2    Q.  Okay.
3    A.  But my assertion is largely based on
4    Kurz, --
5    Q.  Okay.
6    A.  -- which is a better study.  It's the --
7         The available data shows that randomizing
8    patients to forced air reduces infection risk.
9    Q.  But it's the -- maintaining the normothermia
10   that is the hypothesis for why the infection risk is
11   reduced; correct?
12   A.  That's certainly the presumed mechanism.
13   Q.  Okay.  And as we --
14        As you've described, there are other methods
15   of maintaining normothermia in a patient besides the
16   Bair Hugger; correct?
17   A.  Correct.
18   Q.  Mistral is one; correct?
19   A.  Yes.
20   Q.  And VitaHEAT is one; correct?
21   A.  Yes.
22   Q.  How would you describe the VitaHEAT
23   technology?
24   A.  It's an underbody resistive heater with
25   pressure relief.

Page 59

1    Q.  It's not a forced-air warming device;
2    correct?
3    A.  Correct.
4    Q.  Now if we can turn back to Exhibit 12,
5    doctor, you write back to Mr. Hansen on November 16th
6    of 2010; correct?
7    A.  Apparently.
8    Q.  And this is prior to the publication of your
9    paper with Dr. Olmstead and Kuelpmann; correct?
10   A.  Yes.
11   Q.  Okay.  And then you write, "Hi Gary,
12        "On the statistics/P-value spreadsheet, the
13   mean value for the 422 cover (warm) in Utrecht is --
14   is wrong -- fortunately!"  And you say, "The increase
15   with the 635 cover on ambient or warm in Amersfoort
16   seems substantial, roughly a factor-of-five-to-ten.
17   The only reason it isn't statistically significant is
18   that there were only five measurements."  Do you see
19   that?
20   A.  I do.
21   Q.  You would agree with me this was an
22   underpowered study; correct?
23        MR. GORDON:  Object to the form of the
24   question.
25   A.  No.

Page 60

1    Q.  Well what did you mean there when you said
2    the reason --
3         Well you first acknowledge it's -- the data
4    that you and I have been looking at is substantial;
5    correct?
6    A.  Yes.
7    Q.  Okay.  And a factor of five to 10; correct?
8    A.  Yes.
9    Q.  And then you say, "The only reason it isn't
10   statistically significant is that there were only five
11   measurements."  What did you mean by that when you
12   wrote that to Mr. Hansen and Dr. Olmstead before this
13   was published?
14   A.  If you make enough measurements, very small
15   differences will be statistically significant even if
16   they're not clinically important.  Conversely, you can
17   have big differences that are not statistically
18   significant and -- and/or important.
19   Q.  Well why did you write the only reason it
20   isn't statistically significant is that there are only
21   five measurements?
22   A.  It just means that if you did enough
23   measurements, it would become significant.
24   Q.  Statistically significant; correct?
25   A.  Yup.

15  (Pages 57 to 60)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 61

1  Q.  Okay.  Now in the next paragraph you say,
2  "What clinicians will want to see is basically
3  particle counts under three test circumstances (Off,
4  Ambient, and Warm)."  Do you see that?
5  A.  Yup.
6  Q.  Then you write, "Any substantial increase
7  will still concern them and basically validate Scott's
8  point that forced-air warming increases risk.  We can
9  try to convince them that the increase isn't important
10  or that operating rooms still meet DIN standards, but
11  that will be a bit tricky."  Do you see that?
12  A.  Yup.
13  Q.  You knew that physicians would want to see
14  whether, in an individual case such as the 65 -- or
15  635 testing in Amersfoort, that there was a
16  substantial increase in particulates; correct?
17  A.  No, that's not what that means.
18  Q.  Okay.  What -- what -- what were you saying
19  there?
20  A.  That first it --
21      Note the third paragraph where I correct the
22  statistical approach.  You need to look at all the
23  data; you can't just pick one piece of data, one line,
24  one run, and say this characterizes the results.
25  Q.  Okay.

Page 62

1  A.  That's -- that's called data selection; it's
2  a type of research fraud.
3  Q.  Would you agree --
4  A.  You have to look at all the data.
5  Q.  Would you agree with me that any substantial
6  increase would concern clin -- clinicians?
7  A.  Average increase, not -- not results from
8  one run and one circumstance.
9  Q.  Would you agree with me that any substantial
10  increase would concern clinicians?
11      MR. GORDON:  Object to the form of the
12  question, also lack of foundation.
13  A.  Any substantial increase in average values
14  over all conditions would concern people.
15  Q.  Okay.  And then you say in the third
16  paragraph, "Possibly the best statistical approach
17  would be an ANOVA with cover type...;" correct?
18  A.  Yes.
19  Q.  And that's in fact what you guys have ended
20  up doing; correct?
21  A.  Correct.
22  Q.  Okay.  And ANOVA is basically analysis of
23  variance; right?
24  A.  Yes.
25  Q.  And then you say, "But perhaps it would be

Page 63

1  best to consider the hospitals together since that
2  isn't really a factor of interest; and the cover type
3  could be unpaired."  Do you see that?
4  A.  Uh-huh.  Yes.
5  Q.  And in fact what you were describing there
6  is rather than show the results from the two hospitals
7  separately, you were going to group them together for
8  the purposes of the paper; right?
9  A.  Yes, because it -- that's the way it should
10  have been done.  That's -- that's the correct way of
11  handling these data.
12  Q.  Why is it the correct way of handling these
13  data?
14  A.  Because the two hospitals together
15  characterize the general case better than either
16  hospital alone.
17  Q.  Well you know that ORs are different; right?
18  A.  Sure.
19  Q.  Okay.  That can be a confounding factor;
20  right?
21  A.  Could be.
22      MR. GORDON:  Object to the form of the
23  question.
24  Q.  Could be a confounding factor.
25      Did you do any investigation as to whether

Page 64

1  the machine that was used in Amersfoort might have
2  been a used one versus a new one?
3  A.  No.
4  Q.  Or that there was different protocols for
5  how they clean the OR?
6  A.  No.  But it's not relevant to this study,
7  which used artificial particles.  This had nothing to
8  do with bacteria.
9  Q.  Well I think we've already established you
10  don't know whether the Bair Hugger sucks in
11  particulates from off the floor and spews them out
12  into the surgical site; right?
13      MR. GORDON:  Object to the form of the
14  question.
15  A.  I don't think that's relevant to this study
16  where there are 20 million particles floating around
17  that are deliberately introduced.
18  Q.  So it wouldn't be of clinical interest to
19  you.
20  A.  You -- you're confusing two different
21  circumstances.  One is whether forced-air warmers pick
22  up bacteria, retain bacteria or somehow eject
23  bacteria.  If they do, that's a problem.  A second
24  issue, which is what this paper is about, is whether
25  warm air interferes with the laminar flow column.  Has

16  (Pages 61 to 64)

Page 65

1  nothing to do with bacteria.
2  Q. Okay. And you -- you --
3  I think we've established this. You're not
4  an expert on laminar flow or how particulates move in
5  the environment; right?
6  A. I'm not.
7  Q. So you -- you basic --
8  Did you ask anybody why it was that the
9  Amersfoort data appeared so different in terms of the
10  particulate counts?
11  MR. GORDON: Object to the form of the
12  question.
13  A. I don't remember.
14  Q. Was it of interest to you?
15  A. Absolutely.
16  Q. What do you recall doing in connection with
17  that data?
18  A. When you do multicenter studies, it's
19  absolutely routine and normal for the results to
20  differ in the various centers. You -- you expect that
21  just by random motion. And it's also true that the
22  centers are truly different; they have different
23  operating rooms, different anesthesia, different
24  protocols, so you expect real differences among sites
25  in a multicenter study. But you do a multicenter

Page 66

1  study to enhance generalizability. You take all the
2  results you have and you put them together and you
3  present the average because that best characterizes
4  what you know, and that's what we did here.
5  Q. And in this case you did five samples, five
6  runs five minutes each in two hospitals; correct?
7  A. Yes.
8  Q. And in fact you noted here that there were
9  only five measurements; right?
10  A. Correct.
11  Q. So you're standing behind your proposition
12  that this is not an under -- underpowered study;
13  correct?
14  MR. GORDON: Object to the form of the
15  question.
16  A. Correct.
17  Q. Could pooling the data from Amersfoort and
18  Utrecht confound the data?
19  A. No.
20  Q. Why not?
21  A. "Confounding" has a specific meaning, has to
22  be something that's related to exposure and outcome.
23  I don't see how pooling induces confounding.
24  Q. Now I think we talked about this before, but
25  Gary Hansen did the first draft; is that right?

Page 67

1  A. Yes.
2  Q. And then Dr. Olmstead took a crack at it; is
3  that right?
4  A. Yes.
5  Q. And then you edited it; correct?
6  A. "Edited" is a generous term. Virtually
7  every word in the published manuscript was mine.
8  Q. I've handed you, Dr. Sessler, what's been
9  previously marked as Deposition Exhibit 79, which is a
10  marked-up draft of your study which eventually was
11  published and has been previously marked as (Belani)
12  Exhibit 16; correct?
13  A. Yes.
14  Q. Okay. And you were part of this editing
15  process; correct?
16  A. Yes.
17  Q. If we can take a look at draft -- the draft
18  page seven, which bears Bates number 50592, and if we
19  can look at the middle paragraph starting with "We
20  found..."
21  A. Yes.
22  Q. Okay. Midway down there is a section
23  which in this draft reads, "There were noticeable
24  differences in the results between the two operating
25  rooms, probably the result of small differences in

Page 68

1  draping around the OR table, and also perhaps due to
2  differences in the laminar flow systems." Do you see
3  that?
4  A. I do.
5  Q. And there was a deleted box beside that, and
6  what was deleted is "The significantly higher counts
7  seen with the blanket model 635 reflected conditions
8  at OR Amersfoort" or "A..." Do you see that?
9  A. I see it, yes.
10  Q. Okay. Who made the decision to delete from
11  this transcript that there had been significantly
12  higher counts seen with the underbody blanket at the
13  Amersfoort hospital?
14  A. Well, whoever edited the document.
15  Q. Do you know if that was Mr. Hansen at 3M?
16  A. I have no idea who was editing at this
17  point.
18  Q. Okay. Was that something that you had
19  drafted originally, that you had found significantly
20  higher counts seen with the blanket model 635 in
21  Amersfoort?
22  A. I'm not sure I understand the question.
23  Q. My question is: Do you know whether you
24  were the person who originally put in the draft that
25  there had been significantly higher counts seen with

17 (Pages 65 to 68)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 69

1  the underbody blanket at Amersfoort hospital?
2      A.  I have no idea.  Sorry.
3      Q.  You don't recall.
4      A.  Not even vaguely.  This is from when, 2011,
5  and this was years before that.
6      Q.  Well if you were the one who put it in,
7  presumably you -- you put it in originally because you
8  thought that would be of interest to clinicians;
9  correct?
10     MR. GORDON:  Object to the form of the
11  question, lack of foundation.
12     A.  We don't know that I put it in.
13     Q.  Well it's consistent with the e-mail
14  exchange we just went through; correct?
15     MR. GORDON:  Object to the form of the
16  question.
17     A.  It requires supposition.
18     Q.  Well would you agree that this statement is
19  consistent with your -- the deleted statement is
20  consistent with your statement as reflected in the
21  e-mails we just went through, Exhibit 12?
22     MS. DIFRANCO:  Here.
23     (Document handed to the witness.)
24     A.  The statement seems consistent with the
25  data.  Who put it in, who took it out, I have no idea.

Page 70

1      Q.  Okay.  You'd agree with me that the DIN
2  standard that is mentioned in your paper is not
3  designed to detect increased particles from a forced-
4  air warming device; correct?
5      A.  The DIN standard was designed to evaluate
6  the efficacy of laminar flow.
7      Q.  Have you ever -- have you ever advised 3M on
8  sort of any reporting requirements that it may have
9  for infections that people are claiming that they got
10  as a result of use of a Bair Hugger in their surgery?
11     MR. GORDON:  Object to the form of the
12  question.
13     A.  Not at all.  That's nothing I have any
14  expertise in.
15     Q.  Okay.  I've handed you what's been
16  previously marked as Deposition Exhibit 67, and you
17  can take a moment and look at it.
18     MR. GORDON:  Has Dr. Sessler signed the
19  protective order?
20     MS. DIFRANCO:  I think he did last time.
21     MS. CONLIN:  Yeah.  I -- I mean he's got an
22  exclusive consulting relation.  I mean I asked --
23  that's why I asked him at the beginning if he's under
24  confidentiality with 3M.
25     MR. GORDON:  All right.  But I -- I --

Page 71

1  One thing has nothing to do with the other.
2  You think -- you think he did sign this --
3      MS. DIFRANCO:  I think he did --
4      MR. GORDON:  -- protective order?
5      MS. DIFRANCO:  -- in the other case.
6      MR. ASSAAD:  I believe so.
7      MS. DIFRANCO:  Yeah.
8      MR. GORDON:  Okay.
9      A.  Okay.
10     Q.  Okay.  The bottom is a communication between
11  Al Van Duren and Linda Johnson; correct?
12     A.  It appears so.
13     Q.  Okay.  And it -- it says, "To be brief:
14     "Received a number of complaints regarding
15  infections.
16     "2) Within the MDR reporting requirements
17  you are exempt from reporting (Bold Emphasis Mine)
18  based on CFR803.20..."  Do you see that?
19     A.  I do.
20     Q.  Okay.  And then it bolds that "you do not
21  have to report an adverse event if you have
22  information that would lead a person who is qualified
23  to make a medical judgment reasonably to conclude that
24  a device did not cause or contribute to a death or
25  serious injury..."  Do you see that?

Page 72

1      A.  I do.
2      Q.  And then there's -- in the top e-mail
3  there's a reply from Mr. Van Duren to Ms. Johnson with
4  a number of attachments, and I don't know what was
5  written here because it's been redacted, but do you
6  see that in the attachment, the first one is your --
7  your article?
8      A.  Yes.
9      Q.  Okay.  Do you think that your article
10  supports a view that microbial infections can't happen
11  with the Bair Hugger?
12     MR. GORDON:  Object to the form of the
13  question.
14     A.  Would you mind repeating that question?
15     Q.  Sure.  Do you believe that your study
16  supports the proposition that microbial infections
17  cannot occur through use of the Bair Hugger?
18     MR. GORDON:  Object to the form of the
19  question.
20     A.  That seems like a little bit of a convoluted
21  wording, so let me answer by saying that I don't
22  believe that this study supports risk from forced-air
23  warming in terms of infection, and it has to be put in
24  context with other available studies that show that
25  forced-air warming reduces infection in actual

18  (Pages 69 to 72)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 73

1  patients, not in laboratory simulations.
2      Q.  And my question was a little bit different.
3  Do you think your paper supports the proposition that
4  a patient cannot become infected through use of a Bair
5  Hugger?
6          MR. GORDON:  Object to the form of the
7  question.
8      A.  Again this is convoluted wording, but I
9  believe my study shows that forced-air warming does
10  not substantively increase risk.
11      Q.  Based on your five -- five samples of five
12  minutes apiece; correct?
13          MR. GORDON:  Object to the form of the
14  question.
15      A.  That's all you need for a laboratory-based
16  simulation.
17      Q.  Okay.  But you haven't --
18          I mean if it puts it to bed, Dr. Sessler,
19  then why have you been urging Arizant and now 3M for
20  some time to do a study on this issue?
21          MR. GORDON:  Object to the form.
22      A.  The trouble with this study and all the
23  similar studies is that they're laboratory
24  simulations; they don't involve patients, they don't
25  involve bacteria.  These -- these are not -- this is

Page 74

1  not a study of bacteria, it's a study of particulates
2  that are put into the air intentionally to see what
3  happens to them.  The obvious next step, if you're
4  concerned one way or the other, whether you believe
5  it's true or whether you don't believe it's true, the
6  obvious next step is to do a study that at least goes
7  into an operating room and involves real patients.
8  That's what I told them.
9      Q.  And why have they refused to do that?
10          MR. GORDON:  Object to the form of the
11  question, lack of foundation.
12      A.  I haven't a clue.
13          I propose studies all the time.  Companies
14  agree to support a small fraction of the ones I
15  propose, and they make their own -- decisions for
16  their own reasons.
17      Q.  Okay.  No one's ever expressed to you why
18  they refused to do one?
19      A.  No.
20      Q.  Okay.  Now you're doing some current studies
21  for 3M; correct?
22      A.  I am.
23      Q.  Okay.  Well actually, before we get to that,
24  have you talked with 3M at all about whether they have
25  an obligation to --

Page 75

1          I mean have they ever told you that they're
2  getting reports, receiving a number of complaints
3  regarding infection?
4      A.  No.
5      Q.  Okay.  And you've never had any discussions
6  with them on that?
7      A.  No.
8      Q.  What do you do as a science advisor for 3M
9  in their -- on forced-air warming?
10      A.  Well as I said, we haven't met for a long
11  time, but the advisory board when it meets discusses
12  various issues.  The last meeting was all about
13  prewarming; that's essentially all we talked about.
14      Q.  Okay.  But in all these science advisory
15  meetings you've never had a discussion regarding
16  whether use of Bair Hugger can disrupt the currents in
17  the OR?
18      A.  I don't remember that being a topic of a
19  meeting.
20      Q.  Okay.  And in all these science advisory
21  meetings you haven't had discussions about whether the
22  Bair Hugger device itself can harbor microbes?
23      A.  Not that I remember, no.
24      Q.  Now I think you testified earlier that you
25  understood that 3M had a commercial interest in this

Page 76

1  study that we've been talking about; correct?
2      A.  You mean the Anesthesia & Analgesia --
3      Q.  Correct.
4      A.  -- number (Belani) 16?
5      Q.  Correct.
6      A.  Yes, of course they have an interest.
7          (Discussion off the stenographic record.)
8  BY MS. CONLIN:
9      Q.  I've handed you, Dr. Sessler, what's been
10  previously marked as Deposition Exhibit No. 11.  I'm
11  actually going to ask you about the middle e-mail on
12  page two bearing 24810, and it appears to be --
13          Do you know who Teri Woodsock-Sides is?
14      A.  Yes.
15      Q.  Woodwick-Sides.
16          Have you met her before?
17      A.  Yes.
18      Q.  In what context?
19      A.  She worked for Arizant and then I believe
20  for 3M.
21      Q.  Okay.  And it says, "Dear Thomas and Ron,
22          "Great job in recapping the presentations.
23  It is very powerful that Professor Kulpman is speaking
24  (independently) on the topic of forced-air warming and
25  laminar flow.  One reason that we are holding the data

19  (Pages 73 to 76)

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Page 77

1   was to allow time for results to be written up and
2   submitted for publication. We have a researcher in
3   the US interested in co-authoring this research."
4       That person turned out to be you; correct?
5       A.  It looks like it.
6       MR. GORDON: Object to the form of the
7   question, lack of foundation.
8       Q.  Okay. And do you know whether it was after
9   April 23rd of 2010 that you were first contacted
10  regarding the work that Professor Kuelpmann had done
11  that ultimately became the paper that was co-authored
12  by the two of you?
13      A.  I have no idea.
14      Q.  Okay. Then you see it says, "That said,
15  these results are also part of a legal strategy, which
16  we have been carefully outlining. It is important for
17  our longer-term goals that we do not release it too
18  prematurely." Do you see that?
19      A.  Yes.
20      Q.  Were you aware that the study that 3M
21  contacted you on was part of a legal strategy?
22      MR. GORDON: Object to the form of the
23  question.
24      A.  No.
25      Q.  Nobody ever told you that?

Page 78

1       MR. GORDON: Same objection.
2       A.  No.
3       Q.  Would that have been something that you
4   would have wanted to know when they contacted you and
5   said, "We've conducted this study and would like you
6   to be an author on it?"
7       MR. GORDON: Same objection.
8       A.  No. That the study was of interest to them
9   and was part of their legal strategy I -- I guess was
10  pretty obvious.
11      Q.  So that doesn't surprise you.
12      A.  No, it doesn't surprise me. But I don't
13  think I was specifically told. I -- I have not read
14  this previously.
15      Q.  Did you ever go back to them and say, you
16  know, "I think we should have additional sampling
17  points and perhaps we should go back and do some
18  additional work at Amersfoort?"
19      A.  No.
20      Q.  No discussion on that at all?
21      A.  No.
22      Q.  Do you oftentimes find yourself as a
23  consultant to a company that is part of their legal
24  strategy?
25      MR. GORDON: Object to the form of the

Page 79

1   question, lack of foundation.
2       A.  Not often, no.
3       Q.  Okay. I mean they -- 3M --
4       3M put together the protocols for this
5   study; correct?
6       MR. GORDON: Object to the form of the
7   question.
8       A.  Yes.
9       Q.  And 3M personnel conducted the study, Gary
10  Hansen along with -- I think you said Professor
11  Kuelpmann might have been there; right?
12      A.  Well I believe Dr. Kuelpmann conducted the
13  study.
14      Q.  Okay. We established this before. You
15  don't know.
16      A.  That's correct.
17      Q.  Okay.
18      A.  I said I believe.
19      Q.  Okay. And they sent you the raw data.
20      A.  Correct.
21      Q.  And they sent you a draft manuscript that
22  was written by Gary Hansen.
23      A.  Correct.
24      Q.  And this was part, as you see now, of a
25  legal strategy; correct?

Page 80

1       MR. GORDON: Object to the form of the
2   question, lack of foundation.
3       A.  Yes.
4       Q.  And you worked on it -- I --
5       I take it you accepted the raw data as
6   accurate?
7       A.  I did after discussion with Dr. Kuelpmann.
8       Q.  Okay. Did you talk with Gary Hansen about
9   it at all?
10      A.  Yes.
11      Q.  What did you talk with Gary Hansen about, if
12  you recall?
13      A.  I don't recall.
14      Q.  Now you're doing some consulting work, doing
15  some new studies for 3M; is that right?
16      A.  Yes, but --
17      We are doing studies. It's not consulting
18  though.
19      Q.  Okay. Fair enough. You make a dis --
20  distinction between when you're -- when 3M is funding
21  a research project versus when you're doing consulting
22  work for them; correct?
23      A.  Absolutely.
24      Q.  Okay. And I --
25      Is it true that when you're doing consulting

20  (Pages 77 to 80)

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Page 81

1    work for them, such as like on the 3M advisory board,
2    that's billed separately than if they give you -- if
3    they fund a study and give you money for that;
4    correct?
5        A.  Correct.
6        Q.  Okay.  When they fund a study, does it
7    impact your salary at all or -- or your total
8    compensation?
9        A.  Absolutely not.
10       Q.  Okay.  Your --
11           How much funding you get from various
12   companies doesn't impact the salary that you're paid.
13       A.  Not at all.
14       Q.  Okay.  And can you describe for me what
15   current studies you're performing that 3M is funding
16   right now?
17           I'm sorry, --
18       A.  Yes.
19       Q.  -- let me withdraw that and ask a more
20   specific question.
21           What funding is 3M giving you on issues of
22   studies relating to either the Bair Hugger, forced-air
23   warming, or normothermia?
24       A.  Okay.  There are three studies.
25       Q.  Okay.

Page 82

1        A.  Two are registry analyses and one is a
2    randomized trial.
3        Q.  Okay.  Why don't we start with the three
4    registry analyses -- or the --
5        A.  Two registry.
6        Q.  -- two registry analyses.
7        A.  Okay.  One evaluates the relationship
8    between core body temperature during surgery and post-
9    operative myocardial injury.
10       Q.  Okay.  And what's the name of that study?
11       A.  I don't believe it has a --
12           I mean it has some -- some name, but I don't
13   know what it is.
14       Q.  Project Protect?
15       A.  No.
16       Q.  Okay.
17       A.  Protect is the randomized trial.
18       Q.  Okay.  All right.  Okay.  And where is that
19   being conducted?
20       A.  Here.
21           By "that" you mean the registry study?
22       Q.  Yes.
23       A.  Yeah.
24       Q.  The one that --
25       A.  Both registry studies are here.

Page 83

1        Q.  Okay.  And what -- tell me what the setup on
2    those registry stud -- what --
3            What's the second registry study?
4        A.  I'm not sure.  I'm sorry, I don't remember
5    at the moment.  It -- it's some --
6            It's the relationship between the
7    intraoperative core temperature and something, --
8        Q.  Okay.
9        A.  -- but it's not infection.
10       Q.  And describe the difference between a
11   randomized --
12       A.  I don't think -- I don't think it's
13   infection.
14       Q.  Okay.  Do you know if it is?
15       A.  I don't remember the study offhand, but I --
16   I don't think so.  I --
17       Q.  What is the Spot On project?
18       A.  That's been completed for several years.
19       Q.  Would it --
20           What was it?
21       A.  It was an evaluation of a Spot On
22   temperature monitoring system.
23       Q.  Okay.  Why don't you describe the second
24   registry study for me again.  I missed it when you
25   described it.

Page 84

1        A.  Well I described the first registry study,
2    which was core temperature and myocardial injury.
3        Q.  Right.
4        A.  The second one I didn't describe because I
5    can't remember what it is at the moment.
6        Q.  Do you know if it relates to Bair Hugger
7    infections?
8        A.  I -- I don't think so, but I would have to
9    look it up to be sure.
10       Q.  Okay.  I'm going to request that you do
11   that.
12           And then what is the randomized trial that's
13   going on?
14       A.  That's --
15       Q.  Project Protect?
16       A.  -- Protect.  Protect hasn't started yet, but
17   it will be a randomized trial of very mild hypothermia
18   versus aggressive warming with the primary outcome of
19   myocardial injury.
20       Q.  Okay.  The working hypothesis is even small
21   decreases in body temperature can put patients at risk
22   for myocardial issues?
23       A.  Yes.  Or perhaps, turned around, that
24   aggressive warming reduces risk.
25       Q.  What warming modalities are you using in

21  (Pages 81 to 84)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 85

1  that randomized trial?
2  A. Forced air.
3  Q. Just the Bair Hugger?
4  A. Yes.
5  Q. And where is that taking place?
6  A. Some patients will be enrolled here, but the
7  bulk of the study will be done in centers in China.
8  Q. Okay. And what's the -- what's the -- the
9  protocol? What -- what's the test method?
10  A. Take -- take patients at risk for myocardial
11  injury, randomize them to very mild hypothermic versus
12  aggressive warming, and see whether they develop
13  myocardial injury.
14  Q. So you're actually going make patients
15  mildly hypothermic?
16  A. In China most patients are not actively
17  warmed, so even the mildly hypothermic group probably
18  gets more warming than they would get otherwise.
19  Q. So in China, it's basically taking regular
20  patients and then using the Bair Hugger on another set
21  and seeing whether there's a difference in myocardial
22  injury?
23  A. I'm not sure I understand the question.
24  Q. Well you said you're taking patients who are
25  mildly hypothermic. You're not inducing mild

Page 86

1  hypothermia in the China study, or are you?
2  A. Patients are enrolled based on risk, and
3  consent of course, and then in the mild hypothermia
4  group they're allowed to cool to 35.5 degrees and then
5  actively warmed to prevent further hypothermia. In
6  the aggressive warming group, patients will be
7  prewarmed and then they'll be aggressively warmed
8  intraoperatively with two different forced-air covers,
9  surgery permitting, with a goal of having a core
10  temperature of 37 degrees at the end of surgery.
11  Q. How many patients are you enrolling?
12  A. We plan 5,000.
13  Q. How many will be here versus China?
14  A. Here will be probably fewer than 200.
15  Q. When do you expect to have that complete?
16  A. Three or four years.
17  Q. When they were asking you to do this
18  randomized trial, did you go back to them and talk to
19  them about the fact that you still were wondering
20  about the infection risk with the Bair Hugger?
21  A. They didn't ask me to do the study. I -- I
22  proposed it, many times, actually, over the course of
23  several years, and finally they agreed.
24  Q. Okay. How much is the trial? What's the
25  funding on the trial, or the budget?

Page 87

1  A. It's some modest amount: a couple hundred
2  dollars per patient.
3  Q. No. I meant what's the overall cost of the
4  trial?
5  A. I think it's about 1.6 million, most of
6  which is a pass-through to the sites doing the study.
7  Q. Are you doing, other than those three
8  projects, any other projects on forced-air warming for
9  3M?
10  A. I don't believe so.
11  MS. CONLIN: I'm going to go into a new
12  area, so this might be a good time to take a short
13  break. I don't know if --
14  We can go off the record.
15  THE REPORTER: Off the record, please.
16  (Luncheon recess taken.)
17
18
19
20
21
22
23
24
25

Page 88

1  AFTERNOON SESSION
2  BY MS. CONLIN:
3  Q. This morning, Dr. Sessler, I had asked you
4  about whether you had any information regarding the
5  filtration efficiency of the Bair Hugger. Do you
6  recall that testimony?
7  A. Yes.
8  Q. Okay. Or questioning I should say.
9  I've handed you what's been previously
10  marked as Exhibit 6, which is an e-mail between
11  various individuals at 3M.
12  Have you met a Karl Zgoda before?
13  A. Not that I recall.
14  Q. Okay. But Gary Hansen you have; correct?
15  A. Correct.
16  Q. And Ryan Barrows?
17  A. Not that I remember.
18  Q. Okay. And as you see, it says, "As we
19  discussed this morning, please find the media
20  efficiencies (prior to pleating and filter assembly),"
21  and do you see down there on M20 it's got a 58-percent
22  efficiency at three microns?
23  A. Yes.
24  Q. Okay. That isn't --
25  MR. GORDON: It's actually .3 microns.

22 (Pages 85 to 88)

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Page 89

1    MS. CONLIN: Point three, thank you.
2    Q.  Point three microns.  Do you see that,
3    doctor?
4        A.  I do.
5    Q.  And that's not something that you've ever
6    discussed or been aware of with respect to the M20
7    filter used in the Bair Hugger.
8        A.  Correct.
9    Q.  Now the report that -- or the paper that you
10   published with Dr. Olmstead and -- Drs. Olmstead and
11   Kuelpmann underwent a peer-review process; is that
12   right?
13       A.  Yes.
14   Q.  And you'll recall that a number of the
15   reviewers were concerned that there was a conflict of
16   interest by the authors of that study:  yourself,
17   Olmstead and Kuelpmann; correct?
18       MR. GORDON: Object to the form of the
19   question.
20       A.  I don't recall.
21   Q.  I'm going to hand you what's been previously
22   marked as Deposition Exhibit 80, and if you want to
23   take a moment and review that.
24       A.  Okay.
25   Q.  Okay.  Does this refresh your recollection,

Page 90

1    Dr. Sessler, that during the peer-review process of
2    your article there were a number of concerns about
3    whether the study was being done to promote the Bair
4    Hugger product?
5        A.  I have no recollection of the peer-review
6    process.
7    Q.  Okay.  But in any event, that's what the
8    section editor of the Anesthesia & Analgesia
9    publication said; correct?
10       A.  As -- as I read this, the editor is saying
11   because there are conflicts of interest, that the
12   manuscript should be squeaky clean, which I agree with
13   completely.  And we complied.
14   Q.  And they said, "You do not provide a good
15   scientific reason to do the study.  It might appear
16   that the study was conducted to promote Arizant's
17   products." Correct?
18       A.  Did say that.
19   Q.  Okay.  And when the editor wrote you that,
20   did anybody tell the editor that the study was part of
21   3M's legal strategy --
22       MR. GORDON: Object to the form of the
23   question.
24   Q.  -- in connection with the Bair Hugger?
25       MR. GORDON: Object to the form of the

Page 91

1    question.
2        A.  I didn't.
3    Q.  Do you -- do you know if anyone did?
4        A.  I don't know if anyone did.
5    Q.  Okay.  One of the things that he says is,
6    "You don't provide a good scientific reason to do the
7    study." What did you understand the reason that you
8    were pulled into that study?
9        At the time, you didn't know it was part of
10   a legal strategy; right?
11       A.  No.  But there were publications saying that
12   forced -- (clearing throat) excuse me -- that
13   forced-air warming disturbed laminar flow, and this
14   study was designed to address that concern.
15   Q.  Okay.  So it was for the purposes of
16   commercial promotion of the product; correct?
17       A.  No.
18       MR. GORDON: Object to the form of the
19   question.
20       A.  No.  Not at all.  To -- to answer the
21   question does forced-air warming interfere with
22   laminar flow.
23   Q.  Did 3M ever tell you that they viewed your
24   study as having limitations?
25       A.  Come again?

Page 92

1    Q.  Did --
2        Well I'll ask it more directly.  Did
3    Michelle Hulse Stevens ever tell you that she viewed
4    your study as having limitations?
5        A.  She didn't.  But all studies have
6    limitations.
7    Q.  Do you know -- have you ever --
8        Do you know Dr. William Reed, Bill Reed?
9        A.  I don't believe so.
10   Q.  Okay.  How about Dr. McGovern?
11       A.  I don't believe so.
12   Q.  Okay.  Do you know who Mr. Gauthier or Mr.
13   Albrecht are?
14       A.  Mr. Albrecht was an employee of Augustine
15   Biomedical, and that -- that's the sum total of what I
16   know about him.
17   Q.  Have you met him before?
18       A.  I don't believe so.
19   Q.  Okay.  Those were two individuals whom you
20   and Dr. Olmstead tried to prevent as being peer
21   review -- peer reviewers on your article; correct?
22       A.  I don't remember.  I'll take your word for
23   it.
24   Q.  Well if you testified to that previously,
25   that would have been a little closer in time; correct?

STIREWALT & ASSOCIATES
MINNEAPOLIS, MN  1-800-553-1953  info@stirewalt.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 93

1    A. Little closer, yes.
2    Q. Okay. Do you -- do you have any
3  recollection of why you would have suggested that
4  those two not be peer reviewers on your article?
5    A. Yes. It seems -- I guess I -- I thought
6  they had a -- a bias in a different direction and that
7  they might not be fair reviewers.
8    Q. Well you had a bias in one direction; didn't
9  you, sir?
10    A. I'm not sure I would agree with that. I
11  wanted to find the answer.
12    Q. Well you -- you weren't even involved in the
13  study. You were approached by 3M after it was -- the
14  testing had been done; right?
15    A. Yes.
16    MR. GORDON: Object to the form of the
17  question.
18    A. But I --
19    Q. And --
20    A. I had an interest in publicizing the results
21  because I thought they were clear and that the message
22  was important --
23    Q. Did you --
24    A. -- and that they addressed the controversy.
25    Q. Did you look at the protocols and whether

Page 94

1  there was a conclusion written at the protocols before
2  the testing took place?
3    A. I don't remember the details.
4    Q. Okay.
5    A. I -- I simply don't.
6    Q. Okay. Do you think that would be important
7  to know, whether it was conducted in a way to have a
8  certain outcome base?
9    A. How the study is conducted is certainly
10  important, and I certainly did review how the study
11  was done.
12    Q. Now we talked -- when he's pulling that
13  out -- we talked a little bit this morning about your
14  understanding of epidemiology, and I just want to make
15  sure that I have this correct.
16    You've never done any analysis of the number
17  of bacteria or a bacterium that can cause an infection
18  of an implanted foreign material; correct?
19    A. Correct.
20    Q. And whether that happens through an airborne
21  route.
22    A. Correct.
23    Q. Okay. And you would agree with me that
24  soft-tissue infections are -- require a much larger
25  inoculation, correct, because of the host defense that

Page 95

1  you've described?
2    MR. GORDON: Object to the form of the
3  question.
4    A. Larger -- larger than what?
5    Q. Than a joint implant.
6    A. I don't know that.
7    Q. Okay. It's not something that you've ever
8  studied or looked at.
9    A. It's really not my area.
10    Q. Okay.
11    (Discussion off the stenographic record.)
12    (Exhibit 227 was marked for
13    identification.)
14  BY MS. CONLIN:
15    Q. I've handed you, Dr. Sessler, what's been
16  marked as Exhibit 227, which is -- appears to be --
17    The bottom is an e-mail from Al Van Duren to
18  various members at 3M, including Gary Hansen.
19    Do you know who Gary Maharaj is?
20    A. Yes.
21    Q. You've met him before?
22    A. Yes.
23    Q. Okay. And it's reflecting on a telephone
24  call that Al Van Duren had with you on September 21st,
25  2010. Do you see that?

Page 96

1    A. Well I haven't read this yet.
2    Q. Okay. Go ahead. Sorry, sir.
3    A. Okay.
4    Q. Okay. And this is Al Van Duren reflecting a
5  conversation that he had had with you the previous
6  day; correct?
7    MR. GORDON: Object to the form of the
8  question, also lack of foundation.
9    MS. CONLIN: You may answer.
10    Q. See it says, "I talked to Dan Sessler
11  yesterday?"
12    A. It appears to say that, yes.
13    Q. Okay. And in the next paragraph it says,
14  "Dan suggested that we conduct a microbiological study
15  by placing culture dishes in the sterile field for a
16  fixed duration and analyzing the CFUs." Do you see
17  that?
18    A. Yes.
19    Q. And it goes on to state that you thought you
20  were pretty confident that the cost of the study would
21  be modest and there would be no significant
22  differences in outcomes; correct?
23    A. Correct.
24    Q. And that was way back in 2010; right?
25    A. Correct.

24  (Pages 93 to 96)

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Page 97

1    Q. And this was the -- what we talked about
2  this morning. 3M hasn't undertaken that suggestion
3  even today; correct?
4    A. Not that I know of.
5    Q. And you actually got upset with 3M about
6  their refusal to do a bacterial contamination study;
7  correct?
8    A. Where does it say that?
9    Q. Do you recall being upset with 3M, that they
10  wouldn't undertake a bacterial study --
11    A. No.
12    Q. -- as you proposed?
13    A. No.
14    Q. I've handed you, Dr. Sessler, that's --
15  what's been previously marked as Deposition Exhibit
16  14, which the cover page appears to be an e-mail from
17  you to Gary Hansen. I'll give you a moment to review
18  it.
19    A. Yes.
20    Q. Do you recall this exchange?
21    A. No.
22    Q. Do you see, if we can take a look at page
23  two of it, it starts with an e-mail from Steven Shafer
24  at Stanford. Do you see that?
25    A. Okay. I -- I've only read the first page so

Page 98

1  far.
2    Q. Oh, okay. Why don't you go ahead and take a
3  look at the whole document.
4    A. Okay.
5    Q. Have you had a chance to review it?
6    A. I have.
7    Q. Does this refresh your recollection that Dr.
8  Shafer, who was then editor in chief of Anesthesia
9  & --
10    A. Analgesia.
11    Q. -- Analgesia wrote you in August of 2012
12  regarding the publication of your study?
13    A. Yes.
14    Q. Okay. And he raises a number of criticisms;
15  correct?
16    A. He does.
17    Q. Okay. And he said, "We have received a
18  credible report suggesting that your recent paper in
19  Anesthesia & Analgesia misrepresents the safety of
20  forced air warming." Do you see that?
21      And it says, "The --
22    A. Yes.
23    Q. -- "complaint we have received is quite
24  detailed," and then he lists a number of issues with
25  your paper; correct?

Page 99

1    A. Correct.
2    Q. Okay. And he goes on to state, "I don't
3  find the concerns about your intentions credible.
4  Thus, your intentions are not in question. The
5  question before us is entirely scientific: is your
6  study description accurate (e.g., the statement that
7  it complies with an accepted standard), and are your
8  conclusions fully supported by your findings?" Do you
9  see that?
10    A. I do.
11    Q. Okay. And one of the things that they --
12  criticism they had is that you didn't measure the
13  effects of rising waste heat from forced-air warming
14  devices; correct?
15      In number six.
16    A. Yes.
17    Q. Okay. And in fact, I think you've testified
18  previously that it's your understanding that the Bair
19  Hugger generates about 400 watts of heat.
20    A. Correct.
21    Q. About 80 of which are absorbed by the
22  patient; correct?
23    A. That's about right.
24      MR. GORDON: Object to the form of the
25  question.

Page 100

1    Q. And 320 of those watts then go into the
2  operating room; correct?
3    A. Correct.
4    Q. And then it goes on to say, "Your study
5  omitted two of the standard test procedures." Do you
6  know what that was about?
7    A. No.
8    Q. And it says under number one, "The
9  'standard' test procedures were not designed to test
10  forced air warming devices." Do you see that?
11    A. I do.
12    Q. Okay. And do you know what that was about?
13    A. Not offhand.
14    Q. Okay. And then you write, in response to
15  this e-mail from the editor of the journal in which
16  your study was published, you write to Gary Hansen, Al
17  Van Duren and Russ Olmstead as well as Dr. Kuelpmann;
18  correct?
19    A. Correct.
20    Q. And you say, "Hi Folks,
21      "We have a problem, in the form of an
22  official complaint, obviously from Scott Augustine,
23  about the laminar flow paper."
24      Why did you assume it was obviously from
25  Scott Augustine?

25  (Pages 97 to 100)

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Page 101

1    A. I don't remember why I assumed it.
2    Q. Okay. Have you ever seen any publications
3  by doctors at Stanford that raise concerns about the
4  lack of filtration efficiency in Bair Huggers?
5    A. Not that I remember.
6    Q. Are you aware of an outbreak of
7  Acinetobacter baumannii --
8    Did I pronounce that correct?
9    A. Acinetobacter.
10   Q. Thank you. Yeah, Acinetobacter.
11   -- that occurred in a hospital in Kentucky?
12   A. No.
13   Q. Are you aware that after they changed the
14  Bair Hugger filters, the outbreak stopped?
15   A. No. But that's meaningless.
16   Q. "Meaningless." What do you mean?
17   A. That's a typical regression-to-mean,
18  before-and-after type issue. That's scientifically
19  meaningless, to do before-and-after studies that --
20  that have almost no scientific value --
21   Q. Well --
22   A. -- because --
23   Q. -- if -- if you're out there promoting the
24  safety of the Bair Hugger, aren't these things that
25  you should actually know about, doctor?

Page 102

1    MR. GORDON: Object to the form of that
2  question, argumentative.
3    A. I can't know everything.
4    Q. But in any event, it's meaningless to you;
5  right?
6    A. Before-and-after data are absolutely
7  meaningless.
8    Q. And the fact that the outbreak stopped after
9  changing of the Bair Hugger filter doesn't matter to
10  you as somebody who's out there promoting the safety
11  of Bair Hugger; is that right?
12   MR. GORDON: Object to the form of the
13  question.
14   A. That is absolutely meaningless data.
15  Before-and-after studies are confounded by the fact
16  that many things change simultaneously. You have a
17  Hawthorne effect, you have regression to mean. It's
18  just of no value.
19   Q. Okay. And my question was a little bit
20  different. If somebody is out there promoting the
21  safety of Bair Hugger, it's not important data to you;
22  right?
23   MR. GORDON: Object to the form of the
24  question.
25   A. What's not important data?

Page 103

1    Q. The fact that they found Bair Huggers
2  contaminated with this particular bacteria, had an
3  outbreak in the hospital, and the outbreak stopped
4  after they changed the filters and cleaned the
5  machine.
6    MR. GORDON: Object to the form of the
7  question, it misstates -- mischaracterizes the facts.
8    A. With what you've told me, I can't tell
9  whether this is important or not.
10   Q. Okay. But in any event, it's not something
11  that you knew about; right?
12   A. I'm sorry, I didn't hear that.
13   Q. It's not anything that you knew about before
14  today; correct?
15   A. I did not.
16   Q. Okay. So you write to, in connection with
17  this letter by Dr. -- or e-mail from Dr. Shafer of
18  Stanford University, you write to Gary Hansen, Al Van
19  Duren, Russ Olmstead and Dr. Kuelpmann; right?
20   A. Yes.
21   Q. Okay. And you say in the second sentence,
22  "Steve wants to discuss the issue with me on Sunday
23  and I need to have a full and convincing response
24  ready. Unfortunately, this topic is well outside my
25  area of expertise so I'm going to need your help." Do

Page 104

1  you see that?
2    A. I do.
3    Q. Okay. Is it your position, at least as
4  reflected in this e-mail, that the questions raised
5  about your study were outside your area of expertise?
6    A. Some of them were for sure.
7    Q. Why don't we go through on --
8    On the seven points raised, why don't you
9  tell me which ones are outside your area of expertise.
10   A. Number one I don't think is relevant. Two
11  and three are outside my area.
12   Q. Well okay. One, is one outside your area of
13  expertise?
14   A. I'm not sure how to answer that. I don't
15  think it's relevant.
16   Q. Okay.
17   A. I --
18   Q. But in any event, do you claim to have any
19  expertise in DIN standards?
20   A. No.
21   Q. Okay. Number two, "Your study omitted two
22  of the standard test procedures" for DIN. Is that
23  something within -- that you can talk about?
24   A. No.
25   Q. Okay. How about number three, "Your study

26 (Pages 101 to 104)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

## Page 105

1  omitted the second part of the standard test procedure
2  used in the study?"
3      A.  No.
4      Q.  Not within your area of expertise.
5          How about four, "You modified the standard
6  procedures so that the results would support this
7  device?"
8      A.  Part -- partially in my area.
9      Q.  Okay.  In what way?
10     A.  Well I -- I don't think we did modify the --
11  the standard procedures, and the modifications we made
12  were not designed to support a particular conclusion.
13     Q.  Okay.  Well you weren't involved in the
14  upfront part of this; --
15     A.  That's fair.  Fair -- fair --
16     Q.  -- is that right?
17     A.  -- enough.  Fair enough.  But --
18     Q.  So I mean --
19     A.  -- the -- the protocol, as -- as I
20  understand it, was designed to get the right answer,
21  not to prove a point.
22     Q.  Okay.  But you don't know whether that
23  protocol actually was designed to get a particular
24  answer.
25     A.  Doesn't so matter -- much matter why it was

## Page 106

1  designed or what the theory was.  Either it addresses
2  the question -- either the test procedures are
3  appropriate and answer the question or they were not
4  appropriate.
5      Q.  Okay.  Number six, "You did not measure the
6  effects of rising heat waste from forced air warming
7  devices," that's outside your area of expertise;
8  right?
9      A.  We did measure the effects of rising heat.
10  That was the whole point of the study.
11     Q.  Where in your study does it talk about
12  rising heat?
13     A.  It's the comparison between the ambient
14  temperature and the heated condition.  It's exactly
15  testing that.
16     Q.  For five minutes.
17     A.  The measurement was for five minutes.
18     Q.  Thank you.
19     A.  It's -- it's a laboratory test.  You don't
20  need to measure it for ever and ever.  It doesn't
21  change.
22     Q.  And then it said, seven, "You detected" --
23  "You studied the device in an artificial setting where
24  the rising waste heat phenomenon was least likely to
25  be detectable over the surgical site - restricting the

## Page 107

1  heat to the head end of the patient."  Do you see
2  that?
3      A.  I see that.
4      Q.  Is that within your area of expertise?
5      A.  Yes.
6      Q.  Okay.  And what would be your response to
7  number seven?
8      A.  About 90 percent of all forced-air warming
9  is done with upper-body covers, and so that is the
10  relevant condition.
11     Q.  Then you say, in this next part of your
12  e-mail forwarding the inquiry by Dr. Shafer at
13  Stanford, you say, "I suppose I should point out the
14  obvious.  For a year I've been saying that the only
15  way to put this issue to bed is to do a clinical
16  bacterial sampling study.  We should have had those
17  results by now -- which would fully address this
18  issue.  As is, we're again playing catch up.  It was a
19  foolish decision not to do that study long ago."  Do
20  you see that?
21     A.  I do.
22     Q.  And that's consistent with what you've been
23  testifying here today; correct?
24     A.  I still think the study would be useful.
25     Q.  Okay.  And then Gary Hansen writes back on

## Page 108

1  August 31st and says, "There is much to say, and I've
2  already worked through most of it.  Let me pull it
3  together."  Do you see that?
4      A.  Yes.
5      Q.  Okay.  And then you write Gary back on that
6  same day and say, "Gary,
7          "I'm pretty unhappy.  I took this project on
8  as a favor and it has ended up costing a huge amount
9  of time -- and now more to come.  Further, this may
10  damage my reputation; just the fact that a complaint
11  was filed already has to some extent."  Do you see
12  that?
13     A.  I do.
14     Q.  Okay.  And so you took this project on not
15  for scientific reasons but as a favor to 3M as
16  reflected in this e-mail; correct?
17     A.  No.  I took it on to try to answer the
18  question because I thought the literature that was
19  being published misstated the circumstances.
20     Q.  Well what did you mean when you said, "I
21  took this project on as a favor and it has ended up
22  costing a huge amount of time" and that it may damage
23  your reputation?  What were you referencing there?
24     A.  Well the -- the fact that a complaint has
25  been filed certainly is potentially damaging.  Just

27  (Pages 105 to 108)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 109

1 the fact that a complaint is filed is damaging even if
2 it turns out to be okay.
3     Q.  What do you mean when you say, "I took this
4 project on as a favor...?"
5     A.  Well I wasn't paid for it, if that --
6        This was not a contract.  I didn't get paid
7 for this.
8     Q.  Okay.  And then you go on to say, you know,
9 "I've been talking about doing a bacterial sampling
10 study;" right?
11     A.  Yes.
12     Q.  Then you go on to say, "I'm under -- I'm
13 underwhelming with the way Arizant/3M is being
14 managed.  It has taken forever to get the analysis for
15 DTT."
16        What's that?
17     A.  Deep temperature thermometer.
18     Q.  Okay.  And it says, "As a result, you're
19 going into your big launch without a validation paper
20 even submitted, much less in the press."  What's that
21 a reference to?
22     A.  That they're launching a product without a
23 validation paper in press.
24     Q.  What's a validation paper?
25     A.  It's a study showing that the product works.

Page 110

1     Q.  Okay.  Do you know whether the Bair Hugger
2 was launched without a validation paper?
3     A.  Yes.
4     Q.  Yes, it was launched without a validation
5 paper, or yes, you know?
6     A.  Yes, it was launched without a validation
7 paper.
8     Q.  Okay.  Do you know it --
9        It got approval at the FDA as a 510(k);
10 correct?
11     A.  I believe so.
12     Q.  Okay.  Do you know what the predicate device
13 was that was used for that 510(k)?
14     A.  No.
15     Q.  Do you know whether it was a cast drying
16 device that was manufactured in 1937 through 1943?
17     A.  I -- I know nothing about the approval
18 process.
19     Q.  Did you talk with Mr. Hansen, either by
20 e-mail or over the phone or in person, regarding your
21 e-mail to him of August 31st, 2012?
22     A.  Probably, but I don't remember.
23     Q.  I've handed you, Dr. Sessler, what's been
24 previously marked as Deposition Exhibit 218, which
25 appears to be minutes of a Global Patient Warming

Page 111

1 Advisory Board meeting of October 18th, 2012, showing
2 you present with others.  You can take a moment, if
3 you'd like, to review it.
4     A.  This goes on for a long time.  Do you want
5 me to read the whole thing?
6     Q.  Well no.  I mean what I'm going to do is ask
7 you about certain things and see if you remember them,
8 and if you want to take a moment and review on either
9 side, you're welcome to do so.
10     A.  Well let's do it that way.
11     Q.  Okay.  Do you remember being at a Global
12 Patient Warming Advisory Board meeting?
13        This is the advisory board meetings that you
14 described earlier today; correct?
15     A.  It is.
16     Q.  Okay.  Do you get minutes of these meetings?
17     A.  No, I don't.
18     Q.  Okay.  And if we look down under the
19 "Summary," there's the proposed troponin study --
20     A.  Tro -- troponin.
21     Q.  -- troponin study by you, and -- and you
22 described that earlier today.  Is that that randomized
23 trial?
24     A.  That's correct.
25     Q.  Okay.  I forgot to ask you:  What was the

Page 112

1 Spot On trial that is concluded?  That related to the
2 Spot On device; is that right?
3     A.  Yes.
4     Q.  Okay.
5     A.  Or wait, wait.  I'm sorry.  What was the
6 question?
7     Q.  Well we talked about the Spot On trial
8 earlier today, and I was --
9     A.  Yes.
10     Q.  -- just --
11        I couldn't remember what the technology was
12 in it.
13     A.  It's a zero heat flux.
14     Q.  Meaning what?
15     A.  Meaning it's a surface thermometer that's
16 heated --
17        Basically, it's a heat flux transducer and a
18 heater, and you servo control the heater to no heat
19 flux, at which point there's -- the device becomes a
20 perfect insulator by definition, and you get a little
21 tunnel of warmth that goes down about a centimeter.
22 You put the thermometer some place like the forehead
23 where one centimeter down is core temperature, then
24 you can read core temperature quite accurately from
25 the skin surface.

28 (Pages 109 to 112)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 113

1    Q.  Thank you.
2        And then if we look under -- and this is all
3    part of the summary -- if we look at the last section
4    of the summary of this advisory board meeting, under
5    "Other" it says, "Board approved of proposed 3M/CCL
6    particulate study to counter 'Blowing Air Is Risky'
7    claim from competitors; particularly interested in
8    looking at patient prep phase since clinicians often
9    do not use forced-air warming here."  Do you see that?
10   A.  I do.
11   Q.  So as part of your work on 3M's advisory
12   board, you were advising them on how to counter some
13   of the statements that Scott Augustine was making;
14   correct?
15   A.  Yes.
16   Q.  And had you been involved in that?
17   A.  Not at all.
18   Q.  Other than advising --
19   A.  I -- I'm --
20   Q.  -- them and --
21   A.  Well I --
22   Q.  -- telling them to move forward on it?
23   A.  I was certainly not involved in this study
24   that's being talked about here.  I don't even know
25   what it is --

Page 114

1    Q.  Okay.
2    A.  -- or if it ever happened.
3    Q.  Well you were at the meeting though.  Do you
4    remember anything about this?
5    A.  No.
6    Q.  Okay.  Do you think it's appropriate in your
7    role as a scientific advisor to be advising and
8    improving -- or approving competitive campaigns?
9        MR. GORDON:  Object to the form of the
10   question.
11   A.  My goal is always to get the right answer
12   and to get the truth out.
13   Q.  Now you know Dr. Augustine well; correct?
14   A.  I know him -- I've --
15       I've known Dr. Augustine for more than two
16   decades, --
17   Q.  Okay.
18   A.  -- not well.  I haven't talked to him in
19   years.
20   Q.  Okay.  There was a point in time in which
21   you wanted an interest in his Hot Dog company;
22   correct?
23   A.  No.
24   Q.  That never happened?
25   A.  No.  He approached me and asked me to

Page 115

1    become -- be an advisor for him, and I declined.
2    Q.  Okay.  And did part of your --
3        Did you discuss with him whether you
4    would, if you accepted that position, take an
5    ownership interest in the company?
6    A.  Yes.
7    Q.  And what was that discussion?
8    A.  It was just an absolutely routine
9    negotiation about, if he wants me to do something,
10   what do I expect in return.
11   Q.  Okay.  And as part of that, it was an actual
12   piece of the company; correct?
13   A.  Yes.
14   Q.  And Dr. Augustine said no; right?
15   A.  We mutually disagreed.  I -- I don't -- I
16   don't think he objected to my having ownership in the
17   company.  We couldn't agree on an amount.
18   Q.  Okay.
19   A.  It was just an absolutely standard
20   negotiation.
21   Q.  Okay.
22   A.  Nothing unusual about it.
23   Q.  And that was prior to the time you went on
24   the 3M science advisory board?
25   A.  I don't know.

Page 116

1    Q.  So if we can take a look at page six of
2    this, Dr. Sessler, it bears the last three Bates
3    numbers 445.  Do you, Dr. --
4        By the way, Dr. Sessler, do you have shares
5    in any patient-warming company?
6    A.  Yes.  I have stock options, I think, for
7    VitaHEAT --
8    Q.  Okay.
9    A.  -- that date back before their current
10   arrangement with 3M.  But any fees or compensation I
11   get, including stock options, related to warming, I
12   donate to charity.  I've done this for -- for many
13   years, and I've made it absolutely clear to everyone
14   that -- that all this work is -- is essentially pro
15   bono.
16   Q.  You weren't involved in advising 3M in
17   connection with its arrangement with VitaHEAT?
18   A.  Absolutely not.
19   Q.  Okay.  Did you know that 3M was considering
20   taking an exclusive license to VitaHEAT?
21   A.  I had no inkling.
22   Q.  So if we take a look at page six, this is
23   under the heading --
24       Well it's your proposed study in China;
25   right?

29  (Pages 113 to 116)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 117

1    A.  I don't know.  I'm sorry, I haven't read
2  this yet.
3    Q.  If you look at the page before, in five
4  there's a heading, and would this have been a
5  presentation that you made at this meeting, or are
6  these a summary of the points that you made at the
7  meeting regarding your proposed study in China?
8    A.  It -- I believe it was a presentation.
9    Q.  Okay.  And then at the --
10     If we look at the two bullet points at the
11  top of page six, there's a notation, "Kurz 1996 SSI
12  paper limitations," and it says, "only 200 patients,
13  mostly superficial infections with few clinical
14  consequences (we should focus on deep tissue/organ
15  SSIs, the factor of 3 risk increase is not plausible
16  (30 percent or so is more likely)."  Do you see that?
17    A.  Yes.
18    Q.  Was that information that you presented
19  during this advisory meeting at 3M?
20    A.  Apparently.
21    Q.  Okay.  Then you went on to say, "Melling
22  paper seriously flawed:  only 420 low risk patients,
23  infection was not defined, core temperature not
24  recorded (!)"  See that?
25    A.  Yes.

Page 118

1    Q.  Do you agree that the Melling paper is
2  seriously flawed, as you stated to 3M?
3    A.  Yes.
4    Q.  Okay.  And do you agree with me that you
5  told 3M that the Kurz 1996 SSI paper has limitations
6  and you identified them to 3M?
7    A.  All papers have limitations.
8    Q.  Okay.  Now if we go down --
9     Well, and you in fact mentioned these
10  limitations on the Kurz study to 3M at this meeting as
11  reflected in these notes; correct?
12    A.  Yes.
13    Q.  Okay.  Then we go down and it's got sort
14  of a -- almost like a Q&A.  It says "Question:  why
15  should 3M fund a study to show risks associated with
16  hypothermia when there is already broad acceptance of
17  current evidence?"
18     And then there's a "DS."  Is that referring
19  to you?
20    A.  I assume.
21    Q.  Okay.  It says, "the threat to 3M is that
22  the old studies will begin to be discredited."
23     Is that a reference to Melling and Kurz?
24    A.  Probably.
25    Q.  Okay.  "Once this begins it will pick up

Page 119

1  speed and leave you exposed.  Large outcomes studies
2  are needed to take the place of the old studies."
3    Q.  Is that something that you recall mentioning
4  to 3M at this meeting?
5    A.  No.
6    Q.  Okay.  Do you deny that you said it?
7    A.  Oh, no.  It looks like I did, I just don't
8  recall it.
9    Q.  Okay.  Then if we take a look at page seven,
10  midway down it's "Hooper/laminar flow in hip/knee
11  replacements."  Do you recall what that's about?
12    A.  Only vaguely.
13    Q.  Okay.  What is the Hooper/laminar flow in
14  hip/knee replacements?
15    A.  I know --
16     I don't remember the study, so I know
17  nothing except what I'm reading right here, which is
18  not enough for me to discuss it.
19    Q.  Okay.  And do you see that Al Van Duren
20  said, "Shows laminar flow is not effective.  But
21  potentially could be interpreted to mean that
22  forced-air warming disturbs laminar flow, causing
23  laminar flow not to work."  Do you recall him saying
24  that?
25    A.  No.

Page 120

1    Q.  And if we take a look on the last page, page
2  eight, it says, "Discussion of new aerobiology study
3  to counter the 'BAIR' misinformation."  And it says,
4  "GH" -- I assume that's Gary Hansen -- "presented
5  study proposal.  Board supported the idea."
6     Then it goes on to say "DS" -- which is
7  you -- "Host defense protects against SSI much more
8  than sterile ORs and external conditions.  This study
9  would take the wind out of the 'BAIR' argument.  That
10  is the only reason to do it."
11     Do you see that there?
12    A.  Yes.
13    Q.  Does that sound like a statement you would
14  have made?
15    A.  I -- I don't really know what the new
16  aerobiology study is, so I don't think I can comment
17  here.
18    Q.  Okay.  We did talk today a little bit about
19  your view that the host defense protects against
20  surgical-site infections; right?
21    A.  Host defense is absolutely critical.
22    Q.  Okay.  But you don't know whether --
23     Well let me ask it this way:  What is the
24  host defense if a bacterium lands on an implant, like
25  a knee?

30  (Pages 117 to 120)

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Page 121

1     MR. GORDON: Object to the form of the
2  question.
3     A.  Host defense still applies.
4     Q.  Okay.  Do you know whether the host defense
5  is significantly impeded in connection with an
6  implant?
7     MR. GORDON: Object to the form of the
8  question.
9     A.  I -- I don't know.  I believe that --
10    I simply don't know.
11    Q.  Okay.
12    (Exhibit 228 was marked for
13    identification.)
14 BY MS. CONLIN:
15    Q.  I've handed you, Dr. Sessler, what's been
16 marked as Exhibit 228, which appears to be an e-mail
17 between you and Scott Augustine with a copy to Bob
18 Buehler.
19    Do you know a Bob Buehler?
20    A.  Yes.
21    Q.  Who is that?
22    MS. CONLIN: Is your phone going off?  Do
23 you need step out?
24    MS. DIFRANCO: It's mine.
25    MS. CONLIN: Okay.  I want to -- I know

Page 122

1  you're a doctor, so I wanted to make sure.  All right.
2     Q.  Who is Bob Buehler, or do you know who Bob
3  Buehler is?
4     A.  I do know Bob Buehler.  He worked for Scott.
5  I don't know his title or role.
6     Q.  Okay.  And this is dated 2000, and if we
7  could take a look at the third paragraph down, you
8  write, "I do not at all support the statement that
9  'forced air is the standard of care.'  For one thing,
10 it's not even a true statement!  More than half of all
11 patients in the United States (to say nothing of the
12 world) do not receive force-air warming."
13    Now this is written in 2000, but did you
14 believe that to be accurate when you wrote it?
15    A.  I probably wrote it because I believed it to
16 be accurate.
17    Q.  Okay.  And then midway down that --
18    Well actually, midway down it says, "After
19 all, many patients can be kept warm with passive
20 insulation alone.  Others can be kept normothermic
21 with less effective technologies."
22    Was that a true statement when you wrote it?
23    A.  Yes.
24    Q.  Okay.  And then in the next paragraph you
25 write, "The efficacy of electric warming blankets is

Page 123

1  nearly the same as forced-air warming..."  Was that a
2  true statement?
3     A.  I'm sorry, I'm not seeing the sentence at
4  the moment.
5     Q.  Oh, I'm sorry, doctor, right down there.
6     A.  Oh, okay.  Sorry.  I was in a different
7  paragraph here.
8     Q.  Sorry.
9     A.  Yes.
10    Q.  Okay.  And that's true today in your mind;
11 correct?
12    A.  Yes.
13    (Exhibit 229 was marked for
14    identification.)
15 BY MS. CONLIN:
16    Q.  I've handed you what's been marked as
17 Exhibit 229.  The cover page appears to be an e-mail
18 from you to Al Van Duren dated April -- I'm sorry, May
19 30th, 2014, and attached is a study co-authored by you
20 and others entitled "A Randomized Comparison of
21 Intraoperative PerfecTemp and Forced-Air Warming
22 During Open Abdominal Surgery."
23    Was this a study that you were involved in?
24    A.  Yes.
25    Q.  Okay.  And what was your involvement in this

Page 124

1  study?
2     A.  I designed the protocol, supervised data
3  acquisition, I supervised statistical analysis, and
4  heavily edited -- probably wrote -- most of the
5  manuscript.
6     Q.  Okay.  And PerfecTemp is an underbody
7  resistive-warming system that combines servo-
8  controlled underbody warming with viscoelastic foam
9  pressure relief?
10    A.  Apparently.
11    Q.  Is this -- is this the -- the VitaHEAT?
12    A.  I don't think so.
13    Q.  Okay.  How -- how does it differ, if at all,
14 than the VitaHEAT product?
15    A.  I -- I can't tell you.
16    Q.  Okay.  If we can take a look at the
17 conclusion, which is on Bates page 694, "In
18 summary..."  Do you see that on the left-hand side
19 right before "DISCLOSURES?"
20    A.  Yes.
21    Q.  Okay.  You and the other authors conclude,
22 "In summary, mean intraoperative TWA" --
23    That's time-weighted average; am I right,
24 doctor?
25    A.  You are.

31 (Pages 121 to 124)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 125

1    Q. Okay. "In summary, mean intraoperative TWA
2  core temperatures were no different, and significantly
3  noninferior, with underbody resistive heating than
4  upper-body forced-air warming. Underbody resistive
5  heating may be an alternative to forced-air warming."
6        That's what you concluded in this study that
7  was published in 2011; am I right?
8    A. Yes.
9    Q. And have you seen any counter evidence to --
10  that would undermine the conclusions that you reached
11  in this study?
12    A. No.
13      (Exhibit 230 was marked for
14      identification.)
15  BY MS. CONLIN:
16    Q. I've handed you, Dr. Sessler, what's been
17  marked as Exhibit 230, which is an e-mail exchange
18  between Niya Johnson and Michelle Hulse Stevens with a
19  copy to Al Van Duren. Do you see that?
20    A. Yes.
21    Q. Dated November 18th, 2015, "Subject: BMW
22  refocus: pre-warming." Do you see that?
23    A. Yes.
24    Q. And it says, "Michelle,
25      "I'd like to extend you an invitation to

Page 126

1  join the BMW team call" -- or "team on a call with two
2  KOLs and experts on pre-warming Dr. Brauer and Dr.
3  Sessler." Do you see that?
4    A. Yes.
5    Q. What -- what is the BMW?
6    MR. GORDON: Objection, lack of foundation.
7    A. I haven't a clue.
8    Q. Okay. Are you working with 3M on a
9  prewarming project?
10    A. No.
11    Q. It says "on pre-warming," do you see that,
12  "call with two KOLs and experts on pre-warming Dr.
13  Brauer and Dr. Sessler?"
14    A. I see that.
15    Q. Okay. But you're not aware of any work
16  you're doing with 3M on prewarming right now?
17    A. We -- we are not doing work with 3M on
18  prewarming now.
19    Q. Okay. Do you know if BMW refers to Bair
20  Mobile Warming?
21    MR. GORDON: Objection, lack of foundation.
22    A. No, I don't. I have no idea what it means.
23    Q. Okay.
24    THE REPORTER: We have to change disks. Off
25  the record, please.

Page 127

1      (Recess taken.)
2  BY MS. CONLIN:
3    Q. I've handed you, Dr. Sessler, what's been
4  previously marked as Deposition Exhibit 222. It
5  starts, actually, with an e-mail from you on the third
6  page, so you might want to start on the third page
7  and -- and read up.
8    A. Oh, okay.
9      Okay.
10    Q. Okay. If we can take a look at the third
11  page bearing Bates 541796 of Exhibit 222 first, you
12  write to a number of people at 3M; am I right?
13    A. Yes.
14    Q. About a --
15      Sounds to me like there was a key-opinion-
16  leader meeting in Washington. Was that in connection
17  with your work for 3M or was that just on the SCIP-10
18  protocol in general?
19    A. I don't know.
20    Q. Okay. It says, "One of the points
21  Andrea" --
22      Who is Andrea?
23    A. Probably Andrea Kurz.
24    Q. Okay.
25      -- "Andrea Kurz and I tried to make at the

Page 128

1  KOL meeting in Washington is that the evidence for
2  hypothermia-related complications mostly does not meet
3  current research guidelines for reliability and that
4  previous studies were done with much larger
5  temperature differences than are currently allowed."
6      What do you mean by that?
7    A. The major trials showing that hypothermia
8  causes complications mostly compared temperatures of
9  about 36.5 to about 34.5; no patients now are allowed
10  to get to 34.5.
11    Q. And then in the third paragraph you say,
12  "The writing is on the wall. Without new evidence of
13  harm from current levels of hypothermia, SCIP-10 is
14  unlikely to survive into the next version of pay-for-
15  performance measures."
16      What's that a reference to?
17    A. SCIP-10 is Surgical Care Improvement
18  Project, 10 was one of many measures defining quality
19  criteria, and warming and maintaining normothermia was
20  one of them.
21    Q. And --
22    A. That -- that -- that's what number 10 was.
23    Q. And you were involved in that, right, that
24  proposal?
25    A. I -- I was -- I was somewhat involved in

32  (Pages 125 to 128)

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Page 129

1  that, in the original version.
2      Q.  And how would you describe your involvement?
3      A.  I was one of many, many people. I
4  represented the ASA, I believe, --
5      Q.  Okay.
6      A.  -- American Society of Anesthesiologists, at
7  their request.
8      Q.  And the pay for performance is a reference
9  to the fact that because the SCIP-10 protocol is in
10  place ensures and the government will reimburse for
11  warming modalities in order to keep the patient
12  normothermic; correct?
13      A.  Not quite.
14      Q.  Okay. How would you describe it?
15      A.  SCIP-10 -- well, called pay for
16  performance -- was initially only pay for reporting,
17  so you -- if you reported what you did and the
18  outcomes, you would get -- you would continue to be
19  paid the normal amount. So this was independent of
20  the outcome; all you had to do was report. Then
21  eventually it turned into -- was called pay for
22  performance. Actually, it was a two-percent, I think,
23  decrease in payment if you didn't follow the measure.
24      Q.  Okay. Thank you. It said -- and so what is
25  your --

Page 130

1          What was your concern about SCIP-10 unlikely
2  to survive into the next version? What did you mean
3  by that?
4      A.  I -- I've been concerned for a long time
5  that the old studies that demonstrated benefits of
6  normothermia don't meet current standards, and -- and
7  that's true. It's the best evidence we have. We
8  can't ignore available evidence that shows, for
9  example, that forced-air warming prevents infections,
10  but the quality of the evidence is not what we would
11  use today. The -- the quality of the studies or --
12  or -- is not what we would hope for today. If we were
13  doing those studies now, we would do them differently.
14  I --
15          This is not a -- really a criticism of the
16  studies. They're mostly my studies. They were done
17  to the standards of their time, but the times have
18  changed.
19      Q.  Okay. Are you involved at all in sort of
20  the next-generation SCIP-10 protocols?
21      A.  No. I was -- I was involved in the initial
22  measure, and there have been several since then and I
23  have not been involved in any of them.
24      Q.  Okay. Then on the first page of this
25  document, Exhibit 222, Michelle Hulse Stevens weighs

Page 131

1  in; is that right?
2      A.  Apparently.
3      Q.  To a group at 3M. It says, "All,
4          "I think it is true that the RCT data are
5  old and will not hold under scrutiny soon. Having
6  said that the CDC SSS guideline draft statements on
7  warming will continue to rec active warming but cite
8  the need for more research on whether there are
9  differences in modality." Do you see that?
10      A.  I do.
11      Q.  Okay. And RCT is a reference to randomized
12  clinical trial?
13      A.  Randomized controlled trial, actually.
14      Q.  Does SCIP-10 still exist?
15      A.  And that's a good question.
16      Q.  It's not a trick question. I don't know the
17  answer, which is why I'm asking you.
18      A.  I believe SCIP-10 was require -- was retired
19  because there was no longer a performance gap.
20      Q.  Okay.
21      A.  But I -- I'm not completely sure on what the
22  current standard is. Well the SCIP -- actually, the
23  SCIP measures broadly have been retired, so there's a
24  whole different quality process now.
25          (Exhibit 231 was marked for

Page 132

1          identification.)
2  BY MS. CONLIN:
3      Q.  I've handed you, Dr. Sessler, what's been
4  marked as Exhibit 231, which appears to be some e-mail
5  exchanges between you and various individuals at 3M.
6  You can go ahead and take a look.
7      A.  Okay.
8      Q.  So the --
9          This chain of e-mails starts with an e-mail
10  from a Mark Morken. Do you know who Mr. Morken is?
11      A.  I do.
12      Q.  Okay. Who is he?
13      A.  A 3M employee.
14      Q.  Okay. Have you worked with him in the past?
15      A.  Yes.
16      Q.  Okay. On what kinds of projects?
17      A.  He's one of the key contacts for Protect.
18      Q.  Okay. And it starts out -- this was written
19  on March 4th of 2016 -- "Hello Dan,
20          "Our group met yesterday to discuss the
21  proposed retrospective review of SSI in Colorectal
22  surgery protocol and we have the following questions
23  or clarifications:"
24          Number three he writes, "The infection rate
25  in the 1996 study went from 19 percent to 6.6 percent

33 (Pages 129 to 132)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 133

1  and in the background for this protocol the infection
2  rate is 13 percent - why is there such a difference
3  from what was achieved in 1996 and the current --
4  current status?" Do you see that?
5      A. Yes.
6      Q. And then you wrote him back, right, --
7      A. I did.
8      Q. -- with respect to that?
9          And you -- you numbered your e-mail to
10 respond to the questions he had in the e-mail to you;
11 correct?
12     A. Looks like it.
13     Q. Okay. And in response to number three you
14 say, "Presumably, the infection rates differ because
15 the institutions and definitions differ. Importantly,
16 about half the Clinic cases are inflammatory bowel
17 disease, a group with a high infection rate, where
18 most patients in the 1996 trial had colon cancer. The
19 treatment reported in 1996 is implausibly high (that
20 is, the infection rate probably wasn't actually as low
21 as in our 100 warmed patients). Knowing what we do
22 now about fragile clinical trials, we would never have
23 published such a small study."
24         Do you see that?
25     A. I do.

Page 134

1      Q. Is that a reference to the -- what's known
2  as the 1996 Kurz study?
3      A. Yes, it is.
4      Q. Okay. And what did you mean by knowing what
5  you know now, you wouldn't have published such a small
6  study?
7      A. In 1996, 200 patients was considered a large
8  trial. Now it would be considered a tiny study.
9      Q. Okay. And can you clarify for me this
10 sentence about "The treatment reported in 1996 is
11 implausibly high...?" Do you have evidence on that
12 infection rate? I was just curious.
13     A. I'm sorry. Well --
14         You asked two questions there I think.
15     Q. Yeah. Well first you say, "The treatment
16 reported in 1996 is implausibly high..." What are you
17 referencing there?
18     A. I am not referencing anything. I'm making a
19 statement of -- a judgment statement.
20     Q. Okay. So then you go on to say "...(that
21 is, the infection rate probably wasn't actually as low
22 as in our 100 warmed patients)," and I was just
23 curious how you arrived at that.
24     A. Well what -- what I'm saying is that
25 infections, like almost all outcomes, are

Page 135

1  multifactorial, and therefore any one treatment tends
2  to have a relatively small effect. Short of something
3  like antibiotics or vaccines, we're usually dealing
4  with 30-percent effects, not factor-of-three effects.
5          So the factor of three is what we got; it --
6  it is an accurate statement of the true results. The
7  question is: If we repeated that study 50 times,
8  would you get the same thing each time? Well no, of
9  course not, we would get something different.
10 Probably that something different would be a lot less
11 than a factor of three.
12     Q. Thank you.
13         I've handed you, Dr. Sessler, what's been
14 previously marked as Deposition Exhibit 39, which
15 appears to be an exchange between you and a Martin
16 Grady at Ameritech. Do you know who that is?
17     A. Yes.
18     Q. Who is Martin Grady?
19     A. Martin Grady is anesthesia staff at the
20 Cleveland Clinic. That's just his private e-mail
21 address.
22     Q. Okay. And you start out on the last page
23 and --
24     A. Oh, sorry.
25     Q. -- say you hope you're enjoying your

Page 136

1  vacation. You met with a company this morning that is
2  developing a new temperature monitor. What's that a
3  refer -- a reference to?
4      A. Spot On.
5      Q. Okay. And then you ask him a number of
6  questions; correct?
7      A. Apparently.
8      Q. Number one is: "Do you routinely use BIS
9  monitoring?" What is that?
10     A. BIS is bispectral index. It's a measure of
11 hypnotic depth.
12     Q. And then number two, "Is intraoperative
13 forced-air used and, if so, what kind of cover?" See
14 that?
15     A. Yes.
16     Q. Okay. And then Martin Grady or Dr. Grady
17 wrote you back, then, on April 16th, correct, --
18     A. Apparently.
19     Q. -- of 2009, and he wrote, "No forced air
20 warming device is currently used. I think it would be
21 a tough sell with the surgeons (surgical field
22 concerns)." Do you see that?
23     A. Yes.
24     Q. And then you wrote him back and copied Al
25 Van Duren, Gary Hansen and Gary Maharaj, then at

34  (Pages 133 to 136)

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Page 137

1    Arizant; correct?
2      A.  Apparently.
3      Q.  And Al Van Duren forwards that on to Mark
4    Scott and John Rock on that -- few days later;
5    correct?
6      A.  Apparently.
7      Q.  And says, "Note Dr. Grady's reason that Bair
8    Hugger is not used at Hillcrest (Cleveland Clinic)."
9        So in fact you were aware that one of the
10   reasons that physicians at Cleveland Clinic wasn't
11   using the Bair Hugger was because of surgical field
12   concerns, correct, --
13       MR. GORDON:  Object to the form of the
14   question --
15     Q.  -- as reflected in this document?
16       MR. GORDON:  Object to the form of the
17   question, lack -- also lacks foundation.
18     A.  Actually, first, this is cardiac only.
19   There's no indication for using forced-air warming
20   during cardiac surgery because the bypass pump
21   transfers a hundred times as much heat as forced air.
22   .  I didn't want them to use forced air because
23   forced air might warm the air around the forehead and
24   interfere with the Spot On validations we were doing.
25       The surgical-field concerns does not refer

Page 138

1    to infection; this is just simply who gets what
2    surface area, and the surgeons doing cardiac surgery
3    want to go right up to the neck because they split the
4    sternum starting about here (indicating).
5      Q.  Well he doesn't say that.  He says, "I think
6    it would be a tough sell with the surgeons" because of
7    surgical field concerns; correct?
8        MR. GORDON:  Object to the form of the
9    question.
10     Q.  Did you have a conversation with him
11   following this e-mail about what he meant when he
12   said, "No forced air warming is currently used.  I
13   think it would be a tough sell with surgeons (surgical
14   field concerns)?"
15     A.  No, I didn't.  I -- I didn't want forced air
16   to be used.  Martin's opinion about forced-air warming
17   is just irrelevant to me; he's not an expert in the
18   subject.  That the surgeons want to have access to a
19   certain amount of surface area is perfectly
20   reasonable, it's a surgical decision.  Ultimately,
21   anesthesia is there to help surgeons get on with their
22   job.  This -- this has nothing to do with infection or
23   danger or anything else.
24     Q.  Well you don't know that because you just
25   said that you never had any conversation with him

Page 139

1    about this following his e-mail to you on April 16th;
2    correct?
3        MR. GORDON:  Object to the form of the
4    question.
5      A.  You can read anything you want into it, but
6    that's not what this is about.
7      Q.  I guess my question is a little different.
8    You didn't talk with him about this statement at any
9    point in time; correct?
10     A.  No.  Why would I?  He says they don't use
11   forced air and I didn't want them to use forced air.
12     Q.  Okay.  Now have you done, as part of your
13   Outcomes --
14       What's the name of, I'm sorry, your --
15     A.  Outcomes Research Consortium.
16     Q.  Outcomes -- Outcomes Research Consortium.
17   Have you made presentations regarding
18   PerfecTemp?
19     A.  Well I imagine a study was presented at some
20   point.
21     Q.  Okay.  Do you know whether in a PowerPoint
22   you mentioned that one of the advantages to the
23   PerfecTemp is that it doesn't blow air around?
24     A.  I certainly never presented that.
25     Q.  Okay.  If your department did, would you

Page 140

1    take issue with it?
2      A.  Yes.
3      Q.  Okay.
4      A.  But -- but it wouldn't surprise me that it
5    happened.  I don't control everything that happens
6    in -- in my department or the consortium.
7      Q.  Okay.  But you are chair.
8      A.  I'm a chair, but I don't control everything
9    that happens.  I'm not that kind of chair.
10     Q.  If somebody in your group wrote that one of
11   the advantages of the PerfecTemp -- PerfecTemp is
12   because it doesn't blow air around, there's no chance
13   of potential increase of contamination, would you take
14   issue with that?
15     A.  I would indeed.
16     Q.  Well you'd agree with me that the PerfecTemp
17   doesn't blow air around; right?
18     A.  It does not.
19     Q.  Who -- who in the department would give a
20   presentation on the protocol for the PerfecTemp study?
21     A.  Could be anybody, but most likely it was one
22   of the students involved in the study.
23     Q.  Do you have anybody that you can think of
24   off the top of your head?  Do you know which students
25   were involved in the --

35  (Pages 137 to 140)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 141

1      A.  In PerfecTemp?
2      Q.  Yeah.
3      A.  Absolutely not.
4      Q.  Okay.  Well you published on it, though;
5   right?  You published on -- a study on it.  Did you
6   work with anyone in your department on that study?
7      A.  Well certainly the co-authors of the study
8   were involved.
9      Q.  Okay.  But --
10     A.  There may have been other people also.
11     Q.  But did you have somebody that -- within
12  your group that was assisting you with that?
13     A.  I'm not sure I understand the question.  Our
14  studies are collaborative efforts and lots of people
15  contribute in different ways to a study, so yes,
16  everybody assisted with it.
17     Q.  My question might have been poor.
18        So there were more than one person within
19  your group that worked on that PerfecTemp study?
20     A.  Well it was at least all the co-authors.
21     Q.  Okay.  And those are --
22        So were those colleagues, the co-authors?
23     A.  I -- I believe so.  But we can pull up
24  the --
25     Q.  Yeah.  Would you pull it up?  I'm sorry to

Page 142

1   ask that.
2      A.  I'll tell you exactly who they are.
3      Q.  Thank you.
4      A.  Okay.  So if I can do this without making
5   too much of a mess here --
6        Okay.  The co-authors were Cameron Egan,
7   Ethan Bernstein, Desigen Reddy, Madi Ali, James Paul,
8   Dongsheng Yang, and me.
9      Q.  Okay.  And so those are all within your
10  department.
11     A.  No.
12     Q.  Okay.  Which ones are in your department?
13     A.  Well it's -- it's coded there.  You can
14  simply look at the superscripts and then look down on
15  the bottom left and it tells you exactly --
16     Q.  So Cameron -- Cameron --
17     A.  Cam -- Cameron and Ethan and Dongsheng are
18  from my department, and the other three are from the
19  Department of Anesthesia at Hamilton General Hospital.
20     Q.  Now you also did, back in 2007, you did --
21  did an underbody blanket study for Arizant; is that
22  right?
23     A.  I don't know what you're referring to.  I'm
24  sorry.
25     Q.  Sure.

Page 143

1        (Exhibit 232 was marked for
2        identification.)
3   BY MS. CONLIN:
4      Q.  I've handed you what's been marked, Dr.
5   Sessler, a two-page document bearing Bates page 585482
6   through 83, which is a series of e-mails, it looks
7   like, between various individuals at Arizant.
8      A.  Okay.
9      Q.  Have you had a chance to review it?
10     A.  I have.
11     Q.  Does this refresh your recollection that you
12  in 2006 were working with Arizant on an underbody --
13  underbody blanket study?
14     A.  Yes.
15     Q.  Okay.  And that the conclusion was that
16  there was no significant treatment effect associated
17  with the use of underbody blankets?
18     A.  Correct.
19     Q.  Okay.  And did they talk with you about not
20  publishing the results as initially reported to them?
21     A.  Not that I remember.
22     Q.  I've handed you, Dr. Sessler, what's been
23  marked as Deposition Exhibit 85, which is an e-mail
24  from you to Al Van Duren and others at Arizant dated
25  January 24th, 2007.  Bottom e-mail reads, "Good

Page 144

1   morning, Dan,
2        "Thanks for your cooperation.  Just be
3   clear, I understand that you will not submit this
4   paper for publication until we have had time to study
5   it further."  Do you see that?
6      A.  I do.
7      Q.  Then you write them back and you say,
8   "Understood!  We regard this as a collaborative effort
9   to put the best face on a disappointing clinical
10  result.  Rather than a 'response,' you can make
11  suggestions and necessary changes right in the text of
12  the manuscript."  Do you see that?
13     A.  Yeah.
14     Q.  And that in fact was an attempt, in
15  connection with the underbody study, to put the best
16  face on a disappointing clinical result; is that
17  right?
18     A.  We were trying to understand what the result
19  means.  The -- the difficulty with that result is that
20  it was inconsistent with probably dozens of previous
21  studies.  There -- there's no chance whatsoever that
22  forced air suddenly stopped working in a general
23  sense, we know forced air warms, so there was
24  something special about that study that led to failure
25  then, and what I'm trying to do is understand what

36  (Pages 141 to 144)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 145

1   that special thing is so that we know so we can
2   interpret it. Clear -- clearly, the results of the
3   study are that under those circumstances you shouldn't
4   use forced air, it doesn't help, but it's -- that
5   doesn't mean it doesn't work in other circumstances.
6   It clearly does.
7       Q.   Right. And you reported to the individuals
8   at Arizant that you viewed it as a collaborative
9   effort to put the best face on a disappointing
10  clinical result; correct?
11      A.   Yup.
12          (Exhibit 233 was marked for
13          identification.)
14  BY MS. CONLIN:
15      Q.   And in fact, you edited that paper in order
16  to put the best face on a disappointing clinical
17  result; correct, Dr. Sessler?
18      A.   I don't know. I don't remember what I did.
19      Q.   Okay. I've handed you what has been marked
20  as Deposition Exhibit 233, a one-page document bearing
21  Bates 518536, which is an e-mail from Gary Hansen to
22  Al Van Duren and others at Arizant dated May 8th,
23  2007. Subject line is "Sessler Updated Paper." Do
24  you see that?
25      A.   Yup.

Page 146

1       Q.   And then Gary writes to Al, "Teri is OK with
2   the latest version. I haven't heard back from anyone
3   else, but basically Sessler did what we asked of him.
4   It's now a much more favorable paper." Do you see
5   that?
6       A.   I do.
7       Q.   This suggests to me that you would -- you
8   were working with 3M, at least in connection with this
9   underbody blanket, to put the best face on a
10  disappointing outcome, and you took direction from 3M
11  as to how to do that. Is that a fair reading of these
12  e-mails?
13          MR. GORDON: Object to the form of the
14  question.
15      A.   No. Took suggestions.
16      Q.   Well --
17      A.   Virtually every contract we have with a
18  company to do a study includes that they get to review
19  the manuscript and make suggestions. They can't
20  prevent publication; we -- we publish everything. And
21  they don't control what's in the -- in the paper, but
22  they are welcome to make suggestions. Many of these
23  people are content experts in their own right. And I
24  take suggestions seriously; I don't necessarily accept
25  them.

Page 147

1       Q.   Well in this case they asked you not to
2   publish it and you agreed; correct?
3       A.   No, that's not what they asked.
4       Q.   Well the original -- the original version of
5   it --
6       A.   No. No, they didn't.
7       Q.   -- they asked you not to publish.
8       A.   No, they didn't. Read it.
9       Q.   "Just be clear, I understand that you will
10  not submit this paper for publication until we've had
11  time to study it further."
12      A.   "...until we've had time to study it
13  further."
14      Q.   Okay.
15      A.   And that's written into the contract. I
16  don't even have a choice about that.
17      Q.   Okay. But then they --
18          You agreed to that, and then they came back
19  and --
20      A.   I have to agree to it, it's a con --
21  contractual obligation.
22      Q.   And then they came back to you and basically
23  they repart -- report that Sessler did what we asked
24  of him and it's now a much more favorable paper;
25  right?

Page 148

1       A.   That's what it says.
2       Q.   Okay. And then it says, "Unless anyone else
3   has an opinion, I would tell him to go ahead." Does
4   that mean and publish it?
5          MS. DIFRANCO: You're asking him what Gary
6   meant -- what Gary meant when he said that?
7          MS. CONLIN: Yeah, it's a -- actually,
8   that's a fair objection.
9       Q.   Do you know that after -- whether after,
10  following this series of e-mails, that you did go
11  ahead and publish the underbody study?
12      A.   It was published.
13      Q.   Okay. Do you have a contract with 3M
14  regarding your work?
15      A.   There's a contract for each study.
16      Q.   Okay. I don't know if we've seen those or
17  not, but do they outline what you can publish and when
18  you can publish in connection with a study?
19      A.   The clinic will never sign a contract
20  forbidding publication, but almost all of them include
21  the right to review and have a reasonable amount of
22  time to make suggestions. That -- that's just normal.
23      Q.   Okay. And it would make sense that you
24  would have, at the end of the day, the ultimate right
25  whether to choose to publish something or not.

37  (Pages 145 to 148)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 149

1    A. I absolutely have the ultimate right.
2  And -- and we publishing everything whether it's
3  favorable or not. It was never on the table to not
4  publish this, the only question was how to interpret
5  it most accurately.
6    Q. Or most favorably; correct?
7    A. Most -- most accurately.
8    Q. Well it was to put the best face on a
9  disappointing clinical result; correct?
10    A. Make sense of it.
11    Q. Okay. And in connection with that 2011
12  Sessler/Olmstead/Kuelpmann study, did you have a
13  contract on that?
14    A. No, we didn't, because it was not --
15    They didn't pay me for that.
16    Q. It was because you did a favor, as we saw in
17  the e-mails; correct?
18    A. Yes.
19    MS. CONLIN: Okay. I don't think I have any
20  further questions.
21    MR. GORDON: Take a break. I'm not sure if
22  I do have any questions, but I'll review a couple
23  things.
24    THE REPORTER: Off the record, please.
25    (Discussion off the record.)

Page 150

1    MS. CONLIN: I didn't bring copies of the
2  depositions for everyone because I'm not going into
3  them, I just want to mark them as exhibits. I have
4  two copies. If you can mark that.
5    MR. GOSS: These were the prior depositions?
6    MS. CONLIN: Yeah. I just want to mark them
7  as exhibits. You can mark that. Mark this.
8    (Discussion off the stenographic record.)
9    (Exhibits 234 through 236 were marked for
10    identification.)
11  BY MS. CONLIN:
12    Q. I've handed you, Dr. Sessler, copies of the
13  deposition transcripts of your prior testimony in the
14  Texas litigation that I mentioned earlier today, and
15  my only question for you is: You gave what you
16  believe to be truthful and accurate answers at the
17  time you were deposed as reflected in Exhibits 234,
18  235 and 236?
19    A. I have not read these.
20    Q. Yeah. But I mean as you sit there today, I
21  mean you would stand --
22    A. I believe what I said previously was
23  accurate, best of my abilities at the time, but I have
24  not reviewed the transcripts. I -- I cannot attest to
25  their accuracy.

Page 151

1    Q. Okay. But as you sit here today, you don't
2  know of anything that you said in those transcripts
3  that are not accurate today.
4    A. That's correct.
5    MS. CONLIN: Thank you. I have no further
6  questions.
7    THE REPORTER: Off the record, please.
8    (Recess taken.)
9    (Mr. Gordon indicated off the record that he
10    had no questions, and Ms. DiFranco waived
11    signature.)
12    (Deposition concluded.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 152

1    C E R T I F I C A T E
2    I, Richard G. Stirewalt, hereby certify that
3  I am qualified as a verbatim shorthand reporter, that
4  I took in stenographic shorthand the deposition of DR.
5  DANIEL SESSLER at the time and place aforesaid, and
6  that the foregoing transcript is a true and correct,
7  full and complete transcription of said shorthand
8  notes, to the best of my ability.
9    Dated at Deerwood, Minnesota, this 15th day
10  of January, 2017.
11
12
13
14
15
16
17    RICHARD G. STIREWALT
18    Registered Professional Reporter
19    Notary Public
20
21
22
23
24
25

38 (Pages 149 to 152)