EXHIBIT 46

1                    ANDREW JOHN LEGG

2        UNITED STATES DISTRICT COURT
         DISTRICT OF MINNESOTA
3

4        - - - - - - - - - - - - - - - - - - - - - - - -

5    In re Bair Hugger Forced
     Air Warming Products
6    Liability Litigation,

7                     MDL No. 15-2666 (JNE/FLN)

8        - - - - - - - - - - - - - - - - - - - - - - - -

9        - - - - - - - - - - - - - - - - - - - - - - - -

10

11              VIDEOTAPED DEPOSITION OF

12                 ANDREW JOHN LEGG

13       - - - - - - - - - - - - - - - - - - - - - - - -

14

15

16

17            Taken Thursday, December 1st,2016

18

19

20

21

22

23

24   Reported By: Victoria Davies

25   Job No: 115949

## Page 2

ANDREW JOHN LEGG

APPEARANCES:
THE EXAMINER
Mr. Allen Dyer

SERJEANTS' INN CHAMBERS
85 Fleet Street
London EC4Y 1AE, UK
By: Jonathan Holl-Allen
     For the witness
- and -

MDU SERVICES LIMITED
One Canada Square
London E14 5GS, UK
By: Katie Costello
     For the witness

BLACKWELL BURKE
431 South Seventh Street
Minneapolis, MN 55415
By: Corey Gordon Esq.
     For 3M Company and Arizant Healthcare, Inc.

KENNEDY HODGES
4409 Montrose Boulevard
Houston, TX 77006
By: Gabriel Assaad Esq.
     For Plaintiffs
- and -
MESHBESHER & SPENCE
1616 Park Avenue
Minneapolis, MN 55404
By: Genevieve Zimmerman Esq.
     For Plaintiffs

Also present: Mr. Simon Addinsell, videographer

## Page 3

ANDREW JOHN LEGG

I N D E X

LEGAL ARGUMENT   re SENIOR MASTER          6
     FONTAINE'S ORDER

ANDREW JOHN LEGG  Affirmed          22

EXAMINED by     MR. GORDON          22
EXAMINED by     MS. ZIMMERMAN       89
EXAMINED by     MR. GORDON          111

CERTIFICATE of DEPONENT          118

CERTIFICATE of COURT REPORTER     119

ERRATA SHEET                     120

EXHIBIT 1     File of documents.        27
EXHIBIT 2     Curriculum Vitae of Mr.   113
     Andrew Legg.

## Page 4

ANDREW JOHN LEGG
          Thursday, December, 1st, 2016
THE VIDEOTAPED DEPOSITION OF ANDREW JOHN LEGG
is taken on this 1st day of December 2016,
at The Hilton Sheffield, Victoria Quay, Sheffield.
S4 7YA. England, commencing at 11.02 a.m.
          THE VIDEOGRAPHER:  This is the beginning
of DVD 1 in volume 1 of the deposition of Andrew
Legg in the matter of -- two matters here.  This
order to obtain evidence in the United States
District Court District of Minnesota.  So in the
High Court of Justice Queen's Bench Division before
Senior Master Fontaine, Master in Chambers, in part
of the evidence of the Proceedings in Other
Jurisdictions Act 1975; and in the matter of the
Hague Convention of the 18th March 1970 on the
taking of evidence abroad in civil and commercial
matters and in the matter of a civil proceeding now
pending before the United States District Court for
the District of Minnesota entitled as follows:  In
Re Bair Hugger Forced Air Warming Products Liability
Litigation, Plaintiffs, verses 3M Company and
Arizant Healthcare Incorporated.  The claim number
in the High Court of Justice is CR2016-420.  And in
the District of Minnesota, it is MDL number 15-2666

## Page 5

ANDREW JOHN LEGG
(JNE/FLN).
          Today's date is 1st December 2016 and
the time is 11.02 a.m.  I have just seen that the
recording equipment says "1st November", so I will
have to adjust that in a second.
          The deposition is taking place at the
Hilton Sheffield.  The Court Reporter is Victoria
Davies; videographer Simon Addinsell, both with TSG
Reporting.
          Could counsel in the room please
introduce themselves and state who they are
representing today, please. Starting with you, sir.
          MR. GORDON:  I am Corey Gordon.  I
represent the Defendants 3M and Arizant Healthcare
Inc.
          MS. ZIMMERMAN:  Genevieve Zimmerman.
Represent the Plaintiffs in the American
proceedings, the MDL.
          MR. ASSAAD:  Gabriel Assaad.  I also
represent the Plaintiffs.
          MS. COSTELLO:  Katie Costello.  I am
solicitor for Dr. Legg.
          MR. HOLL-ALLEN:  Jonathan Holl-Allen.  I
am an English barrister representing Mr. Legg.

Page 6

1       ANDREW JOHN LEGG
2       THE VIDEOGRAPHER: Our Court-appointed
3  examiner is Mr. Dyer.
4       THE EXAMINER: My name is Allen Dyer and
5  I am appointed by the order to conduct this
6  examination.
7       Now, Mr. Gordon, before we swear the
8  witness and begin some issues have been raised as to
9  the wording of the order in Section (I) and Section
10 (J). In Section (I)(d) the order purports to permit
11 you to conduct a direct examination, or what we
12 would call an "in-chief examination", and
13 cross-examine and re-examine. I understand that you
14 accept that the words "and cross-examine" appear as
15 an error?
16      MR. GORDON: That is correct; I accept
17 that.
18      THE EXAMINER: I think Mr. Holl-Allen
19 accepts that is a correct interpretation?
20      MR. HOLL-ALLEN: Yes, sir.
21      THE EXAMINER: In paragraph --
22 subparagraph (e) the order purports to restrict the
23 Plaintiff's US Counsel to conducting an
24 examination-in-chief of the witness. In
25 subparagraph (f) each party is restricted to

Page 7

1       ANDREW JOHN LEGG
2  questions which could, in my opinion, properly be
3  asked of a party's own witness at trial. Whereas
4  subparagraph (h) provides:
5       "For the purpose of questioning in the
6  Examination shall be for the purpose only of
7  eliciting and recording testimony appropriate to be
8  given at the trial in the [US] District Court of the
9  District of Minnesota".
10      And paragraph (j) provides for the
11 examination to be "conducted as permitted by the US
12 Federal Rules of Evidence".
13      Now, perhaps you could set out in the
14 first place what your understanding of those
15 subparagraphs of the order is?
16      MR. GORDON: Thank you.
17      My understanding was that because we had
18 originally sought the letters rogatory from our US
19 District Court, without objection from the
20 Plaintiffs, we represented to the High Court that
21 both sides, both parties, wanted the testimony of
22 the witnesses subject to the application. During
23 the High Court proceeding, when the Court indicated
24 that our examination would be limited to a direct
25 examination, we queried the Court as to whether that

Page 8

1       ANDREW JOHN LEGG
2  would apply to the Plaintiffs as well and the Court
3  indicated that it was her intent that the limitation
4  applied both parties and directed that that
5  provision be incorporated into the draft order.
6       It is our position today that we do not
7  object to the Plaintiffs conducting what would be
8  characterized as a "cross-examination" once we have
9  completed our direct examination, notwithstanding
10 the provisions of the High Court order. We would
11 stipulate to them the Plaintiffs being permitted to
12 conduct a cross-examination.
13      THE EXAMINER: I think it might be
14 helpful if Mr. Holl-Allen set out his position next.
15 You will have a full opportunity to respond.
16      Yes. Mr. Holl-Allen, you were actually
17 at this hearing.
18      MR. HOLL-ALLEN: I was, sir. I confirm
19 that at a hearing in front of Senior Master Fontaine
20 on the 8th November of this year I represented not
21 only Mr. Legg but also three other practitioners who
22 are to come in terms of further depositions.
23      As, I think, has been accepted, or at
24 least follows from what Mr. Gordon has said, the
25 restriction on the type of questions that can be

Page 9

1       ANDREW JOHN LEGG
2  asked on the face of the order is not an error; it
3  was intended by this order that the questions to be
4  permitted to be asked by each side would be limited
5  to those questions that could properly be asked by
6  way of examination-in-chief, and cross-examination
7  is not permitted on the face of the order.
8       The only exception to that is as you,
9  sir, yourself have identified, (d), which does make
10 reference to cross-examination in the provision
11 relating to questioning by Mr. Gordon on behalf of
12 the Defendants. But as he has fairly conceded that
13 is an error and is an inconsistency with the form of
14 the order that was made in respect of the other
15 practitioners.
16      So, sir ---
17      THE EXAMINER: It would be an
18 inconsistency even if these words didn't appear in
19 (e) and (f). It would be ridiculous in any order to
20 allow a party examine-in-chief, cross-examine and
21 re-examine.
22      MR. HOLL-ALLEN: Yes. So, sir, my
23 recollection in this sense accords with that of
24 Mr. Gordon, that the "prohibition", if you like, on
25 cross-examination, or the restriction in the order,

ANDREW JOHN LEGG

1
2   which does not permit any party to cross-examine,
3   was a matter which went by agreement on the
4   8th November; there was no dispute about it --
5   although, of course, I accept that the Plaintiffs
6   were not represented at the time of that hearing.
7           My instructions, on behalf of Mr. Legg,
8   and my position, is this:  That Mr. Legg has no
9   objection in the circumstances to Mr. Gordon
10  proceeding today to ask questions of him which, of
11  course, will be by way of questioning in-chief, but
12  I do not have instructions to consent to
13  cross-examination of Mr. Legg on behalf of the -- on
14  behalf of the Plaintiffs.
15          THE EXAMINER:  Plaintiffs.
16          MR. HOLL-ALLEN:  Sir, I don't want to
17  anticipate any approach that you may see fit to take
18  today, but certainly my provisional position is
19  this:  That any variation of this order to permit
20  cross-examination is a matter for the jurisdiction
21  of the Master that made it.
22          THE EXAMINER:  I cannot bury this order,
23  that is absolutely clear.  I am duty-bound to comply
24  with it and if I can find a way through to interpret
25  it that is another matter, but I cannot bury its

ANDREW JOHN LEGG

1
2   provisions.
3           MR. HOLL-ALLEN:  That is helpful and
4   clear, sir.
5           Sir, I note what Mr. Gordon says about
6   the reason why the order is restricted in the way
7   that it is.  It is perhaps self-evident that
8   whatever were and are the Defendant's purposes in
9   restricting the order in this way, the provision,
10  which does not permit cross-examination, affords a
11  degree of protection my client --
12          THE EXAMINER:  I understand that.
13          MR. HOLL-ALLEN:  -- and I do not have
14  instructions to consent to that protection being
15  removed.
16          THE EXAMINER:  I understand.
17          MR. HOLL-ALLEN:  That is all I have to
18  say.
19          THE EXAMINER:  Thank you.  Which of you
20  wants to address me?
21          MS. ZIMMERMAN:  Thank you.  So, Genevieve
22  Zimmerman on behalf of the Plaintiffs in the
23  American Courts.  Just as a preliminary statement I
24  would like to say that the Plaintiffs have
25  co-operated throughout this process and that we have

ANDREW JOHN LEGG

1
2   provided no resistance, nor have we interfered in
3   any way with the approach that 3M and the Defendants
4   have made to the American Courts, or to the Court
5   here in the United Kingdom.  We have not interfered
6   in any way with the scheduling of these depositions.
7           However, we have consistently requested
8   that we be copied on any and all communications with
9   these third-party authors and their counsel, as well
10  as with the High Court in the United Kingdom.
11          Despite Plaintiffs' repeated requests,
12  the Defendants, who I might add are the applicant
13  here in the United Kingdom proceedings, have chosen
14  time and again to exclude the Plaintiffs from this
15  process.
16          There are two courts with meaningful
17  jurisdiction over these depositions, or certainly
18  over the American lawyers that are participating in
19  those proceedings, and that is both the High Court
20  here in the UK and the Federal District Court for
21  the District of Minnesota.  The Plaintiffs' position
22  is that the UK High Court order contains errors that
23  are inconsistent with both the rules applicable here
24  in the UK, for trial testimony, and also
25  inconsistent with the United States' Federal Rules

ANDREW JOHN LEGG

1
2   of Civil Procedure for use at trial, and also the US
3   Rules of Evidence.
4           Specifically focussing on the
5   order itself, the Counsel for both 3M and for the
6   witnesses here have noted potential errors with
7   respect to cross-examination in section I(d).  The
8   Plaintiffs are not in a position to comment on that
9   one way or the other, as to whether that is an error
10  as we were not a part of these proceedings.
11          THE EXAMINER:  No, but if this was solely
12  a US Court order, do you accept that if it will be an
13  error to allow Plaintiffs' Counsel to examine
14  direct, re-examine -- cross-examine and re-examine?
15          MS. ZIMMERMAN:  The Plaintiffs?
16          THE EXAMINER:  Or any party.
17          MS. ZIMMERMAN:  I think typically
18  speaking, yes, that would be inappropriate.
19          THE EXAMINER:  So our procedures are in
20  accordance on that.
21          MR. ASSAAD:  Could be a misplacement as
22  well -- there should be (d) cross-examination.
23          MS. ZIMMERMAN:  Additionally, to the
24  extent that the order allows the petitioning party
25  (Defendants in the American litigation) to do a

Page 14

ANDREW JOHN LEGG

1
2  direct exam does not afford the Plaintiffs the
3  ability to do a cross-exam.  We also object to 3M
4  having the ability to do a re-direct exam.
5      THE EXAMINER:  Okay.
6      MS. ZIMMERMAN:  Let's see.... Excuse me.
7  I will just say that there is a fundamental --
8      THE EXAMINER:  But your position, if I
9  may try to summarize it, is that because of (h),
10  namely that the purpose why we are here is to record
11  trial testimony, that overrides the restriction in
12  (e) on your being limited to examination-in-chief,
13  so that you should be allowed to cross-examine.  Is
14  that a fair summary of your position?
15      MS. ZIMMERMAN:  Precisely, sir, to the
16  extent that some (h) says that the purpose that we
17  are here, the sole purpose of questioning in this
18  examination shall be for:
19      "...only for eliciting and recording
20  testimony appropriate to be given at trial in the
21  United States District Court for the District of
22  Minnesota, the Plaintiffs must be afforded the
23  opportunity to cross-examine".
24      THE EXAMINER:  I understand that and the
25  general points of the Federal Rules of Evidence.

Page 15

ANDREW JOHN LEGG

1  Okay.
2
3      MS. ZIMMERMAN:  I think that is a fair
4  summary.
5      THE EXAMINER:  My decision is as follows,
6  and then we will have to see where we go from that.
7      The words, "and cross-examine",
8  in (d) of I of the order, I think, can effectively
9  be ignored.  Mr. Gordon accepts that they are in
10  error and I think everyone accepts that in any order
11  in any Court they would be wrong.
12      The difficulty comes with the words in
13  (e), apparently restricting the Plaintiffs to
14  conducting an examination-in-chief; and in (f) the
15  words:
16      ".. to ensure equality of arms each side
17  shall be restricted to questions which could, in the
18  opinion of the Examiner, properly be asked of a
19  party's own witness at a trial".
20      So far as (f) is concerned, the
21  words, "to ensure equality of arms", do not normally
22  appear in that type of provision, and the words, "of
23  a party's own witness", do not normally appear.  The
24  words are normally, "properly be asked of a witness
25  at a trial in the High Court of Justice".

Page 16

ANDREW JOHN LEGG

1
2      It seems me that the words that I
3  have identified in (e) and (f) must have been
4  included deliberately in this order.  I cannot
5  imagine that they can be accidental in anyway.  Both
6  Mr. Gordon and Mr. Holl-Allen have submitted to me
7  that, indeed, they were there intentionally in order
8  to restrict cross-examination of these witnesses who
9  are, perhaps, in a peculiar position as third
10  parties.
11      That, however, seems to me to be
12  in direct conflict with (i), (h) and (j), which
13  provide for evidence to be given in accordance with
14  US Federal Rules of Evidence, which I have no doubt
15  at a trial, provide for direct cross-examination and
16  re-examination and the fact that the purpose of
17  eliciting and recording the testimony is for the
18  trial in the United States District Court.
19      However, I am not in a position
20  as Examiner to resolve direct inconsistencies in an
21  order.  If there is an inconsistency which cannot be
22  reconciled, which in my opinion there is, that would
23  have to go back to be resolved by the Senior Master.
24      I consider myself to be bound to
25  follow the words that I have concluded are there

Page 17

ANDREW JOHN LEGG

1
2  intentionally in subparagraphs (e) and (f) and to
3  rule that from my interpretation of the order the
4  Plaintiffs our precluded from cross-examining either
5  this witness or the doctors.
6      Now, that opens up a number of questions
7  of where we go from here.  If you are precluded from
8  cross-examining the witness today, you have a number
9  of options available to you.  One is to withdraw
10  now; another is to allow Mr. Gordon to proceed with
11  his examination (his direct examination) and then to
12  either make objections and proceed, or withdraw at
13  that stage.  That is in order to see whether we can
14  have something meaningful achieved today or not.
15      The second question, of course, relates
16  to subsequent examinations, which are,
17  unfortunately, the first -- the next round is
18  scheduled for Sunday this week, which does not give
19  anyone a lot of time to go back before the Senior
20  Master and say, "What does this order mean?"
21      Was it pointed out to the Senior Master
22  that this restriction on cross-examination would
23  conflict with the general procedure when evidence
24  comes to be given at a trial?
25      MR. HOLL-ALLEN:  I am confident that that

Page 18

ANDREW JOHN LEGG

1
2  point was not specifically made because I am sure
3  that --
4          THE EXAMINER:  Okay.
5          MR. HOLL-ALLEN:  -- I would recall it if it
6  had.
7          THE EXAMINER:  I think, therefore, that
8  my -- it is not a "ruling" because I cannot rule on
9  the order, that is not within my power -- that my
10  interpretation of what the order means leaves it in
11  your hands very much to decide how you want to
12  proceed today, and whether we can proceed today with
13  anything, and at least prevent the possibility that
14  Mr. Legg has to come back, and/or any of us have to
15  come back.  Do you want to take a few moments to
16  consider --
17          MR. ASSAAD:  I just want to understand
18  your order.  Are you saying --
19          THE EXAMINER:  I'm not making an "order"
20  because I cannot make an order.
21          MS. ZIMMERMAN:  They are --
22          MR. ASSAAD:  It is interpretation.  Are
23  you saying we can't ask questions at all -- you said
24  to direct questions, to direct examination.
25          THE EXAMINER:  That's my interpretation

Page 19

ANDREW JOHN LEGG

1
2  of the order.
3          MR. ASSAAD:  Since we're on the record I
4  have a couple questions before we move on.  Is
5  Mr. Legg available at any time in the next two
6  weeks?
7          MR. HOLL-ALLEN:  I have not asked him
8  that question, and I prefer not to do it, if you
9  like, on the record, but I am, of course, happy to
10  ask him.
11          MR. ASSAAD:  Those are questions, I
12  think, when we go off the record we can discuss off
13  the record with our clients:  Is Dr. Legg available
14  at any time in the next two weeks while we're still
15  here; we're still here until the 9th or
16  10th December.
17          MR. HOLL-ALLEN:  Yes.
18          MR. ASSAAD:  The second question is:
19  Going forward I assume that your interpretation is
20  going to apply to all?
21          THE EXAMINER:  Well, I have not studied
22  the other orders, but let's assume for these
23  purposes they are in identical form; I don't think I
24  am likely to change my interpretation.
25          MR. ASSAAD:  As a foreign to the UK

Page 20

ANDREW JOHN LEGG

1
2  judicial system, what is the process of getting a
3  call with the special Master today, or tomorrow, to
4  set something up to resolve this issue?
5          THE EXAMINER:  I don't doubt that the
6  Senior Master's clerk could be approached,
7  explaining the urgency of the matter, and there is
8  no doubt that the Senior Master is thoroughly
9  conversant with conducting telephone hearings -- for
10  example, I know that in asbestosis cases where
11  evidence often has to be taken on commission, almost
12  all the hearings are by way of telephone.  The
13  Senior Master will be perfectly used to that
14  procedure, whether she has any time available
15  between now and the close of business Friday I
16  couldn't say, I don't know what her position is.
17  But in theory, there ought to be no difficulty in
18  arranging a hearing or something before Sunday.
19          MR. GORDON:  Could I suggest that we
20  maybe, while they are taking a break to confer, that
21  we contact the Senior Master's clerk and see if we
22  can possibly get a telephone hearing on --
23          THE EXAMINER:  I think it will be very
24  sensible, myself, because obviously on Sunday if
25  everyone turns up at 8.30 we would want to get going

Page 21

ANDREW JOHN LEGG

1
2  with something, as opposed to having a couple of
3  hours of trying to work out what we're going to do.
4          Probably it will be sensible for
5  you to contact Stephen Llewellyn.
6          MR. GORDON:  I have been in contact with
7  Mr. Llewellyn and the barristers --
8          THE EXAMINER:  He could presumably get
9  the ball moving on that, or counsel's clerk could
10  get the ball moving on that.
11          MR. ASSAAD:  The reason why this is
12  important is because, depending on the special
13  Master's ruling, this is -- his ruling is going to
14  stand --
15          THE EXAMINER:  Hers.
16          MR. HOLL-ALLEN:  And she's the Senior
17  Master.
18          MR. ASSAAD:  I apologize.  Senior Master:
19          MR. HOLL-ALLEN:  That is alright.
20          MR. ASSAAD:  We may, before this, contact
21  the US judge to see whether this will even be
22  admissible instead of wasting your client's time
23  going through with this process and costs.
24          THE EXAMINER:  I quite understand.  I am
25  bound not to tinker with this order, but subject to

6 (Pages 18 to 21)

Page 22

ANDREW JOHN LEGG

1    that, I am very keen to get the maximum,
2    effectively, that can be done today and on Sunday
3    and next week within the confines of everyone's
4    legal positions, which I quite understand.  Shall we
5    go off the record for a bit and then see where we
6    go.  I am sorry.
7        THE VIDEOGRAPHER:  Going off the record
8    at 24-minutes past 11 -- sorry blocks all the sound
9    out.  We're off.
10       (Recess taken)
11       (Following a telephone conference
12        with Senior Master Fontaine)
13       THE VIDEOGRAPHER:  We're back on the
14   record at five-minutes past three.  Two adjustments,
15   as I said at the beginning of the read-in, the video
16   recording was showing the 1st November; it is, of
17   course, 1st December, and I have adjusted the
18   timing immediately on that before the witness is
19   sworn.  The claim number, I think I read it out
20   incorrectly.  In the High Court of Justice Queen's
21   Bench Division, it is claim number CR2016-520.
22   Six-minutes past.
23       THE EXAMINER:  Do we have anyone on the
24   line from Florida?

Page 23

ANDREW JOHN LEGG

1        THE VIDEOGRAPHER:  Not yet.
2        THE EXAMINER:  Mr. Legg, could you repeat
3    after me.
4        ANDREW JOHN LEGG, AFFIRMED
5        THE EXAMINER:  If we could have your full
6    names and your professional address.
7        THE WITNESS:  Andrew John Legg.  My
8    professional address is Rotherham Hospital, and that
9    is in Rotherham.
10       THE EXAMINER:  Thank you.  Yes,
11   Mr. Gordon.
12       ANDREW JOHN LEGG, HAVING BEEN DULY AFFIRMED,
13           TESTIFIED AS FOLLOWS
14   EXAMINATION BY MR. GORDON:
15       Q.  Thank you.  Good afternoon.  I understand
16   that the proper way to refer to you is Mr. Legg, not
17   Dr. Legg.  Is that correct?
18       A.  That is correct, but I don't mind either
19   way.
20       Q.  For the benefit of me and Americans, for
21   whom referring to a doctor as "mister" would be a
22   sign of disrespect, could you explain, as it was
23   explained to me earlier, why it is actually in your
24   case a sign of respect to refer to you as "mister"?

Page 24

ANDREW JOHN LEGG

1        A.  It is an historical thing.  When
2    operations were performed not by doctors, but
3    actually by butchers, I suppose, and, therefore,
4    they were not qualified doctors and they were mister
5    because they were not doctors.  So, when we become
6    surgeons we revert back to being mister rather than
7    doctor.
8        Q.  Yes.
9        THE EXAMINER:  A sign of ascendancy
10   rather than descendancy.
11       THE WITNESS:  It depends who you're
12   talking to, sir, but, yes, I see it that way.
13   BY MR. GORDON:
14       Q.  I wanted to be clear that I am not being
15   disrespectful in referring to you as Mr. Legg.
16       A.  No.
17       Q.  You are a physician, though.  Correct?
18       A.  Yes.
19       Q.  What type of physician are you?
20       A.  Orthopedic surgeon.
21       Q.  How long have you been an orthopedic
22   surgeon?
23       A.  I have been qualified as a consultant
24   orthopedic surgeon since July 2016.

Page 25

ANDREW JOHN LEGG

1        Q.  Prior to being a consultant, what were
2    you?
3        A.  I was what's in the UK is a trainee, or a
4    resident in the States.
5        THE VIDEOGRAPHER:  Can I stop you for a
6    second, sir.  Can we get the person to introduce
7    themselves?
8        THE EXAMINER:  I understand that we have
9    a US attorney in Florida who is on speakerphone and
10   on the videophone.  Can you just introduce yourself
11   for the record?  No-one there.  Let's carry on.
12   BY MR. GORDON:
13       Q.  What was your -- the period that you were
14   a trainee or a resident?
15       A.  For a trainee, I was for eight years, but
16   doing orthopedics, and prior to that, two years.
17       Q.  When did you graduate from medical
18   school?
19       A.  2005.
20       Q.  Where did you obtain your orthopedic
21   training?
22       A.  That was in Sheffield predominantly, but
23   also some in Leeds, New Zealand, and Coventry.
24       Q.  All right.  Just in the interests of

7 (Pages 22 to 25)

Page 26

ANDREW JOHN LEGG

1  moving things along, I am going to mark that large
2  volume in front of you as Exhibit 1 (Legg Exhibit
3  1). All of the pages in it are sequentially
4  numbered at the bottom and I will refer to the
5  individual page numbers in Legg Exhibit 1. Go ahead
6  and mark that.
7       MS. ZIMMERMAN: For the record --
8       THE COURT REPORTER: Just a moment.
9       MS. ZIMMERMAN: For the record, the
10  Plaintiffs object to the exhibit for lack of
11  foundation.
12  BY MR. GORDON:
13      Q.  The first thing I want to direct you to
14  starts at page 411 through 413.
15      THE EXAMINER: He has the same problem I
16  have.
17      MR. GORDON: That is why I took these
18  first couple of big ones out.
19      THE WITNESS: Okay.
20  BY MR. GORDON:
21      Q.  The pages numbered 411 through 413, could
22  you tell us what that document is?
23      A.  This was a paper which was published in
24  the Journal of Bone and Joint Surgery in 2012, I

Page 27

ANDREW JOHN LEGG

1  believe, which I was the primary author on. 2011, I
2  do apologize.
3       Q.  And so, the "A J Legg" there refers to
4  you as the primary author?
5       A.  Yes.
6       Q.  Who were the other authors?
7       A.  Tom Cannon, it was a junior doctor at the
8  time; and Mr. Andrew Hamer was my consultant at the
9  time.
10      Q.  Were you -- and so you were a trainee at
11  the time you were the primary author of this?
12      A.  Correct.
13      Q.  Okay.
14      THE EXAMINER: Let me understand because
15  I thought I read something somewhere else. Is it
16  correct that it is a primary author whose name is
17  first, or is it correct that it is the junior of the
18  authors who is named first?
19      A.  Primary author is named first, and not
20  always, but the senior author is usually last but
21  that is not always the case. But the primary author
22  is first.
23      THE EXAMINER: Thank you.
24  BY MR. GORDON:

Page 28

ANDREW JOHN LEGG

1       Q.  I was actually going to ask that, my
2  question as well. Thank you for clarifying.
3       Now I would like you to just flip to 406
4  through 409?
5       A.  Okay.
6       Q.  In the same manner, could you tell us
7  what this document is?
8       A.  This was the second paper, which was
9  published in 2013 in the same journal.
10      Q.  Again, you were the primary author?
11      A.  I am.
12      Q.  And Dr. Hamer is the senior author?
13      A.  He was.
14      Q.  But Dr. Cannon was not involved in the
15  second paper. Is that correct?
16      A.  No.
17      Q.  Now, in the 2011 paper, what I am trying
18  to do is come up with a sort of a shorthand way to
19  describe that. This was -- this paper was based on
20  work you did involving a volunteer subject. Is that
21  correct?
22      A.  Correct.
23      Q.  And in the 2013 paper it is based on some
24  experimental work that you did involving -- instead

Page 29

ANDREW JOHN LEGG

1  of a human subject it was a mannequin?
2       A.  Yes. Correct.
3       Q.  The only reason I am saying that is that
4  if it is okay with you I would like to refer to the
5  human experiment versus the mannequin experiment.
6  The human will refer to the 2011 paper, and the
7  mannequin will refer to the 2013 paper.
8       Which experiments were conducted first?
9  In other words, was it the human, the one involving
10  the human, or the one involving the mannequin?
11      A.  Human.
12      Q.  And how long after the human one did you
13  conduct the mannequin study?
14      A.  I don't recall exactly, but it was only
15  months.
16      Q.  What was the general time frame in which
17  you conducted the human study?
18      A.  The human study was done in two weekends.
19      Q.  How long was the period of time that you
20  took to do the mannequin study?
21      A.  That was just one day.
22      Q.  How much time was there in between the
23  two studies?
24      A.  Again, I think just a couple of months.

8 (Pages 26 to 29)

Page 30

ANDREW JOHN LEGG

1
2    Q.  If I could flip your attention, or direct
3  your attention, to page 392.  First of all, have you
4  seen this e-mail prior to today?
5    A.  Yes.
6    Q.  When did you first see it?
7    A.  First time I saw it was when I got this
8  bundle.
9    Q.  Okay.
10    A.  So, a few weeks ago.
11    Q.  Okay.  So, you had not seen it other than
12  in connection with this process?
13    A.  No.
14    Q.  Okay.  What I want to do is direct your
15  attention to the very bottom of 392 where it says:
16      "Also, Dr Andrew Legg has invited you
17  guys to Sheffield hospital the weekend of
18  July 17th and 18th to help with the research
19  effort there.  If you are interested the company
20  would be willing to cover your hotel and expenses.
21  Let me know and I'll work to book arrangements".
22      MS. ZIMMERMAN:  Counsel, we would like to
23  renew our objection to lack of foundation.
24  BY MR. GORDON:
25    Q.  My question to you, Dr. Legg, is whether

Page 31

ANDREW JOHN LEGG

1
2  you recall ever meeting an individual named Mark
3  Albrecht?
4    A.  Yes.
5    Q.  Do you recall Mr. Albrecht coming to
6  Sheffield Hospital and conducting any research
7  activities with you there?
8    A.  Yes.
9    Q.  Does the time frame of July 2010 seem
10  about right?
11    A.  Yes.
12    Q.  What I would like to do is see if we can
13  put your human study and your mannequin study into a
14  time frame in connection with that July 2010 time
15  frame.  Had you done either of the -- either the
16  human or the mannequin study -- prior to July 2010?
17    A.  Yes, we had done the human study.
18    Q.  So, I take it then the mannequin study
19  was something you did after 2000 -- after July 2010?
20    A.  We did it in July 2010.
21    Q.  The mannequin study was the one.  So the
22  study that you, was published in 2013, that was
23  based on work you did in July 2010.  Is that
24  correct?
25    A.  Correct.

Page 32

ANDREW JOHN LEGG

1
2    Q.  Okay.  Who was participating in
3  conducting that experiment in July 2010?
4    A.  The mannequin study?
5    Q.  Yes.
6    A.  On that day, myself and Mr. Albrecht.
7    Q.  Was anyone else involved?
8    A.  Mr. Hamer was supervising, but he wasn't
9  present on the day.
10    Q.  Okay.  That was the one you did in one
11  day.  Is that right?
12    A.  Correct.
13    Q.  What role did you play and what role did
14  Mr. Albrecht play in that experiment?
15    A.  From the experiment point of view, it was
16  a follow-on from my first paper and, therefore, the
17  set-up I had already created, it was what exists in
18  the hospital.  His role was the equipment.  The
19  bubble machine, the smoke machine--
20  (Reporter clarification)
21  The bubble machine, smoke machine, temperature
22  probe, and the camera.
23    Q.  What specifically did he do with that
24  equipment?
25    A.  He was able to -- obviously, it was his

Page 33

ANDREW JOHN LEGG

1
2  equipment, he used it to make the bubbles, and took
3  the pictures of the bubbles using a light source.
4    Q.  Did he have anything to do with the
5  experimental design?
6    A.  The experimental design, the set-up, was
7  already created.  We discussed alterations in terms
8  of how we were going to perform it, but the actual
9  theatre set-up was already there.
10    Q.  Had you met Mr. Albrecht prior to
11  July 2010?
12    A.  No.
13    Q.  How did you first come into contact with
14  Mr. Albrecht?
15    A.  It was from my first study.  The first
16  study, to be able to perform that, we needed bits of
17  equipment, involving the temperature probe, and
18  particle counter, and, as the HotDog machine company
19  had highlighted a potential error -- potential
20  problem, should I say -- that is who I contacted to
21  see if we could use some equipment to perform an
22  experiment.  So, from that their representative gave
23  my details to Mark Albrecht who contacted me.
24    Q.  Do you recall the name of the
25  representative?

9 (Pages 30 to 33)

Page 34

ANDREW JOHN LEGG

1
2　A. I don't know.
3　Q. Was it a UK person?
4　A. Yes.
5　Q. Okay. Was the person an employee of
6　HotDog to your --
7　A. To my understanding, yes.
8　Q. You said that the HotDog Company had
9　highlighted -- I don't want to put words in your
10　mouth -- but what was it that the HotDog Company had
11　highlighted that caused you to be interested in
12　doing that initial experiment?
13　A. So, their marketing was in the form of a
14　flier which we had seen, I think it had been sent to
15　Mr. Hamer, and on that flier that there was a
16　picture of how a -- how forced-air warming can
17　disrupt laminar or unidirectional airflow.
18　Q. Was this a marketing brochure?
19　A. Yes.
20　Q. Okay. What -- was there any video that
21　you saw?
22　A. There was video on their website, which I
23　looked at.
24　Q. This was at the HotDog website?
25　A. Correct.

Page 35

ANDREW JOHN LEGG

1
2　Q. What was it that you asked of the HotDog
3　representative that led to your contact with
4　Mr. Albrecht?
5　A. Well, I set up the first experiment and
6　the question we couldn't answer with the equipment
7　we had from the first experiment was: What happened
8　to the airflow, how to visualise it. So, I looked
9　into different methods of visualizing/visualization
10　of airflow and, at that point, they said that a good
11　way of visualizing airflow is with bubbles and that
12　is where Mr. Albrecht came in.
13　Q. In the first study (the human volunteer
14　study) did you use any equipment that was loaned to
15　you by the HotDog Company?
16　A. Yes. They loaned us a smoke machine,
17　temperature probe, and a HotDog warming conductive
18　warming blanket and also a particle counter.
19　Q. Were these -- strike that.
20　How were these pieces of equipment
21　provided to you?
22　A. I contacted the representative. I don't
23　know whether -- I don't recall whether I did that by
24　phone or by e-mail, and they were more than happy to
25　provide me with the equipment and delivered it to me

Page 36

ANDREW JOHN LEGG

1
2　at the hospital.
3　Q. Was it just delivered by like a postal
4　service?
5　A. No, by the representative whose name I,
6　unfortunately, cannot remember.
7　Q. At that point had you had any contact
8　with Mr. Albrecht?
9　A. No.
10　Q. At what point after the equipment was
11　delivered did you have any contact with
12　Mr. Albrecht?
13　A. That was after concluding the first study
14　(the human study) when we were looking, trying to
15　explain our findings.
16　Q. In the first study you --
17　THE EXAMINER: Page?
18　MR. GORDON: I am sorry.
19　THE EXAMINER: Internal page.
20　MR. GORDON: Page 412.
21　THE EXAMINER: 412, yes.
22　BY MR. GORDON:
23　Q. You make reference to a HandiLaz Particle
24　Counter?
25　THE EXAMINER: Where is this?

Page 37

ANDREW JOHN LEGG

1
2　MR. GORDON: On the right column up,
3　three quarters of the way down the page.
4　THE EXAMINER: Yes. Thank you. Do you
5　have that?
6　A. Yes.
7　BY MR. GORDON:
8　Q. Is the HandiLaz hand-held counter
9　referred to there, is that one of the pieces of
10　equipment that was provided by HotDog?
11　A. Correct.
12　Q. Had you ever used one prior to that?
13　A. No.
14　Q. Did anyone from HotDog assist you in
15　configuring it or figuring out how to use it?
16　MS. ZIMMERMAN: Object to form.
17　(Reporter clarification)
18　THE EXAMINER: Object to form. You may
19　answer.
20　A. No.
21　BY MR. GORDON:
22　Q. Were you provided with any kind of manual
23　or instructions?
24　A. Not that I can recall, but it is simple
25　to use.

ANDREW JOHN LEGG

1
2     THE EXAMINER:  The paper says the number
3  of particles was measured.  Was that you who was
4  able to carry out that measurement?
5     A.  Correct.
6  BY MR. GORDON:
7     Q.  I am going to have you take a look at
8  page 149.  It is actually a fairly large document
9  all the way to 221?
10    THE EXAMINER:  This is one I removed in
11 the interests of portability.
12    MS. GARCIA:  I don't think we're going to
13 dwell on it.
14    Have you seen this before?
15    A.  Not until I was given this bundle.
16    Q.  Okay.  And --
17    MS. ZIMMERMAN:  Can I ask a point of
18 clarification?  As we make objections to foundation,
19 for example, should we be looking to you?
20    THE EXAMINER:  You're putting them on the
21 record for the US judge.
22    MS. ZIMMERMAN:  That is what I would
23 assume.  Well, we renew our objection for lack of
24 foundation given the witness's testimony.
25 BY MR. GORDON:

ANDREW JOHN LEGG

1
2     Q.  Do you recall how you set the
3  particle-size channels on the HandiLaz?
4     A.  No, is the answer to that.
5     Q.  When you actually used it for the first
6  study, how did you -- how did you employ it?  In
7  other words, was it something that you held in your
8  hand; did somebody else hold it; was it mounted on
9  something?
10    A.  It was mounted above -- we held it above
11 the surgical site, ie the knee, which was the focus
12 of the operation.
13    THE EXAMINER:  Were you the surgeon in
14 the operating room for the purposes of these
15 experiments?
16    A.  Correct.  And Mr. Cannon, who is the
17 other member on the -- was the patient.
18    THE EXAMINER:  Right.
19    MR. HOLL-ALLEN:  He was the human.
20    THE EXAMINER:  Not the mannequin.
21 BY MR. GORDON:
22    Q.  Was there anyone else present, besides
23 you and Dr. Cannon, for that first experiment?
24    A.  No.
25    Q.  So, you were playing both the role of the

ANDREW JOHN LEGG

1
2  surgeon standing there, and also holding the
3  particle counter?
4     A.  Sure.
5     Q.  Okay.  You also on the -- on page 411,
6  the first page of the 2011 study?
7     MR. ASSAAD:  2012.
8     MR. GORDON:  No. 2011.
9     Q.  Do you have that page 411?
10    A.  Yes.
11    Q.  On the right-hand side, the second
12 paragraph down of text describing the vertical
13 unidirectional ventilation, there is a reference to
14 the walls around the operating area reaching down to
15 30 centimetres from the floor and then a discussion
16 of body exhaust suits.  Then it states:
17    "Both of these systems are employed in
18 our theatre set-up".
19    Then on the next page, on the right-hand
20 side, you refer to an:
21    "ExFlow 90 Howorth enclosure with
22 vertical wall extensions to 1 metre from the floor".
23    A.  Correct.
24    THE EXAMINER:  Where is the second one?
25    MR. GORDON:  In the middle on the

ANDREW JOHN LEGG

1
2  right-hand side.
3     Q.  If you can just help me understand.  How
4  far did the wall extensions extend?  Was it 30
5  centimetres or --
6     A.  One meter off the ground.  I was implying
7  that we used wall extensions on the first page.
8     Q.  Was there ever time when you used wall
9  extensions that went all the way to 30 centimetres
10 on to the floor?
11    A.  No.
12    Q.  Okay.
13    On the first page of the 2011 study, it
14 is page 411 in exhibit 1, in the second line of the
15 introduction you say:
16    "Recently there have been concerns that
17 forced air warming may interfere with unidirectional
18 airflow, potentially posing an increased risk of
19 infection".
20    To what was that referring?  To what
21 concerns?
22    A.  Well, the concerns that had been raised
23 by the HotDog company.
24    Q.  Okay.  At that point were you aware of
25 concerns raised by anyone else?

11 (Pages 38 to 41)

ANDREW JOHN LEGG

1
2  A. No.
3  Q. Okay. Prior to conducting this study,
4  had you had discussions with Mr. Albrecht?
5  A. No.
6  Q. Had you had discussions with anyone
7  connected with HotDog (the HotDog Company) other
8  than the representative who facilitated you getting
9  use of the equipment?
10  A. No.
11  Q. Who designed the study?
12  A. I designing the study, along with the
13  supervision of Mr. Hamer.
14  Q. There are, looks like, 18 references in
15  the published version of the 2011 study. Who did
16  the research to collect those references?
17  A. I did.
18  Q. How did you go about doing that? Was
19  that a computer research? Was there a library --
20  A. It's a combination of library and also
21  doing the big medical journal reference libraries,
22  which you can do searches through, which is what I
23  did for this.
24  Q. Do you remember what the search terms
25  were, the search parameters that led you to these

ANDREW JOHN LEGG

1
2  references?
3  A. No, I don't.
4  Q. Again, going back to the front page of
5  the 2011 article, you say at the beginning of the
6  text paragraph, at the bottom at the last line of
7  that:
8  "There are also concerns that forced air
9  warming devices disrupt unidirectional airflow, thus
10  potentially causing risk of infection".
11  For that it looks like you cite a 2002
12  paper by Tumia and Ashcroft. Is that correct?
13  A. That is correct.
14  Q. Do you recall whether that paper
15  concluded that there was any reason to be concerned
16  about forced-air warming devices disrupting
17  unidirectional airflow?
18  A. I don't specifically know, recall the
19  exact paper, I am afraid.
20  THE EXAMINER: Was that not the paper
21  name set out at note six?
22  THE WITNESS: Correct, yes.
23  BY MR. GORDON:
24  Q. That is what you cited --
25  A. I can't recall the exact conclusion from

ANDREW JOHN LEGG

1
2  that paper.
3  THE EXAMINER: I understand that, but the
4  name of the paper is as set out at note six.
5  THE WITNESS: Absolutely, yes.
6  BY MR. GORDON:
7  Q. For the set-up, for the first experiment,
8  was there any drape suspended from the ceiling?
9  A. Define "ceiling".
10  Q. Maybe that is too broad -- too narrow a
11  question.
12  Was there any drape that was used within
13  the enclosure?
14  A. Yes.
15  MR. GORDON: Where --
16  THE EXAMINER: Do you want to explore,
17  for the purpose of a US jury, what "drape" in these
18  circumstances precisely means?
19  BY MR. GORDON:
20  Q. Yes, thank you.
21  Maybe it is easier if we look at
22  the drawing in your second study. If you turn to --
23  MS. ZIMMERMAN: 407.
24  BY MR. GORDON:
25  Q. 407. Does that depiction on the top of

ANDREW JOHN LEGG

1
2  the page, does that show generally where the drape
3  was?
4  A. Yes.
5  Q. Is the drape the vertical black line that
6  goes down to about the surgeon's elbows?
7  A. No. That is part of the wall extensions,
8  which come out from the Howorth enclosure. The
9  blue, which is blue on mine, is the drape.
10  MR. GORDON: Okay.
11  THE EXAMINER: It comes right down to the
12  patient's chest.
13  THE WITNESS: Yes, and covers the rest of
14  the patient apart from the limb being operated on.
15  BY MR. GORDON:
16  Q. How, so that the -- part of the drape
17  that goes from the patient up, how is that held
18  there? Is it suspended from the ceiling? Suspended
19  from stanchions of some sort?
20  A. Yes. It is suspended. Across the
21  enclosure there is metal railing, which it is
22  clipped to.
23  THE EXAMINER: That is the enclosure of
24  the operating section of the theatre?
25  THE WITNESS: Correct.

12 (Pages 42 to 45)

1           ANDREW JOHN LEGG
2    BY MR. GORDON:
3         Q.  And is that the standard set-up that was
4    employed at the hospital at that time frame for knee
5    arthroplasties?
6         A.  Yes.  That is correct.
7         Q.  Did you ever have any discussions with
8    anyone connected with the Howorth, the makers of the
9    unidirectional airflow enclosure, about that set-up,
10   hanging a drape from inside it?
11        A.  No.
12        THE EXAMINER:  Just before we move away
13   from that diagram, could you explain to me, to
14   clarify, where the forced-air warmer (of whatever
15   type it is) would be in relation to this?
16        THE WITNESS:  It's not -- it doesn't
17   photocopy very well, but if you look on the body of
18   the mannequin there is depicted a device, but
19   essentially it is a torso-warming device.
20        THE EXAMINER:  So it is from neck to
21   waist?
22        THE WITNESS:  Correct.
23        THE EXAMINER:  Thank you.
24   BY MR. GORDON:
25        Q.  In your first study, I believe you do it

1           ANDREW JOHN LEGG
2    on the second one as well but let's start with the
3    first study, you make reference on page, on the
4    second page, page 4 of 12, in the middle of the
5    second, of the second line, to a validation report
6    on the ventilation system conforming to the
7    requirements of Health Technical Memorandum HTM2025.
8         A.  That is correct.
9         Q.  If I could direct your attention now to
10   exhibit -- pages 1 through 121.
11        THE EXAMINER:  Right back at the
12   beginning.
13   BY MR. GORDON:
14        A.  Remind me of the numbers again.
15        Q.  1 through 121.  That document on pages 1
16   through 121 is that the Health Technical Memorandum
17   HTM2025 to which you refer in your 2011 study?
18        A.  Yes.
19        Q.  Have you consulted this document (the
20   HTM2025) in connection with this 2011 study?
21        A.  I know of its existence and what it tries
22   to achieve and I know that as part of the hospital
23   it has to meet certain levels, which this sets out,
24   and the hospital had met that.  So, I know that the
25   hospital conditions had met this criteria.

1           ANDREW JOHN LEGG
2         Q.  And what did you do to satisfy yourself
3    that that was the case?
4         A.  I contacted theatre staff who had
5    evidence that it had past the required tests?
6         THE EXAMINER:  There are specific tests
7    set out in that hospitals have to meet?
8         THE WITNESS:  Correct.
9    BY MR. GORDON:
10        Q.  And if I could now direct your attention
11   to pages 222 through 391.
12        THE EXAMINER:  Another one I thought you
13   were not going to deal with.
14        MR. ASSAAD:  What was it?
15        MS. COSTELLO:  222.
16   BY MR. GORDON:
17        Q.  It's a lengthy document, obviously.  It's
18   entitled "Heating and ventilation systems Health
19   Technical Memorandum 03-01: Specialised ventilation
20   for healthcare premises".  Have you seen this
21   document prior to getting this volume of material
22   for this deposition?
23        A.  No.
24        Q.  Direct your attention to page 223 and the
25   line where about two-thirds of the way down it says

1           ANDREW JOHN LEGG
2    "Superseded docs", and it says, "Health Technical
3    Memorandum 2025".  I will direct your attention to
4    page 225 where the copyright on is indicated as
5    2007.
6         Were you aware, when you did your 2011
7    study, that the HTM2025 had been superseded?
8         A.  No.
9         Q.  I am guessing today is the first you
10   became aware of that?
11        MS. ZIMMERMAN:  Object to form.
12        THE EXAMINER:  You may answer.
13        THE WITNESS:  Yes.
14   BY MR. GORDON:
15        Q.  Going back to the paper, right after you
16   talk about the HTM2025, you say:
17        "Temperature measurements taken before
18   and 30 minutes after warming".
19        Do you see that?
20        A.  Yes.
21        Q.  I am not sure that I understand and I
22   want to clarify.  The "before" I understand, it was
23   before anything had happened.  Right?
24        A.  Yes.
25        Q.  Was the "after warming" after the warming

Page 50

ANDREW JOHN LEGG

1
2 had been turned on or after the warming had been
3 turned off -- turned on and then turned off?
4      A.  No.  After the warming had been turned
5 off, left it for 30 minutes.  At that point we
6 assumed that it had reached a stabilization point,
7 therefore that's what we called the temperature
8 after 30 minutes of warming.  The heating device was
9 on at that point.
10      Q.  And had been on for 30 minutes?
11      A.  Correct.
12      Q.  Okay.  And that was true of both the
13 HotDog and the Bair Hugger?
14      A.  Correct?
15      Q.  Okay.  In the discussion of your 2011
16 paper on the --
17      A.  Remind me what page we were.
18      Q.  Page 413.  You state:
19      "Because of the nature of our experiment
20 we are unable to conclude that the use of a forced
21 air warming device, which produced a change in
22 temperature and an increase in the number of
23 particles, would actually lead to an increased risk
24 of surgical site infection.  The results do suggest
25 that the downward flow of air is disrupted, as the

Page 51

ANDREW JOHN LEGG

1
2 warming device was lower than at the surgical site".
3      Did I read that correctly?
4      A.  Yes.
5      Q.  Can you help me.  I'm not sure that I
6 understand the last sentence of:
7      "The results do suggest the downward flow
8 of air is disrupted, as the warming device was lower
9 than at the surgical site".
10      A.  So, probably the easiest way is to look
11 at the picture.
12      Q.  On the other side?
13      A.  Yes.
14      THE EXAMINER:  Shall we go back for it?
15      MR. HOLL-ALLEN:  407.
16      THE EXAMINER:  Yes.
17      THE WITNESS:  The warming device is on
18 a -- it was on a human at that point, but this on
19 a mannequin with them laid on their back and with
20 their knee bent and, therefore, the knee is higher,
21 the top of the knee is higher than the chest.
22 Therefore, the warming device is lower than where we
23 were measuring the temperature.
24 BY MR. GORDON:
25      Q.  By "device" you are talking about the

Page 52

ANDREW JOHN LEGG

1
2 blanket or the fan unit?
3      A.  The warming device is the blanket, that
4 is what keeps warm in terms of the Bair Hugger or the
5 HotDog conductive fabric.
6      MR. GORDON:  Okay.
7      THE EXAMINER:  The measuring device is at
8 the surgical site.
9      THE WITNESS:  Yes --
10      THE EXAMINER:  Or as close to it as you
11 can get?
12      THE WITNESS:  Yes.  That's what I was
13 concerned about at that point.
14 BY MR. GORDON:
15      Q.  Going back to page 413, your 2011 study,
16 again in the discussion, the next paragraph, you
17 say:
18      "bacteria require particles to transport
19 them, and although we are unable to confirm if any
20 of the particles were transporting bacteria, the
21 significant increase in the number of particles that
22 we found in this study at the surgical site is a
23 concern".
24      Did I read that correctly?
25      A.  Correct.

Page 53

ANDREW JOHN LEGG

1
2      Q.  Did you do anything to try to assess
3 whether there was any transportation of bacteria?
4      A.  It wasn't published here, but I spoke to
5 a microbiologist about trying to measure bacteria,
6 with, I believe it is called a slit sampler.  Their
7 advice was you won't be able to measure it because
8 bacterial load is so low.  We tried and we didn't,
9 actually, to identify if there was any increased
10 bacterial level, but the microbiologists weren't
11 surprised at that.
12      Q.  Tell me how you attempted to measure
13 bacteria?
14      A.  It was using these agar plates, which is
15 a gel which grows the bacteria once it lands on it
16 and, if I recall rightly, air's sucked into this
17 device onto these plates which are then sent to the
18 lab.
19      Q.  So, that is something you did in the
20 first experiment?
21      A.  Yes.
22      Q.  How many of the agar plate devices did
23 you use?
24      A.  I don't recall.
25      Q.  Where were they placed?

14 (Pages 50 to 53)

Page 54

ANDREW JOHN LEGG

1
2      A.  They were placed where we were concerned,
3  which was on the surgical site, which is at the
4  level of the knee.
5      Q.  So, you collected the samples on the agar
6  plates over what period of time?
7      A.  Again, I don't really, really recall.
8  That was on the advice of the microbiologist, but I
9  don't recall how long.
10      Q.  So, before the operation you -- the
11  microbiologist advised you to, how to go about using
12  these agar plate colonies?
13      A.  Yes.
14      Q.  That -- was equipment that the hospital
15  has?
16      A.  Yes, because they do check the level, I
17  don't know how often, but to make sure that the
18  theatre environment is safe.
19      Q.  So, you sent these agar plates to the
20  microbiology lab.  Is that correct?
21      A.  Correct.
22      Q.  And what kind of a report did you get
23  back -- something written, something verbal?
24      A.  Again, I don't recall it.  I'm sure I
25  would have got something written, but I don't recall

Page 55

ANDREW JOHN LEGG

1  it or have it.
2      Q.  Okay.  Do you recall were any bacteria or
3  colony-forming units cultured out on the agar
4  plates?
5      A.  Just came back, which is the recommended
6  level, which is less than one.
7      Q.  Less than one colony-forming unit?
8      A.  Yes.  One ordinary, yes.
9      Q.  And I want to make sure that we're clear.
10  That was a sample you collected during the time that
11  the Bair Hugger warming device was used and the
12  particles that you were counting were moving over to
13  the surgical site?
14      A.  Correct.
15          MS. ZIMMERMAN:  Object to form.
16  BY MR. GORDON:
17      Q.  Why did you decide not to include that
18  information in the publication?
19      A.  Because it didn't really add anything.
20  It's such a poor identification of how much bacteria
21  is present that I don't think it really gives us --
22  it's not very specific or sensitive; you have to
23  have a huge number present to give you a positive
24  value and, therefore, on the advice of the

Page 56

ANDREW JOHN LEGG

1
2  microbiologist, they said that you won't find
3  anything out, which they were correct.
4      Q.  How was it the hospital used these
5  devices?
6      A.  How?
7      Q.  What -- for what purpose did the
8  microbiologist use them?
9      A.  So, I don't know --
10          MS. ZIMMERMAN:  Object to form.
11          THE WITNESS:  -- for other things, but in
12  the operate -- in the orthopedic theatre they use
13  them to test for the level of bacterial level, which
14  has to be, by the standard, less than one
15  colony-forming unit.
16  BY MR. GORDON:
17      Q.  Is this -- under what circumstances would
18  the microbiologist use those to test in the
19  orthopedic operating room?
20      A.  To my knowledge, it happens as a standard
21  of -- a level standard, so I don't know whether they
22  do it every year, but it's periodically they check.
23      Q.  So, on a routine basis?
24      A.  Correct, yes.
25      Q.  So, I just want to make sure that the

Page 57

ANDREW JOHN LEGG

1
2  jury understands.  The hospital routinely was
3  checking the orthopedic surgical suites using the
4  same agar plate device that you used in essentially
5  the same manner?
6          MS. ZIMMERMAN:  Object to form:
7  Misstates the testimony.
8          THE EXAMINER:  You may answer.
9          THE WITNESS:  I don't know specifically
10  how they do it, but how they advised me to do it as
11  part of this experiment is what I did.
12  BY MR. GORDON:
13      Q.  And your understanding was that the
14  standard that they (that the OR) had to meet was
15  less than one colony-forming unit when the
16  microbiologist did the routine testing.  Is that
17  right?
18      A.  Yes.
19      Q.  When you did that testing, that was
20  during the period of time when all the particles
21  that you discussed in the 2011 paper were being
22  mobilized over the surgical site, your paper
23  indicates, because of the convection currents.  Is
24  that right?
25      A.  Yes.

15 (Pages 54 to 57)

ANDREW JOHN LEGG

1
2      Q.  What -- did you consider the -- strike
3  that.
4          Did you have a hypothesis that the
5  particle, the increased particles, would potentially
6  be capable of transporting bacteria?
7      A.  We know that bacteria are carried on
8  particles and, therefore, it's a possibility.
9      Q.  By using the agar plate method that was
10 the routine method of surveillance for the operating
11 room, and finding/getting results that complied with
12 the operating room standards, did that appear to
13 indicate that whatever additional particles were
14 being mobilized over the site by use of the Bair
15 Hugger were not, in fact, adding to the bacterial
16 load?
17     A.  No.
18         MS. ZIMMERMAN:  Object to form.
19 BY MR. GORDON:
20     Q.  Did you have a hypothesis as to how there
21 might be increased bacteria, but this method,
22 standard surveillance method that the hospital uses,
23 wasn't picking it up?
24     A.  Because you have to have a large number
25 of bacteria present on these plates for it to pick

ANDREW JOHN LEGG

1  up a result.
2      Q.  So --
3      A.  So, we weren't looking to see whether
4  there was one bacteria and that doubled to two.  You
5  would have to see a huge volume of bacteria to give
6  you a positive result and that's what the
7  microbiologist advised us why we wouldn't find
8  anything.
9      Q.  When you -- what do you mean by "huge"?
10 You said that going from one to two, it might not
11 pick it up, but what -- at what level would, was
12 your understanding it might have picked it up?
13     A.  I don't know, is the answer to that.
14     Q.  Whatever the "huge" level is, though,
15 were you satisfied that the agar plate testing that
16 you did indicated that there wasn't a huge increase
17 in bacteria?
18         MS. ZIMMERMAN:  Object to form.
19         THE WITNESS:  I was satisfied that it was
20 less than one colony-forming unit per cubic meter.
21 BY MR. GORDON:
22     Q.  During the mannequin study -- strike
23 it.
24         During the human study with the Bair

ANDREW JOHN LEGG

1  Hugger blanket on top of the, I guess it was Dr.
2  Cannon --
3      A.  Yes.
4      Q.  -- was that then covered at all with any
5  kind of cotton blankets or surgical draping or
6  anything else or --
7      A.  Just referring back to the picture
8  probably gives it, shows it best.  There was no
9  further blanket on top, but the drape does come into
10 contact with both warming devices.
11         THE EXAMINER:  But the drape is above the
12 warming device.
13         THE WITNESS:  Correct.
14 BY MR. GORDON:
15     Q.  At that time, when you were -- when the
16 hospital was performing actual knee procedures, was
17 that the standard way of draping just the single
18 drape over the blanket?
19     A.  Correct.
20     Q.  Was the Bair Hugger blanket adhesive
21 strip applied to Dr. Cannon?
22     A.  Yes.
23     Q.  How far way, if you recall, was the edge
24 of the Bair Hugger blanket from the opening in the

ANDREW JOHN LEGG

1  drape for the surgical access?
2      A.  Just clarify what you mean by that.
3      Q.  Well, I recognise that the picture is
4  kind of difficult to see, but if I am understanding
5  it the drape hung down, went -- made essentially a
6  90-degree angle?
7      A.  Correct.
8      Q.  Then at some point there had to be an
9  opening in it --
10     A.  Yes.
11     Q.  -- to get access to the part of the
12 body --
13     A.  Yes.
14     Q.  -- to work on.  Right?
15     A.  So, where the knee is exposed there is a
16 hole in the drape where the leg comes through and it
17 is depicted kind of where it is.  The blanket comes
18 down the torso and the hole in the drape, so the
19 limb that is exposed, is mid-to upper thigh.
20     Q.  And how far from the edge of the Bair
21 Hugger blanket where the adhesive tape was taped off
22 to Dr. Cannon to the opening --
23         THE EXAMINER:  That is from the waist to
24 upper thigh.

16 (Pages 58 to 61)

Page 62

ANDREW JOHN LEGG

1
2     THE WITNESS:  Upper thigh, yes.
3     THE EXAMINER:  Depending on how tall Dr.
4  Cannon was?
5     THE WITNESS:  I can't tell you exactly
6  how -- we didn't measure that.
7  BY MR. GORDON:
8     Q.  Okay.  There were no other -- there was
9  just the single drape on top of the Bair Hugger?
10    A.  Yes.
11    Q.  Do you use any kind of warming device in
12  your current practice?
13    A.  Yes.
14    Q.  What do you use?
15    A.  We use a Bair Hugger.
16    Q.  Is the draping method that you use now
17  essentially the same?
18    A.  No.
19    Q.  How does it differ?
20    A.  So, we don't have -- I don't use wall
21  extensions, so you just have that Howorth enclosure
22  and no wall extensions.  I cover the warming blanket
23  with additional insulation and drapes similar at the
24  top end to how it is, but there are significant
25  changes which I have made.

Page 63

ANDREW JOHN LEGG

1
2     Q.  And are those --
3     A.  That is in my current place.
4     Q.  Are these changes that you implemented
5  yourself?
6     A.  Nobody in my current institute uses the
7  wall extensions.  I don't think we even have them in
8  the hospital.  I can't comment on how other people,
9  whether they insulate the Bair Hugger, but I do
10 that.
11    Q.  And do you do that as a result of your
12 studies?
13    A.  Yes.
14    Q.  If we could turn now to page 430.  Have
15 you seen this document before, this e-mail?
16    A.  Yes.
17    Q.  Prior to when you got this pack of
18 material?
19    A.  Correct, yes.
20    Q.  It is dated September 10th, 2010.  Is
21 that about the time that you would have seen it?
22    A.  Yes.
23    Q.  Could you tell me what the e-mail is?
24    A.  So, the e-mail is -- was attached to
25 that.  There was a manuscript from Mark Albrecht,

Page 64

ANDREW JOHN LEGG

1
2  essentially that had been written by himself, or one
3  of his colleagues, and was given to us for review.
4     Q.  And I apologize, things got a little
5  jumbled.  Well, no, I guess not.  It is a divider.
6     If you look at pages 432 through 450, is
7  that the manuscript that would have been attached to
8  the e-mail?
9     A.  Yes.
10    Q.  Who drafted the manuscript pages 432
11 through 450?
12    A.  Either Mark Albrecht or Christopher
13 Nachtsheim.
14    Q.  Had you -- did you ever meet Christopher
15 Nachtsheim?
16    A.  I never met him or had any contact with
17 him.
18    Q.  What was your understanding of his role
19 in the preparation of this?
20    A.  I didn't really -- didn't really know.
21    Q.  Were you -- strike that.
22    The manuscript pages 432 through 450,
23 what relation, if any did, that have to the
24 experiments that you and Mr. Albrecht carried out in
25 July 2010 at the hospital in Sheffield?

Page 65

ANDREW JOHN LEGG

1
2     A.  It was -- that is what he wrote.
3  That was what was written up on the basis of what
4  happened that day.
5     Q.  Okay.  And if we turn to the 2013 study,
6  pages 406 to 409, is this paper the 2013 paper, that
7  you and Dr. Hamer published, is that based on the
8  same experiments that are discussed in the draft
9  article pages 432 through 450?
10    A.  Correct.
11    Q.  In the published paper, four pages,
12 406-409, is there any reference to participation by
13 Mr. Albrecht or Dr. Christopher Nachtsheim?
14    A.  No.
15    Q.  Why was that?
16    A.  Based on the manuscript, which we
17 received to this draft manuscript, after discussing
18 with Mr. Hamer it felt that it was more appropriate
19 for us to write up the manuscript.  We never had any
20 deal that they were going to write the manuscript,
21 so we were very surprised when that happened and
22 felt very uncomfortable for them to be writing that
23 manuscript.  After a number of e-mails, mainly by
24 Mr. Hamer, it was decided that we would write up the
25 manuscript independently.

17 (Pages 62 to 65)

Page 66

ANDREW JOHN LEGG

1             ANDREW JOHN LEGG
2    Q.  E-mails by Mr. Hamer and you, or someone
3  else?
4    A.  I was copied into them.  Mr. Hamer
5  initially replied to Mr. Albrecht, who then deferred
6  it to Mr. Augustine -- Scott Augustine.
7    Q.  Did you have any contact with Dr. Scott
8  Augustine?
9    A.  No, not directly, only by being copied in
10  the e-mails.
11    Q.  And some of the e-mails were between Dr.
12  Hamer and Dr Scott Augustine?
13    A.  Yes.
14    Q.  Do you recall what the nature of that
15  exchange or those exchanges were?
16    A.  Essentially, we were very -- we were
17  unhappy with how we had been managed, in terms of
18  this paper had been pushed onto us, we had never had
19  agreed that would be the case, and when we explained
20  and expressed our, how unhappy we were about this,
21  they were fairly abrupt and aggressive in their
22  response and suggested that this was normal
23  practice.  But we didn't feel it was and, therefore,
24  initially I think -- well, I do recall Mr. Hamer
25  suggesting that they just took the paper on and

Page 67

ANDREW JOHN LEGG

1             ANDREW JOHN LEGG
2  wrote it themselves, but instead the decision made
3  was that we were going to part company and we were
4  going to write it up.
5    MS. ZIMMERMAN:  Move to strike the
6  response as hearsay.
7    THE EXAMINER:  Hearsay.
8  BY MR. GORDON:
9    Q.  In the interests of time I don't want,
10  I'm not going to go through and do a side-by-side
11  comparison, but I would like to ask you whether the
12  draft that was sent to you by Mr. Albrecht was in
13  any measure used by you in writing the paper that
14  was ultimately published in 2013?
15    A.  No.
16    THE EXAMINER:  Did the draft itself ever
17  proceed down the route towards publication?
18    THE WITNESS:  Not that I'm aware of.
19  BY MR. GORDON:
20    Q.  In the, I'll call it the "Albrecht
21  draft" -- I misspoke.
22    If I could direct your attention onto
23  page 394.  It is an e-mail dated October 4th 2010.
24    A.  Yes.
25    Q.  Do you recall receiving this e-mail?

Page 68

ANDREW JOHN LEGG

1             ANDREW JOHN LEGG
2    A.  Yes.
3    Q.  There are a number of other names on
4  here.  Prior to receiving this e-mail had you ever,
5  ever had any contact with Mike Reed?
6    A.  No, I don't think so.  I had contact with
7  Mike Reed at some point, but I don't think prior to
8  this, to my knowledge.
9    Q.  Have you ever met Dr. Reed -- or Mr.
10  Reed?
11    A.  After this I had, yes.  Not prior to.
12    Q.  And was that in connection with anything
13  to do with studies of Bair Hugger or HotDog, as
14  opposed to, you know, medical society meetings --
15    A.  No, no.  It was coincidently just at a
16  Medical Society meeting.
17    Q.  Right.  Same question with respect to Dr.
18  McGovern.  Had you met him prior to October 4th,
19  2010?
20    A.  No.
21    Q.  Have you met him subsequently?
22    A.  No.
23    Q.  How about Robert -- Dr. Robert Gauthier?
24    A.  No.
25    Q.  And we have already talked about

Page 69

ANDREW JOHN LEGG

1  Nachtsheim.  Have you ever met Scott Augustine?
2    A.  No.
3    Q.  Maybe I have asked you that already,
4  sorry if I did.
5    I want to direct your attention to the
6  bottom of this e-mail, where it says:
7    "I'll also be sending out a revised
8  manuscript that includes Andrew Legg's
9  comments/suggestions in the next week or two.  I
10  look forward to working with you all and wrapping up
11  this research".
12    Do you know what "comments/suggestions"
13  this refers to?
14    A.  I did make comments to that manuscript.
15  I don't have them, I don't know who -- I presume
16  that they were on my hospital e-mail account, which
17  I no longer have access to.  But it was about this
18  time where the comments were made and we were having
19  discussions with Mr. Hamer about what was happening.
20    Q.  At the point where you made the comments
21  and suggestions that Mr. Albrecht refers to here, at
22  that point were you of the view that you were going
23  to work with Mr. Albrecht and --
24    A.  No.  I had my concerns.  I was very

18 (Pages 66 to 69)

1              ANDREW JOHN LEGG
2    junior at the time, which is why I sought advice
3    from Mr. Hamer.
4           THE EXAMINER:  I am a bit confused by
5    this, Mr. Legg.  Perhaps you can help me.  On page
6    430 the attachment is a document called
7    "Manuscript_Legg_9.7.docx" and 600 [kilobytes]I
8    suppose it is.  Do you see that?
9       A.  Yes.
10      Q.  Then if you go back to page 395, we have
11   an Abstract_Waste_Heat_Only document, which is only
12   253 kilobytes and Laminar_research_low_res, that is
13   not a Word document, it is some other type,
14   PowerPoint that is -- of 1105.  So, when he says, "I
15   will also", I'm sorry, "I will also be sending out
16   in the next week or two"... I'm sorry.  A false
17   point.  Maybe you're coming to it.
18   BY MR. GORDON:
19      Q.  That is precisely where I am going.
20   Thank you.
21         (To the witness)  On this e-mail, on page
22   394, the second paragraph at the bottom, it says:
23         "Also, I've attached an abstract draft to
24   be submitted to the British Association for Surgery
25   of the Knee 2011 Annual Meeting in Cardiff".

1              ANDREW JOHN LEGG
2       Q.  Do you see that?
3       A.  Yes.
4       Q.  Could you then turn to page 426.
5    Actually, pages 426 through 428.
6       A.  Okay.
7       Q.  Does that appear to be, to your
8    recollection, the draft to which Mr. Albrecht was
9    referring in the October 4, 2010 e-mail?
10      A.  That they had written, yes.
11      Q.  And had you had any discussions with
12   Mr. Albrecht, prior to October 4th, 2010, about
13   presenting an abstract to the British Association
14   for surgery of the Knee?
15      A.  We spoke, during the time of the
16   experiment, in terms of where I was hoping to move
17   forward with presenting it and publishing it, but to
18   my recollection nothing else apart from that.
19      Q.  Okay.  And this abstract on page -- that
20   begins on page 426 identifies you, Dr. Hamer, Dr.
21   Cannon, Mr. Albrecht and Dr. Nachtsheim as the
22   authors.  Do you -- was this abstract ever presented
23   anywhere?
24      A.  So, this abstract was never presented.
25   An abstract was presented, which again was

1              ANDREW JOHN LEGG
2    independent, after the discussions had been made at
3    the Knee Society meeting.
4       Q.  I am sorry.  So, are we talking about the
5    same -- the British Association -- BASK?
6       A.  Yes.
7       Q.  That 2011 meeting?
8       A.  I don't think it was that meeting.  I
9    can't recall it.  It would be in my CV.  I can't
10   remember exactly when the meeting was but it was
11   presented --
12      Q.  Who was it --
13      A.  -- at the meeting.
14      Q.  Who were identified as the authors?
15      A.  Again, it was myself, Mr. Hamer and
16   Mr. Cannon.
17      Q.  Was there any indication that
18   Mr. Albrecht had participated in the experiments?
19      A.  No.
20      Q.  At that -- in that poster for that
21   presentation was there any indication that the
22   makers of HotDog had supplied you with the use of
23   equipment in doing these experiments?
24      A.  No.
25      Q.  Turn to page 428 --

1              ANDREW JOHN LEGG
2           THE EXAMINER:  If it helps, your CV shows
3    that there was a presentation by you and Mr. Hamer
4    at the 2012 BASK annual meeting --
5           THE WITNESS:  Yes.
6           THE EXAMINER:  -- at which only the two
7    of you were named?
8           THE WITNESS:  There was one prior to
9    that.
10          THE EXAMINER:  Well, that was to the
11   British Hip Society --
12          THE WITNESS:  Okay.
13          THE EXAMINER:  -- the previous year.
14          THE WITNESS:  And who was -- was that
15   Mr. Cannon?
16          THE EXAMINER:  Mr. Cannon, Mr. Legg and
17   Mr. Hamer?
18          THE WITNESS:  I do apologize.  It was the
19   Hip Society meeting.
20          THE EXAMINER:  That was in 2011 and then
21   the same or a similar document to the BASK in 2012?
22          THE WITNESS:  So, the first presentation
23   refers to the first publication, which we're calling
24   the "human"; and the second one is for the
25   mannequin.

19 (Pages 70 to 73)

Page 74

ANDREW JOHN LEGG

1
2     THE EXAMINER:  Thank you.  Sorry, 428?
3  BY MR. GORDON:
4     Q.  Yes.  If you look at 428, I know the
5  photocopy is not terribly good, but I would like you
6  to compare that to the photos on page 407.  You
7  know, that may not be the better representation of
8  that.  I think if you look at page 491 -- I'm sorry
9  I didn't direct your attention to that before -- and
10 compare that top row of photos, the top row of
11 photos, onto the second page of your 2013 study page
12 407 --
13     THE EXAMINER:  407 with 491.
14 BY MR. GORDON:
15    Q.  Yes.
16        Are those the same pictures?
17    A.  Yes.
18    Q.  So, who took those pictures?
19    A.  I don't recall whether I took them, or
20 Mr. Albrecht took them, but they were taken with his
21 camera.
22    Q.  And was it Mr. Albrecht who had selected
23 them for inclusion in the draft BASK abstract
24 presentation?
25    A.  There wouldn't -- I don't...  The images

Page 75

ANDREW JOHN LEGG

1
2  that he questions, I don't recall.  They would have
3  been in his abstract, yes.
4     Q.  And I think if you look at pages 291
5  through -- excuse me, 456 through 491.  I probably
6  should have referred you to that earlier.
7     A.  Yes.
8     Q.  No, I am sorry.  476 through 491.
9  Actually the second page of that page (page 477)
10 refers to an abstract re-do.  Does this appear -- do
11 you know if this is the second draft that
12 Mr. Albrecht did incorporating your comments and
13 suggestions?
14        MS. ZIMMERMAN:  Object to form.
15        THE EXAMINER:  You can answer.
16        THE WITNESS:  I don't know, is the answer
17 to that.  I don't know.
18 BY MR. GORDON:
19    Q.  Okay.  Now if you turn to the back page
20 of this draft (page 491), those photos, they are the
21 same as the ones on page -- the second page of your
22 2013 study page 407?
23    A.  Yes.
24    Q.  Who selected those photos?
25    A.  For what --

Page 76

ANDREW JOHN LEGG

1
2     Q.  Well --
3     A.  -- for this or for mine?
4     Q.  Start with the Albrecht draft?
5     A.  Either -- well, one of the -- they
6  selected it; I don't know whether it was Mark or
7  Mr./Dr. Nachtsheim.
8     Q.  So, when you wrote your 2013 paper you
9  selected the same photos?
10    A.  I selected the photos, which I believed
11 depicted the, what -- our findings the best.  They
12 turned out to be the same, or very similar photos,
13 because it's very clear what happened so they all
14 look the same.
15        THE EXAMINER:  If I could use the
16 vernacular:  You didn't simply lift them out of
17 their draft, you made a selection from the photos
18 you had --
19        THE WITNESS:  Correct.
20        THE EXAMINER:  -- and they choose to be
21 similar or identical?
22        THE WITNESS:  Yes.
23 BY MR. GORDON:
24    Q.  Back to the 2013 paper, same page where
25 the pictures are, I guess, in 407.  In the left-hand

Page 77

ANDREW JOHN LEGG

1
2  column towards the beginning you say, just above
3  "Experimental design":
4        "All investigations were undertaken over
5  one day in a single theatre, with the same equipment
6  and investigators".
7     A.  Correct.
8     Q.  And that would -- is that anyone other
9  than you and Mr. Albrecht?
10    A.  No.
11    Q.  Who set up the neutral-buoyancy helium
12 soap bubble generator?
13        THE EXAMINER:  Sorry, where is that?
14        MR. GORDON:  Under air -- just going,
15 keeping down a little bit.  "Airflow visualisation".
16        THE WITNESS:  He did.
17 BY MR. GORDON:
18    Q.  And who operated the digital camera?
19    A.  He did, although I took some photos, but
20 again it was his camera.
21    Q.  Did -- how were the images stored?  Were
22 they shared?  Did he give you --
23    A.  They were on his card, which he then
24 e-mailed them through to me.
25    Q.  How many pictures did he e-mail to you?

Page 78

ANDREW JOHN LEGG

1
2    A.  I don't recall.  There were many.
3    Q.  Okay.  In this second study, the 2000 --
4  the mannequin study -- did you also use any type of
5  device to see if you could collect bacteria?
6    A.  No.
7    Q.  You did the mannequin study.  Which did
8  you do first, the Bair Hugger or the HotDog?
9    A.  It was random how we did it.  Randomly
10  generated.  So, we set them up so there was not a
11  pattern that flowed.
12    Q.  How much time was lapsed between the
13  completion of one and the starting of the next one?
14    A.  Again, I don't recall.  We ensured that
15  the temperature had returned to the ambient
16  temperature, which was measured outside the theatre,
17  and that the particle levels were back down to
18  normal so they had equalized.
19    Q.  Okay.  The Rocket PS23 Smoke Machine,
20  that generated the 0.3-micron glycerol tracer
21  particles, that was one of the pieces of equipment
22  supplied by the HotDog Company?
23    A.  Correct.
24    Q.  Who set that up?
25    A.  That was set up by both -- I had used it

Page 79

ANDREW JOHN LEGG

1
2  before because I had used it in my previous study.
3    Q.  Did you still have it, or had you sent it
4  back and --
5    A.  No, I still had it.  I still had it.
6    Q.  When you were done with the mannequin
7  study did you keep -- did you keep the Rocket PS23
8  Smoke Machine, or did it go back to the HotDog
9  people?
10    A.  I don't have it, so I don't recall, but I
11  presume that the rep had picked it up.  I
12  re-contacted him and gave it back to him, but I
13  don't have it now.
14    Q.  So, what if any equipment did
15  Mr. Albrecht bring with him?
16    A.  A camera, a light source, the bubble
17  machine, and I don't remember whether we used the
18  temperature probe which I had from the first study,
19  or whether we used the temperature probe which he
20  had as well.
21    Q.  How about that particle counter?  Was
22  that not used?
23    A.  No, that was used and I'm pretty sure
24  that I still had that for the second study so we
25  would have probably used the one that I had from the

Page 80

ANDREW JOHN LEGG

1
2  first study.
3    Q.  And did Mr. Albrecht take back with him,
4  after you were done with this mannequin experiment,
5  the equipment he bought:  The camera; the bubble
6  generator?
7    A.  Correct.
8    Q.  The number -- the particle numbers that
9  you reflect in your 2013 paper would be at page 408.
10    A.  Yes.
11    Q.  They appear to be close, but not
12  identical, to the numbers in the Albrecht drafts and
13  I am wondering is that -- did you do more than one
14  counting?
15    THE EXAMINER:  What is the comparison
16  between -- 408 and? 439 to 440?
17    MR. GORDON:  We can go to that one.  That
18  is fine, I will find the specific pages in it.  Page
19  439 to 440.
20    THE EXAMINER:  Okay.
21  BY MR. GORDON:
22    Q.  And the numbers that I am looking at are
23  2,000,000 -- on the Albrecht draft 2,173,000 --
24    A.  What page is that again?
25    Q.  439.  He's got 2,173,000.

Page 81

ANDREW JOHN LEGG

1
2    A.  Yes.
3    Q.  And 2,172,000?
4    A.  Yes.
5    Q.  And you have 2,174,000?
6    A.  Yes.  He's referring to the difference,
7  whereas I put the exact figures.  So if you take
8  2,174,000 and you take 2,000 away you get his
9  figure.  If you take 1,000 away, you get -- he's put
10  difference but I've put exact.
11    Q.  But they are the same numbers?
12    A.  The same numbers, yes.  It was the same
13  experiment.
14    Q.  But they're different "p" values given?
15    A.  So, again, I had the original data so he,
16  or his -- where he did statistics and I did
17  statistics.
18    Q.  So, you did your own statistics --
19    A.  Yes.
20    Q.  -- for the 2013.  You, yourself, or did
21  you have the assistance of any statistician?
22    A.  No.  I used software, which is SPS
23  software, and did some statistics on the paper.
24    Q.  Now, on your 2013 paper page 408, on the
25  second column sort of in the middle, you say:

Page 82

ANDREW JOHN LEGG

1
2          "There was a little or no waste heat
3  created from the radiant device which was well
4  insulated on the side not in contact with the
5  patient".
6          And we can find it in here, but the use
7  of the phrase "waste heat" is also in the Albrecht
8  draft.  Prior to your writing this paper, if we're
9  2013, had you yourself used the phrase "waste heat"
10 to describe anything in connection with forced-air
11 warming?
12     A.  I don't recall.
13     Q.  Was that a -- is that a term with which
14 you were familiar prior to your working with
15 Mr. Albrecht?
16     A.  I don't know.  I don't know.  It's a term
17 I use, but it's -- I don't know when I started to
18 use it.
19     Q.  The next line after that one is:
20         "It does not appear that the forced-air
21 warming device itself blows potentially contaminated
22 warm air directly into the Howorth enclosure".
23         Did I read that correctly?
24     A.  Yes.
25     Q.  What led you to that conclusion?

Page 83

ANDREW JOHN LEGG

1
2      A.  But this specifically applies to the
3  theatre set-up that we had, that the drape comes all
4  the way down to the ground, and what we looked at
5  was what was heated, it wasn't that particles were
6  being blown elsewhere.  So, the drape was being
7  heated, which made the hot air rise; it wasn't that
8  air was being blown in which would do something else
9  to the airflow.
10         THE EXAMINER:  This is where you had the
11 curtain or drapes coming down the one meter from the
12 floor.
13         THE WITNESS:  Correct, yes.
14 BY MR. GORDON:
15     Q.  In the Albrecht --
16     A.  No, sorry.  Sorry.  No.  So that the
17 front, which essentially blocks off where the
18 patient's head is, the drape comes all the way down
19 to the floor.
20         THE EXAMINER:  Okay.  Thank you, I
21 understand.
22 BY MR. GORDON:
23     Q.  In the Albrecht draft it indicates that
24 there were two different set-ups.  One where the
25 drape was coming down from the ceiling; one where it

Page 84

ANDREW JOHN LEGG

1
2  was just laid over the patient?
3      A.  Correct.
4      Q.  What -- why did you decide not to include
5  information about the results when you had the drape
6  laid over the patient?
7      A.  Because --
8          MS. ZIMMERMAN:  Object to form.
9          THE WITNESS:  -- that is not how I or
10 Mr. Hamer, or anybody in our hospital at the time,
11 would have conducted an operation and, therefore, we
12 felt that it was important just to perform the
13 experiments how we performed the operations.
14 BY MR. GORDON:
15     Q.  And the bottom of page 408 of your 2013
16 study, you say:
17         "If the wall extension and vertical drape
18 that exclude the anaesthetist are not in place, the
19 production of the waste heat may not be as important
20 because the air can leave the enclosure more
21 easily".
22         Did I read that correctly?
23     A.  Yes.
24     Q.  And in your current set-up there are no
25 wall extensions.  Correct?

Page 85

ANDREW JOHN LEGG

1
2      A.  Yes.
3      Q.  And -- yes, I am correct?
4      A.  Yes, you're correct.  Yes, sorry.
5      Q.  And is the vertical drape that you
6  describe in the 2013 study, is that the same that
7  you use now, or is there -- is it configured
8  differently?
9      A.  It is very, very similar.
10     Q.  And the last page of your 2013 study,
11 page 409.  You say:
12         "This study does not show that forced-air
13 warming increases the risk of infection -- only that
14 in certain types of theatre set-up it can
15 significantly disrupt unidirectional airflow and
16 draw particles from the potentially contaminated
17 area below the surgical field.  This is a concern".
18         Did I read that correctly?
19     A.  That is correct.
20     Q.  What was it that led you to conclude that
21 that would -- that your study did not show that
22 forced-air warming increased the risk of infection?
23     A.  Because we didn't show that.  We didn't
24 measure infection.
25     Q.  And in this study you didn't measure

Page 86

ANDREW JOHN LEGG

1
2  bacteria either.  Right?
3      A.  No.
4      Q.  I mean, it is obvious, but you can't have
5  an infection without bacteria.  Right?  At least a
6  bacterial infection?
7      A.  True.
8      Q.  And are there other infections that you
9  were referring to, other than bacterial infections?
10     A.  No.
11     Q.  In the conflicts disclosure, or however
12 you characterize it, on the 2013 Study, you say:
13         "No benefits in any form have been
14 received or will be received from a commercial party
15 related directly or indirectly to the subject of
16 this article".
17         Did I read that correctly?
18     A.  Correct.
19     Q.  Did you consider HotDog to not be a
20 company that was a commercial party, directly or
21 indirectly related to the subject of the article?
22     A.  We didn't benefit financially from the
23 experiment.
24     Q.  Did you consider the use of the equipment
25 that HotDog loaned to you to be a benefit?

Page 87

ANDREW JOHN LEGG

1
2      A.  Without it we couldn't have done the
3  study and wouldn't have done the study.
4      Q.  Did you consider Mr. Albrecht's
5  involvement and assistance to be a benefit?
6      A.  Yes.  Without it we wouldn't have been
7  able to do the study because of the equipment.
8      Q.  Did you have any discussions with Dr.
9  Hamer about whether you should disclose in this
10 conflicts disclosure the involvement of
11 Mr. Albrecht?
12     A.  I don't -- I don't recall having that...
13 About him being on the paper, or whether we should
14 have disclosures about using their equipment?  Which
15 do you mean?
16     Q.  Take them one at a time.
17     A.  About his inclusion in the paper, we did
18 speak about it and from their e-mail discussions we
19 distanced ourselves as they said we should write the
20 paper up independently.
21         In terms of the disclosures of conflicts
22 of interest or using the equipment, I didn't think,
23 I believe that -- it didn't occur to me, I should
24 say, that by using their equipment would have a
25 conflict of interest.

Page 88

ANDREW JOHN LEGG

1
2      Q.  And even though you ended up writing up
3  the study yourself, did you think that there might
4  be some utility or some value to a reader of the
5  paper to know that an employee of the HotDog Company
6  assisted you in actually setting up and running the
7  experiment?
8      A.  The experiment and -- the set-up was
9  already there and, therefore, things weren't changed
10 with Mr. Albright's (sic) input.  What we gained is
11 the picture of how airflow works; nothing was
12 changed.  So, it didn't occur me, at the time I
13 didn't think that it was important to put that down
14 and that it's a conflict of interest.
15     Q.  Did you have a discussion with Mr. Hamer
16 about whether you should disclose something about
17 Mr. Albrecht's involvement?
18     A.  I don't recall -- I recall we spoke about
19 the paper, but not in terms of the conflict of
20 interest, that statement at the end.
21     Q.  I asked you before about references in
22 the first paper, either 13 references on the second
23 paper.  Did you do the research to compile those --
24     A.  I did.
25     Q.  -- as well.  Mr. Albrecht didn't provide

Page 89

ANDREW JOHN LEGG

1
2  any copies of papers to you?
3      A.  No.
4          THE EXAMINER:  Are you going away from
5  that, from that document?
6          MR. GORDON:  I probably shouldn't, no --
7          THE EXAMINER:  I want to see to see
8  whether I have got this right now, Mr. Legg, because
9  my understanding before I came here today was
10 different.  You have got a lamina downwards airflow.
11         THE WITNESS:  Correct.
12         THE EXAMINER:  Keeping the temperature
13 down.  Now you're saying that heating, or convection
14 rising from the blanket --
15         THE WITNESS:  It doesn't -- sorry, it
16 doesn't keep the temperature down, it is airflow.
17         THE EXAMINER:  But convection rising from
18 the blanket --
19         THE WITNESS:  Correct.
20         THE EXAMINER:  -- can interfere with that
21 airflow and potentially allow particles to rise from
22 below the operative site.  Is that right?
23         THE WITNESS:  Correct.  With a very
24 specific theatre set-up.
25         THE EXAMINER:  I am sure you do.  I had

Page 90

ANDREW JOHN LEGG

1
2  previously understood that it was some sort of
3  rising of warm air from the floor up to the site,
4  but I am wrong about that?
5      THE WITNESS:  That is not what -- our
6  conclusion, that is not my belief.  My belief is
7  that it is through warming of the drape that causes
8  particles to rise.
9      THE EXAMINER:  I understand, thank you.
10  You have corrected my understanding today.
11  Now, what have we got on the tape?
12      THE VIDEOGRAPHER:  Five minutes.
13      THE EXAMINER:  Would it be sensible to
14  stop and change the tape or do you think you have
15  got a topic you can do in five minutes?
16      MR. GORDON:  I'm going to be done in five
17  minutes.
18      THE EXAMINER:  Let's get it done.  Five
19  minutes and then we'll change the tape.
20  BY MR. GORDON:
21      Q.  Did Mr. Albrecht set up the smoke
22  generator?
23      A.  There is not much to set up, I can't
24  recall whether he did or not.  I had used it before.
25  You turn it on, you put detergent in it,

Page 91

ANDREW JOHN LEGG

1
2  essentially, so I don't recall whether it was
3  himself or myself, but I was perfectly capable of
4  doing that.
5      Q.  Did you recall whether the velocity was
6  adjustable?
7      A.  No.
8      Q.  Did you tell Mr. Albrecht about your
9  negative results from the agar plates that you had
10  done in the first experiment?
11      A.  Again, I don't recall having a
12  conversation with him, but there is no reason why I
13  wouldn't have done through just discussion
14  throughout the day.  We had spoke about the study
15  previously so, yes, I'm sure I would have done.
16      Q.  Do you recall Mr. Albrecht telling you
17  anything to the effect of that they had also tried
18  to find bacteria and couldn't -- or weren't
19  successful in culturing out any bacteria?
20      A.  I don't remember, but that wouldn't
21  surprise me.
22      Q.  Since moving to your current hospital did
23  you ever suggest to anyone that it would be
24  advisable to switch from using the Bair Hugger to
25  some other form of warming?

Page 92

ANDREW JOHN LEGG

1
2      A.  No.  I have spoken to people about my
3  concerns with waste heat, but I think you can -- if
4  you deal with the waste-heat issue I don't think
5  that the problem is with forced-air warming.
6      MR. GORDON:  Thank you.
7      THE EXAMINER:  Thank you.  Let's take a
8  break.  Change the tape.
9      THE VIDEOGRAPHER:  End of DVD one, volume
10  one of the deposition of Mr. Andrew Legg.  Going off
11  the record at 4.37.  Recording has stopped.
12      (Recess taken)
13      THE VIDEOGRAPHER:  This is the beginning
14  of DVD 2 in volume 1 of the deposition of Mr. Andrew
15  Legg.  We're back on the record at ten-to five.
16
17  EXAMINATION BY MS. ZIMMERMAN:
18      Q.  Mr. Legg, I will do my best to refer to
19  you as "mister" because, of course, in the United
20  States "doctor" is a sign of respect.
21      You have not met with myself before
22  today.  Is that correct.
23      A.  That is correct, no.
24      Q.  And you have not met with anybody else
25  who represents Plaintiffs in the United States

Page 93

ANDREW JOHN LEGG

1
2  litigation?
3      A.  That is correct.
4      Q.  You have had no e-mail conversations with
5  anybody representing patients in the US.  Correct?
6      A.  No.
7      Q.  Your background is in orthopedics.  Is
8  that right?
9      A.  That is correct.
10      Q.  We were just provided today a copy of
11  your curriculum vitae.  Do you have a copy of that
12  as well?
13      A.  I do, yes.
14      Q.  Could you take a minute, as this video
15  may well be played to the judge and potentially the
16  jury in the United States, could you take a minute
17  to introduce yourself to the judge and the jury and
18  tell us a little bit about your medical training?
19      A.  Okay.  My name is Andrew Legg and I am
20  currently a consultant orthopedic surgeon in
21  Rotherham, where I have been consultant since July
22  this year.  Prior to that I did a year's Fellowship,
23  which is specialist higher level training; six
24  months in New Zealand; and six months in Coventry.
25  Prior to that I was on an orthopedic rotation for

24 (Pages 90 to 93)

Page 94

ANDREW JOHN LEGG

1
2 eight years in the South Yorkshire region, with some
3 time in East and West Yorkshire, which in the States
4 is a residency. The two years prior to that, which
5 were, I call, a Foundation Year one and two, which
6 are the first two years after qualifying as a
7 doctor, were in Huddersfield and Bradford, so in the
8 Yorkshire region.
9     Q.  Is some of this what we might call, in
10 the United States, post-doctoral research?
11     A.  I'm not fully familiar in terms of
12 post-doctoral.
13     Q.  So, we have a university program.
14     A.  Yes.
15     Q.  You went to university?
16     A.  Yes, correct.
17     Q.  And then you went to medical school after
18 that?
19     A.  No.  We just go to medical -- some people
20 do go to university, do a degree and then go to
21 medical school.  Whereas the vast majority still go
22 straight to medical school, so I went to medical
23 school at the age of 18.  As part of my five years
24 as a medical student I took a year out and did a
25 degree, so I was at university for six years.  In

Page 95

ANDREW JOHN LEGG

1
2 that period of time I got a BSc (Bachelor of Science
3 degree) and also my medical degree, which I finished
4 in 2005.
5     Q.  Okay.  Then you have a degree or some
6 training from the Royal College of Surgeons in
7 Edinburgh?
8     A.  Yes.  So that is part of my surgical
9 training.  So, you do a MRCS, which is a Member of
10 the Royal College of Surgeons, and then finally you
11 do another exam, which is an FRCS but that is
12 specifically to orthopedics.
13     Q.  Right.  So, it is a sub-specialty
14 training in orthopedics?
15     A.  Correct, yes.
16     Q.  And you have completed that?
17     A.  Yes.
18     Q.  Do you act as an instructor, at this
19 point, for other orthopedic trainees?
20     A.  I do, yes.
21     Q.  And what does that involve?
22     A.  That involves -- I haven't specifically
23 got one person under me currently.  There are many
24 junior doctors which you have, which involve ward
25 rounds, looking after my patients, on-call

Page 96

ANDREW JOHN LEGG

1
2 responsibilities when we receive acute trauma
3 patients, and also in theatre and clinics,
4 supervising them and guiding them appropriately.
5     Q.  Right.  When we're done going through
6 your curriculum vitae I will offer this copy to the
7 Court Reporter to mark as, I guess, Exhibit 2 -- do
8 we only have one exhibit so far.  All right.
9         From time to time have you published
10 literature in the medical field?
11     A.  Yes.
12     Q.  Could you tell me about that?
13     A.  So, two of the publications which we have
14 today, and then there is a third publication, which
15 I more recently published, which is in 2015, which
16 is a published paper on distal bicep, where the
17 bicep tendon is attached at the elbow essentially.
18     Q.  I should ask:  Do you have a speciality
19 inside of orthopedics?
20     A.  Knee surgery is my specialty.
21     Q.  Okay.  It is my understanding that
22 infection prevention is a critical issue for
23 orthopedic surgeons.  Is that consistent with your
24 practice?
25     A.  Yes, correct.

Page 97

ANDREW JOHN LEGG

1
2     Q.  Would you agree that orthopedic surgeons
3 are -- pardon me orthopedic surgery patients are
4 typically at higher risk for infection than perhaps
5 a different type of surgery?
6         MR. GORDON:  Objection.  Exceeds the
7 scope of permitted examination.
8         THE WITNESS:  Should I answer?
9         THE EXAMINER:  Not for the moment.  Are
10 you maintaining that objection?
11         MS. ZIMMERMAN:  If you go to page seven
12 of the order, schedule D.
13         MR. GORDON:  I will withdraw that.
14         THE EXAMINER:  Okay.
15         MR. GORDON:  Thank you, I am sorry.
16         THE WITNESS:  So, I think the
17 consequences, especially with arthoplasty hip and
18 knee replacement surgery, of getting an infection
19 are more significant.  In terms of the frequency
20 compared to other operations, I don't think I can
21 comment in terms of how whether it is more frequent
22 or not, but the consequences are much greater,
23 potentially.
24 BY MS. ZIMMERMAN:
25     Q.  Earlier Mr. Gordon asked you about

25 (Pages 94 to 97)

ANDREW JOHN LEGG

1              ANDREW JOHN LEGG
2 infection risks.  Do you remember those questions?
3     A.  I remember him asking me, I don't
4 remember what the questions were, I'm afraid.
5     Q.  It has been a long day.
6      Are you familiar with the term "chain of
7 infection"?
8     A.  Not specifically, no.
9     Q.  Not specifically.  I think that you
10 testified earlier that bacteria is required for a
11 bacterial infection.
12     A.  Correct.
13     Q.  Are there any other requirements that you
14 know of for a bacterial infection?
15     A.  It needs a warm, moist environment and
16 the ability for the bacteria to replicate,
17 essentially.
18     Q.  A viable bacteria?
19     A.  Yes.  Correct.
20     Q.  And potentially a susceptible host.
21 Would you agree with that?
22     A.  Yes.
23     Q.  Right.  I would like to turn back to your
24 CV and these articles that you published.  Are these
25 articles in peer-review journals?

1              ANDREW JOHN LEGG
2     A.  Correct.
3     Q.  Could you explain to the judge and the
4 jury in the United States what "peer reviewed"
5 means?
6     A.  Peer review is essentially a group of
7 your colleagues, your peers, they are usually senior
8 colleagues, senior consultants, who have a large
9 amount of experience in orthopedics and, more
10 specifically, in the specific field in which the
11 paper is talking about.  They review your research
12 to make sure that it's of, firstly, high enough
13 standard to be published in that specific journal;
14 and also that it's of good enough quality in terms
15 of what you're actually writing in that report.
16     Q.  Why is the peer-review process important
17 to someone who is reading the article, for example?
18     A.  It is important to make sure that the
19 standard of that article is high, and also that the
20 evidence which is being presented is accurate.
21     Q.  To your knowledge are articles submitted
22 for peer-review consideration and ultimately turned
23 down?
24     A.  Many are turned down.
25     Q.  That happens from time to time?

1              ANDREW JOHN LEGG
2     A.  Very frequently.  The vast majority -- I
3 couldn't tell you a number -- are refused I would...
4     MS. ZIMMERMAN:  Right.  I would like to
5 turn to --
6     THE EXAMINER:  Are you going to mark that
7 before you go --
8     MS. ZIMMERMAN:  Yes.
9     Q.  I'm going to turn to the thing we have
10 called the "human study" thus far, which appears on
11 page 411 of your materials.
12     A.  Okay.
13     Q.  Just for clarification, I think Mr.
14 Gordon referred to this throughout his questioning
15 as a 2011 study.  It appears from the notes on the
16 left-hand side it was submitted for publication in
17 2011?
18     A.  Yes.
19     Q.  And ultimately published in 2012?
20     A.  That is correct, yes.
21     Q.  So, if we refer to it as 2011 and 2012 we
22 know that this is the article we're referring to?
23     A.  Yes, correct?
24     THE EXAMINER:  Remind me, is this the
25 human or the mannequin?

1              ANDREW JOHN LEGG
2     THE WITNESS:  Human.
3     MS. ZIMMERMAN:  The human.
4     Q.  Mr. Legg, is this article a peer-reviewed
5 study?
6     A.  Yes.
7     Q.  And where was it published?
8     A.  It was published in the Journal of Bone
9 and Joint Surgery.
10     Q.  Is that considered a prominent
11 publication?
12     A.  Yes.
13     Q.  What did you measure in this study?
14     A.  We measured a number of factors.
15 Firstly, that they were increased particles and
16 increased temperature when forced-air warming was
17 used in our specific theatre set-up, which we used
18 at the Northern General.
19     Q.  Do you recall questions from Mr. Gordon
20 about whether a particle count automatically equates
21 with a bacteria count?
22     A.  Yes.
23     Q.  And you would agree that a particle count
24 is not necessarily the same as an increased bacteria
25 count?

ANDREW JOHN LEGG

1
2    A.   That's correct.
3    Q.   But you would also agree that an
4    increased particle count is of concern to an
5    orthopedic surgeon.
6        A.   That is correct and that is what I
7    concluded.
8        Q.   Why?
9        A.   Because particles can carry bacteria and,
10   as a result, it could increase the risk of
11   infection.
12       Q.   Is that because bacteria kind of
13   hitchhike on a particle?
14       A.   Correct.
15       Q.   And they can hitchhike on a particle into
16   a surgical site?
17       A.   Yes.
18       Q.   Would you agree that it is important to
19   reduce the particles in an operating room theatre?
20       A.   Yes.
21       Q.   And would you agree that it takes only a
22   very small number of microbes to cause infection in
23   an orthopedic surgery patient?
24           MR. GORDON:   Object to the form of the
25   question.

ANDREW JOHN LEGG

1
2        THE EXAMINER:   I think "microbes" is a
3    term that hasn't yet been used so I don't understand
4    how it fits in with (a) particles and (b) bacteria.
5        MS. ZIMMERMAN:   Sure.
6        Q.   Can "microbes" and "bacteria" be
7    interchangeably --
8        A.   I'm happy to.
9        MS. ZIMMERMAN:   -- to understand both
10   ways.
11       THE EXAMINER:   Okay.
12   BY MS. ZIMMERMAN:
13       Q.   Would you agree that it only takes a very
14   small number of bacteria, or microbes, to cause a
15   potentially devastating infection in an
16   orthopedic-surgery patient?
17       MR. GORDON:   Object to the form of the
18   question.
19       THE EXAMINER:   You can answer.
20       THE WITNESS:   Yes.
21   BY MS. ZIMMERMAN:
22       Q.   When you were conducting the measurements
23   in this first human study, did you take this -- did
24   you make any changes as between the measurements for
25   the Bair Hugger and then later with the HotDog?

ANDREW JOHN LEGG

1
2        A.   No.
3        Q.   With the tools that were doing the
4    measurements?
5        A.   Yes -- no.
6        Q.   At the end of your paper you conclude:
7            "Further work is required to confirm that
8    unidirectional airflow is disrupted by forced-air
9    warming patient warming devices under our specific
10   experimental theatre set-up and future studies are
11   needed to visualise the airflow over the surgical
12   site".
13           Did I read that correctly?
14       A.   Yes.
15       Q.   Did you do additional studies?
16       A.   The additional study was the second
17   paper.
18       Q.   Have you done any other studies beyond
19   the second paper?
20       A.   No.
21       Q.   Turning next to the mannequin study,
22   which appears starting at page 406, that is the,
23   "Forced-air patient warming blankets disrupt
24   unidirectional airflow", is the title of that study.
25   Do you see that as well?

ANDREW JOHN LEGG

1
2        A.   Yes.
3        Q.   Was this published in a peer-review
4    journal?
5        A.   Yes, it was.
6        Q.   Which journal?
7        A.   The Bone and Joint Journal.
8        Q.   Is that the same as the first study?
9        A.   That is correct.
10       Q.   Same journal.  Before I forget, were the
11   operating rooms the same between the two studies?
12       A.   I can't confirm whether -- I don't
13   remember whether they were the same, but it's the
14   same hospital and, therefore, the same -- we presume
15   the same theatre set-up.  I can't recall whether it
16   was exactly the right, the same theatre or not.
17       Q.   Okay.  What did you measure in this
18   mannequin study?
19       A.   We measured the same as before.  We
20   measured temperature, and we measured particle count
21   and we also visualized the airflow using
22   neutrally-buoyant helium bubbles.
23       Q.   Were there three separate types of
24   measurements you were doing?  Temperature?
25       A.   Yes.

1                ANDREW JOHN LEGG
2        Q.  Particle count?
3        A.  Yes.
4        Q.  And then this bubble machine?
5        A.  Correct.
6        Q.  And you made each of those three
7   measurements as to three different scenarios.  The
8   Bair Hugger --
9        A.  Yes.
10       Q.  -- the HotDog, and a control study where
11  there was no heat.  Correct?
12       A.  Correct.
13       Q.  Was there anything changed between when
14  you took the measurements from the Bair Hugger on
15  the temperature, to when you took the measurements
16  for the HotDog regarding temperature?
17       A.  No.
18       Q.  No change to the machine calculating or
19  measuring the temperature?
20       A.  No.
21       Q.  Was there any changes at between when you
22  were measuring temperature to the control?
23       A.  No.
24       Q.  Likewise, was there any changes made to
25  the particle count machine as between when you

1                ANDREW JOHN LEGG
2   measured the forced-air warming blanket and moving
3   to the HotDog?
4        A.  No.
5        Q.  No changes made to the measurement there?
6        A.  No.
7        Q.  Again, no changes as between those and
8   the control?
9        A.  No.
10       Q.  Were there any changes made to the bubble
11  machine between when you had the Bair Hugger on and
12  the HotDog?
13       A.  No.
14       Q.  Any changes to the bubble machine as
15  between when the Bair Hugger was on and the control?
16       A.  No.
17       Q.  You did your best to keep all of the
18  measurements tools the same?
19       A.  Correct.
20       Q.  Why is that important to you?
21       A.  Because we wanted to find out one thing
22  and that is the effect of the warming device and if
23  we changed other parameters it could have resulted
24  in a misleading outcome.
25       Q.  It was important to you that this paper

1                ANDREW JOHN LEGG
2   be accurate?
3        A.  Correct.
4        Q.  What was the principle finding in the
5   mannequin study?
6        A.  That forced-air warming increased the
7   temperature over the surgical site, but
8   fundamentally caused convection currents to be
9   created and particles drawn up from below the level
10  of the table onto the surgical site.
11       Q.  Have you ever had any classes in
12  engineering?
13       A.  If you class physics as engineering at
14  school, yes, but otherwise no.
15       Q.  Okay.  I take it you would not consider
16  yourself an expert in fluid dynamics, for example?
17       A.  No.
18       Q.  Are you familiar with some of the basic
19  ideas in fluid dynamics?
20       A.  Very basic.
21       Q.  All right.  In this mannequin study, you
22  found 1,000-fold increase in concentration of
23  particles for the forced-air warming blankets, as
24  compared to the radiant warming.  Is that correct?
25       A.  That is correct.

1                ANDREW JOHN LEGG
2        Q.  That was significant to you?
3        A.  Yes.
4        Q.  Mr. Gordon asked you some questions about
5   the statistical analysis done in connection with
6   this study?
7        A.  Yes.
8        Q.  Did you do that yourself?
9        A.  I did.
10       Q.  Do you recall what the p-value was of
11  your calculations?
12       A.  It was -- I can't specifically recall.
13  It was very, very low.  I will have to have a look.
14       THE EXAMINER:  408.
15       MS. ZIMMERMAN:  The p-value is .00 --
16       A.  001.
17       Q.  2.
18       THE EXAMINER:  Where do we find that?
19       MS. ZIMMERMAN:  Middle of the first,
20  second full paragraph on page 408.
21       THE EXAMINER:  Right, thank you.
22  BY MS. ZIMMERMAN:
23       Q.  Is that correct?
24       A.  That is correct.
25       THE EXAMINER:  Do you want to explain

Page 110

ANDREW JOHN LEGG

1
2 exactly what a p-value is?
3       THE WITNESS:  So a significance is
4 accepted that significance-of is -- well, it is
5 deemed significant, sorry, if I clarify that, if it
6 is less than 0.05 and that is what is accepted.
7 BY MS. ZIMMERMAN:
8       Q.  Ultimately at the end of this mannequin
9 study, you and Mr. Hamer write:
10       "This study does not show that forced air
11 warming increases the risk of infection only that in
12 certain types of theatre set-up it can significantly
13 disrupt unidirectional airflow and draw particles
14 from the potentially contaminated area below the
15 sterile surgical field.  This is a concern".
16       Did I read that correctly?
17       A.  Yes, you did.
18       Q.  Did you do any additional studies with
19 respect to the concerns you raised?
20       A.  No.
21       Q.  Are you familiar with any 3M employees?
22       A.  Employees in terms of the gentlemen that
23 were, I met within the study, yes.  If they are
24 employees of 3M, I think they are part of 3M
25 company.

Page 111

ANDREW JOHN LEGG

1
2       Q.  Do you deal with anybody at 3M on a
3 regular basis today?
4       A.  No.
5       Q.  Have you had any other connection with 3M
6 employees outside of the scope of these potential
7 two studies?
8       A.  No.
9       Q.  Has anyone for 3M ever reached out to you
10 and asked questions about the concerns that you
11 raised in both the human study and the mannequin
12 study?
13       A.  About the conclusions that we made?
14       Q.  Correct.
15       A.  No.
16       Q.  Has anyone at 3M ever offered to fund
17 additional research for you?
18       A.  No.
19       Q.  Are you aware of any other researchers
20 that have looked into the concerns that you raised?
21       A.  Yes.  Not specifically the concerns that
22 I raised, I think there were some other studies s
23 happening at the similar time, with other authors;
24 some in the north, in the north of England.
25       THE EXAMINER:  But nothing, as I

Page 112

ANDREW JOHN LEGG

1
2 understand it, taking your words, "This is a
3 concern", and saying we must investigate this
4 further?
5       THE WITNESS:  No, not that I'm aware.
6 BY MS. ZIMMERMAN:
7       Q.  Are you aware that 3M has criticized the
8 paper that you published?
9       A.  Until --
10       THE VIDEOGRAPHER:  That is someone
11 joining --
12       MS. ZIMMERMAN:  Is someone on the line?
13       THE VIDEOGRAPHER:  I think it is someone
14 checking the line is open.
15 BY MS. ZIMMERMAN:
16       Q.  Sorry for the interruption.
17       A.  Until I have been involved in this
18 process, no.
19       Q.  Prior to learning of the litigation in
20 the United States?
21       A.  Sure.
22       Q.  Are you aware that 3M sent out
23 characterizations of your studies to many of its
24 customers?
25       A.  No.

Page 113

ANDREW JOHN LEGG

1
2       Q.  Would that come as a surprise to you?
3       A.  Yes.
4       THE VIDEOGRAPHER:  Can I say that this
5 "beep" noise that keeps coming out is someone
6 joining the conference link up and --
7       THE EXAMINER:  I understand that.
8       THE VIDEOGRAPHER:  There was a report
9 they had not been getting audio all day, which I
10 would say is probably because we were off-line on
11 the call.
12       THE EXAMINER:  Strangely reluctant to
13 identify themselves.
14       MS. ZIMMERMAN:  Is anyone on the phone?
15       THE EXAMINER:  I don't think we need
16 worry about it.
17       THE VIDEOGRAPHER:  They say they are
18 receiving audio okay.
19 BY MS. ZIMMERMAN:
20       Q.  Mr. Gordon asked you some questions about
21 your ongoing use of the Bair Hugger in your medical
22 practice.  Do you recall that?
23       A.  Yes.
24       Q.  You testified that you're using a
25 different style of draping your patients now.  Is

ANDREW JOHN LEGG

1
2  that correct?
3      A.  Similar draping, but the theatre set-up
4  is different.
5      Q.  And the changes that you made to your
6  practice now are based on your own research.  Is
7  that right?
8      A.  That is correct.
9      Q.  It is not based on any instruction that
10  you received from 3M?
11      A.  No.
12      Q.  To your knowledge, are there any
13  instructions on Bair Hugger blankets or materials
14  that instruct how to do draping?
15      A.  To set up the Bair Hugger, or the actual
16  draping side of things?
17      Q.  Well, the Bair Hugger with the draping?
18      A.  Not that I'm aware of, but I must admit I
19  haven't looked for it.
20      Q.  Okay.  Do you know what an observational
21  study is?
22      A.  Yes.
23      Q.  How would you explain that to the jury?
24      A.  So, an observational study is, I suppose,
25  what is said about looking at something and making

ANDREW JOHN LEGG

1
2  judgment on the basis of what you see.
3      Q.  Is that what you did in these particular
4  studies, the mannequin study and the human study?
5      A.  Yes, in terms of the observational side
6  of things, yes.
7      Q.  You felt that they were both useful,
8  useful studies?
9      A.  Very much so.
10      Q.  And they both were submitted to highly
11  respected peer-review journals?
12      A.  Yes.
13      Q.  And they were both accepted for
14  publication?
15      A.  Yes.
16      Q.  Do you stand by the findings that you
17  published in these studies?
18      A.  Absolutely.
19      Q.  I don't have anything further?
20      THE EXAMINER:  Except you're going to
21  make that an exhibit.
22      MS. ZIMMERMAN:  That is right.  We will
23  formally offer Exhibit 2.
24      THE VIDEOGRAPHER:  We're still on the
25  record.

ANDREW JOHN LEGG

1
2  EXAMINED BY MR. GORDON:
3      Q.  The journal which you published, the Bone
4  and Joint Journal, excuse me, are there two
5  different versions of it -- an American one and a
6  British one?
7      A.  There is.  Yes.
8      Q.  Which one did you publish?
9      A.  The British.
10      Q.  Do you have any idea what the impact
11  score of the Bone and Joint Journal of Britain is?
12      A.  I don't know, no.
13      Q.  Okay.  Counsel asked you about your
14  discussion about the potential for particles to move
15  bacteria to the surgical site.  Based on your
16  research do you have any reason to think that that
17  concern is anything other than a theoretical
18  concern?
19      A.  It's only a theoretical concern because I
20  didn't prove it.
21      Q.  Okay.  Even with 1,000-fold increase in
22  the particle counts that you saw, the agar testing
23  that the hospital used routinely to see if the OR
24  was okay, it passed that -- it met those standards?
25      MS. ZIMMERMAN:  Object to form.

ANDREW JOHN LEGG

1
2      MR. GORDON:  Correct?
3      THE EXAMINER:  Answer.
4      THE WITNESS:  Yes, it did, but you're
5  getting things slightly confused.  The 1,000-fold is
6  partly because we introduced particles onto the
7  floor in the second study, so we exaggerated the
8  difference.
9  BY MR. GORDON:
10      Q.  Even with that exaggerating difference,
11  agar plate still didn't grow out --
12      A.  No.
13      Q.  -- greater than one CF unit?
14      A.  No.
15      Q.  Okay.  I was a little confused about the
16  reference to 3M employees.  Were you saying that
17  there were 3M employees involved in either of your
18  studies?
19      A.  I don't know exactly who Albright (sic)
20  and Augustine worked for in addition to HotDog in
21  terms of they manufacture the HotDog, but they have
22  no -- if they're not part of 3M, no, is the answer
23  to that.
24      Q.  Did you know at the time that Augustine
25  and Albrecht were affiliated with HotDog?

ANDREW JOHN LEGG

1
2     A.  Yes.
3     Q.  Did you know at the time that HotDog was
4  a competitor of the Bair Hugger?
5     A.  Yes.
6     Q.  In your hospital is the orthopedic
7  surgeon responsible for setting up the draping and
8  the warming device?
9     A.  The warming device is usually applied
10  from the anaesthetic side, but I would, I make sure
11  it is where I want it to be, and then I set up the
12  draping side of things.
13        THE EXAMINER:  You personally, or do you
14  instruct someone else how to do it?
15        THE WITNESS:  Me personally with somebody
16  else.
17  BY MR. GORDON:
18     Q.  In terms of -- what role, if any, does
19  the anesthetist, or I guess you say the
20  "anesthetist --"
21     A.  Anesthetist.
22     Q.  -- have in determining what type of
23  warming to use in the configuration of it?
24     A.  None.  In most, well most hospitals I
25  have worked in there is only the Bair Hugger and,

ANDREW JOHN LEGG

1
2  therefore, warming device is very important.  It
3  goes on the torso, I move it and instruct them if it
4  is too low down or too high up that I am concerned.
5     Q.  Your hospital is part of the NHS.
6  Correct?
7     A.  Correct.
8     Q.  As part of the NHS are you required to
9  report surgical-site infections from the knee and
10  joint replacements?
11     A.  Yes.
12     Q.  In the time that you have been affiliated
13  with your current hospital using Bair Hugger, have
14  those infection rates been high relative to other
15  hospitals---
16        MS. ZIMMERMAN:  Object to the scope.
17  This is outside the scope of cross.  Beyond the
18  scope of cross.
19        THE EXAMINER:  It does seem to go
20  somewhat beyond what was questioned about in
21  cross-examination.
22        THE WITNESS:  Can I answer or not?
23        THE EXAMINER:  If you're not going to
24  take this any further, Mr. Gordon, I will allow the
25  witness to answer the question.

ANDREW JOHN LEGG

1
2  BY MR. GORDON:
3     Q.  Yes.  All I want to know is where the
4  hospital stands in relationship to others?
5     A.  No, is the answer.  It hasn't increased.
6  (Reporter clarification)
7        Increased.
8     Q.  And compared to other hospitals in the
9  NHS it is not an outlier?
10     A.  No.
11        MS. ZIMMERMAN:  Objection:  Foundation.
12        MR. GORDON:  Thank you.  No further
13  questions.
14        THE EXAMINER:  Thank you very much.  That
15  concludes your examination:
16        THE VIDEOGRAPHER:  This is the end of DVD
17  2 in volume 1 of the deposition of Mr. Andrew Legg.
18  We're going off the record at twenty-past five.
19        THE EXAMINER:  Thank you both.
20        THE VIDEOGRAPHER:  Excuse me, we're back
21  on the record for the production -- we're staying
22  on... We need to put the production order on the
23  record, they have asked us, since this is the first
24  deposition.  I believe that, Mr. Gordon, you want a
25  synchronized DVD.  Is that correct?

ANDREW JOHN LEGG

1
2        MR. GORDON:  I don't know that I want
3  synchronized.  What is that?
4        THE VIDEOGRAPHER:  Synchronized to the
5  transcript.
6        MR. GORDON:  I don't.
7        MS. ZIMMERMAN:  It's closed captioning at
8  the bottom.
9        THE VIDEOGRAPHER:  Do you want that?
10        MS. ZIMMERMAN:  I don't think we need it.
11        THE VIDEOGRAPHER:  Not at this point?
12        MS. ZIMMERMAN:  Not at this point.  Yes.
13        THE VIDEOGRAPHER:  Both the other two
14  parties--
15        MR. GORDON:  I don't want it at the -- I
16  don't normally.
17        THE VIDEOGRAPHER:  Just the court report
18  and the exhibits.  Anything else?
19        MR. ASSAAD:  And expedite.  Expedite by
20  tomorrow?
21        THE COURT REPORTER:  By tomorrow?
22        MS. ZIMMERMAN:  Is it a possibility, is
23  what he meant to ask.
24        THE COURT REPORTER:  Maybe by Sunday.
25        THE VIDEOGRAPHER:  Read and sign.

31 (Pages 118 to 121)

Page 122

1        ANDREW JOHN LEGG
2        MS. ZIMMERMAN:  Read and sign.
3        THE VIDEOGRAPHER:  ASCIIs.  We're still
4    doing that.
5        MR. ASSAAD:  I guess the question I have
6    is if it's not going to get until Sunday I won't
7    expedite it.  If you can get before Sunday.
8        THE VIDEOGRAPHER:  Okay.  We're finished
9    at 5.22.  Recording has stopped.
10        (Whereupon the deposition concluded.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 123

1        CERTIFICATE OF DEPONENT
2
3
4
5    I, ANDREW JOHN LEGG, hereby certify that I have read
     the foregoing pages, numbered 1 through 117, of my
6    deposition of testimony taken in these proceedings
     on Thursday, December 1, 2016, and, with the
7    exception of the changes listed on the next page
     and/or corrections, if any, find them to be a true
8    and accurate transcription thereof.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23    Signed:  ........................
24    Name:   ANDREW JOHN LEGG
25    Date:

Page 124

1        CERTIFICATE OF COURT REPORTER
2
3
4    I, VICTORIA MARIE DAVIES LLB(Hons), Member of the
     British Institute of Verbatim Reporters, hereby
5    certify that the testimony of the witness ANDREW
     JOHN LEGG in the foregoing transcript, numbered
6    pages 1 through 117, taken on Thursday, December 1,
     2016 was recorded by me in machine shorthand and was
7    thereafter transcribed by me; and that the foregoing
     transcript is a true and accurate verbatim record of
8    the said testimony.
9
10    I further certify that I am not a relative,
     employee, counsel or financially involved with any
11    of the parties to the within cause, nor am I an
     employee or relative of any counsel for the parties,
12    nor am I in any way interested in the outcome of the
     within cause.
13
14
15
16
17
18
19
20
21
22
23    Signed:  ........................
24        VICTORIA MARIE DAVIES
25    Dated:  December 13, 2016

Page 125

1    NAME OF CASE:
2    DATE OF DEPOSITION:
3    NAME OF WITNESS:
4    Reason Codes:
5        1. To clarify the record.
6        2. To conform to the facts.
7        3. To correct transcription errors.
8    Page _____ Line _____ Reason _____
9    From _____ to _____
10    Page _____ Line _____ Reason _____
11    From _____ to _____
12    Page _____ Line _____ Reason _____
13    From _____ to _____
14    Page _____ Line _____ Reason _____
15    From _____ to _____
16    Page _____ Line _____ Reason _____
17    From _____ to _____
18    Page _____ Line _____ Reason _____
19    From _____ to _____
20    Page _____ Line _____ Reason _____
21    From _____ to _____
22    Page _____ Line _____ Reason _____
23    From _____ to _____
24
          _____
25

32 (Pages 122 to 125)

**A**

**a.m** 4:6 5:4
**ability** 14:3,4 98:16
**able** 32:25 33:16
  38:4 53:7 87:7
**abroad** 4:17
**abrupt** 66:21
**absolutely** 10:23
  44:5 115:18
**abstract** 70:23
  71:13,19,22,24,25
  74:23 75:3,10
**Abstract_Waste...**
  70:11
**accept** 6:14,16 10:5
  13:12
**accepted** 8:23
  110:4,6 115:13
**accepts** 6:19 15:9
  15:10
**access** 61:2,12
  69:18
**accidental** 16:5
**accords** 9:23
**account** 69:17
**accurate** 99:20
  108:2 123:8 124:7
**achieve** 47:22
**achieved** 17:14
**act** 4:15 95:18
**activities** 31:7
**actual** 33:8 60:17
  114:15
**acute** 96:2
**add** 12:12 55:20
**adding** 58:15
**Addinsell** 2:25 5:9
**addition** 117:20
**additional** 58:13
  62:23 104:15,16
  110:18 111:17
**Additionally** 13:23
**address** 11:20 23:7
  23:9
**adhesive** 60:21
  61:22
**adjust** 5:6
**adjustable** 91:6

**adjusted** 22:18
**adjustments** 22:15
**admissible** 21:22
**admit** 114:18
**advice** 53:7 54:8
  55:25 70:2
**advisable** 91:24
**advised** 54:11
  57:10 59:8
**affiliated** 117:25
  119:12
**Affirmed** 3:6 23:5
  23:13
**afford** 14:2
**afforded** 14:22
**affords** 11:10
**afraid** 43:19 98:4
**afternoon** 23:16
**agar** 53:14,22 54:5
  54:12,19 55:4
  57:4 58:9 59:16
  91:9 116:22
  117:11
**age** 94:23
**aggressive** 66:21
**ago** 30:10
**agree** 97:2 98:21
  101:23 102:3,18
  102:21 103:13
**agreed** 66:19
**agreement** 10:3
**ahead** 26:6
**air** 1:5 4:21 41:17
  43:8 50:21,25
  51:8 77:14 82:22
  83:7,8 84:20 90:3
  110:10
**air's** 53:16
**airflow** 34:17 35:8
  35:10,11 41:18
  43:9,17 46:9
  77:15 83:9 85:15
  88:11 89:10,16,21
  104:8,11,24
  105:21 110:13
**Albrecht** 31:3,5
  32:6,14 33:10,14
  33:23 35:4,12

36:8,12 42:4
  63:25 64:12,24
  65:13 66:5 67:12
  67:20 69:22,24
  71:8,12,21 72:18
  74:20,22 75:12
  76:4 77:9 79:15
  80:3,12,23 82:7
  82:15 83:15,23
  87:11 88:25 90:21
  91:8,16 117:25
**Albrecht's** 87:4
  88:17
**Albright** 117:19
**Albright's** 88:10
**Allen** 2:5 6:4
**allow** 9:20 13:13
  17:10 89:21
  119:24
**allowed** 14:13
**allows** 13:24
**alright** 21:19
**alterations** 33:7
**ambient** 78:15
**American** 5:18
  11:23 12:4,18
  13:25 116:5
**Americans** 23:21
**amount** 99:9
**anaesthetic** 118:10
**anaesthetist** 84:18
**analysis** 109:5
**and/or** 18:14 123:7
**Andrew** 1:1,12 2:1
  3:1,6,13 4:1,3,8
  5:1 6:1 7:1 8:1
  9:1 10:1 11:1
  12:1 13:1 14:1
  15:1 16:1 17:1
  18:1 19:1 20:1
  21:1 22:1 23:1,5,8
  23:13 24:1 25:1
  26:1 27:1,9 28:1
  29:1 30:1,16 31:1
  32:1 33:1 34:1
  35:1 36:1 37:1
  38:1 39:1 40:1
  41:1 42:1 43:1

44:1 45:1 46:1
  47:1 48:1 49:1
  50:1 51:1 52:1
  53:1 54:1 55:1
  56:1 57:1 58:1
  59:1 60:1 61:1
  62:1 63:1 64:1
  65:1 66:1 67:1
  68:1 69:1,9 70:1
  71:1 72:1 73:1
  74:1 75:1 76:1
  77:1 78:1 79:1
  80:1 81:1 82:1
  83:1 84:1 85:1
  86:1 87:1 88:1
  89:1 90:1 91:1
  92:1,10,14 93:1
  93:19 94:1 95:1
  96:1 97:1 98:1
  99:1 100:1 101:1
  102:1 103:1 104:1
  105:1 106:1 107:1
  108:1 109:1 110:1
  111:1 112:1 113:1
  114:1 115:1 116:1
  117:1 118:1 119:1
  120:1,17 121:1
  122:1 123:5,24
  124:5
**anesthetist** 118:19
  118:20,21
**angle** 61:7
**annual** 70:25 73:4
**answer** 35:6 37:19
  39:4 49:12 57:8
  59:14 75:15,16
  97:8 103:19 117:3
  117:22 119:22,25
  120:5
**anticipate** 10:17
**anybody** 84:10
  92:24 93:5 111:2
**anyway** 16:5
**apart** 45:14 71:18
**apologize** 21:18
  27:3 64:4 73:18
**apparently** 15:13
**appear** 6:14 9:18

15:22,23 58:12
  71:7 75:10 80:11
  82:20
**APPEARANCES**
  2:4
**appears** 100:10,15
  104:22
**applicable** 12:23
**applicant** 12:12
**application** 7:22
**applied** 8:4 60:22
  118:9
**applies** 83:2
**apply** 8:2 19:20
**appointed** 6:5
**approach** 10:17
  12:3
**approached** 20:6
**appropriate** 7:7
  14:20 65:18
**appropriately** 96:4
**area** 40:14 85:17
  110:14
**ARGUMENT** 3:5
**Arizant** 2:16 4:23
  5:15
**arms** 15:16,21
**arrangements**
  30:21
**arranging** 20:18
**arthoplasty** 97:17
**arthroplasties** 46:5
**article** 43:5 65:9
  86:16,21 99:17,19
  100:22 101:4
**articles** 98:24,25
  99:21
**asbestosis** 20:10
**ascendancy** 24:10
**ASCIIs** 122:3
**Ashcroft** 43:12
**asked** 7:3 9:2,4,5
  15:18,24 19:7
  35:2 69:4 88:21
  97:25 109:4
  111:10 113:20
  116:13 120:23
**asking** 98:3

**Assaad** 2:19 5:20
  5:20 13:21 18:17
  18:22 19:3,11,18
  19:25 21:11,18,20
  40:7 48:14 121:19
  122:5
**assess** 53:2
**assist** 37:14
**assistance** 81:21
  87:5
**assisted** 88:6
**Association** 70:24
  71:13 72:5
**assume** 19:19,22
  38:23
**assumed** 50:6
**attached** 63:24
  64:7 70:23 96:17
**attachment** 70:6
**attempted** 53:12
**attention** 30:2,3,15
  47:9 48:10,24
  49:3 67:22 69:6
  74:9
**attorney** 25:10
**audio** 113:9,18
**Augustine** 66:6,6,8
  66:12 69:2 117:20
  117:24
**author** 27:2,5,12
  27:17,20,21,22
  28:11,13
**authors** 12:9 27:7
  27:19 71:22 72:14
  111:23
**automatically**
  101:20
**available** 17:9 19:5
  19:13 20:14
**Avenue** 2:21
**aware** 41:24 49:6
  49:10 67:18
  111:19 112:5,7,22
  114:18

**B**

**b** 103:4
**Bachelor** 95:2

**back** 16:23 17:19
  18:14,15 22:14
  24:7 43:4 47:11
  49:15 51:14,19
  52:15 54:23 55:6
  60:8 70:10 75:19
  76:24 78:17 79:4
  79:8,12 80:3
  92:15 98:23
  120:20
**background** 93:7
**bacteria** 52:18,20
  53:3,5,13,15 55:3
  55:21 58:6,7,21
  58:25 59:5,6,18
  78:5 86:2,5 91:18
  91:19 98:10,16,18
  101:21,24 102:9
  102:12 103:4,6,14
  116:15
**bacterial** 53:8,10
  56:13 58:15 86:6
  86:9 98:11,14
**Bair** 1:5 4:21 50:13
  52:4 55:12 58:14
  59:25 60:21,25
  61:21 62:9,15
  63:9 68:13 78:8
  91:24 103:25
  106:8,14 107:11
  107:15 113:21
  114:13,15,17
  118:4,25 119:13
**ball** 21:9,10
**barrister** 5:25
**barristers** 21:7
**based** 28:20,24
  31:23 65:7,16
  114:6,9 116:15
**basic** 108:18,20
**basis** 56:23 65:3
  111:3 115:2
**BASK** 72:5 73:4,21
  74:23
**beep** 113:5
**beginning** 4:7
  22:16 43:5 47:12
  77:2 92:13

**begins** 71:20
**behalf** 9:11 10:7,13
  10:14 11:22
**belief** 90:6,6
**believe** 27:2 46:25
  53:6 87:23 120:24
**believed** 76:10
**Bench** 4:12 22:22
**benefit** 23:21 86:22
  86:25 87:5
**benefits** 86:13
**bent** 51:20
**best** 60:9 76:11
  92:18 107:17
**better** 74:7
**beyond** 104:18
  119:17,20
**bicep** 96:16,17
**big** 26:19 42:21
**bit** 22:6 70:4 77:15
  93:18
**bits** 33:16
**black** 45:5
**BLACKWELL**
  2:14
**blanket** 35:18 52:2
  52:3 60:2,10,19
  60:21,25 61:18,22
  62:22 89:14,18
  107:2
**blankets** 60:6
  104:23 108:23
  114:13
**blocks** 22:9 83:17
**blown** 83:6,8
**blows** 82:21
**blue** 45:9,9
**body** 40:16 46:17
  61:13
**Bone** 26:25 101:8
  105:7 116:3,11
**book** 30:21
**bottom** 26:5 30:15
  43:6 69:7 70:22
  84:15 121:8
**bought** 80:5
**Boulevard** 2:18
**bound** 16:24 21:25

**Bradford** 94:7
**break** 20:20 92:8
**bring** 79:15
**Britain** 116:11
**British** 70:24 71:13
  72:5 73:11 116:6
  116:9 124:4
**broad** 44:10
**brochure** 34:18
**BSc** 95:2
**bubble** 32:19,21
  77:12 79:16 80:5
  106:4 107:10,14
**bubbles** 33:2,3
  35:11 105:22
**bundle** 30:8 38:15
**BURKE** 2:14
**bury** 10:22,25
**business** 20:15
**butchers** 24:4

**C**

**calculating** 106:18
**calculations** 109:11
**call** 6:12 20:3 67:20
  94:5,9 113:11
**called** 50:7 53:6
  70:6 100:10
**calling** 73:23
**camera** 32:22
  74:21 77:18,20
  79:16 80:5
**Canada** 2:11
**Cannon** 27:8 28:15
  39:16,23 60:3,22
  61:23 62:4 71:21
  72:16 73:15,16
**capable** 58:6 91:3
**captioning** 121:7
**card** 77:23
**Cardiff** 70:25
**carried** 58:7 64:24
**carry** 25:12 38:4
  102:9
**case** 23:25 27:22
  48:3 66:19 125:1
**cases** 20:10
**cause** 102:22

103:14 124:11,12
**caused** 34:11 108:8
**causes** 90:7
**causing** 43:10
**ceiling** 44:8,9 45:18
  83:25
**centimetres** 40:15
  41:5,9
**certain** 47:23 85:14
  110:12
**certainly** 10:18
  12:17
**CERTIFICATE**
  3:9,10 123:1
  124:1
**certify** 123:5 124:5
  124:10
**CF** 117:13
**chain** 98:6
**Chambers** 2:7 4:13
**change** 19:24 50:21
  90:14,19 92:8
  106:18
**changed** 88:9,12
  106:13 107:23
**changes** 62:25 63:4
  103:24 106:21,24
  107:5,7,10,14
  114:5 123:7
**channels** 39:3
**characterizations**
  112:23
**characterize** 86:12
**characterized** 8:8
**check** 54:16 56:22
**checking** 57:3
  112:14
**chest** 45:12 51:21
**choose** 76:20
**chosen** 12:13
**Christopher** 64:12
  64:14 65:13
**circumstances** 10:9
  44:18 56:17
**cite** 43:11
**cited** 43:24
**civil** 4:17,18 13:2
**claim** 4:23 22:20,22

clarification 32:20
  37:17 38:18
  100:13 120:6
clarify 46:14 49:22
  61:3 110:5 125:5
clarifying 28:3
class 108:13
classes 108:11
clear 10:23 11:4
  24:15 55:10 76:13
clerk 20:6,21 21:9
client 11:11
client's 21:22
clients 19:13
clinics 96:3
clipped 45:22
close 20:15 52:10
  80:11
closed 121:7
co-operated 11:25
Codes 125:4
coincidently 68:15
colleagues 64:3
  99:7,8
collect 42:16 78:5
collected 54:5
  55:11
College 95:6,10
colonies 54:12
colony-forming
  55:4,8 56:15
  57:15 59:21
column 37:2 77:2
  81:25
combination 42:20
come 8:22 18:14,15
  28:19 33:13 45:8
  60:10 113:2
comes 15:12 17:24
  45:11 61:17,18
  83:3,18
coming 31:5 70:17
  83:11,25 113:5
commencing 4:6
comment 13:8 63:8
  97:21
comments 69:15,19
  69:21 75:12

comments/sugge...
  69:10,13
commercial 4:17
  86:14,20
commission 20:11
communications
  12:8
company 2:16 4:22
  30:19 33:18 34:8
  34:10 35:15 41:23
  42:7 67:3 78:22
  86:20 88:5 110:25
compare 74:6,10
compared 97:20
  108:24 120:8
comparison 67:11
  80:15
competitor 118:4
compile 88:23
completed 8:9
  95:16
completion 78:13
complied 58:11
comply 10:23
computer 42:19
conceded 9:12
concentration
  108:22
concern 52:23
  85:17 102:4
  110:15 112:3
  116:17,18,19
concerned 15:20
  43:15 52:13 54:2
  119:4
concerns 41:16,21
  41:22,25 43:8
  69:25 92:3 110:19
  111:10,20,21
conclude 50:20
  85:20 104:6
concluded 16:25
  43:15 102:7
  122:10
concludes 120:15
concluding 36:13
conclusion 43:25
  82:25 90:6

conclusions 111:13
conditions 47:25
conduct 6:5,11
  8:12 29:14
conducted 7:11
  29:9,18 84:11
conducting 6:23
  8:7 15:14 20:9
  31:6 32:3 42:3
  103:22
conductive 35:17
  52:5
confer 20:20
conference 22:12
  113:6
confident 17:25
configuration
  118:23
configured 85:7
configuring 37:15
confines 22:4
confirm 8:18 52:19
  104:7 105:12
conflict 16:12
  17:23 87:25 88:14
  88:19
conflicts 86:11
  87:10,21
conform 125:6
conforming 47:6
confused 70:4
  117:5,15
connected 42:7
  46:8
connection 30:12
  31:14 47:20 68:12
  82:10 109:5 111:5
consent 10:12
  11:14
consequences
  97:17,22
consider 16:24
  18:16 58:2 86:19
  86:24 87:4 108:15
consideration
  99:22
considered 101:10
consistent 96:23

consistently 12:7
consultant 24:24
  25:2 27:9 93:20
  93:21
consultants 99:8
consulted 47:19
contact 20:21 21:5
  21:6,20 33:13
  35:3 36:7,11
  60:11 64:16 66:7
  68:5,6 82:4
contacted 33:20,23
  35:22 48:4
contains 12:22
contaminated
  82:21 85:16
  110:14
control 106:10,22
  107:8,15
convection 57:23
  89:13,17 108:8
Convention 4:16
conversant 20:9
conversation 91:12
conversations 93:4
copied 12:8 66:4,9
copies 89:2
copy 93:10,11 96:6
copyright 49:4
Corey 2:15 5:14
correct 6:16,19
  23:18,19 24:18
  27:13,17,18 28:16
  28:22,23 29:3
  31:24,25 32:12
  34:25 37:11 38:5
  39:16 40:23 43:12
  43:13,22 45:25
  46:6,22 47:8 48:8
  50:11,14 52:25
  54:20,21 55:15
  56:3,24 60:14,20
  61:8 63:19 65:10
  76:19 77:7 78:23
  80:7 83:13 84:3
  84:25 85:3,4,19
  86:18 89:11,19,23
  92:22,23 93:3,5,9

94:16 95:15 96:25
  98:12,19 99:2
  100:20,23 102:2,6
  102:14 105:9
  106:5,11,12
  107:19 108:3,24
  108:25 109:23,24
  111:14 114:2,8
  117:2 119:6,7
  120:25 125:7
corrected 90:10
corrections 123:7
correctly 51:3
  52:24 82:23 84:22
  85:18 86:17
  104:13 110:16
Costello 2:12 5:22
  5:22 48:15
costs 21:23
cotton 60:6
counsel 5:11 6:23
  12:9 13:5,13
  30:22 116:13
  124:10,11
counsel's 21:9
count 101:20,21,23
  101:25 102:4
  105:20 106:2,25
counter 33:18
  35:18 36:24 37:8
  40:3 79:21
counting 55:13
  80:14
counts 116:22
couple 19:4 21:2
  26:19 29:25
course 10:5,11
  17:15 19:9 22:18
  92:19
court 1:2 3:10 4:11
  4:12,19,24 5:8 7:8
  7:19,20,23,23,25
  8:2,10 12:4,10,19
  12:20,22 13:12
  14:21 15:11,25
  16:18 22:21 26:9
  96:7 121:17,21,24
  124:1

**Court-appointed**
6:2
**courts** 11:23 12:4
12:16
**Coventry** 25:24
93:24
**cover** 30:20 62:22
**covered** 60:5
**covers** 45:13
**CR2016-420** 4:24
**CR2016-520** 22:22
**created** 32:17 33:7
82:3 108:9
**criteria** 47:25
**critical** 96:22
**criticized** 112:7
**cross** 119:17,18
**cross-exam** 14:3
**cross-examination**
8:8,12 9:6,10,25
10:13,20 11:10
13:7,22 16:8,15
17:22 119:21
**cross-examine** 6:13
6:14 9:20 10:2
13:14 14:13,23
15:7
**cross-examining**
17:4,8
**cubic** 59:21
**cultured** 55:4
**culturing** 91:19
**current** 62:12 63:3
63:6 84:24 91:22
119:13
**currently** 93:20
95:23
**currents** 57:23
108:8
**curriculum** 3:13
93:11 96:6
**curtain** 83:11
**customers** 112:24
**CV** 72:9 73:2 98:24

**D**

**d** 3:4 6:10 9:9
13:22 15:8 97:12

**data** 81:15
**date** 5:3 123:25
125:2
**dated** 63:20 67:23
124:25
**Davies** 1:24 5:9
124:4,24
**day** 4:4 29:22 32:6
32:9,11 65:4 77:5
91:14 98:5 113:9
**deal** 48:13 65:20
92:4 111:2
**December** 1:17 4:2
4:4 5:3 19:16
22:18 123:6 124:6
124:25
**decide** 18:11 55:18
84:4
**decided** 65:24
**decision** 15:5 67:2
**deemed** 110:5
**Defendant's** 11:8
**Defendants** 5:15
9:12 12:3,12
13:25
**deferred** 66:5
**Define** 44:9
**degree** 11:11 94:20
94:25 95:3,3,5
**deliberately** 16:4
**delivered** 35:25
36:3,11
**depending** 21:12
62:3
**depends** 24:12
**depicted** 46:18
61:18 76:11
**depiction** 44:25
**DEPONENT** 3:9
123:1
**deposition** 1:11 4:3
4:8 5:7 48:22
92:10,14 120:17
120:24 122:10
123:6 125:2
**depositions** 8:22
12:6,17
**descendancy** 24:11

**describe** 28:20
82:10 85:6
**describing** 40:12
**design** 33:5,6 77:3
**designed** 42:11
**designing** 42:12
**Despite** 12:11
**details** 33:23
**detergent** 90:25
**determining**
118:22
**devastating** 103:15
**device** 46:18,19
50:8,21 51:2,8,17
51:22,25 52:3,7
53:17 55:12 57:4
60:13 62:11 78:5
82:3,21 107:22
118:8,9 119:2
**devices** 43:9,16
53:22 56:5 60:11
104:9
**diagram** 46:13
**differ** 62:19
**difference** 81:6,10
117:8,10
**different** 35:9
81:14 83:24 89:10
97:5 106:7 113:25
114:4 116:5
**differently** 85:8
**difficult** 61:5
**difficulty** 15:12
20:17
**digital** 77:18
**direct** 6:11 7:24 8:9
13:14 14:2 16:12
16:15,20 17:11
18:24,24 26:14
30:2,14 47:9
48:10,24 49:3
67:22 69:6 74:9
**directed** 8:4
**directly** 66:9 82:22
86:15,20
**disclose** 87:9 88:16
**disclosure** 86:11
87:10

**disclosures** 87:14
87:21
**discuss** 19:12
**discussed** 33:7
57:21 65:8
**discussing** 65:17
**discussion** 40:15
50:15 52:16 88:15
91:13 116:14
**discussions** 42:4,6
46:7 69:20 71:11
72:2 87:8,18
**dispute** 10:4
**disrespect** 23:23
**disrespectful** 24:16
**disrupt** 34:17 43:9
85:15 104:23
110:13
**disrupted** 50:25
51:8 104:8
**disrupting** 43:16
**distal** 96:16
**distanced** 87:19
**District** 1:2,2 4:11
4:11,19,20,25 7:8
7:9,19 12:20,21
14:21,21 16:18
**divider** 64:5
**Division** 4:12 22:22
**docs** 49:2
**doctor** 23:22 24:8
27:8 92:20 94:7
**doctors** 17:5 24:3,5
24:6 95:24
**document** 26:23
28:8 38:8 47:15
47:19 48:17,21
63:15 70:6,11,13
73:21 89:5
**documents** 3:12
**doing** 25:17 34:12
42:18,21 72:23
91:4 104:3 105:24
122:4
**doubled** 59:5
**doubt** 16:14 20:5,8
**downward** 50:25
51:7

**downwards** 89:10
**Dr** 5:23 19:13
23:18 28:13,15
30:16,25 39:23
60:2,22 61:23
62:3 65:7,13 66:7
66:11,12 68:9,17
68:23 71:20,20,21
76:7 87:8
**draft** 8:5 65:8,17
67:12,16,21 70:23
71:8 74:23 75:11
75:20 76:4,17
80:23 82:8 83:23
**drafted** 64:10
**drafts** 80:12
**drape** 44:8,12,17
45:2,5,9,16 46:10
60:10,12,19 61:2
61:6,17,19 62:9
83:3,6,18,25 84:5
84:17 85:5 90:7
**drapes** 62:23 83:11
**draping** 60:6,18
62:16 113:25
114:3,14,16,17
118:7,12
**draw** 85:16 110:13
**drawing** 44:22
**drawn** 108:9
**DULY** 23:13
**duty-bound** 10:23
**DVD** 4:8 92:9,14
120:16,25
**dwell** 38:13
**Dyer** 2:5 6:3,4
**dynamics** 108:16
108:19

**E**

**e** 3:4 6:22 9:19
14:12 15:13 16:3
17:2
**e-mail** 30:4 35:24
63:15,23,24 64:8
67:23,25 68:4
69:7,17 70:21
71:9 77:25 87:18

93:4
**e-mailed** 77:24
**e-mails** 65:23 66:2
66:10,11
**E14** 2:11
**earlier** 23:24 75:6
97:25 98:10
**easier** 44:21
**easiest** 51:10
**easily** 84:21
**East** 94:3
**EC4Y** 2:8
**edge** 60:24 61:21
**Edinburgh** 95:7
**effect** 91:17 107:22
**effectively** 15:8
22:3
**effort** 30:19
**eight** 25:16 94:2
**either** 17:4,12
23:19 31:15,15
64:12 76:5 86:2
88:22 117:17
**elbow** 96:17
**elbows** 45:6
**eliciting** 7:7 14:19
16:17
**employ** 39:6
**employed** 40:17
46:4
**employee** 34:5 88:5
124:10,11
**employees** 110:21
110:22,24 111:6
117:16,17
**enclosure** 40:21
44:13 45:8,21,23
46:9 62:21 82:22
84:20
**ended** 88:2
**engineering** 108:12
108:13
**England** 4:6
111:24
**English** 5:25
**ensure** 15:16,21
**ensured** 78:14
**entitled** 4:20 48:18

**environment** 54:18
98:15
**equality** 15:16,21
**equalized** 78:18
**equates** 101:20
**equipment** 5:5
32:18,24 33:2,17
33:21 35:6,14,20
35:25 36:10 37:10
42:9 54:14 72:23
77:5 78:21 79:14
80:5 86:24 87:7
87:14,22,24
**ERRATA** 3:11
**error** 6:15 9:2,13
13:9,13 15:10
33:19
**errors** 12:22 13:6
125:7
**especially** 97:17
**Esq** 2:15,19,22
**essentially** 46:19
57:4 61:6 62:17
64:2 66:16 83:17
91:2 96:17 98:17
99:6
**everyone's** 22:4
**evidence** 4:10,14
4:17 7:12 13:3
14:25 16:13,14
17:23 20:11 48:5
99:20
**exact** 43:19,25 81:7
81:10
**exactly** 29:15 62:5
72:10 105:16
110:2 117:19
**exaggerated** 117:7
**exaggerating**
117:10
**exam** 14:2,4 95:11
**examination** 6:6,11
6:12 7:6,11,24,25
8:9 14:18 17:11
17:11 18:24 23:15
92:17 97:7 120:15
**examination-in-c...**
6:24 9:6 14:12

15:14
**examinations**
17:16
**examine** 13:13
**examine-in-chief**
9:20
**EXAMINED** 3:7,8
3:8 116:2
**examiner** 2:5 6:3,4
6:18,21 8:13 9:17
10:15,22 11:12,16
11:19 13:11,16,19
14:5,8,24 15:5,18
16:20 18:4,7,19
18:25 19:21 20:5
20:23 21:8,15,24
22:24 23:3,6,11
24:10 25:9 26:16
27:15,24 36:17,19
36:21,25 37:4,18
38:2,10,20 39:13
39:18,20 40:24
43:20 44:3,16
45:11,23 46:12,20
46:23 47:11 48:6
48:12 49:12 51:14
51:16 52:7,10
57:8 60:12 61:24
62:3 67:7,16 70:4
73:2,6,10,13,16
73:20 74:2,13
75:15 76:15,20
77:13 80:15,20
83:10,20 89:4,7
89:12,17,20,25
90:9,13,18 92:7
97:9,14 100:6,24
103:2,11,19
109:14,18,21,25
111:25 113:7,12
113:15 115:20
117:3 118:13
119:19,23 120:14
120:19
**example** 20:10
38:19 99:17
108:16
**Exceeds** 97:6

**exception** 9:8 123:7
**exchange** 66:15
**exchanges** 66:15
**exclude** 12:14
84:18
**excuse** 14:6 75:5
116:4 120:20
**ExFlow** 40:21
**exhaust** 40:16
**exhibit** 3:12,13
26:3,3,6,11 41:14
47:10 96:7,8
115:21,23
**exhibits** 121:18
**existence** 47:21
**exists** 32:17
**expedite** 121:19,19
122:7
**expenses** 30:20
**experience** 99:9
**experiment** 29:6,6
32:3,14,15 33:22
34:12 35:5,7
39:23 44:7 50:19
53:20 57:11 71:16
80:4 81:13 86:23
88:7,8 91:10
**experimental** 28:25
33:5,6 77:3
104:10
**experiments** 29:9
39:15 64:24 65:8
72:18,23 84:13
**expert** 108:16
**explain** 23:23
36:15 46:13 99:3
109:25 114:23
**explained** 23:24
66:19
**explaining** 20:7
**explore** 44:16
**exposed** 61:16,20
**expressed** 66:20
**extend** 41:4
**extension** 84:17
**extensions** 40:22
41:4,7,9 45:7
62:21,22 63:7

84:25
**extent** 13:24 14:16

---
**F**
---

**f** 6:25 9:19 15:14
15:20 16:3 17:2
**fabric** 52:5
**face** 9:2,7
**facilitated** 42:8
**fact** 16:16 58:15
**factors** 101:14
**facts** 125:6
**fair** 14:14 15:3
**fairly** 9:12 38:8
66:21
**false** 70:16
**familiar** 82:14
94:11 98:6 108:18
110:21
**fan** 52:2
**far** 15:20 41:4
60:24 61:21 96:8
100:10
**Federal** 7:12 12:20
12:25 14:25 16:14
**feel** 66:23
**Fellowship** 93:22
**felt** 65:18,22 84:12
115:7
**field** 85:17 96:10
99:10 110:15
**figure** 81:9
**figures** 81:7
**figuring** 37:15
**File** 3:12
**finally** 95:10
**financially** 86:22
124:10
**find** 10:24 56:2
59:8 80:18 82:6
91:18 107:21
109:18 123:7
**finding** 108:4
**finding/getting**
58:11
**findings** 36:15
76:11 115:16
**fine** 80:18

**finished** 95:3 122:8
**first** 7:14 17:17
  26:14,19 27:18,19
  27:20,23 29:9
  30:3,6,7 32:16
  33:13,15,15 35:5
  35:7,13 36:13,16
  39:5,23 40:6 41:7
  41:13 44:7 46:25
  47:3 49:9 53:20
  73:22,23 78:8
  79:18 80:2 88:22
  91:10 94:6 103:23
  105:8 109:19
  120:23
**firstly** 99:12 101:15
**fit** 10:17
**fits** 103:4
**five** 90:12,15,16,18
  92:15 94:23
  120:18
**five-minutes** 22:15
**Fleet** 2:7
**flier** 34:14,15
**flip** 28:4 30:2
**floor** 40:15,22
  41:10 83:12,19
  90:3 117:7
**Florida** 22:25
  25:10
**flow** 50:25 51:7
**flowed** 78:11
**fluid** 108:16,19
**focus** 39:11
**focussing** 13:4
**follow** 16:25
**follow-on** 32:16
**Following** 22:12
**follows** 4:20 8:24
  15:5 23:14
**Fontaine** 4:13 8:19
  22:13
**FONTAINE'S** 3:5
**forced** 1:5 4:21
  41:17 43:8 50:20
  110:10
**forced-air** 34:16
  43:16 46:14 82:10

82:20 85:12,22
  92:5 101:16 104:8
  104:23 107:2
  108:6,23
**foregoing** 123:5
  124:5,7
**foreign** 19:25
**forget** 105:10
**form** 9:13 19:23
  34:13 37:16,18
  49:11 55:16 56:10
  57:6 58:18 59:19
  75:14 84:8 86:13
  91:25 102:24
  103:17 116:25
**formally** 115:23
**forward** 19:19
  69:11 71:17
**found** 52:22 108:22
**foundation** 26:12
  30:23 38:18,24
  94:5 120:11
**four** 65:11
**frame** 29:17 31:9
  31:14,15 46:4
**FRCS** 95:11
**frequency** 97:19
**frequent** 97:21
**frequently** 100:2
**Friday** 20:15
**front** 8:19 26:3
  43:4 83:17
**full** 8:15 23:6
  109:20
**fully** 94:11
**fund** 111:16
**fundamental** 14:7
**fundamentally**
  108:8
**further** 8:22 60:10
  104:7 112:4
  115:19 119:24
  120:12 124:10
**future** 104:10

**G**

**Gabriel** 2:19 5:20
**gained** 88:10

**GARCIA** 38:12
**Gauthier** 68:23
**gel** 53:15
**general** 14:25
  17:23 29:17
  101:18
**generally** 45:2
**generated** 78:10,20
**generator** 77:12
  80:6 90:22
**Genevieve** 2:22
  5:17 11:21
**gentlemen** 110:22
**getting** 20:2 42:8
  48:21 97:18 113:9
  117:5
**give** 17:18 55:24
  59:6 77:22
**given** 7:8 14:20
  16:13 17:24 38:15
  38:24 64:3 81:14
**gives** 55:22 60:9
**glycerol** 78:20
**go** 15:6 16:23 17:7
  17:19 19:12 22:6
  22:7 26:6 42:18
  51:14 54:11 67:10
  70:10 79:8 80:17
  94:19,20,20,21
  97:11 100:7
  119:19
**goes** 45:6,17 119:3
**going** 19:19,20
  20:25 21:3,13,23
  22:8 26:2 28:2
  33:8 38:7,12 43:4
  48:13 49:15 52:15
  59:11 65:20 67:3
  67:4,10 69:23
  70:19 71:14 89:4
  90:16 92:10 96:5
  100:6,9 115:20
  119:23 120:18
  122:6
**good** 23:16 35:10
  74:5 99:14
**Gordon** 2:15 3:7,8
  5:14,14 6:7,16

7:16 8:24 9:11,24
  10:9 11:5 15:9
  16:6 17:10 20:19
  21:6 23:12,15
  24:14 25:13 26:13
  26:18,21 27:25
  30:24 36:18,20,22
  37:2,7,21 38:6,25
  39:21 40:8,25
  43:23 44:6,15,19
  44:24 45:10,15
  46:2,24 47:13
  48:9,16 49:14
  51:24 52:6,14
  55:17 56:16 57:12
  58:19 59:22 60:15
  62:7 67:8,19
  70:18 74:3,14
  75:18 76:23 77:14
  77:17 80:17,21
  83:14,22 84:14
  89:6 90:16,20
  92:6 97:6,13,15
  97:25 100:14
  101:19 102:24
  103:17 109:4
  113:20 116:2
  117:2,9 118:17
  119:24 120:2,12
  120:24 121:2,6,15
**graduate** 25:18
**greater** 97:22
  117:13
**ground** 41:6 83:4
**group** 99:6
**grow** 117:11
**grows** 53:15
**guess** 60:2 64:5
  76:25 96:7 118:19
  122:5
**guessing** 49:9
**guiding** 96:4
**guys** 30:17

**H**

**h** 7:4 14:9,16 16:12
**Hague** 4:16
**Hamer** 27:9 28:13

32:8 34:15 42:13
  65:7,18,24 66:2,4
  66:12,24 69:20
  70:3 71:20 72:15
  73:3,17 84:10
  87:9 88:15 110:9
**hand** 39:8
**hand-held** 37:8
**HandiLaz** 36:23
  37:8 39:3
**hands** 18:11
**hanging** 46:10
**happened** 35:7
  49:23 65:4,21
  76:13
**happening** 69:20
  111:23
**happens** 56:20
  99:25
**happy** 19:9 35:24
  103:8
**head** 83:18
**Health** 47:7,16
  48:18 49:2
**healthcare** 2:16
  4:23 5:15 48:20
**hearing** 8:17,19
  10:6 20:18,22
**hearings** 20:9,12
**hearsay** 67:6,7
**heat** 82:2,7,9 84:19
  92:3 106:11
**heated** 83:5,7
**heating** 48:18 50:8
  89:13
**held** 39:7,10 45:17
**helium** 77:11
  105:22
**help** 30:18 41:3
  51:5 70:5
**helpful** 8:14 11:3
**helps** 73:2
**high** 4:12,24 7:20
  7:23 8:10 12:10
  12:19,22 15:25
  22:21 99:12,19
  119:4,14
**higher** 51:20,21

93:23 97:4
**highlighted** 33:19
34:9,11
**highly** 115:10
**Hilton** 4:5 5:8
**hip** 73:11,19 97:17
**historical** 24:2
**hitchhike** 102:13
102:15
**HODGES** 2:17
**hold** 39:8
**holding** 40:2
**hole** 61:17,19
**Holl-Allen** 2:8 5:24
5:24 6:18,20 8:14
8:16,18 9:22
10:16 11:3,13,17
16:6 17:25 18:5
19:7,17 21:16,19
39:19 51:15
**hoping** 71:16
**hospital** 23:9 30:17
31:6 32:18 36:2
46:4 47:22,24,25
54:14 56:4 57:2
58:22 60:17 63:8
64:25 69:17 84:10
91:22 105:14
116:23 118:6
119:5,13 120:4
**hospitals** 48:7
118:24 119:15
120:8
**host** 98:20
**hot** 83:7
**HotDog** 33:18 34:6
34:8,10,24 35:2
35:15,17 37:10,14
41:23 42:7,7
50:13 52:5 68:13
72:22 78:8,22
79:8 86:19,25
88:5 103:25
106:10,16 107:3
107:12 117:20,21
117:25 118:3
**hotel** 30:20
**hours** 21:3

**Houston** 2:18
**Howorth** 40:21
45:8 46:8 62:21
82:22
**HTM2025** 47:7,17
47:20 49:7,16
**Huddersfield** 94:7
**huge** 55:24 59:6,10
59:15,17
**Hugger** 1:5 4:21
50:13 52:4 55:12
58:15 60:2,21,25
61:22 62:9,15
63:9 68:13 78:8
91:24 103:25
106:8,14 107:11
107:15 113:21
114:13,15,17
118:4,25 119:13
**human** 29:2,6,7,10
29:11,12,13,18,19
31:13,16,17 35:13
36:14 39:19 51:18
59:25 73:24
100:10,25 101:2,3
103:23 111:11
115:4
**hung** 61:6
**hypothesis** 58:4,20

**I**

**I(d)** 13:7
**idea** 116:10
**ideas** 108:19
**identical** 19:23
76:21 80:12
**identification**
55:21
**identified** 9:9 16:3
72:14
**identifies** 71:20
**identify** 53:9
113:13
**ignored** 15:9
**images** 74:25 77:21
**imagine** 16:5
**immediately** 22:19
**impact** 116:10

**implemented** 63:4
**implying** 41:6
**important** 21:12
84:12,19 88:13
99:16,18 102:18
107:20,25 119:2
**in-chief** 6:12 10:11
**inappropriate**
13:18
**include** 55:18 84:4
**included** 16:4
**includes** 69:9
**inclusion** 74:23
87:17
**inconsistencies**
16:20
**inconsistency** 9:13
9:18 16:21
**inconsistent** 12:23
12:25
**incorporated** 4:23
8:5
**incorporating**
75:12
**incorrectly** 22:21
**increase** 50:22
52:21 59:17
102:10 108:22
116:21
**increased** 41:18
50:23 53:9 58:5
58:21 85:22
101:15,16,24
102:4 108:6 120:5
120:7
**increases** 85:13
110:11
**independent** 72:2
**independently**
65:25 87:20
**indicate** 58:13
**indicated** 7:23 8:3
49:4 59:17
**indicates** 57:23
83:23
**indication** 72:17,21
**indirectly** 86:15,21
**individual** 26:6

31:2
**infection** 41:19
43:10 50:24 85:13
85:22,24 86:5,6
96:22 97:4,18
98:2,7,11,14
102:11,22 103:15
110:11 119:14
**infections** 86:8,9
119:9
**information** 55:19
84:5
**initial** 34:12
**initially** 66:5,24
**INN** 2:7
**input** 88:10
**inside** 46:10 96:19
**institute** 63:6 124:4
**instruct** 114:14
118:14 119:3
**instruction** 114:9
**instructions** 10:7
10:12 11:14 37:23
114:13
**instructor** 95:18
**insulate** 63:9
**insulated** 82:4
**insulation** 62:23
**intended** 9:3
**intent** 8:3
**intentionally** 16:7
17:2
**interchangeably**
103:7
**interest** 87:22,25
88:14,20
**interested** 30:19
34:11 124:12
**interests** 25:25
38:11 67:9
**interfere** 41:17
89:20
**interfered** 12:2,5
**Internal** 36:19
**interpret** 10:24
**interpretation** 6:19
17:3 18:10,22,25
19:19,24

**interruption**
112:16
**introduce** 5:12
25:7,11 93:17
**introduced** 117:6
**introduction** 41:15
**investigate** 112:3
**investigations** 77:4
**investigators** 77:6
**invited** 30:16
**involve** 95:21,24
**involved** 28:15
32:7 112:17
117:17 124:10
**involvement** 87:5
87:10 88:17
**involves** 95:22
**involving** 28:21,25
29:10,11 33:17
**issue** 20:4 92:4
96:22
**issues** 6:8

**J**

**j** 6:10 7:10 16:12
27:4
**JNE/FLN** 1:7 5:2
**Job** 1:25
**John** 1:1,12 2:1 3:1
3:6 4:1,3 5:1 6:1
7:1 8:1 9:1 10:1
11:1 12:1 13:1
14:1 15:1 16:1
17:1 18:1 19:1
20:1 21:1 22:1
23:1,5,8,13 24:1
25:1 26:1 27:1
28:1 29:1 30:1
31:1 32:1 33:1
34:1 35:1 36:1
37:1 38:1 39:1
40:1 41:1 42:1
43:1 44:1 45:1
46:1 47:1 48:1
49:1 50:1 51:1
52:1 53:1 54:1
55:1 56:1 57:1
58:1 59:1 60:1

61:1 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1 72:1
73:1 74:1 75:1
76:1 77:1 78:1
79:1 80:1 81:1
82:1 83:1 84:1
85:1 86:1 87:1
88:1 89:1 90:1
91:1 92:1 93:1
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:5
123:24 124:5
**joining** 112:11
113:6
**joint** 26:25 101:9
105:7 116:4,11
119:10
**Jonathan** 2:8 5:24
**journal** 26:25
28:10 42:21 99:13
101:8 105:4,6,7
105:10 116:3,4,11
**journals** 98:25
115:11
**judge** 21:21 38:21
93:15,17 99:3
**judgment** 115:2
**judicial** 20:2
**July** 24:25 30:18
31:9,14,16,19,20
31:23 32:3 33:11
64:25 93:21
**jumbled** 64:5
**junior** 27:8,18 70:2
95:24
**jurisdiction** 10:20
12:17
**Jurisdictions** 4:15

**jury** 44:17 57:2
93:16,17 99:4
114:23
**Justice** 4:12,24
15:25 22:21

---
### K
**Katie** 2:12 5:22
**keen** 22:2
**keep** 79:7,7 89:16
107:17
**keeping** 77:15
89:12
**keeps** 113:5
**KENNEDY** 2:17
**kilobytes** 70:12
**kilobytes]I** 70:7
**kind** 37:22 54:22
60:6 61:5,18
62:11 102:12
**Kingdom** 12:5,10
12:13
**knee** 39:11 46:4
51:20,20,21 54:4
60:17 61:16 70:25
71:14 72:3 96:20
97:18 119:9
**know** 20:10,16
30:21 34:2 35:23
43:18 47:21,22,24
54:17 56:9,21
57:9 58:7 59:14
64:20 68:14 69:13
69:16 74:4,7
75:11,16,17 76:6
82:16,16,17 88:5
98:14 100:22
114:20 116:12
117:19,24 118:3
120:3 121:2
**knowledge** 56:20
68:8 99:21 114:12

---
### L
**lab** 53:18 54:20
**lack** 26:11 30:23
38:23
**laid** 51:19 84:2,6
**lamina** 89:10

**laminar** 34:17
**Laminar_resear...**
70:12
**lands** 53:15
**lapsed** 78:12
**large** 26:2 38:8
58:24 99:8
**lawyers** 12:18
**lead** 50:23
**learning** 112:19
**leave** 84:20
**leaves** 18:10
**led** 35:3 42:25
82:25 85:20
**Leeds** 25:24
**left** 50:5
**left-hand** 76:25
100:16
**leg** 61:17
**legal** 3:5 22:5
**Legg** 1:1,12 2:1 3:1
3:6,13 4:1,3,9 5:1
5:23,25 6:1 7:1
8:1,21 9:1 10:1,7
10:8,13 11:1 12:1
13:1 14:1 15:1
16:1 17:1 18:1,14
19:1,5,13 20:1
21:1 22:1 23:1,3,5
23:8,13,17,18
24:1,16 25:1 26:1
26:3,6 27:1,4 28:1
29:1 30:1,16,25
31:1 32:1 33:1
34:1 35:1 36:1
37:1 38:1 39:1
40:1 41:1 42:1
43:1 44:1 45:1
46:1 47:1 48:1
49:1 50:1 51:1
52:1 53:1 54:1
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:1,5 71:1 72:1
73:1,16 74:1 75:1

76:1 77:1 78:1
79:1 80:1 81:1
82:1 83:1 84:1
85:1 86:1 87:1
88:1 89:1,8 90:1
91:1 92:1,10,15
92:18 93:1,19
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1,4
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1,17 121:1
122:1 123:5,24
124:5
**Legg's** 69:9
**lengthy** 48:17
**let's** 14:6 19:22
25:12 47:2 90:18
92:7
**letters** 7:18
**level** 53:10 54:4,16
55:7 56:13,13,21
59:12,15 93:23
108:9
**levels** 47:23 78:17
**Liability** 1:6 4:21
**libraries** 42:21
**library** 42:19,20
**lift** 76:16
**light** 33:3 79:16
**Likewise** 106:24
**limb** 45:14 61:20
**limitation** 8:3
**limited** 2:10 7:24
9:4 14:12
**line** 22:25 41:14
43:6 45:5 47:5
48:25 82:19
112:12,14 125:8
125:10,12,14,16
125:18,20,22
**link** 113:6
**listed** 123:7

**literature** 96:10
**litigation** 1:6 4:22
13:25 93:2 112:19
**little** 64:4 77:15
82:2 93:18 117:15
**LLB(Hons)** 124:4
**Llewellyn** 21:5,7
**load** 53:8 58:16
**loaned** 35:14,16
86:25
**London** 2:8,11
**long** 24:22 29:13,20
54:9 98:5
**longer** 69:18
**look** 38:7 44:21
46:17 51:10 64:6
69:11 74:4,8 75:4
76:14 109:13
**looked** 34:23 35:8
83:4 111:20
114:19
**looking** 36:14
38:19 59:4 80:22
95:25 114:25
**looks** 42:14 43:11
**lot** 17:19
**low** 53:8 109:13
119:4
**lower** 51:2,8,22

---
### M
**machine** 32:19,19
32:21,21 33:18
35:16 78:19 79:8
79:17 106:4,18,25
107:11,14 124:6
**maintaining** 97:10
**majority** 94:21
100:2
**makers** 46:8 72:22
**making** 18:19
114:25
**managed** 66:17
**mannequin** 29:2,6
29:8,11,14,21
31:13,16,18,21
32:4 39:20 46:18
51:19 59:23 73:25

78:4,7 79:6 80:4
  100:25 104:21
  105:18 108:5,21
  110:8 111:11
  115:4
**manner** 28:7 57:5
**manual** 37:22
**manufacture**
  117:21
**manuscript** 63:25
  64:7,10,22 65:16
  65:17,19,20,23,25
  69:9,15
**Manuscript_Leg...**
  70:7
**March** 4:16
**MARIE** 124:4,24
**mark** 26:2,7 31:2
  33:23 63:25 64:12
  76:6 96:7 100:6
**marketing** 34:13
  34:18
**Master** 3:5 4:13,13
  8:19 10:21 16:23
  17:20,21 20:3,8
  20:13 21:17,18
  22:13
**Master's** 20:6,21
  21:13
**material** 48:21
  63:18
**materials** 100:11
  114:13
**matter** 4:9,15,18
  10:3,20,25 20:7
**matters** 4:9,18
**maximum** 22:2
**McGovern** 68:18
**MDL** 1:7 4:25 5:19
**MDU** 2:10
**mean** 17:20 59:10
  61:3 86:4 87:15
**meaningful** 12:16
  17:14
**means** 18:10 44:18
  99:5
**meant** 121:23
**measure** 53:5,7,12

62:6 67:13 85:24
  85:25 101:13
  105:17
**measured** 38:3
  78:16 101:14
  105:19,20,20
  107:2
**measurement** 38:4
  107:5
**measurements**
  49:17 103:22,24
  104:4 105:24
  106:7,14,15
  107:18
**measuring** 51:23
  52:7 106:19,22
**medical** 25:18
  42:21 68:14,16
  93:18 94:17,19,21
  94:22,22,24 95:3
  96:10 113:21
**meet** 47:23 48:7
  57:14 64:14
**meeting** 31:2 68:16
  70:25 72:3,7,8,10
  72:13 73:4,19
**meetings** 68:14
**member** 39:17 95:9
  124:4
**Memorandum**
  47:7,16 48:19
  49:3
**MESHBESHER**
  2:21
**met** 33:10 47:24,25
  64:16 68:9,18,21
  69:2 92:21,24
  110:23 116:24
**metal** 45:21
**meter** 41:6 59:21
  83:11
**method** 58:9,10,21
  58:22 62:16
**methods** 35:9
**metre** 40:22
**microbes** 102:22
  103:2,6,14
**microbiologist** 53:5

54:8,11 56:2,8,18
  57:16 59:8
**microbiologists**
  53:10
**microbiology** 54:20
**mid-to** 61:20
**middle** 40:25 47:4
  81:25 109:19
**Mike** 68:5,7
**mind** 23:19
**mine** 45:9 76:3
**Minneapolis** 2:15
  2:22
**Minnesota** 1:2 4:11
  4:20,25 7:9 12:21
  14:22
**minute** 93:14,16
**minutes** 49:18 50:5
  50:8,10 90:12,15
  90:17,19
**misleading** 107:24
**misplacement**
  13:21
**misspoke** 67:21
**Misstates** 57:7
**mister** 23:22,25
  24:5,7 92:19
**MN** 2:15,22
**mobilized** 57:22
  58:14
**moist** 98:15
**moment** 26:9 97:9
**moments** 18:15
**months** 29:16,25
  93:24,24
**Montrose** 2:18
**mounted** 39:8,10
**mouth** 34:10
**move** 19:4 46:12
  67:5 71:16 116:14
  119:3
**moving** 21:9,10
  26:2 55:13 91:22
  107:2
**MRCS** 95:9

—————————————
            **N**
—————————————
**N** 3:4

**Nachtsheim** 64:13
  64:15 65:13 69:2
  71:21 76:7
**name** 6:4 27:17
  33:24 36:5 43:21
  44:4 93:19 123:24
  125:1,3
**named** 27:19,20
  31:2 73:7
**names** 23:7 68:3
**narrow** 44:10
**nature** 50:19 66:14
**necessarily** 101:24
**neck** 46:20
**need** 113:15 120:22
  121:10
**needed** 33:16
  104:11
**needs** 98:15
**negative** 91:9
**neutral-buoyancy**
  77:11
**neutrally-buoyant**
  105:22
**never** 64:16 65:19
  66:18 71:24
**New** 25:24 93:24
**NHS** 119:5,8 120:9
**No-one** 25:12
**noise** 113:5
**normal** 66:22
  78:18
**normally** 15:21,23
  15:24 121:16
**north** 111:24,24
**Northern** 101:18
**note** 11:5 43:21
  44:4
**noted** 13:6
**notes** 100:15
**notwithstanding**
  8:9
**November** 5:5 8:20
  10:4 22:17
**number** 4:23,25
  17:6,8 22:20,22
  38:2 50:22 52:21
  55:24 58:24 65:23

68:3 80:8 100:3
  101:14 102:22
  103:14
**numbered** 26:5,22
  123:5 124:5
**numbers** 26:6
  47:14 80:8,12,22
  81:11,12

—————————————
            **O**
—————————————
**object** 8:7 14:3
  26:11 37:16,18
  49:11 55:16 56:10
  57:6 58:18 59:19
  75:14 84:8 102:24
  103:17 116:25
  119:16
**objection** 7:19 10:9
  30:23 38:23 97:6
  97:10 120:11
**objections** 17:12
  38:18
**observational**
  114:20,24 115:5
**obtain** 4:10 25:21
**obvious** 86:4
**obviously** 20:24
  32:25 48:17
**occur** 87:23 88:12
**October** 67:23
  68:18 71:9,12
**off-line** 113:10
**offer** 96:6 115:23
**offered** 111:16
**okay** 14:5 15:2 18:4
  26:20 27:14 28:6
  29:5 30:9,11,14
  32:2,10 34:5,20
  38:16 40:5 41:12
  41:24 42:3 45:10
  50:12,15 52:6
  55:3 62:8 65:5
  71:6,19 73:12
  75:19 78:3,19
  80:20 83:20 93:19
  95:5 96:21 97:14
  100:12 103:11
  105:17 108:15

113:18 114:20
116:13,21,24
117:15 122:8
**on-call** 95:25
**once** 8:8 53:15
**ones** 26:19 75:21
**ongoing** 113:21
**open** 112:14
**opening** 60:25
61:10,23
**opens** 17:6
**operate** 56:12
**operated** 45:14
77:18
**operating** 39:14
40:14 45:24 56:19
58:10,12 102:19
105:11
**operation** 39:12
54:10 84:11
**operations** 24:3
84:13 97:20
**operative** 89:22
**opinion** 7:2 15:18
16:22
**opportunity** 8:15
14:23
**opposed** 21:2 68:14
**options** 17:9
**order** 3:5 4:10 6:5
6:9,10,22 7:15 8:5
8:10 9:2,3,7,14,19
9:25 10:19,22
11:6,9 12:22 13:5
13:12,24 15:8,10
16:4,7,21 17:3,13
17:20 18:9,10,18
18:19,20 19:2
21:25 97:12
120:22
**orders** 19:22
**ordinary** 55:9
**original** 81:15
**originally** 7:18
**orthopedic** 24:21
24:22,25 25:21
56:12,19 57:3
93:20,25 95:19

96:23 97:2,3
102:5,23 118:6
**orthopedic-surge...**
103:16
**orthopedics** 25:17
93:7 95:12,14
96:19 99:9
**ought** 20:17
**outcome** 107:24
124:12
**outlier** 120:9
**outside** 78:16 111:6
119:17
**overrides** 14:11

---

**P**

**p** 81:14
**p-value** 109:10,15
110:2
**pack** 63:17
**page** 26:6,15 30:3
36:17,19,20 37:3
38:8 40:5,6,9,19
41:7,13,14 43:4
45:2 47:3,4,4
48:24 49:4 50:17
50:18 52:15 63:14
67:23 70:5,10,21
71:4,19,20 72:25
74:6,8,11,11 75:9
75:9,9,19,20,21
75:21,22 76:24
80:9,18,24 81:24
84:15 85:10,11
97:11 100:11
104:22 109:20
123:7 125:8,10,12
125:14,16,18,20
125:22
**pages** 26:4,22
47:10,15 48:11
64:6,10,22 65:6,9
65:11 71:5 75:4
80:18 123:5 124:6
**paper** 26:24 28:9
28:16,18,20,24
29:7,8 32:16 38:2
43:12,14,19,20

44:2,4 49:15
50:16 57:21,22
65:6,6,11 66:18
66:25 67:13 76:8
76:24 80:9 81:23
81:24 82:8 87:13
87:17,20 88:5,19
88:22,23 96:16
99:11 104:6,17,19
107:25 112:8
**papers** 89:2
**paragraph** 6:21
7:10 40:12 43:6
52:16 70:22
109:20
**parameters** 42:25
107:23
**pardon** 97:3
**Park** 2:21
**part** 4:13 13:10
45:7,16 47:22
57:11 61:12 67:3
94:23 95:8 110:24
117:22 119:5,8
**participated** 72:18
**participating** 12:18
32:2
**participation** 65:12
**particle** 33:18
35:18 36:23 40:3
58:5 78:17 79:21
80:8 101:20,23
102:4,13,15
105:20 106:2,25
116:22
**particle-size** 39:3
**particles** 38:3
50:23 52:18,20,21
55:13 57:20 58:5
58:8,13 78:21
83:5 85:16 89:21
90:8 101:15 102:9
102:19 103:4
108:9,23 110:13
116:14 117:6
**particular** 115:3
**parties** 7:21 8:4
16:10 121:14

124:11,11
**partly** 117:6
**party** 6:25 9:20
10:2 13:16,24
86:14,20
**party's** 7:3 15:19
15:23
**passed** 116:24
**patient** 39:17 45:14
45:17 82:5 84:2,6
102:23 103:16
104:9,23
**patient's** 45:12
83:18
**patients** 93:5 95:25
96:3 97:3 113:25
**pattern** 78:11
**peculiar** 16:9
**peer** 99:4,6
**peer-review** 98:25
99:16,22 105:3
115:11
**peer-reviewed**
101:4
**peers** 99:7
**pending** 4:19
**people** 63:8 79:9
92:2 94:19
**perfectly** 20:13
91:3
**perform** 33:8,16,21
84:12
**performed** 24:3
84:13
**performing** 60:17
**period** 25:14 29:20
54:6 57:20 95:2
**periodically** 56:22
**permit** 6:10 10:2
10:19 11:10
**permitted** 7:11
8:11 9:4,7 97:7
**person** 25:7 34:3,5
95:23
**personally** 118:13
118:15
**petitioning** 13:24
**phone** 35:24

113:14
**photocopy** 46:17
74:5
**photos** 74:6,10,11
75:20,24 76:9,10
76:12,17 77:19
**phrase** 82:7,9
**physician** 24:18,20
**physics** 108:13
**pick** 58:25 59:12
**picked** 59:13 79:11
**picking** 58:23
**picture** 34:16 51:11
60:8 61:4 88:11
**pictures** 33:3 74:16
74:18 76:25 77:25
**pieces** 35:20 37:9
78:21
**place** 5:7 7:14 63:3
84:18
**placed** 53:25 54:2
**Plaintiff's** 6:23
**Plaintiffs** 2:19,23
4:22 5:18,21 7:20
8:2,7,11 10:5,14
10:15 11:22,24
12:11,14,21 13:8
13:13,15 14:2,22
15:13 17:4 26:11
92:25
**plate** 53:22 54:12
57:4 58:9 59:16
117:11
**plates** 53:14,17
54:6,19 55:5
58:25 91:9
**play** 32:13,14
**played** 93:15
**playing** 39:25
**please** 5:11,13
**point** 18:2 32:15
35:10 36:7,10
38:17 41:24 50:5
50:6,9 51:18
52:13 61:9 68:7
69:21,23 70:17
95:19 121:11,12
**pointed** 17:21

points 14:25
poor 55:21
portability 38:11
posing 41:18
position 8:6,14
    10:8,18 12:21
    13:8 14:8,14 16:9
    16:19 20:16
positions 22:5
positive 55:24 59:7
possibility 18:13
    58:8 121:22
possibly 20:22
post-doctoral
    94:10,12
postal 36:3
poster 72:20
potential 13:6
    33:19,19 111:6
    116:14
potentially 41:18
    43:10 58:5 82:21
    85:16 89:21 93:15
    97:23 98:20
    103:15 110:14
power 18:9
PowerPoint 70:14
practice 62:12
    66:23 96:24
    113:22 114:6
practitioners 8:21
    9:15
precisely 14:15
    44:18 70:19
precluded 17:4,7
predominantly
    25:23
prefer 19:8
preliminary 11:23
premises 48:20
preparation 64:19
present 2:25 32:9
    39:22 55:22,24
    58:25
presentation 72:21
    73:3,22 74:24
presented 71:22,24
    71:25 72:11 99:20

presenting 71:13
    71:17
presumably 21:8
presume 69:16
    79:11 105:14
pretty 79:23
prevent 18:13
prevention 96:22
previous 73:13
    79:2
previously 90:2
    91:15
primary 27:2,5,12
    27:17,20,22 28:11
principle 108:4
prior 25:2,17 30:4
    31:16 33:10 37:12
    42:3 48:21 63:17
    68:4,7,11,18
    71:12 73:8 82:8
    82:14 93:22,25
    94:4 112:19
probably 21:4
    51:10 60:9 75:5
    79:25 89:6 113:10
probe 32:22 33:17
    35:17 79:18,19
problem 26:16
    33:20 92:5
procedure 13:2
    17:23 20:14
procedures 13:19
    60:17
proceed 17:10,12
    18:12,12 67:17
proceeding 4:18
    7:23 10:10
proceedings 4:14
    5:19 12:13,19
    13:10 123:6
process 11:25
    12:15 20:2 21:23
    30:12 99:16
    112:18
produced 50:21
production 84:19
    120:21,22
Products 1:5 4:21

professional 23:7,9
program 94:13
prohibition 9:24
prominent 101:10
proper 23:17
properly 7:2 9:5
    15:18,24
protection 11:11
    11:14
prove 116:20
provide 16:13,15
    35:25 88:25
provided 12:2
    35:21 37:10,22
    93:10
provides 7:4,10
provision 8:5 9:10
    11:9 15:22
provisional 10:18
provisions 8:10
    11:2
PS23 78:19 79:7
publication 55:19
    67:17 73:23 96:14
    100:16 101:11
    115:14
publications 96:13
publish 116:8
published 26:24
    28:10 31:22 42:15
    53:4 65:7,11
    67:14 96:9,15,16
    98:24 99:13
    100:19 101:7,8
    105:3 112:8
    115:17 116:3
publishing 71:17
purports 6:10,22
purpose 7:5,6
    14:10,16,17 16:16
    44:17 56:7
purposes 11:8
    19:23 39:14
pushed 66:18
put 31:13 34:9 81:7
    81:9,10 88:13
    90:25 120:22
putting 38:20

**Q**
qualified 24:5,24
qualifying 94:6
quality 99:14
quarters 37:3
Quay 4:5
Queen's 4:12 22:21
queried 7:25
question 17:15
    19:8,18 28:3
    30:25 35:6 44:11
    68:17 102:25
    103:18 119:25
    122:5
questioned 119:20
questioning 7:5
    9:11 10:11 14:17
    100:14
questions 7:2 8:25
    9:3,5 10:10 15:17
    17:6 18:23,24
    19:4,11 75:2 98:2
    98:4 101:19 109:4
    111:10 113:20
    120:13
quite 21:24 22:5

**R**
radiant 82:3
    108:24
railing 45:21
raised 6:8 41:22,25
    110:19 111:11,20
    111:22
random 78:9
Randomly 78:9
rates 119:14
re-contacted 79:12
re-direct 14:4
re-do 75:10
re-examination
    16:16
re-examine 6:13
    9:21 13:14,14
reached 50:6 111:9
reaching 40:14
read 22:20 27:16
    51:3 52:24 82:23

84:22 85:18 86:17
    104:13 110:16
    121:25 122:2
    123:5
read-in 22:16
reader 88:4
reading 99:17
really 54:7,7 55:20
    55:22 64:20,20
reason 11:6 21:11
    29:4 43:15 91:12
    116:16 125:4,8,10
    125:12,14,16,18
    125:20,22
recall 18:5 29:15
    31:2,5 33:24
    35:23 37:24 39:2
    43:14,18,25 53:16
    53:24 54:7,9,24
    54:25 55:3 60:24
    66:14,24 67:25
    72:9 74:19 75:2
    78:2,14 79:10
    82:12 87:12 88:18
    88:18 90:24 91:2
    91:5,11,16 101:19
    105:15 109:10,12
    113:22
receive 96:2
received 65:17
    86:14,14 114:10
receiving 67:25
    68:4 113:18
Recess 22:11 92:12
recognise 61:4
recollection 9:23
    71:8,18
recommended 55:6
reconciled 16:22
record 14:10 19:3,9
    19:12,13 22:6,8
    22:15 25:12 26:8
    26:10 38:21 92:11
    92:15 115:25
    120:18,21,23
    124:7 125:5
recorded 124:6
recording 5:5 7:7

14:19 16:17 22:17
92:11 122:9
**reduce** 102:19
**Reed** 68:5,7,9,10
**refer** 23:17,25 26:5
29:5,7,8 40:20
47:17 92:18
100:21
**reference** 9:10
36:23 40:13 42:21
47:3 65:12 117:16
**references** 42:14
42:16 43:2 88:21
88:22
**referred** 37:9 75:6
100:14
**referring** 23:22
24:16 41:20 60:8
71:9 81:6 86:9
100:22
**refers** 27:4 69:14
69:22 73:23 75:10
**reflect** 80:9
**refused** 100:3
**regarding** 106:16
**region** 94:2,8
**regular** 111:3
**related** 86:15,21
**relates** 17:15
**relating** 9:11
**relation** 46:15
64:23
**relationship** 120:4
**relative** 119:14
124:10,11
**reluctant** 113:12
**remember** 36:6
42:24 72:10 79:17
91:20 98:2,3,4
105:13
**Remind** 47:14
50:17 100:24
**removed** 11:15
38:10
**renew** 30:23 38:23
**rep** 79:11
**repeat** 23:3
**repeated** 12:11

**replacement** 97:18
**replacements**
119:10
**replicate** 98:16
**replied** 66:5
**report** 47:5 54:22
99:15 113:8 119:9
121:17
**Reported** 1:24
**Reporter** 3:10 5:8
26:9 32:20 37:17
96:7 120:6 121:21
121:24 124:1
**Reporters** 124:4
**Reporting** 5:10
**represent** 5:15,18
5:21
**representation**
74:7
**representative**
33:22,25 35:3,22
36:5 42:8
**represented** 7:20
8:20 10:6
**representing** 5:13
5:25 93:5
**represents** 92:25
**requested** 12:7
**requests** 12:11
**require** 52:18
**required** 48:5
98:10 104:7 119:8
**requirements** 47:7
98:13
**research** 30:18
31:6 42:16,19
69:12 88:23 94:10
99:11 111:17
114:6 116:16
**researchers** 111:19
**residency** 94:4
**resident** 25:5,15
**resistance** 12:2
**resolve** 16:20 20:4
**resolved** 16:23
**respect** 9:14 13:7
23:25 68:17 92:20
110:19

**respected** 115:11
**respond** 8:15
**response** 66:22
67:6
**responsibilities**
96:2
**responsible** 118:7
**rest** 45:13
**restrict** 6:22 16:8
**restricted** 6:25
11:6 15:17
**restricting** 11:9
15:13
**restriction** 8:25
9:25 14:11 17:22
**result** 59:2,7 63:11
102:10
**resulted** 107:23
**results** 50:24 51:7
58:11 84:5 91:9
**returned** 78:15
**revert** 24:7
**review** 64:3 99:6,11
**reviewed** 99:4
**revised** 69:8
**ridiculous** 9:19
**right** 25:25 31:10
32:11 37:2 39:18
45:11 47:11 49:15
49:23 57:17,24
61:15 68:17 86:2
86:5 89:8,22 93:8
95:13 96:5,8
98:23 100:4
105:16 108:21
109:21 114:7
115:22
**right-hand** 40:11
40:19 41:2
**rightly** 53:16
**rise** 83:7 89:21 90:8
**rising** 89:14,17
90:3
**risk** 41:18 43:10
50:23 85:13,22
97:4 102:10
110:11
**risks** 98:2

**Robert** 68:23,23
**Rocket** 78:19 79:7
**rogatory** 7:18
**role** 32:13,13,18
39:25 64:18
118:18
**room** 5:11 39:14
56:19 58:11,12
102:19
**rooms** 105:11
**rotation** 93:25
**Rotherham** 23:9
23:10 93:21
**round** 17:17
**rounds** 95:25
**route** 67:17
**routine** 56:23
57:16 58:10
**routinely** 57:2
116:23
**row** 74:10,10
**Royal** 95:6,10
**rule** 17:3 18:8
**rules** 7:12 12:23,25
13:3 14:25 16:14
**ruling** 18:8 21:13
21:13
**running** 88:6

**S**

**s** 111:22
**S4** 4:6
**safe** 54:18
**sample** 55:11
**sampler** 53:6
**samples** 54:5
**satisfied** 59:16,20
**satisfy** 48:2
**saw** 30:7 34:21
116:22
**saying** 18:18,23
29:4 89:13 112:3
117:16
**says** 5:5 11:5 14:16
30:15 38:2 48:25
49:2 69:7 70:14
70:22
**scenarios** 106:7

**schedule** 97:12
**scheduled** 17:18
**scheduling** 12:6
**school** 25:19 94:17
94:21,22,23
108:14
**Science** 95:2
**scope** 97:7 111:6
119:16,17,18
**score** 116:11
**Scott** 66:6,7,12
69:2
**search** 42:24,25
**searches** 42:22
**second** 5:6 17:15
19:18 25:7 28:9
28:16 40:11,24
41:14 44:22 47:2
47:4,5,5 70:22
73:24 74:11 75:9
75:11,21 78:3
79:24 81:25 88:22
104:16,19 109:20
117:7
**section** 6:9,9,10
13:7 45:24
**see** 10:17 14:6 15:6
17:13 20:21 21:21
22:6 24:13 30:6
31:12 33:21 49:19
59:4,6 61:5 70:8
71:2 78:5 89:7,7
104:25 115:2
116:23
**seen** 5:4 30:4,11
34:14 38:14 48:20
63:15,21
**selected** 74:22
75:24 76:6,9,10
**selection** 76:17
**self-evident** 11:7
**sending** 69:8 70:15
**senior** 3:5 4:13
8:19 16:23 17:19
17:21 20:6,8,13
20:21 21:16,18
22:13 27:21 28:13
99:7,8

sense 9:23
sensible 20:24 21:4
  90:13
sensitive 55:23
sent 34:14 53:17
  54:19 67:12 79:3
  112:22
sentence 51:6
separate 105:23
September 63:20
sequentially 26:4
SERJEANTS 2:7
service 36:4
SERVICES 2:10
set 7:13 8:14 20:4
  35:5 39:2 43:21
  44:4 48:7 77:11
  78:10,24,25 90:21
  90:23 114:15
  118:11
set-up 32:17 33:6,9
  40:18 44:7 46:3,9
  83:3 84:24 85:14
  88:8 89:24 101:17
  104:10 105:15
  110:12 114:3
set-ups 83:24
sets 47:23
setting 88:6 118:7
seven 97:11
Seventh 2:14
shared 77:22
SHEET 3:11
Sheffield 4:5,5 5:8
  25:23 30:17 31:6
  64:25
shorthand 28:19
  124:6
show 45:2 85:12,21
  85:23 110:10
showing 22:17
shows 60:9 73:2
sic 88:10 117:19
side 9:4 15:16
  40:11,20 41:2
  51:12 82:4 100:16
  114:16 115:5
  118:10,12

side-by-side 67:10
sides 7:21
sign 23:23,25 24:10
  92:20 121:25
  122:2
Signed 123:23
  124:23
significance 110:3
significance-of
  110:4
significant 52:21
  62:24 97:19 109:2
  110:5
significantly 85:15
  110:12
similar 62:23 73:21
  76:12,21 85:9
  111:23 114:3
Simon 2:25 5:9
simple 37:24
simply 76:16
single 60:18 62:9
  77:5
sir 5:13 6:20 8:18
  9:9,16,22 10:16
  11:4,5 14:15
  24:13 25:7
site 39:11 50:24
  51:2,9 52:8,22
  54:3 55:14 57:22
  58:14 89:22 90:3
  102:16 104:12
  108:7,10 116:15
six 43:21 44:4
  93:23,24 94:25
Six-minutes 22:23
slightly 117:5
slit 53:6
small 102:22
  103:14
smoke 32:19,21
  35:16 78:19 79:8
  90:21
soap 77:12
society 68:14,16
  72:3 73:11,19
software 81:22,23
sole 14:17

solely 13:11
solicitor 5:23
somebody 39:8
  118:15
somewhat 119:20
sorry 22:7,9 36:18
  69:5 70:15,16
  72:4 74:2,8 75:8
  77:13 83:16,16
  85:4 89:15 97:15
  110:5 112:16
sort 28:19 45:19
  81:25 90:2
sought 7:18 70:2
sound 22:9
source 33:3 79:16
South 2:14 94:2
speak 87:18
speakerphone
  25:10
speaking 13:18
special 20:3 21:12
Specialised 48:19
specialist 93:23
speciality 96:18
specialty 96:20
specific 48:6 55:23
  80:18 89:24 99:10
  99:13 101:17
  104:9
specifically 13:4
  18:2 32:23 43:18
  57:9 83:2 95:12
  95:22 98:8,9
  99:10 109:12
  111:21
SPENCE 2:21
spoke 53:4 71:15
  88:18 91:14
spoken 92:2
SPS 81:22
Square 2:11
stabilization 50:6
staff 48:4
stage 17:13
stanchions 45:19
stand 21:14 115:16
standard 46:3

56:14,20,21 57:14
  58:22 60:18 99:13
  99:19
standards 58:12
  116:24
standing 40:2
stands 120:4
start 47:2 76:4
started 82:17
starting 5:13 78:13
  104:22
starts 26:15
state 5:12 50:18
statement 11:23
  88:20
states 1:2 4:10,19
  12:25 14:21 16:18
  25:5 40:16 92:20
  92:25 93:16 94:3
  94:10 99:4 112:20
statistical 109:5
statistician 81:21
statistics 81:16,17
  81:18,23
staying 120:21
Stephen 21:5
sterile 110:15
stipulate 8:11
stop 25:6 90:14
stopped 92:11
  122:9
stored 77:21
straight 94:22
Strangely 113:12
Street 2:7,14
strike 35:19 58:2
  59:23 64:21 67:5
strip 60:22
student 94:24
studied 19:21
studies 29:24 63:12
  68:13 104:10,15
  104:18 105:11
  110:18 111:7,22
  112:23 115:4,8,17
  117:18
study 29:14,18,19
  29:21 31:13,13,16

31:17,18,21,22
  32:4 33:15,16
  35:13,14 36:13,14
  36:16 39:6 40:6
  41:13 42:3,11,12
  42:15 44:22 46:25
  47:3,17,20 49:7
  52:15,22 59:23,25
  65:5 74:11 75:22
  78:3,4,7 79:2,7,18
  79:24 80:2 84:16
  85:6,10,12,21,25
  86:12 87:3,3,7
  88:3 91:14 100:10
  100:15 101:5,13
  103:23 104:16,21
  104:24 105:8,18
  106:10 108:5,21
  109:6 110:9,10,23
  111:11,12 114:21
  114:24 115:4,4
  117:7
style 113:25
sub-specialty 95:13
subject 7:22 21:25
  28:21 29:2 86:15
  86:21
submitted 16:6
  70:24 99:21
  100:16 115:10
subparagraph 6:22
  6:25 7:4
subparagraphs
  7:15 17:2
subsequent 17:16
subsequently 68:21
successful 91:19
sucked 53:16
suggest 20:19
  50:24 51:7 91:23
suggested 66:22
suggesting 66:25
suggestions 69:22
  75:13
suites 57:3
suits 40:16
summarize 14:9
summary 14:14

15:4
**Sunday** 17:18
20:18,24 22:3
121:24 122:6,7
**superseded** 49:2,7
**supervising** 32:8
96:4
**supervision** 42:13
**supplied** 72:22
78:22
**suppose** 24:4 70:8
114:24
**sure** 18:2 40:4
49:21 51:5 54:17
54:24 55:10 56:25
79:23 89:25 91:15
99:12,18 103:5
112:21 118:10
**surgeon** 24:21,23
24:25 39:13 40:2
93:20 102:5 118:7
**surgeon's** 45:6
**surgeons** 24:7 95:6
95:10 96:23 97:2
**surgery** 26:25
70:24 71:14 96:20
97:3,5,18 101:9
102:23
**surgical** 39:11
50:24 51:2,9 52:8
52:22 54:3 55:14
57:3,22 60:6 61:2
85:17 95:8 102:16
104:11 108:7,10
110:15 116:15
**surgical-site** 119:9
**surprise** 91:21
113:2
**surprised** 53:11
65:21
**surveillance** 58:10
58:22
**susceptible** 98:20
**suspended** 44:8
45:18,18,20
**swear** 6:7
**switch** 91:24
**sworn** 22:20

**synchronized**
120:25 121:3,4
**system** 20:2 47:6
**systems** 40:17
48:18

───────
**T**
**table** 108:10
**take** 10:17 18:15
31:18 38:7 80:3
81:7,8,9 87:16
92:7 93:14,16
103:23 108:15
119:24
**taken** 1:17 4:4
20:11 22:11 49:17
74:20 92:12 123:6
124:6
**takes** 102:21
103:13
**talk** 49:16
**talked** 68:25
**talking** 24:13 51:25
72:4 99:11
**tall** 62:3
**tape** 61:22 90:11,14
90:19 92:8
**taped** 61:22
**Technical** 47:7,16
48:19 49:2
**telephone** 20:9,12
20:22 22:12
**tell** 26:23 28:7
53:12 62:5 63:23
91:8 93:18 96:12
100:3
**telling** 91:16
**temperature** 32:21
33:17 35:17 49:17
50:7,22 51:23
78:15,16 79:18,19
89:12,16 101:16
105:20,24 106:15
106:16,19,22
108:7
**ten-to** 92:15
**tendon** 96:17
**term** 82:13,16 98:6

103:3
**terms** 8:22 33:7
42:24 52:4 66:17
71:16 87:21 88:19
94:11 97:19,21
99:14 110:22
115:5 117:21
118:18
**terribly** 74:5
**test** 56:13,18
**testified** 23:14
98:10 113:24
**testimony** 7:7,21
12:24 14:11,20
16:17 38:24 57:7
123:6 124:5,8
**testing** 57:16,19
59:16 116:22
**tests** 48:5,6
**text** 40:12 43:6
**thank** 7:16 11:19
11:21 23:11,16
27:24 28:3 37:4
44:20 46:23 70:20
74:2 83:20 90:9
92:6,7 97:15
109:21 120:12,14
120:19
**theatre** 33:9 40:18
45:24 48:4 54:18
56:12 77:5 78:16
83:3 85:14 89:24
96:3 101:17
102:19 104:10
105:15,16 110:12
114:3
**theoretical** 116:17
116:19
**theory** 20:17
**thereof** 123:8
**thigh** 61:20,25 62:2
**thing** 24:2 26:14
100:9 107:21
**things** 26:2 56:11
64:4 88:9 114:16
115:6 117:5
118:12
**think** 6:18 8:13,23

13:17 15:3,8,10
18:7 19:12,23
20:23 22:20 29:25
34:14 38:12 55:22
63:7 66:24 68:6,7
72:8 74:8 75:4
87:22 88:3,13
90:14 92:3,4
97:16,20 98:9
100:13 103:2
110:24 111:22
112:13 113:15
116:16 121:10
**third** 16:9 96:14
**third-party** 12:9
**thoroughly** 20:8
**thought** 27:16
48:12
**three** 8:21 22:15
37:3 105:23 106:6
106:7
**Thursday** 1:17 4:2
123:6 124:6
**time** 5:4 10:6 12:14
17:19 19:5,14
20:14 21:22 27:9
27:10,12 29:17,20
29:23 30:7 31:9
31:14,14 41:8
46:4 54:6 55:11
57:20 60:16 63:21
67:9 69:19 70:2
71:15 78:12 84:10
87:16 88:12 94:3
95:2 96:9,9 99:25
99:25 111:23
117:24 118:3
119:12
**timing** 22:19
**tinker** 21:25
**title** 104:24
**today** 5:13 8:6
10:10,18 17:8,14
18:12,12 20:3
22:3 30:4 49:9
89:9 90:10 92:22
93:10 96:14 111:3
**Today's** 5:3

**Tom** 27:8
**tomorrow** 20:3
121:20,21
**tools** 104:3 107:18
**top** 44:25 51:21
60:2,10 62:9,24
74:10,10
**topic** 90:15
**torso** 61:19 119:3
**torso-warming**
46:19
**tracer** 78:20
**trainee** 25:4,15,16
27:11
**trainees** 95:19
**training** 25:22
93:18,23 95:6,9
95:14
**transcribed** 124:7
**transcript** 121:5
124:5,7
**transcription** 123:8
125:7
**transport** 52:18
**transportation**
53:3
**transporting** 52:20
58:6
**trauma** 96:2
**trial** 7:3,8 12:24
13:2 14:11,20
15:19,25 16:15,18
17:24
**tried** 53:8 91:17
**tries** 47:21
**true** 50:12 86:7
123:7 124:7
**try** 14:9 53:2
**trying** 21:3 28:18
36:14 53:5
**TSG** 5:9
**Tumia** 43:12
**turn** 44:22 63:14
65:5 71:4 72:25
75:19 90:25 98:23
100:5,9
**turned** 50:2,3,3,3,4
76:12 99:22,24

**Turning** 104:21
**turns** 20:25
**twenty-past** 120:18
**two** 4:9 12:16 19:5
  19:14 22:15 25:17
  29:19,24 59:5,11
  69:10 70:16 73:6
  83:24 94:4,5,6
  96:13 105:11
  111:7 116:4
  121:13
**two-thirds** 48:25
**TX** 2:18
**type** 8:25 15:22
  24:20 46:15 70:13
  78:4 97:5 118:22
**types** 85:14 105:23
  110:12
**typically** 13:17
  97:4

— **U** —

**UK** 2:8,11 12:20,22
  12:24 19:25 25:4
  34:3
**ultimately** 67:14
  99:22 100:19
  110:8
**unable** 50:20 52:19
**uncomfortable**
  65:22
**understand** 6:13
  11:12,16 14:24
  18:17 21:24 22:5
  23:16 25:9 27:15
  41:3 44:3 49:21
  49:22 51:6 83:21
  90:9 103:3,9
  112:2 113:7
**understanding**
  7:14,17 34:7
  57:13 59:13 61:5
  64:18 89:9 90:10
  96:21
**understands** 57:2
**understood** 90:2
**undertaken** 77:4
**unfortunately**

17:17 36:6
**unhappy** 66:17,20
**unidirectional**
  34:17 40:13 41:17
  43:9,17 46:9
  85:15 104:8,24
  110:13
**unit** 52:2 55:8
  56:15 57:15 59:21
  117:13
**United** 1:2 4:10,19
  12:5,10,13,25
  14:21 16:18 92:19
  92:25 93:16 94:10
  99:4 112:20
**units** 55:4
**university** 94:13,15
  94:20,25
**upper** 61:20,25
  62:2
**urgency** 20:7
**use** 13:2 33:21
  35:14 37:15,25
  42:9 50:20 53:23
  56:8,12,18 58:14
  62:11,14,15,16,20
  72:22 76:15 78:4
  82:6,17,18 85:7
  86:24 113:21
  118:23
**useful** 115:7,8
**uses** 58:22 63:6
**usually** 27:21 99:7
  118:9
**utility** 88:4

— **V** —

**validation** 47:5
**value** 55:25 88:4
**values** 81:14
**variation** 10:19
**vast** 94:21 100:2
**velocity** 91:5
**ventilation** 40:13
  47:6 48:18,19
**verbal** 54:23
**verbatim** 124:4,7
**vernacular** 76:16

**verses** 4:22
**version** 42:15
**versions** 116:5
**versus** 29:6
**vertical** 40:12,22
  45:5 84:17 85:5
**viable** 98:18
**Victoria** 1:24 4:5
  5:8 124:4,24
**video** 22:16 34:20
  34:22 93:14
**videographer** 2:25
  4:7 5:9 6:2 22:8
  22:14 23:2 25:6
  90:12 92:9,13
  112:10,13 113:4,8
  113:17 115:24
  120:16,20 121:4,9
  121:11,13,17,25
  122:3,8
**videophone** 25:11
**VIDEOTAPED**
  1:11 4:3
**view** 32:15 69:23
**visualisation** 77:15
**visualise** 35:8
  104:11
**visualized** 105:21
**visualizing** 35:11
**visualizing/visual...**
  35:9
**vitae** 3:13 93:11
  96:6
**volume** 4:8 26:3
  48:21 59:6 92:9
  92:14 120:17
**volunteer** 28:21
  35:13

— **W** —

**waist** 46:21 61:24
**wall** 40:22 41:4,7,8
  45:7 62:20,22
  63:7 84:17,25
**walls** 40:14
**want** 10:16 18:11
  18:15,17 20:25
  26:14 30:14 34:9

44:16 49:22 55:10
  56:25 67:9 69:6
  89:7 109:25
  118:11 120:3,24
  121:2,9,15
**wanted** 7:21 24:15
  107:21
**wants** 11:20
**ward** 95:24
**warm** 52:4 82:22
  90:3 98:15
**warmer** 46:14
**warming** 1:5 4:21
  34:16 35:17,18
  41:17 43:9,16
  49:18,25,25 50:2
  50:4,8,21 51:2,8
  51:17,22 52:3
  55:12 60:11,13
  62:11,22 82:11,21
  85:13,22 90:7
  91:25 92:5 101:16
  104:9,9,23 107:2
  107:22 108:6,23
  108:24 110:11
  118:8,9,23 119:2
**wasn't** 32:8 53:4
  58:23 59:17 83:5
  83:7
**waste** 82:2,7,9
  84:19 92:3
**waste-heat** 92:4
**wasting** 21:22
**way** 9:6 10:11,24
  11:6,9 12:3,6 13:9
  20:12 23:17,20
  24:13 28:19 35:11
  37:3 38:9 41:9
  48:25 51:10 60:18
  60:24 83:4,18
  124:12
**ways** 103:10
**we'll** 90:19
**we're** 19:3,14,15
  21:3 22:10,14
  38:12 55:10 73:23
  82:8 92:15 96:5
  100:22 115:24

120:18,20,21
  122:3,8
**website** 34:22,24
**week** 17:18 22:4
  69:10 70:16
**weekend** 30:17
**weekends** 29:19
**weeks** 19:6,14
  30:10
**went** 10:3 41:9 61:6
  94:15,17,22
**weren't** 53:10 59:4
  88:9 91:18
**West** 94:3
**willing** 30:20
**withdraw** 17:9,12
  97:13
**witness** 2:9,12 6:8
  6:24 7:3 15:19,23
  15:24 17:5,8
  22:19 23:8 24:12
  26:20 43:22 44:5
  45:13,25 46:16,22
  48:8 49:13 51:17
  52:9,12 56:11
  57:9 59:20 60:14
  62:2,5 67:18
  70:21 73:5,8,12
  73:14,18,22 75:16
  76:19,22 77:16
  83:13 84:9 89:11
  89:15,19,23 90:5
  97:8,16 101:2
  103:20 110:3
  112:5 117:4
  118:15 119:22,25
  124:5 125:3
**witness's** 38:24
**witnesses** 7:22 13:6
  16:8
**wondering** 80:13
**Word** 70:13
**wording** 6:9
**words** 6:14 9:18
  15:7,12,15,21,22
  15:24 16:2,25
  29:10 34:9 39:7
  112:2

**work** 21:3 28:21,25
  30:21 31:23 61:15
  69:24 104:7
**worked** 117:20
  118:25
**working** 69:11
  82:14
**works** 88:11
**worry** 113:16
**wouldn't** 59:8
  74:25 87:3,6
  91:13,20
**wrapping** 69:11
**write** 65:19,20,24
  67:4 87:19 110:9
**writing** 65:22
  67:13 82:8 88:2
  99:15
**written** 54:23,25
  64:2 65:3 71:10
**wrong** 15:11 90:4
**wrote** 65:2 67:2
  76:8

**X**

**X** 3:4

**Y**

**year** 8:20 56:22
  73:13 93:22 94:5
  94:24
**year's** 93:22
**years** 25:16,17 94:2
  94:4,6,23,25
**Yorkshire** 94:2,3,8

**Z**

**Zealand** 25:24
  93:24
**Zimmerman** 2:22
  3:8 5:17,17 11:21
  11:22 13:15,17,23
  14:6,15 15:3
  18:21 26:8,10
  30:22 37:16 38:17
  38:22 44:23 49:11
  55:16 56:10 57:6
  58:18 59:19 67:5
  75:14 84:8 92:17

97:11,24 100:4,8
  101:3 103:5,9,12
  103:21 109:15,19
  109:22 110:7
  112:6,12,15
  113:14,19 115:22
  116:25 119:16
  120:11 121:7,10
  121:12,22 122:2

**0**

**0.05** 110:6
**0.3-micron** 78:20
**00** 109:15
**001** 109:16
**03-01** 48:19

**1**

**1** 3:12 4:8,8 26:3,4
  26:6 40:22 41:14
  47:10,15,15 92:14
  120:17 123:5,6
  124:6,6 125:5
**1,000** 81:9
**1,000-fold** 108:22
  116:21 117:5
**10th** 19:16 63:20
**11** 22:9
**11.02** 4:6 5:4
**1105** 70:14
**111** 3:8
**113** 3:13
**115949** 1:25
**117** 123:5 124:6
**118** 3:9
**119** 3:10
**12** 47:4
**120** 3:11
**121** 47:10,15,16
**13** 88:22 124:25
**149** 38:8
**15-2666** 1:7 4:25
**1616** 2:21
**17th** 30:18
**18** 42:14 94:23
**18th** 4:16 30:18
**1970** 4:16
**1975** 4:15
**1AE** 2:8

**1st** 4:2,4 5:3,5
  22:17,18
**1st,2016** 1:17

**2**

**2** 3:13 92:14 96:7
  109:17 115:23
  120:17 125:6
**2,000** 81:8
**2,000,000** 80:23
**2,172,000** 81:3
**2,173,000** 80:23,25
**2,174,000** 81:5,8
**2000** 31:19 78:3
**2002** 43:11
**2005** 25:20 95:4
**2007** 49:5
**2010** 31:9,14,16,19
  31:20,23 32:3
  33:11 63:20 64:25
  67:23 68:19 71:9
  71:12
**2011** 27:2 28:18
  29:7 40:6,8 41:13
  42:15 43:5 47:17
  47:20 49:6 50:15
  52:15 57:21 70:25
  72:7 73:20 100:15
  100:17,21
**2012** 26:25 40:7
  73:4,21 100:19,21
**2013** 28:10,24 29:8
  31:22 65:5,6
  67:14 74:11 75:22
  76:8,24 80:9
  81:20,24 82:9
  84:15 85:6,10
  86:12
**2015** 96:15
**2016** 4:2,4 5:3
  24:25 123:6 124:6
  124:25
**2025** 49:3
**22** 3:6,7
**221** 38:9
**222** 48:11,15
**223** 48:24
**225** 49:4

**24-minutes** 22:9
**253** 70:12
**27** 3:12
**291** 75:4

**3**

**3** 125:7
**30** 40:15 41:4,9
  49:18 50:5,8,10
**391** 48:11
**392** 30:3,15
**394** 67:23 70:22
**395** 70:10
**3M** 2:16 4:22 5:15
  12:3 13:5 14:3
  110:21,24,24
  111:2,5,9,16
  112:7,22 114:10
  117:16,17,22

**4**

**4** 47:4 71:9
**4.37** 92:11
**406** 28:4 65:6
  104:22
**406-409** 65:12
**407** 44:23,25 51:15
  74:6,12,13 75:22
  76:25
**408** 80:9,16 81:24
  84:15 109:14,20
**409** 28:5 65:6 85:11
**411** 26:15,22 40:5,9
  41:14 100:11
**412** 36:20,21
**413** 26:15,22 50:18
  52:15
**426** 71:4,5,20
**428** 71:5 72:25 74:2
  74:4
**430** 63:14 70:6
**431** 2:14
**432** 64:6,10,22 65:9
**439** 80:16,19,25
**440** 80:16,19
**4409** 2:18
**450** 64:6,11,22 65:9
**456** 75:5
**476** 75:8

**477** 75:9
**491** 74:8,13 75:5,8
  75:20
**4th** 67:23 68:18
  71:12

**5**

**5.22** 122:9
**55404** 2:22
**55415** 2:15
**5GS** 2:11

**6**

**6** 3:5
**600** 70:7

**7**

**77006** 2:18
**7YA** 4:6

**8**

**8.30** 20:25
**85** 2:7
**89** 3:8
**8th** 8:20 10:4

**9**

**90** 40:21
**90-degree** 61:7
**9th** 19:15