1              UNITED STATES DISTRICT COURT

2                 DISTRICT OF MINNESOTA

3    ------------------------------------------------------------
                                    )
4                                   )
     In Re: Bair Hugger Forced Air  )   File No. 15-MD-2666
5    Warming Devices Products       )   (JNE/FLN)
     Liability Litigation           )
6                                   )   October 24, 2017
                                    )   Minneapolis, Minnesota
7                                   )   Courtroom 12W
                                    )   9:04 a.m.
8                                   )
                                    )
9    ------------------------------------------------------------

10          BEFORE THE HONORABLE JOAN N. ERICKSEN
              UNITED STATES DISTRICT COURT JUDGE

11
              THE HONORABLE FRANKLIN L. NOEL
12             UNITED STATES MAGISTRATE JUDGE

13           THE HONORABLE WILLIAM H. LEARY
            RAMSEY COUNTY DISTRICT COURT JUDGE

14

15           **(MOTIONS HEARING- VOLUME I)**

16   APPEARANCES

17   FOR THE PLAINTIFFS:
                              MESHBESHER & SPENCE
18                            Genevieve M. Zimmerman
                              1616 Park Avenue
19                            Minneapolis, MN  55404

20                            LEVIN PAPANTONIO
                              Ben W. Gordon, Jr.
21                            316 S. Baylen Street
                              Suite 600
22                            Pensacola, FL 32502

23                            CIRESI CONLIN
                              Michael V. Ciresi
24                            Jan Conlin
                              Michael A. Sacchet
25                            225 South 6th Street
                              Suite 4600

                    MARIA V. WEINBECK, RMR-FCRR
                        (612) 664-5109

```
 1                              Minneapolis, MN

 2      FOR THE PLAINTIFFS:
                                  KIRTLAND AND PACKARD LLP
 3                                Behram V. Parekh
                                  2041 Rosecreans Avenue
 4                                Third Floor, Suite 300
                                  El Segundo, CA  90245
 5
                                  KENNEDY HODGES, LLP
 6                                Gabriel Assaad
                                  4409 Montrose Blvd
 7                                Suite 200
                                  Houston, TX 77006
 8
                                  KENNEDY HODGES, LLP
 9                                David W. Hodges
                                  711 W. Alabama Street
10                                Houston, TX 77006

11                                FARRAR & BALL, LLP
                                  Mark Bankston
12                                1010 Lamar, Suite 1600
                                  Houston, TX  77002
13

14      FOR THE DEFENDANTS 3M:    BLACKWELL BURKE P.A.
                                  Jerry Blackwell
15                                Ben Hulse
                                  Mary Young
16                                Deborah Lewis
                                  Corey Gordon
17                                Peter Goss
                                  431 South Seventh Street
18                                Suite 2500
                                  Minneapolis, MN  55415
19
                                  FAEGRE BAKER DANIELS
20                                Bridget M. Ahmann
                                  90 South Seventh Street
21                                Suite 2200
                                  Minneapolis, MN  55402
22

23      COURT REPORTER:           MARIA V. WEINBECK, RMR-FCRR
                                  1005 U.S. Courthouse
24                                300 South Fourth Street
                                  Minneapolis, Minnesota 55415
25
```

1                  P R O C E E D I N G S
2        (9:04 a.m.)
3              THE COURT:  You have to forgive Patrick.  He just
4    found out this morning that he passed the bar, so we're the
5    least of his worries.
6              Welcome.  And let's just get right to it.  Why
7    don't we start with the opening statements.  Defendant?
8              JUDGE LEARY:  Judge Ericksen, if I could just
9    clarify for the record that it is the understanding and the
10   agreement that this is a joint session of the United States
11   District Court as well as Ramsey County District Court
12   Second Judicial District.  If there's any -- if I'm wrong in
13   that regard, somebody needs to speak up.
14              MS. ZIMMERMAN:  No, Your Honor, we agree.
15              MR. BLACKWELL:  Your Honor, you are right in that
16   regard.
17              JUDGE LEARY:  Okay.  Thank you.
18              THE COURT:  And I agree.  Thanks very much.
19   Mr. Blackwell, ready to hear from you.
20              MR. BLACKWELL:  Thank you, Your Honor.
21              Good morning, Your Honors, counsel.  Your Honors,
22   the Seventh Circuit perhaps said it best and as well as *In
23   Re Bausch & Lomb* MDL court, the courtroom is not the forum
24   to advance new scientific theories, noting that "the
25   courtroom is not the place for scientific guesswork, even of

1    the inspired sort.  Law lags science; it does not lead it."

2           I'm speaking this morning on behalf of 3M whose

3    product, the Bair Hugger, the plaintiffs have claimed causes

4    prosthetic joint infections.  While the FDA and the many

5    health and patient organizations inside and outside the

6    country that have weighed in on this have expressly rejected

7    that theory, not one epidemiology study has reached that

8    conclusion, not one clinical trial has reached that

9    conclusion; all are against it.  Not one biological

10   plausibility study supports that theory; all are against it.

11          Plaintiffs' own studies, their own reliant

12   studies, failed to reach the conclusion that the Bair Hugger

13   causes surgical site or prosthetic joint infections.  The 3M

14   Bair Hugger has successfully warmed over 200 million

15   patients, 50 thousand patients a day.  And to this very day,

16   not one treating physician has ever contacted 3M or the FDA

17   to say that they have a patient with a prosthetic joint

18   infection that was caused by the Bair Hugger.

19          So we say that 3M's -- that the plaintiffs' theory

20   is a novel theory.  It is novel not only because it is not

21   generally accepted in the scientific and medical community;

22   it is novel because it has been expressly considered and

23   repeatedly rejected in the scientific and medical

24   communities.  Not one valid scientific study reaches the

25   conclusion that the Bair Hugger causes prosthetic joint

1    infections, not even the plaintiffs' own studies, and

2    plaintiffs' experts here have not conducted even one study

3    of their own that reaches a different conclusion.

4            This is litigation science, plain and simple,

5    promoting a novel scientific theory of the Bair Hugger

6    causing infections when it's unsupported and uniformly

7    rejected outside of litigation in the so-called real world.

8    Why in the world would this Court want to give speculative

9    science, these Courts give speculative science to a jury to

10   reach a scientific conclusion that stands rejected by both

11   the FDA and the weight of the whole scientific and medical

12   communities?  What purpose would that serve?  And what kind

13   of chaos and confusion would that create in the scientific

14   and medical communities for doctors and patients alike?

15   That would be the epitome of the law leading the science and

16   not lagging it.

17           This should not be such a thing as litigation

18   science that stands out front and in stark contrast to the

19   general accepted science in the real world.  Plaintiffs have

20   to have science outside of litigation, testing the end point

21   of whether the Bair Hugger causes surgical site infections

22   or prosthetic joint infections and finding that it in fact

23   does.  They do not.

24           Scientific theories that have only been considered

25   in the general scientific community, considered and rejected

1       in the general scientific community, automatic never to go

2       to a jury for the purpose of establishing counter

3       propositions or to reach findings that go beyond the

4       peer-reviewed studies.  Your Honors should be extremely

5       skeptical about a so-called science generated for the first

6       time in litigation and equally skeptical of any litigation

7       attempts to, in quotes, blue pencil or re-characterize the

8       current body of the scientific evidence to recast it as

9       somehow supportive of causation when they expressly said

10      that it isn't.

11              And to be clear, Your Honors, this is not a weight

12      versus admissibility issue that's at stake here.  For there

13      to be a weight versus admissibility issue, there must be

14      something that constitutes weight under Rule 702.  Under

15      *Glastetter*, that weight must be scientifically valid proof

16      of causation in order for that to get to a jury.  Generally

17      rejected scientific theories should not constitute weight.

18      Reliant studies that expressly and uniformly do not find a

19      causal relationship between the Bair Hugger and infections

20      should not constitute weight.  Causation theories that live

21      and breathe only in litigation expressed by litigation

22      experts who have never publicly expressed those opinions

23      anywhere else should not be weighed.  If the best that can

24      be said of the plaintiffs' scientific theory is that it is

25      generally not supported by the scientific community, that

1    has to be the virtual near opposite of valid scientific

2    proof of causation in fact.  No general acceptance in the

3    peer-reviewed literature and no general acceptance in the

4    medical community should equal no weight, should equal no

5    admissibility.

6           The science upon which the plaintiffs' scientific

7    or medical case relies is unreliable, inherently unreliable,

8    because it is litigation driven, litigation created, has

9    been uniformly rejected in the scientific community outside

10   of this court, and it has severe methodological flaws to the

11   extent it is resting overwhelmingly on the McGovern study

12   and I'll also say the Augustine 2017 study.

13          And so why this is so important, Your Honor, is as

14   the Court said in a different MDL, *In Re Lipitor*, because

15   expert witnesses have the potential to be both powerful and

16   quite misleading, "It is crucial that the District Court

17   conduct a careful analysis into the reliability of the

18   expert's proposed opinion."  Wonderful opinion that's in

19   many respects on all fours with this case, *In Re Lipitor*.

20          I want to tee up for just a second this issue of

21   biological plausibility.  The general causation question

22   here is whether the Bair Hugger causes prosthetic joint

23   infections, not whether it moves air around or moves

24   particles or that sort of thing.  The claim is that it

25   causes infections, that simple, bacterial infection.  They

1    don't have even minimal facts or data that the Bair Hugger

2    is capable of releasing bacteria into the operating room or

3    moving bacteria to the surgical site, let alone prove that

4    it can cause a prosthetic joint infection.

5          There have been over the past 25 years, going back

6    to 1991, Your Honors, some nine different studies, the

7    latest of which is just this year, looking at this question

8    of biological plausibility, and every one of them concluding

9    the same thing that they could not find or culture any

10   bacteria coming from the Bair Hugger blanket when it's being

11   used properly, but the point is that not biological

12   plausibility itself gets you across the analytical gap

13   between the plaintiffs' proof and valid evidence of

14   causation to pass the Daubert muster.  Plaintiffs don't have

15   a single biological plausibility study even supporting the

16   propositions that they state here.

17         MAGISTRATE JUDGE NOEL:  Let me just ask this

18   question, if I could, two questions.  First of all,

19   throughout the papers there are reference to prosthetic

20   joint infection, surgical site infection, and deep joint

21   infection.  For our purposes today, are those -- I

22   understand that there are differences, but for purposes of

23   determining whether these experts are admissible or not, are

24   those synonymous?

25         MR. BLACKWELL:  Yes, Your Honor, from the

1    prosthetic joint infections are just a subset of surgical

2    site infections, and our view is that plaintiffs don't have

3    any science supporting either one.

4         MAGISTRATE JUDGE NOEL:  Okay.

5         MR. BLACKWELL:  So it becomes merged in, there

6    being no data there.

7         MAGISTRATE JUDGE NOEL:  And then my second

8    question is, as I understand it, there has been no clinical

9    studies, that is, blind, whatever you're calling the gold

10   standard, of this very question, whether the Bair Hugger

11   does or doesn't cause these infections.

12        MR. BLACKWELL:  Your Honor, there were two.  I'm

13   sorry, please.

14        MAGISTRATE JUDGE NOEL:  Wouldn't it be in 3M's

15   interest to conduct such a study?  And if so, why has such a

16   study not been done?

17        MR. BLACKWELL:  Your Honor, we'll point out and

18   we'll talk about this more fully in the context of

19   discussing the medical causation experts, but starting in

20   1991 there were two clinical trials done then where patients

21   were compared, those receiving warming from the Bair Hugger

22   to those receiving no warming, and those studies concluded

23   that not only was there not an increase in surgical site

24   infections, that in fact it decreased the incidence of

25   surgical site infection, and that was done early on.

1    And I might add further, Your Honor, in terms of

2    just the burden of proof -- and so the immediate answer to

3    your question is those studies have been done even before 3M

4    bought an interest in this particular product and company in

5    2010, so they had been done some nearly 10 years or plus

6    before, 20 years before.

7    And but the second part of this answer, Your

8    Honor, is that the plaintiffs have the burden to show that

9    to the extent their experts are making these claims that

10    they've got to bring forward that evidence, and we will show

11    to Your Honors that organization after organization,

12    including the FDA, has looked at all of the scientific

13    literature and concluded uniformly that there is no basis

14    for a claim in science that the Bair Hugger is causing or

15    contributing to cause either surgical site infections or

16    prosthetic joint infections.  So -- I'm sorry, Judge

17    Ericksen.

18    THE COURT:  As long as you're already interrupted,

19    is there any brief response you would like to make, you

20    mention the *Glastetter* case, and as you know, the plaintiffs

21    have criticized your reliance on the *Glastetter* case in

22    their papers.  Is there any response that you would make to

23    the criticism that *Glastetter* is not so good to rely on?

24    MR. BLACKWELL:  Only, Your Honor, that the Eighth

25    Circuit relies on it, and that's good enough for me, and

1    it's been relied upon by many courts in this circuit and

2    outside since it was decided.  So I think the plaintiffs'

3    position is probably more characterized as not liking the

4    *Glastetter* opinion, Your Honor, but it's not that it's

5    somehow bad law and is somehow make per curiam tantamount to

6    some unpublished and unreliable.  And it would be news to

7    the Eighth Circuit per curiam shouldn't be relied upon by

8    courts in this circuit.

9        THE COURT:  I think they were talking about the

10   medical certainty standard.

11       MR. BLACKWELL:  Well, the *Glastetter* opinion is

12   very clear in the interpretation of Daubert that there must

13   be scientific ly valid proof of causation, and the

14   *Glastetter* court was even clearer in talking about those

15   scientific proofs have to show causation in the real world,

16   not theoretical animal studies, textings, and so on to show

17   that there is impact in the real world, so those were

18   presented in *Glastetter*, rejected by *Glastetter* court,

19   ultimately concluding that they were not valid scientific

20   proof of causation.

21       And the language in *Glastetter* that the plaintiffs

22   are referring to related to the particular drug involved

23   there where they claimed it caused vascular constriction,

24   where the Court said that there was no scientifically

25   convincing evidence that this drug causes vascular

1      constriction.  That's what the *Glastetter* court in fact said

2      in quotes.  And so the plaintiffs may feel that they don't

3      have to meet the burden set forth in *Glastetter*, but the

4      Eighth Circuit didn't say that.

5              THE COURT:  Thank you.

6              MR. BLACKWELL:  So, Your Honor, getting back to

7      the type of evidence that the plaintiffs have here, I was

8      talking about biological plausibility as sort of an interim

9      sort of a screening, because not even biological

10     plausibility gets you across the hurdle into proper

11     scientific valid proof of causation, and many courts have so

12     held in causation cases such as this, but the plaintiffs

13     don't even have that.

14              So what they're relying on are these tertiary

15     secondary endpoint exploratory studies, studies that involve

16     bubbles and particles and had the beginnings of smoke

17     studies and studies that expressly disclaim causation, and

18     they don't even demonstrate, as I said, biological

19     plausibility.  So what are they relying on here?  They're

20     relying on those what I call smoke particle -- well, bubble

21     and particle studies.  They also rely on animation, a CFD.

22     And no court we could ever found --- could ever find this

23     computation of fluid dynamics animation.  We never found a

24     court that's found that a computer animation, especially an

25     unvalidated one, is a substitute for even showing biological

1    plausibility, much less causation in the real world.

2            They rely on the McGovern study, and we're going

3    to dive deep into McGovern, Your Honors, because at no

4    matter what level you look at the McGovern, on the surface

5    it is -- it is flawed on the surface.  It's flawed for the

6    reasons that Your Honors have already acknowledged that it

7    has many confounders that were not were controlled for and

8    never even considered, but as we plunge the depths of it, we

9    hope to share, and my colleague Cory Gordon who spent quite

10   a bit of time in the UK digging this out will come up to

11   talk about how that McGovern data is in fact cooked, it's

12   manipulated data, it's flawed data, it was manipulated when

13   the data went from Dr. McGovern and got into the hands of

14   Dr. Scott Augustine and his consort, and they essentially

15   manipulated the numbers to try and influence statistical

16   significance, and we can show that to Your Honors as an

17   additional reason why the McGovern study is hopelessly

18   flawed.

19           In the context of McGovern, we also want to talk

20   to Your Honors about the Augustine 2017 study.  This is a

21   study that the plaintiffs were for until they were against

22   it, and they were for it and volunteered it, Dr. Samet,

23   their expert, at his deposition as additional reliance

24   material.  Sorry, Judge Noel.

25           MAGISTRATE JUDGE NOEL:  I have this feeling of

1    déjà vu all over again.  It seems to me that in the context

2    of the motion on punitive damages, I thought everybody

3    agreed that the 2017 Augustine study was a non thing, that

4    it wasn't going to be relied upon by either side.

5    Defendants were attacking it; plaintiffs said we're not

6    going to rely on it.  I thought it was a dead letter, yet it

7    does show back up in footnotes of the memos and you just

8    mentioned it, so is it a thing or not a thing?

9         MR. BLACKWELL:  Your Honor, it is a thing to this

10   extent.  It's a thing to the extent that apart from what the

11   lawyers said, Dr. Samet himself volunteered at his

12   deposition that part of what he was relying on as bolstering

13   his opinion was the Augustine 2017 study.  That's the first

14   thing.

15        The second thing is what it reveals about the

16   motivation behind the manipulation of the McGovern data

17   because the same authors were involved in Augustine, the

18   2017 study.  And we can show Your Honors fairly clearly

19   enough that that was, in fact, again, a fraudulent study

20   that was sent through the peer review process claiming that

21   the Bair Hugger performed poorly at certain hospitals and

22   that we learned in affidavit said they didn't even use the

23   Bair Hugger.  And there was a motivation to cook that data.

24   And the same authors transferred over to McGovern went

25   through the same thing.  And so what we simply want to show

1    Your Honors that what's at bottom here is scientific or at

2    least science being used for marketing purpose and being

3    manipulated and being falsified for purposes unrelated to

4    good science, and so we want to spend just a little time on

5    August 2017 just to make the -- Augustine 2017 to make the

6    transition to McGovern to show it's the same individuals

7    that engaged in the same conduct with the same motivation

8    and the outcomes are just the same.  And it also we think

9    should cast greater skepticism on the overall reliance on

10   McGovern given that baked within it is the sort of

11   dishonesty that's part of a scheme, and that's why we want

12   to talk about it.

13        So, again, Your Honors, as we say, this is not a

14   weight versus admissibility issue, this is profoundly a

15   fundamental gatekeeping issue.

16        So, Your Honors, as I say, very familiar with

17   McGovern, we're going to spend a lot of time talking about

18   McGovern because it's Dr. Samet who said that McGovern is

19   the only study that -- and here's what he said, the McGovern

20   paper supplies the only estimate of the risk associated for

21   deep joint infections associated with the use of forced air

22   warming Bair Hugger device, so absent the quantitative

23   estimate from that paper, while it may be a quite plausible

24   mechanistic basis for increased risk, there would not be an

25   association in the real world.

1          And so we focus on McGovern because it's the only

2     real world study that the plaintiffs purport to rely upon,

3     and it's a very fragile study.  Part of the reason I want to

4     give Your Honors the backdrop and history of the motivation

5     is that it is so fragile that the difference of simply one

6     surgical site infection put over a HotDog column of the

7     study taken away from the Bair Hugger impacts statistical

8     significance, even just one.

9          MAGISTRATE JUDGE NOEL:  Let me just interrupt

10    there because this is question has recurred through all the

11    memos and this appears to be an opportune time to ask it,

12    although perhaps you're going to tell me I should hold my

13    question until you get to whoever is doing McGovern.

14          MR. BLACKWELL:  I don't think I'm allowed to, Your

15    Honor.

16          MAGISTRATE JUDGE NOEL:  In your papers you say

17    repeatedly that when you account for the confounders,

18    including what you're describing now is a

19    mischaracterization of one of the infections, the

20    association between infection and Bair Hugger disappears

21    entirely.

22          MR. BLACKWELL:  Entirely, Your Honor.

23          MAGISTRATE JUDGE NOEL:  Yet throughout the papers

24    there's this more detailed reference where as I understand

25    McGovern concludes that it's like a 3.8 times risk of

1    infection using Bair Hugger and then the plaintiffs go

2    through a bunch of arithmetic, and I believe I've seen this

3    also in your papers acknowledging that it goes from 3.8 down

4    to 2.76.  How does that disappear and what am I missing in

5    those two different factoids?

6            MR. BLACKWELL:  Your Honor, so going to the 2.76

7    is simply trying to correct the math in the first place,

8    putting the confounders aside, because the 3.8 itself is not

9    an accurate number according to the person who did the math

10   in terms of what appeared in there.  So there's a huge fight

11   or argument over what is the actual data and will the real

12   McGovern data please stand up, and we believe that we can

13   show Your Honors that the data we have is the real data.

14            And furthermore, to that point, a hopelessly

15   flawed and confounded study that the plaintiffs compound by

16   arguing that the data is flawed doesn't really help them to

17   prove that it's that much reliable given that the data is

18   supposedly confound and flawed, but once the express or

19   known confounders are controlled for, mostly the

20   anticlotting medication and the antibiotic, even Albrecht

21   who did the number crunching and was one of the study

22   authors of McGovern, says that the statistical significance

23   or difference is reduced to zero once the confounders are

24   controlled for.  So there are issues over the basic math and

25   whether the math is cooked.  I don't think there's a single

1    debate or discussion anywhere in this case that once those

2    confounders are controlled for that that number becomes

3    zero.  I don't think that's disputed and --

4            THE COURT:  Did you say that they're not

5    confounders, they're not real confounders, separate studies

6    show that it doesn't matter what clotting you use so it

7    doesn't matter if you switch the antibiotic?

8            MR. BLACKWELL:  That's right, Your Honor.  And

9    that's what example of what I referred to as sort of the

10   blue pencil approach to this is as to simply say the

11   confounders aren't really confounders, and so that is not

12   what the peer review has concluded, that's not what's

13   generally accepted in the scientific literature.  And with

14   all due respect to the plaintiffs on that regard, they

15   really are just whistling ipse dixit when they make that

16   claim.

17           THE COURT:  Did you just make that up?

18           MR. BLACKWELL:  It felt good, Your Honor.

19           MAGISTRATE JUDGE NOEL:  This is the first case, I

20   was just amused as I'm reading through the papers, the first

21   case I can think of in my 28 years on the bench where I've

22   actually had occasion to use and understand and actually

23   apply in context the phrase ipse dixit.

24           MR. BLACKWELL:  You'll get a lot of practice here

25   too, Your Honor.  Even the argument that the 3.8 odds ratio

1   is so big that it could not have resulted from chance,

2   completely made up.  There's nothing in the scientific

3   literature that says that a 3.8 odds ratio is so big that

4   you don't have to consider confounders.  There is no

5   reputable analytic approach to the science where confounders

6   shouldn't be considered.  Lots of ipse dixit here.

7        So when we get into the deeper dive on McGovern

8   and the numbers, I will tell Your Honors ahead of time it

9   will -- the space will get a little weedy.  We tried to make

10  it condense, but it's important to see, you know, where the

11  flaws are in the data that underlie all of this.  And, as I

12  say, Mr. Gordon will go into that in greater detail.

13       But Your Honors are very familiar with the fact

14  that the FDA has weighed in on the issues that are pending

15  in this lawsuit and the FDA letter that came out on

16  August 30th of 2017, and they did this having reviewed the

17  science, being aware of the claims in the lawsuit, having

18  looked at the literature.  They even looked at the so-called

19  fake MDR's that were discussed in the Court as well that

20  were purportedly, in one instance, sent by Dr. Gothey.  We

21  find out it was stated by Dr. Gothey; they were being

22  written in fact by Scott Augustine, and they looked at those

23  too.  And the FDA concluded, after a thorough review of the

24  available data, the FDA has been unable to identify a

25  consistently reported association between the use of forced

1    air thermal regulation systems and surgical infections.

2              What this is really relevant to and underscores is

3    what is the state of the art in the general scientific and

4    medical community?  The FDA is certainly adds this voice to

5    a consistent body of studies that have all uniformly found

6    that there's no science supporting a causation.

7              MAGISTRATE JUDGE NOEL:  You mention in your paper

8    that this paper came out after the FDA became aware that

9    certain hospitals were reluctant to use forced air warming.

10   How did the FDA become aware of that and what process did

11   the FDA go through in generating this August letter?

12             MR. BLACKWELL:  Well, Your Honor, the FDA became

13   aware in large part because of all of the publicity around

14   the lawsuits filed here in this MDL, from MDR reports, and

15   other reports filed by Scott Augustine to the FDA that have

16   been involved in investigations of claims submitted to the

17   FDA about this for years, and reached the point now where

18   physicians were starting to make decisions about patient

19   care based upon the kind of allegations that are being made

20   here that the FDA does not find any real basis for in the

21   real science out in the real world and so they wanted to

22   give directions to the physicians and patients, and this was

23   the outcome.

24             MAGISTRATE JUDGE NOEL:  So was anybody at 3M

25   involved in notifying the FDA that decisions are being made

1    by doctors based on this claim?

2              MR. BLACKWELL:  3M, Your Honor, was involved, at

3    least the FDA did investigate and question 3M, as they did

4    Scott Augustine.

5              MAGISTRATE JUDGE NOEL:  Sua sponte or 3M asked

6    them to investigate and interview us?

7              MR. BLACKWELL:  No, 3M did not ask FDA to

8    investigate and interview.  3M asked the FDA to investigate

9    the claims that Scott Augustine was making around the

10   science, and we will show Your Honors that as late as 2012,

11   with respect to the McGovern study alone, the FDA wrote to

12   Scott Augustine and asked him to stop making representations

13   that the McGovern study showed that efficacy of this

14   product, the HotDog, was good evidence that the Bair Hugger

15   performed relatively poorly in comparison to it is the best

16   answer I can give Your Honor, but this has been all over

17   from TV broadcast that some of the plaintiffs' firms in here

18   have been associated with.  It's just been into the news, as

19   one might expect.

20             MAGISTRATE JUDGE NOEL:  But isn't this letter,

21   this August letter from the FDA, somewhat unusual to just

22   sua sponte come out with a position in a case that is

23   clearly a major piece of litigation?

24             MR. BLACKWELL:  It's unusual, Your Honor, in a

25   case of unusual things.  It's unusual to have a case of this

1    sort where there are claims of causation where the

2    plaintiffs' own studies don't support causation.  It's

3    unusual for there to be this public kind of uproar and over

4    an issue that no scientific, valid scientific study

5    supports.  And so if the public starts to get worked up by

6    claims, by advertisements, et cetera, this comes to the

7    attention of the FDA and because there is no science and

8    uniformly no science supporting it, they took a position

9    because it becomes a matter of patient safety and care and

10   physicians not knowing what to do in light of this.  So

11   ultimately, Your Honor, so the -- as Your Honors know, the

12   FDA recommended the continued use of thermal regulating

13   devices.

14          And I will say too if the plaintiffs have some

15   evidence that they want to point to, anything that 3M gave

16   to the FDA or anyone else can be gotten through a FOIA

17   request, and if there's any kind of basis for a claim that

18   3M did something improper with respect to the FDA beyond,

19   you know, rumor, I'd love to hear it because we don't know

20   about it.

21          So I'll stop with this, Your Honor, because this

22   In Re Bausch & Lomb case is on all fours with this case in

23   many ways, where the Court there found plaintiffs cited no

24   published peer reviewed or scientific literature concluding

25   that moisture lock is related to an increased rate of

1      non-Fusarium infections because there is none.  No medical

2      or scientific organization or board, epidemiological or

3      anecdotal study has associated non-Fusarium infections with

4      moisture lock use.  That case, same as this case.

5              In sum, plaintiffs' theory is an educated guess.

6      And there it's the same with respect to this case.  There is

7      no study that the plaintiffs have that's a gold standard

8      study that's showing that the Bair Hugger causes surgical

9      site infections.  They don't even have biological

10     plausibility studies at all.

11             And Your Honors may wonder, given how easy it is

12     to test for biological plausibility, in taking up on Judge

13     Noel's question earlier about 3M's testing, that simply was

14     the simplest way, getting a little agar plate of petri plate

15     and just setting it out and trying to capture bacteria and

16     culture it.  How simple and how cheap is that to do?  You'll

17     find that not one of these very highly credential experts

18     did that one time and will come in and tell the Court the

19     results.  And given that, given how simple it is, should

20     cast some degree of skepticism on the science that they're

21     in fact promoting as proof of causation.

22             And we will show Your Honors in fact that the

23     exploratory study, the particles, the air movement and so

24     on, were studies that were concocted by Scott Augustine and

25     what he and his cohort Mr. Albrecht referred to as the

24

1    Augustine publication factory, and those studies were never

2    designed to establish whether the Bair Hugger causes

3    surgical site infections; those were studies designed to

4    completely avoid the question to get results they could use

5    for marketing purpose, and we'll show that to Your Honors

6    too.  It's completely unreliable, disreputable, and not

7    trustworthy.  Thank you, Your Honor.

8             THE COURT:  Thank you, Mr. Blackwell.

9             And Mr. Ciresi.

10            MR. CIRESI:  May it please the Courts, I presume,

11   counsel.  Let me address at the outset the FDA question that

12   was raised by the Court.  I'd love to know what 3M said to

13   the FDA.  What they responded in a specific objection to a

14   request is those documents are not relevant to the parties'

15   claims or defenses.  The deadline for general causation fact

16   discovery has passed and plaintiffs have not sought leave to

17   take out of time discovery.  A pattern of --

18            JUDGE LEARY:  Mr. Ciresi, are you suggesting that

19   the FDA bulletin or letter to physicians or the interested

20   health care providers was cooked in and of itself?

21            MR. CIRESI:  I have no idea whether it was cooked.

22   I'm not accusing the FDA of cooking something.  I am aware,

23   going back to Dalkon Shield to Mirapex, that there has been

24   case after case after case and product after product has not

25   been provided full, complete transparent information.  I

1    don't know what 3M said to them.  Do I believe that the FDA

2    in and of itself cooked its communication?  No.  And I'm not

3    suggesting that.  What I am suggesting is that we don't know

4    what 3M said and we cannot find out because they don't want

5    us to know.

6              JUDGE LEARY:  It strikes me as the most important

7    thing is whether or not in the estimation of the FDA its

8    report or bulletin was reliable, and it seems to me that

9    you're conceding that, from the FDA's point of view, it was

10   reliable.

11             MR. CIRESI:  What was reliable?

12             JUDGE LEARY:  Its report and its advice to

13   physicians and hospitals.

14             MR. CIRESI:  What was this report, Your Honor?

15   What did it say?

16             JUDGE LEARY:  Well, you have it.

17             MR. CIRESI:  Well, what it said was that the --

18   can't identify consistently reported association between

19   forced air warming and SSI's.  It didn't --

20             JUDGE LEARY:  Having looked at the available

21   literature.

22             MR. CIRESI:  It didn't talk about prosthetic

23   infections which goes to a previous question.  There is a

24   difference between deep joint infections and SSI's.  I can

25   get an SSI because you, the doctor, after the operation,

1    engaged in negligence with an unclean changing of the

2    dressing, all kinds of things --

3              JUDGE LEARY:  Let me stop you, Mr. Ciresi.  You're

4    saying that this report had nothing to do with prosthetic

5    surgeries, but the very reason why this report was issued is

6    because of the controversy that was being generated with

7    regard to forced air warming devices and prosthetic

8    surgeries.

9              MR. CIRESI:  Your Honor, what you have to look at

10   is what the FDA says.

11             JUDGE LEARY:  I just paraphrased what they said.

12             MR. CIRESI:  Paraphrased it.  You have to look at

13   the language --

14             JUDGE LEARY:  Mr. Ciresi, the impetus for the

15   report was because of the controversy that had developed

16   relating to the use of forced air warming devices and

17   prosthetic surgeries.  That's the reason they issued it.  So

18   it you want to parse the difference between prosthetic

19   surgeries and a common variety of surgical site infections,

20   that is not in -- that is not in that report.

21             MR. CIRESI:  That's what the data is about.  There

22   hasn't been -- you asked about whether -- one of the Judges

23   asked about whether there's been a study, a particular

24   study, there hasn't been.  3M did not do it.  It was

25   recommended that they do it by Dr. Sessler.

1           JUDGE LEARY:  All I'm talking about is what the

2     FDA did, and they said that they looked at available

3     literature, the --

4           MR. CIRESI:  Your Honor --

5           JUDGE LEARY:  -- issue that was in controversy.

6           MR. CIRESI:  Yes, and they do not have a study

7     that looks specifically at that issue.  Now, as long as

8     we're on epidemiology, I was going to get to that second.

9     I'm here for two purposes.  Number one, what are the

10    material evidentiary facts which establish the general

11    factual construct underlying and underpinning the motions

12    before Your Honors; secondly, the role of epidemiology in a

13    general causation context.  And that's precisely, Your

14    Honor, where you're at right now.

15          The role of epidemiology, statistically

16    significant epi studies, are not required for causation in

17    the scientific world.  Epi studies prove associations, don't

18    prove causation.  Much has been made in the punitive damage

19    orders and other places that this study disclaims causation.

20    That is normal in an epidemiological study.  Statistical

21    significance does not show causation.  In fact, you could

22    have statistical significance and there wouldn't be a

23    causation.  It doesn't address that issue at all.  It talks

24    about the probability of chance.  That's all it does.  It

25    doesn't suggest there's causation in a given situation or

1    not.

2              MAGISTRATE JUDGE NOEL:  But I'm looking at page 31

3    of your memo -- I'm sorry, page 25 of your memo and talking

4    about McGovern.

5              MR. CIRESI:  Which memo, Your Honor?

6              MAGISTRATE JUDGE NOEL:  Good question.  This is

7    the one -- the memo in opposition to exclude Samet, Jarvis,

8    and at the top you say the study authors, meaning the

9    McGovern study authors, the study authors also testified

10   repeatedly that they continue to stand behind their findings

11   that Bair Hugger increases the risk of DJI, deep joint

12   infection.

13             And I guess that caused me to ask a question,

14   because then further down we talk about associations, and I

15   thought the whole point was that nobody claims that McGovern

16   proves causation.  What McGovern shows is an association

17   between the use of the Bair Hugger and a 3.8 times higher

18   rate of deep joint infection.  And I guess my question is,

19   doesn't this line suggest that by saying that the authors

20   stand behind their findings that the Bair Hugger increases

21   the risk is a statement of causation, isn't it?

22             MR. CIRESI:  No, it's not.  It's a statement of an

23   increased risk.  A relative risk is risk in exposed versus

24   risk not exposed.  It doesn't necessarily say there's

25   causation.  It is an element under Bradford Hill criteria

1    that should be taken into account if one is following valid

2    scientific methodology in arriving at a conclusion of

3    causation.

4              MAGISTRATE JUDGE NOEL:  Okay.  So just so that I'm

5    clear, the study authors don't go beyond McGovern.  McGovern

6    simply still stands for the proposition and plaintiffs only

7    put it forward for the proposition that there is an

8    association between the use of Bair Hugger and the incidence

9    of infection?

10             MR. CIRESI:  It stands a little bit more than

11   that, Your Honor.  You're right as far as you went, but it

12   shows an increased risk, relative risk.  Even when you take

13   into account confounding variables that risk is lower, but

14   it's still over two.  Now, the mere fact you're over two

15   does not mean there's causation, and I would never stand in

16   front of you and say that.  For 47 years I've been trying

17   these types of cases.  There's a reason why medical

18   treatises are not given to the jury.  Under 803.18, they're

19   not.  Now, statements of a manufacturer are given to the

20   jury because they should judge the credibility of what

21   they're saying.  They look at those underlying facts.  A

22   medical treatise is examined through an expert witness.  And

23   there are confounding variables in every epidemiological

24   study.  The only study -- you asked, does 3M ever do a

25   study.  The study was recommended to them.  They have a

1    protocol for it.  I took the deposition of the individual.

2    They haven't done it.  They won't do it.

3            MAGISTRATE JUDGE NOEL:  Nor have you, correct?

4            MR. CIRESI:  No, we haven't.  Oh, so that's a very

5    good point.  No, we haven't.  So that what you're saying is

6    that not the manufacturer who is presumed to know it has a

7    legal duty to know more than anybody else about their

8    product does not have to do the study but an injured person

9    out in the field who gets the product used on them should do

10   the study?

11           MAGISTRATE JUDGE NOEL:  Well, yeah, because you're

12   the plaintiff, and that is sort of the way our legal system

13   works, it's your burden to establish causation, correct?

14           MR. CIRESI:  Yes, but we don't have to do that

15   type of study to establish causation, and we're not required

16   to do that type of test to establish causation.  If there

17   was -- you know, Judge, if we look back at epidemiology and

18   go back to Henle Koch, okay, tuberculous, cholera, those

19   tests are different.  There's different types of causality.

20   There the causal factor is necessary and sufficient to prove

21   causation because that's all it does.  If it's removed, you

22   don't get it.  That evolved into the 20th century to the

23   Bradford Hill, and Bradford Hill frankly arose out of

24   cigarettes.  It dealt with lung disease and smoking.  And as

25   the science developed, what the medical world did, an

1    epidemiologist did, is they say you look at other factors.

2    You take in the fact these criteria.  And that's what I

3    would like to get at, the criteria that are present in this

4    case and I think the factual underpinning of how Your Honors

5    are going to have to look at the issues before you.

6         These facts are agreed to, frankly, by all the

7    witnesses, the chain of infection, the biological

8    plausibility.  Gary Hansen, who was at Arizant and its

9    predecessors from 2001 to 2015, was the director of research

10   and development from I believe 2006 through '13.  Before

11   that he was the director of advanced technology.  He had an

12   ongoing responsibility for engineering of the product.  He

13   established policy.  He was at a high level.  He made

14   planning level decisions.  He knew the probability of injury

15   and he was indifferent to it, and his evidence is

16   uncontroverted.  Chain of infection, all present in the Bair

17   Hugger and its environment of use.

18        And I believe this is critically important.  Any

19   product liability case looks at two things, first of all,

20   you identify the hazard as an engineer and then you look to

21   how you eliminate that hazard, if there is a hazard, and it

22   depends upon its probability of reoccurrence, how severe the

23   injuries may be if that does occur, et cetera.

24        What did Mr. Hansen testify to on the chain of

25   infection with the use of the Bair Hugger in its normal

1     operating condition?  The pathogens or the bacterias are

2     present, fomites are present.  Fomites mean particles,

3     non-living particles that carry bacteria, and there are

4     studies that prove that and they're not going to deny that.

5     These particles can be clothes, skin, all kinds of

6     non-living objects.  There's a means of transmission with

7     the Bair Hugger.  That's the air flow.  The pathogens are

8     viable.  There's a susceptible host.

9          And here Mr. Hansen went into detail of the

10    environment of use.  You have compromised patients.  They

11    may even have diabetes which are more compromised, and he

12    knows that.  They could be obese which creates another risk,

13    and they know that.  They know that the environment in the

14    operating room has pathogens in it.  They know the purpose

15    of liamor flow.  They know that you should reduce the level

16    of particles to the greatest degree possible, not increase

17    them, in the area of the surgical site.  Testified to all

18    that, the susceptibility of the host.  And he knows, most

19    importantly, in deep joint infections, which is different

20    than SSI's as a generic term, that a small bolus of

21    bacteria, very small, one or two pathogens, can cause

22    injuries that, in his words, are catastrophic.  He knew all

23    that.  They never tested the product to see whether

24    pathogens come out of the distal end, never.

25          And what do they tell the courts?  Augustine, it's

1    Dr. Augustine, we've spent more time on Dr. Augustine, I

2    salivate at the opportunity to cross-examine Dr. Augustine.

3    Salivate because nothing was done to test this device.

4    510(k) predicate was the wetland, the Sweetland bed warmer,

5    wasn't even used during surgery.  That was the 510(k)

6    predicate, and that's how you can get a device from an FDA,

7    Your Honor, under the market, no testing whatsoever.

8         He mentions one study, Zink.  Zink, those were

9    only eight people.  25 percent of them, a quarter, had

10   bacteria in the dish at the surgical site.  Well, he said

11   there was another study.  He couldn't even pronounce the

12   name.  It was the co-author of Zink.  That's all they did.

13   That's all they did.

14        Now, when you look at this in the simple context

15   of what's the hazard and how do you eliminate it and what

16   did they do, in other words, what did they know, when did

17   they know it, and what did they do about it, it becomes very

18   simple to look at the context of this case and what the

19   facts are from which a jury is entitled to make a

20   conclusion.

21        We give Your Honors, as we do in all these cases,

22   reams of documents and paper saying there's no genuine issue

23   as to any material fact.  And it takes I don't know how many

24   trees to suggest there isn't.  Well, the facts here are

25   pretty direct, and when you analyze the epidemiology in the

1    context of that, then you find that there is a chain of

2    infection here known to this defendant, nothing done to

3    change it, and that infections are happening.  The study

4    that can be done, the bacteriology study, has not been done,

5    as I suggested earlier by 3M, even though it's been

6    suggested by their consultants.  If brakes could fail on a

7    car and it was due to a defect, would anybody suggest that

8    the manufacturer shouldn't remedy that defect regardless of

9    how many times it happened?

10           In case after case of drugs or medical devices,

11   you will find that it's the manufacturer that has all the

12   information.  Epidemiological studies are almost impossible

13   to conduct on all of these.  The power of the studies that

14   are needed are enormous.  It costs millions of dollars to do

15   these studies.  That's why Bradford Hill criteria are used

16   to determine causation.  You really think that a doctor who

17   goes in and makes a differential diagnosis says, oh, is

18   there an epidemiological study?  And then all they're going

19   to rule on that and I'm not going to say there's a cause

20   unless I have that?  No.  They use the epidemiology as an

21   element, as part of the components of making a

22   scientifically valid conclusion and judgment.  That's what

23   we have in this case.

24           The testimony of Hansen, which I've highlighted,

25   is repeated, Your Honors, by Michelle Stevens Hulse, by

1    every deponent that I took, every one.  There's no

2    disagreement here.  The fact is this device has a chain of

3    infection pathway, no different than other products that

4    have been out there, and nothing was done to correct it.

5    And it's not necessary, there are alternative ways to warm a

6    patient which is another element that's considered as to

7    whether someone acts willfully, intentionally, or just

8    negligently.  There's no doubt that the actions of this

9    defendant were deliberate and intentional, none, based on

10   the testimony of their high-level managers.

11          Epidemiology, and on I believe it's page 2 of the

12   motion to exclude our experts is where they use the same old

13   myth that they've been throwing up to these two courts

14   constantly, that's McGovern.  And they say this, Ultimately

15   plaintiffs' experts fall back on just one uncontrolled

16   observational study to support the opinions that the Bair

17   Hugger system increases the risk of DJI.  It's not true.

18   It's false.  And my colleagues as they address each one of

19   the experts in this case, Dr. Samet, Dr. Jarvis, and Dr.

20   Stonnington, will go into that in greater detail.  It simply

21   isn't true.

22          But as I said earlier, and I think this is --

23   excuse my frustration, Your Honors, but epidemiology has

24   been so misused by so many people, courts have been so

25   misled, and, frankly, a lot of decisions are based on the

1    advocacy in front of the courts and rightfully so because

2    the courts can't do it all themselves.  That's why the

3    manual says that epi is not necessary to prove causation.

4           Statistical significance is only a tool.  It is

5    not the determination of causation.  The tradition of

6    scientific explanation requires that an assertion of proof

7    of cause and effect must specify the mechanism by which the

8    effect is produced.  Here, it is present and agreed to by

9    everyone, the chain of infection.  There's a temporal

10   association which is one of the most critical Bradford Hill

11   criteria.  There is a strength of association.  That's

12   McGovern.  And you can argue about that.  That's what it's

13   about.  That's what happens from that witness stand.

14          Mr. Blackwell goes into detail about how, well,

15   you know it's 3.8 but then it's reduced to 2.8 but it's

16   really not 2.8 because of this.  All right, let's see how

17   those experts stand up under the test of cross-examination.

18   I wish that all three of you could have observed the

19   depositions of -- just the ones I took because I can't speak

20   for the other ones, I wasn't there, but I wish you could,

21   you know, you could see what they said and be able to judge

22   their credibility.  That's what these people do, the jury.

23   That's what's happening here.  And we're arguing over

24   inferences and conclusions that should be drawn by a jury so

25   long as we have valid, scientifically credible opinions, and

1    they are.

2         The statement that only McGovern is relied on is

3    belied just by John Samet.  Dr. Samet is one of the

4    preeminent world experts in epidemiology.  He relied on over

5    200 sources.  Ms. Conlin will get into that in greater

6    detail.

7         THE COURT:  Just before you leave McGovern, would

8    it be a relevant factor at all whether the study authors

9    stood to gain financially from the results of this study?

10   How would that factor in?

11        MR. CIRESI:  Your Honor, if I were answering that.

12        THE COURT:  I'm asking you.

13        MR. CIRESI:  I know, and I am going to answer that

14   and whether I was answering here or anyplace, I would say of

15   course it's relevant.  It's a factor that should be taken

16   into account by the trier of fact.

17        THE COURT:  Well, let's assume, because we have a

18   couple of days set aside for Daubert hearing, that the Court

19   does have a gatekeeping role.

20        MR. CIRESI:  I'm not denying that.

21        THE COURT:  And so my question is what, if any --

22   I mean, how -- first of all, was there a financial interest

23   in the outcome of the McGovern study?

24        MR. CIRESI:  I don't know.  Not that I'm aware of,

25   none.

1            THE COURT:  And if there had been, how would the

2     Court use -- what would be the appropriate --

3            MR. CIRESI:  Let me answer that with a

4     hypothetical question which I think answers it, and that is

5     that if 3M does a study which they have the protocol for,

6     they haven't done yet, would their financial interest be a

7     factor that should be considered?  Yes.  In every study

8     that's done where someone gets -- some investigator gets

9     money from a company or an organization, they're required to

10    disclose it.

11           THE COURT:  I think Ms. Conlin wanted to speak to

12    you about whether there's any evidence of a financial --

13           MS. CONLIN:  I was just going to say that the lead

14    author Dr. McGovern -- excuse me, Your Honor -- lost money,

15    so there was no financial interest in the McGovern study.

16    These individuals didn't work for Augustine or anyone else,

17    and I'll get into it in more detail during my presentation.

18           THE COURT:  Okay.  Mr. Ciresi, my question --

19           MR. CIRESI:  Judge, can I ask, is your question in

20    terms of -- let's just speak hypothetically, in terms of

21    financial motivation, is it -- does Your Honor's question go

22    to should you exclude a piece of evidence based solely on --

23           THE COURT:  That's an overly simplified question.

24    As you know, the cases talk about one of the things that a

25    gatekeeping court can take into account is whether science

1     is litigation based, and would that same caution extend to

2     studies where there is a financial interest in the outcome

3     of the study?

4              MR. CIRESI:  I think that it is a factor -- I

5     don't think.  I know it is a factor that one should consider

6     whether one is functioning in the role of gatekeeper or

7     finder of fact.

8              THE COURT:  So my question then specifically on

9     the McGovern, if there's no financial interest, I was struck

10    when I read the study at the end, it says the author or one

11    or more of the authors have received or will receive

12    benefits for personal or professional use from a commercial

13    party related directly or indirectly to the subject of this

14    article.  And my question is what -- how -- what are we to

15    do with that in the context of our directive to take into

16    account whether a study is for the purpose of litigation and

17    if financial benefit is to be considered in a similar way to

18    litigation study, the statement right there in the study

19    that the author or authors will receive personal or

20    professional benefit?

21             MR. CIRESI:  I just want to take a look at the

22    statements.

23             MS. CONLIN:  Your Honor.

24             THE COURT:  I just -- we have -- I have to hear

25    from -- if you want to talk to Mr. Ciresi, but we just got

1    one at a time.  But did you want to go ahead and talk to

2    Ms. Conlin, Mr. Ciresi?

3              Page 9 of -- 9 of -- well, I don't know if you

4    have a copy of it, but just before the references.

5              MR. CIRESI:  I don't see it here, Your Honor.

6    Just let me see if I can consult with Ms. Conlin.

7              It's right at the very end right after the

8    supplementary materials, that's the one you're talking

9    about, Your Honor?

10             THE COURT:  Yes.

11             MR. CIRESI:  Yep.  The author of one or more, I

12   believe, and I will let Ms. Conlin clarify this when she

13   gets up to argue this part of it, but I believe that refers

14   to Mr. Albrecht who was working part-time, I believe, for

15   Augustine when he was matriculating toward his degree and

16   was being paid by him, I believe that's what it was.  So

17   what I say to this is that as this goes back to the point I

18   raised earlier, and that is that in any medical study,

19   because of the fact that there were in the past, as Your

20   Honors know, secret studies, secret studies paid for by

21   other people that had an interest in it and it was not

22   disclosed.

23             THE COURT:  In this case?

24             MR. CIRESI:  No, no, generally so that the

25   practice and the rule is that you should disclose any type

1    of potential economic connection so that a gatekeeper or a

2    trier of fact can take that in account if they decide to

3    based on the balance of the study and whether it is a study

4    that follows valid scientific methodology.  Now, if it

5    doesn't and it's highly speculative and it's nothing but

6    conjecture and the person that's being paid for it, whether

7    it was conducted by 3M or anybody else, I would imagine that

8    would be taken into account.

9         The type of scientific principles that I've talked

10   about in my time here, Your Honor, and I'll close with this,

11   Your Honors, are the ones that were followed by each one of

12   the experts of the plaintiffs.  It is precisely that

13   scientific reasoning and methodology that has been proven

14   reliable and valid over time across a wide range of products

15   and issues regarding associations and causation, and that's

16   what they utilize in framing their opinions in this case.

17        And for any lawyer to stand in front of a court

18   and to suggest or imply that one needs an epidemiological

19   observation study that proves causation or establishes

20   causation is to exhibit a profound lack of understanding of

21   what epidemiology is about.  There are, as I said earlier,

22   confounding variables in every study.  It's just by it's

23   nature there are apparent associations that are not

24   statistically significant may nevertheless be causal and

25   those that are statistically significant may not be casual.

1          Indeed, the test of significance, as I reference,

2     does not even address the issue of whether an association is

3     causal or whether it's due to some error resulting from the

4     study's design, its interpretation, or the conduct of the

5     study itself.  And that is what is evaluated on that

6     component, but that's only one element of a causation

7     opinion.  And as I said, that's why Dr. Samet, for one,

8     relied on over 200 sources.  Yes, Your Honor.

9          MAGISTRATE JUDGE NOEL:  So as I understand the

10    defendants' world view of this case, they want us to believe

11    that your case depends entirely on two questions.  One,

12    whether McGovern is valid science; and two, whether

13    particles are an adequate substitute or proxy for bacteria.

14    Just in 25 words or less, is that wrong?  In other words,

15    are they right that if McGovern goes out and particles are

16    not proxies for bacteria, you don't have a case?

17         MR. CIRESI:  No.

18         MAGISTRATE JUDGE NOEL:  And why not?

19         MR. CIRESI:  Because bacteria can get there in a

20    number of ways, not just on the backs of particles, if you

21    will.  There is no doubt of how this machine works, none.

22    And there's no doubt in anybody's mind that one or two

23    bacteria, one or two bacteria can cause a deep joint

24    infection because it creates the biofilm and it festers for

25    a long period of time.  It's different than other types of

1    infections.

2              In the Mirapex cases which were in this district,

3    they're for Parkinson's diseases.  It was for Parkinson's.

4    And the MDL was here.  It was effective for Parkinson's but

5    it also caused abnormal behaviors because it was a dopamine

6    antagonist and it worked on the part of the brain that

7    created hyperactivities in certain areas.  They knew it.

8    They never warned about it.

9              Now, that isn't to say that Mirapex couldn't be

10   used for Parkinson's, but they should have warned about it

11   because they knew about it.  This device may be good for

12   other types of infections -- or surgeries, I should say,

13   excuse me.  It isn't for this type of surgery.  That's what

14   we're saying.  And not because of one study, Your Honor, or

15   that a bacteria can ride along, if you will, on particles,

16   no, for the whole totality of the Bradford Hill criteria

17   inherent in the experts' opinions that have been proffered

18   for Your Honors.  That's the best way I can answer that,

19   Your Honor.  And I apologize it was more than 25 words.

20             MAGISTRATE JUDGE NOEL:  It was more than 25 words,

21   but it answered my question so thank you.

22             MR. CIRESI:  Thank you, Your Honors.

23             THE COURT:  Thank you very much.  All right.

24   Defendant's motion to exclude SJS, the medical experts.  So

25   is this you, Mr. Blackwell?

```
1              MR. BLACKWELL:  Yes, Your Honor.

2              THE COURT:  Will you be talking about -- are we

3     going to go Samet, Samet, Jarvis, Jarvis, Stonnington,

4     Stonnington?  Or are you going to Samet, Jarvis, Stonnington

5     and they're going to come back with Samet, Jarvis

6     Stonnington?

7              MR. BLACKWELL:  I'm going to do Samet, Jarvis,

8     Stonnington together.

9              THE COURT:  As you briefed them.

10             MR. BLACKWELL:  And I think they want to kind of

11    segregate them out.

12             THE COURT:  All right.  Why don't you go with

13    yours, and they can talk about them in whatever order they

14    want.  But we'll -- so basically we'll hear from you, and

15    then we'll hear from them.

16             You should sometimes come to one of these judge

17    conferences filled with really old people and there's ding,

18    ding, ding, ding, ding, none of us know how to turn off our

19    stuff.  I might have told you that story before.

20             All right.  Mr. Blackwell.

21             MR. BLACKWELL:  Thank you, Your Honor.  I stand

22    here to argue our motion to exclude the opinions of

23    plaintiffs' medical causation experts Samet, Jarvis and

24    Stonnington.  Our argument is largely premised on their

25    reliance on the McGovern study as the only real world study
```

1     they have that shows an impact in the real world.  Our view

2     is that those opinions are based upon completely unreliable

3     data to the extent they premised in McGovern, to the extent

4     premised in the exploratory studies, CFD, studies about

5     particles, air movement, etc., those exploratory studies are

6     completely insufficient proof to bridge the analytical gap

7     between -- around the science plaintiffs have and the

8     science they're required to put on to meet the Rule 702

9     requirements.

10          As I mentioned in the opening, Your Honors, for

11    the McGovern specific aspect of this I'll ask my partner

12    Corey Gordon to speak to just McGovern because that is -- he

13    developed McGovern.  I want to speak to the general state of

14    the science and the fact that the plaintiffs' view and

15    theory of the science is generally rejected in the

16    scientific and medical community.

17          I wanted to take a couple things out of order,

18    just to set the table a little bit, because there was a lot

19    said again about this SSI versus PGI issue, and I want to

20    pull up a slide that might be the Rosetta Stone that kind of

21    gets to the bottom of this, if I could pull up number 37.

22    And what this is, is international consensus meeting, as

23    Your Honors can see, and that of the prosthetic joint

24    infection, and so this is an international consensus meeting

25    that is about PJI.

1            And let's see what they have to say.  This is from

2    October 22nd of 2013, and this group met in light of the

3    kinds of things that came out of McGovern and so on, and but

4    who is this organization?  Four hundred delegates, the

5    world's best experts in musculoskeletal infection from 52

6    countries and 160 societies.  300 of the 400 delegates

7    attended the meeting and were involved in voting, and the

8    consensus processes, Your Honors, to meet there took over

9    10 months, and they purported to have turned over every

10   stone in search of evidence to these questions with over

11   3500 related publications evaluated and most certainly

12   McGovern.

13           I wanted Your Honors to see this in terms of who

14   was there, delegates from various disciplines, orthopedic

15   surgery, infectious disease, and as you can see the rest of

16   these, towards the end it says, Numerous scientists with

17   interests in orthopedic infections came together to evaluate

18   evidence when present or reached consensus regarding the

19   current practices for management of SSI slash PJI.

20   Discussed interchangable, kind of one and the same.  And so

21   the evidence, when available, has been assessed, otherwise

22   the cumulative wisdom of 400 delegates from 52 countries and

23   over 106 societies has been amassed to reach consensus about

24   practices.

25           So what they address is a question that's central

1    to why we're here.  There were over 300 delegates there at

2    the face-to-face meeting there for the voting, and wanted to

3    have Your Honors to see what the strength of consensus means

4    before we show you what the consensus vote was.  And Your

5    Honors can see that at number 3, a super majority strong

6    consensus is a consensus where there's 66 to 99 percent

7    agreement, so just, you know, a category short of unanimous.

8    So the information available in this document is based on

9    evidence, whenever present, or the result of cumulative

10   wisdom of over 400 of the world's experts.

11          So here is the question that they were addressing,

12   SSI slash PJI, do forced-air warming blankets increase the

13   risk of surgical site infections?  Consensus, "We recognize

14   the theoretical risk posed by forced air warming blankets

15   and that no studies have shown an increase in surgical site

16   infections related to the use of these devices.  We

17   recommend further study but no change to current practice."

18          And that was a strong consensus, position, point

19   of view even in the face of McGovern.  So this argument

20   about SSI suddenly meaning something is superficial as

21   opposed to a PJI which means deep joint infection, with all

22   due respect, is insignificant that's created primarily by

23   the lawyers in this courtroom and not by anything that's

24   found in the literature that simply discuss PJI as a subset

25   of SSI.  And here where we have this international consensus

1    meeting of prosthetic joint infection, experts, doctors,

2    etc., by the hundreds strong consensus position that there's

3    no evidence there to support it.

4         MAGISTRATE JUDGE NOEL:  Well, 90 percent of --

5    almost 90 -- 89 percent agreed with the statement that they

6    recognize a theoretical risk and that further study is

7    recommended, right?

8         MR. BLACKWELL:  Yes, Your Honor.  And so further

9    study recommended, meaning that the current state of the

10   science today doesn't support a valid claim for that -- for

11   that risk.  Theoretical is never going to be sufficient to

12   pass muster onto Daubert.  There must be something that

13   shows there's a real world effect.  And like anything else

14   that as far as science knows today, this substance is not

15   dangerous but we always continues to study things.  But the

16   danger is in having litigation lead science by having

17   outcomes in the court of law that don't exist out in the

18   scientific world.  And here you have a strong consensus by

19   those who are concerned about prosthetic joint infections as

20   well as SSI's.

21        I wanted to clarify one other thing related to the

22   Bradford Hill criteria or the Bradford Hill factors.

23   Bradford Hill factors are not factors that can be used to

24   serve to the basis for the valid science establishing a

25   positive cause -- positive association or causation in the

49

1    first instance.  You only reach Bradford Hill factors after

2    there's been a valid finding of a positive association.

3          If I could pull up number 79.  And this is from

4    the reference manual in scientific evidence at pages 598 and

5    599.  The authors of the *Reference Manual on Scientific*

6    *Evidence* emphasize that the Bradford Hill factors are

7    employed after a study, and that's in the text in italics,

8    "only after the study finds association to determine whether

9    that association reflects a true causal relationship."

10         In the context of McGovern, the best that can be

11   said about that study is that it disclaims there being a

12   causal basis for the positive association found due to, it's

13   clear about it, the uncontrolled confounders that are

14   addressed in that study.  Or should I say not addressed in

15   the study but referenced in the study, Your Honors.

16         So this isn't simply a matter of no epidemiology

17   study making a finding of a causation.  This is not about

18   generalities.  The specifics of the McGovern study is that

19   it is clear why it is limited and it's clear on its face

20   it's because the, of amongst other things, the confounders

21   that were not controlled for, wasn't even a randomized

22   study.

23         So I'll show Your Honors in a moment how McGovern

24   has actually been discussed in the broader general medical

25   and scientific communities and the very interpretation here

1    that plaintiffs are espousing that it somehow can be used to

2    get a pair of scissors and a pacepot and cut out the most

3    positive association and rip it from its context, has been

4    rejected in the general scientific medical communities.

5              THE COURT:  Just help me -- my memory of the

6    McGovern study.  I know that some of the confounders that

7    were discussed were the ones that have proof that don't

8    really matter.  Did it also talk about -- I just remember in

9    the plaintiffs' brief they were critical of a list of non --

10   obesity.

11             MR. BLACKWELL:  Yes.  Fitness for surgery.

12             THE COURT:  Right.

13             MR. BLACKWELL:  There's a whole list of those

14   confounders which still were not addressed, and there's been

15   plenty --

16             THE COURT:  And did the McGovern study itself

17   acknowledge that the obesity group of factors also was not

18   taken into account?

19             MR. BLACKWELL:  Yes, it does, Your Honor.  And as

20   Your Honor notes in the punitive damages order that just

21   came out, it does take into account, and it makes a

22   reference that's to the effect of those confounders could

23   have also impacted the outcomes, the positive association

24   seen in the McGovern study.

25             THE COURT:  Right, right, right.  I'm just looking

1    -- right.  But that is in the McGovern study somewhere,

2    isn't it?

3              MR. BLACKWELL:  It is, and so as it says, Your

4    Honor, that I think at pages 5 and 6, McGovern says

5    unfortunately the study was neither randomized nor

6    controlled for variables identified elsewhere as important

7    predictors for deep infection.

8              THE COURT:  I remember the sentence that starts

9    "unfortunately," so it's in there, okay.

10             MR. BLACKWELL:  It is in there, Your Honor, and

11   the types of health factors, co-morbidities, that Your Honor

12   is referring to were included in that list, I think it's

13   around pages 5 and 6 of the McGovern study.

14             Now, so I want to move away from Bradford Hill for

15   just a moment, but we don't reach Bradford Hill unless

16   there's already established good scientifically valid proof

17   of causation, at least a positive association, before we can

18   cross the bridge to Bradford Hill.  And it's not to be used

19   to launder or otherwise insubstantial, not competent

20   opinions to launder through Bradford Hill and then they

21   suddenly come out strong and fortified proof of causation.

22   So the scientific manual on evidence says that these factors

23   are to be employed only after a study, a valid study, finds

24   an association, and here, there isn't any.

25             There can be arguments from all day that lawyers

1    can create about pathways to infection, and what's important

2    from a scientific point of view is not the description of

3    the pathway but the description of what its destination is

4    and what it proves when it arrives there.  Does it prove the

5    Bair Hugger produces surgical site infection?  And there is

6    no study that does that.  Are there types of studies that

7    could?  A proper observational study, if we could pull up

8    number 54, so again, from the *Reference Manual of Scientific*

9    *Evidence*, that observational studies provide good evidence

10   in the following circumstances:  The association seen in

11   studies were different designs on different kinds of

12   subjects and done by different research groups.  That

13   reduces the chance that the association is due to a defect

14   in one type of study, a peculiarity in one group of

15   subjects, or the inaccuracies of one research group.  And so

16   it is calling for the study of more than just one generally

17   and that particularly the one study, such as McGovern,

18   that's hopelessly confounded, there are ways to do proper

19   observational studies.  There, the plaintiffs do not have

20   any.

21          So if I may, Your Honors, returning to the

22   beginning, so to speak, as to why it is we focus on

23   McGovern, I won't dwell on this much because Your Honors

24   have seen it and heard it, and, again, this is what Dr.

25   Samet has said, the McGovern paper supplies the only

1     estimate of the risk associated for deep joint infection

2     associated with use of the forced air-warming Bair Hugger

3     device, so absent the quantitative estimate from that paper

4     it would be -- while there would be a quite plausible

5     mechanistic basis for increased risk, there would not be an

6     association in the real world but for McGovern.  And we

7     might add, we volunteered his reliance on Augustine 2017.

8     Dr. Jarvis, was there any other study that you referenced in

9     your report that purported to show a relative risk of Bair

10    Hugger versus some other warming modality in terms of joint

11    infections?  No.  He was being asked about McGovern, that

12    was -- the solid one was McGovern.  Dr. Jarvis, Your Honor,

13    didn't take into account the confounders in McGovern

14    whatsoever.  He just simply took the conclusion, the

15    positive association, and went down the road.

16          And Dr. Stonnington was a little back and forth,

17    so we ask him about McGovern, and he said, I'm going to say

18    that you have to put them, McGovern and the other studies,

19    together to make a conclusive argument.  And he said I think

20    what's conclusive is the Bair Hugger is dangerous.

21    Augustine, I mean, McGovern is a very important study, very

22    important findings, increased infection rate in patients

23    with Bair Hugger, which I believe to be true, which I

24    believe his findings to be true.

25          So Dr. Stonnington particularly is basing his

1    opinion on his own ipse dixit, and to the extent there's any

2    science at all that's verifiable, repeatable, it doesn't go

3    anywhere beyond simply, again, McGovern.  And, again, Dr.

4    Stonnington doesn't address the confounders whatsoever

5    either.

6           One of the critically important things about each

7    of these three experts, their credentials notwithstanding,

8    is that the opinions they're expressing about the infection

9    and Bair Hugger are being expressed for the first time in

10   the context of this litigation.  They never published that

11   anywhere before.  I couldn't find a speech where they ever

12   said that.  These are opinions being expressed for the first

13   time in litigation.

14           So turning to the general causation question,

15   whether the Bair Hugger causes prosthetic joint infections,

16   and what is the generally accepted view in the scientific

17   community on this question?  So I wanted to walk Your Honors

18   through that by first talking about certain types of

19   studies, and I won't spend much time on them because these

20   studies don't exist in the plaintiffs' hopper to meet their

21   burden.

22           But, first, I have some agreement about what the

23   patient warming benefits are, Your Honor, I wanted to put

24   this up first.  And so here is what the various studies

25   would be addressing.  The benefits of the Bair Hugger that's

 1    shown to not increase but to decrease surgical site

 2    infection, to decrease the incidences of fatal heart

 3    attacks, of blood transfusions, length of hospital stay,

 4    post-operative shivering, and those are the benefits of

 5    intraoperative warming, the benefits of the Bair Hugger.  So

 6    when you talk about patient warming generally, it, to me,

 7    can't be ignored that the overwhelming majority of patients

 8    in America are being warmed by the Bair Hugger, well in

 9    excess of 70 percent of them.

10            So what's the gold standard for epi studies?  The

11    gold standard in the testing of pharmaceutical or other

12    agents is a randomized, double blind, cohort study in which

13    the control and intervention groups are perfectly matched.

14    There won't be any of that in this.  There are no gold

15    standard or either epidemiology studies beyond McGovern that

16    plaintiffs rely on.  For clinical studies similarly

17    randomized trial, clinical trial or true experiment is

18    considered the gold standard for determining the

19    relationship.  And as Your Honors can see here what the

20    standard is for the gold standard in clinical studies.

21            So I wanted to just touch on for just a moment

22    what the primary endpoints are and sort of the hierarchy of

23    studies, how do they all fit?  You know, the primary

24    endpoint of being infectious, studies that show in the real

25    world the Bair Hugger causes infection.  These secondary

1     things don't quite get you there.  There's still an

2     analytical gap between increased bacteria between --

3     deposition of bacteria in the would, correlation of bacteria

4     with species in the wound, those are the so-called

5     biological plausibility studies.  And then a step below

6     those are counting particles, presence of bacteria on

7     surfaces, et cetera, air temperature differences, et cetera,

8     we call tertiary, and those fall short of also.

9             As so Your Honors can see, I've also just stated

10    that but a different way from biological plausibility on

11    down.  And I showed you these to point out that plaintiffs'

12    studies all fall within this bottom category, exploratory

13    studies that lack clinical relevance and have no predictive

14    value.  The most you're going to get from a study counting

15    particles is a hypothesis for doing another study.  It

16    doesn't actually prove causation.

17            And what I will show Your Honors is that when

18    these exploratory studies were done, the particle counts and

19    so on, that these studies were in vision at the time to

20    establish something other than proof of causing surgical

21    site infections.  And I'll show you when those were first

22    kind of masterminded by Scott Augustine and along with Mark

23    Albrecht who's at the root of all the studies that

24    plaintiffs rely on and you can go to right to the epicenter

25    when he's talking about them and what they intended to show

1      and what they're not intended to show, meaning surgical site

2      infections.

3             So if we look at the clinical studies, to Judge

4      Noel's question earlier, there was Kurtz and Melon, two of

5      those, one in 1996, another in 2001 that were comparing

6      patients warmed with Bair Hugger to patients who weren't

7      warmed at all.  And this is where -- and these clinical

8      studies, clinical trials, the conclusion was that the Bair

9      Hugger actually reduces surgical site infections, all of has

10     been made about what 3M didn't do.  This was done.  Tests

11     were done, peer-reviewed studies, and there they are.

12            Biological plausibility studies, all of these

13     studies which are testing whether or not there is an

14     increase in bacteria in the operating room or they can

15     culture bacteria from the Bair Hugger blanket have been used

16     properly.  Mr. Ciresi just spoke about how expensive, how

17     frightfully, terribly, horribly expensive it would be for

18     the plaintiffs and the experts to have to undertake a study.

19     It's as simple as getting a petri dish, putting a petri dish

20     and agar plate in the room, turn it on, it's designed to

21     catch and capture bacteria, and so easily could have gotten

22     one of those for less than a hundred dollars and so

23     certainly would not have cost them, you know, tens of

24     thousands of millions, Your Honor.

25            So these studies have been done.  Three, six, nine

1   of them, one as late as this year, where they are testing

2   whether or not you could culture viable bacteria from the

3   Bair Hugger.  These studies we think are extremely

4   significant to the argument over particles.  Particles are

5   substitutes for actual bacteria.

6           And this case I can't say enough is not about

7   abstractions, whether abstract in the environment of use and

8   abstract in the environment of use in the OR there particles

9   and particles carrying bacteria.  The question related to

10  the general cause question here as to whether the Bair

11  Hugger causes surgical infections is whether there have been

12  any studies that have examined particles from a Bair Hugger

13  and have actually been able to culture any bacteria from

14  those.  Not theoretically, not abstractly, but in fact.

15          And not only have there been not nine studies that

16  have looked at since from 1991, all of which have come back

17  and said no, there have been so-called secret studies that

18  Your Honors will learn that the reason we end up with these

19  exploratory studies of particles and bubbles and so is

20  because they first tried in the secret studies could not

21  culture any bacteria in the room or in the agar plates and

22  so it didn't want to do that again and so it turned the

23  sites into doing things they could train and use as proxies

24  for marketing purposes, and that's how those studies came

25  about that are the plaintiffs' additional reliance studies.

1    And it's avoiding the biological plausibility question.

2             And I wanted to just show you all, Your Honors,

3    this OB study because it just came out this year where the

4    question was airborne bacterial contamination during

5    orthopedic surgery with a normalized control pilot trial.

6    And Your Honors can see here it was a peer reviewed that

7    showed no association between Bair Hugger use and increase

8    in airborne bacteria.  And this study compared airborne

9    bacteria sampling results between the HotDog and the Bair

10   Hugger system during -- and in orthopedic surgeries, and the

11   authors concluded it was not possible to detect any higher

12   bacterial counts on any plate in the forced-air warming

13   group versus the resistive warming group.

14            And it goes on to say that patients were

15   randomized which there was no randomization in McGovern,

16   with excel random numbers to intraoperative warming with

17   either of the systems.  This is simply how they went about

18   the study.  And important finding in that study was the type

19   of patient warming did not influence the amount of bacterial

20   sedimentation on either plate.

21            MAGISTRATE JUDGE NOEL:  Who sponsored this study?

22            MR. BLACKWELL:  Your Honor, it was done by a

23   Dr. Oguz, and if there was a sponsor beyond that, Your

24   Honor, it wasn't 3M, but I couldn't answer that beyond that.

25            MAGISTRATE JUDGE NOEL:  Okay.

1          THE COURT:  And that was published in what?

2          MR. BLACKWELL:  In the *Journal of Clinical*

3    *Anesthesia*, Your Honors, and the Oguz study.  And but again,

4    this is really underscoring the overarching point that if

5    the plaintiffs are going to talk about particles, they

6    should in the same breath talk about the study of particles

7    from the Bair Hugger that found bacteria that could be

8    colonized, and since there's been a study of this many times

9    then where is the proof and if relies only on ipse dixit,

10   then surely there must be some found, and in the real world

11   there haven't been any.

12         THE COURT:  Okay.  Were the medical experts --

13   plaintiffs' medical experts asked about this study or did

14   the study come out after they were -- what did the

15   plaintiffs' experts -- what did Samet -- do you call him

16   Samet or Samet?

17         MR. BLACKWELL:  Samet, Your Honor.

18         THE COURT:  And what did SJS have to say about

19   this study, if anything?

20         MR. BLACKWELL:  If I may have just a moment, Your

21   Honor, just to --

22     (Counsel conferred.)

23         MR. BLACKWELL:  So Your Honor, I did, as you can

24   see, conferred with my colleague, Mr. Gordon, who talked to

25   them and that -- and said that the study was addressed and

1    discussed and the experts simply said it didn't change their

2    opinions with respect to the Bair Hugger causing surgical

3    infections.  And if -- and the plaintiffs will perhaps

4    better speak to it, but our recollection is from the

5    depositions they were asked about it, and they said it

6    didn't change their opinions in the case.

7              THE COURT:  Bear with me, I'm about to ask a

8    question I might not -- I'm just formulating.  It might not

9    make sense.  But I'm thinking about any potential difference

10   between Minnesota's Frye-Mack standard and the Daubert

11   standard, and it strikes me that --

12             MR. BLACKWELL:  Oguz.

13             THE COURT:  Oguz might be a statement of what is

14   generally accepted now because it's a kind of close to a

15   gold standard, purports to be kind of -- and I'm not

16   familiar with this thing at all so all I know is what I just

17   see here.  Maybe it was in the materials and I just didn't

18   get to it, but can you just talk about from a legal

19   standpoint any differences between Daubert and Frye-Mack in

20   terms of what is the appropriate use of a study like this or

21   also the I guess that would also include the 2013, 400

22   experts from around the world meeting in I'm sure a very

23   nice place.

24             MR. BLACKWELL:  What does Frye-Mack under

25   Minnesota Rule 702 or Daubert under 702, I think the

1      conclusion is they essentially merge with respect to Oguz.

2      This is a biological plausibility study and as such, it

3      isn't viewed as a gold standard study because it's not even

4      epidemiology and it's not a clinical trial.  So establishing

5      only biological plausibility still leaves a gap to show that

6      that biological plausibility will turn into causing

7      infection in fact.

8                  THE COURT:  I see.

9                  MR. BLACKWELL:  So what we see here from Oguz and

10     the organization of the prosthetic surgeons, etc., the

11     international consensus is that it is not generally accepted

12     in the scientific and medical community that the Bair Hugger

13     causes -- it's not accepted that it causes surgical

14     infections.

15                 Now, under Minnesota Frye-Mack, that more or less

16     should end the inquiry.  It is not generally accepted.

17     Under Daubert and in 702, it is simply a factor in the

18     analysis that the Court should consider.

19                 MAGISTRATE JUDGE NOEL:  Just as a -- not to put

20     too fine a point on it, but as a legal matter it's possible

21     that Judge Leary may come to one conclusion under Minnesota

22     law and Judge Ericksen come to a different conclusion under

23     federal law.  That's a possibility in light of the way this

24     has been teed up.  Is that a correct statement?

25                 MR. BLACKWELL:  Your Honor, that is a possibility,

1      though obviously we wish you wouldn't.

2              MAGISTRATE JUDGE NOEL:  You don't see it.

3              MR. BLACKWELL:  Right, Your Honor.  I get that

4      because the inquiry under Frye-Mack is really somewhat of a

5      subset analysis from the one the Court may consider in

6      Daubert.  We think on the facts of this case they would be

7      the same to the extent that Daubert allows for the

8      consideration of other factors, those other factors relate

9      to there being other reputable science, scientifically valid

10     proof of causation.  And when you look at what they in fact

11     have as scientifically valid proof of causation, they only

12     have theoretical studies.  They have a CFD.  They have

13     reliance on McGovern.  And beyond that they have just a lot

14     of lawyer argument and accusations about what 3M didn't do

15     and so that somehow helps them meet their burden to show

16     what they in fact did do.  And I think based on -- the

17     difference to me is abstract and theoretical, but on the

18     actual facts of this I think they come out in the same place

19     because there's no there, there.  The science here, to some

20     extent, is like a Potemkin village.  There's nothing behind

21     it.

22              So continuing on, and so here with Oguz, we see

23     the conclusion that Oguz and from the nine published studies

24     over the past 25 years put here under the heading of what's

25     generally accepted in the scientific community.  What's

1    generally accepted is, is that there is no evidence that

2    particles coming out of the Bair Hugger result in the

3    creation or formation of bacteria.  If the plaintiffs want

4    to get up and talk about particles, the only relevant

5    question is what study do you have of a particle that was

6    able to colonize bacteria from the Bair Hugger and hasn't it

7    been studied?  And then where's your study if it's to the

8    contrary?  And Bradfrod Hill doesn't get you there because

9    we only reach Bradford Hill after there's been the proper

10   positive association finding, according to the *Reference*

11   *Manual on Scientific Evidence*.

12           So as I said here, when I talk about -- this is

13   just a couple of cases on the whole issue of biological

14   plausibility, Your Honors, and *In Re Zoloft* where this came

15   up, where this says plaintiffs potentially admissible

16   supports no more than an association between Zoloft and

17   certain birth defects, causation may be based on mere

18   possibility.  *In Re Accutane*, it flat out says, biological

19   plausibility is not proof of causation.  And then *Bausch &*

20   *Lomb*, the suggestion of biological plausibility is

21   insufficient to demonstrate causation.  The same points that

22   biological plausibility is in of and by itself is not

23   sufficient.

24           So I want to switch gears for a minute and point

25   to the exploratory studies and what --

1          THE COURT:  What --

2          MR. BLACKWELL:  I'm sorry, Your Honor.

3          THE COURT:  We're going have to take a break.  It

4    doesn't have to be right this second, but we've been going

5    since about nine clock and it's approaching 11 so.

6          MR. BLACKWELL:  This is a good point, Your Honor,

7    to take a break.

8          THE COURT:  When you said "I'm going to switch

9    gears," what I heard was break time.  All right.  So we'll

10   -- you want to know exactly how long, ten or so minutes.  We

11   won't come out until somebody comes and makes sure that

12   you're all back in your places.

13         MR. BLACKWELL:  Ten minutes is plenty for us, Your

14   Honor.

15         THE COURT:  Okay.  All right we're in recess.

16   Many.

17      (Recess taken from 10:45 a.m. until 11:07 a.m.)

18         THE COURT:  Please be seated.  We're back in

19   session.  And I'll just let you know in advance that Judge

20   Noel is going to have to leave at around 11:30.  He's got

21   criminal duty, and I offered to let him take somebody into

22   custody if that's what it is, so whoever is talking at that

23   point, don't take it -- or do take it personally.  I'm just

24   telling you the facts.

25         MR. BLACKWELL:  Thank you, Your Honor.

1          THE COURT:  Mr. Blackwell.

2          MR. BLACKWELL:  When we left off before the break

3     I had started to talk about the so-called exploratory

4     studies.  What's important, first and foremost, to note

5     about these studies is that the date of them.  They all are

6     relatively recent.  The vast majority of them postdate even

7     all of the biological plausibility studies I showed Your

8     Honor.  And certainly they postdate by quite a few years the

9     first clinical trial in 1991.  And I point those dates out

10    for reasons that will become apparent in just a little bit

11    as to why these studies were created, why do particle

12    studies, airborne studies, bubble studies in the face of all

13    of these biological plausibility studies that have already

14    been done that had turned out negative, so why not first

15    establish biological plausibility since that is obviously a

16    huge scientific question if it's to be believed that the

17    Bair Hugger causes surgical site infections but instead turn

18    around and start doing these theoretical exploratory studies

19    in response?

20          And we'll show Your Honors momentarily these were

21    done primarily to get results that could be used for

22    marketing purposes and not for purposes of proving actual

23    causation in fact of an infection caused by Bair Hugger is

24    the main thing.  But in any event all of these studies,

25    which were part of the plaintiffs' reliant studies in

1    McGovern as a kind of bubbles and component to it, none of

2    them conclude that they established a causation between the

3    Bair Hugger and an infection.

4         So as Your Honors have seen this before, all of

5    them ultimately conclude that no causation, we showed this

6    at science day, so this is plaintiffs' science.  And one the

7    of things that's extraordinary about this case is that the

8    plaintiffs are advancing the theory that the Bair Hugger

9    causes surgical or prosthetic joint infections, and the very

10   studies that they have relied upon disclaim causation.

11        So I wanted to, and I won't dwell on the FDA

12   letter, I talked about it before in the opening, but there's

13   one aspect of it that I did not show Your Honors where the

14   FDA says what it looked at, before it sent this letter dated

15   August 30, 2017, and here it says to determine if there's an

16   increased risk of surgical site infections when forced air

17   thermal regulating systems are used during surgery, the FDA

18   collected and analyzed data available to date from several

19   sources, including medical device records received by the

20   agency, information from manufacturers and hospitals,

21   publicly available medical literature, operating room

22   guidelines, and ventilation requirements.  It's a broad

23   enough search that they undertook, and they said that after

24   a thorough review of available data, the FDA has been unable

25   to identify a consistently reported association between the

1      use of forced air thermal regulating systems and surgical

2      site infections and they recommended the continued use of

3      thermal regulating devices, including forced air thermal

4      regulating devices for surgical procedures when clinically

5      warranted.

6              So I want to stop with that segment and now speak

7      with Your Honors.  I'm sorry, Judge Noel.

8              MAGISTRATE JUDGE NOEL:  I was going to say, do

9      they give any guidance anywhere as to what, quote,

10     clinically warranted means?  When is it clinically

11     warranted?  When is it not clinically warranted?

12             MR. BLACKWELL:  They don't in the letter itself.

13     And it's physician obviously determination, but given the

14     body of science that exists for all of the benefits of

15     patient warming from, you name it, from reduced surgery site

16     infections to fewer adverse health consequences of surgeries

17     in general, it is now the standard for patient care.  And

18     you won't see very many studies of the sort that existed in

19     the early 1990's because it is so accepted that patient

20     warming is the standard now that you wouldn't have a

21     comparison group of somebody not being warmed compared to

22     someone who is, but the FDA doesn't specify, clarify in its

23     letter.

24             I wanted to take a moment to show that in fact in

25     the general scientific and medical community that the

1    plaintiffs' theories being espoused here are in fact

2    rejected in the community.

3              And if I could, just to tee this up, Your Honor, I

4    have a graphic that I'll go through very quickly because

5    this may be just a big note version of scientific medical

6    causation.  So we have on the far left the experimental,

7    which is theoretical, that's the bubbles and the particles

8    and so on which can never be sufficient proof of actual

9    causation because they don't prove that anything causes

10   infection in the real world alone.  The biological

11   plausibility studies, which we looked at, those that don't

12   establish causation in fact.  Valid epidemiology can

13   establish at least a positive association to which there may

14   be applied Bradford Hill factors if there's a valid

15   epidemiology to do it.

16             And what is ideal, and this is in the middle is

17   the sort of chasm, the analytical gap or leap between these

18   types of evidence on the left and actually valid proof of

19   causation, scientifically valid proof of causation, the

20   *Glastetter* standard on the right side, and the chasm in the

21   middle is the abyss into which scientifically invalid proof

22   of causation, you know, plunges.

23             THE COURT:  Are those waves?

24             MR. BLACKWELL:  Those are waves, Your Honor.  No

25   fish and sharks but definitely waves.  So if I may, I'm just

1    going to pull this all up at once just to show which things

2    fall under which.  The plaintiffs have particles, bubbles,

3    and CFD, that's way on the left, for experiment also slash

4    theoretical.  Biological plausibility are studies that

5    actually test whether the Bair Hugger is releasing bacteria

6    in the OR or increasing the quantity of bacteria in the OR.

7    There's not that.  And epi, there's various types of

8    epidemiology studies.  And simple argument is they don't

9    have to have epidemiology, it is not really -- shouldn't be

10   tantamount to an argument they don't have to have anything

11   or that we could simply have particles and bubbles.

12           And obviously we talked about gold standard, gold

13   standard types of epidemiology and clinical trials before,

14   but the point here is that the plaintiffs are relying on the

15   particles and the bubble studies and the litigation CFD

16   created in litigation, and they're relying on McGovern.  And

17   McGovern, we will take a deep dive on that, but McGovern

18   disclaims a causal basis for any positive association.  They

19   don't have epidemiology, they don't have any biological

20   plausibility studies, they don't have any gold standard

21   proof of causation, and so that leaves us talking about

22   particles and bubbles, et cetera.

23           And so that's where we are.  I wanted to tee this

24   up because there may be other arguments that Your Honors

25   hear where we'll we point out which box we're talking in at

1    a given time when we're talking about the evidence.  I'm

2    going to -- going through this, we just talked about

3    international consensus standard just before the break where

4    this particular body came down on sort of rejecting the

5    claim, at least saying that there is not science there that

6    shows an increase in SSI's related to the use of forced-air

7    warming devices, but then there are a number of other

8    independent reviews that find there's no link between

9    forced-air warming and surgical site infection.

10            And I wanted to review a few of those with Your

11   Honors, and the first being, Your Honors, from ECRI, and

12   ECRI is a very respected I call it a pure science

13   organization.  They -- it's nonprofit.  They follow

14   evidence-based medicine.  They provide support to and for

15   some several thousand entities, including state and federal

16   governments in and in governments even outside of the United

17   States, amongst others.

18            And as you can see here, ECRI had been made aware

19   of the allegations in this lawsuit, contamination by

20   forced-air warming in April of 2013.  And ECRI undertook

21   review of the literature.  They learned in March 2013 about

22   the complaints filed here.  They have reviewed the

23   plaintiffs' petition.  It doesn't present any new

24   information that would alter the conclusions we have drawn

25   in this article.  And what they in fact conclude is that

1     there's insufficient evidence to establish that the use of

2     forced-air warming systems leads to an increase in surgical

3     site infections compared to other warming methods.

4            And I wouldn't stop at ECRI because we also have

5     the *Journal of Bone and Joint Surgery*, which, again, is a

6     peer review journal in the field of orthopedic surgery, and

7     here they find in December 2014, Thus the literature appears

8     to indicate that forced-air warming can impact laminar flow

9     under certain very specific conditions but any actual

10    clinical impact on surgical site infections must be

11    considered unproven at this time.  So the stuff that --

12    distributing air flow and so on, does it clinically result

13    in an increase in surgical infections, again, looking at the

14    Bair Hugger, they said the science wasn't there.

15           AORN, which is the Association of Perioperative

16    Nurses, and they represent some 41,000 RAM's across the

17    country, in October of 2013 looked at the issue also, and

18    they said our review uncovered no conclusive evidence that

19    the use of forced-air warming increases the risk of surgical

20    site infections.  The evidence also doesn't support the

21    concern that use of forced-air warming may cause an increase

22    in bacteria near or on the patient or cause unwanted air

23    flow disturbances.

24           So I'm showing this to Your Honors to give you

25    some sense of what the scientific medical community is in

1    fact saying.  This isn't a neutral issue.  They are

2    addressing the issue.  They are rejecting the issue.  And

3    quite generally.  In fact, if there is a reputable health or

4    patient organization that's come out in favor of the theory

5    that plaintiffs espouse, they will point to it when they

6    stand up here.  We're not aware of any.

7              THE COURT:  Could I ask about the AORN journal?  I

8    think the plaintiffs in their papers refer to that as an

9    article by a nurse, is that -- what is that article, the

10   AORN journal?  It says "we."  Was there a study or something

11   done, or was that --

12             MR. BLACKWELL:  Simply review of literature.

13             THE COURT:  By a nurse or by?

14             MR. BLACKWELL:  Can you see there?

15             THE COURT:  Who did it?

16             MR. BLACKWELL:  Yeah, let me find out who did it.

17   They're saying a Ph.D., professor of nursing did it, so it

18   was a professor of nursing.  That's a Ph.D., professor of

19   nursing.

20             THE COURT:  Okay.

21             MR. BLACKWELL:  But certainly an independent

22   review, and they're to be reviewed and reacted to, but it's

23   consistent with everything else that's out there, including

24   studies that in fact specifically looked at McGovern, the

25   idea that McGovern stands for the proposition that the Bair

1    Hugger is causing infections.

2            Dual Infection Control Outreach Network, DICON,

3    looked at this issue and now in analyzing McGovern, and this

4    is how McGovern is viewed in the general scientific

5    community.  Not adequate power, not properly controlled, not

6    statistically significant.  No adequate power, properly

7    controlled, statistically significant, reproducible study

8    has been published demonstrating an increased risk of SSI

9    due to the used of forced-air warming, and that was the

10   reaction to McGovern is that it is not such a study in part

11   because of the improper controls.

12           And back to the *Journal of Bone and Joint Surgery*,

13   this medical journal, peer review medical journal, in the

14   field of orthopedic surgery will recognize McGovern failed

15   to account for age or medical comorbidities, failed to

16   account for other infection control measures implemented

17   during study period, and co-author was employee of

18   conductive warming company was the criticism from the

19   *Journal of Bone and Joint Surgery.*

20           ECRI again weighed on McGovern, and ECRI found the

21   study lacked documentation of normothermia during surgery.

22   Two types of warming were not applied concurrently.  The

23   data was collected retrospectively and noted the changes in

24   antibiotics and thromboprophylactic regimens which was the

25   antibiotic and the blood clotting regimens that changed in

1    between the two test periods between the HotDog and the Bair

2    Hugger.

3              The FDA weighed in on this issue too because

4    Dr. Augustine was apparently making claims drawing from the

5    McGovern study, and it came to the attention of the FDA, and

6    the FDA wrote to him and that's what this letter is,

7    December of 2012, where the FDA says, "The evidence provided

8    in support of such clinical claims does not satisfy the

9    requirement for a pre-market submission for a cleared

10   intended use for the HotDog patient warming system or

11   provide conclusive evidence of a causal relationship between

12   the use of forced-air warming and higher infection rates,

13   nor does it demonstrate a clinically relevant comparison

14   between the use of the HotDog system and forced-air warming

15   in general or the HotDog system in particular.  Prospective,

16   well controlled, well designed studies are needed to provide

17   the evidence needed to support a reduced infection rate

18   claim and a comparative claim."  This is all a part of the

19   FDA's efforts to ask Dr. Augustine to stop making those

20   kinds of claims.

21             THE COURT:  Is this a warning letter that's

22   referred to in the first line there?

23             MR. BLACKWELL:  Yes, yes.  They issued a prior

24   warning letter to Dr. Augustine, and he was supposed to have

25   taken actions to have complied with it.  Now they're

1    reviewing kind of what he had done in response to the

2    warning letter and found that they had not gone far enough.

3    And then he said to the extent he's touting McGovern as even

4    a clinically relevant comparison, it's not even that, and if

5    a proper study was to be done, the last sentence highlighted

6    there is what type of study would needed to have been done

7    which McGovern was not.

8         So stopping there, Your Honor, I showed Your Honor

9    this before about what type of observational study would do,

10   if we talked about studies that were rejected, what type of

11   science would suffice?  Proper observational studies would

12   suffice, proper epidemiological studies would obviously

13   suffice, clinical trials would suffice, none of which exist,

14   none of which do we have here.  Biological plausibility

15   doesn't, but they don't have that here, and exploratory

16   studies certainly don't.

17        So one other point here on observational studies

18   as it relates to confounders is the second bullet point that

19   I put here for Your Honors to see from the *Reference Manual*

20   *on Scientific Evidence* that what the association found in a

21   observational study, it must hold, even when effects of

22   confounding variables are taken into account by appropriate

23   methods; for example, comparing smaller groups that are

24   relatively homogenous with respect to the confounders.  And

25   that is fatal to using McGovern in ways that transcends its

1    bounds given its limitation and the fact that it did not

2    address the issue of confounders.

3           There must be a plausible explanation for the

4    effect of the independent variable.  Alternative

5    explanations in terms of confounding should be less

6    plausible than the proposed causal link.  So all of this is

7    from the *Reference Manual on Scientific Evidence* for what's

8    a proper observational study.

9           So when we talk about the types of evidence,

10   here's a quote from *Glassteter* and the types of evidence

11   that the plaintiffs proffered there.  Here they talk about

12   the particle studies, arguments from lawyers, et cetera,

13   corporate statements.  "Viewed in isolation, Glassteter's

14   different pieces of scientific evidence do not substantiate

15   our experts' conclusion that Parlodel can cause

16   intercerebral hemophage, strokes.  Likewise, we do not

17   believe that the aggregate of this evidence presents a

18   stronger scientific basis for Glassteter's supposition that

19   Polydol can cause these strokes."  And that -- and so this,

20   putting all the evidence together, saying this isn't just an

21   individual piece but we'll put it all together.

22          And in the *In Re Lipitor* case is even more to the

23   point.  "To be sure, it's possible for the entirety of the

24   evidence to support an opinion even when individual pieces

25   of evidence are not sufficient in isolation, but it's also

1    possible that multiple piece of insufficient evidence add up

2    to insufficient evidence."

3              And so we saw the quote earlier from *Bausch &*

4    *Lomb*, I won't repeat it.

5              So I told Your Honors that I wanted to turn your

6    attention to the manipulations of sorts that are behind the

7    particle, the exploratory studies and how they came about

8    that the plaintiffs are relying upon.  And that's the

9    segment I'll spend a few minutes showing Your Honors at this

10   point.  And first, we know a bit about the

11   Augustine-Albrecht connection, but as Your Honors can see

12   here, it goes beyond just knowing each other.  They have a

13   promissory note relationship that is an addendum to the

14   first promissory note dated September 27, 2007, and in

15   August 2010 between Albrecht and Augustine, but here's the

16   real kind of punch line to this.  And I'll pull this --

17             THE COURT:  I suppose I could look, but how long

18   did the relationship between Albrecht and Augustine, when

19   did that conclude, if ever?

20             MR. BLACKWELL:  I don't know that it's concluded

21   to this day.  Do we know if it's concluded?

22        (Counsel conferred.)

23             MR. BLACKWELL:  Pardon.  Mr. Goss said that

24   Albrecht testified that to this day he doesn't know for sure

25   if he still owes Augustine money on this note, so they may

1    still be in some form of relationship, but certainly through

2    all of the McGovern period and the studies at issue here

3    they were in relationship.

4          THE COURT:  Because some of his I guess he only

5    put that disclaimer in the one study, it's not in the other

6    one, so it's not that he didn't have the relationship

7    anymore?

8          MR. BLACKWELL:  Yes, that's correct.  And even

9    more to the point here, it isn't just that Albrecht would

10   have stood the financial benefit.  What this is pointing at

11   here is that if he didn't agree to a certain number of

12   studies for Dr. Augustine, he would have to pay back $21,000

13   currently owed within 60 days of the term to stop work, and

14   some of those studies, the three you see, some here in the

15   A, B and C are studies that are in the plaintiffs' reliant

16   studies materials for their particle stuff, but there's a

17   real connection there.

18          But I had drawn Your Honors' attention to some of

19   the dates on the biological plausibility studies, and we

20   look at the dates on the exploratory studies, and here's

21   Scott Augustine writing to Mike Reed, one of the study

22   authors.  And here he's saying, this is talking about doing

23   these particle studies, these bubble studies in the face of

24   there being biological plausibility studies out there, and

25   he says, Scott Augustine, I like this plan of doing the

1    studies because we know the outcomes before we do the

2    studies and yet they are scientifically and clinically

3    important questions that need verification in multiple

4    studies.  I should mention that when we repeated the

5    experiment of tracer smoke, et cetera.

6         And so the point here is that this is the very

7    opposite of the scientific method that's being employed

8    because they don't start with the scientific question and

9    follow it blindly to its conclusion; they start with the

10   conclusion and then turn around and look for a path to it.

11        And here that's the very opposite of what you

12   should do.  And Dr. Fogel *In Re Accutane* did the same thing,

13   showing a bias of wanting to reach a conclusion which is not

14   right.  So what that makes clear is why not do biological

15   plausibility?  He says, I'm personally not too excited about

16   culturing the wound at the end of the case, even directly by

17   irrigation where you get bacteria then.  This is a crap

18   shoot that could go either way.

19        I think it's important to consider that even if

20   this type of study were to turn out positive, it could be

21   considered to simply -- to simply be another intermediate

22   step similar to particle detection over the wound.  In other

23   words, and this is the real punch line about these

24   exploratory studies that Dr. Augustine is behind, it does

25   not conclusively answer the question does forced-air warming

1    cause wound infections?  Therefore, I'm not sure that it

2    really adds enough to our case to take the risk of a

3    negative study to get to the real scientific question.  And

4    so the real kind of punch words here is these exploratory

5    studies are intermediate steps.  They even referred to the

6    particle detection as an intermediate step and intermediate

7    in the sense that they don't answer the question does

8    forced-air warming cause a wound infection?

9            So it would have been very simple, again, to use

10   an agar plate to test whether there is any biological

11   plausibility, do any particles associated with the Bair

12   Hugger contain bacteria?  Real easy to test, agar plate.

13   And so the fact is, years before they did these exploratory

14   studies from what Mark Albrecht calls the Augustine

15   Publication Factory --

16           THE COURT:  You look for a really good picture of

17   him to put up there?

18           MR. BLACKWELL:  That is one, Your Honor, there you

19   go.  You should see him in the morning.  And so I'm not sure

20   where they came from actually.

21           So 2007, 2008, this is a few years before they did

22   these bubble and particle studies, they had actually gone to

23   a hospital in St. Cloud and Alexandria and Northfield and

24   Hastings to try to measure airborne bacteria to gather

25   whether any particles from the Bair Hugger actually contain

1    any bacteria, and they found no differences in Bair Hugger

2    count -- I'm sorry, bacteria count with the Bair Hugger on

3    or off and no bacteria in the air coming out of even the

4    Bair Hugger hose.

5             So in 2009, McGovern and Reed simulate surgeries

6    to analyze whether use of Bair Hugger could increase

7    bacteria around the operative field.  Not particles, actual

8    bacteria.  The experiment showed no notable increase in

9    either the ambient particle count or bacterial count in the

10   vicinity of an operative field when a forced-air warming

11   device was used in the normal intraoperative manner.

12            Legg study in 2010, tried to identify if there was

13   any increased bacterial level associated with the Bair

14   Hugger by using a slit sampler at the surgical site.

15   Results, all samples came back with less than one CFU,

16   colony-forming unit, the same level his hospital required

17   for operating room air.  So no different than background.

18            So this was already known about actually trying to

19   find bacteria for particles before they decided to do these

20   exploratory particle smoke and bubble studies from the

21   so-called Augustine Publication Factory, as Mark Albrecht

22   referred to it.

23            So here is the plaintiffs' science and how it

24   translates into the studies that Dr. Augustine and Mark

25   Albrecht that were behind, as Your Honor can see, no

1    causation involved, bubbles, particles, particles, bubbles,

2    temperature difference, particles, particles, bubbles, and

3    particles.  And what Your Honor knows about these studies

4    already is every one of them came back finding no causation

5    ultimately.

6            So enough on that, Your Honor.  I'm going to now

7    talk about the McGovern study as the study that Dr. Samet

8    pointed to as the only one that shows an association in the

9    real world which is what we're concerned about here.  And as

10   Your Honors have noted before, this -- I think there was a

11   statement made before about the study authors standing by

12   their opinions from before.  Here is Mark Albrecht who's one

13   of the study authors who's talking about Scott Augustine

14   making claims from McGovern study, and he says this is one

15   of those things where we an step close to the line and we do

16   have important information to present that clinicians should

17   be aware of but we also have to be careful that we do not

18   state claims regarding proof of infection reduction.

19   Unfortunately, Scott Augustine likes to say that he's

20   convinced of such a relationship even though I tell him it

21   is unsupported and I do not agree.  Unsupported and I do not

22   agree.  And he says, well, that is the difference between

23   research and marketing.

24            That is what the author, Mark Albrecht, says that

25   any claims about infection reduction, which is what the

1    McGovern study purports to show, he has told Scott Augustine

2    that such claims are unsupported and that he doesn't agree

3    with those types of claims.

4           Again, there is no question that once the

5    confounders are controlled for, and I just put here the

6    quote from Albrecht's deposition and that where he says he

7    didn't even need to run an analysis to know that there

8    wouldn't be any statistically significant difference if the

9    anticlotting drug and the antibiotics were controlled for.

10   And, again, that fact I think is not in dispute.

11          So with that, Your Honor, I will stop, and I want

12   then now to take the dive into the McGovern data which

13   Mr. Gordon will speak to, and I'll sit down.

14          THE COURT:  Thank you, Mr. Gordon.

15          MR. COREY GORDON:  May I please the Court,

16   counsel.  Good morning, Your Honors.

17          THE COURT:  Good morning.  Did you want to sit or

18   are you okay standing?

19          MR. GORDON:  I am okay standing.

20          THE COURT:  Because the podium will accommodate

21   the chair too.

22          MR. GORDON:  I appreciate that, Your Honor.  If

23   that changes, but hopefully I won't be up on my feet long

24   enough that that will be an issue.  And if I am,

25   Mr. Blackwell will give me the hook.  Mr. Blackwell said

1    that I would be plumbing the depths and getting into the

2    weeds here, so I guess that makes me either a plumber or a

3    weedwhacker, and my wife will tell you those are two skills

4    I clearly do not have.

5            And I want to talk about -- and my goal here is to

6    go deep, do a deep dive on the two so-called epidemiological

7    studies that have surfaced in this case, the Augustine 2017

8    study and the McGovern 2011 study.  And the reason I want to

9    start with Augustine even though it's later in time is some

10   information we learned about it fairly recently.  It's a

11   very recent study and therefore, there is some information

12   that I think we have that's pretty useful to the Court.

13           Judge Noel had asked about, you know, where have I

14   heard this before, essentially?  And indeed he did.  He got

15   a prelude when we moved to enlarge the discovery time so we

16   could take some discovery from hospitals.  So he -- actually

17   he's not missing -- he's not missing that much because he

18   did get a little preview of this, but we did get some

19   additional information from the hospitals that supposedly

20   provided the data upon which Augustine's paper was based.

21           But why is the Augustine paper important at all?

22   Well, number one -- I was born in the 50's.  Technology

23   ain't my thing either.  Plaintiffs' counsel at that motion

24   to compel was saying no, no we don't need -- because our

25   experts aren't going to rely on it.  Unfortunately, or for

1    better or for worse, Dr. Samet made it clear that he is

2    considering the Augustine paper as supporting proof, you

3    know.  I asked him -- he volunteered it.  Why, you know, how

4    can you transfer this one study McGovern from one hospital

5    in England back to the United State?  And he said, well,

6    it's useful.

7          But now there's a second report, that's from the

8    United States hospitals, it has essentially a very similar

9    quantitative assessment of the risk.  And, you know, I asked

10   him, did the Augustine paper have any impact on your

11   opinion?  Yeah, I regarded the paper as another piece of

12   observational evidence that provides an estimate risk to

13   deep joint infections associated with the Bair Hugger

14   device.

15         So whatever plaintiffs' counsel want to say about

16   it, I don't know how an expert unrings the bell.  And to the

17   extent that might even theoretically be possible, we haven't

18   seen any supplemental report from Samet saying I got

19   religion, I'm no longer relying on the Augustine paper.  And

20   I'm not exactly sure what the basis would be for saying he

21   doesn't rely on it because the very indicia of reliability

22   that he says allows him to rely on McGovern are present in

23   the Augustine paper, indeed in some respects, they're on the

24   surface there, even stronger.  It's a peer-reviewed study.

25   It's a -- and in the case of Augustine, it's a multicenter

1       study of three different reporting studies that have some

2       strength ordinarily in epidemiology.

3

4              It reports an even higher odds ratio.  It's got

5       more subjects.  On its surface, all the factors that

6       Dr. Samet says yep, I can rely on that, Augustine has it in

7       spades, yet now they want to --- even though Samet says I've

8       been relying on it, they want to turn away from it.

9              It also provides a lot of insight as to how Dr.

10      Samet, Dr. Jarvis, Dr. Stonnington, all the -- every one of

11      the experts who rely on McGovern, how they go about their

12      reliance materials.  To use that Potemkin village analogy, I

13      mean, those fans of 18th Century Russian history would know

14      that Captain Greg used to float down the rivers and see

15      those Potemkin villages along the river and think, oh, this

16      is great, you know, my country is wonderful.  They are

17      moving down the river a little bit and they were

18      continuously fooled.  This is science.  And Dr. Samet, Dr.

19      Jarvis, and Dr. Stonnington were fooled.  They like what's

20      pretty on the surface and they don't dig below the surface.

21             And I think it's very useful for us to take a

22      little bit of a deep dive below the surface because what

23      lurks there is very illustrative and informative.  And I'm

24      going to borrow a quote from Mr. Ciresi, I wrote it down, I

25      liked it, I'm going to enter into my pantheon, epidemiology

1    has been so misused.  Let's see how misused.  This is the

2    Augustine 2017 paper where he says I'm going to compare Bair

3    Hugger to air-free HotDogs, and here's kind of a quick

4    summary of what his methodology.  In the papers, hips and

5    knees, and he used a one-year baseline for Bair Hugger,

6    followed by a 60-day washout period when they switch over to

7    HotDog, we're not going to collect data for 60 days because

8    we can't tell which -- where the infection was going to come

9    from, but then the 6 to 24 months of HotDog, those are the

10   infection data we're going to compare to, important

11   background for what he's doing.

12           This, again, would be what the peer reviewers

13   would have had before them.  So he says only hospitals

14   reporting no other significant changes, so he's saying don't

15   worry, no confounders, we've already taken care of that.  He

16   says we have a paid independent statistician performing

17   statistical calculations.  Guess who?  Mark Albrecht.  Paid

18   in the sense that he had the sort of damaclies of the

19   promissory notes hanging over his head.  This study was a

20   small letter C on that promissory note that Mr. Blackwell

21   just showed the Courts.

22           He says the only independent variable, kind of

23   backward way of saying no confounders, the only independent

24   variable is the warming.  And the most common brand, just

25   lest there be any doubt, he's saying Bair Hugger was used by

1    all three hospitals.  Okay.  He doesn't identify the

2    hospitals in this.  We know what they are, A, from earlier

3    drafts of this that were produced in discovery; and B, from

4    this testimony of deposition.  First one is Ridgeview

5    Medical Center in Minnesota.  The second one is the

6    Orthopedic and Sports Institute, Fox Valley, I just

7    shortened it to Fox Valley in Wisconsin, and the third one

8    is South Nassau Community Hospitals in New York.

9             And I want to start with South Nassau.  They

10   responded to our subpoena.  Their director of anesthesia

11   provided an affidavit, and the first thing he said was we

12   never use the Bair Hugger.  Yeah, they were using a

13   different forced air warming device, a Stryker warm air, but

14   part of why he was shall we say nonplussed when he saw this

15   study even though South Nassau wasn't identified in the

16   paper, when he found out that that was the case he was not

17   particularly happy.  He didn't provide any knee data.

18   Remember he said -- Augustine said it's going to be hip and

19   knee data.  He didn't provide any just -- and was in

20   response to one of Augustine's sons who just asked him for

21   some data.  Not only were there not any changes, he said

22   during this time period we were doing multiple things to

23   decrease the infection rate.

24             So and I spared you the deep dive on the actual

25   data because I wanted to just focus in on the data from

1      Ridgeview.  This is how the data are presented in the

2      Augustine paper.  Again, this is what the peer reviewers

3      would have seen.  They would have seen that Augustine is

4      claiming that in that two-year period of HotDog use there

5      were two infections out of a total of 677 procedures.  The

6      way Albrecht does his statistical stuff is he disaggregates

7      it.  He did it in McGovern.  He does it here.  I

8      reaggregated it just so you can see the numbers.  Two out of

9      the 677 in the HotDog and the forced air, that would be Bair

10     Hugger, and that should be the 12 months immediately

11     preceding the switchover but for the 60-day washout, six

12     Bair Hugger infections out of 388, hip and knee, remember

13     that.

14              Here are the actual data that Ridgeview provided.

15     There's to remind us of the two out of 677 and six out of

16     388.  Where do these come from?  Well, first of all, the six

17     out of 388 come from 2006 knees only.  The switchover

18     occurred at the end of 2007, beginning of 2008, so what

19     Augustine did was for his one-year baseline, he picked 2006

20     for knees, skipped over hips, skipped over the year 2007.

21     For HotDog, he selected, again, just knees, 332 plus 345,

22     667, there's your two out of 677, so this is what he's

23     reporting.  Had he followed his protocol with these data, he

24     would have, first of all, he would have reported combined

25     hip and knee, the one-year baseline of Bair Hugger would

 1    have been 2007 and it would have reported 2 out of 537 or an

 2    infection rate of .37, and he would have reported 6 out of

 3    1007 HotDog procedures, total or infection rate of .60.

 4              Now, using Augustinian analysis or

 5    Augustinian-Albrechtian analysis, that translates to a

 6    62 percent increase from Bair Hugger to HotDog, meaning that

 7    you're well more than twice as much at risk if you have a

 8    HotDog then if you have a Bair Hugger.  These numbers are as

 9    completely preposterous and as meaningless as taking the

10    numbers that they manipulated in McGovern and as he

11    obviously manipulated here to say that there's a big

12    difference between Bair Hugger and HotDog in favor of

13    HotDog.

14              The point here with this, and I'm sparing Your

15    Honors the deep dive from the data on the other ones as

16    well, this whole thing is cooked.  It's completely

17    fraudulent.  The idea that Scott Augustine did an objective

18    study and he followed his protocol and he gathered these

19    data and he presented them made it look like there was a

20    78 percent reduction when you switch from HotDog to Bair

21    Hugger, it is a complete fraud, an unmitigated lie.

22              And as noted, who did the statistical analysis

23    under his direction?  Mark Albrecht.  This brings us now --

24              JUDGE LEARY:  Can you tell us anything about the

25    journal in which this article was published?

1          MR. COREY GORDON:  Yes, it's an online journal out

2   of Italy, *Page Press* has a series of publications that they

3   pay 500 euros, 600 euros to publish in.

4          JUDGE LEARY:  The author -- the organization that

5   wishes to publish the article pays the money to have it

6   published?

7          MR. COREY GORDON:  That's right.  There's been a

8   proliferation with the Internet of online journals, and

9   there's a -- they run the gamut of respectability to not so

10   much.

11          JUDGE LEARY:  But would it be fair to stay that

12   this journal is a journal of self-published articles?

13          MR. COREY GORDON:  It is essentially.

14          JUDGE LEARY:  Is there any review of the

15   scientific validity?

16          MR. COREY GORDON:  They say it's subject to peer

17   review.  There's an unusual twist in that when you submit

18   your paper for publication, you are required by their rules

19   to provide them with the names of two potential reviewers.

20   Sometimes a lot of journals ask for suggestions.  They

21   require them, but they say it's peer reviewed.  There's an

22   editorial board.

23          This is an important point, if I may, Your Honor,

24   peer reviewers can only review what is presented to them and

25   have to rely on the integrity of those who are submitting

1    them.  There has been an explosion of peer-reviewed

2    published literature being retracted after it was uncovered

3    that there were problems with it.  And this is not just

4    online journals, although online journals tend to be

5    disproportionate.  Some of the top journals in medicine are

6    plagued with this as well.  One might attribute it to the

7    pressures of --

8              JUDGE LEARY:  I'm not really that interested in

9    the --

10             MR. COREY GORDON:  I apologize.

11             JUDGE LEARY: -- general situation with regard to

12   self publication.  I'm concerned about the scientific

13   reliability of the journal in which this article was

14   published.  And if you don't know, that's --

15             MR. COREY GORDON:  Well, I do.  It has an impact

16   factor that tends to be between about two and three, which

17   means it's not in the junky of journals, it's not in the top

18   tier of journals.  It's probably closer to the junky but

19   wouldn't it characterize it as the journal -- I'm not

20   faulting the journal.  I understand they are looking now at

21   this information, and I would hope that they would --

22             JUDGE LEARY:  You've answered the question, thank

23   you.

24             THE COURT:  Does the article itself reveal the

25   skipping over of the 2007 -- what you just pointed out the

1    knee, you know, you've got the '06 knee and then nothing

2    from '07 and then --

3              MR. COREY GORDON:  Not at all.

4              THE COURT:  So that wouldn't be evident from the

5    face of the journal?

6              MR. COREY GORDON:  That's correct, Your Honor.

7    And that's the point, that on the face of it, you know, if

8    you look at that chart, wow, that looks pretty compelling.

9    You know, you've got three different places, they all show a

10   reduction when they switch from Bair Hugger to HotDog.  You

11   combine the totals, you've got an odds ratio of 4.28,

12   conference interval of 1.5 to 12.9 and a P value of 0.0022,

13   it's all fake.

14             THE COURT:  So you're telling us all this.  Is

15   there a witness who says something similar?  Is there a

16   witness who says it's not consistent with respectable

17   scientific methods to rely on a study like this and I -- is

18   there a witness?

19             MR. GORDON:  Yes, two witnesses actually.  There's

20   Professor Borak who, frankly, was the one to kind of unravel

21   this, at least with respect to Ridgeview, and so testified

22   in his deposition, but Dr. Samet, when we showed him at

23   least some of this, he hadn't seen it before.  And I sort of

24   my final question was, doctor, if this is true, would this

25   concern you?  Would this trouble you?  And he said yes, it

1    would.

2              THE COURT:  Did he talk at all about whether in

3    his non-litigation work, he would rely on a study like this?

4              MR. COREY GORDON:  Well, I'm going to answer that

5    question slightly differently.  We did address how in his

6    published work he has talked about the need to rely, to

7    have, you know, more than one epidemiological study, to have

8    consistency, to show consistency across multiple studies,

9    you know, similar to the reference manual quote that

10   Mr. Blackwell put up.  And he acknowledged that that's what

11   he's written and that he stands by that.  And, you know, I

12   was asking him then how do you -- basically how do you just

13   rely on McGovern?  Well, he relies on McGovern because

14   that's what was presented to him.  I guess that's -- and

15   that goes right to really it's the heart of the Daubert

16   issue, you know, how does he do that?  How does he look at

17   one on its face --

18             THE COURT:  He said he also relied on McGovern

19   with others, including this --

20             MR. COREY GORDON:  Well, but the only

21   quantification of risk he acknowledged in the real world,

22   those are his words, was McGovern, then a little later on

23   bolstered by this, but you take away McGovern and Augustine

24   and there is no quantification.  It's all theory.  It's all

25   plausibility.  You've got smoke and you've got bubbles.

1          THE COURT:  Right.  So he specifically relies on

2     McGovern for the quantification, so the statement of how

3     much the Bair Hugger increases the risk, but Daubert

4     wouldn't require a finding of a certain quantification, so

5     to the extent the quantification relies solely on McGovern,

6     that doesn't get you where your motion wants you to go, does

7     it, because it's the ability to do it, the ability to cause

8     the infection at all, not --

9          MR. COREY GORDON:  I think I understand what Your

10     Honor is asking, and I think the answer is if there is some

11     valid evidence of increased risk, the inability to put a

12     specific number on what that increase is becomes a factor to

13     consider.

14          THE COURT:  That was my question.

15          MR. GORDON:  Here, what he is saying, I asked him

16     because in his opinion he said the Bair Hugger is a

17     substantial contributing factor.  I said so, you know

18     without the quantification, can you still say it's a

19     substantial contributing?  No, I can't.  Can you say it's

20     insubstantial contributing factor?  No, he couldn't.  The

21     point being whether it does in fact increase risk at all is

22     gone.

23          THE COURT:  I see.

24          MR. COREY GORDON:  But, certainly, yes, the need

25     to be precise in quantifying it is relaxed, I guess, if

1     you've got something that shows it really does increase

2     risk, but without McGovern and Augustine, they have

3     absolutely nothing to show that it really does increase the

4     risk.  They've got theory.  And in the face of that theory,

5     there's a lot of solid evidence that their theory is wrong,

6     but all they have to even get them to that point where you

7     could invoke the Bradford Hill factors or whatever else they

8     want to talk about, you got to have something to show

9     there's a positive association.  And the main horse they

10    rode was McGovern.  When Augustine came along out of the

11    calvary, the calvary has arrived, the problem with the

12    calvary, let's ignore that.

13            But now if I may, I'd like to do a little bit

14    deeper dive, peel back the curtains, if you will, on

15    McGovern.  There's a lot on the surface of the McGovern

16    paper that we will talk about as to why it, on its face, is

17    unreliable, on its face should raise some red flags to

18    Dr. Samet and anyone else who's trying to rely on it, but

19    through discovery, we've learned a lot more about it.  One

20    of the things we got at the very end of our transatlantic

21    sojourns when Dr. McGovern voluntarily appeared for his

22    deposition was that he gave us his -- all of his electronic

23    files on this study.  Thousands of pages.  And we weren't

24    able to get that from any of the other English authors

25    because they were all -- they were only appearing pursuant

1    to the order of the English High Court which, under their

2    interpretation of English law, precluded us from compelling

3    document production.  We got their deposition, but they

4    weren't required to produce underlying data or anything else

5    related to the actual task, but Dr. McGovern gave us his

6    whole file, electronically, and said that that's what it

7    was.

8          And one of the things that was very interesting

9    was there was an initial draft of the McGovern paper appears

10   as -- it's designated manuscript read 1 PDF, I'm calling it

11   McGovern draft 1, and the main things I want to point out

12   was when they were drafting this version of it, they started

13   out by saying that they're going to do a two-year study

14   period from 9/1/2008 to 9/1/2010.  And I just draw Your

15   Honor's attention to the fact that 9/1/2008 is the way we

16   Americans write dates; it's not the way the Brits write

17   dates.  They would have written 1/9/2008 or if they were

18   trying to do September, they would go 1/9/2008 -- or 1/9 --

19   1 September.  So the point being that it's clear this is

20   Albrecht.

21         But the main thing I want to I call your attention

22   to in this one is their initial draft of Figure 7.  Figure 7

23   looms large in this case.  It's a version of Figure 7

24   ultimately is published.  And indeed, in response to our

25   pointing out that the plaintiffs have previously represented

1    to the Court that Dr. Samet had reviewed all of the

2    underlying broad data of McGovern, their response was, well,

3    no, no, he reviewed Figure 7 as it was published.

4            Well, this is Figure 7 as it was initially

5    drafted, and the two things I want to point out, number one,

6    is again the start date is September 2008; number two, the

7    way the line is depicted here is that it's not a flat line.

8    It shows down and then up and that there's a clearly a very

9    obvious hump where a peak of infections just before the

10   switch over to HotDog.  That peak of infection just happens

11   to coincide with the seven months that they were using

12   rivaroxaban and had such disastrous consequences with it

13   that they switched back to the anticlotting drug they were

14   using prior to that.  But anyone -- so anyone looking at

15   this as it is drafted had it been published this way,

16   presumably could have at least scratched their head and

17   said, gee, you know, the infection rates weren't constant

18   over the Bair Hugger timeframe, they, you know, three

19   percent down to two percent, then over a very short period

20   of time skyrocketed to four percent, what's going on here?

21   If it's the Bair Hugger, why wouldn't -- you know, why would

22   there be these peaks and valleys, particularly this huge

23   peek just before the switchover?

24           Well, they apparently thought well of that because

25   in a very next draft, that line gets flattened out, but I

1     want to jump now to --

2              THE COURT:  Just leave that up for a second.

3              MR. COREY GORDON:  Sure.  You'll see it again.

4              THE COURT:  So the dates are different, so the

5     Figure 7 as published has July of '08, January of '09, July

6     of '09, January of '10, and then we skip over, so it skips

7     that hump period, right?

8              MR. COREY GORDON:  Well, no, the hump period is

9     included in -- in what they analyze as being the Bair Hugger

10    cohort.  The graphic depiction of that hump disappears and

11    the scrunching, if you will, of the -- what they call the

12    jitter plot at the top, I don't know if your eyes are good

13    enough to discern the difference, but you can see that

14    there's a little bit of -- a cluster of infections at the

15    top and a sparsity in the middle of the Bair Hugger period,

16    but there's no way to quantity --

17             THE COURT:  Oh, it's above the infection rate

18    grid?

19             MR. COREY GORDON:  Correct.  On the left-hand axis

20    is the percentage.  The bottom is a combination of the

21    timeline and that massive cluster of what looks like ink

22    smears, supposedly the number of cases, the number of

23    procedures, and then the dots at the top reflect the

24    infections.

25             THE COURT:  I see.

1          MR. COREY GORDON:  And I'm going to take a little

2     bit deeper dive on that in just a second.  And part of what

3     was going on here, it's clear from the text, and I spared

4     you that but it is in our materials, you can see from the

5     text at the time they were writing this they had only 171

6     Bair Hugger procedures, meaning they had about three months

7     of data, meaning September -- they were basically up to

8     September.  And at that point, there were no reported

9     HotDog, infections so, you know, you can't really do a very

10    valid comparison of some number of infections to zero.  So

11    they were waiting to see if they had any infections in the

12    HotDog period before they could do a comparison, and that

13    came about by the end of December they had enough, they had

14    seven months of HotDog data and they had some infections so

15    now they had some numbers to report.

16          Let's see how they drafted that the version have,

17    what I would call the penultimate version, McGovern draft

18    10.  And this is, you will see from the numbers, that this

19    is now based on the data that the final publication is based

20    on.  It just has that Augustinian magic applied to it.  This

21    is before the Augustinian magic has been applied.  Okay.  In

22    draft 10 they show there are 372 HotDog procedures versus

23    1,065 Bair Hugger procedures.  I know this is pretty meaty,

24    and I apologize.

25          THE COURT:  We can follow you so far.

1              MR. COREY GORDON:  Following me one thing is.

2      Staying awake is perhaps a bigger challenge.  But at this

3      point they are reporting a percentage of infections in the

4      HotDog period in that 372 group as 1.08.  Back calculate

5      that, that translates to four infections.  The 3.1 over

6      1065, it's a little more ambiguous depending on how you

7      round up, it could 31, it could 32, it could be 33, so that

8      spells out the numbers for the Bair Hugger.

9              Now let's look at their Figure 7 as drafted in

10     this penultimate version.  You'll see that they -- as Your

11     Honor pointed out in the final version, they moved that --

12     the start date back to July of 2008, and I'll give you I

13     think a good explanation as to why that happened.  But the

14     key thing I want to point out here is in this scatterplot at

15     the top in the HotDog only period are four infections, four

16     dots.  And you can see they flattened out the infection line

17     so, you know, anybody looking at this would not be alerted

18     to the fact that, hmmm, there was quite a peak there right

19     before they switched.

20             And just for comparison, I'm going to go back and

21     forth a little bit here.  So we have these four infections.

22     Now, to unravel this a little bit and see what was going on

23     at the old --

24             JUDGE LEARY:  Just for clarification, Mr. Gordon,

25     are you saying that with regard to this draft 10, the flat

1     line, that's really misrepresenting the data?

2          MR. COREY GORDON:  Well, it represents it in the

3     sense that it's just an average.  It's --

4          JUDGE LEARY:  So it's not plotted in terms of the

5     rate of infection at different points in time?

6          MR. COREY GORDON:  Correct.

7          JUDGE LEARY:  All that's been done with regard do

8     draft 10 is to take the information and then average it

9     across the length of time that the Bair Hugger was used?

10         MR. COREY GORDON:  That's exactly right.

11         THE COURT:  So why would you need it represented

12    as a rate over time if it's just an average?

13         MR. COREY GORDON:  Well, I mean, you wouldn't, but

14    if the average -- I mean, you know, how do with statistics,

15    the average of something that varies dramatically can appear

16    to be pretty static, but when you have something that varies

17    dramatically, it suggests that there's something going on

18    here.

19         THE COURT:  I mean, how do you plot -- I don't

20    know, maybe you're not the right person to ask this, but how

21    do you put on a grid for July of '08 and then your vertical

22    axis says "infection rate percentage" and what you plot

23    there is an average for things that haven't happened yet?

24         MR. COREY GORDON:  Your Honor, I must agree with

25    you.  I am not the right person to ask, and to the extent

1    you're asking me to --

2                THE COURT:  I just don't know -- all right.

3                MR. COREY GORDON:  I think that's pretty slimy

4    because just looking at that, it looks like, well, there's

5    been about three, a little over three percent infection rate

6    across 20 months.

7                THE COURT:  Right.

8                MR. COREY GORDON:  And that's not the case.

9                JUDGE LEARY:  Would it be fair to say that the

10   average that's represented on draft 10 for the Bair Hugger,

11   the average infection rate would be less if you pulled out

12   the spike in infection rates that might have been

13   attributable to a change in regimen, antibiotics regimen?

14               MR. COREY GORDON:  Absolutely.

15               JUDGE LEARY:  Is that what you think happened?

16               MR. COREY GORDON:  Absolutely.  And in about four

17   slides I'll show that.

18               THE COURT:  Okay.  Go ahead with your --

19               MR. COREY GORDON:  To further -- I just want the

20   Court to have a better understanding of what's going on

21   behind the scenes here.  Mark Albrecht gets the data that he

22   uses to come up with draft 10 and Figure 7.  This is his

23   e-mail that he sends to his colleagues after he's done his

24   preliminary analysis of the data.  This is an e-mail

25   January 31, 2011.  The e-mail goes to Mike Reed, to Paul

1    McGovern, and it also goes to Scott Augustine, pretty much

2    everything goes to Scott Augustine, and Professor Nachtsheim

3    gets cc'd on it.  And he says at the top, Barely made it

4    with those sample numbers.  Attached is an updated chart of

5    infection data.  The difference is significant based upon

6    the results of logistic regression.  Some highlights.  There

7    have been 3.1 for forced air, N equals 1065 and 1.08 for

8    HotDog equals, N equals 372.  And boy, they're doing their

9    happy dance.  Okay.  Hopefully we made it here to

10   significant difference so I'll update the manuscript to

11   reflect the new infection numbers.

12            Kind of an interesting way to do a study, to keep

13   gathering data until you make it to statistic significance.

14   Boy, you got to cross your goal line and you do your -- I

15   dont know, you do duck duck gray duck or for those of you

16   from out of Minnesota duck duck goose.  And duck duck gray

17   duck is correct.

18            How does it get published?  What happens?  Well,

19   this goes to Scott Augustine, right?  And we've already seen

20   what Scott Augustine thinks of the truth and the importance

21   of adhering to scientific integrity.  And just barely making

22   it to statistical significance, just below P and having --

23   and they've already calculated the odds ratio using -- they

24   didn't in that draft, but if you -- the odds ratio of 3.1 to

25   1.08 percent would be about 2.87.  And, you know, okay, the

1    confidence interval would be very wide and right about one

2    but just barely significant.

3              Call me a skeptic, but this goes to Augustine and

4    Augustine maybe thinks, hmm, you know what, it's good we

5    show a positive association but it's not as strong as it

6    could be.  Is there a way we can just make it a little

7    stronger?

8              Here's the published version.  Remember that 1065?

9    It becomes 1066.  Remember that 372?  It becomes 371.

10   Remember the -- this time they specify the number of

11   infections for Bair Hugger.  This is interesting, they say

12   32 -- this is in the published paper, and they say that's

13   3.1 percent.  No matter how many times you calculate it, 32

14   is three percent of 1066 which makes me wonder what the peer

15   reviewers were doing, but that's really a very minor issue

16   compared to the decrease in HotDog infections from four to

17   three.

18             So here you have the comparison, the penultimate

19   version, they sent it -- he sent it to Scott Augustine, we

20   barely made it, 1065 versus 362 -- 372.  On the 1.08

21   percent, we need four infections in HotDog.  Published

22   version, there's only three infections in the HotDog period,

23   371 versus 1066.  So how did that happen?  How do those four

24   infections become three infections in the HotDog period?

25   Well, we think we have the answer.  Dr.  McGovern in his

1    voluminous materials provided us with an Excel spreadsheet.

2    And we'll talk about this when we talk more about the

3    Holford -- Dr. Holford's analysis and data upon which he did

4    that analysis.  But Dr. McGovern had the spreadsheet that

5    showed all the infections, the dates, the age, the sex, the

6    procedure for just the infections.  It was an Excel

7    spreadsheet that called out just infection as opposed to the

8    master file, if you will, that had all the procedures, all

9    1400 or so procedures.

10            And what he did was -- you have to squint at this,

11    we did a callout here, somebody, unlike the master set of

12    data that had all those bits of information, including the

13    infection data and the type of infection, there's one column

14    that's added that isn't in that master set and that's a

15    column that shows whether the codes as either become CFW,

16    that's HotDog, or FAW, that's Bair Hugger.  And you can see

17    that the four dates that are shown here are 9/1, 9/15,

18    10/18, and 11/22.  Those are all in the Bair Hugger period.

19    In fact, they're well within the Bair Hugger period.  The

20    switchover occurred from March, April, and May, so it's

21    completed by the end of May.  From June 2010 on, they were

22    using just HotDog.  So September is well in the middle of --

23    in fact, it's dead in the middle of the HotDog only period.

24    Yet for some reason, September 15th, 2010, right in the

25    middle of the HotDog only period, this one procedure gets

1    coded as being a Bair Hugger procedure.  So what happens?

2          Well, and by the way, I just wanted to point out

3    that the -- all the data on McGovern 16 corresponds exactly

4    to the master set of data upon which Dr. Holford did his

5    analysis with the one exception of the 9/15/2010 having a

6    Bair Hugger coding.  All of the other data are still there,

7    the British convention 15-9-2010, the age, the sex, the type

8    of procedure, the type of bacteria, all that is identical.

9    It's not different because there is no warmer coding on the

10   master data.  On this document, it gets coded as FAW.  So

11   how does that impact things?  Well, those four that appeared

12   in the penultimate draft, they become three.  What happens?

13   Well, one of them in the middle gets coded as FAW.

14          Now, one could say -- I suppose one could say when

15   then reviewed the data, oh, gee, I don't know how this

16   happened, but for some reason out of all of those 372

17   procedures that we did when we were supposedly only using

18   HotDog doing, for some reason on September 15, 2010, someone

19   just decided, well, let's use a Bair Hugger on this one case

20   and that one just happened to end up in an infection.  Maybe

21   that's possible.  But if that's the case, you would expect a

22   footnote, okay, here's a fourth dot on this scatterplot,

23   footnote, you know, for whatever reason, this one procedure

24   was done.

25          You would also expect there would be at least some

1    e-mail back and forth.  And I'm going to anticipate what

2    might be a question is what do the witnesses have to say

3    about this?  Unfortunately, when we got these documents from

4    Dr. McGovern, we had already deposed Albrecht, we had

5    already deposed Reed.  We didn't have -- weren't able to ask

6    them.  Dr. McGovern, even though his name is on the

7    beginning of this, is the first name on the study, he had

8    already left the hospital.  He was in his early stages of

9    his residency.  He left the hospital before the switchover

10   even occurred.  He was involved in the bubbles but he had

11   nothing to do with, other than there's kind of a repository

12   for all the e-mails back and forth, for the final aspect of

13   epidemiological lead, interrupted time series, observational

14   study.  So I asked him why would there be a Bair Hugger

15   procedure in the middle of September?  I mean, well, yeah.

16   And he said, which all he could say, of course, is I don't

17   know.

18          So what's the impact of this?  Moving one or

19   re-coding one, moving back the start date, we didn't talk

20   that much about that, but I want to show that.  Remember

21   they started out they were going to start in September of

22   2018 -- or 2008, and by the time they did this, they had

23   bumped back two months.  Well, okay, two months, more data,

24   that's good, isn't it?  Well, what happens is, and this is

25   from Dr. Holford's chart -- or his expert report.  He did a

1    month-by-month analysis of what would be the statistical

2    significance of any odds ratio depending on which month you

3    started the study, the red line being, if you will, the

4    statistical significance goal line.

5            THE COURT:  Who did this?

6            MR. COREY:  I'm sorry?

7            THE COURT:  Who did this?

8            MR. COREY GORDON:  Professor Holford.  He's our

9    biostatistical expert.  And what he showed -- and by the

10    way, he used a chi-square for this analysis.  If you're

11    lucky, you won't hear any more about it, but I'm afraid

12    you're going to hear more about a chi-square.

13            THE COURT:  Well, the plaintiffs are going to say

14    it's a different -- the use of a chi-squared makes it kind

15    of an apples-to-oranges comparison.

16            MR. COREY GORDON:  Yeah, that's basically what

17    they're going to say, and I'm going to keep you in suspense

18    to our response because it's close to lunch and I don't want

19    to put you to sleep.  But the point is was a chi-square

20    analysis, and what he -- what he showed was kind of

21    interesting.  If you start in September of 2008, you don't

22    cross the statistical significance goal line, but if you

23    start in July of 2008, you make it barely across the goal

24    line.  So the start date is so sensitive in this study that

25    just moving it back two months moves it from not

1     statistically significant to statistically significant.  By

2     the way, moving it forward a month or moving it back more

3     than two months would obliterate statistical significance.

4     Moving forward one month for the first six or seven months

5     is still below significance.  The sweet spot that they have

6     to use in order to achieve statistical significance was a

7     start date of July 1, 2008, and to gild the lily, they added

8     an additional -- they moved a HotDog to the Bair Hugger.

9             Now, maybe they switched --

10            THE COURT:  Let's just briefly -- and since Judge

11    Noel is not here, I'll say the 15 words -- or what'd he,

12    25 words or less, tell me why this is an admissibility, all

13    of this -- let's say this is all true, tell me why that's an

14    admissibility issue rather than a weight issue?

15            MR. COREY GORDON:  That's -- obliterating this

16    little one right there, it's certainly weight versus

17    admissibility.  Mr. Ciresi said, oh, this study has.  You

18    know, confounders.  That's true in an abstract sense, but at

19    some point a study becomes so fraught with problems, it's

20    just, it collapses.  The whole point of the gatekeeping

21    function, if you will, or even Frye-Mack is, you know, is

22    there, there?  Is there something reliable upon which the

23    experts can offer an opinion?

24            THE COURT:  And --

25            MR. COREY GORDON:  And the start alone is not --

1       the moving the one infection, that's not it.  The

2       confounders --

3               THE COURT:  What is the legal standard for when it

4       drops below the -- when it becomes a matter of

5       admissibility?

6               MR. GORDON:  Well, there are a number of cases,

7       for example, that say the opposite.  There's no bright line

8       in terms of, for example, statistical significance.  You

9       could have something that's statistically significant that

10      doesn't isn't -- that doesn't, you know, punch your ticket

11      and you get past the gate.  Conversely, there are cases that

12      stand for the proposition that if you don't have, you know,

13      statistical significance, that is necessarily fatal.  So

14      it's not -- there is a certain totality of the evidence.

15      But, again, at some point, when you've got multiple

16      confounders, when you've got multiple flaws in the

17      methodology, when you've got disclosed confounders that were

18      not considered, known/unknowns we might want to call them,

19      when you've got undisclosed confounders, not considered, and

20      you've got pretty strong evidence of data miscoding, to be

21      charitable, manipulation to be more of an advocate, at some

22      point the data simply -- the study is not reliable because

23      the data have not been properly analyzed and properly

24      presented.

25              THE COURT:  So it affects the preponderance that

1    is normally used in evaluating factual underpinnings of an

2    admissibility determination so it goes to whether there is

3    -- the plaintiffs can show by a preponderance of the

4    evidence that this would be reliable?

5              MR. COREY GORDON:  I would guess that it's a

6    preponderance standard, but, you know, in our main -- most

7    -- you know, at least most cases I'm familiar with, the

8    science doesn't -- isn't fraught with this kind of

9    underlying fraud and manipulation.  And in this district, I

10   think the closest parallel would be the *In Re Viagra* MDL

11   where the Court originally permitted the expert testimony to

12   go forward based on a peer-reviewed study that had been done

13   by the proffered expert but then discovery revealed a lot of

14   problems with the underlying data and in revisiting that --

15   the initial decision, the Court in that case excluded it.

16             THE COURT:  All right.  Thank you.

17             MR. COREY GORDON:  I know it's 12:20 and I've got

18   a choice which means you've got a choice.

19             THE COURT:  How many more minutes do you have?

20             MR. COREY GORDON:  Well, what I was going to say

21   is the next stuff is about the confounders I can just as

22   easily do that in the Holford/Borak defense.  It's entirely

23   up to you.

24             THE COURT:  What's the thumbnail of what you're

25   going to say about the confounders?  Are you going to talk

1    about the anticlotting?

2             MR. COREY GORDON:  Yep.

3             THE COURT:  You're not going to talk about the

4    obesity component?

5             MR. GORDON:  Oh, yes.  Let me do the obesity just

6    before we go lunch, if I may.

7             By the way, before I started working on the Bair

8    Hugger case I was 40 pounds lighted, so I'm going to say

9    there's a positive association between working on this case

10   and my now being obese.

11            THE COURT:  You were four pounds lighter?

12            MR. COREY GORDON:  Yeah.  Well, I did have 2 foot

13   -- feet -- foot surgeries in between and, I don't know, that

14   may have had something to do with it, but that's just the

15   confounder.

16            So back to McGovern, what do they say, they say

17   not unfortunately, but there are two unfortunatelies in

18   here, and this is the unfortunately about the antibiotics

19   and the thromboprophylaxis.  And I'm going to skip over that

20   for a second to the second unfortunately.  Unfortunately,

21   the record keeping was a complete --  this is what we would

22   call the patient-specific factors, blood transfusion,

23   obesity, incontinence, and fitness for surgery.  Which have

24   been identified elsewhere as important predictors for deep

25   infection.  That's an important sentence because plaintiffs

1    and their experts want to say, well, before you have to

2    think about confounders, you have -- first, there has to,

3    you know, a priori determination that they have -- that they

4    could be a confounder.

5            Well, we have some disagreement over the details,

6    but there's no disagreement that the authors of the study

7    were saying, hey, these were identified as important

8    predictors for deep infections, i.e., potential confounders,

9    but they don't have any information.  These are known

10   unknowns.  So were the Bair Hugger, would the Bair Hugger

11   cohort a whole bunch more obese, incontinent, you know,

12   people who needed blood transfusions?  The biggest issue

13   really is probably.

14           We don't know, but fitness for surgery and the

15   idea that fitness for surgery could be a really important

16   factor that you have to consider, you don't have to take my

17   word for it.  Take Dr. Jarvis's word for it.  When Dr.

18   Jarvis was at the -- that's one of plaintiffs' expert.  When

19   he was at the CDC, they were called into a hospital in

20   Tennessee to investigate an apparent problem with a cluster

21   of infections in their knee surgery.  And going in, they had

22   the suspicion that it was one particular surgeon.

23           THE COURT:  And he says we don't want to disagree

24   so he went to the Nth degree, blah, blah, blah.

25           MR. COREY GORDON:  They did a great job in

1   analyzing all potential factors, and when they did it, they

2   found, yeah, the surgeon was statistically -- it was

3   associated as statistically significant but so was fitness

4   for surgery.  This surgeon, for whatever reason, had a whole

5   bunch more people with what's called ASA scores, they were

6   high ASA scores compared to all of the other surgeons, so to

7   compare apples to apples, you had to factor that in.

8   McGovern didn't do that.  And they say that we didn't do

9   that.  And, you know, for that reason, just on that alone.

10          One more slide because I promised Judge Leary that

11  I would get to this and I'm finally going to get to it.

12  When you slice out the change in antibiotics and the change

13  in anticlotting drug, there was a period in between where

14  they were the same for Bair Hugger as they were in HotDog.

15  In other words, they switched the antibiotics earlier then

16  switched the anticlotting drug and then switched back.  So

17  by the time they got to the HotDog period, they were using a

18  protocol that they had actually used in the middle, remember

19  that graph that we saw on the earlier graph, Figure 7, when

20  you slice it like that, there is no difference, zero

21  difference in the infection rate.

22          Don't believe me.  Believe Mark Albrecht who when

23  we forced him to kind of go through this analysis conceded,

24  yeah, that would not be, there would be no significance.  In

25  fact, he didn't need to run an analysis to know that it was

1    not significant.

2              THE COURT:  How much infections were there in that

3    seven-month period?

4              MR. COREY GORDON:  The seven-month period of the

5    HotDog either three or four, I believe there were three -- I

6    think there were three in the five-month period.  I can -- I

7    like to be precise so, I mean, I'll -- I don't know if we

8    have that on a chart, so I can certainly provide that to the

9    Court after lunch.

10             THE COURT:  Okay.

11             MR. COREY GORDON:  But just, the point is, just

12   these two factors alone, if they had controlled for them,

13   there's no there, there.  There's no difference.  And this

14   also underscores just the huge impact that the anticlotting

15   drug when, and we get to Holford and Borak we'll talk a lot

16   more about that, but unless the Court has any questions, I

17   think I can actually end there.

18             JUDGE LEARY:  I'm good.

19             THE COURT:  So when we come back from lunch,

20   what's going to happen?

21             Thank you, Mr. Gordon.

22             MR. COREY GORDON:  Thank you, Your Honor.

23             MR. BLACKWELL:  Your Honor, we will close before

24   lunch with our arguments on the exclusion of SJS, and then

25   as to whether the plaintiffs want to take them one by one,

1      I'm presuming --

2             THE COURT:  I guess to be more specific about my

3      question, are you about done with SJS?

4             MR. BLACKWELL:  Yes, Your Honor.  I have only one

5      other thing to put up.

6             THE COURT:  Okay.  Well, why don't you put that

7      up, and then we'll -- welcome back.

8             You know how I said before you shouldn't, I think

9      you should.  So why don't you do whatever you're going to

10     do.

11            MR. BLACKWELL:  Just this in closing, I put up the

12     final quote from *Glastetter* that I think speaks, to some

13     extent, the types of evidence the plaintiffs need here in

14     support of the plaintiffs' medical causation claim.

15     Although plaintiffs' chain of medical reasoning appears

16     sound, its major premise remains proven.  Glastetter's

17     experts failed to produce scientifically convincing evidence

18     that Parlodel causes vascular constriction.  Her experts

19     relied on various types of scientific data, published case

20     reports, medical treatises, human re- challenge data, even

21     animal studies, internal company documents, and the FDA's

22     revocation of parlodel's indication for suppressing

23     lactation to establish that parlodel acts as a vacular

24     constriction.  We agree with the district court's conclusion

25     that this data does not demonstrate to an acceptable degree

1   of medical certainty that parlodel can cause intercerebral

2   hemorrhage, stroke.

3          The types of evidence, the data, that the

4   plaintiffs have here in this case is even less that the

5   *Glastetter* court had.  At least they had animal studies.

6   They in fact had the revocation from the FDA as opposed to,

7   in this case, the endorsement of the product by the FDA, at

8   least the endorsement of the continued use of the product.

9          So we'll rest on our papers with respect to the

10  rest.  Our view is that the general state of the knowledge

11  in the scientific and medical community is that the theory

12  espoused by the plaintiffs here is generally rejected; that

13  the experts' opinions are based upon flawed data; or in the

14  case of exploratory studies and CFD, items that don't tend

15  to prove causation and weren't intended to and the

16  methodology is flawed.  Thank you, Your Honor.

17         THE COURT:  Thank you, Mr. Blackwell.

18         JUDGE LEARY:  What do the parties intend to do

19  with regard to any visual slides that they present today or

20  during these hearings?

21         MR. BLACKWELL:  We had thought, Your Honors, to at

22  the end of each day look at the ones we actually used and

23  then to put those together for the Court on the following

24  day.  We haven't discussed it with the plaintiffs yet, but

25  to make them available to the Court and of course the

1    opposing party then too.

2            MS. CONLIN:  We're fine with that.  I mean, I did

3    bring a slide deck on my presentation, but perhaps it makes

4    sense to provide them to the Court at the close or tomorrow

5    morning.

6            THE COURT:  Then you've got the advantage of

7    knowing which ones were actually used.

8            MS. CONLIN:  That's true.

9            MR. BLACKWELL:  Thank you, Your Honor.

10           THE COURT:  Thank you.  We'll resume at 1:15.

11   We're in recess.

12                      (12:30 p.m.)

13                      (Lunch recess.)

14

15                      (1:18 p.m.)

16                      (IN OPEN COURT)

17           THE COURT:  Please be seated.  Mr. Ciresi.

18           MR. CIRESI:  Yes, Your Honor.  I was just waiting

19   for the judges to sit.

20           THE COURT:  Ms. Conlin.

21           MS. CONLIN:  Good afternoon, Your Honors.  I'd

22   like to start with the Court's question about the FDA letter

23   this morning and the point that that FDA letter, and we

24   don't know what information the FDA had when it put that

25   letter out, but we do know that it says where intraoperative

1     warming is warranted, in cases which intraoperative warming

2     is warranted, and this is a document, an Arizant document,

3     that came from 3M's file, dated June 23rd of 2007.

4            And it's regarding the Bear Paws product, and the

5     Bear Paws product is a forced air warming device

6     manufactured and sold by 3M that warms a patient up and

7     blows hot air on them before surgery.  So Bear Paws is

8     typically used before surgery, Bair Hugger during surgery.

9     And if you look at the advantages listed there for using the

10    Bear Paws, warming up the patient before surgery, it says,

11    Can be used when intraoperative warming is contra-indicated,

12    and then in parentheses it says, Aortic cross clamp in

13    orthopedic cases.

14           And that's what we're talking about here is

15    orthopedic cases and the environment of use, and you heard a

16    little bit from Mr. Ciresi, and you're going to hear more

17    about it as we go through that the reason why orthopedic

18    surgeries are contra-indicated for a Bair Hugger device is

19    because it only takes one or two microbes, CFUs, to land on

20    that implant to cause an infection, and it distinguishes it,

21    and their experts do, too.

22           By the way there is no dispute between the

23    experts.  There is a difference between a surgical site

24    infection and what's known as a deep joint infection or

25    prosthetic joint infection, and that's because, as

1    Mr. Ciresi alluded to, you can have infections that are

2    caused post surgery, on the top of the skin or in the

3    tissue, from bad bandaging or, you know, being unclean or

4    shower.  You name it.

5            But that's the issue, and this document from 2007

6    says, Reduces the potential for nosocomial transmission of

7    pathogens by eliminating the need for intraoperative

8    warming.  I'm quite certain that the FDA did not have that

9    document.

10           The other that I just want to show you because it

11   goes to this FDA letter and one of the questions this

12   morning on particles versus bacteria, this a document from

13   Michelle Hulse Stevens, and you heard 3M talk this morning

14   about the Orthopedic International Consensus, and they put

15   up slides from that.

16           And this is actually an internal memo from

17   Michelle Hulse Stevens, head of 3M Infectious Disease

18   Division.  She's in charge of all this, reporting back on

19   what she heard at that meeting.  She says, All, I sat in on

20   the group addressing the OR environment for this consensus

21   document.  There is an amazing concern about any

22   particulates in the air during joint replacement surgery and

23   almost uniform comment that forced air warming increases

24   particulates in the air.

25           So then they go on in the last line, They equate

1    particulates with bacteria in the air and cite studies.  Do

2    not have the citations.  She didn't have the citations that

3    support this.  That's some of the evidence that I'm going to

4    talk with you about today.

5         *Daubert*, as this Court is aware, basically allows

6    for the liberal admission of expert testimony.  It only need

7    be relevant and reliable, and I don't think as we go through

8    this with respect to our three experts you're going to see

9    much dispute about the reliability of the methodology that

10    they employed in arriving at their conclusions.

11         And under the Frye standard under state law,

12    there's an additional prong which is, it has to be accepted

13    if it's novel, and this isn't a case in which the

14    methodologies that the scientists are employing are novel.

15    3M doesn't even dispute the methodology employed by our

16    experts.  What they're disagreeing with is the conclusion.

17    I think Mr. Gordon made that pretty clear right before

18    lunch.

19         Eighth Circuit does follow *Daubert's* liberal

20    approach.  Doubts are resolved.  Excuse me.  There's a typo

21    there -- in favor of admissibility.  Factual basis for the

22    expert opinion goes to credibility not admissibility, and a

23    District Court abuses its discretion if it results in doubt

24    in favor of excluding expert testimony or decides the

25    correctness of an expert's opinion.

1          I want to talk with you at the start a little bit

2     about the way the briefing took place in this, and I am

3     loathe to cast aspersions on colleagues, particularly those

4     in Minnesota, but I do want to point out a couple of issues

5     in connection with the briefs that were submitted.

6          One of the things that they say, and this is in,

7     the top one is in their first brief on page 14, the very

8     first point under their argument section.  The McGovern

9     study is the only epidemiological study cited by Samet,

10    Jarvis and Stonnington in their report, and it goes on in

11    their reply brief says, Here by contrast, McGovern is the

12    only observational study that SJS rely upon for their

13    opinions.

14         In other words, the story that has been told is

15    that the experts in this case are relying on McGovern and

16    McGovern alone, and that is simply not true.  Let me show

17    you.  Dr. Samet, he is our epidemiology expert in this case.

18    He is world renowned.  When he was working for us in this

19    case, he was at U.S.C.  He is now a dean in Colorado at a

20    public health facility, but he was also head of epidemiology

21    for Johns Hopkins for a couple of decades.

22         He used the Bradford Hill criteria to evaluate

23    causation in this case.  Defendants don't dispute that he

24    used the wrong methodology.  They in fact endorsed

25    Dr. Samet's methodology, and you'll hear when we get to

1     Dr. Borak, 3M's expert, he employed the same methodology,

2     and there was a lot of talk this morning on, well, McGovern

3     and these other things don't show causation, and causation

4     is never shown in an observational study.

5          What an observational study shows is association,

6     and that's what McGovern showed was an association between

7     use of the Bair Hugger and deep joint infections.  Causation

8     is what an epidemiologist does when they look at all of the

9     evidence that's been amassed in a case, and they make a

10    scientific judgment as to causation, and that's what

11    Dr. Samet did here.

12         Dr. Samet, contrary to the suggestion in 3M's

13    brief that we are riding the McGovern train and the McGovern

14    train alone, he considered multiple lines of evidence.  If

15    you look at his reference list in connection with his expert

16    report, he looked at hundreds of medical articles.  He

17    looked at the deposition transcripts of a number of the key

18    players, including all of the McGovern authors who were

19    deposed.

20         There were a couple that refused to in England.  I

21    think Dr. Harper was one of them, but for everybody that was

22    deposed, he looked at those.  He looked at a number of

23    internal 3M documents and Arizant documents.  He looked at

24    depositions of 3M employees.  He looked at the medical

25    literature, and he looked at the expert reports.

1          So to suggest that there's a single McGovern train

2     that we're riding is just simply not borne out by what the

3     experts actually did.  Dr. Jarvis, you'll recall, Your

4     Honor, Your Honor saw him at science day.  He was head of

5     the CDC Division of Infectious Diseases for 17 years.

6          Again, like Dr. Samet, 3M doesn't dispute his

7     qualifications, and like Dr. Samet, he employed a multi

8     disciplinary experience of investigating infectious

9     outbreaks, just as he did at the CDC, and he cited dozens of

10    sources, along with McGovern, and if you look at his report,

11    you'll see, for example, on pages 9, 10, 11, 12, I mean the

12    citations to the relevant evidence that he as a scientist

13    relied upon in reaching his judgment of causation in this

14    case is not limited to McGovern as suggested.

15         Now, defendants may disagree to its conclusions,

16    but that's an issue for the jury, as we talked about this

17    morning.  Dr. Stonnington, he approached this case from a

18    clinician's standpoint.  He performs a high number of

19    surgeries in the orthopedic area, the area of interest, and

20    since he started looking into it, he stopped using the Bair

21    Hugger altogether.

22         Again, looking at evidence from a clinician's

23    standpoint, his investigation and assessment is something

24    that is well accepted and allowed under Minnesota law and

25    the *Daubert* standard.

1            Now, I want to talk with the Court a little bit

2     about the mechanisms of causation, and this is actually a

3     figure from Dr. Samet's report.  It's Figure 3, and it's the

4     mechanism by which Dr. Samet concluded that the Bair Hugger

5     increases the risk for deep joint infections.

6            You have the Bair Hugger device, and as you know

7     from science day and some of the other hearings, that's a

8     device that typically sits on the floor.  Air intake is at

9     the bottom of the device below the sterile operating field.

10    There's been a ton of evidence in this case that 3M knew

11    their filtration system was inadequate.  They led people to

12    believe that it was hepa filtered, and in fact it wasn't

13    until 2016 after this case was well along the way that they

14    informed the FDA that in fact they did have a hepa filter,

15    and it basically harbors bacteria and pathogens, and that is

16    absolutely undisputed by 3M.

17           Underneath this, you've got two mechanisms by

18    which Bair Hugger increases the risk.  You've got on the

19    bottom microbial contamination of the surgical field, and

20    you heard Mr. Blackwell talking about, well, plaintiff

21    should have done their own testing.  They should have done

22    agar plates and seen whether bacteria lands on an agar plate

23    in higher numbers when the Bair Hugger is on.

24           We didn't need to do that study because the

25    studies exist, and you can see them set forth in Jarvis's

 1    report, as well as Samet's.  You have the Tumia study, the

 2    Moretti study, the Zink study.  All of those show that when

 3    the Bair Hugger is on, the agar plate near the surgical site

 4    show an increase in bacteria.

 5           The Oguz case, the one from 2017 that

 6    Mr. Blackwell, put up, showed that with respect to plate 4,

 7    there were six plates in that study.  Plate 4 was the only

 8    plate that was at the surgical site, the hypothetical

 9    surgical site.  That was the plate that showed a substantial

10    increase in the bacteria on that plate, and that's, the

11    other plates were at different locations in the OR.  That

12    plate, plate 4, you can read the study, shows that there was

13    an increase there.

14           Dr. Jarvis also talked about the Bernard study.

15    That was a case in which there was an outbreak of

16    Acinetobacter baumannii in the hospital, and they traced the

17    infection back to both the Bair Hugger device.  The dust in

18    the Bair Hugger device carried that exact pathogen, as well

19    as some dust in another piece of equipment in the OR.

20           The Wood study cites Moretti and says there is an

21    increase, a substantial increase in bacteria on the agar

22    plates when the Bair Hugger is in use.

23           MAGISTRATE JUDGE NOEL:  Can you just direct me

24    where in the memos do you recite all of these studies

25    showing an increase in bacteria?

1          MS. CONLIN:  I think, and I can pull it up.  I'll

2     have Mr. Sacchet pull it up for me, but I think it starts on

3     page 41.  It might be a few pages beyond that, but I will

4     pull it up and show you.

5          MAGISTRATE JUDGE NOEL:  This is the memo in

6     opposition to their motion to exclude Samet's?

7          MS. CONLIN:  It is, Your Honor.  And then the

8     other place that you can look for it is, you can look at, as

9     an example, Dr. Jarvis's report where he talks about these

10    as well.  You know, for example, the bottom of page 13 in

11    Dr. Jarvis's report says, The study did document an increase

12    in mean bacterial load values when the Bair Hugger forced

13    air warming was employed.

14         So I don't have a nice table for you, but it is

15    interspersed throughout briefings and our expert reports.

16         MAGISTRATE JUDGE NOEL:  Okay.  Thank you.

17         MS. CONLIN:  Page 46.  I was off by five pages,

18    Your Honor.

19         MAGISTRATE JUDGE NOEL:  Thank you.

20         MS. CONLIN:  Other independent studies have

21    further found that the Bair Hugger increases both particles

22    and bacteria at the surgical site, Moretti 2009, Samet

23    deposition citing Moretti, the Wood and Tumia.  It goes on

24    from there, Your Honor.

25         MAGISTRATE JUDGE NOEL:  Okay.  Thank you.

1          MS. CONLIN:  The top of the chain causation is

2     disturb uni directional flow, and again not simply relying

3     on McGovern for that proposition.  You have McGovern, which

4     did do a bubble buoyancy test, but you also have Legg,

5     Dasari, Belani, all showed a substantial disturbance of the

6     uni directional know which is considered ideal for

7     orthopedic surgeries, and of course you have Dr. Elgabishi's

8     analysis, our expert who did his own CFD analysis.  He ran

9     his CFD analysis on a computer of which there's only ten.

10    There is a handful in the country.  He used two million

11    hours of CPU processing time to run his simulation.

12          I doubt any of that was in front of the FDA, and

13    I'm going to talk about that a little more.  Then you go on

14    to the increased dose of infectious organisms, again not

15    simply relying on McGovern, but there are two studies that

16    have come out, Stocks and most recently the Darouiche study

17    from 2017, and I'm going to talk about that.

18          But basically what that study showed was, if you

19    take a cubic meter in an operating room, for every ten in a

20    cubic meter, CFUs, increase in CFUs, the colony forming

21    units, so ten particles in that cubic meter carrying

22    bacteria doubles the risk for infection, and we relied on

23    that study, which hasn't been talked about.

24          And then you get to increased risk, and that's

25    where McGovern comes in, and it does because what Samet,

1    Dr. Samet used and Dr. Jarvis used McGovern for was to

2    quantify the risk based on this mechanism of causation, and

3    it's not just our expert's word for it.  Mr. Ciresi put this

4    up, but these are what the parties agreed to in this case

5    through depositions or through their experts.

6         You only need one, as high as ten, but one will do

7    it to cause an implant in a prosthetic joint.  Airborne

8    contamination is how it gets there.  Bair Hugger harbors

9    infectious pathogens.  3M's witnesses said absolutely we

10   know it does, and it increases the particles over the

11   sterile field.  Their 30(b)(6) witness said absolutely it

12   does.

13        Increased particles cause increased bacteria,

14   their experts admitted to that, and increased bacteria

15   causes an increased risk, and at the bottom here is a cite

16   to the Darouiche 2017, and by the way, that was a randomized

17   clinical trial, the gold standard that 3M got up today and

18   talked about and said there isn't anything.

19        Darouiche is the gold standard under their

20   definition, and what it showed and what it said was that for

21   every ten more colony forming units per metered square

22   increases or approximately doubles the probability of an

23   implant infection, and it gets back to the point Mr. Ciresi

24   was making this morning which is, they've never done any

25   testing to ascertain whether the Bair Hugger is appropriate

 1    for use in orthopedic surgeries.

 2              They haven't done it.  You know from the document

 3    I just put up that in back in 2007 they knew that it might

 4    be contra indicated for orthopedic surgeries, and they

 5    haven't done any studies, no studies whatsoever.  They have

 6    Dr. Sessler, part of their medical advisory panel say,

 7    please do a study.  They refuse.  Do you know why they

 8    refused?  Because Dr. Sessler thought the air coming out of

 9    the Bair Hugger was sterile.  He testified to me in his

10    deposition to that.  He didn't realize that the air coming

11    out was dirty.  He didn't realize that it caused this

12    basically turbulence and convective currents in the

13    operating room.

14              So Dr. Elghobashi's analysis, which confirmed some

15    of the smaller studies, but it used a high fidelity, large

16    ed simulation to study the interaction of the Bair Hugger

17    use in the OR and what it does with the air movement.  When

18    the Bair Hugger was off, the operating room carried on as

19    intended and as designed.  When the Bair Hugger was turned

20    on, it showed large levels of turbulence intensity which

21    matters because in orthopedic surgeries in particular,

22    everything below the operating table is considered

23    unsterile.  In fact, you'll hear stories from physicians

24    that if one of the aids in the OR in an orthopedic surgery

25    drops their hands below the table, they're required to go

1    out and scrub in again.

2           So basically what Dr. Elghobashi did, and I'm just

3    going to show you one slide from his rather lengthy report,

4    but this is not heat, by the way.  If you look at this top

5    graph, I'll just represent to the Court, that's actually

6    turbulence.  So a zero is a non-turbulent environment, so 60

7    is highly turbulent, so don't think of it as heat, think of

8    it as turbulence.

9           You can see with the Bair Hugger off, which is the

10   top one, and he ran that I think for 80 seconds.  The

11   operating room is potentially -- or is operating as

12   intended.  You've got the air flow coming down, and you can

13   see that it's pretty much in the non-turbulent area.  Turn

14   the Bair Hugger, on and this is for 37 seconds only, and you

15   can see that in 37 seconds, you already have that degree of

16   turbulence going on, so what it's doing is essentially

17   pulling up all of the unsterile air from underneath that

18   operating table and dumping it in the surgical site, and

19   that's what his study showed.

20          Now, let me talk a little bit about third-party

21   research, all right.  This is just some of the third-party

22   research.  And Your Honor, you asked if we have a table, we

23   really don't, but these are sort of some of the key ones

24   that we see.  Does the Bair Hugger increase particles at the

25   surgical site?  3M's author says -- or 3M's 30(b)(6)

1    witness, Al Van Derg, testified, quote, Every single study

2    indicates that the Bair Hugger increases the particle count

3    over the sterile field.  That's 3M.

4            Sesler, 2011, one of the 3M's paid consultants, 3M

5    funded the study that he did, they also edited, I may add,

6    before it went to publication, also found increased

7    particles over the sterile field.  And, in fact, when I

8    deposed Dr. Sessler, he said that the order of magnitude of

9    increased particles based on what he observed was 10 to 12

10   fold.  That's what Dr. Sessler said on 3M's medical

11   advisory.

12           Legg 2012 and '13, increased the particle

13   concentration a thousandfold over the surgical site on

14   particles -- moving from particles to bacteria.  By the way,

15   on particles, I think Your Honor asked the question this

16   morning, can particles be a proxy for bacteria?  The Stocks

17   and Darouiche studies say absolutely, both of those are

18   peer-reviewed studies, that they absolutely act as a proxy.

19   But Dr. Wenzel, 3M's infectious diesase expert in this case,

20   testified under oath that he believed that bacteria is

21   carried on nearly 40 percent of particles.  That's what 3M

22   says.

23           Does it increase bacteria?  I talked about this

24   before, but Moretti shows mean bacterial loads were

25   significantly increased from Bair Hugger use.  Wood cited

1    Moretti and said yep, it's an increased bacterial load.

2    Tumia in 2002, higher bacteria at the surgical site as a

3    result of the Bair Hugger.  And I talked about Darouiche so

4    I'm not going to go back to that again, but that's basically

5    how the chain of evidence goes.

6            MAGISTRATE JUDGE NOEL:  Let me just ask this

7    question because I'm somewhat confused.

8            MS. CONLIN:  Sure.

9            MAGISTRATE JUDGE NOEL:  So obviously the

10   defendants base their whole attack on McGovern on various

11   citations to the depositions of these three experts, Samet,

12   Jarvis and Stonnington.

13           MS. CONLIN:  Stonnington, yes, Your Honor.

14           MAGISTRATE JUDGE NOEL:  And they cite places where

15   each one says that their opinion does depend or does rely on

16   McGovern.  If what you're saying about Darouiche and Moretti

17   and Tumia are true, why didn't they say no?

18           MS. CONLIN:  Well, what they said, and if you look

19   at the testimony very carefully, and this is sort of the

20   slight of hand that has been going on in this briefing, what

21   they each said, and it's an absolutely truthful statement,

22   is that the odds risk ratio, the percentage or the

23   quantification of that amount of increased risk is based on

24   McGovern because it's an apples-to-apples comparison because

25   it's, you know, conductive warming to forced air warming.

1    They used it, and if you go back and look at their

2    depositions, they say I used that to calculate the odds risk

3    ratio to quantify the risk.  But, yes, you could definitely

4    say that even if McGovern didn't exist, the Darouiche 2017

5    study would show that if you can prove that there's more

6    particles over the surgical site in use, for every ten it

7    doubles the risk, but our experts did rely on McGovern for

8    quantifying that odds risk ratio.

9             You know, we heard this -- we saw slides that had

10    causation X'd out and X'd.  Epidemiological studies don't

11    show causation.  They show association.  This is from the

12    same reference manual that Mr. Blackwell cited to this

13    morning, an association is not equivalent to causation.

14    Causation is a judgment for epidemiologists to make based on

15    the totality of the scientific evidence.  And that's why you

16    see in McGovern, they say we say there's an association

17    because they're looking at one group of patients and they're

18    saying we see an association.  It's for the epidemiologist

19    to come in, look at all of the evidence, look at all of the

20    literature outside of that, and make a causal determination.

21    That's what was done here.  And in fact, their experts

22    agree, deciding whether associations are causal typically is

23    not a matter of statistics alone but also rests in

24    scientific judgment.  And the Hill criteria that our experts

25    relied upon is well-known, not novel, and is used in a

1    number of cases.

2         Now, they talked about the *Viagra* case, and they

3    said, well that's one of those cases where they came back in

4    and they realized that there were problems and they told the

5    litigants that they couldn't rely on it.  Very different

6    situation with respect to the study underlying that.  That

7    was a case in which there was an allegation that Viagra

8    causes NAION or vision loss and they had a study.  What they

9    found out was that some of the participants had vision loss

10   before they ever took Viagra.  That's not the issue here.

11   In fact, both 3M's experts, Dr. Borak and Mr. Holford, said

12   that temporality is met in this case.

13        And I mentioned this before, but the cases are

14   replete where opposing experts often interpret the same

15   different studies differently.  That's why you have a trial.

16   That's why you have subject to cross-examination.  The jury

17   is, at the end of the day, is to make those final

18   determinations.

19        The McGovern study.  Most of the morning was spent

20   on the McGovern study.  I'd like to spend a few minutes on

21   it.  It was peer reviewed, showed a strong association

22   between Bair Hugger and DJI.  This evidence from McGovern

23   shows that it basically increased the risk of an infection

24   if you use the Bair Hugger 3.8 times, tripling the risk.

25   And there was 1437 patients, a fairly robust study.

1          And what's curious about this before I go onto the

2     details of McGovern is that of all of the studies that 3M

3     put up this morning and said that we're presenting some sort

4     of theory that doesn't pass muster under their view of the

5     world, there isn't a single epidemiologic study that

6     contradicts or disproves the association between Bair Hugger

7     and deep joint infections.  3M doesn't have any evidence.

8     So McGovern alone dictates that this goes to the jury.

9     Talked about that a little bit.

10          I want to talk to you a little bit about the

11    McGovern authors.  These are the people that 3M is accusing

12    of academic fraud.  I think it was -- the word "fraudulent"

13    was used.  The word, you know, "lying" was used.  The

14    word --

15          THE COURT:  Setting aside the words, the graphs

16    that were shown to us just before lunch, do you have any --

17    is there any evidence that those don't say what they were

18    shown to say?

19          MS. CONLIN:  Yes.

20          THE COURT:  And the Figure 7, the history of

21    Figure 7.

22          MS. CONLIN:  Yes.

23          THE COURT:  Can you tell us what, if anything, is

24    inaccurate in the defendants' presentation about the

25    previous iterations and the Figure 7?

1          MS. CONLIN:  Yes, absolutely.  Let me go to that

2     and then I'll back up.

3          One of their attacks is these tabulation error

4     that maybe there was one more in each thing or in each

5     period.  Basically, if you look at Figure 7, because one of

6     them was, oh, they took --

7          THE COURT:  They took the 15th, yeah.

8          MS. CONLIN:  So if you look at, I'll tell you what

9     we think happened.  We think that it was a miscoding of the

10    year because if you look at Figure 7 in the McGovern report

11    and you compare it to the draft that was put up, there's,

12    let me just show you, between those two, there's one more

13    dot over here which suggests that what it was the year was

14    miscoded which is why it ended up where it is, but that's

15    where the new dot came up in the final dataset.

16         THE COURT:  That's not the Figure 7 from the final

17    report though.

18         MS. CONLIN:  Yeah, this is Figure 7 from McGovern,

19    Your Honor.  You may have been looking --

20         THE COURT:  So you're pointing up to the dots up

21    above the --

22         MS. CONLIN:  Yeah.  So they made much ado about,

23    you know, this graph as if t was --

24         THE COURT:  How can you tell that one of these

25    dots is associated with that?

1          MS. CONLIN:  You have to look very carefully

2     between the dots on the draft McGovern manuscript that

3     Mr. Gordon put up and this one and that's where it appears.

4          THE COURT:  Do you want to do a side by side?  Do

5     you have those?  That's what you need, you need to take the

6     previous one and then you can find up there, there's going

7     to be one more little dot there?

8          MS. CONLIN:  Yeah.  And in fact, Your Honor, this

9     is Mr. Sacchet is going to get into this in great deal in

10    connection with his motion on Doctors Borak and Mr. Holford,

11    but he's going to walk you though that.

12         Now, here's where it lands at the end of the day.

13    Dr. Samet said one more, one less in each group doesn't move

14    the needle in terms of the overall conclusions of McGovern,

15    the author said that, and in fact, 3M's experts said that as

16    well.  Professor Holford said one more, one less, it doesn't

17    matter.

18         The other issue that they say is that they

19    fabricated the start date.  Again, pretty serious

20    allegations to be --

21         THE COURT:  No, they compared the differences in

22    the statistical outcomes with one start date versus another.

23         MS. CONLIN:  Yeah, but they -- Mr. Gordon said

24    this morning it's fabricated.

25         THE COURT:  Right, well, just compare the Figure 7

1    that has the infection data to the draft.  Yeah, the draft

2    has the number with the peak in 2010 and then the final has

3    this flat line infection rate percentage.

4              MS. CONLIN:  Well, it's basically just taking an

5    average, but if you look --

6              THE COURT:  It doesn't say average.  It says

7    infection rate percentage, and it purports to show it over

8    time, July '08, January '09, July '09, and it doesn't --

9              MS. CONLIN:  It's in the box right above it, Your

10   Honor.  It says "raw case data."  That's where the dots come

11   from, so they're showing exactly when the infections

12   occurred along this timeline, and underneath it, it says

13   average infection rate during period percentage.

14             THE COURT:  But the dots are above any -- you've

15   got no way to quantify those.

16             MS. CONLIN:  Well, it's quantified as a matter of

17   statistics.  What they did here --

18             THE COURT:  It's not a matter of statistics.  It's

19   an average.  It just shows -- what the defendants are saying

20   is you get a different average if you take different

21   numbers.  I mean, that's not -- nothing remarkable about

22   that.  If you -- you're going to get a different average if

23   you start in July of '08 versus if you start in September of

24   '08.

25             MS. CONLIN:  Yes.  And what I'm saying is and

1    that's where I was going which is Dr. Reed testified under

2    oath in this case that the reason that they started the data

3    on July 1st of 2008 was that was the first time that they

4    had full-time surveillance for infections amongst these

5    three hospitals.  In other words, before that time, there

6    was some ad hocness to it, some were reporting, some

7    weren't.  And he testified, and it is unrebutted, that he

8    started -- they started that date because of the fact that

9    was the first time they had full-time surveillance available

10   for the ones at hospital.  And, you know, Mr. Sacchet is

11   going to put up the testimony on it, but that's what they

12   said.

13

14          So, I mean, you look at these three authors,

15   you've got Dr. McGovern basically standing behind the study.

16   You have Dr. Reed standing behind the study.  And Dr. Read,

17   in fact, did further investigation and published on his own

18   a couple of studies post-McGovern on the two confounders,

19   one on the prophylactic antibiotics as well as the

20   antithrombo regimen, and said I can conclusively rule out

21   those two as confounders in that study.

22          You have Dr. Belani who is here in Minnesota at

23   the University of Minnesota, you know, head of

24   anesthesiology, he says, I've looked at this, I stand behind

25   this work.

1          You have Dr. Nachtsheim at the Carlson School of

2     Management here in Minnesota, he's looked at all of the

3     data, I stand behind the conclusions in the McGovern paper.

4          And you have Mark Albrecht, we gave you a better

5     photo of him, who, by the way, we haven't had the chance and

6     haven't questioned in this case because he was subpoenaed by

7     3M.  He spent seven hours under questioning by 3M and he got

8     up and left when the seven hours were up, and so he is

9     somebody that we anticipate subpoenaing for trial, but we

10    haven't had a chance.  But one of the things that he says,

11    because they talked about this tabulation error look, and

12    they're like, look, there's a problem here.  He said -- 3M

13    says I don't know if that's the final data or not, and he

14    says I don't either.  I mean this is a guy who was working

15    his way through school.  And by the way, that consulting

16    agreement they put up postdates McGovern so you can set that

17    aside.  That consulting agreement that Mr. Blackwell waved

18    around with great fanfare was signed after the McGovern

19    study.  But this is --

20          THE COURT:  Well, the McGovern study is the one

21    that says that authors of this have a financial interest in

22    the outcome.

23          MS. CONLIN:  Yeah, yeah, yeah.  Well, and they

24    said that, judge, because Albrecht was working part-time at

25    Augustine when he was getting his MBA from Minnesota.  He's

1      one of the students of Dr. Nachtsheim.

2              THE COURT:  Is there anything in the record to

3      indicate that's the reason that that disclaimer was put on

4      there?

5              MS. CONLIN:  That -- none of these other authors

6      have any connection to Augustine so, I mean --

7              THE COURT:  The record contains the disclaimer.

8      Does the record contain an explanation of the disclaimer?

9              MS. CONLIN:  No, not to my knowledge.  And if I'm

10     wrong, I think Mr. Sacchet can correct it, but all the

11     authors were not paid by Augustine.  Dr. McGovern testified

12     that in connection with running the study, he actually ended

13     up losing money on it.  There isn't anybody who's ever

14     worked at Augustine or had any connection to him outside of

15     this litigation -- or out of this McGovern study.

16              So we talked a little bit about this, but the bulk

17     of statistical studies seen in court are observational.

18     That's straight out of the reference manual.  And Mr. Ciresi

19     touched on this, this morning, but 3M's refused to do the

20     randomized controlled trial.

21              So tabulation error doesn't move the needle, and

22     I'm going let Mr. Sacchet delve into the details on that.

23              Hypothetical confounders, Dr. Read and others have

24     testified they weren't confounding.  And, in fact, what's

25     interesting about this argument is 3M has no scientific

1    evidence to suggest that these are confounders.  It is pure

2    speculation on their part, and the studies that do exist

3    suggest that none of the changes in the antibiotic regimen

4    or the antithrombo protocol map, and you have to have some

5    sort of meaningful relation before you can argue it's a

6    confounder and when the study authors are saying I've done

7    more work and in fact they're not confounders

8    post-publication, they don't have anything to go on.  And in

9    fact, their experts admitted that in the depositions, and

10   you'll see some of those admissions when Mr. Sacchet gets

11   up.  And at best, the challenges go to the weight of Dr.

12   Samet, I would say as well as Dr. Stonnington, Dr. Jarvis,

13   the weight of testimony on McGovern, not its admissibility.

14          Now, I want to, unless the Court has other

15   questions on McGovern, I want to end on a couple of points

16   since they came up in connection with some of the briefing.

17          THE COURT:  Just before you leave McGovern, what

18   do the study authors say, if anything, with respect to the

19   statement, "Unfortunately, recordkeeping was incomplete for

20   the additional factors of blood transfusion, obesity,

21   incontinence, and fitness for surgery"?

22          MS. CONLIN:  They said they don't think it moves

23   the needle, and that's what Dr. Samet said as well.  And if

24   you look above it --

25          THE COURT:  But did they say why they wouldn't

1     think that would move the needle?

2                    MS. CONLIN:  Well, because you've got 1437

3     patients so you've got a fairly high group.  The surgeries

4     were, you know, conducted over relatively short timeframe,

5     and it says demographics revealed no significant difference

6     between the two types of warming for SSI risk factors of

7     age, type of surgery, diabetes, and the late pre-operative

8     state.

9                    THE COURT:  If it doesn't matter, why would they

10    go on to say unfortunately?

11                   MS. CONLIN:  Well, I think they were being

12    cautious like a good researcher does which is why they said

13    hey, we've also got these potential confounders and the

14    change in antibiotic regimen and the anti-thrombo regimen,

15    so they disclosed it all.  They put it out there and said we

16    want everybody who's reading this to know about those

17    particular confounders.  But in point in fact, whether

18    you're diabetic, whether you're obese, you don't just get an

19    infection because of that.  You have to have bacteria

20    landing on the implant before you will ever have an

21    infection.

22                   THE COURT:  Well, can't you have bacteria in there

23    already?  Didn't one of your experts say that at some point

24    from the CDC?

25                   MS. CONLIN:  No, you're putting an implant in so

1    no.  I mean, the cause of PGI's are things being introduced

2    during the operation onto that implant.  So finally --

3              MAGISTRATE JUDGE NOEL:  One last question on that.

4              MS. CONLIN:  Sure.

5              MAGISTRATE JUDGE NOEL:  Because it's been bugging

6    me all morning, and maybe this isn't the right time or

7    you're not the right person, but is every plaintiff suffer

8    -- does every plaintiff in the MDL suffer from a deep joint

9    infection as opposed to some other surgical site infection?

10             MS. CONLIN:  Yes, Your Honor.

11             MAGISTRATE JUDGE NOEL:  Okay.  Thank you.

12             MS. CONLIN:  And so the reason why it's created

13   during surgery is because the wound is closed up.  It's

14   stitched up.  There isn't bacteria entering once that's

15   stitched up.  Now, you might get an infection on the top

16   surface or whatever, but if you have a deep joint infection,

17   something landed on that implant during the surgery, and you

18   don't just have bacteria on an implant because you're obese

19   or diabetic; it has to land there.  Now, it might increase

20   your risk of getting an infection, but without -- and

21   Dr. Jarvis is very clear about that, without bacteria being

22   introduced during surgery, you're not going to have an

23   infection.

24             THE COURT:  Was Jarvis the one who was at the CDC?

25             MS. CONLIN:  Yes.

1          THE COURT:  So when he was at the CDC, though,

2     didn't he say that deep joint infections come from bacteria

3     that's already in the patient?

4          MS. CONLIN:  No, he said surgical site infections

5     can come from.  He wasn't talking about deep joint

6     infections.  And that's been a -- again, a slight of hand

7     and a conflation on that.  And if I'm wrong, I'm sure

8     Mr. Sacchet, but that's my recollection of it so --

9          JUDGE LEARY:  Let me ask this, you know, one of

10    the overriding concerns I have has to do with obviously

11    Rule 702, Daubert, and Frye-Mack, and the issues we have to

12    consider as judges and I have to consider with regard to

13    Frye-Mack is basically whether or not there is scientific

14    reliability to the theories offered by the plaintiff and

15    whether or not they're generally accepted within the

16    relevant scientific community.  And I think many of us are

17    familiar with the expression that a collection of facts does

18    not add up to science.  And that's the thing that I struggle

19    with most in hearing any argument presented with regard to

20    what is the alleged science in this case.  We do have the

21    FDA letter.  We do have the ECRI Institute.  We've got the

22    consensus, the strong consensus of that international body,

23    and I haven't heard anything from the plaintiffs' side that

24    serves to undercut the conclusions that they have come

25    apparently looking at the same evidence.  I'm not hearing

1    anything -- I'm not hearing the plaintiffs suggest that

2    those organizations have any less access to the same

3    information that the plaintiffs' experts are looking at.

4                MS. CONLIN:  We don't know what the FDA reviewed,

5    and 3M has refused to tell us know what the FDA reviewed,

6    but let me address --

7                JUDGE LEARY:  Let's talk about the ECRI.

8                MS. CONLIN:  Yeah, ECRI --

9                THE COURT:  And the international group, they went

10   through and explained a lot of what they looked at.

11               MS. CONLIN:  And Michelle Hulse Stevens came back

12   to 3M and said this is an issue, we've got --

13               THE COURT:  That's one person's statement about

14   what they heard as opposed to an actual report.  There's a

15   difference in terms of the hearsay admissibility.

16               MS. CONLIN:  Well, she's head, but let me address

17   the ECRI first.  And we set this out in our reply brief.

18   The ECRI Institute wanted to do their own study, and the

19   documents, you can see in our reply brief, 3M shut them

20   down.  They said the last thing we want is ECRI doing it.

21   They sent them stuff which they hold in their documents one

22   sided yet competitive, and then they were allowed to edit

23   the ECRI document before it was published.  So --

24               JUDGE LEARY:  Well, here's -- when you -- and with

25   all due respect, when you make comments like that, that

1   really strikes me as lawyer argument, the very thing that

2   *Glastetter* warns against, and it does not in any way

3   undercut what ECRI chose to do.  There's no one in this room

4   that disputes the attempt at objectivity of the ECRI

5   Institute regardless of.  Whether or not the information

6   you're suggesting is accurate, there's no reason to suggest

7   that it in any way altered the recommendation of the ECRI

8   Institute.

9          MS. CONLIN:  Well, ECRI this year did an ECRI

10   update, you're getting warm, uncovering forced-air warming

11   units, same organization.  They said a warming unit should

12   have a HEPA grade or better filters to reduce the risk that

13   airborne dust, bacteria, and mold will be blowing onto the

14   patient or into wounds.  That's --

15          THE COURT:  What exhibit is that?

16          MS. CONLIN:  I'll pull it out, Your Honor.  I'm

17   going to have somebody pull it out.

18          THE COURT:  Okay.  But doesn't it say on the top

19   what ECF document it is?

20          MS. CONLIN:  I don't have it here.  If I might

21   approach, I can hand it up.

22          THE COURT:  Well, I can pull it up myself if you

23   tell me what the docket number is.

24          MR. BLACKWELL:  May we see that, Your Honor?  We

25   don't think that's in the record.

1            MS. CONLIN:  It's Plaintiff's Exhibit 64.

2            THE COURT:  To what?

3            MR. BLACKWELL:  To what?

4            MS. CONLIN:  To our opposition to the motion to

5     exclude --

6            THE COURT:  Which is docket number what?

7            MS. CONLIN:  It's a motion to exclude Samet,

8     Borak, and Stonnington.

9            THE COURT:  I'm looking at the numbers.  I need a

10    number, docket number.

11           MS. CONLIN:  I'll pull it up, Your Honor.  While

12    they're pulling that up, I'll address Your Honor's direct

13    question.  It's not just -- the studies are consistent.

14    This isn't a novel theory.  The studies are consistent.  You

15    use the Bair Hugger, you're going to have more particles and

16    bacteria over the surgical site.  The McGovern --

17           JUDGE LEARY:  When you say that, you seem to be

18    neglecting a number of studies from reputable organizations,

19    including the FDA and the ECRI Institute.

20           MS. CONLIN:  Well, they haven't -- with all due

21    respect, I don't know what the FDA looked at.  I mean, I

22    don't, and I think that would be fair game, but the ECRI

23    Institute doesn't have the admissions of 3M that, yes, their

24    studies and every single study they've seen shows an

25    increase in particles when the Bair Hugger is in use.

1    That's not an uncontested fact.

2              JUDGE LEARY:  So, you know, I'm just trying to

3    make a point from -- a point of view of a judge deciding

4    whether or not the information being presented is

5    scientifically reliable and whether or not it's generally

6    accepted.  We have to take a look at what is out there, and

7    as *Glastetter* says, there may be a forcible argument that

8    can be made that somewhere down the road general causation

9    can be established, but we're not here today, and that's

10   what is of concern to me.  I don't ultimately care who's

11   right or wrong in terms of who wins or loses on this issues.

12   I'm just concerned about our obligation to accurately

13   understand the reliable science as opposed to lawyer

14   argument.  And when you look at the science, I see a lot of

15   argument, but I don't see anything that undercuts FDA, ECRI,

16   or the opinions of the international conference.

17             MS. CONLIN:  Well, I mean, McGovern does give you

18   the odds risk ratio, but you do have Darouiche and Stocks

19   and all the other studies that we showed and that's how

20   epidemiology works which is you take, in our case --

21             JUDGE LEARY:  But doesn't the FDA understand that?

22             MS. CONLIN:  No, they --

23             JUDGE LEARY:  Doesn't the ECRI substitute

24   understand that?  Don't all of the attendees and voters at

25   the international conference, don't they understand that?

1          MS. CONLIN:  Well, you know, on ECRI, you know --

2     and by the way, Your Honor, the docket number is 910-53,

3     Exhibit 64.  ECRI says you should have a HEPA filter which

4     we know 3M does.

5          THE COURT:  The docket number is 879 actually.

6          MAGISTRATE JUDGE NOEL:  No, no, no, she's -- PX-64

7     refers to an exhibit of a declaration or --

8          MS. CONLIN:  Yes, it's an exhibit to a

9     declaration.

10          MAGISTRATE JUDGE NOEL:  And the docket number you

11    gave was?

12          MS. CONLIN:  910-53.  And, Your Honor, it's on the

13    last page of that document, the last paragraph.

14          THE COURT:  All right.  Thank you.

15          MS. CONLIN:  The last sentence.

16          While the Court is pulling that up, the FDA only

17    has available to it what manufacturers give it.  It doesn't

18    have, like the CDC or some organizations, an ability to go

19    out and conduct their own research.  They rely on what is

20    given them, which is why the Bair Hugger was first approved

21    based on a 1937 cast dryer because they have to rely on what

22    the manufacturers are saying to them which is why the FDA

23    going one way or another, the courts have been very

24    consistent on that, doesn't impact whether a matter is ripe

25    for the jury or not.

1          MAGISTRATE JUDGE NOEL:  I'm sorry, Ms. Conlin, was

2    it 910-53, Exhibit 64?

3          MS. CONLIN:  And while they're pulling that up,

4    Judge Leary, there is a difference between methodology and

5    conclusion.  The methodology that our experts employ in this

6    case is not novel, is well grounded in science.  What the

7    issue is the conclusions.  And the conclusions, as long as

8    the methodology is sound and reliable, the conclusions that

9    you draw from that are for the jury, and I think the cases

10   both under Frye-Mack as well as the Daubert standard support

11   that.

12         Do you have it, Your Honor?  Okay.  It was cited

13   in our papers.

14         Lastly, I just want to conclude with a couple of

15   the sort of slight of hand issues that I just want to point

16   out for the Court.  The top of this is on the tabulation

17   error, and 3M writes SJS do not dispute that when the

18   tabulations errors are corrected, the association between

19   the Bair Hugger system and infections disappears.  That's

20   not true.  In fact, Professor Holford testified that if you

21   correct the tabulations errors, your still over 2.0, and

22   that, in fact, is borne out in the testimony that we have

23   cited this.

24         MAGISTRATE JUDGE NOEL:  That was the question I

25   had this morning for Mr. Blackwell and he gave me a

1    different answer.  So explain to me again the difference

2    between -- he thought that the 2.76 number was simply

3    accounting for, even assuming the correctness of the

4    McGovern data, and you're telling us -- and then he said

5    then that all of your witnesses agreed that if you accept

6    their corrections to the McGovern data, that it does go to

7    zero.

8              MS. CONLIN:  No, we don't agree with that.

9              MAGISTRATE JUDGE NOEL:  Work those numbers through

10   for me.  Who says what?

11             MS. CONLIN:  Sure.  Okay.  So this is, at the

12   bottom of this page is a footnote out of Professor Holford's

13   report, and this addresses -- well, is there one more --

14   it's at the very bottom it's small because it's a footnote

15   from Professor Holford's report from 3M, and basically he

16   said, well, if there's one more infection in each group I'm

17   going to calculate that out, and he still has a odds risk

18   ratio of 2.86.

19             Professor Holford also testified that even if you

20   accept the confounding evidence, it's still got more than a

21   doubling of the risk on that, and Mr. Sacchet is going to

22   get into that in great detail in connection with the next

23   presentation.

24             MAGISTRATE JUDGE NOEL:  Okay.

25             MS. CONLIN:  The other thing, just to point out,

1     they say that we dismiss *Glastetter* as unsigned per curiam

2     opinion with no legal effect.  With all due respect, we

3     didn't say that.  If you look at what we actually wrote in

4     our brief which is at the bottom of the slide, we said,

5     Citing only *Glastetter* and science per curiam opinion,

6     defendants insist that, blah, blah, blah.  And we said, The

7     defendants not only misstate the legal standard for medical

8     testimony or Daubert, they misread *Glastetter*.  We never

9     said it had no legal effect.  In fact, we spent the next

10    two pages in our brief explaining *Glastetter* and what we

11    think.  We said that 3M misread it.  We didn't say it had no

12    effect under the law.

13          They also go in their brief, and this is in their

14    reply brief, they say, We also argue there's a land slide of

15    cases contrary to *Glastetter*.  Well, if you look at your

16    actual brief, and these are two chunks from page 13 and 14,

17    we're talking about McLean's conclusive study.  And they do

18    that throughout there where we are accused of things we

19    never said or there's a statement that says we admit it and

20    there's no citation to anything.

21          And, finally, in their reply brief, they go

22    through and say over and over again, and this one

23    particularly sat in my coffer, reasons that are -- should be

24    obvious to this Court, but they keep saying that the

25    analysis of Professor Holford and Dr. Borak were unrebutted.

1    Well, we contest those opinions, and you're going to hear

2    from it in connection with Mr. Sacchet's presentation.

3             The reason why we don't have rebuttal reports is

4    because the Court told us we couldn't file them, and so I do

5    think it's a bit disingenuous to come and say that their

6    expert opinions are unrebutted because we didn't as a

7    procedural vehicle have an opportunity to file a rebuttal,

8    but we do dispute what Dr. Borak and Professor Holford

9    concluded.

10            And when you see the admissions that they made in

11   their depositions about the variation that Mr. Gordon

12   raised, there will be no doubt in your mind that this attack

13   on McGovern is not based in fact and it's not based in

14   science and every single one of those authors who are

15   esteemed in their field.

16            I mean it's interesting because I was at

17   Dr. Belani's deposition and I actually had documents where

18   3M was so mad when that came up that they thought they were

19   going to go and attack Mr. Belani, and I showed him those in

20   the deposition and he was absolutely mortified.  He didn't

21   know that there was an internal plan to try to discredit him

22   or his work and he was highly offended by it.  But this has

23   been an unbelievable and unfair, because it's not borne out,

24   attack on the McGovern's authors.  It is peer reviewed,

25   published in a key journal, a journal which Mr. Blackwell

1    cited peer-reviewed study after peer-reviewed study, none on

2    point, by the way, they weren't looking at prosthetic joint

3    infections or the Bair Hugger, but saying that's the gold

4    standard, said that randomized clinical trials are the gold

5    standard.  Well, Darouiche shows that if you increase the

6    particles over the surgical site, if you get 10 CFUs, you're

7    going to double a patient's risk of infection, and 3M has

8    known that, 3M has refused to do the studies, and 3M has

9    continuously said Bair Hugger for everybody, use it in every

10   surgery when back in 2007 they already knew it was

11   contraindicated in orthopedic surgeries because of the very

12   small number of bugs it needs to cause a devastating

13   infection in the patients.

14          And I'm done unless Your Honors have other

15   questions.

16          THE COURT:  Thank you.

17          MR. BLACKWELL:  Your Honors, may I respond?

18          I particularly want to pick up where counsel left

19   off about things been stuck in her craw.  I've got a craw

20   too, Your Honor, and there's some things sticking in it that

21   I'd like to get clarified right upfront.  First of all, you

22   heard us spend a great deal of time putting up here study

23   after study on biological plausibility, number 17 that Your

24   Honors saw.  Oh, I got to fix this.  Study after study, and

25   it was clear that to the extent they are biological

1    plausibility studies, they don't support plaintiffs' theory.

2    And counsel just stood here and cited Moretti, cited Wood,

3    Tumia, Darouiche for the proposition that when the Bair

4    Hugger is turned on that bacteria is increasing.  And these

5    studies do not say that.  And in fact, the Darouiche study

6    isn't even a study of the Bair Hugger, to be clear about it.

7    And so that's the first thing sticking in the craw.

8         If Your Honors look at the language, and I would

9    suggest that the Court look very carefully at the language,

10   because in a hearing that's supposed to be about the

11   accuracy and reliability of facts and the data are not being

12   confounded by lawyer argument that complicates the thing.

13        And if you look at the actual language, if you

14   took one of these for example, the Zink study, and what the

15   authors actually found, and I quote, in Zink, in conclusion,

16   conclusion, the warming therapy, when properly applied, to

17   direct the flow of air away from the surgical site does not

18   increase the risk of wound contamination in the operating

19   room.  That's what Zink says.  If I look at what --

20        MAGISTRATE JUDGE NOEL:  What's Moretti say?

21        MR. BLACKWELL:  Moretti says, the Bair Hugger does

22   not seem to pose increased risk of nosocomial infections,

23   while it does offer the advantage of the potentially grave

24   consequence produce by hypothermia during major orthopedic

25   surgical procedures.  The increased bacterial load found

1    after application of the body warming system appears to be

2    comparable to or lower than the load present at the time of

3    placement of the patient on the operating table.

4            So using the Bair Hugger, turning it on, either

5    leaves a bacteria load exactly where it was or lower.

6    That's what the study in fact says.

7            And I can't even stop there because this whole

8    ECRI study was brought up which is simply astounding.  First

9    of all, to spend all their time talking about a filter.

10   They don't have a filter expert, so this is nothing but

11   purely lawyer argument.  But if Your Honors in fact looked

12   at the language, that you couldn't have missed it because

13   it's right above the language they're referring to, where it

14   says, and I quote, they -- I'm quoting the wrong thing, Your

15   Honor.  Let me back up.

16           THE COURT:  But you feel really strongly about it,

17   whatever it is.

18           MR. BLACKWELL:  It says, "There is an increasing

19   scrutiny of forced-air warming units and a possible link to

20   infection as a result of airborne contamination.  While

21   studies have shown no proof of this, there is still a

22   concern that the blanket can increase a bacterial

23   contamination to the surgical site, but studies have shown

24   no proof of this.  Why in the world do you bring up an ECRI

25   study for the proposition that somehow some proof when it

1    expressly studies have shown no proof?  ECRI simply iterated

2    what it had said before.  And to bring this up in the

3    context was not being candid with the Court, with all due

4    respect.

5               MAGISTRATE JUDGE NOEL:  What about the 2007 3M

6    chart they showed of when Bair Hugger versus Bair Paws and

7    the benefits of the Bair Paw is that it's not going to cause

8    an infection?

9               MR. BLACKWELL:  The Bair Paws is not the Bair

10   Hugger.

11              MAGISTRATE JUDGE NOEL:  I understand that.

12              MR. BLACKWELL:  It's a separate and completely

13   different product, and --

14              MAGISTRATE JUDGE NOEL:  The point is that what

15   they were showing us in the exhibit, as I understand it, is

16   in attempting to sell the Bair Paws, one of the benefits was

17   that, unlike the Bair Hugger, it's not going to get

18   contamination into the site of an orthopedic surgery or

19   cardiac because it's just being used pre surgery and that's

20   one the reasons you should by a Bair Paw is --

21              MR. BLACKWELL:  I can't speak to the Bair Paws

22   document expressly.  I can't.  One of my colleagues will.

23   First of all, the mere fact that a scientist says something

24   doesn't even make it scientific.  The fact that a fact

25   witness or marketing person says it doesn't make it

1    scientific.  It's not a proxy for science and studies.  And

2    so if you look at the science, there simply is no there

3    there.  It is literally Potemkin science.  And the only way

4    they get at this idea and get anybody behind it is because

5    their lawyers and experts were paid, propping up the

6    village.

7        And if Your Honors were to drill down on what we

8    have here at bottom, the only way that the plaintiffs can

9    take the science that exists and have it support their

10    theory is to recast the science by lawyer argument or using

11    blue pencils.  Confounders aren't really confounders in the

12    studies.  A study that says that there is no causal basis

13    for positive association suddenly becomes a study that says

14    that the Bair Hugger is a causal basis for the association.

15    And then they cite studies like Darouiche that aren't even

16    studies of the Bair Hugger.  That alone should cast a great

17    deal of skepticism on the plaintiffs' science --

18        MAGISTRATE JUDGE NOEL:  They're not offering it

19    for that.  As I understand Darouiche, the point they make is

20    that Darouiche stands for the proposition that if you

21    increase particle over a surgical site, you're going to

22    double the risk that bacteria is going to fall into and

23    cause a surgical infection, whether it's Bair Hugger or

24    anywhere else.  What they're citing it for is the

25    proposition that particles are a proxy for bacteria because

1    if you increase the particles, you're going to increase the

2    risk of bacteria, isn't that what they're telling me?

3              MR. BLACKWELL:  Well, Your Honor, what -- I want

4    to be clear what they're not telling Your Honors s if Your

5    Honors look at the nine studies that span a 25-year period

6    on the screen right now that are looking here at particles

7    emitted from the Bair Hugger, not some abstract, generic

8    sort of thing unrelated in any respect whatsoever to what we

9    specifically know about particles emitted from the Bair

10   Hugger, which is if all particles, no matter what degree,

11   carry bacteria, then why in the world can't they show Your

12   Honors one study involving the Bair Hugger where that's

13   true?  There's only ipse dixit and generalities that have

14   nothing to do with defacing the body of science that are

15   specific to this product and this company and this case

16   which is what this really is about.

17              And so these generic kind of claims, epi studies,

18   and as we know, they don't conclude causation, there's the

19   confounders, in McGovern, it says so, so we believe it.

20   Particles carry bacteria.  It's as if we don't know.  Study

21   after study study the particles from the Bair Hugger and not

22   a single one of them has ever found bacteria.  So before

23   they can meet their burden and get across you talk about

24   issues with the methodology, I guarantee you not a single

25   expert that the plaintiff has uses Bradford Hill for the

1    purpose of determining whether there is causation out in the

2    real world, and I guarantee they certainly don't use it for

3    purpose of deciding whether there is a positive association

4    even in the first place, and the law says they can't do it

5    here either.

6          MAGISTRATE JUDGE NOEL:  So let me go back to the

7    question I asked you this morning and I got a different

8    question from Ms. Conlin which is explain to me this

9    confounder thing.  I understand your answer was their

10   experts agree that if you account for the confounders that

11   you identify or that they identify in McGovern, the

12   association disappears, goes to zero.  And Ms. Conlin says,

13   no, her witnesses don't say that, they say it goes to two

14   times instead of almost four times.

15         MR. BLACKWELL:  Well, what can't really be argued

16   with, Your Honor, and you'll see this with Dr. Holford, is

17   that when you look at the period of time when the HotDog and

18   the Bair Hugger are being subjected to absolutely the same

19   residents, you'll see there is no difference in the surgical

20   site infection rate.  And so that's not expert argument.

21   That's simply what the data shows and they are being both

22   subjected to the same anticlotting regimen and the same

23   antibiotic and regimen which they can't be argued with.

24         But irrespective of it, obviously even though I

25   say this doesn't come down to McGovern, it comes to

1    McGovern, given how much time we've spent talking about

2    McGovern, rightly so.  Apart from this issue, and I don't

3    need to be completely parted from Your Honor's question,

4    it's fraught with many other problems and issues and the

5    comorbidities, the obesity, the fitness for surgery, those

6    areas were not addressed at all by their experts in any way,

7    shape, or form.

8              MAGISTRATE JUDGE NOEL:  Right.  Well, except as I

9    understand what Ms. Conlin tells me is that their experts do

10   address them by saying that those factors might increase the

11   observational risk of a surgical site infection or a deep

12   joint infection but without bacteria getting into the site,

13   those things do not cause a surgical site or deep joint

14   infection.

15             MR. BLACKWELL:  With all due respect to the

16   argument counsel made, the fact is that the study authors

17   found that those items have quite an impact on the potential

18   development of infections that they weren't controlled for.

19   It wasn't a randomized study.  The peer review was

20   considered that.

21             And if I may, Your Honor, we most certainly highly

22   contest an ocean that somehow the body is sterile but for

23   the implant that goes into it which introduces a bacteria.

24   We're going to show and the science is going to show, does

25   show, that the most common source of surgical site

1    infections, prosthetic joint infections, is their own

2    bodies, the sweat glands, the oil ducts.  When you cut into

3    it, it's necessarily contaminated.  When it becomes an

4    infection depends on the body immune systems, and that's

5    where all of these other factors come in, diabetes, this or

6    that, making one person more subject to developing a

7    full-blown infection than another, so we don't accept that.

8                 MAGISTRATE JUDGE NOEL:  Okay.

9                 MR. BLACKWELL:  And we certainly don't agree with

10   any of the statements they made that all the parties agree

11   that fill-in-the-blank, and so I won't go to rebut them all,

12   but we certainly don't agree.

13                MAGISTRATE JUDGE NOEL:  But apparently they don't

14   agree with you every time you say all the parties agree

15   either.

16                MR. BLACKWELL:  Except that I'm right, Your Honor.

17   And so I'll say, Your Honor, certain things are not

18   contested is what I will say, so when I say, for example --

19                MAGISTRATE JUDGE NOEL:  What I'm trying to figure

20   out is what is not contested, and I have a hard time,

21   because you say some things are not contested that they

22   contest.  They say some things are not contested that you

23   contest.

24                MR. BLACKWELL:  You see -- in terms of what

25   matters on the screen right now, nine published studies that

1    address the issue of biological plausibility.  If they can

2    get up and read to Your Honors even one of them involving

3    the Bair Hugger where they culture bacteria, then there's

4    else to really nothing to argue about.  Either they have it

5    or they do not.  So when I say that this study supports, I

6    invite them to get up and show Your Honors a story.  I don't

7    mean lawyer argument or interpreting documents.

8           They had corporate documents in the *Glastetter*

9    case too, and the Court found that that was not sufficient

10   because you pick up a document, pair of scissors or paste

11   pot, cut out the things that you want to refer to and even

12   if it's in the context, it's simply one person expressing an

13   opinion and who knows what the foundation was, who knows how

14   credible it was, it's not science or correct.  If a

15   scientist a said it.  It doesn't make it science because a

16   another scientist says it.  This issue --

17          THE COURT:  What's the study that Ms. Conlin was

18   talking about where she said that with the Bair Hugger

19   turned on twice as many or -- either twice or ten times as

20   many bacteria landed in the petri dish?

21          MR. BLACKWELL:  I think what was referred, was

22   that Moretti she was referring to?  Or Darouiche?  Or Oguz?

23   If it is Oguz, Oguz is the one I showed Your Honor that

24   concluded that there was no increase whatsoever in particles

25   whether or -- bacteria whether the Bair Hugger was turned on

1   or not.

2          THE COURT:  I just don't understand how there

3   could be such different readings of the Oguz.  We've got

4   Oguz somewhere in this material, right?

5          MR. BLACKWELL:  By reading the language, Your

6   Honor, and I quoted the language when I put the Oguz study

7   here for Your Honors to say at slide No. 16 for Your Honors

8   to see exactly what Oguz says.  And so this was the study

9   between, again, the Bair Hugger and the HotDog.

10          THE COURT:  Yeah.

11          MR. BLACKWELL:  You can fast-forward a bit now,

12   Brad, I'm sorry.

13          An important finding of our study was that the

14   type of patient warming did not influence the amount of

15   bacterial sedimentation on either plate keep.  So going,

16   please.  Okay.

17          THE COURT:  Either of you implies that there's

18   two.  I thought she was talking about four different plate

19   positions.  How do we know that --

20          MR. BLACKWELL:  Well, this was the punch line for

21   the Oguz study is here that the ultimate finding of the Oguz

22   study was that -- because I got there quicker, that's the

23   problem.  A dastardly trick, Your Honor.  So Oguz, which was

24   here, they explained what they did, recent peer-reviewed

25   published research in Oguz shows no association between Bair

1    Hugger use and increase in airborne bacteria.  Not possible

2    to detect any higher bacterial counts on any plate, not one,

3    two, three, four, however many, no increased or higher

4    bacterial counts on any plate in the forced air warming Bair

5    Hugger group versus the resistive warming HotDog group.

6            And then Oguz has references.  And Your Honors can

7    see that I would certainly invite Your Honors to study it

8    because this type of hearing given the issues of reliability

9    underlying expert opinion, I do not turn on lawyer

10   characterizations or slants on what the studies actually

11   say.  And so here we're quoting Oguz, and if we have somehow

12   misquoted any part of it, please hold us in account for what

13   this study says.  And so we carefully looked at all of these

14   before we made the statement that there isn't a biological

15   plausibility study that favors or supports the plaintiffs'

16   theory, and if there were, we would have been the only one

17   to have seen or found it, ECRI would have seen or found it,

18   as would have the FDA.

19           If I could briefly look at number 24 because there

20   keeps being a lot of statements made about we don't know

21   what the FDA looked at.  We don't know everything that the

22   FDA looked at, but it's pretty clear, they say that what

23   they did in the second box, they collected and analyzed data

24   available to date from several sources, including medical

25   device reports received by the agency; information from

1    manufacturers and hospitals; publicly available medical

2    literature, which most certainly includes the ones we've

3    been discussing, given that the government was discussed all

4    over the place, the international consensus group to ECRI,

5    etc., addressed McGovern; separating and ventilation

6    requirements.  So it doesn't tell you what specifically

7    everything that the FDA discussed, but it does say that the

8    FDA did look at the available medical literature, so we know

9    that much.

10             So, Your Honor, unless there are other questions I

11   will stop and sit down.

12             JUDGE LEARY:  I do have a question that over time

13   I've been thing of repeatedly but it seems so simplistic

14   that I keep on thinking I shouldn't be reminded of it, but

15   let me ask you this question.  It seems undisputed that all

16   -- both parties agree that maintaining normothermia during

17   prosthetic joint surgeries is a good thing and the science

18   behind it is reliable.  Would you agree with that?

19             MR. BLACKWELL:  I would agree with that, Your

20   Honor.

21             JUDGE LEARY:  And that one of the benefits of

22   maintaining normothermia is it reduces the risk of infection

23   at the surgical site, correct?

24             MR. BLACKWELL:  That's correct.  And the FDA said

25   so in its letter.

 1          JUDGE LEARY:  So if the argument is that the Bair

 2     Hugger is a defective device, if you will, is it the

 3     argument that a Bair Hugger should not be used at all to

 4     maintain normothermia?

 5          MR. BLACKWELL:  That would be in fact the

 6     plaintiffs' argument and that some other warming therapy

 7     should be used, not the Bair Hugger.

 8          JUDGE LEARY:  What I've heard so far today or what

 9     I've read, there's no reason to suggest that the results

10     vis-à-vis infection are any better or any more improved than

11     the HotDog or any other device, nobody's really looked at,

12     other than in the context of the HotDog device.  Is that

13     fair?

14          MR. BLACKWELL:  I would say other than the Oguz of

15     course looks at both types of warming therapies, conductive

16     and convective, and comes to the conclusion that there was

17     difference in bacterial sedimentation.

18          And the FDA language which I just put up here at

19     the bottom with FDA continues to recommend using thermal

20     regulating devices which then it distinguished.  It says

21     including forced-air warming device because it doesn't

22     distinguish.

23          JUDGE LEARY:  And the last question or two I have

24     related to that is that if it's true that maintaining

25     normothermia reduces the risk of infection in surgical

1    sites, isn't the risk of infection using a device such as

2    the Bair Hugger, doesn't that reduce the risk more greatly

3    than not use to at all?  In other words, even if you can

4    make an argument that the infection rate goes up if you pass

5    particles or air over the wound site, it still is an

6    improvement over not maintaining normothermia?

7            MR. BLACKWELL:  It is, absolutely an undisputed

8    improvement over not maintaining normothermia and not just

9    SSIs but for all of the benefits too.

10           MAGISTRATE JUDGE NOEL:  They're shaking their

11   heads.

12           THE COURT:  And they say -- and I might be

13   misremembering their brief, but I think they said it was --

14   that that's only shown with respect to some kind of

15   colorectal surgery, if I'm -- and I'm sorry, I have read so

16   much, if I'm misremembering your brief, I apologize, but I

17   thought they said we don't buy that except -- we don't agree

18   that it's established that keeping an orthopedic patient

19   warm actually reduces, that everybody is just relying on

20   some old colorectal, which, you know, that seemed like there

21   would be a lot of infection in a colorectal.

22           MR. BLACKWELL:  Your Honor, here's what's not

23   being debated about maintaining normal body temperature,

24   fatal heart attacks are reduced, blood transfusions are

25   reduced, length of hospital stay, post-operative shivering,

1    and surgical site infections, all reduced.  And again, if

2    there is a valid science ultimately supporting the

3    proposition that this is not generally accepted in the

4    community, not just lawyer's arguing things for obvious

5    reasons, let them come forward with it.

6           And this is -- and it's so well established that

7    you'd be hard pressed, and they would too, to find a single

8    orthopedic surgery where the treating attending

9    anesthesiologist or treater is not going to be warming the

10   patient intraoperatively because it is so much now the

11   standard of care outside of this courtroom.  It's not even

12   debate.  This is a just simple lawyer's argument because

13   they don't like it.

14           MAGISTRATE JUDGE NOEL:  Thank you.

15           MR. BLACKWELL:  Thank you, Your Honor.

16           MS. CONLIN:  Mr. Blackwell challenged me to come

17   up with the article, so I'd like to take the challenge.  If

18   you look at the Moretti article, I'm quoting from page 4

19   that, In the clinic procedures in which the Bair Hugger was

20   used, the mean bacterial load values were significantly

21   increased.

22           THE COURT:  Oh, so it wasn't Oguz.

23           MS. CONLIN:  Well, I'm going to talk about Oguz in

24   a second.

25           THE COURT:  All your friends told you it was Oguz.

1          MS. CONLIN:  Yeah, well --

2          THE COURT:  You need better friends.

3          MR. ASSAAD:  It's both, Your Honor.

4          MS. CONLIN:  Yeah, it's both, Your Honor.  I mean,

5     this was only 20 patients, so they concluded that there

6     weren't more infections but it was such a small study that

7     you wouldn't expect to see one anyway.  But they found that

8     with the Bair Hugger on, the main bacterial load values were

9     significantly increased on Oguz.  They expressly said this

10    is not a statement of safety on the Bair Hugger, and it was

11    minor orthopedic surgeries less than an hour.

12          And I would urge the Court to look to the Table 2,

13    plate 4, which is the plate that's over the surgical site.

14    They did find a significant increase.  What they found was

15    if you add all of the plates together, it was just barely

16    below statistical significance, but they did find at the

17    plate in a minor orthopedic surgery lasting less than one

18    hour an increased risk.  The other thing I want to address

19    is --

20          JUDGE LEARY:  Can you specifically report -- or

21    point to the language in that study that you characterized?

22          MS. CONLIN:  Sure.  It's Table 2, plate 4 in that

23    table, Your Honor.  Oh the safety statement?

24          JUDGE LEARY:  Just the words from the article.

25          MS. CONLIN:  The study may obviously not be

1    generalized for an overall safety statement on forced-air

2    warming and it's primarily applicable in this particular

3    surgical setup.

4              THE COURT:  It starts right off with a disclaimer,

5    it's not used the way we're being asked to use it, right?

6              MS. CONLIN:  Correct.  Now Judge Leary raised the

7    question of surgical site infections, and throughout this

8    case there has only been one study ever conducted that has

9    shown a lowering of a risk of surgical site infection due to

10   warming, forced-air warming in a hospital.  That's the Kurz

11   study from 1996.  We deposed Dr. Kurz and her co-author

12   Dr. Sessler.  Both of them testified under oath that they

13   have absolutely -- they would not publish the study today

14   and they have absolutely no reason today to believe that

15   warming a patient during surgery reduces surgical site

16   infections.

17             And it goes to the point you made about the FDA

18   because the FDA says you should warm intraoperatively

19   because it reduces surgical site infections?  Well, I don't

20   think the FDA knows that the authors of that study under

21   oath and cited in our brief disclaimed that study and said

22   we wouldn't publish it today and we know of no evidence that

23   suggests that warming during surgery lowers surgical site

24   infections, and that testimony is in our brief.  And so it's

25   not central to the case because there's other ways of

1    warming a patient during surgery if you choose to or as the

2    FDA says, if you think it's warranted.

3           And the exact quote out of Dr. Kurz's deposition

4    is at page 179, line 16, it's Exhibit 59 to our brief.  In

5    today's -- question, In today's scientific standard, there

6    is no reliable evidence that supports that maintaining

7    normothermia reduces the incidence of infection?  Answer,

8    That is correct.

9           The FDA didn't know that.  The FDA writes a letter

10   and says if you warm, it's going to reduce the surgical

11   site.  And that's back to my point which is the FDA only

12   knows what only knows what is put in front of them and

13   absolutely they didn't have that evidence.

14           JUDGE LEARY:  Well, let me ask you this.  Would

15   you say that it's generally accepted within the orthopedic

16   community that maintaining normothermia is beneficial to a

17   patient's outcome?

18           MS. CONLIN:  Yes, I would agree that that's the

19   general statement, but as to surgical site infections, the

20   only thing anyone has ever relied on is the Kurz and Sessler

21   study which the authors themselves say doesn't pass muster.

22           THE COURT:  So page 170 of that deposition, 179?

23           MS. CONLIN:  179, lines 16 through 19.  And the

24   final point I forgot to make when I was up the first time

25   but -- and I didn't talk about it because I don't think it

1    moves the needle one or the another is that 2017 Augustine

2    study which there isn't any author in it other that Scott

3    Augustine, and for the reasons Mr. Ciresi suggested, we

4    haven't had a chance to question him yet, but we are very

5    much looking forward to it.

6              Dr. Samet didn't cite that in his report.  He

7    didn't cite it in his supplemental documents --

8              MAGISTRATE JUDGE NOEL:  I thought Dr. Samet which

9    is why Mr. Blackwell told me --

10             MS. CONLIN:  He mentioned it in passing in his

11   deposition because the study had just come out, but we

12   didn't file a supplemental report saying Dr. Samet is

13   relying on.  He said, you know, in his deposition, one of

14   the reasons he never filed a supplemental report is, unlike

15   McGovern where he kicked the tires, he hadn't kicked the

16   tires on Augustine.  It just had come out, and there was

17   material coming in, so there is no expert --

18             MAGISTRATE JUDGE NOEL:  Just to follow up on the

19   question I asked Mr. Blackwell.  My recollection of the

20   argument in one of the prior motions was that the Augustine

21   2017 article was simply not going to be a thing in this

22   trial.  Is it still the plaintiffs' position that that's not

23   a thing?

24             MS. CONLIN:  Yeah, we are relying on our experts

25   reports as filed and they do not -- Samet does not include

1    Augustine as a point of reference.

2             MAGISTRATE JUDGE NOEL:  Okay.

3             MR. BLACKWELL:  Can I clarify just one point?

4             THE COURT:  Could you just give me one second?

5             MAGISTRATE JUDGE NOEL:  We're never going to get

6    to -- as I understand it, we're still on, like, the first

7    group of motions, and it's almost 3 clock.

8             THE COURT:  We can solve that by not looking at

9    the clock.

10            Epidemiology, can you just talk to me a little bit

11   about that science?

12            MS. CONLIN:  Sure.

13            THE COURT:  I have the overall impression that an

14   epidemiologist looks at risk in -- against a -- like the

15   background risk, you've got people who are at risk of

16   something and then you introduce something and does that

17   increase the chances that there's going to be a negative

18   outcome?

19            MS. CONLIN:  Yeah.

20            THE COURT:  But I don't have the impression that

21   what an epidemiologist does is say, look, we've got two

22   products and I'm going to evaluate one against the other and

23   I'm going to say you ought to use this one instead of that

24   one, so is that epidemiology or is epidemiology saying this

25   will increase, this will increase, or do you know what I

1    mean?

2              MS. CONLIN:  So broadly speaking, an

3    epidemiological study is comparing two groups, so if you

4    take, for example, the McGovern group, one got HotDog, one

5    got Bair Hugger, or the Darouiche study where one was just a

6    patient undergoing surgery and the second group where there

7    was a HEPA air barrier blowing across the surgical site to

8    ensure that no particles came in, and what they do is they

9    rely on observational studies such as --

10             THE COURT:  But Darouiche is different.  I think

11   McGovern from an -- so you think McGovern as comparing --

12   they're comparing two commercial products.

13             MS. CONLIN:  Yep.

14             THE COURT:  And they're saying one we think is

15   better than the other.

16             MS. CONLIN:  No.

17             THE COURT:  Is that epidemiology?

18             MS. CONLIN:  They're comparing two sets of

19   patients, and that's the difference.  The epidemiologists

20   aren't typically saying, you know, this is the product that

21   use or whatever, but what they're doing is comparing two

22   groups of individual and they are determining whether the

23   changes between the two groups effect health outcomes.

24             THE COURT:  Right.  But it's usually a group -- it

25   would be, for example, the HotDog group versus infections

```
1    generally or the Bair Hugger versus the infections

2    generally, right?  Not saying yet a compared, you know a

3    Bair Hugger to a --

4              MS. CONLIN:  To nothing?

5              THE COURT:  Right.

6              MS. CONLIN:  Yeah, so I can put Your Honor's mind

7    at ease on that because both Doctors Borak, their

8    epidemiologist, and Dr. Samet, our epidemiologist, have said

9    that the central question here is, you know, between an

10   alternative forced air warming such as a blanket or

11   conductive warming or all the things that you can do keep a

12   patient warm that don't blow air versus Bair Hugger, and

13   that's in Dr. Borak's report in paragraph 11.  Dr. Samet

14   said you can either compare it against someone who's not

15   warmed at all or you compare it against -- the Bair Hugger

16   against someone who's not warmed at all or you can compare

17   the Bair Hugger against somebody who uses an alternative

18   warming modality such as HotDog.  So there isn't actually

19   really any dispute between the experts in this case on that,

20   and their expert has said that the inquiry that was looked

21   at in McGovern is the appropriate way to look at it.

22             THE COURT:  Okay.  All right.  Thank you.

23             All right.  I apologize, Mr. Blackwell.  You were

24   about to get up when I said hold on.

25             MR. BLACKWELL:  Permission from Judge Noel, I'll
```

1    be very, very -- I understand.  Very brief.  I just wanted

2    to show you all, Your Honors, the actual quote from Dr.

3    Kurz since that was just referred to by counsel where

4    Dr. Kurz supposedly said something about there being no

5    benefit to normothermia.  And the one thing I know all of us

6    know was what the full examination was.  And you see where

7    the question starts at line 14, And earlier I think there

8    were some questions about some comments that had been made

9    either by you or Dr. Sessler that maybe effect size would be

10   only 30 percent.  Do you recall those?  Yes, I do that

11   recall all.  I understand that's just your best judgment,

12   blah, blah.

13          So I want to make it clear you're not saying or

14   are you saying that evidence that no longer supports the

15   idea that make this normothermia reduces the risk of

16   surgical site infections?  I think if I understand you

17   correctly, I'm not saying that.  I am saying that I believe

18   maintenance of normothermia decreases infection risk but the

19   effect size might be closer to 30 percent reduction or so

20   which, in effect, is enormously large effect size for any

21   medical intervention.

22          So it is quite the opposite of saying there is no

23   benefit.  And I once again, I just want the record to be

24   clear about what the testimony really is from Dr.  Kurz.  So

25   thank you, Your Honor.

1            THE COURT:  You know, the exhibit only goes to

2     page 180, at least the one I found, but so we must have a

3     page 200 someplace else.

4            MS. CONLIN:  No.

5            MR. BLACKWELL:  Looking here, so Mr. Hulse is.

6            MR. HULSE:  It's definitely docket 213-2.  May

7     have it some other place as well.

8            THE COURT:  Okay.  But it's in here somewhere.

9            MR. BLACKWELL:  It's a fulsome treatment.  Thank

10    you, Your Honor.

11           THE COURT:  Thank you.  So, now, where are we?

12    Plaintiffs motions to exclude Borak and Holford.

13    Mr. Sacchet.

14           MR. GORDON:  Your Honor, can I indulge the Court

15    for just a very brief bathroom break?

16           THE COURT:  Maybe it's time for a break.  We'll

17    take a break.  We're in recess.

18        (Recess taken from 2:54 p.m. until 3:11 p.m.)

19           (3:11 p.m.)

20

21           THE COURT:  Please be seated.  Mr. Sacchet.

22           MR. SACCHET:  Good afternoon, Your Honors.

23    Michael Sacchet on behalf of all plaintiffs moving to

24    exclude Professor Holford and Dr. Borak.

25           Before I delve into the merits of each respective

1    motion, I would like to make a few preliminary comments.  My

2    intention is to first address the issues with Dr. Holford's

3    report and then to transition to Dr. Borak.  The reason

4    being is because Dr. Borak in large part relies on the same

5    analysis that Professor Holford conducted in his report.  So

6    my analysis of Dr. Borak's testimony will be much briefer

7    than it will be as to Dr. Holford.  However, I promise that

8    the time will be made up with respect to Dr. Borak.

9         I'd also like to be candid with the Court.  When I

10   first reviewed 3M's expert disclosures, I was indeed

11   impressed with their respective backgrounds of Professor

12   Holford and Dr. Borak.  They both teach at Yale.  They

13   published articles in national journals, and they teach

14   extremely bright students.  At the same time, within just a

15   few minutes of reviewing both of their reports, there were a

16   number of issues that stuck out immediately in comparison to

17   Dr. Samet's report and the other expert reports that

18   plaintiffs have proffered in this litigation.  And there are

19   four threshold issues that I'm going to identify first.

20        The first is that unlike Dr. Samet, it is

21   undisputed that Professor Holford relied on 19 sources of

22   evidence, which are in full cited on page 14 of his report,

23   and at his deposition, he admitted numerous times over that

24   he conducted absolutely no independent review of the exigent

25   evidence in this case or in the scientific literature

1     outside of the 19 documents that were provided to him by 3M.

2     That is certainly not the case with respect to Dr. Samet who

3     outlined in his report a comprehensive search of the

4     scientific literature, which in the end amounted to nearly

5     200 sources of evidence that he considered in rendering his

6     opinion as to causation.

7              Numerous courts have concluded across the country

8     that when an expert is spoon fed information in the same

9     manner that Dr. Holford has been spoon fed here, that that

10    shows an improper methodology under Daubert.  We have cited

11    those cases in our papers but one in specific is *In Re TMI*

12    out of the Third Circuit.  It's a comprehensive decision.  I

13    believe it spans over 75 pages long, but as to numerous

14    experts the Court made that very same determination and

15    excluded experts on those grounds.

16             The second contrast to Dr. Samet is that

17    Dr. Holford, and I'll explain a lot about this later, relied

18    on Exhibit 10 as opposed to the final raw data published in

19    Figure 7.  And I understand that the Court is already aware

20    of that, and I will explain it in more detail as I progress

21    in the argument.  What I do want to make clear off the bat

22    is that courts also routinely exclude expert witnesses that

23    attempt to reanalyze, not just analyze, but reanalyze data

24    that is published in peer-reviewed studies and do so based

25    on incomplete or unreliable or inadequate information.

1          In fact, *In Re Baycol*, which was in this district,

2     Judge Davis did just that and excluded an expert for that

3     very reason.

4          JUDGE LEARY:  How is that different than what the

5     plaintiffs' arguments have been with regard to the science

6     cited by the defendants?

7          MR. SACCHET:  Could you?

8          JUDGE LEARY:  How is the statement that you made

9     any different than the type of challenges that the

10    plaintiffs' counsel have made to challenge the defense

11    evidence, scientific evidence?

12         MR. SACCHET:  The primary difference, Judge Leary,

13    is, of course, peer-reviewed scientific literature as a

14    minimum indicia of reliability.  Numerous courts have stated

15    that over and over again.  Daubert too, for example, out of

16    the Ninth Circuit said that if an article is published in

17    the scientifically peer reviewed literature that it at least

18    meets the minimum criteria of reliability.

19         And of course, one can attempt to poke holes in

20    that literature and demonstrate that there may or may not be

21    flaws, but as a threshold matter, experts routinely rely on

22    what's published in the study.  After all it has peer

23    reviewed and has been accepted and in this case The Journal

24    of Bone and Joint Science is a preeminent scientific journal

25    on the particular subject matter of this litigation, which

1    is orthopedics.

2           So it is our view that in any form Dr. Samet had

3    all the right to rely on not just what was published in the

4    McGovern study, but on Figure 7.  And I would like to make

5    this point clear right now, and I was going to save it for

6    later, but many scientific studies do not include something

7    of the sort like Figure 7.  What they generally include is

8    what is Table 2, which is also in the McGovern study.

9           And in Table 2, what is reported there are simply

10   the figures that were compiled based on the underlying data,

11   but there is no representation in the normal course of

12   scientific literature as to a graph containing jitter data

13   points as was included in the McGovern study.  So that is a

14   factor that distinguishes the McGovern study from many other

15   studies that don't even attempt to depict the underlying

16   data.  I hope that answered your question.

17          JUDGE LEARY:  No, I'm not sure that you have.

18   You're saying it's not proper for a party's expert to recast

19   the reports of an expert, and yet your colleagues have done

20   that with regard to the report cited by the defense.  How do

21   you distinguish?

22          MR. SACCHET:  So the main distinguishing feature

23   is that it is our argument that Dr. Holford relied on a

24   flawed data set in attempting to retabulate the data.

25          THE COURT:  So you're saying it's okay to go ahead

1    and use the data from somebody else's study and come up with

2    a different conclusion as long as you do it right.

3            MR. SACCHET:  I think that happens in tons of

4    litigations.  Experts analyze data and if they're relying on

5    appropriate data to reanalyze that data perhaps using a

6    different test or looking at it in a different way that's

7    one thing.  But here my argument as I progress this

8    afternoon is to show that that is not what Professor

9    Holford.  He did not in fact rely on a reliable source, and

10   I have excerpts of deposition testimony where he admits as

11   much.

12           JUDGE LEARY:  Go ahead.

13           MR. SACCHET:  The third contrast with respect to

14   Professor Holford's testimony and Dr. Samet's testimony, and

15   this also applies to Dr. Borak as well, and this has been a

16   topic that's been discussed already a bit ad nauseum here

17   this afternoon is the difference between DGI and SSI.  It is

18   undisputed that Professor Holford and Dr. Borak admitted

19   under oath that they are not one in the same.

20           Moreover, they admitted that it was improper as a

21   scientific matter to conflate one with the other.  And the

22   explanation is simple, they have vastly different

23   ideologies.  A surgical site infection requires hundreds if

24   not thousands of bacteria to create an infection because the

25   body naturally has a host defense that can cleanse those

1   areas of the infection.

2          But with respect to a deep joint infection on a

3   prosthetic implant, there is no blood circulation.  Biofilm

4   can form right over the bacteria area, a very small

5   inoculum, and protect it from antibiotics and other

6   medications that would otherwise be used in other types of

7   surgery.  So the proposition that these are the same thing

8   is belied by the very expert reports that 3M has submitted

9   in this litigation.

10          I don't want to get back into the FDA document,

11   but the same reasoning applies, and it's my view and it

12   stands to reason that the FDA letter specifically used the

13   language SSI.  I understand that it arose out of concerns

14   perhaps due to orthopedic infection.  But at the same time,

15   when the FDA citing studies that purportedly show that the

16   use of intraoperative warming reduces the risk of surgical

17   site infection, there's not a single published study, none,

18   that show intraoperative warming reduces the risk of deep

19   joint infection, which is the outcome of interest in this

20   litigation.

21          But, nonetheless, Dr. Borak throughout his report

22   conflates those terms, and he reveals as much in language

23   such as to the extent that this purported hypothetical

24   confounding variable impacts DGI, only then or in that case,

25   it is a confounder.  Never says that it is, only says if

1      this SSI measure impacts DGI in that case there's a

2      confounder.  That's not a conclusion.  That's speculation

3      and should be excluded.

4              The fourth difference between Dr. Samet and

5      Professor Holford and Dr. Borak is that they attempt to

6      opine on general causation but at the same time all that

7      they have done is critique a single study.  That is not the

8      practice of epidemiology as The Scientific Reference Manual

9      makes clear.  Causation is a judgment informed by scientific

10     expertise based on multiple lines of evidence.  And I do not

11     know how methodology could be sound when one is attempting

12     to opine on general causation based on 19 sources of

13     evidence that 3M provided to that expert.  That is just not

14     the totality of evidence.

15             We included numerous admissions from both of these

16     experts in our papers.  None of them have been disputed.  3M

17     has responded to virtually none of them.  They're sitting

18     there on the paper apparently uncontested.  What 3M did

19     instead is violate Rule 703.  They've cited more than ten,

20     perhaps even 20 documents in their opposition papers to our

21     motions to exclude Professor Holford and Dr. Borak that were

22     never acknowledged, cited, mentioned by either one of those

23     two experts.  That filling a brief is improper, and none of

24     those exhibits can rehabilitate the admission that both of

25     those experts gave us at their depositions.

1           In my view, what that showcases is one thing and

2     one thing alone, their testimony is unreliable and there's

3     an ex post facto attempt to rehabilitate them after the time

4     in which they could have done so, so none of those exhibits

5     should be excluded, and I'm happy to enumerate them and I'll

6     just enumerate the most basic examples:  DX6, DX7, DX8,

7     DX11, DX19, DX20, DX21, DX34, docket 231 --

8           COURT REPORTER:  I'm sorry, I lost you at DX21.

9     Repeat it please.

10          MR. SACCHET:  DX21 -- and actually I appreciate

11    the interruption because DX21 is like the most ripe example

12    that I could possibly bring up.  Dr. Holford admitted at his

13    deposition that he didn't rely on a single study to show

14    that an antithrombotic can confound deep joint infection,

15    not a single one.

16          Now, four months after I took his deposition, 3M

17    has ginned up a study by Brimmo et al from 2016 that

18    purportedly shows that a use of an antithrombotic increases

19    the risk of infection.  I'm going to get into it in more

20    detail, but not only is it improper under Rule 703, but it

21    doesn't even move the needle because it's not the same

22    regimen that was used in the McGovern study.  Although, it

23    involved Rivoraxaban, but it did not involve Tinzaparin.  It

24    involves a completely different antithrombotic.  And the

25    *Glastetter* court made clear that when you evaluate

1    confounding, even the smallest difference in the molecular

2    structure can determine whether or not a variable is a

3    confounder, so even that inadmissible evidence does not save

4    Holford's opinion as to confounding.

5           With respect to Plaintiff's particular motion --

6           Oh, so other exhibits, excuse me, I ended at DX21,

7    DX34 is an internal document from 3M, docket number 231 and,

8    the May 18, 2017 hearing transcript.  In addition to that,

9    there are numerous excerpts of deposition testimony and

10   other exhibits that were shown at those depositions that I

11   do not believe the experts have reviewed and those include

12   DX9, DX10, DX12, DX17, DX25, DX26, DX28, DX31.

13          As to Professor Holford in particular, plaintiffs

14   have moved to exclude his testimony in its entirety, and we

15   have identified seven particular topics of testimony.  It is

16   plaintiffs' view that the first four topics of testimony 3M

17   has failed to respond to and are, therefore, waived and they

18   should be excluded on that basis alone.  Those include

19   Professor Holford's use of competing statistical tests, his

20   opinions about comparing hospital infection rates and time

21   trend data, potential confounders from SSI measures, and his

22   opinions about general causation.  3M has responded to our

23   arguments regarding reclassification of patient data, the

24   new start date, and the potential confounding from the

25   change in antibiotic and antithrombotic, and I would like to

1    move through those seven topics going quite briefly through

2    the first four because 3M has not responded to them and

3    emphasizing the last three as I finish the first four.

4         The first topic is Professor Holford's

5    flip-flopping, if you will, with respect to statistical

6    tests throughout his report.  I'm going to back up for a

7    moment and, hopefully, enlighten the Court that the authors

8    of the McGovern study used a statistical test called

9    chi-square.  It's a commonly used test.  I learned it in

10   college in my Statistics 101 class.  It's used in a lot of

11   studies.  And in fact, Professor Holford uses it probably

12   more than not in most of his studies, and he also used it in

13   particular circumstances that are exactly the same as the

14   McGovern study but for some unknown reason he chose not to

15   do so here.

16        Instead of applying chi-square, Professor Holford

17   uses a test called Fisher's exact test.  And Fisher's exact

18   test has been criticized by numerous statisticians and

19   academics across the country.  When I deposed Professor

20   Holford, he recognized as much because in general it can

21   change a statistically significant value to a

22   non-significant value.  Now all of this is more or less

23   besides the point because whether or not there is a

24   statistically significant association to the McGovern study

25   or whether it's just below or above statistical significance

1    should not be determined -- the determination by which the

2    Court adjudges the McGovern study.  But I would like to

3    point out why I believe that Professor Holford's testimony

4    is litigation driven.

5            There are two rules that statisticians consider in

6    determining whether to apply chi-square as the McGovern

7    authors did versus Fisher's test, which is the test that

8    Professor Holford used, and he used it in order to change

9    the P value.

10           The first rule is if the population of the study

11   participants exceeds one thousand, you should use

12   chi-squared.  There is no dispute that the McGovern study

13   had one 1,437 patients.  Obviously, satisfying that

14   criteria.

15           The second criteria are expected values as opposed

16   to reserved values greater than five.  And I don't want to

17   wade too far into the weeds, but the statistics show that

18   expected values would be greater than five in which case you

19   should apply chi-squared.

20           When I asked Professor Holford why didn't you

21   apply chi-square when the expected values are greater than

22   five?  This is what he said.  I asked, him, "So based on

23   your own bias, you relied on the actual values reported in

24   the study itself as opposed to the expected values that most

25   statisticians rely on to determine whether to apply Fisher

1    or not."  "Yeah.  That's probably less commonly used on

2    observed values, but I prefer to do that because I think in

3    this case actually the expected values are greater I believe

4    than the nominal five, if that's the rule you're using."

5         So Professor Holford not only admitted that he

6    decided to use Fisher's test instead of chi-squared based on

7    his own bias, but he also admitted that the expected values

8    were greater than five, which counsel it must apply

9    chi-squared.  I believe that this excerpt testimony alone

10   shows that Professor Holford's decision to use Fisher's test

11   instead of chi-squared depended on his own bias, which is

12   not reliable and is not a valid methodology by which he

13   attempted to reanalyze the data in the McGovern study.

14        I will also mention that *In Re Lipitor*, which

15   Mr. Blackwell in his opening argument said it was a

16   wonderful case that is on all fours with this case.  I

17   agree.  In that case, they excluded the expert because he

18   flip flopped between different tests just as Dr. Holford did

19   in his report.  At the beginning of his test, he applied

20   Fisher's test and then just as Mr. Gordon admitted in his

21   argument, then he suddenly switched to chi-square.  I would

22   argue that he did so to manipulate the results so he could

23   achieve the desired result.

24        The second topic of testimony that 3M has not

25   responded to in its opposition is Professor Holford's

1      testimony regarding hospital infection rates and time

2      trends.  The background of this argument is that in the

3      McGovern study, the rate of infection among the Bair Hugger

4      group was three percent.  Dr. Holford determined that that

5      rate is out of control, and he got there based on reviewing

6      data from other hospitals that purportedly showed a rate of

7      infection of 0.6 percent.

8              Now, I was struck by this argument when I read it

9      because the first thing I noticed when I was preparing for

10     the deposition is Dr. Holford didn't compare apples to

11     apples.  We keep hearing about apples to apples, But that's

12     not what he with did.  He compared apples to oranges.  He

13     evaluated the 2008 to 2010 period for the Bair Hugger, to a

14     2010 to 2015 period among other hospitals that may or may

15     not have used conductive fabric warming devices instead of

16     the Bair Hugger.

17             I would argue that to the extent that there was a

18     decreased risk of DGI or rate of DGI, that it perhaps

19     aligned exactly with the McGovern study, and the use of

20     conductive fabric warming devices instead of the Bair Hugger

21     device is what caused the decrease.

22             The third issue is that Dr. Reed, who is one of

23     the primary authors of the McGovern study swore under oath

24     that the hospitals in the UK are notorious for under

25     reporting data and that one could not rely on rates reported

1    by other hospitals such as the very ones that Dr. Holford

2    relied on in performing his analysis.

3          Now, outside the courtroom, Dr. Holford has

4    published numerous articles explaining you must rely on

5    complete data, otherwise the analysis will suffer from data

6    artifact.  It's exactly what he did here, and here's another

7    exhibit to prove that.

8          When I was cross examining him on this very

9    question, I said Dr. Holford, do you know the degree of

10   accuracy of the calculations by which you're comparing the

11   Bair Hugger period to these other hospitals?  "I don't know

12   the degree of accuracy.  That was not part of the data that

13   I was provided as to the measure."

14          So I then asked, "and you didn't ask for the

15   data?"  "No."  So I said, "To the extent you argued that the

16   infection from 2010 to 2015 was .6 percent, are you aware

17   that there was a significant decrease in deep joint

18   infections in the NHS from 2013 to 2015?"

19          "I didn't have data specifically relating to

20   these."  I think this excerpt alone shows that Professor

21   Holford did not use reliable methodology in comparing

22   hospital infection rates.  3M has not responded to that

23   argument either.

24          The third topic that 3M has not responded to is

25   hypothetical confounding from SSI measures.  Throughout

1      Dr. Holford's report, he cursorily states, yeah, SSI

2      measures may have confounded the McGovern study, and they

3      should have been controlled because had they not been, that

4      could have resulted in the increased risk of infection that

5      was reported therein.

6              What he told me at his deposition is that he

7      didn't study the impact of surgical site infections on deep

8      joint infection.  That's at page 367.  Surgical site

9      infections are not the same as deep joint infections.

10     That's at page 304.  He does not have expertise to evaluate

11     the relationship between deep joint infections and surgical

12     site infections, and at bottom he had no scientific basis

13     whatsoever to testify that surgical site infection

14     interventions may have confounded the DGI rate.  And here's

15     the admission where he says as much.

16              I asked him, "your report concludes that the SSI

17     bundle may have had an effect on deep joint infection rates,

18     correct?"  "Yes, the things that they were doing to control

19     SSI may have had an effect."

20              So I said, "You have no scientific basis to make

21     that conclusion."  Answer, "I'm -- no, no, I'm just assuming

22     that it does."  This is ipse dixit.

23              The fourth topic of testimony that 3M has not

24     responded to in our papers deals with Professor Holford's

25     general causation findings.  As I mentioned at the outset,

1    epidemiology is the practice of considering multiple lines

2    of evidence and the totality of evidence.  Professor Holford

3    did not do that.  Instead he only offered statistical

4    evaluation based on the McGovern study, and he did not go

5    beyond his biostatistical analysis.

6           And in this slide, we went through that.  In the

7    very beginning of the deposition, I asked him, "Are you

8    offering testimony as to any of the subject matters," that I

9    had previously went through with him, and he said, "I'm

10   offering testimony on statistical aspects that relate to the

11   Bair Hugger.  I don't know if you think that's relevant or

12   not."

13          So I sat on that, and I waited until the end of

14   the deposition, and then I circled back and I said, "Do you

15   agree with the statement from The Reference Manual on

16   statistics that in the end deciding whether associations are

17   causal typically is not a matter of statistics alone but

18   also rests on scientific judgment?"  Answer, "Yes."

19          I believe that slide in and of itself shows that

20   Dr. Holford did not consider more than statistics when he

21   opined that the Bair Hugger was not a substantially

22   contributing cause of deep joint infections and, therefore,

23   he should be excluded from rendering these opinions in this

24   matter.

25          I would also like to point out that with respect

1    to Dr. Holford's testimony at his deposition as opposed to

2    what he wrote in his report, he actually corroborated

3    Dr. Samet's opinions about general causation.  On the

4    record, Professor Holford admitted that temporality was

5    satisfied.  He also admitted that temporality is the only

6    prerequisite under the Bradford Hill criteria by which must

7    be met in order to show causation, and he said that was

8    readily satisfied here.  And as my colleague Ms. Conlin

9    pointed out, Dr. Borak made the same assertion.

10            The second point, and this has been alluded to

11   throughout argument today.  Professor Holford also said even

12   an odds ratio less than 2.0 can be sufficient to show

13   causation.  That's important.  Because even if for the sake

14   of argument, which I don't think is right, that the McGovern

15   3.8 odds ratio is not correct.  Even if it's above 1.0, one

16   can still rely on that to show causation.  That's what he

17   admitted on the record.

18            He also admitted on the record that when an odds

19   ratio is above 2.0, that you can rely on that to show

20   specific causation in a similarly situated individual.

21   That's not only met here based on the risk ratio reported by

22   McGovern, but even if you use Fisher's test, which is what

23   Holford did.  And even if you assumed that there is one less

24   Bair Hugger infection and one more HotDog infection, the

25   odds ratio is still 2.76, which is above the threshold by

1    which Professor Holford admitted we could prove specific

2    causation.

3              He also admitted that consistency was satisfied,

4    which is the third factor under the Bradford Hill criteria,

5    and he said that in some cases one can assume a relationship

6    between particles and bacteria; therefore, agreeing with the

7    chain of infection that plaintiffs have presented in this

8    litigation throughout today's argument.

9              The fourth thing he admitted was that studies can

10   show coherency if they are mechanistic.  And, moreover, that

11   all of the concern as of late with respect to water heater

12   cooler devices and the FDA recall that has ensued involved

13   or coincide the same concern with respect to the Bair

14   Hugger.

15             I'd like to now jump into the three topics of

16   testimony that 3M has responded into their papers.  And the

17   first is, obviously, the hot topic of the reanalysis of the

18   McGovern study.  As background information, and I know

19   Mr. Gordon has made this clear, and so has Ms. Conlin, but

20   it bears repeating, the published study reported 32 out of

21   1066 patients incurred a deep joint infection during the

22   Bair Hugger period.

23             On the other hand, there were three reported

24   HotDog infections out of a population of approximately 371.

25   Instead of using that data, Dr. Holford opines that in fact

1    there were 31 Bair Hugger infections, one less than the 32,

2    and there were four HotDog infections instead of the three

3    that are reported in the study.

4         Figure 7, which is reflected here and has also

5    been brought up this afternoon, and I'm happy to answer

6    questions about it, but, again, the legend of that graph

7    states that it is the raw case data underlying the numbers

8    in Figure 2 of the study, the particular data points are

9    reflected therein in both arms of the study.  But instead of

10   relying on that information, Professor Holford relied on

11   what's been known as Albrecht Exhibit 10.  I'd like to be

12   clear that Albrecht Exhibit 10 was not produced by

13   Mr. Albrecht.  It was not produced by any of the study

14   authors.

15        I also want to make clear that Exhibit 10 is kind

16   of a statistical matter, is not even machine readable.  When

17   you do statistical analysis, you generally do it based on a

18   CSV file, which is a common separate eval file.  The three

19   or four hundred page document that is so-called Exhibit 10

20   is not that and would not be able to be plugged in and

21   generate data based on that fact.

22        Before I critique Professor Holford testimony on

23   this point, I want to go back to the idea let's assume that

24   there was one less Bair Hugger infection, and let's assume

25   that there was one more HotDog infection, if we make that

1    assumption, Professor Holford's report states on page 3 that

2    there would still be nearing a tripling of the risk, an odds

3    ratio of 2.76, and that the P value, even though we dispute

4    that statistical significance matters much, is still

5    significant at 0.048 below the conventional threshold of

6    .05.  That's based on Professor Holford's own analysis.

7           If you apply Fisher's test, which is what he did,

8    the odds ratio stays the same.  It's still 2.76 above the

9    2.0 doubling of the risk threshold, and the P value instead

10   of being .04807 goes up by a few thousandths of a decimal

11   point to .0507.  And based on that difference of a few

12   thousandths of a decimal point, Professor Holford says the

13   McGovern study doesn't mean anything.

14          The United States Supreme Court in the *Matrix*

15   decision in 2011 denounced that very reasoning holding that

16   medical experts do not need to rely on statistically

17   significant data in order to opine on causation.  Moreover,

18   the American Statistical Association came up with guidelines

19   in 2017 that said bright lines should not be drawn based on

20   conventional standards of statistical significance because

21   to do so would invite unreliable conclusions.  That's

22   exactly what Professor Holford opines here.

23          Moreover, Dr. Samet at his deposition, yeah, they

24   asked him what if there was one more or one less?  Dr.

25   Samet's response, it wouldn't change my view.  You still

1    have almost a tripling of the risk.  You still have

2    significance, whether it's clinical or statistical.  It

3    stands of its own weight.

4          Dr. Reed, one of the primary authors of the

5    McGovern study, same exact testimony from him.  And this is

6    what I want to emphasize.  We've heard probably an hour or

7    two of argument about this particular issue.  3M has

8    predicated its expert reports on the existence of one more

9    or one less infection.  They're now up here arguing we can't

10   prove causation as a result.  Let's look at what they told

11   Mr. Albrecht.  My friend on the other side during that

12   deposition asked Mr. Albrecht a few questions about it.  And

13   then this is what he said:

14          "I don't want to focus too much on the difference

15   between 31 and 32 and 3 and 4, because I don't think this is

16   a good use of time at this point."  "Okay."

17          So the very point of all of this argument today

18   was expressly essentially said to be a waste of time at

19   Mr. Albrecht's deposition.  It really doesn't add up in my

20   view, and I think this excerpt proves that point.

21   Notwithstanding the fact that 3M and its attorneys have

22   admitted that it's an immaterial distinction, Professor

23   Holford's reliance on it is fatally flawed for a number of

24   reasons.

25          The first is that he had no foundation whatsoever

1    to believe that Exhibit 10 is the final data.  And, Judge

2    Leary, that's where I distinguish reanalysis of published

3    data based on accurate data from reanalysis based on

4    inaccurate or incomplete data.

5                When I deposed Professor Holford, this is the

6    colloquy that ensued.

7                I said, "Mr. Gordon," which is 3M's counsel,

8    "doesn't know if Exhibit 10 is the original data set."

9                His answer:  "Okay."

10               I then asked, "Mr. Albrecht also doesn't know

11   whether Exhibit 10 is the original data set."  "Yeah."

12               "Mr. Borak," the other epidemiologist at 3M has

13   disclosed in this litigation, "also doesn't know whether

14   Exhibit 10 is the original data set."

15               "Okay."

16               "And you don't know."

17               "Answer:  I don't."

18               I don't know how a statistician can't opine that a

19   peer reviewed study is fatally flawed when he doesn't even

20   know if it's the final data set.  That is the quintessence

21   of unreliability under Rule 702 and 703, and he should be

22   excluded.

23               If that were not enough, and I think it is by any

24   reasonable doubt, he also admitted on the record that

25   Exhibit 10 was incomplete.  He learned for the first time at

1    the deposition that that exhibit was missing an entire page

2    of deep joint infection data during the Bair Hugger period.

3    He didn't know that before because he admitted to me that he

4    didn't go through by hand the exhibit.  He didn't go through

5    the tabulation by hand.  He didn't review it.  He just

6    relied on what 3M gave him, and this is what he told me:

7         "I didn't see that there was a missing page in the

8    data set that I used to analyze."

9         Under this Court's Order *In Re Baycol*, he should

10   be excluded based on these two admissions alone.

11        The last thing I would like to mention is when I

12   examined Dr. Holford, I put Figure 7 side by side with

13   Exhibit 10 in McGovern Exhibit 16, which is the very

14   document that Mr. Gordon, my friend on the other side,

15   presented to you this afternoon, to have allegedly assumed

16   that one of the infections was miscoded as forced air

17   warming instead of conductive fabric warming.

18        When I showed Professor Holford Figure 7 side by

19   side with the data set that underlies that published

20   manuscript number 10, Professor Holford admitted on the

21   record that Exhibit 10 was missing a data point that is

22   reflected in Figure 7 of the McGovern study, specifically in

23   September of 2008.  He admitted that on the record.

24        Dr. Holford also admitted on the record that he

25   did not analyze data that the McGovern authors collected

1    after publication of the study so you heard a lot of

2    allegations by 3M that the McGovern studies or the McGovern

3    authors may have intentionally chosen this particular data

4    or this particular day to achieve statistical significance.

5    Unfortunately, the McGovern authors collected six more

6    months of data after the end of the McGovern study doubling

7    the size of the population of the HotDog group from

8    approximately 371 patients to around 700 patients or 800

9    patients.

10          The same exact results.  Statistically

11   significant, even though we did not depend on that, and all

12   show the ratio of 3.6; albeit a .2 decrease in the odds risk

13   ratio, almost a quadrupling of the risk based on an expanded

14   data set that Dr. Holford admitted at his deposition

15   contradicted his analysis in this case.

16          Dr. Holford also did not review the deposition

17   testimony of the authors who plainly testified that they did

18   not know whether Exhibit 10 was the final data set based on

19   a mere showing of this 300 page document.  Not a single

20   author in this case has said that Exhibit 10 is the final

21   data set.  No one.  Not Mr. Albrecht, not Mr. McGovern, not

22   Dr. Reed, not Dr. Belani, and not Professor Nachtsheim.

23   None of them have said that Exhibit 10 is the final data

24   set.  And that is what 3M has hung its hat on in this case

25   to show the purported invalidity of the McGovern study even

1    though if you add infection or take one away, there's still

2    a 2.76 odds ratio.

3            JUDGE LEARY:  Somebody mentioned something that

4    maybe has been bothering me a little bit in terms of the

5    comments that you've made, Counsel.  The original challenge

6    to McGovern was whether or not, whether that study was

7    scientifically reliable, and in effect whether or not it was

8    properly motivated, and at issue was Augustine and

9    Albrecht's involvement in that study.  And certainly there

10   were internal communications between Augustine and Albrecht

11   that questioned the purpose, the motivation under which that

12   study was undertaken.

13           And I'll draw up, you know, language from criminal

14   case law, where you talk about the fruit of the poisonous

15   tree.  And when you see a motivation like Augustine's, and

16   you see the internal communications between Augustine and

17   Albrecht, and then you see some change in the way

18   information is graphed, and some change in the statistics,

19   you begin to wonder about the overall validity and the

20   motivation of the study.  What you're now suggesting is to

21   bootstrap, if you will, the integrity of that by in effect

22   recasting it and trying to undercut the opinions that

23   Holford holds as a way of legitimizing McGovern.  But still

24   in the first instance in terms of assessing scientific

25   reliability, the motivation behind that study, and the

 1    desire for a certain outcome, I think you just can't will

 2    that away from questioning the analysis by Holford, because

 3    they're two different things.  And when somebody approaches

 4    a scientific study with a lack of objectivity, I don't think

 5    you ever move away and certainly perhaps not in this

 6    particular study from that motivation, regardless of how a

 7    party wishes to undercut somebody else's analysis of that

 8    information.  And that's what troubles me.

 9           MR. SACCHET:  If I could briefly respond.  So this

10    is the first point is not in answer to your question, but I

11    do want to make it clear that for purposes of the motion to

12    exclude Holford, he did not rely on the documents that were

13    put up earlier this afternoon that purport to show any such

14    type of motivation.  So I just want to note that for the

15    purposes of excluding Holford.

16           Now as the real question and the real, answer this

17    is my response.  I haven't seen a document that's been

18    produced that is specific to the McGovern study that has any

19    such suggestion about improper motive for conducting that

20    study.

21           JUDGE LEARY:  Well, how about the internal

22    communication between Augustine and Albrecht?

23           MR. SACCHET:  I have not seen a document this

24    afternoon that suggests that that is particular to the

25    McGovern study itself.

1          THE COURT:  It was this morning.

2          MR. SACCHET:  This morning, I apologize.

3          THE COURT:  We saw it this morning.

4          MR. SACCHET:  I believe the date of that e-mail

5     was after the McGovern study was published.

6          THE COURT:  Before it was published.

7          MR. SACCHET:  Before it was published.

8          THE COURT:  The e-mail said we've achieved

9     statistical significance and that was all before it was

10    published.

11         MR. SACCHET:  So that particular e-mail, the next

12    e-mail line beneath that is a statement from Dr. Reed in

13    which he says I have no doubt that if we continue to collect

14    data, it will show the same results.  That it's not

15    necessarily a panacea for that statement between Albrecht

16    and perhaps it was with Augustine.  But what I will note is

17    that the McGovern authors are some of the most well

18    credentialed people in academics around.

19         I mean Mr. Albrecht was to be sure part of that

20    study.  Who is his supervisor?  Professor Nachtsheim.  I

21    took Professor Nachtsheim's deposition as well.  He's a

22    tenured Professor at the Carlson school of Business here in

23    Minnesota.  He's taught statistics for over two decades.

24    Professor Holford admitted at his deposition that Professor

25    Nachtsheim is an expert in statistics, and in fact, was

210

1   admitted to the college of statistics well before Professor

2   Holford.  And he reviewed all of this information and

3   continues to stand behind the results of the McGovern study.

4           And so too with the other authors.  Dr. Reed, one

5   of the foremost orthopedic surgeons in the UK.  Dr. Belani,

6   the head of anesthesia at the University of Minnesota.

7   Dr. McGovern, I took his deposition as well.  The guy could

8   not be more black and white.  He would not give me a single

9   piece that I was trying to get from him.  He made clear that

10  he has no doubt, he has no hesitation that there were some

11  type of fraud or manipulation of the data set.

12          So whether or not there's an e-mail saying, okay,

13  we got statistical significance, the authors still conducted

14  more analysis after the fact that show the same results, as

15  I just mentioned a few minutes ago, based on an expanded a

16  data set a statistically significant finding with the 3.6

17  odds ratio.  So in my view, this whole suggestion about

18  Augustine has been and always will be a red herring.  The

19  science shows what is in that study the presence or

20  difference of one or more infections does not change that

21  much the ratio or the significance of the study.  And in

22  fact, as I showed even 3M's counsel didn't want to waste

23  time asking the question.

24          I would also like to note, Your Honors, that in

25  the *Viagra* case that was touched on briefly this morning, it

1    appears to be a grounds by which 3M argues that in Viagra

2    too the Court excluded a study because of data discrepancies

3    and miscoding.  Two points of interest, one, the plaintiffs

4    all but failed to dispute that finding.  Their arguments

5    were hollowless and the Court found as much.

6         That is the not case here where their own expert

7    is admitting that he has no basis to rely on Exhibit 10 to

8    prove a mistabulation error.  Second, 11 out of the 21

9    patients in the *In Re Viagra* study were miscoded as to

10   exposure.  That's nearly 50 percent.  Here at best assuming

11   arguendo that there is one miscoded infection, it's one of

12   32, and it doesn't change as I keep saying the odds ratio of

13   being above 2.0 or above 1.0, which Holford agrees can still

14   shows causation.

15        That is the scope of the argument as to the

16   retabulation or reanalysis of patient data.  And I would

17   like to re-emphasize again that Holford admitted on the

18   record he had no foundation to rely on it and that it is

19   missing data and, therefore, he should be excluded on that

20   grounds.  Under *Baycol*, under the Supreme Court case in

21   *Watson*, which we cite, and the host of other cases in

22   footnote 2 in our reply brief.

23        The sixth topic of testimony that we have --

24        JUDGE LEARY:  Let me ask you this Mr. Sacchet, you

25   know, in reviewing the depositions in this case, it's

1     represented that you talk about the integrity of the authors

2     of the McGovern article.  Co-author Michael Reed was blunt

3     in his deposition, was blunt in his deposition according to

4     the defense.  Asked why the authors said this, Reed replied,

5     because it doesn't.  The it, the paper, doesn't establish

6     causation.  And then Albrecht says the study does not

7     establish a causal basis.  And that's, there's a lot of

8     confounding factors that could be at play.

9          In a communication with another research, Albrecht

10    admitted that he had admonished Augustine apparently to no

11    effect, not to overstate the studies findings.  "This is one

12    of those things," this is what Albrecht says, "where we can

13    step close to the line, and we do have important information

14    to present that clinicians should be aware of, but we also

15    have to be careful that we do not state claims regarding

16    proof of infection reduction.  Unfortunately, Scott

17    Augustine likes to say that he's convinced of such a

18    relationship even though I tell him it is unsupported, and I

19    do not agree."

20         Again, this was pointed out at a prior motion,

21    Albrecht finished by saying, "Well, that is the difference

22    between research and marketing."

23         So when you talk about the authors standing by

24    their conclusions and the data in McGovern, you've got Reed

25    and Albrecht saying that there's no causation here.

1          MR. SACCHET:  So if I could draw a very fine line,

2     Your Honor, all of the authors stand by the increased risk

3     of the Bair Hugger, which is what is presented in the

4     McGovern study, and that is an association between the Bair

5     Hugger device and deep joint infection.

6          JUDGE LEARY:  But they're saying there's no causal

7     relationship between the two.

8          MR. SACCHET:  Not a single observational study of

9     any kind, not the McGovern study, not the thousands of

10     others that have been published can ipso facto prove

11     causation.  It's an oxymoron.  Observational studies do not

12     prove causation but associations can help show that based on

13     epidemiology and the totality of evidence.  So when

14     Mr. Albrecht is discussing about what Dr. Augustine has

15     said, I wouldn't doubt that Dr. Augustine has said, yeah,

16     the McGovern study proves causation.  It's wrong.  That is

17     incorrect, but Mr. Albrecht is not saying that he doesn't

18     think that the McGovern study shows an --

19          JUDGE LEARY:  Mr. Albrecht doesn't say what you

20     are saying he said.  And Dr. Reed doesn't say that what

21     you're saying is what he said.  They don't throw out those

22     distinctions.

23          MR. SACCHET:  They say that the McGovern study

24     doesn't prove causation, which is exactly what I'm saying.

25     I'm saying that the McGovern study shows an association of

1    increased risk and that's what observational studies do.

2    They do not, as a matter of law or science, prove causation.

3    And not a single author of the McGovern study has ever said

4    that the McGovern study proves causation.  But they do all

5    stand behind the fact that that study shows an association,

6    which is not the same as causation between the Bair Hugger

7    and deep joint infection.

8              JUDGE LEARY:  I understand what you are saying.

9              MR. SACCHET:  Okay.  In The Scientific Reference

10   Manual, it's the opening line or the opening paragraphs of

11   the section on epidemiology.  Associations don't prove

12   causation.  They show a relationship, and based on that

13   relationship and other evidence, we can consider to

14   determine as a matter of scientific judgment and expertise

15   whether there is causation.

16             And the authors of this study, to be honest, Your

17   Honor, they're not epidemiologists.  They didn't consider

18   the great weight of evidence.  They conducted an

19   observational study.  And at the end of the study, to be

20   sure, they said as they should that that study does not

21   prove causation.

22             THE COURT:  What do you mean "as they should?"

23   Why do you emphasize it like that?

24             MR. SACCHET:  Because no observational study

25   could.  If there was any other suggestion, that would be

1    scientifically problematic.

2            THE COURT:  Well, where in the study do they say

3    we find an association?

4            MR. SACCHET:  Well, the P value of .0216 that is

5    reported in Table 2 of the study is below the conventional

6    line of statistical significance IE.05.

7            THE COURT:  But they never say we find an

8    association.

9            MR. SACCHET:  They say we find an increased risk

10   of infection of 3.8.

11           THE COURT:  Where?

12           MR. SACCHET:  If you look on the very first page

13   of the study in the abstract.  And in fact they also do say

14   this study does not establish a causal basis for this

15   association.  And that is on page 1543 beneath Figure 7 in

16   the first full paragraph, they use the word "association."

17           And as I also mentioned, the last paragraph of the

18   abstract on the first page says, "a significant increase in

19   deep joint infection as demonstrated by an elevated

20   infection odds ratio 3.8 P value .024 was identified during

21   a period when forced air warming was used compared to a

22   period when conductive fabric warming was used.  Error-free

23   warming is therefore recommended over forced air warming."

24           So the authors have not only provided a risk

25   ratio, which quantifies the increased risk which we heard

1   earlier this morning, but it also says that there is an

2   association.

3           THE COURT:  They're reporting what they found, and

4   they're doing a statistical analysis of what they found.

5           MR. SACCHET:  Indeed.

6           THE COURT:  But the sentence, they never say we

7   have and we therefore conclude that there is an association

8   between the use of the Bair Hugger.  They say, I mean

9   there's nothing in here that would cause the disclaimer

10  about how we didn't have complete recordkeeping, and there

11  were other things that changed during this time period, but

12  here's we have this with it, and here's what the statistics

13  show.  But a conclusion from those that there is an

14  association that can be isolated to the Bair Hugger as

15  opposed to the Bair Hugger plus all the other changes

16  doesn't appear.

17          MR. SACCHET:  So my response, I don't mean to be

18  evasive, but it's generally accepted or I'll say it's

19  universally accepted in epidemiology and statistics and the

20  medical literature that if you report a P value that is

21  below the conventional line of statistical significance,

22  that shows by itself inherently an association.

23          THE COURT:  Okay, but you have to look at what the

24  P value purports to demonstrate.  And as they point out, the

25  P value, they don't isolate for the other confounding

1    factors incoming up with that P value.

2         MR. SACCHET:  So I'm going to discuss confounding

3    factors and explain why plaintiffs do not believe that they

4    are in fact confounding factors.

5         THE COURT:  I think we've been pretty well

6    educated on what your arguments are with that.  But I'm

7    talking to you from a statistical standpoint when you are

8    interpreting the amount of significance to give to the P

9    value, what went into the determination that there was a

10   statistically significant difference, there were a number of

11   factors that contributed to that P value.

12        MR. SACCHET:  Okay.

13        THE COURT:  And so that's why I'm asking you where

14   do they say we're isolating out just the Bair Hugger.  You

15   know what I'm saying?

16        MR. SACCHET:  I understand now.  And the answer I

17   think is what you already know, which is they did not

18   isolate those variables out in order to generate a different

19   P value.  So that P value is dependent on those hypothetical

20   confounding variables not being controlled.

21        THE COURT:  Right.  And so there's a difference

22   between saying that there is, the association that is -- I

23   mean there is an association of the statistics are what they

24   are.  But to then say that that means that they have found

25   an association between the Bair Hugger and increased

1   infection disregards the author's own statements of concern

2   about the fact that the Bair Hugger wasn't isolated in

3   coming up with that.

4         So when you say they stand by their conclusions,

5   what is that conclusion?  You're putting these words about

6   the association a little bit in their mouths.  I mean, it

7   does say, therefore, be cautious about using this with, you

8   know, until there's more study.  The Bair Hugger was one of

9   the things that went into -- the Bair Hugger is one of the

10  factors that went into the P value, so you already know

11  about the watching to make sure that people are ready for

12  surgery and so on.

13        But one of the other things that you might want to

14  be aware of is the use of error-free patient warming

15  alternatives.  And they might be recommended in an

16  environment where you need an ultra clean theater.  But

17  that's not the -- I mean here's what we found there's a

18  bunch of things here, and one of them is this, so, hello,

19  study more.

20        MR. SACCHET:  I understand.  What I would say, and

21  I don't mean this to be a non sequitur, but all

22  observational studies may or may not have confounding

23  factors.  You can't control for every particular variable.

24  It's impossible.  You just can't do it.  And, nonetheless,

25  courts have made clear that observational studies can be

1    relied on, and they often are relied on.

2        THE COURT:  Right.  And so you can have an

3    observational study, but just because observational studies

4    as almost all studies aren't going to be perfect doesn't

5    mean that every observational study comes in.  I mean so

6    it's like observational studies can't be perfect, therefore,

7    ours is really, really perfect as even stated by the

8    authors, and that that you can't evaluate the level of

9    imperfection because courts have said that observational

10   studies, not all observational studies come in.

11       MR. SACCHET:  I agree.  What I would say in

12   response is if there are concerns on your behalf, Your

13   Honor, about particular variables that are lurking that the

14   authors alluded to as to disclosed or undisclosed potential

15   confounders that could have impacted the association, I'm

16   well versed in discussing those and explaining why in fact

17   as a scientific matter in an epidemiologic matter they are

18   not confounders.

19       THE COURT:  Okay.  I want to know what your

20   experts say about why doesn't -- I mean I guess I know they

21   say -- okay, what do they say about that big peak?

22   Remember, we saw the raw data just before there was a

23   change.  It's the prior version of Figure 7.  What do you

24   folks have to say about that big pre-March 2010 increase

25   when there was the different -- what's the P value on that

1   one?

2          What do your experts have to say about the fact

3   that there was that big, big jump, you know, that's in the

4   --

5          MR. SACCHET:  Okay, the first part of my response

6   is the threshold response is one can not assume in a

7   scientific matter that DGI rates are always the same within

8   each month.  I mean they can vary depending on, you know,

9   who comes in, what kind of -- is it an orthopedic surgery,

10  you know, what's going on?  I mean all of these different

11  variables can change that factor so to assume that the DGI

12  rate every single day, every single week, every single month

13  of every single year is always going to be three percent,

14  doesn't make sense in my view.  I mean that three percent at

15  some months could be five percent and other months could be

16  two percent and the average is three percent.

17         THE COURT:  I can't remember the name of the drug

18  but there was --

19         MR. SACCHET:  Rivoraxaban.

20         THE COURT:  That one, so when they were using that

21  what you said, there was this peak.  What do your experts

22  say about the relationship, the correlation, if any, between

23  the use of that drug you said and that peak?

24         MR. SACCHET:  Okay.  So the peak coincided in

25  part, not in full, but in part when the change in

221

1    antithrombotic regimen went from a low weight molecular

2    heparin called Tinzaparin to Rivoraxaban and then back to

3    Tinzaparin.  So, in fact, the last month and a half or two

4    months of the Bair Hugger period, the patient still received

5    Tinzaparin.  And that is in fact also when that spike

6    occurred.

7            But with respect to whether there was confounding,

8    and I think that's the question, there is not a single study

9    that shows that the change from Tinzaparin to Rivoraxaban,

10   the two different antithrombotics that were used in this

11   case results in an increased rate of deep join infections.

12   There's not a single one.  And as a matter of scientific

13   methodology, in order for a scientist to conclude that a

14   factor is a confounding variable, it must not only be

15   related to the independent variable, it must also be related

16   to the dependent variable.  In other words, it must be an

17   independent risk factor.

18            THE COURT:  And the other studies showed that

19   that's not an independent risk factor.

20            MR. SACCHET:  Yeah.  So there was a 2010 study by

21   Jenson and Reed.  It evaluated the exact same protocol that

22   was used in the McGovern study, changed from Tinzaparin to

23   Rivoraxaban.  It did not find a meaningful difference in

24   deep joint infection rates between the change in those two

25   antithrombotics.

1              After that, Reed collaborated with another

2       scientist named Jamison in 2013, a few years after

3       publication of the McGovern study.  And they conducted a

4       prospective observational study evaluating the change

5       between a low weight molecular heparin very similar to

6       Tinzaparin and Rivoraxaban in 13,000 patients.  The deep

7       joint infection rates are essentially identical.  The P

8       value I think is .7, extremely high.

9              Based on that study, not only Dr. Reed but

10      Professor Nachtsheim, who again is a tenured professor of

11      statistics at the University of Minnesota had unequivocably

12      ruled out Rivoraxaban as a confounding factor.

13              THE COURT:  So then you still have the spike, so I

14      suppose if the drugs themselves wouldn't be at how do we

15      know that there wasn't a difference in how those drugs were

16      administered?  One was administered one way, one was

17      another.  So if it wasn't, not it wasn't accounted for at

18      all, then the relevance of the studies that show that the

19      drugs themselves don't make a difference.  I mean so your

20      experts say this is just like an anomalous jump?

21              MR. SACCHET:  Our experts say that they've

22      reviewed the scientific literature, and there's not a piece

23      of evidence that suggests that antithrombotics confound DGI

24      rates.

25              THE COURT:  Are they asked specifically about this

1    jump?

2              MR. SACCHET:  They've seen the increase in

3    infection and do not believe that that change in rate, so --

4              THE COURT:  But they couldn't have seen it because

5    this didn't get published.  This is in one of the

6    previous --

7              MR. SACCHET:  Well, we provided our experts with

8    many things to review.  We didn't, unlike Dr. Holford, give

9    him 19 documents that were all favorable to 3M's case.  We

10   actually gave our experts a very wide volume of materials.

11             THE COURT:  So what does that all mean?  No,

12   nobody actually talked about this jump?

13             MR. SACCHET:  Well, Dr. Holford said that, yeah,

14   there's a spike in DGI rates, and that showed that rates

15   were out of control.  But he does that based on splicing the

16   time period into different quarters, and then even go so far

17   as to say if you bring it down to two months, the rate of

18   infection is eight percent whereas the rate reported in the

19   McGovern study is three percent, so we can see that there

20   was a five percent increase.

21             What I would say in response to that is there's no

22   scientific methodology or proof that when you go from eight

23   percent to a two-month period or to three percent to five

24   percent in a different period that that shows that there was

25   confounding by an antithrombotic.

1           Moreover, 3M has produced a document in this very

2    litigation that we cited in our papers that was constructed

3    by their 30(b)(6) witness Mr. Al van Duren that shows that

4    the DGI rates among U.S. hospitals oscillates between 5

5    percent and 7.5 percent, which is almost exactly the same

6    percent of even that spike in the McGovern study.  So to

7    suggest that there was an out of control time period in the

8    McGovern study that somehow would show up confounding is

9    belied by the very graph that 3M 30(b)(6) witness prepared

10   in this case.

11           THE COURT:  Okay.

12           JUDGE LEARY:  Well, then why not show the spike in

13   the graph that was published?

14           MR. SACCHET:  So the authors chose to show an

15   average rate of infection as opposed to a --

16           JUDGE LEARY:  Why is that any more meaningful than

17   actually showing the rate of incidents?

18           MR. SACCHET:  So my view on the subject matter

19   would be in Table 2, in order to determine whether there is

20   a significant difference in infection.

21           JUDGE LEARY:  I'm not interested in your

22   interpretation.  What do Reed, Albrecht, Nachtsheim -- what

23   do any of the authors say about why it was represented the

24   way it was in the published article as opposed to the way it

25   was graphed in the preliminary document?

1          MR. SACCHET:  I don't recall specific testimony on

2     that question.

3          JUDGE LEARY:  It had to be done for some reason,

4     and I'm trying to understand whether or not there was some

5     scientific justification that would have made that graph

6     that was published a better representation or more valuable

7     representation than the actual data.

8          MR. SACCHET:  I could proffer.

9          JUDGE LEARY:  No, I'm not interested, nobody's

10     commented.  The authors of the article have not commented in

11     terms of why the graph was depicted the way it was when it

12     was finally published.

13          MR. SACCHET:  All I know is that the Professor

14     Nachtsheim, the professor at the University of Minnesota,

15     analyzed that graph and worked with Mr. Albrecht and said

16     that it should be better portrayed as an average as opposed

17     to a moving average.  I do know that.

18          JUDGE LEARY:  That's in the record.

19          MR. SACCHET:  It may not be in the record that

20     we've submitted because --

21          JUDGE LEARY:  That's all I'm interested in because

22     that's all we have to go on.

23          MR. SACCHET:  So I'm representing that when I took

24     --

25          JUDGE LEARY:  I'm not interested in what you

1      represent.

2              MR. SACCHET:  When I took Professor Nachtsheim's

3      deposition.

4              JUDGE LEARY:  Okay, if that's part of the record,

5      go ahead.

6              MR. SACCHET:  And the documents that were part of

7      that deposition reflect that Professor Nachtsheim preferred

8      to have an average as opposed to what --

9              JUDGE LEARY:  This is what he testified to?

10             MR. SACCHET:  Yes.

11             JUDGE LEARY:  Okay.

12             MR. SACCHET:  If questions are finished on that

13     particular topic, I can move into I believe I've touched on

14     the issue of confounding with respect to the

15     thromboprophylaxis.

16             I do want to just note for the Court, I'd like to

17     briefly talk about Professor Holford's testimony regarding

18     the change in start date, which is also one of the topics

19     that came up this morning with respect to the study itself.

20             The time period of the McGovern study occurred

21     from July 1st, 2008, and it ended on January 1st, 2011,

22     approximately a 2.5-year time period.  Professor Holford

23     constructed a different analysis in which he said, well, you

24     could have improved the power of the study, and you could

25     have expanded the time period instead of starting on

1    July 1st, moving the date back nine months to October 1st of

2    2007.  And when you do that, there's a nonsignificant

3    difference in deep joint infections when that data is

4    included.

5          Professor Holford's argument depends on the

6    reliability of Albrecht Exhibit 10.  That's the source of

7    the data in which he conducted his pre-McGovern study

8    analysis.  Professor Holford already admitted on the record

9    that Exhibit 10 was incomplete.  And, indeed, the authors of

10   the McGovern study testified to the same fact.

11         Dr. Reed, unlike any of the other authors of the

12   McGovern study, was the only one in charge of collecting the

13   data.  Mr. Albrecht wasn't in charge of collecting the data.

14   Not even Dr. McGovern was in charge of collecting the data.

15   Dr. Reed said on the record that that was his

16   responsibility, and he worked with a team of nurses at

17   Wansbeck Hospital to gather that data.

18         What Dr. Reed also said on the record is that full

19   surveillance did not start until July 1st, 2008.  The exact

20   same date of the McGovern study.  When I cross examined

21   Professor Holford on that issue, I said, do you have any

22   reason to doubt Dr. Reed's testimony?  No.

23         Dr. Reed also testified that if one were to rely

24   on data prior to July 1st, 2008, "it would be very

25   unreliable because it was incomplete because they did not

 1    have full-time surveillance, and there would be large gaps

 2    in the data set."

 3              In this excerpt, Professor Holford agreed about

 4    this proposition.  I asked, "So I just want to be clear,

 5    based on what you just said it's either possible that full

 6    surveillance began on July 1st, 2008, or perhaps even later

 7    January 1, 2009."  To be honest, I don't know where he

 8    pulled that date out of but that's what he said.

 9              And I said, "but you nonetheless constructed your

10    model on data that was prior to that time?"  "That's right."

11    So Professor Holford admitted under oath that full

12    surveillance didn't start until July 1st or perhaps even

13    later, yet when he constructed his new start date analysis

14    of fabricating the October 1st, 2007, date, he relied on

15    data prior to the start date?

16              Dr. Holford, again, has published numerous

17    articles in which he criticizes others and says so much

18    about relying on complete data because to do otherwise would

19    lead to a phenomena called data artifact.  That just means

20    unreliable analysis.  That's exactly what he does here, and

21    this excerpt proves that he relied on data that was not

22    complete prior to the start date.

23              3M makes a couple counter-arguments citing an

24    article by Sprowson and the unpublished transcripts, some of

25    which you've seen.  What I would like to make clear with

1    respect to the second argument is that in those manuscripts,

2    the McGovern authors expanded the data set as much as they

3    could based on complete data, as opposed to contracting it

4    to contrive statistical significance.

5             In fact, as I've already mentioned, they did a

6    post-publication analysis in which they expanded the data

7    set even further and got the same exact results.  So to

8    suggest that the McGovern authors cherry picked a start date

9    in order to achieve that result is belied by the fact that

10   they tried to have as much full data as they could and they

11   expanded the time line accordingly.

12            I asked Dr. McGovern a question point blank, was

13   there any attempt to cherry pick data?  Did you try to start

14   this start date at a particular time to achieve that?  Do

15   you have any idea of any of that happening?  And he said,

16   no, all we tried to do is collect as much as we could as

17   long as it was complete.  And Dr. Reed testified to that

18   same fact.

19            THE COURT:  Okay.  In view of time, I just wonder

20   if you'd be able to wrap up your comments.

21            MR. SACCHET:  Of course.  It would be helpful from

22   Your Honors if I could know in trying to wrap up, there are

23   two topics I really, really would like to mention which

24   deals with potential confounding from antithrombotic and the

25   double control that Judge Noel had asked so much about in

1      attempting to make the odds ratio disappear.

2              THE COURT:  Why don't you go to that because

3      haven't you talked about the antithrombotics?

4              MR. SACCHET:  If I said antithrombotics, I meant

5      antibiotic.  So antibiotics.  Professor Holford curiously

6      never actually says in his report that the antibiotic is a

7      confounder, but what he did do is he included a calculation

8      where he controlled for Bair Hugger patients by only looking

9      at patients, only looking at Bair Hugger patients.  And he

10     compared Bair Hugger patients who received the first

11     antibiotic, which is called Gentamicin, to the second

12     antibiotic, which is called Gentamicin plus Teicoplanin.

13             The inference from Professor Holford's report and

14     the arguments that are made today is that a change from

15     Gentamicin was actually better and that the use of this dual

16     antibiotic lead to decreased infection rates and, therefore,

17     contributed to the drop in infection rates that the HotDog

18     patients had the benefit of but only some of the Bair Hugger

19     patients had the benefit of, if that makes sense.

20             Professor Holford's own calculation defies the

21     entire theory.  When he controlled for Bair Hugger patients,

22     the risk of infection among those who received Gentamicin

23     the first regime was 1.92 percent.  The risk of infection

24     among Bair Hugger patients who received the second regime,

25     almost double, 3.13.

1          So when I saw this report, I really, I had a hard

2     time getting my head around it because his own calculation

3     disproves his own testimony and all of the arguments that 3M

4     had made in this litigation as to the confounding from the

5     antibiotics.  So I asked Professor Holford, okay, so wait a

6     second, so couldn't it actually be possible that there was

7     reverse or negative confounding in that patients who

8     received the HotDog and had the second type of antibiotic

9     Gentamicin plus Teicoplanin actually had a worse antibiotic

10    and therefore the odds ratio should even be higher than what

11    was reported in the study?  And he agreed.  I asked him, so,

12    if anything.

13          THE COURT:  Okay.  So now you're next point.

14          MR. SACCHET:  Fair enough.  The double control

15    issue, which is one that's come up also.  At the end of

16    Professor Holford's report, he attempts to control for all

17    potential confounding variables by only looking at Bair

18    Hugger patients who received Gentamicin and Teicoplanin and

19    Bair Hugger patients who received Tinzaparin, and then

20    looking at HotDog patients who received the same exact

21    protocol.

22          Now this is important.  The McGovern study had

23    over 1400 patients.  When Holford controlled for all

24    hypothetical confounding factors, the number dropped to less

25    than half, 640.  There were three deep joint infections out

1    of 270 Bair Hugger patients, and there were four deep joint

2    infections out of 372 HotDog patients.

3              In this very case, 3M's 30(b)(6) witness, there is

4    a document that we put in, it's on the record in which he

5    testified that in order to have an adequately powered

6    statistical calculation, you would need more than a thousand

7    patients.  Professor Holford's group is 640.  He admitted on

8    the record when I deposed him that he did not a rudimentary

9    power analysis.

10             And, in fact, Mr. Albrecht who we've heard about

11   3M's implication that he agreed to the same fact that it

12   disappears.  He said the very exact same thing at his

13   deposition but that's never been quoted by 3M.  Although,

14   Mr. Albrecht did acknowledge that the rate of infection

15   would be very similar when you control for confounding

16   factors, which is still an increase, although nominal,

17   1.11 percent DGI during the Bair Hugger period compared to

18   1.08 during the HotDog period, that he could not determine

19   the meaningfulness of whether the odds ratio disappeared

20   because the calculation was under-powered.  There's not

21   enough patients and that's proven by 3M's own corporate

22   witness.  It's vastly under-powered.

23             And to be honest, it's no surprise, if you have a

24   small sample size, and you have a very low rate of infection

25   in order to actually see if there's a meaningful difference,

1  you need a lot of patients, and that's the very reason that

2  3M has refused to conduct the randomized controlled trial.

3          THE COURT:  All right.  Thank you.

4          MR. SACCHET:  Do you want to hear anything about

5  Dr. Borak?

6          THE COURT:  We really can't right now.

7          MR. SACCHET:  Okay.  Fair enough.

8          THE COURT:  But you'll be back tomorrow, and we'll

9  consult and actually we'll give you a few minutes to talk

10  about Dr. Borak in the morning, but we have to be in recess

11  now.  And we'll come back tomorrow at 9:00 a.m.

12          MR. SACCHET:  Okay.  Thank you.

13          THE COURT:  We're in recess.

14          (Court adjourned at 4:26 p.m.).

15

16                    *     *     *

17

18      I, Maria V. Weinbeck, certify that the foregoing is

19  a correct transcript from the record of proceedings in the

20  above-entitled matter.

21

22          Certified by:  *s/ Maria V. Weinbeck*

23                         Maria V. Weinbeck, RMR-FCRR

24

25