```
 1                   UNITED STATES DISTRICT COURT

 2                      DISTRICT OF MINNESOTA

 3     ------------------------------------------------------
                                    )
 4                                  )
        In Re: Bair Hugger Forced Air  )   File No. 15-MD-2666
 5      Warming Devices Products       )   (JNE/FLN)
        Liability Litigation           )
 6                                     )   October 25, 2017
                                       )   Minneapolis, Minnesota
 7                                     )   Courtroom 12W
                                       )   9:07 a.m.
 8                                     )
       ------------------------------------------------------
 9
                BEFORE THE HONORABLE JOAN N. ERICKSEN
10                UNITED STATES DISTRICT COURT JUDGE

11                THE HONORABLE FRANKLIN L. NOEL
                  UNITED STATES MAGISTRATE JUDGE
12
                  THE HONORABLE WILLIAM H. LEARY
13               RAMSEY COUNTY DISTRICT COURT JUDGE

14
                   (MOTIONS HEARING - VOLUME II)
15
       APPEARANCES
16
       FOR THE PLAINTIFFS:
17                                  MESHBESHER & SPENCE
                                    Genevieve M. Zimmerman
18                                  1616 Park Avenue
                                    Minneapolis, MN  55404
19
                                    LEVIN PAPANTONIO
20                                  Ben W. Gordon, Jr.
                                    316 S. Baylen Street
21                                  Suite 600
                                    Pensacola, FL 32502
22
                                    CIRESI CONLIN
23                                  Michael V. Ciresi
                                    Jan Conlin
24                                  Michael A. Sacchet
                                    225 South 6th Street
25                                  Suite 4600
                                    Minneapolis, MN
```

```
1    FOR THE PLAINTIFFS:           KIRTLAND AND PACKARD LLP
                                   Behram V. Parekh
2                                  2041 Rosecreans Avenue
                                   Third Floor, Suite 300
3                                  El Segundo, CA  90245

4                                  KENNEDY HODGES, LLP
                                   Gabriel Assaad
5                                  4409 Montrose Blvd
                                   Suite 200
6                                  Houston, TX 77006

7                                  KENNEDY HODGES, LLP
                                   David W. Hodges
8                                  711 W. Alabama Street
                                   Houston, TX 77006
9
                                   FARRAR & BALL, LLP
10                                 Mark Bankston
                                   Kyle Farrar
11                                 1010 Lamar, Suite 1600
                                   Houston, TX  77002
12
     FOR THE DEFENDANTS 3M:        BLACKWELL BURKE P.A.
13                                 Jerry Blackwell
                                   Ben Hulse
14                                 Mary Young
                                   Deborah Lewis
15                                 Corey Gordon
                                   Peter Goss
16                                 Joe Winebrenner
                                   Monica Davies
17                                 431 South Seventh Street
                                   Suite 2500
18                                 Minneapolis, MN  55415

19                                 FAEGRE BAKER DANIELS
                                   Bridget M. Ahmann
20                                 90 South Seventh Street
                                   Suite 2200
21                                 Minneapolis, MN  55402

22   COURT REPORTER:               MARIA V. WEINBECK, RMR-FCRR
                                   1005 U.S. Courthouse
23                                 300 South Fourth Street
                                   Minneapolis, Minnesota 55415
24
          Proceedings recorded by mechanical stenography;
25   transcript produced by computer.
```

```
 1                      P R O C E E D I N G S

 2                      (9:07 a.m.)

 3            THE COURT:  Please be seated.  Mr. Sacchet, we cut

 4    you off yesterday.  Did you have any last thoughts that you

 5    wanted to clear up?

 6            MR. SACCHET:  There is one thought I did want to

 7    clear up.

 8            THE COURT:  Yeah.  I'd be happy to hear from you.

 9    If I had a heart and if I had feelings, I would have felt

10    bad for cutting you off.

11            MR. SACCHET:  Don't worry.  I guess I should

12    clarify your question, though, Your Honor.  With respect to

13    the time, are you just referring to Holford's motion or

14    Borak's motion as well?

15            THE COURT:  I think we're almost done with

16    Holford.

17            MR. SACCHET:  Yeah.  I agree.

18            THE COURT:  What I was wondering is if you had a

19    couple of things you wanted to say about Borak, and I know

20    that Borak is very dependent on Holford, and that comes

21    through, of course, in your memo.  So I don't anticipate

22    that you have too much to say, and if you want a specific

23    number of minutes, I can make up a number.

24            MR. SACCHET:  I was hoping maybe to go 10 minutes

25    on Borak.
```

```
 1                    THE COURT:  All right.

 2                    MR. SACCHET:  Unless that's extreme.

 3                    THE COURT:  No.  Do it.

 4                    MR. SACCHET:  Okay.  And I did have a housekeeping

 5       matter.  I have copies of the decs that we presented

 6       yesterday that we would be happy to give the Court.  I

 7       conferred with my friends on the other side, and they have

 8       copies as well.

 9                    THE COURT:  No one is admitting to being your

10       friend.

11                    MR. SACCHET:  I would hope they would.

12                    THE COURT:  So, Mr. Blackwell, do you have a

13       similar dec?

14                    MR. BLACKWELL:  We do, Your Honor.

15                    THE COURT:  Okay.  Would you mind just giving us

16       those a little bit later because we're over -- under whelmed

17       with space up here.

18                    MR. SACCHET:  I understand.  The only matter left

19       with respect to Mr. Albrecht and the under power calculation

20       that was brought up at the end of my presentation yesterday

21       and --

22                    THE COURT:  Albrecht?

23                    MR. SACCHET:  Mr. Albrecht opines on the same

24       matter that Professor Holford did with respect to the double

25       power calculation.  I wanted to read a quick excerpt from
```

1     Mr. Albrechts' testimony.  Mr. Albrecht's testimony has been

2     cited often and I think miscited as well, and when he was

3     asked specifically about what happens when you control for

4     both hypothetical confounders, does it actually in fact

5     reduce the odds ratio or make it disappear.

6             And yesterday I explained to the Court that when

7     you cut the population of the McGovern study in half from

8     approximately 2400 patients --

9             THE COURT:  Down to 600, you don't have a

10    statistical significance.

11            MR. SACCHET:  There's an issue of numbers, and

12    when Mr. Albrecht was asked this question:  If you were to

13    analyze the data factor taking into consideration the

14    antibiotics and the Rivaroxaban and if that factor goes out,

15    do you still thing there would, even with observational

16    data, it would show a difference between Bair Hugger and

17    HotDog.

18            And Mr. Albrecht responded, I don't know.  There's

19    a period of time here which comes into play.  There's

20    possibly not enough infections, infections to do a multi

21    varied analysis like that where it's properly powered.  I'm

22    not so sure we'd be able to tease out the effect of multiple

23    factors at the same time with the data set that has, you

24    know, few infections like that over multiple cuts of

25    variables.

1        So that's Mr. Albrecht's testimony as to the

2   issues with controlling for two hypothetical confounders on

3   an extremely small duty set within an extremely reduced

4   infection risk ratio.

5        MAGISTRATE JUDGE NOEL:  On that point, authors

6   reaffirming their conclusions in McGovern, is there some

7   place in your memo, I think there is, but I don't have it

8   clearly in mind, and if not, is there somewhere where you

9   can direct us to where each of the authors who were deposed

10  reaffirmed the conclusion of the study?

11       MR. SACCHET:  I can.

12       THE COURT:  And that conclusion being that there's

13  an association?

14       MR. SACCHET:  I can.  If you can give me a minute,

15  though, and this could take an unnecessary amount of time.

16       MAGISTRATE JUDGE NOEL:  If you don't want to take

17  the time right now, if one of your colleagues can be looking

18  for that, and you can give it to us at some point before

19  you're done.

20       MR. SACCHET:  I appreciate that.  Okay.

21       THE COURT:  Would it be in your memorandum in

22  support of Professor Holford?

23       MR. SACCHET:  So I believe we cited it in two

24  memos.  I believe I did direct citations in the opposition

25  to 3M's motion to exclude Samet with testimony from

1    Dr. McGovern saying that he stands by the 3.0 risk ratio not

2    only based on the published McGovern study, but also based

3    on the data that was collected after the study.  That

4    statement is in our papers.

5          Also, in our Holford papers we cited deposition

6    testimony from both Dr. McGovern and Professor Nachtsheim to

7    the same effect, although I don't believe we included a

8    parenthetical citation stating the precise words of their

9    testimony, but I will look for that, and we will present it

10   to the Court in due time.

11         On to Dr. Borak, you are very correct, Your Honor,

12   that Borak's report in large part relies on Professor

13   Holford's analysis, so I will not be repeating that.  What I

14   will do is identify the three ways in which Dr. Borak's

15   testimony differs from Professor Holford's, and I will go

16   through that very quickly.

17         The first is that with respect to Dr. Borak's

18   opinions regarding the relationship between SSI measures and

19   the outcome of interest in this litigation, deep joint

20   infection, he proffers additional testimony on that subject

21   matter, precisely identifying two particular SSI measures

22   that Professor Holford failed to identify.  Those are

23   namely, one, the impact or potential impact of skin

24   preparation; and two, the potential impact of NSSA's nasal

25   screening, and he analyzes those in his report.

1              The first thing to bear mentioning again is that

2     Dr. Borak admitted on the record that he did in fact

3     conflate in his report SSI with DJI, and as I was saying

4     yesterday, they have different etiologies, and I won't

5     re-explain that for the Court again in light of the time,

6     but with respect to the two particular factors of interest

7     that he did analyze, the first was skin preparation.

8              And just as a quick background, some of the

9     patients in the McGovern -- in the Bair Hugger arm received

10    a solution called Povidone-iodine, and that changed in the

11    HotDog group where some patients received chlorhexidine, and

12    Dr. Borak speculates, and it's apparent in the record, that

13    that change, even though it deals with topical skin

14    preparation, could have impacted DJI.

15             And in this colloquy, he makes that clear, and I

16    won't reread it because it's here in the record, and we will

17    provide copies for the Court, but the notable statement is

18    at the end where he essentially says, to the extent that

19    this would have an impact on DJI, then it would be

20    considered a confounder, but he never concludes that skin

21    preparation is in fact a confounder.

22             MAGISTRATE JUDGE NOEL:  Is there any studies post

23    McGovern like the one you were describing on the word I

24    can't pronounce.

25             MR. SACCHET:  Rivaroxaban?

1           MAGISTRATE JUDGE NOEL:  Yes.  That's the one where

2      there was a post study that shows that it doesn't confound.

3      Is there any post McGovern study on either the skin

4      preparation or the antibiotic change or any of the other

5      alleged confounders, or is it just that -- the one I can't?

6           MR. SACCHET:  Rivaroxaban.  I'm not particularly

7      aware of studies with respect to skin preparation and MSSA

8      nasal screening that has concluded that there is a

9      relationship, and to be honest I think it would be a curious

10     conclusion because when I deposed Dr. McGovern and I asked

11     the question, Are you aware of any studies that would

12     evaluate this relationship, he was surprised that I would

13     even ask that question because skin preparation is a topical

14     on your skin.  There is no relation to the joint.

15          The MSSA nasal screening is in the nose.  It can

16     perhaps cleanse bacteria, but the biological plausibility is

17     questionable, and in light of that, I don't think the

18     authors have taken the step to conduct a true study to show

19     that it is not a confounder, but it's the opposite burden.

20     In order to show that it is a confounder, both the citations

21     in Dr. Holford and Dr. Borak's report show that there must

22     be literature showing a substantial difference between one

23     regimen and another, and based on that literature, you can

24     conclude that there is confounding.

25          You cannot conclude that there is confounding

1    based on an a priori assumption in the absence of evidence

2    that there is confounding.  You need scientific proof to

3    make that determination.

4              MAGISTRATE JUDGE NOEL:  But how is -- everybody

5    gets hoisted by their own by tar.  Isn't that the point

6    they're making about your evidence on bacteria generally?

7    In other words, your point is, got to be some way to get

8    that bacteria in there.  Common sense suggested if you're

9    sucking up dirt from the floor and blowing it up the other

10   end, maybe it's going to be a source of the bacteria that

11   gets into the joint.

12             But they keep saying you have no evidence of that.

13   You have no measured study showing increase in bacteria on

14   the agar plates or however else you can count bacteria.  So

15   isn't that -- am I missing something?

16             MR. SACCHET:  I'll address it two ways.  First,

17   there are studies showing statistically significant

18   increases in bacteria as a result of the Bair Hugger, and

19   that is the Moretti study.

20             MAGISTRATE JUDGE NOEL:  Okay.  I'll have to look

21   at Moretti again because Moretti has come up, but Blackwell

22   comes back and yells at us that no, Moretti doesn't say

23   that.

24             MR. SACCHET:  Review that.  So I can tell you that

25   although there was a statistically significant increase in

1    bacteria as a result of the Bair Hugger, there were no deep

2    joint infections, but that's because there was 20 patients.

3    Again, you're not going to have statistically significant

4    increase in infection when your population is 20 persons.

5         So they want to come up here and argue that that

6    study doesn't matter because of that.  In my view, it's

7    scientific sophistry.  What it does show in its plain text

8    is that there's a statistically significant increase in

9    bacteria when the Bair Hugger is turned on, and that's fact.

10   My second response would be, well --

11        JUDGE LEARY:  I'm going to get back to when you

12   make a comment like, in my opinion it's sophistry.  I keep

13   on wanting to get back to the idea of, you have to

14   establish, plaintiffs have to establish, and the defendants

15   as well, for any proposition they're asserting with regard

16   to scientific principle that it's in the record, and the

17   flavor of comments within my opinion, it really doesn't

18   advance the ball.

19        MR. SACCHET:  There is a document that we've put

20   in the record, Your Honor.  It was cited in our response to

21   3M's motion to exclude Dr. Samet, Dr. Jarvis and

22   Dr. Stonnington in which 3M's corporate witness Mr. Al van

23   Duren explains that in order to have a properly powered

24   study, there would need to be more than a thousand patients,

25   and he determined that that was not a good study to conduct

1    because it would have been a bad career move.

2          JUDGE LEARY:  So does he support your opinion that

3    the other topic that you're addressing was sophistry?  I

4    mean, he makes that statement as a matter of principle, but

5    as applied to the statement you made, does he express any

6    opinion?

7          MR. SACCHET:  He does not directly say that

8    Moretti was under powered with respect to deep joint

9    infection rates, but he does say you need at least a

10   thousand people or more.

11         JUDGE LEARY:  I understand that.

12         THE COURT:  So the question that keeps bothering

13   me, I may or may not be able to articulate it.  In making a

14   distinction between DJI and SSI, the plaintiffs make the

15   what appear to be valid scientific points about the

16   differences, and yet in the theory of how Bair Hugger

17   increases DJI, you look at information about bacterial

18   counts on the surface of things, like agar plates or bubbles

19   or -- these are, you're counting things that are above the

20   surface, not down below.

21         And at several points, it seems that you're

22   arguing that nothing that happens on the surface, nothing

23   about SSI, has any relevance at all to the question of the

24   ability of any instrumentality that increases air flow or

25   bacteria in the air, that the SSI has no bearing whatsoever,

1    but I mean, if it an agar plate has some bearing, why

2    wouldn't an SSI have some bearing?

3              MR. SACCHET:  So I hope I answer your question.

4              THE COURT:  Just try it, without the preamble,

5    otherwise we run out of time.

6              MR. SACCHET:  First, SSIs require hundreds of

7    bacteria, and deep joint infections require just a few, and

8    that's why there's a difference in, if you just got a small

9    inoculum of bacteria on an agar plate that you can capture

10   based on the bacteria that may land close to the surgical

11   wound that that increases the risk compared to a different

12   type of infection.

13             The second point is that with respect to

14   confounding, there has been no scientific literature to

15   suggest that surgical site infection interventions have a

16   substantial impact on deep joint infection rates, and part

17   of that inquiry is biological plausibility.  So when we

18   discuss something like the anti thrombotic, which I think

19   goes back to Judge Noel's question a bit earlier about,

20   okay, well, you're talking about common sense here.  You're

21   arguing about that, well, the Bair Hugger picks up bacteria

22   and then it could spit it out and put it on the wound.  If

23   that makes sentence, then why doesn't it apply the same way

24   with respect to confounders?

25             Let's talk about an anti thrombotic.  It is an

 1    anticoagulant or a blood thinner that prevents

 2    vasoconstriction.  There's no relationship to the joint, and

 3    Professor Holford even admitted in his deposition that

 4    temporality is likely not even satisfied because Rivaroxaban

 5    is generally administered post-operatively, when a deep

 6    joint infection can occur during the operation.

 7            So there's a caveat there with respect to the

 8    common sense appeal of the chain of infection, which we

 9    believe we have proven, versus speculation about whether

10    hypothetical confounders that have no relationship to a

11    joint in fact substantially increase deep joint infection

12    risks.

13            MAGISTRATE JUDGE NOEL:  Let's go back to the

14    common sense point, which is -- so the surface preparation,

15    as I understand it, is just what you've put on the area that

16    you're going to cut into to disinfect it before you make the

17    cut.

18            MR. SACCHET:  Precisely.

19            MAGISTRATE JUDGE NOEL:  And if in fact you are

20    removing more bacteria with one preparation than another,

21    doesn't that ipso facto reduce the potential number of

22    bacteria that might fall into the deep incision once it's

23    made to cause the infection, or is that ipse dixit?

24            MR. SACCHET:  Two points:  One, there's been no

25    showing that there is a reduction between Povidone-iodine

1    and chlorhexidine with respect to that outcome; and two, our

2    theory of the case is, even if you've got an open wound, the

3    Bair Hugger could disrupt convection currents and create

4    thermal bodies by which bacteria could be redeposited in

5    that wound space.

6         So there is a mechanism of infection that is not

7    dependent on what's on the skin before or what's on that

8    area, you know, prior to this cut of the wound.  It's what

9    happens once the wound is open and once the Bair Hugger is

10   turned on and whether as a result more bacteria and more

11   particles that otherwise would not be deposited on the

12   surgical site are in fact being deposited there.

13        THE COURT:  So is it -- is the atmosphere

14   completely without any bacteria or particle bearing bacteria

15   in the absence of the Bair Hugger?

16        MR. SACCHET:  That's a great question and this is

17   one of the reasons --

18        THE COURT:  Why thank you.  Got one.

19        MR. SACCHET:  This is one of the reasons why

20   orthopedic cases are different than other types of cases.

21   Use of the Bair Hugger in orthopedic case is the primary

22   problem and why we have not brought cases that are non

23   orthopedic cases.  In orthopedic procedures, there is

24   downward airflow for the express purpose of taking all of

25   the particles and bacteria that would otherwise exist in the

1     atmospheric area above the surgical wound and moving them

2     down in a way from the surgical site and through the exhaust

3     vents of the operating room.

4          In other types of surgery, there is not that

5     degree of protection.  When you put the Bair Hugger in an

6     operating room environment that otherwise has this

7     protective effect created by uni directional air flow, the

8     CFD analysis that Ms. Conlin showed you yesterday with

9     respect to the turbulence that is created from the Bair

10    Hugger changes the whole dynamic.

11         The whole purpose of uni directional flow is to

12    reduce and eliminate the particles and bacteria that are in

13    the operating room environment for an orthopedic surgery

14    precisely because a single bacterium can cause a deep joint

15    infection.

16         THE COURT:  So the same operation rooms are used

17    in multiple surgeries.  You've got that downward airflow, so

18    they don't wheel people into a special operating room to do

19    orthopedic surgeries.  So that alone -- I don't know that

20    they do.

21         MR. SACCHET:  In some cases I think they do, Your

22    Honor.

23         THE COURT:  Well, not always.  I know orthopedic

24    surgery centers and trailers and whatnot.  If there were no

25    HotDog, how would your argument for -- how would your

1    argument be different in the absence of a HotDog?

2          Would you still be saying that the Bair Hugger

3    manufacturer is liable for increased infections if the

4    evidence -- I know this whole colorectal thing, but as the

5    defendants are saying, we actually overall take the HotDog

6    totally out of it, overall if you're going to have your

7    knees or hips replaced, you're better off having a Bair

8    Hugger than nothing.

9          And so how would your argument -- do you still

10   have a case if your argument isn't HotDog is better than

11   Bair Hugger if your argument is, nothing is better than Bair

12   Hugger?

13         MR. SACCHET:  Three responses.  The first is that

14   there are many other products than the HotDog that have been

15   shown to have equivalent efficacy in terms of warming

16   patients.

17         THE COURT:  Okay.  So that would be similar to, it

18   doesn't have to be the HotDog, but something else.  So

19   that's the comparison between Bair Hugger and some new and

20   improved something and other.  Okay.  So my question is,

21   what if we don't have any of this new and improved something

22   or other?  What if it's Bair Hugger versus nothing?

23         MR. SACCHET:  There is an intermediate

24   consideration which is, there are methods of warming that

25   don't involve conductive fabric or forced air warming that

 1   have also shown to be effective in retaining normothermia

 2   that have been used for centuries, not centuries but decades

 3   prior to the introduction of forced air warming.

 4           And third, we would dispute that the evidence

 5   shows that in orthopedic cases that the use of forced air

 6   warming is beneficial for reducing infections.

 7           THE COURT:  Forced air warming or any warming?

 8           MR. SACCHET:  There was -- any warming.

 9           THE COURT:  So your argument is, you're better off

10   with nothing than a Bair Hugger?

11           MR. SACCHET:  In your hypothetical, without the

12   use of other products that are on the market that may or may

13   not be the HotDog, I would still revert to other means of

14   passive warming that do exist and have been used for a long

15   time.

16           If you're going to take all types of other warming

17   things off the table and just say in a vacuum there is the

18   Bair Hugger and there's no other way to warm a patient,

19   which would you do?  In an orthopedic case, I would say

20   don't warm the patient, for infection, for purposes of

21   infection.

22           THE COURT:  Okay.  Because that helps me

23   understand whether you're saying the Bair Hugger shouldn't

24   be used at all, or now that we have other things, our

25   position is, yeah, use these other things instead.

1          MR. SACCHET:  And there are a lot of other things.

2          THE COURT:  Whether there are or aren't, the legal

3     point that you're making is that Bair Hugger is liable for

4     the incremental increase over these other things versus Bair

5     Hugger is liable for the incremental increase over nothing.

6          MR. SACCHET:  What I would also say is, there are

7     other forced air warming devices that are not the Bair

8     Hugger.

9          THE COURT:  What do the experts say about those?

10    Nothing.

11         MR. SACCHET:  I may not be the precise person to

12    ask that question.  One of the issues in the case is the

13    filtration of the Bair Hugger, and there are other forced

14    air warming products that have better filtration than the

15    Bair Hugger thereby ameliorating one of the two causal

16    mechanisms of infection.

17         THE COURT:  Are there studies that show that

18    forced air warming system that has a HEPA filter creates

19    less infection than one that doesn't have a HEPA filter?

20    Where do we look in the record for some support for that

21    proposition?

22         MR. SACCHET:  The documents that Ms. Conlin

23    proffered yesterday, which is the ECRI update, precisely --

24         THE COURT:  The ECRI update doesn't say much.  The

25    bulk of that update has to do with something else, and they

1    do have that line about it, but there's nothing in there

2    about any science.

3             So what study shows that a HEPA filter makes a

4    difference?

5             MR. SACCHET:  Okay.  Well, in terms of making a

6    difference, there's been numerous studies that have been

7    shown when you compare different types of filtration of the

8    Bair Hugger device how much bacteria can come out of the

9    device.  So some of the first studies that were published on

10   the Bair Hugger, namely Albrecht 2009, Albrecht 2011, those

11   studies compared different types of Bair Hugger devices, the

12   505 and the 750, and determined that 3M reduced the

13   filtration of the Bair Hugger device from having a filter

14   that was in the 90 percent range to one that was in the

15   60 percent range and thereby emitted almost 40 percent of

16   particles.

17            THE COURT:  Was there a corresponding 40 percent

18   increase in DJI?

19            MR. SACCHET:  So there is not been a study that

20   has precisely linked HEPA filtration or other types of

21   filtration, to my knowledge, to deep joint infection.  What

22   I will say is this, however:  In the Al Van Duren study,

23   which was conducted I believe in 1992, the authors there

24   analyzed the Bair Hugger and found that there was an

25   increased amount of bacterial sedimentation on agar plates

1       from the product.

2               The authors there expressly concluded that to

3       reduce the risk of deep joint infection, it should be

4       quipped with a HEPA filter.

5               THE COURT:  And then did they put a HEPA filter in

6       and test the difference?

7               MR. SACCHET:  They never have used a HEPA filter.

8               THE COURT:  I mean, how hard would it be to put an

9       agar plate out and run the Bair Hugger with or without a

10      HEPA filter?  Has anybody done that?

11              MR. SACCHET:  HEPA filters reduce 99.9 percent.

12              THE COURT:  Has anybody done that?  No.

13              MR. SACCHET:  I don't believe so.

14              THE COURT:  Okay.  And if the problem is the

15      disturbance of the air flow wouldn't matter if you filtered

16      it, right?

17              MR. SACCHET:  No.  There can be bacteria on the

18      floor of the operating room, which as Ms. Conlin explained

19      yesterday is known to be the unsterile area of the operating

20      room in which uni directional flow pushes everything to the

21      ground.

22              THE COURT:  We have that.

23              MR. SACCHET:  So even if you have a Bair Hugger

24      that has a great filter, if it's releasing excess heat,

25      which is what the Bair Hugger does compared to other forced

255

1    air warming products, that creates the disruption that then

2    brings that sedimentation and bacteria from the floor back

3    to the surgical wound site, regardless of the filtration of

4    the device.

5                THE COURT:  So the temperature matters?

6                MR. SACCHET:  Yes.  And namely, the amount of

7    excess heat that is released by the device, which in terms

8    of the 750, the current Bair Hugger that is on the market,

9    it is a marked increase from the prior models of the device.

10   That is one of the reasons that we allege that the

11   convection currents that are created are extremely strong,

12   and our CFD modeling shows the amount of turbulence that is

13   created in an otherwise sterile environment.

14               THE COURT:  Using what temperature?

15               MR. SACCHET:  That is released from the device?

16               THE COURT:  Right.

17               MR. SACCHET:  I'm going to hand that comment to my

18   colleague.

19               THE COURT:  Your expert said 105.  I'm just

20   wondering where he gets that.

21               MAGISTRATE JUDGE NOEL:  106.

22               THE COURT:  105 or 106.

23               MR. SACCHET:  Where we get the precise temperature

24   reading?

25               THE COURT:  Right.

1          MR. SACCHET:  I apologize.  I'm not qualified to

2     answer the question.

3          THE COURT:  But the temperature matters is what

4     you are saying, and you are qualified to say that the

5     temperature makes a difference.  You just said that that's

6     not the only problem, but the temperature matters.

7          MR. SACCHET:  One study in particular, the Dasari

8     study, independent study, found that the thermal gradient

9     between use of the Bair Hugger around the surgical site

10    versus with the Bair Hugger off is also markedly different.

11         THE COURT:  Okay.

12         JUDGE LEARY:  I want to follow up to your answer

13    to one of Judge Ericksen's questions.  Is it your position

14    with regard to prosthetic knee and hip surgeries that

15    actually it would be better for the patient in terms of

16    outcome not to be warmed?  Is that what you're representing?

17         MR. SACCHET:  That's a broad question in terms of

18    what the outcome is, Your Honor.

19         JUDGE LEARY:  I just want to know, is that what

20    you're representing?  And if so, if you're representing

21    that, is there anywhere in the record that would support

22    what you just said?

23         MR. SACCHET:  If the outcome is deep joint

24    infection, I would say I would prefer -- I would prefer the

25    Bair Hugger should not be used.

1                    JUDGE LEARY:  I'm not talking about the Bair

2       Hugger, I'm talking about warming devices.  Are you saying

3       that with regard to a prosthetic hip surgery or prosthetic

4       knee surgery that it's better not to warm the patient at

5       all?

6                    MR. SACCHET:  No.

7                    JUDGE LEARY?  You're not saying that?

8                    MR. SACCHET:  No.

9                    THE COURT:  So what's the point?

10                   MAGISTRATE JUDGE NOEL:  Just so I understand, I

11      thought what your answer was, if the question is whether

12      there's going to be a deep joint infection or not, you would

13      rather have nothing than the Bair Hugger, but Judge Leary's

14      question is broader than that saying, generally outcome

15      across the board of all prosthetic device surgeries, you're

16      not saying that you should never have anything?

17                   MR. SACCHET:  I interpreted Judge Leary's question

18      to not be exclusive of Bair Hugger versus nothing because he

19      mentioned other types of warming.  So if other types of

20      warming are in play, they should be used, because they don't

21      increase the risk of infection as has been shown with the

22      Bair Hugger.

23                   THE COURT:  Can they decrease the risk of

24      infection?  Never mind.  All right.  Go ahead.

25                   MR. SACCHET:  I'll try to finish up with

1    Dr. Borak.  There are two other aspects of his testimony.

2    In his report, Dr. Borak contends that above and beyond all

3    other potential confounding factors, and I want to emphasize

4    that.

5            Above and beyond all potential other confounding

6    factors that a psychological phenomenon known as the

7    Hawthorne effect confounded the results of the McGovern

8    study.  The Hawthorne effect occurs when there are

9    participants in a study who are being observed and thereby

10   modify their behavior thereby skewing the results of the

11   outcome of the study, because they're not in fact acting as

12   they normally would and instead changing their behaviors

13   that then --

14           THE COURT:  The well-known effect.

15           MR. SACCHET:  The well-known effect.

16           THE COURT:  Get that for all the studies for

17   people washing their hands and they leave the bathroom.

18           MR. SACCHET:  When we cross examined Dr. Borak on

19   this question, he readily admitted, as he had to, that he

20   had no idea if the patients knew that they were being

21   studied because the McGovern study is a retrospective study.

22   There was no Hawthorne effect, so my contention is, above

23   all and beyond all other confounders, if he's arguing that

24   that's the primary confounder, all the other ones fall with

25   it.

1          The last topic that Dr. Borak offers is his

2     general causation findings.  Dr. Borak, unlike Dr. Samet,

3     did not review the totality of evidence.  He critiqued and

4     attacked one study, as we know, the McGovern study.  He

5     predicated his opinion that the Bair Hugger is not a

6     substantially contributing cause of infection based on that

7     analysis alone.

8          He admitted he was not qualified to consider the

9     mechanism of infection that is on page 30 of his deposition.

10    He admitted he did not evaluate the impact of convection

11    currents caused by the Bair Hugger and whether that

12    increases the risk of infection.  He admitted he did not

13    evaluate the filtration issues that have come up today, in

14    his report.  That is on page 103 of his deposition.

15         What he also admitted is that temporality is

16    readily satisfied, which is the first and only prerequisite

17    under the Bradford Hill criteria.  He also admitted that if

18    you have an odds ratio of less than 2.0 that that can still

19    suggest or show causation.

20         He admitted that particle studies contribute to

21    coherence, and finally, he admitted that infectious microbes

22    being harbored in the Bair Hugger unit, it seems reasonable

23    to suggest that they can create the risk of infection.

24         Based on these admissions and Dr. Borak's failure

25    to consider multiple lines of evidence beyond the McGovern

1    study, he did not follow well accepted scientific methods as

2    an epidemiologist would do in considering the totality of

3    evidence in these mechanisms of infection to determine

4    whether the Bair Hugger does increase the risk of infection

5    and cause infection.

6           And for all these reasons, Dr. Borak should be

7    excluded, just as Dr. Holford.

8           MAGISTRATE JUDGE NOEL:  Let me ask one last

9    question from my perspective.  If the Court were somehow

10   able to conclude, and I understand there is no motion to

11   this effect, but if we were just to say McGovern is bad

12   science, McGovern goes out, none of your witness -- all of

13   your witnesses get to testify but they can't mention

14   McGovern, would you still have a case?

15          MR. SACCHET:  Yes.  And I'm going to compare it to

16   *Glastetter*.

17          MAGISTRATE JUDGE NOEL:  I'm sorry?

18          MR. SACCHET:  If you'll entertain, I could compare

19   this case to *Glastetter*.  In *Glastetter*, first and foremost,

20   it was a pharmaceutical case.  The plaintiffs there offered

21   a number of forms of evidence ranging from medical texts,

22   animal studies, internal documents and things of that

23   nature.

24          I do want to note, but I'm not emphasizing this,

25   that the Court expressly said you don't need epidemiologic

1    studies in order to show causation, but this was the wrinkle

2    in *Glastetter* that does not exist here.  They had no

3    evidence to link the relationship between the

4    vasoconstrictive properties of parlodel with the chemical

5    that would result in increased stroke.

6              There was some surmise.  There was ipse dixit to

7    suggest that.  Here, we have established a chain of

8    infection that links it together, and we also have studies

9    that have odds risk ratios.  The Darouiche study expressly

10   found that there is a 2.0 times increased risk for each

11   10 cubic feet -- not cubic feet -- cubic centimeters of CFUs

12   to deep joint infection.

13             That's what separates this case from *Glastetter*.

14   We have a mechanism infection, and the parties agree to all

15   of the intermediate steps.

16             THE COURT:  Let me just ask.  Let me go back on

17   the ultra clean theater business.  You said that orthopedic

18   surgeries are -- so are all the plaintiffs here plaintiffs

19   who were operated on in one of these special ultra clean

20   theaters?  Is that a significant factor?

21             I mean I think what you're telling me is that

22   orthopedic surgeries are conducted in a different operating

23   theater than an other surgery, and first of all, is that

24   somewhere in the record?

25             MR. SACCHET:  It is in the record.  There are

1    studies shown that ultra clean ventilation is used in

2    orthopedic surgeries, the Belani study shows that.

3              THE COURT:  Should be or is?

4              MR. SACCHET:  Is.  They conducted it at the

5    University of Minnesota in an ultra clean environment.

6              THE COURT:  So the plaintiffs here were all

7    operated on in ultra clean environment?

8              MR. SACCHET:  Whether they were all, I don't know.

9    I have not reviewed the 5,000 cases on file.  Many of them

10   were.

11             THE COURT:  Does it matter?  How relevant is it

12   whether we're talking about an ultra clean environment

13   because if you're talking about an increase of one or two

14   particles and that not being acceptable because you're

15   increasing over nothing, then is that a factor that we have

16   to look at with respect to each one of the plaintiffs?

17             MR. SACCHET:  Regardless --

18             THE COURT:  And whether they were operated on?

19             MR. SACCHET:  Regardless of whether there was

20   ultra clean ventilation, the two mechanisms of causation

21   still stand true.  There is still a filtration issue that

22   can result in the deposition of bacteria at the surgical

23   site.  There still can be convection currents that are --

24             THE COURT:  But it doesn't matter.

25             MR. SACCHET:  It doesn't change the ultimate

1    inquiry, but it does show that there's an express purpose

2    for downward air flow, which is to remove particles and

3    bacteria from the surgical site, and the Bair Hugger is

4    doing just the opposite.

5            So I would use it as an example to juxtapose what

6    is done to reduce the risk of infection and what the Bair

7    Hugger does in increasing the risk of infection.  It's

8    antithetical to what --

9            THE COURT:  No.  I get it.  Don't say it one more

10   time.  What, if anything, is in these piles of paper, and I

11   haven't looked at them all, about the air flow disruption

12   effect of a Bair Hugger in a non specialized operating

13   theater, you know, where you don't have the downward flow,

14   and I'm thinking in terms of causation with respect to

15   individual cases.

16           If you've got somebody who was operated on in an

17   environment where you don't have that downward flow, then

18   what is the Bair Hugger air -- how much does the Bair Hugger

19   disrupt the air flow if you are not in that sort of an

20   environment?  Is are there any studies about that?

21           The experts, I'm thinking about the science day

22   and everything.  Everybody is assuming that you've got the

23   air flowing down, and so if it that's true with respect to

24   all of the plaintiffs, then it doesn't matter.  My question

25   is irrelevant, but if it's not and something you don't know

1    if it is, then it seems like something that would have to be

2    reached at the very least with the causation question.

3              MR. SACCHET:  I could speculate, but I really

4    don't want to, and I would much prefer to have my colleague

5    address the question when they argue the engineering

6    motions.

7              MAGISTRATE JUDGE NOEL:  If anything, it would be

8    worse.

9              THE COURT:  I mean I don't know.

10             MR. ASSAAD:  I'm happy to answer that question

11   now.

12             THE COURT:  Just tell me quickly what it is.

13             MR. ASSAAD:  I'll just approach.  My friend here,

14   Mr. Sacchet, is correct.  It's going to be more of a case

15   specific question on the individual case because we don't

16   know about all of those 5,000 cases what's there, but from

17   an engineering standpoint, what the Bair Hugger does is, it

18   increases the turbulent effect.  Now we modelled a uni

19   directional air flow because that is the predominant air

20   flow in most of these orthopedic surgeries.

21             When we get to case specific, we will look at that

22   and see if there's anything different or if the model that

23   we have should be able to be used based on engineering

24   principles, and the engineering principles --

25             THE COURT:  Okay.  But do you have any modelling

1    of the Bair Hugger air disruption in a non uni directional

2    air flow environment?

3              MR. ASSAAD:  Currently?

4              THE COURT:  Yes.

5              MR. ASSAAD:  No, Your Honor.

6              THE COURT:  Okay.  Thank you.  And thank you,

7    Mr. Sacchet.

8              MR. SACCHET:  You're welcome.

9              THE COURT:  Mr. Gordon.

10             MR. GORDON:  Good morning, Your Honor.  May it

11   please the Court.  Counsel.

12             It is my goal to try and be as brief as possible.

13   I am, my task is to rebut some of the arguments.  If I try

14   to rebut them all, everybody here will hate me.  So I'm

15   really going to try to go right for the jugular and right to

16   the key things.

17             THE COURT:  Okay.  Now, don't take this

18   personally, but I'm always amused by the number of speakers

19   who spend five minutes talking about how they're going to be

20   brief.

21             MR. GORDON:  Thank you, Your Honor.  Let me see if

22   I can address some questions that came up just in the last

23   few minutes that I wasn't, that I'm not sure were adequately

24   addressed.  The Court asked about any studies involving HEPA

25   filter forced air versus non HEPA.  It could be found at

1    Document 768-1.  I'm sorry.  Am I reading this wrong?  It's

2    Exhibit 10 to the declaration of Joseph Winebrenner, and I'm

3    sorry to steal Mr. Winebrenner's thunder on this, to the

4    extent he's going to talk about it in connection with the

5    plaintiffs' expert Avid.

6            But this was a study that was done at the

7    Cleveland Clinic.  The Cleveland Clinic had used Bair Hugger

8    for a number of years.  At some point in 2014, their

9    purchasing department got a better deal on a different

10   forced air warmer unit, Stryker Warm Touch.  That does have

11   a HEPA filter.  They switched over to that, and so they

12   actually had a couple of years of literally thousands of

13   procedures with that HEPA filter unit versus, you know,

14   thousands of procedures that had been done with the Bair

15   Hugger unit.

16           And they actually did a study where they actually

17   controlled for all the key patient demographics, and they

18   did the various analyses, and what they found was, with the

19   HEPA filter unit, the Stryker Warm Touch, the rate of

20   infection -- well, first the punch line.  No statistically

21   significant difference between the two, but with respect to

22   the raw numbers, the superficial infections, they broke it

23   out.

24           The superficial infections with the HEPA filter

25   unit were .84 percent.  With the FAW or Bair Hugger, it was

1    1.8 percent.  It was not statistically significant.  The

2    flip side of that was, with the HEPA filter unit, it was .77

3    for the deep joint infections, .47 for the Bair Hugger.

4    Again, it didn't quite make a statistical significance, but

5    to the extent that they want to talk about a HEPA filter as

6    a theoretical construct, these are real data.

7            THE COURT:  So that would at an anti HEPA filter

8    confounder piece of evidence.

9            MR. GORDON:  At best, it shows the HEPA filter

10   makes zero difference.

11           THE COURT:  And that's Exhibit 10 to the

12   Winebrenner?

13           MR. GORDON:  Yes.

14           MAGISTRATE JUDGE NOEL:  Why didn't ECRI recommend

15   that they all have HEPA filters?

16           MR. GORDON:  There's a -- I'm not going to try to

17   get into in the weeds.  There's a mystique about HEPA

18   filters.  HEPA filtration is a filtration concept that was

19   designed for clean rooms for the making of micro chips,

20   where any tiny little particle can mess up the chip.  A HEPA

21   filter filters out 99.97 percent of .3 size micron

22   particles, very, very, very tiny particles.

23           And if you're interested in keeping your micro

24   chips clean, then that's a good thing, but if you are for

25   some reason trying to filter out fungal spores that can get

1    down to that size, that's a good thing.  If your interest,

2    if your focus is filtering out bacteria, the extra value of

3    going down to the .3 micron level of filtration, there's no

4    there there because the smallest bacterium that causes

5    infections and joint infections specifically is just under

6    1 micron .7, .8, .9 depending on which bacteria you want to

7    look at.

8            So that extra benefit for filtering out really

9    tiny particles, there is no there there, which is why, and

10   again I'm stealing other's thunder, the standard for

11   operating room filtration is not HEPA.  It's MERV14.  That

12   being said, there's a perception.  There is a perception

13   amongst doctors.  There's a perception among lots of people

14   that HEPA is better.  If we use a HEPA, that's even cleaner,

15   and that's even better.

16           In the abstract sense, yes, but in terms of what

17   matters, the bacteria, it doesn't, it doesn't add anything

18   over a MERV14, which is what is recommended, which is what

19   happens to be the filter in the Bair Hugger.

20           THE COURT:  So the MERV14, is that lower than

21   10 microns?  What's the particle size that they're talking

22   about, 10 microns?

23           MAGISTRATE JUDGE NOEL:  I don't know.

24           MR. GORDON:  MERV14, it doesn't focus on one

25   specific category.  It has different ranges, and my partner,

1    Pete Goss, will give you more detail on this, but at the

2    level that matters for us, .7, .8, .9, the MERV14 requires I

3    believe -- I don't want to caveat this.  I'm not certain of

4    this, but I think it's 90 percent.  The MERV1414 filter

5    that's in the Bair Hugger --

6         THE COURT:  If you don't mind one last question

7    about HEPA filter.  Is it obvious if are you hospital or a

8    doctor or even a lay person, when you look at a filter, do

9    you know whether you've been sold an HEPA or non HEPA

10   filter?

11        MR. GORDON:  I don't believe so, Your Honor.

12        THE COURT:  So you might be fooled into buying a

13   filter that's HEPA and is not.  If you go to Best Buy and

14   pay a hundred dollars, they put a HEPA filter on vacuum

15   cleaners.  If you have ever cleaned your house, you would

16   know that.

17        MAGISTRATE JUDGE NOEL:  I guarantee you if you're

18   talking about vacuum cleaners and stuff you buy at Best Buy,

19   HEPA they sell it.  It's a big thing.

20        THE COURT:  I know, but I'm saying --

21        MAGISTRATE JUDGE NOEL:  It is not like you can get

22   a Bair Hugger at Wal-Mart.

23        MR. GORDON:  I was actually going to talk about

24   vacuum cleaners in response to your question.

25        THE COURT:  So if you know what you're looking for

1    and you look at your filter, do you know whether you have a

2    HEPA or non HEPA filter?

3              MR. GORDON:  Not just by eyeballing it, no.  You

4    would have to have testing.  You would have to have some

5    representation as to what it is.  Specifically, with respect

6    to vacuum cleaners, the FTC has come down on a couple of

7    manufacturers of vacuum cleaners who are marketing their

8    products as having true HEPA filters, and they did it, but

9    they were marketing it so it made a difference.

10             THE COURT:  My questions go to plaintiffs' point

11   about the FDA being hoodwinked about there being a HEPA

12   filter.  Anyway --

13             MR. GORDON:  And actually, Your Honor, I will

14   leave it to others to go into the details on that because,

15   because I got a lot of other things that I probably need to

16   address.  We didn't get that early draft until essentially

17   the end of, well, it wasn't the very end of discovery, but

18   it was after all of the study authors, except Dr. McGovern,

19   had been deposed.  It was Dr. McGovern who produced that.

20   That was when we had an opportunity.

21             So Nachtsheim, Albrecht, Reed, any of the other

22   authors you want to name, they had not been deposed after we

23   got that.  So no one was asked any questions about that

24   preliminary draft, except Dr. McGovern.  He knew nothing

25   about it.  Why?  Again, this is an important point to

 1     remember.

 2               Dr. McGovern was a young resident at Wansbeck

 3     Hospital at the beginning of the McGovern paper.  All he did

 4     was participate in the bubble portion of it.  By the time

 5     they started switching over to HotDog, he was already at

 6     another hospital.  He was already doing something else and

 7     had nothing to do with the data collection, nothing to do

 8     with data analysis.

 9               And so the fact that he's I know nothing, that's

10     true.  He didn't.  He just happened to have all of the

11     documents because he was cc'd on everything as they were

12     going back and forth and drafting them.  And I also to that

13     point, the fact that Dr. McGovern, quote, "stands by it," I

14     don't know what that means because he says, well, yeah this

15     is what's in the paper.  Yes, that's what was reported.

16               He has no independent knowledge.  He has no

17     personal knowledge.  He has no participation.  What they

18     don't quote is Dr. Reed or Dr. Albrecht, both of whom

19     conceded lots of confounders, lots of reasons to think that,

20     you know, is it live?  Is it Memorex?  No.  This association

21     that we are reporting, it's just that.  Maybe it will spur

22     some further investigation, but there are lots of

23     confounders.

24               MAGISTRATE JUDGE NOEL:  Are you saying that Reed

25     and Albrecht disclaimed the association and don't stand

1      behind the McGovern report?

2              MR. GORDON:  They make it very clear that all they

3      were reporting was, there were these many infections in one

4      group, these many infections in another group.  If you just

5      look at those two factors, these are the numbers, and even

6      on that point, Dr. Reed volunteered, we made a mistake.

7      There should have been one more infection report, he said,

8      in both the HotDog and the Bair Hugger period.

9              That wouldn't change things.  It actually does,

10     but the important point is that all he or McGovern are

11     standing behind, and they repeatedly said, you know, this is

12     just an observational study.  We're not drawing any

13     conclusions.  It's wrong to draw conclusions from it.  It

14     does not -- it's, yes, there is an association reported.

15             And you know, hopefully others will do further

16     studies and see if there is any there there.  They didn't

17     control for confounders.  They acknowledge that, and we've

18     heard several times how, well, the effect continued because

19     they collected six months more of data.  Here's the problem

20     with that.  What they're doing, they could extend the post

21     switch collection to infinity.

22             The fact that somehow the rate was up here in one

23     period of time and it got down to here and stays down here

24     indefinitely, the longer you go out there doesn't change the

25     fact that the reason it got from the high to the low cannot

1    be attributed just to the Bair Hugger.  There were multiple

2    things going on, multiple confounders, multiple changes that

3    I want to talk about very briefly that are addressed

4    extensively, substantively by Dr. Borak, by Dr. Wenzel, by

5    Dr. Mont, statistically by Dr. Holford.

6         Let me just talk about the Nachtsheim deposition

7    because I started out with that, the Figure 7.  I believe

8    the suggestion was that Dr. Nachtsheim had testified that he

9    was the one who decided lets flatten out that graph and just

10   use an average across the whole time period.  Could I have

11   the Nachtsheim?

12        So the decision about where to draw lines and

13   period where forced air warming transition and conductive

14   warming you.  No I.

15        Question:  Did not have --

16        Answer:  No.

17        -- any involvement in those, any discussion about

18   that?

19        Answer:  I had no involvement.  There was no

20   discussion.  This was just the, the data were presented to

21   me.  Here it is, you know.  This is the transition period.

22   Here is before and after.

23        Question:  Other than suggesting to Mark Albrecht

24   that he add the confidence intervals to results that are

25   presented in Figure 7, do you recall providing Mark with any

1        input or guidance or suggestion about either the design or

2        the statistical work that's reflected in Exhibit 4 --

3        Exhibit 4 was the McGovern study -- with respect to

4        infection data?

5                 Answer:  No.

6                 And another point that I want to clear up right

7        away is the so-called missing data, the data that

8        Dr. Holford analyzed.  We heard quite a bit about that,

9        quite a bit about it in their reply brief, not in the

10       opening brief, but the reply brief talks about this missing

11       pages.  So my gosh this September 2008, there's the smoking

12       gun.

13                We also heard yesterday an interesting point that

14       the data in Albrecht Exhibit 10, you can't analyze it.  It's

15       not machine analyzable.  It's just a photocopy.  Yeah.

16       That's true.  Dr. Holford didn't analyze the photocopy.  He

17       didn't analyze the raw data printed out by someone.  He

18       analyzed the electronic file.  The electronic file was what

19       was provided in response to the subpoena by Augustine.

20                That was provided to both the plaintiffs and the

21       defendants.  That was provided, the electronic file, was

22       provided to Dr. Holford.  His analysis is based on the

23       electronic file.  At Dr. Holford's exhibit, counsel handed

24       him a photocopy of Albrecht Exhibit 10, and I dug up the

25       copy that I got when I was sitting at the deposition,

275

1     because I, you know, when I'm handed a copy, I write quickly

2     what it is, and then I put it in my bag.

3              So this is a copy of what was handed out at

4     Dr. Holford's deposition, and sure enough there's a missing

5     page.  Here's the missing page, because we had it.

6     Plaintiffs had it, and I'm happy to provide it to counsel to

7     make it easier for them.  I have copies for the Court.

8              THE COURT:  No.

9              MR. GORDON:  If the Court is interested.

10     Remember.  This is the ominous suggestion that this missing

11     page that's got the column with infection data from that

12     September 2008 time period, and if we just had that, we

13     would see one of those infection corresponds to one of those

14     dots.

15              The column, there is only one column on it that

16     has anything on it.  It would either have a Y or an N for

17     infection.  Every single one of them is N.  So there was no

18     missing page from what was provided to -- by the way, I'm

19     not suggesting in any way that anyone made an intentional

20     error in omitting that particular page from an exhibit, from

21     a photocopy.

22              I'm sure it's a photocopying error, but this is

23     not what Dr. Holford analyzed.  He analyzed the electronic

24     file, and it was complete.  Now, aside from that, we've been

25     told, well, that's terrible, horrible, no good evidence.  We

1    have no idea whether these data are the right ones.

2              Here are the reasons why it's reliable.  Number

3    one, Mr. Albrecht was asked, who has the data?  Do you have

4    the data?  He no longer had it.  He said, Augustine would

5    have the data, and Augustine was asked to produce the

6    underlying McGovern data and did so in response to a

7    subpoena.

8              When Albrecht looked at, and to be candid, he

9    didn't have the electronic file to look at.  We just, we

10   made a printout of an Xcel spreadsheet, which is almost

11   impossible to view, but just to have something to put in the

12   record, you know, are these the data?  He said they were

13   probably the updated set provided to him by Reed.  He wasn't

14   certain, but he said probably.

15             Reed looked at it, and he said, In all honesty it

16   looks like it.  I don't know if it is what I gave, but I

17   don't know how he would have gotten it if it wasn't from me.

18   Good point.  Where else did these come from?

19             And these data were completely 100 percent

20   consistent with that reduced graph, chart that was marked as

21   McGovern Exhibit 16 where just the infection data were

22   called out.  It not even a difference.  It's exactly

23   consistent in terms of the date, the type of infection, the

24   age, the type of procedure, et cetera, et cetera.

25   Completely consistent.

1            And it's entirely consistent with the data that

2      were published if you just move that one, if you reclassify

3      that one HotDog procedure as a Bair Hugger procedure.  It's

4      also, I might add, completely consistent with the

5      penultimate version, version 10.  There were no other raw

6      data produced by any of the coauthors.

7            We couldn't force Reed to produce anything under

8      English law.  No one else produced anything, and no other

9      witnesses -- these are the data, and one final thing.

10     Again, it was electronic data.  So we looked at the meta

11     data, and as we can see, the meta data from what was marked

12     as Albrecht 10, but the electronic file of it, was last

13     modified by Mike Reed, February 24, 2011.

14            The significance of February 24, 2011, is that

15     it's just about 63 days after the last procedure that they

16     included in their analysis, and since they had decided to

17     use a 60-day window, they would have had to have waited

18     until right around the end of February to see if there were

19     any other infections before they could report data through

20     the end of December.

21            So that is the story on the validity of the data

22     here.  With that said, again, Professor Holford's -- and one

23     final thing.  Plaintiffs say that Dr. Reed testified the

24     published data was definitely correct.  Actually, what

25     Dr. Reed said was, the original file I sent to Albrecht for

1    the paper was definitely correct.  It was.  It was

2    definitely correct.

3          The re-coding of the single infection, that's not

4    what Reed was testifying about.  We didn't know it at the

5    time and didn't have the opportunity to ask about it.  What

6    he was testifying to was that the data file that he sent to

7    Albrecht, and remember he also said, you know, there should

8    have been one more infection in each group, he said, and I

9    don't know why Mark didn't -- I don't know why Albrecht

10   didn't make that correction.

11         I don't, either.  I have my ideas.  Let me see if

12   I can just now quickly jump through -- there's several

13   points.  I was surprised again.  This morning counsel said

14   that in order for somebody to be a confounder that there

15   must be a substantial difference.

16         In our response brief, we said that that's what

17   plaintiffs were arguing.  In their reply brief they said,

18   no, no, we're not arguing that it has to be a substantial

19   difference.  Really couldn't argue that given that Dr. Samet

20   agrees.  No.  For something to be confounder, you don't have

21   to have independent, statistically significant impact.  It

22   just has to be associated.

23         And I would love to take the Court's time.  I

24   won't.  I'm just saying I'd love to, going through in great

25   detail all of the various confounders, all the various

1    things that were mentioned that weren't considered that

2    weren't analyzed and things that weren't.

3            And I do want to talk about one of the mentioned

4    confounders, the patient characteristics, the like fitness

5    for surgery, because there was an argument made that well,

6    that doesn't introduce bacteria to the wound.  Aside from

7    the fact that some patient factors actually can.  Obesity,

8    for example, increases the bio burden that the patient

9    brings to the table, and it makes it that much harder to

10   eradicate the patient's own natural bacteria.

11           But the point is, if say you had a hundred

12   patients with an ASA score, a high one of five in one cohort

13   and a hundred patients with an ASA score of one, and the

14   first group was done with Bair Hugger and the second group

15   was done with HotDog, and you had a much higher infection

16   rate with the Bair Hugger group, and you didn't factor in

17   the fact that there was a difference in the ASA scores, the

18   fitness for surgery measurement, then you can't, you cannot

19   draw a conclusion.

20           That is a systemic bias that cannot be controlled

21   for in the technical terms.  What it means is, they don't

22   know.  They admit, and they acknowledge that.  That's one of

23   the unfortunatelys in the McGovern paper.  They have -- they

24   could have gone back and pulled the data, but they opted not

25   to.

1        Again, it's just an observational study.  They are

2    just recording their numbers and hoping there would be other

3    research done, but the fact that they said, you know, we're

4    saying these patient factors have been independently

5    associated with.  That means their confounders,

6    independently identified as risk factors, and we haven't

7    controlled for them.  We don't have numbers.  We don't know.

8    You can't draw any conclusions.  There is no association

9    that can be gleaned from that.  Yeah, there's a number.

10        THE COURT:  Okay.  So Borak and Holford and Mont

11    and Wenzel were all working together; is that right?

12        MR. GORDON:  Directly working together, I want to

13    say Borak, Holford and Wenzel.  In fact they had a meeting

14    together, and that was explored in discovery.  Mont didn't

15    physically meet with them but was providing information back

16    and forth.

17        THE COURT:  And are you going to address Mont and

18    Wenzel as well?

19        MR. GORDON:  My partner Mary Young is going to

20    talk about Dr. Wenzel.

21        THE COURT:  So I'm inclined to mostly take Mont

22    and Wenzel on the papers, but I want to briefly hear from

23    whoever on the plaintiffs' side is going to speak about

24    those two, and then I want just a brief response from you

25    and Ms. Young on those two.

```
 1                    MR. GORDON:  Thank you.  And at this point I'm
 2          going to stop, but I just don't want my failure to address
 3          multiple other things to be construed as acquiescence.  I
 4          think we've addressed many of the things in our brief.
 5                    THE COURT:  Thank you, Mr. Gordon.
 6                    MR. GORDON:  Thank you.
 7                    THE COURT:  We're going to take a 10-minute
 8          recess.
 9                    (Recess at 10:30 a.m.)
10
11                              (10:40 a.m.)
12                    THE COURT:  Welcome back, and please go ahead and
13          be seated everybody.
14                    MR. ASSAAD:  Thank you, Your Honor.  Just before I
15          begin, I know the Court wants me to be brief.  I just want
16          to know just an estimate of how much time I will have so I
17          know what slides to focus on and what slides not to focus
18          on.
19                    THE COURT:  15 minutes.
20                    MR. ASSAAD:  15 minutes?  Thank you.
21                    MAGISTRATE JUDGE NOEL:  I'm sorry, just so that
22          I'm clear, which is -- what are we talking about now, this
23          is?
24                    MR. ASSAAD:  Mont.
25                    MAGISTRATE JUDGE NOEL:  Mont.
```

1              THE COURT:  Oh, I thought you had Mont and Wenzel.

2              MR. ASSAAD:  No, my colleague Ms. Zimmerman will

3     be doing Wenzel.

4              THE COURT:  That's right.

5              MAGISTRATE JUDGE NOEL:  This is Michael Mont.

6              MR. ASSAAD:  Yes.

7              MAGISTRATE JUDGE NOEL:  Got it.  Thank you.

8              MR. ASSAAD:  I will go as quickly as I can, Your

9     Honor, without going too fast for the court reporter.

10             First of all, Your Honor, we do not dispute

11    Dr. Mont's qualifications as an orthopedic surgeon.  He is

12    clearly qualified to testify about implant surgeries as it

13    is aware from record the record that he has done many

14    implant surgeries.  But it's undisputed that Dr. Month has

15    no education, training, or experience in heat transfer or

16    fluid dynamics.  Dr. Mont does not dispute that bacteria

17    causes periprosthetic joint infections.  In fact, he even

18    said that the device causes bacteria into the sterile field,

19    he would not want to be using that device.

20             This case is different, as my colleague said,

21    between the *Glastetter* case.  In that case, it was whether

22    the drug caused vasal constriction.  There is no question on

23    both sides that bacteria is a biological agent that causes

24    periprosthetic joint infections, that it occurs at the time

25    of surgery, and the mechanism is established by the studies

1    as well as the engineering evidence.

2           The journal causation question here is does the

3    Bair Hugger cause bacteria to reach the surgical site during

4    surgery?  And Dr. Mont agrees with many of the opinions that

5    the plaintiffs proffer.  The majority of prosthetic joint

6    infections are initiated through introduction of

7    microorganisms at the time of surgery.  Strategies should be

8    used utilized to lower particulate and bacterial counts at

9    the surgical site.  The probability of surgical site

10   infection correlates directly with the quantity of bacteria

11   that reach the surgical wounds.

12          Disruption of either direction air flow in an

13   operating room can potentially cause the instruments, hands

14   of the surgeon, and implant to become contaminated.  Fewer

15   colony forming units are required to cause a periprosthetic

16   joint infection than a superficial wound infection.

17   Orthopedic surgeons would be concerned if a device was from

18   raising bioburden from underneath the operating room table

19   into the surgical site.

20          Now, we talked about the international consensus

21   of periprosthetic joint infection.  I just want to mention

22   -- the national consensus.  That entire consensus dealt with

23   periprosthetic join infections and not superficial wound

24   infections, and I just want to make clear that everything in

25   the international consensus deals with periprosthetic joint

1     infections as it's been titled.  And in fact, Dr. Mont was

2     an attendee of the international consensus, and he said

3     during his deposition that he thinks it's very

4     authoritative.  And therefore, he agrees, during his

5     deposition, according to the international consensus of

6     orthopedic surgeons that voted on this, over 400, as the

7     defense has indicated, the numbers of bacteria arriving in

8     the surgical wound correlate directly with the probability

9     of surgical site infection.  We recognize the probability of

10    SSI correlates directly with the quantity of bacteria that

11    reach the wound.  97 percent agree, strong consensus.

12          Do the numbers of bacteria in the operating room

13    environment correlate directly the with the probability of

14    surgical site infection?  We recognize that airborne

15    particulate bacteria are a major source of contamination in

16    the operating room environment and that bacteria shed by

17    personnel are the predominant source of these particles.

18    The focus of our recommendation is to reduce the volume of

19    bacteria in the operating room with particular attention to

20    airborne particles.  This is the international consensus,

21    generally accepted opinions of methodology, 93 percent.

22          And they give justification for that.  Air is a

23    potential source of contamination in the operating room.

24    Studies have demonstrated that the number of airborne

25    bacteria around the wound is correlated with the incidence

1   of PJI.  It has been suggested that if it was possible to

2   measure accurately the number of bacteria present in the

3   wound, it should constitute the most precise predictor of a

4   subsequent infection.

5           Bacteria can be considered as part of a total mass

6   of particulates in the air.  Some studies have suggested

7   that airborne particulate count, not bacteria count,

8   particulate count, should be considered as a potential

9   surrogate for airborne microbial density.  Others have found

10  correlation between the number of particulates larger than

11  ten micrometers with the density of viable bacteria at the

12  site of the surgery measured by colony forming units.  And I

13  remember you were referring to the size of the particles.

14  That is one of the reasons why we used ten micrometers for

15  the size of the particles.

16          It has been suggested that monitoring particle

17  counts can be used as a realtime proxy for increased risk of

18  wound contamination or infection.  Persons in the operating

19  room, persons, are a major source of bacterial load and shed

20  bacterial particulates.  These particulates circulate

21  through the operating room via air currents.  Movements of

22  objects can generate significant marked air currents and

23  increase the probability of bacteria being deposited at the

24  surgical site.

25          MAGISTRATE JUDGE NOEL:  Well, let me ask another

1    question related to this question of what is and is not in

2    dispute.  As I understand it, one of the factoids in the

3    case relates to whether bacteria travelled on particles, and

4    there's a question in my mind about the size of the

5    particles.  Is there some consensus between the parties

6    regarding what sized particle can carry bacteria?

7              MR. ASSAAD:  I will speak on behalf of the

8    plaintiffs because I will rely on the studies.  The studies

9    have shown, which was a stock study, that you could

10   correlate particles to bacteria regarding 10 micron -- 10

11   micron particles correlate directly with the biodensity or

12   the density of the bacteria over the surgical site.  There's

13   other studies from the 60's and 70's, Celon and Clark, that

14   have also looked at you could correlate particles and I

15   think they said about five microns with bacteria.

16   Darouiche, 2017, correlated all particles to bacteria.

17             MAGISTRATE JUDGE NOEL:  Regardless of size?

18             MR. ASSAAD:  Regardless of size.  However, as a

19   conservative approach, the plaintiffs took the worst case

20   scenario of 10 microns when we did our CFD study.  Bacteria

21   alone can be aerosolized on its own as well as skin squames.

22   And that I think is a good question, Judge Noel, because

23   when we talk about particles here, we're really talking

24   about skin squames, and that's why the international

25   consensus, over 400 surgeons, all agree that the persons in

1    the operating room are a major source of bacterial load and

2    shed bacteria particulates through skin squames.

3           And ASHRAE, the American Society of Heating and

4    Ventilation -- or Refrigeration and Ventilation, and other

5    studies have indicated between a two- and four-hour surgery,

6    between 1 million and 900 million skin squames are deposited

7    throughout the surgery by the patients to the floor.  Not

8    only that, Dr. --- I mean, all the physicians agree, all the

9    experts agree that the skin squames deposit, and Dr. Mont

10   even testified that there's more bacteria on a person than

11   there is skin cells.  And that is why Dr. Wenzel testified,

12   their expert, that 40 percent of the particles in the

13   operating room, which are mostly skin squames contain

14   bacteria.

15           MAGISTRATE JUDGE NOEL:  So just to make sure I

16   understood your answer, there is some dispute about that

17   between your experts and their experts or all the experts

18   agree to all of the statements you just made?

19           MR. ASSAAD:  I think the dispute will be what size

20   particle, but I think there is uniformity that there's

21   bacteria in the operating room and they could be carried on

22   particles.  The question is whether it's a ten micron or

23   five micron or one micron.

24           MAGISTRATE JUDGE NOEL:  But you're saying your

25   experts for all of the studies that they've done have only

1    opined on the making a particle a proxy for bacteria as to

2    those particles that are ten microns or greater?

3              MR. ASSAAD:  As a very, very conservative approach

4    for the model.  However --

5              MAGISTRATE JUDGE NOEL:  That's a yes?

6              MR. ASSAAD:  Yes.

7              MAGISTRATE JUDGE NOEL:  Okay.

8              MR. ASSAAD:  Yes.  But if you have a five micron,

9    the intensity, the effect of the buoyancy and all the

10   forces, which are generally accepted principles, would also

11   cause the particles to rise.

12             MAGISTRATE JUDGE NOEL:  Thank you.

13             MR. ASSAAD:  This question is the question -- or

14   with respect to forced-air warming blankets, and I want to

15   address it really quick.  So if you recognize the

16   theoretical risk posed by the forced-air warming blanket and

17   that no studies have shown an increase in SSI related to the

18   use of these devices, we recommend further study but no

19   change to the current practice.  I would like the Court to

20   notice that with questions one with respect to bacteria and

21   the amount of bacteria, they didn't request further study to

22   be required.  And this was in 2013.  And I would also like

23   to point --

24             THE COURT:  But you're really -- would you go back

25   to that statement?  So this is an international consensus

 1    which it seems that there is no dispute as between the

 2    plaintiffs and the defendants about the righteousness about

 3    of that convention.

 4         MR. ASSAAD:  There is a little bit of a dispute,

 5    and if you look a couple of more slides, you'll see that the

 6    primary sponsor of that convention was 3M.

 7         THE COURT:  Okay.  Well, is that your -- so I mean

 8    you thought you were relying on things?

 9         MR. ASSAAD:  I --

10         THE COURT:  What's your view of that convention?

11         MR. ASSAAD:  What the general is consensus is

12    relying on here is published studies, and I rely on those

13    published studies, and I agree with the international

14    consensus.  I also --

15         THE COURT:  So that's fine.

16         MR. ASSAAD:  Yeah.  Sorry to interrupt, Your

17    Honor.

18         THE COURT:  So the international consensus then is

19    that there are no studies that have shown an increase in

20    SSI, we recommend further study but no change to current

21    practice, and they recommend no change to what's actually

22    going on in hip and knee implants but further study.  And so

23    you're saying is that further study aught to take place in

24    the courtroom before it takes place out in the real world,

25    such that then in a courtroom we could say, okay, there's

1    been further study and it shows that there is a correlation

2    or a causation.  So the causation is to happen in court?

3              MR. ASSAAD:  No.  No, Your Honor.  We actually

4    performed the further study.  We actually did a

5    computational fluids dynamic test, and there's other studies

6    that our experts relied upon, but if --

7              THE COURT:  Was that in 2013?

8              MR. ASSAAD:  This was 2013.  And since 2013 there

9    's been other studies.  There's been the Stock study.

10   There's been the Darouiche study.

11             THE COURT:  What's the current international

12   consensus?  Or don't we know?

13             MR. ASSAAD:  I think they're meeting, and I'm sure

14   since 3M is sponsoring it, I'm not sure if they're meeting

15   this year or next year.

16             MR. BLACKWELL:  Don't look this way.

17             MR. ASSAAD:  I know there's some testimony, and I

18   forget from who, that they're meeting again very soon, maybe

19   in 2019.  I don't know how long it's going to take.  But

20   further studies required.  It's not like the other studies.

21   We've done the study.  This is an engineering question here.

22   This is not a what causes an infection because we all know

23   and agree bacteria causes the periprosthetic joint

24   infection.

25             THE COURT:  But by further study I don't think

1     they meant litigation related study?

2              MR. ASSAAD:  Well, it just says further study.

3     And if you look regarding the safety and the efficacy of

4     forced-air warming, 3M, who was putting this product out,

5     has made a decision at the highest level not to pursue

6     clinical research work on the safety and efficacy of

7     forced-air warming.

8              THE COURT:  Well, what are we to make of that?  I

9     mean, that -- the punitive damage question has passed.  So

10    when they say further study, does that mean if 3M is not

11    going to do it, then it has to be done for litigation

12    purposes?  Is that what you're saying?

13             MR. ASSAAD:  If that's part of the litigation,

14    Your Honor, is sometimes litigation leads science and forces

15    science to move forward.

16             THE COURT:  So when that happens, of course, not

17    infrequently when there is some sort of new science, but

18    here we've got something that's been around for 20 or 30

19    years and the international consensus is that the state of

20    things as of now is there's no -- it doesn't -- whatever the

21    words were that they said.

22             MR. ASSAAD:  2013.  Not the state of now.  That

23    was 2013.

24             THE COURT:  Well, at the time that the -- I don't

25    know what it is.

1            MR. ASSAAD:  Yes, but they didn't have the --

2            THE COURT:  Well, they don't have anything newer,

3     so I mean --

4            MR. ASSAAD:  Right.  And that is our case, Your

5     Honor, we have new studies, we've had people look at all the

6     studies, and there's the Legg study, there's the Kurz study

7     that looked at the heat -- Kurz who was a 3M advisory looked

8     at when use the Bair Hugger, the heat increases around the

9     operating room table, the heat comes from the Bair Hugger,

10    the heat is what causes the turbulence that causes the

11    eddies which I'll explain in the engineering presentation.

12           THE COURT:  But this has been going on for

13    30 years.

14           MR. ASSAAD:  Lot of things goes on for 30 years

15    and science catches up and, you know --

16           THE COURT:  But science hasn't caught up.  I mean,

17    you're making science catch up because we just saw what

18    science says.  Science says we don't see it.

19           MAGISTRATE JUDGE NOEL:  Well --

20           MR. ASSAAD:  In 2013.  But we've done studies

21    ourselves.  I'm sorry, Judge Noel.

22           MAGISTRATE JUDGE NOEL:  I was just going to say

23    that as I understand the recommendation of this

24    international consensus was that more studies should be

25    done.

1           MR. ASSAAD:  Yes.

2           MAGISTRATE JUDGE NOEL:  There is a question here

3     that needs to be addressed.

4           MR. ASSAAD:  The question is still open.  They

5     have not said -- unlike the other two that bacteria causes

6     infections and the amount, they said further research is

7     required.  And it's kind of funny because it also says

8     further research is required for maintaining normothermia in

9     orthopedic patients, and I'll show you that slide in a

10    second.  But further research is required, and that is what

11    the plaintiffs did.  We went out got one of the premier

12    epidemiologists.  We got the premier computational fluid

13    dynamics expert in particle flow which relies on not theory

14    but mathematical equations that they use to launch rockets,

15    do CFD studies on nuclear explosions, on stuff that is high

16    level, and we'll be explaining in engineering.  The studies

17    have been done by the plaintiff, and those are the studies,

18    and as well as Darouiche and Stocks and all the stuff that

19    the epidemiologist is relying on.

20           I put the slide in just now because of the

21    Moretti, but the international consensus states that Moretti

22    undertook air sampling in experimental conditions and

23    demonstrated an increased bacterial contamination of the air

24    after turning forced-air warming blankets on; however, this

25    was much lower than worsening of air quality induced by the

```
 1    personnel placing a patient in the OR.  That's the

 2    difference in Moretti.  When you compare -- when they're

 3    putting -- you have all the people around, the patient's

 4    moving, they're moving the equipment, that's when know did

 5    the bacteria test and that's why we have to look at Moretti

 6    saying, Moretti increased the bacterial load when you looked

 7    at the OR compared to -- OR at rest compared to when the

 8    Bair Hugger was on.

 9              THE COURT:  Well, the OR at rest was before the

10    patient was moved?

11              MR. ASSAAD:  Yes, but when you're moving the

12    patient -- and Dr. Mont and others agreed with the Moretti

13    when I quested about it, probably the highest burden of

14    bacteria and particles is when you're prepping the patient,

15    you have the nurses coming in and out, moving up and down

16    the drapes, putting on the Bair Hugger, before everything

17    calms down, the operation is set, and then at that point in

18    time --

19              THE COURT:  The problem is that that Moretti

20    didn't study it after the calm down?

21              MR. ASSAAD:  Exactly.  Exactly.  And I just want

22    to point this out, Your Honor.  Does patient normothermia

23    have an essential role in preventing infectious

24    complications?  And they support general surgery but they

25    also say that it requires further research.  And at the
```

1    bottom it says, No such RCT was identified specifically for

2    TJA or orthopedic procedures in general.  The international

3    consensus also thinks this is an open question and that they

4    understand that the Kurz study was on colorectal.

5              And let me tell you something about the Kurz

6    study, Your Honor.  We talked about -- and this is for Judge

7    Leary about who sponsors.  Augustine sponsored the Kurz

8    study.  It was Augustine at the time.  It was Scott

9    Augustine.  And at the time, the reason that Dr. Kurz said

10   it was not scientific accurate at this point in time is they

11   actually cooled the control group.  They actually blowed

12   cold air on the control group which it would be unethical

13   today to do to blow cold air.  So every study has its

14   limitations.  Every study has its issues, the Kurz study,

15   which is the only study this relies on.  Melling which they

16   rely on here is a pre-warming study.  It has nothing do with

17   intraoperative warming.

18             THE COURT:  So let me just ask you one more time.

19   You refer to the international consensus sometimes like it's

20   really the international consensus but then other times you

21   kind of poopoo it by saying 3M sponsored it.  So what is it

22   your view?  Is it -- can we take this as an international

23   consensus or do you say the whole thing is tainted --

24             MR. ASSAAD:  We take it as something that both

25   sides can rely upon.

1           THE COURT:  Okay.  So the international consensus

2     is okay and the fact that it had a sponsor, they weren't

3     influenced by -- you're not alleging that --

4           MR. ASSAAD:  It may or may not, I don't know, Your

5     Honor.  We do have that Michelle Hulse Stevens.

6           THE COURT:  I just want to know, I can't tell

7     whether you're for it or against it.  I mean, when it says

8     something you don't --

9           MR. ASSAAD:  I --

10          THE COURT REPORTER:  One at a time.

11          MR. ASSAAD:  I'm sorry.  Sorry, Your Honor.

12          I believe it's one source of information.  We rely

13    upon it.  It's one of the reliable documents that we rely

14    upon it.

15          THE COURT:  Okay.

16          MR. ASSAAD:  But it also says it's an open

17    question with respect to forced-air warming.

18          The summary of Dr. Mont's opinions, every device

19    or instrument is a potential source of bacteria except the

20    Bair Hugger.  That's his opinion.  Everything in the

21    operating room is a potential source of bacteria or

22    contamination except for the Bair Hugger which blows heat

23    and it's not sterile.

24          Plaintiffs conclude the following things with Dr.

25    Mont.  They are many sources of heat generation in the OR,

1    more significant than the Bair Hugger and other devices that

2    have fans impact airflow in the OR.  There's no evidence

3    that produces more airflow and heat than the Bair Hugger in

4    the OR.

5              We agree with the holding that Judge Noel in

6    *Luminara* that said, It is common for experts to rely on

7    information outside of their field of expertise in rendering

8    expert opinions.  We have no dispute with that.  However,

9    the information the expert relies upon must be cited and it

10   must state what the expert claims it states.

11             Dr. Mont does not know about all of the devices he

12   says that produce heat, how much heat each device has.  He

13   does not know when he says this device, a monitor or an

14   anesthesia machine, blows air, he doesn't know the quantity

15   of air.  So he has to rely on other studies because he did

16   not do any experiments and he's not a fluid or heat transfer

17   engineer.

18             Dr. Mont provided no citations in his expert

19   report.  He attached Exhibit A, which was required by the

20   rule, Federal Rules of Civil Procedure, all the documents he

21   considered, and he put down about 120 documents he

22   considered, but that doesn't meet the Federal Rules of Civil

23   Procedure where a complete statement of all opinions the

24   witness will express and the basis and reasons for them.  In

25   his report and even during this deposition he said this

1    causes air, this causes heat but would not -- he did not

2    know what he was referring to, he did not say he was

3    referring to or put any type of reference.

4         It wasn't until we filed our motion that the

5    lawyers came back with a couple of the citations, not all of

6    them, a few examples, of where and what Dr. Mont was relying

7    upon.  He had plenty of time to review his report, to

8    prepare his report.  He was required under the Rules of

9    Federal Procedure 26, and he's no stranger to litigation,

10   he's testified numerous times, he failed to identify the

11   basis for many of his opinions that are outside of his

12   expertise and therefore his opinions on the devices that

13   produce air and heat must be excluded.  If there are no

14   questions, I will pass it to the defense.

15        THE COURT:  Thank you.

16        MR. GORDON:  Thank you, Your Honor.  I just want

17   to clarify that 3M did indeed was a cosponsor of the

18   international consensus, along with dozens of others --

19   pretty much every medical device or supplier of things that

20   orthopedists might be interested in cosponsored the

21   convention.

22        One more thing, I've been in a lot of trials where

23   the other lawyer says to the jury, now, ladies and gentlemen

24   of the jury, what I say is not evidence.  I never say that

25   because I don't really want to undercut what I'm saying, but

 1    it's true what the lawyer says is not evidence.  I just, I

 2    feel compelled to urge the Court to review what's actual --

 3    you know, the record actually is, what the studies actually

 4    say, what Dr. Mont actually testified to because I don't

 5    want to go into any detail as to where there have been

 6    misrepresentations or mischaracterizations of these things,

 7    and with that, we will rest on our pleadings.

 8            MAGISTRATE JUDGE NOEL:  Let me just ask one

 9    question of it.  So one of the things that struck me about

10    the presentation and reading the memo that Dr. Mont

11    testifies that a number of other items in the operating room

12    can be the source of heat, can be the source of bacteria,

13    correct?

14            MR. GORDON:  I believe specifically what he was

15    saying was virtually anything in the operating room can

16    harbor bacteria and you can, if you swabbed everything in

17    the OR, you would find bacteria.

18            MAGISTRATE JUDGE NOEL:  Including the Bair Hugger?

19            MR. GORDON:  Including the Bair Hugger,

20    absolutely.

21            MAGISTRATE JUDGE NOEL:  So when they say that he

22    testified that all these things other things could be

23    sources except the Bair Hugger, that's a spin?

24            MR. GORDON:  I think so.

25            JUDGE LEARY:  I have a question, and it's really

1    by way of background.  Maybe you're not the best person on

2    your team to answer this question, but is there a specialty

3    within the operating suite that has primary responsibility

4    for the use and operation and safety of the equipment that's

5    contained?  We've talked a lot about orthopedic surgeons and

6    their view with regard to infection and surgical sites, deep

7    joint infections, but I'm not sure that that stands for the

8    proposition that orthopedic surgeons are the ones who order

9    the warming devices that are otherwise used in the operating

10   suite, so is there a specialty that assumes primary

11   responsibility for those issues?  Or is it the hospital that

12   does?

13            MR. GORDON:  I don't know that we can say there's

14   a uniform practice.  There are obviously hospitals have

15   purchasing departments and but specifically what's happening

16   in the OR, Dr. Mont at least has testified that as the

17   orthopedic surgeon, he is ultimately responsible for

18   everything that goes on in the OR and therefore has to be

19   aware of.  You know, that being said, he doesn't literally

20   do everything in the OR.  My partner, Deborah Lewis, former

21   OR nurse, I might add, is going to talk a little bit more

22   about some of the different roles of the charge nurse.  The

23   anesthesiologist, that's typically the person in charge of

24   deciding what's going to be used for patient warming and

25   those sorts of things.  And then there's a whole group of

1    people known as bio meds.  They are the people who are

2    responsible for cleaning, maintaining, you know, and

3    sometimes purchasing the equipment in a hospital.  I don't

4    know if that answers your question, but there are different

5    people, different disciplines, but ultimately when, you

6    know, the buck stops with the orthopedic surgeons for what's

7    going on in his or her operating room so --

8            JUDGE LEARY:  Well, I'm not sure if that last

9    statement is true, at least my understanding, but I'm not

10    going to impose my understanding in terms of what the record

11    is in this case.  But it seems to me that anesthesiology

12    might have something to say about the safety of the patient

13    given that it's the ASA number that is often crucial in

14    determining the condition of the patient for surgery.

15            MR. GORDON:  Absolutely.

16            JUDGE LEARY:  And the other part of it is that

17    Scott Augustine who designed the Bair Hugger as well as the

18    HotDog is my understanding is he's an anesthesiologist, so

19    at some point in time I'd like to hear a little bit more

20    about the dynamic for making decisions about what is

21    appropriate for a patient and recognizing the need for

22    patient safety in the operating room and whether or not it's

23    a collaborative decision or not and whether or not there's

24    anybody outside of -- I assume we would have heard it if it

25    was, but if there's anybody in the field of anesthesia or

1    anesthesiology that has looked at this issue or whether or

2    not hospitals internally take a look or collectively take a

3    look at these issues so.

4              MR. GORDON:  And I think you will hear more about

5    that when we talk about their motion to exclude our

6    anesthesiology expert Dr. Hannenberg or from the OR Nurse

7    Hughes which can be handled by Ms. Lewis.

8              JUDGE LEARY:  Thank you.

9              MR. GORDON:  Thank you, Your Honor.

10             THE COURT:  Thank you.  Ms. Zimmerman, are you

11   going to talk to us about the Wenzel motion?

12             MS. ZIMMERMAN:  Dr. Wenzel, yes, Your Honor.

13             THE COURT:  Ms. Zimmerman, can I ask you a

14   question while that's getting set up?

15             MS. ZIMMERMAN:  Certainly, Your Honor.

16             THE COURT:  Are there studies that have been done

17   after the 2013 convention that are not publicly available?

18   Is the plaintiff relying on any studies that are not

19   publicly available?

20             MS. ZIMMERMAN:  Well, we are relying on

21   Dr. Elgobashi's CFD test, and I think that that is certainly

22   something that was not available to the international

23   consensus.

24             THE COURT:  Right.  Is that publicly available

25   now?

1        MS. ZIMMERMAN:  Well, it is now because it's been

2    publicly filed as exhibits to various motions here, but I

3    know that it's also been submitted for publication.

4        THE COURT:  Okay.  But the hospitals say the --

5    you know, there's some big hospital groups like, well,

6    what's the one in California?

7        MS. ZIMMERMAN:  Kaiser?

8        THE COURT:  Yeah, right, that have huge committees

9    that look at everything.  Would those committees have access

10   to all of the information that you are relying on?

11       MS. ZIMMERMAN:  That's a great question, Your

12   Honor.  I think that, unfortunately, the answer is usually

13   no, they don't have access to internal documents, much like

14   the FDA usually doesn't have access to internal documents.

15       THE COURT:  But the studies?

16       MS. ZIMMERMAN:  Right.  But so, for example, when

17   the international consensus meets and they review what's

18   available, first of all, we don't know everything that they

19   did have available to them.  We know what they ultimately

20   concluded.  But we know just since the time the

21   international consensus met, Darouiche is new, Stocks is

22   new.

23       THE COURT:  But it's not private?

24       MS. ZIMMERMAN:  It is not private.

25       THE COURT:  There's some things that are sealed

1    here, and so I'm just asking about what is -- what's a

2    secret that wouldn't be publicly available to somebody who

3    had, you know, the time and resources to find it, but you're

4    not relying on secret studies.

5              MS. ZIMMERMAN:  We don't have any secret studies

6    that we're relying on, and none of our experts do either.

7              THE COURT:  Okay.

8              MS. ZIMMERAN:  But I think that your last question

9    goes really to the ability of any particular researcher

10   organization or expert on either side of the V to really sit

11   together and draw from the available, publicly available

12   information, confidential documents, testing done as part of

13   this litigation or prior to this litigation, to weave this

14   together to really draw out of those the meaningful answers

15   to the questions that are presented to this Court right now

16   and that is general causation, is the Bair Hugger machine

17   capable of depositing bacteria at the surgical site?

18             THE COURT:  I guess that's kind of what -- that is

19   sort of what I'm asking, is that -- is there something that

20   the litigation process can provide that a medical researcher

21   or a hospital or somebody out in the non-courtroom world

22   couldn't do?  Do orthopedists need us because we have access

23   to things that they don't have?

24             MS. ZIMMERMAN:  I think that they do need us, Your

25   Honor.  I think -- I harken back actually to a case I first

1    appeared in front Judge Leary in Guidant, and I think it is

2    illustrative of some of the questions that came up yesterday

3    with respect to the FDA and what is known.  How did that --

4    how did Guidant come to be a recall?  And I know this is a

5    little bit of aside, but if you'll indulge me for a minute,

6    Guidant became recalled, it was a defibrillator that had a

7    known defect.  It came to be known because a lawyer in Texas

8    got a call from a family in North Dakota who had a 19-year

9    old kid who died, and he died because the defibrillator in

10   his heart had a defect.  And this lawyer took it on and he

11   got the internal documents that were not available to the

12   FDA.  He took depositions and he ultimately discovered and

13   proved that in fact this particular defect was known to the

14   company, that they fixed the defect, that they sent the new

15   machines out to the field, put them on the shelves, didn't

16   retract the old machines, kept them on the shelves so that

17   they couldn't be implanted in patients, but so -- and that's

18   what lead to the recall there.

19          THE COURT:  Right, right.  And there are lots of

20   examples where similar to that.

21          MS. ZIMMERMAN:  Certainly, right.

22          THE COURT:  But here's there's not an allegation

23   of a defect per se that wouldn't be known.  The Guidant

24   defect, the -- I don't know, maybe it was in some on the

25   Stryker litigation, it was commonly you've got a defect that

1    doesn't come to light until that process.

2            MS. ZIMMERMAN:  Until that extra study is done,

3    that's right.

4            THE COURT:  But here, if you're relying on

5    publicly available studies, there's not a -- the aha that

6    can come from that process is -- it seems that it's -- it's

7    difference because it's substituting a judgment over the

8    same information that has been looked at and can be looked

9    at by people who are in the field.

10           MS. ZIMMERMAN:  Well, respectfully, Your Honor, I

11   don't think that we know that it is the same information.

12   And at a minimum, what I would say is that none of these

13   organizations have had the CFD test that Dr. Elghobashi did

14   in this case.  Now, could it have been done prior?

15   Possibly.  It's an extraordinarily fact intensive,

16   technology intensive endeavor.  And much like we see these

17   banners on the international consensus, these organizations,

18   they need sponsorship, whether from 3M or from Stryker or

19   from any kind of a company, apparently -- and sometimes it

20   comes up in litigation.  But we don't have experts that

21   necessarily, even if they want to study something, they

22   don't have the 150, 250, 500 thousand dollars sponsoring the

23   study they want to do.

24           So what I think is important and I would submit to

25   the Court is important in looking at that international

1    consensus data and position is that they are saying we want

2    extra study, we want this done.  And they didn't have, when

3    they issued these opinions in 2013, these widely held

4    consensus statements, they didn't have Darouiche talking

5    about the doubling of the risk of infection for every ten

6    colony forming units perimeter cubed over the surgical site.

7            And so what happens here, and we're going to try

8    to continue to tie this together for Your Honors throughout

9    the rest of today and how this is really an engineering

10   case, it's not a pharmacology case, but the engineering

11   really here explains the role of the machine in depositing

12   the known agent into the patient, and that's something that

13   was not available to the international consensus when they

14   made these proclamations.  So we think that the

15   international consensu is reliable, but they didn't have a

16   full picture.  I don't know what the FDA had.  I don't think

17   they probably had Dr. Elghobashi's report, but we don't

18   know.

19           THE COURT:  All right.  Thank you very much.

20           MS. ZIMMERMAN:  And I know that Your Honors want

21   to get through Wenzel pretty quickly so I'll try to do that.

22   Again, we don't dispute that Dr. Wenzel is a highly

23   qualified physician with expertise in infectious disease,

24   and he agrees with the plaintiffs and with, frankly, the

25   facts in many respects.

1              I wanted to put this up today because Your Honors

2      have had some questions throughout yesterday and today about

3      surgical site infection versus deep joint infection and

4      really what is what?  Surgical site infection is the broad

5      category of infections that can happen during a surgery, and

6      this is a chart, by the way, that comes from Document 810-2,

7      it's also Defendant's Exhibit 47.  It's from the CDC.  And

8      it's a chart that shows the difference, and you'll see at

9      the top, there's superficial incisional SSI surgical site

10     infection.  Those are the kinds of infections that require

11     tens of thousands of pathogens to be deposited to cause that

12     kind of infection.  What we're talking about is the deep

13     incisional SSI that's also known as DJI, deep joint

14     infection, or PJI, periprosthetic joint infection.

15             And this also, same exhibit, Defendant's

16     Exhibit 47, and I know that the font is probably a little

17     bit small, but it does describe in hopefully helpful ways

18     for the Court the difference between superficial incisional

19     surgical site infection and deep incisional surgical site

20     infection, also known as deep joint or periprosthetic joint.

21             So again, Dr. Wenzel agrees, and this is an

22     undisputed fact, bacteria are the real crux of the issue

23     here, so it's not like *Glasstetter* or like many of the other

24     kinds of pharmacology cases that we might be talking about

25     if exposure to a particular agent going to be capable of

```
 1    causing the kind of problems that the plaintiffs allege in

 2    the case.  Here's it's absolutely a question about the

 3    bacteria getting into the incision during the surgery.

 4    That's undisputed.  The question is, how does it get there?

 5              And this kind of goes to the vast majority,

 6    frankly, of Dr. Wenzel's opinion which the plaintiffs

 7    brought our motion to challenge Dr. Wenzel on Daubert

 8    grounds largely because of the Court's scheduling order, and

 9    we felt that we needed to bring Daubert motion now or feel

10    that they would be waived, but most of the opinions that he

11    offers in his report really have to do with case specific

12    issues that don't touch on general causation at this point.

13              Another thing that the plaintiffs agree with, with

14    respect to Dr. Wenzel, he says that infection rates are

15    going up, and that is in his report at 13.  There is some

16    information from the CDC about how much they've been going

17    up.  Significantly, thousands of additional infections.

18              THE COURT:  Percentages going up, too?

19              MS. ZIMMERMAN:  Yes.  So there are more surgeries

20    and there are more infections but it's also a greater

21    percentage of the surgeries are happening.

22              JUDGE LEARY:  So what do you -- what does

23    Dr. Wenzel glean from that?

24              MS. ZIMMERMAN:  What does Dr. Wenzel glean from

25    that?  What he says in his report is that essentially there
```

1    is a lot of people that are more compromised going into

2    surgery, and we disagree with that.  We think that there --

3    because at the end of the day, whether somebody is obese or

4    a smoker or immuno compromised in any way, they don't

5    spontaneously come down with an infection unless they are

6    exposed to the bacteria, so that's the prerequisite for any

7    kind of an infection.

8              Now, it may well be that if the population as a

9    whole is not as well, as healthy, as fit for surgery that

10   they are less capable of fighting off these kinds of

11   bacterias, and so, I mean, certainly we all have bacteria,

12   probably we're all covered in it right now, it doesn't mean

13   you're going to come down with an infection all the time but

14   you may.  So at any rate, the issue really is exposure to

15   the bacteria, particularly during the surgery while the

16   incision is open and these implants are being placed.

17             THE COURT:  So weren't the implants sued?  Are

18   those the Stryker lawsuits?

19             MS. ZIMMERMAN:  There are certainly Stryker

20   lawsuits.  There are a host of defective hip implants and

21   knee implants that have been used in the last many years.

22             THE COURT:  You don't know whether any of those

23   defective implants were used in the McGovern population, do

24   you?

25             MS. ZIMMERMAN:  I don't know that, Your Honor.  I

1    know that one of the issues with respect to surgeries is

2    there are a greater proportion of revision surgeries over

3    the last 15 years, probably because, at least in part, due

4    to all the recalls that have happened, and there is a

5    greater incidence of infection during the revision surgery.

6    The thought process, according to Dr. Jarvis in his report,

7    really has to do with it's a longer surgery, and it would be

8    consistent with the plaintiffs' theory that they're exposed

9    to air that is turned up by the Bair Hugger for a much

10    longer period of time and they're more likely to come down

11    with an infection then.

12                THE COURT:  All right.

13                MS. ZIMMERMAN:  So Dr. Wenzel agrees that as long

14    as there is proper skin antisepsis that is presumed to

15    destroy all viable bacteria on the patient's skin, and

16    that's at his deposition page 204, line 6.  It's Exhibit A.

17                Counsel for 3M in their -- excuse me, in their

18    response to the motion on Dr. Wenzel, they say the fact that

19    no other equipment in the operating room has not been

20    studied, is believed to pose no risk and is of no

21    consequence.  So there's a lot of hay to be made in

22    Dr. Mont's report and in Dr. Wenzel's report about all of

23    these machines that might be causing infection.  And at

24    their deposition and in our motions, we say what are you

25    relying upon for that?  And the response is, well, you know,

1      there's not a lot of study on that.

2              Most importantly, I think, Dr. Wenzel at his

3      deposition testified that perhaps 40 percent of operating

4      room particles carry bacteria.  Why does that matter?  Well,

5      it matters, Your Honors, because the testimony in this case

6      and the admissions from 3M is that use of the Bair Hugger

7      causes increased particles, no matter the study, plaintiffs'

8      study, internal study, external independent study, they all

9      show more particles.

10             And I'm just going to jump ahead really quickly

11     and try to be mindful of the Courts' time.  Dr. Wenzel

12     attaches at the end back of his report starting at page 75,

13     discussion about the applicability of the heater-cooler, and

14     Your Honors may remember this because there was some

15     discussion of it at science day.  And this was another,

16     frankly, that was not before the international consensus

17     when they made their proclamation with forced-air warming.

18             Why does it matter?  Well, first of all, this

19     involved a heater-cooler unit which is pictured on the left.

20     It looks a little bit like the Bair Hugger, but they serve

21     different purposes, and we would not represent to the Court

22     they're absolutely equivalent.  The thing that's important

23     about the multiple studies that happened in the

24     heater-cooler unit that Dr. Wenzel discounts entirely is

25     that the authors of the heater-coolers unit studies, and

1      they're multiple, they find that that particular device is a

2      reservoir of infection, of colony-forming units and bacteria

3      in the operating room.  And what happened there -- and it

4      was contaminated at the source where they made it.  I don't

5      think that that's relevant to the issue before this Court.

6      The question in heater-cooler was if you have a machine

7      sitting in the OR and it's got germs in it, pathogens,

8      bacteria, an they demonstrate that those bacteria can be

9      aerosolized, they can move through the air, and they deposit

10     themselves in the surgical site and cause an infection, so

11     that's a mechanism of injury, that's what they showed in the

12     heater-cooler case, and then ultimately through the course

13     of a number of different studies led to the recall of these

14     particular devices.

15              The only reason that the authors were able to

16     learn about that was because it was such a rare bacteria,

17     mycobacterium chimaera.  And so when Dr. Jarvis talked about

18     it at science day and when he talks about at his deposition

19     and his report, he talks about really as a canary in a coal

20     mine, that if it hadn't been such a bizarre pathogen that's

21     normally found in your lungs, kind of like tuberculosus, or

22     they found it in heart tissue in a couple of different heart

23     surgery patients that have been the same hospital a couple

24     years apart, if they didn't see that, if it wasn't so rare,

25     they wouldn't have known to study it.  And that mechanism of

1    aerosolized bacteria coming from hospital equipment to a

2    patient surgical site was information that was not before

3    the international consensus back in 2013 because it wasn't

4    known yet.  So it's incredibly relevant, despite

5    Dr. Wenzel's disregard of it.  One of the studies used smoke

6    studies in understanding the mechanism of transport from the

7    heater-cooler unit in the operating room to the surgical

8    site.

9            And then, just finally, we would say that with

10   respect to Dr. Wenzel, he's certainly qualified on issues

11   with respect to infectious decease, but his qualifications

12   do have limits.  Plaintiffs will rest on their papers with

13   respect to his expertise in the areas of normothermia and

14   computational fluid dynamics and engineering.  If Your

15   Honors have any questions?  I'll sit down.

16           JUDGE LEARY:  Thank you.

17           THE COURT:  Thank you.

18           MAGISTRATE JUDGE NOEL:  No offense to anybody, I'm

19   leaving to do criminal duty stuff.  I know I got mocked

20   yesterday so.

21           THE COURT:  Did you?

22           MAGISTRATE JUDGE NOEL:  You mocked me.

23           THE COURT:  What did I say?

24           MAGISTRATE JUDGE NOEL:  I don't remember.

25           THE COURT:  It was cruel.

1          MAGISTRATE JUDGE NOEL:  No, it was all in good

2     fun.

3          THE COURT:  Ms. Young.

4          MS. YOUNG:  Good morning, Your Honors, counsel.

5     Dr. Wenzel has a 75-page report in which he carefully

6     analyzes all of the science that would relate to the

7     interrelated topics at issue here, when we're looking at not

8     only whether the Bair Hugger is capable of causing surgical

9     site infections but what the other potential causes might

10    be, and Your Honors have asked a number of questions about

11    confounders, risk factors.  Dr. Wenzel has detailed the

12    research across all of those subjects in his report.

13         There's been a lot of discussion about PJI versus

14    SSI.  Based on the information that Ms. Zimmerman just

15    presented it's clear that PJI is a subset of an SSI, and if

16    you look at the research, they don't always distinguish

17    between the two.  And we submit, again, the issue has been

18    addressed within the context of PJI's and there's no

19    distinction that matters for the purposes of the discussion

20    here today.

21         What Dr. Wenzel also concludes based on the body

22    of scientific evidence, so he's looking at the RCTs, he's

23    looking at the biological plausibility research, he's

24    looking at experimental or theoretical research, and he's

25    looking at the epidemiology.  He has concluded not only that

1    the Bair Hugger is not capable of causing a periprosthetic

2    or prosthetic joint infection but, in fact, the opposite is

3    true.  It is both safe and effective, including for patients

4    undergoing total hip and total knee arthoplasty procedures.

5          And the research that he looked at is not only

6    across all of these interrelated fields, but he's also

7    looked at the evidence in this case and so he's looked at

8    the information that was discovered in the UK, some of the

9    analysis that was done after the data was made available for

10   the McGovern study, and so he is the person who has done the

11   full research on the issues that matter to this Court.

12         He also has a very succinct discussion of McGovern

13   beginning at page 62 of his report.  And what he points out

14   at the very beginning of his opinion, which Your Honor

15   picked up on this yesterday, was that while that study may

16   on its face show an association, that association is not

17   causal as related to the Bair Hugger because of all of the

18   things that we've talked about, about the confounders, about

19   the not being controlled, about the co-morbidities being one

20   of them that were not controlled.  And he also talks about

21   the study having bias, systemic bias that couldn't be

22   controlled, and so Your Honors I think will find that quite

23   succinct discussion at page 62 to 68 of his report, as well

24   as answers to questions about what does the skin prep

25   matter, how do we know that the skin is the primary source

1    of the bacteria that leads to surgical site infections, and

2    he analyzes the science on the p-acnes, which is a

3    particular type of bacteria found only on the shoulder, and

4    how that particular bacterium is responsible for shoulder

5    prosthetic joint infections, not knee and hips.  So he has

6    -- his report I think will be very useful to the Courts in

7    those regards.

8           Very briefly, I think plaintiffs' characterization

9    that Dr. Wenzel agrees that it's bacteria that causes

10    surgical site infections is gross oversimplification of the

11    scientific issues here.  Of course it's the bacteria that

12    causes the surgical site infection, but how does that

13    bacteria get into the wound, and what Dr. Wenzel's analysis

14    has shown is that it's primarily from the skin.  You can

15    prep the skin, you can never make it sterile, and you

16    certainly can't -- remove the bacteria that's below --

17    that's in the patient as well.  So Dr. Wenzel details all of

18    those items.

19           And he also talks about risk factors as being

20    causal.  There's been a lot of discussion about it's not

21    risk factors that cause infection, it's bacteria that causes

22    infection.  And in his deposition, he simply said to

23    plaintiffs' counsel, you and I are just going to disagree on

24    that.  I mean, I think that risk factors are by definition

25    causal.  And you can find his testimony related to that

 1   topic at page 276.

 2           With respect to the heater-cooler unit, as we

 3   talked about at science day, that involved a very particular

 4   type of bacterium that was then linked to a cluster of

 5   infections.  It's not on point and does not support

 6   plaintiffs' position that the Bair Hugger has been --

 7   there's any scientifically valid that the Bair Hugger is

 8   capable of causing infections.

 9           And with that, Your Honor, I will rest on our

10   papers.

11           THE COURT:  Thank you, Ms. Young.

12           JUDGE LEARY:  Thank you.

13           THE COURT:  All right.  Can we talk about Hughes

14   -- or Hannenberg and Huguhes, in whatever order you'd like

15   to address them?  Ms. Zimmerman, is that you?

16           MS. ZIMMERMAN:  Does the Court wish to hear from

17   us?

18           THE COURT:  Or if you want to save your time and

19   move right to engineering.

20           MS. ZIMMERMAN:  With respect to both Hannenberg

21   and Hughes, particularly on the issue of general causation,

22   it's the plaintiffs' perspective -- defendants have not

23   offered Ms. Hughes in particular to opine in any way on the

24   safety or efficacy of the Bair Hugger.  We think that any

25   opinions that she might be qualified to offer would not be

1    relevant to this stage of the proceedings, and we would rest

2    on our papers in that regard.

3              Similarly, with respect to Dr. Hannenberg, he's an

4    anesthesiologist with some experience in using the Bair

5    Hugger in practice.  The plaintiffs' position is that the

6    vast majority of the testimony and opinions offered by

7    Dr. Hannenberg would also really go to specific causation.

8    And we are happy to rest on our papers and take the extra

9    time with our engineers.

10             THE COURT:  Thank you.  Thank you very much for

11   that.

12             Mr. Blackwell, anything from your side on those?

13             MR. BLACKWELL:  Just one moment, Your Honor.

14   Maybe not.

15             Your Honor, we'll briefly make a couple of points

16   on Hannenberg and the engineers.

17             THE COURT:  All right.  Ms. Lewis.

18             MS. LEWIS:  Good morning, Your Honors.  Deborah

19   Lewis.  I would like to, before I start, clear something for

20   the record that was discussed yesterday.  I think it was

21   Judge Noel who asked the question whether all the cases in

22   the MDL were orthopedic cases, and I don't remember which

23   counsel said yes, they were, but that is not the case.  We

24   certainly keep track of all the different types of

25   surgeries, and there are abdominal surgeries that have been

1    filed, neuro surgeries that have been filed, cardiac

2    surgeries filed, cases concerning the muscles and tendons,

3    and the good majority of cases are ortho cases, but for all

4    the ortho cases, all of them aren't involving prostheses and

5    all the patients aren't claiming deep joint infections.

6    There are many cases where they're just claiming a skin

7    infection called cellulitis.

8            THE COURT:  I think for the bellwethers we

9    isolated --

10           MS. LEWIS:  That's right.

11           THE COURT:  Okay.  Thank you.

12           MS. LEWIS:  But that was to clarify.  And

13   Mr. Sacchet said today that was the reason we brought all

14   these cases, you know, for ortho case, and, again, we just

15   wanted to clarify for the record there are all sorts of

16   cases being filed.

17           Defendants are asking this Court to deny

18   plaintiffs' motion to exclude the expert opinions of

19   Dr. Alexander Hannenberg who is a Board certified

20   anesthesiologist.  Dr. Hannenberg's opinions on the safety

21   and effectiveness of the Bair Hugger are relevant, reliable,

22   and are based on reliable scientifically valid evidence.

23           Patients, at least in their papers, challenge

24   Dr. Hannenberg's qualifications, but as evident in both his

25   report and in his CV which is attached to his report and are

1    in the record, his qualifications to offer opinions on

2    normothermia, hypothermia, infection measures employed

3    during surgery, and the safety and effectiveness of the Bair

4    Hugger system are without question and are more than

5    sufficient.

6         He is, as we mentioned in our papers, the only

7    anesthesiologist who's been designated by either party as an

8    expert witness.  That means he's the only medical physician

9    who has actually used the Bair Hugger system.  So he will

10   certainly be important to the trier of fact to discuss how

11   it's used, how anesthesiologists use it, why they use it,

12   why it's his opinion, and others.  The American Society of

13   Anesthesiologists endorses forced-air warming, so he's able

14   to explain to the jury his opinion on the safety and

15   effectiveness of it, and that, to a good part, is also based

16   on his experience, but these are things that he can talk

17   about.

18        Also, as noted in our papers, Dr. Hannenberg has

19   over 30 years as an anesthesiologist and over 20-something

20   years using the Bair Hugger system on a daily basis.

21        Dr. Hannenberg has published.  It's an editorial

22   that he published in 2008.  It was titled Improving

23   Perioperative Temperature Management.  It was in the

24   International Anesthesia Research Society.  It's listed in

25   his CV in which he talked about in that editorial the

1    studies that were germane to the risks of hypo -- that dealt

2    with the risks of hypothermia, including the risk of

3    surgical wound infection with hypothermia.  He talked about

4    the benefits of normothermia and the safety of patient

5    warming systems.

6            Dr. Hannenberg also has been instrumental in

7    developing the performance measures for temperature

8    management by anesthesiologists, and that involves, of

9    course, in treating hypothermia and in maintaining

10   normothermia during the operative procedure.

11           According to Dr. Hannenberg, he said that the Bair

12   Hugger has been part of this strategy to reduce the

13   likelihood of surgical site infections in his practice.

14           With respect to infection prevention issues, he

15   discuss in his report how anesthesiologists are even

16   involved in infection mitigation, something people may not

17   think about from what the anesthesiologists do, but they

18   actually help to mitigate risks.  They, as he mentions in

19   his report, and we know that the one thing that they use, of

20   course, is thermoregulatory systems, patient warming

21   devices, that's one thing they do, but he also mentions that

22   they control, help control blood glucose levels during the

23   surgery because that can have an effect on whether a patient

24   develops an infection, and they also are measured in when

25   they give antibiotics during surgery.  There is a specific

1     time when it's best to give the antibiotic and then if the

2     surgery is too prolonged, they might give an additional

3     dose, but those are things in which anesthesiologists do in

4     order to help reduce surgical site infections.

5          The scientific studies that are the subjects --

6     that include subjects on hypothermia and normothermia and

7     infection prevention are the very types of studies that

8     Dr. Hannenberg knows about, routinely reviews, and they help

9     him make decisions, clinical decisions on the treatment of

10    patients during general surgery.  I won't go anymore into

11    detail about his qualifications because I think it's fairly

12    obvious not only from his report but from his CV as well.

13         With respect to what process he undertook to make

14    his decisions, I think also his report is relatively clear

15    on what he did.  He knows, again, about the Kurz study that

16    we talked about yesterday which is one of the RCTs that

17    involves colorectal surgery.  According to Dr. Hannenberg,

18    it doesn't make a difference that it was colorectal surgery,

19    and he says in his report the reason why is because it's a

20    physiology question.  In other words what happens when we

21    get cold?  We have vasoconstriction.  What happens when our

22    blood vessels vasoconstrict?  That means that the white

23    blood cells can't get to certain tissue, and so that -- and

24    he says it doesn't make a difference, that same thing is

25    going to happen in our body no matter whether it's a hernia,

1    no matter whether it's a orthopedic procedure, no matter

2    whether it's a neuro surgery.  Vasoconstriction is

3    vasoconstriction.

4         And he's not the only one who thinks that as well.

5    That is the consensus of other studies that -- and even as

6    counsel brought up today showing you the ICM and what they

7    said about that in which it said we support the general

8    recommendations from general surgery.  So the orthopedic

9    community is not saying not to warm patients.

10        Just briefly, again, on the other things that he

11   undertook, he looked at, again, the Kurz study, he knew

12   about that study, knew about the Melling study.  The Melling

13   study, although it's prewarming, according to Dr. Hannenberg

14   and what he said during his deposition is what matters, is

15   that patients were warmed and the effect from the Melling

16   study that showed the benefits of warming to patients.

17   Melling I think was involving several different types of

18   surgeries.

19        There is another -- there is a study in 2016 on

20   fracture patients that Dr. Hannenberg also cites that also

21   showed benefits from warming patients.  We talked about the

22   evidence that he looked at that study as well.  But, again,

23   all of the things that he did and undertook are contained

24   within the record at DX1, page 26 is his materials

25   considered list.

1              I will say the last thing with respect to whether

2       this is accepted within the general community,

3       Dr. Hannenberg supplemented his expert report, that is part

4       of the record as well at 869-1, page 28, in which he says

5       the FDA's letter to professionals is a letter that would be

6       addressed to him because, again, he is the one who makes

7       decisions on whether to use the Bair Hugger system or not.

8              And he says that the FDA letter also supports his

9       conclusions reached that the Bair Hugger should be continued

10       to be used, the Bair -- his opinion that the Bair Hugger is

11       safe and effective, and he also says, and I will just quote,

12       This information from the nation's authority on the safety

13       of medical devices further underscores the validity of the

14       conclusions I presented in my earlier letter.

15              Lastly, Dr. Hannenberg does offer an opinion on

16       labelling and warning, and as he mentions in his report and

17       as evident in the *In Re Mirena* IED product liability case,

18       he again is the end user to whom that warning, if warning

19       was needed, would be addressed, so he is certainly qualified

20       to say whether there is a warning necessary, and it's his

21       opinion, as noted in his report, that no warning was

22       necessary because there was no credible evidence of an

23       increased risk of surgical site infections.

24              And I think that based on that, if no questions,

25       we'll rest on our papers.

 1                THE COURT:  All right.  Thank you, Ms. Lewis.

 2                All right.  Now I think the next thing on the

 3     schedule that we sent out would be defendant's motion to

 4     exclude Elghobashi.

 5                MR. ASSAAD:  I think it was to all the engineering

 6     experts.

 7                THE COURT:  Oh, yeah, Elghobashi, Buck,

 8     Koeningshofer, and David.

 9                MR. GOSS:  That's right, Your Honor.  That's

10     right.  May it please the Court, my name is Peter Goss.

11     It's my privilege to be here today representing 3M.

12     Counsel.  And I'm going to be discussing -- how do I lower

13     this?  Or can I?

14                THE COURT:  There you go.

15                MR. GOSS:  There we go.  It's a little more

16     comfortable this way.  Do you have my presentation up?

17     Okay.  Great.

18                All right.  So as the Court noted, I'm here to

19     address the motion on the plaintiffs' engineering experts.

20     There's Daniel Koeningshofer who is an HVAC heating,

21     ventilation, air conditioning engineer who works with

22     hospitals.  There is Dr. Said Elghobashi who is an expert in

23     computational fluid dynamics.  There is Dr. Yadin David who

24     is a biomedical engineer.  You're going to be hearing about

25     him on regulatory issues later, but he does have a couple of

1    opinions that relate to this portion of the case.  And then,

2    finally, there's Michael Buck who did an engineering type

3    study in support of plaintiffs' arguments in this case.

4            But I want to come back to the framework that

5    Mr. Blackwell laid out yesterday for how to analyze issues

6    of medical causation, and what I'm going to be talking about

7    today is really on the left-hand side of the screen in the

8    realm of the experimental and theoretical and the realm of

9    the biological plausible.  And I just want to be clear that

10   those things combined are not enough under the case law to

11   get you to an association that will get you to causation.

12   So within the realm of the experimental and theoretical, the

13   plaintiffs are relying on particle testing, which we've

14   heard a lot about, their litigation CFD, and then there are

15   eight studies that were instigated by Dr. Augustine that

16   concern bacteria, particles, and airflow.

17           We've already many times discussed the fact that

18   there is no biological plausibility study from the

19   standpoint of actually measuring bacteria coming out of the

20   Bair Hugger or bacterial increases in the operating room

21   that can be attributable Bair Hugger operation, and that's

22   been studied many times, and no clinically meaningful

23   increase in bacteria has been found, no bacteria has been

24   found coming out of the Bair Hugger blanket when it's used

25   as it's intended.

1        So, again, I am focused purely in this area on the

2    far left, the experimental and the theoretical, which is

3    never going to be enough to get you over the troubled waters

4    of the joiner gap, which is depicted right here, before you

5    get to the gold standard proof of causation.

6        The exploratory studies, again, from the far left

7    side of the graph here, those were all connected to

8    Dr. Augustine and his employee Mark Albrecht, and it's

9    detailed in our motion how those are connected.  I'm not

10    going to go through that here.  Just suffice to say that all

11    of these exploratory studies ultimately trace their origins

12    to Augustine by medical and design.

13        And Dr. Augustine has promoted two theories of

14    causation, two theories for how the Bair Hugger could cause

15    a surgical infection.  One, you just heard counsel use the

16    reservoir of infection.  This is --

17        THE COURT:  One it blows infection that's in the

18    thing, the other is it stirs up stuff that's on the floor?

19        MR. GOSS:  Yep, exactly right.  So this is the

20    reservoirs of infection brochure that he handed out at

21    American Society of Anesthesiology conference.  It says

22    contaminated air is blowing from the unit.  Particle

23    counters have measured more that 50 million germ-sized

24    particles.  And what are these 50 million particles?  Well,

25    not all of the particles are bacteria but bacteria can be

1    cultured from both the air and hoses of any many hot air

2    warming units.  That's actually not true.  Dr. Augustine and

3    Mark Albrecht tried to culture bacteria from the air of a

4    Bair Hugger system and they failed, so I'm going to talk

5    about that a little bit later.

6         The next theory is this air flow disruption theory

7    where waste heat from the Bair Hugger comes from under the

8    drapes and rises up over the patient and dumps particles

9    containing bacteria into the surgical site.  I think we

10   heard the term that the Bair Hugger churns up the air in the

11   operating room, so that's the other theory.  And those are

12   Augustine's theories, and plaintiffs have adopted them, and

13   so have their experts.

14        And the eight studies break down according to two

15   basic groupings that align with those theories.  They are

16   the three crud and bug studies where Albrecht went to

17   different hospitals and said, hey, we can swab bacteria out

18   of the hoses and out of the warming units and we can count

19   particles.  And so if we publish that, we'll get people to

20   think, aha, there are particles coming out, there are bugs

21   on the surfaces, the particles must be bacteria, but the

22   part that they didn't tell you was that they actually tried

23   to find the bacteria and they got none.

24        And then there are a five air flow disruption

25   studies.  The McGovern 2011 study actually began life as an

1      air flow disruption study, only later did they say, hey, we

2      you know, made the switch to HotDog, let's look at our

3      infection rate and see if we can make something of that.  So

4      it actually started out as one as one of these mechanistic

5      studies and only later became an observational study.

6           And those five air flow disruption studies used

7      bubbles, tracer particles, trace smoke to try to say that

8      this Bair Hugger system is churning the air in the operating

9      room which is a potential mechanism for infection.

10          This is just some shorthand for the plaintiffs'

11     experts actually espousing those theories.  So in the

12     reservoirs of infection, you have Mr. Koeningshofer saying

13     that the Bair Hugger draws particles off the floor into the

14     unit.  Dr. David says the Bair Hugger harbors bacterial

15     growth.  Mr. Buck says the Bair Hugger causes increase in

16     the number of particles in the operating room.  So that's

17     kind of in the reservoir of infection rubric.

18          For air flow disruption, you have Koeningshofer

19     saying the hot air from the Bair Hugger will interfere with

20     the downward flow of clean air from the ceiling diffuser.

21     And Dr. Elghobashi, of course, says based on the model that

22     he outsourced to one of his colleges, Dr. Abdi, the air flow

23     will be disrupted around the operating room table.

24          So the plaintiffs have adopted these theories that

25     were brought to life by Dr. Augustine, but they're theories.

1      And what numerous cases have held is that causation in a

2      medical tort case like this one has to be based on more than

3      a possibility.  And how do you get from possibility to

4      something that the Court can rely on in saying there's

5      enough here to go to a jury?  Well, there has to be testing.

6      And that's what Daubert said.  Daubert said, Ordinarily, a

7      key can question to be answered in determining whether a

8      theory or technique is scientific knowledge that will assist

9      the trier of fact is whether it can be and has been tested.

10             So it's not just is it testable, is it falsifiable

11     but has it actually been tested?  And there are a number of

12     cases that say you have to have testing in order to bring

13     that theory out of the realm of the possible and into

14     something that could be used to support a finding of

15     causation.

16             The *Polski* case from the Eighth Circuit is one

17     where a cough-cold treatment using zinc was accused of

18     causing the plaintiffs to lose their taste, their sense of

19     taste.  And the Court said that the plaintiffs' experts

20     relied on an unproven and indeed untested premise.

21             The *Worth* case is another example where the

22     plaintiffs did a lot of testing they had a lot of ideas

23     about what could have caused, this is actually a very tragic

24     case involving an infant who was burned in a baby bassinet,

25     and they had lots of theories about how this fire could have

1    started but they didn't test the one theory that they said

2    was what actually happened in the case, and so the Court

3    said, well, if you didn't test it, we're not going to admit

4    it.

5           So has there been testing of this idea that the

6    Bair Hugger emits or increases bacteria?  Yes, there has

7    been that testing for nine studies, published studies, over

8    25 years, that question has been tested and the answer has

9    been uniformly no.

10          And I understand Moretti came up again this

11   morning.  Mr. Gordon may have addressed this earlier, but I

12   just want to come back to what the results were of Moretti.

13   This is Figure 2 from Moretti that shows the results of the

14   bacterial sampling that was done in the operating rooms in

15   this study.  And, of course, there's at rest is what the

16   plaintiffs focus on, but here is the level of bacteria

17   during operations without the Bair Hugger, and here is the

18   level of bacteria during operations with the Bair Hugger.

19   And we're here to talk about surgeries in operating rooms

20   with people in there being operated on.  We're not talking

21   about a room with nobody in it.  We're talking about

22   surgeries that are taking place with people who bring their

23   bacteria to the surgery, whether it's the patient or the

24   staff or both.

25                 THE COURT:  Okay.  So I see it says operational

1    with no forced air warmer.

2              MR. GOSS:  Right.

3              THE COURT:  Is that -- I think maybe --

4              JUDGE LEARY:  Operational with forced air warmer.

5              THE COURT:  No, this one.

6              JUDGE LEARY:  Oh, I'm sorry.

7              THE COURT:  I think Mr. Assad was saying that that

8    is a measurement while the nurses and everybody is in there

9    getting the patient ready but then there's a drop

10   afterwards, but is this -- what does this say about whether

11   that high number is when the nurses are and everybody is --

12             MR. GOSS:  I don't think the study is clear what

13   happens during the operational period.  I mean, it --

14             THE COURT:  When it says operational, what does

15   that mean?

16             MR. GOSS:  During the operation, that's what I

17   take that to mean, during operations.  So regardless, the

18   conclusion of the study is what the Bair Hugger does not

19   increase the risk of nosocomial infections so that's

20   Moretti.

21             Let's see, I need to clear it.

22             THE COURT:  I can do it.  Don't worry about it.

23             MR. GOSS:  Oh, thank you.  There we go.  Thank

24   you.

25             So the secret study is done by Mark Albrecht and

1        at the behest of Scott Augustine.  The reason we call them

2        secret studies is that they bear directly on the papers that

3        were later published on this question of does the Bair

4        Hugger increase bacteria in the operating room, but these

5        studies were never disclosed.  It's work that is directly

6        relevant to the issue that was never disclosed in the

7        studies they published later.

8                So just coming back to this, there were four

9        hospitals that Albrecht went to, to look at Bair Hugger

10       devices, and he sampled four bacteria using agar plates

11       which we've heard about.  I checked last night on Amazon.

12       You can get ten of these for $16.80, so it's an inexpensive

13       way to measure bacteria, and it's commonly done.

14               Now, Albrecht went a little bit beyond just using

15       agar plates to measure bacteria in these hospitals where he

16       did his studies.  He actually used something called the

17       Anderson N6 impactor.  I've got part of it highlighted here.

18       And here's a picture of that device.  And what it is, it's a

19       pump that takes air either from the ambient operating room

20       or from the Bair Hugger machine from the end of the hose and

21       it pumps that air and impacts it using this device here onto

22       one of plates.  So you put a plate in there and then it

23       captures the air and literally injects it onto the plate.

24       So you make sure that you're getting a very good sample of

25       wherever it is you're trying to sample.

335

1          All right.  And let's see, what I need to show --

2     I don't know if you can do this, Brett, can you move this

3     out of the way?  That was meant to be animated.  This is a

4     table of the results that he got with the sampler.  Thank

5     you.  And the table on the left or the column on the left is

6     his impaction results.  And on the left you'll see he says,

7     distal hose end, distal hose end, ventilation.  And on the

8     far right where I have it highlighted it says CFU.  And you

9     can see that he's got zeros for distal hose end and for

10    ventilation.

11         Now, the one place of interest is operating room 3

12    where he's got seven there, and what he says in his report

13    is, as a note, we intended to sample all of the ORs at rest

14    but OR3 in Regina had personnel traffic pass through the

15    room while the sampler was running.  Well, that explains how

16    you get 7 CFUs.  There were people in there.  But otherwise

17    he got zero.  That's the results of his testing, using not

18    just a passive bacterial agar plate but a machine that's

19    actually designed to inject the air onto it.

20         So the results of that work that he did was he

21    found no difference in bacteria counts with the Bair Hugger

22    on or off in the operating room and no bacteria in the air

23    coming out of the hose.

24         And I want to come back to Oguz because that's the

25    most recent example of a published study comparing bacterial

1    deposition rates between Bair Hugger and a convection device

2    that does not blow air -- I'm sorry, conductive device that

3    does not blow air and that's the HotDog.  And there may have

4    been some question about whether any of the authors were --

5    had an association of some sort with the parties in the

6    litigation.

7            Oliver Kimberger is a researcher that 3M has

8    retained to do work in the past, but he's also done work for

9    Dr. Augustine.  And in fact, he was a co-author on the Reed

10   crud and bug paper from 2013.  This is what Albrecht

11   referred to as the European crud and bug paper.  He a crud

12   and bug paper in Minnesota where they went to Minnesota

13   hospitals and they said, well, we swabbed bacteria out of

14   devices and we blew particles out of them; therefore,

15   conclude what you will, there must be bacteria coming out of

16   the device.  Never mind the fact that he tested and didn't

17   find any.  So Kimberger is the co-author on the study that

18   was done in Europe at Kimberger's hospital in Vienna.  And

19   so they finally published this study in 2013.

20           But back in 2011 they were still working on the

21   manuscript, and Mark Albrecht wrote an e-mail to

22   Dr. Kimberger, and he said, "Say Oliver, would you able to

23   do me a small favor?  I'm hoping you could go through the

24   attached manuscript and identify what needs to be removed to

25   get rid of the agenda, all of us at the company here are too

1    close to this and are not being objective as to what the

2    data supports, we would be really appreciative of any advice

3    you can offer."  So Dr. Kimberger writes back, and he says,

4    "Dear, Mark.  I will try sanitizing the manuscript in the

5    next week.  Best regards, Oliver."  So this is someone who

6    has a connection to the issues.  He's certainly in this case

7    not a friend to 3M's side of it.  He's aligned with

8    Dr. Augustine and he's helping Mark Albrecht.

9            Now, this is the page from the Oguz paper that has

10   the diagram of the placement of the different plates, and

11   plate 4 is the one that's arguably closer to the surgical

12   site.  And there was a lot quoted from Oguz yesterday, and I

13   wanted to give the Court the full quote.  So first they

14   start out by saying, In our study it was not possible to

15   detect any higher bacterial counts on any plates.  So there

16   are all of these plates, and they said any plate.  In the

17   forced-air warming group verses the resistive warming group.

18   True, the study may not obviously -- or may obviously not be

19   generalized for an overall safety statement on forced-air

20   warming and is primarily applicable in a particular surgical

21   setup, so that's the limitation of the study.

22           But they go on.  However, with class action

23   lawsuits, judging the scientific question of forced-air

24   safety with unsuitable, i.e. legal means, subsequent studies

25   are all the more warranted.  Only a large randomized

1    controlled trial of forced-air warming versus non-forced-air

2    warming will help to decide if patient outcome is influenced

3    by the use of forced-air devices.  Until this study has been

4    performed, the hypothesized risks of forced air warming

5    remain unclear.  With a multitude of factors influencing a

6    patients risk for perioperative infection, only this kind of

7    a study will be able to answer the question if forced-air

8    warming is a major influence on surgical wound contamination

9    whose voice can be reliably detected in the large choir of

10   all the other factors, like you heard about from Dr. Wenzel

11   and Dr. Hannenberg.  The large choir of all the other

12   factors that are associated with surgical infection.

13          So Oguz is who's not lawyer basically reiterated

14   the framework that we laid out, that Mr. Blackwell laid out

15   at the beginning, that if you're really going to answer the

16   question, you need to have an RCT, if you're going to answer

17   the question scientifically.  Short of that, all you have is

18   theory and the need for more study.

19          So what testing have plaintiffs' engineers done?

20   I heard the CFD referred to as a test.  Respectfully, it's

21   not a test.  It's a simulation.  It's a computer similar

22   based on certain inputs.  And in fact, the inputs as I'm

23   going to explain, were not validated and are not supported

24   by actual real world measurements.  But first I want to talk

25   about particles.  The plaintiffs retained Mr. Buck at the

1    University of Minnesota to do a particle counting

2    experiment.  And so he took a Bair Hugger device into a

3    clean room over at the Department of Environment Health

4    where he works, and he hooked it up to a particle counter.

5    That's this device right here.  And it has a probe.  I think

6    you can kind of see right there.  And he's counting

7    particles that are coming out of the hose.

8              All right.  And then after he did that experiment

9    he wanted to see, well, what's coming out of the blanket?

10   So then he set up the Bair Hugger, attached it to a blanket

11   and he put the blanket in this Rubbermaid tub and he put the

12   particle counter and the probe inside the tub to see what

13   particle counts he would get coming out of the blanket.  So

14   those were the two groups of experiments that he did.

15             He didn't look for bacteria.  Were you asked to do

16   an evaluation of bacteria counting as part of your testing?

17   No.  And, you know, as I pointed out, these agar plates are

18   not expensive.  And Mr. Buck testified that he's actually in

19   charge of the micro lab for his department at the

20   University, so one would think it would be a fairly simple

21   plate to but in an agar plate in the Rubbermaid tub or in

22   the clean room, take it to the micro lab and see what you

23   get, but that was not done.

24             He used the particle counter.  And what the Court

25   can see from this picture is the particle counter actually

1     breaks down the particles according to different sizes.  And

2     that's really important because we know that certain

3     particles are too small to carry bacteria.  This actually

4     shows a fairly typical distribution of particle counts

5     within a room.  There will be a very large number of very

6     small particles, and that's just airborne dust.  Very small

7     particles.  And you'll have hundreds of thousand of those

8     particles in any given sample.  But you'll have fewer

9     particles that are -- fewer of the larger particles, those

10    will tend to settle out, and so a typical reading from a

11    particle counter will look a lot like this.

12            And so these are some of Mr. Buck's results from

13    the test inside a clean room.  And at the beginning of the

14    experiment, he turned the Bair Hugger on.  And you can see

15    he gets these spikes in particles, large numbers of

16    particles, but if you take out the particles that are too

17    small to be bacteria or to carry bacteria, you get a very

18    different picture.

19            And this is just a quote from the plaintiffs'

20    brief in opposition.  They say, Everyone in this case agrees

21    that at least 10 micron size particles can carry CFUs.  We

22    agree that 10 micron particles can carry CFUs.  Are -- we

23    have the only microbiologist in this case, it's Dr. Jim Ho,

24    he actually says particles as small as two and a half

25    microns can carry bacteria, smaller than that is too small,

1       they won't be carrying viable bacteria.

2               So if you look at Mr. Buck's results after you get

3       rid of the particles that are too small to be bacteria, too

4       small to carry bacteria, this is what it looks like.  You

5       get a small number of bacteria in the two to five micron

6       range, slightly more in the five to ten micron range, and

7       very few in the greater than ten micron range which is kind

8       of the sweet spot for the plaintiffs that they've

9       identified.

10              And if you look, this orange bar for those greater

11      than ten micron particles, where you see them is at the

12      beginning and the end of the experiment, and that's not a

13      coincidence because what -- the way that Mr. Buck and his

14      colleague did the experiment, they would actually walk into

15      the room, turn the machine on and then walk into the room at

16      the end and turn it off.  And so Mr. Buck said at his

17      deposition, So putting in the blanket into the container,

18      did that generate particles?  Well, I don't want if it did

19      or not.  Probably did.  Well, we could have put particles in

20      the container as we were putting the Bair Hugger in there or

21      the blanket in there, that's a possibility.  Isn't it a

22      probability?  Well, it could be a probability, yes.  So they

23      weren't wearing gloves, they weren't in containment suits,

24      they just walked into the room, turned it on and then turned

25      it off, so the higher readings at the beginning and end are

1       not a coincidence.

2               So there are a lot of these studies, the Augustine

3       studies, that have looked at particle counts.  And you saw

4       in Augustine's brochure he really focused on this idea of

5       millions of germ-size particles coming out of the Bair

6       Hugger, but we know that it's only the particles that are in

7       the 2.5 micron and greater range that matter, and according

8       to the plaintiffs, they've to be ten microns or greater.

9               Well, let's look at the studies.

10              Albrecht's first study in 2009, he said that the

11      FAW blowers were emitting significant levels of internally

12      general airborne contamination in the .5 to 5 micron size

13      range.  Well, as the Court has just seen, that is a pretty

14      broad distribution.  We know that the particle counter

15      measures particles in several bands smaller than that and

16      that that's where most of the particles are, in that .3, .5

17      submicron level.  Here, they're all lumped together up to

18      five microns, so we don't knee really know what he measured

19      at each level, and very likely he included in his count a

20      number, a large number, of particles that are too small to

21      be bacteria or to carry bacteria.

22              The next one in 2011, all he says about the

23      particle count is we counted particles greater than .3

24      micron.  Well, that includes a whole lot of particles that

25      are too small to carry bacteria or to be bacteria.  He

1    didn't break down which particle sizes he actually measured.

2         Reed in 2013, this is the final European crud and

3    bug study, again, greater than .3 micron pure cubic foot.

4    That's going to include a whole lot of particles that are

5    simply irrelevant.

6         Legg actually broke out the particles, particle

7    sizes that they counted in 2012, and you can see there's a

8    large number of .3 micron particles.  I just obscured part

9    of that.  Relatively small number of .5 micron particles,

10   and only 3.6 in the five micron size range.  So out of all

11   of those particles, the only ones that are really relevant

12   are the ones in the 3.6 at the end there, the only ones that

13   are potentially relevant.

14        So, and then finally, the next Legg study from

15   2013 reported an alarming number of particles in the

16   forced-air warming group, 2,174,000 compared to only 1,000

17   for the radiant warming HotDog group.  That's a very large

18   number of particles.  What would account for that?  Well, in

19   the method section of the paper, they disclose that they

20   wanted to visualize the air flow while they were doing this

21   experiment and so they rented this machine, a Rocket PS23

22   smoke machine, from Pea Soup Limited in Ingleby Barwick,

23   United Kingdom, and that machine was actually pumping out a

24   continuous flow of .3 micron glycerol tracer particles.  So

25   the 2,174,000 particles, those are all being pumped out of

1    this machine and they're all .3 micron size particles which

2    everybody agrees are irrelevant because they're too small to

3    be bacteria or to carry bacteria.

4           All right.  So that's what the studies show about

5    particles, but what about the ability to use particles to

6    actually predict bacteria in the air and the risk of

7    infection.  And --

8           THE COURT:  So hold that until after lunch?

9           MR. GOSS:  Sure.  Yes, ma'am.

10          THE COURT:  We will be in recess until one clock.

11          THE CLERK:  All rise.

12               (Court adjourned at 12:16 p.m.)

13

14                    (1:08 p.m.)

15          THE COURT:  Please be seated.  All right.

16   Mr. Goss.

17          MR. GOSS:  Thank you, Your Honors, if I may

18   continue.  All right.  So when we left off, we had just

19   finished talking about the particle counts that were shown

20   in these various studies and how actually a lot of important

21   information about the sizes of the particles had been left

22   out.  Moving on from that, we turn to the question of what

23   can you do with that particle data as far as predicting

24   either bacteria in the air or bacteria in the wound or even

25   to go so far as to predict based on a particle count whether

1    somebody has a risk of infection?  And what the case law

2    says is that for any of this to be admissible and for any of

3    this to carry plaintiffs' burden, you have to show that it's

4    able to reliably predict an effect in humans, and that's

5    what the *Prempro* case says, that you can use lab results but

6    you have to be able to explain how those lab results will

7    reliably predict effects in living humans, and the evidence

8    in this case is that you can't reliably predict based on

9    particle counts either bacteria in the air, bacteria in the

10   wound, or, further most from it, is actual risk of

11   infection.

12           This is a review that was published in 2016 before

13   the Darouiche study.  It's a review by Mora of

14   microorganisms in confined habitats, microbial monitoring

15   and control of intensive care units, operating rooms, clean

16   rooms, and the international space station, because if

17   you're going to spend a bunch of time up there, you might be

18   concerned about bacteria in confined spaces, so this very

19   article reviewed all of the literature.

20           And with respect to using particle counts to

21   predict bacterial count in air, the reviewers noted that

22   many studies have argued that the results of the particle

23   count method do not correlate with the bacterial count

24   results.  And they point out as examples the Landren paper

25   which is in the exhibits, Scaltriti which is unfortunately

1      not, and the Kristina study which is also in the exhibits.

2              They go on to say that only two studies have shown

3      that there is a correlation between the number of airborne

4      particles and the number of CFUs, and those are Celon and

5      Clark from 1990.  And then 20 years later Stocks did it.

6      This is the Stocks paper from 2010, so it's a few years

7      before the international consensus meeting.  This was

8      published and available in the worldwide literature.

9              And the interesting thing about both the Stocks

10     and the Darouiche papers is they actually have a common

11     theme and a common motivation.  You'll notice that a

12     coauthor on the Stocks paper is this --

13             MR. GOSS:  The author on the Stocks paper is this

14     gentleman named Sean Self, and he is the president and CEO

15     of a company called Nimbic Systems, and Nimbic Systems makes

16     a device for use in the operating room called the Air

17     Barrier System, and what it is, it's over here on the left

18     or on the right.  Sorry.

19             It is a device that sucks air up from below the

20     operating table, by the looks of it, filters it, runs it

21     through a hose, and then this nozzle here is mounted to the

22     patient, and it blows air across the surgical wound.  That

23     is the Air Barrier System that the Nimbic Systems Company

24     makes.

25             And this is Dr. Stocks here in a YouTube video

1    promoting the Air Barrier System, and naturally, if you're

2    selling a device that filters air in the operating room and

3    blows it over the surgical wound, you would want to try to

4    establish in the marketplace that it actually does

5    something, that it doesn't just reduce particles, but it

6    actually reduces bacteria and reduces the risk of infection,

7    and so that was the motivation for both the Stocks study and

8    the Darouiche study.

9           Here's a picture of the Air Barrier System from

10    the -- this is actually from the Darouiche article.  Counsel

11    mentioned that this was a randomized double-blind controlled

12    trial, and it was to prove the effectiveness of this Air

13    Barrier System.  So you can see what they do with it.  They

14    take this nozzle, and they mount it to the patient's torso,

15    and then it blows right over the surgical wound, and this is

16    a diagram of their test setup in Darouiche where they the

17    nozzle blowing air right over the wound, and then they have

18    these tubes to collect airborne CFUs and particle sampling.

19           And so it's a bit ironic, but the plaintiffs are

20    relying for their proof of correlation to particles and to

21    bacteria on tests designed to validate a device that blows

22    air in the operating room.  Nevertheless, going to the

23    Stocks article, the authors noted that they only found

24    correlation for particles of 10 microns in size or greater.

25           And they said even for that group of particles,

1    the correlation or the precision of predicting the counts

2    was limited, and if you look at their data, you can see why.

3    So here on this axis you have the colony forming units, and

4    here you have the numbers of 10 micron particles per cubic

5    meter.

6            For all of the dots, that's their data, and you

7    can see it's kind of all over the place, and these lines are

8    their confidence intervals.  And what our microbiologist

9    Dr. Jim Ho will tell you, he's an expert in airborne

10   bacteria, is that this distance is the size of a mile, and

11   that means you can't make reliable predictions based on that

12   data in terms of determining from a particle count how many

13   10 micron bacteria you're going to have per cubic meter.

14           So I'll come back here, and now Darouiche.  The

15   problem with Darouiche is, the authors noted in their

16   methods that they took particle counts at each of these

17   sizes .3 microns, .5 microns, 1 microns, 5 microns and

18   greater than 10 microns, but they didn't report the

19   breakdown by size.  Instead, if you look at the results in

20   Table 2, this is for total hip arthroplasty, they list it as

21   total particulate.

22           So just like Legg and Albrecht, they lumped all

23   the particles together.  So that's how you get these larger

24   numbers of particles and then these small numbers of CFUs,

25   but we know within that roughly 200,000 particles, there are

1    a whole lot of particles that are too small to be bacteria

2    or to carry bacteria.  So how can you make a reliable

3    correlation, knowing that those large numbers are simply not

4    going to be bacteria or even capable of carrying bacteria?

5            After the Darouiche study came out, this is from

6    the Nimbic Systems Facebook page.  They posted it.  They say

7    the Air Barrier System was featured in a ground-breaking

8    clinical trial demonstrating a reduction in costly implant

9    infections, and you'll notice the title is the same, it is

10   Darouiche.  The Association of Airborne Micro Organisms in

11   the Operating Room with Implant Infections.

12           And then down here we've got Sean Self saying,

13   this is great research.  All right.  And the point of this

14   is not to say that it is a terrible study, that it's, you

15   know, this bias ruins it completely, but it was done for a

16   reason.  And that reason is, once again, marketing based,

17   and it raises a question for the Court beyond the fact that

18   the data doesn't support a correlation, it's another indicia

19   of unreliability the Court should take into account in

20   deciding whether the plaintiffs can meet their burden in

21   this case.

22           We also heard a lot about how Darouiche correlated

23   the number of bacteria with the risk of infection.  So

24   setting aside the lack of correlation between particles and

25   bacteria, Darouiche reported a correlation between bacteria

1    levels and infection.  The problem is, Darouiche didn't

2    actually try to determine whether the species detected in

3    the air was the same as the species that the plaintiffs

4    later developed in their infections.

5           And that's important because in this study by

6    Birgand in 2015, the authors actually found that the air

7    contamination was not significantly associated with the

8    wound contamination.  So they actually cultured what was in

9    the air, and they found that what was in the air were

10   species than what they swabbed out of the surgical wounds,

11   which they did in that case.

12          And so they say, A large number of surgical wounds

13   are contaminated at closure.  Organisms may be endogenous

14   and arise from patient skin flora, or they may be exogenous

15   arising from the surgical team or in the air.  This

16   combination of endogenous and exogenous organisms can

17   confound the relationship between the quantitative presence

18   of organisms in the air and those colonizing the wound

19   during the surgery.

20          In other words, just because you have bacteria in

21   the air, you can't assume that a subsequent infection came

22   from the air and that the bugs that gave rise to the

23   infection are the same as the ones that were in the air

24   during the surgery.  There has to be a correlation, and that

25   wasn't shown in Darouiche.

1          And I also want to come back to the Albrecht work

2     because unlike Darouiche and Stocks, which are we looking at

3     the Air Barrier System, Albrecht was actually testing the

4     Bair Hugger system, and he was trying to correlate particle

5     counts in these different size ranges with bacteria.  And

6     he, of course, found no correlation, and that's the most

7     relevant data we have on any attempt to correlate with the

8     Bair Hugger.

9          I want to turn now to one of plaintiffs experts,

10     Mr. Koenigshofer, who is the only expert of the plaintiffs

11     who really touches on this issue of the filter.  He will

12     tell you that he's not a filter efficiency expert.  He's not

13     an expert in the method used to determine filter efficiency,

14     but he does say that the Bair Hugger filters are less

15     efficient than what's in hospital HVAC systems, and that's

16     not quite right.

17          The Bair Hugger filters actually do meet a

18     standard that's set by the American Society of Heating,

19     Refrigeration & Air Conditioning Engineers.  That's the

20     industry body that sets regulations for or industry

21     standards, I should say, for filter efficiency.  And

22     Mr. Koenighofer is a member of it.

23          Our expert Michael Keene is a member of ASHRAE,

24     and the standard that applies to filtration in operating

25     rooms is 170, and that's right here, ASHRAE 170.  What

1    ASHRAE 170 says is, in operating rooms for Class B and C

2    surgery, which would include ortho, the minimum requirement

3    for filtration, they have two filter banks.  One is kind of

4    a pre filter, and then the filter bank number two is the

5    final filter that filters the air going over the patient,

6    you have need a rating of MERV14.

7            And in fact the filters used in the Bair Hugger

8    devices are MERV14 and have never been lower than MERV14, at

9    least for the model 505 and 750, the models that will be at

10   issue in these cases, and the ASHRAE 52.2 standard is the

11   standard for determining filter efficiency.  That's how you

12   get to a MERV rating, and they have a very specific test

13   method, and you determine the efficiency based on how well

14   the filter captures particles in three size ranges .3 to 1,

15   1 to 3 and 3 to 10.

16           So for MERV14, you have to filter at least

17   75 percent of particles between .3 and 1, more than

18   90 percent of particles between 1 and 3, and more than

19   90 percent of particles between 3 and 10.  And just to give

20   the Court some perspective on the size of the particles

21   we're dealing with, typical human hair is 75 microns thick,

22   and the particles that we're filtering with an MERV14 filter

23   are down in this size range at the bottom here, .3 --

24   sorry -- .31, 3.0 and 10.0.

25           And the typical shed skin cell is between 10 and

1    50 microns.  So again to give you some perspective, if you

2    can filter pretty well at this level, then you're not going

3    to have much trouble filtering things that are that big.

4         All right.  This is a filter efficiency test

5    result that 3M obtained from a lab in Bloomington, LMS Labs,

6    for a Bair Hugger filter, and it's done according to test

7    standard 52.2, 2012, and by the way, this is a specification

8    that 3M has imposed on its filter supplier.  They have to

9    occasionally pull filters and submit them for testing to

10   make sure that they meet this MERV14 standard.

11        And the results show for the .3 to 1 micron range,

12   it captures 81.5; for 1 to 3, 98.7; 3 to 10 microns, 100

13   percent.  So just to compare it to the standard, here's just

14   a comparison of the standard against these test results.

15   For those smallest particles, you've got to be above

16   75 percent.  We exceed that.  For the next range, you got to

17   be better than 90 percent.  We have exceed that, and for the

18   final range, we are at 100 percent.

19        And by the way, it's important for me to provide

20   some context, too.  There's no FDA regulation that requires

21   warming devices to have a filter of any sort.  There's no

22   FDA regulation that applies to any fan blowing devices in

23   the operating room that will require any level of filtration

24   so this is a voluntary --

25        THE COURT:  It's filtering the air that is taken

1     up from the unit and then goes into the hose, or is it at

2     the end of the hose, or where is this?

3              MR. GOSS:  Yes.  Great question, Your Honor.  It's

4     right at the intake of the device, and so the plaintiffs

5     have said the device sits on the floor.  I mean, it can sit

6     on the floor, but it actually has a hook mount.  I don't

7     know if you remember from science day.  We had one of

8     these --

9              THE COURT:  But wherever it sits, the filter, the

10    filter is only relevant to what goes into the Bair Hugger,

11    not goes out and also not relevant -- so not to any

12    expulsion of bacteria that might be already in the unit

13    itself or -- and it also doesn't have anything to say about

14    the air disruption.

15             To the extent you've got air coming, you know, the

16    air disruption wouldn't be affected by a filter, and

17    anything coming out of the unit itself wouldn't be affected

18    by the filter, but this would affect the mechanism of

19    drawing micro organisms from the floor into the Bair Hugger

20    and then onto the patient or into the air, right?

21             MR. GOSS:  That's right, Your Honor.  It's

22    designed to filter out the intake, and again, that's whether

23    it's on the floor or -- and it's often mounted to the pole.

24    We also sell rolling carts so you can put it on the cart.

25    It is more ergonomic for the CRNA.

1          THE COURT:  Wherever it is.

2          MR. GOSS:  Wherever it is, but you're right, Your

3     Honor.  The filter it about the intake, and it doesn't have

4     any impact on the air flow, other than to slow the air flow

5     somewhat because it's got to go through the filter, but it's

6     a completely separate issue from the plaintiffs' air flow

7     disruption theory.

8          All right.  So you can see with this result, you

9     know, we're filtering 100 percent of the particles between 3

10    and 10 microns, and the standard only calls for 90 percent,

11    and we know that skin cells are at least that big and often

12    bigger.  Then it really comes as no surprise that the ASHRAE

13    filter efficiency standard when they look at what kinds of

14    contaminants should be controlled by which filters, they say

15    that filters in this range of MERV13 to 16 are appropriate

16    for controlling all bacteria because we know that bacteria

17    is either going to be in a cluster, or it's going to ride on

18    a particle that is of a size that is going to be easily

19    filtered by filters in that class.

20         So HEPA, just so the Court understands, HEPA is

21    focused on filtering particles that are below 1 micron.

22    Those are the tiny particles that aren't relevant to the

23    question of airborne bacteria.  So for this application,

24    ASHRAE, the authority for establishing filtration efficiency

25    standards, they say that this is appropriate for all

1     bacteria, and that's what the Bair Hugger filter is.  It's

2     an MERV14.

3          I want to turn to Dr. Elghobashi and the CFD

4     simulation that he, actually he was retained by the

5     plaintiffs, but he had a colleague of his, Dr. Apte actually

6     run the software to come up with the model, but he started

7     out by visiting an operating room.  This is a picture from

8     his report.  I believe it was in Santa Monica, and they had

9     someone prepped and draped for a knee surgery.

10         And you can sort of see from the lines that they

11    took a bunch of measurements so that they could get the

12    measurements right in the CAD drawing that they were going

13    to use for the model.  So they got out the ruler and

14    measured the size of the drapes, and they came up with this

15    schematic and identified a few key features.

16         So they have the knee area here, the Bair Hugger

17    here, and actually it looks like it's sitting on a cart

18    there.  I'm not sure if that's what was intended or not, but

19    then the critical boundary condition in the model is this

20    area around the surgical drape, which is meant to mimic

21    this.

22         And what Dr. Elghobashi assumed for his model is

23    that all the air leaving the Bair Hugger blanket is going to

24    come out the edges of this drape, and it's going to come out

25    at the same temperature and at the same velocity all around

1       that edge.  So and again, this same applies over here, that

2       the air is all coming out.  For the most part it's coming

3       out this way.

4                  Now, in truth, where the air really comes out is

5       around the head and neck of the patient, and there are

6       several studies that comment on that.  That's where most of

7       the air comes out is around the head and neck, but this is

8       where Dr. Elghobashi assumed that the air was coming out,

9       and he assumed certain conditions relating to that.

10                  So I apologize that this is a bit small, but he

11      says a Dirichlet boundary condition is applied such that the

12      air injected into the room perpendicular to the edges of the

13      drape with this calculation, and what the calculation says

14      is, it's going to come out at a certain velocity,

15      .2694 meters per second, which translates to 53 feet per

16      minute, and then the temperature of the air leaving it is

17      going to be 106 degrees or 41 degrees Celsius.

18                  So those are the key conditions, that the air

19      coming out here and here is going to be coming out at

20      106 degrees and 53 feet per minute all around that boundary,

21      and he didn't actually measure that.  He assumed it, and he

22      was asked in his deposition, Well, why didn't you take

23      measurements to try to see what was actually coming out

24      around that drape boundary?  And he was asked, You thought

25      it was unnecessary to obtain those instruments and to do the

 1    preparation necessary to actually measure the temperature;

 2    is that right?

 3              Well, I never thought unnecessary.

 4              Well, you never thought it was unnecessary?

 5              Correct.

 6              So you thought it was necessary?

 7              Well, yes.

 8              Well, why didn't you do it?

 9              I substituted by thinking hard.  That is what he

10    said.

11              Now I will readily concede that is he a brilliant

12    man, but no amount of thinking is a substitute for empirical

13    measurement when you're trying to make sure that you have

14    got valid inputs for a computer model, especially a very

15    expensive one like this.  I think plaintiffs said they spent

16    about $120,000 on it.  You want to make sure you get it

17    right.

18              He said, Well, I didn't have the equipment with

19    me, and it's very expensive and laborious to get everything

20    together that you need to make sure that you get the

21    temperature right and the velocity right for measurements.

22              Well, there's a company here in St. Paul called

23    TSI that makes these devices called Hot Wire anemometers.  A

24    lot of companies make these.  You can buy them on Amazon.

25    This is kind of a nicer one, but it costs 1,00, 2,000 bucks,

1    something like that.  You can get them more cheaply on

2    Amazon for less than $200, and our mechanical engineering

3    filter expert from the University of Minnesota, Dr. Tom

4    Keene, said, well, something about this assumption of

5    106 degrees and 53 feet per minute doesn't sound right, so I

6    want to check it out.  You know, do you guys, can you take

7    me somewhere where I can actually see what comes out of the

8    drape?

9         And this is just the readout that you get from the

10   an meter.  The big number is the velocity in feet per

11   minute, and then there is temperature and relative humidity.

12   So we took Dr. Keene over to 3M campus, and we had a room,

13   not an operating room, but a room where we had a draped

14   mannequin set up.  There were a couple of nurses,

15   consultants to 3M, that prepped and draped the mannequin in

16   the usual way.

17        And he used the anemometer.  You can see this wand

18   here to measure the temperature at the edge of the drape

19   with the Bair Hugger off, and he got 67.3 degrees and 2 feet

20   per minute.  Then he turned it on just on ambient air,

21   66 degrees and 3 feet per minute, and then he turned it on

22   with the warm air setting, and the highest he got after

23   waiting a few minutes was 72 degrees, 4 feet per minute.

24        Now plaintiffs are going to tell you that there

25   are all kinds of problems with Dr. Keene's temperature

360

 1    readings, but literally all he was doing was taking this Hot

 2    Wire anemometer and this wand and saying, okay, if I put

 3    this next to the drape edge, what do I get?  Do I get

 4    anything close to what Dr. Elghobashi assumed?

 5              THE COURT:  Did Dr. Elghobashi come up with that

 6    106 by looking at Bair Hugger marketing material that said

 7    that the temperature that comes out is 106 or 105 earlier?

 8              MR. GOSS:  Yes, he did.  He said he assumed that

 9    temperature based on what the reported temperature was in

10    3M's CFD, which was actually shown at science day, and it's

11    been available on YouTube for quite some time.

12              THE COURT:  So why is 3M saying it comes out at

13    106 if it comes out at 72?

14              MR. GOSS:  Right.  And the difference has a lot to

15    do with the burden of proof.  So Dr. Abraham, who built our

16    model, was assuming a worst case scenario.  We know that the

17    device is calibrated for 43 degrees Celsius at the end of

18    the end of the hose, 109 Fahrenheit.  So he said, I'm going

19    to assume that it only goes down a little bit because I want

20    to test the worst case to see does this disrupt the air in

21    my model?

22              And so he assumed a very high model, a high

23    temperature in order to really give the plaintiffs' argument

24    the best chance it had to disrupt the air flow over the

25    operating room table in his model, and it actually didn't.

1      Now, a lot of it has to do, a lot of the difference has to

2      do with where the air is coming out, where the air is coming

3      out and how it's coming out.

4           So Dr. Abraham took the studies that there were

5      and said, well, most of the air is coming out of the head

6      and neck area, and he used a larger area.  So you're not

7      going to have as high a velocity for one thing, but

8      Dr. Elghobashi says, it's all coming out here, but again,

9      the main difference is the fact that Dr. Abraham wanted to

10     model a worst case scenario.

11          The plaintiffs are trying to prove, based on this

12     CFD alone, that there is a positive association and a causal

13     relationship between the Bair Hugger and airborne bacteria.

14     It's very different.  We're just using ours through

15     Dr. Abraham as a demonstrative to say, in this hospital,

16     which is modelled after a hospital OR at Fairview Southdale,

17     and only at that OR, the Bair Hugger didn't disrupt the air

18     flow.

19          So we're not really trying to generalize.  It's a

20     demonstrative from that situation.  Whereas, the plaintiffs

21     are saying based on this CFD alone, we think the

22     international consensus should change, we think this case

23     should go to a jury.  So a very different use of CFD.  Okay.

24          Others took measurements.  So another one of our

25     experts who did the Sclieren images, Dr. Settles, he took

1    temperature measurements around a draped mannequin, and the

2    highest temperature he got was 75 degrees.  Actually, in 75

3    in that setup, and then under the drape he got up to 82, but

4    still a far cry from 106 degrees.

5           One of the studies that the plaintiffs rely on,

6    the Legg study, they took temperature readings of the drape.

7    So bar chart showing the theater and drape temperatures for

8    the various types of warming, where the highest they got for

9    forced air warming was 27 degrees Celsius, 80 degrees

10   Fahrenheit.

11          So what you see is, they're just isn't anyone

12   measuring a temperature even close to what Dr. Elghobashi

13   assumed.  Dr. David, another one of plaintiffs' experts, he

14   actually tested a Bair Hugger blanket right under the

15   blanket to see what temperature he could get, and he only

16   got 36 degrees.  Now he says, well, it was a used Bair

17   Hugger unit that I bought off eBay and had fault codes, and

18   I don't know.  Maybe something was wrong with it.

19          But the highest temperature he got was 36 degrees

20   Celsius, which is still significantly less than the

21   41 degrees Celsius that Elghobashi assumed.  Nevertheless,

22   based on this model, we have these huge clouds developing,

23   storm clouds over the operating table.  Well, if you assume

24   the higher degree of energy in temperature and velocity for

25   your model, you're going to put a lot more energy into that

1   model, and you're going to see this kind of result.

2          And this is how you might say that a hurricane

3   could make landfall in Missouri or Minnesota, by putting

4   that much more energy into the system, into the model,

5   you're going to get a skewed result, and what plaintiffs

6   really want to show is that their computer model, and it was

7   done with a computer of which there is only ten in the

8   world, one out of ten in the world, that super computer and

9   their indisputably highly qualified expert, managed to put

10  the bacterial bugs in the knee, and that's their proof of

11  causation.

12         Well, it's only as good as the inputs, and there

13  just isn't reliable support for the inputs, and

14  Dr. Elghobashi did not do any sort of experiment in the real

15  world to see, is the result of this model valid?  He didn't

16  do it.  Now Dr. Abraham testified -- well, he didn't

17  testify.  He was at science day and talked about the

18  importance of validation and how he got burned once when he

19  did a model without validating it and it was proven to be

20  incorrect.

21         After that, he learned to validate, and so what he

22  did with his CFD is, he then went to the same hospital at

23  Fairview Southdale, the same operating room, and did an

24  experiment with a fogger to see, well, does the fog water

25  vapor get over the operating room table with the Bair Hugger

1    on?  And the experiment showed, no, it didn't.  So it was

2    consistent with the results of his model.

3              Dr. Elghobashi did not do any sort of flow

4    visualization experiment to show anything resembling the

5    storm clouds amassing over the operating table that you see

6    in his model.  The other thing that --

7              THE COURT:  Why don't most of the air come out by

8    the head and shoulders?  Is it not taped there or something?

9              MR. GOSS:  Yeah, that is basically where it's not

10   taped there so that it's kind of directed away from the

11   anesthesia screen.  I think I would refer to my partner, the

12   former OR nurse, to answer that question if I could, but my

13   understanding is that it's not taped, and it's kind of all

14   directed in that area.  It's not to say that air doesn't get

15   out in other places, but most of it is going out the head

16   and neck, and I think it's even the McGovern study that says

17   that.

18             The other thing that Dr. Elghobashi does not take

19   on directly in his report is work done by the National

20   Institutes of Health.  There's a CFD expert there named

21   Farhad Memarzadeh who actually has done a lot of work with

22   CFD in operating rooms, and the ASHRAE 170 standards are

23   largely based on work that he has done, and he modelled a

24   Bair Hugger into his operating room model to see is this

25   going to have an effect on air flow.

1    And what he concluded and he says, speaking for

2    the NIH, NIH concluded that in both scenarios there is

3    0 percent deposition on the patient for the contaminant

4    sources and the heat generated by the patient provides some

5    protection, and that last bit is important because the

6    patient actually generates some heat, and my partner who

7    will talk about Sclieren, shows there is a thermal plume

8    that can actually be protective.

9    So when things are falling with these tiny

10   particles, your own heat wave can kind of push them to the

11   side, and the idea behind the velocity in the OR is, you

12   don't want it to be so fast that it actually disrupts your

13   own protective thermal plume, and so that's what he's saying

14   her, that the Bair Hugger doesn't disrupt, doesn't cause

15   particles to fall into the surgical site, and the heat

16   generated by the patient provides some protection.

17   And he says, This investigation validates

18   Moretti's conclusion that forced air warming technology does

19   not increase the risk of surgical wound infection.  Now,

20   what Dr. Elghobashi says in his report, he looked at earlier

21   work by Dr. Memarzadeh or Memarzadeh -- I never know quite

22   which -- did not include the Bair Hugger.

23   And he says, well, that work used a different set

24   of equations.  He used the Reynolds average Navier Stokes

25   equations, and for reasons that I wouldn't be able to

1    understand, that isn't a valid model.  They should have used

2    large-eddy simulations, but what Dr. Memarzadeh does not

3    take on directly is this specific work by Memarzadeh looking

4    at the Bair Hugger and saying, my model shows Moretti was

5    right.  It doesn't increase the risk of surgical wound

6    infection.

7              Just quickly want to turn to Dr. David because he

8    doesn't have a lot to say about general causation.  He did a

9    literature review and included all of the Augustine studies

10   and essentially none of the negative bacteria studies, or at

11   least he doesn't comment on any of those.  And I would just

12   point the Courts to this decision in the Rezulin MDL where

13   the Court held, If the relevant scientific literature

14   contains evidence tending to refute the expert's theory and

15   the expert does not acknowledge or account for that

16   evidence, the expert's opinion is unreliable.

17             And that's what we're saying is true of Dr. David.

18   He looked at all of the Augustine exploratory studies, but

19   he really didn't address in his report or his opinions the

20   nine published studies finding no bacteria.  So I want to

21   come back to what Augustine himself said about -- actually,

22   this was in reference to Reed saying, why don't we try to

23   swab surgical wounds and see if we can match bacteria to

24   bacteria in the air when we're using the Bair Hugger.

25             And Augustine says, well, I don't think it's

1    really such a good idea.  It would simply be another

2    intermediate step similar to particle detection over the

3    wound.  In other words, it does not conclusively answer the

4    question of, does forced air warming cause wound infections,

5    and that's where we are at the end of all of this, is

6    attempts to look at intermediate steps that don't actually

7    correlate.

8              There are tremendous analytical gaps between all

9    of these steps, and they do not conclusively answer the

10   question, Does forced air warming cause wound infection?

11   And I'll just finish with a quote.  This is ripped from the

12   headlines.  My partner Ben Hulse sent this to me this

13   morning.  This is from the Second Circuit who yesterday

14   upheld the exclusion of the plaintiffs' experts in the

15   Mirena MDL.

16             And what the Second Circuit said in looking at the

17   trial court's exclusion of the plaintiffs experts, they

18   said, Finding no direct support in the literature for

19   secondary perforation -- which was the issue in this case.

20   It's about a birth control device, and the question was

21   whether it could cause injury to the uterine lining --

22   having conducted no prior research on the subject, the

23   experts all assumed the existence of the very phenomenon in

24   dispute and then hypothesize how it could occur.  The

25   experts thus begged the very question they were trying to

 1    answer, and that's exactly what's going on here, Your Honor.

 2              Unless the Court has any other questions, I'm

 3    finished.

 4              THE COURT:  Thank you.

 5              JUDGE LEARY:  Thank you.

 6              MR. GOSS:  Thanks.

 7              THE COURT:  Where did Ben Gordon go?

 8              MS. ZIMMERMAN:  If I may, Your Honor, he's had a

 9    severe migraine.  He's actually sends his regrets.

10              THE COURT:  Tell him I hope he feels better.

11              MS. ZIMMERMAN:  I will.

12              THE COURT:  But don't tell him it took half a day

13    to notice him.  I suppose it would be a felony to offer him

14    medication.  Does he have what he needs?

15              MS. ZIMMERMAN:  He has Imitrex but without much

16    success.

17              THE COURT:  Mr. Assaad.

18              MR. ASSAAD:  Thank you, Your Honor.  I'm just

19    trying to figure out where to begin.

20              I've been sitting here, and I've been hearing a

21    lot of studies go up, especially about the Moretti study,

22    about what it actually means, and the defense has stood up

23    here talking about Augustine and about studies and what they

24    mean.  Very little was discussed regarding the methodology

25    that Dr. Elghobashi used.

1          They've been focusing on the weight of the

2     evidence, instead of what this Court is here to decide:

3     Whether or not the experts used proper methodology, whether

4     or not they applied the correct methodology that is used and

5     generally accepted, and whether or not Moretti says the

6     bacteria increases over this part or over that part or what

7     Oguz says, that's for the jury to decide, not for this Court

8     to decide.

9          And I stand up here trying to figure out what do I

10    need to address, because it's very difficult when you hear

11    all these opinions of, as the Court likes to call it, lawyer

12    talk about what stuff means and not actually putting

13    evidence of what the methodology is or what the experts are.

14         And ironically they cited Memarzadeh regarding his

15    CFD studies to show what the ASHRAE standards are based on,

16    and what's ironic or what's actually true is Memarzadeh, who

17    they consider an expert from the NIH, the ASHRAE standards

18    of the air flow in an operating room, the uni directional

19    air flow that is the minimum standards, and that's why we

20    believe that most operating rooms have uni directional air

21    flow because of ASHRAE, and many states have adopted ASHRAE

22    as the minimum standards for operating room, and that's why

23    most operating rooms have uni directional air flow.

24         All the studies Memarzadeh did he did on a CFD

25    because the CFD is a test.  You cannot measure particles

1    simply by using a $30 anemometer or velocity.  As it's

2    stated numerous times in our expert report, you need a

3    particle intensity velocimeter, PIV, that you have to stick

4    in an operating room for over two months and take particle

5    measurements to figure out the turbulent intensity that CFD

6    would do.

7          And that is why computational fluid dynamics is a

8    test.  You don't have to do another test.  If that was the

9    case, companies would be spelling billion and billions of

10   dollars to do a test on a CFD study that they have done.

11   Right now the United States does all their nuclear bomb

12   testing on CFD.  CFD is used in medicine, and I'll talk

13   about that with what Elghobashi has done, how CFD without

14   doing a test is able to have surgeons go in and solve an

15   upper airway respiratory defect in children.

16          THE COURT:  So it matters, of course, what the

17   inputs are with CFD.  I don't think anyone disputes that CFD

18   is really valuable.  What say you with respect to the 106

19   temperature assumption?

20          MR. ASSAAD:  I'll go to that, but just assuming

21   that the inputs are disagreed upon, that's for the trier of

22   fact, and the case law is very clear.  That does not go to

23   methodology.  That's what we fight about in the courtroom.

24          THE COURT:  Just tell me where your expert came up

25   with the 106, why that is consistent with good scientific

 1      practice when you're going to run the CFD?  Why -- and

 2      temperature is an important component.  Why do you not --

 3      outside the litigation context, would you not test to see

 4      what the right temperature input would be?

 5              MR. ASSAAD:  Because it's in their operating

 6      manual of what the output temperature -- it's on the Bair

 7      Hugger.

 8              THE COURT:  Does say it's coming out all over?

 9              MR. ASSAAD:  It is at 43 degrees.  Okay.  Then 3M

10      has provided a, we have testing dots of 3M which I'll show

11      you that says the temperature that comes out at the blanket,

12      because there is a loss in temperature from the entrance to

13      the blanket, comes occupant at 41 to 42 degrees.  Now you

14      have to consider what is going on here.

15              The CFD that Dr. Elghobashi did and the studies

16      and the calculations which I'll show you that he did by

17      hand, they only showed you part of the transcript.  They

18      didn't show you the entire transcript.  You have a surgical

19      drape over the body, over the drape.  Then you have another

20      drape over the Bair Hugger, and you saw that picture.  It's

21      very, I would say, drape intensive.

22              It's creating an insulated area.  Just, for

23      example, you go to a room, and you put in a space heater in

24      this room.  It's going to take a while to heat up the room

25      on a single space heater, but you go to your small office.

1    It's going to be much quicker.  The area under the operating

2    room table where all the drapes are is an insulated area,

3    and what he calculated, and you will see through the

4    calculations that is he did, it wasn't an instantaneous

5    time, you know, like you turn the Bair Hugger, and

6    underneath the operating room table and underneath the

7    drapes is 40 degrees.

8              In fact, it takes about six minutes for the Bair

9    Hugger to even warm up to even 43 degrees to come out of the

10   hose, but he did his calculations based on --

11             THE COURT:  And he never measured the temperature

12   at all.  He doesn't know how long it takes to get to 43

13   because he never measured to 43 ever.

14             MR. ASSAAD:  Well, that's internal 3M documents.

15             THE COURT:  No.  Elghobashi doesn't say he

16   measured it.

17             MR. ASSAAD:  No.  He's relying on 3M documents.

18   Yes.

19             THE COURT:  I know, but he can't say it takes six

20   minutes to get up to this temperature because he never took

21   the temperature.

22             MR. ASSAAD:  We can rely on 3M's documents.

23             THE COURT:  They say they're marketing documents,

24   so was it consistent with his non-litigation practice to

25   rely on marketing documents, I think that's what they said.

 1              MR. ASSAAD:  Also as it's consistent with his

 2     non-litigation practice to rely on 3M's testing documents,

 3     just like Memarzadeh did in his study where he put the exit

 4     temperature at 106 degrees as well.  So it's Memarzadeh who

 5     is there CFD expert and it's generally accepted.  But

 6     regardless, Your Honor, that goes to the weight of the

 7     testimony.  They could argue all they want, and they'll have

 8     Abraham and potentially only some of Dr. Kuhn and Settles to

 9     come in to measure the temperature.

10              But the funny thing is, they showed Settles that

11     showed the temperature was 85 degrees underneath the

12     operating room table.  You saw that picture.  That was done

13     only after a minute or two.  They didn't leave the Bair

14     Hugger for 30 minutes.  Dr. Elghobashi used calculations,

15     which I'll show you, that he calculated the air underneath

16     the operating room table.  And that's based on general

17     accepted principles of science that have been out for

18     hundreds of years.  We're talking about, like, the heat

19     transfer equations, fluid dynamics equations, the

20     Navier-Stokes equations.  Those are all general accepted

21     principles that I don't think anyone is going to come in

22     here and say that that methodology is incorrect.

23              What Dr. Elghobashi did is a real life model.

24     They don't agree with it and they're going to argue against

25     the boundary conditions, but the case law is very clear, and

1    that's -- we've cited cases, and I'll cite to them.  Even if

2    you use the wrong equation for the wrong boundary equation,

3    as long as you use the correct methodology, it's admissible.

4    All that goes to the weight.

5            Let's talk about the qualifications of

6    Dr. Elghobashi.  He has received the DSC, the higher

7    doctorate award, from the Imperial College of London.  That

8    is higher than a Ph.D.  It is where they looked --

9    throughout your years, they look at your contribution to

10   science.  And his contribution is on particle flow, particle

11   transfer and turbulent flow, exactly what he is solving

12   here.

13           He's also the National Academy for Engineering for

14   contributions to understanding and modeling of multiphase

15   turbulent flows.  And actually, there's even a particle map

16   called the Elghobashi map that's been cited so many times in

17   the literature that discusses the particle-to-particle

18   interactions in turbulent flow.  His credentials are

19   impeccable, probably one of the top two or three people in

20   the United States, if not the world.

21           Defendants' experts agree that he's an expert and

22   that he did the equations and calculations correctly.

23   That's Dr. Kuehn, a professor at the University of

24   Minnesota, not a neuro engineer telling this Court that

25   Elghobashi did it incorrectly.  This is an engineering

1    professor.  And by the way, off topic, Your Honor, I'm also

2    an engineer so I can kind of understand this stuff a little

3    bit.

4              THE COURT:  You know, I wish I could say I was an

5    engineer.  I was raised by engineers and statisticians, so I

6    can smell it a mile away.

7              MR. ASSAAD: Even Dr. Settles states that he's an

8    expert in computational fluid dynamics.  He even says it's a

9    very elaborate CFD solution of simulated OR with staff,

10   overhead lights, side tables, and a patient fitted with a

11   forced-air warming blanket.  That's more than what Abraham

12   did.  Abraham didn't have people, didn't have -- didn't put

13   any types of temperature grading from the lights.  He did a

14   real life world test.

15             Now, really the argument stops here because the

16   defense admits that CFD is reliable method, and, in fact,

17   and in fact, if I heard correctly, they even admitted that

18   the kinetic energy in an operating room, they're going to

19   argue about it, actually causes particles to rise.  That's

20   what Peter Go ss said.

21             The defendants claim three issues, that Elghobashi

22   relied on Augustine's opinions.  That is not correct.  There

23   is nothing in his report that he relied upon in anything

24   that Augustine has stated.  They also argue that

25   Elghobashi's boundary positions are incorrect.  That's for

1     the jury to decide.  That doesn't go to methodology.  They

2     also argue that Elghobashi did not test his results.  Again,

3     they have not shown that the methodology that people in

4     Elghobashi's area of expertise use require testing the

5     results.  That's what CFD is for.  CFD is the test.

6     Memarzadeh did not test his results to determine that -- and

7     which many hospitals rely upon that you should have 20 air

8     exchanges per hour in an operating room and what is the

9     speed of the diffuser, the velocity, coming down in inter

10    directional flow?  Memarzadeh doesn't test his results with

11    going in there with a PIV and measuring particles because

12    it's millions and millions of dollars to do that type of

13    test.  We'd have to -- we'd have to rent a --

14              THE COURT:  Would you just hold on?  I'm so busy

15    getting ready to ask you my question that I'm not listening

16    to, so let me just spit this out and then I'll be listening

17    to you.  And the last thing I heard you say was millions and

18    millions of dollars.

19              Does Dr. Elghobashi's report permit a modified

20    opinion for if they change the input or this is the millions

21    and millions of dollars?  Could he change from instead of

22    106, could he plug in 80 or 87 or some of the actual, you

23    know, like some number that came from an actual measurement?

24    Would his value to the jury extend to saying, okay, well,

25    this is the model if it's 106, but if it's 80, then it's

1    this?  Or is that outside his -- he did the one model with

2    this --

3            MR. ASSAAD:  Well, the model can be changed.  The

4    model's a CFD model and you could change the input.  It

5    takes a while because, as you see from the report, if you

6    see from the report, it took two million CFU hours to model,

7    1600 cores at the University of Texas Stampede supercomputer

8    that he used 1600 cores to run the model.  I mean, this is

9    high calculations.

10           THE COURT:  Right.  But does his opinion contain

11   any way of assessing how, you know, if it's not 106, if it's

12   105 what does one degree do to this?  What does -- is there

13   any basis for a determination of the helpfulness of that

14   model in a world where the 106 not assumed?

15           MR. ASSAAD:  Well, the 106 degrees, Your Honor, is

16   a number of 3M.

17           THE COURT:  No, I know that.

18           MR. ASSAAD:  Okay.

19           THE COURT:  I know that.  But --

20           MR. ASSAAD:  So I guess I'm trying to understand

21   if it's 3M --

22           THE COURT:  I'm just thinking about the usefulness

23   of the model, and if the defendants are saying part of the

24   evaluating methodology is have you -- is proper methodology

25   inclusive of proper inputs.  If the Court is persuaded that,

1    from a scientific standpoint, the firm assumption of 106

2    isn't sufficiently grounded and it flies in the face of

3    every actual test that shows that it's not 106, he could

4    still be useful if what he shows is if some different

5    temperature you also have -- this effect remains if the

6    temperature is in some range or does is his opinion

7    inextricably bound to an actual output temperature of 106?

8                 MR. ASSAAD:  No, it's not, Your Honor.

9                 THE COURT:  Okay.

10                MR. ASSAAD:  And I'll explain why, because that's

11   just a model he used.  If it was 105 or 104, it would just

12   take longer.  It's about kinetic energy.

13                THE COURT:  And is that what -- is that in his

14   report somewhere that he says if it's, say -- and I bet he

15   doesn't say 80, but if it's 80 it's going to take longer or

16   what --

17                MR. ASSAAD:  It would denied on the case specific

18   case because it will depend on what the temperature was set,

19   which is most likely 43 degrees, but I do not -- I believe

20   there's room in his report that it is a model and it's up to

21   -- I mean it's -- the model is the base of his opinions, but

22   it's just to show what exactly happens.

23                I want to show you this document because this is a

24   3M document, Your Honor, that talks about the testing that

25   3M has done internally about the temperature where the 750

1     warming unit and a 522 blanket which Dr. Elghobashi relies

2     upon in his document and his report.  If you look at the

3     code, it says under there MCST, which is the average

4     temperature across the blanket.  And if you look over here,

5     there are testings between two different blankets, a new

6     522, which is an upper body blanket, and they have a

7     standard 522.

8              THE COURT:  So are they -- that's the temperature

9     of the actual blanket?

10              MR. ASSAAD:  That's the temperature of the ai --

11     what they did, Your Honor, and --

12              THE COURT:  Because it says temperature of

13     blanket.

14              MR. ASSAAD:  Yes, that is the temperature of the

15     air coming out of the blanket.  That's 3M's testing.  That's

16     what we're relying upon.  This is their measurements outside

17     of litigation.  Dr. Kuehn's measurements, as you will see,

18     are unreliable, and he admitted his temperature measurements

19     were unreliable.  Dr. Settles measurements show the air

20     coming out of the blanket being 33 degrees celsius which --

21              THE COURT:  That's a lot lower than -- I don't

22     know what that is.

23              MR. ASSAAD:  That's lower than body temperature.

24     That would be cooling the body temperature.

25              THE COURT:  Well, wherever it's measured.

1          MR. ASSAAD:  I mean, as the body temperature is 37

2     degrees celsius.  If the air is coming out at 33, it's not

3     going to have a warming effect, that's the first law of

4     thermodynamics.

5          THE COURT:  So he measured it coming out of the

6     blanket or he measured coming out of -- in the air

7     somewhere?

8          MR. ASSAAD:  He measured -- he put a thermocouple

9     right at one millimeter away from the blanket and measured

10    it at 33 degrees celsius.  That doesn't make sense.  That

11    cools the patient down.  That goes against --

12         THE COURT:  Who did that?

13         MR. ASSAAD:  Dr. Settles.  So I don't think this

14    Court can rely on the measurements that defendants has taken

15    during the litigation.

16         JUDGE LEARY:  Do you have any ideas to what the

17    temperature of the operating room was set at?

18         MR. ASSAAD:  In Dr. Settles?

19         JUDGE LEARY:  Yes.

20         MR. ASSAAD:  Yes, actually.  It wasn't an

21    operating room.  It was a warehouse bigger than this.  They

22    created a fake bed, a fake ventilation system, and it was

23    open on all sides, it wasn't temperature controlled.  And so

24    the answer is I think the temperature was around I want to

25    say 50 or 60 degrees or 70 degrees.

1              THE COURT:  50, 60 or 70?

2              MR. ASSAAD:  I'm not sure, I'm --

3              THE COURT:  In that general range?

4              MR. ASSAAD:  It was not controlled.  And in fact,

5      on a couple of occasions they had to re-do the test because

6      of the excess humidity that was disrupting the flow.

7              THE COURT:  What about Dr. Elghobashi, what was

8      his ambient temperature?

9              MR. ASSAAD:  His ambient temperature was 59

10     degrees.

11             THE COURT:  And was that a standard operating room

12     temperature?

13             MR. ASSAAD:  That's based on standard operating

14     room temperature that's done by ASHRAE and it's been very

15     consistent, and, in fact, I don't think the defendants are

16     arguing the ambient temperature.

17             I kind of went way ahead in my PowerPoint

18     presentation so I'm going to go back a little bit to where I

19     was going.  And, again, this goes to the weight, and the

20     case law is very clear.

21             JUDGE LEARY:  Let me ask you about this.  I'm

22     looking at an excerpt out of the Gold case in Minnesota

23     Supreme Court case and it says, in part, foundational

24     reliability requires the proponent of a test to establish

25     that the test itself is reliable, and I would assume that to

1    be the methodology is reliable, and then it's administration

2    in a particular instance can form to the procedure necessary

3    to ensure reliability.

4           You keep on saying that -- I think the second half

5    of that statement which Gold I believe stands for the

6    proposition that both parts of that statement are for the

7    Court to evaluate, but you're suggesting that the second

8    part, that is, the administration of the test or the

9    administration of the particular methodology whether or not

10   it conformed to procedure necessary to ensure reliability,

11   that's for the jury?

12          MR. ASSAAD:  No, I'm not saying that, Your Honor.

13   The numbers and the equations used for the methodology,

14   whether or not they used the right boundary conditions, that

15   goes to the weight.  Whether or not the methodology CFD is

16   correct, undisputed.  The second part I think you're

17   referring to is whether or not the expert properly used the

18   methodology.

19          JUDGE LEARY:  Put the correct input in.

20          MR. ASSAAD:  Huh?

21          JUDGE LEARY:  Put the correct input in.

22          MR. ASSAAD:  Put -- not the correct input, the

23   numbers could be disagreed upon.  That's what the jury

24   decides.  Just like one expert says it's 33 degrees, one

25   expert says it's 28 degrees, our expert says it's another

1   thing.  That is for the jury to decide.  The methodology

2   that was used -- for example, our concern with Dr. Abraham

3   is not the CFD but the methodology and whether or not it is

4   reproducible is our motion to exclude for Dr. Abraham.

5   Whether or not the CFD methodology, which Memarzadeh has

6   used and all the stuff that he cited in his report, he used

7   the exact same -- he identified the methodology and he

8   followed the methodology, and I think that's one or two

9   going for.

10          With respect to the numbers, I think if he has a

11   reasonable basis for the numbers, which is, in this case,

12   3M's own internal documents that they say, and he does the

13   calculation off of those numbers, and they're not very

14   difficult calculations, I understand 3M agrees with them,

15   but that is for the weight -- it goes to the weight, not to

16   the admissibility.  I hope that answers your question.

17          JUDGE LEARY:  Well, I think it does, but it begs

18   this question, if this is a repeatable exercise, why not do

19   it in an operating room?  Why not -- instead of relying just

20   on the computer fluid dynamic model, why isn't it done in an

21   operating room where you have the same parameters, you've

22   got a 59 degree operating suite, you've got the same level

23   of equipment, you know, the same assumptions that you did on

24   the computer model, why not do it in the actual operating

25   room?

1          MR. ASSAAD:  Because the feasibility.  That's what

2     CFD is for.  To do this study in an operating room, number

3     one, plaintiffs would have to rent an operating room from

4     one hospital, which I don't know how much that would cost,

5     probably would be in the millions of dollars to take away an

6     operating room.

7          JUDGE LEARY:  I suspect that the CFD model was

8     pretty expensive too.

9          MR. ASSAAD:  But to do the PIV analysis -- we're

10    not talking about taking temperature measurements to show

11    turbulence.  We're talking about particles, what happens to

12    particles.  That's what Memarzadeh did.  And Memarzadeh did

13    not go -- there, the guy they referred to as relying upon --

14         JUDGE LEARY:  I'm really talking about, for

15    instance, the 106 degrees.  Instead of relying on what you

16    believe to be the proper interpretation of 3M documents, why

17    aren't you measuring that with an actual Bair Hugger being

18    used in an actual operating room with the typical operating

19    room equipment, the typical number of persons present in an

20    operating room?  Why not do it that way and find out what

21    the temperature is, whether it's 106 degrees or not?

22         MR. ASSAAD:  Because we know that it was

23    106 degrees from the internal documents and we could plug it

24    into mathematical equations --

25         JUDGE LEARY:  You're going around in circles.  It

1    seems to me it could we reproducible.  Cost aside, and I'm

2    not sure if the cost is comparable or not comparable to your

3    CFD.

4              MR. ASSAAD:  Well, of course it could be

5    reproducible, and that goes to the admission of

6    Dr. Elghobashi's report.  And if they want to go in and

7    argue to the jury that the number 106 is wrong, that goes to

8    the weight.

9              JUDGE LEARY:  I'm concerned about the law that

10    says you have to look at the science in terms of a real life

11    application, that's what I'm concerned about.

12              MR. ASSAAD:  Well, I'll go later on to get to the

13    real life applications of CFD in the world and, of course,

14    Memarzadeh used it too -- which all operating rooms are

15    designed after without doing a test of particles, and this

16    is at the NIH, because of the difficulty of monitoring

17    particles.  Taking measurements does not tell you what

18    happens to particles.  Particles are dealing with

19    turbulence, and I'll explain turbulence in a little bit, and

20    I think that might help you understand what was done in this

21    case.

22              CFD is a test.  And the Seventh Circuit said a

23    mathematical computer model is a perfectly acceptable form

24    of test.  It relies on engineering principles, Newton's

25    second law, fluid dynamics, heat transfer, Navier-Stokes,

1    Lagrangian and Euler.  These are all accepted, generally

2    accepted principles in engineering.  None of what

3    Dr. Elghobashi did relies upon Augustine.

4         THE COURT:  So this all stands for the proposition

5    that computer modelling can be admissible?

6         MR. ASSAAD:  Yes.

7         THE COURT:  Right.  There's really no doubt about

8    that.  How in a particular case can the -- how do you -- how

9    would the -- how do you validate the code for a CFD model?

10    Because without -- I mean, right?

11         MR. ASSAAD:  The code has to be --

12         THE COURT:  You can't say computers come in, you

13    know, you've got to --

14         MR. ASSAAD:  The code has been validated, and the

15    code is validated by studies.  And Dr. Elghobashi cited

16    those studies in his report and which is ironic because

17    Dr. Abraham did not cite any studies to validate his code.

18    The way validation works is you validate -- I think Your

19    Honor understands --

20         THE COURT:  Right.

21         MR. ASSAAD:  Yes, you're a hundred percent

22    correct.  What they do, and I'm going to -- I actually have

23    20 slides that talk about the validation of the code that

24    Dr. Elghobashi uses.  I was going to go through them one by

25    one because it's kind of tedious, but I can show you a few

 1    to show you how code is validated.  But what they do is they

 2    go and they do -- they think of a model, like the turbulent

 3    flow through a cylinder and they'll run the code and then

 4    they'll go attach a -- test the results, and not just one or

 5    two data points.  They go to look at all of the data that

 6    was collected of a similar experimental model, identical

 7    experimental model, and they'll run a graph, and they'll

 8    show you --

 9            THE COURT:  Wait, did Dr. Elghobashi do all this?

10            MR. ASSAAD:  No, he relied on the code that's

11    already been validated.

12            THE COURT:  Okay.  All right.  So then you relied

13    on the code that's already been validated which puts the

14    emphasis then on the inputs.

15            MR. ASSAAD:  And there's another way to validate

16    -- I'm sorry, I didn't mean to interrupt, and I know I did

17    last time I talked, and I apologize.  I thought you were

18    finished.  Are you done?

19            THE COURT:  I'm afraid -- you know, I do the

20    interrupting and you get blamed for it, so I apologize for

21    that.

22            MR. ASSAAD:  Another way code can be validated is

23    by -- there's three different types of CFD.  There's RANS

24    Model, LES and DNS.  DNS is what the -- what basically --

25    it's the highest level.  It's what Dr. Elghobashi spent a

1    lot of time on.  He uses it for doing military work for the

2    Department of Defense, Department of Energy.  And I really

3    want to bring him here.  He's a fascinating guy.  The stuff

4    he's working on is high level.  He's working on making an

5    aircraft carrier going 90 knots per hour in the ocean with

6    the Department of Defense.

7              THE COURT:  You're all excited now.  Just pretend

8    you're not an engineer.  But anyways, you could also

9    validate the code by using DNS because DNS, direct numerical

10   simulation, is actually more accurate than experiments

11   because experiments have error.  Experiments have error of

12   up to ten percent by taking measurements.  DNS is 100

13   percent accurate.  And engineers, the Department of

14   Military, Boeing, nuclear engineers all rely on CFD without

15   going in there and blowing up an atomic bomb, making 20

16   millionaire airplanes, or doing anything.  It is the gold

17   standard for engineers.

18             And in *Zurn*, *In Re Zurn Plumbing*, this Court has

19   said, The issue here is similar to the one addressed in

20   *Quiet Technology D.C.*  There an expert used a reliable

21   method, computational fluid dynamics, but the parties

22   disputed whether the expert put the wrong information into a

23   computer program that he used to compute his results.  The

24   circuit court determined that when parties dispute the

25   specific numbers to be used in an otherwise reliable

1    scientific analysis, the alleged flaws are of a character

2    that impugn the accuracy of the experts' results, not the

3    general scientific reliability of his methods.  The District

4    Court had therefore not abused it's discretion by declining

5    to exclude the experts' evidence under Daubert.  Objections

6    to generally reliable scientific evidence go to the weight,

7    not its admissibility.  This is not a close call.  This is

8    not a close call.

9          And *Lapsley versus XTEK*, Defendant's argument

10   overlooks the fact that simulation is one of the most common

11   of scientific and engineering tools.  Around the world

12   computers simulate nuclear explosions, quantum mechanic

13   equations, atmospheric weather patterns, and innumerable

14   other systems that are difficult or impossible to observe

15   directly.  A mathematical or computer model is a perfectly

16   acceptable test.

17         And the Court goes on, We do not require experts

18   to drop a proverbial apple each time they wish to use

19   Newton's gravitational constant in the equation.

20         CFD is very accurate.  We just talked about

21   validation.  The methodology that Elghobashi --

22   Dr. Elghobashi has used, as well as Memarzadeh, as well as

23   other people in this field that he cited in his report, do

24   not require to go out and spend another millions of dollars

25   doing the particle tests.

1          THE COURT:  No, the question is relevance because

2     you want to show that whatever was tested is sufficiently

3     relevant -- and is relevant and sufficiently helpful to a

4     determination of the issues at hand, and that's where if

5     it's either, okay, let's say he -- I hesitate to harp one

6     more time on this 106, but okay, so he takes it as 106,

7     fine, and then there's absolutely nothing wrong with the

8     model, there's nothing wrong with what he did, it's just

9     that -- and 3M has that document or whatever it is that says

10    106 but David tested, he came with a lower number, every

11    single person whose actually tested says a lower number so

12    then how do you argue that a test that assumes a number that

13    has been shown not to be a real number is relevant?

14          MR. ASSAAD:  Well, first of all, with Dr. David,

15    he did a test on a faulty device and he put it in his

16    report.

17          THE COURT:  But nobody tested and came up with

18    anything over 100.

19          MR. ASSAAD:  3M did.  I'm relying on their

20    documents.  They tested 106 degrees.  The document I showed,

21    their operating manual.  It's set at 42 degrees.  I don't

22    know what more I could rely upon for the court.  And it just

23    goes to the weight, Your Honor.  They could argue that we

24    used the wrong number.  They could get their engineer to

25    come in here and show different calculations, but it goes to

1    the weight of the evidence.  It doesn't go to the

2    admissibility.  We're talking about the methodology here.

3    We're talking about what Dr. Elgobashi did and whether the

4    methodology he used and whether he followed the methodology

5    according to the methodology.

6            No case has ever excluded CFD for lack of testing.

7    CFD is more accurate, as I said before, than real world

8    tests because it's a mathematical equation.  And what's the

9    greatest think about this computational fluid dynamics test,

10   it has no confounders.  It's Bair Hugger on, what happens;

11   Bair Hugger off, what happens?  That's it.  It's exactly to

12   show what happens to the particles which 40 percent of them

13   -- up to 40 percent carry bacteria happen when the Bair

14   Hugger is turned on.

15           Defense has argued we should do agar plates.  And

16   the funny thing is they say we should do agar plates but

17   then, Mr. Gordon, when talks about the Avadan case about

18   using -- about doing the agar plate with the end of the hose

19   argued, yeah, but we don't know what was between the end of

20   the hose and agar plates.  No mater what we do, the defense

21   is going to say that's the methodology, that's the wrong

22   test.  We could use agar plates and they will say, well,

23   Avadan used agar plates and that's not correct.  You know,

24   we did CFD, we used their numbers, it's not correct.  Again,

25   it goes to the weight, not to the admissibility.

1          And what Elghobashi does, it confirms what 3M

2     already knew in 2007.  And by the way, I don't think this

3     has been discussed about this document about the reduced

4     potential of nosocomial transmission, but the date of this

5     document is before Dr. Augustine said anything publicly

6     about his allegations against the Bair Hugger.  This

7     internal document is in 2007.  If you look at hot air rise

8     campaign which is cited as a footnote in defendants'

9     opposition, that's 2010.  This is before Dr. Augustine said

10    anything about the Bair Hugger.  Al Van Duren, director the

11    clinical research, they knew it and that's why they're doing

12    prewarming, especially for orthopedic surgeries.

13          Also, 3M has also done CFD tests that haven't been

14    produced that they've kept under privilege.

15          The question by Dr. Elghobashi is different than

16    the question that was answered by Dr. Abraham.  What do

17    particles do in turbulence flow?  That was the question

18    answered by Elghobashi, not streamlines.  Streamlines, and

19    everyone admits, all the engineers, that particles do not

20    follow streamlines.  Particles have mass and they have

21    inertia.  The streamlines that Dr. Abraham did have no mass

22    and no inertia.  It's an imaginary study.  It's an imaginary

23    picture.

24          Let me talk about turbulence for a little bit

25    because I think turbulence is one of the most difficult

1     theories to understand, and I'm pulling off a lecture that

2     Dr. Elghobashi has given and he let me borrow his slides

3     that he explains to first-year students at the University of

4     Irvine.  The end of a rocket is turbulent, that's obvious.

5     A jet engine has turbulence in it.  The turbulent is where

6     you have multiple velocities going against each other.  Wavy

7     motion in a ocean is not turbulent flow, but a ship going

8     through an ocean waves are turbulent flow.

9            As when we breathe in air, the air that passes the

10     epiglottis is turbulent and has different velocity, and the

11     reason I want to show this is, CFD is so accurate that they

12     could model an upper airway obstruction in which prior to

13     CFD what Dr. Elghobashi did, the success rate of the surgery

14     was around 50 percent.  After modelling for these children

15     that have an upper airway obstruction, the successful rate

16     of the surgeon was 100 percent.  That is how accurate CFD

17     modelling is.

18            Again, laminar flow, which we talked about a lot

19     which we like to call directional flow, laminar flow doesn't

20     exist in an operating room.  The air is moving too fast.

21     From an engineering standpoint, it doesn't exist.  From a

22     marketing standpoint, it exists.  So that's the difference

23     between laminar flow and turbulent flow.

24            Reynolds.  Reynolds was the first to kind of

25     quantify turbulent flow, and it shows the difference between

1    laminar, transitional and turbulent, and as you can see,

2    what they is stick a dye through water, and as they increase

3    the flow, they want to see what happens to the dye, and you

4    would just expect the dye to follow the path of the water.

5            Well, what turbulent flow does, it makes that dye

6    go up and down.  It changes the velocity.  It's no longer a

7    horizontal uniform velocity.  There are different vectors in

8    the velocity, and as you see, as the increasing the Reynolds

9    number or the increasing flow along that tube, the dye in

10   the tube starts doing some crazy things.  It creates

11   turbulence.  It starts going backwards against the flow.  It

12   does -- that's a circular flow.  This is what turbulence is.

13           Turbulence is when you have multiple velocities.

14   These are called eddies, and that's how you hear large

15   eddies simulation.  Large eddy simulation is where you model

16   the large eddies, the large turbulence, and these are going

17   to have an effect on particles and flow, and depending on

18   intensity, it affects the operating room.

19           As you increase the Reynolds number, you increase

20   the eddies.  Now for the operating room that we modeled,

21   it's about 9,000.  9,000 is a decent size Reynolds number,

22   and it causes multiple turbulence as you'll see in the

23   following as I go forward.

24           Now, you have a spectrum of turbulence, and I

25   might just skip that because it is very complicated, but I

1      bill try to explain it if you would like me to try to

2      explain the large-eddies, but what we have is a scale at the

3      bottom, and as kinetic energy increases, then the eddies get

4      larger and larger, and that's what K is, the turbulent

5      kinetic energy, TKE.

6              I like this one because everyone thinks of

7      turbulence as shaking.  When you get in an airplane, we are

8      going to be approaching turbulence, but the air around an

9      airplane is always turbulent.  The Reynolds number is way

10     too high, but what's interesting, when you start here on

11     bumpy flights and you get large eddies, we are talking about

12     larger than the airplane, and it causes turbulence, or it's

13     larger than the fuselage.  No plane has ever crashed as a

14     result of turbulence, so that's a good thing to know.

15             Large eddies simulation relies on these equations

16     called the Navier-Stokes equations, and you'll hear about

17     them a lot because the difference of what our expert did and

18     Dr. Abraham did is how they manipulated or what was used

19     with the Navier-Stokes equation and what was actually

20     solved, and Navier-Stokes equations have been going on by

21     Navier and Stokes from the 1800s.

22             The impossibility of solving the complete

23     Navier-Stokes equations led to the following:  Werner

24     Heisenberg, the noble laureate, at age 31 was asked, What

25     would you ask God given the opportunity, and his reply was,

1    When I meet God, I am asking to ask him two questions:  Why

2    relativity and why turbulence?  I really believe that he

3    would answer only to the first.

4             According to Richard Feynman, the noble laureate,

5    the most important unresolved problem of classical physics

6    is turbulence, and that's why the invention of the super

7    computer made a difference.  Since 1980, super computers

8    allow the type of work that Elghobashi and others in his

9    field would do, and what it does is, the Navier-Stokes

10   equations cannot be solved by hand.  They can't be solved if

11   it's an open -- it's an open equation.

12            It is an equation that the way the super computers

13   solve it is actually by literally doing an algorithm and

14   putting in number after number in each of the grids of the

15   cells, which we'll talk about later, so that the numbers

16   match at the notes.  So that's why it's intensive.  That's

17   why it takes two million CPU hours to run what we did in an

18   operating room because it's actually just doing a

19   convergence.

20            It's putting numbers in and see what the results

21   are and so they all match, and they say here's the final

22   result, and that's why it's very computer intensive, and

23   that's why it's very expensive, depending on the quality and

24   the type of test you run.  You run RANS, which is the lowest

25   level, very cheap.  If you run DNS, it's very expensive, but

 1    DNS has its limitations, for example the size.

 2              And this is the difference between RANS, LES and

 3    DNS.  DNS solves all the equations, all the equations for

 4    the Navier-Stokes.  Large eddy simulations models the small

 5    eddy, and that's what both sides did and then RANS, and this

 6    is the difference in the results between a DNS and a RANS.

 7    I can go through the validation studies if you'd like.

 8              It has been validated.  There is no dispute.  I

 9    don't think there's a defense that the studies that

10    Elghobashi has cited regarding the validation of a code, but

11    I'd be happy to go through it if the Court likes me to go

12    through it.

13              THE COURT:  It's up to you.

14              MR. ASSAAD:  Okay.

15              JUDGE LEARY:  Let me be clear.  Are you aware of

16    whether or not the defense challenges the reliability or

17    authenticity of the code?

18              MR. ASSAAD:  They've mentioned it here and there.

19    Mr. Blackwell said the code was unvalidated.  I didn't hear

20    much regarding, from Peter Goss.  They've put some stuff in

21    their opposition regarding validation.  Their expert tried

22    to say it wasn't validated, but if you have any question

23    from the Stanford code, which is one of the leading

24    universities regarding turbulent flow, one of the people

25    that has been, that is cited, a guy by the name of Mahesh,

1    which is Stanford PhD, is actually now at the University of

2    Minnesota.

3                And if you have any questions about whether or not

4    the code that he's worked on or what this all means, I

5    welcome you to call him up and say, is the code validated

6    for this type of flow, because it is.  The complexity that

7    this LES CFD is used for is much more than what it's used

8    for in this case.

9                They use it for combustion and all different types

10   of flow, and that's another thing.  If a CFD has been

11   validated for a more complex flow, that's called a

12   benchmark, and when you have a benchmark, that's validated

13   for anything that is less complex than the flow that's used

14   here, and I will go through it real quick.

15               And again, the defense is trying to -- doesn't

16   distinguish between validation and testing.  They've thrown

17   up the NASA thing and said you need validation, and the

18   plaintiff hasn't validated this code, but according to NASA,

19   the page discusses validation assessment which focuses on

20   the message for the validation of a CFD code for a

21   simulation.

22               So this is a code.  This was from 1982, and again

23   I'm not going to go through it.  I'll give you my slides,

24   but Mahesh is up here at the University of Minnesota did a

25   study and tested it towards published data.  You can

1    validate a code by actually going to do the tests, or you

2    can validate it for tests that have been previously done.

3    In this case it was as validated for previously done.  No

4    noticeable difference observed, and this was a laminar flow

5    with recirculation.

6            And again, this is Mahesh.  This is what it looks

7    like when you do a validation study, and this is what you

8    don't see with Dr. Abraham and what he used.  When you

9    validate a code, and this is the code.  You see data points,

10   and then you see lines going through, and you calculate the

11   experimental error, and this code is well validated for this

12   type of test.

13           Again, this was not compared to a DNS model in

14   2004 by Mahesh, and it shows less than a 2 percent

15   difference in the mean and velocity and drag.  It tells you

16   what the error rate is between the code and the experimental

17   results, and when it is left is five percent, and you don't

18   know which one is right because the test could be off by

19   five percent as well.  So if it's within five percent, it's

20   a validated code.

21           And here's more validation.  The code is

22   validated.  Here's another example of testing of the code,

23   the validation, where they have the real data points and

24   what the code is showing, and the lines match up pretty

25   close, if not perfect, and again, another validation to --

1    and these are, and by the way, validations are studies.

2    They're usually published.  So what is used?  That's why you

3    always see them published in the literature.

4           And this series of questions, ask Mahesh.  He is

5    here at the University of Minnesota.  He has worked on this

6    code.

7           THE COURT:  You just have to know that that's

8    completely illegal, right?

9           MR. ASSAAD:  We could get a consulting expert, I

10   guess, if you have a question regarding --

11          THE COURT:  Yeah, no.

12          MR. ASSAAD:  I did not know it was illegal.

13          JUDGE LEARY:  You have provided a very good, very

14   provocative argument for your position, but here it is so

15   technical, it is so scientific, it is so -- it's beyond my

16   capacity as a lawyer and a judge to fully comprehend it, and

17   yet, we're being called upon to determine whether or not it

18   is scientifically reliable.

19          And then you argue, well, it's really -- at some

20   point it's not for me as a judge or any other judge to

21   decide, it's for the jury to decide.  Then you circle back

22   to the argument.  Why are courts and why would a court and

23   why would a jury decide an issue that is so complicated and

24   if it otherwise lacks merit has not been endorsed by the

25   scientific community?

 1          That's a fundamental struggle that I have because

 2     in all honesty, and I think there is case law to support it.

 3     Law doesn't drive the science.  Science has to drive the

 4     law, and when you're asking jurors and when you're asking

 5     judges to engage in these types of scientific fact finding,

 6     I don't think you get the most authentic results through

 7     this process.

 8          And that's why I think courts circle back to the

 9     fact, you have got to rely on the scientists.  You've got to

10     rely on what is considered to be reliable science among

11     competent experts.  It has got to be generally accepted by

12     the scientific community.

13          MR. ASSAAD:  There is no dispute, Your Honor, even

14     under Frye Mack that the methodology used by Elghobashi is

15     generally accepted.  I don't hear anyone saying that CFD is

16     not generally accepted.

17          JUDGE LEARY:  But that only tells us part of the

18     story as to whether or not the plaintiffs' claim is reliable

19     and their science is reliable.

20          MR. ASSAAD:  Of course, it -- you know, Elghobashi

21     is not going to come in and testify that bacteria causes

22     infection.  That's outside of his expertise.  What he's

23     going to come in and say -- by the way, some of their

24     experts agree that the Bair Hugger can increase particles

25     over the surgical site, their engineer experts because they

 1     are based on generally accepted science.

 2              When you turn the Bair Hugger on it affects uni

 3     directional flow, and you'll hear, what is the purpose of

 4     the uni directional flow in the operating room?  The

 5     purpose, and we'll all agree on it, is to put clean air,

 6     filtered air, the air is filtered twice.  There is a pre

 7     filter and then another filter before it enters the room,

 8     over the surgical site to protect it from bacteria.

 9              And Dr. Elghobashi is using general accepted

10     principles Navier-Stokes equations, Newton's second law,

11     heat transfer, fluid dynamics to say when you turn this

12     thing on, this is what happens based on the science,

13     generally accepted science.

14              THE COURT:  Okay.  So he says this is what happens

15     when you turn this on.  Assuming that the assumptions that I

16     put in are correct, this is what happens, and so the

17     preliminary admissibility question has to do with whether or

18     not there is sufficient correspondence between what he put

19     in and what happens in the real world.

20              And I understand that you have good points about

21     how it does correspond sufficiently to what happens in the

22     real world.  So but all he can say is, if this and this and

23     this, then this.

24              MR. ASSAAD:  Yes.

25              THE COURT:  Okay.

1          MR. ASSAAD:  And as we talked about, the weight of

2     the evidence versus admissibility.  They're of course going

3     to say, you know, that it's not the temperature, you know.

4     But, of course, their experts also testified against each

5     other, saying the temperatures they use are wrong so.

6          THE COURT:  Just to isolate.  What the question is

7     for the Court, it's not -- at this time it's just whether

8     the, I guess it comes down fundamentally to whether the

9     temperature is -- whether the inputs were sufficiently

10    connected to the facts of this case, that the running of the

11    tests that he did, assuming that those tests are accurate

12    and reliable and rock solid, would be of use to a finder of

13    fact in deciding whether the Bair Hugger can cause

14    infection.

15          MR. ASSAAD:  I think *Daubert* is more liberal than

16    that, Your Honor.  I think *Daubert* is what the courts say,

17    that the boundary conditions can be disagreed upon and the

18    defense could point with all their evidence they want at the

19    jury and say, he used 106.  We think it's only supposed be a

20    100 or 97 or 75, and the jury is supposed to decide what is

21    the correct temperature.

22          THE COURT:  That's what I asked you what

23    Elghobashi had to say, if anything, about the utility of his

24    test if the temperature was not exactly that.

25          MR. ASSAAD:  There is still utility.  He will

1    testify -- remember, this is general causation.  The

2    question here is, can the Bair Hugger cause bacteria to

3    reach the surgical site?  And when we get to the case

4    specifics, we'll deal with the individual --

5              THE COURT:  I know Elghobashi says if it's at 106,

6    here's what happens, and yes, that would cause all this

7    disruption, and from there you go to the disruption to the

8    particles, which are a proxy for bacteria or even bacteria

9    into the surgical site.  Doesn't take very many, and you're

10   off to the races.

11             MR. ASSAAD:  We've been saying that a lot today.

12   I understand, Your Honor.  I think we could say more than

13   that because we're looking at engineering principles here.

14   Can he say, we'll be able to testify it's at 105?  He could

15   say based on his education, training and experience and the

16   model and the studies that he's done, 105 would probably be

17   the same thing, and there will probably be a limit that he

18   could say more than likely than not this temperature will

19   cause it.

20             THE COURT:  But I'm asking what's in his report.

21   How much tolerance is in his report?

22             MR. ASSAAD:  While my colleagues are looking that

23   up, I will -- if I could continue.  I have to find it

24   exactly in his report, if you give me --

25             MAGISTRATE JUDGE NOEL:  While you're doing that,

1    didn't he also get cross examined about this, about this is

2    the temperature along the drape.  Is that what we're talking

3    about?

4              MR. ASSAAD:  Yes.

5              MAGISTRATE JUDGE NOEL:  And wasn't that a subject

6    of cross-examination?

7              MR. ASSAAD:  Yes, vigorous cross-examination.

8              MAGISTRATE JUDGE NOEL:  Was there a range where he

9    talked about, when you get to below a certain temperature

10   this won't happen?

11             MR. ASSAAD:  I don't think that was ever asked by

12   him in the deposition, but based on, I mean, when it comes

13   time for case specific and they want to say it's a different

14   temperature or set at a different temperature, they can ask

15   him the questions, and he'll either run a new test or rely

16   on the model, but it's based education, training and

17   experience and calculations.

18             THE COURT:  Okay.  I think we probably beat that

19   one.

20             MR. ASSAAD:  So the defense tried to make this

21   thing about a thought experiment.  This is a thought

22   experiment, and they've shown you a part of the deposition.

23   I asked him on cross-exam, because, again, he has never had

24   a deposition before.  It's the first time.  He, you know,

25   he's from a different country, you know.  I want to clarify

1    what he meant when he says I thought about it a lot.

2           He says, I thought about it a lot, and I asked

3    him, And the calculations when you talked about, you thought

4    about it a lot.  Is that the boundary condition?

5           That's regarding the temperature, but regarding

6    the mass loads, it's conserved.  It means on a flow, the air

7    mass flow rate that leave the blower has to come out along

8    the drape because the drape covers everything.  That's no

9    assumption.  Okay.

10          The temperature, yeah, I did some estimate

11   calculation.

12          Okay.  You did calculations?

13          Not a computer.  Hand calculations, and they're

14   mathematical calculations.

15          And those calculations were based on your

16   education, training and experience?

17          Yes.

18          And Dr. Elghobashi, which is enough.  He describes

19   his calculations by hand, actually went back after the

20   deposition and did the calculation or made a copy of the

21   calculation or he did them based on what he did on a piece

22   of paper, because they're very simple for him, and they're

23   like Newton's law, and he provided these calculations.

24          And he provided these calculations, and we

25   provided them to the defense of how he calculated the air

1    from the exit temperature of the blanket, which comes at

2    106 degrees, to the air that was used in the boundary

3    conditions.

4         THE COURT:  Okay.  That's good.  Thanks.  Nobody

5    ever measured that air at 106 but --

6         MAGISTRATE JUDGE NOEL:  106, as I understand it,

7    is something he took from defendants' video of saying what

8    temperature was.

9         MR. ASSAAD:  Defendants video documents their

10   operating manual.  It's defendants' number.  It's not our

11   number, you know, and not only that, the number that they

12   used for Dr. Settles of 33 makes it cooling the patient.

13   The numbers don't make sense.  It has to be warmer than 37

14   at the degrees, otherwise it's not going to warm the

15   patient.

16        THE COURT:  Okay.  We have got to move to a

17   different topic.

18        MR. ASSAAD:  Again, the air in the boundary

19   conditions goes to the weight of the evidence, not

20   admissibility.  Abraham used the same temperature, not

21   inconsistent with any facts, and the source of the

22   temperature, again, and I don't know if Judge Noel was here,

23   but 3M's internal documents.

24        This is what Elghobashi did, and I don't think

25   you've seen the video.  This is when the Bair Hugger is off,

1    and this is the air flow of what occurs with a uni direction

2    national ventilation system.  As you can see, this is not

3    temperature.  This is velocity.  Velocity is faster.  The

4    darker it is, that's where the velocity is faster.

5              THE COURT:  It's going down to the floor and is

6    blowing stuff up.

7              MR. ASSAAD:  Of course, when it hits the floor,

8    but look at the operating room table and what occurs.

9              JUDGE LEARY:  Can I ask a question?  Is there any

10   assumption here as to the presence of other equipment or

11   people?

12             MR. ASSAAD:  There are people in the operating

13   room.  There's an anesthesiologist.

14             JUDGE LEARY:  It has to count for four.

15             MR. ASSAAD:  Yes, you'll see in the following

16   pictures.  Again, Dr. Abraham did not account for people,

17   and this is where the Bair Hugger turned on, and you'll see

18   over time as the heat goes around the edges, not where Peter

19   Goss says it's coming out of.  The heat is going down the

20   edges down through the below, and you start seeing it

21   change, and you start seeing convection currents or changes

22   of velocity going up.

23             This a real world model using generally accepted

24   mathematical principles.

25             THE COURT:  You stopped it before it got to the

 1    patient.

 2              MR. ASSAAD:  Excuse me?

 3              THE COURT:  You stopped it before it got to the

 4    patient.

 5              MR. ASSAAD:  I'm sorry.  I have a bunch of slides,

 6    but this shows temperature, if you want to see the

 7    temperature the change in temperature, I think.

 8              JUDGE LEARY:  Let me interrupt just for a moment.

 9    To Judge Ericksen's point, just before you replayed this,

10    from this depiction do we understand that there's a change

11    in turbulence over the patient?

12              MR. ASSAAD:  No.  I think the change in

13    turbulence, which I'll show in a picture later on, which I

14    think during the general cause, there was a turbulence

15    picture that Ms. Conlin put up that had the red, the

16    difference in turbulence between the Bair Hugger on and the

17    Bair Hugger off.

18              JUDGE LEARY:  And I'm sure you'll correct me if

19    I'm misinterpreting this, but I thought the model was for

20    purpose of depicting the turbulence that occurred over the

21    patient that would result in particulate being in that area,

22    but that's not shown here.

23              MR. ASSAAD:  That's just showing the change of

24    velocity that occurs when you turn the Bair Hugger on of the

25    air around the operating table.

```
 1              JUDGE LEARY:  Thank you.

 2              MR. ASSAAD:  This will just show the change in the

 3    temperature, and I'll skip what happens when the Bair Hugger

 4    is off.  I'll just show when the Bair Hugger is on, and as

 5    you can see, as everyone knows, hot air rises, and they et

 6    buoyancy currents that carry particles, and on top of that,

 7    you have the intensity of the turbulence that's also moving

 8    the particles up, and you'll see that in the following

 9    slides.

10              And what's interesting is, you have the particles

11    go up over the surgical site by turbulence and by velocity

12    factors, and the uni directional downward flow pushes that

13    right onto the patient, and you'll see that when we do the

14    particle slides.  This is the intensity, the difference in

15    turbulence over here, and you can see how the turbulence

16    intensity significantly increases when the Bair Hugger is

17    off, which is A, and when the Bair Hugger is on, which is B.

18              And turbulence is the question here regarding

19    particle flow.  That's what this study very computational

20    intensive.  It is not streamlined.  It's turbulence.

21              And what Dr. Elghobashi did here was, he put three

22    million skin squames, 10 micron particles on the floor about

23    two or three centimeters off the floor, and he color coded

24    them one million red, one million green, one million yellow,

25    so he could determine where are the schemes coming from.
```

1           And you pick 10 micron squames, and I think

2      everyone knows that's a conservative approach.  No one

3      disputes the 10 micron particles that he used, and in fact,

4      in the Memarzadeh, he also used 10 micron particles, but he

5      used RANS instead of LES, and you see with the Bair Hugger

6      on, you see the surgical site, and around the surgical table

7      free of particles.

8           This is not an animation.  This is a real world

9      model of what happens based on generally accepted

10     mathematical principles, and again, this is where the Bair

11     Hugger is on.  I wasn't sure which one I pressed, and what

12     is interesting, as you will see, and all parties agree,

13     Dr. Abraham and Dr. Elghobashi, everything in the operating

14     room makes a difference.  The people make a difference.

15          The people have also have thermal plumes that

16     create, and that's what Elghobashi did here.  The way he did

17     his study was so advanced compared to Dr. Abraham.  What he

18     did first was model the operating room with the

19     measurements.  Then he ran the operating room with no heat

20     properties for the people, and he calculated basically for

21     80 seconds air through the operating room.

22          And as you can see here, the particles go over the

23     surgical table and mostly the red particles, and the reason

24     why they are mostly the red particles is because when you do

25     an operation, usually two people on one side and one person

1    or the other side for most orthopedic surgeries, and you

2    have the anesthesiologist sitting at the head.

3             There's more turbulence and more, the convective

4    currents are going to be blocked with the people on both

5    sides, and that's why we see the red being more predominant

6    over the yellow and green.

7             THE COURT:  Let's say you only have about five

8    minutes left to talk.

9             MR. ASSAAD:  I only have a few more slides.

10            THE COURT:  Just spend the time however you want.

11            MR. ASSAAD:  I'll go really quick.  I just -- this

12   is what you've seen before, but what also Dr. Elghobashi did

13   is, he put boxes around certain areas of the operating room,

14   side Table 1, side Table 2, the surgical site where the knee

15   is and the whole surgical table, and he graphed it.

16            And the importance of that is we're, not just

17   saying that the Bair Hugger, the particles have to get into

18   the wound during the time, but they could also contaminate

19   the surgeon's hand or where the implant is on the side

20   tables when they open it.  Bacteria gets there and

21   contaminates the implant.

22            And this is what happens when the different amount

23   of squames that are shown.  So when you look on side

24   Table 2, you see that in about 15 to 20 seconds, you have

25   about 15 to 20 number of skin squames.  If you look at the

413

1    whole surgical table, you see about 1500 skin squames as a

2    result of the Bair Hugger being turned on in about 20

3    seconds.

4        We're not saying all of those are bacteria, but we

5    also agree that a certain percentage of that is bacteria

6    based on the infectious disease experts, and over the knee

7    in about 25 seconds, you see 200 or 250 skin squames over

8    the knee as a result of the Bair Hugger turned on.  When the

9    Bair Hugger was off, free and clear.

10       Again this is just proving what the defendants

11   knew about back in 2007.  3M conflates biological

12   plausibility with the mechanism of exposure.  This is a

13   mechanistic study.  It's an engineering study.  How does the

14   bacteria get to the wound or to the implant?  And it's done

15   through engineering, which is generally accepted in the

16   community.

17       The concept of biological plausibility asks

18   whether the hypothesize causal link is credible in light of

19   what is known from the science and medicine, about the human

20   body and potentially offending agent.  No dispute here.  The

21   bacteria is the biological agent.  The biological

22   plausibility question is simply whether the offending

23   agent's bacteria causes the injury infection.  Undisputed it

24   does.

25       Biological plausibility is not reasonably in

1    dispute.  There is a general consensus, if not mere anatomy,

2    that bacteria can cause joint infection.  How does the

3    bacteria get there?  The generally accepted scientific model

4    based on Navier-Stokes equations, Newton's second law and

5    many other equations that are hundreds of years old that

6    have been solved by a super computer show how this is

7    mechanistically possible or probable that the Bair Hugger

8    causes, that Bair Hugger puts bacteria over the surgical

9    site.

10              If there's any questions?

11              MAGISTRATE JUDGE NOEL:  I just have one.  You

12   indicated that what we were watching was not an animation,

13   but it is a computer simulation generated by the arithmetic,

14   pardon the expression, that the computer does based on the

15   input that Dr. Elghobashi inputted.  Is that a correct

16   statement?

17              MR. ASSAAD:  Yes, 100 percent.  It is a real live

18   model based on engineering principles.  It's not an

19   animation that we hire someone to put together.  This is

20   what the computer puts out based on the information that it

21   calculates, based on generally accepted engineering

22   principles.

23              MAGISTRATE JUDGE NOEL:  But, again, but it is a

24   simulation in the sense that arguably if you had three

25   million of those color coded things and you threw them on

1   the floor in an operating room and turned on a video camera,

2   you would see the same thing, but this is a computer

3   simulation of that based on the algorithms that

4   Dr. Elghobashi put into the software that created that what

5   we're watching on the screen.

6         MR. ASSAAD:  Yes.  When you say three million,

7   that was best case scenario for 3M studies have been shown

8   and cited that between one million and nine hundred million

9   skin squames fall in a two to four hour period.  So three

10  million was on the low end.  He did that for two reasons.

11  Number one, best case scenario for 3M, and really the other

12  reason is the cost.  If we had to track 20 million

13  particles, it would be, it would show it would exponentially

14  increase the number of particles, but it's just, it would be

15  computer time, and to use the computer, the super computers,

16  you have to be efficient.

17        MAGISTRATE JUDGE NOEL:  Thank you.  Thanks.

18        THE COURT:  All right.  We'll take a 10-minute

19  break.

20        (Afternoon recess at 3:02 p.m.).

21        (3:19 p.m.)

22        THE COURT:  Please be seated.

23        MS. ZIMMERMAN:  It was our sense that because the

24  initial motion was combined on engineering issues that

25  Mr. Goss has made in his presentation with respect to

1    Elgobashi, Buck, Dan Koenighofer and --

2            THE COURT:  He already did that.

3            MS. ZIMMERMAN:  He did that, and then I was just

4    going to add a few moments on Mr. Buck and Mr. Koenighofer

5    because that has not been addressed.

6            MR. GOSS:  That is fine.  I was just going to

7    respond to the argument about Elgobashi, but I can wait if

8    the Court would prefer.

9            THE COURT:  All right.  We have a question.

10           MAGISTRATE JUDGE NOEL:  Just before you begin

11   though, Ms. Zimmerman, I asked a question earlier that after

12   conversing with the two judges during the break, I got

13   confused about what I thought the answer was, and so I'm

14   going to ask it again.  It's my understanding based on what

15   I thought I heard the answer this morning is that all of the

16   plaintiffs in the MDL have suffered a deep --

17           MS. ZIMMERMAN:  Deep joint infection.

18           MAGISTRATE JUDGE NOEL:  Deep joint infection, and

19   the judges told me that they thought that only applied to

20   the plaintiffs selected for bellwether cases, but that

21   there's a range of infections that are not all deep joint

22   infections or periprosthetic joint infections.  So the

23   answer is?

24           MS. ZIMMERMAN:  The answer is almost all that I

25   know of are orthopedic periprosthetic joint infections.  I

1    do believe that there are maybe a handful five or six cases

2    that have been filed by various folks involving a prosthetic

3    valve in a heart surgery because Bair Huggers are also used

4    in cardiac surgeries.  I think that the focus has really

5    been on the implant of a prosthesis because of the nature of

6    biofilm and the ability of these small quantities of

7    bacteria to create an infection.

8            Unfortunately, because there are not just the

9    plaintiffs steering committee members, but there are many

10   hundreds of law firms that filed these cases, I can't speak

11   to every single one of the 4300 cases that are presently

12   pending before Your Honors, but I think the vast majority

13   are orthopedic cases involving deep joint infections and

14   certainly Judge Ericksen is correct that that was a

15   requirement with respect to the bellwether cases, so that's

16   all that we're talking about with respect to bellwethers.

17   Is that helpful?

18            MAGISTRATE JUDGE NOEL:  Thank you very much.

19            MS. ZIMMERMAN:  So I wanted to take just a brief

20   moment to speak to the motions brought against two of the

21   plaintiffs' expert Michael Buck and Dan Koenighofer, and I

22   think that we'll rest largely on our papers, but the rules

23   do not require that every expert that the plaintiffs or the

24   defendants call to provide testimony in this matter be a

25   walk-off, grand slam hitter, so to speak.

1          And so what we have offered by way of expert

2     testimony are a series of experts, seven at this general

3     causation stage, that can establish different pieces of

4     evidence that are appropriate and required for us to prove

5     or meet our burden.

6          Mr. Buck is at the University of Minnesota and

7     part of his job is to do particle testing and biological

8     sampling.  And the experiment that he did and reflected in

9     his report were done prior to the testimony that we had from

10    the 30(b)(6) witness that agreed that every single study

11    that's been done to date shows that Bair Huggers create

12    particles over the surgical site at the time of surgery.

13         So Mr. Buck is certainly well-qualified to talk

14    about what he does as a matter of practice in his employment

15    at the University of Minnesota.  Likewise, Mr. Koenighofer

16    is on the ASHRAE committee along with defendants proffered

17    expert on this Michael Kuhn from Canada, and his testimony

18    is really to talk about the environment of use before Your

19    Honors and the jury in this matter, and really the issue is

20    to some of the questions the Court has asked today about

21    what is the air flow rate like in an operating room?

22         There are minimum standards that are set by

23    ASHRAE, and Mr. Koenighofer would be offered to testify to

24    the jury essentially about what the environment of use is

25    and why air exchange rates and positive pressure and the

1    filtration system in the OR are necessary, based on his

2    training and experience.  Neither of those witnesses are

3    offered to make the ultimate conclusion in this case, which

4    is does the Bair Hugger cause periprosthetic joint

5    infections as a general matter?

6            And, of course, under 702, expert testimony has to

7    be based on sufficient facts or data, and to the extent that

8    any of the facts may by in dispute, the comments to Rule 702

9    make specifically clear that those experts' testimony should

10   not be excluded by the Court in the event the Court finds

11   one more persuasive than another.

12           And this was recently, and I shouldn't say

13   recently, this was addressed square on in both the *Pipitone*

14   *v. Biomatrix* case out of the Fifth Circuit, 288 F.3d. 239.

15   And also in *Micro Chemical v. Lextron*.  The citation is 317

16   F.3d., 1387, and that's a Federal Circuit case from 2003.

17   So in both of these cases stand for the proposition that the

18   Court is not to serve as a replacement for the adversary

19   system.  So to the extent that there are data or facts that

20   are in dispute and, certainly, as we've been here for two

21   talking about what articles may say what and what the

22   interpretation of a particular figure or chart may be,

23   that's something that provided that the experts that have

24   been offered by each side have reliable methodology and are

25   appropriately qualified to opine on, that is something that

 1      goes to the jury.

 2              And with that, I will pass to -- are we going to

 3      say anything about Dr. David right now?

 4              We thought that we would combine all remarks with

 5      respect to Dr. David at one time rather than break it into

 6      two pieces.  Mr. Goss.

 7              MR. GOSS:  Thank you, counsel.  And just to be

 8      clear the basis of our motion on the engineering experts or

 9      the target is the general causation opinions.  So, you know,

10      testimony about air flow rates, air change rates, we're not

11      challenging any of that.  It's really the general cause

12      opinions that we're focused on because that's what the goal

13      of these two days is is to test the sufficiency of the

14      plaintiffs' general cause.

15              Evidence.  And I just wanted to respond to a few

16      things on the CFD.  For one thing, on the different

17      temperature measurements of the temperature data --

18              JUDGE LEARY:  Let me see if I understand what you

19      just said, Mr. Goss.

20              MR. GOSS:  Yes, sir.

21              JUDGE LEARY:  Are you saying that the experts that

22      were commented upon by Mr. Assaad that how we as judges

23      choose to resolve the state of the evidence is really not

24      germane to the ultimate issue that has to be decided that is

25      whether or not Bair Hugger causes deep joint infections?

1          MR. GOSS:  No, Your Honor.  What I meant to say is

2     there are really two issues, one is the foundational

3     reliability under the Frye Mack standard of the evidence

4     that's being offered and if you get past that hurdle, then

5     the question is is it sufficient to meet the plaintiff's

6     burden of proof to establish general causation.  So there

7     really are two thresholds not everything that the

8     plaintiffs' experts are saying really goes to the question

9     of causation.  There are some contextual things such as do

10    you have 20 air changes per minute in an OR?  That doesn't

11    really move the needle one way or the other in terms of

12    their general cause opinions, and so that's what we're

13    really focused on is the sufficiency of the evidence to

14    carry those opinions that will then be used to actually

15    support their claim of general causation.

16          So on the different -- the temperature evidence

17    that was discussed, there was mention of an internal 3M

18    document that had temperature readings and where that came

19    from is a particular ASTM test for warming blankets.  The

20    American Society of Testing materials, there's actually a

21    test standard for making sure that your blanket delivers

22    heat the way you claim it does, and there's a specific test

23    apparatus.  And it's a styrofoam bed that's about the size

24    of this table, maybe a little larger, and it has these

25    copper sensors in it that are imbedded in it to detect the

1    temperature.

2           And so what you do to run that test is you put the

3    blanket on face down, and you run it to see if you're

4    getting the temperatures that are consistent with your specs

5    that are in the operating manual.  Okay.  So that is

6    measuring the temperature of the air and the blanket coming

7    right out and capturing it in an insulated styrofoam test

8    apparatus.

9           What Dr. Elgobashi did was he was assuming that

10   temperature for this drape area on either side here.  Okay.

11   So not directly under the blanket, but coming out of the

12   drape over the blanket from the shoulder all the way down to

13   the floor, and that's what his report says is that he

14   assumed 106 degrees and 53 feet per minute all along this

15   entire perimeter, and he didn't model anything else.   The

16   that's what he committed to.  He didn't leave himself any

17   wiggle room in his report to say, well, you can scale it

18   down, and you'll still have the same effect.

19          He did say in his general opinions appendix that

20   if you modelled with the 505 Bair Hugger, the same thing

21   would happen at a lower rate, but he didn't actually model

22   that.  That's just what he says.

23          Mr. Assaad made a comment that I thought was

24   illuminating.  He said all CFD is imaginary, and to a large

25   extent it is because when you're doing an operation you

1    don't have the surgeon standing like this.  They're moving

2    around.  They're cutting.  They're doing things, and what

3    you see in the model the people are standing stock still,

4    and not all the elements are even there.  There's no

5    anesthesia machine, for example, that would be --

6            THE COURT:  I think that Mr. Assaad used that

7    phrase, "it's all imaginary," I think he used that in one of

8    your dreams.  I don't think he used it in --

9            MR. GOSS:  Did he not say that?  Okay, I'm sorry,

10   I thought I heard it.

11           MR. ASSAAD:   I could tell you how I used if you

12   want, Your Honor.

13           THE COURT:  Did you use it?  Did you use it?

14           MR. ASSAAD:  I said the mass, their CFD guy used

15   particles air with no mass and no inertia and that's an

16   imaginary object.

17           MR. GOSS:  Oh, okay.  I must have misunderstood

18   him, but the point is that it is imaginary in the sense that

19   you don't have people moving around.  That's undisputed.

20   And there's also the fact that he also said, well, the

21   beauty of CFD is that there are no confounders.  Well, in a

22   real operating room, there are always confounders.  There

23   are always people moving around.  There are always people

24   generating air currents just like I'm generating air

25   currents with my movement right now.  That's not reflected

1    in the CFD model.

2           And this is all significant because the case law

3    has said here's a case from Southern District of New York,

4    *Reed Construction Data v. McGraw-Hill Companies*, 49 F.Supp.

5    3d 385.  The Court held "where very minor changes in

6    arbitrarily selected model parameters can entirely alter the

7    models conclusions, that model is insufficiently robust to

8    withstand scrutiny of Rule 702."

9           And then in the Second Circuit, Wills v -- I can't

10   read Mr. Blackwell's handwriting -- but this case, 379 F.3d

11   32, "to be reliable, data analysis must account for major

12   variables including confounding variables."  Well, if you're

13   saying there's no confounders, then there's a problem with

14   the model.

15          And really the test for all this as I think I

16   alluded to earlier is one of foundational reliability.  And

17   the judges don't have to be an engineer just like I don't

18   have to be an engineer.  The Court can simply apply the same

19   test that was used just to determine the admissibility of

20   any piece of evidence and that is is it trustworthy and

21   that's what Daubert ultimately is about, is it trustworthy

22   given all the data that the Court has seen.

23          Dr. Elgobashi was in an operating room in Santa

24   Monica right here (indicating).  He had the opportunity to

25   take temperature measurements.  Now plaintiffs can throw

1    shade on all the measurements that all of our people took,

2    but they didn't take any of their own and why wouldn't they

3    if they're going to spend all this money on a CFD, wouldn't

4    you want to get it right?

5         And, finally, I'll just say that this Court would

6    be the first place in the world really if the CFD were

7    admitted as proof towards general causation to allow or to

8    endorse the idea that a CFD can be used to determine the

9    cause of an infection.  That's never been done anywhere in

10   the peer reviewed literature.  And plaintiffs cited cases

11   where CFDs have been admitted, and they certainly had been

12   admitted in many cases in a variety of circumstances.  I

13   will note in the *Zurn Pex* case, the Eighth Circuit's holding

14   was simply affirming the District Court's discretionary

15   call.

16        But, ultimately, there's no case where a medical

17   mass tort has been decided based on a computer simulation.

18   And if that's what the plaintiffs are saying they have to

19   support general causation, well, it's so far over at the

20   left hand side of our schematic and the exploratory realm,

21   that it simply isn't enough to carry the weight of

22   establishing general causation.  Thank you.

23        THE COURT:  Mr. Goss, could you just -- the thing

24   that the plaintiffs keep coming back to is that they got

25   this 106 from your document.  The document that Mr. Assaad

1    was working from is that the document?  That's the one we're

2    talking about?

3              MR. GOSS:  Yes, that's the one we're talking

4    about.  Where he said he got it was from the You Tube video,

5    but it's essentially the same number.

6              THE COURT:  So is that's the same whatever that is

7    and that says temperature of the blanket?

8              MR. GOSS:  Right.

9              THE COURT:  All right.  Thank you.

10             MR. GOSS:  Okay.  Thank you.

11             MR. ASSAAD:  Abraham is next, Your Honor.

12             THE COURT:  Okay.  So where are we?

13             Do you have -- do you want to make your motion to

14   exclude Abraham?  That's where I'm thinking we are, but you

15   were --

16             MR. ASSAAD:  Unless the Court has any questions on

17   Dr. Elgobashi, I'm going to move on to Abraham.

18             And just real quick on Dr. Elgobashi, I know it's

19   a very complicated CFD topic, and if this Court would like

20   him to come in, we'd be happy to bring him in if there's any

21   questions the Court would like with regard to understanding

22   CFD or any of the subject areas of the calculations that he

23   did because I know it's very complicated.

24             Moving forward to Dr. Abraham.  Defendant admits

25   that Abraham failed to provide the underlying data, facts,

 1     and equations in his expert report.  His expert report

 2     refers to no online videos or no published paper.  And in

 3     fact when he said he had a published paper, defendants

 4     precluded plaintiff from asking any questions regarding the

 5     published paper during his deposition.  Even after the

 6     opportunity to correct or have an errata sheet with any

 7     questions I've had, he only put three things down on his

 8     errata sheet to change anything or to add anything regarding

 9     his testimony during his deposition.

10            I'm going to talk about seven factors very

11     quickly.  His opinions are not relevant.  He is not

12     qualified as an expert on particle movement and turbulent

13     flow.  His report does not have any data to support his

14     opinions.  His CFD model goes to being not reproducible, I

15     think that goes to the second prong that Judge Leary you

16     were talking about earlier.

17            Experimental methodology, his fault studies is

18     flawed and not reliable.  He's not qualified to offer his

19     opinions outside his expertise basically commenting on the

20     medical literature, and his criticisms of Dr. Augustine and

21     his hot air rises is not rebuttal.

22            Undisputed facts.  Dr. Abraham's model lasts only

23     1.2 seconds.  He turns the Bair Hugger on and then he takes

24     his measurements and that's it, doesn't give it time to get

25     up to study state.  It is no different than turning on a

1    heater in this room, raising the temperature by 20 degrees

2    for 1.2 seconds.  It's not going to cause a change in

3    turbulence as we've seen by heat kinetic energy changes

4    turbulence.

5                MAGISTRATE JUDGE NOEL:  The General Services

6    Administration is incapable of raising or lowering the

7    temperature in this room in any given time frame like that.

8                THE COURT:  But they do have a regulation that

9    we're not allowed to use space heaters, so they got that

10   covered.

11               MR. ASSAAD:  Well, I'm glad I didn't bring a space

12   heater and turn it off for 1.2 seconds because you would not

13   see any effect in the air flow in this room.

14               It's undisputed that Dr. Abraham did not use

15   particles.  This case is about particles.  It's not about

16   streamlines.  He models streamlines.  More importantly and

17   ironically, or very importantly, he destroyed all but one

18   file.  He was retained in 2015 during the *Welton* case by 3M

19   by the former attorneys Greenberg Traurig to do a CFD study.

20   He was provided information of CFD studies or data that 3M

21   did as well as testing that was produced.  And he had

22   multiples files that were created, and he discussed it

23   during his deposition and even in his published paper he

24   talked about different time steps and different data he had.

25   He admitted that he deleted all the files that plaintiffs

1    would require to reproduce his results.

2            If you look at his expert report, we do not know

3    what equations he used.  And, furthermore, he used no people

4    in the operating room.  Again, plaintiffs, I don't think

5    anyone here maybe this is the undisputed fact that CFD is a

6    reliable methodology.  I think we could all agree on that.

7            Large-eddy simulation which was done by both sides

8    is acceptable.  It's transient, it's not a steady state.

9    And the difference between steady state and transient is in

10   transient everything is changing, it's time dependent.  You

11   can't turn on the Bair Hugger for 1.2 seconds and say, oh,

12   this is how it is for the next 20 to 30 seconds.  Everything

13   is changing.  Air moves, particle moves.

14           You saw how long it took for particles to go from

15   the floor to the surgical site.  It took over 20 seconds.

16   1.2 seconds is nothing.

17           Plaintiffs' contention is that Abraham's report is

18   lacking in enough description that an individual, an

19   engineer such as Dr. Elgobashi or anyone else in the same

20   field, could have reproduced the report.  Or even more

21   importantly, allow myself or anyone else on the plaintiffs

22   to do a vigorous cross-examination, which is what the trial

23   is for, what the jury is for.

24           No dispute that airborne bacteria travels through

25   the air and airborne bacteria travels on skin squames and

 1   has a mass and inertia.  Elghobashi models squames.  Skin

 2   squames do not follow streamlines, and it's very important

 3   to understand this.  Those pretty pictures that you see on

 4   Abraham's report with the blue lines and green lines, those

 5   are streamlines.  Those are you turn on the Bair Hugger for

 6   1.2 seconds, you stop it, and you look at what are the

 7   velocity vectors of the air at that point in time and you

 8   just take a line and draw a line based on the velocity

 9   vectors.  But the velocity vectors change every single

10   millisecond.  Not only that, particles have massive inertia.

11   All experts agree, even Dr. Abraham that skin squames do not

12   follow streamlines.

13           THE COURT:  You just don't want to think too much

14   about that, I don't think.

15           Just think how many are in this room.

16           MR. ASSAAD:  Streamlines or squames?

17           THE COURT:  Squames.

18           MR. ASSAAD:  There's billions.  This case is about

19   particle movement and turbulent flow.  When asked whether or

20   not he was an expert, Dr. Abraham admits he's not an expert

21   in either low speed or high speed turbulent flow.  3M argues

22   that there's a middle speed, but that is -- if you look at

23   3M's response, he doesn't -- 3M doesn't just recite anything

24   regarding his middle speed.  There's subsonic flow and

25   supersonic flow.  Subsonic flow is anything below the speed

1    of sound, mach one.  Supersonic is high speed, over mach

2    one.  The fact that Dr. Abraham admits he's not an expert in

3    particle flow in low or high speed, he cannot testify, he's

4    not qualified to testify that he could testify that the

5    particles in the operating room move a certain way or

6    different way after turning the Bair Hugger on in 1.2

7    seconds.  He didn't model it.  Unlike Elghobashi who was

8    elected to the National Academy of Engineering based on his

9    particle flow and turbulent flow, to understand multistage

10   turbulent flows, the defendants haven't met their burden

11   that Dr. Abraham is qualified to talk about particles.

12          Streamlines assume imaginary particles.  There's

13   the word imaginary.  There's no such thing as a particle

14   with no mass or no inertia.  Particles act differently.  And

15   if you compare the videos on Elghobashi, you would see how

16   the velocity of air and particles move in different areas

17   and that's because of turbulence.  Turbulence, again, is one

18   of hardest things to measure and calculate and is basically

19   only done by supercomputers.

20          Another thing, sitting here today, plaintiffs have

21   no idea what he modelled.  The mesh on his report is a 60

22   million grid mesh.  At the deposition, he testified that he

23   based his results on an 8.1 million mesh, and I don't know

24   if this Court recalls what the mesh is from science day, but

25   it's when you take -- when you take the room and you divide

1    it into millions and millions of little squares, okay.  So

2    he says his report is 8.1 million, what his results are

3    from.  What's pictured in his report is a 60 million grid

4    mesh, and the file -- the one file, that was produced to us,

5    the one file, is a 9.8 million mesh.  The importance of the

6    mesh is the accuracy and the calculations involved.  This is

7    what he put on his report, a very, very fine mesh, 60

8    million.  And he said he ran it and he said it he ran it

9    before science day, but there's no evidence that he did

10   that.  This is the mesh that was provided to us on the file.

11   Much different.  And it goes to the plaintiffs being able to

12   hire a person to reproduce the results.

13          Now, what's also important is that even this mesh

14   that he provided to us is not the mesh that's on his report.

15   On his report he refers to an 8.1 million mesh for his

16   temperature calculations.  We do not have that file.  He

17   destroyed all the files except for one.

18          Looking at his report, again, CFD is a reliable

19   methodology if you perform it correctly.  If you look at

20   Elghobashi's report, he puts in equations, he puts in

21   exactly what he did, the type of equations, his Duncan

22   conditions, his initial conditions.  There's no equations in

23   Dr. Abraham's report.  There's no initial conditions.  And

24   initial conditions are necessary to reproduce the file

25   results.  If I do not know what he starts with, I can't find

433

1       out what the -- I can't get the results at 1.2 seconds that

2       he did.  He has no -- there's no 8.1 million mesh, and he

3       doesn't include the time step.  And the time step is very

4       important.  The time step is the difference between each

5       calculation of step.  So you're a time step of .01, .001.

6       Dr. Elghobashi put that in his report, and he told you when

7       he changed the time step.  There was no time step in

8       Dr. Abraham's report.  And he admitted during the 40-day

9       run, because he didn't run it on a supercomputer but a

10      laptop, that he changed it multiple times but he doesn't

11      know what it was and what he changed it to.  I can't

12      reproduce his results.  And when I say I can't, I mean

13      plaintiffs by hiring an expert.

14              Abraham refers to obtaining quasi steady state

15      results to determine that his calculations are correct.

16      First of all, quasi steady state in a transient problem is

17      irrelevant.  As you could see from Dr. Elghobashi's video of

18      the particles, it is always changing.  It changes.  And it

19      takes longer than 1.2 seconds to change.  But he admitted

20      that it's impossible for anyone to determine, someone in his

21      field, whether or not his results meet quasi steady state

22      which means there's very little difference without having

23      two data points.  We only have one data point at 1.2

24      seconds.  He destroyed all the data.  We can't reproduce it.

25              He said the only way I could determine whether or

1    not you have a quasi steady solution is to look at two -- at

2    least two TRN files.  And TRN files are the data files

3    produced by the ANSYS program.  Correct.  I only have one

4    TRN file.  You understand that, correct?  I can't reproduce

5    -- or I can't determine whether or not he had quasi steady

6    state results.

7           And by the way, Dr. Abraham used 106 degrees on

8    his CFD model.  I can't reproduce because of a lack of

9    equations, of a lack of initial conditions, and multiple

10   files.  The purpose of the expert report is to determine

11   what the expert did.  And we produced an expert report where

12   Dr. Abraham came in, was at the deposition of

13   Dr. Elghobashi, and I took his deposition and was able to

14   criticize, as the adversarial process allows to be brought

15   forth in front of a jury.  He was able to criticize the

16   equations, his boundary conditions, his mesh, his geometry,

17   his diagrams, that is expert -- that's the adversarial

18   process.  The only thing I can -- the plaintiffs could can

19   at trial is to say you didn't put down your equation, you

20   didn't give us a time step, and we couldn't reproduce your

21   report.  I can't run his report or run his data and say this

22   is what's going to happen.

23          Abraham even agrees to reproduce the results in

24   these initial conditions, the time step, the mesh, and the

25   geometry.  We don't have any one of them.  We don't initial

1    conditions, the time step.  The mesh that he used is not the

2    one that he provided to us.  And by the way, the mesh that

3    was provided to us, the TRN file, was not in response to the

4    expert report.  It was provided to us when we subpoenaed

5    Dr. Abraham when he published the CFD on 3M's website and 3M

6    agreed that it was no longer confidential and they give us

7    one TRN file many, many months before the expert reports

8    were due.

9              THE COURT:  Okay.  So I think you pretty well

10   covered that his work is not reproducible, and I guess you

11   say it doesn't make any sense.  Okay.  Go to your next slide

12   then.

13             MR. ASSAAD:  This is the fog experiment that he

14   did afterwards saying that he tested his results.  Again,

15   first of all, I showed you what validation looks like.  It's

16   a graph.  It's not just I went and took a couple

17   temperatures around the room.  Especially when you run the

18   Bair Hugger for 1.2 seconds, you're not going to see a

19   temperature difference anywhere in the room.  And he didn't

20   identify where he took temperatures.

21             He also states that the model shows that the Bair

22   Hugger forced-air warming does not add appreciably to the

23   cooling work of the operating room.  If this model of 1.2

24   seconds change the operating from 59 degrees to 62 degrees,

25   that is almost like an atomic bomb blowing up an operating

1    room because I don't think any heater could heat this room

2    in 1.2 by three degrees.  I can't reproduce or

3    cross-examine.  He didn't provide the video for the full

4    visualization.  He didn't provide the data.  He didn't

5    provide pictures.  Ipse dixit, I did it, I validated it, it

6    was correct, I'm not going to provide any underlying data.

7    And if you look at his report, there's one paragraph on his

8    testing with no underlying data, no videos.  Of course 3M

9    says you could look at the videos online.  That's not part

10   of his report.  That has not been submitted into evidence.

11   That's --

12           THE COURT:  Okay.  I think we have a good sense

13   for why you think Abraham ought to be excluded.  Let me hear

14   from the defense.  And then if there's something that you

15   need to respond on, we'd be happy to hear from you.

16   Mr. Goss.

17           MR. GOSS:  Thank you, Your Honor.  I'll be -

18           THE COURT:  It sounds bad that the files were

19   destroyed and the information can't be reproduced.

20           MR. GOSS:  All right, it sounds bad but it isn't.

21   We reproduced the master file for the entire CFD in response

22   to subpoena last November.  I was at Dr. Abraham's

23   deposition.  They had the CFD.  Mr. Assad was manipulating

24   it in front of our very eyes and asking Mr. Abraham --

25   Dr. Abraham lots of questions about it.  When it came our

1    turn with Dr. Elghobashi, we were provided a file that was

2    proprietary.  We couldn't even play it because we didn't

3    have the software.  So for him to suggest that somehow he

4    didn't have the information he needed to do the deposition,

5    which went a full -- went well over seven hours is just not

6    true.  We haven't heard anything from Dr. Elghobashi that

7    there was anything missing from Dr. Abraham's report that

8    would not allow him to be able to understand the work that

9    was done and to reproduce it if he chose to do so.  All

10   we've heard is complaining from lawyers but nothing from

11   Dr. Elghobashi.  At his deposition he didn't say a word

12   about Dr. Abraham not producing things.  So this is really

13   all lawyer argument is what it is.

14            THE COURT:  But destroying the files.

15            MR. GOSS:  He didn't --

16            THE COURT:  That's not something somebody would

17   make up.

18            MR. GOSS:  Well, he just didn't retain them.  He

19   kept the master files, but he's got a lot of computer files

20   over there at St. Thomas.  It's not -- he didn't destroy.

21   He just didn't maintain them.  They were culled in the

22   normal process of the way any of us, kind of like you have

23   files, after you finish working on something, the drafts

24   aren't retained.  That's really all it is.  So there was no

25   deliberate destruction.  And again, we produced the master

1    file back in November.  We didn't hear a peep from the

2    plaintiffs about this isn't enough, we don't understand it,

3    it's not enough detail until Dr. Elghobashi's deposition, at

4    which point he is cross-examined to the Nth degree about

5    every last little thing he may have done to prepare his

6    opinions in this case.  So there was no deliberate

7    destruction.  The master file was produced.

8              MAGISTRATE NOEL:  Did he use 106 degrees as the

9    temperature under the blanket -- or under the drapes?

10             MR. GOSS:  Yes, but, again, his model is very

11   different from Dr. Elghobashi's.  It comes out of the head

12   and neck and at a lower velocity.  If he were here, he could

13   explain it lot better than I can, which goes to show that a

14   lot of these criticisms are really about weight and not

15   admissibility on Dr. Abraham's side.

16             As to the complaint about modelling air instead of

17   particles, again, I'm not an engineer.  Mr. Assad would be

18   quick to remind you that I'm not an engineer.  But if the

19   air doesn't get there, then how do the particles get there?

20   Their whole theory is disruption of air flow and if the air

21   delivers particles to the surgical site.  Well, if the

22   streamlines aren't getting there, that means that the

23   particles can't get there either because they will drop out

24   because of inertia and their own mass, according to what

25   Mr. Assaad just said.

 1          So that's really all I had to say in response to

 2     the motion, unless the Court has any other questions.

 3          THE COURT:  Nope.  Thank you.

 4          MR. GOSS:  Thank you.

 5          MR. ASSAAD:  Could I have one minute, Your Honor.

 6          THE COURT:  Yes.

 7          MR. ASSAAD:  Dr. Abraham did not produce a master

 8     file.  Every time you run a CFD and you get a result for

 9     every time step, it spits out a file.  So if you run it with

10     a .1 time step, when that time step is solved, it spits out

11     a data file.  So he didn't produce the master data file, and

12     it's clear there's more than one data file, and that's how

13     you determine whether or not you get quasi steady state by

14     comparing one data file to the second.  In his deposition on

15     page 53, I asked, So those files have been destroyed?  Well,

16     I mean, there's no reason to keep them.  He destroyed those

17     files.  He deleted them.  He deleted our ability to perform

18     a vigorous cross-examination and run his file.  He admits

19     that we can't replicate what he does.

20          MAGISTRATE JUDGE NOEL:  I guess I'm confused by

21     just listening to the lawyers because Mr. Goss just told us

22     that at the deposition you did reproduce it, you ran through

23     several iterations of what it was and made changes and said

24     do this, do this and he did it.  What is it that you can't

25     do?

```
 1              MR. ASSAAD:  Let me explain.  So every time you
 2    run a -- every time the CFD comes up with a result, it
 3    creates a data file.  And in that data file, you could see
 4    what the temperature grading is, what the streamlines are,
 5    and what occurred.  I have the data file only for 1.2
 6    seconds, okay.  He said that he ran the data for -- I have
 7    -- let me rephrase it.  I have data file number 264.  And
 8    every time you run, it gets a result, you got 265, 266, 267.
 9    He deleted 1 which initial -- his initial conditions to 263.
10    Only 264 was reproduced.  He said he ran up to 2500 or 3000
11    time steps, whether or not you want to believe his
12    deposition or his published paper that's not part of the
13    evidence.  And I don't have any of those.  Those were
14    requested, those were relied upon, and they've been deleted
15    and he said he deleted it.

16              Without those two information, first of all, I
17    can't determine whether or not that he got correct results
18    or proper results.  I can't determine quasi study to say the
19    difference between this time step and that time step is so
20    small that I'm almost at study state which Dr. Abraham
21    admits I can't do.  And without the initial conditions of
22    what you started with, what data you put in, I cannot
23    reproduce.  And under Daubert, you should be able to have
24    enough sufficient information for someone in the field to
25    reproduce the results.  And yes, I had one file and I could
```

441

1    see the mesh.  I showed you the mesh which -- I showed the

2    mesh that were provided to us is not the same mesh that's in

3    the report and different than the mesh that he testified to.

4    We're not even sure that the file he gave us is the file

5    that created those pictures and his report because the

6    meshes don't match up.  That's all I have, Your Honor.

7              THE COURT:  All right.  Who is the making the

8    motion -- who is speaking to the motion about Ho?

9              MR. BANKSTON:  Me, Your Honor, Mark Bankston.

10             THE COURT:  All right.  I'm sorry?

11             MR. BANKSTON:  Mark Bankston on behalf of all

12   plaintiffs to argue the motion to exclude Dr. Ho.  Your

13   Honor, I'm going to keep us moving fast.  No prelude, let's

14   just talk about Dr. Ho.  Dr. Ho is a little bit of unusual

15   expert.  He's a late addition, hired substantially later

16   than all of the rest of our experts.  He's about two weeks

17   before his report, and then he produced a report.

18             Dr. Ho is a gentleman who works for the Canadian

19   Military.  His career has been spent developing devices that

20   perform optical laser and other types of sampling of

21   bacterial particles and biological aerosols.  He did not do

22   any of that in this case, though.  The only thing he has

23   done in this case is write a report based upon some

24   materials that he's collected.

25             There are two primary reasons that we seek his

1   exclusion, the first being that the number one point that

2   Dr. Ho is meant to address is this thing that we've been

3   talking about for a long time which is whether airborne

4   particle matter can act as a reasonable surrogate for the

5   presence of bioburden in the air.  As you know, it's a

6   hugely contested thing between the parties, and we've heard

7   a lot of studies about that, both from their side and from

8   our side.  Dr. Ho gave an opinion on that matter but

9   reviewed virtually none of those studies.  Argument is not

10  that every expert has to review every relevant piece of data

11  in the field or every relevant piece of scientific

12  literature, but an expert cannot just abjectly ignore and

13  fail to review the great bulk of all of the literature

14  that's out on this subject and then come in and give an ipse

15  dixit opinion on what that is.

16        I just want to briefly go through what those

17  studies are.  Of course you've heard a lot about Darouiche.

18  Dr. Ho did not review Darouiche.  He was shown it during

19  deposition.  He immediately concluded it must have been

20  wrong.  He said Dr. Darouiche must be motivated in some way

21  would to manipulate the results.  It came out he obviously

22  has a bias.  In their response, 3M has a lot of criticisms

23  of Darouiche.  None of those come from Dr. Ho because, of

24  course, Dr. Ho never even read Darouiche when coming to his

25  opinions.  Obviously when we have somebody up on the stand

1    talking about Darouiche or particles and proxies, they're

2    going to have a very aggressive cross-examination, but none

3    of that comes from Dr. Ho.

4            One article that hasn't been talked about a lot

5    today or yesterday as well is the article by Reval, et al.

6    And this was published in *Cytotherapy* I believe 2014, I may

7    need to check on that date.  There was also another one

8    that's cited in our papers that Dr. Ho did not review.  He

9    also quickly reviewed that and quickly determined it was

10   wrong in the midst of a deposition after two or three

11   minutes of looking at it.  There is another paper by Wing,

12   et al., also concluding that particle mass is a reasonable

13   representation for airborne particles, did not review that

14   either.

15           He did review the paper by Stocks.  That's one of

16   the ones he did that is mentioned in his report.  This is a

17   paper that he said that upon immediate glance at the data,

18   just looking at Figure 1, instantly any qualified person

19   would be able to tell the study is junk, this is the one

20   that's discussed in our papers, though, where when the study

21   came out, 3M sent it to Russ Olmsted at the National

22   Institute of Health who they retained as their biological

23   specialist who does microbiological testing and sampling.

24   He's the one who described the Stock study as fairly

25   remarkable study, particularly for the ability to be present

1    during the actual procedures, and said that it does stand

2    for the proposition and is a reasonable finding that

3    bacteria acts as bioburden.  It really has Mr. Ho has --

4    Dr. Ho has no solid explanation of why to dismiss this study

5    except that any qualified person who sees it would

6    immediately discount it.  That's clearly not true.  That is

7    one of the few studies he actually did review.

8         The only other study that really is meaningful to

9    his opinions that he did review is this older study by Seal

10   and Clark that's also another one that supports bioburden as

11   proxy by particulate matters.  I'm just going to quote for

12   you what he said about it.  He did review this one and said,

13   speculatively, if the dataset from panel 2D was compared to

14   ultraclean live particles, it would appear unlikely to relay

15   positive, significant experiment correlation.  So at least

16   on this one study, there was some semblance of something

17   that looked like analysis, but even by Dr. Ho's own

18   admission, it's completely speculative.  He's only

19   discounting the regard of the study by making his own

20   independent speculations about the data.  He's not done any

21   actual analysis of it.

22        All of these studies, this large body of

23   literature where he's only reviewed a couple of these

24   studies, are things that he wants to testify about now

25   despite not having had any opinions about them in his

1       report.

2               If you look on the other side, which is what does

3       he have to support the opinion that there is -- I mean, in

4       other words, why was he able to ignore this large consensus

5       body of literature?  And if you look at 3M's response, they

6       start citing different studies about why Dr. Ho should be

7       able to ignore this literature.  They say he was -- they

8       discuss and say Bergan in 2015.  Dr. Ho did not review the

9       Bergan study.  It's not included in his report.  He did not

10      base any of his opinions on it.

11              They also cite a literature review by Mora, et

12      al., which does talks about some of the studies that we've

13      been talking about.  Dr. Ho did not review that study.  It

14      does not form any part of his opinions.

15              They talked a little bit about a study called

16      Landrin is one of the ones he cited that actually is in his

17      report.  Landrin is actually discussed by many of the other

18      studies, the significant limitations of that study and the

19      aberrant results.  In fact, the aberrant results of Landrin

20      are, in fact, the motivating factor why so many studies have

21      been done since then.

22              None of those limitations are discussed by Dr. Ho,

23      even though he read the Stock study, he read Darouiche, he

24      knows those limitations exist.  None of that was addressed.

25      That's the only thing that's in his report that really

1    supports any of this because the only other thing you could

2    even remotely site is a study by Christina, et al., which

3    discussed 3M's paper.  The problem with that study is they

4    measured particles in that study from the release of smoke

5    from electrosurgical tools.  And, in fact, they were only

6    measuring two different particle sizes which are directly

7    associated with smoke released from electrosurgical tools.

8    The author specifically discussed this limitation and, in

9    fact, said they warned the study cannot be used to

10   contradict a correlation between the number of particles per

11   meter cubed and CFUs per meter cubed which they noted was

12   reported by the Stocks paper.  So the very purpose why 3M

13   was hoping to use this paper is disclaimed by the authors,

14   do not use this to try to contradict Stocks.

15          So at the end of the day, Dr. Ho has virtually no

16   support.  The only thing that you could even begin to pin on

17   it was Landrin, and so you have this one outlying study that

18   has been roundly rejected by the rest of the literature, and

19   the rest of the literature he didn't even review.

20          When an expert so abjectly fails to acquaint

21   himself on the body of literature, we don't believe that

22   that's a reliable methodology because there's nothing else

23   in his training, background, experience in which he's

24   published any studies like this or done any sort of work

25   like this.  It appears that at the very last moment, in the

 1    hope to fight this issue, 3M retained a person, gave him a

 2    couple studies but he did not have the time or ability to

 3    fully acquaint himself with the materials.  For that reason,

 4    on that topic, we believe he should be excluded.

 5              THE COURT:  Okay.

 6              MR. BANKSTON:  There's just one other really quick

 7    thing.

 8              THE COURT:  Okay.

 9              MR. BANKSTON:  And that is, he gave a filter

10    opinion.  He says the filter but didn't admit it in

11    deposition.  The only opinion he can give is that it's

12    reasonable for the mechanical operation of the device,

13    specifically disclaimed in the ability to talk about its

14    safety, and that's something else I think you should see in

15    the papers.

16              The only other thing in the papers that I think is

17    really worth looking at is this was one of the most unusual

18    witnesses I've ever taken a deposition.  His degree of

19    advocacy, the ability in which he would so radically depart

20    from how a reasonable person would answer is striking.  And

21    I don't want to go into too much about that because I think

22    it's really something you need to read on the paper in the

23    papers.  And when you see it, it is -- it was really

24    disturbing to me to see how much this expert, and it's not

25    totally his fault, he's a neophyte, he doesn't understand --

1   he's not a regular testifier, but he flat out admitted that

2   he believes his role was to be advocate for 3M and to

3   criticize stuff that is unfavorable to 3M but not to

4   criticize things that are favorable to 3M.

5           THE COURT:  All right.

6           MR. BANKSTON:  Let's -- for all those reasons we'd

7   ask --

8           THE COURT:  All right.  Thank you, Mr. Bankston.

9           Who's going to stand up and speak to Dr. Ho?

10          MR. GORDON:  That would be me, Your Honor.  I'll

11  be very brief.  We haven't talked much about it, but I want

12  to just bring up the fact that there's a different standard

13  that applies to rebuttal experts.  Dr. Ho is a rebuttal

14  expert.  We didn't hire him to come forth with opinions to

15  meet our burden of proof; rather, we hired him to address a

16  couple of very specific issues that go to what the

17  plaintiffs are relying on.  Dr. Ho is a microbiologist.

18  He's the only microbiologist on either side.  He's not just

19  a microbiologist.  His speciality is aerobiology.  He's not

20  just an aero biologist.  He may be the world's leading

21  expert on the determination -- on realtime assessment of

22  viable pathogens that are airborne.

23          The reason for -- and let me explain that very

24  briefly.  He has spent his career developing a system, a way

25  of doing realtime measurements of biohazards that are

1    airborne, initially for the Canadian Military, it's now been

2    shared with and he works with the U.S. military and, in

3    fact, all NATO forces use and rely on his equipment.  Why?

4    For chemical warfare.  When the NATO forces are out in the

5    field and there's a concern that, you know, some enemy

6    forces might deploy chemical weapons, they need something

7    that can tell them right now in realtime, let's put on our

8    gas mask.

9         Now, based on plaintiffs' theory, all they'd have

10   to do is use a handy particle counter and, you know, since

11   particles equals bacteria, you know, that's all they need to

12   do.  That's so patently silly to tell, you know, to say that

13   the military should just rely on particle counts as a

14   surrogate.  They don't rely on it as a surrogate for very

15   good reason.  It's no surrogate.  Particles are a quick and

16   dirty way of assessing in realtime, you know, potentially

17   where contaminants might be.  If you want to -- you can't do

18   real -- well, without Dr. Ho's equipment, you can't do

19   realtime measurements of actual bacteria.  You can do very

20   quick realtime assessment of particles.  So if you're in an

21   OR and you want to get a sense of what's going on, you can

22   do a quick particle measurement.  If it's really low, that's

23   probably a good indication that it's a pretty clean

24   environment.  If it's really high, maybe you got a concern,

25   you got to do bacteriological sampling to know, but

1    plaintiffs whole case, a major component of it, is syllogism

2    that particles equals bacteria, Bair Hugger emits particles,

3    therefore Bair Hugger must be admitting particles.  You've

4    always got to be careful of syllogisms for all matter will

5    be Socrates.

6        But let me see if I can give you a different

7    comparison.  We know that most of the lakes in Minnesota

8    have fish in them, lots of fish, some more than others.

9        But there are probably some lakes that have

10    absolutely no fish.  And if you know that a lake has no

11    fish, you've measured it, you've done nine tests of it,

12    you've determined that there are no fish in a lake, the fact

13    that you could say -- and, generally speaking, lakes

14    correlate with fish, with fish being in them, that doesn't

15    mean that there must be fish in the lake that you already

16    know there aren't any fish in.

17        MAGISTRATE JUDGE NOEL:  Just to follow that

18    syllogism, 3M has no scientists who say that there is no

19    bacteria, correct?  In other words, nobody has studied this

20    bacteria issue?  That's the whole point, I thought.

21        MR. GORDON:  Actually, there have been nine -- we

22    could go over them, but there have been nine published

23    studies where a number of different researchers, including

24    most recently the Oguz paper, we've talk about that at

25    length, have in fact studied is there a connection between

1    the use of the Bair Hugger and the increased bacteria.  And

2    there's a reason -- and so there are nine published studies,

3    and there are seven secret studies done by Augustine and his

4    colleagues.  There is a rich body of scientific literature

5    that demonstrates that whatever the general proposition for

6    particles might, under certain circumstances, equal

7    bacteria, that's not the case with the Bair Hugger.  And

8    that's not incredible.  That's one of the areas where Dr. Ho

9    can provide insight to the jury.  The Bair Hugger is a warm,

10   dry environment.  That is not a happy place for bacteria.

11   So the idea that air coming out of the Bair Hugger might not

12   actually contain viable bacteria, even though it might

13   contain lots of tiny little particles, that makes perfect

14   sense, microbiological sense.  And Dr. Ho as a

15   microbiologist, whose life's work has been dedicated to

16   determining the bio burden of actual -- actual viable

17   things, is in a perfect position based on his own

18   experience.  Yes, he did read the key research.  The

19   plaintiffs rely heavily on the Stocks paper.  He reviewed

20   that.  He critiques it.  They don't like his critique of it.

21   That's fine, but -- and they showed him a couple of other

22   papers that he hadn't seen, one including literally a

23   chicken coop where they measured the bacterial burden in the

24   air on the chicken coop and correlated with the particles.

25        Right after 9/11, when there was the apparent

1     anthrax attacks in D.C., the CDC sent a plane up to Medicine

2     Hat, Alberta, to get Dr. Ho and his equipment and his team

3     to fly to Washington to measure the post offices and the

4     Senate offices for the SARS virus.  When a Toronto hospital

5     was dealing -- I say SARS.  With anthrax.  When a Toronto

6     hospital was dealing with a SARS outbreak, they brought in

7     Dr. Ho to use his --

8            So plaintiffs criticize our experts if they've

9     done only a literature review.  Now they criticize Ho for

10    not doing what they think is a thorough literature review.

11    He reviewed plenty of literature, but he is an expert, the

12    expert, if you will, in aerobiology and is perfectly

13    situated as a rebuttal expert to critique the plaintiffs'

14    syllogism and their theories.

15           He's also able to explain to the jury how bacteria

16    behave in the air, the size of the bacteria, how they tend

17    to clump and travel in packs and travel on fomites, they

18    don't travel as tiny little particles, and to quantify the

19    size and therefore allow others to put the pieces together.

20           But he is certainly qualified, even if he didn't

21    read anyone else's paper, but he did read the relevant

22    studies.  And he is critiquing.  He is critiquing this

23    syllogism upon which plaintiffs so heavily rely and for

24    which there is no scientific support as applied to the Bair

25    Hugger.  And, in fact, there is ample scientific, robust

1    scientific report uniformly rejecting the notion that the

2    Bair Hugger, whatever particulate increase occurs from the

3    Bair Hugger, the evidence is clear it is not viable

4    bacteria.

5             And with that, I'll rest on the papers.

6             THE COURT:  Okay.  Thank you, Mr. Gordon.

7             MR. GORDON:  Thank you.

8             THE COURT:  I believe we have to recess today

9    again at 4:30.

10            Mr. BANKSTON:  Let's keep things moving then.  I

11   don't need any extra time.

12            THE COURT:  Okay.  But I think we might be able to

13   cover Lampotang.

14            MR. FARRAR:  We can, Your Honor.  My name is Kyle

15   Farrar.  I haven't been able to speak the last couple days,

16   so just so you know my name.

17            We're mostly going to rely on the papers on

18   Dr. Lampotang, but just a quick background.  He's an

19   engineer and not a doctor, but he is Dr. Lampotang.

20            The real criticism is his methodology or complete

21   lack thereof.  He testified specifically that he didn't use

22   the same methodology he would were he in an academic

23   setting.  And he says on page 248 of his deposition, "I was

24   not writing a paper in my mind, so I didn't apply the same

25   approach that I would use for an academic paper."

1              And if we look at his report and his deposition,

2      it becomes clear -- and I would implore the judges to really

3      look at his report as opposed to listening to me talk about

4      it, but if you look at the materials considered, he's got a

5      handful of plaintiffs' experts' reports, a handful of

6      depositions, cherry-picked documents and eleven pieces of

7      literature, none of which are the nine pieces of literature

8      that 3M has been flashing up that they claim to show that

9      there is no association of causation with the Bair Hugger

10     infection rates.  And then he comes to some conclusions that

11     are kind of just the overall arching conclusions of the

12     case, like the Bair Hugger warming unit is safe, Arizant and

13     3M acted reasonably in designing, developing and marketing

14     the Bair Hugger.  There's no methodology behind it.  This is

15     that ipse dixit, which I never can say right.  He's just

16     saying it.  He said, look, I looked at this stuff and these

17     are the conclusions.  There's no tie to it.  He says

18     specifically 3M acted within industry standards in the

19     design, testing, evaluation and development of the Bair

20     Hugger.  He doesn't tell us what the industry standards are.

21     Where is he gathering that information?  What is he looking

22     at to make that determination?  He has an interesting

23     opinion where he says it is my opinion that Arizant and 3M

24     took the high road and acted with poise and restraint in its

25     official response to allegations about his forced-air

 1   warming technology.  I don't know if he's a warming expert

 2   or a human factors expert or a marketing expert, but that's

 3   just not an opinion that's relevant to the case.  But, more

 4   fundamentally, where is he getting it from?  What's the

 5   methodology that he comes up with any of his opinions?  So

 6   that's really the criticism.  If you look through his

 7   report, he's got eleven different opinions, none of them

 8   does he give an actual methodology of where he came up with

 9   them, and he certainly didn't review the materials that

10   would be necessary to come up with these kind of overarching

11   huge conclusions.

12            Thank you, Your Honor.

13            THE COURT:  Thank you, Mr. Farrar.

14            Ms. Lewis.

15            MS. LEWIS:  Good afternoon.

16            I am just sort of taken aback, because I think

17   that's the weakest argument that plaintiffs can make with

18   respect to Dr. Lampotang, that he did not follow how you

19   would follow writing an academic paper.  As he mentioned in

20   his deposition, he's not writing an academic paper.  He's

21   writing an expert report.  And he did not -- you know, he's

22   not an expert testifier, so he may not know everything that

23   he is supposed to write on his materials-considered list.

24   Those were some of the questions that he was asked during

25   his deposition.

1          The other thing that happened during his

2     deposition is plaintiffs refused to show him things he asked

3     to see.  They would ask him, "Have you seen this particular

4     document?"  And he said, "I don't know.  Show me the

5     document, so I can see if I've reviewed it."  And they

6     wouldn't show it to him.  So that was several times

7     throughout his deposition.  Have you seen this document?  I

8     don't know; can you show me the document, so I can say?

9     There have been lots, hundreds, thousands of documents

10    produced, so -- and they're basing their argument on the

11    fact that they didn't have the courtesy to show him

12    documents so that he could say yes or no, "I've reviewed

13    them."  But let me talk about his methodology.

14          As he mentions in his report, he reviewed the

15    510(k) design history file for both model Bair Hugger units.

16    He reviewed the 510(k) submission to the FDA on the Bair

17    Hugger.  He reviewed filter efficiency testing concerning

18    the Bair Hugger filter.  These were things he was going to

19    talk about.  He reviewed and looked at the ASHRAE standards,

20    what do the ASHRAE standards require?  We've already talked

21    about the fact that the FDA does not require a filter for

22    the Bair Hugger system, but he looked at what did the ASHRAE

23    standards contain, because, as we've talked about earlier,

24    the Bair Hugger filter is a MERV14 filter.  So he wanted to

25    look to see what MERV14 talked about.  So he looked as those

1    standards.  He looked at the testimony of the corporate

2    representative of the vendor that supplied the filter

3    material to 3M.  He looked at the exhibits to that

4    deposition, and he reviewed that deposition testimony.

5    Those are just some of the things he did.

6           With respect to the literature, Dr. Lampotang goes

7    into very detail about his review of two studies, the Avidan

8    study that we've talked about, which was, again, placing the

9    hose over the petri dish, getting bacteria, but when you

10   apply the blanket you got zero.  So that gave him some

11   information about the Bair Hugger in its intended use in the

12   OR.

13          He also looked at a Bernards study.  Plaintiffs

14   haven't talked about it too much.  I take that back.  Maybe

15   they did.  Maybe Ms. Conlin did.  Yes, she did.  She said

16   there was dust removed from the Bair Hugger filter.  And

17   Dr. Lampotang goes through great detail describing in his

18   report that that's not what the study says.  So the study is

19   an exhibit.  I was hoping to be able to give it to you.  I

20   think it's attached to my declaration in opposition to

21   plaintiffs' motion to exclude.  But he goes into detail.  So

22   he reviewed what he needed to review to answer the questions

23   that he was going to address, which was, Was there an issue

24   with the filter, Was there an issue with other things about

25   the design.  That's why he looked at the design history

 1    file.

 2              He knows about the studies that plaintiffs talk

 3    about.  He talked about them in his report.  So that's also

 4    included in his report.

 5              He also talked about some of the criticisms that

 6    he had about plaintiffs' experts.  They talked about a study

 7    by a man named Moon in Houston that had to do with soot.

 8    And so I won't go into detail here, but just to say that

 9    Dr. Lampotang looked at that study, offered his opinion on

10    why that had nothing to do with whether bacteria would come

11    out of the Bair Hugger when in use.

12              So his methodology was appropriate.  He relied on

13    scientifically reliable and valid studies.  He came up with

14    his opinions based on his review of those studies.  As is

15    evident from his qualifications, he's an inventor, he's a

16    researcher.  He knows about thermal dynamics.  He deals with

17    heat conduction.  He knows about that.  He's done research.

18    He's a principal investigator on those issues.  So he knows

19    what to do with respect to the criticism about, you know,

20    does he know what the industry standards are.  I don't know

21    that they asked him that question.  They could have asked

22    him that question, what are the industry standards on which

23    you are relying, but they didn't.  But because he is an

24    inventor, a researcher involved in medical devices, you

25    know, he could have answered that question, but that would

1    be, again, what he would base his opinions on partly because

2    of his experience, 35 years of experience as a researcher,

3    and especially with respect to medical devices.

4            I think beyond saying that, we'll probably rest on

5    our papers.

6            THE COURT:  Very well.  Thank you, Ms. Lewis.

7            We will tomorrow talk about David and Ulatowski.

8            Ms. Conlin, you have a thought?

9            MS. CONLIN:  Well, Your Honor, I had the citations

10   that you requested from McGovern authors, but I'm happy to

11   pick up with that in the morning, if you would like.

12           MAGISTRATE NOEL:  Are they just quick things that

13   we can do in 30 seconds?

14           MS. CONLIN:  I can do it in probably 45, Your

15   Honor.

16           MAGISTRATE NOEL:  Okay.

17           MS. CONLIN:  The first citation is in Docket 910.

18   Exhibit 16.  It's out of Dr. McGovern's testimony.

19   Line 415 -- or internal page 415, lines 8 through 20, as

20   well as internal pages 375, 9 through 14.

21           There's also Professor Nachtsheim's testimony.

22   Docket No. 910.  Exhibit 12 -- I'm sorry -- yeah, Exhibit 12

23   at page 12, internal page 350, lines 4 through 8.  "You

24   continue to stand by the results of the observational data

25   in McGovern?"  Answer, "I do."

1          We also found Dr. Reed's testimony.  Docket No.

2     751.  Exhibit 1 at 311.  That was Mr. Hulse's declaration,

3     so it was testimony that went in in 3M's submission.

4     Internal page 226, lines 12 through 20.

5          The question to Dr. Reed, "Do you stand by your

6     studies, correct?"

7          Answer, "Yes."

8          "And even though Mr. Albrecht and Dr. Augustine

9     funded some of the studies involved, they did not influence

10     the data or results that you have concluded, correct?"

11          Answer, "Yes.  So just to be clear, there was no

12     funding of any of these studies apart from the very first

13     one, which was the one actually that didn't show any

14     deference, but, yes, I do stand by them, yes."

15          I also, Your Honor, you asked about whether there

16     was specific testimony related to an association, that the

17     author said is an association.  Because we didn't know that

18     there was an issue on that, we didn't submit those, but we

19     do have -- and I've got citations; I can file them with the

20     court -- where the authors go through and say, for example,

21     Mr. Albrecht says, answer, "I would agree that it's

22     associated with the 3.8 times increase.  That's what the

23     study would say."  So I was able to find it in various

24     places in the testimony.  If you want me to submit them as

25     supplemental exhibits, I will, but, to be honest with you,

1    Your Honor, even Mr. Gordon said yeah, the McGovern study

2    shows an association.  We didn't, until the questions by

3    Your Honor, understand that that was an issue or holding you

4    up on that.  I mean, what the authors say --

5              THE COURT:  This just started because early

6    yesterday the argument was "All we have to have is

7    association" and then we go to the Bradford Hill, so

8    that's --

9              MS. CONLIN:  Absolutely.  And to be clear --

10             THE COURT:  And so don't submit anything new

11   without running it by Mr. Blackwell and company.

12             MS. CONLIN:  Okay.  And just to be clear, Your

13   Honor, they say that the McGovern study shows association,

14   not causation, consistent with what we've represented to the

15   Court.

16             THE COURT:  Tomorrow we will resume at 9:30,

17   rather than 9 clock.  Have a good evening.  We're in recess.

18             MAGISTRATE JUDGE NOEL:  Is Mr. Gordon going to be

19   here tomorrow?

20             MR. GORDON:  Yes, sir.

21             MAGISTRATE JUDGE NOEL:  Okay.  I have a question

22   on those nine studies, but I'm going to save it for

23   tomorrow.

24                  (Court adjourned at 4:30 p.m.)

25                          *   *   *

1          I, Maria Weinbeck, certify that the foregoing is a

2     correct transcript from the record of proceedings in the

3     above-entitled matter.

4

5                    Certified by:  /s/Maria Weinbeck
                                    Maria Weinbeck, RMR-FCRR
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25