```
 1                  UNITED STATES DISTRICT COURT

 2                     DISTRICT OF MINNESOTA

 3      ------------------------------------------------------
                                   )
 4                                 )
        In Re: Bair Hugger Forced Air   )   File No. 15-MD-2666
 5      Warming Devices Products    )   (JNE/FLN)
        Liability Litigation        )
 6                                   )   October 26, 2017
                                     )   Minneapolis, Minnesota
 7                                   )   Courtroom 12W
                                     )   9:39 a.m.
 8                                   )
        ------------------------------------------------------
 9

10            BEFORE THE HONORABLE JOAN N. ERICKSEN
                UNITED STATES DISTRICT COURT JUDGE
11
                THE HONORABLE FRANKLIN L. NOEL
12              UNITED STATES MAGISTRATE JUDGE

13              THE HONORABLE WILLIAM H. LEARY
              RAMSEY COUNTY DISTRICT COURT JUDGE
14

15               (MOTIONS HEARING - VOLUME III)

16      APPEARANCES

17      FOR THE PLAINTIFFS:
                                   MESHBESHER & SPENCE
18                                 Genevieve M. Zimmerman
                                   1616 Park Avenue
19                                 Minneapolis, MN  55404

20                                 CIRESI CONLIN
                                   Michael V. Ciresi
21                                 Jan Conlin
                                   Michael A. Sacchet
22                                 225 South 6th Street
                                   Suite 4600
23                                 Minneapolis, MN

24                                 KENNEDY HODGES, LLP
                                   Gabriel Assaad
25                                 4409 Montrose Blvd
                                   Suite 200
                                   Houston, TX 77006
```

```
 1    FOR THE PLAINTIFFS:          KIRTLAND AND PACKARD LLP
                                   Behram V. Parekh
 2                                 2041 Rosecreans Avenue
                                   Third Floor, Suite 300
 3                                 El Segundo, CA  90245

 4                                 KENNEDY HODGES, LLP
                                   David W. Hodges
 5                                 711 W. Alabama Street
                                   Houston, TX 77006
 6
                                   FARRAR & BALL, LLP
 7                                 Mark Bankston
                                   Kyle Farrar
 8                                 1010 Lamar, Suite 1600
                                   Houston, TX  77002
 9
      FOR THE DEFENDANTS 3M:       BLACKWELL BURKE P.A.
10                                 Jerry Blackwell
                                   Ben Hulse
11                                 Mary Young
                                   Deborah Lewis
12                                 Corey Gordon
                                   Peter Goss
13                                 Monica Davies
                                   431 South Seventh Street
14                                 Suite 2500
                                   Minneapolis, MN  55415
15
                                   FAEGRE BAKER DANIELS
16                                 Bridget M. Ahmann
                                   Joe Winebrenner
17                                 90 South Seventh Street
                                   Suite 2200
18                                 Minneapolis, MN  55402

19    COURT REPORTER:              MARIA V. WEINBECK, RMR-FCRR
                                   1005 U.S. Courthouse
20                                 300 South Fourth Street
                                   Minneapolis, Minnesota 55415
21
          Proceedings recorded by mechanical stenography;
22    transcript produced by computer.

23

24

25
```

```
 1                      P R O C E E D I N G S

 2                         (9:39 a.m.)

 3              THE COURT:  Good morning.  Welcome back.  Please

 4      be seated.  All right.  Still no Mr. Gordon, but you left

 5      him a chair in case, right, in case he feels better?  What's

 6      his situation today?

 7              MAGISTRATE JUDGE NOEL:  How is he?

 8              MS. CONLIN:  He is still suffering from a

 9      migraine, Your Honors.

10              THE COURT:  And did it spread to Mr. Ciresi?  Is

11      it me?

12              MS. CONLIN:  No, he had a long-standing conflict.

13      He's going to be showing up in a few minutes, Your Honor.

14              THE COURT:  Okay.  Everyone over here is feeling

15      all right.  Did you want to start by asking?

16              MAGISTRATE JUDGE NOEL:  Yes.  Mr. Gordon, Corey

17      Gordon, could I ask you, so yesterday you had your fishless

18      lake analogy, and I was somewhat confused by it.  And I

19      asked a question, and you referred me to the nine studies,

20      and I'm assuming the nine studies you were referring to are

21      the nine that was in one of the slides that I think was used

22      by Mr. Blackwell.

23              MR. GORDON:  Yes, Your Honor.  Mr. Blackwell used

24      it.  Also, Mr. Goss used it.

25              THE COURT:  Who used it isn't the main part.
```

1           MAGISTRATE JUDGE NOEL:  And it's the one that

2     lists Hall through Oguz.

3           MR. GORDON:  That's correct.

4           MAGISTRATE JUDGE NOEL:  And it was my

5     understanding that what those studies show is that there is

6     no increased rate of infection when they studied the Bair

7     Hugger, but that it's not and that none of these are

8     double-blind gold standard clinical studies that show no

9     bacteria coming out of the Bair Hugger.  Am I wrong about

10    that?

11          MR. GORDON:  Slightly.  Actually, yes.  All of

12    these nine studies were not specifically infection studies.

13    There are three or four of them where infection was noted

14    where there were real procedures done, and I should say in

15    none of them were any infections noted, but they weren't

16    primarily infection studies.  They were looking at various

17    issues surrounding the notion of does the Bair Hugger cause

18    an increase in bacteria either in the air, surgical site

19    coming out of the Bair Hugger.

20          One of them, for example, introduced a test

21    bacteria at the intake of the Bair Hugger and then measured

22    with agar plates coming out so that they knew if bacteria

23    were going in.  They found that no bacteria were coming out.

24    That was one method of study.

25          Another was -- my favorite study was where they

 1    somehow recruited a handful of, I think eight University of

 2    Minnesota students who were willing to lay for four hours on

 3    an operating table.

 4              THE COURT:  For money, I'm sure.

 5              MR. GORDON:  I'm sorry?

 6              THE COURT:  For money.

 7              MAGISTRATE JUDGE NOEL:  They got paid to do this.

 8              MR. GORDON:  I assume that they were paid.

 9              MAGISTRATE JUDGE NOEL:  At least the pizza and

10    beer.

11              MR. GORDON:  I would hope so.

12              THE COURT:  I had an University of Minnesota

13    student on a jury, and he said afterwards he was so sorry

14    that the trial wasn't longer because he needed the 40 bucks

15    a day.

16              MR. GORDON:  But a couple of them were in fact

17    randomized trials.  You can't really do a blinded trial with

18    warming versus something else.  And the most recent one, and

19    probably the most compelling one, was the Oguz study, which

20    was a randomized trial, over 80 subjects, 40 of them were

21    randomized to Bair Hugger, the other 40 had orthopedic

22    procedures done using the HotDog.  And they were measuring

23    bacterial contamination with sedentation weights, agar

24    plates in six different locations.  They were specifically

25    looking to see is the method of warming, does that have any

1     impact on bacterial contamination?

2              They were also looking at other potential factors

3     such as whether the so-called laminar flow was on or not,

4     the number of personnel in the room during surgery, and

5     there was a fourth factor.  The only one that they found

6     that did actually have a statistically significant impact on

7     the amount of bacteria that they collected was whether the

8     laminar system was on or not.  If it was on, the rates were

9     significantly lower than if when it was off.

10             When they compared Bair Hugger to HotDog

11    throughout the procedure, and these were short orthopedic

12    surgeries, short being defined as less than an hour,

13    although, I think one or two of them were in fact hip

14    arthroplasties apparently done within hour.  And in the case

15    of the warming device, there was no difference, no

16    statistically significant difference.  In fact, that was --

17    that was kind of really what they were looking for.

18             MAGISTRATE JUDGE NOEL:  Okay.  But I guess the

19    reason I -- my confusion is I was under the impression that

20    there's wildly disparate interpretations of these studies

21    because some of them show up on the plaintiffs' slides,

22    correct?  In other words, Tumia and Moretti and Zink I

23    thought were all studies that plaintiffs cite when we ask

24    them about bacteria.

25             MR. GORDON:  I think that's true, Your Honor.

1    And this is, I would submit that this is lawyer

2    interpretation and lawyer science.  Obviously, I'm doing a

3    lot of interpreting too, but these nine studies have been

4    uniformly, uniformly interpreted by the medical community

5    and the scientific community as standing for the proposition

6    that there's --

7              MAGISTRATE JUDGE NOEL:  That there are no fish in

8    that lake.

9              MR. GORDON:  I have to say, Your Honor, I've

10   gotten a great deal of critique on that analogy, and I wish

11   I could strike it from the record.  If I were a Congressman,

12   I'd have it removed from the record and make believe it

13   never happened.  It was a dreadfully --

14             THE COURT:  Give a man a fish, not happening.

15             MR. GORDON:  Poor fish analogy.

16             MAGISTRATE JUDGE NOEL:  Thank you for your answer.

17   It explains or at least clarifies my confusion.

18             MR. GORDON:  Thank you, Your Honor.

19             MAGISTRATE JUDGE NOEL:  Did you want to say

20   something, Ms. Zimmerman?

21             MS. ZIMMERMAN:  Would Your Honors like to hear

22   from the plaintiffs on this?

23             MAGISTRATE JUDGE NOEL:  Sure.

24             MS. ZIMMERMAN:  Just very briefly, I think that

25   Mr. Gordon summed it up perfectly in his answer to Your

1    Honor's question.  This is lawyer argument and

2    interpretation of studies and that goes to the weight.  It's

3    not to the admissibility.  We can talk about the different

4    studies, but I'll leave it at that at this point.

5              MAGISTRATE JUDGE NOEL:  To follow up the analogy,

6    you think there are fish in that lake.

7              MS. ZIMMERMAN:  I do think there are fish in the

8    lake, Your Honor.

9              THE COURT:  All right.  Before we move on to the

10   scheduled argument for today, which is the summary judgment,

11   we have some experts still either to discuss or to agree

12   that they won't be discussed.  And let's first find out

13   about plaintiffs' motion.  I don't know really who to talk

14   to here, but Settles, Keen and Kuhn.

15             MR. ASSAAD:  Your Honor, we're happy to rest on

16   the papers for Kuhn, Professor Kuhn and Dr. Settles.

17             THE COURT:  And what about Keen?

18             MR. ASSAAD:  And Keen as well.

19             MR. BLACKWELL:  For once in agreement, Your Honor,

20   us as well, the defense too.

21             THE COURT:  I thought so, but I just thought I'd

22   make a check.

23             Okay.  So that leaves David and Ulatowski, and I

24   know that David has not only engineering but also regulatory

25   testimony.  Ulatowski is regulatory only.  Do you want to

1    dispense with Ulatowski now?  Or do you want to separately

2    argue about Ulatowski?

3              MR. BANKSTON:  I believe so, Your Honor.  I think

4    that in fact it may shorten the argument on David if we talk

5    about Ulatowski first.

6              THE COURT:  All right.

7              MR. BANKSTON:  And in effect, we could do it all

8    in one big ball of wax.  Ulatowski, move to David, you know,

9    it's a matter of how you want to handle it.

10             THE COURT:  Well, except that one is your motion.

11   Well, I guess it isn't really.

12             MR. WINEBRENNER:  Your Honor, we're happy to

13   address --

14             THE COURT:  Wait a second.  Wait a second, who are

15   you?  Sorry.

16             MR. WINEBRENNER:  I'm Joe Winebrenner for the

17   defendant, and I prepared some remarks on Dr. David's motion

18   to exclude.  And I actually intended to rest on the papers

19   with regard to the regulatory piece deferring the common

20   ground to Ms. Ahmann, who is going to comment on

21   Mr. Ulatowski.

22             THE COURT:  All right.

23             MR. WINEBRENNER:  We can take him up in either

24   order, whichever the Court prefers.

25             THE COURT:  All right.  You, Mr. Bankston, I'd

1      like to hear from you.

2              MR. BANKSTON:  Yes, Your Honor.  I'm going to try

3      to keep things moving.  My credo has always been power

4      corrupts and PowerPoint corrupts absolutely.  I'm going to

5      keep things moving today.

6              THE COURT:  I'm with you except for the first part

7      of that.  That ain't right.

8              MR. BANKSTON:  Mr. Ulatowski is a long time FDA

9      employee, was involved for his entire career in the

10     evaluation, regulation and compliance enforcement of medical

11     devices.  He was in the Center For Devices and Radiological

12     Health.  The type of organization, the part of the

13     organization that deals specifically with the medical

14     devices as opposed to the pharmacology and all the other

15     stuff that the FDA does.

16             Mr. Ulatowski has decades of experience with the

17     FDA.  He's been offered to talk about regulatory issues and

18     most fundamentally is the idea that compliance with the

19     510(k) regime and the minimum federal regulations

20     surrounding the 510(k) regime, in other words, the

21     continuing regulatory duties that Bair compliance with that

22     is relevant in some way to plaintiffs' design defect and

23     failure to warn claims and negligence claims in this case.

24             In other words, I believe it is Mr. Ulatowski's

25     position, this was a little unclear at deposition, that he

1    is not arguing that 510(k) compliance equals nonnegligent

2    design, but instead is arguing something more like 510(k)

3    compliance is somehow at least relevant to the issue of

4    standard of care and, therefore, wants to talk about all the

5    510(k) compliance issues.

6         So, first, to take up as a threshold legal matter,

7    we've devoted some time in the brief to talking about why we

8    believe Mr. Ulatowski's testimony is generally prejudicial

9    and confusing and a waste of time under 403.  We cited a lot

10   of authority from recent years in the MDL context talking

11   about why the introduction of testimony about Bair

12   compliance and diving into the really the labyrinthian

13   regulations that surround these products is not a good use

14   of the Court's time and is a definite threat of jury

15   prejudice and absolute confusion over what the federal

16   clearances mean versus federal approvals versus what all of

17   these things end up meaning in terms of what the jury is

18   actually supposed to decide.

19        I think the best recent discussion in this is last

20   year, the Fourth Circuit in a case called *CR Bard*.  This was

21   the pelvic repair MDL.  And this is a very extensive

22   discussion of really the kinds of problems posed when the

23   FDA testimony looks a lot like what it does in this case

24   where you have two experts who are going to argue about not

25   only whether the product complied with regulations as a Bair

1    factual matter, but also the over-arching import of those

2    regulations what they actually mean, what they're able to

3    actually guarantee the public.  And when you have these two

4    experts engaged in this kind of battle, you end up having,

5    you know, a huge amount of the trial and expenditure devoted

6    to something that is not actually in the jury's

7    consideration.

8              Ultimately, what the FDA does and what the 510(k)

9    process does has marginal, if any, relevance at all to

10   whether this product is unreasonably dangerous.  Answering

11   the question of what the FDA does doesn't really help you

12   answer that question.

13             JUDGE LEARY:  Let me ask you this, when you

14   question the judgment of the FDA, why is their process for

15   approval not relevant?

16             MR. BANKSTON:  Well, I think you need to

17   understand the difference between FDA approval, which you've

18   referenced which this product does not have, and the

19   difference between pre-market clearance.

20             JUDGE LEARY:  Let's be more precise.  Let's talk

21   about the FDA letter, 2017 letter.

22             MR. BANKSTON:  Okay.

23             JUDGE LEARY:  If the plaintiffs are going to

24   question the judgment of the FDA in terms of the quality and

25   quantity of information they had when they issued that

1   letter, why is it not relevant to talk about what the FDA

2   does as part of a regulatory process?

3            MR. BANKSTON:  Sure.  Let me do two parts of that.

4   First of all, we absolutely question the judgment behind

5   that 2017 letter.  We question the process by which it's

6   created.  And if that does have to become --

7            JUDGE LEARY:  I understand it.  Let's get to the

8   second part.

9            MR. BANKSTON:  Okay.  Well, the important part

10   about that 2017 letter is if that ever comes into any part

11   of this court and this trial, we're going to have to go down

12   a side road about the author of that letter, and some very

13   disturbing criminal acts that call into question his basic

14   integrity not only as a human being but as a regulator.  And

15   we don't think that that's a good use of this Court's time.

16            THE COURT:  Not by "person."  It comes out as an

17   agency letter.

18            MR. BANKSTON:  Sure.

19            THE COURT:  So you're going to rip apart some

20   fellow.  I'm assuming it's a man working for the FDA?

21            MR. BANKSTON:  Correct.  One of the, the head

22   scientific advisor of the FDA.  And, yes, there's absolutely

23   no way to avoid introducing the crimes of moral turpitude

24   that are very much on the record, and this is some very

25   disturbing stuff.

1          JUDGE LEARY:  Well, let's just slow down a little

2     bit.  The FDA letter is, I would assume, based on what the

3     FDA undertook from the beginning of Bair Hugger up until the

4     time that the letter was issued.  So it seems to me that

5     there's relevance not only in terms of explaining what the

6     FDA does in writing that letter, but also there's relevance

7     in explaining what the FDA did up until the point of that

8     letter from the beginning of Bair Hugger up until the time

9     of that letter.  It seems to me to be all relevant.

10          MR. BANKSTON:  I don't share your assumptions

11     about the nature of that letter, but I do think let's go

12     ahead to the second part which draws into everything that

13     happened before that letter and whether or not that is

14     relevant.  And we have to ask ourselves what did the FDA do?

15     And that's extensively discussed in the cases we've decided

16     of what the FDA did during this 510(k) process.

17          So as a beginning threshold matter, we believe

18     that this Court is bound by the U.S. Supreme Court in

19     *Riegel*, in *Medtronic*, saying that the 510(k) process does

20     not speak to safety and effectiveness.

21          JUDGE LEARY:  So what value ultimately is it for

22     the FDA to embark on a process in which they at one level or

23     another pass judgment over a product such as Bair Hugger?

24     Is that totally an unnecessary exercise irrelevant to the

25     public, irrelevant to marketing?

1           MR. BANKSTON:  No, I believe that the 510(k)

2     process has a purpose, and it's purpose is not safety and

3     effectiveness.

4           JUDGE LEARY:  And tell me about that purpose.

5           MR. BANKSTON:  The 510(k) purpose is to remove

6     products that do not have safety questions from that

7     consideration by determining if they are substantially

8     equivalent to an already legally marketed product that has

9     been found to be safe and effective.

10          JUDGE LEARY:  In the FDA's judgment, that was Bair

11    Hugger.

12          MR. BANKSTON:  Correct.  So to start with the

13    first threshold part is what did the FDA do and does it have

14    any value?  We definitely have legal arguments about that.

15    Moving on specifically to what did the FDA do specifically

16    with this specific product?  We also have some very

17    important arguments about that as well.

18          So but just as an introductory threshold matter,

19    we believe if you look at the case law, many, many courts in

20    this exact MDL context said we are controlled by *Riegel*, we

21    are controlled by *Medtronic*.  If we are to find that the

22    510(k) process has any relevance to safety and

23    effectiveness, if that's what that process is designed to

24    do, we are in direct contact with Supreme Court authority.

25          So on a legal matter, we think immediately it goes

1       out.  Ulatowski has been excluded on this exact basis

2       numerous occasions, and those cases are discussed in the

3       *Next Gen* litigation, in the *Ethicon* litigation.  These

4       matters are extensively discussed on those terms, and that's

5       in a vacuum of purely theoretically what the 510(k) process

6       does.  That's totally separate and aside from the

7       fundamental reliability issues that Ulatowski has in this

8       case regarding what specifically happened with this product.

9       And maybe it's better if I move on a little bit to that.

10              The law is there and can be read.  What I think I

11      need to bring everybody up to speed on is the factual record

12      of what happened in this product.  Mr. Ulatowski testified

13      that he was going to, you know, he's going to come to

14      opinions about how the FDA reached a safety decision or

15      endorse this product on a safety level and did so through

16      the 510(k) process.

17              Now, one of the obvious big questions in this case

18      we have a product that was first 510(k)'d for nonoperating

19      room use with a substantial equivalent product that was also

20      a nonoperating room use product.  When the I guess what you

21      call the middle iteration of the Bair Hugger, the Bair

22      Hugger model 500 was the first product that was going to be

23      introduced into the operating room for use.  That was

24      subject to a 510(k) process.

25              We talked to Mr. Ulatowski about that process, and

1    he told us, well, you know, one of the challenges in this

2    case is the decision making documentation for that 510(k)

3    decision is not available.  It was not available for my

4    review, so I have to speculate about what the FDA did during

5    that process.

6           During that process, the FDA has to follow a flow

7    chart to ask questions.  If you answer certain questions

8    "yes," you move on to the next question.  If you answer

9    "no," it directs you to a different part.  It's a basic kind

10   of flow chart.  Where are the elements of this flow chart,

11   if the FDA asked itself this product, does it have the same

12   indications statement, the same indications for use as the

13   prior product?

14          If the answer to that question is "yes," the FDA

15   is done.  You don't have to ask any questions about safety.

16   You've now cleared the product because it has the same

17   indication for use.  There's no changes in the indication

18   for use, so there can be no safety issues by that change.

19          If the FDA finds that, yes, the indications for

20   use have changed, now there must be some sort of inquiry by

21   a reviewer.  Do those new changes raise new questions of

22   safety?  And then that's the process that they're supposed

23   to follow.

24          When asking Mr. Ulatowski, so how does this play

25   out with respect to the Bair Hugger?  Mr. Ulatowski says the

1    FDA would find that the change from outside of an operating

2    room to use of an inside of a delicate operating procedure

3    would be a change in indications for use or indication

4    statement.  Therefore, the reviewer would answer that "yes",

5    and would then next ask does that change alter any of your

6    safety questions?

7           The problem with that analysis is that we actually

8    do have the 510(k) decision making documents.  Apparently,

9    they were provided to Mr. Ulatowski in the prior *Walton*

10   litigation, not part of his report in this matter, and he

11   certainly wasn't aware that they existed.  Those documents

12   show that there was a serious error made in this 510(k)

13   review process.

14          As we put screen shots all throughout our motion,

15   we have the actual flow charts, the actual reviewer comments

16   and the entire process that he followed.  And when he got to

17   the question does the Bair Hugger 500 have the same

18   indication statement as the Bair Hugger 200?  He said yes.

19   So then his next question, which is does it raise new

20   questions of safety?  He doesn't have to answer that

21   question.  And when they have the narrative part saying what

22   did the FDA do to determine new issues of safety and

23   effectiveness?  He writes "N/A" because he does not have to

24   answer that question if that's the finding he made.  We

25   believe that's a clearly erroneous finding.  It's very

1     problematic.

2          Mr. Ulatowski says, well, maybe the FDA didn't

3     find a change to OR use to be significant.  Speculating on

4     that.  And I would submit that if so, if the FDA found that

5     the change from outside an OR to the use of an ultra clean

6     orthopedic surgery wasn't significant then I would submit

7     that the FDA is broken and needs to be fixed because that is

8     an absolutely dangerous conclusion to make.  I mean if you

9     have me on the record in front of a federal court right now,

10    I will tell you without qualification the FDA is broken and

11    needs to be fixed.

12         But in this specific case, we have documentary

13    evidence showing that the very thing that we're going to try

14    to use the 510(k) to establish safety and effectiveness of

15    the product was not answered by the 510 reviewer and that

16    the FDA has never during the 510(k) process meaningfully

17    reviewed the movement of the Bair Hugger from outside an OR

18    into an OR.  Mr. Ulatowski cannot give reliable opinions on

19    this entire subject matter and that is extremely problematic

20    to us.  And this is really not a matter that we would need

21    to pull out and discuss in front of the entire jury.

22         Obviously, 403, one of the questions is is it

23    going to make this a mini-trial?  There is going to be

24    nothing mini about this part of the trial.  If we have to go

25    into this, there's going to be, as you've seen from our

1    punitive damage motion, as you've seen from other briefing,

2    there are so many disputed issues about what went on with

3    the FDA in this case.  For example --

4         THE COURT:  Let me just ask you, I am curious

5    about your understanding of the application of the hearsay

6    rule covering public records:

7         803.8, "A record or statement of a public office

8    is non-hearsay if it sets out a matter observed while under

9    a legal duty to report, but not including, in a criminal

10   case, a matter observed by law enforcement," of course.

11        And then I think what you're talking about with

12   your, and I'm curious what this moral turpitude, et cetera,

13   is of course.  I suppose that would go to you're talking

14   about something under 803.8(B):  "The opponent does not show

15   that the source of information or other circumstances

16   indicate a lack of trustworthiness."  But that is an

17   admissibility question.  It's not a jury question.

18        MR. BANKSTON:  Correct.

19        THE COURT:  So I'm curious about how you're -- I

20   mean you seem so exercised about the fact that there would

21   be a mini-trial, but I'm wondering how you square that with

22   the Rules of Evidence that would apply?

23        MR. BANKSTON:  I agree with you in respect that

24   there is several categories of documents that would likely

25   never be admissible under any scenario.  That is not to say

1      that having Mr. Ulatowski and Dr. David slug it out for days

2      over what is the purpose of the FDA?  What actually happened

3      in this case?  All of these facts wouldn't cause an

4      extremely time consuming mini-trial.

5             It is true that I think some of the documentary

6      evidence that you're talking about, for instance, the FDA

7      letter, I don't see in any way how that can ever come into a

8      courtroom at all.

9             THE COURT:  I just read you the Rule of Evidence.

10             MR. BANKSTON:  Well, no, I don't think there was a

11      legal duty to create that letter.  That's what I'm saying.

12      I think there are plenty of documents in this case that were

13      a legal duty to create.  I don't think that letter goes --

14             THE COURT:  Why do you not think that?

15             MR. BANKSTON:  I don't see any legal statutory

16      basis to cause that letter to be written.  I don't see any

17      regulatory scheme that causes that letter to be written.

18      And I think if we all understand the circumstances, it seems

19      to stretch credulity to think that that letter was created

20      sua sponte by the FDA.  These are things we would obviously

21      like to explore if that has to come in and, again, things we

22      don't need to explore.

23             So I do think there are some things that come in,

24      some things that would under hearsay, but our entire

25      argument is a 403 argument, and I do believe that it would

1      cause a mini-trial if that happens.

2              THE COURT:  All right.  Thank you.

3              MR. BANKSTON:  Moving on from that, there's also

4      the issue that so many of these opinions require him to

5      speculate on what the FDA would have done in the absence of

6      any specific documentation or technical information that he

7      can rely on.  And these were exactly the kinds of opinions

8      that were excluded in *Brown v. Medtronic*.  Interestingly

9      enough, that was attached to Exhibit 10 to Defendant's

10     motion.  They take a reading of that case to talk about

11     Mr. Ulatowski's qualifications, don't really want to apply

12     the part where it talks about the very opinions he gives in

13     this case need to be excluded because they are way too

14     speculative.

15              He has other contradictory opinions about things

16     like warnings that directly contradict the documents, the

17     FDA blue book guidance documents that talk about warnings.

18     And we think in terms of a methodology, if his only

19     methodology is to review FDA statutory and regulatory

20     authority and FDA materials to give the opinions about what

21     the FDA requires, he has to show fidelity to those

22     materials.  If he's not, he's not working under a reasonable

23     methodology.

24              There's also the large problem in this case of

25     Mr. Ulatowski's direct personal involvement with the Bair

1    Hugger and that's going to become very difficult to excise

2    from this case.  And we believe this is a matter that raises

3    significant prejudice.  He does have personal contacts with

4    this product with this company over the course of his

5    career.  He is in fact a 510(k) signatory on a clearance

6    document for Bair Hugger product.  He's been involved with

7    the product line before.

8           He has, there's actually been during the period in

9    which Arizant was trying to I guess fight a commercial

10   damage control mode over some of their competitor's

11   advertising, they wrote a letter to Mr. Ulatowski.

12   Mr. Ulatowski says that he thinks by that point he was in a

13   different job and, thus, would have forwarded the letter to

14   somebody else, but there's no doubt that he is a recipient

15   of that letter.  The finding was that Mr. Ulatowski himself

16   is the author of the FDA's warning letter to 3M or I believe

17   it might have been Arizant at that point regarding burns

18   caused by the Bair Hugger.  Obviously, when we're going to

19   be talking about overall risk utility versus products,

20   that's something we're going to be interested in talking

21   about.  To have the person who authored that warning letter

22   on the burns sitting in the witness stand as a paid

23   representative of the defendants is a -- creates a really

24   ripe opportunity for jury confusion.

25           We think it's going to be very difficult for the

1    jury ultimately to know and to really understand whether

2    Mr. Ulatowski is here as an independent person being paid by

3    the defendants to give opinions or whether he's here giving

4    opinions essentially on behalf of the FDA.  That is an

5    extreme danger to the plaintiffs.  This is not a speculative

6    kind of prejudice.  And given that his testimony really

7    offers very little of value, there seems to be no reason to

8    subject the plaintiffs to that kind of prejudice.

9          Mr. Ulatowski's opinions, really he's had to dial

10   them back because of all of these prior exclusions.  There

11   used to be a time when Mr. Ulatowski would come to a

12   courtroom and say FDA 510(k) process is equivalent to a

13   finding of non-negligent design.  It's directly relevant to

14   plaintiffs' claims.  And after being excluded on that point

15   multiple, multiple times, he's dialed it back to something

16   that is just not helpful to us.  It really doesn't do

17   anything to us.

18         The times that this Court or at least this

19   District has admitted FDA testimony, it has been in the

20   context of where plaintiffs have made specific allegations

21   of violations of the minimum floor of what a manufacturer

22   has to do, and those violations going below that minimum

23   floor is very relevant to a standard of care, at least it

24   can be in many cases.

25         There's no authority out there, and certainly

1    defendants have cited none that says Bair compliance with

2    those regulations is in any way relevant to standard of

3    care.  So if it's not relevant to non-negligent design and

4    product defect, and it's not relevant to standard of care,

5    it really doesn't do a lot for us in this trial.

6          The last thing I want to talk about with

7    Mr. Ulatowski is there's sort of a large gray area about

8    what he may or may not testify about by hooking into certain

9    parts of his opinion, about is he going to testify about

10   regulatory matters or not?  And I tried to pin him down on

11   some of these topics at deposition, and his answer was

12   essentially who knows.  And defendant's response to this is,

13   well, if he's asked to make those opinions then we'll

14   examine his competence then.  And I really don't want that

15   sort of Damocles hanging over it.

16         So I think another part of the thing that

17   plaintiffs are asking for in this order is a limitation that

18   if he's going to testify about anything, it's not going to

19   be orthopedic surgeries, engineering, biomedical issues.

20   The only thing he can be qualified at all in is regulatory

21   testimony.  And we don't believe that any of that is going

22   to be very helpful to us in this case.

23         So unless you have any questions, I'll go ahead

24   and pass it on over to them, and let them tell you about

25   Mr. Ulatowski as well.  Thank you, Your Honor.

1          MS. AHMANN:  Good morning, Your Honors.  Bridget

2     Ahmann for 3M and Arizant in opposition to the motion to

3     exclude Mr. Ulatowski.  May it please the Court, Counsel:

4          I was going to be really, really short because I

5     thought the presentation would be short, but I feel like

6     Mr. Ulatowski has been attacked on numerous grounds that are

7     inconsistent both with what he's saying and what the law

8     provides.

9          First of all, he is here to talk about FDA

10    regulations specific to medical device and also to talk

11    about how 3M, Arizant complied or dealt with those

12    regulations.  The fact is the medical device community is

13    governed by the FDA.  That is the framework within which

14    they operate.

15         Yesterday, there was a comment, I believe, by

16    Mr. Farrar about how one of the experts didn't talk about

17    any standards.  He came without talking about any standards.

18    Well, the fact is Mr. Ulatowski will talk about standards

19    because that's directly what is applicable in the jury's

20    consideration of whether or not this company acted

21    reasonably.  Such testimony is necessary.

22         First, I will talk a little bit about

23    Mr. Ulatowski not that his qualifications have been --

24         MAGISTRATE JUDGE NOEL:  Can I interrupt for a

25    quick second and go back to your opening slide because I

1    think there's a typo or something or I'm confused entirely

2    about what we're doing here.  It's not your motion to

3    exclude --

4              MS. AHMANN:  I'm sorry, in opposition.

5              MAGISTRATE JUDGE NOEL:  Okay, thank you.  I just

6    wanted to make sure.

7              MS. AHMANN:  They were prepared a long time ago,

8    so you're right.  I'm arguing --

9              THE COURT:  If they want him, you'd be getting --

10             (Laughter.)

11             MS. AHMANN:  What Mr. Ulatowski is going to talk

12   about is not just that little 510(k) that is but what one

13   glip on what the FDA's exercise of authority is and their

14   evaluation of medical devices.  They run the gamut, and he

15   was involved at all different stages in medical device

16   evaluations and that's what he's going to talk about.  The

17   510(k), which is the only thing we've heard about in terms

18   of the legal authority, there have been courts that have

19   excluded that type of evidence with regard to the FDA.

20             Specifically, as he says what Mr. Ulatowski is not

21   going to say.  Mr. Ulatowski is not here to say that the

22   510(k) by itself defines or is preemptive, if you will, on

23   the question of whether or not the device was safe and

24   efficacious.  What he's going to say is safety and efficacy

25   go into consideration in the 510 stage.

1             The cases that have held otherwise look at *Lor* and

2     *Riegel*, which are preemptive cases.  They don't deal with

3     relevance.  What they say is you can't make a statement that

4     the 510(k) by itself establishes that this is safe and

5     efficacious.  So it can't preclude any state claims on it.

6     That's not the allegation.  We're here to talk about whether

7     or not evidence on the 510(k) is relevant, and we say it is.

8             The other thing as I showed you here, 510(k) is

9     but a glip.  What they've tried to do is they've tried to

10    glam on to these cases and to try and extend that to go

11    beyond a 510(k) evidence.  In fact, it's interesting because

12    they presented their own regulatory expert until the FDA

13    letter came out, and now all of a sudden they want to

14    withdraw that, and they don't want to talk about the FDA.

15    So his testimony is relevant not just to 510(k), it's beyond

16    that.

17            And might I say that we don't agree with those

18    cases because we think the jury needs to understand what

19    environment these companies work in and how can you judge

20    the reasonableness of their behavior in making design

21    choices, of deciding what risks to talk about if you don't

22    know the environment with which they operate.

23            In fact, many courts, not just the one cited by

24    the plaintiffs, and in fact, he refers to them as gabs or

25    gobs which I take to be many, almost all of the cases

1    emanate out of the MDL mesh litigation in the Southern

2    District of West Virginia.  In those cases, the Judge made a

3    decision, and he has applied that over and over and over

4    again in those cases.  He has been affirmed as indicated by

5    the Fourth Circuit.  We don't agree with those because we

6    think there's lots of other cases which have recognized that

7    in fact FDA evidence is relevant.

8              In Re Fosamax, a lay jury cannot be expected to

9    understand the complex regulatory framework that informs the

10    standard of care in the pharmaceutical and medical device

11    industries.  Admittedly, that's a drug case, but the fact is

12    the FDA is who the FDA is, and they regulate both drug and

13    medical devices.  Minnesota law is consistent with that

14    because the courts have time and again and contrary to what

15    is suggested, they've actually allowed testimony about the

16    FDA when the FDA has found that the defendants act in

17    compliance.

18              In Kruszka v. Novartis case, they allowed the FDA

19    expert to opine on the reasonableness of the defendant's

20    interactions with the FDA in compliance with FDA

21    regulations.  And here's the important part for us today.

22    "And such testimony would be helpful to the trier of fact

23    from a regulatory perspective."  And Kruszka is not the only

24    case.

25              In Huggins v. Stryker, which involved a medical

1    device, a pain pump, the Court recognized that the device

2    manufacturer's interactions with the FDA at the 510(k)

3    clearance were relevant because the jury, they could shed a

4    light on the considerations by the jury.

5         In *Lillebo v. Zimmer*, which was an orthopedic

6    case, they allowed the FDA expert to testify as to FDA

7    processes including the FDA clearance in considering the

8    reasonableness of the manufacturer's design, testing and

9    manufacture.  Minnesota courts allow this.  There really

10   shouldn't be much question about whether or not this is

11   relevant and helpful to the jury.  This is not confusing.

12   This is not -- the Court can certainly control the

13   introduction of evidence to avoid any kind of mini trial.

14        I also want to briefly address some of the

15   reliability arguments.  I'm not going to go into details.

16   Those were addressed in our papers.  Mr. Ulatowski performed

17   the same type of evaluation that he would have when he was

18   at the FDA.  He reviewed thousands and thousands of pages of

19   documents and to criticize because him because he forgot

20   that he had in fact reviewed one particular piece of

21   evidence is really in excusable.  It certainly doesn't go to

22   the credibility or the reliability of his methodology.  He

23   can be cross examined on that.  And, in fact, that would be

24   the appropriate if counsel thinks that that is important,

25   but that goes to the weight of his testimony not the

```
1     admissibility.  And I won't even go into the various other

2     because they're all explained by Mr. Ulatowski.

3          They also complain that he has a conflict of

4     interest because counsel thinks that he's touched these

5     cases.  First of all, they present no legal authority, no

6     regulatory authority, nothing on the issue of ethical

7     obligations of the FDA.  But Mr. Ulatowski talked about that

8     and that's in our brief.  He's talked to the Ethics

9     Committee for the FDA knowing that when he serves as an

10    expert in cases that there are certain things he can't talk

11    about, and he doesn't, and he didn't here.  There's nothing

12    to counter that.

13          And even factually all these ethics and all these

14    biases are founded.  Mr. Ulatowski talked about the fact

15    that he didn't receive the August of 2010 letter because he

16    would have been at a different department.  So counsel says

17    that he thinks he wouldn't have got it.  Well, he knows he

18    wouldn't have gotten it.  He wasn't there.  He had moved on.

19          He also didn't -- he was asked about whether or

20    not he was copied on a letter that dealt with the Bair

21    Hugger fluid warming.  And counsel would like to say that he

22    evaluated that and that's the same thing as the Bair Hugger.

23    It's not.  It is a fluid warming device.  It is not a

24    patient warming device generally.  It is in a totally

25    different division, which he explained in his testimony.
```

1          He was not involved in the division that operated

2     the Bair Hugger and the warming device.  He was the fluid --

3     he was in the division that evaluated the fluid warming

4     device.  And the fact is if counsel would have shown him the

5     full document, the full document shows that this was not a

6     forced air warming device at all.  It was a completely

7     different methodology and engineering to do the fluid

8     warming.

9          And with regard to, there was a letter that he did

10     send out relative to the burns.  And, again, has nothing to

11     do with the issues in this case, and he can certainly be

12     cross examined on that if they think it's appropriate.

13          And the final argument is that we should exclude

14     him from talking about everything else because we don't know

15     if he's going to talk about everything else.  I think that

16     it probably is best to wait and see what he talks about

17     before we exclude him.  His report was very thorough.  And

18     if his opinions were in there, I think that, you know,

19     counsel will be hard pressed at the time unless he's drawn

20     out by other questions from the plaintiffs' side, the fact

21     is there's no reason right now to sit and talk, theorize

22     about what he might be asked.  Unless the Court has

23     questions.

24          THE COURT:  Ms. Ahmann, are you the person to ask

25     about what it is that Mr. Bankston was referring to when he

1    was talking about the --

2              MS. AHMANN:  FDA letter and moral turpitude and

3    all of that?

4              THE COURT:  Yes.

5              MS. AHMANN:  Absolutely not me.  You know, I have

6    to say that, you know, we have not been presented in these

7    days of arguments about a motion to deal with the FDA

8    letter.  It has been referred to several times using what

9    Mr. Blackwell would say, I'm not as good as he is at saying

10   "that horse has left the barn."  We are, you know, the FDA

11   letter is there.  There's no doubt that it's going to be

12   evidence.

13             THE COURT:  But have they shared with you whatever

14   it is that he was --

15             MS. AHMANN:  No, this is the first I've heard of

16   it, so I am definitely not the person to deal with it.

17             THE COURT:  I'm sure it was somebody on your side.

18             MR. BLACKWELL:  Your Honors, if I may?

19             THE COURT:  Yes, please, Mr. Blackwell.

20             MR. BLACKWELL:  Just to put this to rest, the

21   author of that letter was picked up for solicitation roughly

22   five years ago.

23             THE COURT:  Mr. Maisel or Dr. Maisel, M-A-I-S-E-L?

24             MR. BLACKWELL:  Whoever signed it.  I don't have

25   the name in mind, Your Honor, on the FDA letter, but he was

1    then returned to his job, given his job back thereafter.  So

2    if this is something we want to talk about from about five

3    years ago, he was picked up with solicitation.  The FDA

4    restored him to his job sometime thereafter, and that's what

5    they're referring to the dastardly, horrible --

6              THE COURT:  Was he convicted of anything?

7              MR. BLACKWELL:  They're saying, yes, and we don't

8    know, but I expect --

9              THE COURT:  Misdemeanor or felony?

10             MR. BLACKWELL:  Misdemeanor solicitation.

11             MR. BANKSTON:  There were four counts of felony

12   solicitation all pled down to a misdemeanor.

13             THE COURT:  Okay, but the conviction there's 609,

14   you're talking about conviction.

15             MR. BANKSTON:  Correct, Your Honor.

16             THE COURT:  My question has to do with conviction.

17             MR. BANKSTON:  Yes, my understanding is there are

18   convictions on the record against him.

19             THE COURT:  One misdemeanor?

20             MR. BANKSTON:  I actually am not -- I can't speak

21   to you right now whether those are misdemeanor or felonies.

22   My understanding was they were felonies, but I don't --

23             MR. BLACKWELL:  My goodness.  They bring this --

24             THE COURT:  Yeah, that's pretty, yeah, well --

25             MR. BLACKWELL:  They bring this up.  They know

1     it's a misdemeanor solicitation, and at least that's an

2     understanding of what this is about.

3              THE COURT:  All right.  Mr. Bankston, I guess

4     you're the person who brought this all up.  Is that what you

5     were talking about?

6              MR. BANKSTON:  Yes, Your Honor.

7              THE COURT:  And is it your position that --

8              MR. BANKSTON:  It is our position that he is

9     uniquely vulnerable to continued influence given his

10    predilection for picking up and exploiting human trafficking

11    victims off the streets of D.C.  That's our position.

12             THE COURT:  I have an evidence question for you.

13             MR. BANKSTON:  Sure.

14             THE COURT:  Calling your attention to Rule 609,

15    assuming for the moment that it is a misdemeanor prosecution

16    conviction, is it your -- do you have any authority for

17    the --

18             MR. BANKSTON:  That it would be an admissible --

19    you're correct, Your Honor.  Yes, I do.

20             COURT REPORTER:  Don't interrupt, please.

21             THE COURT:  Would you just let me ask the

22    question?

23             MR. BANKSTON:  Oh, I'm sorry, yes.

24             THE COURT:  That that constitutes a crime of

25    falsehood?

1          MR. BANKSTON:  That solicitation under the

2     prostitution statute does?  Constitutes a crime of moral

3     turpitude?  Was that --

4          THE COURT:  No, my question, as you know or should

5     know, misdemeanors under 609 are admissible if they are

6     crimes, you know, crimen falsi, crimes of falsehood.  And to

7     my, in my experience, a prostitution conviction has not and

8     is not considered a crime of falsehood.  My question to you

9     is if you have any authority to the contrary?

10          MR. BANKSTON:  I thought the determinative issue

11     was whether it's a crime involving moral turpitude.

12          THE COURT:  Well, it's not being impeached.  It's

13     --

14          MR. BANKSTON:  Well, I do have the authority on

15     CIMT.

16          THE COURT:  I don't know what "CIMT" is.

17          MR. BANKSTON:  Oh, I'm sorry, Crime Involving

18     Moral Turpitude.  I have Eighth Circuit authority on that.

19          THE COURT:  All right.  Give me a case on that

20     then.

21          MR. BANKSTON:  Sure.  That is *Gomez Gutierrez v.*

22     *Lynch.*  That is 2016 Westlaw 362 24 -- excuse me -- 362 427

23     at *4.  That is the Eighth Circuit in 2016.  And I just

24     wanted to add the reason I'm kind of familiar with that is I

25     have sort of a parallel practice with some immigration

1    issues and have been recently taught in no uncertain words

2    do not let your immigration clients plead to misdemeanor

3    crimes of moral turpitude.

4              THE COURT:  All right.  Well, let's talk about the

5    Rules of Evidence.  That may be all well and good.  609A

6    talks about felonies, subdivision 1, imprisonment for more

7    than one year.  And then there is a second subdivision for

8    non-felony convictions and that ties to a dishonest act or

9    false statement and that is the codification of the common

10   law crimen falsi doctrine.

11             MR. BANKSTON:  Okay.

12             THE COURT:  It doesn't have anything to do with

13   moral turpitude.

14             MR. BANKSTON:  Okay.

15             THE COURT:  So are there any cases that you can

16   cite for the proposition that the sort of conviction that

17   you are talking about with respect to that employee where

18   those have been categorized as dishonest or false statements

19   for purposes of Federal Rule of Evidence 609(a)(2)?

20             MR. BANKSTON:  Not standing here now, no, I don't,

21   Your Honor.  That's certainly something I would like to look

22   into.  And to us the more threshold question is not how such

23   evidence would be admitted, but in our minds, the question

24   is what is the fundamental reliability of that letter?  Is

25   there anything in that letter that makes us question it as

 1     potentially I mean obviously we have basic problems with the

 2     letter itself.  We do have problems with the letter of the

 3     author.  These are issues that we very well could

 4     potentially raise in trial.  And as far as that authority --

 5             THE COURT:  Well, I'm asking you right now since

 6     you're the one who brought it up and were so exercised about

 7     the moral turpitude.

 8             MR. BANKSTON:  I absolutely am very troubled by it

 9     and very troubled by the unique vulnerability that a federal

10     regulator who was allowed to return to that role with such a

11     predilection is subject to potential influence from outside

12     sources.  I'm very concerned about that.

13             THE COURT:  Is there anything else or is that what

14     you're talking about?

15             MR. BANKSTON:  That's what I'm talking about in

16     terms of those crimes.  Correct, Your Honor.

17             THE COURT:  Thank you, Mr. Bankston.  You may be

18     seated now.  I want to hear from Mr. Blackwell on that

19     basis.

20             MR. BLACKWELL:  Your Honor, just want to make sure

21     the record is clear that he did not lose his job.  He pled

22     to one of several counts.  There was a $200 fine, and the

23     rest of the charges were in fact dismissed.  And as Your

24     Honor is well aware, he simply signed on behalf of the

25     agency, and I'm not seeing the tie-in other than simply

1    wanting to raise this for obvious reasons.

2              THE COURT:  All right.  Well, let's talk about

3    Mr. David.  Mr. Winebrenner?

4              MR. WINEBRENNER:  Yes, Your Honor.  Good morning,

5    Your Honors.  I'm Joe Winebrenner on behalf of defendants.

6    I will be discussing defendant's motions to exclude

7    Dr. Yadin David.

8              Dr. David's opinions can be separated roughly into

9    four categories.  Defendants have moved to exclude his

10   opinions in all four in their entirety.  They are his

11   regulatory opinions, his standard of care opinions, his

12   so-called hazard analysis opinions, and his alternative

13   design opinions.  Of these four categories of opinions, the

14   only two that arguably address causation issues are the

15   hazard analysis opinions and alternative design opinions,

16   and for that reason, I intend to address those first.

17             Dr. David conducted what he calls a hazard

18   analysis of the Bair Hugger system.  This consisted of an

19   examination of a used Bair Hugger device as well as a review

20   of a small selection of documents and literature.  And based

21   on this work, Dr. David claims to conclude that the Bair

22   Hugger more likely than not increases the risk of surgical

23   site infections in orthopedic surgeries.  We address in our

24   briefing a number of reasons why this opinion should be

25   excluded.  I'm going to focus on just a few of the high

1      level points today.

2            First, Dr. David is not qualified to opine on the

3      clinical risks of the Bair Hugger system.  And by "clinical

4      risks of the Bair Hugger system," I'm talking about medical

5      causation because that is what his opinion touches on.

6            Dr. David is a biomedical engineer by trade.  He's

7      not a medical doctor.  He is not a clinician.  And although

8      Dr. David has participated in a committee, the Medical

9      Technology Evaluation Committee in which he in the context

10     of a committee makes purchasing recommendations to his

11     employer hospital.  Dr. David is not the one performing the

12     clinical risk assessments of the devices that are being

13     evaluated in that committee.  He defers that task to others

14     who are more appropriately qualified.

15           Now, plaintiffs contend that we're wrong in that

16     regard and that Dr. David performs these clinical risk

17     assessments all the time, but the record does not support

18     that argument.

19           Dr. David in his deposition testified to the

20     makeup of his Medical Device Evaluation Committee.  He says

21     that "my committee consists of many representative

22     stakeholders, physicians, nurses, purchasers,

23     administrators, safety officers, risk control and quality

24     control professionals, and facilities engineering,

25     biomedical engineering and sterile processing supplies."

1           And he goes on:  "So the committee was

2      representing so many expertise, and I was in the position

3      where I had to receive their input and derive recommendation

4      to the hospital management if a device is beneficial with

5      lower risk than what's being used today."

6           Now, to avoid any ambiguity with respect to

7      Dr. David's role in this process, he was asked:

8           "In performing your work for the hospitals, do you

9      rely on physicians and nurses to provide you with

10     information about clinical risks and benefits?

11          Answer:  On the clinical side, yes."

12          So the record does not support plaintiffs'

13     contention that Dr. David performs these clinical risk

14     assessments of devices all the time.  He relied on others to

15     do that.

16          What Dr. David does in his report is different.

17     He does not rely on anyone to assess clinical risks and

18     benefits of the Bair Hugger device.  He does that himself,

19     and this is problematic under Rule 702 not only for

20     qualifications purposes but also because it is a departure

21     from his ordinary methodology.  In the hospital context,

22     Dr. David relies on others to assess clinical risks of the

23     device, but when he is retained as an expert in litigation,

24     he is a one-man show.  He does everything by himself, and

25     Rule 702 does not allow this.

1              The second piece with regard to Dr. David's hazard

2      analysis that I want to raise is a disconnect between the

3      methods that he says he employs and the conclusions that he

4      purports to reach.  In the hospital setting, Dr. David's

5      committee evaluates devices for purposes of making

6      purchasing recommendations not for the purposes of

7      evaluating medical causation, whether a device medically

8      causes a particular outcome.  And the factors that are

9      considered under these two situations are quite different.

10             In the context of a purchasing decision, a decision

11     may be made based on factors that result in conservative

12     decision making, factors such as public health

13     considerations or just the general risk aversion of a

14     hospital such that a hospital may choose to avoid a

15     particular device because of questions about safety or

16     effectiveness even when there is not a sound scientific

17     basis to support those questions.  And those types of

18     factors have no role in a medical causation inquiry under

19     Rule 702.

20             On top of this, Dr. David applied or chose not to

21     apply the industry standard overall methodological framework

22     for assessing the risk of medical devices.  That standard is

23     ISO 14971.  Dr. David opted instead to employ a methodology

24     of his own creation.  It was one that he adapted from the

25     miter standard, which he had used in the past in the

1    hospital setting to evaluate or to prepare for a disaster,

2    disaster preparedness like the shutdown of the electrical

3    grid, for example.  And plaintiffs do not demonstrate how

4    Dr. David's methods fit or can reliably lead to medical

5    causation opinions, which is the purpose of his opinions in

6    his report.

7            The last issue I want to discuss with regard to

8    his hazard analysis is a series of issues, the problems with

9    the steps that Dr. David took in his analysis.  Plaintiffs

10   contend that he reviewed an extensive body of literature,

11   testimony, documents, as well as an examination of the

12   device itself, but Dr. David did not review an extensive

13   body of literature.  He reviewed only 14 published articles,

14   all of which reached conclusions that support, that were

15   relatively favorable to the opinions that he reached.

16           Now, Mr. Blackwell and Mr. Goss discussed those

17   articles over the past two days, and they demonstrated that

18   none of them determined causation and none of them even

19   reach a valid association with the Bair Hugger.  But even

20   setting the substantive shortcomings of those articles

21   aside, Dr. David's actual methods in employing the

22   literature review warrant exclusion of his testimony.  He

23   did not review a single study that was unfavorable to his

24   conclusions.  He didn't even acknowledge a single study that

25   recognized that the Bair Hugger does not increase the risk

1    of infection, and we've heard all about those studies over

2    the past two days.  Courts around the country have

3    recognized that expert witnesses cannot opine on causation

4    based on a literature review that selectively includes only

5    the most favorable stuff.

6         *In Re Rezulin* is an example.  The Court recognized

7    if the relevant scientific literature contains evidence

8    tending to refute the expert's theory and the expert does

9    not acknowledge or account for that evidence, the expert's

10   opinion is unreliable.  And in that particular case, the

11   Court concluded that the scientists have discussed only the

12   evidence that they believed would advance the plaintiffs'

13   position.  Their reports cannot be said to reflect the same

14   level of intellectual rigor that characterizes the practice

15   of an expert in the relevant field, and we would submit that

16   the situation is no different with regard to Dr. David.

17        In a similar manner, Dr. David did not conduct an

18   extensive review of documents in forming his opinion.  The

19   Bair Hugger is a product that has been on the market for

20   30 years.  There's 30 years of regulatory history.

21   Dr. David purports to opine on clinical risks of infection

22   that are not generally accepted in the scientific community,

23   yet he reviewed only 64 3M produced documents.

24        Now, plaintiffs would take the position in their

25   response that the quantity of documents that Dr. David

1    reviewed does not matter but rather it's the quality of the

2    review, but that really just begs the question who is

3    evaluating these documents and determining which ones are of

4    sufficient quality to be sent to Dr. David?

5            And the last building block, so to speak, of

6    Dr. David's hazard analysis opinions was his examination of

7    the Bair Hugger, and we've heard about that.  Dr. David

8    examined a used device that plaintiffs' counsel purchased

9    off of eBay.com, and which we've seen in the papers, and

10   we've heard during the hearing the plaintiffs are

11   affirmatively contending was not even functioning properly

12   at the time Dr. David examined it.

13           And so plaintiffs don't demonstrate how an

14   examination of a device of this sort can possibly support an

15   opinion on medical causation.  So these are all red flags

16   with regard to Dr. David's hazard analysis opinions, and we

17   would submit that they warrant exclusion of his opinions in

18   full.

19           The next piece I would like to address relates to

20   Dr. David's alternative design opinions.  He identifies a

21   number of other patient warming devices that are on the

22   market and as well as some early stage design concepts that

23   have been considered in relation to the Bair Hugger, and he

24   asserts that these are feasible and safer alternative

25   designs.

 1          There are two major problems with this opinion.

 2     The first is that Dr. David includes conductive warming

 3     devices in his opinion.  Devices like the VitaHEAT UB3 and

 4     the Tablegard System, which incorporate conductive warming

 5     technology.  This Court has already concluded that

 6     conductive warming technologies are not viable alternative

 7     designs to the Bair Hugger due to the different technologies

 8     that they employ.  And so those opinions out of the gate

 9     should be excluded.

10          The second problem with Dr. David's alternative

11     design opinions is broader, and it touches on all of his

12     proposed alternatives.  And that problem is that he offers

13     absolutely nothing other than his own say-so that any one of

14     these proposed alternatives is actually safer.  He performed

15     no testing, and he offers no data whatsoever that could

16     possibly be the basis of a contention that any one of the

17     devices that he identifies is actually safer, and he

18     concedes he has no such data.

19          He was asked in his deposition, "Is there any

20     clinical data you're aware of that would suggest there's a

21     difference in infection risk between the Bair Hugger device

22     and any other patient warming device that you've identified

23     in your report?

24          Answer:  I didn't find it so everything that I did

25     is in my report."

1          So Dr. David concedes he has no objective data to

2     support any of his alternative design assertions.  And in

3     fact on the flip side, defendants have proffered that 2017

4     Cleveland Clinic study, which Mr. Gordon discussed

5     yesterday.  And in that study, over 5,000 surgeries were

6     analyzed, half of which had been performed with a Bair

7     Hugger and half of which had been performed with the Stryker

8     Mistral air device, which is one of Dr. David's proposed

9     alternatives and which incorporates a HEPA filter.  And the

10     results of that study showed that there was no statistically

11     significant difference between infection rates of the Bair

12     Hugger group and the Mistral air group.  And so not only

13     does Dr. David lack any objective support for his

14     alternative design assertions, the only comparative evidence

15     that exists contradicts his opinions.  And so for those

16     reasons, we would submit that his alternative design

17     opinions should be excluded as well.

18          Now, with regard to the regulatory and standard of

19     care opinions, I had intended to rest on the papers given

20     the fact that they are, that these are non-dispositive

21     issues in a hearing that's focused primarily on causation,

22     but I just want to make a couple of points with regard to

23     Dr. David's regulatory opinions so that the Court can

24     contrast his qualifications and methods to Mr. Ulatowski's.

25          Dr. David is not a regulatory expert.  He's a

1    biomedical engineer.  He's never worked for the FDA, in

2    contrast to Mr. Ulatowski who has decades of experience

3    within the FDA making actual wholesale regulatory

4    determinations.  Now, plaintiffs rely on some advisory

5    panels that Dr. David has sat on in the past.  And they

6    assert that his experience with these advisory panels

7    qualify him to render regulatory opinions but that's really

8    not the case.

9            Dr. David is never outside the context of

10   litigation, made the types of regulatory analyses that he

11   purports to make in his report.  His experience on the

12   advisory panels has been in the context of him providing

13   biomedical engineering expertise on issues that the FDA

14   specifically raised with him.  He's not on any advisory

15   panel determining substantial equivalence or determining

16   regulatory compliance, which are the very issues that -- the

17   very regulatory issues that he addresses in his report.  And

18   so we would submit that the Court or that Dr. David is not

19   qualified to opine on regulatory matters.

20           And with that, Your Honors, unless the Court has

21   any questions, I think we'll rest on the papers.

22           MAGISTRATE JUDGE NOEL:  I just have one.  The

23   Cleveland Clinic Study that you referenced comparing the

24   HEPA filtered device to the non-HEPA filtered Bair Hugger,

25   is that one of the nine studies that I was asking --

1            MR. WINEBRENNER:  I don't think it's in that list

2       of nine.  That particular study appears as Exhibit 10 to our

3       motion to exclude Dr. David, which is ECF No. 768-1.

4            MAGISTRATE JUDGE NOEL:  Thank you.

5            MR. WINEBRENNER: Thank you, Your Honors.

6            THE COURT:  Thank you, Mr. Winebrenner.

7            Go ahead, Mr. Bankston

8            MR. BANKSTON:  All right, Your Honors, I think I'm

9       going to start with alternative design because I think

10      that's the most important issue before us today, and I want

11      to start to go down the four devices.

12           The first being the Vita Heat, which is resistive

13      mattress design, and we fully understand the Court's prior

14      order.  Obviously, we disagree with it, but we absolutely

15      understand it.  And the Court's order premised on the idea

16      that the resistive mattress was too radical a departure of a

17      kind of technology.  And from the order the language was you

18      can't change a Bair Hugger into a Vita Heat.  That's the

19      idea is it's not like you can make a series of design

20      changes then a Bair Hugger becomes a Vita Heat.

21           While Dr. David in his report describes why he

22      thinks it's a substantial alternative design not a

23      substantially different product, we understand the Court's

24      order, and I'm not going to litigate it today.  But with

25      respect to the Tablegard product, the Tablegard product is

1      something that the Bair Hugger could become quite easily,

2      and in fact is something that 3M explored turning the Bair

3      Hugger into.

4              I direct you to look at Dr. David's report between

5      the pages of 37 and 40 where he talks about, first, 3M's

6      white board designs on how to create a closed recirculating

7      air system.  In other words, right now the Bair Hugger

8      exhausts its air back into the environment.  But what if it

9      recirculated it back into the machine and refiltered the air

10     and kept it in a closed loop?  3M did white board designs to

11     try to figure out how to do this, and this was something

12     they were very much exploring.

13             The Berchtold Tablegard is a practical realization

14     of that design concept.  If you want to take the Berchtold

15     Tablegard apart and the Bair Hugger apart, they are

16     identical.  They are plastic enclosures that contain a

17     blower unit, a forced air blowing unit, a heating element, a

18     temperature sensor, and then a plastic coupling that directs

19     the forced air into a hose, just like the Bair Hugger.  That

20     hose, just like the Bair Hugger, travels to an enclosure, a

21     coverlet in the case of the Bair Hugger.  Now, in the Bair

22     Hugger, I believe it's cotton and polyurethane that makes

23     the blanket and has perforations and it exhausts air out.

24             In the case of the Tablegard, it's a vinyl that's

25     enclosed.  And then at the end instead of an exhaust system,

1    there's a tube that goes right back into the machine.  The

2    Tablegard has done this by integrating it into a surgical

3    table itself.  Instead of making it a disposable item or

4    something that's reusable like a resistive mattress where it

5    has to be taken washed somewhere, it's actually part of the

6    surgical setup, and it does this by having a constant flow

7    of forced air through the vinyl design.  And another benefit

8    of this is that it maintains pressure control because the

9    actual air pressure can change throughout the unit.

10          So you can easily make a Bair Hugger a Tablegard,

11   and they've actually explored doing it.  And the method in

12   which the Tablegard heats the patient is well established.

13   It is true that unlike the Bair Hugger, which is primarily

14   convective, minorly conductive, the Tablegard through its

15   design of making it recirculated becomes primarily

16   conductive and secondarily convective.  But the method in

17   which it warms patients has been shown in studies conducted

18   by Dr. Sessler to be equally effective at raising patient

19   temperatures.

20          Now, it's true that there's not going to be a

21   study out there, nobody has done an RCT yet at all, of

22   course, comparing the Bergland Tablegard to the Bair Hugger

23   in terms of infection rates.  But the Bergland Tablegard

24   removes every mechanism that the plaintiff has identified as

25   causing these infections.  If this device can not introduce

1    air into the room, then it clearly can not affect airborne

2    contamination.

3              It is true that there is not an RCT on that, just

4    like there's not an RCT saying that the Bair Hugger causes

5    infections.  But with Dr. David's experience and

6    understanding of biomedical engineering, I think he can say

7    when the device functionally removes the only mechanism that

8    is being identified as the defect, that device is going to

9    be safer than the Bair Hugger in that respect.  So that

10   design is something that we feel is very much on the table

11   because that is something that 3M itself has even looked at.

12             With respect to the other forced air warming

13   devices, particularly the Mistral, I think what 3M is

14   missing here is the reason the Mistral is a better product

15   in our mind is not primarily because of a HEPA filter, which

16   Dr. David does believe from his engineering background is

17   going to be beneficial.

18             But even Dr. David keys on to a point that Judge

19   Ericksen raised, which is that the presence of a filter,

20   even a more effective filter is not going to have any effect

21   on the amount of heat being put into the environment and

22   whether that mechanism of injury still continues.  So it's

23   not an optimal choice just to put a HEPA filter on the

24   device.

25             The reason the Mistral is being advocated by

1    Dr. David primarily is because it has a conspicuous warning

2    communicated to the manufacturer, and it's one of these in

3    the first pages of the manual with a big triangle with a

4    huge exclamation point saying that clinicians should take

5    into account the possibility of airborne contamination when

6    using this unit in surgeries.  And Dr. David's contention is

7    that kind of warning would have provided a clinician a

8    reasonable basis to make himself aware of the science

9    surrounding this device and make his own clinical judgments,

10   and he believes given his experience in the creation and

11   regulation of warnings that it was an adequate warning.

12          So the Mistral really goes more towards

13   plaintiffs' marketing defect claim than it does its design

14   defect claim, and so as an alternative design, it's an

15   alternative marketing design first and foremost.  So those

16   are the alternative designs that he really talks about.  And

17   I do believe that those are well supported and very well

18   discussed in his report as well.

19          I'd like to move on a little bit to his

20   methodology, particularly the idea of a clinical hazard

21   review.  And, first, just a bit of law.  We cite *Taylor v.*

22   *Danek Medical*, which is an excellent discussion of what a

23   biomedical engineer is.  And biomedical engineers, according

24   to that case, discuss "the proper design and implementation

25   of studies to determine the nature and magnitude of patient

1  risks and the extent to which those risks are realized in

2  clinical practice."  That's what Dr. David has done for as a

3  biomedical engineer for over 30 years.  He has more

4  qualifications than the usual biomedical engineer because we

5  hear about his participation in something called the Medical

6  Technology Evaluation Committee, he's actually the creator

7  and director of that.  That committee evaluates the clinical

8  risk of medical devices for the Texas Medical Center, for

9  the largest conglomeration of hospitals in America.  And he

10  has pioneered the field of medical device evaluation for

11  hospitals.  His qualifications have been grossly undersold.

12         He's also the chair of clinical engineering for

13  the International Federation of Medical Engineers.  He's

14  been given the Lifetime Achievement Award from the American

15  College of Clinical Engineering, and he continues to provide

16  regulatory and clinical evaluation to the Texas Medical

17  Center.  His methodology was discussed as being a one man

18  show and does not like what he does in normal fields and

19  that's just not true because in this case, his opinion

20  discusses and relies heavily on the findings provided to him

21  in the reports of Dr. William Jarvis and Dr. Jonathan Samet,

22  and these clinicians and epidemiologists input is part of

23  what he would do in the normal field as well.

24         He discusses in his report that his review in this

25  case was in fact far more rigorous than what he would

1    normally do in his every day activities, particularly

2    because he's given access to documents that he would not

3    normally have access to that other medical device evaluators

4    and hospitals just simply don't have access to.  So his

5    performance of his job here was fundamentally the same that

6    he did at the Texas Medical Center for 30 years, and he

7    talks about that extensively.

8              They claim in that methodology that he didn't look

9    at any studies that were unfavorable.  In fact, I believe I

10   heard was he didn't examine a single study that was

11   unfavorable to the plaintiffs' position and that's just not

12   true.  If you check into his report, and I have to pull the

13   page number on here, I believe it was page 20.  That's part

14   of where he begins the discussion of the scientific

15   literature that was used to validate the Bair Hugger and

16   sell it to the FDA essentially as a safe product.

17             Moreover, he talks in his section in his finalized

18   opinions is a discussion about defendant's reliance on the

19   materials, what they relied upon, particularly in the terms

20   of the testimony from their corporate representative, their

21   clinical director and their director of R&D, that the nature

22   and findings of the studies they relied upon were not

23   sufficient that a reasonable medical device company would

24   have known that those studies were underpowered and not

25   sufficient to provide a safety statement of the Bair Hugger.

1    That's all there, so I'm not sure why we're hearing that he

2    didn't discuss in any way negative studies.

3          There's also the bit about we obviously agree that

4    an expert doesn't have to review every piece of literature,

5    and this is very different and distinct from the situation

6    we talked about yesterday with Dr. Ho where he just abjectly

7    failed to review any of the literature.  And so if there's a

8    study that, you know, there's studies that Dr. David didn't

9    review or that he was familiar with through his deposition

10   rather than on his reliance list, these are matters of

11   weight and not admissibility.

12         The same is true is when you talk about not enough

13   documents, Dr. David specifically requested what he wanted,

14   and he wanted the kinds of things that ultimately

15   Mr. Ulatowski didn't review like 510(k) decision making

16   documents, and instead of reviewing pages upon pages of

17   clearly irrelevant materials, yes, Dr. David reviewed the

18   most important materials in the case.  So we really don't

19   think that that's an issue of methodology at all.

20         And then I do want to talk about his

21   qualifications of regulation.  It's an interesting position

22   because we, you know, we designated Dr. David and primarily

23   for his engineering opinions but prepared for regulatory

24   opinions.  Strangely enough, as a defendant to a

25   traditionally do, he was a reactive.  We knew they were

1    going to offer FDA opinions.  We needed, although, we don't

2    ever think they should be admissible, We needed somebody in

3    case this Court decides it is admissible, and that's what

4    he's here to do.  We never wanted to go down the road of the

5    FDA and have to deal with that in this trial.

6           But in terms of his qualifications to talk about

7    that, we talk about past participation with the FDA.  He is

8    currently the chair of the FDA's Good Manufacturing

9    Committee, the Good Manufacturing Practices Committee.  He

10   sits on the Orthopedic Medical Device Panel.  Another one of

11   his FDA titles is senior biomedical research reviewer.  They

12   said he's never made the regulatory analysis Mr. Ulatowski

13   has made.  That's not really true either because Dr. David

14   testifies about it and it's in his report that he has made

15   510(k) reviews for the FDA.  He has been asked to do that.

16   It would seem to be defendant's position that unless you

17   were employed by the FDA and drew a paycheck from them, you

18   can't give regulatory testimony and that clearly can't be

19   the law.  Dr. David is perhaps the single most qualified

20   person who is not employed by the FDA.  I can't even

21   contemplate a way a person would become more qualified

22   without becoming a senior member of the FDA.

23          He's also currently the regulatory advisor to the

24   Texas Medical Center.  He's written a textbook on these

25   issues, on regulatory compliance.  And he's been repeatedly

1    upheld on this issue.

2         I do want to discuss the one time he got struck on

3    the issue of FDA and regulation.  And there's a case called

4    *Stevens, Stevens v. Stryker*.  Now, the many cases in which

5    he's been approved on this went swimmingly for him because

6    they had a great report and everything.  The problem was

7    with Stevens, he was designated primarily as an engineer off

8    the bat, and what the plaintiffs tried to pull at the last

9    minute is trying to boot strap some FDA opinions last

10   minute.  And as the Court says in the opinion, there's

11   nothing in the text of his report that says he has FDA

12   qualifications.  The situation is radically different here,

13   and so we don't think there's a qualifications issue.

14        I think that covers the bulk of their argument

15   there.  It's pretty well-briefed in the papers, but if you

16   have any other questions, I'd be happy to answer them.

17   Thank you, Your Honor.

18             MAGISTRATE JUDGE NOEL:  Thank you.

19             THE COURT:  We'll take a morning recess,

20   15 minutes.

21                  (Morning recess at 10:57 a.m.)

22                       (11:15 a.m.)

23                    (IN OPEN COURT)

24             THE COURT:  Please be seated.  Judge Noel has a

25   criminal duty matter so he'll join us when he's able.  Is

1    there any response on the David or did you want to move

2    right to your argument on summary judgment?

3            MR. WINEBRENNER:  We have nothing further on

4    Dr. David.

5            THE COURT:  Anything on this side before we go to

6    summary judgment?  All right.  Mr. Hulse.

7            MR. HULSE:  Good morning, Your Honors.

8            THE COURT:  Good morning.

9            JUDGE LEARY:  Good morning.

10           MR. HULSE:  As we wind up this third day, I want

11    to thank, of course, both the Court and the staff here for

12    the time and attention that you've given to this matter.

13           THE COURT:  You should really thank the court

14    reporter.

15           MR. HULSE:  Believe me, Maria has worked some long

16    days, and we very much appreciate it.

17           THE COURT:  She's got because there was the

18    request for daily transcript, there are people working down

19    below the scenes too.  I say "down" because they're below

20    our floor.

21           MR. HULSE:  And I know we're all very grateful to

22    them too.

23           COURT REPORTER:  Thank you.

24           MR. HULSE:  I'd like to start where Mr. Blackwell

25    began with the Seventh Circuit statement in the *Rosen* case.

1    The statement that was echoed in the *Bausch & Lomb MDL* and

2    has been echoed many times when courts exclude experts as a

3    prelude to summary judgment and that's that the law lags

4    science.  It doesn't lead it.  The courtroom is not the

5    forum to advance new scientific theories.  It's not the

6    place for scientific guesswork even of the inspired sort.

7         And what we've heard from the plaintiffs and their

8    experts is not real science.  It's courtroom science.  It's

9    science opinions that haven't been expressed outside of the

10   courtroom.  Opinions that have been roundly and soundly

11   rejected by authorities that both sides agree are reliable,

12   like the international consensus, recently rejected by the

13   FDA, rejected by numerous authorities who have reviewed

14   exactly the same literature about this product that's been

15   out there for 30 years, been used in 200 million surgeries,

16   used in 50,000 surgeries a day, and is trusted by the

17   overwhelming majority of anesthesiologists, orthopedic

18   surgeons, and people in the medical profession.

19        The general causation question here is does the

20   Bair Hugger system cause prosthetic joint infections or deep

21   joint infections, in the plaintiffs' phrase?  It's not does

22   it in theory?  Can it?  Is it possible?  If there is one

23   lesson that we can take away from the *Glastetter* decision

24   it's that a theory and even a beautiful theory, a theory

25   that seems to make all the sense in the world, which

1    plaintiffs' doesn't here, but what the *Glastetter* case said

2    is even where the chain of medical reasoning appears sound,

3    it's major premise still must be proven, and it must be

4    proven by valid scientific evidence.                When

5    inferences of causation are going to be drawn, they cannot

6    be based on ipse dixit.  They cannot be based on theory.

7    They must be based on actual evidence that the Bair Hugger

8    system causes prosthetic joint infections in the real world.

9    That's what *Glastetter* said.  And there's no real dispute

10    here that expert testimony is required for general

11    causation.

12            The *Lipitor* case did us all a service and did a

13    50-state survey that goes on for about 15 pages in the

14    opinion and doesn't cite just one case for jurisdiction.  It

15    cites multiple cases.  In fact, it cites at least two cases

16    from Minnesota.

17            The *Willard* case, which we cite in our briefs,

18    also talks about Minnesota law.  It says where is it that

19    you don't need an expert to get to medical causation?  Those

20    circumstances would include an immediate onset of symptoms

21    that naturally follow from an accident.  So that's a car

22    accident.  Somebody is injured in a car accident, for

23    example, or a complete lack of any other possible cause.

24            Clearly, when you're talking about things like

25    prosthetic joint infections, you're talking about multiple

1   possible causes, many possible causes.  Most prominently,

2   the patient's own skin.  So in those circumstances, the

3   plaintiffs must have expert testimony to demonstrate general

4   causation, to carry their burden to show that they can get

5   past this point and on to specific cause.

6           Now, I don't know what plaintiffs are going to get

7   up here and say in response to me, but in their papers, they

8   have agreed that they need Dr. Samet, Dr. Jarvis or

9   Dr. Stonnington to get them to general causation.  In their

10  opposition to our brief, they say about Dr. Elgobashi that

11  he may be used to show the mechanism by which the Bair

12  Hugger increases the risk of infection.  We're talking about

13  mechanism.  We're talking about over on the left hand side

14  of the joint or gap.  The experimental theoretical side.

15  Cases, and we've cited many of them in our briefs.  We've

16  shown them to you.  That's not enough to get to general

17  causation.  *Glastetter* says that too.  And plaintiffs in

18  their briefs don't contend that Dr. Elgobashi gets them

19  there.

20          In fact, about Dr. David, they don't even mention

21  Dr. David in their opposition to summary judgment, not one

22  time.  They're not contending that he and his risk analysis

23  can get them to general causation nor Mr. Buck nor

24  Mr. Koenighofer.  It's Samet, Jarvis and Stonnington, and

25  that makes sense.

1          This is a medical injury case, involves complex

2     medical injuries.  If inferences are going to be made about

3     causation based on the evidence, it's going to have to be

4     made by qualified medical professionals.

5          And we've talked about these cases several times.

6     MDL after MDL has held and then *Glastetter* says the same,

7     causation has to be based on more than just possibility.

8     You have to show that this mechanism, this mechanism that

9     they're advancing here really plays out in the real world.

10    And so what do Samet, Jarvis and Stonnington, the three

11    medical experts on the plaintiffs' side rely on to show that

12    this theory that they have actually plays out and causes

13    infections in the real world?

14         Well, Dr. Samet said it best, in reference to the

15    McGovern study, he said, "absent the quantitative estimate

16    from that paper, it would be -- well, there would be a quite

17    plausible mechanistic basis for increased risk.  There would

18    not have been an association in the real world."

19         And why do you need an association?  What The

20    Reference Manual on Scientific Evidence says is that the

21    Bradford Hill factors, the factors that purportedly Samet

22    used, and plaintiffs contend also that Jarvis and

23    Stonnington used something at least close to Bradford Hill,

24    they are employed only after a study finds an association to

25    determine whether that association reflects a true causal

1       relationship.  If you don't have an association, you stop.

2       That's it.  You are on the side of, at best, theory,

3       plausibility.  You don't get to an inference of general

4       causation.

5              In fact, The Reference Manual goes on on the same

6       page in a footnote.  Notes that some experts attempt to use

7       the Bradford Hill factors to "support the existence of

8       causation in the absence of any epidemiologic studies

9       finding an association."  And The Reference Manual says

10      quote, "there may be some logic to that effort but it does

11      not reflect accepted epidemiologic methodology."  If you're

12      going to infer causation as an medical expert, you have to

13      have an association.

14             And when you're basing that association on an

15      observational study, this is what The Reference Manual has

16      to say.  The Reference Manual talks about the weaknesses of

17      observational study.  There's a susceptibility to bias and

18      confounding.  And so this is what The Reference Manual says.

19      If you're going to use an observational study or studies to

20      make a conclusion of causation as Samet, Jarvis and

21      Stonnington did here.  You want to see the association

22      across multiple observational studies with different

23      designs, difference kinds of subjects, and done by different

24      research groups.

25             And why is that?  Because of the susceptibility of

1    confounding.  If we get consistent results across multiple

2    observational studies, multiple facilities, it makes it less

3    likely that an association that was found was the product of

4    bias or confounding.

5          And you have to take into account, the manual

6    says, the effects of confounding variables.  You have to use

7    appropriate methods to do it, including comparing small

8    groups that are relatively homogenous with respect to

9    confounders, which is what Dr. Holford and Dr. Borak did

10   when they showed the McGovern study, when you control for

11   thromboprophylaxis, and you control for antibiotics, any

12   purported association vanishes.  And Mark Albrecht, the

13   co-author, the Augustine employee, agreed.  He didn't even

14   have to do the number crunching.  He knew that that was the

15   case.

16         And you have to take into account plausible

17   explanations for the purported association.  What are the

18   alternative explanations that could explain this?  The

19   introduction of a major infection control initiative, change

20   in antibiotic, change in thromboprophylaxis.  These are the

21   things you have to do in order to make an inference of

22   causation.

23         So does McGovern find an association between use

24   of the Bair Hugger system and increase in deep joint

25   infections?  On its face, it does not.  There has been much

1    misreading of this study in this courtroom.

2              What McGovern says is we had two periods of time.

3    We had a period of time with the Bair Hugger system, and we

4    had a period of time with the HotDog system.  And there was

5    a higher rate of infections that we found during the HotDog

6    period.  The association they found was between the period

7    --

8              THE COURT:  During the HotDog period?

9              MR. HULSE:  I'm sorry, I misspoke.  The higher

10   rate of infection in the Bair Hugger period.  They found the

11   association between the period and the higher rate, and so

12   that's why they came to this statement.  This study doesn't

13   establish a causal basis for this association.  We can't

14   attribute this higher rate in the Bair Hugger period to the

15   use of the Bair Hugger.  And why not?  Because the data are

16   observational, may be confounded by other infection controls

17   instituted by the hospital.  It notes the change to the

18   antibiotic and the thromboprophylaxis.

19             And you may remember the drafts of Figure 7 from

20   McGovern that show the spike during the Rivoraxaban period.

21   It says, "in addition, we were unable to consider other

22   factors that have been associated with SSI, including blood

23   transfusion, obesity, incontinence, and fitness for surgery,

24   which have been identified elsewhere as important predictors

25   for deep infection."

1            So we know these are potential confounders here.

2     That's why we are not able to attribute this increase to the

3     Bair Hugger.  It's not right to say this finds an

4     association between the Bair Hugger system and deep joint

5     infections.  That's not what it finds, and they don't say

6     it.  And you don't have to take my word for it.  Let's take

7     Dr. Reed.

8            Plaintiffs have said that the study authors stand

9     by the study.  They stand by it, and in fact they do.  Now,

10    we didn't have the documents to show Dr. Reed about the

11    transposition of the one infection in the data manipulation,

12    but he stood by his conclusions.  He stood by what he stated

13    in the paper.  Dr. Reed is the senior author.  Why in the

14    paper did you say this study does not establish a causal

15    basis for the association?  He says because it doesn't.  It

16    doesn't establish a causation or study.

17           But here's a question that plaintiffs' counsel

18    asked him.  "Did any of your studies, includes McGovern,

19    indicate that the increase in bacteria around the surgical

20    site increases the likelihood of periprosthetic joint

21    infection by the susceptible host?"

22           And this is key how he explains what the McGovern

23    study found.  "So we have shown," this is his answer -- "So

24    what we have shown is an association with, you know, what we

25    did for a period of time and then we changed.  And then we

1    had a change in infection rates with the caveats that we had

2    changes to our practice.  Apart from that, as we have

3    detailed and as we have put in our paper."

4         In other words, we made some significant changes

5    to our practice.  One of those changes was we switched over

6    to the HotDog.  And when we made those changes, we found a

7    decrease in infection rates.  That's the association they

8    found.

9         What they're reporting here is we know that things

10   like obesity, fitness for surgery, those are known to be

11   factors.  We're also offering you here a new data point, a

12   new possibility that the Bair Hugger Forced Air Warming

13   should be considered as a factor too.  But they're not

14   finding an association between that increase and the Bair

15   Hugger.  They're not attributing it to the Bair Hugger.

16        And so it's not surprising too given these

17   limitations that there has been strong criticism of the

18   McGovern study.  The Duke Infection Control Outreach

19   Network, which is a major resource for practitioners in this

20   area have said no adequately powered, properly controlled

21   statistically significant reproducible studies has been

22   published demonstrating an increased risk of SSI to be used,

23   due to be used of forced air warming devices.

24        Professor Sikka, Dr. Sikka in his published

25   article in The Journal of Bone and Joint Surgery, which was

1    a full literature review in 2014, said that they recognize

2    McGovern failed to account for age or medical comorbidities.

3    Why is this important?  Because everybody who practices in

4    this area knows how important this stuff is failed to

5    account for other infection control measures implemented

6    during the study period, and the co-author was an employee

7    of a conductive warming company.  That was Albrecht, an

8    employee of Augustine.  And, interestingly, here's a medical

9    professional scholar published in a journal who considers

10   that a relevant criterion to assessing the scientific

11   validity, trustworthiness and reliability of the McGovern

12   study.

13            ECRI Institute also notes the confounding and

14   then, of course, there's the FDA.  In 2012, once the

15   McGovern study came out, Dr. Augustine went on his website.

16   He's touting it, hey, this is proof that forced air warming

17   Bair Hugger increases the risk of surgical site infections

18   and shows the HotDog is safer, and the FDA told him to stop.

19   They said that the evidence provided in support, which

20   included the McGovern study, did not "provide conclusive

21   evidence of a causal relationship between the use of forced

22   air warming and higher infection rates."

23            This is a preclude, of course, to what they have

24   now said again recently in response to Augustine's

25   marketing, advertising around this litigation.  And just to

1    go through these confounders, there's no dispute in the

2    medical literature that these issues that they did not

3    account for, did not control for in McGovern are

4    confounders.

5          Here in 1990, Dr. William Jarvis, one of

6    plaintiffs' experts, while he was at the CDC concluded that

7    surgical technique in patients, in a patient's severity of

8    illness were the primary determinate of surgical wound

9    infection after total knee arthroplasty.

10          We've talked about the fact that when you control

11    for the two major changes in thromboprophylaxis and

12    antibiotic that occurred at the very end of the Bair Hugger

13    period before the transition to HotDog, it wipes out this

14    association, the purported association.

15          Dr. Holford's biostatistical analysis found the

16    same thing.  He says you can account for all of the

17    difference in risk reported in the McGovern study simply by

18    accounting for these two confounding variables.  That's

19    before you get to things like fitness for surgery, obesity,

20    and so forth.  Just those two wipe out any difference.

21          And there's no dispute in the medical literature

22    that the antibiotic that was used during that tail end of

23    the Bair Hugger period where you see the spike, Gentamicin

24    is a less effective antibiotic.  Here's Dr. Reed in another

25    paper, McGovern co-author Dr. Reed says there's no evidence

1    for use of systemic Gentamicin is prophylaxis and primary

2    elective THA and TKA surgery.  And he goes on to say that

3    they found that staph develops resistance to Gentamicin,

4    which also can explain the spike.

5          Thromboprophylaxis is also an acknowledged and

6    recognized confounder.  Another change that had been made at

7    the end of the Bair Hugger period was the use of

8    Rivaroxaban.  And the Brimmo study, which came out just a

9    couple years ago, 2016, concluded that, "the use of

10   Rivaroxaban for thromboprophylaxis lead to a significantly

11   increased incidence of deep SSI," that's what we're talking

12   about here, deep joint infections, "in a continuous series

13   of patients undergoing primarily THA and TKA in a single

14   institution."

15         And I bring us back to McGovern Figure 7.  This is

16   before they flattened out the line using the average.  And

17   what it shows is that there is a peak just before and

18   infections just before the switch away from Rivaroxaban.  It

19   peaked that the authors then concealed by flattening the

20   line and using an average.  And these were merely elements

21   of a comprehensive, massive infection control initiative

22   that was undergoing, that was happening at Wansbeck

23   Hospital, part of the North Umbria Trust in England at the

24   tail end of the Bair Hugger period.

25         This is from a study called Gillson.  She was the

1    chief nurse who was involved in this initiative.  This is in

2    the record.  I don't think we have a cite here.  But,

3    anyway, Figure 2 in the Gillson paper shows all of the

4    various initiatives that were introduced at the tail end of

5    the Bair Hugger period and going into the HotDog period.

6           So as Dr. Borak notes, the benefits of this

7    massive initiative that they had undertaken, multiple

8    different things was felt primarily by the patients who were

9    warm with the HotDog, and these include implementing

10   pre-warming, MMSA screening, changes to operating room

11   protocols, changing post-operative wound dressings,

12   repairing the laminar air flow system -- we know that's

13   important -- undertaking root-cause analysis of infections,

14   establishing a Prevention Control Committee, hiring

15   full-time SSI surveillance nurses and implementing more

16   effective pre-operative skin preparation.

17          Dr. Borak explains why all of these are important

18   and could well have contributed, likely did contribute, to

19   the reduction in infections during the HotDog period.  All

20   confounders that in fact are not even disclosed, maybe

21   obliquely referenced in the McGovern paper, and that's even

22   before we get to the data manipulation.

23          And as Mr. Corey Gordon demonstrated, and I'll

24   just do it briefly here, there is a change between draft 10

25   of the McGovern study and the published version.  There is a

1    HotDog infection that disappears and all of a sudden becomes

2    a Bair Hugger infection.  And the data set, which we've

3    established to be the actual, the real data, is consistent

4    with the draft and not the published version.

5           And where did this happen?  When did this data

6    switch happen?  It happened after Dr. Reed, who sent this

7    data set to the United States, to Augustine Biomedical and

8    Design in the possession of Mark Albrecht.  And Dr. Reed

9    testified that there is a difference, a difference between

10   the data that he sent to Mark Albrecht and the published

11   data.  He agreed with that.  He remembered it a little bit

12   differently from how he showed it in the actual data, but he

13   knew there was a difference.

14          And so we go from 4 to 3.  And that is the

15   difference between statistical significance and lack of

16   statistical significance as Dr. Holford shows.

17          In the *Viagra MDL* in this district, the Court

18   initially had admitted the general causation epidemiology

19   expert of the plaintiffs, and then after subsequent

20   discovery revealed that there were serious data credibility

21   issues with the data set on which the epidemiology expert

22   relied.  The Court reversed course, excluded the expert and

23   granted summary judgment to the defendants.

24          And Judge Magnuson noted "Peer review and

25   publication mean little if a study is not based on accurate

1   underlying data."  The peer reviewers don't get the data.

2   They don't get to analyze it.  They're presented with the

3   paper.  And the fact that the McGwin study, this was the

4   single epi study on which the plaintiffs' general causation

5   expert relied appears to have been based on data that cannot

6   now be documented or supported renders it inadmissibly

7   reliable.

8          The data manipulation alone is a sufficient basis

9   to render the McGovern study unreliable.  But even if you

10  take that out as a factor, the failure to account for

11  confounders, confounders that explain the entire difference

12  between the Bair Hugger period and the HotDog period,

13  renders it as every one of these independent authorities

14  have found an unreliable basis for making inferences of

15  causation, and it does it on its face even find an

16  association.

17         JUDGE LEARY:  But even with this alleged

18  manipulation, the ultimate conclusion remains the same by

19  Reed and Albrecht that the association is not causal.

20         MR. HULSE:  Correct.  And that's what the paper

21  says.  As Dr. Reed said, we didn't find an association

22  between the Bair Hugger system and increased infections.

23  That's not what we found.  And statistical --

24         THE COURT:  Just a second.  Mr. Sacchet is

25  indicating that that's not true, I think.  So did you want

1      to?

2                MR. HULSE:  The Court can read the McGovern study.

3      I'm confident that they disagree with what I'm saying up

4      here, but the McGovern study and Dr. Reed's testimony will

5      speak for themselves.

6                MR. SACCHET:  I agree it will speak for itself.

7                MR. HULSE:  And statistical significance, as I

8      showed them, the moving of the single infection removes

9      statistical significance while statistical significance is

10     as some court says is not the Holy Grail of admissibility.

11               In the *Prempro* MDL, the Court said, "as many

12     federal courts observe, if an expert places undue emphasis

13     on statistically insignificant evidence, it may indicate

14     that the expert's methods are unreliable."  And the Court

15     cited *Joiner*.  In fact, the *Prempro* court did ultimately

16     exclude general causation experts on that basis.

17               In fact, in *Joiner* itself, *Joiner* involved the

18     plaintiffs' causation expert's reliance on epi studies.  And

19     despite the existence of epi studies, the Court said the

20     leaps.  This is where that famous ipse dixit language comes

21     from in *Joiner*.  The leaps that were being made by the

22     plaintiffs' causation experts from these epi studies was too

23     far.

24               And, again, the last thing on the topic of

25     statistical significance, we also know because Dr. Holford

1       demonstrates it, the impact of the start date.  The study

2       authors moved the start date to a place where they could

3       achieve statistical significance.  If they had remained with

4       an earlier date, one month earlier, one month later, they

5       would have lost statistical significance.  The date was

6       selected to achieve it just barely and that's how fragile

7       the study is even before you account for confounders.

8               Now, what Dr. Sikka's study published and I showed

9       earlier, is the significance of the financial interest of

10      Mr. Albrecht to the trustworthiness of this study.  Now, as

11      we've shown you, Mr. Albrecht had an over $20,000 promissory

12      note with Augustine.  Of course, he was employed by

13      Augustine from 2005 onward.  He's a long-time employee.

14      He's the guy who did the data crunching for Augustine, and

15      he did it for the McGovern study.  And I think the

16      plaintiffs said the day before yesterday, oh, but this all

17      postdates McGovern.  This is a promissory note from 2012.

18      Well, the first paragraph of this says, "the undersigned is

19      an addendum to the promissory notes dated September 27,

20      2007, and August 10, 2010."  An addendum to promissory notes

21      that already existed.  Mr. Albrecht owed his employer,

22      long-time employer, quite a bit of money.

23              But even so, Mr. Albrecht still made clear in a

24      document and then in his testimony that he didn't support

25      the inferences that Dr. Augustine was making, the same

1    inferences that the plaintiffs' experts are making here from

2    the McGovern study:

3            "Unfortunately, Scott likes to say that he's

4    convinced of such a relationship, that is the relationship

5    between forced air warming and deep joint infections, even

6    though I tell him it is unsupported and I do not agree.

7    Well, that is the difference between research and

8    marketing."

9            So the Court should not consider the McGovern

10   study to be scientifically valid evidence of causation upon

11   which experts can reliably draw inferences of causation.

12   It's not real world scientists, doctors don't draw that

13   inference based on McGovern, and they don't draw it based on

14   McGovern in consideration with the rest of the body of the

15   medical literature.  They don't.  The only place they do

16   that other than in Scott Augustine's marketing is in this

17   courtroom.

18           We spent a lot of time yesterday on

19   Dr. Elgobashi's CFD, which is a computer simulation, and

20   like any simulation is only as good as its inputs.  And

21   general causation has not only the meaning that we've talked

22   about in terms of whether the Bair Hugger system increases

23   actually causes deep joint infections, periprosthetic joint

24   infections.

25           But also general causation involves this question

1    of is this going to be useful in any of the cases, the

2    4,000-plus cases that we have in the MDL and the 60-plus

3    that we've got in Ramsey County?  And Dr. Elgobashi has got

4    a temperature input that we have strong reason to believe

5    that's not the temperature that you'd find if you measured

6    under the draping in any operating room in America.  And so

7    the relevance of this to any of the cases, the bellwethers,

8    and so forth that may be tried is dubious.

9          But even beyond that, the plaintiffs don't cite

10   any case where a CFD has been admitted as proof of causation

11   of a medical injury.  Dr. Elgobashi himself doesn't give the

12   opinion that general causation can be premised on a CFD.  No

13   other expert in this case has given the opinion that general

14   causation conclusion can be based solely on a CFD.  And the

15   plaintiffs haven't pointed to any study, and we haven't

16   found one that says that a CFD can be used to prove the

17   cause of an infection.

18         And in the plaintiffs' summary judgment

19   opposition, again, all they say is it's mechanistic

20   evidence.  They don't claim that it can get them over the

21   hurdle of general causation.

22         Another thing that the plaintiffs' medical experts

23   rely on is an inference.  An inference that increase in

24   particulate matter in the operating room means you have an

25   increase in bacteria.  So if the Bair Hugger increases

1    particulate matter, then it must also increase bacteria in

2    the operating room and at the surgical site.  That's an

3    interesting theory, but it's been tested.  And as the Court

4    has heard repeatedly, it's been tested repeatedly.

5            And as Mr. Gordon showed earlier this morning

6    there are nine studies including most recently Oguz that has

7    consistently found that the Bair Hugger system does not

8    increase bacteria.  The plaintiffs' theory, while it may

9    sound facially appealing, is simply not borne out by the

10    real world evidence.  And the plaintiffs' experts Samet,

11    Jarvis and Stonnington depend on that theory.  They depend

12    on McGovern.  They depend on that theory.  It's just not

13    supported by the real world evidence.

14            And the last refuge here, you'll likely hear more

15    of this from the other side is 3M corporate documents.  We

16    have produced millions and millions of pages of documents in

17    this litigation.  3M and Arizant's consistent position has

18    been as is supported by the science that the Bair Hugger

19    does not increase the risk of infections.  What plaintiffs

20    have done in their brief and may do today is they may pull

21    out snippets of e-mails, of draft documents, snippets of

22    deposition testimony that are contradicted as was the case

23    with Dr. Kurz, by testimony that occurred just pages later

24    in the deposition.

25            But corporate documents even put in the most

1      favorable light are not proof of causation.  A 3M document

2      could say that an apple is a banana, and it wouldn't make it

3      a banana.  The question is is there scientifically valid

4      evidence, *Glastetter* standard, scientifically valid

5      evidence, *Daubert* standard, to support general causation?

6      Not is there an e-mail or a draft document that we think if

7      you cut it out and don't look at anything else, could get us

8      over the general causation hurdle.  And courts consistently

9      have said you can't substitute documents, corporate

10     documents, for scientific proof.

11          The *Mirena* case out of the Southern District of

12     New York, which is just affirmed a couple of days ago by the

13     Second Circuit said, "The statements and public positions of

14     Bayer are not scientific literature that an expert would be

15     expected to confront in the exercise of intellectual rigor

16     in the field."

17          There, we had a situation where actually there

18     were public statements being made about Bayer that seemed

19     adverse to their position on general causation.  Plaintiffs

20     won't point to anything like that here.

21          In the *Lipitor* case, there was an alleged

22     admission in an employee e-mail that Lipitor caused

23     diabetes, and the Court said, "that could not replace expert

24     testimony, and it wasn't sufficient to preclude summary

25     judgment on the issue of general causation."

1           And *Glastetter* too confronted this issue.  There

2    were internal communications among medical professionals, a

3    defendant, that the plaintiffs suggested with some force

4    looked like admissions that were contrary to the position of

5    the defendant that Parlodel did not cause strokes.  But the

6    Eighth Circuit agreed with the District Court that these

7    purported admissions that were cut and pasted from company

8    memoranda did not support general causation.

9           You could weave them together with all the other

10   things that the plaintiffs had in *Glastetter*, things

11   plaintiffs don't have here:  Animal studies, case studies,

12   rechallenged, dechallenged data.  The plaintiffs even had a

13   medical textbook in *Glastetter* that in the Eighth Circuit's

14   words ventured a hesitant conclusion that Parlodel caused

15   strokes.  Individually or together, that wasn't sufficient

16   evidence to get past, to establish the admissibility of the

17   plaintiffs' general causation experts or to withstand

18   summary judgment.

19          And then we come to the International Consensus.

20   General acceptance is a determinative factor under Minnesota

21   Rule of Evidence 702.  And it is a factor to be considered

22   by the Court under *Daubert*, according to the Advisory

23   Committee notes to Rule 702.  Both sides agree here that the

24   International Consensus meeting is reliable.  These are

25   people who work and spend their practice on the kind of

1     surgeries that are primarily at issue here in the MDL, the

2     prosthetic joint infections.

3              And as the Court has heard, the International

4     Consensus meeting, these 400 professionals, bone doctors and

5     so forth, reached a strong consensus.  And you can look at

6     their footnotes and they considered the McGovern study.

7     They considered the mechanistic studies.  They considered

8     the best case for Augustine and the plaintiffs and said, "We

9     recognize the theoretical risk," theoretical risk, "posed by

10    forced air warming blankets and that no studies have shown

11    an increase in SSI related to the use of these devices."

12             Again, they're talking about McGovern, "no studies

13    have shown an increase in SSI related to to the use of these

14    devices."  They took McGovern's authors on their face and

15    they said McGovern doesn't show that.  "We recommend further

16    study but no change to current practice."

17             This is the kind of guidance that real doctors,

18    anesthesiologists, nurses take to hurt when they're making

19    decision about what to do for their patients.

20             They also take to heart what the FDA has to say.

21    The FDA, of course, responsibilities protecting the public,

22    protecting patients from unsafe medical devices and

23    pharmaceuticals.  And the FDA just not too many weeks ago in

24    response as they said to concerns that they were learning

25    about, about the safety of patient warming and safety of

1    forced air warming in particular issued this letter.  And

2    you can find it on their website along with a series of

3    other safety-related letters that they issued from time to

4    time.

5         And what they said is that they considered data

6    "publicly available medical literature," data from

7    manufacturers and hospitals, operating room guidelines and

8    ventilation requirements in assessing whether there was

9    reason for concern.  And their conclusion was this:

10        There are considerable benefits to using patient

11   warming, including forced air warming in surgeries.  And

12   they didn't make any distinction -- oops, sorry.

13        (Short noise interruption.)

14        MR. HULSE:  Mystery solved or remains a mystery?

15        THE COURT:  It deepens.

16        MR. HULSE:  And the FDA reminded, and this was a

17   letter addressed to doctors, to health care providers,

18   doctors, nurses, people who are making decisions about what

19   to do for their patients:

20        "The FDA is reminding health care providers that

21   using thermoregulation devices during surgery, including

22   forced air thermoregulating systems," and the Bair Hugger is

23   far and away the most prominently used of those, "have been

24   demonstrated to result in less bleeding, faster recovery

25   times, and decreased risk of infection for patients."

1          And in fact, the research supports exactly that:

2     Reduced surgical site infections, reduced fatal heart

3     attacks, reduced blood transfusions, reduced length of

4     hospital stay, reduced post-operative shivering.  Those are

5     the benefits of patient warming.

6          But the FDA then goes on to recommend the use of

7     thermoregulating devices, including forced air

8     thermoregulating system, like the Bair Hugger, for surgical

9     procedures when clinically warranted.  They don't say except

10    in orthopedic surgeries, but here's the crux of it.  This is

11    the direction they're giving to health care providers:

12    "Surgical procedures performed without the use of a

13    thermoregulation system may cause adverse health

14    consequences for patients during the post-operative and

15    recovery process."

16         If you don't warm your patients, you may be

17    imperiling your health, their health.  You are putting them

18    in danger.  And the state of play today is that 70 percent

19    or more of hospitals are using the Bair Hugger system.

20         So this is the guidance that medical professionals

21    outside this courtroom taking care of patients performing

22    surgeries, this is the advice that they've gotten.  You're

23    doing the right thing.  Keep doing what you're doing.

24    You're protecting your patients.

25         And if we go forward based on conclusions drawn in

1    the courtroom by experts who've never drawn those

2    conclusions outside the courtroom, who claim that studies

3    say things that they on their face don't say, make leaps

4    they would -- you can't imagine that they would make in

5    their professional lives, and it gets to a jury and the jury

6    is confronted with this and determines, oh, we agree, the

7    Bair Hugger system is unsafe, what are professionals to do?

8    The FDA, the International Consensus has told them it's

9    safe, and now they've got litigation proceedings that say

10   they're not.  They have to make decisions.  Now, they're

11   faced with am I going to be sued for malpractice?  They have

12   to be able to rely on the consensus and what's generally

13   accepted in the community.

14           What we have here, to return to the original

15   point, is litigation science, not real science.  The

16   plaintiffs' own studies don't support their causation

17   theory.  And to Mr. Sacchet's point, we encourage the Court

18   to read the studies.  See what they say, not what the

19   lawyers say about them.  Read what they say.

20           The International Consensus, which has read the

21   studies, the same studies on which the plaintiffs' experts

22   rely, rejects the plaintiffs' causation theory, and the FDA

23   rejects it too.

24           Whether it's determinative as in Minnesota or a

25   factor as under federal law, the consensus rejection of the

1    theory that plaintiffs and their experts have advanced in

2    this courtroom is powerful evidence of its unreliability.

3    And plaintiffs have the burden to demonstrate the

4    admissibility of their expert testimony, and they can't do

5    it.  They don't rely on scientifically valid evidence.  They

6    make flying leaps across the chasm from plausibility and

7    theory to causation, which under *Joiner* they can't do.

8           We ask the Court to exclude the plaintiffs'

9    medical experts, grant summary judgment in the cases in the

10   MDL and in Minnesota.  Thank you very much.

11          THE COURT:  Thank you, Mr. Hulse.  Ms. Conlin.

12          MS. CONLIN:  Good afternoon, Your Honors.  While

13   that's getting set up, I just want to circle back briefly to

14   the August 2017 FDA letter and that's the letter that just

15   came out in August of this year.  We immediately saw it,

16   knew that it wasn't a letter that the FDA typically issues,

17   and we proffered discovery on 3M on this.  We were stone

18   walled on that.  They said we're not going to give you

19   discovery.  It is not relevant to the claims and defenses in

20   this case, and discovery is closed.

21          We learned for the first time at the first day of

22   this hearing under questions, direct questions from this

23   bench to Mr. Blackwell that in fact 3M was behind that

24   letter.  And we don't know what their communications were.

25   We don't know what the FDA looked at, but Mr. Blackwell

1    readily conceded 3M asked the FDA to investigate the claims

2    that Scott Augustine was making in the science.

3         We're not representing Scott Augustine in this

4    case as in Augustine v. 3M.  It's plaintiffs.  But for some

5    reason, just because we are making and have proven the same

6    claims that perhaps Mr. Augustine is making, we've been

7    tainted with that.  And as Mr. Ciresi said, we're looking

8    forward to having him on cross-examination.

9         THE COURT:  Ms. Conlin, anything you want to say

10   on the summary judgment?

11        MS. CONLIN:  I do.  And he raised that letter in

12   the summary judgment, so I just wanted to address that

13   first.

14        I want to start with the notion of what is

15   actually in dispute in connection with this motion.  3M

16   doesn't dispute the qualifications of Dr. Samet, Dr. Jarvis

17   or Dr. Stonnington.  There is no dispute that these are

18   eminently qualified, and in the case of Dr. Jarvis and

19   Dr. Samet world renowned in their respective fields.

20        3M doesn't dispute the methodology that those

21   experts employ.  Dr. Samet employed the Bradford-Hill

22   criteria.  There's no argument by 3M that he didn't

23   faithfully and systematically apply those criteria.  And

24   really what it boils down to, the main thrust of this entire

25   hearing has been 3M's criticism of McGovern, which is a

1   single piece of evidence amongst the body of things that,

2   for example, Dr. Samet looked at.

3          And when we were talking about Dr. Samet, I went

4   through that, and there was literally hundreds and hundreds

5   of references and lines that he went through in making his

6   causation determination.  Things which didn't exist at the

7   time of the 2013 consensus, such as the heater-cooler issue,

8   such as Darouiche.

9          And, most importantly, Dr. Elgobashi's CFD

10  modelling, which 3M knows is good science, which is why we

11  spent half a day yesterday arguing about whether his input

12  was correct, when in fact both experts, Professor Abraham

13  and Dr. Elgobashi both used the same temperature input for

14  the purposes of their model.  There's no dispute here.

15         3M says that basically so long, and this is a

16  quote from their brief, Your Honors, "so long as the Court

17  excludes plaintiffs' three medical experts, summary judgment

18  is appropriate."  And I want to talk a little bit about that

19  because, again, really the focus has been on McGovern.

20         But some of the third party research relied upon

21  by the experts show that Bair Hugger increases particles

22  over the surgical site.  3M's 30(b)(6) witness Al Van Duren

23  testified under oath every single study that is out there

24  indicates that the Bair Hugger increases particle count over

25  the sterile field.  The Legg and Sessler studies the same.

1          There is evidence and scientific studies showing

2     that the Bair Hugger increases bacteria over the surgical

3     site.  The Moretti, Wood and Tumia references that are in

4     our papers.  And the relationship of particles and bacteria

5     to infection, and the Darouiche study, which we have cited

6     in our papers as well and talked about over the course of

7     the last couple of days.

8          Doubts under the Eighth Circuit as well as the

9     Frye standard are resolved in favor of admissibility.  The

10    Court abuses its discretion if it results Doubts in favor of

11    excluding expert testimony or decides the correctness of the

12    expert opinion.

13          And in fact this morning, you heard Mr. Hulse

14    accuse the McGovern authors of data manipulation, of

15    changing Figure 7.  Well, we intend to subpoena Mr. Albrecht

16    and Professor Nachtsheim from the University of Minnesota

17    School of Management, and those questions can be posed to

18    him why was the change done and the averaging done in that

19    study, because that's what they're accusing.

20          They're accusing Dr. Belani, who is head of

21    anesthesiology at the University of Minnesota of academic

22    fraud.  And those are serious allegations, but they also go

23    to credibility and not the study itself.

24          We've never misrepresented McGovern.  What we've

25    said is it shows a strong association between Bair Hugger

1    and deep joint infection, and that's all we've ever cited it

2    for.  We have been very clear since day one that study

3    doesn't show causation.  It shows an association, which is

4    why the experts relied on scores of other literature,

5    including the depositions of 3M in this case, including the

6    Dr. Elgobashi model, including the Darouiche study, that was

7    that entire cumulative body of evidence that led to the

8    causal connection that our experts have opined on.

9          And 3M, by the way, doesn't have a single, not one

10   epidemiological study which disproves what the McGovern

11   authors found.  Not only do they not have any evidence on

12   that, but they've refused to do it despite the urging of the

13   people affiliated both on their external advisory panel as

14   well as internal people.

15         We've talked about this, but epidemiologic studies

16   show associations.  They do not prove causation, and we have

17   been upfront and candid and clear on that.  The evaluating

18   causation requires scientific judgment and expertise.

19   That's the job of an epidemiologist.

20         We have one here who methodically, you didn't hear

21   him saying that Dr. Samet didn't go through the entire body.

22   If you look at his report on page 2 or 3 it might be, where

23   he goes through and lists the searches that he did.  He

24   actually put in his report these are the literature searches

25   I did in connection with that.  And beyond that listed some

1    200 different lines of evidence in connection with his

2    opinion.  And what he did and what hasn't been done to date

3    is that he connected all the dots and that's often what

4    cases like this turn on is having somebody who takes the

5    time to sit down and connect all the dots.

6           The Court said it, I don't need to say it again.

7    Opposing experts often interpret the same studies

8    differently.  That's what cross-examination is for.

9           Now, Dr. McGovern is one of the authors that 3M

10   has accused of data manipulation.  He was deposed --

11          JUDGE LEARY:  Let me comment on that statement,

12   Ms. Conlin.

13          MS. CONLIN:  Sure.

14          JUDGE LEARY:  I don't hear the defense saying that

15   these authors all participated in a manipulation of the

16   data.  The way I understand the argument based on the

17   evidence that's been produced is that a change occurred when

18   after draft 7 when the information was placed in the hands

19   of Mark Albrecht, and that Mark Albrecht was responsible for

20   the data and the representation of the data and the article.

21          Now, maybe I misrecall that, but to the point of

22   you're saying that the defendants are claiming that all of

23   the authors engaged in scientific fraud, I haven't heard

24   that from them; maybe I misunderstand the evidence, but I

25   haven't heard that characterization.

1          MS. CONLIN:  Well, I think that it has been stated

2     most recently in connection with Mr. Hulse's summary

3     judgment motion.  I can pull the transcript but that --

4          JUDGE LEARY:  What I heard him say attributed the

5     alleged manipulation to Mr. Albrecht, to no one else.

6          MS. CONLIN:  Okay.  And maybe I extrapolated

7     beyond what he said.  I guess the record will speak for

8     itself.  Mr. Albrecht and, again, that is a credibility

9     issue, but there is no foundation for what 3M has said about

10    the data manipulation.

11         THE COURT:  Just hold on one second.  I'm

12    scratching around in my memory.  Was it -- did Mr. Albrecht

13    send a prior version of Figure 7 to Dr. Augustine with the

14    statement, "we've reached statistical significance."  And

15    then following a response from Dr. Augustine, did the data

16    change?  Is that what --

17         MS. CONLIN:  No, that is not.  And the e-mail that

18    you're referencing, I know somebody is probably pulling it

19    up for me.  But if you look at the next e-mail below it,

20    it's from Dr. Reed.  And what he says is, yeah, we knew that

21    we would reach statistical significance because they

22    believed in that and that it was only a matter of time.

23         THE COURT:  So Augustine was not in that at all.

24         MS. CONLIN:  He might have been copied.  My

25    understanding is he was copied on a lot of that.

1              THE COURT:  I think you're getting the facts right

2     now.

3              MR. CIRESI:  If I may approach, Your Honor, to

4     give the e-mail itself.

5              MS. CONLIN:  Go ahead.

6              MR. CIRESI:  And, well, I'd have to ask leave of

7     the Court to argue this, but this goes directly to what

8     Judge Leary --

9              THE COURT:  I just want -- Ms. Conlin, is this --

10             MR. CIRESI:  Yes, this is the document.

11             THE COURT:  Who is it too and from on that?

12             MS. CONLIN:  It's an e-mail from Mark Albrecht to

13    Drs. Reed, McGovern, a CC to Scott Augustine and Christopher

14    Nachtsheim at the University of Minnesota.  It says, "Gents,

15    attached is an updated chart of infection data.  The

16    difference is significant based upon the results of logistic

17    regression."

18             It goes on to say some highlights.  And it says,

19    "okay, we made it to significant difference, so I'll update

20    the manuscript to reflect the new infection numbers.  I'll

21    also dig into the difference between hip and knee data and

22    get back to you on that."

23             That's what Mr. Albrecht was is he was the

24    statistician who was crunching the numbers that were being

25    given him by Dr. Reed.  Dr. Reed was the one.  Now, Dr. Reed

1    probably has the final data set, which is reflected in the

2    McGovern report.  We couldn't subpoena documents from

3    Dr. Reed because of the --

4            THE COURT:  Because of the English thing.

5            MS. CONLIN:  The English thing.  So this entire

6    Mark Albrecht said when he was showing it in his deposition,

7    he said, "I don't know if this is the final data set or not

8    because it resided with Mr. Reed."

9            But the idea, and to be honest, I mean to be

10   totally candid with the Court, Dr. Reed did testify in his

11   deposition, and it's five years after the studies, he said,

12   "I recall there being one more infection in each group," but

13   he wasn't entirely sure.  Okay.  If you're going to cook the

14   books, you're not going to move one infection.

15           And in fact Professor Holford, if you look at his

16   report in his very first footnote, he says, "if there's one

17   more infection in each group, it drops the odds risk ratio

18   from 3.8 to 2.86.  So it doesn't drop it below statistical

19   significance even if Dr. Reed's post-recollection belief of

20   the final numbers was accurate, but we don't -- no one has

21   the final data set.  It hasn't been produced.

22           THE COURT:  But it's not -- did Reed recall that

23   there was one more in each group or that there was, I think

24   that was his recollection.  But I think what the defendants

25   are saying -- obviously, we're going to have to go dig this

 1    up -- that one moved, so it's not two more, one for each

 2    side.  It's minus 1 for HotDog or minus 1 for Bair Hugger

 3    and plus 1 for HotDog, right?

 4              MS. CONLIN:  Right.  Dr. Reed didn't testify to

 5    that.

 6              THE COURT:  2.8 is plus one for each side, right?

 7              MS. CONLIN:  Yes.  But the entire crux of their

 8    argument is based on this Albrecht Exhibit 10, which even

 9    Mark Albrecht said I don't know if that's the final data.

10    And part of that was because the authors continued to study

11    post the McGovern study, so they were updating with new

12    figures all the time.

13              But even if, even under their theory that somehow

14    magically they had foundation to say that Exhibit 10 out of

15    Albrecht is the final data set for McGovern, which nobody

16    has testified to, even under their theory, unless you go to

17    the chi-square versus Fisher exact, you're still in every

18    single scenario over statistical significance.

19              And I think one of the things that and, you know,

20    Dr. Reed said he's the one who kept the data.  And he very

21    clearly said I stand behind this study.  And he in fact went

22    and did further research on the identified potential

23    confounders in the McGovern study, the anti-thrombo regimen

24    and the change in antibiotic regimen.

25              And he said in connection with his further study,

1    he concluded that neither one of those were confounders in

2    McGovern, and they haven't cited anything, any medical

3    literature or anything to suggest that either one of those

4    two were actual real confounders.  And it's very, on

5    observational studies, I'm going to show you a few examples

6    including the ones 3M is relying on, the researchers always

7    says there's potential confounders.

8              THE COURT:  Does The Scientific Manual, Mr. Hulse

9    put some words up from that this morning, does it say when

10   you're relying on observational studies, you should have

11   more than one?

12             MS. CONLIN:  Well, one of the Bradford-Hill

13   criteria, Your Honor, is that you have some consistency

14   amongst the literature that you're looking at.  And in fact,

15   Dr. Samet went through that in great detail about looking at

16   the other studies and saying these are consistent.  They

17   don't have an odds risk show because it wasn't a randomized

18   trial, but these studies are consistent with the conclusions

19   drawn in McGovern.

20             THE COURT:  Other observational studies.

21             MS. CONLIN:  Yes.  So Dr. Reed says under oath he

22   stands behind it.  And to make sure I was being clear with

23   the Court, you can see at the bottom, he says, "so what we

24   have shown is an association not causation.  We made that

25   very clear in the paper."

1          3M has hired the McGovern co-authors.  They've

2     never gone to Dr. Reed and say we think that this is -- I

3     mean and think about it.  I mean Dr. Reed does work for 3M.

4     Do you think that under any conceivable scenario, if he

5     thought that this study was not valid that he would stand

6     behind it?

7          3M, I mean here's an e-mail from Mr. Blackwell to

8     Judge Noel regarding these UK depositions on September 19th

9     of last year.  And he says, "Drs. Harper and Reed are

10    prominent researchers in the UK and both have received

11    funding from 3M for important research activities over the

12    years.  Indeed, Dr. Reed is currently involved in unrelated

13    research project for another group at 3M."

14         The fact that somebody sponsors or funds a study

15    does not mean that the study is not valid.  It happens all

16    the time.  And I'm going to show you some examples.  But

17    they think enough of Dr. Reed that they've been using him

18    for other work for him and yet, Dr. Reed has never said I

19    don't stand behind McGovern.  He said exactly the opposite.

20         Dr. Belani at his deposition on page 220, lines 22

21    through 221, line 2:

22         "Okay, do you stand behind the protocols and work

23    which resulted in the Belani Deposition Exhibits 4, 5 and

24    6?"  Which are the Belani, Albrecht and McGovern studies

25    respectively.  He says, "I do."

1           Same with Professor Nachtsheim, and you'll be able

2       to ask him why did you do the flattening out of the graph?

3       Why was the flattening, the average done?  It's done all the

4       time in regression analysis.

5           He says, "Question:  Do you continue to stand by

6       the results of the observational studies?"

7           "Yes."

8           "In the McGovern publication?"

9           "I do."

10          THE COURT:  What are the other observational

11      studies comparing Bair Hugger with HotDog?

12          MS. CONLIN:  McGovern is the only one comparing

13      the two from an infection standpoint.

14          THE COURT:  Okay.

15          MS. CONLIN:  There are other studies that show

16      particulate and bacteria and the other things that the

17      experts have relied on.

18          THE COURT:  Because that was the plurals, the

19      observations.

20          MS. CONLIN:  Yeah, right.  And Mr. Albrecht, which

21      again both Your Honors touched upon it, so I think it's

22      important to pause here about, well, maybe he was the one

23      who did this purported unfounded and no evidence supported

24      data manipulation.

25          And what's interesting is they keep going to an

 1    internal e-mail by Mr. Albrecht.  And what Mr. Albrecht said

 2    in that e-mail was Scott Augustine is going too far with the

 3    McGovern study, so rather than being somebody who was just

 4    following whatever Scott Augustine said.  You saw the

 5    internal document, 3M is relying on it, where Mark Albrecht

 6    says he's taken this too far.  All the study showed was

 7    association.  He can't say that study alone proves

 8    infections.

 9           THE COURT:  I thought that e-mail -- I thought the

10    e-mail said -- I don't know if it was an e-mail, you know

11    the screen that was up this morning or this afternoon, not

12    very long ago, I should remember.

13           MS. CONLIN:  Yeah.

14           THE COURT:  Albrecht was saying Augustine wants to

15    go farther and show that there is causation.  Is that what

16    he said?  Or did he say he wants to show that there's --

17           MS. CONLIN:  What he said was, you know, and I'm

18    paraphrasing because I don't have it here.  But, basically,

19    that Augustine was using McGovern and trying to market it as

20    proof that the Bair Hugger causes infection.  And as we've

21    seen, all the study authors only said it showed an

22    association.

23           THE COURT:  But that's going to say it says

24    causation not association, right?

25           MS. CONLIN:  Yes, proof, I think it said proof of

```
 1    infection.

 2            MR. CIRESI:  Your Honor, may I approach?  I have

 3    it.

 4            THE COURT:  Oh, thank you.

 5            MS. CONLIN:  Thank you, Mr. Ciresi.  Here's the

 6    quote, this is from 3M's brief at page 16:

 7            "In a communication with another researcher,

 8    Albrecht admitted that he had admonished Augustine

 9    apparently to no effect not to overstate the studies

10    findings.  This is one of those things where we can step

11    close to the line, and we do have important information to

12    present that clinicians should be aware of.  But we also

13    have to be careful that we do not state claims regarding

14    proof of infection reduction.  Unfortunately, Scott

15    Augustine likes to say that he's convinced of such a

16    relationship even though I tell him it is unsupported, and I

17    do not agree."

18            THE COURT:  So his relationship, he didn't say

19    association, and he doesn't say cause, he says

20    "relationship."

21            MS. CONLIN:  Yeah, association.

22            THE COURT:  He says 'relationship."  He doesn't

23    say "association," right?

24            MS. CONLIN:  Yes, I mean, yes.  It says,

25    "relationship."  But what he testified to --
```

1          THE COURT:  Or is it regarding proof?  Okay, so

2     proof, and then such a relationship refers back to proof, I

3     suppose, as a grammatical matter.

4          MS. CONLIN:  Yeah, and it says, "unfortunately,

5     Scott Augustine likes to say he's convinced of such

6     relationship even though I tell him it is unsupported and I

7     do not agree."  And in fact consistent with that in his

8     deposition, he testified, "Do you agree with the

9     characterization that you're study found forced air warming

10    found 3.8 times increase in deep point infection rates?"

11    Here's what Mr. Albrecht said:  "I would agree that it's

12    associated with the 3.8 times increase, that's what the

13    study would say."

14          So even the individual that they're accusing of

15    manipulating this has testified very truthfully and in fact

16    pushed back on the internal statements by Augustine.

17          We've talked about the tabulation error, and under

18    the alleged tabulation error, and under any scenario, the

19    study still has statistical significance.  And, again, 3M

20    hasn't posited any foundation for that notion that Albrecht

21    10 is the final data set.  It just doesn't exist.

22          The hypothetical confounders, you saw the

23    testimony from Dr. Reed that they investigated those

24    confounders and found that they in fact did not confound the

25    study.  And with respect to the fabricated start date,

1   there's been absolutely nothing other than lawyer argument

2   regarding the start date.

3          Dr. Reed, the same individual who 3M has hired

4   time and time again to do study for them says that he picked

5   the start date of July 1, 2008, because he felt like that

6   was the first time where full-time surveillance for

7   infection rates at these three hospitals occurred.  There's

8   no evidence for that.  And as we've been beating a dead

9   horse at this point, but those challenges go to the weight

10   of the testimony on McGovern, not its admissibility.

11          On the confounders, we showed you the other day

12   Dr. Reed's testimony.  Here's a quote from 3M's expert

13   Professor Holford:  "Question, so there's no published

14   literature that you're aware of that suggest a relationship

15   between the variable of thromboprophylaxis on the outcome of

16   deep joint infection?"

17          "I don't have any."

18          And the Brimmo, by the way, because they brought

19   up Brimmo study today, there isn't a single one of 3M's

20   experts who have even cited Brimmo.  No one is relying on

21   the study that they're not putting in front of the Court to

22   say that it's a problem.

23          A change from gentamicin to gentamicin plus

24   teicoplanin.  Again, absolutely no scientific literature to

25   support that.  And Professor Nachtsheim said he concluded

1    and was confident that the antibiotics weren't confounding

2    factors.  Same thing that Dr. Reed testified to.  And on the

3    SSI bundle protocol that you saw this morning, basically,

4    their expert said we have no idea.  We're just

5    hypothesizing.  So that's not a confounder.

6            Peer reviewed articles are generally reliable.

7    *Daubert* says that.  Peer reviewed, of course, isn't the

8    end-all, but it certainly is an important characteristic or

9    indicia of credibleness with respect to a study.

10           One of the things that Judge Leary, you asked

11   about, well, wasn't there funding by Augustine?  Didn't he

12   supply the blankets and do some of that?  And so, frankly,

13   we looked for cases on this, but most of the studies that

14   are out there are funded by someone, so it was hard to find

15   cases on it.  These are two that we found.  And in fact,

16   unlike McGovern, I mean, yeah, unlike McGovern, in the

17   *Burton* case, there were studies that had been funded for the

18   purposes of litigation.  That wasn't enough.  It was

19   insufficient to undermine the reliability of plaintiffs

20   expert opinion to the point of rendering it inadmissible.

21           JUDGE LEARY:  Just for the sake of the record that

22   will be developed on, I don't remember him making any

23   statement about Augustine providing blankets or anything

24   like that.

25           MS. CONLIN:  Oh, no, I was saying that because my

1    understanding is he did, Your Honor.  I was not attributing

2    that to you, and I apologize if that was the inference.

3              Here's the Sessler study, which is interesting

4    because 3M relies on this study to say the Bair Hugger is

5    safe.  A couple of interesting things about the Sessler

6    study, and they've been putting it up on their slide.

7              The authors thank Gary Hansen of Arizant for

8    providing not only content resources but editorial

9    assistance.  And if you look in the disclosures there, it's

10   got Russell Olmsted, contribution, conflicts.  He consulted

11   for Arizant Health Care.  So, again, a connection there that

12   is on the same study that 3M is, you know, relying on to say

13   that the Bair Hugger is safe.

14             What's also interesting about this is, this is the

15   study that 3M relies on to say the Bair Hugger is safe, and

16   I mean they cite other stuff, but in their marketing

17   literature and the like the Sessler study looms very

18   prominently in their rebuttal to our case.

19             THE COURT:  Is that --

20             MS. CONLIN:  It's actually Exhibit 4.

21             THE COURT:  Does it have another name?

22             MS. CONLIN:  We refer to it as the Sessler study,

23   Your Honor.  It is Exhibit 4 to our brief in opposition.

24             THE COURT:  Okay.

25             MS. CONLIN:  And what's interesting about this

1    study is that 3M relies on it trying to say that this shows

2    that the Bair Hugger is safe.  You know what they were

3    measuring in this study?  They were measuring particles, the

4    very thing that they now stand up and say particles can't be

5    a proxy.  Well, this was a study that looked at particles.

6            THE COURT:  I suppose it depends on -- I mean if

7    you don't get any particles, it doesn't matter if they're a

8    proxy, but if you do get particles, then it matters if

9    they're a proxy.

10           MS. CONLIN:  Yeah.

11           THE COURT:  Maybe they said there aren't any

12   particles.

13           MS. CONLIN:  Well, no.  Actually, what Dr. Sessler

14   testified to in his deposition was that there was a ten- to

15   twelve-fold increase in particles over the surgical site in

16   this study when the Bair Hugger was on, and we've cited to

17   that testimony, ten to twelve times more particles when it

18   was on.

19           The Kurz study from 1996, this is the only study

20   that exists that says warming of patient during surgery

21   reduces surgical site infections, the only study that 3M has

22   ever relied on.  It was funded by Augustine when he used to

23   own the Bair Hugger company, and what's interesting is, this

24   is study.  We showed you the testimony that both Dr. Kurz

25   and Dr. Sessler now disavow.  This is a study that's been

1    disavowed at least in depositions by the study experts.

2              And what's also interesting about this, a quote of

3    out of here where they talk about confounders in the

4    studies, which is very similar to the type of language that

5    you saw in McGovern and is very, very routine with

6    observational studies, but Dr. Kurz and Dr. Sessler say

7    other factors may have influenced in the patient's

8    susceptibility to wound infection, and they go on from

9    there.

10             THE COURT:  Does the Sessler, is the 10 to

11   12 percent, is that in what size particles?

12             MS. CONLIN:  I don't think they were measuring.  I

13   would have to double check, Your Honor.  I don't believe

14   they were saying what the size was.  I may be mistaken on

15   that.  I'm not entirely sure.

16             And in fact, Dr. Kurz said, you know, in response

17   to a question, In today's scientific standards there's no

18   reliable evidence that supports maintaining normothermia

19   reduces the incidence of an infection?  She said, That is

20   correct.

21             So I'm going to have, Ms. Zimmerman is going to

22   talk about the specific studies because one of the things

23   that 3M has argued is that, that if Samet, Jarvis and

24   Stonnington goes, our case goes, and we think if Samet,

25   Jarvis and Stonnington stay in, that's the end of the

1      inquiry, but we don't think the converse is true for reasons

2      that Ms. Zimmerman is prepared to talk about.

3                    THE COURT:  Great.

4                    MS. CONLIN:  Thank you.

5                    THE COURT:  Thank you very much, Ms. Conlin.

6                    MS. ZIMMERMAN:  And as we approach the studies --

7      May it please the Court, Counsel:

8                    THE COURT:  Welcome back.

9                    MS. ZIMMERMAN:  Thank you.  As we approach the

10     studies, we're going to go back through the mechanism of

11     injury here, the mechanism of defect that has been

12     established through the plaintiff's evidence.

13                   And I point the court to a statement that was made

14     by Mr. Goss yesterday as we were talking about the

15     106 degrees that was used by Dr. Elgobashi and of course by

16     Dr. Abraham as well, but Mr. Goss conceded appropriately

17     that really these are issues that go to the weight, not to

18     the admissibility.

19                   Now, we have different arguments with respect to

20     Dr. Abraham that I will not go back over for the Court, but

21     much of the evidence and much of the argument that has been

22     presented to Your Honors over the past nearly three days now

23     goes to interpretations about studies, about depositions

24     about scientific principles.

25                   So let's walk through what the plaintiff's proof

1    is in this case.  Plaintiff's proofs are grounded in

2    well-accepted methods.  Science has established that

3    bacteria can cause periprosthetic joint infection.  Science

4    has established that computational fluid dynamics is a

5    reliable and accepted tool to test operating room particle

6    movement.

7            That's what Dr. Memarzadeh did.  In fact,

8    Dr. Memarzadeh used 108 degrees, by the way.  He modelled

9    particles in a CFD.  He used a less sophisticated model.  He

10   used the RANS model instead of an LES, but that's what the

11   gold standard has been up to now, and that's really the

12   basis for the ASHRAE standards on operating room error.

13           Science has established that particles are a

14   reliable and accepted proxy for bacteria.  Science has

15   established that blowers in the operating room create

16   additional risk, and we'll talk about that in connection

17   with the heater-cooler.  Well rounded, established and

18   generally accepted scientific methodologies and principles

19   form the basis of every expert opinion offer by plaintiff's

20   experts in this case.

21           The Court is well aware of the standards with

22   respect to summary judgment, and I wanted to touch on a

23   question that Judge Leary asked the other day about the

24   applicability of *Gold v. Tharaldson* to this matter.  So *Gold*

25   *v. Tharaldson* is the Minnesota Supreme Court case where

1    Minnesota declined to adopt *Daubert*, but rather than move to

2    *Daubert*, what happened was, the Minnesota Supreme Court said

3    we're going to stay with our normal two-prong test.

4           And that is that the evidence has to be generally

5    accepted, relevant in the scientific community, and it has

6    to be foundationally reliable, but the question, and I think

7    it's been conflated by counsel for 3M in the briefing in

8    particular, they suggest that the standard in Minnesota is

9    that the opinions need to be generally accepted, and that is

10   absolutely not the standard in Minnesota or in the federal

11   courts.

12          Now, we've cited a Texas case, *Burton versus*

13   *Wyeth,* which is 2007 from the Northern District of Texas,

14   and I would point the Court to this language:  So it says,

15   When determining the admissibility of expert testimony, the

16   trial court is not to consider the conclusions generated by

17   the expert witness, but only the principles and

18   methodologies used to reach those conclusions.

19          When the principles and methodology are sufficient

20   to allow an expert opinion to be presented to the jury, then

21   the party challenging that testimony must resort to vigorous

22   cross-examination, presentation of contrary evidence, and

23   careful instruction on the burden of proof.

24          THE COURT:  What's the case?

25          MS. ZIMMERMAN:  Yes, Your Honor.  It is *Burton*

1    *versus Wyeth*, and it is 513 Fed.Supp.2d 719.  That's the

2    Northern District of Texas in 2007, and the reason that this

3    was an interesting case was that the Court was really

4    interesting again a pharmaceutical product that the

5    plaintiffs alleged it was a Fen-Phen, I believe, and they

6    were alleging some sort of a heart problem.

7             Again, it's different from this case because we

8    don't have -- in this *Burton* case, there was a question

9    about can that drug cause the kind of problems, and here we

10   know that bacteria can cause the problems the plaintiffs

11   have alleged, but again the Court noted at, it's star 726

12   the fact that in that instance, the defendant was not

13   challenging the validity of the -- the challenge was to the

14   conclusions, not to the methodology.

15            And the way that they tried to do that was by

16   offering competing studies, and the Court properly

17   determined that that is not what is supposed to be done at

18   the *Daubert* stage in determining whether or not expert

19   testimony can be properly presented to the trier of fact.

20            We entered some cases in the record yesterday and

21   comments to Rule 702 on point as well.  This is an issue for

22   the trier of fact, but just to be clear for the Court, the

23   methodologies that are at use by Dr. Elgobashi are certainly

24   well accepted.  He did not invent CFD.  They're routinely

25   admitted in courts that follow either *Daubert* or the Frye

1    standard.

2          The Bradford Hill criteria are routinely admitted.

3    The methodologies, and again Ms. Conlin pointed to this.

4    There had been not been an attack on the methodologies

5    employed by the plaintiff's experts.  The attacks repeated

6    over the past few days have been on McGovern, but McGovern

7    is published.  It is peer reviewed, and it is appropriately

8    part of what plaintiff's experts rely upon.

9          So let's talk about what it is that 3M knew and

10   when did they know it and what did they do about it.  So

11   airborne contamination, that's a risk that 3M has known for

12   certainly over 20 years.  This is the 510K submission that

13   was submitted to the FDA, and I offer this only so that Your

14   Honors are reminded that even back in 1996, under number one

15   contamination:

16         Airborne contamination from airborne

17   intraoperatively across the surgical wound may result in

18   airborne contamination.  The notion that bacteria that can

19   cause infections might become aerosolized and travel through

20   the air was known certainly by 1996, and as we presented to

21   the Court in our papers and in prior argument, it was even

22   warned about on the original device that was not used in an

23   operating room.

24         Another piece of evidence that we touched on a

25   little bit yesterday that was not before the international

1      consensus committee prior was the heater-cooler situation,

2      and so what I do is ask that Your Honors pay particular

3      attention to Exhibit 45 to our motion, and this is the CDC

4      health care infection control practices advisory committee

5      notes, and particularly on page 27, the CDC concludes, and

6      this is in 2015, nothing that blows air should be in an

7      operating room theater if possible.

8            That's because of the studies that were done in

9      the heater-cooler where they understood perhaps for the

10     first time as concretely that this particular kind of

11     bacteria, any bacteria could be aerosolized, travel through

12     the air and cause an infection, and so the CDC did an

13     investigation, and this ultimately lead both to the recall

14     of the Sorin 3T cooler devices and to this warning about

15     blown air in an operating room.

16           JUDGE LEARY:  Could you go back to that?

17           MS. ZIMMERMAN:  Certainly.  And this is Exhibit

18     Number 45, Your Honor.

19           JUDGE LEARY:  It says, The heater-cooler unit,

20     first line, appears to be harmless.

21           MS. ZIMMERMAN:  It does.

22           JUDGE LEARY:  From an infection perspective, but

23     the water overflow bottle is likely rarely, if ever,

24     sanitized and is situated in front of a fan.

25           MS. ZIMMERMAN:  That's right, Your Honor.

 1              JUDGE LEARY:  Am I wrong in interpreting that

 2      sentence as saying the problem is not with the heater-cooler

 3      unit but with the water overflow bottle?

 4              MS. ZIMMERMAN:  Respectfully, no, Your Honor.

 5      The issue that the CDC pointed to was actually looking at

 6      this machine at first glance, these are machines that have

 7      been used in an operating room for decades, particularly

 8      with respect to heart surgeries, and no one prior to these

 9      surgeries had ever considered that that particular device

10      might be capable of both hosting pathogens, and then by

11      blowing the air out of that machine, there's an exhaust fan

12      on the machine, that blowing the air might result in

13      aerosolization of that bacteria and transport to the

14      surgical site.

15              THE COURT:  What's this CDC publication about?  Is

16      it about air, or is it about this heater-cooler unit?

17              MS. ZIMMERMAN:  It is about the heater-cooler

18      unit.

19              THE COURT:  So these are comments that are made as

20      an aside as dicta while they're talking the dangers of the

21      heater-cooler unit.

22              MS. ZIMMERMAN:  Yes, Your Honor.  That is true.

23              THE COURT:  But don't put a bucket of never

24      cleaned infected water in the operating room.

25              MS. ZIMMERMAN:  Well, I think that's part of it

1      and that that water inside the heater-cooler was a

2      particularly hospitable place for the bacteria to grow.

3              THE COURT:  It condenses, and it changes

4      temperature, and it drips, and it causes --

5              MS. ZIMMERMAN:  It does, and the Mycobacterium

6      chimaera, the kind of bacteria that was there, is very slow

7      growing bacteria that likes water, but as in this case, the

8      Bair Hugger is a very hospitable environment.

9              THE COURT:  Is there a similar statement that says

10     Bair Hugger is a hospitable environment, just as there is

11     the heater-cooler thing is a hospitable environment?

12             MS. ZIMMERMAN:  There hasn't been a comparison

13     between heater-cooler in that way, but there is admissions

14     from defense counsel and from corporate witnesses that these

15     devices do indeed harbor bacteria.

16             THE COURT:  Right.  We've got the swabbing and

17     everything.  The statement that's similar to the

18     heater-cooler that was examined by the CDC, the Bair Hugger

19     is a particularly hospitable environment for bacteria?

20             MS. ZIMMERMAN:  Some of that testing was done in

21     connection with Project Ducky, I believe, and an evaluation

22     about whether or not it would be appropriate to line the

23     inside of a hose, for example, with a kind of a silver

24     nitrate that might make the hose less susceptible or less

25     hospitable to these kinds of pathogens.

1            THE COURT:  Project Ducky is a new one on me.

2            MS. ZIMMERMAN:  I don't think that Project Ducky,

3    in full disclosure to the Court, is attached to the papers

4    that we've presented here.  They were attached to our

5    punitive damages motion.  So it's part of the record, and

6    I'd be glad to get the citation for Your Honors.

7            But again, the reason that this is important is,

8    we want to understand that these kinds of devices that are

9    in the operating room, they can host bacteria.  That

10   bacteria can become aerosolized because of blown air, which

11   certainly happens with the Bair Hugger.  That's what it's

12   there to do, and the air can carry these bacteria into the

13   surgical site, and Dr. Elgobashi's analysis explains in

14   greater detail how that might happen.

15           Again, the Court, both of you, have heard much

16   argument and evidence over the past several of days about

17   what we agree about.  We all know that bacteria is what

18   causes these periprosthetic joint infections.  The

19   inoculation, the dose of bacteria when you're talking about

20   a deep joint infection, there's just a very few number of

21   bacteria, and it happens during the operation, during the

22   joint surgery.

23           PJI can be caused by airborne contamination.  We

24   have also presented evidence about the relevancy of

25   increased particles and how those are directly correlated

1   with increased bacteria over the sterile field, and an

2   increase in bacteria in the sterile field increases the

3   incidence of periprosthetic joint infections.

4         So I'll just go through this very quickly as Your

5   Honors have certainly heard this.  Both the plaintiffs and

6   the defendants have agreed that bacteria causes

7   periprosthetic joint infection.  They also agree that

8   inoculation, so the does of bacteria is much smaller when

9   you're talking about PJI, than something on the skin level,

10   a surgical site infection.

11         PJI can be caused by airborne contamination.

12   Dr. Jarvis and Dr. Stonnington put it in their reports, and

13   we would certainly encourage Your Honors to take a close

14   look at that time, but also Dr. Wenzel has published and

15   testified about this, the possibility of airborne bacteria

16   originating from patient and from the surgical team, that

17   those suffice to create surgical site infection in these

18   kinds of procedures, particularly when implants are being

19   placed, and that has to do with films and vascularity that

20   we don't need to go into at this point.

21         Dr. Mont agreed periprosthetic joint infection are

22   caused by airborne contamination, and we get to the study

23   that was done by Darouiche, and Darouiche really confirms

24   again, and this is at Exhibit 11, by the way, that for every

25   ten colony forming units per meter cubed, the increase in

1    infection, there is a probability of an implant infection is

2    doubled.

3              And the evidence that has been presented to Your

4    Honors is that the colony forming units that are transported

5    to the surgical site are well in excess of these additional

6    ten per cubic meter.

7              So turning again to the international consensus,

8    everybody agrees that this is a reliable source, but it's

9    also a source that's a couple years old, and even then, they

10   were certainly recognizing the fact that bacteria that

11   arrive at the surgical wound correlate with the probability

12   of having this kind of infection.

13             And I should say that in the international

14   consensus, by the way, they say SSI.  Well, the entire

15   consensus was brought together to talk about deep joint

16   infection.  So if you read the full title of the

17   international consensus, it is International Consensus on

18   Prevention of Peri Operative Joint Infection, I believe if

19   I've got that right.  So that's what they were focused on.

20             THE COURT:  We had a couple comments about the age

21   of this study.  What's the age of the study versus the

22   filing of the first case in the MDL?  The cases were filed

23   here during the time that this wasn't old.

24             MS. ZIMMERMAN:  That is true.  That's true, and I

25   believe that the international consensus came out in 2104.

1    This MDL was assigned in December of 2015.  The first cases

2    that were filed, Walton and Johnson, were in 2013 and 2014,

3    so right about that time, but I think that the timing with

4    respect to the international consensus is appropriately Your

5    Honors' to be aware of, particularly there's been a question

6    about whether or not the law is really leading science or

7    following it, and here law is actually following science.

8         These folks at the international consensus were

9    very concerned about these issues.  They recognize the

10   potential theoretical risk, and they did not have the same

11   kind of information that we have now, but again, we're

12   talking about the conclusions that are ultimately reached on

13   a different data set than what has been presented or what we

14   know as we stand here in 2017.

15        The methodologies by which we arrive at that

16   evidence and present it to Your Honors for consideration,

17   those are well-established methodologies in terms of

18   particle tracing, computational fluid dynamics, the Bradford

19   Hill criteria, and so as Ms. Conlin indicated earlier, the

20   issue here today is not that this is new science.

21        It is that the science that has been developed for

22   many, many years is being woven together into a package that

23   makes sense, and it's a package that the international

24   consensus units has been asking for, and that is really what

25   the -- and I believe Judge Noel asked some questions about

1     the recognized theoretical risk -- pardon me.  It's a been a

2     late couple of nights -- that the international consensus

3     recognized the theoretical risk associated with forced air

4     warming and requested more study be done.

5           Plaintiffs have presented evidence, and the

6     defendants have agreed as well, with respect to question

7     number 1 of the international consensu.  More bacteria, more

8     likely you're going to have an infection.  Question number

9     two, Do the bacteria in the operating room correlate

10    directly with the probability that you're going to have this

11    infection?  Everybody seems to agree, yes.

12          They cite their justification, by the way, and

13    they say that some studies have suggested that airborne

14    particulate count should be considered as the potential

15    surrogate for airborne microbial density.  Others have found

16    correlation between the number of particulates larger than

17    ten micrometers with a density of viable bacteria at the

18    site of surgery measured by colony forming units.

19          So it has been suggested that monitoring

20    particulate count could be used as a real time proxy for

21    increased risk of wound contamination or infection.  This is

22    not new.  This is not developed for litigation inside Your

23    Honors's courtrooms.  This is something that both sides

24    agree is authoritative.  So there's been evidence presented

25    to Your Honors also with respect to what the defendants have

1    done in the face of various studies and complaints, what

2    they have done with respect to filtration.

3           And this is an e-mail from Glen Maharaj in 2013

4    where they are talking about whether or not they can claim

5    their filters have a HEPA efficiency, and he says we have no

6    documentation in regards to that for the 750 or the 775.

7    All we can do is stick by our claim and statement of high

8    efficiency, which testimony from several witnesses here says

9    would agree means nothing unless we specify the size of the

10   thing that's being filtered out and how effective it's being

11   filtered.

12          So HEPA we know is 99.97 percent efficient

13   removing those particles down to a .3-micron size, so that's

14   the import of that kind of efficiency measurement.  Just

15   saying high efficiency doesn't matter on its own without

16   those other pieces of evidence.

17          So the defendants have failed to warn about

18   contamination.  They've known about it, and we have talked

19   about it.  This is Al van Duren's deposition in March of

20   this year.  He was the 30(b)(6) corporate representative,

21   and he said, no, 3M is not disputing the Bair Hugger blower

22   and hose, yep, they can harbor bacteria inside that device,

23   we're not disputing that.

24          And dating back all the way -- this is an e-mail

25   from Gary Hansen to Russell Olmsted, and they're talking

1     about the Stocks paper, and they know there's an increase

2     particle count when the Bair Hugger is being used.  So those

3     are all different pieces of evidence that have been tied

4     together by the plaintiff's experts in understanding the

5     risks that Bair Hugger poses to patients across the country.

6             Al van Duren also says, yes, Bair Hugger increases

7     particles in absolute numbers, and they have no internal

8     data to refute that.  Every study they've done, every study

9     they're aware of, says that when the Bair Hugger is turned

10    on, particles go up, and there's been some testimony,

11    argument from counsel, about whether or not there has been

12    any reports of infection or other kinds of complains from

13    customers.

14            And my recollection is that what's been

15    represented to Your Honors is, there have been no complaints

16    of that sort of thing, but that's not consistent with some

17    of the e-mails that we've seen, and I point Your Honors to

18    this e-mail from Suzanne Tullis to folks at 3M, Mark Scott,

19    and Suzanne Tullis it says here is the district sales

20    manager for Arizant in North and South Carolina.

21            And she says, "This issue is everywhere.  We have

22    to develop a better strategy besides the Zink article," and

23    this is in response to an e-mail she received from Vicki

24    Jones.  The subject is "Forced Air Warming Devices," and at

25    the bottom you can see it says, "Dr. Bratzer, several of our

1     orthopedic physicians are refusing the use of forced air

2     warming devices for joint replacement procedures at our

3     facility.  Their position is that they contribute to post op

4     wound infections because of the circulating air, air

5     turbulence, et cetera.  The literature they have and what I

6     found seems to support their position."

7          So they're getting questions from the field.  Did

8     they do any studies to refute this?  If they had, I think

9     that those would have been presented to Your Honors.  They

10    were getting concerns about contamination from people in the

11    field.

12         Here's an e-mail where Al Van Duren again is

13    recommending that when there is a known device -- if you

14    look at the bottom here, it says we have a model 750 unit,

15    serial number provided, and it has cultured positive for

16    Acinetobacter.  That is a bacteria, and Al Van Duren says,

17    "Do not scrap the unit, remove and discard the filter in the

18    biohazardous waste container."

19         So it's simply, it is not consistent with the

20    evidence to say that there have not been reports from the

21    field of contaminated devices, and we have only some of the

22    evidence here, but in the face of that, when Al Van Duren

23    was asked at his deposition as a corporate representative,

24    well, what have you done with respect to safety validation?

25    What did you do with the filter?  And his answer was, "I

1   don't believe that any particulate filtration efficiency

2   studies were completed," and that was with the 505.

3           And we said, well, have you done any biological

4   testing of the filter?  He says on behalf of the company,

5   I'm unaware, "the company is unaware of any biological

6   testing conducted during the design of the 505."

7           Michelle Hulse-Stevens was asked some questions

8   about why that wasn't studies, and when Mr. Ciresi was

9   deposing her he asked, "Are there other types of studies

10  that you believe provide adequate evidence for the adoption

11  of particular interventions, which could be less difficult

12  to conduct?"

13          And we're getting at the aerobiology study several

14  of their consultants have been recommending that they do,

15  and she says yes.  And well, that particular study, that has

16  been recommended, that hasn't been conducted, correct?

17          "We have not conducted that study."

18          Mr. Ciresi asked, "And decisions have been made at

19  the highest levels not to conduct that studies, correct?"

20          The answer, "Yes."  And Michelle Hulse-Stevens'

21  deposition is an exhibit along with the e-mails that support

22  that decision.

23          In fact, the other thing that the company did was

24  they discouraged independent studies, and here is an e-mail

25  from Gary Hansen, again internally, saying here's our

1    strategy.  "Our first step with ECRI should be to prevent

2    them from doing their own testing, rather, rely on the

3    published data."

4          And at the bottom you can see where it's

5    highlighted, "I'd like to convince them that the valid

6    testing is an arduous undertaking."

7          So the increase in bacteria in the sterile field

8    also increases the incidence of these kinds of infection.

9    Dr. Jarvis talks about that.  Dr. Wenzel agrees.

10   Dr. Wenzel, incidentally, may be interested to hear the

11   argument that was presented before Your Honors yesterday

12   that apparently Stocks and Darouiche are also either

13   engaging in some sort of academic fraud or cooking their

14   studies because they're hocking some sort of other warming

15   device on the side.

16         And I think that that had to do with a new device

17   that was studied in the Darouiche studies, and Mr. Goss --

18   and I'm happy to find a copy of the particular cite to the

19   transcript -- said, well, you know, the only other people

20   that looked at this may be the reason that they came up with

21   the results that they did was because they also had a

22   product to sell.

23         Really at the end of the day, all of that goes to

24   the weight, not to the admissibility, but Dr. Wenzel at any

25   rate agreed at his deposition that Darouiche, he's an

1    expert, and Dr. Darouiche, of course, found correlation

2    between increased bacteria in the sterile field and risk of

3    infection.

4          All right.  And so now I turn your attention, and

5    this is the document that I think Mr. Hulse was really

6    forecasting for Your Honors.  What else did this company

7    know?  When did they know it?  And this is Exhibit 2 to our

8    motion papers, and what this is is a study protocol dated

9    June 23rd of 2007, and it's a study protocol for the Bear

10   Paws device.

11         Bear Paws is another device that is used to warm

12   patients to maintain normothermia, and what Al Van Duren

13   says in September of 2007 is that if you pre-warm a patient

14   before the surgical incision happens, you are capable of

15   preventing significant surgical hypothermia for three hours.

16   That means that you don't need to use forced air warming at

17   all if you get the patient warm enough.

18         That's Al Van Duren says in his document here, but

19   the other thing that he says, and we highlighted this in our

20   brief, and this is at Table 1.  He says, and this is, it's a

21   table that lists advantages and disadvantages of using the

22   Bear Paws prewarming versus the Bair Hugger during an

23   operation.

24         Advantages:  Inexpensive.  Bear Paws is safe.

25   Bear Paws can be used when intraoperative warming is

1    contra-indicated (aortic cross clamp, orthopedic cases.) It

2    also, one benefit, it does not contaminate the sterile field

3    to use the Bear Paws before a surgery starts.

4            Go down two lines on the same chart.  Again Al Van

5    Duren.  This is not Dr. Augustine.  Dr. Augustine is not in

6    the picture.  Bear Paws reduces the incidence of surgical

7    site infection, and it reduces the potential for nosocomial

8    transmission of pathogens by eliminating the need for

9    intraoperative warming.

10           So their own corporate documents say that the Bair

11   Hugger may not be well indicated in orthopedic surgeries,

12   but they didn't tell the orthopedic surgeons about that, and

13   Mr. Van Duren in his corporate deposition, he admitted to

14   that fact as well.

15           So they say that pre warming with their own forced

16   air warming product is equally effective at keeping the

17   patient warm for at least three hours, which is the length

18   of time certainly within which the vast majority of the

19   cases before Your Honors were completed within three hours,

20   and it eliminates these known risks.  It eliminates the

21   risks, and they were known at least in 2007.

22           The other piece of evidence that I would point

23   Your Honors to is this particular document, and that is at

24   Exhibit 2, and the thing that really matters here, this is

25   an internal document, and the notation on the side is not

1    mine.  That is from AVD1, and the testimony presented in

2    this litigation is that that's Al Van Duren.

3         And he's commenting on this protocol on this

4    particular section, and it says, the paper itself says there

5    is no evidence that forced air warming increases risk of

6    surgical site infections and considerable evidence that it

7    does not, most recently from the U. S. National Institutes

8    of Health.  Numerous studies have shown it does not

9    contribute to bacterial contamination in operating theaters.

10        So this is going to be a talking point for sales,

11   by the way, and Al van Duren sees this, and he puts a

12   comment on, and what does it say?  It says actually there is

13   evidence that forced air warming use increases the risk.

14   This evidence was the motivation for Dr. Memarzadeh's work.

15   This isn't Augustine.  This is Al van Duren.  This is the

16   gentleman that they put up as their corporate representative

17   when they did a 30(b)(6) deposition in March of this year,

18   and this is back in 2010.

19        Now Judge Noel, before we left yesterday, you

20   asked, you forecasted that you were going to ask about the

21   nine studies, and I won't belabor this because I know it's

22   getting to be long, but what I will say is that Your Honor

23   appropriately recognized the fish analogy and the pond.

24        What I would say is that I think that Judge Noel's

25   questions to Mr. Gordon were particularly helpful because 3M

1    does point to these nine studies, and they say that means

2    that the Bair Hugger is safe.  Now, first of all this

3    morning, Mr. Gordon conceded that that was attorney argument

4    and interpretation of those studies.

5           And really that means that this goes to the

6    weight, not to admissibility, but to get back to the

7    question that Judge Noel asked, the converse is also true.

8    If 3M had any other studies besides these nine that would

9    speak to the safety of this particular device, we can be

10   sure that we would have seen it by now, but these are the

11   nine that they've got.

12          And we can walk through each one of the nine.  The

13   first one is Hall.  This is not a published peer reviewed

14   paper.  This is a poster presentation.  There are 20

15   patients, 10 are Bair Hugger, 10 are non Bair Hugger.  It's

16   a completely different kind of surgery, it's an oral

17   surgery, not ultra clean.

18          And there are six collection sites, but four were

19   at each corner of the room, two were at the operating room

20   table, one was the surgical site.  So the Hall paper does

21   not speak to whether or not there would be bacteria at the

22   surgical site.

23          Similarly with respect to Zink, again this was a

24   different device.  It was at a lower temperature and a lower

25   air flow rate.  There's only eight patients here, and they

1    use a completely different blanket.  It was the lower body

2    blanket.  The blankets at issue in I would say 99 percent of

3    the cases before Your Honors are the upper body 522 blanket.

4           This was not a real surgery.  These were

5    volunteers that were laying down on the table, and I don't

6    know if they got the pizza and the beer, but that's what was

7    happening here.  The Dirkes study, the Bair Hugger was set

8    to ambient temperature setting.  It wasn't set to warm, and

9    we think that that is relevant for all the reasons that we

10   have presented with respect to the CFD yesterday.

11          Avidan, again they're measuring bacteria at

12   various points inside the machine.  Tumia as well, and we'll

13   walk through each of these, but suffice it to say that as

14   Mr. Gordon indicated, there's different interpretations for

15   each one of these studies that plaintiff's experts are

16   certainly prepared to provide their interpretation of that,

17   and the interpretation of all of those should go to the

18   weight, not the admissibility.

19          MAGISTRATE JUDGE NOEL:  All nine of these studies,

20   though, is Mr. Gordon is correct that they are measuring

21   bacteria?  They're not looking for infection.  Is that a

22   correct statement?

23          MS. ZIMMERMAN:  That is correct Your Honor.

24          THE COURT:  And they're looking for bacteria on

25   these agar plates?

1           MS. ZIMMERMAN:  That is my understanding, yes,

2     Your Honor.

3           MAGISTRATE JUDGE NOEL:  Thank you.

4           MS. ZIMMERMAN:  If the Court has no more

5     questions -- I don't know if Mr. Ciresi was -- if the Court

6     has no more questions, we're all done.

7           THE COURT:  All right.  Thank you.

8           JUDGE LEARY:  Thank you.

9           THE COURT:  Any rebuttal?

10          JUDGE LEARY:  You know, I do have one question for

11    you, Ms. Zimmerman, and I apologize for the delay in asking

12    it.

13          MS. ZIMMERMAN:  No problem.

14          JUDGE LEARY:  With regard to the Frye Mack

15    standard for the Minnesota state cases, am I correct in

16    understanding that you're relying on the Texas case as the

17    basis for saying that Frye Mack was satisfied in that the

18    methodology is generally accepted within the relevant

19    scientific community?

20          MS. ZIMMERMAN:  I should clarify.  So the Texas

21    case is a federal case, and so it's applying *Daubert*.  We

22    think that it's helpful in understanding what weight should

23    be given to these kinds of studies, but in Minnesota as long

24    as, under Frye Mack and *Gold versus Tharaldson*, as long as

25    the methodologies that the experts employ, and that is

1   literature gathering, Bradford Hill criteria, the

2   computational fluid dynamics.

3          As long as they're qualified to do it, and there's

4   been no challenge to the qualifications of any of these

5   experts, and as long as they did it correctly, anything else

6   can be sussed out during cross-examination in front of the

7   trier of fact.

8          THE COURT:  That's what I understood you to have

9   said before.  Thank you.

10          MS. ZIMMERMAN:  Thank you, Your Honor.

11          MR. HULSE:  Good morning -- good afternoon again.

12   Good afternoon Judge Noel.

13          I just want to cover some factual points, but

14   first, of course, the Minnesota Rule of Evidence 702 applies

15   the requirement of general acceptance to novel theories.

16   That's the terminology in Minnesota Rule 702.  I think it's

17   beyond dispute that what we have here is a novel theory, and

18   so the general acceptance rule applies.

19          *Gold versus Tharaldson* is governing, and even if

20   Judge Leary is inclined to look at the Texas federal case, I

21   think what you'll find in that case, too, is that the

22   defendant in that case didn't actually challenge the

23   validity of the studies that the plaintiff's experts relied

24   on.  It stated that specifically in the decision.

25          First point, Ms. Conlin said that we have no idea

1       if the data that Dr. Holford looked at came from Dr. Reed.

2                 And Brett, can you bring that up?

3                 All right.  So this is the Excel spreadsheet that

4       was produced by Augustine.  This was reviewed by

5       Dr. Holford, and what the meta data is, that showed who last

6       modified it when they last modified it, it's Dr. Mike Reed.

7       This was the data that was sent to Augustine.  That doesn't

8       match the final data that is reported in the published

9       study.  You can take that down.

10                Ms. Conlin also said, brought up a quote from

11      Dr. Holford, purporting to admit that there is no literature

12      that supports either antibiotics or anti thrombo prophylaxis

13      as confounders.  As we've explained before, Dr. Holford is a

14      statistician.  He partnered with Dr. Borak, professor of

15      epidemiology, and Dr. Wenzel and Dr. Mont, who reviewed the

16      literature and gave the opinions based on the literature,

17      scientific literature, that in fact both are well supported

18      as confounders, and that wasn't consider Dr. Holford's job.

19      He was the biostatistician.

20                It was also asserted that the Brimmo study which

21      concludes that rivaroxaban, the anti thrombosis regimen,

22      that was in place when you saw the spike in infections

23      purchasing during the Bair Hugger period in the McGovern

24      study, the claim was that Brimmo is nowhere in the case.

25      This is just something that the lawyers came in with, the

1    Brimmo study.

2         Dr. Wenzel relied on the Brimmo study at pages

3    255, 258, 259, 2602 of his deposition, and Dr. Mont

4    specifically cites it in his report where he concludes that

5    it's a confounder.  There was a discussion of Dr. Sessler's

6    studies and the increase in particulates that was found in

7    the Sessler studies.  It's all submicron particles.

8         It was claimed that Dr. Kurz, the author of the

9    study, and this was claimed before, and I thought we had

10   already dealt with this, has disavowed that there is any

11   benefit to patient warming.  So I'm going to quote again

12   Dr. Kurz's actual testimony.  This is page 200 of her

13   deposition.

14        Question:  I want to make it clear, you're not

15   saying, or are you saying, that the evidence today no longer

16   supports the idea that maintenance of normothermia reduces

17   the risk of surgical site infections?

18        Answer:  I think, if I understand you correctly,

19   I'm not saying that.  I'm saying that I still believe that

20   maintenance of normothermia decreases infection risk, but

21   the effect size might be closer to 30 percent reductions or

22   so, which is in effect a humongous, enormously large effect

23   size for any medical intervention.  That's what Dr. Kurz

24   testified.

25        Finally, one of the documents that Ms. Zimmerman

1    put up talked about the effectiveness of the filter in the

2    Bair Hugger, and as we've presented in the evidence, and

3    it's there in our expert reports, too.  The Bair Hugger

4    filter is MERV14.  That is the ASHRAE standard for operating

5    rooms, and in fact, when the Cleveland Clinic conducted its

6    study where it compared infection rates between the Bair

7    Hugger with its MERV14 filter and the Stryker with its HEPA

8    filter, there was no statistically significant difference in

9    infection, and that was an extremely large trial.

10           And I would just like to end on the Cleveland

11   Clinic study.  It is in the record, and I urge the Court to

12   look at it.  In the Bair Hugger period, Cleveland Clinic had

13   an infection rate of .47 percent, and if the plaintiff's

14   theories, their possibilities, their potential theoretical

15   risk that they've advanced here today were true, if it

16   played out in the real world, how could the Cleveland Clinic

17   using the Bair Hugger possibly have achieved a 0.47 percent

18   infection rate?

19           This underscores where you had the higher

20   infection rate found in the McGovern study the critical

21   importance of the confounders of the antibiotics, of the

22   antithrombotics, of fitness for surgery, of obesity, of all

23   the other well-established and recognized factors in

24   infection rates.

25           And finally, just to come back to *Joiner*, and

1    *Joiner* again was a decision where the Supreme Court affirmed

2    the exclusion of causation experts who relied on

3    epidemiological studies.  There comes a point where the

4    inferences of causation that are drawn from scientific

5    literature are too far.

6         The gigantic leap, the flying leap that the

7    plaintiffs medical experts have taken here, they point to no

8    example.  Plaintiff's counsel point to no example where they

9    have ever reached these kind of causation conclusions based

10   on this material, nowhere in their professional lives.  This

11   is courtroom science.  It's not real science.

12        We ask the Court again to exclude the plaintiff's

13   medical experts and grant summary judgment.  Thank you.

14        THE COURT:  Thank you.

15        Were there any documents that were discussed here

16   put up that are under seal that we can unseal?  Do we have

17   any sealing issues?

18        MR. HULSE:  Our favorite topic.

19        MS. ZIMMERMAN:  Of course the Courts will not be

20   surprised that plaintiffs believe that all of this evidence

21   should be publicly available.

22        MR. HULSE:  Well, we may disagree on some points,

23   but I also know from experience with Your Honors that when

24   it comes to summary judgment, it's a pretty restrictive what

25   remains under seal.  So we would like to follow the process.

1     We have got a lot to go through, but of course the

2     defendants will keep that in mind, the public's right to

3     know.

4              THE COURT:  Okay.  I just wonder whether there

5     were sealed documents that were discussed here in open

6     court, and if there were, then those presumably could be

7     unsealed, but you'll go through those.

8              MR. HULSE:  Right.  And I think it would almost

9     exclusively be things that were discussed, sort of the

10    internal corporate documents, but maybe upon, you know, a

11    little bit of thought, we can get past the sealing issue on

12    those.

13             THE COURT:  Okay.  Just something to consider.

14             MAGISTRATE JUDGE NOEL:  Are we done?  I just want

15    to say I'm very impressed with all of the lawyers in this

16    case.  In the three days we've gone through 17 motions, 51

17    memos.  I'm amazed at your, both sides' command of all of

18    the documents, and thank you for, on a very interesting

19    presentation.

20             I've enjoyed being here.

21             THE COURT:  Thank you.

22             MS. ZIMMERMAN:  Thank you.

23             THE COURT:  We don't take enough breaks.  I just

24    want to remind you that the head of China just gave a

25    three-hour speech with no break at all.

1          JUDGE LEARY:  I am sorry.  If I could, on the

2     punitive damages motion, I'm requesting submissions by both

3     parties with regard to their view of the evidence and the

4     law and in the form of proposed findings, as well as the

5     judgment.  If there is any recitation -- let me back up.

6          I rely heavily on representations based on

7     evidence that exists in the record.  That's what my

8     expectation is.  If there's any reference to the evidence, I

9     want to see direct quotes to the literature or to the

10    depositions, whatever is being quoted.  You can put it in

11    the body of the document, or you can put it in an annotation

12    in the footnote.

13         But I want it to be as complete and exhaustive as

14    it was with regard to the punitive damages.  I'll give you

15    three weeks to submit that or three weeks from today's date.

16         MS. ZIMMERMAN:  Thank you, Your Honor.

17         MR. HULSE:  Thank you, Your Honor.

18         THE COURT:  And then, Mr. Blackwell, it looks like

19    you're anticipating my next question, which is -- and --

20    Ms. Zimmerman, same thing for you -- we will take the hard

21    copies of the presentations, and Ms. Zimmerman, do you have

22    the slides that you used today in your argument and,

23    Ms. Conlin, as well?

24         Not right this second, but can you get it?

25         MS. ZIMMERMAN:  If we don't have them, we will

1    make sure to have them messengered over to you.  We also

2    were prepared to provide a digital copy of Dr. Elgobashi's

3    video for the Courts, as that was played in the power points

4    yesterday, and I don't know that it would work on hard copy.

5              THE COURT:  Did we have a video?

6              MR. BLACKWELL:  There was a little clip yesterday.

7              THE COURT:  Oh, yeah, that little clip.

8              MAGISTRATE JUDGE NOEL:  Red and green and yellow.

9              MR. BLACKWELL:  Kind of looked like Dante's

10   Inferno.

11             THE COURT:  Well, you would know.

12             MR. BLACKWELL:  Yes.

13             THE COURT:  So you're just talking that.  You're

14   not going to give us a whole --

15             MS. ZIMMERMAN:  No, I don't think we could get it

16   on a flash drive.  There is a lot of data.

17             THE COURT:  That's wonderful.  Really, it was such

18   a pleasure to talk to you folks, and we'll look forward to

19   any submissions and take the matters, many, many matters,

20   we'll take them all under advisement and issue an order in

21   due course.

22             JUDGE LEARY:  I will accept the Elgobashi

23   demonstration, too, and thank you, and I'll accept your dec

24   copies, as well as plaintiff's dec copies as well.  Not now.

25             MS. ZIMMERMAN:  I will see if we have got them,

1    otherwise I will make sure you get them.

2              THE COURT:  Do we have a status conference that we

3    should talk about whether it makes sense?  This is October.

4    I'm sorry.  I yawned a couple times today.  These were long

5    days for all of us.  I realize they were way, way longer for

6    you than us.

7              MR. BLACKWELL:  November 16th I'm hearing.

8              THE COURT:  I don't think that makes sense.

9              MR. BLACKWELL:  Yeah.  We agree that it doesn't

10   make sense to have it November 16th.  This is sort of what's

11   happening.

12             MAGISTRATE JUDGE NOEL:  This is your report.

13             MS. ZIMMERMAN:  I think that's right.  Given the

14   new scheduling order, we are all going to be very busy, I'm

15   sure, on bellwether issues as well, working on depositions

16   and that sort of thing.

17             THE COURT:  Okay.

18             MR. BLACKWELL:  I do want to say, and I think I

19   speak for just about all the lawyers.  This is about as big

20   a case as any of us can be involved in, and it's kind of

21   rare to be in joint session of both courts, and we've never

22   been in front of a more accessible court than we've

23   experienced in this case.

24             And it's really helped things to go much more

25   smoothly, and I think we have all appreciated it.

 1          JUDGE LEARY:  I also want to echo the comments of

 2     my colleagues.  The professionalism you've all demonstrated

 3     throughout this process has been really a credit to the

 4     profession.  It's been an honor to preside over this, and

 5     also give your colleague best wishes.  I hope he's feeling

 6     better as well, Mr. Gordon.

 7          MS. ZIMMERMAN:  I will check in with him after the

 8     hearing.  Thank you.  I will do that.

 9          THE COURT:  Yeah.  Not my dream, but these two

10     always wanted to be on a three-judge panel.

11          JUDGE LEARY:  I no longer dream it.

12          THE COURT:  Thank you.  We're in recess.

13               (Court adjourned at 1:26 p.m.)

14

15                    *     *     *

16

17          I, Maria V. Weinbeck, certify that the foregoing is

18     a correct transcript from the record of proceedings in the

19     above-entitled matter.

20

21               Certified by:  _s/ Maria V. Weinbeck_

22                         Maria V. Weinbeck, RMR-FCRR

23

24

25